1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF RHODE ISLAND

3

4

5      * * * * * * * * * * * * * *  *      C.A. NO. 00-1051
                                    *
6      THE ESTATE OF YARON UNGAR,   *
       ET AL                        *
7                                   *
                                    *
8          VS.                      *      JULY 15, 2002
                                    *      2:00 P.M.
9      THE PALESTINIAN AUTHORITY,   *
       ET AL                        *
10                                  *
       * * * * * * * * * * * * * *  *      PROVIDENCE, RI

11

12           BEFORE MAGISTRATE JUDGE DAVID L. MARTIN

13

14         (Plaintiffs' Motion to Enter Default Judgment)

15

16     APPEARANCES:

17     FOR THE PLAINTIFFS:        DAVID J. STRACHMAN, ESQ.
18                                McIntyre, Tate, Lynch & Holt
                                  321 South Main Street
19                                Suite 400
                                  Providence, RI   02903

20

21     Court Reporter:           Karen M. Zinni, RPR-RMR-CRR
22                               One Exchange Terrace
                                 Providence, RI   02903

23

24

25        Proceeding reported and produced by computer-aided
                           stenography

1          **I N D E X**

2     **PLAINTIFF WITNESS**                                    **PAGE**

3     Allan Brenman
      Direct Examination by Mr. Strachman              4

4

5

6

7

8                         **E X H I B I T S**

9     **PLAINTIFF**                        **FOR ID**            **IN FULL**
            15                                              29
10          16                                              29
            17                                               6
11    19-24                                                 30

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    15 JULY 2002 -- AFTERNOON SESSION

2         THE COURT:  This is the matter of the Estate of

3    Yaron Ungar, et al, versus The Palestinian Authority,

4    et al, Civil Action Number 00-105L.  This is a

5    continuation of a hearing on the Plaintiffs' motion to

6    enter default judgment against Defendants HAMAS and

7    HAMAS operatives.

8         Mr. Strachman, will you state your full name,

9    please.

10        MR. STRACHMAN:  David Strachman for the

11   Plaintiffs.

12        THE COURT:  Are you ready to proceed?

13        MR. STRACHMAN:  Yes, your Honor.

14        THE COURT:  Call your first witness.

15        MR. STRACHMAN:  Thank you.  Allan Brendan.

16   ALLAN BRENMAN, PLAINTIFF WITNESS, SWORN

17        THE CLERK:  Could you please state your name and

18   spell your last name for the record.

19        THE WITNESS:  Alan Brenman, B-R-E-N-M-A-N.

20        THE COURT:  Is your first name spelled A-L-A-N?

21        THE WITNESS:  Double L-A-N.

22        THE COURT:  You may proceed, Mr. Strachman.

23        MR. STRACHMAN:  Thank you.

24

25
```

# DIRECT EXAMINATION

**BY MR. STRACHMAN:**

Q.   Dr. Brenman, what is your profession?

A.   I'm a licensed psychologist.

Q.   And where were you educated in that profession?

A.   My doctorate and master's are from Harvard University School of Education.

Q.   If you're a psychologist, why were you in the School of Education?

A.   The School of Education has a Department of Human Development and Psychology where a lot of students who wish to do more clinical -- clinically related work go to school and receive their training there.

Q.   And you have a master's degree as well from Harvard?

A.   Right.

Q.   And in what area of psychology do you --

A.   In child psychology.

Q.   You're a child psychologist?

A.   Yes.

Q.   And can you tell us a little bit about your experience and where you've worked.

A.   I did my training in the Boston area at the Franciscan Children's Hospital working with children with emotional and behavioral problems.  I've done an

1   internship at the Dana Farber Cancer Institute working

2   with children and families of cancer patients and a

3   year at the Kennedy Memorial Hospital doing my clinical

4   internship also working with children with medical,

5   cognitive and emotional problems.

6           After graduation, I did a year of post-doctoral

7   training in the Department of Child and Family

8   Psychiatry at Rhode Island Hospital.

9   Q.   Subsequently, you were employed as a psychologist?

10  A.   Yes, I'm self-employed in private practice.

11  Q.   Were you on the staff of Bradley Hospital?

12  A.   I worked part time in the Outpatient Department at

13  Bradley for four years.

14  Q.   Is that a child psychiatric hospital?

15  A.   Yes, it's a total child hospital.

16  Q.   And subsequent to working there, did you -- have

17  you worked in any other -- did you have any other jobs

18  as a psychologist other than your private practice?

19  A.   I worked for Roger Williams Hospital running some

20  bereavement groups for the Hope Center for Life

21  Enhancement, running a group for men with prostate

22  cancer; and I work as a clinical consultant currently

23  with the Department of Human Services helping to run a

24  Medicaid program for disabled children.

25  Q.   In front of you, do you have a copy of Exhibit

1    Number 15 -- excuse me, 17?

2    A.   My resume.

3    Q.   You prepared that?

4    A.   Yes.

5        MR. STRACHMAN:  I'd ask that that be marked as a

6    full exhibit.

7        THE COURT:  It may be so marked.

8        MR. STRACHMAN:  Thank you.

9        (Plaintiff's Exhibit 17 was admitted as a full

10   exhibit)

11   Q.   And could you tell us, Doctor, about your

12   experience in the field of child psychology.

13   A.   I began my training in 1986 working with children

14   with emotional and behavioral problems.  One of the

15   areas of specialty that I've worked in is the whole

16   area of bereavement, death and grief work starting with

17   the work I did at the Dana Farber Cancer Institute

18   working with children with cancer and their families.

19   Q.   Subsequent to that, do you have other experience

20   dealing with children as a child psychologist?

21   A.   Well, my practice currently is about 50 to 60

22   percent working with children and adolescents.

23   Q.   And have you dealt with people -- I think you told

24   us a little bit about grief and bereavement groups.

25   Have you dealt with children whose family has suffered

1   a trauma or children who have lost a parent?

2   A.   That's one of the areas of specialty that I work

3   in.   I get referrals from hospitals when there is a

4   parent with cancer or who has recently died; and I will

5   counsel the children, the family through the grief and

6   bereavement period.

7        I've worked with children from abusive homes in

8   helping them and the families deal with the emotional

9   consequences of those behaviors; and most recently I've

10  treated a family who's lost somebody in the September

11  11th attack.

12  Q.   And have you dealt with, in your practice that

13  deals with adults, have you dealt with -- have you been

14  involved in the bereavement and grief field?

15  A.   All the time, either through working with the

16  families where one of the parents has died from cancer

17  or some other terminal illness through running

18  bereavement groups for adults who have lost a loved one

19  in their families.

20  Q.   You told us that you were involved in grief

21  counselling.   Could you tell us what that entails, what

22  that means?

23  A.   It means that at various points after a loss, I

24  help people to cope with the intense feelings that they

25  experience, natural feelings that they experience as a

