1          UNITED STATES DISTRICT COURT

2

3         FOR THE DISTRICT OF RHODE ISLAND

4

5    +++++++++++++++++++++++++++

6    EFRAT UNGAR, et al    CA No. 00-105 L

7

8        v                    PROVIDENCE, RI
                              12 JULY 2002
9

10   THE PALESTINIAN
     LIBERATION ORGANIZATION
11
     +++++++++++++++++++++++++++
12
           BEFORE MAGISTRATE JUDGE DAVID L. MARTIN
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:    DAVID STRACHMAN, ESQ.
                           321 South Main St.
16                         Suite 400
                           Providence, RI 02903
17                         351-7700

18
     FOR THE DEFENDANT:    DEMING E. SHERMAN, ESQ.
19                         2800 Financial Plaza
                           Providence, RI 02903
20                         274-9200

21
     COURT REPORTER:       JOSEPH A. FONTES
22                         One Exchange Terrace
                           Providence, RI 02903
23                         273-0344

24

25   Proceeding reported and produced by computer-aided
                      stenography

```
1                    I N D E X

2

3   ALAN FRIEDMAN
        DIRECT EXAMINATION              29

4   ADRIAN ZIDERMAN
        DIRECT EXAMINATION              66

5
    MEIR UNGAR
6       DIRECT EXAMINATION              89

7   JUDITH UNGAR
        DIRECT EXAMINATION             101

8
    MICHAL COHEN
9       DIRECT EXAMINATION             119

10  AMICHAI UNGAR
        DIRECT EXAMINATION             125

11
    DAPHNE UNGAR
12      DIRECT EXAMINATION             132

13  URI DASBERG
        DIRECT EXAMINATION             137

14
    YEHUDIT DASBERG
15      DIRECT EXAMINATION             144

16

17

18

19

20

21

22

23

24

25
```

```
 1   JULY 12, 2002 - MORNING SESSION
 2               THE COURT:  Good morning.  This is the
 3   matter of the estate of Yaron Ungar, et al vs the
 4   Palestinian Authority, et al.  This matter is before
 5   the Court this morning on the plaintiff's motion to
 6   enter default judgment against defendant HAMAS and
 7   HAMAS Operatives.  The attorneys will identify
 8   themselves.
 9               MR. STRACHMAN: David Strachman for the
10   plaintiffs.
11               MR. SHERMAN: Deming Sherman for the
12   Palestinian defendants.
13               THE COURT: The first matter the Court will
14   take up in connection with the present motion is an
15   objection that was filed by the Palestinian defendants
16   apparently on July 10th to entry of default judgment in
17   this matter.  Mr. Sherman, are the Palestinian
18   defendants pressing that objection?
19               MR. SHERMAN:  Your Honor, may I make a brief
20   presentation on that?
21               THE COURT:  Yes.
22               MR. SHERMAN:  Thank you, your Honor.  I
23   think it will answer your question.  As your Honor
24   indicated, the Palestinian defendants filed an
25   objection for two reasons.  The first was a concern
```

1    about the impact of this hearing, and a possible

2    default judgment on our clients.  The second -- and

3    this was prompted by a set of documents that were

4    served upon us last weekend -- the second is a concern

5    about the jurisdiction of this Court to enter a default

6    judgment at all.

7        I don't intend to repeat what was in my memorandum

8    filed earlier this week.  We do understand that the

9    Court will proceed with the hearing today largely

10   because the witnesses have traveled great distances.

11       As your Honor indicated in the telephone

12   conference that we had yesterday with all counsel, it

13   is the option of the Palestinian defendants not to

14   participate in the hearing.  Accordingly, we do not

15   intend to participate.  However, I wish to state for

16   the record the position of my clients as follows:

17       Number 1, the default judgment proceedings that

18   are being conducted today against the HAMAS defendants

19   should not be in any way binding upon the Palestinian

20   defendants.

21       2.  None of the evidence received, the findings of

22   fact, the conclusions of law, or orders or judgments,

23   if any, that may be issued, shall have any impact upon

24   the Palestinian Authority, the Palestinian Liberation

25   Organization, or their officers or officials,

1   collectively, the Palestinian defendants, in this case,

2   or in any other context, and shall not be binding or

3   have any preclusive effect upon the Palestinian

4   defendants by way of res judicata, collateral estoppel,

5   issue preclusion, or any other legal theory.

6       The Palestinian defendants shall not be liable --

7   it is our position that the Palestinian defendants

8   shall not be liable directly or indirectly, in whole or

9   in part, for any judgment that the plaintiffs may

10  recover against the HAMAS defendants.  Any judgment

11  that the plaintiffs may recover against the HAMAS

12  defendants shall not be enforceable, or recoverable, or

13  usable in any way against the Palestinian defendants,

14  and shall not provide any basis for imposing any

15  liability or adverse effect upon the Palestinian

16  defendants, and that is position that we assert this

17  morning.  We suggest that in order to avoid future

18  contentions of this sort in this litigation that this

19  position that we have asserted be made clear by order

20  of this Court.  So that is the position that we assert

21  this morning, your Honor.

22          THE COURT:  Well, it doesn't entirely answer

23  my question.  Are you pressing the objection that was

24  filed?

25          MR. SHERMAN:  Yes.

1          THE COURT:  You are.

2          MR. SHERMAN:  Yes.

3          THE COURT:  All right. The Court's intention

4    is to conduct a brief hearing on your objection and to

5    consider the arguments that have been raised by the

6    plaintiffs' attorney as to why the objection is not

7    timely and should not be heard.  But before I proceed

8    to that point, let me just hear from Mr. Strachman.  Do

9    you wish to respond to Mr. Sherman's statement?  I

10   suppose, if by chance you're in agreement with his

11   statement, that we need not have argument about the

12   objection, but if you are in disagreement then my

13   intention is to have a brief hearing on the objection.

14         MR. STRACHMAN:  Well, your Honor, as we

15   suggested in both our filings with the Court yesterday,

16   as well as in our conference, we had suggested that the

17   way out of this issue, if you will, is to sever the

18   cases, and I understand your Honor indicated to the

19   Court that a referral had not yet been made on our

20   motions, and I'm aware that counsel had discussed both

21   at the hearing, which was in a conference yesterday,

22   and subsequently in telephone conferences, whether we

23   could agree, with the Court's permission, of course, to

24   sever the two cases.  It's unclear to me the nature and

25   extent of my brother's statement.  That is their

1    position.  I'm not so sure we have to either agree or

2    disagree with his position as to the effect of this

3    hearing right now, and I think what they're basically

4    saying is that the case should proceed against the

5    defaulted defendants, and I think they seem to concede

6    and to recognize that.  But at the same time, they

7    perceive some procedural benefit, or some substantive

8    benefit, to disallowing the evidence in this

9    proceeding, to enure against them.  I don't know what

10   the effect of that would be.  I don't believe that's

11   really before the Court today.  But I would urge the

12   Court to consider our motion to sever the case, and I

13   think that would probably satisfy both parties.

14            THE COURT:  All right.  Thank you,

15   Mr. Strachman.  You are correct in your observation

16   that the motion to sever, in fact, as I understand it,

17   in response to the objection that was filed by the

18   Palestinian defendants, plaintiffs then filed a motion

19   for sanctions.  One motion was entitled a motion for

20   sanctions, a motion to strike, alternatively to sever.

21   I have now been informed that, in fact, after being

22   advised by, I believe Judge Lagueuxe's clerk, that such

23   a motion was not proper, and that 3 separate motions

24   should be filed, and that plaintiffs have, in fact,

25   done that.  Is that correct, Mr. Strachman?

1        MR. STRACHMAN:  Yes, your Honor.  Yesterday

2   afternoon we separated the 3 motions, correct.

3        THE COURT:  All right.  Those motions have

4   not been referred to me yet, therefore, this Court can

5   take no action regarding the suggestion or request that

6   the HAMAS defendants be severed from the non-defaulting

7   defendants.  So that is not before me this morning.  I

8   can take no action regarding it.  Therefore, I'm going

9   to proceed.

10       As I've indicated, the first matter I'm going to

11   take up is the objection that has been filed by the

12   Palestinian defendants to the entry of default

13   judgment, and I'll ask Mr. Sherman to respond to the

14   arguments that have been raised by plaintiffs, namely

15   that the Palestinian Authority and the PLO did not

16   object back after the motion, the present motion was

17   filed on November 29, 2000, and then on February 5,

18   2000, the PLO and the Palestinian Authority, in a

19   written memorandum in support of their renewed motion

20   for a stay and a motion for leave to seek a protective

21   order, stated: We take no position on that motion,

22   meaning the motion for entry of default judgment, which

23   is before this Court this morning, or whether it should

24   be subject to a stay.  So, Mr. Sherman, I'd like to

25   hear from you regarding why the Court should at this

1    eleventh hour allow the Palestinian Authority and PLO

2    defendants to raise an objection to a motion that has

3    been pending for months.

4         MR. SHERMAN:  Yes, your Honor.  What the

5    Court recited, as a procedural and factual matter, is

6    correct, that the motion was filed in November of 2000,

7    and the filing that my clients made earlier this year

8    with the statement that you referred to is, in fact,

9    what was said.  What prompted this, this objection, as

10   I indicated previously, was the filing of substantial

11   exhibits over the weekend which we had not seen before,

12   and we were also unaware that there were a number of

13   witnesses that were apparently on their way to the

14   United States for this hearing.  I think we perhaps

15   misjudged as to exactly what was going to transpire.

16   In any event, as I indicated earlier, what we are

17   concerned about is what impact this hearing would have

18   against the non-defaulting defendants that we

19   represent.  I think -- our position is there should be

20   no -- there should be no impact, but we're not clear.

21   When we looked at the law on the general procedure with

22   respect to proceeding for a default judgment against

23   some but not all of the defendants, it appeared to us

24   from our research that the general rule is that when

25   there are non-defaulting defendants and there are

1    defaulting defendants, that you should withhold any

2    judgment against the defaulting defendants until such

3    time as the case in chief has been tried.  So it was a

4    combination of those two matters that caused us to file

5    the objection.  I recognize that it was not filed

6    immediately, and after the motion was filed, and we are

7    obviously bound by the statement that we made

8    previously.  But I'm explaining to the Court why we did

9    what we did.

10            THE COURT:  Thank you, Mr. Sherman.  I don't

11   need to hear from plaintiffs.  The Court is satisfied

12   that the objection that was filed by the PA and PLO was

13   not timely and should not be heard by the Court this

14   morning, and I will not allow the PA and PLO to press

15   that objection.  It was simply untimely, filed at the

16   11th hour.  I'm not persuaded that the concerns that

17   have been expressed by the PA and PLO through their

18   counsel this morning were not apparent, or should not

19   have been perceived far before July 10th.  Therefore, I

20   will not allow the PA or PLO attorney to participate

21   further in the hearing this morning.  So the Court

22   overrules the objection that's been filed by the PLO

23   and PA.

24            Mr. Strachman, before we start the hearing,

25   however, I do have some questions for you.  I'd like

1  you to go to the podium, please.

2          MR. STRACHMAN:  Yes, your Honor.

3          MR. SHERMAN:  Your Honor, may I be excused?

4          THE COURT:  You may, Mr. Sherman.

5          MR. SHERMAN:  Thank you.

6          THE COURT:  Mr. Sherman, you're welcome to

7  leave.  I'm just alerting you to the fact that I'm

8  about to ask some questions that may sound similar to

9  some of the questions or statements you just had raised

10 in your objections.  So you may want to stay for

11 5 minutes just out of interest, but you're welcome to

12 leave.

13         MR. SHERMAN:  I'll stay briefly, Judge.

14         THE COURT:  Mr. Strachman, I've made my

15 ruling that I'm not going to allow the PA and PLO to

16 participate in this hearing, nor to voice objections to

17 the proceeding going further.  However, the Court does

18 have some concerns that I want to address with you.

19     Do the plaintiffs contend that the assessment of

20 damages against the defaulting HAMAS defendants would

21 be in any way binding on the PA and the PLO?

22         MR. STRACHMAN:  I don't know, and we have

23 not really addressed that issue.  I think there is -- I

24 think there is an issue, as my brother raises it in law

25 in his motion, but we haven't really addressed that

1   issue.  It's the first time it was -- this is the first
2   time it's been raised.
3            THE COURT:  There is apparently a general
4   rule that when one of several defendants was alleged to
5   be jointly and liable to defaults, judgment should not
6   be entered against that defendant until the matter had
7   been adjudicated with regard to all defendants, or all
8   defendants had been defaulted, and the reason for this
9   rule, in the view of the Court, in the case of
10  Commodities, Futures Trading Commission versus Standard
11  Forex, Inc., 1997, U.S. District, Lexis 22612, Southern
12  District of New York 1997, is that while judgment as to
13  liability may be entered against the defaulting
14  defendants, the proper procedure is to consolidate the
15  inquest to determine the level of damages as to the
16  defaulting defendants with the damages aspect of trial
17  against the non-defaulting defendants.  The rationale
18  underlying this procedure is the prevention of
19  inconsistent judgments with respect to the amount of
20  damages a plaintiff may recover from the defaulting,
21  non-defaulting defendants.
22       What the Court is interested in knowing is that if
23  we go forward today, as I have announced we will, and
24  quite frankly we are going to have testimony, I'm not
25  going to make a ruling on these issues and not have

1    testimony.  The witnesses have traveled too far.  But I

2    do have this concern, and I would be interested in

3    knowing what the plaintiffs' view is regarding this

4    concern other courts have expressed about inconsistent

5    judgments with respect to the amount of damages.  Is

6    that a possibility here?

7              MR. STRACHMAN:  Judge, your Honor, I'm not

8    so sure that's -- it may be a possibility.  I'm not so

9    sure why it should be a concern, respectfully.  This

10   case has a unique history.  It's in a context first of

11   a defendant, the PLO.  The last time it was before a

12   court it took 12 years to judgment, 1985 until 1987,

13   until the case was resolved.  My clients defaulted

14   HAMAS in September of 2000.  It's been 23 months since

15   the default entered.  We've asked the Court on

16   3 occasions, and obviously Judge Lagueux granted our

17   request for a hearing.  There is no reason that the

18   plaintiffs should be forestalled against proceeding

19   against HAMAS because the Palestinian defendants are

20   going to take another 12 years to resolve the case, and

21   we fully anticipate that.  We've said that.  We've

22   acknowledged that in our briefs.  The motions to

23   dismiss, discovery has been stayed, all kinds of

24   pretrial issues.  So none of those cases that your

25   Honor recites, or that are recited by my brother in his

1  brief of Wednesday afternoon, have anything to do where
2  the travel in those cases are so dissimilar to the
3  issues here as to make that rule inpplicable.
4      Also, Judge, what's crucial about this case is
5  this case arises under a very specific statute.  The
6  goal of this statute is to create an economic
7  disincentive to terrorism.  If the terrorists, the
8  actual triggermen, and that's who the HAMAS defendants
9  are, the triggermen, the Palestinian defendants are
10  people who consorted with them, who supplied them, who
11  helped them, et cetera, but it would be an absurdity.
12  It would create an absolute perversion of the statute
13  to say that the triggermen have to wait -- the
14  plaintiffs have to wait 12 years to proceed against the
15  triggermen who chose not to participate in this
16  proceeding in any fashion because another defendant has
17  the right to fully exploit its rights to litigate this
18  case and to continue on to trial.  None of those cases
19  that were cited involve anywhere near this type of
20  situation.  And I would say it would dramatically
21  undermine the purpose of Section 2333, the
22  Anti-terrorism Act of 1990, it would dramatically
23  undermine -- it would make a mockery of the whole
24  process.  The statute specifically says the terrorists
25  and the people who aid terrorists, and the legislative

1    history makes very clear as we've cited in our previous

2    briefs, was well known by Congress that most of the

3    terrorists were going to kill Americans who live

4    abroad.  Because one of the groups that's involved in

5    consorting with this terrorist organization happens to

6    be in the United States, that would mean, and that

7    would allow a shield for the terrorists 12 years, or 5

8    years, or 8 years, but certainly not the fast track

9    that normally occurs in litigation in federal courts,

10   the normal course of litigation.  To allow them to get

11   the benefit of the fact that there is a local party

12   here, to me makes a mockery of the whole situation.

13   Perhaps your Honor could award inconsistent judgments.

14   I don't know why that's a problem.  It's unclear to me

15   why inconsistent judgments would be a problem, as well.

16   I mean, it may not be -- it may not appear tidy, but it

17   certainly would facilitate justice by allowing the

18   terrorists to -- by allowing the plaintiffs to hold the

19   terrorists responsible and then proceed, and we fully

20   intend to proceed, as I've discussed with Mr. Schilling

21   on several occasions, we fully intend to proceed to

22   final judgment, obtain an execution, and go after these

23   terrorists and proceed to help bankrupt them.  We made

24   that representation in a slightly abbreviated form in

25   June when we were here arguing before Judge Lagueux, we

1  renewed our request, and shortly following the hearing

2  Judge Lagueux made the referral.  So I think the

3  operation of the statute and the operation of the trail

4  or travel of this case suggests that that should not

5  really be a big concern for this Court, respectfully.

6      If we were in a business litigation situation, if

7  we were suing two contracting parties, perhaps that

8  would make sense.  But in this context, it does not

9  make sense.

10     It also does something very -- something else.  It

11 creates a disincentive to bring these cases.  It would

12 say that a statute that allows a whole panoply of

13 people who are involved in terrorism to be responsible,

14 it would suggest that the plaintiffs have to file

15 either individual suits and risk that they may be

16 merged, and then subject to that type of rule, or allow

17 one of many defendants to interfere with obtaining

18 justice against defendants who -- who have basically

19 thumbed their nose at this Court and had said we're not

20 going to participate, we don't have to participate, and

21 but for the PLO taking up their position repeatedly,

22 they have not respected this Court.  Why should my

23 clients be at a disadvantage?  Why should the victims

24 be disadvantaged simply because one party says we don't

25 want to show up?  So I guess that's how I would

1    respond.

2         THE COURT:  With regard to your observations

3    that you don't necessarily feel that having

4    inconsistent judgments would be a problem, isn't there

5    a problem posed by the fact that you have alleged the

6    defendants are jointly and severally liable, and if we

7    have two inconsistent judgments, how do we determine

8    what, in fact, the defendants are liable for?

9         MR. STRACHMAN:  Again, Judge, that assumes

10   there would be some inconsistency.  I don't assume that

11   the natural course of events, or the evidence would

12   suggest that there would be inconsistent judgments.  I

13   would assume that the judgments, based on the evidence,

14   would be similar if there was another proceeding

15   against the PLO, and if they were bound by this

16   proceeding.  Frankly I don't think there's much they

17   would do to contest the evidence in this proceeding.

18   I think it's frankly a fairly straightforward type of

19   proceeding.  It's not a complicated business dispute

20   with economists who come up with all kinds of

21   projections.  I think it's fairly a straightforward

22   wrongful death type of situation.

23        THE COURT:  I take it, Mr. Strachman, that

24   the plaintiffs take no position on my question as to

25   whether or not, if I determine after this hearing that

1   the proper amount of damages is X amount of damages,

2   and judgment is entered against the HAMAS defendants

3   for that amount, X amount of dollars, that if and when

4   the PA and PLO are found liable, that that X amount of

5   dollars figure will have no effect on them?

6           MR. STRACHMAN:  I would assume -- frankly,

7   Judge, we haven't researched the issue.  We haven't,

8   you know, learning that there was an objection raised

9   at 4:40 on Wednesday afternoon, haven't fully thought

10  through the issue.  But, as I said, I think it probably

11  would.  I think it probably would.

12          THE COURT:  Would have an effect?

13          MR. STRACHMAN:  Yeah, it probably would,

14  your Honor, because the evidence would be identical.  I

15  don't think there's much of a --

16          THE COURT:  But would there be another

17  hearing?

18          MR. STRACHMAN:  I don't know.  I don't know.

19          THE COURT:  Would they be entitled to

20  another hearing on damages?

21          MR. STRACHMAN:  Perhaps they would.

22          THE COURT:  Would the fact that I've

23  excluded Mr. Sherman from participating in the hearing

24  this morning have a bearing on whether or not they

25  would be entitled to another hearing on the issue of

1    damages?

2              MR. STRACHMAN:  Well, I think you've

3    excluded them, Judge, in the sense that you've

4    suggested their motion is not being heard.  They didn't

5    ask to intervene in this hearing.  They didn't ask to

6    participate.  They didn't ask for discovery.  They

7    didn't ask to depose our witnesses.  Discovery has been

8    stayed at their request.  Perhaps, Judge, all of these

9    questions beg for the severance of these claims, and

10   that would allow preservation of any rights that the

11   Palestinian defendants claim, and it would allow my

12   clients to do what they intend to do, and that is

13   obtain a judgment, a final judgment, an execution, and

14   proceed.  It begs out for that, Judge, so that we do

15   not prejudice the parties.  I think we all sort of

16   recognized that in a conference yesterday, at least

17   counsel all recognized that.

18             THE COURT:  You're indicating if severance

19   were granted, then it would be legally permissible to

20   have judgments in different monetary amounts?

