## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

      vs.                                      C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

### DAMAGES MEMORANDUM

This memorandum will briefly address Plaintiffs' claims for damages against the HAMAS defendants.

## I.  INTRODUCTION AND TRAVEL

On September 7, 2000, this Court entered default against Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat, Iman Mahmud Hassan Fuad Kafishe and HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), hereinafter the "HAMAS defendants."

On November 29, 2000, Plaintiffs filed a Motion to Enter Default Judgment Against Defendants HAMAS and HAMAS operatives along with an accompanying memorandum addressing jurisdiction, service and notice.  These issues have been extensively briefed and the HAMAS defendants have not contested the plaintiffs' position.[1]

---

[1] The nondefaulting PLO and PA similarly do not contest these issues.  They did not object to Plaintiffs motion to enter default judgment or their Motion Requesting a Ruling on their Pending Motion to Enter Default Judgement Against HAMAS Defendants of January 2002.  Similarly they have informed the Court that "We take no position on that motion or whether it should be subject to a stay."  Defendants' Memorandum In Support of Their Renewed Motion for a stay and motion for leave to File a Protective order, p. 1, fn 1.

## II.    NOTICE OF THIS HEARING

The HAMAS defendants are not entitled to notice of the default hearing and plaintiffs have no obligation to serve notice of this hearing.  In general, a party in default is not entitled to notice,

> No service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided for service of summons in Rule 4.

Fed.R.Civ.Pro. 5(a).

Further Rule 55(b)(2) provides that notice of a default judgment hearing must only be provided to a party "appearing,"

> If the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice the application for judgment at least 3 days prior to the hearing on such application.

A party in default is not entitled to notice of a motion to enter default judgement.  Thus, following service of the complaint "neither the plaintiff not the clerk of the court had a further duty to notify the defaulted parties." Cutting v. Town of Allenstown, 936 F.2d 18, 20 (1st Cir. 1991). Virtually all federal courts take a similar position:

> [A] defaulting party who has failed to appear, thereby manifesting no intention to defend, is not entitled to notice of the application for a default judgment under either Rule 55(b)(1) or Rule 55(b)(2).

Wright, Miller & Kane Federal Practice and Procedure: Civil 3rd §2687, see also numerous cases cited therein.

Nonetheless, out of an abundance of caution, plaintiffs provided notice of its motion for entry of default judgment to the HAMAS defendants as follows:

- November 29, 2000 of their motion to enter default judgment,

- January 29, 2002 of their motion requesting a ruling on their motion to enter default judgement,

- June 25, 2002 via international overnight delivery of this Court's June 20, 2002 notice scheduling this matter for July 12, 2002. Packages, including copies of Plaintiffs' November 29, 2000 motion, were sent to two HAMAS headquarters and to the individual defendants, Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe,

- July 5, 2002, plaintiffs sent all defendants copies of their exhibits.

## III.    LIABILITY HAS BEEN ESTABLISHED BY THE HAMAS DEFENDANTS' DEFAULT

This matter is properly scheduled exclusively for determination of plaintiffs' damages. Liability has been established by the Court's entry of default. Thus plaintiffs are not required to present evidence of liability and this Court may "assume that all well pleaded factual allegations are true." Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15 (1st Cir. 1992), Au Bon Pain Corp. v. Artect Inc., 653 F.2d 61, 65 (1st Cir. 1981), see also Wright, Miller & Kane §2688 ("If the court determines that the defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.")

In regard to their damage evidence, Plaintiffs are also entitled to "all reasonable inferences from the evidence offered." Au Bon Pain Corp. v. Artect Inc., 653 F.2d at 65. This Court may "accept as true the plaintiffs' uncontroverted evidence." Elahi v. Islamic Republic of

3

Iran, 124 F.Supp.2d 97, 100 (D.D.C. 2000) citing Alejandre v. Republic of Cuba, 996 F.Supp. 1239, 1243 (S.D.Fla. 1997).

The allegations concerning the statutory claim of international terrorism in plaintiffs' original complaint were considered by Judge Lagueux in his decision of July 24, 2001.  Ungar v. Palestinian Authority, 153 F. Supp.2d 76 (D.R.I. 2001).  In ruling on the motion of the PA and PLO to dismiss the complaint for failure to state a claim, Judge Lagueux stated, "it is the determination of this Court that the complaint sufficiently states a cause of action under 18 U.S.C. 2333." Id. at 98.

Plaintiffs are proceeding to default judgment against the HAMAS defendants only on the first count of their original complaint, the claim for international terrorism under 18 U.S.C. §2333. In July 2001 Judge Lagueux dismissed the supplemental claims against the defendants ruling that Israeli law applies to these causes of action.  Thus the plaintiffs were permitted to amend their complaint to allege similar supplemental claims under Israeli law.

However, by that time, the HAMAS defendants had already been defaulted on the original complaint and plaintiffs' motion for default judgment had been pending for eight months.  Thus, Plaintiffs now proceed for entry of default judgement against the HAMAS defendants only on the statutory claim of international terrorism.

