THE ELECTRONIC INTIFADA
INTRODUCTION | THE MEDIA | EI WIRE | REFERENCE LIBRARY | FOR JOURNALISTS | FOR ACTIVISTS | CONT

SEARCH

# HUMAN RIGHTS

ELECTRONIC INTIFADA REFERENCE LIBRARY 

## Human Rights Watch: "Israel uses excessive force"
Human Rights Watch, *report,* 15 January 2003

**Human rights developments**

The violence that erupted beginning in September 2000 intensified in 2002. Civilians increasingly paid the price for repeated, egregious violations of international humanitarian law by the Israel Defense Forces (IDP) and Palestinian armed groups. At least 1,949 Palestinians and 637 Israelis were killed between September 2000 and late October 2002, the majority civilians, including 292 Palestinian and seventy-nine Israeli children. New patterns of abuse arose, and old ones intensified. Pernicious practices that had been diminishing were revived.

**Israel and the Occupied West Bank and Gaza Strip**

Prime Minister Ariel Sharon's coalition government held the severely weakened Palestinian Authority (PA) responsible for all armed attacks by Palestinians. Following the destruction of the World Trade Center in September 2001, Israeli government ministers consciously imitated the language of U.S. foreign policy. Israeli authorities characterized all armed Palestinian activity as terrorism, and justified Israeli military actions in the Occupied Territories as a part of the global "war on terrorism."

In February, the Israeli government re-introduced into the Knesset the "Illegal Combatants Law," a measure initially designed to legitimize retroactively the continued detention of Lebanese hostages Sheikh 'Abd al-Karim 'Obeid (abducted from Lebanon in July 1989) and Mustafa al-Dirani (abducted from Lebanon in May 1994). The Knesset passed the law, which enabled the military to hold individuals arbitrarily and indefinitely on the basis of assumption rather than proven guilt, on March 7, 2002.

As Israeli military operations escalated in December 2001, so did the number and gravity of violations committed by the Israel Defence Forces. Repeated militarized "arrest raids" into PA-controlled areas in late 2001 grew in size and intensity until, in March 2002, the IDF mobilized some thirty thousand troops for Operation Defensive Shield, reportedly Israel's largest military operation since the 1982 invasion of Lebanon.

During the operation, Israeli soldiers repeatedly used indiscriminate and excessive force, killed civilians willfully and unlawfully, and used Palestinian civilians as human shields. IDF troops also inflicted damage to homes, businesses, and government offices; looted and stole in the course of searches; coerced civilians to assist military operations, and detained at least 4,500 Palestinian men and boys, many of whom reported ill-treatment during arrest and interrogation. From March 29 to April 19, the Israeli authorities impeded the entrance of outside observers, including journalists, human rights activists, United Nations representatives, and the International

### ei ESSENTIALS
- Join our Mailing List
- Support our Work
- Put ei on your Site

### ei SITE HELP
- ei Homepage
- What's New on ei?
- Advanced Search
- Contact Us

### ei NEWS & FEATUR
- Opinion/Editorial
- Diaries from Palestine
- Israel Lobby Watch
- Activism
- Human Rights
- Development

### ei MEDIA ANALYS
- Role of the Media
- Coverage Trends
- Journalists in Danger
- Action Items
- Letters to the Media
- EI in the Press

### ei ENTERTAINMEN
- Arts, Music & Culture
- Bassaleh News Netw

### ei RECOMMENDS
Tanya Reinhart's *Israel/Palestine: How to E the War of 1948* is an excellent book:



Click here to buy the bo on Amazon.com.



Committee of the Red Cross (ICRC). These violations reflected patterns of abuse that--partly reflecting the effective impunity enjoyed by Israeli soldiers--had progressively worsened since September 2000.

Israeli security forces continued to resort to excessive and indiscriminate use of lethal force, causing numerous civilian deaths and serious injuries. In Jenin, Human Rights Watch documented twenty-two civilian killings during the IDF military operations in April. Many of them were killed willfully or unlawfully, and in some cases constituted war crimes. Fifty-seven-year-old Kamal Zghair, a wheelchair-bound man, was shot and then run over by IDF tanks on April 10 as he was moving in his wheelchair--equipped with a white flag--down a major road in Jenin. Thirty-seven-year-old Jamal Fayid, a quadriplegic, was crushed to death in the rubble of his home on April 7 after IDF soldiers refused to allow his family to remove him from their home before a bulldozer destroyed it. Under international law the Israeli authorities were required to criminally investigate these and other killings to ascertain individual responsibility. At this writing, the IDF had not responded to repeated requests from Human Rights Watch for information as to whether these killings were investigated.

