UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs.                                                C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**PLAINTIFFS' MOTION TO STRIKE AND FOR OTHER RELIEF**

For the reasons presented in the accompanying memorandum in support of this motion, plaintiffs hereby move to strike from the memorandum submitted by defendants PA and PLO in support of their "Motion for Protective Order" dated March 12, 2003, the following sections and exhibits, which contain frivolous, irrelevant and scandalous statements prohibited by Fed.R.Civ.P. 11 and 12(f): page 3 (from the second full paragraph on), page 4 (in entirety), page 5 (up to section entitled "Conclusion"), and Exhibits 2 and 3.

Further, plaintiffs request that the PA and PLO be restrained and enjoined from filing similar material in the future.

Plaintiffs, by their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)



## CERTIFICATION

     I hereby certify that on the \_\_2nd\_\_ day of April, 2003 I mailed a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003

Deming E. Sherman
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903

_/s/ [signature]_____

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs.                                                          C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE**

**I      INTRODUCTION**

The memorandum filed by defendants PA and PLO in support of their Motion for Protective Order includes a lengthy diatribe directed at the character and alleged past and current activities of an Israeli attorney and her spouse, whom defendants claim have threatened to bring multiple law suits against them on behalf of American victims of terrorism.

Defendants' latest barrage is a continuation of their disgraceful, on-going attempt to malign the plaintiffs by association and distract the attention of this Court away from the merits of this case. As a matter of law, it makes no difference to the merits of the plaintiffs' case (these or any other plaintiffs) if the spouse of a referring attorney, or the attorney herself for that matter, is a former drug addict, prostitute or criminal. No plaintiff, in any legal action, bears the alleged sins of his or her attorney, and certainly not those of the attorney's spouse. The same is true, *a fortiori*, of the political beliefs of a plaintiff's attorney.

Moreover, no less importantly, defendants' attempt to impugn the plaintiffs by association is utterly frivolous in fact, simply because there is no such "association": Ms. Darshan-Leitner's involvement in this case began and ended when she referred plaintiffs to counsel of record. Her spouse has never represented the plaintiffs and has had absolutely no

involvement in this action. Defendants' disjointed, stream-of-consciousness narrative, filled with bizarre insinuations and allegations of a conspiracy, is rank and grotesque fantasy. Needless to say, defendants' claims are unsupported by any evidence. In actual fact, plaintiffs are represented in this action by trial counsel alone, and have no "agenda" other than legal redress.

Indeed, the allegation that plaintiffs, whose loved ones were murdered in a brutal terrorist attack while driving home from a wedding, are party to some political conspiracy is impertinent, scandalous, and offensive to any decent person, given the actual nature and origins of this action:

i) On the evening of June 12, 1996, plaintiff Meyer Ungar, a college professor, and his wife, plaintiff Judith Ungar, a schoolteacher, were informed that their son, Yaron Ungar, had been murdered in a terrorist attack. That same evening, plaintiffs Uri Dasberg, a renowned rabbinical scholar and encyclopedia editor and his wife Judith, a school principal, were notified that their daughter Efrat Ungar, Yaron's wife, was also murdered in the attack.

ii) Yaron and Efrat left behind, in addition to their parents, two young sons, plaintiffs Dvir and Yishai Ungar. Yaron also left three siblings, plaintiffs Michal Cohen, Amichai Ungar and Dafna Ungar. Yaron's siblings work and study in the field of high-tech and computers.

iii) This Court heard firsthand testimony from the Ungars and the Dasbergs, in the damages hearing conducted in July 2002, regarding the severe anguish, emotional pain and overwhelming sense of bereavement that the murder of Yaron and Efrat Ungar has had, and continues to have, on their children, parents and siblings.

iv) The murderers of Yaron and Efrat were eventually captured and identified as members of the Hamas terrorist organization.

