UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

    v.                        C.A. No.: 00-105L

THE PALESTINIAN AUTHORITY, et al.

### AFFIDAVIT OF DAVID J. STRACHMAN

I, David J. Strachman, affirm and declare:

The attached documents, Exhibits B through N, are true and accurate copies of originals obtained by counsel as indicated:

B.    Curriculum vitae of Hasan Abdel Rahman, Chief Representative of the PLO and the Palestinian Authority in the United States. This document, prepared by Mr. Rahman, indicates that he is the Chief Representative of both the PLO and the Palestinian Authority in the United States. This document was obtained directly from Mr. Rahman's office by a public relations agency and provided to plaintiffs' counsel.

C.    New York Times article of October 16, 2000. This article contains Mr. Rahman's admissions and indicates his role as "representative of the Palestine Liberation Organization and Palestinian National Authority," and that he employs nine staff members in his Washington office. This document was obtained by plaintiffs' counsel from the New York Times website archive.

D.    Washington Post website of Thursday, October 12, 2000. This document is a transcript of an online live chat with Mr. Rahman and was obtained by plaintiffs' counsel from the Washington Post website archive.

E.    Reports of the Attorney General to Congress of the United States on the Administration of Foreign Agents Registration Act of 1938, as amended, for the six months ending June 26, 1999, October 31, 1999, September 30, 2001 and April 28, 2002. These documents indicate that both the Palestine Liberation Organization and Palestinian Authority have had a fully staffed Washington office for many years, spend hundreds of thousands of dollars per annum in the United States, and retain counsel and a public relations firm in the U.S. For example, for the six-month period ending March 31, 1999, the office expended $200,132.74 on

activities ranging from conducting interviews, giving lectures, and contacting the media. See Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938, as amended, for the Six Months Ending June 30, 1999, available at http://www.doj.gov/criminal/fara/faralst99/COUNTRY/PALESTIN.HTM.  These documents were obtained by counsel from the Department of Justice website, www.doj.gov/criminal/fara.

F.    Washington Post article of Thursday, January 20, 2000.  This article is a profile of and contains admissions from Edward B. Abington of the public relations and lobbying firm of Bannerman & Associates, an agent of the PLO and PA.  It indicates that PA and PLO activities in the United States include advocacy training and developing a public relations campaign. The three year budget for these activities was $2.25 million. This article was obtained by plaintiffs' counsel from the Washington Post's website archive.

G.    Forward article, January 2000. This article provides information about and admissions from Edward B. Abington, PLO and PA agent in the United States. This article was obtained by plaintiffs' counsel from the Forward website archive.

H.    Int'l Techs. Integration, Inc. v. Palestine Liberation Organization, 66 F.Supp. 2d 3 (D.D.C. 1999).  This decision details some of the commercial activities of the ʻ PLO and PA in the United States.

I.    Int'l Techs. Integration, Inc. v. Palestine Liberation Organization, 98-00756 (CKK) order of July 2, 1999.  This order reveals that the PA and the PLO maintain several bank accounts in New York at three U.S. banks with deposits totaling approximately $18 million dollars.  This document is a true and accurate copy of the original order filed in the U.S. District Court for the District of Columbia.

J.    Affidavits of Norfork County Deputy Sheriff Peter J. Morin.  This proof of service on the PA and PLO indicates service was made in Brookline, Massachusetts.

K.    Affidavit of Process Server Freeman R. Woodbury.  This proof of service on Mr. Rahman on behalf of the PA and PLO indicates that service was made in Washington, DC.

L.    Declaration of Mr. Marwan Jilani. This declaration indicates that he acknowledges participating in political and public relations activities on behalf the PLO and PA in the United States and that both maintain an office in New York. This document was provided to the Court by defendants' counsel.

M.     Declaration of Hasan Abdel Rahman. The declaration of Mr. Rahman establishes that he is the Chief Representative of the PLO in the United States. This document was provided to the Court by defendants' counsel.

N.     Short Form Listing of Registrant's Foreign Agents. This document proves that Mr. Rahman is one of three registered agents of the PLO in the United States. This document was obtained by plaintiffs' counsel from the Department of Justice Website. ("Short Form Listing of Registrant's Foreign Agents", available at http://www.usdoj.gov/criminal/fara/faralst99/SHRTFORM/ SHRTFORM.HTM).

David J. Strachman

STATE OF RHODE ISLAND
PROVIDENCE, SC.

Subscribed and affirmed to before me in Providence on the ___30___ day of May, 2003.

Notary Public

My Commission Expires ___10/10/04___

3

Biography

## HASAN ABDEL RAHMAN

Chief Representative of the P.L.O. and the P.N.A. in the United States

Since 1994, Mr. Hasan Abdel Rahman has headed the Palestinian Mission in the United States as Chief Representative of the Palestine Liberation Organization (P.L.O.) and the Palestinian National Authority (P.N.A.).

From 1992 to 1993, Mr. Abdel Rahman served as Chief of the Palestinian Mission in Canada. Between October 1991 and September 1993, Mr. Abdel Rahman served as Senior Political Advisor to the Palestinian Delegation to the Madrid Peace Conference and the peace talks in Washington, D.C.

From 1988 to 1992, he was Director of the Palestine Affairs Center in Washington, D.C.

From 1982 to 1988, Mr. Abdel Rahman served as the Director of the Palestine Information Office in Washington, D.C.

From 1974 to 1982, he served as Deputy Permanent Representative of the P.L.O. to the United Nations where he represented the P.L.O. on the Special Political Committee of the General Assembly and the Security Council.

Mr. Abdel Rahman has given presentations on Palestinian issues and the Israeli-Arab conflict at universities, thinktanks and clubs in the United States and abroad. He has represented the P.L.O. and the P.N.A. at various international conferences and other forums. He is a frequent guest on television news programs on CNN, NBC, CBS and ABC. His interviews have been printed in the U.S., Arab and Latin American press. Mr. Abdel Rahman is fluent in Arabic, English, Spanish and Portuguese.

In 1972, he obtained a Master of Arts degree in Public Administration from the University of Puerto Rico. In 1971, he received a Bachelor of Arts degree in Political Science from the Catholic University of Puerto Rico. From 1972 until 1974, Mr. Abdel Rahman was a doctoral candidate in Comparative Politics at the City University of New York.

Exhibit C

# National

*The New York Times*
ON THE WEB

| Home | Site Index | Site Search | Forums | Archives | Shopping |

October 16, 2000

✉ E-Mail This Article

PUBLIC LIVES

# Reflecting the Palestinian Viewpoint in a World of Images

**By PHILIP SHENON**

**W**ASHINGTON -- Hasan Abdel Rahman, the de facto Palestinian ambassador to the United States, understands the power that a single photograph can wield. When he thinks of the Vietnam War, he says, "I am always reminded of that image of the young Vietnamese girl running down the street after being burned by the napalm."

So in explaining the violence that has pushed the Middle East back to the brink of war, Mr. Abdel Rahman found an early ally in the camera's lens, especially in the haunting image of a 12-year-old Palestinian boy slumped against his father after the boy was shot and killed last month by Israeli soldiers in the Gaza Strip.



Susana Raab for The New York Times
Hasan Abdel Rahman has represented Palestinian interests in Washington since 1994.

Mr. Abdel Rahman, who has been the Washington representative of the Palestine Liberation Organization and Palestinian National Authority since 1994, said he received more than 100 phone calls about the photograph of the dead boy, many from Jewish Americans who wanted "to express their shame."

But the camera is fickle, and on Friday Mr. Abdel Rahman picked up his newspaper with well-justified trepidation. Splashed across the

front page was another horrifying photo, this one of a Palestinian man with his hands in the air, apparently dripping with the blood of an Israeli soldier murdered on the West Bank.

"It was awful," Mr. Abdel Rahman said. "Nobody in his right mind would accept the lynching of another human being."

But while the photograph is being cited by some Israelis and their American supporters as proof of Palestinian savagery, Mr. Abdel Rahman said he saw something else in the image of the man with bloodstained hands.

"I'm not trying to justify it," he said. "But I felt very sorry for him, and I'll tell you why. I think the Israelis have turned our young people into this — 32 years of occupation." He said the result of "this culture of violence" is a young man "who is so mad, so angry, so frustrated, that he's capable of doing something like this."

For now, Mr. Abdel Rahman seems to be losing the battle for support among Americans who make and influence Middle East policy. He sat at his desk beneath a large framed photograph of Yasir Arafat, the Palestinian leader, and patted a stack of clippings, many of them newspaper editorials blaming Mr. Arafat for the bloodshed.

"I feel a sense of frustration that all of this seems to be orchestrated in such a way to put the blame on the Palestinian Authority and on Chairman Arafat," he said. "I read what is being written. And it's very superficial and unfair."

"Yes, there were two Israelis killed," he said of the soldiers who were stabbed and stomped to death after their car turned into the funeral procession for a Palestinian man killed by Israelis earlier in the week.

"But you also have to remember there were 100 Palestinians killed over the last two weeks," he said. "The Israelis have made a declaration of war against the Palestinians. What is war? When you use tanks, when you use helicopters, when you use mortars."

While Prime Minister Ehud Barak of Israel may have gone further than his predecessors in pursuit of peace, his offers "still fall short of what is necessary to reach an agreement," Mr. Abdel Rahman said. "We cannot live with what he has offered us."

"We are not here to assess the character of Mr. Barak," he continued. "The kind of agreement we need to reach with Israel has to be a good agreement that future generations of Palestinians and Israelis can live with, not one custom-tailored to suit Mr. Barak's needs."

This compact, intense 56-year-old Palestinian is used to being outgunned in the battles of public relations.

His staff of nine works in a small suite of offices in a nondescript building near the White House. His "adversary," as he calls it, is the large Israeli Embassy and its lobbying and press operation. "I am not supported by the network that Mr. Barak has," he said.

Mr. Abdel Rahman has lived nearly half his life in the United States. The fifth of nine children of a West Bank farmer, he said he left home as a teenager in search of adventure and wound up in Rio de Janeiro. "I loved Latin America, Latin culture," he said.

He said he wanted to learn Spanish (he is fluent in both Spanish and Portuguese, the language of Brazil) and was accepted for studies at the Catholic University of Puerto Rico. In 1972, he left for the United States, where he was a doctoral candidate in politics at the City University of New York.

GLOBAL politics interrupted his studies in 1974, when he was hired by the P.L.O. to help prepare for a visit by Mr. Arafat to the United Nations. When the organization received formal observer status later that year, Mr. Abdel Rahman became its deputy representative in New York.

At a time when the word Palestinian was often equated with the word terrorist, Mr. Abdel Rahman learned firsthand of the potential threat when his offices on Park Avenue were attacked in October 1974 by a group of Jewish American extremists. "I had a few stitches in my head," he said, rubbing the area on his scalp where he was hit.

It is a sign of how much has changed for Palestinians and for Mr. Abdel Rahman that today he is married to an American-born lawyer of Lebanese descent, and that their four children, aged 14 to 21, consider themselves dual citizens and proudly carry American passports.

"They live in America, they were born in America, they are as American as any other kids," he said. "But they are still Palestinians." And not once, he said, have the children been taunted over their Palestinian roots. "No, they are very assertive," he said. Like their father, he said, "they wouldn't take nonsense from anyone."

✉ E-Mail This Article

Ask questions about National News and tell other readers what you know in Abuzz, a new knowledge network from The New York Times.  

Case 1:00-cv-00105-L-DLM    Document 172-1    Filed 06/12/03    Page 11 of 137 PageID #: 12307

Obituaries | Politics | Quick News | Sports | Science | Technology/Internet | Weather
Editorial | Op-Ed

**Features** | Arts | Automobiles | Books | Cartoons | Crossword | Games | Job Market |
Living | Magazine | Real Estate | Travel | Week in Review

Help/Feedback | Classifieds | Services | New York Today

**Copyright 2000 The New York Times Company**

Washingtonpost.com: Live Onl'

  **.com**

News | OnPolitics | Entertainment | **Live Online** | CameraWorks | Marketplace | onwash



**LIVE ONLINE**

*With PLO Ambassador Hasan Abdel Rahman*
**Thursday, Oct. 12, 2000; Noon EDT**

 

Hasan Abdel Rahman

Get New Responses

Automatically Update Page

Submit Question

**Hasan Abdel Rahman**, the chief Representative of the Palestinian Liberation Organization and the Palestinian National Authority in the United States, will be live online to talk about the crisis in the Middle East on **Thursday, Oct. 12, at Noon EDT.**

Abdel Rahman has represented the PLO and PNA in the United States since 1994, was a senior political adviser to the Palestinian delegation to the Madrid peace conference and the peace talks in Washington, D.C. Before that he served as director of the Palestine Affairs Center.

A graduate of the Catholic University of Puerto Rico, he has a masters degree in public administration from the University of Puerto Rico.

**Submit your questions** now or during the live hour.

Mideast Special Reports
World Section
Talk: World news message boards
World Live Online Archive
Live Online Transcripts

---

**washingtonpost.com:** Our guest today is Hasan Abdel Rahman, chief representative of the Palestinian National Authority and Palestine Liberation Organization, in the United States.

**So. California:** I don't think most people understand the shear frustration, anguish and trauma Palestinians have experienced in 52 years of occupation and severe displacement.

This may not excuse some Palestinian behavior in the last few weeks, but considering that their every move and behavior is controlled by checkpoints and military surveillance, this sort of eruption is inevitable. ...

Would you say this helps us Americans understand the Palestinian perspective?

**Hasan Abdel Rahman:** There is no doubt that the conditions that the Palestinian people are living in are very difficult, both inside and outside the homeland, whether under occupation or as refugees. There was a hope, after so many years of deprivation and uprooting, that the peace process would bring a qualitative improvement to the lives of the Palestinian people and end those decades of expulsion and refugee life

• Frequently Asked Questions

• Contact Us

• About the site

• Advertisers

PAID PROGRAMMING

VII

a liv tha pl iss co a

Shop
Stop wonde get yo online report
$7.9!

Ast

Our R
Carolyn nonsen for the ridden crowd.



experts nothing



T Live

Case 1:00-cv-00105-L-DLM    Document 172-1    Filed 06/12/03    Page 14 of 137 PageID #: 12310

and allow them to live a dignified and free life. But after seven years of peace process the average Palestinian's life has not changed. On the contrary, except in certain circumstances it has worsened. The Israeli occupation continued, the humiliation of the Palestinians persisted. Israel continued to behave toward the Palestinians as an occupying power, notwithstanding the agreements we had with signed with them. These conditions were tolerated, as long as there was a hope that the final status negotiations would change them.

But in the last few months, Israeli behavior around the negotiating table did not support this hope that Palestinians had. On the contrary, Israelis wanted to have sovereignity in Jerusalem over al-Aqsa mosque and al-Haran Shareef. Out of the 22 percent of historic Palestine that the Palestinians wanted for their new homeland, Israel wanted 11 percent. Also Israel did not want to accept any legal or moral responsiblity for millions of Palestinian refugees in West Bank and Gaza and Arab countries. This is what created the frustrated.

The straw that broke the camel's back was Mr. Sharon's provocative visit to al-Haran Shareef.

**Cincinnati, OH:** The Palestinians have not kept faith with any ONE of their agreements with Israel since Oslo. With the brutal murder of two Israeli soldiers inside a Palestinian Authority prison at the most tense time of peace negotiations, why should anyone think that Arafat and the PA want to make peace with Israel? What has been done to show that a Palestinian state desires PEACE, and not war?

**Hasan Abdel Rahman:** I believe this question turns the truth upside down. The truth is that Israel has not kept its promises or implemented the agreement we signed with Israel. For example, the release of Palestinian political prisoners, the redeployment of Israeli troops from West Bank and Gaza. There are 35 items which we submitted to the United States that Israel had not implemented.

As for the two Israeli soldiers in Ramallah, the Palestinian police tried to protect them but they were overpowered by the masses who have been subjected to Israeli bombardment and killing. Over 100 Palestinians have been killed and over 3,000 wounded. So notwithstanding the Palestinian police effort to save those soldiers, who were in civilian clothes and were sent by their commanders to assassinate certain leaders of the demonstrations. So the masses were very angry.

That does not in any way justify Israel's bombardment of Arafat's headquarters and other Palestinian installations.
When 100 Palestinians were killed, the Palestinians did not bombard Mr. Barak or the Israeli Defense Ministry.

**Los Angeles:**
I am a Palestinian American with family in Ramallah. What is the situation today at home after the Israeli attack? What can you tell us?

**Hasan Abdel Rahman:** The situation is very tense. Until a few minutes ago, Israel was bombarding certain sectors of Ramallah. There are demonstrations and expressions of anger by the Palestinian people.

**Fairfax, Va.:** The picture of the young Palestinian man holding up his hands covered with the blood of the recently executed Israeli soldiers to the cheers of the crowd below is one of the most disturbing images I've ever seen. How does the Palestinian Authority ever hope to garner sympathy, to paint the Israelis as the oppressors, when "neutral" people such as myself continue to get a stronger and stronger opinion that the Palestinians aren't interested in peace? That they are, in fact, still in a revolutionary mindset? What a mess! How do we end centuries of hatred? Where do we go from here?

**Hasan Abdel Rahman:** You are getting the wrong impression. You have to look at what has happened in the last two weeks, and even before. Israel faces the peaceful demonstrators with artillery fire, helicopter-launched rockets, sniper bullets and sharpshooters. That is why we have suffered over 100 martyrs and 3,000 people wounded. Because Israel understands only the language of force when it deals with the Palestinians and the Arabs.

In fact, Israel was condemned by the international community for the excessive and inhumane attacks on the Palestinians.

**washingtonpost.com:** There has been a lot of talk about the UN resolution on the Mideast crisis. How do you respond to people who say it is one-sided?

**washingtonpost.com:** "There has been a lot of talk about the UN resolution on the Mideast crisis. How do you respond to people who say it was one-sided?

**Hasan Abdel Rahman:** The resolution assessed the situation came to the conclusion that Israel has violated international law and has been using excessive force in dealing with Palestinian civilian protestors. And this excessive force led to a very high number of civilian casualties. Thus the Security Council for its behavior and called for the establishment commission of inquiry to investigate.
Of course, Israel did not agree to submit to investigation by a neutral international commission. The United States, being an ally of Israel, wanted this resolution to be watered down or withdrawn. Finally, the United States allowed the resolution to pass by abstaining.
The presidential candidates are competing for Jewish money and votes and that's why they have to appease Israel by calling this resolution a one-sided resolution.

**Skokie, IL:** Why hasn't Arafat made a public appeal to his own people for trying to calm their anger down? If Arafat can't control his own people why should Israel negotiate with him?

**Hasan Abdel Rahman:** First of all, Israel is responsible for the violence and not the Palestinians. Why am I saying this? Israel is firing at Palestinians in Palestinian town and villages. Palestinians are not attacking Israelis in Israeli towns or villages. Here is a clear cut aggressor and a clearcut victim. Therefore Yasser Arafat cannot ask the Palestinian people not to defend themselves or protest Israeli aggression. If Israel was serious and willing to end violence, all Israel has to do is

withdraw its army from Palestinian territories.

**Rockville, Maryland:** Do the Palestianian Authority agree to the UN being in charge of the Holy sites in Jerusalem?

**Hasan Abdel Rahman:** This is a very complex question. The issue is not only of the holy places, but it is also the issue of East Jerusalem which was occupied in 1967 where Moslem and Christian holy places are located. We and the international community--including the United States by the way--believe that Israel's unilateral annexation of East Jerusalem was illegal and was rejected by all the countries of the world, including the U.S. So the issue of the holy places falls in this context. You cannot deal with the issue separately from the national sovereignty issue. That's why the answer to your question cannot be answered yes or no.

**Laurel, MD:** What what I understand, Barak offered to split Jerusalem at the Camp David summit. This was farther then any Israeli leader has ever gone, but Arafat would not match him. Why is that?

**Hasan Abdel Rahman:** Jersulem has two sides. One side was under Israeli control before 1967, West Jerusalem. And there is East Jerusalem, which was under Palestinian, Arab control until 1967. The Israelis wanted to keep their exclusive control over the West Side and divide what is ours between them and us.

We proposed to Israel that we are willing to recognize their control over West Jerusalem, if Israel recognized our sovereignty over East Jerusalem, and that the two sections of the city could be united in an open city that would be united, accesible and open to all people. The west side of Jerusalem would be recognized as the capital of the state of Israel and East Jerusalem would be the capital of Palestine.

Israel refused.

**Washington, DC:** The peace process, like any negotiation, requires compromise on both sides to reach a just and fair conclusion. Israel has handed over to the PA much of the West Bank and Barak is reported to have offered virtually the whole of the West Bank plus the Arab and Armenian quarters of Jerusalem.

Are prepared to renounce, as a representative of the Palestinian people, all claims on Israel inside the "Green Line"?

**Hasan Abdel Rahman:** We agreed with Israel and proposed to Israel that the 1967 borders would be the borders of the state of Palestine. This includes the West Bank and Gaza, which constitute only 22 percent of the historic land of Palestine. And we accepted Israel on 78 percent of the land of Palestine. So we have made a historic compromise that is unprecedented for the sake of peace.

But Israel wanted to retain the 78 percent and share with us part of the 22 percent. And this is why it was not possible to reach an agreement at

Case 1:00-cv-00105-L-DLM    Document 172-1    Filed 06/12/03    Page 17 of 137 PageID #: 12313

Camp David.

**Reston, VA:** You claim that the Israelis are firing on "peaceful protesters" (to use your own words). How can you call rock-thowing, fire-bombing mobs and AK-47-toting gunment "peaceful demonstrators?"

**Hasan Abdel Rahman:** The demonstrations are in the face of an Israeli army with tanks and rockets. Any objective observer will note the difference between a tank and a civilian with a stone in his hand. That civilian is absolutely an unarmed civilian. People express their anger by throwing stones at Israeli. If someone throws stones at the police in the United States, the United States does not bring in tanks and helicopters to kill those demonstrators.

**San Francisco, CA :** Mr. Rahman:

Do you believe that the U.S. has been an honest broker in the negotiations, as was cliamed by both Mr. Gore and Gov. Bush?

**Hasan Abdel Rahman:** The United States is a very important broker but the United States is not impartial or objective because the United States is an ally of Israel. So the United States, by definition, is not impartial. It is an important broker and we recognize the importance of its role.

**Reston, Va.:** Sir, how can you justify the violence being committed by your people as we speak? And secondly, are you suprised by the violence and uprest among Israeli Arabs?

**Hasan Abdel Rahman:** I have spoken of the conditions under which the Palestinian people live which led inevitably to the frustration and the explosion which has taken place. The cause has been the Israeli use of firepower, initiated on Sept. 29 in Arab Jerusalem, when Israel fired at the demonstrators killing 6 people and wounding 200, and then the execution style killin of the 12 year old boy on the lap of his father and many other killings. So the Palestinian masses are furious and the Israel serial killing of Palestinians is continuing.

As far as the protests of Palestinians inside Israel, although they are Israeli citizens they have suffered decades of discrimination, in all aspects of their lives, and they felt that Sharon's visit to al-Aqsa mosque was provocative. What added insult to injury for them was that when they protested they were fired at by their own police.

**washingtonpost.com:** Many questioners blame the violence on the Palestinians. You have repeatedly replied that virtually all of the victims, dead and wounded, are Palestinians. Is there anything you can say to the critical questioners to help bridge the difference in perceptions

**washingtonpost.com:** Many questioners are blaming the violence on the

Palestinians. You have repeatedly replied that virtually all of the victims, dead and wounded, are Palestinians. Is there anything you can say to the critical questioners to get them to see the reality of the situation from your point of view?

**Hasan Abdel Rahman:** I think the American people have been subjected to biased coverage of the events, which is not the case in the international media. It is only in the American media. I believe that the repeated allegations by Israel has been internalized to the point that the only voice that is being heard is the Israeli voice, not the Palestinian voice.

People are being subjected to a campaign of misinformation.
But any neutral observer would look at footage of young Palestinians with stones or sticks in their hands facing the Israeli army which is the strongest army in the region. So it is conceivable that the young Palestinian civilians, maybe throwing stones, is the aggressor while the Israeli tanks and the Israeli sharpshooters are the victims.

It is really a perverted logic to even raise the question. How can any Palestinian stone reach a helicopter firing rockets at a crowd?

**Silver Spring, MD:** I think that any armed conflict between people who have to occupy the same realestate is unfortunate. However, I have a problem about the children. I am a mother of 3 (now) adult children. If there had been rioting in the streets of my town, I would never have allowed them outside of the house. How can you condemn Israel for harming children when someone is allowing those children to be outside in the thick of all the fighting?

**Hasan Abdel Rahman:** Palestinian parents don't send their children to the street. Palestinian children are like any other children. They children go to school, go to the supermarket, walk in the streets. So instead of condemning them for being there, we need to condemn those who fire at them indiscriminately.

The boy who was killed yesterday in Gaza was carrying his books and coming home from school.
The boy who was killed in the lap of his father was being protected by father.
So it is not the distortion of the Israelis that we send our children. You cannot excuse under any circumstances, the criminal behavior of Israeli soldiers and the ease by which they fire at children, or adults for that matter.

**Arlington, VA:** Do you belive that the Arab nations will intervene in aiding the defense of the Palestinian people? If so, at what point of escalation of this situation will the Arab nations intervene? ...Do you believe, if the situation escalates, that the Arab summit on Oct. 21 will be of any use in avoiding a direct confrontation?

**Hasan Abdel Rahman:** The Arab masses are very angry at what is happening to their Palestinian brothers. So I think the Arab summit will

take decisions to support the Palestinian people but I don't know how
those are going to be formulated.

**washingtonpost.com:** Is it possible for the Palestinian and Israeli
governments and negotiating teams to talk each with the minimal level
of trust and respect that is needed for the peace process?

**Hasan Abdel Rahman:** Until recently we have had very cordial
relations between the Palestinian and Israeli negotiators. There was
mutual respect until two weeks ago when Israel started shooting at
Palestinian civilians and killing them. Since then there has been an
escalation of confrontation and attack.

We hope the Israeli government will stop the logic of force and resort to
the force of logic instead so we can return to the negotiations to try to
reach an agreement, if it is not too late.

**washingtonpost.com:** Is it too late?

**Hasan Abdel Rahman:** I think with bombardment of the headquarters
of Yasser Arafat and the attack on other Palestinian installations, Israel
is declaring a war. The ramifications of this aggression is going to be
assessed. To be honest with you, I don't know how it is going to affect
the possibility of resuming the negotiations.

