UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR,  )
et al                       )
                            )
                            )
              v.            )      C.A. No. 00-105L
                            )
THE PALESTINIAN AUTHORITY,  )
et al                       )
                            )
_____ )

### AFFIDAVIT OF AMBASSADOR NASSER AL-KIDWA

State of New York      )
                       ) ss:
County of New York     )

Nasser Al-Kidwa being duly sworn deposes and says:

1.   I am the Ambassador of Palestine to the United Nations, and as such am the Chief representative of Palestine at the United Nations.  My formal title is Permanent Observer of Palestine to the United Nations.  I make this affidavit of my own knowledge and upon information and belief for submission with the motion by the PA and PLO to dismiss the amended complaint for lack of subject matter jurisdiction in Ungar v. PA, 00 CV 0105(L), to provide support for the motion pursuant to the judgment of the United States Court of Appeals for the First Circuit on the recent appeal of the PA and PLO from the denial of their prior motions to dismiss.

2.   I have held the position of Ambassador of Palestine to the United Nations since 1991, and have been



assigned to the Observer Mission continuously since 1986 as
alternate Permanent Observer to the PLO, later changed to
Palestine, until my appointment in 1991 as Permanent
Observer.  I am knowledgeable with respect to the history
and past and current events and issues concerning Palestine
including proceedings, deliberations and actions of the
United Nations.

3.    The United Nations and other documents attached
to this affidavit as Exhibits are accurate copies of the
originals to the best of my knowledge and information and
belief.  Those documents support the statements contained
in paragraphs 4 through 30 of this affidavit.

**History And Elements Of Palestinian Statehood**

4.    U.N. General Assembly resolution 181 (II), which
was adopted on 29 November 1947, partitioned mandated
Palestine into a Jewish and an Arab State.  This resolution
was intended to serve as the basis for the establishment of
the independent State of Palestine and the independent
State of Israel. The borders and territory of each State
were clearly defined by resolution 181 (II).

5.    Resolution 181 (II), which defined the borders of
the Jewish and Arab States to be established in partitioned
Palestine, took into consideration the demographics of both
the Jewish and Arab populations present in Palestine,
recognizing the existence of each of these populations.
The Palestinian population was a permanent population,

PRV_581403_1/DSHERMAN

estimated to be at least 80% of the population in Palestine at the time.

6.   Following the June 1967 war, during which Israel occupied the remainder of mandated Palestine, namely the West Bank, including East Jerusalem, and the Gaza Strip, the Security Council adopted resolution 242 (1967), which has for decades served as the basis of the Middle East peace process. Resolution 242, *inter alia*, emphasized the "inadmissibility of the acquisition of territory by war" and the need to work for a just and lasting peace in which every State in the area can live in peace and security. The resolution further called for the "withdrawal of Israel armed forces from territories occupied in the recent conflict" and for the "termination of all claims or states of belligerency and respect for and acknowledgement of the sovereignty, territorial integrity and political independence of every State in the area and their right to live in peace with secure and recognized boundaries free from threats or acts of force"

7.   In accordance with the principles and purposes of the U.N. Charter, subsequent U.N. resolutions have repeatedly recognized, *inter alia*, the Palestinian people's right to self- determination and right to sovereignty over their territory.  Among the first of such resolutions was resolution 2535 B (XXIV), of 10 December 1969, in which the General Assembly reaffirmed the inalienable rights of the

PRV_581403_1/DSHERMAN

people of Palestine.  This was followed by resolution 2672
C (XXV), of 8 December 1970, which recognized that the
people of Palestine are entitled to equal rights and self-
determination in accordance with the U.N. Charter.

8.   On 14 October 1974, the General Assembly, in
resolution 3210 (XXIX), recognized the Palestine Liberation
Organization (PLO) as the representative of the Palestinian
people and invited it to participate in the deliberations
of the General Assembly on the Question of Palestine in
plenary meetings.

