UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR,　)
et al　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　v.　　　　　　　　　)　　C.A. No. 00-105L
　　　　　　　　　　　　　　　　　　)
THE PALESTINIAN AUTHORITY,　　)
et al　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
_____)

**EXHIBITS TO AFFIDAVIT OF AMBASSADOR NASSER AL-KIDWA
IN SUPPORT OF PALESTINIAN DEFENDANTS' RULE 12(b)(1)
<u>MOTION TO DISMISS AMENDED COMPLAINT</u>**

Defendants, the Palestinian Authority ("PA") and the Palestine Liberation Organization

("PLO"), file herewith the exhibits to the Affidavit of Ambassador Nasser Al-Kidwa in support

of their Rule 12(b)(1) Motion to Dismiss Amended Complaint. The exhibits are filed pursuant to

the Court's Order entered June 16, 2003 granting Defendants' Motion to Exceed Page Limit for

Exhibits.

1. General Assembly: Resolution 181 (II) Future government of Palestine

2. Security Council: Resolution 242 (1967) of 22 November 1967

3. Security Council: Resolution 338 (1973) of 22 October 1973

4. General Assembly: 3237 (XXIX), Observer Status for the Palestine Liberation Organization

5. Declaration of Independence, November 15, 1988

6. General Assembly: 43/177 Question of Palestine

7. General Assembly: Security Council: Letter dated 14 December 1988 from the Charge d'affaires a.i. of the Permanent Mission of Qatar to the United Nations addressed to the Secretary-General

8. General Assembly: Security Council: Letter dated 13 December 1988 from the Charge d'affaires a.i. of Oman to the United Nations addressed to the Secretary-General



9.    PLO-Israel Letters of Mutual Recognition

10.    General Assembly: Security Council: Letter dated 8 October 1993 from the Permanent Representatives of the Russian Federation and the United States of America to the United Nations addressed to the Secretary-General

11.    Protocol on Economic Relations Between the Government of Israel and the PLO: dated Paris 29 April 1994

12.    Agreement on the Gaza Strip and the Jericho Area, May 4, 1994

13.    Agreement on Preparatory Transfer of Powers and Responsibilities, August 29, 1994

14.    Interim Agreement on the West Bank and the Gaza Strip, September 28, 1995

15.    The Wye River Memorandum

16.    The Sharm El-Sheikh Memorandum on Implementation Timeline of Outstanding Commitments of Agreements Signed and the Resumption of Permanent Status Negotiations

17.    Draft adopted on 7 July 1988 as resolution 52/250: Question of Palestine

18.    General Assembly: 4 August 1998 Participation of Palestine in the work of the United Nations

19.    General Assembly: Resolution adopted by the General Assembly 57/269.  Permanent sovereignty of the Palestinian people in the Occupied Palestinian Territory, including East Jerusalem, and of the Arab population in the occupied Syrian Golden over their natural resources

Dated:  June 17, 2003

Deming E. Sherman (#1138)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
401-274-9200
401-276-6611 (FAX)

PRV_582206_1/DSHERMAN

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
212-475-3232
212-979-1583 (FAX)

Attorneys for Defendants
The Palestinian Authority and
The PLO

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2003, I mailed a copy of the within Exhibits to Affidavit of Ambassador Nasser Al-Kidwa to David J. Strachman, Esq., McIntyre, Tate, Lynch & Holt, Suite 400, 321 South Main Street, Providence, RI 02903.

- 3 -                                                        PRV_582206_1/DSHERMAN

A/RES/181(II) (A+B) of 29 November 1947



# UNITED NATIONS



## General Assembly

A/RES/181(II) (A+B)
29 November 1947

### Resolution 181 (II). Future government of Palestine

## A

*The General Assembly,*

*Having met* in special session at the request of the mandatory Power to constitute and instruct a special committee to prepare for the consideration of the question of the future government of Palestine at the second regular session;

*Having constituted* a Special Committee and instructed it to investigate all questions and issues relevant to the problem of Palestine, and to prepare proposals for the solution of the problem, and

*Having received and examined* the report of the Special Committee (document A/364) 1/ including a number of unanimous recommendations and a plan of partition with economic union approved by the majority of the Special Committee,

*Considers* that the present situation in Palestine is one which is likely to impair the general welfare and friendly relations among nations;

*Takes note* of the declaration by the mandatory Power that it plans to complete its evacuation of Palestine by 1 August 1948;

*Recommends* to the United Kingdom, as the mandatory Power for Palestine, and to all other Members of the United Nations the adoption and implementation, with regard to the future government of Palestine, of the Plan of Partition with Economic Union set out below;

*Requests that*

(a) The Security Council take the necessary measures as provided for in the plan for its implementation;

(b) The Security Council consider, if circumstances during the transitional period require such consideration, whether the situation in Palestine constitutes a threat to the peace. If it decides that such a threat exists, and in order to maintain international peace and security, the Security Council should supplement the authorization of the General Assembly by taking measures, under Articles 39 and 41 of the Charter, to empower the United Nations Commission, as provided in this resolution, to exercise in Palestine the functions which are assigned to it by this resolution;

A/RES/181(II) (A+B) of 29 November 1947

(c) The Security Council determine as a threat to the peace, breach of the peace or act of aggression, in accordance with Article 39 of the Charter, any attempt to alter by force the settlement envisaged by this resolution;

(d) The Trusteeship Council be informed of the responsibilities envisaged for it in this plan:

*Calls upon* the inhabitants of Palestine to take such steps as may be necessary on their part to put this plan into effect;

*Appeals* to all Governments and all peoples to refrain from taking action which might hamper or delay the carrying out of these recommendations, and

*Authorizes* the Secretary-General to reimburse travel and subsistence expenses of the members of the Commission referred to in Part I, Section B, paragraph 1 below, on such basis and in such form as he may determine most appropriate in the circumstances, and to provide the Commission with the necessary staff to assist in carrying out the functions assigned to the Commission by the General Assembly.

**B 2/**

*The General Assembly*

*Authorizes* the Secretary-General to draw from the Working Capital Fund a sum not to exceed $2,000,000 for the purposes set forth in the last paragraph of the resolution on the future government of Palestine.

*Hundred and twenty-eighth plenary meeting*
*29 November 1947*

*[At its hundred and twenty-eighth plenary meeting on 29 November 1947 the General Assembly, in accordance with the terms of the above resolution [181 A], elected the following members of the United Nations Commission on Palestine:* **Bolivia, Czechoslovakia, Denmark, Panama and Philippines.**]

## PLAN OF PARTITION WITH ECONOMIC UNION

## PART I

## Future constitution and government of Palestine

### A. TERMINATION OF MANDATE, PARTITION AND INDEPENDENCE

1. The Mandate for Palestine shall terminate as soon as possible but in any case not later than 1 August 1948.

2. The armed forces of the mandatory Power shall be progressively withdrawn from Palestine, the withdrawal to be completed as soon as possible but in any case not later than 1 August 1948.

The mandatory Power shall advise the Commission, as far in advance as possible, of its intention to terminate the Mandate and to evacuate each area.

The mandatory Power shall use its best endeavours to ensure than an area situated in the territory of the Jewish State, including a seaport and hinterland adequate to provide facilities for a substantial immigration, shall be evacuated at the earliest possible date and in any event not later than 1 February 1948.

3. Independent Arab and Jewish States and the Special International Regime for the City of Jerusalem, set forth in part III of this plan, shall come into existence in Palestine two months after the evacuation of the armed forces of the mandatory Power has been completed but in any case not later than 1 October 1948. The boundaries of the Arab State, the Jewish State, and the City of Jerusalem shall be as described in parts II and III below.

4. The period between the adoption by the General Assembly of its recommendation on the question of Palestine and the establishment of the independence of the Arab and Jewish States shall be a transitional period.

## B. STEPS PREPARATORY TO INDEPENDENCE

1. A Commission shall be set up consisting of one representative of each of five Member States. The Members represented on the Commission shall be elected by the General Assembly on as broad a basis, geographically and otherwise, as possible.

2. The administration of Palestine shall, as the mandatory Power withdraws its armed forces, be progressively turned over to the Commission; which shall act in conformity with the recommendations of the General Assembly, under the guidance of the Security Council. The mandatory Power shall to the fullest possible extent co-ordinate its plans for withdrawal with the plans of the Commission to take over and administer areas which have been evacuated.

In the discharge of this administrative responsibility the Commission shall have authority to issue necessary regulations and take other measures as required.

The mandatory Power shall not take any action to prevent, obstruct or delay the implementation by the Commission of the measures recommended by the General Assembly.

3. On its arrival in Palestine the Commission shall proceed to carry out measures for the establishment of the frontiers of the Arab and Jewish States and the City of Jerusalem in accordance with the general lines of the recommendations of the General Assembly on the partition of Palestine. Nevertheless, the boundaries as described in part II of this plan are to be modified in such a way that village areas as a rule will not be divided by state boundaries unless pressing reasons make that necessary.

4. The Commission, after consultation with the democratic parties and other public organizations of The Arab and Jewish States, shall select and establish in each State as rapidly as possible a Provisional Council of Government. The activities of both the Arab and Jewish Provisional Councils of Government shall be carried out under the general direction of the Commission.

A/RES/181(II) (A+B) of 29 November 1947

If by 1 April 1948 a Provisional Council of Government cannot be selected for either of the States, or, if selected, cannot carry out its functions, the Commission shall communicate that fact to the Security Council for such action with respect to that State as the Security Council may deem proper, and to the Secretary-General for communication to the Members of the United Nations.

5. Subject to the provisions of these recommendations, during the transitional period the Provisional Councils of Government, acting under the Commission, shall have full authority in the areas under their control, including authority over matters of immigration and land regulation.

6. The Provisional Council of Government of each State acting under the Commission, shall progressively receive from the Commission full responsibility for the administration of that State in the period between the termination of the Mandate and the establishment of the State's independence.

7. The Commission shall instruct the Provisional Councils of Government of both the Arab and Jewish States, after their formation, to proceed to the establishment of administrative organs of government, central and local.

8. The Provisional Council of Government of each State shall, within the shortest time possible, recruit an armed militia from the residents of that State, sufficient in number to maintain internal order and to prevent frontier clashes.

This armed militia in each State shall, for operational purposes, be under the command of Jewish or Arab officers resident in that State, but general political and military control, including the choice of the militia's High Command, shall be exercised by the Commission.

9. The Provisional Council of Government of each State shall, not later than two months after the withdrawal of the armed forces of the mandatory Power, hold elections to the Constituent Assembly which shall be conducted on democratic lines.

The election regulations in each State shall be drawn up by the Provisional Council of Government and approved by the Commission. Qualified voters for each State for this election shall be persons over eighteen years of age who are: (a) Palestinian citizens residing in that State and (b) Arabs and Jews residing in the State, although not Palestinian citizens, who, before voting, have signed a notice of intention to become citizens of such State.

Arabs and Jews residing in the City of Jerusalem who have signed a notice of intention to become citizens, the Arabs of the Arab State and the Jews of the Jewish State, shall be entitled to vote in the Arab and Jewish States respectively.

Women may vote and be elected to the Constituent Assemblies.

During the transitional period no Jew shall be permitted to establish residence in the area of the proposed Arab State, and no Arab shall be permitted to establish residence in the area of the proposed Jewish State, except by special leave of the Commission.

10. The Constituent Assembly of each State shall draft a democratic constitution for its State and choose a provisional government to succeed the Provisional Council of Government appointed by the Commission. The constitutions of the States shall embody chapters 1 and 2 of the Declaration provided for in section C below and include inter alia provisions for:

(a) Establishing in each State a legislative body elected by universal suffrage and by secret ballot on the

basis of proportional representation, and an executive body responsible to the legislature;

(b) Settling all international disputes in which the State may be involved by peaceful means in such a manner that international peace and security, and justice, are not endangered;

(c) Accepting the obligation of the State to refrain in its international relations from the threat or use of force against the territorial integrity of political independence of any State, or in any other manner inconsistent with the purposes of the United Nations;

(d) Guaranteeing to all persons equal and non-discriminatory rights in civil, political, economic and religious matters and the enjoyment of human rights and fundamental freedoms, including freedom of religion, language, speech and publication, education, assembly and association;

(e) Preserving freedom of transit and visit for all residents and citizens of the other State in Palestine and the City of Jerusalem, subject to considerations of national security, provided that each State shall control residence within its borders.

11. The Commission shall appoint a preparatory economic commission of three members to make whatever arrangements are possible for economic co-operation, with a view to establishing, as soon as practicable, the Economic Union and the Joint Economic Board, as provided in section D below.

12. During the period between the adoption of the recommendations on the question of Palestine by the General Assembly and the termination of the Mandate, the mandatory Power in Palestine shall maintain full responsibility for administration in areas from which it has not withdrawn its armed forces. The Commission shall assist the mandatory Power in the carrying out of these functions. Similarly the mandatory Power shall co-operate with the Commission in the execution of its functions.

13. With a view to ensuring that there shall be continuity in the functioning of administrative services and that, on the withdrawal of the armed forces of the mandatory Power, the whole administration shall be in the charge of the Provisional Councils and the Joint Economic Board, respectively, acting under the Commission, there shall be a progressive transfer, from the mandatory Power to the Commission, of responsibility for all the functions of government, including that of maintaining law and order in the areas from which the forces of the mandatory Power have been withdrawn.

14. The Commission shall be guided in its activities by the recommendations of the General Assembly and by such instructions as the Security Council may consider necessary to issue.

The measures taken by the Commission, within the recommendations of the General Assembly, shall become immediately effective unless the Commission has previously received contrary instructions from the Security Council.

The Commission shall render periodic monthly progress reports, or more frequently if desirable, to the Security Council.

15. The Commission shall make its final report to the next regular session of the General Assembly and to the Security Council simultaneously.

C. DECLARATION

A declaration shall be made to the United Nations by the provisional government of each proposed State

A/RES/181(II) (A+B) of 29 November 1947

before independence. It shall contain inter alia the following clauses:

**General Provision**

The stipulations contained in the declaration are recognized as fundamental laws of the State and no law, regulation or official action shall conflict or interfere with these stipulations, nor shall any law, regulation or official action prevail over them.

**Chapter 1**

*Holy Places, religious buildings and sites*

1. Existing rights in respect of Holy Places and religious buildings or sites shall not be denied or impaired.

2. In so far as Holy Places are concerned, the liberty of access, visit and transit shall be guaranteed, in conformity with existing rights, to all residents and citizens of the other State and of the City of Jerusalem, as well as to aliens, without distinction as to nationality, subject to requirements of national security, public order and decorum.

Similarly, freedom of worship shall be guaranteed in conformity with existing rights, subject to the maintenance of public order and decorum.

3. Holy Places and religious buildings or sites shall be preserved. No act shall be permitted which may in any way impair their sacred character. If at any time it appears to the Government that any particular Holy Place, religious building or site is in need of urgent repair, the Government may call upon the community or communities concerned to carry out such repair. The Government may carry it out itself at the expense of the community or communities concerned if no action is taken within a reasonable time.

4. No taxation shall be levied in respect of any Holy Place, religious building or site which was exempt from taxation on the date of the creation of the State.

No change in the incidence of such taxation shall be made which would either discriminate between the owners or occupiers of Holy Places, religious buildings or sites, or would place such owners or occupiers in a position less favourable in relation to the general incidence of taxation than existed at the time of the adoption of the Assembly's recommendations.

5. The Governor of the City of Jerusalem shall have the right to determine whether the provisions of the Constitution of the State in relation to Holy Places, religious buildings and sites within the borders of the State and the religious rights appertaining thereto, are being properly applied and respected, and to make decisions on the basis of existing rights in cases of disputes which may arise between the different religious communities or the rites of a religious community with respect to such places, buildings and sites. He shall receive full co-operation and such privileges and immunities as are necessary for the exercise of his functions in the State.

**Chapter 2**

*Religious and Minority Rights*

A/RES/181(II) (A+B) of 29 November 1947

1. Freedom of conscience and the free exercise of all forms of worship, subject only to the maintenance of public order and morals, shall be ensured to all.

2. No discrimination of any kind shall be made between the inhabitants on the ground of race, religion, language or sex.

3. All persons within the jurisdiction of the State shall be entitled to equal protection of the laws.

4. The family law and personal status of the various minorities and their religious interests, including endowments, shall be respected.

5. Except as may be required for the maintenance of public order and good government, no measure shall be taken to obstruct or interfere with the enterprise of religious or charitable bodies of all faiths or to discriminate against any representative or member of these bodies on the ground of his religion or nationality.

6. The State shall ensure adequate primary and secondary education for the Arab and Jewish minority, respectively, in its own language and its cultural traditions.

The right of each community to maintain its own schools for the education of its own members in its own language, while conforming to such educational requirements of a general nature as the State may impose, shall not be denied or impaired. Foreign educational establishments shall continue their activity on the basis of their existing rights.

7. No restriction shall be imposed on the free use by any citizen of the State of any language in private intercourse, in commerce, in religion, in the Press or in publications of any kind, or at public meetings.

8. No expropriation of land owned by an Arab in the Jewish State (by a Jew in the Arab State) shall be allowed except for public purposes. In all cases of expropriation full compensation as fixed by the Supreme Court shall be paid previous to dispossession.

### Chapter 3

*Citizenship, international conventions and financial obligations*

1. Citizenship. Palestinian citizens residing in Palestine outside the City of Jerusalem, as well as Arabs and Jews who, not holding Palestinian citizenship, reside in Palestine outside the City of Jerusalem shall, upon the recognition of independence, become citizens of the State in which they are resident and enjoy full civil and political rights. Persons over the age of eighteen years may opt, within one year from the date of recognition of independence of the State in which they reside, for citizenship of the other State, providing that no Arab residing in the area of the proposed Arab State shall have the right to opt for citizenship in the proposed Jewish State and no Jew residing in the proposed Jewish State shall have the right to opt for citizenship in the proposed Arab State. The exercise of this right of option will be taken to include the wives and children under eighteen years of age of persons so opting.

Arabs residing in the area of the proposed Jewish State and Jews residing in the area of the proposed Arab State who have signed a notice of intention to opt for citizenship of the other State shall be eligible to vote in the elections to the Constituent Assembly of that State, but not in the elections to the Constituent Assembly of the State in which they reside.

A/RES/181(II) (A+B) of 29 November 1947

2. International conventions. (a) The State shall be bound by all the international agreements and conventions, both general and special, to which Palestine has become a party. Subject to any right of denunciation provided for therein, such agreements and conventions shall be respected by the State throughout the period for which they were concluded.

(b) Any dispute about the applicability and continued validity of international conventions or treaties signed or adhered to by the mandatory Power on behalf of Palestine shall be referred to the International Court of Justice in accordance with the provisions of the Statute of the Court.

3. Financial obligations. (a) The State shall respect and fulfil all financial obligations of whatever nature assumed on behalf of Palestine by the mandatory Power during the exercise of the Mandate and recognized by the State. This provision includes the right of public servants to pensions, compensation or gratuities.

(b) These obligations shall be fulfilled through participation in the Joint economic Board in respect of those obligations applicable to Palestine as a whole, and individually in respect of those applicable to, and fairly apportionable between, the States.

(c) A Court of Claims, affiliated with the Joint Economic Board, and composed of one member appointed by the United Nations, one representative of the United Kingdom and one representative of the State concerned, should be established. Any dispute between the United Kingdom and the State respecting claims not recognized by the latter should be referred to that Court.

(d) Commercial concessions granted in respect of any part of Palestine prior to the adoption of the resolution by the General Assembly shall continue to be valid according to their terms, unless modified by agreement between the concession-holder and the State.

## Chapter 4

### Miscellaneous provisions

1. The provisions of chapters 1 and 2 of the declaration shall be under the guarantee of the United Nations, and no modifications shall be made in them without the assent of the General Assembly of the United nations. Any Member of the United Nations shall have the right to bring to the attention of the General Assembly any infraction or danger of infraction of any of these stipulations, and the General Assembly may thereupon make such recommendations as it may deem proper in the circumstances.

2. Any dispute relating to the application or the interpretation of this declaration shall be referred, at the request of either party, to the International Court of Justice, unless the parties agree to another mode of settlement.

## D. ECONOMIC UNION AND TRANSIT

1. The Provisional Council of Government of each State shall enter into an undertaking with respect to economic union and transit. This undertaking shall be drafted by the commission provided for in section B, paragraph 1, utilizing to the greatest possible extent the advice and co-operation of representative organizations and bodies from each of the proposed States. It shall contain provisions to establish the Economic Union of Palestine and provide for other matters of common interest. If by 1 April 1948 the Provisional Councils of Government have not entered into the undertaking, the undertaking shall be put

A/RES/181(II) (A+B) of 29 November 1947

into force by the Commission.

*The Economic Union of Palestine*

2. The objectives of the Economic Union of Palestine shall be:

(a) A customs union;

(b) A joint currency system providing for a single foreign exchange rate;

(c) Operation in the common interest on a non-discriminatory basis of railways; inter-State highways; postal, telephone and telegraphic services, and port and airports involved in international trade and commerce;

(d) Joint economic development, especially in respect of irrigation, land reclamation and soil conservation;

(e) Access for both States and for the City of Jerusalem on a non-discriminatory basis to water and power facilities.

3. There shall be established a Joint Economic Board, which shall consist of three representatives of each of the two States and three foreign members appointed by the Economic and Social Council of the United Nations. The foreign members shall be appointed in the first instance for a term of three years; they shall serve as individuals and not as representatives of States.

4. The functions of the Joint Economic Board shall be to implement either directly or by delegation the measures necessary to realize the objectives of the Economic Union. It shall have all powers of organization and administration necessary to fulfil its functions.

5. The States shall bind themselves to put into effect the decisions of the Joint Economic Board. The Board's decisions shall be taken by a majority vote.

6. In the event of failure of a State to take the necessary action the Board may, by a vote of six members, decide to withhold an appropriate portion of that part of the customs revenue to which the State in question is entitled under the Economic Union. Should the State persist in its failure to co-operate, the Board may decide by a simple majority vote upon such further sanctions, including disposition of funds which it has withheld, as it may deem appropriate.

7. In relation to economic development, the functions of the Board shall be the planning, investigation and encouragement of joint development projects, but it shall not undertake such projects except with the assent of both States and the City of Jerusalem, in the event that Jerusalem is directly involved in the development project.

8. In regard to the joint currency system the currencies circulating in the two States and the City of Jerusalem shall be issued under the authority of the Joint Economic Board, which shall be the sole issuing authority and which shall determine the reserves to be held against such currencies.

9. So far as is consistent with paragraph 2 (b) above, each State may operate its own central bank, control its own fiscal and credit policy, its foreign exchange receipts and expenditures, the grant of import licenses, and may conduct international financial operations on its own faith and credit. During the first two years after the termination of the Mandate, the Joint Economic Board shall have the

A/RES/181(II) (A+B) of 29 November 1947

authority to take such measures as may be necessary to ensure that--to the extent that the total foreign exchange revenues of the two States from the export of goods and services permit, and provided that each State takes appropriate measures to conserve its own foreign exchange resources--each State shall have available, in any twelve months' period, foreign exchange sufficient to assure the supply of quantities of imported goods and services for consumption in its territory equivalent to the quantities of such goods and services consumed in that territory in the twelve months' period ending 31 December 1947.

10. All economic authority not specifically vested in the Joint Economic Board is reserved to each State.

11. There shall be a common customs tariff with complete freedom of trade between the States, and between the States and the City of Jerusalem.

12. The tariff schedules shall be drawn up by a Tariff Commission, consisting of representatives of each of the States in equal numbers, and shall be submitted to the Joint Economic Board for approval by a majority vote. In case of disagreement in the Tariff Commission, the Joint Economic Board shall arbitrate the points of difference. In the event that the Tariff Commission fails to draw up any schedule by a date to be fixed, the Joint Economic Board shall determine the tariff schedule.

13. The following items shall be a first charge on the customs and other common revenue of the Joint Economic Board:

(a) The expenses of the customs service and of the operation of the joint services;

(b) The administrative expenses of the Joint Economic Board;

(c) The financial obligations of the Administration of Palestine consisting of:

(i) The service of the outstanding public debt;

(ii) The cost of superannuation benefits, now being paid or falling due in the future, in accordance with the rules and to the extent established by paragraph 3 of chapter 3 above.

14. After these obligations have been met in full, the surplus revenue from the customs and other common services shall be divided in the following manner: not less than 5 per cent and not more than 10 per cent to the City of Jerusalem; the residue shall be allocated to each State by the Joint Economic Board equitably, with the objective of maintaining a sufficient and suitable level of government and social services in each State, except that the share of either State shall not exceed the amount of that State's contribution to the revenues of the Economic Union by more than approximately four million pounds in any year. The amount granted may be adjusted by the Board according to the price level in relation to the prices prevailing at the time of the establishment of the Union. After five years, the principles of the distribution of the joint revenues may be revised by the Joint Economic Board on a basis of equity.

15. All international conventions and treaties affecting customs tariff rates, and those communications services under the jurisdiction of the Joint Economic Board, shall be entered into by both States. In these matters, the two States shall be bound to act in accordance with the majority vote of the Joint Economic Board.

16. The Joint Economic Board shall endeavour to secure for Palestine's export fair and equal access to world markets.

A/RES/181(II) (A+B) of 29 November 1947

17. All enterprises operated by the Joint Economic Board shall pay fair wages on a uniform basis.

*Freedom of transit and visit*

18. The undertaking shall contain provisions preserving freedom of transit and visit for all residents or citizens of both States and of the City of Jerusalem, subject to security considerations; provided that each state and the City shall control residence within its borders.

*Termination, modification and interpretation of the undertaking*

19. The undertaking and any treaty issuing therefrom shall remain in force for a period of ten years. It shall continue in force until notice of termination, to take effect two years thereafter, is given by either of the parties.

20. During the initial ten-year period, the undertaking and any treaty issuing therefrom may not be modified except by consent of both parties and with the approval of the General Assembly.

21. Any dispute relating to the application or the interpretation of the undertaking and any treaty issuing therefrom shall be referred, at the request of either party, to the international Court of Justice, unless the parties agree to another mode of settlement.

## E. ASSETS

1. The movable assets of the Administration of Palestine shall be allocated to the Arab and Jewish States and the City of Jerusalem on an equitable basis. Allocations should be made by the United Nations Commission referred to in section B, paragraph 1, above. Immovable assets shall become the property of the government of the territory in which they are situated.

2. During the period between the appointment of the United Nations Commission and the termination of the Mandate, the mandatory Power shall, except in respect of ordinary operations, consult with the Commission on any measure which it may contemplate involving the liquidation, disposal or encumbering of the assets of the Palestine Government, such as the accumulated treasury surplus, the proceeds of Government bond issues, State lands or any other asset.

## F. ADMISSION TO MEMBERSHIP IN THE UNITED NATIONS

When the independence of either the Arab or the Jewish State as envisaged in this plan has become effective and the declaration and undertaking, as envisaged in this plan, have been signed by either of them, sympathetic consideration should be given to its application for admission to membership in the United Nations in accordance with Article 4 of the Charter of the United Nations.

