UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATES OF YARON UNGAR and          :
EFRAT UNGAR by and through the          :
Administrator of their estates          :
David Strachman, DVIR UNGAR, minor,     :
by his guardians and next friend,       :
YISHAI UNGAR, minor, by his             :
guardians and next friend,              :
PROFESSOR MEYER UNGAR, JUDITH           :
UNGAR, RABBI URI DASBERG, JUDITH        :
DASBERG (individually and in their      :
capacity as legal guardians of          :
plaintiffs Dvir Ungar and Yishai        :
Ungar); AMICHAI UNGAR, DAFNA UNGAR      :
and MICHAL COHEN,                       :
                        Plaintiffs,[1]  :
                                        :
          v.                            :      C.A. No. 00-105 L
                                        :
                                        :
THE PALESTINIAN AUTHORITY               :
(A.K.A. "THE PALESTINIAN INTERIM        :
SELF-GOVERNMENT AUTHORITY"),            :
THE PALESTINE LIBERATION                :
ORGANIZATION, YASSER ARAFAT,            :
JIBRIL RAJOUB, MUHAMMED DAHLAN,         :
AMIN AL-HINDI, TAWFIK TIRAWI,           :
RAZI JABALI, HAMAS -- ISLAMIC           :
RESISTANCE MOVEMENT (A.K.A.             :
"HARAKAT AL-MUQAWAMA AL-ISLAMIYYA"),    :
ABDEL RAHMAN ISMAIL ABDEL RAHMAN        :
GHANIMAT, JAMAL ABDEL FATAH             :
TZABICH AL HOR, RAED FAKHRI ABU         :
HAMDIYA, IBRAHIM GHANIMAT and           :
IMAN MAHMUD HASSAN FUAD KAFISHE,        :
                        Defendants.[2]  :

---

[1] The claim of the Estate of Efrat Ungar was dismissed on July 24, 2001, because it was brought pursuant to 18 U.S.C. § 2333, and the Complaint does not allege that Efrat Ungar was a national of the United States.  See Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76, 97, (D.R.I. 2001).  Additionally, all claims based on the death of Efrat Ungar were dismissed as those claims also depended upon her status as a United States national.  See id.

[2] Defendants Yasser Arafat, Jibril Rajoub, Muhammed Dahlan, Amin Al-Hindi, Tawfik Tirawi, and Razi Jabali were dismissed from this action for lack of personal jurisdiction on July 24, 2001.  See id. at 95.

## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

Before the court is Plaintiffs' Motion to Enter Default Judgment Against Defendants Hamas and Hamas Operatives ("Motion to Enter Default Judgment") pursuant to Fed. R. Civ. P. 55(b)(2). This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.R.I. Local R. 32(a). A hearing on the motion was conducted on July 12, 15, and 19, 2002. After reviewing the memoranda and exhibits submitted and performing independent research, I recommend that the Motion to Enter Default Judgment be granted as to defendant Hamas -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya") ("Hamas"), but denied as to defendants Abdel Rahman Ismail Abdel Rahman Ghanimat ("Rahman Ghanimat"), Jamal Abdel Fatah Tzabich Al Hor ("Hor"), Raed Fakhri Abu Hamdiya ("Abu Hamdiya"), Ibrahim Ghanimat, and Iman Mahmud Hassan Fuad Kafishe ("Kafishe"). I further recommend that plaintiffs be awarded $116,409,123.00 in damages, plus interest, attorneys fees of $65,621.25, and costs of $1,437.72.

## I. Background

This lawsuit stems from the June 9, 1996, murder of an American citizen living in Israel, Yaron Ungar, and his Israeli wife, Efrat Ungar, by the terrorist group Hamas. The action is brought by his legal representative and his heirs pursuant to the Antiterrorism Act of 1990 ("ATA"), 18 U.S.C. § 2333, which provides a cause of action for American nationals whose person, property, or business is injured by reason of an act of international terrorism.

The Ungars were attacked near Beit Shemesh, Israel, as they drove home from a wedding. A vehicle, driven by Abu Hamdiya and

occupied by Rahman Ghanimat and Hor, overtook the Ungar car, and Rahman Ghanimat and Hor fired Kalishnikov machine guns at it. Yaron and Efrat Ungar were fatally wounded, but the fusillade of bullets missed their ten month old son, plaintiff Yishai Ungar, who was in the back seat. Another son, plaintiff Dvir Ungar, then age twenty months, was not in the vehicle at the time of the attack.

Subsequent events are detailed in the July 24, 2001, Decision and Order of Senior Judge Ronald L. Lagueux, see Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76 (D.R.I. 2001), relevant portions of which are quoted below:

> Abu Hamdiya, Rahman Ghanimat, and Hor were arrested following the shooting attack. A fourth man, defendant [Kafishe], was also arrested in connection with the shooting. In addition, a warrant was issued for the arrest of Ibrahim Ghanimat on charges relating to the murders of Yaron and Efrat Ungar. Ibrahim Ghanimat remains at large and is believed to be residing within territory controlled by defendant PA [the Palestinian Authority].
>
> All five men involved in the shooting are members of Hamas Islamic Resistance Movement, also known as "Harakat Al-Muqawama Al-Islamiyya" ("Hamas"). A terrorist group dedicated to murdering Israeli and Jewish individuals through bombings, shootings, and other violent acts, Hamas is based in and operates from territories controlled by defendants PA, PLO [Palestine Liberation Organization], and Yasser Arafat. Terrorist attacks are staged by small groups of Hamas members organized as a cell for the purpose of carrying out terrorist activities. Abu Hamdiya, Rahman Ghanimat, Hor, Kafishe, and Ibrahim Ghanimat comprised the terrorist cell that murdered the Ungars.
>
> On May 3, 1998, Abu Hamdiya was convicted by an Israeli court of membership in Hamas and of abetting the shooting murders of Yaron Ungar and Efrat Ungar. On October 21, 1998, an Israeli court convicted Rahman Ghanimat and Hor of membership in defendant Hamas and of the murders of Yaron Ungar and Efrat Ungar. On November 3, 1998, Kafishe was convicted by an Israeli court of membership in Hamas and of being an accessory to the murders of

Yaron and Efrat Ungar.

Thereafter, on October 25, 1999, an Israeli court appointed attorney David Strachman ("Strachman") as administrator of the Estates of Yaron and Efrat Ungar. Strachman was appointed as the administrator of the Ungars' estates for the express purpose of administering and realizing assets, rights, and causes of action that could be pursued on behalf of the Ungars' estates within the United States.

On March 13, 2000, plaintiffs filed an action pursuant to 18 U.S.C. § 2333 *et seq.* and related torts in the United States District Court for the District of Rhode Island. The following parties are listed as plaintiffs: the Estate of Yaron Ungar and the Estate of Efrat Ungar, represented by Strachman; Dvir Ungar and Yishai Ungar, the minor children and heirs-at-law of Yaron Ungar and Efrat Ungar; Professor Meyer Ungar and Judith Ungar, the parents of Yaron Ungar and the legal guardians of plaintiffs Dvir and Yishai Ungar; Rabbi Uri Dasberg and Judith Dasberg, the parents of Efrat Ungar and the legal guardians of plaintiffs Dvir and Yishai Ungar; and Amichai Ungar, Dafna Ungar, and Michal Cohen, the siblings of Yaron Ungar. Plaintiffs Professor Meyer Ungar and Judith Ungar bring this action both as the legal guardians of plaintiffs Dvir and Yishai Ungar and in their individual capacities. Similarly, plaintiffs Rabbi Uri Dasberg and Judith Dasberg bring this action both as the legal guardians of plaintiffs Dvir and Yishai Ungar and in their individual capacities.

The defendants named in this lawsuit can be divided into two groups. The first group is comprised of the PA defendants ....[3]

The second group of defendants is comprised of the Hamas defendants ("Hamas defendants"). This group includes Hamas, as well as the individual operatives of

---

[3] The PA defendants are the Palestinian Authority ("PA"); the Palestine Liberation Organization ("PLO"); Yasser Arafat ("Arafat"), President of the PA and Chairman of the PLO; Jibril Rajoub and Muhammed Dahlan, who commanded and controlled the Palestinian Preventive Security Services; Amin Al-Hindi and Tawfik Tirawi, who commanded and controlled the Palestinian General Intelligence Services; and Razi Jabali, who commanded and controlled the Palestinian Police. See Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76, 82, 84 (D.R.I. 2001).

Hamas responsible for the shooting attack that killed Yaron and Efrat Ungar:  Rahman Ghanimat, Hor, Abu Hamdiya, Kafishe, and Ibrahim Ghanimat.

.... Count I alleges that defendants engaged in acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333 ....[4]

....  Plaintiffs ... allege that the Hamas defendants planned and executed acts of violence against civilians in Israel, Gaza and the West Bank, including the murders of Yaron and Efrat Ungar.  Plaintiffs contend that defendants' actions constitute acts of international terrorism because their actions: (1) were dangerous to human life and are a violation of the criminal laws of the United States,[5] (2) appear to be intended to intimidate or coerce a civilian population, or to influence the policy of a government by means of intimidation or coercion, and (3) occurred outside the territorial jurisdiction of the United States.

Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76, 83-84 (D.R.I. 2001)(third footnote renumbered from original).

## II. Travel

The Complaint in this matter was filed on March 13, 2000. See Document #1.  Service upon Ibrahim Ghanimat was effectuated in accordance with The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial

---

[4] Counts II, III, IV, and V were state law claims which were dismissed by Judge Lagueux on July 24, 2001, on the basis that Israeli law, as opposed to Rhode Island law, applied.  See Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76, 99 (D.R.I. 2001). Plaintiffs here seek default judgment against the Hamas defendants only as to Count I.  See Damages Mem. at 4.

[5] "Specifically, plaintiffs allege that the actions of the Hamas defendants constitute violations of 18 U.S.C. § 2332 (homicide of a United States national outside of the United States), and that the actions of the PA defendants constitute, inter alia, violations of 18 U.S.C. § 3 (Accessory After the Fact) and of 18 U.S.C. § 2339A (Providing Material Support to Terrorists)."  Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d at 84 n.1.

Matters (the "Convention"),[6] specifically sub-paragraph (a) of the first paragraph of Article 5, on April 16, 2000, by delivering a copy of the summons and Complaint to Jamal Abo-Toameh, a licensed advocate, at 4 Saladin Street, Jerusalem, Israel.  See Document #20.  Hor, Abu Hamdiya, Rahman Ghanimat, and Kafishe were personally served in prison in Israel,[7] pursuant to the Convention.  See Documents #11, #26, #28, #29.  Hamas was served by delivery of a copy of the summons and Complaint to Mohammed Abdul Hamid Khalil Salah at 9229 South Thomas, Bridgeview, Illinois, on June 21, 2000, see Document #23, and to Sheik Ahmed Yassin in Gaza, Palestinian Authority, on July 27, 2000, see Document #27.

On September 6, 2000, Plaintiffs' Application for Entry of Default as to defendants Rahman Ghanimat, Hor, Abu Hamdiya, Ibrahim Ghanimat, Kafishe, and Hamas was filed.  See Document #30.  Default was entered by the clerk against these defendants on September 7, 2000.  See Document #32.

The instant Motion to Enter Default Judgment was filed on November 29, 2000.  See Document #38.  It was referred to this Magistrate Judge for findings and recommendations on June 6, 2002.  The PA defendants filed an objection to the motion on July 11, 2002,[8] see Document #77, but the objection was held by this

---

[6] The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, was signed at The Hague on November 15, 1965.  See 20 U.S.T. 361.

[7] Hor and Abu Hamdiya were served on April 25, 2000.  See Documents #11, #26.  Kafishe was served on August 13, 2000, see Document #29, and Rahman Ghanimat was served on August 15, 2000, see Document #28.

[8] As a result of being notified on July 10, 2002, of the PA defendants' intention to file an objection to the Motion to Enter Default, plaintiffs filed a motion to sever the claims against the Hamas defendants.  See Memorandum in Support of Plaintiffs' Motion to Sever at 2-3.  Plaintiffs' Motion to Sever was referred to this Magistrate Judge on November 14, 2002.  It was denied without

Magistrate Judge to be untimely and overruled at the commencement of the July 12, 2002, hearing on the Motion to Enter Default Judgment.[9]  The hearing continued on July 15 and 19, 2002.[10] Thereafter, the court took the matter under advisement.

## III. Jurisdiction

As an initial matter, when judgment is sought against parties who have failed to plead or otherwise defend, a district court has an affirmative duty to assure itself that it has jurisdiction over both the subject matter and the parties.  See Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001); In re Tuli, 172 F.3d 707, 712 (9th Cir. 1999); Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 772 (10th Cir. 1997); Williams v. Life Sav. & Loan, 802 F.2d 1200, 1203 (10th Cir. 1986); Koshel v. Koshel, No. CIV.A.3:01-CV-2006-M, 2002 WL 1544681, at *4 (N.D. Tex. July 11, 2002)(holding that jurisdiction must be established as a threshold matter before a motion for entry of default judgment

---

prejudice by an order entered on December 13, 2002. See Document #97. The order stated that plaintiffs may renew their motion to sever after the court rules upon the instant Motion for Entry of Default Judgment. See id. at 2.

[9] Subsequent to the July 12, 2002, hearing a written order was entered reflecting that the objection had been overruled as untimely. See Document #89.

[10] The July 19, 2002, hearing dealt with the issue of whether the court had personal jurisdiction over Hamas and the individual Hamas defendants.  Plaintiffs were advised by the court on July 15, 2002, of the court's concern about the issue of personal jurisdiction and that it would conduct a hearing on July 19th limited to that issue.  See 7/15/02 Hearing Transcript ("Tr.") at 39-40.  Prior to the hearing the court asked plaintiffs to be prepared to address several questions pertaining to the court's exercise of personal jurisdiction over the Hamas defendants.  See Letter from Martin, M.J., to Strachman of 7/16/02; cf. Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16, (1st Cir. 1992)(noting that after the entry of default the district court may hold a hearing to establish the truth of any averment in the complaint, but the court must make its requirements known in advance so that the plaintiff can understand the direction of the proceeding and marshal such evidence as might be available to him).

can be granted); <u>see</u> <u>also</u> <u>Daynard v. Ness, Motley, Loadholt,</u> <u>Richardson & Poole, P.A.</u>, 290 F.3d 42, 50 (1st Cir. 2002)("To hear a case, a court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decision.'")(quoting <u>United States v. Swiss Am. Bank, Ltd.</u>, 191 F.3d 30, 35 (1st Cir. 1999)); <u>Letelier v. Republic of Chile</u>, 488 F. Supp. 665, 668 (D.D.C. 1980)(holding that issue of subject matter jurisdiction should be fully explored despite previous entry of default); <u>cf.</u> <u>Hugel v. McNell</u>, 886 F.2d 1, 3 n.3 (1st Cir. 1989)("[W]here the court rendering the default judgment is shown to lack personal jurisdiction over the defendant, ... the judgment may be vacated and set aside by the rendering court on motion, or by another court on collateral attack.")(quoting 6 Moore's Federal Practice para. 55.09) (alteration in original). Accordingly, this court examines both subject matter and personal jurisdiction.

