1           UNITED STATES DISTRICT COURT

2

3        FOR THE DISTRICT OF RHODE ISLAND

4

5     ++++++++++++++++++++++++++++

6     YARON UNGAR, et al          CA No. 00-105 L

7

8        v                     PROVIDENCE, RI
                                14 JULY 2003
9

10    PALESTINIAN AUTHORITY, et al

11    ++++++++++++++++++++++++++++++

12

13        BEFORE MAGISTRATE JUDGE DAVID L. MARTIN

14

      APPEARANCES:
15

      FOR THE PLAINTIFF:          DAVID J. STRACHMAN, ESQ.
16                                321 S. Main St.
                                  Suite 400
17                                Providence, RI 02903
                                  351-7700
18

19
      FOR THE DEFENDANT:          RAMSEY CLARK, ESQ.
20                                Ramsey Clark & Lawrence
                                  Schilling Law Offices
21                                36 East 12th Street
                                  New York, NY 10003
22                                1-212-475-3232

23                                DEMING SHERMAN, ESQ.
                                  Edwards & Angell
24                                2800 Financial Plaza
                                  Providence, RI 02903
25                                274-9200

14 JULY 2003

    THE COURT:  Good morning.  This is the matter of the Estate of Yaron Ungar, et al vs the Palestinian Authority, et al, Civil Action 00-105-L.

    The matter before the Court this morning is the plaintiffs' motion for judgment by default against PA, and plaintiffs' motion for judgment by default against PA and PLO for refusal to submit to depositions.

    The Court previously conducted a hearing regarding these motions on May 14, 2003, and continued the matter until today's date.

    The attorneys here in the courtroom will identify themselves, please.

    MR. STRACHMAN:  David Strachman for the plaintiffs.

    MR. SHERMAN:  Deming Sherman for the defendants PA and PLO.

    THE COURT:  The attorneys participating via telephone will identify themselves.

    MR. CLARK:  Good morning, your Honor. Ramsey Clark and Larry Schilling, Palestine Authorities.  I'm in New York and we appreciate letting us appear by phone.

    THE COURT:  Thank you, Mr. Clark.

1    Unfortunately our connection is not as clear as it

2    sometimes is.  We're going to proceed, however.  Can

3    you hear me clearly?

4            MR. CLARK:  I can hear you, yes, sir.  Can

5    you hear me?

6            THE COURT:  Yes, I can.

7            MR. CLARK:  I'll speak loud and directly

8    towards the phone.

9            THE COURT:  Just continue speaking in the

10    manner that you have been speaking, Mr. Clark.  I think

11    we'll manage.  If at anytime either I or any of the

12    attorneys in the courtroom cannot understand you, the

13    attorneys in the courtroom can raise their hand and I

14    will stop Mr. Clark, and we'll see if we can clarify

15    matters.

16            I'm going to state a little bit of the

17    travel that brings us to this point today.

18            I find that this matter is at least

19    procedurally becoming complicated.  I will not start at

20    the beginning, but I will start perhaps at the date

21    that is a convenient starting point.

22            The Court granted plaintiffs' motion for

23    default after a hearing on April 1, 2003.  I issued a

24    memorandum and order on April 18, 2003, granting the

25    plaintiffs' motion for default against the PA

1    defendants.

2           On May 14, 2003, the Court took up

3    plaintiffs' motion for default judgment which had been

4    filed on February 12, 2003, and also took up

5    plaintiffs' motion for default judgment --

6           MR. CLARK:  Hello.

7           THE COURT:  Yes, I'm here, Mr. Clark.  I'm

8    pausing.

9           MR. CLARK:  Sure.

10          THE COURT:  I'm pausing.  The plaintiffs'

11   motion for default judgment which was filed on February

12   12, 2003 was based on the failure of the PA defendants

13   to respond to discovery requests, consisting of

14   interrogatories, request for production of documents

15   and a request for admissions.

16          The plaintiffs' motion for judgment by

17   default, which was filed on April 9, 2003, was based

18   upon, among other things, the failure of the PA

19   defendants' refusal to submit to depositions.

20          The Court conducted a hearing on these

21   motions on May 14th.  At that time, the Court noted

22   that default judgments were not favored, and the

23   defendants had not previously been explicitly warned by

24   the Court that a failure to comply with their discovery

25   obligations could result in the entry of default

1    judgment against them. Consequently, the Court entered

2    an order continuing the hearing on the motion to July

3    14, 2003. The defendants were ordered to comply with

4    all outstanding discovery requests from plaintiffs by

5    July 14, 2003, including completion of depositions of

6    the persons previously noticed by plaintiffs.

7         Defendants were to notify plaintiffs in

8    writing not later than June 16, 2003 of the dates prior

9    to July 14, 2003 that deponents would be available to

10   be deposed in Rhode Island. If the defendants sought

11   to have the depositions conducted somewhere other than

12   in the District of Rhode Island, the defendants were to

13   file a motion seeking such relief not later than

14   Monday, June 16, 2003. Such a motion was to state when

15   and where each deponent for whom such relief was

16   requested would be available to be deposed prior to

17   July 14th. The Court stated it would conduct a prompt

18   hearing on any such motion filed.

19        The order went on to state that if the

20   defendants failed to comply with the requirements of

21   Paragraph 3 of the order by June 16, 2003, and

22   Paragraph 3 of the order was the portion which directed

23   the defendants to notify plaintiffs of when and where

24   their deponents would be available to be deposed, if

25   they were unable to comply with Paragraph 3 of the

1    order, the plaintiffs were directed to bring such

2    failure to the Court's attention, and the Court would

3    advance the hearing on the motion scheduled for July

4    14th to July 23, 2003.

5         The order stated, "Defendants are warned

6    that failure to comply fully with this order may result

7    in the entry of default judgment against them".  The

8    order finally noted that the plaintiffs would be

9    awarded attorneys' fees for the additional work they

10   had incurred as a result of the defendants' failure to

11   respond to plaintiffs' discovery request to date, and

12   the Court would address the matter of attorneys' fees

13   further at the hearing on July 14th.

14        On June 16, 2003, this Magistrate Judge

15   received a copy of a letter from defendants' attorney

16   Ramsey Clark to plaintiffs' counsel David Strachman.  I

17   note that the date on the letterheard states January 6,

18   2003, however, the Court assumed from the context of

19   the letter that, in fact, that was an inadvertent

20   error, that in fact the actual date was June 6, 2003.

21        MR. CLARK:  That is correct, your Honor.

22        THE COURT:  Thank you, Mr. Clark.  In the

23   June 6, 2003 letter, Mr. Clark informed Mr. Strachman

24   that the defendants were not able to engage in any

25   discovery at this point, and the letter went on to

1    indicate that the defendants would be filing a motion

2    to dismiss the amended complaint, it would be a

3    supplemental motion by the PA and the PLO to dismiss

4    the amended complaint for lack of subject matter

5    jurisdiction.  On June 18, 2003, the Court received a

6    letter from attorney David Strachman in which he had

7    indicated to the Court having a -- apparently

8    Mr. Strachman had been informed of the Court's

9    intention to conduct the hearing on June 23, 2003.  The

10   Court apparently had taken that action as a result of

11   the notification contained in Mr. Clark's letter of

12   June 6, 2003 that the defendants would not be complying

13   with their discovery obligations as the Court had

14   ordered in its May 14, 2003 order, and that the Court

15   had indicated it would advance the hearing to June 23,

16   2003.

17            The substance of Mr. Strachman's letter was

18   he would be abroad on June 23rd.  He requested that he

19   be allowed to participate in the hearing via telephone,

20   and if this were not convenient, he respectfully

21   requested that the hearing be continued to anytime

22   subsequent to July 10, 2003.  The Court received on

23   June 23, 2003, a letter dated June 18, 2003 from

24   Mr. Clark.  He acknowledged receiving a copy of

25   Mr. Strachman's letter of June 17, 2003 to the Court.

1    Mr. Clark indicated that, "Under all the circumstances,

2    we think it would better serve the case to reschedule

3    this hearing to a date on or after July 20, 2003".

4    After receiving Mr. Clark's letter, the Court scheduled

5    this hearing for its original date of July 14, 2003.

6        Mr. Clark, I am pausing again so just to let

7    you know you need not check to make sure the phone

8    connection is still working.  It is.

9        MR. CLARK:  It seems to be working fine

10    here, Judge.

11        THE COURT:  All right.  On July 11th, the

12    Court was notified that the defendants intended to file

13    a motion to continue today's hearing.  Defendants, in

14    fact, did file a motion for continuance of the July

15    14th hearing, and the defendants also filed a motion to

16    enlarge the time to respond to a May 30th motion filed

17    by the plaintiffs for default judgment.

18        Neither of the two motions that were filed

19    on July 11th have formally been referred to this

20    Magistrate Judge, however, obviously the motion to

21    continue today's hearing is a matter I feel I must

22    address since we have the hearing about to commence.

23        Regarding the motion to enlarge, defendants'

24    motion to enlarge the time to respond to the May 30th

25    motion, that has not been formally referred to me and I

1    do not propose to act upon it today.

2            My intention is to first address defendants'

3    motion to continue today's hearing.  I recognize that

4    the objection period has not yet run, and I'm not aware

5    that the plaintiffs have filed a written response to

6    that motion.  Mr. Strachman, was there a written

7    response filed?

8            MR. STRACHMAN:  We have not, your Honor.

9    We're ready to argue it today.

10           THE COURT:  So my intention is to first take

11   up the defendants' motion to continue today's hearing,

12   and then depending on how that is decided, we would

13   eitehr proceed to the scheduled motions for entry of

14   default judgment, a hearing on those motions.

15           However, before I even get to that, I now

16   note that, in effect, there are three motions for entry

17   of default judgment that have been filed by the

18   plaintiffs.  The most recent being that filed on May

19   30, 2003.  I'd like to hear from the plaintiffs

20   regarding the fact that there are three motions for

21   entry of default judgment.  I note the most recent is

22   supported by exhibits, although I believe the

23   plaintiffs indicate all of these documents have

24   previously been introduced and are part of the record.

25   Is that correct, Mr. Strachman?

1          MR. STRACHMAN:  I believe that's so, your

2    Honor.  I believe that they were the exact same

3    documents that were provided in response to motion to

4    dismiss the amended complaint, and the only difference

5    being, I believe, is that -- well, for certain, I know

6    that the one difference is I filed an affidavit

7    indicating the source and authenticity of the

8    documents, but I believe also that all of the documents

9    parallel --

10          MR. CLARK:  Your Honor, I --

11          THE COURT:  Can you hear Mr. Strachman,

12    Mr. Clark?

13          MR. CLARK:  We're not able to hear.

14          THE COURT:  I'm going to have Mr. Strachman

15    move to the podium and to start over again, Mr. Clark.

16          MR. CLARK: All right.

17          THE COURT:  All right.  My question to you,

18    Mr. Strachman, was whether or not the exhibits that you

19    have submitted in connection with the May 30, 2003

20    motion for default judgment, whether those exhibits are

21    already part of the record.

22          MR. STRACHMAN:  I believe they are

23    identical, Judge, to the documents that were provided

24    in response to the defendants' second motion to

25    dismiss, or rather the motion to dismiss the amended

1    complaint.  One difference is that the motion to enter

2    default judgment had an attached affidavit from me

3    indicating as to referencing the authenticity of the

4    documents and the source, explicitly the source of the

5    documents, in most cases either from the internet or

6    from the defendants themselves, just for clarity sake.

7            THE COURT:  Mr. Strachman, I have this

8    question for you.  There are two motions for entry of

9    default judgment that have been filed, have been

10   referred to me, are scheduled for hearing today.  Since

11   the last hearing on these motions, which was May 14th,

12   the plaintiffs have filed a third motion for entry of

13   default judgment.  If I were to go ahead and rule upon,

14   issue a Report & Recommendation concerning the first

15   two motions for entry of default judgment which are

16   scheduled for hearing today, what effect does that have

17   on the third motion for entry of default judgment?

18   Would that, if I go ahead and rule on the first two

19   motions for entry of default judgment, and by rule, I

20   mean issue a Report & Recommendation, will that not

21   render moot the third motion for entry of default

22   judgment?  And if it will not render it moot, then why

23   should the Court proceed to issue a Report &

24   Recommendation on these first two motions for entry of

25   default judgment when there is another motion for entry

1    of default judgment which you've since filed and which

2    I assume but I'm not certain you intend to ask the

3    Court to rule upon.  Could you address that matter,

4    please?

5         MR. STRACHMAN:  First, your Honor, the two

6    motions that are before the Court today, as your Honor

7    knows, the Genesis of those two motions are a series of

8    discovery orders and hearings that we've had going way

9    back to conferences with the Court last year, and then

10   a ruling on a motion to stay discovery, and then a

11   hearing in November, following a conference in

12   November, I believe, and then an order in January, and

13   then action this spring.  I think what we would prefer

14   to do, your Honor, is proceed on just parallel tracks.

15   I believe that the defendants clearly are in default

16   for the failure to comply with the discovery orders

17   back in January, back in the November order terminating

18   the stay, and most recently, your Honor, the order from

19   May 14th ordering them to comply with discovery.

20   Mr. Clark responded very frankly in the correspondence

21   that you cited that he would not, his clients would not

22   be complying with the order, and I think we need to

23   proceed in a parallel fashion.

24        Secondly, your Honor, the Rule 55 motion to

25   enter default judgment which we've filed since May 14,

1    defendants have not responded to the motion, are

2    unwilling to respond to the motion, have requested in

3    the motion that was filed on Friday not to respond to

4    the motion until Judge Lagueux takes action on yet

5    basically a fourth attempt to have this matter

6    dismissed.

7             So, it's not as if, from your perspective,

8    or from the procedural quagmire that this case is

9    devolving into, is if it's apparent that we'll get a

10   ruling on that, or have a ruling in the immediate

11   future, I don't see any reason not to proceed in a

12   parallel fashion.  And ultimately because your Honor

13   indicated that you're making a Report & Recommendation,

14   like every other order in this case, like every other

15   report from your Honor, there has been an objection,

16   I'm sure it will end up in front of Judge Lagueux, at

17   any rate, and we would request to go forward today on

18   these two motions.

19            It's important for a variety of reasons.

20   It's important because this case is now 40 months old,

21   and although we don't have an answer in the case after

22   40 months, we still don't have any compliance at all

23   with the discovery orders.  This case is exactly what

24   was described in the, I think you pronounced it Damiani

25   case, which we've cited in our materials, which

1    indicates that in that case, just like here, counsel

2    took it upon themselves to determine the course of this

3    litigation, not the rules, not the court orders, and

4    not the requests of the opposing party to comply with

5    those rules.  So it's imperative from our perspective

6    that we go forward today, and that the Rule 55 motion

7    to enter default judgment would be handled in, I guess,

8    in due course.

9            THE COURT:  Assume for the sake of our

10   colloquy here, Mr. Strachman, that we have the hearing

11   today on the two motions for entry of default judgment,

12   I issue a Report & Recommendation recommending that

13   default judgment be granted.  Assume that Judge Lagueux

14   accepts that, if that occurs, does that render moot

15   your May 30th motion for entry of default judgment?

16           MR. STRACHMAN:  It very well may.

17           THE COURT:  Are there any circumstances

18   under which it would not render it moot?

19           MR. STRACHMAN:  I don't know quite honestly,

20   your Honor.  I haven't really thought through your

21   request.  I think it's very clear that there are dual

22   obligations that these plaintiffs have.  They have to

23   comply with the rules, they have to comply with

24   discovery orders.  They're complying with neither, and

25   I'm not so sure one necessarily cancels out the

1  obligation of the other.

2        THE COURT:  All right, thank you,

3  Mr. Strachman.  All right, I'm going to take up now, as

4  I announced, the defendants' motion to continue this

5  hearing.  Mr. Clark, I'll hear you on your motion to

6  continue this hearing.

7        MR. CLARK:  Thank you, your Honor.  We have

8  separate reasons for seeking a continuance of this

9  hearing.  The first and most important to us, though

10  perhaps not legally most, is that we do have a Rule

11  12(b)(1) motion to dismiss pending before the District

12  Judge, following the remand from the United States

13  Court of Appeals for the First Circuit, and then

14  important is the comments made in its core opinion.

15        The plaintiff has (Inaudible) time to

16  respond up until the 31st of July.  (Inaudible) a new

17  motion in its midst, indicated that it ought to be

18  decided first.  In addition, it cited from favorably

19  plaintiffs, or the defendant --

20        THE COURT:  Mr. Clark, I am going to

21  interrupt you.  We are having some difficulty.  I am

22  going to confer with my clerk to see whether if there

23  is anything we might be able to adjust the clarity of

24  your speech.

25        MR. CLARK:  Okay.

1      THE COURT:  One moment, please.

2  Mrs. Saucier, would calling them back and

3  reestablishing the --

4      THE CLERK:  We can try that, your Honor.

5      THE COURT:  Mr. Clark, I'm going to just

6  interrupt the hearing briefly.  I'm going to have my

7  clerk call you back and see if we can establish the

8  line just a bit more clearly.  I hope it won't take

9  anymore than 2 or 3 minutes.  I'm just going to leave

10  the bench for those 2 or 3 minutes.  When you're ready,

11  Mrs. Saucier, I'll come right back.

12  (Recess)

13      THE COURT:  The Court is back in session.

14  Mr. Clark, can you hear me?

15      MR. CLARK:  Yes, sir.

16      THE COURT:  My clerk advised me that the

17  problem still seemed to be with us.  Although, when you

18  just said "yes, sir", it seemed rather clear.  Resume

19  your argument.  I may interrupt you, but -- in fact,

20  why don't you, if you can, Mr. Clark, try to

21  recapitulate or repeat the argument from the beginning.

22  I'm sorry to make you do that, but I am concerned about

23  the difficulty a stenographer would have transcribing

24  your previous remarks because the clarity was not good.

25  So why don't you try, and if I find we're having the

1  same difficulty, I'm then going to interrupt, we'll

2  take a recess, and my clerk will see if we can use the

3  equipment in another courtroom and see if we can

4  somehow circumvent this problem. So could you begin

5  again, Mr. Clark? I do apologize for making you do

6  that.

7          MR. CLARK: Not at all. We're happy to do

8  it, your Honor. I was discussing --

9          THE COURT: Mr. Clark, I've heard enough to

10  satisfy me that we still have the same problem, so

11  we're going to recess. I'm going to give my clerk time

12  to try to solve this problem. If we can't solve the

13  problem in an hour, it may be necessary to reschedule

14  this hearing and have you attend in person because we

15  must have a record, and it would be impossible for a

16  stenographer to accurately transcribe your remarks at

17  this point. I'm having difficulty catching every word,

18  and I'm sure a stenographer trying to listen to the

19  tape would have similar difficulty. So I'm going to

20  recess. It's now about 25 of 12. If we can't solve

21  this problem in an hour, I'll reconvene briefly, and

22  we'll reschedule this, and I will require counsel to be

23  present in person on another hearing date. The Court

24  will stand in recess.

25          (Recess)

1    THE COURT:  Mr. Clark.

2    MR. CLARK:  Yes, your Honor.

3    THE COURT:  I understand that you're now not

4    on a speakerphone but I gather speaking directly into

5    the receiver, is that correct?

6    MR. CLARK: That's correct.

7    THE COURT:  Yes.  That makes your voice

8    clearer.  We're going to begin again.  I'm going to

9    hear your argument on your motion to continue today's

10   hearing.  I think, please, you should make your entire

11   argument.  I think you can assume that the stenographer

12   would not be able to transcribe your previous remarks.

13   So please begin again.

14   MR. CLARK:  Yes, your Honor.  I apologize

15   for the speakerphone problem.  We should have thought

16   of that.  I'm glad that your clerk -- there is an echo

17   here which makes it a little difficult.  Do you have an

18   echo?

19   THE COURT: Some, but at least --

20   MR. CLARK:  I can work with that.

21   THE COURT:  You are much more clear.  So

22   please just speak slowly.  You've been quite clear in

23   your enunciation, Mr. Clark, and also with your rate of

24   speech.  I would encourage you with the same

25   enunciation and the same deliberate rate of speech, it

1          It also leaves open, in fairness, to the

2    defendants, the option that if the motion to dismiss is

3    denied, and subject matter jurisdiction is established,

4    the opportunity to consider whether they believe it's

5    possible, and whether they believe it is in the

6    interest of their people, to defend the case, where if

7    the motions for default proceeded, that opportunity

8    will be lost.

9          You recall in one of the hearings before

10   you, Judge Martin, I indicated that they had determined

11   that they will not participate in the ordinary

12   proceedings of litigation until the subject matter

13   jurisdiction issue had been determined.  So we would

14   believe that's an important reason in law, that

15   fairness to delay the determination of this motion

16   that's on for consideration today.

17         The second ground is that we filed objection

18   and appeal to the District Judge from both of your

19   orders, the order on depositions, which were impossible

20   for the people that whose depositions were sought be

21   present.  Arafat is still not able to move out of

22   Ramallah, out of his office there, and is beseeched

23   with daily problems that make participation even there

24   impossible at this time.  Of course, we all hope that

25   that will change.  But the Court, just today, has -- I

1  think just today, I first saw it today, it could have

2  been Friday, has set a hearing for July 30th on the

3  appeals based on our objection to the appeal to the two

4  default, notice of default orders, Recommendation &

5  Order that you had entered.

6          THE COURT:  Mr. Clark, I want to be sure I

7  know what orders you are referring to.  Could you be

8  more precise in identifying the order?  Mr. Sherman is

9  about to hand to my clerk, I gather the notice.

