UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs.                                              C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RULE
12(b)(1) MOTION TO DISMISS THE AMENDED COMPLAINT**

## I.    INTRODUCTION

On June 13, 2003, defendants PA and PLO filed a motion to dismiss plaintiffs' Amended

Complaint (hereinafter "complaint") pursuant to Fed.R.Civ.P. 12(b)(1).[1]  Defendants' motion

seeks to dismiss this action *"for lack of subject matter jurisdiction on grounds of sovereign and*

*governmental immunity, nonjusticiability and as jurisdictionally barred by 18 U.S.C. §2337."*

Def. Memo. 1 - 2.

For the reasons stated below and in the exhibits attached hereto, defendants' motion is

groundless and should be denied.  However, plaintiffs respectfully request, for the reasons stated

in Section V below, that the disposition of the instant motion be made simultaneously with, and

not prior to, entry of final judgment in this action.

---

[1] Defendants have requested that the Court take judicial notice of various documents, as well as "historical and other facts" allegedly shown by these documents.  Plaintiffs do not object to the Court taking judicial notice of the actual existence of the documents themselves, but plaintiffs strongly dispute the "historical and other facts" which defendants claim are demonstrated by, or which may be asserted in, these documents (which include inter alia the PLO's so called "declaration of independence").  The purported factual claims, descriptions and characterizations made in many of these documents are essentially political in nature, and are certainly not a proper subject for judicial notice.

In support of this memorandum, plaintiffs submit the sworn declaration of Professor E. Morgan, attached as Exhibit A. Plaintiffs request that the Court accept Professor Morgan as an expert witness pursuant to FRE Rule 702 in regard to the matters discussed in his declaration.

## II.    DEFENDANTS' NONJUSTICIABILITY CLAIM SHOULD BE SUMMARILY DENIED AS UNARTICULATED AND PRECLUDED

Defendants cite "*nonjusticiability*" as grounds for their motion to dismiss (Def. Memo 1) but the memorandum submitted in support of their motion contains not the slightest hint of an argument in support of this claim. The "nonjusticiability" claim is therefore purely pro forma.

Moreover, this Court has already denied defendants' nonjusticiability claim in its decision of November 4, 2002. Ungar v. Palestinian Authority, 228 F. Supp.2d 40 (D.R.I. 2002). This issue is therefore settled.

Defendants' assertion (Def. Memo at 3) that the Court's justiciability holding of November 4, 2002 is not the law of the case is both wrong and - in the light of defendants' complete failure to articulate any grounds whatsoever in support of their current claim of nonjusticiability - perfectly irrelevant. Even assuming, *arguendo*, that the Court's previous decision was not a final determination, defendants have not bothered to argue their current claim or to explain why the previous decision is incorrect. Indeed, since defendants have conceded liability in this action by their intentional refusal to answer the complaint and subsequent default, nonjusticiability arguments are moot.

Thus, defendants' motion for dismissal on grounds of nonjusticiability is wholly unarticulated, settled by the Court's prior decision and moot, and should therefore be denied.

## III.    STATEHOOD AND SOVEREIGN IMMUNITY

### A.    The provisions of 18 U.S.C. §2337(2) and 28 U.S.C. §1604 provide a single defense

The PA and PLO each claim to be a foreign state, and assert that this action is therefore barred by sovereign immunity and 18 U.S.C. §2337. Def. Memo 1 - 2. Section 2337 provides in relevant part that, "*No action shall be maintained under section 2333 of this title against . . . a foreign state . . .*"

Defendants' claim to sovereign immunity necessarily invokes the Foreign Sovereign Immunity Act, 28 U.S.C. §1602 *et. seq.* ("FSIA"), since it is well-established that the "*FSIA sets forth the sole and exclusive standards to be used to resolve all sovereign immunity issues raised in federal and state courts.*" Arriba v. Petroleos Mexicanos, 962 F.2d 528, 532 (5th Cir. 1992) (internal quotations omitted). Section 1604 of the FSIA provides that "*a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.*"

While defendants style sovereign immunity and the provisions of 18 U.S.C. §2337(2) as two separate grounds to dismiss (Def. Memo. at 1-2) an examination of the language and legislative history of 18 U.S.C. §2337(2) clearly demonstrates that §2337(2) is to be read and applied *in pari materia* with 28 U.S.C. §1604. These two provisions function in tandem to provide a "foreign state" a single statutory defense against actions under 18 U.S.C. §2333.

The provision under which the current action is brought, 18 U.S.C. §2333, was originally included in the Antiterrorism Act of 1990 (ATA). The original ATA did not contain §2337, or any other provision which would limit the application of §2333 to non-state defendants only. On the contrary, the original ATA permitted civil actions against all "defendants," without

distinction.  On its face, therefore, the original ATA could have been interpreted as an implied amendment to the FSIA permitting civil actions against foreign states responsible for international terrorism.[2]

In Senate hearings on the ATA, representatives of the executive branch urged Congress to include language in the bill which would make clear that the ATA was not intended to amend the FSIA:

> As presently drafted, the bill does not precisely define those persons or entities subject to suit and may be read to include suits against foreign states and governments as well as government officials and employees.
>
> Under our Foreign Sovereign Immunities Act, 28 U.S.C. §1602 et seq. ("FSIA"), a foreign state would be immune from suit for the torts covered by this bill . . . The scope of FSIA should not be limited.[3]

Congress acceded to this request, and when the ATA was re-introduced in 1991, it included §2337.  The Senate hearings make clear that §2337 was not intended to create any new defense of immunity or expand existing immunities under the FSIA, but merely to preserve the statutory status quo by preventing any interpretation of §2333 as an implied amendment of the FSIA:

> [W]e favor adding a provision to the bill clarifying that the bill's provisions do not apply in suits against the United States, foreign States, or any officer or employee thereof.  The effect of this provision would be to maintain the status quo as regards sovereign States and their officials.  No cause of action for international terrorism exists against them.[4]

---

[2] Following the enactment of the FSIA in 1976, some question existed as to whether it was the sole statutory basis for civil actions against foreign states.  The Supreme Court settled this issue only some years later, ruling that the FSIA "*provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.*"  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989).

[3] *A New Civil Cause of Action in Federal Law for International Terrorism, 1990: Hearings on S. 2465 before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary*, 101st Cong., (1990) (Statement of Steven R. Valentine, Deputy Assistant Attorney General, Civil Division). Exhibit B.

[4] *A New Civil Cause of Action in Federal Law for International Terrorism, 1990: Hearings on S. 2465 before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary*, 101st Cong., (1990)

4

In other words, §2337(2) does no more than prevent the provisions of §2333 from derogating from the sovereign immunities granted in the FSIA.  Section 2337(2) must therefore be interpreted *in pari materia* with the FSIA, and applied in tandem with the provisions of the FSIA.  The "FSIA sets forth 'the sole and exclusive standards to be used' to resolve all sovereign immunity issues raised in federal and state courts."  Arriba v. Petroleos Mexicanos, 962 F.2d 528, 532 (5th Cir. 1992)(citing H.R.Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976), U.S. Code Cong. & Admin.News 1976, pp. 6604, 6610).  Thus, a defendant entitled to sovereign immunity under §1604 of the FSIA is immune from suit under 18 U.S.C. §2333.  Conversely, a defendant not entitled to raise the defense of sovereign immunity under the FSIA *a fortiori* cannot plead a defense under §2337(2).  This was Congress' clear intention in legislating §2337(2).

