UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.                                                    C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

## DECISION AND ORDER

On June 13, 2002, the Court referred plaintiffs' Motion to Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives ("Motion to Enter Default Judgment") to Magistrate Judge David L. Martin for findings and recommended disposition pursuant to 28 U.S.C. §636(b)(1)(B) and D.R.I. Local R. 32(a).

On July 3, 2003, Magistrate Judge Martin issued a Report and Recommendation on the Motion to Enter Default Judgment, recommending that default judgment against HAMAS be granted.

The statutory period provided by Fed.R.Civ.P. 72(b) and Local Rule 32(c)(2) for filing an appeal or objection to the Report and Recommendation elapsed on July 22, 2003, and no appeal or objection has been filed.

The Court will therefore adopt the Report and Recommendation issued by Magistrate Judge Martin on July 3, 2003. However, the Report and Recommendation did not specify the rate of prejudgment interest to be applied. This Court finds that the proper rate of prejudgment interest is 9% per annum. This conforms with this Court's practice of awarding 9% interest in civil rights actions. Chang v. University of Rhode Island, 606 F.Supp. 1161 (D.R.I. 1985). There

is no reason to award less to victims of terrorism than is awarded to those whose civil rights have been violated.

Plaintiffs seek entry of final judgment against HAMAS pursuant to Fed.R.Civ.P. 54(b), though their action against the other defendants in this suit is still pending.  Rule 54(b) provides that "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." A court granting a motion for entry of final judgment under Rule 54(b) against fewer than all the parties must ordinarily, "'make a brief but particularized statement of its reasons [for acting],' in order to demonstrate that the rule was being properly invoked." Feinstein v. Resolution Trust Corporation, 942 F.2d. 34, 39 (1st Cir. 1991)(citing Spiegel v. Trustees of Tufts College, 843 F.2d 38, 44 n. 5 (1st Cir. 1988)), see also Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003) (trial judge must make more than "rote recital of Rule 54(b)'s talismanic phrase").

As grounds for their motion under Rule 54(b), plaintiffs argue that entry of final judgment against HAMAS should not be delayed because the pool of assets against which plaintiffs may be able to execute their judgment is being steadily depleted. The Court finds this argument persuasive.

Plaintiffs have shown that the Department of the Treasury has issued a blocking order against assets belonging to a Texas-based organization known as the "Holy Land Foundation for Relief and Development" ("HLF"), which, the Treasury found, "acts for or on behalf of" HAMAS. Holy Land Foundation v. Ashcroft, 219 F. Supp. 2d 57, 64 (D.D.C. 2002), 333 F.3d 156 (D.C. Cir. 2003).  Specifically, the Treasury has found evidence that the HLF functions as a fund-raising agent for HAMAS in the United States. Id.

2

Plaintiffs state that they will seek to execute their judgment against HAMAS on the blocked assets of the HLF, pursuant to §201 of the Terrorism Risk Insurance Act of 2002 (Public Law 107-297; 116 Stat. 2322) ("TRIA"), which provides in relevant part that,

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Plaintiffs have presented evidence indicating that HLF is permitted by the Treasury to use and deplete these blocked assets, in order to pay their own attorneys to challenge the blocking order imposed by the United States and defend HLF in other proceedings. Therefore, plaintiffs argue, any delay in entering final judgment against HAMAS will allow further depletion of these dwindling assets, and reduce the amount available to satisfy plaintiffs' judgment against HAMAS. Such a result would defeat the clear intention of both the provision under which this action was brought (18 U.S.C. §2333), and of §201 of TRIA, to facilitate the prosecution and enforcement of actions such as this against terrorist organizations such as HAMAS.

The Court finds that plaintiffs have demonstrated a strong rationale for immediate entry of default judgment against HAMAS. While this Court expresses no position on whether plaintiffs are entitled to execute their judgment against the blocked HLF assets, plaintiffs are certainly entitled to attempt to satisfy their judgment before these assets are further depleted. This is particularly so in light of the fact that this case has been pending for some forty months.

Ensuring collection is a proper basis under Rule 54(b) for entering final judgment against a defaulting party when a non-defaulting party continues to litigate, "delay in entry of judgment [against the defaulting party] will cause an injustice to the Plaintiff because the Plaintiff may be

unable to collect . . . " <u>Storage Computer Corporation v. Worldwide Domination Corporation</u>, 208 F.R.D. 474 (D.N.H. 2002). Thus, the Court finds that there is no just reason to delay entry of judgment by default against HAMAS.

