# Palestinian National Authority Official Website
## International Relations

EMBASSIES, MISSIONS, GENERAL AND SPECIAL DELEGATIONS OF PALESTINE ABROAD*

## ALBANIA

**Embassy of Palestine**
Ambassador Ali Al-Kurdi
Address: Street "Skenderbeu"
No. 6.1.1.
Tirana, Albania
Tel: 35542-34300/ 34056
Fax: 35542-32092

## ALGERIA

**Embassy of Palestine**
Ambassador Munzer Al-Dajani
Address: P.O. Box 308
15 Blvd Victor Hugo
Algiers, Algeria
Tel: 2132-718857
Fax: 2132-732165

## ANGOLA

**Embassy of Palestine**
Ambassador Said Abbassi
Address: P.O. Box 421
Luanda/Angola-Rua da Liberdade 108 Bro.NelitoSoares-Vila Alice
Tel: 00244-2-362233
Fax:00244-2-363855
E-mail: palango@netangola.com

## ARGENTINA

**Diplomatic mission of Palestine**
Ambassador Suhail Akel
Address: Riobamba 981
(1116) Buenos Aires, Argentina
Tel: 0054-11-4816-6651
Fax: 0054-11-4816-6652
Mobile: 0054-11-4401-2340

## AUSTRALIA

**General Palestinian Delegation**
Ambassador Ali Kazak

EMBASSIES, MISSIONS AND SPECIAL DELEGATIONS

Address: 19 Carnegie Cres
Narrabundah ACT 2603
P.O. Box 4646
Kingston ACT 2604, Australia
Tel: 612-62950222
Fax: 612-62950021

*The List does not include non-resident representation

## AUSTRIA

**Permanent Mission of Palestine**
Ambassador Faisal Awaideh
Address: Josefsgasse5, A-1080
Vienna, Austria
Tel: 00431-4088202/3
Fax:00431-4088119
E-mail: polvienna@netway.at

## BAHRAIN

**Embassy of Palestine**
Ambassador Wafa Nabhan
Address: P.O. Box 1102
Manama, Bahrain
Tel: 973-276099
Fax: 973-276054

## BANGALDESH

**Embassy of Palestine**
Ambassador Mohammad Zo'rob
Address: P.O. Box 600 Code 1000
Dacca, Bangladesh
Tel: 8802-603308 / 603016
Fax: 8802-883517

## BELGUIM

**Palestinian General Delegation**
Ambassador Shawqi Armali
Address: 111 Rue Franklin
1040 Brussels, Belguim
Tel: 322-7352478 / 7351639
Fax: 322-7352478

## BRAZIL

**Palestinian Special Delegation**
Ambassador Moussa M. Odeh
Address: Shis Qi 09 Conj
06 Casa 02-Lago Sul
72650-060 Brasilia-DF

or

P.O. Box 1055Zip Code #: 71620-980
Lago Sul Brasilia, DF, Brazil
Tel: 00551461-2484482
Fax: 00551461-2485879
e-mail: Palestine@tba.com.br

## BULGARIA

**Embassy of Palestine**
Dr. Mohammed Salaymeh, Charge d'Affaires
Address: P.O. Box 87
Sofia, Bulgaria
Tel: 3592-668947 / 668860
Fax: 3592-9632571

## CANADA

**Palestinian General Delegation**
Ambassador Baker Abdel Munem
Address: 45 Country Club Drive
Ottawa, Ontario KIV 9WI Canada
Tel:1613-7360053
Fax:1613-7360535
http://www.cyberus.ca/~baker/gdpc.htm

## CHILE

**Embassy of the Representation of Palestine**
Ambassador Hussain Abdel Khaleq
Address: Casilla postal 53170
Santiago-1, Chile
email: Falestin@entelchile.net

Tel: 562-2065771/ 2065764
Fax: 562-2282466

## CHINA

**Embassy of Palestine**
Ambassador Mostafa Al-Safarini
Address: P.O. Box 9006
Beijing, China
Tel: 861-5323316/ 5323327
Fax: 861-5323241

## COLOMBIA

**Special Mission of Palestine**
Ambassador Ibrahim Al-Zeben
Address: Calle 45 No. 14-76
Santafe de Bogota, Colombia

EMBASSIES, MISSIONS AND SPECIAL DELEGATIONS

Tel: 571-2877691/ 2877904
Fax: 571-2887439
E-mail:jerusalen@telesat.com.co

## CUBA

**Embassy of Palestine**
Ambassador Imad Jada
Address: Calle 20 No. 714 e/ 7ma
Y.9 na Miramar Ciudad de La Habana, Cuba
Area Code: 00537
Chancellery: 24-2556/ 24-1296
Ambassador's office:24-8851
Fax:       24-1159
Residence:24-1114
E-mail: emb.pal@ip.etecsa.cu

## CYPRUS

**Embassy of Palestine**
Ambassador Samir Abu Ghazaleh
Address: P.O. Box 4669
Nicosia, Cyprus
Tel: 3572-315010/ 11
Fax: 3572-494694/ 312301
E-mail: palestin@spidernet.com.cy

## CZECH REPUBLIC

**Embassy of Palestine**
Ambassador Samih Abed Al-Fatah
Charge'd Altaires:Jamal Al-Jamal.
Address: EMBASSY OF THE STATE OF PALESTINE
PRAGUE 7-TROJA,NA KAZANCE 634/7
APARMENT, NO 16
CZECH REPUBLIC
Tel: 00420-2-3122281
Fax: 00420-2-4311133
Embassy Home Phone:00420-2-8544227
Charge'd Altaires Home Phone:00420-2-7940792.
Charge'd Altaires  mobile:00420-602168456

## DENMARK

**Palestinian General Delegation**
Ambassador Dr. Mohammad Abu-Koash
Address: Ehlersvej 5
2900 Hellerup
Copenhagen, Denmark
Tel: 004520729729
Fax:00453-9614207
E-mail: palestine@post12.tele.dk

## EGYPT

**Embassy of Palestine**
Ambassador Zuhdi Al-Kidra
Address: 33 Al-Nahda Street, Dokki
Cairo, Egypt
Tel: 202-3384762/3
Fax: 202-3384760/4

## ETHIOPIA

**Embassy of Palestine**
Ambassador Yousef Rajab Radii
Address: P.O. Box 5800
Addis Ababa, Ethiopia
Tel: 2511-610811/ 610672
Fax: 2511-611199
e-mail: pal.emb.et@telecom.net.et

## FINLAND

**Palestinian General Delegation**
Ambassador Zuheir El-Wazer
Address: Fredrikinkatu 25 A10
Helsinki 00120, Finland
or P.O. Box 351
Helsinki 00121, Finland
Tel: 3589-2789771
Fax: 3589-2789770
E-mail: pgd@palestineegd.fi
http://www.palestinegd.fi

## FRANCE

**General Delegation of Palestine**
Ambassador Leila Shahid
Address: 14, Rue de Commandant Leandri
75015, Paris, France
Tel: 00331-48286600
Fax: 00331- 48285067

## GABON

**Embassy of Palestine**
Ambassador Amin Abu Hasira
Address: P.O. Box 2168
Libreville, Gabon
Tel: 241-746012
Fax: 241-746014

## GHANA

**Embassy of Palestine**

Ambassador Ibrahim Omar Khalil
Address: P.O. Box 1728 OSU
Accra, Ghana
Tel: 23321-772529 / 228578
Fax: 23321-772528

## GERMANY

**Palestinian General Delegation**
Ambassador Abdallah Ifrenji
Address: August Bier str. 33
3500 Bonn 1, Germany
Tel: 004922-8212035 / 8224650
Fax: 004922-28213594

## GREECE

**Diplomatic Representation of Palestine**
Ambassador Abdallah Abdallah
Address: 31 Marathonodromon str.
154 52 Psychico
Athens, Greece
Tel: 0030-6726062-3
Fax: 301-6726064
E-mail: falastin@hellasnet.gr

## GUINEA

**Embassy of Palestine**
Ambassador Jamal Ghonaim
Address: P.O. Box 1021
Conakry, Guinea
Tel: 224-441132 / 413034
Fax: 224-412230

## GUINEA BISSAU

**Embassy of Palestine**
Ambassador Nabil Al-Wazir
Address: P.O. Box 888
Bissau, Guinea Bissau
Tel: 245-215091/212710
Fax: 245-252650

## HUNGARY

**Embassy of Palestine**
Mr. Khaled Ghazal, Charge d'Affaires
Address: P.O. Box 213
11, Jizsefhegyi
UT 28-30 G/11/6 1025
Budapest, Hungary
Tel: 361-1804518
Fax: 361-1290357
E-mail: elian@freemail.hu

EMBASSIES, MISSIONS AND SPECIAL DELEGATIONS

## INDIA

**Embassy of Palestine**
Ambassador Khaled Al-Shaikh
Address: D1/27 Vasantihar
New Delhi 110057, India
Tel: 9111-6146605/4679115/4676605
Fax: 9111-6142942/6872943

## INDONESIA

**Embassy of Palestine**
Ambassador Ribhi Awad
Address: JL Diponegoro No. 59
Jakarta 10310, Indonesia
Tel: 6221-3108005/3105444
Fax: 6221-3108011

## IRAN

**Embassy of Palestine**
Ambassador Salah Al-Zawawi
Address: P.O. Box 1455-3455
Tehran, Iran
Tel: 9821-664501
Fax: 9821-6402513
E-mail Address:plo@neda.net

## IRAQ

**Embassy of Palestine**
Ambassador Azzam Al Ahmad
Address: P.O. Box 3122
Baghdad, Iraq
Tel: 9641-7180209
Fax: 9641-7181143

## ITALY

**Palestinian General Delegation**
Ambassador Mr. Nimer Hammad
Address: Piazza San Giovanni
In Laterano, 72
Rome, Italy 00184
Tel: 003906-7005041/7008791
Fax: 003906-7005115

## JORDAN

**Embassy of Palestine**
Ambassador Omar Al-Khatib
Address: P.O. Box 995757
Amman, Jordan

Tel: 9626-5677517
Fax: 9626-5661727

## KAZAKHSTAN

**Embassy of Palestine**
Ambassador: Mohammad Tarshahani
Address: Kasteeva St. 38
Almaty 480100, Kazakhstan
Tel & Fax: 007327-2-919501

