UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.                                        C.A. No.: 00-105L

THE PALESTINIAN AUTHORITY, et al.

**PLAINTIFFS' MOTION TO EXCEED PAGE LIMITATION CONCERNING PLAINTIFFS' REPLY (AND EXHIBITS) TO DEFENDANTS' OBJECTION TO PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT PURSUANT TO FED.R.CIV.P.55(b)(2)**

Now come the Plaintiffs and hereby move for an order permitting them to exceed the page limitation on briefs and exhibits.

This matter was raised at the August 22, 2003 hearing before the Honorable Magistrate Judge David L. Martin.

A proposed order is attached.

Plaintiffs, by their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)



## CERTIFICATION

I hereby certify that on the ___25th___ day of August, 2003 I delivered a true copy of the within to:

Ramsey Clark, Esquire
Lawrence W. Schilling, Esquire
36 East 12th Street
New York, NY 10003
    Via Federal Express

Deming E. Sherman, Esquire
Annemarie M. Carney
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903
    Via Hand Delivery

T:\MISCELLANEOUS\Ungar\motions\Motion to Exceed Page Limitation P's Reply 8-29-03.doc

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs.                                          No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**PLAINTIFFS' REPLY MEMORANDUM
IN FURTHER SUPPORT OF THEIR MOTION FOR JUDGMENT BY DEFAULT
PURSUANT TO FED.R.CIV.P. 55(b)(2) AGAINST DEFENDANTS THE PALESTINIAN
AUTHORITY AND THE PALESTINE LIBERATION ORGANIZATION**

I. **THE INABILITY OF THE PA TO CONDUCT "FOREIGN RELATIONS" IS IRRELEVANT TO THE EXISTENCE OF MINIMUM CONTACTS WITH THE UNITED STATES**

Defendants correctly note that "*[u]nder the Oslo Accords the PA is prohibited from engaging in foreign relations.*" Def. Memo at 6.[1] Defendants then proceed to argue that the inability of the PA to conduct foreign relations "*generally negates the possibility of systematic and continuous contacts by the PA within the United States.*" Id. In other words, defendants claim, since the PA cannot conduct "foreign relations," it cannot have the "minimum contacts" with the United States necessary for the exercise of personal jurisdiction.

This argument is based on the ludicrous proposition that if a defendant has "minimum contacts" with the United States, it must per se be conducting "foreign relations" with the United States. It scarcely needs to be noted that literally thousands of individual and corporate foreign defendants - which, like the PA, are unable to conduct "foreign relations" – have been found to have "minimum contacts" with the United States.

---

[1] Defendants cite the Declaration of Prof. Ed Morgan, which was submitted by plaintiffs in support of their opposition to defendants' pending Rule 12(b)(1) motion to dismiss the amended complaint on grounds of sovereign immunity.

Indeed, the PA's extensive contacts with the United States have nothing whatsoever to do with the conduct of foreign relations. These contacts include:

a) Bank and brokerage deposits in the millions of dollars at the New York branches of Citibank, Arab Bank, Salomon Smith Barney. Exhibit I.

b) A twenty-five year commercial contract worth $187,500,000,[2] for the provision of telecommunications services, with International Technologies Integration, Inc. of Virginia. The PA agreed that any dispute arising from this contract would be submitted to the American Arbitration Association branch in Washington, D.C. and that the agreement would be governed by the laws of Virginia. Exhibit H.

c) A multi-year, multi-million dollar contract with Bannerman & Associates ("Bannerman") of Washington, D.C., to perform public relations, lobbying and other activities for the benefit of the PA in the United States. In 1999, the Palestinian Authority retained the services of Bannerman for $2.25 million dollars. Exhibits E 6-11, F, G. Both Bannerman and the PA reported to the U.S. Department of Justice in their Foreign Agent Reporting Act ("FARA") filings that Bannerman is an agent of the PA. Exhibits E 6-11. Bannerman's activities on behalf of the PA include lobbying Congress (Exhibits E 6-11, F, G), advocacy training (Exhibit G), public relations (Exhibits E 8-10, F, G), "arrang[ing] international visits for representatives of the Palestinian Authority" (Exhibits E 6-7), and "T.V. and radio appearances on behalf of the [Palestinian Authority]" (Exhibits E 8-9) FARA reports indicate that between late 1999 and June 2002, Bannerman received $1.5 million from the PA for its services and 11 members of its staff have been reported as registered agents of the PA. Exhibits E 6-11.

d) A multi-year, multi-million dollar contract with the New York-based firm of Strook &

---

[2] See Exhibit H at 8, where the court states that the damage award was 1/10 of the value of the contract.

