ALL-STATE® LEGAL  800-222-0510  EDR11  RECYCLED

Copyright 1999 Federal Document Clearing House, Inc.
FDCH Political Transcripts

View Related Topics

**March 25, 1999, Thursday**

**TYPE:** COMMITTEE HEARING

**LENGTH:** 16853 words

**COMMITTEE:** SENATE APPROPRIATIONS SUBCOMMITTEE ON FOREIGN OPERATIONS

**HEADLINE:** U.S. SENATOR MITCH MCCONNELL (R-KY) HOLDS HEARING ON WYE RIVER AID PACKAGE

**LOCATION:** WASHINGTON, D.C.

**BODY:**
U.S. SENATE COMMITTEE ON APPROPRIATIONS, SUBCOMMITTEE ON FOREIGN

OPERATIONS HOLDS HEARINGS ON WYE RIVER AID PACKAGE

MARCH 25, 1999

SPEAKERS: U.S. SENATOR MITCH MCCONNELL (R-KY), CHAIRMAN

U.S. SENATOR ARLEN SPECTER (R-PA)

U.S. SENATOR JUDD GREGG (R-NH)

U.S. SENATOR RICHARD C. SHELBY (R-AL)

U.S. SENATOR ROBERT F. BENNETT (R-UT)

U.S. SENATOR BEN NIGHTHORSE CAMPBELL (R-CO)

U.S. SENATOR CHRISTOPHER BOND (R-MO)

U.S. SENATOR PATRICK J. LEAHY (D-VT),

RANKING MEMBER

U.S. SENATOR DANIEL K. INOUYE (D-HI)

U.S. SENATOR FRANK R. LAUTENBERG (D-NJ)

U.S. SENATOR TOM HARKIN (D-IA)

U.S. SENATOR BARBARA A. MIKULSKI (D-MD)

U.S. SENATOR PATTY MURRAY (D-WA)

U.S. SENATOR ROBERT C. BYRD (D-WV)

MARTIN S. INDYK, ASSISTANT SECRETARY OF STATE

FOR NEAR EASTERN AFFAIRS, U.S. DEPARTMENT OF STATE

MARK RICHARD, DEPUTY ASSISTANT ATTORNEY GENERAL,

CRIMINAL DIVISION, U.S. DEPARTMENT OF JUSTICE

STEPHEN FLATOW, WEST ORANGE, NEW JERSEY

VICKI EISENFELD, WEST HARTFORD, CONNECTICUT

DIANA CAMPUZANO, NEW YORK, NEW YORK

NATHAN LEWIN, WASHINGTON, D.C.

JEAN-CLAUDE NIDDAM, DIRECTOR, LEGAL ASSISTANCE DIVISION, ISRAELI MINISTRY OF JUSTICE

**HASAN ABDEL RAHMAN,** CHIEF REPRESENTATIVE OF THE PLO

AND THE PNA TO THE UNITED STATES

\*

MCCONNELL: This hearing today is being held at the request of my friend and colleague, Senator Arlen Specter. As the subcommittee proceeds with consideration of the administration's substantial request to meet commitments made at the Wye Plantation, congressional emphasis must be on how the assistance advances America and our regional partners' interests in security and stability.

Today we will focus on the Palestinian piece of the package. The Oslo accords and subsequent agreements negotiated by the administration spell out specific obligations undertaken by the **Palestinian authority.** In reviewing the $400-million request for the Palestinians, we must consider whether they have met these key obligations, including developing and sharing a plan to collect illegal weapons, reducing the size of security forces and cooperating with Israeli and U.S. authorities on cases involving terrorism, especially when Americans are the victims.

As I indicated, my colleague, Senator Specter, will be presiding over this hearing. I thank him for suggesting that we do this, and I'm going to now turn the chair over to Senator Specter.

SPECTER: Mitch, thank you very much. Thank you very much, Senator McConnell, for convening this hearing in your capacity as chairman of the foreign operations subcommittee of Appropriations.

The issues outlined by Chairman McConnell are matters of great importance as they relate to the appropriations bill which will be coming out of this subcommittee. During my service on the subcommittee since I was elected to the Senate I found the work enormously important. It is a very small share of the total federal budget, but a very, very important part, and the aspect of how responses are made to the issue of terrorism is one of enormous importance as we evaluate the allocations to the **Palestinian authority** for the upcoming fiscal year.

This issue came into sharp focus for me in December when I accompanied President Clinton on his trip to Israel. And at that time a number of parents of victims of terrorists attacks, terrorists murders, asked that something be done in a very concrete way, and my response was that we would try to schedule a hearing on the subject and bring together people from the administration who are key participants.

We have a very distinguished panel here with the Honorable Martin Indyk, assistant secretary of state for Near Eastern Affairs, who had been ambassador to Israel, has a very distinguished record and knows this subject and many others related to it.

And Deputy Assistant Attorney General Mark Richard, a man whom I have known for decades. He started his career in 1967 as a real career professional, something that's unusual in Washington, D.C. Mark Richard brings a lot of information. I have worked with him since my days as district attorney of the city of Philadelphia. And we have relatives of victims and then we have the chief representative of the **Palestinian Authority** to the United States with us today -- a man whom I have known over the years; met with as early as Tuesday of this week when Chairman Arafat was in town, we had a meeting. And also the head of the legal assistance between Israel and the **Palestinian Authority** from the Israeli Ministry of Justice.

So we have people who are in a position to know this subject and move ahead to try to resolve it.

It is a matter of tremendous importance since the signing of the Oslo accords 12 American citizens have been killed in terrorist attacks. There is some dispute as to the number, depending on how you count an American citizen, but I think the accurate number is 12. There have been efforts to investigate the matter. There's a real question as to whether the administration is doing what should be done. We note that rewards of up to $5 million have been offered for information or other assistance to lead to the arrest or conviction in many, many other terrorist attacks. But according to the information provided to me, that is not present with the issues of the murder of U.S. citizens.

There have been requests to the **Palestinian Authority** for the transfer to Israel of seven individuals who are suspected of murdering American citizens. There are specific factual matters which have to be determined to activate that, and they have not been turned over. And we're going to be asking very pointed questions on that subject. And there is a question as to whether there has been adequate Israeli cooperation.

I wrote on the subject back last July -- last May -- and received a response in July from Acting Assistant Attorney General Suiten (ph) complaining that the Israelis had delayed in complying with an October, 1996 Department of Justice request for information.

So there are many open questions. We're joined by our distinguished colleague Senator Lautenberg who has been a member of this subcommittee almost as long as I have. He was elected in 1982 and has been a very active participants on this subject and many subjects related to this matter, and he's taken leave of his pressing duties as ranking member of the budget committee, which is on the floor today, to emphasize the importance of this hearing.

Senator Lautenberg?

LAUTENBERG: Thank very much, Senator Specter, for scheduling this hearing on two important subjects -- the Wye aid package and terrorist attacks on U.S. citizens in Israel. And I must say that few here have taken the active interest that Senator Specter has in these matters. And as a matter of further fact is Senator Specter has traveled to what I would consider some risky places to see if he could bring people to the table -- heads of government to the table to engage in sensible dialogue to achieve a peaceful resolution of dispute. And I'm sure though those efforts don't turn out the kinds of effects we like to see immediately, but it does have an impact and we thank you Senator Specter for your hard work.

I'm delighted to see Ambassador Martin Indyk. He served with distinction as our ambassador to Israel before assuming his present important post as assistant secretary for Near East affairs; and Mr. Richard, though we don't know each other directly, Richard, I know of your reputation. It's good and we're pleased to have you here.

I hope that we'll be able to hear how we can best support the peace process. In my view, one step we've got to take is the United States must fulfill President Clinton's commitment at Wye River to additional aid to support redeployment of Israeli forces and to improve conditions in the West Bank and Gaza. I visited there a few months ago and I am persuaded that unless we start to see some improvement in the living standard of the inhabitants of Gaza and the West Bank that you can never really rely on stability to take over. They can't have that kind of disparity between one community and another and expect people to sit back and settle for the deplorable conditions.

So we -- I support fully what we're committed to do. Our emergency supplemental which we now have in front of us includes $100 million also in aid to Jordan to demonstrate our support during the transition following the passing of a great and dear friend of peace, King Hussein.

LAUTENBERG: I'm disappointed, however, that we have not included the Wye aid package for Israel and the Palestinians in the supplemental bill. Now I don't know what kind of recourse we have there, but we'll watch with interest and try to seize any opportunity that we can to make sure that we fulfill a commitment that we have to both parties, even as we hope that both parties will fulfill their commitment to the agreement and with full effort.

In my (OFF-MIKE), we should stand ready to support implementation of the Wye River Memorandum as soon as that process is back on track. Meanwhile, we must not let violence divert us from the road to peace. We must continue to pursue justice for those who have committed -- against those who have committed terrorist acts, particularly those who have injured or killed American citizens. The **Palestinian Authority** must fully investigate any leads in these cases and arrest and prosecute every individual responsible for terrorism, and we must stand with the American victims and their families in their quest for some measure of success.

I want to welcome a friend and constituent, Steve Flatow. Steve's going to be testifying today. Since a suicide bomber took the life of Steve's daughter, Alisa, in 1995, it was the day also that I arrived in Israel on a trip and placed a call to the Flatow family. Steve was already on his way to Israel. They had been notified. We've worked together to try to undermine the sources of support for terrorism. I have great respect for the efforts of Steve Flatow to try to deter that pain and that anguish from any other family, and his daughter was there, an innocent traveler. She wasn't in uniform and she wasn't pursuing a course in conflict. She was a student, and it was a disastrous attack that was leveled against her and her other friends.

Well, on the basis of the legislation that I introduced, Mr. Flatow won a $247 million judgment against Iran as a state sponsor of the terrorist act which killed his daughter. I was in the courtroom when the decisions were handed down in both cases. And I -- that was, first, to judge that the terrorists were Iran-state-supported, and secondly, when the damage awards were made. I continue to work with Steve Flatow to help him collect on this judgment against Iran. I only wish the administration would be helping us more rather than obstructing this effort. And I also want to welcome Vicki Eisenfeld. Her son was -- Matt was killed at the same time that Sarah Duker, another constituent family from New Jersey, in another terrorist attack.

