UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR,        )
et al                             )
                                  )
          v.                      )        C.A. No. 00-105L
                                  )
THE PALESTINIAN AUTHORITY,        )
et al                             )
                                  )
_____ )

## EXHIBIT TO PALESTINIAN DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR RULE 12(b)(1) MOTION TO DISMISS

Defendants, the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO"), file herewith the exhibit to their Reply Memorandum in Support of Their Rule 12(b)(1) Motion to Dismiss the Amended Complaint. The exhibit is filed pursuant to the Court's Order entered September 22, 2003 granting Defendants' Motion to Exceed Page Limit for Exhibits.

1.   John Quigley, MAKING PEACE AGREEMENTS WORK: THE IMPLEMENTATION AND ENFORCEMENT OF PEACE AGREEMENTS BETWEEN SOVEREIGNS AND INTERMEDIATE SOVEREIGNS: ARTICLE: The Israel-PLO Interim Agreements: Are They Treaties?, 30 Cornell Int'l L.J. 717 (1997)

Dated:  September 24, 2003

_____
Deming E. Sherman (#1138)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
401-274-9200
401-276-6611 (FAX)

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
212-475-3232
212-979-1583 (FAX)

Attorneys for Defendants
The Palestinian Authority and
The PLO

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of September, 2003, I mailed a copy of the within Exhibit to David J. Strachman, Esq., McIntyre, Tate, Lynch & Holt, Suite 400, 321 South Main Street, Providence, RI  02903.

_Deming E. Sherman_

PRV_602909_1/DSHERMAN

Copyright (c) 1997 Cornell International Law Journal

Cornell International Law Journal

1997

30 Cornell Int'l L.J. 717

LENGTH: 15605 words

MAKING PEACE AGREEMENTS WORK: THE IMPLEMENTATION AND ENFORCEMENT OF PEACE AGREEMENTS BETWEEN SOVEREIGNS AND INTERMEDIATE SOVEREIGNS: ARTICLE: The Israel-PLO Interim Agreements: Are They Treaties?

John Quigley *

 * Professor of Law, Ohio State University. LL.B., M.A. 1966, Harvard Law School. The author is grateful to Dr. Ian Lustick for comments on a draft of this article and to Ilene Cohen of the United Nations mission in Guatemala for documents on Guatemala.

SUMMARY:   ...  The exact content of what is being undertaken by the United States and the European Union is not clear. ...  Thus, on the basis of the character of the parties and the content of the texts, the Israel-PLO agreements would appear to be treaties. ...

TEXT-1: [*717]


 Introduction

In the resolution of conflict situations in the late twentieth century, non- state parties have featured prominently as signatories to agreements. A non-state party may be an insurgent force contending for power within a state. It may be a political entity representing a segment of the territory of a state, seeking autonomy or independence. It may be a movement assert ing a right of sovereignty to territory on behalf of a people.

   This Article examines the legal character of the agreements between the Palestine Liberation Organization (PLO) and Israel that began in Oslo, Norway, in 1993. Are these agreements "treaties" that are binding on either party at the international level? If the PLO is not a state, can these agreements nonetheless be binding under international law? Is it possible that the PLO, or perhaps the Palestine it seeks to establish, is actually a state and that these agreements are between two states and, on that basis, treaties? This Article explores agreements of non-state parties, and the murky line between statehood and non-statehood, in an effort to find the appropriate characterization of the Israel-PLO agreements.

## I. Varieties of Non-State Agreements

Agreements by non-state entities may be concluded in a variety of contexts. One is in the context of a relationship between a state and one of its com ponent parts. While the state in such a situation may seek to confine the relationship to the domestic law plane, the component entity may seek to internationalize it. For example, consider a 1994 agreement between the Russian Federation and Tatarstan, a constituent part of the Russian Feder ation. <=2> n1 The Tatarstan authorities sought, by the agreement, to place Tatar stan's relation with the Russian Federation on the international plane, while the Russian Federation authorities sought to confine it to one gov- [*718] erned by Russian law. Thus, the agreement defines Tatarstan as a state entitled to participate in international relations and forbids any such inter national agreements that might contravene "the Constitution and interna tional obligations of the Russian Federation." <=3> n2 A linguistic quirk allows each party to argue its view of the character of the instrument, since the Russian word used to denominate it, dogovor, means "treaty" in interna tional law and "contract" in domestic law.

The same issue besets efforts at an arrangement between Moldova and Transdnestr, a section of Moldova that seeks independence. Negotiations conducted to draft a document to define the relationship stalled because Moldova insists that Transdnestr be characterized as an integral part of Moldova. <=4> n3 A draft proposed by Russia would establish a federal system. <=5> n4 That it would have international guarantors, namely, the governments of Russia and Ukraine and the Organization for Security and Cooperation in Europe, is one important feature of the proposed instrument seemingly giving it an international character. <=6> n5

Civil war is another context for agreements between a state and a non- state entity. A series of agreements concluded between the government of Guatemala and an opposition movement, called the Guatemalan National Revolutionary Unity, is a recent example of an agreement arising under this context. <=7> n6

With both the Russia-Tatarstan and the Moldova-Transdnestr arrange ments, one party seeks international status. The agreements in Guatemala involve no such effort; rather, one party sought to replace the other as the government of Guatemala. The Guatemalan agreements, like the proposed Moldova-Transdnestr agreement, feature international oversight. For Gua temala, the United Nations established an observer mission. <=8> n7 U.N. observ ers were stationed throughout Guatemala to take complaints from anyone [*719] claiming that the arrangements for ending the civil war were being violated and, in particular, that human rights were being infringed. <=9> n8 International monitoring protects the non-state party, whose only leverage comes from its armed opposition to the government. Once that party agrees to negoti ate rather than to fight, it loses its leverage and needs the assurance of outside protection.

An agreement signed in Mozambique in 1974 between Portugal and the Front for the Liberation of Mozambique (FRELIMO) is an example of an agreement where a non-state party not only sought statehood but also gained it. <=10> n9 The purposes of that agreement were to

end Portugal's colonial rule in Mozambique and, consequently, to establish FRELIMO as the gov ernment of Mozambique. Twenty years later, FRELIMO-ruled Mozambique in turn signed an agreement with a non-state party, the insurgent group RENAMO (Mozambican National Resistance), to end a civil war. <=11> n10 In South Africa in 1994, the government signed a tripartite agreement with two non-state entities, the Inkatha Freedom Party and the African National Congress, to set procedures for elections in the country. <=12> n11 This agreement contemplated a role for the two non-state parties in the governance of the country.

Thus, agreements between a state and a non-state party are not unknown in international practice. The character of such agreements will be examined below. Whether the Israel-PLO agreements fall into this cate gory, however, is a matter that requires clarification. If the PLO represents a state, or if it otherwise qualifies as a subject of international law, then its agreements can be treaties.

The agreements in question have been concluded between Israel and the PLO beginning in 1993. The agreements followed a conference held in Madrid in 1991, hosted by the United States and the Soviet Union. <=13> n12 As a result of that conference, Israel and a Palestinian delegation negotiated in Washington, D.C. <=14> n13 In 1993, at a time when it was not clear whether those negotiations would succeed, the PLO and the Israeli government met in Oslo at the invitation of the Norwegian foreign minister. The Oslo meet ings led to the drafting of a Declaration of Principles, signed in September 1993. The Declaration provided that Israel would withdraw from the Gaza Strip and from various sectors of the West Bank over a five-year period, **[*720]** allowing the PLO to administer areas as Israel withdrew. <=15> n14 Israel would withdraw quickly from the Gaza Strip and the West Bank town of Jericho and later would withdraw "gradually" from additional but undefined por tions of the West Bank during the interim period. <=16> n15

In a separate document, a letter from PLO Chairman Yasser Arafat to Prime Minister Itzhak Rabin of Israel, the PLO "recognize[d] the right of the State of Israel to exist in peace and security," renounced the use of force against Israel, and declared that provisions of the Palestinian National Covenant that oppose Israel's right to exist were "inoperative and no longer valid." <=17> n16 In 1994, the two parties signed another document, the Agreement on the Gaza Strip and the Jericho Area, which provided the terms for the exercise of authority by the parties and led to Israel's actual withdrawal from the Gaza Strip and Jericho. <=18> n17

The 1994 agreement was superseded by another in 1995, the Interim Agreement on the West Bank and Gaza Strip, which foresaw Israeli with drawal from all major West Bank towns, with the exception of Hebron, where Israel would withdraw from most areas but would keep troops to protect several hundred Israelis who had settled in the center of the town. <=19> n18 The 1995 agreement also gave the Palestinians partial control over 450 vil lages in the West Bank. <=20> n19

Under the 1995 agreement, Israel withdrew from the major West Bank towns except for Hebron. <=21> n20 Israel delayed its withdrawal from Hebron fol lowing bombing incidents in Israel. <=22> n21 In 1997, Israel's new government agreed with the PLO to withdraw from

Hebron, and, at the same time, Israel confirmed that it would comply with the provisions of the 1993 Declaration of Principles. <=23> n22

Both parties have charged the other with violations in the implementation of these agreements of 1993, 1995, and 1997. Thus, each considers [*721] the other to be bound, presumably under some body of law, to comply. After 1993, Israel continued to build housing for its settlers in the West Bank, particularly in the eastern sector of the city of Jerusalem. The PLO considered this construction a violation of the 1993 Declaration of Principles, which provided for eventual talks to resolve the fate of these settlements.

