UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

------------------------------x

THE ESTATE OF YARON UNGAR et al.    :    C.A. No. 00 - 105L
v.                                  :
THE PALESTINIAN AUTHORITY et al.    :    **SUPPLEMENTAL DECLARATION OF ED MORGAN**

------------------------------x

ED MORGAN, of the City of Toronto, in the Province of Ontario, Canada, DECLARES PURSUANT TO 28 U.S.C. §1746, AS FOLLOWS:

I.   **INTRODUCTION**

1.   This declaration supplements my declaration of July 30, 2003 ("original declaration"), the contents of which are hereby incorporated by reference.

2.   This declaration is submitted to provide the Court with facts, evidence and my opinion as an expert regarding the legal arguments and factual claims raised by John Quigley in his article "Making Peace Agreements Work: The Implementation and Enforcement of Peace Agreements Between Sovereigns and Intermediate Sovereigns: Article: The Israel-PLO Interim Agreements: Are They Treaties?" 30 Cornell Int'l L.J. 717 (1997).

II.  **THESIS OF THE ARTICLE**

3.   The thesis of Quigley's article is that the PLO "possesses international subjectivity," i.e. a legal

"status that makes it capable of being a treaty partner," Id. at 740, and that the series of agreements concluded by Israel and the PLO (commonly known as the "Oslo Accords") are therefore binding treaties under international law.

4. In an attempt to prove his thesis, Quigley argues that the PLO is a non-state entity of a type capable of making treaties binding under international law or, alternatively, that the PLO is a "state" and as such is capable of entering a binding treaty. Id.

5. Quigley's claim that the PLO is a non-state entity (specifically: a "national liberation movement" representing an occupied population, Id.) with the capacity to enter binding treaties under international law is of no relevance to the question before the Court, and I will therefore not address this claim.[1]

6. The alternative construct proposed by Quigley in support of his thesis, i.e. his argument that the PLO has a "plausible claim" to be a state, Id. at 726, is riddled with serious factual and legal errors, as demonstrated below.

## III. QUIGLEY'S ANALYSIS IS FUNDAMENTALLY FLAWED SINCE IT FAILS TO DISTINGUISH BETWEEN THE PLO AND THE PA

7. The most glaring and fundamental flaw in Quigley's article is its complete failure to distinguish between the PLO and the PA, and their respective capacities and authority.

---

[1] See Geoffrey Watson, The Oslo Accords: International Law and the Israeli-Palestinian Peace Agreement, Oxford University Press (2000) ("Watson") pp. 55-102, for a detailed discussion of this issue. Watson concludes that the Oslo Accords are not treaties in the traditional sense, but nonetheless legally binding agreements under international law, id. at 74. There is no question that the provisions of the Oslo Accords are binding under international and practice, whether as treaties or as another form of agreement.

2

8. As described at length in my original declaration and the cases, instruments, and scholarly works cited therein, the PA was established pursuant to a series of agreements between Israel and the PLO (collectively "Oslo Accords") to exercise specified powers of local government in certain areas of the West Bank and Gaza Strip.

9. As even a cursory reading makes evident, the Oslo Accords clearly and carefully distinguish between the PLO and the PA: the PLO is a party to Oslo Accords, but is granted no powers or authority in the West Bank or Gaza under the Accords; rather, the powers granted under the Oslo Accords were granted exclusively to a newly-created, elected body, the "Palestinian Interim Self-Government Authority" -- i.e. the PA.

10. Yet Quigley's analysis completely fails to distinguish between the PLO and the PA, and the respective status and capacities of each body. On the contrary, Quigley systematically – and wholly erroneously – attributes to the PLO the powers of local government which were in fact granted exclusively to the PA by the Oslo Accords.

11. Quigley does not attempt to explain why he believes that the municipal powers and authority specifically granted to the PA under the Oslo Accords should be deemed as belonging to the PLO.[2]

---

[2] Quigley does not attempt to argue that the PLO and the PA are one and the same entity, or alter egos. Nor could he, since such a claim would be factually ludicrous and legally baseless: the PLO was founded in 1964 as a "national liberation movement", with its own Charter and clearly-defined organizational structure and hierarchy which continue in force until today. For the history and organizational structure of the PLO, see Palestine U.N. Observer Mission website at www.palestine-un.org/plo/frindex.html. The PA, by contrast, was created and elected as a municipal governmental entity pursuant to the Oslo Accords, in January 1996. The constitutional "Charter" of the PA is of course the Oslo Accords (as discussed at length in my original declaration), and the PA has its own clearly-defined organizational structure and organs which are completely distinct and discrete from those of the PLO. See www.palestine-un.org/pna/frindex.html.

