UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**PLAINTIFFS' REVISED NOTICE OF EVIDENCE CONCEALED BY DEFENDANTS PALESTINIAN AUTHORITY AND PALESTINE LIBERATION ORGANIZATION (In Further Support of Plaintiffs' Motions for Judgment by Default Pursuant to Fed.R.Civ.P. 37 and 55(b)(2))**

Plaintiffs' motions for judgment by default against defendants PA and PLO pursuant to Fed.R.Civ.P. 37 and 55(b) were referred to and are currently pending before Magistrate Judge David L. Martin.

Defendants have opposed the motions for default judgment, arguing inter alia that they lack the minimum contacts with the United States necessary for this Court to exercise personal jurisdiction over them.

Because defendants refused to conduct discovery in this action, plaintiffs were forced to expend considerable time and resources gathering evidence of defendants' continuous and extensive contacts and activities in the United States from various third parties, such as electronic media transcriptions and reports issued by the Department of Justice pursuant to the Foreign Agents Registration Act ("FARA").

While the evidence gathered and submitted by plaintiffs clearly proves that defendants' contacts are far in excess of the "minimum contacts" required under the Fifth Amendment, plaintiffs have (until now) been denied direct access to further evidence and documents held by defendants themselves, which demonstrate defendants' contacts with the United States.



**However, plaintiffs recently succeeded in obtaining from the Justice Department documents prepared and filed by defendants themselves pursuant to FARA, that utterly impeach and refute the claims and representations made in their pleadings before this Court:**

i) Defendants explicitly notified the U.S. Department of Justice that, "**The PLO offices in Washington, D.C. shall represent the PLO and the Palestinian Authority in the United States . . .** " *Exhibit B To Registration Statement Pursuant to the Foreign Agents Registration Act of 1938*, dated March 10, 1998, Exhibit KK. (Emphasis added).

ii) Defendants informed the Justice Department that, "**The PLO and the Palestinian Authority will pay for the expenses of the [Washington, D.C.] office and the salaries of its employees.**" Id. (Emphasis added).

iii) Hasan Abdel Rahman, director of defendants' Washington offices, explicitly identified himself in defendants' FARA filings as "**Chief Representative of the PLO & PNA.**" *Supplemental Statement Pursuant to Section 2 of the Foreign Agents Registration Act of 1938*, for six month period ending September 30, 2001. Exhibit LL, at page 9.

iv) According to the multi-year, $2.25 million contract between Bannerman & Associates and the PA filed with the Justice Department, Bannerman was hired "**to advise and assist the Palestinian Authority and its Washington Office**" and to maintain "**[r]egular contacts**" with "**the Washington Office of the Palestinian Authority.**" *Retainer Agreement*, dated October 10, 1999, Exhibit MM, at §4.

These documents, which were prepared, signed and/or filed by defendants themselves (and not revealed to the plaintiffs and the Court), are further dispositive proof that the activities of defendants' Washington, D.C. offices and staff (including the activities of defendants' Chief

Representative Mr. Rahman) are performed on behalf of, and are financed by, both the PA and the PLO.

Additionally, the Bannerman agreement shows that Bannerman works closely and directly with the PA office in Washington, D.C. and its staff to plan strategy and provide the PA staff with information and analysis, advocacy training, and assistance in developing and conducting public-relations activities on behalf of the PA, Exhibit MM at §§2-8. Bannerman also provides the PA and its personnel with "**general advice and assistance . . . in the areas of public relations, advertising, marketing, corporate relations, legal and other advice within the expertise of the firm.**" Id. at §9.

These provisions of the Bannerman agreement clearly prove, as a matter of fact, that the PA's relationship and contacts with Bannerman would not be excluded by the "government contacts" exception (as claimed by defendants) even if that exception was available to the instant defendants as a matter of law (which it is not).

The agreement demonstrates that the vast majority[1] of Bannerman's activities on behalf of

[1] While some portion of the work performed by Bannerman for defendants may be related to petitioning or lobbying the government, any such activities are but a small part of the total services performed by Bannerman for defendants, and Bannerman's total services themselves constitute only a small fraction of defendants' other aggregate contacts and activities in the United States (none of which include petitioning or lobbying the government). It is elementary that the government contacts exception exempts a defendant from an assertion of personal jurisdiction only "if the sole contact with the District consists of dealing with a federal instrumentality." Zeneca v. Mylan Pharmaceuticals, 968 F.Supp. 268, 275 (W.D. PA. 1997) (emphasis added, internal quotes omitted). Defendants easily have sufficient contacts with United States even if Bannerman's lobbying activities are disregarded.

