**U.S. Department of Justice**
Washington, DC 20530

Exhibit B
To Registration Statement
Pursuant to the Foreign Agents Registration Act of 1938, an amended

OMB No. 1105-0007

INSTRUCTIONS: A registrant must furnish as an Exhibit B copies of each written agreement and the terms and conditions of each oral agreement with his foreign principal, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances by reason of which the registrant is acting as an agent of a foreign principal. One original and two legible photocopies of this form shall be filed for each foreign principal named in the registration statement and must be signed by or on behalf of the registrant.

Privacy Act Statement. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, D.C. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the Administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public. Finally, the Attorney General intends, at the earliest possible opportunity, to make these public documents available on the Internet on the Department of Justice World Wide Web site.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .33 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Criminal Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name of Registrant | 2. Registration No. |
|---|---|
| PLO Washington Office | ~~5074~~ 5244 |

3. Name of Foreign Principal

PLO Headquarters, Gaza

1998 MAR 18 PM 1:34
CRM/ISS REGISTRATION UNIT

Check Appropriate Boxes:

4. ☐ The agreement between the registrant and the above-named foreign principal is a formal written contract. If this box is checked, attach a copy of the contract to this exhibit.

5. ☐ There is no formal written contract between the registrant and the foreign principal. The agreement with the above-named foreign principal has resulted from an exchange of correspondence. If this box is checked, attach a copy of all pertinent correspondence, including a copy of any initial proposal which has been adopted by reference in such correspondence.

6. ☒ The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties. If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any , to be received.

> The PLO offices in Washington, D.C. shall represent the PLO and the Palestinian Authority in the United States and will promote peace and development with Israel. The PLO and the Palestinian Authority will pay for the expenses of the office and the salaries of its employees.

7. Describe fully the nature and method of performance of the above indicated agreement or understanding.

Formerly OBD-65

FORM CRM-155
SEP. 1996

8. Describe fully the activities the registrant engages in or proposes to engage in on behalf of the above foreign principal.

```
1  -  Speak on behalf of the Foreign Principles.  Lectures, media
      appearances and interviews.

2  -  Conduct discussions with U.S. Governmental Agencies and
      departments on behalf of the Foreign Principles.
```

9. Will the activities on behalf of he above foreign principal include political activities as defined in Section 1(o) of the Act and in the footnote below?          Yes ☒   No ☐

If yes, describe all such political activities indicating, among other things, the relations, interests or policies to be influenced together with the means to be employed to achieve this purpose.

```
Same as above in No. 5
```

| Date of Exhibit B | Name and Title | Signature |
|---|---|---|
| March 10, 1998 | Hasan Abdel Rahman<br>Chief PLO Representative | |

Footnote: Political activity as defined in Section 1(o) of the Act means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political interests, policies, or relations of a government of a foreign country or a foreign political party.

**U.S. Department of Justice**
Washington, DC 20530

Supplemental Statement
Pursuant to Section 2 of the Foreign Agents Registration Act
of 1938, as amended

OMB NO. 1105-0002

For Six Month Period Ending **SEP 3 0 2001**
(Insert date)

## I - REGISTRANT

1. (a) Name of Registrant                    (b) Registration No. **5244**

   **Palestine Liberation Organization**

   (c) Business Address(es) of Registrant

   **1717 K Street, N.W.**
   **Suite 407**
   **Washington, D.C. 20036**

2. Has there been a change in the information previously furnished in connection with the following:

   (a)    If an individual:    **N/A**
          (1) Residence address          Yes ☐        No ☐
          (2) Citizenship                Yes ☐        No ☐
          (3) Occupation                 Yes ☐        No ☐

   (b)    If an organization:
          (1) Name                       Yes ☐        No ☒
          (2) Ownership or control       Yes ☐        No ☒
          (3) Branch offices             Yes ☐        No ☒

   (c)    Explain fully all changes, if any, indicated in items (a) and (b) above.


                                   **N/A**


IF THE REGISTRANT IS AN INDIVIDUAL, OMIT RESPONSE TO ITEMS 3, 4, AND 5(a).

3. If you have previously filed Exhibit C¹, state whether any changes therein have occurred during this 6 month reporting period.
                              Yes ☐          No ☐

   If yes, have you filed an amendment to the Exhibit C?        Yes ☐        No ☐

   If no, please attach the required amendment.

                              **N/A**

1 The Exhibit C, for which no printed form is provided, consists of a true copy of the charter, articles of incorporation, association, and by laws of a registrant that is an organization. (a waiver of the requirement to file an Exhibit C may be obtained for good cause upon written application to the Assistant Attorney General, Criminal Division, Internal Security Section, U.S. Department of Justice, Washington, D.C. 20530.)

Form CRM-154
JUNE 1998

Formerly OBD-64

(PAGE 2)

4. (a) Have any persons ceased acting as partners, officers, directors or similar officials of the registrant during this 6 month reporting period?          Yes ☐          No ☒

If yes, furnish the following information:

| Name | Position | Date Connection Ended |
|---|---|---|

(b) Have any persons become partners, officers, directors or similar officials during this 6 month reporting period?
Yes ☒          No ☐

If yes, furnish the following information:

| Name | Residence Address | Citizenship | Position | Date Assumed |
|---|---|---|---|---|
| Mr. Jubran Taweel | 8211 Labbe Lane Vienna, VA 22182 | U.S. | Deputy Director for economic & trade | 6/15/2001 |

5. (a) Has any person named in item 4(b) rendered services directly in furtherance of the interests of any foreign principal?          Yes ☐          No ☒

If yes, identify each such person and describe his service.

N/A

(b) Have any employee or individuals, who have filed a short form registration statement, terminated their employment or connection with the registrant during this 6 month reporting?          Yes ☐          No ☒

If yes, furnish the following information:          N/A

| Name | Position or connection | Date terminated |
|---|---|---|

(c) During this six month reporting period, has the registrant hired as employees or in any other capacity, any persons who rendered or will render services to the registrant directly in furtherance of the interests of any foreign principal(s) in other than a clerical or secretarial, or in a related or similar capacity?          Yes ☐          No ☒

If yes, furnish the following information:

| Name | Residence Address | Citizenship | Position | Date Assumed |
|---|---|---|---|---|

6. Have short form registration statements been filed by all of the persons named in Items 5(a) and 5(c) of the supplemental statement?          Yes ☐          No ☐

If no, list names of persons who have not filed the required statement.

N/A

(PAGE 3)

## II - FOREIGN PRINCIPAL

7. Has your connection with any foreign principal ended during this 6 month reporting period?

Yes ☐          No ☒

If yes, furnish the following information:

*Name of foreign principal*                                    *Date of termination*

N/A

8. Have you acquired any new foreign principal[2] during this 6 month reporting period?

Yes ☐          No ☒

If yes, furnish following information:

*Name and address of foreign principal*                        *Date acquired*

N/A

9. In addition to those named in Items 7 and 8, if any, list foreign principals[3] whom you continued to represent during the 6 month reporting period.

```
Palestine Liberation Organization
```

10.   **EXHIBITS A AND B**
(a)   Have you filed for each of the newly acquired foreign principals in Item 8 the following:

Exhibit A[3]          Yes ☐          No ☐          N/A
Exhibit B[4]          Yes ☐          No ☐

If no, please attach the required exhibit.

(b)   Have there been any changes in the Exhibits A and B previously filed for any foreign principal whom you represented during this six month period?          Yes ☐          No ☐

If yes, have you filed an amendment to these exhibits?          Yes ☐          No ☐

If no, please attach the required amendment.          N/A

2 The term "foreign principal" includes, in addition to those defined in section 1(b) of the Act, an individual organization any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign government, foreign political party, foreign organization or foreign individual. (See Rule 100(a) (9)). A registrant who represents more than one foreign principal is required to list in the statements he files under the Act only those principals for whom he is not entitled to claim exemption under Section 3 of the Act. (See Rule 208.)
3 The Exhibit A, which is filed on form CRM-157 (Formerly OBD-67) sets forth the information required to be disclosed concerning each foreign principal.
4 The Exhibit B, which is filed on Form CRM-155 (Formerly OBD-65) sets forth the information concerning the agreement or understanding between the registrant and the foreign principal.

(PAGE 4)

## III - ACTIVITIES

11. **During this 6 month reporting period, have you engaged in any activities for or rendered any services to any foreign principal named in Items 7, 8, and 9 of this statement?**        Yes ☒        No ☐

If yes, identify each such foreign principal and describe in full detail your activities and services:

Palestine Liberation Organization

(See schedule 3)

12. During this 6 month reporting period, have you on behalf of any foreign principal engaged in political activity[5] as defined below?        Yes ☒        No ☐

If yes, identify each such foreign principal and describe in full detail all such political activity, indicating, among other things, the relations, interests and policies sought to be influenced and the means employed to achieve this purpose. If the registrant arranged, sponsored or delivered speeches, lectures or radio and TV broadcasts, give details as to dates, places, of delivery, names of speakers and subject matter.

Palestine Liberation Organization

We seek to advance the relations and cooperation between the United States Government and the PLO. Also to advance the relations and cooperation between the Palestinian people and the American people. And to advance the Peace Process.

13. In addition to the above described activities, if any, have you engaged in activity on your own behalf which benefits any or all of your foreign principals?        Yes ☐        No ☒

If yes, describe fully.

5 The term "political activities" means any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting or changing the domestic or foreign policies of the United States or with reference to political or public interests, policies, or relations of a government a foreign country or a foreign political party.

(PAGE 5)

## IV - FINANCIAL INFORMATION

**14. (a)  RECEIPTS-MONIES**
During this 6 month reporting period, have you received from any foreign principal named in Items 7, 8, and 9 of this statement, or from any other source, for or in the interests of any such foreign principal, any contributions, income or money either as compensation or otherwise?     Yes ☒     No ☐

If no, explain why.

If yes, set forth below in the required detail and separately for each foreign principal an account of such monies[6]

| Date | From Whom | Purpose | Amount |
|------|-----------|---------|--------|

**(See schedule 1)**

|  |  | Total |  |
|--|--|-------|--|

**(b)  RECEIPTS - FUND RASING CAMPAIGN**
During this 6 month reporting period, have you received, as part of a fund raising campaign[7], any money on behalf of any foreign principal named in items 7, 8, and 9 of this statement?     Yes ☐     No ☒

If yes, have you filed an Exhibit D to your registration?     Yes ☐     No ☐     **N/A**

If yes, indicate the date the Exhibit D was filed.     Date _____

**(c)  RECEIPTS-THINGS OF VALUE**
During this 6 month reporting period, have you received any thing of value[9] other than money from any foreign principal named in Items 7, 8, and 9 of this statement, or from any other source, for or in the interests of any such foreign principal?
Yes ☐     No ☒

If yes, furnish the following information:

| Name of foreign principal | Date received | Description of thing of value | Purpose |
|---------------------------|---------------|-------------------------------|---------|

**N/A**

6, 7  A registrant is required to file an Exhibit D if he collects or receives contributions, loans, money, or other things of value for a foreign principal, as part of a fund raising campaign.  (See Rule 201(e).)
8  An Exhibit D, for which no printed form is provided, sets forth an account of money collected or received as a result of a fund raising campaign and transmitted for a foreign principal.
9  Things of value include but are not limited to gifts, interest free loans, expense free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks," and the like.

(PAGE 6)

**15. (a)  DISBURSEMENTS-MONIES**
During this 6 month reporting period, have you
(1)  disbursed or expended monies in connection with activity on behalf of any foreign principal named in Items 7, 8, and 9 of this statement?          Yes ☒          No ☐

(2)  transmitted monies to any such foreign principal?          Yes ☐          No ☐

If no, explain in full detail why there were no disbursements made on behalf of any foreign principal.


If yes, set forth below in the required detail and separately for each foreign principal an account of such monies, including monies transmitted, if any, to each foreign principal.

| Date | To Whom | Purpose | Amount |
|------|---------|---------|--------|

**(See schedule 2)**

| | Total | |
|--|-------|--|

(PAGE 7)

(b)  **DISBURSEMENTS-THINGS OF VALUE**
During this 6 month reporting period, have you disposed of anything of value[10] other than money in furtherance of or in connection with activities on behalf of any foreign principal named in Items 7, 8, and 9 of this statement?
Yes ☐     No ☒

If yes, furnish the following information:

| Date disposed | Name of person to whom given | On behalf of what foreign principal | Description of thing of value | Purpose |
|---|---|---|---|---|

N/A

(c)  **DISBURSEMENTS-POLITICAL CONTRIBUTIONS**
During this 6 month reporting period, have you from your own funds and on your own behalf either directly or through any other person, made any contributions of money or other things of value[11] in connection with an election to any political office, or in connection with any primary election, convention, or caucus held to select candidates for political office?
Yes ☐     No ☒

If yes, furnish the following information:

| Date | Amount or thing of value | Name of political organization | Name of candidate |
|---|---|---|---|

N/A

---

10, 11 Things of value include but are not limited to gifts, interest free loans, expense free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks" and the like.

(PAGE 8)

## V - INFORMATIONAL MATERIALS

16. During this 6 month reporting period, did you prepare, disseminate or cause to be disseminated any informational materials[12]?

Yes ☐          No ☒

IF YES, RESPOND TO THE REMAINING ITEMS IN SECTION V.

17. Identify each such foreign principal.

**N/A**

18. During this 6 month reporting period, has any foreign principal established a budget or allocated a specified sum of money to finance your activities in preparing or disseminating informational materials?          Yes ☐          No ☒

If yes, identify each such foreign principal, specify amount, and indicate for what period of time.

**N/A**

19. During this 6 month reporting period, did your activities in preparing, disseminating or causing the dissemination of informational materials include the use of any of the following:

☐ Radio or TV broadcasts          ☐ Magazine or newspaper articles          ☐ Motion picture films          ☐ Letters or telegrams

☐ Advertising campaigns          ☐ Press releases          ☐ Pamphlets or other publications          ☐ Lectures or speeches

☐ Other (specify) _____

20. During this 6 month reporting period, did you disseminate or cause to be disseminated informational materials among any of the following groups:

☐ Public Officials          ☐ Newspapers          ☐ Libraries
☐ Legislators          ☐ Editors          ☐ Educational institutions
☐ Government agencies          ☐ Civic groups or associations          ☐ Nationality groups

☐ Other (specify) _____

21. What language was used in the informational materials:
☐ English          ☐ Other (specify) _____

22. Did you file with the Registration Unit, U.S. Department of Justice a copy of each item of such informational materials disseminated or caused to be disseminated during this 6 month reporting period?          Yes ☐          No ☐

23. Did you label each item of such informational materials with the statement required by Section 4(b) of the Act?
Yes ☐          No ☐

12 The term informational materials includes any oral, visual, graphic, written, or pictorial information or matter of any kind, including that published by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or any means or instrumentality of interstate or foreign commerce or otherwise. Informational materials disseminated by an agent of a foreign principal as part of an activity in itself exempt from registration, or an activity which by itself would not require registration, need not be filed pursuant to Section 4(b) of the Act.

## VI--EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swear(s) or affirm(s) under penalty of perjury that he/she has (they have) read the information set forth in this registration statement and the attached exhibits and that he/she is (they are) familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her (their) knowledge and belief, except that the undersigned make(s) no representation as to truth or accuracy of the information contained in the attached Short Form Registration Statement(s), if any, insofar as such information is not within his/her (their) personal knowledge.

(Date of signature)                               (Type or print name under each signature[13])

January 18, 2002

_____

Hasan Abdel Rahman

Chief Representative of the

PLO & PNA

---

[13] This statement shall be signed by the individual agent, if the registrant is an individual, or by a majority of those partners, officers, directors or persons performing similar functions, if the registrant is an organization, except that the organization can, by power of attorney, authorize one or more individuals to execute this statement on its behalf.

