UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
THE ESTATES OF YARON UNGAR and      :
EFRAT UNGAR by and through the      :
Administrator of their estates      :
David Strachman, DVIR UNGAR, minor, :
by his guardians and next friend,   :
YISHAI UNGAR, minor, by his         :
guardians and next friend,          :
PROFESSOR MEYER UNGAR, JUDITH       :
UNGAR, RABBI URI DASBERG, JUDITH    :
DASBERG (individually and in their  :
capacity as legal guardians of      :
plaintiffs Dvir Ungar and Yishai    :
Ungar); AMICHAI UNGAR, DAFNA UNGAR  :
and MICHAL COHEN,                   :
                        Plaintiffs, :
        v.                          :        CA 00-105L
                                    :
THE PALESTINIAN AUTHORITY           :
(A.K.A."THE PALESTINIAN INTERIM     :
SELF-GOVERNMENT AUTHORITY"),        :
THE PALESTINE LIBERATION            :
ORGANIZATION, YASSER ARAFAT,        :
JIBRIL RAJOUB, MUHAMMED DAHLAN,     :
AMIN AL-HINDI, TAWFIK TIRAWI,       :
RAZI JABALI, HAMAS -- ISLAMIC       :
RESISTANCE MOVEMENT (A.K.A.         :
"HARAKAT AL-MUQAWAMA AL-ISLAMIYYA"),:
ABDEL RAHMAN ISMAIL ABDEL RAHMAN    :
GHANIMAT, JAMAL ABDEL FATAH         :
TZABICH AL HOR, RAED FAKHRI ABU     :
HAMDIYA, IBRAHIM GHANIMAT and       :
IMAN MAHMUD HASSAN FUAD KAFISHE,    :
                        Defendants. :
```

## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

Before the court are three motions: 1) Plaintiffs' Motion
Pursuant to Fed.R.Civ.P. 37(b)(2) for Judgment by Default against
Defendant PA and for Other Relief ("First Motion for Default
Judgment" or "First Motion") (Document #106); 2) Plaintiffs'

269

Motion for Judgment by Default 1gainst the PA and PLO and for Other Relief for Refusal to Submit to Depositions ("Second Motion for Default Judgment" or "Second Motion") (Document #125); and 3) Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Third Motion for Default Judgment" or "Third Motion") (Document #168) (collectively the "Motions for Default Judgment"). These motions have been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.R.I. Local R. 32(a). Hearings on the motions were held on May 14, 2003, July 14, 2003, and August 22, 2003. After listening to oral argument, reviewing the memoranda and exhibits submitted, and performing independent research, I recommend that the First and Third Motions be granted, that the Second Motion be granted in part and denied in part, and that default judgment be entered against Defendants the Palestinian Authority, also known as the Palestinian Interim Self-Government Authority ("PA"), in the amount of $116,421,048.00, including attorney's fees, and against the Palestine Liberation Organization ("PLO") in the amount of $116,415,468.00, including attorneys fees.

### Index

I.   Case Statement . . . . . . . . . . . . . . . . . . . 4
II.  Facts . . . . . . . . . . . . . . . . . . . . . . . 5
III. Parties . . . . . . . . . . . . . . . . . . . . . . 6
IV.  Amended Complaint . . . . . . . . . . . . . . . . . 7
V.   Travel . . . . . . . . . . . . . . . . . . . . . . 11
     A. Response to Complaint . . . . . . . . . . . . . 11
     B. Response to Amended Complaint . . . . . . . . . 12
     C. Discovery Initiated . . . . . . . . . . . . . . 13
     D. Discovery Stayed . . . . . . . . . . . . . . . . 14

    E.   Default Judgment Against Hamas . . . . . . . . . 15

    F.   Discovery Stay Terminates . . . . . . . . . . . 17

    G.   Motion to Compel Discovery . . . . . . . . . . 18

    H.   Motion for Reconsideration of Discovery Order . . . . 20

    I.   Entry of Default against Palestinian Defendants . . . 22

    J.   First Motion for Default Judgment . . . . . . . . 23

    I.   Second Motion for Default Judgment . . . . . . . 24

    J.   May 14, 2003, Hearing . . . . . . . . . . . . 24

    K.   Third Motion for Default Judgment . . . . . . . . 27

    L.   July 14, 2003, Hearing . . . . . . . . . . . 29

    M.   Post July 14, 2003, Filings . . . . . . . . . . 29

    N.   August 22, 2003, Hearing . . . . . . . . . . 30

    O.   Post August 22, 2003, Filings . . . . . . . . . 32

**VI. Jurisdiction** . . . . . . . . . . . . . . . . **32**

    A.   Introduction . . . . . . . . . . . . . . . 32

    B.   Subject Matter Jurisdiction . . . . . . . . . . 33

    C.   Personal Jurisdiction . . . . . . . . . . . . 36

        1.   Minimum Contacts . . . . . . . . . . . . 38

        2.   Defendants' Arguments Re Minimum Contacts . . . 44

        3.   Service of Process . . . . . . . . . . . 50

            a.   Judge Lagueux's Findings . . . . . . . 50

            b.   Law of the Case . . . . . . . . . . 51

            c.   Magistrate Judge's Findings . . . . . . . 51

                1) PA and PLO are Unincorp. Associations . 51

                2) Hasan Abdel Rahman is Agent of PA & PLO 52

                    i.  Recently Obtained Evidence . . . 52

                    ii. Other Evidence . . . . . . . 56

                3) Marwan Jilani . . . . . . . . . . 57

        4.   Conclusion Re Personal Jurisdiction . . . . . 58

**VII. The Motions for Default Judgment** . . . . . . . . . . . **58**

    A.   First Motion . . . . . . . . . . . . . . 58

    B.   Second Motion . . . . . . . . . . . . . . 59

        1.   Applicability . . . . . . . . . . . . . 59

        2.   Basis for Second Motion . . . . . . . . . 60

C.    Law Applicable to First and Second Motions . . . . . 60
D.    Application of Law to First and Second Motions . . . 62
E.    Third Motion . . . . . . . . . . . . . . . . . . . . 68
F.    Law Applicable to Third Motion . . . . . . . . . . . 68
G.    Application of Law to Third Motion . . . . . . . . . 69
VIII  **Liability** . . . . . . . . . . . . . . . . . . . . . **70**
IX.   **Damages** . . . . . . . . . . . . . . . . . . . . . . **71**
A.    "Survivors" and "Heirs" . . . . . . . . . . . . . . 71
B.    Measure of Damages . . . . . . . . . . . . . . . . . 71
C.    Evidence of Damages . . . . . . . . . . . . . . . . 71
D.    Treble Damages . . . . . . . . . . . . . . . . . . . 73
E.    Israeli Law Claims . . . . . . . . . . . . . . . . . 74
F.    Interest . . . . . . . . . . . . . . . . . . . . . . 74
X.    **Attorney's Fees** . . . . . . . . . . . . . . . . . . **74**
XI.   **Summary** . . . . . . . . . . . . . . . . . . . . . . **76**
XII.  **Conclusion** . . . . . . . . . . . . . . . . . . . . . **77**
Appendix . . . . . . . . . . . . . . . . . . . . . . . . . 79
A.    Letter of 11/21/02 . . . . . . . . . . . . . . . . . 79
B.    Letter of 7/22/03 . . . . . . . . . . . . . . . . . 81
C.    Letter of 7/25/03 . . . . . . . . . . . . . . . . . 83
D.    Letter of 7/28/03 . . . . . . . . . . . . . . . . . 84
E.    Letter of 8/4/03 . . . . . . . . . . . . . . . . . . 85
F.    Letter of 3/23/04 . . . . . . . . . . . . . . . . . 86

## I.    Case Statement[1]

This lawsuit stems from the June 9, 1996, murder of an

---

[1] The information contained in the Case Statement and Facts is taken in part from this Magistrate Judge's Report and Recommendation of July 3, 2003 (Document #183), which addressed Plaintiffs' Motion to Enter Default Judgment against Defendants Hamas and Hamas Operatives ("Motion to Enter Default Judgment against Hamas") (Document #38). A copy of that Report and Recommendation is attached to Senior Judge Ronald R. Lagueux's Memorandum and Order in Estates of Ungar v. The Palestinian Auth., CA No. 00-105L, 2004 WL 134034, at *8 (D.R.I. Jan. 27, 2004).

American citizen living in Israel, Yaron Ungar, and his Israeli wife, Efrat Ungar, by the terrorist group Hamas -- Islamic Resistance Movement ("Hamas"). The action is brought by his legal representative and his heirs pursuant to the Antiterrorism Act of 1990 ("ATA"), 18 U.S.C. § 2333, which provides a cause of action for American nationals whose person, property, or business is injured by reason of an act of international terrorism. Defendants PA and PLO are alleged, in general, to have provided Hamas with a base of operations and support for conducting terrorist activities which included the murder of the Ungars. See Amended Complaint ¶¶ 29-37.

## II. Facts

The Ungars were attacked on June 9, 1996, near Beit Shemesh, Israel, as they drove home from a wedding. A vehicle driven by Raed Fakhri Abu Hamdiya ("Abu Hamdiya"), and occupied by Abdel Rahman Ismail Abdel Rahman Ghanimat ("Rahman Ghanimat") and Jamal Abdel Fatah Tzabich Al Hor ("Hor"), overtook the Ungar car, and Rahman Ghanimat and Hor fired Kalishnikov machine guns at it. Yaron and Efrat Ungar were fatally wounded, but the fusillade of bullets missed their ten month old son, Plaintiff Yishai Ungar, who was in the back seat. Another son, Plaintiff Dvir Ungar, then age twenty months, was not in the vehicle at the time of the attack.

Subsequent events are detailed in the July 24, 2001, Decision and Order of Senior Judge Ronald R. Lagueux, see Estates of Ungar v. Palestinian Authority, 153 F.Supp.2d 76 (D.R.I. 2001) ("Ungar I"), relevant portions of which are quoted below:

> Abu Hamdiya, Rahman Ghanimat, and Hor were arrested following the shooting attack. A fourth man, defendant Iman Mahmud Hassan Fuad Kafishe, was also arrested in connection with the shooting. In addition, a warrant was issued for the arrest of Ibrahim Ghanimat on charges relating to the murders of Yaron and Efrat Ungar. Ibrahim Ghanimat remains at large and is believed to be

residing within territory controlled by defendant PA.

All five men involved in the shooting are members of Hamas .... A terrorist group dedicated to murdering Israeli and Jewish individuals through bombings, shootings, and other violent acts, Hamas is based in and operates from territories controlled by defendants PA, PLO, and Yasser Arafat. Terrorist attacks are staged by small groups of Hamas members organized as a cell for the purpose of carrying out terrorist activities. Abu Hamdiya, Rahman Ghanimat, Hor, Kafishe, and Ibrahim Ghanimat comprised the terrorist cell that murdered the Ungars.

On May 3, 1998, Abu Hamdiya was convicted by an Israeli court of membership in Hamas and of abetting the shooting murders of Yaron Ungar and Efrat Ungar. On October 21, 1998, an Israeli court convicted Rahman Ghanimat and Hor of membership in defendant Hamas and of the murders of Yaron Ungar and Efrat Ungar. On November 3, 1998, Kafishe was convicted by an Israeli court of membership in Hamas and of being an accessory to the murders of Yaron and Efrat Ungar.

Thereafter, on October 25, 1999, an Israeli court appointed attorney David Strachman ("Strachman") as administrator of the Estates of Yaron and Efrat Ungar. Strachman was appointed as the administrator of the Ungars' estates for the express purpose of administering and realizing assets, rights, and causes of action that could be pursued on behalf of the Ungars' estates within the United States.

On March 13, 2000, plaintiffs filed an action pursuant to 18 U.S.C. § 2333 *et seq.* and related torts in the United States District Court for the District of Rhode Island.

<u>Ungar I</u>, 153 F.Supp.2d at 83-84.

**III. Parties**

Originally, the Plaintiffs included the Estate of Efrat Ungar and Rabbi Uri Dasberg and Judith Dasberg in their individual capacities as the parents of Efrat Ungar. <u>See</u> Complaint ¶¶ 4, 7. However, these claims were dismissed on July 24, 2001, because the Complaint did not allege that Efrat Ungar

6

was a national of the United States.  See Ungar I, 153 F.Supp.2d
at 97.

The remaining Plaintiffs in the action are: the Estate of
Yaron Ungar, represented by Strachman; Dvir Ungar and Yishai
Ungar, the minor children and heirs-at-law of Yaron Ungar and
Efrat Ungar; Professor Meyer Ungar and Judith Ungar, in their
individual capacities as the parents of Yaron Ungar and also as
the legal guardians of Plaintiffs Dvir and Yishai Ungar; Rabbi
Uri Dasberg and Judith Dasberg, as legal guardians of Plaintiffs
Dvir and Yishai Ungar; and Amichai Ungar, Dafna Ungar, and Michal
Cohen, the siblings of Yaron Ungar (collectively the "Remaining
Plaintiffs").

The original Defendants included six officials of the PA and
the five members of Hamas involved in the murders of Yaron and
Efrat Ungar.  The individual PA Defendants, Yasser Arafat, Jibril
Rajoub, Muhammed Dahlan, Amin Al-Hindi, Tawfik Tirawi, and Razi
Jabali (the "individual PA Defendants") were dismissed from the
action on July 24, 2001, for lack of jurisdiction over the
person.  See Ungar I, 153 F.Supp.2d at 100.  The individual Hamas
Defendants, Rahman Ghanimat, Hor, Abu Hamdiya, Ibrahim Ghanimat,
and Iman Mahmud Hassan Fuad Kafishe (the "individual Hamas
Defendants"), were dismissed for the same reason on January 27,
2004.  See Estates of Ungar v. The Palestinian Auth., CA No. 00-
105L, 2004 WL 134034, at *2, 6 (D.R.I. Jan. 27, 2004) ("Ungar
III").  The remaining defendants are the PA, the PLO, and Hamas.
Default judgment was entered against Hamas on January 27, 2004.
See id. at *7.

## IV.  The Amended Complaint

The Amended Complaint states four causes of action.  With
the exception of Count I, all claims are brought on behalf of all

Plaintiffs against all Defendants.[2]  Pertinent to the instant
motions, Count I alleges that the PA and PLO (the "Palestinian
Defendants") engaged in acts of international terrorism as
defined in 18 U.S.C. §§ 2331 and 2333 and that their behavior
also constitutes aiding and abetting acts of international
terrorism.  See Amended Complaint ¶¶ 38-48.  Counts II, III, and
IV are claims pled under Israeli law.  See Ungar I, 153 F.Supp.2d
at 99 (giving Plaintiffs 30 days to file an amended complaint
making allegations against the PA and PLO defendants under
Israeli law).  Count II of the Amended Complaint alleges
negligence.  See Amended Complaint ¶¶ 49-64.  Count III is for
breach of statutory obligation.  See id. ¶¶ 65-73.  Count IV
charges Defendants with the "civil wrong" of assault.  See id.
¶¶ 74-82.

     As was the case with the original Complaint, see Ungar I,
153 F.Supp.2d at 84, the factual basis for each claim is
essentially the same.  Plaintiffs charge that the Palestinian
Defendants failed to maintain public order and security in the
territories under their control.  See Amended Complaint ¶¶ 23-25.
Specifically, Plaintiffs allege that the PA and PLO:

> provided defendant HAMAS with safe haven and a base of
> operations, by permitting and/or encouraging defendant
> Hamas to operate freely and conduct activities in the
> territory under their control or in which they maintained
> a police presence, and to advocate, encourage, solicit,
> facilitate, incite for, sponsor, organize, plan and
> execute acts of violence and terrorism against Jewish
> civilians in Israel, Gaza and the West Bank.

Id. ¶ 29.

     In addition, Plaintiffs allege that the PA and PLO: refused

_____

     [2] Count I is brought on behalf of all Plaintiffs except Uri
Dasberg and Judith Dasberg in their individual capacities.  See
Amended Complaint at 9.

requests for the surrender of terrorist suspects, see id. ¶ 31; granted material and financial support to the families of members of Hamas who have been killed or captured while carrying out terrorist violence against Jewish civilians in Israel, Gaza and the West Bank, see id. ¶ 33; assisted Hamas and its members in avoiding apprehension and punishment, see id. ¶ 34; and solicited Hamas and the individual Hamas Defendants to commit the attack on the Ungars' vehicle, see id. ¶¶ 17-18, 36. Plaintiffs also claim that the PA employed several members of Hamas and other terrorist groups suspected of or charged with the murder of U.S. citizens as police officers and/or security officials. See id. ¶ 32.

Plaintiffs further aver that the Palestinian Defendants' actions constitute acts of international terrorism and also aiding and abetting acts of international terrorism because their actions: (1) violate the criminal laws of the United States,[3] see Amended Complaint ¶ 39; (2) "appear to be intended to intimidate or coerce a civilian population," Amended Complaint ¶ 43 (quoting 18 U.S.C. § 2331), and "to influence the policy of a government by means of intimidation or coercion," id. ¶ 43;[4] (3) were dangerous to human life, see id. ¶ 44; and (4) occurred outside the territorial jurisdiction of the United States, see id. ¶ 45.

---

[3] Plaintiffs specifically plead that the actions of the Palestinian Interim Self-Government ("PA") and the Palestine Liberation Organization ("PLO") (collectively "the Palestinian Defendants") constitute violations of 18 U.S.C. § 3 (Accessory After the Fact) and 18 U.S.C. § 2339A (Providing Material Support to Terrorists). See Amended Complaint ¶ 41.

[4] In support of these specific allegations, Plaintiffs assert that the Palestinian Defendants "through their respective representatives, spokesmen and organs: repeatedly praised and lauded defendant HAMAS and HAMAS operatives who had engaged in acts of terrorism and violence against Jewish civilian and Israeli targets; praised, advocated, encouraged, solicited and incited such terrorist acts; and threatened further occurrence of such terrorists acts." Amended Complaint ¶ 43.

The Israeli law counts charge all Defendants with violating three specific sections of the Israeli Civil Wrongs Ordinance (New Version) - 1968 ("CWO").  See id. ¶¶ 51, 55, 63, 75.  Count II asserts that Defendants committed the "civil wrong of Negligence," id. ¶ 62, as that tort is defined in CWO §35,[5] see id. ¶ 56, because "a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the decedents and plaintiffs were liable to be injured by defendants' acts and omissions ...," id. ¶ 61.

Count III charges Defendants with "committing the 'civil wrong' of Breach of Statutory Obligation CWO §63," id. ¶ 71, and cites statutory obligations (and sections) allegedly breached by Defendants.[6]  Count IV asserts the "'civil wrong' of Assault,"

_____

[5]  According to the Amended Complaint:

a person is liable for the "civil wrong" of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances[,] he is obligated not to act as he did.

Amended Complaint ¶ 56.

[6] According to the Amended Complaint, the statutory obligations breached by Defendants are:

a.  The Penal Code - 1977: §300 (murder); §99 (aiding a terrorist organization); §498 (provision of means for commission of a felony); §499 (criminal conspiracy); §30 (solicitation of a crime); §31 (abetting a crime); §95 (non-prevention of national security offense); §262 (non-prevention of a felony).

