UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATES OF YARON UNGAR AND EFRAT UNGAR BY AND THROUGH THE ADMINISTRATOR OF THEIR ESTATES DAVID STRACHMAN; DVIR UNGAR, MINOR, BY HIS GUARDIANS AND NEXT FRIEND, PROFESSOR MEYER UNGAR; JUDITH UNGAR; RABBI URI DASBERG; JUDITH DASBERG (INDIVIDUALLY AND IN THEIR CAPACITY AS LEGAL GUARDIANS OF PLAINTIFFS DVIR UNGAR AND YISHAI UNGAR); AMICHAI UNGAR;  DAFNA UNGAR; AND MICHAL COHEN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs,[1] | ) ) |
| V. | ) ) C.A.No. 00-105L |
| THE PALESTINIAN AUTHORITY (A.K.A. "THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY"); THE PALESTINE LIBERATION ORGANIZATION; YASSER ARAFAT; JIBRIL RAJOUB; MUHAMMED DAHLAN; AMIN AL-HINDI; TAWFIK TIRAWI; RAZI JABALI; HAMAS - ISLAMIC RESISTANCE MOVEMENT (A.K.A. "HARAKAT AL-MUQAWAMA AL-ISLAMIYYA") ABDEL RAHMAN ISMAIL ABDEL RAHMAN GHANIMAT; JAMAL ABDEL FATAH TZABICH AL HOR; RAED FAKHRI ABU HAMDIYA; IBRAHIM GHANIMAT; AND IMAN MAHMUD HASSAN FUAD KAFISHE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants.[2] | ) |

---

[1]On July 24, 2001, this Court dismissed all claims arising out of Efrat Ungar's death because they were brought under 18 U.S.C. § 2333, and the Complaint did not allege that Efrat Ungar was an American national.  Estates of Ungar ex rel. Strachman v. Palestinian Auth., 153 F. Supp. 2d 76, 97 (D.R.I. 2001)(hereinafter, Ungar I).  This included the claims of Efrat Ungar's Estate, those filed by Rabbi Uri Dasberg and Judith Dasberg in their individual capacities, and claims on behalf of Davir and Yishai Ungar.  Id.

[2] On July 24, 2001, this Court dismissed Defendants Yasser Arafat, Jibril Rajoub, Muhammed Dahlan, Amin Al-Hindi, Twfik Tirawi, and Razi Jabali due to a lack of personal jurisdiction.

## DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge

Plaintiffs filed the present action pursuant to 18 U.S.C. § 2333 et seq. after Yaron Ungar, an American citizen, and his wife, Efrat Ungar, were killed in Israel by the terrorist group Hamas. Enacted as part of the Antiterrorism Act of 1991 (hereinafter, "ATA"), 18 U.S.C.A. § 2333[3], provides a cause of action for American nationals injured in their person, property, or business by an act of international terrorism. 18 U.S.C.A. § 2333(a)(1992). The Amended Complaint names as defendants, the Palestinian Authority (hereinafter, "PA"), the Palestinian Liberation Organization (hereinafter, "PLO"), Hamas-Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al-Islamiyya")(hereinafter, "Hamas"), and the individual Hamas members responsible for the murder of the Ungars.

---

Ungar I, 153 F. Supp. 2d at 100. Similarly, on January 27, 2004, this Court dismissed Defendants Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat, and Iman Mahmud Hassan Faud Kafishe due to a lack of personal jurisdiction. Estates of Ungar ex rel. Strachman v. Palestinian Authority, No. 00-105L, 2003 WL 21658605 at *6 (D.R.I. Jan. 27, 2004)(Ungar III).

[3]Congress originally enacted Sections 2331-2338 as part of the Antiterrorism Act of 1990. Pub.L. No. 101-519, § 132, 104 Stat. 2250-2253 (1990). However, that Public Law has no currently effective sections. Congress re-enacted these sections as part of the Federal Courts Administration Act of 1992. Pub.L. No. 102-572, Title X, § 1003(a)(1)-(5), 106 Stat. 4521-4524 (1992), which was amended on October 31, 1994 to Pub.L.No. 103-429, § 2(1), 108 Stat. 4377. Ungar II, 228 F. Supp. 2d at 41 n.1.

This matter is before the Court on the motion of the Defendants PA and PLO to dismiss the Amended Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. These Defendants argue that this Court lacks subject matter jurisdiction over the Amended Complaint due to the existence of non-justiciable political questions and sovereign immunity. This writer addressed similar arguments in Ungar II and arrives at the same conclusions herein. This Court has subject matter jurisdiction because the instant case arises under federal law, namely, the ATA. The doctrines of non-justicibility and sovereign immunity do not divest this Court of jurisdiction over the Amended Complaint for two reasons. First, there are no non-justicibile political questions in this case because the Amended Complaint presents tort claims raising issues that are constitutionally committed only to the judicial branch of government. Second, the PA and PLO do not constitute or represent a State as defined by the law of the United States and applicable international law because both entities lack a defined territory with a permanent population controlled by a government that has the capacity to enter into foreign relations. Therefore, for the reasons that follow, this Court concludes that the motion of the PA and PLO to dismiss must be denied.

I.   **Background and Procedural History**

*The Murders of Yaron and Efrat Ungar*

As this writer discussed in Estates of Ungar ex rel. Strachman v. Palestinian Authority, 153 F. Supp. 2d 76, 82-83 (D.R.I. 2001)("Ungar I")and Estates of Ungar ex rel. Strachman v. Palestinian Authority, 228 F. Supp. 2d 40, 41 (D.R.I. 2002)("Ungar II"), on June 9, 1996, Yaron and Efrat Ungar were traveling home from a wedding in Israel with their nine month old son, Plaintiff Yishai Ungar, when a vehicle driven by Raed Fakhri Abu Hamdiya ("Abu Hamdiya") approached their car. Abdel Rahman Ismail Abdel Rahman Ghanimat ("Rahman Ghanimat") and Jamal Abdel Fatah Tzabich Al Hor ("Hor") opened fire on the Ungars' car and murdered Yaron and Efrat Ungar in cold blood. Yishai Ungar survived the attack uninjured. Plaintiff, Davir Ungar, the Ungars' older son, was not in the car during the shooting.

The men involved in the shooting were members of Hamas, a terrorist group dedicated to murdering Israeli and Jewish people through bombings, shootings, and other violent acts. Hamas is based in and operates from areas controlled by the PA and PLO and Yasser Arafat, the head of the PLO. Small groups of Hamas members organize cells to carry out their terrorist activities. Abu Hamdiya, Rahman Ghanimat, Hor, Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe ("Kafishe") comprised the terrorist cell that murdered the Ungars. Abu Hamdiya, Rahman Ghanimat,

4

Hor, and Kafishe were convicted in the Israeli courts of membership in Hamas and on charges related to the murders of Yaron and Efrat Ungar.  An arrest warrant was issued for defendant Ibrahim Ghanimat who remains at large and is believed to be residing in an area controlled by the PA and PLO.

On October 25, 1999, an Israeli court appointed Rhode Island attorney David Strachman ("Strachman") administrator of the estates of Yaron and Efrat Ungar.  Strachman was to administer and realize assets, rights, and causes of action to pursue within the United States on behalf of the estates.  Strachman initiated the instant litigation on March 13, 2000, utilizing the ATA.

**_Ungar I: The First Motion to Dismiss_**

In _Ungar I_, this writer addressed several grounds raised in the PA and PLO Defendants' motion to dismiss.  This Court determined that it had subject matter and personal jurisdiction over the PA and PLO, found that venue and service of process were proper, and denied the motion to dismiss due to an inconvenient forum.  153 F. Supp. 2d at 100.  This writer dismissed the claims under § 2333 of the ATA involving Efrat Ungar's estate because the Complaint did not allege that Efrat Ungar was an American national.  _Ungar I_, 153 F. Supp. 2d at 97.  The PA and PLO Defendants' motion to dismiss the remaining counts under § 2333 was denied.  _Id._ at 100.  This Court dismissed all claims against Defendants Yasser Arafat, Jibril Rajoub, Muhammed Dahlan, Amin

Al-Hindi, Twfik Tirawi, and Razi Jabali (all PA or PLO officials) due to a lack of personal jurisdiction. Id. This Court granted the motion to dismiss the state law claims for death by wrongful act, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. Id. Finally, Plaintiffs were granted leave to amend the Complaint because they had not pled the state law claims under Israeli law as required by Rhode Island's choice of law rules in tort matters. Id.

