UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATES OF YARON UNGAR AND          )
EFRAT UNGAR BY AND THROUGH THE          )
ADMINISTRATOR OF THEIR ESTATES          )
DAVID STRACHMAN;                        )
DVIR UNGAR, MINOR, BY HIS               )
GUARDIANS AND NEXT FRIEND,              )
PROFESSOR MEYER UNGAR;                  )
JUDITH UNGAR;                           )
RABBI URI DASBERG;                      )
JUDITH DASBERG (INDIVIDUALLY AND        )
IN THEIR CAPACITY AS LEGAL              )
GUARDIANS OF PLAINTIFFS DVIR            )
UNGAR AND YISHAI UNGAR);                )
AMICHAI UNGAR;   DAFNA UNGAR; AND       )
MICHAL COHEN,                           )
                      Plaintiffs,[1]    )
                                        )      C.A.No. 00-105L
           V.                           )
THE PALESTINIAN AUTHORITY               )
(A.K.A. "THE PALESTINIAN INTERIM        )
SELF-GOVERNMENT AUTHORITY");            )
THE PALESTINE LIBERATION                )
ORGANIZATION; YASSER ARAFAT;            )
JIBRIL RAJOUB; MUHAMMED DAHLAN;         )
AMIN AL-HINDI; TAWFIK TIRAWI;           )
RAZI JABALI; HAMAS - ISLAMIC            )
RESISTANCE MOVEMENT (A.K.A.             )
"HARAKAT AL-MUQAWAMA AL-ISLAMIYYA")     )
ABDEL RAHMAN ISMAIL ABDEL RAHMAN        )
GHANIMAT; JAMAL ABDEL FATAH             )
TZABICH AL HOR; RAED FAKHRI ABU         )
HAMDIYA; IBRAHIM GHANIMAT; AND          )
IMAN MAHMUD HASSAN FUAD KAFISHE,        )
                      Defendants.[2]    )
                                        )

---

[1] On July 24, 2001, this Court dismissed all claims arising out of Efrat Ungar's death because they were brought under 18 U.S.C. § 2333, and the Complaint did not allege that Efrat Ungar was an American national.  <u>Estates of Ungar ex rel. Strachman v. Palestinian Auth.</u>, 153 F. Supp. 2d 76, 97 (D.R.I. 2001) (hereinafter, <u>Ungar I</u>).  This included the claims of Efrat Ungar's Estate, those filed by Rabbi Uri Dasberg and Judith Dasberg in their individual capacities, and claims on behalf of Davir and Yishai Ungar.  <u>Id.</u>

[2] On July 24, 2001, this Court dismissed Defendants Yasser Arafat, Jibril Rajoub, Muhammed Dahlan, Amin Al-Hindi, Twfik Tirawi, and Razi Jabali due to a lack of personal jurisdiction.

MEMORANDUM AND ORDER

Ronald R. Lagueux, Senior United States District Judge

There are three matters before this Court: 1) the objections filed by Defendants, the Palestinian Authority ("PA"), and the Palestine Liberation Organization ("PLO"), to a Report and Recommendation issued by Magistrate Judge David L. Martin on March 31, 2004 ("Report and Recommendation"); 2) the PA's appeal of a separate Order issued by Judge Martin granting Plaintiffs' request for attorneys' fees as a sanction for the PA's failure to provide any discovery in the instant case; and 3) Plaintiffs' motion, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, to alter and amend this Court's April 23, 2004 Decision and Order relating to sovereign immunity. The Estates of Yaron Ungar ex rel Strachman v. The Palestinian Authority, 315 F. Supp. 2d 164 (D.R.I. 2004)(hereinafter, Ungar IV).

The facts of this case are described at length in this writer's previous opinions. See Ungar IV, 315 F. Supp. 2d at 168-171; Ungar III, 304 F. Supp. 2d at 244-47; The Estates of

_____

Ungar I, 153 F. Supp. 2d at 100. Similarly, on January 27, 2004, this Court dismissed Defendants Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat, and Iman Mahmud Hassan Faud Kafishe due to a lack of personal jurisdiction. Estates of Ungar ex rel. Strachman v. Palestinian Authority, 304 F. Supp. 2d 232, 241 (D.R.I. 2004)(hereinafter, Ungar III). This Court also entered final judgment against Defendant, Hamas - Islamic Resistence Movement (A.K.A. "Harakat Al-Muqawama Al-Islamiyya") for a total amount of $116,409,123.00 plus attorneys' fees and court costs. Id. at 242-43.

2

<u>Ungar ex rel. Strachman v. The Palestinian Auth.</u>, 228 F. Supp. 2d 40, 41-43 (D.R.I. 2002)(hereinafter, <u>Ungar II</u>); <u>Ungar I</u>, 153 F. Supp. 2d at 82-85; and the attached Report and Recommendation. Therefore, there is no need to repeat the tragic events and extensive procedural history underlying this litigation. It suffices to say here that on April 29, 2003, this writer referred Plaintiffs' three motions for default judgment against the PA and PLO to Magistrate Judge David L. Martin for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 32(a). Judge Martin held hearings on the motions last summer and took the matters under advisement.

Judge Martin reviewed the submitted memoranda and exhibits, performed independent research, and then issued an extensive Report and Recommendation on March 31, 2004, which is attached hereto. Judge Martin recommended that this Court enter default judgment against the PA in the amount of $116,421,048.00 and against the PLO in the amount of $116,415,468.00. Both recommended amounts include attorneys' fees.

The PA and PLO filed objections to Judge Martin's Report and Recommendation on April 19, 2004, before the time period for filing objections set forth in Rule 72(b) of the Federal Rules of Civil Procedure and Local Rule 32 elapsed later that day. The PA and PLO assert the following six grounds for their objections: 1)this Court lacks subject matter jurisdiction because the PA and

PLO are entitled to sovereign and governmental immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604 (1976) ("FSIA"), and the Anti-Terrorism Act of 1991, 18 U.S.C. § 2337(2)(1992)("ATA"),[3] and because the claims asserted against them present non-justiciable political questions; 2)Plaintiffs' claims are legally insufficient and do not support an entry of default judgment; 3)the Report and Recommendation fails to give effect to the PA's and PLO's position that they are entitled to a final determination of their claims to sovereign immunity, including appellate review, before being required to answer the Amended Complaint or participate in discovery; 4)the Report and Recommendation fails to recognize and give effect to the adverse conditions facing the Palestinian government and the PA and PLO, which have made discovery difficult and contrary to Palestinian national interests; 5)this Court lacks personal jurisdiction over the PA and PLO; and 6)the law should not require the "disproportionate compensation" recommended by Judge Martin. Objections of Defs. Palestinian Auth. & Palestine Liberation Organization to the Mag. Judge's Report & Recommendation,

---

[3]Congress originally enacted Sections 2331-2338 as part of the Antiterrorism Act of 1990.  Pub.L. No. 101-519, § 132, 104 Stat. 2250-2253 (1990).  However, that Public Law has no currently effective sections.  Congress re-enacted these sections as part of the Federal Courts Administration Act of 1992.  Pub.L. No. 102-572, Title X, § 1003(a)(1)-(5), 106 Stat. 4521-4524 (1992), which was amended on October 31, 1994 to Pub.L.No. 103-429, § 2(1), 108 Stat. 4377.  Ungar II, 228 F. Supp. 2d at 41 n.1.

(hereinafter, Objections), at 1-3.  That same day, the PA
appealed Judge Martin's March 31, 2004 Order that granted
Plaintiffs' request for attorneys' fees pursuant to Rule 37(b)(2)
of the Federal Rules of Civil Procedure as a sanction for the
PA's failure to provide any discovery in the instant case.  The
PA's arguments with respect to this appeal are identical to its
objections to the Report and Recommendation.  See Notice of
Appeal, at 2.

    Also on April 19, 2004, Plaintiffs filed their own
objections to the Report and Recommendation.  Plaintiffs later
withdrew these objections so as not to impede this Court from
entering a final judgment.  Notice of Withdrawal of Pls.'
Objections to Portions of the Report & Recommendation Issued on
Mar. 31, 2004, at 2.  Thereafter, Plaintiffs responded to the
PA's and PLO's objections and argued that the objections did not
present anything new and were "hopelessly vague, frivolous, or
irrelevant."  Pls.' Resp. to Objections of the Palestinian Auth.
& Palestine Liberation Organization to the Mag. Judge's Report &
Recommendation, at 1.  Plaintiffs requested that this Court make
a de novo determination that rejects each of the objections,
adopts the Report and Recommendation, and enters a final judgment
against the PA and PLO.  Id. at 2.

    On April 27, 2004, Plaintiffs filed a motion, pursuant to
Rule 59(e) of the Federal Rules of Civil Procedure, to alter and

amend this Court's Decision and Order in <u>Ungar IV</u> regarding sovereign immunity. 315 F. Supp. 2d at 164. Plaintiffs request that this Court reconsider and reverse its holding that the PA and PLO did not waive claims to sovereign immunity, and hold instead that "even assuming *arguendo* that Defendants were 'foreign States,' they have waived any claims to sovereign immunity." <u>Mem. in Supp. of Pls.' Mot. Pursuant to Fed. R. Civ. P. 59(e)</u>, at 4. The PA and PLO did not file any objections to Plaintiffs' motion.

The parties briefed and later argued these three matters on June 23, 2004, and they are now in order for decision. For the reasons that follow, this Court overrules each of the PA's and PLO's objections to Judge Martin's Report and Recommendation, adopts that Report and Recommendation in toto and attaches it hereto. The PA's appeal of Judge Martin's separate Order with respect to Plaintiffs' request for attorneys' fees and Plaintiffs' motion to amend this Court's decision in <u>Ungar IV</u> are denied. Furthermore, this Court directs the Clerk to enter default judgment against the PA and PLO as indicated below.

**The Objections to the Report and Recommendation**

The PA and PLO raise six objections to Judge Martin's recommendation that this Court grant Plaintiffs' motions to enter default judgment. Since these motions are dispositive of the claims presented in the Amended Complaint, this Court must

conduct a de novo review of Judge Martin's Report and

Recommendation.  See Harvard Pilgrim Health Care of New England

v. Thompson, No. 02-354L, 2004 WL 1166500 at *4 (D.R.I. May 26,

2004)(noting that a dispositive motion is one that extinguishes a

party's claim or defense and is reviewed by a district court de

novo where that court may accept, reject, or modify the

recommended decision, receive further evidence, or recommit the

matter to the magistrate judge with instructions).  Therefore,

although the PA and PLO do not present this Court with any new

arguments, this writer will consider each objection in turn.

The PA's and PLO's first objection is that this Court lacks

subject matter jurisdiction over the Amended Complaint due to the

existence of non-justiciable political questions and the

sovereign immunity provided in Section 2604 of the FSIA[4] and

Section 2337(2) of the ATA[5].  Objections, at para. 1.  The PA and

PLO raised and this Court rejected the same arguments in Ungar II

and Ungar IV and does so again now.  For the reasons set forth in

_____

[4]28 U.S.C. § 2604 has been repealed.  The defense of
sovereign immunity provided for in the FSIA is now codified at 28
U.S.C. § 1604 (1976), which provides, in part, that "a foreign
State shall be immune from the jurisdiction of the courts of the
United States and of the States except as provided in sections
1605 to 1607 of this chapter."

[5]Section 2337(2) of the Anti Terrorism Act states that "no
action shall be maintained under Section 2333 against a foreign
state, an agency of a foreign state, an officer or employee of a
foreign state or an agency thereof acting within his or her
official capacity or under color of legal authority."  18 U.S.C.
§ 2337(2).

those opinions, this writer reiterates that the Amended Complaint does not present any non-justiciable political questions and neither the PA, the PLO, nor the entity called Palestine is or represents a foreign State and therefore, is not entitled to sovereign immunity. See Ungar IV, 315 F. Supp. 2d at 174-187; Ungar II, 228 F. Supp. 2d at 44-49. Therefore, the PA's and PLO's first objection to the Report and Recommendation is overruled.

The second objection raised by the PA and PLO is that this Court should not enter a default judgement because Plaintiffs' claims are legally insufficient. Objections, at para. 2. The PA and PLO argue that they "legitimately sought to protect and promote Palestinian interests" and lacked the intent required to engage in acts of international terrorism as defined by the ATA.[6]

---

[6] Section 2331(1) of the ATA defines the term international terrorism to mean activities that:

    A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

    B) appear to be intended –
        (i)  to intimidate or coerce a civilian population;
        (ii) to influence the policy of a government by intimidation or coercion; or
        (iii) to affect the conduct of a government by assassination or kidnaping; and

    (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek

me

Id. Furthermore, these Defendants argue that their conduct was not proximately related to Yaron Ungar's murder. Id.

Similar to their claims to sovereign immunity, the above are arguments that should have been raised in an answer to the Amended Complaint or through Defendants' participation in the present litigation. However, these Defendants decided and instructed their counsel not to answer the Amended Complaint or participate in discovery and therefore, were defaulted. See Report & Recommendation, at 69, n.46 & at 70. The First Circuit has repeatedly held that when a default is entered, a court must consider that all of the plaintiff's allegations of fact are true and that his or her claims are established as a matter of law. Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985); accord Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002)(per curiam)(quoting Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir. 1992) and Brockton, 771 F.2d at 13); In Re The Home Restaurants Inc., 285 F.3d 111, 114 (1st Cir. 2002)(citing Franco v. Selective Ins. Co., 184 F.3d 4,9 at n.3 (1st Cir. 1999)); Libertad v. Sanchez, 215 F.3d 206, 208 (1st Cir. 2000).

This Court previously concluded that Plaintiffs would be entitled to relief if the allegations in the Amended Complaint

_____

asylum.

18 U.S.C. § 2331(1).

were true when it denied the Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>Ungar II</u>, 228 F. Supp. 2d at 47. Given the PA's and PLO's default and fact that the allegations in the Amended Complaint must now be deemed true, there is no merit in the second objection, which essentially challenges the ATA claims asserted in the Amended Complaint. Therefore, for these and the reasons set forth in <u>Ungar II</u>, the second objection is also overruled. <u>See</u> 228 F. Supp. 2d at 47.

The PA's and PLO's third objection is that the Report and Recommendation fails to give effect to their argument that they are entitled to a final determination of their claim to sovereign immunity before the burdens of litigation are imposed on them. <u>Objections</u>, at para. 3. To support this argument, the Defendants cite <u>In re Papandreou</u>, which dealt with a defendant's petition for a writ of mandamus to vacate an Order compelling discovery related to a sovereign immunity defense. 139 F.3d 247, 249-50 (D.C. Cir. 1998). The Circuit Court found that this discovery should not have been authorized without a showing of need and before the district court considered the alternate, non-merits routes to dismissal of standing, forum non conveniens, personal jurisdiction, and the act of state doctrine that were asserted by the defendants. <u>Id.</u> at 254-56. The Court noted that an assertion of immunity should not increase litigation costs at the

expense and neglect of swifter routes to dismissal.  See id. at 254.

Aside from the fact that Papandreou does not directly support the Defendants' argument, their continued flawed assertions of sovereign immunity, despite their own admissions that they are not a foreign State as defined by the FSIA, have increased the costs borne by Plaintiffs and prolonged this litigation unnecessarily.  Unlike the situation presented in Papandreou, the PA and PLO refused to participate in discovery even after this Court heard and rejected the alternate, non-merits routes to dismissal of personal jurisdiction, insufficient service of process, improper venue, and forum non conveniens. Ungar I, 153 F. Supp. 2d at 87-100.  Moreover, when Judge Martin heard, considered, and ultimately rejected the Defendants' objection during hearings in July of 2003, this writer had already determined that the PA was not a foreign State or a representative thereof as defined by the FSIA and consequently, was not immune from suit under the ATA.  See Report & Recommendation, at 28-29; Ungar II, 228 F. Supp. 2d at 49.  This Court has since determined that there is no basis whatsoever for the PA or PLO to claim sovereign immunity.  Ungar IV, 315 F. Supp. 2d at 179, n.7.  Therefore, for all of these reasons and those set forth in the portions of Ungar II and Ungar IV referred to above, the Defendants' third objection is also overruled.

The fourth objection asserts that the Report and Recommendation fails to recognize and give effect to the adverse conditions facing the Palestinian government and the PA and PLO, which made discovery difficult and contrary to Palestinian national interests. Objections, at para. 4. This assertion is disingenuous, especially in light of the fact that such conditions have not prevented the PA and PLO from making the extensive filings reflected throughout the procedural history of this case. See Ungar IV, 315 F. Supp. 2d at 169-171. As Judge Martin points out, this objection, although repeatedly raised by the PA and PLO, remains unsupported by affidavit or other admissible evidence. See Report & Recommendation, at 21-22. Furthermore, this Court has granted the PA and PLO numerous indulgences in the form of extensions of time for filing papers and continuances of scheduled hearings. See id. at 25 & 64. Yet, these Defendants made the deliberate choice not participate in this litigation and have not answered a single interrogatory or request for admission or produced a single document sought by Plaintiffs. Therefore, the Defendants' fourth objection to the Report and Recommendation has no merit and is also overruled.

Next, the PA and PLO object to Judge Martin's conclusion that this Court has personal jurisdiction in the instant case. Objections, at para. 5. This Court dealt with the issue of personal jurisdiction at length and rejected this same argument

in <u>Ungar I</u>.  153 F. Supp. 2d at 86.  This writer sees no need to revisit that decision and overrules the Defendants' fifth objection based on the authorities and reasoning set forth in that opinion.  <u>See</u> <u>Ungar I</u>, 153 F. Supp. 2d at 86-91.

The final objection raised by the PA and PLO is that the law should not require the "disproportionate compensation" recommended by the Magistrate Judge "for the death of one person in the context of an ongoing conflict in which thousands of innocent civilians on both sides have been killed without any hope of compensation." <u>Objections</u>, at para. 6.  These Defendants argue that the ultimate burden of this compensation will be borne by an impoverished and oppressed Palestinian people who currently suffer from a continuing humanitarian crisis.  <u>Id.</u>  Defendants are hard pressed to succeed with this argument given the fact that they deliberately stated their intentions not to participate in and thus, waived a hearing on damages.  <u>See</u> <u>Report and Recommendation</u>, at 72 (internal citations omitted).

Defendants' arguments are offensive at best, especially given this Court's adoption of Judge Martin's extensive recommendations relating to the damages owed by Defendant Hamas for the brutal murders that are the subject of this litigation. <u>See</u> <u>Ungar III</u>, 304 F. Supp. 2d at 267-277.  Judge Martin applied those same findings in making his recommendations as to the damages to be assessed against the PA and PLO and this writer

finds no error in those conclusions.  <u>See</u> <u>Report &</u>
<u>Recommendation</u>, at 72-73.  The PA and PLO, and not an
impoverished and oppressed Palestinian people, are responsible
for and must bear the ultimate burden of providing compensation,
which this Court fully acknowledges will never return to
Plaintiffs the relationships and lives that existed prior to June
9, 1996.  This Court hopes that in keeping with the ATA's purpose
to deter acts of international terrorism, its judgment will
"interrupt or at least imperil the flow of terrorism's lifeblood,
money," and thus, prevent the PA and PLO from funding future
terrorist acts such as the one that resulted in the Ungars'
horrific deaths.  <u>Ungar III</u>, 304 F. Supp. 2d at 239(citing
<u>Antiterrorism Act of 1990: Hearing on S2465 Before the Subcomm.</u>
<u>on Cts. and Admin. Practice of the Comm. on the Judiciary U.S.</u>
<u>S.</u>, 101st Cong., at 85 (1990)(statement of Joseph Morris)).  For
all of these reasons, the Defendants' final objection to the
Report and Recommendation is also hereby, overruled.

In sum, this Court overrules each of the PA's and PLO's
objections for the reasons stated above.  This Court adopts in
toto Judge Martin's March 31, 2004 Report and Recommendation and
publishes it with this Memorandum and Order.  Judgment shall be
entered against the PA and PLO as directed below.

## The PA's Appeal of Judge Martin's Order Imposing Sanctions for their Delays and Refusal to Participate in Discovery

The PA appeals a separate Order issued by Judge Martin on

March 31, 2004, which granted Plaintiffs' request for attorneys' fees pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure.  Judge Martin ordered the PA to pay attorneys' fees as a sanction for its delays and ultimate refusal to comply with Plaintiffs' discovery requests and this Court's discovery orders.  Report & Recommendation, at 75.  Judge Martin imposed this sanction separately and independently from his recommendation that this Court award attorneys' fees pursuant to the ATA and in the event that this writer declined to enter a default judgment in this case.  Id.  The PA argues that: 1) the grant of attorneys' fees is unauthorized and excessive in amount; 2) their position with respect to discovery was taken in good faith; and 3) the discovery demanded was unreasonable for essentially the same reasons as those offered in its objections to the Report and Recommendation.  Notice of Appeal, at 1-2.  Once again, this Court does not find any of those arguments persuasive.

