UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE ESTATE OF YARON UNGAR, et al | ) | |
| v. | ) | C.A. No. 00-105L |
| THE PALESTINIAN AUTHORITY, et al | ) | |

**MEMORANDUM IN SUPPORT OF PALESTINIAN DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

**Preliminary Statement**

This memorandum is submitted in support of a motion by the defendants the Palestinian Authority (PA) and Palestine Liberation Organization (PLO) pursuant to Fed.R.Civ.P. 62, Fed.R.App.P. 8(a) and the All Writs Act, 28 U.S.C. sec. 1651(a), for an order in the exercise of the Court's discretion staying all proceedings for the enforcement of the default judgment entered against them herein on July 13, 2004, including issuance of any execution upon the judgment, pending defendants' appeal to the United States Court of Appeals for the First Circuit.

By this motion, defendants are seeking continuation of the present stay which Fed.R.Civ.P. 62(a) imposes for ten days after entry of the judgment, which will expire on Tuesday, July 27, 2004. If the Court denies such a stay, defendants request a brief stay that will allow them to apply to the Court of Appeals for an unsecured stay pending appeal pursuant to FRAP 8(a)(2).

**ARGUMENT**

**I. Issuance of the Stay Being Requested Is Warranted In The Exercise of the Court's Discretion.**

This Court has the discretion to grant the stay being requested. See J. Perez & Cia, Inc. v. United States, 578 F.Supp. 1318, 1320 (D. Puerto Rico), aff'd, 747 F.2d 813, 815 (1st Cir.



1984), noting that "federal courts have statutory or inherent power to stay judgments and orders pending appeal," as cited in Rivera-Perez v. Massachusetts General Hospital, 193 F.R.D. 43, 45 (D.P.R. 2000).  See also Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n, 636 F.2d 755, 760 (D.C. Cir. 1980) ruling that district courts have the power to issue unsecured stays in the exercise of their sound discretion and that Fed.R.Civ.P. 62(d) does not limit this power.  American Pharmaceutical Ass'n reasoned that since the Court of Appeals has the power to issue an unsecured stay under FRAP 8(a) without requiring the filing of a supersedeas bond, the requirement in FRAP 8(a) that an application for such a stay be made first to the district court would make little sense unless the district court also had the power to issue an unsecured stay.

An unsecured stay is especially appropriate and warranted in the exercise of the Court's discretion in this case for at least two reasons.

One, the judgment being appealed is a default judgment.  Defendants contend and hope to establish on appeal that the default was erroneously entered because, as is developed below, defendants were entitled to a final determination of their claims to immunity before being forced to proceed on the merits, which in this case took the form of orders to proceed with discovery and file an answer to the complaint.

Putting to one side the propriety of the entry of default, the default is important because it signifies that the complaint's allegations are unproven.  The Court has taken the position, with which defendants disagree, that defendants' default justifies applying a rule applicable to defaults generally which calls for allegations against a defaulting party to be taken as true.  The Court also based this result in part on its ruling that a Rule 12(b)(6) standard should be followed in deciding whether the definition of international terrorism in §2331(1) of the Anti-Terrorism Act of 1991 (the ATA) had been met.  Application of this rule in the present case is especially problematic because the complaint's allegations are so extreme and wide-ranging and because

the issues they raise are of considerable public importance affecting vital interests of national and international significance that are outside this case and transcend it. However, even if the allegations of the complaint must be taken as true, this is a legal fiction which should not control issuance of the stay defendants are here requesting. In other words, notwithstanding the legal fiction, defendants' claim for a stay is much stronger than it would be if plaintiffs had actually proven their allegations.

The second factor which makes this request for a stay special is that defendants' claim of statehood carries with it a claim for immunity from execution under FSIA §1609. This immunity from execution is independent of sovereign immunity. A foreign state is entitled to this immunity from execution even if for some reason sovereign immunity is unavailable to it, as for example might occur if one of the exceptions in §1605 applied to deprive the state of sovereign immunity. The policy considerations that underlie this immunity from execution as an immunity independent of sovereign immunity make a stay of execution pending appeal particularly appropriate in this case.

