- 18 -

Mr. AL-KIDWA:

### INTRODUCTORY STATEMENT

1. Mr. President, Members of the Court, it is my honour to address you on behalf of Palestine. I wish to thank the International Court of Justice for granting Palestine the opportunity to participate in these advisory proceedings on the *"Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory"*.

2. I stand before you as a representative of the Palestinian people, the indigenous people of the land, who for too long have been denied the right to self-determination and sovereignty over their land and half of whom remain refugees. The Palestinian people have been subject to a military occupation for almost 37 years. They have been dehumanized and demonized, humiliated and demeaned, dispossessed and dispersed, and brutally punished by their occupier. The occupation has systematically denied them their basic rights and freedoms and has controlled almost every single aspect of their lives.

3. This case, however, is not about the whole of the Israeli-Palestinian conflict — it is about the Wall. This Wall is being constructed almost entirely in the Occupied Palestinian Territory. This Wall is not about security: it is about entrenching the occupation and the *de facto* annexation of large areas of Palestinian land. This Wall, if completed, will leave the Palestinian people with only half of the West Bank within isolated, non-contiguous, walled enclaves. It will render the two-State solution to the Israeli-Palestinian conflict practically impossible.

4. The Wall is not just a physical structure; it is a whole régime. It encircles entire communities in walled enclaves and, if completed, will wall-in most of the Palestinian population. It is already causing the displacement of Palestinian civilians and has imprisoned thousands of Palestinians between it and the Armistice Line of 1949, the Green Line. There is, moreover, without a doubt, a correlation between the route of the Wall and the illegal Israeli settlements in the Occupied Palestinian Territory and the water resources in the area.

5. There is also, of course, a correlation between the route of the Wall and Israel's long-standing illegal policies and practices with regard to Jerusalem. East Jerusalem *is* occupied territory. The international community has never recognized Israel's illegal annexation of East Jerusalem. The route of the Wall will clearly entrench this annexation. It will compound the

- 19 -

humanitarian hardships being faced by the Palestinian inhabitants of the city. Moreover, it will isolate the city from the rest of the Palestinian population, obstructing their access to the city and its Holy Places.

6. We are here because the United Nations has a permanent responsibility — legally, politically and morally — for the question of Palestine until the question is resolved in all its aspects. The General Assembly has reaffirmed this in at least 25 resolutions. It is, after all, the General Assembly that, in accordance with the Charter of the United Nations, dealt with mandated Palestine, deciding on 29 November 1947, in resolution 181 (II), to partition Palestine into two States, one Jewish and one Arab. The Arab State has, of course, not yet been realized; and thus the Palestinian people have been unable to exercise their right to self-determination. Indeed, Palestine is still not a Member State of the United Nations, but remains an observer. Since 1947, however, the General Assembly has never ceased dealing with the question of Palestine or its aspects.

7. The Security Council has also continuously dealt with the question of Palestine. It first placed the "Situation in Palestine" on its agenda in 1948. The Council's attention to the matter increased after the Israeli occupation in 1967. Since then, the Council has adopted 38 resolutions addressing the situation in the Occupied Palestinian Territory, 26 of which recall the Fourth Geneva Convention, including its applicability to the territories occupied by Israel since 1967, including Jerusalem.

8. These resolutions, of course, remain valid. Israel has complied with almost none of them. The Council has, historically, failed in its responsibility for the maintenance of international peace and security in the case of Palestine. It has failed to follow up the implementation of its own resolutions and take the necessary measures to ensure compliance, and has failed to prevent the continuous and, at times, *massive* violations of international law and of the Charter itself. The basic reason has been the use, or the threat of use, of veto by one of the Council's Permanent Members. In the 30 years between 1973 and 2003, 27 vetoes have been cast on the Palestinian issue. The most recent was cast on 14 October 2003, when the issue of the construction of the Wall in the Occupied Palestinian Territory was brought before the Council and it failed to act.

