## INTERNATIONAL COURT OF JUSTICE

**YEAR 2004**

**9 July 2004**

2004
**9 July**
**General List**
**No. 131**

## LEGAL CONSEQUENCES OF THE CONSTRUCTION OF A WALL
## IN THE OCCUPIED PALESTINIAN TERRITORY

*Jurisdiction of the Court to give the advisory opinion requested.*

*Article 65, paragraph 1, of the Statute − Article 96, paragraph 1, of the Charter − Power of General Assembly to request advisory opinions − Activities of Assembly.*

*Events leading to the adoption of General Assembly resolution ES-10/14 requesting the advisory opinion.*

*Contention that General Assembly acted* ultra vires *under the Charter − Article 12, paragraph 1, and Article 24 of the Charter − United Nations practice concerning the interpretation of Article 12, paragraph 1, of Charter − General Assembly did not exceed its competence.*

*Request for opinion adopted by the Tenth Emergency Special Session of the General Assembly − Session convened pursuant to resolution 377 A (V) ("Uniting for Peace") − Conditions set by that resolution − Regularity of procedure followed.*

*Alleged lack of clarity of the terms of the question − Purportedly abstract nature of the question − Political aspects of the question − Motives said to have inspired the request and opinion's possible implications − "Legal" nature of question unaffected.*

*Court having jurisdiction to give advisory opinion requested.*

\*      \*

*Discretionary power of Court to decide whether it should give an opinion.*

*Article 65, paragraph 1, of Statute – Relevance of lack of consent of a State concerned – Question cannot be regarded only as a bilateral matter between Israel and Palestine but is directly of concern to the United Nations – Possible effects of opinion on a political, negotiated solution to the Israeli-Palestinian conflict – Question representing only one aspect of Israeli-Palestinian conflict – Sufficiency of information and evidence available to Court – Useful purpose of opinion –* Nullus commodum capere potest de sua injuria propria *– Opinion to be given to the General Assembly, not to a specific State or entity.*

*No "compelling reason" for Court to use its discretionary power not to give an advisory opinion.*

\*         \*

*"Legal consequences" of the construction of a wall in the Occupied Palestinian Territory, including in and around East Jerusalem – Scope of question posed – Request for opinion limited to the legal consequences of the construction of those parts of the wall situated in Occupied Palestinian Territory – Use of the term "wall".*

*Historical background.*

*Description of the wall.*

\*         \*

*Applicable law.*

*United Nations Charter – General Assembly resolution 2625 (XXV) – Illegality of any territorial acquisition resulting from the threat or use of force – Right of peoples to self-determination.*

*International humanitarian law – Regulations annexed to the Fourth Hague Convention of 1907 – Fourth Geneva Convention of 1949 – Applicability of Fourth Geneva Convention in the Occupied Palestinian Territory – Human rights law – International Covenant on Civil and Political Rights – International Covenant on Economic, Social and Cultural Rights – Convention on the Rights of the Child – Relationship between international humanitarian law and human rights law – Applicability of human rights instruments outside national territory – Applicability of those instruments in the Occupied Palestinian Territory.*

\*         \*

*Settlements established by Israel in breach of international law in the Occupied Palestinian Territory – Construction of the wall and its associated régime create a "fait accompli" on the ground that could well become permanent – Risk of situation tantamount to de facto annexation – Construction of the wall severely impedes the exercise by the Palestinian people of its right to self-determination and is therefore a breach of Israel's obligation to respect that right.*

*Applicable provisions of international humanitarian law and human rights instruments relevant to the present case – Destruction and requisition of properties – Restrictions on freedom of movement of inhabitants of the Occupied Palestinian Territory – Impediments to the exercise by those concerned of the right to work, to health, to education and to an adequate standard of living – Demographic changes in the Occupied Palestinian Territory – Provisions of international humanitarian law enabling account to be taken of military exigencies – Clauses in human rights instruments qualifying rights guaranteed or providing for derogation – Construction of the wall and its associated régime cannot be justified by military exigencies or by the requirements of national security or public order – Breach by Israel of various of its obligations under the applicable provisions of international humanitarian law and human rights instruments.*

*Self-defence – Article 51 of the Charter – Attacks against Israel not imputable to a foreign State – Threat invoked to justify the construction of the wall originating within a territory over which Israel exercises control – Article 51 not relevant in the present case.*

*State of necessity – Customary international law – Conditions – Construction of the wall not the only means to safeguard Israel's interests against the peril invoked.*

*Construction of the wall and its associated régime are contrary to international law.*

\*    \*

*Legal consequences of the violation by Israel of its obligations.*

*Israel's international responsibility – Israel obliged to comply with the international obligations it has breached by the construction of the wall – Israel obliged to put an end to the violation of its international obligations – Obligation to cease forthwith the works of construction of the wall, to dismantle it forthwith and to repeal or render ineffective forthwith the legislative and regulatory acts relating to its construction, save where relevant for compliance by Israel with its obligation to make reparation for the damage caused – Israel obliged to make reparation for the damage caused to all natural or legal persons affected by construction of the wall.*

INTERNATIONAL COURT ( JUSTICE

*Legal consequences for States other than Israel* – Erga omnes *character of certain obligations violated by Israel* – *Obligation for all States not to recognize the illegal situation resulting from construction of the wall and not to render aid or assistance in maintaining the situation created by such construction* – *Obligation for all States, while respecting the Charter and international law, to see to it that any impediment, resulting from the construction of the wall, to the exercise by the Palestinian people of its right to self-determination is brought to an end* – *Obligation for all States parties to the Fourth Geneva Convention, while respecting the Charter and international law, to ensure compliance by Israel with international humanitarian law as embodied in that Convention* – *Need for the United Nations, and especially the General Assembly and the Security Council, to consider what further action is required to bring to an end the illegal situation resulting from the construction of the wall and its associated régime, taking due account of the Advisory Opinion.*

\*    \*

*Construction of the wall must be placed in a more general context* – *Obligation of Israel and Palestine scrupulously to observe international humanitarian law* – *Implementation in good faith of all relevant Security Council resolutions, in particular resolutions 242 (1967) and 338 (1973)* – *"Roadmap"* – *Need for efforts to be encouraged with a view to achieving as soon as possible, on the basis of international law, a negotiated solution to the outstanding problems and the establishment of a Palestinian State, with peace and security for all in the region.*

## ADVISORY OPINION

*Present:*    *President* SHI;    *Vice-President* RANJEVA;    *Judges* GUILLAUME, KOROMA, VERESHCHETIN, HIGGINS, PARRA-ARANGUREN, KOOIJMANS, REZEK, AL-KHASAWNEH, BUERGENTHAL, ELARABY, OWADA, SIMMA, TOMKA;    *Registrar* COUVREUR.

On the legal consequences of the construction of a wall in the Occupied Palestinian Territory,

THE COURT,

Composed as above,

*Gives the following Advisory Opinion:*

1. The question on which the advisory opinion of the Court has been requested is set forth in resolution ES-10/14 adopted by the General Assembly of the United Nations (hereinafter the "General Assembly") on 8 December 2003 at its Tenth Emergency Special Session. By a letter dated 8 December 2003 and received in the Registry by facsimile on 10 December 2003, the original of which reached the Registry subsequently, the Secretary-General of the United Nations officially communicated to the Court the decision taken by the General Assembly to submit the question for an advisory opinion. Certified true copies of the English and French versions of resolution ES-10/14 were enclosed with the letter. The resolution reads as follows:

> *"The General Assembly,*
>
> *Reaffirming* its resolution ES-10/13 of 21 October 2003,
>
> *Guided* by the principles of the Charter of the United Nations,
>
> *Aware* of the established principle of international law on the inadmissibility of the acquisition of territory by force,
>
> *Aware also* that developing friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples is among the purposes and principles of the Charter of the United Nations,
>
> *Recalling* relevant General Assembly resolutions, including resolution 181 (II) of 29 November 1947, which partitioned mandated Palestine into two States, one Arab and one Jewish,
>
> *Recalling also* the resolutions of the tenth emergency special session of the General Assembly,
>
> *Recalling further* relevant Security Council resolutions, including resolutions 242 (1967) of 22 November 1967, 338 (1973) of 22 October 1973, 267 (1969) of 3 July 1969, 298 (1971) of 25 September 1971, 446 (1979) of 22 March 1979, 452 (1979) of 20 July 1979, 465 (1980) of 1 March 1980, 476 (1980) of 30 June 1980, 478 (1980) of 20 August 1980, 904 (1994) of 18 March 1994, 1073 (1996) of 28 September 1996, 1397 (2002) of 12 March 2002 and 1515 (2003) of 19 November 2003,
>
> *Reaffirming* the applicability of the Fourth Geneva Convention[1] as well as Additional Protocol I to the Geneva Conventions[2] to the Occupied Palestinian Territory, including East Jerusalem,
>
> *Recalling* the Regulations annexed to the Hague Convention Respecting the Laws and Customs of War on Land of 1907[3],

*Welcoming* the convening of the Conference of High Contracting Parties to the Fourth Geneva Convention on measures to enforce the Convention in the Occupied Palestinian Territory, including Jerusalem, at Geneva on 15 July 1999,

*Expressing its support* for the declaration adopted by the reconvened Conference of High Contracting Parties at Geneva on 5 December 2001,

*Recalling in particular* relevant United Nations resolutions affirming that Israeli settlements in the Occupied Palestinian Territory, including East Jerusalem, are illegal and an obstacle to peace and to economic and social development as well as those demanding the complete cessation of settlement activities,

*Recalling* relevant United Nations resolutions affirming that actions taken by Israel, the occupying Power, to change the status and demographic composition of Occupied East Jerusalem have no legal validity and are null and void,

*Noting* the agreements reached between the Government of Israel and the Palestine Liberation Organization in the context of the Middle East peace process,

*Gravely concerned* at the commencement and continuation of construction by Israel, the occupying Power, of a wall in the Occupied Palestinian Territory, including in and around East Jerusalem, which is in departure from the Armistice Line of 1949 (Green Line) and which has involved the confiscation and destruction of Palestinian land and resources, the disruption of the lives of thousands of protected civilians and the de facto annexation of large areas of territory, and underlining the unanimous opposition by the international community to the construction of that wall,

*Gravely concerned also* at the even more devastating impact of the projected parts of the wall on the Palestinian civilian population and on the prospects for solving the Palestinian-Israeli conflict and establishing peace in the region,

*Welcoming* the report of 8 September 2003 of the Special Rapporteur of the Commission on Human Rights on the situation of human rights in the Palestinian territories occupied by Israel since 1967[4], in particular the section regarding the wall,

*Affirming* the necessity of ending the conflict on the basis of the two-State solution of Israel and Palestine living side by side in peace and security based on the Armistice Line of 1949, in accordance with relevant Security Council and General Assembly resolutions,

*Having received with appreciation* the report of the Secretary-General, submitted in accordance with resolution ES-10/13[5],

*Bearing in mind* that the passage of time further compounds the difficulties on the ground, as Israel, the occupying Power, continues to refuse to comply with international law vis-à-vis its construction of the above-mentioned wall, with all its detrimental implications and consequences,

*Decides*, in accordance with Article 96 of the Charter of the United Nations, to request the International Court of Justice, pursuant to Article 65 of the Statute of the Court, to urgently render an advisory opinion on the following question:

> What are the legal consequences arising from the construction of the wall being built by Israel, the occupying Power, in the Occupied Palestinian Territory, including in and around East Jerusalem, as described in the report of the Secretary-General, considering the rules and principles of international law, including the Fourth Geneva Convention of 1949, and relevant Security Council and General Assembly resolutions?

---

[1] United Nations, *Treaty Series*, Vol. 75, No. 973.

[2] *Ibid.*, Vol. 1125, No. 17512.

[3] See Carnegie Endowment for International Peace, *The Hague Conventions and Declarations of 1899 and 1907* (New York, Oxford University Press, 1915).

[4] E/CN.4/2004/6.

[5] A/ES-10/248."

Also enclosed with the letter were the certified English and French texts of the report of the Secretary-General dated 24 November 2003, prepared pursuant to General Assembly resolution ES-10/13 (A/ES-10/248), to which resolution ES-10/14 makes reference.

2. By letters dated 10 December 2003, the Registrar notified the request for an advisory opinion to all States entitled to appear before the Court, in accordance with Article 66, paragraph 1, of the Statute.

3. By a letter dated 11 December 2003, the Government of Israel informed the Court of its position on the request for an advisory opinion and on the procedure to be followed.

4. By an Order of 19 December 2003, the Court decided that the United Nations and its Member States were likely, in accordance with Article 66, paragraph 2, of the Statute, to be able to furnish information on all aspects raised by the question submitted to the Court for an advisory opinion and fixed 30 January 2004 as the time-limit within which written statements might be submitted to it on the question in accordance with Article 66, paragraph 4, of the Statute. By the same Order, the Court further decided that, in the light of resolution ES-10/14 and the report of the Secretary-General transmitted with the request, and taking into account the fact that the General

Assembly had granted Palestine a special status of observer and that the latter was co-sponsor of the draft resolution requesting the advisory opinion, Palestine might also submit a written statement on the question within the above time-limit.

5. By the aforesaid Order, the Court also decided, in accordance with Article 105, paragraph 4, of the Rules of Court, to hold public hearings during which oral statements and comments might be presented to it by the United Nations and its Member States, regardless of whether or not they had submitted written statements, and fixed 23 February 2004 as the date for the opening of the said hearings. By the same Order, the Court decided that, for the reasons set out above (see paragraph 4), Palestine might also take part in the hearings. Lastly, it invited the United Nations and its Member States, as well as Palestine, to inform the Registry, by 13 February 2004 at the latest, if they were intending to take part in the above-mentioned hearings. By letters of 19 December 2004, the Registrar informed them of the Court's decisions and transmitted to them a copy of the Order.

6. Ruling on requests submitted subsequently by the League of Arab States and the Organization of the Islamic Conference, the Court decided, in accordance with Article 66 of its Statute, that those two international organizations were likely to be able to furnish information on the question submitted to the Court, and that consequently they might for that purpose submit written statements within the time-limit fixed by the Court in its Order of 19 December 2003 and take part in the hearings.

7. Pursuant to Article 65, paragraph 2, of the Statute, the Secretary-General of the United Nations communicated to the Court a dossier of documents likely to throw light upon the question.

8. By a reasoned Order of 30 January 2004 regarding its composition in the case, the Court decided that the matters brought to its attention by the Government of Israel in a letter of 31 December 2003, and in a confidential letter of 15 January 2004 addressed to the President pursuant to Article 34, paragraph 2, of the Rules of Court, were not such as to preclude Judge Elaraby from sitting in the case.

9. Within the time-limit fixed by the Court for that purpose, written statements were filed by, in order of their receipt: Guinea, Saudi Arabia, League of Arab States, Egypt, Cameroon, Russian Federation, Australia, Palestine, United Nations, Jordan, Kuwait, Lebanon, Canada, Syria, Switzerland, Israel, Yemen, United States of America, Morocco, Indonesia, Organization of the Islamic Conference, France, Italy, Sudan, South Africa, Germany, Japan, Norway, United Kingdom, Pakistan, Czech Republic, Greece, Ireland on its own behalf, Ireland on behalf of the European Union, Cyprus, Brazil, Namibia, Malta, Malaysia, Netherlands, Cuba, Sweden, Spain, Belgium, Palau, Federated States of Micronesia, Marshall Islands, Senegal, Democratic People's Republic of Korea. Upon receipt of those statements, the Registrar transmitted copies thereof to the United Nations and its Member States, to Palestine, to the League of Arab States and to the Organization of the Islamic Conference.

INTERNATIONAL COURT OF JUSTICE                                    Page 9 of 65

10. Various communications were addressed to these latter by the Registry, concerning in particular the measures taken for the organization of the oral proceedings. By communications of 20 February 2004, the Registry transmitted a detailed timetable of the hearings to those of the latter who, within the time-limit fixed for that purpose by the Court, had expressed their intention of taking part in the aforementioned proceedings.

11. Pursuant to Article 106 of the Rules of Court, the Court decided to make the written statements accessible to the public, with effect from the opening of the oral proceedings.

