UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.                                                    00 - 105L

THE PALESTINIAN AUTHORITY, et al.

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' OBJECTION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL

#### Preliminary Statement

On July 13, 2004, this Court entered final judgment in favor of plaintiffs and against the Palestinian Authority (PA) and Palestinian Liberation Organization (PLO) in the amount of $116,409,123. Default judgment was entered after the PA and PLO repeatedly refused to answer the complaint or to conduct discovery, following fifty-two months of litigation marred by systematic, contumacious and dilatory behavior by the PA and PLO. Defendants' egregious bad-faith conduct was repeatedly noted by both Senior Judge Ronald R. Lagueux and Magistrate Judge David L. Martin.

Now, the PA and PLO have filed a Motion For Stay Pending Appeal in which they ask this Court -- as a grant of discretionary equitable relief – to stay all execution proceedings and to exempt them entirely from posting a supersedeas bond or any other security that would protect plaintiffs and ensure collection of their judgment. Plaintiffs oppose defendants' motion.

1



## I.   CONDITIONS FOR STAY OF A MONEY JUDGMENT

### A.   <u>General</u>

Fed.R.Civ.P. 62(d) governing stays of monetary judgments upon appeal provides:

> (d) Stay Upon Appeal.  When the appeal is taken the appellant <u>by giving a supersedeas bond</u> may obtain a stay subject to the exceptions contained in subdivision (a) of this rule.   The bond may be given at or after the time of filing of the notice of appeal or procuring the order allowing the appeal, as the case may be.  The stay is effective <u>when the supersedeas bond is approved by the court</u>.

(emphasis added).

The purpose of the bond requirement is simple and stark: to <u>protect</u> the plaintiffs and ensure collection of their judgment.  The Court of Appeals emphasized that the bond requirement is intended to "protect an enforceable judgment in favor of its winner, and protect the winner from any subsequent harm suffered through appellate delay . . . " <u>Perez v. United States</u>, 747 F.2d 813, 815 (1st Cir. 1984) (internal quotations and cites omitted).

Therefore, <u>as a rule</u>, the bond must equal the full amount of the judgment, "*Typically, the amount of the bond matches the full amount of the judgment*." <u>Olcott v. Delaware Flood Co.</u>, 76 F.3d 1538, 1559 (10th Cir. 1996), <u>Poplar Grove v. Bache Halsey Stuart</u>, 600 F.2d 1189, 1191 (5th Cir. 1979) (protective purpose of Rule 62(d) requires that provision requiring a full bond "*normally be imposed.*").  Indeed, Local Rule 37 provides expressly that the bond must <u>exceed</u> the amount of the judgment in order to cover plaintiffs' costs and interest:

> <u>Supersedeas Bond</u>.   A supersedeas bond staying execution of a money judgment <u>shall be in the amount of the judgment plus ten percent</u> of the amount to cover interest and any other award of damages for delay plus $250.00 to cover costs, unless the court's direct otherwise.

See also e.g. Putnam Resources v. Pateman, 757 F.Supp. 157, 170 (D.R.I. 1991) ("motion for a stay of execution pending appeal is granted conditioned upon satisfaction of the requirements for the posting of a bond as set forth in Local Rules 37 and 38").

**B.    The Court May Reduce the Bond Only in Extraordinary Circumstances and Only When Adequate Alternative Security Exists**

Most courts, including the Court of Appeals for this circuit, have agreed that the provisions of Fed.R.Civ.P. 62(d) are not absolute, and that in extraordinary circumstances a court may reduce the amount of the supersedeas bond or permit an appellant to provide adequate alterative security. Specifically, the First Circuit has ruled that a reduced bond or alternative security may be justified in only two narrow circumstances:

a) Where: **"the defendant's ability to pay is so plain that the posting of a bond would be a waste of money"**; or

b) Where: **"the bond would put the defendant's other creditors in undue jeopardy."**

Acevedo v. Vera-Monroig, 296 F.3d 13, 17 (1st Cir. 2002) (citing Olympia Equipment Leasing Co. v. Western Union Tel. Co., 786 F.2d 794, 796 (7th Cir. 1986)).

However, even when an appellant has proven that these conditions obtain, the court must ensure that the reduced bond or alternative security or guaranty of payment fully protects the plaintiffs. As the U.S. Supreme Court has emphasized,

> The District Court may only stay execution of the judgment pending the disposition of certain post-trial motions or appeal if the Court provides for the security of the judgment creditor.

Peacock v. Thomas, 516 U.S. 349, 559 n. 8 (1996).

Thus, even in those extraordinary cases where appellants demonstrated a need for a stay without a full supersedeas bond, the federal courts have consistently required the appellant to post a partial bond or provide other reasonable security. See e.g. Poplar Grove Planting &

Refining Co. v. Bache Halsey Stuart, Inc, 600 F.2d 1189, 1191 (5th Cir. 1979) (court has discretion to require less than full supersedeas bond where judgment debtor presents adequate alternative assurances or where a full bond would mean undue financial burden and court can restrain judgment debtor's financial dealings to provide alternative form of security for judgment creditor); C. Albert Sauter Co. v. Richard S. Sauter Co., 368 F. Supp. 501, 520-21 (E.D. Pa. 1973) (where execution of $1.5 million judgment following defendants' inability to post full supersedeas bond would render them insolvent and eliminate their firm as competitor, court would issue stay on appeal upon conditions, *inter alia*, that defendants place stocks and cash in escrow and post security bond of $100,000); Trans World Airlines v. Hughes, 314 F. Supp. 94 (S.D.N.Y. 1970), appr. in mat. part at 515 F.2d 173, 177-78 (2d Cir. 1975), cert. denied, 424 U.S. 934 (1976) (where posting bond to cover $161 million judgment was "*not practicable*," court would exercise "*inherent power in extraordinary circumstances to provide for form and amount for a stay pending appeal*" and require a bond of $75 million coupled with defendant's assurances that it would maintain a net worth treble the balance of the judgment).

Indeed, even in Olympia Equipment, 786 F.2d at 794-795 (the case expressly relied upon by the First Circuit in Acevedo permitting a reduced bond in the two narrow and extraordinary cases described therein) the Seventh Circuit upheld a decision staying a $36 million judgment without supersedeas bond only because the district judge "*allowed alternative security to be posted, consisting of a pledge of $10 million in cash, $10 million in accounts receivables, and a security interest, which [defendant] represented to be worth about $70 million, in some of the company's physical assets.*"  Moreover, even this formidable security did not satisfy the Seventh Circuit, and it modified the decision of the district court to forbid the transfer of any assets by the

corporate defendant to its parent, absent agreement of the parent company to be bound by the judgment. Id. at 799.

