# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.                                                    00 - 105L

THE PALESTINIAN AUTHORITY, et al.

### PLAINTIFFS' MOTION FOR APPOINTMENT OF A RECEIVER

For the reasons set forth in the accompanying Verified Memorandum and the exhibits

thereto, plaintiffs respectfully move the Court for an Order appointing a Receiver to enforce the

judgment entered by this Court against The Palestinian Authority and The Palestine Liberation

Organization on July 13, 2004. [1]

Plaintiffs, by their Attorneys,

_____
David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

---

[1] As discussed at length in their Verified Memorandum, plaintiffs seek appointment of a Receiver solely
to enforce their judgment. The Receiver would be free to initiate necessary proceedings against the PA
and PLO and any parties holding their property, but the Receiver would have no authority over the
operations and activities of the PA and the PLO themselves. In other words, plaintiffs are not seeking to
place the PA and PLO themselves "in receivership," but rather to appoint a Receiver to act as an officer
and "arm" of the Court to conduct consolidated enforcement proceedings.

1

## CERTIFICATION

I hereby certify that on the _____ day of June, 2005, I mailed a true copy of the within to:

Lawrence W. Schilling
Ramsey Clark
36 East 12th Street
New York, NY 10003
(via Federal Express and Email)

Deming E. Sherman
Edwards & Angell, LLP
2800 Bank Boston Plaza
Providence, RI 02903
(via hand delivery)



UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.                                                    00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**VERIFIED MEMORANDUM
IN SUPPORT OF PLAINTIFFS' MOTION FOR APPOINTMENT OF A RECEIVER**

For the reasons set forth below, plaintiffs move for the appointment of a Receiver authorized to bring appropriate proceedings to enforce the judgment entered by this Court on July 13, 2004.

## I.    BACKGROUND AND RELEVANT TRAVEL

Plaintiffs are the orphaned children, parents, siblings and administrator of the estate of Yaron Ungar, an American schoolteacher murdered along with his pregnant wife in a terrorist attack in June 1996.

Plaintiffs brought this action in March 2000, under the civil provisions of the Antiterrorism Act, 18 U.S.C. §2331 *et seq*. Defendants Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") refused to answer the complaint or conduct discovery and, as this Court repeatedly found, made every effort to delay and hinder the progress of the case for nearly 4-1/2 years.

On July 13, 2004, this Court entered final judgment for plaintiffs against the PA and the PLO in the amount of $116,409,123.00 plus attorney fees.

1

After entry of final judgment in July 2004, defendants moved for an unsecured stay of execution pending appeal. This Court denied defendants' motion and conditioned a stay on deposit of a supersedeas bond in the amount of $50 million. Dkt. #300. Defendants did not deposit the bond.

Defendants then moved the Court of Appeals for an unsecured stay pending appeal, which motion was denied in an order given on December 7, 2004.

On March 31, 2005, the Court of Appeals unanimously affirmed this Court's judgment. Ungar et al. v. The Palestine Liberation Organization et al., 402 F.3d 274 (1st Cir. 2005).

On May 20, 2005, the Court of Appeals denied defendants' motion for a rehearing and/or rehearing en banc.

Defendants have refused to pay any part of the judgment.

## II.    PLAINTIFFS' EFFORTS TO LOCATE AND RESTRAIN DEFENDANTS' ASSETS IN THE UNITED STATES

On April 11, 2005, plaintiffs served both the PA and the PLO with notices of a deposition scheduled for April 20, 2005. Plaintiffs' deposition notices directed defendants, pursuant to Fed.R.Civ.P. 30(b)(6), to designate a person or persons to testify at the deposition regarding defendants' assets in the United States. Exhibits A and B.

Defendants neither appeared for the deposition nor sought a protective order. Instead, on April 19, 2005 – the eve of the scheduled deposition – defendants' counsel sent plaintiffs' counsel a letter stating that defendants "*need to determine whether Palestine is obligated or will agree to produce witnesses pursuant to the notice*," and that the witnesses will be designated and produced for a deposition only "*if Palestine determines that it is obligated, or will agree to the depositions*." Exhibit C.

