UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LESLYE KNOX et al.,

                                Plaintiffs,

                                                    03 Civ. 4466 (VM)
             - against -

THE PALESTINE LIBERATION ORGANIZATION
et al.,                                                    **ORDER**

                                Defendants.

        For the reasons discussed at a hearing before the Court
on July 14, 2005, it is hereby:

        **ORDERED** that Defendants shall pay to Plaintiffs the
$19,625.30 in fees and costs that the Court imposed as
discovery sanctions by Order dated June 22, 2005 by no later
than 30 days from the date of this Order, i.e., by no later
than August 15, 2005, pursuant to Fed. R. Civ. P. 6(a); and it
is further

        **ORDERED** that Defendants shall file their answer to
Plaintiffs' Complaint by no later than August 15, 2005; and it
is further

        **ORDERED** that in the event Defendants do not answer the
Complaint by the date specified herein, Plaintiffs shall have
leave to move for entry of judgment by default; and it is
further

        **ORDERED** that should judgment by default be entered,
within twenty days thereof Plaintiffs shall file and serve

                                  1

papers setting forth the particulars concerning their claims for damages; and it is finally

ORDERED that within thirty days of the filing of Plaintiffs' request for damages, the Court shall conduct an inquest for the purposes of determining any appropriate recovery.

**SO ORDERED.**

Dated:    New York, New York
          15 July 2005

_____
VICTOR MARRERO
U.S.D.J.

2

08/    2005 15:13 #008 P.001/001

From:

FROM :                          FAX NO. :2129791583          Aug. 15 2005 01:48PM  P1

RAMSEY CLARK
LAWRENCE W. SCHILLING

LAW OFFICES
37 WEST 12TH STREET  2B
NEW YORK, N.Y. 10011
212-989-6613
212-979-1583 FAX

August 15, 2005

Hon. Victor Marrero
United States Courthouse                    **BY FAX 212-805-6382**
40 Centre Street
Room 414
New York, New York 10007-1581

          Re:    **Knox v. PLO**
                 **03 CV 4466 (VM)**

Dear Judge Marrero,

     Consistent with their position in the several cases pending in U.S. courts against them for acts alleged to have occurred in Palestine or Israel, the defendants have instructed counsel to present only their position that U.S. courts have no jurisdiction over them and not to answer on the merits.  Therefore no answer on the merits of the complaint will be filed.

     This same position, that the Court has no jurisdiction over them, applies to the order for defendants to pay sanctions.

                                   Sincerely,

                                   Ramsey Clark
                                   Ramsey Clark

cc:    David Strachman (by fax) 401-331-6095
       Lee Squitieri, Esq. (by fax) 212-575-2184



بسام مصلح و محمد ربعي
B. MUSLEH & M. A. RABAI

No. 563104165

Date: 21/3/1998

Palestine National Authority

Ministry of Justice - Gaza Strip

Company Registration Department

Company Law, Year 1929 and its Amendments

Certificate

I certify that the Palestinian Commercial Services Company (PCSC) a joint stock company (private), incorporated in Gaza under No. (563104165) dated 4/8/1994, that its capital has been increased to US Dollars Twenty Million ($20,000,000) in accordance with the Board of Directors decision on 19/3/1998,

The increase in the capital has been registered in Company Registry on 21st March 1998.

This Certificate has been given under my signature on 21st March 1998.

Company Registrar

Fathi Mohammed Al-Aloul

I certify that this is a true copy of the original Certificate.

Attorney

Bassam Musleh        BASSAM MUSLEH        13/1/2003

Al-Birch - Al-Irsal St. - Al-Salam Building
Tel: 2966124 - 2966125
Fax: 2966126

19-JAN-2003 SUN 16:00    ECS                              FAX NO. 972 2 2958410              P. 03



بسام مصلح و محمد زعبي
B. MUSLEH & M. A. RABAI

No. 563104165
Date: 4/8/1994

Palestine National Authority
Gaza Strip-Ministry of Justice
Company Registrar Office

Company Law, Year 1929 and its Amendments
Certificate of Company Incorporation

I certify that the Palestinian Commercial Services Company (PCSC) has been incorporated in accordance with the Company Law for the year 1929 and it's Amendments as a company owned and controlled by the Palestinian Authority.

It has been registered in Gaza under number (563104165) on the 4th day of August 1994.

This Certificate has been issued under my signature on 4th day of August 1994.

Company Registrar
Fathi Mohammed Al-Aloul

I certify that this is a true copy of the original Certificate.

Attorney
Bassam Musleh                              13/1/2003

BASSAM MUSLEH

Al-Birch - Al-Irsal St. - Al-Salam Building
Tel. 2966124 - 2966125
Fax 2966126

Report No. 28990-GZ

# West Bank and Gaza
# Country Financial Accountability Assessment

**June 2004**

West Bank and Gaza (MNCA4)
Operational Core Services Unit (MNACS)
Middle East and North Africa Region



**Document of the World Bank**

**CURRENCY EQUIVALENTS**
Currency Unit = New Israeli Shekel (NIS)
NIS 4.54 = US$ (average 2003)

**FISCAL YEAR**
January 1 – December 31

**ABBREVIATIONS AND ACRONYMS**

| | |
|---|---|
| CAS | Country Assistance Strategy |
| CFAA | Country Financial Accountability Assessment |
| CPAR | Country Procurement Assessment Review |
| CTA | Central Treasury Account |
| DMFAS | Debt Management Financial Accounting System |
| DFID | Department for International Development |
| EMSRP | Emergency Municipal Services Rehabilitation Project |
| ESSP | Emergency Services Support Project |
| EU | European Union |
| GCI | General Control Institute |
| GFS | Government Finance Statistics |
| GPC | General Personnel Council |
| IDA | International Development Association |
| IFAC | International Federation of Accountants |
| IMF | International Monetary Fund |
| INTOSAI | International Organization of Supreme Audit Institutions |
| LACC | Local Aid Coordinating Committee |
| LGU | Local government unit |
| MOE | Ministry of Education |
| MOH | Ministry of Health |
| MOLG | Ministry of Local Government |
| MOF | Ministry of Finance |
| MOP | Ministry of Planning |
| MOSA | Ministry of Social Affairs |
| PA | Palestinian Authority |
| PECDAR | Palestine Economic Council for Development and Reconstruction |
| PC | Petroleum Commission |
| PCBS | Palestine Central Bureau of Statistics |
| PCSC | Palestine Commercial Services Corporation |
| PFM | Public financial management |
| PEPP | Professional Expatriate Palestine Program |
| PIF | Palestine Investment Fund |
| PLC | Palestine Legislative Council |
| PMA | Palestine Monetary Authority |
| QIPP | Quick Impact Intervention Program |
| SESP | Socio-Economic Stabilization Plan |
| SOE | State owned enterprise |
| TFGWB | Trust Fund for Gaza and West Bank |
| UNCTAD | United Nations Conference on Trade and Development |
| UNDP | United Nations Development Program |
| UNRWA | United Nations Relief and Works Agency |
| WB&G | West Bank and Gaza |
| WBES | World Bank Business Environment Strategy |

| | |
|---|---|
| Regional Vice President | Christiaan Poortman |
| Country Director | Nigel Roberts |
| Sector Manager | Samia Msadek |
| Country Program Coordinator | Markus Kostner |
| Country Officer | Claus Astrup |
| CFAA Team | David Shand (Team Leader), Ayman Abu-Haija, Peter Dean (DFID consultant) |

CONTENTS

INTRODUCTION _____ 1

EXECUTIVE SUMMARY _____ 1

1.  BACKGROUND _____ 7

2.  SUMMARY OF RECENT PFM REFORMS _____ 7

3.  DONORS AND THE PA _____ 8

4.  AID MANAGEMENT _____ 9

5.  THE WORLD BANK AND THE PA _____10

6.  ISSUES CONCERNING TRACKING OF FUNDS _____11

7.  THE LEGAL FRAMEWORK FOR PFM _____13

8.  BUDGET CONSTRUCTION _____16

9.  CENTRAL TREASURY ACCOUNT – CASH MANAGEMENT AND BUDGET EXECUTION _____23

10. EXPENDITURE ARREARS _____26

11. DEBT MANAGEMENT _____26

12. GOVERNMENT ACCOUNTING SYSTEM _____27

13. PUBLIC SECTOR PAYROLL _____31

14. PA COMMERCIAL INVESTMENTS _____33

15. STATE OWNED ENTERPRISES_____35

16. OTHER COMMERCIAL ACTIVITIES_____37

17. PUBLIC INSTITUTIONS _____37

18. EXTERNAL AUDIT _____37

19. FINANCIAL CONTROL AND INTERNAL AUDIT _____40

20. THE ROLE OF PLC IN PFM _____45

21. PROCUREMENT_____46

22. FISCAL REPORTING _____47

23. LOCAL GOVERNMENT _____50

24. PFM CAPACITY AND POSSIBLE TECHNICAL ASSISTANCE NEEDS ____51

ANNEX 1: LIST OF DESIRABLE FURTHER ACTIONS_____53

ANNEX 2: LIST OF KEY OFFICIALS AND OTHERS MET_____57

## INTRODUCTION

Work on this CFAA commenced with a mission to West Bank and Gaza (WB&G) from 25 September to 2 October 2003. During this mission extensive discussions were held with the Minister of Finance, with key PA officials, with the IMF and with other donors, particularly DFID and the EU. A draft report was delivered to the Minister of Finance in early December, as the basis for further discussions. A second mission was undertaken from 7 to 13 February, 2004 for these further discussions, to finalize the report.

In both missions full cooperation was received from the Minister of Finance Dr. Salam Fayyad and senior PA officials. All information requested was readily provided. Comments by the Minister and his senior officials have been taken into account in preparing this report.

A Bank internal review meeting was held on March 30, 2004. The comments and advice of the peer reviewers, Jean Van Houtte (World Bank, AFTP4), David Sewell (World Bank, MNATC) and Karim Nashashibi (IMF) are gratefully acknowledged. The assistance of the UK Department for International Development (DFID) in providing funding for a consultant as part of the CFAA team is also acknowledged.

## EXECUTIVE SUMMARY

This CFAA is able to report major improvements in the public financial management (PFM) system of the West Bank and Gaza (WB&G) in the period since mid-2002. On the basis of these improvements, and of Palestinian Authority (PA) commitment to further reforms, the World Bank is able to support a program of general donor budget support to the PA.

However, the CFAA also identifies a significant number of actions which still need to be implemented. Most of the essential steps are either under implementation by the PA, or are planned.

### RECENT AREAS OF IMPROVEMENT

As set out below, major improvements in budgeting (both development and execution) and in fiscal transparency have been introduced during the tenure of the present Minister of Finance. These are highly creditable developments, and mark a major departure from the PFM regime in force prior to his incumbency. Such improvements have clearly positioned the WB&G PFM system on an upward path, and there is reason for confidence that this progress will continue. For this to occur, however, the issues of capacity development discussed in Section 24 of the Main Report will need to be addressed.

Notable improvements in PFM include the following:

1.    All Palestinian Authority (PA) revenues are now paid into the Central Treasury Account (the CTA), a single treasury account which brings together all government revenues and provides a single pool of funds out of which all expenditures are paid. This has eliminated previous non-transparent and discretionary spending from various off-budget petroleum, tobacco and alcohol excise revenue accounts.

2.    The 2003 Budget process represented the first serious attempt in WB&G to develop a budget that accounts for all revenues and sets meaningful (and manageable) limits on expenditure. The process was reinforced during 2004 Budget preparation. An orderly system of budgetary appropriation is now in force.

3.    Reflecting these new and improved processes, the budget speeches and extensive background budget data are posted on a regular basis on the Ministry of Finance's (MOF) external website, itself a symbol of a new approach to transparency and improved budget management. The full Budget documents for 2003 and 2004, which were published, include information on economic parameters, balance of payments, monetary aggregates, external public debt and public sector employment.

4.    MOF is exercising firm control over budget expenditures – with the obvious caveat that the chronic post-September 2000 shortage of Budget funds has led to strict limits on non-wage expenditures and to continuous ad hoc adjustments, with funds often being released by MOF on a daily basis. While far from ideal, MOF has had little other choice. One consequence of chronic revenue shortage and the erratic nature of donor budget support has been a periodic accumulation of expenditure arrears to the PA's pension funds, to commercial suppliers. These arrears and the short-term commercial bank debt that MOF has also contracted are, however, being transparently handled. The IMF is also regularly monitoring budget execution and the arrears and debt situation.

5.    Following the integration of the separate West Bank and Gaza accounting systems, monthly budget execution reports are now being prepared and posted on MOF's external website within a few days of the end of each month. These reports appear to provide reliable information, although delays in closing some ministries' accounts each month mean that some of the information is only preliminary.

6.    A program of placing in each ministry financial controllers who report to MOF has been initiated. This program is designed to ensure appropriate *ex ante* controls over expenditures. A Director-General of Financial Control position in MOF to overview and manage this important function has been created and recently filled.

7.    In response to the weakness in the external auditing function (paragraph 13 below), MOF has launched a program to develop an *ex post* internal audit department in MOF. This program should be accelerated and given strong

external technical support. The need for a clear separation of the *ex ante* financial control function from *ex post* internal auditing is now well accepted, and has led to recent clarifications. A Director-General of Internal Audit position is created in MOF to manage and develop this function is currently being filled.

8.    Control over the civil service payroll has improved significantly. MOF has taken charge of the central payroll system from the General Personnel Council (GPC, the PA's central personnel agency), and is now in a position to monitor new recruitment and pay all public sector salaries, and thereby to contain civil service hiring. The salaries of the PA's 73,000 civil servants have all paid through direct deposit into personal employee bank accounts for some time. From end March 2004 this system of direct salary deposit has been extended to the entire 56,000 security establishment staff.

9.    In the 2004 Budget, the previous large discretionary transfer appropriation for the President's Office has been virtually eliminated (from US$49.75 million in the 2003 Budget to US$0.62 million in the 2004 Budget), with these funds instead transferred to relevant service ministries (Health, Education and Social Affairs).

10.    The establishment of the Palestine Investment Fund (PIF) has brought all PA equity holdings, including virtually all state-owned enterprises (SOEs), under MOF oversight and within a centralized and commercially-oriented management framework. An audit and valuation of all these assets has been completed, with outcomes published on the PIF's external website. PIF has now published its first annual report and audited financial statements (for the 2003 year), and these are available on its website.

11.    Measures have been taken to reduce PA monopolistic activities in the importation of cement, while the management of the Petroleum Commisssion (PC, the PA's petroleum monopoly) has been taken over directly by MOF. The PC is currently under audit and valuation. These actions have led to the capture of lost revenues and have diminished opportunities for non-transparent funds allocation or their diversion.

## AREAS REQUIRING IMPROVEMENT

There are residual weaknesses in financial accountability which relate to the lack of adequate public aggregate financial statements, inadequate auditing and the undeveloped oversight role of the Palestinian Legislative Council (PLC). The shortcomings in the PA's audit systems mean it is not yet possible to confirm the reliability of financial statements and the adequacy of the operation of internal control systems.

12.    In January 2004 the PA produced a first-ever set of consolidated financial statements; these are for the year 2002 and were published more than 12 months after fiscal year's end. The previous lack of such statements and this particular delay reflect a lack of qualified accounting personnel and the absence of

documented procedures for the closing of accounts. While these statements are a promising first attempt, they have a number of limitations which are discussed in Section 22 of the Main Report. The financial statements for the year 2003 offer an opportunity for improvements. Disclosures should go beyond budget execution to cover PA debt, PA arrears and contingent liabilities, and the PA's financial assets (including the investments of the PIF).

13.   There is no adequately functioning system of audit, either external or internal. The external audit institution, the General Control Institute (GCI) reports formally to the President, but neither reports to nor is responsive to the PLC. While the GCI's mandate contains some desirable features of an external audit organization – such as adequate budgetary independence and the power to obtain information – its capacity is weak and the quality of its work low, and it has had no discernible effect on public accountability. New definitional legislation and a major capacity building program are urgently needed. Draft legislation currently being considered by the PLC would establish a new Council of Administrative and Financial Control to replace the GCI. The draft provides for an independent appointment and reporting process for the Head of the Council, for formal reporting to the PLC as well as the President and for coverage of all PA entities, and is a satisfactory basis for reforming the external audit function. Desirable improvements that should be made to the draft in the course of the second and third reading by the PLC include explicit provision for auditing the PA's annual financial statements, clear reference to the international auditing standards that will be applied, and a clarification that compliance, financial and performance audits will all be carried out.

14.   The PLC still lacks the information, resources and experience to play a full role in financial accountability. The weakness of the GCI and the absence of external audit reports has been a severe handicap in developing this role.

15.   MOF still has insufficient ability to control security service recruitment and staffing numbers. Strict procedures over civil service hirings are in place in MOF; there is a need to apply the same controls to security service hirings.

16.   Donor project financing is not well-integrated into the Budget (although some donors have created sub-accounts in the CTA), and this limits the PA's ability to set clear spending priorities and to properly budget for the recurrent cost implications of capital expenditures. The PA has begun to address this issue through the 2004 Budget, which at a conceptual level linked recurrent budget expenditures with an emergency, humanitarian and developmental program for which donor financial support is crucial (these latter needs are detailed in the *Socio-Economic Stabilization Plan 2004-5*, prepared by the Ministry of Planning with the active cooperation of MOF). Improving the operational linkages between the recurrent and capital components of the annual spending plan, however, is being hindered by donors' adherence to their own preferred financing procedures. Unless there are good reasons to the contrary, all donor funding should be provided through the CTA.

17.    Aggregate cash flow forecasting and management by MOF's Treasury Department requires further development, as discussed in Section 9 of the Main Report. Desirable steps would include a daily rather than weekly "sweeping" of revenue and expenditure accounts, a further consolidation of public bank accounts, stricter control over commercial bank borrowing and the establishment of systematic cash planning under a committee with representatives from the Budget, Treasury and Revenue departments of MOF.

## A PROGRAM AND TIMETABLE FOR IMPROVING PALESTINIAN PUBLIC FINANCIAL MANAGEMENT

Some of the issues detailed above can be addressed relatively quickly. The following should be implemented by June 30, 2004:

- Improved control of security service staffing numbers (paragraph 15 above).

- Publication of PA consolidated financial statements for 2003 with improved format and content (paragraph 12 above), these statements to be audited by the PA's new external auditing institution by end-March 2005, or, should this not be feasible by that date, on a one-time basis by an international auditing firm contracted by the PA.

- Presentation to the PLC of a fully satisfactory new draft External Audit Law (paragraph 13 above).

Other reforms currently underway will take longer to implement in full. They should be reflected in the proposed Multi Donor Budget Trust Fund benchmarks that will be developed between the PA and the donor community for fulfillment by December 31, 2004 and by June 30, 2005.

- Internal audit development (paragraph 13 above) is already underway, but it will take approximately twelve months before an adequate internal audit system begins to operate effectively and to show results.

