IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LEBOEUF, LAMB, GREENE & MACRAE LLP,

        Plaintiff,

v.

DAVID STRACHMAN, as the Administrator of
The Estate of Yaron Ungar; DVIR UNGAR,
Minor, By his Guardians and Next Friend;
YISHAI UNGAR, By His Guardians and
Next Friend; JUDITH UNGAR; MEIR UNGAR;
URI DASBERG and JUDITH DASBERG, in their
Capacity as Legal Guardians of Dvir Ungar and
Yishai Ungar; MICHAL COHEN; AMICHAI
UNGAR, and DAFNA UNGAR,

        Defendants.

Civil Action No.:

## COMPLAINT FOR DECLARATORY JUDGMENT

PLAINTIFF, LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"), by its undersigned counsel, for its claims against the DEFENDANTS, David Strachman as the Administrator of The Estate of Yaron Ungar, Dvir Ungar (Minor, By His Guardians and Next Friend), Yishai Ungar (Minor, By His Guardians and Next Friend), Judith Ungar, Meir Ungar, Uri Dasberg and Judith Dasberg (in their Capacity as Legal Guardians of Dvir Ungar and Yishai Ungar), Michal Cohen, Amichai Ungar, and Dafna Ungar (collectively, the "Administrator" or "Defendants" or "Strachman") states as follows:

### PARTIES

1.    Plaintiff LeBoeuf is a limited liability partnership organized under the laws of New York with its principal office located in New York. None of its partners is resident in Rhode Island.

2. The Estate of Yaron Ungar is represented by a court-appointed administrator, Defendant David Strachman, a resident and domiciliary of the State of Rhode Island. Strachman is an attorney with the law firm of McIntyre, Tate, Lynch LLP, 321 South Main Street, Providence, R.I. 02903.

3. Upon information and belief, Defendants Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Uri Dasberg and Judith Dasberg who are the Legal Guardians of Dvir Ungar and Yishai Ungar, Michal Cohen, Amichai Ungar, and Dafna Ungar are residents of the State of Israel. These Defendants are represented by David Strachman and through Strachman, filed suit in this Court in the action captioned The Estate of Yaron Ungar v. The Palestinian Authority, No. 00-105L (D.R.I.), thereby subjecting themselves to the jurisdiction of this Court.

## JURISDICTION AND VENUE

4. Jurisdiction arises under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. §§ 1331 and 1332.

5. In addition to the diversity of the parties, this case involves a federal question and federal court jurisdiction since it concerns an order entered by a federal district court pursuant to 18 U.S.C. §§ 2333 and 2334 and the Rules of Supplemental Jurisdiction and involves the scope and authority of a federal court to issue orders under Article III of the Constitution.

6. Venue is proper in this district under 28 U.S.C. § 1391.

7. The amount in controversy exceeds $75,000, exclusive of interest and costs.

## FACTS

### The Default Judgment Against the Palestinian Authority

8. In a prior, recent action before this Court, The Estate of Yaron Ungar v. The Palestinian Authority, No. 00-105L (D.R.I.), the Court entered a default judgment against defendant Palestinian Authority ("PA") in the approximate amount of $116,000,000.

9. Since then, the Administrator collected millions of dollars against this $116,000,000 default judgment.

10. The Administrator thereafter sought to attach more of the assets of the defaulting PA.

### The Court's Order Regarding the PIF

11. On or about September 13, 2006, the Administrator appeared before this Court on a Creditors' Bill and asked for the award of ownership of two separate legal entities which the Administrator represented to be assets of the PA; namely, the Palestine Commercial Services Company and the Palestine Investment Fund Company (the "PIF").

12. The PIF was not a party to that proceeding.

13. During oral argument, the Court noted that these entities were not present in Rhode Island:

> If I enter a judgment assigning to the plaintiffs all the rights that the PA has in these two entities, that's the limit of the order of the Court, the judgment of the Court, then that has to be executed somewhere where these two entities are doing business. They're not doing business in Rhode Island. As I said from the very beginning, there's no way I'm going to supervise the collection of this judgment because there are no assets in this jurisdiction of the PA and the PLO.

Transcript ("Tr.") at 10-11.

14. At another point during argument, the Court stated "And the Connecticut court will decide who owns these assets." Tr. at 14.

