UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs – Judgment Creditors,

v.

C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

Defendants – Judgment Debtors.

### DECLARATION OF LT. COLONEL (RES.) BARUCH YEDID

I, Baruch Yedid of Jerusalem, Israel, declare pursuant to 28 U.S.C. §1746, as follows:

**a.    Personal and Professional Background**

1. I was born in 1964. I have a degree in Middle Eastern Studies and History from Bar Ilan University, and graduated *magna cum laude* from the Staff and Command College of the Israel Defense Forces.

2. Between 1989 and 2007 I was employed in a variety of positions in the Israeli Civil Administration in the West Bank and Gaza Strip ("Civil Administration") and on the staff of the Coordinator of Activities in the West Bank and Gaza Strip ("Coordinator of Activities").

3. The Civil Administration and the Coordinator of Activities are departments within the Israel Defense Forces ("IDF") which were established to provide governmental and civilian services to the Palestinian population in the West Bank and Gaza Strip.

4. During the course of my employment I served, *inter alia*, as the Head of the Palestinian Affairs Branch in the Headquarters of the Coordinator of Activities (2005-2007), as

1

the Head of the Palestinian Affairs Branch in the West Bank (2001-2005) and as Commander and Advisor on Arab Affairs for the Palestinian Liaison Unit in Nablus (1995-2001).

5. I retired from the IDF in 2007 with the rank of Lieutenant Colonel.

6. I am fluent in Arabic and thoroughly familiar with Palestinian society and with government and politics within the Palestinian Authority.

7. My duties with the Civil Administration and the Coordinator of Activities included liaising and interacting with Palestinian leaders and officials of all types. Since the establishment of the Palestinian Authority ("PA") in 1994, I have met and conferred on hundreds of occasions with numerous officials of the PA.

8. My responsibilities with the Civil Administration and the Coordinator of Activities also included researching and publishing on a wide range of topics related to Palestinian life, society and politics. My research publications, which were widely distributed to senior staff officers throughout the IDF, included the following titles: *Trends in Palestinian Society*; *The Rise of Hamas as a Socio-Governmental Movement*; *The Palestinian Legal System and Basic Law*; *Women and Their Struggle in Palestinian Society*; *The Phenomenon of Suicide Bombers*; *The Palestinian Authority on the Verge of Collapse? – Ramifications*; *Hamas' Funding Apparatus*; *The Palestinian Leadership – Fatah, Hamas, Division of the Palestinian Authority Between Fatah and Hamas*; *Violence in Palestinian Society*; *The Palestinian News Media*.

9. I am very familiar with the judicial and legal system within the PA, as the result of both my professional research and writing and the numerous discussions and meetings I have had over the years (including very recently) with judges, attorneys and governmental legal officials in the PA.

**b.     The Questions Posed**

10.     I have been informed that: (a) in 2004 the United States District Court in Rhode Island entered a judgment in the amount of approximately $116 million in favor of the estate and family of the late Yaron Ungar ("Ungars") and against the Palestinian Authority; (b) in 2006 the same court entered a judgment assigning the Ungars certain rights of the Palestinian Authority in the Palestine Investment Fund ("PIF"); (c) the Ungars then took certain actions which they maintain resulted in the directors, officers and attorneys of the PIF being replaced; and (d) certain persons have contested the legal validity of both (i) the assignment of the Palestinian Authority's rights in the PIF to the Ungars and (ii) the actions taken by the Ungars to replace the directors, officers and attorneys of the PIF.

11.     I have been asked to give my professional opinion in response to the following questions:

    i. As a practical matter, could the Ungars litigate in a court in the Palestinian Authority the validity of the assignment of the Palestinian Authority's rights in the PIF to the Ungars and/or the validity of the actions taken by the Ungars in respect to replacement of the directors, officers and attorneys of the PIF (collectively hereinafter: "the Contested Issues")?

    ii. Would the Ungars be likely to receive a fair hearing regarding the Contested Issues in a court in the Palestinian Authority?

12.     My professional opinion in respect to both of these questions is set forth below.

c.   **The Ungars Cannot Litigate in the Palestinian Authority**

13.   There are at least two significant reasons why the Ungars would be unable, as a practical matter, to litigate the Contested Issues (or any other matters) in a court in the Palestinian Authority:

14.   First, because the Ungars are Jews residing in Israel, there is a very high likelihood that they would be physically attacked or abducted if they entered the Palestinian Authority to attend court.

15.   The civil courts operated by the Palestinian Authority are all located in the Palestinian urban populations centers designated as "Area A" in the Oslo Accords.[1]

16.   There have been a number of cases during the past seven years of Jews being assaulted, murdered or abducted after entering the Area A, and the Ungars would be at serious risk of a similar fate were they to do so.

17.   The Ungars would face an especially high risk of attack in light of the circumstances of the case. Palestinian militants would perceive the Ungars, who brought suit and obtained a judgment against the Palestinian Authority, as enemies who should be targeted for physical attack. The fact that the Ungars are seeking to enforce their judgment against the PIF would only further increase this hostility and thus raise the likelihood of an attack on them.

18.   Second, precisely because of the extreme danger of such attacks, in late 2000 the IDF commander in the West Bank issued a military order (which remains in force today) that prohibits Jewish residents of Israel from entering Area A. Violation of this order is a criminal offense. This prohibition is strictly enforced by the IDF.

---

[1] Area A is defined in Article XI(3)(a) of the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip of September 28, 1995.

19. Thus, if the Ungars were to attend court in the Palestinian Authority, they would be committing a criminal offense, and would be subject to criminal prosecution by Israel.

20. Therefore, in my professional opinion, the Ungars could not litigate the Contested Issues (or any other matters) in a Palestinian Authority court without risking serious physical harm, death or abduction, or without committing a criminal offense and subjecting themselves to prosecution under local law.

d. **The Ungars Would Not Receive a Fair Hearing in a Palestinian Authority Court**

21. It is not only unlikely but *inconceivable* that the Ungars would receive a fair hearing in respect to the Contested Issues in a Palestinian Authority court.

22. Since the establishment of the Palestinian Authority in 1994 and until today, PA officials have repeatedly interfered in the decisions and operation of the PA courts in cases which they consider to be harmful to the interests of the PA.

23. Judges in the PA are systematically pressured and intimidated by PA officials (including members of the various PA security forces), and judges who rule "unfavorably", or who are suspected of being inclined to do so, have been threatened, harassed and fired.

24. There is no question that the PA views the Ungars' suit against the PA and their attempt to enforce their judgment against the PA, and the actions they have taken with respect to the PIF, as harmful to the interests of the PA.

25. Nor is there any question, in my professional opinion and based on my professional experience, that any PA judge hearing the Contested Issues would be subject to pressure and intimidation by PA officials (including possibly the PA security forces), and that a

ruling favorable to the Ungars might well result – as the judge himself would certainly be well aware – in the judge being dismissed, demoted or even physically harmed.[2]

26. In light of the above, there is no chance that the Ungars would receive a fair hearing in a PA court regarding the Contested Issues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

August 3, 2007

_____
Baruch Yedid

---

[2] Given the on-going conflict with Israel, the resultant widespread hostility in Palestinian society toward residents of Israel, and the strong politicization of the PA civil service (including the judiciary) it is quite possible that the judge would treat the Ungars prejudicially even absent any external pressure or threats.

Moreover, it is likely that only a "politically reliable" judge (from the point of view of the PA) would be assigned to hear such a case in the first place.