UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs – Judgment Creditors,

v. C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

Defendants – Judgment Debtors.

**PLAINTIFFS – JUDGMENT CREDITORS' MOTION FOR DECLARATORY JUDGMENT**

Now come the Plaintiffs-Judgment Creditors and hereby move for a judgment declaring that the defendants are not entitled to relief pursuant to Fed.R.Civ.P. 60(b) from the judgment entered in this mater on July 12, 2004.

Plaintiffs-Judgment Creditors' motion is supported by the attached memorandum and exhibits thereto.

Plaintiffs-Judgment Creditors
by their Attorneys,

/s/David J. Strachman

David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

CERTIFICATION

I hereby certify that on August 10, 2007, I served a true copy of the within via ECF to counsel of record:

Lawrence W. Schilling
Ramsey Clark
37 West 12th Street, 2B
New York, NY 10011

Deming E. Sherman
Annemarie M. Carney
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

James R. Oswald
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903

Robert A. Alessi
Tamara L. Schlinger
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, NY 10005-1702

/s/David J. Strachman

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs – Judgment Creditors,

v. C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

Defendants – Judgment Debtors.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS – JUDGMENT CREDITORS' MOTION FOR DECLARATORY JUDGMENT**

**Introduction**

This action was filed in March 2000. Judgment entered in favor of plaintiffs and against defendants Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") on July 12, 2004. That judgment was affirmed by the First Circuit, Ungar v. Palestine Liberation Organization, 402 F.3d 274 (1st Cir. 2005), and defendants' petition for a writ of certiorari to the Supreme Court was denied. Palestine Liberation Organization v. Ungar, 546 U.S. 1034 (2005).

This Court found that defendants had intentionally delayed the progress of this action. See Ungar v. Palestinian Authority, 325 F.Supp.2d 15, 26 (D.R.I. 2004) (affirming imposition of sanctions against the PA "for its deliberate actions to delay the completion of this litigation").

The U.S. Secretary of State has advised the defendants that the judgment of this Court "is final and enforceable in United States courts against property or interests owned by the PA, PLO,

or Hamas" and cautioned the defendants "to respond to U.S. legal proceedings in good faith and a timely manner." See Exhibit A.

Secretary Rice also informed the defendants that if they wish to avoid enforcement actions they should come to terms with the plaintiffs, and generously offered the assistance of her legal advisors to facilitate such an effort. Id.

Defendants have disregarded Secretary Rice's sound advice, and instead have continued post-judgment the same contumacious pattern of conduct which marred the underlying proceedings before this Court: they have refused to honor the judgment, refused to comply with post-judgment discovery requests served by the Ungars, and attempted to thwart, frustrate and delay the numerous enforcement proceedings that the plaintiffs have been compelled (at huge expense and effort) to bring.

Defendants have now launched a frivolous new ploy designed to frustrate enforcement of this Court's judgment, which has compelled the Ungars to seek the relief requested in this motion, as explained below:

In June 2005 the Ungars commenced proceedings to domesticate the judgment of this Court in Israel, where defendants have certain assets. True to form, defendants did all in their power to stall and complicate the Israeli domestication proceeding, repeatedly moving for stays (which were denied after lengthy motion practice) and systematically missing deadlines.

The Israeli court eventually held a trial in the domestication proceeding in January-February 2007, and post-trial briefing was completed in June 2007.

The Israeli court is expected to issue a final ruling at any time. If the court rules in favor of the Ungars, they will be entitled to enforce the judgment of this Court immediately against any assets of the defendants in Israel.

Now, in a last-ditch bad-faith maneuver to delay the ruling in the Israeli domestication proceeding, defendants have submitted to the Israeli court an affidavit from an attorney at the firm of Miller & Chevalier in Washington, D.C., claiming that the judgment of this Court is defective, and that the Miller firm intends (at some unidentified time in the future) to appear in Rhode Island to file a motion to vacate the judgment. See Exhibit B.[1] The Miller affidavit claims that the judgment is subject to vacatur, because this Court purportedly was unaware that the plaintiffs had filed a separate suit against Iran. Id.

On the basis of the Miller affidavit, on August 6, 2007 defendants moved to stay the Israeli domestication proceeding, until this Court rules on the motion to vacate that Miller claims it intends to file at some time in the future. See Exhibit C.

Miller's claims to the Israeli court are blatantly false as a matter of fact. Not only was the Court well aware of the suit against Iran, but defendants repeatedly and expressly argued before this Court – exactly as Miller does now – that if Iran was liable for the murder of the Ungars, then the PA and PLO could not also be liable. See Letter from Nasser Al-Kidwa, January 27, 2003, (Exhibit D) at 2; Letter from Deming E. Sherman, Esq., March 27, 2003 (Exhibit E) at 1; Hearing Transcript, April 1, 2003 (Exhibit F) at 9.

Defendants also raised the identical argument in two (unsuccessful) motions for a stay to the First Circuit, in April 2003 and again in September 2004. See Defendants' Motion Under Rule 8(A)(2) [sic] for a Stay Pending Appeal, April 23, 2003, in Ungar v. Palestinian Authority, #03-1544 (1st Circuit) (Exhibit G) at 11-12; Defendants-Appellants' Motion Under Rule 8(a)(2)

[1] Exhibit B is a motion filed by defendants in Israel, to which the English-language Miller affidavit was attached as an exhibit. See Exhibit B at pp. 5-6. Exhibit B consists of the entire motion exactly as filed by defendants, in the following order: (i) Hebrew-language motion itself (ii) Hebrew-language coversheet on the Miller affidavit from the Israeli Embassy where it was sworn (iii) and the English-language Miller affidavit. An English translation of the motion is included in Exhibit C.

for a Stay Pending Appeal, September 30, 2004, in Ungar v. Palestinian Authority, #04-2079 (1st Circuit) (Exhibit H) at 12-13.

Defendants then completely abandoned this argument on appeal, probably in light of the fact that the federal court hearing the suit against Iran had determined that Iran was not liable for the murder of the Ungars since: "The men who killed Yaron and Efrat Ungar received funding and weapons ***from other sources*** as well as HAMAS . . ." Ungar v. Islamic Republic of Iran, 211 F.Supp.2d 91, 99 (D.D.C. 2002) (emphasis added). This finding by the D.C. federal court directly supports the allegation in the instant action (which the defendants know to be true and were therefore unable and unwilling to defend) that the PA and PLO provided material support and assistance to the Hamas gunmen who murdered the Ungars.

Notably, Miller and the defendants have concealed from the Israeli court both the fact, and the reason, that the Iran case was dismissed. See Exhibits B, C.

Miller's alleged plan to file a motion to vacate is also facially frivolous as a matter of law because an argument raised and abandoned can never serve as the basis for a Rule 60(b) motion. Furthermore, a Rule 60(b)(2) motion (which is the only subsection under which Miller's claim could conceivably be brought) must be made within one year of judgment, and it is well established that a Rule 60(b)(6) motion may not utilized to escape the time restrictions on motions under Rule 60(b)(1)-(3).

Thus, to anyone familiar with the application of Rule 60(b), defendants' planned Rule 60(b) motion is factually and legally meritless on its face.

The problem – and the reason why the relief sought in this motion is urgently required – is that the Israeli judge hearing the domestication proceeding naturally knows nothing about Rule 60(b), and has no independent means of knowing that defendants' planned motion is meritless.

Indeed, the Israeli attorney representing the Ungars in the domestication proceeding, attorney Mordechai Haller, has advised the Ungars that the Israeli court will almost certainly refrain from issuing its final judgment in the domestication proceeding, until defendants' Rule 60(b) arguments are disposed of.

Simply put, the defendants (assisted by Miller) have now stalled the Ungars' enforcement proceedings in Israel – which were brought at great financial expense, have been pending for over two years and are on the verge of final judgment – by falsely representing to the Israeli court that they have valid grounds to vacate the judgment of this Court.

Defendants may be switching counsel, but they clearly have ***not*** abandoned the bad-faith, dilatory litigation tactics employed by them in this case for the past seven and a half years.

The Ungars should not be forced to wait for months until the defendants (whose new counsel has not even appeared in this case or sought admission in this Court) finally get around to preparing their planned Rule 60(b) motion. Every day that passes without the Ungar children receiving the compensation awarded them by this Court for the murder of their parents is another day of injustice and financial harm.

Unless the Ungars ***proactively*** seek and obtain a ruling establishing that the defendants are not entitled to Rule 60(b) relief, the long-pending Israeli domestication proceeding will almost certainly remain frozen one yard from the end zone, for many months or longer, which is precisely the defendants' goal.

Accordingly, the Ungars seek a judgment declaring that the defendants are not entitled to relief from this Court's judgment of July 12, 2004.

## RELEVANT BACKGROUND

After the instant action was filed, and in the course of further researching the activities of Hamas, plaintiffs obtained information regarding the provision by Iran of various forms of material support to Hamas.[2]

Accordingly, in November 2000 (some six months after the instant action was filed), the Ungars filed suit against Iran in the U.S. District Court for the District of Columbia. Ungar v. Islamic Republic of Iran, No. Civ. 00-2606 (JR) (D.D.C.).[3]

In June 2002, the D.C. federal court denied plaintiffs' motion for default judgment against Iran, holding that the Ungars had failed to prove Iran's liability for the murders, since the terrorist gunmen "received funding and weapons from other sources as well as HAMAS" and it had not been shown that the murderers were acting to further Iran's purposes. Ungar, 211 F.Supp.2d at 99-100.

On January 27, 2003, PA and PLO official, Nasser Al-Kidwa, sent a letter to Magistrate Judge David L. Martin, stating that defendants cannot "understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case

---

[2] Iran supports Hamas for its own ideological and political reasons, which are not necessarily identical with the instant defendants' reasons for supporting and cooperating with Hamas. Likewise Syria, which in contrast to Iran is governed by a staunchly secular regime, also supports Hamas for its own purposes. Whatever their respective reasons for supporting and cooperating with Hamas, it is an empirical fact that is a matter of public record (reflected *inter alia* in official publications of the Executive Branch and numerous Congressional resolutions and findings) that Iran, Syria, the PA and the PLO all do so. Indeed, the same cooperation between the instant defendants and Hamas (which resulted in the murder of the Ungars) continued through the first half of 2007, when the PLO and Hamas joined forces in a PA unity government.

[3] The suit against Iran was filed in the District of Columbia federal court because under 28 U.S.C. §1391(f)(4) the District of Columbia is the mandatory venue for such actions. See e.g. Flatow v. Islamic Republic of Iran, 999 F.Supp. 1, 15 n. 6 (D.D.C. 1998) (The District of Columbia is "the dedicated venue for actions against foreign states.").

in Washington, D.C. for the same death claiming Iran is responsible for what HAMAS does." Exhibit D at 2.

On March 27, 2003, defendants' counsel, Deming E. Sherman, Esq., sent a letter to Senior Judge Ronald R. Lagueux discussing the suit against Iran. Exhibit E at 1.

At a hearing on April 1, 2003, defendants' counsel, former United States Attorney General Ramsey Clark, raised the very argument that the defendants have now falsely informed the Israeli court that they will raise for the first time in their planned Rule 60(b) motion:

> [A]s you know, there's a similar case – I say similar, there's a virtually identical case pending in the District of Columbia (inaudible). In that case claiming that Hamas was controlled by Iran for the Ungars, the same plaintiffs, the same factual claims, only there claiming it's Iran and Hamas while here the claim is Palestine and Hamas, and it's not likely that both can be true …

Exhibit E at 9.

Defendants then repeated this argument in an April 23, 2003 motion to the First Circuit. See Exhibit G at 11-12.

In September 2004, after entry of final judgment, defendants raised this same argument once again, in another failed motion to the First Circuit for a stay pending appeal. See Exhibit H at 12-13.

Despite raising this argument in their September 2004 motion to the First Circuit, defendants did not assert it in their appellate papers filed soon thereafter.

Presumably, defendants abandoned this argument on appeal because they realized it was utterly meritless to begin with.[4]

**ARGUMENT**

As demonstrated below, the defendants are not entitled to Rule 60(b) relief, for numerous reasons.

**a. A Rule 60(b) Motion Cannot Be Based on an Abandoned Argument**

As shown *supra*, defendants explicitly raised before this Court and the Court of Appeals their current argument that the allegations in plaintiffs' suit against Iran necessarily negate defendants' liability for the Ungars' murder. That argument did not persuade this Court. If the defendants felt that the Court erred in respect to this argument, they should have raised it in their appeal to the First Circuit. Since they did not do so, this argument cannot serve as the basis for a Rule 60(b) motion. "It is settled that a 60(b) motion 'cannot be used to avoid the consequences of a party's decision . . . to forego an appeal from an adverse ruling.'" Pierce v. United Mine Workers of America Welfare and Retirement Fund, 770 F.2d 449, 451-452 (6th Cir. 1985) (quoting Steinhoff v. Harris, 698 F.2d 270, 275 (6th Cir. 1983)). See also e.g. Martinez-McBean v. Government of Virgin Islands, 562 F.2d 908 911 (3rd Cir. 1977) ("it is improper to grant relief under Rule 60(b)(6) if the aggrieved party could have reasonably sought the same relief by means of appeal."); Pagan v. American Airlines, Inc., 534 F.2d 990, 992 (1st Cir. 1976) ("Rule 60(b) cannot be used as a substitute for an appeal.").

Thus, as a matter of law, defendants are not entitled to Rule 60(b) relief.

[4] Defendants cited the decision of the D.C. court in passing in their petition for a writ of certiorari. See Palestine Liberation Organization v. Ungar, 2005 WL 2708405 (U.S. Oct 17, 2005).

**b. Defendants Are Time-Barred**

Of the six grounds for relief set forth in Rule 60(b), defendants' (fictitious) claim that plaintiffs' action against Iran was concealed from this Court could only be asserted under Rule 60(b)(2).

However, a motion under Rule 60(b)(2) must be made within one year. Fed.R.Civ.P 60(b). Judgment entered in this action over three years ago. Therefore, defendants' argument is obviously time-barred.

Nor can defendants seek relief under Rule 60(b)(6). It is well established that Rule 60(b)(6) and clauses 60(b)(1) through (5) are "mutually exclusive." Pioneer Inv. Servs. Co. v. Brunswick Assocs., 507 U.S. 380, 393 (1993). See also e.g. Blanchard v. Cortes-Molina, 453 F.3d 40 (1st Cir. 2006) (same).

Since defendants' argument in theory could have been brought under Rule 60(b)(2) (assuming it was not otherwise defective, which it is), defendants cannot assert that argument under Rule 60(b)(6).

Furthermore, a Rule 60(b)(6) motion must be made "within a reasonable time." Fed.R.Civ.P 60(b). Since defendants knew all about the suit against Iran even ***before*** judgment was entered, it is pellucid that the "reasonable time" permitted under Rule 60(b)(6) expired years ago.

Therefore, defendants are time-barred from seeking Rule 60(b) relief.

**c. As a Matter of Law and Fact, Nothing About the Suit Against Iran Could Possibly Constitute Newly-Discovered Evidence**

As shown above, defendants have known all about the Iran suit since at least as early as January 2003 – a year and a half before judgment was entered in this case. The defendants' claim

that they were unaware of the Iran suit, or the arguments and evidence presented therein, is utterly ludicrous.

Not only were the defendants free to examine the pleadings and evidence contained in the publicly available court file in the District of Columbia, or on PACER, but the decision of the D.C. federal court recounts plaintiffs' allegations and evidence in great detail. See Ungar v. Islamic Republic of Iran, 211 F.Supp.2d 91 (D.D.C. 2002), passim.

It is elementary that a Rule 60(b)(2) motion "does not provide a vehicle for a party to undo its own procedural failures and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment." Emmanuel v. International Broth. of Teamsters, Local Union No. 25, 426 F.3d 416, 422 (1st Cir. 2005) (emphasis added, quotations omitted).

Defendants were fully aware of the Iran case and decision, and had every opportunity to obtain copies of court file (indeed – they may well have). They are therefore not entitled to relief under Rule 60(b).

