UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

THE ESTATE OF YARON UNGAR, et al          )
                                          )
          Plaintiffs-Appellees,           )
                                          )
     v.                                   )
                                          )     Docket No. 04-2079
THE PALESTINIAN AUTHORITY and             )
THE PALESTINE LIBERATION ORGANIZATION,    )
                                          )
          Defendants-Appellants.          )
_____ )

### DEFENDANTS-APPELLANTS MOTION
### UNDER RULE 8(a)(2) FOR A STAY PENDING APPEAL

Defendants-Appellants, the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) respectfully move pursuant to FRAP 8(a)(2) for an unsecured stay of the enforcement of the judgment below pending appeal and in support of this motion state as follows:

1. The District Court entered a default judgment against appellants of approximately $116.4 million on July 13, 2004. Appellants motion for an unsecured stay of the enforcement of the judgment pending appeal was denied by the District Court at a brief hearing on Thursday, September 23, 2004, as was appellant's application for a brief stay to allow an application for a stay to be made to this Court. The District Court ruled that in order to secure a stay of enforcement pending appeal appellants must file a supersedeas bond in the amount of $50 million by 12 noon on Thursday, September 30,

1

2004. It granted a temporary stay until that time. The District Court's written order was entered on September 28, 2004. This motion is properly made in this Court under FRAP 8(a)(2) because the District Court has effectively denied the relief sought by appellants.

Appellants are not now requesting expedited consideration of this motion, but may urgently need to do so hereafter. Appellants initial motion for a stay pending appeal of the enforcement of the judgment entered on July 13, 2004, was filed in the District Court on July 23, 2004, and was not acted upon prior to the hearing the District Court held on September 23, 2004. Except for the automatic 10 day stay granted by Fed.R.Civ.P. 62(a) which ended on July 27, 2004 and the one week stay granted by the District Court at the hearing on September 23, to afford time for the filing of the supersedeas bond, from September 23 to noon on September 30, 2004, no stay has been in effect  Appellants remain deeply concerned about the threat of irreparable harm to vital Palestinian interests presented by the judgment and urge prompt consideration of this motion for a stay of enforcement pending appeal..

### Issuance of the Stay Being Requested Is Warranted In The Exercise of this Court's Discretion.

2. A unsecured stay is appropriate and warranted in the exercise of this Court's discretion under FRAP 8(a) for at least two reasons.

3. One, the judgment being appealed is a default judgment. Defendants contend and hope to establish on appeal that the default was erroneously entered because, as is developed below, defendants were entitled to a final determination of their claims to

2

immunity before being forced to proceed on the merits, which in this case took the form of orders to proceed with discovery and file an answer to the complaint.

4.  Putting to one side the propriety of the entry of default, the default is important because it signifies that the complaint's allegations are unproven. The District Court has taken the position, with which appellants disagree, that appellants default justifies applying a rule applicable to defaults generally which calls for allegations against a defaulting party to be taken as true. The District Court also based this result in part on its ruling that a Rule 12(b)(6) standard should be followed in deciding whether the definition of international terrorism in §2331(1) of the Anti-Terrorism Act of 1991 (the ATA) 18 U.S.C. sec. 2331 et seq had been met.  Application of this rule in the present case is especially problematic because the complaints allegations are so extreme and wide-ranging and because the issues they raise are of considerable public importance affecting vital interests of national and international significance. However, even if the allegations of the complaint must be taken as true this is a legal fiction which should not control issuance of the stay defendants are here requesting.  In other words, notwithstanding the legal fiction, defendants claim for a stay is much stronger than it would be if plaintiffs had actually proven their allegations.

5.  Two, defendants claim of statehood carries with it a claim for immunity from execution under 28 U.S.C. §1609 of the Foreign Sovereign Immunities Act (FSIA).  This immunity from execution is independent of sovereign immunity.  A foreign state is entitled to this immunity from execution with some exceptions not here applicable even if

3

for some reason sovereign immunity is unavailable to it, as for example might occur if one of the exceptions in FSIA §1605 applied to deprive the state of sovereign immunity in a particular case. The policy considerations that underlie this immunity from execution as an immunity independent of sovereign immunity make a stay of execution pending appeal particularly appropriate in this case.

6.   Issues of immunity and statehood under §1609, similar if not identical to the issues this case presents, will arise and require judicial resolution if enforcement is attempted by plaintiffs. See as an example of assertion of such a claim under §1609, International Ins. Co., v. Caja Nacional de Ahorro y Seguro, 293 F.3d 392 (7th Cir. 2002) a case cited on the earlier interlocutory appeal in this case in this Court's judgment entered on May 27, 2003, attached hereto as Exhibit 1. This multiplicity would be wasteful of judicial resources and otherwise undesirable and warrants a stay of enforcement proceedings pending appeal.

