UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| THE ESTATE OF YARON UNGAR, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 00-105L |
| ) | |
| THE PALESTINIAN AUTHORITY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' MOTION TO
## <u>FOR RELIEF FROM DEFAULT JUDGMENT</u>

Defendants The Palestinian Authority and The Palestine Liberation Organization hereby

move pursuant to Rules 55(c) and 60(b)(6) of the Federal Rules of Civil Procedure, for relief

from this Court's default judgment of July 12, 2004.  For the reasons stated in the accompanying

memorandum of points and authorities and supporting exhibits, and for any other reason the

Court deems appropriate, we urge the Court to set aside the default judgment and to permit

expedited litigation on the merits of this case subject to conditions discussed more fully in the

memorandum of points and authorities.

Defendants further note that, in the accompanying memorandum of points and authorities,

they have encouraged the Court to seek a Statement of Interest from the United States, *see* 28

U.S.C. § 517, regarding the foreign policy implications of denying the Palestinian Authority's

motion to vacate the default judgment.  Defendants made a similar request in support of their

motion for relief from default judgment in *Knox v. PLO,* No. 03cv4466 (S.D.N.Y.) (VM).   On

December 11, 2007, the *Knox* court directed the filing within 45 days of "an expression from the United States of America as to whether it contemplates issuing any suggestion of interest in the resolution of this case or in *any of the other similar cases pending in other Districts*." Ex. A to the Memorandum (Judge Marrero's Order in *Knox*) at 2 (emphasis added). If the Court has any doubts about the foreign policy implications of this case, it should similarly seek input from the United States about how its interests are affected in these matters.

Dated:  December 28, 2007
                                  /s/ Richard A. Hibey
                                    Richard A. Hibey (D.C. Bar #74823)
                                    Admitted *pro hac vice*
                                    Mark J. Rochon (D.C. Bar #376042)
                                    Admitted *pro hac vice*
                                    MILLER & CHEVALIER CHARTERED
                                    655 Fifteenth Street, N.W., Suite 900
                                    Washington, DC  20005-5701
                                    Tel. (202) 626-5800
                                    Fax. (202) 628-0858
                                    rhibey@milchev.com

                                    /s/Deming E. Sherman
                                    Deming E. Sherman (#1138)
                                    EDWARDS ANGELL PALMER & DODGE LLP
                                    2800 Financial Plaza
                                    Providence, Rhode Island 02903
                                    Tel. (401) 274-9200
                                    Fax. (401) 276-6611
                                    dsherman@eapdlaw.com

                                    *Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 28th day of December 2007, a true and genuine copy

of the foregoing was filed by ECF, which automatically provided service to the following:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> <u>Djs@mtlhlaw.com</u>
> *Attorneys for Plaintiffs*

> /s/Richard A. Hibey

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 00-105L |
| ) | |
| THE PALESTINIAN AUTHORITY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO
## VACATE DEFAULT JUDGMENT

Based on the extraordinary circumstances described in the body of this Memorandum, the

Defendants, the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO)

request this Court vacate the $116 million default judgment pursuant to Rule 60(b)(6) of the

Federal Rules of Civil Procedure.  In making such a request, PA and PLO have considered the

age of this lawsuit, the current stage of the proceedings, and the nature of the default.  Defendants

are also mindful of this Court's many decisions in this case, as well as the First Circuit's opinion

in *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005), which upheld both

this Court's decision to reject the sovereign immunity defense and this Court's decision to

proceed immediately toward entry of a default judgment rather than allow an interlocutory appeal

on the sovereign immunity question.  In light of this prior history, Defendants understand that the

Court likely will have serious concerns about vacating the judgment.

Defendants do not take these concerns lightly and will not attempt to condone or justify

many of the earlier actions in this litigation.  We regret these procedural missteps, and have

806298.1

moved to vacate the defaults in other similar cases around the country before seeking vacatur here, in part to demonstrate to this Court the seriousness of Defendants' representations about the manner in which this litigation will be conducted if it is permitted to go forward.

Respectfully, however, Defendants submit the Court should vacate the default judgment and permit litigation on the merits even at this late date.  While the Defendants' manner of conducting the litigation previously did not develop this important fact, there can be no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss, at a time when the PA and PLO were working with the United States and Israeli governments in actively seeking to prevent anti-Israeli attacks.  HAMAS, in fact, likely committed the attack *precisely* to injure the interests of the PA and the PLO by disrupting the peace process that those entities were working so hard to support.  Thus, while Defendants have been found responsible by default based on their failure to file responsive pleadings and participate in discovery, the $116 million judgment against them has no basis in fact.  The judgment as to the PA and PLO is based on how the Defendants proceeded in a foreign court, not on Defendants' culpability in sponsoring acts of terrorism.

Even Plaintiffs have conceded in parallel litigation in the United States District Court for the District of Columbia that HAMAS conducted this attack for the specific purpose of disrupting the peace negotiations between Israel and the PLO.  Simultaneous with the litigation in this case, Plaintiffs pursued a case against Iran in the District of Columbia for supporting HAMAS in this incident.  *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002).  Plaintiffs' theory in the D.C. litigation:  "Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, specifically to disrupt the Israel-PLO peace process." *Id.* at 94.

Defendants acknowledge that default judgments should not be vacated lightly.  The Supreme Court and the First Circuit, however, have confirmed the Court's discretion to grant

relief in extraordinary circumstances under Rule 60(b)(6), discretion that must be exercised in the context of the law's preference for merits litigation. In *Plaut v. Spendthrift Farm*, 514 U.S. 211, 233-34 (1995), for example, the Supreme Court described Rule 60(b) as confirming longstanding "inherent and discretionary power . . . to set aside a judgment whose enforcement would work inequity." Similarly, in *Hugel v. McNell*, 886 F.2d 1, 6 (1st Cir. 1989), the First Circuit explained: "it is well settled that Rule 60(b)(6) allows a district judge to grant relief when equitable considerations so counsel." By vacating a multi-million dollar default judgment, on the ground that the Defendants were not responsible for Plaintiffs' injuries, the Court would be acting well within the scope of discretion provided it under Rule 60(b)(6).

This is especially so given the presence of other compelling mitigating factors in this case. In this motion, Defendants encourage the Court to seek a Statement of Interest from the United States, *see* 28 U.S.C. § 517, regarding the foreign policy implications of denying the motion to vacate. Defendants made a similar request in support of their motion for relief from default judgment in *Knox v. PLO*, No. 03cv4466 (S.D.N.Y.) (VM). On December 11, 2007, the *Knox* court directed the filing within 45 days of "an expression from the United States of America as to whether it contemplates issuing any suggestion of interest in the resolution of this case or in *any of the other similar cases pending in other districts*." Ex. A at 2 (Judge Marrero's order in *Knox* (emphasis added). If this Court has any doubts about whether the PA and PLO should be given an opportunity to defend on the merits, it should also seek the views of the United States or, at the least, await the United States' response to Judge Marrero's order.

This Court has been extraordinarily patient in this case. While the PA and PLO were admittedly slow to understand the United States legal framework and why they could be haled into U.S. courts to answer for an attack in Israel carried out by HAMAS, the Court has before it

3

repentant foreign defendants, who are ready and prepared to litigate this matter fully and responsibly going forward.  To that end, Defendants' motion is supported by a sworn declaration from the Prime Minister of the Palestinian Authority, Salam Fayyad.  Ex. B.  In his declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward.  In his declaration, Prime Minister Fayyad states: "I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process.  I have further instructed new counsel to transmit this commitment to the United States courts."  *Id.* at ¶ 13.

This Court must also consider the undue hardship that will befall the Palestinian people should the PA and PLO not be given another opportunity to litigate the case on the merits. Plaintiff, along with plaintiffs in other terrorism cases pending against the PA and PLO, collectively seek over $4 billion.  Earlier this month, at the December 17, 2007 gathering of 90 donor countries and international organizations in Paris, the international community pledged $7.4 billion over three years to the impoverished Palestinian Authority, with the U.S. pledging $555 million for 2008 alone.  Ex. C (Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*, NEW YORK TIMES, Dec. 18, 2007).  As Secretary of State Rice explained at the conference: "The Palestinian Authority is experiencing a serious budgetary crisis . . . . This conference is literally the government's last hope to avoid bankruptcy."  *Id.* at 1.  Secretary of State Rice noted that the PA's financial condition is tied to the prospects for peace, emphasizing: "This is the most promising opportunity to seek peace that we have had in nearly seven years, and we need to seize it."  Ex. D at 1 (John Ward Anderson, *Conferees Pledge $7.4 Billion in Aid to Palestinian Authority*, WASHINGTON POST, Dec. 18, 2007).  Given the PA's "serious budgetary crisis," the

4

international community's commitment of substantial aid to the PA, and the relationship between the PA's financial situation and the prospects for peace in the region, the Court should give careful consideration to the ramifications of leaving this $116 million default judgment in place.

By contrast, vacatur will not leave Plaintiffs without remedy. Plaintiffs already have a $116 million judgment against the real culprit in the attack, HAMAS. Plaintiffs' remedy should be limited to the real wrongdoer. In addition, Defendants will agree to reimburse Plaintiffs' for any reasonable costs and expenses unnecessarily incurred in the damages hearing, as well as to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the default judgment so that the Defendants can litigate on the merits -- the Defendants again default.

There is a significant difference between the reprehensible and tragic acts committed by HAMAS, and the procedural missteps committed by Defendants in this litigation. The instant judgment, however, imposes precisely the same liability for each. Such liability is unwarranted as a matter of law and equity. Defendants respectfully request that this Court grant the motion and vacate the judgment pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure.

## PROCEDURAL BACKGROUND

This Court is familiar with the procedural history of this case. *See, e.g., Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 315 F. Supp. 2d 164, 168-71 (D.R.I. 2004); *Estates of Ungar v. Palestinian Authority*, 304 F. Supp. 2d 232, 244-47 (D.R.I. 2004); *Estates of Ungar ex rel Strachman v. Palestinian Authority*, 228 F. Supp. 2d 40, 41-43 (D.R.I. 2002); *Estates of Ungar v. Palestinian Authority*, 153 F. Supp. 2d 76, 82-85 (D.R.I. 2002). Magistrate Judge Martin has also extensively discussed the procedural history of this case in *Estates of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004), as has the First Circuit in *Ungar v. Palestinian Authority*, 402 F.3d 274, 276-80 (1st Cir. 2005). Accordingly, Defendants will not revisit the entire procedural history here, but will provide a brief synopsis for the purpose of this motion.

This case arises from a shooting attack that occurred near Beit Shemesh, Israel on June 9, 1996. *Estates of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15, 30 (D.R.I. 2004). The attack was carried out by HAMAS, and the Israeli courts convicted four HAMAS operatives in connection with the incident. *Ungar*, 402 F.3d at 276.

