UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE PALESTINIAN AUTHORITY, et al.,<br><br>Defendants. | C.A. No. 00-105L |

**DEFENDANTS' MOTION TO**
**FOR RELIEF FROM DEFAULT JUDGMENT**

Defendants The Palestinian Authority and The Palestine Liberation Organization hereby move pursuant to Rules 55(c) and 60(b)(6) of the Federal Rules of Civil Procedure, for relief from this Court's default judgment of July 12, 2004. For the reasons stated in the accompanying memorandum of points and authorities and supporting exhibits, and for any other reason the Court deems appropriate, we urge the Court to set aside the default judgment and to permit expedited litigation on the merits of this case subject to conditions discussed more fully in the memorandum of points and authorities.

Defendants further note that, in the accompanying memorandum of points and authorities, they have encouraged the Court to seek a Statement of Interest from the United States, *see* 28 U.S.C. § 517, regarding the foreign policy implications of denying the Palestinian Authority's motion to vacate the default judgment. Defendants made a similar request in support of their motion for relief from default judgment in *Knox v. PLO,* No. 03cv4466 (S.D.N.Y.) (VM). On

December 11, 2007, the *Knox* court directed the filing within 45 days of "an expression from the United States of America as to whether it contemplates issuing any suggestion of interest in the resolution of this case or in *any of the other similar cases pending in other Districts*." Ex. A to the Memorandum (Judge Marrero's Order in *Knox*) at 2 (emphasis added). If the Court has any doubts about the foreign policy implications of this case, it should similarly seek input from the United States about how its interests are affected in these matters.

Dated: December 28, 2007

/s/ Richard A. Hibey
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

/s/Deming E. Sherman
Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 28th day of December 2007, a true and genuine copy of the foregoing was filed by ECF, which automatically provided service to the following:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
Djs@mtlhlaw.com
*Attorneys for Plaintiffs*

/s/Richard A. Hibey

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE ESTATE OF YARON UNGAR, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 00-105L |
| THE PALESTINIAN AUTHORITY, et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO VACATE DEFAULT JUDGMENT**

Based on the extraordinary circumstances described in the body of this Memorandum, the Defendants, the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) request this Court vacate the $116 million default judgment pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure. In making such a request, PA and PLO have considered the age of this lawsuit, the current stage of the proceedings, and the nature of the default. Defendants are also mindful of this Court's many decisions in this case, as well as the First Circuit's opinion in *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005), which upheld both this Court's decision to reject the sovereign immunity defense and this Court's decision to proceed immediately toward entry of a default judgment rather than allow an interlocutory appeal on the sovereign immunity question. In light of this prior history, Defendants understand that the Court likely will have serious concerns about vacating the judgment.

Defendants do not take these concerns lightly and will not attempt to condone or justify many of the earlier actions in this litigation. We regret these procedural missteps, and have

moved to vacate the defaults in other similar cases around the country before seeking vacatur here, in part to demonstrate to this Court the seriousness of Defendants' representations about the manner in which this litigation will be conducted if it is permitted to go forward.

Respectfully, however, Defendants submit the Court should vacate the default judgment and permit litigation on the merits even at this late date. While the Defendants' manner of conducting the litigation previously did not develop this important fact, there can be no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss, at a time when the PA and PLO were working with the United States and Israeli governments in actively seeking to prevent anti-Israeli attacks. HAMAS, in fact, likely committed the attack *precisely* to injure the interests of the PA and the PLO by disrupting the peace process that those entities were working so hard to support. Thus, while Defendants have been found responsible by default based on their failure to file responsive pleadings and participate in discovery, the $116 million judgment against them has no basis in fact. The judgment as to the PA and PLO is based on how the Defendants proceeded in a foreign court, not on Defendants' culpability in sponsoring acts of terrorism.

Even Plaintiffs have conceded in parallel litigation in the United States District Court for the District of Columbia that HAMAS conducted this attack for the specific purpose of disrupting the peace negotiations between Israel and the PLO. Simultaneous with the litigation in this case, Plaintiffs pursued a case against Iran in the District of Columbia for supporting HAMAS in this incident. *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002). Plaintiffs' theory in the D.C. litigation: "Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, specifically to disrupt the Israel-PLO peace process." *Id.* at 94.

Defendants acknowledge that default judgments should not be vacated lightly. The Supreme Court and the First Circuit, however, have confirmed the Court's discretion to grant

relief in extraordinary circumstances under Rule 60(b)(6), discretion that must be exercised in the context of the law's preference for merits litigation. In *Plaut v. Spendthrift Farm*, 514 U.S. 211, 233-34 (1995), for example, the Supreme Court described Rule 60(b) as confirming longstanding "inherent and discretionary power . . . to set aside a judgment whose enforcement would work inequity." Similarly, in *Hugel v. McNell*, 886 F.2d 1, 6 (1st Cir. 1989), the First Circuit explained: "it is well settled that Rule 60(b)(6) allows a district judge to grant relief when equitable considerations so counsel." By vacating a multi-million dollar default judgment, on the ground that the Defendants were not responsible for Plaintiffs' injuries, the Court would be acting well within the scope of discretion provided it under Rule 60(b)(6).

This is especially so given the presence of other compelling mitigating factors in this case. In this motion, Defendants encourage the Court to seek a Statement of Interest from the United States, *see* 28 U.S.C. § 517, regarding the foreign policy implications of denying the motion to vacate. Defendants made a similar request in support of their motion for relief from default judgment in *Knox v. PLO,* No. 03cv4466 (S.D.N.Y.) (VM). On December 11, 2007, the *Knox* court directed the filing within 45 days of "an expression from the United States of America as to whether it contemplates issuing any suggestion of interest in the resolution of this case or in *any of the other similar cases pending in other districts*." Ex. A at 2 (Judge Marrero's order in *Knox* (emphasis added). If this Court has any doubts about whether the PA and PLO should be given an opportunity to defend on the merits, it should also seek the views of the United States or, at the least, await the United States' response to Judge Marrero's order.

This Court has been extraordinarily patient in this case. While the PA and PLO were admittedly slow to understand the United States legal framework and why they could be haled into U.S. courts to answer for an attack in Israel carried out by HAMAS, the Court has before it

repentant foreign defendants, who are ready and prepared to litigate this matter fully and responsibly going forward. To that end, Defendants' motion is supported by a sworn declaration from the Prime Minister of the Palestinian Authority, Salam Fayyad. Ex. B. In his declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward. In his declaration, Prime Minister Fayyad states: "I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts." *Id.* at ¶ 13.

This Court must also consider the undue hardship that will befall the Palestinian people should the PA and PLO not be given another opportunity to litigate the case on the merits. Plaintiff, along with plaintiffs in other terrorism cases pending against the PA and PLO, collectively seek over $4 billion. Earlier this month, at the December 17, 2007 gathering of 90 donor countries and international organizations in Paris, the international community pledged $7.4 billion over three years to the impoverished Palestinian Authority, with the U.S. pledging $555 million for 2008 alone. Ex. C (Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*, NEW YORK TIMES, Dec. 18, 2007). As Secretary of State Rice explained at the conference: "The Palestinian Authority is experiencing a serious budgetary crisis . . . . This conference is literally the government's last hope to avoid bankruptcy." *Id.* at 1. Secretary of State Rice noted that the PA's financial condition is tied to the prospects for peace, emphasizing: "This is the most promising opportunity to seek peace that we have had in nearly seven years, and we need to seize it." Ex. D at 1 (John Ward Anderson, *Conferees Pledge $7.4 Billion in Aid to Palestinian Authority*, WASHINGTON POST, Dec. 18, 2007). Given the PA's "serious budgetary crisis," the

international community's commitment of substantial aid to the PA, and the relationship between the PA's financial situation and the prospects for peace in the region, the Court should give careful consideration to the ramifications of leaving this $116 million default judgment in place.

By contrast, vacatur will not leave Plaintiffs without remedy. Plaintiffs already have a $116 million judgment against the real culprit in the attack, HAMAS. Plaintiffs' remedy should be limited to the real wrongdoer. In addition, Defendants will agree to reimburse Plaintiffs' for any reasonable costs and expenses unnecessarily incurred in the damages hearing, as well as to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the default judgment so that the Defendants can litigate on the merits -- the Defendants again default.

There is a significant difference between the reprehensible and tragic acts committed by HAMAS, and the procedural missteps committed by Defendants in this litigation. The instant judgment, however, imposes precisely the same liability for each. Such liability is unwarranted as a matter of law and equity. Defendants respectfully request that this Court grant the motion and vacate the judgment pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure.

## PROCEDURAL BACKGROUND

This Court is familiar with the procedural history of this case. *See, e.g., Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 315 F. Supp. 2d 164, 168-71 (D.R.I. 2004); *Estates of Ungar v. Palestinian Authority*, 304 F. Supp. 2d 232, 244-47 (D.R.I. 2004); *Estates of Ungar ex rel Strachman v. Palestinian Authority*, 228 F. Supp. 2d 40, 41-43 (D.R.I. 2002); *Estates of Ungar v. Palestinian Authority*, 153 F. Supp. 2d 76, 82-85 (D.R.I. 2002). Magistrate Judge Martin has also extensively discussed the procedural history of this case in *Estates of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004), as has the First Circuit in *Ungar v. Palestinian Authority*, 402 F.3d 274, 276-80 (1st Cir. 2005). Accordingly, Defendants will not revisit the entire procedural history here, but will provide a brief synopsis for the purpose of this motion.

This case arises from a shooting attack that occurred near Beit Shemesh, Israel on June 9, 1996. *Estates of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15, 30 (D.R.I. 2004). The attack was carried out by HAMAS, and the Israeli courts convicted four HAMAS operatives in connection with the incident. *Ungar*, 402 F.3d at 276.

Nearly four years after the incident, on March 13, 2000, Plaintiffs filed this lawsuit against not only HAMAS but also against the PA and PLO.[1] Dkt. 1. Plaintiffs' amended complaint alleged that the PA and PLO were "authorized and responsible, under international instruments, customary international law and local law applying in the West Bank and Gaza, to exercise law enforcement powers and to maintain public order and security in the territories under

[1] The original complaint also named five individual HAMAS members and five individuals who held positions within agencies operated by the Palestinian Authority, including Jabril Rajoub and Amin Al-

their control." Dkt. 41 ¶ 23. The Plaintiffs alleged that the PA and PLO had breached this responsibility purportedly by failing to do enough to stop HAMAS from operating in their territory and by failing to accede to American and Israeli demands to "take effective measures to prevent further terrorist attacks by defendant HAMAS." *Id.* ¶ 27. In the meantime, Plaintiffs also filed a lawsuit in the United States District Court for the District of Columbia seeking to hold Iran responsible for its sponsorship of the attack. *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002). Plaintiffs' theory in the District of Columbia was that "Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, *specifically to disrupt the Israel-PLO peace process.*" *Id.* at 94 (emphasis supplied).

HAMAS declined to defend the Rhode Island lawsuit at all. On September 6, 2000, Plaintiffs moved for entry of default against HAMAS and the individual HAMAS defendants, which the Clerk entered the next day. Dkt. 30. On November 29, 2000, Plaintiffs filed a motion to enter default judgment against HAMAS and the individual HAMAS defendants. Dkt. 38.

While the PA and PLO were raising jurisdictional and other legal defenses, the case against HAMAS proceeded toward judgment. On July 12, 2002, Magistrate Judge Martin commenced a damages hearing in the case against HAMAS. After hearing three days of testimony in an uncontested proceeding, Magistrate Judge Martin recommended an award of $116.4 million in damages against HAMAS. Dkt. 183. On January 27, 2004, this Court accepted the recommendation. Dkt. 253.

In the same time frame, the default proceedings were moving forward against the PA and PLO. After the Court rejected the PA and PLO's motion to dismiss the case on the pleadings, the

---

Hindi. The Plaintiffs filed an amended complaint that removed the individual PA and PLO defendants. Dkt. 41.

PA and PLO filed a motion to reconsider, Dkt. 100, but did not file an answer. On February 7, 2003, the Plaintiffs moved for entry of default against the PA and PLO. Dkt. 105. On April 18, 2003, Magistrate Judge Martin granted the Plaintiffs' motion for entry of default against the PA and PLO, citing both the failure to answer the amended complaint and the failure to participate in discovery. Dkt. 133.

On August 22, 2003, at a hearing before Magistrate Judge Martin, prior counsel for Defendants informed the Court that the PA and PLO did not intend to participate in a hearing on damages. Magistrate Judge Martin accordingly found that the PA and PLO waived a hearing on damages, and issued a report and recommendation applying his damage findings from 2002 (regarding HAMAS) to the PA and PLO. Dkt. 269. On July 12, 2004, this Court adopted his report and recommendation. Dkt. 279.

The PA and PLO appealed. In its 2005 opinion, the First Circuit noted that the appeal raised "exceptionally important questions of justiciability and sovereignty, emblematic of unsettled political conditions that have plagued the Middle East for many years." *Ungar*, 402 F.3d at 276. After carefully reviewing these issues, the Court of Appeals affirmed the decision of this Court with respect to justiciability and sovereign immunity, and also affirmed the Court's decision to proceed to judgment rather than to await an interlocutory appeal on sovereign immunity. On the latter question, the First Circuit emphasized that while it normally would have been appropriate to await disposition of an interlocutory appeal before forcing the Defendants to submit to discovery, in this case "the defendants, for whatever reason, elected not to assert sovereign immunity in either of their first two motions to dismiss" and only raised the issue after this Court had rejected the motions to dismiss and ordered the filing of an answer and fact-based discovery. *Id.* at 293-94. "In view of this history," the Court explained, "we believe that the

district court acted well within the encincture of its discretion in entering the default." *Id.* at 294, *citing*, *Compania Interamericana v. Campania Dominica*, 88 F.3d 948, 951-52 (11th Cir. 1996). On November 28, 2005, the Supreme Court denied certiorari. *PLO v. Ungar*, 546 U.S. 1034 (2005).

## ARGUMENT

## I. RULE 60(b)(6) PERMITS RELIEF FROM JUDGMENT IN EXTRAORDINARY CIRCUMSTANCES

### A. Overview of Rule 60(b)

Federal Rule of Civil Procedure 60(b) "provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 (1988). In particular, Rule 60(b) lists six circumstances in which relief from a judgment is warranted:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

As the Supreme Court has explained, by "authoriz[ing] discretionary judicial revision of judgments in the listed situations and in other extraordinary circumstances," Rule 60(b) "reflects and confirms the courts' own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement

would work inequity." *Plaut v. Spendthrift Farm*, 514 U.S. at 233-34 (*quoting in part, Liljeberg,* 486 U.S. at 864).

In this case, the PA and PLO rely exclusively on Rule 60(b)(6) -- "any other reason that justifies relief" -- as ground for vacatur of the judgment. The Supreme Court has described that provision as "grant[ing] federal courts broad authority to relieve a party from a final judgment 'upon such terms as are just,' provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg,* 486 U.S. at 863. In particular, Rule 60(b)(6) provides courts with authority "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," *Klapprott v. United States,* 335 U.S. 601, 614-15, (1949), but which should be limited to "extraordinary circumstances." *Ackermann v. United States,* 340 U.S. 193, 199 (1950). *See also United States v. Baus*, 834 F.2d 1114, 1123 (1st Cir. 1992) ("the Rule 60(b)(6) motion for relief from judgment must still establish that there are extraordinary circumstances warranting relief in order for the [movants] to prevail."); *Hugel v. McNell*, 886 F.2d 1, 6 (1st Cir. 1989) ("[i]t is well settled that Rule 60(b)(6) allows a district judge to grant relief when equitable considerations so counsel.") (citing cases).

The reason that Rule 60(b)(6) is mutually exclusive of the other provisions is that several clauses of Rule 60(b) are subject to a one-year time limit. Rule 60(c)(1) provides: "A motion under Rule 60(b) must be made within a reasonable time — and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." As a result, "[f]or the most part, cases brought under clause (6) are attempts to avoid . . . the one-year limit in other clauses of Rule 60(b)." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2864 at 365 (2d ed. 1995) (hereinafter "Wright & Miller's *Federal*

*Practice and Procedure*"). *See also Gonzalez v. Walgreens Co.*, 918 F.2d 303, 305 (1st Cir. 1990) (Rule 60(b)(6) motion "must be made within a reasonable time, [but] there is no specific time limit for filing such a motion.").

As a leading treatise has noted, however, the Supreme Court's recognition that Rule 60(b)(6) is mutually exclusive from the other grounds for relief, and that "clause (6) is not an easy escape from the time limit of the first three clauses, does not establish what is needed for relief under clause (6) on a motion made more than a year after judgment." Wright & Miller's *Federal Practice and Procedure* § 2864 at 363. Rather, courts determine the requisite "extraordinary circumstances" on a case-by-case basis and have "found extraordinary circumstances justifying relief, beyond the one-year requirement of the earlier clauses of the rule, in a limited number of cases." *Id.* at 366.

### B. Courts Have Found Extraordinary Circumstances in Cases Involving Default Judgments Where Meritorious Defenses Exist and Where Rigid Adherence to the Judgment Would Have Serious Foreign Policy Implications and Create Extreme Hardship.

There is no talismanic formula for discerning the "limited number of cases" in which "extraordinary circumstances" exist sufficient to warrant relief under Rule 60(b)(6). Nonetheless, clear patterns have emerged.

First, "[t]he cases calling for great liberality in granting Rule 60(b) motions, for the most part, have involved default judgments." Wright & Miller's *Federal Practice and Procedure* § 2857 at 257. This is because "[t]here is much more reason for liberality in reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits." *Id.* This is also because the federal rules expressly provide for setting aside default judgments using Rule 60(b). *Burda Media, Inc. v.*

*Viertel*, 417 F.3d 292, 298 (2d Cir. 2005) (Fed. R. Civ. P. 55(c) "provid[es] that default judgments may be set aside in accordance with Rule 60(b)").

Second, and for related reasons, the most important factor in cases seeking to reopen a *default* judgment is the existence of a meritorious defense. In such cases, where the merits have never been explored, "[a]s long as the movant seeking timely relief has a meritorious defense, doubt should be resolved in favor of a motion to set aside the judgment." Wright & Miller's *Federal Practice and Procedure* § 2857 at 258; *see also Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co. Inc.*, 953 F.2d 17, 20 (1st Cir. 1992).

Third, courts have also exercised leniency in cases seeking relief under Rule 60(b)(6) where the default results from a foreign state's actions to protect what, from its perspective, it reasonably perceives to be its legal rights. *Jackson v. People's Republic of China*, 794 F.2d 1490, 1496-97 (11th Cir. 1986). As the Eleventh Circuit explained in *Jackson*: "[w]e reject out of hand the contention that in seeking an adjudication of jurisdictional issues arising out of United States domestic law China acts improperly *in reserving what it conceives are its rights under international law*." *Id.* (emphasis added).

Fourth, courts have also been particularly willing to provide relief from default judgments in cases with significant foreign policy consequences, since doing so will assist the State Department in convincing reluctant foreign entities to resolve their disputes within the American legal framework. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 & n.19 (D.C. Cir. 1987). As the D.C. Circuit has noted, "[i]ntolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to

resolve disputes within the United States' legal framework." *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo,* 447 F.3d 835, 838-39 (D.C. Cir. 2006).

Fifth, courts have been most sensitive to the need to reopen default judgments where significant amounts of money are at stake. *Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986). As one district court explained in a case involving a $325,000 judgment, "the large amount of money at stake must be considered 'since relief under rule 60(b) is essentially equitable in nature and is to be administered on equitable principles.'" *First National Bank of Batesville v. Ryder Truck Rental Inc.*, Civ. No. 82-0045-B, 1985 U.S. Dist. LEXIS 21565 at * 16 (D. Me. 1985) (*quoting C.K.S. Engineers, Inc. v. White Mountain Gypsum*, 726 F.2d 1202, 1208 (7th Cir. 1984), *Hutton v. Fisher*, 359 F.2d 913, 916 (3d Cir. 1966)).

*****

*Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986), illustrates the proper application of Rule 60(b)(6) in a case where all five of these factors exist. *Jackson* involved a $41 million default judgment entered against the People's Republic of China (PRC), holding the PRC responsible for satisfying obligations to holders of railroad bonds that had been issued in 1911 by a predecessor Chinese government. 794 F.2d at 1492, 1495. The default judgment occurred after the PRC refused to appear in the action, choosing instead to send a series of diplomatic notes to the State Department asserting that it enjoyed absolute sovereign immunity. *Id.* at 1492. Nonetheless, after collection efforts were underway, the PRC moved to vacate the default judgment under, *inter alia*, Rule 60(b)(6). *Id.* at 1492.

The Eleventh Circuit affirmed a grant of vacatur. As the Court of Appeals explained, the case had arisen only a few months after the PRC leadership had been recognized by the United States and had been the subject of repeated high level diplomatic discussions between the PRC

and the United States. *Id.* at 1495. As a result of the recent resumption of relations between the two nations, PRC authorities were "generally unfamiliar with United States judicial practice and procedure . . . .." *Id.* The Court of Appeals also noted that the PRC viewed the bonds as an "odious" debt of a predecessor government, which international law did not require them to honor and did not require them even to litigate in the United States courts. This belief had been altered only as a result of the "considerable diplomatic efforts of the State Department" to educate the PRC about the American legal system and to persuade the PRC to appear and to present its defenses to the court. *Id.* at 1495-96. Under these circumstances, the Eleventh Circuit held that "the district court did not abuse its discretion in setting aside the judgment under Rule 60(b)(6)." *Id.* at 1496. In doing so, the Court of Appeals relied heavily on both the existence of a meritorious defense and on the State Department's representations concerning the "foreign policy implications of the default judgment." *Id.* at 1496. These same factors weigh in favor of granting the default here.

## II. THIS CASE PRESENTS EXTRAORDINARY CIRCUMSTANCES WARRANTING RELIEF FROM THE DEFAULT JUDGMENT

### A. Overview of Extraordinary Circumstances Presented by This Case.

Like *Jackson*, this is another of those rare cases that present the sort of extraordinary circumstances meriting relief under Rule 60(b)(6). These circumstances do not fall within any of the other Rule 60(b) factors; the PA and PLO do not claim that vacatur is warranted here because of any earlier neglect that should now be deemed "excusable." *See* Fed. R. Civ. P. 60(b)(1). Nor do the Defendants assert that there is any "new evidence" that has come to light beyond the time for filing a motion for a "new trial" under Rule 60(b)(2) -- a claim that would be virtually nonsensical in the context of a default judgment where no evidence at all was presented because

no trial occurred. Defendants similarly do not claim that the earlier judgment was procured by fraud under Rule 60(b)(3) or is void under Rule 60(b) (4).

Nor do the Defendants attempt to secure relief under Rule 60(b)(5) by asserting that the judgment has been satisfied. Indeed, Plaintiffs may cite the PA and PLO's failure to satisfy the judgment as a ground for denying this motion, but such an argument will not survive scrutiny. A Rule 60(b)(6) motion *can only be filed* in a case where the judgment has not been satisfied. Otherwise, relief would be available under Rule 60(b)(5), and the motion would be "premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)", thus making relief under 60(b)(6) unavailable pursuant to the Supreme Court's decision in *Liljeberg,* 486 U.S. at 863. Nor do such considerations have any place in a Rule 60(b)(6) motion. As a leading treatise has noted, "if the circumstances justif[y] reopening the judgment, defendant should have been allowed a trial before paying . . . damages." Wright & Miller's *Federal Practice and Procedure* § 2864 at 376.

Instead of falling within the other portions of Rule 60(b), this case presents a variety of compelling but unusual factors that place it squarely within the heartland of Rule 60(b)(6). First and foremost, a compelling defense exists in this case that was never litigated on the merits as a result of the default. Indeed, as Defendants discuss below, an unusual aspect of this case is that much of this defense comes from party-admissions made in pleadings filed by the Plaintiffs in parallel federal litigation that took place in the District of Columbia. That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.

In addition, other circumstances surrounding the default make this case extraordinary. Much like the default judgment vacated in *Jackson* pursuant to Rule 60(b)(6), the default here arose as a result of a foreign government's basic misunderstanding of the United States legal system. Like *Jackson*, moreover, efforts to cure the default occurred only after diplomatic communications and education at the highest levels of American and Palestinian leadership -- communications that themselves have significant foreign policy implications in light of the substantially increased importance of the current Palestinian governing leadership to American foreign policy interests, the commitment of the new leadership to the litigation, and the precarious financial state of that new government.

The United States' relationship with the Palestinian Authority has evolved considerably in the approximately two years since that judgment was affirmed on appeal and certiorari was denied. In March 2005, when the First Circuit affirmed the judgment in this case, President Abbas was newly-elected and had just begun the process of establishing the institutional structures characteristic of a modern government. Ex. E (Declaration of Ahmad Abdel-Rahman). ¶¶ 6-10. The attached declaration of Mr. Abdel-Rahman, former Secretary-General of the Palestinian Authority Cabinet of Ministers and political advisor to President Abbas, describes the considerable obstacles that the Post-Arafat government faced in responding to the United States litigation during that time period. *Id.* It was only after high-level communications between President Abbas and the State Department, and President Abbas' delegation of authority for the litigation to Prime Minister Fayyad, that the PA developed the institutional structure and lines of authority necessary to adequately respond to the litigation.

For his part, in the months since he assumed responsibility for the U.S. litigation and assumed his role as Prime Minister, Salam Fayyad acted promptly in retaining new U.S. counsel

that would litigate the cases on the merits. As Prime Minister Fayyad's attached declaration reflects, Ex. B, the PA and PLO are committed to fully participate in the U.S. litigation, including complete participation in the discovery process.

Taken together, the totality of these considerations rise to the level of extraordinary circumstances under Rule 60(b)(6). This is particularly so given the nature of the allegations at issue in this case. While even this forceful combination of factors might not give rise to "extraordinary circumstances" in a case involving a contract dispute -- although they did under the unusual circumstances of the *Jackson* case -- the allegations here involve government-sponsored terrorism. In such circumstances, it is especially important to provide a governing foreign entity with another opportunity to defend itself against such charges. *Cf. Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005) (vacating default against Sudanese government after noting the "uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists."). Although Plaintiffs will likely assert that leaving a judgment in place only against HAMAS will cause hardship, any cognizable hardship can be substantially eliminated by virtue of the strict conditions Defendants have agreed to below.

**B. The PA and PLO Have Strong Meritorious Defenses.**

Because one primary function of Rule 60(b)(6) is to ensure that a judgment reflects the true merits of the case, the First Circuit has required a litigant to demonstrate the existence of a meritorious defense, and has described this requirement as a "sentry that guards the gateway to Rule 60(b) relief." *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co. Inc.*, 953 F.2d 17, 20 (1st Cir. 1992). The reason is basic. As the Court of Appeals has explained, "it is the invariable rule, and thus, the rule in this circuit, that a litigant, as

a precondition to relief under Rule 60(b), must give the trial court reason to believe that vacating the judgment will not be an empty exercise." *Id.* (citing meritorious defense cases from this and other circuits).

In defining the scope of a litigant's burden to ensure the Court that vacatur will not be an "empty exercise," the First Circuit has relied on cases from the prejudgment default context. *See Superline*, 953 F.2d at 20 (*citing Coon v. Grenier*, 867 F.2d 73, 76 (1st Cir. 1989)). Those cases make clear that "the 'meritorious defense' component of the test for setting aside a default does not go so far as to require that the movant demonstrate a likelihood of success on the merits, particularly in a default judgment case where the merits have never before been explored. Rather, "a party's averments need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense." *Coon v. Grenier*, 867 F.2d at 76 (citing *Keegel, 627 F.2d at 374*; *Moldwood Corp. v. Stutts,* 410 F.2d 351, 352 (5th Cir. 1969) (per curiam)).

Defendants easily satisfy that standard here. There is ample evidence that the shooting at issue occurred during a period in which the PA and PLO were actively engaged in pursuit of peace with Israel following the Oslo Accords. Contrary to the Complaint's suggestion, the PA and PLO were actively seeking to quash HAMAS' influence in West Bank and Gaza and to cut off funding to HAMAS from international sources. Indeed, the PA and PLO would be able to show, if the default is vacated, that HAMAS' shooting of the Ungars on June 9, 1996 was most likely an attempt to derail the peace process that the PA and PLO was championing at the time, and was designed to inflame public opinion, both in Israel and in Palestine, against the goals the PA and PLO were pursuing.

1. *It Is Undisputed That HAMAS, Not the PA and PLO, Carried Out the Shooting.*

The Amended Complaint specifically alleges that members of HAMAS were responsible for the drive-by shooting attack that killed the Ungars. The Amended Complaint identifies Raed Fakhri Abu Hamdiya ("Hamdiya") as the driver of the car and Adbel Rahman Ismail Abdel Rahman Ghanimat ("Rahman Ghanimat") and Jamal Abdel Fatah Tzabich Al Hor ("Al Hor") as the shooters. Dkt. 41 ¶¶ 18, 19. These three individuals were part of a terrorist cell that also included Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe ("Kafishe").[2] *Id.* ¶15. The Amended Complaint further alleges that, prior to the shooting, the five members of the cell planned and made preparations for the shooting. It does not, notably, specifically allege any direct involvement by the PA and PLO in the planning or execution of the shooting.[3]

Rather, the Complaint seeks to assign liability to the PA and PLO for HAMAS' actions on a theory that the PA and PLO provided material support to HAMAS and acted as accessories after the fact to the Ungar shooting. *Id.* ¶ 41. To support that theory, the Plaintiffs cobble together a set of vague and conclusory allegations that ignore concrete evidence that the PA and PLO were actively working against HAMAS at the very time events giving rise to this lawsuit occurred. The result is a Complaint that appears to state a claim on its face but which would fail in the face of meritorious and factually sound defenses.

---

[2] Numerous spellings of the five individuals' names appear in documents cited throughout the remainder of this memorandum. For the purpose of consistency, the spelling that appears in the Amended Complaint will be used for each.

[3] The Plaintiffs allege the PA and PLO "and their officials, employees and agents" solicited and advised HAMAS and the individual HAMAS defendants "to commit the acts attributed to those defendants herein" and "aided, abetted, authorized, ratified and participated in those acts." Dkt. 41 ¶ 36. It is unclear whether this conclusory allegation is meant to refer to the June 9, 1996 shooting, or to the other vague allegations regarding HAMAS' actions that appear throughout the complaint. If it was intended to refer to the June 9, 1996 incident, it is made without any factual support and in contradiction of the earlier allegations in the Complaint that the HAMAS defendants "conspired, planned and made preparations to carry out a machine-gun attack on a random Israeli vehicle." *Id.* ¶17.

2. *HAMAS Engaged in Terrorist Acts to Protest the PLO's and PA's Participation in the Oslo Peace Process.*

In 1993, the United States helped to broker the first agreement between Israel and the PLO. "Under its terms, Israel accepted the PLO as the representative of the Palestinian people and the PLO acknowledged Israel's statehood." *See Ungar v. PLO*, 402 F.3d at 286.

> This rapprochement culminated in the signing of the first of the Oslo Accords: the Declaration of Principles on Interim Self-Government Arrangements (DOP), Sept. 19, 1993, Isr.-P.L.O., 32 I.L.M. 1525. The DOP's stated purposes included the establishment of a Palestinian interim self-governing authority (the PA) as a precursor to a permanent arrangement based on Security Council Resolutions 242 and 338. *Id.* art. I, 32 I.L.M. at 1527. The DOP treated the West Bank and the Gaza Strip as a single territorial unit and stated that, when certain conditions had been achieved, Israel would transfer authority over "education and culture, health, social welfare, direct taxation, and tourism" in those areas to the PA. *Id.* art. VI, 32 I.L.M. at 1529. The DOP also set forth a framework for negotiating the structure of the PA. *Id.* art. VII, 32 I.L.M. at 1530-31.

*Id.*

Following the PLO and PA's agreement to embark on the path toward peace with Israel in 1993, HAMAS almost immediately began attempting to sabotage the peace process -- and the PA/PLO role in it -- by committing acts of Anti-Israeli violence. Thus, by January 23, 1995, President Clinton had determined that HAMAS constituted a terrorist organization that was threatening to disrupt the Middle East Peace Process. *See* Ex. F (Executive Order 12947, *Prohibiting Transactions With Terrorists Who Threaten to Disrupt the Middle East Peace Process*, (January 23, 1995). In 1997, then-Secretary of State Albright exercised her new powers under the Anti-Terrorism and Effective Death Penalty Act by naming HAMAS as one of the first designated foreign terrorism organizations. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997) (designating 30 Foreign Terrorist Organizations, including HAMAS).

By contrast, immediately following the signing of the Declaration of Principles, the PA and PLO worked to quell violence by various Islamic militant groups, including HAMAS. In 1995, the U.S. State Department reported that although HAMAS had "five major anti-Israeli attacks . . . as part of its campaign to derail the peace process," the PA and PLO had actively been trying to thwart such attacks:

> Chairman Yasir Arafat's Palestinian Authority (PA) launched a campaign to crack down on Islamic militants while at the same time initiating political dialogue with HAMAS to bring it into the political process. HAMAS announced a temporary suspension of military activities in August [1995] while engaging in talks with the PA; there were no major HAMAS attacks against Israelis through the end of 1995.

Ex. G at 19-20. (Patterns of Global Terrorism, 1995, Middle East Overview). The State Department also observed that "[t]he PA security apparatus stepped up its campaign to register and confiscate weapons, thwart terrorist plots, and convict Palestinians responsible for anti-Israeli acts. The PA thwarted a [Palestine Islamic Jihad] attack planned for 10 June. In August, the Palestinian Police Force arrested a HAMAS terrorist who was preparing a bomb to be set off in Israel." *Id.* at 20.

Unfortunately, the PA's and PLO's success at controlling HAMAS' violence was short-lived. The first set of elections for President of the Palestinian Authority and for members of the Palestinian Legislative Council, the legislative arm of the PA, occurred on January 20, 1996, and marked a significant step in the realization of the goals of the Oslo Accords. This progress, and the PA's and PLO's continued stated commitment to the peace process, led radical groups, including HAMAS, to ramp up violent attacks in an effort to disrupt the process.

Between January 25 and March 5, 1996, suicide bombings in Tel Aviv and Jerusalem killed 65 persons. Ex. H at 4 (Patterns of Global Terrorism, 1996). HAMAS claimed

responsibility for three of the bombings, and HAMAS and the Palestine Islamic Jihad both claimed responsibility for a fourth. *Id.* In response, 29 world leaders met in March in Sharm el-Sheikh, Egypt and pledged to support the Middle East peace process and to take practical steps to expand regional cooperation against terrorism. *Id.* PA President Yasir Arafat and Israeli Prime Minister Shimon Peres were among the attendees and a topic of discussion at the summit was the goal of cutting off funds to HAMAS. Ex. I (NEW YORK TIMES, Steven Erlanger, *Summit in Egypt: The Symbolism; The Meeting's Message: Put Terrorists on Notice*, March 14, 1996). An unnamed American official told the New York Times that "the real success of the meeting was to make Mr. Peres and the Palestinian leader Yasir Arafat feel less lonely -- Mr. Peres in his search for peace, Mr. Arafat in his decision to crack down harder on HAMAS." *Id.*

In the next six weeks, there was a marked decrease in violence in the region. On May 1, 1996, when President Clinton and Israeli Prime Minister Shimon Peres signed a United States-Israel Counterterrorism Accord, Prime Minister Peres attributed the decrease in violence in the region to "the more serious measures that Yasir Arafat has taken in Gaza and the territories." Ex. J at 5 (Remarks at Signing Ceremony of U.S.-Israel Counterterrorism Accord, May 1, 1996). Peres went on to say, "I feel that he really started to fight terror, and I say it with appreciation." *Id.* In a U.S. State Department dispatch related to the signing of the Accord, President Clinton and Prime Minister Peres "welcomed the decision by the Palestinian National Council to cancel all the provisions of the Palestinian National Covenant which deny Israel's right to exist or are otherwise inconsistent with the September 1993 exchange of letters between Prime Minister Rabin and Chairman Arafat, noting "[t]his action is an important demonstration by the Palestinians of their commitment to honor the terms of the 1993 Oslo Accords." Ex. K at 6 (Remarks at Signing Ceremony, April 30, 1996).

Against this backdrop, HAMAS committed the June 9, 1996 shooting of the Ungars. The evidence suggests it did so to undermine directly the PA and PLO and that the PA and PLO were the attack's indirect target, not its facilitator. In short, the Ungars died because HAMAS wanted to hamper the partnership in peace that was developing between the PA and PLO and Israel.

3. *Plaintiffs' Extensive Party-Admissions in Parallel Federal Litigation Involving The Same Incident Exculpate the PA and PLO from Responsibility.*

The fact that HAMAS committed the shooting to injure PA and PLO interests is supported by a wealth of evidence, the most compelling of which consists of Plaintiffs' own statements in a contemporaneous federal case involving the same incident. Ten months after filing the instant case, Plaintiffs, represented by Mr. Strachman, filed a case in the United States District Court for the District of Columbia. *Ungar v. Islamic Republic of Iran*, Civ. No. 00-2606 (filed Oct. 27, 2000). The complaint sought damages for wrongful death, personal injury, and related torts arising out of the shooting deaths of Yaron and Efrat Ungar. It named the Republic of Iran, the Iranian Ministry of Information and Security, and three individual Iranian government officials as defendants. The Ungars did not sue HAMAS in the District of Columbia case, though they specifically described the role of HAMAS and the individual HAMAS defendants in the complaint. They did not sue the PA or PLO, and the Complaint did not mention the allegations made in this case against the PA, PLO, or against any of the individual PA and PLO defendants named in this case.

Review of pleadings and transcripts in the Washington, D.C. case makes clear why the Ungars made that strategic choice. In Washington, D.C., the Ungars alleged that Iran facilitated, directed, and enabled HAMAS' execution of the Ungar shooting to disrupt the peace process the PA and PLO were pursuing with Israel. Witnesses called by Mr. Strachman described HAMAS

as the PLO's rival and testified about Iran's recruitment of HAMAS as an agent to thwart reconciliation between Israel and the Palestinian people as envisioned by the Oslo Accords. The Ungars' theory was not that Iran enabled HAMAS *along with* or *in addition to* the PA and PLO, but rather that it did so *in opposition to* the PA and PLO and in order to advance its agenda, which conflicted with the PA's and PLO's efforts to reach peace with Israel.

There is no question that Defendants and their counsel were aware of this parallel litigation at earlier points in the proceeding. Indeed, in January 2003, Dr. Nasser Al-Kidwa wrote to Magistrate Judge Martin to assert that the PA and PLO should not be forced to undergo the burdens of participation in discovery prior to disposition of the sovereign immunity question because the "high level of violence" in the region made it impossible to proceed with a defense at the time, and because the PA and PLO could not "understand how plaintiffs can claim the PNA and PLO are responsible for what HAMAS does. The history of the PNA/PLO-HAMAS relationship is public and well known and the claim that the PNA and PLO are responsible for what HAMAS does is simply not credible." Ex. L at 2 (January 27, 2003 Letter from Dr. Nasser Al-Kidwa to Magistrate Judge Martin). As Ambassador al-Kidwa explained, the claims against the PNA and PLO were particularly incredible in light of the parallel federal litigation seeking a recovery from Iran for sponsoring the same HAMAS attack. *Id.*

Defendants were thus generally aware of the Plaintiffs' parallel litigation against Iran as early as 2003, its seeming inconsistency with the litigation here, and the likelihood that evidence from that litigation would support any defense if the PA and PLO ever were to litigate the merits of the case. However, the PA and PLO were not litigating the merits at the time, and in any event, they had no understanding of the extensive party admissions the Plaintiffs had made in the

course of the District of Columbia litigation, admissions that were fundamentally incompatible with their theory of relief here.

In the course of the Washington, D.C. litigation, the Ungars detailed ties between Iran and HAMAS prior to the June 9, 1996 shooting. Dr. Reuven Paz, the Ungars' proffered expert in Palestinian terrorism and terrorist groups, testified that HAMAS viewed itself as a rival and alternative to the PLO, to the Palestinian Authority, and to the national Palestinian leadership. Ex. M at 84. (Tr. 1/15/02). The Ungars alleged that HAMAS developed a close association with Iranian proxy organizations such as Hezbollah and with units of the Iranian Revolutionary Guards in the early 1990's and thereafter, the Iranian Ministry of Information served as the main conduit of financial, material, and training support to HAMAS. Ex. N at 1-3 (Pretrial Summary of December 7, 2001). This training and support enabled HAMAS commanders, who received intensive, high-quality terrorist training in Iran and from Iranian proxy forces in Lebanon, to train individual cells, including the Tsurif cell, on various weapons, explosives, and military equipment, and in tactical use of these weapons. *Id.* at 3.

According to the Ungars, the Oslo Accords and the PA and PLO's resulting movement toward reconciliation with Israel reinforced the links between Iran and HAMAS. They alleged that in 1995 and 1996, Iran and HAMAS believed violent acts of terrorism would influence Palestinian and Israeli public opinion against the peace efforts. *Id.* at 2 (pretrial summary); Ex. M at 85 (Tr. 1/15/02). This strategic goal drove Iran's public support of HAMAS' increased violence in 1996. Ex. N at 2 (pretrial summary).

The Ungars specifically alleged that the June 9, 1996 shooting was a part of this continuing surge in violence and adduced evidence regarding its effect on the Israeli-Palestinian peace process. Dr. Clawson testified that PLO chairman Yasir Arafat was unhappy about the

increasingly tight relationship between Iran and HAMAS in early 1996 and blamed Iran for its encouragement of the suicide bombings that were conducted and claimed by HAMAS. Ex. M at 105-06 (Tr. 1/15/02). He also testified that both Iran and [then Israeli prime minister] Shimon Peres believed the Iranians short-circuited the peace process and prevented the successful completion of an Israeli-Palestinian peace in the late 1990s by supporting HAMAS' suicide bombings. *Id.* at 105.

The Ungars' evidence in the Washington, D.C. case established HAMAS' motive and preparation for the attack on June 9, 1996. It detailed HAMAS' opposition to the peace process the PLO pursued via the Oslo Accords and the establishment of the PA. It highlighted the adversarial positions of HAMAS and the PA and PLO prior to the shootings and established HAMAS' motive for committing the shootings. It is both extensive and entirely inconsistent with the Plaintiffs' theory of the PA's and PLO's liability in this case.

On this point, it is of no assistance to the Plaintiffs in this case that Judge James Robertson ultimately concluded that they had failed to prove Iran's responsibility for the attack in the Washington D.C. case. Nor is it material that Judge Robertson concluded that "[t]he men who killed Yaron and Efrat Ungar received funding and weapons from other sources as well as HAMAS." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002). As the State Department recognized at the time, a number of militant groups were attempting to disrupt the peace process by launching violent attacks in 1995, which only caused "[t]he PA security apparatus [to] step[]up its campaign to register and confiscate weapons, thwart terrorist plots and convict Palestinians responsible for anti-Israeli acts." Ex. G at 20. (1995 Patterns of Global Terrorism Report, 1995). The report from 1996 was similar: "Palestinian extremists opposed to peace with Israel conducted four massive suicide bombings in Tel Aviv and Jerusalem early in

the year which killed 65 civilians." Ex. H at 4 (Patterns of Global Terrorism Report, 1996). Once again, however, the State Department reported that in 1996 "[t]he Palestinian Authority, which is responsible for security in the Gaza Strip and most West Bank towns, continued in 1996 its effort to rein in Palestinian violence aimed at undermining the peace process." *Id.* Against this backdrop, Judge Robertson's ultimate conclusion -- that the Ungars' proof was insufficient as a matter of law to implicate Iran -- does not diminish the relevance of the Ungars' allegations about the HAMAS-PA/PLO relationship in any way. There unquestionably *were* a number of "other sources" of support apart from Iran that were trying to use violence to disrupt the Israeli-PA-PLO peace process in 1996, but the PA and PLO were not among them.

In fact, Judge Robertson's express findings in the case are exculpatory as to the PA and PLO, and may serve as a basis for collateral estoppel if the Court permits merits litigation to occur. Plaintiffs' allegations against Iran in the District of Columbia case rested on two fundamental propositions. The first was that HAMAS had received support for its actions from entities, like Iran, that desired to derail the Israeli-PA/PLO peace process. That proposition was *credited* by Judge Robertson. Based upon the plaintiffs' extensive evidence, Judge Robertson found "as the Palestinian Liberation Organization and Israel began to negotiate a peaceful settlement of Palestinian claims after the Gulf War . . . HAMAS and Iran grew closer until they had formed what the [plaintiffs'] witnesses called a 'partnership.'" *Ungar v. Iran*, 211 F. Supp. 2d at 94 (citing testimony from Ungars' witnesses during hearing on motion for default). He also found "[b]y the mid 1990s, Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, specifically to disrupt the Israel-PLO peace process." *Id.*

These findings were supported by the Ungars' many statements in the D.C. litigation, all of which are admissible against them in this case as party-admissions, and would be admissible

at trial or on summary judgment should the judgment be vacated. Unquestionably, these were statements in which the Ungars had "manifested an adoption or belief in its truth," Fed. R. Evid. 801(d)(2)(b), and the First Circuit has squarely held that a party "cannot indicate to one federal court that certain statements are trustworthy and accurate," while seeking to exclude those same statements from consideration in a parallel federal proceeding. *United States v. Kattar*, 840 F.2d 118, 131 (1st Cir.1988); *see also United States v. Raphelson*, 802 F.2d 588, 592 (1st Cir. 1986) (pleading in an earlier case is a party-admission).

Plaintiffs' allegations against Iran also depended on a second proposition, however -- Plaintiffs' needed to show not only that HAMAS and Iran had a mutual interest in disrupting the Israeli-PA/PLO peace process, but also that Iran sponsored this specific attack. This is where Judge Robertson parted ways with the Plaintiffs by concluding they had failed to specifically tie Iran's extensive general support of HAMAS' efforts to derail the peace process to the commission of this specific act by HAMAS. *Ungar v. Iran*, 211 F. Supp. 2d at 94. That finding, however, is of no relevance here. The fact that Plaintiffs could not prove that Iran's support was implicated in the shooting is immaterial to PA and PLO liability; the pertinent point is that Judge Robertson credited Plaintiffs' own extensive evidence suggesting that the shooting was committed precisely to undermine the interest of the PA and the PLO in peace. Even if Plaintiffs are not collaterally estopped from claiming otherwise here, Plaintiffs could never prove otherwise because the fact of the matter is, the PA and PLO had nothing to do with the attack that caused Plaintiffs' loss.

4. *The PA's and PLO's Actions After The Shooting -- Arresting the Shooters and Making Arrangements for the Israelis to Take Them Into Custody Over the Protests of HAMAS Leadership and Hundreds of HAMAS Supporters -- Further Demonstrate That the PA and PLO Were Working Directly Against HAMAS' Interests.*

The PA's and PLO's actions after the shootings further demonstrate the PA and PLO were acting in contravention of, and not in concert with, HAMAS. The HAMAS terrorist cell that planned and conducted the Ungar shooting was discovered after a March 1997 suicide bombing of the Apropos café in Tel Aviv. Ex. O, Arieh O'Sullivan, *Sharon Edri's Murderers Caught: Kafr Tzurif HAMAS Cell Behind 11 Killings*, JERUSALEM POST (April 11, 1997). HAMAS claimed responsibility for the bombing. Ex. P (Israeli Ministry of Foreign Affairs (IMFA) Press Release, *Suicide Bombing in Tel-Aviv*, March 21, 1997)

Evidence discovered at the scene of the bombing led to arrests of Hamdiya and Kafishe by Israeli security forces and of Rahman Ghanimat and Al Hor by the PA. Rahman Ghanimat and Al Hor were detained by the PA in a prison near Hebron following their arrest. *Id.* On or about September 17, 1997, Israel submitted requests to the PA for the transfer of Rahman Ghanimat and Al Hor. Ex. Q (IMFA Press Release, *Israel Submits Formal Requests to the Palestinians to Hand Over PA Police Commander Ghazi Jabali and 4 Other Terror Suspects*, Sept. 22, 1997). The two were arrested by Israeli forces on November 13, 1997 while in route from the Hebron prison to a prison near Nablus and while in the custody of members of the PA's Protective Security Service. Ex. R at 8-9. (Johara Baker, *Who is Responsible?*, PALESTINE REPORT, Nov. 21, 1997).

HAMAS immediately accused the PA of collaborating with the Israelis to secure the transfer of Rahman Ghanimat and Al Hor from PA custody into Israeli custody. Rahman Ghanimat and Al Hor appear to have written a letter accusing Rajoub, the head of the Palestinian Protective Security Services and Al-Hindi, the head of the Palestinian General Intelligence Services, of secretly orchestrating their surprise capture by the Israel forces. Ex. S (Certified

Translation of What Purports To Be Letter From Abdel Rahman Ghneimat and Jamal Al Hor re capture). In an interview, Gaza HAMAS leader Abdel Aziz Rantisi stated it was possible that the arrests of Rahman Ghanimat and Al Hor resulted from a set up between the PA and Israel. Ex. T (IMRA Interviews with HAMAS leader Rantisi, March 23, 2004). A HAMAS communiqué dated November 16, 1997 accused the PA of coordinating with Israel against the interests of HAMAS, alleging "the abduction of the two mujahadeen was merely an act [carried out] to cover up the direct handover of the mujahadeen by the PA security…" Ex. U at 1.

The arrests of the Ungars' shooters triggered large-scale riots in the village of Tsurif. On November 16, 1997, 300 Palestinians marched in protest, chanting slogans against the Palestinian Authority and the Preventive Security Service. Ex. R. at 9. Demonstrators pelted Palestinian police cars with stones, and the car belonging to Legislative Council member Ali Abu al-Rish was torched. *Id.*

Certainly, these allegations contradict the Plaintiffs' claim that the PA and PLO were providing a "safe haven" to HAMAS and specifically to the five individual HAMAS members that committed the Ungar shooting.[4] Moreover, facilitating the apprehension and prosecution of the two triggermen in the attack would directly contradict the Plaintiffs' theory that the PA and PLO acted as accessories of HAMAS after the fact of the shooting.

The United States Department of State recognized that, as of 1996, the PA "continued its efforts-in cooperation with Israeli authorities-to combat the threat posed by terrorist groups such as HAMAS . . . and to root out those who plan and carry out these attacks." Ex. H at 1. There is

---

[4] It is important to note in connection with the "safe haven" allegation that the HAMAS members that planned and executed the Ungar shooting lived in Surif, West Bank, near Hebron. They operated secretly from a community that had long been their home. This was not a situation in which foreign agents flocked to an area because of a friendly government. The PA and PLO governed an area in which HAMAS was a pervasive and deep-rooted entity.

ample evidence that at the time of the events relative to the Complaint, the PA and PLO not only repudiated the violent approach HAMAS embraced but also worked to disrupt continuously HAMAS' activities in the West Bank and Gaza.

Based on this record, it is clear facts exist "which, if proven at trial, would constitute a cognizable defense." *Coon v. Grenier*, 867 F.2d at 77. This defense is largely bolstered by the Plaintiffs' party-admissions from a parallel federal proceeding by the same plaintiffs involving the same incident. The meritorious defense factor weighs strongly in favor of vacatur.

### C. The Default Judgment in This Case Arose from the PA's and PLO's Basic Misunderstanding of the United States Legal System, but Their Efforts to Remedy That Misunderstanding Have Now Come to Full Fruition Despite Significant Political Turmoil and Institutional Obstacles.

The Defendants' mindset throughout the course of this litigation will be another important factor for this Court to consider in determining whether extraordinary circumstances exist sufficient to warrant vacatur. At the time of the default in this case, Defendants were understandably perplexed about the ability of the United States courts to hale them into Court to answer for the actions of HAMAS -- actions that had occurred in Israel at a time when the PA and PLO were aggressively attempting to prevent such acts. Ex. L (January 27, 2003 Letter of Ambassador Al-Kidwa). From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO.

Accordingly, Defendants acted to protect what they reasonably perceived to be their rights under international law by asserting only jurisdictional and justiciability defenses. Although the

First Circuit and this Court ultimately did not accept this legal position, Defendants' approach to the litigation was not so unreasonable as to warrant the imposition of multi-million dollar liability by default. After all, some courts have emphatically rejected similar attempts to have American courts adjudicate legal questions arising out of the same dispute. *Cf. Doe v. Israel,* 400 F. Supp. 2d 86, 111-12 (D.D.C. 2005) ("It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades. . . . Plaintiffs would have this Court adjudicate the rights and liabilities of the Palestinian and Israeli people . . . . The Court can do none of this.").

As noted, the Eleventh Circuit exercised leniency in the *Jackson v. PRC* litigation in part because of the PRC's understandable failure to comprehend the basis for jurisdiction in the United States over a financial dispute involving a predecessor Chinese government. *Jackson v. People's Republic of China*, 794 F.2d at 1496-97. Other courts have exercised similar leniency where a default results from a foreign state's actions to protect what, from its perspective, it reasonably perceives to be its legal rights. *See Gregorian v. Izvestia*, 871 F.2d 1515, 1524-25 (9th Cir. 1989). A Defendants' belief in its legal position has further been held to be "reasonable" even where that position is ultimately rejected. *Id. See also Carl Marks & Co. v. USSR*, 665 F. Supp. 323, 332 (S.D.N.Y. 1987) ("the Soviet Union's willful default is tempered by its genuine but unfounded belief that it enjoys . . . sovereign immunity"), *aff'd,* 841 F.2d 26 (2d Cir. 1988).

Defendants now understand the importance of full and complete participation within the contours of the legal framework of the United States courts. Unfortunately, this understanding did not come as quickly as would have been desirable. The Supreme Court denied certiorari

from the First Circuit's affirmance of the judgment on November 28, 2005. *PLO. v. Ungar*, 546 U.S. 1034 (2005). At that point, however, the ability to understand these issues was impeded by a period of considerable political turmoil in the Occupied Territories -- turmoil precipitated by President Arafat's death in November 2004 and the legislative elections in early 2006. To present the Court with a fuller picture of the Defendants' mindset during the relevant timeframes, Defendants have submitted the declaration of Ahmad Abdel-Rahman, which was recently filed in another case against the PA and PLO in the Southern District of Florida, *Saperstein v. Palestine Authority*, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.). *See* Ex. E (Declaration of Ahmad Abdel-Rahman).

Mr. Abdel-Rahman is a long-time political advisor to the Palestinian government, who has held important positions under both Presidents Arafat and Abbas. As his declaration makes clear, the Palestinian government has never had the sort of institutional structure characteristic of mature governments like the United States. Ex. E ¶ 3. By 2002, moreover, an escalation in violence in the region had caused "the destruction and/or paralysis of many fledgling institutions of the Palestinian governing system." *Id.* ¶ 4. By 2004, many government buildings and official documents had been destroyed by the violence, and "[n]o person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits." *Id.* ¶ 5.

In the Fall of 2004, President Arafat died. As Mr. Abdel-Rahman explains, "[a]fter [Arafat] died, there was significant disarray and instability in the government. This void in governmental decision-making persisted well after his death." *Id.* ¶ 6.

President Abbas took office in early 2005, just as the First Circuit litigation was approaching its disposition. President Abbas' Chief of Staff, Dr. Rafiq Husseini, took office only a month later in April 2005. After taking office, Dr. Husseini assessed the state of affairs and determined that "building the institutions of modern government would be a long-term and difficult task, particularly in light of the political turmoil that both preceded and followed President Arafat's death." *Id.* ¶ 8. With the support of President Abbas, Dr. Husseini began the process of creating an organizational entity within the President's Office responsible for defending domestic and foreign lawsuits brought against the Palestinian government, but it was a complicated task compounded by both a lack of familiarity in the Palestinian legal community with the American legal system, and by the fact that the Palestinian government had many other pressing problems to address. *Id.* ¶ 9. Chronic diseases had surged, there was substantial unemployment and poverty, and access to safe-drinking water and food was declining. Simply put, there were many urgent issues confronting the Palestinian government at the time, of which responding to this lawsuit was only one. *Id.*

In 2006, various high-level governmental decision-makers were contacted about the litigation from time-to-time in response to particular problems, but the lack of institutional structure still plagued the government's ability to respond. *Id.* ¶ 10. These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit. *Id.* In addition, the HAMAS victory in the 2006 elections complicated matters even more, "particularly in light of the longstanding antagonistic relationship between the PA/PLO on the one hand, and HAMAS on the other." *Id.* ¶ 11.

By the end of 2006, however, "it became clear the Palestinian government urgently needed an institutional framework for responding comprehensively to the litigation in the United States." *Id.* ¶ 12. As Mr. Abdel-Rahman notes, "[t]he failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment." *Id.* As a result, by January 2007, President Abbas had sought guidance about the litigation from the Secretary of State, and would soon delegate to Prime Minister Fayyad the authority to control the litigation so that clear and consistent decision making could occur.

As Prime Minister Fayyad describes more fully in his declaration, after receiving authority over the litigation, he reviewed President Abbas' correspondence with Secretary Rice, engaged in appropriate inquiries and "decided to retain new counsel for the PA and PLO to handle all of the U.S. lawsuits, to provide them with clear instructions about their responsibilities and duties with respect to the litigation, and to discharge predecessor counsel." Ex. B at ¶ 12.

Prime Minister Fayyad's declaration fully describes the manner in which the new Palestinian leadership intends to conduct the litigation going forward:

> I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts. I personally commit to sustain this instruction throughout the effort to litigate these cases. It is my belief that there are meritorious defenses to the claims brought in the United States and it is important to the PA to present those defenses. Moreover, it is important to the PA's role in the international community to participate in the legal process, even when it is process brought in the United States for actions by others that occurred far from the United States. The importance of this was not fully appreciated by the PA government, as a whole, until recently. Now we can act on that understanding, and we therefore seek to contest this litigation, fully and responsively.

Ex. B at ¶ 13.

Prime Minister Fayyad's declaration deserves the Court's serious consideration, particularly in light of his representations concerning the manner in which the litigation will be conducted going forward. *United States v. Schofield*, 197 F.R.D. 6, 8 (D.D.C. 2000) (vacating default largely because Defendant was "now vigorously mounting a defense," explaining that "[s]uch an act cuts strongly against any willfulness of the defendant's previous delay."); *Lawton v. Republic of Iraq*, No. 02-0474, 2006 U.S. Dist. LEXIS 94335, at * 7 (D.D.C. Dec. 6, 2006) (vacating entry of default and refusing to find willfulness in a case alleging that Iraq should be held responsible for the 1995 bombing of a federal building in Oklahoma City in light of political turmoil and based on representations that new leadership was "committed to defending fully against Plaintiffs' alleged claims, on all available grounds, in accordance with the laws, procedures and Court directives applicable to this litigation").

In assessing whether the attitude of the new Palestinian leadership is genuine, this Court should consider the views of the Executive Branch. President Bush has praised the new Palestinian leadership for "striving to build the institutions of a modern democracy," "working to strengthen Palestinian security services, so they can confront the terrorists and protect the innocent," and "ensuring that Palestinian society operates under the rule of law." Ex. V at 1 (July 16, 2007, Speech of President Bush). As President Bush explained in a July 2007 speech, "[b]y supporting the reforms of President Abbas and Prime Minister Fayyad, we can help them show the world what a Palestinian state would look like -- and act like." *Id.* at 1-2. One indication of the PA's and PLO's commitment to "operate[] under the rule of law," is the Defendants' unambiguous desire to vigorously defend this lawsuit within the American legal framework. Defendants thus ask the Court, in reviewing this motion, to weigh the importance of encouraging the designated representatives of the Palestinian people -- representatives who have won the

support of the United States government -- to participate fully in the American legal process. As further evidence of Defendants' readiness to participate in the litigation, Defendants have attached as Exhibit W an Answer, which the Defendants will file if the Court grants permission to do so.

The state of mind necessary to warrant rigid adherence to a default judgment is nuanced and heavily dependent on the facts. The D.C. Circuit has recently emphasized that political turmoil can properly be weighed in the default calculus when it hampers a foreign government's ability to defend. *FG Hemisphere Assocs., LLC*, 447 F.3d at 841 ("DRC [the Congo] was plainly hampered by its devastating civil war, which cost over three million lives [and] shattered the DRC's already shaky political structure . . . . It is not surprising that the war would be accompanied by substantial confusion over responsibilities in the Foreign Ministry . . ."). As noted, at crucial stages of the litigation, the Occupied Palestinian Territories have been in a state of considerable turmoil -- turmoil that prevented Defendants from understanding the importance of full and complete participation in foreign litigation involving acts in Israel perpetrated by HAMAS.

Plaintiffs may argue that this change in mindset was not good enough, and may suggest that Defendants must somehow be "faultless" in order to obtain relief under Rule 60(b)(6). But this one-dimensional standard is only appropriate where a litigant seeks to show extraordinary circumstances based on "neglect" in a motion filed after Rule 60(b)(1)'s one-year time requirement for demonstrating "excusable neglect." Such was the case in *Claremont Flock Corp. v. Alm*, 281 F.3d 297, 299 (1st Cir. 2002), where the Rule 60(b)(6) claim was that any failure to respond to the lawsuit had been the product of loss of access to a P.O. box. In such cases, it makes sense to limit relief to cases where any "neglect" is entirely faultless; otherwise Rule

60(b)(6) could serve as an alternative mechanism for vacatur for all forms of "excusable neglect," permitting litigants to easily bypass the one-year requirement contained in Rule 60(b)(1).

Such a standard, however, would be inadequate to resolve 60(b)(6) cases that never could have been brought under 60(b)(1) because "neglect" is not the pertinent issue. In cases like this one, which involve a meritorious defense to charges of government-sponsored terrorism, which raise highly nuanced foreign policy issues that endanger the developing relationship between the United States government and the new Palestinian leadership, and which involve a massive default judgment whose enforcement would have a devastating effect on the Palestinian economy, the only pertinent question is whether these considerations, taken as a whole, rise to the level of extraordinary circumstances sufficient to warrant vacatur. It would be fundamentally inconsistent with both Rule 60(b)(6)'s language and its historic function as an "inherent and discretionary power . . . to set aside a judgment whose enforcement would work inequity," *Plaut v. Spendthrift Farm*, 514 U.S. at 233-34, to reject such claims based on a formalistic, one-size-fits-all standard. This is why courts around the country have taken a much more expansive and nuanced approach in applying the extraordinary circumstances standard of Rule 60(b)(6) to cases like this one. This Court should as well.

### D. Vacatur Is Also Warranted Because The Default Judgment Has Already Had Significant Foreign Policy Consequences and Will Continue to Do So.

Vacatur is also warranted because of the significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case. As Prime Minister Fayyad's declaration makes clear, this judgment has already been the subject of diplomatic communications at the highest levels between our country's representatives in the State

Department and the governing officials in the Occupied Territories. If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian government -- a relationship that the Executive Branch of the United States government has characterized as being crucial to the Israeli-Palestinian peace process.

It is precisely because of these sorts of delicate concerns that courts are generally more lenient in setting aside default judgments obtained against foreign governing entities. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 & n.19 (D.C. Cir. 1987); *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989); *Gregorian v. Izvestia*, 871 F.2d 1515, 1525 (9th Cir. 1989); *First Fidelity Bank v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) ("Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside.").

While Plaintiffs are likely to suggest that this factor is outdated or applies only if statehood has been achieved, this is not true. Rather, courts' continuing disfavor of default judgments in this context stems from their effect on foreign relations and the "broad divergence" of "cultural, governmental and political" approaches to litigation when a foreign government is involved. *Practical Concepts*, 811 F.2d at 1551; *FG Hemisphere Assocs.*, 447 F.3d at 838-39.

It is true that courts have sometimes declined to provide state-owned instrumentalities relief from default judgments in cases involving ordinary contract disputes. *See, e.g.*, *Compania Interamericana v. Campania Dominica*, 88 F.3d 948, 951-52 (11th Cir. 1996) (applying abuse of discretion standard in affirming denial of national airline's motion for relief from entry of default and default judgment in breach of contract action); *Transaero v. La Fuerza Area Boliviana*, 24 F.3d 457, 462 (2d Cir. 1994) ("The case before us is fundamentally an ordinary contract dispute which has no such profound [foreign policy] implications."); *Claremont Flock Corp. v. Alm*, 281

F.3d 297, 299 (1st Cir. 2002) (denying vacatur under Rule 60(b)(6) where foreign businessman claimed that any neglect in causing default had been excusable result of his failure to understand workings of the United States legal system and loss of access to P.O. Box in Sweeden). This case, however, does not involve an ordinary contract dispute with a state-owned instrumentality but a claim directly against the foreign government, alleging government-sponsored terrorism, which has resulted in massive liability that threatens to undermine the economy of a United States ally.

Though the PA does not enjoy the "foreign state" recognition enjoyed by some foreign governments, the foreign policy implications of this case strongly resemble those in *Jackson v. People's Republic of China*, 794 F.2d at 1496-97, where the Court of Appeals upheld the vacatur under Rule 60(b)(6) of a $41 million default judgment that arose from a foreign government's inability to understand its obligation to respond to lawsuit claiming that it must honor bond obligations undertaken by a prior Chinese government. *Jackson* shares a number of important similarities with this case: Both involve (1) a large default judgment, (2) entered against a foreign government claiming sovereign immunity, (3) the existence of meritorious defenses, and (4) diplomatic efforts at the highest levels in order to persuade the foreign government of its obligations to submit its dispute to the resolution of the United States courts.

In fact, this case has two features that make it arguably more "extraordinary" than *Jackson*. First, *Jackson* involved allegations that China had breached its obligations to holders of railroad bonds; here the PA and PLO are accused of supporting an act of international terrorism. In addition, the size of the default judgment sought in relation to the annual GDP of the defendant is vastly greater here than it was in *Jackson*. Jackson involved a $41 million default judgment against China; this case involves a potential $116 million default judgment against the

Palestinian Authority, whose financial situation is so dire that it was the recent subject of an international donor conference, held for the express purpose of saving the Palestinian government from bankruptcy. Ex. C (Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*, NEW YORK TIMES, Dec. 18, 2007).

If the Court has any doubt about the foreign policy implications of the instant default judgment, we invite the Court to seek a Statement of Interest from the State Department. As noted, Judge Marrero has recently sought such a Statement in connection with the Rule 60(b) motion to vacate the $192 million default judgment in the *Knox* case, which arose under circumstances similar to those here. See Ex.A. Any Statement of Interest can speak to the importance of continuing the progress toward stability being made by the current PA leadership and how the imposition of default liability in cases like this one has affected any current progress. At the recent peace summit in Annapolis, President Bush robustly praised the Palestinian leadership. *See* Ex. X at 2 (Text of President Bush's November 27, 2007 Remarks at the Annapolis Conference) ("President Abbas seeks to fulfill his people's aspirations for statehood, dignity and security. . . . He and Prime Minister Fayyad have both declared, without hesitation, that they are opposed to terrorism and committed to peace. . . . The emergence of responsible Palestinian leaders has given Israeli leaders the confidence they need to reach out to the Palestinians in true partnership.") Secretary of State Rice has often described the effort to establish a Palestinian state and to achieve a peaceful resolution of the Israel-Palestinian conflict as one of President Bush's "highest priorities." *See* Ex. Y at 1-2 ("Remarks with Palestinian Authority President Mahmoud Abbas," Oct. 15, 2007) ("I hope you understand and that everybody understands that the President has decided to make this one of the highest priorities of

his Administration and of his time in office. It means that he is absolutely serious about moving this issue forward and moving it as rapidly as possible to conclusion.").

### E. The Default Judgment Will Have a Devastating Financial Effect on the Palestinian People and Government.

A related concern is the manner in which the instant judgment threatens to disrupt the fledgling Palestinian economy. Even outside the foreign policy context, courts have traditionally been wary of the potential windfall effect of default judgments in cases involving large sums of money. *E.g., Sony Corp. v. Elm State Elecs, Inc.*, 800 F.2d 317, 320 (2d Cir. 1986); *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989). This wariness of large default judgments has been especially acute where the public fisc of a foreign country is at stake. Thus, the Foreign Sovereign Immunities Act strictly protects against default liability, 28 U.S.C. § 1608(e), "reflect[ing] congressional recognition that public fisc should be protected from unfounded claims which would be granted solely because of government's delay in responding." *Compania Interamerica*, 88 F.3d at 948, 951, *citing Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). Although the PA is not recognized as a foreign state and does not automatically receive the benefits afforded under FSIA, any default judgment would be paid from the public fisc and identical principles apply.

Concerns about the public fisc are particularly relevant here, as the $116 million judgment would significantly strain already-scarce Palestinian resources. While Plaintiffs are likely to dispute the effect of the judgment, the financial reality for the Palestinians is undeniable. Secretary Rice has recently urged the international community to save the PA and PLO from bankruptcy. Ex. C (Elaine Sciolino, *$7.4 Billion Pledged for Palestinians*, NEW YORK TIMES,

Dec. 18, 2007). The United Kingdom Foreign Office describes the current state of the PA economy as follows:

> As a result of Israeli restrictions imposed both within the West Bank and Gaza Strip and on Palestinian external economic relations since the start of the Intifada (uprising) in September 2000, the economy has been fragmented. Significant damage has been done to infrastructure, and economic activity and incomes have contracted very sharply. Levels of poverty have increased dramatically, and much of the population is now dependent on food aid.

Ex. Z at 3 (Country Profile of the "Occupied Palestinian Territories" from the U.K.'s Foreign & Commonwealth Office's website).

The Palestinian taxpayers are as deserving as other taxpayers of being protected from a procedural default. No doubt Plaintiffs will assert that the satisfaction of any judgment would not come at the expense of the Palestinian people, but the Plaintiffs' own collection efforts demonstrate that is not the case. Plaintiffs in this case have, for example, sought to attach Arab League funds earmarked for humanitarian aid to the PA, garnish the Value Added Taxes collected by Israel on goods delivered into the Palestinian Territories, acquire ownership of the Palestine Investment Fund, and attach funds of the Palestinian Pension Fund for state employees.[5] The financial implications of refusing to vacate the judgment are indisputably significant, and arguably dire.

---

[5] *See, e.g., Ungar v. Palestinian Auth.*, No. 05-mc-00180-GK (D.D.C. 2005) (garnishment action by *Ungar* plaintiffs against humanitarian aid contributed by League of Arab States to the Palestinian people); *Ungar v. Palestinian Auth.*, No. H/P 4318/05 (Jerusalem Dist. Ct.) (action to domesticate Ungar judgment in Israel and attach VAT funds); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541 (S.D.N.Y. 2005) (discussing attempt by plaintiffs to secure money owed by Orascom to Palestinian Pension Fund); *Estate of Ungar v. Palestinian Auth.*, 2007 N.Y. Slip Op. 6450, 44 A.D.3d 176; 841 N.Y.S.2d 61; (N.Y. App. Div. Aug. 16, 2007) (discussing plaintiff's actions with regard to Palestinian Insurance and Pension Fund); *Estate of Yaron Ungar v. The Palestinian Authority*, No. 3:05mc208 (PCD) (D. Conn. 2005) (actions seeking to acquire ownership of Palestine Investment Fund).

Plaintiffs' collection effort with regard to the Palestine Investment Fund (PIF) demonstrates the sort of financial harm Plaintiffs are attempting to impose upon Palestinian finances and, ultimately, the Palestinian people. The PIF was established with the support and backing of the international community, especially the World Bank and the International Monetary Fund, in order to bring transparency to Palestinian finances and to ensure that they were used in the best interests of the Palestinian people. PIF's assets have been valued at far in excess of $116 million dollars. Ex. AA (E&Y Audited Financial Statement for PIF for Year Ending December 31, 2006). Nonetheless, in *Estate of Yaron Ungar v. The Palestinian Authority*, No. 3:05mc208 (PCD) (D. Conn. 2005), Plaintiffs seek to acquire ownership and control of the entirety of PIF in order to purportedly satisfy this $116 million default judgment.

Defendants realize that the collection efforts on this judgment have not yet yielded the financial implications described herein. Indeed, Plaintiffs will likely cite the failure to pay on the judgment as indicia of recalcitrance. The fact that collection has not occurred does not show that collection will not occur. Moreover, as noted above, while the satisfaction of the judgment would be grounds for vacatur under Rule 60(b)(5), the failure of the PA and PLO to yet satisfy the judgment is not a proper basis to deny vacatur. *See* Wright & Miller's *Federal Practice and Procedure*, § 2864 ("if the circumstances justif[y] reopening the judgment, defendant should have been allowed a trial before paying . . . damages").

**F. The Balance of Equities Weighs in Favor of Litigation on the Merits.**

The final factor the Court must consider is the timing of this motion and the extent to which vacating the judgment will prejudice Plaintiffs in light of the filing of this motion. Rule 60(c)(1) provides that a motion seeking relief under Rule 60(b) "must be made within a reasonable time." "In determining temporal reasonableness under subsection (6), [the Court]

must review 'the specific circumstances of the case,' while bearing in mind that subsection (6) relief 'is reserved for extraordinary cases in which the unusual circumstances justify a party's delay.'" *United States v. Baus*, 834 F.2d at 1121 (citations omitted). In *Baus*, the First Circuit held that the district court had abused its discretion in denying a Rule 60(b)(6) motion filed 7 years after entry of judgment on timeliness grounds, since a number of extenuating circumstances existed to justify the delay. *Id.* at 1121-22.

In doing so, the Court of Appeals analogized the circumstances of the delay to those that existed in *Klapprott v. United States*, 335 U.S. 601, 615, as *modified*, 336 U.S. 942 (1949). There, the Supreme Court found an abuse of discretion in denying a Rule 60(b)(6) on untimeliness grounds based on a four year delay. The Supreme Court held in *Klapprott* that any delay was "certainly" excused because of the movant's incarceration during the period of the delay. *Klapprott*, 335 U.S. at 615.

This is a case where similar equitable concerns warrant a determination that the PA and PLO have filed their motion to vacate within "a reasonable time." As noted, the declaration of Mr. Abdel-Rahman describes the process in which the ability of PA and PLO to act to remedy the default judgment was impeded by substantial political turmoil and a changing Palestinian leadership. Ex. E at 4-5. As that declaration demonstrates, at the time the First Circuit affirmed the default judgment, a new government was taking over, and was only in the very beginning stages of constructing the institutional framework necessary to respond to complex litigation in a distant foreign land. This process was also complicated by the many daunting challenges facing the government at the time and other intervening factors, such as the HAMAS victory in the 2006 elections.

Once Prime Minister Fayyad was placed in control of the litigation, Defendants have moved swiftly to vacate the default judgment. New counsel was retained in May 2007, and immediately began the task of moving to vacate defaults and default judgments in various courts around the country. At the same time, counsel was required to defend on-going damages proceedings, respond to discovery in these cases, and to investigate the availability of meritorious defenses. This investigation was complicated by the existence of multiple parallel cases, such as the one filed in the District of Columbia by Plaintiffs here. Given the cultural, linguistic and logistical hurdles involved, it took substantial efforts to move to vacate all of the defaults and default judgments in less than eight months.

Nonetheless, it is likely that Plaintiffs will argue that the motion should be denied on timeliness grounds because they have suffered prejudice from the delay. Such an argument will not withstand scrutiny, however. On this point, delay alone is not a sufficient basis for establishing prejudice. Rather, the question in determining prejudice is whether the plaintiff can demonstrate tangible harm from any delay such as "loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." *KPS & Assocs. Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 15 (1st Cir. 2003) (*quoting in part, FDIC v. Francisco Inv. Corp.*, 873 F.2d 474, 479 (1st Cir. 1989)).

Here, Plaintiffs did not suffer cognizable prejudice. In July, 2002, Plaintiffs presented evidence and testimony during a damages hearing against HAMAS that continues to serve as the premise for the award in this case. Dkts. 81, 82. To Defendants' knowledge, no evidence has been lost following the default judgment, discovery did not become more difficult, and nothing happened to make fraud or collusion likely. In addition, the active litigation that occurred in the District of Columbia, where Plaintiffs were required to present proof with regard to the incident

itself, makes it unlikely that Plaintiffs would suffer any prejudice from delay. Moreover, granting this motion will not affect the default judgment that Plaintiffs have against the culpable wrongdoer, HAMAS.

Rather than focus on the lost evidence or discovery, the Plaintiffs may also claim prejudice as a result of the litigation and factual development in the damages litigation against HAMAS. However, the prejudice caused by the commencement of the damages litigation should not suffice to prevent merits litigation.

First, any effort expended on the damages litigation will not have been wasted because it still resulted in an enforceable judgment against HAMAS, the real culprit in this incident. Moreover, testimony from the damages hearing can and should still be utilized if, after the default is vacated, the Defendants are ultimately found liable. Thus, from Plaintiffs' perspective, none of the effort expended in developing facts related to the damages hearing will be wasted. If Plaintiffs succeed on the merits, they would have had to present evidence of damages anyway, and they can now do so using any admissible evidence they have already developed. By contrast, if Defendants prevail, Plaintiffs cannot complain about prejudice from preparing for a damages hearing when Defendants were never liable in the first place.

Second, Plaintiffs can be easily reimbursed for reasonable costs unnecessarily incurred in the damages hearing. It is unlikely that any such costs exist here, but as the D.C. Circuit explained in *Jackson v. Beech*, [i]t cannot be argued that justice requires the enforcement of a judgment based on that report to save the time consumed in two days of hearings and in preparing the eight-page report. *Jackson v. Beech*, 636 F.2d at 837 (footnote omitted). It similarly cannot be argued here that justice requires the enforcement of a $116 million dollar default judgment in order to save the time consumed in developing facts related to damages,

particularly when those facts can be used later if liability is found, and where those very same efforts were necessary to secure the judgment against HAMAS -- a judgment that will still exist regardless of whether the judgment against the Palestinian Defendants is vacated.

Plaintiffs should, however, receive reasonable costs and expenses incurred as the result of the default. *Powerserve Int'l Inc. v. Lavi*, 239 F.3d 508, 515-16 (2d Cir. 2001). Although the Court would be warranted in imposing *only* this condition as part of any order vacating the default, *see James Elec. Co. v. Cougar Enters., Inc.*, 111 F.R.D. 324, 326 (D.D.C. 1986), Defendants propose one additional condition. To demonstrate that the motion to vacate is not an effort to delay with the plan of again defaulting in the future, Defendants would agree to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the default judgment so that the Defendants can litigate on the merits -- the Defendants again default. The $1 million would not reduce the damages to which the Plaintiffs are entitled, but instead would compensate Plaintiffs for any delay caused by vacatur.

This bond is unusually high. Indeed Defendants, were they not consenting to it, could argue that it is too high. *See Thorpe v. Thorpe*, 364 F.2d 692, 694-95 (D.C. Cir. 1966) (approving bond condition generally but noting that high amount raised due process concerns). However, Defendants' strong desire to litigate brings them to propose such a high bond.

Additionally, any prejudice that Plaintiffs have suffered can be at least somewhat offset by the fact that they have already collected at least $5 million from the PA and PLO in proceedings to enforce the default judgment. Given the absence of PA and PLO involvement in the shooting, the PA and PLO would have the right to seek reimbursement of those funds if the judgment is vacated. Nonetheless, Defendants will not seek reimbursement of money Plaintiffs have already collected -- even if Defendants ultimately prevail on the question of liability.

However, in the unlikely event Defendants are ultimately found liable for the attack, the money Plaintiffs have already collected can obviously be credited against the amount of any later damages award.

Finally, Plaintiffs may suggest that the family should not be required to testify again about the incident. Defendants agree. If the judgment is vacated and Plaintiffs successfully prove liability, Defendants will stipulate to the admissibility of the family's prior testimony in any damages hearing.

## CONCLUSION

This case presents extraordinary circumstances sufficient to warrant granting relief from the default judgment under Federal Rule of Civil Procedure 60(b)(6). Plaintiffs already have a judgment against the real culprit in the attack, HAMAS, and they have recognized in parallel litigation that the real motivation in the attack was to injure the PA and PLO interests in peace. While it is unfortunate that Defendants did not defend themselves against these unfounded allegations sooner, there is a significant difference between the reprehensible and tragic acts committed by HAMAS, and the procedural missteps committed by Defendants in this litigation. The fact that the instant judgment imposes precisely the same liability for each, as well as the other compelling factors described in this motion, are extraordinary circumstances that warrant vacatur.

Dated: December 28, 2007

/s/ Richard A. Hibey
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800

Fax. (202) 628-0858
rhibey@milchev.com

/s/Deming E. Sherman
Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 28th day of December 2007, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
Djs@mtlhlaw.com
*Attorneys for Plaintiffs*

/s/ Richard A. Hibey

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LESLYE KNOX, individually, as personal representative of the Estate of Aharon Ellis and as natural guardian of plaintiffs Jordan Terrell Ellis, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavyah Carter and Amitai Carter, JORDAN TERRELL ELLIS, minor, REUVEN CARTER, minor, SHANON CARTER, minor, SHAYRAH CARTER, minor, AMITAI CARTER, minor, by their next friend and guardian: Leslye Knox, PRINCE SHALEAK, MELLONEE ELLIS, FRANCINE ELLIS, LYNNE ELLIS, YIHONADAV ELLIS, TSAPHRIRAH ELLIS and ARON CARTER,

Plaintiffs,

- against -

THE PALESTINE LIBERATION ORGANIZATION, THE PALESTINIAN AUTHORITY (aka "The Palestinian Interim Self-Government Authority" and/or "The Palestinian Council" and/or "The Palestinian National Authority"), YASSER ARAFAT, MARWAN BARGHOUTI, NASSER AWIS, ZIAD MUHAMMAD DAAS, ESTATE OF ABDEL SALAM SADEK HASSUNA, deceased and JOHN DOES 1-99,

Defendants.

03 Civ. 4466

**ORDER**

**VICTOR MARRERO, United States District Judge.**

## I. BACKGROUND

This action was brought under the Antiterrorism Act of 1991, 18 U.S.C. §§ 2331-2339D, by the representatives and heirs of Aharon Ellis, an American citizen who was murdered in a terrorist shooting in Hadera, Israel, on January 17, 2002.

Plaintiffs ("Plaintiffs") contend that the terrorist attack was planned and carried out by defendants Palestine Liberation Organization and Palestine Authority (collectively, "Defendants"). This Court issued a default judgment dated July 11, 2006 (the "Default Judgment") in favor of Plaintiffs, after Defendants failed to answer the Plaintiffs' complaint and to acknowledge the jurisdiction of this Court.

Currently before this Court is Defendants' Motion for Relief from Judgment, dated July 31, 2007, seeking to vacate the Default Judgment. Defendants allege that "[a]n allegation of terrorist activities against [Defendants], with whom the United States has diplomatic relations and views as critical participants in the on-going peace process in the Middle East," will have significant foreign policy consequences. (See Defendants' Reply to Plaintiffs' Memorandum in Opposition, dated November 15, 2007). Accordingly, the Court seeks an expression from the United States of America as to whether it contemplates issuing any suggestion of interest in the resolution of this case or in any of the other similar cases pending in other Districts.

## II. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the United States of America (the "Government") is directed to inform this Court within forty-five days of the

date of this Order whether the Government contemplates issuing a suggestion of interest in the resolution of this case, or in any of the other cases pending in other Districts against the defendants in this action raising similar issues as to the appropriateness of reopening default judgments entered against the defendants.

**SO ORDERED.**

Dated: NEW YORK, NEW YORK
11 December 2007

Victor Marrero
U.S.D.J.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs,

v.

THE PALESTINIAN AUTHORITY, et al.,

Defendants.

C.A. No. 00-105L

**DECLARATION OF PRIME MINISTER SALAM FAYYAD**

Pursuant to 28 U.S.C. § 1746, I, Salam Fayyad, declare as follows:

1. I am the Prime Minister of the Palestinian Authority. I first became Prime Minister on June 17, 2007.

2. I am an economist by training, having earned a doctorate in Economics in 1986 from the University of Texas. I also hold a masters degree from St. Edward's University in Austin, Texas. I earned my undergraduate degree from the American University in Beirut.

3. After obtaining my doctorate, I began my career teaching economics at Yarmuk University in Jordan. From 1987 through 1995, I worked for the International Monetary Fund (IMF) in Washington, D.C. From 1995 to 2002, I served as the IMF's Resident Representative for the West Bank and Gaza.

4. In 2002, I became the Finance Minister of the Palestinian government. I served in that position from 2002 through December 5, 2005.

5. During my service as Finance Minister, I became concerned about the manner in which cases like the instant one were affecting the finances of the Palestinian government,

particularly the finances of the Palestinian Pension Fund for the State Administrative Employees in the Gaza Strip. On June 18, 2005, I accordingly sent a letter to Secretary of State Rice requesting her assistance in these cases "consistent with the Constitution and laws of the United States." I emphasized in my letter that the attempt by plaintiffs' counsel to interfere with the actions of the Palestinian government around the world was "not supported by United States law, and also r[a]n counter to international law and the laws of several foreign states in which the PNA operates." I further explained to Secretary Rice my understanding at the time that the PNA's failure to "file an unqualified appearance and answer to plaintiffs' complaint" had occurred in order "to preserve our legal position both in the United States and overseas (with respect to potential efforts by Plaintiffs to seek enforcement of the default judgment in other countries)." At that time I sent this letter, controlling the positions taken by the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) in the litigation was not within the scope of my responsibilities. My focus as Finance Minister for the PA was solely on the immediate financial implications of the litigation and, as noted below, my role as Finance Minister ended not long after I sent the correspondence to Secretary Rice. I have attached a copy of my letter to Secretary Rice to this declaration.

6. On December 5, 2005, I left the Cabinet to found and lead a slate of candidates called "the Third Way." In 2006, I was elected to the Palestinian Legislative Council.

7. On December 21, 2006, I was appointed the head of the Economic Affairs Department in the PLO, and an observing member of the PLO's Executive Committee.

8. In March 2007, I was reappointed as Finance Minister by President Abbas.

9. In June 2007, I was appointed Prime Minister and the Minister of Finance, and I was reappointed to those positions in July 2007.

10. One of my current duties is to address the legal responsibilities of the PA and the PLO in connection with a number of pending lawsuits in the United States judicial system. I have been authorized by President Mahmoud Abbas to make decisions for both the PA and the PLO in connection with these lawsuits.

11. As part of my review of the litigation, I became aware that President Abbas had corresponded with Secretary of State Condoleeza Rice with respect to the ongoing litigation of this and other similar suits filed against it in the United States. As a result of this correspondence, Secretary Rice instructed President Abbas to "respond to U.S. legal proceedings in a good faith and a timely manner."

12. I have endeavored to ensure that all litigation in the United States courts is conducted in accordance with Secretary Rice's instructions going forward. To this end, after engaging in appropriate inquiries, I decided to retain new counsel for the PA and PLO to handle all of the United States lawsuits, to provide them with clear instructions about their responsibilities and duties with respect to the litigation, and to discharge predecessor counsel.

13. I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts. I personally commit to sustain this instruction throughout the effort to litigate these cases. It is my belief that there are meritorious defenses to the claims brought in the United States and it is important to the PA to present those defenses. Moreover, it is important to the PA's role in the international community to participate in the legal process, even when it is process brought in the United States for actions by others that occurred far from the United States. The importance of this was not fully appreciated by the PA government, as a whole, until

recently. Now we can act on that understanding, and we therefore seek to contest this litigation. fully and responsively.

14. I am aware that this declaration is being filed in support of a motion by the PA and PLO to vacate a default, in order to obtain the opportunity to defend the case on the merits. I have authorized the use of my declaration for such a purpose.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of December 2007, at Ramallah, Occupied Palestinian Territory.

Salam Fayyad
Prime Minister of the Palestinian Authority

# EXHIBIT C

The New York Times
nytimes.com

PRINTER FRIENDLY FORMAT SPONSORED BY

**December 18, 2007**

# $7.4 Billion Pledged for Palestinians

**By ELAINE SCIOLINO**

PARIS — Eighty-seven countries and international organizations pledged $7.4 billion in aid to the Palestinians on Monday, in the most ambitious fund-raising effort in more than a decade to help Palestinians create a viable, peaceful and secure state of their own.

The total is set to cover the next three years. The Palestinians had hoped to secure $5.6 billion in budgetary and development support over the next three years, but the amount pledged exceeded that figure.

Secretary of State Condoleezza Rice represented the United States at the one-day conference here.

The Palestinian president, Mahmoud Abbas, said at the conference that a "moment of truth" had arrived, urging the world to increase its aid for Palestinians — or risk disaster.

"Without this support, without the payment of aid that will allow the Palestinian treasury to fulfill its role, we will be facing a total catastrophe in the West Bank and Gaza," Mr. Abbas said.

In appealing for the financing, Prime Minister Salam Fayyad, an economist appointed to lead the Palestinians' caretaker government, formally presented his new recovery plan for economic, institutional and security reform for a future Palestinian state.

The total for 2008 alone, according to the conference's final declaration, was $3.4 billion.

The United States pledged $555 million for 2008, up from $75 million this year. "The Palestinian Authority is experiencing a serious budgetary crisis," Ms. Rice said. "This conference is literally the government's last hope to avoid bankruptcy."

However, the American pledge was misleading, because much of it had been announced previously by the White House but has not been approved by Congress.

The European Union, the largest aid donor to the Palestinians, pledged $650 million for 2008. Separately, European nations made three-year pledges, including France and Sweden at $300 million each, Britain $500 million, Norway $420 million, Spain $360 million and Germany $200 million.

In a move significant both practically and symbolically, the Saudis pledged $500 million over three years.

Many countries do not fulfill pledges that they make at such conferences. Egypt and other Arab countries are known for pledging funds to the Palestinian Authority that they do not deliver.

The donors' meeting is a high-profile effort to build on the momentum of peace talks with Israel last month

in Annapolis, Md., where the Bush administration played host. Those talks were the first serious negotiations between Israel and the Palestinians in years, and the two sides pledged to seek a final peace agreement by the end of 2008.

The event on Monday was the largest Palestinian donor meeting since 1996, and the latest in a string of aid-raising events for the Palestinians over the years. The Palestinians are one of the highest aid-dependent populations in the world, according to a new World Bank report.

Despite the aid pledges, the Palestinian economy will continue to contract unless Israel eases its blockage of the Gaza Strip and removes crucial internal checkpoints to allow Palestinians to move freely in the West Bank, the World Bank cautioned in the report.

The World Bank estimated that without such measures, the Palestinian gross domestic product would probably contract by 2 percent annually over the next five years. If Israel does ease the restrictions, and if the Palestinians put promised reforms in place, the economy could grow by 5 percent a year, the report added.

Mr. Abbas, in his remarks, appealed to Israel to take a number of concrete measures, including a freeze on all settlements in the Palestinian territories, the dismantling of what he identified as "wildcat settlements," a halt to construction of Israel's barrier of separation and the release of more Palestinian prisoners.

The fund-raiser on Monday was also a chance for President Nicolas Sarkozy of France to play diplomatic maestro, backslapping delegates and greeting Ms. Rice with kisses on both cheeks as he opened the conference.

"Our aim is not to perpetuate assistance to the Palestinians indefinitely," said Mr. Sarkozy, who calls himself a close friend of Israel. To that end, he called for Israel to allow freedom of movement of people and goods and to immediately freeze all settlement construction on the West Bank.

"I must insist on this point: it is in Israel's best interest, provided its own security is not threatened, to foster a normal existence in the West Bank," he said. "This alone will enable the Palestinians to work, to stop ruminating on their humiliation, to curb the violence and trafficking and to regain their zest for life."

As for the Palestinians, Mr. Sarkozy told them to live up to their promises to maintain "law and order over its territory" and to overhaul their security services.

*Stephen Castle reported from Brussels and Graham Bowley reported from New York. Isabel Kershner contributed reporting from Jerusalem.*

Copyright 2007 The New York Times Company

# EXHIBIT D

washingtonpost.com

# Conferees Pledge $7.4 Billion in Aid to Palestinian Authority

By John Ward Anderson
Washington Post Foreign Service
Tuesday, December 18, 2007; A13

Advertisement



PARIS, Dec. 17 -- Countries and international organizations pledged $7.4 billion in assistance to the impoverished Palestinian Authority at a conference in Paris on Monday, saying that an infusion of cash would help the peace process begun by the United States last month in Annapolis, Md.

The giving topped the pre-conference goal of $5.6 billion for the next three years. But some delegates said that pumping money into the West Bank and Gaza Strip would not lead to long-term economic growth or political moderation as long as Israel continued expanding Jewish settlements and imposing a regime of checkpoints and closures that was strangling the Palestinian economy.

Israeli Foreign Minster Tzipi Livni said it was a two-way street.

"We do not want the image of Israel in the Palestinian mind to be a soldier at the checkpoint. But we know making every effort to improve quality of life also means making every effort to end the threat to life posed by terror and violence," she said. "Economic advancement and personal security must be advanced together."

Gloomy economic reports and the back-and-forth over long-standing disputes underscored the challenges Israelis, Palestinians and their intermediaries face in meeting the key goal of Annapolis: forging an independent Palestinian state and a lasting peace agreement by the end of 2008.

"This is the most promising opportunity to seek peace that we have had in nearly seven years, and we need to seize it," said U.S. Secretary of State Condoleezza Rice in announcing $555 million in U.S. assistance. Much of the U.S. contribution had been previously announced by the White House and must still be approved by Congress.

"For these efforts to succeed, the continued and unwavering support of the international community is absolutely vital," she said. "This conference is literally the [Palestinian] government's last hope to avoid bankruptcy."

"Economic development is the best guarantee of lasting peace and long-term security for Israel," said French President Nicolas Sarkozy, the conference host. He pledged $300 million to the Palestinians over the next three years and called on Israel to end its occupation of the West Bank, freeze settlement expansion, and reopen checkpoints and barriers "to allow the economy there to breathe."

Other commitments at the one-day meeting included nearly $300 million from Germany, $120 million

from Japan and $640 million from the 27-member European Union over and above what individual member governments pledged.

In seeking $5.6 billion in assistance for 2008-2010, the Palestinians said about 70 percent of the funds would be for budgetary shortfalls and the rest for development assistance. Palestinian Authority Prime Minister Salam Fayyad said that funding would help the government rebuild institutions, cut back on the state payroll, reduce subsidies and implement other economic reforms.

An American official said that U.S. money would be paid through the United Nations and nongovernmental organizations and that $150 million in budget support would be paid directly to the Palestinian Authority. U.S. money also would fund government salaries and humanitarian aid in the Gaza Strip, the official said. But it was unclear how much of the $7.4 billion pledged Monday would go to Gaza, which is controlled by Hamas, a radical Islamic group whose forces expelled the Palestinian Authority from the strip in June.

Events that followed the Nov. 27 Annapolis conference contributed to Palestinian resentment here and in the territories leading up to the Paris meeting. A week after both sides pledged to adhere to the U.S.-backed "road map" for peace -- a plan launched in 2003 that calls for Israel to stop settlement activities and for Palestinians to disarm militant groups and boost security -- Israel announced the construction of more than 300 homes on occupied land on the outskirts of Jerusalem.

"I'll be eager to implement all our commitments under the road map, and I expect the Israeli side to do the same, comprehensively, and without excuses from our side or theirs," Palestinian Authority President Mahmoud Abbas told the delegates. "I expect them to stop all settlement activities, without exceptions."

*Staff writer Glenn Kessler in Washington contributed to this report.*

**Post a Comment**

View all comments that have been posted about this article.

You must be logged in to leave a comment. Login | Register

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2007 The Washington Post Company

Ads by Google

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-20225-CIV-SEITZ/TURNOFF**

MOSHE SAPERSTEIN, *et al.*,

Plaintiff,

v.

THE PALESTINE AUTHORITY, *et al.*,

Defendants.

**DECLARATION OF AHMAD ABDEL-RAHMAN**

Pursuant to 28 U.S.C. § 1746. I, Ahmad Abdel-Rahman, declare as follows:

1. I am an official with a substantial knowledge about the organizational structure of Palestinian government over the last ten years. Over the period 1996-2003. I was Secretary-General of the Palestinian Authority Cabinet of Ministers which was presided over by the late President Yasser Arafat, In 2003, I was appointed political advisor to President Arafat and until his death in November 2004. Ever since - and to date- I have been political advisor to President Arafat's successor, President Mahmoud Abbas. I am also aware that a number of lawsuits similar to the instant one have been filed in the United States against the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) since the year 2000. The purpose of this declaration is to provide information about the significant institutional obstacles the PA and PLO faced in effectively defending these lawsuits in the United States. I am aware my declaration is being filed in connection with the litigation and I have authorized its use for such a purpose.

2. The Palestinian Authority was established in 1994, pursuant to the Oslo accords, as an interim administrative entity which had the mandate of administering a limited form of Palestinian self-governance in the Occupied Palestinian Territories for a period of five years. The Palestinian Authority (PA) had security-related and civilian authority in areas of the West Bank designated as Areas A, which by September 2000 comprised only 17% of the West Bank.

3. In the six years following its creation, the PA had developed an administrative and governmental structure but power remained mainly centralized in one leadership figure, namely the late Yasser Arafat, notwithstanding the creation of a number of institutional frameworks through which power was meant to devolve. By the year 2000, when the political process between Israel and the PLO had reached its height, the Palestinian Authority was still in the beginning stages of developing the sort of institutional structure characteristic of mature governments like that of the United States.

4. In late 2000, however, violence broke out in the region and Israeli Defense Forces began to engage in bombing raids and other actions against the main elements of the Palestinian government. Without regard to the basis for the Israeli raids and actions, the inescapable fact is that, as result of them, by January 2002, the security situation in the Occupied Palestinian Territories approached lawlessness and anarchy, and the organizational structure of the entire government had deteriorated significantly. An upshot of this escalation in violence was the destruction and/or paralysis of many fledging institutions of the Palestinian governing system.

5. By 2004, two years after Yasser Arafat was besieged in Government Headquarters (Muqata'a) with most of its buildings and official documents looted or destroyed by the besieging Israeli Army, no permanent institutional structure of Palestinian government existed for handling domestic and foreign legal actions brought against the Palestinian government. No person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits.

6. In the Fall of 2004, President Arafat became ill and died. Between 2000 and 2004, and as result of the siege on him and his office as well as the re-occupation of the PA areas by the Israeli military forces, President Arafat's power progressively lost what institutionalization it previously had . After he died, there was significant disarray and instability in the government. This void in governmental decision-making persisted well after his death.

7. Following President Arafat's death, Mahmoud Abbas was elected to the Presidency and took office in January 2005. President Abbas also became Chairman of the PLO. One of President Abbas' goals was to establish the sort of organizational structure and permanency that is characteristic of modern governments.

8. In April 2005, Dr. Rafiq Husseini became Chief of Staff under President Abbas. After assuming this role, Dr. Husseini conducted a review of the institutional structure in place

and determined that building the institutions of a modern government would be a long-term and difficult task, particularly in light of the political turmoil that both preceded and followed President Arafat's death. With the support of President Abbas, Dr. Husseini began the laborious process of creating an organizational entity within the President's office responsible for, *inter alia*, defending domestic and foreign lawsuits brought against the Palestinian government.

9. The process of creating such an institution has proven difficult and lengthy, particularly in light of all of the other organizational and structural challenges faced by the Palestinian government. This challenge has been compounded by a lack of familiarity in the Palestinian legal community with the American legal system. Much of the government's focus in 2005 consisted of creating the infrastructure necessary to conduct domestic elections within the Occupied Territories. Then-Finance Minister Salam Fayyad was also focused at the time on significant efforts to reform the financial system. The overall problems in the Occupied Territories were extremely serious. As a result of many factors, the Occupied Territories were suffering from substantial unemployment and poverty. Chronic diseases surged, childhood malnutrition increased and the number of households with safe drinking water dropped substantially over the period. Thus, the creation of an institutional structure for responding to the lawsuits in the United States was only one of many crises facing the Palestinian government between 2005 and 2007.

10. In such an environment, it was difficult to create the sort of permanent governmental institutions needed to respond to litigation in a foreign country. Thus, while the Palestinian government had begun substantial efforts to create a modern governmental structure

in April 2005, and while this effort included the goal of creating a permanent entity designed to respond to foreign litigation, no such structure existed throughout the year 2006. Instead, various high-level governmental decision-makers were contacted about the litigation from time-to-time in response to particular problems. These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit.

11. The legislative elections in early 2006 created additional organizational difficulties. As a result of those elections, many foreign governments began an economic and political boycott of portions of the Palestinian government that had dealings with the Islamic Resistance Movement (HAMAS), which had won the elections. The election results thus greatly added to the challenges facing President Abbas with regard to the creation of permanent governmental institutions, particularly in light of the longstanding antagonistic relationship between the PA/PLO on one hand, and HAMAS on the other.

12. By the end of 2006, the Office of the President had begun in earnest the restructuring of the office, and it became clear the Palestinian government urgently needed an institutional framework for responding comprehensively to the litigation in the United States. Clear and direct lines of authority were needed. The failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment.

13. In early 2007, as a result of the confusion that arose due to the absence of clear lines of responsibility in connection with the U.S. litigation, and also as a result of President Abbas' inquiries to Secretary Rice seeking guidance with respect to the lawsuits, President Abbas decided to place authority for the litigation in the hands of a single decision-maker. President Abbas thus delegated to Salam Fayyad, Prime Minister and Finance Minister of the PA and head of the Economic Affairs Department of the PLO, the authority to oversee litigation in the United States against the PA and PLO. Prime Minister Fayyad discharges those responsibilities today.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20th day of December 2007, at Ramallah, Palestinian Authority, Occupied Palestinian Territory.

AHMAD ABDEL-RAHMAN

# EXHIBIT F

**The American Presidency Project**
*John T. Woolley & Gerhard Peters • University of California at Santa Barbara* **americanpresidency.org**

**• William J. Clinton**

**Executive Order 12947—Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process**

*January 23rd, 1995*

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.), and section 301 of title 3, United States Code,

I, William J. Clinton, President of the United States of America, find that grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and hereby declare a national emergency to deal with that threat.

I hereby order:

Section 1. Except to the extent provided in section 203(b) (3) and (4) of IEEPA (50 U.S.C. 1702(b) (3) and (4)) and in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date: (a) all property and interests in property of:

(i) the persons listed in the Annex to this order;

(ii) foreign persons designated by the Secretary of State, in coordination with the Secretary of the Treasury and the Attorney General, because they are found:

(A) to have committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process, or

(B) to assist in, sponsor, or provide financial, material, or technological support for, or services in support of, such acts of violence; and

(iii) persons determined by the Secretary of the Treasury, in coordination with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of, any of the foregoing persons, that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of United States persons, are blocked;

(b) any transaction or dealing by United States persons or within the United States in property or interests in property of the persons designated in or pursuant to this order is prohibited, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of such persons; (c) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order, is prohibited.

Sec. 2. For the purposes of this order: (a) the term "person" means an individual or entity; (b) the term "entity" means a partnership, association, corporation, or other organization, group, or subgroup; (c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and (d) the term "foreign person" means any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States) or any entity not organized solely under the laws of the United States or existing solely in the United States, but does not include a foreign state.

Sec. 3. I hereby determine that the making of donations of the type specified in section 203(b)(2)(A) of IEEPA (50 U.S.C. 1702(b)(2)(A)) by United States persons to persons designated in or pursuant to this order would seriously impair my ability to deal with the national emergency declared in this order, and hereby prohibit such donations as provided by section 1 of this order.

Sec. 4. (a) The Secretary of the Treasury, in consultation with the Secretary of State and, as appropriate, the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the

Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order. (b) Any investigation emanating from a possible violation of this order, or of any license, order, or regulation issued pursuant to this order, shall first be coordinated with the Federal Bureau of Investigation (FBI), and any matter involving evidence of a criminal violation shall be referred to the FBI for further investigation. The FBI shall timely notify the Department of the Treasury of any action it takes on such referrals.

Sec. 5. Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

Sec. 6. (a) This order is effective at 12:01 a.m., eastern standard time on January 24, 1995. (b) This order shall be transmitted to the Congress and published in the Federal Register.

William J. Clinton
The White House,
January 23, 1995.

[Filed with the Office of the Federal Register, 10:10 a.m., January 24, 1995]

**Citation:** John T. Woolley and Gerhard Peters, *The American Presidency Project* [online]. Santa Barbara, CA: University of California (hosted), Gerhard Peters (database). Available from World Wide Web: (http://www.presidency.ucsb.edu/ws/?pid=51612).

# EXHIBIT G

# PATTERNS OF GLOBAL TERRORISM 1995

April 1996

United States Department of State

**Peru**

Peruvian Government security forces in 1995 continued to reduce the activities of Peru's terrorist organizations—Sendero Luminoso (Shining Path or SL) and the Tupac Amaru Revolutionary Movement (MRTA). Numerous detentions, casualties, and defections further weakened the two groups, and continued arrests of several terrorist leaders kept the level of violence by these groups low compared to previous years. Most of the violence in 1995 took place in rural areas, particularly the coca-rich Upper Huallaga Valley. Violence in Lima and other cities declined. In Lima there were two car bombings, the lowest number in years.

Police arrests helped disrupt Sendero's terrorist plans for the national elections in April 1995. In a major coordinated operation, counterterrorist police arrested approximately 20 members of Sendero Luminoso in the cities of Lima, Callao, Huancayo, and Arequipa. Among those captured was Sendero Central Committee member, and number-two leader of Sendero militants still at large, Margi Clavo Peralta. Clavo later publicly announced her support for peace talks with the government, which jailed Sendero leader and founder Abimael Guzman first advocated in 1993.

Three years after the capture of SL chieftain Guzman, the Maoist terrorist group is struggling, attempting to rebuild and resolve its leadership problems. Sendero Luminoso has become less active, its operations smaller and less sophisticated. While SL's capability to target international targets has diminished, it retains the capability to cause considerable harm, and its "anti-imperialist" animus has not changed. In May the group detonated a car bomb in front of a luxury Lima hotel, killing four and injuring several dozen persons. In July, Sendero terrorists killed a Peruvian employee of a US mining company after seeking by name a US geologist who had left the site a few days earlier.

On 1 December the number-two leader of MRTA still at large, Miguel Rincon, surrendered to police after a firefight that followed a raid of a MRTA safehouse. The police arrested more than a dozen other MRTA members and uncovered weapons and explosives in the residence. The police effort inflicted a severe blow to the weakened terrorist organization, disrupting its plans to conduct attacks.



*Hotel Maria Angola, Lima, site of Sendero Luminoso (SL) car bombing on 24 May.* AP ©

**Middle East Overview**

The deadliest terrorist attack against US interests in the Middle East since the 1983 bombing of the Marine barracks in Beirut took place on 13 November in Riyadh, Saudi Arabia. A vehicle bomb badly damaged the headquarters of the Office of the Program Manager/Saudi Arabian National Guard (OPM/SANG), a military training mission. Seven persons, including five US citizens, were killed and 42 were wounded. Several shadowy groups, including the "Islamic Movement for Change,"



AP ©



AP ©

*Damaged headquarters of the Office of the Program Manager/Saudi Arabian National Guard (OPM/SANG) in Riyadh.*

claimed responsibility for the incident. Saudi Arabian authorities are aggressively investigating the incident in close cooperation with the Federal Bureau of Investigation.

Fatalities from extremist violence in Egypt rose slightly above 1994 totals. Nevertheless, Egyptian authorities continued a successful crackdown against extremists, arresting some important leaders and confining violence to upper Egypt. In November, al-Gama'at al-Islamiyya (the Islamic Group or IG) renewed efforts to target Egypt's tourist industry. In two shooting attacks against trains traveling through Qina and Al Minya Governorates in upper Egypt, two Europeans and 10 Egyptians were wounded.

For the first time, Egyptian extremists extended their campaign of violence outside Egypt's borders. The IG claimed responsibility for an assassination attempt against Egyptian President Hosni Mubarak in Ethiopia in June, and in November the Egyptian Embassy in Islamabad, Pakistan, was bombed, killing 16 and wounding 60. Both the IG and the Jihad Group claimed responsibility for this attack.

In Algeria widespread terrorism continued the trend of recent years. Armed insurgents turned increasingly to the use of indiscriminate bombings in their offensive against the government, deemphasizing their reliance on military-style attacks on Algerian security units. While attacks against foreigners in Algeria decreased overall, Islamic militants expanded their offensive to include targets overseas and US targets in Algeria. In November, Islamic militants set fire to a US Embassy warehouse; this was consistent with threats against foreign—including US—interests in Algeria issued by the Armed Islamic Group (GIA). The same group is suspected of responsibility for the murder in Paris in July of a prominent activist from the Islamic Salvation Front—another Algerian Islamist opposition group—as well as a bombing campaign in Paris that killed eight persons and wounded scores.

Elsewhere in North Africa, incidents of terrorist violence were low. Tunisian authorities maintained effective control of the internal security situation and, in particular, closely followed the activities of the Tunisian Islamic Front, which claimed responsibility for the murders of four policemen and has warned all foreigners to leave Tunisia. In Morocco, an Egyptian detonated a bomb in the consular section of the Russian Embassy, evidently to protest Russian policy in Chechnya. Islamic extremists continued efforts to smuggle weapons through Morocco into Algeria to support extremists there.

In Israel and the occupied territories/Palestinian autonomous areas, incidents of political violence and terrorism continued to plague the Palestinian-Israeli peace

process. On 4 November, a Jewish Israeli extremist assassinated Prime Minister Yitzhak Rabin at a pro-peace rally in Tel Aviv. In subsequent statements the assassin said he acted to protest Rabin's peace process policies.

The overall number of anti-Israeli attacks declined to 33 in 1995 from 79 in 1994 due to a change in the nature of attacks, that is, less frequent but more lethal suicide bombings. Casualty figures thus remained high, with 45 Israeli soldiers and civilians killed, two US civilians killed, and nearly 280 persons wounded in 1995, compared to 55 persons killed and more than 150 wounded in the previous year. The Islamic Resistance Movement (HAMAS) and the Palestine Islamic Jihad (PIJ) claimed responsibility for most of these attacks, including several devastating suicide bombings. Chairman Yasir Arafat's Palestinian Authority (PA) launched a campaign to crack down on Islamic militants while at the same time initiating political dialogue with HAMAS to bring it into the political process. HAMAS announced a temporary suspension of military activities in August while engaging in talks with the PA; there were no major HAMAS attacks against Israelis through the end of 1995.

Lebanon witnessed small improvements in the internal security situation during the year, including in Beirut. Despite government efforts to extend its control, however, many parts of the country remained outside the central government's authority. The terrorist organization Hizballah has yet to be disarmed and still operates freely in several areas of the country, particularly the south. Incidents of internal political violence continued to trouble many parts of the country.

**Algeria**

The security situation in Algeria did not improve substantially in 1995. Accurate casualty figures are difficult to acquire, but as many as 50,000 Algerians—militants, security personnel, and civilians—have died as a result of the nearly four-year-old insurgency. Islamic extremists slowed their attacks against foreign nationals inside Algeria in 1995, but suspicions centered on the Algerian Armed Islamic Group (GIA) for a series of terrorist attacks in France in July, September, and October.

Last year extremists carried out their first attack against a US target in Algeria since Islamic militants began targeting foreigners in 1993. On 9 November, Islamic extremists set fire to a warehouse belonging to the US Embassy. The militants threatened the life of the Algerian security guard because he was working for the United States, and they specifically demanded to know whether there were any US citizens present. The GIA probably carried out the attacks. The group had threatened to strike US and other foreign targets in Algeria, and the modus operandi of the attack was consistent with past GIA operations against foreign facilities.



*The Armed Islamic Group (GIA) is suspected of a truck bomb explosion that killed four persons and injured at least 80 in a suburb of Algiers on 2 September.* Wide World ©

The GIA was responsible for the deaths of 31 foreigners in Algeria in 1995, compared to at least 64 in 1994. Most of the foreigners killed were "soft targets," such as teachers and nuns. From July to October a terrorist bombing campaign in France began against civilian targets, killing eight persons and wounding 160. Suspicion centered on the GIA as a protest of French support for Algiers. Suspicion also focused on the GIA for the death of FIS leader Abdelbaki Sahraoui in Paris in July; the group earlier had published Sahraoui's name in a list of FIS members marked for death due to their conciliatory posture toward negotiating with the Algerian regime.



*The GIA also is suspected of exploding this car bomb in another suburb of Algiers on 4 September.* Wide World ©

Algerian militants changed their tactics slightly in 1995, relying more heavily on the use of homemade bombs—especially car bombs—and decreasing their reliance on more traditional military-style attacks on Algerian security units. The GIA claimed responsibility for the suicide car bombing of a police headquarters in downtown Algiers in January that killed more than 40 persons. Insurgents stepped up attacks on infrastructure targets this year, disabling bridges and electric power facilities throughout the country. In May, GIA commandos attacked foreign workers along a newly constructed gas pipeline, killing five. The GIA continued its attacks against civilian targets, killing women for refusing to wear the *hidjab*, intellectuals, and others it perceived as "cooperating" with the regime and "spreading Western influence." Over 25 journalists were killed in 1995, making Algeria the most dangerous place in the world for practitioners of this profession.

Violence in Algeria slowed significantly in the weeks before the presidential election on 16 November, primarily because of extraordinary measures employed by the security services. As these security measures were relaxed, however, Algeria's fragmented Islamic movement continued to attack foreigners; two Latvian sailors were shot within two weeks after the elections.

**Egypt**

Fatalities from Islamic extremist violence rose slightly in 1995, with the number of victims—including noncombatants and police—and extremists killed increasing from 286 in 1994 to 375 in 1995. Violence primarily was confined to provinces in upper Egypt; there were no attacks in Cairo or urban areas further north.

Al-Gama'at al-Islamiyya (Islamic Group or IG) continued to be the most active Islamic extremist organization in Egypt in 1995. All attacks occurred in upper Egypt, with much of the violence shifting from Asyu't—the previous center of conflict—to Al Minya Governorate, specifically around Mallawi. Some attacks also occurred in Qina Governorate. Police and security elements were the focus of many attacks. The IG also is believed to have been the culprit in the deaths of at least 28 Coptic Christians and at least 20 Muslims alleged to be police informants. In November, the IG also resumed its efforts to damage Egypt's tourist industry, claiming responsibility for two shooting attacks that month against trains traveling through Qina and Al Minya Governorates to tourist sites in upper Egypt. Two Europeans and 10 Egyptians were wounded in the attacks. The IG claims of responsibility were accompanied by warnings for all foreign tourists to leave the country.

Egypt has stepped up its counterterrorist campaign, preventing Islamic extremists from carrying out attacks in Cairo and other urban areas to the north. A police sweep in Al Minya in September resulted in the arrest of a key leader of the IG's military wing, who had been sought since the assassination of President Anwar Sadat in 1981.

During 1995, Egyptian Islamic extremist groups took their campaign of violence outside Egypt for the first time. The IG claimed responsibility for an assassination attempt against Egyptian President Hosni Mubarak in Ethiopia on 26 June. The IG also took responsibility for a car bombing in Rijeka, Croatia, in October that injured 29 Croatian nationals and killed the car's driver. The IG accused the Croatian Government of having arrested a visiting Gama'at member who had been living in Denmark. Both the IG and the Jihad Group claimed responsibility for the bombing on 19 November of the Egyptian Embassy in Islamabad, Pakistan. Sixteen persons were

*Both al-Gama'at al-Islamiyya (IG) and the Jihad Group claimed responsibility for setting off a powerful car bomb that devastated the Egyptian Embassy in Islamabad, killing 16 and wounding 60.*



*Damaged interior of the embassy.* AP©



AP©

killed in the attack and another 60 were injured. The previously unknown International Justice Group also took responsibility for the bombing in Pakistan, as well as for the shooting death of an Egyptian diplomat in Geneva on 13 November.

**Israel and the Occupied Territories/Palestinian Autonomous Areas**

Yigal Amir, a Jewish extremist associated with the little-known "Fighting Jewish Organization" (EYAL), assassinated Prime Minister Yitzhak Rabin at a propeace rally in Tel Aviv on 4 November. Amir claimed to have acted alone, but Israeli security forces charged several other alleged conspirators. Israel also stepped up its investigations of EYAL and other extremist groups that may have had a hand in the murder. Kach and Kahane Chai—which Israel outlawed as terrorist groups after the Hebron massacre in February 1994—remained active in 1995, though they maintained lower profiles.

The overall number of anti-Israeli attacks instigated by Palestinians declined to 33 in 1995 from 79 in 1994 due to a change in the nature of attacks, that is, to less frequent but more lethal suicide bombings. Casualty figures remained high, with 45 Israeli soldiers and civilians and two US citizens killed and nearly 280 persons wounded in 1995, compared to 55 persons killed and more than 150 wounded the previous year. The increased lethality of the attacks was due mainly to Palestinian extremist groups' increased use of suicide bombings, which killed 39 and wounded 252.

The Islamic Resistance Movement (HAMAS) conducted five major anti-Israeli attacks in 1995 as part of its campaign to derail the peace process. The group claimed responsibility for three devastating suicide bombings, including the bombing on 21 August of a bus in Jerusalem's Ramat Eshkol neighborhood that resulted in the death of a US citizen, Joan Davenny, and three Israelis, and the wounding of more than 100 civilians. Following that operation, HAMAS temporarily suspended its military activities and entered into talks with the Palestinian Authority (PA), in which HAMAS discussed the possibility of ending anti-Israeli attacks and participating in the Palestinian elections on 20 January 1996. There were no major HAMAS attacks against Israelis from the August suicide bus bombing through the end of 1995.

*Commuter bus damaged by a suicide bomb explosion in Tel Aviv in July.*



AP©

Other Palestinian groups that reject the peace process also attacked Israelis. The Palestine Islamic Jihad (PIJ)-Shaqaqi Faction claimed responsibility for five suicide bombings that killed a total of 29 persons and wounded 107. One bus bombing on 9 April killed a US citizen, Alisa Flatow, and seven Israelis and wounded 41 other persons. Although the group suffered a strong blow when its leader, Fathi Shaqaqi, was assassinated in Malta on 26 October, it remained capable of striking at Israeli targets. On 2 November, the PIJ carried out two suicide bomb attacks against Israeli targets in Gaza to retaliate for Shaqaqi's murder, which the group believes Israel sponsored. No Israelis were killed in the attacks. The Democratic Front for the Liberation of Palestine (DFLP) and the Popular Front for the Liberation of Palestine (PFLP) also claimed responsibility for several attacks against Israelis that occurred outside Palestinian Authority (PA) held areas in the West Bank.

The PA increased its effort to rein in Palestinian violence against Israelis in 1995. The PA security apparatus stepped up its campaign to register and confiscate weapons, thwart terrorist plots, and convict Palestinians responsible for anti-Israeli acts. The PA thwarted a PIJ attack planned for 10 June. In August, the Palestinian Police Force arrested a HAMAS terrorist who was preparing a bomb to be set off in Israel. Arafat and other senior PA officials regularly condemned acts of terrorism as they occurred, especially the Rabin assassination.

Israel's vigilant border security appeared to effectively prevent infiltrations from Syria, Lebanon, and Jordan. Israeli troops on 12 August, for instance, captured a heavily armed guerrilla attempting to infiltrate into Israel from Jordan. Hizballah and Palestinian rejectionist groups continued to launch occasional—nine times in 1995—Katyusha rocket salvos into northern Israel from southern Lebanon. The most serious rocket attacks occurred in November, when militants in Lebanon fired 30 to 40 Katyushas into northern Israel over a two-day period, wounding six Israeli civilians.

**Jordan**

Jordanian security and police closely monitor secular and Islamic extremists inside the country, detaining individuals suspected of involvement in violent acts aimed at destabilizing the government or its relations with other states. Jordanian authorities detained dozens of persons in terrorist-related cases in 1995, including six members of the Islamic Renewal Movement planning to attack foreign interests and two individuals



*The wreckage of an Israeli bus following a Palestinian suicide bomb attack in Gaza on 2 November.* AP ©

suspected of shooting a French diplomat in February. In late July, Jordan arrested a suspect in the World Trade Center bombing, pursuant to a request from the United States, and rendered him to US law enforcement authorities in early August.

Jordan's peace treaty with Israel—signed on 26 October 1994—commits the two parties to cooperate against terrorism. Amman maintains tight security along its border with Israel and has stopped individuals attempting to infiltrate into the West Bank.

Several Palestinian rejectionist groups maintain a closely watched presence in Jordan, including the Palestine Islamic Jihad (PIJ), Democratic Front for the Liberation of Palestine (DFLP), Popular Front for the Liberation of Palestine (PFLP), Popular Front for the Liberation of Palestine–General Command (PFLP-GC), and the Islamic Resistance Movement (HAMAS). The government in April warned HAMAS spokesman Ibrahim Ghawsha, a Jordanian citizen, not to issue statements supportive of anti-Israeli violence, as this was in violation of Jordanian law. Under that law, Jordan expelled two senior HAMAS leaders in May for making inflammatory statements against Israel. The two did not hold Jordanian citizenship.

**Lebanon**

There was incremental improvement in the Lebanese security environment in 1995 as the Lebanese Government struggled to expand its authority throughout the country. The situation in the Beirut metropolitan area is somewhat improved but remains dangerous. Large sections of Lebanon, however, remain effectively beyond the central government's control. There is a risk to Westerners, in particular, in uncontrolled areas such as in the south and the Al Biqa' (Bekaa Valley). An unknown number of Lebanese civilians were killed, injured, or displaced in the fighting in southern Lebanon this year.

While the government has limited the activities of many violent individuals and groups in Lebanon, the terrorist organization Hizballah has yet to be disarmed and continues to operate as a separate polity within the country. For example, Hizballah has announced that it will operate a separate judicial system based on Islamic jurisprudence within areas under its direct control.

Hizballah's animosity toward the United States continues. In its public rhetoric, the group routinely denounces the United States. In March, Hizballah leader Fadlallah stated that Hizballah "continue(s) to oppose US policy everywhere." Hizballah also continues to make public statements condemning the Middle East peace process.

Militia personnel in February kidnapped two individuals and held them for four days before releasing them. Thousands of people seized during the Lebanese Civil War remain unaccounted for.

Ahmad al-Assad'ad, the son of former Lebanese Parliament speaker Kamel al-Assad'ad, apparently escaped injury on 3 July when handgrenades were thrown at him during a rally in Nabatiyah in southern Lebanon.

In August gunmen shot and killed Shaykh Nizar al-Halbi, the chairman of the Sunni fundamentalist group "Islamic Charitable Projects Association," as he left his home in a West Beirut neighborhood. A group calling itself the "Usama Kassass Organization" claimed responsibility. Two suspects subsequently were arrested.

A car bombing in Jibshit killed a local Hizballah security official in November. No one has claimed responsibility for the attack.

In December, Lebanese security forces reportedly broke up a terrorist ring operating in northern Lebanon. This ring was planning to begin a violent campaign of assassinations and bombings that month.

There were developments in several terrorism trials. In May, the Judicial Council trying Lebanese Forces Leader Samir Ja'ja on charges of domestic terrorism—for the bombing in February 1994 of a Maronite Church in Zuq Mikha'il that killed 11 and wounded 59—issued an indefinite continuance (Sine Die) that suspended the trial. A second defendant, Lebanese Forces Deputy Commander Fu'ad Malik, was granted bail on 17 May for medical reasons. Ja'ja remains imprisoned for the assassination of Dany Chamoun, a political rival, in 1990.

In June, Lebanon's Permanent Military Court sentenced (in absentia) two defendants to death for the Beirut car bombing in December 1994 that killed Hizballah member Fu'ad Mughniyah and two others. Two other defendants received prison sentences.

By the end of the year, following a number of postponements, a Lebanese court was set to proceed with the trial of three members of the Popular Front for the Liberation of Palestine (PFLP) for the murders in 1976 of US Ambassador to Lebanon Francis E. Meloy and US diplomat Robert O. Waring.

Several Palestinian groups that use terrorism to express their opposition to the Middle East peace process maintain an active presence in Lebanon. These include the Islamic Resistance Movement (HAMAS), the Abu Nidal organization (ANO), the Palestine Islamic Jihad (PIJ), and the Popular Front for the Liberation of Palestine–General Command (PFLP-GC). These organizations conduct terrorist training in southern Lebanon.

**Morocco**

There were few terrorist-related incidents in Morocco in 1995. The first terrorist attack against a foreign diplomat in Morocco since 1985 occurred on 28 February, however, when an Egyptian citizen detonated a bomb strapped to his body at the consular department of the Russian Embassy. Although Moroccan officials initially suspected that the bomber had ties to Islamic militants, subsequent investigations led Moroccan officials to believe that the man was acting alone, and that the attack was carried out to demonstrate his solidarity with the Chechen people.

Islamic extremists in Morocco continued their efforts to smuggle weapons into Algeria to support Islamic opposition elements there. In mid-October, Moroccan authorities arrested 16 persons in the eastern province of Oujda whom the Moroccans alleged were transporting weapons to Algeria's Islamic Salvation Front. Four of those arrested were Algerians, strengthening the government claims that the arms were intended for Algerian insurgents.

**Saudi Arabia**

On 13 November, a car bomb exploded outside the Riyadh headquarters of the Office of the Program Manager/ Saudi Arabian National Guard (OPM/SANG). Seven persons died in the blast, five of whom were US citizens, and 42 were injured. At least three groups claimed responsibility for the attack, including the Islamic Movement for Change, the Tigers of the Gulf, and the Combatant Partisans of God. The Saudi Government is aggressively investigating this attack with the assistance of the Federal Bureau of Investigation.

**Tunisia**

Tunis maintained effective control of the security situation in 1995, paying special attention to Islamic dissidents, but did not prosecute any individuals for specific acts of terrorism. In May the extremist Tunisian Islamic Front (FIT) issued a warning that all foreigners in Tunisia should leave, but it did not follow up with any concrete threats or attacks. The group also claimed responsibility for a number of operations in Tunisia, including the murders of four policemen. Tunisian authorities have not confirmed or denied the claims.

There are allegations that the FIT is working in conjunction with the Algerian Armed Islamic Group (GIA), and that its members may be training in GIA camps. Several Tunisians were taken into custody in 1995 for alleged involvement with the GIA network in Europe. The FIT

claimed responsibility for an attack in February against a Tunisian border post on the Tunisia-Algeria border in which seven border guards were killed, but some officials blame the GIA—possibly in conjunction with the FIT—for the attack. As of 31 December, there were no similar incidents.

**Overview of State-Sponsored Terrorism**

The United States and its allies continue to focus on raising the costs for governments that support, tolerate, and engage in international terrorism. It is widely recognized that state support for terrorist groups enhances their capabilities and makes law enforcement efforts to counter terrorism more difficult. To pressure states to stop such support, US law imposes trade and other restrictions on countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism by supporting, training, supplying, or providing safehaven to known terrorists. The United States currently lists Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria as state supporters of terrorism. The list is sent annually to Congress, although countries can be added or removed at any time circumstances warrant.

Cuba no longer is able to actively support armed struggle in Latin America or other parts of the world because of severe ongoing economic problems. While there was no direct evidence of its sponsorship of terrorist acts in 1995, the Cuban Government continued to provide safehaven for several international terrorists. Cuba has not renounced political support for groups that engage in international terrorism.

Iran continued in 1995 to be the world's most active supporter of international terrorism. Although Tehran tried to project a moderate image in the West, it continued to assassinate dissidents abroad and maintained its support and financing of groups that pose a threat to US citizens. Iranian authorities reaffirmed the validity of the death sentence imposed on British author Salman Rushdie, although some Iranian officials claimed that the Government of Iran would not implement the *fatwa*. No specific acts of terrorism attributed to the Iranian-backed Lebanese Hizballah in 1995 were on the scale of the July 1994 bombing of a Jewish cultural center in Buenos Aires, which is believed to have been perpetrated by Hizballah. Hizballah continued attempts to undermine the Middle East peace process and oppose Western interests throughout the Middle East. Iran also supports other radical organizations that commit terrorism in opposition to the peace process, including HAMAS, the Palestine Islamic Jihad (PIJ), and the Popular Front for the Liberation of Palestine–General Command (PFLP-GC). It also provides safehaven to the Kurdistan Workers' Party (PKK), a terrorist group fighting for an independent Kurdish state that carried out numerous terrorist acts in 1995 against Turkish interests.

During 1995 several acts of political violence in northern Iraq matched Baghdad's pattern of using terrorism against the local population and regime defectors. These included a bombing attack on the Iraqi National Congress and the poisoning of a number of regime defectors. Iraq continues to provide a safehaven for various terrorist groups.

Libya continued for another year its defiance of the demands of UN Security Council Resolutions adopted in response to its involvement in the bombings of Pan Am flight 103 (1988) and UTA flight 772 (1989). These resolutions demand that Libya turn over for trial the two intelligence agents indicted for the PA 103 bombing, cooperate with US, UK, and French authorities in investigating the Pan Am and UTA bombings, pay compensation to victims, and cease all support for terrorism. Instead, Libya continued to foster disingenuous "compromises" aimed at diluting or evading the resolutions. It also continued hosting terrorist groups like the Abu Nidal organization (ANO). Further, an investigation into the murder of PIJ leader Fathi Shaqaqi in Malta in October 1995 revealed that he had long been a Libyan client. Tripoli also continued to harass and intimidate the Libyan exile community; it is believed to be responsible for the abduction of US resident Mansur Kikhia in December 1993 and was blamed by Libyan exiles for the murder of a Libyan oppositionist in London in November 1995. The Libyan charge in London was expelled in 1995 for threatening and surveilling Libyan exiles in the United Kingdom.

# EXHIBIT H

**Archive Site for State Department information prior to January 20, 2001.**
**This site is not updated.**
**RETURN to the current State Department web site.**

**Patterns of**

# Global Terrorism

**1996**

---

## Middle East Overview

Spectacular and horrific bombings in Dhahran, Tel Aviv, and Jerusalem dominated terrorist incidents in the Middle East in 1996, and nearly doubled the number of terrorist casualties to 837 from 445 in 1995. The truck bombing of the residential building occupied by US military personnel participating in the Joint Task Force/Southwest Asia near Dhahran, Saudi Arabia, on 25 June killed 19 US citizens and wounded over 500 persons. Several groups claimed responsibility, and the Federal Bureau of Investigation and Saudi Government continue their investigations into the incident.

In Tel Aviv and Jerusalem, suicide bombs in February and March killed 65 persons, including three US citizens. The radical Islamic Resistance Movement (HAMAS) was responsible for three of the bombings, and HAMAS and the Palestine Islamic Jihad (PIJ) both claimed responsibility for a fourth. In December the Popular Front for the Liberation of Palestine claimed responsibility for the shooting of an Israeli woman and her son. Israeli extremists were responsible for several attacks in 1996 that resulted in the deaths of at least two Palestinians.

Following the February and March bombings, 29 world leaders from the Middle East, Europe, North America, and Asia met in March and held the "Summit of the Peacemakers" in Sharm ash Shaykh, Egypt. They pledged to support the Middle East peace process and to take practical steps to expand regional cooperation against terrorism.

The Palestinian Authority continued its efforts-in cooperation with Israeli authorities-to combat the threat posed by terrorist groups such as HAMAS and the PIJ and to root out those who plan and carry out these attacks.

The Egyptian Government cracked down on extremist violence and significantly reduced terrorist incidents at the country's popular tourist sites where attacks had occurred during the previous two years. Fatalities from security incidents in Egypt decreased in 1996. However, extremist violence in upper Egypt and some outlying areas continued. In Cairo, 18 tourists were shot and killed by members of al-Gama'at al-Islamiyya (Islamic Group or IG). Also, the men responsible for carrying out the assassination attempt against President Mubarak in June 1995 remain at large.

In Algeria, political violence and random killings continued on a large scale around the country, causing major loss of life. Car bombs targeting Algerian municipalities, a press center, schools, and cafes were set off regularly. Indiscriminate killing of civilians at false highway checkpoints or in outlying towns were almost daily occurrences. Terrorists often targeted the families of members of government security services.

The Armed Islamic Group (GIA) kidnapped and subsequently killed seven French monks when its demands for the release of GIA members were not fulfilled. Otherwise, attacks against foreigners in Algeria decreased in 1996. Algerian extremists are believed to be behind a deadly bombing of a Paris commuter train in which four persons died and some 80 other passengers were wounded. Elsewhere in North Africa, there were few terrorist incidents.

In Lebanon, the security situation improved as the government continued its efforts to expand the rule of law to more of the country. Lebanese courts are increasingly active in prosecuting terrorists. One was convicted of terrorist attacks on Kuwaiti interests in Beirut in the early 1990s, and two others for the car-bombing death of the brother of a senior Hizballah official. A military appeals court upheld the conviction of the murderer of a French military attache killed in 1986, and another court extradited to Germany a man accused in the 1986 bombing of the La Belle discotheque in Berlin. A Lebanese court upheld the conviction for kidnapping of two men involved in the 1976 kidnapping and murder of two US diplomats-but then released the two under a Lebanese amnesty law. Terrorist groups, especially Hizballah, continued to operate with relative impunity in large areas of Lebanon, particularly the Al Biqa` (Bekaa Valley), southern Lebanon, and Beirut's southern suburbs.

## Algeria

The internal security situation in Algeria has improved since 1994, but the incidence of domestic terrorism, which is among the world's worst, remained high. At least 60,000 Algerians-Islamic militants, civilians, and security personnel-have been killed since the insurgency began in 1992.

Government security forces made substantial progress against the Islamic Salvation Army (AIS)-the reported military wing of the Islamic Salvation Front-that primarily attacks government-related targets. The government was less successful against the Armed Islamic Group (GIA), the most radical of the insurgent groups, which continued terrorist operations against a broad spectrum of Algerian civilian targets in 1996, including women, children, and journalists.

The GIA continued to target foreigners in 1996 and killed at least nine, a sharp decline from the 31 foreigners the group killed in 1995. The total number of foreigners killed by the GIA since 1992 exceeds 110. Most were "soft" targets, including a former Bulgarian attache, who was found beheaded in a forest in mid-November. Although no claims were made for his murder, Algiers blamed the GIA for his death. In August the GIA claimed responsibility for the murder of the French Bishop of Oran, who was killed by a bomb placed outside his residence.

Earlier in 1996 the GIA kidnapped and later beheaded seven French monks from their monastery near Medea. The GIA issued a communique claiming that the monks had been killed because Paris had refused to negotiate with the insurgent group. Algerian extremists are suspected in an explosion in a Paris subway on 3 December that killed four and wounded more than 80. The bomb used in that attack was similar to those used by the GIA in its bombing campaign in France in 1995.

The Algerian Government prosecuted numerous cases of persons charged with committing terrorist acts or supporting terrorist groups in 1996. In July, for example, four men accused of committing murder on behalf of terrorist groups were sentenced to death. Algiers also continued its limited clemency program. Members of militant groups who had surrendered to the authorities for committing murders received 20-year prison sentences instead of the death penalty; those found guilty of membership in terrorist groups received shorter-than-normal prison sentences. President Liamine Zeroual told the Algerian press that, as a result of this program, nearly 2,000 Algerians had surrendered to authorities by September.

## Bahrain

The security situation in Bahrain deteriorated somewhat early in the year but showed signs of improvement at year's end. Antiregime unrest was generally limited, with a few notable exceptions. In the worst incident, seven South Asians were killed in a 14 March arson attack on a restaurant. On 1 July three Bahrainis were convicted and sentenced to death, and five others received lengthy prison sentences for this incident. There were several other attacks, including some using small bombs and incendiary devices. Most of the unrest has consisted of burning tires, exploding propane gas cylinders, and acts of vandalism. Security forces, in return, have conducted a crackdown, killing more than 20 Bahrainis and arresting more than 2,000 since the unrest began in November 1994. At the end of 1996 the scope and intensity of the unrest diminished, though this may be temporary.

Only two incidents directly involved US citizens. On 28 August a US student rented a car that had an improvised incendiary device in the gas tank. The device failed to operate. On 16 September a US citizen's car, parked in front of a luxury hotel in downtown Manama, was firebombed. In neither case, however, does it appear the US citizens were targeted because of their nationality.

Manama in June publicly announced the discovery of an active Bahraini Hizballah cell that was recruited, trained, and supported by Iran. Diplomatic relations between Bahrain and Iran have been strained since the announcement. Bahrain retaliated by recalling its ambassador from Tehran and by restricting commercial services and air transportation between the two countries.

## Egypt

Islamic extremist violence fell in 1996. The number of fatalities-including noncombatants (105), police (59), and extremists (38) killed-fell sharply from 375 in 1995 to 202. Most incidents continued to occur in the provinces of upper Egypt. In spite of improved security, however, al-Gama'at al-Islamiyya (Islamic Group or IG) succeeded in conducting a shooting attack against foreign tourists at a Cairo hotel in April. Although this hotel attack generated the largest casualty count from a single incident in Egypt's modern history, the total number of deaths from extremist violence dropped sharply in 1996 after increasing steadily during the previous four years.

The IG continued its pattern of hit-and-run attacks in upper Egypt against police and suspected police informers and its robberies of jewelry stores to finance its operations. Minya Governorate ranked highest in terrorist incidents-which included the IG's killing of a high-ranking police official in April-but attacks also occurred in Asyut Governorate. The IG's shooting attack in April outside the Europa Hotel in Cairo that killed 18 Greek tourists waiting to board a bus disrupted the previous year's lull in incidents in Cairo and northern urban areas. The IG said it had intended to kill Israeli tourists to avenge Israeli strikes earlier that month against Hizballah forces in southern Lebanon. The smaller group al-Jihad also condemned Israeli action and threatened to hit "American and Israeli targets everywhere." Al-Jihad did not claim responsibility for any attacks in Egypt during 1996.

Although the IG carried out no attacks outside Egypt in 1996, a senior IG leader who said he was speaking from Afghanistan publicly threatened in April to kidnap US citizens in retaliation for the sentencing to life in prison by the United States of Shaykh Umar Abd al-Rahman, the IG's spiritual leader, in January. The shaykh was convicted in October 1995 for planning to carry out several terrorist conspiracies in the United States.

The Egyptian Government hosted the Summit of Peacemakers in March at Sharm ash Shaykh to discuss terrorism and the peace process. President Clinton joined President Mubarak, then Prime Minister Peres,

King Hussein, Chairman Arafat, and other heads of state and government at the meeting.

## Israel and the Occupied Territories/Palestinian Autonomous Areas

Terrorism continued to have a major impact in Israel and the occupied territories in 1996. Palestinian extremists opposed to peace with Israel conducted four massive suicide bombings in Tel Aviv and Jerusalem early in the year, which killed 65 civilians. The overall number of anti-Israeli terrorist attacks instigated by Palestinians declined to 14 in 1996 from 33 in 1995.

On 25 February a suicide bomber blew up a commuter bus in Jerusalem, killing 26, including three US citizens, and injuring 80 others, including another three US citizens. The Islamic Resistance Movement (HAMAS) claimed responsibility for the bombing. (HAMAS also claimed responsibility for a second bombing on the same day in Ashqelon, killing two persons, in an act of domestic terrorism.) On 3 March a suicide bomber detonated a bomb on a bus in Jerusalem, killing 19 and injuring six others. This bomb was wrapped with ball bearings and other metal fragments to increase casualties. A HAMAS spokesman claimed responsibility and said the attack was in response to Israel's rejection of a conditional cease-fire offered by HAMAS. On 4 March a suicide bomber detonated a bomb outside the Dizengoff Center, Tel Aviv's largest shopping mall, killing 20 and wounding 75 others, including two US citizens and children celebrating the Jewish Purim holiday. HAMAS and the PIJ both claimed responsibility for this bombing.



HAMAS suicide bombing in Jerusalem on 25 February left 25 dead and 80 injured.

Other Palestinian groups that reject the peace process also launched anti-Israeli attacks in 1996, including the Popular Front for the Liberation of Palestine (PFLP) and Abu Musa's Fatah-Intifada. Unidentified gunmen, presumably Palestinian rejectionists, conducted another cross-border attack from Lebanon in March, killing 2 soldiers and wounding 9 others. On 11 December gunmen from the PFLP attacked a car carrying Israeli settlers near the settlement of Bet El north of Ram Allah in the West Bank, killing a woman and her 12-year-old son. The PFLP claimed responsibility and threatened other attacks on settlers. Palestinian Authority (PA) courts later convicted three PFLP members for the attack.

Israeli extremists also committed terrorist acts in 1996. On 4 February an unidentified Israeli reportedly fired on a group of Palestinian students on the main Nabulus-Ram Allah road, wounding a 16-year-old boy. On 1 October a Palestinian man died after being shot near Bet Shemesh. On 21 October an Israeli reportedly shot and killed a Palestinian man near the West Bank village of Sinjil.

The United States and Israel increased cooperation against terrorism in 1996. In April President Clinton and then Prime Minister Peres agreed to form the US-Israel Joint Counterterrorism Group, which held its first meeting in Washington in November. In response to the President's request, the US Congress voted to give Israel a grant of $100 million for the purchase of equipment to fight terrorism.

The Palestinian Authority, which is responsible for security in the Gaza Strip and most West Bank towns, continued in 1996 its effort to rein in Palestinian violence aimed at undermining the peace process. The PA security apparatus prevented several planned terrorist attacks and arrested Palestinians

suspected of involvement in terrorist operations, including one who admitted his involvement in the murder of a dual US-Israeli citizen on 13 May. Chairman Arafat and other senior PA officials regularly condemned acts of terrorism.

## Jordan

Jordan and Israel continued implementation of their peace treaty-signed on 26 October 1994-which commits the two parties to cooperate against terrorism. Amman maintains tight security along its border with the West Bank and has interdicted individuals attempting to infiltrate into the West Bank.

Jordanian security and police closely monitor secular and Islamic extremists inside the country and detain individuals suspected of involvement in violent acts aimed at destabilizing the government or its relations with other states. Jordanian authorities detained dozens of people in terrorism-related cases in 1996, including several individuals who reportedly infiltrated into Jordan from Syria with plans to attack Jordanian officials and Israeli tourists. After King Hussein raised the issue of possible Syrian complicity with President Asad in July, Damascus arrested some of the infiltrators' supporters in Syria.

Several Palestinian rejectionist groups maintain a closely watched presence in Jordan, including the Abu Nidal organization (ANO), the Palestine Islamic Jihad (PIJ), the Democratic Front for the Liberation of Palestine (DFLP), the Popular Front for the Liberation of Palestine (PFLP), and the Islamic Resistance Movement (HAMAS). Following the February 1996 suicide bombings in Israel, Jordanian security forces detained dozens of HAMAS members, including an alleged politburo official, and in May once again warned HAMAS spokesman Ibrahim Ghawsha, a Jordanian citizen, not to issue statements supporting anti-Israeli violence.

## Kuwait

US military and diplomatic facilities and personnel came under increasing threat in 1996. International terrorist financier Usama Bin Ladin publicly threatened US interests in the Gulf, including Kuwait, in September and again in December. US and Western establishments received numerous telephoned and faxed bomb threats during the year.

Kuwaiti Hizballah, a Kuwaiti Shia organization that may have links to Iran, in 1996 allegedly assisted a Bahraini opposition group by smuggling weapons into Manama. Kuwaiti Hizballah may also have been engaged in activities directed against the US military presence in Kuwait.

## Lebanon

Lebanon's security environment continued to improve in 1996 as the country worked to rebuild its infrastructure and institutions. However, parts of southern Lebanon and the Bekaa Valley, and portions of Beirut's southern suburbs-including areas surrounding Lebanon's main airport-remain effectively beyond the government's control. In these areas, a variety of terrorist groups, including Hizballah, the Islamic Resistance Movement (HAMAS), the Abu Nidal organization (ANO), the Palestine Islamic Jihad (PIJ), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), continued to operate with relative impunity, conducting terrorist training and other operational activities.

Although no anti-US attacks occurred in Lebanon in 1996, the official US presence there remains under threat. Hizballah's animosity toward the United States has not abated, and the group continues to monitor the US Embassy and its personnel. Group leaders routinely denounce US policies and condemn the Middle East peace process.

Lebanon pursued several high-profile court cases against suspected terrorists in 1996:

- In October Mohammed Hilal, a former official of a Palestinian terrorist group, was convicted (in absentia) of throwing a handgrenade at the Kuwaiti Embassy in Beirut in March 1993 and of attempting to bomb the offices of Kuwait Airways in August 1993. The court sentenced him to life at hard labor and determined that he had acted on the orders of the Iraqi Government.
- Two men were tried in connection with the 1994 car-bombing death of Fuad Mughniyah, brother of senior Hizballah security official Imad Mughniyah. Both were found guilty. One was sentenced to 10 years' hard labor, the other to death. The death sentence was carried out 21 September.
- In October a military appeals court confirmed the life sentence of Hussein Tlays. Tlays had been found guilty previously of the 1986 assassination of a French military attache on the orders of a Hizballah official.
- The Lebanese courts also extradited a Palestinian, Yasser Shraydi, to Germany for trial in connection with the La Belle discotheque bombing in Berlin in 1986, in which three US servicemen and one Turkish woman were killed.

The Lebanese Government pursued through several appeals the case of the 1976 kidnapping and murder of US Ambassador Francis E. Meloy and Economic Counselor Robert O. Waring. In March the civil courts found the two accused guilty of the kidnappings but not the murders. Although the murder of diplomats is not covered by Lebanon's 1991 amnesty law, the law did apply to the kidnappings. Consequently, one of the accused was freed; the other continues to be held for unrelated crimes.

## Morocco

There were few terrorist-related incidents in Morocco in 1996. In July the Russian Embassy in Rabat received a letter from a group calling itself "The Dar al-Islam Western Front" threatening to attack specific Russians in Morocco, but no such attacks followed. On 18 June a prominent Moroccan Jew was the victim of an assassination attempt in Casablanca. It was unclear, however, whether the attempt was the result of a personal vendetta or terrorist activity. Later that month, the US Consulate and another prominent Moroccan Jew, both in Casablanca, received threatening phone calls that future attacks would take place against the Jewish community. The Government of Morocco has demonstrated a readiness to respond to terrorist threats and has investigated such incidents thoroughly.

## Saudi Arabia

On 22 April Saudi authorities televised the confessions of four Sunni Saudi nationals who admitted to planning and conducting the bombing of the Office of the Program Manager/Saudi Arabian National Guard (OPM/SANG) headquarters building in Riyadh in November 1995. They said their disillusionment with the way the regime practiced Islam and Islamic law motivated them to carry out the attack. Three were veterans of the conflicts in Afghanistan, Bosnia, and Chechnya. The four were executed on 31 May in accordance with Saudi law.

On 25 June a large fuel truck containing explosives detonated outside the US military's Khubar Towers housing facility near Dhahran, killing 19 American citizens and wounding some 500 persons. Khubar Towers housed US Air Force personnel and other Western military personnel assigned to duty in Saudi Arabia's Eastern Province as part of the Joint Task Force/Southwest Asia, which enforces the no-fly zone over southern Iraq. Several groups, both Shia and Sunni, purportedly claimed responsibility for the bombing, including: the "Brigades of the Martyr Abdallah al-Hudhaifi," "Hizballah al-Khalij," and the "Islamic Movement for Change." Saudi and US authorities are still investigating the incident.



In June a truck bomb destroyed the Khubar Towers housing facility near Dhahran, Saudi Arabia. Nineteen US citizens were killed and some 500 other persons were wounded. *(Department of Defense)*

Following the Khubar Towers bombing, a variety of US facilities received bomb threats. International terrorist financier Usama Bin Ladin, for instance, in August and again in November, publicly called on his supporters to attack US interests in Saudi Arabia and the other Gulf states.

## Tunisia

There were no reported acts of terrorism in Tunisia in 1996, but the Government of Tunisia remains publicly committed to taking necessary actions to counter terrorist threats, particularly from religious extremists. Tunis continued throughout the year to prosecute individuals belonging to the illegal an-Nahda group, which it considers a terrorist organization, but did not blame an-Nahda for any specific terrorist attacks this year. In October the Tunisian Government arrested two individuals suspected of involvement in the assassination of Belgian Vice Premier Andre Cools in 1991. The investigation is expected to continue in 1997.

## Yemen

In 1996 the Government of Yemen deported Abu Nidal organization (ANO) members residing in the country. Yemen also signed extradition agreements with the Governments of Egypt and Saudi Arabia. According to press reports, in October the Yemenis turned over to the Saudi Government several Saudi suspects. Furthermore, an Ethiopian national who hijacked an airliner to Yemen in April was arrested and jailed. He has not yet been tried.

Yemen, however, remained a base for some terrorist elements. The Yemeni Government has been unable to exercise full control over its territory, and terrorists have committed kidnappings and attacks on foreign interests in remote areas of the country. There were several attacks of this type in 1996:

- In January tribesmen in al Ma`rib Governorate kidnapped 17 elderly French tourists in order to pressure authorities into releasing a member of the tribe. The tourists were released unharmed three days later.
- In June an unidentified assailant threw an explosive device from a passing car into a vacant lot 30 meters from a US Embassy officer's residence near the office of the Canadian Occidental oil company. The company has been accused of polluting Yemeni natural resources.
- A French diplomat was kidnapped by tribesmen in the al Ma`rib Governorate in late October and was released unharmed in early November.

Moreover, Yemeni border security measures are lax and Yemeni passports are easily obtained by terrorist groups. The ruling government coalition also includes both tribal and Islamic elements which have facilitated the entry and documentation of foreign extremists.

(###)

Return to the Department of State Home Page.
This is an official U.S. Government source for information on the WWW. Inclusion of non-U.S. Government links does not imply endorsement of contents.

# EXHIBIT I

The New York Times
nytimes.com

March 14, 1996

# SUMMIT IN EGYPT: THE SYMBOLISM;The Meeting's Message: Put Terrorists on Notice

By STEVEN ERLANGER

Sometimes, symbolism itself is substance.

Today 14 Arab leaders stood in the searing Egyptian sun with the embattled Israeli Prime Minister, Shimon Peres, in an extraordinary show of solidarity against terrorism and of support for a negotiated peace that would finally put an end to the Arab-Israeli conflict.

This is a big photo opportunity," a senior American official admitted of this hastily organized meeting in a Red Sea resort given back to Egypt by Israel in 1982. "But the photo is an important part of the message -- that the future belongs to the peacemakers, and not to those who want to destroy the peace."

But for a half-day meeting grandly titled the Summit of the Peacemakers by the Americans who were behind it, there was one gaping and embarrassing hole in the photo: the missing representatives of Syria and its client state, Lebanon.

And that was not the only obstacle to carrying out today's lauded aims of sharing intelligence to fight terrorism and cutting off money to radical groups like Hamas and Islamic Holy War. Difficulties range from the awkwardness of supplying hard-won intelligence even to Israel, which has spied against the United States, to the private nature of much of Hamas's funds and the charitable activities that win Hamas much of its support.

The Syrian no-show was glaring today, despite all efforts to minimize it. It is Syria, after all, that Washington call the key to a comprehensive Middle East peace. It is Syria that Secretary of State Warren Christopher has visited 17 times. It is Syria that is engaged in peace talks with Israel.

So if this was a summit meeting of the peacemakers, where does Syria fit in? And if this was a summit meeting of those opposed to terrorism, where does Syria really stand?

American officials from President Clinton on down said they were disappointed that Syria refused to come. Damascus chose instead to repeat its call to Israel to return all occupied lands and thus remove the impetus for terror, while saying it continues to support peace.

But American officials were also reluctant to condemn Damascus and President Hafez al-Assad. They suggested instead that Mr. Assad does not want to be browbeaten into one camp or another, wants to keep his options open and did not want to be seen on the stage of President Hosni Mubarak of Egypt, Syria's longtime rival for leadership in the Arab world.

The officials pushed hard to add some substance to the symbolic victory of the meeting. In the next few days, American officials insisted, there would be concrete steps taken with Israel and the Palestinian Authority to share intelligence aimed at disrupting terrorist cells.

But it is not clear how intelligence-sharing might work between the United States and Israel, which in the past employed Americans like Jonathan Pollard to spy against the United States. A senior American official said it was difficult enough just to identify what kinds of intelligence might be useful to Israel and the Palestinians.

The summit meeting also vowed to work to cut off money for Hamas and Islamic Holy War, forming a "working group open to all summit participants" to recommend how best to carry out these goals. The group's first meeting is to be in two weeks in the United States.

While the officials were pleased to have Saudi Arabia attend at the foreign ministry level and to have the participation of the rich Persian Gulf states, it is these very countries that provide most of the private money for Hamas. The Saudi and Kuwaiti royal families are reported to give significant amounts to charities tied to Hamas, which was given initial support by the Israelis as an alternative to the Palestine Liberation Organization. And much money also flows from Palestinians in Europe and the United States.

So how governments will move to cut this money, and how successful they will be, remains open to question, officials concede. But today was not a day for carping details, officials said.

"It's almost enough to have this range of people here," a Russian official said. "Push too hard or be too specific about terrorist supporters, and the cracks start to appear." It was telling, for instance, that only Mr. Peres and Prime Minister John Major of Britain mentioned Iran as a sponsor of terrorism in their statements.

American officials said the real success of the meeting was to make Mr. Peres and the Palestinian leader Yasir Arafat feel less lonely -- Mr. Peres in his search for peace, Mr. Arafat in his decision to crack down harder on Hamas.

"The Arabs are always willing to stand up and take credit at the high points," a senior American official said. "Now they're putting their prestige on line when the threat is terrorism, and the terrorism is against Israel."

And Mr. Arafat said of the suicide bombers: "Their criminal success will be temporary. They will never kill peace. I feel the serious injury inflicted on us. But I feel through this meeting that I and my partner Shimon Peres are not alone."

Copyright 2007 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Back to Top

# EXHIBIT J

Case 1:00-cv-00105-L-DLM Document 408-11 Filed 12/28/2007 Page 2 of 6

***The Avalon Project at Yale Law School***

# *President Clinton and Prime Minister Peres - Remarks at the Signing Ceremony for the U.S.-Israel Counterterrorism Accord; May 1, 1996*

THE PRESIDENT: Good afternoon, Mr. Prime Minister and members of the Israeli and American delegations, ladies and gentlemen. For the past three years Israel and the United States have worked hand in hand to advance the peace process in the Middle East. Today, with this U.S.-Israel Counterterrorism Cooperation Accord, we strengthen our partnership to stop the enemies of peace.

With every new step along the path to peace its enemies grow more and more desperate. They know a new day is dawning in the Middle East, that the vast majority of its people want to enjoy the blessings of a normal life. Their answer, more violence and terror, more bullets and bombs, may seem senseless, but it is the product of cold calculation. By murdering innocent people, they aim to kill the growing hope for peace itself.

We will not do what the enemies of peace want. We will not let our anger turn us away from the pursuit of peace in the Middle East. Maintaining our resolve for peace does not mean, however, turning the other cheek. We must do everything in our power to stop the killing and bring the terrorists to justice. That is the only way to give those who have chosen peace the confidence they need that they have made the right choice, and the courage to keep moving forward.

This agreement does just that, by deepening the cooperation between our two countries in the fight against terrorism. Prime Minister Peres and I worked on it during my visit to Israel last month, in the wake of a terrible string of suicide bombings. Now, we have agreed upon areas for greater cooperation, on information sharing, on the search and development, on training and technical assistance, on investigation, prosecution and extradition. In each one we will look at very practical ways in which we can work together better.

I am pleased to sign this accord. And I am also pleased that the budget I signed just last week included the $50 million I requested earlier this year for our joint antiterrorism efforts in this year, including today's accords. I thank the Congress for their prompt action here and for the bipartisan support it received.

To my friend, the Prime Minister, and the people of Israel, let me say the United States stands with Israel through good times and bad, because our countries share the same ideals -- freedom, tolerance, democracy. We know that wherever those ideals are under siege in one country they are threatened everywhere. We have never been more determined to achieve and to defend those ideals, and to achieve our goal of a just and lasting peace for all the people of the Middle East.

Mr. Prime Minister.

PRIME MINISTER PERES: I would like to thank from the depths of my heart, in the name of the people of Israel, the President, his delegation, his team, and him, personally, for really showing the deepest understanding that one can hope for, the immediate response whenever it is necessary and the friendship that he has offered time and again over the last years.

I see the difference between the camp of terror and the free world. The camp of terror is operating under orders, it's disciplined, it's organized. The camp of freedom keeps its freedom. You cannot lead the camp of freedom unless you have a leader of great inspiration and outstanding capacity.

In my own judgment, Bill Clinton has this great capacity to inspire the whole free world with his ideas; with his determination; with his capacity to distinguish what is right and what is wrong, what is immediate and what is long-range, what is support and what is response. I feel myself very lucky to see a person like him standing ahead and trying to lead the whole world to peace and to peace for everybody -- not just for us, the Israelis, but also for our neighbors; not just for the Middle East, but for Bosnia, Haiti or other places.

We are going and departing by the end of this century a history of bloodshed, and with Godspeed let's hope that we're entering a different world of peace and understanding.

The President played a major role in bringing peace between us and the Jordanians, between us and the Palestinians. He and his Secretary of State are now opening a new chapter to bring peace between us, Syria and Lebanon, that may be the last peace which is necessary in order to make the peace comprehensive and all-

embracing.

Mr. President, I really with a full heart of thanks, would like to express both our admiration and gratefulness to you, to your administration, to the American Congress, to the American people. The world is a better place to live with this sort of a policy and this sort of leadership. Thank you very much.

Q: Mr. Prime Minister, those agreements you're talking about that you'd like to have by all accounts will require Israel giving up territory, buffer zone. The help you got on this trip -- antimissile help, counterterrorism help -- will that make it easier for you to relinquish territory in order to get an agreement with Syria and with Lebanon?

PRIME MINISTER PERES: You're asking me?

Q: Yes, sir.

PRIME MINISTER PERES: We don't intend to remain in Lebanon, anyway. We don't have any territorial ambitions concerning Lebanon. And on the first right occasion our army will be more than happy to leave the territory of Lebanon.

We do recognize the international border between Lebanon and ourselves. If the Lebanese government will take charge and the Lebanese army will become the only armed authority in Lebanon and disarm all the other terroristic organizations, I see very little reason for us to remain in Lebanon.

Q: Yes, sir, but I asked you about Syria and Lebanon, and I asked you if the agreements and the help you've gotten here on this visit will ease your giving up territory, which you're committed to anyhow we know. Does it make it easier for you?

PRIME MINISTER PERES: Well, you're talking about territory and I'm talking about peace. Territory --

Q: I'm talking about land for peace.

PRIME MINISTER PERES: I understand. I mean, if it wouldn't be done what we are doing here, I'm afraid that terror would win the day, and that would be ban of the peace process. We consider the last campaign as a campaign against peace. Now, to answer your question, we have announced that in order to attain peace we are ready to make territorial compromise. Don't expect me now to lay the map on

the table.

THE PRESIDENT: If I could just say one other thing related to this -- this last agreement that was reached and the first one in writing to restore the cease-fire and to set up a monitoring mechanism that involves Israel and Lebanon and Syria, and involves France, who has been very active in this, and then has a larger consultative group that involves Russia and other countries -- because this is in writing and because it gives us a chance to restore a normal life there, if this can be properly implemented, I think that it will be a good signal or a good, if you will, a test run to see how -- whether other progress can be made.

And I have talked to the Prime Minister about this. We are all very concerned about the civilians, the innocent people in Northern Israel, and all the people in Southern Lebanon who have lost loved ones and have suffered great economic disruption. I think we have to implement this agreement faithfully and help the Lebanese to rebuild their infrastructure and restore the stability of their populations.

And I appreciate what the Prime Minister has said to me about that. I wanted to thank you for that.

PRIME MINISTER PERES: I told the President that Israel will clearly respect religiously the understanding that was achieved by the Secretary and his team upon the invitation of the President. Then I told the President that Israel will participate in the effort to restore the damages in Lebanon, together with other nations, and we shall do so.

THE PRESIDENT: Thank you for that.

Q: Mr. President, The Washington Post wrote today that you are betting on Mr. Peres as the next prime minister, and rightly so. Is that the case?

THE PRESIDENT: Well, let me say, first of all, in democracies we have -- we schedule elections. And that's a good thing. That reminds everybody that the people are in charge. But I think it was not only appropriate it was virtually necessary for the Prime Minister to come here at this time, in the wake of recent events not only in Lebanon but some of the developments in their relationship between Israel and the PLO -- as I think all of you know, Mr. Arafat will be here in the next couple of days -- so I think his trip here is entirely appropriate and it was the right thing to do.

The United States has always said that we do not interfere in the internal decisions of other countries, and Israel and the United States are friends and allies

and will be no matter who is elected. I hope that will also be the case no matter who is elected in November in the United States. So our policy on that has not changed and will not and should not.

Q: But, Mr. President, you said in Moscow recently, regarding the Russian election, that elections have consequences and you did not dispute that that election would have consequences for relations between your government and whatever government is there. Is that not also true here, sir?

THE PRESIDENT: Well, and for the Russian people. Then it depends, obviously, on what happens afterward. But all elections have consequences. But the people who decide what the consequences are the citizens of the country -- in this case, the citizens of Israel. You know, they've shown pretty good judgment for quite a long while now, and I'm sure that the Prime Minister would join me in saying that they're in the driver's seat on that question, not me and not anyone else.

Q: Mr. Prime Minister, you spoke of the last bombing campaign, so to speak, the four bombings that occurred within little more than a week. In the weeks since there have been no -- I hate to use the word "successful" -- bombings in Israel. To what would you attribute that?

PRIME MINISTER PERES: To three things: To the conference in Sharm el-Sheikh that was initiated by the President and created a spirit of cooperation and understanding to work together in order to stop the acts of bombing and suicidal terror. The second is the more serious measures that Yasser Arafat has taken in Gaza and the territories. I feel that he really started to fight terror, and I say it with appreciation. And the third is because Israel itself -- maybe that is from our point of view the first thing -- got ourself organized to face this danger. I cannot say that we have a full-fledged answer to the problem, but we are by far much more organized and ready to prevent these sort of actions.

THE PRESIDENT: Thank you very much.

THE PRESS: Thank you.

# EXHIBIT K

Case 1:00-cv-00105-L-DLM Document 408-12 Filed 12/28/2007 Page 2 of 7

POWERED BY
BNET.com



**U.S., Israel sign counter-terrorism cooperation accord - includes test of the accord - Pres. Bill Clinton, Israeli Prime Minister Shimon Peres - Transcript**

Counter-Terrorism Cooperation

Accord Signing Ceremony

Remarks at signing ceremony,

Washington, DC, April 30, 1996.

President Clinton. Good afternoon, Mr. Prime Minister and members of the Israeli and American delegations, ladies and gentlemen. For the past three years, Israel and the United States have worked hand-in-hand to advance the peace process in the Middle East. Today, with this U.S.-Israel Counter-Terrorism Cooperation Accord, we strengthen our partnership to stop the enemies of peace.

With every new step along the path to peace, its enemies grow more and more desperate. They know a new day is dawning in the Middle East, and that the vast majority of its people want to enjoy the blessings of a normal life. Their answer - more violence and terror, more bullets and bombs - may seem senseless, but it is the product of cold calculation. By murdering innocent people, they aim to kill the growing hope for peace itself.

We will not do what the enemies of peace want. We will not let our anger turn us away from the pursuit of peace in the Middle East. Maintaining our resolve for peace does not mean, however, turning the other cheek. We must do everything in our power to stop the killing and bring the terrorists to justice. That is the only way to give those who have chosen peace the confidence they need that they have made the right choice and the courage to keep moving forward.

This agreement does just that, by deepening the cooperation between o two countries in the fight against terrorism. Prime Minister Peres and I worked on it during my visit to Israel last month, in the wake of a terrible string of suicide bombings. Now we have agreed upon areas for greater cooperation on information sharing, on the search and development; on training and technical assistance; on investigation, prosecution, and extradition. In each one we will look at very practical ways in which we can work together better.

I am pleased to sign this accord. I am also pleased that the budget I signed just last week included the $50 million I requested earlier this year for our joint anti-terrorism efforts this year, including today's accords. I thank the Congress for their prompt action here and for the bipartisan support it received.

To my friend, the Prime Minister, and the people of Israel, let me say that the United States stands with Israel through good times and bad, because our countries share the same ideals - freedom, tolerance, democracy. We know that wherever those ideals are under siege in one country, they are threatened everywhere. We have never been more determined to achieve and to defend those ideals and to achieve our goal of a just and lasting peace for all the people of the Middle East. Mr. Prime Minister.

Prime Minister Peres. I would like to thank - from the depths of my heart in the name of the people of Israel - the President, his delegation, his team, and him, personally, for really showing the deepest understanding that one can hope for, the immediate response whenever it is necessary, and the friendship that he has offered time an again over the last years.

I see the difference between the camp of terror and the free world. The camp of terror is operating under orders. it's disciplined; it's organized. The camp of freedom keeps its freedom. You cannot lead the camp of freedom unless you have a lead great inspiration and outstanding capacity.

In my own judgment, Bill Clinton has this great capacity to inspire the whole free world with his ideas; with his determination; with his capacity to distinguish what is light and what is wrong, what is immediate and what is long-range, what is support and what is response. I feel myself very lucky to see a person like him standing ahead and trying to lead the whole world to peace and to peace for everybody - not just for us, the Israelis, but also for our neighbors; not just for the Middle East but for Bosnia, Haiti, or other places.

We are leaving this century with a history of bloodshed. And with God-speed, let's hope that we're entering a different world- one of peace and understanding.

The President played a major role in bringing peace between us and the Jordanians, between us and the Palestinians. He and his Secretary of State are now opening a new chapter to bring peace between us, Syria, and Lebanon that may be the last peace which is necessary in order to make the peace comprehensive and all-embracing.

Mr. President, I really, with a full heart of thanks, would like to express both our admiration and gratefulness to you, to your Administration, to the American Congress, and to the American people. The world is a better place to live with this sort of policy and this sort of leadership. Thank you very much.

Text of Counter-Terrorism

Cooperation Accord Between the

Government of the United States

Of America and the Government

Of the State of israel

Released by the White House, Office of

the Press Secretary, Washington, DC,

April 30, 1996.

The Government of the United States of America and the Government of the State of Israel ("the Parties"):

Unequivocally condemning ill acts, methods and practices of terrorism as criminal and unjustifiable, wherever and by whomever committed and whatever the motivation, in particular the recent heinous acts perpetrated against civilians in Israel;

Recalling the declaration of the participants in the historic Middle East Summit of the Peacemakers on March 13, 1996 that acts of terror are "alien to the moral and spiritual values shared by the peoples of the region" and urging all governments to join in condemning and opposing such acts;

Convinced that the suppression of acts of international terrorism, including those in which States are directly or indirectly

Case 1:00-cv-00105-L-DLM Document 408-12 Filed 12/28/2007 Page 4 of 7

involved, is an essential element for the maintenance of international peace and security;

Calling upon all states to renounce terrorism and to deny financial support, the use of their territory, the provision of arms and equipment, or any other means of support to terrorist organizations;

Convinced that those responsible for acts of international terrorism must be brought to justice through prosecution, extradition, or other legal mechanisms;

Sharing the view that international cooperation is an essential factor in halting the scourge of international terrorism and that states that support terrorism should be subject to sanctions;

Recalling their long-standing and fruitful cooperation on this and other topics of mutual security concern;

Resolved to strengthen their own cooperation in combatting international terrorism and in encouraging and assisting other states to join in this effort;

Have agreed as follows:

Article 1

Spheres of Cooperation

1. With a view to enhancing their capabilities to deter, prevent, respond to and investigate international terrorist acts or threats of international terrorist acts against the United State or Israel, and to enlist the cooperation of others in combatting international terrorism, the Parties agree to share expertise and otherwise assist each other in the following spheres, among others:

1) sharing of information and analyses regarding terrorists and terrorist organizations;

2) training;

3) exchange of experts;

4) exchange of experience in dealing with terrorist incidents, including crisis management;

5) exchange of information regarding terrorism-related investigations;

6) exchange of information on transfers of funds to organizations involved in international terrorism;

7) extradition, prosecution and other legal mechanisms;

8) research and development;

9) consulting closely on counterterrorism policy, including regional and global counterterrorism initiatives; and

10) enhancing the counterterrorism capabilities of others.

Case 1:00-cv-00105-L-DLM Document 408-12 Filed 12/28/2007 Page 5 of 7

2. This agreement is intended to supplement existing agreements and arrangements between the Parties to address international terrorism. Nothing in this agreement shall be construed as derogating from the provisions of such agreements or arrangements.

Article 2

Establishment of Joint

Counterterrorism Group

1. In order to strengthen further their cooperation on counterterrorism the Parties hereby establish the United States-Israel Joint Counterterrorism Group (JCG). The JCG will serve as a forum for regular consultations and development and facilitation of pro@ grams of counterterrorism cooperation in the spheres listed in Article 1 as we as on other mutually agreed counter-terrorism topics.

2. The JCG will be composed of representatives from each Party, including as appropriate representatives from the various relevant agencies and departments of each Party that work on counterterrorism issues. The JCG will be co-chaired by senior counterterrorism officials of each Party.

3. The JCG will normally meet annually, alternately in the United States and Israel. In addition, special meetings of the JCG may be held to deal with particular issues or at the request of either Party. At the request of the JCG, experts of the Parties may meet and be in direct communication at any other time to assist in fulfilling the purposes of this agreement.

4. The JCG may from time to time enter into written understandings or implementing arrangements setting forth specific activities to be conducted under this agreement.

5. Between meetings of the JCG, participants will maintain contacts with their counterparts as required to carry out the purposes of this agreement.

Article 3

Security of Information

To the extent that any items, plans, specifications or information furnished in connection with the implementation of this agreement are classified by either Party for security purposes, the General Security of Information Agreement dated 10 December 1982 between the Parties and that Agreement's Industrial Security Annex, dated 3 March 1983, shall apply, unless the Parties agree upon alternative arrangements for protecting the material from unauthorized disclosures.

Article 4

General Provision

All undertakings of the Parties under this agreement are to be carried out in accordance with their national laws, obligations and policies, and are subject to the availability of appropriated funds, resources and personnel.

Article 5

Interpretation and Amendment

1. All questions or disputes related to the interpretation or implementation of this agreement shall be settled exclusively through the diplomatic channel to the mutual satisfaction of the Parties.

2. Either Party may, at any time, request revision of this agreement by giving the other Party written notice. Each Party should be prepared to discuss the proposal within 90 days thereafter.

Article 6

Entry into Force and Duration

This agreement will enter into force on the date of the second of the diplomatic notes by which the two Parties notify each other of the completion of any necessary internal procedures for entry into force of the agreement. It will remain in force until 6 months after either Party provides written notice to the other through the diplomatic channel of its intention to terminate the agreement.

DONE at Washington, D.C., in duplicate, in English and Hebrew, both texts being equally authentic, this 30th day of April, 1996, corresponding to the 11th day of Iyar, 5756.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE STATE OF ISRAEL:

U.S.-Israel Joint Statement

Released by the White House, Office

of the Press Secretary, Washington,

DC, April 30, 1996.

President Clinton and Prime Minister Peres have concluded two days of intensive discussions on a broad range of issues relating to the U.S.-Israeli relationship. Those discussions reflect the deep, long-standing and unique bonds of friendship which have characterized the U.S.-Israeli relationship and the legacy of shared values, common interests, and mutual respect for democracy that have made this close and special relationship endure.

The President and Prime Minister reviewed the extent of the U.S.-Israeli relationship in all its dimensions. They agreed that this cooperation in security, economic, and diplomatic areas is grounded in institutions that are functioning extremely effectively to the benefit of both countries. At the same time, they agreed that, in view of continuing threats to regional peace and stability, and in particular the dangers posed by proliferation of weapons of mass destruction and advanced military technologies, U.S.-Israeli strategic cooperation will grow in importance.

To this end, the President and the Prime Minister agreed that a steering committee headed by the U.S. Secretary of State and the Israeli Minister Foreign Affairs would be established explore means of enhancing and, where appropriate, formalizing, that cooperation. Two working groups will report the steering committee. The first, dealing with security and defense matters, will consider all options including the possibility of more form security accords, for how best to meet common threats in the years

Case 1:00-cv-00105-L-DLM Document 408-12 Filed 12/28/2007 Page 7 of 7

to come. It will also identify ways to maximize the effectiveness of U.S. aid to Israel. The second will deal with other policy matters relating to U.S.-Israeli strategic cooperation.

The two leaders affirmed that the strategic partnership between the t countries will continue to be based on two key principles. first, the United States, unshakable commitment to Israel's security and its determination to minimize the risks and costs Israel confronts as it pursues peace; and second, the U.S.-Israeli mutual commitment to a comprehensive peace and their determination to move toward that goal.

With respect to Israel's security, the President specifically reaffirmed the United States, commitment to maintain Israel's qualitative edge and to preserve and to strengthen Israel's capability to deter and defend itself, b itself, against any adversary or likely combination of adversaries.

The President and Prime Minister took great pride in signing the U.S.-Israel Counter-Terrorism Cooperation Accord. This agreement sets out practical measures enabling their two countries to make the best possible u of expertise, resources, and capabilities in the war against terror. A Joint Counter-Terrorism Group has been established to monitor and oversee the implementation of the agreement. Israel and the United States also agreed to seek to coordinate their efforts with the international effort against terror launched at Sharm al-Sheikh on March 13, 1996.

The President and the Prime Minister also took note of the joint statement on theater missile defense cooperation signed by the Prime Minister and Secretary of Defense Perry April W. The United States and Israel recognize the defense of Israel will be made more effective by undertaking necessary steps to ensure that Israel's theater missile defenses are supported by related United States capabilities. The two leaders expressed satisfaction with the positive results to date of the ongoing bilateral dialogue on issues relating to the transfer of equipment and technology to third countries.

With respect to their determination to achieve a comprehensive peace, the two leaders agreed on the importance of implementation of agreements reached and the need to expand the orbit of Arab-Israeli peacemaking with a view toward achieving normal, peaceful relations between Israel and all its Arab neighbors. They welcomed the decision by the Palestinian National Council to cancel all the provisions of the Palestinian National Covenant which deny Israel's right to exist or are otherwise inconsistent with the September 1993 exchange of letters between Prime Minister Rabin and Chairman Arafat. This action is an important demonstration by the Palestinians of their commitment to honor the terms of the 1993 Oslo Accords.

The President and Prime Minister also expressed satisfaction with the improved understanding reached last week on Southern Lebanon as a result of Secretary of State Christopher's negotiating efforts and after discussions with the governments of Israel and Lebanon and in consultation with Syria. They noted the importance of prompt activation of the monitoring committee and consultative group established by the understanding.

Finally, the President and the Prime Minister agreed on the need to end the Arab boycott and to eliminate discrimination against Israel in all international organizations, including the United Nations.

COPYRIGHT 1996 U.S. Government Printing Office
COPYRIGHT 2004 Gale Group

# EXHIBIT L

Jan-23-03 Case 1:00-cv-00105-L-DLM Document 391-6 Filed 08/10/2007 Page 1 of 2 P.02

*Permanent Observer Mission*
*of Palestine*
*to the United Nations*

البعثة المراقبة الدائمة
لفلسطين
لدى الأمم المتحدة

January 27, 2003

Honorable David L. Martin
Magistrate Judge
U.S. District Court
Office of the Clerk
Providence, Rhode Island 02903-1720
Re: Ungar v. The Palestinian Authority
C.A. No. 00-105L D.R.I.

Dear Judge Martin,

We have carefully analyzed the three discovery documents in this case and the possibility of our responding to them in the near future.

Our communications with officials from the PNA and the PLO who would normally be concerned with legal requests of this kind have been extremely difficult.

As you know there has been intense violence throughout occupied Palestine for more than two years. The offices of the PNA in Gaza City have been destroyed. Offices in Ramallah have been attacked and partially destroyed and left under continuing siege. Other offices of both the PNA and the PLO have been damaged. Records have been destroyed, damaged, dispersed and lost. Personnel responsible for record keeping have been separated from their offices and records and unable to perform their assigned tasks.

President Arafat has been virtually trapped in the ruins of his office in Ramallah since March of 2002. Other officials and administrators have had similar difficulties. More than 2100 Palestinians have been killed by the Israeli occupying forces on our own soil during the last 28 months affecting everyone's life.

Government offices and officials cannot work effectively or organize even on matters of extreme urgency. It has been impossible under such circumstances to locate people who could seek and find documents, who could gather information and prepare answers to interrogatories and could respond to requests for admissions.

We find the scope of inquiry to be incredibly broad and often unrelated to the claims being made by plaintiffs. Much of it seems politically motivated and seeks records usually deemed confidential including communications between the PNA, or the PLO with foreign states, even with the United States government.

115 East 65th Street New York, NY 10021 Tel. (212) 288-8500 Fax (212) 517-2377

1-27-03 Case 1:00-cv-00105-L-DLM Document 391-6 Filed 08/10/2007 Page 2 of 3

We don't understand how plaintiffs can claim the PNA and PLO are responsible for what HAMAS does. The history of the PNA/PLO- HAMAS relationship is public and well known and the claim that the PNA and PLO are responsible for what HAMAS does is simply not credible.

Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what HAMAS does. Yet we've been advised plaintiffs are doing this. We notice what appears to be a multiplicity of suits coming from the same lawyers and political statements publicly made by them in connection with the suits, which makes it difficult to believe their aim is to pursue the interests of the individual plaintiffs.

It would seem fair and just to wait until there is a final decision on the issue whether the U.S. Court has jurisdiction over the PNA and the PLO for these events before proceeding to these requests. Nothing else is possible for us. Plaintiffs waited nearly four years from the time of the assault to file this case. The time we request which is necessary to make presentation of our defense possible, if a defense becomes necessary, ought to be comparatively short. Only the achievement of a level of stability, free from the threat of daily attacks in our territory can make it possible to free personnel to gather the materials and information needed to proceed with a defense. 9

While we wait until violence subsides and hopefully peace comes, to respond to appropriate discovery requests if jurisdiction is upheld, we must state that neither the PNA nor the PLO played any role and neither had any responsibility for the deaths in this case. We regret these deaths as we do the thousands before them and since in these tragic years of violence.

Under exceedingly difficult circumstances the PNA and PLO have done what they can do to reach a peace agreement and to protect lives even while they have themselves been attacked. We grieve over the deaths and injuries on both sides from the constant physical violence and the impoverishment and economic deprivation inflicted on the Palestinian people. And we fully understand that all who live in these Holy Lands will suffer until peace based on justice and international legitimacy is achieved.

We hope this case will not become an obstacle to such a day.

Sincerely,

Dr. Nasser Al-Kidwa
Ambassador, Permanent Observer of Palestine
to the United Nations

# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DVIR UNGAR, et al.,

Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al.,

Defendants.

Docket No. CA 00-2606 JR

Washington, D.C.
Tuesday, January 15, 2002
9:44 a.m.

FILED
FEB 13 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

For the Plaintiffs: McINTYRE, TATE, LYNCH, AND HOLT
DAVID J. STRACHMAN, ESQ.
321 South Main Street
Suite 400
Providence, Rhode Island 02903
Phone: 401-351-7700

For the Defendants: (No appearances)

Court Reporter: DENNIS A. DINKEL, RDR, CRR
Official Court Reporter
Room 6818, U.S. Courthouse
Washington, D.C. 20001
PHONE: (202) 289-8661

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription

just to tell the head of the anti-terrorist branch of the CIA on this time, Winston Canistrano [phonetic], I hope I pronounce the name good, he was -- he said in 1995, that we know about Iran; we have to fight against Iran, because today they're doing -- they're training people to put bombs in Jerusalem and in Tel Aviv and tomorrow, that's what he said exactly, it's going to be -- the bomb is going to be in Washington. He was not far away.

THE COURT: Mr. Shaked, thank you very much, sir.

MR. STRACHMAN: Thank you, Your Honor.

That's all, Mr. Shaked.

(Witness excused.)

MR. STRACHMAN: We have our next witness, Judge. I think he's in the hall.

THE DEPUTY CLERK: Would the witness step forward, please?

REUVAN PAZ, PLAINTIFFS' WITNESS, AFFIRMED

THE DEPUTY CLERK: Would you please be seated and speak into the microphone, sir?

DIRECT EXAMINATION

BY MR. STRACHMAN:

Q. Your name, sir?

A. Reuven Paz.

Q. Okay. Dr. Paz, what is your field of expertise?

A. My field of expertise is Palestinian society and politics,

and mainly Islamic movements all over the world.
Q. And what -- you have a Ph.D. in what subject, sir?
A. The development of the Palestinian Islamic groups between '67 and '88.
Q. And have you qualified as an expert witness in this very courthouse on several other occasions?
A. Yes. This is actually my fifth expert testimony.
Q. Okay. And do you -- have you written about Palestinian terrorism?
A. Yes. I have written mainly about -- mainly about Hamas and the Palestinian Islamic jihad.
Q. Okay. Where are you currently employed?
A. Well, right now I am senior research fellow at the International Policy Institute for Contraterrorism in Israel; and since last October, I'm developing a new project of the research of radical Islam or radical Islamic movements in Israel.
Q. Dr. Paz, I'm going you what has been marked for identification number 4. Is that your CV?
A. Yes. That's right.
MR. STRACHMAN: Your Honor, I'd like to offer this as a full exhibit.
THE COURT: Exhibit 4 will be received.
(Plaintiffs' Exhibit No. 4 was received into evidence.)

BY MR. STRACHMAN:

Q. Your Honor, based on the testimony and the CV, I'd ask that Dr. Paz be admitted as a -- offer him rather as an expert in Palestinian terrorism and terrorist groups?

THE COURT: Yes. He -- his testimony, his expert testimony in those areas will be received.

MR. STRACHMAN: Thank you.

BY MR. STRACHMAN:

Q. Now, Dr. Paz, could you tell us about the relationship -- the relationship between Hamas, Iran, its genesis and what brings the two together?

A. In the first two or three years of the intifadah, the Palestinian uprising, and the establishment of Hamas on December '87, Hamas, a Sunni movement of the Muslim brotherhood, was opposing actually the Islamic ideology of the Iranian regime and did not tend at that time to cooperate with the Iranians; and actually, the turning point was mainly in '91 following the Gulf War where unlike the PLO and the Palestinian national leadership, which sided totally with the Iraqis, Hamas as a rival of the PLO, started to side with the Saudis, the Kuwaitis, and therefore this was one of the main reasons for a change in the policy and the ideology of Hamas towards the Iranians.

That was one point.

Another point, which is also connected to the Gulf War,

was the fact that Saudi Arabia and the other Gulf states seized at the time to support the PLO and Palestinian national leadership and actually gave -- I would say -- Hamas a green light to change their attitude or their relations with Iran; and following that year, we started to -- the -- to witness growing relations between Hamas and Iran, not only on the political or ideological basis, but gradually on the operational basis as well.

Q. What brings them together? What do they have in common?

A. Well, first of all, maybe I should add another element which is important here in regard to the year '91. This was the Madrid conference which was actually the real start of -- that led afterwards to a kind of reconciliation between Israel and the Palestinians.

The Middle Eastern power that was, let's say, mostly opposed to this new process was first of all Iran and on the Palestinian level, it was Hamas which denied any possibility of any contact, any link, any conciliation with Israel and started to criticize very much the -- the then PLO and on this ground, there was common -- there was a common interest between Iran and Hamas as the leading forces against the new line of policy of the Palestinian leadership.

Q. So did they come to a specific modus operandi or specific agreement as to how to further that common interest?

A. Well, at that time, there was -- there was a very

important linking point between Iran and Hamas, and this was mainly the Sudan, which was supported by the Iranians where Hamas actually opened its first office, official office outside of the Palestinian arena; and through the Sudan, the Iranians did a lot of effort -- paid a lot of effort in order to make contact with Hamas; and more and more, let's say, on the operational level and the level of financing.

**Q.** And is it fair to characterize them as having reached an agreement to act upon the -- their common interest?

**A.** Well, I have never seen any document -- I mean, in this kind of relations, there are no official treaties like between states; but with the development of these relations through the Sudanese and later on, by the way, through the Syrians, there was an agreement to cooperate in favor of terrorism against Israel.

**Q.** How does the notion of jihad enter into their agreement or what they may have had in common?

**A.** Well, Iran formed the start of the Islamic revolution in Iran. Iran was the leading country in the region of the Middle East to -- let's say -- to act in order to actually eliminate the state of Israel as a Jewish state; and it was also very prominent on the background of other processes in the Middle East like the peace agreement Israel and Egypt and later on the peace agreements with -- agreements with other countries in the region; and the Iranians were very much afraid at that time

that the process started by the -- the peace agreement between Israel and Egypt is going to lead to the recognition of the entire world in the existence of Israel, no matter with -- with -- in -- which borders but at least the existence of Israeli entity in the Middle East.

And since then, the line of policy was to look for every element in the Arab world and of course in the Palestinian arena that might cooperate with them to prevent this process.

Q. In order to further that cooperation with Hamas, what was it that Iran was doing? What were they -- what was their end of the agreement or the process?

A. Well, there was another element in the year '92 and mainly '93 which actually helped close the -- caused Iran and Hamas to become closer. This was the deportation of about 400 Hamas members, actually almost all the infrastructure of the movement in the Palestinian territories; and in -- they were deported between December '92 and December '93 when they were allowed to return to the territories. They were deported to south Lebanon where Hizbollah, as a proxy group, initiated and activated actually by the Iranians and the Iranian groups of the Islamic Revolutionary Guards were maintaining closer and closer relations with these Hamas members; and started through -- to offer them financial support and military training.

Q. And is that basically the first time that Iran acted upon this agreement with Hamas to -- actually to provide something

substantial to them?
A. No. There were -- there were also some members -- I would say a few members that started to go to training in Iran around -- if I remember correctly -- around '92. Some of them were even sent from the United States, Palestinians, recruited in the United States, mainly by Moussa abu Marzook who was then the commander of Hamas in the states, and they were sent to training in the -- in -- on Iranian soil.
In '92, there was also another development, there was opened the first Hamas office with the position of official representation in Tehran.
Q. And of those 400 people who were deported, 400 Hamas members who were deported to Israel, how many of them received training in Hizbollah camps in Lebanon?
A. Well, I don't have the exact numbers; but as far as I remember, at least 70 of them received military training. We have to understand that of these 400, only about 380 were Hamas members. The rest were members of the Palestinian Islamic jihad who was -- was in close connections to the Iranians long before.
So among these people, there were many people who were over the age of 50, 60; so only the younger -- the younger members who were in this camp received military training; so as far as I remember, there were about 70 Hamas members.
Q. Now, we talked about the -- we're talking about the

Iranian contribution. In addition to training, what other kinds of contributions did Iran make to this agreement or this partnership with Hamas?

A. Well, first of all, they started to give Hamas -- they started to give Hamas financial support. I don't know the exact numbers at that time, but it developed, and the amounts of financial support grew during the years.

Besides that, they were assisting them in relations and all kinds of operational -- operational connections like false documentation, like flights to all kinds of places. Either to Beirut or Damascus, or to the Sudan or to Tehran for those who were going to receive military training there.

Q. What was Hamas' contribution to this partnership?

A. First of all, if I may use here a term we used to say in Hebrew, the relations during the start of the connections between the two parties, even until today, are that in a state that Iran is like a cow that wants to give -- wants to give more milk to the organizations that she wants their support; than they are willing to receive, because there was in the beginning some -- there were some reservations for -- by Hamas from cooperation with them, and these reservations actually during the year '93, in '94, they disappeared and the action of Hamas was terrorism. They didn't assist Iran, but by the persistence, persistent struggle, terrorist struggle and violence against Israel and in the attempt to serve the Iranian

interest to thwart the peace agreement and peace process between the Palestinians and Israel.

Q. So is it fair to say they provided the manpower, the bodies to do the work?

A. Hamas, yes. Yes.

Q. Okay. You talked about the training and the -- the training from the deportees. In 1994, was there another group of training that occurred in Iran?

A. Yes. In 1994, actually this was as far as I know the first group of Palestinians from the territories that went to Iran through the Sudan and Syria to receive training. It was also the -- for the first time quite a large group of 19 people.

It was organized in the Sudan. From there, they moved through -- they flew through Damascus to Tehran and received training for about three and a half months.

Q. What specifically was the training and who gave them the training?

A. Well, the training -- according to the confessions of those who were trained in that group, the training included the composing of all kinds of explosives, shooting all kinds of weapons, and clandestine behavior, and, let's say, indoctrination, political indoctrination in order to, let's say, to increase their awareness, their political awareness and their devotion for the cause.

Q. Who in Iran specifically was conducting this training?
A. Well, the camp nearby Tehran belonged to the Revolutionary Guards; and the trainers, according to the confessions of those who trained there, they didn't know their trainers. They didn't know them by name; and there were -- they were separated actually from the trainer, closed in this camp, they couldn't get out of this camp; and actually, from their point of view, it was the Iranian Revolutionary Guards.
Q. Okay. And one of the 19 members who went to Iran in 1994 was Hassan Salame; is that true?
A. Yes. That's true.
Q. What do we know -- excuse me, before we get to that. The training that occurred there, were the 19 people trained to become the foot soldiers, the trigger men, or were they trained to become commanders, leaders, and trainers?
A. Well, first of all, I can't say what the Iranians wanted them to be; but in the point of view of Hamas, those that returned to the territories -- not all of them by the way returned to the territories -- those that returned became actually the leading trainers of the organization, the leading people who could compose all kinds of explosives; and from the Hamas point of view, they became senior members of the military wing of the movement; and it was important because some of them did not even like -- like Hassan Salame -- did not actually take part in terrorist operations but remained behind the scene

in order to keep him safe in order that he could train others, compose all kinds of explosives, record people, et cetera.

**Q.** Was that his function in the explosion that killed Eisenfeld and Duker and also Leia Moussa?

**A.** Leia Moussa was wounded.

**Q.** Excuse me, I apologize.

**A.** Yes. He actually was -- he trained the three members that were supposed to -- and actually did carry out the suicide operations. He composed the explosives. He showed them how to activate it; and he was actually, in this case, the -- maybe the most important figure of -- that -- of that group.

**Q.** You testified in the Eisenfeld and Duker case and also in the Moussa case?

**A.** Yes, I did.

**Q.** And what -- can you tell us more about Mr. Salame and what his -- what his -- his function in Hamas was?

**A.** First of all, he was quite senior prior to his training in Iran. He was actually sent to the Sudan in order to work the -- in the official office of Hamas there.

And there, he was -- he was actually in close touch with the most senior officials of Hamas that arrived to the Sudan to organize the activity, to organize the -- the connections with the Iranians, and to organize all kinds of propaganda and financial issues.

And when he was sent to Iran, it was -- and let's say,

when he returned, it was quite obvious that he became one of the senior members of the group mainly in the area of -- the southern part of the southern region of the West Bank.

**Q.** Have you reviewed the documents pertaining to the Ungar murder, the confessions, convictions, information provided by the Israelis?

**A.** Yes, I did.

**Q.** Okay. And what can you tell us about this incident and about how this fits into the scheme of Hamas?

**A.** Well, if I may add in connection to that another element which -- an important element which the Iranians actually influence Hamas, it was the suicide bombing, the modus operandi of suicide bombing, terrorist modus operandi that's actually started in the Middle East in Lebanon by Hizbollah during the eighties and through the influence of Iran and Hizbollah, Hamas started to use this modus operandi since '93 and later on much more frequently in '95, '96, et cetera, until today.

So I mention it because the -- all this activity created an attempt at that time of the Palestinian authority since it was established in '94, not only by Israel to limit Hamas activity.

So all these cells created by Hamas actually in some cases were very fragile and some of them -- and some of the members became wanted either by Israel or by the Palestinian authority.

So it was very important at that time to use members who

were -- who received such good military training like Hassan Salame to use them in several missions.

Now parallel to his mission in the -- in the case of the Jerusalem -- the cell in Jerusalem that carried out these suicide operations in the buses that you mentioned before, he also started to train many other members in other cells in that region of the southern region of the West Bank.

Part of his training was to kidnap soldiers and -- to kidnap Israelis in this case, but mainly soldiers and to shoot from a -- from moving cars; and in the beginning of -- if I'm not mistaken, in February, '95, Hamas decided -- sorry. In February '96, Hamas decided at least temporarily to stop the use of suicide bombing and to move to the modus operandi of kidnaping soldiers and shooting from moving cars.

And actually, Hassan Salame started to train in these months, this period, other members of Hamas in carrying out these operations; and this was exactly actually how -- this was the operation in which the late Ungar couple were killed.

Q. Was he -- was Salame the trainer for the Talachmeh cell?

A. I don't know for sure. But it is probably -- since he confessed that he trained most of the Hamas members in that region at that time, and since he was the main trainer of Hamas at that time in this region, it is very probably, I can say, that he was the trainer of the Talachmeh cell.

Q. Is there anyone else that you know of who could have or

would have done the training for the cell that killed the Ungars? Is there anyone else who has been identified as a trainer of that cell?

**A.** No. Not that I know of. And if I may add we are talking here in this case -- we are not talking about explosives, but we are talking about kidnaping and shooting from moving cars which in no other members of Hamas besides those who were trained in Iran actually were trained in such methods of operation.

So it is very likely that he was the guy who trained the Talachmeh cell; although they didn't know -- the trainer was masked. They didn't know him by name. And they didn't know him at all; and actually, he was also -- he was not from that region. He was from the Gaza Strip; so he wasn't known by local people.

**Q.** The confessions of the four individuals who killed the Ungars, they talk about the training that they did?

**A.** Yes. They talk about it.

**Q.** They themselves said that the trainers were masked or hooded?

**A.** Yes.

**Q.** What word did they use? Do you recall if it was hooded or masked?

**A.** Well, in Hebrew, it is the same. It is the same word.

**Q.** Okay.

A. But I think maybe we should say they were hooded.
Q. Okay. And is that typical of the methodology of Hamas training, that the trainers are not identified to the trainees?
A. Yes. First of all, it was also -- there was much improvement in those years in the operational activity of Hamas. Part of it was due to the training of some of its members by the Iranians or by Hizbollah in other cases; and -- by Hizbollah in Lebanon in other cases.
And part of this improvement was the fact that they became more and more clandestine. They kept much more discipline and they were better organized than in the years before.
Q. Was Salame -- did he discuss his role in choosing locations for attacks as well as -- or the -- sort of the change from suicide bombing to drive-by shootings?
A. The change was not -- in his confession, he said that Talachmeh actually -- who was senior in the hierarchy of Hamas at that time --
Q. Excuse me. Talachmeh was senior?
A. Talachmeh was senior. The problem with Talachmeh at the time was that he was in a Palestinian jail in Jericho; so part of his activity and the connection with him was -- I mean the members of his cell had to come to him in jail and talk to him, and he was not free, out of jail.
But he was actually senior, and Talachmeh actually told Salame about the change in policy. This is another element

that I can conclude from it that since they changed -- there was this change in the policy, he wanted or he had the interest that Salame who trained his people, the members of his cell, I mean Talachmeh's cell in the new, let's say, activities of kidnapping and shooting.

Q. And what do we know about where the weapons and the finances for this organization -- for specifically Talachmeh's organization, what do we know about where that came from?

A. Well, in two cases, one -- a battle rifle, a Kalashnikof was given to them by Talachmeh as he told them -- he told Ismail Ghanimat that it was a present from Hamas.

Q. Excuse me one second. That's Ghanimat. G-H-A-N-I-M-A-T. Is that one of the individuals on the list?

A. In our country we pronounce it differently. Okay. The pronunciation in English.

And he gave them money to buy the other Kalashnikov; and beside that, he gave them at least once money to buy a gun.

Q. What do you know about Ghanimat's capability prior to the beginning of 1996? Was he in need of training? Was he already an expert, a person who could carry out acts or did he need to be trained?

A. No. Actually prior to -- prior to the -- let's say -- February-March of '96, he was involved in several attempts of -- several terrorist attempts and actually he failed in some of them either in shooting or in kidnapping.

And only after February '96, he and his mates started actually to carry out -- from their point of view -- successful operations like the killing of actually five other Jews, Israelis besides the Ungar couple.

**Q.** So is it fair then to make a distinction between pre-'96 and post-'96?

**A.** I think we can say that after the training, mainly the training by shooting, there was a major improvement of the operations.

**Q.** Now, Mr. Salame was convicted, and what was he specifically convicted of with regard to training?

**A.** He was -- well, he was convicted in training between February or March and May '96 -- in training Hamas members in the conviction, let's say -- it didn't say exactly who -- which members. But he was convicted, among other things -- it was not his main conviction, but he was convicted in training Hamas members in that period until he was arrested.

**Q.** But what was he -- training them in what?

**A.** Training in -- mainly in shooting and explosives.

**Q.** Okay. And where does -- where and how does Hamas get or obtain weapons to carry out such attacks?

**A.** Well, they have different sources. There is -- first of all, there is a difference between the period of prior to '94 and after '94. When I say '94, I mean the establishment of the Palestinian authority and the amount of weapons that the

Palestinian authority was actually given by Israel as a legitimate weapon during that period.

So I mentioned it because after '94, there was a lot of weapons in the territories; so their sources were either from the Palestinian authority or weapons stolen from Israel, either from civilians or from the Israeli military forces; and weapons smuggled from outside the Palestinian territories either from Egypt to the Gaza Strip or from Jordan or through Jordan to the West Bank.

Q. And was there an incident approximately eight months ago where a series of shipment of weapons was sent to Hamas on a boat?

THE COURT: Eight months ago?

THE WITNESS: Yes. There was a ship captured by Israel. There was a ship coming from Lebanon and it was actually -- a deal of -- of -- of -- of weapons for Hamas, a combination of the Iranians, Hizbollah, and the group of --

THE COURT: Mr. Strachman, I don't know how much longer you have with this witness. I have a meeting to go to. If you're not going to be finished in the next three or four minutes, we have to break for lunch.

MR. STRACHMAN: We probably have three or four minutes. Maybe we'll just conclude after lunch.

THE COURT: I think we should break for lunch now. Let's be back at 1:40.

MR. STRACHMAN: Great. Thank you, Your Honor.

THE COURT: Thank you.

(Recessed at 12:36 p.m.)

**AFTERNOON SESSION** - (1:47 p.m.)

THE COURT: All right. Ready to proceed, Mr. Strachman? Go ahead.

MR. STRACHMAN: Thank you.

BY MR. STRACHMAN:

**Q.** Dr. Paz, when we -- we left off, we were talking about a shipment of arms that was sent from Hizbollah and other organizations to Hamas. Was that -- where did those weapons come from?

**A.** Well, usually all the weapons of Hizbollah in Lebanon comes from Iran through shipments mainly by flights through the Damascus airport.

So I suppose that these arms were also from Iran.

**Q.** And is that shipment, that process of shipping arms to sponsored groups in Palestine or the territories, is that something that has been going on for a while or is that something that first started with that boat eight months ago?

**A.** First of all, as far as we know, this boat was the first that was captured by Israel. There might be some other boats that managed to smuggle arms through the sea. But there were other ways of smuggling arms either from Iran or from other countries through -- not through the sea, but through the land,

on the ground.
Q. Okay. And does that involve Iran directly or does it involve Hizbollah?
A. Mainly Hizbollah. I would say the ship that was captured two weeks ago, it involved Iran directly; but in that case, the weapons were for the Palestinian authority; but mainly through Hizbollah, most of the Iranian activity with the Islamic groups except for the training on the Iranian soil was through Hizbollah.
Q. And does Hizbollah have the same kind of relationship with Iran that Hamas does, or is it of a different nature?
A. No. It's of a different nature. Actually, Hizbollah was created by the Iranian Revolutionary Guards in '82 in order to, let's say, to maintain Iranian influence and dominance among the Shiites in south Lebanon and to fight the Israeli occupation of south Lebanon at the time; and it was almost totally under the control of the Iranians.
Since June or July '82, Iranian troops and Iranian intelligence officers are in the Bekaa Valley, the eastern part of Lebanon; and they are there since then and actually they controlled and still control the activity of Hizbollah.
Q. And the activities of Iran either directly or through Hizbollah, are they approved of and are they part of the general Iranian -- Iran -- Republic of Iran's -- is that part of their general policy or is that sort of a separate function

or a separate goal of individuals in the government?
A. No. I would say that this is the Iranian policy.
I must say that even what those people who are in recent years viewed as more moderate in Iran like President Hatami, for example, in what concerns the fight against Israel and the wish to eliminate Israel as a Jewish state in the Middle East, there are no moderates or hard-liners in the Iranian regime; and this is the official policy of Iran to fight Israel as much as they can.
Q. In order to do so then, what people like the supreme leader, Ayatollah Khamenei and the president, Mr. Rafsanjani at the time, and the ministry of information, Mr. Khuzestani, would those people have to approve of the relationship between Iran and Hamas?
A. Yes. The relationship with Hamas was part of, let's say, a policy that was actually decided and directed by the superior leadership the Iranian regime; and those names that you mentioned were actually at the time the highest leadership; and actually even today, they're still -- they still have a lot of influence in Iran; and, yes, such a policy was dictated actually by the superior leadership.
Q. So the relationship between Hamas and Iran could not have existed without the approval of these people?
A. Yes. Sure. Sure. And Iran was always -- we have to understand maybe another point which is not directly connected

to terrorism but which is important, and that is that Iran since the -- since the Islamic revolution, was always looking for legitimacy in the Arab world, which is Sunni and non-Shiite Islamic world.

So, therefore, they were looking for every possible corner where they can put their hand and find cooperation and support for their cause.

So that's why the relations they had since the early eighties with the Islamic Palestinian jihad was useless because the Islamic Palestinian jihad was and still is a very, very small and marginal organization among the Palestinians.

So they were always looking for groups like Hamas with a lot of influence in -- among the Palestinians and especially that Hamas viewed itself as a rival and as an alternative to the Palestinian -- to the PLO, to the Palestinian authority, and to the national Palestinian leadership.

So they always wished to increase their relations and cooperation with such a big group like Hamas.

**Q.** They're always willing to give milk?

**A.** That's right.

**Q.** By the way, is that an expression in Hebrew? Is that a common expression in Hebrew?

**A.** Yes. This is a very common expression in Hebrew. It is accepted among most of these experts that that's the way to describe the Iranian policy in this regard.

**Q.** And does the ministry of information in Iran, do they monitor Hamas' operations?

**A.** No.

**Q.** Well, how do they communicate about the Hamas activities?

**A.** Well, their policy is to encourage Hamas to carry out as much as possible terrorist activity against Israel on the one hand and to do the best to prevent any improvement or any progress in the peace progress between Israel and the Palestinian leadership.

So this eggs their policy and for that, they -- let's say in order to achieve this policy, they encourage mainly Hamas terrorism as the main tool to interfere with the peace process and to influence either the Palestinians or the Israeli public opinion.

**Q.** How do they do that?

**A.** They do that first of all by financing all kinds of Hamas activities. They do it by training, and they do it by a lot of propaganda in support either directly or through their influence in Lebanon and through Hizbollah.

**Q.** Let's talk about the financing for a minute. Do you have an idea as to how much money Iran spent financing Hamas over the past decade?

**A.** Well, I can only estimate. As far as I know the only estimations -- I would say -- or I can -- I would estimate that in the early or -- let's say in the first half of the nineties,

Iran gave Hamas -- directly -- about $3 million per year; and this sum of money increased.

And now there is information, talking about $18 million in the last year, during this year of the -- what they called the second intifadah, the second uprising.

So there is an increase in the financial support of the Iranians; but I would mention that this is, let's say, the direct financial support. There is financial support by other means such as the trainings, the flights, the false documentations, et cetera.

Q. The $3 million in the early eighties, that's basically cash payments, right? That doesn't include the training, the income --

A. Yes. I assumed that.

Q. Is it fair to say that there's some wide -- within the academic community there's some wide -- there's a wide range of ideas as to how much money actually Iran gets?

A. Yes.

Q. Is it --

A. I can say that there are people who are talking about $30 million a year; but this is my assumption -- this is my estimation.

Q. You're on the conservative side?

A. Yes. That's right.

Q. And the money that is given by Hamas -- excuse me, given

by Iran to Hamas, is that money give for any specific purpose or is it given general -- generally to Hamas for all of its activities?

A. No. It is not -- the Iranians are not financing so far and didn't do it in earlier years. They are not financing the social or cultural or educational infrastructure of Hamas.

They are financing mainly terrorism.

Q. Okay. Now, you also talked about the other mechanism of support, and that's the training that's provided?

A. Yes.

Q. Can you tell us a little more about the training?

A. Well, the training, so far -- as I can estimate -- there were over 100 members of Hamas trained directly on Iranian soil; and about another 100 or 150 members trained by Hizbollah and Iranians from the Revolutionary Guards in Lebanon.

The training was mainly -- let's say in all kinds of terrorism and guerilla warfare. I mean there were military trainings as well as training on specific terrorist operations like making explosives, very sophisticated explosives, and shooting.

Q. They trained them with missiles as well?

A. Not -- they were trained -- you cannot call -- let's say rockets.

Q. Rockets?

A. Rockets and mortars.

Q. Parachuting?
A. No. No.
Q. And is it the ministry of information that provides the sort of umbrella for the training facilities?
A. Yes. Let's say on the top of the hierarchy there the ministry of information who deals with Iranian terrorism in general.
Q. And did you -- you've reviewed -- I think I already asked you if you reviewed the confessions, and you reviewed the government -- the Israeli government's documents pertaining to the Ungar murder.
Could you tell us how this group came to shoot at the car driven by the Ungars?
A. Well, at that time after they were informed by Talachmeh that that -- the movement -- Hamas is going to stop the suicide bombing, they started to look for soldiers, for kidnapping soldiers and for shooting; and unlike previous periods, they started to drive inside what we call the green line, inside Israel in order to find soldiers who were waiting for a lift or something like that.
And all shooting at moving cars and according to their confessions, they -- the 9th of June, '96, they drove to the rear of -- in the direction, let's say, of the south of Israel in order to -- one of them said in order to kidnap soldiers and to shoot at cars.

One of them said just to shoot at cars, and they were driving there for about an hour unenforced and until actually they saw the car of the Ungar family.

**Q.** What did Mr. Hamdiya say about why this particular car was chosen?

**A.** Well, he said that it was chosen because they saw a woman was driving this car.

**Q.** What significance did that have for him?

**A.** Well, for them as devoted Muslims, it might be more annoying, the fact that a woman was driving the car.

**Q.** Okay. And in conclusion, knowing what you know about Iran and about Hamas and the relationship between the two, can you tell us or give us a brief picture as to what Hamas would look like if it did not have the partnership with Iran and did not receive the training, support, propaganda support, et cetera?

THE COURT: That in the adversary process would be objected to and sustained, but I'll listen to the answer.

THE WITNESS: Well, I would say that Hamas at that time, without the Iranian support, mainly by training, by military training, would seem, let's -- I would say quite anemic, contrary to the well-organized and much more successful group they became especially after '95 and during '96. I would say another thing. In confession -- in a confession of another guy who was not connected to the Ungar case -- and I'm just referring to him as an example -- he was sent by Moussa abu

Marzook to military training in, first of all, in the military camp of Hamas in Kansas City; and then Moussa abu Marzook did not approve the level of the training, so he sent him to Lebanon and Moussa abu Marzook again did not approve the level of the training, so he sent him to Iran in order to be really well-trained.

So I bring that just as an example the training in Iran became very important factor in the improvement of Hamas in its terrorist activity.

MR. STRACHMAN: Thank you. That's all, Your Honor.

THE COURT: Thank you very much, Dr. Paz.

THE WITNESS: You're welcome.

(Witness excused.)

MR. STRACHMAN: Your Honor, we would like to call Dr. Clawson.

THE COURT: All right.

PATRICK CLAWSON, PLAINTIFFS' WITNESS, AFFIRMED

THE DEPUTY CLERK: Please be seated and speak into the microphone.

DIRECT EXAMINATION

BY MR. STRACHMAN:

Q. Doctor, your name sir?

A. Patrick Clawson.

Q. Okay. And where do you work, sir?

A. I work at the Washington Institute for Near East Policy.

Q. In what capacity?
A. I'm the director for research at the institute.
Q. And what do you do there in your capacity as director of research?
A. I direct a staff of approximately a dozen senior researchers and an equal number of research assistants who look at the contemporary Middle East and U.S. policy towards the Middle East.
Q. And what is your area of expertise?
A. I'm by professional training an economist. The country that I follow most closely is, however, Iran, and I cover its -- I study its politics, its military, its support for terrorism, as well as its economy and history.
Q. And have you written on Iran's relationship or sponsorship of terrorist organizations?
A. Yes. I've written numerous articles and a few books and edited a few books about Iran's strategy, including it support for terrorism.
Q. And have you testified in this court about Iran and its relationship to terrorism?
A. Yes, sir. I've testified in several cases in this Court about Iran's support for terrorism.
Q. And, Dr. Clawson, I'm showing you a document. Could you tell us what that is?
A. That is a brief professional resume.

Q. Okay. You prepared it?
A. Correct, sir.
MR. STRACHMAN: Your Honor, we would ask that Exhibit No. 6, which is Dr. Clawson's CV be admitted and also that Dr. Clawson be admitted as an expert to testify concerning Iran and Iranian policy.
THE COURT: All right. He may testify and Exhibit 6 will be received.
(Plaintiffs' Exhibit No. 6 was received into evidence.)
MR. STRACHMAN: Thank you.
BY MR. STRACHMAN:
Q. Dr. Clawson, could you describe for us the relationship between Hamas and Iran?
A. Well, it's gone through several phases. Initially in the 1980s, Hamas was quite suspicious of Iran because of its prejudices about Shiism. By the late 1980s, Hamas and Iran began cooperating; and certainly by the mid-1990s, they developed something of a partnership.
It has its ups and downs. One might make an analogy to a marriage which sometimes the two sides are pretty close to each other and sometimes the two sides are fighting; and occasionally, each one has an affair on the side with somebody else.
Q. But despite that history, is it fair to say --

THE COURT: That's some marriage you just talked about.

THE WITNESS: Well...

I'm afraid, Your Honor, that marriages have been known -- such marriages have been known to exist.

THE COURT: Well, I'll never tell; but go ahead, Doctor.

MR. STRACHMAN: In the Middle East. This is a Middle Eastern marriage.

THE COURT: I hope not. In the Middle East you're in real trouble with a marriage like that.

Go ahead.

BY MR. STRACHMAN:

Q. Is it fair to say that despite the ups and downs, they've continued to maintain this partnership over the last 10 years or so?

A. Over the last 10 years, yes, sir. In December 1992, there was an episode the Israelis deported about 300 Hamas members to Lebanon. Lebanon wouldn't let them in. They sit there on the border for a long time. There's a real breakthrough in the relationship between the two sides. Since then Hamas and Iran have cooperated relatively closely, sometimes extremely closely, sometimes with a little more suspicion on the two sides.

Q. Does our government -- did the United States government

have an articulate -- an official position concerning Iran and concerning its relationship to terrorism?

A. Yes, sir. Every year there is a report issued by the State Department called Patterns of Global Terrorism. That report is a product of a great deal of effort throughout the intelligence and foreign affairs community. Every word is carefully weighed. I've been consulted at times about exactly which word to use in some of the sentences.

And that report has a description about Iran's role as a state sponsor of terrorism and has for years now described Iran as either, one, a leading sponsor or the leading state sponsor of terrorism; and the report also describes in some detail the Iran-Hamas connection.

Q. And is it fair to say that Iran is a charter member of this designation of state -- being a state sponsor of terrorism?

A. Charter member? Certainly since the Iranian revolution more than 20 years ago, it's been on that list. There was a precursor to that list that began a couple of years before the revolution; but since it has been a formal list, Iran has been on it.

Q. Since the list was designated and formulated by the State Department, Iran has been on that list each and every year?

A. I'd have to go back and check as to whether it first began in 1977 or 1978. Iran has been on there for more than 20

years.
Q. Okay. How was Iran characterized in 1996, the year that the Ungars were murdered?
A. It was characterized as the principal state sponsor of terrorism.
Q. In the world?
A. In the world, that's correct.
Q. Okay. And is that designation, is that sort of a tool of -- or used by our government to sort of announce policy or is it sort of a -- a tool to -- you know, as a propaganda tool? Is it conservative in its designation or is it exaggeratory?
A. Well, the report is a very careful and conservative report. The formal designation of which states are state sponsors has many legal implications. I think it is fair to say that the list has become kind of frozen in time in the number of countries -- like Cuba -- that are on the list as they -- the report describes are no longer actively supporting terrorism but are still on the list because of their -- they have never prosecuted or handed over for prosecution the terrorists they supported in the past.
Iran, as the report describes, is a very different situation. It is still an active state sponsor. As a result, under law, there are a whole variety of benefits that are denied to Iran.
Q. How is that -- how were -- did that designation -- how is

that taken by the Iranian government? How does that affect the government?

A. This has always deeply offended the Iranian government. Its self-conception is, after all, as a religious or moral government; and also Iranians are a proud people, proud of their country, proud of their civilization; and they feel that this is -- the Iranian government feels this is disparaging that civilization.

Q. And what is the significance of a designation? I think you said principal sponsor, and I think the report makes it premiere. What's the significance of the use of that type of word in connection with Iran's sponsorship of terrorism?

A. At the time in the mid-1990s, the United States was having an active discussion -- shall we say? -- with a number of our European allies about how best to press Iran to drop its terrorist activities.

And a number of those European countries were suggesting that all Iran's activity in terrorism was a matter of the past; and when it sponsored the hijackings of the -- the kidnappings of the Americans in Lebanon and that wording in that report and the information in that report was part of a vigorous effort by the U.S. government to persuade European governments to take a stronger stance against Iranian terrorism, in particular against Iranian support for terrorism directed against Israel and in Israel.

Q. How -- in doing your research or -- how do you gather information about Iran?

A. Iran is actually a relatively open country. There's a lot of newspapers in Iran. They like to scoop each other by publishing secret documents.

After all the Iran-contra affair, news of that, that was leaked from Iran not from the United States. And at the time we're talking about, there's a reform movement in Iran that started to gather steam and criticized the government. So we see a pretty lively political debate about many of these issues.

It is circumspect about national security affairs, but still quite a bit of information comes through.

Q. And what was the reason that Iran began to have a relationship with Hamas?

A. Iran wanted a relationship with Hamas dating back to the earlier days of the Iranian revolution. It was Hamas which was reluctant. Iran supports the goal of creating an Islamic state in all of the mandatory Palestine, and, therefore, Iran wanted to work with Hamas.

Iran was a little -- was concerned that Hamas was too moderate because initially Hamas in the early 1980s wasn't sponsoring terrorist attacks inside Israel itself, only in the West Bank and Gaza was Hamas involved in terrorist attacks. That was one reason that Iran essentially created a more

radical group than Hamas, the Palestinian Islamic jihad; but Iran then was very pleased it was able to work with Hamas and that Hamas adopted a more radical agenda.

Q. Is the position of the government, the Iranian government, compatible with the goals of Hamas as articulated in its charter?

A. Absolutely. Indeed, Iran's complaint has been at times that Hamas hasn't been vigorous enough in using military force and using terrorism to achieve those goals in that charter.

Q. And do -- how do each -- each, Hamas and Iran -- how do they each conceptualize the notion of jihad? Is that something that they conceptualize differently or that they share?

A. Well, Iran is going to -- Iran emphasizes the use of force, the use of violence for jihad. If anything somewhat more than Hamas does. People in Hamas may talk about jihad as both this violent use of terrorism as well as a more moralistic and striving for moral purity where Iran emphasizes the militaristic aspect much more.

Q. And how -- what methods or what mechanisms do -- does Iran use to encourage this terrorism by Hamas?

A. Well, Iran provides financial support; and, indeed, there have been credible supports from numerous sources -- including Iranian ones -- that suggest that Iran provides payment after terrorist actions, especially after spectacular terrorist actions. Iran can provide a considerable amount of payment.

Iran provides a great deal of training for those to carry out terrorism, and Iran provides a lot of propaganda support. Iran, after all, has a lot of radio stations, newspapers that carry its message throughout the Muslim world.

And especially in the -- from the mid-1990s onward, Iran has used it prestige as a radical force in the world Muslim community. In an earlier period, Iran had problem doing that because of this prejudice against Shiites which has only been overcome in the last -- in the 1990s.

**Q.** And you talk about the financial support. Can you give us an estimate as to how much money is paid by Iran on a yearly basis and does it change? Has it changed over time?

**A.** Well, we have only imperfect information, to put it mildly, on how much Iran provides for terrorism overall. But I've never seen any credible estimates that Iran's total spending on terrorism at the time we're talking about were as low as $50 million a year. I think that they were -- most of the credible estimates are considerably higher, some as high as 200 million a year. Much of that, however, is in Lebanon in the Palestinian area, I mean in -- its -- quite a bit less, some of that goes to the Palestinian Islamic jihad.

How much specifically goes to Hamas, I don't know. But certainly in the millions of dollars.

**Q.** Per year?

**A.** Per year.

Q. Okay. And the balance then of the funds that you talked about would be used with -- in Iran for training?

A. No. The Hizbollah in Lebanon or for that matter some -- Iran at this time, '95, '96 is starting to get going for support for terrorism in the Balkans. Iran is using terrorism to target Iranian dissidents abroad; for instance, there's a murder in Berlin which becomes quite a *cause celebre*, a trial in a German court that finds that the top leaders of the Iranian government were the ones who ordered that assassination; and, indeed, the court finds that they -- the top leaders of the Iranian government are -- provide approval for lots of terrorist actions or are very involved in the approval for terrorism.

Q. You talked about providing funds in response to spectacular activities.

A. Yes.

Q. How does that occur with respect to Hamas?

A. There's been credible reports that after a Hamas suicide bombing, Iran provides literally a cash payment.

Q. Okay. How do --

THE COURT: To the family of the suicide?

THE WITNESS: Yes, sir, but -- Your Honor, but also to Hamas as an organization as well, for it to be able to carry out further such activities. After all, Iran has been concerned that at times it didn't think Hamas was being radical

enough. So when Hamas does something radical, which Iran approves, it is going to want to reward Hamas for having done that.

BY MR. STRACHMAN:

Q. How -- is there communication between Hamas requesting the reward and Iran to --

A. We don't have -- I don't have a very good idea how that works. I suspect some of our intelligence communities do. There had been various suggestions that intermediaries are used, for instance, people here in the United States, but I don't know exactly.

Q. Frequently, or recently, are Hamas activities videotaped to present to Iran?

A. More recently, yes. Right. More recently Hamas has been videotaping its terrorist bombings, and there is reason to believe that is in part to be better able to get payment from Iran.

Q. Okay. Now, the Iranian support for Hamas, is that part of a sort of a national policy of the Iranian government?

A. Absolutely. There is a broad consensus within the Iranian government about its opposition to the existence of the state of Israel and about the appropriateness of the use of terrorism in order to fight against the existence of the state of Israel.

So while there are many disputes in Iran among the political leaders, there's broad consensus on that issue.

Q. And could the -- could the -- strike that.

What is the role of the ministry of information and security with regard to the -- this relationship between -- or this marriage -- as you said -- between Hamas and Iran?

A. Well, the ministry of information and security is a very large agency. And it's the -- shall I put it? -- the heir of the -- the secret police of the former Shah; and it has a lot of technical expertise and provides a lot of technical training in terrorism techniques to Hamas members as well as to other terrorist groups.

Q. How many members or how many employees are there of the ministry of information and security?

A. Certainly 30,000. Potentially more. We know quite a bit about its activities because most of its activities are directed against dissidents inside Iran. And the reform movement in Iran has in recent years revealed a great deal of information about the organization's activities.

We also know a lot about its activities from the defector from that organization who testified in the Berlin trial about the killings I mentioned earlier.

Q. What is its annual budget? Do you have an idea as to that?

A. Its credibly said to be something on the order of a hundred million dollars.

Q. A hundred million?

A. That may be a bit high but certainly is more than 50 million.

Q. Were there some estimates that its budget is 500 million?

A. Estimates that are much higher, yes; but that, I think, is an exaggeration based on the fact Iran has a very artificial economy kind of like the old Soviet Union. So the country's exchange rate is very different. The official exchange rate is very different from the black market rate.

Q. Do the funds that go to Hamas, that are dedicated to Hamas for terrorism, do they come from the ministry of information and security's budget?

A. It would seem they come almost entirely from the ministry of information and security. For some other terrorist groups, the Revolutionary Guards get very involved. For instance with Hizbollah, the Revolutionary Guards seem to be more important; but it would seem with the Palestinians that it is much more the ministry of information and security that's involved.

Iran is a rather messy government with a lot of overlapping institutions, like the Revolutionary Guards is a revolutionary institution created by the new government after the revolution, whereas the ministry of information and security is sort of a technocratic institution of secret police that's been there for a long, long time.

Q. And are there specific communications in relationships between people in Hamas and the ministry of information and

security?

A. Certainly in 1993, when this large group of this some 300 people from Hamas are in southern Lebanon, we have good reason to believe that some of them that went on to get direct training from the ministry of information and security operatives.

Q. How would you describe the relationship between Hamas and Iran? How would you characterize it during the specific period of 1995 and 1996?

A. Oh, at that point the relationship had been improving pretty steadily for -- well, almost eight years. And it had become a pretty tight relationship. In fact, I would say in early 1996, at that point it looked like eight years of steady improvement, the relationship was becoming better and better. Since then there have been ups and downs, but...

Q. And the -- what's described -- this relationship between Hamas and Iran, is this something that's fairly well known in public or is this something that only through research such as your own, such as you -- you or other scholars would do would be able to uncover?

A. It's hardly a secret. Hamas leaders visit Iran and are greeted by the top leaders of the Iranian government. Iranian leadership -- the Iranian newspapers comment on it. It is commented on by people from these -- from Hamas by scholars writing about Hamas. It is commented on. It is frequently by

PLO chairman Yasar Arafat who is not happy about it.
Q. Specifically in the period of early 1996, did the relationship come to the forefront of international affairs?
A. Absolutely. At that time the Israeli prime minister, Shimon Peres, faced a very difficult election campaign in Israel; and he was complaining that the suicide bombings, which Hamas was principally responsible for, were undercutting his campaign and he, of course, went on to lose by a very narrow margin; and Mr. Peres frequently said that he thinks that it was the Iranians who short-circuited the peace process and prevented the successful completion of an Israeli Palestinian peace in the late 1990s.
And that's an evaluation which the Iranians generally share. They think this was a great strategic triumph for them, their support for Hamas at this time.
Q. In that period of time, spring of 1996, were their comments from Chairman Arafat as to his opinion about the relationship between Iran and Hamas?
A. Chairman Arafat was pretty sharp about it, not as sharp as Mr. Peres. In fact, not as sharp as Mr. Arafat became after the fall of '96 when he had to deal with the new Israeli prime minister Mr. Netanyahu and realized what a big problem it caused for him.
It was by late 1999 that Arafat is bitterly denouncing Hamas and is describing -- exposed how much Hamas had been

responsible for the bombings that previous -- earlier that year.

Q. Did he comment about the relationship between -- did Chairman Arafat comment on the relationship between Hamas and Iran during that period of time, the spring of 1996?

A. Yes. Chairman Arafat was blaming Iran for its encouragement of the suicide bombings and at a summit attended by many world leaders in Sharm al Sheek in the Sinai peninsula of Egypt, numerous world leaders condemned Iran for its support for the suicide bombings. Many of them did not mention that the suicide bombings were claimed by Hamas.

Q. What was the argot -- our government -- the United States government's position concerning responsibility of Iran for that spate of terrorism?

A. Both President Clinton and Secretary of State Christopher frequently condemned Iran for its sponsorship of the suicide bombings. I'm not sure if Mr. Clinton made the direct connection to Hamas as the intermediary through which this was done, but certainly Mr. Christopher did.

Q. And you've reviewed -- have you had an opportunity to review the confessions and the convictions of the four individuals who participated in the murder of the Ungars?

A. Yes, sir.

Q. And how would you characterize their -- this incident with regard to their training or their expertise?

A. Well, their confessions certainly describe a -- quite a professionally trained group, and many of the skills which they described for carrying out the terrorist actions are precisely the kind of skills which Iran was noted for in the -- by the Berlin court in the killings there. Many of those skills are precisely the things that Hamas did not have a few years earlier before its cooperation with Iran became much closer.

Q. And in the last few years, there have been a series of judgments against Iran for its participation or its support or involvement in terrorism.

How are those -- how are those judgments -- how are those -- how do they impact the government of Iran? How do they relate to those pronouncements, those judicial pronouncements?

THE COURT: Is that any of my business?

MR. STRACHMAN: Well --

THE COURT: Do I need to know that?

MR. STRACHMAN: I think it is significant, Judge, and I think it has to do with the nature of Iran and how they -- how they interact with their sponsorship of terrorism.

THE COURT: All right.

THE WITNESS: Initially, the judgments were generally ignored in Iran. But especially since Congress changed the law to allow claimants to receive funds, there's been a great deal of attention paid in the Iranian press to these judgments; and

the way the issue is presented in the Iranian press is that the payments that are being made are out of Iranian money.

I know that that's something of a simplification of how the process takes place, but that's how it is presented in the Iranian press; and there's been a great deal of anger expressed. Iran passed -- the parliament passed a law allowing Iranian citizens to sue the United States in response; and there have been a lot of criticisms directed against the current Iranian government for not finding a way to bring an end to these lawsuits.

BY MR. STRACHMAN:

**Q.** Has there been a specific pronouncement by the Iranian government itself?

**A.** The Iranian supreme leader, the Iranian foreign minister, the head of the judiciary, the -- the parliament, in the preamble to the law allowing suits against Americans have all condemned these suits.

**Q.** And have you spoken to any officials of the Iranian government about these types of legal procedures?

**A.** Yes. I have spoken to -- well, officials of the Iranian government. I've spoken to lawyers who work for Iran. For instance, the head counsel for Iran at the Iran-U.S. claims tribunal in the Hague who, in fact, when he made a presentation here in Washington devoted his entire presentation to the subject of these suits, and why he thought they were

inappropriate; and he described also --

THE COURT: When was that?

THE WITNESS: I would have to refresh my memory, Your Honor. I believe the answer is that it was approximately 15 months ago. I would have to check that.

THE COURT: Are those comments available on the web or some other place?

THE WITNESS: I have never seen those comments available, I'm afraid to say. I tried to get a copy of them, and I urged him to write them up for review.

THE COURT: You mentioned the perception in Iran that the money is coming from Iran. Is any money being paid on any of these judgments; and if so, by whom, and where is it coming from?

THE WITNESS: Your Honor, the money is being paid in these judgments for the compensatory damages, and the funds are paid out of the U.S. Treasury against the law which says the funds are to be then reclaimed from the assets which Iran had paid in to the U.S. Treasury before the revolution as prepayment for arms that were to be shipped to Iran.

And there's a sum of more than $400 million that Iran prepaid at that time. And the U.S. government resisted calling that frozen money, frozen funds; and for a long time, there was quite a dispute taking place in Congress -- which I testified frequently -- about this money; and in the end, Congress said

that payments could be made from the U.S. Treasury with a directive that the government was then to seek recovery from that account.

THE COURT: And is the government seeking recovery from that account?

THE WITNESS: That's a matter of considerable dispute. Because that account is in -- is in dispute in this U.S.-Iran claims tribunal. So one way of characterizing what's going to happen --

THE COURT: All in one lump sum or case by case.

THE WITNESS: Case by case, 10,000 lines are being disputed and have been for 20 years. As you might suspect, Your Honor, the accounting from the Defense Department was not perfect; and there's a lot of dispute about each line item, and there was a lot of bad will on both sides.

THE COURT: What about all these $300 million judgments that have come down from this Court?

THE WITNESS: The punitive damages, Congress provided that the individuals could collect -- if they agreed to suborn their punitive damages to the U.S. government, they could collect --

THE COURT: Subrogate?

THE WITNESS: Subrogate. Excuse me. I'm sorry.

THE COURT: Suborning is a different idea entirely.

THE WITNESS: Yes, sir. My apologies, Your Honor.

Then the individuals could collect an additional amount based on the compensatory damages. So, in other words, if you agree to subrogate your punitive damages you get an additional amount calculated as a percentage of your compensatory damages. My understanding is that a number of the -- those who have gotten these judgments have agreed to that subrogation. A number of them have not.

And some of the lawyers involved are vigorously pursuing all kinds of ways of trying to collect money and come up with a variety of ideas that are --

THE COURT: But the compensatory damages are paid out promptly?

THE WITNESS: For those cases which were specifically cited by Congress in the law.

Now there's an interesting process going on of trying to add additional cases to that list --

THE COURT: You mean --

THE WITNESS: The law cited specific -- sorry to interrupt, Your Honor.

THE COURT: The 1996 law?

THE WITNESS: Then there was an amendment to that law. Excuse me, an additional feature -- it wasn't an amendment -- to that law which allowed then collections from this.

MR. STRACHMAN: If I could, Your Honor, it is my

understanding that in October of last year, of 2000, Congress amended the Foreign Sovereign Immunities Act and said -- allowed for five judgments that were then -- had been obtained from the District Court. Those five judgment creditors would be paid the compensatory damages only. As I understand, four of them are against Iran, one was against Cuba.

The structure that was -- Dr. Clawson spoke about was accurate in the sense that there was a provision in the law that allowed for a 10 percent addition to the compensatory damage if the claimants transferred their right to punitive damages to the United States government. There are no -- has been no amendment to that law, to the best of my understanding; so no claims who have been made after -- excuse me, who received judgments that are not included in those five cases have been paid. Including the Elahi case which come down, was heard in December and the -- for instance, and the -- I think that was the first one after the law was passed.

THE WITNESS: I think, sir, there were a couple of other cases cited that in the event of judgments, payment could be made. I'm not sure about this. That was my impression.

THE COURT: We can look that up. That's very interesting. Go ahead.

THE WITNESS: Certainly what's gotten all the attention in Iran is the big numbers. What's gotten the attention in Iran is the large judgment amounts.

BY MR. STRACHMAN:

Q. So then the effect -- is it fair to say there is an effect to a large punitive damage award?

A. The large punitive damage awards gets attention in the Iranian newspapers and the foreign ministry regularly gets excoriated for not having figured out to way to stop this, and the United States gets attacked and there is discussion in the Iranian press as to whether or not Iran's national interests are best served by continuing to have -- its refusal to have dialogue with the United States; and it has helped in the process over the last year and a half of making the question of relations with the United States a matter of vigorous debate inside Iran.

Q. Okay.

MR. STRACHMAN: I believe that's all, Your Honor.

THE COURT: All right. Thank you, Dr. Clawson.

THE WITNESS: Thank you, sir.

(Witness excused.)

MR. STRACHMAN: Your Honor, that's all we have today in terms of the expert witnesses on the issue of liability. We initially thought we would have four witnesses. We have sort of tailored that back to three. We would ask -- I would ask if we could move to admit some of the other exhibits that are on our list.

THE COURT: Let's talk about them.

# EXHIBIT N

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DVIR UNGAR, et al.

vs. 00-02606(JR)

THE ISLAMIC REPUBLIC OF IRAN, et al.

**PRETRIAL SUMMARY OF PROPOSED TESTIMONY AND EXHIBITS**

FILED
DEC - 7 2001
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Plaintiffs file this Pretrial Summary of Proposed Testimony and Exhibits in compliance with this Court's order of October 17, 2001.

I. SUMMARY OF TESTIMONY

The Plaintiffs will present the following witnesses at trial:

1. **Dr. Reuven Paz** –

Hamas (The Islamic Resistance Movement) was founded in Gaza in December, 1987, as an extension of the Palestinian Muslim Brotherhood. It established a clandestine military wing ("Iz al-Din al-Qasam Brigades") to carry out terrorist operations against Israelis, in the West Bank, Gaza, and Israel. In August 1988, Hamas published its covenant, stating its main objectives, including the elimination of Israel as a Jewish State, by using all possible means of armed struggle. The movement started its terrorist activity in early 1988, continuing to the present in a constant, intensive and increasingly sophisticated fashion, moving over the years from stabbings and throwing firebombs, to military-style ambushes and bombings. In the past 14 years, Hamas has murdered over 600 people.

The movement is listed by the U.S. State Department as a terrorist organization.

Hamas members began receiving terrorist training from Iranian proxy organizations such as Hizballah in the early 1990's. Between December 1992 and December 1993, 400 leading

18

Hamas operatives were deported by Israel to Lebanon, where, with Syrian approval, they developed a close association with the pro-Iranian Hizballah and units of the Iranian Revolutionary Guards operating in areas of Lebanon occupied and/or controlled by the Syrian army. Hamas opened an official office in Tehran, and gradually established closer relationships with the Iranian government officials in charge of terrorism, espionage and military operations. The Oslo Accords that led to the establishment of the Palestinian Authority in 1994 reinforced the links between Hamas and Iran. Iran sought to thwart any possible reconciliation between Israel and the Palestinians and to this end Iran promoted Hamas' armed struggle. In late 1994, a group of 19 Hamas members was trained in a military base near Tehran. In the mid-1990's another group of Hamas operatives went through officers course in Iran. This advanced training of senior personnel enabled Hamas to maintain systematic, quality training of its operatives in the Palestinian territories, and to organize highly professional terrorist cells which were able to carry out more sophisticated operations including suicide operations, car bombs, kidnapping of Israeli soldiers, and repeated, successful ambushes and shooting forays within Israeli territory. . Since then, more Hamas members have been sent for training in Iran. Relations with Iran were reinforced in 1998, following the visit of Hamas leader Sheikh Ahmad Yasin to Iran.

In 1995-96 Hamas intensified its terrorist activity in order to affect the Israeli public and political developments in Israel, with public support from Iran. The movement succeeded in establishing many well-trained and well-equipped terrorist cells, including the "Surif Squad," which murdered Yaron and Efrat Ungar in June 1996.

The "Surif Squad" was established in April 1994, by `Abd al-Rahman Isma`il Ghanimat, its commander responsible for the contact with the Hamas headquarters. Between the years 1995-

97, members of this squad carried out at least 7 terrorist operations by shooting and one suicide operation. These operations killed at least 11 civilians and one soldier, and injured 50 others.

The members of this and other cells were intensively trained on various weapons, explosives, and military equipment, and in tactical use of these weapons, by Hamas commanders who had received intensive, high-quality terrorist training in Iran and from Iranian proxy forces in Lebanon Iran's contribution of political, financial, and training support to Hamas has been prominent. The Ministry of Information is the main conduit of financial, material, and training support to Hamas. Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani were leaders of Iran in 1996 and prior thereo, and their approval was necessary to carry out Iran's program of providing financial and material support and training to Hamas.

2. **Dr. Adrien Ziderman** – Dr. Ziderman will testify to the economic losses sustained by the plaintiffs as a result of the murder of Yaron and Efrat Ungar. Specifically, he will testify that Yaron Ungar's lost earnings total $1,273,028, or, adjusted for consumption, $477,386.

3. **Dr. Patrick Clawson** – Iran has been the principal state sponsor of Hamas and of its Izz Al-Din Al-Qassam wing. Hamas publicly acknowledges its support from Iran. Iran routinely provides financial support and terrorist training to Hamas and its members. Specific information about the financing is available from both Iranian and Palestinian sources for the early 1990s; it would appear that Iran pledged $15 million a month but actually delivered more like $27-30 million a year.

Hamas has no source of funding and terrorist training as important or extensive as that provided by Iran. The Iranian Ministry of Information and Security is an agency of the Islamic

Republic of Iran and is the conduit responsible for Iran's program of providing material, financial support and training to Hamas for terrorism.

The confessions and court judgements regarding the members of the Hamas cell which murdered Yaron and Efrat Ungar (Abdel Rahman Ismail Rahman Ghanimat, Jamal Abdel Fatah Tzabieh al-Hor, Iman Mahmud Hassan Fuad Kafishe, and Raed Fakhri Abu Hamdiya) prove they were operatives of Hamas and its Izz Al-Din Al-Qassam wing. Their method of operation is typical of Hamas cells, and the reliance of these operatives on the Hamas leadership for financial support, technical assistance (e.g., arms), training and strategic direction is also characteristic of Hamas. The financial support and technical training Iran provides to Hamas leaders and commanders made it possible for Hamas to provide its terrorist cells (such as the cell which killed the Ungars) with the resources, training and technical ability needed to carry out terrorist attacks of this type.

In 1996 Iran was the world's principal state sponsor of terrorism increasing its economic support of terrorism to between $50-100 million, a substantial increase from 1995. Iran's economic position has increased greatly since 1996 as a result of world oil prices.

4. **Yehudit Barsky** – Ms. Barsky will testify that since the early 1990's, Iran has provided tremendous financial, material and logistic support to Hamas, including training in weapons and explosives. In addition to providing a yearly sum of tens of millions of dollars, Iran, Iran's Revolutionary Guards and the Iranian proxy organization Hizballah have supplied logistic and training to Hamas operatives. In 1992, the Iranian government promised to provide training for 3000 Hamas terrorists. With Iranian support, Hamas opened an "embassy" in Tehran to maintain "contacts and coordination" with Iran and other Iranian sponsored terrorist organizations including Hizballah in the mid 1990's. Musa Mohammad Abu Marzuq, chief of Hamas' Political Bureau, led a "political and military delegation" to Tehran in October 1992 in

order to "conclude a number of political and military cooperation agreements with Iran and Lebanese Hizballah."

5. **Ron Shaked** – Mr. Shaked will testify to the organizational structure and modus operandi of Hamas cells, and the funding, training, and support supplied by Iran. At least two dozen Hamas leaders have trained in Iran and many others have trained in Iranian sponsored camps in the Beka'a Valley of Lebanon. Hamas operatives trained by Iranian forces and proxies assume the role of trainers themselves, and trained Hamas terrorists located in the West Bank and Gaza in the terrorist techniques learned in Iran and Lebanon. Mr. Shaked will testify to the organizational structure and methodology of the Hamas cell which murdered the Ungars.

6. **Dr. Alan Friedman** – Dr. Friedman will testify to the nature of the injuries sustained by Yaron and Efrat Ungar. He will review the forensic medical examinations of the Ungars. Yaron did not die instantaneously. He survived for a short period following the attack. This is indicated by the ascending trajectory of the bullets which struck him and the fact that none penetrated his brain. Effie was killed instantaneously by bullets which created large, gaping wounds in her neck and skull.

7. **Dr. Meyer Ungar** – Dr. Ungar will testify about the close emotional relationship he had with his son, his son's role in his family, the impact of Yaron's death on him and Yaron's two minor children.

8. **Judith Ungar** – From his youth in Philadelphia, Yaron demonstrated leadership qualities and was always at the center of his group of friends, becoming the most popular boy in his class. He gave the eighth grade valedictorian speech. He was a lover of sports, especially basketball, was active in a local youth movement, and an avid hiker. He was very handy at home and always ready to lend a hand. Yaron and Effi met at the age of 23 and were instantly in love.

After three months they were married. Because they were particularly close (speaking almost every day on the phone and visiting virtually every other weekend), the loss is particularly painful. Yaron was a success as a junior high school teacher and was able to touch the hearts of the young people in his class. He led children on trips, played with them during recess, and utilized advanced teaching methods. Together, he and Effi would prepare teaching materials. Yaron prepared the written materials and Effi the pictures. Effi and Yaron were model parents. They were very close to their children. Dvir was especially close to Yaron and always asks for "my father."

9. **Michal Cohen** – As Yaron's older sister, they grew up together and shared numerous childhood experiences. For many years growing up, they shared a bedroom. As Yaron grew, Michal became his confidante. They frequently had serious discussions together about his future and personal relationships. Her life has been greatly impacted by Yaron's death.

10. **Amichai Ungar** – As an older brother, Yaron was his role model and best friend. Yaron helped him mature. Yaron's death had a tremendous emotional impact on him. Yaron constantly took care of him, taking him to play soccer in the neighbor's yard. Yaron was a source of protection and strength. Growing up he was a role model as an athlete and student. After his death, Amichai learned that Yaron secretly financially supported a boy from a disadvantaged family, paying his school tuition.

11. **Dafna Ungar** – Yaron's most prominent trait was his love for life as expressed by an ever-permanent smile on his face. He was a constant source of inspiration and a role model as an older brother. Yaron inspired her with a positive outlook on life. He was constantly smiling.

12. **Uri Dasberg** – Yaron was an ideal son-in-law, someone with whom Rabbi Dasberg shared many things in common, including a love for learning. He collaborated with his

father-in-law on a book concerning Jewish law. He also collaborated with Effi on a weekly newsletter that was widely distributed. As a graphic artist, Effi provided the drawings for ideas by expressed words. She was an excellent and dutiful daughter and mother of her two children. Yaron and Effi were excellent parents.

Both Effi and Yaron were excellent teachers and demonstrated that repeatedly with their two sons.

13. **Judith Dasberg** – Mrs. Dasberg will testify about life for Dvir and Yishai without their parents.

Dvir and Yishai have suffered greatly from their parents' murder and absence from their lives. Yaron was an outstanding, dedicated and loving father. Effi was pleasant, happy, had an upbeat personality, and a sense of serenity and balance. She was never angry. She was a loving and patient mother and did everything with joy and good spirit. As a mother she gave her children confidence and they were developing beautifully upon her murder. As a result of Effi's care for her children, Dvir began speaking before he was 10 months old and started walking before he was a year old. She was an avid reader of "how to" books for parents and was very particular about her children's upbringing. She was inspired by Dvir and her last drawings were about him. She was a dutiful daughter, friend, and resourceful problem solver. She was extremely dependable. At the time of her death, Effi was two months pregnant.

## II. DAMAGE CALCULATION

### A. Compensatory Damage

The Plaintiffs request compensatory damages against the Defendants, jointly and severally, in the following amounts:

| | |
|---|---|
| Dvir Ungar - solatium and loss of consortium | $12,000,000.00 |

| | |
|---|---|
| Yishai Ungar - solatium and loss of consortium | $12,000,000.00 |
| Meyer Ungar - solatium and loss of consortium | $ 5,000,000.00 |
| Judith Ungar - solatium and loss of consortium | $ 5,000,000.00 |
| Amichai Ungar - solatium and loss of consortium | $ 5,000,000.00 |
| Dafna Ungar - solatium and loss of consortium | $ 5,000,000.00 |
| Michal Cohen - solatium and loss of consortium | $ 5,000,000.00 |
| Uri Dasberg - solatium and loss of consortium | $ 2,500,000.00 |
| Judith Dasberg - solatium and loss of consortium | $ 2,500,000.00 |
| Estate of Yaron Ungar - loss of accretions | $ 477,386.00 |
| Estate of Yaron Ungar - survival damages | $ 1,000,000.00 |

B. Punitive Damage

The Plaintiffs further request punitive damages against all Defendants in the amount of $300,000,000.00

III. EXHIBITS

The following exhibits will be introduced by the Plaintiff:

1. Conviction of Iman Mahmud Hassan Fuad Kafishe
2. Conviction of Raed Fakhri Abu Hamdiya
3. Conviction of Abdel Rahman Ismail Abdel Rahman Ghanimat and Jamal Abdel Fatah Tzabich al-Hor.
4. CV – Dr. Reuven Paz
5. CV – Yehudit Barsky
6. CV – Dr. Patrick Clawson
7. CV – Dr. Adrien Ziderman

8. Dr. Adrien Ziderman report

9. CV – Dr. Alan Friedman

10. Forensic medical examination of Yaron Ungar from June 10,1996

11. Forensic medical examination of Efrat Ungar from June 10, 1996

12. Passport of Yaron Ungar

13. Birth certificate of Yaron Ungar

14. Report of the Death of an American Citizen Abroad (Yaron Ungar)

15. Pictures of Yaron and Effi Ungar and family

16. Police crime scene investigation report including pictures

17. Confession of Sharif Dehabrah Alwan to Israeli police on August 3, 1995 (excerpts)

18. Confession of Mahmoud Khalaf to Israeli police on April 19, 1999 (excerpts)

19. Confession of Mahmoud Khalaf to Israeli police on May 11, 1999 (excerpts)

20. Confession of Mahmoud al-Hindi to Israeli police on December 27-28, 1999 (excerpts)

21. Confession of Hasan Salameh to Israeli police on July 2, 1996 (excerpts)

Attorney for the Plaintiffs,

David J. Strachman
D.C. Bar No. D00210
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700

CERTIFICATION

I hereby certify that on the 26th day of November, 2001, I mailed via regular mail (postage paid) as well as via DHL International overnight mail return receipt requested, a true copy of this pleading, along with Farsi translations of this document, references exhibits, and this Court's order of October 17, 2001, to:

Dr. Kamal Kharrazi
The Islamic Republic of Iran
Ministry of Foreign Affairs
Khomeini Avenue United Nations Street
Teheran, Iran

The Iranian Ministry of Information and Security
Pasdaran Avenue Golestan Yekom
Teheran, Iran

Ayatollah Ali Hoseini Khamenei
Supreme Leader of the Islamic Republic of Iran
Office of the Supreme Leader
Palestine Street
Teheran, Iran

Ali Akbar Hashemi-Rafsanjani
Former President of the Islamic Republic of Iran
Presidential Office
Palestine Street
Teheran, Iran

Ali Fallahian-Khuzestani
Former Minister of Information and Security
Ministry of Information and Security
Pasdaran Avenue Golestan Yekom
Teheran, Iran

# EXHIBIT O

## Sharon Edri's murderers caught Kafr Tzurif Hamas cell behind 11 killings

*[Daily Edition]*

Jerusalem Post - Jerusalem

| | |
|---|---|
| Author: | ARIEH O'SULLIVAN |
| Date: | Apr 11, 1997 |
| Section: | News |
| Text Word Count: | 741 |

**Document Text**

*Copyright The Palestine Post Limited Apr 11, 1997*

Lead Story. Box at end of text.

The IDF has located the body of missing Staff-Sgt. Sharon Edri, and broken up the Hamas cell responsible for his kidnap-murder and the killing of at least 11 and the wounding of 49 other Israelis over the past two years.

Two of the terrorists are being held by Israel, two by the Palestinians, and one is still at large. A sixth member of the cell, Moussa Ranimat, blew himself up, apparently unintentionally, at Tel Aviv's Apropo cafe last month, killing three women.

Ironically, the botched bombing led to the capture of the cell. Israel sought and received the help of the Palestinian Authority, which arrested two of the terrorists in the Palestinian-controlled part of Hebron and brought them to the West Bank village of Kafr Tzurif to show where they had buried Edri.

**Exhaust Ringtone**
Send this complimentary ringtone to your phone right now!
RingRingMobile.com

**Toy Box of Wisconsin**
Retail Military Toys & Collectibles "Men with the Toughest Toys Win"
www.toyboxwi.com

**Hot Toys & Hobbies - Sale**
RC Cars, Indoor Helicopters, Boats, Tanks, Airsoft Guns + Free Shipping
www.TrendTimes.com

**Super 9 Airsoft Rifle**
We carry variety Airsoft product. Airsoft Guns and Accessories.
www.airsoftsurplus.com

Defense Minister Yitzhak Mordechai and the IDF brass, nonetheless, did little to hide their disappointment at the lack of Palestinian cooperation to foil terror attacks. "The PA is not working with all force and measures it has to foil terror and to fight against the foundations of terror," Mordechai told a press conference in Tel Aviv.

He said Israel would demand the extradition of the terrorists. OC Central Command Maj.-Gen. Uzi Dayan said the cell, sometimes referred to as the "Halhoul Cell," was responsible for the murder of 11 Israelis in a series of attacks since 1995.

Dayan said the IDF has arrested dozens of Palestinians since the Tel Aviv bombing and that 18 were arrested yesterday in Kafr Tzurif. According to the IDF, the cell was led by Ismail Ranimat, 25, a resident of Kafr Tzurif who studies in Hebron. He was jailed in 1993-1994 as a Hamas member.

Other members were Gamal Jibril Alhour, 27, of Kafr Tzurif; Rayid Salah Abu Hamid, 21, who carried an east Jerusalem ID and lives in Hebron; Ibrahim Abdallah Ranimat, 39, of Kafr Tzurif, who has been detained numerous times for membership in various terror groups; and Iman Mahmud Kafishe, 27, of Hebron, who was once jailed for membership in Hamas.

Israel is holding Abu Hamid and Kafishe, who told their interrogators they underwent military training and claimed at least five drive-by shootings, the Edri kidnap- murder, and planting the bomb at the Apropo cafe.

Among those arrested was Dr. Samir Khadi, head of Alia Hospital in Hebron and a former Hamas deportee, Kafr Tzurif residents said.

Troops converged on the village early Wednesday and barred journalists from entering. An IDF video released afterward, however, showed a handcuffed Palestinian prisoner leading soldiers to an olive tree and pointing downward to Edri's grave. Soldiers soon dug up the body and Edri's personal effects.

From the interrogation, it was learned that some members of the cell set out last September in a vehicle with Israeli license plates toward the Tzrifin army base with the express purpose of kidnapping a soldier. They said Edri was picked

up near the base. One of them drew a pistol and shot Edri dead shortly afterward, when he suspected Edri knew he had been kidnapped by Arabs.

(Box) Tzurif terror

The Kafr Tzurif Hamas cell began its terror with drive-by shootings in late 1995 and moved on to kidnappings and eventually the suicide bombing in Tel Aviv last month, according to the IDF.

March 21, 1997 - Cell member Moussa Ranimat blows himself up at the Apropo cafe in Tel Aviv killing Yael Gilad, Anat Winter-Rosen, and Michal Midan-Avrahami and wounding 47 others.

September 9, 1996 - Kidnapping and murder of Staff- Sgt. Sharon Edri hitchhiking to his home in Moshav Zanoah. His body is buried near the village.

July 26, 1996 - Drive-by shooting near Moshav Tirosh killing Uri Munk, his son Ze'ev, and his wife Rachel.

June 9, 1996 - Members of the cell open fire on a car near Moshav Gefen, killing Yaron and Efrat Unger, of Kiryat Arba.

January 16, 1996 - Murder of Maj. Oz Tivon, a doctor, and Sgt. Yaniv Shimel, a medic when their car is attacked near Karmei Tzur. December 9, 1995 - Drive-by shooting near Neveh Daniel in Gush Etzion. Yonatan Moshitz and his daughter Lior are wounded.

November 18, 1995 - Opened fire on a vehicle driven by a resident of Jerusalem as it passed the village of Beit Omar. No one was injured.

**[Illustration]**
photo; Caption: One of Staff-Sgt. Sharon Edri s alleged killers points out the; Credit: IDF Spokesman

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

**Abstract** (Document Summary)

[Uzi Dayan] said the IDF has arrested dozens of Palestinians since the Tel Aviv bombing and that 18 were arrested yesterday in Kafr Tzurif. According to the IDF, the cell was led by Ismail Ranimat, 25, a resident of Kafr Tzurif who studies in Hebron. He was jailed in 1993-1994 as a Hamas member.

Other members were Gamal Jibril Alhour, 27, of Kafr Tzurif; Rayid Salah Abu Hamid, 21, who carried an east Jerusalem ID and lives in Hebron; Ibrahim Abdallah Ranimat, 39, of Kafr Tzurif, who has been detained numerous times for membership in various terror groups; and Iman Mahmud Kafishe, 27, of Hebron, who was once jailed for membership in Hamas.

From the interrogation, it was learned that some members of the cell set out last September in a vehicle with Israeli license plates toward the Tzrifin army base with the express purpose of kidnapping a soldier. They said [Sharon Edri] was picked up near the base. One of them drew a pistol and shot Edri dead shortly afterward, when he suspected Edri knew he had been kidnapped by Arabs.

**Scion xB Parts**
Springs, Bodykits, Intakes Strut bars, Exhausts, and More
www.RacingSolution.com

**Cars**
Find the Lowest Price Possible Get the car of your dreams
autos.com

Ads by Google

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

# EXHIBIT P

ISRAEL MINISTRY OF FOREIGN AFFAIRS

Search

Go

MFA NEWS

MFA newsletter

About the Ministry
MFA events
Foreign Relations
Facts About Israel
Government
Jerusalem
Treaties
History of Israel
Peace Process
Terrorism
The Iranian Threat
Anti-Semitism/Holocaust
Israel beyond politics
Int'l development
MFA Publications
Our Bookmarks
News Archive
MFA Library

MFA > MFA Library > 1997 > Mar > Suicide Bombing in Tel-Aviv

## Suicide Bombing in Tel-Aviv

21 Mar 1997

E-mail to a friend
Print the article
Add to my bookmarks

### Suicide Bombing in Tel-Aviv
### March 21, 1997

Three women died and forty-eight people were wounded in a suicide bombing on Friday, March 21, in Tel Aviv.

At 1:45 p.m., a suicide bomber detonated a bomb shortly after sitting at a table on the terrace of the packed Apropo cafe, in central Tel Aviv. The cafe, like many other places in downtown Tel Aviv, was filled with families celebrating the Jewish holiday of Purim.

The blast, which was heard throughout the downtown area, blew out windows of nearby buildings and vehicles. Furniture and people were hurled meters from the scene, some into the middle of the street.

Anat Winter-Rosen, a Herzliya lawyer and the mother of a six-month-old baby-girl who was also wounded, died from her wounds at Ichilov Hospital. Dr. Michal Avrahami, 32, of Tel Aviv, a Wolfson Hospital radiologist, died shortly after being taken to the hospital. She was pregnant with her first child. Her husband and mother-in-law were moderately wounded. The third victim was Yael Gilad, 32, a social worker from Neveh Monosson.

Among the injured were several children, some in their Purim costumes.

The terrorist was later identified as Moussa Ranimat, 28, a resident of Kafr Tsurif near Hebron and the father of four.

The terrorist group Hamas claimed responsibility for the blast.

Feedback | Map | Hebrew

© 2007 Israel Ministry of Foreign Affairs - The State of Israel. All rights reserved. Terms of use Use of cookies

# EXHIBIT Q

# Israel Submits Formal Requests to the Palestinians to Hand Over PA Police Commander - 22-Sep-97

22 Sep 1997



Jerusalem, September 22, 1997

## Israel Submits Formal Requests to the Palestinians to Hand Over PA Police Commander Ghazi Jabali and 4 Other Terror Suspects

PA Refuses to Hand Over 4 Terrorists Involved in Murder of 4 Americans

(Communicated by the Israel Government Press Office)

The Agreement - The Interim Agreement (Oslo 2) states that Israel may request from the Palestinian Authority (PA) the transfer ("extradition") of an individual located in the autonomous areas who is suspected of an offense that falls under Israeli criminal jurisdiction (Annex IV, Article 2, par. 7b). The PA is obligated to comply with all formal requests and to arrest and transfer the suspect to Israel (Annex IV, Article 2, par. 7f (1)).

In the Note for the Record attached to the January 15, 1997 Hebron Protocol, the Palestinians reaffirmed their commitment that "Requests for transfer of suspects and defendants will be acted upon in accordance with Article II (7)(f) of Annex IV to the Interim Agreement."

The Violations

On September 17, 1997, Israel submitted five new requests to the PA for the transfer of terror suspects. Previously, on March 31, 1997, Israel submitted 31 formal requests for the transfer of terror suspects. Thus far, the PA has not responded to any of Israel's 36 requests (except for two cases in December 1994, when the PA rejected Israel's requests).

Of the 36 terror suspects whose transfer is being sought by Israel, 12 are either serving in the Palestinian police or are in the process of joining its ranks.

Among the suspects the PA is refusing to hand over are four who were involved in attacks in which 4 American citizens were killed. The four terror suspects are: Nafez Mahmoud Sabih, Muhi a-Din a-Sharif, Abd al-Majid Dudin and Imjad Muhammad Hinawi (details concerning them appear on the list below - see suspects # 2, 14, 31, and 32).

Case 1:00-cv-00105-L-DLM Document 408-18 Filed 12/28/2007 Page 3 of 6

The PA's failure to transfer terror suspects to Israel is a flagrant violation of the Oslo Accords. By refusing to turn them over to Israel, the PA has allowed terrorists to go unpunished, thereby encouraging others to carry out attacks in the knowledge that they will not have to answer for their actions.

5 New Formal Requests Submitted to the PA

1. Col. Ghazi Jabali - Commander of the Palestinian Police Force. Suspected of organizing terrorist cells within the Palestinian police and issuing instructions to Palestinian policemen to carry out terror attacks against Israelis.

2. Imjad Muhammad Hinawi - member of Hamas who took part in the murder of 16-year old David Boim, an American-Israeli citizen, in Beit El in May 1996. The PA detained Hinawi but subsequently released him in February 1997 on holiday leave for the Id al-Fitr festival.

3. Abdel-Rahman Ghneimat - member of the Tzurif terror cell who was involved in numerous terror attacks against Israelis. He took part in the kidnapping and murder of Israeli soldier Sharon Edri and planned the March 21, 1997 bombing at a Tel Aviv cafe which killed Yael Gilad, Anat Rozen-Winter and Michal Avrahami. He was also involved in the murder of Yaron and Efrat Ungar on June 9, 1996 and the murder of Uri, Rachel and Zeev Munk on July 26, 1996.

4. Jamal al-Hor - member of the Tzurif terror cell who was involved in numerous terror attacks against Israelis. He took part in the kidnapping and murder of Israeli soldier Sharon Edri and planned the March 21, 1997 bombing at a Tel Aviv caf which killed Yael Gilad, Anat Rozen-Winter and Michal Avrahami. He was also involved in the murder of Yaron and Efrat Ungar on June 9, 1996 and the murder of Uri, Rachel and Zeev Munk on July 26, 1996.

5. Ibrahim Ghneimat - member of the Tzurif terror cell who was involved in numerous terror attacks against Israelis. He took part in the kidnapping and murder of Israeli soldier Sharon Edri and planned the March 21, 1997 bombing at a Tel Aviv caf which killed Yael Gilad, Anat Rozen-Winter and Michal Avrahami. He was also involved in the murder of Yaron and Efrat Ungar on June 9, 1996 and the murder of Uri, Rachel and Zeev Munk on July 26, 1996.

31 Formal Requests Previously Submitted to the PA

6. Ibrahim Salah Mustafa Alkam - suspect in the murder of Etta Tzur and her 12-year old son Ephraim on December 11, 1996, who were shot to death by terrorists near Beit El while driving in their car.

7. Abdel Nasser Ismail Hassin Alkaisi - suspect in the murder of Etta Tzur and her 12-year old son Ephraim on December 11, 1996, who were shot to death by terrorists near Beit El while driving in their car.

8. Ibrahim Massad Elias Hani - suspect in the murder of Etta Tzur and her 12-year old son Ephraim on December 11, 1996, who were shot to death by terrorists near Beit El while driving in their car.

9. Bassam Khalil Abdel Rahman Aram - resident of Khan Yunis; suspect in the attempted murder of Zvi Fixler at Moshav Gan-Or on December 10, 1993. He was arrested and then set free by the Palestinian police and is now active in the Palestinian security forces.

10. Yasser Muhammad Musa Aram - resident of Khan Yunis;

active in Islamic Jihad; suspected of involvement in the attempted murder of Zvi Fixler at Moshav Gan-Or on December 10, 1993. He was arrested and then set free by the Palestinian police. There are indications that he may have joined the Palestinian security forces.

11. Abdallah Mahmoud Samiri - suspect in the murder of 75-year old Naftali Sahar near Rehovot on February 10, 1994. Sahar, a farmer, was found dead in his orange grove after having been beaten with an iron bar. Islamic Jihad claimed responsibility for the attack.

12. Bassam Subhi Issa - suspected of involvement in the terror attack on Yoel Solomon street in Jerusalem on October 9, 1994. Two people were killed and eight injured in the attack when terrorists opened fire on the crowded street lined with open-air cafes. He also took part in the murder of three IDF soldiers in April 1993. He was arrested and later released by the Palestinian police, and was then drafted to serve in Jibril Rajoub's Palestinian Preventive Security Service.

13. Hisham Salim Dib - suspected on involvement in the suicide bombing attack at Dizengoff Center on March 4, 1996. 13 people were killed in the attack, for which Hamas claimed responsibility.

14. Nafez Mahmoud Sabih - suspected of involvement in planning the two suicide bombing attacks on Bus 18 in Jerusalem on February 25 and March 2, 1996, and the suicide bombing attack in Ashkelon on February 25, 1996. A total of 45 people were killed in the three attacks, for which Hamas claimed responsibility. Among the victims were 2 American citizens - Sara Duker and Matthew Eisenfeld.

15. Imad Mahmoud Issa Abbas - suspect in the murder of Moshe Bino and Amikam Zaltzman, who were stabbed to death in their Karni vegetable packing house near Gaza by terrorists posing as buyers on June 25, 1992.

16. Atef Hamadan - suspect in the attempted kidnapping and murder of an IDF soldier on September 18, 1992, and the murder of several Palestinians suspected on collaborating with Israel. In September 1996, he was arrested and then released by the Palestinian police, and was drafted to serve in Jibril Rajoub's Palestinian Preventive Security Service.

17. Rajah Khalil Ali Abu-Sita - resident of Khan Yunis; a Fatah activist who is suspected of involvement in the murder of Uri Megiddish of Gan-Or on March 9, 1993. Israel formally requested his transfer on September 29, 1994. On December 24, 1994, the Palestinians rejected Israel's request. He has since been arrested by the Palestinian police for having killed a local Palestinian. He confessed to the crime, was tried, and is currently awaiting sentencing.

18. Amru Abdallah Abu-Sita - resident of Khan Yunis; a Fatah activist who is suspected of involvement in the murder of Uri Megiddish of Gan-Or on March 9, 1993. Israel formally requested his transfer on September 29, 1994. On December 24, 1994, the Palestinians rejected Israel's request.

19. Salah Mustafa Othman - resident of Jabalya, Gaza; member of the Hamas military wing, took part in the attack on Bus 25 in Jerusalem on July 1, 1993 (attempted to commandeer the bus with two accomplices, shot and killed one Israeli passenger and wounded several others). Israel formally requested his transfer on several occasions: January 26, 1995, August 29, 1995 and September 6, 1995.

20. Raid Abu Libda - resident of Rafah, Gaza; member of the

PFLP, suspected of murdering Natalia Ivanov in Ashdod on September 23, 1994. Israel formally requested his transfer on November 30, 1994. Currently held by the Palestinian police. An accomplice to the crime, Iman Ahmed Abdallah Hassin, was captured by the IDF on December 14, 1994 near Kfar Darom and is currently in prison.

21. Iyad Hamdi Abu-Shakafa - resident of Khan Yunis; Fatah member suspected in the attempted murder of Shaul David in Ramle on February 9, 1994. Israel formally requested his transfer on several occasions: September 13, 1994, December 13, 1994, August 22, 1995 and September 6, 1995. Currently serving in the Palestinian police.

22-24. Three Palestinian Policemen - During riots at Erez checkpoint on July 17, 1994, Palestinian policemen opened fire on Israeli forces and killed border policeman Jackie Attias. On April 26, 1995, Israel submitted photographic evidence to the PA showing 3 Palestinian policemen shooting at Israeli troops and requested their transfer to Israel.

25. Iyad Abdelkader Ismail Basheeti - resident of Rafah, Gaza; Hamas member, suspected of involvement in the murder of two Israelis in Ramle on August 26, 1994. Israel formally requested his transfer on several occasions: August 28, 1994 and August 22, 1995. He was arrested and then set free by the Palestinian police, who then apparently drafted him to join their ranks.

26. Yusuf Mahmoud Abdelaziz Malahi - resident of Rafah, Gaza; Hamas member, suspected of involvement in the murder of two Israelis in Ramle on August 26, 1994. Israel formally requested his transfer on August 28, 1994 and August 22, 1995. He was arrested and then set free by the Palestinian police, and is currently in the process of being drafted to serve in their ranks.

27. Shahdi Subhi Abdel Rahman Abu Khaja - suspect in the attempted murder of Shimon Dror on September 19, 1994. Israel formally requested his transfer on several occasions: December 13, 1994, August 29, 1995 and September 6, 1995. The PA has failed to respond to the Israeli requests. An accomplice to the crime, Majdi Khalifa, was caught by Israel and is currently serving a 12-year prison sentence.

28. Yusuf Muhammad Ahmed Raghi - resident of Kalkilya; participated in the murder of two Israeli hikers, Ohad Bachrach and Uri Shahor in Wadi Kelt on July 18, 1995. Israel formally requested his transfer on September 13, 1995 and November 14, 1995. He was arrested by Palestinian Intelligence in September 1995 and sentenced to 7 years in prison.

29. Shaher Ali Ahmed Raghi - resident of Kalkilya; participated in the murder of two Israeli hikers, Ohad Bachrach and Uri Shahor in Wadi Kelt on July 18, 1995. Israel formally requested his transfer on September 13, 1995 and November 14, 1995. He was arrested by Palestinian Intelligence in September 1995 and sentenced to 7 years in prison and hard labor. He remains under detention by the Palestinian General Intelligence Service.

30. Khader Saba Yakub Abu Abra - resident of Beit Jallah, Bethlehem; member of the PFLP, suspected of attempts to obtain weapons for the PFLP, and apparently issued instructions to the attackers who killed two Israeli hikers in Wadi Kelt on July 18, 1995. Israel formally requested his transfer on September 13, 1995 and November 14, 1995. He was arrested by the Palestinian police on February 15, 1996 in the wake of a grenade attack on a joint patrol near Beit Jallah. He was held until May 1996, when he was released

and placed under house arrest.

31. Muhi a-Din a-Sharif - transported the explosives to the terrorist who carried out the suicide bombing attack against Bus 26 in Jerusalem in August 1995. Three people were killed in the attack, including Joan Davenny, an American schoolteacher from Connecticut, and 103 others were injured. Israel formally requested his transfer on March 13, 1996.

32. Abd al-Majid Dudin - resident of Dura; Hamas member, trained people to carry out suicide bombings, including the terrorist who attacked Bus 26 in Jerusalem in August 1995. Three people were killed in the attack, including Joan Davenny, a schoolteacher from Connecticut, and 103 others were injured. Israel formally requested his transfer on March 12, 1996. He was arrested by the Palestinian police in July 1996 and sentenced to 12 years in prison.

33. Ala Ahmed Abd al-Munim Salah - resident of Khan Yunis; member of the DFLP; suspected of involvement in the murder of Yossi Zindani in Beni-Ayish on March 31, 1994. Israel formally requested his transfer on July 10, 1996. He was recently arrested by the Palestinian police, apparently in connection with criminal activity.

34. Awad Silmi - resident of Gaza; took part in many terror attacks, including the murder of Lt. Col. Meir Mintz and various shooting attacks, and was connected to at least one suicide bombing attack. Israel formally requested his transfer on March 13, 1996. Currently detained by the Palestinian Preventive Intelligence Service.

35. Ibrahim Lateef Shaheed - resident of Tulkarem; Fatah member wanted for the murder of Labib Latif Shadeed, a suspected collaborator with Israel, on October 12, 1994. Fled to Jericho and is active under the protection of the Palestinian Preventive Security Service. Israel requested his transfer on June 18, 1995 and September 6, 1995. Currently serves in the Palestinian police in Tulkarem.

36. Khalil Abdel Rahman Abadi - suspect in the murder of his brother on March 13, 1995. The motive is believed to have been his brother's alleged collaboration with Israel or perhaps a family dispute. Israel formally requested his transfer on August 29, 1995.



© 2007 Israel Ministry of Foreign Affairs - The State of Israel. All rights reserved. Terms of use Use of cookies

# EXHIBIT R

PALESTINE report

November 21, 1997 - VOL 3 No.24

Table of contents:


- Who will protect the children of "Aida Refugee Camp?... By: Muna Hamzeh-Muhaisen
- Pension fund returns to Palestine... by: Samar Hawari & Stephanie Nolen
- Reflections on Doha
- Arafat: No more "meetings for the sake of meeting"... by: Rose-Marie Barbeau
- Who is responsible?... By: Johara Baker
- Hamas Communique
- Settlement news briefs
- World Bank: Palestinian economy a "black mark" in region
- What shall we do?... By: Haidar 'Abdel Shafi
- The Palestinian street supports Saddam... by: Ghassan Khatib
- News Shorts
- Occupation Update


## Who will protect the children of "Aida Refugee Camp?

By: Muna Hamzeh-Muhaisen

Bethlehem -- Ali Jawariesh looked so young and innocent as his lifeless body, covered with a gleaming Palestinian flag, lay on the stretcher waiting to be taken for burial. Yet his face, still and peaceful, did not seem to be that of a seven-year-old first-grader. His eyelids were puffy, the hair at the front of his head had been shaved, and an ugly, scar protruded across his forehead. This is where the bullet of an Israeli army sniper landed when Ali was shot in `Aida Refugee Camp on November 11. The rubber-coated metal bullet was fired from a range of 15 meters, leaving Ali brain-dead for five days before he was officially declared dead on November 15. Ironically, the announcement of his death came as Palestinians in the PA areas were celebrating the anniversary of their declaration of independence.

At his funeral on November 16, Ali's young classmates looked stricken with grief as they carried a placard reading "students of the Elementary first grade", and wept in silence. Ali was a bright, quiet student, and popular in class. Less than an hour before he was shot, he returned home from school with his report card in hand. He had received a grade point average of all A's, and after showing it to his parents, he rushed out of the house. Ali was eager to show his grades to an aunt who lives nearby.

Shortly thereafter, a distraught Imad Hanash, a car mechanic who runs a car repair shop nearby, was rushing Ali to the hospital in his car. "I found Ali's blood and small pieces of his brain in the back seat of the car," says Hanash. "Cleaning up the mess was one of the hardest things I ever had to do. I'll never get over it." Hanash believes that Ali was shot with a live, and

not a rubber-coated metal, bullet. "As I carried him in my arms, I could see the long bullet sticking a few centimeters out of his head," says Hanash. "A metal bullet is round and would not have been visible."
According to eyewitnesses, Ali was standing with a group of stone-throwing children in Zone A (under Palestinian control) of 'Aida Refugee Camp, when an Israeli soldier at Rachel's Tomb -- in Zone C (under Israeli control), 60 meters away -- came down the hill and shot him. The situation at the Tomb had been tense for two days. Hundreds of Israeli religious fanatics were celebrating the official opening of the Tomb, and dancing crazily in the street under the protection of heavily armed Israeli soldiers. The two-day celebrations came after the Israeli authorities completed construction of a stone wall around the Tomb, as well as a stone watchtower.

"An Israeli soldier approached me earlier that morning and ordered me to disperse a group of stone-throwing children," explains Hanash. "He told me that there were too many Israelis around and he did not want to risk their lives. I replied that the children were too young to pose a threat and that they would go away by themselves." When the soldier persisted, Hanash suggested that he, the soldier, call the District Coordination Office (DCO) -- the joint Israeli-Palestinian military coordination outfit -- who could send out a Palestinian army patrol to peacefully disperse the children. The soldier refused and for the remainder of the day, he kept harassing Hanash. At 2 p.m., the soldier told Hanash he had until 4 p.m. to disperse the boys.

"He threatened me, and told me that after 4 p.m., he would not be responsible for what happens." It was at 4 p.m. that Israeli defense minister Yitzhak Mordechai was expected to arrive at Rachel's Tomb to participate in the celebrations. Shortly after Mordechai's arrival, Ali was shot and, according to Palestinian press reports, it is widely believed that it was one of the minister's guards who fired at Ali.

Ahmed Salah, a mechanic at Hanash's shop who witnessed the shooting, says that Israeli soldiers had caught several young boys earlier that day. "They beat them up and let them go," he says. "The children later set fire to a tire and I was ordered at gunpoint to put out the fire. But too many stones were flying in the air, and I could not get near." Salah says that a few minutes before Ali Jawariesh was shot, five Israeli soldiers came running down the road after a group of young kids. "One of the soldiers grabbed a boy, threw him on the ground and placed his boot over the boy's neck. The soldier then leaned down on his other knee, aimed his sniper gun, and fired at Ali's head.

"He fired to kill," says Ahmed Jawariesh, Ali's uncle. "Ali was only seven for God's sake! The soldier could have aimed at his legs if he had meant to injure him rather than kill him." Eyewitnesses at the scene say that right after Ali was shot, the soldiers arrested three refugee children, ages 12,11 and 10. "They put them in the jeep and took them to Etzion [an Israeli military camp near Hebron], where they beat the living daylights out of them," says Sheik Abu Nasser, the father of one of the children. "At midnight, the jeep dropped the boys off at the Bethlehem checkpoint and ordered them to walk home." Abu Nasser's son, Tha'er, 12, suffered from severe pain in his stomach, back, legs and arms from the beating. "He came home limping from the pain in his leg."

Hanash and several camp residents told Palestine Report that skirmishes between young refugee children under the age of 12 and Israeli soldiers stationed at Rachel's Tomb is a daily occurrence. "It is a worrying situation," says Hanash. "The Israelis who usually come to pray at Rachel's Tomb are fanatics and we always worry that one of them might randomly open fire at

the children." Area residents fear a repeat of the massacre by Israeli settler Baruch Goldstein, who opened fire at Muslim worshipers, including children, in Hebron in early 1994.

"There ought to be a permanent Palestinian military point between the camp and Rachel's Tomb to protect the children," says one camp resident. "Where is the security coordination between the Israelis and the Palestinians? If the Israelis were holding these celebrations, with so many religious fanatics present, why wasn't there a reinforcement of Palestinian forces, to prevent the children from approaching the Tomb?" Camp residents further complain that Israeli undercover units repeatedly enter the camp, indicating that undercover units were in 'Aida just one month ago. As one resident puts it, "the location of 'Aida is very sensitive, and this is why we need permanent Palestinian army points at the borders of the camp."

Meanwhile, Ali's father, Mohammed Jawariesh, looked dazed and numb from the grief and lack of sleep as he received the hundreds of mourners and answered questions from the local and foreign press. The press was mostly interested in knowing what prompted him to donate his son's organs-an unprecedented decision by the parent of a martyr and considered somewhat taboo in a Muslim society which still frowns upon organ donations and autopsies. The press also wanted to confirm the news that Mohammed had donated the organs to needy recipients, whether Arabs or Jews.

"The organ donation bothers the Israelis," says Khaled, a family friend. "They kill the boy and the father turns around, before the entire world, and donates his son's organs to people who could possibly be Jewish. It is embarrassing to the Israelis." Perhaps it is the embarrassment which prompted the Israeli Minister of Health and the Minister of Defense to call Ali's father to extend their condolences. "Mohammed spoke to them briefly, saying he was in no shape to talk, and hung up," says Ahmed Jawariesh. "In one phone call, he was asked to go meet with some high-level military person on November 17, who wanted to apologize to him. When Mohammed refused, they tried to urge him by saying that they had a gift for him but we have no idea what they meant by that."

The donation of Ali's organs was the talk of the week in Bethlehem. Some people considered the father's decision courageous, others thought it was against the teachings of Islamic religion, but all followed the news to learn the identity of the organ recipients who, as it turned out, were all Israeli Arabs.

Meanwhile, little attention was paid to the serious question raised by Ali's untimely death: Who will protect the children of 'Aida from further Israeli attacks?

[Back to contents]

---

## Pension fund returns to Palestine

by: Samar Hawari & Stephanie Nolen

A protracted struggle for control of a large Palestinian pension fund, which came to light with a recent story released by Germany's Der Spiegel, has provided a telling example of some of the

complexities of Palestinian reconstruction. The fight was for control of a US$166 million pension fund established with contributions from government workers in the Gaza Strip. The pension system was originally established by Egyptian president Gamal 'Abdul Nasser, during Egypt's rule of the Strip; when Israel occupied Gaza in 1967, it took over as the "governmental" sector and assumed management of the fund. All civil service workers are now in the employ of the Palestinian Authority.

Under the Oslo agreement in 1993, Israel agreed to relinquish control of the pension fund. Under an agreement, signed by Nabil Sha'ath for the Palestine Liberation Organization, a board of trustees was set up to manage the fund. According to the management agreement, the Palestinian Authority was not allowed access to the fund. Instead, the money was to be placed in a bank outside Palestine under the control of a third party manager. The manager selected by Sha'ath was Ariel Golon.

The board was duly established, and is headed by Justice Minister Freih Abu Middein and includes Local Governance Minster Saeb Erekat and Finance Minister Mohammed Nashashibi. The fund, now being managed by Golon, was placed in the Credit Suisse bank and invested only in shares of Balista Inc.

In August 1997, PA president Yasser Arafat went looking for the money. This was shortly after Israel had frozen transfers of Palestinian tax revenues, which make up a large portion of the PA's operating budget, when Arafat was struggling to meet his payroll. On being informed that the PA could not relocate the pension fund to Gaza, which would have allowed the interest to be earned locally, Arafat ordered an investigation of the pension fund, which revealed a number of problems. The manager, Golon, was a shareholder in Balista Inc., and therefore a direct beneficiary of his investment of the pension fund. And Balista, it emerged, was hardly the kind of blue-chip destination appropriate for a pension fund. In addition, the PA had been paying from its own funds the pensions of all the civil service retirees who were eligible beneficiaries of the fund, without receiving any reimbursement. Arafat also inquired as to why Palestinian money was serving as capital for an international company, when projects in the West Bank and Gaza were desperate for investors; he reportedly wanted the money invested in telecommunications and electrical supply projects in Palestine.

The PA president delegated his economic advisor, Khalid Salaam, to get the money back. Salaam found that there were no financial experts on the original board of trustees, and he put together a team of specialists from regional banks. He received a mandate from the board of trustees, and so in September Credit Suisse transferred some of the money to an account in the Arab Bank in Gaza. Forty percent of the money remained invested in Balista, Inc., however.

Now that most of the fund is in an account in Gaza, there are still questions. Rumors are flying thick and fast on the streets of Gaza; pensioners who have heard the persistent stories about PA corruption and mismanagement are not happy about having their savings in the Authority's control. And while Balista was not a risk-free investment option, telecommunications and electrical projects in the as-of-yet undeclared state of Palestine are hardly any better. According to Salaam, however, that is not his problem. "My job was to get the money back and I've done that," he said. "What happens now is not up to me."

Twenty-seven members of the Legislative Council, including Hussam Khader (Fateh / Nablus),

petitioned LC speaker Ahmed Qrei' two weeks ago, asking that the pension fund issue be discussed in a Council session.
But, according to Khader, Qrei' rejected the suggestion, saying the request was based on nothing more than rumors. Khalid Salaam then met with the Council members, asking them to drop the issue until it was resolved and the funds were secure.

Following the publication of the Der Spiegel story, another round of negotiations were held and control over the majority of the money has now been handed over to the PA.

[Back to contents]

## Reflections on Doha

Trans. by: J. Baker

The following commentary by PA trade and commerce minister Maher Masri is taken from a feature on the Doha economic conference which appeared in al-Hayat al-Jadida on November 16.

Q: Can you define the Doha economic conference and the previous conferences from an economic point of view?

Masri: For a start, the establishment of these conferences in general, not just the Doha conference, are part of a cycle of conferences which began after the Madrid peace conference and the signing of peace agreements [with Israel]. Their purpose is as follows: 1) economic cooperation at the regional level in particular and the international level in general; and 2) allowing Israel to enter the regional economic group which is comprised primarily of Arab countries, in order for regional cooperation to include Israel -- this is the unstated objective of these conferences.

The private sector used to be the focus of these conferences, that is, the promotion of joint ventures. The idea was to support the peace process which began in Madrid, so that it could result in economic growth in the Arab region in general and in Palestine in particular. It was under this slogan, and with the idea of making the slogan a reality, that the first meeting was held in Morocco. Israel occupied center stage at that conference, in the sense that all the participants, at the government level and from the private sector, were approaching the Israeli representatives to find out how they could deal with Israel and what the process for starting joint ventures with Israelis entailed. Israel was also in the spotlight at the next economic conference in Amman. All this is a reflection of the policy at the time, when the peace process was just beginning and the Israeli government at that time was implementing a few articles in the Oslo agreement.
Then came the Cairo conference, which took place under different political circumstances. It was becoming clear that regional cooperation had begun to decline because of the political situation. The current Doha conference is taking place at a time when the political situation is much worse than one year ago, which makes it impossible for the conference to result in any local or joint economic agreements, whether regional or bilateral, between countries or the

different private sector representatives participating in the conference...In short, the conference has two streams: the first is economic cooperation at the governmental level through joint projects funded by international institutions or the World Bank; and the second is the cooperation between private sectors and investors who are participating in this conference.

I think the first conference was just for show, and the start of placing Israel in the Middle East and Arab region. The Israelis presented more than one regional project and they profited from local projects carried out in Israel by other countries. During the period in which the [Israeli] Labor Party was in office, and from the first conference until the start of the Netanyahu government, investments entering Israel amounted to more than US$12 billion. This is an extraordinary sum for investment and it was the result of the Madrid peace conference and the Oslo agreement, as well as these economic conferences which gave Israel the chance to become part of the regional group.

As for the Arab countries participating in these conferences, some of them profited from numerous joint ventures [with Israel]. However, this was not widespread, if measured by the total number of joint investments made by Israel or by the size of foreign investment in Israel. And in fact, many projects were proposed at that time which could be called "regional" projects, such as for the Jordan Valley area, which were Israeli/Jordanian joint projects and none of which, until now, have been implemented properly. There was also an Egyptian/Israeli/Palestinian electricity connection project which also remains on paper only. Another project, the "Palestinian Riviera" in the Gaza Strip, has also not been implemented. These are some of the Arab regional projects which have not been realized. In my opinion, the main beneficiary of these projects is Israel. The size of investments which I mentioned earlier proves this.

As for the Palestinians, we have not really benefited from any of the projects presented at these conferences by either the private sector or by Palestinian institutions. The Palestinian delegations at these conferences, up until the Cairo conference, used to present projects to the private sectors and there was no interest from the West or anyone else for that matter. At the Cairo conference, the Palestinian private sector presented between 15 and 20 active projects which deserved the participation of other parties. However, we did not receive any participation in this sense. With the exception of the industrial zone in Gaza, which received some support a couple of months ago from international investment banks, among them the World Bank and the European Investment Bank, we have not received any support or joint investments.

What is noticeable at these conferences is that the Arab delegations in general did not engage in any bilateral activities. On the contrary, all the Arab countries approached other [non-Arab] countries, particular the Western ones, leaving no communication in terms of Arab-Arab investment. Instead, [the emphasis was on] Arab-foreign investment on an individual basis. This was quite noticeable. Whereas, in the Cairo conference, the discussions focused on the political situation. Our message was clear, and it was a political message, although we presented our projects in a detailed, professional way.

...The question is, what if this approach had worked? In my opinion, if it had succeeded and the whole mechanism by which these conferences worked was different, then we would have benefited enormously from them. However, these conferences were mostly for show and all of the projects proposed at them had already been agreed upon prior to the convening of the conference. That is, the conference served merely for the announcement of a previous

agreement between two participants.

In any case, there was no prior communication with any Arab or Western representatives in order to prepare for the announcement of certain joint ventures. These conferences were only to announce and inform, and not for serious examination of these projects. The detailed examination usually preceded the conferences, so the larger Arab states and the Western countries would agree beforehand on what was to be agreed at the conference. Then the announcement would be made at the conference.

We were not part of this circle which was engaged in preparing for these conferences. So for the conferences to be successful, there must be a change in the working mechanism. If this had been changed and the political situation were good, then we would have been able to profit from these conferences and our economy would have prospered more than that of any of the neighboring countries. I think that the size of investments and economic support for the Palestinian territories should have taken the bigger share in these conferences, considering that the Palestinian question is the crux and the basis of the Middle East conflict. The solution presented in the Oslo agreement was political, and was to coincide with an economic solution, in order to advance the Palestinian economy, which had been occupied and monopolized for more than 25 years.
What should have happened through these economic conferences, which were headed by the United States, was that all the weight should have been placed on investment in the Palestinian territories to increase the standard of living and the economic standards in general. However, this did not happen. What did happen was that through this gathering of the donor countries, which should have been spending their money on the destroyed Palestinian infrastructure, the United States took advantage of these conferences to create a false picture of the level of investment in the Palestinian territories, which was exaggerated in media reports by unbelievable amounts. This resulted in a continuing contradiction which we witnessed this year. Not more than US$100 million was spent from the original US$860 million promised, and that came in the form of technical assistance. If you examine the basis for establishing these conferences, you will find that they were supposed to result in support for the Palestinian people and to later benefit the rest of the area. However, this also did not happen and the fact that it did not, I believe, is dangerous.

When you look at the Arab states, there is no doubt that they possess obvious economic strength. Egypt, for example, has recently witnessed an increase in foreign capital as a result of the economic, administrative and financial reforms undertaken by the Egyptian government. Egypt has received more than 60 percent of the total foreign investments to the region, which has resulted in a noticeable improvement in conditions there. So any Arab country which can improve its conditions and achieve political stability will get foreign investments in the end.

As for the subordination of the Palestinian economy to Israeli economic interests, this remains a controversial issue. There are two theories: one says that "the whale swallows the fish"; the other says that "the fish feeds off the body of the whale." The Palestinian economy is small while the Israeli market is very large. So, provided that the right conditions exist -- which they do not, because of our administrative policy, and Israeli economic policies against the Palestinian people, its leadership and its economic organization -- we could profit from the larger economic powers, including Israel.

[Back to contents]

## Arafat: No more "meetings for the sake of meeting"

by: Rose-Marie Barbeau

As Palestinians in the West Bank and Gaza were celebrating the ninth anniversary of the Declaration of Independence on Saturday, November 15, Palestinian Authority president Yasser Arafat was meeting with US secretary of state Madeleine Albright in Bern, Switzerland.

Palestinian negotiator and PA minister for local governance Sa'eb Erekat told reporters that Arafat had informed Albright yet again that "there is no hope that the peace process will get back on track without implementing further [Israeli] redeployments and ending unilateral actions [by Israel]." And, after Arafat told the secretary of state that they could not continue with "meetings for the sake of meeting", Albright apparently assured the Palestinians that she would do everything in her power over the coming weeks to salvage the peace process.

It appears that Palestinians are now seeing the beginning of a divide, between the continuing intransigence of the Israeli government's position and American impatience to push the peace process forward. PA presidential advisor Nabil Abu Rdeineh said this week that, "perhaps the [boycott of the] Doha economic summit is a clear and comprehensible message that there is a firm Palestinian and Arab position." The Palestinian Authority and the Egyptian government took decisions this week not to send official delegations to the Qatar conference, despite pressure from the United States to participate. Instead, Yasser Arafat and Egyptian president Hosni Mubarak held a meeting in Cairo on November 16, as Arafat was returning from his meeting in Switzerland with Madeleine Albright, in order to discuss the current political situation. Arab states which did attend the Doha meeting were represented by low-level officials and private sector representatives; Israeli ultimately did not send its foreign minister David Levy, but dispatched a delegation of businesspeople headed by trade minister Natan Sharansky. One US official present at Doha commented that "we expected wider participation from the Arab states; they are the losers and those who showed up will gain from it."

Meanwhile, rumors continue to circulate this week about the state of Yasser Arafat's health. However, Arafat himself told reporters that he was not getting enough sleep due to the pressures of work, and Israeli press reports denied the stories previously published that Arafat was suffering from Parkinson's disease.

Negotiations subcommittees for the airport, sea port, safe passage route, civil affairs and industrial zones also met this week in Jericho at the Local Governance Ministry offices. No progress was reported from the meetings.

[Back to contents]

## Who is responsible?

By: Johara Baker

Tensions are running high between Hamas and the Palestinian Authority following the abduction of two Hamas activists on November 14 by Israeli soldiers which, Hamas has charged, was carried out with PA cooperation.

'Abdel Rahman Ghneimat and Jamal al-Hour were arrested by the Israeli army commando unit Duvduvan while in transit, in Palestinian custody, between the Hebron jail and Jneid prison in Nablus. The two men, who are from the West Bank village of Sourif and have been detained by Palestinian Preventive Security for the past two months for alleged involvement in bomb attacks against Israel, were being transferred to Jneid prison, for reasons which have not been made clear. It appears that the vehicle transporting the two men was stopped at an Israeli army checkpoint near Huwara, outside of Nablus in Area C (under Israeli control), where an ambush had been set up by the Duvduvan unit. Ghneimat and al-Hour were abducted by the commandos; two Palestinian security guards were detained for 24 hours and then released.

The incident has caused a deep rift in the already shaky relations between Hamas and the PA. Although the PA has demanded that Israel relinquish custody of the two prisoners, calling it a blatant violation of international covenants and peace agreements, Hamas has expressed its suspicions about the involvement of the PA in the whole fiasco. According to a communique issued by the Hamas leadership (see page 9), the abduction was merely a cover-up for newly-resumed security coordination between the PA and Israel. Hamas sources have voiced suspicion that head of Palestinian Preventive Security Col. Jibril Rjoub had a hand in the operation, in light of the fact that a number of senior PA security officials were in the transport vehicle at the time of the ambush. Hamas has called the incident a conspiracy which is intended weaken national ties between the Palestinians and which has "trespassed" on the dignity of the Authority itself.

In addition to the political fallout, the abductions have wreaked havoc on the popular front as well. On November 16, some 300 angry Palestinians marched in the village of Sourif in protest, chanting slogans against the Palestinian Authority and the Preventive Security Service. Some demonstrators pelted Palestinian police cars with stones. Anti-PA graffiti was found scribbled on walls across the village the next morning and the car belonging to Legislative Council member Ali Abu al-Rish had been torched.

The unprecedented riots have put the Palestinian Authority in an awkward position. Official sources in the PA have been quick to condemn Israel over the abduction, labeling it nothing short of piracy. One source described the Israeli actions as "unsurprising" since Israel is used to breaching international agreements, and gave the failed assassination attempt against Hamas politburo chief Khalid Masha'al last month as the latest example of this.

---

[Back to contents] [Back to Palestine Report]

# EXHIBIT S

GEOTEXT
Translations, Inc.

STATE OF NEW YORK )
) ss
COUNTY OF NEW YORK )

**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Arabic into English of the attached documents regarding the Sureef Al Qassam Cell.

Corin Liandes, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this 3rd day of December, 2007.

KRISTEN D. PLONKA
Notary Public, State of New York
No. 01PL6121852
Qualified In Queens County
Commission Expires January 31, 2009

New York 259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco 220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9500 fax 415.520.0525
London 107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.9909
Hong Kong 20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com | www.geotext.com

**Sureef Al Qassam Cell... Read the most important operations.**

Sureef Al Qassam Cell: Will Palestinian mothers be able to give birth to a new cell?

The cell was able to kill 11 Zionists in absolute secrecy. It snatched Zionist soldier Sharon Edri, killed him, hid him for seven entire months, and rubbed Shabak's nose in the mud after four years of struggle and resistance.

Al Qassam Exclusive

((And We have put a bar in front of them and a bar behind them, and further, We have covered them up; so that they cannot see.))

With these words, then 25 years old Abdul Rahman Ghneimat used to jump over fences at night and cross checkpoints during the day, as he carried out his Jihad mission between 1994 and 1997. Abdul Rahman Ghneimat and the martyr Moussa Ghneimat from the town of Sureef in Hebron Province, Jamal Al Hour, Ayman Qafisheh, and Ra'ed Abu Hamadieh from Hebron were like resting lions. They defined their target, planned and carried out their operations with precision. They dealt a huge blow to the Zionist Shabak Agency when they succeeded in hiding the remains of the Zionist soldier Sharon Edri for seven months without anyone suspecting its whereabouts, until General Jibril Rajoub was able to do so in a dirty operation coordinated with the occupying authorities.

The Beginning of the Start

Since the end of 1995 and the beginning of 1996, the Sureef cell started its activities and carried out quality operations over four years during which it operated in complete secrecy. No one was able to get to it; there weren't any leads that could eventually lead to it. The Sureef cell included five fighters, three of whom were from the town of Sureef located about 15 km Northwest of Hebron, with a population of over 13,000, and two from Hebron. The cell was identified after the operation carried out by the martyr Moussa Ghneimat at the café Apropos on 3/13/1997, which killed four Zionists instantly and injured more than forty.

Discovery of the Cell:

On the morning of 3/21/1997, Moussa Abdel Kader Abu Dieh Ghneimat got up and had a cup of tea. Before he finished it, he took a look around the house and asked his mother for her blessing, then he went to his wife and asked her to take good care of the kids. After that, he picked up his suitcase containing his personal clothes and headed to Tel Aviv (Spring Hill) where he had been working for over 8 years at the Rishon Café. The café is located south of Tel Aviv. The plan that the cell members had put together for Moussa called for him to place the bag with the explosives at the restaurant and leave, then detonate it remotely from outside at a 0.5 km range. Moussa was born in 1969. He was married and the father of four children: Israa, Bushra, Abdelkader, and Mohammed. He spoke Hebrew fluently and was known to be calm and quiet.

At the Café Apropos, Moussa put his bag next to him and sat quietly in the middle of many full tables. However, due to a technical problem, the bomb inside the bag detonated before the martyr Moussa left the place, killing him along with four Zionists, and injuring over 40 others. At that point, the identity of the martyr Moussa was uncovered, as well as his political affiliation. Several hours after the operation, the occupation forces surrounded the town of Sureef and imposed a curfew on the town for 45 days, during which they caused a lot of damage, destroyed 3 homes belonging to cell members and arrested dozens of people. The siege lasted from 3/21/1997 to 5/4/1997. The Zionist forces were able to identify the remaining members of the cell with the help of Jibril Rajoub and the Protective Security Service. Ayman Qafisheh was arrested on 4/5/1997 in the neighborhood of Tel Al Ramideh and Ra'ed Abu Hamadieh was arrested on the Zionist side. Also arrested were Abdul Rahman Ghneimat, Jamal Al Hour, and Ibrahim Ghneimat, who is the full brother of the martyr Moussa Ghneimat. On 4/9/1997, the Protective Security Service determined that the latter was not linked to the cell. During

this same period, the remains of the soldier Sharon Edri were discovered on 4/10/1997 in the town of Sureef, seven months after he was kidnapped and killed. We will tell his story in the course of this report.

A Well Thought Out Plan

The Sureef cell carried out several heroic operations. The occupation authorities had blamed it for the killing of 11 Zionists. However, the most intriguing operation for the Zionist intelligence was the kidnapping of Zionist soldier Sharon Edri. The story started to develop when the cell decided to carry out kidnapping operations in order to free our brave prisoners from the prisons of the occupying authorities. The objective was set while Ra'ed Abu Hamadieh and the martyr Moussa Ghneimat were driving around the Ministry of Defense. They observed a soldier looking for a vehicle at exactly 6:00 p.m. The soldier stopped them and asked them if they wanted to go to the city of Beth Shemesh. When they said yes, he got into the car with them, at which point he was subdued. When the vehicle approached a checkpoint, the soldier started to make noise in order to draw attention to the situation, so they controlled and killed him so that he did not draw any suspicion. He was screaming aloud "Ani lo retsi lamoot" (I don't want to die).

The soldier's body was hidden in the town of Sureef. A few months later, it was removed to another location. The members of the cell stated that the body was treated with dignity and well maintained. The goal behind kidnapping this soldier was to use him to negotiate the release of Sheikh Ahmed Yassin and other prisoners from the occupation prisons. According to reliable information from sources close to the Palestinian Authorities' Intelligence Service, the latter did not spare any effort to identify and locate cell members, including the use of a technique called "opening the mandel," which is a sorcery technique to locate the requested targets.

The Full Story:

After the occupation authorities' arrested fighter Ayman Qafisheh from the Al Qassam Brigades and fighter Ra'ed Saleh Abu Hamadieh, and after the Autonomous Authority's Protective Security Service arrested Jamal Al Hour, Abdul Rahman Ghneimat and Ibrahim Ghneimat, there was one missing episode to complete this story. This episode took place between the Hebron prison in the south, and the Hawareh triangle in Northern Palestine, where Rajoub carried out his filthy plan of handing over members of the cell under the accusation of endangering the so called "security of the Palestinian State." Indeed, in a sort of open drama, the Protective Security Service transported the members of the cell from the Hebron City Municipal Building to a prison in the Nablus area. One of the sources close to the Al Qassam hero Abdul Rahman Ghneimat told us that, according to the cell members themselves after they were arrested and kidnapped, the Protective Security Service suddenly decided that the members of the cell would be transported from the Hebron prison to the city of Nablus to await trial. According to official statements made by Rasmia Ghneimat, who had been placed in Zionist prisons for three months, an unknown individual contacted the department in which she works at the Al Ahly Hospital in Hebron, and told her that Abdul Rahman's family should not go to the Palestinian Authority's prison to visit him on 11/14/1997, the day after the cell was handed over. The members of the cell rejected this decision and their family members officially requested that the Protective Security Service not transfer them to any other prison. The Protective Security Service promised the detainees' families that they would keep them at the Hebron prison and said that they would protect them and not let anything happen to them. On 11/13//1997, the members of the cell were transported out of Hebron via the Valley of Fire road linking Bethlehem, Jerusalem, Ramallah, and Nablus in the north. According to the statement we received, the detainees refused to get into the vehicle but the members of the Protective Security Service attacked, chained and carried them into the vehicle against their will (according to the statement made by Abdul Rahman Ghneimat in a letter he was able to sneak out of his cell after he was handed over to the Jews).

On the road to the northern region, when the convoy carrying the members of the cell reached the Valley of Fire road, a Zionist vehicle approached it and photographed all the Palestinian vehicles, including the one carrying the members of the cell. The members of the cell stated that they were escorted by several vehicles, and that 10 members of the Protective Security Service escorted the

convoy. The communication between the vehicle carrying the members of the cell and the other escort vehicles was interrupted every now and then. The detainees observed the last vehicle flashing low and bright lights. They felt that these were signals sent to other parties as communication was interrupted and the lights were flashing. According to the information given by the detainees, they were told that they would be going to Jericho for trial on Thursday afternoon. When the vehicles passed by the roads leading to Jericho, they felt that they were being taken to the Zionist enemy's camps, not to Jericho. The members of the cell noticed that before the vehicles carrying them reached the Hawareh triangle, the Palestinian vehicles started to flash bright lights only and the communication was completely interrupted between the vehicles of the convoy.

When the Palestinian vehicles approached the Hawareh triangle, which is north of Nablus, Zionist forces in large numbers stopped the Palestinian vehicles and more than 50 Zionist soldiers surrounded the vehicle carrying the members of the cell. Using loud speakers, they called out each cell member's name and demanded that they surrender quietly. They laughed and shouted the good news "Ghneimat, Ghneimat!" Although the members of the Protective Security Service who were escorting the members of the cell on a GMC truck were very strong and fit, there were times where they were made to lay on the ground without any resistance, with the weapons of the Zionist forces placed on their chests while the cell members were being identified and detained. The three detainees were taken to Israeli prisons, in one of the filthiest operations directed by Rajoub, that led to the handover of the cell members. This operation was and will remain a mark of shame on the forehead of Rajoub and the Protective Security Service forever.

Jibril Rajoub, who was then the head of the Protective Security Service, quickly condemned the operation and called it "a piracy in broad daylight." He announced that an investigative committee had been set up to investigate the facts of this matter. Until today, no one knows who the members of this committee are and we have yet to see any of its decisions.

This decision was preceded by several letters from the members of the cell to their families, in which they expressed rising concern that they were going to be handed over to the Zionist Entity. They also said that they had asked to be tried in Palestinian prisons and that the Palestinian Authority told them that it had no intention to try them because they were its guests.

On 11/16/1997, hundreds of citizens from Sureef and Hebron came out and marched to the Authority's headquarters shouting slogans against Rajoub, the Protective Security Service, and the Palestinian Authority. The demonstrators accused Rajoub of handing over the members of the cell openly and in broad day light, and threw rocks on the Authority's headquarters. Sureef residents also held another demonstration during which they burned a car belonging to Palestinian Legislative Council member Ali Abulreesh. The Al Qassam Brigades issued a military release on 11/18/1997, stating that the Palestinian Security Services handed over fighters to the occupation forces, and holding the heads of the security services responsible. The release also mentioned that Rajoub and General Dahlan handed over the members of the cell in a cowardly operation that resulted from the so called "security coordination" with the Zionist enemy. The release included the text of a letter sent by the detainees from the prisons of the Palestinian Authority, before they were handed over. The letter was written by Aymen Qafisheh and Ra'ed Abu Hamdieh to the leaders of the Islamic Movement to keep them up do date with the facts of the event.

The letter stated that the members of the cell decided to disclose the whereabouts of soldier Sharon Edri's remains in exchange of several conditions, including that the Zionist army does not enter areas under the control of the Palestinian Authority, lifting the security perimeter around the Palestinian territories and the siege against Sureef. They also demanded that the homes of the cell members be spared from destruction. They demanded not to be handed over to the Zionist army and to remain at the Hebron prison. Rajoub agreed to all these conditions after he contacted

Arafat. Once he received the map leading to the remains of the soldier, Rajoub broke his promise under the agreement and the three detainees' homes were destroyed, including that of martyr Moussa Ghneimat. The members of the cell stated that one of the investigators told them that the person who had the authority to condemn them to a life sentence also had to authority to release them. In their letter, they also mentioned that they had handed over their weapons to the Palestinian Authority. They ended the letter with the following statement: "Despite all these commitments, we felt that these people wanted to find the roots of the military system and hit the organization's infrastructure. They started to threaten that they will transfer the group to other investigative systems to continue the interrogations. They also threatened to resort to several techniques or transfer us to Jericho or Gaza." The letter ended with the sentence "We feel that they are handing us over indirectly to the Jews."

Jibril Rajoub, the head of the Protective Security Service, denied any responsibility over this matter. In a statement to the Al Quds newspaper on 11/3/1997, he called what happened a "despicable act of piracy by the occupation forces," and said that by doing what they did, the occupation forces started a battle that will not end until the detainees are returned to the Palestinian Authorities.

At the same time, the enemy's radio reported that what happened was part of a deal to stop the trial of three members of the Palestinian police force.

In its 11/22/1997 issue, the Jordanian newspaper Sheihan stated that Rajoub refused to comply with the investigative committee, according to a Fatah official who declined to reveal his name. The same official said that Rajoub refused to comply with the investigative committee set up by Arafat and headed by Tayeb Abderrahim, which also included Nasr Youssef, Hajj Ismail, Abderrazak Al Mujaideh, and Yahya Ashour, regarding his actions and attacks against members of the Legislative Council.

Heroes of the Cell:

Abdul Rahman Ismail Ghneimat was born in 1975 in the town of Sureef located 13 km northeast of Hebron. He is single. He received his primary and secondary education in Sureef, then went on to the University of Jerusalem's Hebron campus. His arrests in 1993 and 1994 because of his activities with Hamas prevented him from continuing his education. Abdul Rahman became a member of the Al Qassam Brigades in 1993 through Mohammed Aziz Rushdi, the leader of the Ezzedine Al Qassam Brigades in charge of the Hebron region. Initially, Abdul Rahman was in charge of aiding and assisting the members of the brigades under the direction of Mohammed Aziz, Maher Abu Soroor from Betlehem (who killed a Shabak operative several months before he was killed), martyr al-Hay Salah Othman, and martyr Mohammed Al Hindi, both from Gaza. The cell was established with Jamal Al Hour and Abdul Rahman Ghneimat as members and received weapons and ammunition. Aymen Qafisheh and Ra'ed Abu Hamadieh from Hebron joined the cell before martyr Moussa Ghneimat who remained a member of the cell until he was killed. After the members of the cell were arrested by the occupation authorities and Abdul Rahman, Jamal Al Hour and Ibrahim Ghneimat (who denied any connection to the cell) were handed over, Abdul Rahman Ghneimat was condemned to five military life sentences and 20 years of prison, which is the equivalent of 515 years. As for Ra'ed Abu Hamadieh, he received four military life sentences, which amounts to 401 years. Jamal Al Hour was condemned to five life sentences and 18 years in prison, which amounts to 513 years. Aymen Abu Qafisheh received 35 years in jail, which was the lightest sentence because he was accused of assisting cell members. He was the one who brought the bag of explosives and gave it to cell members Ghneimat and Al Hour, and trained them on how to use it. The last two were the ones who sent Moussa Ghneimat to the Café Apropos to carry the abovementioned operation.

Operations Carried out by the Sureef cell:

In reality, one of the most important components of this cell's success was the complete secrecy observed in planning, preparing and carrying out its operations, in addition to the fact that its members were very well aware of the geography of the region in which they carried out their operations—Moussa Ghneimat worked in Jerusalem for eight years and knew its streets by heart. Ra'ed Hamidieh worked in Jerusalem, held a blue identity card, and knew the city by heart. Abdul Rahman Ghneimat was known to be wise and politically and militarily smart. Aymen Qafisheh lived in Hebron and is as smart, skilled and committed as any other cell member.

Most important operations claimed by the cell:

1- Prophet Daniel operation injuring one settler, which was carried out after Yahya Ayash was killed.

2- Cell members fired on a Renault near the city of Halhoul, killing a Zionist soldier and injuring one of his comrades.

3- The Beth Shemesh operation, where the cell members went 30 kilometers inside the green line and fired on a vehicle carrying settlers from Kyriat Arbaa, killing two settlers.

4- An operation carried out near the Bitar settlement in Bethlehem, killing three settlers.

5- Kidnapping the soldier Sahron Edri from Beth Shemesh and hiding his body after killing him. The cell did not plan to kill the soldier, but wanted to use him to negotiate the prisoners' release.

6- The first link that led to the discovery of the cell and the arrest of its members was the café Apropos operation, where the identity of the martyr Moussa Ghneimat was uncovered at the site of the explosion. He was supposed to detonate the bag half a kilometer away and come back home with Ra'ed Hamadieh who was waiting for him in a Jerusalem street. When Ra'ed learned that the operator had been killed, he started to drive his car in the opposite direction of traffic. The story ends here, but their path to greatness did not. This is how the cell was discovered by coincidence and with the will of Allah above all, after the tremendous failure of the Zionist intelligence to do so during four years of this cell's continuous struggle.

Text of the letter sent by our heroes from the Sureef cell while they were in the Palestinian Authority prison, as sure evidence that they hold the Palestinian Authority's Security Services responsible for handing them over, especially Jibril Rajoub.

Praise be to Allah, the Lord of the Worlds and peace be upon Prophet Mohammed, his companions and followers:

From the Sureef cell that belongs to the Martyr Ezzeddine Al Qassam Brigades, two of its members; Ayman Qfisha and Raed Abu Hamida are detained by the Jews and two members; Abdul Rahman Ghneimat and Jamal Al Hour, are detained by the [Palestinian] Authority.

To the members of the Islamic Movement, we inform you of what happened to us, we, who are detained and interrogated by the Palestinian Authority in Hebron prison:

1 – Regarding the body of the soldier Sharon Edri; there was an agreement made directly with Jibril Rajoub to disclose the location of the body and in return the occupation army would not enter the Authority's areas, would lift the security ring surrounding the areas, lift the siege of Sureef, the houses of the cell members would not be destroyed, we would not be handed to the Israeli army and that our final destiny is to spend a short period of time in Hebron prison. One of the interrogators said: "Whoever issues a sentence for life, [can] also issue a release order."

2 – Regarding surrendering the weapons: they were surrendered to the Authority in return for ending the situation of one of the brothers accused of possession of these pieces and who has no relation

whatsoever with this cell. Rajoub promised to do that.

Despite all these promises, we have felt that the real intention of these people is to investigate more about the roots of the military apparatus and to strike at the infrastructure of the organization. As we inform you about what happened and the intricacies of this issue, we call on you to act in order to stop this criminal plan, to stop their actions and behavior, which have exceeded the actions and behavior of the Jews. They are threatening to move members of the group to other investigative authorities in order to finish the investigation, and they are threatening to use several procedures and move us to Gaza or Jericho (and we feel that they might indirectly hand us to the Jews).

May Allah grant us success.

Peace and Allah's blessings be upon you.

Your sons,

Abdul Rahman Ghneimat and Jamal Al Hour
Military communiqué from Ezzeddine Al Qassam Brigades:

The Authority Security Forces Hand Over Militants from our Brigades to the Occupation Forces:
Letter smuggled from behind the bars of the Authority prison. Two members of Sureef cell accuse the Authority of its intention to hand them over.
Security Forces heads and chief among them; Jibril Rajoub shall be responsible for this treacherous crime.
The Authority Security Forces, in a shameful and treacherous move, handed the two Brothers Abdul Rahman Ghneimat and Jamal Al Hour, members of Sureef cell that belongs to our militant brigades, to the Zionist Occupation Forces through a theatrical performance directed by the heads of the Authority Security Forces, in association with the heads of the enemy's intelligence services, setting a very serious precedent and a very bad omen for the future of Palestinian society, people, and jihadist forces. Because the detention of our militant heroes was the beginning of humiliation and shame in the face of the Authority's Security Forces, the cowardly act consisting of surrendering our heroes to the Zionist enemy, this treacherous action, is one more evidence that these treacherous meetings aim at liquidating the jihadist project and its pioneer jihadist heroes and to turn the heads of the Authority security forces, by words and deeds, into senior delegates for the Zionist Shabak in the autonomous territories.
It is possible that Rajoub and Al Hindi, these two bastards, were misled by our movement's commitment and the promise we made that we shall fight only the Zionist enemy and to avoid all internal discords despite their treacherous maneuvers inside or outside prison walls and investigation halls. Rajoub and Al Hindi informed the American intelligence service (CIA) and befriended Ami Eylon and Kahlani at their parties... We do not do that out of weakness but because we refuse to be dragged into an internal confrontation in respect of our Movement's commitment.
We also believe that our weapon is too pure to aim it at someone other than the Occupation. We do not issue our accusations lightly [and] we have informed our Brothers Ghneimat and Al Hour, through an official in the Authority security forces, of the intention to move them from their prison to a different one. The two Brothers refused to be moved and expressed their fear that it is only an attempt to hand them to the Occupation forces. Their conviction and their intuition were right and the crime happened and the surrender took place… We do not believe that Jibril Rajoub, Al Hindi and their ilk, were aware of the content of that letter smuggled by our heroes out of prison and in which they spoke of an existing plan to hand them to the Zionist enemy. That letter is a truthful testimony and the evidence about the treachery and the collaboration of those two bastards. For our part, we put our trust in Allah and in His justice and we put our trust in our people and history's judgment. We surrender the fate of oppressors to Allah. Soon enough, these oppressors shall know the wonders of Allah's power. Oppression engenders bad consequences. We shall respond to that treacherous crime in our own way. We shall pierce the heart of the Zionist enemy, and what a better response than that? Let all conspirators carve it in their hearts; the Al Qassam Brigades do not leave their heroes.

(And ye shall certainly know the truth of it (all) after a while. Allah hath full power and control over His affairs; but most among mankind know it not.)

Brigades of the Martyr Ezzeddine Al Qassam
Palestine
Heartssmil heartssmil

Sureef cell

Al Qassam abduction cell and the heroic epic

From A to Z

[The] Sureef cell that was active in the South in the mid-nineties is considered one of the

best cells of Al Qassam Brigades in that area. Its quality operation caused many controversies among the ranks of Zionist intelligence services and has been a puzzling riddle because of the strength and military and secure nature of its operations. During these operations, members of the cell opened fire and stopped traffic in winding roads. They also conducted several other actions, among which the most damaging were the bombing of Café Apropos and the abduction carried out by the cell that ended in a strange and tragic way, in which the security forces, led by Jibril Rajoub, helped with achieving their elimination

The heroes of Sureef cell, and after several years of detention, break their silence and tell their story to the "Brigades" website. In a testimony witnessed by Allah and history, they give many details about its foundation in addition to extremely accurate specifics about its actions and operations, told for the first time ever... how did the cell execute its first operation with two guns and how detentions hit the popular front. Why the first abduction attempt failed and how Sureef cell, succeeded after several attempts in abducting a Zionist soldier and how it could hide him and puzzle the Zionist security forces.

Read new details about the Beth Shemesh operation and the new strategy used by the cell in its abduction operations, and how it used an officially licensed "Zionist" car and how the abduction was aborted after the soldier got inside the car, and how explosives were used by the Sureef Brigade and more details about its martyr operations.

Read about the reasons of the disclosure of the Al Qassam brigade and the detention operations carried out by Zionist and Palestinian authorities. What did we request from the office of Uni Al Reji'i, one of the investigators with the protective security forces and what was his reply when we told him: "How do you secure the roads from Zionists?, and why site officers were transferred that day, and what is the "filsher" s secret behind Issam Al Qadumi's car, and many more details about the "handover" journey with irrefutable

evidence. Here are the details:
First episode

In the name of Allah, the Most Compassionate the Most Merciful

Sureef Cell: The Heroic Epic

Introduction to the Cell:
We will introduce this study by starting with one of the members, the Al Qassam martyr, the leader: Moussa Abdelkader Ghneimat, the hero of the Apropos operation.

I call on the blood of the martyr and it tells me, do you see a reason to shake hands with my killer?

Blood nurtured the flowers of Jerusalem with revenge and if watered with treason they will fade.

This land is watered with our blood, do we sell it one day to the soldiers of immorality?

This is the blood that quenched [the thirst] of the land and the proof of its ownership, its flowers' fragrance and the best of memories that can be remembered by generations. How beautiful is the advice of Abu Ayyub Al Ansari, the revered companion [of the prophet,] to his Mujahideen brothers on his deathbed during the siege of Constantinople: "When I die, take my body under the cover of darkness and bury me at the nearest point from the walls of Constantinople." That's what Muslims did, they buried him there and left back to their land, and each time they were asked about Abu Ayyub, they say: His graveyard is there, awaiting the flowers of Muslim generations to cleanse it from the filth of the Romans. His graveyard became a symbol for Muslim conquests and a song handed down by Mujahideen to others for more than six hundred years. "Here we come Abu Ayyub!" until his graveyard was freed under the hands of the great Ottoman general: "Mohammed the Conqueror." It was as described by the Prophet, peace be upon him, when he said: "Constantinople shall be conquered. Blessed is its army and blessed is its general that does so."

Introduction to the martyr Moussa Abdelkader Ghneimat in a few lines:

We will be introduced through these lines to the life of the martyr Abu Moussa Abdelkader Ghneimat; the martyr who grasped Abu Ayyub's philosophy and who decided to join the cells of his clean body and the drops of his blessed blood to the soil of the violated city Tel Rabia so that his children shall grow up and ask about their father and to hear the faithful mother tell the story: "Your father is there, in your occupied land, waiting for you to cover his graveyard with flowers, and recite the verses of al Isra' and bring him the good tidings that "the army of destruction was destroyed."

He was a jihadist that refused to be swayed by the politics of normalization, and was not duped by the politics and the slogans of false peace, and did not accept in his beliefs words such as cohabitation, conceding, adaptation, and truce. They tempted him by working with their services, when he yearned to hold his rifle and aim it at his enemy's chest. Their rusty rifles aim only at the noble mujahideen's back. His answer was to refuse absolutely. When his companion in Hamas, Jamal Al Hour, asked him to join the Sureef cell in the Azzadine Al Qassam Brigades, he felt such a joy and said: "What are you waiting for, let's go down tonight to Beth Shemesh settlement? Let's not wait for tomorrow!" This is how the martyr Moussa Abdelkader Ghneimat carried himself. He was tall, slender and his face was lit. He was a man who sold his life with all its content and bought what Allah had to offer. He did not hesitate one single instant, nor did he think of his children: (Abdelkader, Isra', Bushra and Mohammed) nor his wife, father or family.

He answered the call to Jihad and used all his talents and capabilities to fulfill his purpose.

He mastered Hebrew better than Jews and knew the alleys of Tel Rabia – Tel Aviv, better than the occupiers. He used to joke with his brethren when they spoke of abducting a soldier to exchange him for prisoners and say: "I challenge Netanyahu if he rides with me in the car to find out or suspect for one moment that I am an Arab or a Palestinian." He spent, may Allah bless him, most of his life working in Zionist shops and restaurants, which added to his faith and his belief that his enemy is dirty and soiled. The rifle became the nymph of his dreams and his lover, he yearned to embrace it and use its bullets to explode the heads of the descendents of monkeys who occupied his land and displaced his people.

He was chosen as a member of the Sureef cell for several reasons: His devotion and his calculated enthusiasm, his character and clean background, his knowledge of Hebrew and driving, and his intimate knowledge of the roads and the precise habits of the Jews, in addition to his mastery of Kung Fu. He was, prior to that, an active member in Hamas in the village of Sureef and he was detained and interrogated in the past for more than a month. He resisted and was released without revealing any secrets about his jihad and his membership. Prior to joining Hamas and because he wanted to fight the Occupation, he was a member of Fatah and participated in confrontations, actions and the taming of some collaborators. However, he soon defined his Islamic identity and his belonging when Hamas' presence became strong in Sureef and after he learned of the true, frugal, and courageous ways of its Mujahideen.

Our martyr Abu Abdelkader was born in 1969 and was known for his calm and poise. He was loved by his brethren and the people of his village. He heard a lot in childhood about the hero "Ibrahim Abu Diyye" who was born in Sureef and was martyred in the '30s fighting against the British occupation and Jewish settlers. Moussa was arrested the first time in 1993 during a campaign that targeted

everyone who had helped or was related to the Intifada in Sureef. Since 1996, he participated in tens of operations aiming at abducting soldiers and carried by the Sureef cell in order to use them to free the prisoners, until the cell succeeded in abducting the soldier Sharon Edri and hiding his body for many months. However, Jibril Rajoub gave it as a present, without anything in return, to his masters in the Zionist intelligence service Shabak and followed by surrendering the two members of the cell: Abdul Rahman Ghneimat and Jamal Al Hour, in a disgraceful and obvious theatrical show that he could not play or direct well enough. Abduction attempts continued until the events of Abu Ghneim settlement, and the group was tasked by the leader Adil Aoudh Allah to plant remote explosives to avenge the dignity of our Palestinian people and sanctity of our land. In the beginning, it was decided that the member Ra'ed Abu Hamadieh will plant the bag and explode it and Moussa would only drive the car.

On 3/21/1997, our hero and Al Qassam martyr and leader Moussa Abdelkader Ghneimat, got up early in the morning, performed Al Fajr prayer in Salah Eddine mosque in the village, took his breakfast with his wife and children, kissed them and embraced them while crying, as if he knew that it was his last farewell to the most endearing people to his heart. He did not know that the plan changed and it was decided that he should plant the bomb and explode it remotely because of his quietness and his self-control. There in Tel Aviv and at Café Apropos, our martyr walked his last steps in his Jihadi path and bidding farewell to life on his way to eternity, to become a martyr in heaven after he killed and wounded 54 Jews when the bag exploded before it reached its planned target because of a defect that has not yet been determined. This is Moussa Abdelkader Ghneimat… the martyr of Tel Rabia. The knight of the Sureef Cell… Who rode off on a mount of his own blood and chanted a line from his Sheikh Al Qassam: "It is a struggle for Victory or Martyrdom." Peace be upon your clean soul oh Abu Abdelkader… We will meet there in Heaven, in a seat of truth before a competent King… This is our martyr and from all of us…

## Rajub Sent Hamas Members into an Israeli Ambush

Tension between Hamas and the Palestinian Authority: Hamas claims that two of the movement's activists that were detained by the Palestinian Preventive Security Service were intentionally transferred to Qalqilia so that they would be eliminated by Israel. At the funeral of Bilal Al Awal, who was killed yesterday, Hamas and Fatah members marched separately.

Ali Wakad

Published: August 24, 2001 at 12:02 A.M.

There is tension, of late, between the Palestinian Authority organizations and Hamas following a series of incidents between the two sides in the last twenty four hours.

Hamas claims that two activists in the movement, Abdullah and Bilal Barghouti, from the village of Beit Rima in the Ramallah region, who were detained approximately two weeks ago by Jibril Rajub's West Bank Preventive Security Service, were beaten as they were being detained. Hamas claims that Rajub tricked his people and directed them to detain the Barghuti brothers, after explaining to them that the two were collaborators with Israel.

Hamas further claims that CIA agents were present during the interrogations of the Barghouti brothers. Members of the movement claim that Rajub directed that the two be transferred to Qalqilia, this despite the closure that is imposed on the territories. Hamas claims that the transfer was intended to bring about the interception and elimination of the two by Israel while they were on their way to Qalqilia. Hamas claims that this trick is identical to one that Jabril carried out against the members of the Tzurif group, who were detained near Hebron, and whom Rajub asked to be transferred to Jerico. On the way to Jerico, the Israel Defense Force detained the group and Rajub's people, and eliminated the members of the group.

According to Hamas, the attempt to transfer the two to Qalqilia was cancelled at the last moment by a special directive of Arafat.

Hamas also claims that members of the West Bank Preventive Security Service attacked two Hamas activists in the Bureij refugee camp in the Gaza Strip when the activists reported, on loudspeakers, the elimination yesterday of Bilal Al Awal, the son of Adnan Al Awal, Deputy Commander of Iz Al-Din al-Qassam Battalions in the Gaza Strip.

Hamas claims that the West Bank Preventive Security Service people attacked ten Hamas activists who were near the hospital to which Al Awal was rushed immediately after the elimination action. Hamas claims that the West Bank Preventive Security Service people seized Al Awal's corpse in order to prevent Hamas activists from participating in the funeral.
In the funeral, which took place yesterday (Thursday), the Hamas people and their supporters marched separately and yelled out slogans condemning Arafat and the Palestinian Authority, and they were accused of treason and of shooting at the Palestinian fighters.

At the same time, Hamas claims that a telephone conversation between Gamal Mantzur, a senior Hamas member who was killed in Nablus at the beginning of the month, and a journalist of the British BBC station, is what led to discovery of the exact location of the Hamas activists. This permitted the Israeli Defense Forces to make an exact identification and led to a direct hit of their offices. In Hamas voices are being heard that request an investigation of the matter.

Hamas further claims that in the course of the same period strange noises were heard on the telephone lines of Hamas activists.

خلية صور يف القسامية هل تنجح الأمهات الفلسطينيات في إنجابها من جديد

الخلية نجحت في قتل 11 صهيونيا بسرية كاملة واختطفت الجندي الصهيوني شارون ادري وقتلته واستطاعت إخفاءه لمدة سبعة اشهر كاملة ومرغ انف الشاباك في الوحل بعد أربع سنوات من الجهاد والمقاومة.

خاص - قسام

))وجعلنا من بين أيديهم سدا ومن خلفهم سدا فاغشيناهم فهم لا يبصرون. ((

بهذه الكلمات كان عبد الرحمن اغنيمات والذي كان عمره آنذاك 25 عاما يتخطى الحواجز ليلا ويجتاز نقاط التفتيش نهارا ،أثناء تنفيذه لمهامه الجهادية في الفترة الواقعة بين الأعوام 1994-1997.

عبد الرحمن اغنيمات والشهيد موسى اغنيمات من بلدة صوريف في محافظة الخليل وجمال الهور ، ايمن فقيشه ، ورائد أبو حمدية من مدينة الخليل كانوا كالأسود الرابضة يحددون الهدف يخططون وينفذون بدقة ، حيث وجهوا صفعة قوية لجهاز الشاباك الصهيوني حينما نجحوا في إخفاء رفات الجندي الصهيوني (شارون ادري) لمدة سبعة اشهر دون اكتشافهم حتى تم ذلك على يد العقيد جبريل الرجوب في عملية تنسيق قذرة مع سلطات الاحتلال

بداية الانطلاق

منذ نهاية عام 1995 وبداية 1996 بدأت خلية صوريف نشاطاتها وقامت بعمليات نوعية على مدى ما أربعة أعوام دون اكتشاف أمرها أو الوصول إليها او إلى خيط يمكن أن يؤدي إلى ذلك وقد ضمت خلية صوريف خمسة مجاهدين ثلاثة منهم من بلدة صوريف التي تبعد حوالي 15 كلم إلى الشمال الغربي لمدينة الخليل ويبلغ عدد سكانها اكثر من 13 ألف نسمة واثنين من مدينة الخليل ، وقد انكشف أمر الخلية بعد تنفيذ عملية مقهى ابوربو التي نفذها الشهيد موسى غنيمات بتاريخ 1997/3/13 وأدت في حينه إلى قتل أربعة صهاينة وجرح اكثر من أربعين.

اكتشاف الخلية

في صباح1997/3/21 وقف موسى عبد القادر أبو دية اغنيمات وتناول كأسا من الشاي وقبل أن يكملها جال بنظراته في محيط البيت وطلب من والدته أن ترضى عليه ثم ذهب الى زوجته واوصاها بأبنائه خيرا ثم حمل حقيبته التي تحتوي على ملابسه الشخصية وانطلق إلى مدينة تل أبيب (تل الربيع) حيث كان يعمل في مقهى ريشون منذ 8 سنوات خلت ويقع هذا المقهى جنوب مدينة تل أبيب وقد كانت الخطة التي رسمت لموسى من قبل أفراد الخلية هو أن يضع موسى حقيبة المتفجرات في المقهى ثم يغادر حيث يتم تفجيرها عن بعد نصف كلم من خارج المقهى.وموسى من مواليد عام 1969 وهو متزوج وأب لاربعة أطفال هم إسراء وبشرى وعبد القادر ومحمد وكان يتحدث اللغة العبرية بطلاقة وكان اكثر ما يميزه الهدوء والسكينة .

وفي مقهى أبوربو وضع موسى حقيبته وجلس بهدوء بين عدة طاولات كانت تعج بالزبائن ولكن لوجود خلل ما انفجرت العبوة الناسفة الموجودة في الحقيبة قبل أن يغادر الشهيد موسى المكان مما أدى إلى استشهاده ومقتل أربعة صهاينة واصابة اكثر من 40 بجروح وعند ذلك عرفت هوية الشهيد موسى وانتماءه السياسي وقد قامت سلطات الاحتلال بعد عدة ساعات بتطويق بلدة صوريف وفرض حظر التجول عليها لمدة (45) يوما وقد عاشوا

فيها فسادا وهدموا فيها 3 منازل لأفراد الخلية واعتقلوا العشرات وقد امتدت فترة الحصار من 1997/3/21 إلى 1997/5/4 وقد تم اكتشاف بقية أفراد الخلية من قبل القوات الصهيونية بمساعدة جبريل الرجوب وجهاز الأمن الوقائي وقد تم اعتقال ايمن قفيشة في حي تل الرميدة في 1997/4/5 ورائد أبو حمدية لدى الجانب الصهيوني فيما أعتقل كلا من عبد الرحمن اغنيمات وجمال الهور وإبراهيم اغنيمات شقيق الشهيد موسى اغنيمات والذي ثبت عدم علاقته بالخلية فيما بعد لدى جهاز الأمن الوقائي في 1997/4/9 وقد تم أيضا في هذه الفترة اكتشاف رفات الجندي) شارون ادري) في بلدة صوريف بعد سبعة اشهر على اختطافه وقتله ذلك في تاريخ 10/4/1997 والذي سنروي قصته في سياق هذا التقرير.

الخطة المحكمة

خلية صوريف قامت بعدة عمليات بطولية فقد نسبت إليها سلطات الاحتلال قتل (11) صهيونيا ولكن العملية التي أذهلت جهاز المخابرات الصهيوني هي عملية اختطاف الجندي الصهيوني (شارون ادري) وقد بدأت فصول القصة عندما قررت ان تقوم بعمليات اختطاف من اجل تحرير أسرانا البواسل من براثن سجون الاحتلال وقد تم تحديد الهدف اثناء تجول رائد ابو حمدية والشهيد موسى اغنيمات امام وزارة الدفاع حيث شاهدوا جنديا صهيونيا يبحث عن سيارة في تمام الساعة السادسة ليلا فاستوقفهم وسألهم هل تريدون الذهاب إلى مدينة بيت شيمش وقد صعد إلى السيارة عندما كان الرد بالإيجاب ثم تمت السيطرة عليه وعندما حاولت السيارة الاقتراب من أحد الحواجز الصهيونية قام الجندي بإثارة الجلبة داخل السيارة وتمت السيطرة عليه وقتله كي لا يثير الشبهة وكان يصرخ بأعلى صوته (أني لو رتسي لموت) أي انا لا أريد أن أموت.

وقد تم إخفاء جثة الجندي في بلدة صوريف وبعد عدة اشهر تم تغيير مكانها وحسب اعترافات أفراد الخلية فقد تعاملوا مع الجثة باحترام وحافظوا عليها وقد كان الهدف من اختطاف الجندي هو المساومة عليها لاطلاق سراح الشيخ احمد ياسين ومعتقلين آخرين من سجون الاحتلال وحسب معلومات مؤكدة من عناصر مقربة من جهاز المخابرات في السلطة الفلسطينية فان الجهاز بذل قصارى جهده للوصول إلى أفراد الخلية وقد ذكرت نفس المصادر أنها لجأت إلى فتح (المندل) وهي طريقة من طرق السحر لتحديد الأهداف المطلوبة.

القصة الكاملة

بعد أن اعتقلت سلطات الاحتلال المجاهد القسامي (ايمن قفيشة )والمجاهد (رائد صالح أبو حمدية )واعتقل جهاز الأمن الوقائي التابع لسلطة الحكم الذاتي جمال الهور وعبد الرحمن اغنيمات وإبراهيم اغنيمات بقيت حلقة واحدة لتكتمل القصة حيث تمتد هذه الحلقة بين سجن الخليل جنوبا ومثلث حواره شمال فلسطين حيث شهد هذا المثلث على قذارة ما قام به الرجرب من تسليم لا فراد الخلية بتهمة التعرض لما يسمى أمن الدولة الفلسطينية حيث قرر جهاز الأمن الوقائي نقل افراد الخلية في تمثيلية مكشوفة من مبنى المقاطعة في الخليل إلى أحد السجون في منطقة نابلس وقد روى لنا أحد المقربين للبطل القسامي عبد الرحمن غنيمات بحسب الرواية الصحيحة التي صدرت من أفراد الخلية أنفسهم بعد اعتقالهم واختطافهم حيث جاء في حيثيات القصة أن جهاز الأمن الوقائي قرر فجأة بأنه سيتم نقل أفراد الخلية من سجن الخليل إلى مدينة نابلس تمهيدا لمحاكمتهم وبناء على اقوال رسمية اغنيمات التي تعرضت للاعتقال في السجون الصهيونية مدة ثلاثة اشهر فإن شخصا مجهولا اتصل بالقسم الذي تعمل فيه في مستشفى الأهلي في الخليل واخبرها بأن لا تقوم عائلة عبد الرحمن بزيارته في سجن السلطة في 14 /1997/11 أي بعد تسليم الخلية بيوم واحد وقد رفض أعضاء الخلية هذا القرار كما قام أهالي أفراد الخلية بالطلب بشكل رسمي من جهاز الأمن الوقائي عدم نقل أبناءهم إلى أي سجن آخر وقد وعد الجهاز أهالي المعتقلين بان يبقوا في سجن الخليل وقالوا بأنهم في حمايتهم ولن يفرطوا بهم وقد تم نقل أفراد الخلية في 13/11/1997 من مدينة الخليل عبر طريق واد النار الذي يربط بين مدينة بيت لحم ومدينة القدس المحتلة ومدينة رام الله ثم نابلس شمالا وحسب الرواية التي وصلت إلينا فإن المعتقلين رفضوا الصعود في السيارة ولكن أفراد الأمن الوقائي هجموا عليهم وقيدوهم وحملوهم في السيارة عنوة (حسب رواية عبد الرحمن اغنيمات في رسالة سربها من

سجنه بعد تسليمه لليهود ) وفي الطريق إلى منطقة الشمال وعندما وصلت القافلة إلى طريق واد النار شوهدت سيارة عسكرية صهيونية تقترب من موكب أفراد الخلية وقد قامت بتصوير السيارات الفلسطينية بما فيها السيارة التي يستقلها أفراد الخلية وقد ذكر أفراد الخلية أن السيارات التي كانت تقلهم كانت تحتوي على عدة سيارات وكان برفقة المعتقلين 10 من عناصر الأمن الوقائي تواجدوا مع الموكب حيث كان الاتصال ينقطع بين الحين والآخر بين السيارة التي كان يستقلها أفراد الخلية وبين السيارات الأخرى المرافقة لها في حين كانت تشاهد آخر السيارات التي كانت تضاء بشكل خافت أحيانا واحيانا أخرى بشكل مرتفع حيث شعر أفراد الخلية أن هناك إشارات ما كانت ترسل إلى جهات أخرى عبر انقطاع الاتصال وأضواء السيارات كما أن أفراد الخلية وحسب معلومات صدرت منهم فانهم ابلغوا في البداية انهم سيحاكمون في أريحا وانهم عصر يوم الخميس سيتوجهون إليها ولما قامت السيارات بتجاوز الطرق المؤدية إلى أريحا شعروا بأنهم في طريقهم إلى معسكرات العدو الصهيوني وليس إلى أريحا وقبل أن تصل السيارات التي كانت تقل أفراد الخلية إلى مثلث حواره لاحظوا أن السيارات الفلسطينية بدأت تستخدم الأضواء المرتفعة فقط .كما أن الاتصال انقطع تماما بين سيارات الموكب

وعندما اقتربت السيارات الفلسطينية من مثلث حواره شمال مدينة نابلس شوهدت قوات صهيونية كبيرة تعترض السيارات الفلسطينية وقد التف اكثر من 50 جنديا صهيونيا حول سيارة أفراد الخلية ثم اخذوا ينادوا بمكبرات الصوت على أفراد الخلية بأسمائهم مطالبين بتسليم أنفسهم بكل هدوء وكانوا يضحكون ويقولون بصوت مرتفع وهم مستبشرين غنيمات ...غنيمات ، وبالرغم من أن أفراد الأمن الوقائي الذين كانوا يرافقون أفراد الخلية في سيارة من نوع (جي ام سي) يتمتعون بقدر عال من اللياقة البدنية إلا انهم في لحظات كانوا مطروحين على الأرض بدون أي نوع من المقاومة وأسلحة أفراد القوات الصهيونية إلى صدورهم حيث تم التعرف على شخصيات أفراد الخلية وتم اعتقالهم وقد تم نقل المعتقلين الثلاثة إلى السجون الإسرائيلية وقد كانت هذه العملية من اقذر العمليات التي اشرف عليها الرجوب وأدت إلى تسليم أفراد الخلية وقد كانت هذه العملية وستظل وصمة عار في جبين الرجوب وجهاز الأمن الوقائي إلى الأبد .

مسؤول الأمن الوقائي جبريل الرجوب في ذلك الحين سارع إلى شجب العملية واعتبرها قرصنة في وضح النهار واكد انه تم تشكيل لجنة تحقيق للبحث في ملابسات القضية ولم يعرف أعضاء هذه اللجنة ولم نر أياً من قراراتها حتى الآن .

وقد سبق هذا القرار ورود عدة رسائل من أفراد الخلية إلى ذويهم أعربوا فيها عن ازدياد قلقهم ومخاوفهم من تسليـهم إلي الكيان الصهيوني وقد اكدوا أيضا بأنهم طالبوا بمحاكمتهم في سجون السلطة الفلسطينية وقد تلقوا ردا بان السلطة لا تنوي محاكمتهم لأنهم ضيوف عندها.

وفي 1997/11/16/ خرج المئات من أهالي بلدة صوريف وأهالي مدينة الخليل حيث توجهوا الى مقر المقاطعة وقاموا بالهتافات ضد الرجوب والأمن الوقائي والسلطة الفلسطينية واتهموا الرجوب بتسليم أفراد الخلية جهارا نهارا وقد قام المتظاهرون بإلقاء الحجارة على مبنى المقاطعة كما نظم أهالي بلدة صوريف مظاهرة أخرى وتم خلالها إحراق سيارة عضو المجلس التشريعي الفلسطيني علي أبو الريش أما كتائب القسام فقد وزعت بياناً عسكريا في 1997/11/18 وصفت فيه أجهزة أمن السلطة الفلسطينية بأنها تقوم بتسليم المجاهدين إلى قوات الاحتلال وحملت المسؤولين إلى رؤساء الأجهزة الأمنية وذكرت في البيان أن الرجوب والعقيد دحلان قاموا بتسليم أفراد لخلية في عملية جبانة جاءت من إفرازات ما يسمى التنسيق الأمني مع العدو الصهيوني وذكر البيان نص رسالة وجها المعتقلون وهم في سجون السلطة قبل تسليمهم وجاءت على لسان ايمن قفيشة ورائد أبو

حمدية حيث وجهت تلك الرسالة إلى رؤساء الحركة الاسلامية لوضعهم في صورة الحدث.

وقد جاء في الرسالة أن الخلية قرروا الاعتراف بمكان جثة الجندي شارون ادري مقابل عدة شروط منها عدم دخول الجيش الصهيوني إلى مناطق السلطة الفلسطينية ورفع الطوق الأمني عن المناطق ورفع الحصار عن صوريف وعدم هدم منازل أفراد الخلية وعدم تسليمهم إلى الجيش الصهيوني وان يكون مقرهم الأخير سجن الخليل وقد وافق الرجوب على هذه الشروط بعد الاتصال بعرفات ،وبعد تسلم الخارطة التي توصلهم إلى رفات الجندي تنصل الرجوب من الاتفاق وتم هدم منازل المعتقلين الثلاثة ومنهم منزل الشهيد موسى اغنيمات وقد أكد أفراد الخلية أن أحد المحققين قال لهم بان الذي يصدر حكم المؤبد هو بنفسه الذي يصدر حكم الإفراج كما ذكروا في رسالتهم انهم قاموا بتسليم أسلحتهم للسلطة الفلسطينية وقد ختموا هذه الرسالة بقولهم (بالرغم من هذه التعهدات إلا أننا شعرنا بان هؤلاء القوم في نيتهم البحث عن جذور الجهاز العسكري وضرب البنية التحتية للتنظيم واصبحوا يهددون بنقل المجموعة إلى أجهزة التحقيق الأخرى لاستكمال التحقيق والتهديد باللجوء إلى أساليب متعددة أو نقلنا إلى أريحا أو غزة وآخر عبارة ذكرت في الرسالة "نحن نشعر انهم يقومون بتسليمنا إلى اليهود بطريقة غير مباشرة . "

أما موقف الرجوب / مسؤول جهاز الأمن الوقائي فقد نفى تحمل المسؤولية وقد ذكر في صحيفة القدس الصادرة في 1997/11/3 قائلا بان ما حدث هو قرصنة سخيفة أقدمت عليه سلطات الاحتلال واكد بان ما قامت به سلطات الاحتلال هو بمثابة معركة بدأت ولن تتوقف إلى ان تعيدهم إلى السلطة.

في حين ذكرت إذاعة العدو أن ما حدث هو صفقة لإيقاف محاكمة ثلاثة من أفراد الشرطة الفلسطينية.

وقد رفض الرجوب الامتثال إلى لجنة التحقيق كما ذكرت صحيفة شيحان الأردنية في 1997/11/22 وقد نسبت هذا القول إلى مسؤول في حركة فتح رفض ذكر اسمه في حينه وقد جاء على لسان هذا المسؤول أن الرجوب رفض الامتثال إلى لجنة التحقيق التي شكلها عرفات برئاسة الطيب عبد الرحيم وعضويه نصر يوسف والحاج إسماعيل وعبد الرزاق المجايدة ويحيى عاشور حول ممارساته وتهجمه على أعضاء المجلس التشريعي .

أبطال الخلية

ولد عبد الرحمن إسماعيل اغنيمات في عام 1975 في بلدة صوريف 13 ك شمال غرب مدينة الخليل وهو أعزب تلقى تعليمه في بلدة صوريف ثم التحق بجامعة القدس المفتوحة فرع الخليل ولم يكمل دراسته بسبب اعتقاله في عام 1993 و 1994 بسبب نشاطه في حركة حماس وكان عبد الرحمن قد انتمى لكتائب القسام عن طريق محمد عزيز رشدي قائد خلايا عز الدين القسام في منطقة الخليل في عام 1993 وكانت مهمة عبد الرحمن في البداية تقديم المعونة والمساعدة لأفراد الكتائب بتوجيه من محمد عزيز وماهر أبو سرور من بيت لحم والذي قتل احد عناصر الشاباك قبل استشهاده بعدة اشهر والشهيد الحي صلاح عثمان والشهيد محمد الهندي وهما من غزة هاشم وقد تم تأسيس الخلية بعضوية جمال الهور وعبد الرحمن غنيمات وقد تم إمداد الخلية بالأسلحة والذخيرة وقد انضم إلى الخلية كل من ايمن قفيشة ورائد أبو حمدية وهما من مدينة الخليل ثم التحق الشهيد موسى غنيمات الذي بقي في الخلية حتى لحظة استشهاده . وبعد اعتقال أفراد الخلية من قبل سلطات الاحتلال وتسليم عبد الرحمن وجمال الهور وإبراهيم اغنيمات الذي أنكر أي علاقة له بالخلية حكم عبد الرحمن اغنيمات بالسجن خمس مؤبدات عسكرية و20 عاما أي ما يعادل 515 عاما أما رائد أبو حمدية فقد حكم بالسجن أربع مؤبدات عسكرية

أي ما يعادل 401 سنة ، وجمال الهور حكم بالسجن لمدة خمس مؤبدات و18 عاما أي ما يعادل 513 عاما أما ايمن قفيشة فقد حكم بالسجن لمدة 35 عاما وقد كان حكمه أخف الأحكام لان تهمته كانت تقديم المساعدة لأعضاء الخلية وهو الذي احضر حقيبة المتفجرات وأعطاها لعضوي الخلية غنيمات والهور ودربهما عليها وهم اللذان أرسلا موسى غنيمات إلى مقهى ابوربو لتنفيذ العملية المذكورة.

العمليات التي قامت بها خلية صوريف

في الحقيقة كان أهم عنصر من عناصر نجاح هذه الخلية هو اتباعها السرية الكاملة في التخطيط والتنفيذ والتحضير بالإضافة إلى معرفة أفرادها بتضاريس المنطقة التي كانوا ينفذون فيها العمليات – موسى غنيمات يعمل في مدينة القدس ويعرف شوارعها بدقة منذ 8 سنوات ورائد أبو حمدية يعمل في مدينة القدس ويحمل بطاقة هوية زرقاء وكان يعرف مدينة القدس شبرا شبرا وعبد الرحمن غنيمات كان يتصف بالحكمة والحنكة والدهاء السياسي والعسكري أما ايمن قفيشة فهو من سكان مدينة الخليل ولا يقل عن أفراد الخلية ذكاءا والتزاما وحنكة واهم العمليات التي نسبت للخلية.

-1عملية النبي دانيال والتي أدت إلى إصابة مستوطن بجروح وتمت بعد استشهاد يحيى عياش

-2كما أطلق أفراد الخلية النار على سيارة من نوع رينو بالقرب من مدينة حلحول وقد قتل فيها عسكري صهيوني وجندي ومرافق له

-3عملية بيت شيمش حيث تعمقت الخلية مسافة 30 كم داخل ما يسمى الخط الأخضر واطلقوا النار باتجاه سيارة كانت تقل مستوطنة من كريات أربع وقتل فيها اثنين من المستوطنين

-4عملية بالقرب من مستوطنة بيتار المقامة على أراضي بيت لحم وقد قتل في العملية 3 مستوطنين.

-5اختطاف الجندي شارون ادري من منطقة بيت شيمش وإخفاءه بعد قتله ولم يكن في خطة الخلية قتل الجندي وانما المساومة عليه لاطلاق سراح الأسرى

-6وقد كان الخيط الأول الذي أدى إلى اعتقال الخلية واكتشاف أمرها هو عملية المقهى حيث اكتشفت هوية الشهيد موسى اغنيمات في المكان بعد انفجار الحقيبة حيث كان من المقرر أن يفجر العبوة على بعد نصف كلم ومن ثم يعود مع رائد ابو حمدية الذي كان ينتظره في أحد شوارع القدس حيث اخذ رائد يسير بعكس اتجاه السيارات حينما علم بان منفذ العملية استشهد . وهكذا انتهت القصة ولكن طريقهم الى العلا لم تنته وهكذا اكتشفت الخلية بطريق الصدفة وقدرة الله فوقها بعد أن سجل جهاز المخابرات الصهيوني فشلا ذريعا بعد مرور أربع سنوات من الجهاد المتواصل لهذه الخلية .

النص الحرفي للرسالة التي سربها أبطالنا من خلية صوريف أثناء سجنهم عند السلطة

لتكون الدلالة الأكيدة على تحميل مسؤولية تسليمها لمسؤلي أجهزة أمن السلطة

وعلى وجه الخصوص جبريل الرجوب

الحمد لله رب العالمين ، والصلاة والسلام على سيدنا محمد وعلى أصحابه والتابعين من بعد وبعد :

من خلية صوريف التابعة لكتائب الشهيد عز الدين القسام والموجود فردين من أفرادها في التحقيق لدى اليهود وهما "ايمن قفيشة، ورائد أبو حمدية" وفردين في التحقيق لدى السلطة وهما "عبد الرحمن غنيمات وجمال

الهور. "

الى رجال الحركة الاسلامية نضعكم في صورة ما حصل معنا نحن الموجودون في التحقيق لدى السلطة في سجن الخليل :

-1بالنسبة لجثة الجندي شارون ادري ، فقد تم الاتفاق مع جبريل الرجوب مباشرة على أن يتم الكشف عن الجثة من قبلنا مقابل عدم دخول جيش الاحتلال لمناطق السلطة ، ورفع الطوق الأمني عن المناطق ورفع الحصار عن صوريف ، وعدم هدم منازل أفراد الخلية ، وعدم تسليمنا للجيش الإسرائيلي، وعلى أن يكون مصيرنا النهائي البقاء لفترة وجيزة في سجن الخليل ، وبالعبارة قال أحد المحققين : إن الذي يصدر حكم المؤبد يصدر حكم الإفراج .

-2بالنسبة لتسليم الأسلحة ، فقد سلمت للسلطة مقابل إنهاء وضع أحد الاخوة المتهمين بحيازة هذه القطع والذي ليس له أي علاقة بالخلية على الإطلاق ، وقد تعهد الرجوب بذلك.

ورغم كل هذه التعهدات شعرنا بان هؤلاء القوم نيتهم هي البحث عن جذور الجهاز العسكري وضرب البنية التحتية للتنظيم ،ونحن إذ نضعكم في صورة الحدث وما جرى في هذه القضية ، نطالبكم العمل على إيقاف هذا المخطط الإجرامي بحق الحركة ، ووضع حد لتصرفاتهم وإجراءاتهم التي تعدت تصرفات وإجراءات اليهود ، واصبحوا يهددون بنقل المجموعة إلى أجهزة تحقيق أخرى لاستكمال التحقيق والتهديد باللجوء إلى أساليب متعددة ، ونقلنا إلى أريحا أو غزة) ونحن نشعر انهم قد يقومون بتسليمنا لليهود بطريقة غير مباشرة. (

والله ولي التوفيق

والسلام عليكم ورحمة الله وبركاته

أبناؤكم

عبد الرحمن غنيمات وجمال الهور .

----------------------

بيان عسكري صادر عن كتائب عز الدين القسام
أجهزة أمن السلطة تقوم بتسليم المجاهدين من كتائبنا لقوات الاحتلال:

رسالة تم تهريبها من خلف قبضان سجن السلطة ،عضوي خلية صوريف يتهمان السلطة بالنية في تسليمهما . رؤساء الأجهزة الأمنية وعلى رأسهم جبريل الرجوب يتحملون مسؤولية تلك الجريمة الخيانية .
قامت أجهزة أمن السلطة في خطوة مجللة بالعار والخيانة بتسليم الأخوين عبد الرحمن غنيمات وجمال الهور عضوي خلية صوريف التابعة لكتائبنا المجاهدة الى قوات الاحتلال الصهيوني عبر مسرحية أخرجها رؤساء ومسؤولو أجهزة أمن السلطة بالاشتراك مع مسؤولي أجهزة مخابرات العدو في سابقة خطيرة تحمل في ثناياها بذور الويل و الشر تجاه المستقبل الفلسطيني) مجتمعاً وشعباً وقوى مجاهدة .(
ولأن شكل اعتقال أبطالنا المجاهدين ابتداء سبة وعار في سفر أجهزة أمن السلطة ورؤسائها ،فإن الفعلة الجبانة في تسليم أبطالنا للعدو الصهيوني ليشكل هذا الفعل الغادر دليلا آخر على أن هذه اللقاءات الخيانية تهدف إلى تصفية المشروع الجهادي والنيل من رواده المجاهدين الأبطال لتحول ذلك حقاً وصدقاً وقولاً وعملاً رؤساء أمن السلطة الى مندوبين كبار للشاباك الصهيوني في مناطق الحكم الذاتي .
ولعله قد غر الرجوب والهندي هذين اللحدين التزامنا بخط حركتنا ،وعهد قطعناه على أنفسنا بأن لا نواجه غير العدو الصهيوني ، وأن نطفىء نار الفتنة الداخلية ونلجم شرارها برغم ممارستهما الخيانية داخل أسوار

المعتقلات ،وفي أقبية التحقيق أو خارجها ،فقد علم الرجوب والهندي صيفي المخابرات الأمريكية C.I.A ورفيقي عامي ايلون وكاهلاني في حفلاتهما...إننا لانفعل ذلك عن ضعف بل لأننا قررنا أن لا ننجر الى مربع المواجهة الداخلية التزاما منا بموقف حركتنا.
ولأننا نرى أن سلاحنا أطهر من أن نصوبه ضد أحد غير أن نصوبه ضد أحد غير الاحتلال ،ولسنا نصدر في اتهاماتنا من فراغ فقد تم ابلاغ الأخوين غنيمات والهور
بواسطة مسؤول في أجهزة أمن السلطة بأن النية تتجه الى نقلهما من سجنهما الى سجن آخر ،ورفض الأخوان الأمر وأعربا عن خشيتهما أن تلك ستكون محاولة لتسليمهما لقوات الاحتلال ،وقد حزر ظنهما وصدق حدسهما فكانت الجريمة وتم التسليم...فيما لا نظن أن جبريل الرجوب والهندي واشباههما حيبا حساب تلك الرسالة التي تمكن أبطالنا من تهريبها من سجنهما عند السلطة بعيد اعتقالهما والتي ننشرها مع بياننا هذا والتي أعربا فيها عن وجود مخطط لتسليمهما الى العدو الصهيوني لتكون رسالتهما تلك هي وثيقة الصدق وشهادة الحق على عمالة وخيانة اللحدين ،ونحن من طرفنا نثق بالله وعدالته ونثق بشعبنا ونثق بحكم التاريخ وامر الظلمة نوكله الى الله الى الله ولن يمر طويلاً حتى يرى هؤلاء الظلمة عجائب قدرة الله فان الظلم مرتعه وخيم سيكون منا الرد على تلك الجريمة الخيانية بطريقتنا الخاصة بأن تقذف بحممنا في قلب عدونا الصهيوني وانعم به منم رد وينقشها كل المتآمرين في قلوبهم إن كتائب القسام تضيع أبطالنا

)ولتعلمن نباه بعد حين والله غالب على أمره ولكن أكثر الناس لايعلمون ..(

كتائب الشهيد عز الدين القسام
فلسطين
**heartssmil heartssmil**

# خلية" صوريف "

## خلية الخطف القسامية.. وملحمة البطولة

## من الألف إلى الياء

تعتبر خلية "صوريف "التي عملت بمنطقة الجنوب في وسط التسعينات، من ابرز خلايا كتائب القسام في تلك المنطقة، وقد شكلت في عملياتها النوعية جدلاً واسعاً في صفوف أجهزة المخابرات الصهيونية، ولغزاً محيراً لقوة عملياتها ونوعيتها المحكمة عسكرياً وأمنياً، حيث قامت خلالها بالعديد من عمليات إطلاق النار وفرض حظر التجوال على الطرق التفافية، والعديد من العمليات الأخرى كان أكثرها إيلاما تفجير مقهى "أبروفو" وعملية الخطف المميزة التي قامت بها الخلية والتي انتهت نهاية تراجيدية غريبة ساهمت أجهزة السلطة الأمنية وعلى رأسها "جبريل الرجوب" بحبك إخراجها.

أبطال خلية "صوريف" وبعد سنوات من الاعتقال يخرجون عن صمتهم ويروون لموقع "الكتائب" في شهادة لله والتاريخ، الكثير من التفاصيل، عن فكرة تأسيسها وتفاصيل دقيقة جداً تروى لأول مرة عن تفاصيل عملياتها، كيف قامت الخلية بتنفيذ أولى عملياتها بمسدسين وتكون الاعتقالات على الجبهة الشعبية. لماذا فشلت محاولة الاختطاف الأولى، وكيف نجحت خلية صوريف بعد عدة محاولات من اختطاف جندي صهيوني، وكيف شكلت عملية إخفائه لغزا لأجهزة الأمن الصهيونية .

اقرأ تفاصيل جديدة عن عملية "بيت شيمش" والآلية الجديدة التي توصلت لها الخلية في عمليات الخطف، وكيف استطاعت الخلية الحصول على سيارة "صهيونية "رسمية ومرخصة، ولماذا تم إلغاء عملية الخطف بعد أن صعد الجندي إلى داخل السيارة، وعن دخول المتفجرات إلى حيز العمل في كتيبة صوريف، وتفاصيل عمليتها الاستشهادية.

اقرأ عن أسباب انكشاف أول خيوط الكتيبة القسامية، وعمليات الاعتقال التي قامت بها السلطات الصهيونية والفلسطينية. لماذا طُلبنا إلى مكتب المدعو "عوني الرجعي" أحد محققي جهاز الأمن الوقائي، وماذا كان رده عندما قلنا له:كيف تضمنون لنا الطرق من الصهاينة، ولماذا تم إبعاد موظفي الموقع في ذلك اليوم، وما هو سر "فلشر" سيارة "عصام القدومي"، والكثير من التفاصيل عن رحلة

التسليم بالأدلة الدامغة واليكم المزيد بالتفاصيل :

الحلقة الأولى

بسم الله الرحمن الرحيم

خلية "صوريف" ملحمة البطولة

مقدمة الخلية:

سنقدم لهذه الدراسة بتعريف بأحد أعضاء الخلية التي عُملت هذه الدراسة من أجلها ألا وهو الشهيد القسامي القائد: موسى عبد القادر غنيمات بطل عملية "أبروفو "البطولية.

نادى علي دم الشهيد يقول لي أترى تحديدا تصافح قاتلي

فالقدس أنبتت الدماء زهورها ثأرا وإن تسقى الخيانة تذبل

هذا التراب مضمخ بدمائنا أنبيعه يوما لجند الباطل ؟!!

إنها الدماء حناء الأرض ومستند ملكيتها الذي لا ينقص، وعبير زهورها، وأجمل ما تحمله الأجيال في ذاكرتها، وما أجمل ما أوصى به الصحابي الجليل أبو أيوب الأنصاري إخوانه المجاهدين عندما حضره الموت أثناء حصار القسطنطينية: أن إذا حضرتني الوفاه فاحملوني تحت جنح الظلام وادفنوني بأقرب مكان من سور القسطنطينية، وفعل المسلمون بوصيته، ودفنوه هناك وعادوا الى بلادهم، وكلما سُئل أحدهم عن أبي أيوب قال: قبره هناك ينتظر سنابل جيل المسلمين لتطهره من رجس الرومان، وصار قبره عنوانا لحملات الفتح، ونشيداً يردده المجاهدون على مدى ستمائة عام أن " :لبيك أبا أيوب " حتى تحرر قبره على يد القائد العثماني العظيم: " محمد الفاتح "فكان كما وصفه النبي الحبيب صلى الله عليه وسلم حين قال : تفتح القسطنطينية، فنعم الجيش جيشها، ونعم الأمير أميرها.

الاستشهادي القائد موسى عبد القادر غنيمات في سطور:

نتعرف عبر هذه السطور على الشهيد موسى عبد القادر غنيمات، الشهيد الذي فهم فلسفة أبي أيوب الأنصاري، فقرر أن يمزج خلايا جسده الطاهر وقطرات دمه الزكية بثرى مدينة "تل الربيع" المغتصبة، ليكبر أبناؤه ويسألوا عن والدهم، فتخبر الأم الوفيه لزوجها : أبوكم هناك في المحتل من أرضكم ينتظركم لتنثروا الزهور على قبره، وترددوا آيات الإسراء، وتبشروه أن جند التتبير قد تبروا ما علوا تتبيرا.

مجاهد لم تروضه سياسات التطبيع، ولم تخدعه سياسات ودعايات السلام الزائف، ولم يدخل قاموس تفكيره مصطلحات التعايش والتنازل والتأقلم والمهادنة، حاولوا إغرائه في العمل في أجهزتهم، لما كان يتوق لحمل البندقية ليوجهها لصدر عدوه، أما بنادقهم الصدئة فلا توجه إلا لظهور المجاهدين الشرفاء، فكان رده الرفض القاطع، وعندما عرض عليه رفيق دربه في حماس " جمال الهور" الانضمام إلى خليه" صوريف" في كتائب الشهيد عز القسام كاد يطير فرحاً وقال: وماذا ننتظر، هيا ننزل الليلة الى مستوطنة "بيت شميش" ولا ننتظر الغد.. هكذا كان الشهيد موسى عبد القادر غنيمات بقامته الطويله وجسده النحيل ووجهه المشرق الوضيء، رجل با ع دنياه بكل ما فيها وإشترى ما عند الله، لم يتردد لحظة، ولم يفكر في أبناءه: (عبد القادر وإسراء وبشرى ومحمد) أو زوجته أو أبيه أو أسرته.

لبى نداء الجهاد وسخَّر كل ما يملك من موهبة وإمكانات في هذه الطرق، فقد كان يتقن العبرية أكثر من أهلها، ويعرف أزقة "تل الربيع" – تل أبيب– أكثر من غاصبيها، وكان يمازح إخوانه عندما كان الحديث يدور حول خطف جندي لمبادلته بالأسرى ويقول: " أتحدى نتنياهو لو ركب معي في السيارة أن يعرف أو يشك للحظة أنني فلسطيني أو عربي"، فقد قضى رحمه الله معظم حياته عاملاً في المحال والمطاعم الصهيونية، وما زاده ذلك إلا تمسكا بدينه وإيماناً بحقه ومعرفة بقذارة عدوه ولؤمه، حتى صارت البندقية فتاة أحلامه ومعشوقته التي يتوق لمعانقتها ليفجر رصاصها برؤوس أحفاد القردة غاصبي أرضه ومشردي شعبه، وتم اختياره كعضو في خلية "صوريف" لعدة مزايا أهمها: إخلاصه واندفاعه المدروس، وأخلاقه وبعده عن الشبهات، وإتقانه العبرية والسياقة، ومعرفته الجيدة بمسالك الطريق ودقائق عادات اليهود، إضافة لإتقانه رياضة ( الكونغ فو) وقد كان قبلها عضواً نشيطاً في صفوف حركة حماس في قرية "صوريف" وسبق وأن اعتقل وحُقِّق معه لأكثر من شهر، فصمد وأطلق سراحه دون أن يكشف السر حول جهاده وانتمائه، وقبل

إنتمائه لحماس ونتيجة لرغبته في مقاومة الإحتلال عمل في صفوف "فتح" وشارك في المواجهات والفعاليات وردع بعض العملاء، ولكنه سرعان ما حدد إسلامية هويته وانتمائه حين إشتد عود حماس في قريته "صوريف" بعد ان وتعرف إلى صدق وتجرد وإقدام مجاهديها.

كان شهيدنا " أبو عبد القادر " المولود عام 1969 م معروفا بالهدوء والإتزان ومحبوبا بين إخوانه وأهل قريته، ولطالما سمع في طفولته عن البطل " إبراهيم أبو ديه " وهو من مواليد صوريف واستشهد في الثلاثينات خلال مقاومته لإستعمار الإنجليز واستيطان اليهود، وكان إعتقال موسى لأول مرة عام 1993 م إثر حملة إعتقالات إستهدفت كل من له علاقة بمساعدة أو الإنخراط في فعاليات الإنتفاضة في صوريف، ومنذ عام 1996 م شارك في عشرات المحاولات لإختطاف جنود ضمن خلية "صوريف "بهدف المساومة عليهم للإفراج عن الأسرى إلى أن نجحت الخلية في إختطاف الجندي " شارون إدري " وإخفاء جثته شهوراً طويلة، إلا أن "جبريل الرجوب" قدمها هديه دون مقابل لأسياده في جهاز المخابرات الصهيونية "الشاباك" وأتبعها بتسليم عضوي الخلية " :عبد الرحمن غنيمات وجمال الهور" في مسرحية مكشوفة مخزية لم يحسن تمثيلها ولا إخراجها، واستمرت محاولات الاختطاف إلى أن اشتعلت أحداث مستوطنة "أبو غنيم"، وتم تكليف المجموعة من قبل القائد: "عادل عوض الله" بوضع قنابل يتم تفجيرها عن بعد، إنتقاماً لكرامة شعبنا وقداسة أرضنا، وفي البداية تقرر أن يقوم عضو المجموعة " رائد أبو حمدية " بوضع الحقيبة وتفجيرها، ويكون دور "موسى" فقط سياقة السيارة.

إستيقظ شهيدنا القسامي القائد موسى عبد القادر الغنيمات في صبيحة يوم الجمعة 1997/3/21 م مبكراً، وأدى صلاة الفجر في مسجد صلاح الدين في القرية، وأفطر مع زوجته وأبنائه وأخذ يقبلهم وعيناه تذرفان الدموع، كأنما عرف أنه وداعه الأخير لأحب الناس إلى قلبه، رغم عدم علمه أن خطة العملية تغيرت، وتقرر أن يقوم هو بوضع الحقيبة وتفجيرها عن بعد، لما يتمتع به من برودة أعصاب وهدوء، وهناك في "تل الربيع" وفي مقهى "أبروفو" كان شهيدنا يخطو آخر خطواته في مشوار جهاده، ويودع الدنيا الى حياة سرمدية، ليرتقي شهيداً في علياء الخلد بعد أن قتل وجرح " 54" يهوديا نتيجة لإنفجار الحقيبة قبل أن تصل الى هدفها المحدد نتيجة خلل لم يتم تحديده بعد...هذه هو موسى عبد القادر غنيمات ...شهيد "تل الربيع .."وفارس خلية "صوريف"..الذي ترجل ممتطياً صهوة دمه مرددا هتاف شيخه القسام: " إنه لجهاد نصر أو استشهاد "...سلام على روحك الطاهرة يا أبا عبد القادر...ولقاؤنا هناك في جنان الخلد في مقعد صدق عند مليك مقتدر...هذه هو شهيدنا الأكرم منا جميعا..

# רג'וב שלח את אנשי החמאס למלכודת ישראלית"

**מתיחות בין החמאס למנגנוני הרשות: בחמאס טוענים כי שני פעילי התנועה שנעצרו בידי הביטחון המסכל הועברו בכוונה לקלקיליה כדי שיחוסלו בידי ישראל. בהלוויית בילאל אל ע'ול, שחוסל אתמול, צעדו אנשי החמאס והפתח בנפרד**

עלי ואקד

פורסם: 24.08.01, 00:02

מתיחות שוררת באחרונה בין ארגוני הרשות הפלסטינית לחמאס בעקבות שורת תקריות ביממה האחרונה בין שני הצדדים.

בחמאס טוענים כי שני פעילי התנועה, עבדאללה ובילאל ברגותי, מהכפר בית רימה שבאזור רמאללה, שנעצרו לפני כשבועיים בידי הביטחון המסכל בגדה של
ג'יבריל רג'וב, הוכו במהלך מעצרם. בחמאס טוענים כי רג'וב רימה את אנשיו והורה להם לעצור את האחים ברגותי, לאחר שהסביר להם כי מדובר בשני משתפי פעולה עם ישראל.
עוד טוענים בחמאס כי סוכנים של ה-CIA נכחו בחקירות האחים ברגותי. גורמים בתנועה טוענים כי רג'וב הורה להעביר את השניים לקלקיליה, זאת חרף הסגר המוטל על השטחים. המעבר, טוענים בחמאס, נועד להביא ליירוטם וחיסולם של השניים בידי ישראל בדרכם לקלקיליה. בחמאס טוענים כי התרגיל זהה לזה שביצע ג'יבריל לאנשי חוליית צוריף, שנעצרו סמוך לחברון ושאותם ביקש רג'וב להעביר ליריחו. בדרך ליריחו עצר כוח של צה"ל את החוליה ואת אנשיו של רג'וב, וחיסל את אנשי החוליה.
על פי החמאס, הניסיון להעביר את השניים לקלקיליה בוטל ברגע האחרון בהוראה מיוחדת של ערפאת.
בחמאס טוענים גם כי אנשי הביטחון המסכל תקפו שני פעילי חמאס במחנה הפליטים בורייג' שברצועה, שעה שהפעילים הודיעו ברמקולים על חיסולו אתמול של בילאל אל ע'ול, בנו של עדנאן אל ע'ול, סגן מפקד גדודי עיז א-דין אל קסאם בעזה.
בחמאס טוענים כי אנשי הביטחון המסכל תקפו עשרה פעילי חמאס שהיו סמוך לבית החולים שאליו הובהל אל ע'ול מייד לאחר פעולת החיסול. בחמאס טוענים כי אנשי הביטחון המסכל חטפו את גופתו של אל ע'ול במטרה למנוע מפעילי החמאס להשתתף בהלווייתו.
בהלוויה שהתקיימה אתמול (ה'), צעדו בנפרד אנשי החמאס ותומכיהם, אשר השמיעו קריאות בגנות ערפאת והרשות הפלסטינית, והאשמו בבגידה ובירי על הלוחמים הפלסטינים.
במקביל בחמאס טוענים כי שיחת טלפון בין ג'מאל מנצור, בכיר החמאס שחוסל בשכם בתחילת החודש, לכתב של תחנת ה-BBC הבריטית, היא שהביאה לגילוי מיקומם המדויק של פעילי החמאס, מה שאיפשר זיהוי מלא של צה"ל ופגיעה ישירה של משרדם. בחמאס נשמעים קולות המבקשים לפתוח בחקירת הנושא.
עוד טוענים בחמאס כי במהלך אותה התקופה נשמעו רעשים מוזרים בקווי הטלפון של פעילי החמאס.

# EXHIBIT T

Case 1:00-cv-00105-L-DLM Document 408-21 Filed 12/28/2007 Page 2 of 20

INDEPENDENT MEDIA IMRA REVIEW ANALYSIS

About Us

Subscribe

Search

A current digest of media, polls and significant interviews and events.

Tuesday, March 23, 2004

**Archives: 9 IMRA interviews with Hamas Head Rantisi**

Archives: 9 IMRA interviews with Hamas Head Rantisi

IMRA- 23 March, 2004 : It was announced today that Abdel Aziz Rantisi has taken the place of Sheikh Ahmed Yassin as the head of Hamas. The following is a collection of IMRA interviews of Rantisi over the years.

#1 HAMAS LEADER RANTISI - MASSACRE THE JEWS

By: Aaron Lerner Date: 8 October, 1997

IMRA interviewed Gaza Hamas leader Abdel Aziz Rantisi, in English, on 8 October, 1997. The entire interview follows

IMRA: We have heard the comments of Sheikh Ahmed Yassin regarding the occupied territories. When he says 'occupied territories' does he mean the area occupied after 1967 or does he mean all of Palestine?

Rantisi: Occupied territories? Who says occupied territories?

IMRA: He appeared on television saying that there can only be peace when Israel is out of the occupied territory.

Rantisi: Surely those were not the words of Sheik Ahmed Yassin but rather the translator.

Case 1:00-cv-00105-L-DLM Document 408-21 Filed 12/28/2007 Page 3 of 20

IMRA: What did he say?

Rantisi: Sheikh Yassin says "the occupation" not territories - the West Bank and Gaza. When he says the occupation this means the occupation of all of Palestine.

IMRA: Can there be any peace with the Jews as long as there is a state?

Rantisi: The Jews are occupiers. Now, let's say that you make peace with Jews as Jews but they are still occupiers. It is impossible to make peace with them when they are occupying your home.

IMRA: That's anywhere in Palestine.

Rantisi: I am speaking about my country. The majority of Palestinians are out of their homes. We have now in exile around four million Palestinians who are living very tragic lives. They should return home.

IMRA: So Israelis - the Left, who say they you can make peace if you make a Palestinian state in the West Bank and Gaza are living a fantasy?

Rantisi: With the withdrawal from the West Bank and Gaza?

IMRA: Yes. The Israelis from the Left say that if Israel withdraws from the West Bank and Gaza that there can be peace even if there is an Israeli state in the remainder of the area - Jaffa, Haifa etc.

Rantisi: Look, where are you from?

IMRA: The States.

Rantisi: Can you accept Jews to establish Israel in your land and make peace with them after that?

IMRA: If there wasn't a state, could the Jews who live in this area now stay or some of them stay or what?

Rantisi: When the Jews were oppressed in Europe they found a good citizenship under the umbrella of an Islamic state. So we are welcoming religions as religions. As Jews and Christians from anywhere. But we will not accept any occupiers.

IMRA; Every year there are tens of thousands of new people coming into the area. What about these newcomers?

Case 1:00-cv-00105-L-DLM Document 408-21 Filed 12/28/2007 Page 4 of 20

Rantisi: You should ask what about the fate of the four million living in camps.

IMRA: What do you see ultimately happening to the people who moved into Israel. We have the people who came from Europe, Russia, the Arab states.

Rantisi: I will tell you something. I feel that it is justice for us to do with Jews as they did with us.

IMRA: To let them stay?

Rantisi: In the same way that they dispossessed our people. They killed thousands of Palestinians in tens of massacres and they destroyed homes. So I think it is just to do with them as they did with us.

#2 HAMAS LEADER RANTISI - HAMAS WILL CONTINUE CALL FOR STRUGGLE

By: Aaron Lerner Date: 16 November, 1997

This weekend Hamas leader Ibrahim Makadmeh came out of hiding and returned to his Gaza home. Israel believes the Makadmeh is linked to a series of terrorist attacks.

IMRA interviewed Gaza Hamas leader Abdel Aziz Rantisi, in English, on 16 November, 1997. The entire interview follows:

IMRA: I wanted to ask you about the return of Ibrahim Makadmeh to his Gaza home. Did he make any promises to the PA to remain silent, not to be active politically or anything like that?

Rantisi: No. But I myself promised that Dr. Makadmeh would be a politician and not a military leader, as they thought. I told the PA that Makadmeh was a political figure and he will continue just as a political leader.

IMRA: Was he only a political leader before?

Rantisi: Yes. He was a political leader. I promised that he would continue as that.

IMRA: So whatever he did in the past he will continue doing the same in the future?

Rantisi: I told then that if he would continue underground then there is the possibility that he would act as a military leader. We want him to be a political leader and they agreed and so we closed that file.

IMRA: As a political leader he can say things in favor of military actions but he can't plan them?

Rantisi: For example, you heard Sheik Yassin. He can freely say the things he believes. Just the things which are forbidden is a violation of the law.

IMRA: So he can call for attacks against Israel but he just can't plan them?

Rantisi: We said, as political leaders - either me or Sheik Yassin, for example, that if the occupation will continue then Hamas will continue the struggle. We did not speak about operations as operations, since the political wing is completely separate from the military one. But we talk about ideology of Hamas. And the ideology of Hamas is that the continuation of the occupation is the continuation of the struggle. And Makadmeh can say that easily.

IMRA: And the continuation of the struggle is a struggle which includes actions by the military wing.

Rantisi: All kinds of struggles. Because our Israeli enemy uses all kinds of aggression: killing and destroying homes and arresting people, Judaization of Jerusalem, building settlements. They use all kinds of aggression against human beings. Against Palestinians. And they continue still going on in their occupation of our land. We want to liberate our land. If they will give us our rights peacefully we will be happy. But if they refuse the only way there is is to continue our struggle using all means.

IMRA: So the political wing of Hamas doesn't call for any limitations or restrictions on the scope of the activities of the military wing.

Rantisi: We have a political wing and a military wing and both are wings of one organization So we have the ideology, the same thinking, the same strategy and the same goals.

IMRA: But does the political wing turn to the military wing and say "do this but don't do that - throw rocks at settlers but don't blow up bombs in Tel Aviv." Does it say anything to the military wing?

Rantisi: No. Not at all.

IMRA: Did it ever?

Rantisi: No. From the beginning it was difficult for both wings to act together or for the military wing to get its instructions

from the political wing because of the security conflict here. So we prefer that the military wing be free with its leaders. Just its leaders can direct the action and we choose complete separation between both wings.

IMRA: Are the military wing leader located inside the PA or overseas?

Rantisi: I believe that Israelis and the PA talk about two underground leaders. I believe that the military leaders are who are inside but underground.

IMRA: You were quoted as saying last week that in terms of actions that Hamas would take actions but not ones which would hurt the PA. Is that the position of the political side or, the military side of both?

Rantisi: I think this is the position of the military side. Because the political side really knows nothing about operations carried out before they take place.

IMRA: You are saying that Dr. Makadmeh could have become active on the military side - so its possible for someone active on the political side to switch over to the military side?

Rantisi: I said that if you continue in putting pressure on one person to keep him underground then he will think to act as a military one rather than as a political one.

IMRA: So its possible for someone from the political wing to switch to the military wing.

Rantisi: No. He will act by himself. No need to join the military wing.

IMRA: What do you mean himself? He will go out by himself with a gun or a bomb?

Rantisi: Yes. I am talking about things which have occurred in this area. If you are going to put someone in a corner then you will push him to be aggressive.

IMRA: How old is Dr. Makadmeh.

Rantisi: 45.

IMRA: So you are saying that he himself sneak into Israel and do something.

Rantisi: If I will be underground for the time and hiding from the

PA I can't keep myself inside a room without thinking about doing something.

IMRA: Last Thursday night two members of the Tzurif cell, Ismail Ranimat and Gamal Jibril Alhour, were captured by Israeli forces when they were in one of Jibril Rajoub's cars. Do you think it was a set-up between the PA and Israel?

Rantisi: This is one possibility. The second possibility is that collaborators working inside PA's secret forces tipped the Israelis off.

#3 HAMAS LEADER RANTISI - PALESTINIAN POLLS ARE FAKED TO BACK FATAH

By: Aaron Lerner Date: 13 December, 1997

IMRA interviewed Gaza Hamas leader Abdel Aziz Rantisi, in English, on 13 December, 1997. The entire interview follows:

IMRA: The Center for Palestine Research & Studies just released a poll of Palestinians in the West Bank and Gaza and their survey finds that support for Sheik Ahmad Yassin has plummeted since his release. Back in November of 1994 the poll showed that 20% would vote for Ahmad Yassin if elections were held for President of the Palestinian Authority, two weeks ago less than 3% said they would vote for Ahmad Yassin. The poll also found that if elections were held today, less than 12% would vote for Hamas while 43% would vote for Fatah.

Do you have some explanation for why Sheik Yassin and Hamas do so poorly in the polls?

Rantisi: Regarding the results you show that Hamas has less than 12%.

IMRA: Yes, less than 12% while Fatah got 43%.

Rantisi: The resutls in the last elections at An-Najah University gave 40 seats for Hamas and 35 seats for Fatah. So we really do not trust these polls and we believe that they are run without any scientific program. Its not a scientific one. It's just a political tactic or something for propaganda and nothing else.

IMRA: Do you think that Dr. Shikaki is just acting for Fatah?

Rantisi: I am not criticizing anyone. Because Dr. Shikaki did not do it by himself. I asked one of them how they do that poll and they tell me that they go to homes and choose one of the members of the home and they ask them and many of our people get afraid from those who are coming and they can't say no for Arafat and yes for

Yassin so we really do not trust any one of these polls.

IMRA: It's interesting because they have another question in the poll asking people if they think that there is corruption in the PA and 63% of the people were willing to say that there is corruption in the PA institutions. You would think that if they were afraid they would be afraid to say that too.

Rantisi: They try to show that their results are correct by putting in some figures. They want to shift us to look for corruption and forget the political deterioration of the peace process etc. Really, we believe that they are clever and they surely do that.

IMRA: They also show a result that more people insist on a state in all of Palestinian rather than just Gaza and the West Bank - which is something that does not go with the official line of the PA - and they published that result.

Rantisi: As I said, I am not trusting at all these polls.

IMRA: What do you think a true result would be?

Rantisi: I can' give any exact figure. If the supporters of Hamas in the West Bank and Gaza were to vote for Sheik Yassin he would get more than 40% - and that's just the supporters of Hamas. How can I trust these polls. Don't forget that not only universities but these institutions: the UNWRA elections in Gaza - all the seats with Hamas, the engineers association, Al-Quds University, An-Najah University, all the institutions in the West Bank - the winner in votes is Hamas all the time. So I think they are speaking about an election poll in Dimona [an Israeli town - IMRA] not in Palestine.

IMRA: Do you think that Sheik Yassin is stronger in the public now that he is out of prison or was he stronger when in prison. Did the mystique of being in prison make him a stronger political force or does his ability now to meet with people face to face make him stronger?

Rantisi: I believe that Sheik Yassin was strong when he was in jail and now he is also strong. I believe that he is stronger now. Even more respectable. I would not make a comparison between Sheik Yassin and Arafat because it's not our will to compete with the PA in that meaning. We are not seeking seats - we just are struggling for liberation.

## #4 HAMAS LEADER RANTISI - PEACE ONLY WHEN ISRAEL CEASES TO EXIST

By: Aaron Lerner Date: 29 December, 1997

IMRA interviewed Gaza Hamas leader Abdel Aziz Rantisi, in English, on 28 December, 1997. The entire interview follows:

IMRA: You were quoted In al-Quds on the 27th saying that the struggle with Israel is, among other things, a cultural struggle, and it won't end until this element of the struggle no longer exists. Is this a change in position? Before you were talking about hudna [a temporary cease fire agreement].

Rantisi: I said before and I am saying now that we are not struggling against Jews as Jews. We are struggling against occupiers. We are defending our people. And until the occupation of our land ends we will continue our struggle. We are just defending our people, our land and we do not do anything against Jews. We lived with Jews and we shared before with them as neighbors and citizens in one state and up until now you can see the Jews and the Christians in Syria and Yemen. So we can live peacefully with each other but we are against occupation.

IMRA: When you say occupation of land you mean all of Palestine?

Rantisi: Where are you from originally?

IMRA: From the U.S.

Rantisi: I hope that some time in the future the Jews will establish another state in the Unites States of America and they will call upon you to coexist with them and accept their occupation of your land. I don't know what you would call the struggle there - terrorism or something else.

IMRA: So you are saying in any part of Palestine.

Rantisi: Everybody in the world knows that the Jews came in 1948 and they occupied our land, uprooted our people from our land and so we consider all of Palestine now under occupation.

We gave our proposal to stop the bloodshed in our area for a while. A temporary truce so that we can live in peace in this area. Stop the bloodshed and leave it up to the coming generations to solve this problem.

IMRA: Do you find that Hamas supporters are discriminated against in the Palestinian army? That they are not allowed to hold senior positions. Does affiliation with Hamas hurt people's chances to advance in the army or police?

Rantisi: Not at all. Anyone who joins the army or police will not be a member of Hamas anymore.

IMRA: They have to leave Hamas to join the police?

Rantisi: Yes. Because Hamas forbids their supporters and members to be in the police.

IMRA: One would think that the security forces are, from a political standpoint, one of the major centers of power in the PA. What's the logic behind denying yourselves, from a political standpoint, leadership within one of the centers of political power in the PA?

Rantisi: Hamas would encourage its supporters and members to join and to be in any army the aim of which is the continuation of the struggle against the occupation. Hamas will not share in any force whose aim is to prevent the struggle.

IMRA: And that's how you view the PA's security forces today?

Rantisi: The Palestinian security forces have clearly declared that they will stop any kind of operation against the occupation. How can the members of Hamas share in these forces?

IMRA: So there aren't any religious people in the police - just secular?

Rantisi: I am not speaking about the degree of religious belief of anyone. You may see religious people who are in the secret police but they are not members or supporters of Hamas. Not everyone who is religious is a Hamas supporter.

IMRA: There are others who are religious but do not support Hamas?

Rantisi: Yes. The majority of Palestinians are religious but not all of them are members or supporters of Hamas.

IMRA: So there are other religious figures, for example in Gaza, with a following?

Rantisi: We do not say and we will not say in the future that the only ones who will go to Paradise are the members of Hamas. No. Or that the religious have to be members of Hamas. Nor will we say that in the future.

IMRA: So there are other religious leaders with the same status as Sheik Yassin?

Rantisi: They are religious and we respect them. We can't say that they should be members or supporters of Hamas.

IMRA: Are their political views different from those of Hamas in

terms of their views of the Arab Israeli conflict or are you talking about other matters?

Rantisi: The Arab-Israeli conflict is just because the Israelis came from overseas and took our land and dismissed our people and so we are suffering now because they uprooted us from our land.

IMRA: Would you say that the other religious officials share Sheik Yassin's view of the Arab-Israeli conflict?

Rantisi: There is a difference between us and other parties that we consider the liberation of our land - the liberation of our occupied land - as a part of our religion. We can['t give up even one centimeter of our land to occupiers. Not just in Palestine but everywhere. Take for example in the United States, you would not give New York to the Cubans.

IMRA: Actually, there are negotiations going on between the USA and Canada over resolving border disputes and there may be some land transferred. Now are you saying that this view about land is particular to Hamas or is this view that there can be no compromise on land is shared by all the religious authorities.

Rantisi: All the religious - not just in Palestine but in the entire Islamic world - believe that they should not give up their land to anyone because the Koran ordered us to liberate our land and to defend it from the occupiers.

IMRA: That applies also to parts of Spain as well.

Rantisi: I am speaking now of Palestine [laughs].

IMRA: Historically there were parts of Spain which were under Moslem control.

Rantisi: I am speaking now about Palestine. I am not talking about France.

IMRA: But these areas were also, by the same token, under Islamic control.

Rantisi: It's up to our religious leaders who can give a fatwa on this. But I am a politician and I am only speaking about our land in Palestine.

#5 SHEIK YASSIN TO GET DIPLOMATIC PASSPORT? RANTISI YES, ISRAEL - NO

By: Aaron Lerner Date: 7 January, 1998

IMRA interviewed Gaza Hamas leader Abdel Aziz Rantisi, in English,

and Shlomo Dror, Spokesman for the Coordinator in the Territories, in Hebrew, on 6 January, 1998:

IMRA: It was reported in Al Quds that Sheik Yassin is getting a diplomatic passport from the Palestinian Authority (PA). How do you see this? As a reconciliation?

Rantisi: No. It's just that he tried to get an ordinary passport and the PA advised that if the passport is a diplomatic one it will be easier for Sheik Yassin to travel.

IMRA: Will the passport enable him to avoid problems with Israelis at the border?

Rantisi: Yes, yes. They said that.

IMRA: Is this something new for the PA in their relations? Were you surprised?

Rantisi: No. It's a normal thing.

IMRA: Is the diplomatic passport just for Sheik Yassin or is it also for his family?

Rantisi: Just for Sheik Yassin. Sheik Yassin will travel just for treatment. His wife can travel easily without it.
+++++++

IMRA: Abdel Aziz Rantisi says that Sheik Yassin is getting a Palestinian diplomatic passport. Does this have any significance with regards to how Israel will treat him at the border?

Dror: Rantisi should first go and learn the Interim Agreement. There is no such thing as a Palestinian diplomatic passport. Maybe they want to issue him some paper. It would be a violation of the agreement for them to issue such a thing. According to the agreement, there is a Palestinian passport which they are to report to us when they issue so that it is included in the list. If it isn't included in the list then it has no value in affording passage at the border. That passport has no value. When he comes to the border they will check it on the computer terminal and if it isn't in the computer he won' leave.

Everyone has a regular passport. There is no diplomatic passport.

By the way, the PA doesn't have diplomatic offices overseas. Those are PLO offices.

IMRA: So what do they have for VIPs?

Dror: There are VIP cards for people with senior positions in the PA.

IMRA: Also someone visiting can be designated as being an important person?

Dror: There is no problem with them also designating a visitor. The only ramification from our standpoint is at the passages. The issuing of a VIP card requires our consent. Jamil Tarifi submits the request and the Coordinator signs along with him. We can deny the card or grant it. There are a limited number of VIP cards. The quantity was used in the interim agreement and we can agree to increasing the number in agreement with the PA. If the PA wants to increase it from 400 to a larger number they need our consent.

I don't see him getting the VIP card because he has no position in the PA and if they want to give him a position they will have to remove someone from the position and this information will have to come to us and we will still have the option to approve the VIP status or not. If they try to create a new position for him and when we check it turns out that the position doesn't really exist then we can reject it. We can also reject the VIP card for the man himself. There are a number of people who we have taken away VIP cards from because they were taking action which we considered unacceptable.

Now the PA can give him a letter attesting to their considering him a VIP but as far as we are concerned this designation is meaningless.

IMRA: What about VIP visitors?

Dror; They can advise that someone is coming to visit who is a VIP and we can decide to give him special treatment.

IMRA: If a VIP man comes with a suitcase do you check it?

Dror: Under the agreement we can. Generally we allow them to pass in an honorable way.

#6 HAMAS LEADER RANTISI - HAMAS WON'T FIGHT PA OVER ARRESTS

By: Aaron Lerner Date: 19 January, 1998

IMRA interviewed Gaza Hamas leader Abdel Aziz Rantisi, in English, on 19 January, 1998. The entire interview follows:

IMRA: How serious is the PA (Palestinian Authority) crackdown on Hamas now?

Case 1:00-cv-00105-L-DLM Document 408-21 Filed 12/28/2007 Page 14 of 20

Rantisi: Nothing new. Nowadays there is nothing new as compared to what they did before. No change at all.

IMRA: Do you think that the people arrested now will be in prison for a long time?

Rantisi: I can't say yes or no. It's up to the PA to decide because most of them are without charges up to now. So we hope that within the coming few days there will be a kind of freeing for some of them.

IMRA Have you had any indication from any PA official?

Rantisi: No. We are just hoping.

IMRA: What do you see happening if they don't release people now?

Rantisi: We will appeal. Nothing else. Because we will not pass into conflict with the PA. We have just one enemy - the occupiers.

IMRA: It seems that they also have arrested some people from the military wing of Hamas. Do you know anything about that?

Rantisi: No. As you know, there is no connection at all between the political and military wing. So we know nothing about their program and their plan to continue in their operations. It is up to them. I really know nothing about that.

IMRA: The PA announced that the two that they recently arrested will spend a long time in jail. Do you think that this is something that the public will stand for?

Rantisi: We will not accept that, and as I said, we will appeal and we will struggle, peacefully, with the PA to release them. But, as you know, our conflict is with the occupiers and not with the PA and we will keep as peaceful an atmosphere in Gaza and the West Bank as we can.

IMRA: Even if that means that some members of Hamas may would have to stay in jail? Even at that cost?

Rantisi: Yes.

IMRA: When is Sheik Yassin going overseas for treatment?

Rantisi: We hope it will be after the Islamic feast which will be in ten days. You can say after three to four weeks.

IMRA: Did he already receive his diplomatic passport from the PA?

Rantisi: Yes. Sheik Yassin received his diplomatic passport.

#7 HAMAS LEADER RANTISI - MILITARY WING HAS NO RELIGIOUS CONSULTANT

By: Aaron Lerner Date: 22 February, 1998

IMRA interviewed Gaza Hamas leader Abdel Aziz Rantisi, in English, on 22 February, 1998. The entire interview follows:

IMRA: Sheik Yassin is quoted recently as saying that he knows that Izzadin al- Kassam is prepared to carry out armed operations against Israeli targets if America attacked Iraq. What's the story here? What do you see happening?

Rantisi: Nothing at all. Sheik Yassin denied this story. He said in his denial that they misunderstood him. What he said was that if there would be any strike against the Iraqi people then we can expect that anyone - not only Izzadin al-Kassam - will do things against Israel. So its just guessing or expecting - analyzing what is going on on the ground. This was a misunderstanding of what the sheik said.

IMRA; So it wasn't from personal knowledge that he says that this is what is going to happen.

Rantisi: He said that he knows nothing about what will happen in the future because, really, there is no relationship between the political and the military wings of Hamas.

IMRA: Do they have a religious authority that they check with? If they have a religious question who do they go to? In the IDF there is a chaplaincy corps which handles religious questions, does the military wing of Hamas have religious authorities working directly with them? Some imam working with them who answers religious questions.

Rantisi: In Islam we differ from other religions. We haven't specific persons for religion. We haven't rabbis. And everyone of us can read the texts and can understand his religion and behave accordingly. For example, for the military wing of Hamas, they have their own reference, which is not the political wing of Hamas.

IMRA: But they have religious authorities who they can refer to?

Rantisi: I don't know about Hamas members. All of them, you can say, have a knowledge about their religion and they can judge without any need for a specific man - a sheik- to speak to them. We have fatwas [religious decrees] which is general for bombing etc. - a fatwa from Sheik Yousef al-Haradow , from 25

professors of religion in Amman. They can read these fatwas and act accordingly. Without a specific man on a day to day basis.

#8 HAMAS LEADER RANTISI - HAMAS WILL NEVER ATTACK PA

By: Aaron Lerner Date: 7 April, 1998

IMRA interviewed Gaza Hamas leader Dr. Abdel Aziz Rantisi, in English, on April 7, 1998.

IMRA: Do you see the possibility of a class between Hamas and the PA (Palestinian Authority) over the Sharif killing?

Rantisi: No. I believe that there will be no clashes at all because our policy is not to clash with the PA.

IMRA: The Israelis have argued that because of this policy there is nothing to prevent Arafat from taking serious steps against Hamas since Hamas will not react against the PA. So the PA can take serious measures against Hamas.

Rantisi: Believe me that the measures which Arafat can take against Hamas will be much less disastrous than a clash between Hamas and the PA.

IMRA; So he can go out and arrest, take guns, etc.

Rantisi: Why arrest?

IMRA: If in order to keep the Americans happy he goes out and arrests people from Hamas.

Rantisi: Just to keep them happy?

IMRA: He is arresting people now, isn't he?

Rantisi: I believe that there is no reason at all to imprison people. I do not believe he will do this because it is impossible to justify the detentions.

IMRA: I do not understand.

Rantisi: The detentions should be reasonable. Without that what will Arafat say to his people? Just detention for detention sake?

IMRA: The argument has always been made that what stops Arafat from taking measures is the fear that he won't be able to handle a revolt from Hamas but from what you are telling me Arafat may have a public opinion problem if he does this but he won't have a

problem from Hamas itself.

Rantisi: Hamas policy on this point is clear. And the PA knows very well that we have stated this in the past and we are doing it now and I think that the same policy will continue in the future. We will not have any clashes with the PA. We are not willing to see Palestinian conflict.

IMRA: Has anyone from Hamas talked with the Hamas member who, according to the PA revealed that Sharif was killed by Adel Awadalllah?

Rantisi: They called us to see him but I refused since he is still being held by the interrogation department. If he is freed I will see him.

Again, according to PA information - from Taib Abdul Rahim - Ghassan [Addasi] met Mahmud Masleh who is inside a Palestinian jail and now I get information that Mahmud Masleh said that the young man told him that the interrogators put pressure on him to tell that story.

I am calling now the PA to allow us to meet with Mahmud Masleh or to make a press conference for him.

IMRA: Last week you were quoted as saying at a rally that the struggle would continue until all of Palestine was liberated including Haifa and other places. What does this mean?

Rantisi: It means that there is this area called Palestine which you call Israel around which a struggle is going on. According to historical facts and religious ones we are the owners of this land. The Israelis say that they came here three thousand years ago and it is their right to establish their state here. We will not give up this land to the Israelis and they won't give it up to us. Accordingly, the struggle and conflict will continue.

IMRA; They are talking about a solution with a Palestinian state in the West Bank and Gaza and part of Jerusalem as the capital. Isn't that a solution?

Rantisi: We announced that we would accept a truce if the Israelis withdraw from the West Bank, Gaza and Jerusalem and evacuate the settlements and a Palestinian state is established. From our side we are ready to then give the Israelis a truce. Not a permanent one - a temporary one.

I would like to make a point about the so called accident. Just twelve hours before the declaration of the PA that Sharif was killed as part of an internal struggle within Hamas, Palestinian

security forces called me and told me that the accident was not a part of an assassination attempt. That Mohiyedine Sharif killed himself while preparing a bomb. I asked them why the injury was in his legs and not in his hands or face if he was preparing a bomb and why he wasn't wearing any clothing - except underwear - when he was turned over to us. This was just twelve hours before their announcement.

#9 Interview: Hamas Spokesman Rantisi -Green Light For Attacks
Aaron Lerner Date: 15 February 2000

IMRA interviewed Dr. Abdel Aziz Rantisi, the Gaza Hamas spokesman and leader who was recently released from detention by the Palestinian Authority, in English, on 15 February 2000:

IMRA: At this stage of developments between Israel and the Palestinians, would it serve the interests of the Palestinian people if there was a returned to armed struggle or would it hurt Palestinian interests.

Rantisi: As you know, the Israelis go head with their aggression against the rights of the Palestinians by building settlements, destroying homes and even carrying out assassinations and they are at the same time talking about peace.

I think that nowadays the Palestinian Authority is sure that the peace process will end to a big zero. It will fail sooner or later and this failure will push the Palestinian people to search for alternatives.

So I believe that they will do that.

IMRA: Right now, today - not in weeks or months - do you think it would serve or hurt the interests of the Palestinians if a bus blew up or there was a bomb in the marketplace to send a message to Israel?

Rantisi: I think you are talking about the interests of the Authority. Not the people. I think that the majority of the Palestinian people do no believe that Oslo serves the interests of the Palestinian people. A bombing would hurt - not the interests of the Palestinian People but of the Palestinian Authority. Not the interests of the Palestinian people.

IMRA: At this stage of the relationship that Hamas has with the Palestinian Authority is the position that Hamas won't interfere with the interests of the Palestinian Authority?

Rantisi: The situation of Hamas all the time is that it will not hurt the interests of the Palestinian people. And Hamas believes that

the interest of the Palestinian people is not Oslo but to continue with the Intafada until we find the solution that gives the Palestinians their rights.

IMRA: And within the framework of the Intafada that would also include the busses and the marketplaces? This kind of thing?

Rantisi: We are against the killing of civilians. Bombs which happened in busses and marketplaces were the answer - they occurred after the killing of civilians by the Israeli side. As Sheik Ahmed Yassin has said many times: if the Israelis stop killing civilian Palestinians then Hamas will stop that.

IMRA: Recently have the Israelis continue to kill civilians?

Rantisi: Recently? I think that just two days ago they killed a Palestinian in the West Bank.

IMRA: So within the framework of a response to that you could have a bus or something else.

Rantisi: As I said to you before, Sheik Ahmed Yassin set the formula. We hope that the Israelis won't kill civilians.
As you know, Islam is against the killing of civilians.

IMRA: Let's put it this way: your advise to somebody who can decide between going or not going on a bus or to the marketplace - given that you say that the Israelis have recently killed a civilian - is that it would not be wise to go?

Rantisi: I won't tell anyone. It is the rule of Islam not to kill women and children. Not to kill the elderly.

IMRA: But given the background that you say that the Israelis have killed a Palestinian recently, would it be prudent for someone to take a bus or go to the marketplace?

Rantisi: As I said, the orders of our religion are not to kill children, women, elderly, or civilians. But at the same time Islam gives the Moslems the green light to do with their enemies in the same way - to treat them the same way.

IMRA: And since you say the Israelis recently killed a Palestinian civilian then you would say that there would be a green light for something.

Rantisi: I am not speaking about Rantisi. I am speaking about Islam.

IMRA: Well I am asking you. Do you see that there is a green light?

Would you think that there would be a green light for a response?

Rantisi: Yes. The green light is not from me. The green light is from Islam.
Now we are doing a political wing and a military wing. And so it is up to the military wing. And the military wing has the right to study any incidents to see what to do against that incident. So it is not the political wing that gives the orders or the advice to the military wing.

Dr. Aaron Lerner, Director
IMRA (Independent Media Review & Analysis)
(mail POB 982 Kfar Sava)
Tel 972-9-7604719/Fax 972-9-7411645
INTERNET ADDRESS: imra@netvision.net.il

<--Previous Next-->

Search For An Article

**Contact Us**

| | |
|---|---|
| **POB 982 Kfar Sava**<br>Tel **972-9-7604719**<br>Fax **972-3-7255730** | **email:imra@netvision.net.il** |

# EXHIBIT U

## Hamas Communique

*HANDING OVER SOURIF MUJAHDEEN AND TORTURING DETAINEES IN JERICHO ARE THE RESULT OF A POLICE OF SECURITY COORDINATION WITH THE OCCUPATION*

The results of security coordination between the PA and the Israeli enemy have appeared again, despite [Israel's] continuing obstruction of the peace process. The Israeli military has arrested two mujahdeen Jamal al-Hour and 'Abdel Rahman Ghneimat, who were detained by PA security.

We believe that the abduction of the two mujahadeen was merely an act [carried out] to cover up the direct handover of the mujahadeen by the PA security, since the [PA security officials] did not resist the enemy soldiers and did not try to defend the dignity of their Authority and [provide] protection for their prisoners

Handing over the mujahdeen in this ugly way and the totally humiliating compliance with Israeli troops [has come] at a time when some interrogators in Palestinian jails are using brute force against captured Palestinian mujahdeen, torturing them to extract information about the heroic mujahed 'Adel Awadallah [currently wanted by the PA and Israel]. These are strong indicators of the Authority's move to end the prevailing tranquillity among Palestinians. It clearly trespasses on the calls for national unity and cooperation which have been and are still being made by Hamas, since [such calls] are the bulwark obstructing and frustrating the Zionist schemes.

We call upon the Authority to present clear and convincing justifications for [Israel's] arrest of the two mujahdeen, al-Hour and Ghneimat, and to hold accountable all those involved in the crime of handing them over. We emphasize the need for the release of political prisoners from PA jails, after proven facts have refuted the allegations that they have been detained for their own protection.

We also emphasize the need to halt the torture of Palestinian prisoners and to hold all those involved accountable for this anti-national and immoral crime, and to act immediately to halt blatant atrocities against ideals and morals which have overstepped the accepted boundaries and have begun to threaten all that the Palestinian people have achieved in terms of national unity. The Authority must first direct its attention to the challenges confronting the Palestinian cause on all sides, [particularly the] Israeli intransigence, instead of continuing in these unjustified practices against our people.

These crimes prove that the Authority is incapable of confronting the enemy and the enemy's crimes, and [prove] the failure of its agreements to protect our people and their rights, [and] increase our people's commitment to continue with jihad against the enemy until achieving victory and liberation.

God is great and victory for believers

IslamiC Resistance Movement
Hamas - Palestine
16/11/1997

[Back to contents]

## Settlement news briefs

Avnei Hefetz Expands
Construction on new housing units is scheduled to begin soon in Alfei Menashe settlement, southeast of Qalqilya; the Israeli authorities issued permits for an additional 300 units several weeks ago. According to a spokesperson for the Council of Jewish Settlers in the West Bank and Gaza Strip (YESHA), work on 72 units frozen by the government for the past five years is also to resume in the very near future. One Israeli government source apparently defended the expansion with the rationale that Alfei Menashe is "not located in the heart of the West Bank" but rather is a "suburb of Kfar Saba" (in Israel). Bulldozing for the expansion began last week on a 4,000-dunam tract of farmland lying near the settlement which has been confiscated from 12 Palestinian families. The Palestinian news agency WAFA reported last week that Israeli bulldozers, guarded by soldiers, had cleared some 20 dunams of land and uprooted 600 olive trees belonging to a farmer near Shoufa, in preparation for the Avnei Hefetz expansion.

Jerusalem Security
The Israeli Housing Ministry is to institute a threefold increase in the budget of security firms currently contracted to provide security for Israeli settlers in Jerusalem's Old City, the Jerusalem village of Silwan (where settlers have taken over Arab homes), and other areas in Arab East Jerusalem. Currently, some NIS11 million per month is allocated to security for Jerusalem settlers. And Israeli prime minister Binyamin Netanyahu made clear his commitment to continued occupation of the city this week, when he told reporters that "if you ask me to choose between Jerusalem and peace, I would choose Jerusalem."

And Elsewhere...
Land-clearing activities were also underway last week in areas near the settlement of Qadumim, on lands from Kufr Qaddum. WAFA reported that Israeli settlers occupied several hundred dunams of land in the area; several dozen dunams were reportedly cleared and several mobile homes installed. Also in the Nablus area, WAFA reported that Israeli troops raided the village of Bani Hassan and searched homes, after a firebomb was apparently thrown at Qadumim settlers.

An Israeli company apparently has plans to open a stone quarry on land in the Hebron area; according to WAFA, residents of Doura, Taffouh and Tarqoumia villages say that they have been threatened with land confiscations for the quarry's establishment. The Ben Aryeh company has been temporarily halted by court order from working on opening the quarry; however, residents said that work is continuing under protection of Israeli soldiers.

Also in Hebron, Suissya settlers last week obstructed local farmers from planting on their land, threatening to take away the Palestinians' farming equipment and uproot any tree seedlings planted.

Palestinians living near the Etzion settlement in the Bethlehem area reported being harassed last week, with settlers and Israeli soldiers barring them from working their farmlands. And in the hamlets of Tabra and Wadi Rahal, which lie near Efrat settlement, local council head Ibrahim Hasaneen reported last week that workers from Efrat had begun setting up street lights on the main road leading to the two villages. Hasaneen told al-Quds that local residents are worried that the improvements are a sign that the road is to be confiscated for use as a

bypass road, (which will prohibit Palestinian land use for 50 meters on either side of the road).

UNanimous Decision
With the unsurprising exceptions of the United States, Israel and Micronesia, the United Nations General Assembly voted in favor of a resolution condemning Israeli settlement policies in the Palestinian territories, particularly in occupied East Jerusalem. The vote was taken on November 13, with 139 countries supporting.

Compiled by Rose-Marie Barbeau@

[Back to contents]

## World Bank: Palestinian economy a "black mark" in region

World Bank vice president Kamal Darwish, speaking at the Middle East and North Africa (MENA) Economic Conference in Doha this week, said that the 30 percent drop in average per capita annual income in the Palestinian territories since 1993 is a "black mark" against the overall steady economic growth in the rest of the region. Darwish said that MENA countries in general had witnessed average annual growth rates of 4.5 percent, compared with 1.5 percent of the previous decade, while the West Bank and Gaza lag far behind.

Coinciding with the Doha conference, the World Bank and the Palestine Economic Policy Research Institute (MAS), a branch of the Palestinian Economic Council for Development and Reconstruction (PECDAR), released a new report this week entitled "Development Under Adversity: the Palestinian Economy in Transition". In it, three areas of policy change are identified which -- if implemented -- could jump start the Palestinian economy. And, with surprising directness for a World Bank publication, the report identifies "the permit and closure policies that Israel has implemented since 1993" as "a major new constraint and challenge to economic development of the WBGS" (West Bank and Gaza Strip). And, says the report, the "post-Oslo period of border closures comes on the heels of large negative shocks generated by the Intifada after 1988 and the Gulf war in 1990-1991; as a result, real per capita expenditure has continued to deteriorate over more than a decade, and is now at its lowest level for any year since 1980."

The two most significant negative characteristics of the Palestinian economy currently are "high and increasing levels of poverty" and "excessively high and widely fluctuating unemployment rates," and the "central story of the West Bank and Gaza Strip economy in the past few years is one of deterioration..." This stands in marked contrast to the "hope of the official actors in the peace era", which was "that domestic job creation by an export-oriented private sector would expand domestic employment fast...", a hope which has been greatly diminished if not extinguished by "political factors in the post-Oslo period" which have "suffocated export-oriented private sector development. When closure policy is implemented, Palestinian workers, businessmen and merchandise can be delayed suddenly and for long periods at the border."

Thus, free access, accompanied by more advantageous trade policy options for Palestinians, is the first of the policy changes which is required in order for the WBGS economy to begin to

pull out of its steady decline. The second change called for by the World Bank and MAS is the establishment of "a modern system of governance". Because of its "rich civil society and high level of skills, Palestinian society has the potential to break the regional mold and jump to a modern state that is efficient and compassionate at once," states the report. However, "while the public sector's track record has not been long, there are indications that it may move toward the regional mold." An improved civil service, increasing revenues and decreased fiscal deficits, and the implementation of stabilizing mechanisms to better offset the shocks of Israeli-imposed closures, are all required in reforming the Palestinian Authority.

Equally as important, however, the PA must be able to effectively tap into the rich resource of skills and experience offered by returnees and NGOs. Of course, given that "NGOs, as special interest groups, may have a conflict of interest with the overall public good", the World Bank/MAS recommends the establishment of "accountability mechanisms with a framework that fosters both competition and the free flow of information".

Ultimately, however, the report stipulates that the Palestinian economy, which "is on a knife's edge between take-off and collapse", will stand or fall on the country's political fortunes. "Under good circumstances, it is perfectly realistic to expect the economy to leap-frog and become a high-tech center in the Middle East, attract back Palestinian Diaspora skills and capital, and link up with the East and West. At the other end of the spectrum, the continuation of the present status quo could produce a socio-economic disaster."
RMB

[Back to contents]

---

## What shall we do?

By: Haidar 'Abdel Shafi

What shall we do? Has the time come for us to put our thoughts and intuition toward formulating an answer to this question? We often hear optimistic statements such as "we will establish our independent state and we will pray together at al-Aqsa mosque in Jerusalem." What lies behind these statements, which have no basis in the depressing reality. Are they made in order to stave off depression and pessimism or what?

Don't such statements only serve to distance us from thinking and trying seriously to overcome our current situation, and deciding what to do about our predicament? At what point do we stop avoiding answering the question of what to do about our problems and the difficult challenges we are facing? The way out of depression and desperation is not through wishful thinking, but by serious thought and organized work.

I believe that every Palestinian wherever s/he is -- inside Palestine or abroad -- has something to offer in advancing our national cause. However, the way to further this cause in practical terms is through organization which takes into consideration the reality of the Palestinian people in all its dimensions and special characteristics. For example, dealing with the majority of the Palestinian people, who live in the Diaspora, is slightly different from dealing with the situation of the Palestinian people inside. I will limit myself here to dealing with the situation

inside.

To begin with, I believe we have no other choice than to adopt democracy as the method which will allow us to organize ourselves satisfactorily. It will also take into consideration our human and economic resources and put them to work for the general good. Democracy will also help to bring about social justice and weaken internal conflicts, and will promote cooperation and communal work which benefits the people as a whole. The ultimate result of this will be harmonious national unity.

I don't that this will be as easy as I have just made it sound. It is really a gamble on ourselves that we have the will to rid ourselves of our painful reality and to persist in bringing about change. This will is what can help us achieve a better, stronger permanent presence on the land we are standing on and holding on to. It is also a call for optimism and hope for the future. I have no doubt that all this will project a better image of Palestinian society and will gain us the compassion and respect of the world, just as it will worry the Israeli authorities and cast doubt on their visions of the future...

Elections are the first step on the road to democratic transformation and realizing the will of the people and their right to self-determination. The election of the Legislative Council under the Palestinian National Authority was an important event in the life of the Palestinian people, their hopes for achieving their national goals and grounding themselves on constitutional principles. Unfortunately, however, the Council's path was disturbed, and so it did not achieve the hoped-for democratic transformation of Palestinian society, for reasons which it is futile to bring up again. Bygones should be bygones, and what is needed now is to look ahead to the future.

In my opinion, the present Legislative Council has lost its power to achieve the required democratic transformation, because of the obstacles placed in its path. In addition, all national parties are not represented in the Council, because of their boycott of the elections. Therefore, we must work on a new beginning which will profit from this brief experience, in order to do better.

I think that the Council should dissolve itself, to pave the way for new elections in which all existing national parties and groups can participate, and a comprehensive representation of Palestinian society is achieved. I think this can be a practical suggestion, if everyone is convinced of its necessity and importance, and if there is enough determination to carry it out. In this way, we will close the door on the past after learning our lessons from it, and we will begin a new day full of hope with a new Council whose duty will be to establish a Palestinian model of democracy.

I make this suggestion fully convinced of its importance and necessity. I present it to everyone in Palestinian society; to all who have not forgotten the martyrs and our great sacrifices in land and wealth; to all those who have not forgotten Jerusalem with all our holy places and heritage. I hope this will open a debate which will lead us to the right path.

And finally, a word to President Arafat. It is my duty, Mr. President, to believe what you say, for we are speaking frankly. I have no doubt that you see the whole picture in its true colors from the benefit of your experience and expertise. There is no doubt that you must decide where you stand without hesitation. You are the leader of a long struggle. You must decide how it will end. I hope that your decision will be to cooperate with the new Council in order to establish a Palestinian model of democracy.

This commentary first appeared in al-Quds on November 17, 1997. Trans. by J. Baker

[Back to contents]

## The Palestinian street supports Saddam

by: Ghassan Khatib

Once again, with tensions between Iraq and the United States on the rise, questions are being asked about the Palestinian public's opinion on the US-Iraqi dispute. Fortunately, no questions have been asked as to what the official position of the Palestinian leadership is toward Iraq. This is probably because the leadership seems to have learned a lesson from the heavy price it paid and continues to pay for expressing is previous support for Iraq during the 1991 Gulf war. But on the popular level, there have been several obvious demonstrations of support for the Iraqi position, its people and government in the Palestinian territories, and many Western diplomats and journalists have been expressing amusement at the "strange" attitude of the Palestinian public.

The Palestinian public has been supportive and remains supportive of Iraq not simply because Iraq is part of the Arab world to which Palestinians belong. Palestinian support for Iraq is also an expression of the frustration and anger caused here by the blatant double standards in the attitudes and actions of the Western superpowers, which move swiftly and dramatically to enforce Iraqi compliance with United Nations Security Council resolutions (as an expression of international legitimacy), while Israel has consistently flaunted Security Council resolutions for the past 30 years without being subject to any kind of pressure from either UN bodies or the superpowers.

On the contrary, last month in Washington DC, the Israeli defense minister Yitzhak Mordechai signed an agreement by which Israel will receive 50 of the most advanced US-made fighter planes. On the very same day in the very same city, his colleague, Israeli foreign minister David Levy, was refusing to demonstrate any flexibility in his talks with the Palestinian delegation, in short, refusing to comply not only with UN resolutions but even with peace agreements signed by Israel itself.

There is another reason that Palestinian public support for Iraq is increasing: Iraq's strong and hostile stand against Israel and the fact that Iraq previously was willing to launch missiles at Israeli targets. For Palestinians, this is a welcome contrast to the fact that despite six years of a peace process that began after the Gulf war, Israel has not changed its attitude toward Palestinians and has not ceased to carry out acts of aggression against Palestinians, their rights, homes, and security. Thus, people are happy to see someone standing up to the United States and Israel, as Palestinian leaders drink coffee and shake hands with the Israelis and Americans who are directly responsible for the increasing poverty and frustration in the West Bank and Gaza.

The last and most significant lesson which can be taken from observing the recent regional developments has to do with the obvious decrease in the United States' ability to form an alliance within the Arab world which is fully supportive of its actions against Iraq. The reason

for this is that Arab governments and people are becomingly increasingly critical of the American approach to running the peace process. They cannot help but see the obvious bias shown toward Israel by the US, despite Israel's clear responsibility for the delays in the peace process, and they cannot help but see that there is a desperate need for the US to take its mediation duties seriously and bring Israel into compliance with the conditions of the peace process--in short, to pressure Israel into implementing the agreements it signed.

[Back to contents]

## NewsShortsNewsShortsNewsShortsNewsShortsNewsShorts

Coals to Newcastle?
A deal was struck this week between Dutch flower wholesalers and the Palestinian Ministry of Agriculture. According to Ata Abu Karsh, assistant deputy agriculture minister, approximately US$200,000 worth of Palestinian cut flowers grown in the Gaza Strip are to be exported to Holland via Egypt.

AIDS in Palestine
Director of preventive medicine for the PA Ministry of Health, As'ad Ramlawi, this week reported that the number of AIDS cases throughout the Palestinian areas is rising, although it remains low. According to Ramlawi, there are 49 cases of AIDS among Palestinians; 16 in Jerusalem, 7 in the Gaza Strip and 26 in the remaining West Bank.

What Peace Treaty?
The first exhibition to promote Jordanian products in Israel, which was scheduled to be held in the Palestinian village of Kufr Kanna inside the Green Line, was frustrated by Israeli authorities who prohibited the Jordanian products from entering Israel. This is the second time the trade fair has been cancelled, and it is unlikely that organizers will try again, since several Jordanian companies have withdrawn after delivery trucks were kept waiting for more than a week at the border without receiving approval to cross into Israel.

Plea for Release
The Palestinian Human Rights Monitoring Group has called upon Palestinian president Yasser Arafat to release Dr. Fathi Subuh in an appeal published this week in the local press. Dr. Subuh, a university professor at al-Azhar University in Gaza city, has been detained without trial by Palestinian authorities since last August after asking his students exam questions relating to corruption in the PA and the university. The appeal for his release was signed by 18 academics, who promised to continue their campaign of protest using all peaceful means available.

Maqadmeh Comes Home
After several months in hiding, Hamas leader Ibrahim Maqadmeh returned to his home in Gaza. Maqadmeh, who is wanted by both the Israeli and Palestinian police, has had an arrest order outstanding against him since the Tel Aviv cafe bombings last March. The PA recently cancelled the arrest order for no apparent reason, whereupon Maqadmeh came out of hiding and returned home.

# EXHIBIT V

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
July 16, 2007

# President Bush Discusses the Middle East

Cross Hall

1:09 P.M. EDT

Video (Windows)
Presidential Remarks
Audio

THE PRESIDENT: Good afternoon. In recent weeks, debate in our country has rightly focused on the situation in Iraq -- yet Iraq is not the only pivotal matter in the Middle East. More than five years ago, I became the first American President to call for the creation of a Palestinian state. In the Rose Garden, I said that Palestinians should not have to live in poverty and occupation. I said that the Israelis should not have to live in terror and violence. And I laid out a new vision for the future -- two democratic states, Israel and Palestine, living side-by-side in peace and security.



Since then, many changes have come -- some hopeful, some dispiriting. Israel has taken difficult actions, including withdrawal from Gaza and parts of the West Bank. Palestinians have held free elections, and chosen a president committed to peace. Arab states have put forward a plan that recognizes Israel's place in the Middle East. And all these parties, along with most of the international community, now share the goal of a peaceful, democratic Palestinian state -- a level of consensus never before seen on this crucial issue.

The past five years have also brought developments far too familiar in the recent history of the region. Confronted with the prospect of peace, extremists have responded with acts of aggression and terror. In Gaza, Hamas radicals betrayed the Palestinian people with a lawless and violent takeover. By its actions, Hamas has demonstrated beyond all doubt that it is [more] devoted to extremism and murder than to serving the Palestinian people.

This is a moment of clarity for all Palestinians. And now comes a moment of choice. The alternatives before the Palestinian people are stark. There is the vision of Hamas, which the world saw in Gaza -- with murderers in black masks, and summary executions, and men thrown to their death from rooftops. By following this path, the Palestinian people would guarantee chaos, and suffering, and the endless perpetuation of grievance. They would surrender their future to Hamas's foreign sponsors in Syria and Iran. And they would crush the possibility of any -- of a Palestinian state.

There's another option, and that's a hopeful option. It is the vision of President Abbas and Prime Minister Fayyad; it's the vision of their government; it's the vision of a peaceful state called Palestine as a homeland for the Palestinian people. To realize this vision, these leaders are striving to build the institutions of a modern democracy. They're working to strengthen the Palestinian security services, so they can confront the terrorists and protect the innocent. They're acting to set up competent ministries that deliver services without corruption. They're taking steps to improve the economy and unleash the natural enterprise of the Palestinian people. And they're ensuring that Palestinian society operates under the rule of law. By following this path, Palestinians can reclaim their dignity and their future -- and establish a state of their own.

Only the Palestinians can decide which of these courses to pursue. Yet all responsible nations have a duty to help clarify the way forward. By supporting the reforms of President Abbas and Prime Minister Fayyad, we can help

them show the world what a Palestinian state would look like -- and act like. We can help them prove to the world, the region, and Israel that a Palestinian state would be a partner -- not a danger. We can help them make clear to all Palestinians that rejecting violence is the surest path to security and a better life. And we can help them demonstrate to the extremists once and for all that terror will have no place in a Palestinian state.

So in consultation with our partners in the Quartet -- the European Union, Russia, and the United Nations -- the United States is taking a series of steps to strengthen the forces of moderation and peace among the Palestinian people.

First, we are strengthening our financial commitment. Immediately after President Abbas expelled Hamas from the Palestinian government, the United States lifted financial restrictions on the Palestinian Authority that we had imposed. This year, we will provide the Palestinians with more than $190 million in American assistance -- including funds for humanitarian relief in Gaza. To build on this support, I recently authorized the Overseas Private Investment Corporation to join in a program that will help generate $228 million in lending to Palestinian businesses. Today, I announce our intention to make a direct contribution of $80 million to help Palestinians reform their security services -- a vital effort they're undertaking with the guidance of American General Keith Dayton. We will work with Congress and partners around the world to provide additional resources once a plan to build Palestinian institutions is in place. With all of this assistance, we are showing the Palestinian people that a commitment to peace leads to the generous support of the United States.

Second, we're strengthening our political and diplomatic commitment. Again today, President Abbas and Prime Minister Olmert sat down together to discuss priorities and resolve issues. Secretary Rice and I have strongly supported these meetings, and she has worked with both parties to sketch out a "political horizon" for a Palestinian state. Now we will intensify these efforts, with the goal of increasing the confidence of all parties in a two-state solution. And we will continue to deliver a firm message to Hamas: You must stop Gaza from being a safe haven for attacks against Israel. You must accept the legitimate Palestinian government, permit humanitarian aid in Gaza, and dismantle militias. And you must reject violence, and recognize Israel's right to exist, and commit to all previous agreements between the parties. As I said in the Rose Garden five years ago, a Palestinian state will never be created by terror.

Third, we're strengthening our commitment to helping build the institutions of a Palestinian state. Last month, former Prime Minister -- British Prime Minister Tony Blair agreed to take on a new role as Quartet representative. In this post, he will coordinate international efforts to help the Palestinians establish the institutions of a strong and lasting free society -- including effective governing structures, a sound financial system, and the rule of law. He will encourage young Palestinians to participate in the political process. And America will strongly support his work to help Palestinian leaders answer their people's desire to live in peace.

All the steps I've outlined are designed to lay the foundation for a successful Palestinian state in the West Bank and Gaza -- a nation with functioning political institutions and capable security forces, and leaders who reject terror and violence. With the proper foundation, we can soon begin serious negotiations toward the creation of a Palestinian state.

These negotiations must resolve difficult questions and uphold clear principles. They must ensure that Israel is secure. They must guarantee that a Palestinian state is viable and contiguous. And they must lead to a territorial settlement, with mutually agreed borders reflecting previous lines and current realities, and mutually agreed adjustments. America is prepared to lead discussions to address these issues, but they must be resolved by Palestinians and Israelis, themselves. Resolving these issues would help show Palestinians a clear way forward. And ultimately, it could lead to a final peace in the Middle East -- a permanent end to the conflict, and an agreement on all the issues, including refugees and Jerusalem.

To make this prospect a reality, the Palestinian people must decide that they want a future of decency and hope -- not a future of terror and death. They must match their words denouncing terror with action to combat terror. The Palestinian government must arrest terrorists, dismantle their infrastructure, and confiscate illegal weapons -- as the road map requires. They must work to stop attacks on Israel, and to free the Israeli soldier held hostage by extremists. And they must enforce the law without corruption, so they can earn the trust of their people, and of the world. Taking these steps will enable the Palestinians to have a state of their own. And there's only way to end the conflict, and nothing less is acceptable.

Israel has a clear path. Prime Minister Olmert must continue to release Palestinian tax revenues to the

government of Prime Minster Fayyad. Prime Minister Olmert has also made clear that Israel's future lies in developing areas like the Negev and Galilee -- not in continuing occupation of the West Bank. This is a reality that Prime Minister Sharon recognized, as well. So unauthorized outposts should be removed and settlement expansion ended. At the same time, Israelis should find other practical ways to reduce their footprint without reducing their security -- so they can help President Abbas improve economic and humanitarian conditions. They should be confident that the United States will never abandon its commitment to the security of Israel as a Jewish state and homeland for the Jewish people.

The international community must rise to the moment, and provide decisive support to responsible Palestinian leaders working for peace. One forum to deliver that support is the Ad Hoc Liaison Committee -- a group chaired by Norway that includes the United States and Japan, the World Bank and the International Monetary Fund, and Arab states such as Saudi Arabia, Egypt, and Jordan. Today I call for a session of this committee to gather soon, so that the world can back its words in real support for the new Palestinian government.

The world can do more to build the conditions for peace. So I will call together an international meeting this fall of representatives from nations that support a two-state solution, reject violence, recognize Israel's right to exist, and commit to all previous agreements between the parties. The key participants in this meeting will be the Israelis, the Palestinians, and their neighbors in the region. Secretary Rice will chair the meeting. She and her counterparts will review the progress that has been made toward building Palestinian institutions. They will look for innovative and effective ways to support further reform. And they will provide diplomatic support for the parties in their bilateral discussions and negotiations, so that we can move forward on a successful path to a Palestinian state.

Arab states have a pivotal role to play, as well. They should show strong support for President Abbas's government and reject the violent extremism of Hamas. They should use their resources to provide much-needed assistance to the Palestinian people. Nations like Jordan and Egypt, which are natural gateways for Palestinian exports, should open up trade to create opportunities on both sides of the border.

Arab nations should also take an active part in promoting peace negotiations. Re-launching the Arab League initiative was a welcome first step. Now Arab nations should build on this initiative -- by ending the fiction that Israel does not exist, stopping the incitement of hatred in their official media, and sending cabinet-level visitors to Israel. With all these steps, today's Arab leaders can show themselves to be the equals of peacemakers like Anwar Sadat and King Hussein of Jordan.

The conflict in Gaza and the West Bank today is a struggle between extremists and moderates. And these are not the only places where the forces of radicalism and violence threaten freedom and peace. The struggle between extremists and moderates is also playing out in Lebanon -- where Hezbollah and Syria and Iran are trying to destabilize the popularly elected government. The struggle is playing out in Afghanistan -- where the Taliban and al Qaeda are trying to roll back democratic gains. And the struggle is playing out in Iraq -- where al Qaeda, insurgents, and militia are trying to defy the will of nearly 12 million Iraqis who voted for a free future.

Ceding any of these struggles to extremists would have deadly consequences for the region and the world. So in Gaza and the West Bank and beyond, the international community must stand with the brave men and women who are working for peace.

Recent days have brought a chapter of upheaval and uncertainty in the Middle East. But the story does not have to end that way. After the wave of killing by Hamas last month, a 16-year-old girl in Gaza City told a reporter, "The gunmen want to destroy the culture of our fathers and grandfathers. We will not allow them to do it." She went on, "I'm saying it's enough killing. Enough."

That young woman speaks for millions -- in Gaza, the West Bank, in Israel, in Arab nations, and in every nation. And now the world must answer her call. We must show that in the face of extremism and violence, we stand on the side of tolerance and decency. In the face of chaos and murder, we stand on the side of law and justice. And in the face of terror and cynicism and anger, we stand on the side of peace in the Holy Land.

Thank you.

END 1:26 P.M. EDT

# EXHIBIT W

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE ESTATE OF YARON UNGAR, et al., Plaintiffs, v. THE PALESTINIAN AUTHORITY, et al., Defendants. | ) | C.A. No. 00-105L |

**ANSWER OF DEFENDANTS THE PALESTINIAN AUTHORITY AND THE PALESTINE LIBERATION ORGANIZATION TO AMENDED COMPLAINT**

Defendants The Palestinian Authority ("PA") and The Palestine Liberation Organization ("PLO") (collectively, "Defendants"), by counsel, and pursuant to FED. R. CIV. P. 8 and 12(a), submit the following Answer to the Plaintiffs' Amended Complaint (the "Complaint") in the above-captioned action and state as follows:

**FIRST AFFIRMATIVE DEFENSE**

With respect to the individual allegations in the Complaint, Defendants respond as follows:

**Introduction**

1. Paragraph 1 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants state, on information and belief, that, on or about June 9, 1996, a shooting occurred near Beit Shemesh, Israel; state, on information and belief, that Yaron Ungar and Efrat Ungar died as a result of the shooting; deny that Defendants "caused" any alleged damages to Plaintiffs or committed any "acts of international

terrorism" against Plaintiffs; and deny any remaining factual allegations contained in paragraph 1 of the Complaint.

**Jurisdiction and Venue**

2. Paragraph 2 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 2 of the Complaint.

3. Paragraph 3 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny any factual allegations contained in paragraph 3 of the Complaint and, therefore, deny the same.

**The Parties**

4. Paragraph 4 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny any factual allegations contained in paragraph 4 of the Complaint and, therefore, deny the same.

5. Paragraph 5 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny the factual allegations contained in paragraph 5 of the Complaint and, therefore, deny the same.

6. Paragraph 6 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny the factual allegations contained in paragraph 6 of the Complaint and, therefore, deny the same.

7. Paragraph 7 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny the factual allegations contained in paragraph 7 of the Complaint and, therefore, deny the same.

8. Paragraph 8 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny the factual allegations contained in paragraph 8 of the Complaint and, therefore, deny the same.

9. Paragraph 9 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants deny as phrased any and all factual allegations contained in paragraph 9 of the Complaint and state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip.

10. Paragraph 10 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants deny as phrased any and all factual allegations contained in paragraph 10 of the Complaint and state that the PLO was founded in 1964 by Egypt and the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords.

11. Paragraph 11 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in

the West Bank and Gaza Strip; deny Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 11 of the Complaint and, therefore, deny the same.

12. Paragraph 12 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 12 of the Complaint and, therefore, deny the same.

**Statement of Facts**

13. Paragraph 13 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip; deny Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint; and deny any remaining factual allegations contained in paragraph 13 of the Complaint.

14. Paragraph 14 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip; state that the PLO was founded in 1964 by Egypt and the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords; deny

Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 14 of the Complaint and, therefore, deny the same.

15. Paragraph 15 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny any factual allegations contained in paragraph 15 of the Complaint and, therefore, deny the same.

16. With respect to the allegations contained in paragraph 16 of the Complaint, Defendants state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip; state that the PLO was founded in 1964 by Egypt and the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords; deny Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 16 of the Complaint and, therefore, deny the same.

17. With respect to the allegations contained in paragraph 17 of the Complaint Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of events occurring at "an unknown date or dates" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 17 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny

the same. Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 17 of the Complaint and, therefore, deny the same.

18. With respect to the allegations contained in paragraph 18 of the Complaint, Defendants state, on information and belief, that, on or about June 9, 1996, a shooting occurred near Beit Shemesh, Israel involving Yaron Ungar and Efrat Ungar; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 18 of the Complaint and, therefore, deny the same.

19. With respect to the allegations contained in paragraph 19 of the Complaint, Defendants state, on information and belief, that, on or about June 9, 1996, a shooting occurred near Beit Shemesh, Israel; state, on information and belief, that Yaron Ungar and Efrat Ungar died as a result of the shooting; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 19 of the Complaint and, therefore, deny the same.

20. Paragraph 20 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information to admit or deny any factual allegations contained in paragraph 20 of the Complaint and, therefore, deny the same.

21. Paragraph 21 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny that they were the subject of any "convictions" relating to the events alleged in the Complaint; deny any factual allegations contained in paragraph 21 of the Complaint to the extent those allegations relate to Defendants; and state that Defendants lack sufficient knowledge or information to admit or deny any

remaining factual allegations contained in paragraph 21 of the Complaint and, therefore, deny the same.

22. Defendants lack sufficient knowledge or information to admit or deny any factual allegations contained in the first and second sentences of paragraph 22 of the Complaint and, therefore, deny the same. With respect to the allegations contained in the third sentence of paragraph 22 of the Complaint, Defendants admit, on information and belief, that, on or about September 17, 1997, a request was made by the Israeli Justice Ministry to the PA; but deny, as phrased, any remaining factual allegations contained in the third sentence of paragraph 22 of the Complaint. Defendants deny the allegations contained in the fourth sentence of paragraph 22 of the Complaint.

23. Paragraph 23 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny as phrased any factual allegations contained in paragraph 23 of the Complaint.

24. Paragraph 24 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of unidentified "officials, employees and agents" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 24 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants further state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in the West

Bank and Gaza Strip; state that the PLO was founded in 1964 by Egypt and the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords; and deny any remaining factual allegations contained in paragraph 24 of the Complaint.

25. Paragraph 25 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "during the period relevant hereto." To the extent a response is required, Defendants state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip; state that the PLO was founded in 1964 by Egypt and the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords; deny Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 25 of the Complaint and, therefore, deny the same.

26. Paragraph 26 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "during the period relevant hereto." To the extent a response is required, Defendants state that the PA was established by the Oslo Accords to serve as the governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip; state that the PLO was founded in 1964 by Egypt and the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords; deny Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 26 of the Complaint and, therefore, deny the same.

27. Paragraph 27 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "during the period relevant hereto." To the extent a response is required, Defendants admit that, at certain times, the State of Israel communicated various demands to the PA; deny Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint; and state that Defendants lack sufficient knowledge or information to admit or deny any remaining factual allegations contained in paragraph 27 of the Complaint and, therefore, deny the same.

28. With respect to the allegations contained in paragraph 28 of the Complaint, Defendants deny that they had any control over defendant Hamas with respect to the events alleged in the Complaint; and deny any remaining factual allegations contained in paragraph 28 of the Complaint.

29. Paragraph 29 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of unidentified "officials, employees and agents" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 29 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 29 of the Complaint.

30. Paragraph 30 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "during the period relevant hereto." To the

extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 30 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants further state that, at certain times, the State of Israel communicated various demands to the PA; deny that Defendants had any control over defendant Hamas with respect to the events alleged in the Complaint and deny any remaining factual allegations contained in paragraph 30 of the Complaint.

31. Paragraph 31 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 31 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 31 of the Complaint.

32. Paragraph 32 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "during the period relevant hereto." To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f);

accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 32 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 32 of the Complaint.

33. Paragraph 33 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of unidentified "officials, employees and agents" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 33 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 33 of the Complaint.

34. Paragraph 34 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto." To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of unidentified "officials, employees and agents" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 34 of the Complaint that assume, relate to or depend on such unspecified allegations and,

therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 34 of the Complaint.

35. Paragraph 35 of the Complaint contains legal conclusions to which no response is required, including, without limitation, the phrase "at all times relevant hereto" and the allegation relating to 18 U.S.C. § 2339A. To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of unidentified "officials, employees and agents" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 35 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 35 of the Complaint.

36. Paragraph 36 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants state that Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of unidentified "officials, employees and agents" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 36 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 36 of the Complaint.

37. Paragraph 37 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants state that Plaintiffs have failed to

allege their claims with the requisite specificity and particularity, including, without limitation, allegations of unidentified "officials, employees and agents," allegations of unspecified and unidentified "acts and omissions" and allegations relating to time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f); accordingly, Defendants lack sufficient knowledge or information to admit or deny any and all factual allegations contained in paragraph 37 of the Complaint that assume, relate to or depend on such unspecified allegations and, therefore, deny the same. Defendants deny any remaining factual allegations contained in paragraph 37 of the Complaint.

**First Count -- All Defendants**
**(International Terrorism Pursuant to 18 U.S.C. § 2333)**

38. Defendants incorporate by reference, as if fully set forth herein, their responses to paragraphs 1-37 of the Complaint.

39. Paragraph 39 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 39 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 39 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 39 of the Complaint and, therefore, deny the same.

40. Paragraph 40 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 40 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 40 do not relate to Defendants, Defendants lack sufficient

knowledge or information to admit or deny the allegations contained in paragraph 40 of the Complaint and, therefore, deny the same.

41. Paragraph 41 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 41 of the Complaint.

42. Paragraph 42 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 42 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 42 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 42 of the Complaint and, therefore, deny the same.

43. Paragraph 43 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 43 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 43 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 43 of the Complaint and, therefore, deny the same.

44. Defendants deny any factual allegations contained in paragraph 44 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 44 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 44 of the Complaint and, therefore, deny the same.

45. Paragraph 45 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 45 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 45 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 45 of the Complaint and, therefore, deny the same.

46. Paragraph 46 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 46 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 46 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 46 of the Complaint and, therefore, deny the same.

47. Paragraph 47 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 47 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 47 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 47 of the Complaint and, therefore, deny the same.

48. Paragraph 48 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 48 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 48 do not relate to Defendants, Defendants lack sufficient

knowledge or information to admit or deny the allegations contained in paragraph 48 of the Complaint and, therefore, deny the same.

**Second Count -- All Defendants**
**(Negligence)**

49. Defendants incorporate by reference, as if fully set forth herein, their responses to paragraphs 1-48 of the Complaint.

50. Paragraph 50 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny that there is a proper factual or legal basis for Plaintiffs' supplemental causes of action.

51. Paragraph 51 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 51 of the Complaint and, therefore, deny the same.

52. Paragraph 52 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 52 of the Complaint and, therefore, deny the same.

53. Paragraph 53 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 53 of the Complaint and, therefore, deny the same.

54. Paragraph 54 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to

admit or deny any factual allegations contained in paragraph 54 of the Complaint and, therefore, deny the same.

55. Paragraph 55 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 55 of the Complaint and, therefore, deny the same.

56. Paragraph 56 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 56 of the Complaint and, therefore, deny the same.

57. Paragraph 57 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 57 of the Complaint and, therefore, deny the same.

58. Paragraph 58 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 58 of the Complaint.

59. Paragraph 59 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 59 of the Complaint.

60. Paragraph 60 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 60 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent

the allegations contained in paragraph 60 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 60 of the Complaint and, therefore, deny the same.

61. Paragraph 61 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 61 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 61 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 61 of the Complaint and, therefore, deny the same.

62. Paragraph 62 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 62 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 62 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 62 of the Complaint and, therefore, deny the same.

63. Paragraph 63 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 63 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 63 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 63 of the Complaint and, therefore, deny the same.

64. Paragraph 64 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 64

of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 64 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 64 of the Complaint and, therefore, deny the same.

**Third Count -- All Defendants**
**(Breach of Statutory Obligation)**

65. Defendants incorporate by reference, as if fully set forth herein, their responses to paragraphs 1-64 of the Complaint.

66. Paragraph 66 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 66 of the Complaint and, therefore, deny the same.

67. Paragraph 67 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 67 of the Complaint and, therefore, deny the same.

68. Paragraph 68 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 68 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 68 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 68 of the Complaint and, therefore, deny the same.

69. Paragraph 69 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 69 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 69 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 69 of the Complaint and, therefore, deny the same.

70. Paragraph 70 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 70 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 70 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 70 of the Complaint and, therefore, deny the same.

71. Paragraph 71 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 71 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 71 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 71 of the Complaint and, therefore, deny the same.

72. Paragraph 72 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 72 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 72 do not relate to Defendants, Defendants lack sufficient

knowledge or information to admit or deny the allegations contained in paragraph 72 of the Complaint and, therefore, deny the same.

73. Paragraph 73 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 73 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 73 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 73 of the Complaint and, therefore, deny the same.

**Fourth Count -- All Defendants**
**(Assault)**

74. Defendants incorporate by reference, as if fully set forth herein, their responses to paragraphs 1-73 of the Complaint.

75. Paragraph 75 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to admit or deny any factual allegations contained in paragraph 75 of the Complaint and, therefore, deny the same.

76. Defendants lack sufficient knowledge or information regarding the allegations contained in paragraph 76 of the Complaint and, therefore, deny the same.

77. Defendants lack sufficient knowledge or information regarding the allegations contained in paragraph 77 of the Complaint and, therefore, deny the same.

78. Paragraph 78 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge or information on which to

admit or deny any factual allegations contained in paragraph 78 of the Complaint and, therefore, deny the same.

79. Paragraph 79 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 79 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 79 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 79 of the Complaint and, therefore, deny the same.

80. Paragraph 80 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 80 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 80 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 80 of the Complaint and, therefore, deny the same.

81. Paragraph 81 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 81 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent the allegations contained in paragraph 81 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 81 of the Complaint and, therefore, deny the same.

82. Paragraph 82 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any factual allegations contained in paragraph 82 of the Complaint to the extent those allegations relate to Defendants; and state that, to the extent

the allegations contained in paragraph 82 do not relate to Defendants, Defendants lack sufficient knowledge or information to admit or deny the allegations contained in paragraph 82 of the Complaint and, therefore, deny the same.

83. Defendants deny any and all allegations in the Complaint that are not expressly and specifically admitted above or to which no response is otherwise made above.

84. Defendants deny that Plaintiffs are entitled to recover any relief against Defendants.

**SECOND AFFIRMATIVE DEFENSE**

This Court lacks subject-matter jurisdiction over this action or, alternatively, subject-matter jurisdiction should be abated.

**THIRD AFFIRMATIVE DEFENSE**

This Court lacks subject matter and/or supplemental jurisdiction over Count II (Negligence), Count III (Breach of Statutory Obligation) and Count IV (Assault).

**FOURTH AFFIRMATIVE DEFENSE**

This Court lacks personal jurisdiction over the Defendants with respect to this action.

**FIFTH AFFIRMATIVE DEFENSE**

Defendants lack the capacity to be sued in this Court with respect to Count II (Negligence), Count III (Breach of Statutory Obligation) and Count IV (Assault).

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs have failed to state a claim on which relief may be granted against Defendants, and, therefore, this action should be dismissed as to the Defendants pursuant to FED. R. CIV. P. 12(b)(6).

**SEVENTH AFFIRMATIVE DEFENSE**

This Court is not a proper venue for this action and should be dismissed; alternatively, this action should be dismissed or transferred under the doctrine of *forum non conveniens*.

**EIGHTH AFFIRMATIVE DEFENSE**

This action should be dismissed as non-justiciable, including, without limitation, under the political question doctrine.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiffs have failed to allege their claims with the requisite specificity and particularity, including, without limitation, allegations of time and place which are deemed material and essential pursuant to FED. R. CIV. P. 9(f).

**TENTH AFFIRMATIVE DEFENSE**

Defendants are immune from suit in the United States under the doctrine of Sovereign Immunity.

**ELEVENTH AFFIRMATIVE DEFENSE**

To the extent Plaintiffs have suffered any legally-cognizable harm or damages under the legal theories alleged in the Complaint, which Defendants deny, such harm or damages are the proximate result of actions or omissions of other defendants and/or third parties for which Defendants were not and are not legally responsible and which also constitute superseding or intervening causes.

**TWELFTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred in whole or in part for failure to join and/or for voluntary dismissal of necessary and indispensable parties.

## THIRTEENTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs have suffered any legally-cognizable harm or damages under the legal theories alleged in the Complaint, which Defendants deny, Plaintiffs' claims are barred in whole or in part by Plaintiffs' failure to mitigate their damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part under the applicable statute of limitations and/or the doctrine of laches.

WHEREFORE, Defendants respectfully request that the Court enter an order: (a) granting judgment in favor of Defendants and against Plaintiffs; (b) dismissing Plaintiffs' claims with prejudice; (c) denying with prejudice all relief requested by Plaintiffs; (d) awarding Defendants the costs and expenses, including reasonable attorney's fees, that they have incurred as a result hereof; and (e) awarding Defendants such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: December 28, 2007

/s/ Richard A. Hibey

Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Miller and Chevalier, Chartered
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
(202) 626-5800 (telephone)
(202) 628-0858 (facsimile)

/s/ Deming E. Sherman

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200 (telephone)
(401) 276-6611 (facsimile)

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 28th day of December 2007, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
Djs@mtlhlaw.com
*Attorneys for Plaintiffs*

/s/
Richard A. Hibey

# EXHIBIT X

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
November 27, 2007

# President Bush Attends Annapolis Conference

Memorial Hall
United States Naval Academy
Annapolis, Maryland

Joint Understanding Read by President Bush at Annapolis Conference

Video (Windows)
Presidential Remarks
Audio
Photos

11:04 A.M. EST

PRESIDENT BUSH: Thank you for coming. Prime Minister Olmert, President Abbas, Secretary General Ban, former Prime Minister Blair, distinguished guests: Welcome to one of the finest institutes we have in America, the United States Naval Academy. We appreciate you joining us in what I believe is an historic opportunity to encourage the expansion of freedom and peace in the Holy Land.



We meet to lay the foundation for the establishment of a new nation -- a democratic Palestinian state that will live side by side with Israel in peace and security. We meet to help bring an end to the violence that has been the true enemy of the aspirations of both the Israelis and Palestinians.

We're off to a strong start. I'm about to read a statement that was agreed upon by our distinguished guests:

The representatives of the government of the state of Israel and the Palestinian Liberation Organization, represented respective by Prime Minister Ehud Olmert, and President Mahmoud Abbas in his capacity as Chairman of the PLO Executive Committee and President of the Palestinian Authority, have convened in Annapolis, Maryland, under the auspices of President George W. Bush of the United States of America, and with the support of the participants of this international conference, having concluded the following joint understanding.

We express our determination to bring an end to bloodshed, suffering and decades of conflict between our peoples; to usher in a new era of peace, based on freedom, security, justice, dignity, respect and mutual recognition; to propagate a culture of peace and nonviolence; to confront terrorism and incitement, whether committed by Palestinians or Israelis. In furtherance of the goal of two states, Israel and Palestine living side by side in peace and security, we agree to immediately launch good-faith bilateral negotiations in order to conclude a peace treaty, resolving all outstanding issues, including all core issues, without exception, as specified in previous agreements.

We agree to engage in vigorous, ongoing and continuous negotiations, and shall make every effort to conclude an agreement before the end of 2008. For this purpose, a steering committee, led jointly by the head of the delegation of each party, will meet continuously, as agreed. The steering committee will develop a joint work plan and establish and oversee the work of negotiations teams to address all issues, to be headed by one lead representative from each party. The first session of the steering committee will be held on 12 December 2007.



President Abbas and Prime Minister Olmert will continue to meet on a bi-weekly basis to follow up the negotiations in order to offer all necessary assistance for their advancement.

The parties also commit to immediately implement their respective

obligations under the performance-based road map to a permanent two-state solution to the Israel-Palestinian conflict, issued by the Quartet on 30 April 2003 -- this is called the road map -- and agree to form an American, Palestinian and Israeli mechanism, led by the United States, to follow up on the implementation of the road map.

The parties further commit to continue the implementation of the ongoing obligations of the road map until they reach a peace treaty. The United States will monitor and judge the fulfillment of the commitment of both sides of the road map. Unless otherwise agreed by the parties, implementation of the future peace treaty will be subject to the implementation of the road map, as judged by the United States.

Congratulations for your strong leadership. (Applause.)

The Palestinian people are blessed with many gifts and talents. They want the opportunity to use those gifts to better their own lives and build a better future for their children. They want the dignity that comes with sovereignty and independence. They want justice and equality under the rule of law. They want freedom from violence and fear.

The people of Israel have just aspirations, as well. They want their children to be able to ride a bus or to go to school without fear of suicide bombers. They want an end to rocket attacks and constant threats of assault. They want their nation to be recognized and welcomed in the region where they live.

Today, Palestinians and Israelis each understand that helping the other to realize their aspirations is key to realizing their own aspirations -- and both require an independent, democratic, viable Palestinian state. Such a state will provide Palestinians with the chance to lead lives of freedom and purpose and dignity. Such a state will help provide the Israelis with something they have been seeking for generations: to live in peace with their neighbors.

Achieving this goal is not going to be easy -- if it were easy, it would have happened a long time ago. To achieve freedom and peace, both Israelis and Palestinians will have to make tough choices. Both sides are sober about the work ahead, but having spent time with their leaders, they are ready to take on the tough issues. As Prime Minister Olmert recently put it, "We will avoid none of [the historic questions], we will not run from discussing any of them." As President Abbas has said: "I believe that there is an opportunity not only for us but for the Israelis, too. We have a historic and important opportunity that we must benefit from." It is with that spirit that we concluded -- that they concluded this statement I just read.



Our purpose here in Annapolis is not to conclude an agreement. Rather, it is to launch negotiations between the Israelis and the Palestinians. For the rest of us, our job is to encourage the parties in this effort -- and to give them the support they need to succeed.

In light of recent developments, some have suggested that now is not the right time to pursue peace. I disagree. I believe now is precisely the right time to begin these negotiations -- for a number of reasons:

First, the time is right because Palestinians and Israelis have leaders who are determined to achieve peace. President Abbas seeks to fulfill his people's aspirations for statehood, dignity and security. President Abbas understands that a Palestinian state will not be born of terror, and that terrorism is the enemy standing in the way of a state. He and Prime Minister Fayyad have both declared, without hesitation, that they are opposed to terrorism and committed to peace. They're committed to turning these declarations into actions on the ground to combat terror.

The emergence of responsible Palestinian leaders has given Israeli leaders the confidence they need to reach out to the Palestinians in true partnership. Prime Minister Olmert has expressed his understanding of the suffering and indignities felt by the Palestinian people. He's made clear that the security of Israel will be enhanced by the establishment of a responsible, democratic Palestinian state. With leaders of courage and conviction on both sides, now is the time to come together and seek the peace that both sides desire.

Second, the time is right because a battle is underway for the future of the Middle East -- and we must not cede victory to the extremists. With their violent actions and contempt for human life, the extremists are seeking to impose a dark vision on the Palestinian people -- a vision that feeds on hopelessness and despair to sow chaos in the Holy Land. If this vision prevails, the future of the region will be endless terror, endless war, and endless suffering.



Standing against this dark vision are President Abbas and his government. They are offering the Palestinian people an alternative vision for the future -- a vision of peace, a homeland of their own, and a better life. If responsible Palestinian leaders can deliver on this vision, they will deal the forces of extremism a devastating blow. And when liberty takes root in the rocky soil of the West Bank and Gaza, it will inspire millions across the Middle East who want their societies built on freedom and peace and hope.

By contrast, if Palestinian reformers cannot deliver on this hopeful vision, then the forces of extremism and terror will be strengthened, a generation of Palestinians could be lost to the extremists, and the Middle East will grow in despair. We cannot allow this to happen. Now is the time to show Palestinians that their dream of a free and independent state can be achieved at the table of peace -- and that the terror and violence preached by Palestinian extremists is the greatest obstacle to a Palestinian state.

Third, the time is right because the world understands the urgency of supporting these negotiations. We appreciate that representatives from so many governments and international institutions have come to join us here in Annapolis -- especially the Arab world. We're here because we recognize what is at stake. We are here because we each have a vital role to play in helping Palestinians forge the institutions of a free society. We're here because we understand that the success of these efforts to achieve peace between Israelis and Palestinians will have an impact far beyond the Holy Land.

These are the reasons we've gathered here in Annapolis. And now we begin the difficult work of freedom and peace. The United States is proud to host this meeting -- and we reaffirm the path to peace set out in the road map. Yet in the end, the outcome of the negotiations they launch here depends on the Israelis and Palestinians themselves. America will do everything in our power to support their quest for peace, but we cannot achieve it for them. The success of these efforts will require that all parties show patience and flexibility -- and meet their responsibilities.



For these negotiations to succeed, the Palestinians must do their part. They must show the world they understand that while the borders of a Palestinian state are important, the nature of a Palestinian state is just as important. They must demonstrate that a Palestinian state will create opportunity for all its citizens, and govern justly, and dismantle the infrastructure of terror. They must show that a Palestinian state will accept its responsibility, and have the capability to be a source of stability and peace -- for its own citizens, for the people of Israel, and for the whole region.

The Israelis must do their part. They must show the world that they are ready to begin -- to bring an end to the occupation that began in 1967 through a negotiated settlement. This settlement will establish Palestine as a Palestinian homeland, just as Israel is a homeland for the Jewish people. Israel must demonstrate its support for the creation of a prosperous and successful Palestinian state by removing unauthorized outposts, ending settlement expansion, and finding other ways for the Palestinian Authority to exercise its responsibilities without compromising Israel's security.

Arab states also have a vital role to play. Relaunching the Arab League initiative and the Arab League's support

for today's conference are positive steps. All Arab states should show their strong support for the government of President Abbas -- and provide needed assistance to the Palestinian Authority. Arab states should also reach out to Israel, work toward the normalization of relations, and demonstrate in both word and deed that they believe that Israel and its people have a permanent home in the Middle East. These are vital steps toward the comprehensive peace that we all seek.

Finally, the international community has important responsibilities. Prime Minister Fayyad is finalizing a plan to increase openness and transparency and accountability throughout Palestinian society -- and he needs the resources and support from the international community. With strong backing from those gathered here, the Palestinian government can build the free institutions that will support a free Palestinian state.

The United States will help Palestinian leaders build these free institutions -- and the United States will keep its commitment to the security of Israel as a Jewish state and homeland for the Jewish people.

The United States strongly feels that these efforts will yield the peace that we want -- and that is why we will continue to support the Lebanese people. We believe democracy brings peace. And democracy in Lebanon is vital, as well, for the peace in the Middle East. Lebanese people are in the process of electing a president. That decision is for the Lebanese people to make -- and they must be able to do so free from outside interference and intimidation. As they embark on this process, the people of Lebanon can know that the American people stand with them -- and we look forward to the day when the people of Lebanon can enjoy the blessings of liberty without fear of violence or coercion.

The task begun here at Annapolis will be difficult. This is the beginning of the process, not the end of it -- and no doubt a lot of work remains to be done. Yet the parties can approach this work with confidence. The time is right. The cause is just. And with hard effort, I know they can succeed.

President Abbas and Prime Minister Olmert, I pledge to devote my effort during my time as President to do all I can to help you achieve this ambitious goal. I give you my personal commitment to support your work with the resources and resolve of the American government. I believe a day is coming when freedom will yield the peace we desire. And the land that is holy to so many will see the light of peace.

The day is coming when Palestinians will enjoy the blessings that freedom brings -- and all Israelis will enjoy the security they deserve. That day is coming. The day is coming when the terrorists and extremists who threaten the Israeli and Palestinian people will be marginalized and eventually defeated. And when that day comes, future generations will look to the work we began here at Annapolis. They will give thanks to the leaders who gathered on the banks of the Chesapeake for their vision, their wisdom and courage to choose a future of freedom and peace.

Thanks for coming. May God bless their work. (Applause.)

END 11:22 A.M. EST

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2007/11/20071127-2.html

CLICK HERE TO PRINT

# EXHIBIT Y

U.S. DEPARTMENT of STATE

# Remarks with Palestinian Authority President Mahmoud Abbas

**Secretary Condoleezza Rice**
Ramallah, West Bank
October 15, 2007

View Video

**PRESIDENT ABBAS:** (Via interpreter) In the name of God, the Compassionate and the Merciful, again, and over seven consecutive times I would like to welcome Dr. Rice, who visits us today, as I said, for the seventh time in a row over the past few months.

We are working diligently and exerting all efforts with our utmost efforts to reach the conference that was called for by President George Bush in order to render this conference successful. We are working hard to formulate a joint document with Israeli side that defines the fundamental basis for solution of final status issues such as Jerusalem, borders, settlements, refugees, security, water and joint relations.

The conference that is scheduled to be held in the fall should launch the negotiations for final status issues in order to reach and conclude a peace agreement based on international the resolutions, the relevant international resolutions, and the Arab Peace Initiative, and the roadmap plan that encompasses the vision of President George Bush. We are seeking a just and genuine and fair peace on all tracks based from on the Palestinian track.

During our meeting I asked Dr. Rice to help us in stopping all settlement activities and freezing all settlement activities, including the natural growth, and that is according to the roadmap plan, and to stop the construction of the annexation wall and to abrogate the decision to confiscate lands from Abu Dis, Azaria and al-Sawahra that is supposed to expand the Ma'ale Adumim settlement in the E-1 area. And as well I asked that they stop the excavations in the vicinity of Al Haram al-Sharif al-Aqsa Mosque.

We are exacting our utmost efforts to consolidate the rule of law and the one unified authority and the legitimate weapon, the unified legitimate arms. I reiterated to the Secretary that the West Bank, including East Jerusalem and the Gaza Strip, is one geographical and political entity that could not be divided. And I reiterated our insistence to continue to deliver the basic needs of our people in Gaza Strip as a whole.

It is important that the coup that took place in Gaza should be reversed and that the Palestinian legitimacy prevails as a full and the whole and not divided, as integral package.

I asked the Secretary to help in parallel of the final status negotiations the release -- to help us in the release of prisoners and to bring back the exiled and also to open the institutions, the closed institutions in East Jerusalem, and to lift the siege and the sanctions imposed on the Palestinians and to return things back to 28th of September of 2000, and also to build the confidence with the Israeli and the Palestinian side, and to create a real political horizon that will bring assurances to the people and launches a genuine and credible peace process.

I trust and I am -- I have trust and confidence in President Bush and you, Dr. Rice, and in your willingness and your ability to support us and to support the achieving of just and comprehensive peace and the ending of the Palestinian suffering. And thank you.

**SECRETARY RICE:** Thank you. And thank you very much, Mr. President. I have been here a great deal and I want to thank you for your hospitality each time. It may be easier to simply take up residency in Ramallah, I've been here so much. But thank you very much for hosting me again.

And we have a lot of work to do. We have noted the important momentum that you and Prime Minister Olmert have achieved in your bilateral discussions. My goal in being here at this time is to see what I can do to help you sustain that momentum toward the conclusion of a joint document that you could bring to an international meeting that President Bush has called for sometime this fall. It is a very important time in the Palestinian-Israeli issue because I think that there is goodwill on both sides, there is growing confidence and growing trust. Your teams are beginning to work and we are going to encourage your teams to work intensively, indeed very, very hard over the next several weeks, because there is a lot of work to be done.

It is also very important that we build confidence between the parties, as you and Prime Minister Olmert have built confidence between yourselves. And that means that we will also be encouraging the parties to implement the first phase obligations under the roadmap. They are spelled out for both parties and they are, in themselves, a kind of reliable guide about how one might get to the establishment of a Palestinian state.

I have said that we need to, at this particular point in time, be certain to avoid any steps that would undermine confidence, because the building of confidence is something that takes time. We've been working at it for a while and we want everyone to know that confident partners are going forward to the international meeting this fall. I'm sure that if we continue to do our work in an atmosphere of goodwill, in an atmosphere of urgency to complete the important work that you and Prime Minister Olmert have set out, that we will be successful in moving toward a meeting in which the international community and the regional states can signal their support for the very important bilateral work that you have remaining to do and for laying a foundation for the establishment of a Palestinian state based on a negotiated solution. And so thank you very much for hosting me here.

**QUESTION:** (Via interpreter) Dr. Rice, your visit -- there is attack by many nations and the refusals by the Israelis in terms of the fall conference as well as the agenda for the final status negotiations. How do you -- how would the conference be successful if there's no clear vision about its contents and about its agenda?

And also, would that make the Arab parties participate in the conference? Mr. President, could you go to the fall conference without a clear agenda?

**SECRETARY RICE:** Well, first let me say, there is a clear agenda, and that is to work on an international basis to support the efforts of Palestinians and Israelis to end their conflict. That's the very clear agenda. We know that that requires the addressing of a number of issues that -- core issues -- that must be resolved ultimately if there is to be a Palestinian state. We know that that must involve looking to improve the lives of Palestinians economically, to improve the lives of the Palestinians in terms of movement and access.

We know, too, that it requires the support of regional states and the support of the international community, so there is an agenda. We've not issued invitations because we want the work of this bilateral track to continue very aggressively moving toward that international meeting. But I think we made some clarifications of the nature of this meeting when I was in New York. We made some clarifications of those that we would expect to invite to be involved.

And I just want to repeat what the President said in an interview that he recently gave to Al Arabiya, which is that this is going to be a serious and substantive conference that will advance the cause of the establishment of a Palestinian state. We, frankly, have better things to do than invite people to Annapolis for a photo op. The United

States of America is a very big country with a lot of responsibilities and a lot of obligations. I hope you understand and that everybody understands that the President has decided to make this one of the highest priorities of his Administration and of his time in office. It means that he is absolutely serious about moving this issue forward and moving it as rapidly as possible to conclusion.

**PRESIDENT ABBAS:** Of course, Dr. Rice clarified that there is a clear agenda and it's understandable and known to everyone and it's not just a photo op. As she mentioned, everything will be clear in this meeting, international meeting, and then afterwards we will move to negotiations within a set time frame in order to reach a peace agreement, conclude a peace agreement. This is what we are seeking and this is what we are working on in the near future.

**QUESTION:** I have a question for both of you. Madame Secretary, you have now met both parties. Do you have any sense that they are any closer together? And Mr. President, do you have the feeling that the Israelis are now ready to make some compromises?

**SECRETARY RICE:** Sylvie, I have met both parties. I will meet both parties again. And I'm going to go to Egypt in between and I will see the King of Jordan after. This is a work in progress and we've got a lot of work ahead of us. But I sense the seriousness and the commitment of both President Abbas and Prime Minister Olmert. I know the commitment of the teams that they have appointed. The very senior people that they have appointed to lead these delegations suggests to me that this is the most serious effort to try to end this conflict in many, many years.

And I know that there is hard work ahead. I know that there are compromises that will have to be made. Let's remember that the November document is not the final status agreement in and of itself; it is a document that is meant to demonstrate that there is a basis for negotiations on the establishment of a Palestinian state. We're not going to -- they're not going to try to solve everything in this November document, but it does need to be a serious and substantive and concrete document that can demonstrate that there is a way forward. And I can just tell you that there is great seriousness, there is great commitment. There are very senior people who are going to lead these delegations, and that gives me confidence that we're going to get the very best efforts of both parties and they're certainly going to get the very best effort of the United States.

**PRESIDENT ABBAS:** (Via interpreter) We and the Israelis have clear terms of reference, which is the roadmap plan, which includes the vision of President Bush and the Arab Peace Initiative. And if we look at this map, at this plan, we will see that it gives the solutions, all the solutions and all the answers for the different issues that we would like to discuss and negotiate, and it has progressed undoubtedly. This plan should be put before the two parties with all honesty and integrity and that the document that we will bring to the international meeting would be on the basis of the roadmap plan.

**QUESTION:** (Via interpreter) Mr. President, until now I did not hear about the timeframe or the limit, the time limits for the joint declaration, for the negotiations. Was this abandoned about the timeframe, the schedule for the declaration?

Dr. Rice, since the first meeting between President Abbas and Prime Minister Olmert, Prime Minister Olmert promised to dismantle military checkpoints and to facilitate the movement for the Palestinians in the West Bank, but nothing happened yet and the situation became worse and more complicated. And the whole process losing credibility for the Palestinian people it's not trustable yet, the whole process with the Israelis. How you want the Palestinians to trust new promises for the core issues which more sensitive and complicated? How you want that? And can you ask the Prime Minister Olmert (inaudible) to implement what he promised or to ask the two parties or the -- all parties to respect the United Nation resolutions relating to the conflict?

**SECRETARY RICE:** Well, I've asked the parties to do exactly that, and I think that those obligations are spelled out in a really rather concrete way in the first phase of the roadmap. And we're going to be working with both parties and the United States will be working with both parties to make certain that those roadmap obligations are implemented. I think that is an important role that we can play as a member of the Quartet and as a party with friendly relations with both Israel and the Palestinians.

As to promises, when you come to the negotiation of the establishment of a Palestinian state, I know the negotiators that President Abbas has appointed, I know the negotiators that Prime Minister Olmert has promised -- has appointed. These are experienced people and they are going to look first for a document that will show a way forward. And when we get to final status negotiations, I'm quite certain that it's going to be a very tough and very straightforward negotiation that will have the support of the international community and that will therefore give a basis on which such agreements could be implemented as conditions permit and as the roadmap obligations are fulfilled.

So I'm concerned right now that we create the very best atmosphere possible to keep this momentum going forward. That means that we're going to be paying a lot of attention to the implementation of roadmap obligations in this period, but it also means that we're going to trying to help the parties to come to a document that will help them with that basis for moving forward.

**QUESTION:** Mr. President, you've made clear what you would like to see included in the document include -- based on the previous agreement. I wondered if you could explain a little bit what specifically or whether or not you've been able to reach agreement on any of those issues to include in the document at this point which of those -- which of those proposals you've not been able to include or have -- the Israelis have objected to, and whether or not -- whether or not you feel like the Bush Administration is doing enough to bridge those differences. Thank you.

**PRESIDENT ABBAS:** (Via interpreter) The Israeli and Palestinian delegations started actually their work towards preparing for the document to be taken to the international meeting. Of course, prior to going to Washington this document will be ready.

As for the negotiations, as for that, they will not be open-ended and they will have a timeframe and time limits and schedule in order to accomplish everything that is needed in the near future.

**QUESTION:** Mr. President, you've made clear what you would like to see included in-- the document include based on the previous agreement. I wondered if you could explain a little bit what specifically, or whether or not you've been able to reach agreement on any of those issues to include in the document at this point; which of those proposals you've not been able to include or the have the Israelis have rejected to; and whether or not you feel like the Bush Administration is doing enough to bridge those differences?

**PRESIDENT ABBAS:** (Via interpreter) Of course, Dr. Rice's presence here and her visit is a good indication of the efforts by the Administration, by Mr. Bush's Administration, in order to reach an agreement. As for the issues that we agreed on and/or disagree on, we are on the beginning, the first step of the negotiations, on the road to negotiations, and all the issues that I mentioned and the things that are mentioned in the roadmap plan are issues to be negotiated, but we cannot say now what we agreed on and what we are disagreeing on because we are in the heart, in the middle of these negotiations. Once we reach a conclusion, we hope that things will be clear.

**QUESTION:** (Via interpreter) Dr. Rice, you heard from the Vice Prime Minister Eli Yishai that in order to discuss final status issues and negotiations could lead to the collapse of the Israeli Government, the government of Mr. Olmert. In your opinion, in the opinion of the United States, is the government more important than the peace process in general, or is the peace process more important than the Israeli Government?

**SECRETARY RICE:** Well, I really can't speak to the internal politics of Israel. That's for Prime Minister Olmert to do and for Prime Minister Olmert to decide how he will handle his own internal situation.

The reason that I spoke to a variety of people within Israel's political spectrum, and indeed I will meet with some civil society leaders later on today, is that I think -- sorry, later on this week -- I think that it's important that a variety of people in Israel hear first hand from the United States, from me representing the President, how important we see the establishment of a Palestinian state to be, how important we see it to be because frankly it's time for the establishment of a Palestinian state and it's time for Israel to live in the security that is going to come with a peaceful and democratic neighbor. It's time for Palestinians to have their own state. We've -- everybody's waited a

long time and so the United States feels strongly that this is the time to make a very big effort.

Now there are lots of bridges to cross before we get there. There are many issues to be discussed. There is a question of building the capability of a Palestinian state to actually govern, building its security forces. There are issues that the Israelis will have to deal with as -- that are as Prime Minister Sharon put it "painful compromises" because the land will, from the Israeli point of view, have to be divided. So there are a lot of very difficult issues ahead.

But I wanted, in my own voice, to be able to say to as many people as possible, the United States sees the establishment of a Palestinian state, a two-state solution, as absolutely essential to the future of not just Palestinians and Israelis but also to the Middle East and, indeed, to American interests. And that's really a message that I think only I can deliver.

By the way, we'll also meet with Palestinian civil society and I'm going to deliver the same message there because ultimately the people, the Palestinian people and the Israeli people, have to want an end to this conflict. I believe they do and I think their leadership is reflecting that in the serious work that President Abbas and Prime Minister Olmert are now embarked upon.

But it's hard. I was standing in this room several months ago when all of the questions were would anybody be willing to talk about the core issues. And now we're talking about a joint document that will seriously and substantively address core issues. We've come quite a long way. We've got quite a long way to go. But we're not going to tire until I've given it my last ounce of energy and my last moment in office.

Thank you.

**2007/T17-8**

Released on October 15, 2007

BACK TO TOP

# EXHIBIT Z

Back to Full Graphics

**BASIC INFORMATION**

**Full Country Name:** The Occupied Palestinian Territories

**Country Profile: The Occupied Palestinian Territories**




**BASIC INFORMATION**

**Full Name:** The Occupied Palestinian Territories
**Area:** 6165 square kms
**Population:** Palestinian Central Bureau of Statistics estimate for 2007 approx. 4m. Outside the Occupied Territories, there are between 4.5m and 5m Palestinians. The largest number, between 2.5m and 2.8m, live in Jordan.
**People:** Arab
**Language(s):** Arabic. English is widely spoken
**Religion(s):** Muslim (97%), Christian (3%)
**Currency:** New Israeli Shekel, Jordanian Dinar (West Bank Only)
**Major political parties:** Fatah, PFLP, DFLP, FIDA, People's Party, Hamas (all except Hamas are members of the PLO); 88 elected member Palestinian Legislative Council (PLC)
**President of The Occupied Palestinian Territories :** Mahmoud Abbas (also known as Abu Mazen)
**Prime Minister:** Salam Fayyad
**Foreign Minister:** Dr Riyad al-Maliki

**GEOGRAPHY**

The West Bank is an area of 5800 square kms - roughly 130 km long and 40-65 km wide. It is hilly and for the most part rugged terrain, which changes from desert and scrub landscape in the south to more lush vegetation in the north. The West Bank has an average elevation of 750m, but it also comprises Jericho and the shores of the Dead Sea which, at 390m below sea level, forms the lowest point on earth.

The Gaza Strip is an area of 365 square kms – some 45 km long and 5-12 km wide. The region is mostly flat and the soil is sandy.

**HISTORY**

For a comprehensive historical perspective please visit the **Middle East Peace Process** section of the FCO website.

**POLITICS**

The Palestinian Authority was established in May 1994 following the signature of the Oslo Accord (which included the Declaration of Principles) in September 1993. The Interim Agreement (1995) gave the PA legislative, executive and judicial authority (but not sovereignty) and paved the way for the first presidential and legislative elections in January 1996.

Mahmoud Abbas became President on 15 January 2005 after winning the majority of the vote in presidential elections held on 9 January 2005. He replaced Yasser Arafat, who passed away on 11 November 2004.

Palestinian Legislative Council elections were held on 25 January 2006 (the first parliamentary elections since 1996). Hamas won 74 out of the 132 seats. On 29 March 2006 the newly appointed, Hamas-nominated, 24-member Cabinet of the Palestinian National Authority was sworn in.

Following an escalation in intra-Palestinian violence, Hamas and Fatah agreed, in Mecca, to form a National Unity Government (NUG) on 8 February 2007. The coalition government was sworn in on 17 March 2007, headed by Prime Minister Haniya (Hamas), with independent Ministers of Finance, Home and Foreign Affairs. But intra-Palestinian violence continued and during May there was a dramatic upsurge in both intra-Palestinian factional violence and Israeli-Palestinian violence. On 10 June, the violence in Gaza increased with reports of kidnappings, public executions and looting, culminating in Hamas seizing full control of Gaza. On 14 June, President Abbas dissolved the NUG and declared a state of emergency. On 17 June, he announced the formation of an emergency Palestinian Government headed by Salam Fayyad who also serves as Finance Minister. The Government is currently made up of independent and Fatah Ministers.

**Jerusalem**

Under the UN partition resolution (1947) Jerusalem was to be a 'corpus separatum' under a UN administered Special Regime. But in the 1948 war, Israel occupied West Jerusalem and Jordan occupied East Jerusalem, including the Old City.

In the 1967 war, Israel also occupied East Jerusalem. The Israeli government immediately extended its civil law to the whole city, simultaneously greatly enlarging the municipal boundaries into the West Bank. This purported annexation of East Jerusalem was affirmed in 1980 when Israel enacted its 'Jerusalem Law', formally declaring East and West Jerusalem together, 'whole and united', to be 'the capital of Israel'.

The Declaration of Principles and the Interim Agreement left the issue of Jerusalem to be decided in "permanent status" negotiations between the two parties.

**The UK position on Jerusalem**

The UK position was formally expressed in April 1950, when HMG extended simultaneous de jure recognition to both Jordan and Israel. However, the statement withheld recognition of the sovereignty of either Jordan or Israel over the sectors of the city which each then held, within the area of the corpus separatum as stipulated in UN General Resolutions 181 of 1947 and 303 (IV) of 1949. In the British view, no such recognition was possible before a final determination of the status of this area, although HMG did recognise that both Jordan and Israel exercised 'de facto authority' over those parts of the city and area which each held.

Since the war of 1967, HMG has regarded Israel as being in military occupation of East Jerusalem, and in this connection subject to the rules of law applicable to such an occupation, in particular the Fourth Geneva Convention of 1949. HMG also holds that the provisions of Security Council Resolution 242 (1967) on the withdrawal of Israeli armed forces from territories occupied in the 1967 war applies to East Jerusalem. The Venice Declaration and subsequent statements (both by the UK alone and with EU partners) have made clear that unilateral attempts to change the status of Jerusalem are invalid.

The UN Security Council unanimously adopted Resolution 478 of 1980 in response to the Israeli annexation, declaring it to be a violation of international law. The UK rejects the Israeli measures taken in 1980 to change the status of Jerusalem

Our Embassy to Israel is in Tel Aviv, not Jerusalem. In East Jerusalem we have a Consulate-General, with a Consul-General who is not accredited to any state: this is an expression of our view that no state has sovereignty over Jerusalem. The UK believes that the city's status has yet to be determined, and maintains that it should be settled in an overall agreement between the parties concerned.

The British Government supports the right of the Palestinian people to establish a sovereign and independent Palestinian state and looks forward to early fulfilment of this right, provided there is a concomitant recognition of Israel's right as a state, and the right of its citizens to live in peace with security.

**ECONOMY**

As a result of Israeli restrictions imposed both within the West Bank and Gaza Strip and on Palestinian external economic relations since the start of the Intifada (uprising) in September 2000, the economy has been fragmented. Significant damage has been done to infrastructure, and economic activity and incomes have contracted very sharply. Levels of poverty have increased dramatically, and much of the population is now dependent on food aid.

**Basic Economic Facts (based on 2006 date)**

**Nominal GDP:** US$4.39bn
**Nominal GDP per capita:** US$1,764
**Exports:** $0.5bn
**Export (% growth from 2005):** $-10.2bn
**Import:** $3.5bn
**Trade:** 91.4% of GDP
**Unemployment:** 23.6%

**Major Industries:** Small family businesses producing construction materials, textiles and metal goods
**Major trading partners:** Israel, Jordan

**UK Trade & Investment country profile: West Bank and Gaza**

**INTERNATIONAL RELATIONS**

The Palestinian Authority's relations with Israel are covered in the **Middle East Peace Process** section of the FCO website.

**THE PALESTINIAN AUTHORITY'S RELATIONS WITH THE UK**

The British Consulate General in Jerusalem handles day-to-day relations between the UK and the Palestinian Authority. Its Consular district covers Jerusalem (West and East), the West Bank and Gaza. As well as work on the Middle East Peace Process and other political issues, the Consulate also promotes trade between the UK and the Occupied Palestinian Territories and manages an extensive programme of aid and development work. The latter is undertaken primarily by the DFID office in Jerusalem.

Her Majesty's Consul-General in Jerusalem is Richard Makepeace.

The Palestinian Authority is represented in London by Manuel Hassassian, the Palestinian General Delegate to the United Kingdom, 5 Galena Road, London W6 0LT.

**UK Development Assistance**

The UK Department for International Development's Palestinian programme is a high profile assistance programme dealing with the complex issues surrounding the conflict in Israel and the Occupied Palestinian Territories. With a team of people based in Jerusalem and London, DFID manage an annual programme of £30 million in assistance to the Palestinian people.

Political uncertainty, economic decline and worsening insecurity have characterised the last year and impacted greatly on efforts to reduce poverty in the Occupied Palestinian Territories. In January 2006 the 'Quartet' (EU, Russia, US and UN) set out three principles with which the Hamas-led Palestinian Authority (PA) had to comply in order for support to continue. These were:

- renunciation of violence;
- recognition of Israel; and
- acceptance of previous peace agreements.

The Hamas-led government failed to adopt these principles and as a result, the UK and many other donors suspended financial and technical assistance through the PA. However, the UK and other donors are committed to continue supporting the Palestinian people. One of our greatest achievements has been the lead role we played in the design and implementation of the Temporary International Mechanism (TIM), a funding mechanism to provide direct assistance to the Palestinian people following the suspension of donor budget support to the PA.

In addition to the annual £30 million budget in 2006/07, DFID also provided £40 million through EU contributions. Total EU aid to the Palestinians for 2006, at around €680 million, was higher in 2006 than in 2005.

Since 2004 our assistance programme in the Occupied Palestinian Territories has been built around supporting the

Palestinian Authority (PA) and the United Nations Relief and Works Agency (UNRWA), to help end conflict and create a viable and prosperous Palestinian state. Our judgement is that, for now, the overall direction outlined in the 2004 DFID Country Assistance Plan (CAP) for Palestinians remains valid. The Palestinian Programme's three main objectives remain:

- More effective, accountable and inclusive PA institutions;
- Humanitarian and development assistance delivered more effectively; and
- Enhanced prospects for peace.

We have successfully adapted our programme with these objectives in mind to continue targeted and valuable support.

**Trade and Investment with the UK**

UK trade with the Palestinians is limited, but BG (formerly British Gas) has discovered substantial gas reserves off Gaza. This gas is by far the most valuable Palestinian natural resource, and could become a very important element of the Palestinian economy.

**Cultural Relations with the UK**

The British Council's activities in the Occupied Palestinian Territories are run from their offices in East Jerusalem, headed by Dr Ken Churchill. The British Council also have staff in Gaza, Ramallah, Nablus and Hebron. See more information about this on **The British Council**

The Press and Public Affairs section at the Consulate-General also aims at advancing and enhancing British-Palestinian relations, while promoting values of democracy, human rights and good government through making information about the UK available and accessible.

**HUMAN RIGHTS**

On several occasions the Palestinian Authority has stated its commitment to respecting all internationally recognised human rights standards and to incorporating them fully into Palestinian law.

The practice of detention without trial or charge continues to be used, and beatings and torture are not uncommon in Palestinian detention centres. The death penalty still exists, and was used as recently as 2006. The Palestinian Authority has also refused to condemn the use of violence for political purposes and the targeting of civilians.

**Recent Visits**

**Inward**

- Feb 07: Rt Hon Margaret Beckett
- Dec 06: Rt Hon Tony Blair MP, Prime Minister
- Dec 06: Tony Blair, Prime Minister
- Dec 06: Hilary Benn, International Development Secretary
- Sept 06:Tony Blair, Prime Minister
- July 06: Dr Kim Howells

**USEFUL LINKS AND PAPERS**

**Jerusalem: British Consulate-General**

**British Council Palestinian Territories**

# EXHIBIT AA

ERNST & YOUNG

■ RAMALLAH
P.O. Box 1373
Sixth Floor
Trust Bldg., Jerusalem St. Sixth Floor
Ramallah – Palestine
Tel.: (02) 240 – 1011
Fax: (02) 240 – 2324

■ GAZA
P.O. Box 5315, Omar Al Mokhtar
Third Floor, Suite 307
Al Jala' Tower, Ahmad Abdel Aziz St.
Gaza – Palestine
Tel.: (08) 2821004
Fax: (08) 2828647

**Independent Auditors' Report to the Shareholders of**

**Palestine Investment Fund Company**

We have audited the accompanying consolidated financial statements of Palestine Investment Fund Company (PIF), which comprise the consolidated balance sheet as at December 31, 2006 and the consolidated income statement, consolidated statement of changes in equity and consolidated cash flow statement for the year then ended, and a summary of significant accounting policies and other explanatory notes. The financial statements of Palestine Commercial Services Company (PCSC), Hanadi Tower Company and Bulk Express Company as at December 31, 2006 were audited by other auditors' whose unqualified reports have been furnished to us. Total assets and revenues of these companies represent 4.5% and 8.7% of the total assets and revenues of the consolidated financial statements of the PIF as at December 31, 2006. Our opinion, as far as it relates to the data included in the financial statements of Palestine Commercial Services Company, Hanadi Tower and Bulk Express, is based solely on the reports of the other auditors.

**Management's Responsibility for the Financial Statements**

The Board of Directors is responsible for the preparation and fair presentation of these financial statements in accordance with International Financial Reporting Standards. This responsibility includes: designing, implementing and maintaining internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances.

**Auditors' Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate for the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

ERNST & YOUNG

We believe that the audit evidence we have obtained and the reports of the other auditors is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, based on our audit and based on the reports issued by the other auditors, the consolidated financial statements give a true and fair view of the financial position of Palestine Investment Fund Company as at December 31, 2006 and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards.

Without qualifying our opinion, as depicted in note (10) to the accompanying financial statements, the available for sale investments include mortgaged securities against credit facilities granted to the shareholder, the fair value of these securities as at December 31, 2006 amounted to U.S. $ 381,695,861.

Ernst + Young

Ramallah, Palestine
April 12, 2007

Palestine Investment Fund Company

**Consolidated Balance Sheet**
As at December 31, 2006

| | Note | 2006 U.S. $ | 2005 U.S. $ |
|---|---|---|---|
| **Assets** | | | |
| **Non-current assets** | | | |
| Property, plant and equipment | 4 | 39,767,842 | 43,126,389 |
| Investment properties | 5 | 9,700,630 | 9,700,630 |
| Projects in progress | 6 | 13,051,057 | 11,738,929 |
| Goodwill | 7 | 28,680,176 | 28,680,176 |
| Investments in associates | 8 | 316,211 | 19,133,718 |
| Loans | 9 | 30,705,475 | 31,118,995 |
| Available for sale investments | 10 | 691,824,352 | 872,664,809 |
| | | 814,045,743 | 1,016,163,646 |
| **Current assets** | | | |
| Accounts receivable | 11 | 39,876,782 | 48,928,489 |
| Other current assets | 12 | 13,692,760 | 17,935,377 |
| Cash and cash equivalents | 13 | 24,508,565 | 53,166,375 |
| | | 78,078,107 | 120,030,241 |
| **Total Assets** | | 892,123,850 | 1,136,193,887 |
| **Equity and Liabilities** | | | |
| **Equity attribution to Equity Holders** | | | |
| Paid-in share capital | 14 | 574,000,000 | 574,000,000 |
| Shareholders current account | | (446,047,696) | (314,841,410) |
| Advances on capital increase | 15 | 798,536 | - |
| Statutory reserve | 17 | 32,406,663 | 22,996,535 |
| Proposed cash dividends | 18 | 50,000,000 | 60,000,000 |
| Foreign currency translations | | 3,492,243 | 483,905 |
| Cumulative changes in fair value | 16 | 531,110,404 | 673,166,567 |
| Retained earnings | | 86,659,970 | 51,968,814 |
| | | 832,420,120 | 1,067,774,411 |
| **Minority interests** | | 247,560 | 197,805 |
| **Total Equity** | | 832,667,680 | 1,067,972,216 |
| **Non-current Liabilities** | | | |
| Long-term interest-bearing loans and borrowings | 19 | 7,272,728 | 16,000,000 |
| Finance lease obligations | 21 | 12,027,719 | 12,674,601 |
| | | 19,300,447 | 28,674,601 |
| **Current Liabilities** | | | |
| Short-term interest-bearing loans and borrowings | 20 | 7,301,399 | 4,001,684 |
| Accounts payable | 22 | 17,327,825 | 20,288,313 |
| Provisions and other current liabilities | 23 | 14,084,100 | 13,813,242 |
| Short term finance lease obligations | 21 | 1,442,399 | 1,443,831 |
| | | 40,155,723 | 39,547,070 |
| **Total Liabilities** | | 59,456,170 | 68,221,671 |
| **Total Equity and Liabilities** | | 892,123,850 | 1,136,193,887 |

The attached notes 1 to 36 form part of these consolidated financial statements.

Palestine Investment Fund Company

**Consolidated Income Statement**
For the Year Ended December 31, 2006

| | Note | 2006 U.S. $ | 2005 U.S. $ |
|---|---|---|---|
| **Revenues** | | | |
| Operating income | 24 | 106,104,032 | 114,047,495 |
| Gain from investment portfolio | 25 | 133,454,612 | 241,677,698 |
| Finance revenues | 26 | 2,619,760 | 3,583,092 |
| Share of loss of associates | | (3,780,091) | (503,661) |
| Gain from selling an aircraft | | - | 1,753,117 |
| Other revenues, net | | 5,776,935 | 66,535 |
| | | 244,175,248 | 360,624,276 |
| **Expenses** | | | |
| Operating expenses | 24 | (91,996,772) | (100,142,295) |
| General and administrative expenses | 27 | (7,567,369) | (12,921,312) |
| Depreciation and amortization | | (646,975) | (791,631) |
| Finance costs | | (1,228,298) | (1,953,186) |
| Decline in fair value of available for sale investments | | (15,597,669) | (125,768,068) |
| Loss from disposal of investment in a subsidiary | 28 | (1,791,902) | (4,240,805) |
| Foreign exchange differences | | (2,472,653) | (1,404,503) |
| Impairment of Projects in progress | | (2,062,499) | (10,225,000) |
| Provision for doubtful accounts and advances | | (26,660,072) | (13,879,133) |
| Disposal of goodwill of sold associates | | - | (9,907,205) |
| Impairment of goodwill | | - | (401,237) |
| Provision for litigations and other contingencies | | - | (3,758,134) |
| **Profit for the year** | | 94,151,039 | 75,231,767 |
| Attributable to: | | | |
| Equity holders of PIF | | 94,101,284 | 75,157,208 |
| Minority interests | | 49,755 | 74,559 |
| **Profit for the year** | | 94,151,039 | 75,231,767 |
| Basic and diluted earnings per share | 29 | 0.16 | 0.13 |

The attached notes 1 to 36 form part of these consolidated financial statements.

Palestine Investment Fund Company

## Consolidated Statement of Changes in Equity
For the Year Ended December 31, 2006

| | Equity Attributable to equity holders | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Paid-in share capital | Shareholders current account | Advances on capital increase | Statutory reserve | Proposed Cash dividends | Foreign currency translations | Cumulative changes in fair value | Retained earnings | Minority interests | Total equity |
| **2006** | U.S. $ | U.S. $ | U.S. $ | U.S. $ | U.S. $ | U.S. $ | U.S. $ | U.S. $ | U.S. $ | U.S. $ |
| **At January 1, 2006** | 574,000,000 | (314,841,410) | - | 22,996,535 | 60,000,000 | 483,905 | 673,166,567 | 51,968,814 | 197,805 | 1,067,972,216 |
| Cumulative changes in fair value | - | - | - | - | - | - | (142,056,163) | - | - | (142,056,163) |
| Foreign currency translation | - | - | - | - | - | 3,008,338 | - | - | - | 3,008,338 |
| Total income and expenses for the year recognized directly in equity | - | - | - | - | - | 3,008,338 | (142,056,163) | - | - | (139,047,825) |
| Profit for the year | - | - | - | - | - | - | - | 94,101,284 | 49,755 | 94,151,039 |
| Total income and expenses for the year | - | - | - | - | - | 3,008,338 | (142,056,163) | 94,101,284 | 49,755 | (44,896,786) |
| Advances on capital increase | - | - | 798,536 | - | - | - | - | - | - | 798,536 |
| Transfers to statutory reserve | - | - | - | 9,410,128 | - | - | - | (9,410,128) | - | - |
| Transfers to the shareholder | - | (191,206,286) | - | - | - | - | - | - | - | (191,206,286) |
| Cash dividends | - | 60,000,000 | - | - | (60,000,000) | - | - | - | - | - |
| Proposed cash dividends | - | - | - | - | 50,000,000 | - | - | (50,000,000) | - | - |
| **At December 31, 2006** | 574,000,000 | (446,047,696) | 798,536 | 32,406,663 | 50,000,000 | 3,492,243 | 531,110,404 | 86,659,970 | 247,560 | 832,667,680 |
| **2005** | | | | | | | | | | |
| **At January 1, 2005** | 574,000,000 | (9,803,635) | - | 15,480,814 | 60,000,000 | 1,391,202 | 260,642,564 | 44,327,327 | 123,246 | 946,161,518 |
| Cumulative changes in fair value | - | - | - | - | - | - | 412,524,003 | - | - | 412,524,003 |
| Foreign currency translation | - | - | - | - | - | (907,297) | - | - | - | (907,297) |
| Total income and expenses for the year recognized directly in equity | - | - | - | - | - | (907,297) | 412,524,003 | - | - | 411,616,706 |
| Profit for the year | - | - | - | - | - | - | - | 75,157,208 | 74,559 | 75,231,767 |
| Total income and expenses for the year | - | - | - | - | - | (907,297) | 412,524,003 | 75,157,208 | 74,559 | 486,848,473 |
| Transfers to statutory reserve | - | - | - | 7,515,721 | - | - | - | (7,515,721) | - | - |
| Transfers to the shareholder | - | (305,037,775) | - | - | - | - | - | - | - | (305,037,775) |
| Cash dividends | - | - | - | - | (60,000,000) | - | - | - | - | (60,000,000) |
| Proposed cash dividends | - | - | - | - | 60,000,000 | - | - | (60,000,000) | - | - |
| **At December 31, 2005** | 574,000,000 | (314,841,410) | - | 22,996,535 | 60,000,000 | 483,905 | 673,166,567 | 51,968,814 | 197,805 | 1,067,972,216 |

The attached notes 1 to 36 form part of these consolidated financial statements.

Palestine Investment Fund Company

## CONSOLIDATED STATEMENT OF CASH FLOWS
For the Year Ended December 31, 2006

| | | 2006 | 2005 |
|---|---|---|---|
| | | U.S. $ | U.S. $ |
| **Operating activities** | | | |
| Profit for the year | | 94,151,039 | 75,231,767 |
| **Adjustments:** | | | |
| Net finance costs | | (1,391,462) | (1,629,903) |
| Share of loss of associates | | 3,780,091 | 503,661 |
| Gain from investment portfolio | | (133,454,612) | (241,677,698) |
| Gain from sale of property, plant and equipment | | - | (1,753,117) |
| Non cash expenditures | | 60,651,708 | 156,404,778 |
| **Change in working capital** | | | |
| Accounts receivable | | (13,609,829) | 19,875,624 |
| Other current assets | | 4,242,617 | 21,837,979 |
| Accounts payable | | (2,960,488) | 5,950,215 |
| Provisions and other current liabilities | | 270,858 | 772,284 |
| Finance costs paid | | (1,228,298) | (364,134) |
| **Net cash flows from operating activities** | | 10,451,624 | 35,151,456 |
| **Investing activities** | | | |
| Purchase of property, plant and equipment | | (767,563) | (2,059,711) |
| Proceeds from sale of property, plant and equipment | | 52,518 | 8,936,984 |
| Disposal of an associate assets | | - | 2,536,433 |
| Purchase of investment properties | | - | (354,160) |
| Purchases of available for sale investments | | (2,839,380) | (166,770,484) |
| Sales of available for sale investments | | 151,590,677 | 124,492,240 |
| Projects in progress | | (3,374,627) | (1,416,001) |
| Loans | | (739,785) | (2,119,855) |
| Proceeds from loans | | 325,000 | 26,514,654 |
| Proceeds from sale of investments in associates | | - | 340,000,000 |
| Dividends received | | 11,292,863 | 5,595,270 |
| Interest received | | 248,065 | 664,097 |
| **Net cash flows from investing activities** | | 155,787,768 | 336,019,467 |
| **Financing activities** | | | |
| Cash dividends paid | | (60,000,000) | (60,000,000) |
| Payments of finance lease obligations | | (648,314) | (5,224,660) |
| Repayments of interest-bearing loans and borrowings | | (5,427,558) | 5,919,050 |
| Shareholders withdrawals | | (131,206,286) | (264,315,872) |
| **Net cash flows used in financing activities** | | (197,282,158) | (323,621,482) |
| **Net (decrease) increase in cash and cash equivalents** | | (31,042,766) | 47,549,441 |
| Cash and cash equivalents, beginning of year | | 53,166,375 | 6,524,231 |
| Foreign currency translations difference | | 2,384,956 | (907,297) |
| **Cash and cash equivalents, end of year** | 13 | 24,508,565 | 53,166,375 |

The attached notes 1 to 36 form part of these consolidated financial statements.