# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**THE ESTATE OF YARON UNGAR, et al.,**

        **Plaintiffs – Judgment Creditors,**

        **v.**                        **C.A. No. 00 – 105 L/DLM**

**THE PALESTINIAN AUTHORITY, et al.,**

        **Defendants – Judgment Debtors.**

## PLAINTIFFS – JUDGMENT CREDITORS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF FROM DEFAULT JUDGMENT

### INTRODUCTION

Plaintiffs – judgment creditors ("Ungars") are the orphaned children, parents, siblings and administrator of the estate of United States citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat Ungar in a terrorist machine-gun attack on June 9, 1996, in Israel.

In March 2000, the Ungars filed suit in this Court against the Palestinian Authority ("PA"), the Palestine Liberation Organization ("PLO"), HAMAS and other defendants under the Antiterrorism Act ("ATA") 18 U.S.C. §2331 *et seq.*.

The PA and PLO retained former United States Attorney General Ramsey Clark, Lawrence Schilling, and the firm of Edwards & Angell to defend the suit, and filed repeated

1

motions to dismiss on multiple grounds, as well as an interlocutory appeal, all of which were rejected. *See Ungar v. Palestinian Authority*, 153 F.Supp.2d 76 (D.R.I. 2001); *Ungar v. Palestinian Authority*, 228 F.Supp.2d 40 (D.R.I. 2002); *Ungar v. Palestinian Authority*, 215 F.R.D. 36 (D.R.I. 2003); *Ungar v. Palestinian Authority*, 2003 WL 21254790 (1st Cir. 2003); *Ungar v. Palestinian Authority*, 315 F.Supp.2d 164 (D.R.I. April 23, 2004).

Though the PA and PLO repeatedly invoked the authority of this Court and the First Circuit in order to dismiss the suit, when their arguments were rejected they refused to answer the complaint or conduct any discovery.

Accordingly, on July 12, 2004, this Court ordered entry of final judgment for the Ungars and against the PA and PLO, jointly and severally, in the amount of $116,409,123. *Ungar v. Palestinian Authority*, 325 F. Supp.2d 15 (D.R.I. 2004).[1]

The PA and PLO appealed to the First Circuit, which affirmed the judgment, and a petition for certiorari was denied by the Supreme Court. *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005).

Upon entering final judgment, this Court emphasized the importance that it attached to the judgment being honored and enforced:

> The PA and PLO . . . are responsible for and must bear the ultimate burden of providing compensation, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to June 9, 1996. This Court hopes that in keeping with the ATA's purpose to deter acts of international terrorism, its judgment will "interrupt or at least imperil the flow of terrorism's lifeblood, money," and thus, prevent the PA and PLO from funding future terrorist acts such as the one that resulted in the Ungars' horrific deaths.

---

[1]  The Court received testimony and evidence regarding plaintiffs' damages in the context of entering judgment against Hamas. At plaintiffs' request – to which the PA and PLO did not object – the Court applied those same damages findings in entering judgment against the PA and PLO. *See Ungar*, 325 F. Supp.2d at 24-25, 66-67.

*Ungar*, 325 F. Supp. 2d at 25.

Well over ***three and a half years*** have passed since this Court penned this powerful statement, but the PA and PLO have refused to satisfy the Ungars' judgment, and have informed the Ungars' counsel that they "will never pay" the judgment. This contumacious refusal is merely the encore to years of intentional delay created by the PA and PLO during the underlying suit. *Ungar*, 325 F. Supp.2d at 26, 62 (finding that the PA and PLO took "deliberate actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible").

Other courts have since noted that the Ungars are faced with "an elusive . . . judgment debtor." *Ungar v. Palestinian Authority*, 412 F. Supp.2d 328 (S.D.N.Y. 2006). *See also Estate of Ungar ex rel. Strachman v. Palestinian Authority*, 841 N.Y.S.2d 61, 65 (1st Dept. 2007) (noting the Palestinian "Authority's documented history of engaging in dilatory tactics to plaintiffs' detriment in the underlying and other litigation").

Indeed, in light of the refusal of the PA and PLO to pay the judgment, this Court issued an injunction on May 5, 2005, prohibiting the PA and PLO from withdrawing or transferring any assets they may have in the United States. Exhibit A.

The U.S. Secretary of State has advised the defendants that the judgment of this Court "is final and enforceable in United States courts against property or interests owned by the PA, PLO, or Hamas" and cautioned the defendants "to respond to U.S. legal proceedings in good faith and a timely manner." Exhibit B. Secretary Rice also informed the defendants that if they wish to avoid enforcement actions they should come to terms with the plaintiffs. *Id*.

Defendants have disregarded the sound advice tendered by Secretary Rice, and instead have continued post-judgment the same contumacious pattern of conduct which marred the underlying proceedings before this Court: they have refused to honor the judgment, refused to

comply with post-judgment discovery requests served by the Ungars, and attempted to thwart, frustrate and delay the numerous enforcement proceedings that the Ungars have been compelled (at huge expense and effort) to bring.

Despite the best efforts of the defendants and their affiliates, the Ungars are today on the verge of collecting some or all of their judgment, and await decisions in their enforcement proceedings in several jurisdictions. *See* Declaration of Robert J. Tolchin ("Tolchin Declaration") Exhibit C.

Now, with the Ungars poised to finally receive the compensation awarded them by this Court for the 1996 murder, defendants have filed a motion for relief under Fed.R.Civ.P. 60(b)(6), seeking to set aside the judgment and start this case over again.

As shown below, defendants' motion is not only meritless but frivolous, and should be firmly denied.

## ARGUMENT

## I.    DEFENDANTS' DEFAULT WAS WILLFUL AND STRATEGIC AND RULE 60(b) RELIEF IS THEREFORE UNAVAILABLE

It is an iron-clad rule of federal jurisprudence that willful and strategic defaults are ***never*** to be relieved from under Rule 60(b)(6). *See Ackermann v. U.S.*, 340 U.S. 193, 198 (1950) ("free, calculated, deliberate choices are not to be relieved from" under Rule 60(b)(6)); *Claremont Flock Corp. v. Alm*, 281 F.3d 297, 299-300 (1st Cir. 2002) ("party must be 'faultless' to avail itself of Rule 60(b)(6) relief") (citing *Pioneer Inv. Servs. Co. v. Brunswick Assoc.,* 507 U.S. 380, 393 (1993); *Paul Revere Variable Annuity Ins. Co. v. Zang*, 248 F.3d 1, 6 (1st Cir. 2001) ("[B]y no stretch of the imagination can . . . voluntary, deliberate, free, untrammeled choice[s] compare with the 'exceptional circumstances' found in other [Rule 60(b)(6)] cases . . . The law presumes that parties will make choices to protect their legal interests, even though

those choices may at times involve a calculated risk. Where a party makes a considered choice, though it may involve some calculated risk, he cannot be relieved of such a choice because hindsight seems to indicate to him that, as it turns out, his decision was probably wrong.") (quoting *Ackermann*) (internal quotations omitted); *Lubben v. Selective Service System Local Bd. No. 27*, 453 F.2d 645, 651-652 (1st Cir. 1972) (holding that "an exercise of free choice . . . preclude[s] 60(b)(6) relief" and therefore denying a Rule 60(b)(6) motion filed by the U.S. government since the government's "decision . . . was one of unfettered choice and free will. Having made that choice, the government must now live with its decision.").

Defendants, who are acutely aware that "an exercise of free choice . . . preclude[s] 60(b)(6) relief" (*Lubben*, 453 F.2d at 651), claim in their motion that their default in this action was not willful, but rather the result of their "basic misunderstanding" of the U.S. legal system, and that this "misunderstanding" entitles them to relief from judgment. Defs' Memo at 31-41.[2]

This claim can and should be rejected for multiple reasons:

**First**, it is completely vague and conclusory. Defendants nowhere explain exactly what it is they "misunderstood" about United States law that they have suddenly come to "understand."

**Second**, defendants fail to support this claim with a whit of evidence, because none exists. On the contrary, the Declaration of Salam Fayyad (submitted by defendants in support of their motion) states explicitly that the defendants have (allegedly) abandoned their previous position of recalcitrance regarding the actions brought against them in the United States only because they realized that ***it is in their own self-interest*** to do so:

---

[2] Much of defendants' argument in this section of their memorandum (pp. 31-41) discusses alleged events ***after*** entry of judgment, and the subsequent death of Yasser Arafat. Events which occurred after judgment was entered are of course irrelevant to the question of whether defendants' default was willful. However, the post-judgment chronology is relevant to whether this motion was filed within a reasonable time as required by Rule 60(b), and will therefore be addressed in Part ___ below, which deals with the issue of timeliness.

> It is my belief that there are meritorious defenses to the claims brought in the United States and it is important to the PA to present those defenses. Moreover, **it is important to the PA's role in the international community to participate in the legal process**, even when it is process brought in the United States for actions by others that occurred far from the United States. **The importance of this was not fully appreciated by the PA government, as a whole, until recently. Now we can act on that understanding, and we therefore seek to contest this litigation . . .**

Defs' Exhibit B at ¶ 13 (emphasis added).

Thus, defendants' own witness collapses their entire "misunderstanding" argument, and confirms that their recent change in strategy did not result from the correction of some "basic misunderstanding" of the U.S. law, but rather from a new assessment of their own self-interest.

*Third*, defendants were represented from day one in this case by their longstanding counsel former Attorney General of the United States, Ramsey Clark and Lawrence Schilling as well as by Deming Sherman, the head of the litigation department at one of the largest firms in New England, Edwards & Angell, and several other lawyers from that firm. Defendants' claim that they were unable to understand these proceedings is therefore facially ludicrous.[3]

*Fourth*, these defendants have demonstrated their complete familiarity with the American legal system, and the requirements of answering and conducting discovery, in the matter of *Bucheit v. Palestinian Authority*, No. 00-1455(GK) (D.D.C.). In *Bucheit*, after their

---

[3] Notably, defendants nowhere assert that their counsel failed to keep them properly informed about the progress of the case and implications of defendants' strategy.

Indeed, the fact that Mr. Sherman and Edwards & Angell have remained on as defendants' counsel to this day can only be seen as a vote of confidence in their representation of defendants in the past. Moreover, defendants recently retained Edwards & Angell to represent them in yet *another* terrorism case. *See Saperstein v. Palestinian Authority*, 04-cv-20225-PAS (S.D.Fla), docket caption. Since defendants have now *expanded* the scope of Edwards & Angell's representation, they must surely be satisfied with the advice and representation they have received from that firm until now.

In any event, an attempt by defendants to falsely blame their counsel for their own decisions would have been doomed to failure, since the First Circuit has "consistently 'turned a deaf ear to the plea that the sins of the attorney should not be visited upon the client.'" *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 16 (1st Cir. 2003) (quoting *Farm Constr. Servs., Inc. v. Fudge*, 831 F.2d 18, 21 (1st Cir. 1987)).

6

motion to dismiss was denied the PA and PLO conducted discovery and went to trial, long before their intentional default of this case. *See id*. dkt. # 50 *et seq*.[4]

Similarly, in the *Klinghoffer* litigation, after its Rule 12(b) motions were denied the PLO answered the complaint and proceeded to merits discovery before settling on the eve of trial. *See Klinghoffer v. S.N.C. Achille Lauro*, Nos. 85 Civ. 9303(LLS), 85 Civ. 9708(LLS) (S.D.N.Y.), docket, *passim*. The First Circuit has already held that the PLO's rich experience litigating *Klinghoffer* between 1985-1997 precludes any claim that the PA and PLO – represented by the same counsel and headed by the same person, i.e. Yasser Arafat – are unfamiliar with our legal system:

> [T]he appellants complain that they were deprived of an opportunity to make a proper showing by the district court. In particular, **they complain that the court's handling of the immunity issue – withholding action on their motion for "leave to assert" such a defense, stating during a hearing that immunity was not then being considered, and thereafter deciding the issue – took them by surprise. This procedural objection rings hollow**. The appellants had ample opportunity to file a properly supported motion under Fed.R.Civ.P. 12(b)(1) seeking dismissal on sovereign immunity grounds. They did not need leave of court to file such a motion and assert such a defense. Indeed, they did just that, through the same counsel, in unrelated litigation thirteen years ago. *See Klinghoffer v. S.N.C. Achille Lauro,* 739 F.Supp. 854, 856-58 (S.D.N.Y. 1990), *vacated on other grounds,* 937 F.2d 44 (2d Cir. 1991). **That course of conduct belies their present complaint.**

*Ungar v. Palestinian Liberation Organization*, 2003 WL 21254790 (1st Cir. 2003) (emphasis added).

Defendants' new claim of "misunderstanding" is simply more "playing dumb" of the precise type they tried and failed to peddle to the First Circuit.

---

[4] As discussed below, defendants have refused to pay the final judgment entered against them in *Bucheit*, a case which has nothing to do with terrorism, thereby demonstrating that their claims are pure nonsense cooked up for the purpose of this motion.

**Fifth**, it is an incontestable matter of record that defendants' default was knowing and intentional. This Court expressly found that:

> [I]t is clear that [defendants'] failure to file an answer to Plaintiffs' Amended Complaint is the result of a deliberate choice and not due to an inability to file an answer. The Palestinian Defendants acknowledge that "[t]he drafting and filing of an answer is within defendants' limited capacities . . ." *Id.* at 2. Indeed, it would be almost impossible for them to contend otherwise given their extensive filings as reflected in the above stated travel. In addition, their counsel, Mr. Ramsey Clark, indicated at the hearing on April 1, 2003, that he had met with President Yasser Arafat in December of 2002 in Ramallah. It is reasonable to assume that this lawsuit was among the matters discussed.