```
 1    result of a death or a loss that they experience.  Very

 2    often for children it's helping them to label their

 3    feelings, helping them to express their feelings in

 4    different ways, to normalize it, help them to explain

 5    the grief process and provide a lot of support during

 6    this period which can last up to a couple of years

 7    after a death.

 8           MR. STRACHMAN:  Your Honor, I'd ask that

 9    Dr. Brenman be qualified as both a child psychologist

10    and expert in grief counselling.

11           THE COURT:  Granted.

12           MR. STRACHMAN:  Thank you.

13    Q.  Now, Dr. Brenman, did you have an opportunity to

14    meet with Dvir and Yishai Unger?

15    A.  Yes, I did.

16    Q.  And did you meet with the Dasberg family?

17    A.  Yes, I did.

18    Q.  And do you speak Hebrew, by the way?

19    A.  Yes.

20    Q.  Were you able to speak to them in Hebrew directly?

21    A.  To the children I spoke directly in Hebrew and to

22    the grandparents in English.

23    Q.  And did you speak to -- could you tell us what you

24    learned about how they're doing and how they're

25    functioning, specifically the children.
```

1    A.    Sure.    In my conversations with the children, it

2    was more superficial, how are you doing and how was the

3    trip in, a little bit about why they were here.    I

4    didn't go into an in-depth assessment of them, but I

5    did with the grandparents.    And I was able to observe

6    the interactions between the grandparents and the

7    grandchildren.

8         From what I could gather from the grandparents,

9    overall the children are doing quite well now.    They're

10   in school, and they're doing well.    They have positive

11   relationships with their grandparents and other members

12   of the family.    They've got some friends.    Socially

13   they seem to be doing fairly well as well.

14        There were a number of points, though, that I

15   picked up on that I did have some concerns about.    For

16   the older boy, Dvir, who is eight years old, one of the

17   things that I observed and that the grandmother also

18   attested to was his overprotectiveness of his younger

19   brother, constantly where is the younger brother, even

20   at home, prefers to play with the younger brother and

21   his friends rather than be with children his own age

22   and older; and this seems to be accepted by everybody.

23        But he's very protective of wanting to play with

24   his younger brother and aware of where he's at, almost

25   to the point of a dependency, which is somewhat odd.

1    You wouldn't expect that from an older brother who

2    typically is off with their own friends and wants very

3    little to do with their younger sibling.  That was one

4    thing that I noticed.

5         The other thing that the grandmother talked a

6    little bit about was with Yishai, the younger boy who

7    is seven, beginning to show a temper and some anger,

8    which is new to him.  And they're not quite sure where

9    this is coming from, but she's observed that and is

10   aware of that.  And Dvir has had some -- the older boy

11   has some aggressive behavior recently in school as well

12   that they're worried about.

13   Q.  And why, if at all, is that notable?

14   A.  Well, any kind of aggressiveness is notable.  You

15   know, an incident of aggression here or there is not

16   unusual; but if it's a pattern of behavior that is

17   sustained and continues, we would want to look at it

18   and explore it further to see where it's coming from,

19   what the source is.  We would need ongoing monitoring

20   supervision.

21   Q.  And how did they -- did you discuss with the

22   parents or with the children -- excuse me, the

23   Dasbergs, the grandparents, how the children are

24   reacting to their parents' death?

25   A.  Yes.  We went back -- I wanted to learn a little

1    bit about what happened right at the time of the

2    murders, and --

3    Q.   What did you learn about that?

4    A.   That overall there was somewhat of an emotional

5    reaction that would have been expected.  I mean, these

6    children were 9 months and about 20 months old, and we

7    would expect there to be an emotional reaction.  At

8    this age, if you think about it, children, all they

9    know is their parents.  Even at 9 months old, babies

10   react more to their parents visually than they do to

11   anybody else, even from birth.  They know their parents

12   best of all.

13        And after 9 months old, that's where they feel

14   their security.  They reach to their parents, they want

15   their parents and certainly at 20 months old the

16   relationship only deepens.  And during this time there

17   are some psychological events that we see, stranger

18   anxieties and separation anxieties, that are normal for

19   all children to go through; but this was the time where

20   their parents were killed and they were separated

21   forever from their parents.

22        There was some crying and distress from the

23   baby, to some extent hard to console for the

24   nine-month-old, for Yishai.  It's hard to say exactly

25   what the separation did for these children; but we do

1    know that, even thinking about it, the two people in

2    their lives to provide them with safety and security

3    were taken away.  Children don't have the language to

4    express what that's like, but all we know is that that

5    is a trauma.  That's a psychic trauma for these

6    children that they have endured and they live with.

7         For the 20-month-old as well it is -- there was

8    a larger connection, a deeper connection with his

9    parents; and how he understands why they're not there

10   is difficult to say and may take time, certainly in the

11   future, to figure out how they're sort of incorporating

12   this event.

13        The other thing that happened was that the older

14   boy, Dvir, became -- at that point, that's when he

15   became very attached to his younger brother, wanted him

16   around, and that didn't surprise me at all.  This is

17   what he knew of his nuclear family.  That's all that

18   was left of the four of them.  So it makes sense to me

19   that even at that young age, he would want something

20   that is familiar and comforting to him around him.

21   Q.  Did you learn anything else about the period

22   subsequent to -- immediately following their parents'

23   death?

24   A.  Overall it sounds like the children have done quite

25   well in attaching to their grandparents.  These are

1     people that they knew, so it wasn't totally foreign.

2     One thing that I did note in talking to the grandmother

3     was how she coped because if she became -- she became

4     the surrogate parent, so to speak.  She took an

5     attitude of there will be no sadness, I will not deal

6     with sadness, I will take this event and I will

7     transform it into something positive, a way to keep her

8     daughter's memory alive; and she said her family

9     adopted the same attitude.

10          And we have to commend them for taking on this

11    challenge and this task of raising these children, and

12    in the short term that's a wonderful way to cope.  She

13    got through that, she was able to provide these boys --

14    she wanted to provide the best life for them that she

15    could.

16          On the other hand, I have some serious concerns

17    about that.  There has to be sadness.  There has to be

18    room for these boys to feel sad that their parents have

19    died and are not there.  And in the long term, that

20    could cause some kind of problems in the future for

21    them.  If sadness isn't tolerated, if sadness is not

22    allowed, if they're not shown how to handle sadness,

23    that certainly could be a source of problems in the

24    future.

25    Q.  What do these children face in the near term?

1    They're now eight and seven.  What do they face in sort

2    of the next period of life?

3    A.   Well, at each developmental stage, they will have

4    to almost be -- have to deal with their parents' death

5    all over again.  As their brains develop and

6    cognitively become more complex and their ability to

7    understand things in a more abstract way and at a

8    deeper level, they will take in this information over

9    and over again.

10         So even now they are asking more questions than

11   they did two years ago or four years ago, and that will

12   continue.  At each stage, they will ask questions and

13   be able to understand it more and more and in more