21             MR. STRACHMAN:  Absolutely.  There would be

22   separate cases.  As we've indicated, your Honor, in our

23   filing yesterday, which were motions but were also in

24   the nature of an objection to the issues raised by my

25   brother, would absolutely be a factor.  The case is

```
 1    very clear, including the determination from the First
 2    Circuit, that severed cases create absolutely separate
 3    cases in the sense that there would be no res judicata,
 4    there'd be no collateral estoppel, there'd be no
 5    binding effect between a judgment obtained in one case
 6    and a judgment in another case, absolutely.
 7              THE COURT:  And you filed that motion for
 8    severance as a separate motion yesterday?
 9              MR. STRACHMAN:  Right.  If I could just back
10    up, Judge.  We were alerted to their motion at 4:48
11    Wednesday.  At 9:30 I was called by your Honor's clerk
12    and indicated that we would have a hearing at 10:30,
13    and at 9:45 we filed, you know, a memorandum which we
14    subsequently separated into separate motions but, yes
15    we've asked for severance, and I think -- I think the
16    representations made by my brother this morning sort of
17    -- are begging the Court to basically do that.  I think
18    it's a recognition that they don't want this proceeding
19    to bind them, yet they're not -- they have not
20    requested to stop this proceeding but for, or
21    participate in this proceeding, but for the allegation
22    that they raise, which your Honor found to be basically
23    waived.  They have the right to do discovery.  We've
24    asked for discovery.  We asked for discovery in
25    January.  Counsel and your Honor had a telephone
```

1   conference, I believe in April, on this matter, very

2   briefly, setting it down for a hearing, and

3   subsequently Judge Lagueux stayed all discovery.

4            THE COURT:  All right.  Mr. Sherman, since

5   you're still here, let me draw upon your presence for a

6   question.  Do you know at this point whether or not the

7   PA and PLO will be opposing the motion for severance,

8   or that matter has not been decided yet?

9            MR. SHERMAN:  It's not been decided, your

10  Honor.  It's under consideration.

11           THE COURT:  I would assume if you are going

12  to object, you'd file it within 10 days.

13           MR. SHERMAN:  Yes.

14           THE COURT:  Very well.  Thank you,

15  Mr. Sherman.  I have some other questions briefly for

16  Mr. Strachman before we get to the hearing.  Do

17  plaintiffs agree that this Court must determine whether

18  it has personal jurisdiction over the HAMAS defendants

19  in the process of deciding this motion for entry of

20  default judgment?

21           MR. STRACHMAN:  Your Honor, we requested

22  default judgment November 29.  In that brief, we filed

23  a -- we filed a 25 page brief, we filed, I believe, 8

24  or 10 exhibits, including an FBI affidavit from a

25  special agent indicating the extensive connections

1    between HAMAS as an organization and this country.  We

2    also referenced the extradition proceeding of a

3    gentleman by the name of Abu Marzook, who is a military

4    leader of HAMAS, who operated for years here.

5            THE COURT:  I have looked at the exhibits.

6    My question is not whether you have submitted evidence

7    in support of that contention but simply whether or not

8    this Court has to reach that issue.  I have to -- in

9    order for the Court to enter default judgment against

10   the HAMAS defendants, the Court must necessarily

11   determine that it has personal jurisdiction over them,

12   do you agree?

13           MR. STRACHMAN:  I think it assumes that.

14   Yes, Judge.

15           THE COURT:  All right.  What standard of

16   proof should the Court apply in making that

17   determination?

18           MR. STRACHMAN:  Well, in this case, I think

19   there's, in a sense, an easy solution to that question,

20   and that is that all of the evidence that we supplied,

21   that's fairly extensive, and as well as -- and I don't

22   want to belabor the point, but other determinatons of

23   other courts concerning HAMAS as an organization, none

24   of that evidence has been objected to, controverted, so

25   all of the evidence, the only evidence before your

1  Honor, is in favor of jurisdiction.  In other words,

2  there's nothing that's been submitted other than a

3  footnote here or a footnote there, in the Palestinian

4  defendants briefs, suggesting that there is an issue.

5  And so it would seem to me that the overwhelming

6  evidence before the Court suggests that there is --

7  that the Palestinian -- the HAMAS defendants are here

8  and are present, such that there would be jurisdiction.

9          THE COURT:  Recognizing that you feel that

10  the evidence is overwhelming, in terms of adopting a

11  standard, however, to measure that evidence, do the

12  plaintiffs feel the Court has to use a clear and

13  convincing standard, or some lesser standard?

14          MR. STRACHMAN:  I think it can use -- I

15  think it can use a standard of -- the standard that's

16  standardly used, it's more probable than not, and --

17          THE COURT:  More probable than not.

18          MR. STRACHMAN:  I think that's an

19  appropriate standard especially in light of the fact

20  that this a default judgment on defendants who have --

21  for which all of the evidence is -- inures to their

22  favor, by law.  By law, all of the evidence inures to

23  their favor -- in our favor because they are in

24  default, and the Court can accept as true all of the

25  statements that we've made in our complaint, in our

1    proceedings, our filings, rather, because they have not

2    contested any of the allegations.  And nor, by the way,

3    just so we're clear, Judge, nor have the Palestinian

4    defendants, while they raise an issue, and they raise

5    this, a red herring here and there, they have never

6    come forward with this Court and to say there is no

7    jurisdiction for HAMAS and here's why.  They've never

8    said why.  So even Mr. Sherman, who now argues on

9    behalf of HAMAS and the lack of jurisdiction in the

10   brief on Wednesday, has not brought forth anything that

11   would suggest otherwise.

12            THE COURT:  Is it the position of the

13   plaintiffs that HAMAS has minimum contacts with the

14   United States sufficient to satisfy the due process

15   clause necessary for the Court to have personal

16   jurisdiction?

17            MR. STRACHMAN:  Absolutely.

18            THE COURT:  Does that also hold true for the

19   individual HAMAS defendants?

20            MR. STRACHMAN:  I think it does, Judge,

21   based on all the reasons that we said in our brief.

22   But recognizing that there is a -- there very well may

23   be a distinction between HAMAS as an organization and

24   the individual defendants.

25            THE COURT:  In reading your brief, it was my

1    impression that you, at least in one section,

2    plaintiffs make the argument the Court may exercise

3    personal jurisdiction over HAMAS even if it does not

4    have minimum contacts.  Am I reading your brief

5    correctly?

6            MR. STRACHMAN:  I think, Judge, that the

7    standard in terrorism cases and the standard in cases

8    involving terrorists which reside abroad, and acts that

9    occurred abroad, have a different level of analysis.

10   These defendants, by the way, Judge, so -- I know your

11   Honor is clear, but just -- I mention it, were all

12   served personally, like the individual HAMAS

13   defendants, and in our brief, we've demonstrated to the

14   Court how they personally were served pursuant to Hague

15   Convention protocols of this proceeding.  And by the

16   way, Judge, were repeatedly served.  In other words, on

17   November 29 of 2000, we sent each of the individual

18   defendants, as well as HAMAS in two locations, two of

19   their offices.  Just the other day HAMAS office also

20   signed personally, and I'll present to the Court, for

21   the notice that we sent to them, I believe on June 25

22   of the Court's notice of this hearing.  So they've been

23   -- and they've been noticed all along.  For instance, a

24   renewed motion in January, a motion for a ruling.  So

25   they've been noticed all along at every stage.

1          THE COURT:  My last question for you,

2     Mr. Strachman, before we start the hearing, is

3     determining the amount of damages, what standard of

4     proof should the Court use?

5          THE COURT:  Well I think the general

6     standard, Judge, in civil cases, and that is it's more

7     probable than not, or it's the general civil standard.

8          THE COURT: All right.  We'll now proceed to

9     commence the hearing.  Mr. Sherman, thank you for your

10    appearance this morning.  You're excused again.

11    (MR. SHERMAN LEAVES THE COURTROOM)

12          MR. STRACHMAN:  Your Honor, might it be

13    possible to move this table?

14          THE COURT:  Where would you like to move it

15    to?

16          MR. STRACHMAN:  Is that inconvenient for the

17    Court?

18          THE COURT:  Do you wish to move the table or

19    just move your position?

20          MR. STRACHMAN:  My position and belongings.

21          THE COURT:  You may move your position and

22    also your belongings.

23          MR. STRACHMAN:  Thank you, your Honor.  Your

24    Honor, before we begin, in order to help move things

25    along, we've premarked all the exhibits.  No one is

1  objecting to any of the exhibits.  I would ask that

2  they be all marked and give the Court a copy, as well

3  as your Honor -- your Honor a copy, so that we can sort

4  of speed through the process and save time.

5          THE COURT:  You may do so.

6          MR. STRACHMAN:  Thank you.

7          THE COURT:  Are you ready with your first

8  witness, Mr. Strachman?

9          MR. STRACHMAN:  Yes, your Honor.  Just I'd

10  like to briefly introduce the parties to you.  The

11  children are here and I'd ask that they leave after I

12  introduce them to your Honor, and also if your Honor

13  feels it appropriate they'd be available to either talk

14  to your Honor or to interview them as you feel

15  appropriate.

16          THE COURT:  All right.  You may introduce

17  them and then they will be excused from the courtroom.

18          MR. STRACHMAN:  Thank you, your Honor.

19  Could I ask that the family stand up.  Your Honor, the

20  two children in front of me are Dvir and Yishai who are

21  the children of Yaron and Erfat.  And next to them, or

22  with them, are Yaron's parents Judith Dasberg, Meir --

23  excuse me, Judith Ungar, Meir Ungar and their son

24  Amichai Ungar, behind them is their daughter Michal

25  Cohen and their daughter Dafna Ungar.  Next to them are

1    Efrat's grandparents -- excuse me, Efrat's parents who

2    are the caretakers for the children now, Rabbi and Mrs.

3    Dasberg.

4              THE COURT:  All right, thank you.  The

5    children may be excused from the courtroom.

6              MR. STRACHMAN:  Lastly, your Honor, I can

7    provide an opening if your Honor feels it's helpful.

8    If not, I'd be happy to just proceed with the

9    witnesses.

10             THE COURT:  I think I'd like to hear a

11    brief opening, if you could perhaps indicate who you

12    will be calling and what you expect each witness to be

13    testifying to, not in minute detail but just generally

14    if you can keep it within 5 minutes, just an overview

15    of what you will be doing.

16             MR. STRACHMAN:  Certainly.  Thank you,

17    Judge.  Your Honor, since liability is not at issue

18    here and we're here simply to assess damages, most of

19    our witnesses will be here to discuss the damages that

20    were caused by this horrible and violent murder of the

21    Ungars.

22        The first witness that we'll call is Doctor Alan

23    Friedman.  He is both an Israeli and an American

24    physician, and he will testify to the injuries that

25    Yaron Ungar received and the nature of the attack and

1    how it occurred.  Subsequently we will present the

2    testimony of Doctor Adrian Ziderman.  He's an

3    economist, and he has provided a report, and also a

4    supplement to his report concerning lost economic

5    damages.  Next, your Honor, we will provide the

6    testimony of Professor Meir Ungar and Mrs. Judith Ungar

7    who are the parents of Yaron.  They will testify to the

8    type of person and character that Yaron had.  They will

9    also testify to their own loss of feelings, loss of

10    consortium.  Similarly, Judge, their 3 children will

11    testify, and they will also provide testimony

12    concerning their own loss of consortium, et cetera.

13        The Dasberg family is here, your Honor, and they

14    will testify to the nature and character and

15    personality of Yaron Ungar, and also the effects on the

16    children, the needs of the children, in light of their

17    parents' brutal murder.

18        Lastly, Judge, we will present the testimony of

19    Doctor Alan Brenman, a psychologist, who will talk

20    about the likely impact and effect that their parents

21    murder will have on Dvir and Yishai.

22            THE COURT:  Fine.  Thank you.

23            MR. STRACHMAN:  Thank you.  Doctor.

24            THE CLERK:  Do you affirm that all the

25    testimony you are about to give in the case now before

1    the Court will be the truth, the whole truth and

2    nothing but the truth, and this you do affirm under the

3    pains and penalties of perjury?

4    　　　　　THE WITNESS:  I do.

5    　　　　　THE CLERK: Could you please state your name

6    and spell your last name for the record?

7    　　　　　THE WITNESS:  Alan Friedman.   A-L-A-N

8    F-R-I-E-D-M-A-N.

9    　　　　　THE CLERK:  Thank you.  You may be seated.

10   　　　ALAN FRIEDMAN, PLAINTIFF WITNESS, SWORN

11   　　　　　　　　DIRECT EXAMINATION

12   BY MR. STRACHMAN:

13   　　　　　MR. STRACHMAN:  Your Honor, since

14   Dr. Friedman's presentation will be somewhat graphic,

15   the family would like to be excused for his testimony.

16   　　　　　THE COURT:  The family may be excused, and

17   anyone else who wishes to leave the courtroom may be

18   excused at this time.

19   　　　　　MR. STRACHMAN:  Thank you.

20   　　　　　THE COURT:  You may proceed.

21   Q.   Doctor Friedman, where do you live?

22   A.   I live in Jerusalem, Israel.

23   Q.   And what is your profession, sir?

24   A.   I'm am physician --

25   　　　　　THE CLERK:  You have to speak into the

1    microphone, please.

2    A.    I am a medical physician.

3    Q.    And what is your education?

4    A.    I went to Yeshiva University in New York City.

5    Followed that with going to Albert Einstein College of

6    Medicine in the Bronx, New York.  Following that, I did

7    an internal medicine residency at North Shore

8    University Hospital in Manhasset, New York, for which

9    I'm board certified in internal medicine by the

10   American Board of Internal Medicine.  Following that, I

11   did a three year residency in physical medicine and

12   rehabilitation at the Kessler Institute for

13   Rehabilitation, University of Medicine and Dentistry,

14   New Jersey.  Again I am board certified in physical

15   medicine and rehabilitation by the American Board of

16   Physical Medicine and Rehabilitation, which is referred

17   to as PM&R.

18   Q.    Now, you have a copy of your resume?

19   A.    No, I don't.

20          MR. STRACHMAN:  May I approach the witness,

21   your Honor?

22          THE COURT:  You may.

23   Q.    Thank you.  Doctor Friedman, I'm showing you

24   what's been marked as Exhibit 4, can you tell us what

25   that is?

1    A.    This is my resume.

2    Q.    You prepared that?

3    A.    Yes, I did.

4            MR. STRACHMAN:  Your Honor, we ask this be

5    marked as a full exhibit?

6            THE COURT:  It may.

7    (Plaintiff's Exhibit 4 was admitted as a full exhibit.)

8    Q.    Now, Doctor Freidman, in connection with your --

9            THE COURT:  Excuse me, Mr. Strachman.  I

10   granted your permission to have that marked as a full

11   exhibit.  Has it been given a designation as A or 1 or

12   something?

13           MR. STRACHMAN: I apologize, your Honor.  I'm

14   sorry, Exhibit 4.

15           THE COURT:  Exhibit 4.

16           MR. STRACHMAN:  Correct.

17           THE COURT:  Thank you.

18           MR. STRACHMAN:  I provide your Honor a

19   packet.  The packet has tabs.  Each of the tabs are

20   tabbed consistent with the way the exhibits have been

21   marked.

22           THE COURT:  All right.

23           MR. STRACHMAN:  I apologize for not

24   explaining that.

25   Q.    Doctor, in connection with your training, have you

```
 1   become licensed in any place?
 2   A.    I am licensed in the State of New York, the State
 3   of New Jersey, as well as Israel.
 4   Q.    You speak Hebrew?
 5   A.    Yes, I do.
 6   Q.    Are you fluent?
 7   A.    Yes.
 8   Q.    Okay.  In connection with your education, have you
 9   done any teaching?
10   A.    Yes, I have.  First as part of any residency, the
11   senior residents are responsible for teaching medical
12   students and the more junior residents.  In addition,
13   as an attending physician, meaning one who is
14   practicing medicine, one de facto teaches the residents
15   that are still working on the wards, as well as other
16   physicians, and at Hadassah University where I work,
17   it's a training program and I do have roles for
18   teaching residents there.
19   Q.    And do you have any experience with trauma
20   victims?
21   A.    Yes, I do.
22   Q.    Describe that experience?
23   A.    Well, unfortunately, a significant amount of what
24   I do entails dealing with trauma victims.  Part and
25   parcel of any PM&R residency deals with trauma both
```

1    blunt and penetrating.  More recently, working at
2    Hadassah Hospital in Jerusalem, unfortunately I've been
3    seeing many trauma victims, more penetrating, dealing
4    with gunshots, explosions, terrorist activities.
5    Q.    And, are you familiar with and treated people with
6    brain injuries?
7    A.    Yes.  Let met explain a little bit more what PM&R,
8    or physiatry entails.  Perhaps this will answer some of
9    your questions a little bit more.  I try to almost
10   define it as two fields, the rehabilitation part of it
11   is the one end of the spectrum in which we deal with
12   more chronic long term injuries such as strokes, the
13   post trauma victims, spinal cord injury, traumatic
14   brain injury, chronic diseases such as Parkinson's
15   disease.  The second half of that, which is the
16   physical medicine realm, almost deals with the total
17   opposite end of the spectrum which is anything
18   orthopedic other than surgery where you're trained in
19   conservative management.  This entails injuries to the
20   back, to the neck, to the limbs, nerve injuries, muscle
21   injuries, and also entails what I refer as peripheral
22   neurology more so than central neurology, meaning the
23   peripheral nervous system supplying the rest of the
24   body other than the brain.  Obviously we do deal with
25   the brain also when we deal with stroke and head

1   trauma.  But neurologists also spend a lot more time

2   dealing with seizures, which we don't normally get

3   involved in.

4   Q.   Do you have any areas of specialization?

5   A.   I specialize -- much of what I do is diagnostic

6   work on peripheral nerve injuries and limb pain and

7   dysfunction, as well as pain management.

8   Q.   Could you tell us what that involves?  What does

9   pain management mean?

10  A.   Pain management -- what I do is the noninvasive

11  pain management.  Just as a parenthetic comment, much

12  of what gets included under the rubric of pain

13  management in this country, when people hang their

14  shingles they're referring to invasive pain management

15  which includes a lot of epidural injections and

16  specific injections, or minor surgical procedures.  I

17  do not deal with the invasive end of it.  What I deal

18  with more is the conservative pain management which is

19  more essentially finding an effective medicine regimen

20  that controls people's pain.  And again this takes

21  awhile to evaluate.  First you have to understand

22  what's causing the pain, where it's coming from, and

23  then a trial basis, and trial and error quite often,

24  finding the proper regimen.

25  Q.   And did you just describe then, or is that

1    separate from -- strike that.  I'm sorry.  When you

2    treat people who have suffered acute injuries, do you

3    come up with something called a rehab plan?

4    A.    Yes.  Again, this is more in the inpatient side or

5    people who have just been released from a rehab unit,

6    but our rehab plan is a comprehensive plan which really

7    entails -- it's a multi specialty approach.  We take

8    the initial trauma report, for instance, in a trauma

9    case, we take the initial trauma report, I would take

10   what has been done for the patient since that time, and

11   where the patient is functioning now, then combining

12   that history with the patient's current complaints and

13   their function, arrive at a plan which entails physical

14   therapy, occupational therapy, sometimes speech therapy

15   if needed, as well as social services, and usually

16   psychological help.

17   Q.    And in the current text of -- in the context of

18   your work, did you say you review trauma reports?

19   A.    Quite often.

20   Q.    Why is that important?

21   A.    Well again, if somebody is involved in a

22   traumatic -- has a traumatic injury, and they then

23   arrive -- for me to arrive at a rehab plan, I need to

24   know exactly what happened to them and how this is

25   impacting on their function.  The key word in rehab is

1    function, and just because, for instance, somebody may

2    have shattered a bone and had a fracture, and then the

3    surgeons plated that fracture or casted it, it doesn't

4    tell me anything about the function or how the injury

5    happened so that I can actually try to figure out

6    specifically what injuries they may have had, and that

7    are now going to impact on their function which did not

8    necessarily impact on what the first line of treatment

9    may have been.

10           MR. STRACHMAN:   Your Honor, at this time I

11   would ask that the witness be qualified as an expert in

12   trauma medicine and the treatment of people who have

13   suffered trauma.

14           THE COURT:   Granted.   The Court so rules.

15           MR. STRACHMAN: Thank you.

16   Q.   Now, Doctor Friedman, in preparing for your

17   testimony today, have you reviewed any documents?

18   A.   I have.   I have reviewed, in Hebrew, the reports

19   prepared by Doctor B. Leavey of the Greenberg Institute

20   of Forensic Medicine.   Essentially, examination of the

21   bodies, both -- there's a report both on Yaron Ungar

22   and Efrat Ungar that I reviewed.

23   Q.   You reviewed both of them?

24   A.   I reviewed both of those in Hebrew.   There is

25   subsequently a translation of Yaron's examination.   I

1  reviewed that in English and compared it to the Hebrew,

2  and the two are consistent with each other.  In

3  addition, I've reviewed a translation of the police

4  report and have received pictures of the police scene

5  and the crime scene and the examination of the bodies.

6  Q.    Okay.  You also have a copy of the crime scene

7  picture board?