## IV.    HISTORICAL BACKGROUND OF 18 U.S.C. §2333

### A.    LEGISLATIVE INTENT

Because this is the first case to allege a claim of international terrorism pursuant to 18 U.S.C. §2333, this memo will review the background of this unique statute.  It was enacted with

very specific goals and intended to remedy the problems confronted by American victims of terrorism.

Prior to enactment of this provision, The travel of litigation initiated by American victims of international terrorism was very circuitous.  For instance, in 1985 the Klinghoffer family (wife and children) initiated a suit against the PLO following the murder of the sixty-nine year old, disabled and wheelchair bound Leon Klinghoffer, who had been pushed off the Achillo Lauro in the Mediterranean by PLO terrorists.  By 1990, the case was bogged down in protracted legal proceedings and appeals over fundamental issues such as jurisdiction and service of process.  U.S. common and statutory law seemed inadequate to allow victims effective recourse against terrorists.

Responding to the procedural problems the Klinghoffer family confronted,[2] the scourge of terrorism committed against Americans, and the difficulty of other victims in obtaining relief under existing U.S. law, Congress enacted the Antiterrorism Act.[3] [4]  Congress expressly intended

---

[2] " The legislative record is replete with references to the then-recent decision  in <u>Klinghoffer v. Palestine Liberation Organization</u>, . . . " <u>Boim v. Quranic Literacy Institute</u>, 291 F.3d 1000, 1010 (7th Cir. 2002)

[3]. "Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub.L. No. 101-519, §132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency.  They were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, 106 Stat. 4506 (1992)." <u>Boim v. Quranic Literacy Institute</u>, 291 F.3d at 1009.

[4]     This legislation will allow American victims of terrorism to bring civil suits in U.S. Federal court.

The need for this legislation couldn't be clearer. While Congress has passed laws providing for the criminal prosecution of terrorists, victims of terrorism face incredibly difficult legal hurdles in pursuing claims against terrorists. The recent case of the Klinghoffer family is a glaring example of this gap in our efforts to develop a comprehensive legal response to international terrorism.

Leon Klinghoffer, a passenger on the Achilles Lauro cruiseliner, was executed and thrown overboard during the 1985 terrorist attack. His widow, Marilyn Klinghoffer, and family took their case to the courts in their home State of New York. Only by virtue of the fact that the attack violated certain admiralty laws and that the organization involved--the Palestine Liberation Organization--had assets and carried on activities in New York, was the court able to establish jurisdiction over the case. A similar attack occurring on an airplane or in some other locale might not have been subject to civil

to provide an entirely new statutory tort. The goal of the act was to "create[] a new federal cause of action" and "a new civil remedy against terrorists." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session July 25 1990 ("Senate Hearing") at 34. This was a direct response to the inadequacy of existing law,

> . . . there are currently no laws expressly providing federal civil remedies against these outrageous acts. Therefore this bill would amend Title 18 United States Code Sections 2331 by providing a plaintiff a civil cause of action in United States District Court for injuries caused by acts of international terrorism.

Id. at 49.

### B.    BROAD APPLICATION

§2333 was intended to be construed broadly in order to maximize its effectiveness in combating terrorism. Senator Grassley, the bill's co-sponsor, indicated that "it empowers victims with  all the weapons available in civil litigation." *Antiterrorism Act of 1991*, Hearing Before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, 102nd Congress, September 18 1992 at 10   (emphasis added).   Thus it was intended that every "weapon" or legal tool would be harnessed to accomplish the task of providing remedies to victims in their fight against terrorism.

The legislative history is replete with laudatory statements by sponsors and those who testified in support of the bill praising the policy of creating wide parameters of relief.  Virtually everyone involve acknowledged the bill's expansive reach.

action. The Anti-Terrorism Act of 1991 would fill in this gap in our laws.

Remarks of Congressman Edward F. Feighan, co-sponsor of the ATA, Congressional Record, May, 2, 1991, p. E1538.

6

Nothing in the history suggests that the statute should be interpreted narrowly. Also, the statute of limitations provision uniquely provides that any period in which defendant is absent from the United States or his whereabouts is concealed is not included in the already generous four year statute of limitation.

### C.    PLAINTIFFS UNDER §2333

Similarly, the potential class of plaintiffs who may utilize the provisions of the act are purposefully broad. For instance, the original language of §2333(a) "was intended to be broad enough to allow indirect victims, such as common carriers, to sue for damage to property, for indemnity and lost profits." Senate Hearing at 86  The original version allowed compensation only for "any national of the United States." Senate Hearing at 8. Family members of terrorism victims who themselves suffered were not explicitly provided for in the original bill.

At the urging of the Justice Department, the bill was expanded explicitly to allow family members of victims (as "survivors" and "heirs") to bring claims and provide each a distinct cause of action. Senate Hearing at 38. During testimony before the Senate Subcommittee on Courts and Administrative Practice, Steven R. Valentine Deputy Assistant Attorney General requested the Senate to amend the language of the original bill to expand the parties who could bring suit,

> . . . that this provision be amended to include, in addition to the individual directly affected, such additional parties as the estate of the decedent, survivors, and heirs. This will ensure that the bill is fully protective of the interests of all relevant parties to the civil suit.