After five suicide bombings in four weeks (described below), Prime Minister Sharon announced on June 18 that the IDF would re-occupy the West Bank and Gaza Strip "as long as terror continues." Israeli troops re-occupied all major population centers except Jericho, and instituted the heaviest restrictions on civilian movement in the Occupied Territories to date. On August 7, Israeli authorities announced their willingness to withdraw from Bethlehem in return for strong Palestinian security measures against armed militants. Israeli troops withdrew from central Bethlehem at the end of August, but returned on November 22.

IDF killings of unarmed Palestinian civilians continued throughout the year. Casualties were aggravated by Israeli policies marked by insufficient regard for civilian life. These included a policy of employing deadly force against civilians to enforce protracted and at times haphazardly implemented curfews. On June 21, four civilians, including three children, were killed as they attempted to buy food in the Jenin market: An initial military inquiry said that local soldiers had "erred." Municipal driver Ahmad al-Qureini was shot and killed by Israeli soldiers on August 10, despite the fact he had permission to travel during curfews. A subsequent IDF investigation stated his vehicle had lacked the flashing light required for proper municipal identification, despite Associated Press video footage of the incident that showed the flashing light.

Israeli authorities intensified their policy of "liquidations," killing individuals whom they accused of planning or carrying out attacks on Israeli military targets or civilians. Israeli forces used snipers, helicopter-fired missiles, tanks, and explosive devices to carry out the killings, many of which appear to have been undertaken in circumstances where the target could have been arrested. According to LAW, the Palestinian Society for the Protection of Human Rights and the Environment, some 148 individuals were killed in these "liquidations" between November 9, 2000 and August 31, 2002. At least forty-six civilian bystanders were also killed. On July 23, 2002, fourteen civilians were killed and some 140 injured in the "liquidation" of Hamas military leader Salah Shehadeh. Eight of the fourteen were children. Israeli political and military authorities had approved the operation, which involved the dropping of a one-ton bomb in a crowded civilian residential area, in violation of Israel's obligation under international humanitarian law to minimize civilian casualties. An IDF inquiry held the next day determined the means of attack had been "inappropriate." The operation was described by Prime Minister Sharon as "a great success."

On January 24, LAW and the Public Committee Against Torture in Israel (PCATI) petitioned the Israeli High Court of Justice to outlaw the "liquidations" policy. The court gave the state forty days to reply to a series of questions regarding the policy's

legality. At the time of writing, Israeli authorities had not replied. After July, such killings continued even in those areas where the IDF exerted direct control, and thus had greater capacity to make arrests.

During military operations, Israeli soldiers routinely coerced Palestinian civilians, including children, to perform life-endangering acts that assisted military operations. The practice, known as the "neighbor procedure," violated the fundamental international humanitarian law principle of civilian immunity, violated multiple provisions of the Fourth Geneva Convention, and recklessly exposed civilians to danger. By April, there were widespread, documented cases in which IDF soldiers explicitly used Palestinian civilians to shield themselves from Palestinian fire. In one case documented by Human Rights Watch, seven men and one fourteen-year-old boy were forced by IDF soldiers to stand on the balcony of a house in the Jenin refugee camp to deter Palestinian gunmen from firing at the IDF soldiers. The eight were compelled to stand in front of the soldiers when the soldiers fired at Palestinian gunmen, the soldiers' resting their rifles on the civilians' shoulders. In another case, Faisal Abu Sariya, a forty-two-year-old teacher, was forced to both shield and assist IDF troops from April 4-6 in the Jenin refugee camp, until he was shot by Israeli forces.

On May 7, in response to a petition by seven local human rights organizations, the IDF informed the High Court of Justice that it would immediately prohibit its forces from using civilians as hostages or human shields. The IDF also committed to investigate the use of the "neighbor procedure," and to clarify to commanders that it could not be used in circumstances that might physically endanger civilians. Despite repeated requests, the IDF did not make a copy of the order or results of the investigation available to human rights groups. After the death of Ahmad Abu Mohsen while being forced to assist IDF soldiers in a military operation in Tubas on August 14, the same seven organizations petitioned the High Court to ban the procedure's use. On August 18, the High Court issued a temporary injunction preventing use of the "neighbor procedure" until a final decision was made. At the time of writing, reports of the procedure's use continued.

IDF operations caused extensive, and often repeated damage to civilian buildings and infrastructure in PA areas, including the partial or complete destruction of roads, sewage networks, water supplies, and electrical grids. In at least Jenin, Nablus, and Ramallah, severe damage appeared to exceed any requirement of military necessity. According to the U.N. Office for the Coordination of Humanitarian Affairs, Israeli military operations between March and May caused some U.S.$342 million worth of damage to physical and humanitarian infrastructure in the West Bank. On July 24, 2002, immediately before its summer recess, the Knesset approved an amendment to the "Law for Handling Claims Related to IDF Activity in Judea and Samaria." The amendment sharply curtailed the ability of civilians to obtain compensation for damage or injury caused by negligent or unlawful acts of the Israeli security forces.