2

v) The Ungars and Dasbergs subsequently learned that two of the Hamas men directly involved in the murder were protected by the Palestinian Authority ("PA") police, which had supplied them with false police identification cards. The men told Israeli police investigators that the PA police uniforms and IDs had been given to them by high-ranking officials of the PA police, in order to help them avoid arrest.

vi) Israeli law enforcement officials also informed the Ungars and Dasbergs that the PA was sheltering one of the Hamas men wanted in the murder (Ibrahim Ghanimat, a defendant in this action, who is still being sheltered by the PA).

vii) Subsequently, the Ungars and the Dasbergs were informed by American and foreign counter-terrorism experts that for approximately two years prior to the murder, the PA and PLO had provided Hamas and its operatives with money, weapons and military training to carry out terrorist attacks, and that senior PA and PLO paramilitary commanders had planned and coordinated terrorist activities carried out by Hamas and other terrorist groups.

viii) Yaron Ungar was an American citizen, and the Ungars and Dasbergs were heartened to discover that the U.S. government took a keen interest in the investigation of the murder and prosecution of the perpetrators, and in the personal welfare of the family. They learned that FBI agents had been sent to Israel and the West Bank to gather information about the murder, and that Congress had publicly called on the PA to surrender Ibrahim Ghanimat for prosecution.

ix) Members of the Ungar and Dasberg families were also invited to private meetings with Senators Arlen Spector and Connie Mack, and Congressmen Jon Fox and Brad Sherman, to discuss the progress of the case.

x) During the course of their meetings and subsequent discussions with American officials, the Ungars and Dasbergs learned that Congress had passed a law several years earlier, allowing U.S. citizens and their families to bring civil suits for terrorist attacks occurring outside of the United States.

xi) The Ungars and Dasbergs decided, despite concerns about the emotional and economic costs involved, to bring such a suit. In light of the significant amount of information they had received pointing to the involvement of the PA and PLO in Hamas' terrorist activities, and the direct support which Yaron's murderers had received from the PA, the Ungars and Dasbergs decided to bring suit against both Hamas and the perpetrators, and against the PA and PLO.

These are the simple facts of this case. Where any reasonable person would see a young couple murdered in a heinous crime and bereaved family members seeking justice, defendants see nothing but political machinations; where any fair person would see educated, intelligent and independent adults choosing, with no little hesitation, to initiate lengthy, expensive and emotionally wrenching legal action, defendants see only a vast conspiracy against them; where any dispassionate person would view the information linking defendants to the crime as more than adequate to justify naming defendants in this legal action, defendants see the indicia of their legal liability for a terrorist murder as no more than points in a propaganda campaign against them, and thereby conclude that they are free to respond to this action by libeling and impugning the plaintiffs.

4

## II   DEFENDANTS' FRIVOLOUS AND VEXATIOUS STATEMENTS SHOULD BE STRICKEN

As noted above, the political beliefs, motives and moral character of a party's counsel (or, *a fortiori*, those of a referring attorney or her spouse) cannot, <u>as a matter of law</u>, have any influence whatsoever on the merits of the issues before the Court. Whether an attorney is motivated by lucre or by a social agenda is no affair of the opposing party. Defendants' attacks are therefore "immaterial" and should be stricken pursuant to Fed.R.Civ.P. 12(f).

Indeed, defendants have previously admitted, as they must, that the plaintiffs, the families of Yaron and Efrat Ungar, are simply victims of a terrorist attack seeking legal redress, and are not "at war" with defendants. *"There is no reason to think the Ungars as plaintiffs in their action are at war."* Defendants' Memorandum in support of their Opposition to plaintiffs' previous Motion to Strike, at 2.

Despite this admission, defendants previously argued that they are entitled to use their pleadings as a vehicle to bring to the Court's awareness the alleged political agenda of a referring attorney and her spouse, and *"other attorneys pursuing their separate agenda in this case and the other of* [sic] *25 or more cases . . . "* <u>Id</u>. Defendants cite no law or precedent in support of this proposition -- because none exist. In a lame attempt to justify this abuse of the proceedings before the Court, defendants can muster up only a vague argument about their own subjective need to edify the Court: *"To defendants, it is essential that the Court have this awareness."* <u>Id</u>. at 3.