Automatically Update Page    |    Get New Responses    |    Submit Question

© Copyright 2000 The Washington Post Company



News    OnPolitics    Entertainment    Live Online    Camera Works    Marketplace    onwasl

# PALESTINE



Return to the Country Listing

Palestine Arab Delegation, #1459
Palestine Liberation Organization, #5244
Strook & Stroock & Lavan, #5141

Palestine Arab Delegation, #1459

Grand Central Station
Post Office Box 608
New York, NY 10163

Arab Higher Committee for Palestine

The registrant engaged in meetings at the United Nations for the purpose of winning support of the United Nations Delegations for the cause of the Palestine Arab people.

$24,000.00 for the six month period ending June 26, 1999

Palestine Liberation Organization, #5244

1730 K Street, N.W.
Suite 1004
Washington, DC 20006

Palestine Liberation Organizations Office

FARA - PALESTINE

The registrant conducted interviews, gave lectures, and contacted the media on behalf of the foreign principal. The registrant also contacted various U.S. Government agencies and departments on behalf of the foreign principal.

$200,132.74 for the six month period ending March 31, 1999

Stroock & Stroock & Lavan, #5141

180 Maiden Lane
New York, NY 10038 -4982

Palestinian National Authority

The registrant provided representation in various infrastructure projects and pension matters.

$335,083.50 for the six month period ending April 30, 1999

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing

# PALESTINE



Return to the Country Listing

Bannerman & Associates, Inc., #3964
Palestine Arab Delegation, #1459
Palestine Liberation Organization, #5244
Stroock & Stroock & Lavan, #5141

Bannerman & Associates, Inc., #3964

888 - 16th Street, N.W.
7th Floor
Washington, DC 20006

Palestinian Authority

The registrant agreed to contact members of Congress, congressional staffers, and U.S. Government officials in order to educate them on the concerns of the Palestinian Authority including issues affecting foreign policy, foreign assistance, defense, and trade. The registrant also agreed to arrange international visits of representatives of the Palestinian Authority.

Finances: None Reported

Palestine Arab Delegation, #1459

Grand Central Station
Post Office Box 608
New York, NY 10163

Arab Higher Committee for Palestine

The registrant engaged in meetings at the United Nations for the purpose of winning support of the United Nations Delegations for the cause of the Palestine Arab people.

$24,000.00 for the six month period ending June 26,1999

Palestine Liberation Organization, #5244

1717 K Street, N.W.
Suite 407
Washington, DC 20036

Palestine Liberation Organizations Office

The registrant conducted interviews, gave lectures, and contacted the media on behalf of the foreign principal. The registrant also contacted various U.S. Government agencies and departments on behalf of the foreign principal.

$352,894.79 for the six month period ending September 30,1999

Stroock & Stroock & Lavan, #5141

180 Maiden Lane
New York, NY 10038 -4982

Palestinian National Authority

The registrant provided representation in various infrastructure projects and pension matters.

$693,305.00 for the six month period ending October 31,1999

---

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing

# PALESTINE



Return to the Country Listing

Bannerman & Associates, Inc., #3964
Palestine Liberation Organization, #5244

Bannerman & Associates, Inc., #3964

888 - 16th Street, N.W.
Suite 250
Washington, DC 20006

Palestinian Authority

The registrant met with members of Congress, congressional staffers, and U.S. Government officials in order to educate them on the concerns of the Palestinian Authority including issues affecting foreign policy, foreign assistance, defense, and trade.

Finances: None Reported

Palestine Liberation Organization, #5244

1717 K Street, N.W.
Suite 407
Washington, DC 20036

Palestine Liberation Organizations Office

The registrant conducted interviews, gave lectures, attended conferences, forums and symposiums on behalf of the foreign principal.

$211,381.60 for the six month period ending September 30, 2001

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing

# PALESTINE



Return to the Country Listing

Bannerman & Associates, Inc., #3964
Palestine Liberation Organization, #5244

Bannerman & Associates. Inc.. #3964

    888 - 16th Street, N.W.
    Suite 250
    Washington, DC 20006

    Palestinian Authority

    The registrant contacted members of Congress, congressional staffers, and U.S. Government officials to discuss all facets of the bilateral relationship including, but not limited to, defense, trade, foreign assistance, and international visits of governmental officials.

    $374,984.00 for the six month period ending April 28,2002

Palestine Liberation Organization. #5244

    c/o 1100 17th Street, N.W.
    Suite 602
    Washington, DC 20036

    Palestine Liberation Organizations Office

    Activities: None Reported

    Finances: None Reported

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing



Tightening the Arafat Connecti    (washingtonpost.com)    Page 1 of 3





News Home Page
Photo Galleries
Politics
Nation

Metro
Business/Tech
Sports
Style
Education
Travel
Health
Opinion
Weather
Weekly Sections
News Digest
Classifieds
Print Edition
Archives
News Index
**Help**

Partner Sites:
**Newsweek.com**
BRITANNICA.com

# Tightening the Arafat Connection

*By John Lancaster*
Washington Post Staff Writer
Thursday, January 20, 2000; Page A21

E-Mail This Article
Printer-Friendly Version

Perhaps no foreign diplomat was on friendlier terms with Yasser Arafat than Edward G. Abington. A mild-mannered Texan who served as the top U.S. envoy to Jerusalem from 1993 to 1997, Abington was in constant touch with the temperamental Palestinian leader, joining him for long lunches at Arafat's seaside headquarters in Gaza and fielding his phone calls any time, day or night.

When a Jewish extremist gunned down Israeli Prime Minister Yitzhak Rabin in 1995, it was Abington who delivered the news to Arafat.

Now their relationship has taken a new twist.

Since leaving the State Department last month after almost 30 years, Abington, 55, has worked for Arafat's Palestinian Authority as its first-ever Washington lobbyist. One of his first assignments has been preparing the ground for Arafat's scheduled meeting here today with President Clinton, who is trying to push Israel and the Palestinians toward a "framework" peace accord by mid-February.

Abington's new employer--the D.C. lobby shop of Bannerman & Associates--is being paid $2.25 million over three years for its work for the Palestinians, a reward that has not gone unnoticed by critics of the former diplomat's career shift.

"It gives the appearance at least of inviting corruption of the diplomatic service if those posted to . . . countries can then turn around and become lobbyists for them," said Malcolm Hoenlein, executive vice chairman of the Conference of Presidents of Major American Jewish Organizations.

But an official at another major American Jewish group saw no cause for alarm. As consul general in Jerusalem, Abington played "a constructive role in the peace process by educating Arafat about what would be required if he wanted to have a constructive relationship with President Clinton," said the official, who spoke on condition of anonymity. "If he can continue that type of influence, then that would be positive."

Abington notes that he is hardly the first ex-diplomat to trade on his former contacts. He also says he has not worked on the Palestinian account since leaving the region more than two years ago--his last job at the department was deputy assistant secretary for intelligence and research--and, in any event, government ethics rules bar him from

lobbyir\_\_\_.he a\_\_\_.inistration for one year.

On the Web



Post A Job

"I know what I'm doing is controversial," he says. But with Arafat having made the transition from guerrilla chieftain to peace partner and regular guest at the White House, Abington suggests, the Palestinians are entitled to a little professional advice.

"My conception of what we're doing is to try to help the Palestinians understand what's happening in Washington, but also to help people here understand what the Palestinians are concerned about," he said.

Abington's close ties to Arafat are in some respects a function of the unique role of the Jerusalem consulate, which reports directly to Washington rather than through the embassy in Tel Aviv. As a result, the consulate traditionally has served as the main U.S. liaison to the Palestinians.

Abington worked hard at strengthening the partnership. He cultivated ties to Arafat and his senior lieutenants. He paid a sympathy call to the family of a Palestinian youngster killed in a clash with Israeli settlers. He was a fixture in Gaza and the West Bank, sometimes turning up at confrontations between Israeli soldiers and stone-throwing Palestinian youths.

"They knew I was conveying their concerns back to Washington, but I also was carrying pretty tough messages" to them, Abington said. "They always understood that the objective was representing American interests and trying to push the peace process."

Abington's outspoken style--he was a favorite of foreign journalists in Jerusalem--did not always endear him to his superiors in Washington. In May 1997, for example, Abington told the New York Times that Israeli settlement-building under then-Prime Minister Binyamin Netanyahu was "ideologically driven," a comment that earned him a reprimand from Secretary of State Madeleine K. Albright.

But Abington says he did not mince words with the Palestinians, either. When a Palestinian bus bombing jolted him awake early one morning, he hurried to the scene--spotting a severed hand along the way--and called Arafat from his mobile phone to insist that he crack down on terrorism.

The Palestinians have been trying for several years to hire a lobbyist in Washington; according to Abington, none of the big firms was willing. But Abington expressed confidence that helping the Palestinians navigate the shoals of Washington policymaking can only serve the larger interests of Middle East peace.

"I wouldn't do it otherwise," he says.

Players

Edward Gordon Abington

Title: Principal associate, Bannerman & Associates.

Case 1:00-cv-00105-L-DLM    Document 172-1    Filed 06/12/03    Page 30 of 137 PageID #: 12326

Age: 55.

Previous job: Deputy assistant secretary, Bureau of Intelligence and Research, State Department.

Education: Bachelor's degree, master's in international relations, University of Florida.

Hobbies: Hiking, bicycling, cooking.

© 2000 The Washington Post Company

◄ Previous Article        Back to the top        Next Article ►



FORWARD : News



# FORWARD

| current Issue | ... | ... |

# Former American Envoy Turns Up on the Payroll of a Lobbyist for Arafat

## *Recently U.S. Consul in Jerusalem, Abington Swings to Arab Side*

### 'This Invites a Corruption of the Diplomatic Service'

By ELI LAKE

FORWARD STAFF

WASHINGTON -- When Yasser Arafat visits Washington next week, he will be backed by the political muscle of a Washington lobbying firm that he recently hired for $2.25 million and whose lobbyists include the State Department official who, from 1993 to 1997, was in charge of representing the American government's interests to Mr. Arafat.

The State Department official, Edward Abington, last month left his post as deputy assistant secretary at the State Department's Bureau of Intelligence and Research to join the lobbying firm Bannerman and Associates, said a Bannerman associate, Mark Habeeb. Also last month, Bannerman and Associates registered itself with the Justice Department as a foreign agent representing the Palestinian Authority, according to public records on file at the Justice Department here.

With Prime Minister Barak and President Clinton pushing to conclude a final status agreement between Israel and the Palestine Liberation Organization before Mr. Clinton's term concludes in one year, the PLO's representation in the American capital is becoming increasingly important. At issue in the final status talks are Jerusalem, Jewish settlements on the West Bank, the disposition of Palestinian-Arab "refugees" and the borders between Israel and areas to be controlled by the PLO. As Mr. Clinton and his aides prepare to mediate the final status talks, which will also be monitored by Congress, Mr. Arafat has apparently decided that it is worth spending $2.25 million to make sure his side of the issues is heard in Washington. The firm has already swung into action, attempting to arrange meetings for congressional aides with Palestinian-Arab officials. Israel has no similar paid lobbyists, relying instead on its embassy and on American Jewish groups.

Bannerman's Mr. Habeeb told the Forward that Mr. Abington's "specific role will be a
function of his personal relations with the players on both sides and his intimate
knowledge of how the State Department works." Mr. Abington will be one of four
principal lobbyists working on the Palestinian Authority account, Mr. Habeeb said;
another is the firm's name partner, Graeme Bannerman, who was a top aide to Senator
Lugar on the Senate Foreign Relations Committee.

As America's consul general in Jerusalem from 1993 to 1997, Mr. Abington served as
the overseas American government official in charge of relations with Mr. Arafat and the
PLO. While based in Israel's capital, the consul general functions as a de-facto
diplomatic mission to the Palestinian Arabs, reporting directly to the State Department in
Washington rather than to the American ambassador to Israel, who is based in Tel Aviv.

Some members of Congress and American Jewish leaders criticized the new arrangement
between Mr. Abington and the PLO.

Rep. Eliot Engel, a Democrat from New York, said the arrangement is "inappropriate."
The American Consulate in Jerusalem "always seemed pro-Palestinian," Mr. Engel said.
"I just felt that the tilt out of that office always seemed to be sympathetic to the
Palestinian Arabs and not to the Israelis."

The executive vice chairman of the Conference of Presidents of Major American Jewish
Organizations, Malcolm Hoenlein, said, "This invites a corruption of the diplomatic
service, if people are employed or can be employed to represent the very countries to
which they were posted immediately after their service."

"This type of huge financial pay-off, soon after Abington's government work, should
never be permitted," said the president of the Zionist Organization of America, Morton
Klein.

Conflict-of-interest laws regarding post-government employment prohibit all former
government officials from lobbying the federal government on matters in which they
have "participated personally and substantially," according to federal regulations.

Mr. Habeeb said, "Obviously whatever he does will be legal" and that Mr. Abington
"was and continues to be in contact with the ethics and legal people at the State
Department to make sure he is in compliance" with the law. Mr. Abington was not
available for comment; Mr. Habeeb said Mr. Abington had asked him to respond on his
behalf.

Other Jewish leaders said they saw no problem with Mr. Abington's involvement and
said it could aid efforts to reach a peaceful settlement in the Middle East.

"He's advising someone who is working to make peace with Israel. I would want Mr.
Arafat to get the best advice in the peace process. I don't see what the hoo-ha is," said the
national director of the Anti-Defamation League, Abraham Foxman.

The founder and political director of Americans for Peace Now, Mark Rosenblum, said,
"Ed Abington brings to the table a knowledge of the region and can help the Palestinians
not only make their cause look better in America but also provide insight to the
Palestinian leadership on the kind of pragmatic policies that will bring a lasting peace."

A copy of the October 15 contract between Bannerman and the Palestinian Authority, on

Case 1:00-cv-00105-L-DLM   Document 172-1   Filed 06/12/03   Page 34 of 137 PageID #: 12330

file at the Justice Department, says one of the American lobbying firm's functions will be to maintain "day-to-day contacts with congressional staff and Administration officials."

The Palestinian Authority will receive advocacy training from Mr. Bannerman's firm, according to the contract. "The firm will work with a designated counterpart team as appointed by the Palestinian Authority, and will continue to build capacity among the team in the areas of communications, writing and lobbying skills in the U.S.," the contract reads. That contract also specifies that Bannerman and Associates will develop a public-relations strategy to "counter negative media coverage of the Palestinian Authority," draft weekly memoranda on developments in Washington and coordinate congressional staff visits to the West Bank and Gaza.

On this last point, Mr. Bannerman's firm has already contacted members of a New York delegation of congressional chiefs of staff visiting Israel on a trip coordinated by the Jewish Community Relations Council of New York.

Bannerman and Associates has also represented Egypt and the United Arab Emirates, Justice Department filings show. Before October 15, the Palestinian Authority employed no formal lobbyists in Washington, relying on a Washington office of the PLO that remained open informally after being closed officially in 1997. However, a New York law firm, Stroock & Stroock & Lavan, is registered with the Justice Department to serve as lawyers for the Palestinian Authority on, among other things, a deal to build a power plant in the Gaza Strip. The interim government has relied in the past on the Palestine Liberation Organization's Washington office and the Palestine Arab Delegation to do its advocacy in Washington.

| current issue | back issues | about | subscribe |

*Back to the* **FORWARD** *home page*

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

C

United States District Court,
District of Columbia.

INTERNATIONAL TECHNOLOGIES
INTEGRATION, INC., Plaintiff,
v.
THE PALESTINE LIBERATION
ORGANIZATION and The Palestinian National
Authority,
Defendants.

**No. CIV.A.98-00756 (CKK).**

June 22, 1999.

Action was brought in state court to confirm arbitration award. Following removal, defendant moved to vacate award. The District Court, Kollar-Kotelly, J., held that: (1) notice of demand to submit dispute to arbitration was properly served, and (2) failure to challenge award within ninety days of receiving notice of award precluded vacation of award.

Motion to confirm granted.

West Headnotes

**[1] Arbitration** 2.2
33k2.2 Most Cited Cases

Where parties agreed to arbitrate disputes under American Arbitration Association rules and in accordance with Virginia law, Virginia's arbitration law, not Federal Arbitration Act, governed determinations of validity of arbitration award. 9 U.S.C.A. § 1 et seq.; Va.Code 1950, § 8.01-581.010.

**[2] Arbitration** 31.11
33k31.11 Most Cited Cases

Under Virginia law, arbitrator must provide fundamentally fair hearing.

**[3] Arbitration** 23.1
33k23.1 Most Cited Cases

Under Virginia law, minimal requirements of fairness in arbitration proceedings is right to receive adequate notice of arbitral proceedings.

**[4] Arbitration** 23.1
33k23.1 Most Cited Cases

Notice of demand to submit dispute to arbitration was properly served, even though notices were not sent to address given in contract; party seeking arbitration sent copies of notice to address listed on opponent's representatives business cards, notice was sent by facsimile and registered mail, return-receipt requested, and notices were otherwise satisfactory.

**[5] Arbitration** 46.4
33k46.4 Most Cited Cases

Party who receives adequate notice of arbitration proceeding, yet who elects to sit idly by in silence until arbitration is complete, award has been rendered, and prevailing party has moved to confirm, cannot emasculate all that has been done by asserting technical right for which there has been no substantive deprivation.

**[6] Arbitration** 46.7
33k46.7 Most Cited Cases

Party that failed to challenge arbitration award within 90 days of receiving notice of award was precluded under Virginia law from asserting grounds for vacating award on motion to confirm award. Va.Code 1950, § 8.01-581.010.

**[7] Arbitration** 72.1
33k72.1 Most Cited Cases

Under Virginia law, court must confirm arbitration award if no party has filed timely petition to vacate or modify award. Va.Code 1950, § 8.01-581.010.

**[8] Arbitration** 46.1
33k46.1 Most Cited Cases

Under Virginia law, party who wishes to contest existence of arbitration agreement must proffer his objection within 90 days of receiving award. Va.Code 1950, § 8.01-581.010.
*4 John David Seiver, Cole, Raywid & Braverman, L.L.P., Washington, DC, for Plaintiff.

Walter J. Pozen, I, Stroock & Stroock & Lavan, Washington, DC, for Defendants.

MEMORANDUM OPINION

KOLLAR-KOTELLY, District Judge.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

66 F.Supp.2d 3
**(Cite as: 66 F.Supp.2d 3)**

To resolve a dispute arising under an agreement between the Plaintiff International Technologies Integration, Inc. ("ITI") and the Defendants the Palestinian Liberation Organization ("PLO") and the Palestinian National Authority ("PNA"), ITI commenced arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA") and forwarding copies of the Demand by both registered mail, return-receipt requested and facsimile to the PNA's president and two ministers.    To neither this Demand nor to numerous other notices of the arbitration proceedings sent by both ITI and the AAA did the Defendants respond.  On October 15, 1997, after conducting an *ex parte* arbitration, an arbitrator found that the PLO and the PNA were liable to ITI in the amount of $18,750,000 for breach of contract.    More than ninety days after the Defendants were served with the arbitrator's award, ITI filed a motion to confirm the award in the District of Columbia Superior Court, which was served on the Defendants by registered mail, return-receipt requested at the same addresses to which all previous arbitral notices had been sent. Responding to the Superior Court summons, the Defendants removed to this Court pursuant to 28 U.S.C. § 1441(d), and concomitantly raised several affirmative defenses, including lack of notice, in moving to vacate the arbitration award.

Only two issues need be resolved by this Court:  1) did the Defendants receive adequate notice of the arbitration proceedings and 2) if so, are they now precluded from moving to vacate the arbitrator's award.  After reviewing the parties' briefs, exhibits, supplemental responses to this Court's May 27, 1999 Order, and comments at oral argument, the Court answers each issue in the affirmative.  Accordingly, ITI's motion to confirm is granted.

#### *5 I. BACKGROUND

On September 13, 1993, the PLO, acting as representative of the Palestinian people, and the Government of Israel signed the Declaration of Principles on Interim Self-Government Arrangements, which extended limited political autonomy to Palestinians within the West Bank and the Gaza Strip.  Emerging from this historic accord was the PNA, the political entity in which is reposed the Palestinian executive, legislative, and judicial powers.    Among the PLO's chief developmental objectives was to "rebuild and modernize the telecommunications network in the Palestinian Territory."  Decl. of Mohammed Rachid ¶ 2. [FN1] ITI is an advanced-technology, research, and

engineering firm incorporated in the Commonwealth of Virginia that provides telecommunications services throughout the world.  *See* Decl. of Howard Graff ¶ 2. On October 3, 1993, ITI executed two substantially identical agreements  [FN2] with both the PLO and the PNA, under which the PNA  [FN3] allegedly granted to ITI the exclusive, non-terminable right to develop a domestic and international communications and telecommunications network in the West Bank, Jericho, and the Gaza Strip.  *See id.* at Exs. A & B.

> FN1. Although counsel for the PNA spells the declarant's name "Rashid," correspondence between the parties, including letters signed personally by the declarant, indicate that his name is spelled "Rachid."

> FN2. Because both agreements are substantively identical, the Court shall collectively refer to them as the "Agreement."

> FN3. Unless the Court specifies otherwise, further references in this Memorandum Opinion to the PNA also include the PLO.

Three discrete provisions in the Agreement, which will receive more elaborate examination later, warrant brief attention at the outset.  First, in Article 2.1 of the Agreement, the parties elected to resolve all disputes by submitting them to binding arbitration in Washington, D.C. under the aegis of the AAA. Second, Article 3 specified that the Agreement was to be interpreted and enforced in accordance with and governed by the laws of the state of Virginia.    And lastly, Section 8.2 of the Conditions of Contract for Telecommunication Concession (Sharing) Agreement--Gaza Strip/West Bank ("Conditions of Contract"), a document annexed to the Agreement, specified that

> [a]ny notice, demand or other communication required or permitted to be given pursuant to the Agreement shall be in writing and shall be (i) personally delivered to an individual then designated as a party's representative ... (ii) transmitted by postage prepaid registered mail (airmail if international), or (iii) transmitted by telefax or telex (with answerback confirmation).

Conditions of Contract, § 8.2 (Decl. of Graff at Ex.

C). Section 8.2 further provided that notices to the PNA were to be addressed to the PNA in Jericho, Palestine, directed to the attention of "H.E. The President." Beyond these specifications, however, Section 8.2 was silent, if not cryptic. Although it indicates that a post office box is part of the address, there is merely a blank line following the "P.O. Box" line. Moreover, where there should be numbers or other data, only blank lines follow such categories as "Telex Number," "Answerback," and "Fax." *See* Conditions of Contract, § 8.2, at 16.

At the time that the parties entered into the Agreement, Chairman Arafat was residing in Tunis, Tunisia, where, in fact, the contract was signed. *See* Decl. of Dennis F. Schonacher ¶ 2; Decl. of Graff at Exs. A (Agreement between ITI and the PLO indicating that "[t]his AGREEMENT is made and entered into in Tunisia on the Third day of October 1993 ...."); *id.* at Ex. B (Agreement between ITI and the PNA indicating that "[t]his AGREEMENT is made and entered into in Tunisia on the third day of October 1993 ...."). Once Chairman Arafat permanently moved to Palestine, ITI directed all written correspondence with the Office of the President *6 of the PNA to the Gaza address. *See* Decl. of Schonacher ¶ 4; *id.* at Ex. I (various letters sent by ITI to the Office of President in Gaza). Moreover, ITI conducted all telephone and facsimile communications with the Office of the President by dialing Gaza phone numbers. *See id.* ¶ 4. Indeed, it was in Gaza that Chairman Arafat, accompanied by representatives from ITI, MCI, and Bezeq, an Israeli telecommunications company, announced a formal transfer of the telecommunications system in Palestine from Bezeq to ITI. *See id.* ¶ 5.

Approximately three years after the parties executed the Agreement, ITI concluded that the PNA wrongfully terminated the Agreement, and, pursuant to Article 2.1 of the Agreement, commenced arbitration by filing a Demand for Arbitration ("Demand") with the AAA on November 12, 1996. ITI, in turn, served copies of the Demand on Yasser Arafat, Chairman of the Executive Committee of the PLO and President of the PNA, His Excellency Eng. Imad Al Falouji, Minister of Post and Communication, and His Excellency F. Abu-Medein, Minister of Justice. For each of the three PNA officials on whom ITI served a copy of the Demand, ITI employed both registered mail, return-receipt requested and facsimile transmission--totaling six separate notices to the PNA. [FN4] All three facsimiles were transmitted successfully, *see* Decl. of Graff ¶ 7 and Exs. F, G, & H (copies of facsimile confirmations to all three recipients), and a stamped

return-receipt indicates that the Minister of Post & Communications received the Demand on November 28, 1996. *See id.* at Ex. I (copy of stamped return-receipt to H.E. Imad Al Falouji); *see also id.* at Ex. J (copy of the Affidavit of Service of Lynn Wiegand (original was submitted to the Arbitrator), attesting that the Demand was served on each of the three PNA officials by registered mail, return-receipt requested and by facsimile). Copies of the Demand were served on each of the three PNA officials at the Gaza addresses that ITI had consistently used to communicate successfully with the PNA. Despite these notices, the PNA never contacted ITI.

> FN4. In addition to authorizing parties to service notice on each other by mail and by personal service, Rule 40 of the AAA's Commercial Arbitration Rules, which is incorporated into the parties' arbitration agreement, *see* AAA Rule 1, provides that "[t]he AAA and the parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these rules." AAA R. 40. The requirements and mechanics of Rule 40 are examined in greater detail *infra*.

Meanwhile, the AAA administrator, Luis M. Martinez, was taking preliminary steps to orchestrate ITI's arbitration demand. On December 5, 1996, he sent a letter to both parties to advise them that the AAA had received ITI's Demand, that the PNA had forty-five days from that point to file a statement of defense and counter-claims, and that he hoped to schedule an administrative conference. *See* Decl. of Luis M. Martinez ¶ 3 & Ex. A. AAA documents indicate that a facsimile of Martinez' letter was successfully transmitted to the PNA's Ministry of Post and Communication. *See id.* at Ex. B. A stamped copy of the Martinez letter that was sent to Minister Imad Al Falouji bears an official PNA stamp that reads, according to the certified translation: "The Palestinian National Authority, Ministry of Post and Communication, Office of the Minister." *See* Decl. of Graff at Ex. K (containing stamped-copy of letter and certified translation). The translation also indicates "American Arbitration Association No. 266/26" and the date of "12/12/96." The PNA did not respond.