9.   This was followed by General Assembly resolution
3237 (XXIX) of 22 November 1974, which granted observer
status to the Palestine Liberation Organization (PLO).  The
resolution invited the PLO to participate in the sessions
and work of the General Assembly in the capacity of
observer and invited the PLO to participate in the sessions
and work of all international conferences convened under
U.N. auspices.

10.   The participation of the PLO in other organs of
the United Nations followed.  In 1975, the PLO began
participating in the Economic and Social Council (ECOSOC)
as an observer.  In 1977, the PLO became a full member of
the Economic and Social Council for Western Asia (ESCWA).
In 1975, the PLO was invited to participate in the debate
of the Security Council, with "the same rights of

PRV_581403_1/DSHERMAN

participation as are conferred when a Member State is
invited to participate under rule 37."

11.   On 23 September 1982, the U.N. Office of Legal
Affairs stated that "Even outside the United Nations
framework, the overwhelming majority of states formally
recognize the PLO as the representative of the Palestinian
people and have established direct links with it on a
bilateral basis, sometimes even granting it full diplomatic
status."

12.   On 2 April 1986, the Asian Group of the U.N.,
comprised of the countries of the region, decided to accept
the PLO as a full member.  By this time, Palestine had also
become a full member of several other regional and
international organizations, namely the League of Arab
States, the Movement of Non-Aligned Countries (NAM), the
Organization of the Islamic Conference (OIC) and the Group
of 77 and China.  Palestine has the same rights and status
as other Member States in all those organizations.

13.   On 15 November 1988, the Palestine National
Council, the Palestinian parliament in exile, representing
the Palestinian people, declared the independence of the
State of Palestine with Jerusalem as its capital.  That
declaration affirmed the PLO to be the sole, legitimate
representative of the Palestinian people, recognized by the
world community as a whole, as well as by related regional
and international institutions.  The Declaration affirmed

PRV_581403_1/DSHERMAN

that the "State of Palestine is the state of Palestinians wherever they may be." It affirmed Palestine to be "an Arab State, an integral and indivisible part of the Arab nation, at one with that nation in heritage and civilization, with it also in its aspiration for liberation, progress, democracy and unity."

14.   The Declaration of the independence of the State of Palestine was followed by numerous statements of official recognition of the independent Palestinian State. This enhanced bilateral relations that had already been established between the PLO and other countries, which included diplomatic embassies in at least 76 countries. Following the Declaration in 1988, the number of countries recognizing Palestine as an independent State increased significantly. All of the Arab countries and the majority of Islamic countries and States members of the Non- Aligned Movement (NAM), as well as several other countries around the world, have full diplomatic relations with Palestine. Other countries, including West European countries, share advanced forms of representation with Palestine. Thus, Palestine has diplomatic representation in the majority of States around the world.

15.   At the U.N., on 15 December 1988, the General Assembly adopted resolution 43/177, in which the Assembly expressed awareness of the proclamation of the State of Palestine by the Palestine National Council in line with

PRV_581403_1/DSHERMAN

General Assembly resolution 181 (III).  That resolution "acknowledges the proclamation of the State of Palestine by the Palestine National Council on 15 November 1988."  The resolution also affirmed the need to enable the Palestinian people to exercise their sovereignty over their territory occupied since 1967.  Lastly, it decided that the designation "Palestine" should be used in place of the designation "Palestine Liberation Organization" in the U.N. system.

    16.  On 9 September 1993, the Government of Israel, in an exchange of letters of mutual recognition between the two sides, decided to recognize the PLO as the representative of the Palestinian people and commence negotiations with the PLO within the Middle East peace process.

    17.  On 13 September 1993, the PLO and Israel signed the Declaration of Principles on Interim Self-Government Arrangements (DOP), which initiated the period of self-government for the Palestinian people. The DOP led to the establishment of the Palestinian Authority, intended to be an interim self-government authority for the Palestinian people in the West Bank and Gaza Strip for a transitional period not exceeding five years, leading to a permanent settlement based on Security Council resolutions 242 (1967) and 338 (1973).