## PART II

## Boundaries 5/

A/RES/181(II) (A+B) of 29 November 1947

## A. THE ARAB STATE

The area of the Arab State in Western Galilee is bounded on the west by the Mediterranean and on the north by the frontier of the Lebanon from Ras en Naqura to a point north of Saliha. From there the boundary proceeds southwards, leaving the built-up area of Saliha in the Arab State, to join the southernmost point of this village. Thence it follows the western boundary line of the villages of `Alma, Rihaniya and Teitaba, thence following the northern boundary line of Meirun village to join the Acre-Safad sub-district boundary line. It follows this line to a point west of Es Sammu'i village and joins it again at the northernmost point of Farradiya. Thence it follows the sub-district boundary line to the Acre-Safad main road. From here it follows the western boundary of Kafr I'nan village until it reaches the Tiberias-Acre sub-district boundary line, passing to the west of the junction of the Acre-Safad and Lubiya-Kafr I'nan roads. From south-west corner of Kafr I'nan village the boundary line follows the western boundary of the Tiberias sub-district to a point close to the boundary line between the villages of Maghar and Eilabun, thence bulging out to the west to include as much of the eastern part of the plain of Battuf as is necessary for the reservoir proposed by the Jewish Agency for the irrigation of lands to the south and east.

The boundary rejoins the Tiberias sub-district boundary at a point on the Nazareth-Tiberias road south-east of the built-up area of Tur'an; thence it runs southwards, at first following the sub-district boundary and then passing between the Kadoorie Agricultural School and Mount Tabor, to a point due south at the base of Mount Tabor. From here it runs due west, parallel to the horizontal grid line 230, to the north-east corner of the village lands of Tel Adashim. It then runs to the north-west corner of these lands, whence it turns south and west so as to include in the Arab State the sources of the Nazareth water supply in Yafa village. On reaching Ginneiger it follows the eastern, northern and western boundaries of the lands of this village to their south-west corner, whence it proceeds in a straight line to a point on the Haifa-Afula railway on the boundary between the villages of Sarid and El Mujeidil. This is the point of intersection.

The south-western boundary of the area of the Arab State in Galilee takes a line from this point, passing northwards along the eastern boundaries of Sarid and Gevat to the north-eastern corner of Nahalal, proceeding thence across the land of Kefar ha Horesh to a central point on the southern boundary of the village of `Ilut, thence westwards along that village boundary to the eastern boundary of Beit Lahm, thence northwards and north-eastwards along its western boundary to the north-eastern corner of Waldheim and thence north-westwards across the village lands of Shafa 'Amr to the south-eastern corner of Ramat Yohanan'. From here it runs due north-north-east to a point on the Shafa 'Amr-Haifa road, west of its junction with the road to I'Billin. From there it proceeds north-east to a point on the southern boundary of I'Billin situated to the west of the I'Billin-Birwa road. Thence along that boundary to its westernmost point, whence it turns to the north, follows across the village land of Tamra to the north-westernmost corner and along the western boundary of Julis until it reaches the Acre-Safad road. It then runs westwards along the southern side of the Safad-Acre road to the Galilee-Haifa District boundary, from which point it follows that boundary to the sea.

The boundary of the hill country of Samaria and Judea starts on the Jordan River at the Wadi Malih south-east of Beisan and runs due west to meet the Beisan-Jericho road and then follows the western side of that road in a north-westerly direction to the junction of the boundaries of the sub-districts of Beisan, Nablus, and Jenin. From that point it follows the Nablus-Jenin sub-district boundary westwards for a distance of about three kilometres and then turns north-westwards, passing to the east of the built-up areas of the villages of Jalbun and Faqqu'a, to the boundary of the sub-districts of Jenin and Beisan at a point north-east of Nuris. Thence it proceeds first north-westwards to a point due north of the built-up

A/RES/181(II) (A+B) of 29 November 1947

area of Zir'in and then westwards to the Afula-Jenin railway, thence north-westwards along the district boundary line to the point of intersection on the Hejaz railway. From here the boundary runs south-westwards, including the built-up area and some of the land of the village of Kh.Lid in the Arab State to cross the Haifa-Jenin road at a point on the district boundary between Haifa and Samaria west of El Mansi. It follows this boundary to the southernmost point of the village of El Buteimat. From here it follows the northern and eastern boundaries of the village of Ar'ara, rejoining the Haifa-Samaria district boundary at Wadi'Ara, and thence proceeding south-south-westwards in an approximately straight line joining up with the western boundary of Qaqun to a point east of the railway line on the eastern boundary of Qaqun village. From here it runs along the railway line some distance to the east of it to a point just east of the Tulkarm railway station. Thence the boundary follows a line half-way between the railway and the Tulkarm-Qalqiliya-Jaljuliya and Ras el Ein road to a point just east of Ras el Ein station, whence it proceeds along the railway some distance to the east of it to the point on the railway line south of the junction of the Haifa-Lydda and Beit Nabala lines, whence it proceeds along the southern border of Lydda airport to its south-west corner, thence in a south-westerly direction to a point just west of the built-up area of Sarafand el'Amar, whence it turns south, passing just to the west of the built-up area of Abu el Fadil to the north-east corner of the lands of Beer Ya'Aqov. (The boundary line should be so demarcated as to allow direct access from the Arab State to the airport.) Thence the boundary line follows the western and southern boundaries of Ramle village, to the north-east corner of El Na'ana village, thence in a straight line to the southernmost point of El Barriya, along the eastern boundary of that village and the southern boundary of 'Innaba village. Thence it turns north to follow the southern side of the Jaffa-Jerusalem road until El Qubab, whence it follows the road to the boundary of Abu Shusha. It runs along the eastern boundaries of Abu Shusha, Seidun, Hulda to the southernmost point of Hulda, thence westwards in a straight line to the north-eastern corner of Umm Kalkha, thence following the northern boundaries of Umm Kalkha, Qazaza and the northern and western boundaries of Mukhezin to the Gaza District boundary and thence runs across the village lands of El Mismiya, El Kabira, and Yasur to the southern point of intersection, which is midway between the built-up areas of Yasur and Batani Sharqi.

From the southern point of intersection the boundary lines run north-westwards between the villages of Gan Yavne and Barqa to the sea at a point half way between Nabi Yunis and Minat el Qila, and south-eastwards to a point west of Qastina, whence it turns in a south-westerly direction, passing to the east of the built-up areas of Es Sawafir, Es Sharqiya and Ibdis. From the south-east corner of Ibdis village it runs to a point south-west of the built-up area of Beit 'Affa, crossing the Hebron-El Majdal road just to the west of the built-up area of Iraq Suweidan. Thence it proceeds southwards along the western village boundary of El Faluja to the Beersheba sub-district boundary. It then runs across the tribal lands of 'Arab el Jubarat to a point on the boundary between the sub-districts of Beersheba and Hebron north of Kh. Khuweilifa, whence it proceeds in a south-westerly direction to a point on the Beersheba-Gaza main road two kilometres to the north-west of the town. It then turns south-eastwards to reach Wadi Sab' at a point situated one kilometre to the west of it. From here it turns north-eastwards and proceeds along Wadi Sab' and along the Beersheba-Hebron road for a distance of one kilometre, whence it turns eastwards and runs in a straight line to Kh. Kuseifa to join the Beersheba-Hebron sub-district boundary. It then follows the Beersheba-Hebron boundary eastwards to a point north of Ras Ez Zuweira, only departing from it so as to cut across the base of the indentation between vertical grid lines 150 and 160.

About five kilometres north-east of Ras ez Zuweira it turns north, excluding from the Arab State a strip along the coast of the Dead Sea not more than seven kilometres in depth, as far as Ein Geddi, whence it turns due east to join the Transjordan frontier in the Dead Sea.

The northern boundary of the Arab section of the coastal plain runs from a point between Minat el Qila and Nabi Yunis, passing between the built-up areas of Gan Yavne and Barqa to the point of intersection. From here it turns south-westwards, running across the lands of Batani Sharqi, along the eastern

A/RES/181(II) (A+B) of 29 November 1947    12486

boundary of the lands of Beit Daras and across the lands of Julis, leaving the built-up areas of Batani Sharqi and Julis to the westwards, as far as the north-west corner of the lands of Beit Tima. Thence it runs east of El Jiya across the village lands of El Barbara along the eastern boundaries of the villages of Beit Jirja, Deir Suneid and Dimra. From the south-east corner of Dimra the boundary passes across the lands of Beit Hanun, leaving the Jewish lands of Nir-Am to the eastwards. From the south-east corner of Dimra the boundary passes across the lands of Beit Hanun, leaving the Jewish lands of Nir-Am to the eastwards. From the south-east corner of Beit Hanun the line runs south-west to a point south of the parallel grid line 100, then turns north-west for two kilometres, turning again in a south-westerly direction and continuing in an almost straight line to the north-west corner of the village lands of Kirbet Ikhza'a. From there it follows the boundary line of this village to its southernmost point. It then runs in a southerly direction along the vertical grid line 90 to its junction with the horizontal grid line 70. It then turns south-eastwards to Kh. el Ruheiba and then proceeds in a southerly direction to a point known as El Baha, beyond which it crosses the Beersheba-El 'Auja main road to the west of Kh. el Mushrifa. From there it joins Wadi El Zaiyatin just to the west of El Subeita. From there it turns to the north-east and then to the south-east following this Wadi and passes to the east of 'Abda to join Wadi Nafkh. It then bulges to the south-west along Wadi Nafkh. It then bulges to the south-west along Wadi Nafkh, Wadi Ajrim and Wadi Lassan to the point where Wadi Lassan crosses the Egyptian frontier.

The area of the Arab enclave of Jaffa consists of that part of the town-planning area of Jaffa which lies to the west of the Jewish quarters lying south of Tel-Aviv, to the west of the continuation of Herzl street up to its junction with the Jaffa-Jerusalem road, to the south-west of the section of the Jaffa-Jerusalem road lying south-east of that junction, to the west of Miqve Israel lands, to the north-west of Holon local council area, to the north of the line linking up the north-west corner of Holon with the north-east corner of Bat Yam local council area and to the north of Bat Yam local council area. The question of Karton quarter will be decided by the Boundary Commission, bearing in mind among other considerations the desirability of including the smallest possible number of its Arab inhabitants and the largest possible number of its Jewish inhabitants in the Jewish State.

## B. THE JEWISH STATE

The north-eastern sector of the Jewish State (Eastern) Galilee is bounded on the north and west by the Lebanese frontier and on the east by the frontiers of Syria and Transjordan. It includes the whole of the Hula Basin, Lake Tiberias, the whole of the Beisan sub-district, the boundary line being extended to the crest of the Gilboa mountains and the Wadi Malih. From there the Jewish State extends north-west, following the boundary described in respect of the Arab State.

The Jewish Section of the coastal plain extends from a point between Minat et Qila and Nabi Yunis in the Gaza sub-district and includes the towns of Haifa and Tel-Aviv, leaving Jaffa as an enclave of the Arab State. The eastern frontier of the Jewish State follows the boundary described in respect of the Arab State.

The Beersheba area comprises the whole of the Beersheba sub-district, including the Negeb and the eastern part of the Gaza sub-district, but excluding the town of Beersheba and those areas described in respect of the Arab State. It includes also a strip of land along the Dead Sea stretching from the Beersheba-Hebron sub-district boundary line to Ein Geddi, as described in respect of the Arab State.

## C. THE CITY OF JERUSALEM

The boundaries of the City of Jerusalem are as defined in the recommendations on the City of Jerusalem.

A/RES/181(II) (A+B) of 29 November 1947                                              Page 15 of 20

(See Part III, Section B, below).

# PART III

## City of Jerusalem

### A. SPECIAL REGIME

The City of Jerusalem shall be established as a *corpus separatum* under a special international regime and shall be administered by the United Nations. The Trusteeship Council shall be designated to discharge the responsibilities of the Administering Authority on behalf of the United Nations.

### B. BOUNDARIES OF THE CITY

The City of Jerusalem shall include the present municipality of Jerusalem plus the surrounding villages and towns, the most eastern of which shall be Abu Dis; the most southern, Bethlehem; the most western, Ein Karim (including also the built-up area of Motsa); and the most northern Shu'fat, as indicated on the attached sketch-map (annex B).

### C. STATUTE OF THE CITY

The Trusteeship Council shall, within five months of the approval of the present plan, elaborate and approve a detailed Statute of the City which shall contain inter alia the substance of the following provisions:

1. *Government machinery; special objectives.* The Administering Authority in discharging its administrative obligations shall pursue the following special objectives:

(a) To protect and to preserve the unique spiritual and religious interests located in the city of the three great monotheistic faiths throughout the world, Christian, Jewish and Moslem; to this end to ensure that order and peace, and especially religious peace, reign in Jerusalem;

(b) To foster co-operation among all the inhabitants of the city in their own interests as well as in order to encourage and support the peaceful development of the mutual relations between the two Palestinian peoples throughout the Holy Land; to promote the security, well-being and any constructive measures of development of the residents, having regard to the special circumstances and customs of the various peoples and communities.

2. *Governor and administrative staff.* A Governor of the City of Jerusalem shall be appointed by the Trusteeship Council and shall be responsible to it. He shall be selected on the basis of special qualifications and without regard to nationality. He shall not, however, be a citizen of either State in Palestine.

The Governor shall represent the United Nations in the City and shall exercise on their behalf all powers of administration, including the conduct of external affairs. He shall be assisted by an administrative staff classed as international officers in the meaning of Article 100 of the Charter and chosen whenever practicable from the residents of the city and of the rest of Palestine on a non-discriminatory basis. A

Case 1:00-cv-00105-DLM   Document 178   Filed 06/17/03   Page 20 of 131  PageID #: 12488

detailed plan for the organization of the administration of the city shall be submitted by the Governor to the Trusteeship Council and duly approved by it.

3. *Local autonomy.* (a) The existing local autonomous units in the territory of the city (villages, townships and municipalities) shall enjoy wide powers of local government and administration.

(b) The Governor shall study and submit for the consideration and decision of the Trusteeship Council a plan for the establishment of a special town units consisting respectively, of the Jewish and Arab sections of new Jerusalem. The new town units shall continue to form part of the present municipality of Jerusalem.

4. *Security measures.* (a) The City of Jerusalem shall be demilitarized; its neutrality shall be declared and preserved, and no para-military formations, exercises or activities shall be permitted within its borders.

(b) Should the administration of the City of Jerusalem be seriously obstructed or prevented by the non-co-operation or interference of one or more sections of the population, the Governor shall have authority to take such measures as may be necessary to restore the effective functioning of the administration.

(c) To assist in the maintenance of internal law and order and especially for the protection of the Holy Places and religious buildings and sites in the city, the Governor shall organize a special police force of adequate strength, the members of which shall be recruited outside of Palestine. The Governor shall be empowered to direct such budgetary provision as may be necessary for the maintenance of this force.

5. *Legislative organization.* A Legislative Council, elected by adult residents of the city irrespective of nationality on the basis of universal and secret suffrage and proportional representation, shall have powers of legislation and taxation. No legislative measures shall, however, conflict or interfere with the provisions which will be set forth in the Statute of the City, nor shall any law, regulation, or official action prevail over them. The Statute shall grant to the Governor a right of vetoing bills inconsistent with the provisions referred to in the preceding sentence. It shall also empower him to promulgate temporary ordinances in case the council fails to adopt in time a bill deemed essential to the normal functioning of the administration.

6. *Administration of justice.* The Statute shall provide for the establishment of an independent judiciary system, including a court of appeal. All the inhabitants of the City shall be subject to it.

7. *Economic union and economic regime.* The City of Jerusalem shall be included in the Economic Union of Palestine and be bound by all stipulations of the undertaking and of any treaties issued therefrom, as well as by the decision of the Joint Economic Board. The headquarters of the Economic Board shall be established in the territory of the City.

The Statute shall provide for the regulation of economic matters not falling within the regime of the Economic Union, on the basis of equal treatment and non-discrimination for all members of the United Nations and their nationals.

8. *Freedom of transit and visit; control of residents.* Subject to considerations of security, and of economic welfare as determined by the Governor under the directions of the Trusteeship Council, freedom of entry into, and residence within, the borders of the City shall be guaranteed for the residents or citizens of the Arab and Jewish States. Immigration into, and residence within, the borders of the city for nationals of other States shall be controlled by the Governor under the directions of the Trusteeship Council.

A/RES/181(II) (A+B) of 29 November 1947

9. *Relations with the Arab and Jewish States.* Representatives of the Arab and Jewish States shall be accredited to the Governor of the City and charged with the protection of the interests of their States and nationals in connexion with the international administration of the City.

10. *Official languages.* Arabic and Hebrew shall be the official languages of the city. This will not preclude the adoption of one or more additional working languages, as may be required.

11. *Citizenship.* All the residents shall become ipso facto citizens of the City of Jerusalem unless they opt for citizenship of the State of which they have been citizens or, if Arabs or Jews, have filed notice of intention to become citizens of the Arab or Jewish State respectively, according to part I, section B, paragraph 9, of this plan.

The Trusteeship Council shall make arrangements for consular protection of the citizens of the City outside its territory.

12. *Freedoms of Citizens.* (a) Subject only to the requirements of public order and morals, the inhabitants of the City shall be ensured the enjoyment of human rights and fundamental freedoms, including freedom of conscience, religion and worship, language, education, speech and press, assembly and association, and petition.

(b) No discrimination of any kind shall be made between the inhabitants on the grounds of race, religion, language or sex.

(c) All persons within the City shall be entitled to equal protection of the laws.

(d) The family law and personal status of the various persons and communities and their religious interests, including endowments, shall be respected.

(e) Except as may be required for the maintenance of public order and good government, no measure shall be taken to obstruct or interfere with the enterprise of religious or charitable bodies of all faiths or to discriminate against any representative or member of these bodies on the ground of his religion or nationality.

(f) The City shall ensure adequate primary and secondary education for the Arab and Jewish communities respectively, in their own languages and in accordance with their cultural traditions.

The right of each community to maintain its own schools for the education of its own members in its own language, while conforming to such educational requirements of a general nature as the City may impose, shall not be denied or impaired. Foreign educational establishments shall continue their activity on the basis of their existing rights.

(g) No restriction shall be imposed on the free use by any inhabitant of the City of any language in private intercourse, in commerce, in religion, in the Press or in publications of any kind, or at public meetings.

13. *Holy Places.* (a) Existing rights in respect of Holy Places and religious buildings or sites shall not be denied or impaired.

(b) Free access to the Holy Places and religious buildings or sites and the free exercise of worship shall be secured in conformity with existing rights and subject to the requirements of public order and

decorum.

(c) Holy Places and religious buildings or sites shall be preserved. No act shall be permitted which may in any way impair their sacred character. If at any time it appears to the Governor that any particular Holy Place, religious building or site is in need of urgent repair, the Governor may call upon the community or communities concerned to carry out such repair. The Governor may carry it out himself at the expense of the community or communities concerned if no action is taken within a reasonable time.

(d) No taxation shall be levied in respect of any Holy Place, religious building or site which was exempt from taxation on the date of the creation of the City. No change in the incidence of such taxation shall be made which would either discriminate between the owners or occupiers of Holy Places, religious buildings or sites, or would place such owners or occupiers in a position less favourable in relation to the general incidence of taxation than existed at the time of the adoption of the Assembly's recommendations.

14. *Special powers of the Governor in respect of the Holy Places, religious buildings and sites in the City and in any part of Palestine.* (a) The protection of the Holy Places, religious buildings and sites located in the City of Jerusalem shall be a special concern of the Governor.

(b) With relation to such places, buildings and sites in Palestine outside the city, the Governor shall determine, on the ground of powers granted to him by the Constitutions of both States, whether the provisions of the Constitutions of the Arab and Jewish States in Palestine dealing therewith and the religious rights appertaining thereto are being properly applied and respected.

(c) The Governor shall also be empowered to make decisions on the basis of existing rights in cases of disputes which may arise between the different religious communities or the rites of a religious community in respect of the Holy Places, religious buildings and sites in any part of Palestine.

In this task he may be assisted by a consultative council of representatives of different denominations acting in an advisory capacity.

## D. DURATION OF THE SPECIAL REGIME

The Statute elaborated by the Trusteeship Council on the aforementioned principles shall come into force not later than 1 October 1948. It shall remain in force in the first instance for a period of ten years, unless the Trusteeship Council finds it necessary to undertake a re-examination of these provisions at an earlier date. After the expiration of this period the whole scheme shall be subject to re-examination by the Trusteeship Council in the light of the experience acquired with its functioning. The residents of the City shall be then free to express by means of a referendum their wishes as to possible modifications of the regime of the City.

## PART IV

## CAPITULATIONS

States whose nationals have in the past enjoyed in Palestine the privileges and immunities of foreigners, including the benefits of consular jurisdiction and protection, as formerly enjoyed by capitulation or usage in the Ottoman Empire, are invited to renounce any right pertaining to them to the re-

establishment of such privileges and immunities in the proposed Arab and Jewish States and the City of Jerusalem.

* * *

*Notes*

1/ See <u>Official Records of the second session of the General Assembly, Supplement No. 11, Volumes I-IV</u>.

2/ This resolution was adopted without reference to a Committee.

3/ The following stipulation shall be added to the declaration concerning the Jewish State: "In the Jewish State adequate facilities shall be given to Arab-speaking citizens for the use of their language, either orally or in writing, in the legislature, before the Courts and in the administration."

4/ In the declaration concerning the Arab State, the words "by an Arab in the Jewish State" should be replaced by the words "by a Jew in the Arab State".

5/ The boundary lines described in part II are indicated in Annex A. The base map used in marking and describing this boundary is "Palestine 1:250000" published by the Survey of Palestine, 1946.

## Annex A

### Plan of Partition with Economic Union
*(map reissued in 1956)*

### Annex B

### CITY OF JERUSALEM
### BOUNDARIES PROPOSED
### BY THE AD HOC COMMITTEE
### ON THE PALESTINIAN QUESTION

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 25 of 131 PageID #: 12493

UNISPAL-select || UNISPAL Home || Français

Français
SpecialRep Jarring (1967); SpecialRep Brunner / Madrid (1991); Arab Peace Initiative (2002)
See also: Palestine letter, 1988 (S/20278); GA resolution 43/176, 1988; Oslo (1993); SpecialCoord Larsen (1999)
Meeting record: S/PV.1382
Photo.

# UNITED
# NATIONS

**S**



## Security Council

S/RES/242 (1967)
22 November 1967

**Resolution 242 (1967)**
**of 22 November 1967**

*The Security Council,*

*Expressing* its continuing concern with the grave situation in the Middle East,

*Emphasizing* the inadmissibility of the acquisition of territory by war and the need to work for a just and lasting peace in which every State in the area can live in security,

*Emphasizing further* that all Member States in their acceptance of the Charter of the United Nations have undertaken a commitment to act in accordance with Article 2 of the Charter,

1. *Affirms* that the fulfilment of Charter principles requires the establishment of a just and lasting peace in the Middle East which should include the application of both the following principles:

(i) Withdrawal of Israel armed forces from territories occupied in the recent conflict;

(ii) Termination of all claims or states of belligerency and respect for and acknowledgment of the sovereignty, territorial integrity and political independence of every State in the area and their right to live in peace within secure and recognized boundaries free from threats or acts of force;

2. *Affirms further* the necessity

*(a)* For guaranteeing freedom of navigation through international waterways in the area;

*(b)* For achieving a just settlement of the refugee problem;

*(c)* For guaranteeing the territorial inviolability and political independence of every State in the area, through measures including the establishment of demilitarized zones;

3. *Requests* the Secretary-General to designate a Special Representative to proceed to the Middle East to establish and maintain contacts with the States concerned in order to promote agreement and assist

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 26 of 131 PageID #:
12494

S/RES/242 (1967) of 22 November 1967

efforts to achieve a peaceful and accepted settlement in accordance with the provisions and principles in this resolution;

4. *Requests* the Secretary-General to report to the Security Council on the progress of the efforts of the Special Representative as soon as possible.

*Adopted unanimously at the 1382nd meeting.*

UNISPAL-select || UNISPAL Home ||

# UNITED
# NATIONS

**S**


## Security Council

S/RES/338 (1973)
22 October 1973

**Resolution 338 (1973)**
**of 22 October 1973**

*The Security Council*

*1. Calls upon* all parties to the present fighting to cease all firing and terminate all military activity immediately, no later than 12 hours after the moment of the adoption of this decision, in the positions they now occupy;

*2. Calls upon* the parties concerned to start immediately after the cease-fire the implementation of Security Council resolution 242 (1967) in all of its parts;

*3. Decides* that, immediately and concurrently with the cease-fire, negotiations shall start between the parties concerned under appropriate auspices aimed at establishing a just and durable peace in the Middle East.

*Adopted at the 1747th meeting*
*by 14 votes to none.* 1/

---

1/ One member (China) did not participate in the voting.

Resolution 3207

Selected Documents Regarding Palestine



# UNITED NATIONS

**A**

## General Assembly

A/RES/3237
(XXIX)
22 November
1974

### 3237 (XXIX). OBSERVER STATUS FOR THE PALESTINE LIBERATION ORGANIZATION

*The General Assembly,*

*Having considered* the question of Palestine,

*Taking into consideration* the universality of the United Nations prescribed in the Charter,

*Recalling* its resolution 3102 (XXVIII) of 12 December 1973,

*Taking into account* Economic and Social Council resolutions 1835 (LVI) of 14 May 1974 and 1840 (LVI) of 15 May 1974,

*Noting* that the Diplomatic Conference on the Reaffirmation and Development of International Humanitarian Law Applicable in Armed Conflicts, the World Population Conference and the World Food Conference have in effect invited the Palestine Liberation Organization to participate in their respective deliberations,

*Noting also* that the Third United Nations Conference on the Law of the Sea has invited the Palestine Liberation Organization to participate in its deliberations as an observer,

1. *Invites* the Palestine Liberation Organization to participate in the sessions and the work of the General Assembly in the capacity of observer;

2. *Invites* the Palestine Liberation Organization to participate in the sessions and the work of all international conferences convened under the auspices of the General Assembly in the capacity of

observer;

3. *Considers* that the Palestine Liberation Organization is entitled to participate as an observer in the sessions and the work of all international conferences convened under the auspices of other organs of the United Nations;

4. *Requests* the Secretary-General to take the necessary steps for the implementation of the present resolution.

Timelines | Documents | Maps | Stats | Suggested Readings | Fact Sheets | Lexicon

# Declaration of Independence

### November 15th ,1988

### In the name of God, the Compassionate, the Merciful

Palestine, the land of the three monotheistic faiths, is where the Palestinian Arab people was born, on which it grew, developed and excelled. Thus the Palestinian Arab people ensured for itself an everlasting union between itself, its land, and its history.