## A. Subject Matter Jurisdiction

Judge Lagueux's analysis and finding of subject matter jurisdiction as to the PA defendants applies equally to the Hamas defendants.

> Count I of plaintiffs' complaint pleads a federal cause of action pursuant to 18 U.S.C. § 2333. 18 U.S.C. § 2333 provides that:
>
>> [a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.
>
> 18 U.S.C. § 2333(a). In addition, 18 U.S.C. § 2338 provides that "[t]he district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter." 18 U.S.C. § 2338 (1994).

Therefore, this Court has subject matter jurisdiction over Count I of plaintiffs' complaint if plaintiffs have alleged sufficient facts to invoke § 2333.

Plaintiffs' complaint alleges that Yaron Ungar is a United States citizen. Pls.' Compl. ¶ 1. It further alleges that Yaron Ungar was murdered by an act of international terrorism as defined by 18 U.S.C. § 2331. Id. at ¶¶ 1, 21-23. The Estate of Yaron Ungar is represented by a court-appointed administrator, plaintiff Strachman, a resident and domiciliary of the State of Rhode Island. Id. at ¶ 4. Although the complaint alleges additional facts demonstrating the existence of subject matter jurisdiction as to Count I of the complaint, the Court need not go any further. Viewing the complaint in the light most favorable to plaintiffs, they have alleged sufficient facts to demonstrate that this Court has subject matter jurisdiction over Count I of the complaint.

Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76, 85-86 (D.R.I. 2001)(alterations in original).

## B. Personal Jurisdiction

Plaintiffs argue that the court may exercise personal jurisdiction over both Hamas and the five individual Hamas defendants consistent with the Due Process Clause of the Fifth Amendment. See Memorandum in Support of Plaintiffs' Motion to Enter Default Judgment Against Defendants Hamas and Hamas Operatives ("Plaintiffs' Mem.") at 2-27. As to defendant Hamas, plaintiffs contend that this court has personal jurisdiction through domestic service of process pursuant to 18 U.S.C. § 2334(a), see id. at 2-10, and Fed. R. Civ. P. 4(k)(1)(D), see id. at 4-10, or in the alternative, pursuant to Fed. R. Civ. P. 4(k)(2), see id. at 10-26. As to defendants Rahman Ghanimat, Hor, Abu Hamdiya, Ibrahim Ghanimat, and Kafishe (the "individual Hamas defendants"), plaintiffs argue that the court has personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2). See id.

This court's exercise of personal jurisdiction over the Hamas defendants must be consistent with the constitutional

requirements of minimum contacts and due process.  <u>See</u> <u>Estates of Ungar v. Palestinian Authority</u>, 153 F. Supp. 2d 76, 82 (D.R.I. 2001).  Judge Lagueux's prior explication of the law regarding personal jurisdiction is fully applicable here.

In a federal question case, the starting point of this Court's minimum contacts analysis is the Due Process Clause of the Fifth Amendment.  U.S. Const. amend.  V. "When the district court's *subject-matter* jurisdiction rests wholly or in part on the existence of a federal question, the constitutional limits of the court's *personal* jurisdiction are drawn in the first instance with reference to the due process clause of the fifth amendment."  <u>Lorelei Corp. v. County of Guadalupe</u>, 940 F.2d 717, 719 (1st Cir.1991).  The relevant inquiry under such circumstances is whether the defendant has minimum contacts with the United States as a whole, rather than whether the defendant has minimum contacts with the particular state in which the federal court sits.  <u>See</u> <u>id.</u> at 719-20.

The reasoning behind this rule of law was aptly explained by Judge Selya in <u>United Elec., Radio and Mach. Workers v. 163 Pleasant St. Corp.</u>, 960 F.2d 1080 (1st Cir.1992).

Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question case, a federal court's power to assert personal jurisdiction is geographically expanded.  In such circumstances, the Constitution requires only that the defendant have the requisite "minimum contacts" with the United States, rather than with the particular forum state (as would be required in a diversity case).

<u>Id.</u> at 1085 (citing <u>Lorelei</u>, 940 F.2d at 719; <u>Trans-Asiatic Oil Ltd. v. Apex Oil Co.</u>, 743 F.2d 956, 959 (1st Cir.1984)).

Despite the fact that "the physical scope of the court's constitutional power is broad," <u>Lorelei</u>, 940 F.2d at 719, this Court's inquiry is not yet complete.  Before a district court can exercise personal jurisdiction over a defendant in a federal question case, plaintiff must also establish that service of process is authorized by

10

a federal statute or rule. See id.  This statutory
limitation on the district court's exercise of personal
jurisdiction must be satisfied, for although service of
process and personal jurisdiction are distinct concepts,
they are also closely related, and a court cannot obtain
personal jurisdiction without effective service of
process. Lorelei, 940 F.2d at 719-20 n. 1 (citing Driver
v. Helms, 577 F.2d 147, 155 (1st Cir.1978)).

Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76,
87 (D.R.I. 2001).

To determine whether the above requirements have been
satisfied, the court asks whether plaintiffs have made a prima
facie showing that the Hamas defendants have minimum contacts
with the United States as a whole.  See King Vision Pay-Per-View
Ltd. v. Spice Restaurant & Lounge, Inc., 244 F. Supp. 2d 1173,
1177 (D. Kan. 2003)("When considering a motion for default
judgment, the court must first determine that plaintiff has made
a prima facie showing of the court's personal jurisdiction over
the defaulting party."); cf. United States v. Swiss American
Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001)(applying prima
facie standard where court rules upon motion to dismiss for lack
of personal jurisdiction without conducting an evidentiary
hearing); Estates of Ungar v. Palestinian Authority, 153 F. Supp.
2d at 88 (applying prima facie test in context of motion to
dismiss filed by defendants).  In deciding whether plaintiffs
have made the requisite showing, the court may look to the
allegations contained in the Complaint.  See Hugel v. McNell, 886
F.2d 1, 4-5 (1st Cir. 1989)(finding allegations in complaint
sufficient to enable district court to exercise in personam
jurisdiction and enter default judgment against non-resident
defendant).  The court also "must accept the plaintiff's
(properly documented) evidentiary proffers as true for the
purpose of determining the adequacy of the prima facie
jurisdictional showing." Foster-Miller, Inc. v. Babcock & Wilcox
Canada, 46 F.3d 138, 145 (1st Cir. 1995)(noting that the prima

facie standard is a useful means of screening out cases in which personal jurisdiction is obviously lacking).  Affidavits submitted are to be construed in the light most favorable to the plaintiff.  See Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1347 (Fed. Cir. 2002) ("[W]hether the plaintiff has made a prima facie showing of personal jurisdiction over the defendant requires construing the pleadings and affidavits in the light most favorable to the plaintiff.")(citing Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1383 n.1 (Fed. Cir. 1998)); Market/Media Research, Inc. v. Union-Tribune Publ'g Co., 951 F.2d 102, 104 (6th Cir. 1992); Gallery 13 Ltd. v. Easter, No. 93 CIV. 8865 (KMW), 1995 WL 258143, at *1 (S.D.N.Y. May 2, 1995)(holding that for purpose of motion for entry of a default judgment "[w]hether plaintiff has made a prima facie showing [of personal jurisdiction over the defendants] is to be determined with all pleadings and affidavits construed in the light most favorable to plaintiff.").

### 1. Hamas

Plaintiffs contend that jurisdiction over Hamas is established through domestic service of process pursuant to 18 U.S.C. § 2334(a) and Federal Rule of Civil Procedure 4(k)(1)(D). See Plaintiffs' Mem. at 2-6.  Rule 4(k)(1)(D) provides that service of a summons is effective to establish jurisdiction over the person of a defendant "when authorized by a statute of the United States."  Fed. R. Civ. P. 4(k)(1)(D).  18 U.S.C. § 2334(a) states that "[p]rocess in [a civil action under section 2333 of this title] may be served in any district where the defendant resides, is found, or has an agent."  18 U.S.C. § 2334(a).  Therefore, plaintiffs have made a prima facie showing of personal jurisdiction as to Hamas if: (1) Hamas has minimum contacts with the United States as a whole, and (2) Hamas was served in any

district where it is found, or has an agent.  See Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d at 88 (making same analysis in the case of defendants PA and PLO.)

### a. Evidence of Minimum Contacts

The exhibits attached to Plaintiffs' Mem. and information contained in In the Matter of Extradition of Mousa Mohammed Abu Marzook ("Marzook"), 924 F. Supp. 565 (S.D.N.Y. 1996), persuade this court that Hamas has minimum contacts with the United States.  Some additional background information is necessary to appreciate the significance of certain facts on which the court relies in making this finding.

Hamas was "founded in the Israeli Occupied Territories in 1987 at the beginning of the Intifada, the Palestinian-led campaign to resist Israeli political dominion over the occupied territories."  Plaintiffs' Mem., Exhibit ("Ex.") B (Affidavit of [FBI Special Agent] Robert Wright) ("Wright Aff.") at 3 n.1.  The stated objective of Hamas is the establishment of a Palestinian identity and homeland.  See Marzook, 924 F. Supp. at 568; Wright Aff. at 3 n.1.  Hamas operates through a political branch and a military branch.  See id.  The political wing promotes political awareness of Palestinian issues and provides education, health care, and other social services.  See Marzook, 924 F. Supp. at 568.  The military wing engages in hostile activities in Israel, see id., and it has claimed credit for violent attacks in that country which are commonly described as terrorist activities,[11]

---

[11] In 1995, Hamas was designated as a terrorist organization by President Clinton through an Executive Order.  See Exec. Order No. 12947, 60 Fed. Reg. 5079, 5081 (Jan. 23, 1995); Memorandum in Support of Plaintiffs' Motion to Enter Default Judgment against Defendants Hamas and Hamas Operatives ("Plaintiffs' Mem."), Exhibit ("Ex.") D (U.S. Department of the Treasury Office of Foreign Assets Control, "What You Need to Know About U.S. Sanctions," 10-26-2000) at 1; see also Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev., 291 F.3d 1000, 1002 (7th Cir. 2002)(noting the designation).  Following the September 11, 2001, attacks on the United States,

see Wright Aff. at 3-4 n.1.

During an extradition proceeding conducted in the Southern District of New York in 1996, Mousa Mohammed Abu Marzook ("Abu Marzook") admitted to being the head of the political wing of Hamas, see Marzook, 924 F. Supp. at 568, and its "de facto ambassador to the world," id. at 586.   He had become the acting leader of Hamas in 1989, following the arrest of Sheikh Yassin, a Hamas leader based in Gaza.   See Plaintiffs' Mem., Ex. E (Affidavit of Yehudit Barsky)("Barsky Aff.") ¶ 7.   Abu Marzook admitted during the extradition proceedings that he had been the leader of Hamas since 1992.   See id.

> Abu Marzook is a native of Rafia, Gaza, who moved to the United States in 1973, and eventually settled in the Washington, D.C./Northern Virginia area as a resident alien until 1993.   Between 1993 and 1995, he resided principally in Jordan, which deported him in June of 1995 for his involvement and senior position in HAMAS.   In July of 1995, after making trips to Iran and Syria, Abu Marzook attempted to reenter the United States at which time he was arrested by Customs and INS officials at the request of the Israeli government which sought to prosecute Abu Marzook for numerous crimes in connection with his leadership of HAMAS.

Wright Aff. ¶ 37.   Israel sought Abu Marzook's extradition.   See Marzook, 924 F. Supp. at 568.

Having provided this additional background, the court now states the facts which demonstrate the existence of minimum contacts.   First, Abu Marzook, the admitted leader of the political wing of Hamas, see Marzook, 924 F. Supp. at 568,

---

President Bush issued "Executive Order 13224 [which] blocks all property and interests in property of the designated terrorist organizations, known as specially designated global terrorists, or SDGTs.   On October 31, 2001, the President designated Hamas as one of the SDGTs subject to the Order."   Holy Land Found. For Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57, 63 (D.D.C. 2002).   Hamas is now "nearly universally recognized" as a terrorist group.   United States v. Yousef, 327 F.3d 56, 108 (2nd Cir. 2003).

resided in the United States until 1993, <u>see</u> Wright Aff. ¶ 37; <u>see also</u> <u>Marzook</u>, 924 F. Supp. at 578 (noting that he "has been a resident in the United States for a number of years and that some of his children have United States citizenship by birth").  It is a reasonable inference that between 1989, when he became acting leader of Hamas, and 1993, when he relocated to Jordan, Abu Marzook conducted significant activities while in the United States on behalf of Hamas.[12]  Although it is theoretically possible that Abu Marzook could have left the United States every time he needed to do anything in his role as leader and to have otherwise scrupulously avoided all Hamas activities, including receiving communications about Hamas matters, such a scenario defies common sense.