10         MR. CLARK:  He can do that.

11         THE COURT:  He has done that and I have it,

12  so I have a copy of the notice setting the hearing for

13  July 30, 2003 on the objection to R&R and Magistrate's

14  orders dated 4/18/03, 5/14/03 and 5/27/03.  So I have

15  the document that tells me what you're referring to,

16  Mr. Clark.  You may proceed.

17         MR. CLARK:  Okay.  The third ground is --

18  came within your -- a new question at the hearing today

19  counsel for plaintiffs, and that is the meeting for the

20  three separate motions for default.  Ordinarily, you've

21  seen a single order, or at least a single judgment for

22  default, a dispositive case, and be no basis for

23  subsequent motions. Our impression is the motion for

24  default or failure to file an answer which flows as we

25  see from the desire and belief that there's a legal

1    right to have subject matter jurisdiction determined

2    first, which is presently before the District Judge,

3    (inaudible) the other two motions for default, that

4    separate accomodations for motions is, if not meeting

5    this, at least waiting unnecessary, that an order of

6    the District Court based upon a recommendation from the

7    Magistrate Judge on any one of the three motions, which

8    are, at best, redundant in terms of (inaudible) would

9    be dispositive of all and not leave anything else to be

10   determined in terms of default. So that from a

11   voluntary standpoint I can think of, the fairest and

12   most efficient way of proceeding is to have the

13   District Judge act upon the two motions that have been

14   appealed to him, the papers of which are before you,

15   and decide what to do about the third motion before you

16   take additional time and labor to do what would be a

17   redundant and unnecessary thing.

18               THE COURT:  Have you concluded, Mr. Clark?

19               MR. CLARK:  Yes, your Honor.

20               THE COURT:  Were your last two words "thank

21   you"?

22               MR. CLARK:  The next two would be, if they

23   weren't.  Thank you.

24               THE COURT:  All right.  I only asked because

25   I couldn't understand the final two words.  I believe

1    they were thank you.  And if they were anything other

2    than that, I wanted to just see what they were to help

3    the stenographer. I think you said thank you.

4              MR. CLARK:  I'm embarrassed to say I don't

5    really know, but I assume so.

6              THE COURT:  All right.  With your consent,

7    I'll state for the record your final two words were

8    thank you.  All right, I'll hear from Mr. Strachman.

9              MR. STRACHMAN:  Thank you, your Honor.  Your

10   Honor, this attempt to disrupt today's proceeding and

11   to litigate this litigation runs parallel to the

12   tactics of the defendants virtually one year ago when

13   we had another default judgment motion hearing

14   scheduled, and the day before we received -- rather

15   maybe 36 hours before the hearing, we received a

16   similar motion to continue this, after the matter had

17   been scheduled for some time.  In both instances, the

18   PA and the PLO come in at the eleventh hour and ask to

19   stop this litigation basically because of their own

20   stratagems, their own techniques of litigation, not

21   because there is something improper, or some improper

22   reason for going forward, but because since the last

23   hearing they decided to take, to file a new motion to

24   dismiss.  Similarly, at the last hearing, because of

25   their own inability to understand what was going on,

1   with their own concerns, they decided they don't want

2   to go to Court, and the Court said very clearly a year

3   ago that it was not going to sanction and tolerate that

4   type of behavior, the case would go forward.  The 11th

5   hour attempt to interfere with the proceedings would

6   not be permitted.  And that's exactly what we have

7   right here.

8            Your Honor scheduled this matter two months

9   ago. It was Mr. Clark who specifically requested, in

10  response to my letter, because I was out of the

11  country, I asked, so as to not have to continue the

12  continuance, if you will, to participate via telephone,

13  and he suggested no, let's go forward on the original

14  date, which is today.  And that's fine with me, and I'm

15  happy to do it in whatever fashion is convenient for

16  the Court.  But to suggest now that we should not be

17  going forward when we have basically eight months of

18  noncompliance with discovery orders is outrageous.  It

19  really should not be tolerated.  The burdens of

20  litigation in this case have been sustained only by one

21  party, and that's my clients.  They have had to sustain

22  the burden of repeated motions to dismiss, the refusal

23  to file them on a timely fashion, the piecemeal

24  litigation, and I'll note for the Court very clearly,

25  Mr. Clark filed a request to be admitted pro hac vice

1    in this case three years ago.  It was, I believe, the

2    September 2000 hearing.  I believe it was in August of

3    2000, he filed a motion for pro hac vice.  And in that

4    motion, he said very clearly, that one of the reasons

5    he needed to be counsel in this case is because there

6    are issues of sovereign immunity.  Now, 40 months after

7    this case has been filed, after Judge Lagueux already

8    ruled the PA is not a state, after the First Circuit

9    has said that they have not followed the rules and

10   admonished them for their discovery techniques and said

11   -- excuse me, their litigation techniques, and said

12   very clearly they too have to follow the rules, and

13   that the appellants have to follow the rules that

14   govern all litigation.  The objections to the

15   procedural morass that they frosted, in the rules of

16   the First Circuit, "rings hollow", now they're

17   attempting to disrupt this.  But the key is that he,

18   himself, Mr. Clark, identified sovereign immunity as an

19   issue that must be raised as a defense.  Judge Lagueux

20   said it is not a defense, and he said that several

21   months ago when we were here, and Judge Lagueux said

22   very clearly in his -- in the April 11 hearing on Page

23   13, he said, "This case is going forward.  There is no

24   sovereign immunity defense."  If the defendants want to

25   file repeated motions to dismiss the case in some

1    sense, I believe they have the right to do that.  In

2    some sense, I think they should be sanctioned for doing

3    that in filing this matter, in filing the defenses in a

4    piecemeal manner.  However, the mere fact that they

5    keep raising these defenses does not allow them to get

6    out of the obligations that they have through prior

7    orders.  They were at a hearing before your Honor in

8    December.  They're subject to an order from January

9    14th.  They were here in the spring when they were told

10   to comply.  They refused to comply.  It's not because

11   of anything the plaintiffs' did, it's not because of

12   anything the Court did, that they find themselves in

13   what they perceive to be an awkward position.  It's

14   because of their own methodologies.  If they had raised

15   all of their defenses in July of 2000, then we would

16   have had a decision.  I believe the decision was

17   rendered in July of 2001.  Discovery would have

18   proceeded, et cetera.  They didn't do that.  Not only

19   did they not do that, Judge Lagueux gave them a

20   separate opportunity.  In September of 2000, he said go

21   back and supplement your memorandum.  They did do that.

22   They again didn't raise the issue of sovereign

23   immunity.  We filed an amended complaint.  They again

24   did not raise the issue of sovereign immunity but had

25   this little trick that they utilized to ask to be

1  allowed to raise new defenses, and the First Circuit
2  saw right through that methodology and dismissed their
3  appeal and said that Judge Lagueux acted properly in
4  his ruling, and they acted improperly, and said very
5  clearly that their appeal was flawed because they did
6  not raise their defenses properly and said, just like
7  it would say to anybody, any other litigant, if you
8  want to raise an issue, you have the right to raise it
9  at some time.  But the mere fact that they have the
10  right to raise an issue does not mean that the entire 3
11  and 1/2 years of litigation should come to a standstill
12  because they said and decided now is the time they want
13  to raise a defense that they knew about 3 and 1/2 years
14  ago, and as the First Circuit says there clearly, they
15  should have.  They did not leave.  And, in fact, they
16  did in the Puritan Oil case, and that's specifically
17  what the First Circuit said.  They should have done it
18  back then.  So we're not doubting whether they have a
19  right to raise issues, but to stop this litigation is a
20  travesty.  And to stop it as a result of this type of
21  action is outrageous.  My clients have had to suffer
22  the burdens of litigation.  The very issue that they're
23  raising is raised improperly, and I'll just say it very
24  simply, a foreign state, an entity that has been
25  described as a foreign state, has the right to have

1    their immunity determined at the beginning, whether
2    they fit within one of the exceptions of the foreign
3    sovereign immunity act.  Not a party claiming for the
4    first time ever to be a foreign state and to be subject
5    to the foreign sovereign immunity act.  And that's what
6    we have here.  The law of this case right now is that
7    the PA is not a state.  That's what Judge Lagueux ruled
8    very clearly in November of 2000.  They want a second
9    crack, a third crack, a fourth crack.  They may have a
10   right to do it, but he said repeatedly the case is
11   going forward.  They are attempting to manipute this
12   doctrine of the foreign sovereign immunity to stop this
13   proceeding, it's inappropriate.  And even if they were
14   to prevail, even if they were to prevail, one of the
15   parties to this case is the PLO.  Very clearly, a
16   political organization, and in no way could be
17   construed as a foreign state.

18          So we think this case should go forward.  We
19   think you should issue rulings today on our default
20   judgment motions, and that this attempt to litigate
21   this motion, and in Mr. Clark's word, the proper order
22   of things, to rearrange the proper order of things, I
23   think has to be put to an end, Judge, and I urge you to
24   grab control of this case in the way that we've been
25   down this road for the last couple of months, and we

1    have a structured proceeding, a structured method,

2    rather, to deal with these issues, and now to disrupt

3    them would basically set us back 3 and 1/2 years.

4    Thank you.

5          THE COURT:  Thank you, Mr. Strachmen.  I'm

6    going to have marked as exhibits for this hearing the

7    three letters that I made reference to.  The first

8    being the letter from Mr. Clark to Mr. Strachman which

9    bears a typed date of January 6, 2003, but as confirmed

10   by Mr. Clark at the hearing this morning, that was in

11   error.  The actual date of that letter is June 6, 2003.

12   Is that correct again, Mr. Clark?

13         MR. CLARK: That's correct, your Honor.

14         THE COURT:  And I will also have marked as a

15   full exhibit the June 17, 2003 letter from

16   Mr. Strachman to the Court.

17         And lastly, I'll have marked as an exhibit

18   the June 18, 2003 letter from Mr. Clark to the Court.

19         Before the Court is the Palestinian

20   defendants' motion for continuance of July 14, 2003

21   hearing.  This motion was filed on July 11th.  As noted

22   by plaintiffs' counsel, this is not the first time that

23   the defendants have filed a motion at the eleventh hour

24   prior to a hearing.  Plaintiffs' counsel is correct

25   that a year ago just prior to the hearing on the motion

1  for default judgment against the Hamas defendants,

2  plaintiffs filed a motion to continue that hearing.

3  The Court denied that motion noting that witnesses had

4  traveled from Israel for the hearing.

5          The Court is going to deny the motion for

6  continuance.  It does so for the following reasons:

7          The Court agrees with the arguments put

8  forward by plaintiffs' counsel here this morning.  The

9  first ground advanced by the defendants for the

10  continuance is that the defendants have since the May

11  14th hearing filed a motion to dismiss.  The Court

12  agrees with plaintiff counsel argument that this issue

13  could been have raised far earlier than the defendants'

14  most recent motion.

15          The second ground advanced by the defendants

16  is that they have filed an objection to my Report &

17  Recommendation and Orders to Judge Lagueux, and that

18  the Court should defer acting upon the pending motions

19  for entry of default judgment until after Judge Lagueux

20  has ruled upon the objections to my Report &

21  Recommendation, and their appeal of my orders dated

22  April 18th, May 14th and May 27, 2003.

23          As the Court indicated at the hearing on May

24  14th, the plaintiffs have a right to have this matter

25  proceed.  It has certainly not moved rapidly, and has

1   been the subject of numerous motions, creating a

2   complicated procedural situation.  The Court agrees

3   with plaintiffs' argument that the best way to get this

4   matter if not on track, but to steer through the

5   procedural complexity, is to adhere to the schedule

6   that the Court announced at the May 14th hearing, which

7   was, in effect, a final attempt by the Court to get the

8   defendants to comply with their discovery obligations.

9   So, I reject the second argument that is advanced by

10  the plaintiffs which is that it would be better to

11  defer action until Judge Lagueux rules upon their

12  objection to my R&R and their appeal of my orders.  I

13  think further delay would, in fact, complicate the

14  number of pending motions.  I think it is best to have

15  a ruling on the two pending motions for entry of

16  default judgment.

17          Regarding the third argument advanced by the

18  defendants, namely that because the plaintiffs have

19  filed a third motion for entry of default judgment, it

20  would be better to delay acting on the first two

21  motions for entry of default judgment until such time

22  as either or all three motions could be heard together,

23  or until such time as there is a ruling on the third

24  and most recent for filing of default judgment.

25          The Court is satisfied that this is not a

1  problem.  That if the Court acts upon, and by acts, I

2  mean issues a Report & Recommendation regarding the two

3  pending motions for entry of default judgment, and if

4  that Report & Recommendation is accepted by Judge

5  Lagueux, as I assess the situation, it would render

6  moot the third motion for entry of default judgment.

7          Therefore, I'm not persuaded that it will be

8  wasteful or unnecessary to proceed with the hearing on

9  the two pending motions.  I think there is a practical

10  value to proceeding with the consideration of the two

11  pending motions.

12          So, for these reasons, the Court denies the

13  Palestinian defendants' motion for continuance of the

14  July 14, 2003 hearing.  Mr. Strachman, I'd ask you to

15  submit an order, brief order, simply reflecting the

16  Court's ruling today.

17          MR. STRACHMAN:  Your Honor says brief, I

18  mean, saying it's denied as opposed to --

19          THE COURT:  Yes.

20          MR. STRACHMAN:  Certainly, your Honor.

21          THE COURT:  The record will speak for

22  itself.  Past history has indicated that attempts to

23  reflect the Court's ruling often, although well

24  intended, seems to produce disagreement between counsel

25  as to what the Court said.  We'll let the record

1    reflect what I said.  The order can simply document the

2    ruling.

3                    MR. STRACHMAN:  Thank you, your Honor.

4                    THE COURT:  All right.  We'll now take up

5    the two motions that are scheduled for hearing, which

6    are the plaintiffs' motion for entry of default

7    judgment.  I'll hear first from Mr. Strachman, then

8    I'll hear from Mr. Clark.  Mr. Strachman.

9                    MR. CLARK:  Your Honor, can we go on hold

10   for just about a minute so that Mr. Schilling can get

11   on another phone and see if he can hear what's being

12   said?

13                   THE COURT:  Yes.  I'll pause one minute.

14   Please get back to me within one minute, Mr. Clark.

15                   MR. CLARK:  Very good.  Thank you.

16   (Pause)

17                   MR. CLARK:  Hello.

18                   THE COURT:  Yes, Mr. Clark.

19                   MR. CLARK:  Yes.  Mr. Schilling?  I don't

20   think he's on.  I can't tell.

21                   THE COURT:  Mr. Schilling, are you on the

22   line?

23                   MR. CLARK:  No, I don't think he is.  He's

24   in another room so I can't --

25                   THE COURT:  Well, I'll wait another 30

1  makes it easier.

2  MR. CLARK: Thank you, your Honor. There

3  are three basic grounds for our motion for a

4  continuance today. The first is that we have pending

5  before the District Judge a new Rule 12(b)(1) motion to

6  dismiss the complaint which is based upon the language

7  in the opinion of the First Circuit in its remand of

8  our appeal, and at this time the Court is waiting until

9  July 31st before they -- reply from the plaintiffs'

10  which is a date that they requested. We would hope and

11  assume that that motion would proceed quickly, and in

12  the proper order of things should go first. We

13  recognize that on that basis it's somewhat out of the

14  ordinary course. Still, if the motion is favorably

15  decided, then all the activity involved in three

16  separate motions for default would be a waste of time

17  and judicial resources.

18  That is important to the defendants because

19  of their concern that they not be forced to appear and

20  participate in the litigious proceedings, foreign

21  jurisdiction, until subject matter jurisdiction has

22  been finally resolved, and we've cited primarily the

23  Pompandreau case, that proposition of the District of

24  Columbia court, the U.S. Court of Appeals, the District

25  of Columbia.

```
 1   seconds, Mr. Clark.  I'll give you one entire minute,
 2   Mr. Clark, so please resolve it in one minute.
 3              MR. CLARK:  Well, we can't make it work,
 4   your Honor.
 5              THE COURT:  All right, you're ready to
 6   proceed, Mr. Clark, then?
 7              MR. CLARK:  Yes.
 8              THE COURT:  Mr. Clark, I don't want to put
 9   you at a disadvantage.  If you need more than a minute
10   to try to arrange to have Mr. Schilling get on another
11   phone, I'm willing to give you, you know, two or three
12   minutes, if that will help solve the situation.
13              MR. CLARK:  I'd appreciate that.
14              THE COURT:  See if you can solve it within 3
15   minutes and come back.  I'll remain in place.  We'll
16   wait for you to come back on the line.
17              (Pause)
18              MR. CLARK:  Hello.
19              THE COURT:  Mr. Clark.
20              MR. CLARK:  Yes.
21              THE COURT:  All right.  Do we have
22   Mr. Schilling on the line?
23              MR. CLARK:  Well, I thought we did but I
24   don't think so now.  Let's just go ahead, your Honor.
25   I'm sorry.
```

1          THE COURT:  All right.  Mr. Strachman.

2          MR. STRACHMAN:  Thank you, your Honor.  In

3     light of the hearing that we had on May 14th, and the

4     extensive argument and representation, I don't think

5     there is much for me to add, your Honor.

6          There was a very detailed discussion of the

7     events.  There was a very detailed decision that your

8     Honor rendered, and also even more significant was your

9     order embodying your decision, and it is very clear

10    that in response to that decision and that order to

11    comply, that on June 13th I received the letter from

12    Mr. Clark, it was dated January 6th, but arrived in my

13    office on June 16th, that they're just not going to

14    comply.  And what's significant, I think, is that there

15    is no attempt at all to partially comply, to indicate

16    certain deponents could be made available, certain

17    documents could be made available, that he was going

18    back to Ramallah to meet with Mr. Arafat again, as he

19    indicated he did in December.  Bring his yellow pad.

20    Jot down some notes.  Jot down some answers to

21    interrogatories.  Try to find some documents.  There's

22    nothing.  Not a word of compliance, and very frank

23    about their unwillingness to comply.  So I think

24    basically what the defendants have done is challenge

25    the Court basically to a game of chicken, and said

1  we're not going to comply, even after the extended

2  courtesies that the Court gave them back in December,

3  and an additional 40 days back in May, an additional

4  month, so I think there is no alternative, really, but

5  to enter default judgment against them.  Thank you.

6            THE COURT:  Thank you, Mr. Strachman.

7  Mr. Clark.

8            MR. CLARK:  Your Honor, this brings up some

9  of the characterizations that you can imagine, but I

10  think I made it clear in your courtroom that there

11  would be no partial compliance because the plaintiffs

12  had instructed us until there was a decision on the

13  jurisdictional issue subject matter that they felt it

14  would not be proper for them to participate in the

15  litigation.

16            THE COURT:  Mr. Clark, the defendants had

17  instructed you, is that correct?  Your clients had

18  instructed you?

19            MR. CLARK:  That's what I told you before,

20  that's correct.

21            THE COURT:  Please resume.

22            MR. CLARK:  So it's not a question of going

23  over and getting partial answer to something which

24  (inaudible) whether we're entitled to determination on

25  subject matter jurisdiction before the proceedings into

1   (inaudible) litigation, and I point out that the first

2   year and a half of this (inaudible) talked about was

3   proceeding by plaintiffs not having pursued under Rhode

4   Island law, (inaudible) before then, since then, the

5   plaintiffs filed 3 separate motions for default on

6   separate failures that (inaudible) the need for any

7   such effort, and that we were told that counsel would

8   be out of town until the 10th of July.  And on the

9   11th, in light of new developments, request for more

10  time to respond to the new motion to dismiss, we

11  thought it would be best to have this motion today,

12  which he would like to move on, continued.  And that's

13  all.

14          THE COURT:  Thank you, Mr. Clark.  The Court

15  will render a written Report & Recommendation regarding

16  the two pending motions for entry of default judgment.

17  I will do so promptly.  I'm concluding one other Report

18  & Recommendation, but I will then make this the one

19  immediately thereafter it.

20          Mr. Clark and Mr. Schilling, if by chance

21  Mr. Schilling is able to hear us, just for future

22  reference, the Court will not be inclined to allow you

23  to participate at future hearings by telephone.  I find

24  that, although with great effort, I think the

25  stenographer is going to be able to transcribe these

1    proceedings.  It clearly places a burden on a

2    stenographer to have to transcribe these hearings where

3    you are participating by telephone, and I just wanted

4    to alert you that if we have any further hearings, you

5    should be prepared to attend in-person here in

6    Providence because the Court is not inclined to repeat

7    this morning's experience, is that understood?

8              MR. CLARK:  Well, I appreciate your concern

9    at this point, your Honor, but I will point out that

10   it's something we do all the time, and I'm sure you do,

11   too.  Usually it's done by a conference call, and

12   perhaps you might consider arranging a conference call

13   if it became necessary to see if all parties could be

14   effectively heard by that type of telephonic

15   arrangement.