The conclusion that the definition of "foreign state" under the FSIA and §2337 are one and the same is also strongly supported by the recent decision of the Court of Appeals for the First Circuit summarily affirming this Court's Decision and Order of November 4, 2002 and Order dated April 22, 2003, denying defendants' sovereign immunity claims:

> The appellants allege an entitlement to sovereign immunity under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §1604, and the counterpart provision in the Antiterrorism Act of 1991, 18 U.S.C. §2337(2). Yet the party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state.

Ungar v. The Palestine Liberation Organization, No. 03-1544 (1st Cir. May 27, 2003), p.1 (emphasis added, internal quotations and brackets omitted).  Thus, the Court of Appeals explicitly held that 18 U.S.C. §2337(2) is the "*counterpart provision*" of 28 U.S.C. §1604 and

(Statement of Alan J. Kreczko, Deputy Legal Adviser, Department of State)(emphasis added). Exhibit C.

that a defendant claiming sovereign immunity under both provisions - such as instant defendants - must prove that "*it satisfies the FSIA's definition of a foreign state.*"

The question before the Court is therefore one: is either the PA or the PLO a "foreign state" within the meaning of the FSIA?

**B.    The criteria of statehood**

The four criteria of statehood are set out in the <u>Restatement (Third) of the Foreign Relations Law of the United States</u>:

> *§201 State Defined:*
>
> *Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities.*

These criteria are well-established. "United States courts have consistently treated the definitional criteria contained in §201 of the Restatement as authoritative or dispositive." Declaration of Professor E. Morgan ("Morgan Declaration"), Exhibit A, §21 (citing Comment (a) to Restatement §201 and cases).  Indeed, defendants explicitly cite the four criteria set forth in §201 of the Restatement as "*the controlling definition of a state.*" Def. Memo at 5.   As demonstrated below, neither the PA nor the PLO meets these criteria.

**C.    The PA does not meet the criteria of statehood**

**i) Foreign relations**

The Restatement provides that, "*a state is an entity . . . that engages in, or has the capacity to engage in, formal relations with other such entities.*" §201.  Comment (e) to §201 of the Restatement further provides that:

> *An entity is not a state unless it has <u>competence, within its own constitutional system</u>, to conduct international relations with other states, as well as the political, technical, and financial capabilities to do so.*

(emphasis added).  In other words, "*an entity that is denied the capacity to engage in foreign relations by its own 'constitutional system' is by definition not a state.*"  Morgan Declaration §24[5]

The PA was created and constituted by, and functions within the normative framework of, the provisions of two agreements between the PLO and the government of Israel, the Declaration of Principles on Interim Self-Governing Arrangements of September 13, 1993 ("DOP") and the "Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip" ("Interim Agreement" or "IA") of September 28, 1995.  Morgan Declaration §§8 - 14.[6]  True copies of the DOP and the IA and of several ancillary agreements[7] made pursuant thereto, are attached hereto as Exhibits D through K. [8]

Article 1 of the DOP provides for the establishment of an elected "Palestinian Interim Self-Government Authority" (the PA), to which would be transferred limited powers from the Israeli military government and civilian administration that have governed the West Bank and the

---

[5] Citing James Crawford, <u>The Creation of States in International Law</u>, p. 47 (1979).  Defendants also agree that this criterion requires "*engaging in foreign relations and possessing the capacity to do so . . .*" Def. Memo at 7.

[6] <u>See</u> also <u>generally</u> Geoffrey Watson, <u>The Oslo Accords: International Law and the Israeli-Palestinian Peace Agreement</u>, Oxford University Press (2000) ("Watson"), Omar M. Dajani, "Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period," 26 Denv. J. Int'l L. & Pol'y 27 (1997).

[7] These ancillary agreements are: Agreement on the Gaza Strip and the Jericho Area of May 4, 1994; Agreement on Preparatory Transfer of Powers and Responsibilities of August 29, 1994; Protocol on Further Transfer of Powers and Responsibilities of August 27, 1995; Protocol Concerning the Redeployment in Hebron of January 15, 1997; Wye River Memorandum of October 23, 1998; and the Sharm el-Sheikh Memorandum of September 4, 1999.  <u>See</u> Morgan Declaration, footnotes 5, 8.

[8] The DOP and the IA, and the minor agreements listed in the previous footnote, are commonly known, collectively, as the "Oslo Accords."

This memorandum and the attached Declaration of Professor Morgan reference the DOP, the Interim Agreement and the ancillary agreements. In light of their considerable physical bulk, plaintiffs have attached hereto a <u>single</u> copy of the instruments comprising the Oslo Accords to serve as exhibits both to this memorandum and to the Declaration.

The complete texts of the Oslo Accords are also available online at the Israeli Foreign Ministry at <www.mfa.gov.il/mfa/go.asp?MFAH00pq0>).

Gaza Strip since 1967. This arrangement is intended to remain in effect until the conclusion of negotiations on the permanent status of these areas. Id. Article V.

The general framework for limited self-government sketched in the DOP was implemented in full detail by the Interim Agreement. The Interim Agreement delineates and controls the specific scope and substance of the powers and capacities granted to the Palestinian Authority. Morgan Declaration §14.

In the words of the former legal advisor to the PLO[9], attorney Omar M. Dajani:

> The powers, structure, and jurisdiction of the PA are defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (IA), which was concluded in Washington, D.C. on September 28, 1995, pursuant to Article VII of the DOP.

Omar M. Dajani, "Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period," 26 Denv. J. Int'l L. & Pol'y 27, 61 (1997) (footnotes omitted) (hereinafter "Dajani").

Thus, "the IA and the DOP are the constituting instruments of the PA, and the provisions of these agreements delineate the powers and capacities of the PA." Morgan Declaration §25 (emphasis added).[10]

---

[9] Mr. Dajani served as legal adviser to the PLO during the 1999-2000 peace talks. See Omar Dajani, "On a Better Road This Time in the Mideast?" *Washington Post*, May 4, 2003, p. B01. Exhibit L

[10] See also Geoffrey Watson, The Oslo Accords: International Law and the Israeli-Palestinian Peace Agreement, Oxford University Press (2000):

> The Interim Agreement is a comprehensive document that today still governs virtually all aspects of the relations between Israel and the Palestinian Authority . . . for all practical purposes, the Interim Agreement is now the centerpiece of the Oslo Accords. It is the 'Basic Law' that governs the Israeli-Palestinian relationship.