Therefore, for the reasons set forth in the Report and Recommendation issued by Magistrate Judge Martin on July 3, 2003, and above, it is hereby

ORDERED that plaintiffs' motion for entry of judgment by default against defendant HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya") is granted, and it is further

ORDERED that judgment be entered on behalf of Plaintiff, David J. Strachman, as administrator of the Estate of Yaron Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for the lost earnings of Yaron Ungar, in the amount of ONE MILLION FOUR HUNDRED THIRTY TWO THOUSAND ONE HUNDRED FIFTY EIGHT DOLLARS ($1,432,158.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, David J. Strachman, as administrator of the Estate of Yaron Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for the pain and suffering of Yaron Ungar, in the amount of ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, Dvir Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for loss of companionship, society, and guidance and mental anguish, in the amount of THIRTY MILLION DOLLARS ($30,000,000.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiffs, Meyer Ungar, Judith Ungar, Uri Dasberg and Judith Dasberg, the legal guardians of Plaintiff Dvir Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for the provision of lost parental services, in the amount of FOUR HUNDRED EIGHTY EIGHT THOUSAND FOUR HUNDRED EIGHTY TWO DOLLARS AND FIFTY CENTS ($488,482.50), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, Yishai Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for loss of companionship, society, and guidance and mental anguish, in the amount of THIRTY MILLION DOLLARS ($30,000,000.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiffs, Meyer Ungar, Judith Ungar, Uri Dasberg and Judith Dasberg, the legal guardians of Plaintiff Yishai Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for the provision of lost parental services, in the amount of FOUR HUNDRED EIGHTY EIGHT THOUSAND FOUR HUNDRED EIGHTY TWO DOLLARS AND FIFTY CENTS ($488,482.50), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, Judith Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for loss of society and companionship and mental anguish, in the amount of FIFTEEN MILLION DOLLARS ($15,000,000.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, Meyer Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-

Islamiyya"), for loss of society and companionship and mental anguish, in the amount of FIFTEEN MILLION DOLLARS ($15,000,000.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, Michal Cohen, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for loss of society and companionship and mental anguish, in the amount of SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, Amichai Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for loss of society and companionship and mental anguish, in the amount of SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000.00), and it is further

ORDERED that judgment be entered on behalf of Plaintiff, Dafna Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for loss of society and companionship and mental anguish, in the amount of SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000.00), and it is further

ORDERED that the amounts listed above shall bear prejudgment interest from June 9, 1996, at the rate of 9% for a total of SEVENTY FIVE MILLION FOURTEEN THOUSAND THIRTY-EIGHT DOLLARS ($75,014,038.00) and it is further

ORDERED that judgment be entered on behalf of Plaintiff, David J. Strachman, as administrator of the Estate of Yaron Ungar, against Defendant, HAMAS -- Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya"), for attorneys fees and costs in the amount of SIXTY SEVEN THOUSAND FIFTY EIGHT DOLLARS AND NINETY SEVEN CENTS ($67,058.97), and it is further

ORDERED, there being no just reason for delay, that the clerk enter final judgment in the amounts indicated above forthwith, and it is further

ORDERED that plaintiffs' motion for default judgment against defendants Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe is denied and that the claims against these defendants are dismissed for lack of personal jurisdiction.

SO ORDERED.

Date:_____

_____
Ronald R. Lagueux
Senior Judge
United States District Court

T:\MISCELLANEOUS\Ungar\orders\Decision and Order 8-14-03.doc

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

    vs.                         C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF FINAL
JUDGMENT AGAINST HAMAS PURSUANT TO FED.R.CIV.P. 54(b)**

**I.    BACKGROUND**

On June 13, 2002, the Court referred plaintiffs' Motion to Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives ("Motion to Enter Default Judgment") to Magistrate Judge David L. Martin for findings and recommended disposition pursuant to 28 U.S.C. §636(b)(1)(B) and D.R.I. Local Rule 32(a).

On July 3, 2003, Magistrate Judge Martin issued a Report and Recommendation on the Motion to Enter Default Judgment, recommending that default judgment against HAMAS be granted.

The statutory period provided by Fed.R.Civ.P. 72(b) and Local Rule 32(c)(2) for filing an appeal or objection to the Report and Recommendation elapsed on July 22, 2003, and no appeal or objection has been filed. Plaintiffs now seek entry of final judgment against HAMAS pursuant to Fed.R.Civ.P. 54(b).

**II.    THE STANDARD FOR ENTRY OF FINAL JUDGMENT PURSUANT TO
FED.R.CIV.P. 54(b)**

Pursuant to Rule 54(b) "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is

no just reason for delay and upon an express direction for the entry of judgment."

A court granting a motion for entry of final judgment under Rule 54(b) against fewer than all the parties must ordinarily, "'make a brief but particularized statement of its reasons [for acting],' in order to demonstrate that the rule was being properly invoked." Feinstein v. Resolution Trust Corporation, 942 F.2d 34, 39 (1st Cir. 1991)(citing Spiegel v. Trustees of Tufts College, 843 F.2d 38, 44 n. 5 (1st Cir. 1988)), see also Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003) (trial judge must make more than "rote recital of Rule 54(b)'s talismanic phrase").