Mobile:0073007220596

## KOREA, Democratic People's Republic

**Embassy of Palestine**
Ambassador Shaher M. Abdallah
Address: P.O. Box 24
Pyong Yang, D.P.R Korea
Tel: 8502-3817465
Fax: 8502-3817259

## KUWAIT

**Embassy of Palestine**
Ambassador: _____
Address: P.O. Box 5363, Al-Safat
Kuwait, Kuwait

## LEBANON

**Palestine Liberation Organization Office**
Ambassador Shafiq Al Hoot
Address: Kurnish Al Mazraa', Al Mazraa'
Beirut, Lebanon

## LIBYA

**Embassy of Palestine**
Ambassador Ali Mohammad Mostafa
Address: P.O. Box 2466
Tripoli, Libya
Tel: 21821-4443935
Fax: 21821-3336161

## MALAYSIA

**Embassy of Palestine**
Ambassador Ahmad Al-Farra
Address: P.O. Box 10554-50716
65, Jalan U. Thant
55000, Kuala Lumpur, Malaysia
Tel: 603-4568905/6
Fax: 603-4561411

EMBASSIES, MISSIONS AND SPECIAL DELEGATIONS

## MALI

**Embassy of Palestine**
Ambassador Ahmad Abdel Rahim
Address: P.O. Box 1951
Bamaco, Mali
Tel: 223-225328
Fax: 223-226462

## MAURITANIA

**Embassy of Palestine**
Ambassador Abdel Shafi Siyam
Address: P.O. Box 408
Nouakchott, Mauritania
Tel: 2222-51343/ 52394
Fax: 2222-53888

## MEXICO

**Special Delegation of Palestine**
Ambassador Fawzi Al-Mashni
Address: Lope de Vega 146 5
Piso col. Polanco Apdo. Postal 5-045
C.P. 11570, D.F. Mexico
Tel: 525-255-2904
Fax: 525-531-3821
e-mail: dpalestina@tichet.com.MX

## MOROCCO

**Embassy of Palestine**
Ambassador Wajih Qasem
Address: P.O. Box: 387
4 Zanket Soussa
Rabat, Morocco
Tel: 2127-767331/ 766008
Fax: 2127-767166

## MOZAMBIQUE

**Embassy of Palestine**
Ambassador Majed Wadi
Address: P.O. Box 1160
Maboto, Mozambique
Tel: 2581-742196
Fax: 2581-492190

## NETHERLANDS

**Palestinian General Delegation**
Ambassador Yousef Al-Habbab
Address: Laan Copes Van Cattenburch 73

2585 EW,The Hague, Netherlands
Tel:3170-3604864
Fax:3170-3657847
E-mail:pgd@wxs.nl

## NICARAGUA

**Embassy of Palestine**
Ambassador George Salamah
Address: P.O. Box 5305
Las Colinas-Calle Las Flores # 136
Managua, Nicaragua
Tel: 5052-651916 -762388
Fax: 5052-650589
e-mail: embpal@ns.tmx.com.ni

## NIGERIA

**Embassy of Palestine**
Ambassador Samir Baker
Address: P.O. Box 7891
12 Festival Road, Victoria Island
Lagos, Nigeria
Tel: 2341-617259
Fax: 2341-618776

## NORWAY

**Palestinian General Delegation**
Ambassador Omar Kittmitto
Address: Drammensveien 104, 0273
Oslo, Norway
Tel: 0047-22560547
Fax: 0047-22731579
E-mail: mkplo@online.no

## OMAN

**Embassy of Palestine**
Ambassador Awni Battash
Mascat, Oman

Tel:00968-697191/697230

Fax: 00968-697251

## PAKISTAN

**Embassy of Palestine**
Ambassador Ahmad Abdel Razzak
Address: No. 486
Islamabad, Pakistan
Tel: 9251-291231/ 291185
Fax: 9251-294703

## PERU

**Special Representation of the Palestine Liberation Organization**
Mr. Walid Ibrahim Al-Mua'qat, Charge d' Affaires
Address: Av.Arequipa 4130 Of. 306
Miraflores
Lima 18/ Peru
Tel: 5114-221-4241
Fax: 5114-221-4240
e-mail: Palpera@telematic.com.pe

## POLAND

**Embassy of Palestine**
Mr. Hafez Al-Nimer, Charge d'Affaires
Address: ul. Staroscinska 1m7
P.O. Box 475
Warsaw, Poland
Tel: 004822-8492122
Fax: 004822-8489005

## PORTUGAL

**General Delegation of Palestine**
Ambassador Issam Bseisso
Address: Rue 22 no. 2
Bairro de Belem
Apartado, 50027
1400-383 Lisbon, Portugal
Tel: 00351-213621098
Fax: 00351-213621095
E-mail address: palestinaport@mail.telepac.pt

## CZECH REPUBLIC

**Embassy of Palestine**
Ambassador Samih Abed Al-Fatah
Charge'd Altaires:Jamal Al-Jamal.
Address: EMBASSY OF THE STATE OF PALESTINE
PRAGUE 7-TROJA,NA KAZANCE 634/7
APARMENT, NO 16
CZECH REPUBLIC
Tel: 00420-2-3122281
Fax: 00420-2-4311133
Embassy Home Phone:00420-2-8544227
Charge'd Altaires Home Phone:00420-2-7940792.
Charge'd Altaires  mobile:00420-602168456

## QATAR

**Embassy of Palestine**

Ambassador Yassin Al-Sharif
Address: P.O. Box 138 Al-Khalij Street
Doha, Qatar
Tel: 974-422530/ 31
Fax: 974-327639
E-mail:palembs@qatar.net.qa

## ROMANIA

**Embassy of Palestine**
Ambassador Fouad Al-Bitar
Address: P.O. Box 314
Bucharest, Romania
Tel: 401-613 3621
Fax: 401-315 2467
Email: al_bitar@cable.ro

## RUSSIAN FEDERATION

**Embassy of Palestine**
Ambassador Khairy Abdel Fattah
Address: Kropotkinsky per 26
Moscow 119034, Russian Federation
Tel: 7095-2013682/ 2022654
Fax: 7095-2302083
E-mail: pna@elenet.msk.ru

## SAUDI ARABIA

**Emba ssy of Palestine**
Ambassador Mostafa Hashem Al-Sheikh Deeb
Address: P.O. Box 3589
Riyadh- Saudi Arabia 11481
Tel: 9661-4880738/ 9
Fax: 9661-4880721

## SENEGAL

**Embassy of Palestine**
Ambassador Sa'id Al-Abbassy
Address: P.O. Box 3169
Dakar, Senegal
Tel: 221-841377
Fax: 221-241377

## SOUTH AFRICA

**Embassy of Palestine**
Ambassador Salman Al-Herfy
Address: P.O. Box 56021 Arcadia
Pretoria 0007, South Africa
Tel: 2712-3430668/ 3426411
Fax: 2712-3433458

## SPAIN

**General Delegation of Palestine**
Ambassador Nabil Ma'rouf
Address: Avda. Pio XII no.20
28016 Madrid, Spain
Tel: 003491_3453266
Fax: 003491_3454287
e-mail: embagoda.palestine@mad.servicom.es

## SRI LANKA

**Embassy of Palestine**
Ambassador Attalah Qobai'a
Address: P.O. Box 207
110/10 Wejerama NW
Colombo 7, Sri Lanka
Tel: 9411-695991/ 588607
Fax: 9411-6959920 / 588580

## SUDAN

**Embassy of Palestine**
Ambassador Omar Shalayel
Address: P.O. Box 2262
Khartoum, Sudan
Tel: 24911-225475/ 6
Fax: 24911-224974/ 224968

## SWEDEN

**Palestinian General Delegation**
Ambassador Eugene Makhlouf
Address: Radmansgatan 48
113 57 Stockholm,Swnden
Tel: 468151588
Fax: 468151528
E-mail: plo.sweden@swipnet.se

## SWITZERLAND

**General Delegation of Palestine**
Ambassador Nabil Al-Ramalawi
Address: 96 Route de Vernier
Case Postal 1828-1211
Geneva 1, Switzerland
Tel: 004122-7967660
Fax:004122-7967860
mission-observer.palestine@itu.ch

## SYRIA

**Embassy of Palestine**
Ambassador Mahmoud Al-Khalidi
Address: P.O. Box 2889

EMBASSIES, MISSIONS AND SPECIAL DELEGATIONS                    Page 14 of 17

Damascus, Syria
Tel: 96311-4450688
Fax: 96311-444352

## TANZANIA

**Embassy of Palestine**
Ambassador Fariz Mehdawi
Address: P.O. Box 20307
Dar-es Salaam, Tanzania
Tel: 255-22254
Fax: 255-68409

## TUNISIA

**Embassy of Palestine**
Mr. Mounir Ghannam, Charge d'Affaires
Address: 17 Rue ErnestConseil
1002 Tunis, P.O. Box 142
Tunis, Tunisia
Tel: 2161-784725
Fax: 2161-782533

## TURKEY

**Embassy of Palestine**
Ambassador Fouad Yassin
Address:  Palestine Embassy
Filistin Sok No. 45
06700 G.O.Pasa,.
Turkey-Ankara
Tel: 0090312-4360823-4
 Fax:0090312-4377801
Tel (Home):00903124460398
Mobile: 00905326625100
E_mail Embassy: embapal@ttnet.net.tr
E_mail: Embassador: fouadyasien@hotmail.com

## UNITED ARAB EMIRATES

**Embassy of Palestine**
Ambassador Khaled Malak
Address: P.O. Box 841
Abu Dhabi, United Arab Emirates
Tel: 9712-434652
Fax: 9712-434363

## UNITED KINGDOM

**Palestinian General Delegation**
Ambassador Afif Safieh
Address: 5 Galena Road, Hammersmith,
London, W60LT United Kingdom
Tel: 44181-3703244-5
Fax: 44181-5630058

e-mail: 106323.3367@compserve.com

## UNITED STATES OF AMERICA

**Palestine Liberation Organization Office**
Ambassador Hasan Abdel Rahman
Address: 1730 K Street NW # 1004
Washington D.C. 20006, U.S.A
Tel: 1202-785-8394 Fax: 1202-887-5337
e-mail: SH.9950@aol .com