Strook & Lavan ("Strook") to perform legal, consulting and other services in the United States for the benefit of the PA. The PA retained the services of Strook at least as early as 1997 Exhibits E 1, G). Strook's activities on behalf of the PA include: "legal services . . . regarding various financial, commercial, and developmental projects" (E 1, see also E 2-3), "representation in various infrastructure projects and pension matters" (E 4-9), and litigation (Exhibits H and I). Between the years June 1997 and June 2001, the PA paid Strook more than $2.8 million and retained at least six of Strook's staff members as agents. Exhibits E 1- 9.

e) Extensive public relations, educational and propaganda activities throughout the United States. As Chief Representative of the PA in the United States, Hasan Abdel Rahman speaks at "universities, think tanks and clubs in the United States . . . is a frequent quest on television news programs on CNN, NBC, CBS and ABC. His interviews have been printed in the U.S. ... press." Exhibits B, X see also C and D (both quoting from Mr. Rahman's "Biography"), Q, R, S, T, U, V ,W, BB, CC, DD, FF see also EE. Likewise, Mr. Rahman's deputy Khalil Foutah also speaks publicly on behalf of the PA. Exhibit II.

As indicated above, Bannerman provided similar public relations services for the PA. Exhibits E 6-11, F, G.

f) The financial department of the PA, the Palestine Monetary Authority, operates a website located on computer in Texas, from which it provides information and various documents and publications to the public in both English and Arabic. Exhibits HH and JJ.

g) Additionally, at least as early as 1997, Larry C. Wallace & Associates of Arkansas was retained by the PA as its U.S. based agent. Exhibits E1-2.

Thus, just like countless other foreign defendants unable to conduct "foreign relations,"

the PA has extensive, continuous and systematic contacts with the United States.[3]

## II. HASAN ABDEL RAHMAN IS AN OFFICER AND MANAGING AND GENERAL AGENT OF THE PA WITHIN THE MEANING OF FED.R.CIV.P. 4(h)(1)

Plaintiffs have provided the Court with clear, definitive evidence that Hasan Abdel Rahman is an officer and/or general or managing agent of the PA within the meaning of Fed.R.Civ.P. 4(h)(1).[4] This evidence consists of Mr. Rahman's own official "Biography," distributed by his office, which identifies him as "Chief Representative" of the PA, (Exhibits B and X) as well as records of public interviews granted by Mr. Rahman in his capacity as a senior representative of the PA. Exhibits S, T, U, V, W, BB, see also Q, R, CC, DD, EE, FF.

The "Biography" of Mr. Rahman was admitted into evidence without objection nearly three years ago. Defendants do not dispute that the "Biography" of Mr. Rahman is authentic and that it was distributed by and obtained from Mr. Rahman's office. Indeed, defendants and their counsel could not dare dispute the authenticity and origin of the Biography since: 1) defendants know well that the "Biography" has been widely distributed by Mr. Rahman's office, and; 2) the "Biography" bears the outgoing facsimile header of Mr. Rahman's office, identical to that

---

[3] Defendants also argue that "*given its origins and existence as a governing authority*" as described in the Declaration of Prof. Morgan, the Court erred when it held in its decision of July 24, 2001 that the PA is an "unincorporated association" for the purpose of service under Fed.R.Civ.P. 4(h) (1). Def. Memo at 7. Defendants do not explain why, in their opinion, a "governing authority" cannot be an unincorporated association. Defendants do not claim that the PA is incorporated, and nothing in Prof. Morgan's Declaration indicates that it is. The PA's exercise of local governmental authority is stated clearly in the complaint and is noted by the Court. Id. at 84. The Court was therefore well aware of the PA's status when it held that the PA is an unincorporated association.