And I look forward to working with Ms. Eisenfeld to identify and hold responsible those who financed, planned and carried out these heinous crimes. I look forward to hearing from all of our witnesses, Mr. Chairman, this morning to see how we can sustain and revitalize the peace process and how we can work together to combat the scourge of terrorism in the Middle East and all around the world, and I thank you

very much for holding this hearing.

SPECTER: Thank you very much, Senator Lautenberg. We have listed General Richard number one, and Secretary Indyk number two. So we'll proceed in that order. Welcome, Mr. Richard. I note that you served in the Justice Department since 1979, trial attorney in the Fraud Section, chief of the Major Violations Unit, director of the attorney general's White Collar Crime Committee. Thank you for joining us on the floor here.

We would like to limit the opening statements, if we might, to five minutes, leaving the maximum amount of time for dialogue, questions and answers. All statements will be made a part of the record in their entirety.

RICHARD: Thank you, Mr. Chairman. Let me begin by apologizing for the lateness of the delivery of my statement. And we will endeavor to be -- to be more timely in the future. And I do want to apologize.

I will summarize just key portions of the statement. The Justice Department, and more particularly, the FBI, initiates an inquiry into each and every terrorist attack that causes the death of a U.S. citizen abroad. The terrorist attacks that killed American citizens in Israel, the West Bank and Gaza over the last several years are no exception. Moreover, U.S. nationals who suffer injuries but who survive terrorist attacks, such as Diana Campuzano, are also investigated. Incidents like that are also investigated by the FBI.

With regard to the particular facts of the cases here, we would say that the attacks that killed David Boim, Yaron Ungar drive-by shootings. Sara Duker, Matthew Eisenfeld, Ira Weinstein, Alisa Flatow, Joanne Davenny, Leah Stern, Yael Botwin were killed in suicide bombing attacks that occurred in public places. Nachon Wachsman, a dual U.S.-Israeli citizen and an Israeli soldier, was kidnaped and held for ransom before being killed by his captors during an Israel rescue attempt. In each of these cases, responsibility is claimed either by Hamas or the Palestinian Islamic Jihad.

The state of Israel or the **Palestinian Authority** has arrested and convicted many of the surviving terrorists who they claim were involved in these attacks, and those persons are now serving sentences in Israeli and Palestinian prisons. As much of the information that we have regarding these incidents is derived from Israeli and **Palestinian authorities**, it would be inappropriate to go into great detail the information that we have available regarding these incidents. Moreover, public revelation at this point of such information could very well prejudice our ongoing inquiries.

Let me describe, though, briefly our efforts to secure cooperation from both the Israeli and **Palestinian authorities**. These efforts involve both formal diplomatic correspondence and more informal exchanges of information. In each of the eight attacks I have listed, the FBI deployed investigators to the region after the incident. Thereafter, the FBI, through the Department of Justice, submitted through diplomatic channels formal requests in which we sought such things as investigative and forensic reports, witness statements and confessions.

Although Israel's response to these requests was not as timely or forthcoming as we had hoped, our first request was denied in part because of the Israeli concerns that disclosure of some information could compromise their national security. We have nevertheless been able to obtain material, information and additional assistance through more direct, in-person meetings with our Israeli counterparts. In March of '98, I led a Justice and FBI delegation to Israel where we were able to secure significant commitments from the Israelis to provide us with all of their law enforcement materials pertinent to these cases subject to national security considerations.

During this visit, we also received assurances from Chairman Arafat that the **Palestinian Authority** would similarly cooperate in our efforts to bring killers of American citizens to justice. I would note that both with

respect to the Israelis and the Palestinians, that their commitment does not necessarily include a willingness to allow American investigators to conduct on-the-ground investigation about these incidents. They are willing to give FBI access to non-classified information generated by their law enforcement and intelligence apparatuses, but at present they are not prepared to allow joint U.S.-Israeli or U.S.-Palestinian investigations.

SPECTER: Who is that unwilling to allow...

RICHARD: Oh, the Palestinians and the Israelis. We do not conduct joint investigations. I would add, though, I am not sure that if the tables were reversed, that we would allow independent foreign investigators to conduct inquiries in our territory under similar circumstances.

Documentary evidence provided by the Israelis and the Palestinians has enhanced our understanding of these incidents. In October of '98, another team went, consisting of two prosecutors and several FBI agents, remaining there for a 2-week period to engage in face-to-face meetings and interviews with Israeli police officers and prosecutors who handled these cases from the crime scenes through the investigation and prosecution. These meetings were very fruitful. Since October, the FBI has been in periodic contact with the Israeli Ministry of Justice, and they will be returning to the region in the near future.

Let me just add in closing that these extra-territorial investigations are complex, but they are nevertheless guided by the same standards that apply to prosecutions of federal crimes in the United States. And that is when -- only when we have sufficient admissible evidence available for use at trial that can obtain and support a conviction, will we seek an indictment. Until that point is reached, these cases -- in these cases, there is no basis for our seeking transfer of suspects being held in either Israeli or Palestinian custody.

Mr. Chairman, that completes my summary of the statement. I'll be glad to answer any questions you may have.

SPECTER: Thank you very much, Mr. Richard. We now turn to Mr. Martin Indyk, Assistant Secretary for Near Eastern Affairs, has served as U.S. Ambassador to Israel 1995 to 1997; and prior to that, was Special Assistant to the President and Senior Director for Near East and South Asian Affairs with the National Security Council. Welcome, Mr. Indyk, and the floor is yours.

INDYK: Thank you very much, Senator Specter. I'm very grateful for this opportunity to address the Senate Appropriations Subcommittee on Foreign Operations, and in particular, to address you, sir, and Senator Lautenberg, whom I have had the pleasure of working with both of you to advance our interests, particularly in peace in the Middle East.

I don't know of two other members of Congress or the Senate who have been actively engaged in the time that I've been in the administration, and we greatly appreciate the -- your involvement, your active interest in this, and we appreciate the opportunity to work with you, not only here but, of course, out there in Israel, Gaza and the West Bank on your many visits there. And we appreciate that highly.

If you'll allow me, Senator Specter, I did want to just make a few remarks about our requests for the Wye supplemental, which I understand is...

SPECTER: Mr. Secretary, that's fine.

INDYK: ... one of the issues. I've got much longer remarks that I appreciate you putting on the record, and I will simply summarize that.

SPECTER: They will be without objection made a part of the record in full.

INDYK: Thank you very much. Mr. Chairman, in this part of the world, it is impossible to separate our political and our economic interests. Economic progress in the Middle East serves America's political interests, and political progress in the Middle East serves our economic interests. The linkages between economics and our political goals are nowhere clearer than in our efforts to achieve a secure, stable and lasting peace in the Middle East.

LAUTENBERG: I'm disappointed, however, that we have not included the Wye aid package for Israel and the Palestinians in the supplemental bill. Now I don't know what kind of recourse we have there, but we'll watch with interest and try to seize any opportunity that we can to make sure that we fulfill a commitment that we have to both parties, even as we hope that both parties will fulfill their commitment to the agreement and with full effort.

In my (OFF-MIKE), we should stand ready to support implementation of the Wye River Memorandum as soon as that process is back on track. Meanwhile, we must not let violence divert us from the road to peace. We must continue to pursue justice for those who have committed -- against those who have committed terrorist acts, particularly those who have injured or killed American citizens. The **Palestinian Authority** must fully investigate any leads in these cases and arrest and prosecute every individual responsible for terrorism, and we must stand with the American victims and their families in their quest for some measure of success.

I want to welcome a friend and constituent, Steve Flatow. Steve's going to be testifying today. Since a suicide bomber took the life of Steve's daughter, Alisa, in 1995, it was the day also that I arrived in Israel on a trip and placed a call to the Flatow family. Steve was already on his way to Israel. They had been notified. We've worked together to try to undermine the sources of support for terrorism. I have great respect for the efforts of Steve Flatow to try to deter that pain and that anguish from any other family, and his daughter was there, an innocent traveler. She wasn't in uniform and she wasn't pursuing a course in conflict. She was a student, and it was a disastrous attack that was leveled against her and her other friends.

Well, on the basis of the legislation that I introduced, Mr. Flatow won a $247 million judgment against Iran as a state sponsor of the terrorist act which killed his daughter. I was in the courtroom when the decisions were handed down in both cases. And I -- that was, first, to judge that the terrorists were Iran-state-supported, and secondly, when the damage awards were made. I continue to work with Steve Flatow to help him collect on this judgment against Iran. I only wish the administration would be helping us more rather than obstructing this effort. And I also want to welcome Vicki Eisenfeld. Her son was -- Matt was killed at the same time that Sarah Duker, another constituent family from New Jersey, in another terrorist attack.

And I look forward to working with Ms. Eisenfeld to identify and hold responsible those who financed, planned and carried out these heinous crimes. I look forward to hearing from all of our witnesses, Mr. Chairman, this morning to see how we can sustain and revitalize the peace process and how we can work together to combat the scourge of terrorism in the Middle East and all around the world, and I thank you very much for holding this hearing.

SPECTER: Thank you very much, Senator Lautenberg. We have listed General Richard number one, and Secretary Indyk number two. So we'll proceed in that order.

Welcome, Mr. Richard. I note that you served in the Justice Department since 1979, trial attorney in the Fraud Section, chief of the Major Violations Unit, director of the attorney general's White Collar Crime Committee. Thank you for joining us on the floor here.

We would like to limit the opening statements, if we might, to 5 minutes leaving the maximum amount of time for dialogue, questions and answers. All statements will be made a part of the record in their entirety.

RICHARD: Thank you, Mr. Chairman. Let me begin by apologizing for the lateness of the delivery of my statement. And we will endeavor to be -- to be more timely in the future. And I do want to apologize.