Israel, in turn, saw violations by the PLO in what it viewed as the PLO's inadequate efforts to curb acts of violence by Palestinians against Israeli civilians. Israel also charged the PLO with attempting to conduct foreign relations in violation of a provision of the 1993 Declaration of Principles that gave foreign relations power to Israel in most matters.

A key feature of the 1993 Declaration of Principles postpones resolution of the major outstanding differences between Israel and the PLO to the end of the "interim period." <=24> n23 These include, in addition to the question of Israel's settlements, differences relating to refugees from the territories in question, borders, and the status of Jerusalem. <=25> n24 Before qualifying as a "treaty," an instrument must manifest an intent of the parties to assume binding obligations, as opposed to being a mere statement of mutual intentions or aspirations. <=26> n25 The fact that the Declaration is, in part, an agreement to agree in the future raises a question of whether it is aspirational only. If so, then it is not a binding instrument regardless of the status of the PLO.

The 1993 Declaration of Principles has been characterized as "a mixture of various types of legal undertakings," including obligations to take certain actions immediately upon entry into force of the Declaration, obligations to conclude agreements on certain issues, and obligations to negotiate on certain issues. <=27> n26

International instruments where the parties agree to negotiate designated issues in the future are not unknown. Despite the inclusion of provisions about agreeing to agree in the future on key issues, the 1993 Declaration of Principles is sufficiently definite in the obligations imposed on each party to be a binding instrument. <=28> n27

Another matter of form can be raised regarding one of the three agreements. The 1997 agreement was in two parts. The portion providing for Israel's withdrawal from Hebron was in the normal format of a document signed by the two parties. <=29> n28 However, the portion setting a timetable for [*722] Israel's subsequent partial withdrawals was called "Notes for the Record" and was written by U.S. negotiator Dennis Ross on the basis of an oral agreement between Netanyahu and Arafat. <=30> n29

Although treaties are typically instruments purporting to have been drafted and signed by the parties, this is not the only fashion in which states may bind themselves. Less formal understandings give rise to treaty obligations. The Permanent Court of International Justice

found that notes made by one foreign minister of a conversation with another foreign minis ter, where a promise was made, gave rise to an international obligation.  <=31>   n30

II. The Claim of Palestine to Statehood

One difficulty in analyzing agreements by non-state entities arises as a result of the indefinite line between a non-state entity and a state. Authori ties representing an entity like Tatarstan or Transdnestr may claim that the entity is a state, under the generally accepted criterion of control over a population within a territory, coupled with the capacity to engage in inter national relations.  <=32>   n31 The PLO claims statehood for a state called Palestine, not only in the future, but also at the present time. Its claim, as will be seen, has received support in the international community. Thus, before analyzing the PLO's agreements on the premise that the PLO represents a non-state entity, one must consider the possibility that the PLO represents a state called Palestine, making an agreement concluded by the PLO with a state, such as Israel, an agreement between two states.

In the 1970s, the U.N. General Assembly declared that the Palestinian people had a right to self-determination, and that the PLO was its represen tative in effectuating that right.  <=33> n32 On this basis, it granted the PLO the status of an observer at the United Nations.  <=34> n33 The U.N. Security Council treated the PLO as a state by admitting it to participate in Security Council sessions when matters of concern to it were being discussed.  <=35>   n34 Under Security Council rules, only a "state" is entitled to participate in such sessions.  <=36> n35

[*723]  In 1988, the Palestine National Council declared statehood for Pales tine, claiming the Gaza Strip and West Bank of the Jordan River as its terri tory.  <=37>   n36 Within a short time, eighty-nine states recognized Palestine as a state.  <=38>    n37 The U.N. General Assembly invited PLO Chairman Yasser Arafat to address it.  <=39>    n38 When the United States denied Arafat a visa to come to U.N. headquarters in New York for this purpose, the General Assembly took the extraordinary step of moving its session to Geneva so that Arafat might address it. <=40>   n39

In a resolution adopted in Geneva following Arafat's address, the U.N. General Assembly, with most Western states abstaining, "acknowledg[ed] the proclamation of the State of Palestine by the Palestine National Council on 15 November 1988," and decided that "the designation 'Palestine' should be used in place of the designation 'Palestine Liberation Organiza tion' in the United Nations system."  <=41>    n40 A later draft resolution was pro posed that would have construed "Palestine" to mean "state" in U.N. documents. This draft resolution was not put to a vote, however, after the United States threatened to withhold payment of its U.N. dues if the resolu tion was adopted.  <=42>   n41

The PLO next applied for membership as a state in the World Health Organization (WHO), <=43>    n42 an apparent first step in a PLO plan involving application for membership in a

number of international organizations and thereby seeking enhancement of international acceptance of its state hood.  <=44>    n43 This effort generated a threat from the United States, which informed the WHO that it would withhold its dues to the organization if Palestine were admitted as a member state.  <=45>    n44 As a result, the WHO direc-  [*724]    tor general asked the PLO to withdraw the application.  <=46>    n45 The WHO voted to postpone the application, apparently because of the United States' pressure.  <=47>    n46

That it did not hold territory was a weakness to Palestine's claim to statehood. When the PLO was sued in a federal court in the United States for alleged involvement in the killing of a passenger aboard a cruise ship in the Mediterranean Ocean, it sought to avoid the litigation by asserting that it was a state and thus immune from suit.  <=48>    n47 The U.S. Court of Appeals for the Second Circuit considered the 1988 Declaration of Independence, but decided that the PLO was not a state because it neither controlled territory nor had a permanent population.  <=49>    n48 Many writers agreed with the Second Circuit's determination that the PLO, in the period immediately following its Declaration of Independence, did not satisfy the criteria for statehood.  <=50>    n49

Even without control of territory in the usual sense, however, the PLO exercised considerable powers in the Gaza Strip and West Bank through its control of various organizations carrying out quasi-governmental func tions. On this basis, it was argued that Palestine was already a state.  <=51>    n50 Then, under the 1995 Interim Agreement with Israel, the PLO came to administer both the Gaza Strip and the major towns of the West Bank. As a result, it appeared to satisfy the criterion of control of a population in a territory.

Moreover, the control requirement has been relaxed in international practice where the putative state was seen to have a right to statehood and where there was not a competing entity seeking statehood in the same ter ritory.  <=52>    n51 The Congo, for example, was recognized and was admitted to  [*725]    U.N. membership after being granted independence by Belgium, but before extending control over the territory of the Congo.  <=53>    n52 Guinea-Bissau was rec ognized and admitted to U.N. membership following Portugal's agreement to recognize it and to withdraw its forces,  <=54>    n53 but before Portugal in fact withdrew.  <=55>    n54

Palestine arguably has the capacity to enter relations with states, another requirement for statehood.  <=56>    n55 It has been recognized by many states,  <=57>    n56 an indication that other states deemed it an entity capable of maintaining state-to-state relations. At the time of the signing of the 1993 Declaration of Principles and the PLO's recognition of Israel, Prime Minis ter Yitzhak Rabin, on Israel's behalf, recognized the PLO "as the representa tive of the Palestinian people."  <=58>    n57 Israel demanded that the PLO recognize it as a state, and the PLO complied; recognition of a state is an act of foreign relations normally performed by a state.  <=59>    n58 Israel's insistence that the PLO recognize it suggests Israel's acknowledgement that the PLO represents a state, even though Israel officially maintains the contrary.  <=60>    n59

In the 1993 Declaration of Principles, foreign affairs is not one of the functions listed as being "transferred" from Israel to the PLO.  <=61>    n60 The PLO agreed that during the interim period it would not exercise foreign affairs functions, and specifically that it would neither invite

foreign states to establish diplomatic missions in territory it controlled nor establish diplo matic missions abroad.  <=62>    n61

An entity does not lack the quality of statehood, however, if it agrees to [*726]   let another state handle its external relations.  <=63>    n62 For example, Morocco, an independent state, concluded with France a protectorate treaty whereby France became responsible for Morocco's foreign relations. Nonetheless, Morocco was treated as a state.  <=64>    n63

The PLO did not cede all foreign relations to Israel. Under the Decla ration of Principles and subsequent agreements, the PLO retained the right to conclude agreements with states and with international organizations relating to economic matters, and to matters of culture, science, and educa tion.  <=65>    n64 It is stipulated, however, that such dealings by the PLO with states and international organizations "shall not be considered foreign rela tions."  <=66>    n65 This last proviso represented an apparent effort by Israel to limit the international status of the PLO.

In 1997, the cabinet of the Palestinian Authority discussed the possi bility of declaring the establishment of a Palestine state with Jerusalem as its capital; Chairman Arafat, asserting that Palestine statehood was "not an Israeli issue" but "an Arab and international issue," indicated that the intent was to do so prior to the final negotiations with Israel on Palestine's status.  <=67> n66 Israeli Prime Minister Benjamin Netanyahu responded that a "unilateral declaration" of a Palestine state would violate the then recently signed agreement on Israeli re-deployment from Hebron.  <=68>   n67

Whether or not Palestine is a state is not a question for Israel to decide. That determination turns on objective criteria, with recognition by states providing significant evidence as to whether these criteria are met. The answer to this question of fact turns on the role an entity plays in the international community. Applying these criteria, Palestine has a plausible claim to statehood because it controls territory and has the capacity to engage in international relations.