3

Instead, Quigley simply ignores this crucial and fundamental difficulty in his analysis. He thus proceeds as if the PA itself, and the express provisions of the Oslo Accords creating and empowering the PA, did not exist,[3] and builds his entire analysis on the patently false postulate that these powers were granted to the PLO.

11.  By assigning the PLO the powers of local government actually held by the PA, Quigley seeks to advance his argument that the PLO is a "state" capable of entering a binding treaty, which argument in turn supports the ultimate thesis of his article, i.e. that the Oslo Accords are binding treaties under international law. However, this attribution of authority to the PLO is factually and legal baseless, as is self-evident from even the briefest examination of the Oslo Accords. That Quigley does not even attempt to explain this yawning gap in his analysis, is therefore not surprising. No explanation is possible.

12.  The scholarly and academic literature treating the Oslo Accords has never questioned the clear distinction between the PLO and the PA, and their respective status and capacities. On the contrary, legal scholars have expressly noted and recognized the legal and functional separation of the PLO and the PA.[4] Indeed, Omar Dajani, the former legal advisor to the PLO, specifically points to this separation as a key component of the Oslo Accords, which prevents both the PLO and the PA from claiming statehood:

> The creation of the PA has not . . . altered the international status of the PLO or, more broadly, of Palestine . . . <u>The legal and functional separation of the PLO and the PA erected by the DOP and subsequent agreements</u> . . . serves . . . s a barricade against changes in the status of either public body: it denies the PLO effective authority over the territory it claims for the Palestinians, and it denies the PA independence and access to

---

[3] The PA is mentioned only once in the article, and even then only tangentially and in passing. See p. 726.

[4] <u>See e.g.</u> Watson at 245 ("The Accords reflect the existence of two Palestinian entities ...").

4

the international decision-making process.[5]

13. Quigley's entire analytical edifice – and, of course, his conclusion that the PLO is a "state" – are thus built on a flawed foundation. Since his entire argument proceeds from, and is skewed by, this erroneous premise, it is unsurprising that Quigley has reached a conclusion that is resoundingly rejected by scholarly consensus.[6]

14. Because Quigley's conclusion relies wholly on this demonstrably false first premise, a point-by-point refutation of his individual arguments and claims would appear to be, for all practical purposes, virtually superfluous. However, for the sake of thoroughness, Quigley's more egregious misstatements of law and fact are addressed treated below.

## IV.  CONTROL AND SOVEREIGNTY IN THE WEST BANK AND GAZA

---

[5] Omar M. Dajani, "Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period", 26 Denv. J. Int'l L. & Pol'y 27, 61 (1997) ("Dajani") p. 91 (emphasis added). Likewise,

> Although the PLO has demonstrated its capacity to enter into foreign relations on behalf of the Palestinian people, the legal and functional separation of the PLO and the PA prevent the PLO from independently implementing international obligations in the territory and with regard to the population of Palestine.

Dajani, p. 87 (emphasis added).

[6] See e.g., Dajani at 57 ("*neither the establishment of the 'State of Palestine' in 1988 or the PA in 1994 has altered the PLO's international role and status*"); Adrien Katherine Wing, "The Palestinian Basic Law: Embryonic Constitutionalism", 31 Case W. Res. J. Int'l L. 383, 411 (1999) ("*Palestine is not a state and may not become a state*"); Adrien Katherine Wing, "Reno v. American-Arab Anti-Discrimination Committee: A Critical Race Perspective", 31 Colum. Human Rights L. Rev. 561, 574 (2000) ("*no independent nation called Palestine currently exists*"); George E. Bisharat, "Peace and the Political Imperative of Legal Reform In Palestine", ("*Clearly, neither Oslo I [the DOP] nor Oslo II [the Interim Agreement] awarded sovereignty over the West Bank and Gaza Strip to the Palestinians.*") 31 Case W. Res. J. Int'l L. 253, 260 (1999); Watson at 68 ("*neither the PLO nor the PA has yet acquired statehood*"); Yoram Dinstein, "The International Legal Status of the West Bank and Gaza Strip - 1998", 28 Israel Yearbook on Human Rights 37, 47-48 ("*The limitations on the empowerment of the Palestinian Council go to the root of the issue of sovereignty/independence. Whatever the future holds for the Palestinians, it is sufficiently clear that they have not crossed the threshold of statehood at the present time ... What has been attained so far by the Palestinians is an autonomous arrangement for areas under their control in the West Bank and Gaza Strip.*") (footnotes and internal quotes omitted).