More importantly, it is well-established that contacts with the government performed through an agent do not fall under the "government contacts" exception. Rather, the exception relates to,

> direct governmental contacts with a federal agency and not contacts with counsel who in turn appear before the agency. In fact, in other cases which have invoked the government contacts doctrine, the contacts in issue have always been direct contacts between the defendant and the "federal instrumentality" and not ones between the defendant and his attorney or agent who later appears before a federal agency . . . [citing cases]

Chase v. Pan-Pacific Broadcasting, Inc., 617 F.Supp. 1414, 1427 (D.D.C. 1985)(emphasis added). See also Bechtel v. Graceland Broadcasting, 1994 WL 85047 at 4 (D.C. Cir. 1994)("Graceland initiated a professional relationship

the PA consist of the provision of services, advice and training to the PA itself and to its staff. In other words, the PA's contacts with Bannerman include both the multi-year, $2.25 million agreement itself, and a continuous, close and direct working relationship in the U.S. between the PA and its personnel and Bannerman and its personnel. This relationship, i.e. Bannerman's provision of services, training and advice in a wide variety of fields directly to the PA and its staff, quite obviously does not constitute "government contacts."

Likewise, the FARA documents filed by defendants and obtained by plaintiffs demonstrate overwhelmingly that defendants' contacts and activities in the United States do not include "government contacts." For example, defendants reported to the Justice Department that during the period between April 1, 1999, and March 31, 2000, their Chief Representative Mr. Rahman engaged in thirty-five different specific public activities and events (an average of about one every ten days)[2] none of which include "government contacts."[3] *Supplemental Statement*

with Bechtel, a District of Columbia law firm, to conduct its FCC business . . . we find that Graceland's contacts with Bechtel fall outside the protective scope of the government contacts doctrine.")

Thus, (even assuming, *arguendo,* that the government contacts exception could apply to the activities of foreign entities such as defendants), the entire contractual-commercial relationship between the PA and Bannerman constitutes a fully cognizable "contact" with the United States, and this "contact" does not fall under the "government contacts" exception, despite any government lobbying which Bannerman may do on behalf of the PA.

[2] Compare to Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44 (2nd Cir. 1991), where the PLO representative conducted such activities only "every month or two," Id. at 52.

[3] The only activities which defendants could conceivably even attempt to claim to be "government contacts" are two briefings in the State Department and a "luncheon and discussion" with State Department official Dennis Ross. However, none of these three events fall within the "government contacts" exception: participants in State Department "briefings" do not lobby or petition the government; nor is there any evidence that the "luncheon and discussion" with Mr. Ross included any lobbying or petitioning either.

Even assuming arguendo that these three events could be considered "government contacts" (and assuming also that that doctrine was applicable to defendants) the remaining thirty-two events and activities reported by defendants for this period – which constitute over 91% of the total – are obviously not "government contacts".

Moreover, defendants' FARA reporting is incomplete: the English-language media interviews by Mr. Rahman on July 14, 1999, and July 19, 1999, transcripts of which were previously submitted into evidence by plaintiffs, were omitted by defendants from the FARA filings.

*Pursuant to Section 2 of the Foreign Agents Registration Act of 1938*, for the six month period ending September 30, 1999, Exhibit NN, at Schedule 3; *Supplemental Statement Pursuant to Section 2 of the Foreign Agents Registration Act of 1938*, for the six month period ending March 31, 2000, Exhibit OO, at Schedule 3.

So, too, the duties of Khalil Foutah, defendants' "Deputy Chief Representative," are entirely to "**Answer questions of students, the media, lecture at universities, address Church groups [sic] on the question of Peace in the Middle East,**" and have nothing to do with the U.S. government. *Short-Form Registration Statement Pursuant to the Foreign Agents Registration Act of 1938*, signed 3/10/98 by Khalil Foutah, Exhibit PP. Likewise, defendants' "Senior Deputy Chief Representative," Said Hamad, described "all services" rendered by him to defendants as consisting entirely of "**promot[ing] peace in the Middle East,**" with no mention of any contacts with the U.S. government. *Short-Form Registration Statement Pursuant to the Foreign Agents Registration Act of 1938*, signed 3/10/98 by Said Hamad. Exhibit QQ.

In any event, defendants' attempt to rely on the "government contacts" exception is frivolous as a threshold matter of law. It is well-established that this doctrine is based upon the First Amendment right to petition the government.[4] Since this exception is derived from constitutional rights and protections, it applies only to the "government contacts" of U.S. citizens.[5] The PLO and PA are foreign entities, not U.S. citizens, and they do not have a "right"

---

Likewise, defendants' filings omit at least five further media interviews given by Mr. Rahman on April 26-27 and May 17-18, 1999, none of which were reported by defendants in their FARA filings. Exhibit RR

Thus, defendants' activities are even more extensive than indicated by these FARA documents.