# UNITED STATES DEPARTMENT OF JUSTICE
# FARA REGISTRATION UNIT
# CRIMINAL DIVISION
# WASHINGTON, D.C. 20530

## NOTICE

Please answer the following questions and return this sheet in triplicate with your Supplemental Statement:

1.    Is your answer to Item 16 of Section V (Informational Materials - page 8 of Form CRM-154, formerly Form OBD-64-Supplemental Statement):

YES_____ or NO_____No_____

(If your answer to question 1 is "yes" do not answer question 2 of this form.)

2.    Do you disseminate any material in connection with your registration:

YES_____ or NO_____No_____

(If your answer to question 2 is "yes" please forward for our review copies of all material including: films, film catalogs, posters, brochures, press releases, etc. which you have disseminated during the past six months.)

_____         _____
*Signature*                                              *Date* Jan. 18, 2002

Hasan Abdel Rahman
**Please type or print name of signatory on the line above**

Chief PLO Representative
*Title*

**PLO Mission**

1717 K Street., N.W., Suite 407
Washington, D.C. 20036
Tel: (202) 785-8394 • Fax: (202) 887-5337



بعثة
منظمة التحرير الفلسطينية
واشنطن

هاتف: ٨٣٩٤ – ٧٨٥ (٢٠٢) • فاكس: ٥٣٣٧ – ٨٨٧ (٢٠٢)

Registration Unit No. 5244          *2001*
Six Months period ending September 30, ~~2002~~   ( Schedule 1 )

| | | |
|---|---|---|
| Previous Balance | $ | 1,635.09 |
| From Finance Ministry | | 211,381.60 |
| Total | $ | 213,016.69 |

**Expenses**

| | |
|---|---|
| Salaries | $ 82,668.00 |
| Other expenses | 131,834.83 |
| Total | $ 214,502.83 |

| | |
|---|---|
| Balance | $ 213,016.69 |
| Total expenses | 214,502.83 |
| Minus _____ | $ 1,486.14 |

## PLO Mission

1717 K Street, N.W., Suite 407
Washington, D.C. 20036
Tel: (202) 785-8394 • Fax: (202) 887-5337



بعثة
منظمة التحرير الفلسطينية
واشنطن

هاتف: ٨٣٩٤ – ٧٨٥ (٢٠٢) • فاكس: ٥٣٣٧ – ٨٨٧ (٢٠٢)

Registration No. 5244
Six months period ending September 30, 2001          (Schedule 2 )

| | |
|---|---:|
| Office rent | $  50,555.62 |
| Parking garage | 2,504.60 |
| Residence rent | 15,610.00 |
| Rent Office machines | 1,966.92 |
| Transportation | 3,636.37 |
| Maintenance office machines | 558.60 |
| Mail/Fedex/DHL | 1,526.04 |
| Office telephones | 9,915.50 |
| Stationary | 396.07 |
| Newspaper/subscriptions | 852.01 |
| Health Insurance | 17,230.00 |
| Auto maintenance | 417.07 |
| Fuel | 1,808.31 |
| Car insurance | 2,318.65 |
| Car payments | 8,244.33 |
| Electricity - residence | 1,012.21 |
| Gas - residence | 1,677.86 |
| Taxes - car | 201.17 |
| Miscellaneous | 913.75 |
| Bank interests | 1,500.00 |
| Hospitality/Hotels | 737.35 |
| Lawyers | 7,000.00 |
| Office furniture | 383.74 |
| Cable & Satellite | 868.65 |
| | |
| Total | $     131,834.83 |

## PLO Mission

1717 K Street., N.W., Suite 407
Washington, D.C. 20036
Tel: (202) 785-8394 • Fax: (202) 887-5337



بعـثـة
منظمة التحرير الفلسطينية
واشنطن

هاتف: ٨٣٩٤ – ٧٨٥ (٢٠٢) • فاكس: ٥٣٣٧ – ٨٨٧ (٢٠٢)

Registration No. 5244
Six months period ending September 30, 2001      (Schedule 3) <u>No transcripts</u>

| | |
|---|---|
| April 2, 2001 | Addressed students from Radnor High School in PA, enrolled in International studies. |
| "    "    " | National Council on US-Arab Relations brought students from US Air Force Academy representing National Model Arab League representing Palestine. |
| April 3, 2001 | Interview - Tunisian Television |
| April 5, 2001 | Attended a briefing given by Middle East Institute (Prospect for a shared Jerusalem) |
| "    "    " | Attended a briefing by Ambassador Walker at the State Department to the Arab Ambassadors |
| April 17, 2001 | Interviewed by Mr. Michael Belgrade from the American University |
| April 27, 2001 | Attended a reception in honor of Amb. Edward Walker Given by the Embassy o;f Saudi Arabia |
| April 28, 2001 | Interviewed by Mr. Arvin Hladnik, Journalist from Slovania |
| May 23, 2001 | Attended a briefing at the Center for Policy Analysis (Palestinian Christians on Peace in the Middle East) |
| May 24, 2001 | Attended the United States Institute of Peace Project (Israeli Society, Globalization and the Transformation of the Nation State) |

| | |
|---|---|
| May 25, 2001 | Attended a briefing by the American Committee on " Jerusalem: The Intifada and Beyond " |
| June 1, 2001 | Attended the CNN Report Conference Speaker: Condoleezza Brown |
| June 20, 2001 | Interview - Public Radio Talk Forum KQED - in San Francisco |
| June 22, 2001 | Attended a Breakfast briefing with Dr. Nabil Shaath National Press Club |
| July 23, 01 | Center for Middle East Peace invitation to luncheon discussion with Senator George Mitchell and Senator Warren Rudman |
| July 25, 2001 | Addressed interns from ADC by Mr. Marvin Wingfield |
| September 11, 2001 | Invited by Bishop Allan Bartlett to speak at their congregation and dialogue with member of the Israeli Embassy at the Washington National Cathedral |
| September 15, 2001 | Attended a conference in Albuquerque, New Mexico at the Continuing Education Conference Auditorium |

# RETAINER AGREEMENT

**THIS AGREEMENT** is made between the PALESTINIAN Authority ("the Government") and Bannerman and Associates, Inc. (the "Firm").

1) The Palestinian Authority and the Firm have agreed that the Firm will render government relations services to assist the Palestinian Authority, working closely with the Palestinian Office in Washington, to further enhance and develop the U.S. - Palestinian bilateral relationship.   The Firm will assist the Palestinian Authority in identifying goals and objectives and  developing strategies to achieve these goals. The Firm will provide the Palestinian Authority with advice and assistance to further improve and complement contacts with all levels of the United States Government.

2) In  order to assist the Palestinian Authority to advance more effectively the interests of  Palestinians in Washington and to improve the U.S. - Palestinian relationship, the Firm will augment the Palestinian Authority and its Washington Office efforts by:

- Developing  with  the  Palestinian  Authority  a clear strategy to promote Palestinian interests in Washington;
- Generating  with the Palestinian Authority creative, concrete approaches to enhance existing relations and to meet challenges in the bilateral relationship;
- Meeting  with  the  Palestinian  Office  representatives  and the Office staff to coordinate efforts on behalf of the Palestinian Authority;
- Working  with  the  Palestinian Authority, the U.S. Administration, and Congress to strengthen and enhance the bilateral relationship;
- Providing the Palestinian Authority with regular analysis of specific  aspects of current thinking in Washington on issues of importance;
- Covering  and  reporting  on Congressional hearings, markups, and conference committee meetings that are relevant to the Palestinian Authority;

1

- Maintaining day-to-day contacts with Congressional staff and Administration officials;

- Tracking and interpreting introduced or pending legislation which may be relevant to the Palestinian Authority and reporting our assessment of these issues back;

- Providing advice on the coordination of Congressional staff visits to the West Bank and Gaza; and,

- Suggesting, identifying, and helping to undertake other initiatives which could benefit Palestinians and further strengthen the U.S. - Palestinian relationship.

3) The Firm will prepare weekly memoranda on developments in Washington which are relevant to the Palestinian Authority. In addition, memoranda on other issues of interest will be prepared as such issues arise.

4) The Firm will be available at all times to advise and assist the Palestinian Authority and its Washington Office. Regular contacts will be established between personnel of the Firm and the Washington Office of the Palestinian Authority. The representative will be kept informed of the issues of importance to Palestinians on which the Firm is active.

5) The Firm will help develop and initiate a public relations campaign, which will help counter negative media coverage of the Palestinian Authority and present Palestinian views in the best possible light.

6) The firm will commit to work with a relevant counterpart team representing the Palestinian Authority on a work program based on the priorities established by the Palestinian Authority during the first two months after signature of this contract.

7) The firm will work with a designated counterpart team as appointed by the Palestinian Authority, and will continue to build capacity among the team in the areas of communications, writing and lobbying skills in the US.

2

8) The firm and the counterpart team will agree on a model of communication to ensure a consistent and dynamic relation which will involve close contacts with the Palestinian Office in Washington DC and with the Palestinian Authority in the West Bank and Gaza respectively.

9) The firm will provide general advice and assistance to the Palestinian Authority as it tries to outsource other specialized firms in the USA in the areas of public relations, advertising, marketing, corporate relations, legal and other advice within the area of the expertise of the firm.

10) For the above and other identified services, the Palestinian Authority will compensate the Firm at the rate of $375,000.00 each six months, inclusive of all expenses incurred by the Firm in Washington. Any costs for travel outside of Washington borne by the Firm at the request of the Palestinian Authority will be reimbursed to the Firm.

Payments will be made semiannually in the sum of Three-hundred and Seventy-five Thousand Dollars ($375,000.00) and will be payable at the beginning of each period: October 15, 1999, April 15, 2000, October 15, 2000, April 15, 2001, October 15, 2001, and April 15, 2002.

11) This agreement shall cover a term of thirty-six months, beginning on the effective date of October 15, 1999 and will be automatically extended annually on the same terms and conditions unless either party terminates or modifies the Agreement by written notice sixty (60) days in advance of the anniversary date of the Agreement.

12) In connection with the above outlined representation, it is understood that the Firm will be required under United States law to register its representation of the Palestinian Authority with the United States Government, and that the Firm will comply with all requirements of United States law in this connection.

3

IN WITNESS THEREOF, THE Parties have caused this Agreement to be executed by their duly authorized representatives on the dates written below:

Palestinian Authority                    Bannerman and Associates, Inc.

To Be Designated                         To Be Designated

_____                  _____
Mohamad Rachid
Economic Advisor to President Yasser Arafat

DATE: _October 10, 1999_                 DATE: _10/15/99_

4

**U.S. Department of Justice**
Washington, DC 20530

Supplemental Statement
Pursuant to Section 2 of the Foreign Agents Registration Act
of 1938, as amended

OMB NO. 1105-0002

For Six Month Period Ending ___ SEP 30 1999 ___

(Insert date)

## I - REGISTRANT

1. (a) Name of Registrant                    (b) Registration No.  **5244**

   **Palestine Liberation Organization**

   (c) Business Address(es) of Registrant

   **1730 K Street, N.W. Suite 1004**
   **Washington, D.C. 20006**

2. Has there been a change in the information previously furnished in connection with the following:

   (a)    If an individual:
          (1) Residence address          Yes ☐    No ☐
          (2) Citizenship                Yes ☐    No ☐       N/A
          (3) Occupation                 Yes ☐    No ☐

   (b)    If an organization:

          (1) Name                       Yes ☐    No ☒
          (2) Ownership or control       Yes ☐    No ☒
          (3) Branch offices             Yes ☐    No ☒

   (c)    Explain fully all changes, if any, indicated in items (a) and (b) above.

                              **N/A**

IF THE REGISTRANT IS AN INDIVIDUAL, OMIT RESPONSE TO ITEMS 3, 4, AND 5(a).

3. If you have previously filed Exhibit C[1], state whether any changes therein have occurred during this 6 month reporting period.
                   Yes ☐        No ☐    **N/A**

   If yes, have you filed an amendment to the Exhibit C?        Yes ☐        No ☒

   If no, please attach the required amendment.

                              **N/A**

1 The Exhibit C, for which no printed form is provided, consists of a true copy of the charter, articles of incorporation, association, and by laws of a registrant that is an organization. (a waiver of the requirement to file an Exhibit C may be obtained for good cause upon written application to the Assistant Attorney General, Criminal Division, Internal Security Section, U.S. Department of Justice, Washington, D.C. 20530.)

Form CRM-154
JUNE 1998

**Formerly OBD-64**

4. (a) Have any persons ceased acting as partners, officers, directors or similar officials of the registrant during this 6 month reporting period?          Yes ☐          No ☒

If yes, furnish the following information:

| Name | Position | Date Connection Ended |
|------|----------|----------------------|

(b) Have any persons become partners, officers, directors or similar officials during this 6 month reporting period?
          Yes ☐          No ☒

If yes, furnish the following information:

| Name | Residence Address | Citizenship | Position | Date Assumed |
|------|-------------------|-------------|----------|--------------|

**N/A**

5. (a) Has any person named in item 4(b) rendered services directly in furtherance of the interests of any foreign principal?
          Yes ☐          No ☒

If yes, identify each such person and describe his service.

(b) Have any employee or individuals, who have filed a short form registration statement, terminated their employment or connection with the registrant during this 6 month reporting?          Yes ☐          No ☒

If yes, furnish the following information:

| Name | Position or connection | Date terminated |
|------|------------------------|-----------------|

**N/A**

(c) During this six month reporting period, has the registrant hired as employees or in any other capacity, any persons who rendered or will render services to the registrant directly in furtherance of the interests of any foreign principal(s) in other than a clerical or secretarial, or in a related or similar capacity?          Yes ☐          No ☒

If yes, furnish the following information:

| Name | Residence Address | Citizenship | Position | Date Assumed |
|------|-------------------|-------------|----------|--------------|

**N/A**

6. Have short form registration statements been filed by all of the persons named in Items 5(a) and 5(c) of the supplemental statement?          Yes ☐          No ☐          **N/A**

If no, list names of persons who have not filed the required statement.

**N/A**

## II – FOREIGN PRINCIPAL

7. Has your connection with any foreign principal ended during this 6 month reporting period?

Yes ☐          No ☒

If yes, furnish the following information:

*Name of foreign principal*                                                    *Date of termination*

**N/A**

8. Have you acquired any new foreign principal[2] during this 6 month reporting period?

Yes ☐          No ☒

If yes, furnish following information:

*Name and address of foreign principal*                                          *Date acquired*

**N/A**

9. In addition to those named in Items 7 and 8, if any, list foreign principals[2] whom you continued to represent during the 6 month reporting period.

### Palestine Liberation Organization

10.    **EXHIBITS A AND B**
  (a)    Have you filed for each of the newly acquired foreign principals in Item 8 the following:

Exhibit A[3]          Yes ☐          No ☐          **N/A**
Exhibit B[4]          Yes ☐          No ☐

If no, please attach the required exhibit.

  (b)    Have there been any changes in the Exhibits A and B previously filed for any foreign principal whom you represented during this six month period?          Yes ☐          No ☐

If yes, have you filed an amendment to these exhibits?          Yes ☐          No ☐

If no, please attach the required amendment.

**N/A**

2 The term "foreign principal" includes, in addition to those defined in section 1(b) of the Act, an individual organization any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign government, foreign political party, foreign organization or foreign individual. (See Rule 100(a) (9)). A registrant who represents more than one foreign principal is required to list in the statements he files under the Act only those principals for whom he is not entitled to claim exemption under Section 3 of the Act. (See Rule 208.)
3 The Exhibit A, which is filed on form CRM-157 (Formerly OBD-67) sets forth the information required to be disclosed concerning each foreign principal.
4 The Exhibit B, which is filed on Form CRM-155 (Formerly OBD-65) sets forth the information concerning the agreement or understanding between the registrant and the foreign principal.