b.  The Terrorism Prevention Ordinance - 1948: §2 (activity in a terrorist organization); §3 (membership in a terrorist organization); §4 (provision of support to a

id. ¶ 75, as that tort is defined in CWO §23.  Among other
allegations contained within Count IV, Plaintiffs allege that the
"PA and PLO and their officials, employees and agents solicited
and advised defendants HAMAS [and the individual Hamas
Defendants] to commit the assault attributed to those defendants
herein, and aided, abetted, authorized, ratified and participated
in that assault ...."  Amended Complaint ¶ 79.  Each of the
Israeli law counts also alleges that the Palestinian Defendants
are vicariously liable under the CWO for the acts and omissions
of their officials, employees, and agents, see id. ¶¶ 64, 80, and
for the breaches of statutory obligations by those officials,
employees, and agents, see id. ¶ 73.

**V.    Travel**

    **A.  Response to Complaint**

---

terrorist organization).

    c.  The Defense Regulations (Emergency) - 1945: Reg. 58
(use of firearms against a person); Reg. 64 (provision of
shelter or resources to national security offender); Reg. 66
(abetting); Reg. 85 (membership in or provision of assistance
to an illegal organization).

    d.  The Agreement on the Gaza Strip and the Jericho Area
of May 4, 1994 (which was enacted into local law): Article
IX(2) (duty to prevent operation of irregular armed forces in
PA areas); Article IX(3) (duty to prohibit possession of
weapons and explosives in PA areas); Article XVIII (duty to
prevent acts of terrorism); Annex III Article II (duty to
surrender suspects).

    e.  Interim Agreement on the West Bank and the Gaza Strip
of September 28, 1995 (which was enacted into local law):
Article XIV(3) (duty to prevent operation of irregular armed
forces in PA areas); Article XIV(4) (duty to prevent
possession of weapons and explosives in PA areas); Article XV
(duty to prevent acts of terrorism); Annex I Article II (duty
to act against terrorism, confiscate arms, arrest and
prosecute terrorists)[;] Annex IV Article II (duty to
surrender suspects).

Amended Complaint ¶ 69.

Plaintiffs filed their original Complaint (Document #1) on March 13, 2000. The PA, PLO, and the individual PA Defendants moved to dismiss on June 15, 2000, for lack of subject matter jurisdiction, lack of personal jurisdiction, insufficient service of process, improper venue, failure to state a claim upon which relief can be granted, and inconvenience of the forum. See Defendants' Motion to Dismiss the Complaint (Document #22). On July 24, 2001, Judge Lagueux denied the motion on all grounds as to the PA and PLO, but granted it as to the individual PA Defendants for lack of personal jurisdiction. See Ungar I, 153 F.Supp.2d 76 (D.R.I. 2001). He also dismissed all claims based on the death of Efrat Ungar as she was not a citizen of the United States. See id. at 97.

**B. Response to Amended Complaint[7]**

Plaintiffs filed their Amended Complaint (Document #41) on August 23, 2001, against the PA, PLO, Hamas, and the individual Hamas Defendants. On September 7, 2001, the PA and PLO filed a motion to extend the time to answer the Amended Complaint by sixty days. See Defendants' Motion to Extend Time to Respond to the Amended Complaint (Document #42). Plaintiffs objected to the motion to extend time, see Plaintiffs' Objection to Defendants' Motion to Extend Time to Respond to the Amended Complaint (Document #43), but Judge Lagueux granted the extension on September 19, 2001, see Document #44 at 3, and set November 13, 2001, as the date by which an answer from the Palestinian Defendants was required, see Docket entry for 9/19/01.

On November 13, 2001, the PA and PLO sought an additional

---

[7] The travel from the filing of the Amended Complaint (Document #41) through the filing of Plaintiffs' Motion to Enter Default (Document #105) has previously been set forth in this Magistrate Judge's Memorandum and Order Granting Motion to Enter Default dated 4/18/03 (Document #133) at 2-6. It is reproduced here with minor changes.

enlargement of fourteen days to respond to the Amended Complaint. See Defendants' Motion for a Further Enlargement of Time (Document #45).[8]  Plaintiffs objected to the motion for an additional enlargement and moved for entry of default on November 15, 2001.  See Plaintiffs' Objection to Defendants' Motion for a Further Enlargement of Time and Motion for Entry of Default (Document #46).

The Palestinian Defendants then moved on November 29, 2001, for dismissal of the Amended Complaint on grounds that it was nonjusticiable and failed to state a claim upon which relief can be granted and, alternatively, for certification of an interlocutory appeal to the Court of Appeals pursuant to 28 U.S.C. § 1292(b) and a stay pending disposition of the application for certification and/or appeal.  See Defendants' Motion for Dismissal and Alternatively for Certification of an Interlocutory Appeal and a Stay ("Motion for Dismissal") (Document #47-1).  On December 7, 2001, a stipulation was filed and subsequently approved by the court, giving Plaintiffs until December 21, 2001, to respond to the Motion for Dismissal.  See Stipulation (Document #47-2).  Plaintiffs' objection to the Motion for Dismissal was received by the court on December 26, 2001.  See Plaintiffs' Objection to Defendants' Motion for Dismissal of the Amended Complaint and Alternatively for Certification of an Interlocutory Appeal and Stay (Document #48).

## C. Discovery Initiated

On January 24, 2002, Plaintiffs served the PA with interrogatories, a request for production of documents and a request for admissions.  See Plaintiffs' Memorandum in Support of

---

[8] Defendants' Motion for Further Enlargement of Time (Document #45) was referred on December 3, 2001, to this Magistrate Judge for determination.  A hearing on the motion was scheduled for December 19, 2001, but the motion was withdrawn on December 13, 2001.  See Docket Entry for 12/13/01.

Their Motion Pursuant to Fed.R.Civ.P. 37(b)(2) for Default Judgment against Defendants PA and for Other Relief ("Plaintiffs' Mem. First Motion"); see also Plaintiffs' Motion to Compel Discovery (Document #65). The following day, January 25, 2002, Plaintiffs noticed the depositions of Yasser Arafat and six other PA officials to be conducted in mid-March 2002 in Providence, Rhode Island. See Notices of Deposition (Documents #49-#55). The Notices of Deposition identified the deponents only in connection with the PA and did not reference the PLO. See id.

### D.  Discovery Stayed

On January 30, 2002, the Palestinian Defendants moved for leave to assert defenses in support of their pending Motion for Dismissal. See Defendants' Motion for Leave to Assert Defenses in Support of their Pending Motion to Dismiss the Amended Complaint or Alternatively for Certification of an Interlocutory Appeal ("Motion for Leave to Assert Defenses") (Document #59). Six days later, on February 5, 2002, the Palestinian Defendants renewed their motion for a stay and moved for leave to seek a protective order regarding the discovery requests which had recently been filed by Plaintiffs. See Defendants' Renewed Motion for a Stay and Motion for Leave to Seek a Protective Order ("Renewed Motion for Stay") (Document #60). Plaintiffs filed on February 20, 2002, an objection to the Renewed Motion for Stay, see Plaintiffs' Objection to Defendants' Renewed Motion for a Stay and Motion for Leave to Seek a Protective Order ("Objection to Renewed Motion for Stay") (Document #61), and on February 25, 2002, an objection to the Motion for Leave to Assert Defenses, see Plaintiffs' Objection to Defendants' Motion for Leave to Assert Defenses in Support of their Pending Motion to Dismiss (Document #62). On February 26, 2002, the Palestinian Defendants filed a motion for a protective order. See Motion for Protective Order (Document #63). Plaintiffs filed an objection to this

motion on March 8, 2002.  See Plaintiffs' Objection to Defendants' Motion for a Protective Order (Document #64).

After the PA failed to respond to the request for documents which had been propounded to them on January 24, 2002, failed to respond to the request for admissions, and indicated that it would not produce its employees for depositions scheduled during the latter half of March, 2002, Plaintiffs filed a motion to compel on March 8, 2002.  See Plaintiffs' Motion to Compel Discovery ("Motion to Compel Discovery" or "Motion to Compel") (Document #65).  The Palestinian Defendants objected to the Motion to Compel, see Palestinian Defendants' Objection to Plaintiffs' Motion to Compel Discovery (Document #66), on the same grounds and reasons as set forth in the memoranda filed in support of their Renewed Motion for Stay and their Motion for Leave to Assert Defenses, see id.  On June 20, 2002, this Magistrate Judge granted the Renewed Motion for Stay (Document #60) and the Motion for Protective Order (Document #63), staying discovery until Judge Lagueux had ruled upon the Palestinian Defendants' pending Motion for Dismissal (Document #47-1).  See Order Staying Discovery (Document #70).

### E.  Default Judgment against Hamas

Meanwhile, Plaintiffs moved to obtain a default judgment against Hamas and the individual Hamas Defendants (collectively the "Hamas Defendants").  See Plaintiffs' Motion to Enter Default Judgment against Defendants Hamas and Hamas Operatives ("Motion to Enter Default Judgment against Hamas") (Document #38).[9]  On June 20, 2002, a hearing on the motion for default judgment was scheduled for July 12, 2002.  See Docket Entry for 6/20/02.  On the day before the hearing, July 11, 2002, the Palestinian

---

[9] Default had been entered by rule of court against Hamas and the individual Hamas Defendants (collectively "the Hamas Defendants") on September 7, 2000.  See Clerk's Entry of Default (Document #32).

Defendants filed an objection to the entry of default judgment against the Hamas Defendants.  <u>See</u> Palestinian Defendants' Objection to Entry of Default Judgment (Document #77).

At the start of the hearing on July 12, 2002, the court asked the attorney representing the Palestinian Defendants, their local counsel, Mr. Deming Sherman, if he was pressing the objection which had been filed.  <u>See</u> Transcript of 7/12/02 hearing ("Tr. of 7/12/02") at 2.  Mr. Sherman responded by asking if he could make "a brief presentation on that?"  <u>Id.</u>  In the course of the remarks that followed, Mr. Sherman stated that "it is the option of the Palestinian defendants not to participate in the hearing.  Accordingly, we do not intend to participate."  <u>Id.</u> at 3.  He continued that it was the position of the Palestinian Defendants that the default judgment proceedings being conducted against the Hamas Defendants "should not be in any way binding upon the Palestinian defendants," <u>id.</u>, and that "[n]one ... of the findings of fact, the conclusions of law, or orders or judgments ... shall have any impact upon the Palestinian [Defendants]," <u>id.</u> at 3-4.  After Mr. Sherman had concluded his presentation, the court again asked him if he was pressing the objection which had been filed.  <u>See</u> <u>id.</u> at 4.  Upon receiving an affirmative response, the court stated that it would conduct a brief hearing on the objection.  <u>See</u> <u>id.</u> at 5.  After brief argument, <u>see</u> <u>id.</u> at 8-9, the court overruled the objection, finding that it had been "filed at the 11[th] hour," Tr. of 7/12/02 at 9; <u>see</u> <u>also</u> Order dated 8/19/02 (Document #89), and was "untimely,"[10] <u>id.</u>

_____

[10]  In response to the Palestinian Defendants' Objection to Entry of Default Judgment (Document #77), Plaintiffs on July 11, 2002, filed three motions: a motion to sever the claim against the Hamas Defendants, <u>see</u> Plaintiffs' Motion to Sever (Document #71); a motion for sanctions against the attorneys for the Palestinian Defendants, <u>see</u> Plaintiffs' Motion for Sanctions (Document #73); and a motion to strike the Palestinian Defendants' objection, <u>see</u> Plaintiffs' Motion

Following the court's ruling, Mr. Sherman requested and received permission to be excused from the hearing. See id. at 10. Thereafter, the court conducted an evidentiary hearing on the Motion to Enter Default Judgment against Hamas (Document #38), see id. at 25-152, which lasted the entire day and resumed on July 15, 2002, see Tr. of 7/15/02. A further hearing was held on July 19, 2002, for the purpose of having Plaintiffs' counsel address certain questions posed by the court regarding the issue of personal jurisdiction. The court then took the matter under advisement and subsequently issued a Report and Recommendation which recommended that the motion for default judgment be granted as to Defendant Hamas, but denied as to the individual Hamas defendants and that the claims against them be dismissed from the action. See Report and Recommendation dated 7/3/03 (Document #183) at 63.

**F. Discovery Stay Terminates**

On November 4, 2002, Judge Lagueux issued a Decision and Order (Document #90), denying Defendants' Motion for Dismissal. This action terminated the stay of discovery which had been granted by this Magistrate Judge on June 20, 2002. See Order Staying Discovery (Document #70); see also Plaintiffs' Mem. First Motion, Ex. B (Letter from Martin, M.J., to Strachman and Schilling of 12/13/02). The Palestinian Defendants filed a motion for reconsideration of Judge Lagueux's decision on November 20, 2002. See Palestinian Defendants' Motion for

---

to Strike ("First Motion to Strike") (Document #75). The Palestinian Defendants subsequently filed objections to these motions. See Palestinian Defendants' Objection to Plaintiffs' Motion to Sever (Document #84); Palestinian Defendants' Objection to Plaintiffs' Motion for Sanctions (Document #83); Palestinian Defendants' Objection to Plaintiffs' Motion to Strike (Document #85). After a hearing on December 12, 2002, Plaintiffs' Motion for Sanctions and Plaintiffs' First Motion to Strike were ruled moot. See Orders dated December 12, 2002 (Documents #92, 93). The Motion to Sever was denied without prejudice. See Order dated December 13, 2002 (Document #97).

Reconsideration ("Motion for Reconsideration") (Document #91). Plaintiffs objected to the motion on December 12, 2002. <u>See</u> Plaintiffs' Objection to Defendants' Motion for Reconsideration (Document #94). Judge Lagueux denied the Motion for Reconsideration on April 22, 2003, and also denied the Palestinian Defendants' request for a stay of proceedings pending appeal. <u>See</u> Document #135. On April 23, 2003, the Palestinian Defendants appealed the denial of the Motion for Reconsideration and Judge Lagueux's November 4, 2002, Decision and Order to the United States Court of Appeals for the First Circuit. <u>See</u> Notice of Appeal of Defendants Palestinian Authority and the Palestine Liberation Organization (Document #136). That court summarily affirmed Judge Lagueux's orders on May 27, 2003.[11] <u>See Judgment in Efrat Ungar, et al. v. The Palestine Liberation Organization, et al.,</u> No. 03-1544 (1st Cir. May 27, 2003) (Document #179).

### G. Motion to Compel Discovery

In the meantime, following the termination of the stay of discovery, the court scheduled on November 18, 2002, a hearing for December 12, 2002, on the Motion to Compel Discovery (Document #65) (and other Plaintiffs' motions not relevant to the determination of the instant Motions for Default Judgment) which had been filed in March. As a courtesy to the PA's primary counsel, Mr. Ramsey Clark and Mr. Lawrence W. Schilling, who were from out of state, the court directed the clerk to give the parties at least twenty-one days notice of the hearing.[12] On

---

[11] In affirming Judge Lagueux's ruling, the Court of Appeals also stated that "[T]his order is without prejudice to the [Palestinian Defendants] raising their sovereign immunity defense in a proper and timely manner. We take no view as to the merits of that defense." <u>Judgment in Efrat Ungar, et al. v. The Palestine Liberation Organization, et al.,</u> No. 03-1544 (1st Cir. May 27, 2003) (Document #179) at 2.

[12] The court acted sua sponte. The courtesy had not been requested.

November 18, 2003, the clerk noticed the hearing on the motion for December 12, 2003.

On November 25, 2002, the court received a letter from Mr. Clark, lead counsel for the PA, in which he requested a continuance of the December 12, 2002, hearing because he was scheduled to appear before the International Criminal Tribunal for Rwanda, in Arusha, Tanzania, on that date and would not be available to appear in Rhode Island until January. See Letter from Clark to Martin, M.J., of 11/21/02 at 1.[13]   The court treated Mr. Clark's letter as a request for a continuance and scheduled a telephonic hearing for December 2, 2002, to consider the motion.

At the hearing on December 2, 2002, the court denied the request for a continuance. See Order entered 12/12/02 (Document #96). The court rejected the suggestion of counsel for the Palestinian Defendants that their filing of the Motion for Reconsideration (Document #94) had revived or reactivated the stay of discovery which had ended on November 4, 2002. Observing that the case had been filed in 2000 and that it was now nearly 2003, the court indicated that it was time for the case to move forward. The court also found that the motions to be heard on December 12th were not so complicated that they could not be handled by counsel other than Mr. Clark. However, as a courtesy, the court indicated that it would allow the attorney representing the Palestinian Defendants on the 12th, presumably Mr. Schilling, to appear via telephone instead of having to travel from New York City. The court granted this dispensation because Mr. Clark indicated that, while he was willing to appear without compensation, to ask another attorney to do so could be somewhat of an imposition.

---

[13] Letters which are not identified as exhibits can be found in the Appendix at the end of this document.

On December 12, 2002, the court conducted a hearing on the Motion to Compel Discovery (Document #65) and granted it. In granting the motion, the Court purposefully gave the PA an extended period of time (45 days from December 12th) within which to respond to Plaintiffs' interrogatories, request for production of documents, and request for admissions. See Order of 1/14/03 (Document #99). The court did so because of the PA's overseas location and its contention that responding to the requests would be difficult because of conditions existing in the Middle East. For the same reason, the court required that Plaintiffs notice the depositions of PA officers and employees at least 60 days in advance. See id. The PA failed to respond to the discovery requests within 45 days or at any time thereafter. See Plaintiffs' Mem. First Motion at 2.

## H.  Motion for Reconsideration of Discovery Order

An order was issued on January 14, 2003, reflecting the granting of the Motion to Compel (Document #65).[14] See Order of 1/14/03 (Document #99). Two weeks later, on January 29, 2003, the Palestinian Defendants filed a motion for reconsideration of the Order granting the Motion to Compel. See Palestinian Defendants' Motion for Reconsideration ("Motion for Reconsideration") (Document #100). Attached to the Motion for Reconsideration was a letter from Dr. Nasser Al-Kidwa, Ambassador, Permanent Observer of Palestine to the United Nations, addressed to this Magistrate Judge. See id. The letter referenced the intense violence which had been occurring "throughout occupied Palestine for more than two years," id. (Letter from Al-Kidwa to Martin, M.J. of 1/27/03) at 1, and stated that "[i]t has been impossible under such circumstances to

---

[14] The delay in the issuance of an order reflecting the December 12, 2002, ruling stemmed from a disagreement between the Palestinian Defendants and Plaintiffs over the wording of the order.

locate people who could seek and find documents, who could gather
information and prepare answers to interrogatories and could
respond to requests for admissions," id.  Dr. Al-Kidwa opined
that "[i]t would seem fair and just to wait until there is a
final decision on the issue whether the U.S. Court has
jurisdiction over the PNA and PLO for these events before
proceeding to these [discovery] requests," id. at 2, and offered
that "[n]othing else is possible for us," id.