### *Plaintiffs File an Amended Complaint*

Plaintiffs then filed an Amended Complaint on August 23, 2001, which states four causes of action. With the exception of Count I, all claims are brought on behalf of all Plaintiffs against all Defendants. Count I of the Amended Complaint is brought only on behalf of Plaintiffs, The Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Meyer Ungar, Judith Ungar, Amichai Ungar, Dafna Ungar, and Michael Cohen.

The factual basis for each claim is essentially the same. Plaintiffs allege that the PA and PLO Defendants repeatedly praised Hamas and its operatives, who engaged in terrorist activities and violent acts against Jewish civilians and Israeli targets. Pls.' Am. Compl. ¶ 43. Plaintiffs also allege that the PA and PLO Defendants "praised, advocated, encouraged, solicited, and incited" these terrorist activities. Id. In addition, Plaintiffs allege that Yaron and Efrat Ungar were killed by these

6

acts of international terrorism and that the individually named Defendants aided and abetted such acts.  Id. ¶ 47.  These killings allegedly caused the decedents and Plaintiffs to suffer severe physical, emotional, and financial injuries.  Id.

Count I of the Amended Complaint asserts that Defendants engaged in acts of international terrorism as defined in 18 U.S.C. § 2331.  Specifically, Plaintiffs allege that the actions of Defendants: 1) constitute violations of United States' criminal law and would be criminal violations if committed within the United States' jurisdiction; 2) appear to be intended to intimidate or coerce a civilian population and influence the policy of a government by intimidation or coercion; and 3) occurred outside the United States.  Pls.' Am. Compl. ¶¶ 41-43.

Count II alleges negligence under Section 35 of the Israeli Civil Wrongs Ordinances ("ICWO").  Plaintiffs allege that a reasonable person under the same circumstances would have foreseen that Plaintiffs would likely be injured by the acts and omissions of Defendants.  Pls.' Am. Compl. ¶ 60.  The Amended Complaint avers that the PA and PLO and their agents, acting within the scope of their employment and agency, failed to use the skill and degree of caution that a reasonable person would have used under similar circumstances.  Id. at ¶ 59.

Count III alleges breaches of statutory obligations under Section 63 of the ICWO.  That Section provides a cause of action

7

for the failure to comply with an obligation imposed by any enactment of the ICWO.  Some of the statutory obligations allegedly breached by Defendants include Section 300 (murder), Section 3 (membership in a terrorist organization), and Article XV of the Interim Agreement on the West Bank and the Gaza Strip of September 28, 1995, ("Interim Agreement").[4]  Article XV of the Interim Agreement was enacted into law by Israel and imposes a duty on public officials to prevent acts of terrorism in the West Bank and Gaza Strip.  See Pls.' Am. Compl. at ¶ 69(a)-(b),(d).

Count IV alleges assault under ICWO Section 23.  That section provides a cause of action for the intentional use of any kind of force against a person's body without his or her consent.  Plaintiffs allege that Hamas and the individual Hamas Defendants attempted to and intentionally used force against the Ungars without their consent.  Pls.' Am. Compl. ¶¶ 76-77.  Plaintiffs further contend that the PA and PLO: 1) solicited and advised the Hamas Defendants to commit the alleged assault; and 2) aided and abetted the commission of said assault.  Pls.' Am. Compl. ¶ 79.

**_Ungar II: The PA and PLO's Motion to Dismiss the Amended Complaint_**

On November 28, 2001, the PA and PLO Defendants filed a motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6)

---

[4]Additionally, Plaintiffs allege violations of numerous other statutory obligations.  For a complete list, see ¶ 69 of the Amended Complaint.

of the Federal Rules of Civil Procedure.  These Defendants argued that: 1)the case lacked judicially discoverable and manageable standards for resolving Plaintiffs' claims; 2)this Court should reconsider its denial of the previous motion to dismiss for failure to state a claim on which relief could be granted; 3)their claim to immunity was stronger than ever because they were closer to full membership in the United Nations than at any time in the past; and alternatively, 4)this court should certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and stay the proceedings pending a disposition of the motion and/or appeal.  On November 4, 2002, this writer rejected the above arguments, denied the motion to dismiss the Amended Complaint, and refused to certify any issues for interlocutory appeal.  See Ungar II, 228 F. Supp. 2d at 41.

On November 20, 2002, the PA and PLO Defendants filed a motion for reconsideration of this Court's November 4, 2002 Decision and Order, which was subsequently denied.  The PA and PLO Defendants then filed a notice of interlocutory appeal.  The Court of Appeals for the First Circuit affirmed this Court's decision in Ungar II and denial of the motion for reconsideration.  However, the Court of Appeals noted that the PA and PLO had not yet answered the Amended Complaint and might still be able to raise a sovereign immunity defense in a proper and timely manner but took no position on the merits of that

defense. <u>Ungar v. Palestinian Liberation Org.</u>, No. 03-1544, 2003 WL 21254790, at *1 (1st Cir. May 27, 2003).

**The PA, PLO, and Hamas Defendants are Defaulted**

On April 21, 2003, the Clerk, at Magistrate Judge David Martin's direction, entered a default as to the PA and PLO Defendants for their failure to answer the Amended Complaint within the time allotted. Thereafter, Judge Martin held hearings on Plaintiffs' motions to enter default judgments against the PA and PLO Defendants and took those matters under advisement. He has recently issued a Report and Recommendation on the subject, which will be dealt with later by this Court. Plaintiffs made a similar motion to enter a default judgment against the Hamas and the individual Hamas Defendants. On January 27, 2004, this Court adopted Judge Martin's Report and Recommendation and granted Plaintiffs' motion to enter a default judgement against the Hamas. <u>See</u> <u>Estates of Ungar ex rel. Strachman v. Palestinian Auth.</u>, No. 00-105L, 2003 WL 21658605 at *7 (D.R.I. Jan. 27, 2004)(<u>Ungar III</u>). This Court denied the motion as to the individual Hamas Defendants and dismissed the claims against those Defendants due to a lack of personal jurisdiction. <u>Id.</u> at *1-2. This Court also granted Plaintiffs' motion to enter a final judgment against the Hamas for a total amount of $116,409,123.00 plus attorneys' fees and court costs. <u>Id.</u> at *7-8.

***The Present Matter: The PA and PLO's Third Motion to Dismiss***

The PA and PLO filed the present motion on June 13, 2003. They argue that non-justiciable political questions, sovereign immunity, and the jurisdictional bar imposed by 18 U.S.C. § 2337 divest this Court of jurisdiction over the Amended Complaint. Plaintiffs filed their objections to the present motion on August 8, 2003, to which the PA and PLO replied on September 15, 2003. Plaintiffs filed a surreply on October 14, 2003, arguing that the PA and PLO had failed to address any of Plaintiffs' specific contentions.

Thereafter, on October 16, 2003, this Court held a hearing on the present motion to dismiss and took the matter under advisement. Then, the PA and PLO filed yet another response to Plaintiffs' surreply in further support of their motion. The issues presented have been extensively and completely briefed and argued and the matter is now in order for decision.

## II.  Standards for Decision

Federal courts have limited subject matter jurisdiction and may only hear a case when there is both constitutional and statutory authority for federal jurisdiction. Erwin Chemerinsky, Federal Jurisdiction, § 5.1, at 258 (3d ed. 1999). Constitutional authority derives from Article III of the United States Constitution, which grants judicial power to hear, among

others, all cases, in law and equity that arise under the Constitution, laws, or treaties of the United States.  U.S. Const., art. III, § 2.  The Supreme Court has interpreted this "arising under" provision broadly and has held that a case arises under the laws of the United States whenever a federal law forms an ingredient of the original cause of action.  Chemerinsky, supra, § 5.2, at 268-69(citing Osborn v. Bank of the United States, 22 U.S.(Wheat) 738, 823 (1824)).

The existence of a constitutional provision, while necessary, is not enough to create subject matter jurisdiction in a federal court.  Chemerinsky, supra, § 5.1, at 258.  There must also be a federal statute authorizing such jurisdiction.  Id. This requirement of statutory authority reflects the power of Congress to create and determine the jurisdiction of the lower federal courts.  See U.S. Const., art. III, § 1.  28 U.S.C. § 1331 provides the requisite statutory authority because that statute gives the federal courts subject matter jurisdiction over cases that arise under the Constitution, laws, or treaties of the United States.  The "arising under" requirement of 28 U.S.C. § 1331 is satisfied when the complaint states a cause of action based on federal law, Louisville and Nashville R.R. v. Mottley, 211 U.S. 149, 152 (1908), and that federal law creates the cause of action, Merril Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 808 (1986), or the lawsuit requires the construction or

application of federal law, Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 199 (1921).