Rule 37(b) of the Federal Rules of Civil Procedure allows a court to order the payment of attorneys' fees as a sanction for failing to obey an order to provide or permit discovery.  Fed. R. Civ. P. 37(b) (West 2004).  A magistrate judge's determination to award attorneys' fees as a discovery sanction pursuant to this Rule is a non-dispositive matter, which the district court reviews under the clearly erroneous standard.  Thomas E. Hoar Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990)

(citations omitted).  <u>See also</u>, <u>Hutchinson v. Pfeil</u>, 105 F.3d 562, 566 (10th Cir. 1997)(noting that discovery orders are non-dispositive and magistrate judges have the authority to order discovery sanctions).  A determination is "clearly erroneous" when, although there is evidence to support it, the court, after reviewing all the evidence, is left with the definite and firm conviction that the magistrate judge made a mistake.  <u>Harvard Pilgrim</u>, 2004 WL at *4(citing <u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948)).  In conducting this review, the district court must refrain from second guessing the magistrate judge's pre-trial discovery rulings.  <u>Id.</u>(citing <u>Mutual Fire, Marine & Inland Ins. Co. v. Jenckes Mach. Co.</u>, No. 85-0586, 1986 WL 9717, at *1 (D.R.I. Feb. 19, 1986)).

As defense counsel conceded during oral arguments, this Court's adoption of Judge Martin's Report and Recommendation disposes of the present appeal.  Given the PA's history of refusing to comply with this Court's orders and the rules of procedure governing depositions, interrogatories, and requests for the production of documents and for admissions, this Court finds Judge Martin's conclusion to sanction the PA for its deliberate actions to delay the completion of this litigation to be clearly correct.  Therefore, for these and the reasons previously mentioned with regard to the other objections to the Report and Recommendation, the PA's appeal of Judge Martin's

Order hereby, is denied.

## Plaintiffs' Motion to Amend this Court's Decision and Order Regarding Sovereign Immunity

The final matter before this Court is Plaintiffs' Motion, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, to amend this Court's Decision and Order regarding sovereign immunity. <u>Ungar IV</u>, 315 F. Supp. 2d 164. In that decision, this Court noted that the PA and PLO had not waived sovereign immunity, even though it ultimately held that those Defendants were not entitled to such immunity. <u>Id.</u> at 173. Plaintiffs request that this Court amend its judgment to hold instead that even assuming that the defendants were "foreign States," they have waived any claims to sovereign immunity. <u>Mem. in Supp. of Pls.' Mot. Pursuant to Fed. R. Civ. P. 59(e)</u>, at 4. Neither the PA nor the PLO have filed any objections to this motion.

Rule 59(e) allows a court to alter or amend its judgment if a motion to do so is filed no later than ten days after the original judgment is entered. <u>See</u> <u>Commercial Assocs. v. Tilcon Gammino Inc.</u>, 801 F. Supp. 939, 942 (D.R.I. 1992); Fed. R. Civ. P. 59(e)(West 2004). A court has broad discretion in deciding a motion brought pursuant to this Rule. <u>DeSenne v. Jamestown Boat Yard Inc.</u>, 781 F. Supp. 866, 869 (D.R.I. 1991)(citing <u>United States v. Land at 5 Bell Rock Rd.</u>, 896 F.2d 605, 611 (1st Cir. 1990)). <u>See also</u> <u>Commercial Assocs.</u>, 801 F. Supp. at 942 (citing <u>White v. N.H. Dep't. of Employment. Sec.</u>, 455 U.S. 445, 450-51

(1982)(quoting the Advisory Committee's notes on the 1946 Amendments to the Federal Rules)).  The most common grounds for granting a Rule 59(e) motion are a manifest error of law or fact or newly discovered evidence.  _DeSenne_, 781 F. Supp. at 869 (citing _Kalman v. Berlyn Corp._, 706 F. Supp. 970, 974 (D.Mass. 1989)).  In order to show a manifest error of law or fact, the moving party must present a substantial reason that the court is in error.  _Id._  Since Plaintiffs have not presented any newly discovered evidence, this Court will confine its discussion to whether or not its conclusion that the PA and PLO did not waive sovereign immunity was a manifest error of law or fact.

This writer made no such error for two reasons.  First, the statements of the PA and PLO cited by Plaintiffs are admissions that they do not satisfy the criteria for statehood required by United States' and international law rather than the explicit waiver of sovereign immunity contemplated by the FSIA exception. Second, this Court's discussion in _Ungar IV_ regarding the issue of waiver is dictum and ancillary to its holding that the PA and PLO were not and did not represent a foreign State that is entitled to sovereign immunity.

As this Court noted in _Ungar IV_, the FSIA provides an exception to sovereign immunity when a foreign State waives its immunity either explicitly or by implication.  315 F. Supp. 2d at 173(citing 28 U.S.C.A. § 1605(a)(1)).  The Supreme Court has

directed that explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign.  Library of Cong. v. Shaw, 478 U.S. 310, 318 (1986).  An express waiver under the FSIA must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity. World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1162 (D.C. Cir. 2002)(citing Aquamar S.A. Del Monte Fresh Produce N.A. Inc., 179 F.3d 1279, 1292 (11th Cir. 1999)).  In creating the waiver exception to sovereign immunity, Congress anticipated that at a minimum, a waiver would not be found absent a State's conscious decision to take part in the litigation and failure to raise the sovereign immunity defense despite an opportunity to do so.  Haven v. Rzeczpospolita Polska, 215 F.3d 727, 733 (7th Cir. 2000)(citing Frolova v. Union of Soviat Socialist Republics, 761 F.2d 370, 378 (7th Cir. 1985)(per curiam)).  A foreign State's indication that it does not intend to participate in the litigation does not constitute the conscious decision required to explicitly waive a sovereign immunity defense.  Id.  However, Federal Courts have found an explicit waiver of sovereign immunity where a foreign State is a party to an agreement whose terms include specific language that the parties waive any right to sovereign immunity.  See World Wide Minerals, 296 F.3d at 1163; Libra Bank Ltd. v. Banco Nacional de Costa Rica, 676 F.2d 47, 49 (2d Cir. 1982)(both

noting the express provisions of various agreements containing explicit waivers of sovereign immunity).  In contrast to an explicit waiver, an admission is an adversary's position which is contrary to and inconsistent with a contention made later in the litigation.  Cox v. Esso Shipping Co., 247 F.2d 629, 632 (5th Cir. 1957); Vockie v. Gen. Motors Corp., 66 F.R.D. 57, 60 (E.D. Pa. 1975).  See also, Black's Law Dictionary, 48 (7th ed. 1999)(admission is a voluntary acknowledgment of the existence of facts relevant to an adversary's case).

Plaintiffs point to the PA's and PLO's statements that their status is "unusual," "particular," and "undefined," as indicating that those Defendants have waived any defense of sovereign immunity.  Mem. in Support of Pls.' Mtn. Pursuant to Fed. R. Civ. P. 59(e), at 2.  These statements are contrary to and inconsistent with the PA's and PLO's position that they satisfy the criteria for statehood discussed in Ungar IV.  See 315 F. Supp. 2d at 177(noting that an entity is a State when it possesses a permanent population, defined territory, a government, and the capacity to enter into relations with other States).  Therefore, the statements are, as Plaintiffs point out, express admissions that neither Defendant satisfies the criteria for statehood and thus, each Defendant is not a foreign State that is entitled to immunity under the FSIA.  See Mem. in Support of Pls.' Mtn. Pursuant to Fed. R. Civ. P. 59(e), at 1 (emphasis

added).  Furthermore, the PA's and PLO's decision and instructions to counsel not to participate in the instant litigation until this Court ruled on their sovereign immunity defense did not constitute a complete, unambiguous, and unmistakable manifestation of an intent to waive any purported sovereign immunity defense.  See Haven, 215 F.3d at 733. Therefore, this Court sees no manifest error in its conclusion that the PA and PLO did not waive the sovereign immunity defense.

Alternatively, this Court's conclusion that neither the PA, the PLO, nor the entity called Palestine was a foreign State entitled to sovereign immunity disposed of Plaintiffs' waiver argument and rendered this Court's discussion of that issue dictum.  See McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 160 (D.R.I. 2003)(citing Black's Law Dictionary, 454 (6th ed. 1990))(dicta constitutes "[o]pinions of a judge which do not embody the resolution or determination of the specific case before the court").  As this Court noted in Ungar IV, the waiver issue only arises if and when a court is satisfied that the party claiming sovereign immunity is a foreign State or an agent or instrumentality of a foreign State.  315 F. Supp. 2d at 176.  See also, Southeby's Inc. v. Garcia, 802 F. Supp. 1058, 1062-63 (S.D.N.Y. 1992)(noting that it was undisputed that the Phillippines was a foreign State as defined in the FSIA and then proceeding to assess whether or not the waiver exception

applied). The specific issue before this Court in <u>Ungar IV</u> was whether or not the PA, PLO, or the entity called Palestine were or represented a foreign State that was protected by sovereign immunity. <u>See</u> 315 F. Supp. 2d at 173, 175 & 178. This writer answered that question in the negative and any observations regarding waiver were not part of the determination of the specific issue of sovereign immunity. <u>See id.</u> at 187. Simply put, the PA and PLO never had a valid defense of sovereign immunity to waive. For all of these reasons, Plaintiffs' motion to amend this Court's decision in <u>Ungar IV</u>, hereby, is denied.

As stated above, the Defendants' objections to Judge Martin's March 31, 2004 Report and Recommendation are overruled and the PA's appeal of Judge Martin's Order with respect to attorneys' fees is denied. Plaintiffs' motion to amend this Court's Decision and Order regarding sovereign immunity is also denied. For the aforementioned reasons, and those set forth in the Report and Recommendation attached hereto, this Court adopts said Report and Recommendation and orders the Clerk to enter final judgment for the specific Plaintiffs listed below against Defendants, the Palestinian Authority and the Palestine Liberation Organization, who are jointly and severally liable for the following amounts with respect to each Plaintiff:

|  |  |
|---|---|
| The Estate of Yaron Ungar | $2,932,158.00 |
| Dvir Ungar | $30,488,482.50 |

| | |
|---|---|
| Yishai Ungar | $30,488,482.50 |
| Judith Ungar | $15,000,000.00 |
| Meir Ungar | $15,000,000.00 |
| Michal Cohen | $7,500,000.00 |
| Amichai Ungar | $7,500,000.00 |
| Dafna Ungar | $7,500,000.00 |

The Clerk shall also enter judgment for Plaintiffs as a group awarding them attorneys' fees against the Palestinian Authority in the amount of $11,925.00 and against the Palestine Liberation Organization in the amount of $6,345.00.  The total amount of judgment, including attorneys' fees, shall be $116,421,048.00 against the Palestinian Authority and $116,415,468.00 against the Palestine Liberation Organization.

The Clerk shall enter judgment as indicated forthwith.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
July 12 , 2004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATES OF YARON UNGAR and          :
EFRAT UNGAR by and through the          :
Administrator of their estates          :
David Strachman, DVIR UNGAR, minor,     :
by his guardians and next friend,       :
YISHAI UNGAR, minor, by his             :
guardians and next friend,              :
PROFESSOR MEYER UNGAR, JUDITH           :
UNGAR, RABBI URI DASBERG, JUDITH        :
DASBERG (individually and in their      :
capacity as legal guardians of          :
plaintiffs Dvir Ungar and Yishai        :
Ungar); AMICHAI UNGAR, DAFNA UNGAR      :
and MICHAL COHEN,                       :
                        Plaintiffs,     :
                                        :          CA 00-105L
        v.                              :
                                        :
THE PALESTINIAN AUTHORITY               :
(A.K.A."THE PALESTINIAN INTERIM         :
SELF-GOVERNMENT AUTHORITY"),            :
THE PALESTINE LIBERATION                :
ORGANIZATION, YASSER ARAFAT,            :
JIBRIL RAJOUB, MUHAMMED DAHLAN,         :
AMIN AL-HINDI, TAWFIK TIRAWI,           :
RAZI JABALI, HAMAS -- ISLAMIC           :
RESISTANCE MOVEMENT (A.K.A.             :
"HARAKAT AL-MUQAWAMA AL-ISLAMIYYA"),    :
ABDEL RAHMAN ISMAIL ABDEL RAHMAN        :
GHANIMAT, JAMAL ABDEL FATAH             :
TZABICH AL HOR, RAED FAKHRI ABU         :
HAMDIYA, IBRAHIM GHANIMAT and           :
IMAN MAHMUD HASSAN FUAD KAFISHE,        :
                        Defendants.     :

## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

        Before the court are three motions: 1) Plaintiffs' Motion
Pursuant to Fed.R.Civ.P. 37(b)(2) for Judgment by Default against
Defendant PA and for Other Relief ("First Motion for Default

1

Judgment" or "First Motion") (Document #106); 2) Plaintiffs' Motion for Judgment by Default 1gainst the PA and PLO and for Other Relief for Refusal to Submit to Depositions ("Second Motion for Default Judgment" or "Second Motion") (Document #125); and 3) Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Third Motion for Default Judgment" or "Third Motion") (Document #168) (collectively the "Motions for Default Judgment").  These motions have been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.R.I. Local R. 32(a).  Hearings on the motions were held on May 14, 2003, July 14, 2003, and August 22, 2003.  After listening to oral argument, reviewing the memoranda and exhibits submitted, and performing independent research, I recommend that the First and Third Motions be granted, that the Second Motion be granted in part and denied in part, and that default judgment be entered against Defendants the Palestinian Authority, also known as the Palestinian Interim Self-Government Authority ("PA"), in the amount of $116,421,048.00, including attorney's fees, and against the Palestine Liberation Organization ("PLO") in the amount of $116,415,468.00, including attorneys fees.

## Index

I.    Case Statement . . . . . . . . . . . . . . . . . . 4
II.   Facts . . . . . . . . . . . . . . . . . . . . . . 5
III.  Parties . . . . . . . . . . . . . . . . . . . . . 6
IV.   Amended Complaint . . . . . . . . . . . . . . . . 7
V.    Travel . . . . . . . . . . . . . . . . . . . . . 11
      A.  Response to Complaint . . . . . . . . . . . . 11
      B.  Response to Amended Complaint . . . . . . . . 12
      C.  Discovery Initiated . . . . . . . . . . . . . 13

    D.   Discovery Stayed . . . . . . . . . . . . . . . 14

    E.   Default Judgment Against Hamas . . . . . . . . 15

    F.   Discovery Stay Terminates . . . . . . . . . . 17

    G.   Motion to Compel Discovery . . . . . . . . . 18

    H.   Motion for Reconsideration of Discovery Order . . . . 20

    I.   Entry of Default against Palestinian Defendants . . . 22

    J.   First Motion for Default Judgment . . . . . . . 23

    I.   Second Motion for Default Judgment . . . . . . . 24

    J.   May 14, 2003, Hearing . . . . . . . . . . . 24

    K.   Third Motion for Default Judgment . . . . . . . 27

    L.   July 14, 2003, Hearing . . . . . . . . . . . 29

    M.   Post July 14, 2003, Filings . . . . . . . . . 29

    N.   August 22, 2003, Hearing . . . . . . . . . . 30

    O.   Post August 22, 2003, Filings . . . . . . . . 32

**VI. Jurisdiction** . . . . . . . . . . . . . . . . . **32**

    A.   Introduction . . . . . . . . . . . . . . . 32

    B.   Subject Matter Jurisdiction . . . . . . . . . 33

    C.   Personal Jurisdiction . . . . . . . . . . . 36

        1.   Minimum Contacts . . . . . . . . . . . 38

        2.   Defendants' Arguments Re Minimum Contacts . . . 44

        3.   Service of Process . . . . . . . . . . . 50

            a.   Judge Lagueux's Findings . . . . . . . 50

            b.   Law of the Case . . . . . . . . . . 51

            c.   Magistrate Judge's Findings . . . . . . . 51

                1) PA and PLO are Unincorp. Associations . 51

                2) Hasan Abdel Rahman is Agent of PA & PLO 52

                    i.   Recently Obtained Evidence . . . 52

                    ii. Other Evidence . . . . . . . 56

                3) Marwan Jilani . . . . . . . . 57

        4.   Conclusion Re Personal Jurisdiction . . . . . 58

**VII. The Motions for Default Judgment** . . . . . . . . . . **58**

    A.   First Motion . . . . . . . . . . . . . . 58

    B.   Second Motion . . . . . . . . . . . . . . 59

        1.   Applicability . . . . . . . . . . . . 59

  2. Basis for Second Motion . . . . . . . . . . . 60

 C. Law Applicable to First and Second Motions . . . . . 60

 D. Application of Law to First and Second Motions . . . 62

 E. Third Motion . . . . . . . . . . . . . . . . 68

 F. Law Applicable to Third Motion . . . . . . . . 68

 G. Application of Law to Third Motion . . . . . . . 69

**VIII Liability** . . . . . . . . . . . . . . . . **70**

**IX. Damages** . . . . . . . . . . . . . . . . **71**

 A. "Survivors" and "Heirs" . . . . . . . . . 71

 B. Measure of Damages . . . . . . . . . . 71

 C. Evidence of Damages . . . . . . . . . . 71

 D. Treble Damages . . . . . . . . . . . 73

 E. Israeli Law Claims . . . . . . . . . . 74

 F. Interest . . . . . . . . . . . . . . 74

**X. Attorney's Fees** . . . . . . . . . . . . **74**

**XI. Summary** . . . . . . . . . . . . . . . **76**

**XII. Conclusion** . . . . . . . . . . . . . . **77**

Appendix . . . . . . . . . . . . . . . . 79

 A. Letter of 11/21/02 . . . . . . . . . . 79

 B. Letter of 7/22/03 . . . . . . . . . . 81

 C. Letter of 7/25/03 . . . . . . . . . . 83

 D. Letter of 7/28/03 . . . . . . . . . . 84

 E. Letter of 8/4/03 . . . . . . . . . . 85

 F. Letter of 3/23/04 . . . . . . . . . . 86

## I. Case Statement[7]

---

[7] The information contained in the Case Statement and Facts is taken in part from this Magistrate Judge's Report and Recommendation of July 3, 2003 (Document #183), which addressed Plaintiffs' Motion to Enter Default Judgment against Defendants Hamas and Hamas Operatives ("Motion to Enter Default Judgment against Hamas") (Document #38). A copy of that Report and Recommendation is attached to Senior Judge Ronald R. Lagueux's Memorandum and Order in <u>Estates of Ungar v. The Palestinian Auth.</u>, CA No. 00-105L, 2004 WL 134034, at *8 (D.R.I. Jan. 27,

This lawsuit stems from the June 9, 1996, murder of an American citizen living in Israel, Yaron Ungar, and his Israeli wife, Efrat Ungar, by the terrorist group Hamas -- Islamic Resistance Movement ("Hamas").  The action is brought by his legal representative and his heirs pursuant to the Antiterrorism Act of 1990 ("ATA"), 18 U.S.C. § 2333, which provides a cause of action for American nationals whose person, property, or business is injured by reason of an act of international terrorism. Defendants PA and PLO are alleged, in general, to have provided Hamas with a base of operations and support for conducting terrorist activities which included the murder of the Ungars. See Amended Complaint ¶¶ 29-37.

## II.  Facts

The Ungars were attacked on June 9, 1996, near Beit Shemesh, Israel, as they drove home from a wedding.  A vehicle driven by Raed Fakhri Abu Hamdiya ("Abu Hamdiya"), and occupied by Abdel Rahman Ismail Abdel Rahman Ghanimat ("Rahman Ghanimat") and Jamal Abdel Fatah Tzabich Al Hor ("Hor"), overtook the Ungar car, and Rahman Ghanimat and Hor fired Kalishnikov machine guns at it. Yaron and Efrat Ungar were fatally wounded, but the fusillade of bullets missed their ten month old son, Plaintiff Yishai Ungar, who was in the back seat.  Another son, Plaintiff Dvir Ungar, then age twenty months, was not in the vehicle at the time of the attack.

Subsequent events are detailed in the July 24, 2001, Decision and Order of Senior Judge Ronald R. Lagueux, see Estates of Ungar v. Palestinian Authority, 153 F.Supp.2d 76 (D.R.I. 2001) ("Ungar I"), relevant portions of which are quoted below:

---

2004).

5

Abu Hamdiya, Rahman Ghanimat, and Hor were arrested following the shooting attack.  A fourth man, defendant Iman Mahmud Hassan Fuad Kafishe, was also arrested in connection with the shooting.  In addition, a warrant was issued for the arrest of Ibrahim Ghanimat on charges relating to the murders of Yaron and Efrat Ungar. Ibrahim Ghanimat remains at large and is believed to be residing within territory controlled by defendant PA.

All five men involved in the shooting are members of Hamas ....  A terrorist group dedicated to murdering Israeli and Jewish individuals through bombings, shootings, and other violent acts, Hamas is based in and operates from territories controlled by defendants PA, PLO, and Yasser Arafat.  Terrorist attacks are staged by small groups of Hamas members organized as a cell for the purpose of carrying out terrorist activities.  Abu Hamdiya, Rahman Ghanimat, Hor, Kafishe, and Ibrahim Ghanimat comprised the terrorist cell that murdered the Ungars.

On May 3, 1998, Abu Hamdiya was convicted by an Israeli court of membership in Hamas and of abetting the shooting murders of Yaron Ungar and Efrat Ungar.  On October 21,

1998, an Israeli court convicted Rahman Ghanimat and Hor
of membership in defendant Hamas and of the murders of
Yaron Ungar and Efrat Ungar.    On November 3, 1998,
Kafishe was convicted by an Israeli court of membership
in Hamas and of being an accessory to the murders of
Yaron and Efrat Ungar.