Thus issues of immunity and statehood under §1609, similar if not identical to the issues this case presents and that will be presented on appeal, will arise and require judicial resolution as enforcement steps taken by plaintiffs are met with claims of immunity from enforcement under §1609. See as an example of such a claim under §1609, International Ins. Co. v. Caja Nacional de Ahorro y Seguro, 293 F.3d 392 (7th Cir. 2002), a case cited on the earlier appeal in this case in the May 27, 2003 judgment of the Court of Appeals (copy attached as Exhibit 1). This multiplicity would be wasteful of judicial resources and otherwise undesirable and warrants a stay of enforcement proceedings pending appeal.

The elements to be considered in assessing a stay pending appeal are satisfied in the present case. They are (1) the likelihood the appeal will succeed on the merits, (2) irreparable

harm to the party seeking a stay if it is denied, (3) irreparable harm to those opposing the stay and (4) the public interest. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) citing Hilton v. Braunskill, 481 U.S. 770, 776-77 (1987). Success on the merits is a flexible concept, variously stated. See Weaver, supra ("likely to succeed on the merits") and Hilton, supra ("A strong showing of success on the merits"); see also Mohammed v. Reno, 309 F.3d 95, 100-02 (2d Cir. 2002) (collecting cases). The flexibility of the "success" standard depends on the other three of the four factors. See Weaver, supra, citing United Steelworkers of America v. Textron, Inc., 836 F.2d 6, 7 (1st Cir. 1987); see also "the approach expressed by the District of Columbia Circuit: 'The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors.' Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 182 U.S. App.D.C. 220, 559 F.2d 841, 843 (D.C. Cir. 1977)," as quoted with approval in Mohammed v. Reno, supra, at 101.

Defendants are threatened with irreparable injury, and vital public interests would be seriously jeopardized by a denial of a stay pending appeal. Denial of a stay would publicly negate defendants' immunity before the issue of immunity has been finally determined. There is no comparable threat to plaintiffs, or any public interest, if a stay is granted.

## II. There is a Compelling Likelihood That Defendants Will Succeed in Their Appeal.

### A. Default Judgment Was Erroneously Entered Against Defendants.

The basis for entry of the default judgment against defendants was their unwillingness to proceed on the merits when ordered to do so – to provide broad discovery on the merits and to file an answer to the complaint. In taking this position defendants repeatedly asserted that they were entitled to a final determination of their right to sovereign and governmental immunity, including appellate review, before being forced to bear the "burdens of litigation" that would have been involved in furnishing discovery on the merits and answering the complaint.

Defendants took this position openly, on the record in good faith, relying on In re Papandreou, 139 F.3d 247, 251 (D.C.Cir. 1998) and similar cases which they repeatedly cited to the Court, including Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 91 (D.C. Cir. 2002); Foremost-McKesson, Inc. v. The Islamic Republic of Iran, 905 F.2d 438, 443 (D.C. Cir. 1990); and Jungquist v. Sheikh Sultan Binkhalifa Al Nahyan, 115 F.3d 1020, 1025-27 (D.C. Cir. 1997).

Obtaining a final determination of their claims to sovereign and governmental immunity and obtaining the dismissal of this case and others pending against them under the ATA in U.S. Courts arising in the course of the Israeli-Palestinian conflict is of particular importance to defendants. Defendants are aware of six such actions, including this one. In the present action and in all but one of the ATA cases, plaintiffs are represented by the same attorneys.

The injuries on which all of these ATA cases are based were not sustained by American tourists visiting Israel or Palestine or by persons targeted as Americans. They were sustained by persons living in settlements in the occupied Palestinian territory or Israel who had chosen to lead lives indistinguishable from the lives of the Israelis in their communities in the midst of the ongoing Israeli-Palestinian conflict in which thousands of innocent civilians on both sides have been killed or wounded with little possibility of recompense. At a briefing of the U.N. Security Council on July 15, 2004, Terje Roed-Larsen, Special Coordinator for the Middle East Peace Process and Personal Representative of the Secretary-General, reported: "So far, since September 2000, 3,499 Palestinians and 949 Israelis have been killed. More than 34,300 Palestinians and 6,000 Israelis have been injured in the daily bloodshed." S/ PV. 5002, 15 July 2004. For the American legal system to award over $116 million against the PA and PLO for the death of one person in the conflict allegedly at the hands of Hamas is disruptive of efforts to achieve peace and reconciliation and disserves the overall interests of justice.

Asserting and upholding the statehood of Palestine in this case is of crucial importance to Palestinian self-determination. Conversely, for defendants to yield and litigate this case on the merits without insisting on their entitlement to a final determination of their immunity would be a destructive step backwards.