9. Over the years, in light of the Council's inaction, the General Assembly has tried to discharge its own responsibilities in line with General Assembly resolution 377 (V) of 1950. Four

- 20 -

of its ten emergency special sessions have been on Palestine and the Middle East situation. In reaction to the last veto, the tenth emergency special session was resumed to consider the situation. Like the Security Council, the Assembly conducted a serious debate on the issue and two draft resolutions were submitted. One requested the International Court of Justice to issue an advisory opinion on the Wall. After intensive consultation and negotiations, however, the Members of the European Union introduced a draft resolution, with the understanding that the co-sponsors of the original two drafts would not insist on a vote on those drafts. The European Union co-sponsored draft resolution was adopted by an overwhelming majority, on 21 October 2003, as resolution ES-10/13.

10. Three specific elements of that resolution should be highlighted: First, it demanded *"that Israel stop and reverse the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem, which is in departure of the Armistice Line of 1949 and is in contradiction to relevant provisions of international law"*. Second, it requested the Secretary-General to report on compliance. And, third, it expressly stated that upon receipt of the first report *"further actions should be considered, if necessary, within the United Nations system"*. The wording of that third element reflected a compromise on the means of following up the issue, including the possibility of a request for an advisory opinion from this Court on the legal consequences in case of non-compliance. The phrase could not have meant anything other than a reference to the Court, and, regardless of the claim made in one Written Statement[1] of a different understanding, it is indisputable that the idea for requesting an advisory opinion was widely discussed and debated.

11. Following the resolution's adoption, Israel not only continued but accelerated its construction of the Wall on Palestinian territory. The Secretary-General, pursuant to the resolution, presented a report containing a clear factual presentation about the Wall. It concluded that *"Israel is not in compliance with the Assembly's demand that it stop and reverse the construction of the wall in the Occupied Palestinian Territory"*[2]. Accordingly, the emergency special session resumed again on 8 December 2003, and adopted by a large majority resolution ES-10/14 requesting this

---

[1] Written Statement of the United Kingdom of Great Britain and Northern Ireland.

[2] A/ES-10/248.

- 21 -

Court to urgently render an advisory opinion on the legal consequences arising from Israel's construction of the Wall.

12. Mr. President, Members of the Court, Israel's Written Statement to the Court claims that it does not deal with the merits of the case. We beg to differ. The Israeli statement is rife with attempts to justify the construction of the Wall through the presentation of a detailed case on terror attacks and through political arguments, including on the Road Map. Israel repeatedly refers to the Road Map and to Security Council resolution 1515 (2003). This is ironic. The Government of Israel has never wanted this Road Map, it has never wanted the Security Council's endorsement of it and has repeatedly caused the delay of both. After the Road Map was formally presented in April 2003, the Israeli Government would not say that it accepted the Road Map itself but only what it called *"the steps set out in the Roadmap"*. Even then, in accordance with the Israeli Cabinet Statement of 25 May 2003, 14 reservations were attached to it.

13. Israel later vehemently objected to the Russian Federation initiative to bring the Road Map to the Security Council for endorsement. When Security Council resolution 1515 (2003) was finally adopted on 19 November 2003, the Council held no debate. This was due to Israel's opposition. Then, on 17 December 2003, Israel undermined the traditional consensus on a General Assembly resolution on "Assistance to the Palestinian People" specifically because the European Union, co-sponsoring the resolution, added a paragraph welcoming the endorsement by the Council of the Road Map in resolution 1515. Israel made its adherence to consensus on that resolution conditional upon the removal of the reference to resolution 1515, which did not occur.

14. Mr. President, Members of the Court, there has been no shortage of peace initiatives on the Middle East and the Israeli-Palestinian conflict. Yet, since the adoption of Security Council resolution 242 (1967), and throughout every one of the subsequent initiatives, Israel has simultaneously been engaged in the intensive colonization of our land. It has transferred 400,000 illegal settlers to the Occupied Palestinian Territory, including East Jerusalem. It is continuously attempting to change the status, physical character, nature and demographic composition of that territory, most recently through its construction of the Wall. Actually, since the signing in 1993 of the Declaration of Principles between the Government of Israel and the Palestine Liberation Organization, Israel not only continued its illegal settlement activities and expansion but actually

- 22 -

doubled the number of its settlers in the Occupied Palestinian Territory, including East Jerusalem. Doubled. How can it be expected that the Palestinian people would continue to believe that peace was imminent under such circumstances?