12. In the course of hearings held from 23 to 25 February 2004, the Court heard oral statements, in the following order, by:

*For Palestine:*     H.E. Mr. Nasser Al-Kidwa, Ambassador, Permanent Observer of Palestine to the United Nations,

          Ms Stephanie Koury, Member, Negotiations Support Unit, Counsel,

          Mr. James Crawford, S.C., Whewell Professor of International Law, University of Cambridge, Member of the Institute of International Law, Counsel and Advocate,

          Mr. Georges Abi-Saab, Professor of International Law, Graduate Institute of International Studies, Geneva, Member of the Institute of International Law, Counsel and Advocate,

          Mr. Vaughan Lowe, Chichele Professor of International Law, University of Oxford, Counsel and Advocate,

          Mr. Jean Salmon, Professor Emeritus of International Law, Université libre de Bruxelles, Member of the Institute of International Law, Counsel and Advocate;

*For the Republic of South Africa:* H.E. Mr. Aziz Pahad, Deputy Minister for Foreign Affairs, Head of Delegation,

          Judge M. R. W. Madlanga, S.C.;

*For the People's Democratic Republic of Algeria:* Mr. Ahmed Laraba, Professor of International Law;

*For the Kingdom of Saudi Arabia:* H.E. Mr. Fawzi A. Shobokshi, Ambassador and Permanent Representative of the Kingdom of Saudi Arabia to the United Nations in New York, Head of Delegation;

| | |
|---|---|
| *For the People's Republic of Bangladesh:* Netherlands; | H.E. Mr. Liaquat Ali Choudhury, Ambassador of the People's Republic of Bangladesh to the Kingdom of the |
| *For Belize:* | Mr. Jean-Marc Sorel, Professor at the University of Paris I (Panthéon-Sorbonne); |
| *For the Republic of Cuba:* | H.E. Mr. Abelardo Moreno Fernández, Deputy Minister for Foreign Affairs; |
| *For the Republic of Indonesia:* | H.E. Mr. Mohammad Jusuf, Ambassador of the Republic of Indonesia to the Kingdom of the Netherlands, Head of Delegation; |
| *For the Hashemite Kingdom of Jordan:* Jordan to the United Nations, New York, Head of | H.R.H. Ambassador Zeid Ra'ad Zeid Al-Hussein, Permanent Representative of the Hashemite Kingdom of            Delegation, |
| | Sir Arthur Watts, K.C.M.G., Q.C., Senior Legal Adviser to the Government of the Hashemite Kingdom of Jordan; |
| *For the Republic of Madagascar:* | H.E. Mr. Alfred Rambeloson, Permanent Representative of Madagascar to the Office of the United Nations at Geneva and to the Specialized Agencies, Head of Delegation; |
| *For Malaysia:* | H.E. Datuk Seri Syed Hamid Albar, Foreign Minister of Malaysia, Head of Delegation; |
| *For the Republic of Senegal:* | H.E. Mr. Saliou Cissé, Ambassador of the Republic of Senegal to the Kingdom of the Netherlands, Head of Delegation; |
| *For the Republic of the Sudan:* | H.E. Mr. Abuelgasim A. Idris, Ambassador of the Republic of the Sudan to the Kingdom of the Netherlands; |
| *For the League of Arab States:* | Mr. Michael Bothe, Professor of Law, Head of the Legal Team; |
| *For the Organization of the Islamic Conference:* | H.E. Mr. Abdelouahed Belkeziz, Secretary General of the Organization of the Islamic Conference, |
| | Ms Monique Chemillier-Gendreau, Professor of Public Law, University of Paris VII-Denis Diderot, as Counsel. |

\*

\*    \*

13. When seised of a request for an advisory opinion, the Court must first consider whether it has jurisdiction to give the opinion requested and whether, should the answer be in the affirmative, there is any reason why it should decline to exercise any such jurisdiction (see *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (I)*, p. 232, para. 10).

\*    \*

14. The Court will thus first address the question whether it possesses jurisdiction to give the advisory opinion requested by the General Assembly on 8 December 2003. The competence of the Court in this regard is based on Article 65, paragraph 1, of its Statute, according to which the Court "may give an advisory opinion on any legal question at the request of whatever body may be authorized by or in accordance with the Charter of the United Nations to make such a request". The Court has already had occasion to indicate that:

> "It is . . . a precondition of the Court's competence that the advisory opinion be requested by an organ duly authorized to seek it under the Charter, that it be requested on a legal question, and that, except in the case of the General Assembly or the Security Council, that question should be one arising within the scope of the activities of the requesting organ." (*Application for Review of Judgement No. 273 of the United Nations Administrative Tribunal, Advisory Opinion, I.C.J. Reports 1982,* pp. 333-334, para. 21.)

15. It is for the Court to satisfy itself that the request for an advisory opinion comes from an organ or agency having competence to make it. In the present instance, the Court notes that the General Assembly, which seeks the advisory opinion, is authorized to do so by Article 96, paragraph 1, of the Charter, which provides: "The General Assembly or the Security Council may request the International Court of Justice to give an advisory opinion on any legal question."

16. Although the above-mentioned provision states that the General Assembly may seek an advisory opinion "on any legal question", the Court has sometimes in the past given certain indications as to the relationship between the question the subject of a request for an advisory opinion and the activities of the General Assembly (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, I.C.J. Reports 1950,* p. 70; *Legality of the Threat or Use of Nuclear Weapons, I.C.J. Reports 1996 (I),* pp. 232 and 233, paras. 11 and 12).

17. The Court will so proceed in the present case. The Court would observe that Article 10 of the Charter has conferred upon the General Assembly a competence relating to "any questions or any matters" within the scope of the Charter, and that Article 11, paragraph 2, has specifically provided it with competence on "questions relating to the maintenance of international peace and security brought before it by any Member of the United Nations . . ." and to make recommendations under certain conditions fixed by those Articles. As will be explained below, the question of the construction of the wall in the Occupied Palestinian Territory was brought before

the General Assembly by a number of Member States in the context of the Tenth Emergency Special
Session of the Assembly, convened to deal with what the Assembly, in its resolution ES-10/2 of
25 April 1997, considered to constitute a threat to international peace and security.

*

18. Before further examining the problems of jurisdiction that have been raised in the present
proceedings, the Court considers it necessary to describe the events that led to the adoption of
resolution ES-10/14, by which the General Assembly requested an advisory opinion on the legal
consequences of the construction of the wall in the Occupied Palestinian Territory.

19. The Tenth Emergency Special Session of the General Assembly, at which that resolution
was adopted, was first convened following the rejection by the Security Council, on 7 March and
21 March 1997, as a result of negative votes by a permanent member, of two draft resolutions
concerning certain Israeli settlements in the Occupied Palestinian Territory (see, respectively,
S/1997/199 and S/PV.3747, and S/1997/241 and S/PV.3756). By a letter of 31 March 1997, the
Chairman of the Arab Group then requested "that an emergency special session of the General
Assembly be convened pursuant to resolution 377 A (V) entitled 'Uniting for Peace'" with a view to
discussing "Illegal Israeli actions in occupied East Jerusalem and the rest of the Occupied Palestinian
Territory" (letter dated 31 March 1997 from the Permanent Representative of Qatar to the United
Nations addressed to the Secretary-General, A/ES-10/1, 22 April 1997, Annex). The majority of
Members of the United Nations having concurred in this request, the first meeting of the Tenth
Emergency Special Session of the General Assembly took place on 24 April 1997 (see A/ES-10/1,
22 April 1997). Resolution ES-10/2 was adopted the following day; the General Assembly thereby
expressed its conviction that:

> "the repeated violation by Israel, the occupying Power, of international law and its
> failure to comply with relevant Security Council and General Assembly resolutions and
> the agreements reached between the parties undermine the Middle East peace process
> and constitute a threat to international peace and security",

and condemned the "illegal Israeli actions" in occupied East Jerusalem and the rest of the Occupied
Palestinian Territory, in particular the construction of settlements in that territory. The Tenth
Emergency Special Session was then adjourned temporarily and has since been reconvened 11 times
(on    15 July 1997,    13 November 1997,    17 March 1998,    5 February 1999,    18 October 2000,
20 December 2001,    7 May 2002,    5 August 2002,    19 September 2003,    20 October 2003    and
8 December 2003).

20. By a letter dated 9 October 2003, the Chairman of the Arab Group, on behalf of the States Members of the League of Arab States, requested an immediate meeting of the Security Council to consider the "grave and ongoing Israeli violations of international law, including international humanitarian law, and to take the necessary measures in this regard" (letter of 9 October 2003 from the Permanent Representative of the Syrian Arab Republic to the United Nations to the President of the Security Council, S/2003/973, 9 October 2003). This letter was accompanied by a draft resolution for consideration by the Council, which condemned as illegal the construction by Israel of a wall in the Occupied Palestinian Territory departing from the Armistice Line of 1949. The Security Council held its 4841st and 4842nd meetings on 14 October 2003 to consider the item entitled "The situation in the Middle East, including the Palestine question". It then had before it another draft resolution proposed on the same day by Guinea, Malaysia, Pakistan and the Syrian Arab Republic, which also condemned the construction of the wall. This latter draft resolution was put to a vote after an open debate and was not adopted owing to the negative vote of a permanent member of the Council (S/PV.4841 and S/PV.4842).

On 15 October 2003, the Chairman of the Arab Group, on behalf of the States Members of the League of Arab States, requested the resumption of the Tenth Emergency Special Session of the General Assembly to consider the item of "Illegal Israeli actions in Occupied East Jerusalem and the rest of the Occupied Palestinian Territory" (A/ES-10/242); this request was supported by the Non-Aligned Movement (A/ES-10/243) and the Organization of the Islamic Conference Group at the United Nations (A/ES-10/244). The Tenth Emergency Special Session resumed its work on 20 October 2003.

21. On 27 October 2003, the General Assembly adopted resolution ES-10/13, by which it demanded that "Israel stop and reverse the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem, which is in departure of the Armistice Line of 1949 and is in contradiction to relevant provisions of international law" (para. 1). In paragraph 3, the Assembly requested the Secretary-General "to report on compliance with the . . . resolution periodically, with the first report on compliance with paragraph 1 [of that resolution] to be submitted within one month . . .". The Tenth Emergency Special Session was temporarily adjourned and, on 24 November 2003, the report of the Secretary-General prepared pursuant to General Assembly resolution ES-10/13 (hereinafter the "report of the Secretary-General") was issued (A/ES-10/248).

22. Meanwhile, on 19 November 2003, the Security Council adopted resolution 1515 (2003), by which it "*Endorse[d]* the Quartet Performance-based Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict". The Quartet consists of representatives of the United States of America, the European Union, the Russian Federation and the United Nations. That resolution

"*Call[ed] on* the parties to fulfil their obligations under the Roadmap in cooperation with the Quartet and to achieve the vision of two States living side by side in peace and security."

Neither the "Roadmap" nor resolution 1515 (2003) contained any specific provision concerning the construction of the wall, which was not discussed by the Security Council in this context.

23. Nineteen days later, on 8 December 2003, the Tenth Emergency Special Session of the General Assembly again resumed its work, following a new request by the Chairman of the Arab Group, on behalf of the States Members of the League of Arab States, and pursuant to resolution ES-10/13 (letter dated 1 December 2003 to the President of the General Assembly from the Chargé d'affaires a.i. of the Permanent Mission of Kuwait to the United Nations, A/ES-10/249, 2 December 2003). It was during the meeting convened on that day that resolution ES-10/14 requesting the present Advisory Opinion was adopted.

*

24. Having thus recalled the sequence of events that led to the adoption of resolution ES-10/14, the Court will now turn to the questions of jurisdiction that have been raised in the present proceedings. First, Israel has alleged that, given the active engagement of the Security Council with the situation in the Middle East, including the Palestinian question, the General Assembly acted *ultra vires* under the Charter when it requested an advisory opinion on the legal consequences of the construction of the wall in the Occupied Palestinian Territory.

25. The Court has already indicated that the subject of the present request for an advisory opinion falls within the competence of the General Assembly under the Charter (see paragraphs 15-17 above). However, Article 12, paragraph 1, of the Charter provides that:

"While the Security Council is exercising in respect of any dispute or situation the functions assigned to it in the present Charter, the General Assembly shall not make any recommendation with regard to that dispute or situation unless the Security Council so requests."

A request for an advisory opinion is not in itself a "recommendation" by the General Assembly "with regard to [a] dispute or situation". It has however been argued in this case that the adoption by the General Assembly of resolution ES-10/14 was *ultra vires* as not in accordance with Article 12. The Court thus considers that it is appropriate for it to examine the significance of that Article, having regard to the relevant texts and the practice of the United Nations.

26. Under Article 24 of the Charter the Security Council has "primary responsibility for the maintenance of international peace and security". In that regard it can impose on States "an explicit obligation of compliance if for example it issues an order or command . . . under Chapter VII" and can, to that end, "require enforcement by coercive action" (*Certain Expenses of*

*the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion of 20 July 1962, I.C.J. Reports 1962*, p. 163). However, the Court would emphasize that Article 24 refers to a primary, but not necessarily exclusive, competence. The General Assembly does have the power, *inter alia*, under Article 14 of the Charter, to "recommend measures for the peaceful adjustment" of various situations (*Certain Expenses of the United Nations, ibid.*, p. 163). "[T]he only limitation which Article 14 imposes on the General Assembly is the restriction found in Article 12, namely, that the Assembly should not recommend measures while the Security Council is dealing with the same matter unless the Council requests it to do so." *(Ibid.)*.

    27. As regards the practice of the United Nations, both the General Assembly and the Security Council initially interpreted and applied Article 12 to the effect that the Assembly could not make a recommendation on a question concerning the maintenance of international peace and security while the matter remained on the Council's agenda. Thus the Assembly during its fourth session refused to recommend certain measures on the question of Indonesia, on the ground, *inter alia*, that the Council remained seised of the matter (*Official Records of the General Assembly, Fourth Session,* Ad Hoc *Political Committee, Summary Records of Meetings, 27 September-7 December 1949*, 56th Meeting, 3 December 1949, p. 339, para. 118). As for the Council, on a number of occasions it deleted items from its agenda in order to enable the Assembly to deliberate on them (for example, in respect of the Spanish question (*Official Records of the Security Council, First Year: Second Series, No. 21*, 79th Meeting, 4 November 1946, p. 498), in connection with incidents on the Greek border (*Official Records of the Security Council, Second Year, No. 89*, 202nd Meeting, 15 September 1947, pp. 2404-2405) and in regard to the Island of Taiwan (Formosa) (*Official Records of the Security Council, Fifth Year, No. 48*, 506th Meeting, 29 September 1950, p. 5)). In the case of the Republic of Korea, the Council decided on 31 January 1951 to remove the relevant item from the list of matters of which it was seised in order to enable the Assembly to deliberate on the matter (*Official Records of the Security Council, Sixth Year*, S/PV.531, 531st Meeting, 31 January 1951, pp. 11-12, para. 57).

    However, this interpretation of Article 12 has evolved subsequently. Thus the General Assembly deemed itself entitled in 1961 to adopt recommendations in the matter of the Congo (resolutions 1955 (XV) and 1600 (XVI)) and in 1963 in respect of the Portuguese colonies (resolution 1913 (XVIII)) while those cases still appeared on the Council's agenda, without the Council having adopted any recent resolution concerning them. In response to a question posed by Peru during the Twenty-third session of the General Assembly, the Legal Counsel of the United Nations confirmed that the Assembly interpreted the words "is exercising the functions" in Article 12 of the Charter as meaning "is exercising the functions at this moment" (Twenty-third General Assembly, Third Committee, 1637th meeting, A/C.3/SR.1637, para. 9). Indeed, the Court notes that there has been an increasing tendency over time for the General Assembly and the Security Council to deal in parallel with the same matter concerning the maintenance of international peace and security (see, for example, the matters involving Cyprus, South Africa, Angola, Southern Rhodesia and more recently Bosnia and Herzegovina and Somalia). It is often the case that, while the Security Council has tended to focus on the aspects of such matters related to international peace and security, the General Assembly has taken a broader view, considering also their humanitarian, social and economic aspects.

28. The Court considers that the accepted practice of the General Assembly, as it has evolved, is consistent with Article 12, paragraph 1, of the Charter.

The Court is accordingly of the view that the General Assembly, in adopting resolution ES-10/14, seeking an advisory opinion from the Court, did not contravene the provisions of Article 12, paragraph 1, of the Charter. The Court concludes that by submitting that request the General Assembly did not exceed its competence.

29. It has however been contended before the Court that the present request for an advisory opinion did not fulfil the essential conditions set by resolution 377 A (V), under which the Tenth Emergency Special Session was convened and has continued to act. In this regard, it has been said, first, that "The Security Council was never seised of a draft resolution proposing that the Council itself should request an advisory opinion from the Court on the matters now in contention", and, that specific issue having thus never been brought before the Council, the General Assembly could not rely on any inaction by the Council to make such a request. Secondly, it has been claimed that, in adopting resolution 1515 (2003), which endorsed the "Roadmap", before the adoption by the General Assembly of resolution ES-10/14, the Security Council continued to exercise its responsibility for the maintenance of international peace and security and that, as a result, the General Assembly was not entitled to act in its place. The validity of the procedure followed by the Tenth Emergency Special Session, especially the Session's "rolling character" and the fact that its meeting was convened to deliberate on the request for the advisory opinion at the same time as the General Assembly was meeting in regular session, has also been questioned.

30. The Court would recall that resolution 377 A (V) states that:

"if the Security Council, because of lack of unanimity of the permanent members, fails to exercise its primary responsibility for the maintenance of international peace and security in any case where there appears to be a threat to the peace, breach of the peace, or act of aggression, the General Assembly shall consider the matter immediately with a view to making appropriate recommendations to Members for collective measures . . ."

The procedure provided for by that resolution is premised on two conditions, namely that the Council has failed to exercise its primary responsibility for the maintenance of international peace and security as a result of a negative vote of one or more permanent members, and that the situation is one in which there appears to be a threat to the peace, breach of the peace, or act of aggression. The Court must accordingly ascertain whether these conditions were fulfilled as regards the convening of the Tenth Emergency Special Session of the General Assembly, in particular at the time when the Assembly decided to request an advisory opinion from the Court.

31. In the light of the sequence of events described in paragraphs 18 to 23 above, the Court observes that, at the time when the Tenth Emergency Special Session was convened in 1997, the Council had been unable to take a decision on the case of certain Israeli settlements in the

Occupied Palestinian Territory, due to negative votes of a permanent member; and that, as indicated in resolution ES-10/2 (see paragraph 19 above), there existed a threat to international peace and security.

The Court further notes that, on 20 October 2003, the Tenth Emergency Special Session of the General Assembly was reconvened on the same basis as in 1997 (see the statements by the representatives of Palestine and Israel, A/ES-10/PV.21, pp. 2 and 5), after the rejection by the Security Council, on 14 October 2003, again as a result of the negative vote of a permanent member, of a draft resolution concerning the construction by Israel of the wall in the Occupied Palestinian Territory. The Court considers that the Security Council again failed to act as contemplated in resolution 377 A (V). It does not appear to the Court that the situation in this regard changed between 20 October 2003 and 8 December 2003, since the Council neither discussed the construction of the wall nor adopted any resolution in that connection. Thus, the Court is of the view that, up to 8 December 2003, the Council had not reconsidered the negative vote of 14 October 2003. It follows that, during that period, the Tenth Emergency Special Session was duly reconvened and could properly be seised, under resolution 377 A (V), of the matter now before the Court.