Therefore, even if the PA and PLO could demonstrate that their "**ability to pay is so plain that the posting of a bond would be a waste of money**," or that posting a bond would place their other creditors "**in undue jeopardy**" (Acevedo, 296 F.3d at 17) they would still be required to post a very substantial bond and/or adequate alternative security to cover their $116 million judgment debt. See also e.g. De La Fuente v. Dci Telecommunications, 269 F. Supp.2d 237, 240 (S.D.N.Y. 2003) ("*The bond requirement should not be eliminated or reduced unless doing so does not unduly endanger the judgment creditor's interest in ultimate recovery.*") (internal quotes omitted).

### C.    Defendants Bear a "Heavy" Burden to Prove the Extraordinary Circumstances Justifying a Reduced Bond or Alternative Security; Plaintiffs Have No Burden Whatsoever

It is long and well-established that an appellant seeking a stay pending appeal must prove the existence of circumstances justifying such relief:

> If a court chooses to depart from the usual requirement of a full security supersedeas bond to suspend the operation of an unconditional money judgment, it should place the burden on the moving party to objectively demonstrate the reasons for such a departure . . . Such a supersedeas bond is a privilege extended the judgment debtor as a price of interdicting the validity of an order to pay money.

Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1191 (5th Cir. 1979) (emphasis added).

Similarly,

> The burden lies with the moving party to demonstrate why the Court should waive the standard requirement that the appellant post a full supersedeas bond.

De La Fuente, 269 F. Supp.2d at 240 (citing cases) (emphasis added). See also e.g. U. S. on

Behalf of Small Business Admin. v. Kurtz, 528 F. Supp. 1113 (E.D.Pa. 1981) (In order to justify provision of security other than supersedeas bond, it is appellant's burden to demonstrate objectively that posting full bond is impossible or impractical; likewise, it is appellant's duty to propose plan that will provide adequate, or as adequate as possible, security for appellee); Brinkman v. Department of Corrections, 815 F. Supp. 407 (D.Kan. 1993) (defendant had burden of objectively demonstrating good cause why district court should deviate from general rule of imposing full supersedeas bond before execution of judgment was stayed pending appeal); Wilmer v. Board of County Com'rs of Leavenworth County, 844 F. Supp. 1414 (D.Kan. 1993) (county had burden to objectively demonstrate good cause for waiving requirement that full supersedeas bond be posted before it could obtain stay of personal injury judgment); Marandino v. D'Elia, 151 F.R.D. 227 (D.Conn. 1993) (party seeking stay pending appeal carries burden of objectively demonstrating reasons for departure from requirement for posting of supersedeas bond); Schreiber v. Kellogg, 839 F. Supp. 1157 (E.D.Pa. 1993) (judgment debtor has burden of demonstrating objective need for departure from usual requirement of full supersedeas bond by showing that posting a full bond is impossible or impracticable); Preston v. Thompson, 565 F. Supp. 310 (N.D.Ill. 1983) (purpose of a supersedeas bond is to secure prevailing party against any risk that judgment debtor will no longer be able to meet its obligations pending appeal and to protect prevailing party from any costs it incurs in foregoing execution of the judgment until the appeal is decided; burden is on party requesting a stay to demonstrate that a bond should not be required); Grand Union Co. v. Food Employers Labor Relations Ass'n, 637 F. Supp. 356 (D.D.C. 1986) (Where district court exercises its discretion to depart from requirement that full security supersedeas bond be posted to stay execution of unconditional money judgment pending appeal, it should place burden on party moving for that stay to objectively demonstrate reasons

for that departure).

Appellant must provide <u>actual evidence</u> in support of its demand for an unsecured stay; conclusory statements by counsel are insufficient. In <u>Marcoux v. Farm Service and Supplies, Inc.</u>, 290 F. Supp.2d 457 (S.D.N.Y. 2003) defendants moved to stay execution of the judgment without bond. Defendants represented in their memorandum that they had adequate insurance to satisfy the plaintiffs' judgment. The court rejected this argument, noting that, "*Defendants did not . . . submit any evidence to this Court in support of that conclusory statement in their Memorandum,*" and, citing the "*total paucity of proof*" and "*the lack of evidence provided by defendants, who retain the burden of proof on this motion,*" the court denied their motion. <u>Id</u>. at 485-486. <u>See also</u> <u>State Industries, Inc. v. Mor-Flo Industries</u>, 124 F.R.D. 613 (E.D.Tenn. 1988) (party failed to establish claim that requiring it to post supersedeas bond by letter of credit equal to amount of judgment would impose undue financial burden or any other exceptional circumstance which might warrant reduction of bond); <u>Coastal Corp. v. Texas Eastern Corp.</u>, 703 F. Supp. 36 (S.D.Tex. 1989) (burden of production and persuasion is on party requesting stay pending appeal).

It is equally well-established that the burden of proof in such cases is heavy indeed. <u>See</u> e.g. <u>Gay Lesbian Bisexual Alliance v. Sessions</u>, 917 F. Supp. 1558 (M.D.Ala. 1996) (stay pending appeal is considered extraordinary relief for which moving party bears heavy burden); <u>Johnson v. Mortham</u>, 926 F. Supp. 1540 (N.D.Fla. 1996) (a stay pending appeal is extraordinary relief for which moving party bears a heavy burden to demonstrate); <u>Dillard v. City of Greensboro</u>, 870 F. Supp. 1031 (M.D.Ala. 1994) (stay of judgment pending appeal is extraordinary relief, for which moving party bears heavy burden).

The burden is exclusively on the defendants, and plaintiffs are not required to demonstrate that defendants are not entitled to an unsecured stay.

> If a court chooses to depart from the usual requirement of a full security supersedeas bond to suspend the operation of an unconditional money judgment, it should place the burden on the moving party to objectively demonstrate the reasons for such a departure. It is not the burden of the judgment creditor to initiate contrary proof.

Poplar Grove Planting, 600 F.2d at 1191 (emphasis added). See also e.g. Hamlin v. Charter Tp. of Flint, 181 F.R.D. 348 (E.D. Mich. 1998) (Should a court choose to depart from the usual requirement of a full security supersedeas bond, it should place the burden on the moving party to objectively demonstrate the reasons for such a departure, and opposing party has no obligation to introduce evidence to the contrary).