2

Defendants' letter of April 19, 2005 – in which defendants state that they will unilaterally purport to "determine" whether they "agree to" and are obligated to comply with discovery requests – is by its plain terms simply an open proclamation of refusal by defendants to provide discovery regarding their assets. In other words, the PA and PLO are persisting in their long-standing, recalcitrant refusal to participate in discovery or to otherwise follow the rules of procedure in this action.

On April 19, 2005, this Court entered a Restraining Order prohibiting the PA and PLO from transferring or withdrawing their U.S.-based assets. (The Restraining Order was later supplanted by an Injunction issued by this Court on May 5, 2005).

On April 21, 2005, plaintiffs registered their judgment in New York State Supreme Court and issued an "Information Subpoena With Restraining Notice" in respect to defendants' assets, pursuant to relevant New York law.

Within a few days, beginning on April 19, 2005, plaintiffs served copies of the Restraining Order issued by this Court, along with copies of the New York "Information Subpoena With Restraining Notice" on **several hundred** banks, brokerages, investment houses and financial institutions across the country, by both facsimile and registered mail.

In order to accomplish this feat, plaintiffs were compelled to hire a team of temporary secretaries who, along with plaintiffs' counsel's regular staff, spent many dozens of man-hours identifying the potential garnishees (banks, brokerages etc.), compiling the names of their registered agents and their addresses and fax numbers, and then preparing the hundreds of registered letters and return receipt cards, and sending the facsimiles.

## III.    DEFENDANTS' ASSETS IN THE UNITED STATES

3

In response to the mass service of this Court's Restraining Order and the New York Information Subpoena described above, plaintiffs received hundreds of replies from the various recipient banks and other financial institutions. Unfortunately, these responses identified no assets of the defendants in the United States (except for some de minimis sums in a bank account used by the PLO to operate its office in the District of Columbia).

Thus, it now appears highly likely that the only assets of the PA and PLO in the United States are those previously identified by plaintiffs though their own research, which are the following:

(1)    Partnership interests in Canaan Equity II Offshore C.V. and Canaan Equity III Offshore C.V., which are private investment funds organized as limited partnerships. Both of these funds are headquartered in Connecticut and California. See Valuation and "Transparency Diagnostics Methodology" reports prepared by the Standard and Poors[1] and the Democracy Council for the Canaan funds, Exhibits D and E.

(2)    A virtually exclusive (99.99960%) ownership interest in Chalcedony LLC, a limited liability corporation incorporated in Delaware and headquartered in Virginia. Chalcedony is a private equity investment management firm that invests and trades in securities, partnership interests and debentures, and makes direct investments in technology companies as well as other private equity funds. See Valuation and Transparency reports for Chalcedony, Exhibit F.

---

[1] The PA holds investment assets in a fund known as the Palestine Investment Fund ("PIF"). See World Bank Report No. 28990-GZ, "West Bank and Gaza Country Financial Accountability Assessment," published in June 2004, Exhibit G, at §§98-109, pp 33-35.

Soon after the establishment of the PIF in 2002, defendants retained Standard & Poors and the Democracy Council to analyze and value the PA's investment portfolio. See PIF webpage "About Us" at www.pa-inv-fund.com/About.aspx, copy attached as Exhibit H. See also Exhibit G at §105.

4

(3)    A virtually exclusive (99.992%) ownership interest in The Onyx Funds LLC, a limited liability corporation incorporated in Delaware and headquartered in Virginia. Onyx is an investment management firm that makes investments in private equity funds and closely held companies. See Valuation and Transparency reports for Onyx, Exhibit I.

(4)    A partnership interest in SilverHaze Partners. SilverHaze is a Delaware limited partnership with headquarters in Virginia. SilverHaze is a private equity investment management entity that functions as a fund-of-funds by investing in other private equity funds. The firm also makes direct early stage investments in technology companies. See Valuation and Transparency reports for Silverhaze, Exhibit J.