- External audit development goes beyond the passage of an adequate new law. Developing the capacity of the new external audit institution to a satisfactory level will require 2-3 years of well-monitored capacity development.

- Developing the capacity of the PLC to assess and monitor accountability (paragraph 14 above) will require a 2-3 year program of capacity building.

- Better integration of donor programming into the annual development budget (paragraph 16 above), including donors channeling their funds through the CTA unless there are good reasons to the contrary, will require strong PA leadership and a much enhanced level of effort by donors to harmonize their planning, disbursement and procurement procedures with those of the PA. A clear action plan with commitments by all parties should be developed by the Ministries of

Planning and Finance as part of the ongoing effort to develop a medium-term planning process.

- Improved cash management and forecasting (paragraph 17 above) is difficult to envisage under current emergency conditions, but should be a point of focus once there is a return to more "normal" conditions.

It should be noted that these measures have all been identified by the PA itself as PFM reform objectives.

This CFAA contains many other recommendations, of varying degrees of importance, to improve PFM in the PA. They are listed at the end of each section of the Main Report, and are summarized in a table at the end. There is a need to develop a time-bound action plan to ensure that these other agenda items are also addressed in the appropriate sequence. This Action Plan should be developed by the Ministry of Finance through appropriate consultations and in various fora by the end of June 2004.

OVERALL RISK ASSESSMENT

The Palestinian PFM system is judged to be adequate insofar as the World Bank's criteria and standards for approval of a general budget support operation (or adjustment lending) are concerned.

The World Bank has a four-point scale for assessing the financial management risks inherent in government financial management systems: low, moderate, significant and high.

This CFAA has concluded that the risk level in the Palestinian PFM system are still significant, but that it should be possible to achieve a rating of moderate by the time of the next CFAA if the proposed program of PFM reforms is well-implemented. A key factor in the current rating is the lack of a properly functioning external audit institution.

It should be understood that that the World Bank provides budget support to many countries in which the level of fiduciary risk is assessed as significant, or even high – presuming that there is a strong government commitment to needed reform. Compared with many of these countries, the Palestinian PFM system shows significant strengths. Of 26 CFAAs completed in 2003, the risk level was assessed as high in 14 countries, significant in 8 countries, moderate in 3 and low in only 1 country.

An important factor which qualifies the PA's PFM system as adequate under the World Bank fiduciary requirements for budget support is a track record of significant improvements in the last two years. The PA's agreement to a continuing reform program, incorporating the PFM benchmarks set out above, reinforces this judgment.

6

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

## 1. BACKGROUND

1.    The Palestinian Authority (PA) assumed a governing role in parts of West Bank and Gaza (WB&G) in May 1994, following the signing of the Oslo Declaration in late 1993. It was necessary to create administrative structures from scratch, including a Ministry of Finance, a Ministry of Planning, a tax and customs administration system, a central statistics bureau and a monetary authority. By 1998 the PA had established these basic building blocks of a PFM system.

2.    While based on sound principles, many of these institutions suffered from lack of adequate staffing and adherence to agreed procedures. As a result a number of deficiencies emerged in the PA's public financial management (PFM) system[1].

3.    The last two years have seen major improvements in the PA's PFM system, under two major sets of reforms, which are now discussed.

## 2. SUMMARY OF RECENT PFM REFORMS

4.    The first major reform, spearheaded by the IMF under the heading of the Economic Policy Framework, was agreed to in June 2000 and was designed to address a number of problems, in particular:

- the diversion of revenue (tobacco, alcohol and petroleum excises, income from PA commercial investments and fees and charges levied by ministries and agencies) to accounts outside the control of MOF

- excessive hiring in the civil service and security services, without regard to funding availability

- lack of transparency and accountability in the management of the commercial investments of the PA

5.    Implementation of the Economic Policy Framework began in Spring 2000, and resulted in:

- excise revenues being channeled to MOF through the Central Treasury Account (CTA)

- an audit of the assets of the Palestine Commercial Services Corporation (PCSC) and an agreement to set up the Palestine Investment Fund (PIF) to manage the PA's commercial investments in a transparent manner.

    However, the PIF was not established and neither did an agreed transfer of the Gaza payroll from GPC to MOF occur.

---

[1] These are documented in a recent IMF report, *West Bank and Gaza; Economic Performance and Reform Under Conflict Conditions,* September 15, 2003.

6.      These two issues, in addition to the diversion of profits from PA commercial investment activities and ministry and agency revenues into special accounts outside the purview of MOF management, had to await the second wave of reforms beginning in June 2002, initiated by the PA as a 100 day Palestinian Reform Plan. The June 2002 reforms were sparked by internal pressure for change as well as pressure from the donor community. Within the sphere of PFM, the agreed reforms covered:

- The channeling of all PA commercial revenues and separate ministry and agency revenues through the MOF, thus fully operationalizing the CTA

- Setting up of the PIF to manage all PA commercial investments

- Integrating the hitherto separate accounting systems of West Bank and Gaza,

- Establishing a modern internal audit function

- Appointing financial controllers in all ministries to overcome the problem of weak expenditure controls that had led to expenditures (mainly in West Bank) made with little regard to budget appropriations

- Paying all security service salaries through personal bank accounts

- Drafting a new external audit law by the PLC, and

- Establishing a new procurement agency in MOF.

7.      The 100 day Reform Plan covers many other areas of public sector governance apart from PFM. Its ongoing implementation is currently monitored by an International Task Force on Palestinian Reform, comprising the Quartet (USA, Russian Federation, EU and UN), the World Bank, and the IMF.


## 3.      DONORS AND THE PA

8.      International donors have provided substantial support to the PA, totaling some US$6 billion since 1994, equivalent to around $200 per capita per annum[2]. This level assistance reflects the importance that donors attach to a resolution of the Israeli/Palestinian conflict. Following the outbreak of the *Intifada* in 2000, donor assistance rose substantially, with increased emphasis on emergency assistance and humanitarian relief, as opposed to the previous concentration on financing physical and social infrastructure. Donors have provided unprecedented levels of direct budget support, totaling $US 1.3 billion in the three years to end 2003.

---

[2] This figure understates the level of donor support, since it does not include assistance provided by UNRWA. UNRWA employs some 14,000 people in WB&G and administers refugee camps, including providing education and health services. It also provides direct financial and food assistance to the poorest section of the refugee population. The registered refugee population accounts for 42 percent of the WB&G population.

9.      The European Union has been a major contributor to the PA's finances. Its special cash facility and direct budget support over the three years to December 2003 totaled some $US 280 million, or about 22 percent of total budget support for that period. Arab countries have also contributed large amounts, totaling $US 880 million over the same period.

10.     Given this level of budget support, and the recently approved multi-donor Public Financial Management Reform Trust Fund which aims to mobilize donor support for the PA budget, donors have a key interest in the quality of the PFM system through which these funds are channeled. The World Bank is managing the Trust Fund on behalf of other donors.

## 4.      AID MANAGEMENT

11.     In 1993, the Palestinian Council for Development and Construction (PECDAR) was established as a fund recipient and implementing agency for donor projects. PECDAR has operated to the satisfaction of most donors. It has a well-functioning accounting system and has been able to produce the financial reports required by donors as well as its own audited financial statements. Although line ministries and other agencies have gradually assumed a greater role in implementation of donor-financed projects, PECDAR continues to be used by donors, including the World Bank.

12.     Other donors have dealt only with line agencies, sometimes creating problems of coordination and coherence. Some elected to disburse money themselves rather than to transfer funds to the PA, choosing this approach because they were obliged to do so by their own disbursement rules or because they considered there was a high risk that funds channeled through the PA might not reach their intended destination, given the perception in the early Oslo period that PA internal controls and financial management systems were weak.

13.     Given recent significant PFM reforms some donors (e.g. World Bank, EC, Norway and the eight donor contributors to ESSP) have chosen to route their assistance through the CTA. This account now has sub-accounts through which donors can fund their projects. But some donors remain unable or unwilling to do this, even though channeling funds through the CTA does not necessarily involve these funds being co-mingled with the PA budget.[3] As donors currently fund virtually the whole of the capital budget (as well as a significant portion of the recurrent budget), MOF needs information on their programs, commitments and disbursements and is endeavoring to centralize this. However a recent questionnaire sent to all donors asking for such information received only a modest response and a single, comprehensive information base on donor aid does not yet exist. As a result the PA lacks adequate information to prioritize expenditures. At the time of writing, the Ministry of Planning is working on the creation of such a database. This issue is further discussed under Budget Construction in Section 8.

---

[3] Rather, it means that the PA has information on donor expenditures, which it can take into account in formulating its own budget priorities.

14.    Transactions through PECDAR are not currently part of the CTA. Payments are authorized by the Managing Director of PECDAR, and all payments over $10,000 also require the signature of the President. MOF has no involvement in or information concerning PECDAR's financial operations. Ensuring that all PECDAR payments are made through the CTA, which would require the agreement of all donors to PECDAR, would contribute to overcoming the problem discussed in paragraph 13 above.

## 5.    THE WORLD BANK AND THE PA

15.    The Bank has played a leading role in shaping donor activity, although its share of overall donor support has been modest (for example 4 percent of total donor disbursements in 2002, rising to an estimated six percent in 2003). In the early 1990s, the Bank established two multi-donor facilities: the Technical Assistance Trust Fund, the main conduit for capacity building funding in 1994-96, and the Holst Fund, through which donors channeled the bulk of their support for the PA budget in 1995-97. In 2002 the Bank initiated the Emergency Services Support Project (ESSP), which funds PA budget non-wage spending in the social ministries (Education, Health and Social Affairs). The Bank has so far committed US$60 million to this facility, and eight other donors have committed another US$77.5 million, making this a key budget support instrument. These contributions are channeled through the CTA.

16.    In the absence of a formal Country Assistance Strategy (CAS) for WB&G, the *World Bank Strategy for West Bank and Gaza* emphasizes assistance in establishing good governance and building an efficient public sector. Reflecting this, the Bank, along with the IMF, has been a major source of advice to the PA on public sector reform, including the PFM reforms discussed in this CFAA report. It has also been a major source of analysis of the economic impact of the closures consequent upon the *Intifada*.[4] It also plays a key role in monitoring the PA reform program through its membership of the International Task Force on Palestinian Reform.

17.    As WB&G is not a sovereign nation it cannot receive assistance in the form available to World Bank member countries. To finance Bank activities in WB&G in 1993 the Bank established a Trust Fund for Gaza, later the Trust Fund for Gaza and West Bank (TFGWB), with an initial contribution of US$50 million, which has been replenished five times for a total allocation of US$460 million. Its balance has also increased by interest earnings. This has permitted total disbursements so far of US$353 million (March 2004 figures) covering a total of 28 projects. Before the *Intifada*, Bank assistance was – with one exception – provided on normal IDA terms. As the PA's fiscal position deteriorated, the World Bank Board of Executive Directors has, since December 2000, approved five projects on grant terms. These projects total US$92.5 million, of which US$56.7 million had been disbursed as of March 2004. In February 2004, the Board of Executive Directors approved the fifth replenishment of the TFGWB in the amount of $80 million.

---

[4] For example, Twenty Seven Months – Intifada, Closures and Palestinian Economic Crisis, An Assessment, World Bank, May 2003

These funds have been programmed for projects in various sectors, and include a $20 million allocation for direct budget support.

18.    Taking the difficult operating environment in WB&G into account, the performance of the World Bank's WB&G portfolio has been good. This appears to be due in part to a strong project coordination unit within MOF, which oversees the accounting and reporting arrangements for these Bank projects (and those of other donors who use the CTA), and strong implementation units in line ministries. At 23 percent in FY 01, 19 percent in FY 02 and 47 percent in FY 03, disbursement ratios have usually exceeded Bank and regional averages.

19.    World Bank projects are implemented using the PA's PFM system, rather than through separate ring-fenced accounting systems. This followed a Bank financial management assessment in February 2001 in preparation for the first ESSP project. This assessment concluded that the PFM systems used by MOF and line ministries met IDA's minimum requirements and displayed sufficient basic controls.

## 6.    ISSUES CONCERNING TRACKING OF FUNDS

20.    A CFAA is not an audit, and does not attempt to track the use of funds to individual expenditure items, which in any case is not possible given their fungibility in a consolidated budget.

21.    Discussion among donors and in the international media has raised questions about the possible diversion of donors funds provided to the PA. It is a matter of record that previously, while VAT and customs revenue were transferred by Israel to MOF as part of the budget, substantial amounts of PA funds were diverted to special PA accounts outside the budget, with little transparency concerning their usage. The IMF estimates that some $591 million of excise duties (on petroleum, tobacco and alcohol) were paid into these off-budget accounts over the period 1995 – 2000, along with at least $300 million in profits from PA commercial activities[5].

22.    This CFAA has clearly established that these revenues are now being paid into the CTA managed by MOF, meaning that this diversion of revenues is now history (see paragraph 65 below). That is not to say that it is not possible for the PA to receive revenues from another undisclosed sources which could be transferred to bank accounts outside the Palestinian banking system. However such transactions would now be subject to review under international agreements for the prevention of money laundering and funding of terrorist financing - as are transactions through the Palestinian banking system as discussed in paragraph 27 below.

---

[5] As to the use to which these funds were put, the petroleum excise revenue was deposited by Israel into an Israeli bank account in Tel Aviv, and expenditures from this account could be readily traced. The IMF review (see footnote 1) has concluded that most of the diverted revenue was used for investment in commercial operations, through the then Palestine Commercial Services Corporation (PCSC)

23.    As to assurances that funds are being used by the PA for their intended purposes, this CFAA discusses the significant improvements in financial management that have occurred with the development of a working budget and financial control system, and improvements in transparency through a comprehensive budget document and the publication of monthly budget execution reports. It also identifies areas where transparency can be improved, and focuses on the lack of a functioning system of audit – either internal or external.

24.    International experience suggests that areas most susceptible to diversion of funds are:

-    payment of salaries in cash. In the PA context this issue has now been resolved and all civil servants and security personnel are now paid through personal bank accounts, as discussed in Section 13 below.

-    off-budget accounts, with little or no transparency concerning their operations. This has been resolved in the PA by the full operation of the CTA.

-    funds under the discretionary control of key individuals. In the PA context the discretionary budget allocation for operating expenses of the President's office of the President has now been almost eliminated, and funding transferred to the relevant line ministries, as discussed in Section 8, paragraph 50 below.

-    state owned enterprises. In the PA context any opportunity for diversion of funds in this area has been substantially reduced through establishment of PIF, through the disbanding of the Cement Company monopoly and through the placing of the Petroleum Commission under the direct control of the Minister of Finance, as discussed in Sections 14 and 15 below.

25.    Diversion of funds outside the budget may reflect or create opportunities for official corruption. However a CFAA is not a detailed diagnosis of corruption issues. Nevertheless some diagnostic information is available for WB&G as for World Bank member countries by way of indicators measuring perceptions of governance and corruption problems. Anecdotal evidence suggests that petty corruption, for example the need to make payments to secure government services or bribery of lower level officials is low or virtually non-existent. The World Bank Business Environment Survey (WBES) of 2000 suggested that petty corruption seldom occurs in WBG, and much less frequently than in Egypt or in other developing countries, and that neither is there significant corruption in procurement. However the World Bank Review of Governance and Business Environment in WB&G (May 2001) [6] reported that there is nevertheless a widespread perception that corruption is a moderate or major constraint on businesses. This may reflect anecdotal evidence of possible corruption at high levels arising from the previous diversion of significant amounts of PA revenue, the previous non transparent operations of the PCSC and the previous operations of the petroleum and cement monopolies.

---

[6] For further discussion see World Bank , *Governance and the Business Environment in West Bank/Gaza,* Middle East and North Africa, Working paper Series. No. 23, May 2001, by David Sewell, p 7-10.

26.    One further factor in the issue of tracking funds concerns the operation of the Palestine Monetary Authority (PMA). The IMF considers that the PMA's prudential requirements are generally consistent with the Basle core principles for banking supervision [7]. It is unlike a central bank in that its single function is control and supervision of the WBG banking system.

27.    The PMA has responsibility for supervision of the 21 commercial banks operating in WB&G. In exercising that responsibility it has access to data on all banking transactions through a system whereby banks submit daily lists of large transactions via diskette. Amounts in excess of US$10,000 are scrutinized (source of funds, beneficiary, etc.) as part of anti-money laundering procedures. Such sums can only be released with PMA approval. It is expected that an inter-bank network will be completed this year, giving PMA direct on-line access to all banking transaction data. It should be noted that the above procedures apply to the banking transactions of all government agencies as they are routed through the banks supervised by PMA.

28.    There are no conclusions or recommendations for this section of the CFAA Report. The issues set out above are intended to provide context to any discussion of the frequently raised issue of the possible diversion of funds.

## 7.    THE LEGAL FRAMEWORK FOR PFM

### THE ORGANIC BUDGET LAW (1998)

29.    Two sources of legal authority exist governing the government budget and public financial management: the annual budget law and the Organic Budget Law No. 7 of 1998, both administered by MOF. The former gives annual authority and the latter permanent authority. In addition Fiscal Directives are issued under the Organic Budget Law. As in other countries, the annual budget law can be used to introduce new financial management principles, thus avoiding the extra trouble of amending the organic law. However, at a certain stage it becomes undesirable to legislate annually on permanent principles. An organic budget law is a safer, more authoritative instrument for establishing and maintaining intact important public financial management principles.

30.    Other sources of PFM legal authority which are separately discussed under their subject headings are:

-    The Audit Law No. 17 of 1995 which established the external audit institution, the General Control Institute

-    Procurement Law No. 9 of 1998 and the General Supplies Law No. 6 of 1999.

31.    The Organic Budget Law is a relatively good framework for budget management, albeit rather general and not comprehensive in its provisions (see paragraph 33 below).

---

[7] *West Bank and Gaza; Economic Performance and Reform Under Conflict Conditions,* IMF, September 15, 2003, Section IIIC

Some aspects of the law are not yet implemented: internal audit (Article 63) and external audit (Articles 18, 66 and 68), and the requirement to hold the consolidated fund balance at the Palestinian Monetary Authority (Article 13 – at present this balance is held in commercial banks). The Organic Budget Law defines roles for the revenue collection agencies, spending agencies, MOF, the Legislative Council and the Council of Ministers, and defines terms such as public funds, special funds, current expenditure and capital expenditure. A new law on external audit drafted for the PLC is under consideration (see Section 18 for further discussion).

32.    The Organic Law covers ministries and agencies and other public institutions such as autonomous institutions (see paragraph 38 below). It does not cover companies or corporations owned in full or part by the PA, nor does it cover public enterprises, which operate under the Companies Law. It also provides the institutional basis for a number of important processes, requirements and principles, for instance:

- preparation, submission and authorization of budgets (together with an established budget calendar providing the dates at which various actions are to be taken)

- financial procedure in the event the budget law is not enacted in time for the start of the financial year

- use of the Central Treasury Account (CTA) for pooling government revenues

- expenditures to be drawn from the CTA only in accordance with the budget law

- the required contents of the budget circular and annual budget law and the requirement for the latter to be a public document

- execution of the budget including the MOF's leading role in this area

- lapse of unused funds at year-end

- the annual budget to establish the upper limit for government borrowing, and

- procedures for the preparing and submission of quarterly reports and annual financial statements.