15. During the course of argument, however, the Administrator declared "We are the PIF now." Tr. at 16.

16. On September 19, 2006, the Court entered Final Judgment for The Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Michal Cohen, Amichai Ungar, and Dafna Ungar. The Final Judgment, prepared by the Administrator, stated that:

> all of the Palestinian Authority's ownership rights in the Palestine Investment Fund Company . . . that are evidenced by the certificate attached hereto as Appendix 3, and
>
> all rights, benefits and interests of the Palestinian Authority in all property, assets and credits, of any type, that are titled and/or owed to . . . the Palestine Investment Fund Company . . . ,
>
> are hereby assigned, transferred and conveyed to The Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Michal Cohen, Amichai Ungar and Dafna Ungar.

Final Judgment, p. 2.

17. The certificate attached to the Final Judgment as Appendix 3 was not a stock certificate. Rather, it was a photocopy of a Certificate of a Public Shareholding Company Issued by the Palestinian National Authority, which would be the rough equivalent of a certificate of incorporation.

18. The PIF is a separate legal entity from the PA.

19. The PIF was not a party to the action, was not present in Rhode Island and was not served with the Creditors' Bill or the Final Judgment.

20. The PIF's Articles of Association expressly prohibit any transfer of the PA's ownership of the PIF.

21. The Articles of Association state that the PA's shares in the PIF "may not be sold, assigned, transferred or pledged." Articles, 4.2.

22. While the Administrator may seek to enforce a default judgment against the PA for up to $116,000,000 (less amounts already collected), the PIF has total assets far in excess of $116,000,000.

23. While this Court could have entered a default judgment against the PA which would allow the judgment creditors to satisfy their judgment by attaching assets up to the amount of the judgment to the extent those assets were within the jurisdiction of some court, this Court could not properly convey interests that are not transferable, in assets that are outside its jurisdiction and which are valued in excess of the value of the judgment.

24. Nevertheless, the Administrator has taken the position that the Ungars now own the PIF.

### LeBoeuf Is Retained by the PIF and "Fired" by the Administrator

25. On or about October 9, 2006, LeBoeuf was asked to represent the PIF in connection with the Connecticut action and another action in New York, where the Administrator was attempting to seize PIF assets in satisfaction of the default judgment against the PA.

26. On October 16, 2006, Thomas G. Rohback ("Rohback") from LeBoeuf submitted a letter to the Court in the Connecticut action informing the Court that the firm had been asked to represent the PIF and wished to be heard on its behalf. Rohback requested permission to file papers on behalf of the PIF relating to Canaan Partners' pending motion in that action, reserving all rights, including the right to contest jurisdiction.

27. On October 20, 2006, LeBoeuf received a letter from Counsel to the Administrator, Robert Tolchin ("Tolchin"), stating that the Ungars now owned the PIF, that he now represented the PIF, and that LeBoeuf had been discharged.

28. According to Tolchin, after seeing the Rohback letter of October 16, 2006, the Ungars claim to have held a meeting without notice at an undisclosed location in "Khabla" on October 19, 2006.

29. According to Tolchin, the Ungars elected themselves to be the new directors of the PIF, discharged the existing directors for cause, hired Tolchin as counsel, and discharged LeBoeuf.

30. Attached to the letter of October 20, 2006, Tolchin included what purported to be minutes of the new board of directors meeting.

31. In those minutes, the Ungars purported to waive advance notice of their October 19, 2006 board of directors meeting.

32. While the PIF's Articles of Association permit the existing directors of the PIF to waive advance notice of a Board of Directors meeting, the Ungars purported to waive advance notice of the meeting at which they appointed themselves to become the "new directors."

33. On October 24, 2006, Rohback wrote back to Tolchin explaining that LeBoeuf could not simply abandon a legal representation that it had been asked to undertake and that LeBoeuf's intention was to obtain guidance from the Court.

34. In response to that letter, Tolchin sent a letter to Rohback dated October 24, 2006 in which Tolchin threatened $350,000,000 in trebled RICO damages against LeBoeuf if it filed any papers with any Court on behalf of the PIF.

35. In his letter, Tolchin stated that LeBoeuf's "claim to continue to represent the PIF is absolutely fraudulent." Tolchin then threatened "if you or LeBoeuf Lamb takes any further action purporting to act on behalf of the PIF (including without limitation filing any court papers purporting to be from the PIF), the Ungars and the PIF will take all measures the law permits against you and your firm" including seeking $350,000,000 in RICO damages.

### Counsel to the Administrator Appears as Counsel to Both Plaintiff and Defendant in the New York Action

36. On October 24, 2006, Tolchin filed a Notice of Appearance on behalf of the PIF in an action he had previously filed on behalf of the Ungars, captioned The Estate of Yaron Ungar v. Orascom Telecom Holding S.A.E., No. 05-CV-7765 (CM) (S.D.N.Y. filed Sept. 2, 2005) ("Ungar v. Orascom action").