Indeed, as a matter of law, information contained in court records can never constitute "newly-discovered evidence" under Rule 60(b)(2). See e.g. Colonial Book Co. v. Amsco School Publications, 48 F.Supp. 794 (S.D.N.Y 1942) (defendant was not entitled to new trial on ground of "newly discovered evidence" disclosing that plaintiff lost a similar case where defendant had knowledge of pending of the other case for some seven months prior to trial of defendant's case.); Chlipala v. A.A. Morrison & Co., 44 F.Supp. 894 (M.D.PA. 1942) aff'd 132 F.2d 320 (3rd Cir. 1942) (defendant was not entitled to a new trial of an action by a husband and wife on the ground of "newly discovered evidence" consisting of a record of a state court in the county where plaintiffs resided showing that plaintiffs had been divorced prior to the date of the

accident resulting in the action, since being a matter of record in the county the evidence could have been discovered prior to trial in the exercise of due diligence.).

### d. Nothing in the Allegations or Evidence in the Iran Suit Derogates from Defendants' Liability

A party is entitled to relief under Rule 60(b)(2) only when the newly discovered evidence "is of such a nature that it would probably change the result were a new trial to be granted." U.S. Steel v. M. DeMatteo Const. Co., 315 F.3d 43, 52 (1st Cir. 2002).

There is no chance that the pleadings or evidence submitted in the Iran suit could change the result of this case, because nothing therein contradicts or detracts one iota from the allegations of the amended complaint in the instant action or from the instant defendants' liability for the murder of the Ungars.

Indeed, defendants' entire argument ignores bedrock principles of joint and several tort liability: the fact that Iran, the PA and PLO all provide material support and resources to Hamas (each for its own reason) does not excuse any of them from liability – as defendants seem to imagine – but rather renders them all liable for terrorist attacks carried out by Hamas, including the murder of the Ungars.

Defendants also ignore the fact that they admitted the allegations of the complaint by their intentional default. To allow a defendant who has admitted its liability to later seek to raise a factual challenge to that liability would be absurd.

Last but not least, defendants ignore the fact that the allegations against Iran were rejected by the D.C., specifically because it found that the terrorist gunmen received weapons and funds from "other sources." Ungar, 211 F.Supp.2d at 99. Those "other sources" included the instant defendants.

**e. Defendants Have No Meritorious Defenses**

In order to obtain Rule 60(b) relief, defendants would have to show that they have "a reasonable chance of success on the merits" on some defense. Gonzalez Rucci v. U.S. I.N.S., 405 F.3d 45, 48 (1st Cir. 2005).

Defendants cannot make this showing because they have already litigated and lost every possible defense available to a defendant.

The Miller affidavit and defendants' motion to the Israeli court assert that defendants would be able to litigate their liability if the judgment were vacated. This claim is baseless: the defendants were defaulted for the wholly independent reason that they refused to provide any discovery. Therefore, the facts which plaintiffs sought to prove by that discovery are established as a matter of law, and cannot be contested.

Thus, defendants have neither procedural nor substantive defenses to this case.

**f. Vacating the Judgment Would Cause the Ungars Extreme Harm and Prejudice**

Defendants cannot obtain Rule 60(b) relief unless they demonstrate that vacating the judgment will not cause unfair prejudice to" the Ungars. Gonzalez Rucci v. U.S. I.N.S., 405 F.3d 45, 48 (1st Cir. 2005).

Defendants can make no such showing because vacating the judgment and allowing the defendants to begin this litigation over would cause the Ungars extreme prejudice.

***First***, it would condone the defendants' contumacious actions throughout the four and a half years of litigation prior to the entry of final judgment. The several hundred pleadings, dozens of hearings and the entire course of the pre-judgment litigation would be reduced to nothing more than a vicious waste of time which the Ungars suffered for naught.

***Second,*** eleven years after the murder, memories fade and documents are lost or destroyed. Indeed, many of the witnesses and much of the evidence sought by the Ungars are now longer available. Mr. Arafat, who directly oversaw defendants' provision of material support and resources to Hamas and whom defendants refused to produce for a deposition, has died. Mr. Dahlan, another key PA/PLO official who was to be deposed, no longer works for the defendants and cannot be compelled to appear. The whereabouts of the other deponents and witnesses is unknown.

Furthermore, even if they wanted to, the PA and PLO cannot produce witnesses or documents located in the Gaza Strip, because as of June 2007 they no longer have any foothold in Gaza.

In short, in light of the amount of time that has passed and the changes in the defendants' own circumstances, it would be impossible for the Ungars to fairly litigate this case today.

***Third***, the Ungars and their counsel have expended literally thousands of hours and hundreds of thousands of dollars over the past three years, first defending the appeal to the First Circuit and later on collection efforts across the United States and overseas, necessitated solely by the defendants' scofflaw refusal to honor the judgment of this Court.

Just to illustrate: the Ungars have paid out over $300,000 in fees and expenses for their New York collections alone. They have instituted proceedings in other jurisdictions as well and have incurred considerable costs in those locales attempting to collect the judgment.

It would be extraordinarily unjust and prejudicial to now wipe away three years of post-judgment efforts and expenses (not to mention the previous 4 1/2 years of litigation).

Therefore, the defendants are not entitled to relief under Rule 60(b).

WHEREFORE the instant motion should be granted.

Plaintiffs- Judgment Creditors
by their Attorneys,

/s/David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

CERTIFICATION

I hereby certify that on August 10, 2007, I served a true copy of the within via ECF to counsel of record:

Lawrence W. Schilling
Ramsey Clark
37 West 12th Street, 2B
New York, NY 10011

Deming E. Sherman
Annemarie M. Carney
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

James R. Oswald
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903

Robert A. Alessi
Tamara L. Schlinger
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, NY 10005-1702

/s/David J. Strachman

THE SECRETARY OF STATE
WASHINGTON

January 12, 2007

Dear President Abbas:

Thank you for your letter of November 28 setting forth your concerns regarding certain rulings by U.S. courts against the Palestinian Authority (PA), the Palestine Liberation Organization (PLO), and most recently the Palestinian Investment Fund (PIF).

As you know, the U.S. District Court in Rhode Island entered judgment in 2004 against the PA, PLO, and Hamas Islamic Resistance Movement ("Hamas"). This judgment was awarded to the estate of an American citizen who, together with his wife, was murdered in Israel in a June 1996 terrorist attack carried out by the military wing of Hamas. The U.S. Court of Appeals for the First Circuit affirmed that judgment in 2005. Because the U.S. Supreme Court has declined to grant further review, the judgment is final and enforceable in United States courts against property or interests owned by the PA, PLO, or Hamas.

Mr. President, I appreciate how difficult and complex these legal actions are and fully recognize the already significant economic crisis that exists for the Palestinian people. I encourage you, as I would any government, to respond to U.S. legal proceedings in good faith and a timely manner

The United States is not party to these enforcement proceedings, and our role is therefore limited under our adversarial system of justice. In short, the appropriateness of the United States' participation in any particular proceedings depends on the specific circumstances and the extent to which U.S. legal interests or obligations are involved.

Where judgment is entered, it is also possible to meet with the opposing side to explore out of court solutions so as to avoid enforcement actions. The Office of the Legal Adviser of the Department is willing to make its good offices available to facilitate such meetings. Additionally, the attorneys representing the PIF may

Mr. Mahmoud Abbas,
President of the Palestinian Authority.

contact the Office of the Legal Adviser to discuss the pending proceedings further and any issues of particular concern.

I remain hopeful that you may find a way toward a resolution of these cases.

Sincerely,

Condoleezza Rice

Condoleezza Rice

**בבית המשפט המחוזי בירושלים**

**ה"פ 4318/05**
**קבוע בפני כב' הש' א. פרקש**

**1. הרשות הפלסטינית**
**2. הארגון לשחרור פלסטין**
שניהם ע"י ב"כ עו"ד יוסף ארנון ואח'
מרח' שלומציון המלכה 18, ירושלים 94146
טל' 02-6245245 פקס 02-6250777

**המבקשים**
המשיבים

בית משפט המחוזי
בירושלים (66)
- 6 -08- 2007
נתקבל / נבדק

-נגד-

**ישי אונגר ואח'**
כולם ע"י ב"כ עו"ד מרדכי הלר ושות'
מרח' כורש 10, ירושלים 94144
טל' 02-9999837 פקס 02-6667211

**המשיבים**
המבקשים

## בקשה לדחיית מועד מתן פסק הדין

בית המשפט הנכבד יתבקש לדחות את מועד מתן פסק הדין בתיק זה.

**ואלו נימוקי הבקשה :**

1. לאחרונה נודע לח"מ כי בדעת באי כח המבקשים (המשיבים בהמרצת הפתיחה) בארצות הברית להגיש בקשה לבית המשפט שנתן את הפסק (בית המשפט המחוזי ברוד איילנד) - בקשה שאם תתקבל, עשוייה להביא לביטול פסק הדין, למתן הזדמנות למבקשים להתגונן מפני התביעה ולעצירת כל הליכי האכיפה והגבייה.

2. העתק מתצהיר בעניין זה רצ"ב **כנספח א'** וכחלק בלתי נפרד מן הבקשה.

3. כפי העולה מן התצהיר, העילה העיקרית לביטול פסק הדין הינה **העובדה** כי התובעים בארצות הברית **העלימו מעיני בית המשפט** שנתן את הפסק (ברוד איילנד) כי **במקביל ניהלו תביעה** (בבית המשפט בוושינגטון) **בגין אותו ארוע** כנגד איראן, משרד ההגנה שלה ומספר מבכיריה.

4. זאת ועוד, במסגרת התביעה כנגד איראן טענו התובעים כי איראן מימנה ואימנה את חברי החמאס האחראיים לפיגוע. בכתב התביעה כנגד איראן אין זכר לקשר או לאחריות הרשות הפלסטינית ו/או אש"פ - המשיבים דכאן - לפיגוע. כתב התביעה כנגד איראן מייחס את מלוא האחריות לפיגוע על איראן ועל החמאס.

.5 מעבר לכך, מומחים מטעם התובעים בתביעה נגד איראן העידו בבית המשפט בוושינגטון כי איראן סייעה לחמאס משום ששאפה להתערב בהליך השלום ולחבל בו, בעוד שהרשות הפלסטינית ואש"פ התנערו במכוון ממעורבות בפעילות טרור וזאת על מנת לקדם את תהליך השלום. עוד נטען במפורש שם כי באותו זמן שררה יריבות בין החמאס ובין הרש"פ ואש"פ.

.6 יוזכר כי בבית המשפט בו ניתן פסק הדין שבפנינו טענו התובעים כי יש להטיל אחריות על הרש"פ ועל אש"פ בשל אחריותם ותרומתם לפעילותו של ארגון החמאס.

.7 ברור לאור זאת כי טענות התובעים בשתי התביעות אינן יכולות לדור בכפיפה אחת אלו עם אלו ואילו היו מוצגות בפני בית המשפט ברוד איילנד הראיות והטענות שהועלו בבית המשפט בוושינגטון, הדבר היה בוודאות גבוהה מביא לדחיית התביעה כנגד הרש"פ ואש"פ.

.8 נדמה כי לא היתה זו טעות שגרמה לתובעים להשמיט לחלוטין את דבר קיומה של התביעה כנגד איראן, בעת שניהלו את ההליך ברוד איילנד.

.9 לפני כשלושה חודשים הוחלף ייצוגם של הרש"פ ואש"פ בארצות הברית ומשרד עורכי הדין הנוכחי עומד להגיש בקשה כאמור לעיל לבית המשפט ברוד איילנד בזמן הקרוב, כפי העולה מן התצהיר.

.10 משמעות הבקשה, אם תתקבל, כאמור לעיל, ביטול פסק הדין, מתן אפשרות לנתבעים להתגונן מפני התביעה וביטול כל הליכי הגבייה.

.11 המבקשים סבורים כי יש להורות על דחיית מועד מתן פסק הדין לאור עובדות אלו ולחילופין על עיכוב ההוצאה לפועל של פסק החוץ - במידה וייקבע כי הוא אכיף במדינת ישראל.

.12 כפי העולה מן התצהיר, בכוונת ב"כ המבקשים בארצות הברית להגיש את הבקשה בקרוב כאשר תוצאותיה יכולות להתקבל בטווח הזמן המיידי - עד מספר חודשים.

.13 המבקשים מודעים להלכה לפיה המונח "ערעור" שבסעיף 3(2) לחוק אכיפת פסקי חוץ פורש באורח מצמצם כך שאינו כולל גם הליך אחר שנועד להביא לביטולו או שינויו של הפסק על ידי בית המשפט שנתן אותו. אולם, **הבקשה דכאן איננה להמנע מאכיפת הפסק לאור הכוונה להגיש את הבקשה בארצות הברית**, אלא רק לדחות את מועד מתן פסק הדין עד לקבלת תוצאותיה. נדמה למבקשים כי מדובר בתוצאה ראויה והוגנת המאזנת

בין זכויות שני הצדדים, וזאת במיוחד לאור נסיבות ונושא התיק, העובדה כי פסק הדין ניתן בהעדר הגנה, מיהות הצדדים וההשלכות האפשריות של אכיפת הפסק במדינת ישראל (כפי שנדונו בתשובת המשיבים להמרצת הפתיחה ובסיכומים שהוגשו לבית המשפט הנכבד).

14. אשר על כן, יתבקש בית המשפט הנכבד לדחות את מועד מתן פסק הדין בתיק זה עד לאחר קבלת תוצאות הבירור המשפטי המחודש בארצות הברית. המבקשים מתחייבים להודיע לבית המשפט ולמשיבים תוצאותיו של הליך זה מייד כשיתקבלו.

יוסף ארנון, עו"ד
מ.ר. 8005
ב"כ המבקשים

א

**EMBASSY OF ISRAEL**
WASHINGTON, D.C.

שגרירות ישראל
וושינגטון

## אימות תצהיר

אני הח"מ, יוסף עדי, סגן קונסול שגרירות ישראל בוושינגטון, מאשר בזה כי
היום יח' אב תשס"ז
התייצב/ה בפני מר/גב' FERGUSON LAURA GOULD
שזיהה/תה עצמו/ה להנחת דעתי עפ"י דרכון אמריקאי מספר 217171043
שניתן ב- ____ בו רשום מס' זהות ____

ולאחר שהזהרתיו/ה כי עליו/ה להצהיר את האמת וכי יהא/תהא צפוי/ה לעונשים הקבועים בחוק אם לא יעשה/תעשה כן, חתם/ה בפני על תצהירו/ה המצורף והמסומן באות "א".

ולראיה באתי על החתום ביום AUG 02 2007

חתימה ____

תואר JOSEPH ADI VICE CONSUL יוסף עדי סגן קונסול

שגרירות ישראל וושינגטון • EMBASSY OF ISRAEL WASHINGTON •

חותמת השגרירות

רישום פעולות נוטריוניות

| שנה | מס' סידורי בדף | מס' הדף | מס' הספר |
|---|---|---|---|
| 07 | 24 | 14 | 190 |

**Affidavit**

I, Laura G. Ferguson, bearer of United States passport number 217171043, hereby declare as follows:

I am a member of Miller & Chevalier Chartered, which since May 2007 has represented the Palestine Authority and the Palestine Liberation Organization in connection with various civil law suits in the United States including *Ungar v. PLO*, No. 00-105L (D.R.I.), No. 04-2079 (1st Cir.). Miller & Chevalier intends to challenge the default judgments entered against the PA and the PLO, in the matter *Ungar v. PLO*, No. 00-105L (D.R.I.), No. 04-2079 (1st Cir.). We believe there are various grounds for vacating the default judgment. Significantly, at the time the Federal District Court in Rhode Island entered the default judgment against the PA and PLO, plaintiffs had filed suit in Federal District Court in Washington, D.C. against the Republic of Iran, the Iranian Ministry of Information and Security, and three individual Iranian government officials for the same underlying incident at issue in the lawsuit against the PA and PLO in Rhode Island.

In the Washington proceeding, plaintiffs averred that Iran funded and trained the alleged Hamas members responsible for the Ungars' deaths and demanded USD 680,000,000 in damages. The Washington complaint did not reference the PA or the PLO and attributed full responsibility to Hamas and Iran. In fact, plaintiffs' experts testified at a hearing in conjunction with the Washington case that Iran funded Hamas because it interfered with the peace process involving the PA and the PLO and affirmed that Hamas was a rival of the PA and PLO.

Plaintiffs' allegations in the Rhode Island court and the Washington court simply cannot be reconciled. Plaintiffs' theory in Washington was that Hamas sought out Iranian support because the PA and PLO had eschewed terrorist acts in favor of the peace process. In contrast, plaintiffs' theory in Rhode Island was that the PA's and PLO's liability arose out of tacit approval of Hamas' cause and providing material support to Hamas, including support after the incident. Indeed, had plaintiffs' evidence from the Washington case been introduced in the Rhode Island case, it would have exculpated the PA and PLO by showing that the PA's and PLO's negotiations with Israel caused Hamas' turn to Iran. This selective presentation and omission of evidence drew the notice of Judge Robertson in Washington, and we will bring it to the attention of the judge in Rhode Island.