7.   The elements to be considered in assessing a stay pending appeal are satisfied in the present case. They are (1) the likelihood the appeal will succeed on the merits, (2) irreparable harm to the party seeking a stay if it is denied, (3) irreparable harm to those opposing the stay and (4) the public interest. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) citing Hilton v. Braunskill, 481 U.S. 770, 776-77 (1987). Success on the merits is a flexible concept, variously stated. See Weaver, supra ("likely to succeed on the merits) and Hilton, supra ("A strong showing of success on the merits"); see also Mohammed v. Reno, 309 F.3d 95, 100-02 (2d Cir. 2002) (collecting cases). The

4

flexibility of the "success" standard depends on the other three of the four factors.  See

Weaver, supra, citing United Steelworkers of American v. Textron, Inc., 836 F.2d 6, 7

(1st Cir. 1987); See also "the approach expressed by the District of Columbia Circuit:

'The necessary 'level' or 'degree' of possibility of success will vary according to the court's

assessment of the other [stay] factors."  Washington Metropolitan Area Transit

Commission v. Holiday Tours, Inc., 182 U.S. App.D.C. 220, 559 F.2d 841 843 (D.C. Cir.

1977), as quoted with approval in Mohammed v. Reno, supra.

 8.   The judgment being appealed presents a threat of irreparable injury to vital

Palestinian interests.  Moreover, denial of a stay of enforcement pending appeal would

publicly negate defendants immunity under FSIA sec. 1609 before the issue of sovereign

immunity has been finally determined.  There is no comparable threat to plaintiffs, or any

public interest, if a stay is granted.

 **There is a compelling likelihood defendants will succeed in their appeal**

**A.** **Default Judgment Was Erroneously Entered Against Defendants**

 9.   The basis for entry of the default judgment against defendants was their

unwillingness to proceed on the merits when ordered to do so – to provide broad and

burdensome discovery on the merits and to file an answer to the complaint.  The

discovery consisted of depositions of President Arafat and other Palestinian leaders,

noticed with the Magistrate Judge's approval to take place in Rhode Island before a

notary public, answers to interrogatories, production of documents and admissions.  In

taking this position defendants repeatedly asserted that they were entitled to a final

5

determination of their right to sovereign and governmental immunity, including appellate review, before being forced to bear the "burdens of litigation" that would have been involved in furnishing discovery on the merits and answering the complaint.

10.  Defendants took this position openly, on the record in good faith, relying on In re Papandreou, 139 F.3d 247, 251 (D.C.Cir 1998) and similar cases which they repeatedly cited to the District Court, including Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 91 (D.C. Cir. 2002); Foremost-McKesson, Inc., v. The Islamic Republic of Iran, 905 F.2d 438, 443 (D.C. Cir. 1990); and Jungquist v. Sheikh Sultan Binkhalifa Al Nahyan, 115 F.3d 1020, 1025-27 (D.C. Cir. 1997). These cases unconditionally demonstrate that defendants claim of immunity was reason enough for the District Court to delay discovery and the filing of an answer until there was a final determination of immunity.

11.  The U.S. Court of Appeals for the District of Columbia recently adhered to these principles with remarkable alacrity in granting a petition for mandamus filed by Libya to obtain relief against discovery on the merits and the filing of an answer ordered by the District Court despite the pendency of an interlocutory appeal by Libya of the denial of its claim for immunity. The Court granted the mandamus petition the day after it was filed in a brief per curiam order which stated:

> ORDERED that any and all proceedings in district court related to the complaint filed in case No. 97-cv-0975, Price v. Socialist People's Libyan Arab Jamahirya, be stayed pending resolution of appeal No. 03-7095, Price v. Socialist People's Libyan Arab Jamahirya.

Per Curiam order filed on April 13, 2004, No. 04-7038, attached hereto as Exhibit 2.

12.  Obtaining a final determination of their claims to sovereign and governmental immunity and obtaining the dismissal of this case and others pending against them under the ATA in U.S. Courts arising in the course of the Israeli-Palestinian conflict is of particular importance to appellants. Appellants are aware of eight such actions, including this one.

13.  The ATA is intended to deter terrorist attacks against U.S. nationals overseas. The ATA has no such deterrent effect in this case and others arising from the Israeli-Palestinian conflict. The injuries on which all of these ATA cases are based were not sustained by American tourists visiting Israel or Palestine or by persons targeted as Americans. They were sustained by persons living in settlements or other locales in Occupied Palestinian Territory or Israel who had chosen to lead lives indistinguishable from the lives of the Israelis in their communities in the midst of the ongoing Israeli-Palestinian conflict who were not identifiable as Americans or attacked as Americans. Thousands of innocent civilians on both sides have been killed or wounded in this conflict with little possibility of recompense. At a briefing of the U.N. Security Council on July 13, 2004, Terje Roed-Larsen, Special Coordinator for the Middle East Peace Process and Personal Representative of the Secretary-General, reported: "So far, since September 2000, 3,499 Palestinians and 949 Israelis have been killed. More than 34,300 Palestinian and 6,000 Israelis have been injured in the daily bloodshed." S/PV.5002, 13 July 2004. For the American legal system to award over $116 million against the PA and

7

PLO for the death of one person in the conflict is disruptive of efforts to achieve peace and reconciliation and disserves the overall interests of justice.