Nearly four years after the incident, on March 13, 2000, Plaintiffs filed this lawsuit against not only HAMAS but also against the PA and PLO.[1] Dkt. 1. Plaintiffs' amended complaint alleged that the PA and PLO were "authorized and responsible, under international instruments, customary international law and local law applying in the West Bank and Gaza, to exercise law enforcement powers and to maintain public order and security in the territories under

---

[1] The original complaint also named five individual HAMAS members and five individuals who held positions within agencies operated by the Palestinian Authority, including Jabril Rajoub and Amin Al-

their control." Dkt. 41 ¶ 23. The Plaintiffs alleged that the PA and PLO had breached this responsibility purportedly by failing to do enough to stop HAMAS from operating in their territory and by failing to accede to American and Israeli demands to "take effective measures to prevent further terrorist attacks by defendant HAMAS." *Id.* ¶ 27. In the meantime, Plaintiffs also filed a lawsuit in the United States District Court for the District of Columbia seeking to hold Iran responsible for its sponsorship of the attack. *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002). Plaintiffs' theory in the District of Columbia was that "Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, *specifically to disrupt the Israel-PLO peace process.*" *Id.* at 94 (emphasis supplied).

HAMAS declined to defend the Rhode Island lawsuit at all. On September 6, 2000, Plaintiffs moved for entry of default against HAMAS and the individual HAMAS defendants, which the Clerk entered the next day. Dkt. 30. On November 29, 2000, Plaintiffs filed a motion to enter default judgment against HAMAS and the individual HAMAS defendants. Dkt. 38.

While the PA and PLO were raising jurisdictional and other legal defenses, the case against HAMAS proceeded toward judgment. On July 12, 2002, Magistrate Judge Martin commenced a damages hearing in the case against HAMAS. After hearing three days of testimony in an uncontested proceeding, Magistrate Judge Martin recommended an award of $116.4 million in damages against HAMAS. Dkt. 183. On January 27, 2004, this Court accepted the recommendation. Dkt. 253.

In the same time frame, the default proceedings were moving forward against the PA and PLO. After the Court rejected the PA and PLO's motion to dismiss the case on the pleadings, the

---

Hindi. The Plaintiffs filed an amended complaint that removed the individual PA and PLO defendants. Dkt. 41.

PA and PLO filed a motion to reconsider, Dkt. 100, but did not file an answer.  On February 7,

2003, the Plaintiffs moved for entry of default against the PA and PLO.  Dkt. 105.  On April 18,

2003, Magistrate Judge Martin granted the Plaintiffs' motion for entry of default against the PA

and PLO, citing both the failure to answer the amended complaint and the failure to participate in

discovery.  Dkt. 133.

On August 22, 2003, at a hearing before Magistrate Judge Martin, prior counsel for

Defendants informed the Court that the PA and PLO did not intend to participate in a hearing on

damages.  Magistrate Judge Martin accordingly found that the PA and PLO waived a hearing on

damages, and issued a report and recommendation applying his damage findings from 2002

(regarding HAMAS) to the PA and PLO.  Dkt. 269.  On July 12, 2004, this Court adopted his

report and recommendation.  Dkt. 279.

The PA and PLO appealed.  In its 2005 opinion, the First Circuit noted that the appeal

raised "exceptionally important questions of justiciability and sovereignty, emblematic of

unsettled political conditions that have plagued the Middle East for many years." *Ungar*, 402

F.3d at 276.   After carefully reviewing these issues, the Court of Appeals affirmed the decision

of this Court with respect to justiciability and sovereign immunity, and also affirmed the Court's

decision to proceed to judgment rather than to await an interlocutory appeal on sovereign

immunity.  On the latter question, the First Circuit emphasized that while it normally would have

been appropriate to await disposition of an interlocutory appeal before forcing the Defendants to

submit to discovery, in this case "the defendants, for whatever reason, elected not to assert

sovereign immunity in either of their first two motions to dismiss" and only raised the issue after

this Court had rejected the motions to dismiss and ordered the filing of an answer and fact-based

discovery. *Id.* at 293-94.  "In view of this history," the Court explained, "we believe that the

8

district court acted well within the encincture of its discretion in entering the default." *Id.* at 294,

*citing*, *Compania Interamericana v. Campania Dominica*, 88 F.3d 948, 951-52 (11th Cir. 1996).

On November 28, 2005, the Supreme Court denied certiorari. *PLO v. Ungar*, 546 U.S. 1034

(2005).

**ARGUMENT**

## I. RULE 60(b)(6) PERMITS RELIEF FROM JUDGMENT IN EXTRAORDINARY CIRCUMSTANCES

### A. Overview of Rule 60(b)

Federal Rule of Civil Procedure 60(b) "provides a procedure whereby, in appropriate

cases, a party may be relieved of a final judgment." *Liljeberg v. Health Services Acquisition*

*Corp.*, 486 U.S. 847, 863 (1988).  In particular, Rule 60(b) lists six circumstances in which relief

from a judgment is warranted:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence,
> could not have been discovered in time to move for a new trial
> under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is
> based on an earlier judgment that has been reversed or vacated; or
> applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

As the Supreme Court has explained, by "authoriz[ing] discretionary judicial revision of

judgments in the listed situations and in other extraordinary circumstances," Rule 60(b) "reflects

and confirms the courts' own inherent and discretionary power, firmly established in English

practice long before the foundation of our Republic, to set aside a judgment whose enforcement

9

would work inequity." *Plaut v. Spendthrift Farm*, 514 U.S. at 233-34 (*quoting in part, Liljeberg,* 486 U.S. at 864).

In this case, the PA and PLO rely exclusively on Rule 60(b)(6) -- "any other reason that justifies relief" -- as ground for vacatur of the judgment. The Supreme Court has described that provision as "grant[ing] federal courts broad authority to relieve a party from a final judgment 'upon such terms as are just,' provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg*, 486 U.S. at 863. In particular, Rule 60(b)(6) provides courts with authority "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," *Klapprott v. United States*, 335 U.S. 601, 614-15, (1949), but which should be limited to "extraordinary circumstances." *Ackermann v. United States,* 340 U.S. 193, 199 (1950). *See also United States v. Baus*, 834 F.2d 1114, 1123 (1st Cir. 1992) ("the Rule 60(b)(6) motion for relief from judgment must still establish that there are extraordinary circumstances warranting relief in order for the [movants] to prevail."); *Hugel v. McNell*, 886 F.2d 1, 6 (1st Cir. 1989) ("[i]t is well settled that Rule 60(b)(6) allows a district judge to grant relief when equitable considerations so counsel.") (citing cases).

The reason that Rule 60(b)(6) is mutually exclusive of the other provisions is that several clauses of Rule 60(b) are subject to a one-year time limit. Rule 60(c)(1) provides: "A motion under Rule 60(b) must be made within a reasonable time — and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." As a result, "[f]or the most part, cases brought under clause (6) are attempts to avoid . . . the one-year limit in other clauses of Rule 60(b)." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2864 at 365 (2d ed. 1995) (hereinafter "Wright & Miller's *Federal*

*Practice and Procedure*"). *See also Gonzalez v. Walgreens Co.*, 918 F.2d 303, 305 (1st Cir. 1990) (Rule 60(b)(6) motion "must be made within a reasonable time, [but] there is no specific time limit for filing such a motion.").

As a leading treatise has noted, however, the Supreme Court's recognition that Rule 60(b)(6) is mutually exclusive from the other grounds for relief, and that "clause (6) is not an easy escape from the time limit of the first three clauses, does not establish what is needed for relief under clause (6) on a motion made more than a year after judgment." Wright & Miller's *Federal Practice and Procedure* § 2864 at 363. Rather, courts determine the requisite "extraordinary circumstances" on a case-by-case basis and have "found extraordinary circumstances justifying relief, beyond the one-year requirement of the earlier clauses of the rule, in a limited number of cases." *Id.* at 366.

> **B.    Courts Have Found Extraordinary Circumstances in Cases Involving Default Judgments Where Meritorious Defenses Exist and Where Rigid Adherence to the Judgment Would Have Serious Foreign Policy Implications and Create Extreme Hardship.**

There is no talismanic formula for discerning the "limited number of cases" in which "extraordinary circumstances" exist sufficient to warrant relief under Rule 60(b)(6). Nonetheless, clear patterns have emerged.

First, "[t]he cases calling for great liberality in granting Rule 60(b) motions, for the most part, have involved default judgments." Wright & Miller's *Federal Practice and Procedure* § 2857 at 257. This is because "[t]here is much more reason for liberality in reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits." *Id.* This is also because the federal rules expressly provide for setting aside default judgments using Rule 60(b). *Burda Media, Inc. v.*

*Viertel*, 417 F.3d 292, 298 (2d Cir. 2005) (Fed. R. Civ. P. 55(c) "provid[es] that default

judgments may be set aside in accordance with Rule 60(b)").

Second, and for related reasons, the most important factor in cases seeking to reopen a

*default* judgment is the existence of a meritorious defense.  In such cases, where the merits have

never been explored, "[a]s long as the movant seeking timely relief has a meritorious defense,

doubt should be resolved in favor of a motion to set aside the judgment."  Wright & Miller's

*Federal Practice and Procedure* § 2857 at 258; *see also Teamsters, Chauffeurs, Warehousemen*

*& Helpers Union, Local No. 59 v. Superline Transp. Co. Inc.*, 953 F.2d 17, 20 (1st Cir. 1992).

Third, courts have also exercised leniency in cases seeking relief under Rule 60(b)(6)

where the default results from a foreign state's actions to protect what, from its perspective, it

reasonably perceives to be its legal rights. *Jackson v. People's Republic of China*, 794 F.2d

1490, 1496-97 (11th Cir. 1986).  As the Eleventh Circuit explained in *Jackson*:  "[w]e reject out

of hand the contention that in seeking an adjudication of jurisdictional issues arising out of

United States domestic law China acts improperly *in reserving what it conceives are its rights*

*under international law.*" *Id.* (emphasis added).

Fourth, courts have also been particularly willing to provide relief from default judgments

in cases with significant foreign policy consequences, since doing so will assist the State

Department in convincing reluctant foreign entities to resolve their disputes within the American

legal framework. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 & n.19

(D.C. Cir. 1987).  As the D.C. Circuit has noted, "[i]ntolerant adherence to default judgments

against foreign states could adversely affect this nation's relations with other nations and

undermine the State Department's continuing efforts to encourage foreign sovereigns generally to

resolve disputes within the United States' legal framework." *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835, 838-39 (D.C. Cir. 2006).