*Ungar v. Palestinian Authority*, 215 F.R.D. 36, 39 (D.R.I. 2003).

Indeed, this decision is actually an understatement, because at the hearing on April 1, 2003, Mr. Clark specifically stated that he had expressly discussed this case – "what we call the lead case" – with Arafat and the Palestinian leadership at their meeting in December 2002. Transcript, April 1, 2003, Exhibit D, at 8-9.

This Court reiterated this finding upon entering judgment. *Ungar*, 325 F.Supp.2d at 23 ("[T]hese Defendants decided and instructed their counsel not to answer the Amended Complaint or participate in discovery and therefore, were defaulted.")

Likewise, at a hearing in September 2004 the Court stated:

> I advised these Defendants a long time ago that the proper way to raise the defense of sovereign immunity was to file an Answer and to raise the affirmative defense of sovereign immunity and then I would have a hearing on that matter. I would stay discovery until that matter was resolved.
>
> Mr. Clark came into court and said unequivocally that Yasser Arafat did not want to file an Answer in this case and did not want to defend this case on the merits.

*See* Transcript, September 23, 2004, Exhibit E, at 3.

Similarly, in imposing the sanction of default on the PA for its failure to conduct discovery the Court expressly found that the PA had acted deliberately. *Ungar*, 325 F.Supp.2d at 63 ("the court rejects as implausible its implicit claim that it could not have answered a single interrogatory, responded to a single request for admission, or produced a single document sought by Plaintiffs . . . the proposition that none of the seven persons noticed for deposition would ever be available to be deposed at any time in any place strains credulity . . . I find the PA's failure to answer Plaintiffs' discovery requests to have been willful.").

Defendants did not appeal this Court's findings that their failure to answer and to conduct discovery had been willful; on the contrary, the Court of Appeals found on the basis of defendants' own words that their default had been intentional and designed to accomplish "some obscure strategic aim":

> By the time that the district court ordered the entry of a default, the defendants still had not moved to dismiss on the ground of sovereign immunity. The district court found, and the defendants' own words appear to confirm, that **this recalcitrance was intentional and designed to accomplish some obscure strategic aim.**

*Ungar*, 402 F.3d at 293 (emphasis added).

Accordingly, defendants are now precluded as a matter of law from disputing these findings of willfulness, because Rule 60(b) may not be used to relitigate issues already decided in the underlying case or on appeal. *See e.g. Dasey v. Massachusetts Dept. of State Police*, 111 Fed.Appx. 620 (1st Cir. 2004) (holding that a party "may not use a Rule 60(b) motion to relitigate issues already decided by [the court of appeals], or to raise issues that might have been, but were not, asserted in prior court proceedings.") *George P. Reintjes Co., Inc. v. Riley Stoker Corp.*, 71 F.3d 44, 49 (1st Cir. 1995) ("Rule 60(b) does not license a party to relitigate, whether via motion or independent action, any 'issues that were made or open to litigation in the former action where

he had a fair opportunity to make his claim or defense.'") (quoting Moore, 7 Federal Practice, ¶ 60.37); *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 60 (2nd Cir. 1984) (a party "may not use proceedings seeking relief from or modification of a judgment under F.R.Civ.P. 60 simply to relitigate matters settled by the original judgment."); *In re Wylie*, 349 B.R. 204, 209 (9th Cir.BAP 2006) ("when reconsideration is sought under FRCP 60(b) after the appeal period has expired, the party seeking reconsideration is not permitted to revisit the merits of the underlying judgment or argue that the trial court committed some legal error in arriving at that judgment."); *Standard Quimica De Venezuela v. Central Hispano Intern., Inc.*, 189 F.R.D. 202, 205 n. 4 (D.P.R. 1999) ("a motion under Rule 60(b) cannot be used as a vehicle to relitigate matters already litigated and decided by the court."); *Gibson v. Commissioner of Mental Health*, 2006 WL 2192865 at *2 (S.D.N.Y. 2006) ("Rule 60(b) motions that simply attempt to relitigate issues and thereby circumvent the appellate process are routinely dismissed."); *Batac Dev. Corp. v. B & R Consultants, Inc.*, 2000 WL 307400, at *3 (S.D.N.Y. 2000) (holding that a party "may not . . . use Rule 60(b) as a substitute for appeal or to relitigate matters already resolved by the court adversely to that party."); *Nutter v. Wefald*, 885 F.Supp. 1445, 1450 (D.Kan. 1995) ("Not a substitute for a direct appeal, a rule 60(b) motion addresses matters outside the issues on which the judgment was entered. It is not the opportunity for the court to revisit the issues already addressed in the underlying order . . .") (citation omitted).

Thus, the fact that defendants willfully defaulted this case is *res judicata* today. And that fact also dooms defendants' Rule 60(b) motion, since it is black-letter law that when a defendant's default was intentional, her Rule 60(b) motion must be denied, irrespective of whether she can demonstrate a meritorious defense and an absence of prejudice to the non-moving party:

> A finding of willful default **ends the inquiry,** for when the court finds an intentional failure of responsive pleadings **there need be no other finding.**

*Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (emphasis added).

Likewise:

> [I]f a party willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, **the court need make no other findings** in denying relief.

*Compania Interamericana Export-Import v. Compania Dominicana De Aviacion*, 88 F.3d 948, 951-952 (11th Cir. 1996) (emphasis added).

Similarly,

> Because this Court finds that APT/UK willfully defaulted in this case, **there is no need to consider whether APT/UK had meritorious counterclaims and the possible prejudice to APT/NY if the default judgment is vacated.** *See Bank of Montreal v. Mitsui Mfrs. Bank,* No. 85 Civ. 1519, 1992 WL 79293, at *1 (S.D.N.Y. Apr. 7, 1992) ("A finding of willful default, however, concludes the Court's inquiry under Rule 60(b)"); *Bank United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Assocs.,* 755 F.Supp. 1195, 1205 (S.D.N.Y. 1989) (ruling that if defendant's default was willful, there is "no need to consider whether [defendant] has a meritorious defense and the resulting prejudice to [plaintiff] if the default judgment [were] vacated").

*Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, 2002 WL 562650 at *7 (S.D.N.Y. 2002) (emphasis added). *See also Action S.A. v. Marc Rich & Co., Inc.,* 951 F.2d 504, 507 (2nd Cir. 1991) ("A default should not be set aside when it is found to be willful."); *Jones v. Phipps*, 39 F.3d 158, 165 (7th Cir. 1994) ("[E]ven if [defendant] had a meritorious defense, her failure to demonstrate good cause for her default and quick action to rectify the default is sufficient to deny her motion to vacate the default judgment."); *Ackermann*, 340 U.S. at 198 ("free, calculated, deliberate choices are not to be relieved from" under Rule 60(b)(6)); *Claremont Flock Corp*, 281 F.3d at 300 ("party must be 'faultless' to avail itself of

Rule 60(b)(6) relief"); *Lubben*, 453 F.2d at 651 ("an exercise of free choice . . . preclude[s] 60(b)(6) relief").

**Thus, the Court need go no further. Defendants took an intentional decision to default this case. They are therefore not entitled to Rule 60(b) relief, period, and granting their motion would turn half a century of dispositive decisional law on its head.**

Defendants attempt to evade this fatal defect in their motion with the argument that "courts are generally more lenient in setting aside default judgments obtained against foreign governing entities." Defs' Memo at 39. This argument is meritless, for the reasons below.

In the first place, the cases cited by defendants for this purported rule do not involve "foreign governing entities" as defendants wishfully assert, but rather **foreign states** generally entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"). As this Court and the First Circuit have determined (and as another federal court found again just recently *see Biton v. Palestinian Interim Self-Gov't Auth.*, 510 F.Supp.2d 144, 147 (D.D.C. 2007)), neither the PA nor the PLO is a foreign state.

Accordingly, any such rule of leniency, if it existed, would have no application to these defendants. Indeed, given the history of this case it is astonishing that defendants have the gall to equate themselves with foreign states.

Moreover, an examination of the cases cited by the defendants reveals that they are either no longer good law, or involve facts and circumstance light years from those obtaining here:

Defendants quote *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189 (2nd Cir. 1989) as stating that "Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside."

But the Second Circuit subsequently clarified that *First Fidelity* did ***not*** state any general rule of leniency in respect to foreign states, and was limited to the unique facts of that case:

> [R]elying on *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission,* 877 F.2d 189, 196 (2d Cir. 1989), BAF argues that the default judgment should be set aside under Rule 60(b)(6) because "default judgments are disfavored, especially those against foreign sovereigns." *Id.* at 196. It is true that the *First Fidelity Bank* court stated that "[c]ourts go to great lengths ... to permit [default] judgments against foreign sovereigns to be set aside." *Id.* But *First Fidelity Bank* was a distinctly different case than the one at hand. The issue in *First Fidelity Bank* was the extent to which the foreign sovereign defendant was bound by the actions of its ambassador to the United Nations and whether the district court had jurisdiction in the circumstances. This was a case which had "serious implications for the relationships between the United States and all foreign states that send duly accredited ambassadors to head their diplomatic missions in this country." *Id.* at 196-97 (Newman, J., dissenting). The case before us is fundamentally an ordinary contract dispute which has no such profound implications.

*Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 462 (2nd Cir. 1994).

Indeed, in *Transaero* the Second Circuit affirmed the district court's refusal to set aside a default judgment against a foreign state.

Likewise, in *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2nd Cir. 1994), the Second Circuit affirmed the district court's refusal to grant a foreign state relief from a default judgment.

Defendants' claim that *First Fidelity* creates a special rule of leniency under Rule 60(b) for foreign states (or governments) is thus meritless.

Furthermore, in *Commercial Bank of Kuwait* the Second Circuit took pains to point out that *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986) – which the instant defendants rely upon heavily throughout their papers here – turned primarily on the finding that

the FSIA does not apply retroactively, and in any case is not the law outside of the Eleventh Circuit.

Notably, a subsequent decision of the Eleventh Circuit, *Compania Interamericana Export-Import v. Compania Dominicana De Aviacion*, 88 F.3d 948, 951-952 (11th Cir. 1996), which affirmed a district court decision refusing to set aside a default entered against a foreign state, demonstrates that *Jackson* created no rule of leniency even in the Eleventh Circuit.[5][6]

Defendants' attempt to rely on *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987) is also completely unavailing. There, the district court vacated a default judgment against Bolivia only after finding that it did not have jurisdiction (i.e. that Bolivia was immune) under the FSIA. The court of appeals reversed, finding that Bolivia was not immune from suit. But the court of appeals ***made no decision*** as to whether the default judgment should stand, and merely remanded for the district court to consider whether there was ground to vacate the judgment on the basis of other defenses asserted by Bolivia. *Id.* at 1545. Significantly, the other defenses asserted by Bolivia which concerned the court were jurisdictional defenses − not merits defenses − specifically: that the case was barred by the "act of state doctrine" and by an arbitration agreement. *See id.* at 1545; *Practical Concepts, Inc. v. Republic of Bolivia*, 613 F.Supp. 863, 865 n.1 (D.D.C. 1985). *See also Practical Concepts*, 811 F.2d at 1552 (citing U.S.

---

[5] Defendants seek to distinguish *Compania Interamericana* as dealing with a foreign state instrumentality, rather than with the foreign state itself. This approach is specious, both because under FSIA §1603 the instrumentality of a foreign state is defined as a "foreign state" and is entitled to full sovereign immunity, and because some of the cases cited by defendants themselves in purported support of their "leniency" theory (*e.g. Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989)) involve agencies or instrumentalities of foreign states. Indeed, the First Circuit explicitly cited *Compania Interamericana* as "permitting entry of default **against foreign state** due to its willful failure to comply with court orders." *Ungar*, 402 F.3d at 294 (emphasis added).

[6] It is highly significant, and not a coincidence, that all or virtually all the cases cited by the defendants (*Jackson, First Fidelity, Practical Concepts*) are from the 1980s, and that the cases declining to open defaults against foreign states (*Transaero, Compania Interamericana*) are later cases. The FSIA was passed only in 1976, and it is understandable that in the first few years subsequent to its enactment courts may have been willing to forgive foreign states which were truly caught unawares by the elimination of the doctrine of absolute immunity which had obtained until then. But by the 1990s, two decades after the FSIA had been enacted, any such liberal tendency in the case law had vanished.

amicus brief for importance of allowing a defendant foreign state to assert "legal" defenses in respect to default judgment).

Thus, not only does *Practical Concepts* provide no support for the instant defendants' demand to set aside the judgment in order to now litigate on the *merits*, but on the contrary, the court of appeals explained at length that a defendant which intentionally defaults *forfeits the right to litigate on the merits*. *Practical Concepts*, 811 F.2d at 1557-1548.

Furthermore, in all of the cases cited by defendants in which default judgment against a foreign state was vacated, the default judgments were set aside specifically because the court determined as a threshold matter of law that the sovereign was immune (*Jackson, Practical Concepts*) or because the sovereign immunity issue – and thus the court's subject-matter jurisdiction – had not yet been litigated (*First Fidelity, Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989), *Hester Intern. Corp. v. Federal Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989)).