14   depth.

15   Q.   What did you learn, if anything, about the

16   questions that they're asking?

17   A.   They don't ask a lot.  They ask, though, about the

18   information, what happened.  They want to know that

19   they've been given -- more recently, Yishai, the

20   younger boy, asked, Is there anything else that I don't

21   know about?  You know, Have you told me everything?

22   Which raises -- to me it means, you know, can I trust

23   that you're really providing me with all the

24   information.

25         And, again, at seven years old, he's only

1    capable of handling a certain amount of information.

2    It raises questions for them now and I think in the

3    future about their religious convictions.  How could --

4    if you believe in a God that is all powerful, how could

5    God allow this to happen to them?  They're already

6    asking that kind of question.  And certainly as they

7    develop their own sense of identity, their own sense of

8    a religious identity, it would not be unreasonable for

9    them to think that -- that's going to be questioned as

10   a result of this act.

11   Q.  You discussed the grandparents and this sort of

12   mechanism or method that they have to deal with this

13   loss, the lack of grieving.  Does that impact the

14   children right now?  Is that causing an impact on the

15   children?

16   A.  Not necessarily right now; but, you know, looking

17   down in the future, these children will have to mourn

18   the death of their parents in order to sort of -- they

19   are being brought up -- also, it's important to

20   remember the context that these children are being

21   brought up in.

22        Their parents, as the mother said, they're sort

23   of all around.  There are pictures of them around.

24   They've published the books from the mother's drawings,

25   from the comic strips.  They're very involved in the

1    works of this mother.  So it's not like these parents

2    are sort of not discussed and not talked about.  So the

3    issue that their parents have died is constantly there

4    for them.  They are growing up with that.

5           And it's also important to remember that, as

6    opposed to when children are older and they have

7    memories of a parent, these children were too young to

8    have any memories from their parents.  Any information

9    they have is what's being provided to them by their

10   families, by the grandparents.  That's very different

11   because there's almost like an absence or an emptiness

12   as a result of their parents' death.

13   Q.  Do they, in fact, have any memories of their

14   parents?  I mean, at age 9 months and 20 or 22 months,

15   do they form any memories of their parents?

16   A.  No, not at that point.  It's more of a sensory

17   piece.  They certainly would know their mother's and

18   their father's smell, their father's feel, et cetera;

19   but memories of events, no.  The brain isn't developed

20   enough at that age to encode that kind of information.

21   Q.  So they, then, would grow up not having any

22   memories of their parents?

23   A.  Right, which makes it more difficult to mourn and

24   grieve.  When I work with kids who have lost a parent,

25   I create a memory book with them.  They bring in

1    pictures.  We tell stories.  I audio tape them.  I

2    write things down for them to create a document that is

3    theirs of their memories.  This helps with the

4    bereavement.  This helps them to connect with the

5    person who is gone; and it helps, again, the process of

6    grieving.

7         These children don't have that.  Anything that

8    they have is from other people's memories.  What

9    children do then is create in their minds almost a

10   fantasy of this person who has died, their relationship

11   with this person who has died; and this is something

12   that lasts throughout life because there's an emptiness

13   there that has to be filled, and they can fill it, and

14   there are any number of ways that they can fill it.

15        It's not uncommon for people to make a martyr

16   out of the parent who has died.  These happen to be

17   wonderful people, but their children can even make that

18   into something larger than life.

19   Q.  Why is that a problem?

20   A.  Well, it can be a problem because you can never

21   measure up to it.  We are constantly aware of our

22   parents' approval of us, want our parents' approval,

23   want our parents to be proud of us.  That is a very

24   natural tendency for people, even grown adults, to want

25   their parents to be pleased with them, to want that

1    approval.

2        When you have a parent who is larger than life,

3    it's almost as if you can never fill that void, you can

4    never be good enough, and that's a lot of pressure to

5    grow up in.  They know their mother was a very talented

6    artist, their father was a learned man, a wonderful

7    teacher.  They could develop very high expectations of

8    themselves based on what they know of their parents.

9    And, again, growing up with this kind of pressure can

10   be very, very difficult.

11   Q.  How is that different if their parents, you know,

12   survived but were very talented?  In other words, they

13   grew up in their household.  Their father was going to

14   be a teacher and rabbi and their mother an illustrator,

15   a well-known sort of personality.

16   A.  Because they would have a relationship with that

17   person who would be able to guide them, to talk with

18   them, to demystify things.  Somebody could say, you

19   know, it looks like this, but this is the reality of

20   the situation, and also just to help them out.

21       In the absence of that, kids have magical

22   thinking.  They think differently than adults, and they

23   can grow up with these fantasies that can last a

24   lifetime; and that's where it can be very, very

25   difficult for them as they grow up.

KAREN M. ZINNI, RPR-RMR-CRR

1    Q.   Is there evidence of that now?

2    A.   The only evidence that the grandmother talked about

3    was the similarities between the boys and their

4    parents; that the older boy very much is like his

5    father, more studious, more serious in book learning

6    and the younger one is more of a freer spirit and

7    artistic type.  I don't know if the parents -- if the

8    grandparents are sort of pegging them to some extent,

9    that you're like your father, you're like your mother,

10   which also can provide comparisons that could be

11   unrealistic for the boys.  That's all that I noticed in

12   seeing them.

13   Q.   When you discussed the role of the grandparents or

14   the grandparents' sort of method of reacting to the

15   death, are there things they could do to sort of

16   improve things for the children?  In other words, are

17   they part of the problem for these kids in terms of

18   growing up, or are they a plus for the children?

19   A.   They're a net plus.  They think, again, given the

20   situation, they are doing, number one, the best job

21   that they can and a fine job at bringing these boys up.

22   They have to also deal with their own reactions and

23   grief to this; and any way that helps them to survive

24   it and move on to provide a nurturing home for these

25   boys, you know, can't be really criticized.

1      That doesn't mean there's not room for

2    improvement.  Nothing's perfect.  Nobody's perfect.  So

3    I think they're trying the best they can, but there are

4    certain things that are inevitable in this situation.

5    The fact that these boys will have to mourn their

6    parents, the fact that they have been brought up

7    without a relationship with their parents, the fact

8    that they may long their whole lives to fill this

9    emptiness is inevitable.  That can't be filled by

10   anybody.

11   Q.  And how is that feeling, how is that going to be

12   manifest, say, in -- when they become adolescents or

13   young adults?

14   A.  Well, adolescence is an interesting time of life

15   where you're really developing your sense of self, who

16   you are, your identity, where you come from, what do

17   you believe in, who am I, and it's very much related to

18   your parents, where you're coming from; and although

19   they have grandparents, these are still grandparents

20   raising children.

21      It's not the same as parents, and even the

22   grandmother noted she's spoiling them.  She's different

23   in how she's raising them than she is with her own

24   children that she raised.

25   Q.  How is that a problem or how does that affect the