8  A.    Yes, I do.

9  Q.    And that's in the original Hebrew?

10  A.    That is in Hebrew, correct.

11        MR. STRACHMAN:  Your Honor, at this time I

12  would ask that Exhibits 1, 2 and 3 be entered as full

13  exhibits.  They were provided, your Honor, by the State

14  of Israel Directorate of the Courts to us, and I would

15  ask that -- they're self-authenticating.  We have

16  translations, as well.  They are attached to the

17  exhibits, your Honor.

18        THE COURT:  All right.  They may be marked

19  as full exhibits.

20        MR. STRACHMAN: Thank you.

21  Q.    Now you said that Doctor Leavey prepared, I think

22  you said, a forensic report.  Is that how you

23  characterized it?

24  A.    Essentially what it was is an external examination

25  of the body.  There was no internal post-mortem or

1    autopsy performed.

2    Q.    And is that standard in Israel?  Is that the

3    practice?

4    A.    The practice in Israel is not to do an internal

5    autopsy unless there is a specific question of a

6    criminal act for which they're trying to determine the

7    cause of death.

8    Q.    Is there any reason -- okay.  Excuse me.  And in

9    your review of these records, have you determined how

10   the injuries to Yaron were sustained?

11   A.    Yes.  By essentially piecing together both the

12   examination of Doctor Leavey and the pictures and the

13   actual writing of the police report, one can piece

14   together almost what happened, or exactly what

15   happened.

16   Q.    Can you tell us -- can you tell us what happened?

17   A.    Yes.  It appears that while the Ungars were

18   driving along in their car, another -- the terrorists,

19   the shooters, drove up behind them, and as they start

20   passing the car on the left side, which is the driver's

21   side, they start shooting.  They get to that because

22   the only bullet -- entries of bullet signs on the back

23   side of the car are on the left, the far left side of

24   the back windshield, which leads me to conclude that

25   they did not start shooting until they started pulling

1    alongside to the left and started shooting at the car

2    at that point.

3    Q.    Excuse me.  Are you referring to anything

4    specific?  Are you referring to the crime scene picture

5    boards?

6    A.    There is a crime scene picture board.

7    Q.    Is that number 11?

8              MR. STRACHMAN:  Your Honor, referring to the

9    large --

10   A.    Yes, 11 and 12.

11             MR. STRACHMAN: Referring to the large

12   picture boards that were provided.  The original is

13   with your Honor, as well as with the clerk.

14             THE COURT:  That's contained in the envelope

15   marked Number 1?

16             MR. STRACHMAN: Yes, your Honor.

17             THE COURT:  And you're on which?

18             MR. STRACHMAN: Number 11, Judge, which is

19   the sixth sheet.

20             THE COURT:  Are these individual sheets

21   numbered or pagenated?

22             MR. STRACHMAN: They are not, Judge, and we

23   did not want to -- you'll see the numbers on the right,

24   Judge, next to the pictures.  We did not want to tamper

25   with the -- they did not come to us from the Government

1   that way, but if I could, your Honor, it's right here.
2   Those are the picture numbers.
3          THE COURT:  Mr. Strachman, I'm going to ask
4   you to look at my copy and locate the documents you're
5   trying to direct my attention to.
6          MR. STRACHMAN: A translation, your Honor, of
7   the captions of each of those pictures are Exhibit 2.
8          THE COURT:  All right.
9   Q.   Now -- I'm sorry, Doctor, continue and tell us how
10  the bullets followed?
11  A.   So then as they start passing the car, coming back
12  along the driver side from the back, the report states
13  there were 6 bullets in the left back window, which
14  would be the back seat window on the driver's side.
15  Some of these appeared to have struck Efrat Ungar
16  directly in the back of the head.  This would be based
17  on pictures Number 15 and 16 in which the police have
18  placed a straight rod through these -- some of these
19  bullet holes straight through the driver's headrest.
20  There's also consistent with the examination report on
21  Efrat that she sustained large wounds in the back of
22  the head and the base of the head, through which her
23  brains essentially left her head.
24  Q.   Those are the pictures in 15 and 16?
25  A.   Yes.

1    Q.    She was driving the car?

2    A.    Yes.

3    Q.    Okay.

4    A.    That would be consistent with her wounds in that

5    case.

6    Q.    And what happened next?

7    A.    Well, as they seemed to approach now the driver's

8    side window, the police report states that there are 16

9    shots that come through this left, essentially the

10   driver's window.  These ones that are alongside of

11   them, again picture number 19 now.  Many of these shots

12   are now perpendicular to both the driver and the

13   passenger in the front passenger seat.  It seems that

14   Yaron suffered wounds to a number of body parts.  The

15   first would be the left forearm and elbow region, which

16   again would be consistent with one of these shots that

17   come through those windows since he's sitting on the

18   right side of the car where his left hand would be

19   facing closest to that window.  The arm is shot, and

20   there are a number of open holes, large holes, through

21   which lacerated and somewhat macerated muscle

22   protrudes.  In addition, there is a picture of his

23   left, most likely his radius.  I believe the pathology

24   report specifically said the radius, or one of the two

25   forearm bones protruding through his skin.  So he was

```
 1   shot through these bones.  And this essentially came

 2   through the -- through the skin.

 3   Q.   Those are the first injuries that he received?

 4   A.   Those were amongst the first injuries that he

 5   received, yes.

 6   Q.   Now pictures of those injuries, they're contained

 7   in the supplemental package that is Exhibit 1?

 8   A.   I don't have an exhibit number but, yes.

 9   Q.   Excuse me, Exhibit 3.

10            MR. STRACHMAN:  These are supplemental

11   pictures, your Honor, that were provided to us.  The

12   pictures that are in the back are fairly graphic as to

13   the specific injuries.

14   Q.   Now after -- so the first -- amongst the first

15   injuries that he received were the injuries to the

16   arms, is that right?

17   A.   It would appear so.

18   Q.   Okay.  And were those injuries the cause of his

19   death?

20   A.   No.  The pathologist actually states specifically

21   that despite the amount of destruction and the large

22   size of the wounds, there's relatively little bleeding

23   which would indicate that no large blood vessel was

24   struck and therefore the only way that he could really

25   have died from the wound to the arm would be bleeding
```

1    to death, and there's no evidence to support that there

2    was a large amount of bleeding.

3            THE COURT:  Excuse me, Mr. Strachman.

4    Doctor, how do you conclude, or what do you base your

5    opinion that was among the first wounds that he

6    sustained?

7            THE WITNESS:  It just seems to follow the

8    path of the way they state that the wound came in.  The

9    fact that he was sitting there.  Perhaps he raised his

10    arm up to protect himself instinctively, but it came

11    through on his left arm whereas the later wounds that

12    he would have received through the -- from the front

13    most likely would not have struck him on the side in

14    the arm.  It's almost on the back side of the --

15            THE COURT:  Would you hold your arm up and

16    show me where the entry wound of that particular wound

17    is that you are describing?

18            THE WITNESS:  Okay.

19            THE COURT:  Hold up your arm.

20            THE WITNESS:  Okay.  The wound is on the

21    back side here.

22            THE COURT:  Okay.  Thank you.  Slightly

23    beneath the elbow?

24            THE WITNESS:  Slightly beneath the elbow.

25    There's one here and apparently one of them -- sorry,

```
 1   upper.  A little bit lower.  But on this part of the
 2   arm.
 3              THE COURT:  Is the wound through and
 4   through?
 5              THE WITNESS:  No.  What you mean, go through
 6   to the other side?
 7              THE COURT:  Entered on one side and exited
 8   on the other side of the arm.
 9              THE WITNESS:  It doesn't appear to be.
10              THE COURT:  Thank you.  You may resume,
11   Mr. Strachman.
12   Q.   Was he conscious when that happened, or subsequent
13   to that, sustaining that injury?
14   A.   Yes.
15   Q.   And would he have been in pain because of that
16   injury?
17   A.   Tremendous amount of pain.  From -- everybody has
18   a different level of pain, but fracturing a bone is a
19   tremendously painful thing.  Muscles have their own,
20   and skin for sure has its own sensory innovation, and
21   this causes -- any traumatic penetrating vein causes
22   pain, the body's natural response.  Such a large amount
23   of trauma would undoubtedly cause pain.
24   Q.   What was the next injury that he sustained?
25   A.   It appears that he rotated himself towards the --
```

1    towards the driver's side almost looking as to what's
2    happening, undoubtedly sees his wife has been shot.
3    The reason I say this is because there's a -- there are
4    14 shrapnel wounds to the chest, the largest of which
5    -- although the pathologist does not say that it's a
6    bullet, it's at the very least a large piece of
7    shrapnel that comes directly through to the right side
8    of the chest, front to back.  The bullet wounds in the
9    windshield were at a slight left to right angle, so
10   that the only way he could really have been shot
11   directly front to back would be if he faced the bullet
12   wounds that are perpendicular to the car, which would
13   have required him turning and facing the driver's side
14   window.  This would almost be consistent with what
15   anybody would do.  You hear shots coming from your left
16   side you would turn to see what happened and,
17   therefore, he takes an almost direct front to back shot
18   in the right side of the chest.
19   Q.    And did that injury, did that wound that -- was
20   that the cause of death?  Would that have caused him to
21   die?
22   A.    Not immediately.  It could have had that -- again,
23   the pathologist does not say that it is a bullet wound
24   which would definitely have penetrated deep and perhaps
25   punctured the lung which could cause death in anywhere

1    from 15 to 30, maybe even more minutes than that.  So

2    even if it did penetrate deep and puncture the lung, it

3    would not have caused him death immediately.  And if it

4    did not penetrate the lung, then it would not be a

5    fatal wound.

6    Q.    And he was conscious at the time then that he was

7    struck; is that right?

8    A.    Yes.

9    Q.    And would he be conscious afterwards?

10   A.    Yes.

11   Q.    How do you know that?

12   A.    This is not striking any of his vital organs.

13   Again, somebody -- let's take the more extreme position

14   that it penetrated and punctured his lung, well people

15   walk into the emergency room with punctured lungs.

16   Even people who have traumatic chest wounds are

17   conscious.  It didn't hit his heart because it's on the

18   right side of his chest, so there's no evidence that he

19   would have bled out immediately from that.

20           THE COURT:  Excuse me, Mr. Strachman.  When

21   you say, Doctor, that you're not sure, cannot tell from

22   the autopsy report whether the wound was made by a

23   bullet or by a piece of shrapnel, where would the

24   shrapnel have come from?

25           THE WITNESS:  The bullet casing or -- he

```
 1   mentions that it's metallic, so presumably a bullet
 2   casing, which is presumably a bullet wound.
 3            THE COURT:  So you're indicating that you
 4   believe that he, in fact, was referring to a bullet
 5   wound?
 6            THE WITNESS:  I believe that it was a bullet
 7   wound, but whether it's the head part -- there is a
 8   picture of part of the lower case of a shell embedded
 9   in a piece of glass.  It could have been something like
10   that.  My understanding is that it is a bullet.
11            THE COURT:  Thank you.  Excuse me,
12   Mr. Strachman, I see it's 11:15.  We normally take a
13   ten minute break mid morning, so I think we'll do that
14   now.
15            THE CLERK:  All rise.
16        (R E C E S S)
17            THE CLERK:  All rise. You may be seated.
18            THE COURT:  You may resume, Mr. Strachman.
19            MR. STRACHMAN:   Thank you, your Honor.
20   Q.   Doctor Friedman, we're talking about this chest
21   wound that Yaron Ungar sustained, can you tell me was
22   he conscious when he sustained that injury?
23   A.   Yes, he was.
24   Q.   And how do you know that?
25   A.   Again, because up until that time, he had not
```

1    received anything that would have been a fatal wound or
2    something that would have hit his -- the senses that
3    control consciousness.
4    Q.    And is there a way you can sort of describe or
5    analogize the type of pain he might have felt receiving
6    that injury?
7    A.    The chest wound?
8    Q.    The chest wound, right.
9    A.    Yes.  Pictures are always worth a thousand words.
10   Imagine if you got hit in the chest with a baseball
11   bat.  Everybody, I think, has the experience of having
12   been hit in the solar plexus at some point, and if you
13   could just remember back to the amount of the sort of
14   panic that takes, just trying to catch your breath, so
15   you start breathing again, then you can just multiply
16   that.  That discomfort feeling impact -- again go back
17   to the baseball bat analogy, there's that searing pain
18   that you would be feeling.  So you have to this thing
19   -- granted he's not being hit in the solar plexus but
20   he's taking a solid whack to his chest.  And again, the
21   chest has a lot of nervous innovation there, tremendous
22   pain.
23            THE COURT:  Doctor, when you say that was
24   the next wound he received, how do you know that's the
25   next wound he received?

1    THE WITNESS:  It makes sense, and again

2    putting together the police report and the -- and the

3    pathology report.  It is conceivable that there was a

4    wound on the right hand, that that occurs almost

5    simultaneously when he turns around, or a second before

6    or a second after, but this is the next large wound

7    that he takes.  It just makes sense, judging it based

8    on the pictures and the police report and the pathology

9    report.  There can't be any other way because again he

10   has to turn around and take -- and get this chest wound

11   on the right side, front to back.

12         THE COURT:  Was there a head wound?

13         THE WITNESS:  There is a head wound.

14         THE COURT:  Why couldn't the head wound not

15   have occurred before the chest wound?

16         THE WITNESS:  The trajectory of the bullet

17   doesn't make sense that that would have occurred first.

18   The trajectory of the bullet on the head wound travels

19   up on the left side of the face.  It doesn't cross over

20   mid line.  So if he was sitting, and it travels

21   upwards, so if he turns towards the driver, the

22   driver's side, he's getting shot front to back.  He's

23   not getting shot bottom to top.  That wouldn't make

24   sense.  And if they're shooting him and they're coming

25   in perpendicular, it would have crossed the mid line.

1  It would have crossed over to the right side of the

2  head, and it doesn't.  It only goes straight up the

3  left side.

4          THE COURT:  Well, if he turned to the left

5  and put his left arm back and he was struck first in

6  the back of his arm, could the impact of that bullet

7  have turned his body backwards tilting his head

8  backwards, which would -- if the next wound that -- the

9  next bullets that then impacted were in the head, would

10  that be consistent with that trajectory?

11          THE WITNESS:  It wouldn't necessarily -- it

12  might throw him, but it wouldn't necessarily throw him

13  back or almost tilt his neck backwards like that.  It

14  might jolt him somewhat but it wouldn't throw him all

15  the way backwards.  And again, you then have to

16  understand how he gets hit in the chest, front to back.

17          THE COURT:  You may resume, Mr. Strachman.

18          MR. STRACHMAN: Thank you.

19  Q.  And subsequent to that chest wound, what was the

20  next injury that he received?

21  A.  The next injury that he receives, and again, he

22  gets hit in the face.  There are -- as the car moves

23  forward, the next -- I'm focusing on the larger wounds

24  here because he gets hit in the face.

25  Q.  Okay.  Can you describe that injury?

1    A.    Yes.   It's best seen in the pictures, which are

2    tremendously graphic.   There is -- the wound that,

3    according to the pathology report, enters on the left

4    side of the nose, travels up towards the base of the

5    eye and fractures the left orbit and enters through the

6    crown or the temple of the head.   Again, staying on the

7    left side of the body.   There is -- as you can see in

8    the pictures, I'm not sure if everybody is looking at

9    this --

10   Q.    Show us which picture you're looking at.

11   A.    This picture.   His brains are hanging out of the

12   left side of his head.

13   Q.    Is that the injury that you believe killed him?

14   A.    Yes, it is.

15   Q.    And why is that?   Why do you feel that way?

16   A.    Again, and this is consistent with the pathologist

17   report that he -- that this is a wound, although not

18   immediately fatal again because it doesn't strike

19   either the areas that control -- it seems more of a

20   frontal wound.   It doesn't hit the respiratory centers

21   in the back -- in the base of the brain, however, it is

22   still a large wound and there are pieces of lacerated

23   brain tissue and there's a shrapnel shell in the brain

24   tissue, that this is a large enough injury that would

25   cause death.

Q.    Now, can you show us on the picture boards?  I
direct your attention to numbers 21, 22, 23.  Can you
tell us if you have any sense as to how that last --
the injury that you just discussed, how that might have
occurred?

A.    Yes.  He gets hit -- at this point he's hit in the
arms, he's hit in the chest.  He's been looking at --
he's seen the cause -- scene of destruction next to
him.  He gets hit in the chest which most definitely
would throw him backwards.  At this point it appears
that he's lying down on the car seat, almost slumped.
And if you look at picture -- well those that you
referred to, 21, 22, there are bullet wounds that --
entry sites into the front windshield that come in at a
low -- at a low angle, but -- see if I can find it.
Okay.  That would certainly be able to come in at that
-- on one side of his face, strike him in the nose and
travel upwards towards the crown of the head.  So that
it does seem that the head wound, as you asked before,
Judge, comes in once already in the front part of the
vehicle.

Q.    So would that be consistent then --

        THE COURT:  Excuse me, Mr. Strachman.  Which
head wound, the head wound to the nose or the head
wound to the left side of the --

1           THE WITNESS:  Same wound.  It's the left

2   side of the wound, left side -- sorry.  Left nose.

3   Left side of the nose up towards the eye, coming out

4   the left side of the head.

5           THE COURT:  Thank you.

6   Q.    So is that consistent then with what you said

7   before in terms of if he was struck in the chest from

8   the side when he turned toward his wife, and he would

9   be pushed back against the seat, is that right?

10  A.    Yes.

11  Q.    And then if he was sort of slumped over, or

12  slumped back in the seat?

13  A.    He would need to be slumped back.

14  Q.    Okay.  And if he was slumped back, would his body

15  be pushed that way from the force of the bullets that

16  struck him in the chest?

17  A.    Yes, it would.

18  Q.    And when he's laying, or sort of slumped back in

19  the seat, is what you're saying then is that in

20  pictures 21 and 22, the sort of lower bullets, if you

21  will, some of the bullets that are lower down on that

22  windshield, those are the bullets that would likely

23  have struck him in the face?

24  A.    Yes, they are.  More probably than not.

25  Q.    Those are the ones that would have killed him?

A.    Yes.

Q.    And did he receive -- along the way, did he receive any other injuries, any notable injuries?  Was there an injury to the neck?

A.    There was an injury to the neck which comes along the left side of the neck laterally, so not in the middle where the trachea or the air pipe is or the spinal cord is.  It's to the side of the vertebral column, going through the muscles of the neck.  That's on the left side.

Q.    Now, when -- would the injury to the neck, would that have killed him?

A.    No, it would not.

Q.    And why is that?

A.    Again, as I said, it does not travel through the air pipe.  It doesn't -- it's to the side of the neck so that it doesn't -- wouldn't cause him to bleed to death.  There's not a lot of blood in the pictures there, and it's more in an area of muscle, so it would be extremely painful.  It's not near the spinal cord, and it's not near again respiratory control centers.

Q.    So, would that have caused him pain?

A.    Yes, it would.

Q.    And can you describe that pain?

A.    Umn, similar to much to what I described before.

1    If you take a -- if you get, excuse the terminology,

2    whacked with a bat or with a fast traveling heavy

3    object, into you, as bad as it will be in the chest,

4    the neck is less bony support, less muscle support, and

5    therefore it would be that much more painful.

6    Q.    Would that have caused him to become unconscious?

7    A.    No.

8    Q.    How do you know that?

9    A.    It would be a traumatic, traumatic injury, not

10   unlike one to the arm.  It doesn't -- it doesn't strike

11   at anything that controls his vital organs.

12   Q.    By this time, in other words, after he sustained

13   the injury to his arms, his chest, and his neck, were

14   all of his vital organs operating?

15   A.    Yes.

16   Q.    He was still breathing?

17   A.    He was still breathing.

18   Q.    I'm sorry?

19   A.    Just to anticipate a question, as mentioned

20   before, even had his lung been punctured, he would

21   still be breathing.

22   Q.    And at this point, up until the head injury, his

23   brain had not been struck; is that right?

24   A.    Correct.

25   Q.    And the injury even to the neck did not strike the

1  stem of the brain?

2  A.    Correct.

3  Q.    And his heart had not been struck.

4  A.    Correct.

5  Q.    And so none of his vital sort of functions were --

6  had stopped; is that right?

7  A.    That is right.  None of his vital organs have been

8  compromised at this point.

9  Q.    Now the last injury, I think you described it

10  previously, in terms of the Judge's question, the last

11  injury, could you describe that to us, how that

12  happened?

13  A.    The head injury?

14  Q.    The head injury.

15  A.    I thought we had already described that.

16  Q.    Okay.

17  A.    He's -- essentially the way I see this is he, as

18  described before, he turns, he gets hit in the chest,

19  straight on blow, he's hit in the arm, he's turned over

20  and slumped.  He's now back on his chair, slumped back,

21  and he gets hit in the face with the bullet that

22  travels up and exits through the brain.

23  Q.    And would he be unconscious at that point?

24  A.    At the point that he got shot?  No.

25  Q.    Okay.  Would he be unconscious following the shot,

1  sustaining that shot?

2  A.    At some point, yes.

3  Q.    And --

4  A.    How long it takes, unclear, but at least for -- it

5  again doesn't hit any of his areas controlling

6  consciousness.  So he would be conscious for at least

7  30 seconds, on the conservative side.  Beyond that,

8  it's hard to say.