Id. at 38. In response to a question posed by Senator Thurmond about whether the amendment would "make certain the ability of family members to file a lawsuit," Valentine responded, "It

would make clear that which is already implied in the bill.  It would remove any doubt that anyone would have as to whether or not they could bring the litigation." Id. at 46[5]

The bill was easily amended to include the Justice Department recommendation.  Thus, the Justice Department further applauded Congress,

> The Department supports legislation to provide a new civil remedy against terrorists and a federal forum for the <u>families and relatives</u> of victims to pursue claims for compensatory damages.

Id. at 34. (emphasis added)

The expansive coverage of 18 U.S.C. §2333 (wide class of potential claimants, inclusion of property and business claims, statute of limitations) is easily understood in light of the dual purpose of the statute.  Congress recognized that terrorism does not simply impact a single individual or even family.  If the effect of terrorism were only felt by the individual victim, Congress would never have designed the statute with such broad parameters.  Recognizing that acts of terrorism occur within a national context, in which frequently the individual victimized is a proxy or symbolic target representing the entire American people, Congress saw the bill as redressing both the rights of an expanded class of victims (survivors and heirs) and also the

---

[5] Similarly Lisa Klinghoffer provided a statement during hearing testimony,

> All Americans deserve the ability to seek justice . . .  Any American victim of terrorism will have legal recourse against those terrorists in any U.S. Federal court. (sic) My father and my family could be any American family. There is need to provide justice for all American terrorist victims.

Id. at 57.

Yet recovery is not limited to Americans but rather to the class or survivors and heirs.  Thus, in a parallel statute involving the Foreign Sovereign Immunities Act 28 U.S.C. §1605, non-Americans have been awarded judgments under the FSIA for their claims of loss of consortium and solatium resulting from terrorism committed against their American relatives.  <u>Anderson v. Islamic Republic of Iran</u>, 90 F.Supp.2d (allowing claim of Lebanese wife of American hostage), <u>Cicippio v. Islamic Republic of Iran</u>, 18 F.Supp.2d 62,68 n. 7 ("The victims. . .  were U.S. citizens at the time they were abducted.  Since their husbands were victims, the Court also has jurisdiction over the claims of [their non-citizen spouses].")

nation as a whole.  As Senator Thurmond said, "Acts of international terrorism against our Nation's citizens, like the recent brutal murder of Col. William Higgins and Leon Klinghoffer, must not be permitted to go unpunished." Id. at 4

### D.  LOSSES SUFFERED BY FAMILIES OF TERROR VICTIMS

#### 1.  CONGRESS INTENDED TO REDRESS THE HARM CAUSED TO ALL VICTIMS OF TERRORISM

The statutory remedy for international terrorism contained in 18 U.S.C. §2333(a) provides,

> **Action and Jurisdiction**  Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

As detailed above, Congress clearly intended to maximize damage awards to plaintiffs in international terrorism cases.  The only circuit court to review a §2333 claim noted that,

> [Its] history, in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law.

Boim v. Quranic Literacy Institute, 291 F.3d at 1010.

The legislative history clearly indicates that the statute serves a dual function.  First, Congress wanted to allow the largest possible class of victims to be made whole.  Hence, not only direct victims, but also family members (survivors and heirs) as well as those not traditionally considered terrorism victims (business and property owners) are able to recover under the act.

Second, the sponsors and advocates recognized the national context of terrorism. An attack on an individual American is seen as an attack on America. Thus, by making terrorists susceptible to very large damage awards for individual acts of terrorism would help punish and deter those who threaten and harm Americans.

> We must not allow these vicious murders to hide behind a false veil of political struggle and spill American blood without facing civil and criminal punishment.

Senate Hearing at 4. The statute's role as a deterrent to international terrorism would only be fully realized if the range of damages awarded in suits brought under the act would be so expansive that the terrorist would feel the "punishment."

Further, by including heirs and survivors in the class of plaintiffs, Congress permitted the widest scope of damages possible including loss of comfort and society.[6] Thus the terrorist would be liable for damages those directly bloodied by the gunmen and for the losses suffered by family members (survivors and heirs).[7]

---

[6] This is consistent with similar state statutes that allow both estates as well as heirs and survivors to maintain separate claims. Channel 20. v. World Wide Towers Services, 607 F.Supp 551, 556 (S.D. Texas 1985)(". . . construing wrongful death and survival statutes . . . two separate and distinct causes of action may arise in a wrongful death case.. . it is clear that the estate of a deceased person is a legal entity which is separate and distinct from those of the widows and other survivors of the deceased.")

[7] This understanding of the 18 U.S.C §2333 is consistent with the jurisprudence concerning other federal causes of action, such as the Death on the High Seas Act, 46 U.S.C §762, the Federal Employers' Liability Act, 45 U.S.C §51, and the Jones Act, 46 U.S.C. App. §688. For instance, the Supreme Court has indicated that when damages are not statutorily limited to "pecuniary losses," family members of the victim may be awarded damages for loss of society. Miles v. Apex Marine Corp, 498 U.S. 19, 31 (1990)("This explicit limitation forecloses recovery for nonpecuniary loss, such as loss of society in a general maritime action.")