The IDF continued to resist appeals to investigate wrongful deaths or other violations by Israeli soldiers. On October 15, the Israeli newspaper Ha'aretz reported some 220 military police investigations had been opened since September 2001. Only thirty of these were reportedly related to weapons-related charges. Investigations were not conducted according to international norms of timeliness, thoroughness, and impartiality.

The Israeli authorities also tightened long-standing restrictions on freedom of movement in the West Bank and Gaza Strip. These restrictions were so severe and widespread as to constitute collective punishment. Palestinian movement on primary roads and the majority of secondary roads was banned for much of 2002, enforced via cement blocks, boulders, earth ramparts, and some 150 to 180 military checkpoints. An IDF program to reduce harassment was introduced at key

checkpoints mid-year.

These crippling movement restrictions were accompanied by extensive IDF-imposed curfews from late June 2002. Formerly concentrated in the Hebron area, in the first week of July some 850,000 Palestinians were under curfew; by late September this number stood at some 550,000, concentrated particularly in the northern West Bank. Notification of curfew impositions and liftings were often inconsistent and erratically enforced.

Throughout the year IDF forces blocked access to emergency medical assistance on numerous occasions and for long periods, often in circumstances that appeared to violate Israel's obligations under international humanitarian law. Israeli soldiers also attacked ambulances and harassed or ill-treated emergency medical personnel, alleging armed Palestinian groups used ambulances to transport weapons and personnel. As of November, the IDF had made public evidence of only one such case, on March 27, 2002, involving a Palestinian ambulance reportedly carrying explosives near Ramallah.

The humanitarian situation in the Occupied Territories deteriorated significantly as a result of the cumulative impact of damage to civilian infrastructure, movement restrictions, and ongoing violence. When visiting the region in October, the head of the International Committee of the Red Cross (ICRC) described the humanitarian situation as "the most dire since 1967."

Economic activity, already severely curtailed, came to a virtual standstill and humanitarian agencies became increasingly responsible for provision of food, medication, and other essential goods and services in the West Bank and Gaza. According to the U.N. special coordinator for the Occupied Territories, by August 31 unemployment stood at 50 percent in both the West Bank and Gaza. More than 55 percent of inhabitants in the West Bank and 70 percent in Gaza lived under the poverty level of two dollars of consumption per day. By November 1, Israeli authorities had transferred $42 million of the estimated $681 million of frozen tax transfers owed by Israel to the PA.

In addition to the logistical challenges imposed by severe movement restrictions, humanitarian organizations complained of increased harassment of staff by IDF soldiers and increased difficulty in gaining permission for expatriate staff to enter Israel.

Israeli forces continued to demolish punitively the homes of families of alleged suicide bombers or other members of armed Palestinian groups. According to B'Tselem, more than eighty-one homes had been punitively demolished from January 1 to November 17, 2002. These acts violated international humanitarian law provisions prohibiting collective punishment. Other dwellings were destroyed for alleged security purposes. According to the Gaza-based Palestinian Center for Human Rights (PCHR), 613 dwellings were destroyed by IDF forces in Gaza from September 2000 to September 25, 2002, leaving more than four thousand individuals homeless. The PCHR reported some seventeen thousand dunums of agricultural land were forcibly cleared during the same period.

Israeli authorities also confiscated Palestinian lands to expand Israeli settlements and for the construction of bypass roads. On May 20, the Israeli group Peace Now reported that fifteen new settlement sites had been established since the election of Prime Minister Sharon in February 2002 in contravention of international humanitarian law. In August, Peace Now reported that eight new settlements had been established in that month alone. On September 19, outspoken settlement supporter Effie Eitam was appointed minister of national infrastructure. Two weeks later, Defense Minister and Labor leader Benyamin Ben-Eliezer ordered the

Case 1:00-cv-00105-L-DLM   Document 90-7   Filed 11/05/02   Page 6 of 13 PageID #: 12
ei: Human Rights Watch: "Israel uses excessive force"
11/26

dismantling of some eighteen unauthorized settlement outposts, the majority uninhabited, before resigning from government on October 28.

More land was confiscated, and de-facto borders re-defined, as Israel began the construction of a "security fence" over 116 kilometers of the northern West Bank, along--but not contiguous with--the Israeli border. Over ten thousand Palestinian inhabitants were expected to be affected as their villages became caught within the proposed fence.

On September 3, the Supreme Court upheld the forcible relocation of two family members of an alleged suicide bomber from the West Bank to Gaza for two years. The court's decision limited the application of the punishment to individuals who themselves constituted a security danger to the state. The determinations were made in administrative proceedings, based on secret evidence unavailable to the defendants and their counsel. Similarly, the right to trial was denied to Nahad Abu Kishaq, whose Israeli citizenship was revoked by the minister of the interior on the basis of Kishaq's alleged involvement in Hamas attacks against civilians.