Defendants' explanation that their ad hominem attacks on unrelated 3rd parties are aimed merely at making the Court aware of a matter which they subjectively deem "essential," is not only bereft of any legal basis, it is blatantly and facially false. If defendants were seeking simply

5

to give notice, they would have sufficed with the statements contained in their previous memorandum of November 20, 2002, or surely with those included in their subsequent memorandum on January 27, 2003. Yet, defendants have once again expended several pages of a memorandum to give the Court further "awareness" of an (irrelevant) allegation regarding which the defendants already made the Court "aware" back in November, 2002.

Defendants' failure to proffer any coherent legal justification for their attacks, and the repetition of those attacks in several, unrelated pleadings, clearly demonstrates that defendants' statements constitute a <u>knowing and intentional attempt to defame, delegitimatize and taint the plaintiffs by association</u>. These statements are therefore "impertinent" and "scandalous" within the meaning of Fed.R.Civ.P. 12(f), and should be stricken pursuant to that Rule.

The statements contained in defendants' memorandum also violate Fed.R.Civ.P. 11(b), which forbids the assertion of claims *"for any improper purpose, such as to harass,"* and requires that claims be *"warranted by existing law."*

Defendants, who are represented by experienced counsel, know full well that their attacks on the political beliefs, motives and moral character of an attorney cannot advance defendants' motion by one iota <u>on the merits</u>. These statements should therefore be stricken, "A court has considerable discretion in striking 'any redundant, immaterial, impertinent or scandalous matter.' Fed.R.Civ.P. 12(f)." <u>Alvarado-Morales v. Digital Equipment Corp.</u>, 843 F.2d 613, 618 (1st Cir. 1988). (noting with approval order of district court striking "scandalous matter which impugned the character of defendants" and holding that "superfluous descriptions [that are] not substantive elements of the cause of action . . . have no place in pleadings before the court").

Moreover,

6

> Allegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting party prejudice.

Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 664-665 (7th Cir. 1992). See also Ramsdell v. Bowles, 64 F.3d 5, 7 (1st Cir. 1995)(upholding order of district court striking opposition brief that was "replete with immaterial, irrelevant and prejudicial statements.")(internal quotation marks omitted); Subway Equip. Leasing Corp. v. Sims (In re Sims), 994 F.2d 210, 214 (5th Cir. 1993)(condemning "repetitious attacks on the veracity and integrity" of opposing party and their counsel and noting with approval decision of district court to strike similar allegations as "scurrilous, impertinent, scandalous and[/]or disrespectful"); Jacobsen-Wayne v. Kam, 198 F.3d 254, 1999 U.S. App. LEXIS 26557, cert. denied, 2000 U.S. LEXIS 4601, (2000)(striking scandalous accusations from reply brief); Chou v. University of Chicago, 2000 WL 222638 at 4, 2000 U.S. LEXUS 2002 at 14 (N.D. Ill. 2000), aff'd 254 F.3d 1347 (Fed. Cir. 2001)(Statements which "are not allegations of fact or conclusions of law [but] nothing more than name calling," and are "unnecessary to the establishment of the cause of action and ... blatantly roped into the narrative" should be stricken as scandalous).

Defendants' vexatious, scandalous and irrelevant statements are contained in page 3 (from the second full paragraph on), page 4 (in entirety), page 5 (up to section entitled "Conclusion"), and Exhibits 2 and 3 of the Memorandum submitted by defendants in support of their "Motion for Protective Order" dated March 12, 2003, and the Court is respectfully requested to strike those sections and exhibits.

Further, plaintiffs request that this Court restrain and enjoin the defendants from making any future filing with this Court concerning Mr. Leitner. Such statements have no place in this litigation and the Court should not tolerate scandalous pleadings. As defendants have raised such

7

issues for the third time, plaintiffs request injunctive relief to protect them from having to respond to these inappropriate and irrelevant claims.

Plaintiffs, by their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

## CERTIFICATION

I hereby certify that on the __2^__ day of April, 2003 I mailed a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003

Deming E. Sherman
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903

8