Two months later, Martinez sent another letter to ITI and the PNA's Minister of Post and Communication. *See* Decl. of Martinez ¶ C. While notifying the

parties of prospective arbitrators and requesting their preferences, Martinez also used this opportunity to admonish the PNA about the consequences of failing to participate in the upcoming arbitration:

*7 Failure to [submit a list of preferred arbitrators] will be deemed an acceptance of the entire list. Please note that this Association has not received a response from the Respondent. It is our policy that absent a Court Order or an agreement by the parties, the arbitration will proceed as to all parties. If one party fails to participate the arbitration will proceed exparte [sic], meaning one party. In the event that any party does not participate it is advised that they attend the hearings because failure to attend will not prevent the arbitrator from issuing an award that can be enforced in either country.

Decl. of Martinez at Ex. C. As he did with his December letter, Martinez faxed a copy of his letter to the PNA's Minister of Post and Communication. Likewise, AAA records indicate that the fax was sent successfully, *see id.* at Ex. D, and the stamp affixed to the fax cover sheet has been translated as: "Stamp of The Palestinian National Authority, Ministry of Post and Communication, Office of the Minister." Decl. of Graff at Ex. L. Having received no response from the PNA, the AAA designated Biagio Civale as Arbitrator, and through Martinez, issued a Notice of Hearing for March 28, 1997. *See* Decl. of Martinez at Ex. E. Once again, a stamp on the facsimile cover sheet sent to the PNA reads: "Stamp of The Palestinian National Authority, Ministry of Post and Communication, Office of the Minister." Handwritten notations also indicate that the facsimile was "Received 03/26/--- 7." Decl. of Graff at Ex. M.

Presumably concerned about the PNA's absence, Arbitrator Civale ordered ITI to contact the Office of the PLO in Washington, D.C. about the pending arbitration. *See* Decl. of Graff ¶ 17. On April 8, 1997, Counsel for ITI complied by sending a brief letter to Minister Imad Al Falouji by facsimile and registered mail, return-receipt requested to both the Gaza address as well as the Office of the PLO in Washington, D.C., in care of Mr. Said Hamad, the Deputy Chief Representative of the PLO. *See id.* A stamp on the facsimile cover sheet sent to the Office of the PLO in Washington, D.C. reads: "Stamp of The Palestinian Liberation Organization." Handwritten in English on the face of the document appear the words: "Received APR 11, 1997." *See id.* at Ex. N. This letter also failed to precipitate a response from the PNA. Accordingly, pursuant to the AAA's rules, the Arbitrator conducted the proceeding *ex parte.*

To substantiate its claim, ITI submitted a number of affidavits and other written documentation to the Arbitrator between April and October of 1997. *See* Decl. of Graff ¶ 19. Notwithstanding the PNA's absence, Arbitrator Civale directed ITI to serve the PNA with copies of every submission that it tendered to him. *See id.* ¶ 20. Significantly, ITI served copies of its arbitral submissions on the PNA's President, Yasser Arafat, the Minister of Justice, F. Abu-Medein, and the Minister of Post and Communication, Imad Al Falouji at their Gaza addresses. *See id.* Because the question of notice assumes dispositive significance in this litigation, it is essential to chronicle ITI's various submissions:

. Three returned receipts to President Arafat, Minister F. Abu-Medein, and Minister Imad Al Falouji acknowledge that the PNA received ITI's April 25, 1997 letter to Arbitrator Civale containing ITI's witness list and suggested testimony. *See id.* at Ex. O.

. Three facsimile confirmations sent to President Arafat, Minister F. Abu- Medein, and Minister Imad Al Falouji indicate that ITI's April 25, 1997 letter was transmitted successfully. *See id.* at Ex. P.

. Three DHL Shipment Airwaybills indicate that ITI mailed its initial submissions to President Arafat, Minister F. Abu-Medein, and Minister Imad Al Falouji on May 12, 1997. *See id.* at Ex. Q.

*8 . A DHL log indicates that ITI's May 12, 1997 initial submissions were delivered to H.E. Eng. Imad Al Falouji.

. DHL Airwaybill 9146324924, which contained ITI's May 12, 1997 initial submissions that were mailed to President Arafat, was received on May 20, 1997 by "Yousra." ITI maintains, and the PNA has not suggested to the contrary, that "Yousra" refers to Yousra Jamil Hassanat, who works in the PNA Presidential Office in Gaza, and who is responsible for President Arafat's "In" & "Out" mail. *See id.* at Ex. S.

. DHL Airwaybill 9146325134, which contained ITI's May 12, 1997 initial submissions that were mailed to Minister F. Abu-Medein, was received on May 20, 1997 by "Nahed." Unchallenged by the PNA, counsel for ITI has averred that "Nahed" refers to Nahed Ichtaouie, who serves as the private secretary to Minister F. Abu-Medein. *See id.* at Ex. T.

. DHL Airwaybill 9100955861, which contained ITI's subsequent May 15, 1997 submission that was mailed to Minister F. Abu-Medein, was received on June 2, 1997 by "Rahada Bsaiso." Counsel for ITI maintains that Rahada Bsaiso is the assistant to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the private secretary to Minister F. Abu-Medein. *See id* at Ex. U. The PNA does not suggest anything to the contrary.

. DHL Airwaybill 9100955846, which contained ITI's subsequent May 15, 1997 submission that was mailed to Minister Imad Al Falouji, was received. *See id.* at Ex. V.

. A document that is purportedly from DHL confirms that ITI's subsequent May 15, 1997 submission that was mailed to President Arafat was received on or about May 26, 1997.

Having never received from the PNA a responsive submission or even so much as a request for an extension of time, Arbitrator Civale rendered his arbitration award ("Award") on October 15, 1997. Although he found that "the Defendants have breached their obligations to perform under the contracts," he declined to award ITI the full value of its expectation damages. *See* Decl. of Graff at Ex. X (written Award of Arbitration).   Concluding that "[t]he award of money to ITI, as compensation for work initially performed, during almost one tenth of the life of the agreement, cannot be greater than one tenth of the value assigned by the experts for a 25 years performance," Arbitrator Civale awarded $18,750,000 (inclusive of all expenses attendant with prosecuting the arbitration) to ITI. *See id.*

After the Award was filed on November 13, 1997, Luis M. Martinez of the AAA sent the Award to the PNA via United Parcel Service ("UPS").   *See* Decl. of Martinez ¶ 8; Decl. of Graff ¶ 24.   As with all previous correspondence sent from the AAA, the Award was addressed to H.E. Eng. Imad Al Falouji, Minister of Post and Communication, in Gaza. *See* Decl. of Graff ¶ 24. Martinez subsequently received a UPS Delivery Notification that indicated that the Award was delivered on November 26, 1997, and was signed for by "Shalom."   In paragraph 25 of his declaration, which the PNA has not rebutted, counsel for ITI avers that Ihab Rassem El Ghoul, an assistant to Yousra Hassanat in the PNA Presidential Office in Gaza, routinely signs delivery receipts with the word "Shalom." *See id.* ¶ 25.; *see also* Decl. of Martinez at Ex. L (copy of the UPS Delivery Notification indicating that one parcel was delivered on 11/26/97 at 3:52 P.M. and that the shipment was signed for by "SHALOM").

On March 2, 1998, ITI filed a Motion to Confirm Arbitration Award in the District of Columbia Superior Court.   Pursuant to D.C. Super. Ct. R. 4(f)(2)(C)(ii), the Clerk of the Court served a copy of the summons and ITI's motion by registered mail, return-receipt requested on President Arafat, Minister

F. Abu-Medein, and Minister Imad Al Falouji at the addresses that ITI and the AAA had used to serve all arbitral notices.   A copy of the return- receipt mailed to President Arafat indicates that *9 he received the summons and motion on March 16, 1998.   Four days later, the PNA's Minister of Finance informed Mohammed Rachid, Economic Advisor to President Arafat, that ITI had brought an arbitration in Washington, D.C., that an award was rendered in ITI's favor in the amount of $18,750,000, and that ITI had commenced legal proceedings in Washington, D.C. to confirm the award.   *See* Decl. of Rachid ¶ 21.   Defendants timely removed ITI's action to this Court pursuant to 28 U.S.C. § 1441(d) on March 24, 1998.

## II. DISCUSSION

A. *Virginia's codification of the Uniform Arbitration Act governs this proceeding*

Before turning to the merits, the Court must resolve a question that neither party has raised.   While both ITI and the PNA have assumed throughout that this proceeding is governed by the Federal Arbitration Act, 9 U.S.C. § § 1-16, this Circuit's decision in *Ekstrom v. Value Health, Inc.,* 68 F.3d 1391, 1395-96 (D.C.Cir.1995), coupled with the Agreement's choice-of-law provision in Article 3, compels the Court to apply Virginia's codification of the Uniform Arbitration Act, Va. Stat. § 8.01-581.01 *et seq.*   In *Ekstrom,* the parties executed a contract in which they agreed to resolve any disputes through binding arbitration.   In a "Governing Law" section, the parties further provided that the agreement "shall be governed by and construed in accordance with the internal laws of the State of Connecticut." *Id.* at 1393.   After a dispute arose, an arbitrator entered an award in the plaintiff's favor.   Within ninety, but more than thirty, days from receiving the award, the defendant moved to vacate the award under the FAA, 9 U.S.C. § 10. While the FAA permits a party to move to vacate an arbitration award within ninety days of its delivery, *see* 9 U.S.C. § 12, Connecticut's arbitration law bars any motion to vacate filed later than thirty days from delivery of the award, *see* Conn. Gen. Stat. Ann. § 52-420(b).   Although both parties conceded that Connecticut's substantive law on contracts and arbitrability should govern the agreement, they differed over whether the state's law controlled issues relating to the timeliness of petitions to vacate arbitration awards.

To resolve this inquiry, the D.C. Circuit first observed that "choice of law provisions in contracts are generally understood to incorporate only

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

Page 6

substantive law, not procedural law such as statutes of limitation." *Id.* at 1395 (brackets omitted) (quoting *Federal Deposit Ins. Corp. v. Petersen,* 770 F.2d 141, 142-43 (10th Cir.1985)). Yet the Circuit determined that, under Connecticut law, "a statute of limitation is 'substantive' when it applies to a right created by statute, as opposed to a right recognized at common law." *Id.* (citing *Baxter v. Sturm, Ruger & Co.,* 230 Conn. 335, 644 A.2d 1297, 1299 (1994)). Connecticut, like Virginia, has adopted the Supreme Court's rationale in *Davis v. Mills,* 194 U.S. 451, 454, 24 S.Ct. 692, 48 L.Ed. 1067 (1904), that a limitations period is substantive if it is " 'directed to the newly created liability so specifically as to warrant saying that it qualifie [s] the right.' " *Thomas Iron Co. v. Ensign-Bickford Co.,* 131 Conn. 665, 42 A.2d 145, 147 (1945) (quoting *Davis,* 194 U.S. at 454, 24 S.Ct. 692); *see also Jones v. R.S. Jones & Assocs.,* 246 Va. 3, 431 S.E.2d 33, 35 (1993) (adopting the *Davis* formulation); *Overstreet v. Kentucky Central Life Ins. Co.,* 950 F.2d 931, 935 (4th Cir.1991) (same). From there, the Circuit had little difficulty concluding that Connecticut arbitration law governed. [FN5]

FN5. The D.C. Circuit also examined, and rejected, the defendants' argument that the FAA pre-empted Connecticut's arbitration law. *See Ekstrom,* 68 F.3d at 1395-96. Interestingly, although *Ekstrom* was argued and decided after the Supreme Court issued its opinion in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), *Mastrobuono* is never cited in *Ekstrom.* Moreover, one of the cases that the D.C. Circuit cites in *Ekstrom* to establish that the FAA did not pre-empt Connecticut law was a Second Circuit case whose holding was explicitly overruled by the Supreme Court in *Mastrobuono.* *See Fahnestock & Co. v. Waltman,* 935 F.2d 512, 517 (2d Cir.1991) (cited in *Ekstrom,* 68 F.3d at 1396), *overruled by Mastrobuono,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Although the Court follows *Ekstrom,* because there is little substantive difference between the FAA and Virginia's codification of the Uniform Arbitration Act, the Court will examine both statutes where appropriate.

**\*10** [1] Moreover, several years before *Ekstrom,* Judge Stanley Harris of this Court explicitly held that

where the parties agreed to arbitrate disputes under the AAA and in accordance with Virginia law, Virginia's arbitration law, not the FAA, governed determinations of the validity of the arbitration award. *See Flight Sys. v. Paul A. Laurence Co.,* 715 F.Supp. 1125, 1127-28 (D.D.C.1989). Under both *Ekstrom* and *Flight Systems,* there can be no doubt that ITI's motion to confirm and the PNA's petition to vacate the arbitration award must be analyzed under Virginia law.

B. *The mechanics of vacating arbitration awards under Virginia's arbitration law*

Once an arbitrator has rendered his award, a party may move to vacate that award under a narrow set of circumstances:

Upon application of a party, the court shall vacate an award where:

1. The award was procured by corruption, fraud or other undue means;

2. There was evident partiality by an arbitrator appointed as a neutral, corruption in any of the arbitrators, or misconduct prejudicing the rights of any party;

3. The arbitrators exceeded their powers;

4. The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing ... in such a way as to substantially prejudice the rights of a party; or

5. There was no arbitration agreement and the issue was not adversely determined in proceedings [to compel arbitration] and the party did not participate in the arbitration hearing without raising the objection.

Va. Stat. § 8.01-581.010(1)-(5). [FN6] To promote one of arbitration's virtues--efficiency and swiftness--a party seeking to vacate an award must file an application "within ninety days after delivery of a copy of the award to the applicant. *Id.* § 8.01-581.010. Although a party may either file an application to vacate by initiating its own court action or "raise[ ] reasons supporting vacation in response to another party's petition to confirm that award," the applicant must nevertheless present its arguments to a court of competent jurisdiction within the ninety-day time frame. *See id.*

FN6. With the exception of subsection 5 of Virginia's codification of the Uniform Arbitration Act, the FAA's four bases for vacating an arbitration award are practically

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

Page 7

identical.  *See* 9 U.S.C. § 10(a)(1)- (4).

[2][3] Without doubt, "an arbitrator must provide a fundamentally fair hearing." *Generica Ltd. v. Pharmaceutical Basics, Inc.,* 125 F.3d 1123, 1130 (7th Cir.1997).  Among the "minimal requirements of fairness" is a right to receive "adequate notice" of arbitral proceedings. *Id.; accord Iran Aircraft Indus. v. Avco Corp.,* 980 F.2d 141, 146 (2d Cir.1992); *Hoteles Condado Beach v. Union De Tronquistas,* 763 F.2d 34, 40 (1st Cir.1985);  *Hall v. Eastern Air Lines, Inc.,* 511 F.2d 663, 663-64 (5th Cir.1975). Speaking generally to the bedrock importance of notice, the Supreme Court observed almost fifty years ago that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all *11 the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).  Regardless of the temporal limitations set forth in Virginia's arbitration act or the FAA, neither statute would foreclose a court from vacating an arbitrator's award where a party was never served with a single notice, and where that party had no constructive notice or other knowledge of the arbitration.   For "when notice is a person's due, process which is a mere gesture is not due process." *Id.* at 315, 70 S.Ct. 652.     Insuch extreme circumstances, it would defy logic and fundamental fairness to permit a party to obtain an arbitral award over an opponent by shrouding the proceedings in a cloak of invisibility.

What this Court must determine, therefore, is whether the PNA received adequate notice of the arbitration.   For if the PNA was ignorant of the proceedings, that would be all that this Court need determine;   such a miscarriage of fundamental fairness would compel vacatur.     That said, it is equally obvious that if the PNA, in fact, received adequate, albeit imperfect, notice of the arbitration, little would be left for this Court to do than simply grant ITI's motion to confirm the Award.

### C. The PNA received adequate, if not actual, notice of the arbitration

By agreeing to arbitrate under the aegis of the AAA, ITI and the PNA incorporated into their Agreement the AAA's Commercial Arbitration Rules.  *See* AAA R. 1 ("The parties shall be deemed to have made these rules a part of their arbitration agreement

whenever they have provided for arbitration by the American Arbitration Association ...."). Among those is Rule 40, which governs how each party is to serve notice on the other.     Divided into two paragraphs, Rule 40 first specifies on whom, at which address, and by which methods notice must be given; its last paragraph expands the methods for service to encompass electronic forms of written communication:

**40. Serving of Notice**

Each party shall be deemed to have consented that any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules ... may be served on a party by mail addressed to the party or its representative *at the last known address* or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard thereto has been granted to the party.

The AAA and the parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these rules.

AAA R. 40 (emphasis added).

[4] Straightforward application of Rule 40 to the facts of this case manifestly establishes that ITI properly served the PNA with notice of its Demand. First, ITI's method of service is beyond reproach.   It not only sent copies of the Demand by facsimile but also by registered mail, return-receipt requested--a method of service that exceeds Rule 40's modest requirements. The PNA's sole protest is that ITI and the AAA sent notices to Gaza instead of Jericho. According to the PNA, Section 8.2 of the Conditions of Contract established Jericho as the PNA's last known address for purposes of complying with Rule 40.   Notably, the PNA does not argue that the service requirements set forth in Section 8.2 of the Conditions of Contract displace or modify Rule 40. [FN7]   Rather, it maintains that Section *12 8.2 operates in tandem with Rule 40 by simply designating the "last known address" to which notices should be sent.     *See* PNA's Memorandum in Response to the Court's Order of May 27, 1999 at 3-4;  *see also* Tr. of Hr'g, May 4, 1999, at 24:24-25:3 ("And it is not a question of whether we are modifying Rule 40 of the AAA. I believe that Rule 40 of the AAA requires them to send it, to make a good faith effort to deliver it to the last known address.  I believe that 8.2 tells them the last known address for this purpose.") (statement of counsel for the PNA).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

Page 8

FN7. One certainly might have construed Section 8.2 as a complete displacement or modification of Rule 40. Pursuant to Rule 1 of the AAA's Commercial Arbitration Rules, "[t]he parties, by written agreement, may vary the procedures set forth in these rules." AAAR. 1. Of course, it is not clear that this would alter the Court's decision. Moreover, the Seventh Circuit's decision in *Gingiss International, Inc. v. Bormet,* 58 F.3d 328, 331-32 (7th Cir.1995), held that a provision akin to Section 8.2 merely spoke to notices required by the underlying contract. For notices sent pursuant to arbitration proceedings, the Seventh Circuit found that Rule 40 remained the governing instrument.

Such an interpretation of Section 8.2, which the Court assumes to be correct, fails to cast a pall of illegitimacy over ITI's service efforts. As of October 3, 1993, when the Agreement was ratified along with the Conditions of Contract, Jericho may very well have been the PNA's last known address. But if all Section 8.2 is designed to do is notify ITI of a last known address, then there is nothing--not only in the Agreement, but certainly nothing in Rule 40--that would prevent ITI from sending notices to an address that they later come to use and recognize as the PNA's last known address. As the undisputed evidence before the Court dramatizes, from almost the Agreement's inception, ITI successfully communicated with the PNA by directing correspondence to its Gaza address. [FN8] Indeed, the PNA itself provided ITI with business cards on which Gaza, not Jericho, addresses and phone and fax numbers were printed. By way of example, the fax number provided on the personal business card of His Excellency Imad Al Falouji, Minister of Post and Communication, is identical to the one that both ITI and the AAA used to send notices of the arbitration. *Compare* Decl. of Schonacher at Ex. 3 (business card of Imad Al Falouji, Minister of Post and Communication, providing a fax number of 972-7-824555) *with* Decl. of Graff at Ex. F (fax confirmation sheet indicating that Demand was successfully sent to the Ministry of Post and Communication at 972-7-824555). Similarly, the Minister of Justice's business card indicates that his address is in the Abu Khadra Building in Gaza to which ITI sent arbitral notices, *see* Decl. of Schonacher at Ex. 4, while business cards from officials in the Office of the President confirm that ITI sent notices to accurate and functioning addresses and fax numbers, *see id.* at Exs. 5-6. Accordingly, because ITI complied with AAA Rule 40 by sending

*13 notice of its Demand for Arbitration to the PNA at its last known address, the Court concludes that the PNA received adequate notice of the pending arbitration.

FN8. Counsel for the PNA takes great liberties with the declaration of Mohammed Rachid, the Economic Advisor to President Arafat, in an attempt to portray Gaza as a city wreaked with chaos and political and economic naivete while heralding Jericho as a sophisticated city accustomed to "day- to- day legal and commercial issues." PNA's Memorandum in Response to the Court's Order of May 27, 1999 at 2. While Rachid underscores a number of infrastructure deficiencies within the Palestinian territories, his declaration speaks to the territories as a whole; none of his comments is unique to Gaza, nor for that matter does he indicate that Jericho is insulated from these same difficulties. *See* Decl. of Rachid ¶ 22. Indeed, some of counsel's statements of "fact" about the PNA, supported nowhere in Rachid's declaration, are patently incorrect. Although counsel boasts that Jericho "is the economic center of Palestine and the seat of the legislative, executive, and judicial branches of the PNA," the reality is that Jericho is a city inhabited by 28,083 while the Gaza area boasts nearly a million persons. *See* The Palestinian National Authority, Ministry of Information, *Basic Information about Palestine* (visited June 8, 1999) < http://www.pna.org/mininfo/general/palestin .html>. Moreover, the Office of the President and the majority of PNA ministries and their ministers, including the Ministry of Justice and the Ministry of Post and Communication, are located in Gaza, not Jericho. *See* Permanent Observer Mission of Palestine to the United Nations, *Ministries of the Palestinian Authority* (visited June 8, 1999) <http://www.palestine- un.org/dir/min.html>. Only the Ministry of Local Government is located in Jericho. *See id.*

Moreover, even if Section 8.2 were construed to constitute an irrevocable designation of the PNA's "last known address," any objection to receiving notice in Gaza is simply to the form of the notice, not

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

to whether it was adequate to comport with minimal fairness. Indeed, at oral argument counsel for the PNA made an important concession about the sufficiency of the notice that ITI sent to the PNA. Asked whether the notices that ITI sent to the PNA in Gaza would otherwise satisfy Rule 40 if the Conditions of Contract had not contained Section 8.2, counsel responded:

> Your Honor, it's very hard for me to answer that without 8.2 If 8.2 didn't exist and [Gaza] was the last known address, *then they would be fine. I don't have any doubt about that.*

Tr. of Hr'g, June 4, 1999, at 24:20-:23 (emphasis added). Counsel's concession merely made explicit what was implicit throughout the PNA's briefs. At no point has the PNA challenged the methods of delivery that ITI and the AAA used to send notice, it has never denied receiving the numerous facsimile transmissions sent by ITI and the AAA, it has never complained that the notices should have been dispatched to an official other than the three to whom ITI sent notice of its Demand, nor has the PNA contested the validity of the signatures on the return-receipt cards or the authority of those persons to receive mail on behalf of the high-ranking officials to whom those notices were sent. All that the PNA can muster is a cryptic, and ultimately unilluminating, statement from Rachid that "I cannot confirm that the PNA ever received such notice." Decl. of Rachid ¶ 22.

[5] Even when a party timely files a petition to vacate, courts have refused to upset an arbitrator's award on the hyper-technical ground that notice did not conform to the parties' underlying agreement. *See, e.g., Gingiss,* 58 F.3d at 331 ("Inadequate notice is not one of [the] grounds [for vacating an award under the FAA], and the Bormets' claim therefore fails."); *Bernstein Seawell & Kove v. Bosarge,* 813 F.2d 726, 729-30 (5th Cir.1987) (affirming district court's conclusion that defendant had actual notice of arbitration where notice was sent to an address that he was currently using but different from the one specified in the partnership agreement); *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos,* 553 F.2d 842, 845 (2d Cir.1977) ("[N]o unfairness results from giving effect to the notice they actually received"); *Shamah v. Schweiger,* 21 F.Supp.2d 208, 215 (E.D.N.Y.1998) ("Shamah received actual notice and was not prejudiced by lack of notice via registered or certified mail."). Indeed, any result to the contrary would undermine the advantages that arbitration offers to parties engaged in a commercial transaction: "a quicker, less structured way of resolving disputes." *Dean v. Sullivan,* 118 F.3d

1170, 1173 (7th Cir.1997). A party who receives adequate notice of an arbitration proceeding, yet who elects to sit idly by in silence until the arbitration is complete, the award has been rendered, and the prevailing party has moved to confirm, cannot emasculate all that has been done by asserting a technical right for which there has been no substantive deprivation. Lest there remain any doubt that this is all that animates the PNA's notice objection, counsel's remarks dispel any doubt. Pressed to explain how any one of the many notices that ITI and the AAA sent to Gaza failed to provide the PNA with notice of the proceedings, counsel remarked:

> There is no question that the plaintiff has fax receipts indicating that faxes were received at PNA offices. But I suggest to Your Honor that the PNA *had a right and did take advantage of an opportunity* to have notices at a different location and they were entitled to receive notices at that location.

*14 Tr. of Hr'g, June 4, 1999, at 33:10-:15 (emphasis added). Regardless of whether the PNA ever possessed a "right" to have notices directed to its Jericho address, the contours of that putative right are neither so broad nor so fixed as to permit the PNA to ignore notices that were actually sent to proper officials at otherwise proper addresses. What matters is that the "means employed [to serve notice] must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane,* 339 U.S. at 315, 70 S.Ct. 652. The lengths to which ITI and the AAA went to appraise the PNA of the arbitration evince methods that one who genuinely wished to communicate with another would employ--methods that would almost certainly succeed. Accordingly, the Court determines that the PNA received adequate, if not actual, notice of the arbitration proceedings.

*D. Having received notice of the arbitration, the PNA is time-barred from asserting any grounds for vacating the arbitration award*

[6] Having determined that the PNA received notice, the Court must resolve whether the PNA may now assert affirmative defenses to the contract, challenge the arbitrator's jurisdiction, or protest the invalid absence of an agreement to arbitrate. Whatever may be said for the merits of the PNA's potential defenses, pellucid statutory language and judicial precedent provide a clear, unambiguous answer: By ignoring the Demand and failing to petition to vacate the Award within ninety days after receiving it, the PNA may not exploit this summary confirmation

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

Page 10

proceeding by litigating now what it should have
contested long ago.