PRV_581403_1/DSHERMAN

18.   Article III of the DOP stated that "in order that the Palestinian people in the West Bank and Gaza Strip may govern themselves according to democratic principles, direct, free and general political elections will be held for the Council." Article IV of the DOP addressed the issue of jurisdiction.  It determined that "Jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations.  The two sides view the West Bank and the Gaza Strip as a single territorial unit, whose integrity will be preserved during the interim period."

19.   The DOP also addressed the issue of the transfer of powers and responsibilities to the Palestinian self-government authority.  It stated, *inter alia*, that "Upon the entry into force of this Declaration of Principles and the withdrawal from the Gaza Strip and the Jericho area, a transfer of authority from the Israeli military government and its Civil Administration to the authorized Palestinians for this task, as detailed herein, will commence." Further, it stated that "immediately after the entry into force of this Declaration" authority will be transferred to the Palestinians in the following spheres: education and culture, health, social welfare, direct taxation and tourism". Moreover, the DOP entrusted the Council to establish, among other things, a Palestinian Electricity Authority, a Gaza Sea Port Authority, a Palestinian

PRV_581403_1/DSHERMAN

Development Bank, a Palestinian Export Promotion Board, a Palestinian Environmental Authority, a Palestinian Land Authority and a Palestinian Water Administration Authority. The Palestinian [Legislative] Council established by the DOP was also empowered to legislate, in accordance with the Interim Agreement, within all authorities transferred to it.

20.   The Paris Protocol on Economic Relations between the Government of Israel and the PLO, concluded on 29 April 1994, further expanded the powers and responsibilities of the Palestinian Authority, particularly in the fields of customs, import, export, trade and taxation.  Several international agreements, including the GATT 1994 and the Brussels Definition of Valuation will apply in this regard.

21.   This was followed by the signing of the Agreement on the Gaza Strip and the Jericho Area on 4 May 1994, which, like preceding agreements, defined the PLO as the representative of the Palestinian people.  In addition to details regarding the withdrawal of Israeli military forces from the Gaza Strip and Jericho area, the agreement covered specific transfers of authority, the structure and composition of the Palestinian Authority, jurisdiction, etc.

22.   Significantly, the Agreement on the Gaza Strip and the Jericho Area (AGSJA) and subsequent agreements specified that Israel would ultimately be responsible for

PRV_581403_1/DSHERMAN

security.  This is clearly stated in Article V, 3.1 of the Agreement regarding jurisdiction, in which it is affirmed that "Israel has authority over the Settlements, the Military Installation Area, Israelis, external security, internal security and public order of Settlements, the Military Installation Area and Israelis, and those agreed powers and responsibilities specified in this Agreement." Moreover, Article VIII on arrangements for security and public order states that "Israel shall continue to carry the responsibility for defense against external threats" as well as the responsibility for overall security of Israelis and Settlements, for the purpose of safeguarding their internal security and public order".

23.   Article VII of the AGSJA on legislative powers of the Palestinian Authority, essential for governing, states that the "Palestinian Authority will have the power, within its jurisdiction to promulgate legislation, including basic laws, laws, regulations and other legislative acts."

24.   On 29 August 1994, the Government of Israel and the PLO signed the Agreement on Preparatory Transfer of Power and Responsibilities, in which it was *inter alia* agreed that "Israel shall transfer and the Palestinian Authority shall assume powers and responsibilities from the Israeli military government and its Civil Administration in the West Bank in the following spheres: education and

culture, health, social welfare, tourism, direct taxation and Value Added Tax on local production."

25.   At the U.N., on 9 November 1994, the General Assembly adopted resolution 49/12 through which arrangements for the Special Commemorative Meeting of the General Assembly on the occasion of the 50th Anniversary of the United Nations, in addition to applying to member states it applied to Palestine in its capacity as Observer.