Resolute throughout that history, the Palestinian Arab people forged its national identity, rising even to unimagined levels in its defense, as invasion, the design of others. and the appeal special to Palestine's ancient and luminous place on the eminence where powers and civilizations are joined. All this intervened thereby to deprive the people of its political independence. Yet the undying connection between Palestine and its people secured for the land its character, and for the people its national genius.

Nourished by an unfolding series of civilizations and cultures, inspired by a heritage rich in variety and kind, the Palestinian Arab people added to its stature by consolidating a union between itself and its patrimonial Land. The call went out from Temple, Church, and Mosque that to praise the Creator, to celebrate compassion and peace was indeed the message of Palestine. And in generation after generation, the Palestinian Arab people gave of itself unsparingly in the valiant battle for liberation and homeland. For what has been the unbroken chain of our people's rebellions but the heroic embodiment of our will for national independence. And so the people was sustained in the struggle to stay and to prevail.

When in the course of modern times a new order of values was declared with norms and values fair for all, it was the Palestinian Arab people that had been excluded from the destiny of all other peoples by a hostile array of local and foreign powers. Yet again had unaided justice been revealed as insufficient to drive the world's history along its preferred course.

And it was the Palestinian people, already wounded in its body, that was submitted to yet another type of occupation over which floated that falsehood that "Palestine was a land without people." This notion was foisted upon some in the world, whereas in Article 22 of the Covenant of the League of Nations (1919) and in the Treaty of Lausanne (1923), the community of nations had recognized that all the Arab territories, including Palestine, of the formerly Ottoman provinces, were to have granted to them their freedom as provisionally independent nations.

Despite the historical injustice inflicted on the Palestinian Arab people resulting in their dispersion and depriving them of their right to self-determination, following upon U.N. General Assembly Resolution 181 (1947), which partitioned Palestine into two states, one

Arab, one Jewish, yet it is this Resolution that still provides those conditions of international legitimacy that ensure the right of the Palestinian Arab people to sovereignty.

By stages, the occupation of Palestine and parts of other Arab territories by Israeli forces, the willed dispossession and expulsion from their ancestral homes of the majority of Palestine's civilian inhabitants, was achieved by organized terror; those Palestinians who remained, as a vestige subjugated in its homeland, were persecuted and forced to endure the destruction of their national life.

Thus were principles of international legitimacy violated. Thus were the Charter of the United Nations and its Resolutions disfigured, for they had recognized the Palestinian Arab people's national rights, including the right of Return, the right to independence, the right to sovereignty over territory and homeland.

In Palestine and on its perimeters, in exile distant and near, the Palestinian Arab people never faltered and never abandoned its conviction in its rights of Return and independence. Occupation, massacres and dispersion achieved no gain in the unabated Palestinian consciousness of self and political identity, as Palestinians went forward with their destiny, undeterred and unbowed. And from out of the long years of trial in ever-mounting struggle, the Palestinian political identity emerged further consolidated and confirmed. And the collective Palestinian national will forged for itself a political embodiment, the Palestine Liberation Organization, its sole, legitimate representative recognized by the world community as a whole, as well as by related regional and international institutions. Standing on the very rock of conviction in the Palestinian people's inalienable rights, and on the ground of Arab national consensus and of international legitimacy, the PLO led the campaigns of its great people, molded into unity and powerful resolve, one and indivisible in its triumphs, even as it suffered massacres and confinement within and without its home. And so Palestinian resistance was clarified and raised into the forefront of Arab and world awareness, as the struggle of the Palestinian Arab people achieved unique prominence among the world's liberation movements in the modern era.

The massive national uprising, the intifada, now intensifying in cumulative scope and power on occupied Palestinian territories, as well as the unflinching resistance of the refugee camps outside the homeland, have elevated awareness of the Palestinian truth and right into still higher realms of comprehension and actuality. Now at last the curtain has been dropped around a whole epoch of prevarication and negation. The intifada has set siege to the mind of official Israel, which has for too long relied exclusively upon myth and terror to deny Palestinian existence altogether. Because of the intifada and its revolutionary irreversible impulse, the history of Palestine has therefore arrived at a decisive juncture.

Whereas the Palestinian people reaffirms most definitively its inalienable rights in the land of its patrimony:

Now by virtue of natural, historical and legal rights, and the sacrifices of successive generations who gave of themselves in defense of the freedom and independence of their

homeland;

In pursuance of Resolutions adopted by Arab Summit Conferences and relying on the authority bestowed by international legitimacy as embodied in the Resolutions of the United Nations Organization since 1947;

And in exercise by the Palestinian Arab people of its rights to self-determination, political independence and sovereignty over its territory,

The Palestine National Council, in the name of God, and in the name of the Palestinian Arab people, hereby proclaims the establishment of the State of Palestine on our Palestinian territory with its capital Jerusalem (Al-Quds Ash-Sharif).

The State of Palestine is the state of Palestinians wherever they may be. The state is for them to enjoy in it their collective national and cultural identity, theirs to pursue in it a complete equality of rights. In it will be safeguarded their political and religious convictions and their human dignity by means of a parliamentary democratic system of governance, itself based on freedom of expression and the freedom to form parties. The rights of minorities will duly be respected by the majority, as minorities must abide by decisions of the majority. Governance will be based on principles of social justice, equality and non-discrimination in public rights of men or women, on grounds of race, religion, color or sex, and the aegis of a constitution which ensures the rule of law and an independent judiciary. Thus shall these principles allow no departure from Palestine's age-old spiritual and civilizational heritage of tolerance and religious coexistence.

The State of Palestine is an Arab state, an integral and indivisible part of the Arab nation, at one with that nation in heritage and civilization, with it also in its aspiration for liberation, progress, democracy and unity. The State of Palestine affirms its obligation to abide by the Charter of the League of Arab States, whereby the coordination of the Arab states with each other shall be strengthened. It calls upon Arab compatriots to consolidate and enhance the emein reality of state, to mobilize potential, and to intensify efforts whose goal is to end Israeli occupation.

The State of Palestine proclaims its commitment to the principles and purposes of the United Nations, and to the Universal Declaration of Human Rights. It proclaims its commitment as well to the principles and policies of the Non-Aligned Movement.

It further announces itself to be a peace-loving State, in adherence to the principles of peaceful co-existence. It will join with all states and peoples in order to assure a permanent peace based upon justice and the respect of rights so that humanity's potential for well-being may be assured, an earnest competition for excellence may be maintained, and in which confidence in the future will eliminate fear for those who are just and for whom justice is the only recourse.

In the context of its struggle for peace in the land of Love and Peace, the State of Palestine

calls upon the United Nations to bear special responsibility for the Palestinian Arab people and its homeland. It calls upon all peace-and freedom-loving peoples and states to assist it in the attainment of its objectives, to provide it with security, to alleviate the tragedy of its people, and to help it terminate Israel's occupation of the Palestinian territories.

The State of Palestine herewith declares that it believes in the settlement of regional and international disputes by peaceful means, in accordance with the U.N. Charter and resolutions. With prejudice to its natural right to defend its territorial integrity and independence, it therefore rejects the threat or use of force, violence and terrorism against its territorial integrity or political independence, as it also rejects their use against territorial integrity of other states.

Therefore, on this day unlike all others, November 15, 1988, as we stand at the threshold of a new dawn, in all honor and modesty we humbly bow to the sacred spirits of our fallen ones, Palestinian and Arab, by the purity of whose sacrifice for the homeland our sky has been illuminated and our Land given life. Our hearts are lifted up and irradiated by the light emanating from the much blessed intifada, from those who have endured and have fought the fight of the camps, of dispersion, of exile, from those who have borne the standard for freedom, our children, our aged, our youth, our prisoners, detainees and wounded, all those ties to our sacred soil are confirmed in camp, village, and town. We render special tribute to that brave Palestinian Woman, guardian of sustenance and Life, keeper of our people's perennial flame. To the souls of our sainted martyrs, the whole of our Palestinian Arab people that our struggle shall be continued until the occupation ends, and the foundation of our sovereignty and independence shall be fortified accordingly.

Therefore, we call upon our great people to rally to the banner of Palestine, to cherish and defend it, so that it may forever be the symbol of our freedom and dignity in that homeland, which is a homeland for the free, now and always.

In the name of God, the Compassionate, the Merciful:

"Say: 'O God, Master of the Kingdom,

Thou givest the Kingdom to whom Thou wilt,

and seizes the Kingdom from whom Thou wilt,

Thou exalted whom Thou wilt, and Thou

abasest whom Thou wilt; in Thy hand

is the good; Thou are powerful over everything."

**Palestine Ministry of Information**



**UNITED NATIONS**

**A**



## General Assembly

A/RES/43/177
15 December 1988

### 43/177. Question of Palestine

*The General Assembly,*

*Having considered* the item entitled "Question of Palestine",

*Recalling* its resolution 181 (II) of 29 November 1947, in which, *inter alia*, it called for the establishment of an Arab State and a Jewish State in Palestine,

*Mindful* of the special responsibility of the United Nations to achieve a just solution to the question of Palestine,

*Aware* of the proclamation of the State of Palestine by the Palestine National Council in line with General Assembly resolution 181 (II) and in exercise of the inalienable rights of the Palestinian people,

*Affirming* the urgent need to achieve a just and comprehensive settlement in the Middle East which, *inter alia*, provides for peaceful coexistence for all States in the region,

*Recalling* its resolution 3237 (XXIX) of 22 November 1974 on the observer status for the Palestine Liberation Organization and subsequent relevant resolutions,

1. *Acknowledges* the proclamation of the State of Palestine by the Palestine National Council on 15 November 1988;

2. *Affirms* the need to enable the Palestinian people to exercise their sovereignty over their territory occupied since 1967;

3. *Decides* that, effective as of 15 December 1988, the designation "Palestine" should be used in place of the designation "Palestine Liberation Organization" in the United Nations system, without prejudice to the observer status and functions of the Palestine Liberation Organization within the United Nations system, in conformity with relevant United Nations resolutions and practice;

A/RES/43/177 of 15 December 1988

4. *Requests* the Secretary-General to take the necessary action to implement the present resolution.

* * *

**RECORDED VOTE ON RESOLUTION 43/177: 104-2-36**

In favour: Afghanistan, Albania, Algeria, Angola, Argentina, Bahrain, Bangladesh, Benin, Bolivia, Botswana, Brazil, Brunei Darussalam, Bulgaria, Burkina Faso, Burma, Burundi, Byelorussia, Cape Verde, Chad, China, Colombia, Comoros, Cuba, Cyprus, Czechoslovakia, Democratic Kampuchea, Democratic Yemen, Djibouti, Ecuador, Egypt, Equatorial Guinea, Ethiopia, Gabon, Gambia, German Democratic Republic, Ghana, Guinea, Guinea-Bissau, Guyana, Haiti, Hungary, India, Indonesia, Iran, Iraq, Jordan, Kenya, Kuwait, Lao People's Democratic Republic, Lebanon, Libya, Madagascar, Malaysia, Maldives, Mali, Malta, Mauritania, Mauritius, Mexico, Mongolia, Morocco, Mozambique, Nicaragua, Niger, Nigeria, Oman, Pakistan, Panama, Papua New Guinea, Peru, Philippines, Poland, Qatar, Romania, Rwanda, Saint Lucia, Saint Vincent and the Grenadines, Samoa, Sao Tome and Principe, Saudi Arabia, Senegal, Seychelles, Sierra Leone, Singapore, Somalia, Sri Lanka, Sudan, Suriname, Swaziland, Syria, Thailand, Togo, Tunisia, Turkey, Uganda, Ukraine, USSR, United Arab Emirates, United Republic of Tanzania, Vanuatu, Viet Nam, Yemen, Yugoslavia, Zambia, Zimbabwe.

Against: Israel, United States.

Abstentions: Antigua and Barbuda, Australia, Austria, Bahamas, Barbados, Belgium, Bhutan, Canada, Central African Republic, Costa Rica, Côte d'Ivoire, Denmark, Finland, France, Federal Republic of Germany, Greece, Iceland, Ireland, Italy, Japan, Lesotho, Liberia, Luxembourg, Malawi, Nepal, Netherlands, New Zealand, Norway, Portugal, Spain, Sweden, Trinidad and Tobago, United Kingdom, Uruguay, Venezuela, Zaire.

Absent: Belize, Cameroon, Chile, Congo, Dominica, Dominican Republic, El Salvador, Fiji, Grenada, Guatemala, Honduras, Jamaica, Paraguay, Saint Kitts and Nevis, Solomon Islands.

*IRAN ANNOUNCED THAT IT WAS NOT PARTICIPATING IN THE VOTE.*

*1 San ple of diplomatic rec nition of the State of Palestine*

|| UNISPAL Home ||



# UNITED NATIONS

# A S

## General Assembly
## Security Council

Distr.
GENERAL

A/43/971
S/20332
15 December 1988

ENGLISH
Original: ARABIC/ENGLISH

GENERAL ASSEMBLY
Forty-third session
Agenda items 37
QUESTION OF PALESTINE

SECURITY COUNCIL
Forty-third year

### Letter dated 14 December 1988 from the Charge d'affaires a.i. of the Permanent Mission of Qatar to the United Nations addressed to the Secretary-General

I have the honour to transmit herewith the statement in Arabic issued by the Council of Ministers of the State of Qatar which includes the recognition by the State of Qatar of the independent Palestinian State (see annex).

I should be grateful if you would have the present letter and its annex distributed as a document of the General Assembly, under agenda item 37, and of the Security Council.

(Signed) Nassir Abdelaziz AL-NASSER
Charge d'affaires a.i.

### ANNEX
### Statement issued on 16 November 1988 by the Council of Ministers of the State of Qatar concerning the recognition of the Palestinian State
### Declaration by the Council of Ministers

The State of Qatar, which has constantly given its utmost support to the fraternal Palestinian people and backed its just struggle to regain its legitimate rights, first and foremost its right to self-determination and to establish an independent State on its own soil under the leadership of the Palestine Liberation Organization, its sole legitimate representative, declares that it warmly welcomes the historic decision issued by the Palestine National Council at its nineteenth extraordinary session, held in the Democratic Republic of Algeria from 12 to 14 November 1988, to declare the establishment of an independent Palestinian State on Palestinian soil.

The State of Qatar, in declaring its recognition of the Palestinian State, expresses its sincere wish that the heroic struggle of the fraternal Palestinian people, which is engaged in resisting the odious Zionist

A/43/977-S/20357   01 December 1988

occupation and which has set admirable examples of courage and displayed a spirit of self-sacrifice, will culminate in a clear victory and that the Palestinian people will attain its noble goal of living as a fully independent master of its land in complete freedom and dignity.

( *Samples 2 + 3 of Recognition*

|| UNISPAL Home ||

# UNITED
# NATIONS

# A S



## General Assembly
## Security Council

Distr.
GENERAL

A/43/960
S/20323
13 December 1988

English
Original: Arabic/English

GENERAL ASSEMBLY
Forty-third session
Agenda items 37 and 40
QUESTION OF PALESTINE
THE SITUATION IN THE MIDDLE EAST

SECURITY COUNCIL
Forty-third year

Letter dated 13 December 1988 from the Charge d'affaires a.i. of
Oman to the United Nations addressed to the Secretary-General

I have the honour to transmit herewith the text of the statement issued by the Government of the Sultanate of Oman on 12 December 1988 concerning the decision by the Palestine National Council, at its extraordinary session at Algiers on 15 November 1988, to proclaim the establishment of an independent Palestinian State (see annex).

I should be grateful if you could arrange for the text of the present letter and its annex to be circulated as a document of the General Assembly, under agenda items 37 and 40, and of the Security Council.

(Signed) Izzat Bin Sabeel AL-ZADGALY
Charge d'affaires a.i.

ANNEX

Recognition of the independent Palestinian State
by the Sultanate of Oman

"Proceeding from the Sultanate of Oman's position of support for the interests of the Palestinian people and Arab rights: on the basis of the communications which have taken place between the Sultanate and the Palestine Liberation Organization in the light of the developments in the Palestinian question: and in affirmation of the rights of the Palestinian people to self-determination, the Sultanate of Oman has

Case 1:00-cv-00105-L-DLM   Document 178   Filed 06/17/03   Page 45 of 131 PageID #: 12513

decided to recognize officially and legally the independent Palestinian State proclaimed by the Palestine National Council at its nineteenth extraordinary session, held from 13 to 15 November 1988 at Algiers.

"The Sultanate of Oman is certain that the Palestinian State will contribute to the security and stability of the Middle East region in a way that strengthens peace and protects the interests of the Arab States."

A/43/930-S/20320 of 12 December 1988                                          Page 1 of 1

# UNITED NATIONS

# A S



## General Assembly
## Security Council

A/43/930
S/20320
12 December 1988

GENERAL ASSEMBLY                              SECURITY COUNCIL
Forty-third session                          Forty-third year
Agenda items 37 and 40
QUESTION OF PALESTINE
THE SITUATION IN THE MIDDLE EAST
  Letter dated 28 November 1988 from the Permanent Representative of
    Malta to the United Nations addressed to the Secretary-General

I have the honour to transmit herewith the text of the statement
issued by the Government of Malta on 16 November 1988 concerning the
decision by the Palestine National Council, at its extraordinary
session in Algiers on 15 November 1988, to proclaim the establishment
of an independent Palestinian State.

"The Maltese Government:

"1. Reaffirms its recognition of the right of the Palestinian people
to a state of their own.

"2. Welcomes the declaration of independence made in Algiers on 15
November 1988 and acknowledges this declaration as a true and genuine
expression of the right of the Palestinian people to a state of their
own.

"3. Considers the said declaration of independence as an opportunity
for a negotiated peaceful settlement which should not be missed.

"4. Welcomes the endorsement of resolution 242 as a very positive
step towards a just and peaceful settlement".

I should be grateful if you would arrange for the text of this letter
to be circulated as a document of the General Assembly, under agenda
items 37 and 40, and of the Security Council.

                    (Signed) Dr. Alexander BORG OLIVIER
                              Ambassador
                       Permanent Representative

## PLO-Israel Letters of Mutual Recognition

**Exchange of Letters between PLO Chairman Yasser Arafat & Israeli Prime Minister Yitzhak Rabin**

**Letter from Chairman Yasser Arafat to Prime Minister Rabin:**

September 9, 1993
Yitzhak Rabin
Prime Minister of Israel

Mr. Prime Minister,

The signing of the Declaration of Principles marks a new era in the history of the Middle East. In firm conviction thereof, I would like to confirm the following PLO commitments:

The PLO recognizes the right of the State of Israel to exist in peace and security.

The PLO accepts United Nations Security Council Resolutions 242 and 338.

The PLO commits itself to the Middle East peace process and to a peaceful resolution of the conflict between the two sides and declares that all outstanding issues relating to permanent status will be resolved through negotiations.

The PLO considers that the signing of the Declaration of Principles constitutes a historic event, inaugurating a new epoch of peaceful coexistence, free from violence and all other acts which will endanger peace and stability. Accordingly, the PLO renounces the use of terrorism and other acts of violence and will assume responsibility over all PLO elements and personnel in order to assure their compliance prevent violations and discipline violators.

In view of the promise of a new era and the signing of the Declaration of Principles and based on Palestinian acceptance of Security Council Resolutions 242 and 338, the PLO affirms that those articles of the Palestinian Covenant which deny Israel's right to exist, and the provisions of the Covenant which are inconsistent with the commitments of this letter are now inoperative and no longer valid. Consequently, the PLO undertakes to submit to the Palestinian National Council for formal approval the necessary changes in regard to the Palestinian Covenant.

Sincerely,

Yasser Arafat
Chairman
The Palestine Liberation Organization

**<u>Letter from Prime Minister Rabin to Yasser Arafat</u>**

September 9, 1993

Yasser Arafat
Chairman
The Palestine Liberation Organization

Mr. Chairman,

In response to your letter of September 9, 1993, I wish to inform you that, in light of the PLO commitments included in your letter, the Government of Israel has decided to recognize the PLO as the representative of the Palestinian people and commence negotiations with the PLO within the Middle East peace process.

Yitzhak Rabin
Prime Minister of Israel

UNISPAL-select || UNISPAL Home || Printer-friendly (pdf)||
Arabic||Chinese||French||Russian||Spanish||

# UNITED NATIONS

**A S**



## General Assembly
## Security Council

A/48/486
S/26560
11 October 1993

| | |
|---|---|
| GENERAL ASSEMBLY | SECURITY COUNCIL |
| Forty-eighth session | Forty-eighth year |
| Agenda item 10 | |

REPORT OF THE SECRETARY-GENERAL ON
THE WORK OF THE ORGANIZATION

<u>Letter dated 8 October 1993 from the Permanent Representatives
of the Russian Federation and the United States of America to
the United Nations addressed to the Secretary-General</u>

As co-sponsors of the peace process launched at Madrid in October
1991 and witnesses to the signing at Washington, D.C., on 13
September 1993 of the Declaration of Principles on Interim Self-
Government Arrangements, including its Annexes, and its Agreed
Minutes, by the Government of the State of Israel and the Palestine
Liberation Organization, we have the honour to enclose the above
document (see annex).

We would be grateful if you would have the present letter and its
attachment circulated as an official document of the forty-eighth
session of the General Assembly, under agenda item 10, and of the
Security Council.

| | |
|---|---|
| (<u>Signed</u>) Madeleine K. ALBRIGHT | <u>Signed</u>) Yuliy M. VORONTSOV |
| Ambassador | Ambassador |
| Permanent Representative | Permanent Representative |
| to the United Nations of the | to the United Nations of |
| United States of America | the Russian Federation |

93-54838 (E) 121093

A/48/486-S/26560 of 11 October 1993

<u>Letter dated 8 October 1993 from the Permanent
Representative of Israel to the United Nations
addressed to the Secretary-General</u>

I have the honour to enclose the Declaration of Principles on Interim
Self-Government Arrangements, including its Annexes, and its Agreed
Minutes, signed at Washington, D.C., on 13 September 1993 by the
Government of the State of Israel and the Palestine Liberation
Organization and witnessed by the United States of America and the
Russian Federation (see annex).

I would be grateful if you would have the present letter and its
attachment circulated as an official document of the forty-eighth
session of the General Assembly, under agenda item 10, and of the
Security Council.

(Signed) Gad YAACOBI
Ambassador
Permanent Representative

<u>Letter dated 8 October 1993 from the Permanent
Observer of Palestine to the United Nations
addressed to the Secretary-General</u>

I have the honour to enclose the Declaration of Principles on Interim
Self-Government Arrangements, including its Annexes, and its Agreed
Minutes, signed at Washington, D.C., on 13 September 1993 by the
Government of the State of Israel and the Palestine Liberation
Organization and witnessed by the United States of America and the
Russian Federation (see annex).

I would be grateful if you would have the present letter and its
attachment circulated as an official document of the forty-eighth
session of the General Assembly, under agenda item 10, and of the
Security Council.

(Signed) Dr. Nasser AL-KIDWA
Permanent Observer of Palestine
to the United Nations

ANNEX

<u>Declaration of Principles on Interim
Self-Government Arrangements</u>

Case 1:00-cv-00105-L-DLM Document 178   Filed 06/17/03   Page 53 of 131 PageID #: 12521

The Government of the State of Israel and the PLO team (in the Jordanian-Palestinian delegation to the Middle East Peace Conference) (the "Palestinian Delegation"), representing the Palestinian people, agree that it is time to put an end to decades of confrontation and conflict, recognize their mutual legitimate and political rights, and strive to live in peaceful coexistence and mutual dignity and security and achieve a just, lasting and comprehensive peace settlement and historic reconciliation through the agreed political process. Accordingly, the two sides agree to the following principles:

## Article I

### AIM OF THE NEGOTIATIONS

The aim of the Israeli-Palestinian negotiations within the current Middle East peace process is, among other things, to establish a Palestinian Interim Self-Government Authority, the elected Council (the "Council"), for the Palestinian people in the West Bank and the Gaza Strip, for a transitional period not exceeding five years, leading to a permanent settlement based on Security Council resolutions 242 (1967) and 338 (1973). It is understood that the interim arrangements are an integral part of the whole peace process and that the negotiations on the permanent status will lead to the implementation of Security Council resolutions 242 (1967) and 338 (1973).

## Article II

### FRAMEWORK FOR THE INTERIM PERIOD

The agreed framework for the interim period is set forth in this Declaration of Principles.

## Article III

### ELECTIONS

1. In order that the Palestinian people in the West Bank and Gaza Strip may govern themselves according to democratic principles, direct, free and general political elections will be held for the Council under agreed supervision and international observation, while the Palestinian police will ensure public order.

2. An agreement will be concluded on the exact mode and conditions of the elections in accordance with the protocol attached as Annex I, with the goal of holding the elections not later than nine months after the entry into force of this Declaration of Principles.

3. These elections will constitute a significant interim preparatory

step toward the realization of the legitimate rights of the Palestinian people and their just requirements.

## Article IV

### JURISDICTION

Jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations. The two sides view the West Bank and the Gaza Strip as a single territorial unit, whose integrity will be preserved during the interim period.

## Article V

### TRANSITIONAL PERIOD AND PERMANENT STATUS NEGOTIATIONS

1. The five-year transitional period will begin upon the withdrawal from the Gaza Strip and Jericho area.

2. Permanent status negotiations will commence as soon as possible, but not later than the beginning of the third year of the interim period, between the Government of Israel and the Palestinian people's representatives.

3. It is understood that these negotiations shall cover remaining issues, including: Jerusalem, refugees, settlements, security arrangements, borders, relations and cooperation with other neighbours, and other issues of common interest.

4. The two parties agree that the outcome of the permanent status negotiations should not be prejudiced or preempted by agreements reached for the interim period.

## Article VI

### PREPARATORY TRANSFER OF POWERS AND RESPONSIBILITIES

1. Upon the entry into force of this Declaration of Principles and the withdrawal from the Gaza Strip and the Jericho area, a transfer of authority from the Israeli military government and its Civil Administration to the authorized Palestinians for this task, as detailed herein, will commence. This transfer of authority will be of a preparatory nature until the inauguration of the Council.

2. Immediately after the entry into force of this Declaration of Principles and the withdrawal from the Gaza Strip and Jericho area, with the view to promoting economic development in the West Bank and Gaza Strip, authority will be transferred to the Palestinians in the following spheres: education and culture, health, social welfare,

A/48/486-S/26560 of 11 October 1993

direct taxation and tourism. The Palestinian side will commence in building the Palestinian police force, as agreed upon. Pending the inauguration of the Council, the two parties may negotiate the transfer of additional powers and responsibilities, as agreed upon.

## Article VII

### INTERIM AGREEMENT

1. The Israeli and Palestinian delegations will negotiate an agreement on the interim period (the "Interim Agreement").

2. The Interim Agreement shall specify, among other things, the structure of the Council, the number of its members, and the transfer of powers and responsibilities from the Israeli military government and its Civil Administration to the Council. The Interim Agreement shall also specify the Council's executive authority, legislative authority in accordance with Article IX below, and the independent Palestinian judicial organs.

3. The Interim Agreement shall include arrangements, to be implemented upon the inauguration of the Council, for the assumption by the Council of all of the powers and responsibilities transferred previously in accordance with Article VI above.