Second, the exhibits submitted indicate that Hamas has used United States banks to deposit and transfer funds to Hamas members and Hamas related organizations in this country and abroad.  <u>See</u> Wright Aff. ¶¶ 2, 4, 21, 38, 41, 45-55; Barsky Aff. ¶¶ 9-10, 14, 19.  For example, bank records indicate that between 1989 and January 1993, more than $752,800 flowed from Abu Marzook (or accounts controlled by Abu Marzook) to Muhammed Salah ("Salah"),[13] <u>see</u> Wright Aff. ¶ 38, a naturalized American citizen

---

[12] Abu Marzook admitted that he had raised money for Hamas.  <u>In the Matter of Extradition of Mousa Mohammed Abu Marzook</u> ("<u>Marzook</u>"), 924 F. Supp. 565, 579 (S.D.N.Y. 1996).  While the <u>Marzook</u> opinion does not indicate if Abu Marzook admitted raising money for Hamas in the United States, he did acknowledge that the evidence showed that he transferred $7,000 to Abu Ahmad, <u>see</u> <u>id.</u> at 586, a.k.a. Muhammed Salah ("Salah"), <u>see</u> <u>id.</u> at 587, a Chicago area resident, <u>see</u> Plaintiffs' Mem., Ex. B (Affidavit of [FBI Special Agent] Robert Wright) ("Wright Aff.") ¶ 4, whom the FBI has identified as a "high-level HAMAS military operative," <u>id.</u> ¶ 11.  Salah is described in the <u>Marzook</u> opinion and the Affidavit of Yehudit Barsky ("Barsky Aff.") as having "admitted to being the head of the military wing of Hamas."  <u>Marzook</u>, 924 F. Supp. at 587; Plaintiffs' Mem., Ex. E (Barsky Aff.) ¶ 11.

[13] Muhammed Salah ("Salah") is also known as Abu Ahmad.  <u>See</u> <u>Marzook</u>, 924 F. Supp. at 587; <u>see also</u> n.12.  On July 27, 1995, Salah's name was added to the United States Treasury Department's List

and Chicago area resident, see id. ¶ 4.  Salah was arrested in Israel in January of 1993 and pled guilty in January of 1995 to belonging to Hamas and illegally channeling funds to it, including funds transferred through an account which Salah and his wife jointly held at the LaSalle Talman Bank ("LaSalle Bank") in Chicago.[14]  See id. ¶ 4.

During the four week period immediately preceding Salah's arrest in Israel, see Wright Aff. ¶¶ 4, 57, "close associates of Abu Marzook initiated a series of wire transfers into Salah's LaSalle Bank account totaling $985,000,"[15] id. ¶ 45.  On December 29, 1992, $300,000 was transferred from an account, which was jointly held by Abu Marzook and Ismail Selim Elbarasse ("Elbarasse"), at the First American Bank of McLean, Virigina, to Salah's LaSalle Bank account.  See id. ¶ 47.  Salah flew to Jerusalem on January 13, 1993.  See id. ¶ 49.  After arriving there, Salah withdrew a significant portion of the $300,000 which had been placed into his account by Elbarasee.  See id.  On January 19, 1993, Salah directed the wire transfer of $200,000 from his LaSalle Bank account to an account at First Chicago Bank of Ravenswood held by Rihbe Abdel Rhaman, see id. ¶ 50, a money changer in Ramallah, West Bank," Marzook, 924 F. Supp. at 592.[16]

---

of Specially Designated Terrorists, 60 Fed. Reg. 44932 (Aug. 29, 1995), because of his facilitation of terrorist activities in the Middle East, see Wright Aff. ¶ 5; Plaintiffs' Mem., Ex. D at 7.

[14] Salah was sentenced to five years in prison.  He was released from an Israeli prison in November of 1997 and was permitted to return to the United States.  See Wright Aff. ¶ 4.

[15] It is not clear from the Wright Aff. if the $985,000 transferred to Salah during this four week period, see Wright Aff. ¶¶ 4, 44-45, includes any of the $752,000 transferred from Abu Marzook (or accounts controlled by Abu Marzook) to Salah between 1989 and January 1993, see id. ¶ 38.

[16] This $200,000 was subsequently transferred from the Chicago Bank of Ravenswood account to the Middle East.  See Wright Aff. ¶ 50.

51. According to bank records reviewed by the FBI, the successful transfer of the $200,000 on January 20, 1993 was closely followed by a succession of large wire transfers from HAMAS-related sources into Mohammed and Azita [Salah]'s LaSalle Bank account. Records from the Salahs' LaSalle Bank account and the First American account of Elbarasse and Abu Marzook show that on January 20, 1993, Elbarasee wire transferred $135,000 into the Salahs' LaSalle Bank account, and followed it with another wire transfer of $300,000 on January 25, 1993.

52. Bank records for the First American Bank of Virginia account held jointly by Abu Marzook and Elbarasse show a further influx of overseas money just prior to this second round of wire transfers to the Salahs' LaSalle Bank account. On January 4, 1993, a second $99,985 wire transfer was received into the First American Account from an individual named Gazi Abu Samah. On January 22, 1993, the First American account was credited another $665,000 from a wire transfer from Faisal Financial of Geneva, Switzerland.

53. FBI review of bank records also show that during the same period, Nasser Al-Khatib ("Al-Khatib"), a United States-based supporter and financial backer of HAMAS and close associate of Abu Marzook, wire transferred additional funds into Salah-controlled accounts in Chicago. In an interview with the FBI in March of 1994, Al-Khatib acknowledged being a supporter of HAMAS, and that he donated money to HAMAS causes. Al-Khatib further related that prior to leaving the United States in June of 1993, he was an employee of Abu Marzook, serving essentially as Abu Marzook's personal secretary. In that capacity, Al-Khatib[] explained, he had access to and was a signatory to some of Abu Marzook's financial accounts, and that he had made financial transactions on Abu Marzook's behalf.

54. A review of bank records reveals that on January 21, 1993, Al-Khatib wired $50,000 into Salah's La Salle Bank account. On the same day, he wired an additional $30,000 into Standard Bank & Trust account number 2393288006-2 held jointly by Salah and his wife. Standard Bank & Trust records reflect that the wire from Al-Khatib was credited in Azita Salah's name. Al-Khatib followed with a $170,000 wire transfer on January 22, 1993 into the Salah's [sic] Standard Trust Bank account

number 239328006-2.[17]

Wright Aff. ¶¶ 51-54 (footnote in ¶ 53 omitted).  When Salah was arrested by Israeli authorities on January 25, 1993, he had $97,400 in his possession.  See id. ¶ 55.  He also had extensive notes of the meetings he had conducted with Hamas operatives and contacts in Israel and the occupied territories over the preceding eleven days.  See id.  On February 10, 1995, the Office of Foreign Assets Control, U.S. Department of the Treasury, ordered all of the known bank accounts of Salah and his wife frozen on the basis that there was reason to believe he had acted on behalf of Hamas, an organization designated by President Clinton, in Executive Order No. 12947, as a terrorist organization.  See id. ¶ 61.

Third, Salah admitted to Israeli authorities that he was the head of the military wing of Hamas, see Marzook, 924 F. Supp. at 587; see also Barsky Aff. ¶ 11, and that he had engaged in activity on behalf of Hamas both in the United States and abroad, see Wright Aff. ¶ 12; Barsky Aff. ¶¶ 11-13.

> 12.  While in Israeli custody after his arrest on January 25, 1993, Salah made a series of statements to Israeli authorities in which he admitted his activities in the United States and abroad as a HAMAS military operative prior to and during the period he was claiming to be a computer analyst for QLI.[18]  According to Salah, his involvement with HAMAS began approximately in 1988 and continued through to the date of his arrest by Israeli authorities on January 25, 1993.  Salah futher divulged that his activities for HAMAS, domestically and

---

[17] The two account numbers in ¶ 54 are not identical, but this is apparently due to a typographical error.

[18] QLI is the Quranic Literacy Institute of Oak Lawn, Illinois, an entity which "represents itself to be a not-for-profit research institute devoted to the translation and publication of sacred Islamic texts and to scholarly research devoted to such topics."  Wright Aff. ¶ 6.

internationally, included recruiting and training new candidates for membership in HAMAS military cells in the Israeli Occupied Territories and to perform terrorist acts, primarily in the State of Israel. Salah told Israeli authorities that his recruitment activities included, among other things, conducting interviews and background checks, as well as identifying and sorting prospective candidates on the basis of expertise and skills relating to, among other things, knowledge of chemicals, explosives and the construction of terrorist devices that might be used in HAMAS military operations in Israel and elsewhere. His training activities for HAMAS, according to Salah, included mixing poisons, development of chemical weapons, and preparing remote control explosive devices.

13. Salah also admitted having served as a financial conduit for HAMAS operations. Relatedly, he admitted to directly financing domestic and international travel and terrorism training for new HAMAS members. Airline records obtained by the FBI show that Salah purchased airline tickets for travel between the United States and sites in the Middle East for himself and other suspected HAMAS terrorists .... A review of the Salahs' bank records revealed that Salah paid for the airfare by executing a check, dated September 29, 1992, drawn from the subject LaSalle Bank account that Salah jointly held with his wife Azita. Additionally, Salah has acknowledged in statements to Israeli authorities that these trips were taken for the purpose of receiving training in preparation for HAMAS military and terrorist operations in Israel.

14. Bank and airline records obtained by the FBI and reviewed in conjunction with statements to Israeli authorities by Salah and other HAMAS operatives indicate that between June 18, 1991 and December 30, 1992, Mohammed Salah expended in excess of $100,000 in direct support of HAMAS military activities.

Wright Aff. ¶¶ 12-14.

Salah also told Israeli authorities that in December of 1992, he was ordered by Abu Marzook to travel to Israel's West Bank in January of 1993 to carry out five missions on behalf of Hamas. See Wright Aff. ¶ 36. "Abu Marzook instructed him to distribute $790,000 to Hamas cells in support of HAMAS-sponsored

military (or terrorist) activities." <u>Id.</u> ¶ 41.   In addition:

> 42.  Salah told Israeli authorities that Abu Marzook
> also identified by name specific contacts and operatives
> with whom Salah was to meet to gather further information
> and make assessments regarding HAMAS' situation following
> the mass deportations and resulting leadership vacuum.
> Additionally, Abu Marzook provided Salah with the names
> of specific individuals who were to be placed into
> leadership positions in various mosques and units to
> replace those who had been deported.
>
> 43.   In response to Abu Marzook's various
> directives, Salah made arrangements for air travel from
> the United States to sites in the Middle East for himself
> and other HAMAS operatives.  The air travel was booked
> through Ghada Sharif.  Sharif was Salah's regular travel
> agent for such purposes, having previously booked the
> airline reservations for Salah to fly to Israel to
> conduct HAMAS business in August or September of 1992, as
> well as those of Hamas operatives Alwan Shareef and
> Razick Saleh Abdel Razick to fly to Syria in September of
> 1992 for HAMAS military training.

Wright Aff. ¶¶ 42-43.  It is a reasonable inference from the
above information that Abu Marzook issued and Salah received the
above mentioned orders and instructions while the two men were in
the United States.

Fourth, the Wright Aff. provides a sufficient basis for
concluding that Salah used the Quranic Literacy Institute ("QLI")
of Oak Lawn, Illinois, as a means of disguising and furthering
his activities in the United States, <u>see</u> Wright Aff. ¶ 11
("Salah's claimed employment with QLI was likely a cover for his
position as a high-level HAMAS military operative."), and that
QLI assisted Salah in this endeavor, <u>see id.</u> ¶¶ 6-10.  Sometime
after January 1, 1991, Salah applied for a mortgage loan in
excess of $100,000 from Standard Bank & Trust Company of
Evergreen Park, Illinois, to purchase a residence at 9229 S.
Thomas, Bridgeview, Illinois.  <u>See</u> Wright Aff. ¶ 7.  In the
application for the loan, Salah claimed that his only employment
was that of a $36,000 a year computer analyst with QLI.  <u>See id.</u>

QLI verified Salah's employment by submitting an employment verification letter on QLI letterhead signed by QLI's Corporate Secretary and Trustee, Amer Haleem. See id. Yet, an examination of QLI's business records by the FBI failed to disclose any type of regular periodic payments to Salah, such as paychecks, or tax withholding records which would indicate that Salah was an employee of QLI. See id. ¶ 9. On February 6, 1998, QLI's attorney denied that that QLI had ever employed Salah. See id. Salah's wife also denied that he was employed by QLI and stated that he only performed volunteer work for the organization. See id. ¶ 9. The FBI concluded that the income tax returns for the years 1988, 1989, and 1990, which Salah had submitted with his mortgage application, were falsified. See id. ¶ 10.

> 21. A review of bank records further indicates that QLI and QLI-related entities or individuals likely were a source of funds for Salah's HAMAS-related expenditures between 1991 and his arrest in January of 1993 and beyond. They also suggest that the QLI-related transfers of funds to Salah were, in significant part, structured in an effort to conceal QLI as the source of the funds.

Id. ¶ 21.

Fifth, there is evidence that real estate purchased by QLI was used to support Salah's Hamas related activities. See Wright Aff. ¶¶ 24-35, 44; see also United States v. One 1997 E35 Ford Van, VIN 1FBJS31L3VHB70844 ("U.S. v. One 1997 E35 Ford Van"), 50 F. Supp. 2d 789, 804 (N.D. Ill. 1999)(stating that the complaint for forfeiture raises that inference). Paragraphs 24 through 35 of Wright's affidavit detail QLI's purchase in 1991 of a large unimproved lot in Woodridge, Illinois, for $820,000. The purchase was accomplished through a chain of transactions which obscured QLI's connection to the purchase and to the overseas transfer of $820,000 from a Saudi entity with which the deal was financed. See Wright Aff. ¶ 33. After the purchase, the

property was leased.  See id. ¶ 29.  Based on the timing and
amounts of certain fund transfers, a reasonable inference can be
drawn that lease proceeds were transferred to Geneva,
Switzerland, and then to Salah's First National Bank account.
See id. ¶ 31; see also U.S. v. One 1997 E35 Ford Van, 50 F. Supp.
2d at 805 (finding such an inference reasonable).[19]

Sixth, plaintiffs have also submitted an affidavit of
Yehudit Barsky, the director of the division on the Middle East
and International Terrorism for the American Jewish Committee.
See Barsky Aff. ¶ 1.  Mr. Barsky has a master's degree in
international relations and Near Eastern studies from New York
University, see id., Attachment ("Att.") 1 at 1, and states that
for the past thirteen years he has researched and investigated
the activities of Middle Eastern terrorist organizations
operating in the United States, see Barsky Aff. ¶ 1.  In addition
to citing information contained in Agent Wright's affidavit and
the Marzook opinion, 924 F. Supp. 565 (S.D.N.Y. 1996), which this
court has already set forth supra, Mr. Barsky affirms the
following:

> 3.  Hamas has had extensive operations in the United
> States since the late 1980's.  Hamas maintains in the
> United    States    a    sophisticated    organizational
> infrastructure and leadership core involved in all
> aspects of the Hamas movement.   The leadership has
> directed Hamas activities in Gaza and the West Bank ....
>
> 4.   Hamas has consistently conducted extensive
> fundraising,    operational   planning,   recruitment,
> propaganda,   public   relations,   money   laundering,
> investment, and communication activities in at least six

---

[19] In United States v. One 1997 E35 Ford Van, VIN
1FBJS31L3VHB70844 ("U.S. v. One 1997 E35 Ford Van"), 50 F. Supp. 2d
789 (N.D. Ill. 1999), the government sought the forfeiture of a Ford
van, a residence, and funds contained in seven bank accounts and two
safe deposit boxes.  See id. at 792.  Salah and his wife asserted
claims to four bank accounts, two safe deposit boxes, and their
residence at 9229 South Thomas, Bridgeview, Illinois.  See id.  QLI
filed claims as to three bank accounts and the Ford van.  See id.  The
action is still pending.

states (Texas, Louisiana, Missouri, Virginia, Illinois, New York) and Washington, DC[,] over at least the past 12 years.