16             THE COURT:  I'm willing to conduct a

17   conference call to discuss if there's a scheduling

18   matter or some procedural matter that needs to be

19   addressed, but I certainly prefer to do hearings in an

20   open courtroom, and I think we need to have the record

21   in a manner which is much easier for a stenographer to

22   transcribe than the record that we have this morning,

23   although I do feel the record this morning will be

24   adequate.  So I'm not ruling out the possibility of

25   having a conference with counsel via telephone, but I'm

1   alerting you, Mr. Clark, that actual hearings, you

2   should plan on attending in person.  This will conclude

3   this morning's hearing.  The Court will stand in

4   recess.

```
 1

 2

 3                 C E R T I F I C A T I O N

 4    I, court approved transcriber, certify that the

 5    foregoing is a correct transcript from the official

 6    electronic sound recording of the proceedings in the

 7    above-entitled matter.

 8

 9

10    _____

11    ALFRED GALLUCCI, COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Ghassan Ramadan

Page 21

A.    I don't understand.  Could you repeat that.

Q.    This exhibit shows that the other payments were deposited into Bank Leumi, other than the one payment to Gordon on May 26, 1995.

A.    So, what is exactly needed from me?

Q.    The question shows that you made the other deposits into Bank Leumi directly?

A.    Yes.  These are like showing that they are directly deposited there.

Q.    All right.  Did you ever, did you and Mr. Bucheit ever have a discussion about this payment of $10,000 that you say you made to Mr. Isherwood?

A.    With whom?

Q.    Mr. Bucheit.

A.    I talked to him on the phone.  I talked to him on the phone and I told him that I gave him the money, but I asked him, I faxed him the paper also, and he keeps like dragging it without giving me the right answer.  And I said this is not also my problem.

Page 22

Q.    Who said --

A.    Well, we will see, I mean, if he admits to that, or he doesn't, we will see.  Just postponing it.

Q.    I am sorry, who said?

A.    Mr. Bucheit.

Q.    Mr. Bucheit said if he admits it, who is he?

A.    Let me tell you this again from the beginning.  I told him that I gave the $10,000 to be deposited in the bank.

And I haven't received anything, a receipt of the deposit.  He is not answering my phone calls, he is not answering my fax, and nothing.

I received nothing, no confirmation from him.  I had sent him also a copy of the fax that I sent to Gordon.

Q.    And did Mr. Bucheit tell you that the $10,000 never made it into Bank Leumi?

A.    They were like aware of everything. And they know everything that goes on.  But,

1  whatever that 10,000, only this here 10,000, we
2  don't know anything about it.
3         How can they deny it?
4    Q.    That wasn't my question.  My
5  question was did Mr. Bucheit tell that you the
6  $10,000 never was deposited into Bank Leumi?
7    A.    I don't know exactly.
8    Q.    Do you have any evidence that the
9  $10,000 was deposited into Bank Leumi?
10   A.    It is not deposited.
11   Q.    It was not deposited.
12   A.    The bank statement does not show
13  that.
14   Q.    Okay.  Now, the agreement called on
15  you to pay for $50,000 worth of the shares, it
16  work that you performed.
17   A.    That it would apparently be for
18  the work that I performed for the factory.
19   Q.    Correct.  For the labor and
20  materials you supplied for the factory?
21   A.    It was basically for the land and
22  for the equipment and for the work, also, that

1  performed, the remaining balance.
2    Q.    The Exhibit 4 shows a charge of
3  $62,000 for the work, for the work performed.
4    A.    It shows the 62 for the work
5  performed.
6    Q.    I have what was marked as a Trial
7  Exhibit H by Defendants.  Now, is this, can you
8  identify this?
9    A.    This actually is for the work, the
10  the third payment that is remaining, the bond
11   Q.    Was this sent by Mr. Al Aidi?
12   A.    Yes.  He and me were working on
13  this.  This is, that is the company of my
14  partner, Al Aidi.
15   Q.    Did you have discussions with
16  Mr. Bucheit about whether he would accept payment
17  of $62,000 in materials as opposed to $50,000 in
18  materials?
19   A.    The work basically was 95.  But it
20  was a part, a portion of the work, not the total
21  amount.
22   Q.    Did Mr. Bucheit and you ever discuss

6 (Pages 21 to )

# Ghassan Ramadan

Page 25

whether it was okay to pay for the shares with $62,000 worth of work, materials and labor, as opposed to $50,000 in labor and materials?

A.    No.

Q.    All right.  Did Mr. Bucheit ever tell you that you wouldn't receive the 5 percent of the shares of the companies because the $10,000 in cash had not been deposited in Bank Leumi?

A.    No.

Q.    Do you know why you never received the 5 percent of the shares?

A.    The investment for Bucheit was going to be in Gaza the amount of $3,300,000.

Q.    I am sorry, I don't understand the answer.

A.    The understanding was that his investment would be $3.3 million in Gaza.

Q.    My question was do you know why you didn't receive the 5 percent of your shares?

A.    They were actually procrastinating and they didn't want to give us any shares or

Page 26

certificates of the 5 percent shares.

Q.    And it wasn't that you were never told that you weren't receiving the shares because the $10,000 payment was not deposited into Bank Leumi?

A.    It is like, as far as I am concerned, I paid the 150,000, but now it is their problem.  They always work together and they know that this was paid and I have no understanding why it wasn't deposited.

Q.    Were you a director of the company?

A.    Yes.

Q.    And do you remember when you became a director?

THE INTERPRETER:  I am sorry?

BY MR. SELTER:

Q.    Do you remember when you became a director?

A.    March of 1995.

Q.    And how long were you a director of the company?

A.    From March 1995 to roughly the

Page

1    beginning of 1996.

2    Q.    Were you terminated as a director?

3    A.    Yes.  According to after they last

4    yes.  They fire me.

5    Q.    Can you turn to Defendants'

6    Exhibit E, is that your signature?

7    A.    No.  It is not my signature.

8    Q.    Now, this is a power of attorney

9    from the company to Mr. Efragangi.  Were you

10   given a power of attorney by the company?

11   A.    No.

12   Q.    No.  You asked Bucheit Internation

13   for a return of the money that you paid for th

14   shares, correct?

15   A.    I don't understand.  Could you

16   repeat that again.

17   Q.    You asked Bucheit International,

18   through an attorney for Bucheit International

19   pay back the money that you had paid for the

20   shares of the company?

21   A.    I don't remember exactly.

22   Q.    I am sorry?

Pa

1    A.    I don't remember exactly.  I don

2    recall.  No contacts continuously with that.

3    contacts continuously about this, I don't reca

4    Q.    Did you ever file a lawsuit to ge

5    the money back?

6    A.    I filed, to get my salary.  I wa

7    asking for my salary and for the rent of the

8    apartment that they have, and also the phone

9    bills.

10   Q.    You never filed suit to get ba

11   $150,000?

12   A.    No.

13   Q.    Do you know if you were ever

14   considered a legal partner of Bucheit

15   International in Gaza?

16   A.    According to the letter of

17   appointment, I was considered their

18   representative of Bucheit International.

19   Q.    And the letter of appointment,

20   you mean letter of appointment as general

21   manager?

22   A.    Yes.

## Ghassan Ramadan

Page 29

Q.    You were their representative.  But, could you act on behalf of Bucheit International without direction from either the officers or the board of Bucheit International?

A.    Who do you mean, the officers of the company?

Q.    For example, Mr. Bucheit.

A.    During work I was always like in contact with him for whether it was a little matter or a big matter.

Q.    I am sorry?

A.    Whether it was a little question or a big issue, I was always in contact with him.

Q.    And you were under the direction of Mr. Bucheit?

A.    At the beginning of the work, Mr. Isherwood was more like present, continuously, more there.  And he was the one I would go directly.

And then they were like sending correspondence letters and they would say that you would be getting in touch with us

Page 30

continuously.

Q.    Okay.  Did you have authority to act on behalf of Bucheit International if you were not given that authority by Mr. Bucheit or Mr. Isherwood?

A.    If it was like a little matter, I mean, locally I would go ahead and do it.  I didn't have to ask him for every reasonable issue.

Q.    They were your boss, Mr. Isherwood and Mr. Bucheit were your bosses?

A.    Yes.

Q.    Were you responsible -- strike that. Bucheit International imported into Gaza certain equipment, crane and the vehicles through Israel into Gaza, correct?

A.    Yes.

Q.    Okay.  And you were responsible for transporting from the border, the equipment, crane and machinery that Bucheit International imported into Gaza?

A.    They came on like two separate

Page

1    shipments.  The first one, the first shipment
2    they entered that through to Gaza.
3          And the second one came into Haifa,
4    and we had all of the, processed all of the
5    paper, all of the work, and he came to Gaza so
6    we received them there.
7          Q.    Did you meet the first shipment i
8    Gaza, did you meet the equipment at the border
9          A.    No.  I wasn't working for that
10          Q.    The second one you met at the
11    border?
12          A.    Yes.
13          Q.    The second shipment, what was
14    included in the second shipment?
15          THE INTERPRETER:  What was includ
16          MR. SELTER:  Uh-huh.
17          THE WITNESS:  There was a crane,
18    three vehicles and three trailers -- kind of a
19    cart where they put the crane on.
20    BY MR. SELTER:
21          Q.    Was this equipment, it was suppose
22    to have documents showing the ownership of the

Page

1    equipment?
2          A.    Yes.
3          Q.    Now, did you obtain these documen
4    from -- strike that.
5          When you took delivery of the
6    equipment, did you obtain these documents?
7          A.    Yes, from the shipping company.
8          Q.    But, did you obtain any document
9    from customs?
10          A.    Yes, for customs and the shippin
11    company.  This was needed to get a license fo
12    the equipment.
13          Q.    And did you obtain the original
14    the documents, or copies?
15          A.    The original, yes.
16          Q.    The original.  And what did you
17    with the originals?
18          A.    They are still there.
19          Q.    Where are they?
20          A.    In my possession.
21          Q.    Do you have them with you?
22          A.    Some of them we obtained a licens

8 (Pages 29 to

# Ghassan Ramadan

Page 33

for that, and some we have the copies, yes,
still.  For the things where we get the license,
we have to submit the original certificates.

And those that we don't have the, we
haven't gotten the license for that, we still
have the documents.

Because those we didn't get that
because they were very old and it is not allowed
to get a license for those all.

Q.    Did you obtain a license for the
crane?

A.    Yes.

Q.    And what did you do with, the
document that you submitted to obtain the license
for the crane, what did you do with it?

A.    Well, we have the, I mean, the whole
file, it is there in file for the whole
equipment for that crane.

Q.    Well, I am sorry, did you submit the
title document for the crane to a government
office?

A.    This is the procedure, of course,

Page 34

that is natural.

Q.    And did you then receive that
document back from the government office?

A.    No.  The original has to stay there
with them in the file.

Q.    When you got the license for the
crane, did you -- you got the license for the
crane?

A.    Yes.  It is with Gaza, of course.
It is not with me here now.  Of course, it is in
Gaza, it is not with me here now.  Could I have a
second.

(Recess 11:33-11:39 a.m.)

BY MR. SELTER:

Q.    Did you get a license for the truck,
for one of the trucks -- strike that.

What else did you get licenses for?

A.    The truck and the lift that takes
the crane, the carrier.

Q.    The trailer?

A.    The trailer.

Q.    Yes, trailer?

Page [35]

1    A.    The truck and the trailer.
2    Q.    And for the truck and the trailer,
3  did you submit the title documents to a
4  government office?
5    A.    The system, the way it works, and
6  once I got the license, then I can get the
7  equipment.  I can have that full control of that
8  without obtaining the actual license.
9    Once you get the license for that
10  equipment, or the car, for example, there is no
11  need for the other equipment pertaining to that.
12    Once you get the license, that is
13  it, no other.
14    Q.    But, did you give the title
15  documents to the government agency to get the
16  license from the truck and the trailer?
17    A.    Yes, of course.
18    Q.    And you did not --
19    A.    This is a loan,
20    Q.    And did you not get the title
21  documents back?
22    A.    Once you get the license, then the

Page [36]

1  is no need for the other document.
2    Q.    My question is, you did not get
3  other documents back.
4    A.    No, it is not needed.
5    Q.    Now, is this a picture of the
6  trailer -- I am not going to have this marked.
7    But, is this a color picture of the
8  trailer?
9    A.    Yes.
10    Q.    Is that a Palestinian license plate
11    A.    It is a foreign license plate.  It
12  is a license tag, but here, I can't tell.
13    Q.    I am sorry?
14    A.    It is licensed and it has a tag,
15  this here, I can't tell.
16    Q.    It is licensed -- I didn't
17  understand the answer, I am sorry.
18    A.    It is licensed and it has Gaza
19  license plate.  But, this here one here on the
20  picture, I can't tell.
21    Q.    Isn't that an Ohio license plate.
22  Isn't that a license plate from Ohio?

9 (Pages 33 to [36])

## Ghassan Ramadan

Page 37

A.    I can't see it.

MR. HANANIA:  For the purposes of the answer, yes, it is an Ohio license plate.

BY MR. SELTER:

Q.    Where would the Palestinian license be?

A.    The same place.

Q.    Do you know why this trailer doesn't have a Palestinian license plate?

A.    They are like, I was still processing the paperwork, I didn't receive -- it takes about a month to get it.

Q.    And do you remember when you received the Palestinian license plate?

A.    I can't, I don't remember.

Q.    Is this a picture of the crane?

A.    Yes.

Q.    And is that a Palestinian license plate?

MR. HANANIA:  That one I am not going to tell you.  It is too far.

BY MR. SELTER:

---

Page [ ]

1    Q.    I am sorry?

2    A.    Together with the papers from the

3  customs.

4    Q.    And you never got those title

5  documents back?

6    A.    Once I obtained the license plate

7  itself, then there is no need for the other

8  document.  I don't get them.

9       Then you can have full possession

10  that and you can sell them, buy them, only with

11  that license that you get, not the original

12  document.

13    Q.    Can you export them from Gaza?

14    A.    I don't know.  No, I don't think

15    Q.    I am sorry?

16    A.    No, I don't know.

17    Q.    Were you ever asked by the

18  accountant at the plant for these title

19  documents?

20    A.    You mean the documents of the

21  vehicles, the equipment?

22    Q.    Yes.

---

Page 38

Q.    Is that a Palestinian license plate?

A.    I can't, I don't see it.  Well, I can't tell which country, it is too small.  The crane, the license plate for the crane that we have is 1003.

Q.    I am sorry?

A.    1003.  But, I don't know if this is the same one.

Q.    The number of the --

A.    The number of the license plate. So, if you, I don't know if this is the same one.

Q.    Do you remember when you got the license plate of the crane?

A.    I don't remember.

Q.    All right.  Was there another truck that you got a license plate?

A.    The trailer that carries the crane.

Q.    So, for the truck, the trailer and the crane, you submitted the title documents to a government office to get the license, correct?

A.    Yes.  Together with the customs papers.

---

Page [ ]

1    A.    This is not needed by the

2  accountant.  He needs the paper that shows the

3  price for the vehicles only.  But he wouldn't

4  need the actual license.

5    Q.    Not the license, the document

6  showing the price for the vehicles, were you

7  asked by the accountant for those documents

8    A.    Of course, the document showing

9  you got this from Ohio, it shows also the price

10  on it.  So, that is what he has.  That is what

11  recorded.

12    Q.    Did the accountant ever tell you

13  was looking for certain documents and asked you

14  for them?

15    A.    The former equipment on the crane

16  that we had before, there are no papers on

17  them.

18    Q.    I am sorry?

19    A.    There are, we didn't have any or

20  or any documents showing anything about the

21  former, the previous equipment that we had, the

22  crane, the old truck, or the old car.

---

10 (Pages 37 t[ ]

# Ghassan Ramadan

Page 41

Q.    But not the 40-ton crane?  The Grove crane, you had papers for that?

A.    The first shipment, or the equipment that we had before that has the crane and the everything, there were no papers for those.  No documentation.

And this is like causing the accountant not to know what to register, not to record for the price of those since they have no records of it.

Q.    Let me show you -- can you turn to what was Defendants' Exhibit V, as in Victor.

MR. HANANIA:  Wait a minute, we have two Vs, which one?

MR. SELTER:  The first one.

BY MR. SELTER:

Q.    This is a letter from Mr. Sabbah to Mr. Bucheit.  Mr. Sabbah is the accountant at the plant.

A.    This is the auditor, not the accountant.

Q.    I am sorry, the auditor.  The

Page 42

auditor writes about the documents, I do not find it in the factory.  I will let you know.

Ghassan said all documents with Gordon.  I need these documents very urgent to start the audit account.

Do you remember the auditor, Mr. Sabbah, asking you for documents?

A.    Well, of course, I mean the accountant asked me, the auditor asked me, the tax department asked me that.

Then a whole lot of people asked me this.  But, we couldn't submit our papers for the taxation because we are lacking, we are missing these things.

Q.    And what documents were you missing?

A.    The ownership of the first shipment.

Q.    The documents, you have the documents for the second shipment?

A.    Yes, we have them.  We licensed three pieces, and the other two pieces were too old.  We couldn't get the license for them.

Q.    And what were the other two pieces?

Page 43

1    A.    It is like two old trailers of the model of 1969, and they are not worth even $100, nobody would get it for $100.

4    Q.    One was 1969, when was the other one?

6    A.    Maybe 1970.  Nobody wanted even to use them, because they are like very old.

8    Q.    Now, Bucheit International had two accounts at the Cairo Amman Bank, correct?

10    A.    One of them in Dierlbalah, the bank of Eretz, Eretz Bank.

12    Q.    The Dierlbalah, Bucheit International had two accounts at the Dierlbalah Bank?

15    A.    The Bank of Eretz, I don't have a signature for me at that bank.

17    Q.    No, I am talking about --

18    A.    They have two.

19    Q.    Now I am talking about the Cairo Amman Bank.

21    A.    Yes, one.

22    Q.    I am sorry?

Page 44

1    A.    Yes, Cairo Amman.

2    Q.    And there were two accounts at the Cairo Amman Bank?

4    A.    I had an account in U.S. dollars and Israel shekels.

6    Q.    And you were a signature on the shekel account, correct?

8    A.    Yes.  I have a signature in the two accounts in that -- I don't remember exactly, but I had a signature for that account.

11    Q.    For the shekel account?

12    A.    Yes.  I would sign the checks for the workers, for the importers.

14    Q.    And that was paid in shekels?

15    A.    Yes.

16    Q.    You were not, and you didn't have signatory power on the U.S. dollar account?

18    A.    We had the signatory power, but I would write checks even for like four or two people.  But, once, like two signatures on one check would be issued.

22    Q.    For the dollar account, could you

## Ghassan Ramadan

Page 45

and Mr. Al Aidi, yourselves, authorize checks on the dollar account?

A.    It was like mine, Mr. Al Aidi's and two other British guys, and like five or six people with signature power.

Q.    On the dollar account?

A.    It was in the accounts, but I don't remember exactly. But, we were like having that power to write checks on the accounts.

Q.    But you don't remember which, I mean you could write checks on the shekel account, correct?

A.    Yes.

Q.    Did you ever write checks on the dollar account?

A.    Some checks that we wrote for British people for their families. I mean it was in dollars, but I don't remember exactly, definitely, that it was for that specific account.

They were getting their money in U.S. dollars.

Page 46

Q.    Okay. But, you don't remember if you could sign the checks by yourself for the dollar account?

A.    I don't remember exactly.

Q.    Did Mr. Efragangi and you arrange for $100,000 in the U.S. dollar account to be blocked in order to guarantee Mr. Efragangi's debt?

A.    We had that account for $100,000 not because of the debt of Mr. Efragangi, but, for so many different things, for the accounts that were going on.

We actually put the block on the $100,000 in order to settle so many different things.

Q.    Were you -- I am sorry.

A.    For the money that they withdrew.

Q.    For the money that who withdrew?

A.    The company, Bucheit International Company. Bucheit and Gordon, they withdrew some money.

They withdrew some money for the

1    first project to get some equipment from Haifa.

2    Q.    And you blocked -- I don't

3    understand.

4    A.    They put a block on the amount, the

5    $100,000 to settle so many different issues. --

6    of them it that they withdrew some money in order

7    to get the equipment from Haifa for the first

8    project.

9        For their investment, when we

10    calculated that, it was way less than what we

11    talked about.

12        The other thing, also the ownership

13    of the first equipment, we never settled that.

14    It was always a question there.

15        There were like existing debts and

16    other like small issues, I don't remember.

17    Q.    Did you also, did you and

18    Mr. Efragangi also transfer $100,000 from the

19    shekel account, I mean from the dollar account

20    the shekel account?

21    A.    It was something done automatically

22    in the bank.

1    Q.    I am sorry?

2    A.    It is something done automatically

3    in the bank. When you have like a lot of

4    payments going on. So, they would transfer

5    something from this account, the dollar account

6    into the shekel account.

7    Q.    But, did you and Mr. Efragangi

8    transfer $100,000 from the dollar account to

9    shekel account?

10    A.    This is done officially between the

11    accounts at the banks.

12    Q.    But, that wasn't my question. Did

13    the two of you, did you and Mr. Efragangi

14    transfer the $100,000 from the dollar to the

15    shekel account?

16    A.    In order to pay the debts for the

17    checks, with the agreement of Bucheit.

18    Q.    When did Mr. Bucheit agree to that?

19    A.    When he took the loan and he

20    transferred the money, and he said pay the money.

21    He requested that in person, also in a letter

22    said with postdated checks in order to pay the

12 (Pages 45 to

## Ghassan Ramadan

people.

Q.    When you blocked -- when did you block the $100,000 in the U.S. dollar account?

A.    I don't know that date.  But maybe by the end of 1995, or early 1996.

Q.    Were you authorized by Mr. Bucheit to block the $100,000?

A.    It is not that we don't have any instructions, the bank doesn't have any instructions.  But it was like done also automatically.

They know that in the bank when you have over payments, they will do the transfer.

Q.    When you say it was not -- you were not authorized by Mr. Bucheit to the block the account.

A.    How would I get the authority from him, because I wanted to face him with the problems that we are facing.

Q.    So the answer is no, you did not?

A.    No.

Q.    You didn't, you weren't authorized

1    Q.    In this letter you ask the bank to
2  transfer $100,000 from the U.S. dollar account to
3  the company's shekel account, and to keep the
4  rest as a guarantee to Mr. Efragangi's account,
5  correct?
6    A.    In order to pay the amount of the
7  checks that we made, according to the
8  instructions of Mr. Bucheit.
9    Q.    That wasn't my question.  My
10 question is, in this one you asked for the amount
11 to be transferred from -- $100,000 to the -- from
12 the dollar account to the shekel account,
13 correct?
14    A.    Yes.  We did that in order to pay
15 for the checks that we made.
16    Q.    And you also asked to keep the rest
17 as a guarantee to Mr. Efragangi's account?
18    A.    No.  To stay in the bank account,
19 not to Efragangi's account.
20    Q.    Could you turn to the second page
21 that is an English translation which says it is
22 guarantee to Mr. Efragangi's account.

by OPIC, the Overseas Private Investment Corporation, to block the account?

A.    No.

(Ramadan Exhibit no. 5 was marked for identification.)

BY MR. SELTER:

Q.    The court reporter has put in front of you what was marked as Exhibit 5.

Is this a letter from you and Mr. Efragangi to the manager of the Cairo Amman Bank dated December 28, 1995?

A.    Yes, that is right.

Q.    And that is your signature?

A.    Are you talking about this signature down here?  It is not that clear.

MR. HANANIA:  This is his signature, since it is not clear, but he does attest this is his letter.

THE WITNESS:  It is the second signature after the word, signature, it is like one, two, three, the one in the middle.

BY MR. SELTER:

1    Is that not an accurate translation?
2    A.    As a guarantee, actually in the
3  account, it stays in the same account, not to go
4  in the account of Efragangi, but to stay in the
5  same account.
6    Q.    Okay.  And you said the -- asking
7  your request to keep the rest of the guarantee in
8  the same account, that was not approved by
9  Mr. Bucheit?
10    A.    No.
11    Q.    But you say that the $100,000
12 transfer was approved by Mr. Bucheit?
13    A.    Yes.  To pay the checks that were
14 made, the postdated checks.
15    MR. HANANIA:  Before you go on,
16 Mr. Selter, I just wanted for the record to note
17 that his signature is not the only signature that
18 is on this document here.
19    MR. SELTER:  Mr. Efragangi's
20 signature is on the document as well, correct?
21    MR. HANANIA:  I am showing there is
22 double signatures.  Two signatures on there.

13 (Pages 49 to 5?)

# Ghassan Ramadan

Page 53

MR. SELTER:  And who are the two signatures?

MR. HANANIA:  One was Ghassan Abdel Aziz Abu Ramadan, and Samia Efragangi.

MR. SELTER:  The translation is accurate?

MR. HANANIA:  Yes, the translation is accurate of that.

THE WITNESS:  He said that the translation is incorrect.

BY MR. SELTER:

Q.  The translation, the two signatures are yourself and Mr. Efragangi's, and Samia Efragangi?

A.  Yes.  But the, he is talking about the translation itself.  I don't know there are two signatures, the other two signatures here, I don't know who they belong to.

Q.  Okay.

A.  Because this word here is the signatures, one, two, three, and then four.

Q.  Okay.

Page 54

MR. SELTER:  Could I ask you to read, to translate the letter, into the record.

THE INTERPRETER:  This?

MR. SELTER:  Yes.

THE INTERPRETER:  With regard to the transfer coming to the Bucheit International account, the amount of $200,000, please transfer what is the equivalent of $100,000 to the shekel account company number, the account number being 208108 and keep the remaining as a guarantee for Mr. Efragangi at the bank, in the same bank as a guarantee for Mr. Abed Samia Efragangi.  And it is dated December 28, 1992.  '92 or ---

MR. HANANIA:  No, it is '95.

THE INTERPRETER:  It is, I think, '95.

MR. HANANIA:  It looks like it is a five.

BY MR. SELTER:

Q.  Why did you keep it as a guarantee to Mr. Efragangi?

A.  It was the reasons we just mentioned

1  before, to pay the debts and settle the other
2  things, questions.
3         If you want me, I can repeat the
4  reasons again.
5    Q.  No, that is okay.  Now, Bucheit
6  International had a contract to build a custom
7  post at Karni (phonetic) or Omar El Mokhtar
8  correct.
9         Bucheit International had a cont[ract]
10 to build a customs post at Karni, correct?
11   A.  Yes.
12   Q.  The contract was for $150,00[0],
13 correct?
14   A.  Yes.
15   Q.  Let me show you what was marked a[s]
16 Plaintiff's Exhibit 32.  This is a check from [the]
17 Ministry of Finance to the Gaza Prefab Buildin[g]
18 Factory, correct?
19   A.  Yes.
20   Q.  Dated January 25, 1996.
21   A.  Yes.  Okay.
22   Q.  Did you cash this check?

1    A.  Yes.
2    Q.  And where did you cash it?
3    A.  Yes.  I spent the money for the
4  workers, the importers, and other things, th[e]
5  debts for other companies with factories, i[n]
6  addition to the workers.
7    Q.  I am sorry?
8    A.  I paid the money, of course I cash[ed]
9  it and I paid that for the workers, the
10 importers, and other debts for other companie[s]
11 and factoriss.
12   Q.  I didn't catch the last part.
13   A.  Other debts for factories and othe[r]
14 companies to pay their debts.  Suppliers, to[o],
15 for suppliers.
16   Q.  At what bank did you cash the che[ck]?
17   A.  I don't remember, it doesn't sho[w]
18 here.
19   Q.  Now, did you pay the employees an[d]
20 suppliers in cash or by check?
21   A.  Cash.
22   Q.  Why didn't you deposit the chec[k]

14 (Pages 53 to

# Ghassan Ramadan

Page 57

into Bucheit International's account at the Cairo Amman Bank?

A.     Because I wouldn't be able to withdraw money to pay the people.

Q.     Well, wasn't this a check payment for a contract performed by Bucheit International?

A.     Yes.

Q.     Did you say if you deposited it in the Cairo Amman Bank you wouldn't have been able to withdraw these funds?

A.     No.  I wouldn't be able to do that.

Q.     And why wouldn't you have been able to withdraw the funds?

A.     Because there was a block on my name and Efragangi's name at the other bank.