Id. p. 46. (emphasis added).

Significantly, Professor Watson made this unequivocal statement long after the originally planned date for the conclusion of the interim period, i.e. May 4, 1999. Indeed, Professor Watson notes "the parties' mutual agreement to continue the [Oslo] Accords in force after 4 May, 1999 . . .. thus the Accords remain in force. Indeed, there is no

The DOP provides that the PA's territorial, functional and personal jurisdiction will be restricted to *"the agreed powers, responsibilities, spheres and authorities transferred to it,"* by Israel's military government and Civil Administration in the West Bank and Gaza Strip, and that the powers not transferred to the PA are retained by Israel.[11]

The IA fully adopts and reflects these principles of the DOP providing for the limited competence and capacity of the PA and maintaining residual Israeli authority:

> Israel shall transfer powers and responsibilities <u>as specified in this Agreement</u> from the Israeli military government and its Civil Administration to the Council[12] in accordance with this Agreement. Israel shall continue to exercise <u>powers and responsibilities not so transferred.</u>

IA Article I (emphasis added).[13]

Thus, under the DOP and the IA, which are the constituent instruments of the PA and control its capacities and functions, the PA possesses only those powers specifically transferred to it. <u>See</u> Morgan Declaration §§15 - 20, 32 – 34.

The PLO itself has expressly conceded that:

> The Palestinian Authority is a government of extremely limited jurisdiction. Its powers are strictly defined by the Interim Agreement, and all residual powers are reserved to Israel.

"Third Submission of the Palestine Liberation Organization to the Sharm El-Sheikh Fact-Finding Committee," April 3, 2001, p. 10. Exhibit M. [14]

---

reason that they cannot remain in force for a long time." <u>Id</u>. p. 249.

[11] DOP Agreed Minutes, B(IV)(2).

[12] In both the DOP and the Interim Agreement, the PA is also denominated as "the Council" or "the Palestinian Council." <u>See</u> e.g. Article I of the DOP (Exhibit D, p. 1) and Preamble to the Interim Agreement (Exhibit E, p. 1).

[13] <u>See also</u> e.g. Interim Agreement Articles I(5), XVII(1), and XVII(4)a-b.

[14] This document was formally submitted by the PLO to the Sharm el-Sheikh Fact-Finding Committee (established by President Clinton in late 2000 and also known as the "Mitchell Committee"). It is currently published online by

Among the powers <u>expressly denied</u> the PA by the provisions of both the DOP and the IA is the capacity to conduct foreign relations:

       a) Article 3(b) of Annex II of the DOP excludes the conduct of foreign relations from the powers of the Palestinian Authority;

       b) Article IX (5) of the IA, which prescribes the powers and capacities of the PA, provides:

> *In accordance with the DOP, the Council will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.*

       c) Article XVII(1)a of the IA states clearly that the jurisdiction of the PA excludes foreign relations, and that the matter of foreign relations is reserved for future negotiations on a permanent status arrangement.

Thus, the instruments which constituted the PA and control its authority and capacities, i.e. its *"constitutional system,"* Restatement §201, expressly deny the PA the capacity to engage in foreign relations. [15]

the PLO on the website of the PLO Negotiations Affairs Department: www.nadplo.org/eye/Response%20to%20Israeli%20Submission.5.pdf .

[15] The express limitation on the capacity of PA to conduct foreign relations "was the deliberate product of intensive negotiations between Israel and the PLO."  Morgan Declaration footnote 19 (citing a chief draftsman of the Oslo Accords, in Joel Singer, "Aspects of Foreign Relations Under the Israel-Palestinian Agreements On Interim Self-Government Arrangements For the West Bank and Gaza."  28 Israel Law Review Nos. 2-3 (1994), p. 283; Joel Singer, "The West Bank and Gaza Strip: Phase Two", Justice, No. 7 (1995) p. 13).

Even more significantly,

> [T]he Oslo Accords deny the PA the capacity to conduct foreign relations with the <u>specific intention</u> of preventing the PA from achieving (or claiming) state status.

<u>Id.</u> (emphasis added).

The PA's lack of capacity to conduct foreign relations has been expressly recognized by scholars of public international law such as Professor Geoffrey Watson:

> The Interim Agreement starkly forbids the PA to engage in even the most fundamental aspect of foreign relations, the establishment of diplomatic relations via embassies and consulates. This type of limitation is obviously inconsistent with the suggestion that the PA now has the 'capacity to engage in foreign relations.'

Watson, The Oslo Accords: International Law and the Israeli-Palestinian Peace Agreement, Oxford University Press (2000), p. 71 (footnote omitted) ("Watson").

Therefore, "[s]ince the PA constitutionally lacks the capacity to conduct foreign relations, it is not and cannot be a state." Morgan Declaration §27. Professor Watson has reached the identical conclusion:

> [T]he PA . . . lacks the final element of statehood, the capacity to engage in foreign relations . . .

Watson, p. 71 (emphasis added).

In conclusion, the PA does not engage in foreign relations because it lacks the constitutional capacity to engage in foreign relations, and it is therefore not a sovereign state.[16]

---

The former legal advisor to the PLO concurs with Professor Morgan:

> Through these provisions [that negate the PA's capacity to conduct foreign relations] the IA expressly disallows the PA from participating in the international process in any way that could influence its international status.

Dajani, p. 68 (emphasis added).

[16] Professor Morgan points out that,

> Since the PA lacks the capacity to conduct foreign relations, any attempt by the PA to purport to engage in foreign relations would be ultra vires its own constitutional powers . . . and would therefore be void ab initio."

Morgan Declaration, footnote 19.

However,

11

In light of the above, it is not surprising that defendants do not claim anywhere in their motion, or in the memorandum and affidavit submitted in support thereof, that the PA conducts foreign relations or that it has the capacity to do so.[17]

### ii)   Governmental control

A state must have, "*a defined territory and a permanent population, under the control of its own government* . . . " Restatement §201 (emphasis added).

In other words, "an entity which has a '*defined territory and a permanent population*' will not be defined as a state unless it *also* possesses sufficient governmental control over its territory and population." Morgan Declaration §29.  The fulfillment of this criterion "requires the exercise of sovereign control." Id. §30.  The leading treatise on this topic states,

> In fact, since its establishment, the PA has avoided engaging in foreign relations.  As noted, the parties to the Oslo Accords are Israel and the PLO. For example, Mahmoud Abbas, who serves as Secretary-General of the PLO Executive Committee as well as Head of the Negotiations Affairs Department of the PLO, negotiated and signed both the DOP and the Interim Agreement "*for the PLO*". Id., signature pages.

Id.

[17] Defendants state only that "*Palestine conducts foreign relations with other states.*"  Def. Memo at 5.  This assertion is meaningless, since "Palestine" is not a defendant in this action. The defendants here are the PA and PLO, and defendants were therefore required to assert explicitly (and of course prove) that the PA and PLO each satisfy the "foreign relations" criterion of statehood.