### III.    THE ON-GOING DEPLETION OF LIMITED HAMAS ASSETS AVAILABLE FOR EXECUTION REQUIRES IMMEDIATE ENTRY OF FINAL JUDGMENT AGAINST HAMAS

Entry of final judgment against HAMAS is required because the limited pool of HAMAS assets against which plaintiffs can execute their judgment is being steadily depleted, as described below.

On January 23, 1995, President Clinton issued Executive Order 12,947 (60 Fed. Reg. 5079) pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §1701 *et seq.* ("IEEPA"). Executive Order 12,947 designated HAMAS as a "Specially Designated Terrorist." Executive Order 12,947 also allowed for similar designations in the future against organizations or persons found to be "owned or controlled by, or to act for or on behalf of" HAMAS. Id, see Holy Land Foundation v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002), 333 F.3d 156 (D.C. Cir. 2003).

On September 23, 2001, the President issued Executive Order 13,224 pursuant to IEEPA. (66 Fed. Reg. 49,079). Executive Order 13,224 designated HAMAS as a "Specially Designated Global Terrorist," or SDGT. Executive Order 13,224 also provided for other persons or organizations to be designated as SDGTs if found to "act for or on behalf of" HAMAS or to be

2

"owned or controlled by" HAMAS, or to "assist in, sponsor, or provide . . . support for" HAMAS

or are "otherwise associated" with HAMAS. Id.

On December 4, 2001, the Secretary of the Treasury determined that a Texas-based

organization known as the "Holy Land Foundation for Relief and Development" ("HLF") "acts

for or on behalf of" HAMAS, and designated the HLF as an SDT under Executive Order 12947

and as an SDGT under Executive Order 13224. Specifically, the Treasury found strong evidence

that HLF functions as the fund-raising arm of HAMAS in the United States. Holy Land

Foundation v. Ashcroft, 219 F. Supp. 2d 57, 64 (D.D.C. 2002).

Pursuant to these designations the Treasury issued a "Blocking Notice" freezing all of

HLF's funds, accounts and real property. Id. These assets and properties, which on information

and belief are worth several million dollars, remained blocked until today. See Holy Land

Foundation v. Ashcroft, 333 F.3d 156 (D.C. Cir. 2003).

On November 26, 2002, President Bush signed into law The Terrorism Risk Insurance

Act of 2002 (Public Law 107-297; 116 Stat. 2322) ("TRIA"). Section 201(a) of Title II of the

TRIA provides in relevant part[1] as follows:

> Notwithstanding any other provision of law . . . in every case in which a person has
> obtained a judgment against a terrorist party on a claim based upon an act of terrorism
> . . . the blocked assets of that terrorist party (including the blocked assets of any
> agency or instrumentality of that terrorist party) shall be subject to execution or
> attachment in aid of execution in order to satisfy such judgment to the extent of any
> compensatory damages for which such terrorist party has been adjudged liable.

The murder of Yaron Ungar was an "act of terrorism" as defined by TRIA[2] and HAMAS

clearly meets the definition of a "terrorist party" under TRIA.[3] Therefore, §201(a) renders all

---

[1] Section 201 of TRIA also permits execution of judgments given under 28 U.S.C. 1605(a)(7) against the assets of
foreign state-sponsors of terrorism. For the background and purpose of §201 see Hill v. Republic of Iraq, Civ.

"blocked assets" of HAMAS, as well as all "blocked assets" of any agency or instrumentality of HAMAS, subject to execution and attachment in aid of execution, in order to satisfy plaintiffs' judgment against HAMAS in this action.

The assets held by HLF and blocked by the Treasury meet the definition of "blocked assets" under TRIA.[4]

As noted, HLF functioned as the fund-raising agent for HAMAS in the United States. Holy Land Foundation v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002), 333 F.3d 156 (D.C. Cir. 2003). Therefore, most or all of the funds held by HLF and blocked by the U.S are actually assets belonging to HAMAS. Furthermore, since the HLF is an agency and instrumentality of HAMAS, its own assets (if any) are subject to attachment and execution under §201 in order to satisfy a judgment against HAMAS.

Therefore, under §201 of the TRIA, plaintiffs will be entitled to execute their judgment against HAMAS in this action against all of the HLF-HAMAS funds and assets that have been blocked by the U.S. Treasury.

---

Action No. 1:99CV03346 (TPJ) 2003 U.S. Dist. LEXIS 3725 (D.D.C. March 11, 2003).

[2] Section 201(d)(1) of TRIA provides that the term ''act of terrorism'' includes any terrorist activity as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))). The latter provision defines terrorist activity as "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following: . . . The use of any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property [or] A threat, attempt, or conspiracy to do any of the foregoing."