## UZBEKISTAN

**Embassy of Palestine**
Ambassador Nabil Lahham
Address: Imam At-Termezi Street
The House Number 50
The Index: 700100, Tashkent, Uzbekistan
Tel: 7-3712-531017 / 549418 / 550266
Fax: 7-3712-531017

## VIETNAM

**Embassy of Palestine**
Ambassador Sayyed Al-Masri
Address: P.O. Box 73
Hanoi, Vietnam
Tel: 844-8524013/ 253016
Fax: 844-8263696/ 8263699

## YEMEN

**Embassy of Palestine**
Ambassador Yehya Rabbah
Address: P.O. Box 185
Sanaa, Yemen
Tel: 9672-64234/ 9671-264237/3/4
Fax: 9672-64236/ 9671-264235

## YUGOSLAVIA

**Embassy of Palestine**
Ambassador:
Address: Maglajska 14
Belgrade 11000, Yugoslavia
Tel: 38111-663372/ 66391
Fax: 38111-663830
E-mail: embpal@eunet.yu

## ZIMBABWE

**Embassy of Palestine**

Ambassador Ali Halimeh
Address: P.O. Box 3817
1 Fairbridge Avenue Belgravia
Harare, Zimbabwe
Tel: 2634-725901/ 2
Fax: 2634-725970

## MISSIONS TO INTERNATIONAL AND REGIONAL ORGANIZATIONS

### LEAGUE OF ARAB STATES

**Permanent Mission of Palestine**
Ambassador Mohammad Sbieh
Address: 33 Al-Nahda Street, Dokki
Cairo, Egypt
Tel: 202-3609873/ 3602997/8
Fax: 202-3602996

### UNITED NATIONS

**Permanent Observer Mission of Palestine**
Ambassador Nasser Al-Kidwa
Address: 115 East 65th Street
New York, N.Y. 10021, U.S.A.
Tel: 1212-288-8500
Fax: 1212-517-2377
e-mail: mission@palestine-un.org

### UNITED NATIONS OFFICE IN GENEVA

**Permanent Observer Mission of Palestine**
Ambassador Nabil Al-Ramlawi
Address: 96 route de Vernier
Case postale 1828-1211
Geneva 1, Switzerland
Tel: 5122-7967660
Fax: 5122-7967860

### UNITED NATIONS OFFICE AND INTERNATIONAL ORGANIZATIONS IN VIENNA

**Permanent Mission of Palestine**
Ambassador Faisal Awaideh
Address: Josefgasse 5,
A-1080 Vienna, Austria
Tel: 431-4088202 / 3
Fax: 431-4088117

### UNESCO

**Permanent Observer Mission of Palestine** Ambassador Ahmad Abdel Razeq
Address: 1, Rue Miollis 75015
Paris, France

Case 1:00-cv-00105-L-DLM   Document 225-1   Filed 08/22/03   Page 18 of 53 PageID #: 12891

Tel: 331- 45683328
Fax: 331- 45683340

| Front Page | Back to Index |
| --- | --- |

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THE ESTATE OF YARON UNGAR et al.   :      C.A. No. 00 - 105L
v.                                  :
THE PALESTINIAN AUTHORITY et al.   :     **DECLARATION OF**
                                     :     **ED MORGAN**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ED MORGAN, of the City of Toronto, in the Province of Ontario, Canada, DECLARES PURSUANT TO 28 U.S.C. §1746, AS FOLLOWS:

## I.   PROFESSIONAL BACKGROUND

1.     I am a tenured associate professor at the University of Toronto, Faculty of Law, and a barrister in the Province of Ontario. I have a B.A. (Northwestern, 1976), an LL.B (Toronto, 1984) and an LL.M. (Harvard, 1986). I clerked for Justice Bertha Wilson of the Supreme Court of Canada in 1984 - 85, and started teaching in 1986. I was called to the Bar of Ontario in 1988.

2.     My research and teaching fields include Public International Law, Private International Law (Conflict of Laws), International Criminal Law, and Constitutional Law. I have written *International Law and the Canadian Courts* (Toronto: Carswell, 1990) and over 30 law journal articles, reviews, case comments and other pieces pertaining to international law and issues in transnational and multi-jurisdictional litigation.

3.     I have served as a guest editor of the *Canadian Journal of Law and Jurisprudence,* 2002 and the *Leiden Journal of International Law*, 2003/4 on special editions devoted to international law. Currently, I am a member of the Board of Editors of the *Canadian Yearbook of International Law*.

4.     I have appeared as counsel in numerous international law cases at all levels of the Ontario and Canadian federal courts. I have also appeared in the Inter-American Court of Human Rights. I was the successful counsel in Canada's now leading sovereign immunity case, *Schreiber v. Federal Republic of Germany*, representing Germany in three levels of Canadian courts up to and including the Supreme Court. In addition, I have filed expert opinions on matters of public international law and private international law in the Ontario Superior Court as well as in various courts in the United States, including the U.S. District Court for the Southern District of New York, the U.S. District Court for the Eastern District of New York, the U.S. District Court for Minnesota, and the Superior Court of California.

5.     A true copy of my resume is annexed hereto as Exhibit "A".

6.     This affidavit is submitted to provide the Court with facts, evidence, and my opinion as an expert, concerning the legal status of the Palestinian Authority and the Palestine Liberation Organization and the question of whether these bodies fulfill the criteria of statehood under international law.

7.     My knowledge of the criteria of statehood and the status of the Palestine Liberation Organization and the Palestinian Authority as presented herein is based on my professional research and publishing in the field of international law over the course of many years, my study of the legal and historical

documents and facts concerning the origins, capacities and functions of the Palestine Liberation Organization and the Palestinian Authority, the series of agreements negotiated between Israel and the Palestine Liberation Organization during past decade (collectively known as the "Oslo Accords") and the professional and academic literature thereon, and a familiarity with the historic and political facts germane to this assessment.

## II.    ORIGINS OF THE PALESTINIAN AUTHORITY

8.    On September 13, 1993, the Palestine Liberation Organization (PLO)[1] and the government of Israel signed a Declaration of Principles on Interim Self-Governing Arrangements (DOP)[2] that established a framework for limited Palestinian self-government in the West Bank and Gaza Strip during an interim period, pending resolution of the permanent status of these areas.

9.    As indicated by its title, the DOP is not a comprehensive final agreement, but rather a statement of basic principles and undertakings by the parties, that leaves the full details of those basic principles and undertakings to be determined in future agreements.

10.    Thus, in the DOP the parties agreed generally that an elected "Palestinian Interim Self-Government Authority" (PA) would be established[3] to serve (as its name indicates) as a self-governing

---

[1] The PLO was established in 1964 as the national liberation organization of the Palestinian Arabs. See, Palestinian National Covenant, in: Leila S. Kadi, ed., Basic Political Documents of the Armed Palestinian Resistance Movement (Pal. Research Center: Beirut, 1969), article 26 ("The Palestinian Liberation Organization, representative of the Palestinian revolutionary forces, is responsible for the Palestinian Arab people's movement in its struggle – to retrieve its homeland …").

[2] 32 I.L.M 1525 (1993).

[3] DOP, Article I.

authority in areas of the West Bank and Gaza Strip pending the outcome of negotiations to determine the final status of those areas, that Israeli military forces would withdraw and/or redeploy from parts of the West Bank and Gaza, and that the PA would exercise certain powers and responsibilities transferred to it from the Israeli military government and civil administration in these areas.

11.    The DOP anticipated that the parties would negotiate and reach additional agreements in the future regarding the details and implementation of these general undertakings, culminating in an overall "Interim Agreement",[4] that would determine and control the structure and composition of the PA and the extent of the powers and authority to be transferred to it, as well all other issues relevant to the "interim period".

12.    Accordingly (after executing several prefatory agreements),[5] on September 28, 1995, Israel and the PLO signed the "Israeli-Palestinian Interim Agreement On the West Bank and the Gaza Strip" (IA).[6]

---

[4] Id., Article VII.

[5] The DOP provided that as an initial stage, pending the completion of the Interim Agreement, Israeli military forces would withdraw from the city of Jericho and part of the Gaza Strip, and transfer the powers and authority exercised by Israel in those areas in the spheres of education and culture, health, social welfare, direct taxation, and tourism. On May 4, 1994, Israel and the PLO signed the "Agreement On the Gaza Strip and the Jericho Area", which delineated precisely the areas from which Israeli military forces were to withdraw in the Jericho and Gaza regions and further detailed the powers to be initially transferred from the Israeli military and civil administration to the Palestinian Authority. On August 29, 1994, Israel and the PLO signed the "Agreement On Preparatory Transfer of Powers and Responsibilities". This agreement further detailed the modalities, logistics and timing of the initial transfer of the spheres of authority from the Israeli military and civil administration to the Palestinian Authority. On August 27, 1995, Israel and the PLO executed the "Protocol On Further Transfer of Powers and Responsibilities", which, as its name suggests, provided for authority in several more civil spheres to be transferred to the Palestinian Authority. As noted, infra, these prefatory agreements were supplanted by the Interim Agreement.

[6] 36 I.L.M. 551.

13.    The IA implements and fulfills in detail the general principles and undertakings agreed upon in the DOP. The IA therefore expressly supplants the earlier prefatory agreements reached pursuant to the DOP (but not the DOP itself).[7]

14.    The IA contains detailed provisions controlling the establishment of the PA and the scope and extent of its legal capacity, powers and authority. It thus serves as the constituting instrument of the PA.[8] Since the IA was executed and the PA established as the consummation of the DOP, the DOP is also properly viewed as a constituting instrument of the PA.[9]

## III.    LEGAL STATUS OF THE PA

### a) The PA Is an Entity of Limited Capacity and Authority

---

[7] Interim Agreement, Preamble.

[8] The parties subsequently executed three minor agreements regarding the details and timing of Israeli redeployments provided for in the Interim Agreement. These are: the Protocol Concerning the Redeployment in Hebron, January 15, 1997, 36 I.L.M. 650 (1997);  the Wye River Memorandum, October 23, 1998, 37 I.L.M. 1251; and the Sharm el-Sheikh Memorandum, September 4, 1999, available online at the Israeli Foreign Ministry website: www.mfa.gov.il.