Most importantly, however, it makes no difference whether the PA is an "unincorporated association" or a corporate entity: Fed.R.Civ.P. 4(h) (1) provides that service on unincorporated associations and on corporations is carried out in the identical fashion. Service on the PA's officers and/or managing or general agents was therefore effective service on the PA, irrespective of whether the PA is an "unincorporated association" or a corporate entity.

[4] The Court has found that Mr. Rahman is a general or managing agent of both the PLO and the PA, and that plaintiffs' service on Mr. Rahman for the PLO and the PA was effective service on both defendants under Fed.R.Civ.P. 4(h) (1). Defendants openly concede that Mr. Rahman is the "Chief Representative" of the PLO in the U.S. and do not dispute that the holding that Mr. Rahman is a general or managing agent of the PLO has been proven by the preponderance of the evidence.

4

appearing on Mr. Rahman's declaration of June 14, 2000, submitted by defendants in support of their first Rule 12(b) motion. Exhibit M.[5]

Rather, while carefully and coyly refraining from ever denying the authenticity of Mr. Rahman's "Biography," defendants attempt to cloud the strength of this evidence by raising meaningless complaints about the lack of a letterhead and making other pointless observations relating to the format of the document. Def. Memo at 4-5.

These are nothing but bad faith obfuscations and evasions by defendants. Defendants know full well that the Biography is authentic, and their mock cavils about its format are an artifice designed to mask their inability to actually challenge its authenticity. While further proof of this document is unnecessary (particularly in light of defendants' failure to object to the admission or dispute the origin and authenticity of the document, and counsel's affidavit attesting thereto), plaintiffs seek to put paid once and for all to defendants' bad faith and evasive posture. Therefore, plaintiffs have obtained a sworn declaration from an officer of the MWW Group, the communications and public relations firm that obtained the Biography from Mr. Rahman's office on their behalf. Exhibit X. This declaration constitutes (further) dispositive proof of the origin and authenticity of the Biography.[6]

In similar disingenuous fashion, defendants do not actually <u>deny</u> that Mr. Rahman gives

---

[5] Unfortunately at the hearing on August 22, 2002, there was slight confusion about this document. Subsequently, counsel checked the entire court file and found that in both instances when this document was proffered to the Court (as an exhibit to its Memorandum in Further Opposition to Defendants' Motion to Dismiss for Lack of Jurisdiction filed on November 18, 2000 and in the bound Exhibits to the present motion filed in June 2003) identical photocopies of the original were filed. For some unknown reason, the loose copy which the Court had at the hearing on August 22 had the fax number cut off.

[6] Plaintiffs will no longer tolerate with equanimity defendants' knowing misrepresentations. If in their Surreply defendants continue, in bad faith and in an attempt to mislead the Court, to challenge, question or seek to cloud the <u>origin and authenticity</u> of the Biography in any manner, plaintiffs will immediately: 1) notice the depositions of Mr. Rahman and his staff; 2) demand discovery of all records and documents relating to Mr. Rahman's activities in the United States; 3) subpoena the phone records of Mr. Rahman's office showing the fax transmission to the MWW Group; 4) seek appropriate sanctions for the knowing misrepresentations included in defendants' pleadings and declarations.

public interviews and speeches in his capacity as a senior PA official, as demonstrated by the evidence submitted by plaintiffs without objection nearly three years ago. (Exhibits C, D). Instead, defendants argue that the interviews in which Mr. Rahman is identified as a senior representative of the PA are not conclusive proof that Mr. Rahman does in fact speak as a PA official because they do not "*quote him as saying so.*" Def. Memo at 5.[7]

This dodge can be easily disposed of, because, in fact, Mr. Rahman has repeatedly and expressly presented himself in public -- in his own words -- as the representative of the PA:

a) On March 25, 1999, Mr. Rahman gave testimony before the Foreign Operations Subcommittee of the Senate Appropriations Committee. The "Prepared Statement" authored and submitted by Mr. Rahman to the committee identifies him as the "**Chief Representative of the PLO and the PNA**" (i.e. "Palestinian National Authority"). Exhibit Q.[8]

Mr. Rahman is similarly identified as "**Chief Representative of the PLO and the PNA**" in the record of his oral testimony before the subcommittee. Exhibit R, pp. 2 and 26.