I will summarize just key portions of the statement. The Justice Department, and more particularly, the FBI, initiates an inquiry into each and every terrorist attack that causes the death of a U.S. citizen abroad. The terrorist attacks that killed American citizens in Israel, the West Bank and Gaza over the last several years are no exception. Moreover, U.S. nationals who suffer injuries but who survive terrorist attacks, such as Diana Campuzano, are also investigated. Incidents like that are also investigated by the FBI.

With regard to the particular facts of the cases here, we would say that the attacks that killed David Boim, Yaron Ungar drive-by shootings. Sara Duker, Matthew Eisenfeld, Ira Weinstein, Alisa Flatow, Joanne Davenny, Leah Stern, Yael Botwin were killed in suicide bombing attacks that occurred in public places. Nachon Wachsman, a dual U.S.-Israeli citizen and an Israeli soldier, was kidnaped and held for ransom before being killed by his captors during an Israel rescue attempt. In each of these cases, responsibility is claimed either by Hamas or the Palestinian Islamic Jihad.

The state of Israel or the **Palestinian Authority** has arrested and convicted many of the surviving terrorists who they claim were involved in these attacks, and those persons are now serving sentences in Israeli and Palestinian prisons. As much of the information that we have regarding these incidents is derived from Israeli and **Palestinian authorities**, it would be inappropriate to go into great detail the information that we have available regarding these incidents. Moreover, public revelation at this point of such information could very well prejudice our ongoing inquiries.

Let me describe, though, briefly our efforts to secure cooperation from both the Israeli and **Palestinian authorities.** These efforts involve both formal diplomatic correspondence and more informal exchanges of information. In each of the eight attacks I have listed, the FBI deployed investigators to the region after the incident. Thereafter, the FBI, through the Department of Justice, submitted through diplomatic channels formal requests in which we sought such things as investigative and forensic reports, witness statements and confessions.

Although Israel's response to these requests was not as timely or forthcoming as we had hoped, our first request was denied in part because of the Israeli concerns that disclosure of some information could compromise their national security. We have nevertheless been able to obtain material, information and additional assistance through more direct, in-person meetings with our Israeli counterparts. In March of '98, I led a Justice and FBI delegation to Israel where we were able to secure significant commitments from the Israelis to provide us with all of their law enforcement materials pertinent to these cases subject to national security considerations.

During this visit, we also received assurances from Chairman Arafat that the **Palestinian Authority** would similarly cooperate in our efforts to bring killers of American citizens to justice. I would note that both with respect to the Israelis and the Palestinians, that their commitment does not necessarily include a willingness to allow American investigators to conduct on-the-ground investigation about these incidents. They are willing to give FBI access to non- classified information generated by their law enforcement and intelligence apparatuses, but at present they are not prepared to allow joint U.S.-Israeli or U.S.-Palestinian investigations.

SPECTER: Who is that unwilling to allow...

RICHARD: Oh, the Palestinians and the Israelis. We do not conduct joint investigations. I would add, though, I am not sure that if the tables were reversed, that we would allow independent foreign investigators to conduct inquiries in our territory under similar circumstances.

Documentary evidence provided by the Israelis and the Palestinians has enhanced our understanding of these incidents. In October of '98, another team went, consisting of two prosecutors and several FBI agents, remaining there for a 2-week period to engage in face-to-face meetings and interviews with Israeli police officers and prosecutors who handled these cases from the crime scenes through the investigation and prosecution. These meetings were very fruitful. Since October, the FBI has been in periodic contact with the Israeli Ministry of Justice, and they will be returning to the region in the near future.

Let me just add in closing that these extra-territorial investigations are complex, but they are nevertheless guided by the same standards that apply to prosecutions of federal crimes in the United States. And that is when -- only when we have sufficient admissible evidence available for use at trial that can obtain and support a conviction, will we seek an indictment. Until that point is reached, these cases -- in these cases, there is no basis for our seeking transfer of suspects being held in either Israeli or Palestinian custody.

Mr. Chairman, that completes my summary of the statement. I'll be glad to answer any questions you may have.

SPECTER: Thank you very much, Mr. Richard. We now turn to Mr. Martin Indyk, Assistant Secretary for Near Eastern Affairs, has served as U.S. Ambassador to Israel 1995 to 1997; and prior to that, was Special Assistant to the President and Senior Director for Near East and South Asian Affairs with the National Security Council. Welcome, Mr. Indyk, and the floor is yours.

INDYK: Thank you very much, Senator Specter. I'm very grateful for this opportunity to address the Senate Appropriations Subcommittee on Foreign Operations, and in particular, to address you, sir, and Senator Lautenberg, whom I have had the pleasure of working with both of you to advance our interests, particularly in peace in the Middle East.

I don't know of two other members of Congress or the Senate who have been actively engaged in the time that I've been in the administration, and we greatly appreciate the -- your involvement, your active interest in this, and we appreciate the opportunity to work with you, not only here but, of course, out there in Israel, Gaza and the West Bank on your many visits there. And we appreciate that highly.

If you'll allow me, Senator Specter, I did want to just make a few remarks about our requests for the Wye supplemental, which I understand is ...

SPECTER: Mr. Secretary, that's fine.

INDYK: ... one of the issues. I've got much longer remarks that I appreciate you putting on the record, and I will simply summarize that.

SPECTER: They will be without objection made a part of the record in full.

INDYK: Thank you very much. Mr. Chairman, in this part of the world, it is impossible to separate our political and our economic interests. Economic progress in the Middle East serves America's political interests, and political progress in the Middle East serves our economic interests. The linkages between economics and our political goals are nowhere clearer than in our efforts to achieve a secure, stable and lasting peace in the Middle East.

INDYK: We have over the years made a major contribution to Israel's economic well being. With a GNP approaching $100 billion and a standard of living equal to much of western Europe, Israel is now able to stand on its own feet economically. And this has enabled the Congress to being the phase-out of economic assistance to Israel. On the other side, however, Israel's Arab partners in the peace process face daunting economic challenges; first and foremost: high unemployment rates which are undercutting support for the peace process.

Unemployment in the West Bank and Gaza and in Jordan is in the 20 to 30 percent range. Per capita incomes are one-tenth of Israel's, and with populations that expected a dividend in return for the risks their leaders took for peace, continued economic stagnation is damaging to the peace process and to our other interests in the region. So economic progress in the West Bank and Gaza and Jordan is essential to our political objective of advancing the peace process, and that is why the Wye supplemental is so important, as Senator Lautenberg has pointed out, in helping to provide the critical economic underpinnings for this stage in the peace process and for the final status talks to come.

The signing of the Wye River Memorandum was an important milestone for the Middle East peace process. That memorandum establishes a parallel process for the implementation of all outstanding obligations of both sides, the Palestinians and the Israelis under the interim agreement. Jordan, too, played an important role at Wye, and we depend on it to play a key role in the peace process as it evolves.

In this transition period following the death of King Hussein, we need to send a strong signal of support for King Abdullah as he continues in the footsteps of his father. Both the government of Israel and the **Palestinian Authority** requested U.S. financial support to help them implement the Wye Memorandum and to provide a tangible demonstration of U.S. support as they approached the final status talks.

Our pledge to work with Congress to secure $400 million in supplemental assistance for the Palestinians has already enabled us to mobilize increased assistance to the tune of about $3 billion in commitments made at the International Donors Conference that the president hosted last fall. The Palestinians need to know that as they fulfill their Wye obligations, their economic circumstances will improve. On the Israeli side, the implementation of Wye will involve security-related costs that the president has promised to help defray.

At the same time as Israel makes peace with the Palestinians, it is also facing wider security challenges which it is seeking our assistance to pay for. And as part of our long-standing commitment to Israel's security, the president believes it is important to provide additional funding to help Israel to meet these wider security challenges.

I won't go through the details of the We Package. That is in my formal presentation. I'll just summarize it as saying that we are seeking $1.2 billion in foreign military financing for Israel, $400 million in economic support funds for the Palestinians, and $300 million for Jordan broken down as $100 million in EHF and $200 million in FF. In the case of Jordan, the Senate has already taken action, which we appreciate very much, in approving the first $100 million tranche of this amount last Tuesday.

It's important that we move forward quickly to demonstrate our support for Jordan's King Abdullah, and this will help significantly. It will also help in the effort that President Clinton has undertaken to mobilize the Gulf States, the Europeans, our other G-7 allies, the Israelis, the IMF and the World Bank to support the various components of a broad package for Jordan, of debt relief, debt rescheduling, additional aid and an effort to expand the market for Jordanian goods and labor, both in the Gulf and in the West Bank and in Israel.

The supplemental is a key element in our approach. We need to deliver the full $300 million that the

president's requested to maintain our leadership in this effort and to ensure a stable transition and provide the leverage to bring other partners on board in this effort to help provide Jordan with the means to ensure that it can grow its economy in this difficult period. In regard to Israel, in recent months we have met on a number of occasions with Israeli officials from the Ministry of Finance and Defense to define together the allocation of the $1.2 billion that we are seeking in supplementary security-related assistance.

We've worked with the Israelis to prioritize their requirements, focusing heavily on U.S.-source FF that would be provided to the Ministry of Defense. We're moving close to agreement with the Israelis on this full package. We've agreed to finance certain expenses relating to relocation of bases, Israeli army bases from the West Bank to Israel proper. These would be priority items for FY99 funding. We are looking into the possibility of the Army Corps of Engineers serving as project manager for this effort.

We also believe we should support other counter-terrorism requirements that the Israelis have, including explosive detection and identification equipment and field vehicles. Finally, we're looking at meeting a portion of Israel's strategic military requirements. These include items such as theater missile defense -- a subject which I know is close to the heart of many in the senate -- and related R&D costs that could help Israel address the emerging Iranian missile threat, Longbow helicopter upgrades, electronic warfare, aerial platforms and other communications and munitions requirements. Our discussions with the Israelis are progressing well, and we expect to finalize the complete package in the coming weeks.

As for the Palestinians, they have pressing needs associated with We implementation, as Senator Lautenberg has mentioned. Their standard of living has fallen by some 40 percent since the signing of the Oslo Accords. Instead of enjoying the tangible benefits of peace, the Palestinian economy has suffered a severe downturn. We are seeking in FY99 a total of $200 million in supplemental resources for specific development projects, $100 million of that used for projects directly related to Wye implementation, such as security equipment to facilitate movement of Palestinian workers and goods through crossing points, cold storage equipment at Gaza Airport, safe passage infrastructure and resources for enhanced people-to-people programs.