III. Statehood in Territory Under Belligerent Occupation

An additional factor in the PLO's situation may make the arguments over the criteria for statehood less than central. The PLO's claim to statehood is affected by the peculiar status of the territories of the Gaza Strip and West [*727]   Bank. A state that occupies territory during hostilities, like Israel's occupa tion of Gaza and the West Bank, holds that territory under a legal regime called "belligerent occupation."  <=69>    n68 This legal regime recognizes the occu pant's control but limits the occupant to temporary possession pending a peace treaty.  <=70> n69 The state that is sovereign at the commencement of the occupation retains that sovereignty even though it exercises no control on the ground.  <=71>    n70 Israel acknowledges that its status in the West Bank and Gaza is that of a belligerent occupant, despite its conclusion of agreements with the PLO that cede part of Israel's control.  <=72>   n71

The state holding sovereignty normally is deemed by the international community as

continuing to exist, and its government is deemed to repre sent it. <=73>   n72 Thus, when Iraq occupied Kuwait in 1990 and purported to incorporate it into Iraq, Kuwait remained a state, <=74>   n73 and the international community continued to recognize it as such and to recognize the terri tory's government as the government of Kuwait, <=75>    n74 despite the fact that the government of Kuwait did not control Kuwait's territory. <=76> n75

[*728]   Applying the analysis to the Gaza Strip and West Bank is more com plex, since sovereignty over these two areas was not clear at the commence ment of Israel's occupation. Egypt had held the Gaza Strip since 1948 but had not incorporated it into Egypt and did not claim sovereignty. Egypt considered Gaza to be part of Palestine. <=77>     n76 Egypt was holding the territory pending the emergence of a Palestine state. <=78>   n77

The West Bank had been held by Jordan since 1948. Jordan had incor porated the West Bank into itself, claiming sovereignty, but doing so sub ject to the future emergence of a Palestine state. <=79>     n78 Thus, from 1950, Jordan deemed itself a provisional sovereign. <=80> n79 In 1988, after the Palestine National Council declared statehood for Palestine, Jordan renounced its sovereignty claim in the West Bank in favor of Palestine's claim. <=81> n80

There is no reason why sovereignty in occupied territory might not change during the period of occupation. If, for example, a state whose territory was occupied decided to merge with another state (not the occu pant), there is no reason it could not so merge. Regarding the Gaza Strip and the West Bank, there was not so much a change in sovereignty, how ever, as a clarification of sovereignty, since Egypt never claimed sover eignty, and Jordan did so only provisionally.

Israel disputes the conclusion that the PLO holds sovereignty in the West Bank and Gaza during the interim period, even though Israel does not claim sovereignty for itself. It takes the position that because belliger ent occupation continues, the PLO cannot hold sovereignty. It says that, given belligerent occupancy,

the Palestinian Council will not be independent or sovereign in nature, but rather will be legally subordinate to the authority of the military govern ment. In other words, operating within Israel, the military government will continue to be the source of authority for the Palestinian Council and the powers and responsibilities exercised by it in the West Bank and Gaza   [*729]   Strip. <=82>   n81

This conclusion confuses control and sovereignty. Israel continues to exer cise control to the extent determined in the interim agreements, but control is a matter separate from sovereignty. With belligerent occupation, there is always a separation of control and sovereignty.

With the Palestine National Council's declaration in 1988, coupled with the prior recognition

of the PLO as the representative of the Palestin ian people, the newly declared Palestine state had a strong claim to being the sovereign of the territory, despite its lack of physical control. Israel as belligerent occupant had no claim to sovereignty and had not asserted one, Egypt had never made a sovereignty claim to the Gaza Strip, and Jordan had renounced its sovereignty claim to the West Bank. In these circum stances, it is not surprising that a large number of states quickly recog nized the newly declared Palestine state, despite its lack of physical control over territory. <=83> n82

Given that Israel is an occupant only, Palestine is sovereign in the Gaza Strip and West Bank. <=84>   n83 Thus, Palestine is a state, and its agreements with Israel are agreements between two states.


## IV. Recognition of Palestine

Recognition of a putative state by other states serves an evidentiary func tion. It is normally taken as indicating that other states find that the puta tive state satisfies the criteria for statehood. <=85>   n84 In Palestine's case, recognition may indicate this, or it may indicate that the other states find it to be the lawful possessor of sovereignty of the occupied territory, regard less of whether it exercises control, and that it is a state on that basis, rather than on the more typical basis of control.

Most European states declined to recognize Palestine following the Declaration of Independence; some declined on the grounds that they wanted a more definite indication of Palestine's positive attitude towards Israel, such as an explicit act of recognition of Israel.  <=86> n85

The U.N. reaction to the declaration of Palestine independence can be contrasted to that body's reaction in another case, five years earlier, of a declaration of independence. In 1983, statehood was declared for a Turk ish Republic of Northern Cyprus.  <=87>     n86 The international community found [*730]  this declaration invalid on the grounds that Turkey had occupied this terri tory militarily and that the putative state was its creation. The U.N. Secur ity Council pronounced the independence declaration illegal.  <=88>     n87 Thus, if the international community finds a declaration of statehood to violate the rights of an existing state, it may well say so. Had there been concern that the Palestine Declaration of Independence violated the rights of Egypt, Jor dan, or Israel, the Security Council might have condemned the declaration, as it did that of the Turkish Republic of Northern Cyprus.


## V. Agreements by Non-State Subjects of International Law

If Palestine is a state, and if the PLO, as representative of that state, con cludes an agreement that in other respects qualifies as a treaty, it is a treaty. However, while treaties are normally

concluded between states, states are not the only potential participants. The Vienna Convention on the Law of Treaties, a widely ratified instrument that regulates treaties con cluded between and among states, recognizes the validity of treaties con cluded by "other subjects of international law," i.e., subjects of international law that are not states.  <=89>   n88

The Vienna Convention on the Law of Treaties does not identify such "other subjects of international law," leaving that matter to customary law. One example of such subjects is international organizations.  <=90>   n89 A separate treaty has in fact been concluded to regulate treaties involving interna tional organizations as participants.  <=91>   n90

## VI. Agreements of Mandate Territories

One other category of subjects of international law is an organization that aspires to establish a state on behalf of a people. During the League of Nations period, the concept of a "people" was formalized through a system whereby certain states, acting in a trustee capacity, administered the terri tory of a "people." The League's Covenant forbade states that had occupied territories during World War I to hold them as colonies.  <=92>   n91 A state that had [*731] occupied a colonial territory whose people were "not yet able to stand by themselves under the strenuous conditions of the modern world" was obliged to promote the "well-being and development of such peoples."  <=93>   n92 The administering state was given a mandate by the League to carry out this task.

The League designated a state to administer each mandate territory, and any claim to sovereignty by such a state was precluded.  <=94>   n93 The man date system was premised on "a rejection of the notion of annexation."  <=95>   n94 An administering power was "not there by any right of possession, but instead acted as a Mandatory with specifically delegated powers."  <=96>   n95

One of the League's mandates was for Palestine. Great Britain occu pied Palestine, then under the Ottoman Empire, during the First World War. The League gave Britain a mandate to administer Palestine.  <=97>   n96 The Palestine that the PLO claims to represent today traces its statehood to the Palestine of the mandate period.  <=98>   n97 The 1988 Palestine Declaration of Inde pendence states that the international community, in Article 22 of the Cov enant of the League of Nations, recognized the right of the Palestinian people to independence.  <=99>   n98

This assertion is not without foundation. Sovereignty in mandate ter ritories resided in the community of persons being administered, which enjoyed an international status. "Communities under mandate," said the Institute of International Law in 1931, were "subjects of international law" since they held "a patrimony distinct from that of the Mandatory State."  <=100>   n99 They could acquire rights and could be held to their obligations.  <=101>   n100 Pales- [*732] tine had its own citizenship during the mandate period.  <=102>   n101 Palestine under Britain's mandate was considered a subject of international law capable of treaty relations, despite the

control exercised by Britain as the administering power. <=103> n102

In a clause similar to that in the agreement between Israel and the PLO, <=104> n103 the mandate instrument concluded between Britain and the League of Nations for Palestine provided that "the Mandatory [Britain] shall be entrusted with the control of the foreign relations of Palestine." <=105> n104 Unlike the agreement between Israel and the PLO, however, the mandate instrument did not specify that Palestine itself has the power to conclude treaties on specific topics. Despite that omission, Palestine became a party in its own name to treaties on a variety of topics. <=106> n105 This practice was not unique to Palestine. Other mandate territories concluded treaties in their own name. <=107> n106

Palestine under the mandate adhered to a number of multilateral treaties. <=108> n107 One, for example, was the International Agreement for the Establishment of an International Bureau of Intelligence on Locusts, concluded in 1926 by Palestine, Transjordania, Iraq, Turkey, and Syria. The text referred to the parties as "contracting ... states." <=109> n108

Palestine under mandate concluded bilateral treaties with regional and European states, including extradition and trade treaties with Egypt, <=110> n109 and treaties on postal services with France, <=111> n110 Greece, <=112> n111 Italy, <=113> n112 Switzer- [*733] land, <=114> n113 and Great Britain. <=115> n114 These bilateral treaties were registered with the League of Nations and published in its treaty series. <=116> n115 Palestine's treaties were also applied as law in the courts of Palestine when relevant. <=117> n116