5

15. As discussed at length in my original declaration, and in the cases, documents, and scholarly publications quoted therein, the limited powers of municipal government exercised by the PA in parts of the West Bank and Gaza Strip fall far short of the effective and sovereign control over territory which is a *sine qua non* condition of statehood. See §§ 15-20, 29-49. Quigley attempts to overcome the sharply limited scope and reach of these powers[7] by raising two specious (if novel) arguments.

16. First, Quigley argues that "the control requirement has been relaxed in international practice where the putative state was seen to have a right to statehood and where there was not a competing entity seeking statehood in the same territory." Id. at 724. As purported examples of the application of this relaxed standard, Quigley cites the cases of the Congo and Guinea-Bissau, which were admitted to the U.N. before obtaining full control over their territory.

17. There is no such general relaxation of the standard for sovereign statehood. In the case of the new Republics to emerge from the former Yugoslavia, for example, the European Community's Arbitration Commission set out the governing legal principles: "The Commission considers . . . that the State is commonly defined as a community which consists of a territory and a population subject to an organized political authority; that such a State is characterized by sovereignty."[8] In this, the Commission confirmed that the traditional criteria of effective control of the territory and the population remains the relevant test for statehood. As the House of Lords said in England's leading case on point:

> By 'exercising de facto administrative control' or 'exercising effective administrative control,' I understand exercising all the functions of a sovereign government, in maintaining law and order, instituting and maintaining courts of justice, adopting or imposing laws regulating the relations of the inhabitants of the territory to one another

---

[7] Which powers Quigley erroneously attributes to the PLO, as noted *supra*.

[8] Opinion No. 1, Arbitration Commission, E.C. Conference on Yugoslavia, November 29, 1991, 92 I.L.R. 162, 165.

6

and to the government.[9]

Likewise, the British Foreign Office maintains that, "[t]conditions for the recognition of a new regime as the de jure government of a State are that the new regime should not merely have effective control over most of the State's territory, but that it should, in fact, be firmly established."[10] As one leading scholar has put it, "[t]he effectiveness of a government is, of course, a *sine qua non* of recognition of an entity as the government of a state; recognition of an entity before it has become effective is 'precipitate' and intervention in a state's affairs contrary to international law."[11]

18.  The British courts have had occasion to re-assess these traditional criteria during the past decade in the case of Somalia, and have held that they still apply. In coming to this conclusion, it was found that and that although an interim government had been established for Somalia under the Djibouti Agreement which, like the Oslo Accords, was meant to start the process of resolving a conflict, the interim government must satisfy the traditional criteria of effective control in order to enjoy the rights of a sovereign. In the words of the Court of Queen's Bench, "[t]he interim government clearly does not satisfy these criteria; the Republic of Somalia currently has no government."[12]

19.  Professor Geoffrey Watson has directly addressed the Quigley argument, and has explained in detail why it fails:

> It has been argued that the traditional requirement of 'control' has been 'relaxed' where 'the putative state was seen to have a right to statehood and where there was not a competing seeking statehood in the same territory' [citing Quigley Id.]. Thus the Congo and Guinea-Bissau obtained UN membership before Belgium and Portugal, respectively,

---

[9] The Arantzazu Mendi, [1939] A.C. 256, 264-5 (H.L.).

[10] Hansard, H.C., vol. 485, cols. 2410-2411, March 21, 1951 (Foreign Secretary Morrison).

[11] D.J. Harris, *Cases and Materials on International Law* (5th edition, Sweet & Maxwell: London), p. 157.

[12] Republic of Somalia v. Woodhouse Drake & Carey Suisse S.A., [1993] Q.B. 54, 66 (Q.B.D.).

7

had ceded them actual control over territory. But in both those cases Belgium and Portugal had already agreed to recognize the new states before withdrawing their troops. That is not the case here. Israel has repeatedly made clear that it does not recognize any Palestinian state, at least not yet. As we have seen, Israel's view on this point is reflected in the Oslo Accords, which pointedly stop short of referring to a Palestinian state.

Watson, p. 70 (footnotes omitted).

Furthermore,

Professor Quigley suggests that Israel's 'insistence that the PLO recognize it' somehow implies 'Israel's acknowledgment that the PLO represents a state, even though Israel officially maintains the contrary.' Quigley, 'The Israel-PLO Interim Agreements,' 725. Quigley's argument rests on the traditional assumption that only *states* may recognize other states. See Lauterpacht, *Recognition in International Law*, 6. There is nothing, however, to prevent non-state entities from purporting to recognize states, as the PA has done here, and indeed national courts and international organizations now routinely assess whether to treat entities as states.