[4] Rose v. Silver, 394 A.2d 1368, 1373-74 (D.C. 1978) ("the First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia, when its contacts are covered by the long-arm statute and are sufficient to withstand a traditional due process attack."), reh'g denied, 398 A.2d 787 (D.C. 1979).

(constitutional or otherwise) to petition or lobby our government.[6]

Finally, the FARA filings also show that defendants' Washington D.C. offices have on-going commercial contracts and/or transactions with scores of U.S.-based businesses and providers of goods and services, to each of which defendants pay thousands, or tens of thousands of dollars, per year. Exhibits NN and OO, both at Schedule 2. Each of these numerous, systematic and continuous commercial contracts and/or transactions constitutes a distinct and separate "contact" of the PA and PLO in the United States.

[5] See e.g. Zeneca v. Mylan Pharmaceuticals, 173 F.3d 829, 831 (Fed. Cir. 1999)(government contacts exception arises from "*need for unfettered access to federal departments and agencies for the entire national citizenry.*") (quoting Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc., 355 A.2d 808, 813 (D.C. 1976) (en banc))(emphasis added); Mallinckrodt Medical v. Sonus Pharmaceuticals, 989 F.Supp. 265, 271 (D.D.C. 1998) ("*because it is important that all citizens from all parts of the country have unfettered access to petition their government, the courts of this jurisdiction have long recognized 'a government contacts' exception*")(emphasis added); Zeneca v. Mylan Pharmaceuticals, 968 F.Supp. 268, 275 (W.D. Pa. 1997) ("*The exception exists to protect the citizenry's right to petition the government, free from fear of exposure to jurisdiction at the situs of the government*") (emphasis added). Bechtel v. Graceland Broadcasting Inc., 1994 WL 85047 at 3 (D.C. Cir. 1994) ("*The doctrine has its roots in the right of citizens to petition the federal government for redress of grievances.*")(emphasis added); Atlantigas v. Nisource, 2003-2 Trade Cas. (CCH) P74, 188, 2003 WL 22387136 at 7 (D.D.C.)("*The District of Columbia is the Nation's capital. Because it is vital that all citizens from all parts of the country have unfettered access to petition their government, the courts of this jurisdiction have long recognized 'a government contacts' exception to the 'transacting business' provision of the long-arm statute.*")(emphasis added).

[6] Indeed, the federal courts have ruled that foreign entities such as defendants do not enjoy constitutional rights of any kind. See Palestine Information Office v. Shultz, 674 F.Supp. 910, 916-919 (D.D.C. 1987) *affd.* 853 F.2d 932 (D.C. Cir. 1988) ("*It has been admitted in plaintiffs' FARA statement that the P[alestine I[nformation] O[ffice] acts as an agent in the United States for the PLO . . . Having found that the PIO is a foreign political entity, this Court finds that the PIO has no due process right under our Constitution or Laws.*"). This holding remains valid. See e.g. Flatow v. Iran, 999 F.Supp. 1 at 20-21 (citing Palestine Information Office in support of finding that foreign entities do not enjoy constitutional rights).

Even assuming *arguendo* that some Fifth Amendment due process protection is available to foreign organizations such the PA and the PLO (a proposition which to date has been neither challenged nor conceded by plaintiffs in this action), the First Amendment considerations which are at the heart of the "government contacts" exception – i.e. the right of U.S. citizens to freely petition or lobby their government – cannot possibly be extended to foreign groups such as defendants.

Plaintiffs, by their Attorneys,

David J Strachman (JLW)

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

CERTIFICATION

I hereby certify that on the 17 day of February, 2004 I ~~delivered~~ mailed a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003

Deming E. Sherman
Annemarie Carney
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903

[signature]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v. C.A. No.: 00-105L

THE PALESTINIAN AUTHORITY, et al.

**DECLARATION OF DAVID J. STRACHMAN**

I, David J. Strachman, declare pursuant 28 U.S.C. §1746, as follows:

1. The Exhibits marked as KK, LL, MM, NN, OO, PP and QQ submitted in support of Plaintiffs' Revised Notice of Evidence Concealed by Defendants Palestinian Authority and Palestine Liberation Organization ("Revised Notice") filed in the above-captioned matter, are true and accurate copies of documents obtained by the plaintiffs from the United States Department of Justice.

2. The Exhibits marked as RR submitted in support of the Revised Notice are true and accurate printouts of transcripts electronically recorded, compiled, stored and published commercially by the news and data corporations respectively listed on each of these exhibits. These news and data corporations record, compile and commercially publish these documents and transcripts in the course of their regular business practice, simultaneously or virtually simultaneously with the events recorded therein. Documents and transcripts of this type, published by each of these news and data corporations, are considered accurate, and are widely used and relied upon, by the public.

I declare under penalty of perjury that the foregoing is true and correct.

February 17, 2004

David J. Strachman