(PAGE 4)

## III - ACTIVITIES

11. During this 6 month reporting period, have you engaged in any activities for or rendered any services to any foreign principal named in Items 7, 8, and 9 of this statement?          Yes ☒          No ☐

If yes, identify each such foreign principal and describe in full detail your activities and services:

### Palestine Liberation Organization

### (See Schedule 3)

12. During this 6 month reporting period, have you on behalf of any foreign principal engaged in political activity[5] as defined below?          Yes ☒          No ☐

If yes, identify each such foreign principal and describe in full detail all such political activity, indicating, among other things, the relations, interests and policies sought to be influenced and the means employed to achieve this purpose. If the registrant arranged, sponsored or delivered speeches, lectures or radio and TV broadcasts, give details as to dates, places, of delivery, names of speakers and subject matter.

### Palestine Liberation Organization

We seek to advance the relations and cooperation between the United States Government and the PLO.  Also to advance the relations and cooperation between the Palestinian people and the American people.

13. In addition to the above described activities, if any, have you engaged in activity on your own behalf which benefits any or all of your foreign principals?          Yes ☐          No ☒

If yes, describe fully.

### N/A

---

5 The term "political activities" means any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting or changing the domestic or foreign policies of the United States or with reference to political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

(PAGE 5)

## IV - FINANCIAL INFORMATION

**14. (a)**  **RECEIPTS-MONIES**

During this 6 month reporting period, have you received from any foreign principal named in Items 7, 8, and 9 of this statement, or from any other source, for or in the interests of any such foreign principal, any contributions, income or money either as compensation or otherwise?          Yes ☒          No ☐

If no, explain why.

If yes, set forth below in the required detail and separately for each foreign principal an account of such monies[6]

| Date | From Whom | Purpose | Amount |
|------|-----------|---------|--------|

**(See schedule 1)**

Total

**(b)**  **RECEIPTS - FUND RASING CAMPAIGN**

During this 6 month reporting period, have you received, as part of a fund raising campaign[7], any money on behalf of any foreign principal named in items 7, 8, and 9 of this statement?          Yes ☐          No ☒

If yes, have you filed an Exhibit D to your registration?          Yes ☐          No ☐

If yes, indicate the date the Exhibit D was filed.          Date _____

**N/A**

**(c)**  **RECEIPTS-THINGS OF VALUE**

During this 6 month reporting period, have you received any thing of value[9] other than money from any foreign principal named in Items 7, 8, and 9 of this statement, or from any other source, for or in the interests of any such foreign principal?          Yes ☐          No ☒

If yes, furnish the following information:

| Name of foreign principal | Date received | Description of thing of value | Purpose |
|---------------------------|---------------|-------------------------------|---------|

**N/A**

---

6, 7  A registrant is required to file an Exhibit D if he collects or receives contributions, loans, money, or other things of value for a foreign principal, as part of a fund raising campaign. (See Rule 201(e).)
8  An Exhibit D, for which no printed form is provided, sets forth an account of money collected or received as a result of a fund raising campaign and transmitted for a foreign principal.
9  Things of value include but are not limited to gifts, interest free loans, expense free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks," and the like.

15. (a)  **DISBURSEMENTS-MONIES**
**During this 6 month reporting period, have you**
(1)  disbursed or expended monies in connection with activity on behalf of any foreign named in Items 7, 8, and 9 of this statement?          Yes ☒          No ☐

(2)  transmitted monies to any such foreign principal?          Yes ☐          No ☒

If no, explain in full detail why there were no disbursements made on behalf of any foreign principal.


If yes, set forth below in the required detail and separately for each foreign principal an account of such monies, including monies transmitted, if any, to each foreign principal.

| Date | To Whom | Purpose | Amount |
|------|---------|---------|--------|

**(See schedule 2)**

Total _____

**(b) DISBURSEMENTS-THINGS OF VALUE**

During this 6 month reporting period, have you disposed of anything of value[10] other than money in furtherance of or in connection with activities on behalf of any foreign principal named in Items 7, 8, and 9 of this statement?

Yes ☐          No ☒

If yes, furnish the following information:

| Date disposed | Name of person to whom given | On behalf of what foreign principal | Description of thing of value | Purpose |
|---|---|---|---|---|

N/A

**(c) DISBURSEMENTS-POLITICAL CONTRIBUTIONS**

During this 6 month reporting period, have you from your own funds and on your own behalf either directly or through any other person, made any contributions of money or other things of value[11] in connection with an election to any political office, or in connection with any primary election, convention, or caucus held to select candidates for political office?

Yes ☐          No ☒

If yes, furnish the following information:

| Date | Amount or thing of value | Name of political organization | Name of candidate |
|---|---|---|---|

N/A

10, 11 Things of value include but are not limited to gifts, interest free loans, expense free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks" and the like.

(PAGE 8)

## V - INFORMATIONAL MATERIALS

16. During this 6 month reporting period, did you prepare, disseminate or cause to be disseminated any informational materials[12]?

Yes ☐          No ☒

IF YES, RESPOND TO THE REMAINING ITEMS IN SECTION V.

17. Identify each such foreign principal.

18. During this 6 month reporting period, has any foreign principal established a budget or allocated a specified sum of money to finance your activities in preparing or disseminating informational materials?          Yes ☐          No ☒

If yes, identify each such foreign principal, specify amount, and indicate for what period of time.

N/A

19. During this 6 month reporting period, did your activities in preparing, disseminating or causing the dissemination of informational materials include the use of any of the following:

☒ Radio or TV broadcasts          ☐ Magazine or newspaper articles          ☐ Motion picture films          ☐ Letters or telegrams

☐ Advertising campaigns          ☐ Press releases          ☐ Pamphlets or other publications          ☒ Lectures or speeches

☐ Other (specify) _____

20. During this 6 month reporting period, did you disseminate or cause to be disseminated informational materials among any of the following groups:

☐ Public Officials          ☐ Newspapers          ☐ Libraries
☐ Legislators          ☐ Editors          ☐ Educational institutions
☐ Government agencies          ☐ Civic groups or associations          ☐ Nationality groups

N/A

☐ Other (specify) _____

21. What language was used in the informational materials:

☐ English          N/A          ☐ Other (specify) _____

22. Did you file with the Registration Unit, U.S. Department of Justice a copy of each item of such informational materials disseminated or caused to be disseminated during this 6 month reporting period?          N/A          Yes ☐          No ☐

23. Did you label each item of such informational materials with the statement required by Section 4(b) of the Act?

Yes ☐          No ☐

N/A

12 The term informational materials includes any oral, visual, graphic, written, or pictorial information or matter of any kind, including that published by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or any means or instrumentality of interstate or foreign commerce or otherwise. Informational materials disseminated by an agent of a foreign principal as part of an activity in itself exempt from registration, or an activity which by itself would not require registration, need not be filed pursuant to Section 4(b) of the Act.

(PAGE 9)

## VI--EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swear(s) or affirm(s) under penalty of perjury that he/she has (they have) read the information set forth in this registration statement and the attached exhibits and that he/she is (they are) familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her (their) knowledge and belief, except that the undersigned make(s) no representation as to truth or accuracy of the information contained in the attached Short Form Registration Statement(s), if any, insofar as such information is not within his/her (their) personal knowledge.

(Date of signature)

(Type or print name under each signature[13])

November 15, 1999

Hasan Abdel Rahman

_____

13 This statement shall be signed by the individual agent, if the registrant is an individual, or by a majority of those partners, officers, directors or persons performing similar functions, if the registrant is an organization, except that the organization can, by power of attorney, authorize one or more individuals to execute this statement on its behalf.

# UNITED STATES DEPARTMENT OF JUSTICE
## FARA REGISTRATION UNIT
## CRIMINAL DIVISION
## WASHINGTON, D.C. 20530

**NOTICE**

Please answer the following questions and return this sheet in triplicate with your Supplemental Statement:

1.  Is your answer to Item 16 of Section V (Informational Materials - page 8 of Form CRM-154, formerly Form OBD-64-Supplemental Statement):

    YES_____ or NO_____NO_____

(If your answer to question 1 is "yes" do not answer question 2 of this form.)

2.  Do you disseminate any material in connection with your registration:

    YES_____ or NO_____NO_____

(If your answer to question 2 is "yes" please forward for our review copies of all material including: films, film catalogs, posters, brochures, press releases, etc. which you have disseminated during the past six months.)

_____
*Signature*

_____November 15, 1999_____
*Date*

___Hasan Abdel Rahman___
**Please type or print name of signatory on the line above**

___Chief PLO Representative___
*Title*

**PLO Office**

1730 K Street, N.W., Suite 1004
Washington, D.C. 20006

Tel: (202) 785-8394
Fax: (202) 887-5337



بعثـة
منظمـة التحريـر الفلسطينيـة
واشنطن
هاتف: ٨٢٩٤–٧٨٥ (٢٠٢)
فاكس: ٥٣٣٧–٨٨٧ (٢٠٢)

Registration No. 5244
Six months period ending September 30th, 1999          (Schedule 1)

| | | |
|---|---|---|
| Previous Balance | $ | 885.08 |
| From Ministry of Finance | | 352,894.79 |
| Total | | $353,779.87 |

Expenses:

| | |
|---|---|
| Salaries | $113,304.00 |
| Other expenses | 150,520.53 |
| | |
| Total | $263,824.53 |

| | |
|---|---|
| Balance | $353,779.87 |
| Total expenditure | 263,824.53 |
| | |
| Remaining balance | $89,955.34 |

**PLO Office**

1730 K Street, N.W., Suite 1004
Washington, D.C. 20006

Tel: (202) 785-8394
Fax: (202) 887-5337



بعثة
منظمة التحرير الفلسطينية
واشنطن

هاتف: ٨٣٩٤-٧٨٥ (٢٠٢)
فاكس: ٥٣٣٧-٨٨٧ (٢٠٢)

Registration No. 5244
Six months period ending September 30th, 1999          (Schedule 2)

| | |
|---|---:|
| Office rent | $25,887.42 |
| Parking/garage | 5,867.01 |
| Rent resident | 21,854.00 |
| Rent office machines | 2,232.47 |
| Transportation | 5,318.38 |
| Maintenance/office machines | 641.78 |
| Mail/Fedex/DHL | 3,179.08 |
| Office telephone | 18,732.05 |
| Residence telephone | 4,651.77 |
| Stationary | 1,101.16 |
| Newspapers/Subscriptions | 2,098.92 |
| Health insurance | 16,473.17 |
| Car maintenance | 1,487.89 |
| Fuel | 2,923.23 |
| Car insurance | 5,265.33 |
| Car payments | 12,543.71 |
| Electricity for residence | 1,662.25 |
| Gas for residence | 734.48 |
| Hospitality/Hotels | 8,717.99 |
| Car tax | 1,881.68 |
| Miscellaneous | 2,056.76 |
| Travel | 5,210.00 |
| Total | $150,520.53 |

**PLO Office**

1730 K Street, N.W., Suite 1004
Washington, D.C. 20006

Tel: (202) 785-8394
Fax: (202) 887-5337



بعثــة
منظمــة التحريــر الفلسطينيــة
واشنطن

هاتف: ٨٣٩٤-٧٨٥ (٢٠٢)
فاكس: ٥٣٣٧-٨٨٧ (٢٠٢)

Six months period ending September 30th, 1999
Registration # 5244                              (Schedule 3)  **No Transcripts**

| | |
|---|---|
| April 12, 1999 | attended the Middle East in the New Millenium Conference (No transcript) Austin, Texas |
| April 20th, 1999 | Addressed the Delegation of American Zionist movement Convention -  Washington, D.C. |
| "      "      " | Discussion on Palestinian Arab Perspective on the Peace Process -  at Meridian International Center in Washington, D.C. (no transcript) |
| April 26th, 1999 | Addressed the 21st conference of the Anti-Defamation League " Review the M.E. Peace Process" |
| April 29th, 1999 | Attended the Public Forum "Two Women for Peace" Lea Rabin and Jehan Sadat |
| April 30th, 1999 | Interviewed -  KPFK Radio Pacific Southern California |
| May 5th, 1999 | Attended a Conference in Atlanta, GA |
| May 7th, 1999 | Addressed a small group from the American Jewish Committee at the office. |
| May 11th, 1999 | Attended  a Press Conference Middle East Institute |
| May 17th, 1999 | Interview - Univision - TV in Spanish |

2

| | |
|---|---|
| June 18th, 1999 | Attended the Washington Institute Annual Soref Symposium " The Barak Victory" Park Hayat Hotel - 24th Street, N.W. |
| June 30th, 1999 | Attended the Ramallah Convention |
| July 14th, 1999 | Interviewd by the Egyptian Television - in Arabic |
| July 14th, 1999 | Interviewd by Abu Dabi Television in Arabic |
| July 16th, 1999 | Interviewed by the Foro InterAmericano T.V. Voice of America Blg. |
| July 21, 1999 | Addressed interns at the National Council on U.S.-Arab Relations - 1140 Connecticut Ave., M.W. |
| July 22, 1999 | Attended the Middle East Insight - Round-table Discussion on "The Path to Peace" Dirkson Senate Office  Room 138 |
| September 1, 1999 | Interview -  CNN |
| September 3, 1999 | Phone Interview  -  Voice of America - Farsi Section |
| September 12, 1999 | Attended the Nation Council on US-Arab Relations The 8th Annual U.S. Mideast Policymakers Conf. Lexington, Virginia |

| U.S. Department of Justice<br>Washington, DC 20530 | Supplemental Statement<br>Pursuant to Section 2 of the Foreign Agents Registration Act<br>of 1938, as amended | OMB NO. 1105-0002 |
|---|---|---|

For Six Month Period Ending ___MAR 3 1 2000___

(Insert date)

## I – REGISTRANT

1. (a) Name of Registrant                                          (b) Registration No.  5 2 4 4

   **Palestine Liberation Organizatin**

   (c) Business Address(es) of Registrant

   **1730 K Street, N.W. Suite 1004
   Washington, D.C. 20006**

2. Has there been a change in the information previously furnished in connection with the following:

   (a)    If an individual:
   
   |  |  |  |  |
   |---|---|---|---|
   | (1) Residence address | Yes ☐ | No ☐ | N/A |
   | (2) Citizenship | Yes ☐ | No ☐ | |
   | (3) Occupation | Yes ☐ | No ☐ | |

   (b)    If an organization:
   
   |  |  |  |
   |---|---|---|
   | (1) Name | Yes ☐ | No ☒ |
   | (2) Ownership or control | Yes ☐ | No ☒ |
   | (3) Branch offices | Yes ☐ | No ☒ |

   (c)    Explain fully all changes, if any, indicated in items (a) and (b) above.

   **N/A**

---

IF THE REGISTRANT IS AN INDIVIDUAL, OMIT RESPONSE TO ITEMS 3, 4, AND 5(a).

3. If you have previously filed Exhibit C[1], state whether any changes therein have occurred during this 6 month reporting period.

   Yes ☐          No ☐

   If yes, have you filed an amendment to the Exhibit C?          Yes ☐          No ☐

   If no, please attach the required amendment.

   **N/A**

---

1 The Exhibit C, for which no printed form is provided, consists of a true copy of the charter, articles of incorporation, association, and by laws of a registrant that is an organization. (a waiver of the requirement to file an Exhibit C may be obtained for good cause upon written application to the Assistant Attorney General, Criminal Division, Internal Security Section, U.S. Department of Justice, Washington, D.C. 20530.)