Plaintiffs reacted on February 5, 2003, by moving to strike
portions of the memorandum and exhibits which the Palestinian
Defendants had filed in support of their Motion for
Reconsideration (Document #100) as violative of Fed. R. Civ. P.
11 and 12(f).  See Plaintiffs' Motion to Strike ("Second Motion
to Strike") (Document #104).[15]  The Palestinian Defendants
objected to the Second Motion to Strike on February 20, 2003.
See Palestinian Defendants' Objection to Plaintiffs' Motion to
Strike (Document #109).  However, at a hearing held on April 11,
2003, Judge Lagueux overruled their objection and granted the
Second Motion to Strike (Document #104).  See Transcript of
4/13/03 hearing ("Tr. of 4/13/03") at 12-14; Order of 4/22/03
(Document #135).

Meanwhile, Plaintiffs had also filed on February 19, 2003,
an objection to the Motion for Reconsideration.  See Plaintiffs'
Objection to Defendants' Motion for Reconsideration Dated January
27, 2003, (Document #107).  The Court denied the Motion for
Reconsideration (Document #100) without a hearing on March 20,
2003, "for the reasons stated in Plaintiffs' Memorandum in
Opposition."  See Order of 3/20/03 (Document #116).  Among the
reasons expressed therein were that the Palestinian Defendants'
claims of impossibility were unsupported by affidavit or other

---

[15] Plaintiffs filed a corrected Motion to Strike on February 21,
2003.  See Plaintiffs' Corrected Motion to Strike (Document #108).

admissible evidence, <u>see</u> Plaintiffs' Memorandum in Opposition to Defendants' Motion for Reconsideration Dated January 27, 2003 (filed with Document #107), at 2-3, that the PA failed to take any action in fulfillment of its discovery obligations, <u>see id.</u> at 3, that the PA failed to utilize other procedures for relief, <u>see id.</u> at 5-7, and that the necessary criteria for reconsideration had not been satisfied, <u>see id.</u> at 8-9.

## I.  **Entry of Default Against Palestinian Defendants**

While the proceedings described above were ongoing, Plaintiffs moved on February 7, 2003, for entry of default against the Palestinian Defendants for failure to answer the Amended Complaint.  <u>See</u> Plaintiffs' Motion to Enter Default against Defendants PA and PLO Pursuant to Fed.R.Civ.P. 55(a) ("Motion to Enter Default") (Document #105).  The Palestinian Defendants objected to the entry of default on February 27, 2003. <u>See</u> Objection of Defendants Palestinian Authority and Palestine Liberation Organization to Plaintiffs' Motion to Enter Default pursuant to Fed. R. Civ. P. 55(a) (Document #111).  This Magistrate Judge conducted a hearing on the motion on April 1, 2003, and issued a Memorandum and Order Granting Motion to Enter Default ("Memorandum and Order of 4/18/03") (Document #133) on April 18, 2003.  In granting the Motion for Default, this Magistrate Judge found that the Palestinian Defendants' failure to file an answer to the Amended Complaint was the result of a deliberate choice and not due to an inability to file an answer. <u>See id.</u> (Document #133) at 7.

The Palestinian Defendants filed an objection on May 5, 2003, to the granting of default.  <u>See</u> Palestinian Defendants' Objection to Memorandum and Order Granting Plaintiffs' Motion to Enter Default (Document #148).  However, their objection was rejected at a July 30, 2003, hearing before Judge Lagueux, who found that the Palestinian Defendants were "in serious default

....," Order of 8/4/03 (Document #202), and affirmed this Magistrate Judge's Memorandum and Order of 4/18/03 (Document #133), see id.

## J.   First Motion for Default Judgment

Plaintiffs filed their First Motion for Default Judgment (Document #106) on February 12, 2003, requesting, among other relief, the entry of default judgment against the PA because of its refusal to comply with the discovery required by the Order of 1/14/03 (Document #99). The Palestinian Defendants objected to the First Motion on March 3, 2003. See Palestinian Defendants' Objection to Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 37(b)(2) for Judgment by Default Against Defendant PA and for Other Relief (Document #112). Nine days later, on March 12, 2003, they moved for a protective order to bar the taking of the depositions, which had been noticed by Plaintiffs on January 24, 2003, of President Yasser Arafat and six other Palestinian leaders.[16] See Palestinian Defendants' Motion for Protective Order (Document #115); see also Notices of Deposition (Document #103).[17]

Plaintiffs filed an objection to the motion for protective order on March 31, 2003. See Plaintiffs' Objection to Palestinian Defendants' Motion for Protective Order (Document #117). This was followed on April 2, 2003, by a motion to strike portions of the memorandum which the Palestinian Defendants had

---

[16] Plaintiffs believed these leaders were involved in providing material support and resources to Hamas for the purpose of carrying out terrorist attacks such as the one in which Plaintiffs' decedent was killed. See Plaintiffs' Memorandum in Support of Their Motion for Default Judgment against the PA and the PLO and for Other Relief for Refusal to Submit to Depositions ("Plaintiffs' Mem. Second Motion") at 1-2; see also Transcript of 5/14/03 hearing ("Tr. of 5/14/03") at 12-13 (setting forth reasons why Plaintiffs want to depose these officials).

[17] The seven Notices of Deposition were assigned a single document number, #103.

filed in support of their motion for a protective order.  See Plaintiffs' Motion to Strike and for Other Relief ("Third Motion to Strike") (Document #119).

The Third Motion to Strike was granted by this Magistrate Judge on April 18, 2003.  See Order Granting Motion to Strike (Document #132).  The Palestinian Defendants objected to the Order, see Palestinian Defendants' Objection to Order Granting Plaintiffs' Motion to Strike (Document #146), but it was affirmed by Judge Lagueux at a hearing held on July 30, 2003, see Order of 8/4/03 (Document #204).

### K.  Second Motion for Default Judgment

Plaintiffs filed their Second Motion for Default Judgment (Document #125) on April 9, 2003, alleging that the Palestinian Defendants had failed to comply with the court's Order of 1/14/03 (Document #99) concerning the depositions of their employees.[18] See Second Motion for Default Judgment (Document #125).  The Palestinian Defendants filed an objection to the Second Motion on April 28, 2003.  See Defendants Palestinian Authority and Palestine Liberation Organization's Objection to Plaintiffs' Motion for Default Judgment and Other Relief with Respect to Depositions Noticed by Plaintiffs (Document #141).

### L.  May 14, 2003, Hearing

On May 14, 2003, this Magistrate Judge conducted a hearing on the Palestinian Defendants' Motion for Protective Order (Document #115), the First Motion for Default Judgment (Document #106), and the Second Motion for Default Judgment (Document #125).  The court denied the request for a protective order which sought to prevent the deposition of the seven Palestinian

---

[18] On March 4, 2003, Plaintiffs' counsel sent the PA's counsel a letter, requesting that they confirm the appearance of their employees at the scheduled depositions.  See Plaintiffs' Mem. Second Motion at 2.  No reply to the letter was received.  See id.

leaders. See Transcript of 5/14/03 hearing ("Tr. of 5/14/03") at 17-19. In doing so, the court found that the Palestinian Defendants were adhering to a course of conduct of not participating in discovery, see id. at 18, and that they had ignored Plaintiffs' request for discovery and had made no attempt to respond to it, see id. at 19;[19] Order of 5/27/03 (Document #162) at 1-2.

The court declined to act immediately upon the two motions seeking default judgment, electing instead to explicitly warn the Defendants[20] that their continued failure to comply with discovery could result in the entry of default judgment against them. See Tr. of 5/14/03 at 27-28;[21] see also Order Continuing

---

[19] In denying the Motion for Protective Order (Document #115), this Magistrate Judge addressed the Palestinian Defendants' argument that conditions in the Middle East prevented the deponents from traveling to the United States:

> This Court had indicated that if there was a problem with the location or other matters regarding the deposition that the defendants could raise that, because the defendants had indicated in prior proceedings about the difficulty of the deponents coming from Palestine, the conditions there, and the Court was clear, as I recall, in indicating that objections as to location or other matters concerning the depositions would be -- at least the defendants could raise that and the Court would address it. But, in fact, the defendants have adhered to a course of conduct, which is not to participate in this action by answering, which they are now in default.

Transcript of 5/14/03 hearing ("Tr. of 5/14/03") at 18. The foregoing statement was incorporated into the Order entered on May 27, 2003 (Document #162), which reflected the denial of the Motion for Protective Order (Document #115).

[20] The court used the term "defendants" in its warning. See Tr. of 5/14/03 at 28-29; Order Continuing Hearing on Motions for Default Judgment (Document #158) ("Order of 5/14/03").

[21] This Magistrate Judge stated at the May 14, 2003, hearing:

> There can be no doubt in the defendants' mind, and I want there to be no doubt in the defendants' mind, that a continued failure to comply with their discovery obligations in this

Hearing on Motions for Default Judgment ("Order of 5/14/03") (Document #158).[22]  The court ordered Defendants to comply with their discovery obligations by responding to Plaintiffs' interrogatories, request for admissions, and request for production within sixty days, see Tr. of 5/14/03 at 28-29; Order of 5/14/03 (Document #158) at 1-2, and by notifying Plaintiffs within thirty days when and where the persons Plaintiffs had noticed for depositions would be produced, see Tr. of 5/14/03 at 28-29; Order of 5/14/03 (Document #158) at 2.  Noting that the Palestinian Defendants' failure to respond to date had caused Plaintiffs to incur additional attorney's fees, the court ruled that the Palestinian Defendants would be responsible for those fees.[23]  See Tr. of 5/14/03 at 29; Order of 5/14/03 (Document #158) at 2.  The hearing on the First Motion for Default Judgment

---

matter may well result in the entry of default judgment. Particularly in view of the fact, as I've indicated, I find almost all of the other factors that would be addressed by a court in considering whether to enter default judgment are already present.

Tr. of 5/14/03 at 28.

[22] The Order of 5/14/03 (Document #158) stated in part:

2.    Defendants are ordered to comply with all outstanding discovery requests from Plaintiffs by July 14, 2003, including completion of the depositions of the persons previously noticed by Plaintiffs.

. . . .

5.  **Defendants are warned that failure to comply fully with this order may result in the entry of default judgment against them.**

Order of 5/14/03 (Document #158) at 1-2.

[23] On August 18, 2003, Plaintiffs filed an affidavit concerning the attorney's fees they had incurred as a result of the Palestinian Defendants "refusal to comply with a series of court orders and the rules of procedure concerning several forms of discovery such as depositions, interrogatories, a request for production of documents and request for admissions." Affidavit of Counsel Fees (Document #220).

and the Second Motion for Default Judgment was continued to July
14, 2003. See Tr. of 5/14/03 at 29; Order of 5/14/03 (Document
#158) at 1.

The Palestinian Defendants appealed both orders which
resulted from the May 14, 2003, hearing.  See Notice of Appeal of
Defendants Palestinian Authority and Palestine Liberation
Organization (Document #166) (appealing Order of 5/14/03
(Document #158) which required Palestinian Defendants to comply
with discovery requests by July 14, 2003); Notice of Appeal of
Defendants Palestinian Authority and Palestine Liberation
Organization (Document #170) (appealing denial of Motion for
Protective Order (Document #115)).  Judge Lagueux rejected these
appeals at the July 30, 2003, hearing, signing orders on August
4, 2003, which affirmed the rulings of this Magistrate Judge.
See Orders of 8/5/03 (Documents #201, #203).

**M.  Third Motion for Default Judgment**

On May 30, 2003, Plaintiffs filed their Third Motion for
Default Judgment.  See Third Motion (Document #168).  The
Palestinian Defendants moved on June 13, 2003, for an extension
of time within which to respond to this motion.  See Palestinian
Defendants Motion for Extension of Time to Respond to Plaintiffs'
Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2)
(Document #173).  They moved for a second extension on June 27,
2003.  See Palestinian Defendants' Motion for Extension of Time
to Respond to Plaintiffs' Motion for Judgment by Default Pursuant
to Fed.R.Civ.P. 55(b)(2) (Document #181).  The first extension
was granted by rule of court on July 2, 2003, see Document #182,
and the second was granted by this Magistrate Judge on July 14,
2003, see Document #191.

The Palestinian Defendants moved for a third extension on
July 11, 2003, see Palestinian Defendants' Motion for Enlargement
of Time to Respond to Plaintiffs' Motion for Judgment by Default

27

Pursuant to Fed.R.Civ.P. 55(b)(2) (Document #188), requesting that the then-current extended date of July 11, 2003, be extended to ten days after the disposition of their pending motion for dismissal pursuant to Fed. R. Civ. P. Rule 12(b)(1).[24]  See Memorandum in Support of Palestinian Defendants' Motion for Continuance of July 14, 2003, Hearing and Motion for Enlargement of Time to Respond to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("Palestinian Defendants' Mem. in Support of Motion for Continuance") at 1.  Although the court rejected the request for an enlargement of time until after disposition of the pending Rule 12(b)(1) motion, the Palestinian Defendants were granted an enlargement until August 18, 2003. See Order Granting Motion for Enlargement (Document #208).

Concurrently with their July 11, 2003, request for a third extension, the Palestinian Defendants filed a motion to continue the scheduled July 14, 2003, hearing on the First and Second Motions for Default Judgment.  See Palestinian Defendants' Motion for Continuance of July 14, 2003, Hearing ("Motion for Continuance") (Document #189).  Among other arguments advanced by the Palestinian Defendants in support of the Motion for Continuance was that they had filed a motion to dismiss the Amended Complaint on June 13, 2003, "for lack of subject matter jurisdiction on grounds of sovereign and governmental immunity, nonjusticiability and the jurisdictional bar imposed by 18 U.S.C. § 2337 ...."  Palestinian Defendants Rule 12(b)(1) Motion to Dismiss the Amended Complaint (Document #174).  They urged that

_____

[24] The Palestinian Defendants had filed on June 13, 2003, a motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1). See Palestinian Defendants' Rule 12(b)(1) Motion to Dismiss the Amended Complaint (Document #174).  The filing was apparently prompted by the May 27, 2003, Judgment from the Court of Appeals.  See Judgment in Efrat Ungar, et al. v. The Palestine Liberation Organization, et al., No. 03-1544 (1st Cir. May 27, 2003) (Document #179) at 2; see also n.11.

Plaintiffs' Motions for Default Judgment be held in abeyance and that the hearing be continued until after their motion to dismiss had been decided. See Palestinian Defendants' Mem. in Support of Motion for Continuance at 3.

### N.  July 14, 2003, Hearing

The Motion for Continuance (Document #189) was heard and denied at the July 14, 2003, hearing.[25] See Tr. of 7/14/03 at 29-32; see also Order of 7/22/03 (Document #199). This Magistrate Judge rejected the Palestinian Defendants' arguments that the filing of a motion to dismiss the Amended Complaint constituted a valid ground to continue the hearing on the motions for entry of default judgment. See Tr. of 7/14/03 at 30 (citing arguments of Plaintiffs' counsel, see id. at 23-29). The court also rejected their argument that action on the motions for default judgment should be delayed until after Judge Lagueux had ruled upon the Palestinian Defendants' appeal of this Magistrate Judge's Orders of 4/18/03 (Document #133), 5/14/03 (Document #158), and 5/27/03 (Document #162). See id. at 30. The court also concluded that it would not be wasteful to address the First and Second Motions for Default Judgment notwithstanding the fact that Plaintiffs had filed a Third Motion for Default Judgment which had not yet been referred to this Magistrate Judge. See id. at 31-32. Following the denial of the Motion for Continuance, the court heard argument on the First and Second Motions for Default Judgment and took the matters under advisement.

### O.  Post July 14, 2003, Filings

On July 16, 2003, Plaintiffs filed a motion pursuant to

---

[25] The Motion for Continuance (Document #189) had not been formally referred to this Magistrate Judge, but because it sought a continuance of the July 14, 2003, hearing, it was addressed at that hearing. See Transcript of 7/14/03 hearing ("Tr. of 7/14/03") at 8, 29-32.

Local Rule 12(a)(2) for an order finding that Plaintiffs' Third Motion for Default Judgment was unopposed, deeming it granted, and entering judgment by default, or alternatively instructing the Palestinian Defendants to respond within three days and to assess expenses against them for their failure to timely respond to it. See Plaintiffs' Motion for Relief Pursuant to Local Rule 12(a)(2) (Document #194). The court denied this motion on August 8, 2003, by an endorsement which referenced the August 7, 2003, Order which gave the Palestinian Defendants until August 18, 2003, to file a response to Plaintiff's Third Motion for Default Judgment. See Document #211.

Plaintiffs filed an objection to the Rule 12(b)(1) motion on August 8, 2003. See Plaintiffs' Objection to Defendants' Rule 12(b)(1) Motion to Dismiss the Amended Complaint (Document #212). The Palestinian Defendants moved on August 13, 2003, for an enlargement of time within which to reply to Plaintiffs' objection. See Palestinian Defendants' Motion for Enlargement of Time to Reply to Plaintiffs' Objection to Defendants' Rule 12(b)(1) Motion (Document #216). The enlargement was granted by rule of court on August 29, 2003. See Document #218.

**P. August 22, 2003, Hearing**

On August 22, 2003, this Magistrate Judge conducted a hearing on Plaintiffs' Third Motion for Default Judgment (Document #168) and also on the attorneys' fees to which the court had determined on May 14, 2003, Plaintiffs' counsel was entitled because of the PA's failure to comply with discovery requests and orders. The court began the hearing by noting that after the July 14th hearing, Plaintiffs' counsel had written to the court and requested that, to the extent the Report and Recommendation on the First and Second Motions for Default Judgment addressed the issue of personal jurisdiction, the court consider the documentation which the Plaintiffs had submitted as

part of the Third Motion for Default Judgment (Document #168).
See Transcript of 8/22/03 hearing ("Tr. of 8/22/03") at 4; see
also Letter from Strachman to Martin, M.J., of 7/22/03.  The
court further explained that, after this request from Plaintiffs,
the Third Motion for Default Judgment (Document #168) had been
referred for a Report and Recommendation and that, based on these
developments, the court decided to conduct a hearing on the Third
Motion and then write a single Report and Recommendation which
addressed all three Motions for Default Judgment.  See Tr. of
8/22/03 at 4; see also Letter from Court to Strachman, Clark, and
Sherman of 7/25/03.

Following this explanation, the court heard argument on the
Third Motion for Default Judgment (Document #168).  See Tr. of
8/22/03 at 6-26.  During the course of the hearing, Plaintiffs'
counsel stated that he had received the Palestinian Defendants'
brief in opposition to the Third Motion on August 20, 2003,[26] and
requested the opportunity to file a response to it.  See id. at
13.  The court granted this request and gave Plaintiffs until
August 29, 2003, to file a response.  See id. at 14, 32.
Defendants were given until September 5, 2003, to file a reply.
See id. at 16, 32.

After both parties had completed their arguments regarding
the Third Motion (Document #168), the court gave counsel the
opportunity to be heard regarding the attorney's fees Plaintiffs'
counsel had requested as authorized by the court's May 14, 2003,
ruling.  See Tr. of 8/22/03 at 26-30.  Thereafter, the court
announced that after receiving the supplemental filings from the
parties it would take the matters under advisement and issue a

---

[26] Due to a power blackout which affected the offices of counsel
for the Palestinian Defendants, the court had granted an extension of
time for the filing of their opposition to the Third Motion for
Default Judgment.