A motion to dismiss an action under Rule 12(b)(1) challenges the federal court's subject matter jurisdiction over the action by questioning whether there is both constitutional and statutory authority to hear the case. See 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure, § 1350, at 194 (West 1990). Litigants use a Rule 12(b)(1) motion to attack two types of defects. Id. at 211. One defect arises when the complaint does not demonstrate that the federal court has subject matter jurisdiction over the case. Id. at 211-12. The other defect stems from the court's substantive lack of jurisdiction over the subject matter, a defect that exists despite the formal sufficiency of the allegations in the complaint. Id. at 212. Since this latter defect often involves a factual dispute, the moving party may use affidavits and other materials to support his or her motion. Id. at 213. See also Valentin v. Hosp. Bella Vista, 254 F.3d 358, 364 (1st Cir. 2002)(when a fact-bound jurisdictional question looms, a court must be allowed considerable leeway in weighing the proof, drawing reasonable inferences, and satisfying itself that subject matter jurisdiction exists); Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 849 (5th Cir. 2000)(quoting Moran v. Kingdom of Saudi Arabia, 27 F.3d 169, 172 (5th Cir. 1994)(court has

discretion to devise a method for determining the jurisdictional issue, which may include considering affidavits, allowing discovery, and hearing oral testimony)).  A party's attachment and the court's consideration of exhibits and materials other than the complaint do not convert a motion to dismiss into a summary judgment motion.  Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002).


## III. Discussion

This Court has constitutional and statutory authority to exercise federal jurisdiction in the present case. Constitutional authority exists because Plaintiffs brought this action pursuant to the ATA, thus making federal law the main ingredient of their cause of action.  This Court also has statutory authority, under 28 U.S.C. § 1331, to exercise jurisdiction because the Amended Complaint states a cause of action based on federal law, that being Section 2333 of the ATA. Section 2333 also creates the present cause of action because it provides a civil remedy for American nationals who are victims of acts of international terrorism.  This lawsuit also requires the construction and application of federal law, again § 2333. Therefore, this Court has both constitutional and statutory authority to exercise jurisdiction in this case.

The present motion addresses the second type of defect, a

substantive lack of jurisdiction. The PA and PLO argue that although the Amended Complaint presents a federal cause of action, the doctrines of non-justicibility and sovereign immunity protect them and divest this Court of subject matter jurisdiction over the Amended Complaint. The issues of non-justiciability and sovereign immunity are properly raised through a Rule 12(b)(1) motion. Wright & Miller, supra, at 195-96.

The PA and PLO make three arguments in support of their motion. First, they argue that the issues in this case present non-justiciable political questions. Second, they contend that this Court lacks subject matter jurisdiction because they enjoy sovereign and governmental immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.A. § 1604 et seq. Finally, they argue, in the alternative, that this Court lacks jurisdiction due to 18 U.S.C. § 2337.

Plaintiffs argue that this Court has already decided these issues and in any event, the PA and PLO have waived the sovereign immunity defense by filing numerous motions before first attempting to raise that claim in January of 2002. Pls.' Mem. in Opp'n. to Defs.' Rule 12(b) Mot. to Dismiss the Am. Compl., at 26. The FSIA provides an exception to sovereign immunity when a foreign State waives its immunity either explicitly or by implication. 28 U.S.C.A. § 1605(a)(1). There is an implicit waiver when a foreign State files a responsive pleading in an

action without raising the sovereign immunity defense.  H.R. Rep. No. 94-1487, reprinted in 1976 U.S.C.C.A.N. at 6617; Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico S.A., 727 F.2d 274, 277 (2d Cir. 1984); Reisen v. Jamaca Vacations Ltd. Inc., 790 F. Supp. 272, 274-75 (S.D. Fl. 1992).  Since the Federal Rules of Civil Procedure explicitly distinguish pleadings from motions, compare Fed. R. Civ. P. 7(a) with Fed. R. Civ. P. 7(b), the consensus among the courts is that motions are not "responsive pleadings" for purposes of raising a sovereign immunity defense.  Canadian Overseas, 727 F.2d at 277; Reisen, 790 F. Supp. at 275.  Therefore, filing a variety of motions, including a motion to dismiss does not automatically waive the defense.  Canadian Overseas, 727 F.2d at 277.  See also Rodriguez v. Transnave Inc., 8 F.3d 284, 289 (5th Cir. 1993)(case law indicates that federal courts are reluctant to find a waiver from a foreign State's participation in litigation).

In this case, the PA and PLO Defendants did not answer the Amended Complaint but filed two previous motions to dismiss. This writer rejected their arguments regarding sovereign immunity in Ungar II.  However, since motions are not responsive pleadings, the PA and PLO Defendants' failure to raise sovereign immunity in their initial motion to dismiss did not automatically waive the defense of sovereign immunity within the meaning of the FSIA exception.  Therefore, although this Court has addressed

some of the issues raised by the PA and PLO in previous opinions at different stages of this litigation, this writer will, once again, consider each of Defendants' arguments in turn.

**_The Present Case Does not Present any Non-Justiciable Political Questions._**

Defendants argue that this Court should dismiss the Amended Complaint because Plaintiffs' claims present non-justiciable political questions. <u>Mem. in Supp. of Palestinian Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl.</u>, at 1. Defendants raised and this Court rejected the same argument in <u>Ungar II</u> and does so again now. <u>See</u> <u>Ungar II</u>, 228 F. Supp. 2d at 44-47.

The PA and PLO repeatedly fail to realize that the non-justiciability doctrine is one of political questions and not political cases. <u>Ungar II</u>, 228 F. Supp. 2d at 45(citations omitted). Plaintiffs brought the present tort claims seeking damages under federal law and raising issues that are constitutionally committed only to the judicial branch of government. <u>Id.</u>(quoting <u>Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro In Amministrazione Straordinaria</u>, 937 F.2d 44, 49 (2d Cir. 1991)). The ATA provides the requisite judicially discoverable and manageable standards for deciding Plaintiffs' claims because that statute creates a federal cause of action for acts of "international terrorism" and precisely defines that term. <u>Biton v. Palestine Interim Self</u>

17

Gov't. Auth., No. 01-0382(RMC), 2004 WL 540504, at *9 (D.D.C. Mar. 18, 2004).  The fact that the PA and PLO's alleged terrorist acts may have arisen in a politically charged context and were committed in an area where the United States has a strong foreign policy interest does not convert the present tort claims into non-justiciable political questions.  Ungar II, 228 F. Supp. 2d at 45(quoting Klinghoffer, 937 F.2d at 49).  In a recent decision, the United States District Court for the Southern District of New York noted that in adjudicating a similar ATA claim against the PA and PLO, the Court would not give its views on the broader political questions forming the backdrop of the lawsuit and would only determine whether and to what extent the plaintiffs could recover in tort for the acts of violence committed against them.  Knox v. Palestine Liberation Org., No. 03 Civ. 4466, 2004 WL 385024, at *22 (S.D.N.Y. Mar. 1, 2004).  Similarly, this Court must only determine whether and to what extent Plaintiffs may recover for the alleged terrorist acts of the PA and PLO.  In so doing, this Court will not express its views on the political context in which these Defendants may have committed such acts.  Since there are no political questions presented, this Court again denies Defendants' motion to dismiss on non-justicibility grounds.

18

**The PA and PLO's Flawed Assertion of Sovereign Immunity**

Contrary to the assertions of the PA and PLO, the ATA and FSIA provide identical rather than alternative defenses of sovereign immunity. In order to effectively raise the shield of sovereign immunity, an entity must be a State or an agency or instrumentality of a State that satisfies the criteria set forth in the Restatement Third on Foreign Relations Law. As discussed below, the PA and PLO's motion to dismiss based on sovereign immunity must be denied for four reasons: 1)no immunity follows from the non-existent statehood of the entity called Palestine; 2)the PA does not satisfy the criteria for statehood; 3)the PLO does not satisfy the criteria for statehood; and alternatively, 4)the United States does not recognize the PA or PLO as a State or as representatives of a purported Palestinian State.

The Sovereign Immunity Inquiries Under the ATA and FSIA are Identical.