   Thereafter, on October 25, 1999, an Israeli court
appointed attorney David Strachman ("Strachman") as
administrator of the Estates of Yaron and Efrat Ungar.
Strachman was appointed as the administrator of the
Ungars' estates for the express purpose of administering
and realizing assets, rights, and causes of action that
could be pursued on behalf of the Ungars' estates within
the United States.

   On March 13, 2000, plaintiffs filed an action pursuant
to 18 U.S.C. § 2333 *et seq.* and related torts in the
United States District Court for the District of Rhode
Island.

Ungar I, 153 F.Supp.2d at 83-84.

**III.  Parties**

   Originally, the Plaintiffs included the Estate of Efrat
Ungar and Rabbi Uri Dasberg and Judith Dasberg in their
individual capacities as the parents of Efrat Ungar.  See

Complaint ¶¶ 4, 7.  However, these claims were dismissed on July 24, 2001, because the Complaint did not allege that Efrat Ungar was a national of the United States.  See Ungar I, 153 F.Supp.2d at 97.

The remaining Plaintiffs in the action are: the Estate of Yaron Ungar, represented by Strachman; Dvir Ungar and Yishai Ungar, the minor children and heirs-at-law of Yaron Ungar and Efrat Ungar; Professor Meyer Ungar and Judith Ungar, in their individual capacities as the parents of Yaron Ungar and also as the legal guardians of Plaintiffs Dvir and Yishai Ungar; Rabbi Uri Dasberg and Judith Dasberg, as legal guardians of Plaintiffs Dvir and Yishai Ungar; and Amichai Ungar, Dafna Ungar, and Michal Cohen, the siblings of Yaron Ungar (collectively the "Remaining Plaintiffs").

The original Defendants included six officials of the PA and the five members of Hamas involved in the murders of Yaron and Efrat Ungar.  The individual PA Defendants, Yasser Arafat, Jibril Rajoub, Muhammed Dahlan, Amin Al-Hindi, Tawfik Tirawi, and Razi Jabali (the "individual PA Defendants") were dismissed from the action on July 24, 2001, for lack of jurisdiction over the person.  See Ungar I, 153 F.Supp.2d at 100.  The individual Hamas Defendants, Rahman Ghanimat, Hor, Abu Hamdiya, Ibrahim Ghanimat, and Iman Mahmud Hassan Fuad Kafishe (the "individual Hamas Defendants"), were dismissed for the same reason on January 27, 2004.  See Estates of Ungar v. The Palestinian Auth., CA No. 00-105L, 2004 WL 134034, at *2, 6 (D.R.I. Jan. 27, 2004) ("Ungar III").  The remaining defendants are the PA, the PLO, and Hamas.  Default judgment was entered against Hamas on January 27, 2004.  See id. at *7.

IV.  **The Amended Complaint**

The Amended Complaint states four causes of action.  With the exception of Count I, all claims are brought on behalf of all

Plaintiffs against all Defendants.[8]  Pertinent to the instant motions, Count I alleges that the PA and PLO (the "Palestinian Defendants") engaged in acts of international terrorism as defined in 18 U.S.C. §§ 2331 and 2333 and that their behavior also constitutes aiding and abetting acts of international terrorism.  See Amended Complaint ¶¶ 38-48.  Counts II, III, and IV are claims pled under Israeli law.  See Ungar I, 153 F.Supp.2d at 99 (giving Plaintiffs 30 days to file an amended complaint making allegations against the PA and PLO defendants under Israeli law).  Count II of the Amended Complaint alleges negligence.  See Amended Complaint ¶¶ 49-64.  Count III is for breach of statutory obligation.  See id. ¶¶ 65-73.  Count IV charges Defendants with the "civil wrong" of assault.  See id. ¶¶ 74-82.

    As was the case with the original Complaint, see Ungar I, 153 F.Supp.2d at 84, the factual basis for each claim is essentially the same.  Plaintiffs charge that the Palestinian Defendants failed to maintain public order and security in the territories under their control.  See Amended Complaint ¶¶ 23-25.  Specifically, Plaintiffs allege that the PA and PLO:

> provided defendant HAMAS with safe haven and a base of operations, by permitting and/or encouraging defendant Hamas to operate freely and conduct activities in the territory under their control or in which they maintained a police presence, and to advocate, encourage, solicit, facilitate, incite for, sponsor, organize, plan and execute acts of violence and terrorism against Jewish civilians in Israel, Gaza and the West Bank.

Id. ¶ 29.

    In addition, Plaintiffs allege that the PA and PLO: refused

---

    [8] Count I is brought on behalf of all Plaintiffs except Uri Dasberg and Judith Dasberg in their individual capacities.  See Amended Complaint at 9.

requests for the surrender of terrorist suspects, see id. ¶ 31; granted material and financial support to the families of members of Hamas who have been killed or captured while carrying out terrorist violence against Jewish civilians in Israel, Gaza and the West Bank, see id. ¶ 33; assisted Hamas and its members in avoiding apprehension and punishment, see id. ¶ 34; and solicited Hamas and the individual Hamas Defendants to commit the attack on the Ungars' vehicle, see id. ¶¶ 17-18, 36.  Plaintiffs also claim that the PA employed several members of Hamas and other terrorist groups suspected of or charged with the murder of U.S. citizens as police officers and/or security officials.  See id. ¶ 32.

Plaintiffs further aver that the Palestinian Defendants' actions constitute acts of international terrorism and also aiding and abetting acts of international terrorism because their actions: (1) violate the criminal laws of the United States,[9] see Amended Complaint ¶ 39; (2) "appear to be intended to intimidate or coerce a civilian population," Amended Complaint   ¶ 43 (quoting 18 U.S.C. § 2331), and "to influence the policy of a government by means of intimidation or coercion," id. ¶ 43;[10] (3) were dangerous to human life, see id. ¶ 44; and (4) occurred outside the territorial jurisdiction of the United States, see

_____

[9] Plaintiffs specifically plead that the actions of the Palestinian Interim Self-Government ("PA") and the Palestine Liberation Organization ("PLO") (collectively "the Palestinian Defendants") constitute violations of 18 U.S.C. § 3 (Accessory After the Fact) and 18 U.S.C. § 2339A (Providing Material Support to Terrorists).  See Amended Complaint ¶ 41.

[10] In support of these specific allegations, Plaintiffs assert that the Palestinian Defendants "through their respective representatives, spokesmen and organs: repeatedly praised and lauded defendant HAMAS and HAMAS operatives who had engaged in acts of terrorism and violence against Jewish civilian and Israeli targets; praised, advocated, encouraged, solicited and incited such terrorist acts; and threatened further occurrence of such terrorists acts." Amended Complaint ¶ 43.

id. ¶ 45.

The Israeli law counts charge all Defendants with violating three specific sections of the Israeli Civil Wrongs Ordinance (New Version) - 1968 ("CWO"). See id. ¶¶ 51, 55, 63, 75. Count II asserts that Defendants committed the "civil wrong of Negligence," id. ¶ 62, as that tort is defined in CWO §35,[11] see id. ¶ 56, because "a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the decedents and plaintiffs were liable to be injured by defendants' acts and omissions ...," id. ¶ 61.

Count III charges Defendants with "committing the 'civil wrong' of Breach of Statutory Obligation CWO §63," id. ¶ 71, and cites statutory obligations (and sections) allegedly breached by Defendants.[12]  Count IV asserts the "'civil wrong' of Assault,"

---

[11] According to the Amended Complaint:

a person is liable for the "civil wrong" of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances[,] he is obligated not to act as he did.

Amended Complaint ¶ 56.

[12] According to the Amended Complaint, the statutory obligations breached by Defendants are:

a. The Penal Code - 1977: §300 (murder); §99 (aiding a terrorist organization); §498 (provision of means for commission of a felony); §499 (criminal conspiracy); §30 (solicitation of a crime); §31 (abetting a crime); §95 (non-prevention of national security

11

id. ¶ 75, as that tort is defined in CWO §23. Among other allegations contained within Count IV, Plaintiffs allege that the "PA and PLO and their officials, employees and agents solicited and advised defendants HAMAS [and the individual Hamas Defendants] to commit the assault attributed to those defendants herein, and aided, abetted, authorized, ratified and participated in that assault ...." Amended Complaint ¶ 79. Each of the Israeli law counts also alleges that the Palestinian Defendants are vicariously liable under the CWO for the acts and omissions

-----

offense); §262 (non-prevention of a felony).

    b. <u>The Terrorism Prevention Ordinance - 1948</u>: §2 (activity in a terrorist organization); §3 (membership in a terrorist organization); §4 (provision of support to a terrorist organization).

    c. <u>The Defense Regulations (Emergency) - 1945</u>: Reg. 58 (use of firearms against a person); Reg. 64 (provision of shelter or resources to national security offender); Reg. 66 (abetting); Reg. 85 (membership in or provision of assistance to an illegal organization).

    d. <u>The Agreement on the Gaza Strip and the Jericho Area of May 4, 1994</u> (which was enacted into local law): Article IX(2) (duty to prevent operation of irregular armed forces in PA areas); Article IX(3) (duty to prohibit possession of weapons and explosives in PA areas); Article XVIII (duty to prevent acts of terrorism); Annex III Article II (duty to surrender suspects).

    e. <u>Interim Agreement on the West Bank and the Gaza Strip of September 28, 1995</u> (which was enacted into local law): Article XIV(3) (duty to prevent operation of irregular armed forces in PA areas); Article XIV(4) (duty to prevent possession of weapons and explosives in PA areas); Article XV (duty to prevent acts of terrorism); Annex I Article II (duty to act against terrorism, confiscate arms, arrest and prosecute terrorists)[;] Annex IV Article II (duty to surrender suspects).

Amended Complaint ¶ 69.

of their officials, employees, and agents, <u>see</u> <u>id.</u> ¶¶ 64, 80, and for the breaches of statutory obligations by those officials, employees, and agents, <u>see</u> <u>id.</u> ¶ 73.

## V.    Travel

### A.    Response to Complaint

Plaintiffs filed their original Complaint (Document #1) on March 13, 2000.  The PA, PLO, and the individual PA Defendants moved to dismiss on June 15, 2000, for lack of subject matter jurisdiction, lack of personal jurisdiction, insufficient service of process, improper venue, failure to state a claim upon which relief can be granted, and inconvenience of the forum.  <u>See</u> Defendants' Motion to Dismiss the Complaint (Document #22).  On July 24, 2001, Judge Lagueux denied the motion on all grounds as to the PA and PLO, but granted it as to the individual PA Defendants for lack of personal jurisdiction.  <u>See</u> <u>Ungar I</u>, 153 F.Supp.2d 76 (D.R.I. 2001).  He also dismissed all claims based on the death of Efrat Ungar as she was not a citizen of the United States.  <u>See</u> <u>id.</u> at 97.

### B.    Response to Amended Complaint[13]

Plaintiffs filed their Amended Complaint (Document #41) on August 23, 2001, against the PA, PLO, Hamas, and the individual Hamas Defendants.  On September 7, 2001, the PA and PLO filed a motion to extend the time to answer the Amended Complaint by sixty days.  <u>See</u> Defendants' Motion to Extend Time to Respond to the Amended Complaint (Document #42).  Plaintiffs objected to the motion to extend time, <u>see</u> Plaintiffs' Objection to Defendants' Motion to Extend Time to Respond to the Amended Complaint

---

[13] The travel from the filing of the Amended Complaint (Document #41) through the filing of Plaintiffs' Motion to Enter Default (Document #105) has previously been set forth in this Magistrate Judge's Memorandum and Order Granting Motion to Enter Default dated 4/18/03 (Document #133) at 2-6.  It is reproduced here with minor changes.

(Document #43), but Judge Lagueux granted the extension on September 19, 2001, see Document #44 at 3, and set November 13, 2001, as the date by which an answer from the Palestinian Defendants was required, see Docket entry for 9/19/01.

On November 13, 2001, the PA and PLO sought an additional enlargement of fourteen days to respond to the Amended Complaint. See Defendants' Motion for a Further Enlargement of Time (Document #45).[14] Plaintiffs objected to the motion for an additional enlargement and moved for entry of default on November 15, 2001. See Plaintiffs' Objection to Defendants' Motion for a Further Enlargement of Time and Motion for Entry of Default (Document #46).

The Palestinian Defendants then moved on November 29, 2001, for dismissal of the Amended Complaint on grounds that it was nonjusticiable and failed to state a claim upon which relief can be granted and, alternatively, for certification of an interlocutory appeal to the Court of Appeals pursuant to 28 U.S.C. § 1292(b) and a stay pending disposition of the application for certification and/or appeal. See Defendants' Motion for Dismissal and Alternatively for Certification of an Interlocutory Appeal and a Stay ("Motion for Dismissal") (Document #47-1). On December 7, 2001, a stipulation was filed and subsequently approved by the court, giving Plaintiffs until December 21, 2001, to respond to the Motion for Dismissal. See Stipulation (Document #47-2). Plaintiffs' objection to the Motion for Dismissal was received by the court on December 26, 2001. See Plaintiffs' Objection to Defendants' Motion for Dismissal of the Amended Complaint and Alternatively for

---

[14] Defendants' Motion for Further Enlargement of Time (Document #45) was referred on December 3, 2001, to this Magistrate Judge for determination. A hearing on the motion was scheduled for December 19, 2001, but the motion was withdrawn on December 13, 2001. See Docket Entry for 12/13/01.

Certification of an Interlocutory Appeal and Stay (Document #48).

### C.  Discovery Initiated

On January 24, 2002, Plaintiffs served the PA with interrogatories, a request for production of documents and a request for admissions.  See Plaintiffs' Memorandum in Support of Their Motion Pursuant to Fed.R.Civ.P. 37(b)(2) for Default Judgment against Defendants PA and for Other Relief ("Plaintiffs' Mem. First Motion"); see also Plaintiffs' Motion to Compel Discovery (Document #65).  The following day, January 25, 2002, Plaintiffs noticed the depositions of Yasser Arafat and six other PA officials to be conducted in mid-March 2002 in Providence, Rhode Island.  See Notices of Deposition (Documents #49-#55).  The Notices of Deposition identified the deponents only in connection with the PA and did not reference the PLO.  See id.

### D.  Discovery Stayed

On January 30, 2002, the Palestinian Defendants moved for leave to assert defenses in support of their pending Motion for Dismissal.  See Defendants' Motion for Leave to Assert Defenses in Support of their Pending Motion to Dismiss the Amended Complaint or Alternatively for Certification of an Interlocutory Appeal ("Motion for Leave to Assert Defenses") (Document #59).  Six days later, on February 5, 2002, the Palestinian Defendants renewed their motion for a stay and moved for leave to seek a protective order regarding the discovery requests which had recently been filed by Plaintiffs.  See Defendants' Renewed Motion for a Stay and Motion for Leave to Seek a Protective Order ("Renewed Motion for Stay") (Document #60).  Plaintiffs filed on February 20, 2002, an objection to the Renewed Motion for Stay, see Plaintiffs' Objection to Defendants' Renewed Motion for a Stay and Motion for Leave to Seek a Protective Order ("Objection to Renewed Motion for Stay") (Document #61), and on February 25, 2002, an objection to the Motion for Leave to Assert Defenses,

see Plaintiffs' Objection to Defendants' Motion for Leave to Assert Defenses in Support of their Pending Motion to Dismiss (Document #62).  On February 26, 2002, the Palestinian Defendants filed a motion for a protective order.  See Motion for Protective Order (Document #63).  Plaintiffs filed an objection to this motion on March 8, 2002.  See Plaintiffs' Objection to Defendants' Motion for a Protective Order (Document #64).

After the PA failed to respond to the request for documents which had been propounded to them on January 24, 2002, failed to respond to the request for admissions, and indicated that it would not produce its employees for depositions scheduled during the latter half of March, 2002, Plaintiffs filed a motion to compel on March 8, 2002.  See Plaintiffs' Motion to Compel Discovery ("Motion to Compel Discovery" or "Motion to Compel") (Document #65).  The Palestinian Defendants objected to the Motion to Compel, see Palestinian Defendants' Objection to Plaintiffs' Motion to Compel Discovery (Document #66), on the same grounds and reasons as set forth in the memoranda filed in support of their Renewed Motion for Stay and their Motion for Leave to Assert Defenses, see id.  On June 20, 2002, this Magistrate Judge granted the Renewed Motion for Stay (Document #60) and the Motion for Protective Order (Document #63), staying discovery until Judge Lagueux had ruled upon the Palestinian Defendants' pending Motion for Dismissal (Document #47-1).  See Order Staying Discovery (Document #70).

**E.  Default Judgment against Hamas**

Meanwhile, Plaintiffs moved to obtain a default judgment against Hamas and the individual Hamas Defendants (collectively the "Hamas Defendants").  See Plaintiffs' Motion to Enter Default Judgment against Defendants Hamas and Hamas Operatives ("Motion

to Enter Default Judgment against Hamas") (Document #38).[15]  On June 20, 2002, a hearing on the motion for default judgment was scheduled for July 12, 2002.  See Docket Entry for 6/20/02.  On the day before the hearing, July 11, 2002, the Palestinian Defendants filed an objection to the entry of default judgment against the Hamas Defendants.  See Palestinian Defendants' Objection to Entry of Default Judgment (Document #77).

At the start of the hearing on July 12, 2002, the court asked the attorney representing the Palestinian Defendants, their local counsel, Mr. Deming Sherman, if he was pressing the objection which had been filed.  See Transcript of 7/12/02 hearing ("Tr. of 7/12/02") at 2.  Mr. Sherman responded by asking if he could make "a brief presentation on that?"  Id.  In the course of the remarks that followed, Mr. Sherman stated that "it is the option of the Palestinian defendants not to participate in the hearing.  Accordingly, we do not intend to participate."  Id. at 3.  He continued that it was the position of the Palestinian Defendants that the default judgment proceedings being conducted against the Hamas Defendants "should not be in any way binding upon the Palestinian defendants," id., and that "[n]one ... of the findings of fact, the conclusions of law, or orders or judgments ... shall have any impact upon the Palestinian [Defendants]," id. at 3-4.  After Mr. Sherman had concluded his presentation, the court again asked him if he was pressing the objection which had been filed.  See id. at 4.  Upon receiving an affirmative response, the court stated that it would conduct a brief hearing on the objection.  See id. at 5.  After brief argument, see id. at 8-9, the court overruled the objection,

_____

[15] Default had been entered by rule of court against Hamas and the individual Hamas Defendants (collectively "the Hamas Defendants") on September 7, 2000.  See Clerk's Entry of Default (Document #32).

finding that it had been "filed at the 11th hour," Tr. of 7/12/02 at 9; see also Order dated 8/19/02 (Document #89), and was "untimely,"[16] id.

Following the court's ruling, Mr. Sherman requested and received permission to be excused from the hearing. See id. at 10. Thereafter, the court conducted an evidentiary hearing on the Motion to Enter Default Judgment against Hamas (Document #38), see id. at 25-152, which lasted the entire day and resumed on July 15, 2002, see Tr. of 7/15/02. A further hearing was held on July 19, 2002, for the purpose of having Plaintiffs' counsel address certain questions posed by the court regarding the issue of personal jurisdiction. The court then took the matter under advisement and subsequently issued a Report and Recommendation which recommended that the motion for default judgment be granted as to Defendant Hamas, but denied as to the individual Hamas defendants and that the claims against them be dismissed from the action. See Report and Recommendation dated 7/3/03 (Document #183) at 63.

---

[16] In response to the Palestinian Defendants' Objection to Entry of Default Judgment (Document #77), Plaintiffs on July 11, 2002, filed three motions: a motion to sever the claim against the Hamas Defendants, see Plaintiffs' Motion to Sever (Document #71); a motion for sanctions against the attorneys for the Palestinian Defendants, see Plaintiffs' Motion for Sanctions (Document #73); and a motion to strike the Palestinian Defendants' objection, see Plaintiffs' Motion to Strike ("First Motion to Strike") (Document #75). The Palestinian Defendants subsequently filed objections to these motions. See Palestinian Defendants' Objection to Plaintiffs' Motion to Sever (Document #84); Palestinian Defendants' Objection to Plaintiffs' Motion for Sanctions (Document #83); Palestinian Defendants' Objection to Plaintiffs' Motion to Strike (Document #85). After a hearing on December 12, 2002, Plaintiffs' Motion for Sanctions and Plaintiffs' First Motion to Strike were ruled moot. See Orders dated December 12, 2002 (Documents #92, 93). The Motion to Sever was denied without prejudice. See Order dated December 13, 2002 (Document #97).

## F.  Discovery Stay Terminates

On November 4, 2002, Judge Lagueux issued a Decision and Order (Document #90), denying Defendants' Motion for Dismissal. This action terminated the stay of discovery which had been granted by this Magistrate Judge on June 20, 2002.  See Order Staying Discovery (Document #70); see also Plaintiffs' Mem. First Motion, Ex. B (Letter from Martin, M.J., to Strachman and Schilling of 12/13/02).  The Palestinian Defendants filed a motion for reconsideration of Judge Lagueux's decision on November 20, 2002.  See Palestinian Defendants' Motion for Reconsideration ("Motion for Reconsideration") (Document #91). Plaintiffs objected to the motion on December 12, 2002.  See Plaintiffs' Objection to Defendants' Motion for Reconsideration (Document #94).  Judge Lagueux denied the Motion for Reconsideration on April 22, 2003, and also denied the Palestinian Defendants' request for a stay of proceedings pending appeal.  See Document #135.  On April 23, 2003, the Palestinian Defendants appealed the denial of the Motion for Reconsideration and Judge Lagueux's November 4, 2002, Decision and Order to the United States Court of Appeals for the First Circuit.  See Notice of Appeal of Defendants Palestinian Authority and the Palestine Liberation Organization (Document #136).  That court summarily affirmed Judge Lagueux's orders on May 27, 2003.[17]  See Judgment in Efrat Ungar, et al. v. The Palestine Liberation Organization, et al., No. 03-1544 (1st Cir. May 27, 2003) (Document #179).