In its July 12, 2004 Order approving the Magistrate Judge's Report and Recommendation and awarding plaintiffs default judgments of over $116 million against each defendant, the Court once again rejected defendants' claim of entitlement to a final determination of their right to immunity. The Magistrate Judge's Report and Recommendation issued on March 31, 2004 ("R&R") similarly rejected this claim of defendants. See 2004 U.S. Dist. LEXIS 12824, at *45-46; Slip. Op. at 30-31. The R&R noted that in July 2003 the Magistrate Judge denied defendants' requests to delay consideration of the entry of default judgment until after the Court decided defendants' pending Rule 12(b)(1) motion. The Magistrate Judge did not wait. He proceeded with hearings on plaintiffs' motions for default judgment and ultimately issued his R&R on March 31, 2004, in advance of the Court's April 23, 2004 decision on the Rule 12(b)(1) motion.

The Court also ruled on July 12, 2004 that Papandreou "does not directly support the Defendant's argument" in part because there had been some discovery in Papandreou unlike the present case in which defendants refused to participate in discovery. The Court observed that defendants persisted in this refusal even after the Court had repeatedly rejected defendants' claims to immunity, and many issues had been decided against them, including several "alternate, non-merits routes to dismissal." The Court did not mention that the Magistrate Judge had denied defendants' request to postpone consideration of the entry of default judgment until the Court decided the pending Rule 12(b)(1) motion. The Court discussed Papandreou as though it were an isolated case. It is not. As defendants have consistently maintained, it is one case

among many that establish a well-settled precedent. The grounds on which the Court distinguished Papandreou and refused to follow it, even if they are a valid reading of Papandreou, which defendants dispute, would not be a sufficient basis for refusing to follow this well-settled precedent. The Court did not take issue with the rationale that underlies this precedent – that the denial of sovereign immunity under the FSIA satisfies the three requirements of the collateral order doctrine and that the denial of immunity is effectively unreviewable on appeal as would have been true in this case if defendants had yielded and proceeded on the merits. It bears repeating: "Sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to [illegible] See Jungquist, supra, 115 F.3d at 1025. The cases on which defendants [illegible] and Foremost-McKesson, as well as Papandreou unconditionally demon[illegible] claim of immunity is reason enough to delay discovery and the filing of ar[illegible] final determination of immunity.

The U.S. Court of Appeals for the District of Columbia recently adhered to these principles with remarkable alacrity in granting a petition for mandamus filed by Libya to obtain relief against discovery on the merits and the filing of an answer ordered by the District Court despite the pendency of an interlocutory appeal by Libya of the denial of its claim for immunity. The Court granted the mandamus petition the day after it was filed in a brief per curiam order which stated:

> ORDERED that any and all proceedings in district court related to the complaint filed in case No. 97-cv-0975, Price v. Socialist People's Libyan Arab Jamahirya, be stayed pending resolution of appeal No. 03-7095, Price v. Socialist People's Libyan Arab Jamahirya.

Per Curiam order filed on April 13, 2004, No. 04-7038. A copy of this order is filed herewith as Exhibit 2.

PRV_669482_1/DSHERMAN

This Court's ruling against defendants' claim of sovereign immunity did not justify forcing defendants to engage in discovery and file an answer to the complaint, which would have effectively destroyed the immunity being claimed and would have been unreviewable after final judgment, and then holding them in default before a final determination had been reached.

Plaintiffs have repeatedly argued that an interlocutory appeal should be unavailable to defendants to review a denial of their claim of sovereign immunity because the statehood of Palestine is itself disputed. This does not matter. The order denying defendants' immunity claims fully meets the requirements of the collateral order doctrine, and if the claim of immunity is upheld, this case would have to be dismissed for lack of subject matter jurisdiction on grounds of sovereign immunity. Plaintiffs might have a point if the disputed claim of statehood was frivolous. But Palestine's claim of statehood is substantial. It is being made by an actual functioning government seeking to protect and promote the welfare of millions of Palestinians. In defendants view the record amply establishes the statehood of Palestine, but even if the issue is ultimately decided against defendants, the question is close and the claim of statehood deserves to be taken seriously. Defendants should not be faulted and in effect punished, as the Court has done by holding them in default, for rightfully insisting on a final determination as to their immunity before allowing the immunity to be destroyed. Plaintiffs' demands for discovery and for an answer should have been held in abeyance until defendants claims to immunity were finally resolved.