15. The Road Map could be different; and we hope that it will be. It is rooted in the principles of resolution 242 (1967) and in the vision affirmed by the Security Council in resolution 1397 (2002) of *"a region where two States, Israel and Palestine, live side by side within secure and recognized borders"*. This initiative deserves a chance — we want it to succeed. But Israel cannot once again be permitted to continue its ceaseless taking of Palestinian property and rights, under the cover of the peace process or the semblance of a peace initiative. The legal rights of the Palestinian people cannot simply be ignored or suspended whenever there is a peace process under way. That plays into the hands of extremists on both sides. One of our chief hopes is that the Court will make it clear that the Palestinian people have rights and that international law is not irrelevant to the situation in the Occupied Palestinian Territory.

16. There is near unanimity among the States in the world that building this Wall is unacceptable. The overwhelming majority of Member States believe that it is in contradiction to international law. The same overwhelming majority believes, as one group, the European Union, has officially declared, that the Wall renders *"the two-State solution physically impossible"*. Saving the Road Map thus and the prospects for peace requires a cessation of the construction of this Wall, its removal and non-recognition by States of any of its consequences.

17. With regard to the Quartet, it has expressed its concerns about the Wall. Moreover, despite the implication in one Statement to the Court[3] that the members of the Quartet are in agreement that an advisory opinion would likely hinder the peace process, it should be clarified that there is no agreement among the Quartet with regard to asking the Court not to render the requested advisory opinion. The Statement of the Russian Federation does not ask the Court to refuse to give an opinion. The Statement of the United Nations does not do so. Nor does the European Union Statement. Ireland's Minister for Foreign Affairs affirmed this in the Irish Senate on 4 February 2004, stating that *"Contrary to some press reports, the EU has not asked the ICJ to refrain from issuing an Advisory Opinion. There would have been no consensus to adopt such a*

---

[3]Written Statement of the United Kingdom of Great Britain and Northern Ireland.

- 23 -

*position.* [4]    Indeed, we even doubt whether the Statement of the United States could be characterized as such.

18. Some States have said that an advisory opinion could harm the final status issues that should be left to the parties for negotiation. It is clearly Israeli actions in the Occupied Palestinian Territory, and not any Court opinion, that will constitute illegal facts on the ground in relation to final status issues. Nevertheless, we do agree that the Court is not being asked to advise on solutions for the final status, although it will undoubtedly be necessary to make some reference to final status issues due to the intricate relationship between the Wall and the settlements and the character and route of the Wall in and around East Jerusalem.

19. Mr. President, Members of the Court, I wish now to address the issue of the suicide bombings, the security situation and Israel's policies and practices in the Occupied Palestinian Territory. Israel claims that the construction of the Wall is a temporary defensive measure to prevent suicide bombings and provide security for Israel. This is not true, and the proof is simple. If this were in fact the case, then Israel would have constructed the Wall on its territory along the Armistice Line of 1949 and not in departure of the Armistice Line and almost entirely in the Occupied Palestinian Territory. If Israel wanted a Wall for security, it could construct it on its territory and raise it to 80 m rather than 8 m if it wished. This would not bode well for mutual coexistence of course, but no one would challenge its legality in principle.

20. The suicide bombings have led to the death of 438 Israelis in Israel. Four hundred and ninety Israelis, mostly soldiers and settlers, have also been killed by other kinds of violence. In contrast, since September 2000 and as of 18 February 2004, the Israeli occupying forces have directly killed, including many by extrajudicial execution, a total of 2,770 Palestinian civilians, including children, women and men. Of those killed, more than 1,200 Palestinians have been killed by the Israeli occupying forces in the Gaza Strip, even though Israel has already built another kind of wall surrounding the Gaza Strip. The question that must be asked is: how then will this Wall being built by Israel solve the security problem? If anything, its route and the illegal measures entailed in its construction ensure that it will actually exacerbate the security situation. It is more than obvious that when you deprive an entire people of their rights, expropriate their land

[4]Statement to Senate of Ireland, 4 February 2004; European Union Presidency (January–June 2004).