32. The Court would also emphasize that, in the course of this Emergency Special Session, the General Assembly could adopt any resolution falling within the subject-matter for which the Session had been convened, and otherwise within its powers, including a resolution seeking the Court's opinion. It is irrelevant in that regard that no proposal had been made to the Security Council to request such an opinion.

33. Turning now to alleged further procedural irregularities of the Tenth Emergency Special Session, the Court does not consider that the "rolling" character of that Session, namely the fact of its having been convened in April 1997 and reconvened 11 times since then, has any relevance with regard to the validity of the request by the General Assembly. The Court observes in that regard that the Seventh Emergency Special Session of the General Assembly, having been convened on 22 July 1980, was subsequently reconvened four times (on 20 April 1982, 25 June 1982, 16 August 1982 and 24 September 1982), and that the validity of resolutions or decisions of the Assembly adopted under such circumstances was never disputed. Nor has the validity of any previous resolutions adopted during the Tenth Emergency Special Session been challenged.

34. The Court also notes the contention by Israel that it was improper to reconvene the Tenth Emergency Special Session at a time when the regular Session of the General Assembly was in progress. The Court considers that, while it may not have been originally contemplated that it would be appropriate for the General Assembly to hold simultaneous emergency and regular sessions, no rule of the Organization has been identified which would be thereby violated, so as to render invalid the resolution adopting the present request for an advisory opinion.

35. Finally, the Tenth Emergency Special Session appears to have been convened in accordance with Rule 9 *(b)* of the Rules of Procedure of the General Assembly, and the relevant meetings have been convened in pursuance of the applicable rules. As the Court stated in its Advisory Opinion of 21 June 1971 concerning the *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, a "resolution of a properly constituted organ of the United Nations which is passed in accordance with that organ's rules of procedure, and is declared by its President to have been so passed, must be presumed to have been validly adopted" (*I.C.J. Reports 1971*, p. 22, para. 20). In view of the foregoing, the Court cannot see any reason why that presumption is to be rebutted in the present case.

*

36. The Court now turns to a further issue related to jurisdiction in the present proceedings, namely the contention that the request for an advisory opinion by the General Assembly is not on a "legal question" within the meaning of Article 96, paragraph 1, of the Charter and Article 65, paragraph 1, of the Statute of the Court. It has been contended in this regard that, for a question to constitute a "legal question" for the purposes of these two provisions, it must be reasonably specific, since otherwise it would not be amenable to a response by the Court. With regard to the request made in the present advisory proceedings, it has been argued that it is not possible to determine with reasonable certainty the legal meaning of the question asked of the Court for two reasons.

First, it has been argued that the question regarding the "legal consequences" of the construction of the wall only allows for two possible interpretations, each of which would lead to a course of action that is precluded for the Court. The question asked could first be interpreted as a request for the Court to find that the construction of the wall is illegal, and then to give its opinion on the legal consequences of that illegality. In this case, it has been contended, the Court should decline to respond to the question asked for a variety of reasons, some of which pertain to jurisdiction and others rather to the issue of propriety. As regards jurisdiction, it is said that, if the General Assembly had wished to obtain the view of the Court on the highly complex and sensitive question of the legality of the construction of the wall, it should have expressly sought an opinion to that effect (cf. *Exchange of Greek and Turkish Populations, Advisory Opinion, 1925, P.C.I.J., Series B, No. 10*, p. 17). A second possible interpretation of the request, it is said, is that the Court should assume that the construction of the wall is illegal, and then give its opinion on the legal consequences of that assumed illegality. It has been contended that the Court should also decline to respond to the question on this hypothesis, since the request would then be based on a questionable assumption and since, in any event, it would be impossible to rule on the legal consequences of illegality without specifying the nature of that illegality.

Secondly, it has been contended that the question asked of the Court is not of a "legal" character because of its imprecision and abstract nature. In particular, it has been argued in this regard that the question fails to specify whether the Court is being asked to address legal

consequences for "the General Assembly or some other organ of the United Nations", "Member States of the United Nations", "Israel", "Palestine" or "some combination of the above, or some different entity".

37. As regards the alleged lack of clarity of the terms of the General Assembly's request and its effect on the "legal nature" of the question referred to the Court, the Court observes that this question is directed to the legal consequences arising from a given factual situation considering the rules and principles of international law, including the Geneva Convention relative to the Protection of Civilian Persons in Time of War of 12 August 1949 (hereinafter the "Fourth Geneva Convention") and relevant Security Council and General Assembly resolutions. The question submitted by the General Assembly has thus, to use the Court's phrase in its Advisory Opinion on *Western Sahara*, "been framed in terms of law and raise[s] problems of international law"; it is by its very nature susceptible of a reply based on law; indeed it is scarcely susceptible of a reply otherwise than on the basis of law. In the view of the Court, it is indeed a question of a legal character (see *Western Sahara, Advisory Opinion, I.C.J. Reports 1975*, p. 18, para. 15).

38. The Court would point out that lack of clarity in the drafting of a question does not deprive the Court of jurisdiction. Rather, such uncertainty will require clarification in interpretation, and such necessary clarifications of interpretation have frequently been given by the Court.

In the past, both the Permanent Court and the present Court have observed in some cases that the wording of a request for an advisory opinion did not accurately state the question on which the Court's opinion was being sought (*Interpretation of the Greco-Turkish Agreement of 1 December 1926 (Final Protocol, Article IV), Advisory Opinion, 1928, P.C.I.J., Series B, No. 16 (I)*, pp. 14-16), or did not correspond to the "true legal question" under consideration (*Interpretation of the Agreement of 25 March 1951 between the WHO and Egypt, Advisory Opinion, I.C.J. Reports 1980*, pp. 87-89, paras. 34-36). The Court noted in one case that "the question put to the Court is, on the face of it, at once infelicitously expressed and vague" (*Application for Review of Judgement No. 273 of the United Nations Administrative Tribunal, Advisory Opinion, I.C.J. Reports 1982*, p. 348, para. 46).

Consequently, the Court has often been required to broaden, interpret and even reformulate the questions put (see the three Opinions cited above; see also *Jaworzina, Advisory Opinion, 1923, P.C.I.J., Series B, No. 8; Admissibility of Hearings of Petitioners by the Committee on South West Africa, Advisory Opinion, I.C.J. Reports 1956*, p. 25; *Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, pp. 157-162).

In the present instance, the Court will only have to do what it has often done in the past, namely "identify the existing principles and rules, interpret them and apply them . . ., thus offering a reply to the question posed based on law" (*Legality of the Threat or Use of Nuclear Weapons, I.C.J. Reports 1996 (I)*, p. 234, para. 13).

INTERNATIONAL COURT OF JUSTICE

39. In the present instance, if the General Assembly requests the Court to state the "legal consequences" arising from the construction of the wall, the use of these terms necessarily encompasses an assessment of whether that construction is or is not in breach of certain rules and principles of international law. Thus, the Court is first called upon to determine whether such rules and principles have been and are still being breached by the construction of the wall along the planned route.

40. The Court does not consider that what is contended to be the abstract nature of the question posed to it raises an issue of jurisdiction. Even when the matter was raised as an issue of propriety rather than one of jurisdiction, in the case concerning the *Legality of the Threat or Use of Nuclear Weapons*, the Court took the position that to contend that it should not deal with a question couched in abstract terms is "a mere affirmation devoid of any justification" and that "the Court may give an advisory opinion on any legal question, abstract or otherwise" (*I.C.J. Reports 1996 (I)*, p. 236, para. 15, referring to *Conditions of Admission of a State to Membership in the United Nations (Article 4 of the Charter), Advisory Opinion, 1948, I.C.J. Reports 1947-1948*, p. 61; *Effect of Awards of Compensation Made by the United Nations Administrative Tribunal, Advisory Opinion, I.C.J. Reports 1954*, p. 51; and *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971*, p. 27, para. 40). In any event, the Court considers that the question posed to it in relation to the legal consequences of the construction of the wall is not an abstract one, and moreover that it would be for the Court to determine for whom any such consequences arise.

41. Furthermore, the Court cannot accept the view, which has also been advanced in the present proceedings, that it has no jurisdiction because of the "political" character of the question posed. As is clear from its long-standing jurisprudence on this point, the Court considers that the fact that a legal question also has political aspects,

"as, in the nature of things, is the case with so many questions which arise in international life, does not suffice to deprive it of its character as a 'legal question' and to 'deprive the Court of a competence expressly conferred on it by its Statute' (*Application for Review of Judgement No. 158 of the United Nations Administrative Tribunal, Advisory Opinion, I.C.J, Reports 1973*, p. 172, para. 14). Whatever its political aspects, the Court cannot refuse to admit the legal character of a question which invites it to discharge an essentially judicial task, namely, an assessment of the legality of the possible conduct of States with regard to the obligations imposed upon them by international law (cf. *Conditions of Admission of a State to Membership in the United Nations (Article 4 of the Charter), Advisory Opinion, 1948, I.C.J. Reports 1947-1948*, pp. 61-62; *Competence of the General Assembly for the Admission of a State to the United Nations, Advisory Opinion, I.C.J. Reports 1950*, pp. 6-7; *Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, p. 155)." (*Legality of the Threat or Use of Nuclear Weapons, I.C.J. Reports 1996 (I)*, p. 234, para. 13.)

In its Opinion concerning the *Interpretation of the Agreement of 25 March 1951 between the WHO and Egypt*, the Court indeed emphasized that, "in situations in which political considerations are prominent it may be particularly necessary for an international organization to obtain an advisory opinion from the Court as to the legal principles applicable with respect to the matter under debate . . ." (*I.C.J. Reports 1980*, p. 87, para. 33). Moreover, the Court has affirmed in its Opinion on the *Legality of the Threat or Use of Nuclear Weapons* that "the political nature of the motives which may be said to have inspired the request and the political implications that the opinion given might have are of no relevance in the establishment of its jurisdiction to give such an opinion" (*I.C.J. Reports 1996 (I)*, p. 234, para. 13). The Court is of the view that there is no element in the present proceedings which could lead it to conclude otherwise.

*

42. The Court accordingly has jurisdiction to give the advisory opinion requested by resolution ES-10/14 of the General Assembly.

*     *

43. It has been contended in the present proceedings, however, that the Court should decline to exercise its jurisdiction because of the presence of specific aspects of the General Assembly's request that would render the exercise of the Court's jurisdiction improper and inconsistent with the Court's judicial function.

44. The Court has recalled many times in the past that Article 65, paragraph 1, of its Statute, which provides that "The Court *may* give an advisory opinion . . ." (emphasis added), should be interpreted to mean that the Court has a discretionary power to decline to give an advisory opinion even if the conditions of jurisdiction are met (*Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (I)*, p. 234, para. 14). The Court however is mindful of the fact that its answer to a request for an advisory opinion "represents its participation in the activities of the Organization, and, in principle, should not be refused" (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, First Phase, Advisory Opinion, I.C.J. Reports 1950*, p. 71; see also, for example, *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission of Human Rights, Advisory Opinion, I.C.J. Reports 1999 (I)*, pp. 78-79, para. 29.) Given its responsibilities as the "principal judicial organ of the United Nations" (Article 92 of the Charter), the Court should in principle not decline to give an advisory opinion. In accordance with its consistent jurisprudence, only "compelling reasons" should lead the Court to refuse its opinion

(*Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, p. 155; see also, for example, *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission of Human Rights, Advisory Opinion, I.C.J. Reports 1999 (I)*, pp. 78-79, para. 29.)

The present Court has never, in the exercise of this discretionary power, declined to respond to a request for an advisory opinion. Its decision not to give the advisory opinion on the *Legality of the Use by a State of Nuclear Weapons in Armed Conflict* requested by the World Health Organization was based on the Court's lack of jurisdiction, and not on considerations of judicial propriety (see *I.C.J. Reports 1996 (I)*, p. 235, para. 14). Only on one occasion did the Court's predecessor, the Permanent Court of International Justice, take the view that it should not reply to a question put to it (*Status of Eastern Carelia, Advisory Opinion, 1923, P.C.I.J., Series B, No. 5*), but this was due to

"the very particular circumstances of the case, among which were that the question directly concerned an already existing dispute, one of the States parties to which was neither a party to the Statute of the Permanent Court nor a Member of the League of Nations, objected to the proceedings, and refused to take part in any way" (*Legality of the Threat or Use of Nuclear Weapons, I.C.J. Reports 1996 (I)*, pp. 235-236, para. 14).

45. These considerations do not release the Court from the duty to satisfy itself, each time it is seised of a request for an opinion, as to the propriety of the exercise of its judicial function, by reference to the criterion of "compelling reasons" as cited above. The Court will accordingly examine in detail and in the light of its jurisprudence each of the arguments presented to it in this regard.

*

46. The first such argument is to the effect that the Court should not exercise its jurisdiction in the present case because the request concerns a contentious matter between Israel and Palestine, in respect of which Israel has not consented to the exercise of that jurisdiction. According to this view, the subject-matter of the question posed by the General Assembly "is an integral part of the wider Israeli-Palestinian dispute concerning questions of terrorism, security, borders, settlements, Jerusalem and other related matters". Israel has emphasized that it has never consented to the settlement of this wider dispute by the Court or by any other means of compulsory adjudication; on the contrary, it contends that the parties repeatedly agreed that these issues are to be settled by negotiation, with the possibility of an agreement that recourse could be had to arbitration. It is accordingly contended that the Court should decline to give the present Opinion, on the basis *inter alia* of the precedent of the decision of the Permanent Court of International Justice on the *Status of Eastern Carelia*.

47. The Court observes that the lack of consent to the Court's contentious jurisdiction by interested States has no bearing on the Court's jurisdiction to give an advisory opinion. In an Advisory Opinion of 1950, the Court explained that:

> "The consent of States, parties to a dispute, is the basis of the Court's jurisdiction in contentious cases. The situation is different in regard to advisory proceedings even where the Request for an Opinion relates to a legal question actually pending between States. The Court's reply is only of an advisory character: as such, it has no binding force. It follows that no State, whether a Member of the United Nations or not, can prevent the giving of an Advisory Opinion which the United Nations considers to be desirable in order to obtain enlightenment as to the course of action it should take. The Court's Opinion is given not to the States, but to the organ which is entitled to request it; the reply of the Court, itself an 'organ of the United Nations', represents its participation in the activities of the Organization, and, in principle, should not be refused." (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, First Phase, Advisory Opinion, I.C.J. Reports 1950*, p. 71; see also *Western Sahara, I.C.J. Reports 1975*, p. 24, para. 31.)

It followed from this that, in those proceedings, the Court did not refuse to respond to the request for an advisory opinion on the ground that, in the particular circumstances, it lacked jurisdiction. The Court did however examine the opposition of certain interested States to the request by the General Assembly in the context of issues of judicial propriety. Commenting on its 1950 decision, the Court explained in its Advisory Opinion on *Western Sahara* that it had "Thus . . . recognized that lack of consent might constitute a ground for declining to give the opinion requested if, in the circumstances of a given case, considerations of judicial propriety should oblige the Court to refuse an opinion." The Court continued:

> "In certain circumstances . . . the lack of consent of an interested State may render the giving of an advisory opinion incompatible with the Court's judicial character. An instance of this would be when the circumstances disclose that to give a reply would have the effect of circumventing the principle that a State is not obliged to allow its disputes to be submitted to judicial settlement without its consent." (*Western Sahara, I.C.J. Reports 1975*, p. 25, paras. 32-33.)

In applying that principle to the request concerning *Western Sahara*, the Court found that a legal controversy did indeed exist, but one which had arisen during the proceedings of the General Assembly and in relation to matters with which the Assembly was dealing. It had not arisen independently in bilateral relations (*ibid.*, p. 25, para. 34).

48. As regards the request for an advisory opinion now before it, the Court acknowledges that Israel and Palestine have expressed radically divergent views on the legal consequences of Israel's construction of the wall, on which the Court has been asked to pronounce. However, as the Court has itself noted, "Differences of views . . . on legal issues have existed in practically every advisory proceeding" (*Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971*, p. 24, para. 34).

49. Furthermore, the Court does not consider that the subject-matter of the General Assembly's request can be regarded as only a bilateral matter between Israel and Palestine. Given the powers and responsibilities of the United Nations in questions relating to international peace

and security, it is the Court's view that the construction of the wall must be deemed to be directly of concern to the United Nations. The responsibility of the United Nations in this matter also has its origin in the Mandate and the Partition Resolution concerning Palestine (see paragraphs 70 and 71 below). This responsibility has been described by the General Assembly as "a permanent responsibility towards the question of Palestine until the question is resolved in all its aspects in a satisfactory manner in accordance with international legitimacy" (General Assembly resolution 57/107 of 3 December 2002). Within the institutional framework of the Organization, this responsibility has been manifested by the adoption of many Security Council and General Assembly resolutions, and by the creation of several subsidiary bodies specifically established to assist in the realization of the inalienable rights of the Palestinian people.

50. The object of the request before the Court is to obtain from the Court an opinion which the General Assembly deems of assistance to it for the proper exercise of its functions. The opinion is requested on a question which is of particularly acute concern to the United Nations, and one which is located in a much broader frame of reference than a bilateral dispute. In the circumstances, the Court does not consider that to give an opinion would have the effect of circumventing the principle of consent to judicial settlement, and the Court accordingly cannot, in the exercise of its discretion, decline to give an opinion on that ground.

*

51. The Court now turns to another argument raised in the present proceedings in support of the view that it should decline to exercise its jurisdiction. Some participants have argued that an advisory opinion from the Court on the legality of the wall and the legal consequences of its construction could impede a political, negotiated solution to the Israeli-Palestinian conflict. More particularly, it has been contended that such an opinion could undermine the scheme of the "Roadmap" (see paragraph 22 above), which requires Israel and Palestine to comply with certain obligations in various phases referred to therein. The requested opinion, it has been alleged, could complicate the negotiations envisaged in the "Roadmap", and the Court should therefore exercise its discretion and decline to reply to the question put.