## II.    DEFENDANTS FAIL TO PLEAD MUCH LESS PROVE ANY GROUNDS FOR AN UNSECURED STAY UNDER THE LAW OF THIS CIRCUIT

In Acevedo the Court of Appeals carefully distinguished between stays pending appeal of non-money judgments, and stays pending appeal of money judgments pursuant to Rule 62(d). It held that motions for a stay of non-money judgments (such as injunctive orders) are to be evaluated under the traditional four-part standard set out in Hilton v. Braunskill, 481 U.S. 770 (1987). Acevedo v. Vera-Monroig, 296 F.3d at 16-17.

By contrast, the First Circuit established a different test for motions for a stay under Rule 62(d), and ruled that a court may grant a motion seeking a reduction in or exemption from the full supersedeas bond required by Rule 62(d) only in two narrow circumstances, i.e. either when "the defendant's ability to pay is so plain that the posting of a bond would be a waste of money" or when "the bond would put the defendant's other creditors in undue jeopardy." Id. at 17.

Defendants' motion seeks a full waiver from supersedeas bond, yet does not attempt to prove and does not even assert that either of the circumstances identified in Acevedo obtain.

8

Their motion is therefore facially frivolous under the controlling law of this circuit and should be summarily denied.

## III. DEFENDANTS' MOTION ALSO FAILS THE <u>HILTON</u> TEST FOR AN UNSECURED STAY

Defendants have erroneously argued their motion under the four-part <u>Hilton</u> test, as if they were appealing a <u>non-monetary judgment</u>. Defs. Mem. at 3-4. This disregard of the controlling law of this circuit is fatal, since the circumstances recognized by the First Circuit as possibly justifying a reduced bond or alternative security for a stay of <u>monetary judgment</u> are not even plead by defendants.

Nevertheless, out of an abundance of caution,[1] plaintiffs will demonstrate that defendants' motion fails to satisfy any of the <u>Hilton</u> criteria. The elements of the quadripartite test set out in <u>Hilton</u> are:

    (1)  Whether the applicant has made a strong showing of success on the merits;

    (2)  Whether the applicant will be irreparably harmed absent injunctive relief;

    (3)  Whether issuance of the stay will injure other parties; and

    (4)  Where the public interest lies.

<u>Weaver v. Henderson</u>, 984 F.2d 11, 12 (1st Cir. 1993) (citing <u>Hilton</u>).

## IV. DEFENDANTS HAVE NO CHANCE OF SUCCESS ON THE MERITS

Defendants have rested their motion almost entirely on the first of the criteria, i.e. success on the merits. Specifically, defendants argue that they will prevail on appeal on the basis of their

---

[1] In a dictum in <u>Acevedo</u>, the Court of Appeals stated that:

> It is at least arguable that a monetary judgment may also be stayed under the traditional standard for issuing injunctions. <u>Adequate protection for plaintiffs/appellees would be a factor in evaluating the propriety of any such request</u>.

<u>Id</u>. at n. 4 (emphasis added).

shop-worn claims to statehood and sovereign immunity.  In fact, defendants have no chance whatsoever of prevailing on appeal, for the following reasons:

**A.**    **Defendants Are Now Barred by the Doctrine of Judicial Estoppel From Pressing Any Claims to Statehood In This Court Or the Court Appeals**

Defendants' statehood claims are utterly frivolous, as fully discussed below.  However, neither this Court nor the Court of Appeals need waste any further time revisiting and rejecting these claims yet again, because defendants are now barred by the doctrine of judicial estoppel from pressing any claims to statehood in any proceedings (including the instant motion or the appeal itself) before this Court or the Court Appeals.

In complete and utter contradiction to their assertions before this Court (both in the past and in support of their current motion for a stay) defendants have recently submitted pleadings and made oral arguments in a judicial proceeding before the International Court of Justice in the Hague (ICJ) asserting and admitting that no Palestinian state exists in the West Bank and Gaza Strip (or elsewhere), and that since 1967 until today there has been no change in the legal status of the West Bank and Gaza Strip.  In an Opinion issued on July 9, 2004, the ICJ expressly adopted defendants' arguments, and ruled that there has been no change in the legal status of the West Bank and Gaza Strip from the time of their occupation by Israel in 1967 until the present day, and that no Palestinian state currently exists.

Under the doctrine of judicial estoppel, discussed below, defendants are now barred from asserting or pressing claims to statehood before this Court and the Court of Appeals.  Their motion for a stay, which is based on those same claims of statehood, must therefore be summarily denied.

**1. Judicial Estoppel**

The First Circuit provided a detailed description of the doctrine of judicial estoppel in a very recent decision:

> "As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *Intergen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003); accord *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8, 147 L. Ed. 2d 164, 120 S. Ct. 2143 (2000). The doctrine's primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system. *New Hampshire*, 532 U.S. at 750; *United States v. Levasseur*, 846 F.2d 786, 792 (1st Cir. 1988). In line with this prophylactic purpose, courts typically invoke judicial estoppel when a litigant is "playing fast and loose with the courts." *Patriot Cinemas, Inc. v. Gen. Cinema Corp.*, 834 F.2d 208, 212 (1st Cir. 1987) (quoting *Scarano v. Cent. R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)) . . .
>
> It is . . . widely agreed that, at a minimum, two conditions must be satisfied before judicial estoppel can attach. *See, e.g., Hall*, 327 F.3d at 396; *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783-84 (9th Cir. 2001); *Levinson v. United States*, 969 F.2d 260, 264-65 (7th Cir. 1992); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982). First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. *See Faigin v. Kelly*, 184 F.3d 67, 82 (1st Cir. 1999); *Levasseur*, 846 F.2d at 794. Second, the responsible party must have succeeded in persuading a court to accept its prior position. *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 13 (1st Cir. 1999); *Gens*, 112 F.3d at 572-73. The presence of these elements creates the appearance that either the first court has been misled or the second court will be misled, thus raising the specter of inconsistent determinations and endangering the integrity of the judicial process. *See New Hampshire*, 532 U.S. at 750-51.

<u>Alternative System Concepts v. Synopsys</u>, 374 F.3d 23, 23-25 (1st Cir. 2004).