(5)    A 42% partnership interest in joint real estate ventures with Delma Real Estate Fund III LP, a Delaware limited partnership operating in New York. See Valuation and Transparency reports for Delma, Exhibit K.

## IV.    DEFENDANTS' ASSETS CANNOT BE REACHED BY EXECUTION PROCESS

There is no question whatsoever that the assets listed above (Canaan Equity, Chalcedony, Onyx, SilverHaze and Delma) are in fact owned by the PA itself: in several sworn affidavits submitted by the PA in civil proceedings pending in the Israeli courts the PA has identified these very assets – specifically by name – as assets owned by the PA and available for the satisfaction of judgments against the PA. See Declaration of Avraham Colthof, Exhibit L.

However, the PA has titled these U.S.-based investments in the name of various shell funds, rather than in its own name. See Exhibits D-K. Therefore, plaintiffs cannot reach defendants' assets by simple execution process. Any execution levied on these assets by

plaintiffs would be returned *nulla bona* since the assets are not titled in the names of judgment-debtors PA or PLO themselves.

Thus, in order to reach these assets—incontrovertibly owned by defendants but titled to their shell funds—plaintiffs will need and intend to utilize equitable doctrines, such as constructive/resulting trust, alter ego and/or veil-piercing.

## V.    ABSENT A RECEIVER PLAINTIFFS WILL BE FORCED TO PURSUE EQUITABLE ENFORCEMENT PROCEEDINGS IN STATE COURTS IN MULTIPLE JURISDICTIONS

Defendants' investments are held by brokerages, banks, investment houses and asset managers located in at least five different states. See Exhibits D-K.

Plaintiffs therefore face the prospect of having to litigate their equitable (e.g. constructive/resulting trust, alter ego and/or veil-piercing) claims in multiple jurisdictions across the country.

Moreover, the ancillary subject-matter jurisdiction of the federal courts to enforce federal judgments does not extend to enforcement proceedings that include claims of this type (trust, alter ego or veil-piercing) absent a further independent basis for subject-matter jurisdiction (e.g. diversity[2]). Peacock v. Thomas, 516 U.S. 349 (1996).

Therefore, absent appointment of a federal Receiver, plaintiffs will have to conduct the proceedings to enforce their federal judgment in state courts in at least five different states from coast to coast.

## VI.    APPOINTMENT OF A FEDERAL RECEIVER WOULD PERMIT A CONSOLIDATED FEDERAL ENFORCEMENT PROCEEDING IN THIS COURT

---

[2] In light of the parties' respective citizenships and domiciles there is no basis for diversity jurisdiction in this case.

Appointment of a Receiver as requested by the plaintiffs will remove all of the above-described obstacles to enforcement of this Court's judgment:

Federal courts are of course empowered under Fed.R.Civ.P. 66 and their general equitable powers to appoint a receiver to conduct judgment enforcement proceedings. See e.g. Citronelle-Mobile Gathering, Inc. v. Watkins, 934 F.2d 1180, 1187 (11th Cir. 1991)(The "rule which emerges" from "the applications of the federal receivership statute in the case law" is that "when a district court has in personam jurisdiction over the defendant . . . the court may appoint a receiver to enforce a judgment upon a showing that such an appointment is necessary"); Santibanez v. Wier McMahon, 105 F.3d 234, 241 (5th Cir. 1997)(Under Fed.R.Civ.P. 66, "the appointment of a receiver can be sought by anyone showing an interest in certain property or a relation to the party in control or ownership thereof such as to justify conservation of the property by a court officer . . . receivership may be an appropriate remedy for a judgment creditor . . . " in certain circumstances)(internal quotations and citations omitted).

Once a federal court appoints a Receiver, it has subject-matter jurisdiction over all actions brought by the Receiver within the scope of the receivership:

> It is well established that a federal district court has subject matter jurisdiction in ancillary actions brought in the court where the receiver is appointed "to accomplish the ends sought and directed by the suit in which the appointment was made." *Pope v. Louisville, New Albany & Chicago Ry. Co.,* 173 U.S. 573, 577, 19 S.Ct. 500, 501, 43 L.Ed. 814 (1899); *Tcherepnin v. Franz,* 485 F.2d 1251 (7th Cir.1973).