33.    While the Organic Law is adequate on budgeting issues, its provisions regarding accounting could be strengthened. Accounts and audit are covered in only four articles (63-66), including one on internal audit. The Organic Law could be improved by a more detailed treatment of these issues. In addition, the development of a separate accounting manual should be a priority. The procedure to be followed for consolidating accounts and the matters to be covered in annual financial statements are only briefly indicated. There is a legal requirement, though, that the financial statements be sent to the Council of Ministers and a copy to be sent to the external audit body. In addition they are to be sent to the PLC within one year of the year-end.

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

FINANCIAL REGULATIONS (1997-98)

34.     These are known as "Fiscal Directives". They comprise 13 pages containing 61 articles.[8] There is some repetition from the Organic Budget Law, but important general principles are established in the Fiscal Directives, including:

- a uniform government accounting system is to be established for accounting records and financial statements, on the double entry principle and in conformity with budget classification. MOF is to design and issue the main fiscal documents to be used by ministries and departments

- revenues are not to be retained by collecting agencies but must be remitted daily to treasury bank accounts

- copies of revenue receipts are to be issued to those who make payments to government

- sums may not be disbursed without specific appropriation in the budget and sums may not be committed in excess of appropriations. Conditions for correct disbursement are specified - budget authority, appropriate documentation, correct figures, legality of purpose and pre-payment approval from the financial controller

- advances made from appropriations must be used for their designated purpose

- no ministry is entitled to open a bank account in the name of the Treasury except with the authority of the Minister of Finance. All bank accounts in the name of the Treasury are shown in the Treasury's financial position

- MOF is recognized as the only authority for concluding loan agreements on behalf of the PA

- MOF is responsible for controlling accounts and financial transactions; all internal auditors in line agencies are considered to be employees of MOF and technically and administratively fall under MOF

35.     The Fiscal Directives could be further improved. They do not provide comprehensive procedures for internal control or accounting, and are lacking somewhat in the guidance they offer to financial management staff and others. The result is a partially-specified system of internal control, with the associated risk of variations in practice in what is intended as a uniform system.

---

[8]  Summary of contents: Articles 1-3 introductory and definitions; Article 4: accounting; Articles 5-7: documents and records; Articles 8-16: revenues; Articles 17-35: expenditures; Articles 36-40: management of monetary assets; Articles 41-49: government debt management; Articles 50-53: fiscal control; Articles 54-62: general provisions.

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

36.    Without attempting a comprehensive review[9], some examples of missing provisions are listed below:

- Procedures for providing regular proofs of the accuracy of accounts (trial balances, bank reconciliations) are not specified

- Standard formats of financial forms in common use do not appear in the Fiscal Directives

- No provision exists for timely accounting of final expenditure financed by advances, and no penalties exist for failure to account for advances promptly, and

- Procedures for keeping, numbering and issuing government forms, cheques etc. are not specified.

37.    However, MOF is currently working on new Finance Regulations, which will address many of these gaps. These regulations are expected to be completed in the second half of July 2004.

SUMMARY

- The Organic Budget Law provides an adequate framework for budget issues, but could be improved, in particular with respect to accounting. The Finance Directives are brief and have a number of omissions.

DESIRABLE FURTHER ACTIONS

➤ While changes in the legislative framework are an intermediate rather than an immediate priority, deficiencies in the regulatory framework, particularly in accounting provisions, are reflected in various failings in the operation of the accounting system – as discussed later. However, most of these steps can be taken in advance of any changes in the legal framework.

➤ The development of an accounting manual, to amplify aspects of the Financial Directives and provide guidance to accounting staff is a particular priority.

8.    BUDGET CONSTRUCTION

38.    Chapter 3 of the Organic Budget law sets out detailed and appropriate procedures for Budget construction. The budget includes all PA ministries and agencies in addition to public institutions such as the Palestine Water Authority, Palestine News Agency, National Radio and Television, Tobacco Authority, Environment Authority, Palestine

---

[9] Such a review would assist in providing more complete financial regulations and in developing a separate government accounting manual. These would provide a basis for training of staff, and a permanent source of guidance.

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

Information Center, Civil Aviation Authority, and Ports Authority. Their expenditures are covered by budget appropriations and their revenues are paid into the CTA.

39.     The following table summarizes the 2004 Budget.

**Palestinian Authority
Summary of the 2004 Budget Proposal
(in millions of US dollars)**

|                                                        | 2004 Budget |
|--------------------------------------------------------|-------------|
| **Revenue**                                            | **806**     |
| Domestic                                               | 298         |
| Taxes collected by Israel on behalf of the PA          | 508         |
| **Total expenditures**                                 | **1694**    |
| Current expenditure                                    | 1444        |
| Development expenditures                               | 250         |
| **Balance**                                            | **-888**    |
|                                                        |             |
| **Financing**                                          | **888**     |
| External budgetary financing                           | 900         |
| Financing to cover recurrent expenditures              | 650         |
| Financing to cover development expenditures            | 250         |
| Funds released by Israel from stock of frozen tax revenue | 180      |
| Expenditure arrears (net accumulation)                 | -180        |
| Gross arrears accumulation                             | 0           |
| Gross arrears repayment                                | -180        |
| Domestic bank financing                                | -12         |
| Domestic bank borrowing                                | 0           |
| Domestic bank repayment                                | -12         |
|                                                        |             |
| **Financing gap**                                      | **0**       |

(Source: Ministry of Finance)

40.     The budget circular must be issued to line ministries and agencies by 1 July (Article 26 of the Organic Budget Law). The budget circular contains indicative figures developed by the Budget Department of MOF. Ministries and agencies have one month to respond. During this period line ministries and MOF engage in detailed discussions of ministries' needs and their cost.

41.     Under the Organic Budget Law the proposed budget should be submitted by MOF to the Council of Ministers (Cabinet) by 15 October. In turn, Cabinet is required to present the budget to the PLC by 1 November, to be passed before the commencement of the Fiscal Year on January 1. This timetable does not provide much time for serious consideration by Cabinet or PLC, but this may reflect the budget's role as a purely financial document, focusing on the expenditure side as a detailed costing of inputs, rather than a policy document explicitly focusing on the PA's economic and social priorities (see discussion below in paragraph 53 and following paragraphs).

17

42.     Article 37 of the Organic Budget law provides for a budget contingency allowance, or reserve – controlled by the Minister of Finance subject to the approval of the Council of Ministers, and intended for emergency expenditures or expenditures unforeseen at the time when the budget was prepared. The amount allocated in the 2003 budget was relatively small – only US$10 million. This item does not appear to have been accounted for in the recently published 2002 financial statements. The amount allocated in the 2004 budget to the reserve is US$63 million. At about 3 percent of the total budget this is high by international standards, which makes it particularly important that the use of the reserve is reported in the budget execution reports, and eventually in the audited financial statements for 2004, so that it does not become a source of significant non-transparent expenditure.

43.     Budget allocations are an authority to make payments i.e. the budget is cash based. There is no formal system of commitment control, an issue which MOF will need to consider as it further improves the PFM system. The Organic Budget Law (Article 50) provides that spending units may not reallocate from one of the 11 predefined expenditure chapters to another[10]. Each chapter has sub-items, and spending units may transfer between these items with the approval of MOF.

44.     The budget document (the Annual Budget Law) for 2004 is a comprehensive document, consisting of some 300 pages of revenue and expenditure tables, figures and narrative explanation. information is provided for each spending unit on actual expenditure in 2002, the 2003 budget allocation, a "best estimate" of actual expenditure in 2003, and the 2004 budget allocation. Expenditure is broken down into expenditure chapters. Actual revenues by item are provided for 2002 and 2003. Although this is a public document (published in Arabic), only 400 copies were printed and it is not posted on the web.

45.     The Minister's budget speech and a budget summary document are published in English on the MOF website[11]. The budget summary does not, however, provide details of individual revenue and expenditure items, and could usefully be expanded.

46.     In pre-2003 budgets, many of the requirements of the Organic Budget Law concerning the submission and processing of the budget were not observed. For those budgets, MOF prepared an "emergency budget", which did not require approval of and was little discussed by the PLC. These budgets were not perceived as realistic expressions of likely funding, or as constraining ministry or agency operations.

47.     The 2003 budget was the first serious attempt to observe the Law's requirements, and was the first budget formally presented to the PLC and published. The 2003 budget exercise was characterized by good dialogue between MOF and spending ministries on the level of the proposed allocations, and by orderly processes governed by the budget

---

[10] The eleven expenditure chapters (each of which has sub-items) are: salaries and wages, operating expenditures, transfers, studies and plans, equipment, vehicles, land purchase, buildings purchase, buildings construction and furniture and fixtures.

[11] http://www.mof.gov.ps/

timetable. This encouraging trend was continued under the 2004 budget exercise, which was conclude when the PLC approved the budget in January 2004.

48.    The 2003 and 2004 budget documents were prepared on the basis of careful macroeconomic analysis. For the 2004 budget this was carried out jointly with the Palestine Central Bureau of Statistics (PCBS), the Bank and the IMF, and has led to one common set of macro-planning indicators. The 2004 budget document offers three macroeconomic scenarios (based on political developments), and discussed exchange rate assumptions and monetary statistics and provides information on public debt. Budget transparency is further enhanced by a comparison of actual budget performance in 2002 and 2003 with the budget as formally passed by the PLC. It indicates proposed financing transactions, including borrowing from the banking system. It also includes comprehensive data on authorized civil service employment, and sets a legal limit on civil service employment growth.

49.    Revenue estimation is inherently difficult, given uncertainties about the continuation of closures and their economic impact, likely levels of donor financing and the stability of the transfers of customs and VAT revenues by Israel. There is thus a need to develop several annual planning scenarios, and this was done for both the 2003 and 2004 budgets.

50.    The allocation for the President's Office has traditionally been an area characterized by little transparency. The 2004 Budget represented a significant improvement compared to earlier years. Notably, the large discretionary transfer appropriation for the President's Office was been virtually eliminated (from US$49.75 million in 2003) to US$0.62 million in the 2004 Budget. These funds were instead allocated to relevant service ministries (Health, Education and Social Affairs). However, at US$33 million in 2004, the operating cost budget of the President's Office remains large. No breakdown of these operating expenditures is provided, as is done for other ministries. A more detailed disclosure of the breakdown of these operating expenditures on the same basis as for other spending units is therefore needed.

51.    Discussions with the security services, which account for around 25 percent of the total budget [12] take place at an aggregate level. The depth of these discussions is questionable, despite efforts by the MOF Budget Department. There is also a lack of transparency in that as with the President's Office (see paragraph 50 above) the budget provides no detailed breakdown of the operating costs devoted to the various security services (US$35.7 million in the 2004 Budget). The standard level of detail should also be provided for these operating costs.

52.    In mid-2003 a new Ministry of Planning was created. Coordination with MOF has improved markedly. While MOP is responsible for aid coordination and capital planning, the Minister of Finance now has the sole authority to conclude loan and financial support

---

[12] This covers the eight separate security services, which either come under the Ministry of the Interior or report direct to the President.

agreements with donors, and with the exception of activities of the Islamic Development Bank and the Saudi government.

53.    There are two major weaknesses in budget construction

-    The budget dialogue between MOF and line ministries appears to be almost entirely about costing of necessary inputs (salaries, travel, transfers etc) with no explicit focus on performance or prioritization.

-    Most donor funding is still excluded, making it difficult to properly determine priorities and to integrate capital or developmental expenditures with recurrent expenditures into the budget.

54.    Building on the solid dialogue between MOF and line ministries during the preparation of both the 2003 and 2004 budgets, attempts should be made in the future to deepen these discussions. In particular, more emphasis should be placed on performance and on prioritization, as opposed to exclusively focusing on the costing of necessary inputs (salaries, travel, transfers etc). A discussion of priorities has generally been limited to a guiding policy that expenditures on health, education and the judicial system are to have priority – which in practice applies mainly to new staff recruitment.

55.    On the issue of prioritization in the context of the 2003 budget, a one-year emergency plan was developed by MOP, which arguably represented the first realistic plan to provide some basis for expenditure prioritization. It was supplemented in mid-2003 by MOP's Quick Impact Intervention Program (QIIP), a creditable effort to focus donors on an updated set of needs/opportunities arising in the context of Roadmap implementation.

56.    In the fall of 2003 work on a two-year emergency plan was undertaken (under a credible joint exercise headed by the Ministry of Planning, partnered by MOF and the Ministry of National Economy and involving discussions with all line ministries and agencies) to develop a more comprehensive *Socio-Economic Stabilization Plan 2004-5* (SESP) which dovetailed with the 2004 budget and included capital expenditures for local government. The SESP prioritizes donor financing among four broad categories, namely investment projects, humanitarian assistance, job creation and budget support.

57.    This provides the opportunity for a move to a strategy and performance-based approach to the budget. The execution of the SESP should form an important criterion in the 2005 Budget discussions, as should the proposed three-year Medium Term Plan being developed under MOP's leadership.

58.    The past exclusion of donor funding from the budget has meant that PA Budgets have contained no information on capital or project expenditures financed by donors, and that the budget has not itself financed any capital expenditures - all public investment was previously financed by donors. For the first time, the 2003 budget included a projection of the capital expenditures likely to be financed by donors, a total of US$212 million in project assistance from donors now using sub-accounts within the CTA (e.g. EU, World Bank and Norway) – as well as including a small PA contribution to capital expenditures

of US$27 million. The 2004 budget represents a much more careful attempt to calculate likely needed development expenditures (totaling US$250 million by all donors and a further US$40 million to be financed by the PA).

59.    The fact that a significant share of donor funding is provided outside the CTA without the PA having adequate information on this further complicates priority-setting, and hampers the integration of capital expenditures with recurrent expenditures in the budget.

60.    For the PA to prioritize development and emergency expenditures the following is required:

- A well-formulated and articulated PA development and emergency relief strategy.

- Coordination among donors and between donors and the PA, to ensure that collectively their expenditures address the key development and relief needs of the Palestinian population in a coherent manner.

- A system under which the PA (MOP and MOF) has full information about donor activity.

61.    The formulation of the SESP was in important first step. Going forward, both donors and the PA need to build upon the experience to improve coordination and increase information flows.

62.    Two important players were not fully integrated into the SESP. The first is the large NGO community that directly provides services to a considerable number of the Palestinian population. The second is UNRWA (United Nations Relief and Works Agency), which operates basic services in the refugee camps and provides direct financial assistance to registered refugees.

63.    Information on donor funding is available to MOF to the extent that it is channeled through CTA. As mentioned above in paragraph 13 use by donors of the CTA does not necessarily imply co-mingling of funds with the PA budget. Rather it provides information that the PA can use in developing its own budget priorities. To overcome the problem of lack of information on donor activities, MOF requested information from all 47 donors with a view to establishing a database to be used in the development of the 2004 budget. However, only about half the donors replied and not all of those replying provided adequate information. This was a predictable reaction, based on past history. Currently MOP is engaging the donors in another data-gathering exercise. This is a well-designed effort and should be given prominence by the PA and the Local Aid Coordination Committee (LACC) co-chairs. MOP is staffing up to conduct quarterly surveys, and will be provided with LACC Secretariat support.

64.    This data base should allow MOP to better consider issues of prioritization, permit donors to review expenditures priorities, and assist MOF in integrating capital and project expenditures into the budget/identifying the recurrent cost implications of donor activities.

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

SUMMARY

- The 2003 and 2004 budget documentation and processes represent a considerable advance over previous budgets. A serious effort was made to develop a comprehensive and realistic budget, notwithstanding the current difficulties in PA revenue estimation and the uncertainty concerning budget support from donors.

- The budget includes only a small portion of total capital or investment spending, reflecting the exclusion of donor financing.

- In 2004, a first substantive effort was made to integrate the recurrent and capital budgets, though work is still needed to factor in the recurrent cost implications of donor investments.

- The budget construction exercise is primarily a detailed costing of inputs rather than an explicit attempt to prioritize expenditures, based on their relative contribution to government objectives

DESIRABLE FURTHER ACTIONS

- ➢ Donors should supply full information on their programs to MOP under the new data collection exercise.

- ➢ Donors should channel their funds through the CTA, unless prevented by their own legal requirements. As part of this issue PECDAR payments, should also be made through the CTA, subject to the agreement of relevant donors (see paragraph 14 above).

- ➢ Future budgets should aim at the full integration of donor funding and should fully factor in recurrent cost implications of capital or investment expenditures.

- ➢ The budget should develop a greater performance focus, with a gradual move to performance budgeting, beginning with the development of ministry programs and activities and their incorporation into the classification system, and subsequently moves to develop a system of performance indicators to inform budget preparation and implementation.

- ➢ The use of the large contingency reserve in the 2004 budget should be carefully monitored and full details of its use reported in budget execution reports and the PA 2004 aggregate financial statements, so that it does not become a source of significant non-transparent expenditure.

- ➢ The budget should provide a breakdown of operating expenditures of the President's office and the Security Services in the same way as for other spending units.

> The amount of budget information provided on the MOF website should be increased.

## 9. CENTRAL TREASURY ACCOUNT – CASH MANAGEMENT AND BUDGET EXECUTION

65.    As mentioned earlier in this report (paragraph 22) all PA revenues are now channeled through the CTA and a separate MOF unit has been set up to monitor the receipt of these revenues. IMF monitoring and a review by the CFAA team confirm that clearance revenues from Israel, receipts of individual spending units, profits from PA commercial undertakings and budget support provided by donors are being paid into the CTA.

66.    Some of the undesirable aspects of the previous cash management arrangements which have now ceased were as follows:

-    cash was held in many separate ministry and agency bank accounts, making it hard to establish the overall cash position of the PA and to manage it so as to meet payment obligations and minimize borrowing requirements. Such a system ran the risk of unnecessary borrowing and interest payments.

-    multiple centers able to give spending instructions existed in MOF; in addition, letters from the President were used to authorize specific expenditures.

-    lump sum cash transfers were made to ministries and agencies without specified identification of final expenditures.

-    extra-budgetary expenditures were made from bank accounts controlled by spending ministries and agencies into which they paid their "own" revenues.

-    scarcity of resources and lack of cash management led to payment arrears; suppliers were not paid on time; government payment orders were distrusted and suppliers to government therefore began to insist on prepayment in cash.

67.    At present the balance of the CTA is held in several commercial bank accounts. In addition spending agencies can choose (with MOF approval) from about 15 commercial banks for the operation of bank accounts from which their expenditures are funded. Due to the large number of bank accounts for both revenues and expenditures, the chart of accounts includes more than 1500 accounts and sub-accounts, including over 650 bank accounts and over 400 accounts used for advances only.