37. In that case, Tolchin filed an Answer on behalf of the PIF to the Complaint he had filed on behalf of the Ungars.

38. In that Answer, the PIF, through Tolchin, purported to admit all the allegations that required an answer by the PIF and consented "to all the relief sought by the Plaintiffs in the First Amended Complaint" -- the very pleading that Tolchin had filed on behalf of the Plaintiffs in this action in January 2006.

### In the New York Action, the Ungars File an Answer on Behalf of an Entity They Deny Exists

39. In the First Amended Complaint dated January 19, 2006, signed by Tolchin, the Ungars alleged that "THE PALESTINE INVESTMENT FUND has no legal existence separate from judgment-debtor PA." First Amended Complaint, ¶4.

40. Further, the Ungars alleged that "any separate legal personality and/or corporate identity formally or nominally enjoyed and/or claimed by any of the Aliases and Shell Funds is artificial and/or fraudulent and so not legally cognizable." Id., ¶52.

41. In addition, the Ungars alleged that "none of the Aliases and Shell Funds, whether or not they have cognizable legal personality or corporate identity separate from the PA, own any property or assets of their own." Id., ¶59.

42. In the Answer he filed on behalf of the PIF, however, Tolchin -- who signed the First Amended Complaint pursuant to Rule 11 alleging that the PIF had no legal existence and owned no assets -- admitted that the entity he now purported to represent had no legal existence and no assets. In that Answer, purportedly served on behalf of the PIF, Tolchin admitted that any claim that there is a separate legal entity is "fraudulent." See Answer, ¶¶4, 52, 59.

43. On October 26, 2006, Tolchin filed both an Offer to Allow Judgment Pursuant to Fed. R. Civ. P. 68 on behalf of the PIF and a Notice of Acceptance of Offer to Allow Judgment Pursuant to Fed. R. Civ. P. 68 on behalf of the Ungars in the Ungar v. Orascom action.

44. Tolchin has now filed appearances and pleadings on behalf of, and purports to represent, both the Plaintiffs and one of the Defendants in the Ungar v. Orascom action.

**Wright Claims to Represent the Ungars and the PIF in Federal Court in Connecticut**

45. On October 25, 2006, Stephen Wright ("Wright"), the Administrator's Connecticut counsel, with Tolchin, filed a Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests of the PIF in the Canaan Funds in the Connecticut action, captioned Strachman v. Palestinian Authority, 05-mc-00208-PCD (D. Conn. filed June 29, 2005) ("Strachman action").

46. On October 25, 2006, now on behalf of the PIF, Wright, with Tolchin, filed a "Statement of the Palestine Investment Fund" in which he stated that the PIF "consents to all the relief sought in Plaintiff's Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests" -- the very motion that he filed on the same day on behalf of the Plaintiffs.

47. On October 26, 2006, Rohback sent a letter to the Court in the Strachman action requesting a conference with the Court as soon as possible to discuss how to proceed.

### LeBoeuf Files Motions to Intervene

48. On October 27, 2006, LeBoeuf filed motions to intervene on its own behalf in the Ungar v. Orascom and Strachman actions to determine who is counsel to the PIF.

49. On November 1, 2006, Judge Colleen McMahon held a telephone conference in the Ungar v. Orascom action.

50. Judge McMahon denied LeBoeuf's motion to intervene without prejudice and subject to renewal at an appropriate time, after LeBoeuf was afforded an opportunity to present its position to this Court.

51. In an Order dated November 2, 2006, Judge McMahon stated that "The Court has advised the parties that NO final judgment will be signed until the RELEVANT courts have sorted out the corporate control matters." Order at 1 (emphasis and capitalization in the original).

### The Ungars' Counsel's Pending Motion in this Court

52. On November 8, 2006, the Ungars, through Attorney Strachman, filed a motion with this Court in The Estate of Yaron Ungar v. The Palestinian Authority, No. 00-105L (D.R.I.) asking the Court to modify the confidentiality stipulation between the Ungars and Canaan Equity

Offshore and its affiliates to remove documents generated by the PIF and any documents to which the PIF is a party or a signatory from the provisions of that stipulation.

53. In the Memorandum in support of the Motion, Strachman represents that "counsel for the PIF has notified counsel for the Ungars that the PIF agrees that the Ungars may use these documents without restriction."