In addition to these grounds, we will also raise other challenges in support of the motion to vacate the default. It is difficult to assess the likelihood of success on the motion as we cannot assess what position, if any, the United States Department of State will take on the Motion, though we are undertaking efforts to gain Department of State support. If the default judgment is vacated, then the PA and PLO will be able to defend the underlying lawsuit. All of the collection actions would have to be dismissed as there would be no judgment to enforce.

Our intent is to raise challenges to the judgment soon. Challenging the default judgment will involve filing pleadings with the Federal District Court in Rhode Island. The Court will then issue an opinion regarding our motion to vacate. The time it would take the Court to rule is dependent on the Judge's schedule and could range from immediately to several months.

I hereby affirm subject to penalty of perjury under the laws of the United States and the State of Israel that the aforesaid is true and correct.

Dated: August 2, 2007

Laura G. Ferguson
Laura G. Ferguson

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs – Judgment Creditors,

v. C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

Defendants – Judgment Debtors.

**DECLARATION OF AVRAHAM COLTHOF**

AVRAHAM COLTHOF, of the City of Jerusalem, Israel, DECLARES PURSUANT TO 28 U.S.C. §1746, AS FOLLOWS:

1. I am a graduate of the Law Faculty of Bar Ilan University in Israel, a member of the Israeli Bar and practice as an attorney in Jerusalem, Israel. I am completely fluent in Hebrew and English, and I am capable of translating accurately between those languages.

2. The English-language document attached hereto and marked as "Translation 1" is a true and accurate copy of the Hebrew-language document attached hereto and marked as "Original 1".

3. The Hebrew language document captioned "Embassy of Israel" attached hereto is a certification that Ms. Laura Gould Ferguson was duly sworn before signing her affidavit of August 2, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

August 10, 2007

AVRAHAM COLTHOF

# Translation 1

**In the Jerusalem District Court**

**H.P. 4318/05**
**Before the Hon. J. A. Farkash**

**1. The Palestinian Authority**
**2. The Palestine Liberation Organization**
Both by their counsel Joseph Arnon, Adv. et al.
18 Shlomtzion Hamalka St., Jerusalem 94146
Tel. 02-6245245 Fax 02-6250777

**Movants**
Respondents

- versus -

District Court
Jerusalem
(66)
08-06-2007
Received/Checked
Hour ________
Signature _____

**Yishai Ungar et al.**
All by their counsel Mordechai Haller Adv. & Co.
10 Coresh St., Jerusalem 94144
Tel. 02-9999837 Fax 02-6667211

**Respondents**
Movants

## MOTION TO POSTPONE ENTRY OF JUDGMENT

The honorable court is requested to postpone entry of judgment in this case.

**These are the grounds for the motion:**

1. The undersigned recently learned that counsel for the movants (the respondents in the underlying motion) in the United States intend to file a motion in the court that entered the judgment (the District Court in Rhode Island) – a motion which if granted, could lead to the vacatur of the judgment, the movants being given the opportunity to defend against the suit and the halting of all the enforcement and collection proceedings.

# **Translation 1**

2. A copy of an affidavit in regard to this issue is attached hereto as Exhibit A, as an integral part of this motion.

3. As discussed in the affidavit, the main ground for vacating the judgment is the fact that the plaintiffs in the United States **concealed from the court** that entered the judgment (in Rhode Island) that **in parallel they conducted a suit** (in a court in Washington) **regarding the same incident** against Iran, its Ministry of Defense, and a number of its senior officials.

4. Moreover, in the context of the suit against Iran the plaintiffs argued that Iran funded and trained the members of Hamas liable for the attack. In the complaint against Iran there is no mention of a connection between the Palestinian Authority and/or the PLO – the instant respondents – and the attack, or their liability therefor. The complaint against Iran attributes the full liability for the attack to Iran and Hamas.

5. Furthermore, plaintiffs' experts in the suit against Iran testified in the court in Washington that Iran assisted Hamas because it aspired to meddle in the peace process and to harm it, whereas the Palestinian Authority and the PLO deliberately eschewed involvement in terrorist activity in order to advance the peace process. It was also explicitly claimed there that at that time a rivalry existed between Hamas and the PA and PLO.

6. It should be recalled that in the court in which the instant judgment was entered the plaintiffs asserted that the PA and PLO should be held liable because of their liability for and contribution to the activity of the Hamas organization.

7. In light of this it is clear that plaintiffs' claims in the two suits are incompatible with one another and if the evidence and arguments presented in the court in Washington had been presented to the court in Rhode Island, there is a high

**Translation 1**

degree of certainty that the suit against the PA and PLO would have been dismissed.

8. It appears that not by mistake did plaintiffs entirely omit the existence of the suit against Iran, while they conducted the proceeding in Rhode Island.

9. About three months ago the representation of the PA and PLO in the United States was changed and the current law firm will soon file the aforementioned motion in the court in Rhode Island, as discussed in the affidavit.

10. The meaning of the motion, if granted, is vacatur of the judgment, the granting to the defendants of an opportunity to defend the suit and cancellation of all the collection proceedings.

11. The movants believe that the entry of judgment should be postponed in light of these facts and alternatively that enforcement of the foreign judgment should be stayed – if it is found to be enforceable in the State of Israel.

12. As discussed in the affidavit, counsel for the movants in the United States intends to file the motion soon and its disposition will be known in a time frame ranging from immediately – to a few months.

13. The movants are aware of the rule that the term "appeal" in Article 3(2) of the Enforcement of Foreign Judgments Law is narrowly construed and does not include other proceedings seeking to vacate or modify the judgment in the court that entered it, however, **the instant motion does not seek to refrain from enforcing the judgment in light of the intention to file the motion in the United States**, but rather only to postpone entry of judgment pending the disposition of the motion. It appears to movants that this is an appropriate and fair result which balances between the rights of the two sides, particularly in light of the circumstances and subject of the case, the fact that the judgment was given by

## Translation 1

default, the identity of the parties and the possible ramifications of the enforcement of the judgment in the State of Israel (as discussed in the movants' response to the underlying motion and in the summations that were submitted to the honorable court).

14. Wherefore, the honorable court is requested to postpone entry of judgment in this case until after the disposition of the renewed legal inquest in the United States. The movants undertake to notify the court and the respondents of the results of this proceeding immediately upon their receipt.

Joseph Arnon, Adv.
L.N. 8005
Counsel for the Movants

Original 1

**בבית המשפט המחוזי בירושלים**

**ה"פ 4318/05**
**קבוע בפני כב' הש' א. פרקש**

**1. הרשות הפלסטינית**
**2. הארגון לשחרור פלסטין**
שניהם ע"י ב"כ עו"ד יוסף ארנון ואח'
מרח' שלומציון המלכה 18, ירושלים 94146
טל' 02-6245245 פקס 02-6250777

**המבקשים**
המשיבים

בית משפט המחוזי
בירושלים (66)
- 6 -08- 2007
נתקבל / נבדק

-נגד-

**שי אונגר ואח'**
כולם ע"י ב"כ עו"ד מרדכי הלר ושות'
מרח' כורש 10, ירושלים 94144
טל' 02-9999837 פקס 02-6667211

**המשיבים**
המבקשים

## בקשה לדחיית מועד מתן פסק הדין

בית המשפט הנכבד יתבקש לדחות את מועד מתן פסק הדין בתיק זה.

**ואלו נימוקי הבקשה :**

1. לאחרונה נודע לח"מ כי בדעת באי כח המבקשים (המשיבים בהמרצת הפתיחה) בארצות הברית להגיש בקשה לבית המשפט שנתן את הפסק (בית המשפט המחוזי ברוד איילנד) - בקשה שאם תתקבל, עשוייה להביא לביטול פסק הדין, למתן הזדמנות למבקשים להתגונן מפני התביעה ולעצירת כל הליכי האכיפה והגבייה.

2. העתק מתצהיר בעניין זה רצ"ב **כנספח א'** וכחלק בלתי נפרד מן הבקשה.

3. כפי העולה מן התצהיר, העילה העיקרית לביטול פסק הדין הינה **העובדה** כי התובעים בארצות הברית **העלימו מעיני בית המשפט** שנתן את הפסק (ברוד איילנד) כי **במקביל ניהלו תביעה** (בבית המשפט בוושינגטון) **בגין אותו ארוע** כנגד איראן, משרד ההגנה שלה ומספר מבכיריה.

4. זאת ועוד, במסגרת התביעה כנגד איראן טענו התובעים כי איראן מימנה ואימנה את חברי החמאס האחראיים לפיגוע. בכתב התביעה כנגד איראן אין זכר לקשר או לאחריות הרשות הפלסטינית ו/או אש"פ - המשיבים דכאן - לפיגוע. כתב התביעה כנגד איראן מייחס את מלוא האחריות לפיגוע על איראן ועל החמאס.

5. מעבר לכך, מומחים מטעם התובעים בתביעה נגד איראן העידו בבית המשפט בוושינגטון כי איראן סייעה לחמאס משום ששאפה להתערב בהליך השלום ולחבל בו, בעוד שהרשות הפלסטינית ואש"פ התנערו במכוון ממעורבות בפעילות טרור וזאת על מנת לקדם את תהליך השלום. עוד נטען במפורש שם כי באותו זמן שררה יריבות בין החמאס ובין הרש"פ ואש"פ.

6. יוזכר כי בבית המשפט בו ניתן פסק הדין שבפנינו טענו התובעים כי יש להטיל אחריות על הרש"פ ועל אש"פ בשל אחריותם ותרומתם לפעילותו של ארגון החמאס.

7. ברור לאור זאת כי טענות התובעים בשתי התביעות אינן יכולות לדור בכפיפה אחת אלו עם אלו ואילו היו מוצגות בפני בית המשפט ברוד איילנד הראיות והטענות שהועלו בבית המשפט בוושינגטון, הדבר היה בוודאות גבוהה מביא לדחיית התביעה כנגד הרש"פ ואש"פ.

8. נדמה כי לא היתה זו טעות שגרמה לתובעים להשמיט לחלוטין את דבר קיומה של התביעה כנגד איראן, בעת שניהלו את ההליך ברוד איילנד.

9. לפני כשלושה חודשים הוחלף ייצוגם של הרש"פ ואש"פ בארצות הברית ומשרד עורכי הדין הנוכחי עומד להגיש בקשה כאמור לעיל לבית המשפט ברוד איילנד בזמן הקרוב, כפי העולה מן התצהיר.

10. משמעות הבקשה, אם תתקבל, כאמור לעיל, ביטול פסק הדין, מתן אפשרות לנתבעים להתגונן מפני התביעה וביטול כל הליכי הגבייה.

11. המבקשים סבורים כי יש להורות על דחיית מועד מתן פסק הדין לאור עובדות אלו ולחילופין על עיכוב ההוצאה לפועל של פסק החוץ - במידה וייקבע כי הוא אכיף במדינת ישראל.

12. כפי העולה מן התצהיר, בכוונת ב"כ המבקשים בארצות הברית להגיש את הבקשה בקרוב כאשר תוצאותיה יכולות להתקבל בטווח הזמן המיידי - עד מספר חודשים.

13. המבקשים מודעים להלכה לפיה המונח "ערעור" שבסעיף 3(2) לחוק אכיפת פסקי חוץ פורש באורח מצמצם כך שאינו כולל גם הליך אחר שנועד להביא לביטולו או שינויו של הפסק על ידי בית המשפט שנתן אותו. אולם, **הבקשה דכאן איננה להמנע מאכיפת הפסק לאור הכוונה להגיש את הבקשה בארצות הברית**, אלא רק לדחות את מועד מתן פסק הדין עד לקבלת תוצאותיה. נדמה למבקשים כי מדובר בתוצאה ראויה והוגנת המאזנת

בין זכויות שני הצדדים, וזאת במיוחד לאור נסיבות ונושא התיק, העובדה כי פסק הדין ניתן בהעדר הגנה, מיהות הצדדים וההשלכות האפשריות של אכיפת הפסק במדינת ישראל (כפי שנדונו בתשובת המשיבים להמרצת הפתיחה ובסיכומים שהוגשו לבית המשפט הנכבד).

14. אשר על כן, יתבקש בית המשפט הנכבד לדחות את מועד מתן פסק הדין בתיק זה עד לאחר קבלת תוצאות הבירור המשפטי המחודש בארצות הברית. המבקשים מתחייבים להודיע לבית המשפט ולמשיבים תוצאותיו של הליך זה מייד כשיתקבלו.

יוסף ארנון, עו"ד
מ.ר. 8005
ב"כ המבקשים

א

**EMBASSY OF ISRAEL**
WASHINGTON, D.C.

שגרירות ישראל
וושינגטון

# אימות תצהיר

אני הח"מ, יוסף עדי, סגן קונסול שגרירות ישראל בוושינגטון, מאשר בזה כי היום יח' אב תשס"ז
התייצב/ה בפני מר/גב' FERGUSON LAURA GOULD
שזיהה/תה עצמו/ה להנחת דעתי עפ"י דרכון אמריקאי מספר 217171043
שניתן ב- / בו רשום מס' זהות /

ולאחר שהזהרתיו/ה כי עליו/ה להצהיר את האמת וכי יהא/תהא צפוי/ה לעונשים הקבועים בחוק אם לא יעשה/תעשה כן, חתם/ה בפני על תצהירו/ה המצורף והמסומן באות "א".

ולראיה באתי על החתום ביום AUG 02 2007

חתימה ____________

תואר JOSEPH ADI VICE CONSUL יוסף עדי סגן קונסול

EMBASSY OF ISRAEL WASHINGTON שגרירות ישראל וושינגטון

חותמת השגרירות

רישום פעולות נוטריוניות

| | | | |
|---|---|---|---|
| 190 | 14 | 24 | 07 |
| מס' הספר | מס' הדף | מס' סידורי בדף | שנה |

Permanent Observer Mission
of Palestine
to the United Nations

البعثة المراقبة الدائمة
لفلسطين
لدى الأمم المتحدة

January 27, 2003

Honorable David L. Martin
Magistrate Judge
U.S. District Court
Office of the Clerk
Providence, Rhode Island 02903-1720
Re: Ungar v. The Palestinian Authority
C.A. No. 00-105L D.R.I.

Dear Judge Martin,

We have carefully analyzed the three discovery documents in this case and the possibility of our responding to them in the near future.

Our communications with officials from the PNA and the PLO who would normally be concerned with legal requests of this kind have been extremely difficult.

As you know there has been intense violence throughout occupied Palestine for more than two years. The offices of the PNA in Gaza City have been destroyed. Offices in Ramallah have been attacked and partially destroyed and left under continuing siege. Other offices of both the PNA and the PLO have been damaged. Records have been destroyed, damaged, dispersed and lost. Personnel responsible for record keeping have been separated from their offices and records and unable to perform their assigned tasks.

President Arafat has been virtually trapped in the ruins of his office in Ramallah since March of 2002. Other officials and administrators have had similar difficulties. More than 2100 Palestinians have been killed by the Israeli occupying forces on our own soil during the last 28 months affecting everyone's life.

Government offices and officials cannot work effectively or organize even on matters of extreme urgency. It has been impossible under such circumstances to locate people who could seek and find documents, who could gather information and prepare answers to interrogatories and could respond to requests for admissions.

We find the scope of inquiry to be incredibly broad and often unrelated to the claims being made by plaintiffs. Much of it seems politically motivated and seeks records usually deemed confidential including communications between the PNA, or the PLO with foreign states, even with the United States government.

115 East 65th Street New York, NY 10021 Tel. (212) 288-8500 Fax (212) 517-2377

We don't understand how plaintiffs can claim the PNA and PLO are responsible for what HAMAS does. The history of the PNA/PLO- HAMAS relationship is public and well known and the claim that the PNA and PLO are responsible for what HAMAS does is simply not credible.

Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what HAMAS does. Yet we've been advised plaintiffs are doing this. We notice what appears to be a multiplicity of suits coming from the same lawyers and political statements publicly made by them in connection with the suits, which makes it difficult to believe their aim is to pursue the interests of the individual plaintiffs.