14. The District Court ruled that <u>Papandreou</u> "does not directly support the Defendant's argument" in part because there had been some jurisdictional discovery in <u>Papandreou</u> unlike the present case involving discovery on the merits in which appellants were unwilling to participate. The District Court observed that defendants persisted in their unwillingness to participate in discovery even after the Court had repeatedly rejected defendants claims to immunity, and many issues had been decided against them, including several "alternate, non-merits routes to dismissal". The Court discussed <u>Papandreou</u> as though it was an isolated case. It is not. As defendants have consistently maintained, <u>Papandreou</u> it is one case among many that establish a well-settled precedent. The grounds on which the Court distinguished <u>Papandreou</u> and refused to follow it, even if they are a valid reading of <u>Papandreou</u>, which appellants dispute, would not be a sufficient basis for refusing to adhere to this well-established precedent. The Court did not take issue with the rationale that underlies this precedent – that the denial of sovereign immunity under the FSIA satisfies the three requirements of the collateral order doctrine and that the denial of immunity is effectively unreviewable on appeal as would have been true in this case if defendants had yielded and proceeded on the merits.

15. On appellants recent motion to the District Court for the stay pending appeal that appellants are now requesting this Court to issue, appellants argued as they are now arguing that the District Court erred in refusing to adhere to <u>Papandreou</u> and defer

consideration of default judgment until there was a final determination of defendants claims of immunity. In opposing the stay, plaintiffs contended this argument was meritless because defendants failed to appeal the District Court's April 23, 2004 decision denying their Rule 12(b)(1) motion, arguing defendants "never actually bothered to file a notice of appeal" ... defendants "could not be troubled to actually seek the relief they now claim they were denied ..." Pltfs. Opposing Memorandum at pp. 22-23.

16.   This argument by plaintiffs, that defendants failed to file a notice of appeal defendants should have filed, should be rejected. Plaintiffs blocked defendants from taking an interlocutory appeal from the April 23 decision by filing a Rule 59(e) motion for reconsideration on April 28, 2004. Plaintiffs did this deliberately as appears from the letter they hand-delivered to the Court on that day. The letter expressed alarm over the possibility that an interlocutory appeal by defendants from the April 23, 2004 decision might be taken and oust the Court of jurisdiction to enter final judgment. It went on to advise the District Court that it "cannot be divested of jurisdiction so long as plaintiffs' Rule 59(e) motion to amend the April 23 decision remains pending," pointing out that if the Rule 59(e) motion is decided prior to the entry of final judgment, appellants would then be able to take an interlocutory appeal. It urged the Court to "retain certain jurisdiction over this action until final judgment is entered," i.e. to dispose of the Rule 59(e) motion at the same time as or as part of the final judgment. A copy of plaintiffs letter is attached hereto as Exhibit 3.

17.   The District Court's decision and order of July 12, 2004, directing entry of

9

final judgment also denied plaintiffs Rule 59(e) motion and final judgment was entered
the next day, on July 13, 2004.

18. It thus appears that beginning on April 28, 2004, with the filing of their Rule
59(e) motion, plaintiffs as they well knew, precluded defendants from taking an
interlocutory appeal from the April 23 decision at any time thereafter through the entry of
final judgment on July 13, 2004. See in addition to Exhibit 3, FRAP 4(a)(4)(A) and (B).

19. It ill-behooves plaintiffs to argue now as they did in the District Court that
defendants entitlement under Papandreou to a final determination of their immunity was
properly denied by the District Court because appellants didn't bother to take an appeal
that plaintiffs well knew would be ineffective because plaintiffs Rule 59(e) motion was
pending.

20. Plaintiffs have repeatedly argued an interlocutory appeal should be
unavailable to appellants to review a denial of their claim of sovereign immunity because
the statehood of Palestine is itself disputed. This does not matter. The order denying
defendants immunity claims fully meets the requirements of the collateral order doctrine,
and if the claim of immunity is upheld this case would have to be dismissed for lack of
subject matter jurisdiction on grounds of sovereign immunity. Plaintiffs might have a
point if the disputed claim of statehood was frivolous. But Palestine's claim of statehood
is substantial. It is being made by an actual functioning government seeking to protect
and promote the welfare of millions of Palestinians. In defendants view the record amply
establishes the statehood of Palestine, but even if the issue is ultimately decided against

defendants, the question is close and the claim of statehood deserves to be taken seriously. Defendants should not be faulted and in effect punished, as the District Court has done by holding them in default, for rightfully insisting on a final determination as to their immunity before allowing the immunity to be destroyed. Plaintiffs demands for discovery on the merits and for an answer should have been held in abeyance until defendants claims to immunity were finally resolved.