Fifth, courts have been most sensitive to the need to reopen default judgments where significant amounts of money are at stake. *Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986). As one district court explained in a case involving a $325,000 judgment, "the large amount of money at stake must be considered 'since relief under rule 60(b) is essentially equitable in nature and is to be administered on equitable principles.'" *First National Bank of Batesville v. Ryder Truck Rental Inc.*, Civ. No. 82-0045-B, 1985 U.S. Dist. LEXIS 21565 at * 16 (D. Me. 1985) (*quoting C.K.S. Engineers, Inc. v. White Mountain Gypsum*, 726 F.2d 1202, 1208 (7th Cir. 1984), *Hutton v. Fisher*, 359 F.2d 913, 916 (3d Cir. 1966)).

\*\*\*\*\*

*Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986), illustrates the proper application of Rule 60(b)(6) in a case where all five of these factors exist. *Jackson* involved a $41 million default judgment entered against the People's Republic of China (PRC), holding the PRC responsible for satisfying obligations to holders of railroad bonds that had been issued in 1911 by a predecessor Chinese government. 794 F.2d at 1492, 1495. The default judgment occurred after the PRC refused to appear in the action, choosing instead to send a series of diplomatic notes to the State Department asserting that it enjoyed absolute sovereign immunity. *Id.* at 1492. Nonetheless, after collection efforts were underway, the PRC moved to vacate the default judgment under, *inter alia*, Rule 60(b)(6). *Id.* at 1492.

The Eleventh Circuit affirmed a grant of vacatur. As the Court of Appeals explained, the case had arisen only a few months after the PRC leadership had been recognized by the United States and had been the subject of repeated high level diplomatic discussions between the PRC

13

and the United States. *Id.* at 1495.   As a result of the recent resumption of relations between the two nations, PRC authorities were "generally unfamiliar with United States judicial practice and procedure . . . .." *Id.*  The Court of Appeals also noted that the PRC viewed the bonds as an "odious" debt of a predecessor government, which international law did not require them to honor and did not require them even to litigate in the United States courts.  This belief had been altered only as a result of the "considerable diplomatic efforts of the State Department" to educate the PRC about the American legal system and to persuade the PRC to appear and to present its defenses to the court. *Id.* at 1495-96.   Under these circumstances, the Eleventh Circuit held that "the district court did not abuse its discretion in setting aside the judgment under Rule 60(b)(6)." *Id.* at 1496.   In doing so, the Court of Appeals relied heavily on both the existence of a meritorious defense and on the State Department's representations concerning the "foreign policy implications of the default judgment." *Id.* at 1496.  These same factors weigh in favor of granting the default here.

## II.   THIS CASE PRESENTS EXTRAORDINARY CIRCUMSTANCES WARRANTING RELIEF FROM THE DEFAULT JUDGMENT

### A.   Overview of Extraordinary Circumstances Presented by This Case.

Like *Jackson*, this is another of those rare cases that present the sort of extraordinary circumstances meriting relief under Rule 60(b)(6).  These circumstances do not fall within any of the other Rule 60(b) factors; the PA and PLO do not claim that vacatur is warranted here because of any earlier neglect that should now be deemed "excusable." *See* Fed. R. Civ. P. 60(b)(1).  Nor do the Defendants assert that there is any "new evidence" that has come to light beyond the time for filing a motion for a "new trial" under Rule 60(b)(2) -- a claim that would be virtually nonsensical in the context of a default judgment where no evidence at all was presented because

no trial occurred.  Defendants similarly do not claim that the earlier judgment was procured by fraud under Rule 60(b)(3) or is void under Rule 60(b) (4).

Nor do the Defendants attempt to secure relief under Rule 60(b)(5) by asserting that the judgment has been satisfied.  Indeed, Plaintiffs may cite the PA and PLO's failure to satisfy the judgment as a ground for denying this motion, but such an argument will not survive scrutiny.  A Rule 60(b)(6) motion *can only be filed* in a case where the judgment has not been satisfied. Otherwise, relief would be available under Rule 60(b)(5), and the motion would be "premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)", thus making relief under 60(b)(6) unavailable pursuant to the Supreme Court's decision in *Liljeberg*, 486 U.S. at 863.  Nor do such considerations have any place in a Rule 60(b)(6) motion.  As a leading treatise has noted, "if the circumstances justif[y] reopening the judgment, defendant should have been allowed a trial before paying . . . damages."  Wright & Miller's *Federal Practice and Procedure* § 2864 at 376.

Instead of falling within the other portions of Rule 60(b), this case presents a variety of compelling but unusual factors that place it squarely within the heartland of Rule 60(b)(6).  First and foremost, a compelling defense exists in this case that was never litigated on the merits as a result of the default.  Indeed, as Defendants discuss below, an unusual aspect of this case is that much of this defense comes from party-admissions made in pleadings filed by the Plaintiffs in parallel federal litigation that took place in the District of Columbia.  That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.

In addition, other circumstances surrounding the default make this case extraordinary. Much like the default judgment vacated in *Jackson* pursuant to Rule 60(b)(6), the default here arose as a result of a foreign government's basic misunderstanding of the United States legal system. Like *Jackson*, moreover, efforts to cure the default occurred only after diplomatic communications and education at the highest levels of American and Palestinian leadership -- communications that themselves have significant foreign policy implications in light of the substantially increased importance of the current Palestinian governing leadership to American foreign policy interests, the commitment of the new leadership to the litigation, and the precarious financial state of that new government.

The United States' relationship with the Palestinian Authority has evolved considerably in the approximately two years since that judgment was affirmed on appeal and certiorari was denied. In March 2005, when the First Circuit affirmed the judgment in this case, President Abbas was newly-elected and had just begun the process of establishing the institutional structures characteristic of a modern government. Ex. E (Declaration of Ahmad Abdel-Rahman). ¶¶ 6-10. The attached declaration of Mr. Abdel-Rahman, former Secretary-General of the Palestinian Authority Cabinet of Ministers and political advisor to President Abbas, describes the considerable obstacles that the Post-Arafat government faced in responding to the United States litigation during that time period. *Id.* It was only after high-level communications between President Abbas and the State Department, and President Abbas' delegation of authority for the litigation to Prime Minister Fayyad, that the PA developed the institutional structure and lines of authority necessary to adequately respond to the litigation.

For his part, in the months since he assumed responsibility for the U.S. litigation and assumed his role as Prime Minister, Salam Fayyad acted promptly in retaining new U.S. counsel

16

that would litigate the cases on the merits. As Prime Minister Fayyad's attached declaration reflects, Ex. B, the PA and PLO are committed to fully participate in the U.S. litigation, including complete participation in the discovery process.

Taken together, the totality of these considerations rise to the level of extraordinary circumstances under Rule 60(b)(6). This is particularly so given the nature of the allegations at issue in this case. While even this forceful combination of factors might not give rise to "extraordinary circumstances" in a case involving a contract dispute -- although they did under the unusual circumstances of the *Jackson* case -- the allegations here involve government-sponsored terrorism. In such circumstances, it is especially important to provide a governing foreign entity with another opportunity to defend itself against such charges. *Cf. Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005) (vacating default against Sudanese government after noting the "uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists."). Although Plaintiffs will likely assert that leaving a judgment in place only against HAMAS will cause hardship, any cognizable hardship can be substantially eliminated by virtue of the strict conditions Defendants have agreed to below.

**B.      The PA and PLO Have Strong Meritorious Defenses.**

Because one primary function of Rule 60(b)(6) is to ensure that a judgment reflects the true merits of the case, the First Circuit has required a litigant to demonstrate the existence of a meritorious defense, and has described this requirement as a "sentry that guards the gateway to Rule 60(b) relief." *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co. Inc.*, 953 F.2d 17, 20 (1st Cir. 1992). The reason is basic. As the Court of Appeals has explained, "it is the invariable rule, and thus, the rule in this circuit, that a litigant, as

a precondition to relief under Rule 60(b), must give the trial court reason to believe that vacating the judgment will not be an empty exercise." *Id.* (citing meritorious defense cases from this and other circuits).

In defining the scope of a litigant's burden to ensure the Court that vacatur will not be an "empty exercise," the First Circuit has relied on cases from the prejudgment default context. *See Superline*, 953 F.2d at 20 (*citing Coon v. Grenier*, 867 F.2d 73, 76 (1st Cir. 1989)). Those cases make clear that "the 'meritorious defense' component of the test for setting aside a default does not go so far as to require that the movant demonstrate a likelihood of success on the merits, particularly in a default judgment case where the merits have never before been explored. Rather, "a party's averments need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense." *Coon v. Grenier*, 867 F.2d at 76 (citing *Keegel, 627 F.2d at 374*; *Moldwood Corp. v. Stutts*, 410 F.2d 351, 352 (5th Cir. 1969) (per curiam)).

Defendants easily satisfy that standard here. There is ample evidence that the shooting at issue occurred during a period in which the PA and PLO were actively engaged in pursuit of peace with Israel following the Oslo Accords. Contrary to the Complaint's suggestion, the PA and PLO were actively seeking to quash HAMAS' influence in West Bank and Gaza and to cut off funding to HAMAS from international sources. Indeed, the PA and PLO would be able to show, if the default is vacated, that HAMAS' shooting of the Ungars on June 9, 1996 was most likely an attempt to derail the peace process that the PA and PLO was championing at the time, and was designed to inflame public opinion, both in Israel and in Palestine, against the goals the PA and PLO were pursuing.

1. *It Is Undisputed That HAMAS, Not the PA and PLO, Carried Out the Shooting.*

18

The Amended Complaint specifically alleges that members of HAMAS were responsible for the drive-by shooting attack that killed the Ungars. The Amended Complaint identifies Raed Fakhri Abu Hamdiya ("Hamdiya") as the driver of the car and Adbel Rahman Ismail Abdel Rahman Ghanimat ("Rahman Ghanimat") and Jamal Abdel Fatah Tzabich Al Hor ("Al Hor") as the shooters. Dkt. 41 ¶¶ 18, 19. These three individuals were part of a terrorist cell that also included Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe ("Kafishe").[2] *Id.* ¶15. The Amended Complaint further alleges that, prior to the shooting, the five members of the cell planned and made preparations for the shooting. It does not, notably, specifically allege any direct involvement by the PA and PLO in the planning or execution of the shooting.[3]

Rather, the Complaint seeks to assign liability to the PA and PLO for HAMAS' actions on a theory that the PA and PLO provided material support to HAMAS and acted as accessories after the fact to the Ungar shooting. *Id.* ¶ 41. To support that theory, the Plaintiffs cobble together a set of vague and conclusory allegations that ignore concrete evidence that the PA and PLO were actively working against HAMAS at the very time events giving rise to this lawsuit occurred. The result is a Complaint that appears to state a claim on its face but which would fail in the face of meritorious and factually sound defenses.