Thus, (aside from the dispositive fact that the defendants are not foreign states) none of these cases is apposite here because the defendants' immunity and the Court's subject-matter jurisdiction are *not* at issue in this case; on the contrary, their immunity argument was rejected *three times* before judgment was entered – twice by this Court (*see Ungar*, 228 F.Supp.2d 40; *Ungar*, 315 F.Supp.2d 164) and once by the Southern District (*see Knox v. Palestine Liberation Org.*, 306 F.Supp.2d 424 (S.D.N.Y. 2004)).

Indeed, in *Gregorian*, the Ninth Circuit expressly held that a foreign state's belief that it was immune from U.S. jurisdiction would be considered "reasonable" – and its default therefore not "culpable" conduct under Rule 60(b) – *only* "until it has received a definitive indication to the contrary from the United States courts." *Gregorian*, 871 F.2d at 1525.

15

Therefore, since the instant defendants' immunity claims received not one but **multiple** "definitive indication[s] to the contrary from the United States courts" long before judgment, the defendants' default was clearly "culpable" even under the liberal rule set by the Ninth Circuit in *Gregorian* (which has not been adopted by the other circuits).[7]

Finally, the cases cited by defendants by defendants are wholly inapposite because in almost all of those cases (*Hester* appears to be the sole exception), the foreign defendant did not even appear in the case until **after** the default judgment had entered.

Here, of course, defendants not only appeared by counsel from day one – by the same counsel representing them today – but filed repeated motions to dismiss on every ground known to the federal rules, took an interlocutory appeal, appealed the final judgment, sought *en banc* review of the appellate decision and sought a writ of *certiorari* from the Supreme Court. Thus, this case was intensively litigated, the judgment herein is a default judgment only in the most technical, narrow sense of the term, and for these defendants to compare themselves to non-appearing defendants is simply laughable.

Such a comparison is also grossly impertinent. The instant defendants, in stark contrast to the defaulting foreign states in the cases which they cite, not only appeared in this case but **intentionally delayed the legal proceedings by a series of bad-faith abuses**, as this Court expressly found. *See Ungar*, 325 F.Supp.2d at 26 (noting defendants' "deliberate actions to delay the completion of this litigation"); Transcript, September 23, 2004, Exhibit E, at 3 ("[T]here is some disingenuous conduct here and some attempts to delay the ultimate resolution of this case. This has been true throughout.").

---

[7] Moreover, even *Gregorian* applies only to the issue of whether an **acknowledged** foreign state, which is **presumptively** subject to the FSIA, reasonably believes that none of the FSIA exceptions to immunity applies. There is not the slightest evidence that *Gregorian* would apply to an entity **claiming to be** a "foreign state".

By contrast, the defaulting foreign state defendants in the cases defendants cite did not abuse the proceedings, they simply stayed away. Had they behaved in the same way as these defendants, they would not have been granted relief.

The PA/PLO not only delayed this case for years, they brazenly attempted a fraud on this Court: defendants submitted to this Court a declaration by their chief representative in the United States, Mr. Abdel Rahman, in which he swore under penalty of perjury that the PA had no representative in the United States, despite the fact – as this Court later found on the basis of "overwhelming" evidence– that Abdel Rahman *himself* was in fact the chief representative of the PA to the United States and had so represented himself to the Treasury Department, to the Senate and in his own biography. *See Ungar*, 325 F.Supp.2d at 56-59.

Needless to say, the defaulted foreign states in the cases to which the PA/PLO now point did not submit perjured affidavits to a federal court in an underhanded effort to deceive them into concluding that they lacked personal jurisdiction, and had they done so, they would not have received any relief whatsoever.

For the PA/PLO, with their track record of *calculated* bad-faith conduct, to now seek to cloak themselves in the mantle of the innocent and unwitting defaulting foreign defendants in the cases they cite, is truly the apogee of cynicism.

Indeed, defendants' contumacious conduct in the underlying action, standing alone, constitutes additional grounds to deny the instant motion. *See e.g. Class v Norton*, 376 F. Supp. 503 (D.C. Conn. 1974) *aff'd in part and rev'd in part on other grounds* 507 F.2d 1058 (2nd Cir. 1974) (extensive noncompliance by defendants with court's previous orders is significant consideration in determination whether relief under Rule 60(b)(6) is appropriate); *Griffin v. Swim-Tech Corp.*, 722 F.2d 677 (11th Cir. 1984) (district court properly denied motion under

Rule 60(b)(6) where judgment had been based upon inexcusable delay and numerous unjustified violations of court orders by moving party); *Allemand Boat Co. v Kirk*, 141 F.R.D. 438 (E.D. La. 1992) (justice would have been disserved by granting relief under Rule 60(b)(6) since defense counsel had disregarded rules of court, refused to accept guidance from court and opposing counsel, and had otherwise interfered with efficient administration of justice).

***

In sum, defendants' default was fully informed, intentional and strategic, and Rule 60(b)(6) relief is unavailable to them irrespective of whether they can demonstrate absence of prejudice to the Ungars and a meritorious defense (which, as will be shown *infra*, they cannot).

## II.   DEFENDANTS' "MISUNDERSTANDING" CLAIM IS A RULE 60(b)(1) ARGUMENT AND IS THEREFORE BARRED AS UNTIMELY

Defendants' claim that their default resulted from a "misunderstanding" of the American legal system (which, as shown above, is a blatant falsehood), must also be rejected for the wholly separate reason that this claim is clearly one of "mistake, inadvertence, surprise, or excusable neglect" governed by Rule 60(b)(1), and therefore subject to the one-year time limit under that rule.

Any doubt that the instant motion is in fact an untimely Rule 60(b)(1) motion can be swiftly and dispositively dispelled by defendants' statements on page 37 of their memorandum, where they assert:

> The state of mind necessary to warrant rigid adherence to a default judgment is nuanced and heavily dependent on the facts. The D.C. Circuit has recently emphasized that political turmoil can properly be weighed in the default calculus when it hampers a foreign government's ability to defend. *FG Hemisphere Assocs., LLC*, 447 F.3d at 841 ("DRC [the Congo] was plainly hampered by its devastating civil war, which cost over three million lives [and] shattered the DRC's already shaky political structure . . . It is not surprising that the war would be accompanied by substantial

> confusion over responsibilities in the Foreign Ministry . . ."). As noted, at crucial stages of the litigation, the Occupied Palestinian Territories have been in a state of considerable turmoil -- turmoil that prevented Defendants from understanding the importance of full and complete participation in foreign litigation involving acts in Israel perpetrated by HAMAS.

Defs' Memo at 37.

By citing and quoting *FG Hemisphere* extensively, both here and elsewhere in their papers, defendants have effectively conceded the instant motion is a Rule 60(b)(1) motion, since *FG Hemisphere* is a Rule 60(b)(1) case. *See FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, 447 F.3d 835, 838 (D.C.Cir. 2006). In other words, by analogizing their circumstances and arguments to those of the Congo in *FG Hemisphere*, defendants have clearly affirmed that those arguments are controlled by Rule 60(b)(1).

Since defendants' arguments are governed by Rule 60(b)(1), they cannot serve as grounds for relief under Rule 60(b)(6), as the First Circuit found in a recent decision on all fours with the instant case and worth quoting at length:

> Rule 60(b) contains six subsections, the first five of which set forth specific grounds for relief. Subsections (1) through (3) carry a one-year time limit, while motions for relief under subsections (4) through (6) need only be made "within a reasonable time." *See Cotto v. United States,* 993 F.2d 274, 278 (1st Cir.1993). Subsection (6) is designed as a catch-all, and relief under that subsection "is only appropriate where subsections (1) through (5) do not apply." *United States v. Baus,* 834 F.2d 1114, 1121 (1st Cir.1987). "To justify relief under subsection (6), a party must show extraordinary circumstances suggesting that the party is faultless in the delay." *Pioneer Inv. Servs. Co. v. Brunswick Assoc.,* 507 U.S. 380, 393, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (internal quotation marks omitted). If a party is "partly to blame," Rule 60(b)(6) relief is not available to that party; instead, "relief must be sought within one year under subsection (1) and the party's neglect must be excusable." *Id.*
>
> Here, in seeking Rule 60(b)(6) relief, Alm characterizes himself as a foreigner unfamiliar with the American legal system and, on that

19

basis, attempts to absolve himself of any fault for his failure to respond to court orders, motions, correspondence and discovery requests. He claims that he believed that his letter answer to the court put an end to the litigation, and therefore he was not surprised or concerned when he did not receive any further correspondence or notices regarding the court dispute.

The district court found, however, that "Alm was a sophisticated international businessman who chose not to contact American counsel after he was served with the complaint." Furthermore, it is undisputed that Alm made no efforts to confirm that the lawsuit had been dismissed or withdrawn or to notify counsel or the court of an alternative mailing address. Nor is there any indication that Alm attempted to compel his wife to forward or preserve his mail. *See Cotto*, 993 F.2d at 278 ("[I]n our adversary system of justice, each litigant remains under an abiding duty to take the legal steps necessary to protect his or her own interests."). Accordingly, the district court determined that the default judgment was "attributable to [Alm's] own negligence and not to extraordinary circumstances beyond the party's control." The district court did not abuse its discretion in drawing this inference of fault from the evidence in the record.

Accordingly, Alm cannot avail himself of Rule 60(b)(6) relief but rather is limited to seeking relief from judgment on grounds of excusable neglect pursuant to Rule 60(b)(1). *See Pioneer,* 507 U.S. at 393, 113 S.Ct. 1489 (holding that party must be "faultless" to avail itself of Rule 60(b)(6) relief). Any such request on that basis, however, would be untimely. As discussed *supra*, a litigant may move for Rule 60(b)(1) relief only within one year of the entry of judgment. *See* Fed.R.Civ.P. 60(b) ("The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."). Here, Alm filed his motion for relief over fourteen months after the court entered final judgment against him; thus any claim to Rule 60(b)(1) relief is time-barred.

*Claremont Flock Corp. v. Alm*, 281 F.3d 297, 299-300 (1ˢᵗ Cir. 2002).

The difference between Mr. Alm and the PA/PLO, of course, is that the latter intentionally defaulted for strategic reasons – conduct which is precisely the opposite of the "faultless" standard demanded by *Pioneer*.

For this reason, too, defendants' motion should be denied.

**III.    THE PROPRIETY OF THE ENTRY OF JUDGMENT BY DEFAULT WAS ALREADY CONCLUSIVELY LITIGATED AND CANNOT BE CHALLENGED IN A RULE 60(b) MOTION**

The instant motion can and should be denied for the additional reason that the very grounds for Rule 60(b) relief asserted by the defendants were already rejected by this Court and the First Circuit in the underlying action, as discussed below.

Defendants argue that the judgment should be set aside under Rule 60(b)(6) because when they refused to answer the complaint or conduct discovery:

> Defendants acted to protect what they reasonably perceived to be their rights under international law by asserting only jurisdictional and justiciability defenses. Although the First Circuit and this Court ultimately did not accept this legal position, Defendants' approach to the litigation was not so unreasonable as to warrant the imposition of multi-million dollar liability by default.

Defs' Memo at 31-32.

But this argument, which is the gravamen of defendants' motion, is ***precluded***, because Rule 60(b) may not be used to relitigate issues already decided in the underlying case or on appeal. *See e.g. Dasey*, *supra*, (a party "may not use a Rule 60(b) motion to relitigate issues already decided by [the court of appeals], or to raise issues that might have been, but were not, asserted in prior court proceedings.") *George P. Reintjes Co.*, *supra*, ("Rule 60(b) does not license a party to relitigate, whether via motion or independent action, any 'issues that were made or open to litigation in the former action where he had a fair opportunity to make his claim or defense.'").[8]

The precise argument now made by the defendants in support of their Rule 60(b) motion – that they should not be "penalized" for their refusal to answer, because it stemmed from a

---

[8] See also the extensive cases cited above.

principled legal position – was raised by them on appeal, and thoroughly considered and rejected

by the First Circuit. In dismissing this argument the First Circuit held:

> The defendants … refused either to answer the amended complaint or to comply with the court's discovery orders. In view of [the] history, we believe that the district court acted well within the encincture of its discretion in entering the default. *See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951-52 (11th Cir. 1996) (permitting entry of default against foreign state due to its willful failure to comply with court orders). The defendants deliberately chose to hold off on asserting a sovereign immunity defense – and **they must live with the consequences of that choice.**

*Ungar*, 402 F.3d at 293-294 (emphasis added). The First Circuit explained the rationale for this

result as follows:

> [A]n entity alleging an entitlement to sovereign immunity may choose to ignore an action or court order directed at it, accept a default, and then assert its immunity at a later state of the litigation. But such a choice represents a rather risky gamble. If the assertion of immunity is valid, the defendant wins the entire pot (i.e., it walks away from the suit unscathed) **but if the assertion of immunity fails, the defendant loses outright (i.e., it must live with the default).**

*Ungar*, 402 F.3d at 293, n. 11 (emphasis added).

Thus, the First Circuit has already held, exactly contrary to defendants' claim that their

"approach to the litigation was not so unreasonable as to warrant the imposition of multi-million

dollar liability by default" (Defs' Memo at 31-32), that "defendants must live with the

consequences of [their] choice" i.e. that since their "assertion of immunity fail[ed]" defendants

"lose[] outright (i.e., [they] must live with the default)." *Ungar, id..*

Accordingly, this entire argument has been litigated and so cannot serve as grounds for a

Rule 60(b) motion. *See e.g. Dasey*, *George P. Reintjes Co.*, *supra.* Indeed, if this Court were to

entertain this argument, it would in effect be reviewing the decision of the First Circuit as to the

propriety of the default judgment, and ultimately granting the defendants' a new appeal on this issue – to which they are not entitled – on any new findings that it makes.