```
1    kids?
2    A.   Well, they're not as tight with them.  They may not
3    allow them to sort of suffer a little bit.  We all --
4    you know, I have kids.  You know, you can't say yes all
5    the time.  You have to be able to say no and teach the
6    kid to be able to tolerate that.  If the children
7    aren't given a lot of chances to tolerate any painful
8    experiences, then they do grow up in a different way,
9    having expectations, being less self-sufficient, not
10   working as hard.
11         So there could be ramifications in the future as
12   a result of that, and some of this is going to come out
13   during adolescence where they're really going to be
14   beginning to rebel from their homes and trying to
15   become independent.  And that's where I see potential
16   for some of the psychological problems, anxieties of
17   going out on their own, becoming independent, where
18   they have been somewhat protected, anxieties of, well,
19   how do I enter into the world when this happened to my
20   parents.  You know, that's potential that could happen
21   to me, too.
22         So issues of anxiety are very large here, fear
23   of other deaths, you know, the fear that if it happened
24   once already, and again they're growing up with death
25   all around them in a sense.  These parents are ever
```

1    present in a way.  So the fear of losing other people

2    in their life.  They are more susceptible and

3    vulnerable to issues of these fears, fears of death,

4    fear of separation from people.  So adolescence

5    potentially is a very difficult time for them.

6    Q.  What about after adolescence, once they're sort of

7    young adults?

8    A.  Again, in the literature, and even in the people

9    that I've treated, difficulties that they experience

10   are really one of forming other relationships, issues

11   of trust, being able to become close with somebody

12   without the fear of them having -- leaving you or

13   abandoning you.  That's a fairly common and big issue

14   for young people with an early loss.  Again, they're

15   very susceptible to these feelings of fear of somebody

16   leaving them.

17   Q.  And do these feelings and this anxiety that you

18   mentioned, do these kinds of feelings and issues

19   dissipate over time, or will they remain with these

20   children for the rest of their lives?

21   A.  It's hard to exactly say now what will happen.  I

22   believe that they will have to deal with all of these

23   issues at some point in their lifetime.  The magnitude

24   and the intensity is very hard to say.  The fact that

25   they will have to struggle with these issues to me is a

given.  That's just part of who they are, part of how
they've developed as a result of their parents' being
murdered at such a young age and this loss in their
life.  That they will have to do.

They will have to, again, go through a mourning
period at different parts in their life.  It is not
uncommon at each milestone in a person's life, when
they finish high school, when they start a university,
when they graduate, when they get married, it brings up
losses.  It's bittersweet.  It's great that these
things are happening, but it would have been nice had
my parents been there.  What would my parents have been
like?  What advice would my parents give me in these
circumstances?  And they won't have that.  So that at
each point they will have to suffer the loss all over
again.

Q.  What will the loss -- ultimately the loss of their
grandparents, you know, who are raising them, how will
that impact them?

A.  I would think pretty significantly because it
catapults them into being orphaned a second time by the
people who basically raised them, at a much younger
age; that they're being raised by a generation older
than their parents, and they will die sooner.  That's a
given.  And, again, any loss -- previous losses sort of

1    are compounded by the earlier ones.

2         So that potentially could be an incredibly

3    difficult time for them, you know, feelings of being

4    alone in the world.  You know, this is all they had,

5    and now they're gone; and chances are these boys are

6    going to be quite young when that happens.  A lot of

7    this, again, left untreated or at its worst can be some

8    serious depression where there's a sense of

9    hopelessness and loneliness and sadness.  At the

10   extreme end is suicide, which happens, but, you know,

11   that is an extreme, to anxiety disorders,

12   post-traumatic stress disorder.

13        It is not inconceivable that at some point in

14   their lives they will hear about these murders from the

15   outside, not necessarily from their families.  They can

16   read about it.  Pictures are available.  In order -- it

17   is possible that kids become traumatized again even

18   hearing about the information in the future.  You don't

19   have to be at the event to suffer a stress disorder.

20   So they are susceptible to that in the future as well

21   just by gathering information about what happened; and,

22   again, during adolescence, young adulthood, that's when

23   people think about, Well, where did I come from?  Who