9  Q.    And that's 30 seconds after?

10 A.    After taking the hit, yes.

11 Q.    Taking the hit.

12 A.    Yes.

13 Q.    And do you have an opinion as to a reasonable

14 degree of medical certainty as to how long this

15 happened?  In other words, from the beginning of the

16 first shots until that last shot occurred?

17 A.    Yes.  It seems that the car with the shooters is

18 passing their car with the intent of firing in and

19 causing as much damage. You can see that there are

20 shots that are -- more than one shot that is

21 perpendicular, so it's clear that the shooter's car is

22 not zooming past.  From the time that he hears the

23 first shot, and until the time that they have shot into

24 the back window, he's now presumably thinking that

25 they've shot his child, that they shoot into the front

1  window, they've killed his wife, he's seen that.  They

2  pass in front of the car.  He's been hit a number of

3  times.  They pass in front of the car and shoot him.

4  We're talking, this has to take, even as a conservative

5  estimate, at least 3 minutes from start to finish that

6  he knows what is going on, 3 to 5 minutes, maybe even

7  more.

8              THE COURT:  Your testimony, Doctor, is that

9  you believe that from the first shot being fired to the

10  end of the last shot being fired is 3 to 5 minutes?

11             THE WITNESS:  I'm sorry.  From the first

12  shot being fired to the last shot being fired, I'm

13  sorry, is -- has to be less than 3 to 5 minutes.  It's

14  probably about 30 seconds to a minute.  I'm sorry.  I

15  was thinking something else.

16  Q.    And why do you say it took that length of time?

17  A.    The 30 seconds?

18  Q.    Yes.

19  Q.    Because they have to -- they start shooting.

20  They're passing the car at the left side, not at top

21  speed because again they're bullets -- there are a

22  number of bullets are come in perpendicular, which

23  shows that they are at least alongside them for a few

24  seconds, and then they pass in front of them, and they

25  continue shooting, and that takes time.

1    Q.   And do you have an opinion as to a reasonable

2    degree of medical certainty as to how long Yaron would

3    have lived following -- having sustained the bullet to

4    the head?

5    A.   Following the bullets in the head?

6    Q.   Right.

7    A.   It's difficult to say but again, conservative

8    estimate, a few minutes following bullets being shot in

9    the head until he dies.  There is evidence of a dying

10    process.  The pathology report mentions that his eye,

11    his pupils are dilated different sizes.  One is

12    5 millimeters on the right side, on the left side is

13    6 millimeters.  Compare that to his wife whose was

14    3 millimeters, and again she died instantly.  There are

15    a number of processes which will cause this all related

16    to brain swelling that would dilate the pupils because

17    the swelling on the brain squeezes down on the nerve

18    that supplies the eye and controls the pupil.  Again on

19    the left side, again the pupil is somewhat more dilated

20    than on the right side, which would indicate that the

21    swelling was worse on the left side of the brain, which

22    is again consistent with these wounds.  But in any

23    event, that shows that there is a dying process, that

24    this did not happen immediately and this takes time to

25    develop, brain swelling.

1    Q.    Now from the time he sustained the last injury

2    until he actually died, that 3 to 5 minutes, do you

3    know if he was conscious?

4    A.    It's difficult to say how long he was conscious

5    for after he got shot in the -- in the head.  It's 3 to

6    5 minutes, which is what I thought you had asked me

7    before.  I confused the question.  3 to 5 minutes is

8    probably from the time that he starts hearing them

9    shooting until the time that he dies, as a conservative

10   estimate, however, how long he's conscious after he is

11   shot in the face, it's difficult to know.

12   Q.    In other words, you can't give us -- you can't

13   tell us that from the time he sustained the fatal head

14   wound, and after that, that he would be conscious; is

15   that right?

16   A.    That is correct.

17            THE COURT:  Did I understand you earlier to

18   indicate that you thought perhaps conservatively 30

19   seconds after he sustained the head wound he'd lose

20   consciousness, or did I misunderstand that, Doctor?

21            THE WITNESS:  I was confused.  I was

22   thinking two different numbers.  That's an estimate,

23   but I cannot substantiate.  I was actually focusing on

24   a different thing in my mind.  I apologize.  I cannot

25   give an exact number to time as to how long he was

```
 1    conscious for.
 2                 THE COURT:  But your estimate is that he
 3    would have died 3 to 5 minutes after receiving the head
 4    wound?
 5                 THE WITNESS:  No.  I believe he asked me
 6    after hearing the shots fired, a number of minutes.
 7    Again, 3 minutes is a conservative estimate how long he
 8    would die after he suffered the head wound.
 9                 THE COURT:  Is it likely that he would --
10    it's a reasonable assumption that he would have lost
11    consciousness prior to dying at some point?
12                 THE WITNESS:  Correct.
13                 THE COURT:  And he would continue to have
14    been alive for some period of time prior to dying?  He
15    would have continued to be unconscious for some period
16    of time prior to dying, is that a reasonable
17    assumption?
18                 THE WITNESS:  Yes.
19                 THE COURT:  You may continue, Mr. Strachman.
20    Q.    Just to clarify, we're not saying -- you're not
21    saying that from the time he was struck with that last
22    bullet he was conscious.  You can't come up with a
23    figure; is that right?
24    A.    I cannot come up with a figure.
25    Q.    Okay.  And you're saying, just so we're clear,
```

1  you're saying that from the time he's struck with that

2  last bullet, you believe he may have lived unconscious

3  for 3 to 5 minutes?

4  A.    Yes, I am.

5  Q.    And is that pretty clear that he would have lived

6  during that period of time?

7  A.    Yes.

8  Q.    Okay.  From the time that the first bullets came,

9  struck his wife, until the time he sustained the last

10  bullet to the head, is that the period that you

11  described as 30 seconds?

12  A.    Yes.  Not necessarily the first bullet that hits

13  his wife, the first bullet that's fired at the car.

14  Q.    Okay.  So from the beginning of this attack, until

15  he becomes unconscious with that last bullet, you

16  believe that's approximately 30 seconds?

17  A.    Yes.

18  Q.    And during that time, he sustains the four major

19  injuries, right?

20  A.    Yes.

21  Q.    The other injuries that you said referred to, as I

22  think you referred to them as less significant, but

23  other --

24  A.    Yes.

25  Q.    And his wife was killed?

1    A.    His wife was killed next to him.

2    Q.    She was killed instantly?

3    A.    She was killed instantly.

4    Q.    And she was killed by that bullet that struck

5    through the seat of her car?

6    A.    Yes, sir.

7    Q.    The headrest of her car?

8    A.    Yes.

9    Q.    And that's shown in that trajectory?

10    A.    Trajectory through the -- from the back window

11    through the headrest.  There's 2 bullets they put rods

12    through that show coming through that back window in

13    through the headrest.

14    Q.    And Yaron Ungar's son Yishai, Y-I-S-H-A-I, was in

15    -- was in the car?

16    A.    There was a car seat in the car.

17    Q.    He was not injured in that -- in this incident; is

18    that right?

19    A.    Umn, there is no report that I have that indicates

20    he was.

21    Q.    Okay.

22              MR. STRACHMAN: I believe that's all, your

23    Honor.

24              THE COURT:  Do you have any training in

25    crime scene investigation, doctor?

1          THE WITNESS:  No, I do not.  However, much
2     of what I do is, again as we touched upon this earlier,
3     is taking a trauma report and piecing together what
4     happens and determining the treatment plan.
5          THE COURT:  Do you know whether or not the
6     car the victims were riding in speeded up prior to the
7     first shot being fired?
8          THE WITNESS:  No.  However, again she's shot
9     in the head, in back of the head twice, immediately.
10    Nobody can know if they sped up or they slowed down.
11    If she's driving, and she's dead, it could be that the
12    foot hits the accelerator and they speed up, or that
13    her car, her foot falls off the gas pedal and they slow
14    down.  I have no clue.
15         THE COURT:  All right.  Have you concluded,
16    Mr. Strachman?
17         MR. STRACHMAN: Yes, your Honor.
18         THE COURT:  Thank you, Doctor.  You're
19    excused.
20         MR. STRACHMAN: Your Honor, at this point I'd
21    move for Exhibit 5 to be admitted as a full exhibit.
22    That was the forensic report, and that was also
23    provided to us pursuant -- by the the Israeli
24    Government pursuant to the certification that's
25    attached, and that is -- I have the original and also a

```
 1  translation.
 2              THE COURT:  All right.  Granted.  Exhibit 5
 3  is full.
 4              MR. STRACHMAN: Thank you.
 5  (Plaintiff's Exhibit 5 was admitted as a full exhibit.)
 6              MR. STRACHMAN: I'd like call to Adrian
 7  Ziderman.
 8              THE COURT:  Swear the witness, please.
 9              THE CLERK:  Please raise your right hand.
10  Do you affirm all the testimony you are about to give
11  in this case now before the Court will be the truth,
12  the whole truth and nothing but the truth, and this you
13  do affirm under the pains and penalties of perjury?
14              THE WITNESS:  I do.
15              THE CLERK:  Will you please state your name
16  and spell your last name for the record?
17      ADRIAN ZIDERMAN, PLAINTIFF WITNESS, SWORN
18                   DIRECT EXAMINATION
19  BY MR. STRACHMAN:
20              THE COURT:  Excuse me, sir.  I'm not sure
21  the tape picked up your voice, also.  The microphone
22  was not in front of you.  Would you spell your last
23  name again?
24              THE WITNESS:  Z-I-D-E-R-M-A-N.
25              THE COURT:  Thank you, Mr. Ziderman.  You
```

1    may proceed, Mr. Strachman.

2            MR. STRACHMAN:    Thank you.

3    Q.    Doctor Ziderman, you are a professor of economics?

4    A.    Yes.

5    Q.    Where do you teach?

6    A.    I teach at Bar-Lian University in Israel.

7    Q.    And where did you go to school?

8    A.    I took my BA in Cambridge, England, MA at Stanford

9    University, and my doctorate at the London School of

10   Economics in the University of London.

11   Q.    And you've been practicing as an economist since

12   when?

13   A.    Since I took my MA, I've had academic and other

14   positions.

15   Q.    When was that?  What year?  You've got to speak up

16   so that --

17   A.    Yes.  I finished my MA in 1963 at Stamford.  I

18   went back to England.  I was working for the economist

19   newspaper as a researcher.  I then went into academia

20   and worked in research institutes at London School of

21   Economics.  I later had academic positions in England.

22   I then moved to Israel after I married an Israeli, and

23   I was at Bar-Lian University, Tel-Aviv University, and

24   I took 4 or so years off to join the World Bank in

25   Washington as their senior economist in human

1  resources.

2  Q.    And do you have a speciality within economics, or

3  concentration within the field of economics?

4  A.    Yes.  My general specialities in labor economics

5  and the economics of education.  More specifically, I

6  work in the fields such as the economics and evaluation

7  of education, manpower training, and financing of

8  education.

9  Q.    And outside of the World Bank, do you have any

10  other experience consulting with organizations?

11  A.    Yes.  Since I left the World Bank, I've been very

12  active in international consultancy.  I'm currently

13  working on projects for the World Bank and for UNESCO.

14  I have also worked for OECD for the British council,

15  for the Asian Development Bank, and other international

16  institutions, and I also have acted as an adviser to

17  many Governments, ministries in Kenya, Mozambique,

18  Tanzania, Thailand, Turkey, South Africa, Zambia, and

19  of course the UK and Israel.

20  Q.    And have you written any books?

21  A.    I've written, -- well, I published 4 books, and my

22  fifth book is now being published by the World Bank.

23  Q.    Okay.  And are they within your field of

24  concentration within economics?

25  A.    They're all within this broader field of human

1    resources, financing education, vocational training and

2    so on.

3    Q.    Have you published any scholarly articles?

4    A.    I published about 65 to 70 articles in scholarly

5    publications, as well as more popular articles in

6    newspapers and magazines.

7    Q.    Those are referee type of articles?

8    A.    Yes.  All those 70 are international referee

9    journals, yes.

10   Q.    And are you the editor of any specific journal?

11   A.    Yes.  I'm the chief editor of the Journal of Human

12   Resources which is international dissimilarly journal

13   in the field of manpower.

14   Q.    Okay.  And is your publishing in English?

15   A.    Yes.  This is a journal that's published from a

16   British publishing company that turns out 150 journals

17   in different fields.

18            MR. STRACHMAN: Your Honor, at this point I

19   would ask that Doctor Ziderman's CV be admitted and

20   also that he be qualified as an expert in economic

21   matters.

22            THE COURT:  Granted as to both.

23            MR. STRACHMAN: Thank you.

24   Q.    Now, Dr. Ziderman, in connection with this case,

25   you were asked to prepare a report; is that right?

1    A.    Yes.

2    Q.    And what was -- what were you -- what did you do?

3    A.    Well, I was asked to prepare a report on the

4    economic losses due to the death of Yaron Ungar, and I

5    saw my task as first of all trying to ascertain what

6    would have been the most probable career pattern.  The

7    problem is, of course, that we're talking about a young

8    man age 26 with many options available to him.  As I

9    had to take a view on what would be his probable career

10   pattern.  The second step would be to estimate what

11   would be his likely earnings in those different

12   positions; and thirdly, we had to convert this stream

13   of earnings into some sort of global present value

14   figure.

15   Q.    Now in connection with your study of the economic

16   losses resulting from Yaron's death, you were given

17   certain information by me and his family; is that

18   right?

19   A.    Yes.

20   Q.    And could you tell us what information you

21   understood in terms of conducting this report -- this

22   study?

23   A.    Well, I understood that Yaron had already embarked

24   upon creating education.  Of course he might have

25   changed direction later on.  He was already a qualified

1    teacher.  He was about to complete his Bachelor of

2    Education degree.  He had already started toward

3    rabbinical ordination, and indeed had written a work on

4    Jewish religious law which was subsequently published

5    after his death.  So this indicated to me that the

6    probabilities were indeed that he would continue in

7    teaching and within the framework of religious

8    education.  What was less clear to me whether he would

9    remain in Israel or perhaps come back to the States,

10   and this was an issue that I dealt with in the report.

11   Q.    Okay.  Now in preparing a report, did you have

12   access to his wage statements, et cetera, indicating

13   his income?

14   A.    Yes.  Of course, being at the outset of his

15   career, we didn't have a lot to go on, but we did have

16   the -- some salary slips from -- relating to the year

17   in which he died, and that's set out in the salary that

18   he then earned as a young inexperienced teacher.

19   Q.    Can you tell us what sources of information or

20   economic data you utilized in preparing your report?

21   A.    Well, I looked at a number of scenarios.  I took

22   what I thought would be the most obvious scenario, that

23   is, what would happen over his career to a young man

24   with his background and potential, that would remain

25   within teaching in Israel.  It's fairly standard that

1   after completing a first degree, a few years later he
2   would then take an MA.  This is pretty standard.
3   Quite likely, he would move on from teaching, possibly
4   to teaching at a teachers training college as a young
5   lecturer.  That's quite -- in his mid 30s.  He'd
6   already started a study towards rabbinical ordination,
7   and I'm quite clear he would complete that, and I could
8   quite see at the age of 40, but later, he could well be
9   a principal of a small Talmudical Yeshivah high school
10  or some institution.  So that marked out for me the
11  career pattern.  The next problem then would be to put
12  in salary figures relating to that.  That was easier
13  because the Ministry of Education in Israel publishes
14  very very elaborate salary tables that are public
15  institutes are required to work with, and so once I
16  knew in my own mind where he would be in his career I
17  could then use these tables to estimate what would be
18  his income on the basis of his academic qualifications,
19  on the basis of his years in the profession, and so on.
20  Q.   Can you tell us the methodology utilized in
21  preparing this report?  How did you go about doing what
22  -- coming up with a calculation of the lost economic
23  benefits?
24  A.   Well, I said, my first step, and this appears in
25  fact in my report in Table 1, was to estimate --

```
 1              THE COURT:  Excuse me, Doctor, which exhibit
 2    are we looking at?
 3              MR. STRACHMAN:  We're referring, your Honor,
 4    to Exhibit 6.
 5              THE COURT:  Thank you.  You may continue,
 6    Doctor.
 7    A.   Yes.  The Table 1 actually continues onto the next
 8    page, and in this table, I see --
 9              MR. STRACHMAN: Excuse me, that's on page 6.
10    A.   Yes.
11    Q.   Is that right?
12    A.   Yes.  In this table, I develop a career
13    development pattern, age by age, and of course one
14    can't be exact, but apart from my own knowledge, I
15    should add that in addition to being a professor of
16    economics I'm also a professor of education.  I teach
17    in the school of education, so I'm aware of the
18    teaching side.  I teach a course in educational
19    planning.  Many of my students are MA students of this
20    type, so I know the sort of careers they pursue.  In
21    addition, I did speak to people, a deputy principal of
22    one of these colleges, to get some confirmation of the
23    way I saw his career pattern, so once I had established
24    a career pattern, I was able to add in the earnings
25    figures which appear in column 4.  We then wanted to
```

1  convert the gross earnings into cash that was actually

2  had in hand, the net earnings, and for this, for the

3  initial year in which Yaron died, we had his salary

4  slips, so we could just take the figure for -- for net

5  of earnings.  We then asked a certified public

6  accountant to provide us with the probable tax,

7  national insurance and health payment deductions.

8  Q.    Did you deduct then in your analysis the taxes?

9  A.    That's right.  Tax compulsory, and that's

10  insurance payments and compulsory health payments, but

11  these -- because you need to have some expertise in tax

12  arrangements, a CPA provided those.

13  Q.    In other words, you were -- when you made your

14  calculation, you came up with net figures, not gross

15  figures; is that right?

16  A.    Yes.  This appears in column 5, and this would be

17  the net salary figure that he'd receive over the year.

18  Q.    Okay.  Now when you conducted -- when you prepared

19  your report, did you assume a retirement age?

20  A.    Yes.  Well, I didn't have to assume the retirement

21  age because this is laid out in ministerial education

22  regulations.  The time is 65, usually.  Of course,

23  Yaron may have had other employments that he could have

24  continued to work, but he would have retired from

25  teaching within ministerial education schools at age

1    65.

2    Q.    Now once you calculated his likely earnings, how

3    then did you complete the task?

4    A.    Well, once we had the earnings stream, we -- we

5    used a process of what we call discounting.  We wanted

6    to know what total sum at the present would be

7    sufficient to release the annual salary figures to

8    disburse year by year the annual salary figures so that

9    at age 76, when we -- which is the -- which is the year

10   in which we assumed Yaron would have died, according to

11   statistical tables from the Government's office.  At

12   the age of 76 then this sum would have been reduced to

13   zero.  So, in other words, you have a present value

14   that a sum would provide sufficient money to pay annual

15   earnings and pension payments up to age 76.

16   Q.    What was the discount rate that you used?

17   A.    Well, we used a 3.5% rate of discount.

18   Q.    And how did you arrive at that figure?

19   A.    Well, it's quite usual to look at the yield on a

20   safe investment, and to take something like Government

21   bonds, and this is what we took the yield on Government

22   bonds.  This is available in the Bank of Israel annual

23   report, and the yield on long term bonds was about

24   5.35 percent.  However, in Israel, these bonds are

25   liable to a 35 percent rate of income tax.  So taking

1    this off, we had a net yield of 3.48 percent which we

2    rounded up to 3.5%, and that was the interest rate we

3    used.

4    Q.    Now, those bonds are taxable in Israel, as you

5    just said?

6    A.    Yes.

7    Q.    They're not taxable in the United States; is that

8    right?

9    A.    Yes.

10   Q.    So in -- and is this -- is this use of this type

11   of figure, this type of discounting figure, and its

12   correlation to Israel Government bonds, is that the

13   common sort of methodology in Israel?

14   A.    This is standard.  This is standard.  You can put

15   -- you can put it another way, if you have -- in order

16   to be sure that you can make these annual payments out

17   of a present value sum, you can't put that money into

18   any risk investment.  You got to be sure the money will

19   be maintained and, therefore, we'll assume that you

20   used a very safe investment in Government bonds, which

21   will yield a lower but safe rate of interest.  So

22   that's why it's usual to take Government bonds.

23   Q.    In other words, when you say it's usual, is it

24   usual in general in economic terms throughout the world

25   to use Government bonds?

1    A.    In these sort of figures.

2    Q.    And is it specifically usual within the context of

3    making projections?

4    A.    Present value.

5    Q.    Israeli present value numbers to use this specific

6    type of bond?

7    A.    Yes, I would say so.

8    Q.    So in other words, you wouldn't use an annual

9    return from the stock market or different type of

10   financial investment?

11   A.    Because it would be risky.  You may find in the

12   end that you're not maintaining your -- I'm sorry, the

13   sum from which you wanted to make your annual

14   disbursements was shrinking.  It's not only the rate of

15   interest, it's maintaining the capital, as well.

16   Q.    Now, you state in your -- in your report, that

17   there are -- the methodology is conservative, and why

18   do you say that?  What's conservative about this

19   report?