## 2. THE ANTITERRORISM ACT FOLLOWS THE MODERN TREND WHICH RECOGNIZES LOSS OF SOCIETY AND COMPANSIONSHIP

The rationale for Congress including heirs and survivors as additional claimants under §2333 has been widely recognized in the last few decades,

> [T]hough recovery for loss of society and comfort is denied under some statutes, it is an item usually recognized and made the basis for an award, at times apparently substantial . . .

> Even jurisdictions that have rejected the loss of society or consortium claim, as such, have permitted one form of it, namely a loss of guidance and advice that the decedent would have provided, at least in the case of deceased parents.

Prosser & Keeton on Torts §127 (1984).

In Miles v. Apex Marine Corp, 498 U.S. 19 (1990) the Supreme Court recognized that claims based on a close emotional relationship are permitted, if not specifically precluded or limited by federal statute. One survey has indicated that "probably a numerical majority of jurisdictions" allow for damages for loss of society and companionship. Speiser, Recovery for Wrongful Death 2d 3:49.

Several courts have indicated that the failure to allow loss of society damages to family members is outdated and immoral. Disallowing such damages is a "barbarous concept . . . [and a] reproach to justice." Hopkins v. McBane, 427 N.W.2d 85 (N.D. 1988) (citing Wycko v. Gnodtke, 361 Mich. 331,105 N.W.2d 118,121 (1960)). Upon certification from the Eleventh Circuit Court, the Florida Supreme Court stated that denial of damages for loss of society is based on "antiquated perception" of the familial relationship as being one of master and servant. United States v. Dempsey, 635 So.2d 961, 963 (Fla. 1994). Further, the court stated that,

> Certainly, in 1973, when this Court set forth the elements of damages that a parent of an injured child is entitled to recover, it was apparent that a child's companionship and society were of far more value to the parent than were the services rendered by the child. Thus, there was an obvious need to recognize this element of damages to fully compensate the parent for the loss suffered because of a negligent injury to the child. The recognition of the loss of companionship element of damages clearly reflects our modern concept of family relationships.

Id. at 964, see also Letelier v. Republic of Chile, 502 F.Supp. 259 (D.D.C. 1980). Similarly, a

leading treatise has noted,

> . . . it has almost always seemed unjust to say that a child, or nonworking wife or mother, or an aged person is worth nothing to his survivors, and juries have at times rendered substantial verdicts in such cases.

Prosser & Keeton on Torts §127 (1984).

Locally, both this Court and the Rhode Island Supreme Court have recognized that loss of

society and companionship are compensable. D'Ambra v. United States, 481 F.2d 14 (D.R.I.

1973), Sindelar v. Leguia, 750 A.2d 967 (R.I. 2000), Fritz v. May Department Stores, 866

F.Supp. 66 (D.R.I 1994), Mitchell v. United States, 141 F.3d 8 (1st Cir. 1998)(recognizing that

Massachusetts allows loss of consortium damages to adult children not financially dependent on

deceased).

In a §2333 case, to hold otherwise would create an absurdity clearly not intended by the

drafters of the Antiterrorism Act.[8]  For example, the terrorist murder of an aged or very young

victim, both having limited earnings, or a murder of someone without compensable heirs or

---

[8]   Congress clearly intended to allow all measures of damages to victims, as the bill "empowers victims with all the weapons available in civil litigation . . ." Remarks of Senator Grassley, Senate Journal p. S4511 April 16, 1991. (emphasis added). As noted above, the act was specifically amended to clarify that claims of family members would be recognized.

survivors, would result in a liable defendant escaping the economic "sanction" and punishment intended by the act. [9]

That §2333 authorizes a claim on behalf of heirs and survivors, as distinct from the victim or his estate, is not unusual. Numerous states and federal courts have interpreted wrongful death statutes to include such claims, even when an applicable statute does not explicitly provide for such relief. Wellborn v. Sears, Roebuck & Co., 970 F.2d 1420,1429 (5th Cir. 1992) (compensation for mother of deceased 14 year old daughter: "Awards for mental anguish should compensate for the 'emotional pain, torment and suffering' experienced due to the death of a family member."), see also LaForest v. Autoriad de Las Fuentes, 536 F.2d 443 (1st Cir. 1976)(applying Puerto Rican law).