According to B'Tselem, Israeli settlers in the Occupied Territories killed at least twelve Palestinian civilians from January to October 2002, and injured dozens more. Settlers attacked Palestinian homes, fields, cars and other property, and blocked major roads with unofficial checkpoints. On July 28, settlers from Kiryat Arba in Hebron killed two Palestinian children and injured at least fifteen others as they attacked and burned houses in Hebron following the funeral of two settlers killed by Palestinian gunmen two days earlier. Settler attacks against Palestinian civilians and civilian property were rarely prevented or halted by the Israeli authorities, and were particularly acute during the October-November olive harvest season.

Israeli military prisons and detention centers overflowed as a result of mass arrests conducted in March-April. Local organizations estimated at least 4,500 Palestinian civilians, including children, were arrested for questioning during Operation Defensive Shield, and a steady stream of arrests continued throughout the year. Reports of ill-treatment were widespread, including kicking, beating, squalid conditions, and deprivation of food and drink. On September 4, the Public Committee Against Torture in Israel reported that there appeared to be a "gradual reversion to the use of torture" despite the September 1999 High Court decision outlawing its use. While the extent of their use was unclear, methods outlawed by the High Court but reportedly used during interrogation included exposure to extremes of temperature, sleep deprivation, the requirement to remain in an enforced position for extended periods, and intense psychological pressure. According to media reports some 1,600 Palestinians were detained on security-related grounds at the end of the year. Nine hundred of them were held in administrative detention, without charge or trial.

On June 5, 2002, the Knesset passed legislation cutting by 24 percent national child allowances for children whose parents had not served in the army. The cuts disproportionately affected Palestinian Arab citizens, the majority of whom were exempt from military service and whose children are the poorest in Israel. The new cuts exacerbated inequalities in educational spending that Human Rights Watch documented in its December 2001 report, Second Class: Discrimination against Palestinian Arab Children in Israel's Schools. The High Court issued a temporary injunction against the cuts on October 14, prior to a full hearing on the issues scheduled for mid-November.

The Israeli Labor Party withdrew from the governing coalition on October 30. Sharon's resulting minority government set an early election date for January 28, 2003.

**Palestinian Authority Territories**

As Israeli military operations increased, armed Palestinian groups mounted the deadliest series of attacks against Israeli civilians in decades. On December 1, 2001, a series of attacks on a Jerusalem pedestrian mall were followed the next day by a Hamas attack on a Haifa city bus. These incidents collectively represented the worst twenty-four hours of civilian attacks in Israel since 1996, but were followed by some six weeks without attacks after President Arafat successfully pressured armed groups to observe a ceasefire.

On January 27, the al-Aqsa Martyrs' Brigades, a network of Fatah-affiliated armed groups, carried out their first suicide attack against Israeli civilians, a tactic already frequently used by Hamas, Islamic Jihad, and, from October 2001, the Popular Front for the Liberation of Palestinian (PFLP). Violence against Israeli civilians peaked in March, when eighty civilians were killed and some four hundred were injured in twelve separate attacks, the most deadly of them was the March 27 bombing of Netanya's Park Hotel, in which twenty-nine civilians were killed and one hundred were injured.

Despite repeatedly condemning suicide bombings and other deliberate attacks on civilians, President Arafat and other PA officials consistently failed to move decisively against those who ordered or organized such attacks. A culture of impunity resulted. While senior Hamas, Islamic Jihad, and PFLP members continued to openly admit their responsibility in ordering such attacks, senior Fatah officials distanced themselves from those carried out by the al-Aqsa Martyrs' Brigades--but failed to cut clearly Fatah's ties with the Brigades. Debate within the Palestinian community over the legitimacy of suicide attacks against civilians increased from May, when a group of some 150 intellectuals published a petition in the East-Jerusalem based newspaper, al-Quds, opposing their use. Attacks declined in frequency after May, but did not stop completely.

In addition to attacks on military targets, armed Palestinians continued to shoot at settlements and to use firearms and roadside bombings against Israeli settlers in the Occupied Territories. On January 15, architect Avi Boaz, seventy-one, was abducted from his car at a police checkpoint near Bethlehem and shot some thirteen times by gunmen of the al-Aqsa Martyrs' Brigades. Although some militants justified such attacks by saying that residents of illegal settlements were legitimate military targets, such attacks directly violated international humanitarian law, which makes clear that civilians are to be protected unless they directly participate in armed hostilities.