Like the FAA, Virginia's arbitration act requires that
any petition to vacate an arbitration award be filed
"within ninety days after delivery of a copy of the
award to the applicant." Va. Stat. § 8.01-581.010;
*compare* 9 U.S.C. § 12 ("Notice of a motion to
vacate, modify, or correct an award must be served
upon the adverse party or his attorney within three
months after the award is filed or delivered.").
While Virginia law explicitly permits a party to raise
arguments that would support vacatur in response to
another party's motion to confirm an arbitral award, it
carefully qualifies that opportunity by mandating that
"such response [be] filed within the prescribed time
limits of this section [ninety days]." Va. Stat. §
8.01-581.010. Although the FAA does not speak
directly to this issue, federal courts have construed
the FAA to do implicitly exactly what Virginia's
arbitration act does explicitly. As the Second Circuit
has held, a party's "failure to move to vacate the
award within the three month time provided [by 9
U.S.C. § 12] precludes him from later seeking that
relief when a motion is made to confirm the award."
*Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 175 (2d
Cir.1984). Far from anomalous, *Florasynth* and its
conception of the FAA have garnered the
endorsement of at least four other circuits. *See Val-
U Constr. Co. v. Rosebud Sioux* Tribe, 146 F.3d 573,
578-79 (8th Cir.1998); *Cullen v. Paine, Webber,
Jackson & Curtis, Inc.,* 863 F.2d 851, 853-54 (11th
Cir.1989); *Professional Administrators Ltd. v.
Kopper-Glo Fuel, Inc.,* 819 F.2d 639, 642 (6th
Cir.1987); *Taylor v. Nelson,* 788 F.2d 220, 225 (4th
Cir.1986).

[7] Any other result would do violence to the
underlying purposes of arbitration in general and the
FAA and the Virginia arbitration act in particular.
As it is with Virginia's arbitration act, "[a]
confirmation proceeding under 9 U.S.C. § 9 is
intended to be summary: confirmation can only be
denied if an award has been corrected, vacated, or
modified in accordance with the [FAA]." *Taylor,* 788
F.2d at 225; *accord Cullen,* 863 F.2d at 854. Under
Virginia law, it is even clearer that a court must
confirm an arbitration award if no party has filed a
timely petition to vacate or modify the award:

Upon application of a party any time after an award
is made, the court *shall* *15 confirm an award,
unless *within the time limits* hereinafter imposed
grounds are urged for vacating or modifying or
correcting the award, in which case the court shall
proceed as provided in §§ 8.01-581.010 and 8.01-
581.011.

Va. Stat. § 8.01-581.09 (emphasis added).

Looking at the undisputed facts in this case, it is
clear that the PNA's defenses come too late in the
proceedings for this Court to entertain them. After the
Award was filed, the AAA sent it to the PNA on
November 13, 1997. *See* Decl. of Graff ¶ 24; Decl.
of Martinez ¶ 8. On November 26, 1997, UPS
delivered the Award to the PNA, where it was signed
for and received. *See* Decl. of Martinez at Ex. L
(copy of the UPS Delivery Notification indicating
that the Award was delivered on 11/26/97 at 3:52
P.M., and signed for by "SHALOM"). [FN9] Ninety-
six days later, on March 2, 1998, ITI filed its Motion
to Confirm Arbitration Award in the District of
Columbia Superior Court. The PNA did not remove
that action to this Court until March 24, 1998.
Because more than ninety days elapsed before the
PNA petitioned to vacate the Award, it is foreclosed
from raising its affirmative defenses.

> FN9. Again, the PNA has never contested
> the authenticity of the signatures on the
> return-receipts nor has it suggested that
> those who signed for and received notices
> from ITI and the AAA lacked authority to
> accept mail on behalf of the PNA or any of
> its high officials. Of course, under AAA
> Rule 40, it is not clear that such agency
> concerns would even be relevant. *See* AAA
> R. 40 (requiring that notices served by mail
> only be *addressed* to the party or its
> representative).

[8] Finally, the PNA suggests that the First Circuit's
decision in *MCI Telecommunications Corp. v. Exalon
Industries, Inc.,* 138 F.3d 426, 430-31 (1st Cir.1998),
permits it to contest whether there existed an
agreement to arbitrate regardless of whether the time
to move to vacate has elapsed. For two reasons,
*MCI* is not the panacea that the PNA hopes it is. At
the most obvious level, *MCI* was applying the time
limits set forth in section 12 of the FAA. By contrast,
this Court is constrained to apply Virginia's
arbitration act. While that statute and the FAA have
a great deal in common, the Virginia arbitration act,
unlike the FAA, expressly addresses whether the
ninety-day limitations period applies to challenges
based on an absence of an agreement to arbitrate.
Among the five bases upon which a party may
predicate a petition to vacate an arbitration award is
when "[t]here was no arbitration agreement and the
issue was not adversely determined in proceedings

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

[to compel arbitration] and the party did not participate in the arbitration hearing without raising the objection." Va. Stat. § 8.01-581.010. In the same section, the Virginia arbitration act provides that "[a]n application under this section shall be made within ninety days after delivery of a copy of the award to the applicant." *Id.* Under Virginia law, therefore, a party who wishes to contest the existence of an arbitration agreement must proffer his objection within ninety days of receiving the award. This the PNA did not do.

Moreover, even were the FAA controlling here, *MCI* is distinguishable; more on point is the Seventh Circuit's decision in *Comprehensive Accounting Corp. v. Rudell,* 760 F.2d 138, 140-41 (7th Cir.1985). While in *MCI* there was no written arbitration clause within the body of the parties' agreement, in *Comprehensive Accounting* there clearly was a "signed contract ... [that] contained a standard arbitration clause." *Id.* at 139. Even the First Circuit recognized this salient difference. *See MCI,* 138 F.3d at 431. As Judge Posner wrote for a unanimous panel in *Comprehensive Accounting:*

> The Rudells had that opportunity [to contest the existence of an arbitration agreement] when they were notified of the arbitration, and they let it pass by. It was then too late for them to sit back and allow the arbitration to go forward, and only after it was all done, and enforcement *16 was sought, say: oh by the way, we never agreed to the arbitration clause. That is a tactic that the law of arbitration, with its commitment to speed, will not tolerate.

*Comprehensive Accounting,* 760 F.2d at 140. The same can be said of the PNA. Article 3 of the Agreement contains a standard arbitration clause, and both the Agreement executed by the PLO and the one executed by the PNA are signed by Yasser Arafat, PLO Chairman and PNA President. Having received notice of the arbitration and the Award that was eventually filed, the PNA cannot delay ITI's confirmation proceeding at this point. Accordingly, whether under the Virginia arbitration act or the FAA, the PNA is time barred from raising any defense to ITI's motion to confirm--even an objection to the existence of an arbitration clause.

### III. CONCLUSION

For the foregoing reasons, ITI's Motion to Confirm Arbitration Award is granted.

### ORDER

For the reasons expressed in the accompanying Memorandum Opinion, it is, this 22 day of June, 1999, hereby

**ORDERED** that the Motion to Confirm Arbitration Award filed by International Technologies Integration, Inc. ("ITI") shall be, and hereby is, **GRANTED;** and it is

**FURTHER ORDERED** that the Arbitration Award filed with the American Arbitration Association on November 13, 1997, and delivered to the Defendants Palestine Liberation Organization ("PLO") and Palestinian National Authority ("PNA") on November 26, 1997, which awarded $18,750,000 to ITI shall be, and hereby is, **CONFIRMED;** and it is

**FURTHER ORDERED** that **JUDGMENT** shall be, and hereby is, entered in favor of ITI and against the PLO and the PNA in the amount of $18,750,000.

**SO ORDERED.**

66 F.Supp.2d 3

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL TECHNOLOGIES
INTEGRATION, INC.,

    Plaintiff,

    v.

THE PALESTINE LIBERATION
ORGANIZATION and THE PALESTINIAN
NATIONAL AUTHORITY,

    Defendants.

Civil Action No. 98-00756 (CKK)

**FILED**

JUL – 2 1999

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

6:20 p.m.

## ORDER

On June 22, 1999, this Court entered Judgment in the amount of $18,750,000 in favor of Plaintiff International Technologies Integration, Inc ("ITI") and against Defendants the Palestine Liberation Organization and the Palestinian National Authority (collectively "PNA"). Late this Friday afternoon, July 2, 1999, ITI filed an ex parte Motion for Temporary Restraining Order, for Registration of Judgment, and for Nunc pro Tunc Validation of Registered Judgment. According to a declaration filed by Neal S. Barlia, counsel for Plaintiff, an ITI representative indicated that Mohammed Rashid, Economic Advisor to PNA President Yasser Arafat, had traveled to New York in order to remove or transfer PNA assets located at Citibank and Arab Bank in New York and brokerage accounts located at Salomon Smith Barney. According to a declaration filed by John D. Seiver, counsel for Plaintiff, ITI is unaware of PNA assets located in the District of Columbia sufficient to satisfy the Judgment.

Based on the allegations set forth in Barlia's and Seiver's declarations, it appears that "immediate and irreparable injury, loss, or damage will result to" ITI. FED. R. CIV. P. 65(b)(1).

37

Accordingly, the Court grants the TRO—subject to several conditions. Foremost among these, the TRO shall be in effect for only one business day; it, therefore, shall expire at 6:00 p.m. on Tuesday, July 5, 1999. Second, the TRO is limited to enjoining $18,750,000. Third, ITI shall post a bond or deposit a check into the registry of the Court in the amount of $15,000. By entering this narrowly tailored TRO, the Court intends to preserve the status quo until it can adjudicate Plaintiff's Motion for Registration of Judgment and for Nunc pro Tunc Validation of Registered Judgment. Equity compels this short-term TRO to preserve the assets from being removed to a jurisdiction beyond the reach of any United States court.

By Tuesday, July 5, 1999, at 9:00 a.m., Defendants shall file any opposition to Plaintiff's Motion for Registration of Judgment and for Nunc pro Tunc Validation of Registered Judgment. Specifically, Defendants shall indicate why good cause does not exist for this Court to order the registration of its June 22, 1999 Judgment pursuant to 28 U.S.C. § 1963. On Tuesday, July 5, 1999, the Court shall notify counsel for both parties if an Order has issued or whether the Court will need to conduct a conference call.

**ACCORDINGLY**, it is, this _2_ day of July, 1999, hereby

**ORDERED** that, pending the hearing and determination of Plaintiff's Motion for an Order Permitting Registration of the Judgment entered in this Court on June 22, 1999 in United States District Court for the Southern District of New York, and for other relief, Defendants the Palestine Liberation Organization and the Palestinian National Authority (collectively, "PNA") and each of their agents, representatives, employees, officers, servants, governmental instrumentalities or agencies, and all others acting on their behalf, as well as those acting in concert with them, are immediately enjoined and restrained from moving transferring, assigning,

2

hypothecating, interfering with or otherwise disposing of, in any manner whatsoever, money,

securities, bonds, cash, cash equivalents, property, assets of whatever kind or nature whatsoever,

and/or any property in which the PNA has an interest, in any account or accounts located at

Citibank, Arab Bank, or Salomon Smith Barney, in which the PNA or any affiliate,

instrumentality, agency, related entity, representative or agent, including but not limited to an

account in any of the following names:

      PLO
      P.L.O.
      Palestine Liberation Organization
      PNA
      P.N.A.
      Palestinian National Authority
      Palestinian Authority
      Palestinian National Fund
      Palestine Liberation Organization, Palestinian National Fund
      Ministry of Finance
      Palestinian National Authority, Ministry of Finance Account
      Palestine Monetary Fund
      Palestinian National Authority, Palestine Monetary Fund
      Joint Investment Fund
      Palestine Liberation Organization Pension Fund
      Palestinian National Authority Pension Fund
      P.E.C.D.A.R.
      P.C.S.C.
      P.A.
      Palestine Liberation Organization, P.L.O., Palestinian National Fund
      SAMED
      Palestinian National Authority, Palestine Monetary Fund, Joint Investment Fund
      Palestinian National Authority, Palestine Monetary Authority
      P.M.A.
      P.M.A., Investment Department
      Palestinian National Authority, Palestine Monetary Authority, Investment Department;
and it is

      **FURTHER ORDERED** that the injunctive relief set forth in the preceding paragraph

shall be limited to preserving $18,750,000 aggregate between the accounts held at Citibank, Arab

Bank, and Salomon Smith Barney; and it is

**FURTHER ORDERED** that this TRO shall expire in one business day on Tuesday, July

5, 1999, at 6:00 p.m.; and it is

**FURTHER ORDERED** that Plaintiff shall file a bond or deposit a check into the

registry of the Court in the amount of $15,000 pursuant to FED. R. CIV. P. 65(c); and it is

**FURTHER ORDERED** that Defendants shall file an opposition to Plaintiff's Motion for

Registration of Judgment and for Nunc pro Tunc Validation of Registered Judgment by no later

than 9:00 a.m. on Tuesday, July 5, 1999, with courtesy copies to be delivered to chambers; and it

is

**FURTHER ORDERED** that service of a copy of this Order, together with the papers

upon which it is granted shall be made upon Defendants by service on their counsel, Stroock &

Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 by facsimile at (212)

806-6006, on or before July 2, 1999.

**SO ORDERED.**

_Colleen Kollar-Kotelly_
COLLEEN KOLLAR–KOTELLY
United States District Judge

4

ALL-STATE® LEGAL  800-222-0510    ©RM1    RECYCLED



*Commonwealth of Massachusetts*

*County of Norfolk*

**SHERIFF'S DEPARTMENT**

**Division of Civil Process**

P.O. Box 910

15 Bryant St., Suite 201 • Dedham, MA 02026

Tel (781) 326-1787 • Fax (781) 326-0288

**Michael G. Bellotti**

*Sheriff*

**Peter J. Morin**

*Director*

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK

Peter J. Morin—————————————, BEING DULY SWORN, DEPOSES AND SAYS THAT HE

IS A DEPUTY SHERIFF FOR THE COUNTY OF NORFOLK. HE FURTHER STATES THAT HE

SERVED AN ATTESTED COPY OF THE WITHIN ——— Summons and Complaint —————————

———————————————————————————————————————————————————————————

ON March 23, —————————, 2000 UPON THE WITHIN NAMED The Palestinian Authority

(A.K.A. The Palestinian Interim Self-Goverment Authority)————————————————

BY DELIVERING IN HAND TO Marwan Jilani, Deputy Permanent Observer of Palestine

to the United Nations, who accepted service for The Palestinian Authority

(A.K.A. The Palestinian Interim Self-Goverment Authority)

SAID SERVICE WAS MADE AT c/o Temple Ohabei Shalom, 1187 Beacon Street, Brookline

at 7:15 p.m.

—————————————————————————

NORFOLK COUNTY DEPUTY SHERIFF

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 24th ————— DAY OF March, 2000

NOTARY PUBLIC

MY COMMISSION EXPIRES APRIL 20, 2001

*The Commonwealth of Massachusetts*
*County of Norfolk*

### SHERIFF'S DEPARTMENT
Division of Civil Process
P.O. Box 910
15 Bryant St., Suite 201 • Dedham, MA 02026
Tel (781) 326-1787 • Fax (781) 326-0288



**Michael G. Bellotti**
*Sheriff*

**Peter J. Morin**
*Director*

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF NORFOLK

<u>Peter J. Morin</u>_____, BEING DULY SWORN, DEPOSES AND SAYS THAT HE

IS A DEPUTY SHERIFF FOR THE COUNTY OF NORFOLK.  HE FURTHER STATES THAT HE

SERVED AN ATTESTED COPY OF THE WITHIN ----<u>Summons and Complaint</u>_____

_____

ON <u>March 23,</u>_____, 2000 UPON THE WITHIN NAMED <u>The Palestine Liberation</u>

<u>Organization</u>_____

BY DELIVERING IN HAND TO <u>Marwan Jilani, Deputy Pemanent Observer of</u>_____

<u>Palestine to the United Nations who accepted for the Palestine Liberati</u>on Organiz

SAID SERVICE WAS MADE AT <u>Temple Ohabei Shalom, 1187 Beacon Street, Brookli</u>ne
at 7:15 p.m.

NORFOLK COUNTY DEPUTY SHERIFF

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 24th_____ DAY OF March, 2000.

NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 20, 2001

## AFFIDAVIT OF
## FREEMAN R. WOODBURY

Now comes Freeman R. Woodbury under oath and states as follows:

1.      On April 13, 2000, having identified Mr. Rahman by a picture of him which I was carrying, I met Mr. Rahman in the elevator of the building located at 1730 K Street, N.W., Washington, DC 20006.

2.      I rode with Mr. Rahman in the elevator and traveled to his suite number 1004.

3.      In the elevator, I introduced and identified myself to him and informed him that I was serving summonses and complaints on him.

4.      When we reached his office, I again informed him that I was serving summonses and complaints on him.

5.      When we walked to his office he refused to accept the documentation so I placed the summonses and complaints on the desk beside him.

_Freeman R. Woodbury_
Freeman R. Woodbury

STATE OF _District of Columbia_
COUNTY OF _Washington_

Subscribed and sworn to before me on the ___8th___ day of September, 2000 under the pains and penalties of perjury.

_Denise P. Selden_
NOTARY PUBLIC

**My commission expires: 11-30-01**

Jun-15-00 02:49P

P.05
P.02

United States District Court
District of Rhode Island

The Estate of Yaron Ungar, et al, )
)
v.                               )        Case No. 00 CA 105
)
The Palestinian Authority, et al )
)
_____)

Declaration of Marwan Jilani

1.   I am the Deputy Permanent Observer of the Permanent
Observer Mission of Palestine to the United Nations.  I have
served in the Mission since 1996.  I had never been to the United
States before I came to serve in the Palestine Mission in 1996.
The Permanent Observer Mission and my sole personal residence are
both located in New York City, New York.  I am a citizen of
Palestine.  I have a B(1) visa issued by the United States
Mission to the United Nations which identifies me as an officer
of the Palestine Observer Mission and includes a waiver for me of
prohibitions on entry of Palestinians to the U.S. to enable me to
serve in the Mission.

2.   The purpose of the Permanent Observer of Palestine to
the U.N. is to present the views of Palestine, representing it
and the Palestinian people in all activities, discussions,
dialogues and debates before the United Nations and its agencies
and to the people of the world who are concerned with those
issues.  The General Assembly designated Palestine to participate

1

Jun-15-00 02:49P                                    P.06

in U.N. activities because it realized that consideration of and understanding the interests, concerns and viewpoints of Palestine and its people is essential to any meaningful discussion of issues involving the Middle East, and broader questions of world peace.  It is a purpose of the Permanent Observer of Palestine to present those same views to the interested public.  This is a duty and the practice of all Ambassadors, permanent Representatives, Inter-Governmental Organizations and invitees at the U.N.  Statements on all such occasions cover the same subjects and have the same content as statements made at the U.N. Headquarters.  As Deputy Permanent Observer I act at the direction of the Permanent Observer, speak on occasion outside the U.N. on U.N. subjects in my official capacity and act for him during his absence.  The Permanent Observer of Palestine to the United Nations is limited in his duties to the duties described above and is not authorized to accept the service of legal process from any court for Palestine, the Palestinian Authority, the PLO, President Arafat, or any other defendant named in these proceedings.

     3.  On March 23, 2000 I flew from New York to Boston, Massachusetts in my official capacity to appear as an invited guest from the Permanent Mission of Palestine in an annual meeting at the Temple Ohabei Shalom in Brookline, Massachusetts in a program on the peace process with a Consul General of Israel to the U.S.

     4.  While inside Temple Ohabei Shalom in Brookline,

Massachusetts on March 23, 2000 I was interrupted in a conversation I was having by a man I did not know and who did not identify himself, who handed me papers, which when I later read them, I learned were a Summons in a Civil Case to the Palestine Liberation Organization (PLO) and a Complaint and a second Summons in Civil Case to the Palestinian Authority and the same complaint filed in the U.S. District Court of Rhode Island alleging claims by persons unknown to me against the PLO, the Palestinian Authority and others. The man who handed me the papers left immediately. After the evening program at Temple Ohabei Shalom I went to a hotel for the night and returned to New York by air the next morning.

5. The Permanent Observer Mission of Palestine to the United Nations is not an office of, or an agent for, either the Palestinian Authority or the PLO. It is an office authorized by the United Nations pursuant to resolutions of the General Assembly going back to November 22, 1974 in which the General Assembly at that time invited the PLO to participate as an observer in certain work of the General Assembly. After the proclamation of the State of Palestine by the Palestine National Council on November 15, 1988, the General Assembly by Resolution 43/177 of December 15, 1988 decided that the designation of Palestine should replace the designation of the PLO in the United Nations System. As recently as July 7, 1998, General Assembly Resolution 52/250 conferred upon Palestine important additional rights and privileges of participation in the work of the General

3

Jun-15-00 02:50P

JUN-14-00 12:01P

Assembly and other organs of the U.N., including the right to participate in general debates of General Assembly Members, a right never conferred on any other non-Member state of the U.N.

6.  I am employed exclusively by the Permanent Observer Mission of Palestine to the United Nations.  I have no authority personally, or arising from my employment to act for /or serve as an agent or accept service on behalf of the Palestinian Authority, the PLO, or any other defendant in these proceedings.

7.  We have consulted The Legal Counsel of the United Nations on this matter of service of process.  His response dated May 5, 2000, attached, concludes as follows:

"...since the Permanent Observer Mission of Palestine to the United Nations in New York is a direct result of General Assembly resolution 3237 (XXIX) and is restricted to United Nations matters, that presence should be considered as not covering the receipt of service of legal process both personally and in rem in regard to matters completely unrelated to that presence. Any measure which might impede the maintenance of facilities of the Permanent Observer Mission of Palestine to the United Nations in New York or its ability to discharge its official functions would contravene the Charter of the United Nations, the Headquarters Agreement and the relevant General Assembly resolutions.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed on June 14th, 2000.

Marwan Jilani

6/14/2000

TOTAL P.01

Exhibit M

RECYCLED

Jun-15-00 02:48P

06/14/00  15:54  ☎202 887 5337    PAC                    @003
Jun-13-00 04:57P                                          P.02

United States District Court
District of Rhode Island

The Estate of Yaron Ungar, et al. )
                                  )
            v.                    )    Case No. 00 CA 105
                                  )
The Palestinian Authority, et al  )
                                  )
_____ )

                                    *HASAN ABDEL RAHMAN*
        Declaration of Hasan Abdel Rahman


    1.    I am the Chief Representative of the Palestine
Liberation Organization in its office in Washington, D.C. which
has been officially and formally designated as a foreign mission
under the Foreign Missions Act.  The Office of Foreign Missions
of the U.S. Department of State wrote in 1995 when this office
was first authorized that:

        The opening of this office reflects the
        positive change in the relationship between
        the United States and the PLO resulting
        from progress achieved in the peace process.
        The Department acknowledges that you are the
        head of this office.

There is no other office of the Palestine Liberation Organization
in the United States.

    2.    In mid-April, 2000 a bundle of papers was found in the
front room of the Mission office containing separate Summonses
and Complaints in a civil case entitled The Estate of Yaron
Ungar, et al v. The Palestine Authority, et al. Case Number CA 00

105L.   The summonses were addressed to defendants The Palestinian Authority, The Palestine Liberation Organization, Yasser Arafat, Muhammad Dahlan, Amin Al-Hindi, Raxi Jabali, Jibril Rajoub, and Tawfik Tirawi.

3.   The Palestinian Authority has no foreign representatives in the United States, or elsewhere, in accordance with the Israeli-Palestinian Interim Agreement entered into in Washington, D.C. on September 28, 1993, and has no presence, or representative in the PLO Mission in Washington, D.C.

4.   To the best of my knowledge, information and belief none of the eight defendants named in paragraph 2 above have any presence or representative anywhere in the United States, except for the officially and formally designated foreign mission of the PLO in Washington D.C. in which I am the Chief Representative. Neither I, nor the foreign mission, has any relationship, or authority with any of the eight defendants which authorizes, or permits acceptance of service of legal process on any of the eight defendants and none are otherwise present, or represented in the United States.

5.   As Chief Representative of the PLO in its foreign mission I am familiar with the organization of the PLO and all its elements and all the constituent groups within what has been called its "umbrella" and Hamas has never been, or claimed to be, by either the PLO, or Hamas, a part of the PLO. It is an entirely independent and separate entity that pursues its own policies and purposes, which often conflict with those of the PLO over which the PLO has never claimed any authority or sought any

P.04

05/14/00  15:58  ☎202 887 8337    PAC    @004

Jun-13-00 04:58P    P.04

influence and any such claim, or effort, if made, would be strongly resisted by Hamas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June  14 , 2000.

6-14-2000

Hasan Abdel Rahman
Chief Representative
Foreign Mission of the PLO
Washington, D.C.
June    , 2000

# Palestine Liberation Organization

---

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Country Listing
Return to the Short Form Listing

---

PALESTINE: Palestine Liberation Organizations Office

## Short Form Listing of Registrant's Foreign Agents

Foutah, Khalil
Hamad, Said
Rahman, Hasan Abdel

---

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Country Listing
Return to the Short Form Listing

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs.                                C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

## DAMAGES MEMORANDUM

This memorandum will briefly address Plaintiffs' claims for damages against the HAMAS defendants.

## I.    INTRODUCTION AND TRAVEL

On September 7, 2000, this Court entered default against Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat, Iman Mahmud Hassan Fuad Kafishe and HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), hereinafter the "HAMAS defendants."

On November 29, 2000, Plaintiffs filed a Motion to Enter Default Judgment Against Defendants HAMAS and HAMAS operatives along with an accompanying memorandum addressing jurisdiction, service and notice. These issues have been extensively briefed and the HAMAS defendants have not contested the plaintiffs' position.[1]

---

[1] The nondefaulting PLO and PA similarly do not contest these issues. They did not object to Plaintiffs motion to enter default judgment or their Motion Requesting a Ruling on their Pending Motion to Enter Default Judgement Against HAMAS Defendants of January 2002. Similarly they have informed the Court that "We take no position on that motion or whether it should be subject to a stay." Defendants' Memorandum In Support of Their Renewed Motion for a stay and motion for leave to File a Protective order, p. 1, fn 1.

## II.    NOTICE OF THIS HEARING

The HAMAS defendants are not entitled to notice of the default hearing and plaintiffs have no obligation to serve notice of this hearing.  In general, a party in default is not entitled to notice,

> No service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided for service of summons in Rule 4.

Fed.R.Civ.Pro. 5(a).

Further Rule 55(b)(2) provides that notice of a default judgment hearing must only be provided to a party "appearing,"

> If the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice the application for judgment at least 3 days prior to the hearing on such application.

A party in default is not entitled to notice of a motion to enter default judgement.  Thus, following service of the complaint "neither the plaintiff not the clerk of the court had a further duty to notify the defaulted parties." <u>Cutting v. Town of Allenstown</u>, 936 F.2d 18, 20 (1st Cir. 1991). Virtually all federal courts take a similar position:

> [A] defaulting party who has failed to appear, thereby manifesting no intention to defend, is not entitled to notice of the application for a default judgment under either Rule 55(b)(1) or Rule 55(b)(2).

Wright, Miller & Kane Federal Practice and Procedure: Civil 3rd §2687, see also numerous cases cited therein.