26.   On 28 September 1995, the Government of Israel and the PLO concluded the Interim Agreement on the West Bank and the Gaza Strip, which among other things provided for the "holding of direct, free and general political elections for the Council and the Ra'ees of the Executive Authority in order that the Palestinian people in the West Bank and the Gaza Strip may democratically elect accountable representatives." The Agreement further recognized that "these elections will constitute a significant interim preparatory step toward the realization of the legitimate rights of the Palestinian people and their just requirements and will provide a democratic basis for the establishment of Palestinian institutions."

27.   Article XII, 1 of the Interim Agreement on the West Bank and the Gaza Strip again affirms Israel's overriding responsibility for security. It states, *inter alia*, "Israel shall continue to carry the responsibility for defense against external threats, including the

responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air, as well as the responsibility for the overall security of Israelis and Settlements, for the purpose of safeguarding their internal security and public order and will have all the powers to take the steps necessary to meet this responsibility."

28.   In the Interim Agreement, Article XVII on jurisdiction specifically states that "In accordance with the DOP, the jurisdiction of the Council will cover West Bank and Gaza Strip territory as a single territorial unit."

29.   At the U.N, on 7 July 1998, the General Assembly adopted resolution 52/250 entitled "Participation of Palestine in the Work of the United Nations." This resolution conferred upon Palestine additional rights and privileges of participation that had previously been exclusive to Member States. These included, for example, the right to participate in the general debate of the General Assembly and the right to cosponsor resolutions and raise points of order on Palestinian and Middle East issues. The resolution essentially upgraded Palestine's representation at the U.N. to a unique and unprecedented level reflecting a clear conviction in terms of status and statehood for Palestine on the part of the international community.

PRV_581403_1/DSHERMAN

30.   On 28 October 1998, Mr. Yasser Arafat, Chairman of the PLO and President of the Palestinian Authority, addressed the 53rd session of the General Assembly during its general debate.  This was the first time in the history of the U.N. that a non- Member State participated under that item.

31.   That Palestine does not have all the rights, privileges and duties of a full member of the United Nations does not affect its statehood.  There are nations such as Switzerland that for years have abstained from U.N. membership.  It joined last year.  For many years, South and North Korea were denied full membership because of potential Security Council vetoes.  No nation is compelled to be a member of the U.N. and a nonmember remains nonetheless a nation.  Based on my knowledge of United Nations rules and procedures, and the political considerations that are operative at the United Nations and my first-hand participation in proceedings at the United Nations and conversations and communication with delegates and other persons there during my years at the United Nations, it is my opinion that the United Nation's failure to offer Palestine full membership is not based on an assumption or opinion that Palestine does not satisfy the definitional elements of statehood.  The U.N. has not been concerned with the legal issue of statehood.  The failure of the

PRV_581403_1/DSHERMAN

U.N. to offer full membership is based on political considerations having nothing to do with criteria for statehood. The chief political consideration blocking U.N. membership for Palestine has been opposition by the United States and Israel. Admission of a new Member to the U.N. requires a decision by the General Assembly upon recommendation of the Security Council. The U.S. has the power to veto any Security Council resolution recommending U.N. membership for Palestine. The opposition of the U.S. and Israel to such membership is unmistakable and has been shown in many ways including Security Council and General Assembly votes over many years in which matters affecting Palestine were at issue and the United States and Israel have time and again both taken positions opposed to the interests of Palestine and often to the views of the vast majority of members in the General Assembly and the Security Council. But for this opposition it is my opinion that Palestine would have been accepted long ago as a member of the United Nations.

Nasser Al-Kidwa
Permanent Observer of
Palestine to the
United Nations

Sworn to before me this 13 day
of June, 2003

*Betty J Bussberg*

BETTY J. BUSSBERG
Notary Public, State Of New York
No. 01BU5078760
Qualified In Queens County
Commission Expires April 29, 07

14

arabkidwadep061303 3ddraft

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of June, 2003, I mailed a copy of the within Affidavit to David J. Strachman, Esq., McIntyre, Tate, Lynch and Holt, Suite 400, 321 South Main Street, Providence, RI 02903.

_Elizabeth M. Kulas_