4. In order to enable the Council to promote economic growth, upon its inauguration, the Council will establish, among other things, a Palestinian Electricity Authority, a Gaza Sea Port Authority, a Palestinian Development Bank, a Palestinian Export Promotion Board, a Palestinian Environmental Authority, a Palestinian Land Authority and a Palestinian Water Administration Authority and any other Authorities agreed upon, in accordance with the Interim Agreement, that will specify their powers and responsibilities.

5. After the inauguration of the Council, the Civil Administration will be dissolved, and the Israeli military government will be withdrawn.

## Article VIII

### PUBLIC ORDER AND SECURITY

In order to guarantee public order and internal security for the Palestinians of the West Bank and the Gaza Strip, the Council will establish a strong police force, while Israel will continue to carry the responsibility for defending against external threats, as well as the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

## Article IX

## LAWS AND MILITARY ORDERS

1. The Council will be empowered to legislate, in accordance with the Interim Agreement, within all authorities transferred to it.

2. Both parties will review jointly laws and military orders presently in force in remaining spheres.

### Article X

## JOINT ISRAELI-PALESTINIAN LIAISON COMMITTEE

In order to provide for a smooth implementation of this Declaration of Principles and any subsequent agreements pertaining to the interim period, upon the entry into force of this Declaration of Principles, a Joint Israeli-Palestinian Liaison Committee will be established in order to deal with issues requiring coordination, other issues of common interest and disputes.

### Article XI

## ISRAELI-PALESTINIAN COOPERATION IN ECONOMIC FIELDS

Recognizing the mutual benefit of cooperation in promoting the development of the West Bank, the Gaza Strip and Israel, upon the entry into force of this Declaration of Principles, an Israeli-Palestinian Economic Cooperation Committee will be established in order to develop and implement in a cooperative manner the programmes identified in the protocols attached as Annex III and Annex IV.

### Article XII

## LIAISON AND COOPERATION WITH JORDAN AND EGYPT

The two parties will invite the Governments of Jordan and Egypt to participate in establishing further liaison and cooperation arrangements between the Government of Israel and the Palestinian representatives, on the one hand, and the Governments of Jordan and Egypt, on the other hand, to promote cooperation between them. These arrangements will include the constitution of a Continuing Committee that will decide by agreement on the modalities of admission of persons displaced from the West Bank and Gaza Strip in 1967, together with necessary measures to prevent disruption and disorder. Other matters of common concern will be dealt with by this Committee.

### Article XIII

## REDEPLOYMENT OF ISRAELI FORCES

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 57 of 131 PageID #: 12525

1. After the entry into force of this Declaration of Principles, and not later than the eve of elections for the Council, a redeployment of Israeli military forces in the West Bank and the Gaza Strip will take place, in addition to withdrawal of Israeli forces carried out in accordance with Article XIV.

2. In redeploying its military forces, Israel will be guided by the principle that its military forces should be redeployed outside populated areas.

3. Further redeployments to specified locations will be gradually implemented commensurate with the assumption of responsibility for public order and internal security by the Palestinian police force pursuant to Article VIII above.

## Article XIV

### ISRAELI WITHDRAWAL FROM THE GAZA STRIP AND JERICHO AREA

Israel will withdraw from the Gaza Strip and Jericho area, as detailed in the protocol attached as Annex II.

## Article XV

### RESOLUTION OF DISPUTES

1. Disputes arising out of the application or interpretation of this Declaration of Principles, or any subsequent agreements pertaining to the interim period, shall be resolved by negotiations through the Joint Liaison Committee to be established pursuant to Article X above.

2. Disputes which cannot be settled by negotiations may be resolved by a mechanism of conciliation to be agreed upon by the parties.

3. The parties may agree to submit to arbitration disputes relating to the interim period, which cannot be settled through conciliation. To this end, upon the agreement of both parties, the parties will establish an Arbitration Committee.

## Article XVI

### ISRAELI-PALESTINIAN COOPERATION CONCERNING REGIONAL PROGRAMMES

Both parties view the multilateral working groups as an appropriate instrument for promoting a "Marshall Plan", the regional programmes and other programmes, including special programmes for the West Bank and Gaza Strip, as indicated in the protocol attached as Annex IV.

## Article XVII

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 58 of 131 PageID #: 12526

MISCELLANEOUS PROVISIONS

1. This Declaration of Principles will enter into force one month after its signing.

2. All protocols annexed to this Declaration of Principles and Agreed Minutes pertaining thereto shall be regarded as an integral part hereof.

DONE at Washington, D.C., this thirteenth day of September 1993.

For the Government of Israel:                    For the PLO:

(Signed) Shimon PERES              (Signed) Mahmud ABBAS

Witnessed by:

The United States of America              The Russian Federation

(Signed) Warren CHRISTOPHER        (Signed) Andrei V. KOZYREV

ANNEX I

Protocol on the Mode and Conditions of Elections

1. Palestinians of Jerusalem who live there will have the right to participate in the election process, according to an agreement between the two sides.

2. In addition, the election agreement should cover, among other things, the following issues:

(a) The system of elections;

(b) The mode of the agreed supervision and international observation and their personal composition;

(c) Rules and regulations regarding election campaigns, including agreed arrangements for the organizing of mass media, and the possibility of licensing a broadcasting and television station.

3. The future status of displaced Palestinians who were registered on 4 June 1967 will not be prejudiced because they are unable to participate in the election process owing to practical reasons.

ANNEX II

## Protocol on Withdrawal of Israeli Forces from the Gaza Strip and Jericho Area

1. The two sides will conclude and sign within two months from the date of entry into force of this Declaration of Principles an agreement on the withdrawal of Israeli military forces from the Gaza Strip and Jericho area. This agreement will include comprehensive arrangements to apply in the Gaza Strip and the Jericho area subsequent to the Israeli withdrawal.

2. Israel will implement an accelerated and scheduled withdrawal of Israeli military forces from the Gaza Strip and Jericho area, beginning immediately with the signing of the agreement on the Gaza Strip and Jericho area and to be completed within a period not exceeding four months after the signing of this agreement.

3. The above agreement will include, among other things:

(a) Arrangements for a smooth and peaceful transfer of authority from the Israeli military government and its Civil Administration to the Palestinian representatives;

(b) Structure, powers and responsibilities of the Palestinian authority in these areas, except: external security, settlements, Israelis, foreign relations and other mutually agreed matters;

(c) Arrangements for the assumption of internal security and public order by the Palestinian police force consisting of police officers recruited locally and from abroad (holding Jordanian passports and Palestinian documents issued by Egypt). Those who will participate in the Palestinian police force coming from abroad should be trained as police and police officers;

(d) A temporary international or foreign presence, as agreed upon;

(e) Establishment of a joint Palestinian-Israeli Coordination and Cooperation Committee for mutual security purposes;

(f) An economic development and stabilization programme including the establishment of an Emergency Fund, to encourage foreign investment and financial and economic support. Both sides will coordinate and cooperate jointly and unilaterally with regional and international parties to support these aims;

(g) Arrangements for a safe passage for persons and transportation between the Gaza Strip and Jericho area.

4. The above agreement will include arrangements for coordination

between both parties regarding passages:

(a) Gaza - Egypt;

(b) Jericho - Jordan.

5. The offices responsible for carrying out the powers and responsibilities of the Palestinian authority under this Annex II and Article VI of the Declaration of Principles will be located in the Gaza Strip and in the Jericho area pending the inauguration of the Council.

6. Other than these agreed arrangements, the status of the Gaza Strip and Jericho area will continue to be an integral part of the West Bank and Gaza Strip, and will not be changed in the interim period.

ANNEX III

## Protocol on Israeli-Palestinian Cooperation in Economic and Development Programmes

The two sides agree to establish an Israeli-Palestinian Continuing Committee for Economic Cooperation, focusing, among other things, on the following:

1. Cooperation in the field of water, including a Water Development Programme prepared by experts from both sides, which will also specify the mode of cooperation in the management of water resources in the West Bank and Gaza Strip, and will include proposals for studies and plans on water rights of each party, as well as on the equitable utilization of joint water resources for implementation in and beyond the interim period.

2. Cooperation in the field of electricity, including an Electricity Development Programme, which will also specify the mode of cooperation for the production, maintenance, purchase and sale of electricity resources.

3. Cooperation in the field of energy, including an Energy Development Programme, which will provide for the exploitation of oil and gas for industrial purposes, particularly in the Gaza Strip and in the Negev, and will encourage further joint exploitation of other energy resources. This Programme may also provide for the construction of a petrochemical industrial complex in the Gaza Strip and the construction of oil and gas pipelines.

4. Cooperation in the field of finance, including a Financial Development and Action Programme for the encouragement of international investment in the West Bank and the Gaza Strip, and in Israel, as well as the establishment of a Palestinian Development

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 61 of 131 PageID #:
12529
A/48/486-S/26560 of 11 October 1993                                           Page 11 of 15

Bank.

5. Cooperation in the field of transport and communications, including a Programme, which will define guidelines for the establishment of a Gaza Sea Port Area, and will provide for the establishing of transport and communications lines to and from the West Bank and the Gaza Strip to Israel and to other countries. In addition, this Programme will provide for carrying out the necessary construction of roads, railways, communications lines, etc.

6. Cooperation in the field of trade, including studies, and Trade Promotion Programmes, which will encourage local, regional and interregional trade, as well as a feasibility study of creating free trade zones in the Gaza Strip and in Israel, mutual access to these zones and cooperation in other areas related to trade and commerce.

7. Cooperation in the field of industry, including Industrial Development Programmes, which will provide for the establishment of joint Israeli-Palestinian Industrial Research and Development Centres, will promote Palestinian-Israeli joint ventures, and provide guidelines for cooperation in the textile, food, pharmaceutical, electronics, diamonds, computer and science-based industries.

8. A Programme for cooperation in, and regulation of, labour relations and cooperation in social welfare issues.

9. A Human Resource Development and Cooperation Plan, providing for joint Israeli-Palestinian workshops and seminars, and for the establishment of joint vocational training centres, research institutes and data banks.

10. An Environmental Protection Plan, providing for joint and/or coordinated measures in this sphere.

11. A Programme for developing coordination and cooperation in the field of communications and media.

12. Any other programmes of mutual interest.

ANNEX IV

## Protocol on Israeli-Palestinian Cooperation concerning Regional Development Programmes

1. The two sides will cooperate in the context of the multilateral peace efforts in promoting a Development Programme for the region, including the West Bank and the Gaza Strip, to be initiated by the Group of Seven. The parties will request the Group of Seven to seek the participation in this Programme of other interested States, such as members of the Organisation for Economic Cooperation and

Development, regional Arab States and institutions, as well as members of the private sector.

2. The Development Programme will consist of two elements:

(a) An Economic Development Programme for the West Bank and the Gaza Strip;

(b) A Regional Economic Development Programme.

A. The Economic Development Programme for the West Bank and the Gaza Strip will consist of the following elements:

(1) A Social Rehabilitation Programme, including a Housing and Construction Programme;

(2) A Small and Medium Business Development Plan;

(3) An Infrastructure Development Programme (water, electricity, transportation and communications, etc.);

(4) A Human Resources Plan;

(5) Other programmes.

B. The Regional Economic Development Programme may consist of the following elements:

(1) The establishment of a Middle East Development Fund, as a first step, and a Middle East Development Bank, as a second step;

(2) The development of a joint Israeli-Palestinian-Jordanian Plan for coordinated exploitation of the Dead Sea area;

(3) The Mediterranean Sea (Gaza) - Dead Sea Canal;

(4) Regional desalinization and other water development projects;

(5) A regional plan for agricultural development, including a coordinated regional effort for the prevention of desertification;

(6) Interconnection of electricity grids;

(7) Regional cooperation for the transfer, distribution and industrial exploitation of gas, oil and other energy resources;

(8) A Regional Tourism, Transportation and Telecommunications Development Plan;

(9) Regional cooperation in other spheres.

3. The two sides will encourage the multilateral working groups and will coordinate towards their success. The two parties will encourage inter-sessional activities, as well as pre-feasibility and feasibility studies, within the various multilateral working groups.

### Agreed Minutes to the Declaration of Principles on Interim Self-Government Arrangements

## A. GENERAL UNDERSTANDINGS AND AGREEMENTS

Any powers and responsibilities transferred to the Palestinians pursuant to the Declaration of Principles prior to the inauguration of the Council will be subject to the same principles pertaining to Article IV, as set out in these Agreed Minutes below.

## B. SPECIFIC UNDERSTANDINGS AND AGREEMENTS

### Article IV

It is understood that:

1. Jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, military locations and Israelis.

2. The Council's jurisdiction will apply with regard to the agreed powers, responsibilities, spheres and authorities transferred to it.

### Article VI (2)

It is agreed that the transfer of authority will be as follows:

1. The Palestinian side will inform the Israeli side of the names of the authorized Palestinians who will assume the powers, authorities and responsibilities that will be transferred to the Palestinians according to the Declaration of Principles in the following fields: education and culture, health, social welfare, direct taxation, tourism and any other authorities agreed upon.

2. It is understood that the rights and obligations of these offices will not be affected.

3. Each of the spheres described above will continue to enjoy existing budgetary allocations in accordance with arrangements to be mutually agreed upon. These arrangements also will provide for the necessary adjustments required in order to take into account the taxes collected by the direct taxation office.

4. Upon the execution of the Declaration of Principles, the Israeli and Palestinian delegations will immediately commence negotiations on a detailed plan for the transfer of authority on the above offices in accordance with the above understandings.

### Article VII (2)

The Interim Agreement will also include arrangements for coordination and cooperation.

### Article VII (5)

The withdrawal of the military government will not prevent Israel from exercising the powers and responsibilities not transferred to the Council.

### Article VIII

It is understood that the Interim Agreement will include arrangements for cooperation and coordination between the two parties in this regard. It is also agreed that the transfer of powers and responsibilities to the Palestinian police will be accomplished in a phased manner, as agreed in the Interim Agreement.

### Article X

It is agreed that, upon the entry into force of the Declaration of Principles, the Israeli and Palestinian delegations will exchange the names of the individuals designated by them as members of the Joint Israeli-Palestinian Liaison Committee. It is further agreed that each side will have an equal number of members in the Joint Committee. The Joint Committee will reach decisions by agreement. The Joint Committee may add other technicians and experts, as necessary. The Joint Committee will decide on the frequency and place or places of its meetings.

### ANNEX II

It is understood that, subsequent to the Israeli withdrawal, Israel will continue to be responsible for external security, and for internal security and public order of settlements and Israelis. Israeli military forces and civilians may continue to use roads freely within the Gaza Strip and the Jericho area.

DONE at Washington, D.C., this thirteenth day of September 1993.

For the Government of Israel:                   For the PLO:

(                                    (
(Signed) Shimon PERES          (Signed) Mahmud ABBAS

Witnessed By:

The United States of America          The Russian Federation
(Signed) Warren CHRISTOPHER      (Signed) Andrei V. KOZYREV

-----

# PROTOCOL ON ECONOMIC RELATIONS BETWEEN THE GOVERNMENT OF ISRAEL AND THE PLO

Paris
29 April 1994

## PREAMBLE

The two parties view the economic domain as one of the cornerstone in their mutual relations with a view to enhance their interest in the achievement of a just, lasting and comprehensive peace. Both parties shall cooperate in this field in order to establish a sound economic base for these relations, which will be governed in various economic spheres by the principles of mutual respect of each other's economic interests, reciprocity, equity and fairness.

This protocol lays the groundwork for strengthening the economic base of the Palestinian side and for exercising its right of economic decision making in accordance with its own development plan and priorities. The two parties recognise each other's economic ties with other markets and the need to create a better economic environment for their peoples and individuals.

## Article I
### FRAMEWORK AND SCOPE OF THIS PROTOCOL

1. This protocol establishes the contractual agreement that will govern the economic relations between the two sides and will cover the West Bank and the Gaza Strip during the interim period. The implementation will be according to the stages envisaged in the Declaration of Principles on Interim Self Government Arrangements signed in Washington D.C. on September 13, 1993 and the Agreed Minutes thereto. It will therefore begin in the Gaza Strip and the Jericho Area and at a later stage will also apply to the rest of the West Bank, according to the provisions of the Interim Agreement and to any other agreed arrangements between the two sides.
2. This Protocol, including its Appendixes, will be incorporated into the Agreement on the Gaza Strip and the Jericho Area (in this Protocol - the Agreement), will be an integral part thereof and interpreted accordingly. This paragraph refers solely to the Gaza Strip and the Jericho Area.
3. This Protocol will come into force upon the signing of the Agreement.
4. For the purpose of this Protocol, the term "Areas" means the areas under the jurisdiction of the Palestinian Authority, according to the provisions of the Agreement regarding territorial jurisdiction. The Palestinian Jurisdiction in the subsequent agreements could cover areas, spheres or functions according to the Interim Agreement. Therefore, for the purpose of this Protocol, whenever applied, the term "Areas" shall be interpreted to mean functions and spheres also, as the case may be, with the necessary adjustments.

## Article II
### THE JOINT ECONOMIC COMMITTEE

1. Both parties will establish a Palestinian-Israeli Joint Economic Committee (hereinafter - the JEC) to follow up the implementation of this Protocol and to decide on problems related to it that may arise from time to time. Each side may request the review of any issue related to this Agreement by the JEC.
2. The JEC will serve as the continuing committee for economic cooperation envisaged in Annex III of the Declaration of Principles.
3. The JEC will consist of an equal number of members from each side and may establish sub-committees specified in this Protocol.
   A sub-committee may include experts as necessary.
4. The JEC and its sub-committees shall reach their decisions by agreement and shall determine their rules of procedure and operation, including the frequency and place or places of their meetings.

Article III
IMPORT TAXES AND IMPORT POLICY

1. The import and customs policies of both sides will be according to the principles and arrangements detailed in this Article.
   a. The Palestinian Authority will have all powers and responsibilities in the sphere of import and customs policy and procedures with regard to the following:
      a. Goods on List Al, attached hereto as Appendix I locally-produced in Jordan and in Egypt particularly and in the other Arab countries, which the Palestinians will be able to import in quantities agreed upon by the two sides up to the Palestinian market needs as estimated according to para 3 below.
      b. Goods on List A2, attached hereto as Appendix II, from the Arab, Islamic and other countries, which the Palestinians will be able to import in quantities agreed upon by the two sides up to the Palestinian market needs as estimated according to para 3 below.
   b. The import policy of the Palestinian Authority for Lists Al and A2 will include independently determining and changing from time to time the rates of customs, purchase tax, levies, excises and other charges, the regulation of licensing requirements and procedures and of standard requirements. The valuation for custom purposes will be based upon the GATT 1994 agreement as of the date it will be introduced in Israel, and until then — on the Brussels Definition of Valuation (BDV) system. The classification of goods will be based on the principles of "the Harmonized Commodity Description and Coding System". Concerning imports referred to in Article VII of this Protocol (Agriculture), the provisions of that Article will apply.
2. For the purposes of para 2(a) above, the Palestinian market needs for 1994 will be estimated by a sub-committee of experts. These estimates will be based on the best available data regarding past consumption, production, investment and external trade of the Areas. The sub-committee will submit its estimate within three months from the signing of the Agreement. These estimates will be reviewed and updated every six months by the sub-committee, on the basis of the best data available regarding the latest period for which relevant data are available, taking into consideration all relevant economic and social indicators. Pending an agreement on the Palestinian market needs, the previous period's estimates adjusted for population growth and rise in per-capita GNP in the previous period, will serve as provisional estimate.
3. The Palestinian Authority will have all powers and responsibilities to independently determine and change from time to time the rates of customs, purchase taxes; levies, excises and other charges on the goods on List B, attached hereto as Appendix III, of basic food items and other goods for the Palestinian economic development program, imported by the Palestinians to the Areas.
   a. With respect to all goods not specified in Lists Al, A2 and B, and with respect to quantities exceeding those determined in accordance with paras 2(a) & 3 above (hereinafter - the Quantities), the Israeli rates of customs, purchase tax, levies, excises and other charges, prevailing at the date of signing of the Agreement , as changed from time to time, shall serve as the minimum basis for the Palestinian Authority. The Palestinian Authority may decide on any upward changes in the rates on these goods and exceeding quantities when imported by the Palestinians to the Areas.
   b. With respect to all goods not specified in Lists A1 and A2, and with respect to quantities exceeding the Quantities, Israel and the Palestinian Authority will employ for all imports the same system of importation, as stipulated in para 10 below, including inter alia standards, licensing, country of origin, valuation for customs purposes etc.
4. Each side will notify the other side immediately of changes made in rates and in other matters of import policy, regulations and procedures, determined by it within its respective powers and responsibilities as detailed in this Article. With regard to changes which do not require immediate application upon decision, there will be a process of advance notifications and mutual consultations which will take into consideration all aspects and economic implications.
5. The Palestinian Authority will levy VAT at one rate on both locally produced goods and services and on imports by the Palestinians (whether covered by the three Lists mentioned above or not), and may fix it at the level of 15% to 16%.
6. Goods imported from Jordan, Egypt and other Arab countries according to para 2(a)(1) above (List Al) will comply with rules of origin agreed upon by a joint sub-committee within three months of the date of the

signing of the Agreement. Pending an agreement, goods will be considered to have been "locally produced" in any of those countries if they conform with all the following:

   a.  They have been wholly grown, produced, or manufactured in that country, or have been substantially transformed there into new or different goods, having a new name, character, or use, distinct from the goods or materials from which they were so transformed;

   b.  They have been imported directly from the said country;

   c.  The value or the costs of the materials produced in that country, plus the direct processing costs in it, do not fall short of 30 percent of the export value of the goods. This rate may be reviewed by the joint committee mentioned in para 16 a year after the signing of the Agreement.

   d.  The goods are accompanied by an internationally recognized certificate of origin;

   e.  No goods will be deemed as substantially new or different goods, and no material will be eligible for inclusion as domestic content, by virtue of having merely undergone simple combining or packaging, or dilution with water or other substances, which do not materially alter the characteristics of the said goods.

vii.  Each side will issue import licences to its own importers, subject to the principles of this Article and will be responsible for the implementation of the licensing requirements and procedures prevailing at the time of the issuance of the licenses. Mutual arrangements will be made for the exchange of information relevant to licensing matters.

viii.  Except for the goods on Lists Al and A2 and their Quantities — in which the Palestinian Authority has all powers and responsibilities, both sides will maintain the same import policy (except for rates of import taxes and other charges for goods in List B) and regulations including classification, valuation and other customs procedures, which are based on the principles governing international codes, and the same policies of import licensing and of standards for imported goods, all as applied by Israel with respect to its importation. Israel may from time to time introduce changes in any of the above, provided that changes in standard requirements will not constitute a non-tariff-barrier and will be based on considerations of health, safety and the protection of the environment in conformity with Article 2.2. of the Agreement on Technical Barriers to trade of the Final Act of the Uruguay Round of Trade Negotiations. Israel will give the Palestinian Authority prior notice of any such changes, and the provisions of para 6 above will apply.

   a.  The Palestinian Authority will determine its own rates of customs and purchase tax on motor vehicles imported as such, to be registered with the Palestinian Authority. The vehicle standards will be those applied at the date of the signing of the Agreement as changed according to para 10 above. However, the Palestinian Authority may request, through the sub-committee on transportation, that in special cases different standards will apply. Used motor vehicles will be imported only if they are passenger cars or dual-purpose passenger cars of a model of no more than three years prior to the importation year. The sub-committee on transportation will determine the procedures for testing and confirming that such used cars comply with the standards' requirements for that model year. The issue of importing commercial vehicles of a model prior to the importation year will be discussed in the joint sub-committee mentioned in para 16 below.

   b.  Each side may determine the terms and conditions for the transfer of motor vehicles registered on the other side to the ownership or use of a resident of its own side, including the payment of the difference of import taxes, if any, and the vehicle having been tested and found compatible with the standards required at that time by its own registration administration, and may prohibit transfer of vehicles.

   a.  Jordanian standards, as specified in the attached Appendix I, will be acceptable in importing petroleum products into the Areas, once they meet the average of the standards existing in the European Union countries, or the USA standards, which parameters have been set at the values prescribed for the geographical conditions of Israel, the Gaza Strip and the West Bank. Cases of petroleum products which do not meet these specifications will be referred to a joint experts' committee for a suitable solution. The committee may mutually decide to accept different standards for the importation of gasoline which meet the Jordanian standards even though, in some of their parameters, they do not meet the European Community or USA standards. The committee will give its decision within six months. Pending the committee's decision, and for not longer than six months of the signing of the Agreement, the Palestinian Authority may import to the Areas, gasoline for the Palestinian market in the Areas, according to the needs of this market, provided that:

      a.  this gasoline is marked in a distinctive colour to differentiate it from the gasoline marketed in Israel; and

   b. the Palestinian Authority will take all the necessary steps to ensure that this gasoline is not marketed in Israel.

   b. The difference in the final price of gasoline to consumers in Israel and to consumers in the Areas, will not exceed 15% of the official final consumer price in Israel. The Palestinian Authority has the right to determine the prices of petroleum products, other than gasoline, for consumption in the Areas.

   c. If Egyptian gasoline standards will comply with the conditions of sub-para (a) above, the importation of Egyptian gasoline will also be allowed.

i. In addition to the points of exit and entry designated according to the Article regarding Passages in Annex I of the Agreement for the purpose of export and import of goods, the Palestinian side has the right to use all points of exit and entry in Israel designated for that purpose. The import and export of the Palestinians through the points of exit and entry in Israel will be given equal trade and economic treatment.

j. In the entry points of the Jordan River and the Gaza Strip:

   a. Freight shipment
      The Palestinian Authority will have full responsibility and powers in the Palestinian customs points (freight-area) for the implementation of the agreed upon customs and importation policy as specified in this protocol, including the inspection and the collection of taxes and other charges, when due. Israeli customs officials will be present and will receive from the Palestinian customs officials a copy of the necessary relevant documents related to the specific shipment and will be entitled to ask for inspection in their presence of both goods and tax collection.
      The Palestinian customs officials will be responsible for the handling of the customs procedure including the inspection and collection of due taxes.
      In case of disagreement on the clearance of any shipment according to this Article, the shipment will be delayed for inspection for a maximum period of 48 hours during which a joint sub-committee will resolve the issue on the basis of the relevant provisions of this Article. The shipment will be released only upon the sub-committee's decision.

   b. Passengers customs lane

   Each side will administer its own passengers customs procedures, including inspection and tax collection. The inspection and collection of taxes due in the Palestinian customs lane will be conducted by customs officials of the Palestinian Authority.
   Israeli customs officials will be invisibly present in the Palestinian customs lane and entitled to request inspection of goods and collection of taxes when due. In the case of suspicion, the inspection will be carried out by the Palestinian official in a separate room in the presence of the Israeli customs official.

k. The clearance of revenues from all import taxes and levies, between Israel and the Palestinian Authority, will be based on the principle of the place of final destination. In addition, these tax revenues will be allocated to the Palestinian Authority even if the importation was carried out by Israeli importers when the final destination explicitly stated in the import documentation is a corporation registered by the Palestinian Authority and conducting business activity in the Areas. This revenue clearance will be effected within six working days from the day of collection of the said taxes and levies.

l. The Joint Economic Committee or a sub-committee established by it for the purposes of this Article will deal inter alia with the following:

   @. Palestinian proposals for addition of items to Lists A1, A2 and B. Proposals for changes in rates and in import procedures, classification, standards and licensing requirements for all other imports;

   a. Estimate the Palestinian market needs, as mentioned in para 3 above;

   b. Receive notifications of changes and conduct consultations, as mentioned in para 6 above;

   c. Agree upon the rules of origin as mentioned in para 8 above, and review their implementation;

   d. Coordinate the exchange of information relevant to licensing matters as mentioned in para 9 above;

   e. Discuss and review any other matters concerning the implementation of this Article and resolve problems arising therefrom.