. . . .

7.  Dr. [Abu] Marzook is former director of the United Association for Studies and Research, a Hamas front organization in Washington, DC ....

8.  Dr. Marzook helped organize and structure Hamas and supervised the wing of Hamas responsible for at least ten terrorist incidents between the years 1990 and 1994.

9.  Dr. Marzook has directed and participated in numerous transfers of funds from the United States to Hamas operatives in Israel ....

10.  Dr. Marzook maintained Hamas bank accounts at the First American Bank in McLean, Virginia[,] and Ruston State Bank in Louisiana.  At his direction, another American Hamas leader, Mohammed Salah of Chicago, accessed these accounts in order to transfer funds to Hamas operatives in Israel.

11.  Muhammed Salah, a.k.a. Abu Ahmad, is an American citizen and has resided in Chicago for many years ....

12.  From his Chicago office, Salah received field reports of Hamas activities in Israel and supervised its members' activities in Gaza.

. . . .

14.  Another American-based Hamas leader, Selim Elbarrasee, served as a Hamas fundraiser and activist, and maintained a joint checking account with Dr. Marzook in Ruston State Bank in Louisiana, from which checks were drawn for the transfer of funds to Hamas activists in Gaza ....

. . . .

16.  On many occasions, Hamas sent money raised in the United States to the West Bank and Gaza by several couriers including Muhammed Salah, Dr. Marzook, and Juma'ah Ibrahim and Muhammed Jarad.  Salah and Muhammed Jarad were convicted in Israel of distributing more than

23

a half million dollars to Hamas activists in Israel, the West Bank and Gaza.  The money was raised in the United States.

17.  Salah Arouri, a Hamas operative in Chicago, helped Dr. Marzook and Mr. Salah coordinate the transfer to Hamas activists in Israel of funds raised in the United States.

18.  Abu Hani, a Hamas activist in Chicago, conducted Hamas origanizational activities in Illinois.

. . . .

21.  Ahmad Bin Yusuf, a Hamas ideologue residing in Virginia, ran a one-man public relations outfit for Hamas.  He routinely received faxed draft communiques from the West Bank which he edited and faxed back to Wa'il Banat, a Hamas activist in Gaza[,] for local distribution.  He directed Hamas activities in Gaza.

22.  Ziyad Khaleel maintains the official Hamas Arabic and English websites ("www.palestine-info.org.", "www.palestine-info.com").  He operates from an office located at 204 Providence Walkway, Columbia, Missouri 65203.  Mr. Khaleel's name and office address are listed in official directory of inte[r]net sites, Internic, as the administrator and billing contact for this website. The official Hamas website therefore originates, is maintained, and its internet service  provider is paid for in the United States.  This U.S. website serves as a main vehicle for Hamas to raise money, recruit members, and spread its message.

23.  The Islamic Association for Palestine, located in Richardson, Texas, serves as the distribution agent for Filistin al-Muslima, the official monthly magazine of the Hamas movement.  Specifically, the Islamic Association for Palestine packages and distributes Filistin al-Muslima to subscribers in the U.S., on behalf of Hamas.  The Islamic Association for Palestine also translates in English and distributes other official Hamas literature in the United States in active promotion of Hamas' political position.

Barsky Aff. ¶¶ 3-23.  Viewing this affidavit in the light most favorable to plaintiffs, there is more than enough evidence to

find that Hamas has minimum contacts with the United States.[20] Accordingly, I so find.

### b. Service

Plaintiffs contend that Hamas was served with process in this action pursuant to Fed. R. Civ. P. 4(h)(1), see Plaintiffs' Mem. at 6, which provides that service on a foreign or domestic corporation or unincorporated association may be effected by serving "an officer" and/or a "managing or general agent" of the corporation or association, see Fed. R. Civ. P. 4(h)(1). "An unincorporated association is defined as a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise." Motta v. Samuel Weiser, Inc., 768

---

[20] Subsequent to the hearing conducted in July of 2002, plaintiffs submitted a copy of the decision in Holy Land Foundation for Relief & Development v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002). In that action, the Holy Land Foundation for Relief and Development ("HLF") of Richardson, Texas, alleged that it was a charitable organization that provided humanitarian aid throughout the world with a primary focus on providing aid to the Palestinian population in the West Bank and Gaza. See id. at 64. However, the court found that "the evidence in the administrative record provide[d] ample support for OFAC [Office of Foreign Assets Control]'s conclusion that HLF acts for or on behalf of Hamas." Id. at 74. As support for this finding, the court noted that there was evidence that HLF had engaged in fund raising for Hamas, see id. at 69, that HLF's tax return for 1993 reflected that it received $210,000 from Marzook, see id. at 70, that between 1990 and 1994 HLF paid for two senior Hamas leaders to make eleven trips to the United States, see id., that senior Hamas officials met with HLF officials at a three day conference in Philadelphia, Pennsylvania, in 1993, and at another meeting in Oxford, Mississippi, in 1994, see id., that "between 1992 and 1999 HLF contributed approximately 1.4 million dollars to eight Hamas-controlled 'zakat' (or charity) committees," id., that "between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations ...," id. at 71, that there was evidence that HLF had provided financial support to the orphans and families of deceased or imprisoned Hamas activists, see id., that there was evidence HLF's Jerusalem office supported Hamas, see id. at 73, and that statements from eight unidentified FBI informants recounted "instances in which HLF leaders stated that HLF funds and supports Hamas," id., and corroboration existed for these statements, see id. at 73 n.27. These findings provide additional support for this court's conclusion that Hamas has minimum contacts with the United States as a whole.

F.2d 481, 485 (1st Cir. 1985)(citing Black's Law Dictionary 111 (5th ed. 1979)); see also Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d 76, 89 (D.R.I. 2001)(quoting Motta). This court is satisfied that Hamas "qualifies as an unincorporated association because '[i]t is composed of individuals, without a legal identity apart from its membership, formed for specific objectives.'" Estates of Ungar v. Palestinian Authority, 153 F. Supp. 2d at 89 (quoting Klinghoffer v. S.N.C. Achille Lauro Ed, 739 F. Supp. 854, 858 (S.D.N.Y. 1990))(alteration in original).

Plaintiffs contend that service was effected on Hamas within the United States on June 21, 2000, by serving Salah at his residence at 9229 South Thomas Avenue, Bridgeview, Illinois, with a summons and a copy of the Complaint. See Plaintiffs' Mem. at 6. Plaintiffs have submitted as an exhibit the declaration of the process server. See Plaintiffs' Mem., Ex. A (Return of Service) at 2; see also Document #23.

> In a federal question case, federal law determines whether a person is an agent for purposes of service under Rule 4. See Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964); Dodco, Inc. v. Am. Bonding Co., 7 F.3d 1387, 1388 (8th Cir.1993). In Klinghoffer, the district court addressed the question of whether the PLO's Permanent Observer to the U.N. qualified as a managing or general agent where he was not specifically designated as such by the PLO. See Klinghoffer, 739 F. Supp. 854. The district court stated that service "is not limited to titled officials of the association or those expressly authorized to accept service," and held that a general or managing agent is an individual with the authority to exercise independent judgment and discretion in the performance of his or her duties. Id. at 867 (citing Grammenos v. Lemos, 457 F.2d 1067, 1073 (2d Cir.1972)). Thus, "service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service." Id. (citations omitted).

<u>Estates of Ungar</u>, 153 F. Supp. 2d at 89-90.

Given that the court in <u>Marzook</u> described Salah as having "admitted to being the head of the military wing of Hamas," <u>Marzook</u>, 924 F. Supp. at 587, that Mr. Barsky affirms that Salah was appointed by Marzook "to be in charge of Hamas military affairs," Barsky Aff. ¶ 11, and that the FBI describes Salah as being "a high-level HAMAS military operative," Wright Aff. ¶ 11, who received orders directly from Abu Marzook regarding such significant matters as who should be placed in leadership positions, <u>see id.</u> ¶ 42, and who was entrusted by Marzook with the distribution of hundreds of thousands of dollars to Hamas operatives, <u>see id.</u> ¶¶ 38, 41, 46-50, this court finds that it is "fair, reasonable and just," <u>Klinghoffer</u>, 739 F. Supp. at 867, to imply Salah's authority to receive service on behalf of Hamas. Based on the level he occupies in the Hamas hierarchy, it is also reasonable to conclude that Salah had authority to exercise independent judgment and discretion in the performance of his duties.   <u>See</u> <u>id</u>.

Consequently, this court finds that it has personal jurisdiction over Hamas pursuant to the nationwide service of process provisions of 18 U.S.C. § 2334(a) and Rule 4(k)(1)(D). Hamas has minimum contacts with the United States as a whole, and it has been served through the delivery of a copy of the summons and Complaint.   Therefore, this court may exercise personal jurisdiction over Hamas consistent with the Due Process Clause of the Fifth Amendment.[21]

The court also notes that Hamas was notified of this action

---

[21] As the court has determined that it has personal jurisdiction over Hamas pursuant to the nationwide service of process provision of 18 U.S.C. § 2334(a) and Rule 4(k)(1)(D), it is unnecessary to discuss whether the court could exercise personal jurisdiction over Hamas pursuant to Rule 4(k)(2).   <u>Cf.</u> <u>Estates of Ungar v. Palestinian Authority</u>, 153 F. Supp. 2d 76, 91 n.3 (D.R.I. 2001)(reaching a similar conclusion in the case of the PA defendants).

by the delivery of a summons and complaint to its headquarters in Damascus, Syria, by registered return receipt mail on July 15, 2000.  See Plaintiffs' Mem., Ex. G (Letter from Elke H. Hitt to David Strachman of 8/29/00 confirming delivery).  Additionally, an article about the instant lawsuit appeared in Arabic in the official HAMAS journal, Filastin Al-Muslimah, in June of 2000. See Barsky Aff. ¶¶ 25-26; see also id., Att. 2 (translated copy of the article).  Based on this article, Mr. Barsky concludes that the HAMAS leadership was informed and has knowledge of this action.  See id. ¶ 25.

### 2. Individual Hamas Defendants

Plaintiffs contend that the individual Hamas defendants' contacts with the United States "are constitutionally sufficient under the due process analysis applied by federal courts in international terrorism cases[.]"  Plaintiffs' Mem. at 17.  As support for this claim, plaintiffs cite six cases applying the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 1605(a)(7) and § 1605 Note.  The cases, in chronological order, are: Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325, 330 (E.D.N.Y. 1998)(holding that "the relevant inquiry with respect to the minimum contacts analysis is whether the effects of a foreign state's actions upon the United States are sufficient to provide fair warning such that the foreign state may be subject to the jurisdiction of the courts of the United States" and concluding that "[a]ny foreign state would know that the United States has substantial interests in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, including civil actions in United States courts.") (internal quotation marks omitted); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 21 (D.D.C. 1998)(finding that "a foreign

state which causes the personal injury or death of a United States national through an act of state-sponsored terrorism has 'minimum contacts' with the United States.")(lower case letters substituted for capitals); <u>Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya</u>, Cv. No. 98-3096 (TFH), 1999 U.S. Dist. LEXIS 15035, at *11-12 (D.D.C. Sept. 23, 1999)(citing and following <u>Rein</u>); <u>Daliberti v. Republic of Iraq</u>, 97 F. Supp. 2d 38, 54 (D.C.C. 2000)(citing <u>Flatow</u> and finding that the detention of three United States nationals had a direct effect in the United States and was consciously designed to affect United States policy and "[i]t is reasonable that Iraq be held to answer in a United States court for acts of terrorism against United States citizens"); <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 110 F. Supp. 2d 10, 14 (D.D.C. 2000)(finding that "unique method for establishing personal jurisdiction under § 1605(a)(7) reflects Congress' understanding that sufficient nexus with the United States exists by definition when the foreign country is accused of torturing an American citizen overseas"), <u>rev'd in part</u>, 294 F.3d 82 (D.D.C. 2002); <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 1, 7 (D.D.C. 2000)(citing <u>Flatow</u> and concluding "that a foreign state that causes the death of a United States national through an act of state-sponsored terrorism has the requisite 'minimum contacts' with the United States so as not to offend 'traditional notions of fair play and substantial justice.'")(quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).[22]

---

[22] Plaintiffs argue that the "Hamas defendants have been given adequate notice and 'fair warning' that they 'may be subject to the jurisdiction of the courts of the United States,'" Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 17 (citing <u>Rein v. Socialist People's Libyan Arab Jamahiriya</u>, 995 F. Supp. at 330), because they "knew that their murder of numerous American citizens would elicit a severe response from the United States," <u>id.</u> As a

Plaintiffs made this same argument as to the PA defendants, and Judge Lagueux considered it, discussing the <u>Flatow</u> and <u>Rein</u> cases in the process. <u>See Estates of Ungar</u>, 153 F. Supp. at 93-95. Judge Lagueux, after noting several important differences between the ATA (under which this action is brought) and the AEDPA, <u>see id.</u> at 94-95, declined "to extend the due process analysis applied by the district courts under the state-sponsored terrorist exception to the FSIA [Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-1611] to the case currently before the Court," <u>id.</u> at 95. Rather, Judge Lagueux held "that in cases brought pursuant to 18 U.S.C. § 2333, a plaintiff must demonstrate that the defendant has sufficient minimum contacts to satisfy a traditional due process analysis." <u>Id.</u> Plaintiffs have not shown that the individual Hamas defendants engaged in the kind of systematic and continuous activity in the United States necessary to support the exercise of general personal jurisdiction over them. Accordingly, as to the individual Hamas defendants Plaintiffs' Motion for Entry of Default Judgment should be denied and the claims against them dismissed for lack of personal jurisdiction. I so recommend.