Q.     Okay.  Did you, were you, did Bucheit International authorize you to receive this check from the Ministry of Finance?

A.     It was actually for me to solve the problems arising in Gaza.

Q.     That wasn't my question, the

---

1     A.     This is the last payment.

2     Q.     All right.  And the second payment

3     was wired into Bucheit International's account,

4     right?

5     A.     The first check came in my name,

6     personal name.  The second one was a transfer,

7     and the third one came like this as cash.

8     Q.     And did you ask the Ministry of

9     Finance to send you the third check made out to

10    the Gaza factory?

11    A.     After the close of the project, I

12    called and they sent a check.

13    Q.     When you say "we," you called?

14    A.     Yes, that means I.

15    Q.     And did you have any discussion

16    about whether the third payment should be made by

17    a wire transfer as opposed to a check?

18    A.     No, because if it came as a

19    transfer, I wouldn't be able to pay the people.

20    So, that is why I requested that it come as cash.

21           There is one thing also I want to

22    clarify here which is different from the system,

---

Page 58

question was were you authorized by Bucheit International to receive these proceeds from the Ministry of Finance?

A.     There was actually a dispute, ongoing dispute and there was no approval or agreement.

Q.     Okay.  Now, how did you, were you authorized by OPIC to receive this check?

A.     I had no contact with OPIC or other authority.

Q.     How did you come to receive this check?  Did you have discussions with the Ministry of Finance to send you the check as opposed to a check -- let me start again.

       How did you come to receive this check?

A.     This is, actually, I am the manager of the factory, and so, they know who is the manager, and they would give the check to the manager.

Q.     Wasn't the contract, weren't there three payments for the contract?

---

1     how it works here.

2           They all know in Gaza that I was

3     one who brought them into this project.  And they

4     trusted me, they know me personally.

5           Even the document, or the paper that

6     came as terminating my position, nobody believed

7     in that, nobody trusted that.  They all know that

8     I was the one taking care of the factory from the

9     beginning.

10    Q.     Well, going back to your discussion

11    when you talked, when you asked the Ministry of

12    Finance to send you the check, was there any

13    discussion about whether they would have to wire

14    the proceeds?

15    A.     The fact that they went away,

16    basically, and the people in the Ministry of

17    Finance, they know that I am the one taking care

18    of this from the beginning.

19          So, they know me and they trust me

20    as the manager of the business.

21    Q.     Did they tell you that under the

22    contract, or -- excuse me.

---

15 (Pages 57 to)

## Ghassan Ramadan

Page 61

Did they tell you that they had instructions that they were supposed to wire the payments to Bucheit International's account?

A.    No. They didn't have instructions.

Q.    Other than this check, did you receive any other proceeds from the Karni customs contract after that check?

A.    The guarantee check, there was a guarantee check.

Q.    Okay. And, how much was the guarantee check?

A.    About 14,000 maybe 500, 600, 700 shekels.

Q.    I am sorry, 14,000?

A.    Maybe 500 or 700, 14,000 something between like 500 and 700 shekels.

Q.    And did you ask the Ministry of Finance to send you that check as well?

A.    No.

Q.    They just sent that to you?

A.    Yes.

Q.    And do you remember when they sent

Page 62

it to you?

A.    A year later.

Q.    A year later. And what did you do with the money?

A.    I paid the debts for people that was standing like right at my door.

Q.    I am sorry?

A.    I paid the debts for people who are actually standing at my door.

Q.    This check, Exhibit 32, for 49,491.81 shekels, that check and the 14,500 shekels that you received from the guarantee check, that doesn't total 50,000 U.S. dollars, correct?

A.    Yes, that is true. Because the project is at a loss. And that is true, this doesn't come to the amount that you are talking about.

Q.    And do you know why, what happened to the other monies?

A.    Well, it is a loss. And late fees, too. It is a late fee, actually.

Page

1    Q.    Do you know how much the late too
2    was?
3    A.    I can't remember.
4    Q.    Do you know when the contract was
5    finished?
6    A.    The date of this payment right her
7    Q.    The date of which payment?
8    A.    This check represents the ending
9    the thing, which is dated January 25, 1996.
10   Q.    Do you know when the work was
11   completed?
12   A.    At the beginning of January. I
13   roughly in January when they left.
14   Q.    Was the work completed before
15   Mr. Bucheit and his daughter left?
16   A.    Yes. That is right. It was
17   completed and they took pictures, and then the
18   left.
19   Q.    Do you know if it was completed
20   before January 1st of 1996?
21   A.    Always there are like a few mino
22   things, like I mean, by the end of any kind of

Page

1    project.
2    Q.    But, it was substantially complet
3    before January 1, 1996?
4    A.    Yes. By the beginning of the ye
5    yes, it was completed.
6    Q.    Now, can you turn to Defendant
7    Exhibit T?
8    MR. HANANIA:  First T or second
9    MR. SELTER:  The first T.
10   BY MR. SELTER:
11   Q.    You have in front of you Defendant
12   Exhibit T. This is a letter from the director
13   of Bucheit International terminating you as the
14   general manager of the plant, correct?
15   A.    Yes. That is right.
16   Q.    And did you receive the letter at
17   about that time?
18   A.    A little bit later. Maybe early
19   February. He sent it with the driver who work
20   there at the factory, and he brought it to me
21   maybe like a few days later.
22   MR. HANANIA:  Few weeks.

16 (Pages 61 to

## Ghassan Ramadan

Page 65

THE WITNESS:  Maybe the beginning of February.

BY MR. SELTER:

Q.    When you received the termination, did you notify the Ministry of Finance about your termination?

A.    No.

Q.    When you received the check on January 25, 1996, there weren't any court judgements in Gaza against Bucheit International, correct?

A.    No.

Q.    And there were no orders placing a lien on any of Bucheit International's assets, correct?

A.    No.

Q.    Did you receive receipts from the workers and suppliers who you paid?

A.    Yes, of course.  I have everything recorded with receipts and with the documents.

But, he refused to have that, or to let anybody in the accounting or auditor to see

Page 66

that.  Or to decide on -- he refused for him to look at the papers.

I asked him also to get any third party to take care of this and to look at, discuss the, study the papers, but he refused.

Q.    Did you show the receipts to the auditor on site?

A.    Everything, I mean, of course, he took everything, all of the papers for the debts.

Q.    Do you still have the receipts?

A.    Yes.  All of the receipts are with the accountant in Gaza.  I can't pay even a penny to the accountant.

Q.    Now, as of January, 1996, Bucheit International had a contract for the administration building, an administration building in Gaza, correct, the airport administration building?

A.    It is not like actually the airport, but it is the Arab contractors.  They are like the main contractors for the project, for the airport.

---

Page

1    Q.    Okay.  Had there been, had Bucheit
2    International performed work on the
3    administration building at the airport?
4    A.    Yes.
5    Q.    And, at the time, was there owing
6    about $17,000?
7    THE INTERPRETER:  They owned?
8    MR. SELTER:  Owing.
9    THE WITNESS:  I think so, but I
10   don't remember exactly the amount.
11   BY MR. SELTER:
12   Q.    Do you remember, did you ever
13   receive the payment of that amount?
14   A.    Yes.
15   Q.    When?
16   A.    When the project was completed.
17   Q.    Do you remember when that was?
18   A.    I can't remember, no.  There are
19   like so many things, there are so many numbers
20   and figures, I can't remember that exactly.
21   Q.    Was it after you were terminated
22   general manager?

Page

1    A.    I think there is like some of that
2    like before and some after.  But, I don't
3    remember exactly what date.
4    Q.    I am sorry?
5    A.    I don't remember exactly what it is
6    or when it was.
7    Q.    Did you deposit the money into
8    Bucheit International's account at the bank?
9    A.    After the dispute, no.
10   Q.    What did you do with the money?
11   A.    I have like a long list of people
12   whom we owe money, and it is until today, we
13   have come up with the payments for them.
14   Q.    You used the money to pay people who
15   worked on the contract?
16   A.    Yes.  For workers, for suppliers
17   for cement, for other things.
18   Q.    Was there also a contract as a
19   subcontractor for the airport -- strike that.
20   Was there another contract where
21   Bucheit International worked as a subcontractor
22   on the airport?

17 (Pages 65 to

# Ghassan Ramadan

Page 69

A.   Yes, the fence of the airport.

Q.   I am sorry?

A.   The fence of the airport.

Q.   The contract was for about $220,000, correct?

A.   I can't remember.  No, I don't remember.

Q.   Did that contract make a profit?

A.   We started actually with the Arab contractors, but we couldn't continue because of so many people asking me for a lot of money, that we couldn't continue.

And the project stopped and the bank guarantee changed and then we didn't continue.

Q.   You stopped work on the contract?

A.   Yes.  We stopped working.

Q.   And when did you stop work on it?

A.   The problem is that people knew me that I was there.  And all of these people are asking for the money, they were coming to me, even though he was continuing the project.

But, people were coming for me to

Page 70

collect their wages and money for the project.

Q.   Say that again.

A.   He appointed another manager.

Q.   Who is he?

A.   He appointed another person named Aidi to complete the project in the airport.  But I think the project stopped sometime in April.

Q.   When the new Mr. Aidi was appointed, Bucheit International was still working on the project, correct?

A.   Yes, sure.

Q.   And you say the work stopped in April?

A.   I can't remember the exact date. But, I think in April.

Q.   Did you receive any payments for work on the contract?

A.   The first payment we put, we deposited that in the Cairo Amman Bank.

Q.   Right.  Did you receive any other payments?

A.   Yes, another payment that was like

the finalized payment.

Q.   Well, did you receive it, or did Bucheit International receive it?

A.   Yes.  I received it.

Q.   How much did you receive?

A.   I think it was like somewhere around $33,000.

Q.   And what did you do with this payment?

A.   Actually I had a lot of people waiting for the payment.  It was like the cement people and for seal and other workers also.

Q.   And when did you receive this payment?  It was after you were terminated?

A.   Yes.  After the project was completed, after the project was stopped.

Q.   So, by this time, you had been terminated?

A.   I was a partner in this project, couldn't see the project collapse, stopped. they knew me, that I remember they are a part there, and continued with it.  I wanted to see

complete, come to a completion.

Q.   When you say you were a partner, were you a partner?

A.   I was a partner because I paid the money.  As a part of the money that they get they entered the equipment that they have, a share of this.

Q.   When you say you were a partner, mean because you had paid money to receive percent shares of Bucheit International?

A.   Actually it was 5 percent, but actuality it was not like 5 percent, it should come out to like 45 or 50 percent.

Q.   I know.  But, you are saying a partner because you paid money for a percent of the ownership of Bucheit International.

A.   All of the money that we agreed upon, I paid.

Q.   And, when you say you are a partner it is because you paid that money for shares Bucheit International.

A.   Yes.  This is part of that,

18 (Pages 69

# Ghassan Ramadan

Page 73

course, another part because he left. He ran away from Gaza and I was faced with the problems going on there.

Q.    Other than your payment -- other than your payment for the shares in Bucheit International, after you were terminated, did you have any other legal relationship with Bucheit International?

A.    Nobody knew, of course, of this except it was me only personally, and all of the people there in Gaza, as contractors or subcontractors and workers and the payment for the workers and the work to be done. I was faced with that problem.

So, it was me who knew about the firing and the termination of the job. But all of the others know that I am still a partner, still I am the one responsible for the work.

Q.    You didn't tell anybody that you were terminated?

A.    It is not necessary.

Q.    The balance due on the

Page 74

administration building, were you authorized by Bucheit International to receive that?

THE INTERPRETER:  I am sorry, the first part?

BY MR. SELTER:

Q.    The administration building, when you received the money, were you authorized by Bucheit International to receive that money?

A.    What administration building?

Q.    The balance due, the approximately $17,000 that you testified you received.

A.    What administration are you talking about?

Q.    The airport administration building.

A.    Part of that I had received before and part afterwards, the work for the administration building.

Q.    The last payment, were you authorized by Bucheit International to receive that?

A.    Since he had run away also the problems and the responsibility, and I was faced

to face that kind of responsibilities. So, I used my name, my reputation there to receive it.

Q.    But you were not authorized by Bucheit International to receive that payment?

A.    No.

Q.    And the $33,000 payment that you received in April for the fence contract, you were not authorized by Bucheit International to receive that?

A.    No. I think this was maybe in May?

Q.    In May?

A.    The $33,000 payment.

Q.    But you were not authorized by Bucheit International to receive that?

A.    No, I wasn't authorized.

Q.    Do you know what happened to the $100,000 that was blocked in the Cairo Amman Bank?

A.    I think Bucheit filed a lawsuit against the bank, and he lost that case.

Q.    But do you know what happened with the $100,000?

A.    The bank did not give me any information regarding that.

Q.    Did Bucheit International have a contract, potential contract to perform work on the Palestine Towers?

A.    Could you repeat the question once please?

Q.    Yes. Did Bucheit international have a proposed contract to perform work on the Palestine Towers?

A.    They submitted that proposal, but wasn't taken, the contract.

Q.    Was Bucheit International owed any money for design work or preparatory work for contract on Palestine Towers?

A.    There was no contract to begin with.

Q.    No. Was Bucheit International owed any work, any money for design work in connection with that project?

A.    I mean they had the money, they had to pay the money? They owed money for the project?

19 (Pages 73 to

## Ghassan Ramadan

Page 77

Q.    Did Palestine Towers owe any money to Bucheit International?

A.    No.

Q.    Would you turn to Exhibit GG, that is the second G.

Now, this is a contract that you entered into with the city of, the mayor of Gaza, to build some seaside villas, correct?

A.    What is the Arabic version of this?

Q.    I don't know.

MR. HANANIA:  Do you have a copy?

MR. BUCHEIT:  This is their translation, but we have the Arab version.

(Discussion off the record.)

BY MR. SELTER:

Q.    Can you turn to Plaintiff's Exhibit 37.

Did you enter into a contract with the mayor of Gaza for the construction of seaside villas?

A.    I am sorry, with whom?

Q.    The mayor of Gaza.

Page 78

A.    Yes.

Q.    And you entered into that in May of 1996?

A.    Yes.

Q.    Now, you used Bucheit International's equipment to perform the contract, correct?

A.    It was a contract that I participated in.

Q.    That wasn't my question.  My question was:  You used Bucheit's International equipment to perform the contract, correct?

A.    My answer is again that the equipment belonged to a project that I was a partner of, so I used that as a partner of the company.

Q.    So, you used the equipment, Bucheit International's?

A.    I am a partner of a company that has thousands of pieces of equipment.

Q.    Things will go a little more quickly if you just try to answer the question.  I am

sure Mr. Hanania can ask you follow-up questions if he wants.

But, if you will just answer my questions, we will be out of here a lot sooner.

A.    Okay, yes.  I used it because I a partner of the company, yes.

Q.    And when you say I used it, you used Bucheit International's equipment?

A.    Yes.

Q.    Okay.  Thank you.  Now, in May 1996, you had been terminated for several months a general manager, correct?

A.    According to what they say, yes.

Q.    Had you been authorized by Bucheit International's board of directors to enter into this contract?

A.    No.

Q.    Okay.  Did you tell Bucheit International's board of directors at the time about this contract?

A.    No.

Q.    Did you tell Bucheit International

board of directors about this contract, the seaside villa contract?

A.    No.  But they called me and they asked me about what is that project, and how it is for and something like this.

Q.    And when did he call you?

A.    This project was about for like a period of 40, 45 days, and maybe during the middle of that project, he called me.

Q.    And what did you tell him?

A.    He told me that also I am faced with a lot of people who are knocking on my door asking me for money.

I have to pay the debts, and I am going to use the money, the proceeds of that to pay off the money.

Q.    Did you notify OPIC that you had entered into this contract?

A.    I didn't have a direct contact with them, but I think Abdel Samia told him about that.

Q.    But you didn't?

20 (Pages 77

## Ghassan Ramadan

Page 81

A.     No, not personally.

Q.     When you entered into the contract, did you have any discussions with the mayor of Gaza about why you were entering into the contract instead of Bucheit International?

A.     Everybody there, I mean in Gaza, know that I am the manager of that project.

They called me and they asked me come and do, we have this project, this work to be performed, and I went there. That is it.

Q.     The mayor of Gaza was appointed by the Palestinian Authority, correct?

THE INTERPRETER:  I am sorry, elected you said?

MR. SELTER:  Appointed.

THE WITNESS:  You mean by the Authority?

BY MR. SELTER:

Q.     Yes.

A.     Yes, that is right.

Q.     Could you turn to Defendant's Exhibit II, which is the second I, and I think

---

payment on August 7, 1996, correct?

A.     I don't remember exactly. Everything was here with details. It was postponed and then they were completed.

Q.     You made a profit on the project?

A.     Yes.

Q.     Now, what did you do with the proceeds that you received from this project?

A.     For the whole amount, I paid off the debts that we had, also from the other. We had people from the cement workers, the steelworkers and other people. So, I paid the whole thing.

All of the bills and the invoices that we had were all recorded, how much money paid.

Q.     Now, at this time in, when you got this money, there was no judgment against Bucheit International that it had been issued, correct?

A.     No.

Q.     And there were no liens against Bucheit International?

A.     No.

---

Page 82

that is also, II, I believe, is an English translation of the one you have there.

What is the number, 37.

A.     37.

Q.     Looking at, if you want to look at 37. This is a report that you prepared about the seaside villas contract.

A.     Yes, I prepared it.

Q.     All right. In the second paragraph you state that a new -- strike that.

In the second paragraph, after showing the shekel cost, it states that you opened a new account for the project, correct?

A.     Yes. That is right.

Q.     And you deposited the proceeds from this contract into this new account, correct?

A.     Yes.

Q.     Now, why didn't you deposit this money into the Bucheit International account?

A.     Well, the account was closed. How would I put the money in there?

Q.     Okay. Now, you received the final

---

Q.     The report says that you received some overdue sums for previous projects.

Do you see that? I think it is would be like right here.

A.     Yes. Yes, I received this amount cash.

Q.     But, it says above that, I think it says, that you received overdue sums for previous projects.

A.     Yes. These two things, actually, one from the contractors, and one from the general, from the secret police.

Q.     I am sorry?

A.     From the secret police, intelligence.

Q.     Okay. And these amounts were deposited into the new account, correct?

A.     There is a statement, actually, that shows all of the figures. I don't remember exactly. But, some were deposited, and it has the statement with all details.

There is a special like cash.

---

21 (Pages 81 to )

## Ghassan Ramadan

Page 85

expenses account, also, that we have. But we don't have all of the documentation and the receipts.

Q. You do not?

A. We have the documentation for the receipts, and the cash expenses, yes, it is separate.

Q. You have it, or you don't have it.

A. Yes. I have the full files of everything.

(Discussion off the record.)

BY MR. SELTER:

Q. Now, you entered into a lease with the Port at Gaza to use Bucheit International's crane, correct?

A. Yes.

Q. Can you turn to Defendant's Exhibit N. And there is also Plaintiff's Exhibit 39, also I think is in Arabic.

A. Okay.

Q. Now, in the lease you represented that you owned the crane, correct?

Page 86

A. Yes.

Q. All right. Now, in fact, Bucheit International owned the crane, correct?

THE INTERPRETER: I am sorry?

BY MR. SELTER:

Q. Bucheit International owned the crane, correct?

A. Since I paid money for the project, I am a partner. So, I have the right to use it. I had to solve a lot of problems and face a lot of problems with that.

So, I am a partner, I have the right of using the equipment.

Q. The owner of the crane was Bucheit International, correct?

A. It is not that. Since I paid money into that, so I am a partner of it.

Q. You are a shareholder of Bucheit International, correct?

A. Yes, of course I have that. I am a partner and I am worried about, I have to save it from being burned or destroyed or collapsing.

1    Q. You are a shareholder of Bucheit
2  International, but Bucheit International is the
3  company that owns the crane, correct?
4    A. Okay.
5    Q. Now, Bucheit International didn't
6  authorize you to lease the crane, did it?
7    A. No.
8    Q. All right. And you didn't notify
9  Bucheit International that you were going to
10  lease the crane, correct?
11    A. No. I didn't have contact with
12  them.
13    Q. Okay. And OPIC didn't authorize
14  to enter into the lease, correct?
15    A. Not OPIC, either.
16    Q. Okay. Now, the crane had Bucheit
17  written on it in large letters, correct?
18    A. Right. Yes.
19    Q. Now, the lease was entered into
20  August 25, 1997, correct?
21    THE INTERPRETER: I am sorry.
22  BY MR. SELTER:

1    Q. The lease was entered into on
2  August 25, 1997.
3    A. Yes.
4    Q. Okay. Did you have any discussion
5  with the port officials about why you entered
6  into the lease as opposed to Bucheit
7  International?
8    A. No.
9    Q. All right. Now, let me show you
10  Plaintiff's Exhibit 40. Have you seen this
11  before?
12    A. Yes.
13    Q. Okay. And what is this?
14    A. This is showing the amount of money
15  for the rental of the crane.
16    Q. Okay. Now, this shows that you
17  received approximately 239,000 shekels for lease
18  of the crane, correct?
19    A. But, the figure is showing here in
20  the document.
21    Q. And are those figures accurate?
22    A. Yes. 100 percent.

22 (Pages 85 to 8

# Ghassan Ramadan

Page 89

Q.    So, the crane was used from September, 1997 through March, 1999?

A.    Yes.  That is correct.

Q.    Do you know what happened after March 1999 with the crane?

A.    The engine broke down.  I had to pay enough money for repairing it and I couldn't pay any more.

MR. SELTER:  I am sorry?

THE INTERPRETER:  I couldn't pay any more.

MR. SELTER:  I didn't catch the first part of it.

THE INTERPRETER:  The engine broke down.  We paid some money for fixing it, but then later on we couldn't pay it anymore.

BY MR. SELTER:

Q.    Were you responsible for maintaining the crane during the lease?

A.    The maintenance, actually for that I was responsible, but because the crane was there, there was an agreement between the port itself

Page 90

would pay for the maintenance, and when I have some money, I will pay also for the maintenance of it to maintain it.

There was another document like this one here that shows how much money I paid for my part for the maintenance.

We have another document that shows exactly how much money we paid for the maintenance through that period.

Q.    Well, I don't have it in front of me.  Do you remember how much you paid for maintenance?

A.    It is like a long period of time here.  I don't remember exactly how much, the details of how much.  But we have the document.

It is not like always the same, every month we have the same amount.  Sometimes we paid only a little bit, sometimes we paid a lot.

But I have the other document that shows the details of the expenses.

Q.    Do you know what the current

condition of the crane is?

A.    Bucheit sold it.

Q.    He did?  Do you know that for a fact?

A.    Yes, yes.  He sold it for $8,000.

Q.    And do you know where the crane is now?

THE INTERPRETER:  I am sorry?

BY MR. SELTER:

Q.    Do you know where the crane is now?

A.    Yes.  It is working in the port.

Q.    At the port.  Do you know when he sold it?

A.    I think in 2001.  I think, I am not sure.

Q.    Do you know who bought it?

A.    I don't know.  I know that he is from the family of Hessy, I don't know him personally.

Q.    Could you turn to, I hope it is Plaintiff's Exhibit 60.

A.    60.  It is different.

Q.    Let's go back.  Why don't you turn to Defendants' Exhibit UU -- strike that, hold on.

Exhibit PP -- strike that.  I've got the wrong one.  I am sorry, it is RR.

Now, this is a translation of answers to OPIC questions.  Have you seen this translation before?

A.    Yes.  I asked the translation office to translate that.

Q.    And these are answers that you and Mr. Efragangi prepared to certain questions that asked the Palestinian Authority?

A.    Yes.

Q.    And you believe this use of -- were you the one who supplied the information for the answers?

THE INTERPRETER:  For these?

BY MR. SELTER:

Q.    For those answers, yes.

A.    Yes.  Abdel Samia.

Q.    Could you turn to Exhibit CC, that

23 (Pages 89 to )

# Ghassan Ramadan

Page 93

1  is the second C.  Now, this contains a number of
2  documents which I would like to go through.
3        The first one is a suit by As-Sahel
4  Ready Mix Cement Company versus Bucheit
5  International.  Do you see that?
6        MR. HANANIA:  Could you repeat your
7  question?
8  BY MR. SELTER:
9        Q.    Yes.  This looks like a complaint in
10 a lawsuit brought by As-Sahel Ready Mix Cement
11 Company versus Bucheit International?
12       A.    Do you have the Arabic here with
13 that?
14       Q.    I am sorry, this is the Defendants'
15 Exhibit.  This is what I got.
16       A.    This is from the As-Sahel Ready Mix
17 Company.
18       Q.    Are you familiar with that lawsuit?
19       A.    Yes.  This was submitted or filed
20 with Abdel Samia and the As-Sahel Company.  But,
21 I don't know if this continued or in the process
22 of the lawsuit or not.

Page 94

1        Q.    Okay.  You don't know what was the
2  outcome of the lawsuit?
3        A.    No.  I don't know.
4        Q.    Could you turn to the next page.
5        A.    Okay.
6        Q.    The next page is a summons to you to
7  be tried on charges of a misdemeanor.
8        Do you see that?
9        A.    There are a lot of papers coming
10 from the police, from the court.  I have so many
11 papers connected with the work of that project.
12       Q.    But you don't remember this
13 particular summons?
14       A.    I have all of the papers, not with
15 me.  But, I have a lot of papers coming from the
16 police, or from the authorities, from the court.
17       But, I don't remember exactly this
18 one here.  If I had a full, I have the full complete
19 of all of the papers related to that project.
20       Q.    But, you don't remember what this
21 particular paper is about?
22       A.    I have so many papers from the

1        courts coming.  But, I don't remember exactly
2  this one.
3        Q.    Okay.  Could you turn to the next
4  page.
5        A.    I don't remember the date exactly
6  because I have so many of them.
7        Q.    All right.  So, you don't remember
8  this one.  The next page.  This is a notice of
9  hearing about a settlement from Mohammad Abdul
10 Karim Al Kurd?
11       A.    Yes, I paid this amount here in
12 full.
13       Q.    Do you remember what the amount was?
14       A.    About 9,000 shekels, 8,500, or
15 something like this.
16       Q.    But there was never a formal
17 judgment in this case?
18       A.    Yes.  They sent them actually to
19 jail and I had to go pay the money for the
20 people.  It was all because of Bucheit
21 International.
22       Q.    When were you in jail?

1        A.    No.  They sent him, but then I paid
2  the money.  They give you two-day notice.  You
3  either pay, or you can be in jail.
4        Q.    And you paid?
5        A.    Yes.
6        Q.    You never went to jail?
7        A.    No.  He is from a very well-known
8  family, prestigious family in Gaza, so it is not
9  easy for them to just throw him in jail.
10       Q.    The next two pages relate to the
11 same suit by the -- well, strike that.
12       The next page is just a duplicate,
13 no, it isn't.  The next page, Notice of Hearing
14 relates to the same claim by Mohammad Abdul Karim
15 Al Kurd, correct?
16       A.    Yes, it is the same.
17       Q.    The next page relates to the lawsuit
18 brought by As-Sahel Ready Mix Concrete, that is
19 the one you don't know about?
20       A.    Yes.
21       Q.    That is the one you don't know
22 about?

24 (Pages 93 to )

## Ghassan Ramadan

Page 97