Moreover, it is evident that the term "Palestine" as used in defendants' memorandum, is not meant as a synonym for the PA or the PLO, but rather refers to the geographical region historically known (inter alia) as "Palestine." Thus, for example, "*Beginning at least with the Palestinian state described at length in U.N. General Assembly (GA) Resolution 181 adopted in November 29, 1947, partitioning mandated Palestine, Palestine has always had defined borders and territory . . .*" Def. Memo at 6.  Likewise, "*More than two millenniums before Palestine became the British mandate that existed when the United Nations was created, there was and has always been a permanent Palestinian population living in Palestine . . .*" Def. Memo at 7.

Since the PLO and PA were created in 1964 and 1994, respectively, and did not exist "*two millenniums*" ago, or even in 1947, the term "Palestine" obviously cannot be a synonym for either the PLO or the PA, but is used by defendants as a geographical term.  Thus, defendants' assertion that "*Palestine conducts foreign relations with other states,*" Id., says absolutely nothing about whether the PA (or the PLO) allegedly conduct foreign relations. Defendants have therefore failed to even plead compliance with this criterion.  Defendants' failure to do so is hardly surprising, since any claim that the PA purports to conduct foreign relations is clearly contradicted by, and would imply an attempt to breach, the express provisions of the IA and the DOP.

> There must . . . be a sovereign government. Sovereignty is supreme authority, which on the international plane means . . . legal authority which is not in law dependent on any other earthly authority. Sovereignty in the strict and narrowest sense of the term implies, therefore, independence all round, within and without the borders of the country.

1 Oppenheim's International Law 122, R. Jennings and A. Watts, eds., 9th ed., (1992).[18]

To satisfy this standard, a state must possess, "*the sole right of decision in all matters economic, political, financial or other.*"[19]  Or, in other words, "*a coherent system of authority regulating all aspects of life within the territory under that government's control.*"[20]

The degree of control required for statehood must absolute and not subordinate: "*the government, in exercising its power, must be capable of acting independently of foreign governments.*"[21] Moreover, "[t]*here must not be even nominal subordination to an outside governmental authority.*"[22]  The PA fails to satisfy this criterion of statehood because it enjoys only limited powers of local government which it exercises subject to numerous restrictions.

As discussed, *supra*, the DOP and IA provide that the PA's territorial, functional and personal jurisdiction are restricted to the specific powers transferred to it under the agreements, and that powers not transferred to the PA are retained by Israel's military government in the West Bank and Gaza Strip.  See Morgan Declaration §§15 - 20, 32 – 34.

Indeed, as noted, the PLO itself has conceded that:

The Palestinian Authority is a government of extremely limited jurisdiction.  Its powers are strictly defined by the Interim Agreement, and all residual powers are

---

[18] As Professor Morgan demonstrates, the authorities are unanimous on this matter. Id. §§30 - 31.

[19] Austro-German Customs Union Case, P.C.I.J. Series A/B No. 41, at 45 (1931).

[20] Nii Lante Wallace-Bruce, Claims to Statehood in International Law (1994), p. 54.

[21] Karl Doehring, "State" in: 10 Encyclopedia of Public International Law 423, 426 (R. Bernhardt, ed., 1981).

[22] Gerhard von Glahn, Law Among Nations 56 (6th ed., 1992).

reserved to Israel.

Exhibit M, p. 10.

Thus, since it is a "*government of extremely limited jurisdiction*," Id., the PA does not enjoy sovereign governmental control over any of the West Bank or Gaza, and therefore does not meet this criterion of statehood.

Moreover, under the IA, the West Bank and Gaza Strip are divided into a patchwork of non-contiguous geographical areas, and the jurisdiction of the PA is strictly defined and limited in each of these respective areas. Morgan Declaration §35. See Exhibit E, especially color "Map No. 1."

Thus, "the PA exercises its 'maximum' grant of authority under the IA only in an archipelago of jurisdictional 'islands' scattered throughout the West Bank and Gaza. In most areas of the West Bank and Gaza, the PA exercises less than its maximal authority, or none at all." Id. Exhibit E, especially color "Map No. 1."

Professor Morgan quotes at length an "up-to-date description of this jurisdictional situation," recently provided by the PLO itself:

> In the Interim Agreement, Israel and the PLO devised a system for limited Palestinian self-government during the interim period. Two key features of this system bear mentioning: First, although the Interim Agreement affirms that both sides regard the West Bank and Gaza Strip as "a single territorial unit," that "unit" is divided into a patchwork of smaller enclaves. In the West Bank, these enclaves fall into one of the following categories:
>
> Area A: (Around 17.2% of the West Bank) The Palestinian Authority has full responsibility for internal security and public order. It also has wide powers in the civil sphere.
>
> Area B: (Around 23.8% of the West Bank) The Palestinian Authority has responsibility for maintaining public order for Palestinians, as well as powers in the civil sphere like those it holds in Area A. Israel has overriding security responsibility to safeguard Israelis and combat terrorism.

14

*Area C: (Around 59% of the West Bank) Israel has full responsibility for security and public order, as well as territory-related civil matters (e.g., resource allocation and infrastructure).*

*Area H-1: (Applicable only to parts of Hebron) The Palestinian Authority has powers similar to those in Area A, with certain exceptions related to the presence of Jewish settlers in the heart of Hebron.*

*Area H-2: (Applicable only to parts of Hebron) Israel retains full responsibility for public order and internal security.  The Palestinian Authority has powers in the civil sphere, but only with respect to Palestinian residents.*

*[. . .]*

*[A]s of the completion of the second phase of Israel's further redeployment in March 2000, only Area C is contiguous; it surrounds and divides Areas A and B. Accordingly, no persons, no vehicles, and no goods can enter areas under Palestinian jurisdiction without first passing through areas under Israel's exclusive control.*

*Gaza Strip territory is divided into the following categories . . . :*

*Settlements: Israel retains exclusive authority.*

*Egyptian Border: Israel retains exclusive authority.*

*Yellow area: Israel exercises overriding security responsibility and powers. The Palestinian Authority exercises authority in the civil sphere and responsibility for public order for Palestinians in certain areas.*

*Residual Area: The Palestinian Authority has full responsibility for internal security and public order, except along lateral roads to Israeli settlements, where Israel retains the powers necessary "to conduct independent security activity." As in Area A in the West Bank, the Palestinian Authority also has wide powers in the civil sphere.*

*In addition, Israel retains responsibility for "safety and security" in the sea off the coast of the Gaza Strip and "may take any measures necessary against vessels suspected of being used for terrorist activities or for smuggling arms, ammunition, drugs, goods, or for any other illegal activity." Thus, like Areas A and B in the West Bank, the areas of the Gaza Strip under Palestinian jurisdiction are surrounded by areas under full Israeli security control.*

*Second, the territorial jurisdiction regime described above is subject to an overriding system of personal jurisdiction.  The Interim Agreement provides that "the territorial and functional jurisdiction of the [Palestinian] Council will apply to all persons, except for Israelis, unless otherwise provided in this Agreement."*

15

> *Israel maintains exclusive personal jurisdiction over Israelis in all criminal matters, even for offenses committed in areas under PA jurisdiction. Israelis, moreover, only come under the jurisdiction of Palestinian judicial authorities in civil matters when they explicitly consent in writing to that jurisdiction, when they maintain ongoing businesses in territory under Palestinian authority, or when the subject matter of the action is real property located in Palestinian territory. <u>In sum, the PA's powers extend only over the Palestinian population and other non-Israelis who are within the limited, non-contiguous areas of the Occupied Palestinian Territories that are subject to Palestinian jurisdiction.</u>*

Exhibit M,  pp. 11-13 (citations omitted, emphasis added).