[3] Section 201(d)(4) of TRIA provides that the term ''terrorist party'' includes a "terrorist organization" as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi). The latter provision defines a terrorist organization as including "an organization . . . that is a group of two or more individuals, whether organized or not, which engages in" terrorist activity."

[4] Section 201(d)(2) of TRIA provides that the term "blocked asset" includes any asset blocked pursuant to IEEPA. As noted, the Executive Orders under which the HLF-held assets were blocked were issued pursuant to IEEPA.

However, these blocked HAMAS and HLF assets are being steadily depleted. Upon information and belief, HLF is permitted by the Treasury to use and deplete these blocked assets, in order to pay their own attorneys to challenge the blocking order and defend HLF against a civil action arising from its collection of funds for HAMAS:

> That [blocked] money is being used at a rapid rate to pay lawyers for the Holy Land Foundation for their work in challenging the seizure and in defending against the lawsuit I brought. If the litigation goes on long enough, all the seized funds will be spent paying for the Holy Land Foundation's lawyers.

"Testimony of Nathan Lewin", United States Senate Committee on the Judiciary (November 20, 2002) Exhibit A (emphasis added). See also 02-CV-442 Holy Land Foundation v. Ashcroft, order of July 9, 2003. Exhibit B

Thus, any delay in entering final judgment against HAMAS will allow further depletion of these dwindling assets, and reduce the amount available to satisfy plaintiffs' judgment against HAMAS. Since HAMAS is designated as a terrorist organization, it is extremely unlikely that HAMAS will bring new assets into the United States. The blocked HLF-HAMAS assets may well be plaintiffs' sole source to satisfy their judgment. When these assets are fully depleted, which appears inevitable, plaintiffs' judgment against HAMAS most likely will become a dead letter. Such a result would defeat the clear intention of both the provision under which this action was brought (18 U.S.C. §2333) and of §201 of TRIA to facilitate the prosecution and enforcement of actions such as this against terrorist organizations such as HAMAS.

Ensuring collection is a proper basis under Rule 54(b) for entering final judgment against a defaulting party when a non-defaulting party continues to litigate, "delay in entry of judgment [against the defaulting party] will cause an injustice to the Plaintiff because the Plaintiff may be

unable to collect . . . " <u>Storage Computer Corporation v. Worldwide Domination Corporation</u>, 208 F.R.D. 474 (D.N.H. 2002).

The Court is therefore respectfully requested to enter default judgment against HAMAS as recommended by Magistrate Judge Martin, with the addition of prejudgment interest as detailed below.

## IV.    PREJUDGMENT INTEREST

Magistrate Judge Martin recommended an award of prejudgment interest.  On July 10, 2003, during a hearing on related matters, Judge Lagueux noted that the Report and Recommendation did not contain a reference to the source of law for that ruling.  (Tr. July 30, 2003 p. 21) Judge Lagueux suggested that the plaintiffs provide the court with an analysis of both the legal basis for awarding prejudgment interest and the appropriate rate of interest. Plaintiffs' analysis follows.

### A.    Rationale for prejudgment interest

It has been widely acknowledged that prejudgment interest is appropriate in federal tort actions,

> Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress.

21A Fed. Proc. L.Ed. §51:82.

> The absence of a federal statute governing the award of prejudgment interest in federal court litigation does not indicate a legislative determination that prejudgment interest should not be awarded; rather, it merely indicates that the question is governed by traditional judge-made principles.  The federal common law rule governing the interest to be recovered as damages for delayed payment of contractual obligation to the United States is not controlled by state statute or local common law.  In the absence of a controlling statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of

damages, expressed in terms of interest, for nonpayment of the amount found to be due.

21A Fed. Proc. L.Ed. §51:86, see also 45 Am Jur 2d §56.

The Court of Appeals for the First Circuit has stated that in federal question cases prejudgment interest may be imposed by the trial court. <u>Cottrill v. Sparrow, Johnson & Ursillo</u>, 100 F.3d 220 (1st Cir. 1996). Prejudgment interest is routinely awarded in a variety of federal statutory actions including those brought under ERISA (<u>Id</u>.), the Security and Exchange Act of 1934 (<u>Holmes v. Bateson</u>, 434 F.Supp. 1365 (D.R.I. 1977), aff'd in part 583 F.2d 542 (1st Cir. 1978)), admiralty cases (<u>CEH, Inc. v. F/V Seafarer</u>, 880 F.Supp. 940 (D.R.I. 1995)), the bankruptcy code (<u>In Re Roco Corp.</u>, 37 B.R. 770 (Bkrtcy D.R.I. 1984)), civil rights actions brought under Title VII (<u>U.S. v. Rhode Island Dept. of Employment</u>, 619 F.Supp. 509 (D.R.I. 1985)), the Age Discrimination in Employment Act (<u>Powers v. Grinnell Corp.</u>, 915 F.2d 34 (1st Cir. 1990)), and §1983 actions (<u>Brule v. Southworth.</u>, 552 F.Supp. 1157 (D.R.I.1982), <u>Conetta v. National Hair Care Centers, Inc.</u>,236 F.3d 67 (1st Cir. 2001)).