These later agreements implement and elaborate, rather than modify, the IA, and do not alter or detract from the provisions of the IA regarding the capacities and authority of the PA, or the status of the IA as the constituent instrument of the PA.  As one scholar has noted:

> The Interim Agreement is a comprehensive document that today still governs virtually all aspects of the relations between Israel and the Palestinian Authority ... for all practical purposes, the Interim Agreement is now the centrepiece of the Oslo Accords. It is the 'Basic Law' that governs the Israeli-Palestinian relationship.

> Geoffrey Watson, The Oslo Accords: International Law and the Israeli-Palestinian Peace Agreement, Oxford University Press (2000), p. 46.

[9] The DOP and the IA, and the minor agreements which preceded and followed the IA, are commonly known, collectively, as the "Oslo Accords".

15.    Even a cursory reading of the basic provisions of the DOP and IA discloses that the PA is, and was intended to be, an entity of limited capacity and authority, that does not possess the attributes of sovereignty.

16.    The DOP specifically restricts the Palestinian Authority's jurisdiction to only "the agreed powers, responsibilities, spheres and authorities transferred to it."[10]  Moreover, the Agreed Minutes to the DOP provide that "the withdrawal of the military government will not prevent Israel from exercising the powers and responsibilities not transferred to the Council."[11]

17.    Likewise, under the IA, the PA was granted only those limited "powers and responsibilities as specified", while "Israel shall continue to exercise powers and responsibilities not so transferred."[12]

18.    Accordingly, the PA was created under the IA to administer local government but was not constituted as the sovereign power in the territories which it administers. The IA is, as its very name suggests, a temporary arrangement, and does not reflect either an attainment of sovereignty by the PA or a transfer of sovereignty to it; rather, it specifies that it is signed without prejudice to "the outcome of the negotiations on the permanent status to be conducted pursuant to the DOP."[13] Likewise, the full formal

---

[10] DOP, Article IV.

[11] DOP, Article VII(5). In both the DOP and the IA, the PA is also referred to as "the Council" or "the Palestinian Council." See e.g. Article I of the DOP and the Preamble to the IA.

[12] IA, Article I(1).

[13] IA, Article XXXI(6).

name of the PA, the "Palestinian Interim Self-Government Authority,"[14] indicates explicitly that the PA

is a temporary body, constituted to exercise local self-government.

19.     The former legal advisor to the PLO[15], attorney Omar M. Dajani, has accurately described the

limited capacity, status and purpose of the PA, and its non-sovereign nature:

> *The powers, structure, and jurisdiction of the PA are defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (IA), which was concluded in Washington, D.C. on September 28, 1995, pursuant to Article VII of the DOP. The Interim Agreement, as its name suggests, is a self-consciously temporary arrangement. While it governs the administration of portions of the OPT [Occupied Palestinian Territories] during "the transitional period," the Agreement is purposefully vague about both to what and from what the parties are making a transition. It makes no fundamental changes to the legal status of the OPT and, indeed, explicitly limits its effect to the interim period. The OPT, therefore, remain under Israeli occupation, even if Palestinians are now afforded a broader role in their administration. Accordingly, the authority of the Palestinian governing institutions established by the DOP is entirely local in character.*

> Omar M. Dajani, "Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period", 26 Denv. J. Int'l L. & Pol'y 27, 61 (1997) (emphasis added, footnotes omitted) (hereinafter "Dajani").

20.     As discussed below, Dajani's characterization was accurate when published in 1997, and remains

so today.

### b) The PA Does Not Meet the Criteria of Statehood

---

[14] See DOP Article I; IA, Preamble.

[15] Mr. Dajani served as legal adviser to the PLO during the 1999-2000 peace talks. See Omar Dajani, "On a Better Road This Time in the Mideast?", Washington Post, May 4, 2003, p. B01.

Similarly, Professor Adrien K. Wing, a former legal consultant to the PA, has opined that the PA "*is still not a country, but rather an autonomous entity ...*" 93 ASIL Proc. 214, 242 (2000). Professor Wing served as a consultant to the PA on legislative issues, see id.

21.    The limited powers and capacities granted to and exercised by the PA fall short of the requirements of statehood under international law.  The four well-established criteria[16] of statehood are set out in the Restatement (Third) of the Foreign Relations Law of the United States:

> § 201 State Defined:
>
> *Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities.*

United States courts have consistently treated the definitional criteria contained in §201 of the Restatement as authoritative or dispositive.[17]

22.    As detailed below, the PA fails to meet these criteria.

### i.    Foreign Relations

23.    As noted, the Restatement provides that, "a state is an entity ... that engages in, or has the capacity to engage in, formal relations with other such entities." §201.  Comment (e) to §201 of the Restatement further provides that:

---

[16] These criteria have been recognized in international law for over half a century, "*The definition in this section is well-established in international law; it is nearly identical to that in Article 1 of the Montevideo Convention on the Rights and Duties of States, 1933, 49 Stat. 3097, T.S. No. 881, 165 L.N.T.S. 19.*"  Restatement §201 Comment (a).

[17] See e.g. Klinghoffer v. Palestine Liberation Organization, 937 F.2d 44, 47 (2nd Cir. 1991); National Petrochemical Co. v. M/T Stolt Sheaf 860 F.2d 551, 553 (2nd Cir. 1988) cert. denied 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989); Morgan Guar. Trust Co. v. Republic of Palau, 924 F.2d 1237, 1243, 1245, 1246 (2nd Cir. 1991); Matimak Trading Co. v. Khalily, 118 F.3d 76, 80 (2nd Cir. 1997) cert. denied 522 U.S. 1091, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998); U.S. v. Jordan, 223 F.3d 676, 693 (7th Cir. 2000); First American Corp. v. Al-Nahyan, 948 F.Supp. 1107, 1121 (D.D.C. 1996); Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362, 374 (E.D.La. 1997).

*An entity is not a state unless it has <u>competence</u>, <u>within</u> <u>its</u> <u>own</u> <u>constitutional</u> <u>system</u>, to conduct international relations with other states, as well as the political, technical, and financial capabilities to do so.*
(emphasis added)

24.    Therefore, an entity that is denied the capacity to engage in foreign relations by its own "constitutional system" is by definition not a state.[18]

25.    As discussed above, the IA and the DOP are the constituting instruments of the PA, and the provisions of these agreements delineate the powers and capacities of the PA.  Several provisions of both the DOP and the IA expressly deny the PA the capacity to conduct foreign relations:

    a) Article 3(b) of Annex II of the DOP excludes the conduct of foreign relations from the powers of the Palestinian Authority;

    b) Article IX (5) of the IA, which prescribes the powers and capacities of the Palestinian Authority, provides:

*In accordance with the DOP, the Council will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.*

    c) Article XVII(1)a of the IA states clearly that the jurisdiction of the PA excludes foreign relations, and that the matter of foreign relations is reserved for future negotiations on a permanent status arrangement.

---

[18] The capacity to engage in relations with other states is a *sine qua non* condition of statehood.  James Crawford, <u>The Creation of States in International Law</u> 47 (1979) ("Crawford").  A study conducted for the U.S. Department of State has found that the lack of capacity to conduct foreign relations is a typical characteristic of non-sovereign entities. Hurst Hannum and Richard Lillich, "The Concept of Autonomy in International Law," 74 Am. J. Int'l L. 858, 872 (1980).

26.    This express restriction on the capacity of the PA has attracted the attention of scholars of public international law:

> *The Interim Agreement starkly forbids the PA to engage in even the most fundamental aspect of foreign relations, the establishment of diplomatic relations via embassies and consulates. This type of limitation is obviously inconsistent with the suggestion that the PA now has the 'capacity to engage in foreign relations.'*

> Geoffrey Watson, The Oslo Accords: International Law and the Israeli-Palestinian Peace Agreement, Oxford University Press (2000), p. 71 (footnote omitted) ("Watson").

27.    Thus, the "constitutional system" of the PA – i.e. the instruments which constituted the PA and control its authority and capacities – expressly deny the PA the capacity to engage in foreign relations.  Since the PA constitutionally lacks the capacity to conduct foreign relations, it is not and cannot be a state:

> *[T]he PA . . . lacks the final element of statehood, the capacity to engage in foreign relations . . .*

> Watson, p. 71 (emphasis added)

28.    In conclusion, the PA constitutionally lacks the capacity to engage in foreign relations and is therefore not a sovereign state.[19]

---

[19] Since the PA lacks the capacity to conduct foreign relations, any attempt by the PA to purport to engage in foreign relations would be ultra vires its own constitutional powers. An entity's capacity to conduct foreign relations is contingent on "*its legal competence to participate in the international process and to carry its international obligations into effect on the domestic level ... the foreign relations requirement is essentially a synthesis of the government and independence criteria ...*" Dajani at 86 (footnotes omitted, emphasis added), citing Crawford, *supra*, at 46.  Furthermore, any putative attempt by the PA to conduct such relations could not be implemented by the PA as it lacks the capacity "*to carry its international obligations into effect on the domestic level*". Id. By contrast, as the Privy Council held with respect to Canada when its independent status from Britain was in dispute, sovereign states must have both the capacity to carry on international affairs, Croft v. Dunphy, [1932] 59 C.C.C. 141 (P.C.), and the ability to implement international obligations on the domestic level, A.G. Canada v. A.G. Ontario (The Labour Conventions Case), [1937] A.C. 326 (P.C.).

## ii. Governmental Control

29.    According to Restatement §201, a state must have, "*a defined territory and a permanent population, under the control of its own government* ..." (emphasis added). <u>See also</u> <u>Klinghoffer</u>, 937 F.2d at 47-48.  In other words, an entity which has a "*defined territory and a permanent population*" will not be defined as a state unless it <u>also</u> possesses sufficient governmental control over its territory and population.

30.    It is long-established that this criterion requires the exercise of sovereign control.  That is, a state must possess, "*the sole right of decision in all matters economic, political, financial or other*."  <u>Austro-German Customs Union Case</u>, P.C.I.J. Series A/B No. 41, at 45 (1931).  Other scholars demand, in a similar vein, "*a coherent system of authority regulating all aspects of life within the territory under that government's control*".  Nii Lante Wallace-Bruce, <u>Claims to Statehood in International Law</u> (1994), p. 54.