Moreover, the substance of both his written and oral testimony make clear that Mr. Rahman testified (under oath!) before the committee as a representative and in the name of the PA. Id. at p. 27.[9]

---

[7] Defendants also claim that these exhibits are inadmissible. Def. Memo at 4. Defendants' objection is tardy: these exhibits were admitted into evidence nearly three years ago without any objection by defendants. Even absent defendants' failure to object, these documents would be admissible on at least three separate bases as business records, commercial publications and electronically stored and produced originals.

[8] Exhibits A through P were already admitted into evidence by plaintiffs prior to the hearing on August 22, 2003, without objection by defendants, and these transcripts are also supported by the affidavit of David J. Strachman attached hereto as Exhibit Z. If defendants' Surreply attempts to frivolously dispute Mr. Rahman's own words as recorded in these professionally compiled, commercially published and electronically stored and generated transcripts, plaintiffs will forthwith: 1) depose Mr. Rahman about these and all his other public appearances and activities in the United States on behalf of the PA; 2) conduct third-party custodian depositions to obtain the original video images; 3) move for sanctions pursuant to Fed.R.Civ.P. 11(b)(4) (frivolous denial of factual contentions).

[9] Indeed, the subject of the hearing was the PA's failure to cooperate with the investigation of terrorist attacks in which American citizens were killed or injured, and Mr. Rahman was invited to present the position of the PA. The PLO was not even mentioned during the hearing. Ironically, one of the American terror victims discussed in the

6

b) On November 10, 2001, in the course of a televised interview, Mr. Rahman stated:

**I'm speaking on behalf of the Palestinian Authority and the PLO.**

CNBC News Transcripts, November 10, 2001, Exhibit T, p. 2.

c) On October 7, 2001, in the course of a televised interview, Mr. Rahman stated:

**So this is our official position. This is the position of the Palestinian authority and the PLO, and that's where we stand.**

ABC News Special transcript, October 7, 2001, Exhibit S, p. 25.

d) On December 2, 2001, in the course of a televised interview, Mr. Rahman stated:

**Let me reiterate the position of the Palestinian Authority. We condemn those acts.**

CNN, Breaking News transcript, December 2, 2001, Exhibit U, p. 1.

e) In televised interviews on November 6, 1998 (on CNN) and on December 4, 2001 (Fox News), Mr. Rahman issued condemnations in the name of the PA. Exhibits V and W.

Thus, Mr. Rahman has explicitly identified himself as "chief representative" of the PA, and repeatedly spoken as a representative and in the name of the PA, in the public arena. This conduct comports <u>exactly</u> with the contents of Mr. Rahman's "Biography," where he likewise identifies himself as "Chief Representative" of the PA, and states that he has represented the PA *"at various international confererences and other forums."*

The evidence is therefore clear and overwhelming that Mr. Rahman is an officer and/or general or managing agent of the PA, within the meaning of Fed.R.Civ.P 4(h)(1).

In the face of all this defendants' argue only that the vague and conclusory statement by Mr. Rahman in his Declaration of June 14, 2000 (i.e. that the PA has no "foreign

---

hearing was Yaron Ungar. <u>See</u> testimony of Mark Richard, Deputy Assistant Attorney General, Exhibit R, pp. 8.

representative"[10] in the U.S., somehow trumps Mr. Rahman's own Biography and the other concrete evidence demonstrating that in fact he is the senior PA representative in the United States. This tepid argument would fail even if there were no previous indicia that the Declaration of June 14, 2000 lacks all credibility. In fact, however, the Court has already found this Declaration to be false or inaccurate:

a) Mr. Rahman's claim that the service papers were simply *"found"* in his office, (Exhibit M §2) was thoroughly impeached by the sworn affidavit of the process server, who described in detail how he introduced himself to and twice informed Mr. Rahman (while riding with him in the elevator and walking with Mr. Rahman to his office) that he was being served, and how Mr. Rahman unsuccessfully attempted to dodge service. Ungar v. Palestinian Authority, 153 F. Supp.2d 76, 96 (D.R.I. 2001), Exhibit K.

b) Mr. Rahman misleadingly claimed that aside from his office in Washington, D.C. *"[t]here is no other office of the Palestine Liberation Organization in the United States."* Exhibit M §1. Yet, as the Court pointed out (on the basis of an explicit U.N.