An additional $100 million will be programmed for urgent Palestinian needs focusing on activities such as community development, rule of law, maternal child health care, a scholarship program for higher education in key sectors and the urgent task of preparing the Palestinians to take advantage of the potential for tourism in the year of the millennium. In the outyears in 2000, 2001, our proposal would include $100 million each for projects with longer lead times that involve infrastructure, key infrastructure, projects in the West Bank, things like the West Bank Industrial State.

It is our view that it is important to secure congressional support now for the full Palestinian funding package. Programmatically, we need the certainty of the outyear funding to enable us to begin to identify funding intermediaries and structures for projects in areas such as community development. It is important to emphasize that all these funds would be directly administered by USAID for specific projects for the benefit of the Palestinian people. No funds go to the **Palestinian Authority** itself.

Disbursement of both the Israeli and Palestinian components of this package would only occur in the context of Wye implementation. We are pressing both sides to fully meet their Wye obligations. The key Israeli commitment is to a sequence of redeployments in the West Bank. The key Palestinian commitment involves sustained and intensive security cooperation to fight terrorism and its infrastructure. In the Wye Memorandum, the Palestinians committed themselves to a more rigorous and systematic set of security obligations than they have done in any previous agreement with the Israelis.

It includes systematic unilateral efforts to prevent terror according to a detailed security work plan, intensive cooperation with Israel's security services, bilateral cooperation with us and a trilateral security structure with both Israel and the United States. Since the signing of the Wye Memorandum, the Palestinians have taken some important steps to combat terrorism and terrorist organizations. They have arrested scores of Hamas members, interrogated terrorism suspects and acted on that information.

Recently, Palestinian security force operations prevented what would have been very serious terrorist acts in Israel. Prime Minister Netanyahu recently telephoned Chairman Arafat to acknowledge these particular operations. Israeli Defense Minister Aarons (ph) has also spoken publicly in positive terms about what the Palestinians have been doing to combat terror. Mr. Chairman, I think I've been reading the Jerusalem Post for the last 6 years every day, as you probably have. I've not seen a headline like this one that appeared yesterday which says Netanyahu lauds the **Palestinian Authority** for following (ph) bombing.

More can and must be done because it is essential to peace that the Palestinians make a 100 percent effort to fight terrorism both unilaterally and in cooperation with Israel. But we have seen some important progress, and it's important to bear in mind that this is happening at a time when Israel, for various reasons, is not going ahead with its obligations under the second phase of the Wye agreement. At a time when this committee is understandably focusing on the glass half empty when it comes to the issue of fugitives, suspects who've been involved in the killing of American citizens, I hope you'll also bear in mind that the glass is also half full when it comes to Palestinian actions against terrorism.

We will continue to insist that the Palestinian leadership be even more vigilant in stopping these efforts. As in other aspects of the peace process, there must be a partnership on security between the **Palestinian Authority** and Israel. We are actively involved in fostering this partnership at the request of both sides, and it is now beginning to pay real dividends in terms of improving the security of the Israeli people. This underscores the important role the United States has to play in Wye implementation. What is needed now is increased bilateral assistance, in the first instance, for Jordan but also for Israel and the Palestinians as the Wye Memorandum is implemented.

Mr. Chairman, we are at a key juncture in the Middle East. The Wye agreement, with all its unmet promise, awaits full implementation. Final status talks are on the horizon. Israel is in the throes of an intense internal debate about the tradeoffs associated with peace as it approaches elections in May. Jordan is in a period of transition. And the Palestinians, as they look to difficult future negotiations, are desperately seeking ways to deliver a peace dividend to their people for the agreements that have already been struck.

INDYK: We have a unique opportunity to help Israel, Palestinians and Jordan make peace. This is a role the administration and Congress have played together since the beginning of the peace process in 1973. In the same vein, I hope Congress and the administration can work together in the coming months as we shape the package that can play a vital role in underpinning Middle East peace. Thank you very much, sir.

SPECTER: Thank you very much, Mr. Secretary. Before proceeding to the questioning, we've been joined by the distinguished chairman of the full committee, Senator Stevens, would you care to make a comment at this time?

STEVENS: Well, thank you very much. We've got several subcommittees meeting this morning. I do appreciate your courtesy in letting me ask. I don't understand these offsets. You say that the offsets to the Wye agreement are there. Explain those offsets to me, will you?

INDYK: Mr. Chairman, this is something that, as you know, the Office of Management and Budget is engaged in negotiations with you and others on this committee and in the House. The offsets have been put together by the Office of Management and Budget, so it's...

STEVENS: Well, I'm looking at your statement, and on page 2 it says that these amounts for the employee offset with budget authority, this breaks down to $600 million, the first item, and MFF for Israel. But the package itself is $1.2 billion for Israel. Is that list a list of what's in the package, or is it a list of the offset?

INDYK: What's presented here is the -- what we've laid out is the full request for $1.2 billion for Israel over 3 years.

STEVENS: It's a breakdown of the request, not of the...

INDYK: That's...

STEVENS: ... offsets?

INDYK: That's right, that's a breakdown of the request.

STEVENS: You -- well, I've been trying to find out what the offsets are, and I would urge you to let us know.

INDYK: Well, I'll be glad to get the OMB to provide that to you, sir.

STEVENS: I'm constrained to make -- to ask one question, and that is you entered into this agreement in October, and I think it is an important milestone, as (OFF-MIKE) substantial support. But you -- did anyone tell you there was a budget ceiling and we did not have the money unless it was somehow or other offset?

INDYK: We didn't need to be told, Mr. Chairman. I think we're very much aware of the budget caps and particularly of the caps on foreign assistance. The president was asked by the prime minister of Israel and Chairman Arafat to assist in defraying the costs associated with the implementation of Wye and other security-related costs when it came to -- comes to Israel's defense. And that is something that the president committed to consult with Congress about trying to achieve, and this is what we're doing here in terms of coming up and proposing this. However, precisely because of our understanding of the budget ceiling, we have not presented this as emergency supplemental that would not be offset. On the contrary, we've come up with a full package of offsets.

STEVENS: I would encourage you to find some way to have some consultation with those of us who have the responsibility to live up to the budget agreement which the president signed into law. And I think that's our basic problem. We found it in the supplemental. We just did not have offsets for the Wye agreement. If we had had them that were realistic, we would've put the whole agreement funding in the supplemental. We were only able to deal with a portion of that agreement because of the offset problem. And I think it misleads a lot of people worldwide to enter into agreements that on their face and beyond the limits of the budget agreement that is a matter of law. We live under that law for another two years.

The chairman of the budget committee is right here and he can tell you -- he was the chairman, he is a ranking member -- but he can tell us even more than I about the process of satisfying such agreements that are made without regard to the current year's limitations on expenditures. It makes some of us appear to be enemies of the process that we very much support. I think I feel more aggravated about that than anything else.

I would urge you to tell them and we would like to know, and I think in a process like this since there is disagreements between the Senate and the House on the one hand with our CBO process and the Office of Management and Budget process, on how some of these things are scored. Before we lead people in other countries to believe the money is available there ought to be an agreement. There ought to be an agreement of where that money is going to come from as I think there is going to be a terrible let down in this area if we are not able to fund that Wye agreement. Right now I have to tell you, I cannot find the money to fund it.

LAUTENBERG: Mr. Chairman, I...

MCCONNELL: Senator Lautenberg, we are going to have to go ahead with the hearing in regular course.

LAUTENBERG: Thank you, Mr. Chairman.

MCCONNELL: Thank you, Senator Stevens. Before moving to the questions on terrorism and we are going to have five minutes rounds, we have a very, very extensive list of witnesses so we are going to have to proceed. We did not interrupt the Secretary because he did cover some other subjects of very substantial importance; but if we are to conclude this hearing before one o'clock which is the outside time, we are going to have to move in accordance with the time limitations. Before taking up the question of the terrorism which is the central point of our hearing, you have raised the issue of aid to Israel generally as well as aid to the Palestinians and Jordan generally.

The government of Israel has initiated a program of trying to reduce its request for US economic assistance. That is obviously a difficult question. The administration, after a year since Israel has made the proposal, is still engaged in discussions with the Government of Israel over the plan. As I understand the figures and I am trying to get this confirmed, they sent forward a budget which has deeper cuts by some $150 million than the Israeli plan had envisioned. It would be very helpful to this subcommittee in looking at your budget request, for you to conclude your discussions with Israel and to give us your judgment as to those. I don't want to go into the question in any greater detail because there are so many more focused questions which we have here today. If you could give us a response in writing, Mr. Secretary, I would appreciate it.

INDYK: Mr. Chairman, if you would just allow me to correct one thing very quickly. It is not $150 million extra; it is $30 million extra. Israel suggested that its ESF should be cut by $120 million and we are suggesting that it should be cut by $150 million.

MCCONNELL: OK, so the total cut is $150 million instead of the $120 million. Mr. Richard, let me move to the question as to the cooperation which we have had from both Israel and the Palestinians. I am informed that the FBI has encountered difficulties obtaining Palestinian cooperation with their investigation. I alluded earlier to a letter from Assistant Secretary Suitan (ph) that the Israeli's were delaying in complying with a Department of Justice request for documents October of 1996. I would like for you to supply the subcommittee with the details on compliance.

My view is that it is absolutely mandatory that we have cooperation from both sides when we make actual requests. In the context where we are making very large allocations of funding, speaking for myself, I am not going to support the funding to anybody who does not comply with our requests for information. That is an indispensable prerequisite for our judging whether or not we ought to be making those allocations.

We have some 10 Palestinian suspects who have not been extradited and we are going to have an obvious problem in getting through all of that today. What I want to focus on are the suspects related to the victims that are here today. I am going to ask both Mr. Richard and Mr. Indyk to stay with us during the course of this hearing to respond to questions which arise, if you possibly can, so we can boil down and focus on the issues we have.