## VII. Agreements of National Liberation Movements

The United Nations took the concept that communities under mandate were subjects of international law and expanded it to any people deprived of a territory to which it has a legitimate claim. This concept was reflected in a resolution of the U.N. General Assembly stating that "all peoples have an inalienable right to complete freedom, the exercise of their sovereignty and the integrity of their national territory," and, on that basis, colonial powers are prohibited from using force to prevent a people from establishing its independence. <=118> n117

In the era of the United Nations, certain organizations representing peoples entitled to self-determination have become subjects of international law. <=119> n118 It has been reasoned that such organizations, sometimes called national liberation movements, represent a people that enjoy an internationally guaranteed right to self-determination. <=120> n119 Such a movement need not necessarily control territory in order to be deemed a subject of international law. <=121> n120

National liberation movements have made agreements with states under circumstances suggesting that the state understood it was contracting with another subject of international law. <=122> n121 Often, such agreements, like that between Israel and the PLO, have been made to terminate a military conflict. <=123> n122

[*734]    The Saharan Arab Democratic Republic (SADR), which was declared by the POLISARIO movement in the territory of the former Spanish Sahara (now Western Sahara), was granted membership as a state by the Organization of African Unity, even though it did not control territory. <=124>    n123 POLISARIO concluded a peace agreement with Mauritania in 1979 that provided for Mauritania's withdrawal from, and renunciation of a claim to, territory claimed by POLISARIO as forming part of Western Sahara. <=125>    n124

In humanitarian law, a movement representing a people is deemed to have the capacity to bring international norms on warfare into effect in a military conflict in which the movement may be involved. Thus, Protocol I Additional to the Geneva Conventions of 12 August 1949, a treaty that prescribes rules for the conduct of warfare between states, provides for the possibility of accession to the treaty by "the authority representing a people engaged against a High Contracting Party in an armed conflict." <=126>    n125 Under Protocol I, such an authority may file a declaration to abide by the Protocol and the four Geneva conventions of 1949 on warfare. <=127>    n126 The four conventions and Protocol I thereby immediately come into force as between the authority and any state against which it is fighting. <=128>    n127 Hence, a national liberation movement is in a treaty relationship.

It has been suggested that even if an organization representing a people entitled to self-determination is a subject of international law, agreements concluded by such an organization are not international agreements, since "partial and limited subjects of international law logically have only partial capacity under that law." <=129>    n128 An agreement concluded by such an organization may encounter difficulty, to be sure, because of a non-state's incapacity to resort to international mechanisms available to a state to secure compliance by an errant treaty partner. But this practical incapacity does not detract from the international character of the agreement. The agreement can still properly be called a "treaty" and be governed by international law. <=130>    n129 Indeed, even territories in a colonial status have been party to instruments that were clearly treaties, as, for example, was India prior to its independence from Britain. <=131>    n130

[*735]

VIII. Agreements by Authorities of Occupied Territory

The PLO, in making agreements with Israel relating to the Gaza Strip and West Bank, enjoys international subjectivity in one other way. If a state or other authority representing the population of a territory under belligerent occupation makes an agreement with the occupying power, such an agreement is subjected under international law to a particular regime. The Geneva Civilians Convention addresses such agreements. Its Article 47 reads:

Protected persons who are in occupied territory shall not be deprived, in any case or in any manner whatsoever, of the benefits of the present Convention by any change introduced, as the result of the occupation of a territory, into the institutions or government of the said territory, nor by any agreement concluded between the authorities of the occupied territories and the

Occupying Power, nor by any annexation by the latter of the whole or part of the occu pied territory. <=132>  n131

Thus, the population of occupied territory is given protection against an occupant that may be able to extract from the authorities representing the population a regime more favorable to the occupant than is provided by the Geneva Civilians Convention. <=133>  n132 The agreements between Israel and the PLO are of the same type contemplated by Article 47, since Israel is an occupying power and the PLO represents the occupied population.

Under Article 47, an agreement between the occupying power and the authorities representing the occupied population is not governed by the domestic law of either party. Instead, such an agreement is governed by limitations binding on both parties under international law. <=134> n133 Thus, whether or not the authorities in question constitute a state, the Geneva Civilians Convention recognizes in them a capacity to conclude agreements that are binding under international law.

IX. Other Agreements of the PLO

The PLO's agreements with Israel are not its first. The PLO has concluded a number of agreements that arguably are treaties. In 1969, it concluded an agreement with Lebanon and, in 1970, another with Jordan, both relat ing to PLO armed forces in the territory of those states. <=135>  n134 These agree ments were considered to be binding on both parties and to bear an [*736]  international character. <=136>  n135 Lebanon and Jordan recognized the PLO's right to engage in military action against Israel to effectuate the Palestinian peo ple's right to self-determination and thus appeared to treat the PLO as a subject of international law. <=137>  n136

The PLO has concluded agreements with a number of international organizations, including the United Nations Development Programme, the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA), the United Nations Educational, Scientific and Cultural Organization (UNESCO), and the International Labor Organization. <=138>  n137

X. Status of the PLO As Reflected in the Israel-PLO Agreements

As for the Declaration of Principles, information relevant to its character can be gleaned from its text. First, Israel deemed itself to be contracting with the PLO not simply as that organization, but as the representative of a people. The preamble refers to the "PLO team" and the "Palestinian Delega tion" as "representing the Palestinian people." <=139>  n138 Thus, Israel evidenced an understanding that it was contracting with the representative of a commu nity of people, a representative that, moreover, has been recognized by the international community as fulfilling that role. <=140>  n139 Israel seems, thereby, to acknowledge that it is dealing with a party

that has status in the interna tional community sufficient to make an agreement binding on an entire nation of people.

A "people," at least a people that has a territory that is not under the sovereignty of a state, has a right to statehood in that territory if it so elects. <=141>    n140 Israel's recognition in the Declaration of the PLO as representa tive of the Palestinian people reflects a view that the Palestinian people, as represented by the PLO, have a right to determine their political status. <=142>    n141 Thus, Israel again appears to understand that it is contracting with a party that is a subject of international law.

[*737]    Second, the preamble recites that the parties "recognize their mutual legitimate and political rights" and that they "strive to live in peaceful coex istence" and to "achieve a just, lasting and comprehensive peace settlement and historic reconciliation." <=143>    n142 This wording reinforces a view of the PLO as a party representing a people and that Israel was dealing with the PLO with an understanding that the PLO was fulfilling such a role. The refer ence to political rights bespeaks a recognition of the Palestinians' right to an independent political existence. <=144>    n143 "Peaceful co-existence" describes a state of relations one normally associates with two independent states. <=145>    n144

The reference in the Declaration of Principles to "borders" as an issue still to be resolved implies a state-to-state relationship between the two par ties, since a border separates states. <=146>    n145 One analyst concludes from the wording of the preamble of the Declaration of Principles that, "[i]t is hard to escape the logical conclusion that by pleading mutuality, Israel has in fact, albeit in a round-about way, implicitly recognized the right of the Palestinians to a similar status, the occasional vehement protestations of Israel government spokesman ... notwithstanding." <=147>    n146

The Declaration of Principles and the agreements between Israel and the PLO that followed appear to be premised on an understanding by each side of an international status held by the other. The 1994 and 1995 interim agreements each include a species of savings clause providing that the terms of those agreements should not be taken as a waiver of claims of any nature. The provision, identical in the two agreements, reads: "Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions." <=148>    n147 This provision seems applicable to the PLO's claim, or position, that it rep resents the state of Palestine.

One analyst, however, finds that the texts of the Israel-PLO agreements do not reflect an acknowledgement by Israel that it is dealing with a state as its negotiating partner, and that, as a result, they are not treaties: "Because the Palestinian side is so far definitively not treated as a state in the negotiating process, and the PLO has accepted this diminished status, the agreements reached <=149>    n148 are not treaties in a technical sense under inter-  [*738]  national law." <=150>    n149 This view attributes too great a significance to Israel's official appraisal of the status of the PLO, and too little to the manner in which it has dealt with the PLO in the negotiating process, as reflected in the quoted terms of the three agreements. <=151> n150

## XI. International Enforcement

The international community appears to regard the Israel-PLO agreements as binding, presumably under international law. The U.N. Security Coun cil has twice called on the parties to implement their agreements. In 1994, the Council urged "the implementation of the declaration of principles ... without delay," <=152> n151 a call evidently based on the assumption that the decla ration is more than aspirational. Again in 1996, at a time when implemen tation appeared to be in jeopardy, the Security Council called on the two parties to resume negotiations. In the 1996 resolution, the Council "urg[ed] the parties to fulfill their obligations, including the agreements already reached." <=153> n152 The Council thus referred to the agreements as imposing "obligations" on the two parties.

The United Nations has been heavily involved in monitoring settle ments in various contexts in recent years, such as that in the Guatemalan civil war, as related above. The Palestine problem is the longest-standing territorial item on the U.N. agenda. From the General Assembly's recom mendation of a partition in 1947, <=154> n153 through monitoring armistice agree ments in the 1950s, <=155> n154 through a 1967 resolution that forms the basis of current negotiations, <=156> n155 through recognition of the PLO and promotion of its aim of self- determination, <=157> n156 the United Nations has often been at the center of efforts to resolve the status of Palestine.