More to the point, it seems inappropriate to suggest that Israel has impliedly recognized the PLO simply because Israel seeks the PLO to recognize it, given that Israel has *explicitly* refused to recognize any Palestinian state. Implied recognition is increasingly common in international practice, but 'recognition is a matter of intention and . . . care must be taken not to imply recognition from acts which, although amounting to a limited measure of intercourse, do not reveal an intention to recognize.' *Oppenheim's International Law*, §50, 1:169-70. Israel's 'intention' could not be more plain: it does not recognize a Palestinian state.

Id. at 70, note 57 (emphasis in the original).

20. Moreover, Quigley's claim of implicit Israeli recognition of PLO "statehood" is further refuted by a subsequent article written by Quigley himself. In a 1999 journal article, Quigley remonstrated that, "Israel and the PLO are locked in dispute over the Gaza Strip and West Bank, which constitute only about twenty per cent of the territory of the former Palestine, and <u>Israel is not disposed to allow Palestinian sovereignty even in that small area</u>." John Quigley, "The Role of Law in a Palestinian-Israeli Accommodation" 31 Case W. Res. J. Int'l L. 351, 375 (1999) (emphasis added).

21. Thus, Quigley's argument – i.e. that Israel has implicitly recognized the PLO's "statehood" and

8

that therefore the PLO, like the Congo and Guinea-Bissau, should be deemed a state despite its lack of effective government control – has been thoroughly refuted by the courts, by international law scholars (with whom I fully agree), and by Quigley's own later writings.

22. Additionally, while the Congo and Guinea-Bissau were granted recognition as states and admitted to the UN in light of the virtually unique circumstances of their creation (including the recognition granted by their respective colonial powers), despite their lack of full and effective governmental control, it is extremely doubtful that this recognition conformed with the accepted requirements of statehood under U.S law as reflected in the Restatement § 201. In other words, these countries were not recognized <u>pursuant</u> to the accepted criteria set out in the Restatement, but rather <u>despite</u> and as a <u>deviation</u> from these criteria. Thus, the claim that the case of the West Bank and Gaza is analogous to that of the Congo and Guinea-Bissau is in fact an admission that the West Bank and Gaza <u>fail to conform</u> with the criteria stated in §201 of the Restatement. While the Executive Branch may for political reasons elect to extend recognition even when these criteria are not met, it is well-established that the Judicial Branch determines the existence *vel non* of statehood solely on the basis of § 201.[13]

23. Quigley's second argument in favor of PLO "statehood," set out in part III of his article, concedes that Palestinian governmental authority over the West Bank and Gaza is insufficient to meet the requirements of §201 of the Restatement, and, moreover, frankly disregards these criteria as "less

---

[13] See Klinghoffer v. Palestine Liberation Organization, 937 F.2d 44, 47 (2nd Cir. 1991) ("this Court has limited the definition of 'state' to entities that have a defined territory and a permanent population, that are under the control of their own government, and that engage in, or have the capacity to engage in, formal relations with other such entities")(internal brackets, quotes and ellipses omitted). See also National Petrochemical Co. v. M/T Stolt Sheaf 860 F.2d 551, 553 (2nd Cir. 1988) cert. denied 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989); Morgan Guar. Trust Co. v. Republic of Palau, 924 F.2d 1237, 1243, 1245, 1246 (2nd Cir. 1991); Matimak Trading Co. v. Khalily, 118 F.3d 76, 80 (2nd Cir. 1997) cert. denied 522 U.S. 1091, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998); U.S. v. Jordan, 223 F.3d 676, 693 (7th Cir. 2000); First American Corp. v. Al-Nahyan, 948 F.Supp. 1107, 1121 (D.D.C. 1996); Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362, 374 (E.D.La. 1997).

than central" to the PLO's claim. Id. at 726.

24. Instead, Quigley argues that the PLO should be viewed as a state, despite the lack of effective control demanded by §201, because it purportedly acquired nominal "sovereignty" over the West Bank and Gaza, during the course of, and despite, Israeli occupation of these areas:

> With the Palestine National Council's declaration in 1988, coupled with the prior recognition of the PLO as the representative of the Palestinian people, the newly declared Palestine state had a strong claim to being the sovereign of the territory, despite its lack of physical control.

Id. at 729. (emphasis added).