4. (a) Have any persons ceased acting as partners, officers, directors or similar officials of the registrant during this 6 month reporting period?    Yes ☐    No ☐

If yes, furnish the following information:    N/A

| Name | Position | Date Connection Ended |
|------|----------|-----------------------|
|      |          |                       |

(b) Have any persons become partners, officers, directors or similar officials during this 6 month reporting period?
Yes ☐    No ☒

If yes, furnish the following information:

| Name | Residence Address | Citizenship | Position | Date Assumed |
|------|-------------------|-------------|----------|--------------|

N/A

5. (a) Has any person named in item 4(b) rendered services directly in furtherance of the interests of any foreign principal?
Yes ☐    No ☒

If yes, identify each such person and describe his service.

(b) Have any employee or individuals, who have filed a short form registration statement, terminated their employment or connection with the registrant during this 6 month reporting?    Yes ☐    No ☒

If yes, furnish the following information:

| Name | Position or connection | Date terminated |
|------|------------------------|-----------------|

N/A

(c) During this six month reporting period, has the registrant hired as employees or in any other capacity, any persons who rendered or will render services to the registrant directly in furtherance of the interests of any foreign principal(s) in other than a clerical or secretarial, or in a related or similar capacity?    Yes ☐    No ☒

If yes, furnish the following information:

| Name | Residence Address | Citizenship | Position | Date Assumed |
|------|-------------------|-------------|----------|--------------|

N/A

6. Have short form registration statements been filed by all of the persons named in Items 5(a) and 5(c) of the supplemental statement?    Yes ☐    No ☐

If no, list names of persons who have not filed the required statement.    N/A

## II - FOREIGN PRINCIPAL

7. Has your connection with any foreign principal ended during this 6 month reporting period?

        Yes ☐        No ☒

If yes, furnish the following information:

*Name of foreign principal*                                        *Date of termination*

**N/A**

8. Have you acquired any new foreign principal[2] during this 6 month reporting period?

        Yes ☐        No ☒

If yes, furnish following information:

*Name and address of foreign principal*                              *Date acquired*

9. In addition to those named in Items 7 and 8, if any, list foreign principals[2] whom you continued to represent during the 6 month reporting period.

**Palestine Liberation Organization**

10.    **EXHIBITS A AND B**
    (a)    Have you filed for each of the newly acquired foreign principals in Item 8 the following:

        Exhibit A[3]        Yes ☐    No ☐      **N/A**
        Exhibit B[4]        Yes ☐    No ☐

        If no, please attach the required exhibit.

    (b)    Have there been any changes in the Exhibits A and B previously filed for any foreign principal whom you represented during this six month period?    Yes ☐    No ☐

        If yes, have you filed an amendment to these exhibits?    Yes ☐    No ☐

        If no, please attach the required amendment.

                                **N/A**

2 The term "foreign principal" includes, in addition to those defined in section 1(b) of the Act, an individual organization any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign government, foreign political party, foreign organization or foreign individual. (See Rule 100(a) (9)). A registrant who represents more than one foreign principal is required to list in the statements he files under the Act only those principals for whom he is not entitled to claim exemption under Section 3 of the Act. (See Rule 208.)
3 The Exhibit A, which is filed on form CRM-157 (Formerly OBD-67) sets forth the information required to be disclosed concerning each foreign principal.
4 The Exhibit B, which is filed on Form CRM-155 (Formerly OBD-65) sets fourth the information concerning the agreement or understanding between the registrant and the foreign principal.

### III - ACTIVITIES

11. During this 6 month reporting period, have you engaged in any activities for or rendered any services to any foreign principal named in Items 7, 8, and 9 of this statement?    Yes ☒    No ☐

If yes, identify each such foreign principal and describe in full detail your activities and services:

Palestine Liberation Organization

(See Schedule 3)

12. During this 6 month reporting period, have you on behalf of any foreign principal engaged in political activity[5] as defined below?    Yes ☒    No ☐

If yes, identify each such foreign principal and describe in full detail all such political activity, indicating, among other things, the relations, interests and policies sought to be influenced and the means employed to achieve this purpose. If the registrant arranged, sponsored or delivered speeches, lectures or radio and TV broadcasts, give details as to dates, places, of delivery, names of speakers and subject matter.

Palestine Liberation Organization

We seek to advance the relations and cooperation between the United States Government and the PLO  Also to advance the relations and cooperation between the Palestinian people and the American people.  Also to advance the Peace Talk negotiations.

13. In addition to the above described activities, if any, have you engaged in activity on your own behalf which benefits any or all of your foreign principals?    Yes ☐    No ☒

If yes, describe fully.

___

5 The term "political activities" means any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting or changing the domestic or foreign policies of the United States or with reference to political or public interests, policies, or relations of a government aforeign country or a foreign political party.

## IV - FINANCIAL INFORMATION

**14. (a)  RECEIPTS-MONIES**

During this 6 month reporting period, have you received from any foreign principal named in Items 7, 8, and 9 of this statement, or from any other source, for or in the interests of any such foreign principal, any contributions, income or money either as compensation or otherwise?     Yes ☒     No ☐

If no, explain why.

If yes, set forth below in the required detail and separately for each foreign principal an account of such monies[6]

| Date | From Whom | Purpose | Amount |
|------|-----------|---------|--------|

**(See schedule 1)**

Total _____

**(b)  RECEIPTS - FUND RASING CAMPAIGN**

During this 6 month reporting period, have you received, as part of a fund raising campaign[7], any money on behalf of any foreign principal named in items 7, 8, and 9 of this statement?     Yes ☐     No ☒

If yes, have you filed an Exhibit D to your registration?     Yes ☐     No ☐

If yes, indicate the date the Exhibit D was filed.     Date _____

**N/A**

**(c)  RECEIPTS-THINGS OF VALUE**

During this 6 month reporting period, have you received any thing of value[9] other than money from any foreign principal named in Items 7, 8, and 9 of this statement, or from any other source, for or in the interests of any such foreign principal?     Yes ☐     No ☒

If yes, furnish the following information:

| Name of foreign principal | Date received | Description of thing of value | Purpose |
|---------------------------|---------------|-------------------------------|---------|

**N/A**

6, 7  A registrant is required to file an Exhibit D if he collects or receives contributions, loans, money, or other things of value for a foreign principal, as part of a fund raising campaign. (See Rule 201(e).)
8  An Exhibit D, for which no printed form is provided, sets forth an account of money collected or received as a result of a fund raising campaign and transmitted for a foreign principal.
9  Things of value include but are not limited to gifts, interest free loans, expense free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks," and the like.

(PAGE 6)

15. (a)  **DISBURSEMENTS-MONIES**
During this 6 month reporting period, have you
(1)  disbursed or expended monies in connection with activity on behalf of any foreign named in Items 7, 8, and 9 of this statement?          Yes ☒          No ☐

(2)  transmitted monies to any such foreign principal?          Yes ☐          No ☐

If no, explain in full detail why there were no disbursements made on behalf of any foreign principal.

If yes, set forth below in the required detail and separately for each foreign principal an account of such monies, including monies transmitted, if any, to each foreign principal.

Date                    To Whom                    Purpose                    Amount

(See schdule 2)

Total

(v)  **DISBURSEMENTS-THINGS OF VALUE**
During this 6 month reporting period, have you disposed of anything of value[10] other than money in furtherance of or in connection with activities on behalf of any foreign principal named in Items 7, 8, and 9 of this statement?

Yes ☐          No ☒

If yes, furnish the following information:

| Date disposed | Name of person to whom given | On behalf of what foreign principal | Description of thing of value | Purpose |
|---|---|---|---|---|
| | | | | |

N/A

(c)  **DISBURSEMENTS-POLITICAL CONTRIBUTIONS**
During this 6 month reporting period, have you from your own funds and on your own behalf either directly or through any other person, made any contributions of money or other things of value[11] in connection with an election to any political office, or in connection with any primary election, convention, or caucus held to select candidates for political office?          Yes ☐          No ☒

If yes, furnish the following information:

| Date | Amount or thing of value | Name of political organization | Name of candidate |
|---|---|---|---|
| | | | |

N/A

---

10, 11  Things of value include but are not limited to gifts, interest free loans, expense free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks" and the like.

## V - INFORMATIONAL MATERIALS

16. During this 6 month reporting period, did you prepare, disseminate or cause to be disseminated any informational materials[12]?

          Yes ☐        No ☒

IF YES, RESPOND TO THE REMAINING ITEMS IN SECTION V.

17. Identify each such foreign principal.

**N/A**

18. During this 6 month reporting period, has any foreign principal established a budget or allocated a specified sum of money to finance your activities in preparing or disseminating informational materials?    Yes ☐    No ☒

If yes, identify each such foreign principal, specify amount, and indicate for what period of time.

**N/A**

19. During this 6 month reporting period, did your activities in preparing, disseminating or causing the dissemination of informational materials include the use of any of the following:

☒ Radio or TV broadcasts    ☐ Magazine or newspaper articles    ☐ Motion picture films    ☐ Letters or telegrams

☐ Advertising campaigns    ☐ Press releases    ☐ Pamphlets or other publications    ☒ Lectures or speeches

☐ Other (specify) _____

20. During this 6 month reporting period, did you disseminate or cause to be disseminated informational materials among any of the following groups:

☐ Public Officials    ☐ Newspapers    ☐ Libraries
☐ Legislators    ☐ Editors    ☐ Educational institutions
☐ Government agencies    ☐ Civic groups or associations    ☐ Nationality groups

                              **N/A**
☐ Other (specify) _____

21. What language was used in the informational materials:
☐ English    ☐ Other (specify) _____
            **N/A**

22. Did you file with the Registration Unit, U.S. Department of Justice a copy of each item of such informational materials disseminated or caused to be disseminated during this 6 month reporting period?    Yes ☐    No ☐
                                      **N/A**

23. Did you label each item of such informational materials with the statement required by Section 4(b) of the Act?
        Yes ☐    No ☐
                          **N/A**

---

12 The term informational materials includes any oral, visual, graphic, written, or pictorial information or matter of any kind, including that published by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or any means or instrumentality of interstate or foreign commerce or otherwise. Informational materials disseminated by an agent of a foreign principal as part of an activity in itself exempt from registration, or an activity which by itself would not require registration, need not be filed pursuant to Section 4(b) of the Act.

## VI--EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swear(s) or affirm(s) under penalty of perjury that he/she has (they have) read the information set forth in this registration statement and the attached exhibits and that he/she is (they are) familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her (their) knowledge and belief, except that the undersigned make(s) no representation as to truth or accuracy of the information contained in the attached Short Form Registration Statement(s), if any, insofar as such information is not within his/her (their) personal knowledge.

(Date of signature)

(Type or print name under each signature[13])

April 28, 2000

_Hasan Abdel Rahman_

---

13 This statement shall be signed by the individual agent, if the registrant is an individual, or by a majority of those partners, officers, directors or persons performing similar functions, if the registrant is an organization, except that the organization can, by power of attorney, authorize one or more individuals to execute this statement on its behalf.

# UNITED STATES DEPARTMENT OF JUSTICE
# FARA REGISTRATION UNIT
# CRIMINAL DIVISION
# WASHINGTON, D.C.  20530

## NOTICE

Please answer the following questions and return this sheet in triplicate with your Supplemental Statement:

1.    Is your answer to Item 16 of Section V (Informational Materials - page 8 of Form CRM-154, formerly Form OBD-64-Supplemental Statement):

YES_____ or NO____NO_____

(If your answer to question 1 is "yes" do not answer question 2 of this form.)

2.    Do you disseminate any material in connection with your registration:

YES_____ or NO____NO_____

(If your answer to question 2 is "yes" please forward for our review copies of all material including: films, film catalogs, posters, brochures, press releases, etc. which you have disseminated during the past six months.)

_____                    April 28, 2000
*Signature*                                 _____
                                            *Date*


___Hasan Abdel Rahman___
**Please type or print name of**
**signatory on the line above**


___Chief PLO Representative___
*Title*

**PLO Office**

1730 K Street, N.W., Suite 1004
Washington, D.C. 20006

Tel: (202) 785-8394
Fax: (202) 887-5337



بعثـة
منظمـة التحريـر الفلسطينيـة
واشنطن
هاتف: ٨٢٩٤–٧٨٥ (٢٠٢)
فاكس: ٥٣٣٧–٨٨٧ (٢٠٢)

Registration No. 5244
Six Months Period ending March 31, 2000                    (Schedule 1)

|  |  |
|---|---|
| Previous Balance | $   89,955.34 |
| From Ministry of Finance | $  125,838.84 |
| Total | $   215,794.18 |

**Expenses**

| | |
|---|---|
| Salaries | $ 87,011.00 |
| Other expenses | 128,835.53 |
| Total | $ 215,846.53 |

| | |
|---|---|
| Balance | $215,794.18 |
| Total expenditure | $215,846.53 |
| Remaining balance : Minus | 52.35 |

## PLO Office

1730 K Street, N.W., Suite 1004
Washington, D.C. 20006

Tel: (202) 785-8394
Fax: (202) 887-5337



بعثة
منظمـة التحريـر الفلسطينيـة
واشنطن

هاتف: ٨٢٩٤-٧٨٥ (٢٠٢)
فاكس: ٠٢٢٧-٨٨٧ (٢٠٢)

Registration No. 5244
Six months period ending March 31, 2000          (Schedule 2)

| | |
|---|---:|
| Office rent | 16,468.40 |
| Parking garage | 5,595.75 |
| Rent residence | 15,610.00 |
| Rent office machines | 2,268.53 |
| Transportation | 4,798.15 |
| Maintenance for office machines | 961.30 |
| Mail/Fedex/DHL | 2,319.30 |
| Office telephone | 22,444.35 |
| Stationary | 946.48 |
| Newspaper subscriptions | 1,891.44 |
| Health Insurance | 15,281.60 |
| Car maintenance | 579.43 |
| Fuel | 2,167.89 |
| Car insurance | 5,434.25 |
| Car payments | 8,797.60 |
| Electricity for residence | 1,118.99 |
| Gas for residence | 894.11 |
| Car tax | 265.00 |
| Miscellaneous | 1,561.07 |
| Office insurance | 505.00 |
| Hospitality/Hotels | 4,620.06 |
| Travel | 10,247.77 |
| Books | 435.71 |
| Furniture | 3,623.35 |
| | |
| **Total** | **128,835.53** |

PLO Office

1730 K Street, N.W., Suite 1004
Washington, D.C. 20006

Tel: (202) 785-8394
Fax: (202) 887-5337



بعثـة
منظمـة التحريـر الفلسطينيـة
واشنطن

هاتف: ٨٢٦٤–٧٨٥ (٢٠٢)
فاكس: ٥٣٣٧–٨٨٧ (٢٠٢)

Six months period ending March 31, 2000
Registration 5244

(Schedule 3)   No transcripts

| Date | Activity |
|---|---|
| October 8, 1999 | Interview<br>Foro Inter American  -  Spanish TV |
| October 8, 1999 | Luncheon and discussion with<br>Mr. Dennis Ross |
| October 21, 1999 | Addressed the Palestinian American Community<br>in Cleveland |
| November 17, 1999 | Addressed the National Association of State<br>Development Agencies<br>In Orlando, Florida |
| December 3, 1999 | Addressed students at the University of<br>Middle East Project<br>in Boston, MA |
| December 13, 1999 | Attended a briefing by Amb. Martin Indyk<br>State Department |
| December 19, 1999 | Interview - CPAN |
| January 6, 2000 | Attended discussion at the Washington Institute |
| January 12, 2000 | Attended the Amberican Jewish Community's<br>Conference |
| January 21, 2000 | Attended the swearing in of Amb. Martin Indyk<br>At the State Department |

2

January 25, 2000                Attended discussion at the Jewish Federation of
                                Palm Beach

February 8, 2000                Attended dinner in honor of Amb. Edward Walker

March 23, 2000                  Attended a dialogue at the Augusta State University

March 29, 2000                  Attended a briefing by Amb. Edward Walker
                                at the State Department

March 30, 2000                  Attended a luncheon in honor of Mr. Shimon Peres
                                Given by Center for Middle East Peace

U.S. Department of Justice
Washington, DC 20530

Short-Form Registration Statement
Pursuant to the Foreign Agents Registration Act of 1938, as amended

OMB NO. 1105-0013

Each partner, officer, director, associate, employee, and agent of a registrant is required to file a short form registration statement unless he engages in no activities in furtherance of the interests of the registrant's foreign principal or unless the services he renders to the registrant are in a secretarial, clerical, or in a related or similar capacity.