single Report and Recommendation which addressed the three Motions for Default Judgment and a separate memorandum and order which addressed the attorney's fees attributable to non-compliance with discovery obligations. See id. at 33.

### Q.  Post August 22, 2003, Filings

Plaintiffs filed their reply memorandum on August 29, 2003. See Plaintiffs' Reply Memorandum in Further Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Plaintiffs' Reply Mem."). The Palestinian Defendants filed their supplemental memorandum on September 15, 2003. See Palestinian Defendants['] Memorandum in Further Opposition to Plaintiffs['] Motions for Default Judgment and in Opposition to an Award of Attorneys Fees (Document #232). Thereafter, the court took the Motions for Default Judgment under advisement.

On February 12, 2004, Plaintiffs filed a notice of concealed evidence, alleging that the Palestinian Defendants had concealed evidence regarding their agents and contacts in the United States. See Plaintiffs' Notice of Evidence Concealed by Defendants Palestinian Authority and Palestine Liberation Organization (Document #262). A revised version of that document was filed on February 17, 2004. See Plaintiffs' Revised Notice of Evidence concealed by Defendants Palestinian Authority and Palestine Liberation Organization ("Revised Notice") (Document #265).

## VI. Jurisdiction

### A.  Introduction

A court which is asked to enter default judgment should assure itself that it has jurisdiction both over the subject matter and the parties. See Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001)("'[W]hen

entry of default [judgment] is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties.'") (quoting <u>Williams v. Life Sav. & Loan</u>, 802 F.2d 1200, 1203 (10th Cir. 1986)) (first alteration in original); <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151, 154 (2nd Cir. 1999) (vacating default judgment where district court had not determined "jurisdictional facts by a preponderance of the evidence"); <u>In re Balbir Singh Tuli</u>, 172 F.3d 707, 712 (9th Cir. 1999) (citing <u>Williams v. Life Sav. & Loan</u>); <u>United States v. 51 Pieces of Real Property, Roswell, New Mexico</u>, 17 F.3d 1306, 1309 (10th Cir. 1994) (quoting <u>Williams v. Life Sav. and Loan</u>); <u>see also</u> <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 50 (1st Cir. 2002) ("To hear a case, a court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decision.'") (quoting <u>United States v. Swiss Am. Bank, Ltd.</u>, 191 F.3d 30, 35 (1st Cir. 1999)); <u>Hugel v. McNell</u>, 886 F.2d 1, 3 n.3 (1st Cir. 1989) ("[W]here the court rendering the default judgment is shown to lack personal jurisdiction over the defendant ... the judgment may be vacated and set aside by the rendering court on motion, or by another court on collateral attack.") (quoting 6 <u>Moore's Federal Practice</u> ¶ 55.09) (second alteration in original); <u>Letelier v Republic of Chile</u>, 488 F.Supp. 665, 668 (D.D.C. 1980) (holding the issue of subject matter jurisdiction should be fully explored despite previous entry of default). Consequently, this court examines both subject matter and personal jurisdiction.

**B. Subject Matter Jurisdiction**

Judge Lagueux has previously determined that subject matter jurisdiction exists in this action. <u>See</u> 153 F.Supp.2d 76, 85-86 (D.R.I. 2001). In <u>Ungar I</u>, Judge Lagueux found that Count I of the Complaint pled a federal cause of action pursuant to 18

U.S.C. § 2333.  See id. at 85.  He also concluded that the federal claim and the state law claims derived from a common nucleus of operative fact and that this gave the court subject matter jurisdiction over the state law claims under the doctrine of supplemental jurisdiction.  See id. at 86.

In Estates of Ungar v. The Palestinian Auth., 228 F.Supp.2d 40 (D.R.I. 2002) ("Ungar II"), Judge Lagueux considered the claims pled in the Amended Complaint in the context of a motion to dismiss for failure to state a claim upon which relief can be granted.  See id. at 41.  Count I of the Amended Complaint is almost identical to Count I of the original Complaint.  Compare Amended Complaint ¶¶ 1-48 with Complaint ¶¶ 1-51.  The primary difference is the omission of the individual PA Defendants as defendants, see Amended Complaint ¶¶ 4-12, and the Estate of Efrat Ungar as a plaintiff, see id. ¶ 48.  Judge Lagueux found that the Remaining Plaintiffs had alleged sufficient facts in Count I to invoke 18 U.S.C. § 2333, see Ungar II, 228 F.Supp.2d at 47 (citing Ungar I, 153 F.Supp.2d at 98), and denied the Palestinian Defendants' motion to dismiss Count I, see id.  Judge Lagueux also determined in Ungar II that this court could "exercise subject matter jurisdiction over Plaintiffs' state law claims [as pled in the Amended Complaint] because the state and federal claims 'derive from a common nucleus of operative fact.'"  Ungar II, 228 F.Supp.2d at 47-48 (quoting Ungar I, 153 F.Supp.2d at 86).

In making these determinations regarding the existence of subject matter jurisdiction, Judge Lagueux applied the liberal standards applicable to the particular motions before him.  In Ungar I, he applied the standard for ruling on a Rule 12(b)(1) motion, which required him to treat as true all well-pleaded facts and to indulge all reasonable inferences in favor of the plaintiffs.  See Ungar I, 153 F.Supp.2d at 85 (citing Aversa v.

34

<u>United States</u>, 99 F.3d 1200, 1210 (1st Cir. 1996)).  In <u>Ungar II</u> Judge Lagueux applied the similar standard for motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which required him to take all well pleaded allegations as true and to give the plaintiff the benefit of all reasonable inferences.  <u>See Ungar II</u>, 228 F.Supp.2d at 44 (citing <u>Figueroa v. Rivera</u>, 147 F.3d 77, 80 (1st Cir. 1998)).  However, for purposes of the present Motions for Default Judgment, the court must make these same determinations using a preponderance of the evidence standard.  <u>See Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151, 153-54 (2nd Cir. 1999)(holding that district court may not grant default without finding jurisdictional facts established by a preponderance of the evidence, even if court has previously denied a motion to dismiss for lack of personal jurisdiction); <u>cf.</u> <u>Prou v. United States</u>, 199 F.3d 37, 45 (1st Cir. 1999) (holding that courts are obligated at every stage of the proceedings to consider the question of subject matter jurisdiction); <u>Walsh v McGee</u>, 918 F.Supp. 107, 112 (S.D.N.Y. 1996)("[Q]uestions of subject matter jurisdiction are generally exempt from law of the case principles.").

Despite this higher standard, the court has little difficulty finding that the allegations which support subject matter jurisdiction have been proven by Plaintiffs by a preponderance of the evidence.  Because default has already entered against the Palestinian Defendants, <u>see</u> Memorandum and Order of 4/18/03 (Document #133), the factual allegations of the Amended Complaint must be taken as true.  <u>See Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.</u>, 771 F.2d 5, 13 (1st Cir. 1985) ("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its ... claims must be considered established as a matter of law.").  Therefore, the facts necessary to state a claim

35

pursuant to 18 U.S.C. § 2333 have been established,[27] and the court has jurisdiction over that claim pursuant to 28 U.S.C. § 1331. Similarly, the "common nucleus of operative fact," Ungar I, 153 F.Supp.2d at 86, from which Plaintiffs' federal and state law claims arise has also been established.[28] The court has jurisdiction over those supplemental causes of action pursuant to 28 U.S.C. § 1367. Subject matter jurisdiction is, therefore, established for all counts of the Amended Complaint.

### C. Personal Jurisdiction

In Ungar I, Judge Lagueux found that this court could exercise personal jurisdiction over the Palestinian Defendants. See Ungar I, 153 F.Supp.2d at 91. Judge Lagueux used a prima facie standard for determining that they had minimum contacts with the United States as a whole. See id. at 88. That standard required Judge Lagueux to restrict his inquiry to whether Plaintiffs had proffered evidence which, if credited, was sufficient to support a finding of personal jurisdiction. See id. at 86 (citing Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001)).

As explained in the Introduction to this Section, supra at 32-33, the court may not grant the Motions for Default Judgment unless personal jurisdiction has been proven by a preponderance

_____

[27] The court notes additionally that it conducted an evidentiary hearing on July 12 and 15, 2002, in connection with the Motion to Enter Default Judgment Against Defendants Hamas (Document #38). While that hearing was concerned primarily with the issue of damages, the court received evidence in the form of testimony, documents, and photographs, which proved by at least a preponderance of the evidence that Yaron Ungar was a United States citizen, that he and his Israeli wife, Efrat Ungar, were murdered on June 9, 1996, in an armed attack carried out by three of the individual Hamas defendants, and that this attack constituted an act of international terrorism.

[28] This conclusion is also supported by the facts adduced at the hearing on damages which the court conducted in July of 2002. See n.18.

of the evidence.  To meet this burden, Plaintiffs have resubmitted the materials which Judge Lagueux previously considered in deciding the Motion to Dismiss the Complaint (Document #22).  See Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Exhibits to Mem. Third Motion") (Document #172); see also Ungar I, 153 F.Supp.2d at 88-91 (discussing materials provided by Plaintiffs); Letter from Strachman to Martin, M.J., of 7/22/03 (noting the re-submission of materials) at 1.  The resubmitted materials are accompanied by an affidavit from Plaintiffs' counsel, attesting to the authenticity and origin of each document, see Exhibits to Mem. Third Motion, Exhibit ("Ex.") A (Affidavit of Strachman).

Plaintiffs have also filed additional exhibits in further support of their Motions for Default Judgment.  See Exhibits to Plaintiffs' Reply Memorandum in Further Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Reply Exhibits") (Document #229); Plaintiffs' Revised Notice of Evidence Concealed by Defendants Palestinian Authority and Palestine Liberation Organization ("Revised Notice") (Document #265).  After reviewing these filings, the court finds that they are sufficient to establish by at least a preponderance of the evidence that the Palestinian Defendants have minimum contacts with the United States as a whole and that the PA and PLO were served with process pursuant to the nationwide service of process provisions of 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(1)(D).[29]  See Ungar I, 153 F.Supp.2d at

---

[29] As the court concludes that it has personal jurisdiction over the Palestinian Defendants pursuant to the nationwide service of process provision of 18 U.S.C. § 2334(a) and Fed. R. Civ. P.

86-91 (discussing the requirements for exercise of personal jurisdiction and finding that Plaintiffs have made a prima facie showing that those requirements have been satisfied).  Thus, the court may exercise personal jurisdiction over the PA and the PLO consistent with the Due Process Clause of the Fifth Amendment. See id. at 91 (reaching same conclusion using prima facie standard).  The evidence on which the court relies for each of these findings is discussed below.

**1.  Minimum Contacts**

The PLO maintains an office in Washington, D.C.  See Revised Notice, Ex. KK (Exhibit B to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended ("FARA"), dated March 10, 1998) at 1, 2, Ex. LL (Supplemental Statement Pursuant to Section 2 of FARA, dated January 18, 2002) at 1, 9, Ex. NN (Supplemental Statement Pursuant to Section 2 of FARA, dated November 15, 1999) at 1, 9, Ex. OO (Supplemental Statement Pursuant to Section 2 of FARA, dated April 28, 2000) at 1, 9, Ex. PP (Short-Form Registration Statement Pursuant to FARA, dated March 10, 1998), Ex. QQ (Short-Form Registration Statement Pursuant to FARA, dated March 10, 1998).  As of October, 2002, the office had a staff of nine employees.  See Exhibits to Mem. Third Motion, Ex. C (New York Times article dated 10/16/00) at 2.

The PA also has an office in Washington, D.C.  See id. at 1; Revised Notice, Ex. KK,[30] Ex. MM (Retainer Agreement between PA

---

4(k)(1)(D), it is unnecessary to discuss whether the court could exercise personal jurisdiction over them pursuant to Rule 4(k)(2). Cf. Estates of Ungar v. Palestinian Auth., 153 F.Supp.2d 76, 91 n.3 (D.R.I. 2001) ("Ungar I") (reaching same conclusion).

[30]  "The PLO offices in Washington, D.C. shall represent the PLO and the Palestinian Authority in the United States .... The PLO and the Palestinian Authority will pay for the expenses of the office and the salaries of its employees."  Revised Notice, Ex. KK (Exhibit B to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended ("FARA"), dated March 10, 1998) at 1 (bold added).

and Bannerman and Associates, Inc., signed by PA on October 10, 1999)[31] at 1-4.  Both offices are headed by Hasan Abdel Rahman, the Chief Representative of the PLO and the PA in the United States.  See Revised Notice, Ex. LL at 9;[32] Reply Exhibits, Ex. Q (Prepared Statement of Hasan Abdel Rahman, Chief Representative of the PLO and the PNA to the United States, before the Senate Appropriations Committee Subcommittee on Foreign Operations) at 1-2, Ex. R (Tr. of March 25, 1999, Senate Appropriations Subcommittee on Foreign Operations Hearing) at 1, 26-27, Ex. S (Transcript of October 7, 2001, ABC News Special: America Fights Back) at 24-25, Ex. T (Transcript of November 10, 2001, CNBC Rivera Live) at 1-2,[33] Ex. U (Transcript of December 2, 2001, CNN Breaking News) at 1,[34] Ex. V (Transcript of November 6, 1998, CNN Morning News) at 1, Ex. W (Promotional Announcement for The O'Reilly Factor, Fox News Channel, December 4, 2001), Ex. X (Declaration of Ronn D. Torossian) ¶ 3, Ex. Z (Affidavit of David

---

[31] "The Firm will be available at all times to advise and assist the Palestinian Authority and its Washington Office.  Regular contact will be established between personnel of the Firm **and the Washington Office of the Palestinian Authority**."  Revised Notice, Ex. MM (Retainer Agreement between PA and Bannerman and Associates, Inc., signed by PA on October 10, 1999) at 2 (bold added).

[32] Mr. Hasan Abdel Rahman identifies himself in a January 18, 2002, Supplemental Statement Pursuant to Section 2 of the FARA, as "**Chief Representative of the PLO and PNA.**"  Revised Notice, Ex. LL at 9 (bold added).

[33]  The transcript of the broadcast reflects that Mr. Abdel Rahman stated: "Mr. Rivera, I said to Mr. Pinkas, **I'm speaking on behalf of the Palestinian Authority and the PLO.**" Reply Exhibits, Ex. T (Transcript of November 10, 2001, CNBC Rivera Live) at 2 (bold added).

[34] According to the transcript of the broadcast, Mr. Abdel Rahman stated:"**Let me reiterate the position of the Palestinian Authority.** We condemn those acts. We oppose them, and we will do everything we can to stop them."  Reply Exhibits, Ex. U (Transcript of December 2, 2001, CNN Breaking News) at 1 (bold added).

J. Strachman dated August 29, 2003).[35]

The PLO Office reported expending $200,132.74 on activities such as giving interviews and lectures and contacting the media during the six month period ending March 31, 1999.  See Exhibits to Mem. Third Motion, Ex. E (Report of the Attorney General to Congress of the United States on the Administration of Foreign Agents Registration Act of 1938, as amended, for the six months ending June 26, 1999, October 31, 1999, September 30, 2001, and April 28, 2002) at 2.[36]  For the six month period ending September 30, 1999, it reported expending $352,894.79, for similar activity.[37]  See id. at 4.  The expenditure for the six

[35] Plaintiffs have also submitted additional exhibits to prove Hasan Abdel Rahman's status as chief representative in the United States of both the PLO and the PA.  See Reply Exhibits, Ex. BB (Listing of 24 interviews in which Mr. Abdel Rahman is identified as PA representative or spokesman and 10 additional broadcasts with similar references), Ex. CC (Remarks of Mr. Abdel Rahman at the National Press Club, Washington, D.C., May 9, 2002), Ex. DD (Web Page for Project on Justice in Times of Transition 8/28/03, identifying Mr. Abdel Rahman as Chief Representative of the PA in U.S.), Ex. EE (Letter from Bernard Cardinal Law to Mr. Abdel Rahman dated December 4, 2001), Ex. FF (News Release for September 11, 2001, Middle East Forum identifying Mr. Abdel Rahman as Chief Representative of the PLO and the PA).

[36] Some of Plaintiffs' individual exhibits (or tabs of exhibits) consist of multiple documents, each with its own pagination.  See, e.g., Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Exhibits to Mem. Third Motion"), Ex. E (Report of the Attorney General to Congress of the United States on the Administration of Foreign Agents Registration Act of 1938, as amended, for the six months ending June 26, 1999, October 31, 1999, September 30, 2001, and April 28, 2002).  For ease of reference, the court has numbered sequentially the pages of such exhibits and cites to those page numbers rather than the page numbers which appear on the individual documents.

[37] Another exhibit reflects the PLO Office reporting an expenditure of $263,824.53 for the same six month period.  See Revised Notice, Ex. NN (Supplemental Statement Pursuant to Section 2 of FARA, dated November 15, 1999) at 11.  This apparent discrepancy does not affect the court's conclusions in this matter.

months ending March 31, 2000, was reported as $215,846.53, see Revised Notice, Ex. OO at 11, for activities which took place at addresses in Cleveland, Ohio, Orlando, Florida, Boston, Massachusetts, and Palm Beach, see id. at 13-14.  For the six month period ending September 30, 2001, the PLO Office reported expending $214,502.83, see id., Ex. LL at 11, and it engaged in activities which included speaking to high school students in Pennsylvania and attending a conference in Albuquerque, New Mexico, as well as  giving interviews to members of the press and other electronic media, see id., Ex. LL, at 13-14.

The PA has engaged American agents to represent it.  In 1997, the Little Rock, Arkansas, firm of Larry C. Wallace & Associates, P.A., served as an agent for the PA.  See Reply Exhibits, Ex. E, Tabs 1, 2.  In October of 1999, the PA entered into a three year, $2,250,000.00 contract with Bannerman and Associates, Inc. ("Bannerman"), of Washington, D.C., for the provision of public relations services.  See Revised Notice, Ex. MM ¶ 10.  Reports filed pursuant to FARA for the period from April 28, 2000, to April 28, 2002, reflect payment to Bannerman of $1.5 million and identification of eleven members of the firm as registered agents of the PA.  See Reply Exhibits, Ex. E, Tabs 7-11.  Bannerman's activities on behalf of the PA included lobbying Congress, see id.; Exhibits to Mem. Third Motion, Ex. F (January 20, 2000, Washington Post Online article), Ex. G (Forward article), providing advocacy training, see Exhibits to Mem. Third Motion, Ex. G at 3, public relations, see id., "arrang[ing] international visits of representatives of the Palestinian Authority," Reply Exhibits, Ex. E, Tabs 6, 7, and making "T.V. and radio appearances on behalf of the [Palestinian Authority]," id., Tabs 8, 9.