The PA and PLO present the FSIA and § 2337 of the ATA as alternative grounds for their motion to dismiss. This is erroneous because it is well-established that the FSIA sets forth the sole and exclusive standard to resolve all issues of sovereign immunity. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989); Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 59 (D.C. Cir. 2003); Rodriguez v. Transnave Inc., 8 F.3d 284, 287 (5th Cir. 1993); Alberti v. Empresa Nicaraguense De la Carne, 705 F.2d 250, 252 (7th Cir.

1983); <u>First Am. Corp. v. Sheikh Zayed Bin Sultan Al-Nahyan</u>, 948 F. Supp. 1107, 1120 (D.D.C. 1996); <u>Republic of France v. Standard Oil Co.</u>, 491 F. Supp. 161, 166 (N.D. Ill. 1979); H.R. Rep. 94-1484, 94th Cong., 2d Sess. at 6 (1976) <u>reprinted in</u>, 1976 U.S.C.C.A.N. 6604, 6610; 14A Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, <u>Federal Practice and Procedure</u>, § 3662, at 203 (3d ed. 1998).

The language and legislative history of Section 2337(2) of the ATA demonstrate that it is to be read and applied *in pari materia* with the FSIA.[5] For example, one Executive Branch official urged Congress to include Section 2337(2) to be clear that the ATA would not limit the scope of the FSIA, but rather clarify its ordinary principles of sovereign immunity. <u>Antiterrorism Act of 1990: Hearing on S2465 Before the Subcomm. on Cts. and Admin. Practice of the Comm. on the Judiciary, U.S. S.</u>, 101st Cong., at 37 (1990)(statement of Steven R. Valentine, Deputy Assistant Attorney General, Civil Division). <u>See also</u> <u>Knox</u>, 2004 WL at *5. Another official testified that adding § 2337(2) would "maintain the status quo regarding sovereign States and their officials: no cause of action for acts of international

---

[5]Section 2337(2) of the Anti Terrorism Act states that no action shall be maintained under Section 2333 against a foreign state, an agency of a foreign state, an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority. 18 U.S.C.A. § 2337(2)(2002).

terrorism exists against them." Id. at 18 (statement of Alan J. Kreczko, Deputy Legal Advisor, Department of State, Washington, D.C.). However, not including this limitation could change the law of sovereign immunity and lead hostile states to enact reciprocal legislation for use in alleging that legitimate activities of the United States military constitute terrorist acts. Id. at 19.

In other words, Section 2337(2) prevents Section 2333 from derogating the sovereign immunity granted by the FSIA. The ATA reflects the doctrine of sovereign immunity and the relevant sections of the ATA and FSIA function in tandem to provide a foreign State with a single statutory defense to actions brought under the ATA. See Knox, 2004 WL at * 5(making it clear that the sovereign immunity inquiries under the ATA and FSIA are identical). Thus, a defendant entitled to sovereign immunity under the FSIA is immune from suit under the ATA. Conversely, a defendant who is not entitled to sovereign immunity under the FSIA cannot plead that defense under Section 2337(2) of the ATA. This Court's inquiry under both provisions is the same: whether the PA and/or the PLO represent or constitute a foreign State and are thus entitled to sovereign immunity.

The Doctrine of Sovereign Immunity

Sovereign immunity is a doctrine of international law that requires domestic courts to relinquish jurisdiction over a

foreign state in appropriate cases.  H.R. Rep. 94-1487, reprinted in, 1976 U.S.C.C.A.N. at 6606.  The United States Congress adopted this doctrine by enacting the FSIA in 1976.  Id.  The FSIA brought the practice of the United States into conformity with that of other nations by leaving sovereign immunity determinations exclusively to the courts.  28 U.S.C.A. § 1602 (1994); H.R. Rep. 94-1487, reprinted in, 1976 U.S.C.C.A.N. at 6610.

The doctrine of sovereign immunity limits a district court's subject matter jurisdiction.  See, Verlinden v. Central Bank of Nigeria, 461 U.S. 476, 489 (1983)(noting that under the FSIA, a federal court lacks subject matter jurisdiction over an action against a foreign state unless the action falls within one of the FSIA's enumerated exceptions); accord Peterson, 264 F. Supp. 2d at 59; Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000); Reisen, 790 F. Supp. at 274.  See also 28 U.S.C.A. § 1605 (1994)(stating the exceptions to foreign sovereign immunity).  In order to effectively raise the shield of sovereign immunity, a foreign entity must establish a prima facie case on two elements: 1)that it is a foreign state under the definition employed by the FSIA; and 2)that the claim relates to a public act.  Alberti, 705 F.2d at 256.  If and when this evidence is produced, the FSIA provides a presumption of immunity, which a plaintiff may rebut by demonstrating that one

of the statutory exceptions applies.  <u>Id.</u>  If the plaintiff so demonstrates, the defendant must prove its entitlement to immunity by a preponderance of the evidence.  <u>Id.</u>  <u>See also</u> <u>Phoenix Consulting</u>, 216 F.3d at 40(defendant has the burden of proving that plaintiff's allegations do not bring the case within a statutory exception to immunity); <u>accord</u> <u>Southway v. Cent. Bank of Nigeria</u>, 198 F.3d 1210, 1215 (10th Cir. 1999); <u>Knox</u>, 2004 WL, at *19.  A defendant entitled to sovereign immunity not only has a defense to liability on the merits of the case but also is immune from trial and the burdens of litigation. <u>Phoenix Consulting</u>, 216 F.3d at 39.  <u>See also</u> Wright, Miller & Cooper, <u>supra</u>, § 3662, at 173.

The legislative history of the FSIA indicates that Congress viewed sovereign immunity as an affirmative defense that a party must specifically plead to avoid a waiver.  H.R. Rep. No. 94-1487, <u>reprinted in</u>, 1976 U.S.C.C.A.N. at 6616; <u>Southway</u>, 198 F.3d at 1215-16(quoting the aforementioned House Report); <u>Canadian Overseas</u>, 727 F.2d at 277.  Rule 8(c) of the Federal Rules of Civil Procedure requires a defendant to specifically set forth any applicable affirmative defenses in his or her answer to the plaintiff's complaint.

The current posture of this case presents a procedural irregularity because the PA and PLO failed to file an answer and have been defaulted.  These Defendants have chosen not to

challenge the merits of Plaintiffs' case and decided instead to place all of their eggs in one basket: this present motion. Unfortunately for Defendants, as will be discussed below, that basket is porous.  However, procedurally, sovereign immunity is a jurisdictional defense, which a defendant may raise at any point in the litigation.  Jakobsen v. Mass. Port Auth., 520 F.2d 810, 813 n.3 (1st Cir. 1975)(citing Edeleman v. Jorden, 415 U.S. 651, 677-78 (1974)).  Therefore, the PA and PLO Defendants' failure to file an answer and thus default do not affect their ability to now raise a sovereign immunity defense.

The PA and PLO Must Demonstrate that they Satisfy the Legal Criteria for Statehood.

Only States enjoy sovereign immunity.  The FSIA defines a State to include a political subdivision or an agency or instrumentality of a Foreign State.  28 U.S.C.A. § 1603(a)(1994). This language indicates that the starting point in any sovereign immunity analysis must be the question of whether the entity claiming the defense is a State or is an agent or instrumentality of an established State.  The PA and PLO then, have the daunting task of demonstrating to this Court that the PA, PLO, or the entity called Palestine satisfy the legal requirements for statehood.

International law determines statehood.  Omar M. Dajani, Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period, 26 Denv. J. Int'l. L. &

24

Pol'y., 27, 80 (1997).  The 1933 Montevideo Convention on the Rights and Duties of States sets forth the legal standard for evaluating an entity's claim to statehood.  <u>Convention on the Rights and Duties of States</u>, Dec. 26, 1933, art. 1, 49 Stat. 3097, T.S. No. 881, 165 L.N.T.S. 19(entered into force Dec. 26, 1934)(hereinafter "Montevideo Convention").  <u>See also</u>, Dajani, <u>supra</u>, at 81.  Under the Montevideo Convention, an entity is a State when it possesses: 1)a permanent population; 2)a defined territory; 3)a government and 4)the capacity to enter into relations with other states.  <u>Id.</u>

The United States adopted these criteria and codified them in Section 201 of the Restatement Third on Foreign Relations Law. Federal courts consistently apply the four criteria to determine whether or not an entity is a State and thus qualifies for the protections of sovereign immunity.  <u>Doe v. Islamic Salvation Front</u>, 993 F. Supp. 3, 9 (D.D.C. 1998); <u>accord</u> <u>Kadic v. Karadzic</u>, 70 F.3d 232, 244 (2d Cir. 1996); <u>Morgan Guar. Trust Co. v. Republic of Palau</u>, 924 F.2d 1237, 1243 (2d Cir. 1991)(quoting the Restatement Third of Foreign Relations); <u>Klinghoffer</u>, 937 F.2d at 47(applying the four criteria and concluding that the PLO met none of the requirements for statehood); <u>Nat'l Petrochemical Co. of Iran v. The M/T Stolt Sheaf</u>, 860 F.2d 551, 553 (2d Cir. 1988); <u>Tel-Oren v. Libyan Arab Republic</u>, 726 F.2d 774, 791 n.21 (D.C. Cir. 1984); <u>Biton</u>, 2004 WL at *6; <u>Knox</u>, 2004 WL at *8.