## G.  Motion to Compel Discovery

_____

[17] In affirming Judge Lagueux's ruling, the Court of Appeals also stated that "[T]his order is without prejudice to the [Palestinian Defendants] raising their sovereign immunity defense in a proper and timely manner.  We take no view as to the merits of that defense."  Judgment in Efrat Ungar, et al. v. The Palestine Liberation Organization, et al., No. 03-1544 (1st Cir. May 27, 2003) (Document #179) at 2.

In the meantime, following the termination of the stay of discovery, the court scheduled on November 18, 2002, a hearing for December 12, 2002, on the Motion to Compel Discovery (Document #65) (and other Plaintiffs' motions not relevant to the determination of the instant Motions for Default Judgment) which had been filed in March. As a courtesy to the PA's primary counsel, Mr. Ramsey Clark and Mr. Lawrence W. Schilling, who were from out of state, the court directed the clerk to give the parties at least twenty-one days notice of the hearing.[18] On November 18, 2003, the clerk noticed the hearing on the motion for December 12, 2003.

On November 25, 2002, the court received a letter from Mr. Clark, lead counsel for the PA, in which he requested a continuance of the December 12, 2002, hearing because he was scheduled to appear before the International Criminal Tribunal for Rwanda, in Arusha, Tanzania, on that date and would not be available to appear in Rhode Island until January. See Letter from Clark to Martin, M.J., of 11/21/02 at 1.[19] The court treated Mr. Clark's letter as a request for a continuance and scheduled a telephonic hearing for December 2, 2002, to consider the motion.

At the hearing on December 2, 2002, the court denied the request for a continuance. See Order entered 12/12/02 (Document #96). The court rejected the suggestion of counsel for the Palestinian Defendants that their filing of the Motion for Reconsideration (Document #94) had revived or reactivated the stay of discovery which had ended on November 4, 2002. Observing that the case had been filed in 2000 and that it was now nearly

_____

[18] The court acted sua sponte. The courtesy had not been requested.

[19] Letters which are not identified as exhibits can be found in the Appendix at the end of this document.

2003, the court indicated that it was time for the case to move forward.  The court also found that the motions to be heard on December 12th were not so complicated that they could not be handled by counsel other than Mr. Clark.  However, as a courtesy, the court indicated that it would allow the attorney representing the Palestinian Defendants on the 12th, presumably Mr. Schilling, to appear via telephone instead of having to travel from New York City.  The court granted this dispensation because Mr. Clark indicated that, while he was willing to appear without compensation, to ask another attorney to do so could be somewhat of an imposition.

On December 12, 2002, the court conducted a hearing on the Motion to Compel Discovery (Document #65) and granted it.  In granting the motion, the Court purposefully gave the PA an extended period of time (45 days from December 12th) within which to respond to Plaintiffs' interrogatories, request for production of documents, and request for admissions.  See Order of 1/14/03 (Document #99).  The court did so because of the PA's overseas location and its contention that responding to the requests would be difficult because of conditions existing in the Middle East.  For the same reason, the court required that Plaintiffs notice the depositions of PA officers and employees at least 60 days in advance.  See id.  The PA failed to respond to the discovery requests within 45 days or at any time thereafter.  See Plaintiffs' Mem. First Motion at 2.

### H.  Motion for Reconsideration of Discovery Order

An order was issued on January 14, 2003, reflecting the granting of the Motion to Compel (Document #65).[20]  See Order of

_____

[20] The delay in the issuance of an order reflecting the December 12, 2002, ruling stemmed from a disagreement between the Palestinian Defendants and Plaintiffs over the wording of the order.

1/14/03 (Document #99).  Two weeks later, on January 29, 2003, the Palestinian Defendants filed a motion for reconsideration of the Order granting the Motion to Compel.  See Palestinian Defendants' Motion for Reconsideration ("Motion for Reconsideration") (Document #100).  Attached to the Motion for Reconsideration was a letter from Dr. Nasser Al-Kidwa, Ambassador, Permanent Observer of Palestine to the United Nations, addressed to this Magistrate Judge.  See id.  The letter referenced the intense violence which had been occurring "throughout occupied Palestine for more than two years," id. (Letter from Al-Kidwa to Martin, M.J. of 1/27/03) at 1, and stated that "[i]t has been impossible under such circumstances to locate people who could seek and find documents, who could gather information and prepare answers to interrogatories and could respond to requests for admissions," id.  Dr. Al-Kidwa opined that "[i]t would seem fair and just to wait until there is a final decision on the issue whether the U.S. Court has jurisdiction over the PNA and PLO for these events before proceeding to these [discovery] requests," id. at 2, and offered that "[n]othing else is possible for us," id.

Plaintiffs reacted on February 5, 2003, by moving to strike portions of the memorandum and exhibits which the Palestinian Defendants had filed in support of their Motion for Reconsideration (Document #100) as violative of Fed. R. Civ. P. 11 and 12(f).  See Plaintiffs' Motion to Strike ("Second Motion to Strike") (Document #104).[21]  The Palestinian Defendants objected to the Second Motion to Strike on February 20, 2003. See Palestinian Defendants' Objection to Plaintiffs' Motion to Strike (Document #109).  However, at a hearing held on April 11,

---

[21] Plaintiffs filed a corrected Motion to Strike on February 21, 2003.  See Plaintiffs' Corrected Motion to Strike (Document #108).

22

2003, Judge Lagueux overruled their objection and granted the
Second Motion to Strike (Document #104). See Transcript of
4/13/03 hearing ("Tr. of 4/13/03") at 12-14; Order of 4/22/03
(Document #135).

Meanwhile, Plaintiffs had also filed on February 19, 2003,
an objection to the Motion for Reconsideration. See Plaintiffs'
Objection to Defendants' Motion for Reconsideration Dated January
27, 2003, (Document #107). The Court denied the Motion for
Reconsideration (Document #100) without a hearing on March 20,
2003, "for the reasons stated in Plaintiffs' Memorandum in
Opposition." See Order of 3/20/03 (Document #116). Among the
reasons expressed therein were that the Palestinian Defendants'
claims of impossibility were unsupported by affidavit or other
admissible evidence, see Plaintiffs' Memorandum in Opposition to
Defendants' Motion for Reconsideration Dated January 27, 2003
(filed with Document #107), at 2-3, that the PA failed to take
any action in fulfillment of its discovery obligations, see id.
at 3, that the PA failed to utilize other procedures for relief,
see id. at 5-7, and that the necessary criteria for
reconsideration had not been satisfied, see id. at 8-9.

I. **Entry of Default Against Palestinian Defendants**

While the proceedings described above were ongoing,
Plaintiffs moved on February 7, 2003, for entry of default
against the Palestinian Defendants for failure to answer the
Amended Complaint. See Plaintiffs' Motion to Enter Default
against Defendants PA and PLO Pursuant to Fed.R.Civ.P. 55(a)
("Motion to Enter Default") (Document #105). The Palestinian
Defendants objected to the entry of default on February 27, 2003.
See Objection of Defendants Palestinian Authority and Palestine
Liberation Organization to Plaintiffs' Motion to Enter Default
pursuant to Fed. R. Civ. P. 55(a) (Document #111). This
Magistrate Judge conducted a hearing on the motion on April 1,

23

2003, and issued a Memorandum and Order Granting Motion to Enter Default ("Memorandum and Order of 4/18/03") (Document #133) on April 18, 2003.  In granting the Motion for Default, this Magistrate Judge found that the Palestinian Defendants' failure to file an answer to the Amended Complaint was the result of a deliberate choice and not due to an inability to file an answer. See id. (Document #133) at 7.

The Palestinian Defendants filed an objection on May 5, 2003, to the granting of default.  See Palestinian Defendants' Objection to Memorandum and Order Granting Plaintiffs' Motion to Enter Default (Document #148).  However, their objection was rejected at a July 30, 2003, hearing before Judge Lagueux, who found that the Palestinian Defendants were "in serious default ....," Order of 8/4/03 (Document #202), and affirmed this Magistrate Judge's Memorandum and Order of 4/18/03 (Document #133), see id.

## J.  First Motion for Default Judgment

Plaintiffs filed their First Motion for Default Judgment (Document #106) on February 12, 2003, requesting, among other relief, the entry of default judgment against the PA because of its refusal to comply with the discovery required by the Order of 1/14/03 (Document #99).  The Palestinian Defendants objected to the First Motion on March 3, 2003.  See Palestinian Defendants' Objection to Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 37(b)(2) for Judgment by Default Against Defendant PA and for Other Relief (Document #112).  Nine days later, on March 12, 2003, they moved for a protective order to bar the taking of the depositions, which had been noticed by Plaintiffs on January 24, 2003, of President Yasser Arafat and six other Palestinian leaders.[22]  See

---

[22] Plaintiffs believed these leaders were involved in providing material support and resources to Hamas for the purpose of carrying out terrorist attacks such as the one in which

Palestinian Defendants' Motion for Protective Order (Document #115); see also Notices of Deposition (Document #103).[23]

Plaintiffs filed an objection to the motion for protective order on March 31, 2003. See Plaintiffs' Objection to Palestinian Defendants' Motion for Protective Order (Document #117). This was followed on April 2, 2003, by a motion to strike portions of the memorandum which the Palestinian Defendants had filed in support of their motion for a protective order. See Plaintiffs' Motion to Strike and for Other Relief ("Third Motion to Strike") (Document #119).

The Third Motion to Strike was granted by this Magistrate Judge on April 18, 2003. See Order Granting Motion to Strike (Document #132). The Palestinian Defendants objected to the Order, see Palestinian Defendants' Objection to Order Granting Plaintiffs' Motion to Strike (Document #146), but it was affirmed by Judge Lagueux at a hearing held on July 30, 2003, see Order of 8/4/03 (Document #204).

K.  **Second Motion for Default Judgment**

Plaintiffs filed their Second Motion for Default Judgment (Document #125) on April 9, 2003, alleging that the Palestinian Defendants had failed to comply with the court's Order of 1/14/03 (Document #99) concerning the depositions of their employees.[24]

---

Plaintiffs' decedent was killed. See Plaintiffs' Memorandum in Support of Their Motion for Default Judgment against the PA and the PLO and for Other Relief for Refusal to Submit to Depositions ("Plaintiffs' Mem. Second Motion") at 1-2; see also Transcript of 5/14/03 hearing ("Tr. of 5/14/03") at 12-13 (setting forth reasons why Plaintiffs want to depose these officials).

[23] The seven Notices of Deposition were assigned a single document number, #103.

[24] On March 4, 2003, Plaintiffs' counsel sent the PA's counsel a letter, requesting that they confirm the appearance of their employees at the scheduled depositions. See Plaintiffs' Mem. Second Motion at 2. No reply to the letter was received.

25

<u>See</u> Second Motion for Default Judgment (Document #125).  The
Palestinian Defendants filed an objection to the Second Motion on
April 28, 2003.  <u>See</u> Defendants Palestinian Authority and
Palestine Liberation Organization's Objection to Plaintiffs'
Motion for Default Judgment and Other Relief with Respect to
Depositions Noticed by Plaintiffs (Document #141).

### L.  May 14, 2003, Hearing

On May 14, 2003, this Magistrate Judge conducted a hearing
on the Palestinian Defendants' Motion for Protective Order
(Document #115), the First Motion for Default Judgment (Document
#106), and the Second Motion for Default Judgment (Document
#125).  The court denied the request for a protective order which
sought to prevent the deposition of the seven Palestinian
leaders.  <u>See</u> Transcript of 5/14/03 hearing ("Tr. of 5/14/03") at
17-19.  In doing so, the court found that the Palestinian
Defendants were adhering to a course of conduct of not
participating in discovery, <u>see id.</u> at 18, and that they had
ignored Plaintiffs' request for discovery and had made no attempt
to respond to it, <u>see id.</u> at 19;[25] Order of 5/27/03 (Document

---

<u>See id.</u>

[25] In denying the Motion for Protective Order (Document
#115), this Magistrate Judge addressed the Palestinian
Defendants' argument that conditions in the Middle East prevented
the deponents from traveling to the United States:

> This Court had indicated that if there was a problem with
> the location or other matters regarding the deposition
> that the defendants could raise that, because the
> defendants had indicated in prior proceedings about the
> difficulty of the deponents coming from Palestine, the
> conditions there, and the Court was clear, as I recall,
> in indicating that objections as to location or other
> matters concerning the depositions would be -- at least
> the defendants could raise that and the Court would
> address it.  But, in fact, the defendants have adhered to
> a course of conduct, which is not to participate in this

#162) at 1-2.

The court declined to act immediately upon the two motions seeking default judgment, electing instead to explicitly warn the Defendants[26] that their continued failure to comply with discovery could result in the entry of default judgment against them. See Tr. of 5/14/03 at 27-28;[27] see also Order Continuing Hearing on Motions for Default Judgment ("Order of 5/14/03") (Document #158).[28]  The court ordered Defendants to comply with

---

action by answering, which they are now in default.

Transcript of 5/14/03 hearing ("Tr. of 5/14/03") at 18.  The foregoing statement was incorporated into the Order entered on May 27, 2003 (Document #162), which reflected the denial of the Motion for Protective Order (Document #115).

[26] The court used the term "defendants" in its warning.  See Tr. of 5/14/03 at 28-29; Order Continuing Hearing on Motions for Default Judgment (Document #158) ("Order of 5/14/03").

[27] This Magistrate Judge stated at the May 14, 2003, hearing:

There can be no doubt in the defendants' mind, and I want there to be no doubt in the defendants' mind, that a continued failure to comply with their discovery obligations in this matter may well result in the entry of default judgment.  Particularly in view of the fact, as I've indicated, I find almost all of the other factors that would be addressed by a court in considering whether to enter default judgment are already present.

Tr. of 5/14/03 at 28.

[28] The Order of 5/14/03 (Document #158) stated in part:

2.  Defendants are ordered to comply with all outstanding discovery requests from Plaintiffs by July 14, 2003, including completion of the depositions of the persons previously noticed by Plaintiffs.
. . . .
5.  **Defendants are warned that failure to comply fully with this order may result in the entry of default**

27

their discovery obligations by responding to Plaintiffs'
interrogatories, request for admissions, and request for
production within sixty days, see Tr. of 5/14/03 at 28-29; Order
of 5/14/03 (Document #158) at 1-2, and by notifying Plaintiffs
within thirty days when and where the persons Plaintiffs had
noticed for depositions would be produced, see Tr. of 5/14/03 at
28-29; Order of 5/14/03 (Document #158) at 2.  Noting that the
Palestinian Defendants' failure to respond to date had caused
Plaintiffs to incur additional attorney's fees, the court ruled
that the Palestinian Defendants would be responsible for those
fees.[29]  See Tr. of 5/14/03 at 29; Order of 5/14/03 (Document
#158) at 2.  The hearing on the First Motion for Default Judgment
and the Second Motion for Default Judgment was continued to July
14, 2003.  See Tr. of 5/14/03 at 29; Order of 5/14/03 (Document
#158) at 1.

The Palestinian Defendants appealed both orders which
resulted from the May 14, 2003, hearing.  See Notice of Appeal of
Defendants Palestinian Authority and Palestine Liberation
Organization (Document #166) (appealing Order of 5/14/03
(Document #158) which required Palestinian Defendants to comply
with discovery requests by July 14, 2003); Notice of Appeal of
Defendants Palestinian Authority and Palestine Liberation
Organization (Document #170)(appealing denial of Motion for
Protective Order (Document #115)).  Judge Lagueux rejected these

---

judgment against them.

Order of 5/14/03 (Document #158) at 1-2.

[29] On August 18, 2003, Plaintiffs filed an affidavit
concerning the attorney's fees they had incurred as a result of
the Palestinian Defendants "refusal to comply with a series of
court orders and the rules of procedure concerning several forms
of discovery such as depositions, interrogatories, a request for
production of documents and request for admissions."  Affidavit
of Counsel Fees (Document #220).

appeals at the July 30, 2003, hearing, signing orders on August 4, 2003, which affirmed the rulings of this Magistrate Judge. <u>See</u> Orders of 8/5/03 (Documents #201, #203).

### M.  Third Motion for Default Judgment

On May 30, 2003, Plaintiffs filed their Third Motion for Default Judgment.  <u>See</u> Third Motion (Document #168).  The Palestinian Defendants moved on June 13, 2003, for an extension of time within which to respond to this motion.  <u>See</u> Palestinian Defendants Motion for Extension of Time to Respond to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) (Document #173).  They moved for a second extension on June 27, 2003.  <u>See</u> Palestinian Defendants' Motion for Extension of Time to Respond to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) (Document #181).  The first extension was granted by rule of court on July 2, 2003, <u>see</u> Document #182, and the second was granted by this Magistrate Judge on July 14, 2003, <u>see</u> Document #191.

The Palestinian Defendants moved for a third extension on July 11, 2003, <u>see</u> Palestinian Defendants' Motion for Enlargement of Time to Respond to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) (Document #188), requesting that the then-current extended date of July 11, 2003, be extended to ten days after the disposition of their pending motion for dismissal pursuant to Fed. R. Civ. P. Rule 12(b)(1).[30]  <u>See</u> Memorandum in Support of Palestinian Defendants' Motion for

---

[30] The Palestinian Defendants had filed on June 13, 2003, a motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1).  <u>See</u> Palestinian Defendants' Rule 12(b)(1) Motion to Dismiss the Amended Complaint (Document #174).  The filing was apparently prompted by the May 27, 2003, Judgment from the Court of Appeals.  <u>See</u> <u>Judgment in Efrat Ungar, et al. v. The Palestine Liberation Organization, et al.</u>, No. 03-1544 (1st Cir. May 27, 2003) (Document #179) at 2; <u>see also</u> n.11.

29

Continuance of July 14, 2003, Hearing and Motion for Enlargement of Time to Respond to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("Palestinian Defendants' Mem. in Support of Motion for Continuance") at 1. Although the court rejected the request for an enlargement of time until after disposition of the pending Rule 12(b)(1) motion, the Palestinian Defendants were granted an enlargement until August 18, 2003. See Order Granting Motion for Enlargement (Document #208).

Concurrently with their July 11, 2003, request for a third extension, the Palestinian Defendants filed a motion to continue the scheduled July 14, 2003, hearing on the First and Second Motions for Default Judgment. See Palestinian Defendants' Motion for Continuance of July 14, 2003, Hearing ("Motion for Continuance") (Document #189). Among other arguments advanced by the Palestinian Defendants in support of the Motion for Continuance was that they had filed a motion to dismiss the Amended Complaint on June 13, 2003, "for lack of subject matter jurisdiction on grounds of sovereign and governmental immunity, nonjusticiability and the jurisdictional bar imposed by 18 U.S.C. § 2337 ...." Palestinian Defendants Rule 12(b)(1) Motion to Dismiss the Amended Complaint (Document #174). They urged that Plaintiffs' Motions for Default Judgment be held in abeyance and that the hearing be continued until after their motion to dismiss had been decided. See Palestinian Defendants' Mem. in Support of Motion for Continuance at 3.

**N.  July 14, 2003, Hearing**

The Motion for Continuance (Document #189) was heard and denied at the July 14, 2003, hearing.[31]  See Tr. of 7/14/03 at

---

[31] The Motion for Continuance (Document #189) had not been formally referred to this Magistrate Judge, but because it sought a continuance of the July 14, 2003, hearing, it was addressed at that hearing. See Transcript of 7/14/03 hearing ("Tr. of

29-32; see also Order of 7/22/03 (Document #199).  This
Magistrate Judge rejected the Palestinian Defendants' arguments
that the filing of a motion to dismiss the Amended Complaint
constituted a valid ground to continue the hearing on the motions
for entry of default judgment.  See Tr. of 7/14/03 at 30 (citing
arguments of Plaintiffs' counsel, see id. at 23-29).  The court
also rejected their argument that action on the motions for
default judgment should be delayed until after Judge Lagueux had
ruled upon the Palestinian Defendants' appeal of this Magistrate
Judge's Orders of 4/18/03 (Document #133), 5/14/03 (Document
#158), and 5/27/03 (Document #162).  See id. at 30.  The court
also concluded that it would not be wasteful to address the First
and Second Motions for Default Judgment notwithstanding the fact
that Plaintiffs had filed a Third Motion for Default Judgment
which had not yet been referred to this Magistrate Judge.  See
id. at 31-32.  Following the denial of the Motion for
Continuance, the court heard argument on the First and Second
Motions for Default Judgment and took the matters under
advisement.