The judgment of the Court of Appeals on the interlocutory appeal defendants filed in April 2003 provides support for defendants' claim that they are entitled to a final determination on the issue of immunity before addressing the merits and that they were wrongfully held in default. The judgment, issued on May 27, 2003 (Ex. 1). It refers to the "jurisdictional implications" of the immunity issue and suggested that defendants might "still be able to file a

fully supported Rule 12(b)(1) motion below." The judgment stated that it was being rendered "without prejudice to the appellants raising their sovereign immunity defense in a proper and timely manner," and expressly took no position on immunity: "We take no view as to the merits of that defense." Acting on the suggestion in the judgment, defendants filed such a fully supported Rule 12(b)(1) motion promptly on June 13, 2003. The motion presented full evidence on statehood and immunity. Defendants responded with additional evidence. This Court decided the motion in a published opinion on April 23, 2004, which its order of July 12 identifies as Ungar IV, 315 F.Supp.2d 164. The motion was decided on a record that was full, unlike the bare record in the prior appeal. Defendants, having raised and fully supported their sovereign immunity defense promptly by motion as suggested by the judgment of the Court of Appeals, were entitled to interlocutory appellate review and/or a final determination of the issue of immunity before being held in default for asserting that right. If the default judgment entered on July 13, 2004 is not vacated and the case dismissed for lack of subject matter jurisdiction or on some other dispositive ground, the judgment must be vacated solely on the ground that the entry of default was unwarranted.

## B. This Is Not An Ordinary Tort Case.

An overriding source of error in this case has been the Court's repeated insistence that this is an ordinary tort case. It is not. It is a case of alleged "international terrorism" that would not be in this Court if it were not such a case. It requires this Court to determine at the outset whether defendants acted with the requisite motivation and intent necessary for their alleged conduct to constitute "international terrorism" or support for international terrorism. The determination requires the defendants' alleged conduct to be evaluated in the context of the Israeli-Palestinian conflict.

The Court's view of this action as an ordinary tort case led it to minimize, if not ignore, the necessity for demonstrating international terrorism. It is also at the heart of erroneous analysis which led the Court to view the case as justiciable.

**C. Key Issues In This Case Are Nonjusticiable.**

Defendants are charged with responsibility for acts by Hamas, for furnishing support to Hamas and failing to stop attacks by Hamas, among other things. Defendants are not charged with any specific conduct relating to the death of Yaron Ungar. How can this Court adjudicate such issues? The perpetrators of the murder of the Ungars are alleged to be Hamas members. The District Court in Washington, D.C. in an action plaintiffs brought against Iran based on the death of the Ungars, questioned such membership and the confession plaintiffs relied upon. See Ungar v. Iran, 211 F.Supp.2d 91, 97 (D.D.C. 2002). But even if the killers were members of Hamas, how can this Court determine whether defendants had the ability to curb violence by Hamas? Hamas is a militant faction, with members and sympathizers located throughout Palestine with military branches. It has political and social programs and objectives. It is not controlled by defendants. Far from it. Hamas vies with defendants for the popular support of the Palestinian people, day to day in the streets and also at the polls. And if the Court is able to determine that defendants had the ability in terms of raw power to curb, prevent and/or punish violence by Hamas, would it have been feasible for defendants to do so? Defendants have consistently opposed violence by Hamas. What would the political consequences have been if defendants stepped up their efforts to stop or curb violence by Hamas? Surely defendants could not employ missile attacks to assassinate Hamas leaders as Israel has openly done in blatant disregard of international law. Answers to these questions would have to take into consideration that violence by Hamas is taking place against the backdrop of Israel's belligerent and oppressive occupation of the Palestinian territories and Israel's use of excessive military force against

Palestinians, continuously resulting in death and injury to innocent civilians, as well as other domineering and oppressive Israeli measures resulting in economic hardship and creating humanitarian crises for the Palestinian people. What actions would it have been feasible for defendants to take against Hamas without alienating the people or losing their essential support or undermining the morale and will of the people to persevere under Israeli oppression?

Other aspects of this case are also nonjusticiable.

For years, a dominant Palestinian motivation has been to bring Israel's illegal occupation of the Palestinian territories to an end. Palestinian actions taken for this purpose do not fit within the definition of international terrorism in 18 U.S.C. sec. 2331(1) that is an essential element of this Court's subject matter jurisdiction as well as the legal sufficiency of the civil cause of action plaintiffs are alleging under sec. 2333.