- 24 -

and property and wall them into enclaves and ghettos, you are not solving the security problem but creating an untenable situation that will combust.

21. At this time, I wish to make our position vis-à-vis the suicide bombings very clear. We have consistently, repeatedly and unequivocally condemned these bombings. We condemn any violence directed at civilians in this conflict, whether Israeli or Palestinian. We consider the suicide bombings to be unlawful. They are also harmful to the just and honourable cause of the Palestinian people.

22. That said, I draw attention to the fact that the first suicide bombing occurred nearly 27 years after the onset of this oppressive military occupation of the Palestinian people. This phenomenon is the result of Israeli policies and measures, including the relentless colonization of our land. It is not the cause of those policies and measures. It is also imperative that a distinction be made between such unlawful acts of violence against Israeli civilians in Israel and acts of Palestinian resistance to the Israeli occupation and to military attacks by the occupying forces, consistent with international law. Nevertheless, Palestine reaffirms its commitment to a peaceful, negotiated solution to end this occupation and end this conflict.

23. There is a humanitarian crisis in the Occupied Palestinian Territory. Serious violations and grave breaches of international humanitarian and human rights law are being committed. The Wall, part and parcel of these violations and breaches, is severely exacerbating this situation. How can the Road Map truly succeed under such circumstances? It cannot. How can Israel expect the Palestinian side to be able to act effectively when it has destroyed Palestinian security capabilities and has confined the leader of the Palestinian people and elected President of the Palestinian Authority, Yasser Arafat, for more than two years, undermining the leadership's ability to properly function? It cannot. How can Israel's construction of this Wall and its continued confiscation and colonization of the Palestinian land lead to peace and security for both peoples? It cannot.

24. The colonization by Israel of the Palestinian land under its occupation and the attempts to change its legal status are not new phenomena. What is new, however, is the magnitude of Israel's attempt to change the legal status and to effect the *de facto* annexation of large parts of the Occupied Territory by means of the Wall. The Wall will be the culmination of all previous illegal measures and practices carried out by Israel since 1967 towards that end. It will destroy the hopes

- 25 -

of the Palestinian people for the realization of their inalienable rights, including the right to self-determination, and destroy their faith in the rule of international law and the international community's ability to uphold it in the face of such grievous violations. It will destroy the hopes of the international community for implementation of the Road Map and the "two-State" solution of Israel and Palestine, both living side by side within secure and recognized boundaries. Such a lamentable outcome must be avoided at all costs.

25. Mr. President, Members of the Court, on behalf of Palestine, the Palestinian people and their leadership, I respectfully request the Court to give full consideration to the gravity of this situation and to the importance of an advisory opinion at this critical moment. In your most recent address before the General Assembly, Mr. President, you underlined the role of the Court as the *"guardian of international law"* and you assured the Assembly *"that the Court will pursue its efforts to respond to the hopes placed in it"*. The Palestinian people have great hopes for this proceeding and have full confidence that the Court will help the General Assembly to carry out its functions by rendering the advisory opinion. This would allow the Assembly to make its own substantial contribution in response to Israel's continued construction of the Wall and the ensuing threats to the prospects for peace between the two peoples. It is our firm belief that such an advisory opinion can lead to positive developments and perhaps even a chain of events similar to that resulting from the Court's Advisory Opinion on Namibia.

26. Mr. President, Members of the Court, our delegation now wishes to make a brief factual presentation of what we believe to be the minimum necessary to help clarify the legal submissions that will follow. It will be made by Ms Stephanie Koury. She will be followed by Professor James Crawford, who will address the question of admissibility of the request. He will be followed by Professor Georges Abi-Saab, addressing the question of the application of international humanitarian law and international human rights law in the Occupied Palestinian Territory, and then by Professor Vaughan Lowe, who will speak on the violations of those laws. Our submissions will be closed by Professor Jean Salmon, who will speak on the relation between the Road Map and the right of self-determination and on the legal consequences of the Wall.

Thank you, Mr. President. Thank you, Members of the Court.

The PRESIDENT: Thank you, Mr. Al-Kidwa. I now give the floor to Ms Stephanie Koury.