This is a submission of a kind which the Court has already had to consider several times in the past. For instance, in its Advisory opinion on the *Legality of the Threat or Use of Nuclear Weapons*, the Court stated:

"It has . . . been submitted that a reply from the Court in this case might adversely affect disarmament negotiations and would, therefore, be contrary to the interest of the United Nations. The Court is aware that, no matter what might be its conclusions in any opinion it might give, they would have relevance for the continuing debate on the matter in the General Assembly and would present an additional element

in the negotiations on the matter. Beyond that, the effect of the opinion is a matter of appreciation. The Court has heard contrary positions advanced and there are no evident criteria by which it can prefer one assessment to another." *(I.C.J. Reports 1996 (I)*, p. 237, para. 17; see also *Western Sahara, I.C.J. Reports 1975*, p. 37, para. 73.)

52. One participant in the present proceedings has indicated that the Court, if it were to give a response to the request, should in any event do so keeping in mind

"two key aspects of the peace process: the fundamental principle that permanent status issues must be resolved through negotiations; and the need during the interim period for the parties to fulfil their security responsibilities so that the peace process can succeed".

53. The Court is conscious that the "Roadmap", which was endorsed by the Security Council in resolution 1515 (2003) (see paragraph 22 above), constitutes a negotiating framework for the resolution of the Israeli-Palestinian conflict. It is not clear, however, what influence the Court's opinion might have on those negotiations: participants in the present proceedings have expressed differing views in this regard. The Court cannot regard this factor as a compelling reason to decline to exercise its jurisdiction.

54. It was also put to the Court by certain participants that the question of the construction of the wall was only one aspect of the Israeli-Palestinian conflict, which could not be properly addressed in the present proceedings. The Court does not however consider this a reason for it to decline to reply to the question asked. The Court is indeed aware that the question of the wall is part of a greater whole, and it would take this circumstance carefully into account in any opinion it might give. At the same time, the question that the General Assembly has chosen to ask of the Court is confined to the legal consequences of the construction of the wall, and the Court would only examine other issues to the extent that they might be necessary to its consideration of the question put to it.

\*

55. Several participants in the proceedings have raised the further argument that the Court should decline to exercise its jurisdiction because it does not have at its disposal the requisite facts and evidence to enable it to reach its conclusions. In particular, Israel has contended, referring to the Advisory Opinion on the *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania*, that the Court could not give an opinion on issues which raise questions of fact that cannot be elucidated without hearing all parties to the conflict. According to Israel, if the Court decided to give the requested opinion, it would be forced to speculate about essential facts and make assumptions about arguments of law. More specifically, Israel has argued that the Court could not rule on the legal consequences of the construction of the wall without enquiring, first,

into the nature and scope of the security threat to which the wall is intended to respond and the effectiveness of that response, and, second, into the impact of the construction for the Palestinians. This task, which would already be difficult in a contentious case, would be further complicated in an advisory proceeding, particularly since Israel alone possesses much of the necessary information and has stated that it chooses not to address the merits. Israel has concluded that the Court, confronted with factual issues impossible to clarify in the present proceedings, should use its discretion and decline to comply with the request for an advisory opinion.

56. The Court observes that the question whether the evidence available to it is sufficient to give an advisory opinion must be decided in each particular instance. In its Opinion concerning the *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania* (*I.C.J. Reports 1950*, p. 72) and again in its Opinion on the *Western Sahara*, the Court made it clear that what is decisive in these circumstances is "whether the Court has before it sufficient information and evidence to enable it to arrive at a judicial conclusion upon any disputed questions of fact the determination of which is necessary for it to give an opinion in conditions compatible with its judicial character" (*Western Sahara, I.C.J. Reports 1975*, pp. 28-29, para. 46). Thus, for instance, in the proceedings concerning the *Status of Eastern Carelia*, the Permanent Court of International Justice decided to decline to give an Opinion *inter alia* because the question put "raised a question of fact which could not be elucidated without hearing both parties" (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, I.C.J. Reports 1950*, p. 72; see *Status of Eastern Carelia, P.C.I.J., Series B, No. 5*, p. 28). On the other hand, in the *Western Sahara* Opinion, the Court observed that it had been provided with very extensive documentary evidence of the relevant facts (*I.C.J. Reports 1975*, p. 29, para. 47).

57. In the present instance, the Court has at its disposal the report of the Secretary-General, as well as a voluminous dossier submitted by him to the Court, comprising not only detailed information on the route of the wall but also on its humanitarian and socio-economic impact on the Palestinian population. The dossier includes several reports based on on-site visits by special rapporteurs and competent organs of the United Nations. The Secretary-General has further submitted to the Court a written statement updating his report, which supplemented the information contained therein. Moreover, numerous other participants have submitted to the Court written statements which contain information relevant to a response to the question put by the General Assembly. The Court notes in particular that Israel's Written Statement, although limited to issues of jurisdiction and judicial propriety, contained observations on other matters, including Israel's concerns in terms of security, and was accompanied by corresponding annexes; many other documents issued by the Israeli Government on those matters are in the public domain.

58. The Court finds that it has before it sufficient information and evidence to enable it to give the advisory opinion requested by the General Assembly. Moreover, the circumstance that others may evaluate and interpret these facts in a subjective or political manner can be no argument

for a court of law to abdicate its judicial task. There is therefore in the present case no lack of information such as to constitute a compelling reason for the Court to decline to give the requested opinion.

*

59. In their written statements, some participants have also put forward the argument that the Court should decline to give the requested opinion on the legal consequences of the construction of the wall because such opinion would lack any useful purpose. They have argued that the advisory opinions of the Court are to be seen as a means to enable an organ or agency in need of legal clarification for its future action to obtain that clarification. In the present instance, the argument continues, the General Assembly would not need an opinion of the Court because it has already declared the construction of the wall to be illegal and has already determined the legal consequences by demanding that Israel stop and reverse its construction, and further, because the General Assembly has never made it clear how it intended to use the opinion.

60. As is clear from the Court's jurisprudence, advisory opinions have the purpose of furnishing to the requesting organs the elements of law necessary for them in their action. In its Opinion concerning *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide*, the Court observed: "The object of this request for an Opinion is to guide the United Nations in respect of its own action." (*I.C.J. Reports 1951*, p. 19.) Likewise, in its Opinion on the *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, the Court noted: "The request is put forward by a United Nations organ with reference to its own decisions and it seeks legal advice from the Court on the consequences and implications of these decisions." (*I.C.J. Reports 1971*, p. 24, para. 32.) The Court found on another occasion that the advisory opinion it was to give would "furnish the General Assembly with elements of a legal character relevant to its further treatment of the decolonization of Western Sahara" (*Western Sahara, I.C.J. Reports 1975*, p. 37, para. 72).

61. With regard to the argument that the General Assembly has not made it clear what use it would make of an advisory opinion on the wall, the Court would recall, as equally relevant in the present proceedings, what it stated in its Opinion on the *Legality of the Threat or Use of Nuclear Weapons*:

> "Certain States have observed that the General Assembly has not explained to the Court for what precise purposes it seeks the advisory opinion. Nevertheless, it is not for the Court itself to purport to decide whether or not an advisory opinion is needed by the Assembly for the performance of its functions. The General Assembly has the right to decide for itself on the usefulness of an opinion in the light of its own needs." (*I.C.J. Reports 1996 (I)*, p. 237, para. 16.)

62. It follows that the Court cannot decline to answer the question posed based on the ground that its opinion would lack any useful purpose. The Court cannot substitute its assessment of the usefulness of the opinion requested for that of the organ that seeks such opinion, namely the General Assembly. Furthermore, and in any event, the Court considers that the General Assembly has not yet determined all the possible consequences of its own resolution. The Court's task would be to determine in a comprehensive manner the legal consequences of the construction of the wall, while the General Assembly – and the Security Council – may then draw conclusions from the Court's findings.

*

63. Lastly, the Court will turn to another argument advanced with regard to the propriety of its giving an advisory opinion in the present proceedings. Israel has contended that Palestine, given its responsibility for acts of violence against Israel and its population which the wall is aimed at addressing, cannot seek from the Court a remedy for a situation resulting from its own wrongdoing. In this context, Israel has invoked the maxim *nullus commodum capere potest de sua injuria propria*, which it considers to be as relevant in advisory proceedings as it is in contentious cases. Therefore, Israel concludes, good faith and the principle of "clean hands" provide a compelling reason that should lead the Court to refuse the General Assembly's request.

64. The Court does not consider this argument to be pertinent. As was emphasized earlier, it was the General Assembly which requested the advisory opinion, and the opinion is to be given to the General Assembly, and not to a specific State or entity.

*    *

65. In the light of the foregoing, the Court concludes not only that it has jurisdiction to give an opinion on the question put to it by the General Assembly (see paragraph 42 above), but also that there is no compelling reason for it to use its discretionary power not to give that opinion.

*

*    *

66. The Court will now address the question put to it by the General Assembly in resolution ES-10/14. The Court recalls that the question is as follows:

> "What are the legal consequences arising from the construction of the wall being built by Israel, the occupying Power, in the Occupied Palestinian Territory, including in and around East Jerusalem, as described in the report of the Secretary-General, considering the rules and principles of international law, including the Fourth Geneva Convention of 1949, and relevant Security Council and General Assembly resolutions?"

67. As explained in paragraph 82 below, the "wall" in question is a complex construction, so that that term cannot be understood in a limited physical sense. However, the other terms used, either by Israel ("fence") or by the Secretary-General ("barrier"), are no more accurate if understood in the physical sense. In this Opinion, the Court has therefore chosen to use the terminology employed by the General Assembly.

The Court notes furthermore that the request of the General Assembly concerns the legal consequences of the wall being built "in the Occupied Palestinian Territory, including in and around East Jerusalem". As also explained below (see paragraphs 79-84 below), some parts of the complex are being built, or are planned to be built, on the territory of Israel itself; the Court does not consider that it is called upon to examine the legal consequences arising from the construction of those parts of the wall.

68. The question put by the General Assembly concerns the legal consequences of the construction of the wall in the Occupied Palestinian Territory. However, in order to indicate those consequences to the General Assembly the Court must first determine whether or not the construction of that wall breaches international law (see paragraph 39 above). It will therefore make this determination before dealing with the consequences of the construction.

69. To do so, the Court will first make a brief analysis of the status of the territory concerned, and will then describe the works already constructed or in course of construction in that territory. It will then indicate the applicable law before seeking to establish whether that law has been breached.

*       *

70. Palestine was part of the Ottoman Empire. At the end of the First World War, a class "A" Mandate for Palestine was entrusted to Great Britain by the League of Nations, pursuant to paragraph 4 of Article 22 of the Covenant, which provided that:

"Certain communities, formerly belonging to the Turkish Empire have reached a
stage of development where their existence as independent nations can be provisionally
recognized subject to the rendering of administrative advice and assistance by a
Mandatory until such time as they are able to stand alone."

The Court recalls that in its Advisory Opinion on the *International Status of South West Africa*,
speaking of mandates in general, it observed that "The Mandate was created, in the interest of the
inhabitants of the territory, and of humanity in general, as an international institution with an
international object – a sacred trust of civilization." (*I.C.J. Reports 1950*, p. 132.) The Court also
held in this regard that "two principles were considered to be of paramount importance: the principle
of non-annexation and the principle that the well-being and development of . . . peoples [not yet able
to govern themselves] form[ed] 'a sacred trust of civilization'" (*ibid.*, p. 131).

The territorial boundaries of the Mandate for Palestine were laid down by various instruments,
in particular on the eastern border by a British memorandum of 16 September 1922 and an
Anglo-Transjordanian Treaty of 20 February 1928.

71. In 1947 the United Kingdom announced its intention to complete evacuation of the
mandated territory by 1 August 1948, subsequently advancing that date to 15 May 1948. In the
meantime, the General Assembly had on 29 November 1947 adopted resolution 181 (II) on the future
government of Palestine, which "*Recommends* to the United Kingdom . . . and to all other Members
of the United Nations the adoption and implementation . . . of the Plan of Partition" of the territory, as
set forth in the resolution, between two independent States, one Arab, the other Jewish, as well as the
creation of a special international régime for the City of Jerusalem. The Arab population of Palestine
and the Arab States rejected this plan, contending that it was unbalanced; on 14 May 1948, Israel
proclaimed its independence on the strength of the General Assembly resolution; armed conflict then
broke out between Israel and a number of Arab States and the Plan of Partition was not implemented.

72. By resolution 62 (1948) of 16 November 1948, the Security Council decided that "an
armistice shall be established in all sectors of Palestine" and called upon the parties directly involved
in the conflict to seek agreement to this end. In conformity with this decision, general armistice
agreements were concluded in 1949 between Israel and the neighbouring States through mediation by
the United Nations. In particular, one such agreement was signed in Rhodes on 3 April 1949 between
Israel and Jordan. Articles V and VI of that Agreement fixed the armistice demarcation line between
Israeli and Arab forces (often later called the "Green Line" owing to the colour used for it on maps;
hereinafter the "Green Line"). Article III, paragraph 2, provided that "No element of the . . . military
or para-military forces of either Party . . . shall advance beyond or pass over for any purpose
whatsoever the Armistice Demarcation Lines . . ." It was agreed in Article VI, paragraph 8, that these
provisions would not be "interpreted as prejudicing, in any sense, an ultimate political settlement
between the Parties". It was also stated that "the Armistice

Demarcation Lines defined in articles V and VI of [the] Agreement [were] agreed upon by the Parties without prejudice to future territorial settlements or boundary lines or to claims of either Party relating thereto". The Demarcation Line was subject to such rectification as might be agreed upon by the parties.

73. In the 1967 armed conflict, Israeli forces occupied all the territories which had constituted Palestine under British Mandate (including those known as the West Bank, lying to the east of the Green Line).

74. On 22 November 1967, the Security Council unanimously adopted resolution 242 (1967), which emphasized the inadmissibility of acquisition of territory by war and called for the "Withdrawal of Israel armed forces from territories occupied in the recent conflict", and "Termination of all claims or states of belligerency".

75. From 1967 onwards, Israel took a number of measures in these territories aimed at changing the status of the City of Jerusalem. The Security Council, after recalling on a number of occasions "the principle that acquisition of territory by military conquest is inadmissible", condemned those measures and, by resolution 298 (1971) of 25 September 1971, confirmed in the clearest possible terms that:

> "all legislative and administrative actions taken by Israel to change the status of the City of Jerusalem, including expropriation of land and properties, transfer of populations and legislation aimed at the incorporation of the occupied section, are totally invalid and cannot change that status".

Later, following the adoption by Israel on 30 July 1980 of the Basic Law making Jerusalem the "complete and united" capital of Israel, the Security Council, by resolution 478 (1980) of 20 August 1980, stated that the enactment of that Law constituted a violation of international law and that "all legislative and administrative measures and actions taken by Israel, the occupying Power, which have altered or purport to alter the character and status of the Holy City of Jerusalem . . . are null and void". It further decided "not to recognize the 'basic law' and such other actions by Israel that, as a result of this law, seek to alter the character and status of Jerusalem".

76. Subsequently, a peace treaty was signed on 26 October 1994 between Israel and Jordan. That treaty fixed the boundary between the two States "with reference to the boundary definition under the Mandate as is shown in Annex I *(a)* . . . without prejudice to the status of any territories that came under Israeli military government control in 1967" (Article 3, paragraphs 1 and 2). Annex I provided the corresponding maps and added that, with regard to the "territory that came under Israeli military government control in 1967", the line indicated "is the administrative boundary" with Jordan.

77. Lastly, a number of agreements have been signed since 1993 between Israel and the Palestine Liberation Organization imposing various obligations on each party. Those agreements *inter alia* required Israel to transfer to Palestinian authorities certain powers and responsibilities exercised in the Occupied Palestinian Territory by its military authorities and civil administration. Such transfers have taken place, but, as a result of subsequent events, they remained partial and limited.

78. The Court would observe that, under customary international law as reflected (see paragraph 89 below) in Article 42 of the Regulations Respecting the Laws and Customs of War on Land annexed to the Fourth Hague Convention of 18 October 1907 (hereinafter "the Hague Regulations of 1907"), territory is considered occupied when it is actually placed under the authority of the hostile army, and the occupation extends only to the territory where such authority has been established and can be exercised.

The territories situated between the Green Line (see paragraph 72 above) and the former eastern boundary of Palestine under the Mandate were occupied by Israel in 1967 during the armed conflict between Israel and Jordan. Under customary international law, these were therefore occupied territories in which Israel had the status of occupying Power. Subsequent events in these territories, as described in paragraphs 75 to 77 above, have done nothing to alter this situation. All these territories (including East Jerusalem) remain occupied territories and Israel has continued to have the status of occupying Power.

*

79. It is essentially in these territories that Israel has constructed or plans to construct the works described in the report of the Secretary-General. The Court will now describe those works, basing itself on that report. For developments subsequent to the publication of that report, the Court will refer to complementary information contained in the Written Statement of the United Nations, which was intended by the Secretary-General to supplement his report (hereinafter "Written Statement of the Secretary-General").

80. The report of the Secretary-General states that "The Government of Israel has since 1996 considered plans to halt infiltration into Israel from the central and northern West Bank . . ." (Para. 4.) According to that report, a plan of this type was approved for the first time by the Israeli Cabinet in July 2001. Then, on 14 April 2002, the Cabinet adopted a decision for the construction of works, forming what Israel describes as a "security fence", 80 kilometres in length, in three areas of the West Bank.