It is undisputed that judicial estoppel will apply fully even when the party seeking estoppel was not a party to the other proceeding in which the contradictory claims were made and did not act in reliance on those claims. <u>Ryan Operations G.P. v. Santiam-Midwest Lumber Co.</u>, 81 F.3d 355, 360 (3rd Cir. 1996) (citing <u>Patriot Cinemas, Inc. v. General Cinema Corp.</u>, 834 F.2d 208, 214 (1st Cir. 1987)); <u>Burnes v. Pemco Aeroplex, Inc.</u>, 291 F.3d 1282, 1286 (11th Cir. 2002) (Plaintiff *"argues that [defendant] cannot rely on the doctrine of judicial estoppel because it was not a creditor or a party to the bankruptcy proceedings. [Plaintiff] is incorrect. The*

*doctrine of judicial estoppel protects the integrity of the judicial system, not the litigants; therefore, numerous courts have concluded, and we agree, that while privity and/or detrimental reliance are often present in judicial estoppel cases, they are not required.*") (citing cases) (internal quotes and brackets omitted).

It is also well-established that judicial estoppel may be asserted in our federal courts on the basis of a foreign proceeding. See e.g. Guinness v. Ward, 955 F.2d 875 (4th Cir. 1992) (judicial estoppel bars party from raising claim before Maryland federal court which contradicts position it asserted before a British court); Rapture Shipping v. Allaround Fuel Trading, 2004 U.S. Dist. LEXIS 1816, 2004 AMC 796 (S.D.N.Y 2004) (When party asserted existence of contract before Dutch court it is barred by judicial estoppel from disputing existence of contract in proceeding before New York federal court).

The assertions made by the defendants here will therefore be subject to judicial estoppel to the extent that they are "*inconsistent with a position taken by*" defendants "*in a prior legal proceeding*" (Alternative System, 374 F.3d at 23), i.e. if the claims advanced in the instant motion contradict claims and assertions formally plead by the defendants before the ICJ which were adopted in its Opinion.

## 2. Defendants' Statehood Claims Before This Court

Defendants' claims to statehood before this Court in the instant motion, and the underlying factual assertions made in support thereof, directly contradict the arguments made by them in the ICJ and adopted by the ICJ Opinion.

In the memorandum in support of defendants' motion, defendants assert repeatedly that they constitute and/or are part of a "State of Palestine" that allegedly exists in the West Bank and

Gaza.  See e.g. Defs. Mem. at 15 ("*the PA and PLO must be recognized as part of the state of Palestine itself*"), Id. at 8 ("*Palestine's claim of statehood is substantial*").

According to defendants, this "State of Palestine" (which they allegedly constitute and/or are part of) meets the four accepted criteria of statehood as set out in Restatement §201 (Third) of the Foreign Relations Law of the United States:

> *Palestine meets the criteria set forth in the Restatement. It has the requisite territory, population and functioning government and engages in and has the ability to engage in foreign relations.*

Id. at 14.

Defendants also argue that what "*makes this request for a stay special is that defendants' claim of statehood carries with it a claim for immunity from execution under FSIA §1609. A foreign state is entitled to this immunity from execution . . .*" Defs. Mem. at 3.  Indeed, defendants' entire motion for a stay is predicated on their claims to statehood and immunity, which they believe will be vindicated on appeal.

### 3. Defendants' Assertions Before the ICJ; the Adoption of Those Assertions By the ICJ

In direct contradiction to their claims before this Court, defendants asserted in legal proceedings before the ICJ that there is not and has never been a Palestinian state.[2]  This dispositive admission was delivered by none other than Nasser al-Kidwa, the PLO observer representative to the UN.  The Court may recall that Mr. al-Kidwa's June 13, 2003 affidavit formed the backbone of defendants' Rule 12(b) motion to dismiss on grounds of statehood and sovereign immunity, which was denied by the Court in its decision of April 23, 2004.  In that sworn affidavit, Mr. al-Kidwa asserted that a Palestinian state meeting all the criteria of

---

[2] The proceedings before the ICJ were in the matter of the request for advisory opinion submitted by the General Assembly of the United Nations to the ICJ regarding the "Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory."

statehood currently exists in the West Bank and Gaza Strip. See e.g. Id. at §31. Yet, in oral arguments before the ICJ on February 23, 2004, al-Kidwa stated:

> We are here because the United Nations has a permanent responsibility . . . for the question of Palestine until the question is resolved in all its aspects . . . It is, after all, the General Assembly that, in accordance with the Charter of the United Nations, dealt with mandated Palestine, deciding on 29 November 1947, in resolution 181 (II), to partition Palestine into two States, one Jewish and one Arab. The Arab State has, of course, not yet been realized; and thus the Palestinian people have been unable to exercise their right to self-determination.

Exhibit A.[3]

This stark, crystal-clear admission by al-Kidwa that no Palestinian state exists flatly contradicts and completely collapses defendants' entire sovereign immunity argument. Needless to say, al-Kidwa's statement before the ICJ also utterly impeaches the sworn affidavit submitted by him to this Court in support of defendants' Rule 12(b) motion.

Additionally, as noted above, defendants repeatedly assert before this Court in support of their instant motion that they constitute and/or are part of a "foreign state" that satisfies the four-part test of statehood set out in Restatement §201. This test requires, inter alia, full sovereign control over territory and population as a sine qua non condition of statehood.

Yet, in a written brief submitted to the ICJ on January 30, 2004 (signed by al-Kidwa), the PLO asserted at length and in detail that the limited municipal authority granted to the PA under the Oslo Accords does not even approach sovereign control, and that this grant of administrative authority did not change the legal status of the West Bank and Gaza:

> There is no doubt that the 1967 War was an international armed conflict within the meaning of the Geneva Convention. During this armed conflict Israeli armed forces invaded and occupied, inter alia, the West Bank and the Gaza Strip . . .

---

[3] The Verbatim Record of public sitting before the ICJ on February 23, 2004, Testimony of Nasser al-Kidwa on behalf of the PLO at §6 (emphasis added). As this document is 64 pages long, Plaintiffs have attached al-Kidwa's statement as Exhibit A. The entire Verbatim Record is available on the website of the ICJ at www.icj-cij.org/icjwww/idocket/imwp/imwpframe.htm.

> *The proper characterization of <u>Israel's current status</u> in respect of this territory remains that of an occupier . . . <u>the essential test is one of actual overall control. It does not matter that day-to-day administration may be exercised by local authorities.</u> Territory once occupied remains occupied until a definitive withdrawal from that territory, or a definitive, internationally acceptable settlement. <u>Neither of these events has occurred.</u>*

"Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory (Request for an Advisory Opinion) Written Statement Submitted by Palestine"[4] to the International Court of Justice, January 30, 2004, p. 156 (emphasis added). Exhibit B. [5]

The PLO emphasized similarly,

> *Israel remains in occupation of the West Bank including East Jerusalem, and the Gaza Strip. While there has been <u>a partial transfer of certain powers and responsibilities</u> from Israel to the Palestinian Authority (the precise features of which need not be examined by the Court) in respect of some parts of Palestinian territory, <u>Israel remains in overall control of the Occupied Palestinian Territory,</u> including East Jerusalem.*

<u>Id</u>. at p. 165 (emphasis added). [6]

Likewise, the PLO's written statement to the ICJ cites with full approval the conclusion of the UN Special Rapporteur on the Occupied Palestinian Territory ("OPT") that: *The Oslo Accords leave <u>Israel</u> with <u>the ultimate legal control</u> over <u>all of the OPT</u>.* <u>Id</u>. (emphasis added).