American Freedom Train Foundation v. Spurney, 747 F.2d 1069, 1073 (1st Cir. 1984).

Similarly,

> We begin with the undisputed proposition that the initial suit which results in the appointment of the receiver is the primary action and that any suit which the receiver thereafter brings in the appointment court in order to execute his duties is ancillary to the main suit. As such, the district court has ancillary subject matter

> jurisdiction of every such suit irrespective of diversity, amount in controversy or any other factor which would normally determine jurisdiction.

Haile v. Henderson National Bank, 657 F.2d 816, 822 (6th Cir. 1981).

Moreover, 28 U.S.C. §§ 754 and 1692 empower a federal Receiver to effectuate nationwide service of process and so grant the appointing court personal jurisdiction over out-of-state garnishees against whom the Receiver brings claims. See Securities and Exchange Commission v. Bilzerian, 378 F.3d 1100 (D.C. Cir. 2004); American Freedom Train Foundation v. Spurney, 747 F.2d 1069, 1073 (1st Cir. 1984); Haile v. Henderson National Bank, 657 F.2d 816, 822 (6th Cir. 1981); U.S. Small Business Administration v. Chimicles, 2004 WL 2223304 (E.D.Pa. 2004).

Thus, a Receiver appointed to enforce the judgment of this Court will be able to bring consolidated enforcement proceedings in this Court against all relevant garnishees and third-parties, and this Court will have both subject-matter jurisdiction over such proceedings and personal jurisdiction over the parties thereto.

## VII.    APPOINTMENT OF A RECEIVER IS NECESSARY AND APPROPRIATE

The appointment of a Receiver to conduct judgment enforcement proceedings is within the sound equitable discretion of this Court.  See e.g. Fleet Nat'l Bank v. H & D Entertainment, Inc., 926 F.Supp. 226, 239 (D.Mass. 1996) aff'd 96 F.3d 532 (1st Cir. 1996) cert. denied 117 S.Ct. 1335 (1997) ("The appointment of a receiver is a matter resting within the sound discretion of the court.") (citing Wright & Miller, Federal Practice and Procedure: Civil §2983); Santibanez v. Wier McMahon, 105 F.3d 234, 241 (5th Cir. 1997) (Under Fed.R.Civ.P. 66 "the appointment of a receiver . . . is in the sound discretion of the court.").

8

Appointment of a federal Receiver to prosecute enforcement proceedings in this Court is both necessary and wholly appropriate, and the Court is respectfully requested to exercise its discretion to appoint such a Receiver, for all the following reasons:

### a.    Plaintiffs Have No Remedy at Law

The lack of an enforcement remedy at law is a well-recognized ground for appointment of a Receiver. See e.g. Consolidated Rail Corporation v. Fore River Railway Co., 861 F.2d 322, 326-327 (1st Cir. 1988) ("Courts have recognized many factors that are relevant for a court to consider when determining the appropriateness of the appointment of a receiver. These include . . . the inadequacy of available legal remedies"); Santibanez 105 F.3d at 241-242 (same); Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316-17 (8th Cir. 1993) (same); 12 Wright & Miller §2983 ("receivership may be an appropriate remedy for a judgment creditor . . . who has had execution issued and returned unsatisfied . . . or who seeks to subject equitable assets to the payment of the judgment"); Pittsburgh Equitable Meter Co. v. Paul C. Loeber & Co., 160 F.2d 721, 728 (7th Cir. 1947) (Appointment of a federal receiver to enforce a judgment "is a branch of equity jurisdiction not dependent upon any statute. That right is based primarily on the ground that equity will come to the aid of any one who has exhausted his remedies at law.").

As discussed above, defendants have titled their assets in the United States in the names of various shell funds, and plaintiffs therefore cannot reach these assets by execution and attachment at law. Any execution or attachment process levied on those assets will be returned *nulla bona*, for the simple reason that the assets are titled under names that differ from the names of the judgment debtors appearing on the judgment.