68.    Steps have recently been taken to correct the problems identified in paragraph 66 above.

-    Spending agencies were instructed to close bank accounts used for holding their "own" revenues and banks were instructed to transfer the balances to the CTA. This has been implemented.

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

- Spending agencies are now permitted to open designated bank accounts to be used only for making payments. Separate accounts were opened for the deposit of revenues. These revenue accounts can no longer be used to make payments and are swept regularly (each week) and transferred to the CTA.

- Commercial banks were instructed that loans could not be provided to spending agencies; that the bank accounts used to fund their expenditure were not to run into overdraft, and that no new bank accounts were to be opened without MOF approval. This instruction has also been implemented.

- Some expenditure payments have been centralized in MOF. As discussed below under accounting issues (paragraphs 79 and 80), MOF now makes payments on behalf of line ministries and agencies on certain budget lines in accordance with their approved budgets. For other items it transfers monthly sums to line agencies own bank accounts for them to make payments, but again only in accordance with budget approval.

69.    The resultant cash management arrangements are a considerable improvement on what went on before. There is, however, scope for further improvement.

- Revenue and expenditure accounts could be swept daily rather than weekly (with a system of zero bank balance at the end of each day's business), and the number of bank accounts could be further reduced. Consideration should be given in the longer term to consolidating all bank accounts into one single account, with sub-accounts as necessary

- More attention should be given to regular checks between accounting records and bank statements ("bank reconciliations"), and the practice of writing and then holding payment orders before issuing them should be eliminated.

- The practice of borrowing from commercial banks should be brought under strict control, with the PLC involved in approving both temporary and end of year borrowing limits and receiving reports of actual borrowing compared with the agreed borrowing limits. Under the 2003 budget law the PA cannot now borrow from the PMA or other PA institutions. In due course such controls on borrowing should be incorporated into the Organic Budget Law.

70.    It is hardly surprising, given various sources of instability, that a systematic cash forecasting system governing both cash management and budget execution does not exist. This reflects the current abnormal, unpredictable conditions. At present, expenditure releases are determined by two factors: available liquid funds and an assessment of day-to-day priorities. With a return to more normal conditions, cash forecasting will be necessary as a basis for better cash management and budget execution. Indeed, such conditions would permit a more systematic approach to cash management.

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

71.    As explained in a recent IMF report[13], financial planning is needed for both smooth budget execution and minimal borrowing costs. A cash plan should be prepared to support the orderly execution of the budget. Such plans should be regularly updated to reflect changes in key parameters. In the case of WB&G it may not be possible to implement the budget as planned, due to revenue uncertainties. But a Cash Management Committee with representation from the Budget, Treasury and Revenue Departments of MOF could be an effective means of ensuring regular and frequent updating of budget execution and cash management plans.

SUMMARY

- All PA revenues are now being paid into the CTA.

- In addition, cash management practices and budget execution arrangements have been significantly improved and strengthened.

- Cash forecasting and management remains rudimentary, reflecting in part current revenue unpredictability.

DESIRABLE FURTHER ACTION

- MOF should sweep all bank accounts on a daily basis, with consideration being given in the longer term to consolidating all banking arrangements into one account with sub-accounts as necessary for ministry and agency operations.

- MOF should ensure that all ministries (MOF and line ministries) regularly carry out bank reconciliation.

- MOF should also ensure that line ministries do not issue payment orders until funds are available.

- A system of cash forecasting (involving a Cash Management Committee comprising different parts of MOF) should be developed, in order to alleviate the current short-term (day by day) approach to funds release and to provide a basis for monitoring the extent to which the budget (both revenues and expenditures) is on track.

- Provisions governing limits on borrowing from commercial banks should be incorporated into the Organic Budget Law. These provisions should include appropriate reporting on actual levels of borrowing to PLC.

---

[13] Fiscal Management Reform Strategy, by O. Hovland and K. Nashashibi, September 2002.

## 10.  EXPENDITURE ARREARS

72.    Under the 2003 and 2004 budget laws the PA cannot borrow from the PMA[14] or from other PA institutions, such as PIF. In due course, such provisions concerning borrowing should be incorporated in the Organic Budget law. Expenditures arrears are monitored by IMF as part of its overall monitoring of the WB&G budget implementation.

73.    Debts or arrears of expenditures exist to

-    private sector suppliers, estimated at US$370 million at end-2003, (equivalent to 10 percent of GDP)

-    commercial banks, estimated at US$193 million at end-2003 (equivalent to 5.4 percent of GDP)

-    other PA institutions. According to IMF figures past borrowings here include $150 million (end of 2002) in pension deductions from security personnel (10% of salaries) for a pension scheme which has not yet been established and $100 million (end of May 2003) of employee deductions owing to the Gaza Pension Scheme.

-    transfers to municipalities withheld (about $10 million), to be offset against electricity supply arrears owed to Israel by municipalities and paid by the PA. However overall the PA is owed more than this by municipalities and is thus a net debtor.

74.    In addition, the two separate pension systems for West Bank (pay as you go) and Gaza (funded) are not financially sustainable in the longer term, although the Gaza scheme currently operates on a cash surplus. The West Bank scheme has been closed to new entrants and new civil service appointees join the Gaza scheme.

75.    On the "credit side" Israel owes a substantial (but disputed sum) to PA for health and national insurance deductions made from Palestinian workers in Israel, dating back some years, plus withheld PA revenues currently amounting to NIS 832m (approximately US$200m), held by Israel as a result of legal claims against the PA by Israeli citizens.

76.    The level of these arrears is known and transparent, and is being managed as part of the budget process. The size of these arrears reflects the significant fiscal problems being faced by the PA.

## 11.  DEBT MANAGEMENT

77.    Debt management is a responsibility of MOF. A unit responsible for a debt recording and management has been established in MOF. It uses the UNCTAD (DMFAS) debt information system, installation of which was completed at the end of

---

[14] Nor under its legislation is the PMA permitted to lend to the PA.

2001. Previously there was no central recording of PA debt and debt servicing payments were not always made on time, leading at one stage to a suspension of World Bank loan disbursements. The system is deemed to operate satisfactorily, but an independent audit would be required to confirm this.

## 12. GOVERNMENT ACCOUNTING SYSTEM

78.    Within a few days at the end of each month, the PA prepares budget execution reports that provide consolidated budget revenues and expenditure of WB&G for the month just ended. As some expenditure amounts represent advances to spending ministries and agencies rather than final expenditures[15], and accounting for these advances is necessary before final figures can be reported, the initial budget execution reports contains only preliminary figures, which are revised as new information becomes available. The reports are posted on the MOF website, thus providing a high level of transparency.

### BASIC DESIGN

79.    The accounting system has two main parts: a central system (Oracle-based) operated directly by MOF, and separate systems operated by line ministries and agencies based on varying platforms. The first part covers the CTA, which the MOF operates in accordance with the authorized budget, making payments on budget lines that it controls directly (the main ones being all wage-related expenditure, rental charges, overseas traveling expenses, expenditure on training courses and interest payable). There is no accounting manual setting out procedures and other operating guidance to accounting staff.

80.    The second part concerns monthly transfers from the CTA into bank accounts controlled by the line agencies. Line ministries make payments from these accounts in accordance with the budget lines for which they are responsible, and are also responsible for accounting for them. Typical items of expenditure paid directly by ministries and agencies are power, fuel, communications, office expenditure, maintenance, transportation and consumable stores. The proportion of such direct expenditure varies between ministries. For example, Ministry of Social Affairs directly pays only 5 percent of its budgeted expenditures; for Ministry of Health the figure is 50 percent.

81.    Ministries and agencies report their monthly expenditure to MOF. The accounting systems of line agencies have been established individually. Thus the information

---

[15] The presence of a large number of advances where money has been provisionally disbursed but where months or even years after the advance was made, the recipient ministry has still not accounted finally for the use of the funds delays the reporting of final expenditure. Advances arise when expenditure already made by spending ministries has not (yet) been subsequently approved by MOF. In such cases the whole of the advance is treated as un-discharged. This is a needless complication; expenditures should be treated as final when made. MOF proposes to make this change as discussed in paragraph 141 under financial controllership.

technology solution varies from agency to agency. Some have accounting manuals. Some report quickly and accurately; others do not. Some still operate manual accounting systems. The detail and frequency of management reporting for expenditures also varies. Some ministries (MOSA and MOED) have developed their own systems in house, and these appear to operate satisfactorily. On the other hand a purpose built system developed with donor assistance for MOH is now being set aside in favor of the existing MOF system.

82.    In summary, responsibility for accounting is partly centralized in MOF and partly decentralized to line ministries.[16] A uniform chart of accounts, a single set of financial regulations and uniform reporting requirements bring the two parts of the accounting system together. For such a system to provide accurate, timely and complete consolidated reports, two conditions must be fulfilled. First, line ministries must report their final expenditures to MOF in a form suitable for aggregate monitoring and reporting. For this they need good accounting systems to produce. Without this, expenditures of line ministries can only be reported in a preliminary way as lump sum advances received. Second, MOF must establish and comply with standard accounting procedures and carry out comprehensive accounting routines according to a set schedule. This involves *inter alia* carrying out regular proofs of accuracy to ensure that final figures can be easily prepared, verified, aggregated and reported.

83.    The current chart of accounts consists of eight digits:

- First digit shows the main account classification:

    1.    Assets
    2.    Liabilities
    3.    Revenues
    4.    Expenditures

- Second digit shows the main sub-group, e.g. General Treasury Account (Account no. 11)

- Third digit shows the main category of the sub-group, e.g. General Treasury Account at the Palestine Monetary Authority (account no. 111); or General Treasury Account at commercial banks (account no. 112)

- Fourth and fifth digits provide further details at ministry level, e.g. General Treasury Account-Cash at line ministries (Account no. 1111). Treasury account at Ministry of Education is 11111.

- Sixth digit indicates the currency used

- Seventh and eighth digits reflect the location of account (e.g. at Arab Bank).

---

[16] It can be noted that a donor project to develop a comprehensive GFMIS (Government Financial Management Information System) commenced by the World Bank in 1994 and later taken over by another donor was eventually abandoned.

84.    The chart of accounts facilitates the recording of accounting transactions. It does not, however, allow an economic classification on the use of funds or on major government functions as recommended under the IMF's system of government finance statistics (GFS). Nor is there any functional or program classification, reflecting the input focus of the current budgeting system, which will be required in future under any gradual move to performance budgeting.

RECENT INNOVATIONS

85.    As part of on-going reforms MOF has unified the accounting systems in Gaza and West Bank and placed strong emphasis on bringing the accounting systems of MOF and line ministries closer to international best practice. The new government accounting system currently being phased in aims at meeting line ministry and agency financial management needs as well as those of MOF and was developed internally by MOF. The system is oracle-based and uses an IBM server. It consists of the following modules: budgeting, payments, bank accounts, accounting and revenues. The next phase (within 18-24 months) is planned to include payroll, procurement and internal audit. The MOF offices in West Bank and Gaza are linked through leased telephone lines. It is envisaged to use satellite facilities to link West Bank with Gaza in the future and to use microwave telecommunication systems within Gaza strip. For West Bank, microwave facilities would be used within each city and satellite facilities between different cities.[17]

86.    The new central accounting system automates all financial transactions from initiation to final settlement through bank transfer or issuance of payment check to the ultimate beneficiary. It also automatically generates accounting records and permits financial reporting. The system has a single point of data entry and thus a transaction is entered only once. All authorizations are automated through the system. Access to the accounting system is restricted to authorized personnel who furthermore have only access to modules under his or her assigned duties.

87.    Currently, MOF loads the annual budget of all line ministries into the budget module at the beginning of the fiscal year. In the future it is intented that budget data will be entered at the level of the line ministries or their basic units and aggregated at MOF level. This will facilitate budget preparation and execution and also expedite the implementation of changes to budget allocations that may happen during the fiscal year. Also, the PLC will be given access to the system, and thus be able to directly review budget execution.

88.    The new central accounting system provides a wide range of financial reports including: balance sheet data, bank balances, payment status, and advances. Backup is made daily by MOF. The new system is currently being piloted at MOF and will be

---

[17] Allowing PA to use microwave and satellite facilities requires coordination with Israel. Estimated costs of introducing microwave and satellite services is US$ 2 million for Gaza and US$ 7 million for West Bank. This change is expected to improve communication significantly and reduce costs.

rolled out to all line ministries within 12-24 months, with priority given to the Ministries of Health and Education.

## PRODUCTION OF FINANCIAL STATEMENTS

89.    The annual financial statements for 2002, the first aggregate financial statements produced by the PA, were presented in January 2004. The extended processing time was partly due to problems of consolidation and reconciliation of outstanding advances by spending ministries, and partly due to unfamiliarity with the task Procedures for closing accounts, proving their accuracy, making final adjustments and formulating financial statements have not been formally established. Such procedures are needed. For 2004 the PA should set a target for completion and issue of the annual financial statements of no more than six months after the year-end. For the following year, the target completion date should be further advanced. In the meantime, formal procedures for the closing of accounts and the finalization of financial statements should be established.

## SUMMARY

- The central accounting system, operated by MOF, as being developed, is a well designed, functional system, which will have the capacity to meet MOF needs. It remains to be determined, however, whether this system can meet the more detailed information needs of spending ministries and agencies or whether separate, but compatible systems are more appropriate.

- The classification system could usefully be expanded to include activities and programs, to provide improved information to ministry and agency management and to facilitate a greater performance focus in the budget in the future.

- Monthly figures of revenue and expenditure are available in a matter of days after the month-end. It should be noted that these are only provisional due to difficulties of integrating line agency expenditure data. There were delays in finalizing the 2002 aggregate financial statements because of lack of documented procedures for closing and consolidating accounts. Much could be gained by further streamlining of accounting system of line ministries and by harmonizing those systems with MOF's.

## DESIRABLE FURTHER ACTION

- ➢ Assess ministry and agency information requirements and determine the extent to which they can be met from the central MOF system. If necessary, provide guidance for development of ministry accounting systems harmonized with the central system.

- ➢ In due course, review the existing classification system so that it is able to provide information on departmental activities and programs.

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

> Develop an accounting manual, to provide financial staff with more guidance on accounting procedures, including procedures for consolidation and reporting, so as to reduce the current delays in reporting final figures in monthly budget execution reports and in preparing the aggregate financial statements.

13.   **PUBLIC SECTOR PAYROLL**

90.   Salary payments, which in 2004 are expected to account for some 60 percent of recurrent budget expenditures, are treated a priority item for payment. As of end June 2004, salary payments were made on time and there were no salary arrears. At end 2003 total public sector employment stood at 129,560, comprising 72,920 civil servants and 56,640 security personnel. As with 2003, the 2004 budget document includes comprehensive data on civil service employment, including the security services.

91.   There are three major related issues concerning the payroll:

-   ensuring that decisions on staff numbers (new recruitment etc) are consistent with the funds provided in the budget

-   ensuring that payments are appropriately made, only to authorized personnel (and are thus not liable to be used for other unauthorized or unknown purposes)

-   establishing the reliability of the payroll system through a comprehensive audit

92.   On the first issue, until 2002, decisions on staffing (hiring, promotion, etc.) were made by the General Personnel Council (GPC) outside the control of MOF. The President signed a decree on 10 January 2000 transferring the GPC to MOF, but the decree was only implemented in August 2002. The move of the payroll management from GPC to MOF was a significant development in improving budgetary control over the payroll, as recruitment had previously been undertaken by GPC without explicit consideration of budget allocations. GPC remains responsible for personnel policy issues and regular promotion decisions, but MOF now controls new recruitment, and promotions outside normal salary progression. GPC continues to maintain the central employee data base and its full cooperation with MOF is essential in preparing an accurate budget, maintaining control of staffing numbers and maintaining the integrity of the central payroll system.

93.   The budget allocation for staffing is now determined by MOF as part of the budget dialogue with each line ministry and agency and budget execution reflects only the agreed allocation of funds. The 2003 and 2004 budget laws set limits on civil service employment increases, distributed across ministries and agencies. While hiring by security organizations is to be limited by the amount of the budget appropriation, the MOF's mechanisms for enforcing this need strengthening.

94.   On the second issue, all new civil service recruitments are required to be submitted to the Budget Office of MOF to check funds availability and are personally approved by the Minister. No person can be placed on the payroll without the approval of the relevant financial controller, the budget department of MOF, the Director-General of

Financial Control in MOF and finally the Minister himself. This highly centralized control may be appropriate given current budgetary problems, but will need to be relaxed in the longer term as trained, professional financial controllers are placed in each line ministry.

95.    However, the recruitment process has not yet been fully regularized for all the security services. It appears that the system of submitting new recruitment proposals to MOF for approval by the Minister which operates for civil servants, does not always operate in the same way for the security services. Thus while the budget allocations for the security services are intended to act as limits on new recruitment, this may not always occur.

96.    The 73,000 civil servants have been paid through bank accounts since the establishment of the PA. Until August 2003, security personnel salaries were paid in cash, with funds transferred by MOF to security service bank accounts for this purpose, thus creating an inherent potential for diversion of funds. In August 2003, the salaries of some 25,000 security personnel from four agencies (including civil police and preventive security), but excluding 31,000 security personnel from units which report direct to the President were moved from cash to personal bank deposit payments using the MOF central payroll system. Following a Presidential decision in February 2004, the remaining 31,000 security personnel have been transferred to direct deposit payments at end March 2004.

97.    With regard to the third issue, MOF has initiated an audit of the payroll. However, focus has so far primarily been on lower level systems issues rather than the issue of whether all persons currently on the payroll are authorized (and whether they even exist). MOF is aware of the need to broaden the scope of this audit and this should be a high priority, once an adequate internal or external audit system is established (see separate discussion on audit arrangements in Sections 18 and 19). Full cooperation of GPC in carrying out this audit will be needed, as it holds the central personnel records of civil servants. In the meantime MOF will be undertaking sample reviews across a range of departments, comparing its payroll records with those of individual ministries and checking that salary levels correctly reflect the formal qualifications of individual civil servants.

SUMMARY

- Considerable progress has been made in integrating staff budgeting into the overall budget exercise and ensuring adequate control over and transparency of staff numbers.

- But there is still inadequate MOF control over security service staff numbers and recruitment.

DESIRABLE FURTHER ACTION

The following actions should be taken:

➢ Undertake a comprehensive audit (by the new Internal Audit Department of MOF) of the payroll system, with the full cooperation of GPC, both to ensure that the system provides adequate controls to ensure payment only to appropriate persons and that the existing payroll data base is correct.

➢ Develop a comprehensive employee data base which includes security personnel as well as civil servants

➢ Apply the same MOF controls over recruitment of security personnel as apply to civil servants

## 14.    PA COMMERCIAL INVESTMENTS

98.    The PA has invested in a range of commercial undertakings, both with a view to generate revenue for the PA, and to stimulate economic growth in WB&G through strategic local investments. As mentioned earlier, using PA revenues not paid into the budget (petroleum, tobacco and alcohol excises plus ongoing profits from these commercial operations) the PA-owned Palestine Commercial Service Organization (PCSC) invested PA funds in some 79 commercial undertakings, both within WB&G and abroad. These included monopolies in cement and petroleum, which were acquired at an early date. The President appointed the chairman of the PCSC.