54. Attached to the Memorandum is a letter to Strachman from Tolchin -- who also represents the Ungars -- in which Tolchin advises Strachman that he is "writing on behalf of the PIF to inform you that the PIF authorizes the Ungars to make free use of copies of any documents in their possession (whatever their origin) which were generated by the PIF (e.g. internal PIF instruments) and/or to which the PIF is a party or signatory (e.g. agreements and correspondence sent or received by the PIF)."

55. On November 9, 2006, Wright and Tolchin filed a motion with the U.S. District Court for the District of Connecticut in the Strachman action. In that motion, they requested that the Court enter an order consistent with the Statement they had previously filed on behalf of the PIF in which they had represented that the PIF consented to all the relief sought in the Ungars' Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests -- the motion that Wright and Tolchin had filed on behalf of the Ungars on October 25, 2006.

### AS AND FOR A FIRST CAUSE OF ACTION

### The District Court Could Not Properly Convey Ownership in the PIF

56. LeBoeuf repeats and realleges the allegations of Paragraphs 1 through 55 as if fully set forth herein.

57. A real and justiciable controversy exists between LeBoeuf and Defendants as to who owns and controls the PIF and therefore who has the power to hire and fire legal counsel to represent the PIF.

58. In argument before this Court in The Estate of Yaron Ungar v. The Palestinian Authority, the Court clearly articulated the limits of its jurisdiction:

> If I enter a judgment assigning to the plaintiffs all the rights that the PA has in these two entities, that's the limit of the order of the Court, the judgment of the Court, then that has to be executed somewhere where these two entities are doing business. They're not doing business in Rhode Island. As I said from the very beginning, there's no way I'm going to supervise the collection of this judgment because there are no assets in this jurisdiction of the PA and the PLO.

Tr. 10-11.

59. The order, prepared by Strachman, and signed by the Court on September 19, 2006, however, exceeded the Court's authority.

60. PIF is a separate legal entity and was not before the Court.

61. Even if the PA owned all of the PIF, the PIF's value greatly exceeded the amount of the Ungars' default judgment.

62. The Court's order should be vacated or modified to make clear that Defendants do not have legal ownership over a separate company that was outside the Court's jurisdiction, which had assets far in excess of their default judgment, and which was not served with notice of the proceeding to which it was not a party.

## AS AND FOR A SECOND CAUSE OF ACTION

### The Ungars' Purported Take Over of the PIF was Ineffective Under Applicable Corporate Law and Under the Articles of Association of the PIF

63. LeBoeuf repeats and realleges the allegations of Paragraphs 1 through 55 as if fully set forth herein.

F:\MFM\PALESTINE INVESTMENT FUND\Complaint.DOC                                    - 11 -

64.  The allegations in the preceding paragraphs demonstrate that a real and justiciable controversy exists between LeBoeuf and the Defendants.

65.  The PIF is organized under the laws of Palestinian National Authority ("Palestine").

66.  The Articles of Association could not be amended by the Defendants, and they did not purport to do so.

67.  Just as any action taken with respect to a Delaware corporation would have to comply with Delaware laws, any action taken with respect to the ownership, control, and corporate governance of a Palestinian corporation would have to comply with Palestinian law.

68.  The actions of the Defendants in purporting to take ownership of the PIF, discharge directors and officers, and appoint themselves directors and officers are ineffective under Palestine corporate law.

69.  In accordance with Rule 44.1 of the Federal Rules of Civil Procedure, LeBoeuf states that the determination of this controversy is governed in part by the laws of Palestine, and accordingly hereby gives notice of its intention to rely upon such laws.

### The October 17 Resolution Was Defective

70.  Immediately after receiving the Rohback letter dated October 16, 2006, the Defendants executed a Resolution on October 17, 2006, in which they, as the purported "New Owners" of the PIF, purportedly dismissed the current Directors of the PIF from their positions and appointed new directors, including Defendants Meir Ungar, Uri Dasberg, and Amichai Ungar.

71.  While the Defendants purported to appoint directors in their Resolution, the Articles of Association provide that vacancies on the Board of Directors of the PIF must be

nominated by the Nominating Committee (Articles, 6.10), and that meetings of the Board of Directors, or any committees thereof, must be held in Palestine. Articles, 6.2(e).

72. Further, the Resolution does not indicate whether it was reached and executed during a meeting and, if so, where that meeting was held.