It would seem fair and just to wait until there is a final decision on the issue whether the U.S. Court has jurisdiction over the PNA and the PLO for these events before proceeding to these requests. Nothing else is possible for us. Plaintiffs waited nearly four years from the time of the assault to file this case. The time we request which is necessary to make presentation of our defense possible, if a defense becomes necessary, ought to be comparatively short. Only the achievement of a level of stability, free from the threat of daily attacks in our territory can make it possible to free personnel to gather the materials and information needed to proceed with a defense. 9

While we wait until violence subsides and hopefully peace comes, to respond to appropriate discovery requests if jurisdiction is upheld, we must state that neither the PNA nor the PLO played any role and neither had any responsibility for the deaths in this case. We regret these deaths as we do the thousands before them and since in these tragic years of violence.

Under exceedingly difficult circumstances the PNA and PLO have done what they can do to reach a peace agreement and to protect lives even while they have themselves been attacked. We grieve over the deaths and injuries on both sides from the constant physical violence and the impoverishment and economic deprivation inflicted on the Palestinian people. And we fully understand that all who live in these Holy Lands will suffer until peace based on justice and international legitimacy is achieved.

We hope this case will not become an obstacle to such a day.

Sincerely,

Dr. Nasser Al-Kidwa
Ambassador, Permanent Observer of Palestine
to the United Nations

# EDWARDS & ANGELL, LLP

COUNSELLORS AT LAW

2800 FINANCIAL PLAZA
PROVIDENCE, RI 02903-2499
(401) 274-9200
FAX (401) 276-6611

**Deming E. Sherman**
Direct Dial: (401) 276-6443
Direct Fax: (888) 325-9061
E-Mail: dsherman@ealaw.com

March 27, 2003

**BY HAND**

The Honorable Ronald R. Lagueux
Senior Judge
United States District Court
District of Rhode Island
U.S. Courthouse
One Exchange Terrace
Providence, RI 02903

RE: **The Estate of Yaron Ungar, et al v. The Palestinian Authority et al.**
**C. A. No. 00-105L**

Dear Judge Lagueux:

There has been pending since November 20, 2002, a Motion for Reconsideration by defendants of your decision entered on November 5, 2002, on defendants' Motion to Dismiss the amended complaint.

There are currently Motions for Default filed by plaintiffs on defendants' failure to file an answer, failure to respond to interrogatories, and demands for documents and admissions. In addition, defendants have applied for a protective order against depositions plaintiffs have noticed of defendants' leadership.

There is a hearing scheduled by Magistrate Judge Martin on April 1, 2003, to consider entry of default for failure to file an answer.

The defendants are anxious to obtain a final decision from U.S. Courts, including the U.S. Court of Appeals, on issues raised in their Motion to Dismiss before the case proceeds to default and, if dismissal is ordered, on issues of defendants' liability for acts of Hamas, of damages, and other remaining issues. See Ungar v. Islamic Republic of Iran, 211 F.Supp.2d 91 (DDC 2002) (No. 00CV2606 JR) and the proceedings therein involving the same plaintiffs suing on the same deaths.

Defendants strongly believe they should not be forced to choose between default and trial on the merits until their immunity, justiciability of the claims and subject matter jurisdiction are finally decided. They believe that under the volatile conditions that exist and their present physical inability to defend themselves and their people, such proceedings would cause serious and irreparable injury. The defendants, the Palestinian Authority and the Palestine Liberation Organization, together are the present and only government the Palestinian people have, and their political status is approaching universal recognition.

We therefore respectfully request you to act on the pending Motion for Reconsideration in order to facilitate appeals if desired by either party, before the case proceeds further in your Court. Appellate review may become more difficult without the ruling requested.

Thank you.

Very truly yours,

Deming Sherman

Deming E. Sherman

cc: The Honorable David L. Martin
United States Magistrate Judge
David J. Strachman, Esq.
Ramsey Clark, Esq.
Lawrence W. Schilling, Esq.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

++++++++++++++++++++++++++

EFRAT UNGAR CA No. 00-105 L

v PROVIDENCE, RI
1 APRIL 2003

THE PALESTINIAN LIBERATION ORGANIZATION

+++++++++++++++++++++++++++++

BEFORE MAGISTRATE JUDGE DAVID L. MARTIN

APPEARANCES:

FOR THE PLAINTIFF: DAVID J. STRACHMAN, ESQ.
321 S. Main St
Providence, RI 02903
351-7700

FOR THE DEFENDANT: RAMSEY CLARK, ESQ.
LARRY W. SCHILLING, ESQ.
36 East 12th St.
New York, NY 10003
1-212-475-3232

1 APRIL 2003

THE COURT: This is the matter of the estate of Yaron Ungar, et al vs the Palestinian Authority, et al, Civil Action 00-105 L. Before the Court is the plaintiff's motion to enter default against defendants Palestinian Authority and PLO. The attorneys will identify themselves.

MR. STRACHMAN: David Strachman for the plaintiffs.

MR. CLARK: Ramsey Clark for the defendants. With me is Larry Schilling.

THE COURT: I have also had referred to me the Palestinian defendant's motion for a protective order, and I have received the plaintiff's objection to Palestinian defendant's motion for a protective order. I'll first hear argument on the motion then for default against the defendants Palestinian Authority and PLO, and at that point I will assess what we need to do about the other motion.

Mr. Strachman, I'll hear you on the motion for entry of default.

MR. STRACHMAN: Thank you. Your Honor, just as a preliminary matter, I wasn't aware that the second motion was referred to your Honor for hearing today.

THE COURT: Well, it's not scheduled for

hearing.

MR. STRACHMAN: Okay.

THE COURT: And it was referred to me on March 27th and notice has not been sent to counsel of the pendency of that motion, and if counsel are not prepared -- it's not before me. I just note -- I've had it referred to me, and when I saw it and I looked at the present motion that was scheduled for today's hearing, I thought there may be an interrelationship between the two that one may have an affect on the other, at least this motion may affect the motion for protective order. I'll hear you on what's scheduled for today, which is the motion to enter default.

MR. STRACHMAN: Thank you, your Honor. If your Honor please, this matter has a long history. It is now past the 3 year anniversary of this case.

On November 4, this past year, Judge Lagueux rendered a very lengthy and detailed decision on the defendant's motion to amend -- excuse me, motion to dismiss the amended complaint. Very simply, pursuant to Rule 12(a)(4)(A), the defendants have 10 days to file an answer, 10 days from November 4, 2002. And just some sort of very simple side history, the Court had a conference with counsel telephonically on 12/2. We had a hearing on 12/12 before your Honor concerning

discovery issues. At the 12/2 -- excuse me, the 12/12 hearing, your Honor made it very clear that a stay that had entered previously was not applicable now that Judge Lagueux had rendered his decision on November 4th. Your Honor followed that up with a letter to counsel, and this case has proceeded in the sense that a series of motions have been filed concerning discovery, and defendant's counsel and I worked out over the course of a month the exact language of a discovery order following your Honor's ruling. We find ourselves now 145 days after the answer was due, and we still have no answer, and it's -- there's just no excuse for not filing an answer. We're entitled to it under the rules. The defendants have had the amended complaint for 20 months. So for 20 months, because it was filed August of 2001, they had 20 months to prepare an answer. Defendants indicate, I believe somewhat brazenly to this Court, on Page 2 of their objection in the memorandum in support of their objection, they indicate that they "had the abil -- that drafting and filing an answer is within defendant's limited capabilities although inadvisable." So they've admitted to the Court they have the capacity, which I don't think anyone could really plausibly question, to begin with, and we have no answer. We have no answer.

We have no way of knowing what their defenses are, factual, legal or otherwise, other than the defenses that were rejected now twice in a motion to dismiss the complaint and in a motion to dismiss the amended complaint. We have an order of discovery which has not been complied with and is the subject of other motions but clearly contemplates that the case is finally going to get moving and move along a specific track already ordered by your Honor in terms of discovery, interrogatories and depositions, and we find ourselves without an answer even as yesterday's first deposition was suppose to go forward, after 4 and a half months since the rules require an answer to be filed. Thank you.

THE COURT: Thank you, Mr. Strachman. Mr. Clark.

MR. CLARK: Thank you, sir. Good afternoon, Judge.

THE COURT: Good afternoon.

MR. CLARK: This is, as our presence attests, in both the matter to the defendants and the Palestinian people (inaudible).

The defendants have been anxious, and I think it's been apparent in getting to have a full and final determination and review of their motion to

dismiss, which they think is meritorious. They have a motion for reconsideration pending to Judge Lagueux's order of November 5, all the time that we've been talking about, without knowing that we'll be held to answer in this court. My instructions have been do not answer, do not take any steps that would replace us here, and we have anxiously awaited the decision on motion for reconsideration. I think in this connection the Papandreo case which we cited to you from the District of Columbia, Court of Appeals -- United States Court of Appeals for the District of Columbia, they have two other courts there, which observed that the importance of determining immunity applies not only to what you're held in court but to all of the burdens of litigation, and it observes that proposed burdens of litigation before that issue is determined can compromise the rights and well-being of the defendant, and that's why the Court of Appeals granted a Writ of Mandamus in that case, prevent the case from going forward.

We've now, of course, had a, I guess it's an order, from Judge Lagueux, on the 27th of, which is now last month, March, setting the hearing not only on the motion for reconsideration but on the other motion we're talking about, the motion for default and the

motion for protective order on discovery. So it would seriously prejudice the rights of the accused here -- I practice too much criminal law -- to be forced to answer and proceed until their status is clear. I don't want to argue the merits of the jurisdiction, but I will observe that there has been steady development in the legal status of Palestine.

You'll note that (inaudible) doesn't refer anymore to the permanent representative of the PLO, now refers to, this is by vote of the United Nations, the Permanent Representative from Palestine. President Bush has just recently as two weeks ago described his intense interest in a statement in the Rose Garden, in proceeding as quickly as possible, not only with the peace process but with the full recognition of the government of Palestine. You know, (inaudible) because a great majority of the members of the United Nations have recognized Palestine, their Embassies. So the point is that since the Achille Laura and other cases, you have entirely different legal factual status, and we're anxious for Judge Lagueux to reconsider and review his decision on that basis, and we're anxious that the prejudice, irrevocable injury that can flow from trying to get into depositions, that it not occur prematurely.



THE COURT: Mr. Clark, let me interrupt you

with a question. If Judge Lagueux denies your motion for reconsideration, would your client then file an answer at that point, or would your client continue with the position, that I gather from your filings your client takes, which is they are immune from suit, and that they ought to have, if Judge Lagueux won't reconsider his ruling, then they will continue with their present course of action and seek review ultimately by the First Circuit?

MR. CLARK: I hope the answer is clear, but I will make it as clear as I can. The desire to (inaudible) is set forth in Papandreo to have those issues determined before proceeding to answer and all of the discovery and other matters that follow, and burdens of litigation, as they call it, is ripe, and we will seek, we don't know what Judge Lagueux's disposition will be now, but we would seek an opinion from that ruling and process it as quickly as we could.

THE COURT: Thank you for answering.

MR. CLARK: Now the other consideration is existing conditions which make proceeding essentially impossible. I went to Rhamalla in mid December, the 15th and 16th, maybe the 16th and 17th of December, and met with the leadership, including President Arafat.

9

This was the only business that I had, this case, and

several cases, but this is the what we call the lead case. I say that even though there's, as you know, there's a similar case -- I say similar, there's a virtually identical case pending in the District of Columbia (inaudible). In that case claiming that Hamas was controlled by Iran for the Ungars, the same plaintiffs, the same factual claims, only there claiming it's Iran and Hamas while here the claim is Palestine and Hamas, and it's not likely that both can be true, but can observe that there Judge Robertson has refused. There's no appearance there. Iran has failed, if not refused, to appear in a number of cases like that. There have been default judgments up in the billions of dollars entered against it. So, but the conditions, to get in to see the leadership of the PLO, knowing the government's situation there for some time, of all the government buildings that I've ever been in, in Gaza are destroyed, and and quite often there are tanks out there. Records destroyed. And in many cases, the headquarters to the Palestinian National Guard image, or even in existence during the (inaudible), is rubble. I've (inaudible) break my neck climbing over literally rubble of (inaudible) to get in there. The president has been essentially a prisoner

10

there, Mr. Arafat, since sometime last March, a year ago, March of 2002. He has not been out. (Inaudible).

But that's been his way to try to keep his people alive.

So the ability -- we were generous when we said that with the resources and the opportunities available, we can probably file an answer, but the fact is that to file an answer would cross the line, it would be (inaudible) unnecessary, creates an appearance that we hope will prove to be fallacious. We have a duty under the U.S. law to respond, and then the next day we'd file such an answer. We'd be immediately confronted with an impossibility. Observed it yesterday, President Araft, (inaudible) testify here in Rhode Island, before a notary public yesterday. (Inaudible). He didn't come here. A default would be based on that theory. So when you're starting down a road, you can only create political usage in the media, appearances that may prove to be misleading, if not will be harmful under any circumstances, and then (inaudible) very tough over there. Six people killed in Bethlehem a couple of days ago, 3 in one little family. American killed by a bulldozer in Gaza last week. So we really -- I (inaudible) when it's impossible to defend because of circumstances beyond

11

our control. So going forward at this time, I think, would be -- may be terribly unfair. I think it would

be contrary at least to the decision in Papandreo where a district judge decided to go ahead and was (inaudible) that it would deny due process. It would make absolutely no progress. We'd be confronted with the same problems the next day. So all of (inaudible), which can't go forward. Can't give discovery. That's why I was pressing to suggest this other motion, as you mentioned, might be discussed today, could be relevant on this issue. It certainly is.

There's also a question, we don't know, (inaudible) it would seem that it would be improvident, improvident in Providence, to proceed when Judge Lagueux has just announced an intention to consider all these motions. So I would urge, as strong as I can, that the Court defer. If the Judge says go ahead, there would be no need for another argument, as far as I can tell on this motion. (Inaudible)

THE COURT: I'm sorry, if the Judge says go ahead and what, Mr. Clark?

MR. CLARK: If he said after the hearing on the 11th, did he decide, could he say he's going to consider all of these motions, four or five, we assume that you have seen his or her motion, his record

12

(inaudible).

THE COURT: I'm aware that he has scheduled a hearing on several motions for, I believe, April 13th

or thereabouts. Is it the 11th?

MR. CLARK: The 11th.

THE COURT: And among the motions that he's scheduled a hearing on is your motion for reconsideration. I'm aware of that, Mr. Clark.

MR. CLARK: Yes. Also two motions to dismiss, which would therefore (inaudible).

THE COURT: All right. You're suggesting to me that if he rules favorably on the motion for reconsideration, then that would have an impact on the motion for entry of default here.

MR. CLARK: Well, what I'm concerned is, he's considering all of them. That's what I'm saying, he's considering all of them. He would -- I would (inaudible) naturally, whatever he decides on reconsideration. If he decides no reconsideration, he decides whether -- the last time, you know, he refused a stay pending appeal, and discussed the problem of certification, the issue of certification. It was not clear exactly to me what was intended here, but presumably he would say what he thinks should be done with all of these matters. He already referred this

13

issue to you, your Honor, but that was before the letter of March 27th, which notified all of us that he was going to hear all of these matters on the 11th. So

if he wants to hear all these matters on the 11th, you could take this under advisement, or however you want to do, see what he says on the 11th and then proceed if that's what's indicated. To proceed before that I think might be improvident.

THE COURT: All right, Mr. Clark. Thank you.

MR. STRACHMAN: May I briefly respond?

THE COURT: Yes, Mr. Strachman.

MR. STRACHMAN: Thank you. First in terms of the scheduling, your Honor, as I indicated in the letter Friday, this motion was scheduled and referred to your Honor by Judge Lagueux while all of the other motions were pending before the Court. So he referred this matter, with the docket entry, for all of the other motions having already been made, (inaudible) until the motions were pending.

Second, your Honor, it's even respectfully more brazen now to say that the defendants cannot file an answer after having met with counsel in December, and I'm sort of shocked to hear that counsel would meet with the clients, and as Mr. Clark said, primarily on

14

this case. That's what primarily (inaudible) to meet with his clients, and then wait 4 and a half months, not file an answer, not ask this Court for additional time, not send a letter or request or stipulation

amongst the parties, never having discussion with the Court or counsel about extending the time.

And in response to your Honor's, I think, questions, really gets to the exact nub of the issue, and that is, if the motion for reconsideration is denied, are you going to file an answer? Mr. Clark essentially says no. That means this case is even more so than when we wrote our initial memo within the Conetta case, and that involves a wilful determination of not filing an answer, and now we see it even more so flushed out before the Court.