21. This Court's judgment on the interlocutory appeal appellants filed in this case in April 2003, provides support for appellants claim they are entitled to a final determination on the issue of immunity before addressing the merits and that they were wrongfully held in default. The judgment, Ex. 1 hereto, referred to the jurisdictional implications of the immunity issue and suggested that defendants might "still be able to file a fully supported Rule 12(b)(1) motion below." The judgment stated it was being rendered "without prejudice to the appellants raising their sovereign immunity defense in a proper and timely manner," and stated: "We take no view as to the merits of that defense." Acting on the suggestion in the judgment, defendants filed such a fully supported Rule 12(b)(1) motion promptly on June 13, 2003. The motion presented full evidence on statehood and immunity. Defendants responded with additional evidence. The District Court decided the motion more than 10 months after it was filed in a published opinion on April 23, 2004, 315 F.Supp.2d 164. The motion was decided on an evidentiary record, unlike the bare record in the prior appeal. Defendants having raised and fully supported their sovereign immunity defense promptly by motion as suggested

by this Court's judgment were entitled to interlocutory appellate review and/or a final determination of the issue of immunity before being held in default for asserting that right. If the default judgment entered on July 13, 2004 is not vacated and the case dismissed for lack of subject matter jurisdiction or on some other dispositive ground, the judgment should be vacated solely on the ground the entry of default was unwarranted

**B.    This is not an ordinary tort case.**

22.    An overriding source of error in this case has been the District Court's repeated insistence that this is an ordinary tort case. It is not. It is a case of alleged "international terrorism" under the ATA that would not be in this Court if it were not such a case. It requires defendants alleged conduct to be evaluated in the context of the Israeli-Palestinian conflict.

23.    The District Court's mistaken view that this is an ordinary tort case led it to exclude from consideration significant factors that support the non-justiciability of key issues and to view the default judgment mistakenly as an ordinary money judgment.

**C.    Key Issues In This Case are Nonjusticiable**

24.    Defendants are charged with responsibility for acts by Hamas, for furnishing support to Hamas and failing to stop attacks by Hamas, among other things. Defendants are not charged with any specific conduct relating to the death of Yaron Ungar. How can the Court in an ATA action adjudicate such issues? The perpetrators of the murder of the Ungars are alleged to be Hamas members. The District Court in Washington, D.C. in an action plaintiffs commenced in 2000 seeking to hold Iran responsible for the deaths of the

12

Ungars, expressed doubt about such membership and the confessions plaintiffs relied

upon. See Ungar v. Iran, 211 F.Supp.2d 91, 97 (D.D.C. 2002). But even if the killers

were members of Hamas, how can the Court in an ATA action determine whether

defendants had the ability to curb violence by Hamas? Hamas is a militant faction, with

members and sympathizers located throughout Palestine with military branches. It has

political and social programs and objectives. It is not controlled by appellants. Far from

it. Hamas vies with appellants for the popular support of the Palestinian people, day to

day in the streets and also at the polls. And if the Court in an ATA action is able to

determine that defendants had the ability in terms of raw power to curb, prevent and/or

punish violence by Hamas would it have been feasible for defendants to do so?

Defendants have consistently opposed violence by Hamas. What would the political

consequences have been if defendants stepped up their efforts to stop or curb violence by

Hamas? Surely defendants could not employ missile attacks to assassinate Hamas leaders

as Israel has openly done in blatant disregard of international law. Answers to these

questions would have to take into consideration that violence by Hamas is taking place

against the backdrop of Israel's belligerent and oppressive occupation of the Palestinian

territories and Israel's use of excessive military force against Palestinians, continuously

resulting in death and injury to innocent civilians, as well as other domineering and

oppressive Israeli measures resulting in economic hardship and creating humanitarian

crises for the Palestinian people. What actions would it have been feasible for defendants

to take against Hamas without alienating the people or losing their essential support or

undermining the morale and will of the people to persevere under Israeli oppression?

25. Other aspects of this case are also nonjusticiable..

26. For years, a dominant Palestinian motivation has been to bring Israel's illegal occupation of the Palestinian territories to an end. Palestinian actions taken for this purpose do not fit within the definition of international terrorism in 18 U.S.C. sec. 2331(1) that is an essential element of this Court's subject matter jurisdiction as well as the legal sufficiency of the civil cause of action plaintiffs are alleging under sec. 2333.

27. Moreover, the determination whether defendants alleged actions in this case are within this definition and constitute international terrorism will require an examination of defendants intent and motivation and this in turn will require an assessment of the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza, and many other factors. Palestinian actions and the intent and motivation for them cannot be understood and evaluated for purposes of sec. 2331 without this context being taken into account.