---

[2]  Numerous spellings of the five individuals' names appear in documents cited throughout the remainder of this memorandum. For the purpose of consistency, the spelling that appears in the Amended Complaint will be used for each.

[3]  The Plaintiffs allege the PA and PLO "and their officials, employees and agents" solicited and advised HAMAS and the individual HAMAS defendants "to commit the acts attributed to those defendants herein" and "aided, abetted, authorized, ratified and participated in those acts." Dkt. 41 ¶ 36. It is unclear whether this conclusory allegation is meant to refer to the June 9, 1996 shooting, or to the other vague allegations regarding HAMAS' actions that appear throughout the complaint. If it was intended to refer to the June 9, 1996 incident, it is made without any factual support and in contradiction of the earlier allegations in the Complaint that the HAMAS defendants "conspired, planned and made preparations to carry out a machine-gun attack on a random Israeli vehicle." *Id.* ¶17.

2.   *HAMAS Engaged in Terrorist Acts to Protest the PLO's and PA's Participation in the Oslo Peace Process.*

In 1993, the United States helped to broker the first agreement between Israel and the

PLO. "Under its terms, Israel accepted the PLO as the representative of the Palestinian people

and the PLO acknowledged Israel's statehood." *See Ungar v. PLO*, 402 F.3d at 286.

> This rapprochement culminated in the signing of the first of the Oslo Accords: the Declaration of Principles on Interim Self-Government Arrangements (DOP), Sept. 19, 1993, Isr.-P.L.O., 32 I.L.M. 1525. The DOP's stated purposes included the establishment of a Palestinian interim self-governing authority (the PA) as a precursor to a permanent arrangement based on Security Council Resolutions 242 and 338. *Id.* art. I, 32 I.L.M. at 1527. The DOP treated the West Bank and the Gaza Strip as a single territorial unit and stated that, when certain conditions had been achieved, Israel would transfer authority over "education and culture, health, social welfare, direct taxation, and tourism" in those areas to the PA. *Id.* art. VI, 32 I.L.M. at 1529. The DOP also set forth a framework for negotiating the structure of the PA. *Id.* art. VII, 32 I.L.M. at 1530-31.

*Id.*

Following the PLO and PA's agreement to embark on the path toward peace with Israel

in 1993, HAMAS almost immediately began attempting to sabotage the peace process -- and the

PA/PLO role in it -- by committing acts of Anti-Israeli violence. Thus, by January 23, 1995,

President Clinton had determined that HAMAS constituted a terrorist organization that was

threatening to disrupt the Middle East Peace Process. *See* Ex. F (Executive Order 12947,

*Prohibiting Transactions With Terrorists Who Threaten to Disrupt the Middle East Peace*

*Process*, (January 23, 1995). In 1997, then-Secretary of State Albright exercised her new powers

under the Anti-Terrorism and Effective Death Penalty Act by naming HAMAS as one of the first

designated foreign terrorism organizations. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997) (designating

30 Foreign Terrorist Organizations, including HAMAS).

By contrast, immediately following the signing of the Declaration of Principles, the PA and PLO worked to quell violence by various Islamic militant groups, including HAMAS. In 1995, the U.S. State Department reported that although HAMAS had "five major anti-Israeli attacks . . . as part of its campaign to derail the peace process," the PA and PLO had actively been trying to thwart such attacks:

> Chairman Yasir Arafat's Palestinian Authority (PA) launched a campaign to crack down on Islamic militants while at the same time initiating political dialogue with HAMAS to bring it into the political process. HAMAS announced a temporary suspension of military activities in August [1995] while engaging in talks with the PA; there were no major HAMAS attacks against Israelis through the end of 1995.

Ex. G at 19-20. (Patterns of Global Terrorism, 1995, Middle East Overview). The State Department also observed that "[t]he PA security apparatus stepped up its campaign to register and confiscate weapons, thwart terrorist plots, and convict Palestinians responsible for anti-Israeli acts. The PA thwarted a [Palestine Islamic Jihad] attack planned for 10 June. In August, the Palestinian Police Force arrested a HAMAS terrorist who was preparing a bomb to be set off in Israel." *Id.* at 20.

Unfortunately, the PA's and PLO's success at controlling HAMAS' violence was short-lived. The first set of elections for President of the Palestinian Authority and for members of the Palestinian Legislative Council, the legislative arm of the PA, occurred on January 20, 1996, and marked a significant step in the realization of the goals of the Oslo Accords. This progress, and the PA's and PLO's continued stated commitment to the peace process, led radical groups, including HAMAS, to ramp up violent attacks in an effort to disrupt the process.

Between January 25 and March 5, 1996, suicide bombings in Tel Aviv and Jerusalem killed 65 persons. Ex. H at 4 (Patterns of Global Terrorism, 1996). HAMAS claimed

responsibility for three of the bombings, and HAMAS and the Palestine Islamic Jihad both claimed responsibility for a fourth. *Id.* In response, 29 world leaders met in March in Sharm el-Sheikh, Egypt and pledged to support the Middle East peace process and to take practical steps to expand regional cooperation against terrorism. *Id.* PA President Yasir Arafat and Israeli Prime Minister Shimon Peres were among the attendees and a topic of discussion at the summit was the goal of cutting off funds to HAMAS. Ex. I (NEW YORK TIMES, Steven Erlanger, *Summit in Egypt: The Symbolism; The Meeting's Message: Put Terrorists on Notice*, March 14, 1996). An unnamed American official told the New York Times that "the real success of the meeting was to make Mr. Peres and the Palestinian leader Yasir Arafat feel less lonely -- Mr. Peres in his search for peace, Mr. Arafat in his decision to crack down harder on HAMAS." *Id.*

In the next six weeks, there was a marked decrease in violence in the region. On May 1, 1996, when President Clinton and Israeli Prime Minister Shimon Peres signed a United States-Israel Counterterrorism Accord, Prime Minister Peres attributed the decrease in violence in the region to "the more serious measures that Yasir Arafat has taken in Gaza and the territories." Ex. J at 5 (Remarks at Signing Ceremony of U.S.-Israel Counterterrorism Accord, May 1, 1996). Peres went on to say, "I feel that he really started to fight terror, and I say it with appreciation." *Id.* In a U.S. State Department dispatch related to the signing of the Accord, President Clinton and Prime Minister Peres "welcomed the decision by the Palestinian National Council to cancel all the provisions of the Palestinian National Covenant which deny Israel's right to exist or are otherwise inconsistent with the September 1993 exchange of letters between Prime Minister Rabin and Chairman Arafat, noting "[t]his action is an important demonstration by the Palestinians of their commitment to honor the terms of the 1993 Oslo Accords." Ex. K at 6 (Remarks at Signing Ceremony, April 30, 1996).

Against this backdrop, HAMAS committed the June 9, 1996 shooting of the Ungars.  The evidence suggests it did so to undermine directly the PA and PLO and that the PA and PLO were the attack's indirect target, not its facilitator.  In short, the Ungars died because HAMAS wanted to hamper the partnership in peace that was developing between the PA and PLO and Israel.

    3.  *Plaintiffs' Extensive Party-Admissions in Parallel Federal Litigation Involving The Same Incident Exculpate the PA and PLO from Responsibility.*

The fact that HAMAS committed the shooting to injure PA and PLO interests is supported by a wealth of evidence, the most compelling of which consists of Plaintiffs' own statements in a contemporaneous federal case involving the same incident.  Ten months after filing the instant case, Plaintiffs, represented by Mr. Strachman, filed a case in the United States District Court for the District of Columbia.  *Ungar v. Islamic Republic of Iran*, Civ. No. 00-2606 (filed Oct. 27, 2000).  The complaint sought damages for wrongful death, personal injury, and related torts arising out of the shooting deaths of Yaron and Efrat Ungar.  It named the Republic of Iran, the Iranian Ministry of Information and Security, and three individual Iranian government officials as defendants.  The Ungars did not sue HAMAS in the District of Columbia case, though they specifically described the role of HAMAS and the individual HAMAS defendants in the complaint.  They did not sue the PA or PLO, and the Complaint did not mention the allegations made in this case against the PA, PLO, or against any of the individual PA and PLO defendants named in this case.

Review of pleadings and transcripts in the Washington, D.C. case makes clear why the Ungars made that strategic choice.  In Washington, D.C., the Ungars alleged that Iran facilitated, directed, and enabled HAMAS' execution of the Ungar shooting to disrupt the peace process the PA and PLO were pursuing with Israel.  Witnesses called by Mr. Strachman described HAMAS

as the PLO's rival and testified about Iran's recruitment of HAMAS as an agent to thwart reconciliation between Israel and the Palestinian people as envisioned by the Oslo Accords. The Ungars' theory was not that Iran enabled HAMAS *along with* or *in addition to* the PA and PLO, but rather that it did so *in opposition to* the PA and PLO and in order to advance its agenda, which conflicted with the PA's and PLO's efforts to reach peace with Israel.

There is no question that Defendants and their counsel were aware of this parallel litigation at earlier points in the proceeding.  Indeed, in January 2003, Dr. Nasser Al-Kidwa wrote to Magistrate Judge Martin to assert that the PA and PLO should not be forced to undergo the burdens of participation in discovery prior to disposition of the sovereign immunity question because the "high level of violence" in the region made it impossible to proceed with a defense at the time, and because the PA and PLO could not "understand how plaintiffs can claim the PNA and PLO are responsible for what HAMAS does.  The history of the PNA/PLO-HAMAS relationship is public and well known and the claim that the PNA and PLO are responsible for what HAMAS does is simply not credible."  Ex. L at 2 (January 27, 2003 Letter from Dr. Nasser Al-Kidwa to Magistrate Judge Martin).  As Ambassador al-Kidwa explained, the claims against the PNA and PLO were particularly incredible in light of the parallel federal litigation seeking a recovery from Iran for sponsoring the same HAMAS attack. *Id.*

Defendants were thus generally aware of the Plaintiffs' parallel litigation against Iran as early as 2003, its seeming inconsistency with the litigation here, and the likelihood that evidence from that litigation would support any defense if the PA and PLO ever were to litigate the merits of the case.  However, the PA and PLO were not litigating the merits at the time, and in any event, they had no understanding of the extensive party admissions the Plaintiffs had made in the

24

course of the District of Columbia litigation, admissions that were fundamentally incompatible with their theory of relief here.