Defendants' motion must therefore be denied.

## IV. DEFENDANTS' OTHER GROUNDS FOR RELIEF WERE ALREADY RAISED AND REJECTED IN THE UNDERLYING LITIGATION, AND IN ANY CASE ARE BASELESS, UNSUPPORTED AND HOPELESSLY VAGUE

Defendants also demand that the judgment be vacated (a) because of the purported "significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case" and (b) because the judgment will purportedly "Have a Devastating Financial Effect on the Palestinian People and Government." Defs' Memo at 38-44. As shown below, both of these arguments are utterly meritless.

In support of their "foreign policy consequences" claims, defendants present only a two-sentence argument, asserting that: "this judgment has already been the subject of diplomatic communications at the highest levels between our country's representatives in the State Department and the governing officials in the Occupied Territories. If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian government – a relationship that the Executive Branch of the United States government has characterized as being crucial to the Israeli-Palestinian peace process." Defs' Memo at 38-39.

Clearly, the fact that a foreign defendant has communicated with the State Department to complain about a law suit in U.S. courts is meaningless. And the claim that the judgment threatens to undermine the relationship between the United States and the PA is entirely vague.

Moreover, the defendants have been making identical claims all along – yet, the plain fact is that their relationship with the United States has never been warmer than it is now, and the peace process is back in full swing today:

➢ In the underlying case the defendants repeatedly warned that if this action were not dismissed the peace process would be destroyed. *See e.g.* Defendants' Motion Under Rule 8(A)(2) for a Stay Pending Appeal, April 22, 2003, *Ungar v. Palestinian Authority*, No. 03-1544 (1st Cir.), Exhibit F, at ¶ 14 ("Proceedings in this case in which the District Court assumes a stateless condition for the Palestinian people will have important political and governmental ramifications affecting the peace process in the Middle East, the Palestinian-Israeli conflict and violence"); *Id*. at ¶ 21("Large default judgments which in similar cases involving Iran, Rwanda, Bosnia and other governments and political movements and leaders have resulted in damages ranging from over one billion dollars to hundreds of millions of dollars. Such judgments can complicate a final settlement between Israel and Palestine"); Memorandum in Support of Palestinian Defendants' Objection to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2), August 21, 2003, dkt. # 221, at 2 ("discovery and this action generally pose a drastic, unacceptable threat to the Israeli-Palestinian peace process"); Memorandum in Support of Palestinian Defendants' Motion for Continuance of July 14, 2003 Hearing and Motion for Enlargement of Time to Respond to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2), July 11, 2003, dkt. #188, at 4 ("There are serious impediments to the entry of default judgment against defendants at this time. Defendants once again urge the Court to take judicial notice of . . . the extremely important public interests at stake in the current ongoing fragile peace process which in themselves provide an ample basis for forbearance.").

➢ After judgment was entered and the Ungars initiated their enforcement proceedings, PA finance minister Fayyad wrote to Secretary of State Rice on June 18, 2005, complaining fulsomely about the difficulties purportedly being suffered by the defendants,

warning in full hair-raising detail about the alleged threat to the defendants' financial stability, to peace efforts and to U.S. interests in the Middle East, and demanding that the United States intervene in the proceedings on the defendants' behalf. *See* letter from Salam Fayyad to Condoleezza Rice, June 18, 2005, Exhibit G.

➢     Defendants raised the same claims about a threat to the peace process and to their relationship with the United States in yet another letter they sent to Secretary Rice in April 2006. *See* letter from Afif Safieh to Condoleezza Rice, April 27, 2006, Exhibit H.

Thus, defendants have been sounding the tocsin of doom for the peace process and the U.S.-Palestinian relationship for years now, both prior and subsequent to judgment. Notwithstanding defendants' gloomy prognosis, however, the empirical fact is – as defendants themselves point out at length in the motion papers – that the United States today maintains a close relationship with the defendants' new leadership. Furthermore, it is a matter of public record (which will be discussed further below) that Israeli-Palestinian peace negotiations are back on track now for the first time in years.

In light of the above, it is clear that the instant judgment has done nothing whatsoever to harm either the peace process or defendants' relationship with the United States, both of which have newly-flourished in recent months.

Defendants' demand to set aside the judgment because of the allegedly "devastating" financial effect it will have is equally baseless. Moreover, this argument is barred at the threshold, because it was made by defendants in the underlying litigation and resoundingly rejected by this Court:

> These Defendants argue that the ultimate burden of this compensation will be borne by an impoverished and oppressed Palestinian people who currently suffer from a continuing humanitarian crisis. Defendants are hard pressed to succeed with

> this argument given the fact that they deliberately stated their intentions not to participate in and thus, waived a hearing on damages.
>
> Defendants' arguments are offensive at best . . . ***The PA and PLO, and not an impoverished and oppressed Palestinian people, are responsible for and must bear the ultimate burden of providing compensation***, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to [the murder].

*Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 24-25 (D.R.I. 2004) (emphasis added). *See also e.g.* Defendants' Motion Under Rule 8(A)(2) for a Stay Pending Appeal, April 22, 2003, *Ungar v. Palestinian Authority*, No. 03-1544 (1st Cir.), Exhibit F, at ¶ 22 ("Palestine is totally impoverished, its economic viability will depend on the terms of the peace agreement . . . its per capital income is less than 10% of the per capital of Israel and the political resolution of this conflict should not be burdened by extra territorial private tort litigation in U.S. courts.").

As discussed above, arguments litigated and lost in the underlying litigation cannot serve as grounds for a Rule 60(b) motion.

Furthermore, since spring 2005, the Ungars have restrained well over $100 million dollars of defendants' funds. *See* Exhibit C, Tolchin Declaration at ¶¶ 1-7. Yet, clearly, defendants have not collapsed as a result. Therefore, there would be no collapse if the Ungars succeed in enforcing their judgment against those long-frozen funds.

In a truly Orwellian twist, defendants point to the fact that they just received funding of some $7.4 billion as proof of their precarious situation. Defs' Memo at 42-43. But what defendants fail to inform the Court is that they had ***only sought*** funding of $5.5 billion to cover their needs, and that they now have a surplus of some $2 billion beyond their requirements. *See* Exhibits I.

Notably, moreover, defendants' entire claim of financial ruin is completely unsupported by any evidence, or any hard facts or figures about their current financial state, despite the fact that nothing would be easier than for them to submit such documentation.

Finally, defendants' argument that the judgment should be vacated because of specific enforcement actions taken by the Ungars is completely nonsensical. If the PA has an objection to a given enforcement proceeding, it can seek to oppose that proceeding. What could that possibly have to do with the underlying judgment?

This argument is particularly galling, considering that the PA itself has disregarded the judgment of this Court on the Ungars' creditor's bill in September 2006, awarding ownership of the Palestine Investment Fund ("PIF") to the Ungars. The PA's own financial publications show that the PA withdrew some $27 million dollars from the PIF between October – December, 2006 – i.e. *after* the PIF had been assigned to the Ungars. *See* Declaration of Marwan Abdel-Rahman, Exhibit J, at ¶ 3, Appendix 1.

A defendant which behaves lawlessly in this manner, brazenly disregarding the judgments of this Court (both the underlying judgment and the September 2006 judgment) is in no position to complain to the Court, and is certainly not entitled to equitable relief under Rule 60(b)(6).

## V.    THE UNGARS WILL BE SEVERELY AND IRREPARABLY PREJUDICED IF THE JUDGMENT IS VACATED

A party seeking relief under Rule 60(b) bears the burden of proving that vacating the judgment will not prejudice the opposing party. *Caisse v. DuBois*, 346 F.3d 213, 215 (1st Cir. 2003) ("To succeed on a Rule 60(b) motion, the movant must show that . . . vacating the judgment will not cause unfair prejudice to the opposing party.").

Defendants have not even attempted to meet their burden of proving that vacating the judgment will not harm the Ungars, and for good reason: vacating the judgment would cause the Ungars severe and irreparable prejudice, as the defendants know full well and as is shown below.

### A.    Key Deponents Are Dead or Unavailable and an Entire Universe of Responsive Documents Is Unavailable

In the First Circuit, "prejudice cannot be inferred merely from the passage of time but, instead, relates to whether 'witnesses have died,' 'memories have dimmed beyond refreshment,' a 'discovery scheme has been thwarted,' or 'evidence has been lost' during the time that elapsed from a party's default." *Snyder v. Talbot*, 836 F.Supp. 26, 30 (D.Me. 1993) (quoting *Coon v. Grenier*, 867 F.2d 73, 76 (1st Cir. 1989)). *See also e.g. Reilly v. Keystone Health Plan East, Inc.,* 1998 WL 422037 at *2 (E.D.Pa. 1998) ("Prejudice is demonstrated where 'circumstances have changed since the entry of the default such that plaintiff's ability to litigate its claim is now impaired in some material way or if evidence has become lost or unavailable.'") (quoting *Angelo Bros. v. A & H Co.,* 1996 WL 571720 at *2 (E.D.Pa. 1996)).

That is exactly the situation here: vacating the judgment in this action would cause the Ungars extreme prejudice – indeed, would leave them with no effective means of litigating this case – because since entry of judgment in this case, in July 2004, crucial witnesses have died or left the employ of the defendants, and an entire universe of relevant documents has been lost.

### i.    Arafat Has Died

Judgment entered in this case on July 13, 2004. Yasser Arafat, who was both the president of the PA and the chairman of the PLO, died four months later, on November 11, 2004. *See* Exhibit K.

This Court has accurately summarized the allegations of this case as follows:

> *Plaintiffs, in essence, allege that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts of terrorism, including the attack on Yaron Ungar and his wife.*

*Ungar*, 325 F.Supp.2d at 62.[9]

Arafat was named as a defendant in this action. Plaintiffs' complaint expressly alleged that Arafat was personally and directly involved in the PA's and PLO's provision of material support to Hamas. *See* Complaint, dkt. #1, at ¶¶ 29-41.

Though Arafat was dismissed from this case for lack of personal jurisdiction (*Ungar*, 153 F.Supp.2d at 95), in light of his direct, personal involvement in the provision of material support to Hamas by the PA and PLO, the Ungars sought to depose him in his official capacity as president of the PA regarding those activities. *Ungar*, 325 F.Supp.2d at 40, n. 22.

Accordingly, on January 24, 2003, the Ungars noticed Arafat's deposition in his capacity as president of the PA. *See* dkt. # 103; *Ungar*, 325 F.Supp.2d at 40. However, the PA refused to produce Arafat for his deposition, despite repeated extensions and warnings by the Court. *Ungar*, 325 F.Supp.2d at 41-43, 60-64.

It is obvious that if the judgment in this matter is vacated and the Ungars required to litigate without the benefit of Arafat's testimony, they would be severely prejudiced. Indeed, this Court has ***already*** found that the Ungars are entitled to depose Arafat, and are prejudiced by the absence of Arafat's testimony:

> As for the prejudice to Plaintiffs, it is clear that the PA's refusal to provide any discovery greatly prejudices Plaintiffs' ability to prove their claims. Plaintiffs, in essence, allege that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts

---

[9] Plaintiffs alleged that this conduct by the PA and PLO constituted both "international terrorism" and aiding and abetting "international terrorism" under 18 U.S.C. §2333, as well as the torts of Negligence, Breach of Statutory Obligation and aiding and abetting Assault under Israeli law. Amended Complaint ¶¶ 38-82.

of terrorism, including the attack on Yaron Ungar and his wife. *See* Amended Complaint ¶ 35. By refusing to answer any interrogatories, admit any facts, produce any documents, or produce any officers or employees for depositions, the PA effectively frustrates the Plaintiffs' ability to prove their claims.

*Ungar*, 325 F.Supp.2d at 62.

The Court's holdings that the Ungars were entitled Arafat's testimony, and that the absence of that testimony prejudices the Ungars, are the law of the case and cannot be challenged by defendants in this motion. *George P. Reintjes*, 71 F.3d at 49 ("Rule 60(b) does not license a party to relitigate, whether via motion or independent action, any 'issues that were made or open to litigation in the former action where he had a fair opportunity to make his claim or defense.'"); *Standard Quimica De Venezuela*, 189 F.R.D. at 205 n. 4 ("a motion under Rule 60(b) cannot be used as a vehicle to relitigate matters already litigated and decided by the court."); *Nutter*, 885 F.Supp. at 1450 ("Not a substitute for a direct appeal, a rule 60(b) motion addresses matters outside the issues on which the judgment was entered. It is not the opportunity for the court to revisit the issues already addressed in the underlying order . . .") (citation omitted).

Moreover, Arafat is not some run-of-the-mill witness, the substance of whose testimony can be gleaned from other sources. On the contrary, the Ungars alleged from day one in this suit that Arafat **personally led and orchestrated** defendants' provision of material support and resources for Hamas (*see* Complaint, dkt. #1, at ¶¶ 29-41), including specifically the provision of financial support for Hamas' terrorism (*see Ungar*, 325 F.Supp.2d at 64).

Indeed, **defendants themselves admit that decision-making in the PA was highly centralized in the person of Arafat when he was alive**. *See* Defs' Exhibit E at ¶ 3. Thus, since Arafat was the central decision-maker in the PA in his day, any serious attempt to discover the

facts of the PA's provision of material support to Hamas during Arafat's reign would *per se* necessarily require an examination of Arafat himself.