24   were these people?  And their own investigations about

25   what happened could lead to them being traumatized all

1    over again.

2    Q.   I just wanted to go back for one second.   The

3    actual trauma or potential trauma of actually being in

4    that car for Yishai, is there any evidence that he

5    suffered any particularized trauma that sort of affects

6    him?

7    A.   There's no outward evidence.   A lot of this is

8    invisible, you know, and it also depends on the way you

9    understand child development.   If you think about this

10   child having heard the gunshots, crying, startle

11   response, which most likely happened, crying as a

12   result without their primary caretaker responding, on a

13   sensory level, that's a trauma.   How long he was in the

14   car before somebody found them is unknown.   It might

15   have been hours and hours.

16       Then the, again, ripping away the parents, who

17   are the main source of safety and security for these

18   children, even at nine months old is a trauma.   How

19   that encodes in the brain, we don't exactly know; but

20   the fact that it was a trauma to him, that he

21   experienced that is true, making him susceptible and

22   vulnerable to some psychological problems in the

23   future.

24   Q.   And is that, then, basically your conclusion as to

25   how this loss affects these children?   In other words,

1    you've told us that they seem to be doing pretty good

2    now, pretty well?

3    A.   Yes.

4    Q.   And they are subject to some issues in terms of

5    their behavior but nothing that is clinical or has --

6    A.   Right.

7    Q.   -- immediate ramifications?

8    A.   Exactly.

9    Q.   Or immediate implications; is that right?

10   A.   Right.

11   Q.   Is what, then, you're telling us that these

12   children are at risk for these kinds of sufferings down

13   the road?

14   A.   Absolutely.

15   Q.   And can you discuss what that means because I just

16   want to be clear for the Court in terms of we're not --

17   you're not saying, from what I understand, that right

18   now these kids are debilitated.  You don't know that

19   they will be debilitated, but you know that they're at

20   risk.  What does that mean?

21   A.   Right.  All I can say now is that they are

22   different than their peers.  They are being brought up

23   by their grandparents because their parents were

24   murdered.  That's not a typical case scenario, and

25   their friends are aware of that and the community is

1    aware of that.  So they are being brought up somewhat

2    differently than a regular child, an average child.

3        But yes, the ramifications of this are a lot in

4    the future, but they are susceptible to deal with

5    issues of depression and anxiety and post-traumatic

6    stress disorder as a result of this in the future.

7    They will have a lot of issues to sort of work through

8    in their lifetime as a result.

9    Q.  Is there any way to know if these issues are going

10   to manifest themselves to the extent that they will

11   need intensive treatment or counselling or suffer any

12   of the sort of particularized types of manifestations

13   that you referenced before?

14   A.  There's no way to -- I can't say yes or no.  I

15   wouldn't -- you know, again, given these situations, I

16   wouldn't be surprised given the adults that I've

17   treated where there's been a significant loss in the

18   past, I wouldn't be surprised if, yes, at some point in

19   their lifetime they would need some kind of

20   psychotherapy to help them cope with the feelings that

21   come up.

22       It also depends on their personalities.

23   Everybody responds differently, even to these

24   situations where death -- they've grown up, again, with

25   death.  Some people respond by it limits them.  They

KAREN M. ZINNI, RPR-RMR-CRR

1    sort of become a viewer of life because of that sadness

2    and emptiness.  They don't participate as fully because

3    of that depression.  Other people become risk-takers,

4    and they almost defy death.  You can't get me.  And

5    those are the ones jumping out -- the James Dean types

6    who take risks and almost defy it.  You can't get me.

7    You got my parents.  You're not going to get me.  That

8    puts people at certain risks as well.

9         So, again, it's hard to determine exactly how

10   these boys are going to respond in the future, but all

11   I know is they have a huge psychological and emotional

12   battle to deal with in their lifetime as a result.

13        MR. STRACHMAN:  Thank you.

14        THE COURT:  You may step down, Doctor.  Thank

15   you.

16        MR. STRACHMAN:  Your Honor, I would just like at

17   this point, if I could, to introduce some remaining

18   exhibits.  We have provided to the Court an original

19   and a copy of the notice to the Defendants that we

20   provided on June 25, 2002, of this hearing.  I'd like

21   that to be made part of the record that they were

22   particularly notified of this hearing.  We also have --

23        THE COURT:  We'll do that.  Has it been

24   designated?

25        MR. STRACHMAN:  Yes, your Honor.  That's