20   A.    Well, it's conservative in a number of ways.  Most

21   of the work that I do is not on the individual basis

22   but for Governments, and I have to provide reports that

23   are very firmly based on statistical sources, and I'm

24   pretty sure that they are correct.  So I did an initial

25   calculation in which I assumed, as you said, a

1    conservative scenario, and this would mean that Yaron

2    would have pursued a fairly standard successful career

3    in Jewish religious teaching in Israel. So it's

4    conservative first in terms of sort of career he would

5    have assumed. I didn't add in, for example, the

6    possibility that he would work as a part time Rabbi in

7    Israel. Many senior teachers would combine work with a

8    part time position in Rabbi, half time position. I

9    didn't --

10    Q.    Excuse me. You mean with -- as a clergyman in a

11    congregation, is that --

12    A.    Well, in Israel, we don't so much have Rabbis of

13    synagogues, we have rather district Rabbis, Rabbis that

14    are appointed by the Government, by the Ministry of

15    Jewish affairs to serve as a Rabbi of a city, of a

16    village, a district within the town, and this is the

17    sort of position that many of -- that many people who

18    would be teaching, teaches training college, or

19    Yeshivah would have.

20    Q.    All right. But you did not assume in your

21    calculations --

22    A.    I did --

23    Q.    Let me finish the question, okay, because he's got

24    to take it down. But you did not assume then that he

25    would have any part time employment?

A.    The only assumption I made, which is a very liked one, is that Yaron would have had one-and-a-half positions as a teacher, and that's absolutely standard. The normal -- the official standard workload in Israel is 24 hours, spread over a 6 day working week, and a college teacher 16 hours, and it's absolutely standard for -- to have a job and a half, and that's what I assumed.   Indeed, as a student teacher in 1996, Yaron actually had 1.08 positions, so he already was teaching more.   I should also make clear, the half position doesn't have to be another institution.   You can even have the extra half position at the same institution, and it's quite common.   But apart from that, I assumed that you would not have had other forms of income, which is a pretty strong assumption.

Q.    So did you say that it's common that in Israel for teachers who were working in religious schools to sort of have supplemental type of work, even at their own school?

A.    Oh, yes.   And not only religious teachers, most teachers would have more than one pos -- more than one teaching position.

Q.    And is that a function of the low salaries?

A.    Yes.

Q.    Are the salaries livable?

1  A.    It's the function of those salaries, and also the

2  opportunities, because they are relatively short and

3  you can teach the same subjects in parallel.

4  Q.    And you said that over a 6 day work week, and can

5  you describe what you mean by that?  In Israel, do

6  people work from Sunday to Friday?

7  A.    Well, we've moved towards a 5 day working week in

8  industry, but in teaching it's still teachers work from

9  Sunday through to Friday, with Saturday being the one

10  day off.

11  Q.    So, in other words, children would go to school

12  Sunday through Friday?

13  A.    That's right.

14  Q.    And did you include in your calculations any

15  sabbatical type of arrangements?

16  A.    No.  I -- in Israel, teachers will have a

17  sabbatical every seventh year.

18  Q.    Even elementary type teachers or say teachers

19  college, teachers?

20  A.    It's -- sabbatical leave is quite common in

21  Israel.  The point is that on your sabbatical, you

22  could then take another job, and this is permitted.

23  There are limitations.  I made no assumption about

24  extra income from these sabbatical jobs because it

25  would be purley speculation.  Many -- somebody like

1    Yaron could quite likely have gone to America for that

2    year to teach in a Jewish high school or even work as a

3    Rabbi, but this is speculation.  And although I haven't

4    ignored that possibility, I didn't include that in what

5    I called my conservative estimate.  I wanted the

6    conservative career scenario to be fairly clearly

7    based, strongly based.  I think it's most likely that

8    he would have had extra --

9    Q.    But you didn't calculate for it?

10   A.    I didn't calculate them in the conservative career

11   scenario.

12   Q.    In addition, in Israel, do students -- excuse me.

13   Do teachers in these kinds of schools get contributions

14   to educational funds?

15   A.    Well, it's not only in teaching.  It's quite

16   common for an employer to contribute towards an

17   education fund which is available to the employee to

18   use to attend conferences, to update his general

19   knowledge, but he can also over time, if he doesn't use

20   these fundings, he could take it off his income, over

21   -- if it's within the fund long enough.  So it's a bit

22   flex -- it could be translated into extra income, and I

23   didn't make that assumption here.

24   Q.    And based on your works, have you come to a

25   conclusion as to the lost earnings that Yaron's death

1   has caused?

2   A.   Well, my -- using this conservative career

3   scenario, my conclusion was that the -- the losses in

4   income would have totaled 1,273,028.  That's the way

5   that figures in dollars.

6   Q.   That's American dollars?

7   A.   That's American dollars.

8   Q.   Now is that discounted?  Is that after you've done

9   your discounting?

10  A.   That's the present value of the last stream of his

11  earnings.

12  Q.   Okay.  So, in other words, that's what would be

13  needed in a bank account or annuity such that funds

14  could be paid to replace his income?

15  A.   That's right.

16  Q.   Such that at the time --

17  A.   His income plus his pension, as well, yes.

18          MR. STRACHMAN:  Based on that, your Honor,

19  I'd ask that Exhibit 7 be admitted as a full exhibit.

20          THE COURT:  Did you say Exhibit 7(b)?

21          MR. STRACHMAN:  7, your Honor.

22          THE COURT:  7.

23          MR. STRACHMAN:  And that is Doctor

24  Ziderman's report.

25          THE COURT:  Is it Exhibit 6?

```
 1          MR. STRACHMAN: I apologize.  His CV was --
 2    correct, it's number 6, your Honor.
 3          THE COURT:  Granted as to Exhibit 6.
 4          MR. STRACHMAN:  Thank you.
 5    (Plaintiff's Exhibit 6 was admitted as a full exhibit.)
 6    Q.    Now in addition to the report that you did, there
 7    is prepared a supplemental report?
 8    A.    Yes.
 9    Q.    And that's included along with Exhibit 6 labeled a
10    note on the economic cost of lost parental services?
11    A.    Yes.
12    Q.    Okay.  And you were asked by me to come up with a
13    economic determination as to the lost services caused
14    to Dvir and Yishai as a result of their father's death.
15    Could you describe what you did in coming up with that
16    calculation?
17    A.    Well, of course, there can't be any substitute for
18    the care and love and loss of a parent, but we tried to
19    estimate what would be the market value of these
20    services.  Now, the -- there are two ways in which you
21    could do it.  The first way was simply to list all of
22    these services and then try to find experts that would
23    provide these sort of services.
24    Q.    When you say services, what do you mean?  What
25    kinds of things?
```

A.    Well, let's give some examples.  Getting kids

ready for school, laundry, helping them with homework,

school assignments, sitting with them, giving them

advice, career path of what to study at school,

attending meetings, school meetings with teachers, and

so on.  Now, there is no one occupation that provides

these, so I couldn't go to any particular experts and

say how much do you charge.  So one way could have been

to take each of the services and try to, to -- and cost

them separately, but it seemed more -- again, it seemed

more re -- reasonable to look for the closest

substitute, not a very good substitute, but the closest

substitute.  That would be to see how much somebody who

works in what I call the care section in Israel, people

who work with elderly, nannies, au pairs, how much they

would command in the labor market, and this was the

approach I adopted, and again that's a very

conservative approach because they can't provide all

the services that we have in mind.

Q.    Is it fair to say that it's far cheaper to hire

one person to live in with these kids and take care of

these kids or if you analyze it rather that way, their

grandparents are taking care of them, but if you

analyze it in that way as opposed to hiring a cook to

come for 2 hours a day, and hiring a chef and hiring a

1    laundry person, a driver, is that right?

2    A.    That's right.  It's cheaper.  Clearly the services

3    are less quality but that's obviously more practical

4    way of going about it.

5    Q.    And did you come up with a calculation as to what

6    it would cost to have someone on a full time basis

7    taking care of these children?

8    A.    What we did was to survey a number of agencies in

9    Israel to see what the rates they were paying and, of

10   course, there's a whole range of rates.  Somebody who's

11   just starting off would -- most of these workers

12   actually come from abroad, and somebody who's just

13   arrived in Israel, not familiar with the country, with

14   institutions, would command between 5, $600 a month,

15   but clearly a person of this type would not be useful.

16   We need somebody who can take kids to school and speak

17   to teachers.  The range in this market is from about

18   $500 to say $1,000.  So it seemed to me that we should

19   go to the top of the range, and I assumed indeed that

20   the cost would be $1,000 a month, salary costs.  But

21   there are of course many other costs involved.

22   Q.    What are those?

23   A.    Well, I've outlined them in Table 1 of the note I

24   prepared, annual costs in addition to the salary costs.

25   Of course, the work would require a vacation, holidays,

1    and we'd need replacement for that, so I put in

2    vacation replacement.

3    Q.    How much was that a year?

4    A.    Well, I assumed 21 days, which is three-quarters

5    of a monthly salary, $750.  It's usual to give these

6    workers so-called pocket money.

7    Q.    Excuse me one second, Doctor.  So, in other words,

8    when this individual would go on a vacation, you would

9    need to hire someone to replace them for 3 weeks; is

10   that right?

11   A.    Yes, that would be -- yes.

12   Q.    And then?

13   A.    Then there's pocket money.  That varies from 50 to

14   a hundred Shekels a month, but I took 80 Shekels which

15   seemed to be reliable, say $20.00 a week, which comes

16   out say $1,040 a month -- a year.

17   Q.    You came up with a figure for insurance, is that

18   for health insurance?

19   A.    Yes, but these aren't big figures, $520, but it

20   could be a bit more, bit less.

21   Q.    That's a year?

22   A.    Yes.  Very rough figures.

23   Q.    Okay.  And what is the board and lodging, what is

24   that figure that you came up with?

25   A.    Well clearly we're talking about the live-in

1    arrangement and, therefore, we'd have to provide food,

2    lodging for this worker.  Again, I -- I think I -- I

3    again surveyed a number of ----- to ask how much seemed

4    reasonable.  We took $280 a month as a very reasonable,

5    I think very reasonable figure for food,

6    accommodations, so on.  That gives us --

7    Q.    In other words, the person who's living -- who's

8    performing this function, the family would need to pay

9    for their food, pay for their electricity, utilities;

10   is that right?

11   A.    That's right.

12   Q.    Even living in the house?

13   A.    Yes.  And we could also, I think, reasonably say

14   that the use of a room implies a cost.  But we added a

15   small amount, not the economic cost, and I think the

16   280 figure is a very much underestimate, but I didn't

17   want to move into areas which I was uncertain so

18   clearly 280 would be a safe figure.

19   Q.    $280 a month?

20   A.    A month.  That comes out to $3,360 a year.

21   Q.    And is that where your total comes to then,

22   $18,011?

23   A.    That's right.

24   Q.    And does that figure represent the sum then that

25   you would need to spend to have someone full time,

1  round the clock, 24 hours, 7 days a week, 52 weeks a

2  year, to take care of these children?

3  A.   Yes.  That's very much a minimal sum except we

4  made one further adjustment.  I said we used what I

5  call the top of the line in that profession, but none

6  of the workers in that profession have much more than

7  high school education.  And, we took -- we would need

8  somebody who could provide other services such as

9  helping with assignments, speaking to teachers.  There

10 I thought it reasonable to add 25 percent to the

11 monthly salary of the thousand dollars to come up with

12 a second scenario.  So I have two scenarios.  One is

13 top of the line as exists, and the second one would add

14 25 percent to the salary.  So --

15 Q.   How did you come up with that premium, if you

16 will, of 25 percent?

17 A.   Well, again, you can ask how much more would a

18 graduate earn than a non graduate.  In fact, it's much

19 more that 25 percent, that's why I feel safe with that

20 assumption.  So we have two estimate, one is $18,010 a

21 year, and the other one is $21,010 a year.

22 Q.   So did you calculate that sum for the -- for --

23 how many years did you calculate that sum out for?

24 A.   Well, we assumed that the services would not be

25 required after age 18 and, therefore, as the youngest

1  child was about one year, we had 17 years of annual
2  payments.
3  Q.   Okay.  And did you discount that stream of
4  payments, or subject that stream of payments to the
5  same discount rate you utilized in your -- in your last
6  earnings report?
7  A.   Yes, yes.
8  Q.   So --
9  A.   In other words, we came up with a total sum which
10  would be enough to release an annual figure of 18,010
11  per year for 17 years, and this appears in the second
12  table, Table 2.  The lower estimate is based upon an
13  annual or -- excuse me, a monthly earnings of a
14  thousand dollars, and while I call it the realistic
15  estimate is based upon an extra 25 percent premium to
16  the salary.
17  Q.   Okay.  Thank you.
18            MR. STRACHMAN:  That's all, your Honor.  I
19  would ask Doctor Ziderman's supplemental report, or his
20  note, which is also included with Exhibit 6, be
21  admitted as a full exhibit.
22            THE COURT:  Granted.  We'll take our noon
23  recess and we'll resume at two o'clock.  We've gone
24  through 2 witnesses, Mr. Strachman.  I would encourage
25  you to use some of the time during lunch hour to see if

```
 1   we can't increase the pace.  The Court will stand in
 2   recess.
 3              THE CLERK: All rise.
 4       (R E C E S S)
 5              THE COURT:  Call your next witness,
 6   Mr. Stracham.
 7              MR. STRACHMAN: Thank you.
 8        MEIR UNGAR, PLAINTIFF WITNESS, SWORN
 9                 DIRECT EXAMINATION
10   BY MR. STRACHMAN:
11   Q.    Mr. Ungar, where do you live?
12   A.    I live in Sharei Tikva.
13   Q.    In Israel?
14   A.    In Israel.
15   Q.    Okay.  And Yaron was your son?
16   A.    Yaron was my second child.  My first son, yes.
17   Q.    And before we begin, I want to clarify, Yaron was
18   an American citizen?
19   A.    Yes.  Yaron was born in the States while I was
20   studying towards my Ph.D. at the University of
21   Columbia.  I -- we stayed there for a period of
22   4 years, and then Yaron was born, and then I stayed
23   there another year after I finished my studies,
24   teaching at a Hebrew college.  Later on we came back
25   for sabbaticals.  The second time we came back I taught
```

1    at the University of Houston in Texas, and Yaron

2    studied there for his first grade, and later on we came

3    for another couple of years to Philadelphia where I

4    taught at the Walton School of Economics at the

5    University of Pennsylvania.  While there, Yaron studied

6    junior high, finishing his 7th and 8th grade in

7    Philadelphia.

8    Q.   You provided to me a passport and a birth

9    certificate and a report of the death of an American

10   citizen; is that right?

11   A.   Right, right.

12           MR. STRACHMAN:  Your Honor, those are

13   Exhibits 8, 9 and 10.  We ask that they be admitted as

14   full exhibits.

15           THE COURT:  They may be so admitted.

16   Granted.

17   (Plaintiff's Exhibits 8, 9 and 10 admitted as full

18   exhibits)

19   Q.   And, also, you and your family gave to me pictures

20   of Yaron and his family.

21           MR. STRACHMAN: May I approach, your Honor?

22           THE COURT:  You may.

23   Q.   I'm showing you, sir, what has been marked as

24   Plaintiff's Number 11 for Identification, and are these

25   the pictures that were provided to me of the family and

1    Yaron?

2    A.    Yeah.  This one Amichai, --

3              MR. STRACHMAN:  It's on your list,

4    A-M-I-C-H-A-I.

5    A.    -- Bar Mitzvah ceremony.

6    Q.    I don't want to go through them all, --

7    A.    Okay.

8    Q.    -- but are these the pictures that were provided

9    to me?

10   A.    Yes.

11   Q.    You recognize them?

12   A.    From Yaron's wedding and so forth, right.

13             MR. STRACHMAN:  Your Honor, I'd ask that the

14   pictures that had been marked as number 11 be admitted

15   as a full exhibit.

16             THE COURT:  They may be so admitted.

17             MR. STRACHMAN: Here are copies in color for

18   the Court.

19             THE COURT:  Thank you.

20   Q.    Now can you tell us what kind of a boy was Yaron

21   growing up?

22   A.    Well, Yaron, I really don't know what to say.

23   There's so much to tell about him.  Yaron was a great

24   helper at home.  He helped me while we were building

25   our home, our new house.  He helped me a lot in fixing

1  all kinds of things.  When later on he came home, for a
2  weekend from the dormitory he stayed in, he used to
3  help me gardening and basically was a very good and
4  beautiful son.
5  Q.    And prior to --prior to his death, how often did
6  you talk?  How often did you see him?
7  A.    While he got married, they used to come to us with
8  his wife and later on with the children, if we have the
9  weekend, but during the week we talked say on the phone
10 every other day.  He used to tell us about what is --
11 about his accomplishments during the day, about the
12 boys, about the school where he was teaching in, and so
13 forth.
14 Q.    When you said that he came to your home every
15 other weekend, did he stay with you for the weekend?
16 A.    Sure.  He came over on Friday and he stayed
17 usually until after sabbath.
18 Q.    Sabbath, which -- a Saturday evening or Sunday
19 morning?
20 A.    Sometimes during vacations Sunday mornings, but
21 during the school year until Saturday night.
22 Q.    And he was 26 when he died?
23 A.    It was just about before his 26th birthday.
24 Q.    And even when he was married, did he come with his
25 family to you every other weekend?

A.    Sure.

Q.    And how did you learn of his death?

A.    Well, in the middle of the night the doorbell rang and they -- I didn't know what was it, so I ran out, I ran down the stairs, I called out, who is it, but I think nobody answered, so I opened the door, and there was an entire delegation of the -- from the community headed by our Rabbi and a physician, and I already guessed.  I feared there's some horrible news are coming, and then they told me the terrible news.

Q.    And what did you learn?  What did they tell you?

A.    They told me that Yaron was shot in a car, a shooting out, and then I asked what about Effie, and they told me Effie, too.  So -- and then my wife shouted for me, what happened, and then I told her.

Q.    What kind of person was Yaron?  What was his personality like?

A.    Yaron was a very bright boy.  He was very much loved by his classmates.  He was kind of a natural leader in his group.  And he was simply usually the center of the -- of the gathering, or the center of the group.

Q.    What about him made him the center of the attention?

A.    Well, you could always say tests, all kinds of

1    tests, and he used to carry them out without any

2    hesitation, and he was that kind of a guy during all

3    his career, short career.

4    Q.    And what profession did he have?

5    A.    Yaron was attracted to the educational field for

6    many years.  He used to be a counsellor at scouts group

7    in our -- in our place, and he was -- he loved very

8    much his mates, his pupils, I mean, and also he was

9    loved by them.  And later on, when he continued to

10   study in a rabbinical seminary, he went to an

11   educational expedition to Russia to teach there.

12   (Phone rang)

13           THE COURT:  Sorry about that interruption.

14   Go ahead.

15   A.    He went to Russia to teach up there young kids, as

16   well.  And later on, when in college, he started to

17   study education.  He was about to finish his BA degree

18   in education, and he also finished his senior teachers

19   diploma.

20   Q.    And why did he -- why did he want to become a

21   teacher?

22   A.    He wanted to raise a new and better generation of

23   kids.

24   Q.    He told you that?

25   A.    We talked about it all the time, yes.

```
 1    Q.    What kinds of things did he say about that?
 2    A.    Well, it came natural to him.  He didn't have
 3    probably any other -- it was with him for a long time.
 4    He was, as he phrased, for that mission.  He saw it as
 5    a mission.
 6    Q.    And how many children do you have?
 7    A.    Well, I have four children, including him.
 8    Q.    And he was the oldest son?
 9    A.    He was my second child, the oldest son.
10    Q.    What role did he have in your family, in your
11    family life together?
12    A.    Well, when he grew up, when he got older,
13    especially when he went to high school and then later
14    on to the rabbinical seminary, he became like a
15    spiritual leader in the family, especially to his
16    younger siblings.  They looked up to him for advice,
17    for comfort, and they looked up at him as if he was a
18    father.
19    Q.    Can you describe your relationship with him?
20    A.    Well, we did many things together, and as I said
21    before, we used to work around the house together,
22    gardening together.  I remember one day one of the big
23    trees tended to fall so we had to wait until he comes,
24    after he got married, until he comes home for the
25    second weekend to cut the tree, in order not to ruin
```

1   the entire garden.  So 3 of us, Amichai, Yaron and

2   myself, cut the tree and helped it fall down quickly.

3   Q.   And following his -- following his murder, how did

4   that -- how did you react to his murder?

5   A.   Well, I became much more closed and nervous, and

6   much more unhappy.

7   Q.   Can you explain what you mean by that?

8   A.   Well, before the murder, for example, I had a

9   hobby of going to folk dancing about twice a week, and

10  I love it very much, and after the murder, I simply

11  couldn't do it any more.  I stopped going to folk

12  dancing.  I felt I don't have the right to be happy.

13  Only lately I forced myself to start again.  But it's

14  not the same.  I simply don't have the joy of the life

15  as I had before, and sometimes during the dancing I

16  start to think about Yaron, and then I tell myself I

17  don't have the right to do it any more.

18  Q.   Any other times, specific times, that you think

19  about him or that it affects you?