The Model Survival and Death Act §3(d)(3) provides that a deceased's "closely related survivors" are entitled to recover "reasonable compensation for mental anguish and loss of companionship." See also Carter v. University of Medicine and Dentistry of New Jersey, 838 F.Supp 957, 967 (D. N. J. 1993)("the recent propensity of some courts, in New Jersey and elsewhere to "recognize[] the more progressive jurisprudential trend permitting a parent's *per quod* claim for loss of her child's society and companionship" by statute or "' by analogy with the right of a spouse to recover damages for the loss of consortium.'"), Enochs v. Brown, 872 S.W.2d 312 (Tx. 1994), see also Gallimore v. Children's Hospital Medical Center, 67 Ohio St.3d 244, 617 N.E.2d 1052, 1056 (1993)(although Ohio statute permitted such recovery, "We can find

---

[9] This obviously was not the intent of this statute as its drafters desired to create sanctions for the murderers of Mr. Klinghoffer, a retired, disabled, wheelchair bound sixty-nine year old man. If the Palestinian terrorists who murdered him would escape significant judgement merely because they chose a victim without obvious pecuniary damages, the Antiterrorism Act would be impotent. The same analysis applies in this case where the deceased has modest earnings. Yet the statute supplies the appropriate sanction by allowing damages for his children and parents, thus increasing the economic disincentive to terrorism.

no specific common-law impediments to recovery for such losses. If there were any, they would be devoid of rational justification in the modern law."), <u>Garner V. Houck</u>, 312 S.C. 481, 435 S.E.2d 847 (1993).

The modern trend allowing loss of society and companionship is expansive. Liability extends to adult children, those who have no actual knowledge of the deceased and in cases where the victim survives. For example, a parent's claim for consortium is permitted for an injured adult child. <u>Masaki v. General Motors</u>, 780 P.2d 566, 577 (Haw. 1989)(citations omitted),

> We realize that a number of courts which recognize the parents' cause of action for loss of consortium of their injured children restrict the action to minor children. This rule is generally premised on the rationale that upon emancipation, parents are no longer entitled to the services and earnings of their children. We find such reasoning outmoded and illogical. At common law, the child, like the wife, was relegated to the role of a servant and considered an economic asset to the family. In the modern family, however, children have become less of an economic asset and more of a financial burden to their parents. Today children are valued for their society and companionship.

An unborn child of deceased may make a claim for emotional distress. In <u>Artache v. Autoridad de Energia Electria</u>, 924 F.Supp. 346 (D.P.R. 1996) the court found that a child unborn at the time of her father's death had a sufficient cause of action,

> Jessica has lost a biological parent she will never know. A jury could reasonably find that she has and will suffer emotional distress as a result.

<u>Id</u>. at 351. Parents can similarly recover for the loss of society of a stillborn fetus. <u>Riley v. Koneru</u>, 228 Ill. App.3d 883, 593 N.E.2d 788 (Ill. 1993).

### 3.    APPLICATION TO TERRORISM CASES

The inclusion of loss comfort and companionship damages is particularly pertinent in terrorism cases and consistent with other federal remedies for terrorism victims.[10]  It fulfills the twin goal of maximizing the damage impact on terrorists and also allows recovery to all those who are impacted by terrorism.  The facts surrounding the death impairs the survivors' emotional recovery thus requiring a remedy matched to the horrible suffering,

> This type of action deserves a reply in damages that will fully compensate for the truly terrible emotional suffering of the surviving parents and siblings.

Eisenfeld v. Islamic Republic of Iran, 172 F.Supp.2d at 8.

The nature of the death, often gruesome, bloody, and unanticipated is unique, "the unexpected quality of death may be taken into consideration in gauging the emotional impact to those left behind." Id.  Death caused by terrorism creates a heightened sense of loss to the surviving family members. The leading case on the subject of suffering by family members of terrorist victims indicates that, "When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time."[11] Flatow v. Islamic Republic of Iran, 999 F.Supp. 28, 31 (D.D.C. 1998).

---

[10]  For instance, all of the federal provisions dealing with civil claims against terrorists and their sponsors provide the right of relatives of victims to seek compensation.  In addition to 18 U.S.C. § 2333(a), both the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(7) and §1605 note, and the Torture Victim's Protection Act, 28 U.S.C. §1350 note (expanding claim beyond the direct victim to include " any person who may be a claimant in an action for wrongful death.") allow relatives of victims to seek damages.

[11] Most of the cases involving terrorism over last several years have been brought under the Foreign Sovereign Immunities Act, 28 U.S.C. §§1602-1611. Unlike 18 U.S.C. §2333, that statute merely provides for jurisdiction and does not create a separate cause of action. Sutherland v. Republic of Iran, 151 F Supp.2d 27 (D.D.C. 2001) The Flatow Amendment 28 U.S.C. 1605 note provides the damages available in an action brought against a foreign state, including "solatium" which encompasses damages for "injury to the feelings and loss of decedent's comfort and society." Flatow v. Islamic Republic of Iran, 999 F.Supp. at 29.   As the legislative history of 18 U.S.C. §2333

Flatow provides the most exhaustive treatment of the concept of loss of society and comfort in the context of a death caused by terrorism:

Originally, wrongful death acts provided compensation only for the decedent's lost cash income stream. The next evolutionary stage was to recognize the economic value of decedent's personal services to claimant, such as household maintenance and nursing care. Many jurisdictions have now expanded recovery for loss of comfort and society to include all benefits which the claimant would have received had decedent lived. "Society" has evolved to include "a broad range of mutual benefits which 'each family member' receives from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection."

The calculations for mental anguish and loss of society share some common considerations. First, the calculation should be based upon the anticipated duration of the injury. Claims for mental anguish belong to the claimants and should reflect anticipated persistence of mental anguish in excess of that which would have been experienced following decedent's natural death. When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time.