The Palestinian Legislative Council criticized the participation of children in armed activities is reaction to growing community concern after several incidents in Gaza in which Palestinian boys aged under sixteen were killed as they attempted to attack settlements on April 24. Hamas and Islamic Jihad published statements publicly requesting children not to take part in such activities, but the groups failed to specify the age at which they considered participating in military activities to be legitimate. In contrast, the al-Aqsa Martyrs' Brigades recruited at least three children to carry out suicide attacks against Israeli civilians. In September, the Palestinian Journalists' Association sought to ban media coverage of children participating in political demonstrations.

Armed Palestinians killed at least twenty-two alleged collaborators with Israel. PA officials declared a one-month official amnesty for collaborators on July 10, promising leniency and fair trials for those that gave themselves up. A convicted collaborator, Hossam Hissi, was shot by Gazan prison authorities the same day while "trying to escape." According to media reports, individuals suspected of collaboration were sometimes required to prove their loyalty by carrying out attacks against Israeli military targets or civilians; according to uncorroborated documents released by the Israeli security forces, officials of the Palestinian General Intelligence Service may

have also ordered or carried out the vigilante killing of collaborators. The PA failed to bring to justice those responsible for such killings.

PA control over the territory delegated to it under the Oslo Accords became weaker throughout the year as Israel's destruction of PA infrastructure undercut the PA's ability to deliver civilian and security services. Internal and external pressure on President Arafat to reform PA structures continued to build steadily throughout the year. On May 28, Arafat finally signed several laws long-sought by human rights advocates, including the Basic Law and the Judicial Authority Law. In June, Arafat announced parliamentary elections would be held in January 2003. Palestinian groups worked hard to define practical reform steps and indicators of success, while the E.U. and U.S. joined with Japan and international financial institutions to ensure international support for the process via an International Palestinian Reform Task Force. At the time of writing, tentative preparations for elections, scheduled for January 20, had begun.

The PA system of justice deteriorated further under the pressure of a fracturing political climate, ongoing military operations, and the destruction of court records and infrastructure. Proceedings in civilian courts virtually ground to a standstill. Even state security and military courts, which failed to meet minimum international fair trial standards and usurped many of the functions of the civilian courts, operated at best erratically throughout the year. At least thirteen persons were sentenced to death after summary trials. On April 4, five men and one boy were sentenced to death by the State Security Court on charges of collaboration with the Israeli General Security Service, while another man was sentenced to fifteen years hard labor. The boy's sentence was commuted to life imprisonment. On June 5, one month after Arafat signed the Judicial Authority Law, the Gaza State Security Court sentenced Faisal Abu Teilakh, twenty-six, and Sa'id al-Najjar, twenty-nine, to death for the rape and murder of Islam Mahmoud al-Khatib, a seven-year-old. The men were convicted and sentenced after a three-hour hearing. Both men were executed the following day. Haidar Ghanem, a Gaza-based fieldworker for B'Tselem, was sentenced to death on charges of collaboration on October 28. State Security Court verdicts were not open to appeal.

The cumulative damage suffered by PA prisons and other detention facilities aggravated still further the chaotic and arbitrary conditions under which PA detainees were being held. Individuals continued to be held in makeshift detention facilities, often without charge or trail. The PA continued to hold Ahmed Sa'adat, leader of the PFLP and other members of Palestinian armed groups without charge or trial. In May, during the period Arafat was confined for thirty-four days in his compound by the IDF, the PA convicted four of five men alleged to have organized or carried out the killing of Israeli tourism minister, Rehavam Ze'evi, in a show trial. The five men, plus Arafat adviser Fu'ad Shubaki, were transferred under U.S. and U.K. international supervision to Jericho prison on May 1. The Palestinian High Court ordered Sa'adat's release on June 3 on the basis of a lack of evidence against him. PA officials did not comply with the court order.

Strains within and between the PA and members of armed Palestinian groups saw an increase in incidents of internal politically-motivated violence, as well as a rise in the use of lethal force by Palestinian police. On May 14, PA Minister for NGOs Hassan Asfour was hospitalized after being severely beaten by masked men, reportedly as a result of internal political rivalries. On September 22, the home of Nabil Amr, Palestinian Legislative Council member and reform proponent, was shot at by unknown men in a drive-by shooting. One week later, Arab newspapers reported that Fatah General Secretary Mahmud Abbas had received death threats as a result of rumours that he was a potential candidate for prime minister, a position some members of the Palestinian Legislative Council had advocated as a potential mechanism for executive reform. The proposal was officially dropped following a ten-

day Israeli siege of the Ramallah government compound in October. On October 8, Hamas members reportedly captured and killed riot police chief Colonel Rajah Abu Lehiya in revenge for the killing of two Palestinian demonstrators exactly one year before.

**Defending human rights**

Israeli restrictions on freedom of movement and entry hampered the ability of human rights defenders to collect and disseminate information. Human rights defenders from a variety of nongovernmental organizations were denied entry or re-entry into Israel, including Human Rights Watch, the Palestinian Center for Human Rights, and the International Rehabilitation Council for Torture Victims. Palestinian lawyers continued to be prevented from gaining access to clients held in detention facilities inside Israel.