Nonetheless, out of an abundance of caution, plaintiffs provided notice of its motion for entry of default judgment to the HAMAS defendants as follows:

- November 29, 2000 of their motion to enter default judgment,

- January 29, 2002 of their motion requesting a ruling on their motion to enter default judgement,

- June 25, 2002 via international overnight delivery of this Court's June 20, 2002 notice scheduling this matter for July 12, 2002. Packages, including copies of Plaintiffs' November 29, 2000 motion, were sent to two HAMAS headquarters and to the individual defendants, Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe,

- July 5, 2002, plaintiffs sent all defendants copies of their exhibits.

III.  **LIABILITY HAS BEEN ESTABLISHED BY THE HAMAS DEFENDANTS' DEFAULT**

This matter is properly scheduled exclusively for determination of plaintiffs' damages. Liability has been established by the Court's entry of default. Thus plaintiffs are not required to present evidence of liability and this Court may "assume that all well pleaded factual allegations are true." Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15 (1st Cir. 1992), Au Bon Pain Corp. v. Artect Inc., 653 F.2d 61, 65 (1st Cir. 1981), see also Wright, Miller & Kane §2688 ("If the court determines that the defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.")

In regard to their damage evidence, Plaintiffs are also entitled to "all reasonable inferences from the evidence offered." Au Bon Pain Corp. v. Artect Inc., 653 F.2d at 65. This Court may "accept as true the plaintiffs' uncontroverted evidence." Elahi v. Islamic Republic of

3

<u>Iran</u>, 124 F.Supp.2d 97, 100 (D.D.C. 2000) citing <u>Alejandre v. Republic of Cuba</u>, 996 F.Supp. 1239, 1243 (S.D.Fla. 1997).

The allegations concerning the statutory claim of international terrorism in plaintiffs' original complaint were considered by Judge Lagueux in his decision of July 24, 2001. <u>Ungar v. Palestinian Authority</u>, 153 F. Supp.2d 76 (D.R.I. 2001). In ruling on the motion of the PA and PLO to dismiss the complaint for failure to state a claim, Judge Lagueux stated, "it is the determination of this Court that the complaint sufficiently states a cause of action under 18 U.S.C. 2333." <u>Id</u>. at 98.

Plaintiffs are proceeding to default judgment against the HAMAS defendants only on the first count of their original complaint, the claim for international terrorism under 18 U.S.C. §2333. In July 2001 Judge Lagueux dismissed the supplemental claims against the defendants ruling that Israeli law applies to these causes of action. Thus the plaintiffs were permitted to amend their complaint to allege similar supplemental claims under Israeli law.

However, by that time, the HAMAS defendants had already been defaulted on the original complaint and plaintiffs' motion for default judgment had been pending for eight months. Thus, Plaintiffs now proceed for entry of default judgement against the HAMAS defendants only on the statutory claim of international terrorism.

## IV.   HISTORICAL BACKGROUND OF 18 U.S.C. §2333

### A.   LEGISLATIVE INTENT

Because this is the first case to allege a claim of international terrorism pursuant to 18 U.S.C. §2333, this memo will review the background of this unique statute. It was enacted with

4

very specific goals and intended to remedy the problems confronted by American victims of terrorism.

Prior to enactment of this provision, The travel of litigation initiated by American victims of international terrorism was very circuitous.  For instance, in 1985 the Klinghoffer family (wife and children) initiated a suit against the PLO following the murder of the sixty-nine year old, disabled and wheelchair bound Leon Klinghoffer, who had been pushed off the Achillo Lauro in the Mediterranean by PLO terrorists.  By 1990, the case was bogged down in protracted legal proceedings and appeals over fundamental issues such as jurisdiction and service of process.  U.S. common and statutory law seemed inadequate to allow victims effective recourse against terrorists.

Responding to the procedural problems the Klinghoffer family confronted,[2] the scourge of terrorism committed against Americans, and the difficulty of other victims in obtaining relief under existing U.S. law, Congress enacted the Antiterrorism Act.[3][4]  Congress expressly intended

---

[2] " The legislative record is replete with references to the then-recent decision  in Klinghoffer v. Palestine Liberation Organization, . . . " Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1010 (7th Cir. 2002)

[3]. "Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub.L. No. 101-519, §132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency.  They were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, 106 Stat. 4506 (1992)." Boim v. Quranic Literacy Institute, 291 F.3d at 1009.

[4]     This legislation will allow American victims of terrorism to bring civil suits in U.S. Federal court.

The need for this legislation couldn't be clearer. While Congress has passed laws providing for the criminal prosecution of terrorists, victims of terrorism face incredibly difficult legal hurdles in pursuing claims against terrorists. The recent case of the Klinghoffer family is a glaring example of this gap in our efforts to develop a comprehensive legal response to international terrorism.

Leon Klinghoffer, a passenger on the Achilles Lauro cruiseliner, was executed and thrown overboard during the 1985 terrorist attack. His widow, Marilyn Klinghoffer, and family took their case to the courts in their home State of New York. Only by virtue of the fact that the attack violated certain admiralty laws and that the organization involved--the Palestine Liberation Organization--had assets and carried on activities in New York, was the court able to establish jurisdiction over the case. A similar attack occurring on an airplane or in some other locale might not have been subject to civil

to provide an entirely new statutory tort. The goal of the act was to "create[] a new federal cause of action" and "a new civil remedy against terrorists." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session July 25 1990 ("Senate Hearing") at 34. This was a direct response to the inadequacy of existing law,

> . . . there are currently no laws expressly providing federal civil remedies against these outrageous acts. Therefore this bill would amend Title 18 United States Code Sections 2331 by providing a plaintiff a civil cause of action in United States District Court for injuries caused by acts of international terrorism.

Id. at 49.

**B.    BROAD APPLICATION**

§2333 was intended to be construed broadly in order to maximize its effectiveness in combating terrorism. Senator Grassley, the bill's co-sponsor, indicated that "it empowers victims with all the weapons available in civil litigation." *Antiterrorism Act of 1991*, Hearing Before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, 102nd Congress, September 18 1992 at 10    (emphasis added).    Thus it was intended that every "weapon" or legal tool would be harnessed to accomplish the task of providing remedies to victims in their fight against terrorism.

The legislative history is replete with laudatory statements by sponsors and those who testified in support of the bill praising the policy of creating wide parameters of relief. Virtually everyone involve acknowledged the bill's expansive reach.

action. The Anti-Terrorism Act of 1991 would fill in this gap in our laws.

Remarks of Congressman Edward F. Feighan, co-sponsor of the ATA, Congressional Record, May, 2, 1991, p. E1538.

6

Nothing in the history suggests that the statute should be interpreted narrowly.  Also, the statute of limitations provision uniquely provides that any period in which defendant is absent from the United States or his whereabouts is concealed is not included in the already generous four year statute of limitation.

C.      **PLAINTIFFS UNDER §2333**

Similarly, the potential class of plaintiffs who may utilize the provisions of the act are purposefully broad.  For instance, the original language of §2333(a)  "was intended to be broad enough to allow indirect victims, such as common carriers, to sue for damage to property, for indemnity and lost profits." Senate Hearing at 86  The original version allowed compensation only for "any national of the United States." Senate Hearing at 8.  Family members of terrorism victims who themselves suffered were not explicitly provided for in the original bill.

At the urging of the Justice Department, the bill was expanded explicitly to allow family members of victims (as "survivors" and "heirs") to bring claims and provide each a distinct cause of action. Senate Hearing at 38.  During testimony before the Senate Subcommittee on Courts and Administrative Practice, Steven R. Valentine Deputy Assistant Attorney General requested the Senate to amend the language of the original bill to expand the parties who could bring suit,

> . . .  that this provision be amended to include, in addition to the individual directly affected, such additional parties as the estate of the decedent, survivors, and heirs.  This will ensure that the bill is fully protective of the interests of all relevant parties to the civil suit.

Id. at 38.  In response to a question posed by Senator Thurmond about whether the amendment would "make certain the ability of family members to file a lawsuit," Valentine responded, "It

would make clear that which is already implied in the bill.  It would remove any doubt that anyone would have as to whether or not they could bring the litigation." Id. at 46[5]

The bill was easily amended to include the Justice Department recommendation.  Thus, the Justice Department further applauded Congress,

> The Department supports legislation to provide a new civil remedy against terrorists and a federal forum for the <u>families and relatives</u> of victims to pursue claims for compensatory damages.

Id. at 34. (emphasis added)

The expansive coverage of 18 U.S.C. §2333 (wide class of potential claimants, inclusion of property and business claims, statute of limitations) is easily understood in light of the dual purpose of the statute.  Congress recognized that terrorism does not simply impact a single individual or even family.  If the effect of terrorism were only felt by the individual victim, Congress would never have designed the statute with such broad parameters.  Recognizing that acts of terrorism occur within a national context, in which frequently the individual victimized is a proxy or symbolic target representing the entire American people, Congress saw the bill as redressing both the rights of an expanded class of victims (survivors and heirs) and also the

---

[5] Similarly Lisa Klinghoffer provided a statement during hearing testimony,

> All Americans deserve the ability to seek justice . . .  Any American victim of terrorism will have legal recourse against those terrorists in any U.S. Federal court. (sic) My father and my family could be any American family. There is need to provide justice for all American terrorist victims.

Id. at 57.

Yet recovery is not limited to Americans but rather to the class or survivors and heirs.  Thus, in a parallel statute involving the Foreign Sovereign Immunities Act 28 U.S.C. §1605, non-Americans have been awarded judgments under the FSIA for their claims of loss of consortium and solatium resulting from terrorism committed against their American relatives. <u>Anderson v. Islamic Republic of Iran</u>, 90 F.Supp.2d (allowing claim of Lebanese wife of American hostage), <u>Cicippio v. Islamic Republic of Iran</u>, 18 F.Supp.2d 62,68 n. 7 ("The victims. . . were U.S. citizens at the time they were abducted.  Since their husbands were victims, the Court also has jurisdiction over the claims of [their non-citizen spouses].")

nation as a whole. As Senator Thurmond said, "Acts of international terrorism against our Nation's citizens, like the recent brutal murder of Col. William Higgins and Leon Klinghoffer, must not be permitted to go unpunished." Id. at 4

**D.    LOSSES SUFFERED BY FAMILIES OF TERROR VICTIMS**

**1.    CONGRESS INTENDED TO REDRESS THE HARM CAUSED TO ALL VICTIMS OF TERRORISM**

The statutory remedy for international terrorism contained in 18 U.S.C. §2333(a) provides,

> **Action and Jurisdiction**  Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

As detailed above, Congress clearly intended to maximize damage awards to plaintiffs in international terrorism cases. The only circuit court to review a §2333 claim noted that,

> [Its] history, in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law.

Boim v. Quranic Literacy Institute, 291 F.3d at 1010.

The legislative history clearly indicates that the statute serves a dual function. First, Congress wanted to allow the largest possible class of victims to be made whole. Hence, not only direct victims, but also family members (survivors and heirs) as well as those not traditionally considered terrorism victims (business and property owners) are able to recover under the act.

9

Second, the sponsors and advocates recognized the national context of terrorism. An attack on an individual American is seen as an attack on America. Thus, by making terrorists susceptible to very large damage awards for individual acts of terrorism would help punish and deter those who threaten and harm Americans.

> We must not allow these vicious murders to hide behind a false veil of political struggle and spill American blood without facing civil and criminal punishment.

Senate Hearing at 4. The statute's role as a deterrent to international terrorism would only be fully realized if the range of damages awarded in suits brought under the act would be so expansive that the terrorist would feel the "punishment."

Further, by including heirs and survivors in the class of plaintiffs, Congress permitted the widest scope of damages possible including loss of comfort and society.[6] Thus the terrorist would be liable for damages those directly bloodied by the gunmen and for the losses suffered by family members (survivors and heirs).[7]

---

[6] This is consistent with similar state statutes that allow both estates as well as heirs and survivors to maintain separate claims. Channel 20. v. World Wide Towers Services, 607 F.Supp 551, 556 (S.D. Texas 1985)(". . . construing wrongful death and survival statutes . . . two separate and distinct causes of action may arise in a wrongful death case... it is clear that the estate of a deceased person is a legal entity which is separate and distinct from those of the widows and other survivors of the deceased.")

[7] This understanding of the 18 U.S.C §2333 is consistent with the jurisprudence concerning other federal causes of action, such as the Death on the High Seas Act, 46 U.S.C §762, the Federal Employers' Liability Act, 45 U.S.C §51, and the Jones Act, 46 U.S.C. App. §688. For instance, the Supreme Court has indicated that when damages are not statutorily limited to "pecuniary losses," family members of the victim may be awarded damages for loss of society. Miles v. Apex Marine Corp, 498 U.S. 19, 31 (1990)("This explicit limitation forecloses recovery for nonpecuniary loss, such as loss of society in a general maritime action.")

10

2.   **THE ANTITERRORISM ACT FOLLOWS THE MODERN TREND WHICH RECOGNIZES LOSS OF SOCIETY AND COMPANSIONSHIP**

The rationale for Congress including heirs and survivors as additional claimants under §2333 has been widely recognized in the last few decades,

> [T]hough recovery for loss of society and comfort is denied under some statutes, it is an item usually recognized and made the basis for an award, at times apparently substantial . . .

> Even jurisdictions that have rejected the loss of society or consortium claim, as such, have permitted one form of it, namely a loss of guidance and advice that the decedent would have provided, at least in the case of deceased parents.

Prosser & Keeton on Torts §127 (1984).

In Miles v. Apex Marine Corp, 498 U.S. 19 (1990) the Supreme Court recognized that claims based on a close emotional relationship are permitted, if not specifically precluded or limited by federal statute. One survey has indicated that "probably a numerical majority of jurisdictions" allow for damages for loss of society and companionship. Speiser, Recovery for Wrongful Death 2d 3:49.

Several courts have indicated that the failure to allow loss of society damages to family members is outdated and immoral. Disallowing such damages is a "barbarous concept . . . [and a] reproach to justice." Hopkins v. McBane, 427 N.W.2d 85 (N.D. 1988) (citing Wycko v. Gnodtke, 361 Mich. 331,105 N.W.2d 118,121 (1960)). Upon certification from the Eleventh Circuit Court, the Florida Supreme Court stated that denial of damages for loss of society is based on "antiquated perception" of the familial relationship as being one of master and servant. United States v. Dempsey, 635 So.2d 961, 963 (Fla. 1994). Further, the court stated that,

11

Certainly, in 1973, when this Court set forth the elements of damages that a parent of an injured child is entitled to recover, it was apparent that a child's companionship and society were of far more value to the parent than were the services rendered by the child. Thus, there was an obvious need to recognize this element of damages to fully compensate the parent for the loss suffered because of a negligent injury to the child. The recognition of the loss of companionship element of damages clearly reflects our modern concept of family relationships.

Id. at 964, see also Letelier v. Republic of Chile, 502 F.Supp. 259 (D.D.C. 1980). Similarly, a leading treatise has noted,

. . . it has almost always seemed unjust to say that a child, or nonworking wife or mother, or an aged person is worth nothing to his survivors, and juries have at times rendered substantial verdicts in such cases.

Prosser & Keeton on Torts §127 (1984).

Locally, both this Court and the Rhode Island Supreme Court have recognized that loss of society and companionship are compensable. D'Ambra v. United States, 481 F.2d 14 (D.R.I. 1973), Sindelar v. Leguia, 750 A.2d 967 (R.I. 2000), Fritz v. May Department Stores, 866 F.Supp. 66 (D.R.I 1994), Mitchell v. United States, 141 F.3d 8 (1st Cir. 1998)(recognizing that Massachusetts allows loss of consortium damages to adult children not financially dependent on deceased).

In a §2333 case, to hold otherwise would create an absurdity clearly not intended by the drafters of the Antiterrorism Act.[8]  For example, the terrorist murder of an aged or very young victim, both having limited earnings, or a murder of someone without compensable heirs or

---

[8]  Congress clearly intended to allow all measures of damages to victims, as the bill "empowers victims with all the weapons available in civil litigation . . ." Remarks of Senator Grassley, Senate Journal p. S4511 April 16, 1991. (emphasis added).  As noted above, the act was specifically amended to clarify that claims of family members would be recognized.

12

survivors, would result in a liable defendant escaping the economic "sanction" and punishment intended by the act. [9]

That §2333 authorizes a claim on behalf of heirs and survivors, as distinct from the victim or his estate, is not unusual. Numerous states and federal courts have interpreted wrongful death statutes to include such claims, even when an applicable statute does not explicitly provide for such relief. Wellborn v. Sears, Roebuck & Co., 970 F.2d 1420,1429 (5th Cir. 1992) (compensation for mother of deceased 14 year old daughter: "Awards for mental anguish should compensate for the 'emotional pain, torment and suffering' experienced due to the death of a family member."), see also LaForest v. Autoriad de Las Fuentes, 536 F.2d 443 (1st Cir. 1976)(applying Puerto Rican law).

The Model Survival and Death Act §3(d)(3) provides that a deceased's "closely related survivors" are entitled to recover "reasonable compensation for mental anguish and loss of companionship." See also Carter v. University of Medicine and Dentistry of New Jersey, 838 F.Supp 957, 967 (D. N. J. 1993)("the recent propensity of some courts, in New Jersey and elsewhere to "recognize[] the more progressive jurisprudential trend permitting a parent's *per quod* claim for loss of her child's society and companionship" by statute or "" by analogy with the right of a spouse to recover damages for the loss of consortium.'"), Enochs v. Brown, 872 S.W.2d 312 (Tx. 1994), see also Gallimore v. Children's Hospital Medical Center, 67 Ohio St.3d 244, 617 N.E.2d 1052, 1056 (1993)(although Ohio statute permitted such recovery, "We can find

---

[9] This obviously was not the intent of this statute as its drafters desired to create sanctions for the murderers of Mr. Klinghoffer, a retired, disabled, wheelchair bound sixty-nine year old man. If the Palestinian terrorists who murdered him would escape significant judgement merely because they chose a victim without obvious pecuniary damages, the Antiterrorism Act would be impotent. The same analysis applies in this case where the deceased has modest earnings. Yet the statute supplies the appropriate sanction by allowing damages for his children and parents, thus increasing the economic disincentive to terrorism.

no specific common-law impediments to recovery for such losses.  If there were any, they would be devoid of rational justification in the modern law."), Garner V. Houck, 312 S.C. 481, 435 S.E.2d 847 (1993).

The modern trend allowing loss of society and companionship is expansive.  Liability extends to adult children, those who have no actual knowledge of the deceased and in cases where the victim survives.  For example, a parent's claim for consortium is permitted for an injured adult child.  Masaki v. General Motors, 780 P.2d 566, 577 (Haw. 1989)(citations omitted),

> We realize that a number of courts which recognize the parents' cause of action for loss of consortium of their injured children restrict the action to minor children. This rule is generally premised on the rationale that upon emancipation, parents are no longer entitled to the services and earnings of their children.  We find such reasoning outmoded and illogical.  At common law, the child, like the wife, was relegated to the role of a servant and considered an economic asset to the family.  In the modern family, however, children have become less of an economic asset and more of a financial burden to their parents.  Today children are valued for their society and companionship.

An unborn child of deceased may make a claim for emotional distress.  In Artache v. Autoridad de Energia Electria, 924 F.Supp. 346 (D.P.R. 1996) the court found that a child unborn at the time of her father's death had a sufficient cause of action,

> Jessica has lost a biological parent she will never know.  A jury could reasonably find that she has and will suffer emotional distress as a result.

Id. at 351.  Parents can similarly recover for the loss of society of a stillborn fetus.  Riley v. Koneru, 228 Ill. App.3d 883, 593 N.E.2d 788 (Ill. 1993).

14

3.    **APPLICATION TO TERRORISM CASES**

The inclusion of loss comfort and companionship damages is particularly pertinent in terrorism cases and consistent with other federal remedies for terrorism victims.[10]  It fulfills the twin goal of maximizing the damage impact on terrorists and also allows recovery to all those who are impacted by terrorism.  The facts surrounding the death impairs the survivors' emotional recovery thus requiring a remedy matched to the horrible suffering,

> This type of action deserves a reply in damages that will fully compensate for the truly terrible emotional suffering of the surviving parents and siblings.

Eisenfeld v. Islamic Republic of Iran, 172 F.Supp.2d at 8.

The nature of the death, often gruesome, bloody, and unanticipated is unique, "the unexpected quality of death may be taken into consideration in gauging the emotional impact to those left behind." Id.  Death caused by terrorism creates a heightened sense of loss to the surviving family members. The leading case on the subject of suffering by family members of terrorist victims indicates that, "When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time."[11] Flatow v. Islamic Republic of Iran, 999 F.Supp. 28, 31 (D.D.C. 1998).

---

[10]  For instance, all of the federal provisions dealing with civil claims against terrorists and their sponsors provide the right of relatives of victims to seek compensation.  In addition to 18 U.S.C. § 2333(a), both the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(7) and §1605 note, and the Torture Victim's Protection Act, 28 U.S.C. §1350 note (expanding claim beyond the direct victim to include " any person who may be a claimant in an action for wrongful death.") allow relatives of victims to seek damages.

[11]  Most of the cases involving terrorism over last several years have been brought under the Foreign Sovereign Immunities Act, 28 U.S.C. §§1602-1611.  Unlike 18 U.S.C. §2333, that statute merely provides for jurisdiction and does not create a separate cause of action. Sutherland v. Republic of Iran, 151 F Supp.2d 27 (D.D.C. 2001) The Flatow Amendment 28 U.S.C. 1605 note provides the damages available in an action brought against a foreign state, including "solatium" which encompasses damages for "injury to the feelings and loss of decedent's comfort and society." Flatow v. Islamic Republic of Iran, 999 F.Supp. at 29.   As the legislative history of 18 U.S.C. §2333

<u>Flatow</u> provides the most exhaustive treatment of the concept of loss of society and comfort in the context of a death caused by terrorism:

> Originally, wrongful death acts provided compensation only for the decedent's lost cash income stream. The next evolutionary stage was to recognize the economic value of decedent's personal services to claimant, such as household maintenance and nursing care. Many jurisdictions have now expanded recovery for loss of comfort and society to include all benefits which the claimant would have received had decedent lived. "Society" has evolved to include "a broad range of mutual benefits which 'each family member' receives from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection."
>
> The calculations for mental anguish and loss of society share some common considerations. First, the calculation should be based upon the anticipated duration of the injury. Claims for mental anguish belong to the claimants and should reflect anticipated persistence of mental anguish in excess of that which would have been experienced following decedent's natural death. When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time.
>
> The nature of the relationship between the claimant and the decedent is another critical factor in the solatium analysis. If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as companionship, love, affection, protection, and guidance. Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with decedent; as well as decedent's achievements and plans for the future which would have affected claimants.
>
> Finally, unlike lost wages, which can be calculated with a fair degree of mathematical certainty, solatium cannot be defined through models and variables. Courts have therefore refused to even attempt to factor in the present value of future mental anguish and loss of society. While economic losses can be reduced to present value with simple equations to establish the amount of an annuity established today which would have matched the decedent's ostensible income stream, the scope and uncertainty of human emotion renders such a calculation wholly inappropriate. This is the paradox of solatium; although no amount of

makes clear, the widest possible remedies were intended by Congress for claims of international terrorism, regardless of whether they are denominated as "consortium" or "solatium."

money can alleviate the emotional impact of a child's or sibling's death, dollars are the only means available to do so.

Flatow v. Islamic Republic of Iran, 999 F.Supp. at 31-32 (citations omitted).

## V.    **PLAINTIFFS' DAMAGES**

The plaintiffs respectfully request the Court to award damages consistent with the judgments in other terrorism cases. As noted below, the general damage formula utilized in most terrorism cases can serve as guidance in this action.

By following the guidelines, this Court will accomplish several goals intended by the proponents of the Antiterrorism Act. First and foremost, as indicated by Flatow such an award will attempt to fully compensate all of the plaintiffs for the horrible, almost unimaginable, losses suffered. Second, by following the damage structure of the Foreign Sovereign Immunities cases, the statutes will be harmonized. No distinction will be made between the state sponsors and the triggermen and their terrorist organization. Third, a departure from this guideline may be interpreted by the perpetrators of terrorism as a weakening of American resolve.[12] Lastly, virtually all previous judgments involving actions for terrorism are against the sponsors of terrorism, not the actual gunmen. Here where the actual murderers and the terrorist organization are defendants, awards at least as high as those against supporting financier-states are appropriate.

---

[12] Jenco v. Islamic Republic of Iran, 154 F.Supp. at 39 (indicating that failure to make similar punitive damages award as in prior cases "might actually be construed as a condonation of MOIS's rogue behavior.")

A.    **THE ESTATE OF YARON UNGAR**

1.    **BACKGROUND**

Yaron Ungar, an American citizen, was born in New York in 1970.  As a child he resided in New York, Houston, and Philadelphia as well as Israel.  At the time of his death, Yaron was working as a schoolteacher in Israel.  He had completed three and a half years of rabbinical studies working toward ordination, obtained a teacher-training certificate and would shortly receive his bachelors degree.  He wrote two books, a workbook on the Book of Samuel and with his father-in-law, a small treatise on Jewish law.

Yaron was married to Efrat, with whom he had two children.  At the time of the terrorist attack, Efrat was two months pregnant with the couple's third child.  The couple had two children, Dvir, then almost two and Yishai, then nine months old.  Efrat was an artist who illustrated and wrote a series of popular children's comics which appeared on a regular basis in an Israeli newspaper.

2.    **LOST EARNINGS**

The simplest measure of damages is the claim of the Estate of Yaron Ungar for the economic losses caused by his wrongful murder.  Plaintiffs presented the testimony of economist Dr. Adrian Ziderman in regard to lost accretions.  As a schoolteacher following a fairly routine career path, Yaron's earnings, reduced to present value, would be $1,273,028 and $1,400,000.  In light of the nature Yaron's death and the gruesome method employed by the HAMAS defendants, the Estate respectfully requests that this Court award the higher, less conservative figure.  In order to fulfill Congress' intent in enacting the Antiterrorism Act, the largest sanction should be imposed.

### 3.    PAIN AND SUFFERING

Dr. Alan Friedman testified that Yaron Ungar outlived his wife, having witnessed her murder and the attackers' machine gun shots coming from the back of their car in the direction of their nine month old son.  The courts have recognized the right to pain and suffering in cases involving less onerous circumstances.

> If Plaintiff presents sufficient evidence of conscious pain and suffering, determination of the compensation has largely been relegated to the discretion of the trier of fact by courts in this jurisdiction based upon factors including the duration and nature of the suffering endured.  The United States Court of Appeals for the District of Columbia Circuit has firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering.