13. The Palestinian Authority will have the right to exempt the Palestinian returnees who will be granted permanent residency in the Areas from import taxes on personal belongings including house appliances and passenger cars as long as they are for personal use.

14. The Palestinian Authority will develop its system for temporary entry of needed machines and vehicles

used for the Palestinian Authority and the Palestinian economic development plan.
Concerning other machines and equipment, not included in Lists A1, A2 and B, the temporary entry will be
part of the import policy as agreed in para 10 above, until the joint sub-committee mentioned in para 16
decides upon a new system proposed by the Palestinian Authority. The temporary entry will be coordinated
through the joint sub-committee.

15. Donations in kind to the Palestinian Authority will be exempted from customs and other import taxes if
destined and used for defined development projects or non-commercial humanitarian purposes. The
Palestinian Authority will be responsible exclusively for planning and management of the donors'
assistance to the Palestinian people. The Joint Economic Committee will discuss issues pertaining to the
relations between the provisions in this Article and the implementation of the principles in the above
paragraph.

## Article IV
## MONETARY AND FINANCIAL ISSUES

1. The Palestinian Authority will establish a Monetary Authority (PMA) in the Areas. The PMA will have the
powers and responsibilities for the regulation and implementation of the monetary policies within the
functions described in this Article.
2. The PMA will act as the Palestinian Authority's official economic and financial advisor.
3. The PMA will act as the Palestinian Authority's and the public sector entities' sole financial agent, locally
and internationally.
4. The foreign currency reserves (including gold) of the Palestinian Authority and all Palestinian public sector
entities will be deposited solely with the PMA and managed by it.
5. The PMA will act as the lender of last resort for the banking system in the Areas.
6. The PMA will authorize foreign exchange dealers in the Areas and will exercise control (regulation and
supervision) over foreign exchange transactions within the Areas and with the rest of the world.
   a. The PMA will have a banking supervision department that will be responsible for the proper
   functioning, stability, solvency and liquidity of the banks operating in the Areas.
   b. The banking supervision department will predicate its supervision on the international principles and
   standards reflected in international conventions and especially on the principles of the "Basle
   Committee".
   c. The supervision department will be charged with the general supervision of every such bank,
   including:
      a. The regulation of all kinds of banking activities, including their foreign activities;
      b. The licensing of banks formed locally and of branches, subsidiaries, joint ventures and
      representative offices of foreign banks and the approval of controlling shareholders;
      c. The supervision and inspection of banks.

The PMA will relicense each of the five branches of the Israeli banks operating at present in the Gaza Strip and
the West Bank, as soon as its location or the authorities regarding it come under the jurisdiction of the Palestinian
Authority. These branches will be required to comply with the general rules and regulations of the PMA
concerning foreign banks, based on the "Basle Concordat". Para 10 d, e, and f below will apply to these branches.

   a. Any other Israeli bank wishing to open a branch or a subsidiary in the Areas will apply for a license to the
   PMA and will be treated equally to other foreign banks, provided that the same will apply to the Palestinian
   banks wishing to open a branch or a subsidiary in Israel.
   b. Granting of a license by both authorities will be subject to the following arrangements based on the "Basle
   Concordat" valid on the date of signing of the Agreement and to the host authority's prevailing general
   rules and regulations concerning opening of branches and subsidiaries of foreign banks.
   In this para 10 "host authority" and "home authority" apply only to the Bank of Israel (BOI) and the PMA.
   c. A bank wishing to open a branch or establish a subsidiary will apply to the host authority, having first
   obtained the approval of its home authority. The host authority will notify the home authority of the terms of
   the license, and will give its final approval unless the home authority objects.

d. The home authority will be responsible for the consolidated and comprehensive supervision of banks, inclusive of branches and subsidiaries in the area under the jurisdiction of the host authority. However, the distribution of supervision responsibilities between the home and the host authorities concerning subsidiaries will be according to the "Basle Concordat".

e. The host authority will regularly examine the activities of branches and subsidiaries in the area under its jurisdiction. The home authority will have the right to conduct on site examinations in the branches and subsidiaries in the host area. However, the supervision responsibilities of the home authority concerning subsidiaries will be according to the "Basle Concordat".
Accordingly, each authority will transfer to the other authority copies of its examination reports and any information relevant to the solvency, stability and soundness of the banks, their branches and subsidiaries.

f. The BOI and the PMA will establish a mechanism for cooperation and for the exchange of information on issues of mutual interest.

a. The New Israeli Sheqel (NIS) will be one of the circulating currencies in the Areas and will legally serve there as means of payment for all purposes including official transactions. Any circulating currency, including the NIS, will be accepted by the Palestinian Authority and by all its institutions, local authorities and banks, when offered as a means of payment for any transaction.

b. Both sides will continue to discuss, through the JEC, the possibility of introducing mutually agreed Palestinian currency or temporary alternative currency arrangements for the Palestinian Authority.

c. The liquidity requirements on all deposits in banks operating in the Areas will be determined and announced by the PMA.

d. Banks in the Areas will accept NIS deposits. The liquidity requirements on the various kinds of NIS deposits (or deposit linked to the NIS) in banks operating in the Areas will not be less than 4% to 8%, according to the type of deposits. Changes of over 1% in the liquidity requirements on NIS deposits (or deposits linked to the NIS) in Israel will call for corresponding changes in the above mentioned rates.

e. The supervision and inspection of the implementation of all liquidity requirements will be carried out by the PMA.

f. The reserves and the liquid assets required according to this paragraph will be deposited at the PMA according to rules and regulations determined by it. Penalties for non compliance with the liquidity requirements will be determined by the PMA.

The PMA will regulate and administer a discount window system and the supply of temporary finance for banks operating in the Areas.

a. The PMA will establish or license a clearing house in order to clear money orders between the banks operating in the Areas, and with other clearing houses.

b. The clearing of money orders and transactions between banks operating in the Areas and banks operating in Israel will be done between the Israeli and the Palestinian clearing houses on same working day basis, according to agreed arrangements.

Both sides will allow correspondential relations between each others' banks.

The PMA will have the right to convert at the BOI excess NIS received from banks operating in the Areas into foreign currency, in which the BOI trades in the domestic inter-bank market, up to the amounts determined per period, according to the arrangements detailed in para 16 below.

a. The excess amount of NIS, due to balance of payments flows, that the PMA will have the right to convert into foreign currency, will be equal to:
   a. Estimates of all Israeli "imports" of goods and services from the Areas, valued at market prices (inclusive of taxes), which were paid for in NIS, less:
      i. the taxes collected by the Palestinian Authority on all Israeli "imports" from the Areas and rebated to Israel in NIS, and
      ii. the taxes collected by Israel on all Israeli "imports" from the Areas and included in their

market value, and not rebated to the Palestinian Authority,

       minus

b.   Estimates of all Israeli "exports" of goods and services to the Areas, valued at market prices (inclusive of taxes), which were paid for in NIS, less
     i.   the taxes collected by Israel on such "exports" and rebated to the Palestinian Authority, and
     ii.   the taxes collected by the Palestinian Authority on such "exports" and included in their market value, and not rebated to Israel;

       plus

c.   The accumulated net amounts of foreign currency converted previously into NIS by the PMA, as recorded in the BOI Dealing Room.

b.   The said flows and amounts will be calculated as of the date of the signing of the Agreement.

Notes to para 16:

i.   The estimates of the said "exports and imports" of goods and services will include inter alia labor services, NIS expenditure of tourists and Israelis in the Areas and NIS expenditure of Palestinians of the Areas in Israel.

ii.   Taxes and pension contributions on "imports" of labor services, paid to "importing" side and rebated to the "exporting" one, will not be included in the estimates of the sums to be converted, as the "exports' " earnings of labor services are recorded in the statistics inclusive of them, although they do not accrue to the individuals supplying them.

The PMA and the BOI will meet annually to discuss and determine the annual amount of convertible NIS during the following calendar year and will meet semi-annually to adjust the said amount. The amounts determined annually and adjusted semi-annually will be based on data and estimates regarding the past and on forecasts for the wi following period, according to the formula mentioned in para 16. The first meeting will be as soon as possible within three months after the date of the signing of the Agreement.

a.   The exchange of foreign currency for NIS and vice-versa by the PMA will be carried out through the BOI Dealing Room, at the market exchange rates.

b.   The BOI will not be obliged to convert in any single month more than 1/5 of the semi-annual amount, as mentioned in para 17.

c.   There will be no ceiling on the annual foreign currency conversions by the PMA into NIS. However, in order to avoid undesirable fluctuations in the foreign exchange market, monthly ceilings of such conversions will be agreed upon in the annual and semi-annual meetings referred to in para 17.

d.   Banks in the Areas will convert NIS into other circulating currencies and vice-versa.

e.   The Palestinian Authority will have the authorities, powers and responsibilities regarding the regulation and supervision of capital activities in the Areas, including the licensing of capital market institutions, finance companies and investment funds.

## Article V
## DIRECT TAXATION

1.   Israel and the Palestinian Authority will each determine and regulate independently its own tax policy in matters of direct taxation, including income tax on individuals and corporations, property taxes, municipal taxes and fees.

2.   Each tax administration will have the right to levy the direct taxes generated by economic activities within its area.

Case 1:00-cv-00105-L Document 178    Filed 06/17/03    Page 74 of 131 PageID #: 12542

3. Each tax administration may impose additional taxes on residents within its area on (individuals and corporations) who conduct economic activities in the other side's area.
4. Israel will transfer to the Palestinian Authority a sum equal to:
   a. 75% of the income taxes collected from Palestinians from the Gaza Strip and the Jericho Area employed in Israel.
   b. The full amount of income taxes collected from Palestinians from the Gaza Strip and Jericho Area employed in the settlements.
5. The two sides will agree on a set of procedures that will address all issues concerning double taxation.

**Article VI**
**INDIRECT TAXES ON LOCAL PRODUCTION**

1. The Israel and the Palestinian tax administrations will levy and collect VAT and purchase taxes on local production, as well as any other indirect taxes, in their respective areas.
2. The purcha

# Agreement on the Gaza Strip and the Jericho Area, May 4, 1994

The Government of the State of Israel and the Palestine Liberation Organization (hereinafter "the PLO"), the representative of the Palestinian people;

PREAMBLE

WITHIN the framework of the Middle East peace process initiated at Madrid in October 1991;

REAFFIRMING their determination to live in peaceful coexistence, mutual dignity and security, while recognizing their mutual legitimate and political rights;

REAFFIRMING their desire to achieve a just, lasting and comprehensive peace settlement through the agreed political process;

REAFFIRMING their adherence to the mutual recognition and commitments expressed in the letters dated September 9, 1993 , signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO;

REAFFIRMING their understanding that the interim self-government arrangements, including the arrangements to apply in the Gaza Strip and the Jericho Area contained in this Agreement, are an integral part of the whole peace process and that the negotiations on the permanent status will lead to the implementation of Security Council Resolutions 242 and 338;

DESIROUS of putting into effect the Declaration of Principles on Interim Self-Government Arrangements signed at Washington, D.C. on September 13, 1993, and the Agreed Minutes thereto (hereinafter "the Declaration of Principles"), and in particular the Protocol on withdrawal of Israeli forces from the Gaza Strip and the Jericho Area;

HEREBY AGREE to the following arrangements regarding the Gaza Strip and the Jericho Area:

ARTICLE I
DEFINITIONS

For the purpose of this Agreement:

1. the Gaza Strip and the Jericho Area are delineated on map No. 1 and map No. 2 attached to this Agreement;

2. "the Settlements" means the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as shown on attached map No. 1;

3. "the Military Installation Area" means the Israeli military installation area along the Egyptian border in the Gaza Strip, as shown on map No. 1; and

4. the term "Israelis" shall also include Israeli statutory agencies and corporations registered in Israel.

ARTICLE II
SCHEDULED WITHDRAWAL OF ISRAELI MILITARY FORCES
1. Israel shall implement an accelerated and scheduled withdrawal of Israeli military forces from the Gaza Strip and from the Jericho Area to begin immediately with the signing of this Agreement. Israel shall complete such withdrawal within three weeks from this date.

2. Subject to the arrangements included in the Protocol Concerning Withdrawal of Israeli Military Forces and Security Arrangements attached as Annex I , the Israeli withdrawal shall include evacuating all military bases and other fixed installations to be handed over to the Palestinian Police, to be established pursuant to Article IX below (hereinafter "the Palestinian Police").

3. In order to carry out Israel's responsibility for external security and for internal security and public order of Settlements and Israelis, Israel shall, concurrently with the withdrawal, redeploy its remaining military forces to the Settlements and the Military Installation Area, in accordance with the provisions of this Agreement. Subject to the provisions of this Agreement, this redeployment shall constitute full implementation of Article XIII of the Declaration of Principles with regard to the Gaza Strip and the Jericho Area only.

4. For the purposes of this Agreement, "Israeli military forces" may include Israel police and other Israeli security forces.

5. Israelis, including Israeli military forces, may continue to use roads freely within the Gaza Strip and the Jericho Area. Palestinians may use public roads crossing the Settlements freely, as provided for in Annex I.

6. The Palestinian Police shall be deployed and shall assume responsibility for public order and internal security of Palestinians in accordance with this Agreement and Annex I.

ARTICLE III
TRANSFER OF AUTHORITY
1. Israel shall transfer authority as specified in this Agreement from the Israeli military government and its Civil Administration to the Palestinian Authority, hereby established, in accordance with Article V of this Agreement, except for the authority that Israel shall continue to exercise as specified in this Agreement.

2. As regards the transfer and assumption of authority in civil spheres, powers and responsibilities shall be transferred and assumed as set out in the Protocol Concerning Civil Affairs attached as Annex II .

3. Arrangements for a smooth and peaceful transfer of the agreed powers and responsibilities are set out in Annex II.

4. Upon the completion of the Israeli withdrawal and the transfer of powers and responsibilities as detailed in paragraphs 1 and 2 above and in Annex II, the Civil Administration in the Gaza Strip and the Jericho Area will be dissolved and the Israeli military government will be withdrawn. The withdrawal of the military government shall not prevent it from continuing to exercise the powers and responsibilities specified in this Agreement.

5. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC") and two Joint Regional Civil Affairs Subcommittees for the Gaza Strip and the Jericho Area respectively shall be established in order to provide for coordination and cooperation in civil affairs between the Palestinian Authority and Israel, as detailed in Annex II.

6. The offices of the Palestinian Authority shall be located in the Gaza Strip and the Jericho Area pending the inauguration of the Council to be elected pursuant to the Declaration of Principles.

ARTICLE IV
STRUCTURE AND COMPOSITION OF THE PALESTINIAN AUTHORITY
1. The Palestinian Authority will consist of one body of 24 members which shall carry out and be responsible for all the legislative and executive powers and

responsibilities transferred to it under this Agreement, in accordance with this Article, and shall be responsible for the exercise of judicial functions in accordance with Article VI, subparagraph 1.b. of this Agreement.

2. The Palestinian Authority shall administer the departments transferred to it and may establish, within its jurisdiction, other departments and subordinate administrative units as necessary for the fulfillment of its responsibilities. It shall determine its own internal procedures.

3. The PLO shall inform the Government of Israel of the names of the members of the Palestinian Authority and any change of members. Changes in the membership of the Palestinian Authority will take effect upon an exchange of letters between the PLO and the Government of Israel.

4. Each member of the Palestinian Authority shall enter into office upon undertaking to act in accordance with this Agreement.

ARTICLE V
JURISDICTION
1. The authority of the Palestinian Authority encompasses all matters that fall within its territorial, functional and personal jurisdiction, as follows:

1.1. The territorial jurisdiction covers the Gaza Strip and the Jericho Area territory, as defined in Article I, except for Settlements and the Military Installation Area.

Territorial jurisdiction shall include land, subsoil and territorial waters, in accordance with the provisions of this Agreement.

1.2. The functional jurisdiction encompasses all powers and responsibilities as specified in this Agreement. This jurisdiction does not include foreign relations, internal security and public order of Settlements and the Military Installation Area and Israelis, and external security.

1.3. The personal jurisdiction extends to all persons within the territorial jurisdiction referred to above, except for Israelis, unless otherwise provided in this Agreement.

2. The Palestinian Authority has, within its authority, legislative, executive and judicial powers and responsibilities, as provided for in this Agreement.

3. 3.1. Israel has authority over the Settlements, the Military Installation Area, Israelis, external security, internal security and public order of Settlements, the Military Installation Area and Israelis, and those agreed powers and responsibilities specified in this Agreement.

3.2. Israel shall exercise its authority through its military government, which, for that end, shall continue to have the necessary legislative, judicial and executive powers and responsibilities, in accordance with international law. This provision shall not derogate from Israel's applicable legislation over Israelis in personam.

4. The exercise of authority with regard to the electromagnetic sphere and airspace shall be in accordance with the provisions of this Agreement.

5. The provisions of this Article are subject to the specific legal arrangements detailed in the Protocol Concerning Legal Matters attached as Annex III . Israel and the Palestinian Authority may negotiate further legal arrangements.

6. Israel and the Palestinian Authority shall cooperate on matters of legal assistance in criminal and civil matters through the legal subcommittee of the CAC.

ARTICLE VI
POWERS AND RESPONSIBILITIES OF THE PALESTINIAN AUTHORITY

1. Subject to the provisions of this Agreement, the Palestinian Authority, within its jurisdiction:

1.1. has legislative powers as set out in Article VII of this Agreement, as well as executive powers;

1.2. will administer justice through an independent judiciary;

1.3. will have, inter alia, power to formulate policies, supervise their implementation, employ staff, establish departments, authorities and institutions, sue and be sued and conclude contracts; and

1.4. will have, inter alia, the power to keep and administer registers and records of the population, and issue certificates, licenses and documents.

2. 2.1. In accordance with the Declaration of Principles, the Palestinian Authority will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the Gaza Strip or the Jericho Area, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.

2.2. Notwithstanding the provisions of this paragraph, the PLO may conduct negotiations and sign agreements with states or international organizations for the benefit of the Palestinian Authority in the following cases only:

2.2.1. economic agreements, as specifically provided in Annex IV of this Agreement;
2.2.2. agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Palestinian Authority;
2.2.3. agreements for the purpose of implementing the regional development plans detailed in Annex IV of the Declaration of Principles or in agreements entered into in the framework of the multilateral negotiations; and
2.2.4. cultural, scientific and educational agreements.

2.3. Dealings between the Palestinian Authority and representatives of foreign states and international organizations, as well as the establishment in the Gaza Strip and the Jericho Area of representative offices other than those described in subparagraph 2.a. above, for the purpose of implementing the agreements referred to in subparagraph 2.b. above, shall not be considered foreign relations.

ARTICLE VII
LEGISLATIVE POWERS OF THE PALESTINIAN AUTHORITY
1. The Palestinian Authority will have the power, within its jurisdiction, to promulgate legislation, including basic laws, laws, regulations and other legislative acts.

2. Legislation promulgated by the Palestinian Authority shall be consistent with the provisions of this Agreement.

3. Legislation promulgated by the Palestinian Authority shall be communicated to a legislation subcommittee to be established by the CAC (hereinafter "the Legislation Subcommittee"). During a period of 30 days from the communication of the legislation, Israel may request that the Legislation Subcommittee decide whether such legislation exceeds the jurisdiction of the Palestinian Authority or is otherwise inconsistent with the provisions of this Agreement.

4. Upon receipt of the Israeli request, the Legislation Subcommittee shall decide, as an initial matter, on the entry into force of the legislation pending its decision on the merits of the matter.

5. If the Legislation Subcommittee is unable to reach a decision with regard to the entry into force of the legislation within 15 days, this issue will be referred to a board of review. This board of review shall be comprised of two judges, retired judges or senior jurists (hereinafter "Judges"), one from each side, to be appointed from a compiled list of three Judges proposed by each.
In order to expedite the proceedings before this board of review, the two most senior Judges, one from each side, shall develop written informal rules of procedure.

6. Legislation referred to the board of review shall enter into force only if the board of review decides that it does not deal with a security issue which falls under Israel's responsibility, that it does not seriously threaten other significant Israeli interests protected by this Agreement and that the entry into force of the legislation could not cause irreparable damage or harm.

7. The Legislation Subcommittee shall attempt to reach a decision on the merits of the matter within 30 days from the date of the Israeli request. If this Subcommittee is unable to reach such a decision within this period of 30 days, the matter shall be referred to the Joint Israeli-Palestinian Liaison Committee referred to in Article XV below (hereinafter "the Liaison Committee"). This Liaison Committee will deal with the matter immediately and will attempt to settle it within 30 days.

8. Where the legislation has not entered into force pursuant to paragraphs 5 or 7 above, this situation shall be maintained pending the decision of the Liaison Committee on the merits of the matter, unless it has decided otherwise.

9. Laws and military orders in effect in the Gaza Strip or the Jericho Area prior to the signing of this Agreement shall remain in force, unless amended or abrogated in accordance with this Agreement.

ARTICLE VIII
ARRANGEMENTS FOR SECURITY AND PUBLIC ORDER
1. In order to guarantee public order and internal security for the Palestinians of the Gaza Strip and the Jericho Area, the Palestinian Authority shall establish a strong police force, as set out in Article IX below. Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian border and the Jordanian line, and for defense against external threats from the sea and from the air, as well as the responsibility for overall security of Israelis and Settlements, for the purpose of safeguarding their internal security and public order, and will have all the powers to take the steps necessary to meet this responsibility.

2. Agreed security arrangements and coordination mechanisms are specified in Annex I .

3. A joint Coordination and Cooperation Committee for mutual security purposes (hereinafter "the JSC"), as well as three joint District Coordination and Cooperation Offices for the Gaza district, the Khan Yunis district and the Jericho district respectively (hereinafter "the DCOs") are hereby established as provided for in Annex I.

4. The security arrangements provided for in this Agreement and in Annex I may be reviewed at the request of either Party and may be amended by mutual agreement of the Parties. Specific review arrangements are included in Annex I.

ARTICLE IX
THE PALESTINIAN DIRECTORATE OF POLICE FORCE
1. The Palestinian Authority shall establish a strong police force, the Palestinian Directorate of Police Force (hereinafter "the Palestinian Police"). The duties, functions, structure, deployment and composition of the Palestinian Police, together with provisions regarding its equipment and operation, are set out in Annex I, Article

III. Rules of conduct governing the activities of the Palestinian Police are set out in Annex I, Article VIII.

2. Except for the Palestinian Police referred to in this Article and the Israeli military forces, no other armed forces shall be established or operate in the Gaza Strip or the Jericho Area.

3. Except for the arms, ammunition and equipment of the Palestinian Police described in Annex I, Article III, and those of the Israeli military forces, no organization or individual in the Gaza Strip and the Jericho Area shall manufacture, sell, acquire, possess, import or otherwise introduce into the Gaza Strip or the Jericho Area any firearms, ammunition, weapons, explosives, gunpowder or any related equipment, unless otherwise provided for in Annex I.

ARTICLE X
PASSAGES Arrangements for coordination between Israel and the Palestinian Authority regarding the Gaza-Egypt and Jericho-Jordan passages, as well as any other agreed international crossings, are set out in Annex I, Article X.

ARTICLE XI
SAFE PASSAGE BETWEEN THE GAZA STRIP AND THE JERICHO AREA
Arrangements for safe passage of persons and transportation between the Gaza Strip and the Jericho Area are set out in Annex I, Article IX.

ARTICLE XII
RELATIONS BETWEEN ISRAEL AND THE PALESTINIAN AUTHORITY
1. Israel and the Palestinian Authority shall seek to foster mutual understanding and tolerance and shall accordingly abstain from incitement, including hostile propaganda, against each other and, without derogating from the principle of freedom of expression, shall take legal measures to prevent such incitement by any organizations, groups or individuals within their jurisdiction.

2. Without derogating from the other provisions of this Agreement, Israel and the Palestinian Authority shall cooperate in combatting criminal activity which may affect both sides, including offenses related to trafficking in illegal drugs and psychotropic substances, smuggling, and offenses against property, including offenses related to vehicles.

ARTICLE XIII
ECONOMIC RELATIONS The economic relations between the two sides are set out in the Protocol on Economic Relations signed in Paris on April 29, 1994 and the Appendices thereto, certified copies of which are attached as Annex IV, and will be governed by the relevant provisions of this Agreement and its Annexes.

ARTICLE XIV
HUMAN RIGHTS AND THE RULE OF LAW Israel and the Palestinian Authority shall exercise their powers and responsibilities pursuant to this Agreement with due regard to internationally-accepted norms and principles of human rights and the rule of law.

ARTICLE XV
THE JOINT ISRAELI-PALESTINIAN LIAISON COMMITTEE
1. The Liaison Committee established pursuant to Article X of the Declaration of Principles shall ensure the smooth implementation of this Agreement. It shall deal with issues requiring coordination, other issues of common interest and disputes.

2. The Liaison Committee shall be composed of an equal number of members from each Party. It may add other technicians and experts as necessary.

3. The Liaison Committee shall adopt its rules of procedure, including the frequency and place or places of its meetings.

4. The Liaison Committee shall reach its decisions by Agreement.

ARTICLE XVI
LIAISON AND COOPERATION WITH JORDAN AND EGYPT
1. Pursuant to Article XII of the Declaration of Principles, the two Parties shall invite the Governments of Jordan and Egypt to participate in establishing further liaison and cooperation arrangements between the Government of Israel and the Palestinian representatives on the one hand, and the Governments of Jordan and Egypt on the other hand, to promote cooperation between them. These arrangements shall include the constitution of a Continuing Committee.

2. The Continuing Committee shall decide by agreement on the modalities of admission of persons displaced from the West Bank and the Gaza Strip in 1967, together with necessary measures to prevent disruption and disorder.

3. The Continuing Committee shall deal with other matters of common concern.

ARTICLE XVII
SETTLEMENT OF DIFFERENCES AND DISPUTES Any difference relating to the application of this Agreement shall be referred to the appropriate coordination and cooperation mechanism established under this Agreement. The provisions of Article XV of the Declaration of Principles shall apply to any such difference which is not settled through the appropriate coordination and cooperation mechanism, namely:

1. Disputes arising out of the application or interpretation of this Agreement or any subsequent agreements pertaining to the interim period shall be settled by negotiations through the Liaison Committee.