## IV. Liability

Plaintiffs' Complaint adequately pleads the elements of

---

consequence, plaintiffs assert that the Hamas defendants "cannot now claim surprise at the assertion of jurisdiction by this Court over claims brought in response to its actions." <u>Id.</u> (quoting <u>Daliberti v. Republic of Iraq</u>, 97 F. Supp. 2d 38, 54 (D.D.C. 2000)). However, in the instant case there is no evidence that the Hamas defendants knew or had any reason to believe that the vehicle they attacked contained a United States national. <u>Cf. Daliberti v. Republic of Iraq</u>, 97 F. Supp. 2d at 54 ("The detention of these three plaintiffs had a direct effect in the United States and was consciously designed to affect United States policy.") Yaron Ungar had resided continuously in Israel for twelve years prior to his death, <u>see</u> 7/12/02 Hearing Tr. at 100, and had not been in the United States since he was fourteen years old, <u>see id.</u> at 92, 100. Thus, claims of surprise, at least by the individual Hamas defendants, at being subject to suit in the United States would not be baseless.

liability under 18 U.S.C. § 2333, see Complaint ¶¶ 27-51, and Hamas' default relieves plaintiffs of proving these elements, see Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999)("A party who defaults is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated."); Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, a P'ship v. Medfit Int'l, Inc., 982 F.2d 686, 693 (1st Cir. 1993)(noting "the maxim that an entry of a default against a defendant establishes the defendant's liability"); Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985) ("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its seven claims must be considered as established as a matter of law."); Eisler v. Stritzler, 535 F.2d 148, 153 (1st Cir. 1976)("The default judgment on the well-pleaded allegations in plaintiffs' complaint established ... defendant's liability.").  Thus, Hamas' liability has been established, and the court now proceeds to consider damages.

## V. Damages

28 U.S.C. § 2333(a) allows the estate of a United States national who is killed by an act of international terrorism and his or her survivors or heirs to recover threefold the damages they sustain and the cost of the suit, including attorney's fees. See 28 U.S.C. § 2333(a).

### A. "Survivors" and "Heirs"

The statute does not define "survivors" or "heirs."  Id. This lack of definition is somewhat problematic because the terms "survivors" and "heirs" are usually defined (or determined) by state law.  See, e.g., Vildibill v. Johnson, 802 F.2d 1347, 1350 (11th Cir. 1986)(accepting Florida Supreme Court's determination that under state Wrongful Death Act non-dependent parents of an

adult child are not "survivors"); <u>Mingolla v. Minnesota Mining & Mfg. Co.</u>, 893 F. Supp. 499, 505 (D.V.I. 1995)(noting that under Virgin Islands Wrongful Death Act adult children are not "survivors" unless partially or wholly dependent upon decedent for support); <u>Allen v. Pacheco</u>, No. 01SC744, 2003 WL 21310267, at *5 (Colo. June 9, 2003)("the term 'heirs' under the [Colorado] Wrongful Death Act refers only to lineal descendants of the deceased"); <u>DeWitt v. Frenchie's Custom Helmets</u>, No. 93-2332-JWL, 1994 WL 171571, at *2 (D. Kan. Apr. 1, 1994)(finding under Kansas Wrongful Death Act that parents of decedent are not heirs at law where decedent is survived by a child).  Yaron Ungar had not been a resident of any state in this country since he was fourteen years old.  <u>See</u> 7/12/02 Hearing Tr. at 92, 100.  Thus, the meaning of the terms "survivors" and "heirs" as used in § 2333(a) cannot be determined by referring to the law of a particular state.

Notwithstanding the lack of a definition for "heirs," the court has no hesitancy in finding that Dvir and Yishai, the sons of Yaron, are his "heirs."  First, the Complaint alleges that they are his "heirs-at-law," Complaint ¶ 5, and, default having been entered, the allegations of fact in the Complaint must be taken as true, <u>see</u> <u>Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.</u>, 771 F.2d 5, 13 (1st Cir. 1985).  Second, as Yaron's immediate and direct lineal descendants, it is virtually inconceivable that his sons would not be his heirs.  Third, Israeli law provides that when a decedent dies intestate the "legal heirs entitled to succession [are]: (1) Spouse of deceased; (2) children and their descendants and parents of deceased and their descendants."  Martindale-Hubbell International Law Digest, Israel Law Digest, Estates and Trusts, Descent and Distribution at 8.

Yaron's parents, Judith and Meir Ungar, and his siblings,

Michal Cohen, Amichai Ungar, and Dafna Ungar, do not allege that they are either "heirs" or "survivors." See Complaint ¶¶ 6, 8. Presumably they make their claims as "survivors" and not "heirs" since, as noted above, the Complaint asserts that Dvir and Yishai are Yaron's heirs. Cf. Bridges v. Phillips Petroleum Co., 733 F.2d 1153, 1155 (5th Cir. 1984)(noting that under Texas law it is well settled that parents and siblings are not heirs of the body); Barnes v. Robison, 712 F. Supp. 873, 875 (D. Kan. 1989) (finding surviving parent(s) of decedent who left no children to be his heirs under Kansas law, but not his surviving siblings); Saunders v. Air Florida, Inc., 558 F. Supp. 1233, 1235 (D.D.C. 1983)(finding parents are not "heirs" under District of Columbia or California law where decedent left a wife and three children). However, because the term "survivors" is not defined in § 2333(a) and Yaron's parents and siblings have not specifically pled that they bring this action as "survivors," the court must determine whether the parents and siblings of a decedent who died leaving children are "survivors" within the meaning of the statute.

Black's Law Dictionary defines "survivor" as "[o]ne who survives another; one who outlives another; one who lives beyond some happening; one of two or more persons who lives after the death of the other or others." Black's Law Dictionary 1446 (6th Ed. 1990). This definition is of little assistance here because, applied literally, it means that everyone who outlives the decedent, even a non-relative, is his survivor. On the other hand, some statutes define "survivors" rather narrowly. See, e.g., 38 U.S.C. § 1318(a) (defining survivors as "the surviving spouse and ... children of a deceased veteran"); Kan. Stat. Ann. § 40-3103 ("'Survivor' means a decedent's spouse, or child under the age of 18 years, where death of the decedent resulted from an injury."). Between the two poles represented by Black's extremely broad definition and the narrow definitions contained

in the veterans and Kansas statutes, there are intermediate classifications. See Cortes v. American Airlines, Inc., No. 96-0727-CIV, 1997 WL 33125722, at *3 (S.D. Fla. Nov. 19, 1997)(noting that the Florida Wrongful Death Act defines "survivors" as "the decedent's spouse, children, parents, and, when partially or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters"); Mingolla v. Minnesota Mining & Mfg. Co., 893 F. Supp. 499, 505 (D.V.I. 1995)(noting same definition in Virgin Islands Wrongful Death Act); Arnold v. Logue, 592 A.2d 735, 738 (Pa. Super. Ct. 1991)(noting that repealed No-Fault Act had defined "survivor" as meaning "(A) spouse; or (B) child, parent, brother, sister or relative dependent upon the deceased for support").

Given the variability of the meaning of the term "survivors," the court looks to the legislative history of the statute for assistance. In Boim v. Quranic Literacy Institute & Holy Land Foundation for Relief & Development, 291 F.3d 1000 (3rd Cir. 2002), the Third Circuit discussed the legislative history of §§ 2331 and 2333:

> That history, in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to **extend civil liability for acts of international terrorism to the full reaches of traditional tort law.** See 137 Cong. Rec. S4511-04 (April 16, 1991) ("The [antiterrorism act] accords victims of terrorism the remedies of American tort law, including treble damages and attorney's fees."); Antiterrorism Act of 1990, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session, July 25, 1990 (hereafter "Senate Hearing"), Testimony of Joseph Morris, at 136 ("**[T]he bill as drafted is powerfully broad,** and its intention ... is to ... bring [in] all of the substantive law of the American tort law system."). In particular, the statute itself contains all of the elements of a traditional tort: breach of a duty (i.e., committing an

> act of international terrorism); injury to the person, property or business of another; and causation (injured "by reason of") ....
>
> ....
>
> The Senate Report on the bill notes that "**[t]he substance of [an action under section 2333] is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts.** This bill opens the courthouse door to victims of international terrorism." S. Rep. 102-342, at 45 (1992).

Id. at 1010-11 (alterations in original)(emphasis added). The highlighted language at the very least suggests that Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly. The parents or siblings of a U.S. national killed by terrorists are undeniably "victims of international terrorism" in the sense that they suffer the loss of a close family member.

More substantial evidence of Congress' intent exists. As originally drafted, § 2333 allowed compensation only for "any national of the United States ...." Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts & Admin. Practice of the Senate Comm. on the Judiciary, 101st Congress 8 (1990) ("Senate Hearing"). The Justice Department suggested that Congress modify the text of the bill to explicitly allow suits by the family members (as "survivors" and "heirs" of the victim). See Senate Hearing at 38 (statement of Steven R. Valentine). In a statement to the Senate Subcommittee, Deputy Assistant Attorney General Steven R. Valentine proposed:

> that this provision be amended to include, in addition to the individual directly affected, such additional parties as the estate of the decedent, survivors, and heirs. This will ensure that the bill is fully protective of **the interests of all relevant parties to the civil suit.**

Id. (emphasis added).[23]  In response to a question from Senator
Thurmond as to whether the modification was necessary "to make
certain the ability of family members to file a lawsuit on behalf
of a slain or injured relative," Senate Hearing at 46, Mr. Lloyd
Green, counselor to the Assistant Attorney General in charge of
the Civil Division, see id. at 25, responded: "It would make
clear that which is already implied in the bill.  It would remove
any doubt that anyone would have as to whether or not they could
bring the litigation," id. at 46 (statement of Lloyd Green).

Congress accepted the recommendation of the Justice
Department and modified the language of § 2333 to create a cause
of action for "[a]ny national of the United States injured in his
or her person, property, or business by reason of an act of
international terrorism, or his or her estate, survivors, or
heirs ...." 18 U.S.C. § 2333(a).  By including the term
"survivors" in the class of persons eligible to bring an action,
Congress evidenced an intention that family members who are not
legal heirs (such as the parents and siblings of a decedent who
leaves children) may bring an action pursuant to the statute.  If
this were not the case, there would have been no need to include
the term "survivors."

Based on the foregoing legislative history and on the
substantial policy consideration that allowing parents and
siblings to bring actions in their own right (regardless of
whether the decedent is survived by a spouse and/or children)

---

[23] Mr. Valentine also expressed the general position of the
Department of Justice regarding the legislation: "The Department
supports legislation to provide a new civil remedy against terrorists
and a federal forum **for the families and relatives of victims to
pursue claims for compensatory damages**." Antiterrorism Act of 1990:
Hearing Before the Subcomm. on Courts & Admin. Practice of the Senate
Comm. on the Judiciary, 101st Congress 34 (1990) ("Senate Hearing")
(statement of Steven R. Valentine) (emphasis added).

increases the deterrent effect[24] of the legislation, this court concludes that the term "survivors" as used in § 2333(a) includes the parents and siblings of a U.S. national killed by an act of international terrorism.  Accordingly, the court finds that Judith and Meir Ungar, Michal Cohen, Amichai Ungar, and Dafna Ungar are "survivors" of Yaron Ungar and are within the class of plaintiffs who may bring an action under the statute.

### B. Measure of Damages

"The measure of damages for causing the death of another depends upon the wording of the statute creating the right of action and its interpretation."  Restatement (Second) of Torts § 925 (1979).  However, § 2333(a) does not specify the nature of the damages which may be recovered by the persons entitled to bring an action.  In this respect, the statute differs from § 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA") which specifically identifies the damages recoverable as including "economic damages, solatium, pain, and suffering, and punitive damages ...."  28 U.S.C. § 1605 note.  Plaintiffs seek damages for both pecuniary and non-economic losses.  See Damages Mem. at 18-24.  Therefore, this court must determine whether § 2333(a) should be interpreted to allow recovery for both pecuniary damages and non-economic damages, including loss of companionship and society and mental anguish experienced by the victim's surviving family members.

The only reported case which this court could find awarding damages pursuant to 18 U.S.C. § 2333(a) is Smith v. Islamic Emirate of Afghanistan, No. 01 CIV. 10132(HB), 2003 WL 21027170, at *15 (S.D.N.Y. May 16, 2003), an action arising out of the

---

[24] Mr. Valentine also testified that it was the position of the Department of Justice that "it is essential that both the Congress and the Executive Branch take measures, such as the present bill, to deter terrorist attacks against American nationals overseas ...."  Senate Hearing at 31.

September 11, 2001, attack on the World Trade Center. The action was brought against certain non-sovereign defendants pursuant to § 2333, see id. at *1, and against Iraq pursuant to 28 U.S.C. § 1605(a)(7), see id. at *5. The Smith court awarded damages for funeral expenses, lost earnings, and pain and suffering pursuant to both statutes, but awarded damages for loss of solatium only pursuant to § 1605(7). See id. at *10, *15, *17. The opinion does not indicate whether plaintiffs sought solatium damages pursuant to § 2333(a), and there is no discussion as to how the court determined the nature of the damages available under § 2333(a). The court appears to have assumed that the only damages available pursuant to § 2333(a) were those for pecuniary loss and for pain and suffering. See id. at *10-11, *15. Therefore, the opinion is of limited assistance in answering the present question.

In the absence of other case law, the court again looks to the legislative history of the statute. Sections 2331-2338 were enacted as part of the Antiterrorism Act of 1990 ("ATA")[25] and were intended to "create[] a new federal cause of action ... [and] a new civil remedy against terrorists ...." Senate Hearing at 34 (statement of Mr. Valentine). As the court has previously determined, the legislative history indicates that the ATA was to be construed broadly. Senator Grassley, the bill's co-sponsor,

---

[25] Sections 2331-2338 were originally enacted in 1990 as part of the Antiterrorism Act of 1990, Pub.L. No. 101-519, sec. 132, 104 Stat. 2250-2253 (1990). This Public Law, however, has no currently effective sections. Nevertheless, these sections were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, sec. 1003(a)(1)-(5), 106 Stat. 4521-4524 (1992).