```
       A.   Yes.  We had a kind of like
agreement that I would bring the money and then
we settle it, and then we don't follow-up on
that.
       Q.   So, you don't personally really know
about this lawsuit?
       A.   I had like some knowledge of this
before.  But, I know that also they settle things
between them, and that was it.
       Q.   I am sorry?
       A.   I didn't go on to complete with
that.  But I had previous knowledge of this, and
I know that they settled the issue, and they
didn't continue.
       Q.   You know this one settled?
       A.   I paid about roughly 45,000 shekels
out of the almost 100,000 and some shekels, and
they settled the issue.  But I don't know what
was the outcome, they settled the thing between
them.
       Q.   I am sorry, you paid 45,000 shekels?
       A.   Yes.
```

Page 98

```
       Q.   And it settled?
       A.   They knew that I have no more money,
I mean, to pay.  So they took only that.  And
that is all they paid in all.
            They told me also that in case you
have the extra money later on, then you remember
us, and you will pay us the rest.  But it was
stopped at that.
       Q.   Stopped at that point?
       A.   At that point, yes.  I don't know
exactly, but they said okay, we are going to stop
it at this point.
       Q.   Okay.  If you will turn to the next
page, that is the lawsuit brought by Mr. Al Kurd,
that is the one that you paid the $8,500 for?
       A.   Yes.
       Q.   The next one is brought by
Mr. Maghari?
       A.   Okay, yes.
       Q.   Do you know about this one?
       A.   I paid the money.
       Q.   That was settled?
```

Page 99

```
 1     A.   I paid approximately like 4,500
 2 shekels, about 4,900.
 3     Q.   4,900, okay.  The next one?  The
 4 next page, this is a suit accusing you of writing
 5 a bounced check, correct?
 6     A.   That is the postdated checks that
 7 Bucheit asked to write.  Of course, the other
 8 partner, who signed on the check, the British
 9 people, they left and I was the only one here
10 with the police, and they were chasing me in this
11 case.  I paid that also in full.
12     Q.   Did you use any of the $100,000 that
13 you transferred from the dollar account to the
14 shekel account to pay this?
15     A.   No.
16     Q.   Why not?
17     A.   I had like so much debt.  I had a
18 lot of payments coming for me to make.
19     Q.   Was the $100,000, was any of the
20 money that was blocked in the Cairo Amman Bank
21 intended to pay this check?
22     A.   No.
```

Page 100

```
 1     Q.   How about any of the $100,000 that
 2 was transferred that you transferred, was that
 3 intended to pay this check?
 4     A.   This was actually 1997.  This was
 5 after the, so many other checks.
 6     Q.   No.  But it says that you bounced
 7 the check in December of 1995.
 8     A.   It was somewhere like '95, and I
 9 filed a lawsuit against me personally, not
10 against Bucheit International.
11          And I was trying to talk to him to
12 settle the issue, just wait for us, and they
13 filed the lawsuit at that time.  Despite the
14 check is the company check, it is not mine
15 personally.
16     Q.   You testified that none of the money
17 in the Cairo Amman Bank was intended to pay this
18 check?
19     A.   We, of course, didn't have money to
20 pay the other debts, for the other people.  And
21 this came after the January of 1996.
22          This was for later work that was
```

25 (Pages 97 to 100)

## Ghassan Ramadan

### Page 101

```
 1   done in the airport, and we were late in paying
 2   it.  That is when he filed the lawsuit against
 3   us.
 4        Q.   I am sorry, what?
 5        A.   It is like for the work related also
 6   to the airport.  And it was late, later than the
 7   other check, the other payments.
 8             I tried to talk to him to postpone
 9   it, and then he filed the lawsuit against it.
10        Q.   Okay.  The next page is for the same
11   part of the same case?
12        A.   This sum, you are talking about
13   this, the same case on the previous page?
14        Q.   Right.
15        A.   Yes.  I paid them all.
16        Q.   Okay.  Let's skip the next page,
17   which just says copy of registration, and then go
18   to the page which has columns and Nos. 1, 2, 3,
19   4, and it says signed by you.
20        A.   Okay.
21        Q.   What is this?
22        A.   We made this to show how much money
```

### Page [1]

```
 1        A.   Yes.  That is the same.
 2        Q.   And does that show an amount that
 3   was paid to Al-Sahel, or an amount that they
 4   claimed?
 5        A.   It was like part of that, I mean
 6   what they have still, what 55,000, and I paid
 7   others, other amount.  This was prepared before
 8   completed the payments.
 9        Q.   I am sorry, what does the 71,000
10   represent?
11        A.   It is the amount for the company,
12   the concrete company.
13        Q.   If you turn to the first page of the
14   exhibit, they are claiming 100,000 in shekels.
15        A.   I paid part of that before I was
16   preparing this.
17        Q.   So, in other words, you paid around
18   a 30,000 --
19        A.   Now, the actual amount owed was
20   55,000.
21        Q.   So, you've paid an additional
22   shekels after you have prepared this?
```

### Page 102

```
 1   we owed.  We sent it to the prosecutor, to show
 2   him how much money, just to give the details of
 3   the money for the insurance, money for the
 4   Al-Sahel Company.
 5        Q.   When did you prepare this?
 6        A.   I don't know exactly.  But maybe it
 7   could be '97, could be '98.  This is here showing
 8   that it lost, the last sentence, showing the rent
 9   for 1997/98.  So, this could be 1999.
10        Q.   No. 1, the $150,000 showing owing to
11   you, that is because you are claiming that you
12   are entitled to a refund of the payments that you
13   made for the stock?
14        A.   Yes.
15        Q.   You never sued for that amount?
16   Mr. Ramadan never sued for that amount, correct?
17        A.   No.
18        Q.   The next shows 71,336 shekels to the
19   Al-Sahel Ready Mix Concrete Company.
20        A.   Yes.
21        Q.   Is that related to the suit, if you
22   turn to the first page of the exhibit?
```

### Page [1]

```
 1        A.   Yes.  The final amount now remains
 2   is 55,000.
 3        Q.   All right.  So, are these amounts
 4   shown as owed, these are amounts that were owed
 5   as of 1999?
 6        A.   It shows the figures.  I paid of
 7   course, after this stage, I paid some, and there
 8   is still some money owed.
 9        Q.   Right.  But, these are the amounts
10   that were owed as of 1999.
11        A.   1999.  But, now it is different.
12        Q.   I understand that.  What is the
13   Trust Insurance Company figure?
14        A.   You can ask Mr. Bucheit personal,
15   he knows about this.
16        Q.   Well, I am asking you.  Do you know
17   what this is about?
18        A.   Because we have this, we bought
19   insurance from this company and the amount was
20   not paid.
21        Q.   All right.  And do you know that
22   personally?
```

**Esquire Deposition Services**                    **1-800-441-3**

## Ghassan Ramadan

Page 105

A.    I knew that later on, I was
surprised to know that later on when I got the
bills from the trust company, that there is still
a claim for that amount.

Q.    Okay.  And do you know what happened
to that amount?  Has it been paid or is it still
owing?

A.    They actually still, I mean, like
are asking us, they filed even a lawsuit on that,
and they know that I have no money to pay them.
They asked for that legally.

Q.    And the last one, the rent.

A.    That is the rent for the last two
years.

Q.    Had you read the lease?

THE INTERPRETER:  I am sorry?

MR. SELTER:  Had Mr. Ramadan read
the lease for the rented land, for the factory?

THE WITNESS:  No.  It was him who
made the, signed the contract.

BY MR. SELTER:

Q.    So, you don't know the terms of the

Page 106

lease?

A.    No.

Q.    Do you know if this amount is still,
do you know if there has been any judgment for
the $60,000?

A.    I think the landlord, I mean, like
filed a lawsuit on this.  But I don't know the
details, what kind of, or the outcome of the
court on this.

Q.    Were there any other amounts owing
by Bucheit International as of 1999, when you
prepared this list?

A.    Basically these are the main things.
There are some minor amounts that I have paid
some of them and maybe some of them are still
owed.

Q.    Do you know how much the minor
amounts total?

A.    I paid like personally what could be
the total of between $75,000 to $80,000.

Q.    Total or just for the minor amounts
that aren't on this list?

Page 107

A.    No, not those.  The other debts, for
the workers, for the suppliers and other things.

Q.    So, you paid a total of $75,000 or
$80,000?

A.    Yes, approximately.

Q.    Were you aware of the loan from OPIC
to the Bucheit International?

A.    He gave me an idea that there is a
loan of $2 million.

Q.    All right.  Did you ever review any
of the loan documents?

A.    He didn't show me any certain piece
of paper.

Q.    Were you aware that you couldn't
lease any of Bucheit International's property
without OPIC's okay?

THE INTERPRETER:  I am sorry?

BY MR. SELTER:

Q.    Were you aware that you couldn't
lease any of Bucheit International's property
without the okay of OPIC?

A.    No, I didn't know that.

Page 108

MR. SELTER:  If you will give me a
minutes, we may be done.

(Recess 2:04-2:09 p.m.)

BY MR. SELTER:

Q.    Mr. Ramadan, I have no further
questions.  But, I would like to stipulate on the
record, that you will be in court during
Plaintiff's direct case.

Can we get that stipulation on the
record?

MR. HANANIA:  Yes.

MR. SELTER:  Thank you.  That is it.

MR. HANANIA:  I have no questions.

(Deposition adjourned at 2:10 P.M.

(Signature waived.)

27 (Pages 105 to 108)

# Ghassan Ramadan

Page 109