This detailed description clearly demonstrates that the PA cannot even approximate the independent government control that is a <u>sine</u> <u>qua</u> <u>non</u> of statehood.

Furthermore, as detailed below, "the DOP and IA deny the PA <u>precisely those powers which are the basic indicia of a sovereign state</u> even in the areas where it exercises its maximum authority . . . " Morgan Declaration §36 (emphasis added).

For example, "one of the fundamental powers of a sovereign state, the responsibility for external security and defense, is denied the PA and expressly vested in Israel." <u>Id</u>. §37. The Interim Agreement expressly provides that:

> *Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air . . . and will have all the powers to take the steps necessary to meet this responsibility.*

<u>Id</u>. Article XII(1).[23]

Likewise, another "related prerogative of sovereignty, control over airspace,[24] is expressly

---

[23] <u>See</u> <u>also</u> Annex II of the Agreed Minutes to the DOP, which provides that "*It is understood that, subsequent to the Israeli withdrawal, Israel will continue to be responsible for external security,*" and Article VIII of the DOP, which provides that Israel remains responsible for defending against external threats.

[24] As Professor Morgan notes, it is a principle of customary international law that "*every state has complete and exclusive sovereignty over the airspace above its territory.*" <u>Id</u>. (citing Chicago Convention on International Aviation, 15 U.N.T.S. 295 (1944), §1, and <u>Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. U.S.)</u> 1986 I.C.J. 14, 111).

denied the PA." Morgan Declaration §39.  The Interim Agreement stipulates that the airspace above the PA is controlled exclusively by Israel:

> *All aviation activity or use of the airspace by any aerial vehicle in the West Bank and Gaza Strip shall require prior approval of Israel. It shall be subject to Israeli air traffic control including, inter alia, monitoring and regulation of air routes. . .*

IA, Security Annex, Article XIII(4). [25]

Similarly, in accordance with its exclusive authority over external security, Israeli retains responsibility for maritime safety and security off the Gaza Coast[26] and for security at border crossings and terminals.[27]  Israel also reserves overall authority for internal security in Area B.[28]  Morgan Declaration §40.

Moreover, "internally, even in its area of maximum authority, the PA does not have jurisdiction or authority over all persons present in its territory.  The PA has no security or law-enforcement jurisdiction whatsoever over Israeli citizens present anywhere in the territory of the PA."[29]  Furthermore, the PA has almost no civil authority over Israeli citizens, even in Area A, where it exercises its maximal authority.[30]

---

[25] See also IA Article XVII(2)(a), which provides that the territorial jurisdiction of the PA extends only to land, subsoil and territorial waters. As discussed below, the PA's authority over its territorial waters is strictly limited.

[26] IA, Security Annex, Article XIV.  Israeli vessels are also permitted to navigate freely through three maritime zones off the Gaza Coast.

[27] IA, Security Annex, Articles VIII(2)(b)(1) and VIII(2)(b)(2); Security Annex, Appendix 5, Section C(1).

[28] IA, Article XIII(2)(a); Security Annex, Article V(3).

[29] Morgan Declaration §41, citing Security Annex to the Interim Agreement: "*Israelis shall under no circumstances be apprehended or placed in custody or prison by Palestinian authorities . . . vehicles bearing Israeli license plates shall not be stopped except for identification, which shall be conducted by a joint [Israeli-Palestinian] patrol . . . Israeli military forces, and vehicles of the Israeli military forces, shall not be stopped by the Palestinian Police in any circumstances, and shall not be subject to any identification requirements.*" Article XI(4) of the Security Annex; Articles X(4), XII, XIII(2)(a) of the IA.

[30] See Morgan Declaration §41, citing Article XVII(2)(c) of the IA.  See also, the Legal Annex to the IA, Article III(2) (limiting the PA's civil jurisdiction in civil actions to which an Israeli is a party and providing when an Israeli citizen is a defendant in a civil action, the courts of the PA lack jurisdiction unless the Israeli defendant consents

As Professor Morgan notes, "Under governing principles of international law, every sovereign state has the capacity to define its own nationality rules . . . The authority over nationality, residency, and immigration is, simply put, a basic prerogative of sovereignty." Morgan Declaration §43 (citing cases).

Yet, under Article 28(11) of Appendix 1 to the Civil Annex of the IA, permanent residency in any areas of the PA may only be granted to specified categories of persons and only *"with the prior approval of Israel."* Thus, the PA lacks the legal authority to grant permanent residency status anywhere within its territory.

Similarly, persons seeking to visit areas of the West Bank and Gaza Strip under PA jurisdiction are required to obtain permission from Israel,[31] and Israel may refuse such permission to any person who is not already a legal resident of the West Bank or Gaza.[32]

Finally, and perhaps most significantly, Article XVIII(4)a of the IA provides that:

> *Legislation which exceeds the jurisdiction of the Council or which is otherwise inconsistent with the provisions of the DOP, this Agreement, or of any agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio.*

This provision "expressly restricts the <u>legislative capacity</u> of the PA [and] gives clear, frank and direct expression to the limited and non-sovereign legal capacity and status of the PA." Morgan Declaration §45.[33]

---

thereto in writing).

[31] IA, Civil Affairs Annex, Appendix 1, Article 28(13).

[32] IA, Security Annex, Article VIII(3)(f): ". . . each side will have the authority to deny the entry of persons who are not residents of the West Bank and the Gaza Strip."