Therefore it is entirely appropriate to award prejudgment interest in this action brought under 18 U.S.C. §2333. As indicated below, the legislative history and purpose of this unique statute clearly suggest that the maximum amount of damages be awarded, and prejudgment interest is an integral part of making the plaintiffs whole.

**B.    Rate of prejudgment interest**

The First Circuit has indicated that,

As a general rule, federal law governs the scope of remedies available when a claim arises under a federal statute, and this doctrine extends to the rate of prejudgment interest. *See Colon Velez v. Puerto Rico Marine Mgmt., Inc.,* 957 F.2d 933, 941 (1st Cir. 1992). Of course, if the particular federal statute is silent, courts have discretion to select an appropriate rate, and they may look to outside sources, including state law, for guidance. *See id.* Because ERISA is inscrutable

7

on the subject, a court that elects to award prejudgment interest in an ERISA case has broad discretion in choosing a rate. *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 983-85 (5th Cir. 1991). In such a situation, equitable considerations should guide the exercise of judicial discretion. *See, e.g., Kinek v. Paramount Communications, Inc.*, 22 F.3d 503, 514 (2d Cir. 1994); *Anthuis*, 971 F.2d at 1009.

The appellant insists that the lower court departed from "clear federal appellate court precedent" favoring the use of state prejudgment interest rates in ERISA cases. He is wrong. Although federal courts sometimes have looked to state rates for guidance, *see, e.g., Hansen*, 940 F.2d at 983-84, they have done so as a matter not of compulsion, but of discretion. Indeed, the appellant's argument conveniently overlooks numerous ERISA cases in which federal appellate and district courts have approved use of the federal statutory rate for prejudgment interest. *See, e.g. Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1331 (8th Cir. 1995); *Sweet*, 913 F.2d at 270; *Blanton v. Anzalone*, 760 F.2d 989, 992-93 (9th Cir. 1985); *United States v. Mason Tenders Dist. Council*, 909 F.Supp. 891, 895 (S.D.N.Y. 1995).

We need not tarry. The law confers discretion on the trial judge, not on the court of appeals. In this instance the judge chose to use the federal statutory rate in computing prejudgment interest. Utilizing this rate promoted uniformity in ERISA cases. Furthermore, the federal rate is an objective measure of the value of money over time, and the record makes manifest that, in selecting it, the district judge considered both the rationale of full compensation and ERISa's underlying goals. We note, too, that the federal rate is especially appropriate in this case because the Plan's funds were initially invested in Treasury bills. *See, e.g., Algie*, 891 F.Supp. at 899 (finding the feral rate appropriate when it more closely approximated the likely return on the funds withheld). Mindful of these realties, we do not think that equity demands the use of a higher rate.

<u>Cottrill v. Sparrow, Johnson & Ursillo</u>, 100 F.3d 220, 224-225 (1st Cir. 1996). Accordingly, this Court has broad discretion to award an equitable rate of interest. see also <u>Brule v. Southworth</u>, 552 F.Supp. 1157,1170 (D.R.I.1982). ("The selection of an interest rate is nothing more than a subjective determination by the Court.")

In exercising its discretion, the Court has several options from which to chose. At the high end, the Court may look to Rhode Island law and its current statutory rate of 12% contained in R.I.G.L.§9-21-10. In the past, this Court has utilized the Rhode Island statute in federal

question cases (albeit when the rate was lower), i.e. Donovan v. Freeway Const. Co., 551 F.Supp. 869 (D.R.I. 1982), Holmes v. Bateson, 434 F.Supp. 1365 (D.R.I. 1977), aff'd in part 583 F.2d 542 (1st Cir. 1978).  The Court is clearly within its discretion to choose this rate.  Colon Velez v. Puerto Rico Marin Management, 957 F.2d 933 (1st Cir. 1992) (district court could utilize Puerto Rico law in awarding 12% prejudgment interest under the Labor Management Relations Act).

At the low end, the Court could choose to utilize the federal post judgment interest rate statute 28 U.S.C. §1961 as a guide.  This statute provides that the post judgment interest rate is,

> calculated   . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment.

28 U.S.C. 1961(a).  However in virtually all reported federal question cases in this jurisdiction, the court has not chosen the federal post judgment interest rate as a guide in exercising its discretion in awarding prejudgment interest.