---

In fact, since its establishment, the PA has avoided engaging in foreign relations.  As noted, the parties to the Oslo Accords are Israel and the <u>PLO</u>.  For example, Mahmoud Abbas, who serves as Secretary-General of the PLO Executive Committee as well as Head of the Negotiations Affairs Department of the PLO, negotiated and signed both the DOP and the Interim Agreement "*for the PLO*". <u>Id</u>., signature pages.  Significantly, the Oslo Accords deny the PA the capacity to conduct foreign relations with the specific intention of preventing the PA from achieving (or claiming) state status. Dajani explaines:

> Through these provisions *[that negate the PA's capacity to conduct foreign relations]* the IA <u>expressly disallows</u> the PA from participating in the international process <u>in any way that could influence its international status</u>." Dajani, p. 68 (emphasis added).

If the PA were to breach this provision of the IA, its acts would be ultra vires the PA's constituting documents and would therefore be void ab initio. Joel Singer, the former legal advisor to the Israeli Foreign Ministry who served as a primary draftsman of the Oslo Accords, has also confirmed that the express limitation on the capacity of PA to conduct foreign relations was the deliberate product of intensive negotiations between Israel and the PLO. <u>See</u> Joel Singer, "Aspects of Foreign Relations Under the Israel-Palestinian Agreements On Interim Self-Government Arrangements For the West Bank and Gaza", 28 Israel Law Review Nos. 2-3 (1994), p. 283; Joel Singer, "The West Bank and Gaza Strip: Phase Two", Justice, No. 7 (1995) p. 13.

31.    In other words, statehood requires that, "*the government, in exercising its power, must be capable of acting independently of foreign governments.*"  Karl Doehring, "State," in: 10 <u>Encyclopedia of Public International Law</u> 423, 426 (R. Bernhardt, ed., 1981).  Likewise, the scholar Gerhard von Glahn specifies that, as a condition of statehood, international law requires that "[t]*here must not be even nominal subordination to an outside governmental authority.*" Gerhard von Glahn, <u>Law Among Nations</u> 56 (6th ed., 1992).  Oppenheim described this criterion simply and starkly:

> *There must ... be a sovereign government. Sovereignty is supreme authority, which on the international plane means ... legal authority which is not in law dependent on any other earthly authority.  Sovereignty in the strict and narrowest sense of the term implies, therefore, independence all round, within and without the borders of the country.*
>
> 1 <u>Oppenheim's International Law</u> 122, R. Jennings and A. Watts, eds., 9th ed., (1992).[20]

As detailed below, the PA enjoys only limited powers of local government which it exercises subject to numerous restrictions. The PA therefore fails to meet this criterion of statehood.


32.    The DOP provided that the PA's territorial, functional and personal jurisdiction would be restricted to "*the agreed powers, responsibilities, spheres and authorities transferred to it,*" by Israel's military government and Civil Administration in the West Bank and Gaza Strip.[21]  Accordingly, under the DOP, the powers not transferred to the PA are retained by Israel: "*the withdrawal of the military government will not prevent Israel from exercising the powers and responsibilities not transferred to the*

---

[20] The question of whether a given entity exercises effective governmental control is applied strictly in the case of the creation of a state *ab initio*.  See, e.g., <u>Aaland Islands Case</u>, Report of the International Committee of Jurists, L.N.O.J., Special Supp. No. 3, p. 3 (considering the sovereignty of Finland). In other circumstances, e.g. the extinction of existing states, the test may be less exacting. See, e.g., <u>Republic of Somalia v. Woodhouse Drake & Carey Suisse S.A.</u>, [1993] Q.B. 54 (Q.B.D.) (considering whether there is a "government" of Somalia).  See generally, Crawford, pp. 48-9.

[21] Agreed Minutes, B(IV)(2).

*Council."*[22] Thus, in the DOP, Israel and the PLO agreed that the PA would have limited capacities, and

that Israel would reserve underlying, residual authority.

33.    The IA fully adopts and reflects these principles of the DOP, providing for the limited competence

and capacity of the PA while maintaining the residual jurisdiction of the Israeli military government.

Article I of the IA provides:

> *Israel shall transfer powers and responsibilities as specified in this Agreement from the Israeli*
> *military government and its Civil Administration to the Council in accordance with this*
> *Agreement.  Israel shall continue to exercise powers and responsibilities not so transferred.*
> (emphasis added)

Similarly, IA Article I(5) provides:

> *The withdrawal of the military government shall not prevent it from exercising the powers and*
> *responsibilities not transferred to the Council.*

Likewise, Article XVII(1) of the IA provides:

> *[T]he jurisdiction of the Council will cover West Bank and Gaza Strip territory as a single*
> *territorial unit, except for: ... powers and responsibilities not transferred to the Council.*

And again in Article XVII(4)a and b:

> *Israel, through its military government, has the authority over areas that are not under the*
> *territorial jurisdiction of the Council, powers and responsibilities not transferred to the Council*
> *and Israelis.  To this end, the Israeli military government shall retain the necessary legislative,*
> *judicial and executive powers and responsibilities, in accordance with international law.*

34.    Thus, in the DOP and the IA, which are the constituting instruments of the PA and control its

capacities and functions, the PA was designed to possess only those powers specifically transferred to it,

all powers and authority not so transferred remain vested in the Israeli military government, and the

---

[22] Id., B(VII)(5).

Israeli military government "*retain[s] the necessary legislative, judicial and executive powers and responsibilities, in accordance with international law*". In other words, the PA does not enjoy the sovereign or independent governmental authority required for statehood. Rather, the PA is an entity of limited capacity, specifically made subject to the residuary authority of the Israeli military government in the West Bank and Gaza.

35.    Moreover, the IA divides the West Bank and Gaza Strip into non-contiguous geographical areas, and strictly defines and limits the jurisdiction of the PA in each of the respective areas. Thus, the PA exercises its "maximum" grant of authority under the IA only in an archipelago of jurisdictional "islands" scattered throughout the West Bank and Gaza. In most areas of the West Bank and Gaza, the PA exercises less than its maximal authority, or none at all. An up-to-date description of this jurisdictional situation was recently provided by the PLO:[23]

> *In the Interim Agreement, Israel and the PLO devised a system for limited Palestinian self-government during the interim period. Two key features of this system bear mentioning: First, although the Interim Agreement affirms that both sides regard the West Bank and Gaza Strip as "a single territorial unit," that "unit" is divided into a patchwork of smaller enclaves. In the West Bank, these enclaves fall into one of the following categories:*
>
> *Area A: (Around 17.2% of the West Bank) The Palestinian Authority has full responsibility for internal security and public order. It also has wide powers in the civil sphere.*
>
> *Area B: (Around 23.8% of the West Bank) The Palestinian Authority has responsibility for maintaining public order for Palestinians, as well as powers in the civil sphere like those it holds in Area A. Israel has overriding security responsibility to safeguard Israelis and combat terrorism.*
>
> *Area C: (Around 59% of the West Bank) Israel has full responsibility for security and public order, as well as territory-related civil matters (e.g., resource allocation and*

---

[23] This document was produced and formally submitted by the PLO to the Sharm el-Sheikh Fact-Finding Committee (established by President Clinton in late 2000 and also known as the "Mitchell Committee"). It is published on the website of the Negotiations Affairs Department of the PLO, online at: www.nadplo.org/eye/Response%20to%20Israeli%20-Submission.5.pdf .

*infrastructure).*

*Area H-1: (Applicable only to parts of Hebron) The Palestinian Authority has powers similar to those in Area A, with certain exceptions related to the presence of Jewish settlers in the heart of Hebron.*

*Area H-2: (Applicable only to parts of Hebron) Israel retains full responsibility for public order and internal security. The Palestinian Authority has powers in the civil sphere, but only with respect to Palestinian residents.*

*[. . .]*

*[A]s of the completion of the second phase of Israel's further redeployment in March 2000, only Area C is contiguous; it surrounds and divides Areas A and B. Accordingly, no persons, no vehicles, and no goods can enter areas under Palestinian jurisdiction without first passing through areas under Israel's exclusive control.*

*Gaza Strip territory is divided into the following categories . . . :*

*Settlements: Israel retains exclusive authority.*

*Egyptian Border: Israel retains exclusive authority.*

*Yellow area: Israel exercises overriding security responsibility and powers. The Palestinian Authority exercises authority in the civil sphere and responsibility for public order for Palestinians in certain areas.*

*Residual Area: The Palestinian Authority has full responsibility for internal security and public order, except along lateral roads to Israeli settlements, where Israel retains the powers necessary "to conduct independent security activity." As in Area A in the West Bank, the Palestinian Authority also has wide powers in the civil sphere.*

*In addition, Israel retains responsibility for "safety and security" in the sea off the coast of the Gaza Strip and "may take any measures necessary against vessels suspected of being used for terrorist activities or for smuggling arms, ammunition, drugs, goods, or for any other illegal activity." Thus, like Areas A and B in the West Bank, the areas of the Gaza Strip under Palestinian jurisdiction are surrounded by areas under full Israeli security control.*

*Second, the territorial jurisdiction regime described above is subject to an overriding system of personal jurisdiction. The Interim Agreement provides that "the territorial and functional jurisdiction of the [Palestinian] Council will apply to all persons, except for Israelis, unless otherwise provided in this Agreement." Israel maintains exclusive personal jurisdiction over Israelis in all criminal matters, even for offenses committed in areas under PA jurisdiction. Israelis, moreover, only come under the jurisdiction of Palestinian judicial authorities in civil matters when they explicitly consent in writing to that jurisdiction, when they maintain ongoing businesses in territory under Palestinian*

*authority, or when the subject matter of the action is real property located in Palestinian territory. In sum, the PA's powers extend only over the Palestinian population and other non-Israelis who are within the limited, non-contiguous areas of the Occupied Palestinian Territories that are subject to Palestinian jurisdiction.*

"Third Submission of the Palestine Liberation Organization to the Sharm El-Sheikh Fact-Finding Committee," April 3, 2001, pp. 11-13 (citations omitted, emphasis added)

This description (which remains accurate in that there have been no further Israeli withdrawals subsequent to its publication)[24] demonstrates that the PA cannot satisfy the criterion of independent government necessary for statehood.

36.    Moreover, the DOP and IA deny the PA precisely those powers which are the basic indicia of a sovereign state even in the areas where it exercises its maximum authority, as detailed below.