---

[10] Mr. Rahman claims in his declaration that the PA has no "foreign representative" in the United States, "in accordance with" the Oslo Accords, Id. § 3. This statement is extremely misleading.

As defendants admit, and as the Declaration of Prof. Morgan explains, the PA is prohibited from conducting "foreign relations." Id. §§ 23-28. This prohibition includes *"the appointment of . . . of diplomatic and consular staff, and the exercise of diplomatic functions."* Id. § 25 (quoting the relevant provision of the Oslo Accords).

Thus, the Oslo Accords prevent the PA from conducting "foreign relations" through "diplomatic or consular" representatives. The Oslo Accords contain no provision (and defendants have pointed to none) prohibiting the PA from conducting other, non-diplomatic activities (such as commercial, public relations, lobbying, or educational activities) through its representatives, officers and agents abroad.

Plaintiffs have never asserted that Mr. Rahman is a diplomatic or consular official, or that he conducts "foreign relations" on behalf of the PA or the PLO. He clearly does not. Mr. Rahman's activities on behalf of both the PA and PLO consist of public relations, propaganda, and educational activities, as detailed above.

Indeed, significantly, Mr. Rahman's own Biography describes him as chief representative of the PA and PLO in the United States (and not to the United States). The Court may properly take judicial notice of the fact that – like the PA and PLO -- many thousands of foreign corporations and a wide variety of foreign organizations, associations and other bodies have representatives in the United States, who conduct a broad gamut of commercial, public relations, educational, lobbying and other non-diplomatic functions which have nothing to do with the conduct of "foreign

8

document submitted by plaintiffs), the so-called "Palestine Observer Mission" in New York is simply the original PLO Observer Mission with a cosmetic name change. <u>Ungar v. Palestinian Authority</u>, 153 F. Supp.2d at 90.

 c) Mr. Rahman also claimed in his declaration that he does not have "any relationship, or authority . . . which authorizes, or permits acceptance of service of legal process on" the PLO. Exhibit M. §4. In fact, of course, the Court found, "*notwithstanding his assertions to the contrary*" that Mr. Rahman is authorized to accept service on behalf of the PLO. <u>Ungar v. Palestinian Authority</u>, 153 F. Supp.2d at 91.

Mr. Rahman's Declaration therefore has very little weight even standing alone; and in the face of the overwhelming evidence mustered by the plaintiffs' of Mr. Rahman's true status, the Declaration is meaningless.

Plaintiffs have therefore proven Mr. Rahman's status as an officer and/or general and managing agent of both the PA and the PLO within the meaning of Fed.R.Civ.P. (h)(1), well beyond the mere preponderance of the evidence.

### III.  THE RESTRICTIONS ON PLO ACTIVITIES IN THE UNITED STATES WERE SUSPENDED NEARLY A DECADE AGO

In its decision of July 24, 2001, the Court held that the PLO had minimum contacts with the United States based on the following factual predicates:

 a) The PLO maintains an office in Washington, D.C., headed by Hasan Abdel Rahman, the Chief Representative of the PLO (and the PA) in the U.S.;

 b) The PLO's Washington. D.C. office employs nine staff members;

 c) For the six month period ending March 31, 1999, the PLO's Washington. D.C. office expended $200,132.74 on activities ranging from conducting interviews, giving relations."

lectures, and contacting the media;

    d) The PLO has significant commercial contacts with the United States, and maintained several bank accounts in New York with deposits totaling million of dollars.

    e) The PLO maintains an Observer Mission to the United Nations in New York. The Permanent Observer and Deputy Permanent Observer employed by the Observer Mission participate in public speaking engagements outside of their U.N. activities.

Id. at 88. The evidence supporting these factual predicates was admitted without objection by defendants, and until now defendants have not disputed any of these specific factual findings.