We are going to need from you, Mr. Richard, details of why extradition has not been requested on others. Let me call your attention to a specific item that the suspect in the murder of American David Boim, Amjad Hinawi confessed to his role in the killing in open court in the **Palestinian Authority.** He sought in litigation to say that he drove the car, but did not realize his friend on the passenger side would shoot people. The **Palestinian Authority** sentenced the defendant to 10 years in prison, but there are reports that he has been released.

Where you have the driver of a car, there is as much guilt attached there as there is to the actual shooter. It may go to the issue of sentencing, but a representative of the United States Consulate who speaks fluent Arabic was present at the trial and heard the confession. Is not this confession a sufficient basis for an indictment? I am going to go through the list of 10 with you. You are really going to have to respond in writing to them. With that kind of evidence at hand, why has there been no indictment?

RICHARD: As I alluded to in my statement, I mean, we have to judge the reliability of any prosecution by our standards. The question about the voluntariness, the corroboration of that confession . . .

MCCONNELL: Voluntariness, it is open court, Mr. Richard.

RICHARD: The question of the process in which the confession, if you will, was obtained becomes relevant.

MCCONNELL: It is in open court, Mr. Richard.

RICHARD: I appreciate that, but I mean there is a question of what lead up to it, the prior treatment, and the like which may be relevant.

MCCONNELL: Well, what was the prior treatment?

RICHARD: I am suggesting to you that it becomes relevant to determination of whether it is going to be admissible in a courtroom here.

MCCONNELL: Do you know this case? Are you able to speak factually about this case?

RICHARD: I have the facts available, but I will say this much that we are not really going to be in a position to lay out in the kind of detail that I suspect you are looking for the precise information regarding each of these cases.

MCCONNELL: I am not talking about each of these cases. I am talking about this case. I am making an inquiry as to whether you know the facts sufficient to comment? When you have a confession which is made in open court, I would suggest to you that unless there is some trickery, or coercion, or deceit which is induced, this it is not a question of coerced confession and it is not a question of Miranda warnings. This is Israel. When there is a confession in open court my experience tells me, and I have had a little, that it is admissible. Well, my red light is on. We are not going to conclude the hearing if even the Chairman ignores the red light, so I am not going to do so.

Senator Lautenberg.

LAUTENBERG: I thank the chairman, and I have to go back to the budget on the floor and so I will just take these couple minutes. I regret that I am not going to be able to be here through the testimony of Mr. Flatow and Mrs. Eisenfeld. I want to ask Ambassador Indyk, do you think that the civil penalties that we were able to have awarded to Mr. Flatow serve as a deterrent to terrorist groups?

INDYK: I am sorry, I missed that last word.

LAUTENBERG: Serves as a deterrent. These penalties can serve as a deterrent to state-sponsorship of terrorist groups?

INDYK: I think we have to look at the record since the judgment was made. We do not see a direct connection between the judgment and a change in behavior. The behavior has not changed. In this case we are talking about Iran. The judgment was made against the Government of Iran. The support for Palestine's Islamic Jihad, which is the organization that was responsible for the very untimely and tragic death of Alisa Flatow, continues to get support from Iran. We do not see a change in that.

LAUTENBERG: Let me interrupt, Mr. Ambassador, because of the time limit. Let me say this. I think that part of the problem is that the full impact of the award has not been felt, not full, not even a beginning impact. As a consequence, I think it is almost impossible to measure. I ask this question because it is my belief that it would serve as a deterrent. We are talking about a court award, Mr. Chairman that was a quarter of a billion dollars. There are many things we have seen -- Mr. Anderson's intent to file a claim. I would ask, please, to review with the administration what it is that they can do to facilitate the Flatow's efforts to collect the damages against Iran. These people are not interested in money. I know them very well. They are interested in making sure that other families are protected to the extent that we can.

I want to also ask, Mr. Ambassador, the National Security Council staff, State/Justice Department officials have not followed through on an important issue the President made a commitment on when Steve Flatow met with him in early February. I would therefore put the question to you. Is the administration prepared to release income from the Iranian Embassy to help satisfy the judgment that he holds against Iran as the state sponsor of the terrorist act that killed his daughter?

INDYK: I looked into this question, Senator Lautenberg, and the answer that I have been given is not likely to satisfy you but it is the only one I can give you. It is that this is a subject of litigation between the U.S. government and Mr. Flatow. The Department of Justice has filed a brief in this case and we would be glad to provide you with the position that the Department of Justice has taken in this regard. Let me say beyond that, that I am therefore circumscribed from commenting on this particular issue. We have sought to identify assets that could be used for attachment by the Flatows and others in these cases, and we will continue to try to point them in that direction where it does not conflict with our other obligations, such as under the Vienna Convention on diplomatic property.

LAUTENBERG: The biggest problem seems to be access. We have met with several people joining from Sandy Berger on, each one with a commitment frankly, as I heard it personally, to make the records available. The Treasury Department has its interests, obviously, in terms of their forfeiture assets that they are responsible for protecting. I would ask please, that you see to the extent that you can that the Flatows and their representatives and the Eisenfelds have as much access as possible to the records that we have. That is the only way that we are going to be able to see whether or not we can deter these acts before they occur.

INDYK: I would be glad to do that, Senator. I have not been personally involved in this, but if they would like to meet with me, I would be glad to take this up.

MCCONNELL: Thank you very much, Senator Lautenberg. In making the request that you remain, Mr. Secretary and Attorney General Richard, I do so because we are going to be getting into some of the specifics. Secretary Indyk did not really get into the details of the terrorist attack matters the question which Senator Lautenberg has raised. As I understand it, there has been a waiver of that provision of law with respect to the verdict in the Flatow case.

I believe that the members of this subcommittee and the full Congress are going to be looking very closely at this question in evaluating the aid and we raise the question both as to Israeli cooperation as well as

Palestinian cooperation: What I want to do here, I want to hear from the next four witnesses who will be talking as victims, and what I want to come to grips with, Mr. Richard, is what has happened to the suspects in these cases.

I appreciate the fact that you may not be in a position to comment on all the details now as to why there has not been extradition, but you may be in a position to comment about why there have not been rewards offered as there have been in other cases. Mr. Secretary, I think it would be helpful for you to hear what we are dealing with on the Flatow case and others, so we would ask you to stay.

INDYK: I am in a very awkward position here, sir, because it was expressly communicated to me that we would give our testimony and then we would be released. I have other scheduled meetings immediately after this.

MCCONNELL: Well, you are not under subpoena.

INDYK: That is why I said I feel very awkward about it. I am not going to be able to stay and I am sorry.

MCCONNELL: How long can you stay?

INDYK: I have just asked my staff to check and I will let you know in a moment. I am told that I have to be back in the office at 12:30 p.m. so I have to leave here at 12:15 p.m. if that is all right with you.

MCCONNELL: OK fine, well, that would be helpful. I appreciate that to the extent that you can stay till 12:15 p.m. that would be very helpful.

INDYK: Would you allow me, sir, to just make -- since I didn't make an opening presentation -- to make a few comments about this particular issue of the American terrorist suspects.

MCCONNELL: Well, OK. I would like you to be brief. I would like you to hear these victims who are here today, but go ahead Mr. Secretary.

INDYK: First of all I want to make clear that the issue of bringing to justice terrorist suspects accused of involvement in killing American citizens is a high priority for the administration. It has been a subject on President Clinton's agenda, in his talks with Chairman Arafat over a number of years beginning back in their meeting in Sharmelshek (ph) in 1995. The secretary of state, myself, Dennis Ross, and our Consular General John Herps (ph) have constantly raised this issue with the Palestinians.

I could say in terms of my own views on this that Alisa Flatow, Matt Eisenfeld, Sarah Duker, Joanne Davenny and David Boim were all killed on my watch as U.S. ambassador in Israel. In fact, Alisa was killed on the day that I presented my credentials, a day that I will not ever forget. I personally take it very seriously that we need to find ways to bring these people to justice.

As Attorney General Richard explained to you, we don't have at the moment -- I think you are very much aware -- any indictments against any of these suspects. In the mean time, our focus is on making sure that they are apprehended. Now in this regard, I would just like to point out that there are four categories here. The first are terrorist suspects that are in Israeli custody, and there are a large number of those - over twenty.

Second category are those who are dead mainly because they blew themselves up in these terrorist acts. The

third category are those that are in the custody of the **Palestinian Authority.** There are, according to our belief, seven in custody. We have physically verified that six are in fact in custody and this has been done in the last month by officials from the consulate. We are endeavoring to verify the seventh. We have not yet been able to do so. There are eight fugitives believed to be in the areas under the control of **Palestinian Authority.** These are not to the best of our knowledge people who are walking around free. They are at large and the **Palestinian Authority** is pursuing them.

In one particular case that I have been very focused on over the years, Muhammad Daef (ph) who was responsible we believe for the killing of Nachon Wachsman has been the subject of the highest level intervention by the president and other very senior officials in this administration. There was recently a serious effort to apprehend him, which was unfortunately unsuccessful, but we have good reason to believe from our own sources that the **Palestinian Authority** did make a serious effort to apprehend him in recent months.

MCCONNELL: Mr. Richard.

RICHARD: If I may just make a couple of general remarks. We have focused in terms of our investigated priorities on individuals who remain fugitives or are still awaiting trial. There is a variety of reasons for that including the fact that to the extent that Israel has already prosecuted individuals, the current extradition treaty would serve as a significant barrier, if you will, to re-extradition for the same offense. Moreover in terms of being able to get them out of custody, Israeli custody, there is no easy mechanism at the present time. Our principal efforts though in terms of...

MCCONNELL: No easy mechanism to get them out of Israeli custody?

RICHARD: That is correct.

MCCONNELL: The Israelis will not turn them over to the United States?

RICHARD: The treaty itself -- the extradition treaty with Israel -- if you have somebody currently convicted of that crime serving time in Israel and we seek an extradition under the treaty of that individual who is serving time in Israel for that same crime -- we are seeking his extradition for the same crime -- one the treaty would not provide for that it has like, its called an invisa needan (ph) clause which is like a double jeopardy issue. Secondly, the treaty does not have a mechanism until the sentence is completed for them . . .