The Israel-PLO agreements were negotiated under the auspices of the United States and Soviet Union (now the Russian Federation), and it was anticipated that these two states would use their good offices to ensure compliance by each party. <=158> n157 The two states witnessed the signatures on the Declaration of Principles and the 1995 Interim Agreement but did not undertake any legal responsibility with respect to compliance by the parties. <=159> n158

[*739] However, the territory in question is under Israel's belligerent occupa tion, a fact that gives rise to international responsibility for compliance with basic norms. <=160> n159 The states parties to the Geneva Civilians Conven tion, which includes most of the international community, and specifically the United States and the Russian Federation, bear an obligation towards the population of the territory to see that the occupier affords rights to which the population is entitled under the law of belligerent occupa tion. <=161> n160 Thus, these states are bound to act to prevent any ill treatment of the population by Israel.

Moreover, with respect to the 1997 Hebron agreement, U.S. Secretary of State Warren Christopher sent letters to both Israel and the PLO in which he suggested that the United States would undertake some role in ensuring compliance. <=162> n161 The U.S. letter to the PLO said that the United States was committed to assist in the implementation of the Hebron agreement. <=163> n162

The European Union wrote the PLO a similar letter, in which it said that the European Union would "use all its political and oral weight to ensure that all the provisions in the agreements

already reached will be fully implemented on the basis of reciprocity by both Israeli and Palestin ian sides in a timely fashion." <=164> n163 This statement, with its reference to "the agreements already reached," apparently applies not only to the Hebron agreement but to the Declaration of Principles and the 1995 Interim Agree ment as well.

The exact content of what is being undertaken by the United States and the European Union is not clear. However, both the United States and the European Union by their letters indicate an intent to undertake an enforcement role.

Conclusion

The situation of the Palestine Liberation Organization is neither that of a party to a civil war nor that of a constituent part of a state. The PLO does not seek a role within the state of Israel. Rather, it seeks an independent life for Palestine, involving no constitutional relationship with Israel. Early on, the question of the legal character of the interim agreements seemed one of only passing interest, because it was anticipated that they would soon be replaced by a final agreement. According to the Declaration of Principles, talks were to begin in 1996 leading to a permanent arrange- [*740] ment by 1999. <=165> n164 However, soon after the accession of Benyamin Netany ahu to the post of prime minister in 1996, it appeared that this timetable might not be met.

The Israel-PLO agreements are regarded by the two parties, and by the international community, as binding. Each side charges the other with vio lations, thereby manifesting its view that the agreements are binding. Since the agreements are not governed by the legal system of any state, the only other body of law that could govern them is international law.

The Israel-PLO interim agreements are governed by international law and, hence, are treaties. The PLO holds, in three ways, a status that makes it capable of being a treaty partner. First, it represents the population of territory under belligerent occupation, giving it a strong claim to present sovereignty, despite the control exercised by Israel as a belligerent occu pant. Second, the PLO has a claim to being a state on the basis of its con trol of Gaza and parts of the West Bank. Third, the PLO represents the Palestinian people, a people bearing a right to self-determination, and this status makes it a subject of international law, even if not a state.

However one analyzes the PLO's status, the interim agreements may be more difficult for either party to enforce in case of breach than with a treaty between two states that exercise complete control of their territory.

Nonetheless, it would appear that the Israel-PLO agreements impose binding obligations. The PLO possesses international subjectivity on any one of three bases: (1) under the generally accepted criteria for being a state, because it controls a population within a territory and has the capac ity to engage in treaty relations; (2) as the authority representing the popu lation of territory under belligerent occupation; (3) as a national liberation movement representing a people entitled to self-determination.

Israel, in the instruments themselves, appears to be dealing with a negotiating partner that has such international legal subjectivity. The agreements contain firm commitments that import a sense of obligation, as opposed to aspiration only. It is the apparent intent of the two parties that their obligations are assumed under international law. Thus, on the basis of the character of the parties and the content of the texts, the Israel-PLO agreements would appear to be treaties.

Under whatever category the agreements are characterized, interna tional oversight is essential, both to ensure that the eventual terms of a final settlement are fair, and to ensure compliance thereafter. It would be ironic if, at this late date, the United Nations abandoned its efforts on the Pales tine question and allowed a settlement that could be dictated in line with the power equation of the day. Unless the resulting final agreements reflect the legitimate expectations of the parties, the Palestine problem could remain on the United Nations agenda for another half century.

FOOTNOTES:

n1. Dogovor Rossiiskoi Federatsii i Respubliki Tatarstan "O razgranichenii predmetov vedeniia i vzaimnom delegirovanii polnomochii mezhdu organami gosudarstvennoi vlasti Rossiiskoi Federatsii i organami gosudarstvennoi vlasti Respubliki Tatarstan" [Treaty of the Russian Federation and the Republic of Tatarstan "On the Delimitation of Competencies and Mutual Delegation of Powers between the Governmental Organs of the Russian Fed eration and the Republic of Tatarstan"], Feb. 15, 1994, reprinted in Ross. gazeta, Feb. 17, 1994, at 6.

n2. Id. preamble, art. II(11). See also Gennady M. Danilenko, The New Russian Con stitution and International Law, *88 Am. J. Int'l L. 451, 458 (1994)* (noting that the instru ment fails to indicate how the two parties are to coordinate their activities in international relations).

n3. President Snegur States His Objections to Draft on Future of Dnestr Region, BBC Summary of World Broadcasts, Aug. 16, 1996, available in NEXIS, News Library.

n4. Svetlana Fyodorova, Tiraspol and Kishinev in a State of Cold War, Segodnya [Rus sian Press Digest], Aug. 10, 1996, at 4, available in NEXIS, News Library.

n5. Roman Arkadyev & Boris Talov, Transdniestria Will Be Recognized in the Long Run, Obshchaya gazeta, July 5, 1996, at 5, available in NEXIS, News Library.

n6. Unidad Revolucionaria Nacional Guatemalteca.

n7. Letter dated 17 January 1994 from the Secretary-General to the President of the General Assembly and to the President of the Security Council, Annex: Framework Agreement for the Resumption of the Negotiating Process between the Government of Guatemala and the UNIDAD Revolucionaria Nacional Guatemalteca (Government of Guatemala and Unidad Revolucionaria Nacional Guatemalteca), chap. VI (requesting U.N. to verify all agreements to be made between them), U.N. Doc. A/49/61, S/1994/53 (1994); Letter dated 8 April 1994 from the

Secretary-General to the President of the General Assembly and to the President of the Security Council: Annex I: Comprehensive Agreement on Human Rights (Government of Guatemala and Unidad Revolucionaria Nacional Guatemalteca), chap. X (requesting Secretary-General to organize a mission for the verification of human rights), U.N. Doc. A/48/928, S/1994/448 (1994), reprinted in *36 I.L.M. 276 (1997)*.

n8. Situation in Central America: Procedures for the Establishment of a Firm and Lasting Peace and Progress in Fashioning a Region of Peace, Freedom, Democracy and Development, Annex: Fifth Report of the Director of the United Nations Mission for the Verification of Human Rights and of Compliance with the Commitments of the Compre hensive Agreement on Human Rights in Guatemala, U.N. Doc. A/50/1006 (1996).

n9. Mario Dujisin, Mozambique Elections: A Chronology of Suffering, Inter Press Ser vice, Oct. 27, 1994, available in NEXIS, News Library.

n10. Id.

n11. U.N. Council Welcomes Breakthrough Agreement Between South African Parties, Xinhua News Agency, Apr. 19, 1994, available in NEXIS, News Library.

n12. Raja Shehadeh, From Occupation to Interim Accords: Israel and the Palesti nian Territories 103 (1997).

n13. Id. at 105.

n14. Declaration of Principles on Interim Self-Government Arrangements, art. 13, Sept. 13, 1993, reprinted in *32 I.L.M. 1525 (1993)* (agreement between Israel and the PLO).

n15. Id.

n16. Letter from Yasser Arafat, Chairman, Palestine Liberation Organization, to Prime Minister Yitzhak Rabin (Sept. 9, 1993), reprinted in 7 Palestine Y. B. Int'l L. 230 (1992- 94).

n17. Agreement on the Gaza Strip and the Jericho Area, Cairo, May 4, 1994, reprinted in *33 I.L.M., 622 (1994),* and in 7 Palestine Y.B. Int'l L. 243 (1992-94) (agreement between Israel and the PLO).

n18. Interim Agreement on the West Bank and Gaza Strip, Sept. 28, 1995, reprinted in 8 Palestine Y.B. Int'l L. 353 (1994/95) (agreement between Israel and the PLO).

n19. Id.

n20. Shehadeh, supra note 12, at 135.

n21. Israel Says Delay Likely in Its Hebron Withdrawal, Reuters World Service, Mar. 13,

1996, available in NEXIS, News Library.

n22. Protocol Concerning the Redeployment in Hebron, Jan. 15, 1997, < http://almachrig.hiof.no/israel/300/320/327/lobran-agreemnt.html> (website at Middle East Review of Int'l Affairs, Begin-Sadat Center for Strategic Studies). See also Mideast Accord; Looking Ahead: Two U.S. Documents, N.Y. Times, Jan. 17, 1997, at A12 (giving the text of a document headed Notes for the Record drafted at the request of Mr. Netanyahu and Mr. Arafat by a U.S. representative to summarize points agreed to between them).

n23. Declaration of Principles on Interim Self-Government Arrangements, supra note 14, art. 5.

n24. Id.

n25. Vienna Convention on the Law of Treaties, art. 1(a), 1155 U.N.T.S. 331.