25. This argument suffers from a number of severe flaws.

26. Firstly, according to Quigley, the PLO acquired sovereignty in the West Bank and Gaza circa 1988, as a result of the PLO's "declaration of statehood" and the recognition of the PLO by a number of countries. Id. Yet, subsequent to this purported acquisition of sovereignty by the PLO, the Court of Appeals for the Second Circuit rejected the PLO's claim of statehood, Klinghoffer v. PLO, 937 F.2d 44, 47 (2nd Cir. 1991). Indeed, Klinghoffer expressly considered and rejected the claim now echoed by Quigley, i.e. that the PLO's 1988 "declaration of statehood," coupled with recognition of the PLO, could serve as a basis for statehood in the absence of effective governmental control.[14]

---

[14] As the Klinghoffer court explained,

> [D]espite the fact that some countries have "recognized" the PLO, the PLO does not have the capacity to enter into genuine formal relations with other nations. This is true primarily because, without a defined territory under unified governmental control, the PLO lacks the ability actually to implement the obligations that normally accompany formal participation in the international community.

Id. at 48.

10

27. Secondly, there is no precedent or authority in international law for the *ab initio* acquisition of nominal or de jure "sovereignty" as proposed here by Quigley, and in fact Quigley cites none. Indeed, Quigley's claim – that an entity could somehow acquire "sovereignty" over territory in which it does not exercise effective control, and then leverage that titular "sovereignty" into a claim to statehood – is not only erroneous, it is a *non sequitor* and a complete misapprehension of the term "sovereignty." Sovereignty "is not itself a <u>right</u>, nor is it a <u>criterion</u> for statehood. It is a . . . <u>description</u> of statehood; a brief term for the State's attribute of more-or-less plenary competence".[15] In other words, "sovereignty" is "an <u>incidence</u> or <u>consequence</u> of statehood, namely, the plenary competence that States *prima facie* possess."[16] Under governing principles of international law, the act of recognition of an entity "is not constitutive but merely declaratory. The State exists by itself (*par lui-même*) and the recognition is nothing else than a declaration of this existence, recognized by the States from which it emanates."[17]

28. Thus, Quigley puts the cart before the horse: since "sovereignty" is "an incidence or consequence of statehood," <u>Id.</u>, the PLO cannot possibly acquire "sovereignty" without <u>first</u> achieving statehood.[18]

---

[15] James Crawford, <u>The Creation of States in International Law</u> 26-7 (1979) ("Crawford") (footnotes omitted, emphasis added).

[16] Id. at 71 (footnotes omitted, emphasis added).

[17] *Deutsche Continental Gas-Gesellschaft v. Polish State* (1929), 5 A.D. 11, 13 (German-Polish Mixed Arbitral Tribunal).

[18] Quigley attempts to buttress his claim that sovereignty can arise *ab initio* under military occupation, by reference to the accepted principle that military occupation does not extinguish the pre-existing statehood of the occupied state. However, the attempt to rely on this rule is wholly unavailing. This rule is set out in the Restatement:

> **Military occupation, whether during war or after an armistice, does not <u>terminate</u> statehood, e.g. Germany's occupation of European states during World War II, or the allies occupation of Germany and Japan after that war.**
>
> Reporters' Notes, 3, <u>Military Occupation</u>, Restatement §201 (emphasis added).

29.  Thirdly, as indicated above, Quigley himself subsequently retreated from this claim, and expressly conceded that the PLO has <u>not</u> acquired sovereignty in these areas.[19]

30.  Fourthly, the claim that the PLO has obtained "sovereignty" over these areas is refuted by the provisions of the Oslo Accords themselves. As discussed in detail in my original declaration and the authorities cited therein, the Oslo Accords provide the PA with specific, enumerated powers of local government to be exercised during an interim period (pending resolution of the permanent status of the West Bank and Gaza) while explicitly reserving residual authority in these areas to Israel.[20] Moreover, the powers retained by Israel (and denied the PA) include those which constitute the typical indicia of sovereignty. §§36-45. Additionally, the Accords provide that the parties "view the West Bank and Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period" (Article XXXI(8) of the IA), and that "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations" (<u>Id</u>. at XXXI(7)). The PLO is, obviously, a party to the Accords, and so willingly agreed to

---

Both the language of the Note ("...*terminate statehood*..."), and the examples cited therein, make perfectly clear that this rule serves only to <u>preserve</u> the statehood of an occupied nation. This rule therefore has nothing to do with the <u>initial creation or establishment of new states</u>. Prior to their capture by Israel in 1967, the West Bank and Gaza Strip were held by Jordan and Egypt, respectively, and no PLO state or Palestinian state ever existed in these areas. Therefore, this rule is completely inapposite to Israel's capture and control of these areas: there simply never was any Palestinian statehood to preserve from "termination".