Privacy Act Statement.  Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, D.C. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act.  The Attorney General also transmits a semi-annual report to Congress on the Administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent.  This report is available to the public.  Finally, the Attorney General intends, at the earliest possible opportunity, to make these public documents available on the Internet on the Department of Justice World Wide site.

Public Reporting Burden.  Public reporting burden for this collection of information is estimated to average .429 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Criminal Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| | |
|---|---|
| 1. Name <br><br> **Khalil Foutah** | 2. Registration No. <br><br> ~~5074~~   *5244* |
| 3. Residence Address(es) <br><br> **1730 K St. N.W. Suite 1004** <br> **Washington, D.C. 20006** | 4. Business Address(es) <br><br> **1730 K St. N.W. Suite 1004** <br> **Washington, D.C. 20006** |
| 5. Date and Place of Birth <br><br> **Jerusalem,   10/8/1945** <br> Nationality <br><br> Present Citizenship   **U.S.** | 6. If present citizenship was not acquired by birth, indicate when, and how acquired. <br><br> **Washington, D.C.** <br> **by marriage** |

7. Occupation   **Deputy Chief Representative**

8. What is the name and address of the primary registrant?

Name

**PLO Office**

Address
**1730 K St. N.W.  Suite 1004**
**Washington, D.C. 20006**

9. Indicate your connection with the primary registrant:

☐ partner  ☐ director  ☐ employee  ☐ consultant
☒ officer  ☐ associate  ☐ agent  ☐ subcontractor
☐ other *(specify)* _____

10. List every foreign principal to whom you will render services in support of the primary registrant.

**PLO**

11. Describe separately and in detail all services which you will render to the foreign principal(s) listed in Item 10 either directly, or through the primary registrant listed in Item 8, and the date(s) of such services.  (If space is insufficient, a full insert page must be used.)

**Answer questions of students, the media, lecture at universities, address Church groupts on the question of Peace in the Middle East.**

(stamp: 1998 MAR 18 PM 1:34 — CRM/ISS REGISTRATION UNIT)

12. Do any of the above described services include political activity as defined in Section 1(o) of the Act and in the footnote below?

Yes ☒    No ☐

If yes, describe separately and in detail such political activity.

**To promote peace in the Middle East**

13. The services described in Items 11 and 12 are to be rendered on a
☒ full time basis            ☐ part time basis            ☐ special basis

14. What compensation or thing of value have you received to date or will you receive for the above services?

☒ Salary: Amount $ 15,816.00 per ___Year___            ☐ Commission at _____ % of _____

☐ Salary: Not based solely on services rendered to the foreign principal(s).

☐ Fee: Amount $ _____            ☐ Other thing of value _____

15. During the period beginning 60 days prior to the date of your obligation to register to the time of filing this statement, did you make any contributions of money or other things of value from your own funds or possessions and on your own behalf in connection with any election to political office or in connection with any primary election, convention, or caucus held to select candidates for any political office?            Yes ☐    No ☒

If yes, furnish the following information:

| Date | Amount of thing of value | Name of political organization | Name of candidate |
|------|--------------------------|-------------------------------|-------------------|
|      |                          | N/A                           |                   |

## EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirm(s) under penalty of perjury that he/she has read the information set forth in this registration statement and that he/she is familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

**I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.**

_____3/10/98_____            _Khalil Foutah_____
*(Date of signature)*                                              *(Signature)*

Footnote: Political activity as defined in Section 1(o) of the Act means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political interest, policies, or relations of a government of a foreign country or a foreign political party.

**U.S. Department of Justice**
Washington, DC 20530

Short-Form Registration Statement
Pursuant to the Foreign Agents Registration Act of 1938, as amended

OMB NO. 1105-0013

Each partner, officer, director, associate, employee, and agent of a registrant is required to file a short form registration statement unless he engages in no activities in furtherance of the interests of the registrant's foreign principal or unless the services he renders to the registrant are in a secretarial, clerical, or in a related or similar capacity.

Privacy Act Statement. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, D.C. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the Administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public. Finally, the Attorney General intends, at the earliest possible opportunity, to make these public documents available on the Internet on the Department of Justice World Wide Web site.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .429 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Criminal Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| | |
|---|---|
| 1. Name<br><br>**Said Hamad** | 2. Registration No.<br><br>~~5074~~  *5244* |
| 3. Residence Address(es)<br><br>**1730 K Street, N.W. Suite 1004<br>Washington, D.C. 20006** | 4. Business Address(es)<br><br>**1730 K Street, N.W. Suite 1004<br>Washington, D.C. 20006** |
| 5. Date and Place of Birth<br><br>**Jerusalem    December 3,1950**<br>Nationality<br><br>Present Citizenship  **U.S.** | 6. If present citizenship was not acquired by birth, indicate when, and how acquired.<br><br>**Washington, D.C.<br>by marriage** |

7. Occupation

**Senior Deputy Chief Representative**

8. What is the name and address of the primary registrant?
   Name                                                      Address
   **Palestine Liberation Organization**          **1730 K Street, N.W. Suite 1004<br>Washington, D.C. 20006**

9. Indicate your connection with the primary registrant:
   ☐ partner              ☐ director           ☐ employee           ☐ consultant
   ☒ officer              ☐ associate          ☐ agent              ☐ subcontractor
   ☐ other *(specify)*_____

10. List every foreign principal to whom you will render services in support of the primary registrant.

    **PLO**

11. Describe separately and in detail all services which you will render to the foreign principal(s) listed in Item 10 either directly, or through the primary registrant listed in Item 8, and the date(s) of such services. (If space is insufficient, a full insert page must be used.)

    **To promote peace in the Middle East**

FORM CRM-156
SEP. 1996

12. Do any of the above described services include political activity as defined in Section 1(o) of the Act and in the footnote below?

                               Yes ☒  No ☐

If yes, describe separately and in detail such political activity.

                     **Promote Peace in the Middle East**

13. The services described in Items 11 and 12 are to be rendered on a
     ☒ full time basis             ☐ part time basis             ☐ special basis

14. What compensation or thing of value have you received to date or will you receive for the above services?

     ☒ Salary: Amount $ __14,816.00__ per __Year__     ☐ Commission at _____ % of _____

     ☐ Salary: Not based solely on services rendered to the foreign principal(s).

     ☐ Fee: Amount $ _____          ☐ Other thing of value _____

15. During the period beginning 60 days prior to the date of your obligation to register to the time of filing this statement, did you make any contributions of money or other things of value from your own funds or possessions and on your own behalf in connection with any election to political office or in connection with any primary election, convention, or caucus held to select candidates for any political office?               Yes ☐  No ☒

If yes, furnish the following information:

| Date | Amount of thing of value | Name of political organization | Name of candidate |
|------|--------------------------|-------------------------------|-------------------|
|      |                          |                               |                   |

                        **N/A**

## EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirm(s) under penalty of perjury that he/she has read the information set forth in this registration statement and that he/she is familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

**I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.**  **3/10/98**

       *(Date of signature)*                                     *(Signature)*

Footnote: Political activity as defined in Section 1(o) of the Act means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political interest, policies, or relations of a government of a foreign country or a foreign political party.

1

CNN EARLY EDITION, May 18, 1999

FOCUS - 1 of 8 DOCUMENTS

Content and programming copyright **1999** Cable News Network Transcribed under license by Federal Document Clearing House, Inc. Formatting copyright **1999** Federal Document Clearing House, Inc. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to Cable News Network. This transcript may not be copied or resold in any media.
CNN

**SHOW:** CNN EARLY EDITION 07:00 am ET

May 18, **1999**; Tuesday 7:35 am Eastern Time

Transcript # 99051806V08

**TYPE:** INTERVIEW

**SECTION:** News; Domestic

**LENGTH:** 534 words

**HEADLINE:** Rahman: 'There is an Opportunity now to Renew the Peace Process with more Vigor'

**GUESTS: LEXIS-NEXIS Related Topics** Full Article  Related Topics Overview

This document contains no targeted Topics.

**BYLINE:** Bill Hemmer

**HIGHLIGHT:**
Hasan Abdel Rahman, chief Palestinian representative to the U.S., says that the election of Ehud Barak should reintroduce some new vigor into the Middle East peace process. Rahman also says that Barak was elected because the Israeli people desire peace, and that all countries involved in the process should come together for a common solution.

**BODY:**

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

BILL HEMMER, CNN ANCHOR: Ehud Barak says to he will try to make a secure peace with the Palestinians. That Barak pledge comes amidst a freeze in the Middle East peace process.

And joining us now from Washington, with his reaction to the Barak victory and peace prospects, Hasan Abdel Rahman, he is the top Palestinian diplomat in the U.S.

Sir, good morning to you, nice to see you again.

HASAN ABDEL RAHMAN, CHIEF PALESTINIAN REP. TO U.S.: Good morning.

HEMMER: With Ehud Barak's victory and the Labor Party now going into power, do you think the Palestinians will now be granted their long sought state in the Middle East?

RAHMAN: I hope so. I believe that there is an opportunity now to renew the peace process with more vigor and with more expediency also. We are pleased with the results of the election.

CNN EARLY EDITION, May 18, 1999

HEMMER: One of the reasons why Benjamin Netanyahu stated that he slowed down the peace process, because he was not convinced that the Palestinians could grant security for Israelis in the West Bank and in the Gaza Strip.

Is that issue going to be taken care of?.

RAHMAN: I believe that Mr. Netanyahu wanted to put the cart before the horse. I believe that the only security, permanent security, that can be achieved is through peace and not the other way around. I believe peace and security are very much linked together. We will do our share for the security of the whole region, not only Israel, but for ourselves also.

We expect the Israelis to do the same but, the only security, as I said, is through the implementation of the agreements, the establishment of credibility for the peace process, building up confidence, and moving forward with the agreements. . HEMMER: And along the same lines, some have suggested that this vote yesterday in Israel puts the Middle East on the verge of making history.

Is that a bit of an overstatement at this point?

RAHMAN: No, I believe that it is very important opportunity that is presented now to the Israelis leadership, new leadership, to move forward. And I believe that this was a plus on the side of the peace process and Mr. Netanyahu's reluctance to move forward. The Israeli public made it clear to the Israeli leadership that they want peace. This was the verdict of the overwhelming majority of the Israeli public. On our side, we are also committed to peace and I hope that our partnership for peace will succeed.

HEMMER: We only have about 15 seconds left now, sir.

But, do you think the Golan Heights, do you think southern Lebanon will all be thrown in this mix as well?

RAHMAN: I am sure that lasting peace needs to be a comprehensive peace. And, without reaching peace on the Lebanon front and on the Syrian tract, peace will be incomplete, and, therefore, we urge the Israeli government to take advantage of this opportunity and move forward.

HEMMER: Hasan Abdel Rahman, live from Washington with us this morning.

Thank you for your time, sir.

RAHMAN: Thank you, sir.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

**LOAD-DATE:** May 18, **1999**

FOCUS - 2 of 8 DOCUMENTS

Copyright **1999** National Public Radio (R).  All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio.  This transcript may not be reproduced in whole or in part without prior written permission.  For further information, please contact NPR's Permissions Coordinator at (202) 513-2000.
National Public Radio (NPR)

**SHOW:** TALK OF THE NATION (2:00 PM ET)

May 18, **1999,** Tuesday

**LENGTH:** 6740 words

**HEADLINE:** ELECTION OF EHUD BARAK AND THE IMPLICATIONS IT MAY HAVE ON THE MIDDLE EAST PEACE TALKS

**ANCHORS:** RAY SUAREZ

**BODY:**

RAY SUAREZ, host:

This is TALK OF THE NATION.  I'm Ray Suarez.

The new Israeli electoral system, which had tried to introduce new stability, stop governments from suddenly falling and tried to insulate the prime minister from the fractious, razor-thin coalition politics of the Knesset didn't work.  Just three years after the last poll, Israelis once again had to elect a government.  After arriving in the prime minister's office on the strength of a 1/2 of 1 percent win and leading a deeply divided coalition that didn't agree on much beyond wanting Labor out, Benjamin Netanyahu is now on his way out and has resigned as leader of the Likud bloc.  Now Ehud Barak is forming a government.  A much decorated soldier, will Barak continue Netanyahu's policies regarding peace with Syria, normalization of relations with Lebanon, an endurable settlement with the Palestinians?  Should Barak read the vote as a rejection of Netanyahu's policies, or merely of Netanyahu himself?  Lisa Breyer is the Jerusalem bureau chief for Time magazine.  She joins us from her home in Jerusalem.  Good to have you with us.

Ms. LISA BREYER (Jerusalem Bureau Chief, Time Magazine): Thank you very much.

SUAREZ: And Yossi Klein Halevi is a senior writer for Jerusalem Report, a biweekly news magazine.  He's speaking to us from NPR's Jerusalem bureau. Welcome to the program.

Mr. YOSSI KLEIN HALEVI (Jerusalem Report): Thank you.

SUAREZ: And our number is (800) 989-8255.  That's (800) 989-TALK.  I guess, Lisa Breyer, in Israeli terms, 15, 16 points is a landslide.

Ms. BREYER: Absolutely a landslide.  Toward the end of the election it was more or less anticipated, but no one was really prepared to believe that there would be that big of a breaking of the historical tie between the two blocs here, Labor and Likud.

SUAREZ: But is a lot of this still really just a refinement of the idea that there's two camps in Israeli politics?  And you may call yourself different names and huddle under umbrellas that now have changing names as well, but it's a bipolar world?

Mr. BREYER: Well, I think that that election--this election has very much challenged that notion.  It used to be that there were two principal parties and they got, you know, the largest--by far the lion's share of the votes in the parliament

National Public Radio (NPR) May 18, 1999, Tuesday

and that didn't happen this time. The Likud only got 19 seats out of a Knesset of 120. That's down from 32 in the last election. So it's not exactly clear--if there are two camps--what the second camp is anymore.

SUAREZ: Well, Yossi Klein Halevi, let's hear from you on what people are making of this. Does this mean that Likud and its allied parties have a wilderness period, like the Republicans after 1964 in the United States, and start to regroup and figure out what to do next?

Mr. HALEVI: Well, the temptation in Israeli coalition politics is always for the government to co-op the opposition. And in this case, I think the temptation for the Likud to join the government is very strong. The Likud, if it remains in opposition, will have a very hard time recouping. And here, the most important point is that we have a new competition that's emerged in Israeli politics, and that is between the Likud and Shas. Most of Shas' augmented support came at the expense of the Likud, and the Likud has to try to figure out how to win back working class Sephardian Jews from Middle Eastern origin, which is now the Shas mainstay.

SUAREZ: Well, let's talk about the religious parties. Will we see some realignment there along the lines of their belief about the nature of the Jewish state and the role of the government in religion that doesn't make as much of a difference about Sephardian and Ashkenazi and so on?