The PA also engaged the New York law firm of Stroock & Stroock & Lavan ("Stroock") to perform legal, consulting and

other services in the United States.  According to FARA reports, Stroock was retained by the PA at least as early as 1999, <u>see</u> Reply Exhibits, Ex. E, Tab 2 at 5; Exhibits to Mem. Third Motion, Ex. E at 2.  Stroock provided the PA with "legal services ... regarding various financial, commercial, and development projects," Reply Exhibits, Ex. E, Tab 1 at 5, <u>see also</u> <u>id.</u>, Tabs 2-3, "representation in various infrastructure projects and pension matters," <u>id.</u>, Tabs 4-9, and litigation, <u>see</u> Exhibits to Mem. Third Motion, Ex. H at 1, Ex. I at 4.  Between November 1, 1996, and April 30, 2001, the PA paid Stroock more than $2.8 million and at least six Stroock employees served as registered agents for the PA.  <u>See</u> Reply Exhibits, Ex. E, Tabs 1-9.

In 1993, the PA and the PLO entered into separate but substantively identical agreements with International Technologies Integration, Inc. ("ITI"), which granted ITI the right to develop a domestic and international communications network in the West Bank, Jerico, and the Gaza Strip.  <u>See</u> Exhibits to Mem. Third Motion, Ex. H (<u>Int'l Tech. Integration, Inc. v. The Palestine Liberation Org.</u>, 66 F.Supp.2d 3 (D.D.C. 1999)).  The contract was apparently to be performed over a twenty-five year period and had a total value of approximately $187,500,000.00.  <u>See</u> <u>id.</u> at 5 (noting that the arbitrator awarded $18,750,000.00 to ITI as compensation for work performed during almost one tenth of the life of the agreement). Significant for purposes of minimum contacts is the fact that the PA and PLO agreed that any dispute arising under the agreements would be submitted to binding arbitration in Washington, D.C., under the aegis of the American Arbitration Association and also agreed that the agreements would be interpreted and enforced in accordance with the laws of Virginia.  <u>See</u> <u>id.</u> at 2.

There is evidence from which a reasonable inference can be drawn that in July of 2002 the PA had millions of dollars on

deposit in the New York branches of Citibank and Arab Bank banks and a brokerage account at Salomon Smith Barney.  See Exhibits to Mem. Third Motion, Ex. I (Temporary Restraining Order entered in Int'l Tech. Integration, Inc. v. The Palestine Liberation Org. & The Palestinian Nat. Auth., Civil Action No. 98-00756 (CKK) (D.D.C. July 2, 1999)(enjoining the movement of $18,750,000.00 for one business day)).  There is also evidence that the financial department of the PA, the Palestine Monetary Authority ("PMA"), operates a web site which is based in the United States. See Reply Exhibits, Ex. JJ (Palestine Monetary Authority Website).  "[T]he computer files that collectively constitute the web site of the Palestine Monetary Authority are installed in a computer physically located in Houston, Texas.  Whenever the Palestine Monetary Authority updates, removes, or otherwise changes its web site, it is in actuality manipulating files on [the] computer in Texas."  Id., Ex. HH (Affidavit of Michael Bilow) ¶ 16.  Similarly, when persons view the web site of the PMA they are accessing files installed in this computer in Texas. See id.  ¶ 17.

The PA and PLO have engaged in extensive public relations, educational, and propaganda activities throughout the United States.  Hasan Abdel Rahman, the Chief Representative of the PA and PLO, speaks at high schools, colleges, universities, and clubs in the United States and appears frequently on television news programs.  See Exhibits to Mem. Third Motion, Ex. B (Biography of Mr. Abdel Rahman), Exs. C, D; Reply Exhibits, Exs. S, T, U, V, W, X, BB (Listing of 24 interviews in which Mr. Abdel Rahman is identified as PA representative or spokesman and 10 additional broadcasts with similar references), CC (Remarks of Mr. Abdel Rahman at the National Press Club, Washington, D.C., May 9, 2002), DD (Web Site for Project on Justice in Times of Transition identifying Mr. Abdel Rahman as a speaker and also as

the Chief Representative of the PA in U.S.), FF (News Release for September 11, 2001, Middle East Forum identifying Mr. Abdel Rahman as a participant and also as Chief Representative of the PLO and the PA); Revised Notice, Ex. LL at 13-14, Ex. NN at 13-14, Ex. OO at 13-14, Ex. RR (Transcript of May 18, 1999, <u>Talk of the Nation</u>, National Public Radio).

Mr. Abdel Rahman's deputy, Khalil Foutah, makes similar public appearances on behalf of the PA and PLO. <u>See</u> Reply Exhibits, Ex. II (Transcript of March 24, 1997, <u>NewsHour,</u> PBS);[38] <u>see also</u> Revised Notice, Ex. PP.[39] The PLO's Permanent Observer to the United Nations ("U.N."), Nasser Al Kidwa, conducts frequent public interviews outside of the U.N. <u>See</u> Reply Exhibits, Ex. AA (Listing 37 television interviews). The Deputy Permanent Observer, Marwan Jilani, engages in similar activity as reflected in his declaration, <u>see</u> Exhibits to Mem. Third Motion, Ex. L (Declaration of Marwan Jilani) ¶ 2 ("As Deputy Permanent Observer I ... speak on occasion outside the U.N. on U.N. subjects in my official capacity ...."); <u>see also</u> Reply Exhibits, Ex. GG (reflecting a April 11, 2002, interview of Mr. Jalani on KYW-TV), and by his March 23, 2000, appearance in Brookline, Massachusetts, in a program on the peace process, <u>see</u> Exhibits to Mem. Third Motion, Ex. L ¶ 3.

### 2. Defendants' Arguments Re Minimum Contacts

The Palestinian Defendants claim that "[t]he level of the

---

[38] During an appearance on the PBS <u>Online NewsHour</u> program, Mr. Khalil Foutah stated: "And I want to state here the opposition [sic] of the Palestinian National Authority under President Arafat, that we are still committed to the peace process." Reply Exhibits, Ex. II (Transcript of March 24, 1997, <u>Online NewsHour</u>, PBS) at 3-4.

[39] In a March 10, 1998, Short-Form Registration Statement Pursuant to FARA, Khalil Foutah described the duties he performed for the PLO as: "Answer questions of students, the media, lecture at universities, address Church groups on the question of Peace in the Middle East." Revised Notice, Ex. PP.

non-UN activity of the Permanent Observer Mission has not been established by a preponderance of the evidence," Memorandum in Support of Palestinian Defendants' Objection to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("PA & PLO Mem. Re Third Motion") at 5, and suggest that the Plaintiffs "assume throughout that the level of Palestinian activities in the United States at issue in this case is the same as and is essentially a continuation of the activities that were considered in Klinghoffer [v. S.N.C. Achille Lauro Ed, 795 F.Supp. 112 (S.D.N.Y. 1992)]," id. Such assumption is mistaken, according to the Palestinian Defendants, because of "the drastic restrictions the Anti-Terrorism statute placed on PLO activities in the United States in 1988 ...." Id.

The court finds this argument to be in the nature of a straw man and, in any case, unpersuasive. First, it does not appear that Judge Lagueux in Ungar I relied upon a "presumption of continuity," PA & PLO Mem. Re Third Motion at 6 (quoting Klinghoffer v. S.N.C. Achille Lauro Ed, 795 F.Supp. at 115), as a basis for the assertion of personal jurisdiction over the PLO, see Ungar I, 153 F.Supp.2d at 88-91. Second, the restrictions the Palestinian Defendants cite were suspended in 1994, see Reply Exhibits, Ex. Y (Presidential Determination No. 94-13 of January 14, 1994), and the suspension has been continually renewed by the President since that time,[40] see Plaintiffs' Reply Memorandum in

---

[40] The restrictions contained in the Antiterrorism Act of 1988 have been waived by the President from 1994 to the present. See Presidential Determination No. 94-30, 59 Fed. Reg. 35607 (July 13, 1994); Presidential Determination No. 95-12, 60 Fed. Reg. 2673 (Jan. 11, 1995); Presidential Determination No. 95-31, 60 Fed. Reg. 35827 (July 11, 1995); Presidential Determination No. 95-36, 60 Fed. Reg. 44725 (Aug. 28, 1995); Presidential Determination No. 95-50, 60 Fed. Reg. 53093 (Oct. 11, 1995); Presidential Determination No. 96-5, 60 Fed. Reg. 57821 (Nov. 22, 1995); Presidential Determination No. 96-8, 61 Fed. Reg. 2889 (Jan. 29, 1996); Presidential Determination No. 96-20, 61 Fed. Reg. 26019 (May 23, 1996); Presidential Determination No. 96-32, 61 Fed. Reg. 32629 (June 25, 1996); Presidential Determination

Further Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Plaintiffs' Reply Mem.") at 11-12.    Thus, the restrictions have not been an obstacle to PLO activities in the United States for almost ten years.    The court also notes that the suspension of these restrictions was not disclosed by the Palestinian Defendants in their argument.    See PA and PLO Mem. Re Third Motion at 5-6. Third, the court has detailed numerous exhibits which reflect extensive non-U.N. activity by the Palestinian Defendants.    See Section VI.C.1. supra at 38-45.

The Palestinian Defendants assert that "[t]he activities of Hasan Abdel Rahman and the PLO Mission in Washington, D.C., ... are within the ambit of the well-recognized government contacts exception, as are any lobbying or other government related activities of the Bannerman firm and of the one law firm reporting essentially unspecified activities on defendants['] behalf ...."    Palestinian Defendants['] Memorandum in Further Opposition to Plaintiffs['] Motions for Default Judgment and in Opposition to an Award of Attorneys Fees ("PA & PLO Reply Mem. Re Third Motion") at 2.    Apart from a citation two paragraphs prior in their memorandum to Klinghoffer v. S.N.C. Achille Lauro Ed,

No. 96-41, 61 Fed. Reg. 43137 (Aug. 21, 1996); Presidential Determination No. 97-17, 62 Fed. Reg. 9903 (Mar. 4, 1997); Presidential Determination No. 98-8, 62 Fed. Reg. 66255 (Dec. 18, 1997); Presidential Determination No. 98-29, 63 Fed. Reg. 32711 (June 16, 1998); Presidential Determination No. 99-5, 63 Fed. Reg. 68145 (Dec. 9, 1998); Presidential Determination No. 99-25, 64 Fed. Reg. 29537 (June 2, 1999); Presidential Determination No. 00-2, 64 Fed. Reg. 58755 (Nov. 1, 1999); Presidential Determination No. 2000-19, 65 Fed. Reg. 24852 (Apr. 27, 2000); Presidential Determination No. 01-13, 66 Fed. Reg. 20585 (Apr. 24, 2001); Presidential Determination No. 2002-14, 67 Fed. Reg. 20427 (Apr. 25, 2002); Presidential Determination No. 03-03, 67 Fed. Reg. 65471 (Oct. 25, 2002); Presidential Determination No. 2003-20, 68 Fed. Reg. 20327 (Apr. 25, 2003); Presidential Determination No. 2004-04, 68 Fed. Reg. 60841 (Oct. 14, 2003).

937 F.2d 44, 51 (2nd Cir. 1991), the Palestinian Defendants cite
no authority for this claim.

In <u>Klinghoffer</u>, the Court of Appeals for the Second Circuit,
in finding that jurisdiction over the PLO could not be based on
the PLO's participation in U.N. related activities, observed that
"[i]n an analogous context, courts have held that jurisdiction in
the District of Columbia may not be grounded on a non-resident's
'getting information from or giving information to the
government, or getting the government's permission to do
something.'" <u>Id.</u> at 51 (quoting <u>Investment Co. Inst. v. United
States</u>, 550 F.Supp. 1213, 1216-17 (D.D.C. 1982)). However, the
Second Circuit acknowledged that the "'government contacts' rule
is based in part on the constitutional right 'to petition the
Government for redress of grievances.'" <u>Id.</u> (quoting <u>Naartex
Consulting Corp. v. Watt</u>, 722 F.2d 779, 786-87 (D.C. Cir. 1983));
<u>see also</u> <u>Zeneca Ltd. v. Mylan Pharm., Inc.</u>, 173 F.3d 829, 831
(Fed. Cir. 1999)("[T]his [government contacts] exception is
grounded in concerns regarding the First Amendment right to
petition the federal government as well as the policy against the
creation of national supercourts in the District of Columbia.").
Given this basis, the applicability of the exception to the
Washington Office of the Palestinian Defendants seems
questionable.

It is true that the Second Circuit in <u>Klinghoffer</u> opined
that the government contacts exception "also appears to be based
on non-constitutional policy considerations, such as the
Judiciary's reluctance to interfere with the smooth functioning
of other governmental entities," <u>Klinghoffer</u>, 937 F.2d at 51, and
that the Federal Circuit has suggested that the exception may
also implicate due process, <u>see</u> <u>Zeneca Ltd. v. Mylan Pharm.,
Inc.</u>, 173 F.3d at 831 ("The government contacts exception may
also have due process underpinnings."). While these

considerations could arguably make the exception applicable to the Palestinian Defendants here, this court finds that the activities of the Washington Office of the PA and PLO go well beyond contact with the official branches of the federal government.  See Section VI.C.1. supra at 38-45.  Thus, even if the court excludes from its consideration contacts by the Washington Office of the PLO with the federal government, the other activities of that office are sufficient to allow this court to find minimum contacts.

The Palestinian Defendants also contend that Judge Lagueux failed to consider fully the effects of the Oslo Accords on the PA's status in the United States.  See PA & PLO Mem. Re Third Motion at 6.  They assert that because the PA is prohibited under the Oslo Accords from engaging in foreign relations this circumstance "compels the finding that Palestine's Permanent Mission to the United Nations is not an agency of the PA and generally negates the possibility of systematic and continuous contacts by the PA with the United States."  Id.  As evidence of the prohibition against the PA conducting foreign relations, the Palestinian Defendants cite the Declaration of Ed Morgan which Plaintiffs filed as an exhibit in support of their objection to the Rule 12(b)(1) motion filed by the Palestinian Defendants on June 13, 2003.  See id. at 6-7; see also Exhibits to Palestinian Defendants' Memorandum in Support of Objection to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("PA & PLO Exhibits"), Ex. 2 (Declaration of Ed Morgan ("Morgan Decl.")) ¶ 9.  Professor Morgan, an expert in international law, see id. ¶ 4, stated that "several provisions of both the DOP [Declaration of Principles on Interim Self-Governing Arrangements] and the IA [Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip] expressly deny the PA the capacity to conduct foreign relations," id. ¶ 25.

The short answer to this argument is that while the PA is prohibited from conducting "foreign relations," Morgan Decl. ¶¶ 23-28, including "the appointment of ... diplomatic and consular staff, and the exercise of diplomatic functions," id. ¶ 25b, there is nothing in the Oslo Accords, as Plaintiffs point out, which prohibits the PA "from conducting other non-diplomatic activities (such as commercial, public relations, lobbying, or educational activities) through its representatives, officers and agents abroad,"[41] Plaintiffs' Reply Mem. at 8 n.10. It is precisely these types of activities which have caused this court to find that both the PA and PLO have sufficient minimum contacts with the United States to allow the exercise of personal jurisdiction. Thus, the fact that the PA cannot conduct foreign relations does not mean that it cannot have minimum contacts with the United States. As Plaintiffs note, there are thousands of individuals and corporations, which like the PA are unable to conduct foreign relations, but which have sufficient minimum contacts with this country to allow the exercise of personal jurisdiction over them. See Plaintiffs' Reply Mem. at 1.

The Palestinian Defendants additionally argue that Judge Lagueux misinterpreted an exhibit submitted by Plaintiffs and incorrectly concluded that "the PA ... identifies the [Permanent Observer] Mission as its official representative to the U.N." PA & PLO Mem. Re Third Motion at 8 (quoting Ungar I, 153 F.Supp.2d at 90). According to the Palestinian Defendants, "[t]he list does not purport to show a PA agency in the United States. It is a list of Embassies, etc. of Palestine. The posting of the list on a PNA website, if such is the fact, does not make the

---

[41] Mr. Abdel Rahman's own biography describes him as "Chief Representative of the PLO and the P.N.A. in the United States," Exhibits to Mem. Third Motion, Ex. B (Biography of Abdel Rahman) at 1 (underlining added), and not to the United States.

organizations on the list agencies of the PA." Id. at 8.  While the list may "not purport to show a PA agency in the United States," id., this court notes that it also includes the Palestine Liberation Organization Office, headed by Mr. Abdel Rahman, in Washington, D.C.  The Palestinian Defendants' argument would appear to be equally applicable to this Office, but the evidence is overwhelming that Mr. Abdel Rahman is an agent of the PA.  Given this fact, the court attaches little weight to the Palestinian Defendants' protestations as to what the list purports to show.  At the very least, the listing is additional evidence of the connection which exists between the PA and the Observer Mission.

### 3. Service of Process

#### a. Judge Lagueux's Findings

In Ungar I, Judge Lagueux, appearing to using a prima facie standard, see 153 F.Supp.2d at 88, determined that the PA and the PLO qualified as unincorporated associations for purposes of service of process, see id. at 89, and that each had been properly served with process pursuant to Fed. R. Civ. P. 4(h)(1) through delivery of the summons and Complaint to a managing or general agent, see id. at 91.  Specifically, Judge Lagueux found that Marwan Jilani, the PLO's Deputy Permanent Observer to the United Nations, and Hasan Abdel Rahman, the Chief Representative of both entities in the United States, each qualified as a general or managing agent of the PA and PLO.  See id. at 90-91.  Since each man had been served, Mr. Jilani on March 23, 2000, in Brookline, Massachusetts, and Mr. Abdel Rahman on April 13, 2000, in Washington, D.C., see id. at 89-90, Judge Lagueux concluded that this court has personal jurisdiction over the PA and PLO pursuant to the nationwide service of process provisions of 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(1)(D), see id. at 91.

**b.  Law of the Case**

As an initial matter, Judge Lagueux's determination that the PA and PLO qualify as unincorporated associations for purposes of service of process pursuant to Fed. R. Civ. P. 4(h)(1) may constitute the law of the case.  Research regarding this doctrine has not provided a definitive answer to this question.  <u>See</u> <u>Arizona v. California</u>, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)("[L]aw of the case is an amorphous concept.  As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.); <u>Ellis v. United States</u>, 313 F.3d 636, 646 (1st Cir. 2002)("[A] court ordinarily ought to respect and follow its own rulings, made earlier in the same case.")(citing <u>Arizona v. California</u>); <u>Fed. Ins. Co. v. Scarsella Bros., Inc.</u>, 931 F.2d 599, 601 n.4 (9th Cir. 1991) (holding that, while some opinions have gone so far as to suggest that law of the case doctrine does not apply to pretrial rulings, "[b]ecause the ... doctrine is amorphous, it is not easily susceptible to such broad generalizations.")(citation omitted); <u>Boundy v. Dolenz</u>, No. CIV.A. 3:96CV0301-G, 2002 WL 1160075, at *1 (N.D. Tex. May 30, 2002)("Under the law of the case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.'")(quoting <u>Martin's Herend Imports, Inc.</u> <u>v. Diamond & Gem Trading United States of America Co.</u>, 195 F.3d 765, 771 (5th Cir. 1999)(apparently quoting <u>Arizona v.</u> <u>California</u>)).  Out of an abundance of caution, this Magistrate Judge will make his own determination regarding the status of the PA and PLO.