Although this writer will discuss and analyze the four criteria separately with regard to the PA and PLO, international jurisprudence suggests that the criteria relate to and are defined by one another.  Krystyna Marek, <u>Continuity of States in Public International Law</u>, at 162 (1968)(suggesting that a State exists in the international law sense, "when there is an independent legal order, effectively valid throughout a defined territory, and with regard to a defined population"); Lassa Oppenheim, <u>International Law</u>, § 34 (8th ed. 1947)(noting a State proper is in existence when a people is settled in a territory under its own sovereign government).  Therefore, the four criteria are intertwined making it difficult, if not impossible, to satisfy one or two requirements while failing to satisfy the others.  Thus, an entity's claim to statehood fails if any one criterion is not satisfied.

<u>The PA and PLO Cannot Rely on the "Statehood" of Palestine to Support Their Claims to Sovereign Immunity.</u>

The PA and PLO argue that they are core elements and perform core functions of the Palestinian government and this Court must consider them part of the State of Palestine.  <u>Defs.' Resp. to Pls.' Surreply in Further Supp. of Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl.</u>, at 4.  As such, they assert that they are protected by a sovereign immunity that follows from "the statehood of Palestine."  <u>Id.</u> at 3.  Plaintiffs argue that there is no State of Palestine and in any event, the entity called

26

Palestine is not a current defendant.  Pls.' Mem. in Opp'n. to Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl., at 12, n.17.

The PA and PLO's argument must fail because Palestine[6] does not satisfy the four criteria for statehood and is not a State under prevailing international legal standards.  Dajani, supra, at 79.  Rather, Palestine is a people, a territory, or an Interim Authority of rather limited authority.  Id. at 74.  The United Nations refers to this entity as "the question of Palestine." Summary Record of the 217th Meeting, [1995], U.N. Doc. A/AC. 183/SR. 217, at para. 3; U.N. Doc. A/Res/3210(XXIX)(1974); Ex. 17 to Defs.' Mot. to Dismiss the Am. Compl.  The United States does not give diplomatic recognition to Palestine and instead refers to it as an entity.  Klinghoffer, 937 F.2d at 46; Zenineh v. Fed. Labs. Inc., 975 F. Supp. 774, 777 (W.D. Pa. 1994).  While close to one-hundred and fourteen nations gave some form of recognition to a Palestinian State by April of 1989, a majority of these countries recognized it as a "legitimate aspiration" rather than an existing reality.  Dajani, supra, at 60.  The recent Roadmap for Peace evinces the aspirational nature of Palestinian statehood by noting the desire for a negotiated settlement that will result, through a series of phases, in the "emergence of an

---

[6]Here and elsewhere, this writer uses the term "Palestine" to refer to the Palestinian territory rather than the State of Palestine, whose legal existence is one of the underlying issues raised by the present motion. See Knox, 2004 WL at *5, n.7.

independent, democratic, and viable Palestinian State living side by side in peace and security with Israel and its other neighbors." A Performance-Based Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict, U.N. Doc. S/2003/529, annex (May 7, 2003), available at, http://domino.un.org/unispal.nsf. Furthermore, Palestinian Cabinet Minister Saeb Ereka recently stated that Israel's unilateral disengagement plan was a deliberate attempt by Israel's Prime Minister Ariel Sharon to postpone or delay the creation of a Palestinian State. Karin Laub, Sharon: Palestinian State May Take Years, Associated Press, Apr. 5, 2004. Neither the Declaration of Principles, the Interim Agreement, nor any of the Oslo Accords purports to create a State of Palestine. Knox, 2004 WL at *8. Instead, the documents are clear that Palestinian statehood is aspirational and apportion power to ensure that there could be no State of Palestine under the Restatement criteria. Id. Thus, Palestine is an amorphous entity whose status remains a question. This questionable status disposes of the PA and PLO's arguments that they enjoy the same immunity as Palestine. Palestine, lacking statehood, does not enjoy any sovereign immunity and the PA and PLO cannot stake their claims to sovereign immunity in the ground of a non-existent state. Therefore, this Court now turns to the question of whether the current defendants, the PA and PLO, satisfy the four criteria for

statehood and are, thus, entitled to sovereign immunity.

<u>The PA does not Satisfy the Legal Criteria for Statehood</u>

The PLO and the Israeli government negotiated and agreed to the Declaration of Principles on Interim Self-Governing Arrangements of September 13, 1993 ("DOP") and the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip of September 28, 1995 ("Interim Agreement"), which created and set forth the powers and capacities of the PA.  Israel surrendered some of its sovereignty over an undefined area to the PA so that the PA could govern the Palestinian people within Israeli territory.  <u>Interim Agreement on the West Bank and the Gaza Strip</u>, art. 1, para. 1, Sept. 28, 1995, <u>available at</u>, 36 I.L.M. 551, 558 <u>and Ex.14 of Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl.</u>(hereinafter, <u>Interim Agreement</u>).  The general framework for limited self-government by the PA was outlined in the DOP and implemented in full detail by the Interim Agreement. <u>Interim Agreement</u>, at preamble, 36 I.L.M. at 558.  The Interim Agreement sets forth and controls the scope and substance of the PA's powers and capacities.  The limited powers and capacities transferred to the PA via the Interim Agreement make it clear that the PA does not satisfy the legal criteria for statehood.

The PA argues that Palestine has long satisfied the Restatement's criteria for statehood notwithstanding the Israeli occupation of Palestinian territories since 1967.  However, there

is no current State of Palestine and that entity is not a current defendant.  For the reasons discussed below, this Court finds the PA's arguments unpersuasive and concludes that the PA does not satisfy the criteria for statehood.

*Defined Territory*

An entity may have a defined territory even though its boundaries are not finally settled, another state claims some of the territory, or there are other existing boundary disputes. Restatement (Third) of Foreign Relations Law § 201 cmt.(b).  See also, North Sea Continental Shelf Cases, (F.R.G. v. Den.)(F.R.G. v. Neth.) 1969 I.C.J. Rep. 12, at 63-65 (stating that there is no rule that a state's land frontiers must be fully delimited and defined).  An entity does not loose its statehood when a foreign power occupies all of its territory or when the entity temporarily loses control of such territory.  Id.

The PA argues that since the November 29, 1947, adoption by the United Nations General Assembly of Resolution 181, which partitioned the mandate of Palestine, Palestine has always had defined borders despite periodic disputes.  Mem. in Supp. of Palestinian Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl., at 6.  They argue that at present, Palestinian territory consists of the West Bank, the Gaza Strip, and East Jerusalem.  Id. Plaintiffs argue that the PA lacks a defined territory because it lacks sovereign control over any area.  Pls.' Mem. in Opp'n. to

Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl., at 21.

This Court is not persuaded by the PA's arguments and concludes that the first criterion for statehood is not satisfied. The PA lacks a defined territory under its control because the Interim Agreement provides that the West Bank and Gaza Strip will remain undefined areas until a final status agreement is achieved and, in the meantime, any territorial boundaries are subject to change by Israeli redeployment. Interim Agreement, art. XI, para. 2, 36 I.L.M. at 561; art. XIII, para. 5, 36 I.L.M. at 563. See also, Declaration of Principles on Interim Self Government Arrangements, art. V, para. 3, Sept. 13, 1993, available at, 32 I.L.M. 1525, 1529 (1993). Although border disputes do not automatically negate the element of a defined territory, the current dispute over Israel's construction of a massive barrier cutting into the West Bank and separating Israeli and Palestinian population centers weakens the PA's claim to a defined territory in that area. See Charles A. Radin and Dan Ephorn, Israel to sit out Hearing on Barrier, Boston Globe, Feb. 13, 2004, at A8; Aluf Benn, Sharon Draws a Line in the Hills, Wash. Post, Feb. 8, 2004, at B1 (noting that the United Nations General Assembly has asked the International Court of Justice for an advisory opinion on whether the "Israeli Wall" is in "occupied Palestinian territory," as the Palestinians claim or is a "disputed no-man's land," as Israel asserts). Therefore,

the PA lacks a defined territory and is thus not a State entitled to sovereign immunity.[7]

*Permanent Population*

The PA and PLO argue that this element is satisfied by the "millions of Palestinians living in Palestine." Mem. in Supp. of Palestinian Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl., at 6. They note that as of July 2002, the West Bank had an estimated population of 2,163,667, the Gaza Strip of 1,225,911, and that over 200,000 Palestinians lived in East Jerusalem. Id. at 7. However, the fatal flaw in this argument follows from the fact that the PA lacks a defined territory.