   **O.  Post July 14, 2003, Filings**

   On July 16, 2003, Plaintiffs filed a motion pursuant to
Local Rule 12(a)(2) for an order finding that Plaintiffs' Third
Motion for Default Judgment was unopposed, deeming it granted,
and entering judgment by default, or alternatively instructing
the Palestinian Defendants to respond within three days and to
assess expenses against them for their failure to timely respond
to it.  See Plaintiffs' Motion for Relief Pursuant to Local Rule
12(a)(2) (Document #194).  The court denied this motion on August
8, 2003, by an endorsement which referenced the August 7, 2003,
Order which gave the Palestinian Defendants until August 18,

_____

7/14/03") at 8, 29-32.

2003, to file a response to Plaintiff's Third Motion for Default Judgment.  See Document #211.

Plaintiffs filed an objection to the Rule 12(b)(1) motion on August 8, 2003.  See Plaintiffs' Objection to Defendants' Rule 12(b)(1) Motion to Dismiss the Amended Complaint (Document #212). The Palestinian Defendants moved on August 13, 2003, for an enlargement of time within which to reply to Plaintiffs' objection.  See Palestinian Defendants' Motion for Enlargement of Time to Reply to Plaintiffs' Objection to Defendants' Rule 12(b)(1) Motion (Document #216).  The enlargement was granted by rule of court on August 29, 2003.  See Document #218.

### P.  August 22, 2003, Hearing

On August 22, 2003, this Magistrate Judge conducted a hearing on Plaintiffs' Third Motion for Default Judgment (Document #168) and also on the attorneys' fees to which the court had determined on May 14, 2003, Plaintiffs' counsel was entitled because of the PA's failure to comply with discovery requests and orders.  The court began the hearing by noting that after the July 14th hearing, Plaintiffs' counsel had written to the court and requested that, to the extent the Report and Recommendation on the First and Second Motions for Default Judgment addressed the issue of personal jurisdiction, the court consider the documentation which the Plaintiffs had submitted as part of the Third Motion for Default Judgment (Document #168). See Transcript of 8/22/03 hearing ("Tr. of 8/22/03") at 4; see also Letter from Strachman to Martin, M.J., of 7/22/03.  The court further explained that, after this request from Plaintiffs, the Third Motion for Default Judgment (Document #168) had been referred for a Report and Recommendation and that, based on these developments, the court decided to conduct a hearing on the Third Motion and then write a single Report and Recommendation which addressed all three Motions for Default Judgment.  See Tr. of

8/22/03 at 4; <u>see</u> <u>also</u> Letter from Court to Strachman, Clark, and Sherman of 7/25/03.

Following this explanation, the court heard argument on the Third Motion for Default Judgment (Document #168). <u>See</u> Tr. of 8/22/03 at 6-26. During the course of the hearing, Plaintiffs' counsel stated that he had received the Palestinian Defendants' brief in opposition to the Third Motion on August 20, 2003,[32] and requested the opportunity to file a response to it. <u>See</u> <u>id.</u> at 13. The court granted this request and gave Plaintiffs until August 29, 2003, to file a response. <u>See</u> <u>id.</u> at 14, 32. Defendants were given until September 5, 2003, to file a reply. <u>See</u> <u>id.</u> at 16, 32.

After both parties had completed their arguments regarding the Third Motion (Document #168), the court gave counsel the opportunity to be heard regarding the attorney's fees Plaintiffs' counsel had requested as authorized by the court's May 14, 2003, ruling. <u>See</u> Tr. of 8/22/03 at 26-30. Thereafter, the court announced that after receiving the supplemental filings from the parties it would take the matters under advisement and issue a single Report and Recommendation which addressed the three Motions for Default Judgment and a separate memorandum and order which addressed the attorney's fees attributable to non-compliance with discovery obligations. <u>See</u> <u>id.</u> at 33.

### Q. **Post August 22, 2003, Filings**

Plaintiffs filed their reply memorandum on August 29, 2003. <u>See</u> Plaintiffs' Reply Memorandum in Further Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine

---

[32] Due to a power blackout which affected the offices of counsel for the Palestinian Defendants, the court had granted an extension of time for the filing of their opposition to the Third Motion for Default Judgment.

Liberation Organization ("Plaintiffs' Reply Mem.").  The Palestinian Defendants filed their supplemental memorandum on September 15, 2003.  <u>See</u> Palestinian Defendants['] Memorandum in Further Opposition to Plaintiffs['] Motions for Default Judgment and in Opposition to an Award of Attorneys Fees (Document #232).  Thereafter, the court took the Motions for Default Judgment under advisement.

On February 12, 2004,  Plaintiffs filed a notice of concealed evidence, alleging that the Palestinian Defendants had concealed evidence regarding their agents and contacts in the United States.  <u>See</u> Plaintiffs' Notice of Evidence Concealed by Defendants Palestinian Authority and Palestine Liberation Organization (Document #262).  A revised version of that document was filed on February 17, 2004.  <u>See</u> Plaintiffs' Revised Notice of Evidence concealed by Defendants Palestinian Authority and Palestine Liberation Organization ("Revised Notice") (Document #265).

## VI. Jurisdiction

### A. Introduction

A court which is asked to enter default judgment should assure itself that it has jurisdiction both over the subject matter and the parties.  <u>See</u> <u>Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy</u>, 242 F.3d 322, 324 (5th Cir. 2001)("'[W]hen entry of default [judgment] is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties.'")(quoting <u>Williams v. Life Sav. & Loan</u>, 802 F.2d 1200, 1203 (10th Cir. 1986))(first alteration in original); <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151, 154 (2nd Cir. 1999)(vacating default judgment where district court had not determined "jurisdictional facts by a preponderance of the evidence"); <u>In re Balbir Singh Tuli</u>, 172

F.3d 707, 712 (9th Cir. 1999)(citing Williams v. Life Sav. & Loan); United States v. 51 Pieces of Real Property, Roswell, New Mexico, 17 F.3d 1306, 1309 (10th Cir. 1994)(quoting Williams v. Life Sav. and Loan); see also Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002)("To hear a case, a court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decision.'")(quoting United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 35 (1st Cir. 1999)); Hugel v. McNell, 886 F.2d 1, 3 n.3 (1st Cir. 1989)("[W]here the court rendering the default judgment is shown to lack personal jurisdiction over the defendant ... the judgment may be vacated and set aside by the rendering court on motion, or by another court on collateral attack.")(quoting 6 Moore's Federal Practice ¶ 55.09)(second alteration in original); Letelier v Republic of Chile, 488 F.Supp. 665, 668 (D.D.C. 1980) (holding the issue of subject matter jurisdiction should be fully explored despite previous entry of default).   Consequently, this court examines both subject matter and personal jurisdiction.

**B.   Subject Matter Jurisdiction**

Judge Lagueux has previously determined that subject matter jurisdiction exists in this action.   See 153 F.Supp.2d 76, 85-86 (D.R.I. 2001).   In Ungar I, Judge Lagueux found that Count I of the Complaint pled a federal cause of action pursuant to 18 U.S.C. § 2333.   See id. at 85.   He also concluded that the federal claim and the state law claims derived from a common nucleus of operative fact and that this gave the court subject matter jurisdiction over the state law claims under the doctrine of supplemental jurisdiction.   See id. at 86.

In Estates of Ungar v. The Palestinian Auth., 228 F.Supp.2d 40 (D.R.I. 2002) ("Ungar II"), Judge Lagueux considered the claims pled in the Amended Complaint in the context of a motion to dismiss for failure to state a claim upon which relief can be

granted.  See id. at 41.  Count I of the Amended Complaint is almost identical to Count I of the original Complaint.  Compare Amended Complaint ¶¶ 1-48 with Complaint ¶¶ 1-51.  The primary difference is the omission of the individual PA Defendants as defendants, see Amended Complaint ¶¶ 4-12, and the Estate of Efrat Ungar as a plaintiff, see id. ¶ 48.  Judge Lagueux found that the Remaining Plaintiffs had alleged sufficient facts in Count I to invoke 18 U.S.C. § 2333, see Ungar II, 228 F.Supp.2d at 47 (citing Ungar I, 153 F.Supp.2d at 98), and denied the Palestinian Defendants' motion to dismiss Count I, see id.  Judge Lagueux also determined in Ungar II that this court could "exercise subject matter jurisdiction over Plaintiffs' state law claims [as pled in the Amended Complaint] because the state and federal claims 'derive from a common nucleus of operative fact.'" Ungar II, 228 F.Supp.2d at 47-48 (quoting Ungar I, 153 F.Supp.2d at 86).

In making these determinations regarding the existence of subject matter jurisdiction, Judge Lagueux applied the liberal standards applicable to the particular motions before him.  In Ungar I, he applied the standard for ruling on a Rule 12(b)(1) motion, which required him to treat as true all well-pleaded facts and to indulge all reasonable inferences in favor of the plaintiffs.  See Ungar I, 153 F.Supp.2d at 85 (citing Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)).  In Ungar II Judge Lagueux applied the similar standard for motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which required him to take all well pleaded allegations as true and to give the plaintiff the benefit of all reasonable inferences.  See Ungar II, 228 F.Supp.2d at 44 (citing Figueroa v. Rivera, 147 F.3d 77, 80 (1st Cir. 1998)).  However, for purposes of the present Motions for Default Judgment, the court must make these same determinations using a preponderance of the evidence standard.  See Credit

Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 153-54 (2nd Cir. 1999)(holding that district court may not grant default without finding jurisdictional facts established by a preponderance of the evidence, even if court has previously denied a motion to dismiss for lack of personal jurisdiction); cf. Prou v. United States, 199 F.3d 37, 45 (1st Cir. 1999) (holding that courts are obligated at every stage of the proceedings to consider the question of subject matter jurisdiction); Walsh v McGee, 918 F.Supp. 107, 112 (S.D.N.Y. 1996)("[Q]uestions of subject matter jurisdiction are generally exempt from law of the case principles.").

Despite this higher standard, the court has little difficulty finding that the allegations which support subject matter jurisdiction have been proven by Plaintiffs by a preponderance of the evidence.  Because default has already entered against the Palestinian Defendants, see Memorandum and Order of 4/18/03 (Document #133), the factual allegations of the Amended Complaint must be taken as true.  See Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985) ("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its ... claims must be considered established as a matter of law.").  Therefore, the facts necessary to state a claim pursuant to 18 U.S.C. § 2333 have been established,[33] and the

_____

[33] The court notes additionally that it conducted an evidentiary hearing on July 12 and 15, 2002, in connection with the Motion to Enter Default Judgment Against Defendants Hamas (Document #38).  While that hearing was concerned primarily with the issue of damages, the court received evidence in the form of testimony, documents, and photographs, which proved by at least a preponderance of the evidence that Yaron Ungar was a United States citizen, that he and his Israeli wife, Efrat Ungar, were murdered on June 9, 1996, in an armed attack carried out by three of the individual Hamas defendants, and that this attack constituted an act of international terrorism.

court has jurisdiction over that claim pursuant to 28 U.S.C. § 1331. Similarly, the "common nucleus of operative fact," Ungar I, 153 F.Supp.2d at 86, from which Plaintiffs' federal and state law claims arise has also been established.[34] The court has jurisdiction over those supplemental causes of action pursuant to 28 U.S.C. § 1367. Subject matter jurisdiction is, therefore, established for all counts of the Amended Complaint.

## C.  Personal Jurisdiction

In Ungar I, Judge Lagueux found that this court could exercise personal jurisdiction over the Palestinian Defendants. See Ungar I, 153 F.Supp.2d at 91. Judge Lagueux used a prima facie standard for determining that they had minimum contacts with the United States as a whole. See id. at 88. That standard required Judge Lagueux to restrict his inquiry to whether Plaintiffs had proffered evidence which, if credited, was sufficient to support a finding of personal jurisdiction. See id. at 86 (citing Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001)).

As explained in the Introduction to this Section, supra at 32-33, the court may not grant the Motions for Default Judgment unless personal jurisdiction has been proven by a preponderance of the evidence. To meet this burden, Plaintiffs have resubmitted the materials which Judge Lagueux previously considered in deciding the Motion to Dismiss the Complaint (Document #22). See Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Exhibits to Mem. Third Motion") (Document #172); see also Ungar I, 153

---

[34] This conclusion is also supported by the facts adduced at the hearing on damages which the court conducted in July of 2002. See n.18.

F.Supp.2d at 88-91 (discussing materials provided by Plaintiffs); Letter from Strachman to Martin, M.J., of 7/22/03 (noting the re-submission of materials) at 1.  The resubmitted materials are accompanied by an affidavit from Plaintiffs' counsel, attesting to the authenticity and origin of each document, see Exhibits to Mem. Third Motion, Exhibit ("Ex.") A (Affidavit of Strachman).

Plaintiffs have also filed additional exhibits in further support of their Motions for Default Judgment.  See Exhibits to Plaintiffs' Reply Memorandum in Further Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Reply Exhibits") (Document #229); Plaintiffs' Revised Notice of Evidence Concealed by Defendants Palestinian Authority and Palestine Liberation Organization ("Revised Notice") (Document #265).  After reviewing these filings, the court finds that they are sufficient to establish by at least a preponderance of the evidence that the Palestinian Defendants have minimum contacts with the United States as a whole and that the PA and PLO were served with process pursuant to the nationwide service of process provisions of 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(1)(D).[35]  See Ungar I, 153 F.Supp.2d at 86-91 (discussing the requirements for exercise of personal jurisdiction and finding that Plaintiffs have made a prima facie showing that those requirements have been satisfied).  Thus, the court may exercise personal jurisdiction over the PA and the PLO consistent with the Due Process Clause of the Fifth Amendment.

---

[35] As the court concludes that it has personal jurisdiction over the Palestinian Defendants pursuant to the nationwide service of process provision of 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(1)(D), it is unnecessary to discuss whether the court could exercise personal jurisdiction over them pursuant to Rule 4(k)(2).  Cf. Estates of Ungar v. Palestinian Auth., 153 F.Supp.2d 76, 91 n.3 (D.R.I. 2001) ("Ungar I") (reaching same conclusion).

See id. at 91 (reaching same conclusion using prima facie standard).  The evidence on which the court relies for each of these findings is discussed below.

### 1.  Minimum Contacts

The PLO maintains an office in Washington, D.C.  See Revised Notice, Ex. KK (Exhibit B to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended ("FARA"), dated March 10, 1998) at 1, 2, Ex. LL (Supplemental Statement Pursuant to Section 2 of FARA, dated January 18, 2002) at 1, 9, Ex. NN (Supplemental Statement Pursuant to Section 2 of FARA, dated November 15, 1999) at 1, 9, Ex. OO (Supplemental Statement Pursuant to Section 2 of FARA, dated April 28, 2000) at 1, 9, Ex. PP (Short-Form Registration Statement Pursuant to FARA, dated March 10, 1998), Ex. QQ (Short-Form Registration Statement Pursuant to FARA, dated March 10, 1998).  As of October, 2002, the office had a staff of nine employees.  See Exhibits to Mem. Third Motion, Ex. C (New York Times article dated 10/16/00) at 2.

The PA also has an office in Washington, D.C.  See id. at 1; Revised Notice, Ex. KK,[36] Ex. MM (Retainer Agreement between PA and Bannerman and Associates, Inc., signed by PA on October 10, 1999)[37] at 1-4.  Both offices are headed by Hasan Abdel Rahman,

---

[36] "**The PLO offices in Washington, D.C. shall represent the PLO and the Palestinian Authority in the United States** ....  The PLO and the Palestinian Authority will pay for the expenses of the office and the salaries of its employees."  Revised Notice, Ex. KK (Exhibit B to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended ("FARA"), dated March 10, 1998) at 1 (bold added).

[37] "The Firm will be available at all times to advise and assist the Palestinian Authority and its Washington Office. Regular contact will be established between personnel of the Firm **and the Washington Office of the Palestinian Authority**."  Revised Notice, Ex. MM (Retainer Agreement between PA and Bannerman and Associates, Inc., signed by PA on October 10, 1999) at 2 (bold added).

the Chief Representative of the PLO and the PA in the United States.  See Revised Notice, Ex. LL at 9;[38] Reply Exhibits, Ex. Q (Prepared Statement of Hasan Abdel Rahman, Chief Representative of the PLO and the PNA to the United States, before the Senate Appropriations Committee Subcommittee on Foreign Operations) at 1-2, Ex. R (Tr. of March 25, 1999, Senate Appropriations Subcommittee on Foreign Operations Hearing) at 1, 26-27, Ex. S (Transcript of October 7, 2001, ABC News Special: America Fights Back) at 24-25, Ex. T (Transcript of November 10, 2001, CNBC Rivera Live) at 1-2,[39] Ex. U (Transcript of December 2, 2001, CNN Breaking News) at 1,[40] Ex. V (Transcript of November 6, 1998, CNN Morning News) at 1, Ex. W (Promotional Announcement for The O'Reilly Factor, Fox News Channel, December 4, 2001), Ex. X (Declaration of Ronn D. Torossian) ¶ 3, Ex. Z (Affidavit of David J. Strachman dated August 29, 2003).[41]

---

[38] Mr. Hasan Abdel Rahman identifies himself in a January 18, 2002, Supplemental Statement Pursuant to Section 2 of the FARA, as **"Chief Representative of the PLO and PNA."**  Revised Notice, Ex. LL at 9 (bold added).

[39] The transcript of the broadcast reflects that Mr. Abdel Rahman stated: "Mr. Rivera, I said to Mr. Pinkas, **I'm speaking on behalf of the Palestinian Authority and the PLO."** Reply Exhibits, Ex. T (Transcript of November 10, 2001, CNBC Rivera Live) at 2 (bold added).

[40] According to the transcript of the broadcast, Mr. Abdel Rahman stated:"**Let me reiterate the position of the Palestinian Authority.**  We condemn those acts. We oppose them, and we will do everything we can to stop them."  Reply Exhibits, Ex. U (Transcript of December 2, 2001, CNN Breaking News) at 1 (bold added).

[41] Plaintiffs have also submitted additional exhibits to prove Hasan Abdel Rahman's status as chief representative in the United States of both the PLO and the PA.  See Reply Exhibits, Ex. BB (Listing of 24 interviews in which Mr. Abdel Rahman is identified as PA representative or spokesman and 10 additional broadcasts with similar references), Ex. CC (Remarks of Mr. Abdel

The PLO Office reported expending $200,132.74 on activities such as giving interviews and lectures and contacting the media during the six month period ending March 31, 1999.  See Exhibits to Mem. Third Motion, Ex. E (Report of the Attorney General to Congress of the United States on the Administration of Foreign Agents Registration Act of 1938, as amended, for the six months ending June 26, 1999, October 31, 1999, September 30, 2001, and April 28, 2002) at 2.[42]  For the six month period ending September 30, 1999, it reported expending $352,894.79, for similar activity.[43]  See id. at 4.  The expenditure for the six months ending March 31, 2000, was reported as $215,846.53, see

---

Rahman at the National Press Club, Washington, D.C., May 9, 2002), Ex. DD (Web Page for Project on Justice in Times of Transition 8/28/03, identifying Mr. Abdel Rahman as Chief Representative of the PA in U.S.), Ex. EE (Letter from Bernard Cardinal Law to Mr. Abdel Rahman dated December 4, 2001), Ex. FF (News Release for September 11, 2001, Middle East Forum identifying Mr. Abdel Rahman as Chief Representative of the PLO and the PA).

[42] Some of Plaintiffs' individual exhibits (or tabs of exhibits) consist of multiple documents, each with its own pagination.  See, e.g., Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Exhibits to Mem. Third Motion"), Ex. E (Report of the Attorney General to Congress of the United States on the Administration of Foreign Agents Registration Act of 1938, as amended, for the six months ending June 26, 1999, October 31, 1999, September 30, 2001, and April 28, 2002).  For ease of reference, the court has numbered sequentially the pages of such exhibits and cites to those page numbers rather than the page numbers which appear on the individual documents.

[43] Another exhibit reflects the PLO Office reporting an expenditure of $263,824.53 for the same six month period.  See Revised Notice, Ex. NN (Supplemental Statement Pursuant to Section 2 of FARA, dated November 15, 1999) at 11.  This apparent discrepancy does not affect the court's conclusions in this matter.

Revised Notice, Ex. OO at 11, for activities which took place at addresses in Cleveland, Ohio, Orlando, Florida, Boston, Massachusetts, and Palm Beach, see id. at 13-14. For the six month period ending September 30, 2001, the PLO Office reported expending $214,502.83, see id., Ex. LL at 11, and it engaged in activities which included speaking to high school students in Pennsylvania and attending a conference in Albuquerque, New Mexico, as well as giving interviews to members of the press and other electronic media, see id., Ex. LL, at 13-14.

The PA has engaged American agents to represent it. In 1997, the Little Rock, Arkansas, firm of Larry C. Wallace & Associates, P.A., served as an agent for the PA. See Reply Exhibits, Ex. E, Tabs 1, 2. In October of 1999, the PA entered into a three year, $2,250,000.00 contract with Bannerman and Associates, Inc. ("Bannerman"), of Washington, D.C., for the provision of public relations services. See Revised Notice, Ex. MM ¶ 10. Reports filed pursuant to FARA for the period from April 28, 2000, to April 28, 2002, reflect payment to Bannerman of $1.5 million and identification of eleven members of the firm as registered agents of the PA. See Reply Exhibits, Ex. E, Tabs 7-11. Bannerman's activities on behalf of the PA included lobbying Congress, see id.; Exhibits to Mem. Third Motion, Ex. F (January 20, 2000, Washington Post Online article), Ex. G (Forward article), providing advocacy training, see Exhibits to Mem. Third Motion, Ex. G at 3, public relations, see id., "arrang[ing] international visits of representatives of the Palestinian Authority," Reply Exhibits, Ex. E, Tabs 6, 7, and making "T.V. and radio appearances on behalf of the [Palestinian Authority]," id., Tabs 8, 9.