Moreover, the determination whether defendants' alleged actions in this case are within this definition and constitute international terrorism will require an examination of defendants' intent and motivation, and this in turn will require an assessment of the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza, and many other factors. Palestinian actions and the intent and motivation for them cannot be understood and evaluated for purposes of sec. 2331 without this context being taken into account.

In testimony at a Senate subcommittee hearing in 1990, a State Department deputy Legal Adviser pointed to the these difficulties

> S. 2465 defines an "act of terrorism" as an intentional tort committed for political ends. No other tort of which we are aware requires a demonstration of this motivation, or a ruling by our courts of motivation and intent that have such potential to embarrass other states or to interfere in the Executive Branch's ability to conduct foreign affairs...

Sen.Hrg. 101-1193, on S. 2465, 101st Cong., Second Session, Serial no. J-101-87, at pages 22-23.

Determining whether actions constitute terrorism requires rulings of unique difficulty of "motivation and intent... [with] potential to embarrass other states or to interfere in the Executive Branch's ability to conduct foreign affairs." These are hallmarks of nonjusticiability.

The context provided by the Israeli-Palestinian conflict would include many factors that govern the motivation and intent with which defendants allegedly acted. These would have to be judicially assessed to judge the feasibility of a Court's determining whether the activities plaintiffs allege constitute international terrorism. These factors include defendants' need to address and take into account the continuing oppression, poverty, malnutrition and humiliation of the Palestinian people, Israel's violation of the Palestinian people's human rights by excessive military force and other means, and relative popular support of the people from time to time for the Palestinian government, militant factions and violence –all of which are directly affected by Israel's oppressive and illegal conduct. U.N. reports submitted to the International Court of Justice at the Hague, established under the Charter of the United Nations, also known as the World Court, as part of the U.N.'s Dossier in support of the General Assembly's recent request for an advisory opinion on the legal consequences of the wall under construction by Israel on Palestinian land in the West Bank confirm that throughout the period covered by this case the intent and motivation with which defendants acted was constantly and powerfully affected by many aspects of the Israeli-Palestinian conflict, including violation of Palestinian human rights and the humanitarian crises suffered by the Palestinian people. Part III of the Dossier consists of four recent U.N. reports detailing these violation and crises. The U.N.'s Dossier is posted in full on the court's website, www.icj-cij.org, in a pdf file of 1164 pages. The four reports in Part III appear at pdf pages 389, 418, 446 and 461.

Defendants submit that the facts necessary to answer these questions are not susceptible to judicial ascertainment. Further, even if the facts bearing on defendants and Hamas and their actions and attitudes toward one another, the effect of Israeli excessive military force and oppressive measures upon the Palestinian people and the likely reactions of the Palestinian people to efforts by defendants to prevent and punish violence by Hamas and other militant factions under all the relevant facts and circumstances could somehow be ascertained, there are no judicial standards for formulating and adjudicating the issues they would present. The task would be especially problematic for a U.S. court. Even if this Court is correct in viewing this case as one committed to the judicial branch, the issues it presents are unmanageable and nonjusticiable. The adjudication would be especially problematic for a U.S. court. Even if this Court is correct in viewing this case as one committed to the judicial branch, the issues it presents are unmanageable and nonjusticiable.

**D.    The Court's Reasons For Rejecting Palestinian Statehood Were Erroneous as a Matter of Law; the Court Erred in Failing To Uphold Palestinian Statehood and Defendants Immunity.**

The FSIA does not define the term "foreign state." It provides only that the term "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b) [of 28 U.S.C. sec. 1603]." See Garb v. Republic of Poland, 207 F.Supp.2d 16, 34 (E.D.N.Y. 2002), vacated and remanded on other grounds, 72 Fed.Appx. 850, 2003 U.S. App. LEXIS 16112 (2d Cir. 2003). Nor does the ATA define the term.

The Court gave conclusive effect to Palestine's less than full U.N. membership as a basis for rejecting its statehood. See, Ungar v. PA, 228 F.Supp.2d 40, 49 (D.R.I. 2002) ("Close is simply not good enough."). This was mistaken for several reasons. The United States was a sovereign state though it had not joined the League of Nations, just as Switzerland among others was a sovereign state though for 50 years it did not join the United Nations. It is also mistaken

because Palestine's status at the United Nations is tantamount as a practical and legal matter to full membership, and the reasons why Palestine's full membership has been blocked are political and have nothing to do with the criteria by which statehood is measured. And most basically it is mistaken because statehood is not dependent on recognition. Restatement, sec. 202, comment b.