The project was taken a stage further when, on 23 June 2002, the Israeli Cabinet approved the first phase of the construction of a "continuous fence" in the West Bank (including East Jerusalem). On 14 August 2002, it adopted the line of that "fence" for the work in Phase A, with a view to the construction of a complex 123 kilometres long in the northern West Bank, running

from the Salem checkpoint (north of Jenin) to the settlement at Elkana. Phase B of the work was approved in December 2002. It entailed a stretch of some 40 kilometres running east from the Salem checkpoint towards Beth Shean along the northern part of the Green Line as far as the Jordan Valley. Furthermore, on 1 October 2003, the Israeli Cabinet approved a full route, which, according to the report of the Secretary-General, "will form one continuous line stretching 720 kilometres along the West Bank". A map showing completed and planned sections was posted on the Israeli Ministry of Defence website on 23 October 2003. According to the particulars provided on that map, a continuous section (Phase C) encompassing a number of large settlements will link the north-western end of the "security fence" built around Jerusalem with the southern point of Phase A construction at Elkana. According to the same map, the "security fence" will run for 115 kilometres from the Har Gilo settlement near Jerusalem to the Carmel settlement south-east of Hebron (Phase D). According to Ministry of Defence documents, work in this sector is due for completion in 2005. Lastly, there are references in the case file to Israel's planned construction of a "security fence" following the Jordan Valley along the mountain range to the west.

81. According to the Written Statement of the Secretary-General, the first part of these works (Phase A), which ultimately extends for a distance of 150 kilometres, was declared completed on 31 July 2003. It is reported that approximately 56,000 Palestinians would be encompassed in enclaves. During this phase, two sections totalling 19.5 kilometres were built around Jerusalem. In November 2003 construction of a new section was begun along the Green Line to the west of the Nazlat Issa-Baqa al-Sharqiya enclave, which in January 2004 was close to completion at the time when the Secretary-General submitted his Written Statement.

According to the Written Statement of the Secretary-General, the works carried out under Phase B were still in progress in January 2004. Thus an initial section of this stretch, which runs near or on the Green Line to the village of al-Mutilla, was almost complete in January 2004. Two additional sections diverge at this point. Construction started in early January 2004 on one section that runs due east as far as the Jordanian border. Construction of the second section, which is planned to run from the Green Line to the village of Taysir, has barely begun. The United Nations has, however, been informed that this second section might not be built.

The Written Statement of the Secretary-General further states that Phase C of the work, which runs from the terminus of Phase A, near the Elkana settlement, to the village of Nu'man, south-east of Jerusalem, began in December 2003. This section is divided into three stages. In Stage C1, between *inter alia* the villages of Rantis and Budrus, approximately 4 kilometres out of a planned total of 40 kilometres have been constructed. Stage C2, which will surround the so-called "Ariel Salient" by cutting 22 kilometres into the West Bank, will incorporate 52,000 Israeli settlers. Stage C3 is to involve the construction of two "depth barriers"; one of these is to run north-south, roughly parallel with the section of Stage C1 currently under construction between Rantis and Budrus, whilst the other runs east-west along a ridge said to be part of the route of Highway 45, a motorway under construction. If construction of the two barriers were completed, two enclaves would be formed, encompassing 72,000 Palestinians in 24 communities.

Further construction also started in late November 2003 along the south-eastern part of the municipal boundary of Jerusalem, following a route that, according to the Written Statement of the Secretary-General, cuts off the suburban village of El-Ezariya from Jerusalem and splits the neighbouring Abu Dis in two.

As at 25 January 2004, according to the Written Statement of the Secretary-General, some 190 kilometres of construction had been completed, covering Phase A and the greater part of Phase B. Further construction in Phase C had begun in certain areas of the central West Bank and in Jerusalem. Phase D, planned for the southern part of the West Bank, had not yet begun.

The Israeli Government has explained that the routes and timetable as described above are subject to modification. In February 2004, for example, an 8-kilometre section near the town of Baqa al-Sharqiya was demolished, and the planned length of the wall appears to have been slightly reduced.

82. According to the description in the report and the Written Statement of the Secretary-General, the works planned or completed have resulted or will result in a complex consisting essentially of:

(1) a fence with electronic sensors;

(2) a ditch (up to 4 metres deep);

(3) a two-lane asphalt patrol road;

(4) a trace road (a strip of sand smoothed to detect footprints) running parallel to the fence;

(5) a stack of six coils of barbed wire marking the perimeter of the complex.

The complex has a width of 50 to 70 metres, increasing to as much as 100 metres in some places. "Depth barriers" may be added to these works.

The approximately 180 kilometres of the complex completed or under construction as of the time when the Secretary-General submitted his report included some 8.5 kilometres of concrete wall. These are generally found where Palestinian population centres are close to or abut Israel (such as near Qalqiliya and Tulkarm or in parts of Jerusalem).

83. According to the report of the Secretary-General, in its northernmost part, the wall as completed or under construction barely deviates from the Green Line. It nevertheless lies within occupied territories for most of its course. The works deviate more than 7.5 kilometres from the Green Line in certain places to encompass settlements, while encircling Palestinian population areas. A stretch of 1 to 2 kilometres west of Tulkarm appears to run on the Israeli side of the Green Line. Elsewhere, on the other hand, the planned route would deviate eastward by up to

22 kilometres. In the case of Jerusalem, the existing works and the planned route lie well beyond the Green Line and even in some cases beyond the eastern municipal boundary of Jerusalem as fixed by Israel.

84. On the basis of that route, approximately 975 square kilometres (or 16.6 per cent of the West Bank) would, according to the report of the Secretary-General, lie between the Green Line and the wall. This area is stated to be home to 237,000 Palestinians. If the full wall were completed as planned, another 160,000 Palestinians would live in almost completely encircled communities, described as enclaves in the report. As a result of the planned route, nearly 320,000 Israeli settlers (of whom 178,000 in East Jerusalem) would be living in the area between the Green Line and the wall.

85. Lastly, it should be noted that the construction of the wall has been accompanied by the creation of a new administrative régime. Thus in October 2003 the Israeli Defence Forces issued Orders establishing the part of the West Bank lying between the Green Line and the wall as a "Closed Area". Residents of this area may no longer remain in it, nor may non-residents enter it, unless holding a permit or identity card issued by the Israeli authorities. According to the report of the Secretary-General, most residents have received permits for a limited period. Israeli citizens, Israeli permanent residents and those eligible to immigrate to Israel in accordance with the Law of Return may remain in, or move freely to, from and within the Closed Area without a permit. Access to and exit from the Closed Area can only be made through access gates, which are opened infrequently and for short periods.

*      *

86. The Court will now determine the rules and principles of international law which are relevant in assessing the legality of the measures taken by Israel. Such rules and principles can be found in the United Nations Charter and certain other treaties, in customary international law and in the relevant resolutions adopted pursuant to the Charter by the General Assembly and the Security Council. However, doubts have been expressed by Israel as to the applicability in the Occupied Palestinian Territory of certain rules of international humanitarian law and human rights instruments. The Court will now consider these various questions.

87. The Court first recalls that, pursuant to Article 2, paragraph 4, of the United Nations Charter:

> "All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any State, or in any other manner inconsistent with the Purposes of the United Nations."

On 24 October 1970, the General Assembly adopted resolution 2625 (XXV), entitled "Declaration on Principles of International Law concerning Friendly Relations and Co-operation among States" (hereinafter "resolution 2625 (XXV)"), in which it emphasized that "No territorial acquisition resulting from the threat or use of force shall be recognized as legal." As the Court stated in its Judgment in the case concerning *Military and Paramilitary Activities in and against Nicaragua (Nicaragua* v. *United States of America)*, the principles as to the use of force incorporated in the Charter reflect customary international law (see *I.C.J. Reports 1986*, pp. 98-101, paras. 187-190); the same is true of its corollary entailing the illegality of territorial acquisition resulting from the threat or use of force.

88. The Court also notes that the principle of self-determination of peoples has been enshrined in the United Nations Charter and reaffirmed by the General Assembly in resolution 2625 (XXV) cited above, pursuant to which "Every State has the duty to refrain from any forcible action which deprives peoples referred to [in that resolution] . . . of their right to self-determination." Article 1 common to the International Covenant on Economic, Social and Cultural Rights and the International Covenant on Civil and Political Rights reaffirms the right of all peoples to self-determination, and lays upon the States parties the obligation to promote the realization of that right and to respect it, in conformity with the provisions of the United Nations Charter.

The Court would recall that in 1971 it emphasized that current developments in "international law in regard to non-self-governing territories, as enshrined in the Charter of the United Nations, made the principle of self-determination applicable to all [such territories]". The Court went on to state that "These developments leave little doubt that the ultimate objective of the sacred trust" referred to in Article 22, paragraph 1, of the Covenant of the League of Nations "was the self-determination . . . of the peoples concerned" (*Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971*, p. 31, paras. 52-53). The Court has referred to this principle on a number of occasions in its jurisprudence (*ibid.*; see also *Western Sahara, Advisory Opinion, I.C.J. Reports 1975*, p. 68, para. 162). The Court indeed made it clear that the right of peoples to self-determination is today a right *erga omnes* (see *East Timor (Portugal* v. *Australia), Judgment, I.C.J. Reports 1995*, p. 102, para. 29).

89. As regards international humanitarian law, the Court would first note that Israel is not a party to the Fourth Hague Convention of 1907, to which the Hague Regulations are annexed. The Court observes that, in the words of the Convention, those Regulations were prepared "to revise the general laws and customs of war" existing at that time. Since then, however, the International Military Tribunal of Nuremberg has found that the "rules laid down in the Convention were recognised by all civilised nations, and were regarded as being declaratory of the laws and customs of war" (Judgment of the International Military Tribunal of Nuremberg, 30 September and 1 October 1946, p. 65). The Court itself reached the same conclusion when examining the rights and duties of belligerents in their conduct of military operations (*Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (I)*, p. 256, para. 75). The Court considers that the provisions of the Hague Regulations have become part of customary law, as is in fact recognized by all the participants in the proceedings before the Court.

The Court also observes that, pursuant to Article 154 of the Fourth Geneva Convention, that Convention is supplementary to Sections II and III of the Hague Regulations. Section III of those Regulations, which concerns "Military authority over the territory of the hostile State", is particularly pertinent in the present case.

90. Secondly, with regard to the Fourth Geneva Convention, differing views have been expressed by the participants in these proceedings. Israel, contrary to the great majority of the other participants, disputes the applicability *de jure* of the Convention to the Occupied Palestinian Territory. In particular, in paragraph 3 of Annex I to the report of the Secretary-General, entitled "Summary Legal Position of the Government of Israel", it is stated that Israel does not agree that the Fourth Geneva Convention "is applicable to the occupied Palestinian Territory", citing "the lack of recognition of the territory as sovereign prior to its annexation by Jordan and Egypt" and inferring that it is "not a territory of a High Contracting Party as required by the Convention".

91. The Court would recall that the Fourth Geneva Convention was ratified by Israel on 6 July 1951 and that Israel is a party to that Convention. Jordan has also been a party thereto since 29 May 1951. Neither of the two States has made any reservation that would be pertinent to the present proceedings.

Furthermore, Palestine gave a unilateral undertaking, by declaration of 7 June 1982, to apply the Fourth Geneva Convention. Switzerland, as depositary State, considered that unilateral undertaking valid. It concluded, however, that it "[was] not – as a depositary – in a position to decide whether" "the request [dated 14 June 1989] from the Palestine Liberation Movement in the name of the 'State of Palestine' to accede" *inter alia* to the Fourth Geneva Convention "can be considered as an instrument of accession".

92. Moreover, for the purpose of determining the scope of application of the Fourth Geneva Convention, it should be recalled that under common Article 2 of the four Conventions of 12 August 1949:

"In addition to the provisions which shall be implemented in peacetime, the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.

The Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance.

Although one of the Powers in conflict may not be a party to the present Convention, the Powers who are parties thereto shall remain bound by it in their mutual relations. They shall furthermore be bound by the Convention in relation to the said Power, if the latter accepts and applies the provisions thereof."

93. After the occupation of the West Bank in 1967, the Israeli authorities issued an order No. 3 stating in its Article 35 that:

> "the Military Court . . . must apply the provisions of the Geneva Convention dated
> 12 August 1949 relative to the Protection of Civilian Persons in Time of War with
> respect to judicial procedures. In case of conflict between this Order and the said
> Convention, the Convention shall prevail."

Subsequently, the Israeli authorities have indicated on a number of occasions that in fact they
generally apply the humanitarian provisions of the Fourth Geneva Convention within the occupied
territories. However, according to Israel's position as briefly recalled in paragraph 90 above, that
Convention is not applicable *de jure* within those territories because, under Article 2, paragraph 2, it
applies only in the case of occupation of territories falling under the sovereignty of a High Contracting
Party involved in an armed conflict. Israel explains that Jordan was admittedly a party to the Fourth
Geneva Convention in 1967, and that an armed conflict broke out at that time between Israel and
Jordan, but it goes on to observe that the territories occupied by Israel subsequent to that conflict had
not previously fallen under Jordanian sovereignty. It infers from this that that Convention is not
applicable *de jure* in those territories. According however to the great majority of other participants
in the proceedings, the Fourth Geneva Convention is applicable to those territories pursuant to
Article 2, paragraph 1, whether or not Jordan had any rights in respect thereof prior to 1967.

94. The Court would recall that, according to customary international law as expressed in
Article 31 of the Vienna Convention on the Law of Treaties of 23 May 1969, a treaty must be
interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their
context and in the light of its object and purpose. Article 32 provides that:

> "Recourse may be had to supplementary means of interpretation, including the
> preparatory work of the treaty and the circumstances of its conclusion, in order to
> confirm the meaning resulting from the application of article 31, or to determine the
> meaning when the interpretation according to article 31 . . . leaves the meaning
> ambiguous or obscure; or . . . leads to a result which is manifestly obscure or
> unreasonable." (See *Oil Platforms (Islamic Republic of Iran* v. *United States of
> America), Preliminary Objections, I.C.J. Reports 1996 (II)*, p. 812, para. 23; see,
> similarly, *Kasikili/Sedudu Island (Botswana/Namibia), I.C.J. Reports 1999 (II)*, p. 1059,
> para. 18, and *Sovereignty over Pulau Ligitan and Pulau Sipadan (Indonesia/Malaysia),
> Judgment, I.C.J. Reports 2002*, p. 645, para. 37.)

95. The Court notes that, according to the first paragraph of Article 2 of the Fourth Geneva
Convention, that Convention is applicable when two conditions are fulfilled: that there exists an
armed conflict (whether or not a state of war has been recognized); and that the conflict has arisen
between two contracting parties. If those two conditions are satisfied, the Convention applies, in
particular, in any territory occupied in the course of the conflict by one of the contracting parties.

The object of the second paragraph of Article 2 is not to restrict the scope of application of the
Convention, as defined by the first paragraph, by excluding therefrom territories not falling under the
sovereignty of one of the contracting parties. It is directed simply to making it clear that, even if
occupation effected during the conflict met no armed resistance, the Convention is still applicable.

This interpretation reflects the intention of the drafters of the Fourth Geneva Convention to protect civilians who find themselves, in whatever way, in the hands of the occupying Power. Whilst the drafters of the Hague Regulations of 1907 were as much concerned with protecting the rights of a State whose territory is occupied, as with protecting the inhabitants of that territory, the drafters of the Fourth Geneva Convention sought to guarantee the protection of civilians in time of war, regardless of the status of the occupied territories, as is shown by Article 47 of the Convention.

That interpretation is confirmed by the Convention's *travaux préparatoires*. The Conference of Government Experts convened by the International Committee of the Red Cross (hereinafter, "ICRC") in the aftermath of the Second World War for the purpose of preparing the new Geneva Conventions recommended that these conventions be applicable to any armed conflict "whether [it] is or is not recognized as a state of war by the parties" and "in cases of occupation of territories in the absence of any state of war" (*Report on the Work of the Conference of Government Experts for the Study of the Conventions for the Protection of War Victims, Geneva, 14-26 April 1947*, p. 8). The drafters of the second paragraph of Article 2 thus had no intention, when they inserted that paragraph into the Convention, of restricting the latter's scope of application. They were merely seeking to provide for cases of occupation without combat, such as the occupation of Bohemia and Moravia by Germany in 1939.

96. The Court would moreover note that the States parties to the Fourth Geneva Convention approved that interpretation at their Conference on 15 July 1999. They issued a statement in which they "reaffirmed the applicability of the Fourth Geneva Convention to the Occupied Palestinian Territory, including East Jerusalem". Subsequently, on 5 December 2001, the High Contracting Parties, referring in particular to Article 1 of the Fourth Geneva Convention of 1949, once again reaffirmed the "applicability of the Fourth Geneva Convention to the Occupied Palestinian Territory, including East Jerusalem". They further reminded the Contracting Parties participating in the Conference, the parties to the conflict, and the State of Israel as occupying Power, of their respective obligations.

97. Moreover, the Court would observe that the ICRC, whose special position with respect to execution of the Fourth Geneva Convention must be "recognized and respected at all times" by the parties pursuant to Article 142 of the Convention, has also expressed its opinion on the interpretation to be given to the Convention. In a declaration of 5 December 2001, it recalled that "the ICRC has always affirmed the *de jure* applicability of the Fourth Geneva Convention to the territories occupied since 1967 by the State of Israel, including East Jerusalem".

98. The Court notes that the General Assembly has, in many of its resolutions, taken a position to the same effect. Thus on 10 December 2001 and 9 December 2003, in resolutions 56/60 and 58/97, it reaffirmed "that the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, is applicable to the Occupied Palestinian Territory, including East Jerusalem, and other Arab territories occupied by Israel since 1967".

99. The Security Council, for its part, had already on 14 June 1967 taken the view in resolution 237 (1967) that "all the obligations of the Geneva Convention relative to the Treatment of Prisoners of War . . . should be complied with by the parties involved in the conflict".