---

[4] The PLO was granted observer status at the UN in 1974. In 1988, the UN General Assembly decided that "*effective as of 15 December 1988, the designation 'Palestine' should be used in place of the designation 'Palestine Liberation Organization' in the United Nations system.*" A/RES/43/177. However, this change in nomenclature was made "*without prejudice to the observer status and functions of the Palestine Liberation Organization within the United Nations system.*" <u>Id</u>.

In other words, the term "Palestine" in the UN system is a synonym for the PLO (except, of course, when used in a geographic sense). Thus, the submission to the ICJ by "Palestine" was made by the PLO.

[5] This 411 page document is published on the website of the ICJ at: www.icj-cij.org/icjwww/idocket/imwp/imwpstatements/iWrittenStatement_08_Palestine.pdf. In light of the document's length, plaintiffs have submitted as Exhibit B true copies of the sections quoted.

[6] The PLO defines the term "Occupied Palestinian Territory" as used in its statement as "the Palestinian territory of the West Bank, including East Jerusalem, and the Gaza Strip occupied by Israel since 1967 . . ." <u>Id</u>. at p. 7.

In its Opinion of July 9, 2004, the ICJ <u>adopted</u> the assertions made by the defendants, and expressly held that the restricted municipal powers granted to the PA under the Oslo Accords have effected no change in the legal status of the areas occupied by Israel in 1967:

> [A] number of agreements have been signed since 1993 between Israel and the Palestine Liberation Organization imposing various obligations on each party. Those agreements inter alia required Israel to transfer to Palestinian authorities certain powers and responsibilities exercised in the Occupied Palestinian Territory by its military authorities and civil administration. Such transfers have taken place, but, as a result of subsequent events, they remained partial and limited . . .
>
> The territories situated between the Green Line . . . and the former eastern boundary of Palestine under the Mandate were occupied by Israel in 1967 during the armed conflict between Israel and Jordan.  Under customary international law, these were therefore occupied territories in which Israel had the status of occupying Power. <u>Subsequent events in these territories . . . have done nothing to alter this situation. All these territories (including East Jerusalem) remain occupied territories</u> and Israel has continued to have the status of occupying Power.

Advisory Opinion of the International Court of Justice, "Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory" July 9, 2004 §§77 -78 (emphasis added). Exhibit C.

Obviously, since the status of "***All these territories***" has not changed since 1967, and they remain occupied by Israel, no "State of Palestine" exists therein.  Indeed, the ICJ Opinion explicitly accepts defendants' admission (which is glaringly obvious in any case) that no Palestinian state currently exists:

> The Court considers that it has a duty to draw the attention of the General Assembly, to which the present Opinion is addressed, to the need for these efforts [at negotiations] to be encouraged with a view to <u>achieving as soon as possible . . . the establishment of a Palestinian State . . .</u>

<u>Id</u>. at §162 (emphasis added).

### 4.  <u>Defendants' Statehood Claims Are Now Barred By Judicial Estoppel</u>

As demonstrated above, the statehood arguments made by defendants before this Court in support of the instant motion are completely contradicted and impeached by their arguments before the ICJ. Moreover, the defendants <u>prevailed</u> on their arguments before the ICJ, and the ICJ Opinion explicitly adopts defendants' assertions that no change has occurred in the legal status of the West Bank and Gaza since 1967 and that no Palestinian state exists therein.

Once the ICJ adopted defendants' assertions in its Opinion, the conditions for the application of judicial estoppel (i.e. that the party both <u>assert</u> and <u>prevail</u> on its contrary position in the other proceeding) were met. The doctrine of judicial estoppel *"prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant . . . in a prior legal proceeding . . ."* <u>Intergen N.V. v. Grina</u>, 344 F.3d 134, 144 (1st Cir. 2003) (emphasis added).

The glaring and brazen contradictions between defendants' positions before the ICJ and those argued before this Court demonstrate clearly that defendants are *"playing fast and loose with the courts,"* and that permitting them to continue to assert their mutually exclusive positions would be a *"perversion of the judicial process."* <u>New Hampshire</u>, 532 U.S. at 750.

Therefore, following the decision of the ICJ, defendants <u>can no longer press</u> their claims to statehood (and the underlying factual assertions in support thereof) in this Court or the Court of Appeals. Since these claims are now precluded by the doctrine of judicial estoppel, defendants cannot rely on or assert these claims in support of their instant motion.

**B.**     **<u>Defendants Themselves Demonstrably Do Not Believe Their Own Claims To Statehood And Sovereign Immunity, And These Bad-Faith Claims Are Now Barred By Fed.R.Civ.P. 11 And Should Not Be Entertained By The Court</u>**

Even assuming *arguendo* that defendants' statehood claims were not precluded by judicial estoppel, their motion for stay in reliance on these claims should be denied because these claims are made in blatant bad faith.

Defendants' formal statements before the ICJ, detailed above, make perfectly clear that they themselves do not believe their claims to statehood asserted before this Court. Their own representative, Mr. al-Kidwa, whom defendants presented as an affiant in the instant action, told the ICJ in the clearest possible language that no Palestinian state has been established, and defendants insisted repeatedly in their written statement to the ICJ that no legal change has occurred in the West Bank and Gaza.

Defendants' statements to the ICJ reflect their official position and belief. For example, on May 11, 2004, the official PA information service published a statement by the senior leaders of the PA and PLO, Yasser Arafat and Ahmed Qurei, asserting that a Palestinian state would be established in 2005,

> [T]he Palestinian leadership is adherent to the year 2005 as a time for the establishment of the independent state of Palestine . . . President Arafat and PM Qurei made it clear that this date cannot be postponed . . .

PA news release, May 11, 2004. Exhibit D. [7]

Defendants' statehood claims therefore confront this Court with a textbook case of litigants making assertions which they know to be untrue. The statehood argument is therefore "patently sophist and frivolous and designed to delay the rendition of judgment." Caisse Nationale De Credit Agricole v. Valcorp, 28 F.3d 259, 263 (2nd Cir. 1994) (upholding an award of sanctions for pressing claims and defenses when it had become "readily apparent" that they were frivolous).