9

Plaintiffs therefore have no enforcement remedies at law, and can reach these assets only through equitable doctrines such as constructive/resulting trust, alter ego and piercing the corporate veil.

**Thus, since plaintiffs have no remedy at law—and must in any case resort to equitable relief in order to satisfy their judgment—the appointment of an equity Receiver to conduct enforcement proceedings is highly appropriate and desirable.**

### b. Plaintiffs Should Not Be Forced to Seek Enforcement In Multiple Jurisdictions

As discussed, *supra*, defendants' refusal to honor the judgment of this Court will force the plaintiffs—after over five years of litigation and two appeals—to initiate a whole series of equitable enforcement proceedings against defendants in state courts across the country, which will take years to resolve and impose an unbearable burden and expense on plaintiffs.

Such a prospect would be extremely inequitable and a mockery of justice, to say the least.

Plaintiffs submit that the need to conduct multiple execution proceedings in various state courts to enforce their judgment constitutes (standing alone, even assuming *arguendo* that those proceedings could be conducted at law rather than equity) an "***inadequacy of available legal remedies***" sufficient to merit appointment of a Receiver. Consolidated Rail, 861 F.2d at 327.

As discussed, appointment of a Receiver as sought by plaintiffs would eliminate the need for multiple proceedings, consolidate enforcement in this Court and thereby render satisfaction of the judgment of this Court infinitely simpler and more efficient for all.

Needless to say, consolidation of proceedings in the hands of a Receiver will also prevent the massive waste of precious judicial time and resources that would otherwise result from duplicative and piecemeal proceedings in numerous courts across the country.

c.   **Appointment of a Federal Receiver Will Vindicate the Strong Federal Policy Interests Underlying 18 U.S.C. §2333**

The proceedings to enforce plaintiffs' judgment belong in federal court, and not state courts, for an important additional reason:

Plaintiffs' judgment was entered under the civil provisions of the Antiterrorism Act, 18 U.S.C. §2333. Civil actions under §2333 are within the exclusive subject-matter jurisdiction of the federal district courts. 18 U.S.C. §2338.

The legislative history clearly indicates that exclusive federal jurisdiction over §2333 actions was intended "***to fully effectuate the legislative purpose of providing a comprehensive federal scheme to cover civil and criminal cases involving terrorist acts abroad against United States nationals.***" Statement of Deputy Assistant Attorney General Steven R. Valentine, Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts & Admin. Practice of the Senate Comm. on the Judiciary, 101st Congress 8 (1990) at 38 (emphasis supplied).[3]

Moreover, Congress did not intend that §2333 actions provide American victims of terrorism with an unenforceable piece of paper and a mere "moral victory." On the contrary, this Court found that:

> The legislative history of 18 U.S.C. §2333 evinces a clear congressional intent to deter and punish acts of international terrorism. During the floor debates, Senator Grassley spoke of holding terrorists accountable "where it hurts them most: at their lifeline, their funds." 136 Cong. Rec. S14279-01 (1990). He stated that his bill would put terrorists on notice "to keep their hands off Americans and their eyes on their assets," 136 Cong. Rec. S14279-01, and "would allow victims to pursue renegade terrorist organizations, their leaders, and the resources that keep them in business, their money." 138 Cong. Rec. S17252 (1992).

Ungar v. Palestinian Authority, 304 F. Supp. 2d 232, 238 (D.R.I. 2004).

---

[3] As originally drafted the Antiterrorism Act did not include §2338. Section 2338 was apparently added to the final version of the bill in response to a request made by Mr. Valentine on behalf of the Department of Justice. Id.

Congress could not have been clearer. Congress intended that §2333 judgments be enforced as part of an express federal policy aimed at deterring and punishing terrorism against American citizens.

The important federal policy goals that Congress intended enforcement of §2333 judgments to fulfill are further grounds in favor of appointment of a federal Receiver to enforce plaintiffs' §2333 judgment, particularly when – as in the instant case – plaintiffs' only alternative is to seek relief in state courts.