99.    There was little transparency and accountability concerning the operations of the PCSC. However, as part of the Economic Framework reforms of June 2000 an of international auditing firm was retained to assess the value (subsequently estimated at US$345 million) of PCSC's commercial holdings. It was agreed that the valuation was to be a precursor to transferring commercial profits and other diverted revenues back to the PA budget. However this did not happen, nor was a Presidential decree, issued in October 2000, establishing the Palestine Investment Fund (PIF) to manage these assets on a commercial basis, including selling where appropriate, implemented at that time.

100.    However the PIF was formally established in October 2002, as a component of the 100 days Palestinian Reform Plan. PIF is an autonomous entity, wholly owned by the PA and is incorporated under PA companies legislation. Under the decree it is illegal for the PA to conduct any commercial activity or hold commercial assets outside of PIF.

101.    The articles of association of PIF outline the authorities and responsibilities of the Board of Directors and the management of the company, and provide for proper management and governance of the PIF. The Minister of Finance chairs the seven member board of directors, which includes four members from the private sector, one of whom who serves as deputy chairman. The other two directors are the Minister of Economy, Trade and Industry and the managing director (who is the former chairman of

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

the PCSC and the President's financial advisor). Three directors' signatures are required for any investment decision. Apart from the Articles of Association, a detailed policies and procedures manual governs its operations. However it does not appear that PIF has adequate professional staffing, given the size of the portfolio and the complex policy issues it faces, and this matter should be reviewed by the PIF Board.

102.    Under its Articles PIF is required to prepare an annual report within a "reasonable time" of the end of the financial year. It is also required to prepare quarterly (un-audited) and annual (audited) financial statements. In April 2004 PIF presented its first annual report and annual financial statements - for the year 2003. These statements were audited by the international firm Ernst and Young and received an unqualified audit opinion. They are available on the PIF website [18] and show total assets, including investments, fixed assets, cash and receivables of US$799 million, and net equity of US$713 million.

103.    PIF has initiated a review its entire portfolio with a view to formulating an investment and privatization strategy. It may dispose of its holdings in companies operating in WB&G where it considers that government involvement is no longer necessary. While PIF is able to invest in WB&G companies to promote economic development it is likely that this will be done only where entities have no alternative access to capital, and that revenue earning and capital growth will be the dominant objectives, with the Board determining the balance between these two objectives. PIF is allowed to invest liquid funds in temporary investments, but is not allowed to lend to the PA budget.

104.    Nevertheless MOF now has a direct role in over-seeing the operations of PIF, which establishes a direct link with the budget so that the Minister may determine what amounts should flow from PIF as budget revenues. The 2004 budget includes a line item covering this revenue of US$35 million, compared with US$31 million in 2003 and zero in 2002.

105.    In late 2002, the new PIF board engaged the international firm of Standard and Poors to undertake a valuation and "transparency assessment" of the companies in which PIF held shares A report was issued on March 9, 2003 listing all investments along with their valuation, totaling some US$633 million[19]. In addition, the report also listed current bank accounts formerly controlled by the Palestinian Commercial Services Company (PCSC) with cash balances of $74 million in several banks.

106.    The transparency assessment reviewed the availability and reliability of financial and other data, as well as how each entity is owned, organized and operated, and whether based on the findings it will be judged both "transparent and respectable" by international standards. The intention is that all PIF investments must reach this standard. Anti-competitive behavior, unfair or preferential relationships with the PA or corruption issues

---

[18] http://www.pa-inv-fund.com/lasse.asp
[19] The total valuation of US$633 million for investments suggests that the 2000 PCSC valuation by SABA may have been incomplete in its coverage. The Standard and Poor report along with PIF by-laws are published on the PIF website http://www.pa-inv-fund.com/lasse.asp

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

were included in the diagnostics. This diagnostic information concerning each entity is also available on the PIF website.

107.    The report was presented to and discussed by the Palestinian Legislative Council.

108.    The largest PA investments (totaling US$336 million), their valuation and the percentage of the company held by PIF are as follows:

| Investment | % held by PIF | Valuation (US$m) |
|---|---|---|
| Orascom Telecom Algeria | (23%) | $90.0 |
| Orascom Telecom Tunisia | (20%) | $50.0 |
| Orascom parent company | (3%) | $25.2 |
| Fastlink (Jordan Mobile Telecommunications) | (14%) | $66.1 |
| PA Cement | (100%) | $54.0 |
| Palestine Telecommunications (PALTEL) | (6.75%) | $13.6 |
| Palestine Cellular Communications (PALCEL) | (35%) | $36.9 |

109.    The Petroleum Commission, which is both a regulatory and a marketing organization, is not included in PIF, having been made directly accountable to the Minister of Finance.

SUMMARY

- The establishment of the PIF and the listing and valuation of PA commercial investments, particularly the disclosure of investment details on the PIF website, is a major step in overcoming the previous insufficient transparency in these investment operations. It provides the opportunity to ensure that these entities are managed in the financial interests of the PA, either through providing revenue to the budget or through privatization or sale where appropriate.

- Likewise the publication of the PIF annual report and audited financial statements for 2003 represents a significant advance in fiscal transparency.

DESIRABLE FURTHER ACTIONS.

- ➢ The PIF Board should review the adequacy of PIF professional staffing to assist it in its management of PIF.

15.    STATE OWNED ENTERPRISES

110.    WB&G has relatively few state owned enterprises (SOEs), i.e. commercial entities controlled and managed by PA to provide public services within WB&G. The

main active SOEs, are the Petroleum Commission [20] (now directly administered by MOF), the Electricity Monitoring Distribution Company (owned jointly by PA and Gaza municipalities), Al-Bahr Company (responsible for information technology and computer programming services to the PA), Palestine Development Company (a construction company jointly owned by PA and Italian interests) and Al-Sakhra Company (the purchasing arm of the security services – which is in the process of being wound up). Paltel, the telecommunications monopoly in WB&G is not an SOE; it is a public company listed on the stock exchange, albeit with a small PA equity held by PIF. Likewise the postal and water systems are operated by budget entities and hence are not SOE's (see Section 16, below).

111.    SOEs were part of the 2003 valuation study carried out by Standard and Poors (see paragraph 105 above) and are part of the PIF investment portfolio[21]. However, as of November 2003 no market values had been determined for SOE's on the basis that their objective is to provide services to the PA on a cost recovery basis, usually on a monopoly basis. Therefore, a business valuation of those companies using a market approach was not considered appropriate.

112.    Each SOE operates on commercial basis and is not included in the PA budget. They operate under the Companies Law. The Companies Law requires SOE's to prepare audited financial statements, a requirement that not all SOE's have thus far adhered to

113.    At the direction of the Minister of Finance a special-purpose audit of one of the largest SOEs (the Al-Sakhra company) was conducted by a qualified West Bank auditor and coordinated by MOF. The audit report identified substantial control weaknesses and misuse of funds. Among the litany of control weaknesses were signing of blank checks, lack of documents to support various material financial transactions and lack of clear basis for payroll calculation and benefits. Various unjustified perks to the general manager and financial manager were identified. More substantively, significant revenues recorded elsewhere as having being paid to Al-Sakhra were not received by the company, and appear to have been deposited into other bank accounts, including in one case the personal account of the general manager. A building was registered in the name of the general manager and various motor vehicles in the names of company staff. As a consequence the Al-Sakhra company is to be wound up and its functions transferred back into the security services, and a senior staff member was removed.

114.    The situation in this company reflects what may arise in the absence of a clear financial management and accountability framework for SOEs. The operation of PIF provides this framework. Nevertheless, as discussed in Section 14 above, for this framework to work it is important that PIF have adequate professional staff and that the Company law requirements for preparation of audited financial statements are observed

---

[20] The Petroleum Commission is both a regulatory and a marketing organization. It is intended to privatize its commercial activities at some future stage, and for the Commission to then function only as a regulatory authority.
[21] According to the 2003 Standard and Poors valuation report, 15 SOEs ceased operations as of January 1, 2003. They include companies of trading nature (e.g. glass company, logo company, Al-Borhan company)

DESIRABLE FURTHER ACTION

➤ Ensure that all SOEs are appropriately monitored under PIF and that they prepare the annual financial statements, audited by professional firms, as required under the Companies law.

## 16.  OTHER COMMERCIAL ACTIVITIES

115.   Included in the PA budget are a number of agencies which are primarily of a commercial nature. These include the Ministry of Posts and Telecommunications which operates the postal system. These institutions operate as autonomous public institutions, but like ministries and agencies, their expenditures and revenues are part of the budget.

DESIRABLE FURTHER ACTION

➤ Given the inherently commercial nature of their operations, consideration should be given in due course to having these organizations operate on a commercial basis subject to a performance accountability regime – with boards of directors, financial targets, and annual reports, including audited financial statements prepared on a commercial basis.

## 17.  PUBLIC INSTITUTIONS

116.   These are autonomous entities whose revenues and expenditures are included in the government budget. Examples, such as the Palestine Water Authority and Palestine News Authority are set out in paragraph 38 above. Each institution maintains its own books of accounts, generally on a cash basis. So far, none have prepared annual financial statements. They are subject to the Organic Budget law and Finance Directives, and to GCI audit and are required to follow government procurement procedures.

DESIRABLE FURTHER ACTIONS

➤ Public institutions should prepare and publish annual reports to the PLC, including audited annual financial statements.

## 18.  EXTERNAL AUDIT

117.   The PA external audit institution is the General Control Institute (GCI), established under Law 17 of 1995. It has about 90 professional and 20 support staff, with requested increases in staff numbers being provided for in both the 2003 and 2004 budgets. Its staff are public servants but are remunerated at a higher level than comparable civil servants. It operates from Gaza, with other offices in Ramallah, Nablus and Hebron.

118.    The Law gives GCI a wide scope of activity. The audit mandate covers financial, value-for-money and compliance auditing. It is authorized to carry out ex post audits of all PA organizations, including the security services, public enterprises and companies in which the PA holds shares, as well as local government, although it does not appear to currently exercise its role in local government (see separate discussion on Local Government in Section 23 below). Under the Law the President is able to exclude certain undertakings from its audit coverage, although it is not clear whether any organizations have been exempted to date. GCI is required to audit the annual financial statements of the PA, although the recently completed 2002 financial statements do not carry an audit opinion (see paragraph 162 below). The GCI is also required to audit the quarterly budget execution reports and forward them to ministries with its comments. It is not clear the extent to which GCI is currently auditing revenues. This is an important area for scrutiny.

119.    GCI is also charged with a number of tasks that are extraneous to a national audit institution, although these are not a large part of its total work. For example, it investigates complaints from the public about poor services or misconduct of PA staff, which in other jurisdictions would normally be the responsibility of a separate administrative body (or, for the latter issue, GPC). It is also authorized to monitor the implementation of investment projects, which is usually considered a management role.

120.    GCI has no prosecutorial role. It refers any cases requiring legal action to the appropriate authorities.

121.    The institutional arrangements for GCI have a number of desirable features for a national audit institution. It has adequate budgetary independence. Its authority covers all PA organizations, it has a broad scope mandate and full authority to obtain information it requires. There are, however, a number of deficiencies in its legal set-up. The President appoints the Chairman (on recommendation of the Cabinet) and the Chairman reports directly to the President, with no formal provision for reporting to the PLC or otherwise making the reports publicly available. Although the President may forward its reports to the PLC, he has not done so since 1997. And it carries out a number of extraneous functions, as discussed above in paragraph 119.

122.    GCI is a member of INTOSAI[22] and its associated organization ARABOSAI, which brings together the supreme audit institutions of Arab nations. However it is not clear what professional auditing standards it uses in its work.

123.    No information is available on the content of GCI reports forwarded to the President, as these have not been made public since the report provided to the PLC in 1997. The 1997 report was stated by PLC to contain inaccuracies and generally to not be useful. Without access to any of GCI's audit reports it has not been possible to form a clear judgment on its work. However from discussions by the CFAA team with MOF, line ministries, a PLC representative and some donors it appears that GCI is adding little or no value in its current role. It is perceived as lacking technical skills and focusing on relatively small compliance issues rather than on issues of systems, materiality and risk.

---

[22] International Organization of Supreme Audit Institutions

Neither MOF nor line ministries interviewed considered that GCI identified material issues which needed correcting. Nor is there evidence of any of its recommendations being implemented.

124.    No international donor, with the exception of the Islamic Development Bank, uses GCI for the audit of its projects in WBG. GCI reports on the quarterly budget execution reports do not appear to be used by MOF, the line ministries and agencies concerned nor by the PLC.

125.    Although PLC may request GCI to review certain issues it has not done so, except on a few occasions. When it has made requests no response has been forthcoming from GCI (see discussion of PLC in Section 20)

126.    Conflicts of interest regarding the current Chairman of GCI are a matter of concern and need to be resolved. The Chairman is currently the Governor of the Islamic Development Bank representing the PA, in which capacity he has signed financial agreements on behalf of the PA that only the Minister of Finance is authorized to sign. In addition he is a board member of the Palestine Monetary Authority (PMA).

127.    There is a clear need to strengthen both the legal basis and the capacity of the PA's external audit institution. A new draft law has been developed for the Committee of Budget and Financial Affairs of the PLC. This draft law would establish a Council of Financial and Administrative Control, to replace GCI. It contains many of the requirements for an adequate external auditing law. In particular it provides for independence in funding and for PLC approval of the President's appointment of the head of the Council. It provides for full right of access to information, coverage of all PA organizations and for quarterly and annual reporting to the PLC as well as the President and has provisions concerning conflict of interests.

128.    However the draft law also has some deficiencies. The GCI's role is extended well beyond external audit to include functions related to an administrative tribunal or ombudsman, and others that are functions of the executive arm of government. In addition the audit provisions lack clarity. There is no clear statement that compliance, financial and performance audits are required and there is no clear requirement for the audit of budget execution reports and annual financial statements. In addition, the law should make reference to the minimum auditing standards (as for example issued by the International Federation of Accountants (IFAC) and the International Organization of Supreme Audit Institutions (INTOSAI) that the work of GCI should be subject to.

129.    To become the basis for a fully satisfactory external audit institution the draft law therefore requires some redrafting – both clarification and narrowing. The PLC Budget and Financial Affairs Committee should address this, as the draft law proceeds through subsequent legislative stages.

SUMMARY

- GCI does not meet international standards for a professional external audit institution. In the PA context, with heavy donor support and an extensive PFM reform program being implemented, the need for a professional audit institution on which both the PA and donors can rely to add credibility to published financial statements and to provide some assurance that new systems and arrangements are functioning as required, cannot be over-emphasized.

- A particular weakness is the current lack of formal relationship between GCI and the PLC, resulting in a lack of responsiveness to the PLC. The authority of the President to exempt any undertaking from audit is another deficiency.

- The draft law to establish a new external audit organization, the proposed Council of Financial and Administrative Control, while containing many of the requirements for a good external audit law, requires some clarification and modification to be fully satisfactory as the basis for a new external audit organization.

DESIRABLE FURTHER ACTIONS

- ➢ The PLC Budget and Financial Affairs Committee to revise the draft new audit law as suggested in paragraph 128 above, as it moves through subsequent legislative changes.

- ➢ Urgently institute a program of capacity building, with assistance from the national audit institution of one or two donor countries. This could first take the form of a "peer review" of the quality of GCI's work

- ➢ Resolve the conflicts of interest of the current chairman of GCI.

## 19.    FINANCIAL CONTROL AND INTERNAL AUDIT

130.    The financial control and internal audit functions were previously discussed as one issue in PA PFM reform plans, giving rise to some confusion. However MOF has now correctly made a clear distinction between *ex ante* financial control (sometimes referred to confusingly as "pre audit") and *ex post* internal audit. A recent Ministerial Decree formally establishes separate Internal Audit and Financial Control Departments within MOF, with the internal audit and financial control staff posted in each ministry to become formally part of these MOF departments.

FINANCIAL CONTROLLERSHIP ROLE

131.    Prepayment checks, which are the main component of the PA financial controllership function, are a necessary part of any PFM system. In riskier environments and where the control systems of spending agencies are less advanced, it is common for

MOF to undertake such checks. In more mature systems the spending agencies are responsible for the integrity of their own prepayment controls. Audit institutions (either internal or external) might review the effectiveness of these controls on a selective basis but would not be involved in detailed checks of transactions.

132.    Obligatory pre-payment checking is mandated in the Fiscal Directives (article 21/5). For expenditures (which included to commitments entered into and to procurement) to be correctly incurred, the following conditions must be met (as also outlined in paragraph 34 above):

-   The relevant appropriation account has sufficient funds to cover the proposed expenditure

-   the proposal is backed by correct documentation including the necessary authorizations

-   the sums involved have been correctly calculated, classified and described

-   that the proposed expenditure does not violate the law, directives in force etc.

133.    Having verified this, financial controllers authorize individual expenditures. If an error is found the transaction is referred back to the ministry or agency concerned for correction. If there are no errors, payment may be made.

134.    Financial control has been carried out by the internal control and audit department of MOF and by similar units located in line ministries. MOF and line ministries each carry out prepayment controls on their own expenditures.

135.    A plan for comprehensive development of the financial control function was laid out in the 2004 Budget Speech of the Minister of Finance and was approved by Cabinet on February 9, 2004. The objective of the plan is to develop a fully effective financial control function by making financial control a clear MOF responsibility, with all financial controllers in spending units being MOF staff, and reporting to the new director-general of financial control in MOF. In addition methodological guidance will be developed and training provided to financial control staff.

136.    It should be noted that financial control will extend beyond pre-payment checking, to checks on key financial duties of line ministries. While the extent and type of control have not yet been defined, it is anticipated that they would apply to the timeliness and correctness of accounting reports and to bank reconciliations prepared by line ministries.

137.    About half of all ministries (including all large ministries) now have financial controllers. MOH has five financial controllers; MOSA has one, appointed in 2003. In due course this will extend to all ministries, as provided in the 2002 100 days Reform Plan. At present, financial controllers do not issue reports concerning their work. It would seem desirable for them to do so (to the chief executive of the ministry concerned with a copy to MOF).

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

138.    Once the new system of financial control is established, MOF will abandon its system of post-disbursement audits (paragraph 141 below) At the same, internal control staff currently employed by line ministries will be transferred to MOF. The staffing needs of the new system are currently estimated at about 320 (200 in West Bank and 120 in Gaza). These needs are expected to be met by the reassignment of staff and not by new recruitment.

139.    Manuals, check lists and computer programs have already been developed by MOF, along with training programs, to support the development of this function.