73. If the Resolution was reached during a meeting of the PIF, the meeting was required to take place at a place within Palestine designated by the General Manager, or, if the General Manager did not designate a place or if a special meeting was called, the meeting had to take place at the principal office of the PIF in Palestine. Articles, 12.2. Written notice of a meeting of the Shareholder had to be delivered at least 21 days before the date of the meeting and if the notice was mailed, it is deemed delivered upon receipt by an acknowledged delivery mail service addressed to the Shareholder at the Shareholder's address. Articles, 12.3.

74. The Resolution does not indicate whether the meeting was held in Palestine and whether the Shareholder was given 21 days notice of the meeting, as required by the Articles of Association. If these requirements were not complied with, the Resolution was not valid and Defendants Meir Ungar, Uri Dasberg, Amichai Ungar and the others listed in the Resolution were not directors of the PIF at the time of the October 19, 2006 Board of Directors meeting.

75. If the Resolution was reached by action without a meeting, the Articles of Association require that the action be evidenced by written consent describing the action taken, signed by the Shareholder, and delivered to the General Manager of the PIF. Actions taken in this manner are not effective until ten days after the written consent is signed and received by the PIF or its designated agent unless the consent specifies another effective date. Articles, 12.4.

76. The Resolution does not indicate that it was delivered to the General Manager of the PIF. If it was not delivered to the General Manager, or it did not provide an effective date of at least ten days thereafter, the Resolution was not valid and Defendants Meir Ungar, Uri Dasberg, Amichai Ungar and the others listed in the Resolution were not directors of the PIF at the time of the October 19, 2006 Board of Directors meeting.

### The Defendants' Elimination of a General Manager Violated the Articles

77. At their Board of Directors meeting on October 19, 2006, the Defendants purported to dismiss all the current officers of the PIF, including the General Manager.

78. The Articles of Association provide that the officers of the PIF "shall consist of a General Manager, a Secretary and a Treasurer." Articles, 5.2.

79. The Articles of Association provide that the General Manager is the chief executive of the PIF and is authorized to conduct the day-to-day business of the PIF, subject to the general supervision of the PIF's Board of Directors. Articles, 5.2(d).

80. Pursuant to the Articles of Association, the General Manager must be a Palestinian. Articles, 5.2(d).

81. The Defendants did not appoint a new General Manager.

82. The Defendants improperly sought to circumvent these requirements by purporting to appoint Uri Dasberg as the Secretary of the PIF and Meir Ungar as the Treasurer of the PIF and by giving Dasberg and Ungar the powers of the General Manager.

### PIF's Corporate Purpose Was Violated

83. Pursuant to the Articles of Association, the purposes of the PIF are to "acquire or otherwise invest in . . . Investments that promote economic growth and infrastructure development in Palestine and stimulate private sector investment . . . to achieve sustainable long-term economic prosperity for Palestine . . . ." Articles, 3.1.

84. The Board of Directors is authorized to adopt bylaws, regulations and operating procedures for the PIF that are consistent with the Articles of Association. Articles, 6.3(d).

85. The resolutions and operating procedures purportedly adopted by the Defendants at the October 19, 2006 meeting are not consistent with the Articles of Association.

### The Actions Were Self-Serving and Did Not Include Any Disinterested Directors

86. The various actions the Defendants have purported to take on behalf of the PIF are all taken for the benefit of the Defendants personally.

87. The Defendants' self-dealing is ineffective under any applicable law.

88. Plaintiff LeBoeuf seeks a declaratory judgment as to who owns the PIF, who are the directors and officers of the PIF, whether LeBoeuf has been retained by the PIF to act as PIF's legal counsel, whether the Defendants could discharge LeBoeuf as counsel to the PIF, and whether the Defendants did discharge LeBoeuf as counsel to the PIF.

WHEREFORE, LeBoeuf respectfully requests judgment as follows:

For an Order adjudging, declaring and decreeing that the Defendants do not own the PIF; that Strachman and the Defendants are not the directors and officers of the PIF; that LeBoeuf has been retained by the PIF to act as PIF's legal counsel; that Strachman and the Defendants could not discharge LeBoeuf as counsel to the PIF; and that Strachman and the Defendants could not retain Tolchin as counsel to the PIF; and granting LeBoeuf such other and further relief as the Court deems just and proper together with attorneys' fees and costs.

Dated: Providence, Rhode Island
November 16, 2006

Matthew F. Medeiros (#1856)
Little, Medeiros, Kinder, Bulman &
   Whitney, P.C.
72 Pine Street
Providence, Rhode Island 02903
Telephone: 401-272-8080
Fax: 401-521-3555
mfm@lmkbw.com

Counsel for Plaintiff LeBoeuf, Lamb,
   Greene & MacRae LLP