Also as has been made clear in many cases, as been made clear by your Honor in the discovery matter, the mere filing of a motion to reconsider a, for reconsideration, does not stay the whole case. You can't file a motion for reconsideration and then get out of, sort of get out of jail free pass, from all the rules of civil procedure, and frankly because each and every motion has an order of this case, there's been a motion to reconsider, we're litigating the litigation in this case, I would fully expect that we would have

15

many more such motions down the road. That doesn't stop the rules of procedure from operating. That doesn't excuse this defendant, these defendants from their obligations.

the 3 year anniversary. I presume there is no case in this district that an answer has not been filed 3 years after litigation. And I would urge your Honor to look at this matter in a very simplistic way, actually, because it's really just a simple application of Rule 12, and the representations by Mr. Clark that he met with his counsel, he's been instructed not to file an answer, and he was instructed in December, even after talking about this specific case, and his response to your Honor's question, that even if the motion to reconsider would be denied, there would be no answer forthcoming because there's some appeal that they may decide to file.

Just so we're clear, your Honor, there is no motion for an interlocutory decision. No appeal has been taken. No further action has been taken. So the threats about taking appeals, et cetera, cannot give a -- cannot be a carte blanche for just stopping this litigation. Thank you, your Honor.

Oh, I'd just like to add one other thing,

17

which has been neglected to be mentioned. Tomorrow, in Washington, the PLO is going on trial. The PLO and the PA are going on trial in the case of Burkheit v Palestine Liberation Organization, 00-CV-1455. I have the docket sheet which I'd like to provide to the Court

and also to counsel. They're going to trial tomorrow in a case that was scheduled several months ago. They have counsel defending the case, and presumably the PLO is giving instructions in one case how to answer, and the PA, as well, and how to respond to a case and how to litigate a case, and how to show up for trial, and yet we have instructions from allegedly Mr. Arafat suggesting in December he's not going to file an answer in this case, and that type of conduct can't be sanctioned. And if I could, your Honor, I'd like to provide just the docket sheet that I received --

THE COURT: Have opposing counsel -- do you have a copy for them, please?

MR. STRACHMAN: I presume they have it, but I do have a copy for them.

MR. CLARK: We don't have it.

THE COURT: Mr. Clark, would you like to briefly respond?

MR. CLARK: Very briefly, your Honor.

THE COURT: All right.



MR. CLARK: I will say first I've never -- I'm unaware of this case (inaudible), but what it is, if it's commercial payments, something like that, whatever it is, this case is this case. And April 11th is hardly forever. And the point I said about our instruction was that we were told not to file an answer

until the issue of jurisdiction had been finally resolved by "appeals", and that's our right under (inaudible) and it's our right under simple justice. Thank you.

THE COURT: All right. Thank you, Mr. Clark.

The Court is conscious of how long this case has been pending, and of the history that was recited by Mr. Strachman, and of the need for a prompt decision on the pending motion. I am, however, not going to rule from the bench today. I do want to look at the Papandreo case again that Mr. Clark has cited both in the memo and in his oral argument today. I do not know whether I will accede to the request, Mr. Clark, of not ruling prior to the hearing before Judge Lagueux, but I can assure all parties that a decision would be made promptly after Judge Lagueux's hearing at the latest on the present motion before me.

Regarding the motion for a protective order,

19

since that was not scheduled for hearing, I will not take that up. It seems to the Court that, as I indicated in my remarks at the beginning of the hearing, that the present motion could impact the need to have a hearing on the motion for protective order. That's the reason why I should proceed promptly to

decide this pending motion. I will include a footnote in my decision, or some -- perhaps not a footnote in the decision, but some notice to the parties regarding the status of the motion for a protective order at the time I impact upon the motion for entry of default judgment, which as I say will be done promptly. I thank the attorneys for their arguments. The Court will stand in recess.

(RECESS)

20

C E R T I F I C A T I O N

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al | ) |
| Plaintiffs-Appellees | ) |
| v. | ) |
| THE PALESTINIAN AUTHORITY and THE PALESTINE LIBERATION ORGANIZATION, | ) |
| Defendants-Appellants | ) |

**DEFENDANTS' MOTION UNDER RULE 8(A)(2)**
**FOR A STAY PENDING APPEAL**

Defendants the PALESTINIAN NATIONAL AUTHORITY ("PNA") named and referred to in the Court below as "The Palestinian Authority," and the PALESTINE LIBERATION ORGANIZATION ("PLO") respectfully move pursuant to FRAP Rule 8(a)(2) for a stay of further proceedings in the District Court pending the disposition of this appeal, and in support of this motion state as follows:

1. This is an interlocutory appeal by defendants who constitute the government of Palestine from the denial of their request for the dismissal of this action on grounds of sovereign and governmental immunity, non justiciability and as barred by 18 U.S.C. sec. 2337. This motion is properly made in this Court under Rule 8(a)(2) because the District Court has denied a stay pending appeal, stating from the bench at a hearing on Friday, April 11, 2003 "...I will deny the...stay pending appeal. This case is going forward whether or not there is an interlocutory

appeal." Transcript of April 11, 2003 hearing, attached hereto as Ex.1, TR9, L.1 reiterated at TR12, L.15.[1]

2. Defendants request that this motion be expedited because in the absence of a stay defendants are threatened with irreparable harm by continued demands for discovery and motions by plaintiffs for entry of default and default judgment and other relief. Indeed within a week after the April 11, 2003 hearing defendants were ready to file their appeal and motion for a stay and repeatedly requested in vain entry of an order in accordance with the District Court's denial of their motion for reconsideration at the April 11, 2003 hearing, TR8-9, L.25 from which they could take this appeal. Despite their efforts, no such appealable order was forthcoming. In the absence of a stay the Magistrate Judge, on Friday, April 18, 2003 granted two of plaintiffs' several pending motions. One motion was for the entry of default against defendants under Rule 55(a) for failure to file an answer to the complaint. The other was a motion to strike portions of defendants' papers on their motion for a protective order against the taking the noticed depositions of President Arafat and other leading Palestinian officials. These rulings and orders of the Magistrate Judge inflicted precisely the kind of irreparable harm that should be stayed pending appeal. As is developed below, they are "burdens of litigation" that should not be imposed before issues of immunity are finally

[1] References beginning "TR" are to pages of the transcript of the hearing before the District Court on April 11, 2003.

resolved.

3. On April 22, 2003 the District Court signed the order from which this appeal is being taken. The order was entered on April 22, 2003 and is attached hereto as Ex.2. The order denies defendants' timely motion filed on November 20, 2002, for reconsideration of the District Court's decision and order entered on November 5, 2002, which denied defendants' motion to dismiss the amended complaint. Defendants' papers on the motion for reconsideration are attached as Ex.3. The District Court's decision and order entered on November 5, 2002 is attached as Ex.4. The decision is reported, 228 F.Supp. 2d 40 (D.R.I. 2002), and is hereinafter referred to as "the Opinion."

4. Defendants' notice of appeal was filed on April 22, 2003 following entry of the order denying defendants' November 20, 2002 motion for reconsideration. A copy of the notice of appeal is attached as Ex.5. The appeal is timely. Defendants' motion for reconsideration tolled the time for appeal from the order and decision entered on November 5, 2002. The time for filing a notice of appeal from the November 5, 2002 order and the order denying the November 20, 2002 motion for reconsideration began to run when the latter order was entered on April 22, 2003. Fed.R.App.P. 4(a)(4); Acevedo-Villalobos v. Hernandez, 22 F.3d 384, 387, 390 (1st Cir. 1994); see also Marrical v. The Detroit News, Inc., 805 F.2d 169, 171 (6th Cir. 1986); Cf. Blair v. Equifax Check Services, Inc., 181 F.3d 832, 837 (7th Cir. 1999).

5. At the end of its Opinion the District Court denied a stay "pending disposition of the application for certification and/or appeal." 228 F.Supp. 2d at 51. An earlier stay issued by the Magistrate Judge ended when the Opinion was issued. The Opinion asserted that the stay was being denied "in accordance with the broad discretion granted to United States district courts under 28 U.S.C. sec. 1292(b)," which overlooked the limiting effect of the law applicable to appeals, or mandamus proceedings involving issues of sovereign immunity, governmental immunity, non justiciability and applicability of 18 U.S.C. sec. 2337, upon the Court's discretion to deny a stay pending appeal.

6. It is well established that issues of immunity are to be finally resolved before a defendant claiming immunity is subjected to further burdens of litigation. See e.g. In re Papandreou 139 F.3d 247, 251 (D.C. Cir. 1998),

> "Sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." The infliction of those burdens may compromise it just as clearly as would an ultimate determination of liability. For that reason a trial court's denial of an immunity defense entitles the defendant to an immediate appeal under Cohen. ("Deprivation of the right not to be tried satisfies the...requirement of being 'effectively unreviewable on appeal from a final judgment'"). The scope of jurisdictional discovery under FSIA poses the same issue, writ slightly smaller. Here too, we think, immediate review is appropriate. (Citations omitted).

Defendants cited three cases to the same effect in their memorandum in support of their motion for reconsideration, at p.5, Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 91 (D.C. Cir. 2002); Foremost-McKesson, Inc., v. The Islamic

Republic of Iran, 905 F.2d 438, 443 (D.C. Cir. 1990); and Jungquist v. Sheikh Sultan Binkhalifa Al Nahyan, 115 F.3d 1020, 1025-27 (D.C. Cir. 1997).

7. The November 20 motion, Ex.3 hereto, in addition to requesting reconsideration of the grounds for dismissal, also:

(a) argued that the grounds on which the Opinion ruled as a matter of law that defendants were not a foreign state, were erroneous as a matter of law, i.e. reliance on Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44 (2d Cir. 1991) was misplaced, because it was based on conditions existing in 1985 at a time when the PLO was headquartered in Tunis and not present in occupied Palestine. The PNA did not exist. The opinion also gave undue weight to defendants' lack of full U.N. membership. Universally recognized states, including Switzerland, have never been Members of the U.N. The grounds relied on by the District Court failed to take into account decisively important changes bearing on the status of Palestine that had occurred since 1985 which required recognition of defendants as a foreign state. The changes included matters defendants requested leave to brief by motion filed on January 30, 2002 which it was necessary for the District Court to consider in order to benefit from submissions of the parties on the subject, but which the Court failed to do.

(b) requested that the motion the defendants filed on January 30, 2002, that was not acted upon, be granted. The motion for reconsideration pointed out that the Opinion did not dispose of or mention this pending motion. The overlooked motion

requested leave to assert defenses and to fully brief the issues of sovereign immunity and the application of 18 U.S.C. sec. 2337 as a bar to maintenance of the action, identifying these as issues of subject matter jurisdiction to be decided before answer. A copy of the January 30, 2002 motion is attached as Ex.6. Despite not having decided this motion, the Judge rejected the statement of defendants' counsel in the April 11 hearing that there were materials bearing on sovereign immunity and statehood that the Court had not considered, asserting: "I beg to differ. The whole issue of sovereign immunity was thoroughly briefed and thoroughly argued on the motion to dismiss and I made a thorough and complete ruling on that subject... I considered every facet of it." TR4, L.8, TR6, L.19.

(c) stated that some discovery bearing on immunity might be necessary. See, <u>In re Papandreou</u>, <u>supra</u>, 139 F.3d at 253 (discovery to determine whether immunity bars jurisdiction must proceed with circumspection). It asked that a stay of further proceedings other than those bearing on immunity, if any, be issued pending the determination of the motion for reconsideration and if the dismissal of the action is denied, that a further stay be issued pending determination of defendants' appeal to the Court of Appeals,

8. The November 20, 2002 motion for reconsideration was pending for a period of almost 5 months before it was decided. During this period defendants were unable to file an effective notice of appeal. Fed.R.Civ.P. 4(a)(4). Defendants wrote to the

Court on March 27, 2003 when they faced an April 1 hearing before the Magistrate Judge on one of plaintiffs' motions for default, asking that the November 20, 2002, motion be decided before other proceedings occurred, so that if it was denied defendants could appeal. The letter is attached as Ex.7. The Court immediately scheduled the motion and others for a hearing on April 11, 2003. At the hearing the Court explained the motion for reconsideration had been "lost in the cracks," and the Court was unaware it was pending. TR3, L.5.

9. During this period of almost 5 months, in the absence of the stay defendants had requested, plaintiffs pressed for discovery and moved first for the entry of default under Fed.R.Civ.P. 55(a) on the grounds that the complaint had not been answered and thereafter made two motions for default judgment, one on February 12, 2003, for not providing discovery and another on April 9, 2003, for not submitting to depositions. Defendants made applications for stays as to each such motion by plaintiffs filed before April 1, 2003, all of which were denied.

10. Plaintiffs proceeded with discovery by demand and motion, pressing for answers to interrogatories, production of documents and admissions. They noticed depositions in Providence, Rhode Island before a notary public of President Arafat and six other prominent Palestinian leaders. Defendants resisted such demands and motions. After plaintiffs obtained an order for discovery, defendants filed a motion before the Magistrate Judge on January 27, 2003 asking that the order be

reconsidered, setting forth grounds and supported by a letter from Palestine Ambassador to the U.N., Nasser Al-Kidwa. The letter is attached as Ex.8. As were others, the motion was denied. Thereafter, plaintiffs moved for the entry of default judgment under Fed.R.Civ.P. 37(b)(2). Plaintiffs' motion for the entry of default under Rule 55(a) had earlier been assigned to Magistrate Judge Martin. The Magistrate Judge held a hearing on the motion on April 1, 2003 after receiving notice of the District Court's Order scheduling a hearing for April 11 on all the motions. The Magistrate Judge reserved decision on the motion for default for failure to file an answer at the April 1, 2003 hearing, stating "that a decision would be made promptly after Judge Lagueux's hearing [on April 11, 2003] at the latest." P.18, L.21. This is the motion for entry of default referred to in para. 2, supra which the Magistrate Judge granted on Friday, April 18, 2003 while defendants were requesting in vain entry of an order which they submitted that would enable them to take this appeal. The Clerk entered the default on Monday, April 21, 2003, again before this appeal could be taken by defendants. The transcript of the April 1, 2003 hearing is attached as Ex.9.

11. The discovery sought by plaintiffs was not limited to issues of immunity or subject matter jurisdiction. Plaintiffs' discovery demands, for answers to interrogatories, production of documents and admissions, are attached hereto as Ex.10. It was directed to the merits of the case and ranged far beyond the issues presented in the complaint. It was intrusive and sought

information on privileged and confidential matters, and was improper in many other ways. Defendants continue to oppose as a matter of right all further proceedings in the case including filing of an answer until the issues of sovereign immunity, subject matter jurisdiction and justiciability, including political questions, and the applicability of 18 U.S.C. sec. 2337 are determined by the Court of Appeals.

12. Defendants' incapacity to defend this case under present conditions which have prevailed for many months is the result of violent conduct in violation of international law and domestic law of Israel and PNA. The violence by Israeli forces targets PNA and PLO officials and offices, as well as other Palestinian organizations in occupied Palestine and includes indiscriminate violence against the Palestinian people. The occupation of Palestine and the Israeli settlements which have illegally seized Palestinian territory, are universally recognized as illegal under the Fourth Geneva Convention and international law generally.

13. The violent conditions and Israeli assaults directed at the PNA and PLO and other circumstances and events that have contributed to the incapacity are a matter of public knowledge susceptible of judicial notice. They are described in part in the letter from Ambassador Al-Kidwa to the District Court. Ex.8. The incapacity is the result of the widely reported chaos and violence in the Palestinian territories including attacks directed at the PNA and PLO political leadership, its police

capacity and ability to function and the destruction of PNA and PLO buildings and records by the Israeli military -- all ongoing for many months and increasing to this date. See among nearly daily newspaper reports, The N.Y. Times article, In Leaderless Gaza, Israeli Forces And Hamas Fight It Out, appearing on March 10, 2003, which was attached as an exhibit to the PNA's motion for a protective order filed on March 12, 2003 against the depositions of President Arafat and other Palestinian leaders, and which is attached hereto as part of Ex.11.

14. Proceedings in this case in which the District Court assumes a stateless condition for the Palestinian people will have important political and governmental ramifications affecting the peace process in the Middle East, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the welfare and plight of the Palestinian people under Israel's illegal occupation of their territories and the ability of defendants to function effectively as a government. The "infliction of those burdens" of litigation will severely compromise defendants' rights and well being even if they are ultimately found to be immune from suit, or the Court to be otherwise without jurisdiction. See Papandreou, supra, p.3. This is the reason an appeal is authorized at this stage and a stay of proceedings is essential to protect important rights and public interests.