28. The context provided by the Israeli-Palestinian conflict would include the many factors that govern the motivation and intent with which defendants allegedly acted. These would have to be judicially assessed to judge the feasibility of a Court's determining whether the activities plaintiffs allege constitute international terrorism. These factors include defendants' need to address and take into account the continuing oppression, poverty, malnutrition and humiliation of the Palestinian people, Israel's violation of the Palestinian people's human rights by excessive military force and other

14

means, and relative popular support of the people from time to time for the Palestinian government, militant factions and violence –all of which are directly affected by Israel's oppressive and illegal conduct. Recent U.N. reports submitted to the International Court of Justice as part of the U.N.'s Dossier in support of the General Assembly's request for an advisory opinion on the legal consequences of the wall Israel is constructing, discussed below, confirm that throughout the period covered by this case the intent and motivation with which defendants acted was constantly and powerfully affected by many aspects of the Israeli-Palestinian conflict, including violation of Palestinian human rights and the humanitarian crises suffered by the Palestinian people. Part III of the Dossier consists of four recent U.N. reports. The reports are posted in full on the Court's website: www.icj-cij.org. The Dossier is posted in a pdf file of 1164 pages. The four reports in Part III appear at pdf pages 389, 418, 446 and 461.

29.   Defendants submit that the facts necessary to answer these questions are not suseptible to judicial determination. Further, even if the facts bearing on appellants and Hamas and their actions and attitudes toward one another and the likely reactions of the Palestinian people to efforts by defendants to prevent and punish violence by Hamas under all the relevant facts and  circumstances of the Israeli-Palestinian conflict and the ongoing peace process could somehow be ascertained, there are no judicial standards for adjudicating the issues they would present. Even if the District Court is correct in viewing this case as one committed to the judicial branch, the issues it presents are unmanageable and nonjusticiable. The adjudication would be especially problematic for a U.S. court.

**D.    The Court's Reasons for Rejecting Palestinian Statehood were erroneous as a Matter of Law; The Court Erred in Failing To Uphold Palestinian Statehood and Defendants Immunity**

30.    The FSIA does not define the term "foreign state." It provides only that the term "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b) [of 28 U.S.C. sec. 1603]". See Garb v. Republic of Poland, 207 F.Supp.2d 16, 34 (E.D.N.Y. 2002), vacated and remanded on other grounds, 72 Fed.Appx. 850 (2d Cir. 2003). Nor does the ATA define the term.

31.    The District Court gave conclusive effect to Palestine's less than full U.N. membership as a basis for rejecting its statehood See, Ungar v. PA, 228 F.Supp.2d 40, 49 (D.R.I. 2002) ("Close is simply not good enough."). This was mistaken for several reasons. The United States was a sovereign state though it had not joined the League of Nations, just as Switzerland among others was a sovereign state though for 50 years it did not join the United Nations. It is also mistaken because Palestine's status at the United Nations is tantamount as a practical and legal matter to full membership and the reasons why Palestine's full membership has been blocked are political, and have nothing to do with the criteria by which statehood is measured. And most basically it is mistaken because statehood is not dependent on recognition. Restatement (Third), The Foreign Relations Law of the United States, sec. 202, comment b. (ALI 1986).

32.    The very recent case previously mentioned, before the International Court of Justice at the Hague, (the World Court), established under the Charter of the United Nations, on the General Assembly's request for an advisory opinion on the legality of the

wall under construction by Israel on Palestinian land in the West Bank powerfully
confirms Palestine's sovereignty and statehood. The World Court's advisory opinion and
several separate opinions were rendered on July 9, 2004. Palestine exercised the full
perogatives of a state in this case. It had a leading role in initiating the proceedings and in
presenting facts and legal argument in extensive written submissions and in oral
argument. The extensive materials filed with the Court by Palestine and the by United
Nations, which filed a voluminous dossier, and filed by others provide a wide range of
detailed facts from knowledgable and authoritative official and other sources and in the
aggregate strongly support Palestinian statehood and sovereignty. These materials merit
careful study. They are all posted verbatim on the World Court's website, www.icj-
cij.org.

33.   The record amply establishes that Palestine meets the objective criteria of
statehood set forth in sec. 201of the Restatement. It has the requisite territory, population
and functioning government and engages in and has the ability to engage in foreign
relations.

34. Palestine is not able to end the occupation by force, or, to date, by negotiation.
It cannot prevent many oppressive Israeli measures, even the forced confinement of the
PA's President to the rubble of the PA offices in Ramallah for over two years. It is often
coerced into acceptance of conditions it opposes or would reject, many exacted by Israel
in violation of international law controlling Israel as an occupying power. These
conditions affected the language and substance of agreements reached including the Oslo

Accords. To the extent that the Oslo Accords or other agreements conflict with the requirements of the Fourth Geneva Convention, the Convention prevails as a matter of international law. See, Imseis, On the Fourth Geneva Convention and the Occupied Palestinian Territory, 44 Harv. Int'l. Law J. 65, 127 (2003).