In the course of the Washington, D.C. litigation, the Ungars detailed ties between Iran and HAMAS prior to the June 9, 1996 shooting. Dr. Reuven Paz, the Ungars' proffered expert in Palestinian terrorism and terrorist groups, testified that HAMAS viewed itself as a rival and alternative to the PLO, to the Palestinian Authority, and to the national Palestinian leadership. Ex. M at 84. (Tr. 1/15/02). The Ungars alleged that HAMAS developed a close association with Iranian proxy organizations such as Hezbollah and with units of the Iranian Revolutionary Guards in the early 1990's and thereafter, the Iranian Ministry of Information served as the main conduit of financial, material, and training support to HAMAS. Ex. N at 1-3 (Pretrial Summary of December 7, 2001). This training and support enabled HAMAS commanders, who received intensive, high-quality terrorist training in Iran and from Iranian proxy forces in Lebanon, to train individual cells, including the Tsurif cell, on various weapons, explosives, and military equipment, and in tactical use of these weapons. *Id.* at 3.

According to the Ungars, the Oslo Accords and the PA and PLO's resulting movement toward reconciliation with Israel reinforced the links between Iran and HAMAS. They alleged that in 1995 and 1996, Iran and HAMAS believed violent acts of terrorism would influence Palestinian and Israeli public opinion against the peace efforts. *Id.* at 2 (pretrial summary); Ex. M at 85 (Tr. 1/15/02). This strategic goal drove Iran's public support of HAMAS' increased violence in 1996. Ex. N at 2 (pretrial summary).

The Ungars specifically alleged that the June 9, 1996 shooting was a part of this continuing surge in violence and adduced evidence regarding its effect on the Israeli-Palestinian peace process. Dr. Clawson testified that PLO chairman Yasir Arafat was unhappy about the

increasingly tight relationship between Iran and HAMAS in early 1996 and blamed Iran for its

encouragement of the suicide bombings that were conducted and claimed by HAMAS. Ex. M at

105-06 (Tr. 1/15/02). He also testified that both Iran and [then Israeli prime minister] Shimon

Peres believed the Iranians short-circuited the peace process and prevented the successful

completion of an Israeli-Palestinian peace in the late 1990s by supporting HAMAS' suicide

bombings. *Id.* at 105.

The Ungars' evidence in the Washington, D.C. case established HAMAS' motive and

preparation for the attack on June 9, 1996. It detailed HAMAS' opposition to the peace process

the PLO pursued via the Oslo Accords and the establishment of the PA. It highlighted the

adversarial positions of HAMAS and the PA and PLO prior to the shootings and established

HAMAS' motive for committing the shootings. It is both extensive and entirely inconsistent

with the Plaintiffs' theory of the PA's and PLO's liability in this case.

On this point, it is of no assistance to the Plaintiffs in this case that Judge James

Robertson ultimately concluded that they had failed to prove Iran's responsibility for the attack in

the Washington D.C. case. Nor is it material that Judge Robertson concluded that "[t]he men

who killed Yaron and Efrat Ungar received funding and weapons from other sources as well as

HAMAS." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002). As the

State Department recognized at the time, a number of militant groups were attempting to disrupt

the peace process by launching violent attacks in 1995, which only caused "[t]he PA security

apparatus [to] step[]up its campaign to register and confiscate weapons, thwart terrorist plots and

convict Palestinians responsible for anti-Israeli acts." Ex. G at 20. (1995 Patterns of Global

Terrorism Report, 1995). The report from 1996 was similar: "Palestinian extremists opposed to

peace with Israel conducted four massive suicide bombings in Tel Aviv and Jerusalem early in

the year which killed 65 civilians." Ex. H at 4 (Patterns of Global Terrorism Report, 1996).

Once again, however, the State Department reported that in 1996 "[t]he Palestinian Authority,

which is responsible for security in the Gaza Strip and most West Bank towns, continued in 1996

its effort to rein in Palestinian violence aimed at undermining the peace process." *Id.* Against

this backdrop, Judge Robertson's ultimate conclusion -- that the Ungars' proof was insufficient

as a matter of law to implicate Iran -- does not diminish the relevance of the Ungars' allegations

about the HAMAS-PA/PLO relationship in any way. There unquestionably *were* a number of

"other sources" of support apart from Iran that were trying to use violence to disrupt the Israeli-

PA-PLO peace process in 1996, but the PA and PLO were not among them.

    In fact, Judge Robertson's express findings in the case are exculpatory as to the PA and

PLO, and may serve as a basis for collateral estoppel if the Court permits merits litigation to

occur. Plaintiffs' allegations against Iran in the District of Columbia case rested on two

fundamental propositions. The first was that HAMAS had received support for its actions from

entities, like Iran, that desired to derail the Israeli-PA/PLO peace process. That proposition was

*credited* by Judge Robertson. Based upon the plaintiffs' extensive evidence, Judge Robertson

found "as the Palestinian Liberation Organization and Israel began to negotiate a peaceful

settlement of Palestinian claims after the Gulf War . . . HAMAS and Iran grew closer until they

had formed what the [plaintiffs'] witnesses called a 'partnership.'" *Ungar v. Iran*, 211 F. Supp.

2d at 94 (citing testimony from Ungars' witnesses during hearing on motion for default). He also

found "[b]y the mid 1990s, Iran and HAMAS were cooperating for purposes of jihad, or violent

struggle, specifically to disrupt the Israel-PLO peace process." *Id.*

    These findings were supported by the Ungars' many statements in the D.C. litigation, all

of which are admissible against them in this case as party-admissions, and would be admissible

at trial or on summary judgment should the judgment be vacated. Unquestionably, these were statements in which the Ungars had "manifested an adoption or belief in its truth," Fed. R. Evid. 801(d)(2)(b), and the First Circuit has squarely held that a party "cannot indicate to one federal court that certain statements are trustworthy and accurate," while seeking to exclude those same statements from consideration in a parallel federal proceeding. *United States v. Kattar*, 840 F.2d 118, 131 (1st Cir.1988); *see also United States v. Raphelson*, 802 F.2d 588, 592 (1st Cir. 1986) (pleading in an earlier case is a party-admission).

Plaintiffs' allegations against Iran also depended on a second proposition, however -- Plaintiffs' needed to show not only that HAMAS and Iran had a mutual interest in disrupting the Israeli-PA/PLO peace process, but also that Iran sponsored this specific attack. This is where Judge Robertson parted ways with the Plaintiffs by concluding they had failed to specifically tie Iran's extensive general support of HAMAS' efforts to derail the peace process to the commission of this specific act by HAMAS. *Ungar v. Iran*, 211 F. Supp. 2d at 94. That finding, however, is of no relevance here. The fact that Plaintiffs could not prove that Iran's support was implicated in the shooting is immaterial to PA and PLO liability; the pertinent point is that Judge Robertson credited Plaintiffs' own extensive evidence suggesting that the shooting was committed precisely to undermine the interest of the PA and the PLO in peace. Even if Plaintiffs are not collaterally estopped from claiming otherwise here, Plaintiffs could never prove otherwise because the fact of the matter is, the PA and PLO had nothing to do with the attack that caused Plaintiffs' loss.

     4.    *The PA's and PLO's Actions After The Shooting -- Arresting the Shooters and Making Arrangements for the Israelis to Take Them Into Custody Over the Protests of HAMAS Leadership and Hundreds of HAMAS Supporters -- Further Demonstrate That the PA and PLO Were Working Directly Against HAMAS' Interests.*

The PA's and PLO's actions after the shootings further demonstrate the PA and PLO were acting in contravention of, and not in concert with, HAMAS. The HAMAS terrorist cell that planned and conducted the Ungar shooting was discovered after a March 1997 suicide bombing of the Apropos café in Tel Aviv. Ex. O, Arieh O'Sullivan, *Sharon Edri's Murderers Caught: Kafr Tzurif HAMAS Cell Behind 11 Killings*, JERUSALEM POST (April 11, 1997). HAMAS claimed responsibility for the bombing. Ex. P (Israeli Ministry of Foreign Affairs (IMFA) Press Release, *Suicide Bombing in Tel-Aviv*, March 21, 1997)

Evidence discovered at the scene of the bombing led to arrests of Hamdiya and Kafishe by Israeli security forces and of Rahman Ghanimat and Al Hor by the PA. Rahman Ghanimat and Al Hor were detained by the PA in a prison near Hebron following their arrest. *Id.* On or about September 17, 1997, Israel submitted requests to the PA for the transfer of Rahman Ghanimat and Al Hor. Ex. Q (IMFA Press Release, *Israel Submits Formal Requests to the Palestinians to Hand Over PA Police Commander Ghazi Jabali and 4 Other Terror Suspects*, Sept. 22, 1997). The two were arrested by Israeli forces on November 13, 1997 while in route from the Hebron prison to a prison near Nablus and while in the custody of members of the PA's Protective Security Service. Ex. R at 8-9. (Johara Baker, *Who is Responsible?*, PALESTINE REPORT, Nov. 21, 1997).

HAMAS immediately accused the PA of collaborating with the Israelis to secure the transfer of Rahman Ghanimat and Al Hor from PA custody into Israeli custody. Rahman Ghanimat and Al Hor appear to have written a letter accusing Rajoub, the head of the Palestinian Protective Security Services and Al-Hindi, the head of the Palestinian General Intelligence Services, of secretly orchestrating their surprise capture by the Israel forces. Ex. S (Certified

Translation of What Purports To Be Letter From Abdel Rahman Ghneimat and Jamal Al Hor re

capture).  In an interview, Gaza HAMAS leader Abdel Aziz Rantisi stated it was possible that

the arrests of Rahman Ghanimat and Al Hor resulted from a set up between the PA and Israel.

Ex. T (IMRA Interviews with HAMAS leader Rantisi, March 23, 2004).  A HAMAS

communiqué dated November 16, 1997 accused the PA of coordinating with Israel against the

interests of HAMAS, alleging "the abduction of the two mujahadeen was merely an act [carried

out] to cover up the direct handover of the mujahadeen by the PA security..."  Ex. U at 1.

The arrests of the Ungars' shooters triggered large-scale riots in the village of Tsurif.  On

November 16, 1997, 300 Palestinians marched in protest, chanting slogans against the

Palestinian Authority and the Preventive Security Service.  Ex. R. at 9.  Demonstrators pelted

Palestinian police cars with stones, and the car belonging to Legislative Council member Ali Abu

al-Rish was torched.  *Id.*

Certainly, these allegations contradict the Plaintiffs' claim that the PA and PLO were

providing a "safe haven" to HAMAS and specifically to the five individual HAMAS members

that committed the Ungar shooting.[4]  Moreover, facilitating the apprehension and prosecution of

the two triggermen in the attack would directly contradict the Plaintiffs' theory that the PA and

PLO acted as accessories of HAMAS after the fact of the shooting.