Finally, while the plaintiffs' allegations that Arafat personally directed and supervised defendants' terrorism may not have been common knowledge when this action was filed, they have subsequently been resoundingly confirmed by the United States government:

- On April 30, 2003, in a statement officially published by the White House, the White House spokesman confirmed that:

   > Yasser Arafat was not a party to peace. Yasser Arafat was a part of the problem . . . Yasser Arafat lied to President Bush . . . and **actively worked on behalf of the terrorists**, lying to the President of the United States about Palestinian support, **led by Yasser Arafat, for terrorism**.

   Exhibit L, p. 7 (emphasis added).[10]

- On May 4, 2006, the State Department declassified a report confirming that Arafat was personally involved in the abduction and murder of two U.S. diplomats by PLO terrorists in Khartoum. Exhibit M.

- In January, 2007, Secretary of State Rice publicly confirmed that Arafat "had one foot in terror and one foot in politics" and that under Arafat's rule the PA had been "overrun by its ties with terrorism." Exhibit N, p. 5.

In sum, Arafat was the central figure in defendants' provision of material support and resources to Hamas, and it would be impossible for the Ungars to fairly litigate this action without his testimony.[11]

---

[10] Downloaded from http://www.whitehouse.gov/news/releases/2003/04/print/20030430-10.html.

[11] Indeed, even if Arafat, the other deponents and the documents were all available today – and they are not – for the Ungars to attempt to put on their case at this late date, nearly 12 years after the murder itself and some 14 years after the defendants' provision of material support to Hamas commenced, would be extraordinarily difficult:

It is all too convenient for defendants to "repent" and demand a trial on liability now that Arafat, the main witness in this case, is dead and his testimony is unavailable to the Ungars. But defendants fail to realize that some things in life, such as the loss of Arafat's testimony, are simply irreversible and irreplaceable. Defendants can no more demand a trial on the merits now than they can bring Arafat back to life.

### ii.    Deponent Razi Jabali Is No Longer Employed by Defendants and Currently Serves as an Advisor to the Leader of Hamas in Damascus

The Ungars also noticed the deposition of Razi Jabali. *See* dkt. # 103.[12] Jabali was the commander of the PA Police, and was alleged by plaintiffs to have been personally involved with the provision of material support to Hamas by the PA and PLO. *See* Complaint, dkt. # 1, at ¶¶ 14, 17, 18, 20, 30, 35, 38, 40, 41, 44 and 46.

The Court ordered the defendants to produce Jabali for his deposition, but they refused. *Ungar*, 325 F.Supp.2d at 40-43, 60-64.

The defendants could not produce Jabali now even if they wanted to – and, notably, defendants have ***not*** offered to produce ***any*** of the deponents – because he no longer works for the PA. Indeed, Jabali currently resides in Damascus, Syria, where he serves as an advisor to Hamas leader Khaled Mashaal. *See* Declaration of Marwan Abdel-Rahman, Exhibit J, at ¶¶ 4-5, Appendices 2-3.

---

Vacating the default and requiring the plaintiffs to litigate the merits of their case now-eight years after they commenced this action and nine years after the events complained of-surely would cause irreparable prejudice . . . The eight year delay . . . inevitably renders it difficult for plaintiffs to reconstruct and prove events which occurred almost a decade ago.

*Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 507-508 (2nd Cir. 1991).

[12] Jabali's first name is sometime transliterated as "Ghazi" rather than "Razi". *See* Declaration of Marwan Abdel-Rahman at ¶ 4, n. 1.

The absence of Jabali's testimony severely prejudices the Ungars, as this Court previously found. *Ungar*, 325 F.Supp.2d at 62.

Indeed, Jabali's importance as a witness is even clearer today, in light of the fact that his relationship with Hamas has blossomed into a full-blown advisory role.

### iii.    Deponent Muhammed Dahlan Is No Longer Employed by Defendants

The Ungars noticed the deposition of Muhammed Dahlan as well. *See* dkt. # 103. Dahlan was the commander of the "Palestinian Preventive Security Services," and was alleged by plaintiffs to have been personally involved with the provision of material support to Hamas by the PA and PLO. *See* Complaint, dkt. # 1, at ¶¶ 12, 17, 18, 20, 30, 35, 38, 40, 41, 44 and 46.

The Court ordered the defendants to produce Dahlan for his deposition, but they refused. *Ungar*, 325 F.Supp.2d at 40-43, 60-64.

The defendants could not produce Dahlan for his deposition now even if they wanted to, because he left the defendants' employ in mid-2007. *See* Exhibits O, P, Q.

Subsequent admissions by Dahlan demonstrate his crucial importance as a witness. The Ungars specifically informed the Court that Dahlan had been operating in close association with Hamas terrorist leader Muhammed Deif. *Ungar*, 325 F.Supp.2d at 64. Muhammed Deif is the leader of the Hamas' terrorist wing. *See* Exhibit R.

On January 22, 2006, Dahlan appeared in a televised pre-election debate with Hamas leader Mahmoud Al-Zahar, and openly admitted that the PA's security services, including Dahlan personally, had been sheltering Hamas' terrorist leadership, among them Deif:

> All [Hamas'] military commanders have been protected by the security establishment throughout this Intifada. They were provided with full protection, and Israel has accused us of this several times, and so has the American administration. I was the prominent person to be accused of this - Muhammad Deif was the leading figure (to receive protection). When they left our

protection and moved to that of Hamas, half of them were assassinated.

*See* Exhibit J, Declaration of Marwan Abdel-Rahman at ¶ 6, Appendix 4.

Thus, precisely as the Ungars alleged, Muhammed Dahlan was personally involved in the defendants' provision of material support to Hamas' terrorist leadership, including Hamas terrorist commander Muhammed Deif.

The loss of Dahlan's testimony therefore seriously prejudices the Ungars.

**iv.    Deponent Amin al-Hindi Is No Longer Employed by Defendants**

The Ungars also noticed the deposition of Amin al-Hindi. *See* dkt. # 103. Al-Hindi was the commander of the "Palestinian General Intelligence Services," and was alleged by plaintiffs to have been personally involved with the provision of material support to Hamas by the PA and PLO. *See* Complaint, dkt. # 1, at ¶¶ 13, 17, 18, 20, 30, 35, 38, 40, 41, 44 and 46.

The Court ordered the defendants to produce al-Hindi for his deposition, but they refused. *Ungar*, 325 F.Supp.2d at 40-43, 60-64.

The defendants could not produce al-Hindi for his deposition today (even if they wanted to) because (according to the biography of al-Hindi published by the Palestinian Academic Society for the Study of International Affairs) he was removed from his position in 2005. *See* Exhibit S.[13]

The absence of al-Hindi's testimony severely prejudices the Ungars, as this Court previously held. *Ungar*, 325 F.Supp.2d at 62.

**v.    Defendants Cannot Produce Responsive Documents Located in Gaza**

---

[13] Downloaded from www.passia.org at "Palestine Facts & Info" and "Personalities."

As noted, plaintiffs alleged in this case "that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts of terrorism, including the attack on Yaron Ungar and his wife." *Ungar*, 325 F.Supp.2d at 62.

Accordingly, the Ungars served the PA with requests for production of documents intended to document the defendants' provision of support to Hamas for the commission of terrorism. *See* Exhibit T.

It is a matter of public record that in June 2007, the PA was driven out of Gaza by Hamas, and today exercises no authority in Gaza whatsoever:

> In June 2007, Hamas launched a wide-scale attack on PA security and police personnel and posts throughout the Gaza Strip. Hamas quickly routed the PA forces, many of whom were killed and captured, and destroyed *or took control of all of the PA's security and police posts and the PA's governmental offices throughout the Gaza Strip.*
>
> Thus, as, of June 2007, the Palestinian Authority exercises no control, authority or power whatsoever in the Gaza Strip.

*See* Declaration of Brigadier General (Res.) Yosef Kuperwasser, Exhibit U, at ¶¶ 23-24 (emphasis added).

Since the PA has no authority in the Gaza Strip today – indeed, since all of the PA's governmental offices in Gaza were seized by Hamas – the PA is utterly incapable of producing any responsive documents located in Gaza.

Thus, an entire universe of responsive documents is no longer in the defendants' possession, and the Ungars cannot possibly fairly litigate this case today (even assuming that defendants had expressed a willingness to produce all responsive documents in their possession, which they have not).

***

In summary, vacating the judgment at this late date would cause the Ungars extreme prejudice, because they would be unable to litigate this case without the testimony of Arafat, Jabali, Dahlan and al-Hindi, and without the responsive documents in Gaza which are no longer in defendants' possession.

Accordingly, defendants' motion should be denied. *See e.g. Cutting v. Town of Allenstown*, 936 F.2d 18 (1st Cir. 1991) (denying Rule 60(b) motion since death of key witness (plaintiff) left estate unable to prove the case); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2nd Cir. 1991) (denying Rule 60(b) motion in light of "the long delay in mounting this attack on the judgment, which has seriously weakened appellees' case by making it less likely that they will be able to recover documents and records that show a shortfall in the oil delivered"); *McKenna v. Ward*, 1997 WL 66779 at *6 (S.D.N.Y. 1997) (denying Rule 60(b) motion because "Considering the length of time that has passed . . . the Defendants' ability to present their defense would be hindered by witnesses' fading memory, destroyed or lost documents, and the fact that parties and witnesses have moved away.").

### B.    Assets of Defendants Currently Restrained by the Ungars and Subject to Pending Enforcement Proceedings Will Be Removed from U.S. Jurisdiction or Otherwise Rendered Judgment-Proof

It is well established that among the types of "prejudice" to the plaintiff that preclude relief under Rule 60(b) is the risk that the defendant will exploit vacatur of the judgment to conceal assets or otherwise place assets beyond the plaintiff's reach. *See e.g. Franchise Holding II, LLC. v. Huntington Restaurants Group, Inc.*, 375 F.3d 922, 926 (9th Cir. 2004) (affirming decision of district court denying Rule 60(b) motion to set aside $24 million default judgment since "any delay in judgment would allow [defendant] to move and hide assets" and plaintiff

would thereby be prejudiced); *La Barbera v. Whitney Trucking, Inc.*, 245 F.R.D. 142, 146 n. 6 (S.D.N.Y. 2007) (denying Rule 60(b) motion because "plaintiffs will be prejudiced if the Court vacates the default because a further delay will provide [defendant's] successors with a further opportunity to distance their assets from plaintiffs"); *Murray v. Solidarity of Labor Organization Intern. Union Benefit Fund*, 172 F.Supp.2d 1134, 1148 (N.D.Iowa 2001) (denying Rule 60(b) motion because "setting aside the default judgment and 'unfreezing' [defendant's] accounts" would constitute "concrete" prejudice to the plaintiff "because it might make it more likely that assets of the [defendant] from which a judgment could be paid would simply disappear from the accounts during what might turn out to be protracted litigation, thus adversely affecting [plaintiff]'s rights to relief.").[14]

There is not a risk but rather an ***absolute certainty*** that the Ungars would be prejudiced exactly in this way if defendants' Rule 60(b) motion is granted:

After enormous investigative and legal effort, the Ungars have succeeded in restraining and are currently seeking to enforce their judgment against three separate pools of PA assets in the United States. *See* Exhibit C, Tolchin Declaration at ¶¶ 1-7. Those proceedings have been pending for over two and a half years in federal courts in New York and Connecticut, and in New York state court. *Id.*

If the judgment in this action is vacated the judgment creditor process served by the Ungars will be extinguished, and the defendants will be able to remove the assets which are the subject of those proceedings from the United States and/or transfer ownership of those assets to some separate entity to make them judgment-proof. *Id.* at ¶¶ 9-10.

---

[14] Indeed, the danger that the plaintiffs would be unable to enforce its judgment constitutes "prejudice" even under the more liberal standard governing vacatur of a mere default (rather than default judgment). *See Standard Chartered Bank v. Red Rock Commodities Ltd.*, 151 F.R.D. 261 (S.D.N.Y. 1993) (refusing to set aside default under Rule 55(c) in light of risk to plaintiff that defendant would lose or dissipate assets during course of litigation).

Likewise, if the underlying judgment of this Court is vacated, the judgment of this Court on the Ungars' creditor's bill, awarding them ownership of the Palestine Investment Fund ("PIF") and the Palestinian Commercial Services Company ("PCSC") and of the PA assets held by those entities, would be subject to vacatur.

Defendants have refused to honor the judgment, and have aggressively opposed the Ungars' enforcement proceedings in respect to even *de minimis* amounts. For example, defendants recently appeared in New York state court in order to oppose plaintiffs' enforcement proceedings against a mere $11,000. *See* Exhibit C, Tolchin at ¶ 12. Likewise, defendants filed multiple motions and other pleadings, battled the Ungars for nearly a year, and even filed a motion for reconsideration, all in an effort to prevent the Ungars from enforcing their judgment against the sum of some $196,000 held in defendants' bank account in Washington, D.C.. *See Ungar v. Palestinian Authority*, 05-mc-180(GK) (D.D.C.), dkt. nos. 7, 8, 17, 19, 23, 27, 35; *Ungar v. Palestinian Authority*, 2006 WL 1274986 (D.D.C. 2006).

Since defendants have both refused to pay the judgment and shown that they are prepared to fight the Ungars tooth-and-nail over even paltry amounts, there cannot be the slightest doubt that if the judgment in this action is vacated, the defendants will exploit that opportunity to remove their assets from the U.S. or otherwise render them immune from execution.[15]

Similarly, in early 2007, following entry of judgment on the creditor's bill, the PA attempted to retroactively negate the operation and effect of that judgment by purporting to

---

[15] Furthermore, $45 million of the amount currently restrained by the Ungars is an intangible contractual debt owed by a third-party garnishee (an Egyptian company) which has made clear that it will pay the debt at the first opportunity and would have done so already but for the restraining notices served by the Ungars. Exhibit C, Tolchin at ¶ 10.