```
 1    Number 15.
 2          THE COURT:  All right.  So 15 is full.
 3          (Plaintiff's Exhibit 15 was admitted as a full
 4    exhibit)
 5          MR. STRACHMAN:  Thank you.  Your Honor, we also
 6    had a copy of the book that was written about Dvir by
 7    his mother.  I would like to mark that as Number 16.
 8          THE COURT:  It may be marked as a full exhibit.
 9          (Plaintiff's Exhibit 16 was admitted as a full
10    exhibit)
11          MR. STRACHMAN:  Thank you.  And also, your
12    Honor, today we provided to the Court, a copy of which
13    is on your Honor's bench, the original's with your
14    Honor's clerk, several additional exhibits that are
15    really in the form of government documents.  I filed
16    those documents in response to your Honor's inquiry to
17    Professor Unger, and I thought it might be helpful to
18    the Court.
19          And those are Items 19 through 24, and those are
20    government references to the murder of Yaron Unger as
21    an American citizen, and they include -- excuse me,
22    those are 20 through 24, and I've outlined the page
23    numbers as well.  A couple of the documents are long.
24    Number 19, your Honor, is an FBI document that attests
25    to the activities of the HAMAS in the United States.  I
```

1    would like to add that as well, particularly in

2    reference to your Honor's question before the hearing

3    as to the HAMAS's activities in the United States.  So

4    we would move for 19 through 24 to be admitted as full

5    exhibits.

6            THE COURT:  They may be so admitted as full

7    exhibits.

8            (Plaintiff's Exhibits 19 through 24 were

9    admitted as full exhibits)

10           MR. STRACHMAN:  Thank you.  And I had a question

11   for your Honor, if I may, as to your Honor's ruling the

12   other day.  Will the Court be issuing an order

13   following the hearing on Mr. Sherman's motion?  Shall

14   counsel prepare an order?

15           THE COURT:  This is with regard to my ruling

16   denying the PLO or the PA standing in effect to

17   participate in the hearing?  Is that what you're

18   referring to?

19           MR. STRACHMAN:  Well, I think the ruling was

20   more in terms of the proceeding going forward.  I think

21   that -- their objection was to going forward, not

22   really to participating.  I just didn't know if your

23   Honor was preparing an order or if you would like me

24   to.

25           THE COURT:  I would like you to, Mr. Strachman.

1          MR. STRACHMAN:  Thank you.

2          THE COURT:  Let me just consult my notes,

3    because I did take notes, so I can refresh my memory as

4    to what that ruling was.  According to my notes,

5    Mr. Strachman, I overruled the objection filed by the

6    PA and the PLO to the hearing going forward.  So you

7    may reduce that to an order, and I'll sign it.

8          MR. STRACHMAN:  Thank you.  Lastly, your Honor,

9    if it would be helpful to the Court, I'd like to

10   provide a closing; and we also have a brief summary of

11   damages that I'd like to present to the Court as well

12   in written form.

13         THE COURT:  You may do so.

14         MR. STRACHMAN:  Your Honor, much of what I would

15   say is contained in our memo, and I don't want to be

16   repetitive, but I think what's crucial in this case at

17   this stage of the proceedings is that we have a very

18   clear statute, a statute that is somewhat unique in the

19   sense that it has not been utilized frequently; but it

20   is crystal clear in the statutory, legislative history,

21   both in the memorandum that we previously filed with

22   this Court and the memorandum that I just filed this

23   afternoon, as to what the intent was.

24         The intent was extremely clear, and that is to

25   provide a tool for Americans to fight terrorists in

1    their own way, and that is through the courts in

2    utilizing explicitly all weapons, quote, "all weapons

3    available to litigants."  The quotes and the

4    statements, the sentiments of Congress are included in

5    the very detailed legislative history that is quoted at

6    length in our brief.

7         And this proceeding, I think, has an opportunity

8    for the first time to really implement that to its full

9    extent; and to that extent, Judge, I would ask that the

10   full panoply of relief that we're asking for in this

11   case be granted.

12        First, we start with the proceeding not against

13   the PLO, who helped provide material support,

14   et cetera, to these terrorists, but to the actual

15   triggermen themselves and the organization, the

16   terrorist organization to which they belong.  And I

17   think that's crucial; that in such a case, to disallow

18   the full panoply of relief to be granted would somehow

19   send the diametrically opposite result or message that

20   Congress intended.

21        And here we have a statute where Congress went

22   out of its way to create jurisdiction in this Court, to

23   create mechanisms for service, to create an expanded

24   class of Plaintiffs, to even allow treble damages in

25   its own -- in Congress's own analysis of how to provide

a punitive type of element for these terrorists.  And
here we've asked to fully implement that statute such
that we're asking for not only economic damages, as the
witnesses testified to, lost wages, the lost services
to these children, but also to the estate, the family
and the heirs, survivors as explicitly mentioned in the
statute.

While this case is somewhat unique in the sense
that it is literally the first case brought under this
statute that I think has ever been identified, no one
has been able to identify another case that was filed
under this statute, what we do have is we have a very
clear analogy for measuring damages, for dealing with
some of the losses that the Unger family has suffered
and that the children particularly will suffer going
forward.

Those cases are all outlined very clearly --
hopefully very clearly in our memorandum, and that is
an analogy to the 1996 act which amended the Foreign
Sovereign Immunities Act.  That act is a little bit
different.  It sets things up a little bit differently,
but courts have clearly said how to measure damages and
how to address issues very much just like this case in
cases against the sponsors of terrorism.

Here we have measures of damages that we're

1    seeking against the actual triggermen and their

2    terrorist organization, HAMAS.

3         We would ask the Court, as we've outlined in our

4    memorandum, to analogize the damages so that the family

5    members who testify and who are seeking compensation in

6    the form of damages would fit within the same sort of

7    general guidelines that were made in those Foreign

8    Sovereign Immunities cases.

9         Each of those cases allow for emancipated --

10   excuse me, involved or many of the cases involved

11   emancipated adults, family members of emancipated

12   adults receiving an award for their pain and suffering.

13   So, too, for minor children, in many cases for children

14   whose fathers were taken captive and ultimately

15   returned to them, unlike the case here.  And what's

16   crucial, I think, also to recognize is that the

17   suffering here is, it's sort of awkward to say, but not

18   the generalized suffering that a person would have

19   knowing that a family member died.

20        This isn't a car accident case, and that's why

21   Dr. Freedman isn't an accident reconstructionist.  He

22   is a person who testifies as to how this person -- how

23   Yaron Unger was killed, following the police report,

24   following the records of the police who investigated

25   this scene.

1   This gentleman, Mr. Unger, 26, witnessed his

2   wife's death.  He faced her while she was dying.  He

3   turned facing her, facing the terrorists.  He knew his

4   son was in the back seat.  Within, as the testimony