20  A.   Well, in synagogue many times during the day, but

21  especially during my prayer to God, when I pray to God

22  and then I start to visualize the site of the

23  happening, how the bullets of the murderers struck the

24  car, and I start to think about Yaron being hit, not

25  knowing what happened to his wife and his small child,

1    Ishai, I-S-H-A-I.  Ishai was with them in the car.  Not

2    knowing whether they were saved or not saved, and

3    didn't have any idea probably, and at the time when I

4    think about him and about Effie, who also got killed,

5    tears start coming down my cheeks, and I can't help it.

6    Q.    And did it affect your personality in any other

7    way?

8    A.    Well, I think that if before the murder my family

9    was always in the first place, but my job was almost an

10   equal, at an equal level.  After the murder, my

11   families, of course, not only the first place, but also

12   the second and third, and only next comes my job.  Even

13   though I try to fulfill all my responsibilities towards

14   my students, as before, for example when I grade the

15   exams, I always do it the next day, and always do

16   whatever I have to do, whatever, is related to my

17   students, papers, seminars, et cetera, but my research

18   simply suffers.  I don't evaluate any more as I used to

19   do it before, and my research takes a toll.

20   Q.    You're a professor?

21   A.    I am an associate professor.

22   Q.    What subject?

23   A.    In business administration, corporate finance.

24   Specializing in corporate finance.

25   Q.    Now prior to his murder, were you publishing

1  articles, writing books, doing things like that?

2  A.    Well, I was publishing at the rate of let's say

3  one and a half to two papers a year, which is

4  considered a normal publishing rate, yes.

5  Q.    Since his death in June of 1996, has that been

6  affected?

7  A.    Well, since then, 6 years has passed, and I

8  published about 2 papers only, and probably one of them

9  at least started to be breeded before the murder.  I

10 simply -- the publishing rate diminished to a

11 miniscule, to a minute rate.

12 Q.    And in terms of your disposition or your

13 personality, how has the murder affected you?

14 A.    Well, as I said before, I became much more closed.

15 Many things that interested me before don't interest me

16 so much any more, and I become more family type guy.

17 Q.    Are you able to interact with other people in the

18 same way or --

19 A.    More or less force myself at least for on the

20 outside to do my best.

21 Q.    And you talked about your publishing rate.  Since

22 you were -- since the murder, have you been promoted in

23 your job?

24 A.    Not yet.  I don't know if I will be promoted at

25 this rate, but I can't help it much.

1    Q.    And can you be promoted if you're not publishing?

2    A.    No.

3    Q.    Is that why you haven't been promoted?

4    A.    Promotion in Israel, as in States, is based mainly

5    -- I don't want to say entirely, but 95 percent on

6    publishing.

7    Q.    And without publishing, would you be able to be

8    promoted?

9    A.    No, no way.

10   Q.    Now has Yaron's death affected your family life,

11   your entire family life?

12   A.    Well, we are much more concerned about our kids.

13   We were concerned before, but now we have to know every

14   minute where they are located and at what point.  If

15   our smaller kids who are still at home who are

16   unmarried, if they go out, we have to know where they

17   are, when they come home, if they are in a safe place,

18   and before we go to sleep, we have to make sure that

19   they are in some safe place, and my wife is really very

20   very nervous about it, very crazy about it.

21   Q.    Can you give some examples of that?

22   A.    Well, she makes so many phone calls, and she

23   drives my kids crazy about it.

24   Q.    How old are they?  How old are your older kids?

25   Your younger kids who reside with you?

1    A.    The younger one is 22, and the middle one Amichai

2    is 25.

3    Q.    And could you tell us why -- why did you bring

4    this lawsuit?

5    A.    Well, we felt that somebody who does such a

6    horrible thing should pay for it.  We don't want

7    revenge because nothing can bring back Yaron and Effie.

8    But at least we know that by helping them at least

9    financially they might think twice before carrying out

10   such a terrorists acts, this country and every country,

11   especially these terrorists organizations, and if they

12   are going to pay for their deeds they simply will stop

13   doing that.

14             MR. STRACHMAN: Thank you.  That's all, your

15   Honor.

16             THE COURT:  Mr. Ungar, how many years had

17   your son been living continuously in Israel at the time

18   of his death?

19             THE WITNESS:  Continuously, 12 years.

20             THE COURT:  Thank you.  You may step down.

21             THE CLERK:  Do you affirm that all the

22   testimony you're about to give in the case now before

23   the Court will be the truth, the whole truth and

24   nothing but the truth, and this you do affirm under the

25   pains and penalties of perjury?

```
 1              THE WITNESS:  I do.
 2              THE CLERK:  Please state and spell your name
 3    for the record.
 4              THE WITNESS:  My name is Judith Ungar,
 5    U-N-G-A-R.
 6              JUDITH UNGAR, PLAINTIFF WITNESS, SWORN
 7                    DIRECT EXAMINATION
 8    BY MR. STRACHMAN:
 9    Q.    Miss Ungar, what is your profession?
10    A.    I'm a psychologist.
11    Q.    You have a master's degree in psychology?.
12    A.    I have a master's degree in psychology but I work
13    in the Teachers College in Israel.
14    Q.    And can you tell us what Yaron was like, what his
15    personality was like?
16    A.    I think that the most -- the things that will be
17    most characteristic of Yaron is his happiness, his joy
18    of life, his delight in his eyes.  He was always full
19    of life, you know, always people around him, always
20    friends coming to him and always doing things with his
21    friends.  He was really -- he was really something
22    else, what can I tell you.  And even as a boy, when as
23    a baby, was a healthy and happy baby.  As a boy when he
24    grew up he was always such an -- every mother would
25    like to have a boy like him, you know.  I never had
```

```
 1   problems with him.  He -- as a pupil, he was a good
 2   pupil.  He was loved by his friends.  He was a good
 3   athlete.  Always winning trophies, you know, for the
 4   stuff he did.  He never gave us problems, and we -- he
 5   could do it because we moved a lot, you know.  When he
 6   was first grade, we moved to Houston, and it's a major
 7   thing for a boy to change, you know, environment
 8   especially in first grade, but he never complained and
 9   he got along so well.  Everything was okay.  We came
10   back to Israel, he got along really good, then we took
11   him back to Philadelphia and he managed so nicely that
12   all his teachers loved him.  It's the 8th grade when
13   there was ceremonies there.  The graduation ceremony he
14   was delivering the valedictorian speech.  Even if he
15   was new there, relatively new, only 2 years, everybody
16   thought of him very highly.  And that was really part
17   of him.  I always like him.  I can picture myself, you
18   know, in a wedding of our friends, and he was there
19   dancing with the crowds there, and I was looking at him
20   and I said, this is my boy, this is Yaron.  I really
21   was proud of him because he was handsome, he was tall,
22   blond, blue eyes, really handsome and lovable.  You
23   know, you could see the light in his eyes, always
24   laughing, always happy, always good natured.  He really
25   was something else.
```

1    Q.    What was your relationship with him like?  Can you

2    describe it?

3    A.    Because he was a very open person, not a closed

4    one, he was always -- we had very warm relationship and

5    close relationships because he was open.  He was always

6    telling us what's going on with him.  Even, you know,

7    when he was in high school, he was away from home.  He

8    wasn't in a dorm.  We thought he would get a better

9    education if he'd be away from home.  He came home

10   every second weekend, and he always when he came we

11   would always sit around the sabbath table, around the

12   table, and all of us listen to Yaron telling stories

13   about his friends and about the teachers and about

14   what's going on.  He was always the center of

15   everything.  He would teach us, you know, when we sit

16   we had this custom, Saturday -- Friday night before the

17   sabbath we have the custom to sit around the table, all

18   of us, and sing songs, and he would teach us the new

19   songs he started and learned in school, and he would --

20   he would tell us the stories, and he was always -- and

21   we had really good relationships also because we were

22   the same -- approximately the same field.  I teach the

23   Teachers College, I work at the Teachers College, and

24   he was taking teaching position.  He would consult me

25   and I would lend him books I had in the library, and he

1    would consult me and tell me what's going on, and

2    telling me how he prepares his lessons, and he showed

3    me.  I was very proud to see the lessons he prepares.

4    It was really on high level because he cooperated with

5    his wife.  His wife was illustrating the pictures and

6    he was making up the questions of the lesson to the

7    pupils.  It was really -- we really had very close

8    relationship.

9    Q.    And can you give us any other examples of his

10   personality or that would illustrate what his

11   personality was like?

12   A.    As I said, he was a -- he was a happy person.  He

13   was a leader in his group, and he had this thing with

14   -- he wasn't an idealistic person.  He wasn't -- he

15   wasn't -- he didn't care for money.  Money wasn't the

16   matter for him.  He wanted to give to society, to

17   contribute to society, to be involved, not like other

18   people who say I'm not -- I don't want to get involved.

19   He was involved in everything he did.  That's why he

20   went to education, I think.  It was a matter of

21   idealism for him.  He didn't care the salary is low.

22   He said, I have to contribute to society, what can I do

23   good, what can I do best, and he knew that he was very

24   good with children, I can do best to teach them, to

25   educate them to be good citizens, to be good persons,

```
 1   and that's what he did, and I saw it everywhere.  I can
 2   just remember, you know, the time, it was two days
 3   before his wedding, we went -- we went to the city to
 4   pick up his suit.  He bought a new suit, of course, we
 5   went to the city to pick up the new suit.  I was with
 6   him in the car, and before us there was a minor
 7   accident, I think, and the driver and the other driver
 8   started fighting each other, blaming each other.  Yaron
 9   wanted to get out of our car and I said to him, Yaron,
10   sit down.  What are you doing?  And he said, I have to
11   go and separate them.  And I said to him, are you
12   crazy, two days before you're wedding, you stay put,
13   don't go out, don't do anything, don't get involved,
14   and he said, how can I not get involved, they're
15   fighting, and he went out and he separated them.  He
16   had to be involved in everything he did.  That's why he
17   also went to Russia.  It was hard on him.  It wasn't
18   easy to be in those times, I think it was 1992.  I
19   don't remember exactly the date, and it was hard on him
20   to go and to leave everything and go to Russia for 4
21   months, to some village over there, some city, and he
22   did it because he thought he would be able to do
23   something for the community, not for his community, but
24   for the Jews in Russia.  So it was very important for
25   him to do.
```

Q.    He was teaching in Russia?

A.    He was teaching Jewish laws and things like that, stuff like that, because he went to a rabbinical college and he knew a lot, and he was teaching.

Q.    And other than that work in Russia, did he do any other charitable work?

A.    Oh, yes, a lot.  First of all, there are things we learned about only after his death, after his murder. We -- there are things about him that he didn't even tell us.  For instance, only after the murder, we learned to know that he would, every month he would -- he and Effie would add their salaries and see how much they earned this month and put aside 10% from their earnings for charity.  We learned to know only after the death, we learned to know that there was a student in the high school he taught in that they paid for his tuition because he was disadvantaged.  He couldn't pay his tuition, and he told the principal not to tell anybody.  He didn't even tell us because he knew that we will be amazed, we would be opposed to it.  We didn't imagine they were -- they lived very low standard of living this time, and how can he afford also giving charity to others, but it was his point to give 10% of his earnings every month for -- for charity.  He also worked with -- when he was a teacher

1  in college -- I'm sorry, when he was a teacher at the

2  junior high where he taught, he also in the afternoons

3  were working with counsellors of students who worked

4  with disadvantaged pupils like you have here, like Big

5  Brother, something like that called Big Brother, is the

6  same program in Israel that students who want to pay

7  low tuition they have to adopt disadvantaged child, and

8  to meet him twice a week or so, and help him with

9  everything they can, and Yaron was counselling those

10 students who did it, and, you know --

11 Q.    And he had been married at the time of his death

12 for how many years?

13 A.    For 3 years -- for 3 -- almost 3 years.  Less than

14 3 years.

15 Q.    And what was he like -- he had 2 children, Dvir

16 and Yishai, and what was he like as a parent?

17 A.    He was, like I said, he was a good natured boy.

18 He was a good natured father.  He was -- that was his

19 personality.  You could see also the way he treated his

20 children because he was always very calm with them,

21 very close to them, especially to the older one.  They

22 had such a bond between them, I didn't see -- usually

23 you see it with the mother and child, but with father

24 and child, you seldom see it, you know, because really

25 the father is going out to work, coming, having less

1   time, and the mother is the main one who create this
2   bond with children, but with Yaron, especially with
3   Yishai, especially bond with them.  He always asked for
4   father.  He would cry at night, wouldn't cry mommy, he
5   would cry daddy, daddy.  And I could see them, you
6   know, and Yaron holding Dvir, and you know when he got
7   up from sleep, they were always for, I don't know, a
8   few minutes, more than a few minutes, cranky, so he
9   would always say to us, don't talk to him now, wait a
10  second, he would take him on his hands and sooth him
11  and sit with him quietly until he woke up and never he
12  -- Effie, too, they were both special couple.  They got
13  -- they never raised their voice on the children, even
14  really he's not most peaceful quiet boy in the world.
15  If he did something wrong, they would never spank him,
16  would never raise their voice at him.  They would sit
17  and say, Dvir, you didn't -- what you did wasn't right,
18  you know, explaining to him was something -- he was, I
19  don't know, I wasn't used to such way of handling
20  children maybe because he was the mother and father,
21  but I think it's because of his personality that he was
22  like that.
23  Q.   What kinds of things -- were there any other kinds
24  of things that he did as a father with the children?
25  Any specific things?

1  A.   He did everything with them.  He like -- well, he

2  bathed them and he diapers them and he crawled on the

3  floor with them, and he did everything with them.  He

4  was really, you know, when he was with them he was like

5  a baby.  He was doing everything with them.  He loved

6  hiking around, you know, the country.  He took them

7  even when they were tiny little babies, they would put

8  them on their back, backpack --

9  Q.   Backpack.

10  A.   Backpack, and they going all around and taking

11  them everywhere they went.

12  Q.   And how -- do you know if he was involved with

13  their care when they were babies?  Did he feed them or

14  did he bathe them?

15  A.   Sure, sure, all the time.  He was equal to Effie,

16  you know.  There was not a thing that Effie could do

17  and he couldn't do, you know.  He was taking care of

18  the children the way Effie did.  They both were, they

19  both were busy.  He maybe was more busier than Effie

20  because she -- part of her job did at home, but they

21  both took care equal parts in the household.  He did

22  everything with the kids.  Except of nursing the

23  babies, he did everything with them.

24  Q.   And how did you react to his death?  How -- how

25  did you feel following his death?

A.    It's very hard to -- to convey the feelings
because, you feel like the world is coming down on you,
caving on you.  You feel like the world is going to
stop now.  Nothing will happen, you know, from now on.
Everything is going to stop.  You can't bear it.  You
know, I think for a mother to -- for a parent -- for a
mother to lose a child, it's the most horrible thing
that can happen.  People, you know, I lost my father I
loved very much, but he came of age not long ago, but
he was over 80 already, and it was very painful, but I
didn't feel like all the world is coming apart, but
when you lose a child, when you lose a son, I -- it's a
terrible thing.  I can't explain it.  But on top of it
you lose it in such a way, such a cold, cruel and
horrible way, you know.  It's not that he died of an
illness.  In one minute he was a happy lively man with
his wife, you know.  I remember the last time I spoke
to him it was two days before he was killed.  We were
with daughter in Jerusalem for her birthday, and I've
talked to him over the phone, and he told me, mommy,
I'm so happy, I'm really happy, you know.  He had the
hobby of carpentering, and he started a new course in
carpentry, and the vacation just started, he finished
the school year, and the vacation just started, and he
said, you know mommy, I'm so happy, I'm -- just I'm

```
 1    happy.  It went so good for him.  He had a lovely wife
 2    he loved so much.  He had 2 great children and
 3    suddenly, suddenly such a cruel death.  You know you
 4    think everything is going to stop.  But everything
 5    continues, you know, the way it's -- it's not like
 6    that.  And I had a decision to make.  And usually I'm a
 7    very rational person, and I had a decision to make.  I
 8    could do the easiest -- the easiest thing to do was to
 9    go in bed and to stay in bed and forget about the
10    world, you know, to be wrapped up in my soul, but I
11    have two other young -- I had then, my daughter -- my
12    youngest daughter was 16, my son was 19, and I had a
13    married daughter with grandchildren, and I had parents,
14    and I had a husband I have to think of, and I had made
15    a rational decision to go on with my life.  Not to --
16    not to stop anything.  To do -- to go on for them.  And
17    I'm sure that Yaron, you know, would want me to do the
18    same, to go on and not to let everything pass by, or
19    something like that.  So I made the decision to go on.
20    I can't say that he didn't -- you know, when somebody
21    looks at me from the outside, you can say, well, she's
22    okay, she's working, she has a family, she's going out,
23    she's going to weddings, she's going -- she's doing
24    everything that every normal person does, but I know
25    it's not the same, you know, because in the back of my
```

```
 1   mind, you know, in the heart, you always have this
 2   terrible weight, you know.  Whatever you do, it's
 3   always in the back of your mind.  Whatever I do, it's
 4   never -- I don't -- you can't never enjoy anything you
 5   do, even happy stuff, because Yaron is there all the
 6   time, you know.  It's like somebody, if you are sick
 7   and you don't have any taste buds any more, you
 8   continue on eating as usual, but you don't taste what
 9   you're eating.  That's the way it is.  That's the way
10   it is.
11   Q.   Have you -- did you change any of your activities
12   in any way?  You said you went to work.  Any other --
13   any changes in your activities or your daily life?
14   A.   The main thing I do, the same as I did before,
15   yeah.  The other small stuff, you know, the small, like
16   I used to go to a sing-a-long to a choir, I don't go
17   any more, you know, and holidays, when we sit around
18   the tables we don't sing any more like we used to.
19   Every holiday is a very tough time for us, you know,
20   when Yaron is not there.  And every -- you know, every
21   thing, happy thing, it's -- the sorrow is there.  When
22   Dvir -- when Yishai just started walking his first
23   step, we always thought Yaron couldn't see.  When --
24   you know, everything, when my daughter gave birth to
25   twin daughters, I couldn't be happy because Yaron
```

```
 1   wasn't there.  So I didn't change anything but, you
 2   know, there are, as I say, small things.  But usually
 3   you can't tell, but it's there all the time.
 4   Q.   And how did it affect -- how did it impact your
 5   family, your family life?
 6   A.   I think that all my family did the same as I did,
 7   you know, they continue.  They continue.  But it has --
 8   it has its toll.  We are all more nervous.  I know I'm
 9   very nervous.  I can't help it.  And I don't know, I
10   really -- I know that everybody, like my son, my little
11   daughter, they always -- they pretend that everything
12   is okay.  Just be -- we are okay, don't worry about us,
13   we are okay.  But I'm -- it's not -- it's not
14   manifested in anything that -- complete thing that I
15   can say, you know.  It's not they dropped out of school
16   or something, didn't even go to concerting, but it's
17   there all the time, this heavy feeling, you know.  It's
18   there all the time.
19   Q.   Are there any particular things that make you
20   think about his death or remind you of him?
21   A.   Everything.  When I hear -- when I hear singing, a
22   song he loved.  When I go in the street, suddenly I see
23   a young couple, you know, she's black hair, he's blond,
24   and then child with them, I always think that's Yaron.
25   I see his friends, you know, raising family, having
```

1    already 3 kids, 4 kids, and I think of him.  I think of

2    him all the time, especially on holidays when, you

3    know, we used to do -- we build up, you know, holidays

4    we have to build this Sukka, I don't know what -- how

5    to call it in English, but he was always there, you

6    know, decorating it.  He loved to decorate it.  He's

7    not there, and everything, everything, Hanukkah,

8    lighting candles, he would always be there and sing.

9    He's not there.

10   Q.   How do you -- how were the kids, Dvir and Yishai,

11   impacted?  Did you notice an impact on them?

12   A.   They were too small to remember.  It's not like

13   you know, like even 4 or 5 year old when the parents

14   are gone, they still have some memories of them.  They

15   was not even 2 years old, less than 2 years old.

16   Yishai was 10 months old.  So it's hard to say if it's

17   impacted them.  I don't know.  I really don't know.

18   It's hard to say.  But what pains me the most is that

19   they didn't know them.  They don't remember.  It pains

20   me that they don't remember them, because they were

21   such wonderful people, you know.  I know when I grew

22   up, it's my parents' house, was always the pictures of

23   my grandparents who perished at the Holocaust, and

24   there's pictures, I would look at them.  I knew they

25   were my grandparents but I didn't have any emotional

1    attachment to them.  I know they're my grandparents,

2    okay.  I'm afraid that's the same feeling the children

3    have towards their parents because they know all the

4    stories, they know the pictures, they know what's

5    happened, but it's just pictures for them.  It pains me

6    because they lost wonderful parents.  I don't know,

7    maybe in the long run, if I'm doing -- if I'm thinking

8    of it as psychology, I'm sure that in the long run it

9    will affect them, but I don't want to refer it as a

10   psychologist, so that's it.

11   Q.   Now following their deaths, were there any

12   particular ways that they were memorialized by their

13   friends or by their family?  I'm talking about Yaron

14   and Efrat.

15   A.   I don't understand the question.  What do you

16   mean?

17             MR. STACHMAN:  May I approach the witness,

18   your Honor?