The nature of the relationship between the claimant and the decedent is another critical factor in the solatium analysis. If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as companionship, love, affection, protection, and guidance. Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with decedent; as well as decedent's achievements and plans for the future which would have affected claimants.

Finally, unlike lost wages, which can be calculated with a fair degree of mathematical certainty, solatium cannot be defined through models and variables. Courts have therefore refused to even attempt to factor in the present value of future mental anguish and loss of society. While economic losses can be reduced to present value with simple equations to establish the amount of an annuity established today which would have matched the decedent's ostensible income stream, the scope and uncertainty of human emotion renders such a calculation wholly inappropriate. This is the paradox of solatium; although no amount of

makes clear, the widest possible remedies were intended by Congress for claims of international terrorism, regardless of whether they are denominated as "consortium" or "solatium."

money can alleviate the emotional impact of a child's or sibling's death, dollars are the only means available to do so.

Flatow v. Islamic Republic of Iran, 999 F.Supp. at 31-32 (citations omitted).

## V.  **PLAINTIFFS' DAMAGES**

The plaintiffs respectfully request the Court to award damages consistent with the judgments in other terrorism cases. As noted below, the general damage formula utilized in most terrorism cases can serve as guidance in this action.

By following the guidelines, this Court will accomplish several goals intended by the proponents of the Antiterrorism Act. First and foremost, as indicated by Flatow such an award will attempt to fully compensate all of the plaintiffs for the horrible, almost unimaginable, losses suffered. Second, by following the damage structure of the Foreign Sovereign Immunities cases, the statutes will be harmonized. No distinction will be made between the state sponsors and the triggermen and their terrorist organization. Third, a departure from this guideline may be interpreted by the perpetrators of terrorism as a weakening of American resolve.[12] Lastly, virtually all previous judgments involving actions for terrorism are against the sponsors of terrorism, not the actual gunmen. Here where the actual murderers and the terrorist organization are defendants, awards at least as high as those against supporting financier-states are appropriate.

---

[12] Jenco v. Islamic Republic of Iran, 154 F.Supp. at 39 (indicating that failure to make similar punitive damages award as in prior cases "might actually be construed as a condonation of MOIS's rogue behavior.")

### A.    THE ESTATE OF YARON UNGAR

#### 1.    BACKGROUND

Yaron Ungar, an American citizen, was born in New York in 1970.  As a child he resided in New York, Houston, and Philadelphia as well as Israel.  At the time of his death, Yaron was working as a schoolteacher in Israel.  He had completed three and a half years of rabbinical studies working toward ordination, obtained a teacher-training certificate and would shortly receive his bachelors degree.  He wrote two books, a workbook on the Book of Samuel and with his father-in-law, a small treatise on Jewish law.

Yaron was married to Efrat, with whom he had two children.  At the time of the terrorist attack, Efrat was two months pregnant with the couple's third child.  The couple had two children, Dvir, then almost two and Yishai, then nine months old.  Efrat was an artist who illustrated and wrote a series of popular children's comics which appeared on a regular basis in an Israeli newspaper.

#### 2.    LOST EARNINGS

The simplest measure of damages is the claim of the Estate of Yaron Ungar for the economic losses caused by his wrongful murder.  Plaintiffs presented the testimony of economist Dr. Adrian Ziderman in regard to lost accretions.  As a schoolteacher following a fairly routine career path, Yaron's earnings, reduced to present value, would be $1,273,028 and $1,400,000.  In light of the nature Yaron's death and the gruesome method employed by the HAMAS defendants, the Estate respectfully requests that this Court award the higher, less conservative figure.  In order to fulfill Congress' intent in enacting the Antiterrorism Act, the largest sanction should be imposed.

### 3.    PAIN AND SUFFERING

Dr. Alan Friedman testified that Yaron Ungar outlived his wife, having witnessed her murder and the attackers' machine gun shots coming from the back of their car in the direction of their nine month old son. The courts have recognized the right to pain and suffering in cases involving less onerous circumstances.

> If Plaintiff presents sufficient evidence of conscious pain and suffering, determination of the compensation has largely been relegated to the discretion of the trier of fact by courts in this jurisdiction based upon factors including the duration and nature of the suffering endured. The United States Court of Appeals for the District of Columbia Circuit has firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering.

Taylor v. Washington Terminal Co. 409 F.2d 145, 150 (1969). An award is even more warranted in an action for death by terrorism,

> As the cases clearly indicate, the courts have increasingly been awarding monetary relief for the suffering exacted when a person, in the midst of his normal enjoyment of life, is suddenly and cruelly required to confront his death, as well as to experience it.

Notes, Kimball, Axelrod & Goldstein, Damages in Tort Actions, §21.02[4].

In suits involving acts of terrorism, survival damages are routinely awarded to the deceased's estate for emotional distress and pain and suffering which the victim could have recovered had he lived. Flatow v. Islamic Republic of Iran, 999 F.Supp. 28. Surviving such horror, even for a short period of time, is surely deserving of compensation.