Israeli security forces detained several Palestinian and Israeli human rights activists. On January 2, prominent activist Dr. Mustapha Barghouti was arrested twice by Israeli security officials and severely beaten. He was released without charge and sought treatment for a fractured right patella the same day. Abed Rahman al-Ahmar, an employee of the Palestinian Human Rights Monitoring Group, was released on May 23 after more than one year in administrative detention. Yasser Ali Mohammad Dissi, an employee of al-Haq, was detained by the IDF on March 30 during a search of al-Haq's offices, and placed under a three-month detention order on April 13. He was released from the Ansar-3 detention center after the order's expiry on July 2, one week after he was injured in a prison protest for more humane conditions of detention.

Israeli nongovernment organizations faced increased use of intimidatory tactics by the Israeli authorities. On August 5, the Israeli newspaper Ha'aretz reported that the prime minister had requested the attorney general to examine possible legal steps against Israeli peace group Gush Shalom, after the group had warned fifteen soldiers that it was compiling evidence of violations of the laws of war for potential use in a national or international tribunal. In mid-August, the attorney general's office notified Gush Shalom that such letters "could be in violation of extortion laws" but that the office would not initiate legal proceedings "for the moment." On August 11, the Legal Center for Arab Minority Rights learned from media reports that it was to be investigated by the Israeli Registrar of Associations for alleged breaches of the Associations Law. The registrar did not engage in any initial process of clarification with Adalah, nor did he inform it of his decision until August 18.

The PA continued to allow human rights organizations to operate in the territory under its authority, but continued to deny human rights workers access to prisons and unofficial detention facilities. Three members of the Grassroots International Protection for the Palestinian People were kidnapped on September 18 and held hostage by former members of the PA security services. The three were released without harm the following day. A representative of the International Committee of the Red Cross was kidnapped on November 7, allegedly by the same group, and later released without harm.

**The role of the international community**

On December 5, 2001, the High Contracting Parties to the Fourth Geneva Convention met and issued a detailed declaration in which they reaffirmed the convention's applicability to the Occupied Territories, including East Jerusalem. The U.S. did not attend. On June 26, a Belgian appeals court ruled that the case against Prime Minister Sharon, and others, brought by survivors of the 1982 Sabra and Shatila massacres in Lebanon, could not proceed because the defendant could not be tried in absentia. The plaintiffs appealed the decision on July 3. A complaint in

Belgium filed against President Arafat on November 26, 2001 had yet to be heard.

**United Nations**

The secretary-general and high commissioner for human rights consistently criticized violations of human rights and international humanitarian law. The secretary-general regularly emphasized that there would be no lasting security without a political settlement, a position he emphasized both individually and in his capacity as a member of the "Quartet," a diplomatic group comprised of the E.U., Russia, the U.N., and the U.S. The special rapporteur of the Commission on Human Rights on the situation of human rights in the Palestinian territories occupied by Israel since 1967, John Dugard, submitted reports in March and August.

On December 14, 2001, the Security Council debated a resolution condemning violence on the ground and supporting the establishment of an international monitoring mechanism. The resolution failed to pass as a result of a U.S. veto. Similar language was incorporated into a resolution of the fifteenth resumed meeting of the Tenth Emergency Special Session of the General Assembly on December 20, 2001.

The U.N. Security Council passed five resolutions on the situation in Israel and the Occupied Territories from January to November 2002. As Israeli incursions into PA-controlled areas accelerated, the Security Council passed Resolution 1397 on March 12, which for the first time affirmed "a vision of a region where two States, Israel and Palestine, live side by side within secure and recognized borders." After Operation Defensive Shield was launched on March 29, Resolution 1397 was followed by 1402 on March 30, which called for a ceasefire and the withdrawal of Israeli troops from Palestinian cities. On April 4, the council passed Resolution 1403, which demanded the implementation of 1402.

On April 5, the Commission on Human Rights requested the high commissioner for human rights to organize an urgent mission to report on the deteriorating human rights situation in the Occupied Territories. The mission was called off on April 19 because it "would not be facilitated by the Israeli authorities." The same day, the Security Council passed Resolution 1405, which emphasized the "dire humanitarian situation" of the Palestinian population in the Occupied Territories and welcomed the secretary-general's initiative to develop a fact-finding team regarding events in the Jenin refugee camp. While the Israeli government originally consented to the fact-finding team under U.S. pressure, it expressed progressively broader objections to the team's mandate and composition. The secretary-general disbanded the team--which had already begun preliminary information-gathering--on May 3, 2002.