Taylor v. Washington Terminal Co. 409 F.2d 145, 150 (1969).  An award is even more warranted in an action for death by terrorism,

> As the cases clearly indicate, the courts have increasingly been awarding monetary relief for the suffering exacted when a person, in the midst of his normal enjoyment of life, is suddenly and cruelly required to confront his death, as well as to experience it.

Notes, Kimball, Axelrod & Goldstein, Damages in Tort Actions, §21.02[4].

In suits involving acts of terrorism, survival damages are routinely awarded to the deceased's estate for emotional distress and pain and suffering which the victim could have recovered had he lived.  Flatow v. Islamic Republic of Iran, 999 F.Supp. 28.  Surviving such horror, even for a short period of time, is surely deserving of compensation.

Courts ruling on terrorist default judgements have recognized that even very short periods of pain and suffering prior to death are compensable.  Elahi v. Islamic Republic of Iran, 124 F.Supp.2d at 113.  ($1 million awarded when witness testified that death occurred "at least something like 30 seconds" following shooting), Eisenfeld v. Islamic Republic of Iran, 172 F.Supp.2d 1, ($1 million awarded for each victim of a bombing who survived for "several

minutes"), <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. at 29.  ($1 million when "conscious pain and suffering continued for at least three to five hours.")

In none of the previous cases was the victim a witness to his wife's murder and the possible killing of his son.  Surely, the psychological stress and anguish Yaron suffered in the final minutes of his life were unbearable.  The combination of the overwhelming physical pain caused by the terrorists' bullets and the emotional trauma of their attack on his family produced an excruciating end to his life.

The Estate respectfully requests an award of $1,000,000 for Yaron's pain and suffering.

**B.     DVIR AND YISHAI**

**1.     COMPANIONSHIP, SOCIETY AND GUIDANCE**

At the time of their father's murder, Dvir was almost two years old and Yishai was nine months old.  As both heirs and survivors, they have an independent claim for damages for the loss of consortium.

These unfortunate children will never know of their parents.  Despite Yaron's and Efrat's many accomplishments and their unique personalities, their children will only know them through the memory of others.  As youngsters, they will never benefit from their father's compassion, teaching skills, religious education and, overall guidance.  Also, they have been deprived of the intimacy and companionship of a parental relationship and surely will suffer this absence for their entire lives.  They will carry this loss throughout their lives and will be susceptible to increased risk of mental heath problems.

Compounding their sorrow is the knowledge of the horror in which their parents were killed.  Throughout their lives, any thought about their parents and their murder will surely

reflect the gruesome and barbaric manner of their murder.  Thus, besides suffering a lifetime of loss, the knowledge of their parents' last minutes will surely exacerbate their anguish.

Further, the murder of Yaron has created a heightened loss because of Efrat's murder.  As the remaining parent, Yaron's murder was thus even more devastating.  The killing of their last parent exacerbates the children's loss.  A damage award at least as high as in other terrorism cases is therefore appropriate.

While impossible to value the suffering and loss of companionship felt by a child following a parent's murder, the courts which have addressed the issue have developed a range of awards.  In <u>Alejandre v. Republic of Cuba</u>, 996 F.Supp. 1239, 1251 (S.D. Fla. 1997) $7.5 million was awarded to a college aged student for the death of her father. In <u>Hegna v. Iran</u>, 00-716, January 22, 2000 (D.D.C.) the Court made awards of  $3 million and $5 million to adult children for the lost companionship of their father.  In <u>Weinstein v. Republic of Iran</u>, 184 F.Supp.2d 13 (D.D.C. 2002) the court awarded $5 million each to adult children of a bombing victim.  In <u>Higgins v. Islamic Republic of Iran</u>, 2000 WL 33674311 (D.D.C) the court awarded $12 million to a high school senior for the loss of society and companionship of her father following his kidnapping, torture and murder.  (The Court noted that grown child's "caring relationship with her father . . . She has been bereft of the guidance he would have provided throughout her life.") In <u>Sutherland v. Islamic Republic of Iran</u>, 151 F.Supp.2d 27, 52 (D.D.C. 2001) the court awarded $6.5million to children who suffered "extensive anxiety, frustration and loneliness" during their father's six-and-a-half years of torture and kidnapping.

The Guardians of Dvir and Yishai respectfully request judgment for $10,000,000 each for the losses they have individually suffered.

2.  **LOSS OF SERVICES**

The family witnesses will testify to the nature and extent of Yaron's contribution to the family and especially the children during their short lifetime with him.  He was an excellent, caring and engaging father.  As a result of their father's murder, Dvir and Yishai will no longer be able to receive the benefit of his parental services.

The children are more than adequately cared for by their grandparents.  However, the loss suffered by not having the services of Yaron as a caretaker is real.  The terrorists should not be subsidized merely because the children have grandparents willing to step into Yaron's (and Efrat's) shoes.  While most terrorism cases have not addressed the issue, in <u>Alejandre v. Republic of Cuba</u>, 996 F.Supp at 1249 the court awarded $206,388 for "loss of household services."  Dr. Adrian Ziderman has calculated the present value of the loss of services by their father to the children to be between $279,155 and $325,655

The Guardians of Dvir and Yishai respectfully request an award for the children for the loss of parental services in the amount of $325,655.

C.  **JUDITH AND MEIR UNGAR**

Yaron's parents have suffered tremendously following Yaron's murder.  Their joi de vivre has been lost.  They constantly experience the loss of their oldest son, even while working hard at trying to maintain their daily routines.[13]  Joyous occasions are diminished because they

---

[13] Their ability to continue on with life should not be seen as a factor mitigating their suffering,

Individuals can react very differently even under similar circumstances; while some sink into clinical depression and bitterness, others attempt to salvage something constructive from their personal tragedy.  Such constructive behavior should not be considered as mitigating solatium, but rather as an equally compensable reaction, one in which courage to face their own mental anguish prevails in order to survive, and in some circumstances, to benefit another.

feel the perpetual loss of Yaron. Yaron's death is especially poignant given his unique role in the family.

Several reported cases involve the terrorist murder of emancipated children. The courts have routinely awarded at least $5 million to the surviving parents. i.e. <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F.Supp.2d 1, <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1, see also <u>Alejandre v. Republic of Cuba</u>, 996 F.Supp 1239 ($7.5 million awarded to parents of murdered 24 and 29 year old sons).

Judith and Meir Ungar respectfully request an award of $5,000,000 each for their loss of society and companionship.

### D.    <u>MICHAL COHEN, AMICHAI AND DAFNA UNGAR</u>

Each of Yaron's siblings had a special intimate relationship with him. As an older sister, Michal was Yaron's longstanding confidante. Yaron was a guide, teacher and role model to Amichai and Dafna. As their older brother, they looked to him for advice and guidance especially as they were coming to maturity.

Damages have been awarded to adult siblings in several terrorism cases. In <u>Jenco v. Islamic Republic of Iran</u>, 154 F. Supp. 2d 27 (D.D.C. 2001) the court awarded damages in the amount of $1.5 million each to adult siblings of a priest who had been tortured and kidnapped for almost seven years. The court distinguished the case from the other terrorism rulings because the victim had been ultimately set free and rejoined his family.

When adult siblings are killed in cases of terrorism, the courts have routinely awarded $2.5 for the death of brothers and sisters in their early 20s. <u>Eisenfeld v. Iran</u>, 172 F.Supp.2d 1,

<u>Flatow v. Islamic Republic of Iran</u>, 999 F.Supp. at 31.

23

Flatow v. Islamic Republic of Iran, 999 F. Supp. at 32. In Elahi v. Islamic Republic of Iran, 124 F.Supp.2d 97 an adult sibling of an adult terrorism victim was awarded $5 million as they had a particularly close relationship.

Michal, Amichai and Dafna respectfully request an award of $2.5million each for their loss of society and companionship.

## VI.    TREBLE DAMAGES, ATTORNEY FEES, COSTS, AND INTEREST

§2333 states that plaintiffs "shall recover threefold the damages he or she sustains and the cost of suit, including attorney fees." As the treble damage provision was intended to provide a "punishment" and "sanction" to the terrors, supra, it is vital that the underlying damage award be substantial. As noted by the commentators above, it is unjust to allow those responsible for a wrongful death to escape liability merely because the victim was a low wage earner.

This case presents a potential for such an injustice. The wrongful death was not caused by negligence but rather an intentional, brutal, evil act, yet Yaron earned a modest salary. While Congress intended to maximize awards by allowing treble damages, the effect of this provision could actually undermine the rationale behind the Antiterrorism Act. For instance, the underlying conduct giving rise to the HAMAS defendants' liability is by definition a criminal act.[14] Absent the treble damage provision, plaintiffs would surely be able to recover punitive damages. Punitive damages are permitted in actions brought under many federal statutes, including those that involve a far less compelling basis for their imposition.[15] In the FSIA cases

---

[14] For example, "international terrorism" is defined in part under 18 U.S.C. §2331(1)(A) as a "violation of the criminal laws of the United States or of any State, or that would be a criminal violation of committed within the jurisdiction of the United States or of any State . . . "

[15] The Foreign Sovereign Immunities Act, 28 U.S.C. §1605 et seq., FELA, 45 U.S.C. §51, 42 U.S.C. §1983, the

24

the punitive damages have been hundred of millions of dollars.  Congress' "sanction" and "punishment" is, therefore, actually lower here against the triggermen and HAMAS than it would be had the Antiterrorism Act not included a treble damage provision.  Moreover, a modest award will have minimal impact as a deterrent against HAMAS in light of its tremendous assets and yearly budget.

Following the hearing, plaintiffs respectfully request the opportunity to provide affidavits of counsel fees and costs.  They further request that the court impose statutory interest on the judgment from June 9, 1996.

## VII.    CONCLUSION

The plaintiffs respectfully request entry of judgment against the HAMAS defendants as outlined above.  As a damage structure has developed in cases of international terrorism, plaintiffs urge the court not to depart from this jurisprudence.  In each of the cases cited above, terror "sponsoring" nations were dealt a huge financial blow.  Yet, judgments were entered only against the state sponsors not the actual triggerman.   Here, where liability is more direct and plaintiffs seek judgment against the gunmen and their terrorist organization, there is no basis to deviate from the pattern set by the federal courts which have previously heard such cases.

In fact there are several good reasons to closely follow the previous cases.  First, this case seeks judgment against the triggerman and their terrorist organization (as opposed to a distant state sponsor).  Second, a deviation from prior awards may be interpreted as proving that American anti-terrorism measures are inadequate to protect Americans.  Lastly,  as any departure may be viewed by the terrorists as a weakening of American resolve in combating terrorism.

Alien Torts Act, 28 U.S.C. §1350, the Torture Victims Protection Act, 28 U.S.C. §1350 note, general maritime actions, CEH, Inc. v. F/V Seafarer, 70 F.3d 694 (1st Cir. 1995).

25

Attorney for the Plaintiffs,

David J. Strachman    #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.                                               C.A. No. _____
                                        (Formerly C.A. 00-105L)

HAMAS - ISLAMIC RESISTANCE MOVEMENT, et al.

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a civil action pursuant to 18 U.S.C. §2333 *et seq.* brought by the heirs, survivors and the administrator of the estates of U.S. citizen Yaron Ungar and his wife Efrat Ungar, who were killed in a shooting attack on June 9, 1996, in Israel. The defendants in this action are HAMAS - Islamic Resistance Movement ("HAMAS") and five HAMAS members who participated in the murder of decedents: Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Iman Mahmud Hassan Fuad Kafishe, and Ibrahim Ghanimat ("individual HAMAS defendants").[1]

HAMAS and the five individual HAMAS defendants were served with summonses and complaints in this action but none has filed a responsive pleading. Default was entered against HAMAS and the individual HAMAS defendants on September 7, 2000. Plaintiffs have moved for entry of default judgment against these defendants pursuant to Fed.R.Civ.P. 55(b).

---

[1] This action was also originally brought against The Palestinian Authority ("PA") and The Palestine Liberation Organization ("PLO"). On _____, 2002, this Court granted plaintiffs' motion to sever the action against HAMAS and the individual HAMAS defendants from the action against the PA and the PLO, pursuant to Fed.R.Civ.P. 21. The action against HAMAS and the individual HAMAS defendants therefore proceeds separately.

Plaintiffs' motion for default judgment against HAMAS and the individual HAMAS defendants was referred by Judge Ronald R. Lagueux, and on July 12 and 15, 2002, the Court heard testimony and received evidence relating to plaintiffs' quantum of damages against HAMAS and the individual HAMAS defendants. On the basis of the testimony and evidence submitted by plaintiffs, the Court makes the following findings of fact and conclusions of law.

## I.    LIABILITY

Plaintiffs' detailed complaint adequately pleads the elements of liability under 18 U.S.C. §2333 and defendants' default relieves plaintiffs of proving these elements. Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15 (1st Cir. 1992), Au Bon Pain Corp. v. Artect Inc., 653 F.2d 61, 65 (1st Cir. 1981), see also Wright, Miller & Kane §2688 ("If the court determines that the defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.") In any case, core facts such as the murder of Yaron and Efrat Ungar in a drive-by shooting and Yaron's U.S. citizenship have been established by the plaintiffs through sworn testimony and the documentary evidence submitted by plaintiffs.

## II.    PERSONAL JURISDICTION

Despite defendants' default, before entering judgment this Court must nonetheless consider whether it may exercise *in personam* jurisdiction over the defendants. See System Pipe v. Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001), citing In re Tuli, 172 F.3d 707 (9th Cir. 1999), Dennis Garberg & Assoc., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767 (10th Cir. 1997) and Williams v. Life Savings and Loan, 802 F.2d 1200, 1203 (10th Cir. 1986). For the reasons stated below, the Court concludes that the exercise of personal jurisdiction over defendants conforms with both the Federal Rules of Civil Procedure and constitutional due process requirements.

2

## A.    HAMAS

### 1.    This Court has personal jurisdiction over HAMAS through domestic service of process pursuant to 18 U.S.C. §2334(a)

#### a.    Conditions for establishing personal jurisdiction

A district court hearing a federal question case may exercise personal jurisdiction over a defendant served within the United States:

> When the district court's subject-matter jurisdiction rests wholly or in part on the existence of a federal question, the constitutional limits of the court's personal jurisdiction are drawn in the first instance with reference to the due process clause of the Fifth Amendment. The physical scope of the constitutional power is broad. It is clear that the fifth amendment 'permits a federal court to exercise personal jurisdiction over a defendant in a federal question case if that defendant has sufficient contacts with the United States as a whole,' Whistler Corp. v. Solar Electronics, Inc., 684 F. Supp. 1126, 1128 (D. Mass. 1988), citing Trans-Asiatic Oil Ltd. S.A. v. Apex Oil Co., 743 F.2d 956, 959 (1st Cir. 1984), and that sufficient contacts exist whenever the defendant is served within the sovereign territory of the United States. Johnson Creative Arts, Inc. v. Wool Masters, Inc., 743 F.2d 947, 950 n. 3 (1st Cir. 1984), Driver v. Helms, 577 F.2d 147, 156 n. 25 (1st Cir. 1978).

Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 719-720 (1st Cir. 1991).

However, service of process in such a case must be authorized by a federal nationwide service of process provision:

> Fed.R.Civ.P. 4(e) authorizes extraterritorial service, but only in two prescribed circumstances. The first is where a United States statute provides for such service, as in the number of laws that allow nationwide service of process in suits stating particular causes of action.

Id.

Similarly:

> When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment. See Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 719 (1st Cir. 1991) (per curiam); Whistler Corp. v.

3

Solar Elecs., Inc., 684 F. Supp. 1126, 1128 (D.Mass. 1988). Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question case, a federal court's power to assert personal jurisdiction is geographically expanded. In such circumstances, the Constitution requires only that the defendant have the requisite 'minimum contacts' with the United States, rather than with the particular forum state (as would be required in a diversity case). See Lorelei, 940 F.2d at 719; Trans-Asiatic Oil Ltd. v. Apex Oil Co., 743 F.2d 956, 959 (1st Cir. 1984).

Nevertheless, while courts in federal question cases have found "that sufficient contacts [to justify the assertion of personal jurisdiction] exist whenever the defendant is served within the sovereign territory of the United States," Lorelei, 940 F.2d at 719 (citing cases), the basis for service of process returnable to a particular court must be grounded within a federal statute or Civil Rule. See, e.g., id. at 719-20; Johnson Creative Arts, Inc. v. Wool Masters, Inc., 743 F.2d 947, 950 (1st Cir. 1984).

United Electrical·Workers v. 163 Pleasant Street Corp., 960 F.2d 1080, 1085 (1st Cir. 1992)

The federal rule permitting extraterritorial service (which at the time of Lorelei was contained in Fed.R.Civ.P. 4(e)) is codified today in Rule 4(k)(1)(D), which provides that "Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant . . . when authorized by a statute of the United States."

In numerous decisions during the past decade, this Court has ruled that in federal question actions, personal jurisdiction is obtained over defendants who lack minimum contacts with Rhode Island and are not amenable to service of process under its long-arm statute whenever service is effected pursuant to a nationwide service provision. For example,

Where a federal court has subject matter jurisdiction over an action pursuant to a federal statute, it may exert personal jurisdiction over the defendant in one of two ways: pursuant to an express authorization for nationwide service in the federal statute, or pursuant to the long arm statute of the state in which the court sits. United Elec. Workers v. 163 Pleasant Street Corp., 960 F.2d 1080, 1085-86 (1st Cir. 1992).

Barry v. Mortgage Servicing Acquisition Corporation, 909 F. Supp. 65, 72 (D.R.I. 1995).

Likewise:

> This Court concludes that it does have in personam jurisdiction over [defendant] on the basis of the nationwide service of process provision found in section 1965(d) of RICO. This exercise of jurisdiction is constitutionally proper even though [defendant's] activities do not subject him to service of process under the Rhode Island long-arm statute.

Bridge v. Invest America, Inc., 748 F. Supp. 948, 949 (D.R.I. 1990), see also Omni Video Games, Inc. v. Wing Co., 754 F. Supp. 261, 263 (D.R.I. 1991), McAleer v. Smith, 818 F. Supp. 486 (D.R.I. 1993) affirmed 57 F.3d 109 (1st Cir. 1995), U.S. v. Davis, 1997 U.S. District LEXIS 22243 (D.R.I. 1997), Jonette Jewelry Company vs. Merlite Industries, Inc., 1998 U.S. Dist. LEXIS 9706 (D.R.I. 1998).

Other district courts in this circuit have held similarly,

> Under the Due Process Clause the defendant need only have 'sufficient contacts' with the United States, not necessarily the forum state . . . That standard is low, and would easily be met here: if the defendant is served 'within the sovereign territory of the United States,' then sufficient contacts exist.

Burke v. Town of Walpole, 2000 U.S. Dist. LEXIS 10422 (D.Mass. 2000)(citing Lorelei and United Electrical Workers).

> The Fifth Amendment, unlike the Fourteenth Amendment, permits the court to exercise personal jurisdiction over a defendant if that defendant has 'minimum contacts' with the United States as a whole . . . The necessary 'minimum contacts' exist whenever the defendant is served within the sovereign territory of the United States.

McArdle v. Freeman, 1997 U.S. Dist. LEXIS 17410 (D.Me. 1997), see also Snow v. American Morgan Horse Assoc., Inc., 1994 U.S. Dist. LEXIS 13602 (D.N.H. 1994).

### b. 18 U.S.C. §2334(a) authorizes nationwide service of process in actions under 18 U.S.C. §2333

Plaintiffs' suit is brought under 18 U.S.C. §2333(a), which provides a federal cause of action for American citizens and their estates, survivors and heirs who were injured by an

act of international terrorism.  Section 2334(a) provides:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. <u>Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent</u>.

Thus, Congress clearly and unequivocally provided that process in actions brought under §2333 may be served anywhere within the United States.  Therefore, whenever such service is effected, "the personal jurisdiction power of this Court is coextensive with the boundaries of the United States . . . " <u>Omni Video Games, Inc., v. Wing Co.</u>, 754 F. Supp. at 263 (internal quotation marks omitted).

### c.    Service of process was effected on defendant HAMAS within the United States

On June 21, 2000, plaintiffs personally served Mr. Mohammed Salah of Bridgeview, Illinois, with a summons to HAMAS and with a copy of plaintiffs' complaint.[2]  Fed.R.Civ.P. 4(h)(1) provides that service on a foreign or domestic corporation or unincorporated association may be effected by serving "an officer" and/or "a managing or general agent" of the corporation or association.  The Court finds that the service of process on Mohammed Salah was effective service on HAMAS, because Salah is "an officer" and/or "a managing or general agent" of HAMAS within the meaning of Fed.R.Civ.P. 4(h)(1).

The affidavit testimony submitted by plaintiffs, and the findings made by the U.S. District Court for the Southern District of New York in <u>In the Matter of the Extradition of Mousa Mohammed Abu Marzook</u>, 924 F. Supp. 565, 587 (S.D.N.Y. 1996), indicate that Mohammed

---

[2] The summons bearing the return of service was appended as Exhibit A to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

Salah headed and organized defendant HAMAS' activities in the United States for at least the past decade. Salah's duties and activities on behalf of HAMAS have included, *inter alia*: recruitment and training of HAMAS members, channeling and transferring hundreds of thousands of dollars of HAMAS funds originating in Europe and the Middle East through U.S. banks and into real estate transactions in the U.S., the transfer of substantial funds to HAMAS members in Israel, the West Bank and Gaza Strip, and repeated travel to the Middle East to organize and fund HAMAS activities.

Salah was apprehended by Israeli authorities and convicted in 1995 by an Israeli court for his activities on behalf of HAMAS. Salah was released from Israeli custody and returned to the United States in late 1997.

While under arrest in Israel, Salah gave statements to Israeli authorities detailing his HAMAS activities. Additionally, Salah composed a comprehensive written account of his HAMAS activities, which he passed to fellow prisoners whom he believed to be HAMAS members. This document, written in Arabic in Salah's hand, was obtained by Israeli authorities and provided to U.S. law enforcement agencies. See In the Matter of the Extradition of Mousa Mohammed Abu Marzook, 924 F. Supp. 565 (S.D.N.Y. 1996).[3]

Salah's HAMAS activities are detailed in an affidavit submitted to the U.S. District Court for the Northern District of Illinois by Special Agent Robert Wright of the FBI's Counter-

---

[3] Salah's summary of his activities also implicated HAMAS leader Musa Abu Marzook, and was expressly relied upon by the District Court hearing the matter of Abu Marzook's extradition:

> Israel has submitted statements of a co-conspirator named Abu Ahmad, also known as Muhamad Salah, who admitted to being the head of the military wing of HAMAS. One particular statement is especially damning, not only because it directly implicates Abu Marzook, but also because it was hand-written by Abu Ahmad to give to persons whom he thought were members of HAMAS.

Id.

Terrorism Task Force:

> Salah . . . divulged that his activities for HAMAS, domestically and internationally, included recruiting and training new candidates for membership in HAMAS military cells in the Israeli Occupied Territories and to perform terrorist acts, primarily in the State of Israel. Salah told Israeli authorities that his recruitment activities included, among other things, conducting interviews and background checks, as well as identifying and sorting prospective candidates on the basis of expertise and skills relating to, among other things, knowledge of chemicals, explosives and the construction of terrorist devices that might be used in HAMAS military operations in Israel and elsewhere. His training activities for HAMAS, according to Salah, included mixing poisons, development of chemical weapons, and preparing remote control explosive devices.

> Salah also admitted having served as a financial conduit for HAMAS operations. Relatedly, he admitted to directly financing domestic and international travel and terrorist training for new HAMAS members.

Affidavit of FBI Special Agent Robert Wright, June 8, 1998, §§12-13, submitted in U.S. v. One 1997 E35 Ford Van, 50 F. Supp.2d 789 (N.D.Ill. 1999)(hereinafter "FBI Affidavit")[4].

> Salah's U.S. based financial activities on behalf of HAMAS are also under investigation

by the FBI:

> The Chicago FBI Terrorist Task Force has been conducting an investigation into activity dating back to 1989 and continuing to the present involving the transfer or transmission of money from Europe and the Middle East to a network of individuals and organizations in the United States, including, in the Chicago area, Mohammad Salah . . . There is probable cause to believe that some of these transfers or transmissions have been of money intended for use in support of domestic and international terrorist activities . . .

FBI Affidavit, §2.

> The illegally transferred funds . . . were used to generate income (in the form of rent and sales profits) to facilitate the activities of Mohammad Salah and others in the HAMAS conspiracy involving past and continuing violent terrorist attacks . . .

---

[4] Appended as Exhibit B to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

FBI Affidavit, §68.

Moreover, on June 9, 1998, the United States began forfeiture proceedings in the United States District Court for the Northern District of Illinois against funds and assets held by Mohammed Salah, which are intended to be used for HAMAS terrorist activities:

> The funds in the Salahs' bank accounts . . . each of which is currently frozen pursuant to order of the Office of Foreign Asset Control, U.S. Department of Treasury, as authorized under Executive Order 12947 and based on reason to believe that Mohammed Salah acted on behalf of and in concert with the HAMAS terrorist organization . . . are moneys transferred, or traceable to moneys transferred from outside the United States, into the United States, with the intent of supporting HAMAS in the commission of specified unlawful activity, involving extortion, kidnapping and murder . . .

FBI Affidavit, §70. These forfeiture proceedings are still pending. See <u>U.S. v. One 1997 E35 Ford Van</u>, 50 F. Supp.2d 789 (N.D.Ill. 1999).

On the basis of his HAMAS activities, in 1995 the United States government designated Mohammed Salah a "Specially Designated Terrorist" pursuant to the International Emergency Economic Powers Act (50 U.S.C. §1701 *et seq*.) and Executive Order 12947.[5]

Additionally, the FBI has identified Mohammad Salah as: "a high-level HAMAS military operative." FBI Affidavit at §11.

Moreover, the United States District Court for the Southern District of New York has found, on the basis of his own statements to Israeli authorities and handwritten summary of his HAMAS activities, that Salah has, "admitted to being the head of the military wing of HAMAS." <u>In the Matter of the Extradition of Mousa Mohammed Abu Marzook</u>, 924 F. Supp. 565, 587

---

[5] See 60 Fed. Reg. No. 155, p 41153, August 11, 1995 and "Terrorism - What You Need to Know About U.S. Sanctions", October 26, 2000, published by the Office of Foreign Assets Control of the U.S. Treasury, p. 8, appended as Exhibits C and D, respectively, to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

(S.D.N.Y. 1996). <u>See also</u> Affidavit of Yehudit Barsky (hereinafter "Barsky Affidavit"),[6] and further details and corroboration of Salah's activities on behalf of HAMAS in <u>U.S. v. Alwan</u>, 279 F.3d 431 (7th Cir. 2002).