2. Disputes which cannot be settled by negotiations may be settled by a mechanism of conciliation to be agreed between the Parties.

3. The Parties may agree to submit to arbitration disputes relating to the interim period, which cannot be settled through conciliation. To this end, upon the agreement of both Parties, the Parties will establish an Arbitration Committee.

ARTICLE XVIII
PREVENTION OF HOSTILE ACTS Both sides shall take all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against each other, against individuals falling under the other's authority and against their property, and shall take legal measures against offenders. In addition, the Palestinian side shall take all measures necessary to prevent such hostile acts directed against the Settlements, the infrastructure serving them and the Military Installation Area, and the Israeli side shall take all measures necessary to prevent such hostile acts emanating from the Settlements and directed against Palestinians.

ARTICLE XIX
MISSING PERSONS The Palestinian Authority shall cooperate with Israel by providing all necessary assistance in the conduct of searches by Israel within the Gaza Strip and the Jericho Area for missing Israelis, as well as by providing information about missing Israelis. Israel shall cooperate with the Palestinian Authority in searching for, and providing necessary information about, missing Palestinians.

ARTICLE XX
CONFIDENCE BUILDING MEASURES With a view to creating a positive and supportive public atmosphere to accompany the implementation of this Agreement, and to establish a solid basis of mutual trust and good faith, both Parties agree to carry out confidence building measures as detailed herewith:

1. Upon the signing of this Agreement, Israel will release, or turn over, to the

Palestinian Authority within a period of 5 weeks, about 5,000 Palestinian detainees and prisoners, residents of the West Bank and the Gaza Strip. Those released will be free to return to their homes anywhere in the West Bank or the Gaza Strip. Prisoners turned over to the Palestinian Authority shall be obliged to remain in the Gaza Strip or the Jericho Area for the remainder of their sentence.

2. After the signing of this Agreement, the two Parties shall continue to negotiate the release of additional Palestinian prisoners and detainees, building on agreed principles.

3. The implementation of the above measures will be subject to the fulfillment of the procedures determined by Israeli law for the release and transfer of detainees and prisoners.

4. With the assumption of Palestinian authority, the Palestinian side commits itself to solving the problem of those Palestinians who were in contact with the Israeli authorities. Until an agreed solution is found, the Palestinian side undertakes not to prosecute these Palestinians or to harm them in any way.

5. Palestinians from abroad whose entry into the Gaza Strip and the Jericho Area is approved pursuant to this Agreement, and to whom the provisions of this Article are applicable, will not be prosecuted for offenses committed prior to September 13, 1993.

ARTICLE XXI
TEMPORARY INTERNATIONAL PRESENCE
1. The Parties agree to a temporary international or foreign presence in the Gaza Strip and the Jericho Area (hereinafter "the TIP"), in accordance with the provisions of this Article.

2. The TIP shall consist of 400 qualified personnel, including observers, instructors and other experts, from 5 or 6 of the donor countries.

3. The two Parties shall request the donor countries to establish a special fund to provide finance for the TIP.

4. The TIP will function for a period of 6 months. The TIP may extend this period, or change the scope of its operation, with the agreement of the two Parties.

5. The TIP shall be stationed and operate within the following cities and villages: Gaza, Khan Yunis, Rafah, Deir El Ballah, Jabaliya, Absan, Beit Hanun and Jericho.

6. Israel and the Palestinian Authority shall agree on a special Protocol to implement this Article, with the goal of concluding negotiations with the donor countries contributing personnel within two months.

ARTICLE XXII
RIGHTS, LIABILITIES AND OBLIGATIONS
1. 1.1. The transfer of all powers and responsibilities to the Palestinian Authority, as detailed in Annex II, includes all related rights, liabilities and obligations arising with regard to acts or omissions which occurred prior to the transfer. Israel will cease to bear any financial responsibility regarding such acts or omissions and the Palestinian Authority will bear all financial responsibility for these and for its own functioning.

1.2. Any financial claim made in this regard against Israel will be referred to the Palestinian Authority.

1.3. Israel shall provide the Palestinian Authority with the information it has regarding pending and anticipated claims brought before any court or tribunal against Israel in this regard.

1.4. Where legal proceedings are brought in respect of such a claim, Israel will notify the Palestinian Authority and enable it to participate in defending the claim and raise any arguments on its behalf.

1.5. In the event that an award is made against Israel by any court or tribunal in respect of such a claim, the Palestinian Authority shall reimburse Israel the full amount of the award.

1.6. Without prejudice to the above, where a court or tribunal hearing such a claim finds that liability rests solely with an employee or agent who acted beyond the scope of the powers assigned to him or her, unlawfully or with willful malfeasance, the Palestinian Authority shall not bear financial responsibility.

2. The transfer of authority in itself shall not affect rights, liabilities and obligations of any person or legal entity, in existence at the date of signing of this Agreement.

ARTICLE XXIII
FINAL CLAUSES
1. This Agreement shall enter into force on the date of its signing.

2. The arrangements established by this Agreement shall remain in force until and to the extent superseded by the Interim Agreement referred to in the Declaration of Principles or any other agreement between the Parties.

3. The five-year interim period referred to in the Declaration of Principles commences on the date of the signing of this Agreement.

4. The Parties agree that, as long as this Agreement is in force, the security fence erected by Israel around the Gaza Strip shall remain in place and that the line demarcated by the fence, as shown on attached map No. 1, shall be authoritative only for the purpose of this Agreement.

5. Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the interim agreement or on the permanent status to be conducted pursuant to the Declaration of Principles. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.

6. The two Parties view the West Bank and the Gaza Strip as a single territorial unit, the integrity of which will be preserved during the interim period.

7. The Gaza Strip and the Jericho Area shall continue to be an integral part of the West Bank and the Gaza Strip, and their status shall not be changed for the period of this Agreement. Nothing in this Agreement shall be considered to change this status.

8. The Preamble to this Agreement, and all Annexes, Appendices and maps attached hereto, shall constitute an integral part hereof.

Done in Cairo this fourth day of May, 1994.

For the Government of the
State of Israel

For the PLO

Witnessed By:

The United States of America
The Russian Federation

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 85 of 131 PageID #: 12553

The Arab Republic of Egypt

©2001-2003 electronicIntifada.net unless otherwise noted. You may freely print out, copy, and redistribute this page for informational purposes on a non-commercial basis.

# Agreement on Preparatory Transfer of Powers and Responsibilities, August, 29, 1994

The Government of the State of Israel and the Palestine Liberation Organization (hereinafter "the PLO"), the representative of the Palestinian people;

PREAMBLE
WITHIN the framework of the Middle East peace process initiated at Madrid in October 1991;

REAFFIRMING their determination to live in peaceful coexistence, mutual dignity and security, while recognizing their mutual legitimate and political rights;

REAFFIRMING their desire to achieve a just, lasting and comprehensive peace settlement through the agreed political process;

REAFFIRMING their adherence to the mutual recognition and commitments expressed in the letters dated September 9, 1993, signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO;

REAFFIRMING their understanding that the interim self-government arrangements, including the preparatory arrangements to apply in the West Bank contained in this Agreement, are an integral part of the whole peace process and that the negotiations on the permanent status will lead to the implementation of Security Council Resolutions 242 and 338;

FOLLOWING the Agreement on the Gaza Strip and the Jericho Area as signed at Cairo on May 4, 1994 (hereinafter "the Gaza-Jericho Agreement");

DESIROUS of putting into effect the Declaration of Principles on Interim Self-Government Arrangements as signed at Washington, D.C. on September 13, 1993 (hereinafter "the Declaration of Principles"), and in particular Article VI regarding preparatory transfer of powers and responsibilities and the Agreed Minutes thereto;

HEREBY AGREE to the following arrangements regarding the preparatory transfer of powers and responsibilities in the West Bank:

ARTICLE I
DEFINITIONS
For the purpose of this Agreement, unless otherwise indicated in the attached Protocols:

a. the term "the Palestinian Authority" means the Palestinian Authority established in accordance with the Gaza-Jericho Agreement;

b. the term "Joint Liaison Committee" means the Joint Israeli-Palestinian Liaison Committee established pursuant to Article X of the Declaration of Principles;

c. the term "Interim Agreement" means the interim agreement referred to in Article VII of the Declaration of Principles; and

d. the term "Israelis" also includes Israeli statutory agencies and corporations registered in Israel.

ARTICLE II
PREPARATORY TRANSFER OF POWERS AND RESPONSIBILITIES
1. Israel shall transfer and the Palestinian Authority shall assume powers and responsibilities from the Israeli military government and its Civil Administration in the West Bank in the following spheres: education and culture, health, social

welfare, tourism, direct taxation and Value Added Tax on local production (hereinafter "VAT"), as specified in this Agreement (hereinafter "the Spheres").

2. For the purposes of this Agreement, the Palestinian Authority shall constitute the authorized Palestinians referred to in Article VI of the Declaration of Principles.

3. The Parties will explore the possible expansion of the transfer of powers and responsibilities to additional spheres.

ARTICLE III
SCOPE OF THE TRANSFERRED POWERS AND RESPONSIBILITIES
1. The scope of the powers and responsibilities transferred in each Sphere, as well as specific arrangements regarding the exercise of such powers and responsibilities, are set out in the Protocols attached as Annexes I through VI.

2. In accordance with the Declaration of Principles, the jurisdiction of the Palestinian Authority with regard to the powers and responsibilities transferred by this Agreement will not apply to Jerusalem, settlements, military locations and, unless otherwise provided in this Agreement, Israelis.

3. The transfer of powers and responsibilities under this Agreement does not include powers and responsibilities in the sphere of foreign relations, except as indicated in Article VI(2)(b) of the Gaza- Jericho Agreement.

ARTICLE IV
MODALITIES OF TRANSFER
1. The transfer of powers and responsibilities in the sphere of education and culture pursuant to this Agreement will be implemented on August 29, 1994. The transfer of powers and responsibilities in the remaining Spheres will be implemented in accordance with Article XI below.

2. The transfer of powers and responsibilities shall be coordinated through the Civil Affairs Coordination and Cooperation Committee referred to in Article X below and shall be implemented in accordance with the arrangements set out in this Agreement in a smooth, peaceful and orderly manner.

3. Upon the signing of this Agreement, the Israeli side shall provide the Palestinian side with, or enable free access to, all information that is necessary for an effective and smooth transfer.

4. On the date of the transfer of powers and responsibilities, Israel shall also transfer all movable and immovable property which exclusively serves the offices of the Civil Administration in the Spheres, including premises, whether government-owned or rented, equipment, registers, files and computer programs. The treatment of property which serves the offices transferred to the Palestinian Authority as well as offices which are not so transferred will be as mutually agreed between the two sides, such as on the basis of sharing or exchange.

5. The coordination of the transfer of powers and responsibilities pursuant to this Article shall also include a joint review of the Civil Administration contracts the duration of which extends beyond the date of the transfer with a view to deciding which contracts will remain in force and which will be terminated.

ARTICLE V
ADMINISTRATION OF THE TRANSFERRED OFFICES
1. The Palestinian Authority shall be fully responsible for the proper functioning of the offices included in the Spheres and for the management of their personnel in all aspects, including employment and placement of employees, payment of their salaries and pensions and ensuring other employee rights.

2. The Palestinian Authority will continue to employ Palestinian Civil Administration

employees currently employed in the offices included in each Sphere and shall maintain their rights.

3. The main office of each of the Spheres will be situated in the Jericho Area or in the Gaza Strip. The Palestinian Authority will operate the existing subordinate offices in the West Bank. The two sides may agree on the establishment of additional subordinate offices in the West Bank, if necessary, in such locations as mutually agreed.

4. The Palestinian Authority has the right to coordinate its activities in each of the Spheres with other Spheres in which it is empowered.

ARTICLE VI
RELATIONS BETWEEN THE TWO SIDES
1. With regard to each Sphere, the Palestinian Authority shall coordinate with the Civil Administration on issues relating to other spheres in which the Palestinian Authority is not empowered.

2. The military government and its Civil Administration shall assist and support the Palestinian Authority in promoting the effective exercise of its powers and responsibilities. In addition, the military government and its Civil Administration shall, in exercising their own powers and responsibilities, take into account the interests of the Palestinian Authority and do their utmost to remove obstacles to the effective exercise of powers and responsibilities by the Palestinian Authority.

3. The Palestinian Authority shall prevent any activities with a military orientation within each of the Spheres and will do its utmost to maintain decorum and discipline and to avoid disruption in the institutions under its responsibility.

4. The Palestinian Authority will notify the military government and its Civil Administration and will coordinate with them regarding any planned public large-scale events and mass gatherings within the Spheres.

5. Nothing in this Agreement shall affect the continued authority of the military government and its Civil Administration to exercise their powers and responsibilities with regard to security and public order, as well as with regard to other spheres not transferred.

ARTICLE VII
LEGISLATIVE POWERS OF THE PALESTINIAN AUTHORITY
1. The Palestinian Authority may promulgate secondary legislation regarding the powers and responsibilities transferred to it. Such legislation includes amendments and changes to the existing laws, regulations and military orders specified in Appendix A to each Annex.

2. Legislation promulgated by the Palestinian Authority shall be consistent with the provisions of this Agreement.

3. Legislation promulgated by the Palestinian Authority shall be communicated to Israel which may, within a period of thirty (30) days, notify the Palestinian Authority that it opposes such legislation for any of the following reasons:

a. it exceeds the powers and responsibilities transferred to the Palestinian Authority;

b. it is inconsistent with the provisions of this Agreement; or

c. it otherwise affects legislation or powers and responsibilities which were not transferred to the Palestinian Authority.

4. Where Israel opposes proposed legislation, it shall specify the reason for the

opposition.

5. If Israel has no reservations concerning the proposed legislation, it shall accordingly notify the Palestinian Authority at the earliest opportunity. If at the end of the thirty-day period Israel has not communicated any opposition concerning the proposed legislation, such legislation shall enter into force.

6. The Palestinian Authority may, in the event of opposition to the proposed draft legislation, submit a new draft or request a review by the Legislation Subcommittee established under the Gaza-Jericho Agreement.

7. The Legislation Subcommittee shall attempt to reach a decision on the merits of the matter within thirty days. If the Legislation Subcommittee is unable to reach a decision within this period, the Palestinian Authority shall be entitled to refer the matter to the Joint Liaison Committee. The Joint Liaison Committee shall consider the matter immediately and will attempt to settle it within thirty days.

8. Where, upon communicating to Israel proposed legislation consisting of detailed technical regulations, the Palestinian Authority states that such regulations fulfill the requirements of paragraph 3 above and requests a speedy review, Israel shall immediately respond to such a request.

9. Legislation regarding the West Bank shall be published as a separate part of any publication of legislation regarding the Gaza Strip and the Jericho Area issued by the Palestinian Authority.

ARTICLE VIII
LAW ENFORCEMENT
1. The Palestinian Authority may bring disciplinary proceedings concerning persons it employs in the West Bank before disciplinary tribunals operating in the Gaza Strip or the Jericho Area.

2. The Palestinian Authority may, within each of the Spheres, authorize employees to act as civilian inspectors to monitor compliance with laws and regulations in that Sphere, within the powers and responsibilities transferred to the Palestinian Authority. Such inspectors shall operate in each Sphere separately and shall not be organized into a central unit. These inspectors shall not wear uniforms or carry arms, and shall not in any other way have the nature of a police force. They shall be required to carry the identification documentation referred to in paragraph 3 below. The number of employees to be authorized as civilian inspectors shall be agreed upon by both sides. The names of these employees shall be notified to Israel and, where these employees enjoy privileges pursuant to subparagraph 3 below, shall be agreed upon by both sides.

3. The Palestinian Authority shall issue the civilian inspectors in the West Bank with identification documentation specifying the office in which they are employed. Such documentation shall be used for identification and will not grant privileges, except those agreed in the Civil Affairs Coordination and Cooperation Committee referred to in Article X below, or immunities. This committee shall determine the format of the identification documenation.

4. Except as specifically provided in this Agreement, all powers and responsibilities regarding law enforcement, including investigation, judicial proceedings and imprisonment, will continue to be under the responsibility of the existing authorities in the West Bank.

ARTICLE IX
RIGHTS, LIABILITIES AND OBLIGATIONS
1. a. The transfer of powers and responsibilities to the Palestinian Authority under this Agreement will include all related rights, liabilities and obligations arising with regard to acts or omissions which occurred prior to the transfer. Israel and the Civil

Administration will cease to bear any financial responsibility regarding such acts or omissions and the Palestinian Authority will bear all financial responsibility for these and for its own functioning.

b. Any financial claim made in this regard against Israel or the Civil Administration will be referred to the Palestinian Authority.

c. Israel shall provide the Palestinian Authority with the information it has regarding pending and anticipated claims brought before any court or tribunal against Israel or the Civil Administration in this regard.

d. Where legal proceedings are brought in respect of such a claim, Israel will notify the Palestinian Authority and enable it to participate in defending the claim and raise any arguments on its behalf.

e. In the event that an award is made against Israel or the Civil Administration by any court or tribunal in respect of such a claim, the Palestinian Authority shall, once the award has been paid by Israel, reimburse Israel the full amount of the award.

f. Without prejudice to the above, where a court or tribunal hearing such a claim finds that liability rests solely with an employee or agent who acted beyond the scope of the powers assigned to him or her, unlawfully or with willful malfeasance, the Palestinian Authority shall not bear financial responsibility.

g. Notwithstanding subparagraphs 1.d through 1.f above, Israel may, pursuant to agreement within the Legal Subcommittee of the CAC established under the Gaza-Jericho Agreement, request an Israeli court or tribunal to dismiss a claim brought before it and, with regard to a pending claim, dismiss the claim and transfer the proceedings to a local court or tribunal.

h. Where a claim has been so transferred or where a new claim has been brought in a local court or tribunal subsequent to the dismissal of the claim pursuant to subparagraph 1.g above, the Palestinian Authority shall defend it and, in accordance with subparagraph 1.a above, in the event that an award is made for the plaintiff, shall pay the amount of the award.

i. The Legal Subcommittee referred to in subparagraph 1.g above shall agree on arrangements for the transfer of proceedings from Israeli courts or tribunals pursuant to subparagraph 1.g above and, where necessary, for the provision of legal assistance by Israel to the Palestinian Authority in defending such claims.

2. In accordance with paragraph 1 above:

a. The Palestinian Authority may bring legal proceedings in respect of any acts or omissions relating to powers and responsibilities transferred under this Agreement which occurred prior to the date of the transfer. Israel shall provide the Palestinian Authority with the legal assistance necessary to bring such proceedings.

b. The Palestinian Authority may collect any taxes due under Annexes V and VI on the date of the transfer of powers and responsibilities in respect of these taxes, and shall assume responsibility for the payment of any rebates or refunds.

3. Subject to the provisions of this Article, the transfer of powers and responsibilities in itself shall not affect rights, liabilities and obligations of any person or legal entity, in existence at the date of signing of this Agreement.

ARTICLE X
LIAISON AND COORDINATION
1. The Joint Civil Affairs Coordination and Cooperation Committee established in accordance with the Gaza-Jericho Agreement, (hereinafter "the CAC"), will deal with all issues of mutual concern regarding this Agreement.

2. The operation of the CAC shall not impede daily contacts between representatives of the Civil Administration and the Palestinian Authority in all matters of mutual concern.

ARTICLE XI
BUDGETARY ISSUES
1. The military government and its Civil Administration shall provide the Palestinian Authority with full information concerning the budget of each Sphere.

2. The Palestinian Authority shall immediately employ personnel who will promptly begin the process of becoming acquainted with the current budget issues. On the date of the transfer of powers and responsibilities in each of the Spheres, these personnel will assume responsibility for all accounts, assets and records on behalf of the Palestinian Authority.

3. Israel shall continue to provide the services of Israeli experts currently employed in the fields of income tax and VAT to ensure a smooth transition and efficient establishment of the taxation system of the Palestinian Authority. The terms of their employment shall be agreed upon by the two sides.

4. The Palestinian Authority will do its utmost to establish its revenue collection system immediately with the intent of collecting direct taxes and VAT.

5. The two sides will jointly approach the donor countries during the upcoming meetings of the Consultative Group and of the Ad Hoc Liaison Committee, scheduled for September 8 through 10, 1994 in Paris, with a request to finance the shortfall that may be created in the collection of the direct taxes and the VAT during the initial period while the Palestinian Authority establishes its own revenue collection system.

6. The two sides will meet no later than three days after the conclusion of these meetings in order to decide on the date of transfer of powers and responsibilities in the remaining Spheres, based, among other things, on the response of the donor countries to the joint request.

7. The CAC will provide the donor countries, when necessary, with information to help adjust the allocation of contributions as a result of variations in tax collection.

8. The Palestinian Authority shall also assume full responsibility for any additional expenditures beyond the agreed budget which is attached as Schedule 1, as well as for any shortfall in tax collection that is not actually covered by the donor countries.

9. If actual revenues from the Spheres, including the donor contributions, exceed the budgeted revenues, the excess shall be applied to development of the Spheres.

10. The inclusion of the sphere of VAT in the spheres to be transferred to the Palestinian Authority shall constitute the adjustment referred to in paragraph (3) of the Agreed Minute to Article VI(2) of the Declaration of Principles, and no further adjustment shall be required.

ARTICLE XII
MUTUAL CONTRIBUTION TO PEACE AND RECONCILIATION
With regard to each of the Spheres, Israel and the Palestinian Authority will ensure that their respective systems contribute to the peace between the Israeli and Palestinian peoples and to peace in the entire region, and will refrain from the introduction of any motifs that could adversely affect the process of reconciliation.

ARTICLE XIII

FINAL CLAUSES

1. This Agreement shall enter into force on the date of its signing.

2. The arrangements established by this Agreement are preparatory measures and shall remain in force until and to the extent superseded by the Interim Agreement or by any other agreement between the Parties.

3. Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the Interim Agreement or on the permanent status to be conducted pursuant to the Declaration of Principles. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.

4. The two Parties view the West Bank and the Gaza Strip as a single territorial unit, the integrity of which will be preserved during the interim period.

5. The Gaza Strip and the Jericho Area shall continue to be an integral part of the West Bank and the Gaza Strip. The status of the West Bank shall not be changed for the period of this Agreement. Nothing in this Agreement shall be considered to change this status.

6. The Preamble to this Agreement and the Annexes, Appendices and Schedules attached hereto, shall constitute an integral part hereof.

Done at Erez this twenty-ninth day of August 1994.

©2001-2003 electronicIntifada.net unless otherwise noted. You may freely print out, copy, and redistribute this page for informational purposes on a non-commercial basis.

# Interim Agreement on the West Bank and the Gaza Strip, September 28, 1995

### Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip

Washington, D.C., September 28, 1995

The Government of the State of Israel and the Palestine Liberation Organization (hereinafter "the PLO"), the representative of the Palestinian people;

PREAMBLE

WITHIN the framework of the Middle East peace process initiated at Madrid in October 1991;

REAFFIRMING their determination to put an end to decades of confrontation and to live in peaceful coexistence, mutual dignity and security, while recognizing their mutual legitimate and political rights;

REAFFIRMING their desire to achieve a just, lasting and comprehensive peace settlement and historic reconciliation through the agreed political process;

RECOGNIZING that the peace process and the new era that it has created, as well as the new relationship established between the two Parties as described above, are irreversible, and the determination of the two Parties to maintain, sustain and continue the peace process;

RECOGNIZING that the aim of the Israeli-Palestinian negotiations within the current Middle East peace process is, among other things, to establish a Palestinian Interim Self-Government Authority, i.e. the elected Council (hereinafter "the Council" or "the Palestinian Council"), and the elected Ra'ees of the Executive Authority, for the Palestinian people in the West Bank and the Gaza Strip, for a transitional period not exceeding five years from the date of signing the Agreement on the Gaza Strip and the Jericho Area (hereinafter "the Gaza-Jericho Agreement") on May 4, 1994, leading to a permanent settlement based on Security Council Resolutions 242 and 338;

REAFFIRMING their understanding that the interim self-government arrangements contained in this Agreement are an integral part of the whole peace process, that the negotiations on the permanent status, that will start as soon as possible but not later than May 4, 1996, will lead to the implementation of Security Council Resolutions 242 and 338, and that the Interim Agreement shall settle all the issues of the interim period and that no such issues will be deferred to the agenda of the permanent status negotiations;

REAFFIRMING their adherence to the mutual recognition and commitments expressed in the letters dated September 9, 1993, signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO;

DESIROUS of putting into effect the Declaration of Principles on Interim Self-Government Arrangements signed at Washington, D.C. on September 13, 1993, and the Agreed Minutes thereto (hereinafter "the DOP") and in particular Article III and Annex I concerning the holding of direct, free and general political elections for the Council and the Ra'ees of the Executive Authority in order that the Palestinian people in the West Bank, Jerusalem and the Gaza Strip may democratically elect accountable representatives;

RECOGNIZING that these elections will constitute a significant interim preparatory step toward the realization of the legitimate rights of the Palestinian people and

their just requirements and will provide a democratic basis for the establishment of Palestinian institutions;

REAFFIRMING their mutual commitment to act, in accordance with this Agreement, immediately, efficiently and effectively against acts or threats of terrorism, violence or incitement, whether committed by Palestinians or Israelis;

FOLLOWING the Gaza-Jericho Agreement; the Agreement on Preparatory Transfer of Powers and Responsibilities signed at Erez on August 29, 1994 (hereinafter "the Preparatory Transfer Agreement"); and the Protocol on Further Transfer of Powers and Responsibilities signed at Cairo on August 27, 1995 (hereinafter "the Further Transfer Protocol"); which three agreements will be superseded by this Agreement;

HEREBY AGREE as follows:

CHAPTER I - THE COUNCIL

ARTICLE I
Transfer of Authority

1. Israel shall transfer powers and responsibilities as specified in this Agreement from the Israeli military government and its Civil Administration to the Council in accordance with this Agreement. Israel shall continue to exercise powers and responsibilities not so transferred.

2. Pending the inauguration of the Council, the powers and responsibilities transferred to the Council shall be exercised by the Palestinian Authority established in accordance with the Gaza-Jericho Agreement, which shall also have all the rights, liabilities and obligations to be assumed by the Council in this regard. Accordingly, the term "Council" throughout this Agreement shall, pending the inauguration of the Council, be construed as meaning the Palestinian Authority.

3. The transfer of powers and responsibilities to the police force established by the Palestinian Council in accordance with Article XIV below (hereinafter "the Palestinian Police") shall be accomplished in a phased manner, as detailed in this Agreement and in the Protocol concerning Redeployment and Security Arrangements attached as Annex I to this Agreement (hereinafter "Annex I").

4. As regards the transfer and assumption of authority in civil spheres, powers and responsibilities shall be transferred and assumed as set out in the Protocol Concerning Civil Affairs attached as Annex III to this Agreement (hereinafter "Annex III").