Estates of Ungar v. Palestinian Authority, 228 F. Supp. 2d 40, 41 n.1 (D.R.I. 2002); see also Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev., 291 F.3d 1000, 1009 n.6 (7th Cir. 2002).

indicated that "it empowers victims with **all** the weapons available in civil litigation." <u>Antiterrorism Act of 1990: Hearing before the Subcomm. on Intellectual Prop. & Judicial Admin. of the House Comm. on the Judiciary</u>, 102nd Congress 10 (1992)(emphasis added).  This suggests that Congress intended that the full range of damages should be available to persons entitled to bring actions pursuant to § 2333(a).

Limiting compensable losses under the statute to economic losses would not be in accord with a nationwide legislative tendency in the last few decades.

> Though recovery for loss of society and comfort is denied under some statutes, it is an item usually recognized and made the basis for an award, at times apparently substantial ....

> Even jurisdictions that have rejected the loss of society or consortium claim, as such, have permitted one form of it, namely a loss of guidance and advice that the decedent would have provided.

<u>Prosser & Keeton on Torts</u> § 127 (5th ed. 1984)(footnotes omitted).

The Florida Supreme Court has observed that the denial of damages for loss of society is based on an "antiquated perception" of the familial relationship as being one of master and servant. <u>United States v. Dempsey</u>, 635 So.2d 961, 963 (Fla. 1994).  The court explained:

> Certainly, in 1973, when this Court set forth the elements of damages that a parent of an injured child is entitled to recover, it was apparent that a child's companionship and society were of far more value to the parent than were the services rendered by the child. Thus, there was an obvious need to recognize this element of damages to fully compensate the parent for the loss suffered because of a negligent injury to the child. The recognition of the loss of companionship element of damages clearly reflects our modern concept of family relationships.

Id. at 964; see also Masaki v. Gen. Motors Corp., 780 P.2d 566, 577-78 (Haw. 1989)(holding that a parent may recover for the loss of filial consortium of an injured adult child and observing that "services have become only one element of the consortium action while the intangible elements of love, comfort, companionship, and society have emerged as the predominant focus of consortium actions").  In a similar vein, the Supreme Court of North Dakota condemned as a "barbarous concept" the notion that a parent who brings a wrongful death action may only recover for pecuniary loss.  Hopkins v. McBane, 427 N.W.2d 85, 90 (N.D. 1988)(quoting Wycko v. Gnodtke, 105 N.W.2d 118, 121 (Mich. 1960)).  This court agrees with these observations.

Section 2333(a) grants federal rights, and the Supreme Court has stated that:

> [W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.  And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)(footnote omitted).  There is no doubt that in bringing this action pursuant to § 2333 plaintiffs are invoking a federally created legal right.

The Seventh Circuit, in considering the federally created rights provided by 42 U.S.C. § 1983, found that, although the statute was silent on the nature of the damages recoverable under it, the parents of a twenty-three year old son who was fatally shot by a police officer could recover for the loss of his society and companionship.  See Bell v. City of Milwaukee, 746 F.2d 1205, 1232, 1244-45 (7th Cir. 1984), overruled on other grounds, DeShaney v. Winnebago County Dep't of Social Servs., 489

U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); cf. Figueroa-Rodriquez v. Aquino, 863 F.2d 1037, 1045 (1st Cir. 1988)(noting that "the measure of damages in section 1983 actions is a matter of federal common law.").  In reaching the conclusion that such damages were recoverable, the Seventh Circuit noted that "Section 1983 was enacted not simply to enforce existing wrongful death remedies but to give force to the newly-conceived constitutional amendments, which are remedial in purpose."  Bell v. City of Milwaukee, 746 F.2d at 1250.[26]  Similarly here, the legislative history indicates that § 2333 was enacted to provide new and additional remedies to victims of international terrorism.  See Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev., 291 F.3d 1000, 1010 (7th Cir. 2002)(noting an intent by Congress to codify general tort law principles and extend civil liability to acts of international terrorism to the full reaches of traditional tort law).

---

[26] See also Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1983)(finding that interest in companionship and society exists between parent and child and may be asserted in § 1983 action), overruled on other grounds, Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999); Trujillo v. Board of County Comm'rs of County of Santa Fe, 768 F.2d 1186, 1189-90 (10th Cir. 1985)(finding sister had actionable right under § 1983 for deprivation of right to intimate association with brother who died while incarcerated provided the deprivation was intentional).  But see Valdivieso Ortiz v. Burgos, 807 F.2d 6, 7 (1st Cir. 1986)(finding that step-father and siblings do not have a constitutionally protected interest in the companionship of their adult son and brother which is actionable under § 1983).

The holding in Valdivieso Ortiz v. Burgos does not dissuade this court from the conclusion that the parents and siblings of Yaron Ungar may recover damages for the loss of his society and companionship. The court in Valdivieso emphasized that its "conclusion is simply that, in light of the limited nature of the Supreme Court precedent in this area, it would be inappropriate to extend recognition of an individual's liberty interest in his or her family or parental relationship to the facts of this case." Id. at 10.  Here the legislative history of § 2333 provides adequate guidance to conclude that Congress intended that surviving family members, including parents and siblings, be allowed to recover damages for loss of society and companionship.

Additionally, the First Circuit, this court, and the Rhode Island Supreme Court have all recognized circumstances in which the loss of society and companionship is compensable.  See Mitchell v. United States, 141 F.3d 8, 19 (1st Cir. 1998)(finding that there is no requirement under Massachusetts law that adult children be financially dependent upon decedent in order to recover for consortium-like damages); Fritz v. May Dep't Stores Co., 866 F. Supp. 66, 70 (D.R.I. 1994)(recognizing that unemancipated minor need not suffer physical injury to recover for loss of her mother's society and companionship); D'Ambra v. United States, 481 F.2d 14, 20 (D.R.I. 1973)(recognizing that loss of society and companionship of minor child are compensable); Sindelar v. Leguia, 750 A.2d 967, 972 (R.I. 2000) (noting that § 10-7-1.2 of R.I. Wrongful Death Act "allows for the bringing of a claim for loss of consortium, where a preexisting relationship between decedent and survivor is relevant to recovery.").[27]

One of the purposes of § 2333(a) was the deterrence of terrorist attacks.[28]  The deterrent effect of the legislation will be maximized if it is interpreted to subject terrorists to the broadest possible range of damages.  Accordingly, this court finds that § 2333(a) should be interpreted to allow for recovery of both pecuniary damages, cf. Kristine Cordier Karnezis, Annotation, Award of Damages under State-Sponsored Terrorism Exception to Foreign Sovereign Immunities Act (28 U.S.C.A. § 1605(A)), 182 A.L.R. Fed. 1 (2002) at 13 (noting that damages for economic loss have been awarded in the overwhelming majority

---

[27] In addition to allowing a spouse to recover for loss of consortium, R.I. Gen. Laws § 10-7-1.2 also allows recovery for an unemancipated minor's loss of parental society and companionship and also for a parent's loss of a minor's society and companionship.  See R.I. Gen. Laws § 10-7-1.2 (1997 Reenactment).

[28] See n.24.

of cases brought [under § 1605(a)] ...”), and also for non-economic damages, including loss of companionship, society, and mental anguish experienced by the victim's surviving family members, including his siblings, cf. id. (noting that solatium damages have been awarded in “most [§ 1605(a)] cases ....”).

### C. Estate of Yaron Ungar

#### 1. Lost Earnings

At the hearing on July 12, 2002, plaintiffs presented the testimony of Dr. Adrian Ziderman, a professor of economics at Bar-Ilan University in Israel and the holder of a doctorate from the London School of Economics. See 7/12/02 Tr. at 66. He was qualified as an expert in economic matters. See id. at 68.

At the time of his death, Yaron Ungar was near his 26th birthday and a qualified teacher in Israel. See id. at 69-70, 92. He was about to complete his Bachelor of Education degree and had started towards rabbinical ordination. See id. at 70. Dr. Ziderman testified that, assuming Mr. Ungar had pursued “a fairly standard successful career in Jewish religious teaching in Israel,” see id. at 77, the present value of his lost earnings in U.S. dollars was $1,273,028, see id. at 81; see also Hearing Ex. 6 (Report on Economic Losses Due to the Death of Yaron Ungar) at 10. Dr. Ziderman indicated that this career path assumption was “conservative,” 7/12/02 Tr. at 77, because it did not include the possibility that Yaron would also work as a part time rabbi in Israel, see id., or that he would work during sabbaticals (which teachers in Israel have every seventh year), see id. at 79. In his report, Hearing Ex. 6, Dr. Ziderman states that “it is now fairly standard for teacher/rabbis to spend periods of time (usually for a minimum period of three years) employed in one of the Jewish communities abroad, particularly in the United States,” Hearing Ex. 6 at 10, and that “[a]s [an] American, this scenario [was] a quite realistic one for Yaron, and would result

43

in considerably enhanced earnings," id.  If this latter career scenario were assumed, Dr. Ziderman believed that "it would be very easy to justify a considerably higher earnings loss figure, reaching some $1,800,000." Id. at 11.  However, acknowledging that this scenario was "largely speculative, particularly with regard to the estimation of additional earnings," id. at 10, Dr. Ziderman made "a minimal estimate by rounding up the earnings loss estimates to $1,400,000 (representing only about an addition of ten percent to total earnings) ...," id. at 10-11.

The court finds Dr. Ziderman's reasoning persuasive and sets the present value of Yaron Ungar's lost earnings in U.S. dollars as $1,400,000.  However, this figure must be adjusted to account for Yaron's personal consumption.  See 22A Am. Jur. 2D Death § 192 (2003)(noting that generally in determining pecuniary loss to the beneficiaries it must determined what proportion of the decedent's probable future earnings or income actually would have gone to the beneficiaries); Feldman v. Allegheny Airlines, Inc., 524 F.2d 384, 389 (2nd Cir. 1975)(finding that trial judge's computation of decedent's living expenses was too low for purpose of determining loss of earnings pursuant to Connecticut law); Daliberti v. Republic of Iraq, 146 F. Supp. 2d 19, 26 (D.D.C. 2001)(stating that determination of loss of earnings included "appropriate assumptions as to inflation, rise in productivity, job advancement, **personal consumption** and net earnings")(emphasis added).  Using methodology explained in Hearing Ex. 6 at 9, Dr. Ziderman determined that economic loss due to lost earnings, after deduction of Yaron's consumption, is $477,386.  I find Dr. Ziderman's methodology to be reasonable, and I adopt the figure of $477,386 as being the amount which should be awarded to the estate for lost earnings.

### 2. Pain and Suffering

At the hearing on July 12, 2002, Alan Friedman, M.D., whom

the court found to be qualified as an expert in trauma medicine and the treatment of people who have suffered trauma, see 7/12/02 Hearing Tr. at 36; see also Hearing Ex. 4 (CV of Dr. Friedman), testified regarding the injuries suffered by Yaron Ungar, see 7/12/02 Hearing Tr. at 41-64.  Dr. Friedman stated that he had reviewed the police report concerning the attack (both the original report which is in Hebrew and an English translation of that report), photographs of the crime scene and of the bodies of Yaron Ungar and Efrat Ungar, and the reports of the examination of the bodies.  See id. at 36-37; see also Hearing Exs. 1 (Israeli police report and photographs), 2 (English translation of Hebrew description of 29 crime scene photographs), 3 (crime scene photographs and photographs of bodies), 5 (forensic examination of Yaron Ungar on 6/10/96).  Based on that review, Dr. Friedman testified that it appeared the terrorists approached the Ungar car from behind and that as they started to pass the Ungar car on the left they began shooting.  See 7/12/02 Hearing Tr. at 38-39.  There were six bullet holes in the left rear window on the driver's side.  See id. at 40.  Some of these bullets passed through the driver's headrest and struck Efrat Ungar in the back of the head, see id. at 40, killing her instantly, see id. at 63.  Sixteen bullet holes were found in the driver's side window, indicating that the terrorists fired more rounds as they pulled along side the Ungar car.  See id. at 41. One of these rounds caused the first injury to Yaron Ungar, striking his left forearm and elbow region.  See id. at 41. Based on the bullet holes, the location, and the nature of the injury, Dr. Friedman theorized that Yaron threw his arm up instinctively to protect himself.  See id. at 43.  The shot fractured the radius, pushing it through the skin, and caused a number of large, jagged holes in the arm.  See id. at 41-42.  The pain from this wound would have been "tremendous."  Id. at 44.

After being shot in the left arm, Yaron turned his body to the driver's side and received an almost direct front to back shot to the upper right side of the chest.  See id. at 44-45; see also Hearing Ex. 3.  Dr. Friedman stated that the turning was consistent with a person hearing shots coming from his left side and turning to see what was happening.  See 7/12/02 Hearing Tr. at 45.  There were a total of fourteen shrapnel wounds to the chest.[29]  See id.  A large wound to the upper right chest could have caused death in fifteen to thirty minutes if the lung was penetrated, but Yaron would still have remained conscious for most of that time.[30]  See id. at 45-46.  If the lung was not penetrated, the wound would not have been fatal.  See id. at 46.  Dr. Friedman described the pain caused by this as similar to being hit in the chest with a baseball bat, see id. at 48, accompanied by "searing pain," id.

Dr. Friedman theorized that after being struck in the chest, Yaron was thrown backwards so that he was almost lying down on the passenger's seat.  See id. at 52.  While in this slumped position, Yaron was hit in the face by a bullet which entered through the front windshield.[31]  See id. at 52-53.  The bullet struck the left side of the nose, traveled up to the base of the

---

[29] In response to a question from the court as to the source of the shrapnel, Dr. Friedman testified that presumably it came from the "bullet casing."  7/12/02 Hearing Tr. at 46.  He noted that one photograph appeared to show "part of the lower case of a shell embedded in a piece of glass."  Id. at 47.

[30] There was no internal examination of the body.  See 7/12/02 Hearing Tr. at 37-38.  Dr. Friedman testified that the practice in Israel is not to perform an internal autopsy unless there is a specific question of a criminal act and the authorities are trying to determine a cause of death.  See id. at 38.