```
 1           CERTIFICATE OF COURT REPORTER
 2  UNITED STATES OF AMERICA    )
 3  DISTRICT OF COLUMBIA        )
 4       I, LORI GOODIN MACKENZIE, a Notary Public
    of the District of Columbia, do hereby certify
 5  that the within names, RADWAN HAKIM, was duly
    sworn by me to interpret the examination of
 6  GHASSAN ABDEL AZIZ ABU RAMADAN.
 7       I further certify that the within
    named, GHASSAN ABDEL AZIZ ABU RAMADAN, personally
 8  appeared before me at the time and place herein
    set out, and after having been duly sworn by me,
 9  through the interpreter, RADWAN HAKIM, was
    interrogated by counsel.
10       I further certify that the
    examination was recorded stenographically by me
11  and this transcript is a true record of the
    proceedings.
12       I further certify that the
    stipulation contained herein was entered into by
13  counsel in my presence.
         I further certify that I am not of
14  counsel to any of the parties, nor an employee of
    counsel, nor related to any of the parties, nor
15  in any way interested in the outcome of this
    action.
16       As witness my hand and notarial seal
    this 1st day of April, 2003.
17
    My commission expires:
18  April 14, 2006       LORI GOODIN MACKENZIE
                         Notary Public
19
20
21
22
```

**Esquire Deposition Services**          **1-800-441-3376**

Docket as of April 4, 2003 7:38 pm                    Web PACER (v2.3)

---

# U.S. District Court

## USDC District of Columbia (Washington)

## CIVIL DOCKET FOR CASE #: 00-CV-1455

## BUCHEIT v. PALESTINE LIBERATION, et al

Filed: 06/20/00
Assigned to: Judge Gladys Kessler
Jury demand: Plaintiff
Demand: $6,600,000
Nature of Suit: 190
Lead Docket: None
Jurisdiction: Diversity
Dkt# in other court: None
Cause: 28:1332 Diversity-Breach of Contract

---

```
Case type: 1. civil 2. null
B. J. BUCHEIT, Trustee          Michael H. Selter
     plaintiff                  FTS 261-1000
                                202-887-0336 FAX
                                Suite 700
                                [COR LD NTC ret]
                                MANELLI, DENISON & SELTER
                                2000 M Street, NW
                                Washington, DC 20036-3307
                                AREA CODE (202)
                                B. J. BUCHEIT
                                FTS 795-6124
                                [COR LD NTC pse] [PRO SE]
                                9023 Baybury Lane
                                West Palm Beach, FL 33411
                                AREA CODE (561)
          v.
THE PALESTINE LIBERATION        Maher Hanna Hanania
ORGANIZATION                    FTS 778-2400
     defendant                  Suite 101
                                [COR LD NTC ret]
                                HANANIA  KHEDER & NAWASH
                                6066 Leesburg Pike
                                Falls Church, VA 22041
                                AREA CODE (703)

PALESTINIAN AUTHORITY           Maher Hanna Hanania
     defendant                  (See above)
                                [COR LD NTC ret]

OVERSEAS PRIVATE INVESTMENT     Robert Ernest Leidenheimer, Jr.
CORPORATION (OPIC)              FTS 514-7238
     Non Party                  202-305-0955 FAX
                                Room 10-816
                                [COR LD NTC ret]
                                U.S. ATTORNEY'S OFFICE
                                Judiciary Center Building
                                555 Fourth Street, NW
                                Washington, DC 20001
```

AREA CODE (202)

# DOCKET    PROCEEDINGS

| DATE | # | DOCKET    ENTRY |
|------|---|------|
| 6/20/00 | 1 | COMPLAINT filed by plaintiff B. J. BUCHEIT; jury demand; attachments (2) (bm) [Entry date 06/21/00] |
| 6/20/00 | -- | SUMMONS (2) issued for defendants PALESTINE LIBERATION, and PALESTINIAN AUTH. (bm) [Entry date 06/21/00] |
| 7/21/00 | 2 | RETURN OF SERVICE/AFFIDAVIT of summons and complaint executed on 6/23/00 upon defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH. (tb) [Entry date 07/24/00] |
| 8/8/00 | 3 | AFFIDAVIT in support of default  by plaintiff B. J. BUCHEIT (tb) [Entry date 08/15/00] |
| 8/15/00 | 4 | DEFAULT vs. defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH.  By Clerk (N) (tb) |
| 9/14/00 | 5 | MOTION filed by defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH. for Maher H. Hanania to appear pro hac vice ( 1510 H Street, NW, Suite 20 Washington, DC, 20005 (202) 347-5800, ) (tb) [Entry date 10/20/00] |
| 9/14/00 | 6 | MOTION filed by defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH. vacating defendant judgment (tb) [Entry date 10/20/00] [Edit date 10/20/00] |
| 9/25/00 | 7 | MEMORANDUM by plaintiff B. J. BUCHEIT  in opposition to motion vacating defendant judgment [6-1] by PALESTINIAN AUTH., PALESTINE LIBERATION (tb) [Entry date 10/20/00] |
| 10/6/00 | 8 | REPLY by defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH. in opposition to motion vacating defendant judgment [6-1] by PALESTINIAN AUTH., PALESTINE LIBERATION (tb) [Entry date 10/24/00] |
| 10/26/00 | 9 | ORDER by Judge Gladys Kessler: granting motion for Maher H. Hanania to appear pro hac vice ( 1510 H Street, NW, Suite 20 Washington, DC, 20005 (202) 347-5800, ) [5-1] by PALESTINIAN AUTH., PALESTINE LIBERATION  (N) (pob) |
| 11/24/00 | 11 | NOTICE OF CHANGE OF ADDRESS by B. J. BUCHEIT representing plaintiff B. J. BUCHEIT .  New address: 9023 Baybury Lane West Palm Beach Florida 33411 (561)795-6124. (td) [Entry date 12/04/00] |
| 11/28/00 | 10 | INITIAL SCHEDULING ORDER  by Judge Gladys Kessler status hearing set for 10:00 1/5/01 (N) (pob) [Entry date 11/29/00] |
| 1/2/01 | 14 | MEET AND CONFER STATEMENT/REPORT PURSUANT TO L.R. 16 filed by plaintiff B. J. BUCHEIT, defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH. . (tb) [Entry date 01/08/01] |

| | | |
|---|---|---|
| 1/4/01 | 12 | ORDER by Judge Gladys Kessler: granting motion vacating defendant judgment [6-1] by PALESTINIAN AUTH., PALESTINE LIBERATION; judgment entered on 8/15/00 is vacated. (N) (pob) |
| 1/5/01 | -- | STATUS HEARING before Judge Gladys Kessler: discovery closes 3/5/01; dispositive motions due 3/20/01; status hearing set for 9:30 4/10/01; witness list due 1/22/01; Post-R. 26)(a) Discovery due 2/5/01. Reporter: Susan Tyner (pob) |
| 1/5/01 | 13 | ORDER by Judge Gladys Kessler: confirming status hearing of 01/05/01 (N) (pob) |
| 2/13/01 | 15 | ORDER by Judge Gladys Kessler  : status hearing set for 9:30 4/10/01   (N) (pob) [Entry date 02/14/01] |
| 2/23/01 | 16 | MOTION filed by plaintiff B. J. BUCHEIT to extend time for filing discovery for 60 days, and to extend time for dispositive motions and all other deadlines in this case for 60 days; exhibits (1) (cdw) [Entry date 02/26/01] |
| 3/13/01 | 17 | ORDER by Judge Gladys Kessler  : granting motion to extend time for filing discovery for 60 days [16-1] by B. J. BUCHEIT, granting motion to extend time for dispositive motions and all other deadlines in this case for 60 days [16-2] by B. J. BUCHEIT  (N) (pob) |
| 4/10/01 | -- | STATUS HEARING before Judge Gladys Kessler: oral motion by plaintiff to extend discovery heard and granted; Status Report due: 7/12/01; status hearing set for 9:30 7/17/01 Reporter: Susan Tyner (pob) |
| 4/10/01 | 18 | ATTORNEY APPEARANCE  for plaintiff B. J. BUCHEIT by Michael H. Selter (pob) |
| 4/10/01 | 19 | ORDER by Judge Gladys Kessler: discovery closes 7/6/01; status hearing set for 9:30 7/17/01;Status Report due: 7/12/01  (N) (pob) |
| 6/18/01 | -- | SCHEDULING NOTICE: status hearing reset from 7/17/01 to 10:00 7/26/00 before Judge Gladys Kessler Courtroom 19, 6th Floor. (pob) |
| 6/20/01 | 20 | MOTION filed by plaintiff B. J. BUCHEIT for an ordering sanctioning defendants for failure toproduce a witness with knowledge to testify regarding matters in two rule 30(b)(6) deposition notices; exhibits (5) (cdw) [Entry date 06/21/01] |
| 6/28/01 | -- | SCHEDULING NOTICE: status hearing reset for 9:30 8/15/01 before Judge Gladys Kessler Courtroom 19, 6th Floor. (pob) |
| 7/10/01 | 21 | MOTION filed by plaintiff B. J. BUCHEIT to strike defendants affirmative defenses, or alternatively for an order compelling defendants to supplement their answers; exhibits (2) (cdw) [Entry date 07/11/01] |
| 7/11/01 | 22 | REPLY by plaintiff B. J. BUCHEIT in support of motion to strike defendants affirmative defenses [21-1] by B. J. BUCHEIT (aet) [Entry date 07/12/01] |
| 7/12/01 | 23 | STATUS REPORT by plaintiff B. J. BUCHEIT, defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH. (aet) [Entry date 07/15/01] |

Case 1:00-cv-00105-L-DLM    Document 198    Filed 07/21/03    Page 69 of 96 PageID #:
14206
U.S. District Court Web P            (v2.3) Docket Report                                      Page 4 of 9

7/23/01   24      RESPONSE by defendants to plaintiff's motion for an
                  ordering sanctioning defendants for failure toproduce a
                  witness with knowledge to testify regarding matters in two
                  rule 30(b)(6) deposition notices [20-1] and memorandum in
                  support of by B. J. BUCHEIT (cdw) [Entry date 07/24/01]

7/26/01   --      SCHEDULING NOTICE: status hearing reset for 10:15 8/15/01
                  before Judge Gladys Kessler Courtroom 19, 6th Floor. (pob)

8/14/01   25      ORDER by Judge Gladys Kessler  : granting motion for an
                  ordering sanctioning defendants for failure to produce a
                  witness with knowledge to testify regarding matters in two
                  Rule 30(b)(6) deposition notices [20-1] by B. J. BUCHEIT;
                  plaintiff shall within two weeks from the date of this
                  Order submit the foregoing expenses, including reasonable
                  attorney's fees to defendants for payment, if parties are
                  unable to agree on the amount, they shall sumit this
                  dispute to the Court. (N) (pob)

8/14/01   26      ORDER by Judge Gladys Kessler: denying motion to strike
                  defendants affirmative defenses [21-1] by B. J. BUCHEIT,
                  denying motion for an order compelling defendants to
                  supplement their answers [21-2] by B. J. BUCHEIT  (N) (pob)

8/22/01   --      STATUS HEARING  before Judge Gladys Kessler : motion for
                  summary judgment due 9/28/01; response to motion for
                  summary judgment due 10/15/01; reply motion for summary
                  judgment due 10/30/01   Reporter: Susan Tyner (pob)

9/4/01    27      SCHEDULING ORDER  by Judge Gladys Kessler dispositive
                  motions due 9/28/01 ; response to dispositive motions due
                  10/15/01 ; reply to dispositive motions due 10/30/01 ;
                  (N) (dam)

9/21/01   28      MOTION (CONSENT) filed by plaintiff B. J. BUCHEIT to amend
                  the Court's 9/4/01 order [27-1],[27-2] (cdw)
                  [Entry date 09/24/01]

10/3/01   29      ORDER by Judge Gladys Kessler: granting motion to amend the
                  Court's 9/4/01 order [27-1],[27-2] [28-1] by B. J. BUCHEIT;
                  dispositive motions due 10/9/01; response to dispositive
                  motions due 10/23/01; reply to dispositive motions due
                  11/6/01 (N) (pob)

10/5/01   30      MOTION (CONSENT) filed by plaintiff B. J. BUCHEIT to amend
                  the Court's order of 9/4/01 [27-1], [27-2] (cdw)
                  [Entry date 10/09/01]

10/10/01  31      ORDER by Judge Gladys Kessler: granting motion to amend the
                  Court's order of 9/4/01 [27-1], [27-2] [30-1] by B. J.
                  BUCHEIT; dispositive motions due 10/15/01; response to
                  dispositive motions due 10/29/01; reply to dispositive
                  motions due 11/12/01  (N) (pob)

10/15/01  32      MOTION (CONSENT) filed by plaintiff B. J. BUCHEIT to amend
                  order of 10/10/01 [31-1], [31-2] (cdw) [Entry date 10/17/01]

10/18/01  33      ORDER by Judge Gladys Kessler: granting motion to amend
                  order of 10/10/01 [31-1], [31-2] [32-1] by B. J. BUCHEIT
                  dispositive motions due 10/23/01; response to dispositive
                  motions due 11/6/01; reply to dispositive
                  motions due 11/20/01  (N) (pob)

10/23/01  34      MOTION filed by plaintiff B. J. BUCHEIT for partial
                  summary judgment; exhibits (36) (cdw) [Entry date 10/25/01]

10/23/01  35      MOTION filed by defendant PALESTINE LIBERATION, defendant

```
                    PALESTINIAN AUTH. to dismiss  complaint [1-1], or in the
                    alternative for summary judgment; declarations (1),
                    exhibits (1) (cdw) [Entry date 10/25/01]

11/1/01   36        MOTION filed by defendant PALESTINE LIBERATION, defendant
                    PALESTINIAN AUTH. to amend order filed 10/18/01 [33-1],
                    order [33-2] (tth) [Entry date 11/02/01]

11/6/01   37        ORDER by Judge Gladys Kessler: granting motion to amend
                    order filed 10/18/01 [33-1], order [33-2] [36-1] by
                    PALESTINIAN AUTH., PALESTINE LIBERATION; dispositive
                    motions due 10/23/01; response to dispositive motions due
                    11/13/01; reply to dispositive motions due 11/27/01 (N) (pob)

11/13/01  38        RESPONSE by defendant PALESTINE LIBERATION, defendant
                    PALESTINIAN AUTH. to motion for partial summary judgment
                    [34-1] by B. J. BUCHEIT; exhibits (11) (cdw)
                    [Entry date 11/16/01]

11/13/01  39        RESPONSE by plaintiff B. J. BUCHEIT in opposition to motion
                    to dismiss complaint [1-1] [35-1] or alternatively for
                    summary judgment [35-2] by PALESTINIAN AUTH., PALESTINE
                    LIBERATION; exhibits (1) (cdw) [Entry date 11/16/01]

11/27/01  40        MOTION (CONSENT) filed by plaintiff B. J. BUCHEIT to
                    extend time to 11/30/01 for parties to file replies in
                    support of their respective dispositive motions (cdw)
                    [Entry date 11/29/01]

11/29/01  41        ORDER  by Judge Gladys Kessler : granting motion to
                    extend time to 11/30/01 for parties to file replies in
                    support of their respective dispositive motions [40-1] by
                    B. J. BUCHEIT reply to dispositive motions due by 11/30/01 ;
                    (N) (dam) [Entry date 11/30/01]

11/30/01  42        REPLY by defendant PALESTINE LIBERATION, defendant
                    PALESTINIAN AUTH. in support of motion to dismiss complaint
                    [1-1] [35-1] or for summary judgment [35-2] by PALESTINIAN
                    AUTH., PALESTINE LIBERATION (cdw) [Entry date 12/04/01]

11/30/01  43        REPLY by plaintiff B. J. BUCHEIT in support of motion for
                    partial summary judgment [34-1] by B. J. BUCHEIT; exhibits
                    (2) (cdw) [Entry date 12/04/01]

1/17/02   44        MOTION filed by plaintiff B. J. BUCHEIT to enforce
                    sanctions order; exhibits (6) (cdw) [Entry date 01/23/02]

2/21/02   45        ORDER   by Judge Gladys Kessler: directing that within two
                    weeks from the date of this Order, Defendants shall pay
                    Plainitiff his expenses, including reasonable attorney's
                    fees, associated with Plaintiff's Motion for Sanctions in
                    the amount of $2,963.50. (N) (tth) [Entry date 02/22/02]

6/13/02   46        SUPPLEMENTAL MEMORANDUM  by plaintiff B. J. BUCHEIT  in
                    support of motion for partial summary judgment [34-1] by B.
                    J. BUCHEIT; exhibits (1) (cdw) [Entry date 06/17/02]
                    [Edit date 06/17/02]

9/23/02   47        MEMORANDUM OPINION  by Judge Gladys Kessler   (N) (tb)
                    [Entry date 09/24/02]

9/23/02   48        ORDER   by Judge Gladys Kessler : denying motion for
                    partial summary judgment [34-1] by B. J. BUCHEIT  (N) (tb)
                    [Entry date 09/24/02]