[33] Morgan notes, too, <u>Id.</u>, that the agreements "also control various aspects of the PA's economy. <u>See</u> <u>e.g.</u>, in Annex V of the IA: Article III(2) and (10) (import and customs policy, restricted goods), Article III(14) (Israeli customs officials controls), Article IV(10) (Israeli Shekel set as official currency,), Article VIII (restrictions regarding transport of livestock), Article XI (restrictions on the insurance industry). These provisions are inconsistent [with]

18

There is no question therefore, in the face of the substance and extent of the limitations on its powers and authority, discussed above, that "the PA does not possess the independent control which is a *sine qua non* of statehood." Morgan Declaration §46.[34]

This analysis of the PA's limited authority has been previously presented, and the identical conclusion drawn, by Professor Watson:

> [A]t the time of the Interim Agreement, the Palestinian Authority was closer to statehood - but it was still not quite there. It was still not clear, for example, that the PA satisfied the third prong of statehood - the requirement of a government in control of its territory. It is true that the PA did at last exercise a range of governmental and quasi-governmental functions in the West Bank and Gaza Strip, but then again so did Israel. Even after the Interim Agreement, Israel retained 'residual powers' not exercised by the PA; in the words of the Agreement, 'Israel shall continue to exercise powers and responsibilities not ... transferred' to the Palestinian Legislative Council. Likewise, the Interim Agreement and other Oslo Accords assert that the 'status' of the territories 'will be preserved during the interim period.'
>
> In more concrete ways, the Gaza-Jericho Agreement and Interim Agreement ensured a continuing and important role for Israel in the 'control' of PA-administered areas. One striking example is law enforcement. The PA lacks criminal jurisdiction over offences committed in the PA's territory by Israelis. Israel retained criminal and, in many cases, civil jurisdiction over Israelis in the PA's territories; indeed, Palestinian authorities even lack the authority to 'arrest Israelis or place them in custody,' though PA police may 'detain' Israeli suspects 'in place' until Israeli police arrive. As a leading Palestinian lawyer has observed, 'the security arrangements agreed upon substantially limit the jurisdiction of the Palestinian Council in all respects including in Area A,' the area of maximal Palestinian authority. These examples can be multiplied to include Israeli authority over PA airspace and sea-lanes, Israeli regulation of safe passage between the West Bank and the Gaza Strip, and other Israeli authority over internal matters that no true state would cede to another. These

the PA exercising the control of a sovereign state."

[34] Morgan cites there "a much quoted passage" by Chief Justice John Marshall in 1812:

> The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.

The Schooner Exchange v. McFaddon, 7 Cranch 116, 11 U.S. 116 (1812).

*examples raise continued doubts about any claim that the PA satisfies the requirement that a state be in 'control' of its territory*

*[...]*

*There is one last difficulty with the claim that the PA had 'control' of territory at the time of the Interim Agreement, and that difficulty also relates to the final element of statehood, the capacity to engage in foreign relations. A government in 'control' of its territory presumably has the right to exclusive control over the borders of that territory; that was not the case with the Palestinian Authority at the time of the Interim Agreement, or today. Israel retained (and still retains) that power. That suggests not only that the PA lacks ultimate 'control' over its territory, but also that it lacks the final element of statehood, the capacity to engage in foreign relations. Such capacity presumes that most fundamental aspect of sovereignty - the ability to control one's own borders.*

Watson, pp. 69-71 (footnotes omitted).

Similarly:

*The most commonly accepted definition of statehood includes four elements: (1) a defined territory, (2) a permanent population, (3) a government in control of that territory, and (4) the capacity to engage in foreign relations. As of now elements (3) and (4) are both in doubt. As to element (3), the PA does not have unfettered control over any of its territory, even in Area A, since Israel retains responsibility for borders and external security even as to that Area. As to element (4), the PA now plainly lacks the capacity to engage in foreign relations, since the Oslo Accords forbid it to do so except for certain limited purposes.*

Watson, p. 250 (footnotes omitted).

The same conclusion has been reached by the former legal advisor to the PLO:

*[T]he interim character and extraordinarily limited powers of the PA make it impossible to characterize that body as the "effective government" of the OPT.[35] The PA's authority, after all, is conferred on it by the agreements reached between Israel and the PLO, not by international law. While an independently constituted Palestinian government conceivably could assert a legitimate claim to being the "effective government" of Palestine without having established full control over the territory it claims, the PA is not such a government.*

Dajani, p. 86.

---

[35] An acronym for "Occupied Palestinian Territories," the author's term for the West Bank and Gaza.

In conclusion then, the PA exercises only limited, municipal authority that does not meet the sovereign and independent governmental control sufficient for statehood.[36]

### iii)    Defined territory

The Restatement §201 provides that a state must have a "defined territory" under its control. As discussed, the PA does not have independent control anywhere in the West Bank or Gaza Strip. Therefore, the PA "cannot meet this criterion [of defined territory] since it does not have sovereign control over <u>any</u> area. Without any territory under its control, the PA cannot be said to have 'defined territory.'" Morgan Affidavit §51.

Omar M. Dajani, the former legal advisor to the PLO, has reached the very same conclusion:

> [T]he defined-territory criterion does not require the legal demarcation of a state's boundaries. Indeed, the international community has on several occasions extended recognition to states whose territorial borders remained in dispute. What appears central, instead, is the putative state's exercise of independent governmental authority over a territory.
>
> It is in that last respect that Palestine, as presently constituted, fails to meet the defined territory criterion . . .
>
> What is an impediment is the fact that a Palestinian government does not yet exercise independent authority over a defined territory. As discussed above, agreements between Israel and the PLO severely limit the territorial, functional, and personal jurisdiction of the PA. While the PA has significant municipal authority over areas of the OPT[37], it does not possess sovereignty over them in any

---

[36] Defendants' assertion that *"the PA and the PLO function effectively as the a [sic] Government of Palestine,"* Def. Memo at 5, is based entirely on the powers exercised by the PA under the Oslo Accords (as summarized in the affidavit submitted in support of defendants' motion). See "The Functioning Government," Def. Memo II(3). The question before the Court therefore, is not <u>which</u> powers the PA exercises – this is not in dispute -- but rather <u>whether</u> the powers exercised by the PA pursuant to the Oslo Accords fulfill this criterion of statehood. As demonstrated above, the answer to this question is, obviously, negative.

As discussed below, since the Oslo Accords did not grant the PLO direct governmental authority in the West Bank or Gaza, the conclusion that the PA lacks sovereign control applies <u>a fortiori</u> to the PLO.

[37] An acronym for "Occupied Palestinian Territories," the author's term for the West Bank and Gaza.

> *practical sense. Israel retains authority to review all legislation governing the administration of the territories, it has personal jurisdiction over all Israelis in the territories, it exercises control over most aspects of economic development and security in the territories, and it continues to regulate movement between the Palestinian administrative enclaves. As a result, <u>it cannot be said that a Palestinian government exercises independent authority over any territory at all</u>.*

Dajani, pp. 83-84 (emphasis added).

As Professor Morgan notes, Dajani's "accurate analysis and conclusion, authored following the signing of the IA, remains entirely valid today." Morgan Declaration §51.

The PA fails to meet the "defined territory" criterion for an additional reason. While this criterion can be satisfied even when the precise borders of a state have not been finally set, "nevertheless, when the doubts as to the future frontiers are of a serious nature, statehood becomes in doubt." Morgan Declaration §52[38] The Interim Agreement expressly provides that borders of the territory under the PA's jurisdiction will remain undefined until a final status agreement is achieved, and that in the meanwhile these boundaries are subject to change through future Israeli redeployments.[39] Therefore, Professor Morgan concludes, "the territory of the PA is intentionally 'defined as undefined' and cannot meet this criterion of statehood." <u>Id</u>.