Plaintiffs respectfully suggest that the Court award prejudgment interest of 9%.[5]  This is more than reasonable in light of this Court's longstanding practice of awarding 9% interest in civil rights actions. Chang v. University of Rhode Island, 606 F.Supp. 1161 (D.R.I. 1985).  There is no reason to award less to victims of terrorism (including in this case two orphans), than is awarded those whose civil rights have been violated.

Moreover, the legislative history of §2333 suggests that the Court should not look to minimize an award of interest but rather should make an award of prejudgment interest that comports with the intended purpose of the statute.  The only Circuit Court to construe §2333

---

[5] This is slightly higher than the 6-8% rates awarded for damages sustained in the early 90s.  For instance in CEH, Inc. v. F/V Seafarer, 880 F.Supp.940 (D.R.I. 1995) the court awarded 6% because "it is a rough approximation of the prevailing average rate from 1992 to the present." Similarly in Showalter v. Allison Reed Group, Inc., 767 F.Supp. 1205 (D.R.I. 1991) the court followed the 8% prejudgment award in Conway v. Electro Switch Corp., 825 F.2d 593, 602 (1st Cir. 1987).

found that its purpose is to exact the full measure of damages and penalties against the defendants such as HAMAS, "[The Antiterrorism Act] evidences an intent by Congress to . . . extend civil liability for acts of international terrorism to the full reaches of traditional tort law." <u>Boim v. Quranic Literacy Institute & Holy Land Foundation for Relief & Development</u>, 291 F.3d 1000, 1010 (7th Cir. 2002).

Thus, choosing a rate of prejudgment interest that is at least as high as that imposed in more common federal questions cases is consistent with the comprehensive purpose of 18 U.S.C. §2333. Magistrate Judge Martin, in discussing the appropriate measure of damages to be awarded under 18 U.S.C. §2333, found that "the legislative history indicates that the ATA was to be construed broadly." Report and Recommendation, July 3, 2003 p. 39 (citing Senator Grassley's statement that "it empowers victims with all the weapons available in civil litigation."). Magistrate Judge Martin noted that "The deterrent effect of the legislation will be maximized if it is interpreted to subject terrorists to the broadest range of damages." <u>Id</u>. p. 42. Choosing an interest rate lower than in other federal subject matter cases would undermine this purpose of the statute.

Therefore, Plaintiffs respectfully suggest that the Court award prejudgment interest of $75,014,038 to the plaintiffs calculated at follows:

    - Damages of $116,409,123.00 at 9% = $10,476,821 yearly prejudgment interest

    - June 9, 1996 through August 9, 2003 = 7.16 years x $10,476,821 = $75,014,038

## V.     CONCLUSION

In order to permit plaintiffs to execute their judgment before HAMAS' assets are further, or entirely, depleted, plaintiffs respectfully request that this Court:

(1) grant plaintiffs' motion to enter default judgment against HAMAS,

(2) affirm and adopt the Report and Recommendation of Magistrate Judge David L. Martin of July 3, 2003,

(3) make an express determination that, for the reasons stated above, there is no just reason for delaying entry of final judgment, and

(4) direct the Clerk to enter final judgment consistent with the Report and Recommendation with the addition of prejudgment interest of $75,014,038.

Plaintiffs, by their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095  (fax)

## CERTIFICATION

I hereby certify that on the _18__ day of August, 2003 I mailed a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003   via fax

Deming E. Sherman
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903   via fax

HAMAS
Mohammed Abdul Hamid Khilil Solah
9229 South Thomas
Bridgeview, Illinois 60455

Sheik Ahmed Yassin
Sabra District
Gaza, Palestinian Authority
VIA Israel

Hamas – Islamic Resistance Movement
Harakat Al-Muqawama Al-Islamiyya
Yarmouk Refugee Camp
Damascus
Syria

T:\MISCELLANEOUS\Ungar\motions\Memo in Support of Mot for Entry of FJ Pursuant to 54(b) 8-13-03.doc

**United States Senate**
# Committee on the Judiciary

Committee Information ▾  Go

HOME > HEARINGS > "AN ASSESSMENT OF THE TOOLS NEEDED TO FIGHT THE FINANCING OF TERRORISM "

Testimony of
**Mr. Nathan Lewin**

Lewin & Lewin, LLP

 PRINTABLE
VERSION

November 20, 2002

My name is Nathan Lewin. I am a lawyer in private practice in Washington, D.C., in a family law firm called Lewin & Lewin LLP that I operate with my daughter, Alyza Lewin. I was a prosecutor with the Department of Justice and practice white-collar criminal defense law and appellate litigation. I have represented former President Richard Nixon and Attorney General Ed Meese, have argued 27 cases in the Supreme Court of the United States, and have taught at Harvard, University of Chicago, Georgetown, Columbia and George Washington University Law Schools.