37.    Firstly, one of the fundamental powers of a sovereign state, the responsibility for external security and defense, is denied the PA and expressly vested in Israel. Annex II of the Agreed Minutes to the DOP provide that "*It is understood that, subsequent to the Israeli withdrawal, Israel will continue to be responsible for external security*", while Article VIII of the DOP provides that Israel would continue to carry the responsibility for defending against external threats. In the same vein, Article XII(1) of the IA stipulates that:

*Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air ... and will have all the powers to take the steps necessary to meet this responsibility.*

---

[24] On the contrary, since this document was published Israel has returned its forces to many areas of the West Bank and Gaza from which it had withdrawn pursuant to the IA. See, James Bennet, "Israelis Step Up Gaza Intervention", New York Times, March 8, 2003, Section A, p. 1; Molly Moore, "Israel Storms Into Hebron After Attack", Washington Post, November 17, 2002, Section A, p. A1; "Israeli Armor Enters Nablus", Washington Post, August 2, 2002, p. A16; "Israeli Troops Enter Ramallah", Washington Post, June 24, 2002, p. A16.

38.    The PA's lack of any authority over its own external defense and security is a characteristic typical of non-state entities:

> *There is an overwhelming consensus that responsibility for and authority over national defense matters rest with the central or sovereign government and that, in general, the autonomous non-sovereign entity exercises no power in the national defense area.*

> Hurst Hannum and Richard Lillich, "The Concept of Autonomy in International Law," 74 Am. J. Int'l L. 858, 872 (1980).[25]

39.    Another related prerogative of sovereignty, control over airspace,[26] is expressly denied the PA. Article XVII(2)(a) of the IA provides that the territorial jurisdiction of the PA extends only to land, subsoil and territorial waters[27].  Additionally, the Security Annex to the IA stipulates in Article XIII(4) that Israel, and not the PA, controls the airspace above the PA:

> *All aviation activity or use of the airspace by any aerial vehicle in the West Bank and Gaza Strip shall require prior approval of Israel. It shall be subject to Israeli air traffic control including, inter alia, monitoring and regulation of air routes ...*

40.    In addition to its exclusive authority over external security, Israeli vessels are permitted to navigate freely through maritime zones off the Gaza Coast, and Israel retains responsibility for maritime safety and security off the Gaza Coast.[28]  Security at border crossings and terminals,[29] and internal security in

---

[25] This study, conducted for the U.S. Department of State, found that the second clear characteristic of autonomous entities is the lack of capacity to conduct foreign relations. Thus, the PA is marked by both of the signature restrictions on competence which distinguish a non-sovereign entity from a sovereign state.

[26] The Chicago Convention on International Aviation provides that *"every state has complete and exclusive sovereignty over the airspace above its territory."* Id., §1, 15 U.N.T.S. 295 (1944). This rule is declarative of customary international law, see Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. U.S.) 1986 I.C.J. 14, 111.

[27] As discussed below, the PA's jurisdiction over coastal waters is highly restricted.

[28] IA, Security Annex, Article XIV

Area B,[30] are also within Israel's exclusive jurisdiction.

41.    Moreover, internally, even in its area of maximum authority, the PA does not have jurisdiction or authority over all persons present in its territory. The PA has no security or law-enforcement jurisdiction whatsoever over Israeli citizens present anywhere in the territory of the PA.[31] The PA likewise has virtually no civil authority over Israeli citizens in PA territory.[32] Additionally, joint Israeli - Palestinian patrols operate throughout Areas "B" and "C".[33]

42.    Additionally, many of the powers which are granted to the PA can be exercised by the PA only after authorization from, or pursuant to coordination with, Israel. For example, under the IA, Israel is granted significant control over immigration to, and granting of residency status in, all areas of the PA. Under Article 28(11) of Appendix 1 to the Civil Annex of the IA, permanent residency in the PA can only be granted to certain categories of persons and only *"with the prior approval of Israel."* In other words, the PA lacks the general, unfettered authority to grant permanent residency status anywhere

---

[29] IA, Security Annex, Articles VIII(2)(b)(1) and VIII(2)(b)(2); Security Annex, Appendix 5, Section C(1).

[30] IA, Article XIII(2)(a); Security Annex, Article V(3).

[31] See, Security Annex to the Interim Agreement: *"Israelis shall under no circumstances be apprehended or placed in custody or prison by Palestinian authorities"*; *"vehicles bearing Israeli license plates shall not be stopped except for identification, which shall be conducted by a joint [Israeli-Palestinian] patrol"*; *"... Israeli military forces, and vehicles of the Israeli military forces, shall not be stopped by the Palestinian Police in any circumstances, and shall not be subject to any identification requirements."* Article XI(4) of the Security Annex; Articles X(4), XII, XIII(2)(a) of the IA.

[32] Article XVII(2)(c) of the IA. See also, the Legal Annex to the IA, Article III(2) (limiting the PA's civil jurisdiction in actions to which an Israeli is a party and providing that in action where an Israeli citizen is a defendant, the courts of the PA lack jurisdiction unless the Israeli defendant has consented thereto in writing. On this point, the Supreme Court of Canada has held that as an attribute of its sovereignty a state must have criminal jurisdiction over foreign persons, including foreign military personnel, present within its territory. Reference Re U.S. Forces, [1943] S.C.R. 487.

[33] IA, Security Annex, Article III(4) and (5); Articles V(4) and (5); Articles VI(7)-(9).

within its own territory.

43.    Under governing principles of international law, every sovereign state has the capacity to define its own nationality rules, Nationality Decrees in Tunis and Morocco (Advisory Opinion), [1923] P.C.I.J. 7, 24. In the Nottebohm Case (Leichtenstein v. Guatemala), [1955] I.C.J. Rep. 11, 20, the International Court of Justice stated definitively that, "*It is for Liechtenstein, as it is for every sovereign state, to settle by its own legislation the rules relating to the acquisition of its nationality, and to confer that nationality by naturalization granted by its own organs in accordance with that legislation.*"  The authority over nationality, residency, and immigration is, simply put, a basic prerogative of sovereignty: "*It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.*" Nishimura Ekiu v. U.S., 142 U.S. 651, 659 (1892).[34]

44.    Persons requesting to visit those areas of the West Bank and Gaza under PA jurisdiction must obtain permission from Israel.[35]  Israel may refuse entry to any person who is not already a legal resident of the West Bank or Gaza Strip.[36]

45.    Perhaps most significantly, Article XVIII(4)a of the IA also expressly restricts the legislative

---

[34] See also Kleindeist v. Mandel, 408 U.S. 753 (1972); J. Brierly, The Law of Nations 276 (6th ed. 1963); Hans Kelsen, Principles of International Law 372-373 (2nd ed. 1966); J. Starke, An Introduction to International Law 345 (1972).

[35] IA, Civil Affairs Annex, Appendix 1, Article 28(13).

[36] IA, Security Annex, Article VIII(3)(f): ". . . each side will have the authority to deny the entry of persons who are not residents of the West Bank and the Gaza Strip."

<u>capacity</u> of the PA:[37]

> *Legislation which exceeds the jurisdiction of the Council or which is otherwise inconsistent with the provisions of the DOP, this Agreement, or of any agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio.*

This provision gives clear, frank and direct expression to the limited and non-sovereign legal capacity and status of the PA.

46.    In light of the limitations on its powers and authority, outlined above, the PA does not possess the independent control which is a *sine qua non* of statehood. The powers and attributes of the PA, even within its areas of maximum authority, are not comparable to that of a sovereign nation, whose powers were described in a much quoted passage by Chief Justice John Marshall in 1812:

> *The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.*

<u>The Schooner Exchange v. McFaddon</u>, 7 Cranch 116, 11 U.S. 116 (1812).

47.    This analysis of the PA has been previously presented – with the identical conclusion – by scholars of public international law:

> *[A]t the time of the Interim Agreement, the Palestinian Authority was closer to statehood - but it was still not quite there. It was still not clear, for example, that the PA satisfied the third prong of statehood - the requirement of a government in control of its territory.  It is true that the PA did at last exercise a range of governmental and quasi-governmental functions in the West Bank and Gaza Strip, but then again so did Israel.  Even after the Interim Agreement, Israel retained 'residual powers' not exercised by the PA; in the words of the Agreement, 'Israel shall continue to exercise powers and responsibilities not . . . transferred' to the Palestinian Legislative Council.  Likewise, the Interim Agreement and other Oslo Accords assert that the 'status' of the territories 'will be preserved during the interim period.'*

---

[37] The agreements also control various aspects of the PA's economy. <u>See</u> e.g., in Annex V of the IA: Article III(2) and (10) (import and customs policy, restricted goods); Article III(14) (Israeli customs officials controls); Article IV(10) (Israeli Shekel set as official currency,); Article VIII (restrictions regarding transport of livestock); Article XI (restrictions on the insurance industry). These provisions are inconsistent the PA exercising the control of a sovereign state.

*In more concrete ways, the Gaza-Jericho Agreement and Interim Agreement ensured a continuing and important role for Israel in the 'control' of PA-administered areas. One striking example is law enforcement. The PA lacks criminal jurisdiction over offences committed in the PA's territory by Israelis. Israel retained criminal and, in many cases, civil jurisdiction over Israelis in the PA's territories; indeed, Palestinian authorities even lack the authority to 'arrest Israelis or place them in custody,' though PA police may 'detain' Israeli suspects 'in place' until Israeli police arrive. As a leading Palestinian lawyer has observed, 'the security arrangements agreed upon substantially limit the jurisdiction of the Palestinian Council in all respects including in Area A,' the area of maximal Palestinian authority. These examples can be multiplied to include Israeli authority over PA airspace and sea-lanes, Israeli regulation of safe passage between the West Bank and the Gaza Strip, and other Israeli authority over internal matters that no true state would cede to another. These examples raise continued doubts about any claim that the PA satisfies the requirement that a state be in 'control' of its territory ...*

*There is one last difficulty with the claim that the PA had 'control' of territory at the time of the Interim Agreement, and that difficulty also relates to the final element of statehood, the capacity to engage in foreign relations. A government in 'control' of its territory presumably has the right to exclusive control over the borders of that territory; that was not the case with the Palestinian Authority at the time of the Interim Agreement, or today. Israel retained (and still retains) that power. That suggests not only that the PA lacks ultimate 'control' over its territory, but also that it lacks the final element of statehood, the capacity to engage in foreign relations. Such capacity presumes that most fundamental aspect of sovereignty - the ability to control one's own borders.*

Watson, pp. 69-71.