Likewise, defendants' objection to the instant motion does not dispute findings (a)-(d) above. These non-disputed findings, standing alone, easily constitute "minimum contacts" with the United States necessary for the exercise of personal jurisdiction. Moreover, the PLO's subsequent filings with the Department of Justice (published after this issue was first briefed in 2000) provide further evidence of the PLO's systematic, continuous and extensive contacts with the United States. Exhibits E 7-11.

In their objection, defendants question (for the first time) factual finding (e) above. Here too, defendants do not actually <u>dispute</u> that their Observer Mission personnel conduct activities outside of the U.N. Rather, defendants argue that plaintiffs merely "assume" without proving that the Palestinian Observer Mission continues to conduct the non-U.N. activities described in <u>Klinghoffer</u>, and that by making such an assumption plaintiff "overlook the drastic restrictions" placed on PLO activities in the U.S. in 1988 by the Anti-Terrorism Act, 22 U.S.C. §§ 5201-5203. Def. Memo at 5.

This argument fails, in the first place, because it is based on a fiction: neither plaintiffs

nor the Court relied on any "presumption of continuity" from <u>Klinghoffer</u> to establish that the Mission conducts non-U.N. activities today. In fact, both the plaintiffs in their pleadings and the Court in its decision relied on the admission by Deputy Observer Marwan Jilani that the Mission's role is, <u>inter alia</u>, to conduct public relations and propaganda outside of the U.N., "*in all activities, discussion, dialogues and debates . . . to the people of the world who are concerned with those issues*" and to "*present the views of Palestine to the interested public.*" <u>Ungar v. Palestinian Authority</u>, 153 F. Supp.2d 90. Indeed, Mr. Jilani himself was served with process while giving a public lecture near Boston. <u>Ungar v. Palestinian Authority</u>, 153 F. Supp.2d. at 90. and conducts interviews outside the U.N. Exhibit GG.

Likewise, Mr. Jilani's superior, Observer Nasser al-Kidwa, conducts frequent public interviews outside of the U.N. For example, during a sample 18 month period examined by plaintiffs (between October 2000 and April 2002) Mr. al-Kidwa was interviewed or spoke publicly outside of the U.N. about the Middle East, Palestinian affairs and other matters nearly 30 (!) times.[11] Exhibit AA.

Moreover, defendants' attempt to rely on the 1988 Antiterrorism Act is wholly unavailing. In fact, several months after the signing of the Oslo Accords in 1993, the President <u>suspended</u> the provisions of the Antiterrorism Act that restricted PLO activities in the United States.[12]

---

[11] For the sake of simplicity, plaintiffs' have excluded from this count numerous other public appearances by Mr. al-Kidwa during this period where he discussed strictly U.N. matters, even though such news media interviews <u>about</u> U.N. matters are also clearly "contacts with the U.S." outside of the PLO's official activities at the U.N., under the standard set in <u>Klinghoffer</u>.

[12] <u>See</u> Presidential Determination No. 94-13, "Lifting Restrictions on U.S. Relations With the Palestine Liberation Organization" 59 FR 4777, February 1, 1994, at I (A) (3). Exhibit Y.

This waiver of the restrictions contained in the Antiterrorism Act of 1988 has been continually renewed by the President from 1994 until the present day. <u>See</u> Presidential Determination No. 94-30, 59 FR 35607, July 13, 1994; Presidential Determination No. 95-12, 60 FR 2673, January 11, 1995; Presidential Determination No. 95-31, 60 FR 35827, July 11, 1995; Presidential Determination No. 95-36, 60 FR 44725, August 28, 1995; Presidential

Defendants know full well that these restrictions were lifted nearly a decade ago. Indeed, Mr. Rahman's Biography indicates that he assumed his position as "Chief Representative" of the PLO (and the PA) in 1994, immediately following the suspension of the restrictions on PLO activities. Exhibit B. The PLO has been conducting systematic, continuous and extensive activities in the United States, as fully detailed above, ever since. Thus, defendants' putative reliance on restrictions imposed in 1988, made without revealing that those restrictions were lifted in 1994, is simply an attempt to mislead the Court.