MCCONNELL: Mr. Richard, may we defer that? We are talking about people in custody in Israeli detention. I would be delighted and interested to hear there is technically no double jeopardy. You can be prosecuted federally and also in Pennsylvania as you and I both know, but we are on a different question. We are on the question of suspects who are being held by the **Palestinian Authority.** We have a law which authorized prosecution in the United States and I would like to get to that point if I may.

Let me call the next panel of witnesses. We need a couple of extra chairs. I would like to have Mr. Steven Flatow, Ms. Vicki Eisenfeld, Ms. Diana Campuzano, and Mr. Nathan Lewin if you folks would step forward.

UNKNOWN: Mr. Chairman, should we stay here?

MCCONNELL: Yes, please do. Yes, please stay where you are. I found in these hearings, with some

experience, that when we have overlapping issues, the best thing to do is to listen and comment. It gets to the point a lot faster than coming back to it.

We welcome you here and we know of the tremendous suffering which the families of these victims have sustained. The business of extraterritorial jurisdiction is something that we have grappled with mightily. It was only in 1984 that federal law comprehended brining people who were either kidnap victims or hostage victims -- and then in 1985 we had the killings of US citizens at the Rome and Vienna airports -- and I introduced the legislation in 1986 which was passed, the Terrorist Prosecution Act, making it a violation of US law. That is what we are on at the present time.

To the extent that your statements are brief, we will have more time to question Mr. Indyk. To the extent they are longer, we will have enough time to question Mr. Richard.

Mr. Flatow, we welcome you here. We know that your daughter Alisa at the age of 20 was a student at Brandeis University, one of seven people killed in an April 9, 1995 bus bombing in Fleur (ph) Rome on the Gaza Strip.

FLATOW: Mr. Chairman, thank you very much for the opportunity to be here this morning. I would also like to go on record thanking those members of the Congress on both sides of the aisle whom have been so supportive to us in the past four years.

Today I bring up, I prefer not to dwell on the loss of Alisa's life, but our response to that loss and the losses of other American families. Please understand that we have never sought revenge for Alisa's death. We have only been seeking justice over the past four years, pursuing her killers, and those who sponsored the terrorist attack which took her life.

Mr. Richard referred before to the lack of Palestinian cooperation with the FBI that did begin with Alisa's case back in April of 1995 when the FBI was rebuffed. I don't think there is anything wrong with one police force cooperating with another country's police in the investigation of a homicide. As far as I know, no public protest was ever lodged by our Government with the **Palestinian Authority** over this issue.

In 1997 with the encouragement of the president of the United States and the passage of the Anti-Terrorism and Effective Death Penalty Act of 1996, our family filed a lawsuit against the Islamic Republic of Iran as the financial backer of the Palestinian Islamic Jihad and recovered a $247 million judgment. Our experts will tell you quite clearly, Senator, that recovering on that judgment will be a deterrent to future terrorist attacks and the funding of such terrorist attacks. It is a well-known fact in academic circles and in practical circles in the fields, if you will.

However, I do not want to dwell on that case. I would rather talk today about a confession that I have to make and that is I now understand what the phrase means that ignorance is bliss. Until a few short months ago, I thought that the attack which took Alisa's life was a small circle of fanatics. Little did I understand how wide that circle was and how many people were actually involved in the planning and the execution of the attack.

Two years ago I had the opportunity to meet with Dr. Nabill Shahot (ph), Planning Minister of the **Palestinian Authority**, who expressed his condolences on the loss of Alisa's life and his willingness to cooperate with our family as we proceeded to seek justice. Unfortunately I tried on several occasions to reach Dr. Shahot (ph) by fax, by letter, as we prepared our lawsuit against the Iranians, but there was no response coming from the **Palestinian Authority** at that time.

The problem as I see it does not lie with the perpetrators being anonymous. They are not anonymous. The

problem in my opinion lies with the **Palestinian Authority's** willingness to turn a blind eye to these killers in their midst. As our government moves along investigating Alisa's death, it seems to be clear that justice will be delayed unless the **Palestinian Authority** moves now to arrest all of those responsible for Alisa's death.

Unfortunately, our government is not without fault either, sir. While the State of Israel has requested a transfer of suspects in Alisa's case, the United States has not done so. Justice in the **Palestinian Authority**, in my opinion, is spotty, if not an outright embarrassment to the concept of justice.

I must also question why the U.S. is able to extradite killers when the death involves American oil company employees in Pakistan or a shooting outside of CIA headquarters. I also have to question why the Department of State's incident Web site, called The Heroes Homepage, is devoid of any reference to American lives lost in Israel to Palestinian Arab terrorism. Why does the State Department post rewards when it comes to killings in Africa or in Pakistan or all around the world but not when that killing takes place in Israel? I don't want to believe for a second that our government's position is that Alisa's life is worth one penny less than any other American's life.

Perhaps the answer lies in the fact that our government does not want to force the hand of the **Palestinian Authority** at this time. Maybe our government does not want risk a confrontation with the PA over potential refusal to turn over killers for trial here. I must then ask what kind of partnership is the US going to have with the **Palestinian Authority**? Will they all give by the United States of our money and our recognition? What will be quick pro quo from the PA? Will it continue to harbor terrorists? Will it continue to turn a blind eye to this cancer? What kind of authority are we creating when we do not hold the PA to the same standards as we hold the rest of the world when it deals with terrorism?

The price of leadership, Mr. Chairman, and a spot on the family of nations demands choosing between political expediency and doing that which is morally and legally correct. Perhaps the PA does have the authority and the courage to arrest those responsible for deaths of Americans, but we will never know if we don't ask them to do so. I know the names of Alisa's killers. I have them here with me today. It hurts me to know that they are in Gaza walking the streets and it hurts me more to know that our government . . .

SPECTER: Mr. Flatow, I am sorry to interrupt you, but I have just been informed that we're going to start three votes at 12 o'clock, which means that I have to leave this podium at 12:05. And that's going to take the better part of an hour when we start them. So we're going to have to -- we're going to have move ahead. Very, very sorry. We'll make your full statement a part of the record.

FLATOW: Thank you, sir.

SPECTER: I'd like to turn now to Mr. Nathan Lewin, who has a long resume which I'm going to avoid. He is here representing the family of David Boim. Mr. Lewin, the floor is yours.

LEWIN: Thank you, Senator Specter. I've submitted an extended statement for the record. I would just like -- I'm here today to represent Joyce and Stanley Boim, who are our clients and are residing in Israel and could not be here to testify in person about the murder of their son and the efforts that have been made -- that they have been making since that time to get the United States government to prosecute the admitted participant in that murder.

David Boim was a 17-year-old American, native-born American, who was learning at a yeshiva in Israel, and was killed in a drive-by shooting in which Mr. Ojmed Hanowi was allegedly the driver of the car. And the person who did the shooting, who was subsequently released by the **Palestinian Authority,** thereafter was one of the suicide bombers who blew himself up at the Binyahuda Mall, which resulted in the deaths, I think, of 12 people and the wounding of 192. I'm sorry; the deaths of seven, including an American citizen, and the wounding of 192 people.

Mr. Hanowi, who was prosecuted by the **Palestinian Authority** in February of '98, and in the course of that proceeding, his confession was read in open court and he acknowledged being in the car. He was convicted by the Palestinian court but, to this day, the United States Department of Justice has still not indicted him for what is clearly a crime under American law. And this is totally inexplicable and, I submit, totally inexcusable.

In my time in the Department of Justice when I was a prosecutor, I recall civil rights prosecutions. For example, there was a woman by the name of Viola Liuso (ph). And I don't know whether you'll recall that, Senator Specter. She was a civil rights worker down South who was killed in a drive-by shooting. And the United States Department of Justice proceeded to prosecute in that case very vigorously.
Here -- proceeded to prosecute all the people who were in the car. Here there's no question that Mr. Hanowi was in the car. He's acknowledged that. He's been convicted by the **Palestinian Authority** and to this day, the United States Department of Justice says, we don't have enough evidence on which to indict this man.

LEWIN: Now, I was a prosecutor years ago. I've been a defense counsel since then. If that admission and, indeed, that conviction in the Palestinian -- court of the **Palestinian Authority** is not sufficient, I don't know what would be sufficient to return an indictment. Why it takes three visits by Department of Justice personnel and the FBI to return an indictment of that case is a total . . .

SPECTER: Mr. Richard, would you sit down with Mr. Lewin in the course of the next week or two, and talk to him about this case?

RICHARD: Be glad to.

LEWIN: We have also in my prepared statement also outlined what we think are important civil remedies which we will be pursuing on behalf of Mr. And Mrs. Boim with regard to this murder. They also were enacted by Congress precisely to allow prosecution of all those who participated in these events. That would include, we submit, those who financed terrorism and, indeed, even the **Palestinian Authority** for its release of personnel.

We are waiting for Mr. Hanowi, who apparently was released shortly after his arrest, for a Muslim holiday. I have no idea whether he's among the six people who Secretary Indyk has said is now in custody. Our reports were that he was marching around free. Are we waiting for him to blow himself up as another suicide bomber and, therefore, make his case moot?

INDYK: Ojmed Hanowi is -- has been verified as in detention by our people, in PA custody.

LEWIN: Well, for a long period of time, I have to say, Senator Specter, it was clear that he was not. If he'd been taken back into custody recently, I think it's been because there was increased public attention on these cases. And so he's been brought back into custody. Whether he will be released again for some holiday and then find himself as a suicide bomber in some other case, I hope not.

SPECTER: We're going to ask Mr. Richard and Mr. Indyk to pursue these matters. We're not going to have time, as I said, for the kind of dialog that I had hoped for. But when the bells ring for the votes, that's the number one responsibility of the senator.

LEWIN: Well, let me just say in conclusion, Joyce and Stanley Boim are not political activists. They are the bereaved parents of a murdered 17-year-old American. They cannot understand why the attorney

general of the United States refuses to enforce laws that were passed by Congress to protect them and their family. This committee should demand that the attorney general do her duty.