n26. Antonio Cassese, The Israel-PLO Agreement and Self-Determination, 4 Euro. J. Int'l L. 564, 565-66 (1993).

n27. Katherine Meighan, Note, The Israel-PLO Declaration of Principles: Prelude to a Peace?, 34 Va. J. Int'l L. 435, 455 (1994) (stating that the Declaration is more than "a commitment to strive for harmonious relations," and that "[t]he definite provisions of the Declaration ... create an agreement resembling traditional hard law documents in terms of its substantive content").

n28. Protocol Concerning the Redeployment in Hebron, supra note 22.

n29. Id.

n30. Legal Status of Eastern Greenland, 1933 P.C.I.J. 21, 71 (Ser. A/B, no. 53) (where Norway and Denmark disputed ownership of a sector of Greenland, and Norway's foreign minister told Denmark's foreign minister that Norway would "make no difficulties" for Denmark over Greenland, and Denmark's foreign minister made a note of the remark, the remark as thus recorded was binding on Norway, precluding it from claiming sovereignty).

n31. Inter-American Convention on Rights and Duties of States, art. 1, 49 Stat. 3097, T.S. No. 8811, 165 L.N.T.S. 19 (listing: a permanent population, a defined territory, government, and a capacity to enter into relations with other states); Restatement of Foreign Relations Law 201 (1987) (listing same items).

n32. G.A. Res. 3236, U.N. GAOR, 29th Sess., Supp. No. 31 at 4, U.N. Doc. A/9631 (1974).

n33. G.A. Res. 3237, U.N. GAOR, 29th Sess., Supp. No. 31 at 4, U.N. Doc. A/9631 (1974).

n34. U.N. SCOR, 44th Sess., 2841st mtg., U.N. Doc. S/PV.2841 (1989).

n35. Security Council, Provisional Rules of Procedure, Rule 14, U.N. Doc. S/96/Rev.4 (1946).

n36. Palestine National Council, Declaration of Independence, Nov. 15, 1988, U.N. Doc. A/43/827, S/20278, Nov. 18, 1988, reprinted in *27 I.L.M. 1668 (1988)*.

n37. Paul Lewis, Arabs at U.N. Relax Stand on P.L.O., N.Y. Times, Dec. 6, 1989, at A3.

n38. Robert Pear, U.S. Won't Oppose U.N. Geneva Session, N.Y. Times, Nov. 29, 1988, at A3.

n39. Paul Lewis, U.N. Votes to Move Session to Geneva, N.Y. Times, Dec. 3, 1988, at A1.

n40. G.A. Res. 43/177, U.N. GAOR, 43d Sess., Supp. (No. 49), at 62, U.N. Doc. A/43/49 (1989); Paul Lewis, U.N. Ends Its Session in Geneva, Approving 2 Mideast Resolutions, N.Y. Times, Dec. 16, 1988, at A15 (104 voting in the affirmative, Israel and U.S.A. voting in the negative, and 44 states, including many European states, abstaining).

n41. Lewis, supra note 37, at A3; Frederic Kirgis, Admission of 'Palestine' as a Member of a Specialized Agency and Withholding the Payment of Assessments in Response, *84 Am. J. Int'l L. 218, 220 n.14 (1990)*.

n42. Constitution of the World Health Organization, July 22, 1946, 14 U.N.T.S. 185, 62 Stat. 2679, T.I.A.S. No. 1808.

n43. Jonathan C. Randal, WHO Again Postpones Vote on PLO Admission; Issue Threat ens U.S. Funds for U.N. Agency, Wash. Post, May 11, 1989, at A36.

n44. Paul Lewis, U.N. Health Agency Seeks Compromise on P.L.O., N.Y. Times, May 7, 1989, at A5; U.S. Warns WHO on Admitting PLO, L.A. Times, May 1, 1989, at A1 (state ment of State Dept. spokesperson Margaret Tutwiler); Adam Pertman, US Vows Cutoff in WHO Funds if PLO Joins, Boston Globe, May 2, 1989, at A1 (statement of Secretary of State James Baker of U.S. to end funding to WHO if Palestine were admitted). See also Jonathan C. Randal, PLO Defeated in Bid to Join World Health Organization, Wash. Post, May 13, 1989, at A1 (Yasser Arafat, president of the putative Palestine state, called the U.S. threat to withhold funds "blackmail," as the United States then contributed one fourth of WHO's budget).

n45. Norman Kempster, PLO Urged to Drop Bid to U.N. Unit; U.S. Warns It Would Withhold Money for Health Agency, L.A. Times, May 3, 1989, at A9.

n46. Randal, supra note 44, at A1. Burton Bollag, U.N. Health Agency Defers P.L.O. Application to 1990, N.Y. Times, May 13, 1989, at A3 (vote: 83-47). See also Kirgis, supra note 41, at 218 (the United States was apparently prepared to threaten to withhold dues from any international organization that might admit Palestine).

n47. *Klinghoffer v. Achille Lauro, 937 F.2d 44, 47 (2d Cir. 1991)* (citing the Foreign Sovereign Immunities Act *28 U.S.C. 1602* et. seq.).

n48. *Id. at 47-48* (stating that it was insufficient that the PLO anticipated having terri tory in

the future).

n49. Kirgis, supra note 41, at 219 ("It is very doubtful that 'Palestine' currently quali fies as a state under international law."); James Crawford, The Creation of the State of Palestine: Too Much Too Soon?, 1 Euro. J. Int'l L. 307, 308 (1990) (finding that the PLO did not satisfy the criterion of control of territory, since Israel was in occupation). See also id. at 309 (arguing that the PLO's "considerable influence" in the Israeli-occupied territories fell short of being an "organized self-governing community"); Ruth Lapidoth & N.K. Colvo-Goller, Les elements constitutifs de l'etat et la declaration du Conseil National palestinien du 15 Novembre 1988, 96 Revue generale de droit international public 777, 792-96 (1992).

n50. Francis A. Boyle, The Creation of the State of Palestine, 1 Euro. J. Int'l L. 301, 302 (1990); Francis A. Boyle, Create the State of Palestine!, Am.-Arab Affairs, Summer 1988, at 94 (arguing that this level of control sufficed to consider Palestine a state).

n51. M.N. Shaw, International Law 142 (1991) ("The evolution of self-determina tion has affected the standard necessary as far as the actual exercise of authority is concerned, so that it appears a lower level of effectiveness, at least in decolonisation situations, has been accepted."); James Crawford, The Creation of States in Intern ational Law 46 (1979) (requirement of effective control is applied less strictly if no com peting entity claims title).

n52. Crawford, supra note 51, at 43.

n53. Joint Declaration (Guinea-Bissau, Portugal) signed at Algiers, Aug. 26, 1974, reprinted in 78 Revue generale de droit international public 1252-53 (1974).

n54. G.A. Res. 3205, U.N. GAOR, 29th Sess., Supp. No. 31, at 2, U.N. Doc. A/9631 (1975). See also Lapidoth & Colvo-Goller, supra note 49, at 800 (seeking to distinguish the Congo and Guinea-Bissau cases on grounds that those two putative states controlled some territory, whereas PLO controlled none). This factual distinction does not hold from the time the PLO came into control of Gaza and parts of West Bank.

n55. Inter-American Convention on Rights and Duties of States, supra note 31, art. 1; Restatement of Foreign Relations Law 201 (1987).

n56. See Lewis, supra note 37. See also Zimbabwe recognises Palestinian passports, Xinhua News Agency, Feb. 8, 1996, at A3, available in NEXIS, News Library (identifying Zimbabwe as one of several states to accept passports the PLO began to issue).

n57. Letter from Prime Minister Yitzhak Rabin to PLO Chairman Arafat, Sept. 9, 1993, reprinted in 7 Palestine Y.B. Int'l L. 231 (1992-94).

n58. Letter, Yasser Arafat, supra note 16.

n59. H. Lauterpacht, Recognition in International Law 6 (1947) (describing recog nition as an

act done by states).

n60. Declaration of Principles on Interim Self-Government Arrangements, supra note 14, art. 6, para. 2.

n61. Agreement on the Gaza Strip and the Jericho Area, Cairo, May 4, 1994, art. VI, para. 2(a), reprinted in *33 I.L.M., 622 (1994),* and in 7 Palestine Y.B. Int'l L. 243 (1992- 94). An identical provision appears in the Interim Agreement on the West Bank and Gaza Strip (art. IX, para 5). The Interim Agreement superseded the Agreement on the Gaza Strip and the Jericho Area.

n62. Antonio Cassese, International Law in a Divided World 78 (1986); Crawford, supra note 51, at 53-54.

n63. Oliver Lissitzyn, Territorial Entities Other Than States in the Law of Treaties, 125 Recueil des cours 5, 53 (1983-III); Case Concerning Rights of Nationals of the United States of America in Morocco (France v. U.S.A.), 1952 I.C.J. 176, 185, 188, 193-94 (1992).

n64. Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, supra note 17, art. VI, para. 2(b); Interim Agreement on the West Bank and Gaza Strip, Sept. 28, 1995, supra note 18, art. IX, para. 5(b).

n65. Agreement on the Gaza Strip and the Jericho Area, supra note 17, art. VI, para. 2(c); Interim Agreement on the West Bank and Gaza Strip, supra note 18, art. IX, para. 5(c).

n66. Arafat's Cabinet Discusses Establishment of State, Reuters North American Wire, Jan. 24, 1997, available in NEXIS, News Library, Wires File.