[19] John Quigley, "The Role of Law in a Palestinian-Israeli Accommodation" 31 Case W. Res. J. Int'l L. 351, 375 (1999) (Israel and the PLO are locked in dispute over the Gaza Strip and West Bank ... and Israel <u>is not disposed to allow Palestinian sovereignty</u> even in that small area") (emphasis added).Quigley has also since abandoned his unfounded claim that the UN has "treated the PLO as a state", <u>id</u>. at 722, arguing in 1999 only that the PLO's observer status at the United Nations has "moved it <u>closer</u> to being considered a state". 31 Case W. Res. J. Int'l L. 351, 361 (1999) (emphasis added).

[20] §§ 32-35, 47. <u>See also</u> Watson at 69: "Even after the Interim Agreement, Israel retained 'residual' powers not exercised by the PA". Moreover, as Watson notes, "Advocates for both sides agree on this interpretation". Id. at note 69 citing Joel Singer, "The West Bank and Gaza Strip: Phase Two" in *Justice*, December 1995, at 3, and Raja Shehadeh, <u>From Occupation to Interim Accords</u> (London: Kluwer Law International, 1997) at 35 ("all residual powers and responsibilities shall continue to

these provisions and limitations, all of which clearly negate any possible claim to statehood or sovereignty over the West Bank and Gaza. Effectively, then, Quigley is asserting a claim of sovereignty which the PLO itself has agreed to waive or defer "pending the outcome of the permanent status negotiations"[21] on the West Bank and Gaza.[22]

31. Fifth, Quigley predicates his PLO "sovereignty" argument on a purported absence of any countervailing claims, noting that Egypt has never claimed sovereignty in Gaza and that Jordan has dropped its claim to the West Bank, id. at 729, and asserting that "Israel does not claim sovereignty for itself" in these areas, Id. at 728. While it is true that Egypt and Jordan make no claims on the West Bank and Gaza, Quigley's assertion that Israel does not claim sovereignty is entirely inaccurate. Joel Singer, the former Israeli Foreign Ministry Legal Advisor (and a primary draftsman of the Oslo Accords) notes that though the West Bank and Gaza are currently "territories under the control of Israeli military government," nonetheless "Israel has a claim to sovereignty over these areas."[23] Thus, Quigley's argument that the PLO should be deemed a sovereign by default in the West Bank and Gaza, is founded on the erroneous premise that no other party asserts a claim to sovereignty in these areas.[24]

---

be exercised by Israel").

[21] See Watson at 250: "[T]he question of Palestinian statehood is the quintessential 'permanent status' issue".

[22] In fact, Quigley has criticized what he considers to be excessive PLO concessions in the Oslo Accords. See John Quigley, "The Oslo Accords: More than Israel Deserves" 12 Am. U.J. Int'l L. & Pol'y 285, 297 (1997). ("For Israel, the Oslo agreements do not represent a bad bargain. Israel keeps the territory it took in 1948 and reaps the rewards of the ethnic cleansing it carried out at that time"). See also id. at 285 ("The Oslo agreements offer the Palestinians much less than that to which they are legally entitled."); John Quigley, "Oppressed Palestinians Deserve More Than This", Columbus Dispatch (Ohio) September 26, 1993, ("Israel has been able to exact from the Palestinians a deal that gives them much less than their entitlement").

[23] Joel Singer, "Aspects of Foreign Relations Under the Israel-Palestinian Agreements On Interim Self-Government Arrangements For the West Bank and Gaza", 28 Israel Law Review Nos. 2-3 (1994), p. 274.

[24] Under the Oslo Accords, both the Palestinians and the Israelis are free to seek sovereignty in the West Bank and Gaza as an future goal, i.e. as the ultimate <u>outcome</u> of the negotiations on the permanent status of these areas:

13

32.     Therefore, Quigley's novel thesis that the PLO has acquired "sovereignty" in the West Bank and Gaza, has no basis in fact or in international law. Moreover, in making this argument, Quigley has frankly conceded that the PLO does not meet the requirement of effective governmental control as set out §201 of the Restatement.

## V.     FOREIGN RELATIONS

33.     Quigley argues that while the "PLO agreed that during the interim period it would not exercise foreign affairs functions," it has delegated its conduct of foreign relations to Israel, and an "entity does not lack the quality of statehood . . . if it agrees to let another state handle its external relations." Id. at 725-6. As an analogy, Quigley cites France's conduct of foreign affairs on behalf of Morocco. Id.