Mr. HALEVI: Well, I think the dilemma--and it's a very cruel dilemma confronting Barak now--is whether to include Shas into his coalition or not. The problem with Shas is that it's an ultraorthodox fundamentalist party religiously, but politically it's rather dovish. And Barak will be sorely tempted to bring Shas in and to back his peace policy. The problem with that approach is that Barak not only ran on a peace platform, he also ran on a very strong platform to curtail ultraorthodox power. And if he brings Shas in, Shas comes with a very expensive price tag.

SUAREZ: Well, exactly. I mean, it may be useful when you're talking about peace and normalizing relations with your neighbors, but when you start to talk about the real hot-button issues like conversions and who is a Jew and the nature of the state's involvement in education, then it's very tough to have Shas inside that tent.

Mr. HALEVI: I think the astonishing rise of Shas--which no one expected, and certainly not to this extent: 17 seats out of 120 in parliament; the third largest party--means that Israel is essentially fighting for its democratic life. Shas is no longer a party that is trying to redress social wrongs, but an avowedly theocratic movement whose aim is to replace Israeli democracy with Shas-style religion. And if Barak tries to win Shas' support for its peace process at the price of increasing Shas' standing in the government, Shas' access to government funding, then I think Barak is placing Israeli democracy in danger.

SUAREZ: Lisa Breyer, let's look at the left side of the spectrum. Along with one Israel, which includes Labor and Ehud Barak, you have more let's say secular Soviet immigrants. You've got Meretz and some Arab parties and the center party. How did they perform in the race, and can Barak form a government without looking over to the Shases and the Likud?

Ms. BREYER: Absolutely he can. One of the former Likud politicians, Dan Meridor, said today that he's faced with an embarrassment of riches. I mean, Barak really is in a position probably unique of any prime minister elect in Israel that he can pick and choose whomever he wants to form a government with. It's really up to him. The center and the left did astonishingly well in this election. At the same time, the right did very, very poorly. Not only was the Likud more or less trounced, but there was a party, the Third Way, that was devoted really exclusively to the notion that Israel must retain the Golan Heights at all costs, and it was routed from parliament. And on top of that, the Eretz Yisrael Party, the party dedicated to the idea of a greater land of Israel encompassing the West Bank, was reduced from a handful--I think seven members of Knesset going into the race, down to three. So the peace process really wasn't particularly an issue, or wasn't a major issue or wasn't the major issue perhaps for the first time in this election. And aside from that to the extent that it was, the Nationalistic cause got a whooping.

SUAREZ: But can Barak make any decisive moves? Does he have that kind of clout, a mighty arm to do that, or does he have to have some protection on his right flank inside the government in order to do anything that's going to be deeply divisive in Israel?

Ms. BREYER: Right. Well, in terms of holding a government together, I don't think he has anything to worry about. I think just in terms of the narrow interest of holding a coalition together he can do more or less what he wants in the peace process and maintain a coalition. But he doesn't want to do that. I mean, Barak has made very clear that he doesn't want to repeat the mistake of Yitzhak Rabin, which was to say that as long as he had, in a democracy, 50 percent

National Public Radio (NPR) May 18, 1999, Tuesday

plus 1 vote, you know, for his peace process, that that was enough. Not bearing in mind that the other 49 percent of the people were virulently against what he was doing. Barak is very, very much committed in principle basis to having as broad a consensus as possible for the decisions that--the very crucial decisions now that Israel must make in order to form a permanent peace settlement with the Palestinians. And that's why he's going to want a certain amount of support, you know, in the center certainly, and in the right. Not to hold a coalition together, but to make a peace that everybody in Israel will accept.

SUAREZ: Yossi Klein Halevi, let's look back over our shoulders at the last three years. What, if anything, should Benjamin Netanyahu understand about his tenure and about his inability to get over in this second election?

Mr. HALEVI: That the Israeli public craves a censorious prime minister. Not someone on the right, and not someone on the left. Or to put it another way, the Israel public is prepared to accept a Likud prime minister who is pro peace or conversely a Labor prime minister who is hawkish and security-minded. Now Netanyahu won the last elections by presenting himself as a pragmatic right-winger. He managed to convince the Israeli public that he is neither pragmatic nor particularly a principled right-winger. Barak won these elections precisely because he managed in some way to repeat on the left what Netanyahu did on the right three years ago, which is run as a censorious and security-minded pragmatist. And this is a very significant point because Barak did not run as a Shimon Peres style Labor leader. He went back to Yitzhak Rabin who saw the peace process in very unsentimental terms. Rabin, unlike Peres, never invoked a new Middle East, for example.

And Israelis saw Peres as a kind of dangerous utopian who really could not be trusted with navigating Israel through the Middle East. And Barak in a sense has really out Netanyahued Netanyahu by reassuring Israelis he is going to be tough. Yasser Arafat's face did not appear in a single Labor TV commercial. The only Arab leader that Labor promoted was the late King Hussein, who is a virtual saint in Israeli society. And I think that was a deliberate decision. So that what we can expect from Barak, based on candidate Barak, what we can expect from Prime Minister Barak, is to reach out to the moderate right--and today the Likud is, by and large, moderate. Let's say center right--and to include significant elements of the Likud in his coalition and together try to devise a consensus peace policy that 70, 75 percent of the Israeli public can support. And such a policy exists.

SUAREZ: Lisa Breyer, Israel is not only a country that is occupying a security zone in Lebanon, nor has annexed Syrian territory or wonders how to solve the riddle of the West Bank, it's also a place with insurance and the cost of gasoline and issues involving the sustainability of the land and water rights. I mean, it's a regular place with regular problems. Does Labor talk much about its old hearty socialist roots and the spirit of the '50s and '60s when the Histadrut was a big player in the national life and the way the AFL-CIO might have been at one time?

Ms. BREYER: Oh, God forbid. All those red flags are absolutely banished. No, no. The Labor Party has been very, very careful to purge all images of, you know, Socialist inspiration. That's in large part a reflection of the fact that nobody is a Socialist anymore. But aside from that, the most important swing voters in this election were Russian voters, immigrants, Jewish immigrants for the most part, from the former Soviet Union. The last thing that appeals to those voters is any kind of--anything that has to do with red. So absolutely not. On the other hand, it's certainly true that the domestic issues in Israel were, I would say, the major issue in this campaign. I mean, in recent years, the relationship with the Arab world has been the primary argument in Israel. And it was astonishing to what extent in this election that didn't play. Netanyahu tried it. He tried to make Jerusalem the issue, he tried to make Arafat the issue, he tried to make Israel security the issue and the voters just didn't go for it. They weren't interested. The Labor Party tried to make economics an issue, and I--my impression is that that didn't work particularly well either, but the one domestic issue that did play was the religion issue.

SUAREZ: You're listening to TALK OF THE NATION. I'm Ray Suarez. We're going to take a short break right now. When we return, we'll speak to the chief PLO representative in Washington and we'll begin taking your calls at (800) 989-8255. You can e-mail us at totn@npr.org or send us a letter. TALK OF THE NATION Letters, 635 Massachusetts Avenue Northwest, Washington, DC 20001.

At 21 minutes past the hour, it's TALK OF THE NATION from NPR News.

(Announcements)

National Public Radio (NPR) May 18, 1999, Tuesday

SUAREZ: Welcome back to the program. I'm Ray Suarez. Today we're talking about the victory of the new prime minister in Israel, Ehud Barak, and what it means for Israel and the faltering Middle East peace process. Joining us now is Hason Obdel Rockmon, the chief PLO representative in Washington. Welcome back to the program.

Mr. HASON OBDEL ROCKMON (Chief PLO Representative in Washington, DC): Thank you, sir.

SUAREZ: Well, I understand that there has now been a communication between the new prime minister designate and the chairman Yasser Arafat. What did they have to say and what is the PLO--how does the PLO look upon these results?

Mr. ROCKMON: Well, I'm sure that President Arafat had the opportunity to congratulate Mr. Ehud Barak and assure him that we will continue working for peace. I'm also aware that Mr. Barak also assured President Arafat that he would pursue the negotiations with the aim of achieving a comprehensive and lasting peace between the Palestinians and the Israelis and in the region as a whole.

SUAREZ: It was widely reported in the weeks leading up to the election that the PLO was encouraged to not make a unilateral declaration of independence for fear that that would deliver the election to Prime Minister Netanyahu. Where does that declaration of independence stand at the moment? Is it still part of the PLO's idea about how to move forward?

Mr. ROCKMON: Well, that's not totally accurate. That was not the only reason, the elections, but I'm sure that what was happening around us affected our decisions, and that also our decision was affected by the international environment, not only by Israeli politics. We wanted to have the endorsement of the international community for a decision like the decision that we were about to take. We listened to our friends, we listened to our allies around the world and in the Arab world in particular, and their advice was to ask for us to give another period of time for the efforts to succeed. And we hope now that we will be able to achieve our objectives within the time frame that was talked about by President Clinton and by the European community.

SUAREZ: Hasan Abdel Rahman is the chief PLO representative in Washington. Thanks for joining us, sir.

Mr. ROCKMON: Thank you, sir.

SUAREZ: My guests for the remainder of the hour are Lisa Breyer, Jerusalem bureau chief for Time magazine; and Yossi Klein Halevi, senior writer for Jerusalem Report, a biweekly news magazine. Both my guests are in Jerusalem. If you want to join us, the number is (800) 989-8255. We'll start in Philadelphia with Lois. Welcome to the program.

LISA (Caller): Thank you. I wish the people that you have as guests would comment on three things. I've added something. One, when Barak had agreed to sign a letter to President Clinton, he then backtracked on that and refused because I think that he's going to be a puppet of Clinton's. Secondly is the role of Shimon Peres, who ran rings around Rabin and is sort of like a wild card. I believe he was number two man on the list, and I think he's very wily and will outsmart Barak in every single way that he can and is uncontrollable. And third, is Arafat's decision that the UN Resolution 181 supercedes Oslo, Hebron and the Wye agreements. I'd like to listen to what they have to say.

SUAREZ: OK.

Mr. HALEVI: Yes, Lois, yes. I'll take your last question first. I think it's in some ways the most serious. And that is, just for the listeners who don't know what 181 is, that was the UN partition vote in 1947 which awarded statehood both to the Israelis and the Palestinians and offered Israel a substantially reduced state than it actually formed in 1948. So I think that what--one can look at Arafat's invocation of 181 in different ways. If--Israeli left-wingers will say that it's a sign of desperation, and he's using it as a pressure tactic to get Israel to commit--live up to its commitments. Right-wingers will say that Arafat is revealing his true face and we might as well realize that we can't reach an agreement with him even on the basis of the 1967 borders. Now I think if there's anyone whose best positioned to test Arafat's true intentions, it is a pragmatic left-winger like Barak who certainly will not accept anything less than a secure arrangement for Israel, and will manage, I believe, first of all, to come to the negotiations with a very strong majority of Israelis behind him, something which Netanyahu would not have been able to bring to the table. And also an enhanced international status for Israel. So that when Israel will ultimately sit down with the Palestinians for a final settlement, we will be positioned, both internally and externally, to truly test the Palestinians' intentions.

National Public Radio (NPR) May 18, 1999, Tuesday

As far as the role of Shimon Peres, I would rest assured that his role will be largely symbolic. Barak has no particular love for Peres. Peres tried to sabotage Barak early on when he took over the Labor Party, and Barak will pay Peres his due respect, but not much beyond that.

SUAREZ: And, Lisa Breyer, I guess the Clinton administration wanted to leave as little an impression as possible pursuant to Lois' point about her belief that Barak will be a Clinton puppet.

Ms. BYER: Well, I think that paints the administration as perhaps somewhat more neutral in this race than it actually was. It was certainly a feeling among the decision makers who deal with the Middle East in the State Department that they would certainly prefer Barak, and I think there were some subtle and not so subtle efforts to help him along. However, it's sort of a consensus that in the last election, the administration bent over too far in supporting the Labor Party and that, perhaps, it backfired. And so there was some subtlety there. I think that the caller's notion that Barak will be a puppet of Clinton--I'm not really sure what she's basing that on, but certainly, nobody here has seen any evidence of anything like that.

SUAREZ: Lois in Philadelphia, thanks for your call.

Michael is next in West Bloomfield, Michigan. Hi, Michael.

MICHAEL (Caller): Hi. I wanted to ask your guests if they could make any predictions as to what might happen if and when Israel ever gets to final status negotiations with the Palestinians. I've heard an awful lot of speculation that the timetable might be speeded up with the new prime minister. I know the Clinton administration wants final status negotiations to go forward sooner, but I haven't heard anybody make any suggestion as to what kind of compromise might actually be reached that would be acceptable to anything like the substantial fraction of the Israelis and the Palestinians. And I'll take that off the air.

SUAREZ: Michael, thanks for your call. And Michael's point, that there are sort of mutually exclusive views of the future of Jerusalem--it makes you remember why they left it for last. Lisa.

Ms. BYER: I think that any of us that grapple with these issues share that frustration that it really does seem on every level impossible to come to a final agreement on those really sticky issues like Jerusalem, like the future of the settlements, like the borders, like the future rights of the Palestinian entity, whatever it's called, whether it's a state or not. However, it should be said that Israel and the Palestinians have gotten to permanent status negotiations. I mean, technically, they have begun at two various points in the past. They've never gotten very far but, you know, there's no obstacle to starting them up.

And it also should be noted that before the last government fell in 1996 that Abu Mazzen, who is Arafat's--probably his chief lieutenant--and Yosie Bailin, who was then the deputy foreign minister, did not knock out a draft of a final status agreement. It wasn't approved formally by either side, but they did come to solutions or were able to, in places where they couldn't come to final solutions, adopt interim solutions while they continued to discuss certain fine points that at least those who negotiators were able to agree on. And that does give some hope that there are ways to settle these disputes at last.

SUAREZ: Pikesville, Maryland, is next. LeRoy, welcome to the program.

LeROY (Caller): Thank you. I think you guys already answered my question, but I'm kind of pessimistic about a government where the Orthodox may have so much control. I know they had so much control with Netanyahu, and are they really going to have less control now?

SUAREZ: Yossie.

Mr. HELEVY: Well, for the first time in the country's history, we had a new party running called Shinui whose single-issue platform was stopping the ultra-Orthodox.

SUAREZ: And how'd they do?

Mr. HELEVY: They won six seats. They came out of nowhere, which was astonishing. And if you add to those six seats the nine seats of the anticlericalist left wing Meretz party and the anticlericalist Russian party Yisrael ba-Aliya, you have a significant bloc to stop the ultra-Orthodox. Now, again, Barak is going to have to choose. Will he implement his promise to curtail ultra-Orthodox power, or will he be tempted by the stability of a broad government with Shas? And Shas will be a very willing and compliant coalition partner. All you have to do is bribe them. And Shas has risen in

National Public Radio (NPR) May 18, 1999, Tuesday

every election. In '96, they went from six seats to 10 seats. Now they went from 10 to 17. And one of the reasons they've been able to do that is precisely because of their access to almost unlimited government funding. If Barak repeats the mistakes of his predecessors, then, yes, there is serious reason to worry for the future of Israel.

SUAREZ: LeRoy in Pikesville, Maryland, thanks for your call.

We'll go next to New Hampstead, New York. Saul, welcome.

SAUL (Caller): Yeah, hi, Ray. I really see the election as a repudiation of Netanyahu, who succeeded in three years in destroying what Begin built up in 30. He managed to slice off the right wing with Benny Begin and the left center wing by his abrasive personal politics and firing Mordechai. So he really destroyed himself by his basically obnoxious behavior. Truth is, he had a difficult job. He had to walk a fine line between inheriting Oslo from Rabin and not giving away land, which was sort of his right-wing mandate. But the thing that concerns me most in this election is that I see it as the cleavages in Israeli society, although Barak himself personally won a victory, the Labor Party only has 27 seats of its own. So that is actually quite small, maybe the smallest it's been.