**c.  Magistrate Judge's Findings**

**1) PA and PLO are Unincorporated Associations**

This Magistrate Judge, applying a preponderance of the

evidence standard, finds that the PA and the PLO are unincorporated associations for purposes of service of process. The PA is not presently recognized as a foreign state by the United States, and, therefore, it is most appropriately categorized as an unincorporated association,[42] and the court so finds. See Motta v. Samuel Weiser, Inc., 768 F.2d 481, 485 (1st Cir. 1985)("An unincorporated association is defined as a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise.")(citing Black's Law Dictionary). The PLO, as Judge Lagueux noted, has previously been determined to qualify as an unincorporated association. See Ungar I, 153 F.Supp.2d at 89 (citing Klinghoffer v. S.N.C. Achille Lauro Ed, 739 F.Supp. 854, 858 (S.D.N.Y. 1990)). For the same reasons expressed by Judge Lagueux and the court in Klinghoffer, this Magistrate Judge also concludes that the PLO is an unincorporated association.

### 2) Hasan Abdel Rahman is Agent of PA and PLO

#### i. Recently Obtained Evidence

With regard to the service of process upon the Palestinian

---

[42] The Palestinian Defendants argue that the PA cannot be treated as an unincorporated association because of "its origins and existence as a governing authority ...." Memorandum in Support of Palestinian Defendants' Objection to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("Defendants' Mem. Re Third Motion") at 7 (citing the Declaration of Ed Morgan ("Morgan Decl.") which Plaintiffs filed as an exhibit in support of their objection to the Rule 12(b)(1) motion filed by Defendants on June 13, 2003). Defendants apparently assume that a "governing authority" cannot be an unincorporated association. This court fails to see why this is necessarily so. The court also notes that Defendants do not state that the PA is incorporated, and there is no evidence in the record to suggest that it is. In any case, whether the PA is an "unincorporated association" or a corporate entity does not affect the validity of service here. Fed. R. Civ. P. 4(h)(1) provides that service on unincorporated associations and on corporations is effected in identical fashion. To the extent that the Palestinian Defendants are suggesting that the PA is a hybrid entity which cannot be served in any manner pursuant to Rule 4, such argument is rejected.

Defendants, Plaintiffs have submitted additional documentary evidence, which the court finds to be clear and convincing, that Hasan Abdel Rahman is the Chief Representative of both the PA and PLO in the United States. Further, this evidence casts considerable doubt on the Palestinian Defendants' assertion that they are acting in "good faith," Memorandum of Defendants Palestinian Authority and Palestine Liberation Organization in Support of their Objection to Plaintiffs' Motion for Default Judgment and Other Relief with Respect to Depositions Noticed by Plaintiffs ("Defendants' Mem. Re Second Motion") at 1, as it directly contradicts statements made by Mr. Abdel Rahman in his declaration and by their counsel at the hearing on August 22, 2003.

In his June 14, 2000, Declaration, Mr. Abdel Rahman states:

> 3.    **The Palestinian Authority has no foreign representatives in the United States,** or elsewhere, in accordance with the Israeli-Palestinian Interim Agreement entered into in Washington, D.C.[,] on September 28, 1993, and **has no presence, or representative in the PLO Mission in Washington, D.C.**

Exhibits to Mem. Third Motion, Ex. M ("Abdel Rahman Decl.") ¶ 3 (bold added). Mr. Clark, the Palestinian Defendants' counsel, referring to this declaration, at the August 22, 2003, hearing stated:

> Now on where we are today, let me say that there are two affidavits, not one, before the Court, that under penalty of perjury state that there is no PNA office in the United States.... **The PNA is not authorized to have an office in the United States, and does not have one** ....

> But he has given an affidavit. It's before this Court. **It's the only conscious formal statement made under penalties of perjury that is made before this Court in which he says that he does not represent the PNA** and could not represent the PNA. That doesn't mean he can't state the position of the PNA .... It just means that

**he's not the PNA or a representative of the PNA**, and
wouldn't be a part of the mission that's authorized under
the Foreign Missions Act of the United States of the PLO
in Washington, if he were a member, a representative of
the PNA.  So all the statements with Geraldo Rivera and
the New York Times and. [Mr.  Abdel Rahman's] purported
biography, this one page statement, [a]s to Abbda [sic]
Rahman's background, that don't make him a representative
of the PNA, and do not overcome, or begin to overcome the
weight of a sworn statement under penalties of perjury,
that he is not such a member, that he's not such a
representative.[43]

Tr. of 8/22/03 hearing at 18-20 (bold added).

Yet, on January 18, 2002, Mr. Abdel Rahman executed, under
penalty of perjury, a nine page Supplemental Statement Pursuant
to Section 2 of the FARA, covering the six month period ending
September 30, 2001, and identified himself as the "**Chief
Representative of the PLO & PNA.**" Revised Notice, Ex. LL
(Supplemental Statement Pursuant to Section 2 of the FARA) at 9
(bold added).  Moreover, almost four years earlier, on March 10,
1998, Mr. Abdel Rahman executed another filing pursuant to FARA

---

[43] In their memorandum, counsel for the Palestinian Defendants
similarly belittle the evidence which had been submitted by Plaintiffs
prior to the August 22, 2003, hearing to support Plaintiffs' claim
that Mr. Abdel Rahman is the Chief Representative of the Palestinian
Authority in the United States.  <u>See</u> PA & PLO Mem. Re. Third Motion at
4-5.  Counsel describe a <u>New York Times</u> article which states that Mr.
Abdel Rahman has been the Washington representative of "the Palestine
National Authority since 1994," <u>see</u> <u>id.</u> at 4 (citing Exhibits to Mem.
Third Motion, Ex. C) as "double hearsay and inadmissible," <u>id.</u>, and
having "little or no probative value," <u>id.</u>  A transcript "of an online
live chat," <u>id.</u> (citing Exhibits to Mem. Third Motion, Ex. D) is
described in like manner, <u>see</u> <u>id.</u>  Counsel characterize the one page
biography of Mr. Abdel Rahman (Exhibits to Mem. Third Motion, Ex. B),
which lists him as Chief Representative of the PNA in the United
States, as a "weak refutation at best of the denial in his declaration
made under penalty of perjury on June 14, 2000." <u>Id.</u>  Given what the
recently submitted documentary evidence has revealed regarding Mr.
Abdel Rahman's status and the veracity of his declaration, <u>see</u> Revised
Notice, Exs. KK-MM, the court dismisses these arguments as unworthy of
discussion.

which contained the following statements:

> **The PLO Offices in Washington, D.C.**[,] **shall represent the PLO and the Palestinian Authority in the United States** and will promote peace and development with Israel. The PLO and the Palestinian Authority will pay for the expenses of the office and the salaries of its employees.

<u>Id.</u>, Ex. KK (Exhibit B to Registration Statement Pursuant to FARA) at 1 (bold added).

The claims of Mr. Abdel Rahman that "[t]he Palestinian Authority has no foreign representatives in the United States ... and has no presence, or representative in the PLO Mission in Washington, D.C.," Exhibits to Mem. Third Motion, Ex. M ("Abdel Rahman Decl.") ¶ 3, are also contradicted by the October, 1999, Retainer Agreement between the PA and Bannerman. The Retainer Agreement contains the following provisions, all of which clearly indicate that the PA has an office in Washington, D.C., and that Bannerman was representing the PA:

> 2) In order to assist the Palestinian Authority to advance more effectively the interests of Palestinians in Washington and to improve the U.S. - Palestinian relationship, [Bannerman] will augment **the Palestinian Authority and its Washington Office** efforts by:
>
> ....
>
> 4) [Bannerman] will be available at all times to advise and assist **the Palestinian Authority and its Washington Office.** Regular contacts will be established between personnel of [Bannerman] and **the Washington Office of the Palestinian Authority.**
>
> ....
>
> 8) [Bannerman] and the counterpart team will agree on a model of communication to ensure a consistent and dynamic relation which will involve close contacts with **the Palestinian Office in Washington**[,] **DC** and with the Palestinian Authority in the West Bank and Gaza respectively.
>
> ....
>
> 12) In connection with the above outlined representation, it is understood that **[Bannerman] will be required under**

**United States law to register its representation of the Palestinian Authority with the United States Government,** and that [Bannerman] will comply with all requirements of United States law in this connection.

Revised Notice, Ex. MM at 1-3 (bold added).

### ii. Other Evidence

Plaintiffs have also submitted evidence that Mr. Abdel Rahman has repeatedly and expressly presented himself as the representative of the PA. On March 25, 1999, Mr. Abdel Rahman testified before the Foreign Operations Subcommittee of the Senate Appropriations Committee.[44] A copy of Mr. Abdel Rahman's "Prepared Statement" bears a headline, identifying him as the "Chief Representative of the PLO and the PNA to the United States," Reply Exhibits, Ex. Q at 1, and his remarks reflect that he is speaking for the PA, see id. at 1-2. The transcript of the hearing also identifies Mr. Abdel Rahman in like manner, see id., Ex. R at 2, and evidences that he delivered approximately half of the statement before being interrupted by Senator Arlen Specter, who stated that Mr. Abdel Rahman's statement would be made part of the record, see id. at 27. In the testimony which he did deliver, Mr. Abdel Rahman twice invoked the name of the "Palestinian Authority," id. at 26-27, and it is clear from the context that in each instance he was speaking on behalf of the

---

[44] The subcommittee was considering the President's request for $400 million in assistance to the Palestinians to meet commitments made at the Wye Plantation. See Reply Exhibits, Ex. R (Transcript of March 25, 1999, Senate Appropriations Subcommittee on Foreign Operations Hearing) at 1. The specific subject of the hearing was whether the PA had met its obligations under the Oslo Accords and other agreements for "developing and sharing a plan to collect illegal weapons, reducing the size of security forces and cooperating with Israeli and U.S. authorities on cases involving terrorism, especially when Americans are the victims." Id. In testimony given before the subcommittee, Deputy Assistant Attorney General Mark Richard identified Yaron Ungar as one of the U.S. citizens killed in a terrorist attack in Israel. See id. at 8.

PA, see id.

During a November 6, 1998, CNN Morning News interview, Mr. Abdel Rahman expressed the PA's condemnation of a car bombing in a crowded Jerusalem market. See id., Ex. V at 1. On October 7, 2001, he appeared on an ABC News Special and stated: "So this is our official position. This is the position of the Palestinian [A]uthority and the PLO, and that's where we stand." Reply Exhibits, Ex. S at 25. On November 10, 2001, during a CNBC television interview, Mr. Abdel Rahman stated that: "I'm speaking on behalf of the Palestinian Authority and the PLO." Id., Ex. T at 2. In another CNN television interview conducted on December 2, 2001, Mr. Abdel Rahman stated: "Let me reiterate the position of the Palestinian Authority. We condemn those acts." Id., Ex. U at 1. Plaintiffs have also submitted an exhibit indicating that Mr. Abdel Rahman appeared on the television program The O'Reilly Factor on December 4, 2001, and that the promotional "teased segment" for the program states "Hasan Abdel Rahman, PLO representative to U.S., says no one should kill babies or civilians. Rahman says the Palestinian authority condemn, and oppose the killing of civilians." Id., Ex. W.

Based on all of the foregoing exhibits, the court finds the evidence overwhelming that Mr. Abdel Rahman is an agent of both the PLO and the PA and that as their Chief Representative in the United States he exercises independent judgment in the performance of his duties such that it is fair, reasonable, and just to imply his authority to accept service on behalf of both the PLO and PA. Plaintiffs served Mr. Abdel Rahman with process on April 13, 2000, in Washington, D.C. See Exhibits to Mem. Third Motion, Ex. K (Affidavit of Freeman R. Woodbury).

### 3) Marwan Jilani

The Palestinian Defendants tout Mr. Jilani's declaration (as they did Mr. Abdel Rahman's) as "competent and persuasive

evidence," PA & PLO Mem. Re Third Motion at 3, that he is not an agent of either the PLO or the PA, see id.; see also Exhibits to Mem. Third Motion, Ex. L (Declaration of Marwan Jilani).  In light of the apparent falsity of Mr. Abdel Rahman's declaration, the court views these similar pronouncements regarding Mr. Jilani's declaration with skepticism.  However, the court concludes that it is unnecessary to determine using a preponderance of the evidence standard whether Mr. Marwan Jilani is an agent of the PA and PLO as the evidence is overwhelming that Mr. Abdel Rahman is agent of both defendants.  It is only necessary that the court find that the Palestinian Defendants have been served, not that they have been served twice.

### 4.  Conclusion Re Personal Jurisdiction

Accordingly, the court finds by a preponderance of the evidence that it has personal jurisdiction over the PLO and the PA by virtue of the nationwide service of process provision of 18 U.S.C. § 2334(a) and Rule 4(k)(1)(D).  Cf. Ungar I, 153 F.Supp.2d at 88-91 (making such finding under prima facie standard).  Plaintiffs have demonstrated that the PA and PLO have minimum contacts with the United States as a whole and that each Defendant has been served with a copy of the summons and Complaint by delivery to a managing or general agent of each Defendant.  Cf. id. at 91.  The court may, therefore, exercise personal jurisdiction over the PLO and PA without violating the Due Process Clause of the Fifth Amendment.  Cf. id.

## VII.  The Motions for Default Judgment

### A.  First Motion

Plaintiffs' First Motion for Default Judgment (Document #106) is directed against the PA and is brought pursuant to Fed. R. Civ. P. 37(b)(2).  Default judgment is sought as a sanction for the PA's failure to respond to Plaintiffs' interrogatories, a request for production of documents, and a request for

admissions.  See Plaintiffs' Mem. First Motion at 1.

**B.  Second Motion**

    **1.  Applicability**

The Second Motion for Default Judgment (Document #125) is directed against both the PLO and the PA.  The Palestinian Defendants take issue with this direction and argue that "plaintiffs' discovery demands are directed solely to the PA and not the PLO."  Memorandum of Defendants Palestinian Authority and Palestinine Liberation Organization in Support of Their Objection to Plaintiffs' Motion for Default Judgment and Other Relief with Respect to Depositions Noticed by Plaintiffs ("PA & PLO Mem. Re Second Motion") at 2.  Plaintiffs admit that their requests for documents and admissions were addressed only to the PA.  See Letter from Strachman to Martin, M.J., of 3/23/04 at 1.  However, they note that of the seven persons Plaintiffs sought to depose, two, Yasser Arafat and Razi Jabali, "are PLO officials, in addition to their official positions in the PA."  Id. Plaintiffs also observe that the Motion for Protective Order (Document #115) in response to the deposition notices was filed by both the PLO and PA.  See id. at 2.

On this question, the court is not persuaded by Plaintiffs' arguments.  It is true that the Motion for Protective Order (Document #115) was brought by both the PLO and the PA.  However, this fact does not outweigh the more significant factor that the Notices of Deposition only identified the deponents, including Yasser Arafat and Razi Jabali, in connection with the PA.  See Notices of Deposition (Documents #49, 50, 103).  It is also true that this Magistrate Judge on occasion referred to Defendants complying with their discovery obligations.  See, e.g., Tr. of 7/14/03 at 31.  However, in so speaking, the court assumed from the fact that Plaintiffs were seeking default judgment against both the PA and PLO that discovery requests had been directed to

both Defendants.  This assumption was erroneous.  Of even greater significance, the Order of 1/14/03 (Document #99), granting the Motion to Compel, states:

> **Plaintiffs may issue deposition notices to The Palestinian Authority officers and employees** upon 60 days notice.  The deposition notices may issue for depositions to occur in the District of Rhode Island.  **The Palestinian Authority** may file objections to the depositions indicating with specificity their objection, such as location, etc.

Order of 1/14/03 (Document #99).  There is nothing on the face of the Order which indicates that the PLO was ordered to do anything.  For these reasons, the court declines to find that the PLO violated the Order of 1/14/03.  The court also declines to find that the PLO failed to comply with its discovery obligations given that no discovery requests were specifically directed to the PLO.  Accordingly, as to the PLO, the court finds that the Second Motion for Default Judgment should be denied, and I so recommend.

### 2.  Basis for Second Motion

Plaintiffs' Second Motion for Default Judgment (Document #125) is brought pursuant to Fed. R. Civ. P. 37(b)(2), and it seeks default judgment against the PA and the PLO as a sanction.  The basis for the Second Motion is the PA's and PLO's failure to produce any of the seven PA employees who had been noticed for deposition by Plaintiffs.

### C. Law Applicable to First and Second Motions

Plaintiffs' First and Second Motions seek default judgment as a sanction because of the PA's[45] failure to comply with discovery.  Fed. R. Civ. P. 37(b)(2)(C) specifically recognizes

---

[45] The court has already determined that to the extent the Second Motion seeks default judgment against the PLO it should be denied.  See Section VII.B.1. supra.

that the entry of judgment by default is among the sanctions available to the court.  Utilization of this sanction for failure to comply with a discovery order is within the sound discretion of the district court.  See Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976).  However, "a default judgment is ... a drastic sanction that should be employed only in an extreme situation." Luis C. Forteza e Hijos, Inc. v. Mills, 534 F.2d 415, 419 (1st Cir. 1976); cf. United States v. Certain Real Prop. Located at Route 1, Bryant, Alabama, 126 F.3d 1314, 1317 (11th Cir. 1997)("The decision to ... enter default judgment 'ought to be a last resort--ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders.'") (quoting Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1556 (11th Cir. 1986)).

The United States Court of Appeals for the Fifth Circuit has held that before a district court awards default judgment as a discovery sanction two criteria must be met: "the penalized party's discovery violation must be willful ... [and] the drastic measure is only to be employed where a lesser sanction would not substantially achieve the desired deterrent effect." United States v. $49,000 Currency, 330 F.3d 371, 376 (5th Cir. 2003) (citations omitted).  The Court of Appeals for the Seventh Circuit similarly requires "that when a court enters default judgment as a discovery sanction, the court must find that the party against whom sanctions are imposed displayed wilfulness, bad faith or fault." Aura Lamp & Lighting, Inc. v. Int'l Trading Corp., 325 F.3d 903, 909 (7th Cir. 2003); see also Downs v. Westphal, 78 F.3d 1252, 1257 (7th Cir. 1996)(finding abuse of discretion where a default judgment is entered without a showing of willfulness, bad faith or fault on the part of the defaulted party).

61

The United States Court of Appeals for the Third Circuit has identified the following factors which a district court should consider in deciding whether to impose default judgment:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party o[r] the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 919 (3rd Cir. 1992)(citing Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 868 (3rd Cir. 1984)).

### D. Application of Law to First and Second Motions

The court finds the six factors enumerated by the Third Circuit in Poulis v. State Farm Fire & Casualty Co. to be helpful and discusses them here. In terms of the personal responsibility of the PA for the failure to comply with the discovery ordered by the court, there is no reason to believe that the failure was attributable to counsel rather than the PA itself. Indeed, Mr. Clark stated at the April 1, 2003, hearing on the motion to enter default: "My instructions have been do not answer, do not take any steps that would replace [sic] us here ...." Transcript of April 1, 2003, hearing ("Tr. of 4/1/03") at 6. At the same hearing, Mr. Clark also stated that in December of 2002 he had met with President Yasser Arafat "and the leadership," id. at 8. It is reasonable to assume that this lawsuit was among the matters discussed and that the potential consequences of failing to respond to Plaintiffs' discovery requests were also discussed. Thus, I find that the PA, and not its counsel, is responsible for the decision not to respond to Plaintiffs' discovery requests.