In order to satisfy the second criterion, an entity claiming statehood must have a significant number of inhabitants in its territory. Restatement (Third) of Foreign Relations Law § 201 cmt.(c). While the PA cites the estimated populations of the West Bank, Gaza Strip, and East Jerusalem, these areas do not represent PA territory. Since the PA lacks a defined territory as discussed above, it must also lack a permanent population. See Klinghoffer, 937 F.2d at 47-48 (holding that because the PA lacks a defined territory, it cannot have a permanent population

---

[7]Since statehood requires satisfaction of all four criteria, this Court could essentially end its analysis of the PA's claim to sovereign immunity at this point. However, this writer will examine each criterion as it relates to each Defendant to make it clear that both Defendants cannot, through any argument, prevail on their sovereign immunity claims.

within the meaning of the Restatement criteria).  Lacking a
permanent population, the PA cannot claim either statehood or
sovereign immunity.

*Governmental Control*

The third criterion requires some authority that exercises
governmental functions and is able to represent the entity in
international relations.  Restatement (Third) of Foreign
Relations Law § 201 cmt(d).  In order to satisfy this standard, a
State must have the sole right to make decisions in all economic,
political, and financial matters.  Austro-German Customs Union
Case, 1931 P.C.I.J. (ser. A/B) No. 41, at 45 (1931).  This
control must be absolute and not subordinate, meaning that there
cannot be even nominal subordination to an outside governmental
authority.  Karl Doehring, 10 Encyclopedia of Public
International Law, 423, 426 (R. Bernhardt, ed., 1981).  The PA
argues that it meets this criterion because the PA and PLO make
up the current functioning government of Palestine.  Mem. in
Supp. of Palestinian Defs.' Rule 12(b)(1) Mot. to Dismiss the Am.
Compl., at 7.  However, this argument must also fail because the
PA lacks sovereign governmental control over any area of the West
Bank or Gaza Strip.

The Interim Agreement divided the West Bank and Gaza Strip
into a series of non-contiguous geographical areas and strictly
defined and limited the PA's control over those areas.  Interim

Agreement, arts. XI & XVII, 36 I.L.M. at 561-62, 564. These
limitations make it clear that any governmental control exercised
by the PA is subordinate to the outside government of Israel.
Knox, 2004 WL at * 10. For example, the PA lacks control over
its airspace and Israel retains all responsibilities for security
and defense. Interim Agreement, art. XII, para. 1, 36 I.L.M. at
562. In fact, the PA concedes that Israel is responsible for
security. See Aff. of Ambassador Nasser Al-Kidwa, at 11,
attached to Mem. in Supp. of Palestinian Defs.' Rule 12(b)(1)
Mot. to Dismiss the Am. Compl. While the PA is responsible for
internal security and public order within certain areas, it has
no security or law enforcement jurisdiction over Israeli citizens
located in the West Bank or Gaza Strip, the "territory" it claims
to govern. Interim Agreement, Annex I: Protocol Concerning
Redeployment and Security Arrangements, art. XI, para. 4, 36
I.L.M. at 585. The PA may grant permanent residency status only
to specific categories of people and only with Israel's prior
approval. Interim Agreement, Annex III: Protocol Concerning
Civil Affairs, App. I, art. 28, para. 11, 36 I.L.M. at 617.
People seeking to visit areas of the West Bank and Gaza Strip
must first obtain Israel's permission. Id. at para. 13. The PA
lacks control over all economic matters because the Interim
Agreement: 1) contains specific provisions regarding restricted
goods and import and customs policies controlled by Israeli

34

customs officials (Annex V, art. III, para. 14, 33 I.L.M. 698 (1994)); 2)requires that the PA accept the Israeli Shekel as the one of the circulating currencies (art. IV, 33 I.L.M. 704 (1994)); and 3)restricts the transport of livestock (art. VIII, para. 8, 33 I.L.M. 711 (1994)).  Perhaps most significantly, the Interim Agreement restricts the PA's legislative capacity by declaring that any legislation inconsistent with the DOP, the Interim Agreement, or any agreement reached between the two sides during the interim period "shall have no effect and shall be void ab initio."  Interim Agreement, art. XVIII, para. 4(a), 36 I.L.M. at 565.

The PA argues that these restrictions are solely attributable to Israel's illegal and oppressive occupation and do not affect their claim to statehood.  Mem. in Support of Palestinian Defs.' Mot. to Dismiss the Am. Compl., at 9.  An identical argument was made to and rejected by the District Court in Knox.  That Court noted that international law allows a State to maintain its statehood during a belligerent occupation if and when a sovereign entity satisfying all the criteria for statehood existed prior to the occupation.  Knox, 2004 WL at *10.  The defendants had not argued that there was an independent State immediately before Israel's alleged illegal occupation and the Court concluded that it would be anomalous to hold that an entity could achieve statehood in the first instance while subject to

the hostile military occupation of a separate sovereign.  _Id._

This Court finds no merit in the PA's identical argument made here.  The restrictions set forth in the Interim Agreement subordinate the PA to Israel's control and negate the PA's claim to the functioning government required for statehood.  _See_ _id._ at *8(noting that the PA and PLO do not meet and are not part of any entity that meets the criteria for statehood because they do not sufficiently control Palestine and lack the capacity to engage in foreign relations).  Therefore, the PA does not satisfy the third criterion for statehood.

_Capacity to Conduct International Relations_

The final criterion requires the competence from within the entity's constitutional system and the political, technical, and financial capabilities to conduct international relations with other states.  _Restatement (Third) of Foreign Relations Law_ § 201 cmt(e).  The entity must also be able to fulfill the obligations that correspond to such agreements.  This is difficult, if not impossible, when the entity lacks a defined territory under unified governmental control.  _See Klinghoffer_, 937 F.2d at 48; _Knox_, 2004 WL at *11.

The PA argues that Palestine's "substantial and increasing participation" in the work of the United Nations demonstrates its capacity to and engagement in foreign relations.  _Mem. in Supp. of Palestinian Defs.' Rule 12(b)(1) Mot. to Dismiss the Am._

Compl., at 8.  However, this argument is unpersuasive because the entity called Palestine is not a current defendant.  This Court concludes that the PA lacks the capacity to conduct international relations because the DOP and the Interim Agreement expressly exclude the ability to conduct foreign relations from the PA's powers.  Declaration of Principles, Annex II: Protocol on the Withdrawal of Israeli Forces from the Gaza Strip and Jericho Area, para. 3(b), 32 I.L.M. at 1536; Interim Agreement, art. IX(5), 36 I.L.M. at 561.  See also, Knox, 2004 WL at *11 (noting that the Interim Agreement expressly prohibits the PA from conducting foreign relations); accord Geoffrey Watson, The Oslo Accords: International law and the Israeli-Palestinian Peace Agreement, at 71 (Oxford University Press, 2000); Dajani, supra, at 72-73.  This express limitation nullifies any suggestion that the PA has the capacity to engage in foreign relations and thus it cannot satisfy the fourth criterion for statehood.  Furthermore, Israel intensively negotiated the Interim Agreement provisions dealing with foreign relations and took great care to ensure that those provisions did not grant the PA or PLO the foreign relations capacity necessary for statehood.  Pls.' Surreply in Further Opp'n. to Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl., Ex.A: Supp. Declaration of Ed Morgan, at pg 18(citing Joel Singer, Aspects of Foreign Relations Under the Israel-Palestinian Agreements on Interim Self-Government

_Arrangements for the West Bank and Gaza_, 28 Israel Law Rev. Nos. 2-3, at 283 (1994)).  Since this was the purpose of Article IX and Israel and the PLO deliberately negotiated and agreed to this provision, the PLO and the PA acting through the PLO, are bound to the provision under the principle of _pacta sunt servanda._ Vienna Convention on the Law of Treaties, opened for signature May 23, 1969, arts. 18 &26 1155 U.N.T.S. 331, 8 I.L.M. 679(stating that treaties are binding on the parties who may not defeat their object and purpose).