The PA also engaged the New York law firm of Stroock & Stroock & Lavan ("Stroock") to perform legal, consulting and other services in the United States. According to FARA reports,

43

Stroock was retained by the PA at least as early as 1999, see
Reply Exhibits, Ex. E, Tab 2 at 5; Exhibits to Mem. Third Motion,
Ex. E at 2.  Stroock provided the PA with "legal services ...
regarding various financial, commercial, and development
projects," Reply Exhibits, Ex. E, Tab 1 at 5, see also id., Tabs
2-3, "representation in various infrastructure projects and
pension matters," id., Tabs 4-9, and litigation, see Exhibits to
Mem. Third Motion, Ex. H at 1, Ex. I at 4.  Between November 1,
1996, and April 30, 2001, the PA paid Stroock more than $2.8
million and at least six Stroock employees served as registered
agents for the PA.  See Reply Exhibits, Ex. E, Tabs 1-9.

   In 1993, the PA and the PLO entered into separate but
substantively identical agreements with International
Technologies Integration, Inc. ("ITI"), which granted ITI the
right to develop a domestic and international communications
network in the West Bank, Jerico, and the Gaza Strip.  See
Exhibits to Mem. Third Motion, Ex. H (Int'l Tech. Integration,
Inc. v. The Palestine Liberation Org., 66 F.Supp.2d 3 (D.D.C.
1999)).  The contract was apparently to be performed over a
twenty-five year period and had a total value of approximately
$187,500,000.00.  See id. at 5 (noting that the arbitrator
awarded $18,750,000.00 to ITI as compensation for work performed
during almost one tenth of the life of the agreement).
Significant for purposes of minimum contacts is the fact that the
PA and PLO agreed that any dispute arising under the agreements
would be submitted to binding arbitration in Washington, D.C.,
under the aegis of the American Arbitration Association and also
agreed that the agreements would be interpreted and enforced in
accordance with the laws of Virginia.  See id. at 2.

   There is evidence from which a reasonable inference can be
drawn that in July of 2002 the PA had millions of dollars on
deposit in the New York branches of Citibank and Arab Bank banks

and a brokerage account at Salomon Smith Barney.  <u>See</u> Exhibits to Mem. Third Motion, Ex. I (Temporary Restraining Order entered in <u>Int'l Tech. Integration, Inc. v. The Palestine Liberation Org. & The Palestinian Nat. Auth.</u>, Civil Action No. 98-00756 (CKK) (D.D.C. July 2, 1999)(enjoining the movement of $18,750,000.00 for one business day)).  There is also evidence that the financial department of the PA, the Palestine Monetary Authority ("PMA"), operates a web site which is based in the United States. <u>See</u> Reply Exhibits, Ex. JJ (Palestine Monetary Authority Website).  "[T]he computer files that collectively constitute the web site of the Palestine Monetary Authority are installed in a computer physically located in Houston, Texas.  Whenever the Palestine Monetary Authority updates, removes, or otherwise changes its web site, it is in actuality manipulating files on [the] computer in Texas."  <u>Id.</u>, Ex. HH (Affidavit of Michael Bilow) ¶ 16.  Similarly, when persons view the web site of the PMA they are accessing files installed in this computer in Texas. <u>See</u> <u>id.</u>  ¶ 17.

The PA and PLO have engaged in extensive public relations, educational, and propaganda activities throughout the United States.  Hasan Abdel Rahman, the Chief Representative of the PA and PLO, speaks at high schools, colleges, universities, and clubs in the United States and appears frequently on television news programs.  <u>See</u> Exhibits to Mem. Third Motion, Ex. B (Biography of Mr. Abdel Rahman), Exs. C, D; Reply Exhibits, Exs. S, T, U, V, W, X, BB (Listing of 24 interviews in which Mr. Abdel Rahman is identified as PA representative or spokesman and 10 additional broadcasts with similar references), CC (Remarks of Mr. Abdel Rahman at the National Press Club, Washington, D.C., May 9, 2002), DD (Web Site for Project on Justice in Times of Transition identifying Mr. Abdel Rahman as a speaker and also as the Chief Representative of the PA in U.S.), FF (News Release for

45

September 11, 2001, Middle East Forum identifying Mr. Abdel
Rahman as a participant and also as Chief Representative of the
PLO and the PA); Revised Notice, Ex. LL at 13-14, Ex. NN at 13-
14, Ex. OO at 13-14, Ex. RR (Transcript of May 18, 1999, Talk of
the Nation, National Public Radio).

Mr. Abdel Rahman's deputy, Khalil Foutah, makes similar
public appearances on behalf of the PA and PLO.  See Reply
Exhibits, Ex. II (Transcript of March 24, 1997, NewsHour, PBS);[44]
see also Revised Notice, Ex. PP.[45]  The PLO's Permanent Observer
to the United Nations ("U.N."), Nasser Al Kidwa, conducts
frequent public interviews outside of the U.N.  See Reply
Exhibits, Ex. AA (Listing 37 television interviews).  The Deputy
Permanent Observer, Marwan Jilani, engages in similar activity as
reflected in his declaration, see Exhibits to Mem. Third Motion,
Ex. L (Declaration of Marwan Jilani) ¶ 2 ("As Deputy Permanent
Observer I ... speak on occasion outside the U.N. on U.N.
subjects in my official capacity ...."); see also Reply Exhibits,
Ex. GG (reflecting a April 11, 2002, interview of Mr. Jalani on
KYW-TV), and by his March 23, 2000, appearance in Brookline,
Massachusetts, in a program on the peace process, see Exhibits to
Mem. Third Motion, Ex. L ¶ 3.

## 2. Defendants' Arguments Re Minimum Contacts

The Palestinian Defendants claim that "[t]he level of the

---

[44] During an appearance on the PBS Online NewsHour program,
Mr. Khalil Foutah stated: "And I want to state here the
opposition [sic] of the Palestinian National Authority under
President Arafat, that we are still committed to the peace
process."  Reply Exhibits, Ex. II (Transcript of March 24, 1997,
Online NewsHour, PBS) at 3-4.

[45] In a March 10, 1998, Short-Form Registration Statement
Pursuant to FARA, Khalil Foutah described the duties he performed
for the PLO as: "Answer questions of students, the media, lecture
at universities, address Church groups on the question of Peace
in the Middle East."  Revised Notice, Ex. PP.

non-UN activity of the Permanent Observer Mission has not been established by a preponderance of the evidence," Memorandum in Support of Palestinian Defendants' Objection to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("PA & PLO Mem. Re Third Motion") at 5, and suggest that the Plaintiffs "assume throughout that the level of Palestinian activities in the United States at issue in this case is the same as and is essentially a continuation of the activities that were considered in Klinghoffer [v. S.N.C. Achille Lauro Ed, 795 F.Supp. 112 (S.D.N.Y. 1992)]," id. Such assumption is mistaken, according to the Palestinian Defendants, because of "the drastic restrictions the Anti-Terrorism statute placed on PLO activities in the United States in 1988 ...." Id.

The court finds this argument to be in the nature of a straw man and, in any case, unpersuasive. First, it does not appear that Judge Lagueux in Ungar I relied upon a "presumption of continuity," PA & PLO Mem. Re Third Motion at 6 (quoting Klinghoffer v. S.N.C. Achille Lauro Ed, 795 F.Supp. at 115), as a basis for the assertion of personal jurisdiction over the PLO, see Ungar I, 153 F.Supp.2d at 88-91. Second, the restrictions the Palestinian Defendants cite were suspended in 1994, see Reply Exhibits, Ex. Y (Presidential Determination No. 94-13 of January 14, 1994), and the suspension has been continually renewed by the President since that time,[46] see Plaintiffs' Reply Memorandum in

---

[46] The restrictions contained in the Antiterrorism Act of 1988 have been waived by the President from 1994 to the present. See Presidential Determination No. 94-30, 59 Fed. Reg. 35607 (July 13, 1994); Presidential Determination No. 95-12, 60 Fed. Reg. 2673 (Jan. 11, 1995); Presidential Determination No. 95-31, 60 Fed. Reg. 35827 (July 11, 1995); Presidential Determination No. 95-36, 60 Fed. Reg. 44725 (Aug. 28, 1995); Presidential Determination No. 95-50, 60 Fed. Reg. 53093 (Oct. 11, 1995); Presidential Determination No. 96-5, 60 Fed. Reg. 57821 (Nov. 22, 1995); Presidential Determination No. 96-8, 61 Fed. Reg. 2889 (Jan. 29, 1996); Presidential Determination No. 96-20, 61 Fed.

Further Support of Their Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) against Defendants the Palestinian Authority and the Palestine Liberation Organization ("Plaintiffs' Reply Mem.") at 11-12. Thus, the restrictions have not been an obstacle to PLO activities in the United States for almost ten years. The court also notes that the suspension of these restrictions was not disclosed by the Palestinian Defendants in their argument. See PA and PLO Mem. Re Third Motion at 5-6. Third, the court has detailed numerous exhibits which reflect extensive non-U.N. activity by the Palestinian Defendants. See Section VI.C.1. supra at 38-45.

The Palestinian Defendants assert that "[t]he activities of Hasan Abdel Rahman and the PLO Mission in Washington, D.C., ... are within the ambit of the well-recognized government contacts exception, as are any lobbying or other government related activities of the Bannerman firm and of the one law firm reporting essentially unspecified activities on defendants['] behalf ...." Palestinian Defendants['] Memorandum in Further Opposition to Plaintiffs['] Motions for Default Judgment and in Opposition to an Award of Attorneys Fees ("PA & PLO Reply Mem. Re

---

Reg. 26019 (May 23, 1996); Presidential Determination No. 96-32, 61 Fed. Reg. 32629 (June 25, 1996); Presidential Determination No. 96-41, 61 Fed. Reg. 43137 (Aug. 21, 1996); Presidential Determination No. 97-17, 62 Fed. Reg. 9903 (Mar. 4, 1997); Presidential Determination No. 98-8, 62 Fed. Reg. 66255 (Dec. 18, 1997); Presidential Determination No. 98-29, 63 Fed. Reg. 32711 (June 16, 1998); Presidential Determination No. 99-5, 63 Fed. Reg. 68145 (Dec. 9, 1998); Presidential Determination No. 99-25, 64 Fed. Reg. 29537 (June 2, 1999); Presidential Determination No. 00-2, 64 Fed. Reg. 58755 (Nov. 1, 1999); Presidential Determination No. 2000-19, 65 Fed. Reg. 24852 (Apr. 27, 2000); Presidential Determination No. 01-13, 66 Fed. Reg. 20585 (Apr. 24, 2001); Presidential Determination No. 2002-14, 67 Fed. Reg. 20427 (Apr. 25, 2002); Presidential Determination No. 03-03, 67 Fed. Reg. 65471 (Oct. 25, 2002); Presidential Determination No. 2003-20, 68 Fed. Reg. 20327 (Apr. 25, 2003); Presidential Determination No. 2004-04, 68 Fed. Reg. 60841 (Oct. 14, 2003).

Third Motion") at 2.  Apart from a citation two paragraphs prior
in their memorandum to Klinghoffer v. S.N.C. Achille Lauro Ed,
937 F.2d 44, 51 (2nd Cir. 1991), the Palestinian Defendants cite
no authority for this claim.

In Klinghoffer, the Court of Appeals for the Second Circuit,
in finding that jurisdiction over the PLO could not be based on
the PLO's participation in U.N. related activities, observed that
"[i]n an analogous context, courts have held that jurisdiction in
the District of Columbia may not be grounded on a non-resident's
'getting information from or giving information to the
government, or getting the government's permission to do
something.'"  Id. at 51 (quoting Investment Co. Inst. v. United
States, 550 F.Supp. 1213, 1216-17 (D.D.C. 1982)).  However, the
Second Circuit acknowledged that the "'government contacts' rule
is based in part on the constitutional right 'to petition the
Government for redress of grievances.'"  Id. (quoting Naartex
Consulting Corp. v. Watt, 722 F.2d 779, 786-87 (D.C. Cir. 1983));
see also Zeneca Ltd. v. Mylan Pharm., Inc., 173 F.3d 829, 831
(Fed. Cir. 1999)("[T]his [government contacts] exception is
grounded in concerns regarding the First Amendment right to
petition the federal government as well as the policy against the
creation of national supercourts in the District of Columbia.").
Given this basis, the applicability of the exception to the
Washington Office of the Palestinian Defendants seems
questionable.

It is true that the Second Circuit in Klinghoffer opined
that the government contacts exception "also appears to be based
on non-constitutional policy considerations, such as the
Judiciary's reluctance to interfere with the smooth functioning
of other governmental entities," Klinghoffer, 937 F.2d at 51, and
that the Federal Circuit has suggested that the exception may
also implicate due process, see Zeneca Ltd. v. Mylan Pharm.,

Inc., 173 F.3d at 831 ("The government contacts exception may
also have due process underpinnings.").  While these
considerations could arguably make the exception applicable to
the Palestinian Defendants here, this court finds that the
activities of the Washington Office of the PA and PLO go well
beyond contact with the official branches of the federal
government.  See Section VI.C.1. supra at 38-45.  Thus, even if
the court excludes from its consideration contacts by the
Washington Office of the PLO with the federal government, the
other activities of that office are sufficient to allow this
court to find minimum contacts.

The Palestinian Defendants also contend that Judge Lagueux
failed to consider fully the effects of the Oslo Accords on the
PA's status in the United States.  See PA & PLO Mem. Re Third
Motion at 6.  They assert that because the PA is prohibited under
the Oslo Accords from engaging in foreign relations this
circumstance "compels the finding that Palestine's Permanent
Mission to the United Nations is not an agency of the PA and
generally negates the possibility of systematic and continuous
contacts by the PA with the United States."  Id.  As evidence of
the prohibition against the PA conducting foreign relations, the
Palestinian Defendants cite the Declaration of Ed Morgan which
Plaintiffs filed as an exhibit in support of their objection to
the Rule 12(b)(1) motion filed by the Palestinian Defendants on
June 13, 2003.  See id. at 6-7; see also Exhibits to Palestinian
Defendants' Memorandum in Support of Objection to Plaintiffs'
Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2)
("PA & PLO Exhibits"), Ex. 2 (Declaration of Ed Morgan ("Morgan
Decl.")) ¶ 9.  Professor Morgan, an expert in international law,
see id. ¶ 4, stated that "several provisions of both the DOP
[Declaration of Principles on Interim Self-Governing
Arrangements] and the IA [Israeli-Palestinian Interim Agreement

50

on the West Bank and the Gaza Strip] expressly deny the PA the capacity to conduct foreign relations," id. ¶ 25.

The short answer to this argument is that while the PA is prohibited from conducting "foreign relations," Morgan Decl. ¶¶ 23-28, including "the appointment of ... diplomatic and consular staff, and the exercise of diplomatic functions," id. ¶ 25b, there is nothing in the Oslo Accords, as Plaintiffs point out, which prohibits the PA "from conducting other non-diplomatic activities (such as commercial, public relations, lobbying, or educational activities) through its representatives, officers and agents abroad,"[47] Plaintiffs' Reply Mem. at 8 n.10. It is precisely these types of activities which have caused this court to find that both the PA and PLO have sufficient minimum contacts with the United States to allow the exercise of personal jurisdiction. Thus, the fact that the PA cannot conduct foreign relations does not mean that it cannot have minimum contacts with the United States. As Plaintiffs note, there are thousands of individuals and corporations, which like the PA are unable to conduct foreign relations, but which have sufficient minimum contacts with this country to allow the exercise of personal jurisdiction over them. See Plaintiffs' Reply Mem. at 1.

The Palestinian Defendants additionally argue that Judge Lagueux misinterpreted an exhibit submitted by Plaintiffs and incorrectly concluded that "the PA ... identifies the [Permanent Observer] Mission as its official representative to the U.N." PA & PLO Mem. Re Third Motion at 8 (quoting Ungar I, 153 F.Supp.2d at 90). According to the Palestinian Defendants, "[t]he list does not purport to show a PA agency in the United States. It is

_____

[47] Mr. Abdel Rahman's own biography describes him as "Chief Representative of the PLO and the P.N.A. in the United States," Exhibits to Mem. Third Motion, Ex. B (Biography of Abdel Rahman) at 1 (underlining added), and not to the United States.

51

a list of Embassies, etc. of Palestine.  The posting of the list
on a PNA website, if such is the fact, does not make the
organizations on the list agencies of the PA."  Id. at 8.  While
the list may "not purport to show a PA agency in the United
States," id., this court notes that it also includes the
Palestine Liberation Organization Office, headed by Mr. Abdel
Rahman, in Washington, D.C.  The Palestinian Defendants' argument
would appear to be equally applicable to this Office, but the
evidence is overwhelming that Mr. Abdel Rahman is an agent of the
PA.  Given this fact, the court attaches little weight to the
Palestinian Defendants' protestations as to what the list
purports to show.  At the very least, the listing is additional
evidence of the connection which exists between the PA and the
Observer Mission.

### 3. Service of Process

#### a.  Judge Lagueux's Findings

In Ungar I, Judge Lagueux, appearing to using a prima facie
standard, see 153 F.Supp.2d at 88, determined that the PA and the
PLO qualified as unincorporated associations for purposes of
service of process, see id. at 89, and that each had been
properly served with process pursuant to Fed. R. Civ. P. 4(h)(1)
through delivery of the summons and Complaint to a managing or
general agent, see id. at 91.  Specifically, Judge Lagueux found
that Marwan Jilani, the PLO's Deputy Permanent Observer to the
United Nations, and Hasan Abdel Rahman, the Chief Representative
of both entities in the United States, each qualified as a
general or managing agent of the PA and PLO.  See id. at 90-91.
Since each man had been served, Mr. Jilani on March 23, 2000, in
Brookline, Massachusetts, and Mr. Abdel Rahman on April 13, 2000,
in Washington, D.C., see id. at 89-90, Judge Lagueux concluded
that this court has personal jurisdiction over the PA and PLO
pursuant to the nationwide service of process provisions of 18

U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(1)(D), see id. at 91.

### b.  Law of the Case

As an initial matter, Judge Lagueux's determination that the PA and PLO qualify as unincorporated associations for purposes of service of process pursuant to Fed. R. Civ. P. 4(h)(1) may constitute the law of the case.  Research regarding this doctrine has not provided a definitive answer to this question.  See Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)("[L]aw of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.); Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002)("[A] court ordinarily ought to respect and follow its own rulings, made earlier in the same case.")(citing Arizona v. California); Fed. Ins. Co. v. Scarsella Bros., Inc., 931 F.2d 599, 601 n.4 (9th Cir. 1991) (holding that, while some opinions have gone so far as to suggest that law of the case doctrine does not apply to pretrial rulings, "[b]ecause the ... doctrine is amorphous, it is not easily susceptible to such broad generalizations.")(citation omitted); Boundy v. Dolenz, No. CIV.A. 3:96CV0301-G, 2002 WL 1160075, at *1 (N.D. Tex. May 30, 2002)("Under the law of the case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.'")(quoting Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of America Co., 195 F.3d 765, 771 (5th Cir. 1999)(apparently quoting Arizona v. California)).  Out of an abundance of caution, this Magistrate Judge will make his own determination regarding the status of the PA and PLO.

### c.  Magistrate Judge's Findings

### 1) PA and PLO are Unincorporated Associations

This Magistrate Judge, applying a preponderance of the evidence standard, finds that the PA and the PLO are unincorporated associations for purposes of service of process. The PA is not presently recognized as a foreign state by the United States, and, therefore, it is most appropriately categorized as an unincorporated association,[48] and the court so finds.  See Motta v. Samuel Weiser, Inc., 768 F.2d 481, 485 (1st Cir. 1985)("An unincorporated association is defined as a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise.")(citing Black's Law Dictionary).  The PLO, as Judge Lagueux noted, has previously been determined to qualify as an unincorporated association.  See Ungar I, 153 F.Supp.2d at 89 (citing Klinghoffer v. S.N.C. Achille Lauro Ed, 739 F.Supp. 854, 858 (S.D.N.Y. 1990)).  For the same reasons expressed by Judge Lagueux and the court in Klinghoffer, this Magistrate Judge also concludes that the PLO is

---

[48] The Palestinian Defendants argue that the PA cannot be treated as an unincorporated association because of "its origins and existence as a governing authority ...."  Memorandum in Support of Palestinian Defendants' Objection to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2) ("Defendants' Mem. Re Third Motion") at 7 (citing the Declaration of Ed Morgan ("Morgan Decl.") which Plaintiffs filed as an exhibit in support of their objection to the Rule 12(b)(1) motion filed by Defendants on June 13, 2003).  Defendants apparently assume that a "governing authority" cannot be an unincorporated association.  This court fails to see why this is necessarily so. The court also notes that Defendants do not state that the PA is incorporated, and there is no evidence in the record to suggest that it is.  In any case, whether the PA is an "unincorporated association" or a corporate entity does not affect the validity of service here.  Fed. R. Civ. P. 4(h)(1) provides that service on unincorporated associations and on corporations is effected in identical fashion.  To the extent that the Palestinian Defendants are suggesting that the PA is a hybrid entity which cannot be served in any manner pursuant to Rule 4, such argument is rejected.

an unincorporated association.