The very recent case before the World Court on the General Assembly's request for an advisory opinion on the legality of the wall under construction by Israel on Palestinian land in the West Bank powerfully confirms Palestine's sovereignty and statehood. The World Court's advisory opinion and several separate opinions were rendered on July 9, 2004. Palestine exercised the full prerogatives of a state in this case. It had a leading role in initiating the proceedings and in presenting facts and legal argument in extensive written submissions and in oral argument. The extensive materials filed with the Court by Palestine and by the United Nations, which filed a voluminous dossier, and filed by others provide a wide range of detailed facts from knowledgeable and authoritative official and other sources and in the aggregate strongly support Palestinian statehood and sovereignty. These materials merit careful study. They are all posted verbatim on the World Court's website, www.icj-cij.org.

The record amply establishes that Palestine meets the criteria of statehood set forth in the Restatement. It had the requisite territory, population and functioning government and engages in and has the ability to engage in foreign relations.

Palestine is not able to end the occupation by force, or, to date, by negotiation. It cannot prevent many oppressive Israeli measures, even the forced confinement of the PA's President to the rubble of the PA offices in Ramallah for over two years. It is often coerced into acceptance of conditions it opposes or would reject, many exacted by Israel in violation of international law controlling Israel as an occupying power. These conditions no doubt affected the language and substance of agreements reached, including the Oslo Accords. To the extent that the Oslo

Accords or other agreements conflict with the requirements of the Fourth Geneva Convention, the Convention prevails as a matter of international law. See, Imseis, "On the Fourth Geneva Convention and the Occupied Palestinian Territory," 44 Harv. Int'l. Law J. 65, 127.

Limitations and restrictions on the functioning of the Palestinian government under the Oslo Accords or otherwise, to which plaintiffs might point to argue that Palestine fails to meet the governance element or other aspects of the Restatement's definition of a state, are caused by the occupation and the oppressive and coercive conduct of Israel under the occupation and do not alter the statehood of Palestine. The Oslo Accords should not be taken as a decisive or even reliable indicia of circumstances bearing negatively on Palestine's statehood. The negotiations leading to the accords were to a considerable extent the product of Israel's coercive advantages over Palestine, and Israel repeatedly acted for the specific purpose of negating Palestinian statehood and obscuring the extent to which Palestine meets or would otherwise have met the Restatement's criteria for statehood.

The statehood of Palestine cannot be negated on the basis of limitations and restrictions upon the Palestinian government and the Palestinian people caused by occupation and repression as a matter of international law and fundamental fairness.

**E. The PA and PLO Are Part Of The State Of Palestine And Must Be So Recognized For Purposes Of The Foreign Sovereign Immunities Act and 18 U.S.C. sec. 2337(2).**

Defendants are entitled to the same immunity as Palestine. They constitute core structural elements and perform core functions of the government of Palestine as it now operates, crippled and compromised as it is by Israeli occupation. Accordingly, the PA and PLO must be recognized as part of the state of Palestine itself. Cf. Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994) (2-1), cert. denied, 513 U.S. 1150 (1995) (the armed

forces of a state must in all cases be considered as part of the foreign state itself); see Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (same with respect to the Iranian Ministry of Intelligence and Security (MOIS)); see also Regier v. Islamic Republic of Iran, 281 F.Supp.2d 87, n.10 at 100,102 (D.D.C.2003), following Roeder, holding MOIS must be considered part of Iran, against which punitive damages cannot be awarded under the FSIA, noting and declining to follow several District Courts in awarding punitive damages against MOIS, notwithstanding Roeder.

**Conclusion**

Defendants' motion for a stay pending appeal should be granted.

Dated: August 10, 2004

Deming E. Sherman (#1138)
Annemarie M. Carney (#3980)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
401-274-9200
401-276-6611 (FAX)

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
212-475-3232
212-979-1583 (FAX)

Attorneys for Defendants
The Palestinian Authority
and The PLO

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of August, 2004, I mailed a copy of the within Memorandum to David J. Strachman, Esq., McIntyre, Tate, Lynch and Holt, Suite 400, 321 South Main Street, Providence, RI 02903.

PRV_669482_1/DSHERMAN