Subsequently, on 15 September 1969, the Security Council, in resolution 271 (1969), called upon "Israel scrupulously to observe the provisions of the Geneva Conventions and international law governing military occupation".

Ten years later, the Security Council examined "the policy and practices of Israel in establishing settlements in the Palestinian and other Arab territories occupied since 1967". In resolution 446 (1979) of 22 March 1979, the Security Council considered that those settlements had "no legal validity" and affirmed "*once more* that the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, is applicable to the Arab territories occupied by Israel since 1967, including Jerusalem". It called "*once more upon* Israel, as the occupying Power, to abide scrupulously" by that Convention.

On 20 December 1990, the Security Council, in resolution 681 (1990), urged "the Government of Israel to accept the *de jure* applicability of the Fourth Geneva Convention . . . to all the territories occupied by Israel since 1967 and to abide scrupulously by the provisions of the Convention". It further called upon "the high contracting parties to the said Fourth Geneva Convention to ensure respect by Israel, the occupying Power, for its obligations under the Convention in accordance with article 1 thereof".

Lastly, in resolutions 799 (1992) of 18 December 1992 and 904 (1994) of 18 March 1994, the Security Council reaffirmed its position concerning the applicability of the Fourth Geneva Convention in the occupied territories.

100. The Court would note finally that the Supreme Court of Israel, in a judgment dated 30 May 2004, also found that:

> "The military operations of the [Israeli Defence Forces] in Rafah, to the extent they affect civilians, are governed by Hague Convention IV Respecting the Laws and Customs of War on Land 1907 . . . and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War 1949."

101. In view of the foregoing, the Court considers that the Fourth Geneva Convention is applicable in any occupied territory in the event of an armed conflict arising between two or more High Contracting Parties. Israel and Jordan were parties to that Convention when the 1967 armed conflict broke out. The Court accordingly finds that that Convention is applicable in the Palestinian territories which before the conflict lay to the east of the Green Line and which, during that conflict, were occupied by Israel, there being no need for any enquiry into the precise prior status of those territories.

\*

102. The participants in the proceedings before the Court also disagree whether the international human rights conventions to which Israel is party apply within the Occupied Palestinian Territory. Annex I to the report of the Secretary-General states:

"4. Israel denies that the International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights, both of which it has signed, are applicable to the occupied Palestinian territory. It asserts that humanitarian law is the protection granted in a conflict situation such as the one in the West Bank and Gaza Strip, whereas human rights treaties were intended for the protection of citizens from their own Government in times of peace."

Of the other participants in the proceedings, those who addressed this issue contend that, on the contrary, both Covenants are applicable within the Occupied Palestinian Territory.

103. On 3 October 1991 Israel ratified both the International Covenant on Economic, Social and Cultural Rights of 19 December 1966 and the International Covenant on Civil and Political Rights of the same date, as well as the United Nations Convention on the Rights of the Child of 20 November 1989. It is a party to these three instruments.

104. In order to determine whether these texts are applicable in the Occupied Palestinian Territory, the Court will first address the issue of the relationship between international humanitarian law and human rights law and then that of the applicability of human rights instruments outside national territory.

105. In its Advisory Opinion of 8 July 1996 on the *Legality of the Threat or Use of Nuclear Weapons*, the Court had occasion to address the first of these issues in relation to the International Covenant on Civil and Political Rights. In those proceedings certain States had argued that "the Covenant was directed to the protection of human rights in peacetime, but that questions relating to unlawful loss of life in hostilities were governed by the law applicable in armed conflict" (*I.C.J. Reports 1996 (I)*, p. 239, para. 24).

The Court rejected this argument, stating that:

"the protection of the International Covenant of Civil and Political Rights does not cease in times of war, except by operation of Article 4 of the Covenant whereby certain provisions may be derogated from in a time of national emergency. Respect for the right to life is not, however, such a provision. In principle, the right not arbitrarily to be deprived of one's life applies also in hostilities. The test of what is an arbitrary deprivation of life, however, then falls to be determined by the applicable *lex specialis*, namely, the law applicable in armed conflict which is designed to regulate the conduct of hostilities." (*Ibid.*, p. 240, para. 25.)

106. More generally, the Court considers that the protection offered by human rights conventions does not cease in case of armed conflict, save through the effect of provisions for derogation of the kind to be found in Article 4 of the International Covenant on Civil and Political Rights. As regards the relationship between international humanitarian law and human rights law, there are thus three possible situations: some rights may be exclusively matters of international

humanitarian law; others may be exclusively matters of human rights law; yet others may be matters of both these branches of international law. In order to answer the question put to it, the Court will have to take into consideration both these branches of international law, namely human rights law and, as *lex specialis*, international humanitarian law.

107. It remains to be determined whether the two international Covenants and the Convention on the Rights of the Child are applicable only on the territories of the States parties thereto or whether they are also applicable outside those territories and, if so, in what circumstances.

108. The scope of application of the International Covenant on Civil and Political Rights is defined by Article 2, paragraph 1, thereof, which provides:

> "Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."

This provision can be interpreted as covering only individuals who are both present within a State's territory and subject to that State's jurisdiction. It can also be construed as covering both individuals present within a State's territory and those outside that territory but subject to that State's jurisdiction. The Court will thus seek to determine the meaning to be given to this text.

109. The Court would observe that, while the jurisdiction of States is primarily territorial, it may sometimes be exercised outside the national territory. Considering the object and purpose of the International Covenant on Civil and Political Rights, it would seem natural that, even when such is the case, States parties to the Covenant should be bound to comply with its provisions.

The constant practice of the Human Rights Committee is consistent with this. Thus, the Committee has found the Covenant applicable where the State exercises its jurisdiction on foreign territory. It has ruled on the legality of acts by Uruguay in cases of arrests carried out by Uruguayan agents in Brazil or Argentina (case No. 52/79, *López Burgos* v. *Uruguay*; case No. 56/79, *Lilian Celiberti de Casariego* v. *Uruguay*). It decided to the same effect in the case of the confiscation of a passport by a Uruguayan consulate in Germany (case No. 106/81, *Montero* v. *Uruguay*).

The *travaux préparatoires* of the Covenant confirm the Committee's interpretation of Article 2 of that instrument. These show that, in adopting the wording chosen, the drafters of the Covenant did not intend to allow States to escape from their obligations when they exercise jurisdiction outside their national territory. They only intended to prevent persons residing abroad from asserting, vis-à-vis their State of origin, rights that do not fall within the competence of that State, but of that of the State of residence (see the discussion of the preliminary draft in the Commission on Human Rights, E/CN.4/SR.194, para. 46; and United Nations, *Official Records of the General Assembly, Tenth Session, Annexes*, A/2929, Part II, Chap. V, para. 4 (1955)).

110. The Court takes note in this connection of the position taken by Israel, in relation to the applicability of the Covenant, in its communications to the Human Rights Committee, and of the view of the Committee.

In 1998, Israel stated that, when preparing its report to the Committee, it had had to face the question "whether individuals resident in the occupied territories were indeed subject to Israel's jurisdiction" for purposes of the application of the Covenant (CCPR/C/SR.1675, para. 21). Israel took the position that "the Covenant and similar instruments did not apply directly to the current situation in the occupied territories" (*ibid.*, para. 27).

The Committee, in its concluding observations after examination of the report, expressed concern at Israel's attitude and pointed "to the long-standing presence of Israel in [the occupied] territories, Israel's ambiguous attitude towards their future status, as well as the exercise of effective jurisdiction by Israeli security forces therein" (CCPR/C/79/Add.93, para. 10). In 2003 in face of Israel's consistent position, to the effect that "the Covenant does not apply beyond its own territory, notably in the West Bank and Gaza . . .", the Committee reached the following conclusion:

"in the current circumstances, the provisions of the Covenant apply to the benefit of the population of the Occupied Territories, for all conduct by the State party's authorities or agents in those territories that affect the enjoyment of rights enshrined in the Covenant and fall within the ambit of State responsibility of Israel under the principles of public international law" (CCPR/CO/78/ISR, para. 11).

111. In conclusion, the Court considers that the International Covenant on Civil and Political Rights is applicable in respect of acts done by a State in the exercise of its jurisdiction outside its own territory.

112. The International Covenant on Economic, Social and Cultural Rights contains no provision on its scope of application. This may be explicable by the fact that this Covenant guarantees rights which are essentially territorial. However, it is not to be excluded that it applies both to territories over which a State party has sovereignty and to those over which that State exercises territorial jurisdiction. Thus Article 14 makes provision for transitional measures in the case of any State which "at the time of becoming a Party, has not been able to secure in its metropolitan territory or other territories under its jurisdiction compulsory primary education, free of charge".

It is not without relevance to recall in this regard the position taken by Israel in its reports to the Committee on Economic, Social and Cultural Rights. In its initial report to the Committee of 4 December 1998, Israel provided "statistics indicating the enjoyment of the rights enshrined in the Covenant by Israeli settlers in the occupied Territories". The Committee noted that, according to Israel, "the Palestinian population within the same jurisdictional areas were excluded from both the report and the protection of the Covenant" (E/C.12/1/Add. 27, para. 8). The Committee expressed

its concern in this regard, to which Israel replied in a further report of 19 October 2001 that it has "consistently maintained that the Covenant does not apply to areas that are not subject to its sovereign territory and jurisdiction" (a formula inspired by the language of the International Covenant on Civil and Political Rights). This position, continued Israel, is "based on the well-established distinction between human rights and humanitarian law under international law". It added: "the Committee's mandate cannot relate to events in the West Bank and the Gaza Strip, inasmuch as they are part and parcel of the context of armed conflict as distinct from a relationship of human rights" (E/1990/6/Add. 32, para. 5). In view of these observations, the Committee reiterated its concern about Israel's position and reaffirmed "its view that the State party's obligations under the Covenant apply to all territories and populations under its effective control" (E/C.12/1/Add.90, paras. 15 and 31).

For the reasons explained in paragraph 106 above, the Court cannot accept Israel's view. It would also observe that the territories occupied by Israel have for over 37 years been subject to its territorial jurisdiction as the occupying Power. In the exercise of the powers available to it on this basis, Israel is bound by the provisions of the International Covenant on Economic, Social and Cultural Rights. Furthermore, it is under an obligation not to raise any obstacle to the exercise of such rights in those fields where competence has been transferred to Palestinian authorities.

113. As regards the Convention on the Rights of the Child of 20 November 1989, that instrument contains an Article 2 according to which "States Parties shall respect and ensure the rights set forth in the . . . Convention to each child within their jurisdiction . . .". That Convention is therefore applicable within the Occupied Palestinian Territory.

\*        \*

114. Having determined the rules and principles of international law relevant to reply to the question posed by the General Assembly, and having ruled in particular on the applicability within the Occupied Palestinian Territory of international humanitarian law and human rights law, the Court will now seek to ascertain whether the construction of the wall has violated those rules and principles.

\*

115. In this regard, Annex II to the report of the Secretary-General, entitled "Summary Legal Position of the Palestine Liberation Organization", states that "The construction of the Barrier is an attempt to annex the territory contrary to international law" and that "The de facto annexation of land interferes with the territorial sovereignty and consequently with the right of the Palestinians to

self-determination." This view was echoed in certain of the written statements submitted to the Court and in the views expressed at the hearings. *Inter alia*, it was contended that: "The wall severs the territorial sphere over which the Palestinian people are entitled to exercise their right of self-determination and constitutes a violation of the legal principle prohibiting the acquisition of territory by the use of force." In this connection, it was in particular emphasized that "The route of the wall is designed to change the demographic composition of the Occupied Palestinian Territory, including East Jerusalem, by reinforcing the Israeli settlements" illegally established on the Occupied Palestinian Territory. It was further contended that the wall aimed at "reducing and parcelling out the territorial sphere over which the Palestinian people are entitled to exercise their right of self-determination".

116. For its part, Israel has argued that the wall's sole purpose is to enable it effectively to combat terrorist attacks launched from the West Bank. Furthermore, Israel has repeatedly stated that the Barrier is a temporary measure (see report of the Secretary-General, para. 29). It did so *inter alia* through its Permanent Representative to the United Nations at the Security Council meeting of 14 October 2003, emphasizing that "[the fence] does not annex territories to the State of Israel", and that Israel is "ready and able, at tremendous cost, to adjust or dismantle a fence if so required as part of a political settlement" (S/PV.4841, p. 10). Israel's Permanent Representative restated this view before the General Assembly on 20 October and 8 December 2003. On this latter occasion, he added: "As soon as the terror ends, the fence will no longer be necessary. The fence is not a border and has no political significance. It does not change the legal status of the territory in any way." (A/ES-10/PV.23, p. 6.)

117. The Court would recall that both the General Assembly and the Security Council have referred, with regard to Palestine, to the customary rule of "the inadmissibility of the acquisition of territory by war" (see paragraphs 74 and 87 above). Thus in resolution 242 (1967) of 22 November 1967, the Security Council, after recalling this rule, affirmed that:

"the fulfilment of Charter principles requires the establishment of a just and lasting peace in the Middle East which should include the application of both the following principles:

(i) Withdrawal of Israel armed forces from territories occupied in the recent conflict;

(ii) Termination of all claims or states of belligerency and respect for and acknowledgement of the sovereignty, territorial integrity and political independence of every State in the area and their right to live in peace within secure and recognized boundaries free from threats or acts of force".

It is on this same basis that the Council has several times condemned the measures taken by Israel to change the status of Jerusalem (see paragraph 75 above).

118. As regards the principle of the right of peoples to self-determination, the Court observes that the existence of a "Palestinian people" is no longer in issue. Such existence has moreover been recognized by Israel in the exchange of letters of 9 September 1993 between Mr. Yasser Arafat, President of the Palestine Liberation Organization (PLO) and Mr. Yitzhak Rabin, Israeli Prime Minister. In that correspondence, the President of the PLO recognized "the right of the State of Israel to exist in peace and security" and made various other commitments. In reply, the Israeli Prime Minister informed him that, in the light of those commitments, "the Government of Israel has decided to recognize the PLO as the representative of the Palestinian people". The Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip of 28 September 1995 also refers a number of times to the Palestinian people and its "legitimate rights" (Preamble, paras. 4, 7, 8; Article II, para. 2; Article III, paras. 1 and 3; Article XXII, para. 2). The Court considers that those rights include the right to self-determination, as the General Assembly has moreover recognized on a number of occasions (see, for example, resolution 58/163 of 22 December 2003).

119. The Court notes that the route of the wall as fixed by the Israeli Government includes within the "Closed Area" (see paragraph 85 above) some 80 per cent of the settlers living in the Occupied Palestinian Territory. Moreover, it is apparent from an examination of the map mentioned in paragraph 80 above that the wall's sinuous route has been traced in such a way as to include within that area the great majority of the Israeli settlements in the occupied Palestinian Territory (including East Jerusalem).

120. As regards these settlements, the Court notes that Article 49, paragraph 6, of the Fourth Geneva Convention provides: "The Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies." That provision prohibits not only deportations or forced transfers of population such as those carried out during the Second World War, but also any measures taken by an occupying Power in order to organize or encourage transfers of parts of its own population into the occupied territory.

In this respect, the information provided to the Court shows that, since 1977, Israel has conducted a policy and developed practices involving the establishment of settlements in the Occupied Palestinian Territory, contrary to the terms of Article 49, paragraph 6, just cited.

The Security Council has thus taken the view that such policy and practices "have no legal validity". It has also called upon "Israel, as the occupying Power, to abide scrupulously" by the Fourth Geneva Convention and:

"to rescind its previous measures and to desist from taking any action which would result in changing the legal status and geographical nature and materially affecting the demographic composition of the Arab territories occupied since 1967, including Jerusalem and, in particular, not to transfer parts of its own civilian population into the occupied Arab territories" (resolution 446 (1979) of 22 March 1979).

INTERNATIONAL COURT OF JUSTICE

The Council reaffirmed its position in resolutions 452 (1979) of 20 July 1979 and 465 (1980) of 1 March 1980. Indeed, in the latter case it described "Israel's policy and practices of settling parts of its population and new immigrants in [the occupied] territories" as a "flagrant violation" of the Fourth Geneva Convention.

The Court concludes that the Israeli settlements in the Occupied Palestinian Territory (including East Jerusalem) have been established in breach of international law.

121. Whilst the Court notes the assurance given by Israel that the construction of the wall does not amount to annexation and that the wall is of a temporary nature (see paragraph 116 above), it nevertheless cannot remain indifferent to certain fears expressed to it that the route of the wall will prejudge the future frontier between Israel and Palestine, and the fear that Israel may integrate the settlements and their means of access. The Court considers that the construction of the wall and its associated régime create a "fait accompli" on the ground that could well become permanent, in which case, and notwithstanding the formal characterization of the wall by Israel, it would be tantamount to *de facto* annexation.

122. The Court recalls moreover that, according to the report of the Secretary-General, the planned route would incorporate in the area between the Green Line and the wall more than 16 per cent of the territory of the West Bank. Around 80 per cent of the settlers living in the Occupied Palestinian Territory, that is 320,000 individuals, would reside in that area, as well as 237,000 Palestinians. Moreover, as a result of the construction of the wall, around 160,000 other Palestinians would reside in almost completely encircled communities (see paragraphs 84, 85 and 119 above).

In other terms, the route chosen for the wall gives expression *in loco* to the illegal measures taken by Israel with regard to Jerusalem and the settlements, as deplored by the Security Council (see paragraphs 75 and 120 above). There is also a risk of further alterations to the demographic composition of the Occupied Palestinian Territory resulting from the construction of the wall inasmuch as it is contributing, as will be further explained in paragraph 133 below, to the departure of Palestinian populations from certain areas. That construction, along with measures taken previously, thus severely impedes the exercise by the Palestinian people of its right to self-determination, and is therefore a breach of Israel's obligation to respect that right.