Defendants are prohibited from asserting and pressing claims that they know and believe to be frivolous. Fed.R.Civ.P. 11. Defendants therefore cannot prevail on appeal on the basis of these barred claims.

---

[7] Plaintiffs' counsel downloaded this document from the PA's official website <www.ipc.gov.ps/ipc_e/ipc_e-1/e_News/news2004/2004_05/056.html> on August 23, 2004.

### C.      Defendants' Statehood Claims Are Hopeless on the Merits

Even if defendants' statehood and immunity claims were not now barred under judicial estoppel and Fed.R.Civ.P. 11, they are absolutely meritless, as this Court demonstrated in its decision of April 23, 2004. There is no need to reiterate here the Court's thorough analysis and conclusions, which plaintiffs hereby incorporate by reference in support of their argument that defendants' appeal has no chance of success.[8]

Moreover, this Court's July 12, 2004 decision (adopting the magistrate's report and recommendation and entering final judgment) noted that it had "*determined that there is no basis whatsoever for the PA or PLO to claim sovereign immunity.*" Id. at 23. As a matter of law, a finding that there is "no basis whatsoever" for defendants' defense logically demands the conclusion that defendants have no chance whatsoever of success on appeal.

Additionally, the decision in <u>Knox v. Palestine Liberation Organization</u>, 306 F. Supp.2d 424 (S.D.N.Y. 2004) rejecting defendants' immunity claims strongly indicates that defendants have no chance on appeal and is therefore further grounds to deny their stay request. <u>See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Coric</u>, 167 F.R.D. 356 (N.D.N.Y. 1996) (In assessing whether party seeking stay pending appeal has satisfied burden of showing substantial possibility of success, District Court should turn to external, preferably objective, indicia of accuracy of its judgment, with extent to which the challenged decision is supported by precedent being prominent among the indicia).

### D.      Defendants' "Good-Faith Stonewalling" Defense is Frivolous and Impudent

---

[8] To the extent that the instant motion is based on defendants' non-justiciability claims, plaintiffs incorporate by reference this Court's repeated analysis and rejection of those claims in support of plaintiffs' position that defendants' cannot prevail on appeal.

Defendants argue that even if their statehood claims are rejected on appeal, they *"should not be faulted and in effect punished, as the Court has done by holding them in default"* for refusing to answer the complaint or conduct discovery when ordered, because their stonewalling was grounded in their *"good-faith"* claims to immunity. Defs. Mem. at 5, 8. Since their fifty-two months of contumacious conduct was all in *"good-faith,"* the judgment should be vacated and the litigation should start all over again, even if defendants' immunity defense fails and they lose the appeal. Id. at 9.

The Court effectively disposed of this obnoxious argument in its final decision. This argument is doomed on appeal for the following additional reasons:

**Firstly**, defendants' written and oral statements to the ICJ openly admitting that no Palestinian state exists, and official declarations by PA and PLO leaders that such a state will be established by 2005 clearly demonstrate that <u>defendants themselves do not believe</u> the claims to statehood asserted before this Court and that these claims were made in <u>gross bad faith</u>;

**Secondly**, virtually all of the "burdens of litigation" which defendants assert were erroneously imposed upon them – i.e. the duty to answer the complaint and the court's various discovery orders – occurred <u>before</u> defendants' abortive appeal to the Court of Appeals in 2003. Indeed, after filing that appeal, defendants filed a motion for a stay in the Court of Appeals, which echoed the very same "burden of litigation" complaints against this Court contained in the instant motion. The Court of Appeals did not grant the stay. On the contrary, it summarily affirmed this Court's decision denying defendants' immunity claims, expressly rejected defendants' claims of error against and strongly criticized defendants for their improper litigation conduct. <u>Ungar v. Palestinian Authority</u>, 2003 WL 21254790 (1st Cir. 2003).

Thus, the May 27, 2003 judgment of the Court of Appeals expressly disposes of and precludes any claim of "error" up until that date. Entry of default and the court's discovery orders all <u>preceded</u> the judgment of the Court of Appeals.

Therefore, defendants' claim that this Court erred in forcing them to bear the "burdens of litigation" prior to a final determination of their immunity claim, is necessarily limited to the period <u>after</u> May 27, 2003. The only matter litigated after that date was the entry of default judgment.

The shrill charges of "error" levied by defendants against this Court for proceeding to hear plaintiffs' motion for default judgment prior to "*a final determination of their right to sovereign and governmental immunity, including appellate review*" (Defs. Mem. at 4) are a cynical attempt to rewrite the travel of this case: In fact, defendants <u>never even sought a stay</u> of proceedings in this Court pending disposition of their Rule 12(b) motion and appellate review thereon. Rather, defendants filed only a Motion For Enlargement of Time to respond to plaintiffs' motion for default judgment, seeking to <u>delay</u> their time to respond to the default judgment motion until ten days after their Rule 12(b) motion to dismiss. Thus, defendants did not seek a stay, and requested an enlargement only until after the disposition of the Rule 12(b) motion by this Court, not by the Court of Appeals.

On August 7, 2003, Magistrate Judge Martin issued an order granting in part defendants' motion to enlarge. The order enlarged defendants' time to answer plaintiffs' motion for default judgment until August 18, 2003, and <u>denied</u> their motion to enlarge their time to answer until after the disposition of their Rule 12(b) motion.

**Yet surprisingly – nay, <u>astoundingly</u> in light of their subsequent accusations of error against this Court – defendants never appealed the Magistrate Judge's order denying their**

motion to enlarge their time to respond to the motion for default judgment. **Defendants'**

**failure to appeal the order to the District Judge is <u>fatal</u> to their claim that this Court**

**"erred" by proceeding with default judgment despite the pendency of their Rule 12(b)**

**motion.** Fed.R.Civ.P 72(a) provides that:

> Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; <u>a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made</u>.

Defendants failed to make any objection to the order directing them to proceed with the "burden" of litigating plaintiffs' motion for default judgment, and are now estopped from asserting that that order was erroneous. Indeed, defendants' failure to object to the order to proceed constitutes waiver of the right to challenge this issue on appeal. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986), <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

In other words, defendants are now arguing that they were entitled to stonewall this Court (in "*good faith*"), rather than exercise the simple expedient of objecting to a magistrate's order.