**d.   Absent the Relief Sought Enforcement Against Defendants' Partnership Interests Would Likely Require Appointment of Multiple State Receivers**

A significant part of defendants' assets in the United States (i.e., both of the Canaan Equity funds, SilverHaze and Delma Real Estate) are interests in limited partnerships. See Exhibits D, E, J and K.

The Uniform Limited Partnership Act contains a special provision that anticipates the use of a Receiver as part and parcel of judgment enforcement proceedings against interests in limited partnership. See Id. §703(a) ("On application to a court of competent jurisdiction by any judgment creditor of a partner or transferee, the court may charge the transferable interest of the judgment debtor with payment of the unsatisfied amount of the judgment with interest . . . The court may appoint a receiver of the share of the distributions due or to become due to the judgment debtor in respect of the partnership . . . ") (emphasis supplied).

This receivership provision (or a variation thereon) has been adopted by many, if not most states, including the states in which defendants' partnership assets are located, as an integral part of the provisions governing judgment enforcement against limited partnership interests. See e.g. New York Partnership Law §111(1); 6 Delaware Code §17-703(a); Connecticut General Statutes §34-349(a).

12

The need for a special provision permitting appointment of a Receiver for enforcement against a partnership interest is obvious – unlike a simple execution against property or cash conducted by a sheriff or marshal, the process of managing, assessing and foreclosing on a partnership interest requires hands-on supervision and control that only a fiduciary can provide.

Thus, in order to reach defendants' numerous partnership interests in the United States, plaintiffs will -- absent the appointment of a single federal Receiver -- almost certainly be compelled to seek appointments of state receivers in each of the various relevant jurisdictions (New York, Connecticut, Delaware etc.) where those partnerships are based.

It would be an extreme burden and an egregious waste of resources for both the judiciary and the plaintiffs, if plaintiffs are forced to seek the appointment of multiple receivers in several states, and it would be far more just, efficient and logical (even for the defendants and their counsel) to appoint a single federal Receiver in this Court to handle all necessary proceedings regarding defendants' partnership interests.

**e.    Defendants Have Refused to Respond to Discovery Requests Regarding Their Assets**

As discussed, the PA and PLO have rebuffed plaintiffs' attempt to obtain discovery regarding defendants' assets in the United States, brazenly declaring that they alone will unilaterally "determine" whether to participate in such discovery. Exhibit C.

It is well established that a judgment-debtor's refusal to conduct discovery constitutes grounds for appointment of a Receiver. Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 317 (8th Cir. 1993) (refusal to cooperate with discovery of assets constitutes grounds for appointment of receiver).

Indeed, in the instant case a Receiver will be of crucial assistance in locating documents and obtaining evidence relating to defendants' assets. Because of defendants' refusal to conduct

discovery regarding their assets, plaintiffs will be required to seek relevant documents and information regarding defendants' assets from the various third-parties (i.e. partnerships, funds etc.) holding those assets. As noted, these third-party garnishees are scattered among at least five states, from coast-to-coast. See Exhibits D-K.

Due to the geographical limitations on third-party subpoenas imposed by Fed.R.Civ.P. 45, the crucial task of obtaining documents and evidence regarding defendants' assets would require plaintiffs to register their judgment, issue subpoenas and conduct discovery in each jurisdiction—within 100 miles of each asset-holder—in multiple districts across the country.[4]

By contrast, a Receiver appointed by this Court can and should be authorized to obtain the relevant documents from the numerous third-parties on demand, in most cases simply by sending a letter or facsimile. See e.g. Citronelle-Mobile v. Watkins, 934 F.2d 1180, 1186 (11th Cir. 1991)("Receiver is authorized and directed to obtain information relating to all financial accounts, real property and personal assets in the name of or held for the benefit of" debtors).

Appointment of a Receiver would therefore spare plaintiffs a nationwide document-hunt, and the substantial expenses and lengthy delay such an endeavor would entail.