SUMMARY

- Financial controllers have a key role in meeting the PA's current need both to ensure and to demonstrate that expenditures are only incurred as authorized by the annual budget law, and that they are correctly classified and reported. An effective financial controller system can also provide significant comfort to donors about proper use of funds.

- Financial controllers are not yet fully in place in all ministries and it is too early to judge their effectiveness. But useful steps have been taken, including the appointment of a director-general of financial control in MOF to manage and develop this function. An effective external audit institution could usefully review the effectiveness of the financial controller role, once it is fully operational. It is clear the financial controllers must have both capacity and independence to operate effectively.

- It is important that the financial control function operate in a timely and cost-efficient manner, avoiding duplication in procedures and staff.

DESIRABLE NEXT STEPS

- ➢ Strong support should be given to the policy of putting financial controllers in place in each ministry, ensuring they have adequate authority and independence and that they report on their work to MOF

- ➢ MOF should ensure that the structure, objectives, responsibilities, reporting standards and operational procedures of the financial control function are properly defined and documented, and do not overlap with the responsibilities of internal audit.

(EX POST) INTERNAL AUDIT

140.    A prior appreciation of the weakness of external audit in the PA and its causes and impact (see section 18 above) is necessary to an understanding of the current development of ex post internal audit in WB&G. At present, MOF does not posses the means to verify the correct operation of its financial management systems (for example

the government accounting system, the CTA, and the payroll, procurement and debt management systems). A well-functioning internal audit system would provide an effective means of verifying whether these systems are indeed operating correctly and satisfactorily. As mentioned above in Section 13, a comprehensive audit of the public sector payroll is a priority for such a new department.

141.    In addition, MOF carries out ex post audit of the completed payments of line ministries. Expenditure of line ministries before this MOF audit remains an advance and is not treated as final expenditure. This arrangement duplicates work and results in multiple, time-consuming checks and authorizations. Often, because disbursement has already occurred, MOF checks are too late to prevent irregularities. Moreover the system results in excessive sums being treated as advances, which delays the completion of financial statements (see footnote 16 above).

142.    MOF has established an internal audit department, to be headed by a director-general of internal audit, to carry out ex post system-based audits. In the interim an expatriate Palestinian consultant with strong professional qualifications was recruited for several months to advise on internal audit issues, to undertake the necessary staff development and to ensure the development of a fully professional internal audit department. MOF has now recruited 52 staff for this department, to carry out state-of-the-art audits for MOF. An international auditing firm currently provides training (classroom based and on the job) plus drafting of procedural manuals to achieve this, with funding assistance from the European Commission.

143.    A draft internal audit charter has been approved by the Minister of Finance. Apart from providing for an independent, fully professional internal audit department as part of MOF, it contains internal audit procedures and standards based on those published by the Institutes of Internal Auditors in USA and UK. It covers the following topics: role and objectives of the internal audit directorate, its relation to other ministries and public institutions, scope of work, quality standards, professional standards and the qualifications of internal auditors, the nature of internal audit (covering both operational and financial audit), the development of audit programs and steps to be taken as part of internal audit assignments. The draft charter constitutes a sound basis for developing internal audit in government of WB&G.

144.    This initiative has the potential to fill an existing gap in the PA's public financial management architecture. The PFM reforms, which aim to establish financial management systems that will match international best practice, cannot progress satisfactorily without a systems-based audit. It is therefore important that the internal audit initiative be given maximum support. To accomplish this the following are suggested:

  -    clear differentiation between the roles of financial controllers and internal auditors (different names, different roles expressed in separate charters or statements of objectives, and different responsibilities)

- steps to ensure that the leadership of internal audit remains professionally qualified[23] and to ensure that internal auditors are properly trained and equipped with appropriate skills

- adequate backing/authority to ensure appropriate access to the information and documents of line agencies

- the publication of comprehensive procedural guidance regarding internal audit and financial control

145.    The short-term aim, once the unit is staffed and the auditors trained, should be to establish internal audit formally in the structure of government (e.g. by amending the organic budget law or fiscal directives) so that its role, responsibilities and powers are clear.

146.    In the longer-term, the internal audit initiative raises transitional problems. These will become clearer when the PA's system of external audit has developed further:

- how will the roles of internal and external audit be defined?

- how will those roles develop once external audit is put on a sound footing?

- with two separate sets of MOF staff operating in the financial control and internal audit environment at spending agency level, how will spending agencies develop responsibility for their own financial control systems?

147.    Possible duplication of functions between external and internal auditors might be a concern in the longer term. In the near term, however, such considerations are secondary and the priority is to establish a credible audit capacity to underpin the current PFM reforms.

SUMMARY

- The development of the ex post internal audit function based in MOF is a high priority, both for donors and the PA. In due course, the relationship of this development with upgrading of the external audit institution, GCI, will need to be determined.

DESIRABLE FUTURE ACTIONS

➢ MOF should provide strong support to the development of this function, to ensure that there are appropriate staffing and training arrangements put in place as soon as possible, so that the envisaged internal audit program can begin.

---

[23] This means holding the full accounting/auditing qualification of an internationally recognized professional institute and having experience of leading the audit function in a large, modern organization.

> ➢ MOF should give a comprehensive audit of the payroll, both civil service and security services priority in the internal audit program.

## 20.   THE ROLE OF PLC IN PFM

148.   The PLC Committee on Budget and Financial Affairs, which consists of 14 members out of the total membership of the PLC of 120 has the following terms of reference:

- review the draft budget law (it can propose reductions in expenditure but not increases) and recommend approval/rejection to the PLC

- question the government on its financial plans and issues of fiscal stability

- question ministers on financial matters

- ensure integration between budget and economic plan

- discuss/approve proposed budget amendments during the year

149.   The Committee may also request an investigation into the financial operations of any ministry or agency. It may also request copies of GCI reports on MOF budget execution. However various PLC requests to GCI for its reports on budget execution, for a review of PMA and for a review of the award of a hospital construction contract (financed by Saudi Arabia) have elicited no response from GCI. The Organic Budget Law (Article 52) requires quarterly reports on budget execution to be submitted to the Council of Ministers and to PLC, and this is now being done. However it does not appear that the PLC makes use of these reports.

150.   As discussed above (paragraphs 41) under the Organic Budget Law, the budget is required to be submitted to PLC by 1 November and passed before the beginning of the fiscal year. The PLC may reduce proposed appropriations, but may not increase them. Its review of the 2003 budget was active and it reduced the level of staffing increases sought in the draft budget. The Committee expressed views on the priority to be given to various payments in view of the PA's difficult budgetary situation, stressing the importance of expenditures on infrastructure rehabilitation and medicines and payments to families of prisoners, amongst other items. However, the PLC has also been preoccupied with other issues including proposed civil service reform and laws on civil service pensions and capital markets, a report on the PMA, and the review and approval of the changes to the Petroleum Commission proposed by the Minister of Finance, which has limited the time it devoted to reviewing the proposed budgets.

151.   The fact that the budget is largely a detailed listing of inputs, with no explicit focus on performance or priorities (see paragraph 53 above) may limit the level of PLC interest in the budget. A future program or performance budgeting approach may change this. It does not appear that the PLC review has focused on the overall fiscal strategy and position of the PA.

152.    MOF provides quarterly budget execution reports to the PLC, as required by the Organic Budget law. The Committee previously discussed budget execution issues with the Minister of Finance on a weekly basis, until movement restrictions put in place throughout the West Bank and Gaza by Israel prevented this. Indeed because of travel difficulties caused by closures it has been difficult for the PLC, let alone any of its committees, to meet on a regular or predictable basis.

153.    However the Committee has been particularly active in developing and reviewing the draft new audit legislation, discussed in paragraphs 127 and 128 above.

SUMMARY

- The capacity of PLC and in particular its Budget and Financial Affairs Committee should be enhanced in order to strengthen the system of public financial accountability.

- The PLC requires improved information, professional staffing resources and a formal linkage with the external audit institution to be able to do this.

DESIRABLE FUTURE ACTION

➢ The PLC should receive copies of the annual PA financial statements and annual reports including audited financial statements of the PIF, individual state-owned enterprises and public institutions.

➢ GCI should also formally submit its reports to the PLC, and be responsive to requests and other information needs identified by the PLC.

➢ The PLC and its committees should be adequately staffed to enable it to analyze and pursue budgetary issues with the executive.

21.    PROCUREMENT

154.    Procurement in WB&G is governed by two separate laws: Procurement Law No. 9 of 1998 on "General Supplies" (the Goods Law) and Law No. 6 of 1999 on public works tenders (the Works Law). While the former is supplemented by detailed regulations, there are no such regulations under the Works law. Two ministries are thus involved in procurement policy – the Ministry of Finance, which has a procurement monitoring unit, and the Ministry of Public Works and Housing.

155.    Both laws are only partially enforced, and many spending units have developed their own independent procurement practices. The situation is further complicated by many purchases being funded under donor projects, with a range of different donor procurement requirements to be met. There is some anecdotal evidence that this leads to significantly higher costs, and that greater harmonization of donor requirements would be advantageous. A further issue in procurement is the extent to which generally accepted

good procurement practices such as international competitive bidding or national bidding are feasible given current circumstance on the ground in the West Bank and Gaza.

156.    In many countries procurement systems have significant risk of financial irregularity. A World Bank CPAR (Country Procurement Assessment Review) is now commencing, with a draft report expected by June/July 2004 and a final report by October/November 2004. For this reason discussion of procurement issues in this CFAA is brief and contains no recommendations.

## 22.    FISCAL REPORTING

157.    Reliable fiscal reporting, both at aggregate and organizational level, is a key component of sound PFM. There have been significant improvements in this area, mainly the publication of monthly budget execution reports on the MOF website, the publication of actual figures for 2002 in the 2003 budget documents, the publication of the first PA aggregate financial statements (for the 2002 year) and the publication of the first audited financial statements for PIF (for the 2003 year).

158.    A missing factor continues to be the absence of an adequate audit of the budget execution reports and the absence of any aggregate financial statements. This is needed to verify the integrity of data and to add credibility to the fiscal reporting – or to comment on the adequacy of controls in the systems used to prepare this information and to verify the likelihood that financial transactions are being correctly recorded.

### AGGREGATE FINANCIAL STATEMENTS

159.    The PA submitted its first set of aggregate financial statements, those for 2002, to the PLC in January 2004. This roughly complies with the Organic Budget Law, which requires the final statements to be presented to the Council of Ministers within one year of the end of the fiscal year. This permitted time is overly generous and should be reduced to six months. Article 65 requires preliminary accounts to be submitted within six months, and somewhat anomalously the Fiscal Directives (Article 58) require the year's fiscal accounts to be prepared by 30 April. The Organic Budget Law also contains certain requirements about the contents of the annual financial statements but these do not include showing actual and budgeted expenditures for major items, or provide for comparative figures. Nor is the definition of the budget/surplus deficit adequate.

160.    Overall, the 2002 statements are a reasonable first attempt to present meaningful financial statements and provide important aggregate budget information. However they require clarification, rearranging and expansion to provide an adequate basis for financial accountability. This should be addressed in the preparation of the 2003 financial statements, which desirably should be completed no later than 30 June 2004, and then audited by an international firm.

161.    The 2002 statements consist of some twelve pages covering a series of sub-statements, which are difficult to link with each other. They include:

- a summary of actual budget revenues and expenditures, and financing sources

- a summary of revenue and financing sources

- a summary of current and development expenditures, broken down by spending unit under four categories (development, transfer, operating and salary expenditures) and showing actual compared with budget

- a statement setting out the overall budget deficit and its financing

- a statement of cash receipts and payments, including changes in deposits cash balances and loans (this statement is particularly hard to follow)

Development expenditures are included to the extent that they are financed by the PA or the transactions take place through the CTA.

162. As mentioned above (paragraph 160) the 2003 statements should address the deficiencies in the 2002 statements. On procedural issues, for the 2002 statements there is

- no statement of accounting policies or what the statements are intended to convey

- no certification of the statements by the Minister or any responsible officials

- no audit opinion

163. In terms of desirable informational content, the 2002 statements do not contain information on the financial position of the PA. It is important that these statements contain more than a statement of budget execution. Information should also be provided on the PA investments in various commercial organizations such as a summary of their financial results, assets and liabilities or net value (see separate PIF discussion in Section 14), of the PA financial assets and financial liabilities (public debt including amounts owing to commercial banks and creditors including payment arrears to suppliers, and arrears to the separate pensions funds – all of which are discussed in Section 10 above) and of contingent liabilities. There is no statements of the use of the contingency reserve or of losses or write-offs. Comparative figures for previous years should also be provided.

164. While it is recognized that some of this information, for example on public debt and arrears is included in the budget document, inclusion in the financial statements provides independent verification through the audit of the statements.

165. A legal provision exists for the annual financial statements to be audited but not for an audit opinion attached to the financial statements testifying to their accuracy and reliability. To meet international standards the financial statements should in future be audited by an independent auditor (in this case an international audit firm is suggested) and should bear the certificate of the auditor expressing a professional opinion on their adequacy and reliability.

166.    A legal provision also exists for quarterly (budget execution) financial statements to be submitted to the Palestinian Legislative Council (PLC). International standards require that an annual financial statement be submitted so that the authority that authorized the budget (the legislature) can reach an opinion on whether the money has been raised and spent according to its decisions. This procedure is not yet properly established in practice.

### FINANCIAL STATEMENTS OF PIF, SOEs AND PUBLIC INSTITUTIONS

167.    As discussed separately in Section 14 above, an important recent development is that the PIF now brings all PA investments under the purview of the Minister of Finance and his Ministry. As discussed in paragraph 102 above under its Articles PIF is required to prepare quarterly un-audited and annual audited financial statements. The first audited financial statements, for the year 2003, were issued in April 2004 and are posted on the PIF website.

168.    Likewise, the requirement that state-owned enterprises to produce annual audited financial statements is not being observed in all cases (see paragraph 112 above)

169.    For autonomous public institutions no such annual reporting requirements have been developed (see paragraph 116 above)

### SUMMARY

- Considerable progress has been made in improving fiscal reporting through the publication of budget execution reports. The 2002 financial statements, the first to be presented by the PA are a reasonable first attempt, but improvements in clarity and coverage are needed for the 2003 financial statements, which should also be audited. PIF has produced its first set of audited financial statements (for the 2003 year).

- But there remain some gaps in annual financial reporting. Not all state owned enterprises have yet produced required audited financial statements. Annual reporting arrangements also need to be developed for public institutions and in due course for ministries and agencies.

### DESIRABLE FURTHER ACTION

The following steps should be taken:

➢ The form and content of the PA annual financial statements for the preparation of the 2003 aggregate financial statements should be reviewed.

➢ The 2003 PA financial statements should be finalized by 30 June 2004 and audited by an international auditing firm.

> The audited financial statements required from SOEs should be prepared in all cases.

> An annual reporting regime including financial statements for autonomous public institutions (and in due course for ministries and agencies) should be developed.

## 23.    LOCAL GOVERNMENT [24]

170.    The quality of PFM in local government is not directly examined in this CFAA. However the following brief discussion provides some context to their operations and their impact on the operations of the PA. Transfers from central government are small, consisting only of 45 percent of automobile licensing fees and fines, which are allocated in proportion to their population size. This amounted to around $5 million in 2002.

171.    Local government units (LGUs), including 120 municipalities and 251 village councils provide local services such as water, sewage, health inspection, waste disposal and roads and in some cases electricity supply. The bulk of their revenue comes from user charges (e.g. water and electricity charges) with smaller amounts from property tax and limited transfers from the central government. Overall LGU operations are relatively small, accounting for about 8 percent of total public expenditures or 2.6 percent of GDP (2000 figures). Total staff employed is around 11,400, compared with 130,000 in central government.

172.    As discussed in Section 3 above on donor activities, some LGUs have in the past negotiated directly with donors for project assistance, although this has now ceased. The current initiative by MOP and MOF to develop a data base of donor funding and projects and to develop a *Medium Term Plan 2004 – 2005,* incorporates LGU capital expenditures.

173.    LGUs have recently accumulated payment arrears (much of it to Israel for electricity supply) because of falling revenues due to the economic contraction since the Intifada. The Law permits them to borrow (which in practice means from local banks) subject to MOLG approval. Recently fiscal transfers due from the central government have been withheld because of the PA budget difficulties and also as an offset against arrears of utility payments due to Israel, which have been paid by the central government.

174.    Under the Local Government Law (1997), local governments in WBG are defined as "local bod(ies)...considered as a financially independent juridical body corporate." But they are at least in theory subject to extensive overview by the Ministry of Local Government (MOLG). For example the law[25] states that MOLG is responsible for endorsing the annual budget and the year-end financial statements of local governments. While local councils are authorized to set and collect fees, taxes, revenues, fines and

---

[24] The World Bank's *MNA Decentralization and Municipal Management: An Assessment of Intergovernmental Fiscal Relations in Eight MNA Countries (work in progress)* has been a useful source of information for this section.
[25] Local Government Law, Article 15, para 25.

expenditures[26], these too are contingent on MOLG approval. Local governments have latitude in establishing salary scales but these expenditure commitments must be reflected in the annual budget, which requires MOLG ratification. It appears that many of these MOLG roles have been exercised irregularly and compliance with the requirement to submit annual financial statements has been very irregular.

175.    All local government units use a standard financial management system prescribed by MOLG; a unified system of accounts has been developed to record expenditures and revenues in accordance with standard budget line items used across all LGUs. However the quality of these accounting systems appears variable. While a major initiative is underway to automate these systems, a focus on improving manual systems is needed urgently in the interim.

176.    LGUs are required to follow a uniform system of procurement but this has been observed irregularly in the past. LGUs are also subject to audit either by GCI or an auditor acceptable to MOLG, but it appears that in general private auditors are used (if any audit is undertaken at all) and that GCI does not currently exercise its possible role.

177.    The Emergency Municipal Services Rehabilitation Project (EMSRP) currently being undertaken by the World Bank aims to provide emergency financial assistance to address the fiscal crisis now being experienced by most LGUs , reflecting the economic downturn since the Intifada. It also includes measures to improve compliance with reporting requirements, leading to the establishment of a municipal data base to enable MOLG to more effectively exercise its oversight role. An audit firm is to be engaged to carry out a special purpose audit of selected LGUs to develop an action plan to strengthen financial management and reporting, including developing a standard format for the annual financial statements.

## 24.    PFM CAPACITY AND POSSIBLE TECHNICAL ASSISTANCE NEEDS

178.    This CFAA has not attempted a review of the PFM capacity in the PA to implement in a sustainable way the ambitious PFM reform program already commenced by the Minister of Finance, and the additional steps proposed in this CFAA. Correspondingly there has been no attempt in this CFAA to systematically identify areas where various donors might usefully provide technical assistance.

179.    However it is clear to the CFAA team that the Ministry of Finance is not currently able to provide the Minister of Finance with the high-level support he requires to develop and carry these PFM reforms through, and that without further support the sustainability of some of the reforms may be in doubt. For example, weaknesses in the Treasury are indicated by the delay in producing aggregate financial statements and the lack of documented procedures. In addition, it is questionable whether the PIF has adequate professional staff to provide its Board with the high level analysis and advice it requires.