15. In assessing these ramifications this case ought to be considered together with other similar civil actions brought

against the PNA and PLO defendants in the District of Columbia, see e.g. Biton v. PA, 01 CV 0382 and Gilmore v. PA, 01 CV 0853, and elsewhere, including Israel, by the same plaintiffs' attorneys. The ramifications of the litigation and its cumulative effect as a whole and the full extent of the harm being threatened are relevant. Much harm will result from requiring defendants to file an answer which implies the absence of immunity and other jurisdictional defenses that will receive widespread media coverage, from the conduct of discovery and judgments of default and other potential proceedings in these cases. Forcing defendants to take positions and assert defenses in an answer needlessly compromises relationships and feeds hostile news coverage. The injuries threatened by subjecting President Arafat and other Palestinian leaders to depositions at such a difficult time in the peace process and in Rhode Island, when the Prime Minister of Israel has threatened to bar their return to Palestine, as proposed by plaintiffs' attorneys in this case, or by any failure, or refusal to depose are severe.

16. The proceedings in the U.S. District Court for the District of Columbia in the case filed there by Ungar counsel herein for the Ungar family against HAMAS and the government of Iran for the same deaths alleged herein without informing either court of the other proceeding, or explaining their action to either court, threatens defendants with political injury, hostility and potential violence by creating material for propaganda associating defendants with Iran in efforts to injure

Israel. See, Ungar v. Iran, 211 F.Supp. 2d 91 (D.D.C. 2002). The threatened irreparable harm to defendants and to the public interests at stake from premature burdens of litigation establish the need for and the appropriateness of the stay pending appeal that defendants are here requesting.

17. These actions individually and in the aggregate constitute a political attack on defendants and Palestinian leadership, charging them in broad terms with terrorism over decades, in allegations going far beyond the bounds of the issues arising from the events that are the subject of these actions, seeking to use the Courts of the U.S. and Israel to place all blame for violence over decades on Palestinian and to bankrupt and destroy the PNA and PLO and its leadership.

18. The allegations of the complaint in Gilmore pending in Washington, D.C., are typical and could not be broader or more extreme:

> 17. ...Under the leadership of defendant ARAFAT, defendant PLO and its Fatah faction have planned and carried out thousands of terrorist hijackings, bombings and shootings, resulting in the deaths of hundreds of civilians and the wounding of thousands more. Dozens of United States citizens have been murdered, and scores more wounded, by terrorist attacks carried out by defendants PLO and its Fatah faction.
>
> * * *
>
> [Paragaraphs 18-24 charge the PLO and President ARAFAT beginning in the 1970's and later the PNA as well, with establishing terrorist and guerilla units and funding and directing their terrorist activities directly and through others.]
>
> 25. On an unknown date in September 2000 or prior thereto, defendants PA, PLO and ARAFAT authorized, ordered, instructed and directed the terrorist factions

and guerrilla leaders under their control and employ, including Force 17, Fatah and Tanzim, and defendants ABU SHARAH, DAMARA and BARGHOUTI, to organize, plan and execute widespread acts of terrorism against civilians in Israel, Gaza and the West Bank. In accordance with this authorization and these directives and instructions, members of Force 17, Fatah and Tanzim have planned and executed, since September 2000 until the present time, numerous shootings, bombings and other acts of terrorist violence against civilians in Israel, Gaza and the West Bank, in which dozens of civilians were murdered and scores injured.

19. The District Court has rejected the suggestion that politically motivated allegations, discovery requests and trial tactics against defendants can harm the peace process, and other public interests, place impediments in the road map to peace, or that there is a judicial interest in addressing repeated assertions by counsel in the media that their motive is to use the courts of the United States and Israel in a political attack against defendants to destroy them. The District Court has threatened counsel with sanctions for raising these issues in the case. It has also rejected the precedents requiring a stay of proceedings pending appeal of issues of immunity.

20. The District Court sees this case as an ordinary tort action, see e.g. its statement at the April 11, 2003 hearing: "This case is a tort case. Pure and simply. It is not a political case." TR13 L.11. This same reasoning has led the District Court to reject defense claims that the case is not justiciable because it involves issues delegated to the political branches of government without briefing as to what those political issues are. These many issues at the heart of the political attack in this case, include whether Palestinians are

responsible for all the decades of violence and the extent to which, if at all, defendants have had the ability and a duty or obligation to prevent violence by HAMAS and other militant and disaffected Palestinian groups and individuals both in Palestine and in Israel and whether Israel had some such duties in Palestinian territories which it unlawfully occupied. That same occupation confronted defendants with a near impossible challenge to maintain political stability and order and necessary popular support for the Palestinian government in the face of the dire impoverishment, discouragement, and anger of the Palestinian people as a result of continuing excessive military force by the IDF, oppressive economic, social and political measures by Israel and aggressive maintenance and expansion of settlements in the occupied Palestinian territories, among many other things.

21. The irreparable injury inflicted by forcing defendants to bear the burdens of litigation which may compromise it at this critical time in the peace process is more that the use of litigation as war by other means. Large default judgments which in similar cases involving Iran, Rwanda, Bosnia and other governments and political movements and leaders have resulted in damages ranging from over one billion dollars to hundreds of millions of dollars. Such judgments can complicate a final settlement between Israel and Palestine which Israel may insist determine the liability of Palestine for them.

22. Palestine is totally impoverished, its economic viability will depend on the terms of the peace agreement, it has

suffered many thousands of deaths and injuries in the last two years alone, its per capital income is less than 10% of the per capital of Israel and the political resolution of this conflict should not be burdened by extra territorial private tort litigation in U.S. courts.

23. At the hearing held on Friday, April 11, 2003, the District Court granted plaintiffs' motion to strike a paragraph and sentence -- all of section 2(c) and the second sentence of 2(d) -- from defendant's memorandum in support of their November 20, 2002, motion for reconsideration on the theory urged by plaintiffs that the attorneys' motives and objectives are irrelevant to the merits, that they constitute a "personal attack on counsel", albeit in the publicly spoken and reported words of those counsel themselves, and warned that further conduct of this kind could result in revocation of the pro hac vice status of two of defendants' attorneys and imposition of monetary sanctions. TR14, L.2. Defendants believe the District Court's concern is clearly erroneous and an abuse of discretion.

24. Selected pleadings filed by defendants that set forth the political agenda of plaintiffs' attorneys potentially in conflict with the interests of their clients, but improper in any case are attached as Ex.11. The same counsel have made the same assertions repeatedly for the media in Israel and the U.S. claiming to have filed as many as 25 cases.

25. In contrast to defendants' citations of counsel for plaintiffs own words to show an improper and harmful political

agenda, plaintiffs' counsel have filed motions and objections in the District Court, which are presently pending and will be decided soon in the absence of a stay, which include allegations that defendants have submitted "false data", "lied," committed "intentional fraud on the Court", and characterized defendants' pleadings as "out right falsehood", "blatantly and facially false", "bizarre", and "rank and grotesque fantasy," and that defendants' and their counsel have committed other improper, if not criminal acts. Selected pleadings of plaintiffs' counsel in which this language and invective appears are attached hereto as Ex.12. More such allegations must be expected if the case goes forward before a final determination of immunity is made by this Court. The District Court has not noted these and other similar charges by plaintiffs' counsel, nor compared them with defendants' submissions on the political motives of plaintiffs' counsel that have been included in the papers defendants have filed. Such language and invective by plaintiffs' attorneys are part of their purpose to use this litigation as they say to destroy defendants and to seek to place the imprimatur of the judiciary on their allegations through further statements to the media. Such actions are hardly intended to enhance the peace process or reconciliation between the peoples of Israel and Palestine.

26. The elements to be considered in assessing a stay pending appeal are (1) the likelihood of success on the merits, (2) irreparable harm to the party seeking a stay if it is denied,

(3) irreparable harm to those opposing the stay and (4) the public interest. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) citing Hilton v. Braunskill, 481 U.S. 770, 776-77 (1987). Success on the merits is a flexible concept, variously stated. See Weaver, supra ("likely to succeed on the merits) and Hilton, supra ("A strong showing of success on the merits"); see also Mohammed v. Reno, 309 F.3d 95, 100-02 (2d Cir. 2002) (collecting cases). The flexibility of the "success" standard depends on the other three of the four factors. See Weaver, supra, citing United Steelworkers of American v. Textron, Inc., 836 F.2d 6, 7 (1st Cir. 1987); See also "the approach expressed by the District of Columbia Circuit: 'The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors." Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 182 U.S. App.D.C. 220, 559 F.2d 841 843 (D.C. Cir. 1977), as quoted with approval in Mohammed v. Reno, supra.

27. Defendants are threatened with irreparable injury and vital public interests would be seriously jeopardized by a denial of a stay pending appeal. There is no comparable threat to plaintiffs, or any public interest, if a stay is granted.

28. On the merits, the District Court erred as a matter of law in its conclusion that defendants are not a foreign state based on the Klinghoffer case and the absence of full UN membership of Palestine.

29. To demonstrate the likelihood that defendants will

prevail on the merits for purposes of a stay, but without presenting its full brief on the merits in its motion for such a stay, defendants state they will show that they satisfy the definitional criteria of the Restatement of the Law Third, The Foreign Relations Law of the United States (1986), for determining whether an entity is a foreign state, including the Restatement's position that statehood does not depend upon recognition. The District Court was incorrect as a matter of law in giving the decisive weight it did to Palestine's less than full U.N. membership, stating: "Close is simply not good enough." 228 F.Supp. 2d at 49, nor did the Court discuss what law should be applied in weighing statehood. Decisive weight should be given to the Restatement's definition of statehood which has repeatedly been accepted as authoritative. See e.g. Kadic v. Karadzic, 70 F.3d 232, 244-45 (2d Cir. 1995).

30. The PNA is a state under the Restatement's definitional criteria because it has a defined territory, a permanent population, the only authority exercising most governmental functions even under its existing violent conditions and is able to represent Palestine in international relations with the capacity to conduct international relations. The PNA has a domestic police force for the public safety and protection of property. Indeed plaintiffs' complaint is based in part on the alleged failure of the PNA to provide police protection for plaintiffs. See the amended complaint, para. 23 alleging defendants "are authorized and responsible, under international

instruments, customary international law and local law applying in the West Bank and Gaza, to exercise law enforcement powers and to maintain public order and security in the territories under their control." In 1985 there was no Palestinian police force. See Restatement sec. 201 State Defined and Comments a.-e. Israel's illegal occupation of the Palestinian territories, oppression of the Palestinian people through the use of excessive military force and oppressive restrictions and mistreatment and heavy military attacks on personnel and destruction of office and facilities and disruption of the PNA's and PLO's capacity to function, do not affect Palestine's entitlement to recognition of its statehood. Cf. Reporters' Notes 3. to sec. 201, Military Occupation. Nor is statehood dependent on recognition. Comments b, sec. 202.

31. The merits of this motion are supported, in addition to the PNA's entitlement to statehood under the Restatement's criteria, and by material in the record, by a large body of governmental actions, agreements and material overwhelmingly susceptible of judicial notice which would have been provided by the briefing of issues of immunity for which defendants sought leave in their motion filed on January 30, 2002. The briefing would establish the PNA's sovereign immunity as a functioning government based on the Oslo Accords from 1993 and subsequent amendments and related diplomatic measures (hereinafter "the Oslo Accords"). This Court can be provided such materials from public sources appropriate for judicial notice.

32. This motion does not attempt to identify or address all of the issues raised by this interlocutory appeal. It would be beyond the motion's function to do so. The motion seeks a stay that defendants submit is necessary, will serve the interests of justice and would do little if any harm to plaintiffs' interests. Without a stay the action would proceed in the District Court and continue to impose upon defendants burdens of litigation that they lack the capacity to bear and which by the overwhelming weight of authority they should not be called upon to bear prior to a final determination of their right to immunity, including especially review by this Court.

## Conclusion

Defendants' motion for a stay pending appeal should be granted.

April 22, 2003

Respectfully submitted,

Ramsey Clark (by fax)

Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
212-475-3232
212-979-1583 (FAX)

Deming E. Sherman (#1138) (by fax)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
401-274-9200
401-276-6611 (FAX)

Attorneys for Defendants-Appellants

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

| | | |
|---|---|---|
| THE ESTATE OF YARON UNGAR, et al<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>THE PALESTINIAN AUTHORITY and<br>THE PALESTINE LIBERATION ORGANIZATION,<br><br>Defendants-Appellants. | ) | Docket No. 04-2079 |

DEFENDANTS-APPELLANTS MOTION
UNDER RULE 8(a)(2) FOR A STAY PENDING APPEAL

Defendants-Appellants, the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) respectfully move pursuant to FRAP 8(a)(2) for an unsecured stay of the enforcement of the judgment below pending appeal and in support of this motion state as follows:

1. The District Court entered a default judgment against appellants of approximately $116.4 million on July 13, 2004. Appellants motion for an unsecured stay of the enforcement of the judgment pending appeal was denied by the District Court at a brief hearing on Thursday, September 23, 2004, as was appellant's application for a brief stay to allow an application for a stay to be made to this Court. The District Court ruled that in order to secure a stay of enforcement pending appeal appellants must file a supersedeas bond in the amount of $50 million by 12 noon on Thursday, September 30,

2004. It granted a temporary stay until that time. The District Court's written order was entered on September 28, 2004. This motion is properly made in this Court under FRAP 8(a)(2) because the District Court has effectively denied the relief sought by appellants.

Appellants are not now requesting expedited consideration of this motion, but may urgently need to do so hereafter. Appellants initial motion for a stay pending appeal of the enforcement of the judgment entered on July 13, 2004, was filed in the District Court on July 23, 2004, and was not acted upon prior to the hearing the District Court held on September 23, 2004. Except for the automatic 10 day stay granted by Fed.R.Civ.P. 62(a) which ended on July 27, 2004 and the one week stay granted by the District Court at the hearing on September 23, to afford time for the filing of the supersedeas bond, from September 23 to noon on September 30, 2004, no stay has been in effect Appellants remain deeply concerned about the threat of irreparable harm to vital Palestinian interests presented by the judgment and urge prompt consideration of this motion for a stay of enforcement pending appeal..

**Issuance of the Stay Being Requested Is Warranted In The Exercise of this Court's Discretion.**

2. A unsecured stay is appropriate and warranted in the exercise of this Court's discretion under FRAP 8(a) for at least two reasons.

3. One, the judgment being appealed is a default judgment. Defendants contend and hope to establish on appeal that the default was erroneously entered because, as is developed below, defendants were entitled to a final determination of their claims to

immunity before being forced to proceed on the merits, which in this case took the form of orders to proceed with discovery and file an answer to the complaint.

4. Putting to one side the propriety of the entry of default, the default is important because it signifies that the complaint's allegations are unproven. The District Court has taken the position, with which appellants disagree, that appellants default justifies applying a rule applicable to defaults generally which calls for allegations against a defaulting party to be taken as true. The District Court also based this result in part on its ruling that a Rule 12(b)(6) standard should be followed in deciding whether the definition of international terrorism in §2331(1) of the Anti-Terrorism Act of 1991 (the ATA) 18 U.S.C. sec. 2331 et seq had been met. Application of this rule in the present case is especially problematic because the complaints allegations are so extreme and wide-ranging and because the issues they raise are of considerable public importance affecting vital interests of national and international significance. However, even if the allegations of the complaint must be taken as true this is a legal fiction which should not control issuance of the stay defendants are here requesting. In other words, notwithstanding the legal fiction, defendants claim for a stay is much stronger than it would be if plaintiffs had actually proven their allegations.

5. Two, defendants claim of statehood carries with it a claim for immunity from execution under 28 U.S.C. §1609 of the Foreign Sovereign Immunities Act (FSIA). This immunity from execution is independent of sovereign immunity. A foreign state is entitled to this immunity from execution with some exceptions not here applicable even if

for some reason sovereign immunity is unavailable to it, as for example might occur if one of the exceptions in FSIA §1605 applied to deprive the state of sovereign immunity in a particular case. The policy considerations that underlie this immunity from execution as an immunity independent of sovereign immunity make a stay of execution pending appeal particularly appropriate in this case.