35. Limitations and restrictions on the functioning of the Palestinian government under the Oslo Accords or otherwise, to which plaintiffs might point to argue Palestine fails to meet the governance element or other aspects of the Restatement's definition of a state are caused by the occupation and the oppressive and coercive conduct of Israel under the occupation and do not alter the statehood of Palestine. The Oslo Accords should not be taken as a decisive or even reliable indicia of circumstances bearing negatively on Palestine's statehood. The negotiations leading to the accords were to a considerable extent the product of Israel's coercive advantages over Palestine, and Israel repeatedly acted for the specific purpose of negating Palestinian statehood and obscuring the extent to which Palestine meets or would otherwise have met the Restatement's criteria for statehood.

36. The statehood of Palestine cannot be negated on the basis of limitations and restrictions upon the Palestinian government and the Palestinian people caused by occupation and repression as a matter of international law and fundamental fairness.

**E.    The PA and PLO Are Part Of The State Of Palestine And Must Be So Recognized For Purposes Of The Foreign Sovereign Immunities Act and 18 U.S.C. sec. 2337(2)**

37. Defendants are entitled to the same immunity as Palestine. They constitute core structural elements and perform core functions of the government of Palestine as it now operates, crippled and compromised as it is by Israeli occupation. Accordingly the PA and PLO must be recognized as part of the state of Palestine itself. Cf. Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994) (2-1), cert. denied, 513 U.S. 1150 (1995) (the armed forces of a state must in all cases be considered as part of the foreign state itself); see Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (same with respect to the Iranian Ministry of Intelligence and Security (MOIS); see also Regier v. Islamic Republic of Iran, 281 F.Supp.2d 87, 100 (D.D.C. 2003), following Roeder, holding MOIS must be considered part of Iran, against which punitive damages cannot be awarded under the FSIA, noting and declining to follow several District Courts in awarding punitive damages against MOIS, notwithstanding Roeder.

## Conclusion

Defendants motion for a stay pending appeal should be granted.

Dated:   September 30, 2004                         Respectfully submitted,

*Ramsey Clark*
Ramsey Clark

*Lawrence W. Schilling*
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
212-475-3232
212-979-1583 (FAX)

Deming E. Sherman
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
401-274-9200
401-276-6611 (FAX)

Attorneys for Defendants-Appellants
Palestinian Authority and Palestine
Liberation Organization

# United States Court of Appeals
## For the First Circuit

---

No. 03-1544

EFRAT UNGAR, ET AL.,

Plaintiffs, Appellees,

v.

THE PALESTINIAN LIBERATION ORGANIZATION, ET AL.,

Defendants, Appellants.

---

Before

Selya, Lipez and Howard,
<u>Circuit Judges</u>.

---

JUDGMENT

Entered: May 27, 2003

We agree with appellees that, on the present record, this appeal is devoid of merit. Accordingly, we bypass the jurisdictional question, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Woods</u>, 210 F.3d 70, 74 & n.2 (1st Cir. 2000), grant the appellees' motion for summary disposition, and summarily affirm.

The appellants allege an entitlement to sovereign immunity under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1604, and the counterpart provision in the Antiterrorism Act of 1991, 18 U.S.C. § 2337(2). Yet "[t]he party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state." <u>Keller</u> v. <u>Central Bank of Nigeria</u>, 277 F.3d 811, 815 (6th Cir. 2002); <u>Accord</u>, <u>e.g.</u>, <u>Virtual Countries, Inc.</u> v. <u>Repub. of S. Africa</u>, 300 F.3d 230, 241 (2d Cir. 2002); <u>International Ins. Co.</u> v. <u>Caja Nacional de Ahorro y Seguro</u>, 293 F.3d 392, 397 (7th Cir.

*Ex 1*

2002). Here, the appellants have not attempted to make such an evidentiary showing.

To be sure, the appellants complain that they were deprived of an opportunity to make a proper showing by the district court. In particular, they complain that the court's handling of the immunity issue - withholding action on their motion for "leave to assert" such a defense, stating during a hearing that immunity was not then being considered, and thereafter deciding the issue - took them by surprise. This procedural objection rings hollow. The appellants had ample opportunity to file a properly supported motion under Fed. R. Civ. P. 12(b)(1) seeking dismissal on sovereign immunity grounds. They did not need leave of court to file such a motion and assert such a defense. Indeed, they did just that, through the same counsel, in unrelated litigation thirteen years ago. See Klinghoffer v. S.N.C. Achille Lauro, 739 F. Supp. 854, 856-58 (S.D.N.Y. 1990), vacated on other grounds, 937 F.2d 44 (2d Cir. 1991). That course of conduct belies their present complaint.

We need go no further. Given the bare record, the appellants cannot prevail on this appeal. Of course, they have not yet answered the complaint, and we do not discount the fact that they may still be able to file a properly supported Rule 12(b)(1) motion below. This seems especially likely given the jurisdictional implications of the issue and the appellees' characterization of the court's immunity ruling as "interlocutory." But the appellants must adhere to the rules that govern all litigants.