The United States Department of State recognized that, as of 1996, the PA "continued its

efforts-in cooperation with Israeli authorities-to combat the threat posed by terrorist groups such

as HAMAS . . . and to root out those who plan and carry out these attacks."  Ex. H at 1.  There is

---

[4]  It is important to note in connection with the "safe haven" allegation that the HAMAS members that
planned and executed the Ungar shooting lived in Surif, West Bank, near Hebron.  They operated
secretly from a community that had long been their home.  This was not a situation in which foreign
agents flocked to an area because of a friendly government.  The PA and PLO governed an area in which
HAMAS was a pervasive and deep-rooted entity.

ample evidence that at the time of the events relative to the Complaint, the PA and PLO not only

repudiated the violent approach HAMAS embraced but also worked to disrupt continuously

HAMAS' activities in the West Bank and Gaza.

Based on this record, it is clear facts exist "which, if proven at trial, would constitute a

cognizable defense." *Coon v. Grenier*, 867 F.2d at 77. This defense is largely bolstered by the

Plaintiffs' party-admissions from a parallel federal proceeding by the same plaintiffs involving

the same incident. The meritorious defense factor weighs strongly in favor of vacatur.

> **C.     The Default Judgment in This Case Arose from the PA's and PLO's
>         Basic Misunderstanding of the United States Legal System, but Their
>         Efforts to Remedy That Misunderstanding Have Now Come to Full
>         Fruition Despite Significant Political Turmoil and Institutional
>         Obstacles.**

The Defendants' mindset throughout the course of this litigation will be another

important factor for this Court to consider in determining whether extraordinary circumstances

exist sufficient to warrant vacatur. At the time of the default in this case, Defendants were

understandably perplexed about the ability of the United States courts to hale them into Court to

answer for the actions of HAMAS -- actions that had occurred in Israel at a time when the PA

and PLO were aggressively attempting to prevent such acts. Ex. L (January 27, 2003 Letter of

Ambassador Al-Kidwa). From Defendants' view, it seemed illogical that American courts could

properly adjudicate claims arising from a long-standing and on-going foreign conflict,

particularly where the witnesses and evidence were located thousands of miles away, where the

victims were not targeted because of their American citizenship, and where the act itself had

been committed by a rival group that was actively trying to undermine the PA and PLO.

Accordingly, Defendants acted to protect what they reasonably perceived to be their rights

under international law by asserting only jurisdictional and justiciability defenses. Although the

First Circuit and this Court ultimately did not accept this legal position, Defendants' approach to the litigation was not so unreasonable as to warrant the imposition of multi-million dollar liability by default. After all, some courts have emphatically rejected similar attempts to have American courts adjudicate legal questions arising out of the same dispute. *Cf. Doe v. Israel,* 400 F. Supp. 2d 86, 111-12 (D.D.C. 2005) ("It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades. . . . Plaintiffs would have this Court adjudicate the rights and liabilities of the Palestinian and Israeli people . . . . The Court can do none of this.").

As noted, the Eleventh Circuit exercised leniency in the *Jackson v. PRC* litigation in part because of the PRC's understandable failure to comprehend the basis for jurisdiction in the United States over a financial dispute involving a predecessor Chinese government. *Jackson v. People's Republic of China,* 794 F.2d at 1496-97. Other courts have exercised similar leniency where a default results from a foreign state's actions to protect what, from its perspective, it reasonably perceives to be its legal rights. *See Gregorian v. Izvestia,* 871 F.2d 1515, 1524-25 (9th Cir. 1989). A Defendants' belief in its legal position has further been held to be "reasonable" even where that position is ultimately rejected. *Id. See also Carl Marks & Co. v. USSR,* 665 F. Supp. 323, 332 (S.D.N.Y. 1987) ("the Soviet Union's willful default is tempered by its genuine but unfounded belief that it enjoys . . . sovereign immunity"), *aff'd,* 841 F.2d 26 (2d Cir. 1988).

Defendants now understand the importance of full and complete participation within the contours of the legal framework of the United States courts. Unfortunately, this understanding did not come as quickly as would have been desirable. The Supreme Court denied certiorari

from the First Circuit's affirmance of the judgment on November 28, 2005. *PLO. v. Ungar*, 546 U.S. 1034 (2005). At that point, however, the ability to understand these issues was impeded by a period of considerable political turmoil in the Occupied Territories -- turmoil precipitated by President Arafat's death in November 2004 and the legislative elections in early 2006. To present the Court with a fuller picture of the Defendants' mindset during the relevant timeframes, Defendants have submitted the declaration of Ahmad Abdel-Rahman, which was recently filed in another case against the PA and PLO in the Southern District of Florida, *Saperstein v. Palestine Authority*, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.). *See* Ex. E (Declaration of Ahmad Abdel-Rahman).

Mr. Abdel-Rahman is a long-time political advisor to the Palestinian government, who has held important positions under both Presidents Arafat and Abbas. As his declaration makes clear, the Palestinian government has never had the sort of institutional structure characteristic of mature governments like the United States. Ex. E ¶ 3. By 2002, moreover, an escalation in violence in the region had caused "the destruction and/or paralysis of many fledgling institutions of the Palestinian governing system." *Id.* ¶ 4. By 2004, many government buildings and official documents had been destroyed by the violence, and "[n]o person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits." *Id.* ¶ 5.

In the Fall of 2004, President Arafat died. As Mr. Abdel-Rahman explains, "[a]fter [Arafat] died, there was significant disarray and instability in the government. This void in governmental decision-making persisted well after his death." *Id.* ¶ 6.

President Abbas took office in early 2005, just as the First Circuit litigation was approaching its disposition. President Abbas' Chief of Staff, Dr. Rafiq Husseini, took office only a month later in April 2005. After taking office, Dr. Husseini assessed the state of affairs and determined that "building the institutions of modern government would be a long-term and difficult task, particularly in light of the political turmoil that both preceded and followed President Arafat's death." *Id.* ¶ 8. With the support of President Abbas, Dr. Husseini began the process of creating an organizational entity within the President's Office responsible for defending domestic and foreign lawsuits brought against the Palestinian government, but it was a complicated task compounded by both a lack of familiarity in the Palestinian legal community with the American legal system, and by the fact that the Palestinian government had many other pressing problems to address. *Id.* ¶ 9. Chronic diseases had surged, there was substantial unemployment and poverty, and access to safe-drinking water and food was declining. Simply put, there were many urgent issues confronting the Palestinian government at the time, of which responding to this lawsuit was only one. *Id.*

In 2006, various high-level governmental decision-makers were contacted about the litigation from time-to-time in response to particular problems, but the lack of institutional structure still plagued the government's ability to respond. *Id.* ¶ 10. These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit. *Id.* In addition, the HAMAS victory in the 2006 elections complicated matters even more, "particularly in light of the longstanding antagonistic relationship between the PA/PLO on the one hand, and HAMAS on the other." *Id.* ¶ 11.

By the end of 2006, however, "it became clear the Palestinian government urgently needed an institutional framework for responding comprehensively to the litigation in the United States." *Id.* ¶ 12. As Mr. Abdel-Rahman notes, "[t]he failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment." *Id.* As a result, by January 2007, President Abbas had sought guidance about the litigation from the Secretary of State, and would soon delegate to Prime Minister Fayyad the authority to control the litigation so that clear and consistent decision making could occur.

As Prime Minister Fayyad describes more fully in his declaration, after receiving authority over the litigation, he reviewed President Abbas' correspondence with Secretary Rice, engaged in appropriate inquiries and "decided to retain new counsel for the PA and PLO to handle all of the U.S. lawsuits, to provide them with clear instructions about their responsibilities and duties with respect to the litigation, and to discharge predecessor counsel." Ex. B at ¶ 12.

Prime Minister Fayyad's declaration fully describes the manner in which the new Palestinian leadership intends to conduct the litigation going forward:

> I have instructed new counsel that the Defendants will participate
> fully in this and other litigation, in a cooperative manner, including
> complete participation in the discovery process. I have further
> instructed new counsel to transmit this commitment to the United
> States courts. I personally commit to sustain this instruction
> throughout the effort to litigate these cases. It is my belief that
> there are meritorious defenses to the claims brought in the United
> States and it is important to the PA to present those defenses.
> Moreover, it is important to the PA's role in the international
> community to participate in the legal process, even when it is
> process brought in the United States for actions by others that
> occurred far from the United States. The importance of this was
> not fully appreciated by the PA government, as a whole, until
> recently. Now we can act on that understanding, and we therefore
> seek to contest this litigation, fully and responsively.

Ex. B at ¶ 13.

Prime Minister Fayyad's declaration deserves the Court's serious consideration, particularly in light of his representations concerning the manner in which the litigation will be conducted going forward. *United States v. Schofield*, 197 F.R.D. 6, 8 (D.D.C. 2000) (vacating default largely because Defendant was "now vigorously mounting a defense," explaining that "[s]uch an act cuts strongly against any willfulness of the defendant's previous delay."); *Lawton v. Republic of Iraq*, No. 02-0474, 2006 U.S. Dist. LEXIS 94335, at * 7 (D.D.C. Dec. 6, 2006) (vacating entry of default and refusing to find willfulness in a case alleging that Iraq should be held responsible for the 1995 bombing of a federal building in Oklahoma City in light of political turmoil and based on representations that new leadership was "committed to defending fully against Plaintiffs' alleged claims, on all available grounds, in accordance with the laws, procedures and Court directives applicable to this litigation").

In assessing whether the attitude of the new Palestinian leadership is genuine, this Court should consider the views of the Executive Branch. President Bush has praised the new Palestinian leadership for "striving to build the institutions of a modern democracy," "working to strengthen Palestinian security services, so they can confront the terrorists and protect the innocent," and "ensuring that Palestinian society operates under the rule of law." Ex. V at 1 (July 16, 2007, Speech of President Bush). As President Bush explained in a July 2007 speech, "[b]y supporting the reforms of President Abbas and Prime Minister Fayyad, we can help them show the world what a Palestinian state would look like -- and act like." *Id.* at 1-2. One indication of the PA's and PLO's commitment to "operate[] under the rule of law," is the Defendants' unambiguous desire to vigorously defend this lawsuit within the American legal framework. Defendants thus ask the Court, in reviewing this motion, to weigh the importance of encouraging the designated representatives of the Palestinian people -- representatives who have won the

support of the United States government -- to participate fully in the American legal process. As further evidence of Defendants' readiness to participate in the litigation, Defendants have attached as Exhibit W an Answer, which the Defendants will file if the Court grants permission to do so.

The state of mind necessary to warrant rigid adherence to a default judgment is nuanced and heavily dependent on the facts. The D.C. Circuit has recently emphasized that political turmoil can properly be weighed in the default calculus when it hampers a foreign government's ability to defend. *FG Hemisphere Assocs., LLC*, 447 F.3d at 841 ("DRC [the Congo] was plainly hampered by its devastating civil war, which cost over three million lives [and] shattered the DRC's already shaky political structure . . . . It is not surprising that the war would be accompanied by substantial confusion over responsibilities in the Foreign Ministry . . ."). As noted, at crucial stages of the litigation, the Occupied Palestinian Territories have been in a state of considerable turmoil -- turmoil that prevented Defendants from understanding the importance of full and complete participation in foreign litigation involving acts in Israel perpetrated by HAMAS.