Thus, in respect to this asset, there is no question of it being "left" in the United States for future execution by the Ungars: rather, if the restraint is lifted the Egyptian company will immediately pay out the sum to the defendants, and there is not the slightest reason to believe that the payment would be made to defendants' in the United States.

modify the PIF's articles of association. *See* Exhibit C, Tolchin at ¶ 8. While this devious *post hoc* attempt by the PA to negate this Court's judgment on the creditor's bill can have no retroactive effect on that judgment (as the Ungars have asserted before the federal court in Connecticut), ***the very attempt to do so itself*** makes crystal clear that if the 2006 judgment on the creditor's bill is vacated (as a result of vacatur of the underlying judgment from 2004) the PA will immediately reorganize the PIF and its holdings in such a manner as to place them beyond the Ungars' reach.

Defendants' bad-faith intentions can also be readily gleaned from the fact, discussed above, that the PA siphoned over $27 million out of the PIF in the three months ***after*** entry of judgment in the creditor's bill assigning ownership of the PIF to the Ungars. *See* Declaration of Marwan Abdel-Rahman, Exhibit J, at ¶ 3, Appendix 1.

Thus, defendants' intention to "take the money and run" if their Rule 60(b) motion is granted, is pellucid.

**Indeed, tellingly, defendants do not even claim anywhere in their motion papers that they would pay any future judgment entered against them**. Nor would any such claim be entitled to a micron of credit, in light of defendants' reprehensible conduct to date. *See Franchise Holding*, 375 F.3d at 926 ("Franchise Holding argued below that any delay in judgment would allow HRG to move and hide assets . . . HRG disputes this finding, maintaining that it is willing and able to settle any dispute. HRG's behavior suggests otherwise.").

In light of the above, the prejudice to the Ungars could not be starker:

Today, the Ungars are poised to enforce their judgment against assets of defendants in the United States which ***are sufficient to satisfy the entire judgment*** (*see* Exhibit C, Tolchin ¶¶ 1-7); in the future, however, if the judgment is vacated and then ultimately re-entered after trial, the

Ungars will be left with no means whatsoever of enforcing their judgment (other than the difficult and extremely uncertain route of foreign enforcement).

Simply put – and as defendants know and no doubt intend by their motion – vacating the judgment would render this entire case a virtually pointless exercise: re-litigating and winning this case after a trial would leave the Ungars high and dry, with no way to enforce their judgment.

In light of the above, defendants' offer to deposit a million dollars as a guarantee against a future default on their part emerges as nothing but a cynical ploy. With over $100 million already restrained by the Ungars and potentially subject to execution by them, it would be eminently economically rational (and typical) for these defendants to offer to deposit $1 million in order to free their assets and spirit them abroad, and thereby render themselves effectively judgment-proof. Thus, the fact that defendants are prepared to sacrifice a million to save a hundred million neither demonstrates that they are "repentant," nor protects the Ungars from prejudice.

In sum, granting defendants' motion will allow them to shield themselves from a future judgment, thereby severely and irreversibly prejudicing the Ungars. For this reason, too, defendants' motion should be denied.

### C.     The Palestinian Authority Is a Merely Temporary Entity and Is Scheduled to Be Superseded by a "State of Palestine" Within a Year

If defendants' Rule 60(b) motion is granted the Ungars would suffer severe and irreparable prejudice for an additional reason, which is unique to cases against the Palestinian Authority:

The full legal name of the Palestinian Authority is "Palestinian *Interim* Self-Government Authority." *See* Interim Agreement on the West Bank and the Gaza Strip, September 28, 1995, 36 I.L.M. 551, 558, Preamble (emphasis added).

This name reflects the fact that the Palestinian Authority was created to be a merely temporary entity, established to administer the West Bank and Gaza Strip only until conclusion of negotiations regarding the permanent status of those territories. "In 1993, the PLO and the government of Israel agreed to a Declaration of Principles on Interim Self-Governing Arrangements (DOP) that established a framework for limited Palestinian self-government *during an interim period*, pending resolution of the permanent status of the territory occupied by Israel since 1967." Omar M. Dajani, *Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period,* 26 Denv. J. Int'l L. & Pol'y 27, 27-28 (1997) (emphasis added).

Thus, "[t]he terms of the DOP . . . characterize the PA as an *interim measure* pending the conclusion of permanent status negotiations." *Id*. at 90 (emphasis added). Moreover, "[t]he powers, structure, and jurisdiction of the PA are defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip . . . The Interim Agreement, as its name suggests, *is a self-consciously temporary arrangement*." *Id*. at 61 (emphasis added). *See also e.g.* Addendum to Report by the Special Representative of the Secretary-General on the Situation of Human Rights Defenders, Exhibit V, at p. 8, ¶ 7 ("The Palestinian Authority is an interim administrative organization established in 1994 pursuant to the Oslo Accords").[16]

Indeed, as the Palestinian Authority itself explains on one of its own official websites:

---

[16] Downloaded from http://daccessdds.un.org/doc/UNDOC/GEN/G06/117/43/PDF/G0611743.pdf?OpenElement.

> The Palestinian Authority is a temporary administrative body . . .
> intended only to serve during the interim period prior to the
> establishment of a Palestinian state . . .

*See* Exhibit W, pp. 1 and 3. [17]

Thus, the PA is a ***temporary*** legal entity, which will be supplanted and superseded – i.e. will cease to exist – once a Palestinian state is established.

In late November 2007, Israeli and Palestinian leaders held a summit at Annapolis, Maryland, and committed themselves – with the full backing of the United States – to establish a Palestinian state by the end of 2008:

> After seven years without progress toward Mideast peace, Israeli
> Prime Minister Ehud Olmert and Palestinian President Mahmoud
> Abbas yesterday pledged to launch immediate negotiations aimed
> **at creating a Palestinian state by the end of next year.**

*See* "Mideast Peace Talks Advance, Palestinian State in 2008 is Goal; US Assumes Monitoring Role," Boston Globe, November 28, 2007, Exhibit X (emphasis added). *See also* "Israel and Palestinians Set Goal of a Treaty in 2008," New York Times, November 28, 2007, Exhibit Y.

In early January 2008, President Bush visited the Middle East and reiterated that he expects a Palestinian state to be established by the end of his term. *See* "Bush Outlines Mideast Peace Plan," New York Times, January 11, 2008, Exhibit Z.

Thus, if all goes as planned, a Palestinian state will be established within a year. Upon establishment of a Palestinian state, the Palestinian Authority – which as the PA itself explains is merely "a temporary administrative body . . . intended only to serve during the interim period prior to the establishment of a Palestinian state" (Exhibit W, p. 3) will have finished its historical role and will be superseded by the Palestinian state and cease to exist.

---

[17] Downloaded from http://www.mofa.gov.ps/day.php?m=3&y=2003&d=10. Notably, this official statement by the PA directly contradicts the PA's argument in this Court in the underlying action that it constitutes a "foreign state," thus demonstrating that that argument was not made in good faith.

Notably, none of the parties to the negotiations – Palestinian, Israeli or American – refer to the PA itself *becoming* the Palestinian state. Rather, their repeatedly declared goal is to "establish" or "create" a Palestinian state – i.e. an entirely *new* legal entity. This careful phraseology is completely consistent with the fact that the PA was intended all along to be a "temporary" and "interim" legal entity meant to exist only until a Palestinian state is created.

Clearly, if defendants' Rule 60(b) motion is granted and then a Palestinian state is established and the Palestinian Authority ceases to exist with a year – as the defendants themselves are fully planning and intending – the Ungars will be severely prejudiced. With the Palestinian Authority no longer in existence as a legal entity, the action against the PA would be pointless at best, and very possibly summarily extinguished for lack of a defendant.[18]

The prejudice that would be inflicted on the Ungars in this case is therefore unique, overwhelming and dispositive: if the Rule 60(b) motion is granted, defendant Palestinian Authority is likely to cease to exist long before any future judgment could be entered.[19]

That fact, standing alone, is sufficient reason to deny the motion.

## VI.    DEFENDANTS' MOTION IS UNTIMELY

Motions under Rule 60(b)(6) "must be made within a reasonable time." Fed.R.Civ.P. 60(c)(1). "What is 'reasonable' depends upon the circumstances of the particular case. The circumstances to be considered include the length of the delay, the justification for it, and the prejudice (if any) associated with the granting of relief." *Farm Credit Bank of Baltimore v. Ferrera-Goitia*, 316 F.3d 62, 66 (1st Cir. 2003) (citation omitted).

---

[18] We note for the record that if the PA were *itself* to achieve statehood – contrary to both its organizational purpose and the consistent public statements of its leaders regarding their intent to create a Palestinian state as a *new* entity – this case would *not* be affected, because sovereign immunity is determined at the time of the filing of the suit. *See Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).

[19] Indeed, that may well be defendants' intention, and precisely why they waited all these years to bring their Rule 60(b) motion.

Since the severe prejudice to the Ungars was discussed and demonstrated above, the remaining reasonableness factors are "the length of the delay" and "the justification for it." *Id*. As shown below, both the length of defendants' delay and their alleged "justification" for it are extremely ***unreasonable***, and their motion should be denied for this reason as well.

In support of their claim that their nearly three and a half year delay in bringing this motion is "reasonable" defendants submit the declaration of one of their officials, Ahmad Abdel-Rahman, whom defendants cite and quote at length. *See* Defs' Ex. E; Defs' Memo at 33-35.

Abdel-Rahman asserts that Arafat was the central decision-maker in the PA in his time and never created a system of institutional decision-making, that after Arafat's death no institutional framework existed in the PA for handling foreign litigation, and that such a framework was created only recently, when President Abbas placed Salam Fayyad in charge of litigation in the United States against the PA and PLO. Defs' Ex. E, *passim*; Defs' Memo at 33-35. Abdel-Rahman harps repeatedly, indeed obsessively, on the PA's lack of an "institutional" framework or structure, repeating this phrase talismanically in virtually every paragraph.

This attempt by Abdel-Rahman and defendants to justify their delay should be rejected as absolutely frivolous for several reasons:

***First***, this is not a case where a defendant took no position in litigation and defaulted by nonfeasance. On the contrary, these defendants had an affirmative, clear and explicit policy of refusal to answer or conduct discovery in this case set by Arafat, as PA president and PLO chairman. If Mr. Abbas decided not to modify this position after ***he*** became PA president and PLO chairman that constitutes a decision no less than the original decision taken by Arafat.

***Second***, the claim that creating an "institutional" or "organizational" framework was a necessary precondition to filing the instant motion is ludicrous. The plain fact is that Arafat, as

44

PA president and PLO chairman, called the shots regarding this case when he was alive. If Mr. Abbas elected not to do so after he became PA president and PLO chairman that is no concern of the Ungars or of this Court. Nor is the fact that Mr. Abbas waited over three years to place Mr. Fayyad in charge of U.S. litigation. On the contrary, the fact that Abbas waited all those years before delegating the issue to Fayyad shows that Abbas either agreed with the intransigent position taken by Arafat in respect to this case or that the issue was just too unimportant to defendants to attend to – either way, the delay is grossly unreasonable.

> *Third*, the alleged critical importance of an "institutional" decision-making framework is belied by the fact that ***no such "framework" was ever established***. Rather, according to defendants' own version, their change in policy came about because Mr. Abbas appointed Mr. Fayyad – who is an economist, not a lawyer – to deal with their U.S. litigation. Appointing a single person to make decisions clearly does not constitute establishment of the "institutional framework" which defendants claim they needed in order to file the instant motion. Defendants' whole tale thus makes no sense on its face. Indeed, defendants are back exactly where they were in the days of Arafat, with a single person making all the decisions regarding their U.S. litigation (the difference being that Arafat was an engineer and Fayyad is an economist).

> *Fourth*, the fact that Fayyad may have a different approach than Abbas or Arafat neither erases nor excuses defendants' delay one iota. An organizational or governmental defendant is fully responsible for its litigation policies, irrespective of any change in office-holders or in controlling regime. In *Socialist Republic of Romania v. Wildenstein & Co. Inc.*, 147 F.R.D. 62 (S.D.N.Y. 1993), Romania moved for Rule 60(b)(6) relief to set aside a judgment that had been entered against it for refusal to conduct discovery, arguing that the default had resulted from the

litigation strategy of the previous (communist) regime, which it now repudiated. This argument

was resoundingly rejected:

> Romania is not relieved of responsibility for the consequences of
> its litigation strategy merely because it is a nation-state whose
> government has changed. An analogy may be drawn to a
> hypothetical multi-national corporation ("Jamo, Inc.") whose
> management has been ousted but which, under former
> management, litigated a case in this Court and lost. Jamo Inc.
> clearly could not prevail on a Rule 60(b)(6) motion merely because
> it claimed that its former management was corrupt and therefore
> had failed to pursue a winning litigation strategy. One reason why
> Jamo Inc., the hypothetical corporation, could not win such a
> motion is that a change in management is not an extraordinary
> event-management changes regularly, and to allow such an event
> to support a Rule 60(b)(6) motion would wholly negate the finality
> of judgments. *See United States v. Besser Manuf. Co.,* 125 F.Supp.
> 710, 713 (E.D.Mich. 1954); *see also In re 1330 19th St. Corp.,* 101
> B.R. 397, 398 (D.D.C.Bankr. 1989) (change in ownership or
> control is not the type of changed circumstance contemplated by
> Rule 60(b)). Similarly, governments regularly change, yet each is
> in privity with its predecessor. … In the context of democratically
> elected governments, those who govern periodically change. In
> other systems, and throughout history, governments change when
> political systems are altered or when the regime in power falls out
> of favor. Such a change in government, or the fact that a former
> regime pursued a different litigation strategy than would the
> government currently in power, does not constitute an
> extraordinary event sufficient to support a Rule 60(b)(6) motion.