5   was, approximately 30 seconds, he would have lost

6   consciousness and died; but his last final seconds were

7   knowing that his wife's -- literally the back of her

8   head was blown off by shots that struck straight

9   through the headrest of her seat, just bypassing, thank

10  God, this little nine-month-old child, not knowing what

11  happened to that child because this car was riddled

12  with 50 bullets.

13      And the horror that he suffered, the horror that

14  his family suffers is somewhat unimaginable.  It's not

15  akin to much else, I think, that comes before this

16  Court or certainly before counsel in terms of our

17  practices, in terms of dealing with damages.  These

18  children will always know how their parents died.  When

19  they get older, as Dr. Brenman said, if they

20  independently look for records, they will know that --

21  they will see these pictures.  They will see picture of

22  how their father was killed, and that is an

23  unimaginable horror.

24      So the damages in this case, I think, have to

25  reflect that scenario.  The cases that deal with

1    terrorism specifically address those kinds of issues.

2    A loss from terrorism is unlike a car accident case in

3    the sense that it's entirely unexpected.  There's

4    entirely no analogy that someone could use or someone

5    could make for dealing with the grief and the

6    suffering.

7        It involves cutting off people who are

8    absolutely innocent, two young people not involved in

9    politics, not carrying weapons, not involved in any

10   movements or politics or anything, just coming back

11   from a colleague's wedding, and to see their family

12   devastated this way is an unimaginable suffering.  And

13   as Dr. Brenman said, thankfully the suffering that

14   these children will potentially suffer is in a sense in

15   the form of their vulnerability, their vulnerability to

16   these types of syndromes, this anxiety.

17       Thankfully they landed in a decent spot and have

18   excellent grandparents.  There's no denying that, and

19   we're fortunate for that; but they have to carry this

20   with them for the rest of their lives.  When their

21   grandparents die and they're in their fifties, when

22   they die 20 or 30 years from now, these children will

23   be, as Dr. Brenman said, in a sense orphaned again.

24   Hopefully they can deal with it in a good fashion.

25       And it's not clear, and I don't want to

1    overstate the case either, we're not saying these kids

2    will absolutely suffer in this way.  No one can predict

3    that, and no one knows that, and the kids are doing

4    fairly well now, it's obvious; but to live with this

5    kind of a burden, to live with this risk and this

6    vulnerability demands an in-kind measure of damages.

7         And I would ask the Court to make the analogy

8    between the loss of comfort and society in the Foreign

9    Sovereign Immunities cases to this case.

10        It's particularly crucial, your Honor, to do so

11   here for another reason.  In each of those cases, in

12   virtually every single one except, as I'm aware of,

13   except really basically one case, they involve an

14   indirect party, the party that supplied Hizbollah with

15   weapons, the party that trained Hizbollah or even

16   trained HAMAS members.

17        Here the awkward situation is that when Congress

18   created this statute, they gave a measure of punitive

19   damages.  The punitive damages are the threefold

20   damages.  So the strange thing here is that the

21   measure, the ultimate total of damages in this case may

22   very well be less than the punitive damages awarded in

23   cases against the mere sponsors, the financing parties.

24        And I think that was an unintended consequence

25   by Congress.  It clearly can't be that Congress said

1    the triggermen get -- are on the hook for less than the

2    state sponsor because the state sponsor we made an

3    exception, we allow punitive damages to apply; but

4    Yaron Unger had fairly modest means, he was a

5    schoolteacher, and the income -- that even trebled loss

6    of income is a fairly modest sum or relatively modest

7    sum, as it were.

8         So to that extent, I think the Court -- we urge

9    the Court to implement all measures of damages in the

10   broadest fashion, and I think that's particularly

11   intended.

12        I would bring the Court -- in that light, I

13   would bring the Court's attention to specific

14   references that are made in the record and are

15   identified in our brief.  I won't belabor the Court

16   with this citation.  When this statute was first --

17   when this bill was first drafted in 1990, and it has a

18   little bit of a tortured history, it was enacted in

19   '90, it was repealed by mistake, literally by mistake,

20   and reenacted the next year.  The citations and the

21   sources are clarified for the Court in our submission.

22   But the first draft of this bill did not allow suits on

23   behalf of heirs and survivors.

24        The Department of Justice testified at the

25   hearing that, in order to clarify who was on the hook

1    and what the potential remedies for families of

2    terrorists would be, asked Congress to specifically

3    include the word "heirs and survivors."  By doing so,

4    they specifically said it would make clear that the

5    families of Americans who are killed can bring suit and

6    can recover in their own right.

7        Congress gladly, to the best of my knowledge,

8    without any objection, made that very simple change.

9    And, in fact, that's how we have the law now.  So now

10   the law reads -- Section 233(a) says the estate, heirs

11   and survivors can bring suit.  And it could be that

12   that is the remedy for, in a sense, the disparate

13   treatment between the gunmen on the one hand and the

14   sponsors on the other hand; that by allowing a broad

15   range of damages and by using, as Senator Grassley I

16   believe said, quote, "all weapons available to

17   litigants," unquote, there could be some measure of

18   justice obtained in the form of huge judgments that

19   potentially could bankrupt these organizations and

20   bankrupt the parties who are doing these horrible and

21   evil types of deeds.  Thank you.

22       THE COURT:  Thank you, Mr. Strachman.

23   Mr. Strachman, you are correct that the Court continues

24   to have some concerns about the issue of personal

25   jurisdiction, and my inclination is to schedule a

1    hearing for later in this week where you can be

2    prepared on that single issue and I can also focus my

3    thoughts on it and perhaps ask questions that are not

4    clearly formulated in my mind at the present time but I

5    think after I review your materials will be more

6    clearly formulated.  Are you available Friday afternoon

7    at 2:00?

8            MR. STRACHMAN:  I will be, sure.

9            THE COURT:  All right.  I'm going to schedule a

10   hearing in this matter for 2:00 this Friday where I'd

11   like you to be prepared to argue the existence of

12   personal jurisdiction both as to the HAMAS organization

13   and also as to the individual operatives; and the

14   Court, I anticipate, will have some questions in the

15   course of your presentation.

16           I think the total amount of time will not exceed

17   one hour.  It may be less than that; but since I

18   concluded that I must make a determination that there

19   is personal jurisdiction in order to reach the monetary

20   issues that you have addressed this afternoon, I deem

21   it helpful to have a hearing on that point, on that

22   issue by itself.

23           MR. STRACHMAN:  Could I ask the Court if the

24   Court -- if there's something that I might be able to

25   supplement in terms of the record.  For instance, the