19             THE COURT:  You may.

20   A.   Memorize?

21   Q.   My English isn't too good.  I'm sorry.

22   A.   No.  I am too emotional to --

23   Q.   I'd like to show you --

24   A.   Yeah, yeah, okay.

25   Q.   -- picture -- this is a picture --

1    A.    Yeah, yeah, memorized.

2    Q.    -- in the packet number 11, could you tell us what

3    this picture is?

4    A.    Yes.  I said Yaron had many friends.  Wherever he

5    went, wherever he was, he had these friends, you know,

6    from high school and then from the rabbinical college,

7    and everywhere, you know, where we lived, everywhere he

8    has this circle of friends.  When Yaron was murdered,

9    his friends decided to build a monument in the place

10   that the murder had occurred, and this is the monument,

11   and we dedicated it.  It's not only the monument, it's

12   also a forest.  Well, in Israel you don't have forests.

13   It's a real -- it's a small forest, let's say.  This is

14   the monument and the small forest.  They both like --

15   it's all dedicated in the memory of Yaron.  His friends

16   also published -- we have two -- we have others.  Maybe

17   you don't have them, two pamphlets, books, booklets in

18   his memory.  Two of his friends published and one

19   pupils of high school published in memory -- memorial

20   booklets on their behalf.  They did it themselves.

21   It's not a family, and they -- it's their friends wrote

22   here, things about them, you know, paragraphs about

23   them, and we have also many many boys that were born

24   first to the family and also to his friends that are

25   called after him.  That are called Yaron, either Yaron

1   or combination of the name Yaron and Effie, and the

2   frat, they, they -- there are at least I think 10 boys

3   that I know of that are called after them, are named

4   after them, yeah, are named after them, at least 10,

5   and there are also others -- where we live, it's the

6   place we live in, --

7          (phone rings)

8              THE COURT:  Excuse me.

9   A.   It's a place we live in, we have playground for

10  the children that is named after them, and I know in

11  the -- it's a college -- it's a high school that he

12  taught, he was a teacher there, they named a teaching

13  college hall after on his name.  So we have many, and

14  also I don't know if we have -- you know, his friends

15  come over to us.  In the beginning they used to come

16  every month, for we had a meeting in our house every

17  month, the first year after the murder, and we would

18  gather together, and they would come and lecture and

19  gave a lectures either in topic of education or on

20  Jewish studies.  We would -- he would give this

21  lecture.  That was at the first year we would gather

22  his friends, like 30 friends would come every month.

23  The second year we did it less, and now lately the last

24  years we do it like 3 or 4 times a year, they gather by

25  us and we have a lecture on his memories and we have a

1    get-together in talking everybody, what's new, who got

2    engaged, who got married, who had children.   Now

3    everybody is married already and, --

4    Q.    When was the last time you had one of those

5    lectures?

6    A.    It was just after Passover, I think.

7    Q.    In the spring?

8    A.    Yeah.

9    Q.    Okay.   And how many people come to those lectures?

10   A.    About, at the beginning, there were more than 30.

11   At the beginning there were much more.   Now it's very

12   hard for them to come because they're spread all over

13   Israel, you know, they don't live in one place, they

14   live all over, so they come, about 30 people come.

15   Sometimes they come with the wife, and they come, you

16   know, and they also call us, you know, and before

17   every -- before every holiday they call us to say to

18   us, you know, happy holidays, and they say they have a

19   child, they call us to say I had a daughter, I had a

20   son, and we -- they're always in connection with us.

21   They're always staying in touch with us.

22   Q.    And what you described before is the memorial

23   book, is this what's been marked as Exhibit 18?

24   A.    This is the memorial book the friends published.

25   Q.    His friends put this together?

```
 1   A.    Put this together, put the pictures, and also the

 2   paintings of Effie's paintings.

 3   Q.    Effie did them?

 4   A.    Yes.

 5              MR. STRACHMAN: Your Honor, I'd like to have

 6   this marked as Exhibit 18.  This is not in the package.

 7              THE COURT: It may be so marked.

 8              THE COURT:  Thank you.

 9   (Plaintiff's Exhibit 18 was admitted as a full

10   exhibit.)

11              THE COURT:  You may step down.  Thank you.

12              THE CLERK:  Do you affirm that all the

13   testimony you are about to give in the case now before

14   the Court will be the truth, the whole truth and

15   nothing but the truth, and this you do affirm under the

16   pains and penalties of perjury?

17              THE WITNESS:  I do.

18              THE CLERK:  Would you please state and spell

19   your name for the record.

20              THE WITNESS:  My name is Michal Cohen,

21   C-O-H-E-N.

22         MICHAL COHEN, PLAINTIFF WITNESS, SWORN

23                  DIRECT EXAMINATION

24   BY MR. STRACHMAN:

25   Q.    Michal, where do you live?
```

1    A.    I live in Jerusalem, Israel.

2    Q.    Okay.  And you are Yaron's older sister?

3    A.    I'm Yaron's elder sister.  I was 3 years old when

4    Yaron was born.

5    Q.    And do you live in America together?

6    A.    Yeah, we were together.  I really don't remember a

7    time without Yaron.  We were always together.  We moved

8    between a lot of towns and a lot of places, so the one

9    constant was us being together.  We were childhood

10   friends.  I remember how we were these brave detectives

11   and we used to solve mysteries together, how we went up

12   on trees, we just pretended that we were on desert

13   island and seeking for planes, and we have all these

14   childhood things that we did together.  I remember how

15   we used to sneak onto the porch after the curfew time,

16   to peak and see the TV.  It was just growing up

17   together.

18   Q.    Did you live in the same room at some point

19   together?

20   A.    Yeah, yeah.  We were roommates, and it really made

21   a good connection.  We used to talk about the day

22   before we fell asleep, and he was a nice brother to be

23   with.

24   Q.    And when you got older, what kind relationship did

25   you have?

A.    Well, as we grew older, we became friends.   There
was this kind of bond and trust between us so that we
could talk about everything.   I remember, I was already
married, and Yaron used to come to me for advice about
his girl friends, about his future, and even when he
met Effie, Efrat, I remember him coming over and
showing us the photographs and like looking for my
approval, is she okay?   What do you think?   It was
really touching.

Q.    Did you have any common interests?

A.    Yeah, we liked the same songs, and I liked science
fiction books, so I taught him, I introduced him to
science fiction, so he loved it, too.   I remember that
after he was murdered, my parents brought me this book
that was by his bedside.   They saw it was science
fiction so right away they brought it to me and I read
this book and got to the middle of the book and I saw
his book mark in there, and it was really a great shock
because I knew that this is where he came to, and he
would never ever read ahead of this place.   It was just
terrible.

Q.    And when he got married, did you still remain
close?

A.    Yup.   We were very close.   He used to call me, I
used to call him.   I remember after Dvir was born,

1    Effie was still in the hospital and I went with him

2    shopping.  We went to buy baby clothes and bottles, and

3    I showed him what kind of detergent he should buy for

4    the baby clothes.  I remember him saying to me, Michal,

5    I'm so lucky to have you as my sister, but little did

6    he know that I was really lucky to have him.  I'm

7    sorry.

8    Q.    When was the last time you spoke with him?

9    A.    Well, it was -- it was about a week before the

10   murder.  We talked over the phone and I remember him

11   telling me how proud he was.  He finished this library

12   he was building.  He loved to build things with his

13   hands so he built this library and was proud of how

14   good it came out.  And two days before the murder it

15   was my 29th birthday, and my parents came over for the

16   weekend to celebrate my birthday, and he was calling me

17   to congratulate me, but I couldn't come to the phone.

18   My mother talked to him and I told her, tell him I'll

19   call him in a couple of days, there's no big hurry, and

20   I missed the last chance for me to speak with my

21   brother.

22   Q.    When was the last -- excuse me.  How did you react

23   to his death?

24   A.    Well, it's really very hard, as you see.  I'm very

25   -- I'm very emotional.  Especially after the death, I

```
 1   became very emotional.  Every small thing that happens
 2   I take it hard.  My family is very mathematicalized and
 3   they try to hide everything inside, and that's one way
 4   to take the grief, and I'm very emotional, and it's
 5   hard.  I gave birth a couple of years ago to twins, and
 6   it should have been the happiest day of my life, and it
 7   was happy, but I was thinking how sad it is Yaron isn't
 8   here, and that the twins won't be able to see this
 9   wonderful lovely crazy uncle who could crawl with them
10   and sing with them and jump with them and just teach
11   them, and that's hard.  It's also hard for my -- I have
12   two daughters who were 2 and 4 at the time of the
13   death, and how can I raise them when they ask me,
14   mommy, are you going to die?  When are you going to
15   die?  Usually I see -- my friends tell their children,
16   oh, you'll be a grandparent when I'll die.  You don't
17   have to worry.  I can't tell them that.  They see their
18   cousins that are orphans.  They have no father and
19   mother, and what should I tell my kid.  How can I raise
20   them to be -- to know that we'll be there.  And it's
21   hard.
22   Q.   Following his death, did you -- was there any
23   change in your activities or your lifestyle?
24   A.   Well, there -- there are some things it changes.
25   Well first of all.  I called -- my twins are named
```

1    after one of Yaron and one after Efrat, so every day

2    when I talk to them and I see them I remember Yaron and

3    Effie.   And just day-to-day things, I walk in a mall, I

4    hear his favorite song, I just get paralyzed.   I have

5    to snap myself back.   Or seeing in the distance a tall

6    blond guy, I know my head tells me it's not Yaron, but

7    for just a split second my heart says maybe it's him.

8    Even if it's illogical, it's always there.

9    Q.    And how has it impacted your parents, your family?

10    Have you been able to observe how it affects them?

11    A.    Yeah.   Since I'm living with my husband and kids,

12    I see and I come a lot to my parents' house, and every

13    other weekend we're there, with Dvir and Yishai.   I can

14    see from the inside how it's affected the household.

15    How everybody is so nervous.   They don't take out

16    anything. Everybody is keeping it inside because it

17    doesn't want the other one to get hurt.   So it's like

18    walking on egg shells.   My brother is a big guy

19    already, but my mother has to know where he is, and

20    it's really tense, really tense.   Everybody is nervous.

21    Every petty thing becomes this major issue, and they

22    weren't like that before.   They were just a happy

23    family, singing, laughing, and it's not like that any

24    more.

25    Q.    Do you go to your parents on the weekends?

```
 1   A.    Yeah, yeah.  We try to make it a point to be there

 2   every time.  Dvir and Yishai are there every other

 3   weekend so that we'll be together.  Our kids are

 4   practically the same age and they play together, and --

 5   Q.    Is that for the sabbath?

 6   A.    Yes.

 7   Q.    You stay overnight there?

 8   A.    For the whole weekend, from Friday until Sunday

 9   night, yeah.

10                MR. STRACHMAN:  Thank you.

11                THE COURT:  You may step down.  Thank you.

12                THE CLERK:  Do you affirm that all the

13   testimony you are about to give in the case now before

14   the Court will be the truth, the whole truth and

15   nothing but the truth, and this you do affirm under the

16   pain and penalties of perjury?

17                THE WITNESS:  I do.

18                THE CLERK:  And will you please state your

19   name for the record?

20                THE WITNESS:  Amichai Ungar, A-M-I-C-H-A-I,

21   U-N-G-A-R.

22       AMICHAI UNGAR, PLAINTIFF WITNESS, SWORN

23                  DIRECT EXAMINATION

24   BY MR. STRACHMAN:

25   Q.    Amichai, how old are you?
```

1    A    I'm 25 years old.

2    Q.    And do you live with your parents?

3    A.    I live with my parents, yes.

4    Q.    Okay.  And like your brother, you're an American

5    citizen?

6    A.    I am.  I was born in Houston, Texas.

7    Q.    And do you work or go school?

8    A.    I just graduated.  I got my bachelor's degree in

9    computer science.  I finished last test and I'm working

10    for 2 years in a computer company.

11    Q.    And how many years different were there between

12    you and your brother?

13    A.    There are 6 years difference between us.

14    Q.    And how did you learn about his murder?

15    A.    I wasn't at home when it happened, and it become

16    that I was the last one to know.  My parents couldn't

17    reach me.  They didn't know where I was.  So I started

18    the day, it was more than 6 hours after it happened,

19    everybody already knew, and I was with my friends, and

20    then someone called me out and told me that Yaron has

21    died, and the first question I asked is, what with

22    Effie?  And he said he didn't know.  He didn't have any

23    information.  I was shocked at the moment.  I didn't

24    know what to think about, and I went home with my

25    friends, I started hitchhiking home, and on the way on

1  the radio I heard that there was a gunshot, and two
2  people were killed, and they said Yaron and Effie.  And
3  that's the way I heard that also my brother and his
4  wife were killed, by the radio.
5  Q.    What kind of relationship did you have with your
6  brother?  Can you describe it?
7  A.    Umn, he was kind of my hero.  My big brother, tall
8  one, strong, good in sports.  I was the little child
9  that look up to him, and he was something of a
10 protector of mine, physical protector and mental
11 protector.  I have an example for that.  When I was
12 something like 3, or I think 4 years old, I went to,
13 with his friends, they played soccer, and I went to --
14 he took me with him.  I sat on the grass and watched
15 them, and they played, and suddenly a big dog came from
16 nowhere and knocked me down to the grass, and he stood
17 above me, and I don't know if I called him, or he saw
18 it, and he come running and he kicked the dog off.
19 Something -- maybe it's every brother would do that,
20 but this is something from my childhood that I
21 remember, and also after I told that to Dvir and
22 Yishai, after it happened, of course, it's a story that
23 they very liked to hear, how their father is a
24 protective father.  This is the big brother that I had,
25 that I know, that I can rely on, can help me if I'm in

1    trouble, come and rescue me, and also a mental

2    protector.  When I was 13 years old, I just was on

3    vacation from school, and he wrote me a letter.  I have

4    here something.  I translated some of it.  I was on

5    vacation, and he was very afraid of my -- how would I

6    be in the vacation, so I want to read a little bit from

7    something he wrote me.  "Dear Brother, hi:  How are

8    you?  How is the vacation?  Are you bored yet?  I

9    decided to write to you because I'm worried.  Why am I

10   worried?  I'll explain to you with an example.  When

11   you take a delicate pot and heat it up to a high

12   temperature, you cannot put it suddenly in cold water.

13   This sudden change will make it break.  What does this

14   have to do with you?  During school, you have a daily

15   schedule and suddenly comes vacation, you shouldn't

16   make a sudden change like that delicate pot.  You

17   should still make a point to learn a little each day.

18   Don't be a Doctor Jekyll during school and then

19   Mr. Hyde on vacation.  And it continues, and then he

20   signs love and kisses to all.  Yaron".

21   Q.    Is that letter published somewhere?

22   A.    Yeah.  Nobody knew about this letter.  It's

23   something that he wrote to me.  I got it, I read it.  I

24   hope I worked upon it.  But it was in my drawer, and

25   nobody knew about it.  After it happened, when all

1    friends and family came to us, I took it out and I

2    showed it the first time to my parents and to the

3    friends, and I took it as a personal letter from a big

4    brother to his little brother, but they also look at

5    the things that people can -- little children can learn

6    about that, because it was in the beginning for me, but

7    every child that is on vacation can take the points

8    from that note and look at it as it was written to him.

9    So it was published in also some newspapers, but also

10   in the youth group that he was teaching there.

11   Everyone that got on vacation got a copy of this letter

12   and they taught people about it.

13   Q.    That was just an excerpt that you read to us; is

14   that right?

15   A.    Yeah.  That's without the personal things.

16   Q.    And following his death, how did you react to his

17   death?  How did you experience it?

18   A.    I -- I had to go on with my life, but things

19   aren't the same.  Now when Dvir and Yishai come to us

20   every other weekend, my job is to -- I'm the one that

21   is more taking them to -- I bathe them and I put them

22   to sleep, and many times I'm there when the lights are

23   off, I look at them and I sleep near them, and I think

24   that it's not my job to be -- I'm not supposed to be

25   there.  The one that's supposed to be there tucking

1    them to bed and closing the window and seeing that

2    they're okay is the father and mother.  I'm only the

3    uncle.  I only need to play with them once, I don't

4    know, but now I have to be also when it's our place, I

5    also need to be also a father and mother to see that

6    they're okay, not only to play with them.

7    Q.    How has the death affected your parents?

8    A.    Well, very tense family now after it happens.  If

9    something falls, suddenly we all jump.  We shout more

10   at each other.  We're very tense.  I'm getting 26 in

11   some months and still if I'm late home, I know that my

12   mother doesn't go to sleep until I'm home, and she's

13   calling me wherever I am, and it's very hard.  It's

14   frustrating because your a grownup person, but you have

15   to tell every moment where you are, what are you going

16   to do.  When I go to travel, I need to think everything

17   twice.  Before I could jump and run on the hills, and

18   not think.  Now I need to think, wait a minute, if

19   something were to happen, now I can let myself do less

20   things because I can't let my family suffer twice.

21   They've suffered enough, and enough, and I can't let

22   them lose another son.

23   Q.    Any things you do differently now following his

24   death than you did before?

25   A.    A lot of black humor after it happened.  I need to

1  be responsible of Dvir and Yishai, so if on a weekends

2  my friends go somewhere, I can't go with them because I

3  need to be first with Dvir and Yishai and help them and

4  be with them, and only after they go to sleep I can see

5  if I can take time to myself and not before.

6  Everything in -- for example, I think my first time I

7  was at a wedding of my friends after it happened, happy

8  occasion, and everyone was happy and we all dancing,

9  and suddenly I saw the one that got married, my friend,

10  dancing with his brother, and I couldn't dance.  I went

11  over to sit and cried, and I knew that this thing, I

12  won't ever have.  I won't have my brother dance with me

13  in my wedding, something that I can only dream of.  And

14  another thing is this, the first time that we all

15  rationale, all of my family, and this is the first time

16  I think my parents hear me talk about it, because I

17  know that it's very hard to express your feelings, even

18  if it would make you feel better, if you know that what

19  you're saying would help people that you love.  And

20  that's why for more than 6 years, I need to be at least

21  me.  I can't be -- I need to be a rock that I'm okay.

22  I'm not -- I should continue because I know if I

23  express my real feelings and it's hard also for me, I

24  would hurt my family, and I prefer to be with my soul,

25  and with myself, and deal with it inside of me even

1   though I guess it's not so healthy and easy, but it's

2   better than to hurt the people that you love.

3   Q.    Okay.   Thank you.

4         THE COURT:   You may step down.   We'll take

5   our afternoon recess.

6         THE CLERK:   All rise.

7   (R E C E S S)

8         THE COURT:   Call your next witness,

9   Mr.

10        THE CLERK:   Do you affirm that all of the

11  testimony you are about to give in the case now before

12  the Court will be the truth, the whole truth, and

13  nothing but the truth, and this you do affirm under the

14  pains and penalties of perjury?

15        THE WITNESS:   Yes I do.

16        THE CLERK:   Could you please state and spell

17  your name for the record, please.

18        THE WITNESS:   Daphne Ungar, D-A-P-H-N-E

19  U-N-G-A-R.

20      DAPHNE UNGAR, PLAINTIFF WITNESS, SWORN

21              DIRECT EXAMINATION

22  BY MR. STRACHMAN:

23  Q.    Daphne, how old are you?

24  A.    I'm 22.

25  Q.    And you live with your parents?

1    A.    Yes, in Sharei Tikva.

2    Q.    And how many years difference are there between

3    you and Yaron?

4    A.    6 years apart.  I was a -- I'm sorry.  9 years

5    apart.  I was -- when I was born, Yaron was 9, and he

6    always was my great big brother.  I mean, other brother

7    is 3 years older than me, but Yaron was my really big

8    brother, and always I remember him as a big protecting

9    brother.  One of my first memories in life was when I

10   was a child, I was about 3 years old, I was at

11   kindergarten and I fell off the swing and I cut my

12   chin, and Yaron came and he took me, and he tried to

13   calm me, and he was with me.  He took me to the

14   hospital.  They had to put stitches, and he just took

15   care of me and promised me everything will be all

16   right, and don't need to worry, and that is the image I

17   have of Yaron to be there to protect me, there to make

18   sure I'm all right.

19   Q.    What was he like as a person?

20   A.    I think the main thing, when you recall Yaron, the

21   main thing you think of is the smile.  He had the

22   everlasting smile on his face.  He always made jokes.

23   He always laugh with us, tell us funny stories, and I

24   have in my room poster he gave to me as present on my

25   birthday.  Maybe I was 10 years old then, a poster with

1    it has a picture of a clown, and it is written there if

2    you meet someone without a smile, give them one of your

3    own as a gift.  And really that characterized Yaron,

4    always smiling and always trying to keep everyone

5    happy.  And he was a very -- he was a person that

6    everybody would be attracted to.  Magnetized by his

7    power and his happiness.  And one of the things that

8    hurts me the most when I think of Yaron is that I

9    really knew him only as a child, because I was 16 when

10    he was murdered, and I had the connection with him like

11    a little child to her big brother, but I haven't had

12    the chance to know him as an adult.  I was robbed of

13    the chance to meet him, to be a friend of him, to talk

14    to him eye-by-eye because when I was already an adult

15    he wasn't there.  And because after the murder I heard

16    from his friends and from family so much stories about

17    Yaron, I knew the big thing I have missed, because I

18    didn't know him that way.  I knew him in a different

19    way and didn't have the chance to know him that way.