Courts ruling on terrorist default judgements have recognized that even very short periods of pain and suffering prior to death are compensable. Elahi v. Islamic Republic of Iran, 124 F.Supp.2d at 113. ($1 million awarded when witness testified that death occurred "at least something like 30 seconds" following shooting), Eisenfeld v. Islamic Republic of Iran, 172 F.Supp.2d 1, ($1 million awarded for each victim of a bombing who survived for "several

minutes"), <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. at 29. ($1 million when "conscious pain and suffering continued for at least three to five hours.")

In none of the previous cases was the victim a witness to his wife's murder and the possible killing of his son. Surely, the psychological stress and anguish Yaron suffered in the final minutes of his life were unbearable. The combination of the overwhelming physical pain caused by the terrorists' bullets and the emotional trauma of their attack on his family produced an excruciating end to his life.

The Estate respectfully requests an award of $1,000,000 for Yaron's pain and suffering.

**B.    DVIR AND YISHAI**

**1.    COMPANIONSHIP, SOCIETY AND GUIDANCE**

At the time of their father's murder, Dvir was almost two years old and Yishai was nine months old. As both heirs and survivors, they have an independent claim for damages for the loss of consortium.

These unfortunate children will never know of their parents. Despite Yaron's and Efrat's many accomplishments and their unique personalities, their children will only know them through the memory of others. As youngsters, they will never benefit from their father's compassion, teaching skills, religious education and, overall guidance. Also, they have been deprived of the intimacy and companionship of a parental relationship and surely will suffer this absence for their entire lives. They will carry this loss throughout their lives and will be susceptible to increased risk of mental heath problems.

Compounding their sorrow is the knowledge of the horror in which their parents were killed. Throughout their lives, any thought about their parents and their murder will surely

20

reflect the gruesome and barbaric manner of their murder. Thus, besides suffering a lifetime of loss, the knowledge of their parents' last minutes will surely exacerbate their anguish.

Further, the murder of Yaron has created a heightened loss because of Efrat's murder. As the remaining parent, Yaron's murder was thus even more devastating. The killing of their last parent exacerbates the children's loss. A damage award at least as high as in other terrorism cases is therefore appropriate.

While impossible to value the suffering and loss of companionship felt by a child following a parent's murder, the courts which have addressed the issue have developed a range of awards. In Alejandre v. Republic of Cuba, 996 F.Supp. 1239, 1251 (S.D. Fla. 1997) $7.5 million was awarded to a college aged student for the death of her father. In Hegna v. Iran, 00-716, January 22, 2000 (D.D.C.) the Court made awards of $3 million and $5 million to adult children for the lost companionship of their father. In Weinstein v. Republic of Iran, 184 F.Supp.2d 13 (D.D.C. 2002) the court awarded $5 million each to adult children of a bombing victim. In Higgins v. Islamic Republic of Iran, 2000 WL 33674311 (D.D.C) the court awarded $12 million to a high school senior for the loss of society and companionship of her father following his kidnapping, torture and murder. (The Court noted that grown child's "caring relationship with her father . . . She has been bereft of the guidance he would have provided throughout her life.") In Sutherland v. Islamic Republic of Iran, 151 F.Supp.2d 27, 52 (D.D.C. 2001) the court awarded $6.5million to children who suffered "extensive anxiety, frustration and loneliness" during their father's six-and-a-half years of torture and kidnapping.

The Guardians of Dvir and Yishai respectfully request judgment for $10,000,000 each for the losses they have individually suffered.

## 2.    **LOSS OF SERVICES**

The family witnesses will testify to the nature and extent of Yaron's contribution to the family and especially the children during their short lifetime with him.  He was an excellent, caring and engaging father.  As a result of their father's murder, Dvir and Yishai will no longer be able to receive the benefit of his parental services.

The children are more than adequately cared for by their grandparents.  However, the loss suffered by not having the services of Yaron as a caretaker is real.  The terrorists should not be subsidized merely because the children have grandparents willing to step into Yaron's (and Efrat's) shoes.  While most terrorism cases have not addressed the issue, in <u>Alejandre v. Republic of Cuba</u>, 996 F.Supp at 1249 the court awarded $206,388 for "loss of household services."  Dr. Adrian Ziderman has calculated the present value of the loss of services by their father to the children to be between $279,155 and $325,655

The Guardians of Dvir and Yishai respectfully request an award for the children for the loss of parental services in the amount of $325,655.

## C.    **JUDITH AND MEIR UNGAR**

Yaron's parents have suffered tremendously following Yaron's murder.  Their joi de vivre has been lost.  They constantly experience the loss of their oldest son, even while working hard at trying to maintain their daily routines.[13] Joyous occasions are diminished because they

---

[13] Their ability to continue on with life should not be seen as a factor mitigating their suffering,

Individuals can react very differently even under similar circumstances; while some sink into clinical depression and bitterness, others attempt to salvage something constructive from their personal tragedy.  Such constructive behavior should not be considered as mitigating solatium, but rather as an equally compensable reaction, one in which courage to face their own mental anguish prevails in order to survive, and in some circumstances, to benefit another.

feel the perpetual loss of Yaron. Yaron's death is especially poignant given his unique role in the family.