On May 19, a resumed meeting of the Emergency Special Session requested the secretary-general to present a report on events in Jenin and other cities. The report, collated from existing sources of information without the cooperation of the Israeli authorities, was released on August 2. Although recognizing the limitations inherent in the secretary-general's mandate, human rights groups criticized the report for making limited reference to the obligations of the parties under international law, reaching few clear conclusions about violations of that law, and failing to raise the issue of accountability for serious violations that may have been committed

As the year continued, the U.N., like other international organizations, became increasingly responsible for providing humanitarian assistance to the civilian population. The United Nations Relief and Works Agency for Palestine Refugees (UNRWA) experienced a nine-fold increase in its hardship caseload, despite facing increasingly severe problems with the movement of staff and goods. Catherine Bertini, the secretary-general's personal humanitarian envoy, reported in mid-August that a "serious humanitarian crisis" existed in the West Bank and Gaza, linked closely

to restrictions on freedom of movement. Bertini said Israeli authorities had committed to address "some of the most immediate constraints," but noted the existence of a wide gap between official policies and their implementation. In September, the U.N. Office for the Coordination of Humanitarian Activities reported that some twenty U.N. staff had been denied permission to enter Israel.

On September 25, during Israel's siege of Arafat's compound, the Security Council passed Resolution 1435. The resolution demanded Israel cease its activities in Ramallah, and withdraw to the position it occupied in September 2000. The resolution also reiterated a call for a complete halt to all acts of violence. The U.S. abstained from voting, but did not veto the resolution. Israel publicly refused to comply with the resolution, although it withdrew from the compound four days later under intense U.S. pressure.

On October 4, the U.N. Committee on the Rights of the Child issued its concluding observations on Israel's first periodic report. Amongst its many recommendations the committee encouraged the creation of a focal point for children, called for the allocation of sufficient resources to implement current legislation, and emphasized the need for Israel to fully comply with international humanitarian law in the Occupied Territories.

**European Union**

While E.U. leaders at times used forceful language on the violence in Israel and the West Bank and Gaza, E.U. political actions continued to be subordinated to U.S. policy interests, a reflection of weak E.U. influence in Israel, and of differences among E.U. member states.

The E.U. remained the pre-eminent donor to the Palestinian Authority and other key humanitarian institutions. From January to October, 2002, the E.U. provided an estimated total of  219 million to Palestinian organizations and projects, as well as  70 million to the UNRWA. E.U. funding continued to provide emergency budgetary support for the PA at  10 million per month.

E.U. funding to the PA became the subject of controversy in late April, when Israeli officials alleged that it had been used to fund armed activities against Israel. The European Commission asked Israel for proof of its allegations on May 8. On June 20, External Affairs Commissioner Chris Patten announced a joint E.U.-IMF inquiry had found there was "no evidence [that] E.U. funds [were] used for other purposes than those agreed. There is no reason to state that E.U. money has financed terrorism or bought weapons."

In January 2002, the E.U. wrote to the Israeli prime minister to protest the IDF's destruction of some U.S.$15 million worth of E.U. funded projects, including schools, irrigation and sewage schemes, and forestry projects. E.U. officials explicitly reserved "the right to claim reparation in the appropriate fora." E.U. criticism of Israel's isolation of President Arafat and heavy use of force grew still sharper after February 8, when an IDF helicopter fired missiles into Arafat's offices while E.U. Special Envoy Moratinos met with Arafat.

In February and October, the E.U. took preliminary steps to require importers who sold goods made by Israeli manufacturers to either provide proof that the products were not made in the Occupied Territories, or deposit funds against any future tariffs. Despite pressure from the European Parliament, which on April 10 voted 269 to 208 to suspend the Euro-Israeli Association Agreement, the E.U. failed to call a special meeting of the Association Council or to undertake other concrete association-related actions to influence Israeli policies.

Case 1:00-cv-00105-L-DLM    Document 90-7    Filed 11/05/02    Page 12 of 13 PageID #: 12
ei: Human Rights Watch: "Israel uses excessive force"
11732

E.U. leaders continued to urge the resumption of political and security negotiations between Israel and the Palestinians throughout 2002. In December 2001 and early 2002, E.U. statements emphasized the continued legitimacy of President Arafat as leader of the PA, criticized IDF incursions in PA areas, urged Palestinian leaders to end attacks against civilians, and re-affirmed the applicability of the Fourth Geneva Convention to the Occupied Territories. E.U. members abstained on the resolution on violations of human rights in the Occupied Territories at the Commission on Human Rights, but from April E.U. leaders highlighted the humanitarian consequences of IDF military activities. From July, the E.U. began to play a leading role in the "International Taskforce on Palestinian Reform," in its capacity as a member of the Quartet. A draft peace plan was proposed by the Danish Presidency on September 4 and discussed by Quartet members on September 17. The plan was presented to Israeli and Palestinian authorities, and was under discussion at this writing.