The facts and findings described above clearly demonstrate that Mohammed Salah is "an officer" and/or "a managing or general agent" of defendant HAMAS within the meaning of Rule 4(h)(1). <u>See</u> <u>Klinghoffer v. S.N.C. Achille Lauro</u>, 739 F. Supp. 854 (S.D.N.Y 1990). Therefore service on Salah for defendant HAMAS was effective service of process on HAMAS consistent with the nationwide service of process provision contained in 18 U.S.C. §2334(a).

Because "sufficient contacts exist whenever the defendant is served within the sovereign territory of the United States," the requirements of the 5th Amendment have been met.[7] <u>Lorelei Corp. v. County of Guadalupe</u>, 940 F.2d at 719, <u>United Electrical Workers v. 163 Pleasant St., Corp.</u>, 960 F.2d at 1085. This Court, therefore, has *in personam* jurisdiction over HAMAS.

Finally, the Court notes that in addition to the notice of this action given HAMAS by service of process, HAMAS has provided public confirmation that it has actual notice of this suit. Plaintiffs have submitted an article which appeared in June, 2000, in the official HAMAS organ, "Filastin Al-Muslimah," which reported in detail on the current action.[8] The status of "Filastin Al-Muslimah" as an official organ of HAMAS was recognized in <u>In the Matter of the Extradition</u>

---

[6] Appended as Exhibit E to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

[7] Moreover, though a showing of further contacts is not required by <u>Lorelei</u>, HAMAS has a widespread network of extensive and continuous contacts with the United States, as described *infra*.

[8] <u>See</u> Affidavit of Yehudit Barsky and accompanying English translation of the article.

of Mousa Mohammed Abu Marzook, 924 F. Supp. 565, 581-585 (S.D.N.Y. 1996).[9] The

publication of this article indicates clearly that HAMAS has actual knowledge of this suit.[10]

      **2.**    **This Court may also exercise personal jurisdiction over HAMAS pursuant to Fed.R.Civ.P. 4(k)(2)**

Even assuming, *arguendo*, the absence of domestic service on HAMAS, the Court may

exercise *in personam* jurisdiction over HAMAS in this case pursuant to Fed.R.Civ.P. 4(k)(2),

which provides that,

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

On July 27, 2000, plaintiffs served HAMAS with a summons and complaint in this action

pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial

Documents in Civil or Commercial Matters of 1965 ("Hague Convention"). Fed.R.Civ.P. 4(f)(1)

and 4(h)(2) permit service of process outside the United States on corporations and

---

[9] The district court found that several specific terrorist attacks were committed by HAMAS, on the basis of statements claiming responsibility for the attacks which were published in "Filastin Al-Muslimah".

[10] HAMAS was also served a summons and complaint at their offices in Damascus, Syria via Federal Express which was accepted and signed for on July 15, 2000. Plaintiffs have provided the Court with a Federal Express "proof of delivery" as Exhibit G to their Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

      Moreover, while Fed.R.Civ.P. 55(b)(2) does not require the Court or plaintiffs to provide notice to a defendant in default, plaintiffs have consistently provided notice to the HAMAS defendants of their attempts to obtain judgment. For example, subsequent to entry of default, plaintiffs provided the following notice to the HAMAS defendants: November 29, 2000 of their motion to enter default judgment; January 29, 2002 of their motion requesting a ruling on their motion to enter default judgement; June 25, 2002 via international overnight delivery of this Court's June 20, 2002 notice scheduling this matter for July 12, 2002. Packages, including copies of Plaintiffs' November 29, 2000 motion, were sent to two HAMAS addresses and to the individual defendants, Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe; July 5, 2002, plaintiffs sent all defendants copies of their exhibits. Despite these repeated notices, defendants have failed to respond, contest the proceedings or appear in Court.

unincorporated associations by means of the Hague Convention.[11]  This service is sufficient to establish personal jurisdiction over HAMAS under Rule 4(k)(2), provided that HAMAS is not subject to the jurisdiction of any state and has sufficient contacts with the United States as a whole:

> [A] plaintiff who seeks to invoke Rule 4(k)(2) must make a prima facie case for the applicability of the rule.  This includes a tripartite showing (1) that the claim asserted arises under federal law, (2) that personal jurisdiction is not available under any situation-specific federal statute, and (3) that the putative defendant's contacts with the nation as a whole suffice to satisfy the applicable constitutional requirements.  The plaintiff, moreover, must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state.

United States v. Swiss American Bank, Ltd., 191 F.3d 30, 41 (1st Cir. 1999).

This civil action is brought under federal law (18 U.S.C. §2333), and thus the first prong of the Swiss American test is satisfied.

The assumption (which we make arguendo for the purpose of analyzing this alternative basis for personal jurisdiction) that the domestic service of process on HAMAS pursuant to §2334(a) was ineffective, clearly implies that HAMAS is not amenable to service under §2334(a) and that personal jurisdiction over HAMAS is therefore unavailable under any situation-specific federal statute.  Thus the second prong of the Swiss American test is satisfied as well.

As required by Swiss American, plaintiffs have also affirmed "based on the information that is readily available" to them and their counsel that HAMAS is not subject to suit in the courts of general jurisdiction in any state.

---

[11] A certificate of service of process on HAMAS was issued by the Israeli Directorate of Courts (which is the "Central Authority" designated by Israel pursuant to Article 2 of the Hague Convention) and was filed with the Court on September 1, 2000. Documents accompanying the certificate of service returned by Israel indicate that HAMAS was served at its Gaza City address by local registered mail (a signed receipt was returned).

12

movement. The leadership has directed HAMAS activities in Gaza and the West Bank. By taking advantage of its sophisticated technological apparatus, it has maintained direct communication with its local leadership in Gaza and the West Bank.

HAMAS has consistently conducted extensive fundraising, operational planning, recruitment, propaganda, public relations, money laundering, investment, and communication activities in at least six states (Texas, Louisiana, Missouri, Virginia, Illinois, New York) and Washington, DC over at least the past 12 years.

Barsky Affidavit.

HAMAS activities in the United States are carried out by numerous activists:

The role played by HAMAS leader Dr. Marzook exemplifies the widespread activities of HAMAS in the United States.

Dr. Marzook is the former director of the United Association for Studies and Research, a HAMAS front organization in Washington, DC. Dr. Marzook's membership and leading role in HAMAS is not in dispute. For example, at his extradition hearing, he admitted that he has been a member and leader of HAMAS since 1992 and that he raised money for HAMAS in various states . . .

Dr. Marzook has directed and participated in numerous transfers of funds from the United States to HAMAS operatives in Israel.

Dr. Marzook maintained HAMAS bank accounts at the First American Bank in McLean, Virginia and Ruston State Bank in Louisiana . . .

Another American-based HAMAS leader, Selim Elbarrasee, served as a HAMAS fundraiser and activist, and maintained a joint bank account with Dr. Marzook in Ruston State Bank in Louisiana, from which checks were drawn for the transfer of funds to HAMAS activists in Gaza. According to FBI records, he transferred $300,000 from his First America Bank of McClean, Virginia to Salah's LaSalle Bank account. Salah directed a wire withdrawal of $200,000 of these funds for distribution to HAMAS in Israel.

Salah has indicated that thirty-one charitable organizations plus many more mosques in the United States have raised money for HAMAS.

On many occasions, HAMAS has sent money raised in the United States to the West Bank and Gaza by several couriers including Muhammad Salah, Dr. Marzook, and Juma'ah Ibrahim and Muhammed Jarad. Salah and Muhammad Jarad were convicted in Israel of distributing more than a half million dollars to

14

HAMAS activists in Israel, the West Bank and Gaza. The money was raised in the United States.

Salah Arouri, a HAMAS operative in Chicago, helped Dr. Marzook and Mr. Saleh coordinate the transfer to HAMAS activists in Israel of funds raised in the United States.

Abu Hani, a HAMAS activist in Chicago, conducted HAMAS organizational activities in Illinois.

Barsky Affidavit.

Further, the details of HAMAS' U.S. activities during the past decade, particularly the broad scope of HAMAS' financial transactions in the United States, are documented at length in the Affidavit of Special Agent Wright of the FBI's Counter-Terrorism Taskforce. Special Agent Wright summarizes:

HAMAS . . . has been engaged in a more than decade-long campaign of subversive and violent activity--commonly denominated as terrorist activity—undertaken primarily in Israel, and supported in part by illegal activities in the United States . . .

FBI Affidavit, p. 4, n. 1.

Finally, a recent decision of the U.S. district court for the District of Columbia found "ample support" for the conclusion that from 1989 until the present, HAMAS has operated a sophisticated and professional fund-raising apparatus in the United States. Holy Land Foundation v. Ashcroft, C.A. No. 02-442 (GK), 2002 U.S. Dist. LEXIS 14641 at 38, (D.D.C. 2002).

In light of the above, HAMAS clearly has continuous, extensive and systematic contacts with the United States as a whole sufficient to satisfy Fifth Amendment requirements. Moreover, as noted above, HAMAS has actual notice of this proceeding. This Court may therefore exercise personal jurisdiction over HAMAS pursuant to Fed.R.Civ.P. 4(k)(2).

**B.   INDIVIDUAL HAMAS DEFENDANTS**

This Court also has personal jurisdiction over the individual HAMAS defendants pursuant to Rule 4(k)(2).  Service of process on the individual HAMAS defendants was effected by Israel pursuant to the Hague Convention between April 16 and August 15, 2000.[13]  Plaintiffs have also satisfied the other requirements of <u>Swiss American</u>: (1) this action arises under federal law, (2) personal jurisdiction is not available under any situation-specific federal statute as to the individual HAMAS defendants, since they do not reside in the United States and §2334(a) authorizes only nationwide, and not worldwide service of process, (3) plaintiffs have certified that, based on the information that is available to them, the individual HAMAS defendant are not subject to suit in the courts of general jurisdiction of any state.

Finally, under the due process analysis applied by the federal courts in civil actions arising from international terrorism, the individual defendants have sufficient contacts with the United States to satisfy the Fifth Amendment.  In a series of recent decisions interpreting and applying the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) (28 U.S.C. §1605(a)(7) and §1605 Note), which grants U.S. citizens injured in terrorist acts a civil cause of action against foreign states and their officials who sponsor terrorism, the district courts for the District of Columbia and the Eastern District of New York have developed a due process analysis specially fitted to the unique circumstances of civil actions against foreign terrorists and their sponsors.

In <u>Flatow v. The Islamic Republic of Iran</u>, 999 F. Supp. 1, 22 (D.D.C. 1998) the court found that AEDPA permitted foreign terrorists and their sponsors to be haled into an American

court, based on the rationale that sufficient contacts with the United States are created when a U.S. citizen is harmed or killed.  The rule in <u>Flatow</u> was restated and applied in a series of AEDPA decisions.  <u>See</u> <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp.2d 1, 7 (D.D.C. 2000), <u>Rein v. Socialist People's Libyan Arab Jamahiriya</u>, 995 F. Supp. 325, 330 (E.D.N.Y. 1997), aff'd in part & appeal dismissed in part, 162 F.3d 748 (2d Cir. 1998), <u>Hartford Fire Insurance Co. v. The Socialist People's Libyan Arab Jamahiriya</u>, 1999 U.S. Dist. LEXIS 15035, 11-12, (D.D.C. 1999), <u>Daliberti v. Republic of Iraq</u>, 97 F. Supp.2d 38, 52-53 (D.D.C. 2000), <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 110 F. Supp.2d 10, 11-12 (D.D.C. 2000).

Like §2333(a) of the ATA, the AEDPA allows suits against individuals.  28 U.S.C. §1605 Note "Civil Liability for Acts of State Sponsored Terrorism" permits actions against "an official, employee or agent" of a foreign state sponsor of terrorism.  In <u>Flatow</u> and <u>Eisenfeld</u>, plaintiffs sued three current and former Iranian officials.  The court rendered judgments against those individuals on the basis of the "international terrorism" due process analysis.

Finally, like the AEDPA defendants, HAMAS defendants have been given adequate notice and "fair warning" that they "may be subject to the jurisdiction of the courts of the United States."  <u>Rein v. Socialist People's Libyan Arab Jamahiriya</u>, 995 F. Supp. at 330.  Defendants knew that their murder of numerous American citizens would elicit a severe response from the United States.  They "cannot now claim surprise at the assertion of jurisdiction by this Court over claims brought in response to its actions."  <u>Daliberti v. Republic of Iraq</u>, 97 F. Supp.2d at 53.

The Court therefore finds that the individual HAMAS defendants have sufficient contacts with the United States to satisfy the due process requirements of the Fifth Amendment, and that

---

[13] Hague Convention certificates of service were returned by Israel and filed with the Court.

it may properly exercise *in personam* jurisdiction over these defendants pursuant to Fed.R.Civ.P. 4(k)(2).

## III.    DAMAGES

This is apparently the first judgment given under 18 U.S.C. §2331 *et seq.*, which provisions creates a civil cause of action for acts of international terrorism.  In determining the type and scope of remedies available under 18 U.S.C. §2331 *et seq.*, therefore, the Court must necessarily look to the legislative history and intent behind these provisions.

Sections 2331 *et seq.* were enacted as part of the Antiterrorism Act of 1990 ("ATA"), as an entirely new statutory tort.[14]  The express goal of the ATA was to "create a new federal cause of action" and "a new civil remedy against terrorists." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session July 25 1990 ("Senate Hearing") at 34.

Congress passed the ATA as a direct response to the inadequacy of existing law,

> . . . there are currently no laws expressly providing federal civil remedies against these outrageous acts.  Therefore this bill would amend Title 18 United States Code Sections 2331 by providing a plaintiff a civil cause of action in United States District Court for injuries caused by acts of international terrorism.

Id. at 49.

The legislative history makes clear that the ATA was intended to be construed broadly in order to maximize its effectiveness in compensating victims of terrorism.  Senator Grassley, the bill's co-sponsor, indicated that "it empowers victims with <u>all</u> the weapons available in civil

---

[14] "Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub.L. No. 101-519, §132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency. They were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, 106 Stat. 4506 (1992)." <u>Boim v. Quranic Literacy Institute</u>, 291 F.3d 1000, 1009 (7th Cir. 2002).

litigation." *Antiterrorism Act of 1991*, Hearing Before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, 102[nd] Congress, September 18 1992 at 10  (emphasis added).  Thus, Congress intended that the full gamut of legal tools available in civil litigation would be harnessed to the task of providing remedies to victims of terrorism.

Indeed, the legislative history is replete with statements by the congressional sponsors and supporters of the ATA as well as representatives of the executive branch who testified in support of the bill, praising the wide scope and broad effect of the bill's provisions.  Nothing in the history or purpose of the ATA  suggests that it should be interpreted narrowly.  The only circuit court to review a §2333 claim noted that,

> [Its] history, in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law.

Boim v. Quranic Literacy Institute, 291 F.3d at 1010, (emphasis added).

Accordingly, the class of plaintiffs who may bring a civil action under §2333 is broad. The original language of §2333 "was intended to be broad enough to allow indirect victims, such as common carriers, to sue for damage to property, for indemnity and lost profits."  Senate Hearing at 86.  Yet, because the original language allowed compensation only for "any national of the United States" (possibly excluding family members of terrorism victims), the Justice Department urged Congress to modify the text of the bill to explicitly allow suits by the family members of victims (as "survivors" and "heirs" of the victim).  Senate Hearing at 8, 38.  Thus,

> The Department supports legislation to provide a new civil remedy against terrorists and a federal forum for the <u>families and relatives</u> of victims to pursue claims for compensatory damages.

<u>Id</u>. at 34. (emphasis added)

During testimony before the Senate Subcommittee on Courts and Administrative Practice, Deputy Assistant Attorney General Steven R. Valentine specifically requested,

> . . .  that this provision be amended to include, in addition to the individual directly affected, such additional parties as the estate of the decedent, survivors, and heirs.  This will ensure that the bill is fully protective of the interests of all relevant parties to the civil suit.

<u>Id</u>. at 38.  In response to a question posed by Senator Thurmond about whether the suggested modification in the language of the bill would "make certain the ability of family members to file a lawsuit," Valentine responded, "It would make clear that which is already implied in the bill.  It would remove any doubt that anyone would have as to whether or not they could bring the litigation." <u>Id</u>. at 46

Congress accepted the recommendation of the Justice Department, and modified the language of §2333 to create a cause of action for "any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs . . . "

The expanded language of §2333 reflects the intention of Congress to allow the largest possible class of victims to be made whole.  Hence, direct victims, but also family members (survivors and heirs) as well as those not traditionally considered terrorism victims (business and property owners) are able to recover under the act.

Further, by including "survivors" in the class of plaintiffs, Congress permitted recovery under §2333 for the widest scope of damages possible, including both economic damages and

recovery for loss of comfort and society and mental anguish.[15]   Thus, both those personally injured or killed by an act of international terrorism, and their family members and survivors, are entitled to relief under §2333.[16]

Congress' inclusion of family members ("survivors") as claimants under §2333 conforms with the nation-wide legislative tendency in the last few decades,

> [T]hough recovery for loss of society and comfort is denied under some statutes, it is an item usually recognized and made the basis for an award, at times apparently substantial . . .
>
> Even jurisdictions that have rejected the loss of society or consortium claim, as such, have permitted one form of it, namely a loss of guidance and advice that the decedent would have provided, at least in the case of deceased parents.

Prosser & Keeton on Torts §127 (1984).

In Miles v. Apex Marine Corp, 498 U.S. 19 (1990) the Supreme Court recognized that claims based on a close emotional relationship are permitted, if not specifically precluded or limited by federal statute.   One survey has indicated that "probably a numerical majority of jurisdictions" allow for damages for loss of society and companionship.   Speiser, Recovery for Wrongful Death 2d 3:49.

Several courts have recognized that the failure to allow loss of society damages to family members is outdated and immoral.   Disallowing such damages is a "barbarous concept . . . [and

---

[15] This is consistent with similar state statutes that allow both estates as well as  heirs and survivors to maintain separate claims. See e.g. Channel 20. v. World Wide Towers Services, 607 F. Supp. 551, 556 (S.D. Texas 1985)(construing wrongful death and survival statutes, "it is clear that the estate of a deceased person is a legal entity which is separate and distinct from those of the widows and other survivors of the deceased.")

[16]  This interpretation of 18 U.S.C. §2333 is consistent with the jurisprudence concerning other federal causes of action, such as the Death on the High Seas Act, 46 U.S.C. §762, the Federal Employers' Liability Act, 45 U.S.C. §51, and the Jones Act, 46 U.S.C. App. §688.  For instance, the Supreme Court has indicated that when damages are not statutorily  limited to "pecuniary losses," family members of the victim may be awarded damages for loss of society. Miles v. Apex Marine Corp, 498 U.S. 19, 31 (1990)("This explicit limitation forecloses recovery for nonpecuniary loss, such as loss of society in a general maritime action.")

a] reproach to justice." <u>Hopkins v. McBane</u>, 427 N.W.2d 85 (N.D. 1988) (citing <u>Wycko v. Gnodtke</u>, 361 Mich. 331, 105 N.W.2d 118,121 (1960)).  Upon certification from the Eleventh Circuit Court, the Florida Supreme Court stated that denial of damages for loss of society is based on "antiquated perception" of the familial relationship as being one of master and servant. <u>United States v. Dempsey</u>, 635 So.2d 961, 963 (Fla. 1994).  Further, the court stated that,

> Certainly, in 1973, when this Court set forth the elements of damages that a parent of an injured child is entitled to recover, it was apparent that a child's companionship and society were of far more value to the parent than were the services rendered by the child.  Thus, there was an obvious need to recognize this element of damages to fully compensate the parent for the loss suffered because of a negligent injury to the child.  The recognition of the loss of companionship element of damages clearly reflects our modern concept of family relationships.

<u>Id</u>. at 964, see also <u>Letelier v. Republic of Chile</u>, 502 F. Supp. 259 (D.D.C. 1980).  Similarly, a leading treatise has noted,

> . . . it has almost always seemed unjust to say that a child, or nonworking wife or mother, or an aged person is worth nothing to his survivors, and juries have at times rendered substantial verdicts in such cases.

<u>Prosser & Keeton on Torts</u> §127 (1984).

Indeed, numerous states and federal courts have interpreted wrongful death statutes to include such claims by heirs and survivors, even when an applicable statute does not explicitly provide for such relief.  <u>Wellborn v. Sears, Roebuck & Co.</u>, 970 F.2d 1420,1429 (5th Cir. 1992) (compensation for mother of deceased 14 year old daughter: "Awards for mental anguish should compensate the 'emotional pain, torment and suffering' experienced due to the death of a family member."), see also <u>LaForest v. Autoriad de Las Fuentes</u>, 536 F.2d 443 (1st Cir. 1976)(applying Puerto Rican law).

22

The Model Survival and Death Act §3(d)(3) provides that a deceased's "closely related survivors" are entitled to recover "reasonable compensation for mental anguish and loss of companionship." See also Carter v. University of Medicine and Dentistry of New Jersey, 838 F. Supp. 957, 967 (D.N.J. 1993)(noting "the recent propensity of some courts, in New Jersey and elsewhere to recognize a *per quod* claim in the parent-child setting" which is "the more progressive jurisprudential trend" and allows recovery for a child's loss "by analogy with the right of a spouse to recover damages for the loss of consortium."), Enochs v. Brown, 872 S.W.2d 312 (Tx. 1994), see also Gallimore v. Children's Hospital Medical Center, 67 Ohio St.3d 244, 617 N.E.2d 1052, 1056 (1993)("We can find no specific common-law impediments to recovery for such losses. If there were any, they would be devoid of rational justification in the modern law."), Garner v. Houck, 312 S.C. 481, 435 S.E.2d 847 (1993).

The modern trend allowing recovery for loss of society and companionship and for mental anguish is expansive, extending to adult children, those who have no actual knowledge of the deceased and to relatives of surviving victims. For example, the parent of an injured adult child may make a claim for loss of consortium. Masaki v. General Motors, 780 P.2d 566, 577 (Haw. 1989)(citations omitted),

> We realize that a number of courts which recognize the parents' cause of action for loss of consortium of their injured children restrict the action to minor children. This rule is generally premised on the rationale that upon emancipation, parents are no longer entitled to the services and earnings of their children. We find such reasoning outmoded and illogical. At common law, the child, like the wife, was relegated to the role of a servant and considered an economic asset to the family. In the modern family, however, children have become less of an economic asset and more of a financial burden to their parents. Today children are valued for their society and companionship.

23

An unborn child of a deceased may also make such a claim.  In <u>Artache v. Autoridad de Energia Electria</u>, 924 F. Supp. 346 (D.P.R. 1996) the court found that a child unborn at the time of her father's death had a sufficient cause of action,

> Jessica has lost a biological parent she will never know.  A jury could reasonably find that she has and will suffer emotional distress as a result.

<u>Id</u>. at 351.  Parents can similarly recover for the loss of society of a stillborn fetus.  <u>Riley v. Koneru</u>, 228 Ill. App.3d 883, 593 N.E.2d 788 (Ill. 1993).

Permitting recovery for loss of society and companionship and for mental anguish is particularly appropriate in suits arising from acts of terrorism, and is consistent with the remedies available under other federal statutes allowing civil actions for terrorism and torture.[17]  It fulfills the goal of allowing recovery to all those who are impacted by terrorism.[18]  The circumstances surrounding the death of a victim of terrorism normally inflict severe mental anguish and suffering on the victim's survivors, thereby mandating an appropriate remedy,

> This type of action deserves a reply in damages that will fully compensate for the truly terrible emotional suffering of the surviving parents and siblings.

<u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp.2d at 8.

---

[17]  All of the federal provisions dealing with civil claims against terrorists and their sponsors recognize recovery by relatives of the victims.  In addition to 18 U.S.C. §2333(a), both the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(7) and §1605 note, and the Torture Victim's Protection Act, 28 U.S.C. §1350 note (expanding claim beyond the direct victim to include "any person who may be a claimant in an action for wrongful death.") allow relatives of victims to seek damages.

[18]  Congress clearly intended to allow all measures of damages to victims, as the bill "empowers victims with <u>all</u> the weapons available in civil litigation . . ." Remarks of Senator Grassley, Senate Journal p. S4511 April 16, 1991. (emphasis added).  As noted above, the language of the ATA was specifically modified in order to clarify that claims of family members would be recognized.

Thus, the Court finds that §2333 allows recovery for both pecuniary damages and for non-economic damages, including loss of consortium and society and mental anguish experienced by the victim's surviving family members.

### A.    THE ESTATE OF YARON UNGAR

#### 1.    BACKGROUND

Yaron Ungar, an American citizen, was born in New York in 1970. As a child he resided in New York, Houston, and Philadelphia as well as Israel. Yaron was married to Efrat, with whom he had two children. Efrat was an artist who illustrated and wrote a series of popular children's comics which appeared on a regular basis in an Israeli newspaper.

On June 9, 1996, Yaron and Efrat Ungar were murdered in a machine-gun attack near Beit Shemesh, Israel, while driving home from a wedding. Their son plaintiff Yishai Ungar, then nine months old, survived the attack unscathed. The Ungars' other child, plaintiff Dvir Ungar, then 2 years old, was not in the car. At the time of the terrorist attack, Efrat was two months pregnant with the couple's third child. Four members of HAMAS, defendants Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya and Iman Mahmud Hassan Fuad Kafishe, were convicted by an Israeli court for their roles in carrying out the attack in which the Ungars were murdered. A fifth suspect, defendant Ibrahim Ghanimat, has not been apprehended.

At the time of his death, Yaron was working as a schoolteacher in Israel. He had completed three and a half years of rabbinical studies working toward ordination, obtained a teacher-training certificate and would shortly receive his bachelors degree. He authored two books on religious topics.

## 2.   LOST EARNINGS

The simplest measure of damages is the claim of the Estate of Yaron Ungar for the economic losses caused by his wrongful murder.  In regard to their damage evidence, plaintiffs are entitled to "all reasonable inferences from the evidence offered."  Au Bon Pain Corp. v. Artect Inc., 653 F.2d at 65.  This Court may "accept as true the plaintiffs' uncontroverted evidence." Elahi v. Islamic Republic of Iran, 124 F. Supp.2d at 100 citing Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1243 (S.D.Fla. 1997).

Dr. Adrian Ziderman, an expert economist, testified as to the lost economic damages suffered as a result of the murder of Yaron Ungar.

Yaron was a young teacher, already qualified with a teaching certificate and about to complete his Bachelor of Education degree.  He had studied three and a half years toward rabbinic ordination and co-authored two works on Jewish religious topics.  Yaron was likely to follow a fairly standard career pattern for someone with his background.  He would likely have completed his rabbinic studies, obtained ordination, and eventually obtained a masters degree and ultimately become principal of a religious school.  pp. 69-71, Exhibit 6.