5. After the inauguration of the Council, the Civil Administration in the West Bank will be dissolved, and the Israeli military government shall be withdrawn. The withdrawal of the military government shall not prevent it from exercising the powers and responsibilities not transferred to the Council.

6. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC"), Joint Regional Civil Affairs Subcommittees, one for the Gaza Strip and the other for the West Bank, and District Civil Liaison Offices in the West Bank shall be established in order to provide for coordination and cooperation in civil affairs between the Council and Israel, as detailed in Annex III.

7. The offices of the Council, and the offices of its Ra'ees and its Executive Authority and other committees, shall be located in areas under Palestinian territorial jurisdiction in the West Bank and the Gaza Strip.

ARTICLE II

Elections

1. In order that the Palestinian people of the West Bank and the Gaza Strip may govern themselves according to democratic principles, direct, free and general political elections will be held for the Council and the Ra'ees of the Executive Authority of the Council in accordance with the provisions set out in the Protocol concerning Elections attached as Annex II to this Agreement (hereinafter "Annex II").

2. These elections will constitute a significant interim preparatory step towards the realization of the legitimate rights of the Palestinian people and their just requirements and will provide a democratic basis for the establishment of Palestinian institutions.

3. Palestinians of Jerusalem who live there may participate in the election process in accordance with the provisions contained in this Article and in Article VI of Annex II (Election Arrangements concerning Jerusalem).

4. The elections shall be called by the Chairman of the Palestinian Authority immediately following the signing of this Agreement to take place at the earliest practicable date following the redeployment of Israeli forces in accordance with Annex I, and consistent with the requirements of the election timetable as provided in Annex II, the Election Law and the Election Regulations, as defined in Article I of Annex II.

ARTICLE III
Structure of the Palestinian Council

1. The Palestinian Council and the Ra'ees of the Executive Authority of the Council constitute the Palestinian Interim Self-Government Authority, which will be elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip for the transitional period agreed in Article I of the DOP.

2. The Council shall possess both legislative power and executive power, in accordance with Articles VII and IX of the DOP. The Council shall carry out and be responsible for all the legislative and executive powers and responsibilities transferred to it under this Agreement. The exercise of legislative powers shall be in accordance with Article XVIII of this Agreement (Legislative Powers of the Council).

3. The Council and the Ra'ees of the Executive Authority of the Council shall be directly and simultaneously elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip, in accordance with the provisions of this Agreement and the Election Law and Regulations, which shall not be contrary to the provisions of this Agreement.

4. The Council and the Ra'ees of the Executive Authority of the Council shall be elected for a transitional period not exceeding five years from the signing of the Gaza-Jericho Agreement on May 4, 1994.

5. Immediately upon its inauguration, the Council will elect from among its members a Speaker. The Speaker will preside over the meetings of the Council, administer the Council and its committees, decide on the agenda of each meeting, and lay before the Council proposals for voting and declare their results.

6. The jurisdiction of the Council shall be as determined in Article XVII of this Agreement (Jurisdiction).

7. The organization, structure and functioning of the Council shall be in accordance with this Agreement and the Basic Law for the Palestinian Interim Self-government Authority, which Law shall be adopted by the Council. The Basic Law and any regulations made under it shall not be contrary to the provisions of this Agreement.

8. The Council shall be responsible under its executive powers for the offices, services and departments transferred to it and may establish, within its jurisdiction, ministries and subordinate bodies, as necessary for the fulfillment of its responsibilities.

9. The Speaker will present for the Council's approval proposed internal procedures that will regulate, among other things, the decision-making processes of the Council.

ARTICLE IV
Size of the Council

The Palestinian Council shall be composed of 82 representatives and the Ra'ees of the Executive Authority, who will be directly and simultaneously elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip.

ARTICLE V
The Executive Authority of the Council

1. The Council will have a committee that will exercise the executive authority of the Council, formed in accordance with paragraph 4 below (hereinafter "the Executive Authority").

2. The Executive Authority shall be bestowed with the executive authority of the Council and will exercise it on behalf of the Council. It shall determine its own internal procedures and decision making processes.

3. The Council will publish the names of the members of the Executive Authority immediately upon their initial appointment and subsequent to any changes.

4. a. The Ra'ees of the Executive Authority shall be an ex officio member of the Executive Authority.

b. All of the other members of the Executive Authority, except as provided in subparagraph c. below, shall be members of the Council, chosen and proposed to the Council by the Ra'ees of the Executive Authority and approved by the Council.

c. The Ra'ees of the Executive Authority shall have the right to appoint some persons, in number not exceeding twenty percent of the total membership of the Executive Authority, who are not members of the Council, to exercise executive authority and participate in government tasks. Such appointed members may not vote in meetings of the Council.

d. Non-elected members of the Executive Authority must have a valid address in an area under the jurisdiction of the Council.

ARTICLE VI
Other Committees of the Council

1. The Council may form small committees to simplify the proceedings of the Council and to assist in controlling the activity of its Executive Authority.

2. Each committee shall establish its own decision-making processes within the general framework of the organization and structure of the Council.

ARTICLE VII
Open Government

1. All meetings of the Council and of its committees, other than the Executive Authority, shall be open to the public, except upon a resolution of the Council or the

relevant committee on the grounds of security, or commercial or personal confidentiality.

2. Participation in the deliberations of the Council, its committees and the Executive Authority shall be limited to their respective members only. Experts may be invited to such meetings to address specific issues on an ad hoc basis.

ARTICLE VIII
Judicial Review

Any person or organization affected by any act or decision of the Ra'ees of the Executive Authority of the Council or of any member of the Executive Authority, who believes that such act or decision exceeds the authority of the Ra'ees or of such member, or is otherwise incorrect in law or procedure, may apply to the relevant Palestinian Court of Justice for a review of such activity or decision.

ARTICLE IX
Powers and Responsibilities of the Council

1. Subject to the provisions of this Agreement, the Council will, within its jurisdiction, have legislative powers as set out in Article XVIII of this Agreement, as well as executive powers.

2. The executive power of the Palestinian Council shall extend to all matters within its jurisdiction under this Agreement or any future agreement that may be reached between the two Parties during the interim period. It shall include the power to formulate and conduct Palestinian policies and to supervise their implementation, to issue any rule or regulation under powers given in approved legislation and administrative decisions necessary for the realization of Palestinian self-government, the power to employ staff, sue and be sued and conclude contracts, and the power to keep and administer registers and records of the population, and issue certificates, licenses and documents.

3. The Palestinian Council's executive decisions and acts shall be consistent with the provisions of this Agreement.

4. The Palestinian Council may adopt all necessary measures in order to enforce the law and any of its decisions, and bring proceedings before the Palestinian courts and tribunals.

5. a. In accordance with the DOP, the Council will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.

b. Notwithstanding the provisions of this paragraph, the PLO may conduct negotiations and sign agreements with states or international organizations for the benefit of the Council in the following cases only:

(I) economic agreements, as specifically provided in Annex V of this Agreement:

(2) agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council,

(3) agreements for the purpose of implementing the regional development plans detailed in Annex IV of the DOP or in agreements entered into in the framework of the multilateral negotiations, and

Case 1:00-cv-00105-L-DLM     Document 178     Filed 06/17/03     Page 100 of 131 PageID #: 12568

(4) cultural, scientific and educational agreements. Dealings between the Council and representatives of foreign states and international organizations, as well as the establishment in the West Bank and the Gaza Strip of representative offices other than those described in subparagraph 5.a above, for the purpose of implementing the agreements referred to in subparagraph 5.b above, shall not be considered foreign relations.

6. Subject to the provisions of this Agreement, the Council shall, within its jurisdiction, have an independent judicial system composed of independent Palestinian courts and tribunals.

## CHAPTER 2 - REDEPLOYMENT AND SECURITY ARRANGEMENTS

### ARTICLE X
### Redeployment of Israeli Military Forces

1. The first phase of the Israeli military forces redeployment will cover populated areas in the West Bank - cities, towns, villages, refugee camps and hamlets - as set out in Annex I, and will be completed prior to the eve of the Palestinian elections, i. e., 22 days before the day of the elections.

2. Further redeployments of Israeli military forces to specified military locations will commence after the inauguration of the Council and will be gradually implemented commensurate with the assumption of responsibility for public order and internal security by the Palestinian Police, to be completed within 18 months from the date of the inauguration of the Council as detailed in Articles XI (Land) and XIII (Security), below and in Annex I.

3. The Palestinian Police shall be deployed and shall assume responsibility for public order and internal security for Palestinians in a phased manner in accordance with XIII (Security) below and Annex I.

4. Israel shall continue to carry the responsibility for external security, as well as the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

5. For the purpose of this Agreement, "Israeli military forces" includes Israel Police and other Israeli security forces.

### ARTICLE XI
### Land

1. The two sides view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

2. The two sides agree that West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations, will come under the jurisdiction of the Palestinian Council in a phased manner, to be completed within 18 months from the date of the inauguration of the Council, as specified below:

a. Land in populated areas (Areas A and B), including government and Al Waqf land, will come under the jurisdiction of the Council during the first phase of redeployment.

b. All civil powers and responsibilities, including planning and zoning, in Areas A and B, set out in Annex III, will be transferred to and assumed by the Council during the first phase of redeployment.

c. In Area C, during the first phase of redeployment Israel will transfer to the

Case 1:00-cv-00105-L-DLM     Document 178     Filed 06/17/03     Page 101 of 131 PageID #: 12569

Council civil powers and responsibilities not relating to territory, as set out in Annex III.

d. The further redeployments of Israeli military forces to specified military locations will be gradually implemented in accordance with the DOP in three phases, each to take place after an interval of six months, after the inauguration of the Council, to be completed within 18 months from the date of the inauguration of the Council.

e. During the further redeployment phases to be completed within 18 months from the date of the inauguration of the Council, powers and responsibilities relating to territory will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

f. The specified military locations referred to in Article X, paragraph 2 above will be determined in the further redeployment phases, within the specified time-frame ending not later than 18 months from the date of the inauguration of the Council, and will be negotiated in the permanent status negotiations.

3. For the purpose of this Agreement and until the completion of the first phase of the further redeployments:

a. "Area A" means the populated areas delineated by a red line and shaded in brown on attached map No. 1;

b. "Area B" means the populated areas delineated by a red line and shaded in yellow on attached map No. 1, and the built-up area of the hamlets listed in Appendix 6 to Annex I, and

c. "Area C" means areas of the West Bank outside Areas A and B, which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in accordance with this Agreement.

ARTICLE XII
Arrangements for Security and Public Order

1. In order to guarantee public order and internal security for the Palestinians of the West Bank and the Gaza Strip, the Council shall establish a strong police force as set out in Article XIV below. Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air, as well as the responsibility for overall security of Israelis and Settlements, for the purpose of safeguarding their internal security and public order, and will have all the powers to take the steps necessary to meet this responsibility.

2. Agreed security arrangements and coordination mechanisms are specified in Annex I.

3. A Joint Coordination and Cooperation Committee for Mutual Security Purposes (hereinafter "the JSC"), as well as Joint Regional Security Committees (hereinafter "RSCs") and Joint District Coordination Offices (hereinafter "DCOs"), are hereby established as provided for in Annex I.

4. The security arrangements provided for in this Agreement and in Annex I may be reviewed at the request of either Party and may be amended by mutual agreement of the Parties. Specific review arrangements are included in Annex I.

5. For the purpose of this Agreement, "the Settlements" means, in the West Bank the settlements in Area C; and in the Gaza Strip - the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as shown on

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 102 of 131 PageID #: 12570

attached map No. 2.

ARTICLE XIII
Security

l. The Council will, upon completion of the redeployment of Israeli military forces in each district, as set out in Appendix 1 to Annex I, assume the powers and responsibilities for internal security and public order in Area A in that district.

2. a. There will be a complete redeployment of Israeli military forces from Area B. Israel will transfer to the Council and the Council will assume responsibility for public order for Palestinians. Israel shall have the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism.

b. In Area B the Palestinian Police shall assume the responsibility for public order for Palestinians and shall be deployed in order to accommodate the Palestinian needs and requirements in the following manner:

(l) The Palestinian Police shall establish 25 police stations and posts in towns, villages, and other places listed in Appendix 2 to Annex I and as delineated on map No. 3. The West Bank RSC may agree on the establishment of additional police stations and posts, if required.

(2) The Palestinian Police shall be responsible for handling public order incidents in which only Palestinians are involved.

(3) The Palestinian Police shall operate freely in populated places where police stations and posts are located, as set out in paragraph b(1) above.

(4) While the movement of uniformed Palestinian policemen in Area B outside places where there is a Palestinian police station or post will be carried out after coordination and confirmation through the relevant DCO, three months after the completion of redeployment from Area B, the DCOs may decide that movement of Palestinian policemen from the police stations in Area B to Palestinian towns and villages in Area B on roads that are used only by Palestinian traffic will take place after notifying the DCO.

(5) The coordination of such planned movement prior to confirmation through the relevant DCO shall include a scheduled plan, including the number of policemen, as well as the type and number of weapons and vehicles intended to take part. It shall also include details of arrangements for ensuring continued coordination through appropriate communication links, the exact schedule of movement to the area of the planned operation, including the destination and routes thereto, its proposed duration and the schedule for returning to the police station or post.

The Israeli side of the DCO will provide the Palestinian side with its response, following a request for movement of policemen in accordance with this paragraph, in normal or routine cases within one day and in emergency cases no later than 2 hours.

(6) The Palestinian Police and the Israeli military forces will conduct joint security activities on the main roads as set out in Annex I.

(7) The Palestinian Police will notify the West Bank RSC of the names of the policemen, number plates of police vehicles and serial numbers of weapons, with respect to each police station and post in Area B.

(8) Further redeployments from Area C and transfer of internal security responsibility to the Palestinian Police in Areas B and C will be carried out in three phases, each to take place after an interval of six months, to be completed 18

months after the inauguration of the Council, except for the issues of permanent status negotiations and of Israel's overall responsibility for Israelis and borders.

(9) The procedures detailed in this paragraph will be reviewed within six months of the completion of the first phase of redeployment.

ARTICLE XIV
The Palestinian Police

1. The Council shall establish a strong police force. The duties, functions, structure, deployment and composition of the Palestinian Police, together with provisions regarding its equipment and operation, as well as rules of conduct, are set out in Annex I.

2. The Palestinian police force established under the Gaza-Jericho Agreement will be fully integrated into the Palestinian Police and will be subject to the provisions of this Agreement.

3. Except for the Palestinian Police and the Israeli military forces, no other armed forces shall be established or operate in the West Bank and the Gaza Strip.

4. Except for the arms, ammunition and equipment of the Palestinian Police described in Annex I, and those of the Israeli military forces, no organization, group or individual in the West Bank and the Gaza Strip shall manufacture, sell, acquire, possess, import or otherwise introduce into the West Bank or the Gaza Strip any firearms, ammunition, weapons, explosives, gunpowder or any related equipment, unless otherwise provided for in Annex I.

ARTICLE XV
Prevention of Hostile Acts

1. Both sides shall take all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against each other, against individuals falling under the other's authority and against their property and shall take legal measures against offenders.

2. Specific provisions for the implementation of this Article are set out in Annex I.

ARTICLE XVI
Confidence Building Measures

With a view to fostering a positive and supportive public atmosphere to accompany the implementation of this Agreement, to establish a solid basis of mutual trust and good faith, and in order to facilitate the anticipated cooperation and new relations between the two peoples, both Parties agree to carry out confidence building measures as detailed herewith:

1. Israel will release or turn over to the Palestinian side, Palestinian detainees and prisoners, residents of the West Bank and the Gaza Strip. The first stage of release of these prisoners and detainees will take place on the signing of this Agreement and the second stage will take place prior to the date of the elections. There will be a third stage of release of detainees and prisoners. Detainees and prisoners will be released from among categories detailed in Annex VII (Release of Palestinian Prisoners and Detainees). Those released will be free to return to their homes in the West Bank and the Gaza Strip.

2. Palestinians who have maintained contact with the Israeli authorities will not be subjected to acts of harassment, violence, retribution or prosecution. Appropriate

Case 1:00-cv-00105-L-DLM    Document 178    Filed 06/17/03    Page 104 of 131 PageID #: 12572

ongoing measures will be taken, in coordination with Israel, in order to ensure their protection.

3. Palestinians from abroad whose entry into the West Bank and the Gaza Strip is approved pursuant to this Agreement, and to whom the provisions of this Article are applicable, will not be prosecuted for offenses committed prior to September 13, 1993.

# CHAPTER 3 - LEGAL AFFAIRS

## ARTICLE XVII
### Jurisdiction

1. In accordance with the DOP, the jurisdiction of the Council will cover West Bank and Gaza Strip territory as a single territorial unit, except for:

a. issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, specified military locations, Palestinian refugees, borders, foreign relations and Israelis; and

b. powers and responsibilities not transferred to the Council.

2. Accordingly, the authority of the Council encompasses all matters that fall within its territorial, functional and personal jurisdiction, as follows:

a. The territorial jurisdiction of the Council shall encompass Gaza Strip territory, except for the Settlements and the Military Installation Area shown on map No. 2, and West Bank territory, except for Area C which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council. At this time, the jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

Territorial jurisdiction includes land, subsoil and territorial waters, in accordance with the provisions of this Agreement.

b. The functional jurisdiction of the Council extends to all powers and responsibilities transferred to the Council, as specified in this Agreement or in any future agreements that may be reached between the Parties during the interim period.

c. The territorial and functional jurisdiction of the Council will apply to all persons, except for Israelis, unless otherwise provided in this Agreement.

d. Notwithstanding subparagraph a. above, the Council shall have functional jurisdiction in Area C, as detailed in Article IV of Annex III.

3. The Council has, within its authority, legislative, executive and judicial powers and responsibilities, as provided for in this Agreement.

4. a. Israel, through its military government, has the authority over areas that are not under the territorial jurisdiction of the Council, powers and responsibilities not transferred to the Council and Israelis.

b. To this end, the Israeli military government shall retain the necessary legislative, judicial and executive powers and responsibilities, in accordance with international law. This provision shall not derogate from Israel's applicable legislation over Israelis in personam.

5. The exercise of authority with regard to the electromagnetic sphere and air space shall be in accordance with the provisions of this Agreement.

6. Without derogating from the provisions of this Article, legal arrangements detailed in the Protocol Concerning Legal Matters attached as Annex IV to this Agreement (hereinafter "Annex IV") shall be observed. Israel and the Council may negotiate further legal arrangements.

7. Israel and the Council shall cooperate on matters of legal assistance in criminal and civil matters through a legal committee (hereinafter "the Legal Committee"), hereby established.

8. The Council's jurisdiction will extend gradually to cover West Bank and Gaza Strip territory, except for the issues to be negotiated in the permanent status negotiations, through a series of redeployments of the Israeli military forces. The first phase of the redeployment of Israeli military forces will cover populated areas in the West Bank - cities, towns, refugee camps and hamlets, as set out in Annex I - and will be completed prior to the eve of the Palestinian elections, i.e. 22 days b

©2001-2003 electronicIntifada.net unless otherwise noted. You may freely print out, copy, and redistribute this page for informational purposes on a non-commercial basis.

# THE WYE RIVER MEMORANDUM

The following are steps to facilitate implementation of the Interim Agreement on the West Bank and Gaza Strip of September 28, 1995 (the "Interim Agreement") and other related agreements including the Note for the Record of January 17, 1997 (hereinafter referred to as "the prior agreements") so that the Israeli and Palestinian sides can more effectively carry out their reciprocal responsibilities, including those relating to further redeployments and security respectively. These steps are to be carried out in a parallel phased approach in accordance with this Memorandum and the attached time line. They are subject to the relevant terms and conditions of the prior agreements and do not supercede their other requirements.

## I. FURTHER REDEPLOYMENTS

A. Phase One and Two Further Redeployments

1. Pursuant to the Interim Agreement and subsequent agreements, the Israeli side's implementation of the first and second F.R.D. will consist of the transfer to the Palestinian side of 13% from Area C as follows:

1% to Area (A)
12% to Area (B)

The Palestinian side has informed that it will allocate an area/areas amounting to 3% from the above Area (B) to be designated as Green Areas and/or Nature Reserves. The Palestinian side has further informed that they will act according to the established scientific standards, and that therefore there will be no changes in the status of these areas, without prejudice to the rights of the existing inhabitants in these areas including Bedouins; while these standards do not allow new construction in these areas, existing roads and buildings will be maintained.

The Israeli side will retain in these Green Areas/Nature Reserves the overriding security responsibility for the purpose of protecting Israelis and confronting the threat of terrorism. Activities and movements of the Palestinian Police forces may be carried out after coordination and confirmation: the Israeli side will respond to such requests expeditiously.

2. As part of the foregoing implementation of the first and second F.R.D., 14.2% from Area (B) will become Area (A).

B. Third Phase of Further Redeployments

With regard to the terms of the Interim Agreement and of Secretary Christopher's letters to the two sides of January 17, 1997 relating to the further redeployment process, there will be a committee to address this question. The United States will be briefed regularly.

## II. SECURITY

In the provisions on security arrangements of the Interim Agreement, the Palestinian side agreed to take all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against the Israeli side, against individuals falling under the Israeli side's authority and against their property, just as the Israeli side agreed to take all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against the Palestinian side, against individuals falling under the Palestinians side's authority and against their property. The two sides also agreed to take legal measures against offenders within their jurisdiction and to prevent incitement against each other by any organizations, groups or individuals within their jurisdiction.

Both sides recognize that it is in their vital interests to combat terrorism and fight violence in accordance with Annex I of the Interim Agreement and the Note for the Record. They also recognize that the struggle against terror and violence must be comprehensive in that it deals with terrorists, the terror support structure, and the environment conducive to the support of terror. It must be continuous and constant over a long-term, in that there can be no pauses in the work against terrorists and their structure. It must be cooperative in that no effort can be fully effective without Israeli-Palestinian cooperation and the continuous exchange of information, concepts, and actions.

Pursuant to the prior agreements, the Palestinian side's implementation of its responsibilities for security, security cooperation, and other issues will be as detailed below during the time periods specified in the attached time line:

A. Security Actions

1. Outlawing and Combating Terrorist Organizations

(a) The Palestinian side will make known its policy of zero tolerance for terror and violence against both sides.

(b) A work plan developed by the Palestinian side will be shared with the U.S. and thereafter implementation will begin immediately to ensure the systematic and effective combat of terrorist organizations and their infrastructure.

(c) In addition to the bilateral Israeli-Palestinian security cooperation, a U.S.-Palestinian committee will meet biweekly to review the steps being taken to eliminate terrorist cells and the support structure that plans, finances, supplies and abets terror. In these meetings, the Palestinian side will inform the U.S. fully of the actions it has taken to outlaw all organizations (or wings of organizations, as appropriate) of a military, terrorist or violent character and their support structure and to prevent them from operating in areas under its jurisdiction.

(d) The Palestinian side will apprehend the specific individuals suspected of perpetrating acts of violence and terror for the purpose of further investigation, and prosecution and punishment of all persons involved in acts of violence and terror.

(e) A U.S.-Palestinian committee will meet to review and evaluate information pertinent to the decisions on prosecution, punishment or other legal measures which affect the status of individuals suspected of abetting or perpetrating acts of violence and terror.

2. Prohibiting Illegal Weapons

(a) The Palestinian side will ensure an effective legal framework is in place to criminalize, in conformity with the prior agreements, any importation, manufacturing or unlicensed sale, acquisition or possession of firearms, ammunition or weapons in areas under Palestinian jurisdiction.

(b) In addition, the Palestinian side will establish and vigorously and continuously implement a systematic program for the collection and appropriate handling of all such illegal items in accordance with the prior agreements. The U.S. has agreed to assist in carrying out this program.

(c) A U.S.-Palestinian-Israeli committee will be established to assist and enhance cooperation in preventing the smuggling or other unauthorized introduction of weapons or explosive materials into areas under Palestinian jurisdiction.

3. Preventing Incitement

(a) Drawing on relevant international practice and pursuant to Article XXII (1) of the Interim Agreement and the Note for the Record, the Palestinian side will issue a decree prohibiting all forms of incitement to violence or terror, and establishing mechanisms for acting systematically against all expressions or threats of violence or terror. This decree will be comparable to the existing Israeli legislation which deals with the same subject.

(b) A U.S.-Palestinian-Israeli committee will meet on a regular basis to monitor cases of possible incitement to violence or terror and to make recommendations and reports on how to prevent such incitement. The Israeli, Palestinian and U.S. sides will each appoint a media specialist, a law enforcement representative, an educational specialist and a current or former elected official to the committee.

B. Security Cooperation

The two sides agree that their security cooperation will be based on a spirit of partnership and will include, among other things, the following steps:

1. Bilateral Cooperation

There will be full bilateral security cooperation between the two sides which will be continuous, intensive and comprehensive.

2. Forensic Cooperation

There will be an exchange of forensic expertise, training, and other assistance.

3. Trilateral Committee

In addition to the bilateral Israeli-Palestinian security cooperation, a high-ranking U.S.-Palestinian-Israeli committee will meet as required and not less than biweekly to assess current threats, deal with any impediments to effective security cooperation and coordination and address the steps being taken to combat terror and terrorist organizations. The committee will also serve as a forum to address the issue of external support for terror. In these meetings, the Palestinian side will fully inform the members of the committee of the results of its investigations concerning terrorist suspects already in custody and the participants will exchange additional relevant information. The committee will report regularly to the leaders of the two sides in the status of cooperation, the results of the meetings and its recommendations.

C. Other Issues

1. Palestinian Police Force

(a) The Palestinian side will provide a list of its policemen to the Israeli side in conformity with the prior agreements.

(b) Should the Palestinian side request technical assistance, the U.S. has indicated its willingness to help meet these needs in cooperation with other donors.

(c) The Monitoring and Steering Committee will, as part of its functions, monitor the implementation of this provision and brief the U.S.

2. PLO Charter

The Executive Committee of the Palestine Liberation Organization and the Palestinian Central Council will reaffirm the letter of 22 January 1998 from PLO Chairman Yasir Arafat to President Clinton concerning the nullification of the Palestinian National Charter provisions that are inconsistent with the letters exchanged between the PLO and the Government of Israel on 9/10 September 1993. PLO Chairman Arafat, the Speaker of the Palestine National Council, and the Speaker of the Palestinian Council will invite the members of the PNC, as well as the members of the Central Council, the Council, and the Palestinian Heads of Ministries to a meeting to be addressed by President Clinton to reaffirm their support for the peace process and the aforementioned decisions of the Executive Committee and the Central Council.

3. Legal Assistance in Criminal Matters

Among other forms of legal assistance in criminal matters, the requests for arrest and transfer of suspects and defendants pursuant to Article II (7) of Annex IV of the Interim Agreement will be submitted (or resubmitted) through the mechanism of the Joint Israeli-Palestinian Legal Committee and will be responded to in conformity with Article II (7) (f) of Annex IV of the Interim Agreement within the twelve week period. Requests submitted after the eighth week will be responded to in conformity with Article II (7) (f) within four weeks of their submission. The U.S. has been requested by the sides to report on a regular basis on the steps being taken to respond to the above requests.