[31] The police report states that there were both entry and exit bullet holes in the front windshield.  See Hearing Ex. 2 ¶ 23.  In addition, bullet holes were found in the hood, left front headlight, and bumper of the vehicle.  See id. ¶¶ 4, 9, 21.

eye, fracturing the left orbit, and continued through the crown or temple of the head. See id. at 51. This injury caused Yaron's death, although not immediately because the shot did not hit the respiratory centers in the base of the brain. See id. Dr. Friedman was unable to estimate how long Yaron would have remained conscious after receiving this wound, see id. at 61, but it is clear to the court from the photographs of this horrific injury that the loss of consciousness would have been almost immediate, see Hearing Ex. 3 (body examination photographs #2, #3).[32]

In addition to the above injuries, Yaron sustained an injury to the left side of his neck laterally which would not have been fatal although extremely painful. See id. at 54. There was no testimony as to when this wound was inflicted. However, from the photographs it appears that this wound may have been sustained at the same time as the fourteen shrapnel wounds to the chest because it is somewhat similar in appearance and in close proximity to them. See Hearing Ex. 3 (photographs #2 and #4).

Dr. Friedman estimated the time from the first shots striking the vehicle to the point at which Yaron was rendered unconscious by the bullet wound to his face and head as being approximately thirty seconds. See id. at 62. Quantifying this period of time is obviously difficult. Dr. Friedman acknowledged that he had no training in crime scene investigation and that he did not know if the Ungar vehicle had increased its speed prior to the first shot being fired. See id. at 63-64. While thirty seconds seems to the court to be at the high end of the possible

---

[32] At one point in the testimony, Dr. Friedman appeared to say that Yaron would have been conscious for thirty seconds after being shot in the face. See id. at 57. However, Dr. Friedman later testified that he could not "come up with a figure" for this period of time, id. at 61, and he subsequently said that thirty seconds was the amount of time from the beginning of the attack to point at which Yaron became unconscious, see id. at 62.

range of time consumed by the attack (with the low end being ten or fifteen seconds), it is not an unreasonable estimate, and the court therefore accepts it.

The physical injuries suffered by Yaron prior to his losing consciousness were severe and caused great pain. In addition, he experienced the mental pain resulting from observing that his wife had been horribly wounded and probably killed while seated next to him and knowing that his young son, lying in the back seat, was in danger of being killed. While this physical and mental agony was of mercifully brief duration, a substantial award for pain and suffering is justified. Accordingly, I recommend an award of $500,000 for pain and suffering to the estate. Cf. Smith v. Islamic Emirate of Afghanistan, No. 01 CIV. 10132(HB), 2003 WL 21027170, at *15 (S.D.N.Y. May 16, 2003) (awarding $2.5 million for pain and suffering to estate of plaintiff who realized he was trapped and doomed in the North Tower of World Trade Center and likely experienced a very painful death); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 18, 23 (D.D.C. 2002)(awarding $10 million for pain and suffering to estate of bombing victim who survived with severe burns for forty-nine days and who suffered a higher level of pain throughout his stay at the hospital than a patient with his injuries otherwise would have endured because usual doses of pain medication could have lowered his blood pressure and killed him); Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 113 (D.D.C. 2000)(finding $1 million appropriate compensation for pain and suffering of decedent who apparently struggled with his assassin for thirty seconds before being shot eight times); Higgins v. Islamic Republic of Iran, No. 1:99CV00377, 2000 WL 33674311, at *8 (D.D.C. Sept. 21, 2000)(awarding $30 million for pain and suffering where decedent was held captive for 529 days in primitive conditions and whose body indicated grievous

injuries and barbaric mutilations); <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 1, 5, 8 (D.D.C. 2000)(concluding that $1 million was appropriate to compensate for "several minutes" of pain and suffering of bombing victim who expired on the scene); <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1, 29 (D.D.C. 1998)(finding $1 million appropriate to compensate for three to five hours of pain and suffering of bombing victim).

### D. Dvir and Yishai Ungar

#### 1. Loss of Companionship, Society and Guidance, and Mental Anguish

At the time of their father's murder, Dvir Ungar was twenty months old and Yishai was ten months old.  <u>See</u> 7/12/02 Hearing Tr. at 114, 148.  Although they are not American citizens,[33] 28 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States, and this court will not read such a requirement into the statute.  <u>Cf.</u> <u>Anderson v. Islamic Republic of Iran</u>, 90 F. Supp. 2d 107, 113 (D.D.C. 2000)(allowing claim of Lebanese wife of American hostage pursuant to 28 U.S.C. § 1605(a)(7)); <u>Cicippio v. Islamic Republic of Iran</u>, 18 F. Supp. 2d 62, 64, 68 n.7 (D.D.C.

---

[33]  The general requirement for acquisition of citizenship by a child born outside the United States and its outlying possessions and to parents who are married, one of whom is a citizen and the other of whom is an alien, is set forth in 8 U.S.C. § 1401(g).  The statute provides that the child is also a citizen if, before the birth, the citizen parent had been physically present in the United States for a total of five years, at least two of which were after the parent turned 14 years of age.

<u>Tuan Anh Nguyen v. Immigration & Naturalization Serv.</u>, 533 U.S. 53, 59, 121 S.Ct. 2053, 2058, 150 L.2d 115 (2001).  The record indicates that Yaron Ungar was not physically present in the United States for two years after turning age fourteen.  <u>See</u> 7/12/02 Hearing Tr. at 92, 100.

1998)(finding that court had jurisdiction over claims brought pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(7) of non-citizen spouses of U.S. citizens who had been kidnapped).

In assessing damages for loss of companionship and mental anguish, this court finds guidance in the opinion in Flatow v. Islamic Republic of Iran, 999 F. Supp. 2d 1 (D.D.C. 1998):

> The calculations for mental anguish and loss of society share some common considerations. First, the calculation should be based upon the anticipated duration of the injury. Claims for mental anguish belong to the claimants and should reflect anticipated persistence of mental anguish in excess of that which would have been experienced following decedent's natural death. When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time.
>
> The nature of the relationship between the claimant and the decedent is another critical factor in the solatium analysis. If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as companionship, love, affection, protection, and guidance. Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with decedent; as well as decedent's achievements and plans for the future which would have affected claimants.
>
> Finally, unlike lost wages, which can be calculated with a fair degree of mathematical certainty, solatium cannot be defined through models and variables. Courts have therefore refused to even attempt to factor in the present value of future mental anguish and loss of society. While economic losses can be reduced to present value with simple equations to establish the amount of an annuity established today which would have matched the decedent's ostensible income stream, the scope and uncertainty of human emotion renders such a

> calculation wholly inappropriate. This is the paradox of
> solatium; although no amount of money can alleviate the
> emotional impact of a child's or sibling's death, dollars
> are the only means available to do so.

Flatow v. Islamic Republic of Iran, 999 F. Supp. 2d at 31-32
(citations omitted).[34]

Applying the first of the factors described above to the
circumstances of the present case, the court finds that the
duration of the injury is very long. Yaron Ungar was twenty-six
years old at the time of his death, and he could have reasonably
been expected to live another fifty years. See Hearing Ex. 6
(Ziderman Report) at 5 (stating that the life expectancy for
Jewish males in Israel is 76.5 years). If he had not been
murdered, his sons likely would have enjoyed his companionship
for approximately fifty years. Their mental anguish over the
murder of their father, while likely to diminish somewhat over
time, will always be with them even into old age.

Plaintiffs presented testimony that the relationship between
Yaron and his sons was particularly close and loving. See
7/12/02 Hearing Tr. at 107-09, 146. As an example of this fact,
Judith Dasberg, Yaron's mother-in-law, testified that Efrat once

---

[34] A more concise statement of the factors to be considered in
determining the award for loss of consortium and solatium was given by
the court in Kerr v. Islamic Republic of Iran, 245 F. Supp. 2d 59
(D.D.C. 2003):

> (1) whether the decedent's death was sudden and
> unexpected; (2) whether the death was attributable to
> negligence or malice; (3) whether the claimants have
> sought medical treatment for depression and related
> disorders resulting from the decedent's death; (4) the
> nature (i.e. closeness) of the relationship between the
> claimant and the decedent; and (5) the duration of the
> claimant's mental anguish in excess of that which would
> have been experienced following the decedent's natural
> death.

Id. at 64.

told her that, although she (Efrat) was with the children all day long, when Yaron came home the children focused their attention on him to such an extent that she almost felt she was being ignored. See id. at 147. Mrs. Dasberg also noted that the night they received the news of Yaron and Efrat's deaths, Dvir awoke and cried repeatedly for his "daddy," not mentioning his mother. See id. at 147-48. The next morning he asked about the absence of both his parents, but that night he had cried exclusively for his father. See id. at 148.

Dvir's special attachment to his father was also noted by Yaron's mother, Mrs. Judith Ungar, who is a psychologist with a master's degree. See id. at 101, 107. Mrs. Ungar testified that usually there is a special bond between a mother and a child because the father goes to work and has less time with the child. See id. at 107-08. However, in the case of Yaron and Dvir, that type of bond was present. See id. at 108. She noted that when Dvir cried at night, he would always cry for his father and not his mother. See id. Mrs. Ungar described Yaron as doing "everything with [the children]," id. at 109, crawling on the floor with them, and generally being the equal of Efrat in terms of providing care to the children, see id. The boys now live with the Dasbergs, and Mrs. Dasberg testified that she and her husband, because of their ages, cannot play on the floor with the boys. See id. at 151.

The evidence indicates that Yaron intended to be actively involved in the education of his children as a loving and caring parent. See id. at 146. He was an educator himself, and he was very good with children. See id. at 104. His ability to relate well to young persons was also reflected by his participation in a program for disadvantaged students similar to the Big Brothers organization in the United States. See id. at 107. Yishai and Dvir have been deprived of the benefit of the special educational

skills and talents which their father possessed.

Dr. Allan Brenman, a child psychologist, testified after having interviewed the children (in Hebrew) and the grandparents (in English).  See 7/15/02 Hearing Tr. at 8.  From the information gathered during these interviews, it appeared to Dr. Brenman that overall the children were doing quite well.  See id. at 9.  They had attached to their grandparents, see id. at 12, and this attachment had been facilitated by the fact that their grandparents were familiar persons to them prior to their parents' deaths, see id. at 12-13.

At the same time, Dr. Brenman expressed some concerns about the boys.  He noted that Dvir has become overprotective of his brother, Yishai, "almost to the point of a dependency ...."  Id. at 9.  As an example of this, Dr. Brenman cited the fact that Dvir prefers to play with Yishai and Yishai's friends rather than with children his own age.  See id.  Dr. Brenman also stated that there had been some instances of aggressive behavior by Dvir at school and that this should be monitored to see if it is a pattern of behavior which needed further exploration.  See id. at 10.

Dr. Brenman testified that the loss of both of their parents had caused the children "psychic trauma," id. at 12, although it was difficult to gauge the magnitude and impact, see id. at 12-13, 25.  He noted that because the children were being raised by their grandparents, they would be "orphaned a second time by the people who basically raised them [and] at a much younger age." Id. at 23.  Dr. Brennan stated that in the future the children were susceptible to developing depression, anxiety, and post-traumatic stress disorder.  See id. at 27.  He also offered that he would not be surprised if at some point in their lives they required psychotherapy to cope with feelings which may arise. See id.  In sum, Dr. Brennan opined that although the children

were doing well at present, they were at increased risk for developing problems in the future as a result of the loss of both their parents.  See id. at 25-28.

The fact that the children lost their mother at the same time as their father makes this loss even more traumatic.  Given that Dvir and Yishai have been deprived of the companionship of their father for approximately fifty years, including virtually all of their childhood, and that they will eventually know that their father died a bloody and painful death at the hands of terrorists, a substantial award is warranted.  The court also takes into consideration the awards for loss of consortium and mental anguish which have been made in other cases involving the death or abduction of a parent in a terrorist attack: Smith v. Islamic Emirate of Afghanistan, No. 01 CIV. 10132(HB), 2003 WL 21027170, at *16 (S.D.N.Y. May 16, 2003)(awarding $3 million to each of six children of victim who died in the North Tower of World Trade Center); Kerr v. Islamic Republic of Iran, 245 F. Supp. 2d 59, 64 (D.D.C. 2003)(awarding $3 million each for solatium to four adult children whose father was shot in the back of the head by terrorists); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 23 (D.D.C 2002)(awarding $5 million to each adult child of bombing victim); Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 52 (D.D.C. 2001)(finding that daughters of kidnapping victim who was held for 6 ½ years were each entitled to $6.5 million for solatium damages); Higgins v. Islamic Republic of Iran, No. 1:99CV00377, 2000 WL 33674311, at *9 (D.D.C Sept. 21, 2000)(awarding $12 million to high school student for loss of companionship and mental anguish resulting from father's kidnapping, torture and murder); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1249 (S.D. Fla. 1997) (awarding $7.5 million for mental pain and suffering and $.5 million for loss of parental companionship and guidance to

college-aged student for death of her father).  Accordingly, I recommend that Dvir Ungar and Yishai Ungar each be awarded $10,000,000 for the loss of parental society, companionship,  and guidance and mental anguish caused by their father's death.[35]

## 2. Loss of Parental Services

In addition to the loss of companionship, Dvir and Yishai were deprived of their father's parental services.  These services include such tasks as babysitting, feeding, bathing, doing the laundry, getting them ready for school, and similar assistance normally performed by a parent for a child.  See 7/12/02 Hearing Tr. at 83.  While there is no one occupation which would provide all of these services, Dr. Ziderman looked to what he called the care sector of the Israeli economy—for example, people who work with the elderly, nannies, and au pairs—and the cost of providing such care services as the closest substitute for these parental services in order to determine their value.  See id.  Using this approach, he fixed the value of lost parental services to the children as being between $18,011 and $21,010 per year, depending on the educational level of the workers utilized.  See id. at 86-87.  Dr. Ziderman assumed that these parental services would not be required beyond the age of eighteen.  See id. at 87.  Stating that the youngest child was about one year old at the time of his father's death, Dr. Ziderman determined the cost of providing such services for seventeen years.  See id. at 87-88.  Discounting the amount required over seventeen years, Dr. Ziderman determined that the

---

[35] The court deems it desirable to treat each child equally notwithstanding the evidence of a special bond between Dvir and his father.  See 7/12/02 Hearing Tr. at 107-08.  It is reasonable to infer that a similar special bond would have also developed between Yishai and his father.  Also, Dvir enjoyed his father's companionship for twenty months while Yishai's period of enjoyment was limited to ten months.  These considerations cause the court to make an equal award to each child.

amount was $325,655.  <u>See</u> Hearing Ex. 6, Supplement.  This figure was based on a cost per year of $21,010 which the court finds to be reasonable.  In light of the college level education which both of their parents possessed, employment of child care workers possessing a higher level of education is appropriate and fully justified.  Therefore, I recommend that the legal guardians of Dvir Ungar and Yishai Ungar be awarded $325,655 ($162,827.50 for each child) for loss of parental services.