9/26/02   49        MEMORANDUM OPINION  by Judge Gladys Kessler   (N) (tth)
```

Case 1:00-cv-00105-L-DLM    Document 198    Filed 07/21/03    Page 71 of 96 PageID #:
U.S. District Court Web PACT (v2.3) Docket Report                              Page 6 of 9
1208

9/26/02  50      ORDER  by Judge Gladys Kessler  : denying motion to
                 dismiss  complaint [1-1] [35-1] by PALESTINIAN AUTH,
                 PALESTINE LIBERATION  (N) (tth)

10/4/02  51      MOTION filed by plaintiff B. J. BUCHEIT for
                 reconsideration of order of 9/23/02 [48-1] (cdw)
                 [Entry date 10/08/02]

10/7/02  --      SCHEDULING NOTICE: status hearing set for 11:15 10/16/02 ;
                   before Judge Gladys Kessler Courtroom 19, Sixth Floor.
                 (tth)

10/16/02 --      STATUS HEARING  before Judge Gladys Kessler  : pretrial
                 conference set for 2/6/03; trial set for 2/26/03;
                 Reporter: Patty Gels (tth) [Entry date 10/18/02]

10/16/02 52      SCHEDULING ORDER  by Judge Gladys Kessler pretrial
                 conference set for 4:15 2/6/03 ; trial set for 9:30 2/26/03
                 ;  (N) (tth) [Entry date 10/21/02]

10/18/02 53      MOTION filed by defendants to extend time to 10/28/02 to
                 file opposition to plaintiff's motion for reconsideratiuon
                 of Courts order of 9/23/02 (cdw) [Entry date 10/22/02]

10/18/02 54      ORDER  by Judge Gladys Kessler  : granting motion to
                 extend time to 10/28/02 to file opposition to plaintiff's
                 motion for reconsideratiuon of Courts order of 9/23/02
                 [53-1] by PALESTINIAN AUTH, PALESTINE LIBERATION  (N) (tth)
                 [Entry date 10/24/02]

10/28/02 55      CONSENT MOTION filed by defendants to extend time to file
                 oppositon to plaintiff's motion for reconsideration of
                 order of 9/23/02 (cdw) [Entry date 10/30/02]

10/29/02 56      ORDER  by Judge Gladys Kessler  : granting motion to
                 extend time to file oppositon to plaintiff's motion for
                 reconsideration of order of 9/23/02 [55-1] by PALESTINIAN
                 AUTH, PALESTINE LIBERATION  (N) (tth) [Entry date 10/30/02]

11/1/02  57      RESPONSE by defendants to motion for reconsideration of
                 order of 9/23/02 [48-1] [51-1] by B. J. BUCHEIT (cdw)
                 [Entry date 11/05/02]

1/23/03  58      JOINT MOTION by plaintiff B. J. BUCHEIT, and defendants
                 PALESTINE LIBERATION, PALESTINIAN AUTH to extend time to
                 2/3/03 to file joint pretrial statement (bm)
                 [Entry date 01/24/03]

1/28/03  59      ORDER   by Judge Gladys Kessler: granting joint motion to
                 extend time to 2/3/03 to file joint pretrial statement
                 [58-1] by PALESTINIAN AUTH, PALESTINE LIBERATION, B. J.
                 BUCHEIT  (N) (tth)

2/3/03   60      JOINT PRETRIAL STATEMENT by plaintiff B. J. BUCHEIT, and
                 defendants PALESTINE LIBERATION, PALESTINIAN AUTH;
                 attachments (3) (Note: attachments 2 and 4 to be supplied)
                 (bm) [Entry date 02/04/03]

2/5/03   61      NOTICE OF FILING by plaintiff, defendants exhibits 2 and 4
                 to the joint pretrial statment filed on 2/3/03 (cdw)
                 [Entry date 02/10/03]

2/6/03   --      PRE-TRIAL CONFERENCE held before Judge Gladys Kessler
                 reporter: Santa Zizzo (tth) [Entry date 02/12/03]

2/10/03  62      ORDER   by Judge Gladys Kessler: defendants shall file a
                 briefing of the relevant law of the Gaza Strip as of

12/20/95, including, but not limited to, the law of conversion, contracts, partnership, agency, and creditor prioritization, by 2/12/03; any opposition shall be filed by 2/18/03; (N) (tth) [Entry date 02/11/03]

2/12/03   63   MOTION filed by defendants to extend time to 2/21/03 to file its motion on Palestinian Laws (rje) [Entry date 02/13/03]

2/13/03   64   ORDER   by Judge Gladys Kessler: granting motion to extend time to 2/21/03 to file its motion on Palestinian Laws [63-1] by PALESTINIAN AUTH, PALESTINE LIBERATION motion due by 2/12/03; response to motion due by 2/21/03;   (N) (tth) [Entry date 02/14/03]

2/14/03   65   MOTION filed by defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH to extend time to file the Commercial Laws of Palestine (nmr) [Entry date 02/19/03]

2/19/03   67   MOTION filed by defendants to extend time to 2/20/03 to file commerical/corporate laws of Palestine (rje) [Entry date 02/22/03]

2/20/03   66   ORDER   by Judge Gladys Kessler: granting motion to extend time to file the Commercial Laws of Palestine [65-1] by PALESTINIAN AUTH, PALESTINE LIBERATION; Brief on Commercial Laws of Palestine due 2/18/03. (N) (tth)

2/20/03   68   MOTION filed by plaintiff B. J. BUCHEIT to enforce subpoenas to the overseas private investment corporation; exhibits (9) (rje) [Entry date 02/24/03]

2/20/03   70   MEMORANDUM by defendant PALESTINE LIBERATION, defendant PALESTINIAN AUTH of Brief of the Commerical/Corporate Laws of Palestine; Attachments   (Bulky) (ks) [Entry date 02/24/03]

2/21/03   69   ORDER   by Judge Gladys Kessler: granting motion to extend time to 2/20/03 to file defendant's motion for extension of time to file commerical/corporate laws of Palestine [67-1] by PALESTINIAN AUTH, PALESTINE LIBERATION motion due by 2/20/03;   (N) (tth) [Entry date 02/24/03]

2/24/03   71   MOTION (Consent) filed by defendants for re-schedule trial (rje) [Entry date 02/25/03]

2/24/03   73   ORDER   by Judge Gladys Kessler: granting motion to re-schedule trial [71-1] by PALESTINIAN AUTH, PALESTINE LIBERATION trial set for 4/2/03;   (N) (tth) [Entry date 02/27/03]

2/25/03   72   MOTION filed by plaintiff B. J. BUCHEIT to extend time to 3/12/03 for filing their memorandum on Palestinian Corporate Law. (ks) [Entry date 02/26/03]

2/27/03   74   ORDER   by Judge Gladys Kessler: granting motion to extend time to 3/12/03 for filing their memorandum on Palestinian Corporate Law. [72-1] by B. J. BUCHEIT memorandum due by 3/12/03; (N) (tth)

3/3/03    75   MOTION (Consent) filed by Non Party OVERSEAS PRIV INVST to extend time to 3/11/03 to respond to the plaintiff enforce subpoenas (rje) [Entry date 03/04/03]

3/5/03    76   ORDER   by Judge Gladys Kessler: granting motion to extend time to 3/11/03 to respond to the plaintiff enforce subpoenas [75-1] by OVERSEAS PRIV INVST response to

Case 1:00-cv-00105-L-DLM     Document 198     Filed 07/21/03     Page 73 of 96 PageID #:
U.S. District Court Web PACF  v2.3) Docket Report                              Page 8 of 9
14210

                        motion(s) due by 3/11/03;   (N) (tth) [Entry date 03/07/03]

3/10/03   77      MOTION (Second Consent) filed by Non Party OVERSEAS PRIV
                        INVST to extend time to 3/18/03 to respond to plaintiff's
                        motion to enforce a subpoena. (rje) [Entry date 03/11/03]

3/11/03   78      ORDER   by Judge Gladys Kessler: granting motion to extend
                        time to 3/18/03 to respond to plaintiff's motion to enforce
                        a subpoena. [77-1] by OVERSEAS PRIV INVST response to
                        motion due by 3/18/03;   (N) (tth)

3/12/03   79      MEMORANDUM by plaintiff B. J. BUCHEIT on Palestinian Law;
                        exhibits (5) (rje) [Entry date 03/13/03]

3/17/03   80      MOTION (Consent Protective) filed by Non Party OVERSEAS
                        PRIV INVST to extend time to respond to the motion of
                        plaintiff's to enforce a subpoena (rje)
                        [Entry date 03/19/03]

3/18/03   81      ORDER   by Judge Gladys Kessler: granting motion to extend
                        time to respond to the motion of plaintiff's to enforce a
                        subpoena to Overseas Private Investment Corporation within
                        seven days of the entry of an order, if any, declining to
                        accept the stipulation concerning OPIC's testimony. [80-1]
                        by OVERSEAS PRIV INVST (N) (tth) [Entry date 03/19/03]

3/24/03   82      ORDER   by Judge Gladys Kessler: granting motion to enforce
                        subpoenas to the overseas private investment corporation
                        [68-1] by B. J. BUCHEIT; OPIC shall produce the opinion by
                        Sharhabeel Y. Al-Zaeem by 3/28/03; OPIC shall produce
                        Richard Corrigan to testify as a witness on behalf of
                        plaintiff at the trial beginning 4/2/03. (N) (tth)

3/26/03   83      MOTION (Consent) filed by plaintiff B. J. BUCHEIT to amend
                        joint pre-trial statement dated 2/3/03 [60-1] by
                        PALESTINIAN AUTH, PALESTINE LIBERATION, B. J. BUCHEIT;
                        exhibit (1) (rje) [Entry date 03/27/03]

3/27/03   84      ORDER   by Judge Gladys Kessler: granting motion to amend
                        joint pre-trial statement; Pl. Ex. 64-71 shall be added to
                        Plaintiff's Exhibit List. Defendants shall note any
                        objections to these new exhibits prior to the commencement
                        of trial. [60-1] by PALESTINIAN AUTH, PALESTINE LIBERATION,
                        B. J. BUCHEIT [83-1] by B. J. BUCHEIT  (N) (tth)
                        [Entry date 03/28/03]

4/1/03    85      STIPULATION filed and fiated  by Judge Gladys Kessler
                        concerning testimony of non-party overseas private
                        investment corporation. (N) (tth) [Entry date 04/03/03]

4/2/03    --      NON-JURY TRIAL   before Judge Gladys Kessler  begun and
                        continued to 10:00 4/3/03. Plaintiff's Witnesses: Bernard
                        Bucheit, Ghassan Abu Ramadan. reporter: Susan Tyner (tth)
                        [Entry date 04/04/03]

4/3/03    --      NON-JURY TRIAL   before Judge Gladys Kessler  begun,
                        concluded and taken under advisement. Defendant's Witness:
                        Leonard Lock Jr.,  reporter: Susan Tyner (tth)
                        [Entry date 04/04/03]

                        _____

                              Case Flags:
                              TYPE                                    -

U.S. District Court Web PACER (2.3) Docket Report                                    Page 9 of 9

F JURY

END OF DOCKET: 1:00cv1455

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 04/08/2003 11:57:21 | | |
| PACER Login: | ▮▮▮▮ | Client Code: |
| Description: | docket report | Search Criteria: | 1:00cv01455 |
| Billable Pages: | 11 | Cost: | 0.77 |

**Linda Reiss-Wolicki, Advocate & Notary**
לינדה ריס-וויליצקי, עו"ד נוטריון
31 Reuven Street, Beit Shemesh Israel
02-9918218 Fax: 02-9997505

--------------------------------------------------------------------------

מס׳ **No. 360/2003**

## CERTIFICATION OF TRANSLATION

אישור תרגום

I, the undersigned Linda Reiss-Wolicki
a Notary in Beit Shemesh
hereby declare that I am well
acquainted with the Hebrew and
English languages and that the
document attached marked – **A'** is a
correct English translation
of the original document drawn up in
the Hebrew language which has been
presented to me and of which a true
copy is attached and marked **B.'**

In witness whereof I certify the
correctness of the said translation and
the copy by my signature and seal.

אני החי"מ לינדה ריס וויליצקי
נוטריון בבית שמש

מצהירה כי אני שולטת היטב בשפות
עברית ואנגלית וכי המסמך המצורף
והמסומן באות **א׳** הוא תרגום באנגלית

מדויק של המסמך המקורי הערוך בשפת
העברית שהוצג בפני ושהעתק נכון ממנו
מצורף ומסומן באות **ב׳**

ולראיה הנני מאשרת את דיוק התרגום
ונכונות ההעתק הנ"ל בחתימת ידי
ובחותמי.

This day 02 April 2003

היום 02 אפריל 2003

N.I.S. 357 - fees paid.

שכר בסך 357 ש"ח שולם.

NOTARY'S SEAL
חותם הנוטריון

חתימה
SIGNATURE







עינת ברגר
EINAT BERGER

## APOSTILLE
### (Convention de la Haye du 5 Octobre 1961)

| | |
|---|---|
| 1 **STATE OF ISRAEL** | 1. מדינת ישראל |
| This public document | מסמך ציבורי זה |
| 2. Has been signed by | 2. נחתם בידי |
| _Linda Reiss Wolicki_ Advocate | עו"ד לינדה רייס וויליקי |
| 3. acting in capacity of Notary | 3. המכהן בתור נוטריון |
| 4. bears the seal/stamp of the above Notary | 4. נושא את החותם / החתימת של נוטריון הנ"ל |
| Certified | **אושר** |
| 5. at the Ministry of Justice, Jerusalem | 5. במשרד המשפטים בירושלים |
| 6. by an official appointed by the Minister of Justice under the Notaries Law, 1976 | 6. על ידי מי שמונה בידי שר המשפטים לפי חוק הנוטריונים, תשל"ו -1976 |
| 7. Serial number _____ | 7. מס' סידורי _____ |
| 8. Seal/Stamp | 8. החותם / החתימת |
| 9. Signature _____ | 9. חתימה _____ |
| 10. Date _____ 3/4/2003 | 10. ביום _____ |

עינת ברגר
EINAT BERGER

עינת ברגר
EINAT BERGER

# [National Symbol]
# COURT

**JERUSALEM DISTRICT COURT**                    Misc. Civ. 000585/03

**Before: Hon. Judge Miriam Mizrahi**                    3/12/2003

In the Matter of:        **Haksharat Hayishuv Insurance Company Ltd.**
By counsel, attorney D. Abulafiyah

**Movant**

**Versus**

1. **The Palestinian Authority**
2. **The Palestinian Council**
By counsel, attorneys Y. Arnon, B. Salameh,
Y. Granot

**Respondents**

**Present:**        Counsel for the movant, attorney D. Abulafiyah
Counsel for the respondents, attorneys Y. Arnon, B. Salameh,
Y. Granot
Court interpreter - Mr. Nehemia Eshed

# **PROTOCOL**

**The witness, Muhanad Aljouni after being lawfully cautioned and sworn**

**Examination by attorney Arnon**

Q. A.   The content of my affidavit is true.

**Cross Examination**

Q.        I understand that you are the Palestinian Assistant Minister of Finance?

A.        Yes.

Q.        In what field do you serve as Assistant Minister?

A.    I am Dr. Fayed's assistant, I aide him in a number of matters. My primary profession is accounting. As he requires my assistance I provide it, such as arranging meetings or sometimes an administrative report, or matters relating to taxes, it depends on the requirements he presents to me.

Q.    For how long have you served as Assistant Minister?

A.    Nearly six months.

Q.    What did you do previously?

A.    I worked in various fields, including assistant to the executive committee for constitutional matters, as well as in matters concerning not-for-profit organizations, NPO, and the European Union.

Q.    Everything in financial matters?

A.    Both financial and administrative.

Q.    How much time has passed since you completed your degree in accounting?

A.    I received the diploma in '94.

Q.    Did you assist the Finance Minister to clarify what the assets of the Palestinian Authority are, and to ascertain exactly what they are?

A.    If you mean the report, then, yes, in order clarify that, an agreement was made with an international company to examine the accuracy of the accounts, the company is Standard and Poors.

Q.    Did you assist the Finance Minister to prepare the report, to gather the various records?

A.    The examination was intentionally assigned to an international company, so that no internal element would interfere in this matter.

Q.    Have you read the law suit and the motion for attachments?

A.    He explained the matter to us, and we conferred with the lawyer about it.

Q.    Who explained to you?

A.    The law firm.

Q.    I asked if you had read the law suit and the motion for an attachment?

A.    Yes.

Q.    You say in paragraph 4 of your affidavit, that from the financial perspective the law suit is extremely exaggerated, and I request that you explain what is exaggerated in the law suit.

A.    I do not agree to your law suit.

Q.    That's not the question. What is exaggerated in the law suit?

A.    From a fundamental perspective, I do not agree to the law suit.  I do not agree to any monetary item that appears in the law suit, because I fundamentally do not agree to it.

Q.    So, its not that there are exaggerated amounts in the law suit?

A.    Without distinguishing between the amounts that are written and the main reason - I object to everything.

Q.    I am asking about the amounts, do you know what amount the law suit is for?

A.    Yes, according to what I recall, you are seeking more than 20 million New Israeli Shekels in damages from us.

Q.    What is the law suit about?

A.    About an insurance company, about car thefts and your attempt to file a law suit on that basis.

Q.    Do you know anything about car thefts?

A.    No.

Q.    Then why don't you agree to the suit?

A.    The Finance Ministry has no connection to all these issues.

Q.    If I ask you how many stolen cars have reached the Authority, you won't be able to answer the question?

A.    Of course I don't know.



Q.   You attached to your affidavit an article from the Globes newspaper (exhibit A to the affidavit), do you read Hebrew?

A.   The lawyer showed me the article and explained it to me.

Q.   Is it correct?

A.   From what I understood it is correct.

Q.   You say in paragraph 14 of your affidavit, that the attachments prevent the transfer of funds to Palestinian families as salaries?

A.   We, the Finance Ministry, have a arrangement made up of different categories. There is something called a budget. The two most important items in the budget, or the balance, are the income and the expenses.  Income is important, and so are expenses, since one is connected to the other.

Q.   Do the attachments interfere with payment of salaries to employees?

A.   Those salaries have to come out of the budget.

Q.   So salaries are not being paid now?

A.   They are being paid.

Q.   Do you know what the Palestinian Authority's debts to other parties are?

A.   Debts to whom?

Q.   To all types of parties in the country, in the world, in Palestine?

A.   In general, there are loans, according to the authorization of the Finance Ministry, or part of it [sic -*translator*] the legislative council agreed regarding the loans, and all this is connected to the balance, the budget, according to the economic plan.

Q.   Do you know who the Authority owes money to, is there a list of debts?

A.   These matters are in the budget and are published on the internet.

Q.   Is there a list of who is owed money?

A.   There are agreements with every institution with which we reached an agreement.

Q.   Do you know which debts the Authority pays and which it does not pay?



A.   Every debt that is based on agreements, in which the dates on which payment is to be made are written, and according to what percentages, and there are set dates for payment, according to what I know, the authority pays according to the fixed dates.

Q.   Do you know to whom the Authority owes money, and how much?

A.   Most of the money which it receives, it receives as grants, for example from the World Bank, what's called INF [sic -*translator*].

Q.   Do you know if the Palestinian Authority owes money to the Israeli Electric Company?

A.   There is an agreement that they will provide electricity to the Authority, according to what I know, this matter has a financial side and according to the agreement the Authority has to pay money, and there are sums that were paid and there are sums the payment of which was delayed.  As far as I know, these issues are determined by the Energy Minister and the responsible person in the Electric Company.

Q.   Do you know who else in Israel the Authority owes?

A.   There are several matters for which the Palestinian Authority is being sued. As far as I know, the suits are in court and no decisions have been given about them, and they are still pending. To the best of my knowledge, it has not yet been determined that the Authority has debts.

Q.   Do you know of bodies in Israel to which the Authority owes money?