In conclusion, the PA does not have a "defined territory" within the meaning of §201 of the Restatement, and is therefore not a sovereign state.[40]

---

[38] Citing H. Lauterpacht, <u>Recognition in International Law</u> p. 30 (1947) (quotation marks and brackets omitted).

[39] IA, Article XXXI(5), Article XI. See also Article V(3) of the DOP.

[40] Here, again, defendants make no express claim that the PA (or the PLO) have a defined territory. Rather, defendants claim that "*Palestine has a defined territory,*" Def. Memo at 5, and that "*Beginning at least with the Palestinian state described at length in U.N. General Assembly (GA) Resolution 181 adopted in November 29, 1947, partitioning mandated Palestine, Palestine has always had defined borders and territory . . .*" Def. Memo at 6.

Plaintiffs have not brought suit against the geographical region historically known (in 1947 and much earlier) as "Palestine," but against the legal entities known as the PLO and the PA, established circa 1964 and 1994. The question before the court is not whether a geographical region known as "Palestine" existed in 1947, or exists today,

22

### iv) Lack of a "permanent population"

Foreign states within the meaning of the FSIA are limited to entities that have a "permanent population" under their sovereign governmental control.    Restatement §201, Klinghoffer v. Palestine Liberation Organization, 937 F.2d 44, 47 (2nd Cir. 1991)

As demonstrated herein, however, the PA does not exercise effective and independent governmental control over a defined territory.  Because the PA "does not have a defined territory, it cannot have a permanent population . . . " within the meaning of the criterion set out in §201 of the Restatement.  Klinghoffer v. Palestine Liberation Organization, 937 F.2d at 47-8.

For this reason as well, the PA is not a sovereign state.[41]

### D.    The PLO does not meet the criteria of statehood

The non-state status of the PLO was settled by the United States Court of Appeals for the Second Circuit in Klinghoffer v. Palestine Liberation Organization, 937 F.2d 44 (2nd Cir. 1991).[42] "There has been no change in circumstances that would alter or affect that holding."  Morgan Declaration §54.

Indeed, as the former legal advisor to the PLO has stated, *"neither the establishment of*

---

in a "defined territory"; the question before the court is whether the PA or the PLO is a "foreign state," as claimed, and whether the PA or the PLO control a "defined territory" within the meaning of §201 of the Restatement.

[41] Defendants argue that this criterion *"is satisfied by the millions of Palestinians living in Palestine . . . "* and that *"More than two millenniums before Palestine became the British mandate that existed when the United Nations was created, there was and has always been a permanent Palestinian population living in Palestine . . . "* Def. Memo at 7.

Defendants miss the point once again. The question is not whether and for how many millennia there has been a permanent population in the geographical region known as "Palestine," but whether the PA or the PLO has a "permanent population" under its sovereign control.  Neither defendant does, because neither defendant has sovereign control anywhere.

[42] The majority of the arguments asserted in the instant motion relate to circumstances and events that preceded the decision in Klinghoffer (such as the PLO's "declaration of statehood" in 1988 and United Nations activities) and were explicitly considered and rejected in Klinghoffer v. Palestine Liberation Organization, 937 F.2d at 46 - 48. Thus, Klinghoffer settled, and therefore moots, most of the arguments asserted by defendant in the instant motion.

the 'State of Palestine' in 1988 or the PA in 1994 has altered the PLO's international role and status . . . " Dajani, p. 57.

The powers and authorities granted under the Oslo Accords were granted to the PA, not to the PLO. As discussed, *supra*, the powers exercised by the PA do not even approximate the independent control required for statehood. "Thus, even if the PLO would claim to exercise some vicarious and indirect authority in the West Bank and Gaza through its relationship with the PA, this indirect authority would necessarily be no greater than that enjoyed by the PA itself – which fails to meet the requirements of statehood." Morgan Declaration §56

Former PLO legal advisor Dajani agrees:

> Since the PLO at present exercises authority in the OPT[43] only through its relationship to the PA, its effectiveness is similarly limited. Palestine therefore lacks an effective government.

Dajani, p. 86. In other words, the PA's lack of sovereign control over any territory applies a fortiori to the PLO.

Moreover, as discussed *supra* regarding the PA, without sovereign control over any territory, the PLO also necessarily lacks a "defined territory" and a "permanent population" within the meaning of §201 of the Restatement.

Additionally, the PLO lacks the capacity to conduct foreign relations within the meaning of §201 of the Restatement. An entity's capacity to conduct foreign relations requires "*legal competence to participate in the international process and to carry its international obligations into effect on the domestic level* . . . *the foreign relations requirement is essentially a synthesis of*

---

[43] An acronym for "Occupied Palestinian Territories," the author's term for the West Bank and Gaza.

*the government and independence criteria . . . "* Dajani at 86 (footnotes omitted, emphasis added).

Yet, the PLO "lacks the legal capacity to '*carry its international obligations into effect'* in the West Bank and Gaza, since the PLO is not empowered to exercise any governmental authority in these areas." Morgan Declaration §58.

Once again, Dajani is in agreement:

> *Although the PLO has demonstrated its capacity to enter into foreign relations on behalf of the Palestinian people, the legal and functional separation of the PLO and the PA prevent the PLO from independently implementing international obligations in the territory and with regard to the population of Palestine.*

Dajani, p. 87.

This identical reasoning was employed by the Court of Appeals for the Second Circuit in Klinghoffer as the basis of its holding that the PLO does not have the capacity to engage in foreign relations:

> [D]espite the fact that some countries have 'recognized' the PLO, the PLO does not have the capacity to enter into genuine formal relations with other nations. This is true primarily because, without a defined territory under unified governmental control, the PLO lacks the ability actually to implement the obligations that normally accompany formal participation in the international community.

Klinghoffer v. Palestine Liberation Organization, 937 F.2d at 48.

The holding in Klinghoffer remains completely valid today:

> *The creation of the PA has not . . . altered the international status of the PLO or, more broadly, of Palestine . . . The legal and functional separation of the PLO and the PA erected by the DOP and subsequent agreements maintains the independence of the PLO, despite Israeli control of the OPT.[44] It also serves, however, as a barricade against changes in the status of either public body: it denies the PLO effective authority over the territory it claims for the Palestinians, and it denies the PA independence and access to the international decision-*

---

[44] An acronym for "Occupied Palestinian Territories," the author's term for the West Bank and Gaza.

*making process.*

Dajani, p. 91.

In sum then, the PLO, like the PA, does not meet the criteria of statehood under international law as set forth in the Restatement.

### E.    Conclusion

Therefore, as Professor Watson has found, "*neither the PLO nor the PA has yet acquired statehood.*"[45] This conclusion "is as correct today as it has been since the inception of both of those organizations." Morgan Declaration §60.