I am gratified to have received your invitation to testify on "An Assessment of the Tools Needed to Fight the Financing of Terrorism" because I believe I have discovered the cheapest means, from the perspective of the American taxpayer, to fight the financing of terrorism from sources within the United States. The principal tool for this battle is, I believe, America's private litigators – lawyers who are ready to bring private lawsuits against private organizations and individuals who provide funds to organizations that engage in terrorist acts abroad or in the United States.

I speak from personal experience. Sometime in 1997, when I was visiting the State of Israel, as I frequently do, I was introduced to Joyce and Stanley Boim, the parents of David Boim, a young man who was killed by Hamas terrorists in May 1996 when he was only 17 years old. David, who was born in the United States to American parents, was standing at a bus stop near the school he attended when a car drove past and shot randomly at passengers boarding a bus and others standing nearby.

The killers were two members of Hamas, the organization that immediately took credit for the attack. One of the killers went on to be a suicide bomber in September 1997 in the heart of Jerusalem, when he killed 7 others (including a young girl who was an American citizen) and wounded 192 (including several young American students). The second –the driver of the car– is named Amjad Hinawi. He confessed when he was finally brought to trial in a court of the Palestinian Authority in early 1997. An American State Department representative, Mr. Abdelnour Zaibeck, witnessed the confession. Hinawi received a slap on the wrist from the Palestinian court. Although he was found guilty and sentenced to 10 years of prison at hard labor, he has been seen walking around free in Palestinian territory. I testified about this outrage and the inexplicable failure of the Department of Justice to indict Hinawi and seek his extradition before Senator Specter on March 25, 1999. Absolutely no progress has been made since that time. There is no reason in the world why a confessed murderer of an American student shot in cold blood while waiting at a bus stop has not been criminally charged by American authorities and brought to trial in an American court.

The Boims asked me whether they had any remedy at all under American law. I did what too few lawyers do today and looked at the books. I found that in 1991 and 1992 Congress had passed anti-terrorism laws, including what is now 18 U.S.C. § 2333, that gave American-citizen victims of such terror anywhere in the world a civil remedy, with treble damages and attorneys'fees, against those who commit murder or assault.

Obviously, Hinawi has no funds that can be reached for a judgment, should the Boims involve that statute. And his confederate killed himself and 7 others in a later suicide bombing. Against whom can such a statute be used?

Over initial objections from my then-partners, I drafted and filed a lawsuit against those who enabled the perpetrators to kill David Boim – the organizations in the United States that collected funds and provided other support for Hamas in the years preceding May 1996. I was challenged by partners, friends and other lawyers, who wanted to know why I was suing the leading Muslim

charity in the United States – the Holy Land Foundation for Relief and Development– and others that were engaged in purportedly "charitable" activities in the Middle East. I responded that the defendants in my case – none of whom are foreign governments or government agencies– knew that they were also funding violence by Hamas directed against civilians.

I sued in federal district court in Chicago in the Northern District of Illinois because the United States had seized $1.4 million in a civil forfeiture action based on allegations of money-laundering on behalf of Hamas. I hoped that the Boims– who are victims of Hamas terrorism – would be able to reach those funds. Our complaint was filed on May 12, 2000. On January 11, 2001, District Judge George Lindberg denied motions by the Holy Land Foundation and other defendants to dismiss the complaint. I agreed to the defendants' request for an interlocutory appeal to the Court of Appeals for the Seventh Circuit because I believed it important that the litigation's deterrence to contributions for terrorism receive great prominence.

Briefs were filed and the case was set to be argued on September 25, 2001. And then came September 11. The judges on the Court of Appeals, realizing the importance of the issues they were being asked to decide, asked the Department of Justice to file a friend-of-the-court brief. We argued the case on September 25, and in November 2001, the Department of Justice filed its brief supporting my argument that any organization that contributes to a terrorist organization with knowledge that it engages in terrorism is an aider-and-abettor of the terrorism and liable for damages. The Court of Appeals accepted that argument in a landmark decision issued on June 5, 2002. It is called Boim v. Quranic Literacy Institute and is reported at 291 F.3d 1000. The Holy Land Foundation did not seek Supreme Court review, and we are now engaged in the discovery process.

We are fortunate to have the volunteer assistance of the firm of Wildman Harold Allen & Dixon of Chicago – and specifically Stephen Landes and Richard Hoffman of that firm– in this time-intensive discovery stage. If not, we would not be able to continue with this exceedingly important lawsuit. And this brings me to my recommendations for legislative amendments that are essential to make this deterrent to the funding of terrorism work.