In a similar vein:

*The most commonly accepted definition of statehood includes four elements: (1) a defined territory, (2) a permanent population, (3) a government in control of that territory, and (4) the capacity to engage in foreign relations. As of now elements (3) and (4) are both in doubt. As to element (3), the PA does not have unfettered control over any of its territory, even in Area A, since Israel retains responsibility for borders and external security even as to that Area. As to element (4), the PA now plainly lacks the capacity to engage in foreign relations, since the Oslo Accords forbid it to do so except for certain limited purposes.*

Watson, p. 250.

48.    The former legal advisor to the PLO has reached the identical conclusion:

*[T]he interim character and extraordinarily limited powers of the PA make it impossible to characterize that body as the "effective government" of the OPT. The PA's authority, after*

*all, is conferred on it by the agreements reached between Israel and the PLO, not by international law. While an independently constituted Palestinian government conceivably could assert a legitimate claim to being the "effective government" of Palestine without having established full control over the territory it claims, the PA is not such a government.*

Dajani, p. 86.

49.    Thus, the PA does not have governmental control sufficient for statehood.

### iii.    Defined Territory

50.    As noted, a state must have a "defined territory" under its control. Restatement §201, <u>Klinghoffer</u>, 937 F.2d at 48.

51.    The PA cannot meet this criterion since it does not have sovereign control over <u>any</u> area.  Without any territory under its control, the PA cannot be said to have "defined territory."  This point has been made articulately by Dajani:

*[T]he defined-territory criterion does not require the legal demarcation of a state's boundaries. Indeed, the international community has on several occasions extended recognition to states whose territorial borders remained in dispute. What appears central, instead, is the putative state's exercise of independent governmental authority over a territory.*

*It is in that last respect that Palestine, as presently constituted, fails to meet the defined territory criterion ....*

*What is an impediment is the fact that a Palestinian government does not yet exercise independent authority over a defined territory. As discussed above, agreements between Israel and the PLO severely limit the territorial, functional, and personal jurisdiction of the PA. While the PA has significant municipal authority over areas of the OPT, it does not possess sovereignty over them in any practical sense. Israel retains authority to review all legislation governing the administration of the territories, it has personal jurisdiction over all Israelis in the territories, it exercises control over most aspects of economic*

*development and security in the territories, and it continues to regulate movement between the Palestinian administrative enclaves. As a result, <u>it cannot be said that a Palestinian government exercises independent authority over any territory at all</u>.*

Dajani, pp. 83-84 (emphasis added).

This accurate analysis and conclusion, authored following the signing of the IA, remains entirely valid today.

52.    The PA lacks a "defined territory" for an additional reason.  While it is true, as Dajani notes, that this criterion can be satisfied even when the precise, final borders of the state have not been set, nevertheless, "when the doubts as to the future frontiers [are] of a serious nature, statehood becomes in doubt."[38] Yet, Article XI of the IA provides that the territory under the PA's jurisdiction remain undefined until a final status agreement is achieved, and that the boundaries of this territory are subject to modifications through future Israeli redeployments.  Furthermore, Article V(3) of the DOP reserves the determination of the final borders between Israel and the PA for the permanent status negotiations.  Therefore, the territory of the PA is intentionally "defined as undefined" and cannot meet this criterion of statehood.

53.    For these reasons, the PA does not have a "defined territory" and is therefore not a sovereign state.

## IV.    LEGAL STATUS OF THE PLO

54.    The United States Court of Appeals for the Second Circuit determined in <u>Klinghoffer</u>, 937 F. 2d

---

[38] <u>See</u> H. Lauterpacht, <u>Recognition in International Law</u> 30 (1947), citing the non-recognition of Lithuania in 1919, on the grounds that unresolved border disputes rendered Lithuania's territory insufficiently defined.

44, that the PLO (as distinct from the PA, which did not then exist) does not meet the criteria of statehood.  There has been no change in circumstances that would alter or affect that holding.

55.    The Second Circuit denied the PLO's claim to statehood – which purported to rest on the PLO's "declaration of statehood" in 1988 – primarily on the grounds that the PLO does not have control over any territory, much less sufficient governmental control over a defined territory and permanent population. These grounds remain true and valid. As former PLO legal advisor Dajani has stated, *"neither the establishment of the 'State of Palestine' in 1988 or the PA in 1994 has altered the PLO's international role and status ...".*  Dajani, p. 57.

56.    Those powers and authorities that are possessed and exercised by Palestinians in the West Bank and Gaza are possessed and exercised by the PA, not the PLO. As discussed above, the powers exercised by the PA fall far short of the independent and effective control required to meet this criterion of statehood. Thus, even if the PLO would claim to exercise some vicarious and indirect authority in the West Bank and Gaza through its relationship with the PA, this indirect authority would necessarily be no greater than that enjoyed by the PA itself – which fails to meet the requirements of statehood.  In the words of Dajani:

> *Since the PLO at present exercises authority in the OPT only through its relationship to the PA, its effectiveness is similarly limited. Palestine therefore lacks an effective government.*

Dajani, p. 86.

57.    Moreover, while the PLO conducts relations in the international sphere, the "foreign relations" engaged in by the PLO do not meet the criterion required for statehood.  As discussed, the "capacity to

conduct foreign relations" necessary for statehood is the "*legal competence to participate in the international process <u>and to carry ... international obligations into effect on the domestic level</u> ...".*[39]

58.    The PLO, however, lacks the legal capacity to "*carry its international obligations into effect*" in the West Bank and Gaza, since the PLO is not empowered to exercise any governmental authority in these areas. Here, too, Dajani has provides a cogent and accurate analysis:

> *Although the PLO has demonstrated its capacity to enter into foreign relations on behalf of the Palestinian people, the legal and functional separation of the PLO and the PA prevent the PLO from independently implementing international obligations in the territory and with regard to the population of Palestine.*

Dajani, p. 87.

59.    In conclusion, then, the establishment of the PA has wrought no change in the non-state status of the PLO:

> *The creation of the PA has not ... altered the international status of the PLO or, more broadly, of Palestine ... The legal and functional separation of the PLO and the PA erected by the DOP and subsequent agreements maintains the independence of the PLO, despite Israeli control of the OPT. It also serves, however, as a barricade against changes in the status of either public body: it denies the PLO effective authority over the territory it claims for the Palestinians, and it denies the PA independence and access to the international decision-making process.*

Dajani, p. 91.

This analysis, in my view, presents a true and correct picture of the legal status of the PLO and the PA.

---

[39] Dajani at 86 (footnotes omitted), citing Crawford at 47.

## V.    CONCLUSION

60.    As discussed in detail above, neither the PA nor the PLO fulfill the criteria of statehood under

international law that are reflected in the <u>Restatement (Third) of the Foreign Relations Law of the United

States</u>.[40]  Thus the conclusion of Professor Geoffrey Watson that, *"neither the PLO nor the PA has yet

acquired statehood"*[41] is as correct today as it has been since the inception of both of those organizations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is

true and correct.

August 1, 2003

ED MORGAN

---

[40] In light of the failure of the PA and PLO to comply with the other criteria of statehood, I express no final opinion with
respect to whether the PA or PLO have a "permanent population".

[41] Watson, p. 68.

# ED MORGAN

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| July 1998 - present | Associate Professor<br>University of Toronto, Faculty of Law<br>(tenure granted May 1999)<br><br>Teaching fields: Public International Law,<br>Private International Law, International Criminal Law,<br>Constitutional law |
| 1989 - June 1998 | Special Lecturer in International Law<br>University of Toronto, Faculty of Law |
| 1986 - 1989 | Assistant Professor<br>University of Toronto, Faculty of Law |

## LAW PRACTICE

| | |
|---|---|
| 1997 - present | Counsel practice in conflicts of law and international law, constitutional litigation, corporate and property disputes, commercial crime, professional responsibility, human rights |
| 1991 - 1997 | Partner, Davies Ward & Beck, Toronto |
| 1989 - 1991 | Associate, Davies Ward & Beck |

## JUDICIAL CLERKSHIP

| | |
|---|---|
| 1984 - 1985 | Law Clerk to The Hon. Madam Justice Bertha Wilson, Supreme Court of Canada |

Faculty of Law, University of Toronto, 84 Queens Park, Toronto, Canada  M5S 2C5
Tel (416) 946-4028  Fax (416) 946-5069  ed.morgan@utoronto.ca

## EDUCATION

1985 - 1986                    LL.M., Harvard Law School

1981 - 1984                    J.D., University of Toronto

                               Michael Moldaver prize for Standing First in Third Year
                               of Law (1984)
                               Honours List in Law (1982, 1983, 1984)
                               Co-Editor of *Faculty of Law Review*

1972 - 1976                    B.A., Northwestern University

## SELECTED CONSTITUTIONAL and INTERNATIONAL LAW CASES

*Halpern v. A.G. Canada,* counsel to Coalition of Liberal Rabbis for Same Sex Marriage as
intervenor in Ontario Court of Appeal

*Bouzari v. Islamic Republic of Iran,* expert witness in Ontario Superior Court on sovereign
immunity for Iranian dissident suing for torture while in Iranian prison

*Russo v. A.G. Canada,* counsel for plaintiff Green Party leader challenging first-past-the-post
electoral system as violation of right to vote and equality rights

*Freitag v. Speaker of the Ontario Legislature,* Ontario Superior Court and Court of Appeal
challenge to the opening of legislative sessions with the Lord=s Prayer.

*Suresh v. Minister of Immigration,* counsel to Canadian Arab Federation as intervenor in
Supreme Court of Canada appeal regarding membership in a Aterrorist organization≅.

*Schreiber v. Federal Republic of Germany,* counsel to Germany in Ontario Superior Court,
Ontario Court of Appeal and Supreme Court of Canada in Canada's leading sovereign
immunity case.

*Regina v. Parker,* counsel to Epilepsy Association of Toronto as intervenor in Ontario Court
of Appeal advocating medical use exemption to marijuana charges.

**Ed Morgan**                               -3-

*In re Livent, Inc.,* expert evidence submitted to U.S. District Court for the Southern District of New York on jurisdictional issues, Ontario class action certification and other procedural issues on *forum non conveniens* motion.

*In re Corel Corp. Securities Litigation,* expert evidence submitted to U.S. District Court for the Eastern District of New York on conflicts of law, jurisdictional and procedural issues.