### IV.  PERSONAL JURISDICTION OVER DEFENDANTS HAS ALSO BEEN ESTABLISHED PURSUANT TO FED.R.CIV.P. 4(k)(2)

Plaintiffs have asserted and argued at length in the alternative that this Court's <u>in personam</u> jurisdiction over the PA and PLO has been established pursuant to Fed.R.Civ.P. 4(k)(2), through the undisputed service of process that was effected by plaintiffs on the PA and PLO pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 1965. Memorandum in Support of their Objection to Defendants' Motion to Dismiss the Complaint (filed September 13, 2000) pp. 8-9, Memorandum in Further Opposition to Defendants' Motion to Dismiss for Lack of Jurisdiction (filed November 15, 2000) pp. 7- 10.

---

Determination No. 95-50, 60 FR 53093, October 11, 1995; Presidential Determination No. 96-5, 60 FR 57821, November 22, 1995; Presidential Determination No. 96-8, 61 FR 2889, January 29, 1996; Presidential Determination No. 96-20, 61 FR 26019, May 23, 1996; Presidential Determination No. 96-32, 61 FR 32629, June 25, 1996; Presidential Determination No. 96-41, 61 FR 43137, August 21, 1996; Presidential Determination No. 97-17, 62 FR 9903, March 4, 1997; Presidential Determination No. 98-8, 62 FR 66255, December 18, 1997; Presidential Determination No. 98-29, 63 FR 32711, June 16, 1998; Presidential Determination 99-5, 63 FR 68145, December 9, 1998; Presidential Determination No. 99-25, 64 FR 29537, June 2, 1999; Presidential Determination No. 00-2, 64 FR 58755, November 1, 1999; Presidential Determination No. 2000-19, 65 FR 24852, April 27, 2000; Presidential Determination No. 01-13, 66 FR 20585, April 24, 2001; Presidential Determination No. 2002-14, 67 FR 20427, April 25, 2002; Presidential Determination No. 03-03, 67 FR 65471, October 25, 2002; Presidential Determination No. 2003-20, 68 FR 20327, April 25, 2003.

Because the Court found that service on the PLO and PA was effective under Rule 4(h)(1), and that it could therefore exercise personal jurisdiction over these defendants pursuant to 18 U.S.C. §2334(a) and Rule 4(k)(1)(D), it did not rule on plaintiffs' alternative assertion of personal jurisdiction under Rule 4(k)(2). <u>Ungar v. Palestinian Authority</u>, 153 F. Supp.2d. at 91 n. 3.

As demonstrated well beyond the preponderance of the evidence, plaintiffs have effected service of process pursuant to Rule 4(h)(1) on the officers and/or managing or general agents of the PA and PLO, and the Court is respectfully requested to make such an affirmative finding.

Nevertheless, in the interest of thoroughness and in order to preserve this alternative basis[13] for personal jurisdiction, plaintiffs assert and reiterate their claims regarding the exercise of personal jurisdiction over the PA and PLO pursuant to Fed.R.Civ.P. 4(k)(2). Because these claims were previously plead in thorough detail, for the sake of economy plaintiffs hereby incorporate by reference those pleadings (and the relevant exhibits thereto) as if fully set out herein.

## V.    CONCLUSION

Therefore, the Court is respectfully requested to enter judgment by default against the PA and the PLO as requested in plaintiffs' motion.

---

[13] As discussed at length in plaintiffs' pleadings, Rule 4(k) (2) would constitute an alternative basis for jurisdiction in the event that the Court found that neither Mr. Rahman nor Mr. Jilani is an officer or agent of defendants under Rule 4(h) (1), but that defendants have contacts with the United States sufficient to satisfy the requirements of due process. Plaintiffs' pleadings on this issue are fully supported by the analysis of Rule 4(k) (2) contained Court's

Plaintiffs, by their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

## CERTIFICATION

I hereby certify that on the 29th day of August, 2003 I delivered a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
    Via Federal Express

Deming E. Sherman
Annemarie Carney
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903
    Via Hand Delivery

---

subsequent decision. see Ungar v. Palestinian Authority, 153 F. Supp.2d at 91-92.