SPECTER: We're doing just that.

LEWIN: Thank you.

SPECTER: I'd like to now turn to Ms. Vicki Eisenfeld.

INDYK: Could I just add one more point, Mr. Chairman, on this...

SPECTER: Mr. Indyk, we are not going to hear the last two witnesses if we do, but if you have to...

INDYK: Thirty seconds.

SPECTER: Go ahead.

INDYK: I have just been told -- we have verified Hanowi's detention, not only this year in January, but a year ago as well. So, you know, I think that it's important that, insofar as we can establish, that the killer of David Boim is in custody; that we have been able to do so.

LEWIN: Why has he not been indicted, Senator Specter? That's the question. Even if...

SPECTER: We're going to have a meeting, Mr. Lewin, with Mr. Richard.

Mrs. Vicki Eisenfeld, son Matthew, age 25, was killed in a bus bombing in Jerusalem on February 25, 1996. He was a graduate of Yale University and a rabbinical student at Jewish Theologic Seminary in New York City.

EISENFELD: Mr. Chairman, I thank you and the members of this committee for inviting me to testify today about my family's personal experience with terrorism. Testifying in front of a Senate Subcommittee on Foreign Operations is not something I would have chosen to have on my list of things to do. Three years and one month ago today, the events of February 25, 1996, changed my life forever. It began with the telephone ringing.

Let me take you there for a few moments and then maybe we can see where we need to go forward together.

The phone is ringing. It's four thirty in the morning; not unusual in my house. My husband is a doctor. Excuse me. I hardly hear the phone at night any more. But Len is not on call this night. He answers and in brief moments he sounds very strange. His tone invades my sleep. I turn on the lights. He looks awful. He's asking someone, will you tell my wife? What? Tell me what? What's going on?

The phone is dropped into my hand. A woman tells me -- sorry. A woman tells me she is Catherine O'Reilly, calling from the American Embassy in Israel. She's telling me about a bus bombing that happened a few hours ago in Jerusalem. My mind races. As fast as I wonder why she's calling me, my heart is

reaching for Matthew, for my son. And the sleep falls away completely. I think he must be hurt. I wonder what hospital he's in and how fast can I get there.

But this is not the message Mrs. O'Reilly delivers. She keeps talking and I keep talking. I don't know where my voice is coming from now. I hear myself but I seem to be somewhere outside of myself. My voice sounds calm and familiar, but the words I'm saying can't make sense. I'm asking her what I'm supposed to do. She asks where I want to bury Matt. I say, I don't know. I never thought of that before. In Israel? At home? Okay, at home. No, Matt hadn't chosen to live in Israel. He just meant to be studying there for a year.

How do I bring him home? Shall I just hop on a plane and come get him? Excuse me, Catherine, can I have your phone number? Can I call you back? Can I verify that I'm not having a nightmare, a bad dream, or that I'm the victim of a sick joke? I need to verify that this is the worst possible nightmare of reality. Are you real, Catherine? And so simply, it began.

Three years have passed now and with the great love of family and friends, my husband's heart, my daughter's heart and my heart, have begun to heal. We were blessed with the gift of Matthew and the example of his life. We were blessed with knowing he was loved and in love with a wonderful young woman, Sarah Duker. Sarah died on Bus 18 that day also, along with 23 others. Matt and Sarah exemplified the kinds of kids we all hope to raise. They were bright, vibrant, interested, exciting young people.

Matt was studying to be a rabbi. He had a love of people that drew him to want to be involved in personal lives and community in a loving, caring way, and had a thirst for learning that encouraged him to reach for understanding from many sources and cultures. And there was Sarah.

Sarah was studying on a graduate level and working at Hebrew University in the field of environmental microbiology. Separately and together they're dreams were to participate actively and consciously in healing the wounds of the world physically and spiritually.

Neither of these two young people was naive about the chaos and pain that exists in the world. Neither one was afraid to confront its repair. There are forces that create havoc, chaos and evil in the world, and they're very strong. Murderous terrorist attacks strike at the soul and core of humanity, and can erase the sanity that rests there.

Those of us with voices must raise them strong, loud, clear and in unison, and say that the loss of a single life to terrorism is not simply another death. It's a strike against hope, against faith, against God, against the shared belief that each of us is a God-given gift to the world, born precious, deserving of love and respect. And each of us contains the ability to contribute to the world uniquely. I know this is the legacy that Matt and Sarah left all of us. For the values we believe in and the ones we raised our children to hold dear.

Terrorism threatens the United States and its citizens at home and abroad. A strong and consistent policy to bring to justice terrorists and their sponsors is the most effective way to deter those who seek to harm Americans. My son and Sarah Duker were the victims of terrorism when they were killed in Jerusalem on February 25, 1996. And many of those who were involved in the planning and organization of a terrorist attack such as the one killed Matt and Sarah, are still at large.

I stated that my family has been healing. Yet, there is no closure. Information exists that claim people involved in terrorist act against Israel and against American citizens, can be found within Yasser Arafat's organization. Some are said to be on a special police force. We are responsible for defining the laws of the United States will uphold, and we are responsible to see that everyone abides by the rule of law. And so I wonder, why are we asking for the extradition of identified murderers?

I'm not a lawyer, or a diplomat, or a politician, I'm just a mother. As a mother, it seems to me that when an engineer of terrorism has his foot on the ladder of Arafat's special forces, it isn't a long way to the top of the ladder. Acts of terrorism are excruciating for the families who suffer these losses, and limit the freedom of all Americans. Terrorists try to force us to their will by threatening all Americans, and what happens -

SPECTER: Ms. Eisenfeld, could you - could you summarize the balance? I know this is very difficult for you, but we're just about out of time.

EISENFELD: I'd just like to say that while I am Jewish and I support and love Israel, I am an American. I was born here and raised here, as was my son. And I would just - I would just like to ask for the help of all of the people here in addressing these issues, focusing on them, and encouraging the **Palestinian Authority**, particularly since the Wye River Agreements, to help us.

I understand that they very recently released information about the Palestinian - about the Senate Republic of Iran, funding Hamas terrorism. And Matt and Sarah were killed by Hamas. I would like them to share the information and the evidence that they have with us, and support us in this fight. I'd like them to join with us.

SPECTER: We will do our very best to get to the bottom of it and to bring the murderers to justice. We understand what you've gone through and we thank you for sharing it with us today.
I'd like to turn now to Ms. Diana Campuzano who, on September 4, 1997, while visiting Israel, was in a cafe in downtown Jerusalem when three terrorists detonated bombings; the bombs killing 5 and injuring nearly 200 people including Ms. Campuzano. Thank you for being here.

CAMPUZANO: Thank you. I'm basically here just to tell my side of the story, because most people always -- most people don't get a chance to hear a story from a victim.

About a year and a half ago, I went to Israel for a month vacation, and that was it. I was there to study -- (OFF-MIKE) -- just have fun. And I went to Binyahuda to buy a gift for a girl who was cat-sitting in my apartment in New York City. And I sat down in front of the Village Green cafe.

Why would it be any different? I was there, like, the entire - almost every single day three weeks prior to that. We actually did see one of the suicide bombers who walked by us. He was dressed in drag and the girl in front of me had mentioned that, there's a girl, there's somebody dressed in drag, and I looked and I said, okay, and turned around and chose to ignore it.

At 3:09, approximately, the bomb went off and I remember falling to the ground and grabbing my forehead. And I said some things I really can't say right now. And, I couldn't see anything. I didn't hear anything because I was in complete shock. I ended up in Herdasso. There were eight of us that were critically injured and I was the second most critically injured person. I ended up having a 7- hour surgery to reconstruct my forehead. I had a multiple skull fracture the size of a golf ball, and half of my forehead is fake.

I have about six screws in my forehead right now. My nose was completely pushed inside my nose cavity. I did not have a nose at the time. Also, other injuries that I have sustained are second degree burns on my arms and my legs, and my eyes hemorrhaged. As a result, in my right eye, excuse me, as a result in my right eye, I have a scar right on the retina, so my vision is now impaired. Both of my sinuses at the top of my forehead are completely gone. I no longer taste and I no longer smell. The loss in my left ear; the eardrum was exploded.

When I came to the United States, I was in Gaza for about 5-1/2 weeks, of which Netanyahu never came to

visit the critically injured people.

When I came to the United States, I stayed to live with my parents. And it was probably the hardest year of my life, and it's still very hard. My nose was left crooked in Israel. The vision, I had no pressure in my eye. Eventually, it did come back. Since I've been in the United States, I've had three surgeries. I've had to undergo surgery on my eye to remove a cataract and other various things. I've had my nose broken and re-set and not only that, I've had scar tissue removed out of my nasal passages because I couldn't breathe, and I've had -- my last surgery was on my ear, to have my eardrum invoked (ph).

I have another surgery coming up at the end of May to have my forehead reconstructed, my eyebrow -- my orbit reconstructed, have an eyelid tucked, and have the screws taken out of my forehead. The bottom line here is that, you know, and I don't mean any disrespect to anybody, but -- and we should never forget the people who've died in these crises, because it's a horrific thing. But people always forget about us who survive, because, oh, she's alive, she's OK. Well, I'm not. OK? I've had -- my life has been turned upside down. I've had my self-worth taken away. I -- my security's been taken away. I'm not working at the moment so my financial situation has also been disrupted.

It's as if -- somebody told me once, he said Diana, you died on that day. You were born again on that day. And it's almost as if I'm learning how to walk all over again. And, I'll get bouts of depression, I'll throw temper tantrums, and the way I was before, I am not that person. And I have to totally relive and renew who I am.

Americans think, oh, it'll never happen to us, it'll never happen to us, because we're on this side of the water. No. It can happen to anybody. Why would I think that this would happen to me? What? It wouldn't. I mean, people go to Israel and they come back fine, the come back in one piece. And I happen to be eating in a cafe and Binyahuda where everybody else goes. Why would it be any different? But it wasn't. And this -- you know, my parents got sick, and talked to me. I'm alive. But part of me is dead. And my parents have it just as hard. Because they see me going through this difficult time. And then have to deal with Israel as well. And that's -- I don't even want to go into details on that. That's difficult as it is.