n67. Netanyahu Reiterates "Self-Rule and Not a State" for Palestinians, BBC Summary of World Broadcasts, Jan. 25, 1997, available in NEXIS, News Library (from Jerusalem Israel Television Channel 1 Network in Hebrew 1700 gmt, Jan. 23, 1997).

n68. See generally Gerhard von Glahn, The Occupation of Enemy Territory (1957).

n69. Id.

n70. Id.

n71. Joel Singer, The Declaration of Principles on Interim Self-Government Arrange ments, 1 Justice 4, 6 (pub'd by International Association of Jewish Lawyers and Jurists 1994) (explaining that the West Bank and Gaza Strip remain under belligerent occupa tion during the interim period contemplated by the 1993 Declaration of Principles: "[N]otwithstanding the transfer of a large portion of the powers and responsibilities currently exercised by Israel to Palestinian hands, the status of the West Bank and Gaza Strip will not be changed during the interim period."). The author was Legal Adviser to the Israeli Ministry of Foreign Affairs. For a view that status of belligerent occupation continued, see also G.A. Res. 50/29B, Feb. 5, 1996 ("reaffirm[ing] that the Geneva Con vention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, is applicable to the occupied Palestinian territory, including Jerusalem, ..."). See

also John Quigley, The Israel-PLO Agreements versus the Geneva Civilians Convention, 7 Palestine Y.B. Int'l L. 45, 61 (1992-94) (interim agreements do not end status of belligerent occupation).

n72. Restatement of Foreign Relations Law 201, Comment b ("An entity does not necessarily cease to be a state even if all of its territory has been occupied by a foreign power or if it has otherwise lost control of its territory temporarily."); von Glahn, supra note 68, at 31-37; Morris Greenspan, The Modern Law of Land Warfare 217 (1959) ("The legal (de jure) sovereignty still remains vested where it was before the territory was occupied, although obviously the legal sovereign is unable to exercise his ruling powers in the occupied territory."); Crawford, supra note 51, at 59 (belligerent occupation does not negate statehood).

n73. Louis Henkin et al., International Law: Cases and Materials 247 (1993) ("Kuwait remained a state notwithstanding its occupation and putative annexation by Iraq in 1990").

n74. S.C. Res. 662, U.N. SCOR, 45th Sess., U.N. Doc. S/RES/662 (1990), reprinted in 29 I.L.M. 1327 (1990) ("decides that annexation of Kuwait by Iraq under any form and whatever pretext has no legal validity, and is considered null and void; ... demands that Iraq rescind its actions purporting to annex Kuwait").

n75. Eyal Benvenisti, The International Law of Occupation 151 (1993) (stating that S.C. declaration of the illegality of Iraq's annexation of Kuwait "reaffirmed the basic tenet of the law of occupation, the inalienability of sovereignty through the use of force").

n76. Carol Farhi, On the Legal Status of the Gaza Strip, in 1 Military Government in the Territories Administered by Israel 1967-1980, at 61, 75 (1982).

n77. Republican Decree Announcing Constitutional System of Gaza Sector, Mar. 9, 1962, art. 1, 17 Middle East J. 156 (1963) (1962 constitution adopted for Gaza by Egypt in 1962 stated: "The Gaza Strip is an indivisible part of the land of Palestine."). See also id. art. 73 ("This constitution shall continue to be observed in the Gaza Strip until a permanent constitution for the state of Palestine is issued.").

n78. Albion Ross, Amman Parliament Vote Unites Arab Palestine and Transjordan, N.Y. Times, Apr. 25, 1950, at A1 (Jordan's parliament specifying that by incorporating the West Bank into Jordan, it acted "without prejudicing the final settlement of Palestine's just case within the sphere of national aspirations, inter-Arab co-operation and international justice").

n79. G. Feuer, Les Accords Passes par les Gouvernements Jordanien et Libanais Avec les Organisations Palestiniennes (1968-1970), 16 Annuaire francais de droit international 177, 189 (1970) ("One might thus conclude, it seems, that the Palestinians are only provisionally placed under Jordanian sovereignty.") (translation by Author) (emphasis added).

n80. John Kifner, Hussein Surrenders Claims on West Bank to the P.L.O., N.Y. Times, Aug. 1, 1988, at A1; Excerpts from Hussein's address on abandoning claims to the West Bank, N.Y. Times, Aug. 1, 1988, at A4 ("The independent Palestinian state will be established on the

occupied Palestinian land after its liberation.").

n81. Singer, supra note 71, at 6.

n82. See infra note 120 and accompanying text.

n83. Eugene Cotran, Some Legal Aspects of the Declaration of Principles: A Palestinian View, in The Arab-Israeli Accords: Legal Perspectives 67, 73 (E. Cotran & E. Mallat eds., 1996).

n84. Cassese, supra note 62, at 79 ("[T]he attitude of single States acquires considera ble weight as evidence for or against the existence of new legal subjects.").

n85. Maurice Flory, La Naissance d'un Etat Palestinien, 93 Revue generale de droit international public 385, 401 (quoting President Francois Mitterand of France: "Many European countries are not ready to recognize a Palestine state. Others think that between recognition and non-recognition there are significant degrees; I am among these.").

n86. Cassese, supra note 62, at 80 (declaration of Nov. 15, 1983).

n87. S.C. Res. 541, U.N. SCOR, 38th Sess., Res. & Decs. 15, U.N. Doc. S/INF/39 (1983) ("[c]oncerned at the declaration by the Turkish Cypriot authorities issued on 15 November 1983 which purports to create an independent State in northern Cyprus, ... [c]onsidering ... that the attempt to create a 'Turkish Republic of Northern Cyprus' is invalid, ... [c]onsiders the declaration referred to above as legally invalid and calls for its withdrawal"). See also Cassese, supra note 62, at 80.

n88. Vienna Convention on the Law of Treaties, art. 3, 1155 U.N.T.S. 331 ("The fact that the present Convention does not apply to international agreements concluded between States and other subjects of international law or between such other subjects of international law ... shall not affect ... the legal force of such agreements.").

n89. South West Africa Case (preliminary objections), 1962 I.C.J. 330 (finding the League of Nations mandate over South West Africa to be a treaty between the U.K. and the League of Nations: "The Mandate, in fact and in law, is an international agreement having the character of a treaty or convention").

n90. Vienna Convention on the Law of Treaties between States and International Organizations or Between International Organizations, Mar. 21, 1986, U.N. Doc.A/CONF.129/15 (1986), reprinted in 25 I.L.M. 543 (1986).

n91. League of Nations Covenant art. 22.

n92. Id.

n93. International Status of South-West Africa (Advisory Opinion), 1950 I.C.J. 131. See also

Duncan Hall, Mandates, Dependencies, and Trusteeships 81 (1948) (stating that the Permanent Mandates Commission, which monitored compliance by administering powers, "consistently challenged on every possible occasion any policy or legal text that seemed to imply directly or indirectly that the mandatory state possessed or could possess sovereignty.").

n94. Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) Notwithstanding Security Council Resolution 276 (1970), 1971 I.C.J. 1, 30 para. 50.

n95. Aaron Margalith, The International Mandates 46 (1930).

n96. Mandate for Palestine, Permanent Mandates Commission no. 466, League of Nations Doc. C.529.M.314.1922.VI and C.667.M.396.1922.VI, 8 League of Nations O.J. 1007 (1922), reprinted in Terms of League of Nations Mandates: Republished by the United Nations, U.N. Doc. A/70 (1946), and also in Convention between the United States and Great Britain Concerning Palestine, Dec. 3, 1924, 44 Stat. 2184.

n97. But see Shabtai Rosenne, Isra<um e>l et les Traites Internationaux de la Palestine, 77 Journal du Droit International (Clunet) 1140, 1143-45 (1950) (indicating that Israel did not deem itself to be a successor state to Palestine and did not deem itself bound by Palestine's treaties).

n98. Palestine National Council, Declaration of Independence, supra note 36, preamble.

n99. James Brown Scott, The Two Institutes of International Law, *26 Am. J. Int'l L. 87, 91 (1932)* (giving text of Institute's resolution on mandates).

n100. *Id. at 91.*

n101. Norman Bentwich, Nationality in Mandated Territories Detached from Turkey, *7 Brit. Y.B. Int'l L. 97, 102 (1926).*

n102. The mandate instrument, to be sure, also provided that Great Britain should provide for a Jewish "national home" in Palestine. Mandate for Palestine, supra note 96, art. 2. Ambiguous authorization might have meant that there was more than one "community of persons" in Palestine enjoying international subjectivity. If that is the proper interpretation, it would mean that a "community of persons" constituting those other than Jews was one subject of international law, while the Jews constituted another.

n103. See supra notes 60-61 and accompanying text.

n104. Mandate for Palestine, supra note 96, art. 12.

n105. J.L., The International Status of Palestine, 90 Journal du droit international 964 (1963). Britain also concluded treaties for Palestine.

n106. Lissitzyn, supra note 63, at 55-56 (indicating that treaties were concluded more by "Class A" mandate territories, of which Palestine was one, than by "Class B" and "Class C" mandate territories. "Class A" mandate territories were deemed closer to being ready for independence than "Class B" or "Class C" mandate territories).