34.     In the first place, the ability to independently conduct foreign affairs is one of the ordinary attributes of sovereignty. The hallmark of a sovereign state, as opposed to, for example, a colony, is that while a colonial administration may have a substantial amount of domestic self-rule, it is the sovereign parent that handles international relations. The Supreme Court of Canada has addressed this issue with respect to the status of Newfoundland following the Imperial Conference of 1926, when Britain delineated the status of its self-governing Dominions. In the Supreme Court's analysis:

> . . . during the period immediately following 1926 two factors distinguished the position of Newfoundland from that of the other Dominions. Newfoundland chose not to be a member of the League of Nations and Newfoundland chose to leave the conduct of its

---

Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the permanent status to be conducted pursuant to the DOP. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.

IA Article XXXI(6).

external relations to the British authorities. These two factors did cause considerable confusion concerning the manner in which Newfoundland was to be dealt with in treaties. These considerations may reflect on whether Newfoundland was an independent person in the eyes of international law.[25]

35. The question is whether the entity in question willfully delegated the foreign affairs powers it otherwise possessed, or contrarily, whether it never possessed those powers in the first place. With respect to Quigley's claim regarding Morocco, Professor Watson has specifically addressed and refuted the point, explaining that neither the PLO nor the PA could have delegated the conduct of "foreign relations" to Israel:

> [S]tates can delegate responsibility for foreign relations to other states. [Citing Quigley, Id.]. Morocco, for example, was treated as a state even after it agreed to permit France to handle its foreign relations . . . But it is more difficult to characterize the Palestinian-Israel relationship as a 'delegation' of pre-existing Palestinian rights to Israel. Before the Oslo Accords, it was even more clear that there was no State of Palestine, and <u>thus no power of foreign relations to delegate</u>. The Interim Agreement starkly forbids the PA to engage in even the most fundamental aspect of foreign relations, the establishment of diplomatic relations via embassies and consulates. This type of limitation is obviously inconsistent with the suggestion that the PA now has the 'capacity to engage in foreign relations.'[26]

36. In my view, Professor Watson's analysis is correct. Since no Palestinian state has ever arisen, neither the PLO nor the PA has ever possessed any "foreign relations capacity" to delegate in the first place.[27]

---

[25] Reference re Seabed and Subsoil of the Continental Shelf Offshore Newfoundland (1984), 5 D.L.R. (4th) 385, 401-2 (S.C.C.).

[26] Watson, at 71 (footnotes omitted, emphasis added).

[27] See e.g. Reporters' Note 4 to §201 of the Restatement: "In the past, one state sometimes turned over to another some or all control of its foreign relations, retaining the right to reassert such control". In other words, the existence of statehood is a <u>condition precedent</u> of the delegation of foreign relations authority. That is because the capacity to conduct foreign relations is a "consequence" of statehood that is "a conflation of the requirements of government and independence". Crawford at 47-48.

37. Moreover, the claim that Israel conducts foreign relations on behalf of the PLO not only lacks legal support, but Quigley has provided no factual basis on which to support such an assertion. I know of no evidence, and in my view there is none, to support a factual assertion to the effect that Israel does now, or has ever, conducted foreign relations on behalf of the PLO (or the PA for that matter).

38. Finally, Quigley argues that because the PLO is authorized by the Oslo Accords to conclude international agreements in several limited spheres (economic matters, culture, science and education), the PLO should be deemed to have the capacity to conduct foreign relations, despite the express agreement of the PLO itself in the Accords that these dealings "shall not be considered foreign relations." Id. at 726, citing Article IX 5(c) of the Interim Agreement (IA).

39. This argument fails, in the first place, because under the accepted criteria of statehood, a state must have the "*capacity* to enter into the full range of international relations . . ." Crawford at 47 (italics in the original, emphasis by underline added). Yet, under the Oslo Accords, the PLO is authorized to enter agreements only in an extremely limited number of areas, i.e. only agreements "relating to economic matters, and to matters of culture, science and education." Quigley at 726. These limited spheres are, quite obviously, light years from "the full range of international relations" required for statehood.[28]

40. Moreover, under international law and practice, "[c]apacity to enter into relations with States is

---

[28] Additionally, the international activities engaged in by the PLO do not meet the "foreign relations" criterion required for statehood because the "capacity" to conduct foreign relations necessary for statehood is the "legal competence to participate in the international process and to carry ... international obligations into effect on the domestic level ..." Dajani at 86 citing Crawford at 47. The PLO, however, lacks the legal capacity to "carry its international obligations into effect" in the West Bank and Gaza, since the PLO is not empowered to exercise any governmental authority in these areas. See Dajani at 87 ("the legal and functional separation of the PLO and the PA prevent the PLO from independently implementing international obligations in the territory and with regard to the population of Palestine").