And the Shas Party--I do disagree with Mr. Helevy that it wasn't a case of bribery. My sense is that though the Shas Party is nominally a haraidy(ph) religious swarty(ph) party, they didn't get those seven seats from haragin, they got those seven seats from traditional Sephardic who are not completely religious but who will not vote for the Ashkenazi Labor Party, who they believe has done terrible things to them over the years. And, again, that highlights the cleavages in society which still remain the Ashkenazin vs. Sephardim, the religious vs. the non-religious.

So I guess my question is, is even though the Shas is now the third largest party, how will Barak make a government without them? And if he does, that's going to put him in direct conflict with Sharansky's party because they both want the interior ministry, and it's going to be a very tough thing for him. I just wanted to hear what they would say about that.

SUAREZ: Well, Yossie, why don't you--Saul has a little difference of opinion with you. Maybe you could talk it out with him.

Mr. HELEVY: Yeah, look    )ur point is well-taken, that certainly, the majority of Shas voters are not ultra-Orthodox. Shas is drawing on several sources. One is ethnic rage. And I would add legitimate ethnic rage toward the largely Ashkenazi elite. Although one has to temper that by noting that in recent years, the position of swarty in Israeli society has gotten considerably better. This is--in fact, in this last Cabinet, Netanyahu's Cabinet, for the first time, swarty were actually 50 percent of Cabinet ministers. So that--what Shas is doing is in a sense setting back swarty progress into mainstream Israel by encouraging an almost antiquated ethnic rage, an archaic ethnic rage, and putting the swarty back into a ghetto, this time an ultra-Orthodox rather than ethnic ghetto, but a ghetto nonetheless. Swarty kids in Shas schools are not being equipped to cope with the modern, high-tech economy. They're being taught a kind of Judaism that will not prepare them for integration into modern Israel. And Shas is first and foremost a tragedy for (technical difficulties). Today in a more pluralistic Israel, Shas ironically has turned into the greatest impediment for swarty integration and success.

SUAREZ: Lisa Byer, how are the parties describing their own showings today? I mean, you've got winners and losers. Even on the losing side, there are, like Shas, some winners. How do they describe themselves to the rest of society?

Ms. BYER: Well, Shas is unbelievably jubilant. I mean, the celebrations at the Shas headquarters certainly last night equaled if didn't exceed the celebrations at the Barak headquarters. In the Likud, obviously, they're, you know, mortified and confused and virtually unconscious. Some of the other parties, more or less, did as they thought they'd do, aside from the secular party that Yossie mentioned, Shinui, which is, again, delighted.

SUAREZ: I'm Ray Suarez. You're listening to TALK OF THE NATION from NPR News.

And Penina Rosenblum?

Ms. BYER: She didn't make it.

SUAREZ: Oh, man, she had the best-looking posters, that's for sure. (800) 989-8255. Let's get a comment from--oh, he just dropped off. Where do things stand right now? Forty-five days to form a government, but Mr. Barak is prime minister. We should refer to him as the prime minister, Lisa?

9

National Public Radio (NPR) May 18, 1999, Tuesday

Ms. BYER: No, he's not the prime minister yet. He's the prime minister-elect until he forms a government. And he should be able to do that very quickly, except that presumably, he might want to get into negotiations with the Likud about some sort of--he doesn't want to call it a national unity government, but a government anyway that would include the Likud, and the Likud doesn't have a leader at the moment. Netanyahu is the leader of the Likud, but he's announced his intention to resign, and it's going to take some time for the Likud to get organized to elect a successor, which means that at the moment, Barak doesn't have anybody to talk to over there.

SUAREZ: And the president is the one who summons the person leading the largest coalition to form a government?

Ms. BYER: It doesn't work that way anymore. That's the old system. The new system is that the prime minister is directly elected, and so the president doesn't need to summon anyone. It's determined by the voters.

SUAREZ: OK. You're listening to TALK OF THE NATION. I'm Ray Suarez. My guests are Lisa Byer, who you just heard, and Yossie Klein Helevy. We're going to take a short break right now. When we return, we'll continue talking about how the election of the new Israeli prime minister, Ehud Barak, will affect Israeli politics and the Middle East peace process, and we'll take more of your calls at (800) 989-8255. You can comment on the program by e-mail at totn@npr.org. Or send us a card or letter. The address: TALK OF THE NATION Letters, 635 Massachusetts Avenue, Northwest, Washington, DC 20001.

At 40 minutes past the hour, it's TALK OF THE NATION from NPR News.

(Announcements)

SUAREZ: Welcome back to the program. I'm Ray Suarez. Tune in at this time tomorrow for a look at video games and violence. Are they connected in ways that we can really demonstrate or are we just guessing? And Thursday, the May meeting of the TALK OF THE NATION Book Club of the Air, "Down and Out in Paris and London" by George Orwell, a really stunning book about living rough, as they called it, in Britain in the '30s and Orwell's non-fiction contribution to a tremendous body of work. There's still plenty of time to read the book if you pick it up today. By Thursday, this hour, TALK OF THE NATION bookclub of the air, "Down and Out in Paris and London."

Today we're talking about the results of the Israeli election and what the future holds for both Israel and the prospects for peace. My guests are Lisa Byer, Jerusalem bureau chief for Time magazine, and Yossie Klein Helevy, senior writer for Jerusalem Report, a biweekly newsmagazine in Israel. If you want to join the conversation, our number here is (800) 989-8255.

Toby writes, I hope the new prime minister will be able to stand up to the US, both from the government and from US Jewish groups. Our lives and families in the US are not on the line. The people of Israel are. Israel has a right to self-determination. The US' ability to protect Israel and enforce any peace agreement is in serious question given US and NATO performance in Somalia and Kosovo.'

And Jay writes, I'm very excited about the Barak victory in Israel and I'm glad you're having a discussion about the election results. However, Ray, was it necessary to interview a Palestinian representative when speaking about an internal Israeli matter? You might have instead asked for the comments of the Israeli Arab who ran for prime minister of Israel. Do you even know his name?'

Well, I believe his name is Dr. Bashara(ph), but--I think that's his name.

Next time you have a program about an Arab states holding free and fair elections, please make sure you invite an Israeli spokesman to comment on the internal affairs of that nation's elections. What's fair for the goose--enjoy your shows most of the time.'

Well, I guess if and when Israel ever holds such a direct stake in and has an effect on the lives of, I don't know, Tunisians, Moroccans, the way it does on Palestinians, I guess your idea and suggestion will be very much appropriate.

Daniel writes from Minneapolis, The thing that I as a non-Jewish American am most interested in is the impact of James Carville in the Israeli elections. While it is true that he did not originate the idea, Mr. Carville did raise the practice of campaign by 30-second TV commercial to a new level of art in the 1992 election. I wonder how the people of Israel have responded to our replacing their traditionally substantive debate with our own country's practice of meaningless sound bites and nonsensical drivel?'

National Public Radio (NPR) May 18, 1999, Tuesday

Well? How did it go over, Lisa?

Ms. BYER: Well, typically, it went over with a certain sense of superiority and disdain. But at the same time, it was incredibly effective. I mean, there were some polls that showed that virtually every approach that Carville and his team used worked enormously well, not just the short campaign ads, which, by the way, Netanyahu was the one to introduce in the last election. That wasn't something that Carville needed to bring here. It was already...

SUAREZ: And Netanyahu also had an American media adviser.

Ms. BYER: That's right, Arthur Finkelstein(ph). But the Carville team was able to transform Barak from what one commentator called a constipated potato into a very eloquent talking head. They didn't let him get on live TV very much. They didn't let him debate Netanyahu, you know, one on one because they knew that Netanyahu had an advantage on television. But when they had him speaking in their campaign ads, he looked beautiful.

SUAREZ: Well, was there complaining, Yossie, similar to that, that you heard in recent Israeli elections about the Americanization of Israeli politics?

Mr. HELEVY: Well, there's no country that complains more about Americanization and loves America as much as Israel. And, yes, there are complaints. I think some of the complaints are well-founded in that we are debating life-and-death issues here, and almost every issue in Israeli politics somehow becomes an issue of survival. And the frivolity of the American approach to campaigning is something that seems to me out of sync with the gravity of the issues we're facing.

SUAREZ: Let's go next to Seattle. Zamir(ph), welcome to the program.

ZAMIR (Caller): Yes, sir, thanks for taking my call. I have little concern, you know, about the Muslim living in different part of the world. That third, you know, holiest Muslim shrine lives in Jerusalem, from there the holy prophet Muhammad Sarefsalon(ph) was descended to the heaven. And now they talk about the--What you say, capital?--making Palestinian capital in Jerusalem, this and that. But they never mention, you know, this thing that Muslim cannot visit that holy place freely since ...(unintelligible) many, many years. So is there anything going on in Barak, you know, government that they will let the Muslim to come over there and visit that holy place? That's all.

Mr. HELEVY: Yes, Zamir, I appreciate your point. I would say that in terms of Palestinians, Muslims living in Jerusalem and in Israel proper, there is completely free access. The question is really for West Bank Palestinians and Gaza Palestinians, and there, it is more an issue of security considerations than anything else. For many years, there was free access from the territories to the mosques on the Temple Mount in Jerusalem. And that began to change after the suicide bombings by the Hamas fundamentalists in 1996, when security considerations began to really pre-empt other issues, other considerations. I think that Barak will be very sensitive to issues of religious freedom, and the truth is that on the Temple Mount itself, Israel has, since 1967, given free reign to Muslim authorities. In fact, it restricts Jewish prayer. The Temple Mount is also the holiest site for the Jewish people, and yet, though, successive Israeli governments have wisely deferred to Muslim sensitivities and allowed the Wak Fee(ph), Muslim religious trust, to determine who may pray and who may not pray on the mount.

SUAREZ: But isn't that also made a little less complicated by the fact that very many pious Jews won't step onto the mount for fear or standing on the spot on the Holy of Holies? I mean, it's not like they're lining up, waiting to get up into there, into the precincts of the dome.

Mr. HELEVY: In fact, there are religious groups that are precisely doing that. They are lining up outside the door. And they're stopped by the Israeli police. There is a growing movement within the religious community--not the ultra-Orthodox. What you said applies certainly to the ultra-Orthodox. But to religious nationalists and especially West Bank settlers, the Temple Mount is a very keen goal, almost an obsession so that I think there's a growing movement among religious Jews demanding the right to pray on the Mount, and hopefully, the Israeli government will continue to resist the temptation.

SUAREZ: Zamir in Seattle.

Ms. BYER: If I may pitch in on this, Ray.

SUAREZ: Go ahead, Lisa.

11

National Public Radio (NPR) May 18, 1999, Tuesday

Ms. BYER: In the draft of the final peace settlement that I mentioned earlier that was put together by Abu Mazzen and Yosie Bailin, one of the first acts toward settling the Jerusalem question under this plan that Israel would actually seek sovereignty at the Temple Mount. I know it's hard to believe but that's in the plan. I checked it myself.

SUAREZ: Wow.

Mr. HELEVY: And, Lisa, I think that's a position that the overwhelming majority of Israelis would accept.

Ms. BYER: You do?

Mr. HELEVY: Yes. Yes, yes, I do. Aside from the hard-core religious community, 20 or 30 percent, strong majority would--in exchange for continued Israeli political control over united Jerusalem, we will compromise on the religious status of Jerusalem. And I think that's really the equation that has a chance of working.

SUAREZ: I'm Ray Suarez. You're listening to TALK OF THE NATION from NPR News.

St. Paul, Minnesota's, next. Anna, welcome to the program.

ANNA (Caller): Hi. I wanted to get the guests' thoughts about the prospect of negotiating with Syria concerning the Golan Heights. And also, do they think that an agreement will emerge? And how does the Israeli public feel about a possible agreement with Syria on the Golan Heights?

SUAREZ: Good question.

Ms. BYER: There was a party in this campaign called The Third Way which was represented in the previous Knesset, and this time, they focused their entire campaign on the Golan Heights. And the campaign was basically, If you care about the Golan Heights, vote for us. Only we will protect the Golan Heights and keep future governments from giving it back to Syria.' They got trounced. They got run out of the Knesset. They didn't win a single seat. Now it's not exactly a fair referendum on the Golan Heights question because there weren't that many voters who wanted to vote only on that issue. But by putting it in that way, you know, obviously, they invite the conclusion that Israelis really don't particularly care about keeping the Golan Heights. Ehud Barak has voiced in the past when he was a military man his concerns about giving up the Heights for security reasons, but I think since he's become a politician, he's considerably mellowed on that issue, and I think that we can more or less assume that he will take the position that the Labor Party has taken in recent years, which is that if adequate security arrangements can be made with the Syrians and if they're willing to have a real, true, contractual peace, the Syrians with Israel, that the Golan Heights is Syria's for the asking.

SUAREZ: Yossie, how important is the passing of Hafez Al-Assad to bringing that process forward? How potent is he as a symbol of just the kind of people that Israel's had a terrible time doing business with in the past 40 years?

Mr. HELEVY: Well, I think if you ask--I have to strongly disagree with Lisa on this. I think that sentiments for the Golan runs very deep in Israel, and if The Third Way was voted out, it was simply because Barak had promised the electorate that any withdrawal from the Golan would be preceded by a national referendum so that we would get our chance to vote on the Golan. I think if you asked the person on the street today whether Israel should cede the Golan Heights to an aging, sick, perhaps deathly ill Syrian dictator, I would suspect that the strong majority would say no. The Golan provides 30 percent of Israel's water sources, a substantial sense of security for Israelis. And we also don't have an occupation problem on the Golan in terms of the Palestinians. We're not occupying another people. The Golan is largely empty. There are just about as many Jews living on the Golan as there are Drus. There are about 18,000 Drus and 16,000 Jews. So that the Golan is not a moral issue. It is purely a strategic question. And here, I think there's a very, very deep Israeli reluctance to trust the Syrians of all people in the Middle East, to be sitting on top of us once again as they did before the '67 war and turned our lives into hell when they were sitting up on the Golan.

SUAREZ: And how does peace or not peace over the Golan with Syria fit into a wider picture of the region that might include pulling back from that security zone in South Lebanon, Lisa?

Ms. BYER: Well, they're probably, unfortunately, absolutely linked. I mean, there has been a lot of discussion in Israel lately about a unilateral withdrawal from Lebanon. In other words, instead of waiting to get Lebanon's agreement to move into the area that Israel now occupies, an agreement that Lebanon could not give without serious permission, the idea would be that Israel would simply on its own pull out and hope for the best. Barak doesn't seem to subscribe to that idea. He's not at all convinced of it. His notion is that Israel will get out of Lebanon through negotiations, and those

12

National Public Radio (NPR) May 18, 1999, Tuesday

negotiations necessarily have to go through Syria because Syria is the overlord of Lebanon and, so far, sees no reason to allow Israel to escape from the quagmire of South Lebanon.

SUAREZ: Well, callers, thanks for waiting patiently and thanks for joining us, all of you, but we have more callers than time this hour. That's all the time for today.  I'd like to thank everyone who wrote, everyone who called and especially my guests.  Lisa Byer, good to talk to you.

Ms.  BYER: Thank you very much.

SUAREZ: Lisa Byer is Jerusalem bureau chief for Time magazine.  She spoke to us from her home in Jerusalem. And, Yossie Klein Helevy, great to have you with us.

Mr.  HELEVY: Well, nice to be with you.