As for the prejudice to Plaintiffs, it is clear that the PA's refusal to provide any discovery greatly prejudices

Plaintiffs' ability to prove their claims. Plaintiffs, in essence, allege that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts of terrorism, including the attack on Yaron Ungar and his wife. See Amended Complaint ¶ 35. By refusing to answer any interrogatories, admit any facts, produce any documents, or produce any officers or employees for depositions, the PA effectively frustrates the Plaintiffs' ability to prove their claims. This is not a case where default judgment is sought as a sanction for one or two discovery failings, such as the failure to produce for deposition a key witness or to produce certain documents. In such a case, the court could assess the degree of prejudice which the party denied the requested discovery has suffered. It is entirely possible that the court could find that while the party has been prejudiced, the party has not been totally blocked from proceeding with its case and that the entry of default judgment is too extreme a sanction. Here, in contrast, I find that the blanket refusal of the PA to provide **any** discovery is extremely prejudicial. Given the nature of Plaintiffs' claims, information within the control of the PA (and which Plaintiffs have sought via discovery) is critical to the proof of those claims.

The PA has demonstrated a history of dilatoriness throughout this litigation. Its initial response in February of 2002 to Plaintiffs' discovery requests was to jointly request with the PLO a stay rather than provide specific objections. When the stay of discovery terminated on November 4, 2002, the PA made no effort to respond to the outstanding discovery requests or to file objections thereto. After the court granted the Motion to Compel on December 12, 2002, the PA remained intransigent, filing motions for reconsideration and a protective order. More than six months later, on May 14, 2003, the court explicitly warned

the PA, both orally and in writing, that its continued refusal to comply with discovery could result in the entry of default judgment. See Tr. of 5/14/03 at 28-29; Order of 5/14/03 (Document #158) at 2. Yet, notwithstanding another extended period (sixty days) which the court set for satisfaction of the long overdue discovery obligations, the PA did not take a single step towards complying with the court's Orders of December 12, 2002 (Document #99), or May 14, 2003 (Document #158).

The PA (and also the PLO) has requested repeated re-scheduling of hearings, which this Magistrate Judge accommodated (until the court concluded the requests were excessive and directed that if lead counsel were not available local counsel would have to act in their place). See Letter from Martin, M.J., to Counsel of 8/4/03; see also Letter from Strachman to Martin, M.J., of 7/28/03 ("We vigorously oppose Mr. Schilling's request to continue the August 15, 2003, hearing. Plaintiffs are at a loss to identify a single hearing which the PA and PLO have not sought to postpone."). In short, the record in this case supports the conclusion that the PA has sought to delay these proceedings as long as possible.

With regard to willfulness or bad faith, although the PA (and also the PLO) has consistently argued that conditions in the Middle East prevent it from answering the discovery requests, see, e.g., Exhibits to Palestinian Defendants' Memorandum in Support of Their Objection to Plaintiffs' Motion for Default Judgment and Other Relief with Respect to Depositions Noticed by Plaintiffs (Document #154), Ex. A (Defendants' Motion Under Rule 8(A)(2) for a Stay Pending Appeal) ¶¶ 12-13; see also id. ¶ 13 (referring to "[t]he violent conditions and Israeli assaults directed at the PNA and PLO ..."), the court rejects as implausible its implicit claim that it could not have answered a single interrogatory, responded to a single request for

admission, or produced a single document sought by Plaintiffs.

Furthermore, even if the court were to accept the argument that the violence and destruction around Mr. Arafat's headquarters made it impossible for the PA to find documents or to answer the interrogatories or request for admissions, the proposition that none of the seven persons noticed for deposition would ever be available to be deposed at any time in any place strains credulity. See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Protective Order (filed with Plaintiffs' Objection to Palestinian Defendants' Motion for Protective Order) (Document #117) at 9 (noting that some of the requested deponents "regularly travel to Europe and Asia, and to the United States ....").

Indeed, Counsel for Plaintiffs noted at the May 14, 2003, hearing that the other PA officials had flown to the United States and had been deposed in other cases. See Tr. of 5/14/03 at 14-16. Plaintiffs' counsel introduced as an exhibit at the May 14, 2003, hearing a copy of the deposition of Ghassan Abdel Aziz Abu Ramadan, the manager of the PA's Office of Environment and Information in Gaza, which was conducted on March 31, 2003, in Washington, D.C., in the case of Bernard J. Bucheit v. The Palestine Liberation Organization and The Palestinian Authority, No. 1:00 CV 01455 (D.D.C.). See Plaintiffs' 5/14/03 Hearing Exhibit (copy of deposition of Mr. Ramadan) at 1-3 (full page numbering). Although Mr. Ramadan is not one of the seven officials Plaintiffs sought to depose in this matter, see Tr. of 5/14/03 at 15, the fact that he was able to leave Gaza and come to the United States to be deposed casts doubt on the PA's claims that conditions there prevent anyone from leaving. Similarly, Plaintiffs presented evidence that Mr. Muhanad Aljouni, the PA "Assistant Minister of Finance," testified on March 12, 2003, in Jerusalem District Court in the case of Haksharat Hayishuv Ins.

<u>Co., Ltd. v. The Palestinian Authority</u>.  <u>See</u> Plaintiffs'
Memorandum in Support of Their Motion for Default Judgment
Against the PA and PLO and for Other Relief for Refusing to
Submit to Depositions ("Plaintiffs' Mem. Second Motion"), Ex. B
(Translated Jerusalem District Court Document).  The fact that
Mr. Aljouni was able to appear in court in Jerusalem further
undermines the PA's implicit claim that none of the seven
officials are available to deposed anywhere at any time.  For
these reasons, I find the PA's failure to answer Plaintiffs'
discovery requests to have been willful.

As for the effectiveness of other sanctions, the court does
not see how any alternative sanction would be effective.  The PA
(and also the PLO) has made the decision not to engage in this
litigation.  While the court could, perhaps, impose monetary
sanctions on the PA, such sanctions would be of little or no
value to Plaintiffs because there is no reason to believe that
such sanctions will produce the desired result of compliance with
the discovery orders.  Additionally, collection of such monetary
sanctions could be problematic.  Accordingly, the court concludes
that other sanctions would not be effective in dealing with the
problem posed by the PA's conduct.

The final factor, the meritoriousness of the Plaintiffs'
claims, poses some difficulty.  While the culpability of Hamas
for the deaths of Yaron and Efrat Ungar is relatively clear, <u>see</u>
<u>Ungar I</u>, 153 F.Supp.2d at 83 (noting trial and conviction of
Hamas members for murdering the Ungars), assessment of the
validity of Plaintiffs' claims against the PA (and also the PLO)
on the present record is difficult.  The court is cognizant of
Ambassador Al-Kidwa's statement, albeit unsworn, that "neither
the PNA nor the PLO played any role and neither had any
responsibility for the deaths in this case.  We regret these
deaths as we do the thousands before them and since in these

66

tragic years of violence." Motion for Reconsideration (Document #100), Attachment (Letter from Ambassador Al-Kidwa to Martin, M.J., of 1/27/03) at 2. At the same time, the court also has before it the remarks of Plaintiffs' counsel at the May 14, 2003, hearing regarding the seven PA officials Plaintiffs were attempting in vain to depose:

> We have a tape of Mr. Jabali indicating that he provides Hamas terrorists support. He puts them into his own security forces. We have Mr. Dahlan. Mr. Dahlan met with Mr. Deif who is the Hamas leader right around the time of the Ungar murder. And we have information that he was given a green light to specifically conduct terrorist activities in June of 1996. We've asked to depose Mr. Rajoub. His men, men under his control, were the ones who gave the fake PA police documents to the actual murder[er]s of the Ungars. They're the ones who supervised the Tzurif gang, the actual gang that was involved in killing the Ungars. We've asked to depose Tawiq Tarrari. He gave money. It's been proven and documented that he gave money and weapons for specific terrorist attacks during this period of time. Mr. Al-Hindi has been accused and has documents of his same activities. Mr. Boughati is a mastermind of a series of activities during this entire period of time. Mr. Arafat, he is not just a person who happens to be a Palestinian Authority, but he himself has a direct hand in various forms of terrorism, and more specifically his signature itself was on a piece of paper indicating approval for the killing of Americans after the fact. He rewarded Palestinian terrorists in the form of compensation, financial compensation, for killing Americans.

Tr. of 5/14/03 at 12-13.

While it is difficult to ignore the fact that the PA's refusal to participate in discovery may have deprived Plaintiffs of the very evidence which would demonstrate the validity of their claims, putting that fact aside, this factor neither favors nor disfavors the entry of default judgment as the court is unable to determine the meritoriousness of Plaintiffs' claims. Thus, of the six factors, five point to the granting of the First

and Second Motions and one is neutral.  Accordingly, I find that both motions should be granted against the PA, and I so recommend.

### E.    Third Motion

The Palestinian Defendants did not answer the Amended Complaint following the denial of their motion to dismiss, and the clerk entered default against them on April 21, 2003. Accordingly, default judgment is sought against them pursuant to Fed. R. Civ. P. 55(b)(2) because of their failure to answer or otherwise defend.

### F.    Law Applicable to Third Motion

It does not appear that the Court of Appeals for the First Circuit has articulated any specific factors which should be considered in determining whether to enter default judgment pursuant to Fed. R. Civ. P. 55(b)(2).  The First Circuit has emphasized the importance of the notice requirement of the Rule. See United States v. $23,000 in United States Currency, 356 F.3d 157, 163 (1st Cir. 2004); Key Bank of Maine v. Tablecloth Textile Co., 74 F.3d 349, 355 (1st Cir. 1996)(describing as "grave error" failure to provide the requisite notice).  The First Circuit has also observed that a "failure to file the requested memoranda or even explain the failure after months of delay, amounted to a failure under Fed. R. Civ. P. Rule 55(a) to 'otherwise defend' the suit," Alameda v. Sec'y of Health, Educ. & Welfare, 622 F.2d 1044, 1048 (1st Cir. 1980), which would justify the entry of default judgment in the case of a private litigant.  Beyond these considerations, this Magistrate Judge has identified no other requirements mandated by First Circuit law.

The Court of Appeals for the Eighth Circuit has "noted generally that default judgment is appropriate if the conduct is willful, contumacious or intentional." Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 857 (8th Cir. 1996).  This court

determined in the prior section that the PA's conduct was willful, and the court previously made that same determination as to both the PA and the PLO regarding their failure to answer when it granted default.[46]  The Third Circuit has stated that "[d]epending on the record before the court, consideration of one or more of the Poulis[ v. State Farm Fire & Cas. Co., 747 F.2d 863, 868 (3rd Cir. 1984)] factors may be required ... when a party moves under Rule 55(b) for a default judgment as a sanction for a failure to plead or otherwise defend." Anchorage Assocs. v. Virgin Island Bd. of Tax Review, 922 F.2d 168, 177 (3rd Cir. 1990).

### G.  Application of Law to Third Motion

There is no question that the Palestinian Defendants received notice of the Third Motion.  They appeared at the August 22, 2003, hearing on that motion and submitted filings relative thereto.  The notice requirement has been satisfied.

Applying the Poulis factors which are applicable to a failure to defend situation results in a finding that the Third

---

[46] In the Memorandum and Order Granting Motion to Enter Default (Document #133) the court stated:

> Although the Palestinian Defendants assert that "their ability to litigate has been drastically compromised by the chaotic and volatile situation that has prevailed for some time in the Mid-East," Memorandum of Defendants Palestinian Authority and Palestin[e] Liberation Organization in Support of Objection to Plaintiffs' Motion to Enter Default Pursuant to Fed. R. Civ. P. 55(a) ("Palestinian Defendants' Mem.") at 1-2, it is clear that their failure to file an answer to Plaintiffs' Amended Complaint is the result of a deliberate choice and not due to an inability to file an answer.  The Palestinian Defendants acknowledge that "[t]he drafting and filing of an answer is within defendants' limited capacities ...." Id. at 2.  Indeed, it would be almost impossible for them to contend otherwise given their extensive filings as reflected in the ... travel.

Id. at 6-7.

Motion should be granted.  The failure to answer the Amended Complaint is directly attributable to the Palestinian Defendants (and not to their counsel as evidenced by Mr. Clark's statement regarding his instructions, see Tr. of 4/1/03 hearing at 6).  The Palestinian Defendants have been given an abundance of time within which to answer the Amended Complaint.  Their failure to answer is willful.  Lastly, the merits of Plaintiffs' claim neither favor nor disfavor the granting of the motion. Accordingly, I recommend that the Third Motion be granted.

## VIII.  Liability

Plaintiffs' Amended Complaint adequately pleads the elements of liability under 18 U.S.C. § 2333, see Amended Complaint ¶¶ 38-51, and the Palestinian Defendants' default relieves Plaintiffs of proving these elements, see Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999)("A party who defaults is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated."); Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, a P'ship v. Medfit Int'l, Inc., 982 F.2d 686, 693 (1st Cir. 1993)(noting "the maxim that an entry of a default against a defendant establishes the defendant's liability"); Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985)("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its seven claims must be considered established as a matter of law."); Eisler v. Stritzler, 535 F.2d 148, 153 (1st Cir. 1976)("The default judgment on the well-pleaded allegations in plaintiffs' complaint established ... defendant's liability.").  Thus, the Palestinian Defendants' liability has been established, and the court now proceeds to consider damages.

## IX.    Damages

18 U.S.C. § 2333(a) allows the estate of a United States national who is killed by an act of international terrorism and his or her survivors or heirs to recover threefold the damages they sustain and the cost of the suit, including attorney's fees. See 18 U.S.C. § 2333(a).

### A.    "Survivors" and "Heirs"

For the same reasons stated in this Magistrate Judge's Report and Recommendation of July 3, 2003 (Document #183),[47]   I find that Dvir Ungar and Yishai Ungar, the sons of Yaron Ungar, are his "heirs," Report and Recommendation dated 7/3/03 (Document #183) at 31-32, and that Judith and Meir Ungar, Michal Cohen, Amichai Ungar, and Dafna Ungar are "survivors" of Yaron Ungar and are within the class of plaintiffs who may bring an action under the statute, id. at 32-37.

### B.    Measure of Damages

Similarly, for the same reasons stated in the Report and Recommendation of 7/3/03, I find that § 2333(a) should be interpreted to allow for recovery of both pecuniary damages and also for non-economic damages, including loss of companionship, society, and mental anguish experienced by the victim's surviving family members, including his siblings.  See Report and Recommendation of 7/3/03 (Document #183) at 37-43.

### C.    Evidence of Damages

At the August 22, 2003, hearing Mr. Strachman, counsel for Plaintiffs, stated that he had written to counsel for the Palestinian Defendants approximately three weeks earlier and offered to make the witnesses who had testified at the damages hearing which this Magistrate Judge had conducted on July 12 and 15, 2002, in connection with the Motion to Enter Default Judgment

---

[47] See n.1.

71

against Hamas (Document #38) available to be deposed or cross-examined either in Israel or the United States.  <u>See</u> Tr. of 8/22/03 hearing at 6-7.  Mr. Strachman stated that he had not received a reply to that letter, and, therefore, requested that the damages findings made by the court as a result of that hearing be applied to the Palestinian Defendants.  <u>See</u> <u>id.</u> at 7-8.  Subsequently, the court asked Mr. Clark about Plaintiffs' offer to have the witnesses from the damages hearing made available for deposition either in Israel or here.  Mr. Clark responded that the Palestinian Defendants:

> did not participate in the hearing on default and damages for Hamas, and we do not intend to participate.  Our instructions have been that we would not participate.  We informed this court on April 1st [2003] that those were our instructions, and it['] s been reinformed a couple of time[s] .... [W]e do not seek to examine any of their witnesses if they appear and if they don't appear, because our instructions are that we should not participate in the proceedings until there has been a final decision on immunity.

Tr. of 8/22/03 hearing at 25-26.

Based on these facts, the court finds that the Palestinian Defendants have waived a hearing on damages.  <u>See</u> <u>KPS & Assocs.</u> <u>v. Designs by FMC</u>, 318 F.3d 1, 21 (1st Cir. 2003)("In limited circumstances we have permitted district courts to dispense with a Rule 55(b)(2) hearing, even in the face of apparently unliquidated claims."); <u>Ortiz-Gonzalez v. Fonovisa</u>, 277 F.3d 59, 63-64 (1st Cir. 2002)("Rule 55 grant[s] wide discretion to the district court ....  Discretion as to the judgment or the need for a hearing on damages is vested with the district court.); <u>Jones v. Winnepesaukee Realty</u>, 990 F.2d 1, 4 (1st Cir. 1993) (affirming a finding of damages following entry of default in tort action, made on basis of plaintiff's unchallenged testimony).  Accordingly, the court will apply the findings regarding damages which it made as to each Plaintiff based on the

evidence presented at the July, 2002, hearing on the Motion to Enter Default Judgment against Hamas (Document #38) to the present Motions for Default Judgment.  See Report and Recommendation dated 7/3/03 (Document #183) at 43-60.

### D.  Treble Damages

18 U.S.C. § 2333(a) provides that plaintiffs "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."  18 U.S.C. § 2333(a).  After tripling, the amounts which I recommended be awarded to each plaintiff are shown below:

Estate of Yaron Ungar
    for lost earnings                $1,432,158.00
    for pain and suffering of decedent   $1,500,000.00

Dvir Ungar (son)
    for loss of companionship, society,
       and guidance and mental anguish   $30,000,000.00
    for loss of parental services      $488,482.50[48]

Yishai Ungar (son)
    for loss of companionship, society,
       and guidance and mental anguish   $30,000,000.00
    for loss of parental services      $488,482.50[49]

Judith Ungar (mother)
    for loss of society and
      companionship and mental anguish   $15,000,000.00

Meir Ungar (father)
    for loss of society and
      companionship and mental anguish   $15,000,000.00

Michal Cohen (sister)
    for loss of society and
      companionship and mental anguish   $ 7,500,000.00

---

[48] The amount designated for loss of parental services shall be paid to the legal guardians of Dvir Ungar.

[49] The amount designated for loss of parental services shall be paid to the legal guardians of Yishai Ungar.

Amichai Ungar (brother)
    for loss of society and
      companionship and mental anguish   $ 7,500,000.00

Dafna Ungar (sister)
    for loss of society and
      companionship and mental anguish   <u>$ 7,500,000.00</u>

                   Total:   $116,409,123.00

### E.  Israeli Law Claims

The court finds that no additional damages are due for the claims pled under Israeli law as the injuries sustained by the Plaintiffs are the same and have already been addressed by the award recommended above.