In sum, the PA does not satisfy any of the four criteria for statehood.  The PA lacks a defined territory under its control because the Interim Agreement leaves the PA territory undefined. This lack of a defined territory also creates a lack of a permanent population and causes the PA to fail to meet the second criterion for statehood.  Next, the PA lacks sovereign and exclusive governmental control over any area of the West Bank or Gaza Strip because of the extensive amount of power and supervision retained by Israel.  Finally, the Interim Agreement that created and defined the authority of the PA expressly forbids the PA from engaging in foreign relations and thus ensures that the PA does not meet the fourth criterion.  Since the PA fails to satisfy the legal criteria for statehood, the PA is not entitled to sovereign immunity and its motion to dismiss must be denied.

38

<u>The PLO does not Satisfy The Legal Criteria for Statehood.</u>

Similar to the PA, the PLO does not possess any of the four attributes of statehood. In short, the PLO is a political organization, not a State. <u>Ungar II</u>, 228 F. Supp.2d at 49. <u>See also</u> <u>Tel-Oren</u>, 726 F.2d at 791 (noting that the PLO is not a recognized State) and 824 (the PLO "ought to remain an organization of whose existence we know nothing"). Therefore, the PLO is not entitled to sovereign immunity.

As this writer has stated in previous opinions, the Second Circuit's decision in <u>Klinghoffer</u> is dispositive of the PLO's claim to sovereign immunity. That case arose out of the seizure of the Italian cruise liner, <u>Achille Lauro</u>, in the Eastern Mediterranean Sea. 937 F.2d at 47. During the seizure, four people murdered Leon Klinghoffer, an elderly, wheelchair bound, Jewish American passenger, by throwing him overboard. <u>Id.</u> The original defendants impleaded the PLO seeking indemnification or contribution and punitive damages for tortious interference with their business. <u>Id.</u> The Second Circuit reviewed the PLO's motion to dismiss based on sovereign immunity, applied the Restatement's four criteria, and concluded that the PLO was not a State and thus not immune from suit. <u>Klinghoffer</u>, 937 F.3d at 46-48. Relying on <u>Klinghoffer</u> once again, this writer concludes that the PLO cannot establish any of the criteria necessary for statehood and therefore is not entitled to sovereign immunity.

39

See Ungar II, 228 F. Supp. 2d at 49.

*Defined Territory*

The PLO has no defined territory. Klinghoffer, 937 F.2d at 47. The PLO's declaration of statehood "contemplates" that its territory will consist of the West Bank, Gaza Strip, and East Jerusalem (the same territory claimed by the PA). However, the fact that the PLO contemplates a defined territory in the future does not establish that it has a defined territory at present. Id. The PLO's assertion that "the State of Palestine is the State of Palestinians wherever they may be," further evinces the PLO's current lack of a territorial structure. Id. Since the PLO fails to satisfy the first criterion, it does not qualify for statehood and the PLO is not protected by sovereign immunity.

*Permanent Population*

The PLO's arguments regarding the second criterion are identical to those advanced by the PA and suffer from the same fatal flaws. As discussed above, since the PLO lacks a defined territory, it cannot have a permanent population. Klinghoffer, 934 F.2d at 47-48. The PLO fails to satisfy the second criterion, is not a State, and therefore, does not enjoy sovereign immunity.

*Governmental Control*

The PLO cannot satisfy this criterion because the PLO does not govern the Palestinian people, but rather exists to secure

40

for the Palestinian people the right to govern themselves. Dajani, _supra_, at 74.  As the Second Circuit inquired, since the PLO lacks a defined territory, what could it possibly claim to govern?  _Klinghoffer_, 937 F.2d at 48.  In fact, there is no recognized State that the PLO claims to govern.  _United States v. Palestine Liberation Org._, 695 F. Supp. 1456, 1459 (S.D.N.Y. 1988).  Even assuming without deciding that a State of Palestine incorporates the West Bank, Gaza Strip, and East Jerusalem as the PA and PLO suggest, these areas are all under the control of Israel and not the PLO.  _Klinghoffer_, 937 F.2d at 48.  Such a lack of control over any part of any territory distinguishes the PLO from other revolutionary movements that have received international recognition.  Dajani, _supra_, at 57 (citing Evyatar Levine, _A Landmark on the Road to Legal Chaos: Recognition of the PLO as a Menace to World Public Order_, 10 Denv. J. Int'l. L. & Pol'y. 259 (1981)).  Since the PLO cannot establish the third criterion of governmental control, it lacks statehood and does not enjoy sovereign immunity.

_Capacity to Conduct International Relations_

The PLO fails to demonstrate that it complies with the fourth criterion as well.  Although some countries have recognized the PLO, it lacks the capacity to enter into genuine formal relations with other states.  _Klinghoffer_, 937 F.2d at 48. _See also_, Dajani, _supra_, at 57(noting that in its present

41

disarray, the PLO cannot negotiate on behalf of the people it claims to represent). Similar to the situation with the PA, what the Interim Agreement gives with one hand, it takes away with the other. For example, the Agreement allows the PLO to negotiate and sign agreements with states or international organizations only in matters of economic, social, and/or technical development. Interim Agreement, art. 9, para. 5(b), 36 I.L.M. at 561. However, that same document limits the extent to which the PLO may use this participation to alter its international status during the interim period and specifically states that such participation shall not constitute an engagement in foreign relations. Id. at 5(b)(5). See also, Dajani, supra, at 73.

International law grants a sovereign State certain well-accepted rights and capacities, including sovereignty over its territory and nationals and the capacity to join with other states to make international law by custom or agreement. Morgan, 924 F.2d at 1243-44. However, along with these rights comes certain obligations such as those set forth in the Charter of the United Nations. The PLO's case demonstrates once again that the four criteria for statehood are intertwined in that without a defined territory under unified governmental control, the PLO cannot implement and fulfill the obligations that accompany the right to formal participation in the international community. Klinghoffer, 937 F.2d at 48; Knox, 2004 WL at *11. Therefore,

the PLO fails to satisfy the fourth criterion and, thus, is not a State entitled to sovereign immunity.

The PLO argues that its observer status at the United Nations evinces its capacity to enter into international relations.  As this writer has stated, Members of the United Nations enjoy diplomatic immunity, Permanent Observers do not. Ungar II, 228 F. Supp. 2d at 49.  The PA previously argued to this Court that it was closer to full membership in the United Nations than at any time in the past.  Id. at 48.  However, at present, the United Nations has not admitted the PA, the PLO, or Palestine as a full Member.  Id. at 49; Knox, 2004 WL at *6. This Court's opinion remains unchanged; close is simply not good enough.  Ungar II, 228 F. Supp. 2d at 49.

In November of 1974, the United Nations' General Assembly invited the PLO to participate in its sessions and the work of all international conferences it convened in the capacity of an Observer.  G.A. Res. 3237, U.N. GAOR, 29th Sess., A/Res/3237 (1974).  The United Nations' Charter is silent on the issue of observer status leaving the interpretation to state practice. Question of Criteria for the Granting of Observer Status in the General Assembly, U.N. GAOR 6th Comm., 49th Sess., 10th mtg., at 2, para. 5, U.N. Doc. A/C.6/49/SR.10 (1994).  As a result, observer status for specialized agencies has been largely regulated through agreements with the United Nations, while

individual ad hoc General Assembly resolutions have determined whether or not to grant observer status to other intergovernmental organizations.  Id.

It has never been suggested that observer status equates with statehood.  The United Nations' Charter clearly states that the United Nations is, and shall remain, an organization of States.  U.N. Charter, art. 4.  Consequently, membership in the General Assembly is reserved for States.  See U.N. Charter, art. 9.  The General Assembly gives non-members observer status to enable them to actively participate in and contribute to the General Assembly's work.  Question of Criteria for the Granting of Observer Status in the General Assembly, U.N. GAOR 6th Comm., 49th Sess., 10th mtg., at 7, para. 26, U.N. Doc. A/C.6/49/SR.10 (1994).  Although at present, there are no defined criteria for granting observer status, practice demonstrates that it correlates with the potential contribution an Observer will make to the General Assembly's work.  Id.