### 2) Hasan Abdel Rahman is Agent of PA and PLO

#### i.   Recently Obtained Evidence

With regard to the service of process upon the Palestinian Defendants, Plaintiffs have submitted additional documentary evidence, which the court finds to be clear and convincing, that Hasan Abdel Rahman is the Chief Representative of both the PA and PLO in the United States.  Further, this evidence casts considerable doubt on the Palestinian Defendants' assertion that they are acting in "good faith," Memorandum of Defendants Palestinian Authority and Palestine Liberation Organization in Support of their Objection to Plaintiffs' Motion for Default Judgment and Other Relief with Respect to Depositions Noticed by Plaintiffs ("Defendants' Mem. Re Second Motion") at 1, as it directly contradicts statements made by Mr. Abdel Rahman in his declaration and by their counsel at the hearing on August 22, 2003.

In his June 14, 2000, Declaration, Mr. Abdel Rahman states:

> 3.   **The Palestinian Authority has no foreign representatives in the United States,** or elsewhere, in accordance with the Israeli-Palestinian Interim Agreement entered into in Washington, D.C.[,] on September 28, 1993, and **has no presence, or representative in the PLO Mission in Washington, D.C.**

Exhibits to Mem. Third Motion, Ex. M ("Abdel Rahman Decl.") ¶ 3 (bold added).  Mr. Clark, the Palestinian Defendants' counsel, referring to this declaration, at the August 22, 2003, hearing stated:

> Now on where we are today, let me say that there are two affidavits, not one, before the Court, that under penalty of perjury state that there is no PNA office in the United States.... **The PNA is not authorized to have an office in the United States, and does not have one ....**

But he has given an affidavit. It's before this Court. **It's the only conscious formal statement made under penalties of perjury that is made before this Court in which he says that he does not represent the PNA** and could not represent the PNA. That doesn't mean he can't state the position of the PNA .... It just means that **he's not the PNA or a representative of the PNA**, and wouldn't be a part of the mission that's authorized under the Foreign Missions Act of the United States of the PLO in Washington, if he were a member, a representative of the PNA. So all the statements with Geraldo Rivera and the New York Times and [Mr. Abdel Rahman's] purported biography, this one page statement, [a]s to Abbda [sic] Rahman's background, that don't make him a representative of the PNA, and do not overcome, or begin to overcome the weight of a sworn statement under penalties of perjury, that he is not such a member, that he's not such a representative.[49]

Tr. of 8/22/03 hearing at 18-20 (bold added).

Yet, on January 18, 2002, Mr. Abdel Rahman executed, under penalty of perjury, a nine page Supplemental Statement Pursuant

---

[49] In their memorandum, counsel for the Palestinian Defendants similarly belittle the evidence which had been submitted by Plaintiffs prior to the August 22, 2003, hearing to support Plaintiffs' claim that Mr. Abdel Rahman is the Chief Representative of the Palestinian Authority in the United States. See PA & PLO Mem. Re. Third Motion at 4-5. Counsel describe a New York Times article which states that Mr. Abdel Rahman has been the Washington representative of "the Palestine National Authority since 1994," see id. at 4 (citing Exhibits to Mem. Third Motion, Ex. C) as "double hearsay and inadmissible," id., and having "little or no probative value," id. A transcript "of an online live chat," id. (citing Exhibits to Mem. Third Motion, Ex. D) is described in like manner, see id. Counsel characterize the one page biography of Mr. Abdel Rahman (Exhibits to Mem. Third Motion, Ex. B), which lists him as Chief Representative of the PNA in the United States, as a "weak refutation at best of the denial in his declaration made under penalty of perjury on June 14, 2000." Id. Given what the recently submitted documentary evidence has revealed regarding Mr. Abdel Rahman's status and the veracity of his declaration, see Revised Notice, Exs. KK-MM, the court dismisses these arguments as unworthy of discussion.

to Section 2 of the FARA, covering the six month period ending September 30, 2001, and identified himself as the **"Chief Representative of the PLO & PNA."** Revised Notice, Ex. LL (Supplemental Statement Pursuant to Section 2 of the FARA) at 9 (bold added).  Moreover, almost four years earlier, on March 10, 1998, Mr. Abdel Rahman executed another filing pursuant to FARA which contained the following statements:

> **The PLO Offices in Washington, D.C.[,] shall represent the PLO and the Palestinian Authority in the United States** and will promote peace and development with Israel.  The PLO and the Palestinian Authority will pay for the expenses of the office and the salaries of its employees.

Id., Ex. KK (Exhibit B to Registration Statement Pursuant to FARA) at 1 (bold added).

The claims of Mr. Abdel Rahman that "[t]he Palestinian Authority has no foreign representatives in the United States ... and has no presence, or representative in the PLO Mission in Washington, D.C.," Exhibits to Mem. Third Motion, Ex. M ("Abdel Rahman Decl.") ¶ 3, are also contradicted by the October, 1999, Retainer Agreement between the PA and Bannerman.  The Retainer Agreement contains the following provisions, all of which clearly indicate that the PA has an office in Washington, D.C., and that Bannerman was representing the PA:

> 2)  In order to assist the Palestinian Authority to advance more effectively the interests of Palestinians in Washington and to improve the U.S. - Palestinian relationship, [Bannerman] will augment **the Palestinian Authority and its Washington Office** efforts by:
> ....
> 4) [Bannerman] will be available at all times to advise and assist **the Palestinian Authority and its Washington Office.**  Regular contacts will be established between personnel of [Bannerman] and **the Washington Office of the Palestinian Authority.**
> ....

8) [Bannerman] and the counterpart team will agree on a model of communication to ensure a consistent and dynamic relation which will involve close contacts with **the Palestinian Office in Washington[,] DC** and with the Palestinian Authority in the West Bank and Gaza respectively.

....

12) In connection with the above outlined representation, it is understood that **[Bannerman] will be required under United States law to register its representation of the Palestinian Authority with the United States Government,** and that [Bannerman] will comply with all requirements of United States law in this connection.

Revised Notice, Ex. MM at 1-3 (bold added).

### ii.    Other Evidence

Plaintiffs have also submitted evidence that Mr. Abdel Rahman has repeatedly and expressly presented himself as the representative of the PA.  On March 25, 1999, Mr. Abdel Rahman testified before the Foreign Operations Subcommittee of the Senate Appropriations Committee.[50]  A copy of Mr. Abdel Rahman's "Prepared Statement" bears a headline, identifying him as the "Chief Representative of the PLO and the PNA to the United States," Reply Exhibits, Ex. Q at 1, and his remarks reflect that he is speaking for the PA, see id. at 1-2.  The transcript of the hearing also identifies Mr. Abdel Rahman in like manner, see id.,

---

[50] The subcommittee was considering the President's request for $400 million in assistance to the Palestinians to meet commitments made at the Wye Plantation.  See Reply Exhibits, Ex. R (Transcript of March 25, 1999, Senate Appropriations Subcommittee on Foreign Operations Hearing) at 1.  The specific subject of the hearing was whether the PA had met its obligations under the Oslo Accords and other agreements for "developing and sharing a plan to collect illegal weapons, reducing the size of security forces and cooperating with Israeli and U.S. authorities on cases involving terrorism, especially when Americans are the victims."  Id.  In testimony given before the subcommittee, Deputy Assistant Attorney General Mark Richard identified Yaron Ungar as one of the U.S. citizens killed in a terrorist attack in Israel.  See id. at 8.

Ex. R at 2, and evidences that he delivered approximately half of
the statement before being interrupted by Senator Arlen Specter,
who stated that Mr. Abdel Rahman's statement would be made part
of the record, see id. at 27.  In the testimony which he did
deliver, Mr. Abdel Rahman twice invoked the name of the
"Palestinian Authority," id. at 26-27, and it is clear from the
context that in each instance he was speaking on behalf of the
PA, see id.

     During a November 6, 1998, CNN Morning News interview, Mr.
Abdel Rahman expressed the PA's condemnation of a car bombing in
a crowded Jerusalem market.  See id., Ex. V at 1.  On October 7,
2001, he appeared on an ABC News Special and stated: "So this is
our official position.  This is the position of the Palestinian
[A]uthority and the PLO, and that's where we stand."  Reply
Exhibits, Ex. S at 25.  On November 10, 2001, during a CNBC
television interview, Mr. Abdel Rahman stated that: "I'm speaking
on behalf of the Palestinian Authority and the PLO."  Id., Ex. T
at 2.  In another CNN television interview conducted on December
2, 2001, Mr. Abdel Rahman stated: "Let me reiterate the position
of the Palestinian Authority.  We condemn those acts."  Id., Ex.
U at 1.  Plaintiffs have also submitted an exhibit indicating
that Mr. Abdel Rahman appeared on the television program The
O'Reilly Factor on December 4, 2001, and that the promotional
"teased segment" for the program states "Hasan Abdel Rahman, PLO
representative to U.S., says no one should kill babies or
civilians.  Rahman says the Palestinian authority condemn, and
oppose the killing of civilians."  Id., Ex. W.

     Based on all of the foregoing exhibits, the court finds the
evidence overwhelming that Mr. Abdel Rahman is an agent of both
the PLO and the PA and that as their Chief Representative in the
United States he exercises independent judgment in the
performance of his duties such that it is fair, reasonable, and

just to imply his authority to accept service on behalf of both
the PLO and PA.  Plaintiffs served Mr. Abdel Rahman with process
on April 13, 2000, in Washington, D.C.  See Exhibits to Mem.
Third Motion, Ex. K (Affidavit of Freeman R. Woodbury).

### 3) Marwan Jilani

The Palestinian Defendants tout Mr. Jilani's declaration (as
they did Mr. Abdel Rahman's) as "competent and persuasive
evidence," PA & PLO Mem. Re Third Motion at 3, that he is not an
agent of either the PLO or the PA, see id.; see also Exhibits to
Mem. Third Motion, Ex. L (Declaration of Marwan Jilani).  In
light of the apparent falsity of Mr. Abdel Rahman's declaration,
the court views these similar pronouncements regarding Mr.
Jilani's declaration with skepticism.  However, the court
concludes that it is unnecessary to determine using a
preponderance of the evidence standard whether Mr. Marwan Jilani
is an agent of the PA and PLO as the evidence is overwhelming
that Mr. Abdel Rahman is agent of both defendants.  It is only
necessary that the court find that the Palestinian Defendants
have been served, not that they have been served twice.

### 4.  Conclusion Re Personal Jurisdiction

Accordingly, the court finds by a preponderance of the
evidence that it has personal jurisdiction over the PLO and the
PA by virtue of the nationwide service of process provision of 18
U.S.C. § 2334(a) and Rule 4(k)(1)(D).  Cf. Ungar I, 153 F.Supp.2d
at 88-91 (making such finding under prima facie standard).
Plaintiffs have demonstrated that the PA and PLO have minimum
contacts with the United States as a whole and that each
Defendant has been served with a copy of the summons and
Complaint by delivery to a managing or general agent of each
Defendant.  Cf. id. at 91.  The court may, therefore, exercise
personal jurisdiction over the PLO and PA without violating the
Due Process Clause of the Fifth Amendment.  Cf. id.

## VII.  The Motions for Default Judgment

### A.  First Motion

Plaintiffs' First Motion for Default Judgment (Document #106) is directed against the PA and is brought pursuant to Fed. R. Civ. P. 37(b)(2).  Default judgment is sought as a sanction for the PA's failure to respond to Plaintiffs' interrogatories, a request for production of documents, and a request for admissions.  See Plaintiffs' Mem. First Motion at 1.

### B.  Second Motion

#### 1.  Applicability

The Second Motion for Default Judgment (Document #125) is directed against both the PLO and the PA.  The Palestinian Defendants take issue with this direction and argue that "plaintiffs' discovery demands are directed solely to the PA and not the PLO." Memorandum of Defendants Palestinian Authority and Palestinine Liberation Organization in Support of Their Objection to Plaintiffs' Motion for Default Judgment and Other Relief with Respect to Depositions Noticed by Plaintiffs ("PA & PLO Mem. Re Second Motion") at 2.  Plaintiffs admit that their requests for documents and admissions were addressed only to the PA.  See Letter from Strachman to Martin, M.J., of 3/23/04 at 1.  However, they note that of the seven persons Plaintiffs sought to depose, two, Yasser Arafat and Razi Jabali, "are PLO officials, in addition to their official positions in the PA." Id. Plaintiffs also observe that the Motion for Protective Order (Document #115) in response to the deposition notices was filed by both the PLO and PA.  See id. at 2.

On this question, the court is not persuaded by Plaintiffs' arguments.  It is true that the Motion for Protective Order (Document #115) was brought by both the PLO and the PA.  However, this fact does not outweigh the more significant factor that the Notices of Deposition only identified the deponents, including

Yasser Arafat and Razi Jabali, in connection with the PA.  See Notices of Deposition (Documents #49, 50, 103).  It is also true that this Magistrate Judge on occasion referred to Defendants complying with their discovery obligations.  See, e.g., Tr. of 7/14/03 at 31.  However, in so speaking, the court assumed from the fact that Plaintiffs were seeking default judgment against both the PA and PLO that discovery requests had been directed to both Defendants.  This assumption was erroneous.  Of even greater significance, the Order of 1/14/03 (Document #99), granting the Motion to Compel, states:

> **Plaintiffs may issue deposition notices to The Palestinian Authority officers and employees** upon 60 days notice.  The deposition notices may issue for depositions to occur in the District of Rhode Island.  **The Palestinian Authority** may file objections to the depositions indicating with specificity their objection, such as location, etc.

Order of 1/14/03 (Document #99).  There is nothing on the face of the Order which indicates that the PLO was ordered to do anything.  For these reasons, the court declines to find that the PLO violated the Order of 1/14/03.  The court also declines to find that the PLO failed to comply with its discovery obligations given that no discovery requests were specifically directed to the PLO.  Accordingly, as to the PLO, the court finds that the Second Motion for Default Judgment should be denied, and I so recommend.

## 2.  Basis for Second Motion

Plaintiffs' Second Motion for Default Judgment (Document #125) is brought pursuant to Fed. R. Civ. P. 37(b)(2), and it seeks default judgment against the PA and the PLO as a sanction. The basis for the Second Motion is the PA's and PLO's failure to produce any of the seven PA employees who had been noticed for deposition by Plaintiffs.

## C. Law Applicable to First and Second Motions

Plaintiffs' First and Second Motions seek default judgment as a sanction because of the PA's[51] failure to comply with discovery. Fed. R. Civ. P. 37(b)(2)(C) specifically recognizes that the entry of judgment by default is among the sanctions available to the court. Utilization of this sanction for failure to comply with a discovery order is within the sound discretion of the district court. See Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). However, "a default judgment is ... a drastic sanction that should be employed only in an extreme situation." Luis C. Forteza e Hijos, Inc. v. Mills, 534 F.2d 415, 419 (1st Cir. 1976); cf. United States v. Certain Real Prop. Located at Route 1, Bryant, Alabama, 126 F.3d 1314, 1317 (11th Cir. 1997)("The decision to ... enter default judgment 'ought to be a last resort--ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders.'") (quoting Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1556 (11th Cir. 1986)).

The United States Court of Appeals for the Fifth Circuit has held that before a district court awards default judgment as a discovery sanction two criteria must be met: "the penalized party's discovery violation must be willful ... [and] the drastic measure is only to be employed where a lesser sanction would not substantially achieve the desired deterrent effect." United States v. $49,000 Currency, 330 F.3d 371, 376 (5th Cir. 2003) (citations omitted). The Court of Appeals for the Seventh Circuit similarly requires "that when a court enters default judgment as a discovery sanction, the court must find that the

---

[51] The court has already determined that to the extent the Second Motion seeks default judgment against the PLO it should be denied. See Section VII.B.1. supra.

party against whom sanctions are imposed displayed wilfulness, bad faith or fault." Aura Lamp & Lighting, Inc. v. Int'l Trading Corp., 325 F.3d 903, 909 (7th Cir. 2003); see also Downs v. Westphal, 78 F.3d 1252, 1257 (7th Cir. 1996)(finding abuse of discretion where a default judgment is entered without a showing of willfulness, bad faith or fault on the part of the defaulted party).

The United States Court of Appeals for the Third Circuit has identified the following factors which a district court should consider in deciding whether to impose default judgment:

> (1) the extent of the party's personal responsibility;
> (2) the prejudice to the adversary caused by the failure
> to meet scheduling orders and respond to discovery;  (3)
> a history of dilatoriness;  (4) whether the conduct of
> the party o[r] the attorney was willful or in bad faith;
> (5) the effectiveness of sanctions other than dismissal,
> which entails an analysis of alternative sanctions;  and
> (6) the meritoriousness of the claim or defense.

Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 919 (3rd Cir. 1992)(citing Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 868 (3rd Cir. 1984)).

### D.  Application of Law to First and Second Motions

The court finds the six factors enumerated by the Third Circuit in Poulis v. State Farm Fire & Casualty Co. to be helpful and discusses them here.  In terms of the personal responsibility of the PA for the failure to comply with the discovery ordered by the court, there is no reason to believe that the failure was attributable to counsel rather than the PA itself.  Indeed, Mr. Clark stated at the April 1, 2003, hearing on the motion to enter default: "My instructions have been do not answer, do not take any steps that would replace [sic] us here ...."  Transcript of April 1, 2003, hearing ("Tr. of 4/1/03") at 6.  At the same hearing, Mr. Clark also stated that in December of 2002 he had met with President Yasser Arafat "and the leadership," id. at 8.

It is reasonable to assume that this lawsuit was among the matters discussed and that the potential consequences of failing to respond to Plaintiffs' discovery requests were also discussed. Thus, I find that the PA, and not its counsel, is responsible for the decision not to respond to Plaintiffs' discovery requests.

As for the prejudice to Plaintiffs, it is clear that the PA's refusal to provide any discovery greatly prejudices Plaintiffs' ability to prove their claims. Plaintiffs, in essence, allege that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts of terrorism, including the attack on Yaron Ungar and his wife. See Amended Complaint ¶ 35. By refusing to answer any interrogatories, admit any facts, produce any documents, or produce any officers or employees for depositions, the PA effectively frustrates the Plaintiffs' ability to prove their claims. This is not a case where default judgment is sought as a sanction for one or two discovery failings, such as the failure to produce for deposition a key witness or to produce certain documents. In such a case, the court could assess the degree of prejudice which the party denied the requested discovery has suffered. It is entirely possible that the court could find that while the party has been prejudiced, the party has not been totally blocked from proceeding with its case and that the entry of default judgment is too extreme a sanction. Here, in contrast, I find that the blanket refusal of the PA to provide **any** discovery is extremely prejudicial. Given the nature of Plaintiffs' claims, information within the control of the PA (and which Plaintiffs have sought via discovery) is critical to the proof of those claims.

The PA has demonstrated a history of dilatoriness throughout this litigation. Its initial response in February of 2002 to Plaintiffs' discovery requests was to jointly request with the

PLO a stay rather than provide specific objections.  When the stay of discovery terminated on November 4, 2002, the PA made no effort to respond to the outstanding discovery requests or to file objections thereto.  After the court granted the Motion to Compel on December 12, 2002, the PA remained intransigent, filing motions for reconsideration and a protective order.  More than six months later, on May 14, 2003, the court explicitly warned the PA, both orally and in writing, that its continued refusal to comply with discovery could result in the entry of default judgment.  See Tr. of 5/14/03 at 28-29; Order of 5/14/03 (Document #158) at 2.  Yet, notwithstanding another extended period (sixty days) which the court set for satisfaction of the long overdue discovery obligations, the PA did not take a single step towards complying with the court's Orders of December 12, 2002 (Document #99), or May 14, 2003 (Document #158).

The PA (and also the PLO) has requested repeated re-scheduling of hearings, which this Magistrate Judge accommodated (until the court concluded the requests were excessive and directed that if lead counsel were not available local counsel would have to act in their place).  See Letter from Martin, M.J., to Counsel of 8/4/03; see also Letter from Strachman to Martin, M.J., of 7/28/03 ("We vigorously oppose Mr. Schilling's request to continue the August 15, 2003, hearing.  Plaintiffs are at a loss to identify a single hearing which the PA and PLO have not sought to postpone.").  In short, the record in this case supports the conclusion that the PA has sought to delay these proceedings as long as possible.

With regard to willfulness or bad faith, although the PA (and also the PLO) has consistently argued that conditions in the Middle East prevent it from answering the discovery requests, see, e.g., Exhibits to Palestinian Defendants' Memorandum in Support of Their Objection to Plaintiffs' Motion for Default

66

Judgment and Other Relief with Respect to Depositions Noticed by Plaintiffs (Document #154), Ex. A (Defendants' Motion Under Rule 8(A)(2) for a Stay Pending Appeal) ¶¶ 12-13; see also id. ¶ 13 (referring to "[t]he violent conditions and Israeli assaults directed at the PNA and PLO ..."), the court rejects as implausible its implicit claim that it could not have answered a single interrogatory, responded to a single request for admission, or produced a single document sought by Plaintiffs.