*

123. The construction of the wall also raises a number of issues in relation to the relevant provisions of international humanitarian law and of human rights instruments.

124. With regard to the Hague Regulations of 1907, the Court would recall that these deal, in Section II, with hostilities and in particular with "means of injuring the enemy, sieges, and bombardments". Section III deals with military authority in occupied territories. Only Section III is currently applicable in the West Bank and Article 23 *(g)* of the Regulations, in Section II, is thus not pertinent.

INTERNATIONAL COURT OF JUSTICE

Section III of the Hague Regulations includes Articles 43, 46 and 52, which are applicable in the Occupied Palestinian Territory. Article 43 imposes a duty on the occupant to "take all measures within his power to restore, and, as far as possible, to insure public order and life, respecting the laws in force in the country". Article 46 adds that private property must be "respected" and that it cannot "be confiscated". Lastly, Article 52 authorizes, within certain limits, requisitions in kind and services for the needs of the army of occupation.

125. A distinction is also made in the Fourth Geneva Convention between provisions applying during military operations leading to occupation and those that remain applicable throughout the entire period of occupation. It thus states in Article 6:

"The present Convention shall apply from the outset of any conflict or occupation mentioned in Article 2.

In the territory of Parties to the conflict, the application of the present Convention shall cease on the general close of military operations.

In the case of occupied territory, the application of the present Convention shall cease one year after the general close of military operations; however, the Occupying Power shall be bound, for the duration of the occupation, to the extent that such Power exercises the functions of government in such territory, by the provisions of the following Articles of the present Convention: 1 to 12, 27, 29 to 34, 47, 49, 51, 52, 53, 59, 61 to 77, 143.

Protected persons whose release, repatriation or re-establishment may take place after such dates shall meanwhile continue to benefit by the present Convention."

Since the military operations leading to the occupation of the West Bank in 1967 ended a long time ago, only those Articles of the Fourth Geneva Convention referred to in Article 6, paragraph 3, remain applicable in that occupied territory.

126. These provisions include Articles 47, 49, 52, 53 and 59 of the Fourth Geneva Convention.

According to Article 47:

"Protected persons who are in occupied territory shall not be deprived, in any case or in any manner whatsoever, of the benefits of the present Convention by any change introduced, as the result of the occupation of a territory, into the institutions or government of the said territory, nor by any agreement concluded between the authorities of the occupied territories and the Occupying Power, nor by any annexation by the latter of the whole or part of the occupied territory."

Article 49 reads as follows:

"Individual or mass forcible transfers, as well as deportations of protected persons from occupied territory to the territory of the Occupying Power or to that of any other country, occupied or not, are prohibited, regardless of their motive.

Nevertheless, the Occupying Power may undertake total or partial evacuation of a given area if the security of the population or imperative military reasons so demand. Such evacuations may not involve the displacement of protected persons outside the bounds of the occupied territory except when for material reasons it is impossible to avoid such displacement. Persons thus evacuated shall be transferred back to their homes as soon as hostilities in the area in question have ceased.

The Occupying Power undertaking such transfers or evacuations shall ensure, to the greatest practicable extent, that proper accommodation is provided to receive the protected persons, that the removals are effected in satisfactory conditions of hygiene, health, safety and nutrition, and that members of the same family are not separated.

The Protecting Power shall be informed of any transfers and evacuations as soon as they have taken place.

The Occupying Power shall not detain protected persons in an area particularly exposed to the dangers of war unless the security of the population or imperative military reasons so demand.

The Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies."

According to Article 52:

"No contract, agreement or regulation shall impair the right of any worker, whether voluntary or not and wherever he may be, to apply to the representatives of the Protecting Power in order to request the said Power's intervention.

All measures aiming at creating unemployment or at restricting the opportunities offered to workers in an occupied territory, in order to induce them to work for the Occupying Power, are prohibited."

Article 53 provides that:

"Any destruction by the Occupying Power of real or personal property belonging individually or collectively to private persons, or to the State, or to other public authorities, or to social or cooperative organizations, is prohibited, except where such destruction is rendered absolutely necessary by military operations."

Lastly, according to Article 59:

"If the whole or part of the population of an occupied territory is inadequately supplied, the Occupying Power shall agree to relief schemes on behalf of the said population, and shall facilitate them by all the means at its disposal.

Such schemes, which may be undertaken either by States or by impartial humanitarian organizations such as the International Committee of the Red Cross, shall consist, in particular, of the provision of consignments of foodstuffs, medical supplies and clothing.

All Contracting Parties shall permit the free passage of these consignments and shall guarantee their protection.

A Power granting free passage to consignments on their way to territory occupied by an adverse Party to the conflict shall, however, have the right to search the consignments, to regulate their passage according to prescribed times and routes, and to be reasonably satisfied through the Protecting Power that these consignments are to be used for the relief of the needy population and are not to be used for the benefit of the Occupying Power."

127. The International Covenant on Civil and Political Rights also contains several relevant provisions. Before further examining these, the Court will observe that Article 4 of the Covenant allows for derogation to be made, under various conditions, to certain provisions of that instrument. Israel made use of its right of derogation under this Article by addressing the following communication to the Secretary-General of the United Nations on 3 October 1991:

"Since its establishment, the State of Israel has been the victim of continuous threats and attacks on its very existence as well as on the life and property of its citizens.

These have taken the form of threats of war, of actual armed attacks, and campaigns of terrorism resulting in the murder of and injury to human beings.

In view of the above, the State of Emergency which was proclaimed in May 1948 has remained in force ever since. This situation constitutes a public emergency within the meaning of article 4 (1) of the Covenant.

The Government of Israel has therefore found it necessary, in accordance with the said article 4, to take measures to the extent strictly required by the exigencies of the situation, for the defence of the State and for the protection of life and property, including the exercise of powers of arrest and detention.

In so far as any of these measures are inconsistent with article 9 of the Covenant, Israel thereby derogates from its obligations under that provision."

The Court notes that the derogation so notified concerns only Article 9 of the International Covenant on Civil and Political Rights, which deals with the right to liberty and security of person and lays down the rules applicable in cases of arrest or detention. The other Articles of the Covenant therefore remain applicable not only on Israeli territory, but also on the Occupied Palestinian Territory.

128. Among these mention must be made of Article 17, paragraph 1 of which reads as follows: "No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation."

Mention must also be made of Article 12, paragraph 1, which provides: "Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence."

129. In addition to the general guarantees of freedom of movement under Article 12 of the International Covenant on Civil and Political Rights, account must also be taken of specific guarantees of access to the Christian, Jewish and Islamic Holy Places. The status of the Christian Holy Places in the Ottoman Empire dates far back in time, the latest provisions relating thereto having been incorporated into Article 62 of the Treaty of Berlin of 13 July 1878. The Mandate for Palestine given to the British Government on 24 July 1922 included an Article 13, under which:

> "All responsibility in connection with the Holy Places and religious buildings or sites in Palestine, including that of preserving existing rights and of securing free access to the Holy Places, religious buildings and sites and the free exercise of worship, while ensuring the requirements of public order and decorum, is assumed by the Mandatory . . ."

Article 13 further stated: "nothing in this mandate shall be construed as conferring . . . authority to interfere with the fabric or the management of purely Moslem sacred shrines, the immunities of which are guaranteed".

In the aftermath of the Second World War, the General Assembly, in adopting resolution 181 (II) on the future government of Palestine, devoted an entire chapter of the Plan of Partition to the Holy Places, religious buildings and sites. Article 2 of this Chapter provided, in so far as the Holy Places were concerned:

> "the liberty of access, visit and transit shall be guaranteed, in conformity with existing rights, to all residents and citizens [of the Arab State, of the Jewish State] and of the City of Jerusalem, as well as to aliens, without distinction as to nationality, subject to requirements of national security, public order and decorum".

Subsequently, in the aftermath of the armed conflict of 1948, the 1949 General Armistice Agreement between Jordan and Israel provided in Article VIII for the establishment of a special committee for "the formulation of agreed plans and arrangements for such matters as either Party may submit to it" for the purpose of enlarging the scope of the Agreement and of effecting improvement in its application. Such matters, on which an agreement of principle had already been concluded, included "free access to the Holy Places".

This commitment concerned mainly the Holy Places located to the east of the Green Line. However, some Holy Places were located west of that Line. This was the case of the Room of the Last Supper and the Tomb of David, on Mount Zion. In signing the General Armistice Agreement, Israel thus undertook, as did Jordan, to guarantee freedom of access to the Holy Places. The Court

considers that this undertaking by Israel has remained valid for the Holy Places which came under its control in 1967. This undertaking has further been confirmed by Article 9, paragraph 1, of the 1994 Peace Treaty between Israel and Jordan, by virtue of which, in more general terms, "Each party will provide freedom of access to places of religious and historical significance."

130. As regards the International Covenant on Economic, Social and Cultural Rights, that instrument includes a number of relevant provisions, namely: the right to work (Articles 6 and 7); protection and assistance accorded to the family and to children and young persons (Article 10); the right to an adequate standard of living, including adequate food, clothing and housing, and the right "to be free from hunger" (Art. 11); the right to health (Art. 12); the right to education (Arts. 13 and 14).

131. Lastly, the United Nations Convention on the Rights of the Child of 20 November 1989 includes similar provisions in Articles 16, 24, 27 and 28.

*

132. From the information submitted to the Court, particularly the report of the Secretary-General, it appears that the construction of the wall has led to the destruction or requisition of properties under conditions which contravene the requirements of Articles 46 and 52 of the Hague Regulations of 1907 and of Article 53 of the Fourth Geneva Convention.

133. That construction, the establishment of a closed area between the Green Line and the wall itself and the creation of enclaves have moreover imposed substantial restrictions on the freedom of movement of the inhabitants of the Occupied Palestinian Territory (with the exception of Israeli citizens and those assimilated thereto). Such restrictions are most marked in urban areas, such as the Qalqiliya enclave or the City of Jerusalem and its suburbs. They are aggravated by the fact that the access gates are few in number in certain sectors and opening hours appear to be restricted and unpredictably applied. For example, according to the Special Rapporteur of the Commission on Human Rights on the situation of human rights in the Palestinian territories occupied by Israel since 1967, "Qalqiliya, a city with a population of 40,000, is completely surrounded by the Wall and residents can only enter and leave through a single military checkpoint open from 7 a.m. to 7 p.m." (Report of the Special Rapporteur of the Commission on Human Rights, John Dugard, on the situation of human rights in the Palestinian territories occupied by Israel since 1967, submitted in accordance with Commission resolution 1993/2 A and entitled "Question of the Violation of Human Rights in the Occupied Arab Territories, including Palestine", E/CN.4/2004/6, 8 September 2003, para. 9.)

There have also been serious repercussions for agricultural production, as is attested by a number of sources. According to the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories

"an estimated 100,000 dunums [approximately 10,000 hectares] of the West Bank's
most fertile agricultural land, confiscated by the Israeli Occupation Forces, have been
destroyed during the first phase of the wall construction, which involves the
disappearance of vast amounts of property, notably private agricultural land and olive
trees, wells, citrus grows and hothouses upon which tens of thousands of Palestinians
rely for their survival" (Report of the Special Committee to Investigate Israeli Practices
Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied
Territories, A/58/311, 22 August 2003, para. 26).

Further, the Special Rapporteur on the situation of human rights in the Palestinian territories occupied
by Israel since 1967 states that "Much of the Palestinian land on the Israeli side of the Wall consists
of fertile agricultural land and some of the most important water wells in the region" and adds that
"Many fruit and olive trees had been destroyed in the course of building the barrier."
(E/CN.4/2004/6, 8 September 2003, para. 9.) The Special Rapporteur on the Right to Food of the
United Nations Commission on Human Rights states that construction of the wall "cuts off
Palestinians from their agricultural lands, wells and means of subsistence" (Report by the Special
Rapporteur of the United Nations Commission on Human Rights, Jean Ziegler, "The Right to Food",
Addendum, Mission to the Occupied Palestinian Territories, E/CN.4/2004/10/Add.2,
31 October 2003, para. 49). In a recent survey conducted by the World Food Programme, it is stated
that the situation has aggravated food insecurity in the region, which reportedly numbers 25,000 new
beneficiaries of food aid (report of the Secretary-General, para. 25).

It has further led to increasing difficulties for the population concerned regarding access to
health services, educational establishments and primary sources of water. This is also attested by a
number of different information sources. Thus the report of the Secretary-General states generally
that "According to the Palestinian Central Bureau of Statistics, so far the Barrier has separated
30 localities from health services, 22 from schools, 8 from primary water sources and 3 from
electricity networks." (Report of the Secretary-General, para. 23.) The Special Rapporteur of the
United Nations Commission on Human Rights on the situation of human rights in the Palestinian
territories occupied by Israel since 1967 states that "Palestinians between the Wall and Green Line
will effectively be cut off from their land and workplaces, schools, health clinics and other social
services." (E/CN.4/2004/6, 8 September 2003, para. 9.) In relation specifically to water resources,
the Special Rapporteur on the Right to Food of the United Nations Commission on Human Rights
observes that "By constructing the fence Israel will also effectively annex most of the western aquifer
system (which provides 51 per cent of the West Bank's water resources)." (E/CN.4/2004/10/Add.2,
31 October 2003, para. 51.) Similarly, in regard to access to health services, it has been stated that, as
a result of the enclosure of Qalqiliya, a United Nations hospital in that town has recorded a
40 per cent decrease in its caseload (report of the Secretary-General, para. 24).

At Qalqiliya, according to reports furnished to the United Nations, some 600 shops or
businesses have shut down, and 6,000 to 8,000 people have already left the region (E/CN.4/2004/6,
8 September 2003, para. 10; E/CN.4/2004/10/Add.2, 31 October 2003, para. 51). The Special
Rapporteur on the Right to Food of the United Nations Commission on Human Rights has also
observed that "With the fence/wall cutting communities off from their land and water without other

means of subsistence, many of the Palestinians living in these areas will be forced to leave."
(E/CN.4/2004/10/Add.2, 31 October 2003, para. 51.) In this respect also the construction of the wall
would effectively deprive a significant number of Palestinians of the "freedom to choose [their]
residence". In addition, however, in the view of the Court, since a significant number of Palestinians
have already been compelled by the construction of the wall and its associated régime to depart from
certain areas, a process that will continue as more of the wall is built, that construction, coupled with
the establishment of the Israeli settlements mentioned in paragraph 120 above, is tending to alter the
demographic composition of the Occupied Palestinian Territory.

134. To sum up, the Court is of the opinion that the construction of the wall and its associated
régime impede the liberty of movement of the inhabitants of the Occupied Palestinian Territory (with
the exception of Israeli citizens and those assimilated thereto) as guaranteed under Article 12,
paragraph 1, of the International Covenant on Civil and Political Rights. They also impede the
exercise by the persons concerned of the right to work, to health, to education and to an adequate
standard of living as proclaimed in the International Covenant on Economic, Social and Cultural
Rights and in the United Nations Convention on the Rights of the Child. Lastly, the construction of
the wall and its associated régime, by contributing to the demographic changes referred to in
paragraphs 122 and 133 above, contravene Article 49, paragraph 6, of the Fourth Geneva Convention
and the Security Council resolutions cited in paragraph 120 above.

135. The Court would observe, however, that the applicable international humanitarian law
contains provisions enabling account to be taken of military exigencies in certain circumstances.

Neither Article 46 of the Hague Regulations of 1907 nor Article 47 of the Fourth Geneva
Convention contain any qualifying provision of this type. With regard to forcible transfers of
population and deportations, which are prohibited under Article 49, paragraph 1, of the Convention,
paragraph 2 of that Article provides for an exception in those cases in which "the security of the
population or imperative military reasons so demand". This exception however does not apply to
paragraph 6 of that Article, which prohibits the occupying Power from deporting or transferring parts
of its own civilian population into the territories it occupies. As to Article 53 concerning the
destruction of personal property, it provides for an exception "where such destruction is rendered
absolutely necessary by military operations".

The Court considers that the military exigencies contemplated by these texts may be invoked in
occupied territories even after the general close of the military operations that led to their occupation.
However, on the material before it, the Court is not convinced that the destructions carried out
contrary to the prohibition in Article 53 of the Fourth Geneva Convention were rendered absolutely
necessary by military operations.

136. The Court would further observe that some human rights conventions, and in particular
the International Covenant on Civil and Political Rights, contain provisions which States parties may
invoke in order to derogate, under various conditions, from certain of their conventional obligations.
In this respect, the Court would however recall that the communication notified by

Israel to the Secretary-General of the United Nations under Article 4 of the International Covenant on Civil and Political Rights concerns only Article 9 of the Covenant, relating to the right to freedom and security of person (see paragraph 127 above); Israel is accordingly bound to respect all the other provisions of that instrument.

The Court would note, moreover, that certain provisions of human rights conventions contain clauses qualifying the rights covered by those provisions. There is no clause of this kind in Article 17 of the International Covenant on Civil and Political Rights. On the other hand, Article 12, paragraph 3, of that instrument provides that restrictions on liberty of movement as guaranteed under that Article "shall not be subject to any restrictions except those which are provided by law, are necessary to protect national security, public order *(ordre public)*, public health or morals or the rights and freedoms of others, and are consistent with the other rights recognized in the present Covenant". As for the International Covenant on Economic, Social and Cultural Rights, Article 4 thereof contains a general provision as follows:

> "The States Parties to the present Covenant recognize that, in the enjoyment of those rights provided by the State in conformity with the present Covenant, the State may subject such rights only to such limitations as are determined by law only in so far as this may be compatible with the nature of these rights and solely for the purpose of promoting the general welfare in a democratic society."