**<u>Thirdly</u>**, while defendants complain of being denied an opportunity to exercise their purported right to interlocutory appellate review of this Court's April 23, 2004, decision denying their immunity defenses, defendants never actually bothered to file a notice of appeal of that decision. Moreover, while defendants never tire of citing to <u>In re Papandreou</u>, 139 F.3d 247 (D.C. Cir. 1998) and several other District of Columbia mandamus cases involving actual foreign states, defendants themselves never got around to requesting mandamus relief from the Court of Appeals to stay this action pending the interlocutory appellate review which defendants now complain of being denied. Defendants' inaction is all the more surprising, since at the hearing on

April 11, 2003, defendants threatened to seek mandamus relief if this Court denied their motion for a stay.  Tr. April 11, 2003, pp. 8-12.[9]

Since they themselves could not be troubled to actually seek the relief they now claim they were denied (e.g. by filing a notice of appeal, requesting mandamus relief, or objecting to a magistrates order, *supra*), defendants are effectively now arguing that this Court and/or the Court of Appeals should have stayed all proceedings *sua sponte*, and since they did not do so defendants were entitled to ignore their obligation to file an answer and comply with discovery.

**Fourthly**, it is well-established that litigants who strategically elect to default in order to seek appellate or collateral review on the basis of a dispositive defense, and lose that gamble -- lose the case.  See e.g. Solano v. Lascola, 48 Fed. Appx. 4 (1st Cir. 2002) (denial of motion to vacate default affirmed when defendant "*decided to rely on [attorney's] conjecture that a suit. . . was of questionable viability. That reliance apparently caused [defendant] to simply ignore the subsequently-filed action -- a risky and doubtful gamble which he lost.*"); Conetta v. National Hair Care Centers, 182 F.R.D. 403, 407 (D.R.I. 1998) ("*it would be an injustice to vacate the default judgments if [defendant] took an unsuccessful gamble that it could ignore this court's summons and avoid liability*"), Carteret Savings v. Jackson, 1986 U.S. Dist. LEXIS 22566 at 27 (D. Mass. 1986) ("*defendants knowingly and voluntarily decided not to defend in the Florida suit . . . but instead to gamble that a court in Massachusetts, when subsequently asked to enforce the judgment, would conclude that the court in Florida had no personal jurisdiction.  The defendants lost their gamble, and in the interests of judicial economy and fairness to the plaintiff who was*

---

[9] Defendants similarly stated "Defendants have repeatedly requested stays which have either been denied or not acted upon, and are coming under pressure, akin to the pressure that led the ministers in Papandreou to petition for mandamus" on page 3 of their Memorandum of Defendants Palestinian Authority and Palestinian Liberation Organization in Support of Objection to Plaintiffs' Motion to Enter Default Pursuant to Fed.R.Civ.P. 55.

*ready, willing and able to proceed with a resolution on the merits in Florida, the defendants must live with the results."*).

Here, too, defendants made a strategic decision to rest their defense of this case on their sovereign immunity claims. If they lose that gamble, "the defendants must live with the results." Id.

## V. DEFENDANTS FAIL TO ARGUE AND SUBSTANTIATE ANY OF THE THREE REMAINING <u>HILTON</u> CRITERIA; THESE THREE CRITERIA ALSO MILITATE AGAINST A STAY

As noted, defendants have focused their motion almost entirely on the first prong of the <u>Hilton</u> test, success on the merits. Defendants' sole attempt to assert the other three elements of the test (harm to movant absent a stay, harm to other parties if motion is granted, and the public interest) appears in the following paragraph:

> Defendants are threatened with irreparable injury, and vital public interests would be seriously jeopardized by a denial of a stay pending appeal. Denial of a stay would publicly negate defendants' immunity before the issue of immunity has been finally determined. There is no comparable threat to plaintiffs, or any public interest, if a stay is granted.

Defs. Mem. at 4.

Defendants have not bothered to support this conclusory, anemic and *pro forma* recitation of the grounds for stay with affidavits or any other evidence. Yet, as shown above, the courts have universally held that unsupported or conclusory statements cannot constitute grounds for a stay pending appeal:

> Defendant . . . has made application for a stay of proceedings to enforce our judgment against him pending appeal. His application includes the unverified assertion that he owns no substantial assets and consequently is unable to post a supersedeas bond, but it does not include financial records or an affidavit showing what security defendant could provide to the judgment creditor, the government. These omissions require us to deny the application for a stay.

U.S. on Behalf of Small Business Admin. v. Kurtz, 528 F. Supp. 1114 (E.D.Pa. 1981), see also e.g. Marcoux v. Farm Service and Supplies, Inc., 290 F. Supp.2d 457 (S.D.N.Y. 2003) (conclusory and unsupported statements by counsel made in a memorandum of law in support of a motion to stay constitute a *"total paucity of proof"*).  Thus, defendants' motion fails to provide any substantiated grounds whatsoever in support of the remaining three prongs of the Hilton test.

While (as discussed *supra*) plaintiffs are not required to disprove defendants' claimed entitlement to an unsecured stay, out of an abundance of caution plaintiffs nevertheless note that the three remaining Hilton factors all strongly militate against granting defendants' motion.

Firstly, requiring a defendant to pay a money judgment is never considered irreparable harm, and does not constitute grounds for a stay:

> Defendants argue they risk irreparable harm if their motion [for a stay] is denied because plaintiff is incarcerated and therefore unlikely to be able to refund the judgment if defendants succeed on appeal and subsequently at trial.   This argument is refuted by the well-established principle that quantifiable money damages cannot be deemed irreparable harm.  *See, e.g., Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) ("Irreparable injury means injury for which a monetary award cannot be adequate compensation."); *General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994).

Harris v. Butler, 961 F. Supp. 61, 63 (S.D.N.Y. 1997).

Secondly, the terrorist murder that is the subject of this action occurred over eight years ago, and this action has been pending for over fifty two months.  Any further delay would cause further egregious harm to plaintiffs:

> To prolong plaintiff's recovery even further at this stage by granting a stay of the judgment seems particularly unfair.  Now, more than six years after the initiation of his action, plaintiff has a strong interest in receiving the remedy provided by law for his injuries.

Id.

Thirdly, the public interests in deterring terrorism and bringing succor to its victims that underlie the federal antiterrorism statute pursuant to which plaintiffs' judgment was given (28 U.S.C. §2333) require that defendants either post a full bond or satisfy the judgment without further delay.  Indeed, this public interest applies even in garden-variety suits:

> [W]hile the public may have no direct interest in the dispute between these parties, every citizen derivatively benefits from the swift resolution of all litigation.    I therefore find that both the plaintiff's and the public's interest militate against granting defendants' motion for a stay of judgment.