### f.  Defendants Have Openly Declared Their Refusal To Pay the Judgment and to Obey the Courts of the United States

Appointment of a Receiver to conduct consolidated enforcement proceedings is also appropriate because defendants have flatly informed plaintiffs that they will not honor the judgment of this Court. Plaintiffs' undersigned counsel has attempted to initiate discussions with respect to payment of the judgment with defendants' counsel in Rhode Island, New York and

---

[4] Rule 45(a)(2) requires that subpoenas commanding production of documents or appearance at a deposition issue from the district court for the district in which the production or deposition is to occur, and Rule 45(b)(2) requires that subpoenas be served within the district of the issuing court or within 100 miles of the place of production or deposition.

Washington, D.C.. Plaintiffs' counsel made several such attempts with each of defendants' various counsel, all of which were rebuffed. Indeed, in a face-to-face meeting in May 2005, defendants' D.C. counsel, Maher Hanania, told plaintiffs' counsel flatly that the PA and PLO "will never pay" the judgment of this Court.

This frank statement of contumacious intent by defendants is merely the encore to their five-year history of recalcitrance and bad-faith conduct in this action, in the course of which this Court found that defendants repeatedly made false declarations and assertions. See Ungar v. Palestinian Authority, 325 F. Supp.2d 15, 59 (D.R.I. 2004) (noting "*the apparent falsity*" of sworn declaration submitted by defendants' senior official), at 56 (finding that evidence submitted by plaintiffs "*casts considerable doubt on the Palestinian Defendants' assertion that they are acting in 'good faith'*") and at 62-63 (finding that defendants' claim that none of the seven persons noticed for deposition would ever be available to be deposed at any time in any place "*strains credulity*" in light of the fact that other PA officials had traveled to the United States and to Israel to testify in other cases and rejecting as "*implausible*" PA's claim "*that it could not have answered a single interrogatory, responded to a single request for admission, or produced a single document sought by Plaintiffs.*").

Since defendants have had no compunctions about utilizing illegitimate methods (false affidavits and assertions) in an attempt to defeat this action, they will clearly have no compunctions about similar illegitimate tactics in other courts in order to avoid payment of the judgment in this action.

**There is a difference between playing hardball and simply cheating – and defendants have repeatedly attempted to cheat.**

15

Moreover, in a pleading filed last month in <u>Knox v. Palestine Liberation Organization et al.</u>, (03-CV-4466 S.D.N.Y.), which like the instant case is a civil action under the Antiterrorism Act ("ATA") for the terrorist murder of an American citizen, the PA and PLO issued a general proclamation of defiance vis-à-vis <u>all</u> United States courts and declared their readiness to defy our courts whenever they see fit:

In <u>Knox</u> defendants asserted that they lack minimum contacts with the United States constitutionally sufficient for the exercise of personal jurisdiction and that court therefore ordered jurisdictional discovery regarding defendants' commercial activities in the United States.

True to form, defendants refused to comply with the <u>Knox</u> court's discovery orders despite repeated warnings from the court over a period of 11 months. On March 21, 2005, a magistrate judge issued a report finding that defendants' conduct was part of a deliberate policy of recalcitrance adopted by them throughout the federal courts and recommending sanctions of estoppel and attorney's fees. <u>Knox v. Palestine Liberation Organization et al.</u>, 2005 WL 712005 (S.D.N.Y. March 21, 2005).

On April 9, 2005, defendants filed a pleading in <u>Knox</u> styled as "Objections" to the magistrate's report, but whose substance was in the nature of a political manifesto in which defendants for the first time <u>openly declared a global policy of refusal to obey all decisions of the U.S. courts with which they disagree ideologically</u>:

> From defendants' viewpoint, the issue of personal jurisdiction is one small part of their overall position on statehood and sovereign immunity <u>on which they must stand firm whatever may be the result</u> on the issue of personal jurisdiction, <u>or in the ATA cases generally</u>.

> It is Palestine's firm conviction that it is a sovereign state . . . This Court and others have ruled adversely to Palestine's statehood. <u>Palestine cannot and will not relinquish or compromise its statehood in order to conform to these judicial rulings</u>.

"Objections of Defendants Palestinian Authority and Palestine Liberation Organization," Exhibit M, at §§ 10-11 (emphasis supplied).