---

[26] Article 15, Section B, para 1.

180.    The CFAA team is aware of the Minister's desire that the reforms should be "home grown" if they are to be sustainable, of his intention to develop and promote more promising junior officers and of his preference for avoiding external consultants wherever possible. Reflecting this, only one consultant has recently been employed on PFM reform issues – a Palestinian expatriate employed under the Worlds Bank's Professional Expatriate Palestinian Program (PEPP), to develop internal audit. Nevertheless the CFAA team believes that further analysis of training and possible technical assistance needs is warranted.

181.    To name but a few areas where external assistance may be desirable, this CFAA identifies the need for accounting manuals to be developed and for a policy on the form and content of the aggregate financial statements to be developed. External assistance would be highly desirable here. In addition it seems clear that external audit cannot be improved without significant external assistance to develop capacity within a new external audit organization.

182.    In addition, it appears that not all ministers, PLC members and senior officials fully appreciate the need for and the objectives of the PFM reform program. For this reason it is highly desirable that following acceptance of the final CFAA report by the Minister of Finance, the report be widely disseminated among key players to make sure there is full understanding of the objectives and content of the reforms. It would also be desirable for donors to participate in this dialogue. A widely representative workshop may be the appropriate basis to commence this dialogue.

## ANNEX 1: LIST OF DESIRABLE FURTHER ACTIONS

### LEGAL FRAMEWORK FOR PFM

➢ While changes in the legislative framework are an intermediate rather than an immediate priority, deficiencies in the regulatory framework, particularly in accounting provisions, are reflected in various failings in the operation of the accounting system – as discussed later. However, most of these steps can be taken in advance of any changes in the legal framework.

➢ The development of an accounting manual, to amplify aspects of the Financial Directives and provide guidance to accounting staff is a particular priority.

### BUDGET CONSTRUCTION

➢ Donors should supply full information on their programs to MOP under the new data collection exercise.

➢ Donors should channel their funds through the CTA, unless prevented by their own legal requirements. As part of this issue PECDAR payments should also be made through the CTA, subject to the agreement of the relevant donors.

➢ Future budgets should aim at the full integration of donor funding and should fully factor in recurrent cost implications of capital or investment expenditures.

➢ The budget should develop a greater performance focus, with a gradual move to performance budgeting, beginning with the development of ministry programs and activities and their incorporation into the classification system, and subsequently moves to develop a system of performance indicators to inform budget preparation and implementation.

➢ The use of the large contingency reserve in the 2004 budget should be carefully monitored, and full details of its use reported in budget execution reports and the PA 2004 aggregate financial statements, so that it does not become a source of significant non-transparent expenditure.

➢ The budget should provide a breakdown of operating expenditures of the President's office and the Security Services in the same way as for other spending units.

➢ The amount of budget information provided on the MOF website should be increased.

## CENTRAL TREASURY ACCOUNT

➢ MOF should sweep all bank accounts on a daily basis, with consideration being given in the longer term to consolidating all banking arrangements into one account with sub-accounts as necessary for ministry and agency operations.

➢ MOF should ensure that all ministries (MOF and line ministries) regularly carry out bank reconciliation.

➢ MOF should also ensure that line ministries do not issue payment orders until funds are available.

➢ A system of cash forecasting (involving a Cash Management Committee comprising different parts of MOF) should be developed, in order to alleviate the current short-term (day by day) approach to funds release and to provide a basis for monitoring the extent to which the budget (both revenues and expenditures) is on track.

➢ Provisions governing limits on borrowing from commercial banks should be incorporated into the Organic Budget Law. These provisions should include appropriate reporting on actual levels of borrowing to PLC.

## GOVERNMENT ACCOUNTING SYSTEM

➢ Assess ministry and agency information requirements and determine the extent to which they can be met from the central MOF system. If necessary, provide guidance for development of ministry accounting systems harmonized with the central system.

➢ In due course, review the existing classification system so that it is able to provide information on departmental activities and programs.

➢ Develop an accounting manual, to provide financial staff with more guidance on accounting procedures, including procedures for consolidation and reporting, so as to reduce the current delays in reporting final figures in monthly budget execution reports and in preparing the aggregate financial statements.

## PUBLIC SECTOR PAYROLL

The following actions should be taken:

➢ Undertake a comprehensive audit (by the new Internal Audit Department of MOF) of the payroll system, with the full cooperation of GPC, both to ensure that the system provides adequate controls to ensure payment only to appropriate persons and that the existing payroll data base is correct.

---

WEST BANK AND GAZA – COUNTRY FINANCIAL ACCOUNTABILITY ASSESSMENT

---

➢ Develop a comprehensive employee data base which includes security personnel as well as civil servants

➢ Apply the same MOF controls over recruitment of security personnel as apply to civil servants

## PA COMMERCIAL INVESTMENT

➢ The PIF Board should review the adequacy of PIF professional staffing to assist it in its management of PIF.

## STATE OWNED ENTERPRISES

➢ Ensure that all SOEs are appropriately monitored under PIF and that they prepare the annual financial statements, audited by professional firms, as required under the Companies law.

## OTHER COMMERCIAL ACTIVITIES

➢ Given the inherently commercial nature of their operations, consideration should be given in due course to having these organizations operate on a commercial basis subject to a performance accountability regime – with boards of directors, financial targets, and annual reports, including audited financial statements prepared on a commercial basis.

## PUBLIC INSTITUTIONS

➢ Public institutions should prepare and publish annual reports to the PLC, including audited annual financial statements.

## EXTERNAL AUDIT

➢ The PLC Budget and Financial Affairs Committee to revise the draft new audit law as suggested in paragraph 128 above, as it moves through subsequent legislative changes.

➢ Urgently institute a program of capacity building, with assistance from the national audit institution of one or two donor countries. This could first take the form of a "peer review" of the quality of GCI's work

➢ Resolve the conflicts of interest of the current chairman of GCI.

## FINANCIAL CONTROL AND INTERNAL AUDIT

➢ Strong support should be given to the policy of putting financial controllers in place in each ministry, ensuring they have adequate authority and independence and that they report on their work to MOF

➢ MOF should ensure that the structures, objectives, responsibilities, reporting standards and operational procedures of the financial control function are properly defined and documented, and do not overlap with the responsibilities of internal audit

➢ MOF should provide strong support to the development of the internal audit function, to ensure that there are appropriate staffing and training arrangements put in place as soon as possible, so that the envisaged internal audit program can begin.

➢ MOF should give a comprehensive audit of the payroll, both civil service and security services priority in the internal audit program.

## THE ROLE OF PLC IN PFM

➢ The PLC should receive copies of the annual PA financial statements and annual reports including audited financial statements of the PIF, individual state-owned enterprises and public institutions.

➢ GCI should also formally submit its reports to the PLC, and be responsive to requests and other information needs identified by the PLC.

➢ The PLC and its committees should be adequately staffed to enable it to analyze and pursue budgetary issues with the executive.

## FISCAL REPORTING

The following steps should be taken:

➢ The form and content of the PA annual financial statements for the preparation of the 2003 aggregate financial statements should be reviewed.

➢ The 2003 PA financial statements should be finalized by 30 June 2004 and audited by an international auditing firm.

➢ The audited financial statements required from SOEs should be prepared in all cases.

➢ An annual reporting regime including financial statements for autonomous public institutions (and in due course for ministries and agencies) should be developed.

## ANNEX 2: LIST OF KEY OFFICIALS AND OTHERS MET

| Name | Title | Department | Ministry |
|---|---|---|---|
| Mr. Farid Ghannam | Director | Budget | Finance |
| Mr. Saed Al-Kidra | Director | Treasury | Finance |
| Mr. Mazen Jadallah | Director | Development Projects | Finance |
| Ms. Muna Al-Masri | Acting Director | Financial Controller | Finance |
| Dr. Hussein Abu-Al Nada | Director | Information Systems | Finance |
| Dr. Naser Tahboub | Director | Tax | Finance |
| Mr. Tayseer Barzakh | Manager | Treasury | Finance |
| Mr. Nafez Abu-Samra | Manager | Banks Accounting | Finance |
| Mr. Jamal Al-Uztaz | Manager | General Accounting | Finance |
| Mr. Jawad Al-Baz | Manager | Revenues | Finance |
| Mr. Ghanem Al-Astal | Director | Finance | Health |
| Mr. Bassam Abu-Gharbieh | Director | Finance | Public Works |
| Mr. Mohammed Jubran | Director | Finance | Education |
| Mr. Basri Saleh | Director | International Relations | Education |
| Dr. Jihad Al-Wazir | Director General | | Planning |
| Dr. Raisa Al-Tibi | Director | Finance | Social Affairs |
| Dr. Jawad Al-Tibi | Chairman | Budget and Finance Committee | Legislative Council |
| Mr. Jarrar Al-Kodwa | Chairman | | General Control Institute |
| Mr. Mohamed Abu-Hafseh | Director | Banking Supervision | Palestine Monetary Authority |

Other Key Stakeholders:

| | | |
|---|---|---|
| Dr. Karim Nashashibi | Resident Representative | IMF |
| Mr. Hilal Salah | Internal Audit Consultant | MOF |
| Ernest & Young | | |
| Deloitte Touche Tohmatsu (Audit Capacity Building Project) | | |

## UNITED STATES DISTRICT COURT
### DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

         Plaintiffs – Judgment Creditors

   v.                            C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

         Defendants – Judgment Debtors

## PLAINTIFFS' MOTION TO FILE UNDER SEAL EXHIBIT F TO PLAINTIFFS' CREDITOR'S BILL PURSUANT TO R.I.G.L. §9-28-1

Plaintiffs move pursuant to LR Gen 102 to file under seal Exhibit F to Plaintiffs' Creditors' bill. Plaintiffs' motion is supported by the attached memorandum. A proposed order is also attached.

Plaintiffs, by their Attorneys,

_____
David J. Strachman  #4404
McIntyre, Tate & Lynch
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

## CERTIFICATION

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                   :

THE ESTATE OF YARON UNGAR et al.    :        C.A. No. 00 - 105L

v.                                 :

THE PALESTINIAN AUTHORITY et al.   :    **DECLARATION OF**
                                     :    **AVRAHAM COLTHOF**
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

AVRAHAM COLTHOF, of the City of Jerusalem, Israel, DECLARES PURSUANT TO 28 U.S.C. §1746, AS FOLLOWS:

1.    I am a graduate of the Law Faculty of Bar Ilan University in Israel, a member of the Israeli Bar and a practicing attorney. I am employed as an associate at the firm of S.L. Becker & Co. Law Offices, in Jerusalem, Israel.

2.    I am fluent in Hebrew, English and Dutch, and I am capable of translating accurately between these languages.

3.    I was retained by the family of Yaron Ungar, deceased, to locate records and documents, including court records, relating to assets of the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO"). I have discovered, *inter alia*, the following:

4.    Over the past few years several dozen civil suits have been filed against the PA and PLO in the Israeli courts by Israeli citizens harmed by terrorist attacks. In many of these cases, the plaintiffs sought and were granted a prejudgment attachment on the assets of the PA.

5.    One such suit is <u>Alex Weintraub et al. v. The Palestinian Authority et al.</u>, which was brought in the Tel Aviv District Court in 2004 by the family of a woman killed in a terrorist attack on June 28, 2001.

6.    On July 13, 2004, the Tel Aviv court granted the <u>Weintraub</u> plaintiffs' *ex parte*
motion for an attachment on the assets of the PA.

7.    On July 25, 2004, the PA filed a "Motion to Vacate Temporary Attachment
(Granted Ex Parte)" in <u>Weintraub</u> (hereinafter: "PA Motion to Vacate"), a copy of which is in my
possession.

8.    The PA Motion to Vacate (which is ten pages in length and of course in Hebrew)
sought to vacate the *ex parte* attachment on the assets of the PA entered on July 13, 2004, or in
the alternative to reduce the amount of the attachment to 3 million New Israeli Shekels (NIS).

9.    Under Israeli law, a plaintiff seeking a prejudgment attachment must show both a
strong chance of success on the merits and that absent a prejudgment attachment enforcement of
any eventual judgment will be difficult. This latter requirement is generally referred to in Israeli
jurisprudence as the "element of difficulty".

10.   The PA Motion to Vacate asserted that the "element of difficulty" was not
present, and that there was no *"fear of the existence of a difficulty in satisfying the judgment if
and when received by the respondents,"* because:

> [T]he Palestinian Authority has investments worth at least 600 million dollars
> in various companies, including the Algerian, Jordanian and Tunisian
> communication companies, the Palestinian cement company, as well as hotels,
> banks, airlines, real estate ventures and the like.

PA Motion to Vacate, Section E, §§ 33, 36.

11.   The PA Motion to Vacate further argued in this vein that, *"it has not been
claimed at all that the movants have failed to honor judgments against them and that it will
not be possible to satisfy the judgment in this way ... the respondents . . . fail to note the simple
possibility – [that] the movants will pay the judgment!"* <u>Id</u>. at §§45-46.

2

12.    In support of the PA's claim that the "element of difficulty" was not present because the PA would honor any judgment rendered in favor of the Weintraubs and has more than adequate assets to pay such a judgment, the PA submitted along with its Motion to Vacate a sworn Affidavit from Nadim Al-Barahama, the legal advisor for the PA's "Office of Finance" (hereinafter: "Al-Barahama Affidavit").

13.    Attached to the Al-Barahama Affidavit submitted by the PA was a three-page English-language document captioned "**FULL LISTING OF ASSETS**", which is referred to in Section 5 of the Al-Barahama Affidavit as "*the appendix to the report by the Standard and Poors company regarding assets of the Authority…*" and designated therein as "Appendix A" to the Al-Barahama Affidavit.

14.    A true photocopy of the original Al-Barahama Affidavit (including "Appendix A" thereto) along with a true and accurate English translation thereof, are attached to the instant Declaration and marked as Exhibit 1.

15.    To date I have identified four other civil suits in the Israeli courts in which the PA has moved to contest prejudgment attachments on its assets, in each of which the PA submitted affidavits virtually identical to the Al-Barahama Affidavit (along with the Standard and Poors appendix) and asserted that no prejudgment attachment was necessary because the PA assets listed in the Standard and Poors appendix are sufficient to pay any future judgments.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

May 5, 2005

_____
AVRAHAM COLTHOF

3

# AFFIDAVIT

I the undersigned <u>Nadim Al-Barahama</u> I.D. No. <u>410021869</u> after having been warned to declare the truth, and that if I do not do so I will be liable for the penalties provided by law, hereby declare as follows:

1.     I serve as legal counsel for the Palestinian Office of Finance, and make this affidavit in support of the motion of the Palestinian Authority to vacate the order of attachment that was entered against its property.

2.     According to legal advice that I have received, the motion[1] is not supported by an affidavit and should be denied.

3.     Pursuant to the agreements between the Authority and the State of Israel, there is a current cash flow between the State of Israel and the Palestinian Authority, such that the State of Israel receives on a regular basis, each month, significant sums of money, which it is supposed to transfer each month to the Palestinian Authority.

4.     Each month the State of Israel receives sums ranging from approximately 140 million NIS to approximately 200 million NIS per month or more. These are tax funds that it collects for the Palestinians.

5.     Likewise, the Palestinian Authority has investments worth at least 600 million dollars in various companies, including the Algerian, Jordanian and Tunisian communication companies, the Palestinian cement company, as well as hotels, banks, airlines, real estate ventures and the like.

      A copy of the appendix to the report by the Standard and Poors company regarding assets of the Authority is attached hereto as **Appendix A** as an inseparable part of my affidavit.

6.     As indicated by the appendix to the report, the Palestinian Authority owns many assets, the value of which is many times greater than the amount of the suit and of other suits filed against the Authority. There is no fear that the Authority will act to "illegitimately transfer" these funds merely in order to avoid paying a debt – if one is entered against it.

7.     Entering the attachment will cause harm to the Authority since these attachments prevent the transfer of funds, both for salaries and to other entities with which the Authority transacts. This is in addition to the injury to the honor and image of the Palestinian Authority both vis-à-vis the Palestinian people and vis-à-vis foreign nations and institutions.

---

[1] Apparently referring to the motion for the attachment – *translator*.

8.    Entry of attachments in significant amounts completely disrupts the Palestinian economy, severely harms the Authority's budget, delays timely payment of salaries and causes a breach of the Authority's obligations toward third parties.

9.    According to legal advice that I have received, even if the Authority's preliminary arguments are rejected and its liability – which is disputed -- is established, there is no justification at all for entering an attachment in amounts which lack any foundation from a legal perspective. There has never been a judgment given in the Israeli courts that required payment of compensation in these exaggerated amounts and this matter cries out to the heavens and constitutes an abuse of the judicial system.

10.   This is my name and that is my signature and the content of my affidavit above is true, after it was read to me and translated into Arabic.


_____/S/_____
The affiant


Before me, attorney O. Saadi, appeared on the date 7.20.04 Mr. Nadim Al-Barahama whom I identified by I.D. No. 410021869, and after I warned him that he is required to state the truth, and that if he does not do so he will be liable for the penalties provided by law, affirmed the accuracy of his affidavit and signed it before me.

I declare that I am fluent in the Arabic language, the language of the affiant, and in Hebrew, and I translated the affidavit for the affiant, and after the affiant understood what is stated in the affidavit, he signed it before me.