6. Issues of immunity and statehood under §1609, similar if not identical to the issues this case presents, will arise and require judicial resolution if enforcement is attempted by plaintiffs. See as an example of assertion of such a claim under §1609, International Ins. Co., v. Caja Nacional de Ahorro y Seguro, 293 F.3d 392 (7th Cir. 2002) a case cited on the earlier interlocutory appeal in this case in this Court's judgment entered on May 27, 2003, attached hereto as Exhibit 1. This multiplicity would be wasteful of judicial resources and otherwise undesirable and warrants a stay of enforcement proceedings pending appeal.

7. The elements to be considered in assessing a stay pending appeal are satisfied in the present case. They are (1) the likelihood the appeal will succeed on the merits, (2) irreparable harm to the party seeking a stay if it is denied, (3) irreparable harm to those opposing the stay and (4) the public interest. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) citing Hilton v. Braunskill, 481 U.S. 770, 776-77 (1987). Success on the merits is a flexible concept, variously stated. See Weaver, supra ("likely to succeed on the merits) and Hilton, supra ("A strong showing of success on the merits"); see also Mohammed v. Reno, 309 F.3d 95, 100-02 (2d Cir. 2002) (collecting cases). The

flexibility of the "success" standard depends on the other three of the four factors. See Weaver, supra, citing United Steelworkers of American v. Textron, Inc., 836 F.2d 6, 7 (1st Cir. 1987); See also "the approach expressed by the District of Columbia Circuit: 'The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors." Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 182 U.S. App.D.C. 220, 559 F.2d 841 843 (D.C. Cir. 1977), as quoted with approval in Mohammed v. Reno, supra.

8. The judgment being appealed presents a threat of irreparable injury to vital Palestinian interests. Moreover, denial of a stay of enforcement pending appeal would publicly negate defendants immunity under FSIA sec. 1609 before the issue of sovereign immunity has been finally determined. There is no comparable threat to plaintiffs, or any public interest, if a stay is granted.

**There is a compelling likelihood defendants will succeed in their appeal**

**A. Default Judgment Was Erroneously Entered Against Defendants**

9. The basis for entry of the default judgment against defendants was their unwillingness to proceed on the merits when ordered to do so – to provide broad and burdensome discovery on the merits and to file an answer to the complaint. The discovery consisted of depositions of President Arafat and other Palestinian leaders, noticed with the Magistrate Judge's approval to take place in Rhode Island before a notary public, answers to interrogatories, production of documents and admissions. In taking this position defendants repeatedly asserted that they were entitled to a final

determination of their right to sovereign and governmental immunity, including appellate review, before being forced to bear the "burdens of litigation" that would have been involved in furnishing discovery on the merits and answering the complaint.

10. Defendants took this position openly, on the record in good faith, relying on In re Papandreou, 139 F.3d 247, 251 (D.C.Cir 1998) and similar cases which they repeatedly cited to the District Court, including Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 91 (D.C. Cir. 2002); Foremost-McKesson, Inc., v. The Islamic Republic of Iran, 905 F.2d 438, 443 (D.C. Cir. 1990); and Jungquist v. Sheikh Sultan Binkhalifa Al Nahyan, 115 F.3d 1020, 1025-27 (D.C. Cir. 1997). These cases unconditionally demonstrate that defendants claim of immunity was reason enough for the District Court to delay discovery and the filing of an answer until there was a final determination of immunity.

11. The U.S. Court of Appeals for the District of Columbia recently adhered to these principles with remarkable alacrity in granting a petition for mandamus filed by Libya to obtain relief against discovery on the merits and the filing of an answer ordered by the District Court despite the pendency of an interlocutory appeal by Libya of the denial of its claim for immunity. The Court granted the mandamus petition the day after it was filed in a brief per curiam order which stated:

> ORDERED that any and all proceedings in district court related to the complaint filed in case No. 97-cv-0975, Price v. Socialist People's Libyan Arab Jamahirya, be stayed pending resolution of appeal No. 03-7095, Price v. Socialist People's Libyan Arab Jamahirya.

Per Curiam order filed on April 13, 2004, No. 04-7038, attached hereto as Exhibit 2.

12. Obtaining a final determination of their claims to sovereign and governmental immunity and obtaining the dismissal of this case and others pending against them under the ATA in U.S. Courts arising in the course of the Israeli-Palestinian conflict is of particular importance to appellants. Appellants are aware of eight such actions, including this one.

13. The ATA is intended to deter terrorist attacks against U.S. nationals overseas. The ATA has no such deterrent effect in this case and others arising from the Israeli-Palestinian conflict. The injuries on which all of these ATA cases are based were not sustained by American tourists visiting Israel or Palestine or by persons targeted as Americans. They were sustained by persons living in settlements or other locales in Occupied Palestinian Territory or Israel who had chosen to lead lives indistinguishable from the lives of the Israelis in their communities in the midst of the ongoing Israeli-Palestinian conflict who were not identifiable as Americans or attacked as Americans. Thousands of innocent civilians on both sides have been killed or wounded in this conflict with little possibility of recompense. At a briefing of the U.N. Security Council on July 13, 2004, Terje Roed-Larsen, Special Coordinator for the Middle East Peace Process and Personal Representative of the Secretary-General, reported: "So far, since September 2000, 3,499 Palestinians and 949 Israelis have been killed. More than 34,300 Palestinian and 6,000 Israelis have been injured in the daily bloodshed." S/PV.5002, 13 July 2004. For the American legal system to award over $116 million against the PA and

PLO for the death of one person in the conflict is disruptive of efforts to achieve peace and reconciliation and disserves the overall interests of justice.

14. The District Court ruled that Papandreou "does not directly support the Defendant's argument" in part because there had been some jurisdictional discovery in Papandreou unlike the present case involving discovery on the merits in which appellants were unwilling to participate. The District Court observed that defendants persisted in their unwillingness to participate in discovery even after the Court had repeatedly rejected defendants claims to immunity, and many issues had been decided against them, including several "alternate, non-merits routes to dismissal". The Court discussed Papandreou as though it was an isolated case. It is not. As defendants have consistently maintained, Papandreou it is one case among many that establish a well-settled precedent. The grounds on which the Court distinguished Papandreou and refused to follow it, even if they are a valid reading of Papandreou, which appellants dispute, would not be a sufficient basis for refusing to adhere to this well-established precedent. The Court did not take issue with the rationale that underlies this precedent – that the denial of sovereign immunity under the FSIA satisfies the three requirements of the collateral order doctrine and that the denial of immunity is effectively unreviewable on appeal as would have been true in this case if defendants had yielded and proceeded on the merits.

15. On appellants recent motion to the District Court for the stay pending appeal that appellants are now requesting this Court to issue, appellants argued as they are now arguing that the District Court erred in refusing to adhere to Papandreou and defer

consideration of default judgment until there was a final determination of defendants claims of immunity. In opposing the stay, plaintiffs contended this argument was meritless because defendants failed to appeal the District Court's April 23, 2004 decision denying their Rule 12(b)(1) motion, arguing defendants "never actually bothered to file a notice of appeal" ... defendants "could not be troubled to actually seek the relief they now claim they were denied ..." Pltfs. Opposing Memorandum at pp. 22-23.

16. This argument by plaintiffs, that defendants failed to file a notice of appeal defendants should have filed, should be rejected. Plaintiffs blocked defendants from taking an interlocutory appeal from the April 23 decision by filing a Rule 59(e) motion for reconsideration on April 28, 2004. Plaintiffs did this deliberately as appears from the letter they hand-delivered to the Court on that day. The letter expressed alarm over the possibility that an interlocutory appeal by defendants from the April 23, 2004 decision might be taken and oust the Court of jurisdiction to enter final judgment. It went on to advise the District Court that it "cannot be divested of jurisdiction so long as plaintiffs' Rule 59(e) motion to amend the April 23 decision remains pending," pointing out that if the Rule 59(e) motion is decided prior to the entry of final judgment, appellants would then be able to take an interlocutory appeal. It urged the Court to "retain certain jurisdiction over this action until final judgment is entered," i.e. to dispose of the Rule 59(e) motion at the same time as or as part of the final judgment. A copy of plaintiffs letter is attached hereto as Exhibit 3.

17. The District Court's decision and order of July 12, 2004, directing entry of

final judgment also denied plaintiffs Rule 59(e) motion and final judgment was entered the next day, on July 13, 2004.

18. It thus appears that beginning on April 28, 2004, with the filing of their Rule 59(e) motion, plaintiffs as they well knew, precluded defendants from taking an interlocutory appeal from the April 23 decision at any time thereafter through the entry of final judgment on July 13, 2004. See in addition to Exhibit 3, FRAP 4(a)(4)(A) and (B).

19. It ill-behooves plaintiffs to argue now as they did in the District Court that defendants entitlement under Papandreou to a final determination of their immunity was properly denied by the District Court because appellants didn't bother to take an appeal that plaintiffs well knew would be ineffective because plaintiffs Rule 59(e) motion was pending.

20. Plaintiffs have repeatedly argued an interlocutory appeal should be unavailable to appellants to review a denial of their claim of sovereign immunity because the statehood of Palestine is itself disputed. This does not matter. The order denying defendants immunity claims fully meets the requirements of the collateral order doctrine, and if the claim of immunity is upheld this case would have to be dismissed for lack of subject matter jurisdiction on grounds of sovereign immunity. Plaintiffs might have a point if the disputed claim of statehood was frivolous. But Palestine's claim of statehood is substantial. It is being made by an actual functioning government seeking to protect and promote the welfare of millions of Palestinians. In defendants view the record amply establishes the statehood of Palestine, but even if the issue is ultimately decided against

defendants, the question is close and the claim of statehood deserves to be taken seriously. Defendants should not be faulted and in effect punished, as the District Court has done by holding them in default, for rightfully insisting on a final determination as to their immunity before allowing the immunity to be destroyed. Plaintiffs demands for discovery on the merits and for an answer should have been held in abeyance until defendants claims to immunity were finally resolved.

21. This Court's judgment on the interlocutory appeal appellants filed in this case in April 2003, provides support for appellants claim they are entitled to a final determination on the issue of immunity before addressing the merits and that they were wrongfully held in default. The judgment, Ex. 1 hereto, referred to the jurisdictional implications of the immunity issue and suggested that defendants might "still be able to file a fully supported Rule 12(b)(1) motion below." The judgment stated it was being rendered "without prejudice to the appellants raising their sovereign immunity defense in a proper and timely manner," and stated: "We take no view as to the merits of that defense." Acting on the suggestion in the judgment, defendants filed such a fully supported Rule 12(b)(1) motion promptly on June 13, 2003. The motion presented full evidence on statehood and immunity. Defendants responded with additional evidence. The District Court decided the motion more than 10 months after it was filed in a published opinion on April 23, 2004, 315 F.Supp.2d 164. The motion was decided on an evidentiary record, unlike the bare record in the prior appeal. Defendants having raised and fully supported their sovereign immunity defense promptly by motion as suggested

by this Court's judgment were entitled to interlocutory appellate review and/or a final determination of the issue of immunity before being held in default for asserting that right. If the default judgment entered on July 13, 2004 is not vacated and the case dismissed for lack of subject matter jurisdiction or on some other dispositive ground, the judgment should be vacated solely on the ground the entry of default was unwarranted

**B. This is not an ordinary tort case.**

22. An overriding source of error in this case has been the District Court's repeated insistence that this is an ordinary tort case. It is not. It is a case of alleged "international terrorism" under the ATA that would not be in this Court if it were not such a case. It requires defendants alleged conduct to be evaluated in the context of the Israeli-Palestinian conflict.

23. The District Court's mistaken view that this is an ordinary tort case led it to exclude from consideration significant factors that support the non-justiciability of key issues and to view the default judgment mistakenly as an ordinary money judgment.

**C. Key Issues In This Case are Nonjusticiable**

24. Defendants are charged with responsibility for acts by Hamas, for furnishing support to Hamas and failing to stop attacks by Hamas, among other things. Defendants are not charged with any specific conduct relating to the death of Yaron Ungar. How can the Court in an ATA action adjudicate such issues? The perpetrators of the murder of the Ungars are alleged to be Hamas members. The District Court in Washington, D.C. in an action plaintiffs commenced in 2000 seeking to hold Iran responsible for the deaths of the

Ungars, expressed doubt about such membership and the confessions plaintiffs relied upon. See Ungar v. Iran, 211 F.Supp.2d 91, 97 (D.D.C. 2002). But even if the killers were members of Hamas, how can the Court in an ATA action determine whether defendants had the ability to curb violence by Hamas? Hamas is a militant faction, with members and sympathizers located throughout Palestine with military branches. It has political and social programs and objectives. It is not controlled by appellants. Far from it. Hamas vies with appellants for the popular support of the Palestinian people, day to day in the streets and also at the polls. And if the Court in an ATA action is able to determine that defendants had the ability in terms of raw power to curb, prevent and/or punish violence by Hamas would it have been feasible for defendants to do so? Defendants have consistently opposed violence by Hamas. What would the political consequences have been if defendants stepped up their efforts to stop or curb violence by Hamas? Surely defendants could not employ missile attacks to assassinate Hamas leaders as Israel has openly done in blatant disregard of international law. Answers to these questions would have to take into consideration that violence by Hamas is taking place against the backdrop of Israel's belligerent and oppressive occupation of the Palestinian territories and Israel's use of excessive military force against Palestinians, continuously resulting in death and injury to innocent civilians, as well as other domineering and oppressive Israeli measures resulting in economic hardship and creating humanitarian crises for the Palestinian people. What actions would it have been feasible for defendants to take against Hamas without alienating the people or losing their essential support or

undermining the morale and will of the people to persevere under Israeli oppression?

25. Other aspects of this case are also nonjusticiable..

26. For years, a dominant Palestinian motivation has been to bring Israel's illegal occupation of the Palestinian territories to an end. Palestinian actions taken for this purpose do not fit within the definition of international terrorism in 18 U.S.C. sec. 2331(1) that is an essential element of this Court's subject matter jurisdiction as well as the legal sufficiency of the civil cause of action plaintiffs are alleging under sec. 2333.

27. Moreover, the determination whether defendants alleged actions in this case are within this definition and constitute international terrorism will require an examination of defendants intent and motivation and this in turn will require an assessment of the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza, and many other factors. Palestinian actions and the intent and motivation for them cannot be understood and evaluated for purposes of sec. 2331 without this context being taken into account.

28. The context provided by the Israeli-Palestinian conflict would include the many factors that govern the motivation and intent with which defendants allegedly acted. These would have to be judicially assessed to judge the feasibility of a Court's determining whether the activities plaintiffs allege constitute international terrorism. These factors include defendants' need to address and take into account the continuing oppression, poverty, malnutrition and humiliation of the Palestinian people, Israel's violation of the Palestinian people's human rights by excessive military force and other

means, and relative popular support of the people from time to time for the Palestinian government, militant factions and violence –all of which are directly affected by Israel's oppressive and illegal conduct. Recent U.N. reports submitted to the International Court of Justice as part of the U.N.'s Dossier in support of the General Assembly's request for an advisory opinion on the legal consequences of the wall Israel is constructing, discussed below, confirm that throughout the period covered by this case the intent and motivation with which defendants acted was constantly and powerfully affected by many aspects of the Israeli-Palestinian conflict, including violation of Palestinian human rights and the humanitarian crises suffered by the Palestinian people. Part III of the Dossier consists of four recent U.N. reports. The reports are posted in full on the Court's website: www.icj-cij.org. The Dossier is posted in a pdf file of 1164 pages. The four reports in Part III appear at pdf pages 389, 418, 446 and 461.

29. Defendants submit that the facts necessary to answer these questions are not suseptible to judicial determination. Further, even if the facts bearing on appellants and Hamas and their actions and attitudes toward one another and the likely reactions of the Palestinian people to efforts by defendants to prevent and punish violence by Hamas under all the relevant facts and circumstances of the Israeli-Palestinian conflict and the ongoing peace process could somehow be ascertained, there are no judicial standards for adjudicating the issues they would present. Even if the District Court is correct in viewing this case as one committed to the judicial branch, the issues it presents are unmanageable and nonjusticiable. The adjudication would be especially problematic for a U.S. court.

**D. The Court's Reasons for Rejecting Palestinian Statehood were erroneous as a Matter of Law; The Court Erred in Failing To Uphold Palestinian Statehood and Defendants Immunity**

30. The FSIA does not define the term "foreign state." It provides only that the term "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b) [of 28 U.S.C. sec. 1603]". See Garb v. Republic of Poland, 207 F.Supp.2d 16, 34 (E.D.N.Y. 2002), vacated and remanded on other grounds, 72 Fed.Appx. 850 (2d Cir. 2003). Nor does the ATA define the term.