The motion for summary disposition is allowed and the orders appealed from are summarily affirmed. See Loc. R. 27(c). This order is without prejudice to the appellants raising their sovereign immunity defense in a proper and timely manner. We take no view as to the merits of that defense.

So ordered.

By the Court:

RICHARD CUSHING DONOVAN

Richard Cushing Donovan, Clerk.

[Cert. cc: Hon. Ronald R. Lagueux and David DiMarzio, Clerk, U.S.D.C. of Rhode Island, Messrs: Clark, Schilling, Sherman and Strachman]

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 04-7038                                  September Term, 2003

97cv00975

Filed On: April 13, 2004 [815909]

In re: Socialist People's Libyan Arab Jamahiriya,
Petitioner

BEFORE:    Edwards, Randolph, and Garland, Circuit Judges

## O R D E R

Upon consideration of the petition for a writ of mandamus, it is

**ORDERED** that any and all proceedings in district court related to the complaint filed in case No. 97-cv-0975, *Price v. Socialist People's Libyan Arab Jamahirya*, be stayed pending resolution of appeal No. 03-7095, *Price v. Socialist People's Libyan Arab Jamahirya*.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Deputy Clerk/LD

*Ex 2*

# MCINTYRE, TATE, LYNCH & HOLT LLP

COUNSELLORS AT LAW

JERRY L. MCINTYRE †
DEBORAH MILLER TATE *Δ
WILLIAM J. LYNCH
WILLIAM F. HOLT
DAVID J. STRACHMAN
ROBERT S. PARKER*

Also member
† New York Bar
* Massachusetts Bar
Δ Florida Bar

VIA HAND DELIVERY

April 28, 2004

The Honorable Judge Lagueux
United States District Court
for the District of Rhode Island
One Exchange Terrace
Providence, RI 02903

Re:    **Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al.**
        **C.A. No. 00-105L**

Dear Judge Lagueux:

I write to alert your Honor to the serious possibility that the Court may be inadvertently divested of jurisdiction in this matter, thereby delaying its final disposition indefinitely.

On April 23, 2004, the Court rendered a Decision and Order denying defendants' motion to dismiss this action on grounds of sovereign immunity.[1]

Defendants believe that an order denying a motion to dismiss on grounds of sovereign immunity is immediately appealable by right under the "collateral order" doctrine, and they have long indicated that they will attempt an interlocutory appeal of any decision denying their motion to dismiss, as they did previously.

Plaintiffs believe that a decision finding that a defendant is not a "foreign state" (as distinct from a decision finding an exception to the immunity of an acknowledged foreign state) is not immediately appealable as a "collateral order."

---

[1] In conformance with the well-established rule that failure to press a claim of waiver of immunity may result in waiver of the claim of waiver of immunity, Watters v. Washington Metro. Area Transit Auth., 295 F.3d 36, 42 n. 13 (D.C. Cir. 2002), plaintiffs have filed a motion to amend the decision of April 23, 2004, pursuant to Fed.R.Civ.P. 59(e), in light of the Court's holding that defendants did not waive immunity.

Ex. 3

The Honorable Judge Lagueux
Page Two
April 28, 2004

The parties argued their respective positions on this question in the context of defendants' abortive appeal last year, but the First Circuit carefully refrained from deciding whether a decision holding that a defendant is not a "foreign state" is immediately appealable as a "collateral order." Ungar v. The Palestine Liberation Organization, 2003 WL 21254790 (1st Cir. 2003)

Moreover, neither plaintiffs nor defendants have been able to locate any case law on this question. This issue therefore remains unsettled, and it is certainly not impossible that the Court of Appeals would ultimately adopt defendants' position.

The ramifications of this issue are considerable: if defendants are correct and the Court's Decision and Order of April 23 is immediately appealable, then the filing of an effective notice of appeal by defendants will divest this Court of its jurisdiction on all matters at issue on appeal. Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982).

Since the appeal would relate to this Court's subject-matter jurisdiction, this Court will lack jurisdiction to enter judgment once a notice of appeal becomes effective, and any judgment entered subsequent to an effective notice of appeal would be void. U.S. v. Brooks, 145 F.3d 446, 454 (1st Cir. 1998); U.S v. One Parcel of Land, 16 Fed. Appx. 16, 20 (1st Cir. 2001).

Thus, once a notice of appeal becomes effective under FRAP 4(a)(4)(B)(1), the Court and the parties will be cast into a thick fog of uncertainty about the Court's jurisdiction. Until the Court of Appeals rules on defendants' "collateral order" claim, it will be impossible to know whether this Court has retained jurisdiction or if jurisdiction has been vested in the Court of Appeals. This Court will be faced with the difficult choice of either issuing a final judgment which may ultimately be held to be void, or staying an action for long months pending the disposition of an appeal over which the Court of Appeals may have no jurisdiction.