Plaintiffs may argue that this change in mindset was not good enough, and may suggest that Defendants must somehow be "faultless" in order to obtain relief under Rule 60(b)(6). But this one-dimensional standard is only appropriate where a litigant seeks to show extraordinary circumstances based on "neglect" in a motion filed after Rule 60(b)(1)'s one-year time requirement for demonstrating "excusable neglect." Such was the case in *Claremont Flock Corp. v. Alm*, 281 F.3d 297, 299 (1st Cir. 2002), where the Rule 60(b)(6) claim was that any failure to respond to the lawsuit had been the product of loss of access to a P.O. box. In such cases, it makes sense to limit relief to cases where any "neglect" is entirely faultless; otherwise Rule

60(b)(6) could serve as an alternative mechanism for vacatur for all forms of "excusable neglect," permitting litigants to easily bypass the one-year requirement contained in Rule 60(b)(1).

Such a standard, however, would be inadequate to resolve 60(b)(6) cases that never could have been brought under 60(b)(1) because "neglect" is not the pertinent issue. In cases like this one, which involve a meritorious defense to charges of government-sponsored terrorism, which raise highly nuanced foreign policy issues that endanger the developing relationship between the United States government and the new Palestinian leadership, and which involve a massive default judgment whose enforcement would have a devastating effect on the Palestinian economy, the only pertinent question is whether these considerations, taken as a whole, rise to the level of extraordinary circumstances sufficient to warrant vacatur. It would be fundamentally inconsistent with both Rule 60(b)(6)'s language and its historic function as an "inherent and discretionary power . . . to set aside a judgment whose enforcement would work inequity," *Plaut v. Spendthrift Farm*, 514 U.S. at 233-34, to reject such claims based on a formalistic, one-size-fits-all standard. This is why courts around the country have taken a much more expansive and nuanced approach in applying the extraordinary circumstances standard of Rule 60(b)(6) to cases like this one. This Court should as well.

### D.   Vacatur Is Also Warranted Because The Default Judgment Has Already Had Significant Foreign Policy Consequences and Will Continue to Do So.

Vacatur is also warranted because of the significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case. As Prime Minister Fayyad's declaration makes clear, this judgment has already been the subject of diplomatic communications at the highest levels between our country's representatives in the State

Department and the governing officials in the Occupied Territories.   If left intact, the judgment

threatens to undermine the relationship between the United States and Palestinian government --

a relationship that the Executive Branch of the United States government has characterized as

being crucial to the Israeli-Palestinian peace process.

It is precisely because of these sorts of delicate concerns that courts are generally more

lenient in setting aside default judgments obtained against foreign governing entities. *Practical*

*Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 & n.19 (D.C. Cir. 1987); *Hester Int'l*

*Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989); *Gregorian v. Izvestia*,

871 F.2d 1515, 1525 (9th Cir. 1989); *First Fidelity Bank v. Government of Antigua & Barbuda-*

*Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) ("Courts go to great lengths to avoid

default judgments against foreign sovereigns or to permit those judgments to be set aside.").

While Plaintiffs are likely to suggest that this factor is outdated or applies only if

statehood has been achieved, this is not true.  Rather, courts' continuing disfavor of default

judgments in this context stems from their effect on foreign relations and the "broad divergence"

of "cultural, governmental and political" approaches to litigation when a foreign government is

involved. *Practical Concepts*, 811 F.2d at 1551; *FG Hemisphere Assocs.*, 447 F.3d at 838-39.

It is true that courts have sometimes declined to provide state-owned instrumentalities

relief from default judgments in cases involving ordinary contract disputes. *See, e.g., Compania*

*Interamericana v. Campania Dominica*, 88 F.3d 948, 951-52 (11th Cir. 1996) (applying abuse of

discretion standard in affirming denial of national airline's motion for relief from entry of default

and default judgment in breach of contract action); *Transaero v. La Fuerza Area Boliviana*, 24

F.3d 457, 462 (2d Cir. 1994) ("The case before us is fundamentally an ordinary contract dispute

which has no such profound [foreign policy] implications."); *Claremont Flock Corp. v. Alm*, 281

F.3d 297, 299 (1st Cir. 2002) (denying vacatur under Rule 60(b)(6) where foreign businessman

claimed that any neglect in causing default had been excusable result of his failure to understand

workings of the United States legal system and loss of access to P.O. Box in Sweeden).  This

case, however, does not involve an ordinary contract dispute with a state-owned instrumentality

but a claim directly against the foreign government, alleging government-sponsored terrorism,

which has resulted in massive liability that threatens to undermine the economy of a United

States ally.

   Though the PA does not enjoy the "foreign state" recognition enjoyed by some foreign

governments, the foreign policy implications of this case strongly resemble those in *Jackson v.*

*People's Republic of China*, 794 F.2d at 1496-97, where the Court of Appeals upheld the vacatur

under Rule 60(b)(6) of a $41 million default judgment that arose from a foreign government's

inability to understand its obligation to respond to lawsuit claiming that it must honor bond

obligations undertaken by a prior Chinese government.  *Jackson* shares a number of important

similarities with this case:  Both involve (1) a large default judgment, (2) entered against a

foreign government claiming sovereign immunity, (3) the existence of meritorious defenses, and

(4) diplomatic efforts at the highest levels in order to persuade the foreign government of its

obligations to submit its dispute to the resolution of the United States courts.

   In fact, this case has two features that make it arguably more "extraordinary" than

*Jackson*.  First, *Jackson* involved allegations that China had breached its obligations to holders of

railroad bonds; here the PA and PLO are accused of supporting an act of international terrorism.

In addition, the size of the default judgment sought in relation to the annual GDP of the

defendant is vastly greater here than it was in *Jackson*.  Jackson involved a $41 million default

judgment against China; this case involves a potential $116 million default judgment against the

Palestinian Authority, whose financial situation is so dire that it was the recent subject of an international donor conference, held for the express purpose of saving the Palestinian government from bankruptcy.   Ex. C (Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*, NEW YORK TIMES, Dec. 18, 2007).

If the Court has any doubt about the foreign policy implications of the instant default judgment, we invite the Court to seek a Statement of Interest from the State Department.  As noted, Judge Marrero has recently sought such a Statement in connection with the Rule 60(b) motion to vacate the $192 million default judgment in the *Knox* case, which arose under circumstances similar to those here.   See Ex.A.  Any Statement of Interest can speak to the importance of continuing the progress toward stability being made by the current PA leadership and how the imposition of default liability in cases like this one has affected any current progress.  At the recent peace summit in Annapolis, President Bush robustly praised the Palestinian leadership.  *See* Ex. X at 2 (Text of President Bush's November 27, 2007 Remarks at the Annapolis Conference) ("President Abbas seeks to fulfill his people's aspirations for statehood, dignity and security. . . . He and Prime Minister Fayyad have both declared, without hesitation, that they are opposed to terrorism and committed to peace. . . . The emergence of responsible Palestinian leaders has given Israeli leaders the confidence they need to reach out to the Palestinians in true partnership.")  Secretary of State Rice has often described the effort to establish a Palestinian state and to achieve a peaceful resolution of the Israel-Palestinian conflict as one of President Bush's "highest priorities."   *See* Ex. Y at 1-2 ("Remarks with Palestinian Authority President Mahmoud Abbas," Oct. 15, 2007) ("I hope you understand and that everybody understands that the President has decided to make this one of the highest priorities of

his Administration and of his time in office. It means that he is absolutely serious about moving

this issue forward and moving it as rapidly as possible to conclusion.").

### E.   The Default Judgment Will Have a Devastating Financial Effect on the Palestinian People and Government.

A related concern is the manner in which the instant judgment threatens to disrupt the

fledgling Palestinian economy. Even outside the foreign policy context, courts have traditionally

been wary of the potential windfall effect of default judgments in cases involving large sums of

money. *E.g., Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986); *Hester Int'l*

*Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989). This wariness of large

default judgments has been especially acute where the public fisc of a foreign country is at stake.

Thus, the Foreign Sovereign Immunities Act strictly protects against default liability, 28 U.S.C.

§ 1608(e), "reflect[ing] congressional recognition that public fisc should be protected from

unfounded claims which would be granted solely because of government's delay in responding."

*Compania Interamerica*, 88 F.3d at 948, 951, *citing Commercial Bank of Kuwait v. Rafidain*

*Bank*, 15 F.3d 238, 242 (2d Cir. 1994). Although the PA is not recognized as a foreign state and

does not automatically receive the benefits afforded under FSIA, any default judgment would be

paid from the public fisc and identical principles apply.

Concerns about the public fisc are particularly relevant here, as the $116 million

judgment would significantly strain already-scarce Palestinian resources. While Plaintiffs are

likely to dispute the effect of the judgment, the financial reality for the Palestinians is undeniable.

Secretary Rice has recently urged the international community to save the PA and PLO from

bankruptcy. Ex. C (Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*, NEW YORK TIMES,

Dec. 18, 2007). The United Kingdom Foreign Office describes the current state of the PA

economy as follows:

> As a result of Israeli restrictions imposed both within the West
> Bank and Gaza Strip and on Palestinian external economic
> relations since the start of the Intifada (uprising) in September
> 2000, the economy has been fragmented. Significant damage has
> been done to infrastructure, and economic activity and incomes
> have contracted very sharply. Levels of poverty have increased
> dramatically, and much of the population is now dependent on
> food aid.

Ex. Z at 3 (Country Profile of the "Occupied Palestinian Territories" from the U.K.'s Foreign &

Commonwealth Office's website).

The Palestinian taxpayers are as deserving as other taxpayers of being protected from a

procedural default. No doubt Plaintiffs will assert that the satisfaction of any judgment would

not come at the expense of the Palestinian people, but the Plaintiffs' own collection efforts

demonstrate that is not the case. Plaintiffs in this case have, for example, sought to attach Arab

League funds earmarked for humanitarian aid to the PA, garnish the Value Added Taxes

collected by Israel on goods delivered into the Palestinian Territories, acquire ownership of the

Palestine Investment Fund, and attach funds of the Palestinian Pension Fund for state

employees.[5] The financial implications of refusing to vacate the judgment are indisputably

significant, and arguably dire.