*Socialist Republic of Romania*, 147 F.R.D. at 65-66.

**Fifth**, between Arafat's death and the present day, defendants had no trouble whatsoever

pursuing their appeal, their motion for *en banc* review of the appellate decision, or their petition

to the Supreme Court for *certiorari*. Moreover, during this period defendants intensively battled

plaintiffs' attempts to enforce their judgment. *See Ungar*, 05-mc-180(GK) (D.D.C.), dkt. nos. 7,

8, 17, 19, 23, 27, 35; *Ungar*, 2006 WL 1274986 (D.D.C. 2006); Exhibit C, Tolchin Declaration.

Furthermore, between Arafat's death and the present day, these defendants filed

numerous and extensive pleadings in the other cases pending against them in U.S. courts. *See*

*Biton v. Palestinian Interim Self-Government Authority*, (Civ. No. 01-0382) (D.D.C.); *Gilmore v. Palestinian Interim Self-Government Authority*, (Civ No. 01-853) (D.D.C.); *Klieman v. Palestinian Authority*, (Civ. No. 04-1173) (D.D.C.); *Shatsky v. Syrian Arab Republic et al.*, (Civ. 02-2280) (D.D.C.); *Saperstein v. Palestinian Authority*, (Civ. No. 04-20225) (S.D.Fla.).

Since defendants were fully capable of fighting the Ungars' collection proceedings and litigating these other cases, the claim that they were incapable of filing a Rule 60(b) motion in this case is patently absurd.

**Sixth**, even after authority for the U.S. litigation was delegated to Fayyad in "early 2007" (see Defs' Ex. E at ¶ 13), defendants **waited nearly a year** to file the instant motion. Defendants attempt to excuse this delay by arguing that their counsel was too busy with other proceedings to file a Rule 60(b) motion in this Court. Defs' Memo at 46. This excuse is insufficient and frivolous as a matter of law. Moreover, it is baseless as a matter of fact: Edward & Angell and Miller & Chevalier have many hundreds of attorneys at their disposal, and could easily have filed this motion long ago, in "early 2007" when Mr. Fayyad took charge. Notably, this claim is **not** supported by any evidence or affidavit.

**Seventh**, commencing in early August 2007, at the latest, defendants **purposely delayed filing this motion for strategic purposes, in order to lobby the State Department to file a statement of interest in their favor**. This fact emerges clearly from an affidavit submitted by defendants' counsel, in support of a motion filed by them in the Jerusalem District Court to stay proceedings brought by the Ungars' to domesticate their judgment in Israel, which stated:

> Miller & Chevalier intends to challenge the default judgments entered against the PA and the PLO, in the matter *Ungar v PLO*, No. 00-105L (D.R.I.), No. 04-2079 (1st Cir). We believe there are various grounds for vacating the default judgment . . .

It is difficult to assess the likelihood of success on the motion as we cannot assess what position, if any, the United States Department of State will take on the Motion, **though we are undertaking efforts to gain Department of State support** . . .

**Our intent is to raise challenges to the judgment soon**. Challenging the default judgment will involve filing pleadings with the Federal District Court in Rhode Island.

*See* Affidavit of Laura G. Ferguson, August 2, 2007, Exhibits AA, BB (emphasis added).[20]

Defendants' admission in August 2007 that they were delaying the filing of their Rule 60(b) motion for their own strategic purposes – i.e. in order to lobby the State Department to submit a statement of interest – is sufficient, standing alone, to render their motion untimely under Rule 60(b). In *R.C. by Alabama Disabilities Advocacy Program v. Nachman*, 969 F.Supp. 682 (M.D.Ala. 1997) the federal court found that agencies of the State of Alabama had waited to file a Rule 60(b) motion for similar strategic purposes – i.e. until there had been "a shift in the political winds" and therefore denied that motion as untimely:

> The only reason that the Court can fathom for the defendant's tardy filing is a shift in the political winds. Such maneuvering does not warrant the Court's indulgence. *See Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, No. 87 C 9853, 1993 WL 524226, at *2 (N.D.Ill. Dec.10, 1993) (finding that 60(b) motion not filed within a reasonable time where defendant waited to file until such time as was strategically expedient).

*R.C. by Alabama Disabilities Advocacy Program v. Nachman*, 969 F.Supp. 682, 701 (M.D.Ala. 1997).

---

[20] Exhibit AA is a motion filed by defendants in Israel, to which was attached an English-language affidavit executed by defendants' U.S. counsel, Laura G. Ferguson of Miller & Chevalier. *See* Exhibit AA at pp. 5-6. Exhibit AA consists of the entire motion exactly as filed by defendants, in the following order: (i) Hebrew-language motion itself (ii) Hebrew-language coversheet on the Ferguson affidavit from the Israeli Embassy where it was sworn (iii) and the English-language Ferguson affidavit.

An English translation of the motion is included as Exhibit BB.

Here, too, because defendants intentionally delayed the filing of their motion until it was "strategically expedient," in hopes of a change in the "political winds," their motion must be denied as untimely.

The decision in *Nachman* is relevant to the circumstances here for a further reason: in denying the Alabama state agencies' Rule 60(b) motion, the court noted that motion had been filed by a new state administration because the previous Alabama administration "has saddled its successor with serious obligations with which it would rather not comply." *Id*. at 689, n. 7. The court therefore dismissed the tardy Rule 60(b) motion as "political gamesmanship." *Id*.

So, too, here, the fact that Abbas administration is unhappy that the Arafat administration "saddled" the PA "with serious obligations with which it would rather not comply" does not entitle the PA to relief under Rule 60(b).

In light of all the above it is pellucid that defendants' motion was not filed within a reasonable time, and should be denied.

Notably, courts have denied Rule 60(b) relief as untimely in far less egregious circumstances and after far shorter delays. *See e.g. Socialist Republic of Romania*, 147 F.R.D. at 65 (two year delay found unreasonable); *Fustock v. Conticommodity Serv. Inc.*, 122 F.R.D. 151, 158 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 38 (2d Cir. 1989) (two year delay found unreasonable); *Menashe v. Sutton*, 90 F. Supp. 531, 533 (S.D.N.Y. 1950) (two years and four months unreasonable); *Hallmark Cards, Inc. v. JTK Corp.*, 1992 WL 118805, at *2 (E.D.N.Y. 1992) (three-year delay unreasonable); *McCloud v. Lawrence Gallery, Ltd.*, 1992 WL 6199, at *2 (S.D.N.Y. 1992) (two-year delay unreasonable), *aff'd*, 970 F.2d 896 (2d Cir. 1992).

## VII.    DEFENDANTS' HAVE FAILED TO PRESENT ANY MERITORIOUS DEFENSE

A defendant seeking relief under Rule 60(b) must show a meritorious defense. *See e.g. Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17 (1st Cir. 1992).

However, the existence of a potential meritorious defense is a necessary, but not a sufficient condition for Rule 60(b) relief. Thus, as discussed at length *supra*, Rule 60(b) relief will be denied when the default was intentional, irrespective of whether the movant can show a meritorious defense. Likewise, the presence of a meritorious defense will not be sufficient for Rule 60(b) relief, in the face of prejudice to the plaintiff. *See e.g. Cutting v. Town of Allenstown*, 936 F.2d 18, 22 (1st Cir. 1991) (denying Rule 60(b) motion, despite existence of several meritorious defenses, because vacatur would prejudice plaintiff). Since, as shown above, defendants' default was intentional and the Ungars would be severely prejudiced if the judgment were vacated, the question of whether defendants have presented a meritorious defense is purely academic.

In support of their motion, defendants purport to assert a single meritorious defense: absence of liability for the murder of Yaron Ungar.[21] As shown below: (a) defendants have failed to assert a meritorious defense; and (b) in any event, defendant PA is precluded as a matter of law from seeking to assert a meritorious defense on the matter of liability.

### a.    Defendants Have Failed to Assert a Meritorious Defense

---

[21] Notably, in the underlying action the defendants implicitly admitted their liability fir the murder:

> [D]efendants' conduct legitimately sought to protect and promote Palestinian interests and lacked the intent that is required under the statutory definition of "international terrorism," and which is also essential to the Court's subject matter jurisdiction under the Anti-Terrorism Act of 1991.

*See* Objections of Defendants Palestinian Authority and Palestine Liberation Organization to the Magistrate Judge's Report and Recommendation, April 19, 2004, dkt. #271 at ¶ 2.

While a Rule 60(b) movant cannot satisfy the "meritorious defense" requirement by merely conclusory assertions, she need not prove her claim. Rather, she need only assert specific facts which, if proven, would constitute a defense. *See Teamsters,* 953 F.2d at 21.

Thus, in a tort case (as opposed, say, to a contract case), a "meritorious defense" is easy to present, since the defendant need only deny the specific relevant factual elements of the tort. Absent a prior admission or criminal conviction, virtually any defendant in a tort case would be able to make this showing. This is especially so where, as here, the defendant is not an individual but a legal entity. An organizational defendant facing allegations of a tort need only assert that the employee or official alleged to be involved acted outside his agency and employment.

Thus, any virtually defendant which is a corporation or association, facing allegations analogous to the allegations in this action, would be able to assert a "meritorious defense" for the purpose of Rule 60(b), simply by making specific denials of the relevant factual elements of the tortious conduct alleged and/or by disputing that the employee involved was acting in the scope of his employment.

Yet, despite this extremely low standard, the instant defendants have failed to assert a meritorious defense to the allegations of the amended complaint in this action.

In the amended complaint, the Ungars alleged that – for a period of several years prior to the murder of the Ungar couple in June 1996 – the defendants provided material support and resources to Hamas, which enabled and caused the murder of the Ungars, and that defendants' conduct constituted international terrorism, and aiding and abetting international terrorism, within the meaning of 18 U.S.C. § 2333(a). *See generally Boim v. Holy Land Foundation for Relief and Development*, 511 F.3d 707 (7th Cir. 2007) (analyzing elements of civil liability under § 2333(a) in respect to provision of support to Hamas).

The amended complaint alleged that the material support and resources provided to Hamas by the defendants took several forms. The most detailed allegations (with the extent of the detail being a reflection of the extent of the information known to the plaintiffs at the time) assert that for a period of several years prior to the Ungars' murder, the defendants provided Hamas and its terrorist leadership with shelter and safe-haven, and allowed Hamas to plan and carry out terrorist attacks from PA territory. Amended Complaint at ¶¶ 23-31.

Significantly, the precise conduct alleged – i.e. allowing a terrorist group to operate within PA territories – has been held to constitute provision of material support and resources within the meaning of 18 U.S.C. §2339A, which in turn constitutes liable conduct under §2333(a). *See Rux v. Republic of Sudan*, 461 F.3d 461, 470-471 (4th Cir. 2006) (holding that Sudan provided material support to al Qaeda within the meaning of §2339A by permitting it to operate within Sudanese territory); *Boim,* 511 F.3d 707 (provision of material support within the meaning of §2339A to Hamas is actionable under §2333(a) (*passim*). [22]

---

[22] Defendants assert that the amended complaint seeks to impose liability on them for acting as accessories after the fact to the Ungars' murderers. Defs' Memo at 19. By this remark, defendants completely misunderstand – or pretend to misunderstand – the allegations of the complaint in respect to provision of safe-haven and shelter. Plaintiffs did not allege that the defendants are liable because they sheltered the gunmen who killed the Ungars after the fact. Plainly, civil liability could not arise from assisting a tortfeasor after commission of the tort. Rather, plaintiffs alleged that by providing safe-haven and shelter to the Hamas terrorist leadership in the years **preceding** the Ungars' murder – i.e. by allowing Hamas to build and operate a terrorist infrastructure in areas in the PA – defendants facilitated the murder of the Ungars. But for that provision of an operating base by the defendants, Hamas could not have murdered the Ungars.

Defendants' confusion appears to arise from the fact that ¶ 41 of the amended complaint alleges that defendants' actions "if committed within the jurisdiction of the United States, would constitute, *inter alia*, without limitation, violations of 18 U.S.C. §3 ("Accessory After the Fact") and of 18 U.S.C. §2339A ("Providing Material Support to Terrorists"). The Ungars cited these provisions as examples meant to demonstrate that the conduct alleged was criminal, as required by §2331 of the ATA. The reference to "Accessory After the Fact" relates to defendants' *sheltering of Hamas terrorist leadership during the years prior to the Ungars' murder*, not to the murderers of the Ungars. Defendants' conduct vis-à-vis the murderers of the Ungars after the fact is thus completely irrelevant to the defendants' liability.

The amended complaint also alleged that the defendants provided financial support to Hamas and its terrorist operatives, both in specific forms and generally. Amended Complaint, ¶¶ 32, 33, 35. Monetary support of this type is unquestionably "material support" within the meaning of §2339A and so actionable under §2333(a).