```
 1    FBI affidavit we originally filed with the Court 20
 2    months -- you know, in our initial motion to enter
 3    default judgment discusses the transactions involving
 4    HAMAS operatives.
 5         The Marzook case, which is cited there, shows
 6    how Mr. Marzook was the head of the HAMAS military wing
 7    operating freely in the United States.  So, too, with
 8    Mr. Salah and the One Ford Van case.  So, too, with the
 9    affidavit of Yahudi Barski who indicates the publishing
10    house was -- the web sites, the other activities of the
11    HAMAS; and I'm just wondering if there's something else
12    I can -- some direction the Court can give me, and I
13    will be happy to supplement our filings or direct sort
14    of my inquiry.
15         THE COURT:  I would suggest you simply be
16    familiar with the materials that you've already filed.
17    I'm going to be reviewing them again, Mr. Strachman.
18    If in the course of the hearing we reach a point where
19    you feel that had you been alerted to a particular
20    avenue of inquiry you would have supplemented the
21    record further, I'll give you the opportunity.
22         I won't fault you if on Friday you find that you
23    weren't anticipating a particular avenue of inquiry by
24    the Court and would be able to satisfy the Court's
25    inquiry given additional time.  So I appreciate your
```

1    alerting the Court today saying that you'd be willing

2    to try to prepare further materials for Friday.  I

3    don't think that's necessary.  I'm suggesting that you

4    just focus your preparation for that hearing on the

5    issue of the existence of personal jurisdiction, what

6    it is in the record that the Court should be looking at

7    to find personal jurisdiction both as to the HAMAS

8    organization and as to the individual operatives.

9        I have looked at those exhibits.  I'm going to

10    look at them again.  I think if you have focused on

11    them and I focused on them, that we'll have a

12    productive hearing.

13        MR. STRACHMAN:  Thank you, your Honor.

14        THE COURT:  Court will stand in recess.

15        (Court adjourned)

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3

4              I, Karen M. Zinni, RPR-RMR-CRR, do

5    hereby certify that the foregoing pages are a true and

6    accurate transcription of my stenographic notes in the

7    above-entitled case.

8

9

10

11    _____

12    Karen M. Zinni, RPR-RMR-CRR

13

14

15

16

17    _____

18    Date

19

20

21

22

23

24

25

KAREN M. ZINNI, RPR-RMR-CRR