20    Q.    After his death, after his murder, how did you --

21    how did you react to his murder?  Any things that you

22    did or didn't do because of that, because he was

23    murdered?

24    A.    Well, it has an impact on your life that is very

25    hard to explain.  It's not -- I had a sudden urge to

```
 1   continue talking with Yaron.  I used to have a
 2   conversation everytime before I went to sleep with his
 3   picture, and he wasn't really answering me, but I used
 4   to tell him what's going on, and I wrote a letters to
 5   him and to Effie.  I told him -- told them, all kinds
 6   of things that happens in our life, especially things
 7   that changed in Yishai's field, when Yishai had walked
 8   his first step, and Yaron and Effie weren't there to
 9   see it.  I felt I have to let them know what happened.
10   And even though they may be looking from the sky down
11   at us and seeing it, it's -- I felt I must tell them
12   the news, and they're missing a lot down here.  They're
13   missing their beautiful child growing up, and it's a
14   pity.
15   Q.   And are there any ways, any other ways that you
16   feel the loss or you experience the loss of Yaron?
17   A.   Yes.  It comes to you all the time.  Even when not
18   expected.  Me and Yaron were alike in many kinds of
19   ways.  Many ways.  We liked the same food, and
20   sometimes just sit and eat my favorite snack, and it
21   was Yaron's favorite snack, too, and keep reminding me
22   Yaron liked it, and when we used to sit together when
23   he was over us for the weekend, and we gave Dvir, was a
24   little boy, we gave him that snack, and we both would
25   be racing who would take most of the food out and eat
```

1    most because we both loved it very much.  And you

2    remember him all of the time just hearing a song over

3    the radio and reminded that Yaron liked the song.  Even

4    when there was a new song on the radio and it's just

5    some singer that sings about her boyfriend that leaves

6    her and she said, oh, why did you go, and to my mind

7    "why did you go" have a different meaning.  I suddenly

8    think of Yaron, and how he have left us.  It comes to

9    you all the time.  It's not -- it's not that we always

10   walk around in deep sorrow but in every act that we do

11   we have this on the background of our mind reminding us

12   all the time what have happened.

13   Q.    And what was Yaron like as a father?

14   A.    He was great.  He was -- was really inspiring to

15   see him with his children.  He -- once I remember Dvir

16   was running around our house, my parents' house, and he

17   broke a vase that stood over there, and instead of

18   getting angry at him or shouting at him or doing what,

19   Yaron just took him and put him on his lap and started

20   saying, Dvir, you know, you are a good boy, right, and

21   good boy doesn't do things like that.  And he would be

22   so patient to him, and so loving, it would be amazing

23   to see it.

24              THE COURT:  You may step down.

25              THE CLERK:  Do you affirm that all the

```
 1   testimony you are about to give in the case now before
 2   the Court will be the truth, the whole truth and
 3   nothing but the truth, and this you do affirm under the
 4   pain and penalties of perjury?
 5                  THE WITNESS:  I do
 6                  THE CLERK:  Please state and spell your name
 7   for the record.
 8                  THE WITNESS:  Uri Dasberg, D-A-S-B-E-R-G.
 9   Uri, U-R-I.
10   Q.         URI DASBERG, PLAINTIFF WITNESS, SWORN
11                       DIRECT EXAMINATION
12   BY MR. STRACHMAN:
13   Q.    Rabbi Dasberg, where do you live?
14   A.    I live in the suburbs of Jerusalem.
15   Q.    And you are Effie's father; is that
16   right?
17   A.    I'm Effie's father.
18   Q.    And what kind of relationship did you have with
19   Yaron?
20   A.    I think it was a special relation.  I have my
21   grownup boy, the first born, is a little bit elder than
22   Yaron, but when I thought about doing things together
23   and my occupation is writing, editing books, when I
24   thought about it, it occurred to me that I can work
25   with Yaron much better than with any other person.  It
```

1  happened that, of course before the murder, I was asked

2  to edit a book, a guide for a Jewish laws for the

3  traveler in Israel.  I did it already with a book for

4  travelers abroad outside of Israel, and in the college

5  in which I'm working I was asked to write something

6  like that for the traveler in Israel, but I didn't have

7  enough time to collect all the material, all the

8  details about such an issue, so I thought about who can

9  help me in this work, and suddenly I found myself near

10  Yaron, Yaron can do it, because first of all he loved

11  very much to travel alone and in groups, so he knew the

12  details, he knew the conditions, and he knew also the

13  books.  He was a learned person.  So he could go over

14  the books and see whatever he can see there.  So I ask

15  him, Yaron, can you help me in this work.  So he

16  thought about it, I think, a little bit, and he said

17  okay, I'll take it.  Then I told him look at the book

18  that I wrote before, the laws for the one who travels

19  abroad out of Israel, and this will be like the same.

20  Every word has to be as much -- must have a source, a

21  written source, in our -- by sages in the bible, so he

22  said okay, I do it.  Then he wrote all the chapters,

23  and then I found out some material that is not written

24  anywhere.  For example, if you go on a trip, of course

25  it was written in this book that if you go on a trip,

1    there are people on this trip that feel -- don't feel
2    away from home and they are alone, they are sad, and
3    you as a guide, you as a member of the group, must take
4    care of them and must treat them different than in
5    regular situations.  So I asked Yaron where is this
6    thing is written, and he looked at me and said, it's
7    written here, pointing to his heart.  So I said, Yaron,
8    we spoke about not writing things which is not written
9    before.  He say, I can't give you material without this
10   dittel, for example, and it is written in the book.  We
11   published later on.  The day they were murdered, I'm --
12   I was talking with Effie's wife on the phone, and it
13   was the end of the learning year, and he had some other
14   plans, and I thought he wouldn't be able to finish the
15   work on time, so I asked him -- I asked Effie, tell
16   Yaron that if he doesn't finish this work, so I do it
17   for him, I'll finish the work, and she brought that
18   evening the work, what he wrote, it was almost all the
19   book, to me, and I had to finish the work, yeah.  I
20   think there was -- yeah, this is it.
21   Q.   Now showing you these copies -- are these the
22   copies of the book?
23   A.   This is a copy of this guide for a traveler in
24   Israel, two different editions with the same context
25   from which I pointed out just now, from page 13, what

1    -- something which he was written before, what I

2    describe before about behaving to your fellows during

3    the trip, this is the book.

4    Q.   And how many copies of the books were published?

5    A.   I think each edition was published in 5,000 items,

6    which is a great quantity in for such books.  For

7    example, this book about traveling outside of Israel,

8    was published, I think, 2,000 or 3,000 times, that's

9    all.

10   Q.   And are they distributed by the youth group that

11   he was involved in?

12   A.   It is distributed by both, by the college in which

13   I'm working and also the youth group where he was

14   working asked the permission to republish it for their

15   members.

16   Q.   And do you know if Yaron published any other

17   books?

18   A.   Yes.  It was in this attitude of combining the

19   knowledge of the written sources, and the atmosphere

20   which goes among the people who has to read this book,

21   went again in another book in which -- booklet, to be

22   more exact, that in which Effie and Yaron took jobs

23   together.  Yaron was writing and Effie was drawing.

24   One of the most difficult things is to review things,

25   material that you learned already, because it's boring,

1    it's dull.  How can you go over a material that you

2    read already, you studied already, and he did an

3    excellent one about the Book of Samuel in the Bible in

4    which a student is requested to review what he learned

5    already but with questions which are very interesting

6    when it makes you enjoy the learning of this -- of this

7    study.  And you look at this book, you have the desire

8    to go over all the Book of Samuel again in order to

9    answer the questions, to explain the pictures you see,

10   et cetera.

11   Q.    And Effie illustrated the book and he wrote it; is

12   that right?

13   A.    Effie illustrated the book and he wrote it.  It's

14   a marvelous work together of a couple who worked

15   together.  I congra -- every couple that will be able

16   to work such a -- in such a common way.

17   Q.    And the children, Dvir and Yishai, they live with

18   you and your wife?

19   A.    Dvir and Yishai live with us all the time, yes.

20   Q.    And how did they deal with their parents' murder?

21   A.    Sometimes they are asking questions what happened,

22   and of course pictures of Effie and Yaron are in the

23   house, and they're asking us, of course they love us

24   yes, and how do they react?  Do they see us?  We don't

25   hide from them anything.  Whatever they have to know,

1    they know.  And they are calling us Abba, Eema, which

2    means Hebrew mommy and daddy.  That was because my

3    sister -- she was not my real sister, she also grew in

4    my parents' house after the Holocaust, and she was 60

5    when the murder happened, and she came to us, make

6    these boys a favor, let them call you mommy and daddy

7    because I, a woman 60 years old, had no -- in my life I

8    didn't have the chance to call anybody mommy and daddy,

9    and let them have this chance.  So we told our other

10   kids when you call Dvir, tell him to go to Abba, go to

11   daddy, go to mommy, so he'll call you also -- he'll

12   call us also daddy and mommy and won't miss what my

13   sister missed.

14   Q.   And do -- what kinds of questions do they ask you

15   about their parents?

16   A.   Just lately, a few years ago, a few days ago, they

17   asked is there any part of the story that we don't

18   know?  For example, Yishai said, I know I was in the

19   hospital, because the same day when it happened, I was

20   in Jerusalem.

21            THE COURT:  Excuse me, in Jerusalem?

22            THE WITNESS:  In Jerusalem.  I was in

23   Jerusalem, and when I came home, what I knew is that

24   Dvir and Yishai should be in our home, and they were

25   going to a wedding, and the two children are with us.

1    So I was awake, as other members of the family were

2    asleep already, and I was waiting for them.  11:00

3    o'clock, 11 and a half, 12 o'clock on the radio, on the

4    TV, I heard that there was a couple who were shot, and

5    a she baby is still -- was also in that car.  So, as an

6    optimistic person I thought this is not they because

7    they didn't go with with a baby, and they don't have a

8    she baby.  But after awhile, I heard the make of the

9    car on the radio, so I went to see if the two kids are

10   in bed, and when I saw that Yishai is not there, so I

11   shouted, Yishai is not here.  And my wife woke up, and

12   then I drove to the place where it happened, and they

13   told me that Yishai is in the hospital.  So just a few

14   days ago, Yishai was asking me what happened there, and

15   I told you -- I told him this story.

16   Q.    And is it something that, you know, comes up every

17   once in awhile for them or infrequently, or --

18   A.    Infrequently, when we are talking about  --

19   sometimes they are talking about Abba, daddy, so we ask

20   him who is this daddy, Abba Yaron, Yaron, or Abba Uri,

21   so then he has to explain to whom he is referring.

22   Q.    And you picked up Yishai from the hospital?

23   A.    Yes, I did.

24   Q.    Yourself?

25   A.    Yes.

1  Q.    And he wasn't injured at all?

2  A.    He wasn't injured.  That was a real miracle after

3  something like 50 bullets.  Effie was driving and Yaron

4  was sitting beside Effie, and Yishai was sitting in his

5  baby's chair behind Effie so she protected him not only

6  through her life by nursing, et cetera, but also with

7  her body when she was shot.

8            MR. STRACHMAN: Thank you.

9            THE CLERK:  Do you affirm that all the

10  testimony you are about to give in the case now before

11  the Court will be the truth, the whole truth, and

12  nothing but the truth, and this you do affirm under the

13  pains and penalties of perjury?

14            THE WITNESS:  I do.

15            THE CLERK:  Please state and spell your name

16  for the record.

17        YEHUDIT DASBERG, PLAINTIFF WITNESS, SWORN

18                DIRECT EXAMINATION

19  BY MR. STRACHMAN:

20            THE COURT:  You may proceed.

21  Q.    Mrs. Dasberg, you're married to Rabbi Dasberg; is

22  that right?

23  A.    Yes.

24  Q.    And the children live with you?

25  A.    Yes.

1  Q.    Since --

2  A.    Since it happened.

3  Q.    Okay.  And what's -- by the way, what's your

4  profession?  Do you have a profession?

5  A.    Yeah, I am a teacher.  I started -- I worked as a

6  teacher for 15 years, then I was a manufacturer, and

7  then I was working in public relations for an

8  institute, an educational institute, and after Effie

9  and Yaron died I had to leave my job, I wanted to be

10  more in the house with the children.

11  Q.    And when Effie and Yaron were killed, was Effie

12  pregnant?

13  A.    Yes.  A week before they were killed, she just

14  told me that she's 2 months pregnant.

15  Q.    And did -- before they were murdered, did the

16  family live near you?

17  A.    Yes.  They lived about 15 minutes drive from our

18  house, and we were on the way to Jerusalem, so whenever

19  they were commuting to Jerusalem they would come, they

20  would leave the children with us, like they did now on

21  the way to their wedding.  And the first year of their

22  marriage, she was working in our neighborhood, so

23  everyday she would come in and out, and Yaron was also

24  quite often in our house.

25  Q.    Did you have an opportunity to observe them as

1    parents?

2    A.    Yes.  They're very loving, and as you heard from,

3    they were very outgoing and very warm to the kids, and

4    very open, and very positive.  They were like -- Yaron

5    loved to run with the children on the floor, on the

6    carpet, and once we had a discussion about the

7    education, he said when my child grows, I will never

8    say to him, no, you're not allowed, but I'll say why

9    won't you do the other way.  Like he built up a way of

10   -- a method of education, and that was very important

11   for him.  All the attitude, bring children was not just

12   raising family, it was educating them, and that was

13   very important for him.

14   Q.    What kinds of things, what kinds of activities did

15   he do with the children?

16   A.    Well anything that the father would do with a

17   child he loves.  Okay, he had Effie in the house

18   washing the children, and diapering them and playing

19   with them, feeding them, and the most important thing

20   is that, okay, Yishai did not speak, so I don't know

21   his attitude, but I do know Dvir's.  One day I heard

22   Dvir say --

23   Q.    Excuse me one second.  You're talking about prior

24   to their death, Yishai was 9 months old?

25   A.    Yes.  Yishai was at the death he was 9 months old,

1    so before that he was even younger.

2    Q.    So he wasn't speaking.

3    A.    Yes.  Like when they grew up a bit, so Dvir said

4    to Yishai, remember, I asked him -- I asked him, do you

5    remember anything from your parents?  So Dvir says,

6    Yishai, remember how I sat on daddy and you were

7    petting mommy's cheek, so suddenly -- I know what he

8    was talking about.  So I said, do you mean this

9    picture?  He said yes, but when he saw his picture, he

10    kind of cuddled up of the memory of how he enjoyed

11    being hugged by his father.

12    Q.    And was Dvir particularly close to his father?

13    A.    Very much so.  He was all the time daddy.  I'll

14    tell you about two incidents.  First of all, one day

15    Effie said to me, I don't understand -- mommy.  I'm

16    sorry, mommy, I don't understand, all the day I'm with

17    the children, I'm doing everything with them, for them.

18    The moment daddy comes in, daddy, daddy, they're

19    running to him and I'm as if I'm out of here.  I'm

20    being ignored completely.  And -- okay.  I explain to

21    her that's tough, that's life, that's how it's usually

22    is.  And another story that in the day when -- on the

23    night when they were killed, the moment we heard, and

24    we decided that we are going to the hospital to fetch

25    Yishai from the hospital, Dvir woke up, daddy, I want

1    daddy, take me to daddy now.  He was only, nearly 20

2    years -- 20 months old, but he was talking completely,

3    so -- and he demanded to go to daddy.  He didn't

4    mention mommy.  But the next morning when they didn't

5    come, he asked me why aren't my parents coming?  He

6    asked about both of them.  Actually it was I think the

7    first time that he actually related to the absence of

8    the mother because the father he asked about that night

9    before.

10   Q.    And how subsequent to that, after, in other words,

11   after their death, how have the kids -- how have the

12   kids adjusted?  How have they responded to their

13   parents' death?

14   A.    Okay.  About Yishai, it's very hard to say.  I

15   just know that he was in the car for who knows how long

16   crying because when the guy that found him, found him

17   in a very very harsh state of crying, of suffering.  So

18   I don't know what of it is left in his soul.  But that

19   was then a trauma.  Dvir, for a very long time, I can't

20   say exactly how long, did not leave Yishai out of his

21   sight.  If Yishai crawled -- following somebody, and

22   Dvir for a minute didn't see him, where's Yishai,

23   where's Yishai.  You know, he was edgy, looking for

24   Yishai as if -- and he was a baby.  It's unbelievable,

25   he was not 2 years yet, but he was kind of hanging onto

1    this presence of Yishai in the area.  Until today, he

2    is kind of dependent on the fact that Yishai has to be

3    where he is.  And when Yishai goes to friends, until

4    today, he goes with him, to the young friends.  He

5    doesn't mind to go to the younger kids, and in that

6    age, age is very important.  He goes with Yishai just

7    to be with him.

8        About relating to the death, when he was about 5

9    and a half years old, he asked, if God can do anything,

10   why didn't he do that my parents will not be killed?

11   And after -- well, not half a year ago, he wanted to

12   show off to his friends that his father is also playing

13   soccer, so he took the trophy that Yaron won in high

14   school -- in elementary school, a trophy of soccer, and

15   he brought it to show to his friends.  He came back

16   home and the trophy was broken.  So Yishai says, wow,

17   what should we do now?  How we will -- we won't be able

18   to return it to our parents when they come back.  So

19   Dvir says, mommy, when will be resurrection?  They've

20   been so long away, when are they going to come back?

21   Anytime that they ask these questions, I answer.  I

22   don't have problems in answering, but I have problems

23   in my heart.  But I'm answering.  I hope that when

24   they'll be older, I'll still have the ability to answer

25   harder questions.

Q.   Do those kinds of questions come up a lot or are they infrequent?

A.   Usually they live their life.  Our life, you know -- they live like everybody else, but, when -- like when the trophy was broken, there was a problem.  It has to be solved.  So they discussed it, applying to the dead and to resurrection, or when he asked about if God can do anything.  So he learn.  I don't remember, I think I was telling him about the creation of the world, Genesis, the beginning of Genesis.  I was telling him every night near bedtime.  I'm telling them a piece from the Bible, a story.  I'm sure that that is exactly what their father would have done.  So I'm doing the same.  And I believe that I taught them about genesis, so God can do anything, so why didn't he prevent the death of their parents.

Q.   And do you have a sense as to what the -- what the biggest loss is for them?  What loss do they suffer from not having their parents?

A.   First, there are so many losses that I can start counting.  Okay, first of all, that they don't have real identity.  We are doing for them the best, but the best is not enough because we are not the real thing. We are substitutes, and there's no substitutes for the parents.  As that is said beforehand that we are

1    telling them about their parrents all the time, but
2    they can believe us.  They don't really know.  So they
3    don't have their parents.  How do you pass on the
4    parentage of a person you don't know?  How do you make
5    a person love somebody that you never experience his
6    love?  They don't have their parents, with all the big
7    huge implication about it.  And about us, okay, so
8    we're trying to substitute for the parents, but then
9    they don't have us as grandparents, and that's very --
10   that's also very hard for them because we are the
11   grandparents of our other grandchildren.  And when they
12   come in, it's a very complicated life.  When my sons
13   are coming in, they try to substitute for Yaron.  They
14   crawl around with the kids on the carpet.  They wrestle
15   with him.  So Dvir starts crying.  He's not used to
16   that.  I can't play with him.  My husband, we don't
17   play with him on the floor because of age problems.  So
18   I'm teaching them chess.  So we're playing something
19   else.  But if I'm teaching them chess as a parent, I
20   can't let them win as I would do if I was a grandmother
21   only to them, because then they won't learn.  So we
22   have a lot of problems which we are trying to solve in
23   the best way possible.  But as I said, the best is not
24   enough in this occasion because it's not the real
25   thing.

1          MR. STRACHMAN:  Thank you. Your Honor, we

2     had one other witness, Doctor Alan Brenman.  He is not

3     here because I did not -- and he's local, and I'm

4     wondering if it's possible on Monday sometime to

5     schedule 45 minutes or a half-hour or so, to hear his

6     testimony?  And if Monday is not convenient, then some

7     other time.  That is our last witness, and since he's

8     from the area, I did not push to have him testify right

9     away.

10          THE COURT:  Do we have time on Monday,

11     Mrs. Saucier?

12          THE CLERK:  Yes, your Honor, we do, from 2

13     p.m. on.

14          THE COURT:  Can you have him here for 2 p.m.

15     on Monday?

16          MR. STRACHMAN:  Yes, your Honor.

17          THE COURT:  All right. We will resume this

18     matter then on Monday afternoon for the final witness,

19     one witness on at 2 p.m.  After that witness testifies,

20     I'll take the matter under advisement.  I will be

21     rendering a written decision.  Anything further we need

22     to address before I leave the bench?

23          MR. STRACHMAN:  No, your Honor.  Thank you.

24          THE COURT:  All right,  the Court will stand

25     in adjournment.

1

2

3                    C E R T I F I C A T I O N

4

5        I hereby certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10    _____

11    JOSEPH A. FONTES

12

13    _____

14    Date

15

16

17

18

19

20

21

22

23

24

25