Several reported cases involve the terrorist murder of emancipated children. The courts have routinely awarded at least $5 million to the surviving parents. i.e. <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F.Supp.2d 1, <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1, see also <u>Alejandre v. Republic of Cuba</u>, 996 F.Supp 1239 ($7.5 million awarded to parents of murdered 24 and 29 year old sons).

Judith and Meir Ungar respectfully request an award of $5,000,000 each for their loss of society and companionship.

### D.    **MICHAL COHEN, AMICHAI AND DAFNA UNGAR**

Each of Yaron's siblings had a special intimate relationship with him. As an older sister, Michal was Yaron's longstanding confidante. Yaron was a guide, teacher and role model to Amichai and Dafna. As their older brother, they looked to him for advice and guidance especially as they were coming to maturity.

Damages have been awarded to adult siblings in several terrorism cases. In <u>Jenco v. Islamic Republic of Iran</u>, 154 F. Supp. 2d 27 (D.D.C. 2001) the court awarded damages in the amount of $1.5 million each to adult siblings of a priest who had been tortured and kidnapped for almost seven years. The court distinguished the case from the other terrorism rulings because the victim had been ultimately set free and rejoined his family.

When adult siblings are killed in cases of terrorism, the courts have routinely awarded $2.5 for the death of brothers and sisters in their early 20s. <u>Eisenfeld v. Iran</u>, 172 F.Supp.2d 1, <u>Flatow v. Islamic Republic of Iran</u>, 999 F.Supp. at 31.

Flatow v. Islamic Republic of Iran, 999 F. Supp. at 32.  In Elahi v. Islamic Republic of Iran, 124 F.Supp.2d 97 an adult sibling of an adult terrorism victim was awarded $5 million as they had a particularly close relationship.

Michal, Amichai and Dafna respectfully request an award of $2.5million each for their loss of society and companionship.

## VI.    TREBLE DAMAGES, ATTORNEY FEES, COSTS, AND INTEREST

§2333 states that plaintiffs "shall recover threefold the damages he or she sustains and the cost of suit, including attorney fees."  As the treble damage provision was intended to provide a "punishment" and "sanction" to the terrors, supra, it is vital that the underlying damage award be substantial.  As noted by the commentators above, it is unjust to allow those responsible for a wrongful death to escape liability merely because the victim was a low wage earner.

This case presents a potential for such an injustice.  The wrongful death was not caused by negligence but rather an intentional, brutal, evil act, yet Yaron earned a modest salary.  While Congress intended to maximize awards by allowing treble damages, the effect of this provision could actually undermine the rationale behind the Antiterrorism Act.  For instance, the underlying conduct giving rise to the HAMAS defendants' liability is by definition a criminal act.[14]  Absent the treble damage provision, plaintiffs would surely be able to recover punitive damages.  Punitive damages are permitted in actions brought under many federal statutes, including those that involve a far less compelling basis for their imposition.[15]  In the FSIA cases

---

[14] For example, "international terrorism" is defined in part under 18 U.S.C. §2331(1)(A) as a "violation of the criminal laws of the United States or of any State, or that would be a criminal violation of committed within the jurisdiction of the United States or of any State . . . "

[15] The Foreign Sovereign Immunities Act, 28 U.S.C. §1605 et seq., FELA, 45 U.S.C. §51, 42 U.S.C. §1983, the

the punitive damages have been hundred of millions of dollars.    Congress' "sanction" and "punishment" is, therefore, actually lower here against the triggermen and HAMAS than it would be had the Antiterrorism Act not included a treble damage provision.    Moreover, a modest award will have minimal impact as a deterrent against HAMAS in light of its tremendous assets and yearly budget.

Following the hearing, plaintiffs respectfully request the opportunity to provide affidavits of counsel fees and costs.    They further request that the court impose statutory interest on the judgment from June 9, 1996.

## VII.    <u>CONCLUSION</u>

The plaintiffs respectfully request entry of judgment against the HAMAS defendants as outlined above.    As a damage structure has developed in cases of international terrorism, plaintiffs urge the court not to depart from this jurisprudence.    In each of the cases cited above, terror "sponsoring" nations were dealt a huge financial blow.    Yet, judgments were entered only against the state sponsors not the actual triggerman.    Here, where liability is more direct and plaintiffs seek judgment against the gunmen and their terrorist organization, there is no basis to deviate from the pattern set by the federal courts which have previously heard such cases.

In fact there are several good reasons to closely follow the previous cases.    First, this case seeks judgment against the triggerman and their terrorist organization (as opposed to a distant state sponsor).    Second, a deviation from prior awards may be interpreted as proving that American anti-terrorism measures are inadequate to protect Americans.    Lastly,  as any departure may be viewed by the terrorists as a weakening of American resolve in combating terrorism.

Alien Torts Act, 28 U.S.C. §1350, the Torture Victims Protection Act, 28 U.S.C. §1350 note, general maritime actions, <u>CEH, Inc. v. F/V Seafarer</u>, 70 F.3d 694 (1st Cir. 1995).

Attorney for the Plaintiffs,

7/15/02

David J. Strachman        #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700