**United States**

U.S. policy on Israeli and Palestinian issues was inconsistent for much of 2002. Affected by differences between the State Department, White House, and Defense Department, policies were directly influenced first by the rhetoric and actions of the "war on terrorism," and later by the proposed war against Iraq.

Israel remained the largest recipient of U.S. bilateral aid. Under the provisions of the 2002 Foreign Operations Appropriations Bill, Israel received $720 million in economic support, $60 million assistance for migrants and refugees resettling in Israel, $2.04 billion in military financing, and an unspecified amount under the heading "Nonproliferation, Anti-Terrorism, Demining and Related Programs."

U.S. assistance to the Palestinians comprised some $100 million to UNRWA and $75 million in U.S. Agency for International Development (USAID) projects in 2002.

The IDF continued to employ U.S.-supplied weaponry in military operations, including Apache and Cobra helicopters, F-16 fighter aircraft, munitions, and M-16 automatic weapons. In September 2002, the State Department Authorization Bill signed into law by President Bush provided an extra $100 million in military assistance to Israel, under the title of war reserve stockpiles. The same bill provided $50 million in Palestinian emergency disaster relief projects. Special Envoy Anthony Zinni and other U.S. officials made multiple visits to the region, many of them disrupted by violence. The most prominent was Secretary of State Powell's visit in mid-April, at the end of Operation Defensive Shield. Powell reiterated U.S. demands that Israel withdraw from Palestinian cities and proposed a mid-year multilateral peace conference. The proposal lapsed after June 24, at which time President Bush delivered a speech demanding reform of Palestinian institutions and new Palestinian leadership: "When the Palestinian people have new leaders, new institutions and new security arrangements with their neighbors, the United Sates of America will support the creation of a Palestinian state whose borders and certain aspects will be provisional until resolved as part of a final settlement in the Middle East."

The United States' pursuit of reform, via the Quartet, was coupled with an emphasis on the humanitarian situation in the West Bank and Gaza Strip. U.S. efforts continued to be hampered by strong public perception of bias in favor of Israel, aggravated by the administration's refusal to meet with senior Palestinian leaders despite frequent meetings with Prime Minister Sharon. On August 5, Israel and the United States signed a bilateral treaty preventing the citizens of either country from facing charges in the International Criminal Court. On August 28, Israel informed the U.N. secretary-general that it did not intend to become a party to the ICC statute, and therefore had no legal obligations arising from its December 31, 2000 signature.

U.S. reactions to reported Israeli violations of international humanitarian law

continued to emphasize Israel's right of self-defense without clear reference to international humanitarian law standards. The U.S. continued its stated opposition to Israel's policy of "liquidations," reiterated on November 5, after the U.S. targeted killing of an alleged al-Qaeda associate in Yemen. U.S. language on Palestinian civilian casualties strengthened somewhat toward the end of the year. On October 7, a Department of State spokesperson described the U.S. as "deeply troubled" by the civilian casualties caused by an IDF attack in Gaza, and called on the Israeli authorities to act with "the utmost care to avoid harm to civilians," particularly when conducting operations in heavily populated areas. U.S. language was not, however, accompanied by public steps to pressure Israel to meets its obligations under international humanitarian law.

**Related Links**:

- Human Rights Watch: World Report 2003, January 2003
- Human Rights Watch: Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians, November 2002
- Human Rights Watch: Jenin: IDF Military Operations, May 2002
- Human Rights Watch: In a Dark Hour: The Use of Civilians During IDF Arrest Operations, April 2002



The Electronic Intifada needs your ongoing help to offer information about the Israeli-Palestinian Conflict from a Palestinian perspective. Please support our important work now.

 TOP OF PAGE | HUMAN RIGHTS | WHAT'S NEW ON EI?

---

**EI HOME**
Where our most important content is featured.

**WHAT'S NEW ON EI?**
Chronological, searchable list of content added to this site.

**INTRODUCTION**
To the conflict, to the media, to the Electronic Intifada.

**THE MEDIA**
Commercial news content, with EI opinion, editorials, and analysis.

**REFERENCE LIBRARY**
Reference, international law, human rights, and development.

**EI WIRE**
Browse through our wire service/content stream menu and order a take out.

**FOR JOURNALISTS**
Information geared to help working journalists navigate the maze.

**FOR ACTIVISTS**
You are a large and diverse community with some great ideas.

**JOIN/SUPPORT/CONTACT**
We're here to stay, so stay in touch and help us grow.

---

©2000-2002 electronicIntifada.net unless otherwise noted. Content may represent personal view of author. You may freely print out, copy, and redistribu page for informational purposes on a noncommercial basis. To republish content credited to the Electronic Intifada in online or print publications, please touch via electronicIntifada.net/contact