Dr. Ziderman calculated the loss of accretions to the estate caused by Yaron's murder using a standard method of calculating income over Yaron's expected career trajectory, and discounting lifetime earnings to present value.  Exhibit 6.  Dr. Ziderman concluded that the loss of income, in U.S. dollars, discounted to present value would be $1,273,028.  p. 81, Exhibit 6.

The Court finds this calculation to be reasonable and conservative, since Dr. Ziderman did not adjust Yaron's projected earnings for work as a communal rabbi, earnings during sabbaticals, potential earnings in the United States and customary contributions to education funds.  pp. 76 – 80. Exhibit 6.

3. **PAIN AND SUFFERING**

Dr. Alan Friedman, an expert in trauma medicine, testified about the injuries sustained by Yaron Ungar during the machine-gun attack. On the basis of the coroner's report prepared by Dr. B. Levy of the Israeli Ministry of Health (Exhibit 5) as well as the detailed crime scene report and re-enactment photos prepared by Israeli police (Exhibits 1, 2, 3) Dr. Friedman described the injuries which caused the death of Yaron and Efrat Ungar.

Efrat Ungar was driving, Yaron was riding in the front passenger seat and Yishai was in the back seat when defendants pulled up behind the Ungars' vehicle and began shooting at it from behind. Efrat was struck in the back of the head by one of the first bullets fired and killed instantly. pp. 40, 63, Exhibit 1 (pictures 15 and 16). The first shots fired struck Yaron in several locations, including the left forearm, which injury causes a tremendous amount of pain. pp. 41, 44.

Defendants then pulled alongside the Ungars' vehicle on the left, while continuing to shoot, and fired through the driver's side window, and Yaron was struck with 14 shrapnel wounds in the right side of his chest. These wounds would have caused him significant pain, but would not have rendered him unconscious. Yaron's injuries, on his right side, indicate that he was conscious and able to turn to his left, facing his murdered wife. pp. 44-45, 48.

Yaron was also struck by a bullet in the side of the neck, which missed the trachea and the spinal chord. Dr. Friedman testified that this was a non-fatal injury, and that after sustaining injury Yaron was still conscious and in pain. pp. 54-55.

Next, while still conscious and breathing, Yaron was struck by a bullet on the left side of his nose. The bullet traveled up toward the base of the eye and entered the temple. Dr. Friedman found, on the basis of the coroner's report, that this bullet ultimately killed Yaron Ungar, but not

instantaneously. p. 51. Dr. Friedman testified that following this last bullet, Yaron remained conscious (pp. 57, 62) and lost consciousness and died between 3 to 5 minutes later. p. 62.

Dr. Friedman testified that the total time that Yaron was conscious and aware that he and his family were under attack, during which time he turned toward his murdered wife and sustained four painful gunshot injuries, until he ultimately lost unconsciousness following the entry of the last bullet, was approximately 30 seconds. p. 62.

Dr. Friedman testified that Yaron Ungar outlived his wife and witnessed her murder, and was aware that the machine-gun fire might have injured or killed his nine-month old son in the back seat.

The courts have recognized the right to pain and suffering in cases involving less onerous circumstances.

> If Plaintiff presents sufficient evidence of conscious pain and suffering, determination of the compensation has largely been relegated to the discretion of the trier of fact by courts in this jurisdiction based upon factors including the duration and nature of the suffering endured. The United States Court of Appeals for the District of Columbia Circuit has firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering.

Taylor v. Washington Terminal Co., 409 F.2d 145, 150 (C.A.D.C. 1969).

An award is even more warranted in an action for a violent and cruel death by terrorism,

> As the cases clearly indicate, the courts have increasingly been awarding monetary relief for the suffering exacted when a person, in the midst of his normal enjoyment of life, is suddenly and cruelly required to confront his death, as well as to experience it.

Notes, Kimball, Axelrod & Goldstein, Damages in Tort Actions, §21.02[4].

In suits involving acts of terrorism, the federal courts have routinely awarded survival damages to the deceased's estate for the physical and emotional pain and suffering endured by

28

the victim in the moments before death. The courts have recognized that even very short periods of pain and suffering prior to death in a terrorist attack are compensable. See, e.g., Elahi v. Islamic Republic of Iran, 124 F. Supp.2d 97, 113 (D.D.C. 2000) ($1 million awarded when witness testified that death occurred "at least something like 30 seconds" following shooting); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp.2d 1 ($1 million awarded for each victim of a bombing who survived for "several minutes"); Flatow v. Islamic Republic of Iran, 999 F. Supp. at 29 ($1 million award when "conscious pain and suffering continued for at least three to five hours.")

The physical pain and mental anguish consciously suffered by Yaron Ungar in the final moments of his life were excruciating. Moreover, unique to this case is fact that, before his death, Yaron witnessed the violent murder of his wife, and surely feared for his infant son. The combination of the overwhelming physical pain caused by the terrorists' bullets and the emotional trauma of the attack on his family produced an agonizing end to Yaron Ungar's life.

The Court therefore finds appropriate an award of $1,000,000 for Yaron Ungar's pain and suffering prior to death.

**B.    DVIR AND YISHAI**

**1.    LOSS OF COMPANIONSHIP, SOCIETY AND GUIDANCE AND MENTAL ANGUISH**

At the time of their father's murder, Dvir Ungar was almost two years old and Yishai Ungar was nine months old. As survivors of Yaron Ungar, §2333 provides them with an independent claim for damages for their loss of consortium and parental society and guidance.[19]

---

[19] This standing parallels that granted by the Foreign Sovereign Immunities Act 28 U.S.C. §1605 to the non-Americans relatives of American victims of terrorism, to bring claims for loss of consortium. See e.g. Anderson v. Islamic Republic of Iran, 90 F. Supp.2d 107 (D.D.C. 2000) (allowing claim of Lebanese wife of American hostage),

These unfortunate children will never know their parents. Despite Yaron and Efrat's many accomplishments and admirable personalities, their children will only know them through the memory of others. As youngsters, they will never benefit from their father's compassion, teaching skills, religious education and overall guidance. Also, they have been deprived of the intimacy and companionship of a parental relationship and surely will suffer this absence for their entire lives. They will carry this loss throughout their lives and will be susceptible to increased risk of mental heath problems.

Compounding their loss is the knowledge of horrible circumstances of their parents' murder. Throughout their lives, any thought about their parents will surely reflect the gruesome and barbaric manner of their murder. Thus, besides suffering a lifetime of loss, the knowledge of their parents' last minutes will surely exacerbate their anguish.

Further, the murder of Yaron Ungar is a more devastating loss to his children, because of the murder of their mother Efrat. The testimony provided by plaintiffs clearly demonstrate the searing impact Yaron's murder has had, and will continue to have, on Dvir and Yishai. Rabbi Dasberg, the boys' grandfather, testified that the children ask about their parents, and had recently inquired about how Yishai was collected from the hospital on the night his parents were murdered. p. 143.

Judith Dasberg, Yaron's mother-in-law, testified that Yaron and Efrat were very warm, open and positive parents. Yaron was particularly concerned with educating his children. p. 146. Dvir was particularly close to his father. In fact on one occasion Efrat had complained to her

---

Cicippio v. Islamic Republic of Iran, 18 F. Supp.2d 62, 68 n. 7 ("The victims . . . were U.S. citizens at the time they were abducted. Since their husbands were victims, the Court also has jurisdiction over the claims of [their non-citizen spouses].")

mother that despite the fact she was with the children all day, she was struck by the fact that they cried out to Yaron and ran to him when returning home.  p. 147.  Even on the night of the murder, Dvir cried out for his father exclusively. p. 148.

As a reaction to the murder of their parents, the children have become particularly close. Mrs. Dasberg testified that Dvir is dependent on Yishai and that even today, Dvir "has to be where [Yishai] is" and goes to play with younger children (Yishai's friends) so as to constantly be with him.  pp. 148-149.

Dvir has asked why God allowed his parents to be killed and anticipates their resurrection asking, "They've been so long away, when are they going to come back?" p. 149.

Dr. Alan Brenman, a child psychologist, testified after having interviewed the children and grandparents.  He expressed concern about Dvir's overprotectiveness of Yishai which is at the point of dependency. p. 9.   He also commented on Yishai's temper and anger and Dvir's aggressiveness. p. 10.

Dr. Brenman indicated that the loss of their parents caused the children "psychic trauma," although it is difficult to determine its magnitude and impact.  pp. 12-13, 25.  He also indicated that the children now ask more questions about their parents and will continue to do so, especially because they have no memories of them.   pp. 14,16.   This impacts their ability to mourn for their parents.  p. 17.

The murder of their parents will cause the children to have at least some psychological issues to address their entire life.  For example, the emptiness the children will feel about the loss of their parents may cause them to idealize their parents, which may create additional problems such as feeling that they can not measure up to their standards, are not good enough and will

31

never have their approval. pp. 17, 18.  These problems will exist despite that fact that the children have loving grandparents who are doing a good job raising them.  p. 20.

The issues identified by Dr. Brenman will persist throughout adolescence.  p. 21.  They will become highlighted as the children become more independent.  Anxiety problems will be significant, including fear of death, fear of separation and losing other people.  pp. 21-22.  As adults, Dvir and Yishai may experience difficulty forming relationships, and suffer from mistrust and an inability to become close to others.  p. 22.

Although their magnitude and intensity is hard to predict, it is a given that the children will have to struggle during their lifetime with psychological issues.  pp. 22-23.  Each milestone in life will be bittersweet and will cause Dvir and Yishai to suffer the loss all over again.  p. 23.  Even the eventual death of their grandparents will have heightened significance because it will "catapult them into being orphaned a second time."  p. 23.  Previous losses will compound later ones.  pp. 23-24.

Even as adults Dvir and Yishai will be susceptible to stress disorders, for instance if they were to review crime scene picture of the murders.  p. 24.  They are vulnerable to psychological problems such as depression, anxiety and post-traumatic stress disorder in the future.  pp. 25, 27.  Dr. Brenman expects that at some time in their lives, they will need some kind of psychotherapy.  p. 27.

Dr. Brenman concluded by stating that, "it's hard to determine exactly how these boys are going to respond in the future, but all I know is they have a huge psychological and emotional battle to deal with in their lifetimes . . . "  p. 28.

The nature of death in a terrorist attack, often gruesome and bloody and always unanticipated, inflicts upon the victim's survivors with a uniquely egregious sense of loss, and

"the unexpected quality of death may be taken into consideration in gauging the emotional impact to those left behind." Eisenfeld v. Islamic Republic of Iran, 172 F. Supp.2d at 8.

Death caused in a terrorist attack creates a heightened sense of loss to the surviving family members. The leading case on the subject of loss of consortium and society by family members of terrorist victims indicates that, "When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." Flatow v. Islamic Republic of Iran, 999 F. Supp. at 31.

Flatow provides the most exhaustive treatment of the loss of consortium and society and mental anguish in the context of a death caused by terrorism:

> "As damages for mental anguish are extremely fact-dependent, claims require careful analysis on a case-by-case basis.

> "It is entirely possible to come to terms with the fact of death, and yet be unable to resolve the sense of anguish regarding the circumstances of death. This is particularly true where the death was sudden and violent. How the claimant learned of decedent's death, and whether there was an opportunity to say good-bye or view the body can be a significant factor contributing to the claimant's anguish . . .

> " . . . Even where the death results from the most extreme forms of negligence, the primary visceral reaction is to the tragedy. This is not the case with deaths resulting from terrorist attacks, in which the tragedy itself is amplified by the malice which inspired the event. The malice associated with terrorist attacks transcends even that of premeditated murder. The intended audience of a terrorist attack is not limited to the families of those killed and wounded or even just Israelis, but in this case, the American public, for the purpose of affecting United States government support for Israel and the peace process. The terrorist's intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve political objectives. Thus the character of the wrongful act itself increases the magnitude of the injury. It thus demands a corresponding increase in compensation for increased injury.

Id. at 30 (citations omitted)(emphasis added).

While the loss of companionship and mental anguish experienced by the family members of a victim of terrorism are obviously difficult to assess, <u>Flatow</u> provides an analytical framework and standards for such an assessment:

> Originally, wrongful death acts provided compensation only for the decedent's lost cash income stream. The next evolutionary stage was to recognize the economic value of decedent's personal services to claimant, such as household maintenance and nursing care. Many jurisdictions have now expanded recovery for loss of comfort and society to include all benefits which the claimant would have received had decedent lived. "Society" has evolved to include "a broad range of mutual benefits which 'each family member' receives from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection."

> The calculations for mental anguish and loss of society share some common considerations. First, the calculation should be based upon the anticipated duration of the injury. Claims for mental anguish belong to the claimants and should reflect anticipated persistence of mental anguish in excess of that which would have been experienced following decedent's natural death. When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time.

> The nature of the relationship between the claimant and the decedent is another critical factor in the solatium analysis. If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as companionship, love, affection, protection, and guidance. Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with decedent; as well as decedent's achievements and plans for the future which would have affected claimants.

> Finally, unlike lost wages, which can be calculated with a fair degree of mathematical certainty, solatium cannot be defined through models and variables. Courts have therefore refused to even attempt to factor in the present value of future mental anguish and loss of society. While economic losses can be reduced to present value with simple equations to establish the amount of an annuity established today which would have matched the decedent's ostensible income stream, the scope and uncertainty of human emotion renders such a calculation wholly inappropriate. This is the paradox of solatium; although no amount of money can alleviate the emotional impact of a child's or sibling's death, dollars are

34

the only means available to do so.

Id. at 31-32 (citations omitted).

Applying the standards and guidelines articulated in Flatow, the federal courts have developed a consistent and fixed range of awards for loss of consortium and mental anguish suffered as a result of the death or abduction of a parent in a terrorist attack. In Weinstein v. Republic of Iran, 184 F. Supp.2d 13 (D.D.C. 2002) the court awarded $5 million each to adult children of a HAMAS bombing victim. In Higgins v. Islamic Republic of Iran, 2000 WL 33674311 (D.D.C.) the court awarded $12 million to a high school senior for the loss of society and companionship of her father following his kidnapping and murder. (The Court noted the grown child's "caring relationship with her father . . . She has been bereft of the guidance he would have provided throughout her life.") In Sutherland v. Islamic Republic of Iran, 151 F. Supp.2d 27, 52 (D.D.C. 2001) the court awarded $6.5 million to children who suffered "extensive anxiety, frustration and loneliness" during their father's six-and-a-half years as a hostage. In Alejandre v. Republic of Cuba, 996 F. Supp. at 1251, $7.5 million was awarded to a college-aged student for the death of her father. In Hegna v. Iran, 00-716, January 22, 2000 (D.D.C.) the Court made awards of $3 million and $5 million to adult children for the lost companionship of their father.

The Court will award damages for loss of consortium and mental anguish consistent with the judgments awarded victims of terrorism under the FSIA. As indicated by Flatow, an award of compensatory damages on this scale is demanded by the extreme sense of loss and mental anguish which inevitably accompanies the malicious and horrible circumstances of death in a terrorist attack. The heightened damage award for loss of consortium and mental anguish resulting from terrorism developed in Flatow and its progeny relates to compensatory damages.

35

Because here, as in <u>Flatow</u>, these are awards of compensatory damages, designed to make the plaintiff "whole" after a terrorist attack, the calculation of damages is unaffected by the identity of the defendants, and it makes no difference whether the defendant is a state-sponsor of terrorism, a terrorist group or an individual terrorist.[20]

The Court therefore finds an award of $10,000,000 each to Dvir Ungar and Yishai Ungar appropriate for the loss of parental society, companionship and guidance, and the mental anguish, caused them by the murder of their father.

### 2.    LOSS OF SERVICES

While Dvir and Yishai are more than adequately cared for by their grandparents, the loss suffered by not having the services of Yaron as a caretaker is real. The economic loss of Yaron as a caretaker should not be overlooked merely because the children have grandparents willing to step into Yaron's (and Efrat's) shoes. While most civil actions resulting from terrorism have not addressed this type of relief, in <u>Alejandre v. Republic of Cuba</u>, 996 F. Supp. at 1249 the court awarded $206,388 for "loss of household services."

The testimony provided to the Court clearly demonstrates Yaron's contribution to the children during their short time with him. He was an excellent, caring and involved father. As a result of their father's murder, Dvir and Yishai will no longer be able to receive the benefit of his parental services.

Dr. Adrian Ziderman calculated the cost of lost parental services caused to Dvir and Yishai. Dr. Ziderman testified that the cost of providing a round the clock skilled caretaker for

---

[20] <u>Flatow</u> and progeny employ a separate standard for establishing punitive damages against state-sponsors of terrorism under the FSIA, which is not relevant to this action.

the children, in their home, would be $21,010 per year. p. 87. Spread over 17 years and discounted to present value, the loss is $325,655. (Exhibit 6, supplement)

The Court therefore awards the legal guardians of Dvir Ungar and Yishai Ungar $325,655 for the loss of parental services.

### C.    JUDITH AND MEIR UNGAR

Yaron's parents have suffered tremendously following Yaron's murder. Their *joi de vivre* has been lost. They constantly experience the loss of their oldest son, even while working hard at trying to maintain their daily routines.[21] Joyous occasions are diminished because they feel the perpetual loss of Yaron. Yaron's death is especially poignant given his unique role in the family.

Professor Meir Ungar, Yaron's father, testified at length about Yaron's character and his close, warm and loving relationship with his son. Meir Ungar recalled how as a young boy, Yaron was very bright and was loved by his classmates, a natural leader who was the center of attention. p. 92. As he grew, Yaron became a much-loved boy scout counselor, p. 94, a great helper at home and a good son. p. 92.

When he went to study at a rabbinical seminary, Meir Ungar testified, Yaron became like a spiritual leader in the family, especially to his younger siblings. They looked up to him, looked

---

[21] Their ability to continue on with life should not be seen as a factor mitigating their suffering,

> Individuals can react very differently even under similar circumstances; while some sink into clinical depression and bitterness, others attempt to salvage something constructive from their personal tragedy. Such constructive behavior should not be considered as mitigating solatium, but rather as an equally compensable reaction, one in which courage to face their own mental anguish prevails in order to survive, and in some circumstances, to benefit another.

Flatow v. Islamic Republic of Iran, 999 F. Supp. at 31.

to him for advice, for comfort and as if he was a father.  p. 95.  As a rabbinic student he traveled to Russia to teach young children.  p. 94.

At the time of his death, he was about the finish his bachelors degree and had previously received a senior teachers diploma.  p. 94.  Yaron became a teacher, in his words because it was his "mission."  p. 95.  He wanted to raise a new and better generation.  p. 94.

Even after he married, Yaron spoke to his parents by phone every other day about his activities, teaching and Dvir and Yishai.  p. 92.

As an adult and even when married, Yaron along with his family would come to his parents' home every other weekend to stay overnight for the Sabbath.  p. 92.  During those visits he would help his parents with tasks around the house.  p. 95.

In reaction to Yaron's murder, his father became more closed, nervous and unhappy.  p. 96.  He lost interest in many things.  He has to force himself to interact with other people.  p. 98.  He felt that he did not have the right to be happy.  He was unable to continue certain hobbies, such as his twice-weekly folk dancing.  Yet even when he forced himself to start again, he felt he did not have the right to do it anymore.  His joy of life had dissipated.  p. 96.

Meir thinks about his son often, during daily prayers and while at the synagogue, causing him to cry.  He visualizes the murder site, thinks about Yaron being shot, not knowing what happened to his wife and small child Yishai, whether they were killed or saved.  pp. 96-97.

Yaron's death has taken a toll on Meir Ungar's family life.  He and his wife constantly need to know where their adult children are at all times.  His wife especially has been effected, he described her as being "very, very, nervous about it, very crazy about it.  She makes so many phone calls, and she drives the kids crazy about it."  p. 99.

38

Yaron's death has impacted his professional career. Prior to the murder, Meir Ungar published scholarly articles at the rate of one and a half to two a year. Yet in the six years since the murder, he has only been able to publish two articles, one of which was begun prior to the murder. p. 98. As an associate professor, his promotion to full professor is dependent in great part on publishing scholarly articles. Without publishing, there is no way he would be promoted. p. 99.

Yaron's mother, Judith Ungar, testified that Yaron's most characteristic personality trait was his happiness, his joy of life, the delight in his eyes, always laughing and happy and good-natured. pp. 101-102. He was full of life, constantly visiting with friends. p. 101. He was very idealistic, didn't care for money and wanted to give to society. Yaron chose teaching as a matter of idealism, he wanted to educate children to be good citizens and good persons. pp. 104-105.

Judith Ungar recalled that Yaron was very charitable. After his death, the family learned that each month Yaron and Efrat would put aside 10% of their earnings to help pay for a student's tuition in the school in which Yaron taught. In the afternoon, Yaron worked with disadvantaged students in a program similar to Big Brother. pp. 106-107.

Judith described Yaron was very warm and open, and as the center of attention in the family. When he would come home from school, the family would gather around the Sabbath table and listen to Yaron's stories of his friends. The family had a custom to sing together and Yaron would teach them new songs. p. 103.

Judith had a very close relationship with Yaron. Adding to their closeness was the fact that like Yaron, she is a teacher, and they shared professional interests. Yaron would consult with her and discuss his lesson plans. p. 104.

39

<u>Republic of Iran</u>, 172 F. Supp.2d 1, <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1; <u>see also</u> <u>Alejandre v. Republic of Cuba</u>, 996 F. Supp 1239 ($7.5 million awarded to parents of murdered 24 and 29 year old sons).

The Court will therefore award Judith and Meir Ungar damages in the amount of $5,000,000 each for the loss of society and companionship and mental anguished caused them by the death of their son.

### D.      MICHAL COHEN, AMICHAI UNGAR AND DAFNA UNGAR

Each of Yaron's siblings had a special intimate relationship with him. As an older sister, Michal was Yaron's long-standing confidante. Yaron was a guide, teacher and role model to Amichai and Dafna. As their older brother, they looked to him for advice and guidance especially as they were coming to maturity.

Michal testified as to the close relationship she and Yaron had throughout their lives. Growing up together in the U.S. and Israel they were constantly together. p. 120. When they were older, Yaron and Michal shared many interests, such as science fiction. As a young adult, Yaron sought her advice on his future, career and girlfriends. Before he was married, Yaron sought her approval of Efrat as a wife. p. 121.

Even after Michal and Yaron each married, they remained very close. p. 121. For instance, upon Dvir's birth, they shopped for baby clothes together. p. 122.

Yaron's death has been very difficult for Michal. Even happy occasions such as the birth of her twins become sad events as the loss of Yaron is remembered. p. 123. As she is reminded of him during routine day to day activities such as walking in a mall or hearing a song he liked, she becomes paralyzed. p. 124.

41

Amichai Ungar, Yaron's younger brother, testified that Yaron was his hero and "mental protector." p. 128. Yaron would look after Amichai. When Amichai was 13, Yaron wrote him a letter at the end of the school year urging him to continue his studies and to maintain a proper lifestyle during the summer months. p. 128. The letter impressed so many people that upon Yaron's death it was published in newspapers and distributed to the youth group that Yaron worked for. p. 129.

After Yaron's death, Amichai has assumed responsibility for taking care of Dvir and Yishai every other weekend, bathing them, and putting them to sleep. p. 129. He has curtailed certain activities to be able to take care of them. p. 131.

Amichai acknowledged the toll that Yaron's death has had on the family and particularly their family life. He has a heightened fear for his own safety because he does not want his parents to suffer should anything happen to him. The household is very tense and his relationship with his mother has become strained because of her nervousness. p. 130. The family is unable to talk about Yaron's death. He feels a need to "be a rock" and to keep his feelings inside because to do otherwise would cause pain and hurt to his family. p. 131.

Happy occasions become sad for Amichai. For instance, at a friend's wedding, he started to cry and was unable to join in the dancing. p. 131.

Dafna Ungar, Yaron's younger sister, testified that Yaron was her "big protecting brother." p. 133.

She described Yaron as having an "everlasting smile on his face." p. 133. He was always trying to keep everyone happy. p. 134. Dafna recalls Yaron as always telling jokes, telling funny stories. p. 133.

42

Dafna is most hurt by Yaron's death in that she never had a chance to interact with him as an adult. After his death, she relates having conversations with him and writing letters to him. She felt as if she had to let him know what was happening with his children, what he was missing. p. 135.

She feels the loss of Yaron frequently when listening to music or eating a snack food that they both enjoyed. p. 135. She testified that his memory "comes to you all the time" and that "in every act that we do we have this on the background of our mind reminding us all the time what [has] happened." p. 136.

Dafna described Yaron as a "great, inspiring" father. He was very patient with Dvir. She described an incident when Dvir broke a vase. Instead of shouting at him, he was "so patient [with] him, and so loving, it would be amazing to see." p. 136.

The testimony makes abundantly clear that Yaron Ungar's murder has inflicted great mental anguish on his siblings, and they have suffered greatly from the loss of Yaron's society and companionship, and will continue to do so.

Damages for loss of society and mental anguish have been awarded to adult siblings of victims of terrorism, and the courts have routinely awarded $2.5 million to each sibling in several such cases. Eisenfeld v. Iran, 172 F. Supp.2d 1, Flatow v. Islamic Republic of Iran, 999 F. Supp. at 32. In Elahi v. Islamic Republic of Iran, 124 F. Supp.2d 97 an adult sibling of an adult terrorism victim was awarded $5 million as they had a particularly close relationship.[22]

---

[22] In Jenco v. Islamic Republic of Iran, 154 F. Supp.2d 27 (D.D.C. 2001) the court awarded damages in the amount of $1.5 million each to adult siblings of a priest who had been held hostage for almost seven years. However, the court distinguished this award from that given in other terrorism judgment rulings because the victim had been ultimately set free and rejoined his family.

43

The Court will therefore award Michal Cohen, Amichai Ungar and Dafna Ungar damages in the amount of $2,500,000 each for the loss of society and companionship and mental anguished caused them by the death of their brother.

**E.    ATTORNEY FEES AND TREBLE DAMAGES**

Section 2333 provides that plaintiffs "shall recover threefold the damages he or she sustains and the cost of suit, including attorney fees."

Therefore, the damages awards described above will be trebled as statutorily mandated. In addition, plaintiffs have documented counsel fees and costs in the amount of $68,858.

Plaintiffs, by their Attorney,

David J. Strachman #4404
McIntyre, Tate, Lynch and Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095  fax

<u>CERTIFICATION</u>

I hereby certify that on the _16__ day of August, 2002 I mailed a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003

Deming E. Sherman
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903

44