4. Human Rights and the Rule of Law

Pursuant to Article XI (1) of Annex I of the Interim Agreement, without derogating from the above, the Palestinian Police will exercise powers and responsibilities to implement this Memorandum with due regard to internationally accepted norms of human rights and the rule of law, and will be guided by the need to protect the public, respect human dignity, and avoid harassment.

## III. INTERIM COMMITTEES AND ECONOMIC ISSUES

1. The Israeli and Palestinian sides reaffirm their commitment to enhancing their relationship and agree on the need actively to promote economic development in the West Bank and Gaza. In this regard, the parties agree to continue or to reactivate all standing committees established by the Interim Agreement, including the Monitoring and Steering Committee, the Joint Economic Committee (JEC), the Civil Affairs Committee (CAC), the Legal Committee, and the Standing Cooperation Committee.

2. The Israeli and Palestinian sides have agreed on arrangements which will permit the timely opening of the Gaza Industrial Estate. They also have concluded a "Protocol Regarding the Establishment and Operation of the International Airport in the Gaza Strip During the Interim Period."

3. Both sides will renew negotiations on Safe Passage immediately. As regards to the southern route, the sides will make best efforts to conclude the agreement within a week of the entry into force of this Memorandum. Operation of the southern route will start as soon as possible thereafter. As regards the northern route, negotiations will continue with the goal of reaching agreement as soon as possible. Implementation will take place expeditiously thereafter.

4. The Israeli and Palestinian sides acknowledge the great importance of the Port of Gaza for the development of the Palestinian economy, and the expansion of Palestinian trade. They commit themselves to proceeding without delay to conclude an agreement to allow the construction and operation of the port in accordance with the prior agreements. The Israeli-Palestinian Committee will reactivate its work immediately with a goal of

concluding the protocol within sixty days, which will allow commencement of the construction of the port.

5. The two sides recognize that unresolved legal issues adversely affect the relationship between the two peoples. They therefore will accelerate efforts through the Legal Committee to address outstanding legal issues and to implement solutions to these issues in the shortest possible period. The Palestinian side will provide to the Israeli side copies of all its laws in effect.

6. The Israeli and Palestinian sides also will launch a strategic economic dialogue to enhance their economic relationship. They will establish within the framework of the JEC an Ad Hoc Committee for this purpose. The committee will review the following four issues: (1) Israeli purchase taxes; (2) cooperation in combating vehicle theft; (3) dealing with unpaid Palestinian debts; and (4) the impact of Israeli standards as barriers to trade and the expansion of the A1 and A2 lists. The committee will submit an interim report within three weeks of the entry into force of this Memorandum, and within six weeks will submit its conclusions and recommendations to be implemented.

7. The two sides agree on the importance of continued international donor assistance to facilitate implementation by both sides of the agreements reached. They also recognize the need for enhanced donor support for economic development in the West Bank and Gaza. They agree to jointly approach the donor community to organize a Ministerial Conference before the end of 1998 to seek pledges for enhanced levels of assistance.

## IV. PERMANENT STATUS NEGOTIATIONS

The two sides will immediately resume permanent status negotiations on an accelerated basis and will make a determined effort to achieve the mutual goal of reaching an agreement by May 4, 1999. The negotiations will be continuous and without interruption. The U.S. has expressed its willingness to facilitate these negotiations.

## V. UNILATERAL ACTIONS

Recognizing the necessity to create a positive environment for the negotiations, neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip in accordance with the Interim Agreement.

**ATTACHMENT**: Time Line

This Memorandum will enter into force ten days from the date of signature.

Done at Washington, D.C. this 23rd day of October 1998.

B. Netanyahu (signed) For the Government of the State of Israel

Y. Arafat (signed)  For the PLO

Witnessed by: William B. Clinton (signed) The United States of America

## TIME LINE

Note: Parenthetical references below are to paragraphs in "The Wye River Memorandum" to which this time line is an integral attachment. Topics not included in the time line follow the schedule provided for in the text of the Memorandum.

1. Upon Entry into Force of the Memorandum:

•Third further redeployment committee starts (I (B))
•Palestinian security work plan shared with the U.S. (II (A) (1) (b))
•Full bilateral security cooperation (II (B) (1))
•Trilateral security cooperation committee starts (II (B) (3))
•Interim committees resume and continue; Ad Hoc Economic Committee starts (III)
•Accelerated permanent status negotiations start (IV)

2. Entry into Force - Week 2:

•Security work plan implementation begins (II (A) (1) (b)); (II (A) (1) (c)) committee starts
•Illegal weapons framework in place (II (A) (2) (a)); Palestinian implementation report (II (A) (2) (b))
•Anti-incitement committee starts (II (A) (3) (b)); decree issued (II (A) (3) (a))
•PLO Executive Committee reaffirms Charter letter (II (C) (2))
•Stage 1 of F.R.D. implementation: 2% C to B, 7.1% B to A. Israeli officials acquaint their Palestinian counterparts as required with areas; F.R.D. carried out; report on F.R.D. implementation (I (A))

3. Week 2-6:

•Palestinian Central Council reaffirms Charter letter (weeks two to four) (II (C) (2))
•PNC and other PLO organizations reaffirm Charter letter (weeks four to six) (II (C) (2))
•Establishment of weapons collection program (II (A) (2) (b)) and collection stage (II (A) (2) (c)); committee starts and reports on activities.
•Anti-incitement committee report (II (A) (3) (b))
•Ad Hoc Economic Committee: interim report at week three; final report at week six (III)
•Policemen list (II (C) (1) (a)); Monitoring and Steering Committee review starts (II (C) (1) (c)
•Stage 2 of F.R.D. implementation: 5% C to B. Israeli officials acquaint their Palestinian counterparts as required with areas; F.R.D. carried out; report on F.R.D. implementation (I (A))

4. Week 6-12:

- Weapons collection stage II (A) (2) (b); II (A) (2) (c) committee report on its activities.
- Anti-incitement committee report (II (A) (3) (b))
- Monitoring and Steering Committee briefs U.S. on policemen list (II (C) (1) (c))
- Stage 3 of F.R.D. implementation: 5% C to B, 1% C to A, 7.1% B to A. Israeli officials acquaint Palestinian counterparts as required with areas; F.R.D. carried out; report on F.R.D. implementation (I (A))

5. After Week 12:

Activities described in the Memorandum continue as appropriate and if necessary, including:

- Trilateral security cooperation committee (II (B) (3))
- (II (A) (1) (c)) committee
- (II (A) (1) (e)) committee
- Anti-incitement committee (II (A) (3) (b))
- Third Phase F.R.D. Committee (I (B))
- Interim Committees (III)
- Accelerated permanent status negotiations (IV)

**The Sharm El –Sheikh Memorandum on Implementation Timeline of Outstanding Commitments of Agreements Signed and the Resumption of Permanent Status Negotiations**

The Government of the State of Israel ("GOI") and the Palestine Liberation Organization (PLO) commit themselves to full and mutual implementation of the Interim Agreement and all other agreements concluded between them since September 1993 (hereinafter "the prior agreements"), and all outstanding commitments emanating from the prior agreements. Without derogating from the other requirements of the prior agreements, the two Sides have agreed as follows:

1. Permanent Status negotiations:

   1. In the context of the implementation of the prior agreements, the two Sides will resume the Permanent Status negotiations in an accelerated manner and will make a determined effort to achieve their mutual goal of reaching a Permanent Status Agreement based on the agreed agenda i.e. the specific issues reserved for Permanent Status negotiators and other issues of common interest.
   2. the two Sides reaffirm their understanding that the negotiations on the Permanent Status will lead to the **implementation of Security** Council resolutions 242 and 338;
   3. The two Sides will make a determined effort to conclude a Framework Agreement on all permanent Status issues in five months from the resumption of the Permanent Status negotiations;
   4. The two Sides will conclude a comprehensive agreement on all Permanent Status issues within one year from the resumption of the Permanent Status negotiations;
   5. Permanent Status negotiations will resume after the implementation of the first stage of release of prisoners and the second stage of the First and Second Further Redeployments and not later than September 13, 1999. In the Wye River Memorandum, the United States has expressed its willingness to facilitate these negotiations.

2. Phase One and Phase Two of the Further Redeployments

The Israeli Side undertakes the following with regard to Phase One and Phase Two of the Further Redeployments:

   1. On September 5, 1999, to transfer 7% from Area C to Area B;
   2. On November 15, 1999, to transfer 2% from Area B to Area A and 3% from Area C to Area B;
   3. On January 20, 2000, to transfer 1% from Area C to Area A, and 5.1% from Area B to Area A.

3. Release of Prisoners

1. The two Sides shall establish a joint committee that shall follow-up on matters related to release of Palestinian prisoners.
2. The Government of Israel shall release Palestinian and other prisoners who committed their offences prior to September 13, 1993, and were arrested prior to May 4, 1994. The Joint Committee shall agree on the names of those who will be released in the first two stages. Those lists shall be recommended to the relevant Authorities through the Monitoring and Steering Committee;
3. The first stage of release of prisoners shall be carried out on September 5, 1999 and shall consist of 200 prisoners. The second stage of release of prisoners shall be carried out on October 8, 1999 and shall consist of 150 prisoners;
4. The joint committee shall recommend further lists of names to be released to the relevant Authorities through the Monitoring and Steering Committee;
5. The Israeli side will aim to release Palestinian prisoners before next Ramadan.

4. Committees

1. The Third Further Redeployment Committee shall commence its activities not later than September 13, 1999;
2. The Monitoring and Steering Committee, all Interim Committees (i.e. CAC, JEC, JSC, legal committee, people to people), as well as Wye River Memorandum committees shall resume and/or continue their activity, as the case may be, not later than September 13, 1999. The Monitoring and Steering Committee will have on its agenda, inter alia, the Year 2000, Donor/PA projects in Area C, and the issue of industrial estates;
3. The Continuing Committee on displaced persons shall resume its activity on October 1, 1999 (Article XXVII, Interim Agreement);
4. Not later than October 30, 1999, the two Sides will implement the recommendations of the Ad-hoc Economic Committee (Article III-6, WRM).

5. Safe Passage

1. The operation of the Southern Route of the Safe Passage for the movement of persons, vehicles, and goods will start on October 1, 1999 (Annex I, Article X, Interim Agreement) in accordance with the details of operation, which will be provided for in the Safe Passage Protocol that will be concluded by the two Sides not later than September 30, 1999;
2. The two Sides will agree on the specific location of the crossing point of the Northern Route of the Safe Passage as specified in Annex I, Article X, provision c-4, in the Interim Agreement not later than October 5, 1999;
3. The Safe Passage Protocol applied to the Southern Route of the Safe Passage shall apply to the Northern Route of the Safe Passage with relevant agreed modifications;
4. Upon the agreement on the location of the crossing point of the Northern Route of the Safe Passage, construction of the needed facilities and related procedures shall commence and shall be ongoing. At the same time, temporary facilities will be

established for the operation of the Northern Route not later that four months from the agreement on the specific location of the crossing-point;

5. In between the operation of the Southern crossing point of the Safe Passage and the Northern crossing point of the Safe Passage, Israel will facilitate arrangements for the movement between the West Bank and the Gaza Strip, using non-Safe Passage routes other than the Southern Route of the Safe Passage;

6. The location of the crossing points shall be without prejudice to the Permanent Status Negotiations (Annex I, Article X, provision e, Interim Agreement).

## 6. Gaza Sea Port

The two Sides have agreed on the following principles to facilitate and enable the construction works of the Gaza Sea Port. The principles shall not prejudice or preempt the outcome of negotiations on the Permanent Status:

1. The Israeli Side agrees that the Palestinian Side shall commence construction works in and related to the Gaza Sea Port on October 1, 1999;

2. The two Sides agree that the Gaza Sea Port will not be operated in any way before reaching a joint Sea Port protocol on all aspects of operating the Port, including security;

3. The Gaza Sea Port is a special case, like the Gaza Airport, being situated in an area under the responsibility of the Palestinian Side and serving as an international passage. Therefore, with the conclusion of a joint Sea Port Protocol, all activities and arrangements relating to the construction of the Port shall be in accordance with the provisions of the Interim Agreement, especially those relating to international passages, as adapted in the Gaza Airport Protocol;

4. The construction shall ensure adequate provision for effective security and customs inspection of people and goods, as well as the establishment of a designated checking area in the Port;

5. In this context, the Israeli side will facilitate on an on-going basis the works related to the construction of the Gaza Sea Port, including the movement in and out of the Port of vessels, equipment , resources, and material required for the constriction of the Port;

6. The two Sides will coordinate such works, including the designs and movement, through a joint mechanism.

## 7. Hebron Issues

1. The Shuhada Road in Hebron shall be opened for the movement of Palestinian vehicles in two phases. The first phase has been carried out not later than October 30, 1999;

2. The wholesale market-Hasbahe will be opened not later than November 1, 1999, in accordance with arrangements which will be agreed upon by the two Sides;

3. A high level Joint Liaison Committee will convene not later than September 13, 1999 to review the situation in the Tomb of the Patriarchs/ Al Haram Al Ibrahimi

(Annex I, Article VII, Interim Agreement and as per the January 15, 1998 US Minute of Discussion).

8. Security

1. The two Sides will, in accordance with the prior agreements, act to ensure the immediate, efficient and effective handling of any incident involving a threat or act of terrorism, violence or incitement, whether committed by Palestinians or Israelis. To this end, they will cooperate in the exchange of information and coordinate policies and activities. Each Side shall immediately and effectively respond to the occurrence or anticipated occurrence of an act of terrorism, violence, or incitement and shall take all necessary measures to prevent such an occurrence;

2. Pursuant to the prior agreements, the Palestinian side undertakes to implement its responsibilities for security, security cooperation, on-going obligations and other issues emanating from the prior agreements, including, in particular, the following obligations emanating from the Wye River Memorandum:

   1. continuation of the program for the collection of the illegal weapons, including reports;
   2. apprehension of subjects, including reports;
   3. forwarding of the list of Palestinian policemen to the Israeli Side not later than September 13, 1999;
   4. beginning of the review of the list by the Monitoring and Steering Committee not later than October 15,1999.

9. The two Sides call upon the international donor community to enhance its commitment and financial support to the Palestinian economic development and the Israeli-Palestinian peace process.

10. Recognizing the necessity to create a positive environment for the negotiations, neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip in accordance with the Interim Agreement.

11. Obligations pertaining to dates, which occur on holidays or Saturdays, shall be carried out on the first subsequent working day.

This memorandum will enter force one week from the date of its signature.

Made and signed in Sharm el-Sheikh, this fourth day of September 1999.

For the Government of the State of Israel
For the PLO


Witnessed by
For the Arab Republic of Egypt

For the United States of America
For the Hashemite Kingdom of Jordan

Signed by
For the Government of Israel: Prime Minister Ehud Barak
For the Palestine Liberation Organization: President Yasser Arafat
For the Arab Republic of Egypt: President Hosni Mubarak
For the United States of America: Secretary of State Madeline Albright
For the Hashemite Kingdom of Jordan: King Abdullah

# Draft adopted on 7 July 1998 as resolution 52/250

# General Assembly

Distr.
GENERAL

A/52/L.53/Rev.2
2 July 1998

ORIGINAL: ENGLISH

Fifty-second session
Agenda item 36

QUESTION OF PALESTINE

Afghanistan, Algeria, Bahrain, Bangladesh, Comoros, Cuba, Djibouti,
Egypt, Guinea, Indonesia, Jordan, Kuwait, Malaysia, Mauritania, Oman,
Qatar, Saudi Arabia, Sudan, Tunisia, United Arab Emirates, Viet Nam,
and Yemen: revised draft resolution

Participation of Palestine in the work of the United Nations

The General Assembly,

Recalling its resolution 181 (II) of 29 November 1947, in which it, inter alia,
recommended the partition of Palestine into a Jewish State and an Arab State, with
Jerusalem as a corpus separatum,

Recalling also its resolution 3237 (XXIX) of 22 November 1974, in which it granted
observer status to the Palestine Liberation Organization,

Recalling further its resolution 43/160 A of 9 December 1988, adopted under the item
entitled "Observer status of national liberation movements recognized by the
Organization of African Unity and/or the League of Arab States", in which it decided that

the Palestine Liberation Organization was entitled to have its communications issued and circulated as official documents of the United Nations,

Recalling its resolution 43/177 of 15 December 1988, in which it acknowledged the proclamation of the State of Palestine by the Palestine National Council on 15 November 1988 and decided, inter alia, that the designation "Palestine" should be used in place of the designation "Palestine Liberation Organization" in the United Nations system,

Recalling its resolutions 49/12 A of 9 November 1994 and 49/12 B of 24 May 1995, through which, inter alia, arrangements for the Special Commemorative Meeting of the General Assembly on the occasion of the fiftieth anniversary of the United Nations, in addition to applying to all Member and observer States, were also applied to Palestine, in its capacity as observer, including in the organizing process of the list of speakers for the Commemorative Meeting,

Recalling further that Palestine enjoys full membership in the Group of Asian States and the Economic and Social Commission for Western Asia,

Aware that Palestine is a full member of the League of Arab States, the Movement of Non-Aligned Countries, the Organization of the Islamic Conference and the Group of 77 and China,

Aware also that general democratic Palestinian elections were held on 20 January 1996 and that the Palestinian Authority was established on part of the Occupied Palestinian Territory,

Desirous of contributing to the achievement of the inalienable rights of the Palestinian people, thus achieving a just and comprehensive peace in the Middle East,

1. Decides to confer upon Palestine, in its capacity as observer, and as contained in the annex to the present resolution, additional rights and privileges of participation in the sessions and work of the General Assembly and the international conferences convened under the auspices of the Assembly or other organs of the United Nations, as well as in United Nations conferences;

2. Requests the Secretary-General to inform the Assembly, within the current session, on the implementation of the modalities annexed to the present resolution.

ANNEX

The additional rights and privileges of participation of Palestine shall be effected through the following modalities, without prejudice to the existing rights and privileges:

1. The right to participation in the general debate of the General Assembly.

2. Without prejudice to the priority of Member States, Palestine shall have the right of inscription on the list of speakers under agenda items other than Palestinian and Middle East issues at any meeting of the plenary after the last Member State inscribed on the list of that meeting.

3. The right of reply.

4. The right to raise points of order related to the proceedings on Palestinian and Middle East issues, provided that the right to raise such a point of order shall not include the right to challenge the decision of the presiding officer.

5. The right to co-sponsor draft resolutions and decisions on Palestinian and Middle East issues. Such draft resolutions and decisions shall only be put to a vote upon request from a Member State.

6. The right to make interventions, with a precursory explanation or the recall of relevant General Assembly resolutions being made only once by the President of the General Assembly at the start of each session of the Assembly.

7. Seating for Palestine shall be arranged immediately after non-Member States and before the other observers[;] and with the allocation of six seats in the General Assembly Hall.

8. Palestine shall not have the right to vote or to put forward candidates.


-----

# UNITED
# NATIONS

**General Assembly**
**A/52/1002**
**4 August 1998**

-----------------------------------------------------------------------

**Fifty-second session**
**Agenda item 36**
**Question of Palestine**

**Participation of Palestine in the work of the United Nations**

**Note by the Secretary-General**

The General Assembly, pursuant to paragraph 1 of its resolution 52/250 of 7 July 1998, decided to confer upon Palestine, in its capacity as observer, and as contained in the annex to the present resolution, additional rights and privileges of participation in the sessions and work of the General Assembly and the international conferences convened under the auspices of the Assembly or other organs of the United Nations, as well as in United Nations conferences. In paragraph 2 of the same resolution, the Assembly requested the Secretary-General to inform the Assembly, within the current session, on the implementation of the modalities annexed to the present resolution.

Based on the Secretary-General's understanding of resolution 52/250 and the annex thereto, the additional rights and privileges of participation of Palestine, in its capacity as observer, would be effected through the following modalities, without prejudice to the existing rights and privileges in the sessions and work of the General Assembly and the international conferences convened under its auspices; in the other organs of the United Nations; as well as in United Nations conferences:

1. The right to participate in the general debate of the General Assembly.

Since the list of speakers for the general debate of the fifty-third session of the General Assembly was prepared prior to the adoption of resolution 52/250, Palestine was inscribed on the last day of the general debate of the fifty-third session. Henceforth, the Permanent Observer Mission of Palestine will be invited to submit three preferences of date and meeting (morning or afternoon) from within the period of the general debate of a regular session of the General Assembly. If the General Assembly decides upon a different methodology of establishing the list of speakers for the general debate of a session, Palestine will have the right to participate in that methodology.

2. Without prejudice to the priority of Member States, Palestine shall have the right of inscription on the list of speakers under agenda items other than Palestinian and Middle

East issues at any plenary meeting of the General Assembly, after the last Member State inscribed on the list of that meeting.

In the plenary meetings of the General Assembly, the established practice concerning the inscription of Palestine on the list of speakers under agenda item Question of Palestine will continue. Under agenda items on Palestinian and Middle East issues, Palestine will be inscribed on the list of speakers in the order in which it signifies its desire to speak. Under agenda items other than Palestinian and Middle East issues, Palestine will have the right to be inscribed on the list of speakers at any meeting of the plenary after the last Member State inscribed on the list of that meeting.

3. The right of reply.

The presiding officer will accord the right of reply to Palestine in the order in which it signifies its desire to make a reply.

4. The right to raise points of order related to the proceedings on Palestinian and Middle East issues, provided that the right to raise such a point of order shall not include the right to challenge the decision of the presiding officer.

On matters related to the proceedings on agenda items concerning Palestinian and Middle East issues, Palestine may rise to a point of order, with the exception of a point of order made in connection with the actual conduct of voting. A point of order will be immediately decided by the presiding officer in accordance with the rules of procedure of the General Assembly. Palestine may not appeal against the ruling of the presiding officer.

Palestine will not have the right to make procedural motions including the adjournment of debate, the closure of debate and the suspension or adjournment of the meeting.

5. The right to co-sponsor draft resolutions and decisions on Palestinian and Middle East issues. Such draft resolutions and decisions shall only be put to a vote upon request from a Member State.

Palestine will have the right to co-sponsor a draft resolution, draft decision or amendment under agenda items concerning Palestinian and Middle East issues but may not be the sole sponsor of such draft resolution, draft decision or amendment. Action will be taken on such draft resolution, draft decision or amendment upon request from a Member State.

6. The right to make interventions, with a precursory explanation or the recall of relevant General Assembly resolutions being made only once by the President of the General Assembly at the start of each session of the Assembly.

At the beginning of each session of the General Assembly, during its consideration of the report of the General Committee, the President will indicate that Palestines participation

in that session will be in accordance with General Assembly resolution 52/250 of 7 July 1998, after which there will be no precursory explanation prior to any intervention by Palestine in the session.

7. Seating for Palestine shall be arranged immediately after non-Member States and before the other observers; and with the allocation of six seats in the General Assembly Hall.

Palestine will be seated after non-member States and before intergovernmental organizations. In the General Assembly Hall, Palestine will occupy three seats as well as the three seats immediately behind.

To reflect the new arrangements, the next edition of the Permanent Missions to the United Nations, the Blue Book, will list Palestine under a new category III, Entities having received a standing invitation to participate in the sessions and work of the General Assembly and maintaining permanent observer missions at Headquarters, immediately after category II, Non-member States maintaining permanent observer missions at Headquarters. Category III, Entities ..., will be followed by categories IV, Intergovernmental organizations ..., V, Other entities ..., and VI, Specialized agencies and related organizations ....

8. Palestine shall not have the right to vote or to put forward candidates.

Palestine will not have the right to vote, including in elections. Palestine may neither submit its own candidacy for any election or appointment nor submit the names of candidates for any election or appointment.

United Nations

A/RES/57/269

 **General Assembly**

Distr.: General
5 March 2003

---

**Fifty-seventh session**
Agenda item 91

## Resolution adopted by the General Assembly

*[on the report of the Second Committee (A/57/536)]*

**57/269. Permanent sovereignty of the Palestinian people in the Occupied Palestinian Territory, including East Jerusalem, and of the Arab population in the occupied Syrian Golan over their natural resources**

*The General Assembly,*

*Recalling* its resolution 56/204 of 21 December 2001, and taking note of Economic and Social Council resolution 2002/31 of 25 July 2002,

*Reaffirming* the principle of the permanent sovereignty of peoples under foreign occupation over their natural resources,

*Guided* by the principles of the Charter of the United Nations, affirming the inadmissibility of the acquisition of territory by force, and recalling relevant Security Council resolutions, including resolutions 242 (1967) of 22 November 1967, 465 (1980) of 1 March 1980 and 497 (1981) of 17 December 1981,

*Reaffirming* the applicability of the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949,[1] to the Occupied Palestinian Territory, including East Jerusalem, and other Arab territories occupied by Israel since 1967,

*Expressing its concern* at the exploitation by Israel, the occupying Power, of the natural resources of the Occupied Palestinian Territory, including East Jerusalem, and other Arab territories occupied by Israel since 1967,

*Also expressing its concern* at the extensive destruction by Israel, the occupying Power, of agricultural land and orchards in the Occupied Palestinian Territory during the recent period,

*Aware* of the additional detrimental economic and social impact of the Israeli settlements on Palestinian and other Arab natural resources, especially the confiscation of land and the forced diversion of water resources,

*Reaffirming* the need for the immediate resumption of negotiations within the Middle East peace process, on the basis of Security Council resolutions 242 (1967),

---

[1] United Nations, *Treaty Series*, vol. 75, No. 973.

338 (1973) of 22 October 1973 and 425 (1978) of 19 March 1978 and the principle of land for peace, and for the achievement of a final settlement on all tracks,

*Taking note* of the note by the Secretary-General on the economic and social repercussions of the Israeli occupation on the living conditions of the Palestinian people in the Occupied Palestinian Territory, including Jerusalem, and of the Arab population in the occupied Syrian Golan,[2]

1.    *Reaffirms* the inalienable rights of the Palestinian people and the population of the occupied Syrian Golan over their natural resources, including land and water;

2.    *Calls upon* Israel, the occupying Power, not to exploit, cause loss or depletion of or endanger the natural resources in the Occupied Palestinian Territory, including East Jerusalem, and in the occupied Syrian Golan;

3.    *Recognizes* the right of the Palestinian people to claim restitution as a result of any exploitation, loss or depletion of, or danger to, their natural resources, and expresses the hope that this issue will be dealt with in the framework of the final status negotiations between the Palestinian and Israeli sides;

4.    *Requests* the Secretary-General to report to it at its fifty-eighth session on the implementation of the present resolution, and decides to include in the provisional agenda of its fifty-eighth session an item entitled "Permanent sovereignty of the Palestinian people in the Occupied Palestinian Territory, including East Jerusalem, and of the Arab population in the occupied Syrian Golan over their natural resources".

*78th plenary meeting*
*20 December 2002*

---

[2] A/57/63-E/2002/21.

2