**E. Judith and Meir Ungar**

Yaron's parents, Judith and Meir Ungar, both testified at the hearing.  <u>See</u> 7/12/02 Hearing Tr. at 89-119.  They both described in poignant detail the devastating impact that Yaron's death has had upon them and their family.  <u>See</u> <u>id.</u>  The relationship which they had with Yaron was close, and that closeness continued even after his marriage to Efrat.  Every other weekend Yaron, Efrat, and the boys would stay with them from Friday night to either Saturday night or Sunday morning. <u>See</u> <u>id.</u> at 92.  Although Mr. and Mrs. Ungar have tried valiantly to carry on for the sake of their other children, a large measure of joy has gone out of their lives.  <u>See</u> <u>id.</u> at 96, 111-12. Their family life has suffered.  <u>See</u> <u>id.</u> at 99.  Meir Ungar noted that he and his wife both need to know where their adult children are at all times and that his wife is "very nervous about it ...."  <u>Id.</u>

Meir Ungar testified that it was hard for him to participate in activities such as folk dancing, which he formerly enjoyed, because he felt that he did not "have the right to be happy." <u>Id.</u> at 96.  An associate professor of business administration, specializing in corporate finance, Professor Ungar's rate of publishing has drastically declined since his son's murder, and his promotion to full professor depends almost entirely upon publication of scholarly articles.  <u>See</u> <u>id.</u> at 97-98.

Mrs. Ungar described the loss of her son as being like a "terrible weight" in her heart that is always with her and stated that she can never enjoy anything, even happy occasions, because the memory of Yaron is always with her. <u>See</u> <u>id.</u> at 112. She noted that even when her daughter gave birth to twin daughters, she was unable to be happy. <u>See</u> <u>id.</u> at 112-13. Prior to Yaron's death, she sang in a choir, but she no longer participates in it. <u>See</u> <u>id.</u> at 112. Her family life suffered as everyone is "more nervous." <u>Id.</u> at 113. Mrs. Ungar testified that for a mother to lose a child is "the most horrible thing that can happen." <u>Id.</u> at 110. Her pain was compounded by the knowledge of the "cold, cruel and horrible way" in which Yaron had died. <u>Id.</u>

The court has no doubt from the testimony presented that Mr. and Mrs. Ungar have suffered and will continue to suffer severe grief and loneliness from Yaron's death. Bearing in mind their suffering and loss, I recommend that Judith Ungar and Meir Ungar each be awarded damages in the amount of $5,000,000 for the loss of society and companionship and mental anguish caused them by the death of their son. This award is comparable to other awards made to parents whose emancipated children have been murdered. <u>See</u> <u>Smith v. Islamic Emirate of Afghanistan</u>, No. 01 CIV. 10132(HB), 2003 WL 21027170, at *15 (S.D.N.Y. May 16, 2003) (awarding $3 million for solatium to father of victim trapped in the North Tower of World Trade Center); <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 1, 9 (D.D.C. 2000)(awarding for solatium $5 million each to the surviving parents of two bombing victims); <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1, 32 (D.D.C. 1998)(finding award of $5 million each to parents of bombing victim for solatium appropriate); <u>see also</u> <u>Alejandre v. Republic of Cuba</u>, 996 F. Supp. 1239, 1249 (S.D. Fla. 1997) (awarding $5.5 million for mental pain and suffering and for loss of society and companionship to each of four parents whose sons

were murdered when their unarmed civilian plane was shot down over international airspace).

**F. Michal Cohen, Amichai Ungar and Dafna Ungar**

Each of Yaron's siblings had a special intimate relationship with him. His sister, Michal, who was three years older than Yaron, described a "bond and trust between [them] so that [they] could talk about everything." 7/12/02 Hearing Tr. at 121. This close relationship which had begun during their childhood continued even after Yaron was married. When Efrat was still in the hospital recovering from the birth of Dvir, Michal and Yaron went shopping together to buy things for the baby. See id. at 122. On this occasion Yaron told her how lucky he was to have her for a sister, but Michal testified that it was she who was lucky to have Yaron for a brother. See id.

Michal recounted how her brother's death had affected her and her family. See id. at 123. She observed that when her twins were born two years earlier it should have been the happiest day of her life, but she could not help thinking how sad it was that Yaron was not there and that her twins "won't be able to see this wonderful lovely crazy uncle who would crawl with them and sing with them and jump with them and just teach them ...." Id. at 123. Michal related how hearing Yaron's favorite song being played in a mall would "paralyze[]" her, id. at 124, and that "seeing in the distance a tall blond guy," id., would cause her to think for a split second that it was Yaron even though it was illogical, see id. The loss of Yaron was always with her. See id.

Amichai Ungar testified that he viewed his older brother as his hero and his protector. See id. at 127. He described an incident from his childhood when he was knocked down by a large dog and Yaron came running to his aid, knocking the dog off Amichai. See id. Amichai read from a letter which Yaron had

written to him when Amichai was thirteen which contained brotherly advice and evidenced a close relationship between them. See id. at 128. Since his brother's death, Amichai testified that "things aren't the same." Id. at 129. He noted that when Dvir and Yishai come to stay with the family, his job is to look after them. See id. While Amichai performs this task lovingly, he observed that the ones who are supposed to care for the children are their parents and that he is only their uncle. See id. at 129-30. He recounted being at a wedding after Yaron's death, seeing the groom and the groom's brother dancing together, and having to cry to because he realized when he got married Yaron would not be there to dance with him. See id. at 131.

Since Yaron's death, Amichai testified that his family has been "very tense." Id. at 130. He related that if something falls, everyone jumps. See id. Voicing frustration at how overprotective his parents have become, Amichai noted that even though he is twenty-five years old, his mother will not go to sleep until he is home. See id. He also indicated that he will refrain from participating in activities he formerly enjoyed, such as climbing and running on the hills, if there is an element of risk because "I can't let them lose another son." Id. at 130.

Yaron's younger sister, Dafna,[36] testified that she remembered him as her "big protecting brother," id. at 133, and that he always made them laugh and always had a smile on his face. See id. She noted that she was only sixteen when Yaron was murdered and that she was robbed of the chance to know him as an adult. See id. at 134. His death deeply affected her. See id. at 135. She described how after his death she felt the need to talk with Yaron and that she would have a "conversation" with

_____

[36] When she testified at the hearing, Yaron's younger sister spelled her name as "Daphne." 7/12/02 Hearing Tr. at 132. For consistency, the court uses "Dafna," the spelling which appears in the Complaint.

his photograph every night before she went to sleep.  See id.
She even wrote letters to him and Efrat.  See id.

Dafna also described the current state of the family: "it's
not that we always walk around in deep sorrow but in every act
that we do we have this on the background of our mind reminding
us all the time what ha[s] happened."  Id. at 136.  This
description encapsulates the essence of the testimony of the
other family members.

The court finds that there was a deep and strong emotional
attachment between Yaron and his siblings.  Accordingly, I
recommend that they each be awarded $2,500,000 for the loss of
society and companionship and mental anguish caused by the death
of their brother.  This award is within the range which other
courts have found reasonable for siblings.  See Smith v. Islamic
Emirate of Afghanistan, No. 01 CIV. 10132(HB), 2003 WL 21027170,
at *16 (S.D.N.Y. May 16, 2003)(awarding $2 million for solatium
to each sibling of victim of World Trade Center attack); Kerr v.
Islamic Republic of Iran, 245 F. Supp. 2d 59, 64 (D.D.C.
2003)(awarding $1.5 million each for solatium to sisters of
victim of terrorist shooting attack); Elahi v. Islamic Republic
of Iran, 124 F. Supp. 2d 97, 112 (D.D.C. 2000)(concluding that an
award for solatium of $5 million each to brothers of
assassination victim was appropriate); Eisenfeld v. Islamic
Republic of Iran, 172 F. Supp. 2d 1, 9 (D.D.C. 2000) (awarding
$2.5 million each to siblings of two bombing victims); Flatow v.
Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C.
1998)(finding award of $2.5 million for solatium to siblings of
bombing victim appropriate).

### G. Treble Damages

28 U.S.C. § 2333(a) provides that plaintiffs "shall recover
threefold damages he or she sustains and the cost of the suit,
including attorney's fees."  28 U.S.C. § 2333(a).  After

tripling, the amounts which I recommended be awarded to each plaintiff are shown below:

Estate of Yaron Ungar
     for lost earnings                  $1,432,158.00
     for pain and suffering of decedent  $1,500,000.00

Dvir Ungar (son)
     for loss of companionship, society,
       and guidance and mental anguish  $30,000,000.00
     for loss of parental services     $488,482.50[37]

Yishai Ungar (son)
     for loss of companionship, society,
       and guidance and mental anguish  $30,000,000.00
     for loss of parental services     $488,482.50[38]

Judith Ungar (mother)
     for loss of society and
       companionship and mental anguish  $15,000,000.00

Meir Ungar (father)
     for loss of society and
       companionship and mental anguish  $15,000,000.00

Michal Cohen (sister)
     for loss of society and
       companionship and mental anguish  $ 7,500,000.00

Amichai Ungar (brother)
     for loss of society and
       companionship and mental anguish  $ 7,500,000.00

Dafna Ungar (sister)
     for loss of society and
       companionship and mental anguish  <u>$ 7,500,000.00</u>

                     Total:  $116,409,123.00

## H. Interest

    Plaintiffs have requested that interest be awarded on the

---

[37] The amount designated for loss of parental services shall be paid to the legal guardians of Dvir Ungar.

[38] The amount designated for loss of parental services shall be paid to the legal guardians of Yishai Ungar.

judgment from June 9, 1996. <u>See</u> Damages Mem. at 25. The court finds that the award of interest is appropriate and so recommends.

## VI. Attorney's Fees

Plaintiffs have submitted an Affidavit of Counsel Fees and Costs Pursuant to 18 U.S.C. § 233(a), seeking $67,421.25 in attorney's fees for 299.65 hours of work and $1,437.72 in costs and expenses for a combined total of $68,858.97. <u>See</u> Affidavit of Counsel Fees and Costs Pursuant to 18 U.S.C. § 2333(a) ("Fee Aff."). Because this Magistrate Judge has previously indicated that he will not normally approve a claim for more than 15 hours of time in one day, <u>see</u> <u>Gray v. Brown Univ.</u>, C.A. No. 95-639ML, slip op. at 48 n.132 (D.R.I. Apr. 16, 1999),[39] the court recommends that no compensation be allowed for 3 of the 18 hours claimed for 3/2/00 and 5 of the 20 hours claimed for 3/8/00. This reduction is also warranted because the time billed for these dates is attributed exclusively to travel and there is no indication that counsel worked continuously while traveling. <u>See</u> Fee Aff., Att. at 2.

While the hourly rate of compensation of $225 per hour is higher than this court has previously approved for attorneys with the number of years of experience as plaintiffs' counsel (thirteen), this litigation presented special challenges. There was little precedent to follow. Plaintiffs' counsel had to travel to Israel to gather evidence to support the claims being made. Most significantly, the quality of the legal work performed by plaintiffs' counsel has been of an exceptionally

---

[39] "It is generally recognized that to produce 8 billable hours requires more than 8 hours. Producing 15 billable hours would require virtually all of the time available for work, since time must necessarily be spent on other non-billable matters." <u>Gray v. Brown Univ.</u>, C.A. No. 95-639ML, slip op. at 48 n.132 (D.R.I. Apr. 16, 1999); <u>Cohen v. Brown Univ.</u>, C.A. No. 92-197, slip op. at 32 n.23 (D.R.I. Aug. 10, 2001)(same).

high caliber. Accordingly, the court finds that the requested hourly rate of $225 per hour is warranted. The court recommends that plaintiffs be allowed attorney's fees of $65,621.25 (291.65 hours at $225.00 per hour = $65,621.25) and costs of $1,437.72.

## VII. Summary

For the reasons expressed in part III B of this opinion, I find that defendant Hamas has minimum contacts with the United States and that this court may exercise personal jurisdiction over it consistent with constitutional requirements of due process. However, I also find the evidence does not show that the individual Hamas defendants have engaged in the kind of systematic and continuous activity in the United States necessary to support the exercise of general personal jurisdiction over them. Consequently, I recommend that the claims against the individual Hamas defendants be dismissed for lack of personal jurisdiction.

For the reasons expressed in part V of this opinion, I recommend that damages be awarded to the following plaintiffs in the amounts indicated: Estate of Yaron Ungar ($2,932,158.00), Dvir Ungar ($30,488,482.50), Yishai Ungar ($30,488,482.50), Judith Ungar ($15,000,000.00), Meir Ungar ($15,000,000.00), Michal Cohen ($7,500,000.00), Amichai Ungar ($7,500,000.00), and Dafna Ungar ($7,500,000.00). I recommend that interest be awarded on these amounts from June 9, 1996. I also recommend that plaintiffs be awarded attorney's fees in the amount of $65,621.25 and costs of $1,437.72.

## VIII. Conclusion

For the reasons stated above, I recommend that the Motion to Enter Default Judgment be granted as to defendant Hamas, but denied as to defendants Rahman Ghanimat, Hor, Abu Hamdiya, Ibrahim Ghanimat, and Kafishe and that the claims against these latter defendants be dismissed for lack of personal jurisdiction.

I further recommend that default judgment enter against defendant Hamas and that plaintiffs be awarded a total of $116,409,123.00 in damages, plus interest, attorney's fees of $65,621.25, and costs of $1,437.72.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.  See Fed. R. Civ. P. 72(b); D.R.I. Local R. 32.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

David L. Martin
United States Magistrate Judge
July 3, 2003