A.   All the debts in respect to Israel can be divided in two: either according to agreements, or on the basis of law suits. In general, the relations which the Authority has with Israel are according to clear agreements.

Q.   Are you familiar with the list or not?

A.   I don't know if a list even exists.

Q.   Are you familiar with the agreements that were signed between the Palestinians and Israel?

A.   Are you referring to the economic aspect?

Q.   No, in general.

A.   Yes, generally.

Q.    If I ask you about the agreements will you be able to answer?

A.    I want to remind you that I am an official in the Finance Ministry and do not deal with political matters. My knowledge is general.

Q.    The Palestinian Council ....

A.    Are you referring to the legislative council?

Q.    Yes. Do you know what Palestinian Council is?

A.    Yes.

Q.    What is the executive body of the Palestinian Council?

A.    I want to repeat my previous remarks, in general we have the Finance Ministry which is connected to the Authority, and if you have a defined question I will answer.

Q.    Is it true that the Palestinian Authority is the executive arm of the Palestinian Council?

A.    I don't know about these political issues.

Q.    In other words, in paragraph 7 of your affidavit, when you speak about the agreements, you don't know what is actually in the agreements?

**Attorney Arnon**: I request not to mislead the witness. What my colleague asked is not written. There is precise language about what he knows regarding the agreements.

Q.    In paragraph 7 you referred to the agreements. To which agreements do you refer?

A.    The things that I know, in respect to paragraph 7, is that there are agreements between the Authority and the State of Israel, and on the basis of those agreements Israel collects the taxes.

Q.    That's written, but which agreements are we talking about?

A.    At this moment I cannot answer which agreements, but I could easily obtain them. This is one of the most important provisions between Israel and the Authority in respect to financial matters. In fact, from '94, since the establishment of the Authority until the end of the 90's, the transfer of money was based on the provision that I mentioned, in a very good fashion between the sides.

Q.    You mentioned to us that the report appears on the internet?

A.    Correct.

Q.    I see that "Palestine Investment Fund" appears. What is that?

A.    A council of trustees was formed at the head of which is Dr. Salim Fayed, who is Finance Minister, whose expertise is international. He is the person responsible for this fund.

Q.    Do all these assets which you speak of belong to the fund?

A.    To the best of my knowledge, there are 79 companies and institutions, some of which are local and some of which are international, some of them are in the West Bank and some are in Jordan, Egypt and other countries, and yes, they do belong to the fund.

Q.    Where is this fund, is it a legal, or other, body?

A.    Yes, and I believe that there is information about all the financial policy and members of the administrative council most of whom are Palestinian businessmen, headed by Dr. Fayed, all of the information, in detail, is on the internet.

Q.    I asked if this fund is a legal body?

A.    Yes.

Q.    Where is located, situated?

A.    The meetings of the administrative council that took place in recent months were in Ramallah and I believe that one or two meetings took place in Jericho.

Q.    Where is this fund registered?

A.    To the best of my knowledge, in Ramallah.

Q.    I refer to exhibit 2 that was attached to your affidavit, regarding assets which are controlled or owned – do you know which assets are owned and which are controlled?

A.    Yes, all of the investments mentioned in exhibit 2, some of them are owned by the Authority, and in some of them the Authority has shares. Those owned by the Authority are under the total control of the Authority according to law, while those in which the Authority has shares, it depends on how many shares these companies have. Therefore, next to each company a percentage is listed.



Q.     Is it possible that some of these assets are registered in the name of the *Ra'is*? [Arabic term denoting leader of the PA, i.e. Mr. Arafat - *translator*]

A.     To the best of my knowledge, and according to all that has been done by Dr. Fayed, these companies are the property of the Palestinian people and not of a specific person.

Q.     When you say that you do not agree to the law suit, why do you say that?

A.     There is more than one reason but the most important is that my minister, Dr. Fayed, and the Finance Ministry, as well as the legal advisors, also do not agree to it.

Q.     I asked why you yourself do not agree?

A.     In accordance with my previous answer, and what I discussed with the lawyers and the ministry, and as an official of the ministry, I don't see a reason for the law suit.

Q.     Why?

A.     I have no further explanation beyond what I said in the paragraph.

Q.     What are the reasons?

A.     The discussion about the reasons was together with the defense lawyer.

Q.     What are the reasons that you oppose the suit?

**Attorney Arnon**: The witness does not have to relate to the entire defense brief now.

A.     What I have to say is that this law suit was rejected by the Finance Ministry, and therefore we do not accept it. If there are reasons why it should be accepted its your job to say what they are.

Q.     You don't know what they are?

A.     As far as I know, and according to my discussion with the lawyers, and according to my discussions with the Finance Ministry and the people in charge, there is no basis for the filing of the suit.

Q.     You don't know the reasons?

A.     That's all I can say.



Q.    Can the Authority provide the court with a bank guarantee from a European bank in lieu of the attachment?

A.    The Authority is a type of entity whose activity is similar to that of a state. It has monthly income, some of which comes via the State of Israel, and some by other income, and any agreements that another state can make the Authority can fulfill.

Q.    That's not what I asked, rather, can the Authority provide a bank guarantee from a European bank in place of the attachment?

A.    I don't know exactly, but there are agreements with foreign banks pursuant to which large sums are transferred to various ministries, and some of the amounts are larger, for example, than the amount of this suit. There are also agreements with a number of banks in institutions [sic -*translator*] and all of the agreements are honored and valid. The most important agreement in my opinion is Israel's collection, more than 100 million New Israeli Shekels per month, and Israel collects these amounts and transfers them to the Authority.

Q.    Do you know what a bank guarantee is?

A.    I believe I know.

Q.    Can the Authority provide a bank guarantee?

**Attorney Arnon**: In my opinion the witness gave a full answer to the question.

**Re-Direct Examination**

Q.    You said that you didn't know about the report, if the property listed in it belongs to the Palestinian Authority, and you were asked how much belongs to the Authority and how much belongs to Arafat. You answered that part of the assets belong to the people. What did you mean?

A.    I am trying to follow the path of Dr. Fayed, which is, in respect to us, that we be professionals, that we have no connection to politics, and I believe that the leader of any state, the property of that state does not belong to him.

Q.    In the registration of most of the property, of 600 million dollars ....

**Attorney Abulafia**: I object. My colleague is attempting to lead the witness.

**Attorney Arnon**: I want to know what percentage out of the six hundred million is registered in the name of the Authority and what in the name of the people.



# DECISION

**I permit the question.**

**Given this day, 8th of Adar II, 5763 (March 12, 2003).**

_____

**Miriam Mizrahi, Judge**

A.    According to what I know, all of those assets belong to the Palestine Investment Fund, the full six hundred million in its complete entirety.

Q.    You were asked whether the Authority can provide a bank guarantee to the court. Will giving a bank guarantee harm the Authority's line of credit?

A.    As far as I know, the Authority has the ability to make agreements, and it all depends on the amount of the loan.

# DECISION

**Summations by counsel for the movant within 7 days; summations by counsel for the respondents within 7 days after receipt of summations by counsel for the movant. Right of reply to counsel for the movant within 5 days.**

**The secretariat shall transfer the file to me after receipt of the parties' summations.**

**Given this day, 8th of Adar II, 5763 (March 12, 2003) in the presence of the parties.**

_____

**Miriam Mizrahi, Judge**

14



בית המשפט

בית משפט מחוזי ירושלים

בש"א 000555/03

12/03/2003

בפני: כבוד השופטת מרים מזרחי

בעניין: חכשרת הישוב חברה לביטוח בע"מ
ע"י ב"כ עו"ד ד' אבולעפיה                     המבקשת

נ ג ד

1. הרשות הפלסטינאית
2. המועצה הפלסטינאית
ע"י ב"כ עו"ד י' ארגון, ב' סלאמה, י' גרנות                     המשיבים

נוכחים: ב"כ המבקשת עו"ד אבולעפיה
ב"כ המשיבות עורכי הדין י' ארגון, ב' סלאמה, י' גרנות
מתורגמן ביהמ"ש - מר נחמיה אשר

פרוטוקול

העד, מנחנו אלב/עוננ לאחר שהוזחר והתחייב כדין
חקירה לעו"ד ארנון
ש.ת. האמור בתצחירי אמת.

חקירה נגדית
ש. אני מבין שאתה שאתה עוזר שר האוצר הפלסטיניני
ת. כן.
ש. באיזה תחום אתה משמש עוזר השר?
ת. אני עוזרו של ד"ר פיאד, אני עוזר לו במספר עניינים. מקצועי העיקרי חוא ראיית חשבון. כשיש לו צורך בעזרתי אני עוזר לו, כמו בסידור פגישות או לפעמים בדו"ח מינהלי או עניינים חשמורים למקסים, וזה תלוי לפי חדרישות שחוא מציג לי.
ש. כמה זמן אתה משמש עוזר השר?
ת. קרוב לשישה חודשים.
ש. מה עשית קודם?
ת. עבדתי בתחומים שונים בינהם עוזר של חועד חפועל לעניייני חוסח, ולגם בדברים הקשורים למוסדות שאינם רווחיים, מלב"ר, ובאיחוד האירופי.

15

**בית המשפט**

<div dir="rtl">

בית משפט מחוזי ירושלים

בפני:                 כבוד השופטת מרים מזרחי

ש. הכל מדברים כספיים?

ת. גם כספיים וגם מינהליים.

ש. כמה זמן חלף מאז השלמת את התואר בראיית חשבון?

ת. בשנת 94' קיבלתי את התעודה.

ש. האם עזרת לשר האוצר לברר מה חרמוש של חרשות הפלסטינית, ולוודא
מהו מדיניו?

ת. אם אתה מתכוון לדו"ח אז כן, כדי לברר זאת נערך הסכם עם חברה עולמית
כדי לבדוק את הדיוק של חשבונות, חהברה היא סטנדרטס אנד פורס.

ש. האם עזרת לשר האוצר לחקין את הדו"ח, לאסוף את חרישומים חשונים?

ת. חבירור ניתן בכוונה לחברת חעולמית כדי שגזרס פנימי לא יתערב בעניין
חזה.

ש. האם קראת את חתביעה ואת חבקשה לעיקולים?

ת. חוא חסביר לנו את חעניין ודנו עם עורך חדין על כך.

ש. מי חסביר לך?

ת. משרד עורך חדין.

ש. שאלתי האם קראת את כתב חתביעה ובקשת חעיקול?

ת. כן.

ש. אתח אומר בתצחירך בסעיף 4, שמחצד חכספי חתביעה מופרזת ביותר ואני
מבקש שתסביר מח מופרז בתביעה.

ת. אני איננו מסכים לתביעה שלכם.

ש. אין זו חשאלה, מח מופרז בתביעה?

ת. אני לא מסכים לגבי חתביעה מבחינה יסודית. אני לא מסכים לאף סעיף
כספי שמופע בתביעה מכיוון שבאופן יסודי איננו מסכים לח.

ש. אז זה לא שיש סכומים מופרזים בתביעה?

ת. מבלי לחבחין בין הסכומים שכתובים לבין חסיבה חעיקרית  - אני מתנגד
לכל.

ש. אני שואל על חסכומים, חאם אתח יודע על מח סכומי חתביעה?

ת. כן, לפי מח שאני זוכר מדובר על מעל 20 מיליון ש בעניין פניתיכם לפיצויים
מאיתנו.

ש. בקשר למח חתביעה?

</div>

16



בית המשפט

בשא/000585/03

12/03/2003

בפני: כבוד השופטת מרים מזרחי

ת. בקשר לחברת הביטוח, בקשר לגניבת רכבים וניסיון מצדכם לחגיש תביעה על סמך זאת.

ש. אתח יודע משחו על גניבות רכב?

ת. לא.

ש. אז מדוע אינך מסכים לתביעה?

ת. למשרד חכספים אין קשר לכל חעניינים חללו.

ש. אם אשאל אותך כמה כלי רכב גנובים חגיעו לרשות אינך יכול לענות על חשאלח?

ת. כמובן שאינני יודע.

ש. צירפת לתצחיר שלך ידיעה מעיתון גלובס (נספח א' לתצחיר), חאם אתח קורא עברית?

ת. עורך חדין חציג לי את חידיעה וחסביר לי אותה.

ש. חאם חיא נכונח?

ת. לפי מח שחבנתי חיא נכונח.

ש. אתח אומר בסעיף 14 לתצחירך, שחעיסקולים מונעים חעברת כספים למשפחות חפלסטינאיות למשכורות?

ת. אנו משרד חאוצר יש לנו סדר שחוא בנוי מסוגים שונים. יש דבר שנקרא תקציב. שני חסעיפים חחשובים ביותר בתקציב, או חמאזן, חן חחכנסות וחחוצאות. חחכנסות חשובות וכך גם חחוצאות כאשר אחד קשור בשני.

ש. חאם חעיסקולים מפריעים לשלם משכורות לעובדים?

ת. חמשכורות חאלו צריכות לצאת מחתקציב.

ש. אז לא משלמים עכשיו משכורות?

ת. משלמים.

ש. חאם אתח יודע מחן חובות חרשות חפלסטינית לאחרים?

ת. חובות למי?

ש. לכל מיני גורמים בארץ, בעולם, בפלשתין?

ת. יש באופן כללי חלוואות, לפי חסכמח של משרד חאוצר, או חלק ממנח, חמועצת חמחוקקת חסכימח לגבי חלוואות, וכל זאת קשור למאזן, חתקציב, לפי חתכנית חכספית.

ש. חאם אתח יודע למי חרשות חייבת כספים, חאם יש רשימת חובות?

17



בית המשפט

ת. הדברים האלה נמצאים בתקציב ומפורסמים באינטרנט.
ש. האם יש רשימה למי חייבים כסף?
ת. ישנם הסכמים עם כל מוסד עמו הגענו לידי הסכם.
ש. האם אתה יודע אלו חובות הרשות משולמת ואלו אינה משולמת?
ת. כל חוב שמבוסס על הסכמים וכתוב בחוב תאריכים מתי יש לשלם אותם,
ולפי אלו אחוזים, וישנם תאריכים קבועים לתשלום, לפי מה שאני יודע,
הרשות משלמת לפי התאריכים הקבועים.
ש. אתה יודע למי הרשות חייבת כספים ובמה?
ת. רוב חכספים שמגיעים אליח מגיעים כמענקים, למשל מהבנק חבינלאומי
מח שנקרא INF.
ש. חאם אתה יודע אם הרשות הפלסטינית חייבת כספים לחברת חחשמל
הישראלית?
ת. יש חסכם שיספקו חשמל לרשות, לפי ידיעתי, יש לנושא זח צד כספי
וחרשות בחתאם לחסכם צריכה לשלם כספים, ויש סכומים ששולמו ויש
סכומים שתשולמם נדחה. לפי ידיעתי, חדברים האלה נקבעים לפי שר חאנרגיה
וחאדם חאחראי בחברת חחשמל.
ש. חאם אתה יודע למי עוד חייבת הרשות בישראל?
ת. יש במח דברים שתובעים מהרשות הפלסטינית. לידיעתי, חתביעות נמצאות
בביחמ"ש וטרם ניתנו החלטות לגביהן, ועדיין נמצאות בדיון. למיטב ידיעתי
טרם חתברר שיש חובות לרשות.
ש. חאם אתה מכיר גופים בישראל לחם חייבת הרשות כספים?
ת. כל חחובות לגבי ישראל מתחלקים לשניים: או בחתאם להסכמים או
בחתאם לחגשת תביעות. באופן כללי, חקשרים שיש לרשות עם מדינת ישראל
חם בחתאם לחסכמים ברורים.
ש. חאם אתה מכיר את הרשימה? או לא?
ת. אני לא יודע אם בכלל קיימת רשימה.
ש. אתח מכיר את חחסכמים שנחתמו בין חפלסטינאים לבין ישראל?
ת. אתח מתייחס לצד חכלכלי?
ש. לא, בכלל.
ת. כן, באופן כללי.





18



**בית המשפט**

בשא/000585/05                    בית משפט מחוזי ירושלים

12/05/2005                        בפני: כבוד השופטת מרים מזרחי

ש. אם אשאל אותך אודות החסכמים תוכל לחשיב?

ת. ברצוני לחזכיר לך שאני פקיד במשרד האוצר ולא מטפל בעניינים מדיניים.
הידיעות שלי חן כלליות.

ש. חמועצה הפלסטינית...

ת. אתה מתכוון למועצה המחוקקת?

ש. כן. האם אתה יודע מחי חמועצה הפלסטינית?

ת. כן.

ש. מי חגוף חמבצע של המועצה הפלסטינית?

ת. אני רוצה לחזור על דבריי קודם, באופן כללי יש לנו את משרד האוצר שחוא
קשור לרשות, ואם יש לך שאלה מוגדרת אשיב.

ש. חאם נכון שחרשות הפלסטינית חיא חזרוע חמבצעת של חמועצה
הפלסטינית?

ת. בעניינים מדיניים אלה אינני יודע.

ש. כלומר, כשאתה מדבר בסעיף 7 בתצחירך על החסכמים אתה לא יודע מח יש
בחסכמים ממש!

**עו"ד ארנון:** אבקש שלא לחטעות את העד. מח שחברי שאל לא כתוב. יש ניסוח
מדויק מח בחסכמים חוא יודע.

ש. בסעיף 7 התייחסת לחסכמים. לאלו הסכמים אתה מפנח?

ת. חדברים שאני יודע לגבי סעיף 7 שיש חסכמים בין חרשות למדינת ישראל
ועל יסוד אותם חסכמים ישראל גובה את חמסים.

ש. זה רשום, אך באלו חסכמים מדובר?

ת. ברגע זח לא אוכל לחשיב על אלו חסכמים, אך אוכל לחשיג אותם בקלות.
זח אחד חסעיפים חחשובים ביותר בין ישראל לבין חרשות בכל חנוגע לעניינים
כספיים. למעשה, משנת 94' מאז חקמת חרשות ועד סוף שנות ח-95 חעברת
חכספים נסמכח על יסוד סעיף זח שחזכרתי, בצורה טובה מאוד בין שני
הצדדים.

ש. אמרת לנו שחדו"ח מופיע באינטרנט!

ת. נכון.

19



בית המשפט

בית משפט מחוזי ירושלים

בפני:    כבוד השופטת מרים מזרחי

ש. אני רואה שמופיע Palestine investment fund מי אלה?

ת. החברה מועצה של נאמנים וברשותה עומד ד"ר סלאם פייאד שהוא שר האוצר וחמומחיות שלו חיא בינלאומית. חוא חאישה אחראי על תקרן חזו.

ש. כל הנכסים חאלח עליחם אתח מדבר האם חינו שייכים לקרון

ת. למיטב ידיעתי, ישנם 79 חברות ומוסדות שחלקם מקומיים וחלקם בינלאומיים, חלקם בגדח חמערבית וחלקם בירדן ובמצרים ובארצות אחרות, ואכן חם שייכים לקרן.

ש. איפה חקרן חזו, האם חיא חיא גוף משפטי או אחר?

ת. כן, ואני סבור שיש גם ידיעות על כל חמדיניות חכספית וחברי חמועצה חמינחלית שדובם אנשי עסקים פלסטינייים ברשות ד"ר פייאד, כל חידיעות, ובאופן מפורט, נמצאות באינטרנט.

ש. שאלתי האם חקרן חזו חיא חיא גוף משפטי?

ת. כן.

ש. איפח חיא ממוקמת, יושבת?

ת. הפגישות של חמועצה חמינחלית שחתקיימו בחודשים חאחרונים חיו ברמאללח ואני סבור שישבח אחת או שתיים חתקיימו בירחי.

ש. חיכן רשומח חקרן חזו?

ת. למיטב ידיעתי, ברמאללה.

ש. מפנה לנספח 2 שצורף לתצחירך באשר לנכסים בשליטח או בבעלות - חאם אתח יודע אלו אלו נכסים חם בבעלות ואלו חם בשליטח?

ת. כן, כל חחשקעות חמוזכרות בנספח 2 חלקן בבעלות חרשות ובחלקן יש לרשות מניות. חחלקים שחם בבעלות חרשות נמצאים תחת שליטותח חמלאח של חרשות בחתאם לחוקים, ואילו אלו שיש לרשות מניות בחם, תלויים במספר חמניות שיש לחברות חללו. לכן, ליד כל חברח רשום אחוז.

ש. חאם יתכן שחלק מתנכסים רשומים על שם חראיס?

ת. למיטב ידיעתי, ובחתאם לכל חנעשח על ידי ד"ר פייאד, החברות חללו חן רכוש חעם חפלסטיני ולא של אדם מסוים.

ש. כשאתח אומר שאינך מסכים לתביעח מדוע אתח אומר כך?

ת. יש יותר מסיבח אחת אך חחשובח חיותר חיא שתחשר שלי ד"ר פייאד, ומשרד _ חאוצר, כמו חיועצים חמשפטיים, גם אינם מסכימים לח.

20



**בית המשפט**

בשא000585/03                          בית משפט מחוזי ירושלים
12/05/2003                    בפני:        כבוד השופטת מרים מזרחי

ש. שאלתי מדוע אתה אינך מסכים:

ת. בהתאם לתשובתי הקודמת, ובהתאם לדברים שדיברתי עם עורכי הדין
וחמשרד, ובתור פקיד במשרד, אינני רואה סיבה לתביעה.

ש. מדוע:

ת. אין לי הסבר נוסף למה שאמרתי בסעיף.

ש. מהן הסיבות:

ת. הדיון כאשר לסיבות היה ביחד עם עורך דין ההגנה.

ש. מהן חסיבות בגינן אתה מתנגד לתביעה:

**עו"ד ארנון:** חעד לא חייב להתייחס לכל כתב ההגנח עתה.

ת. מה שיש לי לומר הוא, שהתביעה הזו סורבח על ידי משרד האוצר ולכן אנו
לא מסכימים לקבל אותה. אם ישנן סיבות שצריך לקבל מ תפקידגם לומר מהן.

ש. אתה אינך יודע מהן:

ת. בהתאם לידיעתי, ובהתאם לשיחתי עם עורכי הדין, ובהתאם לשיחותיי עם
משרד האוצר והאנשים הממונים, אין יסוד להגשת התביעה.

ש. את הסיבות אינך יודע:

ת. זה כל מה שאוכל לומר.

ש. האם חרשות יכולח לחמציא לביחמ"ש במקום חעיקול ערבות בנקאית של
בנק אירופי:

ת. חרשות חיא מעין גוף שפעילותו דומה לפעילות מדינה. יש לו חבנסות
חודשיות, חלקן מגיעות באמצעות מדינת ישראל, וחלקן על ידי חבנסות אחרות
וכל הסכמים שיכולח לעשות מדינה אחרת יש לרשות יכולת לקיימם.

ש. זה לא מה ששאלתי, אלא האם חרשות יכולח לתת ערבות בנקאית של בנק
אירופי במקום חעיקול:

ת. אינני יודע בדיוק, אך ישנם חסכמים עם בנקים זרים לפיחם מוזרמים
סכומים גדולים למשרדים שונים, וחלק מחמסכומים יותר גדולים מחמסכומים
למשל של תתבועח חזו. יש גם הסכמים עם מספר בנקים במוסדות וכל
חחסכמים מכובדים וקיימים. חחסכם החשוב ביותר לפי ידיעתי חיא הגבייה
של ישראל למעלה ממאח מיליון ₪ לחודש, וישראל גובה סכומים אלח ונותנת
אותם לרשות.





21



בית המשפט

בש"א 0005585/03

12/03/2005

<u>בית משפט מחוזי ירושלים</u>

בפני:    כבוד השופטת מרים מזרחי

ש. אתה יודע מהי ערבות בנקאית?

ת. אני סבור שאני יודע.

ש. האם חרשות יכולה להעביר ערבות בנקאית?

<u>עו"ד ארנון</u>: לדעתי חעד נתן תשובה מלאה לשאלה.

<u>חקירה חוזרת</u>

ש. אמרת שאינך יודע על חדו"ח אם הרכוש בו שייך לרשות הפלסטינית, ונשאלת כמה שייך לרשות וכמה שייך לעראפת. השבת שחלק מהנכסים שייכים לעם. למה התכוונת?

ת. אני מנסה ללכת בדרכו של ד"ר פייאד שהיא ביחס אלינו שנחיה אנשים מקצועיים, שאין לנו קשר לפוליטיקה, ואני סבור שנשיא של מדינה כלשהי, חרפוש של אותה מדינה לא שייכת לו.

ש. ברישום רוב חרכוש של 600 מיליון דולר...

<u>עו"ד אפולעפסקי</u>: אני מתנגד. חברי מנסה להדריך את חעד.

<u>עו"ד ארנון</u>: אני רוצה לדעת איזה אחוז מתוך חשש מאות מיליון רשום על שם הרשות ואיזה על שם העם.

<u>החלטה</u>

מתירה את השאלה.

ניתנה היום ח' ב אדר ב, תשס"ג (12 במרץ 2003).

<u>מרים מזרחי, שופטת</u>

ת. לפי מח שאני יודע, כל הכספים חאלה שייכים לקרן החשקעית הפלסטיני, כל חשש מאות מיליון בשלמותם ובמלואם.

ש. נשאלת אם הרשות יכולה לתת ערבות בנקאית לביחמ"ש. אם יתנו ערבות בנקאית האם זה יפגע בקו חאשראי של הרשות?

ת. לפי ידיעתי, יש לרשות יכולת לעשות חסכמים וכל זה תלוי בגודל החלוואה.



22



בית המשפט

בש"א 000585/03

12/03/2003

<u>בית משפט מחוזי ירושלים</u>

בפני:    כבוד השופטת מרים מזרחי

<u>החלטה</u>

סיכומי ב"כ המבקשת תוך 7 ימים, סיכומי ב"כ המשיבות תוך 7 ימים לאחר קבלת סיכומי ב"כ המבקשת. זכות תשובה לב"כ המבקשת תוך 5 ימים.

המזכירות תעביר אליי תיק לאחר קבלת סיכומי הצדדים.

ניתנת היום ח' ב אדר ב, תשס"ג (12 במרץ 2003) במעמד הצדדים.

מרים מזרחי, שופטת