## IV.    DEFENDANTS HAVE WAIVED SOVEREIGN IMMUNITY CLAIMS

Defendants first attempted to raise a claim to statehood and sovereign immunity in this action in their "Motion for Leave to Assert Defenses" of January 30, 2002.    In their memorandum of opposition to the motion of January 30, 2002, plaintiffs argued, inter alia, that neither defendant was a state and that, moreover, both defendants had previously represented themselves to the Court as non-states and had thereby waived any claim to sovereign immunity pursuant to 28 U.S.C. §1605(a)(1).

As shown clearly above and in the exhibits attached hereto, neither defendant even remotely satisfies the criteria of statehood, and the Court is respectfully requested to make an affirmative finding that neither defendant fulfills these criteria.

Nevertheless, in the interest of thoroughness and in order to preserve these alternative claims, plaintiffs incorporate herein by reference the claims of waiver under 28 U.S.C. §1605(a)(1) asserted in Plaintiffs' Memorandum in Support of Their Opposition to Defendants'

---

[45] Watson, p. 68.

Motion For Leave to Assert Defenses in Support of Their Pending Motion to Dismiss, dated February 25, 2002, Exhibit N.

## V.    THE DISPOSITION OF THIS MOTION SHOULD BE INCLUDED IN THE COURT'S FINAL JUDGMENT IN THIS ACTION

Defendants' dilatory conduct has delayed this action for forty months, thereby causing a significant waste of judicial time and resources, and serious prejudice to the plaintiffs.    In order to prevent further such waste, prejudice and delay, plaintiffs respectfully request that the disposition of the instant motion be made <u>simultaneously with</u>, and not prior to, the entry of final judgment in this action requested in plaintiffs' pending motions for entry of default judgment pursuant to Fed.R.Civ.P. 37 and 55(b)(2).

Defendants' have clearly indicated that if the instant motion is denied in a separate decision issued <u>prior</u> to the entry of final judgment in this action, defendants will immediately make yet another frivolous attempt to appeal such a decision to the Court of Appeals and stay proceedings in this court, as they have done previously.    Indeed, defendants even filed a motion on July 11, 2003, the sole purpose of which is to have this Court issue a <u>separate decision</u> on defendants' latest immunity claims <u>prior</u> to the entry of final judgment in this action, rather than have the disposition of those claims included in the Court's final judgment.

Defendants' goal is obvious: if the Court issues a separate decision denying defendants' immunity claims, defendants will immediately file an appeal and a motion for a stay with the Court of Appeals, arguing that they are entitled to an interlocutory appeal by right under the "collateral order" doctrine - exactly as they did previously.    It is reasonable to assume that briefing, arguing and determining defendants' claim to a right of interlocutory appeal under the "collateral order" doctrine (a claim strongly disputed by plaintiffs) would be a lengthy and

burdensome process, and might well delay proceedings in this Court – i.e. entry of final judgment -- for an extensive period.

Defendants should not be allowed to set this scheme in motion.   This case has been pending for nearly three and one-half years.  Defendants have intentionally defaulted this action, and stonewalled and openly disobeyed this Court in an outrageous and unprecedented fashion. Entry of judgment by default is now inevitable, as defendants are well aware.   Defendants' should not be allowed to carry out a further, dilatory, last-ditch stratagem to freeze this action one inch from the finish line.

Defendants have had three and one-half years to raise a properly supported claim of sovereign immunity.  Since the outset of this action they have filed a brief specifically on the matter of personal jurisdiction,[46] as well as two previous motions to dismiss, none of which raised this claim at all.  Defendants then filed a "motion for leave" to raise claims of sovereign immunity as well as a "motion for reconsideration" asserting this claim.   When this Court rejected these claims, defendants attempted to appeal to the Court of Appeals.  Thus, defendants have had repeated opportunities before this Court, and before the Court of Appeals, to have their claims determined, reconsidered and reviewed on appeal.  There is no reason to further indulge the defendants by allowing them to artificially carve-out a further significant delay in the normal course of these proceedings, at the expense of the Court and the plaintiffs.

Defendants are certainly entitled to full appellate review of this Court's disposition of their latest attempt to claim sovereign immunity.  Defendants will have a full opportunity to

---

[46] At a hearing on September 20, 2000, the Court instructed parties to brief the issue of personal jurisdiction in this action. Since the exercise of personal jurisdiction over foreign states is controlled exclusively by the Foreign Sovereign Immunities Act, see 28 U.S.C. §1330(b), Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 485 n.5, a claim to sovereign immunity necessarily implicates the issue of personal jurisdiction. Yet, plaintiffs' memorandum on personal jurisdiction made no mention at all of this claim.

receive this appellate review: when they appeal the final judgment in this action.  Defendants will therefore suffer no prejudice whatsoever, if the Court's disposition of their sovereign immunity claims is included in a final judgment.

By contrast, allowing defendants to artificially delay the final disposition of this action by launching yet another frivolous campaign for interlocutory appellate review would be a colossal waste of judicial resources and severely prejudice the plaintiffs with further unjustified delay and expense.

Therefore, while the entry of judgment in this suit will necessarily require the Court to address the claims raised in the instant motion, the disposition of these claims may and should properly be included in, or entered simultaneously with, the Court's final judgment in this action.

## VI.    CONCLUSION

For the reasons stated above, the Court is respectfully requested to deny defendants' motion simultaneously with the entry of final judgment in this action.

Plaintiffs, by their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095  (fax)

## CERTIFICATION

I hereby certify that on the 6th day of August, 2003 I mailed a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003

Deming E. Sherman
Annemarie M. Carney
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903

T:\MISCELLANEOUS\Ungar\motions\Memo in Opposition to Rule 12(b)(1) Motion to Dismiss 8-4-03.doc

FEB 16 2003

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs.                                          C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

### PLAINTIFFS' MOTION FOR RELIEF PURSUANT TO LOCAL RULE 12(a)(2)

For the reasons presented in the accompanying memorandum in support of this motion, plaintiffs hereby move, pursuant to Local Rule 12(a)(2), for an Order,

(1) finding that plaintiffs' Motion For Judgment By Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("plaintiffs' Motion") is unopposed, deeming plaintiffs' motion granted, and entering judgment by default as requested in plaintiffs' motion; or, alternatively,

(2) instructing defendants PA and PLO to respond to plaintiffs' motion within three (3) days, and assessing reasonable expenses, including attorneys' fees, against defendants PA and PLO, for their failure to respond timely to plaintiffs' motion which failure necessitated the instant motion.

Plaintiffs, by their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095  (fax)

RECEIVED

AUG 05 2003

☐ Referred to U.S.M.J. Martin
☐ for findings & accommodations
☑ for determination
☐

Ronald R. Lagueux, Senior U.S. District Judge
Date: 8 - 5 - 0 3

DENIED.  See Order Granting Motion for
Enlargement dated 8/7/03.

David L. Martin, U.S.M.J.
August 8, 2003

DAWD L. MARTIN, U.S. MAGISTRATE JUDGE
U.S. DISTRICT COURT, DISTRICT OF RHODE ISLAND

211