First, although 18 U.S.C. § 2333 provides for very substantial damage awards– treble damages and attorneys' fees – it does nothing to enable lawyers to pursue the litigation prior to a final judgment. I, and the firms I have been with since I began this project, have invested approximately one million dollars of attorneys' time in this case. Although $1.4 million of seized funds is sitting in the Clerk's office in the federal court in Chicago, we have received not one penny for the heretofore successful prosecution of this action. The law should provide that if a plaintiff is successful in defeating a motion to dismiss, he automatically recovers attorneys' fees and out-of-pocket expenses from the defendants. That will enable private attorneys general– such as I am in this case – to continue to prosecute these cases to a successful conclusion. Otherwise, well-financed defendants can exhaust a plaintiff's lawyer with all the preliminary skirmishes that have marked this case.

Second, funds that have been seized by the United States from defendants in these cases should be made available for the payment of plaintiffs' attorneys' fees whenever the plaintiffs have prevailed at the pretrial stages. I felt vindicated when, on December 4, 2001, President Bush, Attorney General Ashcroft and Treasury Secretary O'Neill held a joint news conference to announce that the United States Government was seizing the assets of the Holy Land Foundation. President Bush stated, "Money raised by the Holy Land Foundation is used by Hamas to support schools and indoctrinate children to grow up into suicide bombers. Money raised by the Holy Land Foundation is also used by Hamas to recruit suicide bombers and to support their families. . . . [T]he terrorists benefit from the Holy Land Foundation." As a result of that action, approximately seven million dollars were seized and are now being held by the Office of Foreign Assets Control ("OFAC") of the United States Treasury.

That money is being used at a rapid rate to pay lawyers for the Holy Land Foundation for their work in challenging the seizure and in defending against the lawsuit I brought. If the litigation goes on long enough, all the seized funds will be spent paying for the Holy Land Foundation's lawyers. They have just lost their challenge to the seizure in a decision by a liberal Clinton-appointee judge in the District of Columbia. Judge Gladys Kessler held:

[T]he administrative record contains ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leaders; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas.

The Holy Land Foundation lawyers are being paid top dollar from seized assets to make this unsuccessful defense. The lawyers for victims of terrorism are required to do their work pro bono publico. That is not justice.

Third, the law should more clearly authorize and require the federal government to cooperate with private attorneys general bringing lawsuits against the funders of terrorism. Prosecutors are loath to share their information with private attorneys, as we found in the initial stages of our lawsuit. Restrictions on statutes and court rules often prohibit such cooperation. The law should be amended to authorize and direct disclosure of grand jury and other investigative materials to private attorneys on application to a federal court. If, in a proceeding initiated on notice to the United States (but not to the defendant), a party establishes that evidence or other information in the possession of the United States would assist the prosecution of a civil lawsuit brought on behalf of American victims of terrorist acts, federal prosecutors should be directed and/or authorized to disclose such information to attorneys for the plaintiffs pursuant to a federal court order.

Fourth, the laws should be amended to provide explicitly the causes of action that we have established in our litigation. Section 2333 should state explicitly that any person or organization that knowingly provides material support or resources to an organization that engages in terrorist activities is an aider-and-abettor who is liable for the damages provided in the statute. Although we have not yet sued any individual contributor, it is important that the deterrent to funding terrorism be equally effective with regard to individuals as it now is with regard to charitable organizations.

Fifth, the statute of limitations – which is now four years – should be extended to 10 years. Funders of terrorism frequently operate in secrecy and their identity is not known until long after they have paid those who commit murder and other forms of violence. The current fouryear statute provides only a short window of opportunity.

In addition, the limitations period should be extended for any new defendant whose involvement is first revealed in the course of discovery. If a plaintiff learns of the participation of an individual or entity that has successfully concealed its role, the plaintiff should have one year after that disclosure to add it as a party defendant.

There are, of course, other amendments that could usefully be made to existing law. These are just several that have occurred to me since your invitation to testify. I would, of course, be happy to work with the Committee staff to make the needed statutory improvements.

Thank you again for the opportunity to testify.



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HOLY LAND FOUNDATION FOR         )
    RELIEF AND DEVELOPMENT       )
                                 )
          Plaintiff,             )
                                 )
          v.                     )    Civil Action No. 02-442 (GK)
                                 )
JOHN ASHCROFT, in his            )    **FILED**
    official capacity as         )
    Attorney General of the      )    JUL 0 9 2003
    United States, et al.        )
                                 )    NANCY MAYER WHITTINGTON, CLERK
          Defendants.            )         U.S. DISTRICT COURT
                                 )

## ORDER

Following the status conference held on July 9, 2003, it is this 9th day of July 2003, hereby

ORDERED, that the proceedings in the above-captioned case shall be stayed pending exhaustion of Plaintiff's appeals. Plaintiff shall notify the Court if it does not file a certiorari petition to the U.S. Supreme Court; it is further

ORDERED, that, no later than July 23, 2003, Defendants' counsel shall file a Praecipe advising the Court of when OFAC has indicated it will submit overdue payments to Plaintiff's counsel.

                              Gladys Kessler
                              United States District Judge