*Canadian Foundation for Children v. Attorney General of Canada,* expert opinion submitted to Superior Court of Ontario on issues of treaty interpretation and constitutional law.

*Awas Tingni v. Government of Nicaragua,* co-counsel to Assembly of First Nations as Intervenor in Inter-American Court of Human Rights in aboriginal land rights claim.

*Taylor v. Attorney General of Canada,* counsel to Canadian Jewish Congress as Intervenor in Federal Court of Appeal in challenge to judicial immunity doctrine for spectator expelled from court for refusing to remove religious headwear.

*Tapper v. Law Society of Upper Canada,* counsel to Law Society in constitutional and jurisdictional challenge to Ontario Bar levies on out-of -province members.

*Minister of Citizenship v. Tobiass, Dueck, Oberlander,* counsel to Canadian Jewish Congress as Intervenor on appeal to Supreme Court of Canada of stay order pertaining to judicial independence in denaturalization proceedings against alleged war criminals.

*Luigino=s Inc. v. Maple Leaf Foods Inc.,* expert opinion submitted to U.S. District Court for Minnesota on issues of choice of forum and non-exclusive jurisdiction clauses.

*Minister of Immigration v. Nemsila,* counsel to Canadian Jewish Congress as Intervenor in Federal Court Trial Division and Federal Court of Appeal review of Immigration Appeal Board decision on war criminal deportation.

*Wong v. Estate of Chan,* expert opinion submitted to Superior Court of California on issues of Canadian choice of law in tort claim.

*Adler v. Ontario,* counsel to Applicants at trial, Court of Appeal and Supreme Court of Canada in freedom or religion and equality rights challenge to Education Act.

*Rosen and Sav-On Drugs v. Ontario,* counsel to Appellants in Court of Appeal in freedom of expression challenge to Tobacco Control Act prohibition on sale of tobacco in pharmacies.

**Ed Morgan**                                    -4-

*Hill v. Church of Scientology*, counsel to Writers' Union, PEN Canada, Canadian Association of Journalists and others as Intervenors in Court of Appeal and Supreme Court of Canada in freedom of expression challenge to libel law.

*Iorfida and NORML Canada v. MacIntyre*, counsel to Plaintiffs in freedom of expression challenge to "drug literature" provision in Criminal Code.

*Regina v. Finta*, counsel to Canadian Jewish Congress as Intervenor in Supreme Court of Canada appeal of first Criminal Code war crimes prosecution.

*Kazembe v. Law Society*, counsel to Applicant in appeal of bar admission conditions violating freedom of expression.

*Toronto Stock Exchange v. Quotron Systems*, expert evidence in area of Canadian private international law and Ontario court jurisdiction submitted to and cited by U.S. District Court for Southern District of New York.

*In the Matter of Christine Lamont and David Spencer*, counsel to Canadians in Brazilian prison in presenting submissions to Minister of Foreign Affairs requesting Canadian government espousal and intervention.

*Keegstra v. The Queen*, co-counsel to Canadian Jewish Congress as Intervenor in Supreme Court of Canada appeal of hate propaganda prosecution.


PUBLICATIONS

BOOK

*International Law and the Canadian Courts* (Toronto: Carswell, 1990).


EDITOR

*Canadian Journal of Law and Jurisprudence*, 2002, guest editor of special issue on international law theory

*Leiden Journal of International Law*, 2003/4 (forthcoming), guest editor of special issue on the aesthetics of international law

**Ed Morgan**                    -5-

*Canadian Yearbook of International Law*, member of the Board of Editors, 1997 - present

## ARTICLES

"On Art and the Death Penalty: Invitation to a Beheading, *Cardozo Studies in Law and Literature* (2003) (forthcoming)

"Academic Culture in the Petri Dish", Political and Legal Anthropology Review (2003) (forthcoming)

"The Crying of Rule 49", proceedings of conference on International Law and the Environment (2003-4) (forthcoming)

"International Laws Literature of Terror, (2002) 15 Canadian Journal of Law and Jurisprudence 317

"A Thousand and One Rights, in: *The Security of Freedom: Essays on Canada's Anti-Terrorism Bill*, Daniels, Macklem, Roach, eds. (Toronto: U. of T. Press, 2001), p. 405

"Securities Fraud: Class Actions Go International, forthcoming in [2001] *Proceedings of Canadian Council of International Law*

"Law Enforcement Isn't Just Chasing Phantoms, 22 *Policy Options* 33 (2001)

"Religious Equality Comes to Ontario Education, 32 *Orbit* 72 (2001)

"The Apprenticeship of Ariel Sharon (2001) 2 German Law Journal 16

"The Roullette of Suffering≅, 8 Cardozo J. Int'l & Comp. Law 401 (2001)

"Constitutionalizing Procedure, Special Lectures of the Law Society of Upper Canada, 2000, p. 1

"The Other Death of International Law, (2001) 14 Leiden J. Int'l Law 3

"From Marienbad to Worse in International Law, (2000) 13 Hague Yearbook of International Law 5

**Ed Morgan**                          -6-

"Indigenous Rights in the Inter-American System: The Amicus Brief of the Assembly of First Nations in *Awas Tingni v. Republic of Nicaragua,* 22 Human Rights Quarterly 569 (2000) (with Patrick Macklem).

"Discovery, [1999] 10 European J. Int. Law 583 (1999).

"In the Penal Colony: Internationalism and the Canadian Constitution, [1999] 49 U. Toronto L.J. 447 (1999).

"Cyclops Meets the Privy Council: The Conflict in the Conflict of Laws", [1996] Can. Yearbook of Int. Law 1.

"Religion, Education and Communities on the Fringe", *Legal Images of Our Schools in the 21st Century*, Canadian Bar Association, 1996 Institute of Continuing Legal Education.

"Act of Blindness, State of Insight", 13 Boston U. Int. L.J. 1 (1995).

"An International Legal Perspective on Resolution 242", *United Nations Security Council Resolution* 242: A 25 *Year Retrospective* 12 (1992).

"The Hermaphroditic Paradigm of International Law", *State Sovereignty: The Challenge of a Changing World*, 78 Canadian Council on International Law (1992).

"Rabbi Kahane, International Law and the Courts: Democracy Stands on Its Head", 4 Temple J. Int. and Comp. Law 185 (1991) (with Ofer Attias).

"When the Minister Meets His Equal: International Law and the Jurisdiction to Tax", Ontario Centre for International Business, Working Paper 1988-89 (12), 1989.

"Aliens and Process Rights: The Open and Shut Case of Legal Sovereignty", 7 Wisc. Int'l L.J. 107 (1989).

"Foreign State Debtors in the Domestic Courts: A Theory of Sovereign Immunity", 3 Banking & Fin. Law Rev. 287 (1989).

"International Law in a Post-Modern Hall of Mirrors", 26 Osg. Hall L.J. 209 (1988).

"The Imagery and Meaning of Self-Determination", 20 N.Y.U. Jo. Int. Law & pol. 355 (1988).

"Criminal Process, International Law and Extra-Territorial Crime", 38 U.T.L.J. 245 (1988).

**Ed Morgan**                                     -7-

"Retributory Theater", 3 Am. Univ. J. Int. Law 1 (1988).

"Internalization of Customary International Law: An Historical Perspective", 12 Yale J. Int. Law.

"Contract Theory and the Sources of Rights: An Approach to the Arbitrability Question", 60 So. Cal. L. Rev. 1059 (1987).

"Self-Government and the Constitution: A comparative Look at Native Canadians and American Indians", 12 Am. Ind. Law Rev. 39 (1985).

"The Defence of Necessity: Justification of Excuse?" 42 U.T. Fac. Law Rev. 165 (1984).

"Market Share Liability for Injurious Products: A Comment on Sindell", 41 U.T. Fac. Law Rev. 52 (1983).

"The 1977 Elections in Djibouti: A Tragi-Comic End to French Colonial Rule", 1 Horn of Africa (1978).

"A Geographic Evaluation of the Ethiopia-Eritrea Conflict", 15 J. of Modern African Stud. 667 (1977).


## CASE COMMENTS and BOOK REVIEWS

Microreview: *Six Days of War*≅, March/April 2002, Boston Review (forthcoming)

Microreview: *The Helsinki Effect: Inernational Norms, Human Rights, and the Demise of Communism*≅, October/November 2001, Boston Review

"International Law in the Interdisciplinary Mirror", 94 Am. J. Int=l Law 595 (2000).

"Heroes In a Hard Sell", (1993) 21 Viewpoints 5.

"*Chutzpah*: The Next Generation", (1992) 20 Viewpoints 5.

"Pit Bulls and Tort Reform", 1 D.M.P.L. 327 (1992).

"The Public Interest of Private Parties", 1 D.M.P.L. 242 (1992).

"Property Tax and the Charitable Instinct", 1 D.M.P.L 213 (1991).

**Ed Morgan**                              -8-

"Conflicting Trade Agreements: No Exit for International Law", 3 I.B.T.L. Newsletter 8 (1991).

"The Courts in Bingotown", 1 D.M.P.L 197 (1991).
"Municipal Liability Takes a Break", 1 D.M.P.L. 181 (1991).

"Man Bites Dog!", 1 D.M.P.L. 165 (1991).

"Private Parts of a Public Body", 1 D.M.P.L. 149 (1991).

"Expropriation and the Fourth Dimension", 1 D.M.P.L 133 (1991).

"Mushrooms, Zoning and the Invention of the Wheel", 1 D.M.P.L. 117 (1991).

"Judicial Review and the Modern Narrator", 1 D.M.P.L 99 (1991).

"Freedom of Speech and Community Planning", 1 D.M.P.L.  83 (1991).

"R. v. Sharma; R. v. Greenbaum", 1 D.M.P.L. 69 (1991).

"Save Richmond Farmland Society v. Township of Richmond", 1 D.M.P.L. 55 (1991).

"Atlantic Wholesalers Ltd. v. Douglas Group Holdings Inc.", 1 D.M.P.L. 39 (1991).

"Bredin v. City of Cornwal", 1 D.M.P.L. 27 (1990).

"Newfoundland Telephone Co. v. Town of Marstown", 1 D.M.P.L. 13 (1990).

"Vezina v. City of Scarborough", 1 D.M.P.L. 1 (1990).

"The Persian Gulf and International Law", 2 I.B.T.L. Newsletter 7 (1990).