And when my father found out, he got a phone call when this whole thing happened; he got a collect call and also a call from Israel. And when he found out, he -- he had heard that there was a bombing in Israel and he turned on CNN. When he turned on CNN and they did the headline news, there was a picture of a girl in a dress being carried on a stretcher, and that was me.

My mother found out, she was on vacation with my brother. My father called my mother, that he located her. My mother was looking at the USA Today and what picture did she see? Me. That was me in that picture. I actually have the pictures with me. But that was me.

When my father came to visit me in Israel -- Israel brought them over to the United States, my father walked right past me. He had no idea who I was because I had a bandage over my head. I had -- I was full of blood, blood on my face, and I also had, it was (OFF-MIKE) and I was on a respirator. They didn't know if I was going to be dumb, or retarded, or be blind.

But, I'm not here -- I'm not a politician. I cannot make argument regarding politics. I'm just here to tell you my side of the story and to make you realize that there are people who are alive and were suffering and --

SPECTER: Diana, you've told a very, very compelling story.

CAMPUZANO: Thank you.

SPECTER: We thank you very much for coming in.

We will pursue all of these matters to the final degree to find out what is happening on all these cases. We'll be reviewing them in detail with Mr. Richard and the Department of Justice, and Mr. Indyk, and we will press as hard as we can to see that the perpetrators are brought to justice.

I'd like now to call our final panel; see how far we can get here. Mr. Niddam and Mr. **Hasan Abdel Rahman.**

The specific situation -- Mr. Richard, would you please give way to the next panel? The situation on the Senate floor is that the vote has started on an amendment which is actually mine on the National Institute of Health. And, as I say, we have two more back- to-back to-back. But, let us start with Mr. **Hasan Abdel Rahman.** And note the compliment from the Jerusalem Post which Prime Minister Netanyahu paid to the **Palestinian Authority** and the note in the Washington Post today about the foiled bombing which had targeted Tel Aviv, and extend our thanks to the **Palestinian Authority** as well. You may proceed.

RAHMAN: Mr. Chairman, I gratefully appreciate the opportunity to appear before this distinguished committee of the United States Senate. Palestinian people admire the American democracy and its fine institutions and hope to learn from them...

SPECTER: May I interrupt you, sir, just -- are you in a position to stay for a while, if I go vote and come back?

RAHMAN: I can stay here until a little bit before one.

SPECTER: Well, you better proceed, because I won't be back by then, from the voting.

RAHMAN: The Palestinian people admire the American democracy and its fine institutions and hope to learn from them as we build our own political and economic systems. Both the **Palestinian Authority** and its public are very grateful for the leading goal of the United States in the march for a just and comprehensive peace in the Middle East.

Allow me, Mr. Chairman, in these opening remarks, to make a few important points about our policy to have peace in the Middle East and about our bilateral relations with the United States.

First, our diligence to seek a peaceful settlement with Israel and to eject violence as a means to political ends are final and irreversible. The Oslo Accords created an opportunity for mutual acceptance and coexistence. That we intend to exploit until a full and permanent peace prevails between us.

Israelis and Palestinians are fated to be neighbors forever. And we must both tell our children for a life of peace, acceptance and mutual respect. We will not go back on this position.

Second, our fight with thousands is strategic and unending. We do not find thousands morally because it threatens other states, no. In (OFF-MIKE). But because thousand threatens our own society and the kind of democratic institutions we intend to build.

Our fight with thousand is not contingent. It is an unending commitment, as such. On this issue, our

interests with the United States, Israel and Arab neighbors are identical.

Third, the days when we viewed Israel as our enemy are over. The peace process has opened up common interests that are bigger than the differences.

Today there's a new division. Palestinians and Israelis united for peace, challenging Palestinians and Israelis who oppose this. To be sure, we have some serious differences with Israel and many important issues of contention in our arduous negotiation. But our aim is to resolve these issues through peaceful negotiations. Knowing very well that the majority of Israelis and Palestinians remain solidly behind peace, even in the midst of crisis.

RAHMAN: Fourth, we consider our growing bilateral relations with the United States as a cornerstone of our peace policy. The United States has been an indispensable leader in every successful peace effort between Israel and its neighbors, and has been crucial in cementing the Oslo Agreements and securing the Wye River Memorandum.

The growing coordination and cooperation between us have led to an increasing level of mutual trust that has enabled the **Palestinian Authority** to take risks for peace even in the face of public skepticism. The stronger this relationship, the higher the prospects for peace.

For fifth, our bilateral relations with the United States are important for our efforts to build the kind of political, educational, economic and legal systems that our people desire and deserve. The Palestinian people admire the American democracy and the economy of free trade. We're Palestinian. We have traditions and social institutions that we value and must take into account in constructing our system. But we have much to learn from the United States. The education, economic and legal cooperation efforts -

SPECTER: Mr. Rahman, I'm sorry to interrupt you. Your full statement will be made a part of the record. We just have to turn to Mr. Niddam. We will be in touch with you further to discuss this.

RAMONE: OK.

SPECTER: Mr. Niddam?

NIDDAM: Thank you, Mr. Chairman, for providing me the opportunity to testify before the Committee today. My name is Jean- Claude Niddam. I am the Director of the Legal Assistance Division of the Israeli Ministry of Justice. This Division deals with matters of legal assistance between Israel and the **Palestinian Authority.** Some of the most important cases the division handles concerns Palestinians suspected of terrorist activity. Israel has provided the United States authorities with information in relevant cases. Since the beginning of the Oslo Process in 1993, 285 Israeli and foreign innocent bystanders have been killed in terrorist attacks. During this period, 1,417 have been injured. At least 12 American citizens were among those killed in terrorist attacks.

Terrorists suspected of killing these American citizens have found shelter in the **Palestinian Authority.** To date, Israel has officially submitted to the **Palestinian Authority** 38 requests for the arrest and transfer of suspected terrorists. And to summarize because I know the Committee is eight in time, short in time, from the 38 requests submitted to the **Palestinian Authority,** 18 of the suspects are not under arrest. And this information is updated.

One is under arrest, but is free to come and go as he wish - wishes. Seven are on and unknown status.

Maybe, we should know what is their exact status. Twelve are under arrest. Suspects directly responsible for the death of American citizens are among these terrorists. I will focus on eight who were involved in killing American citizens.

The **Palestinian Authority** has detained three of these terrorists. They are Nafez Mahmud Sabih, Abd al-Majid Dudin and Omjed Hanowi. Nafez Mahmoud Sabih, currently in detention, was involved in an attack that killed Alisa Flatow from New Jersey. Abd al-Majid Dudin, sentenced to twelve years in jail, was involved in an attack that killed Joanne Davenny of Connecticut. Omjed Hanowi confessed in a Palestinian court to killing David Boim, an American student.

The confrontation was witnessed by a United States Consulate General Officer, Mr. Obdinul Zybeck (ph). Omjed Hanowi was sentenced to ten years in prison. I will submit for the record a copy of the judgment and of the reports of Mr. Zybeck's (ph). Another suspect, Ibrim Animax (ph.), was tied to a terrorist cell responsible for the attack of a young couple, (OFF-MIKE) Yaron Unger, an American citizen, and his wife (OFF-MIKE). Both were killed following a shooting attack on their car. Their infant child, in the car at the time, survived the attack.

As far as we know, Mr. Animax (ph) spends his nights in prison, but he's free to come and go during the day. Three additional Palestinian terrorists who killed Americans are free. They are Adnan Enrol (ph), Yusef Sumeri (ph) and Mohammed Def (ph). They were involved in the death of Alisa Flatow, among other incidents. The eighth terrorist, Nafez Sabih, was involved in a bombing that killed Americans. He was serving in the Palestinian police force until last week, even though a former request to arrest and transfer him was submitted to the **Palestinian Authority** two years ago.

According to our information, Mr. Sabih, has been arrested in the last few days. It is important to present to this Congressional Committee the procedure that is (OFF-MIKE) before submitting the request to the **Palestinian Authority** for the transfer of the suspects. Firstly, we hand over to the Israeli attorney general, actually Mr. Rubenstein's office, evidence concerning the case.

If the attorney general is convinced that there is sufficient evidence that links the suspect to a crime which (OFF-MIKE) his arrest and interrogation, the case is forwarded to Israeli courts (OFF-MIKE). If this court is convinced of the validity of the evidence, our government officially requests from the **Palestinian Authority**, to hand over the suspects. We have submitted requests like this for the past four years. Not one has been answered.

I would also like to point out that there is very little **Palestinian Authority** cooperation on legal matters. Even in cases involving rape, theft and other criminal activities committed by Palestinians. The same applies to civil matters.

SPECTER: Mr. Niddam, I must interrupt you.

NIDDAM: Yes.

SPECTER: Your full statement will be made a part of the record. I want to express my regrets that we're unable to really handle this matter as we would have liked to, but once the voting starts, and I'm going to have to ask for an extension of time because I'm going to be late as we arrive. I want to express my special apologies to Ms. Campuzano and to Ms. Eisenfeld and Mr. Flatow for not being able to give you more time here today, and to all of the witnesses.

But this is a matter of enormous importance, and the subcommittee will be pursuing it; to find out indictments have not been returned in cases where there is evidence, and why matters are not being pursued

with the **Palestinian Authority.** Thank you all very much.


END


**NOTES:**
Unknown - Indicates Speaker Unkown
Inaudible - Could not make out what was being said.
off mike - Indicates could not make out what was being said.

**PERSON:**  MITCH MCCONNELL (94%); ARLEN SPECTER (57%); JUDD ALAN
GREGG (57%); BEN NIGHTHORSE CAMPBELL (56%); PATRICK J LEAHY (55%); DANIEL K
INOUYE (55%); CHRISTOPHER (KIT) BOND (55%); TOM HARKIN (54%); FRANK R
LAUTENBERG (54%); ROBERT C BYRD (53%); PATTY MURRAY (53%);

**LOAD-DATE:** April 2, 1999