n107. 138 L.N.T.S. 149 (taxation, Mar. 30, 1931); 109 L.N.T.S. 121 (health, May 20, 1926); 1 L.N.T.S. 59 (patents/copyrights, June 30, 1920); 1 L.N.T.S. 83 (legal proce dures, March 18, 1904); 9 L.N.T.S. 415 (status of women March 31, 1922); 7 L.N.T.S. 35 and 7 L.N.T.S. 65 (water transport, April 20, 1921); 186 L.N.T.S. 301 (mass media, Sept. 23, 1936).

n108. Agreement concerning the Creation of an International Office for Information regarding Locusts, May 20, 1926, art. 2, 109 L.N.T.S. 121.

n109. Provisional Agreement with regard to the Extradition of Fugitive Offenders (Egypt-Palestine), Aug. 7, 1922, 36 L.N.T.S. 343; Exchange of Notes constituting a Provi sional Commercial Agreement, June 6 & 21, 1928 (Egypt-Palestine), 80 L.N.T.S. 277.

n110. 172 L.N.T.S. 17 (treaty of June 19, 1936).

n111. 170 L.N.T.S. 145 (treaty of March 28, 1936).

n112. 139 L.N.T.S. 59 (treaty of Dec. 16, 1931).

n113. 95 L.N.T.S. 395 (treaty of May 15, 1929).

n114. 13 L.N.T.S. 9 (treaty of Jan. 23, 1922).

n115. See supra notes 109-14 and accompanying text. See also 1950(2) Y.B. Int'l L. Comm. 209-10 (report by Israel, Ministry for Foreign Affairs, lists treaties to which Pales tine was a party).

n116. Shehadeh v. Commissioner of Prisons, Jerusalem, Palestine Supreme Court, Oct. 31, 1947, reprinted in 14 Ann. Dig. & Rep. of Pub. Int'l L. Cases 42 (1951) (applying a 1921 extradition treaty, apparently not registered with League of Nations, between Pales tine and Syria-Lebanon).

n117. Declaration on the Granting of Independence to Colonial Countries and Peoples, G.A. Res. 1514, U.N. GAOR, 15th Sess., Supp. (No. 15), at 66, U.N. Doc. A/4684 (1961); see also Lissitzyn, supra note 63, at 66-71, 78-81 (treaties have been made in their own name by certain colonies, including India, the Philippines, and Southern Rhodesia, prior to attaining independence.).

n118. H. Wilson, International Law and the Use of Force by National Liberation Movements 117-23 (1988).

n119. Cassese, supra note 62, at 91 ("[National liberation movements] are given inter national

status on account of their political goals: their struggle to free themselves from colonial domination, a racist regime or alien occupation.").

n120. Id. at 91.

n121. Julio A. Barberis, Nouvelles Questions Concernant la Personnalite Juridique Internationale, 179 Recueil des cours 145, 259-64 (1983-I).

n122. Eyal Benvenisti, The Israel-Palestinian Declaration of Principles: A Framework for Future Settlement, 4 Euro. J. Int'l L. 542, 545 (1993); Barberis, supra note 121, at 260- 61.

n123. Edward Schumacher, Saharan Rebels Win a Diplomatic Victory, N.Y. Times, Nov. 18, 1984, at D5 (OAU recognized SADR and admitted it to OAU membership).

n124. Peace Agreement, reprinted in Special Committee on Decolonization, U.N. GAOR, 34th Sess., 1161st mtg., at 61, U.N. Doc. A/AC.109/PV.1161 (1979). See also Benvenisti, supra note 75, at 152; Robert T. Vance, Jr., Recognition as an Affirmative Step in the Decolonization Process: The Case of Western Sahara, 7 Yale J. World Pub. Order 45, 62 (1980-81).

n125. Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict (Protocol I), art. 96(3), 1125 U.N.T.S. 3.

n126. Id.

n127. Id.

n128. Yehuda Z. Blum, From Camp David to Oslo, *28 Israel L. Rev. 211, 213 (1994).*

n129. Cassese, supra note 62, at 97 ("Organized peoples have the power to enter into agreements with States and international organizations. Such agreements are regulated by the international law governing treaties proper.").

n130. Kellogg-Briand Pact, Aug. 27, 1928, 46 Stat. 2343, 94 L.N.T.S. 57.

n131. Convention Relative to the Treatment of Civilian Persons in Time of War, art. 47, August 12, 1949, 75 U.N.T.S. 287 (1950) (emphasis added).

n132. See Commentary: Geneva Convention Relative to the Protection of Civilian Persons in Time of War 275 (J. Pictet ed. 1958) (explaining the historical background for art. 47 and stating that "cases have in fact occurred where the authorities of an occupied territory have, under pressure from the Occupying Power, refused to accept supervision by a Protecting Power, banned the activities of humanitarian organizations and tolerated the forcible enlistment or deportation of protected persons by the occupying authorities").

n133. Convention Relative to the Treatment of Civilian Persons in Time of War, supra note

131, art. 47.

n134. Barberis, supra note 121, at 261-64; Feuer, supra note 79, at 177.

n135. Flory, supra note 85, at 390.

n136. Feuer, supra note 79, at 187-88 ("inasmuch as the relations between the state [Lebanon] and the organizations involve a certain element of 'exteriority,' they can be deemed international relations. Agreements concluded in this framework bear incon testably the character of agreements under international law, at least in a certain mea sure"); Barberis, supra note 121, at 263 ("The Amman Accord of October 13, 1970 ... shows clearly the international situation enjoyed by the PLO"); L'Accord, Le Monde, Oct. 15, 1970, at 5 (summarizing text of Amman Accord).

n137. G.A. Res. 50/58, U.N. GAOR, 50th Sess., U.N. Doc. A/RES/50/58 (Mar. 7, 1996) (preambular paragraph lists these agreements).

n138. Declaration of Principles on Interim Self-Government Arrangements, supra note 14, preamble.

n139. G.A. Res. 3236, supra note 32.

n140. International Covenant on Civil and Political Rights, entered into force March 23, 1976, 999 U.N.T.S. 171 ("All peoples have the right of self-determination. By virtue of that right they freely determine their political status"). See also Multilateral Treaties Deposited with the Secretary-General, status as at December 31, 1991, at 149 (ratification by Israel, Oct. 3, 1991).

n141. Benvenisti, supra note 122, at 543-44 (referring to the Declaration preamble, states "the Israeli recognition of the Palestinian people does constitute an implied recog nition of the right of that people to determine freely its political status").

n142. Declaration of Principles on Interim Self-Government Arrangements, supra note 14, preamble.

n143. Blum, supra note 128, at 214 ("While [the Declaration of Principles] ... scrupu lously avoids any reference to Palestinian self-determination and independence, its wording leans heavily in that direction. The parties pledge mutual recognition of their legitimate and political rights." (emphasis in original)).

n144. Id. at 214 ("the references to peaceful co-existence etc. that appear in the DOP's preamble characteristically describe relations between states.").

n145. John V. Whitbeck, Now, Drop the Veil: The Palestinian State Exists, Middle East Int'l, Mar. 21, 1997, at 18.

n146. Blum, supra note 128, at 214-15.

n147. Agreement on the Gaza Strip and the Jericho Area, supra note 17, art. 23(5); Interim Agreement on the West Bank and Gaza Strip, supra note 18, art. 31(6).

n148. Declaration of Principles, supra note 14, Agreement on the Gaza Strip and the Jericho Area, supra note 17, Interim Agreement on the West Bank and Gaza Strip, supra note 18.

n149. Richard Falk, Some International Law Implications of the Oslo/Cairo Framework for the PLO/Israeli Peace Process, 8 Palestine Y.B. Int'l L. 19, 29 (1994/95).

n150. But see id. at 29, where, despite the author's statement just quoted, he finds that by virtue of the manner in which the agreements have been treated by the international community, the PLO has come to play "a state-like role in the process" and that this makes the agreements "treaty-like for most purposes."

n151. S.C. Res. 904, U.N. SCOR, 49th Sess., 3351st mtg., U.N. Doc. S/RES/904 (1994), reprinted in 33 I.L.M. 548 (1994).

n152. S.C. Res. 1073, U.N. SCOR, 50th Sess., U.N. Doc. S/RES/1073 (1996).

n153. G.A. Res. 181, U.N. GAOR, 2d Sess., U.N. Doc. A/519 (1947).

n154. John Quigley, Palestine and Israel: A Challenge to Justice 154 (1990).

n155. S.C. Res. 242, U.N. SCOR, 22d Sess., at 8, U.N. Doc. S/INF/22/Rev.2 (1968).

n156. G.A. Res. 3236, supra note 32.

n157. See, e.g., infra notes 161-62 and accompanying text.

n158. Interim Agreement on the West Bank and Gaza Strip, supra note 18, at 373.

n159. Convention Relative to the Treatment of Civilian Persons in Time of War, supra note 131, art. 1 ("The High Contracting Parties undertake to respect and to ensure respect for the present Convention in all circumstances.").

n160. Id.

n161. "Secret" Letter to Arafat Says USA "Committed" to Implementing Peace Accord, BBC Summary of World Broadcasts, from Ha'aretz (Israeli daily, Tel Aviv, Jan. 31, 1997), available in NEXIS, News Library.

n162. Id.

n163. David Makovsky, EU Wrote Letter of Hebron Assurance to Arafat, Jerusalem Post, Feb. 10, 1997, at 1 (giving full text of letter).

n164. Declaration of Principles on Interim Self-Government Arrangements, supra note 14, art. 5.