16

no longer, if it ever was, the exclusive prerogative of States." Crawford, Id. (footnote omitted). On the contrary, non-state entities are commonly granted a degree of limited power to make international agreements, and "[s]uch treaty making power is most often restricted to economic, cultural, social, and similar matters . . ." Hurst Hannum and Richard Lillich, "The Concept of Autonomy in International Law," 74 Am. J. Int'l L. 858 (1980). Thus, the enumerated spheres in which the PLO is authorized to conclude agreements (i.e. economic, cultural, scientific and educational matters) conform perfectly with the international practice regarding non-state entities.[29]

41.   In light of the authorities cited above, it is readily apparent that Article IX 5(c) of the IA, which provides that the PLO's entry into agreements in these limited spheres "shall not be considered foreign relations," accurately reflects international law and practice. In other words, this provision does not (merely) enshrine an agreement between the PLO and Israel about how to define the substantive nature of this limited power, but rather adopts into the Oslo Accords the objective legal status of this power. Therefore, Quigley's suggestion that this provision be disregarded (in order to clear the way for his statehood argument), is essentially a suggestion to disregard the clear practice and precedents of public international law regarding the "foreign relations" criterion of statehood.

42.   Lastly, even if Article IX 5(c) of the IA was not reflective of international law, but merely a definition "stipulated" by the parties as Quigley asserts, Id. at 726, there would be no basis in

---

[29] See Harris, supra, p. 144 (identifying the PLO as a non-state entity, able to sign agreements and to join international organizations despite its lack of sovereign state status). Under the Oslo Accords, the limited spheres in which the PLO may conclude agreements are granted only to the PLO but withheld entirely from the PA. See §§ 23-28 of my original declaration and the sources and authorities cited therein; see also Watson at 71 ("The Interim Agreement starkly forbids the PA to engage in even the most fundamental aspect of foreign relations, the establishment of diplomatic relations via embassies and consulates. This type of limitation is obviously inconsistent with the suggestion that the PA now has the 'capacity to engage in foreign relations'.")

international law to disregard it. Quigley's grounds for ignoring this provision are that it "represented an apparent effort by Israel to limit the international status of the PLO." Id. In fact, this characterization is correct: the provisions of the Oslo Accords dealing with foreign relations were intensively negotiated, and Israel took great care to ensure that these provisions did not grant the PLO or the PA the "foreign relations" capacity necessary for statehood.[30] Yet, precisely <u>because</u> this was the purpose of Article IX 5(c), and <u>because</u> Israel and the PLO deliberately and intensively negotiated this provision, and <u>because</u> the PLO itself agreed to this provision, the validity and binding force of Article IX 5(c) should be accepted and respected by all judicial bodies and third parties.

43.   Indeed, Quigley himself maintains that the Oslo Accords are full-fledged, binding treaties. It certainly does not lie with the PLO or the PA to impugn a provision of the Oslo Accords when their own argument turns on the binding force of those agreements. The International Law Commission's Commentary to the Vienna Convention on the Law of Treaties enshrines this estoppel, stating that a party to an agreement will always be taken to have consented to be bound to its terms where it invokes the provisions of the agreement or otherwise treats the agreement as being in force.[31]

44.   Whether the Accords are in fact treaties or some other form of international agreement is a matter of academic debate, but it is not seriously disputed that the Accords are binding.[32] Quigley's attempt to single out and arbitrarily jettison this material provision therefore has no grounds or rationale in international law. It is elementary in international law that "a treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the

---

[30] See Joel Singer, "Aspects of Foreign Relations Under the Israel-Palestinian Agreements On Interim Self-Government Arrangements For the West Bank and Gaza", 28 Israel Law Review Nos. 2-3 (1994), p. 283.

[31] International Law Commission Commentary on the Vienna Convention, article 8, Yearbook of the I.L.C., 1966, II, p. 193.

[32] See footnote 1.

light of its object and purpose."[33] As the International Court of Justice has said, "[i]t is the duty of the Court to interpret the Treaties, not to revise them."[34]

## VI. CONCLUSION

45. As a result of the errors of fact, law and analysis described above, Quigley has concluded that the PLO is a state. In my view, this conclusion is legally wrong.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

October 13, 2003

_____
ED MORGAN

---

[33] Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331; 8 I.L.M. 679 (1969); 63 A.J.I.L. 875 (1969), article 31.

[34] Interpretation of Peace Treaties Case (Second Phase) (Advisory Opinion), I.C.J. Rep. 1950, p. 221.

19