SUAREZ: Yossie Klein Helevy is senior writer for Jerusalem Report, a biweekly newsmagazine.  He joined us from NPR's Jerusalem bureau. Earlier, we spoke with Hasan Abdel Rahman, chief PLO representative in Washington.

And in Washington, I'm Ray Suarez, NPR News.

**LOAD-DATE:** May 19, **1999**

FOCUS - 4 of 8 DOCUMENTS

Content and programming copyright 1999 Cable News Network Transcribed under license by Federal Document Clearing House, Inc. Formatting copyright 1999 Federal Document Clearing House, Inc. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to Cable News Network. This transcript may not be copied or resold in any media.
CNN

**SHOW:** CNN CROSSFIRE 19:30 pm ET

May 17, **1999;** Monday 7:30 pm Eastern Time

Transcript # 99051700V20

**TYPE:** SHOW

**SECTION:** News; International

**LENGTH:** 1801 words

**HEADLINE:**  Can Ehud Barak Bring New Hope to the Mid-East Peace Process?

**GUESTS: LEXIS-NEXIS Related Topics** Full Article  Related Topics Overview

This document contains no targeted Topics.

**BYLINE:**  Bill Press, Robert Novak

**HIGHLIGHT:**
 Today's election for prime minister was a landslide for the Labor candidate, Ehud Barak, a war hero and a peace advocate.  Exit polls gave the 57-year-old General Barak as much as 58-and-a-half percent against the incumbent, hard-line Prime Minister Benjamin Netanyahu, whose political career is in ruins at age 49.

**BODY:**

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

(BEGIN VIDEO CLIP)

EHUD BARAK, ISRAELI PRIME MINISTER-ELECT: I hope that we are at the first step for unity, change and new hope for Israel.

(END VIDEO CLIP)

ROBERT NOVAK, CO-HOST: Tonight, Israel elects a new prime minister.  Can Ehud Barak bring new hope to the Mid-East peace process?

ANNOUNCER: Live from Washington, CROSSFIRE.  On the left, Bill Press.  On the right, Robert Novak.  In the crossfire, the Palestine Liberation Organization's chief representative to the United States, Hasan Abdel Rahman and Democratic Congressman Eliot Engel of New York.

CNN CROSSFIRE, May 17, 1999

NOVAK: Good evening. Welcome to CROSSFIRE.

For once, the Israelis didn't have a cliff hanger. Today's election for prime minister was a landslide for the Labor candidate, Ehud Barak, a war hero and a peace advocate. Exit polls gave the 57- year-old General Barak as much as 58 and a half percent against the incumbent, hard-line Prime Minister Benjamin Netanyahu, whose political career is in ruins at age 49.

Just one hour after the polls closed, Netanyahu conceded defeat and resigned as head of the conservative Likud Party.

Does this mean a legitimate new push for a final settlement between Israel and the Palestinians or will there be the same old stalemate with a smiling new face in Jerusalem? That's our crossfire. Bill?

BILL PRESS, CO-HOST: Mr. Rahman, during the campaign, Benjamin Netanyahu's supporters used a slogan, "If Barak wins, Yasir Arafat wins." Did Yasir Arafat win today?

HASAN ABDEL RAHMAN, PLO CHIEF REPRESENTATIVE TO U.S.: I think peace won today because hopefully Barak will carry on the mandate that was given to him by the Israeli public. We understand the results of the election today to mean a plebiscite on the peace process and a vote against the policies of Mr. Netanyahu, which froze the agreements that we -- and reneged on them -- that were signed between the Palestinians and Israel. PRESS: Well, Chairman Arafat said earlier yesterday that his message to the Israelis was elect the peace. Now, that's not so subtle. So surely the PLO wanted Barak to win because you believe, don't you now with this election, with this victory that a Palestinian state is imminent?

RAHMAN: Well, the behavior of Mr. Netanyahu over the last three years have been very disappointing not only to the Palestinians, but to the Arabs, to the United States and to the world as a whole. Here displayed a total disregard for agreements and for peace and that's why the Palestinians were very, very disappointed and they are happy to see a change in Israel, hoping that this change will bring the opportunity to pursue the peace process and continue on the path of peace.

NOVAK: Congressman Engel, as an American congressman, but a good friend of Israel, you were neutral in this election, as the White House was. But you know and I know that they're dancing in the aisles at the State Department and the White House over the victory of General Barak. Are you dancing?

REP. ELIOT ENGEL (D), NEW YORK: Well, I'm not dancing. I mean I...

NOVAK: Are you happy?

ENGEL: I feel -- well, I'm happy because I hope that this will mean a new beginning and peace. I have never supported any candidate for prime minister of Israel. I've supported a good relationship between the U.S. and Israel and I think that that relationship has to transcend whoever happens to be president of the United States at the time or prime minister of Israel. But I think it's very important that now there's a new prime minister and there's hopefully a new beginning. And I think both sides have a chance to give peace a chance.

NOVAK: Congressman, "The Washington Post" journalist Molly Wainruth (ph), who knows Israel very well, said, wrote recently of Prime Minister Netanyahu, "He has succeeded in bringing the U.S. - Israeli relationship to one of its all time low points." That's true, isn't it?

ENGEL: No, I think that's a little harsh. I mean I think there have been disagreements. Look, the Israeli side, and I think pretty much on both sides, will say that the Palestinians haven't really lived up to a lot of the accords. The Palestinians will say the Israelis haven't lived up to the accords. I think, quite frankly, both sides have a great opportunity now to put their heads together and push peace along.

NOVAK: Now, there's no question that Prime Minister Netanyahu was against a Palestinian state and it's pretty clear that General Barak has opened the door to a Palestinian state. A lot of people think it's inevitable now. What do you think?

ENGEL: Well, it might be inevitable. The question is what kind of a Palestinian state. Is it a state that will be demilitarized? Is it a state that will allow other states to come in and station troops? I think this is part of the negotiating process. I think that the Palestinian people...

CNN CROSSFIRE, May 17, 1999

RAHMAN: I think this is...

ENGEL: ... are entitled to the same hopes and aspirations that all people have. But I think the Israeli people are entitled to security and that's what they feel they haven't been getting from the Palestinian Authority.

PRESS: Mr. Rahman?

RAHMAN: Two points. One is that the Palestinians have not lived to their commitments and I believe that we are on record that we have implemented almost everything that we were supposed to importantly from the Wye River agreements and the State Department and the White House testifies to that. Second, on the issue of the Palestinian state, I think that the right to self-determination and national independence is a basic, in fact, inalienable right and should not be a subject of negotiations because what is the alternative to independence and to the establishment of an independent Palestinian state? It is occupation.

So, who wants the Palestinians to continue to live under Israeli occupation? I believe that 30 years of occupation is more than enough and it is time for the Palestinian people to exercise that right and live as an independent nation in an independent state next to Israel in peace and harmony.

PRESS: I think what...

ENGEL: You were saying that the Palestinians have implemented every aspect of the agreement. In reality they haven't. I mean Israel's main security needs are very important to everyone in Israel and the fact of the matter is that the Palestinian Authority has not gone after the Hamas infrastructure, has not systematically tried to eradicate Hamas. That has been a real problem.

They have individually at times when the Israelis can point out certain people that are there done it. But in terms of rooting out, going after the infrastructure, that was agreed to at Wye. That hasn't been implemented. There are many, many weapons, way over what's supposed to happen. Those were supposed to have been eliminated, in Palestinian hands. That hasn't been implemented. The Palestinian police numbers are way over what was agreed to at Wye. That was supposed to be reduced. That hasn't been implemented.

So I think on the Israeli side there are a lot of serious concerns and the Palestinians have to address this.

NOVAK: Mr. Rahman?

RAHMAN: I believe that the problem with what you are saying is that you are uncritically repeating the slogans raised by Mr. Netanyahu as a pretext in order not to implement his side of the agreement.

ENGEL: Net...

RAHMAN: Let me finish, please...

ENGEL: No pretext...

PRESS: Let him...

RAHMAN: ... because I, I waited for you so I think that you should wait for me to finish what I am saying. We have implemented, there are items in the agreement that need time to be implemented and they are continuously being implemented. When you say that to destroy the infrastructure of Hamas, what do you mean? Are we going to go after the schools that Hamas owns? Are we going to go after the kindergartens that Hamas runs? Or are we...

ENGEL: Go after the terrorist cells...

RAHMAN: ... we...

ENGEL: ... after the terrorist cells.

RAHMAN: We have done that and we have...

ENGEL: No you haven't.

RAHMAN: We did not do that because of Israel. We do that because we believe that security and fighting terrorism and violence is in the interests of the Palestinian people.

PRESS: Can I raise a couple of specifics?

CNN CROSSFIRE, May 17, 1999

RAHMAN: Yes.

PRESS: Because to think that all the issues have been resolved is just, you know, Alice in Wonderland. We heard that tonight rockets from southern Lebanon are striking the northern part of Israel. Ehud Barak said that Israel would withdraw from southern Lebanon within a year of his election. I mean is that realistic now and do you expect Israel to do that when there are still rockets hitting Israeli villages?

RAHMAN: First of all, we have to remember that the south of Lebanon is occupied by Israel. It's occupied by the Israeli troops.

ENGEL: A very small part is occupied.

RAHMAN: What do you -- regardless, there is part of the south Lebanon that is occupied by Israel.

ENGEL: All of Lebanon is occupied by Syria.

RAHMAN: When do you expect, what do you expect...

ENGEL: Syria occupies all of Lebanon. Lebanon doesn't make a move unless Syria gives its agreement.

RAHMAN: ... with the acquiescence of the Lebanese. That's an agreement.

ENGEL: Oh, no.

RAHMAN: The Lebanese people are saying to the Israelis get out of our country.

NOVAK: I want to ask Mr. Rahman one quick thing. There's no question that General Barak agrees with Prime Minister Netanyahu on one thing, Jerusalem must be an undivided capital for Israel. Is that a deal breaker?

RAHMAN: Absolutely. It is unacceptable to us because Jerusalem -- let me finish -- Jerusalem was occupied by Israel in 1967. The letter of assurances from the United States government to the Palestine Liberation Organization in 1991 stipulates clearly that the United States does not accept the annexation of Jerusalem, does not accept any...

PRESS: Congressman?

ENGEL: Yes?

PRESS: Very quickly. Very quickly.

ENGEL: Mr. Rahman, I wish the Palestinian people well, but Jerusalem will always remain the undivided capital of Israel.

RAHMAN: Why? Jerusalem is a Palestinian...

PRESS: Come back and we'll debate that, gentlemen.

RAHMAN: Why?

PRESS: Mr. Hasan Rahman, thank you very, very much for joining us. Sorry we have to cut things short tonight.

RAHMAN: Thank you.

PRESS: Thank you, congressman, for coming in. And that's it for CROSSFIRE. From the left, I'm Bill Press. Good night for CROSSFIRE.

NOVAK: From the right, I'm Robert Novak. Join us next time for another edition of CROSSFIRE.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

**LOAD-DATE:** May 17, 1999

FOCUS - 6 of 8 DOCUMENTS

Copyright **1999** Video Monitoring Services of America, L.P.
Video Monitoring Services of America

**SHOW:** The Early Edition of Eyewitness News

April 27, **1999**, Tuesday AM

**NETWORK:** WWL-TV

**MEDIUM:** Television

**TYPE:** Television

**LENGTH:** 113 words

**BODY:**
START: 38.55

Teased Segment - Yassar Arafat.  The U.S. is trying to keep Yassar Arafat from declaring an independent state next week on May 1st.
Graphic - Photo of Yassar Arafat.
Visual - Yassar Arafat.
Visual - President Clinton and Yassar Arafat.
Visual - White House.
Interview - Joe Lockhart, White House Spokesman, talked about the U.S. efforts.
Visual - Palestinian Council.
Visual - President Clinton in Gaza.
Interview - Hasan Abdel Rahman, PLO Representative, talked about the establishment of a state.
Interview - Zalman Shoval, Israeli Ambassador, talked about the affect on the peace process. Andrea Koppel reporting.
END: 41.15

**SEGMENT-ID:** 33

**PROGRAM-ID:** wwl05000427

**LOAD-DATE:** May 28, **1999**

FOCUS - 7 of 8 DOCUMENTS

Content and programming copyright **1999** Cable News Network Transcribed under license by Federal Document Clearing House, Inc. Formatting copyright **1999** Federal Document Clearing House, Inc. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to Cable News Network. This transcript may not be copied or resold in any media.

CNN

**SHOW:** CNN WORLDVIEW 18:00 pm ET

April 26, **1999**; Monday 6:23 pm Eastern Time

Transcript # 99042602V18

**TYPE:** PACKAGE

**SECTION:** News; International

**LENGTH:** 451 words

**HEADLINE:** Clinton Administration Tries to Avert Crises in Israeli/Palestinian Negotiations

**GUESTS: LEXIS-NEXIS Related Topics** Full Article  Related Topics Overview

This document contains no targeted Topics.

**BYLINE:** Judy Woodruff, Andrea Koppel

**HIGHLIGHT:**
President Clinton has sent a letter to Palestinian leader Yasser Arafat in an attempt to avert a crisis in the Middle East peace negotiations. Yasser Arafat will make a decision in the coming days as to whether or not to declare an independent Palestinian state.

**BODY:**

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

(JOINED IN PROGRESS)

JUDY WOODRUFF, CNN ANCHOR: ... to prevent Palestinian Leader Yasser Arafat from declaring an independent state next week.

CNN State Department correspondent Andrea Koppel reports.

(BEGIN VIDEOTAPE)

ANDREA KOPPEL, CNN CORRESPONDENT (voice-over): For years, the threat he might unilaterally declare a Palestinian state on May 4th has been Yasser Arafat's ace in the hole.  A historic peace agreement between the Israelis and Palestinians signed almost six years ago set May 4th as the date when all issues would be resolved.

But now, with only one week remaining before the Oslo Peace Accord expires, and with the most important issues outstanding, the United States has stepped in to try to avert a potential crisis in the Middle East.

JOE LOCKHART, WHITE HOUSE PRESS SECRETARY: The United States calls on both parties to engage in accelerated permanent status talks, status negotiations, and to rededicate themselves to the goal of reaching an agreement within a year.

KOPPEL: That's one of many points the White House says President Clinton made in a timely letter sent to Arafat Monday; timed to reach Arafat before the Palestinian Central Council meets on Tuesday to decide whether to declare a state May 4th. CNN has learned President Clinton's letter also reiterated a key message of a speech he delivered in Gaza last December.

WILLIAM J. CLINTON, PRESIDENT OF THE UNITED STATES: Before you the opportunity to shape a new Palestinian future on your own land.

HASAN ABDEL RAHMAN, PLO REPRESENTATIVE TO U.S.: This means, in our view, that the United States supports the right of self- determination for the Palestinian people. And the right of self- determination includes the establishment of a state.

KOPPEL: U.S. officials, however, deny the U.S. is moving to support Palestinian independence, and say that's a matter to be negotiated by the two parties. ZALMAN SHOVAL, ISRAELI AMB. TO U.S.: If they did declare a state unilaterally, it would have been a disaster, not just for the peace process, but for themselves.

KOPPEL (on camera): Senior administration officials say Chairman Arafat Has indicated he is satisfied with the president letter, but a final decision on a declaration of statehood won't come until Tuesday. In the meanwhile President Clinton has indicated he will host another Israeli/Palestinian summit in six months which officials say underscores that remaining negotiations should not be opened ended.

Andrea Koppel, CNN at the State Department.

(END VIDEOTAPE)

TO PURCHASE A VIDEOTAPE OF THIS PIECE, PLEASE CALL 800-CNN-NEWS

**LOAD-DATE:** April 26, 1999