### H.  Interest

Plaintiffs have requested that interest be awarded on the judgment from June 9, 1996.  <u>See</u> Plaintiffs' Mem. Third Motion at 10 (incorporating by reference their Damages Memorandum which requests such award at 25).  However, Judge Lagueux determined in <u>Ungar III</u> that prejudgment interest should not be added to damages awarded pursuant to 18 U.S.C. § 2333.  <u>See</u> <u>Ungar III</u>, 2004 WL 134034, at 2, 4-6.  Therefore, Plaintiffs' request for prejudgment interest should be denied, and I so recommend.[50]

### X.  Attorney's Fees

Plaintiffs have submitted an Affidavit of Counsel Fees (Document #220), seeking $11,925.00 in attorney's fees for fifty-three hours of work.  <u>See</u> Affidavit of Counsel Fees ("Fees Aff."), Attachment (Statement of Fees in Connection with Defendants' Refusal to Provide Discovery ("Statement of Fees"))

---

[50] Whether prejudgment interest is authorized for any of the claims brought under Israeli law has not been addressed by Plaintiffs. The court declines to investigate a matter of foreign law unaided by counsel, particularly when it is not even certain that Plaintiffs contend that prejudgment interest is authorized for the Israeli claims.

at 4.  The affidavit states that the attorney's fees are sought because of the Palestinian Defendants "refusal to comply with a series of court orders and the rules of procedure concerning several forms of discovery such as depositions, interrogatories, a request for production of documents, and a request for admissions."  Fees Aff. at 1.  While this Magistrate Judge is issuing a separate order awarding these fees to Plaintiffs as against the PA for their refusal to provide discovery, upon consideration there seems no reason why a recommendation for the award of such fees should also not be included in this Report and Recommendation, especially in view of the fact that Plaintiff's counsel has advised the court that "no affidavit of costs or attorney['']s fees other than the affidavit of August 18, 2003, has been or will be filed in respect to the pending motions for default judgment against the PA and PLO," Letter from Strachman to Martin, M.J., of 3/23/04 at 2.

Obviously, Plaintiffs are not entitled to collect the same fees twice, but, at least as to the PA, the award of attorney's fees is authorized both under Fed. R. Civ. P. 37(b)(2) for the PA's failure to comply with discovery ordered by the court and also under 18 U.S.C. § 2333(a) as part of the judgment.  If Judge Lagueux or an appellate court determines that default judgment should not be granted against the PA, thereby negating the award of attorney's fees pursuant to 18 U.S.C. § 2333(a), the separate Order awarding attorney's fees to Plaintiffs as a sanction pursuant to Fed.R.Civ.P. 37(b)(2) for the PA's delaying and ultimately refusing to comply with discovery requests and orders may (and is intended by this Magistrate Judge to) provide a separate and independent basis for upholding the award of attorney's fees against the PA.

The court has reviewed the hours claimed and work performed as reflected in the Fees Aff. and finds that they are reasonable

and necessary.  The court has also previously determined that an hourly rate of $225 per hour is reasonable for Plaintiff's counsel, who has ably represented Plaintiffs throughout these proceedings.  <u>See</u> Report and Recommendation of 7/3/03 at 62-63. Accordingly, I recommend that Plaintiffs be awarded $11,925.00 in attorney's fees as against the PA.

Although the court has determined that no sanction may be imposed on the PLO for alleged discovery violations, the Fees Aff. does reflect time expended by Plaintiffs' counsel opposing motions for reconsideration and for a protective order which were filed by both the PA and the PLO.  <u>See</u> Statement of Fees at 2-4. Specifically, the court identifies the time claimed on the following dates as attributable (or sufficiently related) to such filings or the obtaining of default so as to warrant the award of attorney's fees against the PLO pursuant to 18 U.S.C. § 2333(a): February 10, 11, and 17, 2003; March 12, 26, 27, 28, 30, and 31, 2003; April 1, 7, and 8 (half of the time on the latter two dates), 2003; May 13, 14, and 21, 2003; June 10 and 13, 2003; July 10, 14, 17, 29, and 30, 2003.  <u>See</u> <u>id.</u>  The hours identified total 28.20 hours.  Multiplying those hours by the $225 hourly rate which the court has found appropriate for Plaintiff's counsel yields the amount of $6,345.00.  Accordingly, the court recommends that Plaintiffs be awarded attorney's fees against the PLO in the amount of $6,345.00.

## XI.  Summary

### A.  First Motion

For the reasons expressed in Section VII., I recommend that the First Motion for Default Judgment be granted and that default judgment be entered against the PA in the amount stated in paragraph D below.

### B.  Second Motion

For the reasons expressed in Section VII., I recommend that

the Second Motion for Default Judgment be granted in part and denied in part.  Specifically, I recommend that it be granted to the extent that default judgment be entered against the PA but denied as to the PLO.  The amount of default judgment to be entered against the PA is stated in paragraph D below.[51]

### C. Third Motion

For the reasons expressed in Section VII. G., I recommend that the Third Motion for Default Judgment be granted and that default judgment be entered against both the PA and the PLO in the amounts indicated in paragraph D below.

### D. Amount of Default Judgment

For the reasons expressed in Section IX, I recommend that damages be awarded to the following Plaintiffs in the amounts indicated: Estate of Yaron Ungar ($2,932,158.00); Dvir Ungar ($30,488,482.50); Yishai Ungar ($30,488,482.50); Judith Ungar ($15,000,000.00); Meir Ungar ($15,000,000.00); Michal Cohen ($7,500,000.00); Amichai Ungar ($7,500,000.00); and Dafna Ungar ($7,500,000.00).  I also recommend that Plaintiffs be awarded attorney's fees as against the PA in the amount of $11,925.00 and attorney's fees as against the PLO in the amount of $6,345.00. Because the Palestinian Defendants are jointly and severally liable to Plaintiffs for the damages awarded, see Amended Complaint ¶¶ 48, 62, 71, 82, the total amount of the recommended judgment against the PA, including attorney's fees, is $116,421,048.00, and the total amount of the recommended judgment against the PLO, including attorney's fees, is $116,415,468.00.

## XII. Conclusion

For the reasons stated above, I recommend that the Motions for Default Judgment be granted to the extent and as stated in Section XI above.  Any objections to this Report and

---

[51] Although the court has recommended granting all three motions as to the PA, obviously only one default judgment can be entered.

Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. <u>See</u> Fed. R. Civ. P. 72(b); D.R.I. Local R. 32. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


David L. Martin
United States Magistrate Judge
March 31, 2004

RAMSEY CLARK

LAWRENCE W. SCHILLING

LAW OFFICES

36 EAST 12TH STREET

NEW YORK, N.Y. 10003

(212) 475-3232

FAX (212) 979-1583

November 21, 2002

RECEIVED

NOV 25 2002

U.S. District Court
District of Rhode Island

Honorable David L. Martin
Magistrate Judge
U.S. District Court
Office of the Clerk
Providence, Rhode Island 02903-1720

Re:  **Ungar v. The Palestinian Authority**
      **C.A. No. 00-105L**

Dear Magistrate Judge Martin:

I have been informed by the Trial Chamber presiding over the trial of Pastor Elizaphan Ntakirutimana at the International Criminal Tribunal for Rwanda to appear before it in Arusha, Tanzania for proceedings on December 12, 2002.

I am the only defense counsel for the Pastor and have represented him at all times since his arrest in 1996.

The date in Arusha was set several weeks ago and the case could not proceed in my absence. It conflicts with the time of the hearing that has just been scheduled in <u>Ungar</u>. For these reasons I must request that the December 12 hearing in <u>Ungar</u> be rescheduled.

As lead counsel for the defendants in <u>Ungar</u>, it is important that I be present at the hearing before your Honor which will cover matters of considerable importance in the case and may affect several other cases against my clients which are pending in other federal courts.

I will leave for Arusha as early as December 4, 2002 and expect to be back in the United States by December 22, 2002. I will be available in January and thereafter.

-2-


        The defendants filed a motion for reconsideration yesterday
in <u>Ungar</u> which requests a stay of all proceedings except those
dealing with immunity.  This could affect the timing of the
hearing.  I have arranged for a courtesy copy of the motion to be
hand-delivered to you.

        Thank you for your consideration.

                                    Sincerely,

                                    Ramsey Clark

cc:  David J. Strachman
     (by fax and mail)

MCINTYRE, TATE,
LYNCH & HOLT LLP

COUNSELLORS AT LAW

**RECEIVED**

JUL 22 2003

DAVID L. MARTIN, U.S. MAGISTRATE JUDGE
U.S. DISTRICT COURT, DISTRICT OF RHODE ISLAND

JERRY L. MCINTYRE †
DEBORAH MILLER TATE *Δ
WILLIAM J. LYNCH
WILLIAM F. HOLT
DAVID J. STRACHMAN
ROBERT S. PARKER*

Also member
† New York Bar
* Massachusetts Bar
Δ Florida Bar

HAND DELIVERED

July 22, 2003

The Honorable Magistrate Judge Martin
United States District Court
for the District of Rhode Island
1 Exchange Terrace
Providence, RI 02903

Re:    **Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al.**
       **C.A. No. 00-105L**

Dear Magistrate Judge Martin:

        After reviewing the transcript of the hearing of July 14, 2003, plaintiffs would like to address a point that perhaps was not fully clarified in the hearing.

        Plaintiffs' pending motion for entry of default judgment pursuant to Rule 55(b)(2) against the Palestinian Authority and the Palestine Liberation Organization incorporates the documentation and evidence relating to defendants' contacts with the United States, that was previously submitted to the Court in response to the defendants' motion to dismiss the complaint.

        Plaintiffs re-submitted these materials, accompanied by an affidavit from counsel attesting to the authenticity and origin of each document, in order to permit the Court to determine that this evidence meets the preponderance of evidence standard required for the entry of default judgment. Judge Lagueux has already determined that these documents and evidence were sufficient to show a prima facie finding of minimal contacts with the United States. Therefore, the question which remains is not whether the facts are sufficient to constitute minimal contacts, but whether the facts have been proven by a preponderance of the evidence. Since the vast majority of the documents originate from the United States Government and/or the defendants themselves (and were therefore not challenged by defendants) this determination would appear to be a virtual formality. Indeed, given the nature of the documents, counsel's affidavit of authenticity was submitted more from caution than from necessity.

The Honorable Magistrate Judge Martin
Page Two
July 22, 2003

      Defendants' refusal to comply with discovery despite your order of May 14, 2003, and the apparent likelihood of default judgment as a sanction therefore, have made the matter of personal jurisdiction fully germane in respect to the two Rule 37 motions for default judgment which have been referred to Your Honor.

      As plaintiffs stated (though perhaps with insufficient clarity) at the hearing on July 14, 2003, to the extent that the Report and Recommendation on plaintiffs' two Rule 37 motions for default judgment will address the matter of personal jurisdiction, plaintiffs request to incorporate the documentation already in the record and counsel's affidavit of authenticity (submitted as part of plaintiffs' Rule 55(b)(2) motion), in support of their Rule 37 motions. This would permit the court to enter default judgment and make an explicit finding that sufficient minimum contacts with the United States have been proven by a preponderance of the evidence.

                    Sincerely,

                    David J. Strachman

DJS/dc
cc:   Ramsey Clark
       Lawrence W. Schilling
       Deming E. Sherman
       Annemarie M. Carney

82

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
JOHN O. PASTORE FEDERAL BUILDING
TWO EXCHANGE TERRACE
PROVIDENCE, RHODE ISLAND 02903-1779

(401) 752-7080
FAX (401) 752-7085

DAVID L. MARTIN
U.S. MAGISTRATE JUDGE

July 25, 2003

David J. Strachman, Esquire
McIntyre, Tate, Lynch & Holt
Counselors at Law
321 South Main Street, Suite 400
Providence, RI 02903

Ramsey Clark, Esquire
Lawrence W. Schilling, Esquire
Clark & Schilling Law Offices
36 East 12th Street
New York, NY 10003

Deming E. Sherman, Esquire
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

RE:  Estate of Ungar, et al. v. The Palestinian Authority, et al.    CA 00-105L

Dear Counsel:

On July 22, 2003, the court received a letter from Mr. Strachman which requested that, to the extent that the Report and Recommendation on the two Rule 37 motions for default judgment which the court presently has under advisement addresses the matter of personal jurisdiction, the court consider documentation submitted as part of Plaintiffs' Rule 55(b)(2) motion.

On July 23, 2003, Senior Judge Lagueux referred Plaintiff's Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Plaintiffs' Rule 55(b)(2) Motion") to me for findings and recommendations.

In light of these developments, the court has decided that it will conduct a hearing on Plaintiffs' Rule 55(b)(2) Motion at 11:30 a.m. on Friday, August 15, 2003. The court will then write a single Report and Recommendation which addresses all three motions.

Very truly yours,

David L. Martin

DAVID L. MARTIN
U.S. MAGISTRATE JUDGE

DLM/mis

83

MCINTYRE, TATE,
    LYNCH & HOLT LLP
    COUNSELLORS AT LAW

JERRY L. MCINTYRE †
DEBORAH MILLER TATE *Δ
WILLIAM J. LYNCH
WILLIAM F. HOLT
DAVID J. STRACHMAN
ROBERT S. PARKER*

Also member
† New York Bar
* Massachusetts Bar
Δ Florida Bar

VIA FAX (401) 752-7265

July 28, 2003

**RECEIVED**

JUL 29 2003

DAVID L. MARTIN, U.S. MAGISTRATE JUDGE
U.S. DISTRICT COURT, DISTRICT OF RHODE ISLAND

The Honorable Magistrate Judge Martin
United States District Court
for the District of Rhode Island
1 Exchange Terrace
Providence, RI 02903-1720

Re:     **Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al.**
        **C.A. No. 00-105L**

Dear Magistrate Judge Martin:

        We vigorously oppose Mr. Schilling's request to continue the August 15, 2003 hearing. Plaintiffs are at a loss to identify a single hearing which the PA and PLO have not sought to postpone. Further, in addition to Mr. Clark, plaintiffs are ably represented by three other experienced attorneys. Mr. Schilling and Mr. Sherman have both previously appeared without Mr. Clark on behalf of the defendants. Mr. Clark could also participate from Europe via telephone.

        If the Court entertains the request to reschedule the hearing, I respectfully suggest any day prior to Mr. Clark's vacation, including Wednesday, July 30th, when the parties are appearing before Judge Lugueux at 11:00. If it not inconvenient for the Court, perhaps the case could be scheduled later that day.

                                Sincerely,

                                David J. Strachman

DJS/smm
cc:   Ramsey Clark (Via fax 212-979-1583)
      Lawrence W. Schilling (Via fax 212-979-1583)
      Deming E. Sherman (Via fax 401-276-6611)
      Annmarie Carney (Via fax 401-276-6611)

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
JOHN O. PASTORE FEDERAL BUILDING
TWO EXCHANGE TERRACE
PROVIDENCE, RHODE ISLAND  02903-1779

(401) 752-7080
FAX (401) 752-7085

DAVID L. MARTIN
U.S. MAGISTRATE JUDGE

August 4, 2003

David J. Strachman, Esquire
McIntyre, Tate, Lynch & Holt
Counselors at Law
321 South Main Street, Suite 400
Providence, RI 02903

Ramsey Clark, Esquire
Lawrence W. Schilling, Esquire
Clark & Schilling Law Offices
36 East 12th Street
New York, NY 10003

Deming E. Sherman, Esquire
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

RE:  Estate of Ungar, et al. v. The Palestinian Authority, et al.    CA  00-105L

Dear Counsel:

In reply to the two letters from Mr. Schilling and one from Mr. Strachman, all dated July 28, 2003, regarding the hearing scheduled for August 15, 2003, the court reluctantly will grant Mr. Schilling's request and reschedule the hearing to 11:00 a.m. on Friday, August 22, 2003.   The court was not available on July 30th, the alternative date suggested by Mr. Strachman.

While the court is granting Mr. Schilling's request, the court agrees with Mr. Strachman that the number of hearings which have been rescheduled at the request of the PA and PLO is becoming excessive. Accordingly, counsel for the PA and PLO are advised that future requests for rescheduling will not be viewed favorably.  If primary counsel are not available on the scheduled date, local counsel should be prepared to act in their place.

Very truly yours,

DAVID L. MARTIN
U.S. MAGISTRATE JUDGE

DLM/mis

85

McINTYRE, TATE,
LYNCH & HOLT LLP
COUNSELLORS AT LAW

JERRY L. McINTYRE †
DEBORAH MILLER TATE *∆
WILLIAM J. LYNCH
WILLIAM F. HOLT
DAVID J. STRACHMAN
ROBERT S. PARKER*

Also member
† New York Bar
* Massachusetts Bar
∆ Florida Bar

HAND DELIVERED

March 23, 2004

RECEIVED

MAR 23

The Honorable Magistrate Judge Martin
United States District Court
for the District of Rhode Island
Two Exchange Terrace
Providence, RI 02903

Re:    **Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al.**
       **C.A. No. 00-105L**

Dear Judge Martin:

In response to your letter of March 22, 2004, the plaintiffs respectfully respond as follows:

The plaintiffs do not agree with the defendants' assertion that the plaintiffs' discovery requests were "directed solely to the PA and not the PLO."

It is true that plaintiffs' requests for documents and admissions were directed only at the PA. However, of the seven persons whose depositions were noticed (and refused by defendants), at least two are PLO officials, in addition to their official positions in the PA.

Specifically, Yasser Arafat is the Chairman of the PLO Executive Committee, and Razi Jabali is a member of the Military Council of the PLO Central Council. See description of PLO structure and list of members of the PLO Central Council published by the PLO U.N. Observer Mission, http://www.palestine-un.org/plo/frindex.html. (Razi Jabali is listed there as "Ghazi al-Jabali," an alternative English transliteration of his name).

Accordingly, the memorandum in support of Plaintiffs' Motion For Default Judgment Against the PA and PLO and For Other Relief For Refusal To Submit To Depositions [docket #125] expressly states that, "*Plaintiffs requested to depose seven PA/PLO officials . . .*" (p. 2) and "*Plaintiffs seek from deponents, who are officers of the PA and/or PLO, specific information relating to defendants' operational and financial relations with Hamas . . .*" (p. 3).

The Honorable Magistrate Judge Martin
Page Two
March 23, 2004


Significantly, the motion for a protective order in response to the deposition notices was filed by both the PLO and the PA.  This clearly demonstrates defendants' acknowledgement and admission that the requested deponents were officials of both the PLO and the PA: if the requested deponents were officials of the PA only, the PLO would have had no reason -- nor standing -- to seek a protective order.

Finally, plaintiffs would like to clarify that no affidavit of costs or attorneys fees other than the affidavit of August 18, 2003, has been or will be filed in respect to the pending motions for default judgment against the PA and PLO.

Sincerely,

David J. Strachman

DJS/dc
cc:    Ramsey Clark (v/fax 212-979-1583)
       Lawrence W. Schilling (v/fax 212-979-1583)
       Deming E. Sherman (v/fax 401-276-6611)
       Annemarie M. Carney (v/fax 401-276-6611)