While the PLO enjoys a unique status as an Observer in the General Assembly and may have broader access to General Assembly activities than any other non-state entity, the PLO still does not enjoy the same full access to United Nations' activities accorded to Member States.  Dajani, supra, at 54.  For example, while the PLO may address the General Assembly and Security Council, it lacks the right to reply to any Member State during

general debates and the right to vote because these rights are reserved for Member States. Eric Ting-Lun Huang, <u>Taiwan's Status in a Changing World: United Nations Representation and Membership for Taiwan</u>, 9 Ann. Surv. Int'l.& Comp. L. 55, 76 (2003). <u>See also</u>, <u>Mem. in Supp. of Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl.</u>, at Ex. 17. In short, the most that can be said about the PLO's observer status is that the PLO is an "other organization" and is presently at the United Nations as an invitee. <u>United States v. Palestine Liberation Org.</u>, 695 F. Supp. at 1459. If anything, the PLO's observer status, as opposed to full membership, further highlights the fact that neither the PLO nor Palestine meet the legal requirements for statehood.

In sum, the PLO has not demonstrated any change in its status since the decisions in <u>Klinghoffer</u> and <u>Ungar II</u>. The PLO still does not meet the legal requirements for statehood and thus is not shielded by sovereign immunity. Therefore, the PLO's motion to dismiss must be denied.

The present case is analogous to the situation presented in <u>Morgan Guaranty Trust Co. v. Republic of Palau</u>. 924 F.2d 1237 (2d Cir. 1991). That action arose when Palau, a trust territory of the United States, defaulted on various bank loans it had received for the construction of an electric power plant and fuel storage facility. <u>Id.</u> Palau raised the defense of sovereign

immunity and the Second Circuit concluded that Palau did not satisfy the Restatement's criteria for statehood.  <u>Id.</u> at 1247.

Palau, an archipelago of approximately two-hundred islands in the South-west Pacific, was governed by Japan under a League of Nations' mandate between World War I and World War II.  <u>Id.</u> at 1238.  In 1947, the United Nations' Security Council and the United States entered into a Trusteeship Agreement, which designated the United States as Trustee of the islands formerly governed under the Japanese mandate.  <u>Id.</u> at 1239.  According to the Trusteeship Agreement, the United States had full powers of administration, legislation, and jurisdiction over Palau and had the right to apply United States' domestic law as it deemed appropriate.  <u>Id.</u> at 1244.  While over time, the islands of Palau received increasing responsibility for their own governance and negotiated agreements for permanent changes to their political status, the United States' government retained the power to suspend any acts of Palau's legislature that were inconsistent with United States' laws or treaties.  <u>Morgan</u>, 924 F.2d at 1241.

The Second Circuit concluded that a political entity whose laws might be suspended by another lacks any type of sovereignty. <u>Id.</u> at 1245.  Since the United States retained ultimate authority over the governance of Palau, the Court could not conclude that Palau was an entity under the control of its own government with general authority over its nationals.  <u>Id.</u>  Palau did not exhibit

the attributes of statehood specified by the Restatement and thus could not be considered a foreign sovereign that was entitled to immunity.  Id.

The status of the PA and PLO has also evolved over time, as evidenced by the granting of observer status, in a move toward self-governance for the Palestinian people.  The international community agrees that the Palestinian people have a right to self government and self-determination.  Dajani, supra, at 70.  However, the Interim Agreement is clear that any step in this direction will not alter the status of the PA or PLO during the interim period.  Interim Agreement, art. IX, para. 5(b), 36 I.L.M. at 561.  Similar to the relationship between the United States and Palau, Israel retains ultimate authority over the PA and PLO in many areas, including the authority to nullify any legislative action inconsistent with the Interim Agreement or Israeli law.  Therefore, the PA and PLO remain political entities who lack any type of sovereignty.  Given Israel's ultimate authority over many aspects of Palestinian governance, this writer must conclude that neither the PA nor the PLO is an entity under the control of its own government with general authority over its nationals.  Thus the result is the same as in Morgan: absent all the attributes of statehood required by the Restatement and international law, this Court opines that the PA and PLO are not foreign States that are entitled to sovereign

immunity.

### Alternatively, the PA and PLO are not Entitled to Sovereign Immunity Because the United States Does not Recognize Them as States or as Representatives of a Purported Palestinian State.

Even assuming, without deciding, that a State of Palestine exists, the PA and PLO are still not entitled to sovereign immunity because there is no evidence that the United States has recognized or otherwise treated Palestine as a sovereign state. Knox, 2004 WL, at *12. Nor is there any indication that the United States recognizes the PA or PLO as official representatives of a purported Palestinian State and affords them the privileges and immunities ordinarily given to official representatives of sovereign entities. Id. While the Restatement does not require recognition as a criterion of statehood, an unrecognized State is not a judicial nullity. Kadic v. Karadzic, 70 F.3d at 244. Federal courts have regularly given effect to the "state" action of unrecognized states. Id. (citations omitted).

Recognized states enjoy certain privileges such as access to United States' courts and head of state immunity. Knox, 2004 WL at *12 (citations omitted). The effect that United States' courts give to the actions or privileges and immunities of an unrecognized state is determined by applying the doctrine of comity. Id. Comity is a grace or expression of the friendly relationship between sovereign states. Id.(quoting Banco

Nacional de Cuba v. Sabbatino, 376 U.S. 398, 409 (1964)).  Comity
may not be demanded as of right, but rather is extended as a
favor.  Id. at *13(quoting Russian Socialist Federated Soviet
Republic v. Cibrario, 139 N.E. 259, 260 (1923)).  Comity raises
the question of whether, as a matter of public policy, a court
should protect the unrecognized foreign entity involved in the
case pending before it.  Knox, 2004 WL at *12.

Courts have taken different approaches to the claims of
unrecognized foreign entities to sovereign or governmental
immunity.  See generally, Knox, 2004 WL at *14-18 (citing
Sabbatino, 376 U.S. at 410(allowing a foreign entity access to
United States' courts when the Executive Branch clearly expressed
its support for extending such privileges); Latvian State Cargo &
Passenger S.S. Line v. McGrath, 188 F.2d 100, 1003 (D.C. Cir.
1951)(noting that when non-recognition of a certain entity is
deliberate and a part of United States' foreign policy, this non-
recognition must be given effect by the courts); Banque de France
v. Equitable Trust Co., 33 F.2d 202, 206 (S.D.N.Y. 1929)(deciding
to hear a case when the Executive Branch is silent if such action
will not violate United States' domestic policy or otherwise
conflict with the interests of justice); Kadic, 70 F.3d at 245
(when the Executive Branch has not suggested a foreign policy
interest in an action involving an unrecognized state, refusing
to allow the unrecognized state to assert sovereign immunity to

49

alleged violations of basic human rights or international law); United States v. Lumumba, 741 F.2d 12, 15 (2d Cir. 1984)(noting that an unrecognized foreign state may not assert sovereign immunity); Cibrario, 139 N.E. at 262(noting that absent recognition, no comity exists)). See also, Klinghoffer, 937 F.2d at 48(noting that "there is no bar to suit where an unrecognized regime is brought into court as a defendant").

Assuming that there is a State of Palestine, or even that the PA or PLO meet the requirements for statehood, there is no bar to the instant litigation because similar to the situation in Klinghoffer, this is a case where two unrecognized regimes have been brought to this court as defendants. Although the PLO has declared Palestine a State and several other nations have recognized Palestine as such, the United States has yet to do so and affirmatively opposes the idea that a sovereign Palestine exists. Aff. of Ambassador Nasser Al-Kidwa, at 14, attached to Mem. in Supp. of Palestinian Defs.' Rule 12(b)(1) Mot. to Dismiss the Am. Compl. See also, Knox, 2004 WL at *20. The United States has been clear that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and international law. 22 U.S.C.A. § 5201(b)(1990); Knox, 2004 WL at *21; United States v. Palestine Liberation Organization, 695 F. Supp. at 1460. Therefore, even if Palestine and the PA and PLO regimes satisfied the criteria

for statehood, this Court would not allow these unrecognized entities to invoke sovereign immunity as a shield from application of the ATA.  Like the Court in <u>Knox</u>, this Court will not find sovereign immunity where it does not exist.  2004 WL, at * 19.

## IV.  Conclusion

It is clear from all of the evidence produced in this case that the PA and PLO have limited and not complete sovereignty and fail to satisfy all four criteria for statehood.  The PA and PLO are not and do not represent a foreign State under the law of the United States and therefore are not entitled to sovereign immunity.  Thus, for the aforementioned reasons, the motion of the PA and PLO to dismiss the Amended Complaint hereby is denied.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
April 23, 2004