Furthermore, even if the court were to accept the argument that the violence and destruction around Mr. Arafat's headquarters made it impossible for the PA to find documents or to answer the interrogatories or request for admissions, the proposition that none of the seven persons noticed for deposition would ever be available to be deposed at any time in any place strains credulity. See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Protective Order (filed with Plaintiffs' Objection to Palestinian Defendants' Motion for Protective Order) (Document #117) at 9 (noting that some of the requested deponents "regularly travel to Europe and Asia, and to the United States ....").

Indeed, Counsel for Plaintiffs noted at the May 14, 2003, hearing that the other PA officials had flown to the United States and had been deposed in other cases. See Tr. of 5/14/03 at 14-16. Plaintiffs' counsel introduced as an exhibit at the May 14, 2003, hearing a copy of the deposition of Ghassan Abdel Aziz Abu Ramadan, the manager of the PA's Office of Environment and Information in Gaza, which was conducted on March 31, 2003, in Washington, D.C., in the case of Bernard J. Bucheit v. The Palestine Liberation Organization and The Palestinian Authority, No. 1:00 CV 01455 (D.D.C.). See Plaintiffs' 5/14/03 Hearing Exhibit (copy of deposition of Mr. Ramadan) at 1-3 (full page numbering). Although Mr. Ramadan is not one of the seven

officials Plaintiffs sought to depose in this matter, see Tr. of 5/14/03 at 15, the fact that he was able to leave Gaza and come to the United States to be deposed casts doubt on the PA's claims that conditions there prevent anyone from leaving.  Similarly, Plaintiffs presented evidence that Mr. Muhanad Aljouni, the PA "Assistant Minister of Finance," testified on March 12, 2003, in Jerusalem District Court in the case of Haksharat Hayishuv Ins. Co., Ltd. v. The Palestinian Authority.  See Plaintiffs' Memorandum in Support of Their Motion for Default Judgment Against the PA and PLO and for Other Relief for Refusing to Submit to Depositions ("Plaintiffs' Mem. Second Motion"), Ex. B (Translated Jerusalem District Court Document).  The fact that Mr. Aljouni was able to appear in court in Jerusalem further undermines the PA's implicit claim that none of the seven officials are available to deposed anywhere at any time.  For these reasons, I find the PA's failure to answer Plaintiffs' discovery requests to have been willful.

As for the effectiveness of other sanctions, the court does not see how any alternative sanction would be effective.  The PA (and also the PLO) has made the decision not to engage in this litigation.  While the court could, perhaps, impose monetary sanctions on the PA, such sanctions would be of little or no value to Plaintiffs because there is no reason to believe that such sanctions will produce the desired result of compliance with the discovery orders.  Additionally, collection of such monetary sanctions could be problematic.  Accordingly, the court concludes that other sanctions would not be effective in dealing with the problem posed by the PA's conduct.

The final factor, the meritoriousness of the Plaintiffs' claims, poses some difficulty.  While the culpability of Hamas for the deaths of Yaron and Efrat Ungar is relatively clear, see Ungar I, 153 F.Supp.2d at 83 (noting trial and conviction of

Hamas members for murdering the Ungars), assessment of the validity of Plaintiffs' claims against the PA (and also the PLO) on the present record is difficult.  The court is cognizant of Ambassador Al-Kidwa's statement, albeit unsworn, that "neither the PNA nor the PLO played any role and neither had any responsibility for the deaths in this case.  We regret these deaths as we do the thousands before them and since in these tragic years of violence."  Motion for Reconsideration (Document #100), Attachment (Letter from Ambassador Al-Kidwa to Martin, M.J., of 1/27/03) at 2.  At the same time, the court also has before it the remarks of Plaintiffs' counsel at the May 14, 2003, hearing regarding the seven PA officials Plaintiffs were attempting in vain to depose:

> We have a tape of Mr. Jabali indicating that he provides Hamas terrorists support.  He puts them into his own security forces.  We have Mr. Dahlan.  Mr. Dahlan met with Mr. Deif who is the Hamas leader right around the time of the Ungar murder.  And we have information that he was given a green light to specifically conduct terrorist activities in June of 1996.  We've asked to depose Mr. Rajoub.  His men, men under his control, were the ones who gave the fake PA police documents to the actual murder[er]s of the Ungars.  They're the ones who supervised the Tzurif gang, the actual gang that was involved in killing the Ungars.  We've asked to depose Tawiq Tarrari.  He gave money.  It's been proven and documented that he gave money and weapons for specific terrorist attacks during this period of time.  Mr. Al-Hindi has been accused and has documents of his same activities.  Mr. Boughati is a mastermind of a series of activities during this entire period of time.  Mr. Arafat, he is not just a person who happens to be a Palestinian Authority, but he himself has a direct hand in various forms of terrorism, and more specifically his signature itself was on a piece of paper indicating approval for the killing of Americans after the fact.  He rewarded Palestinian terrorists in the form of compensation, financial compensation, for killing Americans.

Tr. of 5/14/03 at 12-13.

69

While it is difficult to ignore the fact that the PA's refusal to participate in discovery may have deprived Plaintiffs of the very evidence which would demonstrate the validity of their claims, putting that fact aside, this factor neither favors nor disfavors the entry of default judgment as the court is unable to determine the meritoriousness of Plaintiffs' claims. Thus, of the six factors, five point to the granting of the First and Second Motions and one is neutral. Accordingly, I find that both motions should be granted against the PA, and I so recommend.

### E. Third Motion

The Palestinian Defendants did not answer the Amended Complaint following the denial of their motion to dismiss, and the clerk entered default against them on April 21, 2003. Accordingly, default judgment is sought against them pursuant to Fed. R. Civ. P. 55(b)(2) because of their failure to answer or otherwise defend.

### F. Law Applicable to Third Motion

It does not appear that the Court of Appeals for the First Circuit has articulated any specific factors which should be considered in determining whether to enter default judgment pursuant to Fed. R. Civ. P. 55(b)(2). The First Circuit has emphasized the importance of the notice requirement of the Rule. See United States v. $23,000 in United States Currency, 356 F.3d 157, 163 (1st Cir. 2004); Key Bank of Maine v. Tablecloth Textile Co., 74 F.3d 349, 355 (1st Cir. 1996)(describing as "grave error" failure to provide the requisite notice). The First Circuit has also observed that a "failure to file the requested memoranda or even explain the failure after months of delay, amounted to a failure under Fed. R. Civ. P. Rule 55(a) to 'otherwise defend' the suit," Alameda v. Sec'y of Health, Educ. & Welfare, 622 F.2d 1044, 1048 (1st Cir. 1980), which would justify the entry of

default judgment in the case of a private litigant.  Beyond these considerations, this Magistrate Judge has identified no other requirements mandated by First Circuit law.

The Court of Appeals for the Eighth Circuit has "noted generally that default judgment is appropriate if the conduct is willful, contumacious or intentional."  Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 857 (8th Cir. 1996).  This court determined in the prior section that the PA's conduct was willful, and the court previously made that same determination as to both the PA and the PLO regarding their failure to answer when it granted default.[52]  The Third Circuit has stated that "[d]epending on the record before the court, consideration of one or more of the Poulis[ v. State Farm Fire & Cas. Co., 747 F.2d 863, 868 (3rd Cir. 1984)] factors may be required ... when a party moves under Rule 55(b) for a default judgment as a sanction for a failure to plead or otherwise defend."  Anchorage Assocs. v. Virgin Island Bd. of Tax Review, 922 F.2d 168, 177 (3rd Cir.

---

[52] In the Memorandum and Order Granting Motion to Enter Default (Document #133) the court stated:

> Although the Palestinian Defendants assert that "their ability to litigate has been drastically compromised by the chaotic and volatile situation that has prevailed for some time in the Mid-East," Memorandum of Defendants Palestinian Authority and Palestin[e] Liberation Organization in Support of Objection to Plaintiffs' Motion to Enter Default Pursuant to Fed. R. Civ. P. 55(a) ("Palestinian Defendants' Mem.") at 1-2, it is clear that their failure to file an answer to Plaintiffs' Amended Complaint is the result of a deliberate choice and not due to an inability to file an answer.  The Palestinian Defendants acknowledge that "[t]he drafting and filing of an answer is within defendants' limited capacities ...."  Id. at 2.  Indeed, it would be almost impossible for them to contend otherwise given their extensive filings as reflected in the ... travel.

Id. at 6-7.

71

1990).

### G.  Application of Law to Third Motion

There is no question that the Palestinian Defendants received notice of the Third Motion.  They appeared at the August 22, 2003, hearing on that motion and submitted filings relative thereto.  The notice requirement has been satisfied.

Applying the <u>Poulis</u> factors which are applicable to a failure to defend situation results in a finding that the Third Motion should be granted.  The failure to answer the Amended Complaint is directly attributable to the Palestinian Defendants (and not to their counsel as evidenced by Mr. Clark's statement regarding his instructions, <u>see</u> Tr. of 4/1/03 hearing at 6).  The Palestinian Defendants have been given an abundance of time within which to answer the Amended Complaint.  Their failure to answer is willful.  Lastly, the merits of Plaintiffs' claim neither favor nor disfavor the granting of the motion. Accordingly, I recommend that the Third Motion be granted.

### VIII.  Liability

Plaintiffs' Amended Complaint adequately pleads the elements of liability under 18 U.S.C. § 2333, <u>see</u> Amended Complaint ¶¶ 38-51, and the Palestinian Defendants' default relieves Plaintiffs of proving these elements, <u>see</u> <u>Franco v. Selective Ins. Co.</u>, 184 F.3d 4, 9 n.3 (1st Cir. 1999)("A party who defaults is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated."); <u>Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, a P'ship v. Medfit Int'l, Inc.</u>, 982 F.2d 686, 693 (1st Cir. 1993)(noting "the maxim that an entry of a default against a defendant establishes the defendant's liability"); <u>Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.</u>, 771 F.2d 5, 13 (1st Cir. 1985)("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be

taken as true and each of its seven claims must be considered established as a matter of law."); Eisler v. Stritzler, 535 F.2d 148, 153 (1st Cir. 1976)("The default judgment on the well-pleaded allegations in plaintiffs' complaint established ... defendant's liability.").  Thus, the Palestinian Defendants' liability has been established, and the court now proceeds to consider damages.

## IX. Damages

18 U.S.C. § 2333(a) allows the estate of a United States national who is killed by an act of international terrorism and his or her survivors or heirs to recover threefold the damages they sustain and the cost of the suit, including attorney's fees. See 18 U.S.C. § 2333(a).

### A. "Survivors" and "Heirs"

For the same reasons stated in this Magistrate Judge's Report and Recommendation of July 3, 2003 (Document #183),[53]  I find that Dvir Ungar and Yishai Ungar, the sons of Yaron Ungar, are his "heirs," Report and Recommendation dated 7/3/03 (Document #183) at 31-32, and that Judith and Meir Ungar, Michal Cohen, Amichai Ungar, and Dafna Ungar are "survivors" of Yaron Ungar and are within the class of plaintiffs who may bring an action under the statute, id. at 32-37.

### B. Measure of Damages

Similarly, for the same reasons stated in the Report and Recommendation of 7/3/03, I find that § 2333(a) should be interpreted to allow for recovery of both pecuniary damages and also for non-economic damages, including loss of companionship, society, and mental anguish experienced by the victim's surviving family members, including his siblings.  See Report and

---

[53] See n.1.

Recommendation of 7/3/03 (Document #183) at 37-43.

### C. Evidence of Damages

At the August 22, 2003, hearing Mr. Strachman, counsel for Plaintiffs, stated that he had written to counsel for the Palestinian Defendants approximately three weeks earlier and offered to make the witnesses who had testified at the damages hearing which this Magistrate Judge had conducted on July 12 and 15, 2002, in connection with the Motion to Enter Default Judgment against Hamas (Document #38) available to be deposed or cross-examined either in Israel or the United States. See Tr. of 8/22/03 hearing at 6-7. Mr. Strachman stated that he had not received a reply to that letter, and, therefore, requested that the damages findings made by the court as a result of that hearing be applied to the Palestinian Defendants. See id. at 7-8. Subsequently, the court asked Mr. Clark about Plaintiffs' offer to have the witnesses from the damages hearing made available for deposition either in Israel or here. Mr. Clark responded that the Palestinian Defendants:

> did not participate in the hearing on default and damages for Hamas, and we do not intend to participate. Our instructions have been that we would not participate. We informed this court on April 1st [2003] that those were our instructions, and it['']s been reinforced a couple of time[s] .... [W]e do not seek to examine any of their witnesses if they appear and if they don't appear, because our instructions are that we should not participate in the proceedings until there has been a final decision on immunity.

Tr. of 8/22/03 hearing at 25-26.

Based on these facts, the court finds that the Palestinian Defendants have waived a hearing on damages. See KPS & Assocs. v. Designs by FMC, 318 F.3d 1, 21 (1st Cir. 2003)("In limited circumstances we have permitted district courts to dispense with a Rule 55(b)(2) hearing, even in the face of apparently

74

unliquidated claims."); <u>Ortiz-Gonzalez v. Fonovisa</u>, 277 F.3d 59, 63-64 (1st Cir. 2002)("Rule 55 grant[s] wide discretion to the district court ....  Discretion as to the judgment or the need for a hearing on damages is vested with the district court.); <u>Jones v. Winnepesaukee Realty</u>, 990 F.2d 1, 4 (1st Cir. 1993) (affirming a finding of damages following entry of default in tort action, made on basis of plaintiff's unchallenged testimony).  Accordingly, the court will apply the findings regarding damages which it made as to each Plaintiff based on the evidence presented at the July, 2002, hearing on the Motion to Enter Default Judgment against Hamas (Document #38) to the present Motions for Default Judgment.  <u>See</u> Report and Recommendation dated 7/3/03 (Document #183) at 43-60.

### D.  Treble Damages

18 U.S.C. § 2333(a) provides that plaintiffs "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).  After tripling, the amounts which I recommended be awarded to each plaintiff are shown below:

```
Estate of Yaron Ungar
       for lost earnings                    $1,432,158.00
       for pain and suffering of decedent   $1,500,000.00

Dvir Ungar (son)
       for loss of companionship, society,
         and guidance and mental anguish    $30,000,000.00
       for loss of parental services        $488,482.50[54]

Yishai Ungar (son)
       for loss of companionship, society,
         and guidance and mental anguish    $30,000,000.00
```

--------

[54] The amount designated for loss of parental services shall be paid to the legal guardians of Dvir Ungar.

for loss of parental services          $488,482.50[55]

Judith Ungar (mother)
     for loss of society and
          companionship and mental anguish     $15,000,000.00

Meir Ungar (father)
     for loss of society and
          companionship and mental anguish     $15,000,000.00

Michal Cohen (sister)
     for loss of society and
          companionship and mental anguish     $ 7,500,000.00

Amichai Ungar (brother)
     for loss of society and
          companionship and mental anguish     $ 7,500,000.00

Dafna Ungar (sister)
     for loss of society and
          companionship and mental anguish     $ 7,500,000.00

                         Total:     $116,409,123.00

### E.  Israeli Law Claims

The court finds that no additional damages are due for the claims pled under Israeli law as the injuries sustained by the Plaintiffs are the same and have already been addressed by the award recommended above.

### H.  Interest

Plaintiffs have requested that interest be awarded on the judgment from June 9, 1996.  See Plaintiffs' Mem. Third Motion at 10 (incorporating by reference their Damages Memorandum which requests such award at 25).  However, Judge Lagueux determined in Ungar III that prejudgment interest should not be added to damages awarded pursuant to 18 U.S.C. § 2333.  See Ungar III, 2004 WL 134034, at 2, 4-6.  Therefore, Plaintiffs' request for

---

[55] The amount designated for loss of parental services shall be paid to the legal guardians of Yishai Ungar.

76

prejudgment interest should be denied, and I so recommend.[56]

## X.  Attorney's Fees

Plaintiffs have submitted an Affidavit of Counsel Fees (Document #220), seeking $11,925.00 in attorney's fees for fifty-three hours of work.  See Affidavit of Counsel Fees ("Fees Aff."), Attachment (Statement of Fees in Connection with Defendants' Refusal to Provide Discovery ("Statement of Fees")) at 4.  The affidavit states that the attorney's fees are sought because of the Palestinian Defendants "refusal to comply with a series of court orders and the rules of procedure concerning several forms of discovery such as depositions, interrogatories, a request for production of documents, and a request for admissions."  Fees Aff. at 1.  While this Magistrate Judge is issuing a separate order awarding these fees to Plaintiffs as against the PA for their refusal to provide discovery, upon consideration there seems no reason why a recommendation for the award of such fees should also not be included in this Report and Recommendation, especially in view of the fact that Plaintiff's counsel has advised the court that "no affidavit of costs or attorney['']s fees other than the affidavit of August 18, 2003, has been or will be filed in respect to the pending motions for default judgment against the PA and PLO," Letter from Strachman to Martin, M.J., of 3/23/04 at 2.

Obviously, Plaintiffs are not entitled to collect the same fees twice, but, at least as to the PA, the award of attorney's fees is authorized both under Fed. R. Civ. P. 37(b)(2) for the PA's failure to comply with discovery ordered by the court and

---

[56] Whether prejudgment interest is authorized for any of the claims brought under Israeli law has not been addressed by Plaintiffs. The court declines to investigate a matter of foreign law unaided by counsel, particularly when it is not even certain that Plaintiffs contend that prejudgment interest is authorized for the Israeli claims.

also under 18 U.S.C. § 2333(a) as part of the judgment.  If Judge Lagueux or an appellate court determines that default judgment should not be granted against the PA, thereby negating the award of attorney's fees pursuant to 18 U.S.C. § 2333(a), the separate Order awarding attorney's fees to Plaintiffs as a sanction pursuant to Fed.R.Civ.P. 37(b)(2) for the PA's delaying and ultimately refusing to comply with discovery requests and orders may (and is intended by this Magistrate Judge to) provide a separate and independent basis for upholding the award of attorney's fees against the PA.

The court has reviewed the hours claimed and work performed as reflected in the Fees Aff. and finds that they are reasonable and necessary.  The court has also previously determined that an hourly rate of $225 per hour is reasonable for Plaintiff's counsel, who has ably represented Plaintiffs throughout these proceedings.  See Report and Recommendation of 7/3/03 at 62-63. Accordingly, I recommend that Plaintiffs be awarded $11,925.00 in attorney's fees as against the PA.

Although the court has determined that no sanction may be imposed on the PLO for alleged discovery violations, the Fees Aff. does reflect time expended by Plaintiffs' counsel opposing motions for reconsideration and for a protective order which were filed by both the PA and the PLO.  See Statement of Fees at 2-4. Specifically, the court identifies the time claimed on the following dates as attributable (or sufficiently related) to such filings or the obtaining of default so as to warrant the award of attorney's fees against the PLO pursuant to 18 U.S.C. § 2333(a): February 10, 11, and 17, 2003; March 12, 26, 27, 28, 30, and 31, 2003; April 1, 7, and 8 (half of the time on the latter two dates), 2003; May 13, 14, and 21, 2003; June 10 and 13, 2003; July 10, 14, 17, 29, and 30, 2003.  See id.  The hours identified total 28.20 hours.  Multiplying those hours by the $225 hourly

rate which the court has found appropriate for Plaintiff's counsel yields the amount of $6,345.00. Accordingly, the court recommends that Plaintiffs be awarded attorney's fees against the PLO in the amount of $6,345.00.

## XI. Summary

### A. First Motion

For the reasons expressed in Section VII., I recommend that the First Motion for Default Judgment be granted and that default judgment be entered against the PA in the amount stated in paragraph D below.

### B.   Second Motion

For the reasons expressed in Section VII., I recommend that the Second Motion for Default Judgment be granted in part and denied in part. Specifically, I recommend that it be granted to the extent that default judgment be entered against the PA but denied as to the PLO. The amount of default judgment to be entered against the PA is stated in paragraph D below.[57]

### C.   Third Motion

For the reasons expressed in Section VII. G., I recommend that the Third Motion for Default Judgment be granted and that default judgment be entered against both the PA and the PLO in the amounts indicated in paragraph D below.

### D.   Amount of Default Judgment

For the reasons expressed in Section IX, I recommend that damages be awarded to the following Plaintiffs in the amounts indicated: Estate of Yaron Ungar ($2,932,158.00); Dvir Ungar ($30,488,482.50); Yishai Ungar ($30,488,482.50); Judith Ungar ($15,000,000.00); Meir Ungar ($15,000,000.00); Michal Cohen ($7,500,000.00); Amichai Ungar ($7,500,000.00); and Dafna Ungar

---

[57] Although the court has recommended granting all three motions as to the PA, obviously only one default judgment can be entered.

($7,500,000.00).  I also recommend that Plaintiffs be awarded attorney's fees as against the PA in the amount of $11,925.00 and attorney's fees as against the PLO in the amount of $6,345.00. Because the Palestinian Defendants are jointly and severally liable to Plaintiffs for the damages awarded, <u>see</u> Amended Complaint ¶¶ 48, 62, 71, 82, the total amount of the recommended judgment against the PA, including attorney's fees, is $116,421,048.00, and the total amount of the recommended judgment against the PLO, including attorney's fees, is $116,415,468.00.

## XII. Conclusion

For the reasons stated above, I recommend that the Motions for Default Judgment be granted to the extent and as stated in Section XI above.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); D.R.I. Local R. 32.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


_____

David L. Martin
United States Magistrate Judge
March 31, 2004