The Court would observe that the restrictions provided for under Article 12, paragraph 3, of the International Covenant on Civil and Political Rights are, by the very terms of that provision, exceptions to the right of freedom of movement contained in paragraph 1. In addition, it is not sufficient that such restrictions be directed to the ends authorized; they must also be necessary for the attainment of those ends. As the Human Rights Committee put it, they "must conform to the principle of proportionality" and "must be the least intrusive instrument amongst those which might achieve the desired result" (CCPR/C/21/Rev.1/Add.9, General Comment No. 27, para. 14). On the basis of the information available to it, the Court finds that these conditions are not met in the present instance.

The Court would further observe that the restrictions on the enjoyment by the Palestinians living in the territory occupied by Israel of their economic, social and cultural rights, resulting from Israel's construction of the wall, fail to meet a condition laid down by Article 4 of the International Covenant on Economic, Social and Cultural Rights, that is to say that their implementation must be "solely for the purpose of promoting the general welfare in a democratic society".

137. To sum up, the Court, from the material available to it, is not convinced that the specific course Israel has chosen for the wall was necessary to attain its security objectives. The wall, along the route chosen, and its associated régime gravely infringe a number of rights of Palestinians residing in the territory occupied by Israel, and the infringements resulting from that route cannot be justified by military exigencies or by the requirements of national security or public order. The construction of such a wall accordingly constitutes breaches by Israel of various of its obligations under the applicable international humanitarian law and human rights instruments.

\*

138. The Court has thus concluded that the construction of the wall constitutes action not in conformity with various international legal obligations incumbent upon Israel. However, Annex I to the report of the Secretary-General states that, according to Israel: "the construction of the Barrier is consistent with Article 51 of the Charter of the United Nations, its inherent right to self-defence and Security Council resolutions 1368 (2001) and 1373 (2001)". More specifically, Israel's Permanent Representative to the United Nations asserted in the General Assembly on 20 October 2003 that "the fence is a measure wholly consistent with the right of States to self-defence enshrined in Article 51 of the Charter"; the Security Council resolutions referred to, he continued, "have clearly recognized the right of States to use force in self-defence against terrorist attacks", and therefore surely recognize the right to use non-forcible measures to that end (A/ES-10/PV.21, p. 6).

139. Under the terms of Article 51 of the Charter of the United Nations:

"Nothing in the present Charter shall impair the inherent right of individual or collective self-defence if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security."

Article 51 of the Charter thus recognizes the existence of an inherent right of self-defence in the case of armed attack by one State against another State. However, Israel does not claim that the attacks against it are imputable to a foreign State.

The Court also notes that Israel exercises control in the Occupied Palestinian Territory and that, as Israel itself states, the threat which it regards as justifying the construction of the wall originates within, and not outside, that territory. The situation is thus different from that contemplated by Security Council resolutions 1368 (2001) and 1373 (2001), and therefore Israel could not in any event invoke those resolutions in support of its claim to be exercising a right of self-defence.

Consequently, the Court concludes that Article 51 of the Charter has no relevance in this case.

140. The Court has, however, considered whether Israel could rely on a state of necessity which would preclude the wrongfulness of the construction of the wall. In this regard the Court is bound to note that some of the conventions at issue in the present instance include qualifying clauses of the rights guaranteed or provisions for derogation (see paragraphs 135 and 136 above). Since those treaties already address considerations of this kind within their own provisions, it might be asked whether a state of necessity as recognized in customary international law could be invoked with regard to those treaties as a ground for precluding the wrongfulness of the measures or decisions being challenged. However, the Court will not need to consider that question. As the Court observed in the case concerning the *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, "the state of necessity is a ground recognized by customary international law" that "can only be accepted on an exceptional basis"; it "can only be invoked under certain strictly defined conditions which must be cumulatively satisfied; and the State concerned is not the sole judge of whether those conditions have been met" (*I.C.J. Reports 1997*, p. 40, para. 51). One of those conditions

was stated by the Court in terms used by the International Law Commission, in a text which in its present form requires that the act being challenged be "the only way for the State to safeguard an essential interest against a grave and imminent peril" (Article 25 of the International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts; see also former Article 33 of the Draft Articles on the International Responsibility of States, with slightly different wording in the English text). In the light of the material before it, the Court is not convinced that the construction of the wall along the route chosen was the only means to safeguard the interests of Israel against the peril which it has invoked as justification for that construction.

141. The fact remains that Israel has to face numerous indiscriminate and deadly acts of violence against its civilian population. It has the right, and indeed the duty, to respond in order to protect the life of its citizens. The measures taken are bound nonetheless to remain in conformity with applicable international law.

142. In conclusion, the Court considers that Israel cannot rely on a right of self-defence or on a state of necessity in order to preclude the wrongfulness of the construction of the wall resulting from the considerations mentioned in paragraphs 122 and 137 above. The Court accordingly finds that the construction of the wall, and its associated régime, are contrary to international law.

*

*      *

143. The Court having concluded that, by the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem, and by adopting its associated régime, Israel has violated various international obligations incumbent upon it (see paragraphs 114-137 above), it must now, in order to reply to the question posed by the General Assembly, examine the consequences of those violations.

*      *

144. In their written and oral observations, many participants in the proceedings before the Court contended that Israel's action in illegally constructing this wall has legal consequences not only for Israel itself, but also for other States and for the United Nations; in its Written Statement, Israel, for its part, presented no arguments regarding the possible legal consequences of the construction of the wall.

INTERNATIONAL COURT OF JUSTICE

145. As regards the legal consequences for Israel, it was contended that Israel has, first, a legal obligation to bring the illegal situation to an end by ceasing forthwith the construction of the wall in the Occupied Palestinian Territory, and to give appropriate assurances and guarantees of non-repetition.

It was argued that, secondly, Israel is under a legal obligation to make reparation for the damage arising from its unlawful conduct. It was submitted that such reparation should first of all take the form of restitution, namely demolition of those portions of the wall constructed in the Occupied Palestinian Territory and annulment of the legal acts associated with its construction and the restoration of property requisitioned or expropriated for that purpose; reparation should also include appropriate compensation for individuals whose homes or agricultural holdings have been destroyed.

It was further contended that Israel is under a continuing duty to comply with all of the international obligations violated by it as a result of the construction of the wall in the Occupied Palestinian Territory and of the associated régime. It was also argued that, under the terms of the Fourth Geneva Convention, Israel is under an obligation to search for and bring before its courts persons alleged to have committed, or to have ordered to be committed, grave breaches of international humanitarian law flowing from the planning, construction and use of the wall.

146. As regards the legal consequences for States other than Israel, it was contended before the Court that all States are under an obligation not to recognize the illegal situation arising from the construction of the wall, not to render aid or assistance in maintaining that situation and to co-operate with a view to putting an end to the alleged violations and to ensuring that reparation will be made therefor.

Certain participants in the proceedings further contended that the States parties to the Fourth Geneva Convention are obliged to take measures to ensure compliance with the Convention and that, inasmuch as the construction and maintenance of the wall in the Occupied Palestinian Territory constitutes grave breaches of that Convention, the States parties to that Convention are under an obligation to prosecute or extradite the authors of such breaches. It was further observed that "the United Nations Security Council should consider flagrant and systematic violation of international law norm[s] and principles by Israel, particularly . . . international humanitarian law, and take all necessary measures to put an end [to] these violations", and that the Security Council and the General Assembly must take due account of the advisory opinion to be given by the Court.

\*      \*

147. Since the Court has concluded that the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem, and its associated régime, are contrary to various of Israel's international obligations, it follows that the responsibility of that State is engaged under international law.

148. The Court will now examine the legal consequences resulting from the violations of international law by Israel by distinguishing between, on the one hand, those arising for Israel and, on the other, those arising for other States and, where appropriate, for the United Nations. The Court will begin by examining the legal consequences of those violations for Israel.

*

149. The Court notes that Israel is first obliged to comply with the international obligations it has breached by the construction of the wall in the Occupied Palestinian Territory (see paragraphs 114-137 above). Consequently, Israel is bound to comply with its obligation to respect the right of the Palestinian people to self-determination and its obligations under international humanitarian law and international human rights law. Furthermore, it must ensure freedom of access to the Holy Places that came under its control following the 1967 War (see paragraph 129 above).

150. The Court observes that Israel also has an obligation to put an end to the violation of its international obligations flowing from the construction of the wall in the Occupied Palestinian Territory. The obligation of a State responsible for an internationally wrongful act to put an end to that act is well established in general international law, and the Court has on a number of occasions confirmed the existence of that obligation (*Military and Paramilitary Activities in and against Nicaragua (Nicaragua* v. *United States of America), Merits, Judgment, I.C.J. Reports 1986*, p. 149; *United States Diplomatic and Consular Staff in Tehran, Judgment, I.C.J. Reports 1980*, p. 44, para. 95; *Haya de la Torre, Judgment, I.C.J. Reports 1951*, p. 82).

151. Israel accordingly has the obligation to cease forthwith the works of construction of the wall being built by it in the Occupied Palestinian Territory, including in and around East Jerusalem. Moreover, in view of the Court's finding (see paragraph 143 above) that Israel's violations of its international obligations stem from the construction of the wall and from its associated régime, cessation of those violations entails the dismantling forthwith of those parts of that structure situated within the Occupied Palestinian Territory, including in and around East Jerusalem. All legislative and regulatory acts adopted with a view to its construction, and to the establishment of its associated régime, must forthwith be repealed or rendered ineffective, except in so far as such acts, by providing for compensation or other forms of reparation for the Palestinian population, may continue to be relevant for compliance by Israel with the obligations referred to in paragraph 153 below.

152. Moreover, given that the construction of the wall in the Occupied Palestinian Territory has, *inter alia*, entailed the requisition and destruction of homes, businesses and agricultural holdings, the Court finds further that Israel has the obligation to make reparation for the damage caused to all the natural or legal persons concerned. The Court would recall that the essential forms of reparation in customary law were laid down by the Permanent Court of International Justice in the following terms:

> "The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law." (*Factory at Chorzów, Merits, Judgment No. 13, 1928, P.C.I.J., Series A, No. 17*, p. 47.)

153. Israel is accordingly under an obligation to return the land, orchards, olive groves and other immovable property seized from any natural or legal person for purposes of construction of the wall in the Occupied Palestinian Territory. In the event that such restitution should prove to be materially impossible, Israel has an obligation to compensate the persons in question for the damage suffered. The Court considers that Israel also has an obligation to compensate, in accordance with the applicable rules of international law, all natural or legal persons having suffered any form of material damage as a result of the wall's construction.

\*

154. The Court will now consider the legal consequences of the internationally wrongful acts flowing from Israel's construction of the wall as regards other States.

155. The Court would observe that the obligations violated by Israel include certain obligations *erga omnes*. As the Court indicated in the *Barcelona Traction* case, such obligations are by their very nature "the concern of all States" and, "In view of the importance of the rights involved, all States can be held to have a legal interest in their protection." (*Barcelona Traction, Light and Power Company, Limited, Second Phase, Judgment, I.C.J. Reports 1970*, p. 32, para. 33.) The obligations *erga omnes* violated by Israel are the obligation to respect the right of the Palestinian people to self-determination, and certain of its obligations under international humanitarian law.

156. As regards the first of these, the Court has already observed (paragraph 88 above) that in the *East Timor* case, it described as "irreproachable" the assertion that "the right of peoples to self-determination, as it evolved from the Charter and from United Nations practice, has an *erga omnes* character" (*I.C.J. Reports 1995*, p. 102, para. 29). The Court would also recall that under the terms of General Assembly resolution 2625 (XXV), already mentioned above (see paragraph 88),

"Every State has the duty to promote, through joint and separate action, realization of the principle of equal rights and self-determination of peoples, in accordance with the provisions of the Charter, and to render assistance to the United Nations in carrying out the responsibilities entrusted to it by the Charter regarding the implementation of the principle . . ."

157. With regard to international humanitarian law, the Court recalls that in its Advisory Opinion on the *Legality of the Threat or Use of Nuclear Weapons*, it stated that "a great many rules of humanitarian law applicable in armed conflict are so fundamental to the respect of the human person and 'elementary considerations of humanity' . . .", that they are "to be observed by all States whether or not they have ratified the conventions that contain them, because they constitute intransgressible principles of international customary law" (*I.C.J. Reports 1996 (I)*, p. 257, para. 79). In the Court's view, these rules incorporate obligations which are essentially of an *erga omnes* character.

158. The Court would also emphasize that Article 1 of the Fourth Geneva Convention, a provision common to the four Geneva Conventions, provides that "The High Contracting Parties undertake to respect and to ensure respect for the present Convention in all circumstances." It follows from that provision that every State party to that Convention, whether or not it is a party to a specific conflict, is under an obligation to ensure that the requirements of the instruments in question are complied with.

159. Given the character and the importance of the rights and obligations involved, the Court is of the view that all States are under an obligation not to recognize the illegal situation resulting from the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem. They are also under an obligation not to render aid or assistance in maintaining the situation created by such construction. It is also for all States, while respecting the United Nations Charter and international law, to see to it that any impediment, resulting from the construction of the wall, to the exercise by the Palestinian people of its right to self-determination is brought to an end. In addition, all the States parties to the Geneva Convention relative to the Protection of Civilian Persons in Time of War of 12 August 1949 are under an obligation, while respecting the United Nations Charter and international law, to ensure compliance by Israel with international humanitarian law as embodied in that Convention.

160. Finally, the Court is of the view that the United Nations, and especially the General Assembly and the Security Council, should consider what further action is required to bring to an end the illegal situation resulting from the construction of the wall and the associated régime, taking due account of the present Advisory Opinion.

*

*      *

161. The Court, being concerned to lend its support to the purposes and principles laid down in the United Nations Charter, in particular the maintenance of international peace and security and the peaceful settlement of disputes, would emphasize the urgent necessity for the United Nations as a whole to redouble its efforts to bring the Israeli-Palestinian conflict, which continues to pose a threat to international peace and security, to a speedy conclusion, thereby establishing a just and lasting peace in the region.

162. The Court has reached the conclusion that the construction of the wall by Israel in the Occupied Palestinian Territory is contrary to international law and has stated the legal consequences that are to be drawn from that illegality. The Court considers itself bound to add that this construction must be placed in a more general context. Since 1947, the year when General Assembly resolution 181 (II) was adopted and the Mandate for Palestine was terminated, there has been a succession of armed conflicts, acts of indiscriminate violence and repressive measures on the former mandated territory. The Court would emphasize that both Israel and Palestine are under an obligation scrupulously to observe the rules of international humanitarian law, one of the paramount purposes of which is to protect civilian life. Illegal actions and unilateral decisions have been taken on all sides, whereas, in the Court's view, this tragic situation can be brought to an end only through implementation in good faith of all relevant Security Council resolutions, in particular resolutions 242 (1967) and 338 (1973). The "Roadmap" approved by Security Council resolution 1515 (2003) represents the most recent of efforts to initiate negotiations to this end. The Court considers that it has a duty to draw the attention of the General Assembly, to which the present Opinion is addressed, to the need for these efforts to be encouraged with a view to achieving as soon as possible, on the basis of international law, a negotiated solution to the outstanding problems and the establishment of a Palestinian State, existing side by side with Israel and its other neighbours, with peace and security for all in the region.

*

*    *

163. For these reasons,

THE COURT,

(1) Unanimously,

*Finds* that it has jurisdiction to give the advisory opinion requested;

(2) By fourteen votes to one,

*Decides* to comply with the request for an advisory opinion;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;

AGAINST: *Judge* Buergenthal;

(3) *Replies* in the following manner to the question put by the General Assembly:

A. By fourteen votes to one,

The construction of the wall being built by Israel, the occupying Power, in the Occupied Palestinian Territory, including in and around East Jerusalem, and its associated régime, are contrary to international law;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;

AGAINST: *Judge* Buergenthal;

B. By fourteen votes to one,

Israel is under an obligation to terminate its breaches of international law; it is under an obligation to cease forthwith the works of construction of the wall being built in the Occupied Palestinian Territory, including in and around East Jerusalem, to dismantle forthwith the structure therein situated, and to repeal or render ineffective forthwith all legislative and regulatory acts relating thereto, in accordance with paragraph 151 of this Opinion;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;

AGAINST: *Judge* Buergenthal;

C. By fourteen votes to one,

Israel is under an obligation to make reparation for all damage caused by the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;

AGAINST: *Judge* Buergenthal;

D. By thirteen votes to two,

All States are under an obligation not to recognize the illegal situation resulting from the construction of the wall and not to render aid or assistance in maintaining the situation created by such construction; all States parties to the Fourth Geneva Convention relative to the Protection of

INTERNATIONAL COURT O   JSTICE

Civilian Persons in Time of War of 12 August 1949 have in addition the obligation, while respecting the United Nations Charter and international law, to ensure compliance by Israel with international humanitarian law as embodied in that Convention;

  IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;

  AGAINST: *Judges* Kooijmans, Buergenthal;

  E. By fourteen votes to one,

    The United Nations, and especially the General Assembly and the Security Council, should consider what further action is required to bring to an end the illegal situation resulting from the construction of the wall and the associated régime, taking due account of the present Advisory Opinion.

  IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;

  AGAINST: *Judge* Buergenthal.

    Done in French and in English, the French text being authoritative, at the Peace Palace, The Hague, this ninth day of July, two thousand and four, in two copies, one of which will be placed in the archives of the Court and the other transmitted to the Secretary-General of the United Nations.

                          *(Signed)* SHI Jiuyong,
                                    President.

                          *(Signed)* Philippe COUVREUR,
                                    Registrar.

    Judges KOROMA, HIGGINS, KOOIJMANS and AL-KHASAWNEH append separate opinions to the Advisory Opinion of the Court; Judge BUERGENTHAL appends a declaration to the Advisory Opinion of the Court; Judges ELARABY and OWADA append separate opinions to the Advisory Opinion of the Court.

                          *(Initialled)* J.Y.S.

                          *(Initialled)* Ph.C.

——————