Id.  This applies all the more so in the instant action, brought under §2333 by the minor orphans and other family members of an American citizen murdered in a terrorist attack.

## VI.  DEFENDANTS' FAILURE TO PROPOSE ANY ALTERATIVE SECURITY ALSO DOOMS THEIR MOTION

The First Circuit has explicitly held that, even assuming, *arguendo*, that a stay of a money judgment could be requested under the Hilton criteria, nevertheless, in any case, adequate protection for plaintiffs/appellees would be a factor in evaluating the propriety of any such request.  Acevedo, 296 F.3d at 17.

This holding comports with the clear directive of the Supreme Court that a court may only stay execution of a judgment pending appeal "*if the Court provides for the security of the judgment creditor,*" Peacock v. Thomas, 516 U.S. 349, 559 n. 8 (1996), and the rule that even when a full bond is not required, "*it is the appellant's duty to propose a plan that will provide adequate (or as adequate as possible) security for the appellee.*"  U. S. on Behalf of Small Business Admin. v. Kurtz, 528 F. Supp. 1113 (E.D.Pa. 1981) (citing Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc., 600 F.2d at 1190 (5th Cir. 1979)).

Indeed, even in Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n, 636 F.2d 755, 760-761 (D.C. Cir. 1980) (emphasis added), which is the main case relied upon by

defendants (and subsequent case law) in support of a court's authority to permit a reduced or alternative security in extraordinary circumstances, the D.C. Circuit unequivocally stated that protection of plaintiffs' recovery rights is <u>always</u> a *sine qua non* condition of the exercise of this discretion:

> [A] full supersedeas bond should be the requirement <u>in normal circumstances, such as where there is some reasonable likelihood of the judgment debtor's inability or unwillingness to satisfy the judgment in full</u> upon ultimate disposition of the case and where posting adequate security is practicable. In unusual circumstances, however, the district court in its discretion may order partially secured or unsecured stays <u>if they do not unduly endanger the judgment creditor's interest in ultimate recovery</u>.

Needless to say, defendants have not proposed or identified any alternative security of any type. On the contrary, defendants are quite clearly demanding a stay without <u>any security whatsoever</u> for the plaintiffs. This alone constitutes grounds to deny their motion. <u>Cf.</u> <u>Harris v. Butler</u>, 961 F. Supp. 61, 63 (S.D.N.Y. 1997) (motion for stay denied when "*defendants ask that the Court relieve them of any obligation to satisfy the judgments pending the final adjudication of their appeal, <u>but offer no means to protect plaintiff's rights</u>*") (emphasis added).

**Defendants <u>have not identified a single case</u> in which a stay of a money judgment was granted without a finding that plaintiffs' judgment was secured and protected in some alternative manner, and to the best of plaintiffs' knowledge no such precedent exists.**

Obviously, in the instant case, there is far more than "*some reasonable likelihood of the judgment debtor's inability or unwillingness to satisfy the judgment in full.*" <u>Federal Prescription Serv.</u>, 636 F.2d at 760-761. Defendants have never stated their willingness to satisfy the judgment in this action. On the contrary, for some fifty-two months defendants have refused to recognize the authority and jurisdiction of this Court and have brazenly disregarded numerous

orders of the Court.[10]  Even in their motion for a stay, defendants <u>do not even hint at a readiness</u> to pay the judgment if they lose on appeal.  In fact, defendants have refused to pay plaintiffs the costs assessed by the Court Appeals following their previous appeal, despite repeated requests to do so.

Given defendants' conduct to date, and their audacious refusal to honor even an order of the Court of Appeals to pay plaintiffs several hundred dollars in out-of-pocket costs, there can be no doubt that defendants will refuse to voluntarily satisfy the multi-million dollar judgment in this action.

The recent decision in <u>Rodriguez v. Hernandez</u>, 304 F. Supp.2d 227 (D.P.R. 2004) provides an excellent illustration of the heavy burden on an appellant seeking an unsecured stay, and of how far defendants are from meeting that burden.  Employees of the Commonwealth of Puerto Rico were found liable for violating the plaintiffs' civil rights and judgment was entered for $1.9 million.  The defendants sought a stay of execution without the filing of a supersedeas bond, arguing that since Puerto Rico had provided legal representation in the action to the defendant officials, *"the actual payor would be the Government of Puerto Rico, whose payment capacity should not be in issue."* <u>Id</u>. at 230.

The district court rejected that argument, noting that under Puerto Rico law, the decision to provide legal representation to public official in a given proceeding did not require the

---

[10] <u>See</u> <u>e.g.</u> the Court's finding in its decision entering judgment:

> Given the PA's history of refusing to comply with this Court's orders and the rules of procedure governing depositions, interrogatories, and requests for the production of documents and for admissions, this Court finds Judge Martin's conclusion to sanction the PA for its deliberate actions to delay the completion of this litigation to be clearly correct.

<u>Ungar v. Palestinian Authority</u>, 325 F. Supp.2d 15, 25 (D.R.I. 2004)

28

government to satisfy a subsequent judgment.  It denied defendants' motion, and conditioned a stay on posting a supersedeas bond in the full amount of the judgment plus costs and interest:

> [U]ntil there is <u>absolute certainty</u> that [Puerto Rico] has <u>agreed unconditionally</u> to pay the judgment in this case, the mere existence of such possibility is an unacceptable substitute for the guarantees provided by a supersedeas bond.
>
> Accordingly, defendants' request to stay the execution of the monetary judgment without posting a supersedeas bond is **DENIED**.  The automatic stay pursuant to Rule 62(d) will be effective only after defendants post with the Clerk of this Court a supersedeas bond in the amount of **TWO MILLION FIVE HUNDRED DOLLARS** ($2,500,000.00).

<u>Id</u>. at 231 (emphasis added).  By contrast, in the instant case plaintiffs face an "absolute certainty" that defendants <u>will not</u> voluntarily pay the judgment.

## VII.    CONCLUSION

Therefore, like the <u>Rodriguez</u> defendants, the PA and PLO cannot be relieved of the obligation to post a supersedeas bond unless they provide plaintiffs with alternative security that ensures with "*absolute certainty*" the ultimate payment of plaintiffs' judgment.  <u>Id</u>.

Plaintiffs, by their Attorney,

_____
David J. Strachman  #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

## CERTIFICATION

I hereby certify that on the _____ day of September, 2004 I faxed and mailed a true copy of the within memorandum to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
(fax 212-979-1583)

Deming E. Sherman
Annemarie M. Carney
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903
(fax 401-276-6611)