Thus, with the ink barely dry on the decision of the Court of Appeals for the First Circuit in this action resoundingly rejecting defendants' sovereign immunity claim, defendants have made their position perfectly clear: they do not accept the rulings of United States federal courts as binding on them, they intend to "***stand firm whatever may be the result***" and they will not "***conform to these judicial rulings***."

Defendants' cards are now open and on the table. They simply do not recognize the authority of the United States courts, and they have no intention of honoring this Court's judgment in plaintiffs' favor or any qualms about scuttling plaintiffs' collection efforts.

Yet incredibly, at the very same time, defendants maintain a rich investment portfolio in the United States that includes limited partnership interests, venture capital shares, real estate, stock and shares in corporations, and securities, totaling millions of dollars. Exhibits D-K.

**Thus, defendants are enjoying the fruits of the United States economy while at the same time brazenly refusing to honor a judgment entered and affirmed by the United States federal courts.**

Plaintiffs respectfully submit that in light of this outrageous and unjust state of affairs, principles of equity and fundamental justice not only permit but cry out for equitable relief in the form of appointment of a federal Receiver to conduct all necessary enforcement proceedings.

## VIII. APPOINTMENT OF A RECEIVER WILL PROTECT THE INTEGRITY OF THE JUDICIAL PROCESS

Federal courts have inherent power "to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." Laker Airways v. Sabena, 731 F.2d 909, 927 (D.C.Cir. 1984).

17

Thus, for example, a federal court "may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation" by issuing appropriate post-judgment anti-suit injunctions. Id at 928.

Plaintiffs respectfully submit that this same fundamental general principle—the Court's authority "to protect the integrity of its judgments" from the vexatious conduct of a judgment-debtor—strongly favors appointment of a Receiver to enforce the judgment of the Court in this action.

A Receiver serves as an "officer" and an "arm" of the court that appoints him. See e.g. Taylor v. Sternberg, 293 U.S. 470, 471 (1935)("[R]eceiver is an officer of the court which appoints him."); In re Indian Motorcycle Litigation 307 B.R. 7, 17 (D.Mass. 2004)("Receiver is an arm of the court")(citing Ralph E. Clark, 1 A Treatise on the Law and Practice of Receivers § 11 (3rd ed. 1959)).

A Receiver, serving as an officer and the arm of this Court, is infinitely more capable than plaintiffs of protecting and vindicating the integrity of this Court's judgment and of the judicial process, in the face of the defiant posture of recalcitrance adopted by defendants (detailed in section VII(f) supra).

## IX. APPOINTMENT OF A RECEIVER WILL NOT PREJUDICE OR HARM DEFENDANTS

In light of defendants' refusal to honor the final judgment of this Court or even to conduct discovery regarding their assets, and their five-year record of contumacious and dilatory conduct in this Court, plaintiffs respectfully believe that the Court need not even consider whether appointment of a Receiver will somehow "harm" or "prejudice" the defendants.

But in any event, appointment of a Receiver will cause defendants no harm or prejudice whatsoever. Indeed, consolidating judgment enforcement in the hands of a Receiver appointed

18

by this Court can only save defendants the expense and inconvenience of defending multiple proceedings in numerous state courts.

Finally, in order to spare the Court and themselves unnecessary wrangling with defendants over de minimis amounts, the proposed Order for appointment of a Receiver submitted by plaintiffs excludes from the Receiver's authority the existing bank accounts used by defendants to operate their offices in the UN and in the District of Columbia.

WHEREFORE plaintiffs' motion should be granted.

I declare under penalty of perjury that the foregoing is true and correct.

June 3, 2005.

Plaintiffs, by their Attorneys,

6/3/05

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

## CERTIFICATION

I hereby certify that on the 3rd day of June, 2005, I mailed a true copy of the within to:

Lawrence W. Schilling
Ramsey Clark
36 East 12th Street
New York, NY 10003
(via Federal Express and Email)

Deming E. Sherman
Edwards & Angell, LLP
2800 Bank Boston Plaza
Providence, RI 02903
(via hand delivery)



19