Osama Saadi, Esq.
Lic. No. 13423

_____/S/_____
O. Saadi, Esq.

## APPENDIX C



*Palestine Investment Fund*
صندوق الإستثمار الفلسطيني

## FULL LISTING OF ASSETS

| Entity | Value | Ownership Interest |
|---|---|---|
| **Cash** [1] | $ 73,982,370 | |
| **Companies Evaluated by Standard & Poor's** [2] | | 23.63% |
| Orascom Telecom Algeria (via its 54.711% interest in Oratel) | 90,000,000 | |
| Jordan Mobile Telecommunications Company, Ltd. ("JMTS" or "Fastlink") | 66,110,000 | 14.29% |
| Cement Company | 54,000,000 | 100.00% |
| Orascom Telecom Tunisia (via its 44.05% interest in Orascom Tunisia Holding and Carthage Consortium) | 50,000,000 | 20.00% |
| Palestine Cellular Communications Company, Ltd. ("PALCEL") | 36,920,000 | 35.00% |
| Cap Holdings Oasis Hotel Casino Resort ("Oasis") | 28,510,000 | 23.08% |
| Orascom Telecom ("OT") | 25,240,000 | 11 million shares |
| Palestine Telecommunications Company, PLC ("PALTEL") | 13,600,000 | 6.75% |
| Bioniche Life Sciences Inc. ("Bioniche") | 7,100,000 | 14.29% |
| Gaza Ahlia Insurance Company ("GAIC") | 1,570,000 | 23.63% |
| **Companies Under Evaluation Process by Standard & Poor's** [2] | | |
| Gas Project (BG) | 57,000,000 | 22.50% |
| Aviation Project | 19,000,000 | 80% |
| Various Real Estate | 15,000,000 | 100% |
| APIC | 9,000,000 | 20% |
| PADICO | 8,500,000 | 7% |
| Delma | 8,300,000 | NA |
| Internet Egypt | 7,500,000 | 15% |
| Venture Capital Investments | 7,000,000 | NA |
| Chalcedony LLC | 5,300,000 | NA |
| Peace Technology Fund | 4,000,000 | 34% |
| Palestinian Electricity Co. | 3,200,000 | 6% |
| Qaser Jaser Hotel | 3,300,000 | 21% |
| United for Storage & Refrigeration | 3,000,000 | 80% |
| Hanadi Tower Project | 3,800,000 | 100% |
| Tri Fitness | 3,000,000 | NA |
| Palestinian Flour Mills Company | 2,800,000 | 47% |
| Canaan Equity III | 2,800,000 | NA |
| Al-Yazgi Group for Soft Drinks (Pepsi) | 2,700,000 | 49% |
| Palestinian Investment Bank | 2,600,000 | 8% |
| Evergreen III L.P. | 2,200,000 | 5.5% |
| Coca Cola | 1,500,000 | 15% |
| Bethlehem Convention Center | 1,900,000 | 45% |
| Korea Fund | 1,900,000 | NA |
| Canaan Equity II | 1,800,000 | NA |
| Jerusalem Housing Project | 1,700,000 | 50% |
| Al-Ahlia AlAqariah | 1,400,000 | 50% |

# APPENDIX C



| Entity | Value | Ownership Interest |
|---|---|---|
| **Companies under evaluation by Standard & Poor's[3] (Continued)** | | |
| AVMAX Aircraft Management | $ 1,250,000 | 12.50% |
| The Onyx Fund LLC | 1,100,000 | NA |
| National Aluminum & Profile Co. | 900,000 | 20% |
| Steel Company | 900,000 | 15% |
| Grand Park Hotel | 400,000 | 26% |
| Al-Moutakhasesa Investment | 800,000 | 6.67% |
| Vegetable Oil Co. | 900,000 | 7% |
| College & School | 600,000 | 100% |
| Al-Salaam International Co. | 500,000 | 5% |
| Arab Palestinian Marketing Centers | 400,000 | 9% |
| Al-Marie Company | 300,000 | 33% |
| Al-Sharq Company (Al-Waha) | 300,000 | NA |
| Al-Ahlia Industrial Co. | 300,000 | 15% |
| Jordanian Specialized Co. | 200,000 | 3.75% |
| Al-Tekanion Engineering Co. | 200,000 | 30% |
| Silver Haze Partners, LP | 200,000 | NA |
| Palestinian Imports Egyptian Prods. | 100,000 | 65% |
| Belgium Company | 100,000 | 30% |
| 1st Option Management | 10,000 | 30% |
| The Middle East Pipe Factory | 0[6] | 100% |
| Petroleum Authority | 0[6] | 100% |
| Electricity Monitoring Distribution Company | 0[6] | NA |
| Al-Bahar Company | 0[6] | NA |
| Mortgage Company | 0[6] | NA |
| Tobacco Authority | 0[6] | 100% |
| Palestine Development Company (Italy – Palestine) | 0[6] | NA |
| Al-Sakhra Company | 0[6] | NA |
| **Companies that have ceased operation[5]** | | |
| Golden Gate Project (Jerusalem) | 0 | NA |
| Bazar Project (Jerusalem) | 0 | 100% |
| Gaza Juice Factory | 0 | 100% |
| Al-Borhan Company | 0 | 51% |
| Palestinian Cigarettes Co. | 0 | 50% |
| Ampal Company Gaza | 0 | 49% |
| Ethar Print Shop Company | 0 | 66.7% |
| Al-Saker Securities Company | 0 | 60% |
| Palestinian Tunisian Company | 0 | 100% |
| Green Jericho Company | 0 | 40% |
| Glass Company | 0 | 40% |
| Qubaa Al-Watan Company | 0 | 35% |
| National Cement Manufacturing Co. | 0 | 50% |
| West Bank & Gaza Fund | 0 | 3% |
| Logo Company | 0 | 28% |

# APPENDIX C

*Palestine Investment Fund*
صندوق الاستثمار الفلسطيني

## Footnotes to Appendix C:

(1)  See supporting detail of bank statement of accounts on following page.

(2)  Value (in US dollars) based on Standard & Poor's valuation.

(3)  Rough estimate of value (in US dollars) from PIF management for the purpose of this disclosure.

(4)  Companies and Investments for which no current estimate of value is available.

(5)  Companies that have ceased operation as of January 1st, 2003.  PIF expects these companies to have minimal or no positive values.

# תצהיר

אני החי"מ נדים אל - בראהמה, ת.ז. מסי 410021869 לאחר שהוזהרתי כי עלי להצהיר את האמת, וכי אם לא אעשה כן, אהיה צפוי לעונשים הקבועים בחוק, מצהיר בזאת כדלקמן :

1.   אני משמש כיועץ משפטי למשרד האוצר הפלסטיני, ועושה תצהירי זה בתמיכה לבקשת הרשות הפלסטינית לבטל את צו העיקול שהוטל על נכסיה.

2.   על פי עצה משפטית שקיבלתי, הבקשה אינה נתמכת בתצהיר ודינה להדחות.

3.   על פי ההסכמים בין הרשות ומדינת ישראל, קיים תזרים מזומנים שוטף בין מדינת ישראל ובין הרשות הפלסטינית, כשלידי מדינת ישראל מגיעים באופן קבוע, מדי חודש, סכומי כסף ניכרים, אותם היא אמורה להעביר כל חודש לידי הרשות הפלסטינית.

4.   מדי חודש מגיעים לידי מדינת ישראל סכומים שנעים בין כ- 140 מיליון ש"ח ובין כ- 200 מיליון ש"ח בחודש או יותר. מדובר בכספי מסים שהיא גובה עבור הפלסטינים.

5.   כמו כן, לרשות הפלסטינית השקעות בשווי של לפחות 600 מיליון דולר בחברות שונות, ביניהן חברות התקשורת האלג'יראית, חירדנית והתוניסאית, חברת חמלט הפלסטינית ואף בתי מלון, בנקים, חברות תעופה, עסקי נדל"ן וכיו"ב.

     העתק מנספח דו"ח חברת סטנדרט אנד פורס בעניין נכסי הרשות מצ"ב **כנספח א'** כחלק בלתי נפרד מתצהירי.

6.   כפי שעולה מן הנספח לדו"ח, הרשות הפלסטינית היא בעלת נכסים רבים, בשווי העולה עשרות מונים על סכום התביעות ושל תביעות נוספות שהוגשו נגדה כלפי הרשות. לא קיים חשש כי הרשות תפעל ל"הברחת" כספים אלו, רק על מנת להמנע מתשלום חוב - אם ייפסק נגדה.

7.   הטלת העיקול תגרום נזק לרשות שכן עיקולים אלו מונעים העברת כספים, גם למשכורות וגם לגופים אחרים שהרשות מתקשרת איתם. וזאת בנוסף לפגיעה בכבוד ובתדמית של הרשות הפלסטינית הן כלפי העם הפלסטיני והן כלפי מדינות ומוסדות מחוץ לארץ.

8.   הטלת העיקולים בסכומים משמעותיים משבשת לחלוטין את הכלכלה הפלסטינית, פוגעת קשות בתקציב של הרשות, מעכבת תשלומי משכורות במועדן וגורמת להפרת התחייבויות הרשות כלפי צדדים שלישיים.

9. על פי עצה משפטית שקיבלתי, גם אם תדחנה הטענות המקדמיות של חרשות ותקבע אחריותה – דבר המוכחש כשלעצמו – אין כל הצדקה להטלת עיקול בסכומים חסרי כל יסוד מבחינה משפטית. מעולם לא ניתן פסק דין בבתי משפט בישראל שמחייב תשלום פיצוי בסכומים מוגזמים כאלה והדבר זועק לשמים ומהווה שימוש לרעה במערכת השיפוטית.

10. זה שמי זו חתימתי ותוכן תצהירי לעיל אמת, לאחר שהוקרא בפני ותורגם לערבית.



_____
המצהיר

בפני עו"ד _____ *ק.מ.ל* הופיע ביום *25.7.04* מר נדים אל - בראחמה ,אשר זיהיתיו לפי ת.ז. מס' 410021869 ולאחר שהזהרתיו כי עליו לומר את האמת, וכי אם לא יעשה כן, יהיה צפוי לעונשים הקבועים בחוק, אישר את נכונות הצהרתו וחתם עליה בפני.
אני מצהיר כי אני שולט בשפה הערבית, שפתו של המצהיר, ובעברית, ואני תרגמתי למצהיר את התצהיר, ולאחר שהמצהיר הבין את האמור בתצהיר, חתם בפני.

עו"ד אוסאמה סעדי
מ.ר. 15423
_____
*ק.מ.ל* , עו"ד

## APPENDIX C



*Palestine Investment Fund*
صندوق الإستثمار الفلسطيني

## FULL LISTING OF ASSETS

| Entity | Value | Ownership Interest |
|---|---|---|
| Cash [1] | $ 73,982,370 | |
| | | |
| **Companies Evaluated by Standard & Poor's** [2] | | 23.63% |
| Orascom Telecom Algeria (via its 54.711% interest in Oratel) | 90,000,000 | |
| Jordan Mobile Telecommunications Company, Ltd. ("JMTS" or "Fastlink") | 66,110,000 | 14.29% |
| Cement Company | 54,000,000 | 100.00% |
| Orascom Telecom Tunisia (via its 44.05% interest in Orascom Tunisia Holding and Carthage Consortium) | 50,000,000 | 20.00% |
| Palestine Cellular Communications Company, Ltd. ("PALCEL") | 36,920,000 | 35.00% |
| Cap Holdings Oasis Hotel Casino Resort ("Oasis") | 28,510,000 | 23.08% |
| Orascom Telecom ("OT") | 25,240,000 | 11 million shares |
| Palestine Telecommunications Company, PLC ("PALTEL") | 13,600,000 | 6.75% |
| Bioniche Life Sciences Inc. ("Bioniche") | 7,100,000 | 14.29% |
| Gaza Ahlies Insurance Company ("GAIC") | 1,570,000 | 23.63% |
| | | |
| **Companies Under Evaluation Process by Standard & Poor's** [3] | | |
| Gas Project (BG) | 57,000,000 | 22.50% |
| Aviation Project | 19,000,000 | 80% |
| Various Real Estate | 15,000,000 | 100% |
| APIC | 9,000,000 | 20% |
| PADICO | 8,500,000 | 7% |
| Delma | 8,300,000 | NA |
| Internet Egypt | 7,500,000 | 15% |
| Venture Capital Investments | 7,000,000 | NA |
| Chalcedony LLC | 5,300,000 | NA |
| Peace Technology Fund | 4,000,000 | 34% |
| Palestinian Electricity Co. | 3,200,000 | 6% |
| Qaser Jaser Hotel | 3,300,000 | 21% |
| United for Storage & Refrigeration | 3,000,000 | 80% |
| Hanadi Tower Project | 3,800,000 | 100% |
| Tri Fitness | 3,000,000 | NA |
| Palestinian Flour Mills Company | 2,800,000 | 47% |
| Canaan Equity III | 2,800,000 | NA |
| Al-Yazgi Group for Soft Drinks (Pepsi) | 2,700,000 | 49% |
| Palestinian Investment Bank | 2,600,000 | 8% |
| Evergreen III L.P. | 2,200,000 | 5.5% |
| Coca Cola | 1,500,000 | 15% |
| Bethlehem Convention Center | 1,900,000 | 45% |
| Korea Fund | 1,900,000 | NA |
| Canaan Equity II | 1,800,000 | NA |
| Jerusalem Housing Project | 1,700,000 | 50% |
| Al-Ahlia AlAqariah | 1,400,000 | 50% |

342

## APPENDIX C



| Entity | Value | Ownership Interest |
|---|---|---|
| **Companies under evaluation by Standard & Poor's[cb]** (Continued) | | |
| | | |
| AVMAX Aircraft Management | $ 1,250,000 | 12.50% |
| The Onyx Fund LLC | 1,100,000 | NA |
| National Aluminum & Profile Co. | 900,000 | 20% |
| Steel Company | 900,000 | 15% |
| Grand Park Hotel | 400,000 | 26% |
| Al-Montakhasea Investment | 800,000 | 6.67% |
| Vegetable Oil Co. | 900,000 | 7% |
| College & School | 600,000 | 100% |
| Al-Salaam International Co. | 500,000 | 5% |
| Arab Palestinian Marketing Centers | 400,000 | 9% |
| Al-Marie Company | 300,000 | 33% |
| Al-Sharq Company (Al-Waha) | 300,000 | NA |
| Al-Ahlia Industrial Co. | 300,000 | 15% |
| Jordanian Specialized Co. | 200,000 | 3.75% |
| Al-Tekanion Engineering Co. | 200,000 | 30% |
| Silver Haze Partners, LP | 200,000 | NA |
| Palestinian Imports Egyptian Prods. | 100,000 | 65% |
| Belgium Company | 100,000 | 30% |
| 1st Option Management | 10,000 | 30% |
| The Middle East Pipe Factory | 0[e] | 100% |
| Petroleum Authority | 0[e] | 100% |
| Electricity Monitoring Distribution Company | 0[e] | NA |
| Al-Bahar Company | 0[e] | NA |
| Mortgage Company | 0[e] | NA |
| Tobacco Authority | 0[e] | 100% |
| Palestine Development Company (Italy – Palestine) | 0[e] | NA |
| Al-Sakhra Company | 0[e] | NA |
| | | |
| **Companies that have ceased operation[2]** | | |
| | | |
| Golden Gate Project (Jerusalem) | 0 | NA |
| Bazar Project (Jerusalem) | 0 | 100% |
| Gaza Juice Factory | 0 | 100% |
| Al-Borhan Company | 0 | 51% |
| Palestinian Cigarettes Co. | 0 | 50% |
| Ampal Company Gaza | 0 | 49% |
| Ethar Print Shop Company | 0 | 66.7% |
| Al-Saker Securities Company | 0 | 60% |
| Palestinian Tunisian Company | 0 | 100% |
| Green Jericho Company | 0 | 40% |
| Glass Company | 0 | 40% |
| Qubaa Al-Watan Company | 0 | .35% |
| National Cement Manufacturing Co. | 0 | 50% |
| West Bank & Gaza Fund. | 0 | 3% |
| Logo Company | 0 | 28% |

343

## APPENDIX C

*Palestine Investment Fund*
(صندوق الاستثمار الفلسطيني)

### Footnotes to Appendix C:

(1) See supporting detail of bank statement of accounts on following page.

(2) Value (in US dollars) based on Standard & Poor's valuation.

(3) Rough estimate of value (in US dollars) from PIF management for the purpose of this disclosure.

(4) Companies and Investments for which no current estimate of value is available.

(5) Companies that have ceased operation as of January 1st, 2003. PIF expects these companies to have minimal or no positive values.

344

**David J. Strachman**

| | |
|---|---|
| **From:** | Saved by Microsoft Internet Explorer 5 |
| **Sent:** | Friday, June 30, 2006 8:47 AM |
| **Subject:** | Forbes.com - Magazine Article |



International
## Hamas Goes For The Gold
Nathan Vardi, 03.09.06, 6:00 AM ET

NEW YORK - Hamas might not be looking very far to find a pitch for its money troubles. The radical Islamic group is believed to be eyeing the old assets of one-time rival Yasir Arafat, the late Palestinian Authority president.

Arafat set up a slew of off-balance-sheet investments during his rule. But before Arafat died in 2004, a reform-minded finance minister, Salam Fayyad, managed to grab some of those holdings and consolidate them into the Palestine Investment Fund. The fund even published Ernst & Young-audited financials, which showed it held $1 billion of assets at the end of 2004, including big stakes in the Cairo-based cell phone high-flier **Orascom Telecom** and **PALTEL**, a Palestinian telecommunications company. Arafat made the investments by diverting $900 million from Authority bank accounts, according to a 2003 International Monetary Fund report.

The investment fund is now believed to hold $1.4 billion in assets, which would be very helpful to a new Hamas government. Designated a terrorist group by the U.S., Hamas stunningly won the Palestinian legislative elections in January and is now getting ready to form a new government. But Hamas is already struggling to find a way to finance the Palestinian budget now that the U.S., Israel and other foreign donors are threatening to stop providing funds to a Hamas-run Palestinian Authority.

At the same time, Hamas is refusing to make political concessions, such as formally recognizing Israel, and won't quell fears that transferred funds will be used to bankroll terrorism. This means there is little chance Israel will continue to transfer the vital $60 million per month that it collects on behalf of the Palestinian Authority, like the value-added taxes paid by Palestinians on purchases made in Israel.

The Palestinian Authority is already in a money crunch; it ran a budget deficit of at least $500 million last year, largely due to President Mahmoud Abbas' decision to raise public-sector salaries before the country's elections. That move broke agreements the Palestinian Authority had with donors, particularly the European Union, which then froze its supplementary commitments. Abbas, a political rival to Hamas known as Abu Mazen, made up for the Palestinian part of the shortfall by taking out about $500 million in bank loans secured by investment-fund assets. Negotiations are going on for the current government to take out more loans to fund the authority until Hamas takes over. Before the World Bank released $42 million on Tuesday to help pay public-sector salaries, James Wolfensohn, an international envoy to the Middle East, had stated that the Palestinian Authority could go bankrupt within weeks.

These financial difficulties make it more likely that the PIF will eventually finance Hamas. U.S. State Department officials and other diplomats are scrambling to figure out what will happen to the fund.

7/3/2006

"There will definitely be a fight over the fund," says James Prince, president of the Los Angeles-based Democracy Council, a nonprofit that helped set up and audit the fund. "Abu Mazen is trying to take control of it--the fund's existence and what legally can be done is a question people are grappling with right now."

The PIF was set up by Fayyad to fund long-term economic development projects and provide economic stimulus to the West Bank and to poverty-stricken Gaza. It primary purpose is not to fund government budgets; the fund was originally designed to be out of the reach of the Palestinian Authority president so that Arafat could not tap into it. The PIF is run by a board of directors chaired by the finance minister and made up of independent Palestinians from the private sector. For a while, its managing director was Arafat's money man, Mohammed Rashid, but he has been replaced by Mohammed Mustafa, a former World Bank official.

Through intense pressure, Abbas did manage to get the fund to take out the loans that helped pay for the recent Palestinian Authority budget shortfalls. Fayyad resigned his positions at the finance ministry and investment fund in order to run in the Palestinian parliamentary elections, in which he won a seat. Hamas could draft new legislation to give its government control of the fund, or it could swipe it outright.

Such a move would strengthen Hamas' hand in the short term, but on balance, it would leave the Palestinian people poorer.