31. The District Court gave conclusive effect to Palestine's less than full U.N. membership as a basis for rejecting its statehood See, Ungar v. PA, 228 F.Supp.2d 40, 49 (D.R.I. 2002) ("Close is simply not good enough."). This was mistaken for several reasons. The United States was a sovereign state though it had not joined the League of Nations, just as Switzerland among others was a sovereign state though for 50 years it did not join the United Nations. It is also mistaken because Palestine's status at the United Nations is tantamount as a practical and legal matter to full membership and the reasons why Palestine's full membership has been blocked are political, and have nothing to do with the criteria by which statehood is measured. And most basically it is mistaken because statehood is not dependent on recognition. Restatement (Third), The Foreign Relations Law of the United States, sec. 202, comment b. (ALI 1986).

32. The very recent case previously mentioned, before the International Court of Justice at the Hague, (the World Court), established under the Charter of the United Nations, on the General Assembly's request for an advisory opinion on the legality of the

wall under construction by Israel on Palestinian land in the West Bank powerfully confirms Palestine's sovereignty and statehood. The World Court's advisory opinion and several separate opinions were rendered on July 9, 2004. Palestine exercised the full perogatives of a state in this case. It had a leading role in initiating the proceedings and in presenting facts and legal argument in extensive written submissions and in oral argument. The extensive materials filed with the Court by Palestine and the by United Nations, which filed a voluminous dossier, and filed by others provide a wide range of detailed facts from knowledgable and authoritative official and other sources and in the aggregate strongly support Palestinian statehood and sovereignty. These materials merit careful study. They are all posted verbatim on the World Court's website, www.icj-cij.org.

33. The record amply establishes that Palestine meets the objective criteria of statehood set forth in sec. 201of the Restatement. It has the requisite territory, population and functioning government and engages in and has the ability to engage in foreign relations.

34. Palestine is not able to end the occupation by force, or, to date, by negotiation. It cannot prevent many oppressive Israeli measures, even the forced confinement of the PA's President to the rubble of the PA offices in Ramallah for over two years. It is often coerced into acceptance of conditions it opposes or would reject, many exacted by Israel in violation of international law controlling Israel as an occupying power. These conditions affected the language and substance of agreements reached including the Oslo

Accords. To the extent that the Oslo Accords or other agreements conflict with the requirements of the Fourth Geneva Convention, the Convention prevails as a matter of international law. See, Imseis, On the Fourth Geneva Convention and the Occupied Palestinian Territory, 44 Harv. Int'l. Law J. 65, 127 (2003).

35. Limitations and restrictions on the functioning of the Palestinian government under the Oslo Accords or otherwise, to which plaintiffs might point to argue Palestine fails to meet the governance element or other aspects of the Restatement's definition of a state are caused by the occupation and the oppressive and coercive conduct of Israel under the occupation and do not alter the statehood of Palestine. The Oslo Accords should not be taken as a decisive or even reliable indicia of circumstances bearing negatively on Palestine's statehood. The negotiations leading to the accords were to a considerable extent the product of Israel's coercive advantages over Palestine, and Israel repeatedly acted for the specific purpose of negating Palestinian statehood and obscuring the extent to which Palestine meets or would otherwise have met the Restatement's criteria for statehood.

36. The statehood of Palestine cannot be negated on the basis of limitations and restrictions upon the Palestinian government and the Palestinian people caused by occupation and repression as a matter of international law and fundamental fairness.

**E. The PA and PLO Are Part Of The State Of Palestine And Must Be So Recognized For Purposes Of The Foreign Sovereign Immunities Act and 18 U.S.C. sec. 2337(2)**

37. Defendants are entitled to the same immunity as Palestine. They constitute core structural elements and perform core functions of the government of Palestine as it now operates, crippled and compromised as it is by Israeli occupation. Accordingly the PA and PLO must be recognized as part of the state of Palestine itself. Cf. Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994) (2-1), cert. denied, 513 U.S. 1150 (1995) (the armed forces of a state must in all cases be considered as part of the foreign state itself); see Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (same with respect to the Iranian Ministry of Intelligence and Security (MOIS); see also Regier v. Islamic Republic of Iran, 281 F.Supp.2d 87, 100 (D.D.C. 2003), following Roeder, holding MOIS must be considered part of Iran, against which punitive damages cannot be awarded under the FSIA, noting and declining to follow several District Courts in awarding punitive damages against MOIS, notwithstanding Roeder.

Conclusion

Defendants motion for a stay pending appeal should be granted.

Dated: September 30, 2004

Respectfully submitted,

Ramsey Clark

Ramsey Clark

Lawrence W. Schilling

Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
212-475-3232
212-979-1583 (FAX)

Deming E. Sherman
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
401-274-9200
401-276-6611 (FAX)

Attorneys for Defendants-Appellants
Palestinian Authority and Palestine
Liberation Organization

# United States Court of Appeals
## For the First Circuit

---

No. 03-1544

EFRAT UNGAR, ET AL.,

Plaintiffs, Appellees,

v.

THE PALESTINIAN LIBERATION ORGANIZATION, ET AL.,

Defendants, Appellants.

---

Before

Selya, Lipez and Howard,
Circuit Judges.

---

JUDGMENT

Entered: May 27, 2003

We agree with appellees that, on the present record, this appeal is devoid of merit. Accordingly, we bypass the jurisdictional question, see, e.g., United States v. Woods, 210 F.3d 70, 74 & n.2 (1st Cir. 2000), grant the appellees' motion for summary disposition, and summarily affirm.

The appellants allege an entitlement to sovereign immunity under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1604, and the counterpart provision in the Antiterrorism Act of 1991, 18 U.S.C. § 2337(2). Yet "[t]he party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state." Keller v. Central Bank of Nigeria, 277 F.3d 811, 815 (6th Cir. 2002); accord, e.g., Virtual Countries, Inc. v. Repub. of S. Africa, 300 F.3d 230, 241 (2d Cir. 2002); International Ins. Co. v. Caja Nacional de Ahorro y Seguro, 293 F.3d 392, 397 (7th Cir.

Ex 1

2002). Here, the appellants have not attempted to make such an evidentiary showing.

To be sure, the appellants complain that they were deprived of an opportunity to make a proper showing by the district court. In particular, they complain that the court's handling of the immunity issue - withholding action on their motion for "leave to assert" such a defense, stating during a hearing that immunity was not then being considered, and thereafter deciding the issue - took them by surprise. This procedural objection rings hollow. The appellants had ample opportunity to file a properly supported motion under Fed. R. Civ. P. 12(b)(1) seeking dismissal on sovereign immunity grounds. They did not need leave of court to file such a motion and assert such a defense. Indeed, they did just that, through the same counsel, in unrelated litigation thirteen years ago. See Klinghoffer v. S.N.C. Achille Lauro, 739 F. Supp. 854, 856-58 (S.D.N.Y. 1990), vacated on other grounds, 937 F.2d 44 (2d Cir. 1991). That course of conduct belies their present complaint.

We need go no further. Given the bare record, the appellants cannot prevail on this appeal. Of course, they have not yet answered the complaint, and we do not discount the fact that they may still be able to file a properly supported Rule 12(b)(1) motion below. This seems especially likely given the jurisdictional implications of the issue and the appellees' characterization of the court's immunity ruling as "interlocutory." But the appellants must adhere to the rules that govern all litigants.

The motion for summary disposition is allowed and the orders appealed from are summarily affirmed. See Loc. R. 27(c). This order is without prejudice to the appellants raising their sovereign immunity defense in a proper and timely manner. We take no view as to the merits of that defense.

So ordered.

By the Court:

RICHARD CUSHING DONOVAN

Richard Cushing Donovan, Clerk.

[Cert. cc: Hon. Ronald R. Lagueux and David DiMarzio, Clerk, U.S.D.C. of Rhode Island, Messrs: Clark, Schilling, Sherman and Strachman]

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 04-7038

September Term, 2003

97cv00975

Filed On: April 13, 2004 [815909]

In re: Socialist People's Libyan Arab Jamahiriya,
Petitioner

**BEFORE:** Edwards, Randolph, and Garland, Circuit Judges

**ORDER**

Upon consideration of the petition for a writ of mandamus, it is

**ORDERED** that any and all proceedings in district court related to the complaint filed in case No. 97-cv-0975, *Price v. Socialist People's Libyan Arab Jamahiriya*, be stayed pending resolution of appeal No. 03-7095, *Price v. Socialist People's Libyan Arab Jamahiriya*.

Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Deputy Clerk/LD

Ex 2

MCINTYRE, TATE,
LYNCH & HOLT LLP
COUNSELLORS AT LAW

JERRY L. MCINTYRE †
DEBORAH MILLER TATE *Δ
WILLIAM J. LYNCH
WILLIAM F. HOLT
DAVID J. STRACHMAN
ROBERT S. PARKER*

Also member
† New York Bar
* Massachusetts Bar
Δ Florida Bar

VIA HAND DELIVERY

April 28, 2004

The Honorable Judge Lagueux
United States District Court
for the District of Rhode Island
One Exchange Terrace
Providence, RI 02903

Re: **Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al.**
**C.A. No. 00-105L**

Dear Judge Lagueux:

I write to alert your Honor to the serious possibility that the Court may be inadvertently divested of jurisdiction in this matter, thereby delaying its final disposition indefinitely.

On April 23, 2004, the Court rendered a Decision and Order denying defendants' motion to dismiss this action on grounds of sovereign immunity.[1]

Defendants believe that an order denying a motion to dismiss on grounds of sovereign immunity is immediately appealable by right under the "collateral order" doctrine, and they have long indicated that they will attempt an interlocutory appeal of any decision denying their motion to dismiss, as they did previously.

Plaintiffs believe that a decision finding that a defendant is not a "foreign state" (as distinct from a decision finding an exception to the immunity of an acknowledged foreign state) is not immediately appealable as a "collateral order."

[1] In conformance with the well-established rule that failure to press a claim of waiver of immunity may result in waiver of the claim of waiver of immunity, Watters v. Washington Metro. Area Transit Auth., 295 F.3d 36, 42 n. 13 (D.C. Cir. 2002), plaintiffs have filed a motion to amend the decision of April 23, 2004, pursuant to Fed.R.Civ.P. 59(e), in light of the Court's holding that defendants did not waive immunity.



Ex. 3

The Honorable Judge Lagueux
Page Two
April 28, 2004

The parties argued their respective positions on this question in the context of defendants' abortive appeal last year, but the First Circuit carefully refrained from deciding whether a decision holding that a defendant is not a "foreign state" is immediately appealable as a "collateral order." Ungar v. The Palestine Liberation Organization, 2003 WL 21254790 (1st Cir. 2003)

Moreover, neither plaintiffs nor defendants have been able to locate any case law on this question. This issue therefore remains unsettled, and it is certainly not impossible that the Court of Appeals would ultimately adopt defendants' position.

The ramifications of this issue are considerable: if defendants are correct and the Court's Decision and Order of April 23 is immediately appealable, then the filing of an effective notice of appeal by defendants will divest this Court of its jurisdiction on all matters at issue on appeal. Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982).

Since the appeal would relate to this Court's subject-matter jurisdiction, this Court will lack jurisdiction to enter judgment once a notice of appeal becomes effective, and any judgment entered subsequent to an effective notice of appeal would be void. U.S. v. Brooks, 145 F.3d 446, 454 (1st Cir. 1998); U.S v. One Parcel of Land, 16 Fed. Appx. 16, 20 (1st Cir. 2001).

Thus, once a notice of appeal becomes effective under FRAP 4(a)(4)(B)(1), the Court and the parties will be cast into a thick fog of uncertainty about the Court's jurisdiction. Until the Court of Appeals rules on defendants' "collateral order" claim, it will be impossible to know whether this Court has retained jurisdiction or if jurisdiction has been vested in the Court of Appeals. This Court will be faced with the difficult choice of either issuing a final judgment which may ultimately be held to be void, or staying this action for long months pending the disposition of an appeal over which the Court of Appeals may have no jurisdiction.

Obviously, such a state of affairs would result in a massive waste of judicial resources, confusion, and further unjust delays and prejudice to plaintiffs, who have suffered defendants' dilatory and contumacious conduct in this action for over four years.

The Supreme Court has recognized the need to protect innocent and long-suffering litigants such as the instant plaintiffs from the "*harassment and cost of a succession of separate appeals.*" Firestone Tire v. Risjord, 449 U.S. 368, 374 (1981)(internal quotes and cite omitted). Similarly, the First Circuit recently reiterated that, "*By their nature, interlocutory appeals are disruptive, time-consuming, and*

*expensive. Thus, we . . . endeavor[] to discourage piecemeal appeals.*" Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 294 (1st Cir. 2000).

Such are the pathologies of "regular" interlocutory appeals; all the more so when, as here, the right of appeal is unsettled and the district court and parties will be left in jurisdictional limbo indefinitely, after four years of arduous litigation and just one inch from the finish line.

Plaintiffs are calling attention to this potential jurisdictional quagmire because they assume that the Court intends to issue a final judgment in this case in the near future and that it is therefore appropriate for the Court to retain certain jurisdiction.

As noted, the Court will retain certain jurisdiction unless and until a notice of appeal becomes effective under F.R.A.P. 4(a)(4)(B)(1). That rule provides that a notice of appeal becomes effective only when an order disposing of the last of the enumerated post-judgment motions is entered.

Thus, the Court cannot be divested of jurisdiction by a notice of appeal so long as plaintiffs' Rule 59(e) motion to amend the April 23 decision remains pending. FRAP 4(a)(4)(B)(1). Therefore, if the order/decision disposing of plaintiffs' Rule 59(e) motion is entered simultaneously with, or as part of, the final judgment in this action, the Court's jurisdiction will remain intact to the end.

(Contrarily, if the Rule 59(e) motion is disposed of at any time prior to entry of final judgment, any notice of appeal will become effective immediately and this Court may be divested of jurisdiction to enter final judgment, for the reasons cited above).

Plaintiffs respectfully believe that the Court should retain certain jurisdiction over this action until final judgment is entered. Allowing defendants to artificially and indefinitely delay the final disposition of this action by creating uncertainty regarding this Court's jurisdiction would cause a colossal waste of the resources of this Court and the Court of Appeals, and severely prejudice the plaintiffs with further unjustified delay and expense.[2] Consolidated Rail v. Fore River Railway, 861 F.2d 322, 325 (1st Cir. 1988)

---

[2] Plaintiffs note that the Court of Appeals ordered the PA and PLO to pay costs incurred by plaintiffs due to defendants' last attempt to appeal, yet defendants have brazenly disobeyed this Order. This bad-faith, scofflaw conduct regarding an Order of the Court of Appeals constitutes yet further grounds to prevent defendants from inflicting further "*harassment and cost*" on the plaintiffs and on the Court itself by attempting another superfluous interlocutory appeal of questionable validity. Firestone, 449 U.S. at 374.

("*Piecemeal appeals should not be allowed unless the need for early and separate judgment as to a particular claim truly outweighs the risk of flooding the appellate docket.*")

Final judgment is at hand, and once it is entered defendants will be free to obtain appellate review of all issues, including of course their claim to sovereign immunity.

In conclusion I note that, in order to facilitate and ease the Court's disposition of the Magistrate's Report, plaintiffs have withdrawn their few objections to that Report (which in any case did not touch on dispositive matters) and have filed early their response to defendants' objections to the Report. The pleadings are therefore complete.

Sincerely,

David J. Strachman

DJS/dc

cc: Ramsey Clark/Lawrence W. Schilling (v/fax 212-979-1583)
Deming E. Sherman/Annemarie M. Carney (v/fax 401-276-6611)

RAMSEY CLARK
LAWRENCE W. SCHILLING

LAW OFFICES
36 EAST 12TH STREET
NEW YORK, N.Y. 10003
(212) 475-3232
FAX (212) 979-1583

# FAX TRANSMISSION SHEET

DATE: September 30, 2004

FAXED TO: David J. Strachman

FAXED NUMBER(S): 401-331-6095

FAXED FROM: L. W. Schilling

TIME: 3:35 p.m.

NUMBER OF PAGES INCLUDING THIS PAGE: 28

RE: Ungar v. PA and PLO
Docket No. 04-2079

COMMENTS:

IMPORTANT NOTICE: This transmission may be PRIVILEGED, CONFIDENTIAL, ATTORNEY-CLIENT communication. If you are not the intended recipient, please notify us immediately.