Obviously, such a state of affairs would result in a massive waste of judicial resources, confusion, and further unjust delays and prejudice to plaintiffs, who have suffered defendants' dilatory and contumacious conduct in this action for over four years.

The Supreme Court has recognized the need to protect innocent and long-suffering litigants such as the instant plaintiffs from the "*harassment and cost of a succession of separate appeals.*" Firestone Tire v. Risjord, 449 U.S. 368, 374 (1981)(internal quotes and cite omitted). Similarly, the First Circuit recently reiterated that, "*By their nature, interlocutory appeals are disruptive, time-consuming, and*

The Honorable Judge Lagueux
Page Three
April 28, 2004

*expensive. Thus, we . . . endeavor[] to discourage piecemeal appeals.*" Waste Mgmt.
Holdings, Inc. v. Mowbray, 208 F.3d 288, 294 (1st Cir. 2000).

Such are the pathologies of "regular" interlocutory appeals; all the more so when,
as here, the right of appeal is unsettled and the district court and parties will be left in
jurisdictional limbo indefinitely, after four years of arduous litigation and just one inch
from the finish line.

Plaintiffs are calling attention to this potential jurisdictional quagmire because
they assume that the Court intends to issue a final judgment in this case in the near future
and that it is therefore appropriate for the Court to retain certain jurisdiction.

As noted, the Court will retain certain jurisdiction unless and until a notice of
appeal becomes effective under F.R.A.P. 4(a)(4)(B)(1). That rule provides that a notice
of appeal becomes effective only when an order disposing of the last of the enumerated
post-judgment motions is entered.

Thus, the Court cannot be divested of jurisdiction by a notice of appeal so long as
plaintiffs' Rule 59(e) motion to amend the April 23 decision remains pending. FRAP
4(a)(4)(B)(1). Therefore, if the order/decision disposing of plaintiffs' Rule 59(e) motion
is entered simultaneously with, or as part of, the final judgment in this action, the Court's
jurisdiction will remain intact to the end.

(Contrarily, if the Rule 59(e) motion is disposed of at any time prior to entry of
final judgment, any notice of appeal will become effective immediately and this Court
may be divested of jurisdiction to enter final judgment, for the reasons cited above).

Plaintiffs respectfully believe that the Court should retain certain jurisdiction over
this action until final judgment is entered. Allowing defendants to artificially and
indefinitely delay the final disposition of this action by creating uncertainty regarding this
Court's jurisdiction would cause a colossal waste of the resources of this Court and the
Court of Appeals, and severely prejudice the plaintiffs with further unjustified delay and
expense.[2] Consolidated Rail v. Fore River Railway, 861 F.2d 322, 325 (1st Cir. 1988)

---

[2] Plaintiffs note that the Court of Appeals ordered the PA and PLO to pay costs incurred by plaintiffs due to
defendants' last attempt to appeal, yet defendants have brazenly disobeyed this Order. This bad-faith,
scofflaw conduct regarding an Order of the Court of Appeals constitutes yet further grounds to prevent
defendants from inflicting further "*harassment and cost*" on the plaintiffs and on the Court itself by
attempting another superfluous interlocutory appeal of questionable validity. Firestone, 449 U.S. at 374.

The Honorable Judge Lagueux
Page Four
April 28, 2004

("*Piecemeal appeals should not be allowed unless the need for early and separate judgment as to a particular claim truly outweighs the risk of flooding the appellate docket.*")

Final judgment is at hand, and once it is entered defendants will be free to obtain appellate review of all issues, including of course their claim to sovereign immunity.

In conclusion I note that, in order to facilitate and ease the Court's disposition of the Magistrate's Report, plaintiffs have withdrawn their few objections to that Report (which in any case did not touch on dispositive matters) and have filed early their response to defendants' objections to the Report. The pleadings are therefore complete.

Sincerely,

David J. Strachman

DJS/dc

cc:   Ramsey Clark/Lawrence W. Schilling (v/fax 212-979-1583)
      Deming E. Sherman/Annemarie M. Carney (v/fax 401-276-6611)

4

RAMSEY CLARK

LAWRENCE W. SCHILLING

LAW OFFICES
36 EAST 12TH STREET
NEW YORK, N.Y. 10003
(212) 475-3232
FAX (212) 979-1583

# FAX TRANSMISSION SHEET

DATE:                    September 30, 2004

FAXED TO:                David J. Strachman

FAXED NUMBER(S):         401-331-6095

FAXED FROM:              L. W. Schilling

TIME:                    3:35 p.m.

NUMBER OF PAGES INCLUDING THIS PAGE: 28

RE:    Ungar v. PA and PLO
       Docket No. 04-2079

COMMENTS:

IMPORTANT NOTICE: This transmission may be PRIVILEGED, CONFIDENTIAL, ATTORNEY-CLIENT communication. If you are not the intended recipient, please notify us immediately.