---

[5] *See, e.g., Ungar v. Palestinian Auth.*, No. 05-mc-00180-GK (D.D.C. 2005) (garnishment action by
*Ungar* plaintiffs against humanitarian aid contributed by League of Arab States to the Palestinian
people); *Ungar v. Palestinian Auth.*, No. H/P 4318/05 (Jerusalem Dist. Ct.) (action to domesticate Ungar
judgment in Israel and attach VAT funds); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541
(S.D.N.Y. 2005) (discussing attempt by plaintiffs to secure money owed by Orascom to Palestinian
Pension Fund); *Estate of Ungar v. Palestinian Auth.*, 2007 N.Y. Slip Op. 6450, 44 A.D.3d 176; 841
N.Y.S.2d 61; (N.Y. App. Div. Aug. 16, 2007) (discussing plaintiff's actions with regard to Palestinian
Insurance and Pension Fund); *Estate of Yaron Ungar v. The Palestinian Authority*, No. 3:05mc208
(PCD) (D. Conn. 2005) (actions seeking to acquire ownership of Palestine Investment Fund).

Plaintiffs' collection effort with regard to the Palestine Investment Fund (PIF) demonstrates the sort of financial harm Plaintiffs are attempting to impose upon Palestinian finances and, ultimately, the Palestinian people. The PIF was established with the support and backing of the international community, especially the World Bank and the International Monetary Fund, in order to bring transparency to Palestinian finances and to ensure that they were used in the best interests of the Palestinian people. PIF's assets have been valued at far in excess of $116 million dollars. Ex. AA (E&Y Audited Financial Statement for PIF for Year Ending December 31, 2006). Nonetheless, in *Estate of Yaron Ungar v. The Palestinian Authority*, No. 3:05mc208 (PCD) (D. Conn. 2005), Plaintiffs seek to acquire ownership and control of the entirety of PIF in order to purportedly satisfy this $116 million default judgment.

Defendants realize that the collection efforts on this judgment have not yet yielded the financial implications described herein. Indeed, Plaintiffs will likely cite the failure to pay on the judgment as indicia of recalcitrance. The fact that collection has not occurred does not show that collection will not occur. Moreover, as noted above, while the satisfaction of the judgment would be grounds for vacatur under Rule 60(b)(5), the failure of the PA and PLO to yet satisfy the judgment is not a proper basis to deny vacatur. *See* Wright & Miller's *Federal Practice and Procedure*, § 2864 ("if the circumstances justif[y] reopening the judgment, defendant should have been allowed a trial before paying . . . damages").

**F.     The Balance of Equities Weighs in Favor of Litigation on the Merits.**

The final factor the Court must consider is the timing of this motion and the extent to which vacating the judgment will prejudice Plaintiffs in light of the filing of this motion. Rule 60(c)(1) provides that a motion seeking relief under Rule 60(b) "must be made within a reasonable time." "In determining temporal reasonableness under subsection (6), [the Court]

must review 'the specific circumstances of the case,' while bearing in mind that subsection (6) relief 'is reserved for extraordinary cases in which the unusual circumstances justify a party's delay.'" *United States v. Baus*, 834 F.2d at 1121 (citations omitted). In *Baus*, the First Circuit held that the district court had abused its discretion in denying a Rule 60(b)(6) motion filed 7 years after entry of judgment on timeliness grounds, since a number of extenuating circumstances existed to justify the delay. *Id.* at 1121-22.

In doing so, the Court of Appeals analogized the circumstances of the delay to those that existed in *Klapprott v. United States*, 335 U.S. 601, 615, as *modified*, 336 U.S. 942 (1949). There, the Supreme Court found an abuse of discretion in denying a Rule 60(b)(6) on untimeliness grounds based on a four year delay. The Supreme Court held in *Klapprott* that any delay was "certainly" excused because of the movant's incarceration during the period of the delay. *Klapprott*, 335 U.S. at 615.

This is a case where similar equitable concerns warrant a determination that the PA and PLO have filed their motion to vacate within "a reasonable time." As noted, the declaration of Mr. Abdel-Rahman describes the process in which the ability of PA and PLO to act to remedy the default judgment was impeded by substantial political turmoil and a changing Palestinian leadership. Ex. E at 4-5. As that declaration demonstrates, at the time the First Circuit affirmed the default judgment, a new government was taking over, and was only in the very beginning stages of constructing the institutional framework necessary to respond to complex litigation in a distant foreign land. This process was also complicated by the many daunting challenges facing the government at the time and other intervening factors, such as the HAMAS victory in the 2006 elections.

Once Prime Minister Fayyad was placed in control of the litigation, Defendants have moved swiftly to vacate the default judgment. New counsel was retained in May 2007, and immediately began the task of moving to vacate defaults and default judgments in various courts around the country. At the same time, counsel was required to defend on-going damages proceedings, respond to discovery in these cases, and to investigate the availability of meritorious defenses. This investigation was complicated by the existence of multiple parallel cases, such as the one filed in the District of Columbia by Plaintiffs here. Given the cultural, linguistic and logistical hurdles involved, it took substantial efforts to move to vacate all of the defaults and default judgments in less than eight months.

Nonetheless, it is likely that Plaintiffs will argue that the motion should be denied on timeliness grounds because they have suffered prejudice from the delay. Such an argument will not withstand scrutiny, however. On this point, delay alone is not a sufficient basis for establishing prejudice. Rather, the question in determining prejudice is whether the plaintiff can demonstrate tangible harm from any delay such as "loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." *KPS & Assocs. Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 15 (1st Cir. 2003) (*quoting in part, FDIC v. Francisco Inv. Corp.*, 873 F.2d 474, 479 (1st Cir. 1989)).

Here, Plaintiffs did not suffer cognizable prejudice. In July, 2002, Plaintiffs presented evidence and testimony during a damages hearing against HAMAS that continues to serve as the premise for the award in this case. Dkts. 81, 82. To Defendants' knowledge, no evidence has been lost following the default judgment, discovery did not become more difficult, and nothing happened to make fraud or collusion likely. In addition, the active litigation that occurred in the District of Columbia, where Plaintiffs were required to present proof with regard to the incident

itself, makes it unlikely that Plaintiffs would suffer any prejudice from delay. Moreover,
granting this motion will not affect the default judgment that Plaintiffs have against the culpable
wrongdoer, HAMAS.

Rather than focus on the lost evidence or discovery, the Plaintiffs may also claim
prejudice as a result of the litigation and factual development in the damages litigation against
HAMAS. However, the prejudice caused by the commencement of the damages litigation should
not suffice to prevent merits litigation.

First, any effort expended on the damages litigation will not have been wasted because it
still resulted in an enforceable judgment against HAMAS, the real culprit in this incident.
Moreover, testimony from the damages hearing can and should still be utilized if, after the
default is vacated, the Defendants are ultimately found liable. Thus, from Plaintiffs' perspective,
none of the effort expended in developing facts related to the damages hearing will be wasted. If
Plaintiffs succeed on the merits, they would have had to present evidence of damages anyway,
and they can now do so using any admissible evidence they have already developed. By contrast,
if Defendants prevail, Plaintiffs cannot complain about prejudice from preparing for a damages
hearing when Defendants were never liable in the first place.

Second, Plaintiffs can be easily reimbursed for reasonable costs unnecessarily incurred in
the damages hearing. It is unlikely that any such costs exist here, but as the D.C. Circuit
explained in *Jackson v. Beech*, [i]t cannot be argued that justice requires the enforcement of a
judgment based on that report to save the time consumed in two days of hearings and in
preparing the eight-page report. *Jackson v. Beech*, 636 F.2d at 837 (footnote omitted). It
similarly cannot be argued here that justice requires the enforcement of a $116 million dollar
default judgment in order to save the time consumed in developing facts related to damages,

particularly when those facts can be used later if liability is found, and where those very same efforts were necessary to secure the judgment against HAMAS -- a judgment that will still exist regardless of whether the judgment against the Palestinian Defendants is vacated.

Plaintiffs should, however, receive reasonable costs and expenses incurred as the result of the default. *Powerserve Int'l Inc. v. Lavi*, 239 F.3d 508, 515-16 (2d Cir. 2001). Although the Court would be warranted in imposing *only* this condition as part of any order vacating the default, *see James Elec. Co. v. Cougar Enters., Inc.*, 111 F.R.D. 324, 326 (D.D.C. 1986), Defendants propose one additional condition. To demonstrate that the motion to vacate is not an effort to delay with the plan of again defaulting in the future, Defendants would agree to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the default judgment so that the Defendants can litigate on the merits -- the Defendants again default. The $1 million would not reduce the damages to which the Plaintiffs are entitled, but instead would compensate Plaintiffs for any delay caused by vacatur.

This bond is unusually high. Indeed Defendants, were they not consenting to it, could argue that it is too high. *See Thorpe v. Thorpe*, 364 F.2d 692, 694-95 (D.C. Cir. 1966) (approving bond condition generally but noting that high amount raised due process concerns). However, Defendants' strong desire to litigate brings them to propose such a high bond.

Additionally, any prejudice that Plaintiffs have suffered can be at least somewhat offset by the fact that they have already collected at least $5 million from the PA and PLO in proceedings to enforce the default judgment. Given the absence of PA and PLO involvement in the shooting, the PA and PLO would have the right to seek reimbursement of those funds if the judgment is vacated. Nonetheless, Defendants will not seek reimbursement of money Plaintiffs have already collected -- even if Defendants ultimately prevail on the question of liability.

However, in the unlikely event Defendants are ultimately found liable for the attack, the money

Plaintiffs have already collected can obviously be credited against the amount of any later

damages award.

Finally, Plaintiffs may suggest that the family should not be required to testify again

about the incident.  Defendants agree.  If the judgment is vacated and Plaintiffs successfully

prove liability, Defendants will stipulate to the admissibility of the family's prior testimony in

any damages hearing.

## CONCLUSION

This case presents extraordinary circumstances sufficient to warrant granting relief from

the default judgment under Federal Rule of Civil Procedure 60(b)(6).  Plaintiffs already have a

judgment against the real culprit in the attack, HAMAS, and they have recognized in parallel

litigation that the real motivation in the attack was to injure the PA and PLO interests in peace.

While it is unfortunate that Defendants did not defend themselves against these unfounded

allegations sooner, there is a significant difference between the reprehensible and tragic acts

committed by HAMAS, and the procedural missteps committed by Defendants in this litigation.

The fact that the instant judgment imposes precisely the same liability for each, as well as the

other compelling factors described in this motion, are extraordinary circumstances that warrant

vacatur.

Dated:  December 28, 2007         /s/ Richard A. Hibey

Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800

Fax. (202) 628-0858
rhibey@milchev.com


 /s/Deming E. Sherman
Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com


*Attorneys for the Palestinian Authority and the*
*Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 28th day of December 2007, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> Djs@mtlhlaw.com
> *Attorneys for Plaintiffs*

/s/ Richard A. Hibey