Clearly, in light of the specific allegations of the amended complaint, if defendants sought to assert a meritorious defense to this action, they needed to proffer equally specific factual assertions disputing each of the relevant allegations.

Thus, for example, defendants should have asserted that during the years prior to the Ungars' murder they did not allow Hamas to operate in their territory, and did not shelter the Hamas terrorist leadership, and did not provide financial support to Hamas and its members. **But defendants have provided no such specific denials, because they cannot**: It is a matter of undisputed public record that the defendants did indeed allow Hamas to operate bases in PA territory and provided shelter and safe-haven to Hamas and its terrorist leadership:

> Hamas has demonstrated again that it is a murderous group of fanatics who are so poisoned with hate--so obsessed with slaughter--that no innocent life is safe.
>
> Terrorism experts have stated that Hamas and its allies will attempt to inflict this sort of horror on Americans. We must work together with the Israelis in stopping these madmen.
>
> Arafat must also shoulder his share of the blame for this situation. **He has failed to prevent the uses of territory under his administration from being used as a staging area for these plots.**

Remarks of Rep. Ros-Lehtinen, Congressional Record, H1719, March 6, 1996 (emphasis added).

Similarly:

> An important aspect of our resolution calls on Yasser Arafat to recognize that this is his last chance to demonstrate that he has the will and the capability to pulverize **the terrorist infrastructure of**

> **Hamas in territory under his control**. We have had for too long a double-faced approach by Arafat saying the right things to the West but praising to high heaven some of the most brutal terrorists, like the engineer who created the most terrible weapons of destruction in recent times in this terrorist wave.

Remarks of Rep. Lantos, Congressional Record, H2072, March 12, 1996 (emphasis added).

Likewise:

> Mr. President, once again, we have seen the ugly, undeniably brutal, horrific actions of terrorism. We have seen the destructive impact of it in Jerusalem so vividly put forth over the TV screens, but it goes well beyond. We are told that 6 people died, over 150 have been injured, and obviously our sympathy goes out to them and to their families and to the people of that region who are held captive by these kinds of terrorist attacks. **This is the work of Hamas, the Hamas who are given sanctuary, who operate out of the territories under the direct control of Yasser Arafat.**
>
> **Now, make no mistake about it: The responsibility for this terrorist act and the previous bombings lies with Mr. Arafat.** He, Mr. President, has the power to deter these murderers but does nothing. Indeed, **he gives them sanctuary**.

Remarks of Senator D'Amato, Congressional Record, S8782, September 4, 1997 (emphasis added).

Additionally, in late 1996, the Israeli Foreign Ministry government officially published a list of wanted Hamas terrorists being sheltered by the PA. *See* Exhibit CC. [23] Notably, many of these Hamas terrorists had been sheltered by the PA between 1994-1996, and many of them had been given financial support via sinecures – precisely as alleged by the Ungars. *See id.*

Clearly, defendants cannot possibly deny any of these facts in the public record.

So, unable to deny the undeniable fact that they did indeed provide shelter and support to Hamas exactly as alleged in the complaint – i.e., finding themselves unable to properly assert a

---

[23] Downloaded from
http://www.mfa.gov.il/MFA/Archive/Peace+Process/1996/TRANSFER+OF+TERRORIST+SUSPECTS+TO+ISRAEL+BY+THE+PA.htm?DisplayMode=print

meritorious defense – defendants have resorted instead to what Judge Selya has inimitably described as "periphrastic circumlocutions [and] hyperbolic rodomontade." *Teamsters,* 953 F.2d at 18.

The "rodomontade" proffered by defendants in their papers in lieu of an actual meritorious defense takes two forms, both wholly unavailing:

*First*, defendants argue that at certain periods of time they cracked down on Hamas. But this assertion does not rise to a meritorious defense, because even if it were true – i.e. even assuming that there were periods in which defendants reined in Hamas (which plaintiffs dispute) – that would not relieve defendants of liability for a terrorist attack facilitated in some way by defendants' provision of material support and resources to Hamas at other periods of time. Simply put, if defendants provided material support to Hamas in January and February, and cracked down on Hamas in March and April, they will still be liable for terrorism committed by Hamas in May or June which was somehow facilitated by the material support provided before the crackdown. *See generally Boim, id*.

Thus, it is insufficient as a matter of law for defendants to claim as a purported meritorious defense that there were periods in which they fought Hamas; rather, defendants would have to assert that during the years prior to the Ungars' murder (a) they *never once* provided any material support to Hamas or (b) that if they provided such support it did not in any way facilitate Hamas' murder of the Ungars. *See Boim* (*sine qua non* causation not required under §2333).

Defendants have not made such denials, because they cannot: it is undisputable that defendants did indeed provide such material support to Hamas.

***Second***, defendants attempt to convince the Court that they have presented an actual "meritorious defense" by arguing breathlessly at length that assertions made by the Ungars in their suit against Iran exculpate defendants from liability in this case.

As an initial matter, many of defendants' characterizations of the Ungars' assertions in the Iran case are pure fiction and bear no resemblance at all to what appears in the record.

More importantly, this argument gets the defendants exactly nowhere under Rule 60(b) because it is based entirely on a specious, unproven and easily refutable assumption:

Defendants argue that since (a) the Ungars' asserted in the Iran suit that Hamas carried out terrorist attacks in order to interfere with the PLO-Israeli peace process, therefore (b) the PA and PLO would never have assisted Hamas to carry out terrorism.

But prong (b) of this syllogism is completely unfounded, for several reasons:

In the first place, if Hamas – in its own black-and-white crackpot worldview – happens to believe that terrorist attacks will disrupt the peace process, it does not necessarily follow that the PA and PLO must share Hamas' assessment. Indeed, defendants' entire argument is circular, because it assumes as a ***given*** that they view terrorism as detrimental under any circumstances, and negates from the outset the possibility – which many Middle East experts would endorse as correct – that the PA and PLO have a much more subtle and sophisticated view of Hamas' terrorism, considering it as a means of advancing their own negotiation position in the peace process and casting themselves as moderates in the eyes of the West.

Simply put, in the papers defendants quote from the Iran suit the Ungars were seeking to describe Hamas' particular view of the world – which is not by any means necessarily congruent with the world as it really is.

More importantly, and dispositively, whatever sundry internal political motivations and considerations they might have it is a matter of empirical fact in the public record that the defendants **do indeed** provide Hamas with such assistance. That fact has been repeatedly reflected in the Congressional Record, as discussed above. Likewise, defendants' official, Mohammed Dahlan, expressly admitted that:

> All [Hamas'] military commanders have been protected by the security establishment throughout this Intifada. They were provided with full protection, and Israel has accused us of this several times, and so has the American administration. I was the prominent person to be accused of this - Muhammad Deif was the leading figure (to receive protection). When they left our protection and moved to that of Hamas, half of them were assassinated.

*See* Exhibit J, Declaration of Marwan Abdel-Rahman at ¶ 6, Appendix 4.

Similarly, Jibril Rajoub, another of defendants' officials named as a defendant in this action and whom defendants refused to produce for his deposition, has confirmed as follows:

> We were the ones who fought and kept up the resistance, sir. We never removed the resistance from our platform, and we never will.
> …
> We have never had a dispute with Hamas or anyone else regarding the principle of resistance. In all our agreements our brothers in Hamas and the other factions, we always insist that resistance is our legitimate right.

*See* Exhibit J, Declaration of Marwan Abdel-Rahman at ¶ 7, Appendix 5.

Thus, while the defendants have political disputes with Hamas, on the issue of "resistance" – i.e. terrorism – they are in agreement.

Rajoub's description of the PA/PLO – Hamas relationship was echoed by Hamas leader Khaled Mashaal in an interview with the BBC. Pressed by the BBC reporter to concede that Hamas and the PA/PLO are rivals, Mashaal rejected this simplistic characterization and answered as follows:

> Yes we are different politically but we agree on many other matters. We agreed about the intifada. We agreed about resistance. You see Hamas, Aqsa martyrs, Jihad factions and others, we agree on several issues. We agree on the Palestinian right but disagree in interpretations and some political programs. This is very natural.

*See* BBC interview with Khaled Mashaal, Exhibit DD.

**Indeed, Dr. Reuven Paz, defendants' expert on Hamas in the D.C. suit, specifically testified – in a passage that defendants carefully omit – that in the 1990s the Palestinian Authority was supplying Hamas with weapons**. *See* Defs' Ex. M at p. 80 lines 4-5.

Finally, we note that the quasi-covert cooperation between Hamas and the PA/PLO circa 1996 which resulted in the Ungars' murder, has since become open and unabashed. It is a matter of public record (susceptible to judicial notice) that in early 2007, the PLO and Hamas set up a unity government to run the PA. This arrangement ended only when Hamas decided to expel the PA and PLO from the Gaza Strip.

Defendants' attempt to sell this Court a false and simplistic picture of the PA/PLO – Hamas relationship is therefore highly misleading. The plain fact is that while the defendants and Hamas are political rivals, they often work together – particularly when it comes to "resistance" activities.

***

In sum, notwithstanding their "periphrastic circumlocutions [and] hyperbolic rodomontade," defendants have failed to assert a cognizable meritorious defense.

**b.    Additionally or Alternatively, the PA Is Precluded From Asserting a Meritorious Defense**

Additionally or alternatively, the PA is precluded from asserting a meritorious defense because the Court has already determined – a determination which it failed to appeal – that the

appropriate sanction for its intentional refusal to conduct discovery is to enter default judgment establishing their liability under Fed.R.Civ.P. 37.[24] As a matter of law, that sanction cannot now be challenged, much less reversed.

Nor could the PA now remedy its prior refusal to do discovery even if it wanted to: as discussed above, four of the PA officers whom the PA was ordered to produce for depositions in 2003 – Arafat, Dahlan, Jabali and al-Hindi – are either dead or no longer employed by the defendants, and many of the documents requested by the plaintiffs – i.e. all responsive documents located in the Gaza Strip, from which the defendants were expelled by Hamas in June 2007 – are now no longer under defendants' control. Since the Court already held that plaintiffs are entitled to depose these witnesses and receive these documents, that holding is the law of the case for the purposes of the instant motion and defendants cannot now argue that these witnesses or documents are unnecessary to plaintiffs' case.

Thus, because the PA's liability was established as a matter of law as a <u>sanction</u> for its refusal to provide discovery, as a matter of law the PA cannot now claim to have a meritorious defense.

## VIII. DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE THEY ARE ACTING IN BAD-FAITH

Defendants are not entitled to equitable relief under Rule 60(b)(6) because they are acting in bad faith in several ways. First of all, as shown above, this motion is founded on the blatantly

---

[24] While Fed.R.Civ.P. 37 refers to the sanction of "default judgment" it is obvious that a defendant's jurisdictional defenses cannot be impacted by the discovery sanction of "default judgment," nor can a plaintiff's damages be established thereby. *See e.g. Michigan Window Cleaning Co. v. Martino*, 173 F.2d 466, 468 (6th Cir. 1949) (court entering Rule 37 sanction of default judgment must determine separately whether it has subject-matter jurisdiction); *Volkart Bros., Inc. v. M/V Palm Trader*, 130 F.R.D. 285, 288 (S.D.N.Y. 1990) (Rule 37 sanctions may be imposed only if the court has personal jurisdiction over the party that has refused compliance). Indeed, this Court disposed of defendants' jurisdictional defenses and the matter of plaintiffs' damages separately – as a necessary prerequisite to actual entry default judgment – despite having imposed "default judgment" as a sanction. Thus, the effect of a sanction of default judgment under Rule 37 is to establish the defendant's <u>liability</u>.

false claim that defendants "misunderstood" U.S. law. Parties who seek to mislead the court are not entitled to equity, and certainly not to Rule 60(b)(6) relief:

> [I]t is unfathomable that this Defendant would have the audacity to come before this Court seeking to have a default vacated by means of patently false representations . . . It is generally inadvisable to defraud the court from which one seeks relief.

*Boron v. West Texas Exports*, 680 F.Supp. 1532, 1536 (S.D.Fla. 1988) (denying motion to vacate default).

Furthermore, it is pellucid that if the Court were to grant the instant motion and ultimately enter a new judgment in favor of the Ungars after trial, the defendants would not pay it. Not only does defendants' motion nowhere pledge to pay any new judgment, such a pledge would be demonstrably false: defendants continue to refuse to honor the $2 million judgment in the *Bucheit v. Palestinian Authority* case, which was entered years ago, as recently confirmed by counsel for the *Bucheit* plaintiffs. *See* email correspondence between Michael Selter, Esq., and David Strachman, Esq., December 31, 2007, Exhibit EE. Nor have defendants moved to vacate *Bucheit*. They simply refuse to pay, exactly as they have refused to pay the judgment in this action for well over three years now, and exactly as they would refuse to pay a future judgment in the Ungars' favor entered after trial.

Thus, defendants' representation that they have "turned over a new leaf," and are now prepared to respect and comply with the orders of the courts of the United States in good faith, is a full-blown fraud. Defendants are more than happy to invoke the power of our courts for their benefit – the instant motion being a good example – but will not respect the authority of the courts when it comes to paying a judgment.

This entire motion is therefore nothing but a "heads we win tails you lose" proposition, wherein the defendants can only win and the Ungars can only lose.

Since defendants are acting in bad faith, the instant motion should be denied.

**IX.    CONCLUSION**

Defendants' motion should be denied.

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman  #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

**CERTIFICATION**

I hereby certify that on February 6, 2008 this document and the attached exhibits were served  via ECF to the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701

  /S/ David J. Strachman