**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**THE ESTATE OF YARON UNGAR, et al.,**

**Plaintiffs – Judgment Creditors,**

**v.** **C.A. No. 00 – 105 L/DLM**

**THE PALESTINIAN AUTHORITY, et al.,**

**Defendants – Judgment Debtors.**

**PLAINTIFFS – JUDGMENT CREDITORS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF FROM DEFAULT JUDGMENT**

**INTRODUCTION**

Plaintiffs – judgment creditors ("Ungars") are the orphaned children, parents, siblings and administrator of the estate of United States citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat Ungar in a terrorist machine-gun attack on June 9, 1996, in Israel.

In March 2000, the Ungars filed suit in this Court against the Palestinian Authority ("PA"), the Palestine Liberation Organization ("PLO"), HAMAS and other defendants under the Antiterrorism Act ("ATA") 18 U.S.C. §2331 *et seq*..

The PA and PLO retained former United States Attorney General Ramsey Clark, Lawrence Schilling, and the firm of Edwards & Angell to defend the suit, and filed repeated

motions to dismiss on multiple grounds, as well as an interlocutory appeal, all of which were rejected. *See Ungar v. Palestinian Authority*, 153 F.Supp.2d 76 (D.R.I. 2001); *Ungar v. Palestinian Authority*, 228 F.Supp.2d 40 (D.R.I. 2002); *Ungar v. Palestinian Authority*, 215 F.R.D. 36 (D.R.I. 2003); *Ungar v. Palestinian Authority*, 2003 WL 21254790 (1st Cir. 2003); *Ungar v. Palestinian Authority*, 315 F.Supp.2d 164 (D.R.I. April 23, 2004).

Though the PA and PLO repeatedly invoked the authority of this Court and the First Circuit in order to dismiss the suit, when their arguments were rejected they refused to answer the complaint or conduct any discovery.

Accordingly, on July 12, 2004, this Court ordered entry of final judgment for the Ungars and against the PA and PLO, jointly and severally, in the amount of $116,409,123. *Ungar v. Palestinian Authority*, 325 F. Supp.2d 15 (D.R.I. 2004).[1]

The PA and PLO appealed to the First Circuit, which affirmed the judgment, and a petition for certiorari was denied by the Supreme Court. *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005).

Upon entering final judgment, this Court emphasized the importance that it attached to the judgment being honored and enforced:

> The PA and PLO . . . are responsible for and must bear the ultimate burden of providing compensation, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to June 9, 1996. This Court hopes that in keeping with the ATA's purpose to deter acts of international terrorism, its judgment will "interrupt or at least imperil the flow of terrorism's lifeblood, money," and thus, prevent the PA and PLO from funding future terrorist acts such as the one that resulted in the Ungars' horrific deaths.

[1] The Court received testimony and evidence regarding plaintiffs' damages in the context of entering judgment against Hamas. At plaintiffs' request – to which the PA and PLO did not object – the Court applied those same damages findings in entering judgment against the PA and PLO. *See Ungar*, 325 F. Supp.2d at 24-25, 66-67.

*Ungar*, 325 F. Supp. 2d at 25.

Well over ***three and a half years*** have passed since this Court penned this powerful statement, but the PA and PLO have refused to satisfy the Ungars' judgment, and have informed the Ungars' counsel that they "will never pay" the judgment. This contumacious refusal is merely the encore to years of intentional delay created by the PA and PLO during the underlying suit. *Ungar*, 325 F. Supp.2d at 26, 62 (finding that the PA and PLO took "deliberate actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible").

Other courts have since noted that the Ungars are faced with "an elusive . . . judgment debtor." *Ungar v. Palestinian Authority*, 412 F. Supp.2d 328 (S.D.N.Y. 2006). *See also Estate of Ungar ex rel. Strachman v. Palestinian Authority*, 841 N.Y.S.2d 61, 65 (1st Dept. 2007) (noting the Palestinian "Authority's documented history of engaging in dilatory tactics to plaintiffs' detriment in the underlying and other litigation").

Indeed, in light of the refusal of the PA and PLO to pay the judgment, this Court issued an injunction on May 5, 2005, prohibiting the PA and PLO from withdrawing or transferring any assets they may have in the United States. Exhibit A.

The U.S. Secretary of State has advised the defendants that the judgment of this Court "is final and enforceable in United States courts against property or interests owned by the PA, PLO, or Hamas" and cautioned the defendants "to respond to U.S. legal proceedings in good faith and a timely manner." Exhibit B. Secretary Rice also informed the defendants that if they wish to avoid enforcement actions they should come to terms with the plaintiffs. *Id*.

Defendants have disregarded the sound advice tendered by Secretary Rice, and instead have continued post-judgment the same contumacious pattern of conduct which marred the underlying proceedings before this Court: they have refused to honor the judgment, refused to

comply with post-judgment discovery requests served by the Ungars, and attempted to thwart, frustrate and delay the numerous enforcement proceedings that the Ungars have been compelled (at huge expense and effort) to bring.

Despite the best efforts of the defendants and their affiliates, the Ungars are today on the verge of collecting some or all of their judgment, and await decisions in their enforcement proceedings in several jurisdictions. *See* Declaration of Robert J. Tolchin ("Tolchin Declaration") Exhibit C.

Now, with the Ungars poised to finally receive the compensation awarded them by this Court for the 1996 murder, defendants have filed a motion for relief under Fed.R.Civ.P. 60(b)(6), seeking to set aside the judgment and start this case over again.

As shown below, defendants' motion is not only meritless but frivolous, and should be firmly denied.

## ARGUMENT

### I. DEFENDANTS' DEFAULT WAS WILLFUL AND STRATEGIC AND RULE 60(b) RELIEF IS THEREFORE UNAVAILABLE

It is an iron-clad rule of federal jurisprudence that willful and strategic defaults are ***never*** to be relieved from under Rule 60(b)(6). *See Ackermann v. U.S.*, 340 U.S. 193, 198 (1950) ("free, calculated, deliberate choices are not to be relieved from" under Rule 60(b)(6)); *Claremont Flock Corp. v. Alm*, 281 F.3d 297, 299-300 (1st Cir. 2002) ("party must be 'faultless' to avail itself of Rule 60(b)(6) relief") (citing *Pioneer Inv. Servs. Co. v. Brunswick Assoc.*, 507 U.S. 380, 393 (1993); *Paul Revere Variable Annuity Ins. Co. v. Zang*, 248 F.3d 1, 6 (1st Cir. 2001) ("[B]y no stretch of the imagination can . . . voluntary, deliberate, free, untrammeled choice[s] compare with the 'exceptional circumstances' found in other [Rule 60(b)(6)] cases . . . The law presumes that parties will make choices to protect their legal interests, even though

those choices may at times involve a calculated risk. Where a party makes a considered choice, though it may involve some calculated risk, he cannot be relieved of such a choice because hindsight seems to indicate to him that, as it turns out, his decision was probably wrong.") (quoting *Ackermann*) (internal quotations omitted); *Lubben v. Selective Service System Local Bd. No. 27*, 453 F.2d 645, 651-652 (1st Cir. 1972) (holding that "an exercise of free choice . . . preclude[s] 60(b)(6) relief" and therefore denying a Rule 60(b)(6) motion filed by the U.S. government since the government's "decision . . . was one of unfettered choice and free will. Having made that choice, the government must now live with its decision.").

Defendants, who are acutely aware that "an exercise of free choice . . . preclude[s] 60(b)(6) relief" (*Lubben*, 453 F.2d at 651), claim in their motion that their default in this action was not willful, but rather the result of their "basic misunderstanding" of the U.S. legal system, and that this "misunderstanding" entitles them to relief from judgment. Defs' Memo at 31-41.[2]

This claim can and should be rejected for multiple reasons:

***First***, it is completely vague and conclusory. Defendants nowhere explain exactly what it is they "misunderstood" about United States law that they have suddenly come to "understand."

***Second***, defendants fail to support this claim with a whit of evidence, because none exists. On the contrary, the Declaration of Salam Fayyad (submitted by defendants in support of their motion) states explicitly that the defendants have (allegedly) abandoned their previous position of recalcitrance regarding the actions brought against them in the United States only because they realized that ***it is in their own self-interest*** to do so:

[2] Much of defendants' argument in this section of their memorandum (pp. 31-41) discusses alleged events ***after*** entry of judgment, and the subsequent death of Yasser Arafat. Events which occurred after judgment was entered are of course irrelevant to the question of whether defendants' default was willful. However, the post-judgment chronology is relevant to whether this motion was filed within a reasonable time as required by Rule 60(b), and will therefore be addressed in Part ___ below, which deals with the issue of timeliness.

> It is my belief that there are meritorious defenses to the claims brought in the United States and it is important to the PA to present those defenses. Moreover, **it is important to the PA's role in the international community to participate in the legal process**, even when it is process brought in the United States for actions by others that occurred far from the United States. **The importance of this was not fully appreciated by the PA government, as a whole, until recently. Now we can act on that understanding, and we therefore seek to contest this litigation . . .**

Defs' Exhibit B at ¶ 13 (emphasis added).

Thus, defendants' own witness collapses their entire "misunderstanding" argument, and confirms that their recent change in strategy did not result from the correction of some "basic misunderstanding" of the U.S. law, but rather from a new assessment of their own self-interest.

***Third***, defendants were represented from day one in this case by their longstanding counsel former Attorney General of the United States, Ramsey Clark and Lawrence Schilling as well as by Deming Sherman, the head of the litigation department at one of the largest firms in New England, Edwards & Angell, and several other lawyers from that firm. Defendants' claim that they were unable to understand these proceedings is therefore facially ludicrous.[3]

***Fourth***, these defendants have demonstrated their complete familiarity with the American legal system, and the requirements of answering and conducting discovery, in the matter of *Bucheit v. Palestinian Authority*, No. 00-1455(GK) (D.D.C.). In *Bucheit*, after their

---

[3] Notably, defendants nowhere assert that their counsel failed to keep them properly informed about the progress of the case and implications of defendants' strategy.

Indeed, the fact that Mr. Sherman and Edwards & Angell have remained on as defendants' counsel to this day can only be seen as a vote of confidence in their representation of defendants in the past. Moreover, defendants recently retained Edwards & Angell to represent them in yet ***another*** terrorism case. *See Saperstein v. Palestinian Authority*, 04-cv-20225-PAS (S.D.Fla), docket caption. Since defendants have now ***expanded*** the scope of Edwards & Angell's representation, they must surely be satisfied with the advice and representation they have received from that firm until now.

In any event, an attempt by defendants to falsely blame their counsel for their own decisions would have been doomed to failure, since the First Circuit has "consistently 'turned a deaf ear to the plea that the sins of the attorney should not be visited upon the client.'" *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 16 (1st Cir. 2003) (quoting *Farm Constr. Servs., Inc. v. Fudge*, 831 F.2d 18, 21 (1st Cir. 1987)).

motion to dismiss was denied the PA and PLO conducted discovery and went to trial, long before their intentional default of this case. *See id*. dkt. # 50 *et seq*.[4]

Similarly, in the *Klinghoffer* litigation, after its Rule 12(b) motions were denied the PLO answered the complaint and proceeded to merits discovery before settling on the eve of trial. *See Klinghoffer v. S.N.C. Achille Lauro*, Nos. 85 Civ. 9303(LLS), 85 Civ. 9708(LLS) (S.D.N.Y.), docket, *passim*. The First Circuit has already held that the PLO's rich experience litigating *Klinghoffer* between 1985-1997 precludes any claim that the PA and PLO – represented by the same counsel and headed by the same person, i.e. Yasser Arafat – are unfamiliar with our legal system:

> [T]he appellants complain that they were deprived of an opportunity to make a proper showing by the district court. In particular, **they complain that the court's handling of the immunity issue – withholding action on their motion for "leave to assert" such a defense, stating during a hearing that immunity was not then being considered, and thereafter deciding the issue – took them by surprise. This procedural objection rings hollow**. The appellants had ample opportunity to file a properly supported motion under Fed.R.Civ.P. 12(b)(1) seeking dismissal on sovereign immunity grounds. They did not need leave of court to file such a motion and assert such a defense. Indeed, they did just that, through the same counsel, in unrelated litigation thirteen years ago. *See Klinghoffer v. S.N.C. Achille Lauro*, 739 F.Supp. 854, 856-58 (S.D.N.Y. 1990), *vacated on other grounds*, 937 F.2d 44 (2d Cir. 1991). **That course of conduct belies their present complaint.**

*Ungar v. Palestinian Liberation Organization*, 2003 WL 21254790 (1st Cir. 2003) (emphasis added).

Defendants' new claim of "misunderstanding" is simply more "playing dumb" of the precise type they tried and failed to peddle to the First Circuit.

---

[4] As discussed below, defendants have refused to pay the final judgment entered against them in *Bucheit*, a case which has nothing to do with terrorism, thereby demonstrating that their claims are pure nonsense cooked up for the purpose of this motion.

***Fifth***, it is an incontestable matter of record that defendants' default was knowing and intentional. This Court expressly found that:

> [I]t is clear that [defendants'] failure to file an answer to Plaintiffs' Amended Complaint is the result of a deliberate choice and not due to an inability to file an answer. The Palestinian Defendants acknowledge that "[t]he drafting and filing of an answer is within defendants' limited capacities . . ." *Id*. at 2. Indeed, it would be almost impossible for them to contend otherwise given their extensive filings as reflected in the above stated travel. In addition, their counsel, Mr. Ramsey Clark, indicated at the hearing on April 1, 2003, that he had met with President Yasser Arafat in December of 2002 in Ramallah. It is reasonable to assume that this lawsuit was among the matters discussed.

*Ungar v. Palestinian Authority*, 215 F.R.D. 36, 39 (D.R.I. 2003).

Indeed, this decision is actually an understatement, because at the hearing on April 1, 2003, Mr. Clark specifically stated that he had expressly discussed this case – "what we call the lead case" – with Arafat and the Palestinian leadership at their meeting in December 2002. Transcript, April 1, 2003, Exhibit D, at 8-9.

This Court reiterated this finding upon entering judgment. *Ungar*, 325 F.Supp.2d at 23 ("[T]hese Defendants decided and instructed their counsel not to answer the Amended Complaint or participate in discovery and therefore, were defaulted.")

Likewise, at a hearing in September 2004 the Court stated:

> I advised these Defendants a long time ago that the proper way to raise the defense of sovereign immunity was to file an Answer and to raise the affirmative defense of sovereign immunity and then I would have a hearing on that matter. I would stay discovery until that matter was resolved.
>
> Mr. Clark came into court and said unequivocally that Yasser Arafat did not want to file an Answer in this case and did not want to defend this case on the merits.

*See* Transcript, September 23, 2004, Exhibit E, at 3.

Similarly, in imposing the sanction of default on the PA for its failure to conduct discovery the Court expressly found that the PA had acted deliberately. *Ungar*, 325 F.Supp.2d at 63 ("the court rejects as implausible its implicit claim that it could not have answered a single interrogatory, responded to a single request for admission, or produced a single document sought by Plaintiffs . . . the proposition that none of the seven persons noticed for deposition would ever be available to be deposed at any time in any place strains credulity . . . I find the PA's failure to answer Plaintiffs' discovery requests to have been willful.").

Defendants did not appeal this Court's findings that their failure to answer and to conduct discovery had been willful; on the contrary, the Court of Appeals found on the basis of defendants' own words that their default had been intentional and designed to accomplish "some obscure strategic aim":

> By the time that the district court ordered the entry of a default, the defendants still had not moved to dismiss on the ground of sovereign immunity. The district court found, and the defendants' own words appear to confirm, that **this recalcitrance was intentional and designed to accomplish some obscure strategic aim.**

*Ungar*, 402 F.3d at 293 (emphasis added).

Accordingly, defendants are now precluded as a matter of law from disputing these findings of willfulness, because Rule 60(b) may not be used to relitigate issues already decided in the underlying case or on appeal. *See e.g. Dasey v. Massachusetts Dept. of State Police*, 111 Fed.Appx. 620 (1st Cir. 2004) (holding that a party "may not use a Rule 60(b) motion to relitigate issues already decided by [the court of appeals], or to raise issues that might have been, but were not, asserted in prior court proceedings.") *George P. Reintjes Co., Inc. v. Riley Stoker Corp.*, 71 F.3d 44, 49 (1st Cir. 1995) ("Rule 60(b) does not license a party to relitigate, whether via motion or independent action, any 'issues that were made or open to litigation in the former action where

he had a fair opportunity to make his claim or defense.'") (quoting Moore, 7 Federal Practice, ¶ 60.37); *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 60 (2nd Cir. 1984) (a party "may not use proceedings seeking relief from or modification of a judgment under F.R.Civ.P. 60 simply to relitigate matters settled by the original judgment."); *In re Wylie*, 349 B.R. 204, 209 (9th Cir.BAP 2006) ("when reconsideration is sought under FRCP 60(b) after the appeal period has expired, the party seeking reconsideration is not permitted to revisit the merits of the underlying judgment or argue that the trial court committed some legal error in arriving at that judgment."); *Standard Quimica De Venezuela v. Central Hispano Intern., Inc.*, 189 F.R.D. 202, 205 n. 4 (D.P.R. 1999) ("a motion under Rule 60(b) cannot be used as a vehicle to relitigate matters already litigated and decided by the court."); *Gibson v. Commissioner of Mental Health*, 2006 WL 2192865 at *2 (S.D.N.Y. 2006) ("Rule 60(b) motions that simply attempt to relitigate issues and thereby circumvent the appellate process are routinely dismissed."); *Batac Dev. Corp. v. B & R Consultants, Inc.*, 2000 WL 307400, at *3 (S.D.N.Y. 2000) (holding that a party "may not . . . use Rule 60(b) as a substitute for appeal or to relitigate matters already resolved by the court adversely to that party."); *Nutter v. Wefald*, 885 F.Supp. 1445, 1450 (D.Kan. 1995) ("Not a substitute for a direct appeal, a rule 60(b) motion addresses matters outside the issues on which the judgment was entered. It is not the opportunity for the court to revisit the issues already addressed in the underlying order . . .") (citation omitted).

Thus, the fact that defendants willfully defaulted this case is *res judicata* today. And that fact also dooms defendants' Rule 60(b) motion, since it is black-letter law that when a defendant's default was intentional, her Rule 60(b) motion must be denied, irrespective of whether she can demonstrate a meritorious defense and an absence of prejudice to the non-moving party:

> A finding of willful default **ends the inquiry,** for when the court finds an intentional failure of responsive pleadings **there need be no other finding.**

*Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (emphasis added).

Likewise:

> [I]f a party willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, **the court need make no other findings** in denying relief.

*Compania Interamericana Export-Import v. Compania Dominicana De Aviacion*, 88 F.3d 948, 951-952 (11th Cir. 1996) (emphasis added).

Similarly,

> Because this Court finds that APT/UK willfully defaulted in this case, **there is no need to consider whether APT/UK had meritorious counterclaims and the possible prejudice to APT/NY if the default judgment is vacated.** *See Bank of Montreal v. Mitsui Mfrs. Bank,* No. 85 Civ. 1519, 1992 WL 79293, at *1 (S.D.N.Y. Apr. 7, 1992) ("A finding of willful default, however, concludes the Court's inquiry under Rule 60(b)"); *Bank United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Assocs.*, 755 F.Supp. 1195, 1205 (S.D.N.Y. 1989) (ruling that if defendant's default was willful, there is "no need to consider whether [defendant] has a meritorious defense and the resulting prejudice to [plaintiff] if the default judgment [were] vacated").

*Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, 2002 WL 562650 at *7 (S.D.N.Y. 2002) (emphasis added). *See also Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 507 (2nd Cir. 1991) ("A default should not be set aside when it is found to be willful."); *Jones v. Phipps*, 39 F.3d 158, 165 (7th Cir. 1994) ("[E]ven if [defendant] had a meritorious defense, her failure to demonstrate good cause for her default and quick action to rectify the default is sufficient to deny her motion to vacate the default judgment."); *Ackermann*, 340 U.S. at 198 ("free, calculated, deliberate choices are not to be relieved from" under Rule 60(b)(6)); *Claremont Flock Corp*, 281 F.3d at 300 ("party must be 'faultless' to avail itself of

Rule 60(b)(6) relief"); *Lubben*, 453 F.2d at 651 ("an exercise of free choice . . . preclude[s] 60(b)(6) relief").

**Thus, the Court need go no further. Defendants took an intentional decision to default this case. They are therefore not entitled to Rule 60(b) relief, period, and granting their motion would turn half a century of dispositive decisional law on its head.**

Defendants attempt to evade this fatal defect in their motion with the argument that "courts are generally more lenient in setting aside default judgments obtained against foreign governing entities." Defs' Memo at 39. This argument is meritless, for the reasons below.

In the first place, the cases cited by defendants for this purported rule do not involve "foreign governing entities" as defendants wishfully assert, but rather **foreign states** generally entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"). As this Court and the First Circuit have determined (and as another federal court found again just recently *see Biton v. Palestinian Interim Self-Gov't Auth.*, 510 F.Supp.2d 144, 147 (D.D.C. 2007)), neither the PA nor the PLO is a foreign state.

Accordingly, any such rule of leniency, if it existed, would have no application to these defendants. Indeed, given the history of this case it is astonishing that defendants have the gall to equate themselves with foreign states.

Moreover, an examination of the cases cited by the defendants reveals that they are either no longer good law, or involve facts and circumstance light years from those obtaining here:

Defendants quote *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189 (2nd Cir. 1989) as stating that "Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside."

But the Second Circuit subsequently clarified that *First Fidelity* did ***not*** state any general rule of leniency in respect to foreign states, and was limited to the unique facts of that case:

> [R]elying on *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission,* 877 F.2d 189, 196 (2d Cir. 1989), BAF argues that the default judgment should be set aside under Rule 60(b)(6) because "default judgments are disfavored, especially those against foreign sovereigns." *Id.* at 196. It is true that the *First Fidelity Bank* court stated that "[c]ourts go to great lengths ... to permit [default] judgments against foreign sovereigns to be set aside." *Id.* But *First Fidelity Bank* was a distinctly different case than the one at hand. The issue in *First Fidelity Bank* was the extent to which the foreign sovereign defendant was bound by the actions of its ambassador to the United Nations and whether the district court had jurisdiction in the circumstances. This was a case which had "serious implications for the relationships between the United States and all foreign states that send duly accredited ambassadors to head their diplomatic missions in this country." *Id.* at 196-97 (Newman, J., dissenting). The case before us is fundamentally an ordinary contract dispute which has no such profound implications.

*Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 462 (2nd Cir. 1994).

Indeed, in *Transaero* the Second Circuit affirmed the district court's refusal to set aside a default judgment against a foreign state.

Likewise, in *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2nd Cir. 1994), the Second Circuit affirmed the district court's refusal to grant a foreign state relief from a default judgment.

Defendants' claim that *First Fidelity* creates a special rule of leniency under Rule 60(b) for foreign states (or governments) is thus meritless.

Furthermore, in *Commercial Bank of Kuwait* the Second Circuit took pains to point out that *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986) – which the instant defendants rely upon heavily throughout their papers here – turned primarily on the finding that

the FSIA does not apply retroactively, and in any case is not the law outside of the Eleventh Circuit.

Notably, a subsequent decision of the Eleventh Circuit, *Compania Interamericana Export-Import v. Compania Dominicana De Aviacion*, 88 F.3d 948, 951-952 (11th Cir. 1996), which affirmed a district court decision refusing to set aside a default entered against a foreign state, demonstrates that *Jackson* created no rule of leniency even in the Eleventh Circuit.[5] [6]

Defendants' attempt to rely on *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987) is also completely unavailing. There, the district court vacated a default judgment against Bolivia only after finding that it did not have jurisdiction (i.e. that Bolivia was immune) under the FSIA. The court of appeals reversed, finding that Bolivia was not immune from suit. But the court of appeals ***made no decision*** as to whether the default judgment should stand, and merely remanded for the district court to consider whether there was ground to vacate the judgment on the basis of other defenses asserted by Bolivia. *Id*. at 1545. Significantly, the other defenses asserted by Bolivia which concerned the court were jurisdictional defenses – not merits defenses – specifically: that the case was barred by the "act of state doctrine" and by an arbitration agreement. *See id.* at 1545; *Practical Concepts, Inc. v. Republic of Bolivia*, 613 F.Supp. 863, 865 n.1 (D.D.C. 1985). *See also Practical Concepts*, 811 F.2d at 1552 (citing U.S.

---

[5] Defendants seek to distinguish *Compania Interamericana* as dealing with a foreign state instrumentality, rather than with the foreign state itself. This approach is specious, both because under FSIA §1603 the instrumentality of a foreign state is defined as a "foreign state" and is entitled to full sovereign immunity, and because some of the cases cited by defendants themselves in purported support of their "leniency" theory (*e.g. Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989)) involve agencies or instrumentalities of foreign states. Indeed, the First Circuit explicitly cited *Compania Interamericana* as "permitting entry of default **against foreign state** due to its willful failure to comply with court orders." *Ungar*, 402 F.3d at 294 (emphasis added).

[6] It is highly significant, and not a coincidence, that all or virtually all the cases cited by the defendants (*Jackson*, *First Fidelity*, *Practical Concepts*) are from the 1980s, and that the cases declining to open defaults against foreign states (*Transaero*, *Compania Interamericana*) are later cases. The FSIA was passed only in 1976, and it is understandable that in the first few years subsequent to its enactment courts may have been willing to forgive foreign states which were truly caught unawares by the elimination of the doctrine of absolute immunity which had obtained until then. But by the 1990s, two decades after the FSIA had been enacted, any such liberal tendency in the case law had vanished.

amicus brief for importance of allowing a defendant foreign state to assert "legal" defenses in respect to default judgment).

Thus, not only does *Practical Concepts* provide no support for the instant defendants' demand to set aside the judgment in order to now litigate on the ***merits***, but on the contrary, the court of appeals explained at length that a defendant which intentionally defaults ***forfeits the right to litigate on the merits***. *Practical Concepts*, 811 F.2d at 1557-1548.

Furthermore, in all of the cases cited by defendants in which default judgment against a foreign state was vacated, the default judgments were set aside specifically because the court determined as a threshold matter of law that the sovereign was immune (*Jackson*, *Practical Concepts*) or because the sovereign immunity issue – and thus the court's subject-matter jurisdiction – had not yet been litigated (*First Fidelity*, *Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989), *Hester Intern. Corp. v. Federal Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989)).

Thus, (aside from the dispositive fact that the defendants are not foreign states) none of these cases is apposite here because the defendants' immunity and the Court's subject-matter jurisdiction are ***not*** at issue in this case; on the contrary, their immunity argument was rejected ***three times*** before judgment was entered – twice by this Court (*see Ungar*, 228 F.Supp.2d 40; *Ungar*, 315 F.Supp.2d 164) and once by the Southern District (*see Knox v. Palestine Liberation Org.*, 306 F.Supp.2d 424 (S.D.N.Y. 2004)).

Indeed, in *Gregorian*, the Ninth Circuit expressly held that a foreign state's belief that it was immune from U.S. jurisdiction would be considered "reasonable" – and its default therefore not "culpable" conduct under Rule 60(b) – *only* "until it has received a definitive indication to the contrary from the United States courts." *Gregorian*, 871 F.2d at 1525.

Therefore, since the instant defendants' immunity claims received not one but ***multiple*** "definitive indication[s] to the contrary from the United States courts" long before judgment, the defendants' default was clearly "culpable" even under the liberal rule set by the Ninth Circuit in *Gregorian* (which has not been adopted by the other circuits).[7]

Finally, the cases cited by defendants by defendants are wholly inapposite because in almost all of those cases (*Hester* appears to be the sole exception), the foreign defendant did not even appear in the case until ***after*** the default judgment had entered.

Here, of course, defendants not only appeared by counsel from day one – by the same counsel representing them today – but filed repeated motions to dismiss on every ground known to the federal rules, took an interlocutory appeal, appealed the final judgment, sought *en banc* review of the appellate decision and sought a writ of *certiorari* from the Supreme Court. Thus, this case was intensively litigated, the judgment herein is a default judgment only in the most technical, narrow sense of the term, and for these defendants to compare themselves to non-appearing defendants is simply laughable.

Such a comparison is also grossly impertinent. The instant defendants, in stark contrast to the defaulting foreign states in the cases which they cite, not only appeared in this case but ***intentionally delayed the legal proceedings by a series of bad-faith abuses***, as this Court expressly found. *See Ungar*, 325 F.Supp.2d at 26 (noting defendants' "deliberate actions to delay the completion of this litigation"); Transcript, September 23, 2004, Exhibit E, at 3 ("[T]here is some disingenuous conduct here and some attempts to delay the ultimate resolution of this case. This has been true throughout.").

---

[7] Moreover, even *Gregorian* applies only to the issue of whether an ***acknowledged*** foreign state, which is ***presumptively*** subject to the FSIA, reasonably believes that none of the FSIA exceptions to immunity applies. There is not the slightest evidence that *Gregorian* would apply to an entity ***claiming to be*** a "foreign state".

By contrast, the defaulting foreign state defendants in the cases defendants cite did not abuse the proceedings, they simply stayed away. Had they behaved in the same way as these defendants, they would not have been granted relief.

The PA/PLO not only delayed this case for years, they brazenly attempted a fraud on this Court: defendants submitted to this Court a declaration by their chief representative in the United States, Mr. Abdel Rahman, in which he swore under penalty of perjury that the PA had no representative in the United States, despite the fact – as this Court later found on the basis of "overwhelming" evidence– that Abdel Rahman ***himself*** was in fact the chief representative of the PA to the United States and had so represented himself to the Treasury Department, to the Senate and in his own biography. *See Ungar*, 325 F.Supp.2d at 56-59.

Needless to say, the defaulted foreign states in the cases to which the PA/PLO now point did not submit perjured affidavits to a federal court in an underhanded effort to deceive them into concluding that they lacked personal jurisdiction, and had they done so, they would not have received any relief whatsoever.

For the PA/PLO, with their track record of ***calculated*** bad-faith conduct, to now seek to cloak themselves in the mantle of the innocent and unwitting defaulting foreign defendants in the cases they cite, is truly the apogee of cynicism.

Indeed, defendants' contumacious conduct in the underlying action, standing alone, constitutes additional grounds to deny the instant motion. *See e.g. Class v Norton*, 376 F. Supp. 503 (D.C. Conn. 1974) *aff'd in part and rev'd in part on other grounds* 507 F.2d 1058 (2nd Cir. 1974) (extensive noncompliance by defendants with court's previous orders is significant consideration in determination whether relief under Rule 60(b)(6) is appropriate); *Griffin v. Swim-Tech Corp.*, 722 F.2d 677 (11th Cir. 1984) (district court properly denied motion under

Rule 60(b)(6) where judgment had been based upon inexcusable delay and numerous unjustified violations of court orders by moving party); *Allemand Boat Co. v Kirk*, 141 F.R.D. 438 (E.D. La. 1992) (justice would have been disserved by granting relief under Rule 60(b)(6) since defense counsel had disregarded rules of court, refused to accept guidance from court and opposing counsel, and had otherwise interfered with efficient administration of justice).

***

In sum, defendants' default was fully informed, intentional and strategic, and Rule 60(b)(6) relief is unavailable to them irrespective of whether they can demonstrate absence of prejudice to the Ungars and a meritorious defense (which, as will be shown *infra*, they cannot).

## II. DEFENDANTS' "MISUNDERSTANDING" CLAIM IS A RULE 60(b)(1) ARGUMENT AND IS THEREFORE BARRED AS UNTIMELY

Defendants' claim that their default resulted from a "misunderstanding" of the American legal system (which, as shown above, is a blatant falsehood), must also be rejected for the wholly separate reason that this claim is clearly one of "mistake, inadvertence, surprise, or excusable neglect" governed by Rule 60(b)(1), and therefore subject to the one-year time limit under that rule.

Any doubt that the instant motion is in fact an untimely Rule 60(b)(1) motion can be swiftly and dispositively dispelled by defendants' statements on page 37 of their memorandum, where they assert:

> The state of mind necessary to warrant rigid adherence to a default judgment is nuanced and heavily dependent on the facts. The D.C. Circuit has recently emphasized that political turmoil can properly be weighed in the default calculus when it hampers a foreign government's ability to defend. *FG Hemisphere Assocs., LLC*, 447 F.3d at 841 ("DRC [the Congo] was plainly hampered by its devastating civil war, which cost over three million lives [and] shattered the DRC's already shaky political structure . . . It is not surprising that the war would be accompanied by substantial

> confusion over responsibilities in the Foreign Ministry . . ."). As noted, at crucial stages of the litigation, the Occupied Palestinian Territories have been in a state of considerable turmoil -- turmoil that prevented Defendants from understanding the importance of full and complete participation in foreign litigation involving acts in Israel perpetrated by HAMAS.

Defs' Memo at 37.

By citing and quoting *FG Hemisphere* extensively, both here and elsewhere in their papers, defendants have effectively conceded the instant motion is a Rule 60(b)(1) motion, since *FG Hemisphere* is a Rule 60(b)(1) case. *See FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, 447 F.3d 835, 838 (D.C.Cir. 2006). In other words, by analogizing their circumstances and arguments to those of the Congo in *FG Hemisphere*, defendants have clearly affirmed that those arguments are controlled by Rule 60(b)(1).

Since defendants' arguments are governed by Rule 60(b)(1), they cannot serve as grounds for relief under Rule 60(b)(6), as the First Circuit found in a recent decision on all fours with the instant case and worth quoting at length:

> Rule 60(b) contains six subsections, the first five of which set forth specific grounds for relief. Subsections (1) through (3) carry a one-year time limit, while motions for relief under subsections (4) through (6) need only be made "within a reasonable time." *See Cotto v. United States*, 993 F.2d 274, 278 (1st Cir.1993). Subsection (6) is designed as a catch-all, and relief under that subsection "is only appropriate where subsections (1) through (5) do not apply." *United States v. Baus*, 834 F.2d 1114, 1121 (1st Cir.1987). "To justify relief under subsection (6), a party must show extraordinary circumstances suggesting that the party is faultless in the delay." *Pioneer Inv. Servs. Co. v. Brunswick Assoc.*, 507 U.S. 380, 393, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (internal quotation marks omitted). If a party is "partly to blame," Rule 60(b)(6) relief is not available to that party; instead, "relief must be sought within one year under subsection (1) and the party's neglect must be excusable." *Id.*
>
> Here, in seeking Rule 60(b)(6) relief, Alm characterizes himself as a foreigner unfamiliar with the American legal system and, on that

> basis, attempts to absolve himself of any fault for his failure to respond to court orders, motions, correspondence and discovery requests. He claims that he believed that his letter answer to the court put an end to the litigation, and therefore he was not surprised or concerned when he did not receive any further correspondence or notices regarding the court dispute.
>
> The district court found, however, that "Alm was a sophisticated international businessman who chose not to contact American counsel after he was served with the complaint." Furthermore, it is undisputed that Alm made no efforts to confirm that the lawsuit had been dismissed or withdrawn or to notify counsel or the court of an alternative mailing address. Nor is there any indication that Alm attempted to compel his wife to forward or preserve his mail. *See Cotto,* 993 F.2d at 278 ("[I]n our adversary system of justice, each litigant remains under an abiding duty to take the legal steps necessary to protect his or her own interests."). Accordingly, the district court determined that the default judgment was "attributable to [Alm's] own negligence and not to extraordinary circumstances beyond the party's control." The district court did not abuse its discretion in drawing this inference of fault from the evidence in the record.
>
> Accordingly, Alm cannot avail himself of Rule 60(b)(6) relief but rather is limited to seeking relief from judgment on grounds of excusable neglect pursuant to Rule 60(b)(1). *See Pioneer,* 507 U.S. at 393, 113 S.Ct. 1489 (holding that party must be "faultless" to avail itself of Rule 60(b)(6) relief). Any such request on that basis, however, would be untimely. As discussed *supra,* a litigant may move for Rule 60(b)(1) relief only within one year of the entry of judgment. *See* Fed.R.Civ.P. 60(b) ("The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."). Here, Alm filed his motion for relief over fourteen months after the court entered final judgment against him; thus any claim to Rule 60(b)(1) relief is time-barred.

*Claremont Flock Corp. v. Alm*, 281 F.3d 297, 299-300 (1st Cir. 2002).

The difference between Mr. Alm and the PA/PLO, of course, is that the latter intentionally defaulted for strategic reasons – conduct which is precisely the opposite of the "faultless" standard demanded by *Pioneer*.

For this reason, too, defendants' motion should be denied.

## III. THE PROPRIETY OF THE ENTRY OF JUDGMENT BY DEFAULT WAS ALREADY CONCLUSIVELY LITIGATED AND CANNOT BE CHALLENGED IN A RULE 60(b) MOTION

The instant motion can and should be denied for the additional reason that the very grounds for Rule 60(b) relief asserted by the defendants were already rejected by this Court and the First Circuit in the underlying action, as discussed below.

Defendants argue that the judgment should be set aside under Rule 60(b)(6) because when they refused to answer the complaint or conduct discovery:

> Defendants acted to protect what they reasonably perceived to be their rights under international law by asserting only jurisdictional and justiciability defenses. Although the First Circuit and this Court ultimately did not accept this legal position, Defendants' approach to the litigation was not so unreasonable as to warrant the imposition of multi-million dollar liability by default.

Defs' Memo at 31-32.

But this argument, which is the gravamen of defendants' motion, is ***precluded***, because Rule 60(b) may not be used to relitigate issues already decided in the underlying case or on appeal. *See e.g. Dasey, supra*, (a party "may not use a Rule 60(b) motion to relitigate issues already decided by [the court of appeals], or to raise issues that might have been, but were not, asserted in prior court proceedings.") *George P. Reintjes Co., supra*, ("Rule 60(b) does not license a party to relitigate, whether via motion or independent action, any 'issues that were made or open to litigation in the former action where he had a fair opportunity to make his claim or defense.'").[8]

The precise argument now made by the defendants in support of their Rule 60(b) motion – that they should not be "penalized" for their refusal to answer, because it stemmed from a

[8] See also the extensive cases cited above.

principled legal position – was raised by them on appeal, and thoroughly considered and rejected by the First Circuit. In dismissing this argument the First Circuit held:

> The defendants … refused either to answer the amended complaint or to comply with the court's discovery orders. In view of [the] history, we believe that the district court acted well within the encincture of its discretion in entering the default. *See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951-52 (11th Cir. 1996) (permitting entry of default against foreign state due to its willful failure to comply with court orders). The defendants deliberately chose to hold off on asserting a sovereign immunity defense – and **they must live with the consequences of that choice.**

*Ungar*, 402 F.3d at 293-294 (emphasis added). The First Circuit explained the rationale for this result as follows:

> [A]n entity alleging an entitlement to sovereign immunity may choose to ignore an action or court order directed at it, accept a default, and then assert its immunity at a later state of the litigation. But such a choice represents a rather risky gamble. If the assertion of immunity is valid, the defendant wins the entire pot (i.e., it walks away from the suit unscathed) **but if the assertion of immunity fails, the defendant loses outright (i.e., it must live with the default).**

*Ungar*, 402 F.3d at 293, n. 11 (emphasis added).

Thus, the First Circuit has already held, exactly contrary to defendants' claim that their "approach to the litigation was not so unreasonable as to warrant the imposition of multi-million dollar liability by default" (Defs' Memo at 31-32), that "defendants must live with the consequences of [their] choice" i.e. that since their "assertion of immunity fail[ed]" defendants "lose[] outright (i.e., [they] must live with the default)." *Ungar, id.*.

Accordingly, this entire argument has been litigated and so cannot serve as grounds for a Rule 60(b) motion. *See e.g. Dasey, George P. Reintjes Co.*, *supra*. Indeed, if this Court were to entertain this argument, it would in effect be reviewing the decision of the First Circuit as to the

propriety of the default judgment, and ultimately granting the defendants' a new appeal on this issue – to which they are not entitled – on any new findings that it makes.

Defendants' motion must therefore be denied.

## IV. DEFENDANTS' OTHER GROUNDS FOR RELIEF WERE ALREADY RAISED AND REJECTED IN THE UNDERLYING LITIGATION, AND IN ANY CASE ARE BASELESS, UNSUPPORTED AND HOPELESSLY VAGUE

Defendants also demand that the judgment be vacated (a) because of the purported "significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case" and (b) because the judgment will purportedly "Have a Devastating Financial Effect on the Palestinian People and Government." Defs' Memo at 38-44. As shown below, both of these arguments are utterly meritless.

In support of their "foreign policy consequences" claims, defendants present only a two-sentence argument, asserting that: "this judgment has already been the subject of diplomatic communications at the highest levels between our country's representatives in the State Department and the governing officials in the Occupied Territories. If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian government – a relationship that the Executive Branch of the United States government has characterized as being crucial to the Israeli-Palestinian peace process." Defs' Memo at 38-39.

Clearly, the fact that a foreign defendant has communicated with the State Department to complain about a law suit in U.S. courts is meaningless. And the claim that the judgment threatens to undermine the relationship between the United States and the PA is entirely vague.

Moreover, the defendants have been making identical claims all along – yet, the plain fact is that their relationship with the United States has never been warmer than it is now, and the peace process is back in full swing today:

➢ In the underlying case the defendants repeatedly warned that if this action were not dismissed the peace process would be destroyed. *See e.g.* Defendants' Motion Under Rule 8(A)(2) for a Stay Pending Appeal, April 22, 2003, *Ungar v. Palestinian Authority*, No. 03-1544 (1st Cir.), Exhibit F, at ¶ 14 ("Proceedings in this case in which the District Court assumes a stateless condition for the Palestinian people will have important political and governmental ramifications affecting the peace process in the Middle East, the Palestinian-Israeli conflict and violence"); *Id*. at ¶ 21("Large default judgments which in similar cases involving Iran, Rwanda, Bosnia and other governments and political movements and leaders have resulted in damages ranging from over one billion dollars to hundreds of millions of dollars. Such judgments can complicate a final settlement between Israel and Palestine"); Memorandum in Support of Palestinian Defendants' Objection to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2), August 21, 2003, dkt. # 221, at 2 ("discovery and this action generally pose a drastic, unacceptable threat to the Israeli-Palestinian peace process"); Memorandum in Support of Palestinian Defendants' Motion for Continuance of July 14, 2003 Hearing and Motion for Enlargement of Time to Respond to Plaintiffs' Motion for Judgment by Default Pursuant to Fed.R.Civ.P. 55(b)(2), July 11, 2003, dkt. #188, at 4 ("There are serious impediments to the entry of default judgment against defendants at this time. Defendants once again urge the Court to take judicial notice of . . . the extremely important public interests at stake in the current ongoing fragile peace process which in themselves provide an ample basis for forbearance.").

➢ After judgment was entered and the Ungars initiated their enforcement proceedings, PA finance minister Fayyad wrote to Secretary of State Rice on June 18, 2005, complaining fulsomely about the difficulties purportedly being suffered by the defendants,

warning in full hair-raising detail about the alleged threat to the defendants' financial stability, to peace efforts and to U.S. interests in the Middle East, and demanding that the United States intervene in the proceedings on the defendants' behalf. *See* letter from Salam Fayyad to Condoleezza Rice, June 18, 2005, Exhibit G.

- Defendants raised the same claims about a threat to the peace process and to their relationship with the United States in yet another letter they sent to Secretary Rice in April 2006. *See* letter from Afif Safieh to Condoleezza Rice, April 27, 2006, Exhibit H.

Thus, defendants have been sounding the tocsin of doom for the peace process and the U.S.-Palestinian relationship for years now, both prior and subsequent to judgment. Notwithstanding defendants' gloomy prognosis, however, the empirical fact is – as defendants themselves point out at length in the motion papers – that the United States today maintains a close relationship with the defendants' new leadership. Furthermore, it is a matter of public record (which will be discussed further below) that Israeli-Palestinian peace negotiations are back on track now for the first time in years.

In light of the above, it is clear that the instant judgment has done nothing whatsoever to harm either the peace process or defendants' relationship with the United States, both of which have newly-flourished in recent months.

Defendants' demand to set aside the judgment because of the allegedly "devastating" financial effect it will have is equally baseless. Moreover, this argument is barred at the threshold, because it was made by defendants in the underlying litigation and resoundingly rejected by this Court:

> These Defendants argue that the ultimate burden of this compensation will be borne by an impoverished and oppressed Palestinian people who currently suffer from a continuing humanitarian crisis. Defendants are hard pressed to succeed with

> this argument given the fact that they deliberately stated their intentions not to participate in and thus, waived a hearing on damages.
>
> Defendants' arguments are offensive at best . . . ***The PA and PLO, and not an impoverished and oppressed Palestinian people, are responsible for and must bear the ultimate burden of providing compensation***, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to [the murder].

*Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 24-25 (D.R.I. 2004) (emphasis added). *See also e.g.* Defendants' Motion Under Rule 8(A)(2) for a Stay Pending Appeal, April 22, 2003, *Ungar v. Palestinian Authority*, No. 03-1544 (1st Cir.), Exhibit F, at ¶ 22 ("Palestine is totally impoverished, its economic viability will depend on the terms of the peace agreement . . . its per capital income is less than 10% of the per capital of Israel and the political resolution of this conflict should not be burdened by extra territorial private tort litigation in U.S. courts.").

As discussed above, arguments litigated and lost in the underlying litigation cannot serve as grounds for a Rule 60(b) motion.

Furthermore, since spring 2005, the Ungars have restrained well over $100 million dollars of defendants' funds. *See* Exhibit C, Tolchin Declaration at ¶¶ 1-7. Yet, clearly, defendants have not collapsed as a result. Therefore, there would be no collapse if the Ungars succeed in enforcing their judgment against those long-frozen funds.

In a truly Orwellian twist, defendants point to the fact that they just received funding of some $7.4 billion as proof of their precarious situation. Defs' Memo at 42-43. But what defendants fail to inform the Court is that they had ***only sought*** funding of $5.5 billion to cover their needs, and that they now have a surplus of some $2 billion beyond their requirements. *See* Exhibits I.

Notably, moreover, defendants' entire claim of financial ruin is completely unsupported by any evidence, or any hard facts or figures about their current financial state, despite the fact that nothing would be easier than for them to submit such documentation.

Finally, defendants' argument that the judgment should be vacated because of specific enforcement actions taken by the Ungars is completely nonsensical. If the PA has an objection to a given enforcement proceeding, it can seek to oppose that proceeding. What could that possibly have to do with the underlying judgment?

This argument is particularly galling, considering that the PA itself has disregarded the judgment of this Court on the Ungars' creditor's bill in September 2006, awarding ownership of the Palestine Investment Fund ("PIF") to the Ungars. The PA's own financial publications show that the PA withdrew some $27 million dollars from the PIF between October – December, 2006 – i.e. ***after*** the PIF had been assigned to the Ungars. *See* Declaration of Marwan Abdel-Rahman, Exhibit J, at ¶ 3, Appendix 1.

A defendant which behaves lawlessly in this manner, brazenly disregarding the judgments of this Court (both the underlying judgment and the September 2006 judgment) is in no position to complain to the Court, and is certainly not entitled to equitable relief under Rule 60(b)(6).

## V. THE UNGARS WILL BE SEVERELY AND IRREPARABLY PREJUDICED IF THE JUDGMENT IS VACATED

A party seeking relief under Rule 60(b) bears the burden of proving that vacating the judgment will not prejudice the opposing party. *Caisse v. DuBois*, 346 F.3d 213, 215 (1st Cir. 2003) ("To succeed on a Rule 60(b) motion, the movant must show that . . . vacating the judgment will not cause unfair prejudice to the opposing party.").

Defendants have not even attempted to meet their burden of proving that vacating the judgment will not harm the Ungars, and for good reason: vacating the judgment would cause the Ungars severe and irreparable prejudice, as the defendants know full well and as is shown below.

### A. Key Deponents Are Dead or Unavailable and an Entire Universe of Responsive Documents Is Unavailable

In the First Circuit, "prejudice cannot be inferred merely from the passage of time but, instead, relates to whether 'witnesses have died,' 'memories have dimmed beyond refreshment,' a 'discovery scheme has been thwarted,' or 'evidence has been lost' during the time that elapsed from a party's default." *Snyder v. Talbot*, 836 F.Supp. 26, 30 (D.Me. 1993) (quoting *Coon v. Grenier*, 867 F.2d 73, 76 (1st Cir. 1989)). *See also e.g. Reilly v. Keystone Health Plan East, Inc.*, 1998 WL 422037 at *2 (E.D.Pa. 1998) ("Prejudice is demonstrated where 'circumstances have changed since the entry of the default such that plaintiff's ability to litigate its claim is now impaired in some material way or if evidence has become lost or unavailable.'") (quoting *Angelo Bros. v. A & H Co.*, 1996 WL 571720 at *2 (E.D.Pa. 1996)).

That is exactly the situation here: vacating the judgment in this action would cause the Ungars extreme prejudice – indeed, would leave them with no effective means of litigating this case – because since entry of judgment in this case, in July 2004, crucial witnesses have died or left the employ of the defendants, and an entire universe of relevant documents has been lost.

#### i. Arafat Has Died

Judgment entered in this case on July 13, 2004. Yasser Arafat, who was both the president of the PA and the chairman of the PLO, died four months later, on November 11, 2004. *See* Exhibit K.

This Court has accurately summarized the allegations of this case as follows:

> Plaintiffs, in essence, allege that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts of terrorism, including the attack on Yaron Ungar and his wife.

*Ungar*, 325 F.Supp.2d at 62.[9]

Arafat was named as a defendant in this action. Plaintiffs' complaint expressly alleged that Arafat was personally and directly involved in the PA's and PLO's provision of material support to Hamas. *See* Complaint, dkt. #1, at ¶¶ 29-41.

Though Arafat was dismissed from this case for lack of personal jurisdiction (*Ungar*, 153 F.Supp.2d at 95), in light of his direct, personal involvement in the provision of material support to Hamas by the PA and PLO, the Ungars sought to depose him in his official capacity as president of the PA regarding those activities. *Ungar*, 325 F.Supp.2d at 40, n. 22.

Accordingly, on January 24, 2003, the Ungars noticed Arafat's deposition in his capacity as president of the PA. *See* dkt. # 103; *Ungar*, 325 F.Supp.2d at 40. However, the PA refused to produce Arafat for his deposition, despite repeated extensions and warnings by the Court. *Ungar*, 325 F.Supp.2d at 41-43, 60-64.

It is obvious that if the judgment in this matter is vacated and the Ungars required to litigate without the benefit of Arafat's testimony, they would be severely prejudiced. Indeed, this Court has ***already*** found that the Ungars are entitled to depose Arafat, and are prejudiced by the absence of Arafat's testimony:

> As for the prejudice to Plaintiffs, it is clear that the PA's refusal to provide any discovery greatly prejudices Plaintiffs' ability to prove their claims. Plaintiffs, in essence, allege that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts

[9] Plaintiffs alleged that this conduct by the PA and PLO constituted both "international terrorism" and aiding and abetting "international terrorism" under 18 U.S.C. §2333, as well as the torts of Negligence, Breach of Statutory Obligation and aiding and abetting Assault under Israeli law. Amended Complaint ¶¶ 38-82.

> of terrorism, including the attack on Yaron Ungar and his wife. *See* Amended Complaint ¶ 35. By refusing to answer any interrogatories, admit any facts, produce any documents, or produce any officers or employees for depositions, the PA effectively frustrates the Plaintiffs' ability to prove their claims.

*Ungar*, 325 F.Supp.2d at 62.

The Court's holdings that the Ungars were entitled Arafat's testimony, and that the absence of that testimony prejudices the Ungars, are the law of the case and cannot be challenged by defendants in this motion. *George P. Reintjes*, 71 F.3d at 49 ("Rule 60(b) does not license a party to relitigate, whether via motion or independent action, any 'issues that were made or open to litigation in the former action where he had a fair opportunity to make his claim or defense.'"); *Standard Quimica De Venezuela*, 189 F.R.D. at 205 n. 4 ("a motion under Rule 60(b) cannot be used as a vehicle to relitigate matters already litigated and decided by the court."); *Nutter*, 885 F.Supp. at 1450 ("Not a substitute for a direct appeal, a rule 60(b) motion addresses matters outside the issues on which the judgment was entered. It is not the opportunity for the court to revisit the issues already addressed in the underlying order . . .") (citation omitted).

Moreover, Arafat is not some run-of-the-mill witness, the substance of whose testimony can be gleaned from other sources. On the contrary, the Ungars alleged from day one in this suit that Arafat ***personally led and orchestrated*** defendants' provision of material support and resources for Hamas (*see* Complaint, dkt. #1, at ¶¶ 29-41), including specifically the provision of financial support for Hamas' terrorism (*see Ungar*, 325 F.Supp.2d at 64).

Indeed, ***defendants themselves admit that decision-making in the PA was highly centralized in the person of Arafat when he was alive***. *See* Defs' Exhibit E at ¶ 3. Thus, since Arafat was the central decision-maker in the PA in his day, any serious attempt to discover the

facts of the PA's provision of material support to Hamas during Arafat's reign would *per se* necessarily require an examination of Arafat himself.

Finally, while the plaintiffs' allegations that Arafat personally directed and supervised defendants' terrorism may not have been common knowledge when this action was filed, they have subsequently been resoundingly confirmed by the United States government:

- On April 30, 2003, in a statement officially published by the White House, the White House spokesman confirmed that:

  > Yasser Arafat was not a party to peace. Yasser Arafat was a part of the problem . . . Yasser Arafat lied to President Bush . . . and ***actively worked on behalf of the terrorists***, lying to the President of the United States about Palestinian support, ***led by Yasser Arafat, for terrorism***.

  Exhibit L, p. 7 (emphasis added).[10]

- On May 4, 2006, the State Department declassified a report confirming that Arafat was personally involved in the abduction and murder of two U.S. diplomats by PLO terrorists in Khartoum. Exhibit M.

- In January, 2007, Secretary of State Rice publicly confirmed that Arafat "had one foot in terror and one foot in politics" and that under Arafat's rule the PA had been "overrun by its ties with terrorism." Exhibit N, p. 5.

In sum, Arafat was the central figure in defendants' provision of material support and resources to Hamas, and it would be impossible for the Ungars to fairly litigate this action without his testimony.[11]

---

[10] Downloaded from http://www.whitehouse.gov/news/releases/2003/04/print/20030430-10.html.

[11] Indeed, even if Arafat, the other deponents and the documents were all available today – and they are not – for the Ungars to attempt to put on their case at this late date, nearly 12 years after the murder itself and some 14 years after the defendants' provision of material support to Hamas commenced, would be extraordinarily difficult:

It is all too convenient for defendants to "repent" and demand a trial on liability now that Arafat, the main witness in this case, is dead and his testimony is unavailable to the Ungars. But defendants fail to realize that some things in life, such as the loss of Arafat's testimony, are simply irreversible and irreplaceable. Defendants can no more demand a trial on the merits now than they can bring Arafat back to life.

**ii. Deponent Razi Jabali Is No Longer Employed by Defendants and Currently Serves as an Advisor to the Leader of Hamas in Damascus**

The Ungars also noticed the deposition of Razi Jabali. *See* dkt. # 103.[12] Jabali was the commander of the PA Police, and was alleged by plaintiffs to have been personally involved with the provision of material support to Hamas by the PA and PLO. *See* Complaint, dkt. # 1, at ¶¶ 14, 17, 18, 20, 30, 35, 38, 40, 41, 44 and 46.

The Court ordered the defendants to produce Jabali for his deposition, but they refused. *Ungar*, 325 F.Supp.2d at 40-43, 60-64.

The defendants could not produce Jabali now even if they wanted to – and, notably, defendants have ***not*** offered to produce ***any*** of the deponents – because he no longer works for the PA. Indeed, Jabali currently resides in Damascus, Syria, where he serves as an advisor to Hamas leader Khaled Mashaal. *See* Declaration of Marwan Abdel-Rahman, Exhibit J, at ¶¶ 4-5, Appendices 2-3.

---

> Vacating the default and requiring the plaintiffs to litigate the merits of their case now-eight years after they commenced this action and nine years after the events complained of-surely would cause irreparable prejudice . . . The eight year delay . . . inevitably renders it difficult for plaintiffs to reconstruct and prove events which occurred almost a decade ago.

*Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 507-508 (2nd Cir. 1991).

[12] Jabali's first name is sometime transliterated as "Ghazi" rather than "Razi". *See* Declaration of Marwan Abdel-Rahman at ¶ 4, n. 1.

The absence of Jabali's testimony severely prejudices the Ungars, as this Court previously found. *Ungar*, 325 F.Supp.2d at 62.

Indeed, Jabali's importance as a witness is even clearer today, in light of the fact that his relationship with Hamas has blossomed into a full-blown advisory role.

**iii. Deponent Muhammed Dahlan Is No Longer Employed by Defendants**

The Ungars noticed the deposition of Muhammed Dahlan as well. *See* dkt. # 103. Dahlan was the commander of the "Palestinian Preventive Security Services," and was alleged by plaintiffs to have been personally involved with the provision of material support to Hamas by the PA and PLO. *See* Complaint, dkt. # 1, at ¶¶ 12, 17, 18, 20, 30, 35, 38, 40, 41, 44 and 46.

The Court ordered the defendants to produce Dahlan for his deposition, but they refused. *Ungar*, 325 F.Supp.2d at 40-43, 60-64.

The defendants could not produce Dahlan for his deposition now even if they wanted to, because he left the defendants' employ in mid-2007. *See* Exhibits O, P, Q.

Subsequent admissions by Dahlan demonstrate his crucial importance as a witness. The Ungars specifically informed the Court that Dahlan had been operating in close association with Hamas terrorist leader Muhammed Deif. *Ungar*, 325 F.Supp.2d at 64. Muhammed Deif is the leader of the Hamas' terrorist wing. *See* Exhibit R.

On January 22, 2006, Dahlan appeared in a televised pre-election debate with Hamas leader Mahmoud Al-Zahar, and openly admitted that the PA's security services, including Dahlan personally, had been sheltering Hamas' terrorist leadership, among them Deif:

> All [Hamas'] military commanders have been protected by the security establishment throughout this Intifada. They were provided with full protection, and Israel has accused us of this several times, and so has the American administration. I was the prominent person to be accused of this - Muhammad Deif was the leading figure (to receive protection). When they left our

> protection and moved to that of Hamas, half of them were assassinated.

*See* Exhibit J, Declaration of Marwan Abdel-Rahman at ¶ 6, Appendix 4.

Thus, precisely as the Ungars alleged, Muhammed Dahlan was personally involved in the defendants' provision of material support to Hamas' terrorist leadership, including Hamas terrorist commander Muhammed Deif.

The loss of Dahlan's testimony therefore seriously prejudices the Ungars.

**iv. Deponent Amin al-Hindi Is No Longer Employed by Defendants**

The Ungars also noticed the deposition of Amin al-Hindi. *See* dkt. # 103. Al-Hindi was the commander of the "Palestinian General Intelligence Services," and was alleged by plaintiffs to have been personally involved with the provision of material support to Hamas by the PA and PLO. *See* Complaint, dkt. # 1, at ¶¶ 13, 17, 18, 20, 30, 35, 38, 40, 41, 44 and 46.

The Court ordered the defendants to produce al-Hindi for his deposition, but they refused. *Ungar*, 325 F.Supp.2d at 40-43, 60-64.

The defendants could not produce al-Hindi for his deposition today (even if they wanted to) because (according to the biography of al-Hindi published by the Palestinian Academic Society for the Study of International Affairs) he was removed from his position in 2005. *See* Exhibit S.[13]

The absence of al-Hindi's testimony severely prejudices the Ungars, as this Court previously held. *Ungar*, 325 F.Supp.2d at 62.

**v. Defendants Cannot Produce Responsive Documents Located in Gaza**

[13] Downloaded from www.passia.org at "Palestine Facts & Info" and "Personalities."

As noted, plaintiffs alleged in this case "that the PA provided Hamas with safe haven, a base of operations, and material and financial support, which allowed Hamas members to commit acts of terrorism, including the attack on Yaron Ungar and his wife." *Ungar*, 325 F.Supp.2d at 62.

Accordingly, the Ungars served the PA with requests for production of documents intended to document the defendants' provision of support to Hamas for the commission of terrorism. *See* Exhibit T.

It is a matter of public record that in June 2007, the PA was driven out of Gaza by Hamas, and today exercises no authority in Gaza whatsoever:

> In June 2007, Hamas launched a wide-scale attack on PA security and police personnel and posts throughout the Gaza Strip. Hamas quickly routed the PA forces, many of whom were killed and captured, and destroyed *or took control of all of the PA's security and police posts and the PA's governmental offices throughout the Gaza Strip.*
>
> Thus, as, of June 2007, the Palestinian Authority exercises no control, authority or power whatsoever in the Gaza Strip.

*See* Declaration of Brigadier General (Res.) Yosef Kuperwasser, Exhibit U, at ¶¶ 23-24 (emphasis added).

Since the PA has no authority in the Gaza Strip today – indeed, since all of the PA's governmental offices in Gaza were seized by Hamas – the PA is utterly incapable of producing any responsive documents located in Gaza.

Thus, an entire universe of responsive documents is no longer in the defendants' possession, and the Ungars cannot possibly fairly litigate this case today (even assuming that defendants had expressed a willingness to produce all responsive documents in their possession, which they have not).

***

In summary, vacating the judgment at this late date would cause the Ungars extreme prejudice, because they would be unable to litigate this case without the testimony of Arafat, Jabali, Dahlan and al-Hindi, and without the responsive documents in Gaza which are no longer in defendants' possession.

Accordingly, defendants' motion should be denied. *See e.g. Cutting v. Town of Allenstown*, 936 F.2d 18 (1st Cir. 1991) (denying Rule 60(b) motion since death of key witness (plaintiff) left estate unable to prove the case); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2nd Cir. 1991) (denying Rule 60(b) motion in light of "the long delay in mounting this attack on the judgment, which has seriously weakened appellees' case by making it less likely that they will be able to recover documents and records that show a shortfall in the oil delivered"); *McKenna v. Ward*, 1997 WL 66779 at *6 (S.D.N.Y. 1997) (denying Rule 60(b) motion because "Considering the length of time that has passed . . . the Defendants' ability to present their defense would be hindered by witnesses' fading memory, destroyed or lost documents, and the fact that parties and witnesses have moved away.").

**B. Assets of Defendants Currently Restrained by the Ungars and Subject to Pending Enforcement Proceedings Will Be Removed from U.S. Jurisdiction or Otherwise Rendered Judgment-Proof**

It is well established that among the types of "prejudice" to the plaintiff that preclude relief under Rule 60(b) is the risk that the defendant will exploit vacatur of the judgment to conceal assets or otherwise place assets beyond the plaintiff's reach. *See e.g. Franchise Holding II, LLC. v. Huntington Restaurants Group, Inc.*, 375 F.3d 922, 926 (9th Cir. 2004) (affirming decision of district court denying Rule 60(b) motion to set aside $24 million default judgment since "any delay in judgment would allow [defendant] to move and hide assets" and plaintiff

would thereby be prejudiced); *La Barbera v. Whitney Trucking, Inc.*, 245 F.R.D. 142, 146 n. 6 (S.D.N.Y. 2007) (denying Rule 60(b) motion because "plaintiffs will be prejudiced if the Court vacates the default because a further delay will provide [defendant's] successors with a further opportunity to distance their assets from plaintiffs"); *Murray v. Solidarity of Labor Organization Intern. Union Benefit Fund*, 172 F.Supp.2d 1134, 1148 (N.D.Iowa 2001) (denying Rule 60(b) motion because "setting aside the default judgment and 'unfreezing' [defendant's] accounts" would constitute "concrete" prejudice to the plaintiff "because it might make it more likely that assets of the [defendant] from which a judgment could be paid would simply disappear from the accounts during what might turn out to be protracted litigation, thus adversely affecting [plaintiff]'s rights to relief.").[14]

There is not a risk but rather an ***absolute certainty*** that the Ungars would be prejudiced exactly in this way if defendants' Rule 60(b) motion is granted:

After enormous investigative and legal effort, the Ungars have succeeded in restraining and are currently seeking to enforce their judgment against three separate pools of PA assets in the United States. *See* Exhibit C, Tolchin Declaration at ¶¶ 1-7. Those proceedings have been pending for over two and a half years in federal courts in New York and Connecticut, and in New York state court. *Id.*

If the judgment in this action is vacated the judgment creditor process served by the Ungars will be extinguished, and the defendants will be able to remove the assets which are the subject of those proceedings from the United States and/or transfer ownership of those assets to some separate entity to make them judgment-proof. *Id.* at ¶¶ 9-10.

---

[14] Indeed, the danger that the plaintiffs would be unable to enforce its judgment constitutes "prejudice" even under the more liberal standard governing vacatur of a mere default (rather than default judgment). *See Standard Chartered Bank v. Red Rock Commodities Ltd.*, 151 F.R.D. 261 (S.D.N.Y. 1993) (refusing to set aside default under Rule 55(c) in light of risk to plaintiff that defendant would lose or dissipate assets during course of litigation).

Likewise, if the underlying judgment of this Court is vacated, the judgment of this Court on the Ungars' creditor's bill, awarding them ownership of the Palestine Investment Fund ("PIF") and the Palestinian Commercial Services Company ("PCSC") and of the PA assets held by those entities, would be subject to vacatur.

Defendants have refused to honor the judgment, and have aggressively opposed the Ungars' enforcement proceedings in respect to even *de minimis* amounts. For example, defendants recently appeared in New York state court in order to oppose plaintiffs' enforcement proceedings against a mere $11,000. *See* Exhibit C, Tolchin at ¶ 12. Likewise, defendants filed multiple motions and other pleadings, battled the Ungars for nearly a year, and even filed a motion for reconsideration, all in an effort to prevent the Ungars from enforcing their judgment against the sum of some $196,000 held in defendants' bank account in Washington, D.C.. *See Ungar v. Palestinian Authority*, 05-mc-180(GK) (D.D.C.), dkt. nos. 7, 8, 17, 19, 23, 27, 35; *Ungar v. Palestinian Authority*, 2006 WL 1274986 (D.D.C. 2006).

Since defendants have both refused to pay the judgment and shown that they are prepared to fight the Ungars tooth-and-nail over even paltry amounts, there cannot be the slightest doubt that if the judgment in this action is vacated, the defendants will exploit that opportunity to remove their assets from the U.S. or otherwise render them immune from execution.[15]

Similarly, in early 2007, following entry of judgment on the creditor's bill, the PA attempted to retroactively negate the operation and effect of that judgment by purporting to

[15] Furthermore, $45 million of the amount currently restrained by the Ungars is an intangible contractual debt owed by a third-party garnishee (an Egyptian company) which has made clear that it will pay the debt at the first opportunity and would have done so already but for the restraining notices served by the Ungars. Exhibit C, Tolchin at ¶ 10.

Thus, in respect to this asset, there is no question of it being "left" in the United States for future execution by the Ungars: rather, if the restraint is lifted the Egyptian company will immediately pay out the sum to the defendants, and there is not the slightest reason to believe that the payment would be made to defendants' in the United States.

modify the PIF's articles of association. *See* Exhibit C, Tolchin at ¶ 8. While this devious *post hoc* attempt by the PA to negate this Court's judgment on the creditor's bill can have no retroactive effect on that judgment (as the Ungars have asserted before the federal court in Connecticut), ***the very attempt to do so itself*** makes crystal clear that if the 2006 judgment on the creditor's bill is vacated (as a result of vacatur of the underlying judgment from 2004) the PA will immediately reorganize the PIF and its holdings in such a manner as to place them beyond the Ungars' reach.

Defendants' bad-faith intentions can also be readily gleaned from the fact, discussed above, that the PA siphoned over $27 million out of the PIF in the three months ***after*** entry of judgment in the creditor's bill assigning ownership of the PIF to the Ungars. *See* Declaration of Marwan Abdel-Rahman, Exhibit J, at ¶ 3, Appendix 1.

Thus, defendants' intention to "take the money and run" if their Rule 60(b) motion is granted, is pellucid.

**Indeed, tellingly, defendants do not even claim anywhere in their motion papers that they would pay any future judgment entered against them**. Nor would any such claim be entitled to a micron of credit, in light of defendants' reprehensible conduct to date. *See Franchise Holding*, 375 F.3d at 926 ("Franchise Holding argued below that any delay in judgment would allow HRG to move and hide assets . . . HRG disputes this finding, maintaining that it is willing and able to settle any dispute. HRG's behavior suggests otherwise.").

In light of the above, the prejudice to the Ungars could not be starker:

Today, the Ungars are poised to enforce their judgment against assets of defendants in the United States which ***are sufficient to satisfy the entire judgment*** (*see* Exhibit C, Tolchin ¶¶ 1-7); in the future, however, if the judgment is vacated and then ultimately re-entered after trial, the

Ungars will be left with no means whatsoever of enforcing their judgment (other than the difficult and extremely uncertain route of foreign enforcement).

Simply put – and as defendants know and no doubt intend by their motion – vacating the judgment would render this entire case a virtually pointless exercise: re-litigating and winning this case after a trial would leave the Ungars high and dry, with no way to enforce their judgment.

In light of the above, defendants' offer to deposit a million dollars as a guarantee against a future default on their part emerges as nothing but a cynical ploy. With over $100 million already restrained by the Ungars and potentially subject to execution by them, it would be eminently economically rational (and typical) for these defendants to offer to deposit $1 million in order to free their assets and spirit them abroad, and thereby render themselves effectively judgment-proof. Thus, the fact that defendants are prepared to sacrifice a million to save a hundred million neither demonstrates that they are "repentant," nor protects the Ungars from prejudice.

In sum, granting defendants' motion will allow them to shield themselves from a future judgment, thereby severely and irreversibly prejudicing the Ungars. For this reason, too, defendants' motion should be denied.

### C. The Palestinian Authority Is a Merely Temporary Entity and Is Scheduled to Be Superseded by a "State of Palestine" Within a Year

If defendants' Rule 60(b) motion is granted the Ungars would suffer severe and irreparable prejudice for an additional reason, which is unique to cases against the Palestinian Authority:

The full legal name of the Palestinian Authority is "Palestinian ***Interim*** Self-Government Authority." *See* Interim Agreement on the West Bank and the Gaza Strip, September 28, 1995, 36 I.L.M. 551, 558, Preamble (emphasis added).

This name reflects the fact that the Palestinian Authority was created to be a merely temporary entity, established to administer the West Bank and Gaza Strip only until conclusion of negotiations regarding the permanent status of those territories. "In 1993, the PLO and the government of Israel agreed to a Declaration of Principles on Interim Self-Governing Arrangements (DOP) that established a framework for limited Palestinian self-government ***during an interim period***, pending resolution of the permanent status of the territory occupied by Israel since 1967." Omar M. Dajani, *Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period*, 26 Denv. J. Int'l L. & Pol'y 27, 27-28 (1997) (emphasis added).

Thus, "[t]he terms of the DOP . . . characterize the PA as an ***interim measure*** pending the conclusion of permanent status negotiations." *Id*. at 90 (emphasis added). Moreover, "[t]he powers, structure, and jurisdiction of the PA are defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip . . . The Interim Agreement, as its name suggests, ***is a self-consciously temporary arrangement***." *Id*. at 61 (emphasis added). *See also e.g.* Addendum to Report by the Special Representative of the Secretary-General on the Situation of Human Rights Defenders, Exhibit V, at p. 8, ¶ 7 ("The Palestinian Authority is an interim administrative organization established in 1994 pursuant to the Oslo Accords").[16]

Indeed, as the Palestinian Authority itself explains on one of its own official websites:

---

[16] Downloaded from http://daccessdds.un.org/doc/UNDOC/GEN/G06/117/43/PDF/G0611743.pdf?OpenElement.

> The Palestinian Authority is a temporary administrative body . . . intended only to serve during the interim period prior to the establishment of a Palestinian state . . .

*See* Exhibit W, pp. 1 and 3.[17]

Thus, the PA is a ***temporary*** legal entity, which will be supplanted and superseded – i.e. will cease to exist – once a Palestinian state is established.

In late November 2007, Israeli and Palestinian leaders held a summit at Annapolis, Maryland, and committed themselves – with the full backing of the United States – to establish a Palestinian state by the end of 2008:

> After seven years without progress toward Mideast peace, Israeli Prime Minister Ehud Olmert and Palestinian President Mahmoud Abbas yesterday pledged to launch immediate negotiations aimed **at creating a Palestinian state by the end of next year.**

*See* "Mideast Peace Talks Advance, Palestinian State in 2008 is Goal; US Assumes Monitoring Role," Boston Globe, November 28, 2007, Exhibit X (emphasis added). *See also* "Israel and Palestinians Set Goal of a Treaty in 2008," New York Times, November 28, 2007, Exhibit Y.

In early January 2008, President Bush visited the Middle East and reiterated that he expects a Palestinian state to be established by the end of his term. *See* "Bush Outlines Mideast Peace Plan," New York Times, January 11, 2008, Exhibit Z.

Thus, if all goes as planned, a Palestinian state will be established within a year. Upon establishment of a Palestinian state, the Palestinian Authority – which as the PA itself explains is merely "a temporary administrative body . . . intended only to serve during the interim period prior to the establishment of a Palestinian state" (Exhibit W, p. 3) will have finished its historical role and will be superseded by the Palestinian state and cease to exist.

---

[17] Downloaded from http://www.mofa.gov.ps/day.php?m=3&y=2003&d=10. Notably, this official statement by the PA directly contradicts the PA's argument in this Court in the underlying action that it constitutes a "foreign state," thus demonstrating that that argument was not made in good faith.

Notably, none of the parties to the negotiations – Palestinian, Israeli or American – refer to the PA itself ***becoming*** the Palestinian state. Rather, their repeatedly declared goal is to "establish" or "create" a Palestinian state – i.e. an entirely ***new*** legal entity. This careful phraseology is completely consistent with the fact that the PA was intended all along to be a "temporary" and "interim" legal entity meant to exist only until a Palestinian state is created.

Clearly, if defendants' Rule 60(b) motion is granted and then a Palestinian state is established and the Palestinian Authority ceases to exist with a year – as the defendants themselves are fully planning and intending – the Ungars will be severely prejudiced. With the Palestinian Authority no longer in existence as a legal entity, the action against the PA would be pointless at best, and very possibly summarily extinguished for lack of a defendant.[18]

The prejudice that would be inflicted on the Ungars in this case is therefore unique, overwhelming and dispositive: if the Rule 60(b) motion is granted, defendant Palestinian Authority is likely to cease to exist long before any future judgment could be entered.[19]

That fact, standing alone, is sufficient reason to deny the motion.

## VI. DEFENDANTS' MOTION IS UNTIMELY

Motions under Rule 60(b)(6) "must be made within a reasonable time." Fed.R.Civ.P. 60(c)(1). "What is 'reasonable' depends upon the circumstances of the particular case. The circumstances to be considered include the length of the delay, the justification for it, and the prejudice (if any) associated with the granting of relief." *Farm Credit Bank of Baltimore v. Ferrera-Goitia*, 316 F.3d 62, 66 (1st Cir. 2003) (citation omitted).

---

[18] We note for the record that if the PA were ***itself*** to achieve statehood – contrary to both its organizational purpose and the consistent public statements of its leaders regarding their intent to create a Palestinian state as a ***new*** entity – this case would ***not*** be affected, because sovereign immunity is determined at the time of the filing of the suit. *See Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).

[19] Indeed, that may well be defendants' intention, and precisely why they waited all these years to bring their Rule 60(b) motion.

Since the severe prejudice to the Ungars was discussed and demonstrated above, the remaining reasonableness factors are "the length of the delay" and "the justification for it." *Id*. As shown below, both the length of defendants' delay and their alleged "justification" for it are extremely ***unreasonable***, and their motion should be denied for this reason as well.

In support of their claim that their nearly three and a half year delay in bringing this motion is "reasonable" defendants submit the declaration of one of their officials, Ahmad Abdel-Rahman, whom defendants cite and quote at length. *See* Defs' Ex. E; Defs' Memo at 33-35.

Abdel-Rahman asserts that Arafat was the central decision-maker in the PA in his time and never created a system of institutional decision-making, that after Arafat's death no institutional framework existed in the PA for handling foreign litigation, and that such a framework was created only recently, when President Abbas placed Salam Fayyad in charge of litigation in the United States against the PA and PLO. Defs' Ex. E, *passim*; Defs' Memo at 33-35. Abdel-Rahman harps repeatedly, indeed obsessively, on the PA's lack of an "institutional" framework or structure, repeating this phrase talismanically in virtually every paragraph.

This attempt by Abdel-Rahman and defendants to justify their delay should be rejected as absolutely frivolous for several reasons:

***First***, this is not a case where a defendant took no position in litigation and defaulted by nonfeasance. On the contrary, these defendants had an affirmative, clear and explicit policy of refusal to answer or conduct discovery in this case set by Arafat, as PA president and PLO chairman. If Mr. Abbas decided not to modify this position after ***he*** became PA president and PLO chairman that constitutes a decision no less than the original decision taken by Arafat.

***Second***, the claim that creating an "institutional" or "organizational" framework was a necessary precondition to filing the instant motion is ludicrous. The plain fact is that Arafat, as

PA president and PLO chairman, called the shots regarding this case when he was alive. If Mr. Abbas elected not to do so after he became PA president and PLO chairman that is no concern of the Ungars or of this Court. Nor is the fact that Mr. Abbas waited over three years to place Mr. Fayyad in charge of U.S. litigation. On the contrary, the fact that Abbas waited all those years before delegating the issue to Fayyad shows that Abbas either agreed with the intransigent position taken by Arafat in respect to this case or that the issue was just too unimportant to defendants to attend to – either way, the delay is grossly unreasonable.

***Third***, the alleged critical importance of an "institutional" decision-making framework is belied by the fact that ***no such "framework" was ever established***. Rather, according to defendants' own version, their change in policy came about because Mr. Abbas appointed Mr. Fayyad – who is an economist, not a lawyer – to deal with their U.S. litigation. Appointing a single person to make decisions clearly does not constitute establishment of the "institutional framework" which defendants claim they needed in order to file the instant motion. Defendants' whole tale thus makes no sense on its face. Indeed, defendants are back exactly where they were in the days of Arafat, with a single person making all the decisions regarding their U.S. litigation (the difference being that Arafat was an engineer and Fayyad is an economist).

***Fourth***, the fact that Fayyad may have a different approach than Abbas or Arafat neither erases nor excuses defendants' delay one iota. An organizational or governmental defendant is fully responsible for its litigation policies, irrespective of any change in office-holders or in controlling regime. In *Socialist Republic of Romania v. Wildenstein & Co. Inc.*, 147 F.R.D. 62 (S.D.N.Y. 1993), Romania moved for Rule 60(b)(6) relief to set aside a judgment that had been entered against it for refusal to conduct discovery, arguing that the default had resulted from the

litigation strategy of the previous (communist) regime, which it now repudiated. This argument was resoundingly rejected:

> Romania is not relieved of responsibility for the consequences of its litigation strategy merely because it is a nation-state whose government has changed. An analogy may be drawn to a hypothetical multi-national corporation ("Jamo, Inc.") whose management has been ousted but which, under former management, litigated a case in this Court and lost. Jamo Inc. clearly could not prevail on a Rule 60(b)(6) motion merely because it claimed that its former management was corrupt and therefore had failed to pursue a winning litigation strategy. One reason why Jamo Inc., the hypothetical corporation, could not win such a motion is that a change in management is not an extraordinary event-management changes regularly, and to allow such an event to support a Rule 60(b)(6) motion would wholly negate the finality of judgments. *See United States v. Besser Manuf. Co.*, 125 F.Supp. 710, 713 (E.D.Mich. 1954); *see also In re 1330 19th St. Corp.*, 101 B.R. 397, 398 (D.D.C.Bankr. 1989) (change in ownership or control is not the type of changed circumstance contemplated by Rule 60(b)). Similarly, governments regularly change, yet each is in privity with its predecessor. … In the context of democratically elected governments, those who govern periodically change. In other systems, and throughout history, governments change when political systems are altered or when the regime in power falls out of favor. Such a change in government, or the fact that a former regime pursued a different litigation strategy than would the government currently in power, does not constitute an extraordinary event sufficient to support a Rule 60(b)(6) motion.

*Socialist Republic of Romania*, 147 F.R.D. at 65-66.

***Fifth***, between Arafat's death and the present day, defendants had no trouble whatsoever pursuing their appeal, their motion for *en banc* review of the appellate decision, or their petition to the Supreme Court for *certiorari*. Moreover, during this period defendants intensively battled plaintiffs' attempts to enforce their judgment. *See Ungar*, 05-mc-180(GK) (D.D.C.), dkt. nos. 7, 8, 17, 19, 23, 27, 35; *Ungar*, 2006 WL 1274986 (D.D.C. 2006); Exhibit C, Tolchin Declaration.

Furthermore, between Arafat's death and the present day, these defendants filed numerous and extensive pleadings in the other cases pending against them in U.S. courts. *See*

*Biton v. Palestinian Interim Self-Government Authority*, (Civ. No. 01-0382) (D.D.C.); *Gilmore v. Palestinian Interim Self-Government Authority*, (Civ No. 01-853) (D.D.C.); *Klieman v. Palestinian Authority*, (Civ. No. 04-1173) (D.D.C.); *Shatsky v. Syrian Arab Republic et al*., (Civ. 02-2280) (D.D.C.); *Saperstein v. Palestinian Authority*, (Civ. No. 04-20225) (S.D.Fla.).

Since defendants were fully capable of fighting the Ungars' collection proceedings and litigating these other cases, the claim that they were incapable of filing a Rule 60(b) motion in this case is patently absurd.

***Sixth***, even after authority for the U.S. litigation was delegated to Fayyad in "early 2007" (see Defs' Ex. E at ¶ 13), defendants ***waited nearly a year*** to file the instant motion. Defendants attempt to excuse this delay by arguing that their counsel was too busy with other proceedings to file a Rule 60(b) motion in this Court. Defs' Memo at 46. This excuse is insufficient and frivolous as a matter of law. Moreover, it is baseless as a matter of fact: Edward & Angell and Miller & Chevalier have many hundreds of attorneys at their disposal, and could easily have filed this motion long ago, in "early 2007" when Mr. Fayyad took charge. Notably, this claim is ***not*** supported by any evidence or affidavit.

***Seventh***, commencing in early August 2007, at the latest, defendants **purposely delayed filing this motion for strategic purposes, in order to lobby the State Department to file a statement of interest in their favor**. This fact emerges clearly from an affidavit submitted by defendants' counsel, in support of a motion filed by them in the Jerusalem District Court to stay proceedings brought by the Ungars' to domesticate their judgment in Israel, which stated:

> Miller & Chevalier intends to challenge the default judgments entered against the PA and the PLO, in the matter *Ungar v PLO*, No. 00-105L (D.R.I.), No. 04-2079 (1st Cir). We believe there are various grounds for vacating the default judgment . . .

> It is difficult to assess the likelihood of success on the motion as we cannot assess what position, if any, the United States Department of State will take on the Motion, **though we are undertaking efforts to gain Department of State support** . . .
>
> **Our intent is to raise challenges to the judgment soon**. Challenging the default judgment will involve filing pleadings with the Federal District Court in Rhode Island.

*See* Affidavit of Laura G. Ferguson, August 2, 2007, Exhibits AA, BB (emphasis added).[20]

Defendants' admission in August 2007 that they were delaying the filing of their Rule 60(b) motion for their own strategic purposes – i.e. in order to lobby the State Department to submit a statement of interest – is sufficient, standing alone, to render their motion untimely under Rule 60(b). In *R.C. by Alabama Disabilities Advocacy Program v. Nachman*, 969 F.Supp. 682 (M.D.Ala. 1997) the federal court found that agencies of the State of Alabama had waited to file a Rule 60(b) motion for similar strategic purposes – i.e. until there had been "a shift in the political winds" and therefore denied that motion as untimely:

> The only reason that the Court can fathom for the defendant's tardy filing is a shift in the political winds. Such maneuvering does not warrant the Court's indulgence. *See Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, No. 87 C 9853, 1993 WL 524226, at *2 (N.D.Ill. Dec.10, 1993) (finding that 60(b) motion not filed within a reasonable time where defendant waited to file until such time as was strategically expedient).

*R.C. by Alabama Disabilities Advocacy Program v. Nachman*, 969 F.Supp. 682, 701 (M.D.Ala. 1997).

---

[20] Exhibit AA is a motion filed by defendants in Israel, to which was attached an English-language affidavit executed by defendants' U.S. counsel, Laura G. Ferguson of Miller & Chevalier. *See* Exhibit AA at pp. 5-6. Exhibit AA consists of the entire motion exactly as filed by defendants, in the following order: (i) Hebrew-language motion itself (ii) Hebrew-language coversheet on the Ferguson affidavit from the Israeli Embassy where it was sworn (iii) and the English-language Ferguson affidavit.

An English translation of the motion is included as Exhibit BB.

Here, too, because defendants intentionally delayed the filing of their motion until it was "strategically expedient," in hopes of a change in the "political winds," their motion must be denied as untimely.

The decision in *Nachman* is relevant to the circumstances here for a further reason: in denying the Alabama state agencies' Rule 60(b) motion, the court noted that motion had been filed by a new state administration because the previous Alabama administration "has saddled its successor with serious obligations with which it would rather not comply." *Id*. at 689, n. 7. The court therefore dismissed the tardy Rule 60(b) motion as "political gamesmanship." *Id*.

So, too, here, the fact that Abbas administration is unhappy that the Arafat administration "saddled" the PA "with serious obligations with which it would rather not comply" does not entitle the PA to relief under Rule 60(b).

In light of all the above it is pellucid that defendants' motion was not filed within a reasonable time, and should be denied.

Notably, courts have denied Rule 60(b) relief as untimely in far less egregious circumstances and after far shorter delays. *See e.g. Socialist Republic of Romania*, 147 F.R.D. at 65 (two year delay found unreasonable); *Fustock v. Conticommodity Serv. Inc.*, 122 F.R.D. 151, 158 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 38 (2d Cir. 1989) (two year delay found unreasonable); *Menashe v. Sutton*, 90 F. Supp. 531, 533 (S.D.N.Y. 1950) (two years and four months unreasonable); *Hallmark Cards, Inc. v. JTK Corp.*, 1992 WL 118805, at *2 (E.D.N.Y. 1992) (three-year delay unreasonable); *McCloud v. Lawrence Gallery, Ltd.*, 1992 WL 6199, at *2 (S.D.N.Y. 1992) (two-year delay unreasonable), *aff'd,* 970 F.2d 896 (2d Cir. 1992).

## VII. DEFENDANTS' HAVE FAILED TO PRESENT ANY MERITORIOUS DEFENSE

A defendant seeking relief under Rule 60(b) must show a meritorious defense. *See e.g. Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17 (1st Cir. 1992).

However, the existence of a potential meritorious defense is a necessary, but not a sufficient condition for Rule 60(b) relief. Thus, as discussed at length *supra*, Rule 60(b) relief will be denied when the default was intentional, irrespective of whether the movant can show a meritorious defense. Likewise, the presence of a meritorious defense will not be sufficient for Rule 60(b) relief, in the face of prejudice to the plaintiff. *See e.g. Cutting v. Town of Allenstown*, 936 F.2d 18, 22 (1st Cir. 1991) (denying Rule 60(b) motion, despite existence of several meritorious defenses, because vacatur would prejudice plaintiff). Since, as shown above, defendants' default was intentional and the Ungars would be severely prejudiced if the judgment were vacated, the question of whether defendants have presented a meritorious defense is purely academic.

In support of their motion, defendants purport to assert a single meritorious defense: absence of liability for the murder of Yaron Ungar.[21] As shown below: (a) defendants have failed to assert a meritorious defense; and (b) in any event, defendant PA is precluded as a matter of law from seeking to assert a meritorious defense on the matter of liability.

**a. Defendants Have Failed to Assert a Meritorious Defense**

[21] Notably, in the underlying action the defendants implicitly admitted their liability fir the murder:

> [D]efendants' conduct legitimately sought to protect and promote Palestinian interests and lacked the intent that is required under the statutory definition of "international terrorism," and which is also essential to the Court's subject matter jurisdiction under the Anti-Terrorism Act of 1991.

*See* Objections of Defendants Palestinian Authority and Palestine Liberation Organization to the Magistrate Judge's Report and Recommendation, April 19, 2004, dkt. #271 at ¶ 2.

While a Rule 60(b) movant cannot satisfy the "meritorious defense" requirement by merely conclusory assertions, she need not prove her claim. Rather, she need only assert specific facts which, if proven, would constitute a defense. *See Teamsters*, 953 F.2d at 21.

Thus, in a tort case (as opposed, say, to a contract case), a "meritorious defense" is easy to present, since the defendant need only deny the specific relevant factual elements of the tort. Absent a prior admission or criminal conviction, virtually any defendant in a tort case would be able to make this showing. This is especially so where, as here, the defendant is not an individual but a legal entity. An organizational defendant facing allegations of a tort need only assert that the employee or official alleged to be involved acted outside his agency and employment.

Thus, any virtually defendant which is a corporation or association, facing allegations analogous to the allegations in this action, would be able to assert a "meritorious defense" for the purpose of Rule 60(b), simply by making specific denials of the relevant factual elements of the tortious conduct alleged and/or by disputing that the employee involved was acting in the scope of his employment.

Yet, despite this extremely low standard, the instant defendants have failed to assert a meritorious defense to the allegations of the amended complaint in this action.

In the amended complaint, the Ungars alleged that – for a period of several years prior to the murder of the Ungar couple in June 1996 – the defendants provided material support and resources to Hamas, which enabled and caused the murder of the Ungars, and that defendants' conduct constituted international terrorism, and aiding and abetting international terrorism, within the meaning of 18 U.S.C. § 2333(a). *See generally Boim v. Holy Land Foundation for Relief and Development*, 511 F.3d 707 (7th Cir. 2007) (analyzing elements of civil liability under § 2333(a) in respect to provision of support to Hamas).

The amended complaint alleged that the material support and resources provided to Hamas by the defendants took several forms. The most detailed allegations (with the extent of the detail being a reflection of the extent of the information known to the plaintiffs at the time) assert that for a period of several years prior to the Ungars' murder, the defendants provided Hamas and its terrorist leadership with shelter and safe-haven, and allowed Hamas to plan and carry out terrorist attacks from PA territory. Amended Complaint at ¶¶ 23-31.

Significantly, the precise conduct alleged – i.e. allowing a terrorist group to operate within PA territories – has been held to constitute provision of material support and resources within the meaning of 18 U.S.C. §2339A, which in turn constitutes liable conduct under §2333(a). *See Rux v. Republic of Sudan*, 461 F.3d 461, 470-471 (4th Cir. 2006) (holding that Sudan provided material support to al Qaeda within the meaning of §2339A by permitting it to operate within Sudanese territory); *Boim,* 511 F.3d 707 (provision of material support within the meaning of §2339A to Hamas is actionable under §2333(a) (*passim*). [22]

---

[22] Defendants assert that the amended complaint seeks to impose liability on them for acting as accessories after the fact to the Ungars' murderers. Defs' Memo at 19. By this remark, defendants completely misunderstand – or pretend to misunderstand – the allegations of the complaint in respect to provision of safe-haven and shelter. Plaintiffs did not allege that the defendants are liable because they sheltered the gunmen who killed the Ungars after the fact. Plainly, civil liability could not arise from assisting a tortfeasor after commission of the tort. Rather, plaintiffs alleged that by providing safe-haven and shelter to the Hamas terrorist leadership in the years ***preceding*** the Ungars' murder – i.e. by allowing Hamas to build and operate a terrorist infrastructure in areas in the PA – defendants facilitated the murder of the Ungars. But for that provision of an operating base by the defendants, Hamas could not have murdered the Ungars.

Defendants' confusion appears to arise from the fact that ¶ 41 of the amended complaint alleges that defendants' actions "if committed within the jurisdiction of the United States, would constitute, *inter alia*, without limitation, violations of 18 U.S.C. §3 ("Accessory After the Fact") and of 18 U.S.C. §2339A ("Providing Material Support to Terrorists"). The Ungars cited these provisions as examples meant to demonstrate that the conduct alleged was criminal, as required by §2331 of the ATA. The reference to "Accessory After the Fact" relates to defendants' ***sheltering of Hamas terrorist leadership during the years prior to the Ungars' murder***, not to the murderers of the Ungars. Defendants' conduct vis-à-vis the murderers of the Ungars after the fact is thus completely irrelevant to the defendants' liability.

The amended complaint also alleged that the defendants provided financial support to Hamas and its terrorist operatives, both in specific forms and generally. Amended Complaint, ¶¶ 32, 33, 35. Monetary support of this type is unquestionably "material support" within the meaning of §2339A and so actionable under §2333(a).

Clearly, in light of the specific allegations of the amended complaint, if defendants sought to assert a meritorious defense to this action, they needed to proffer equally specific factual assertions disputing each of the relevant allegations.

Thus, for example, defendants should have asserted that during the years prior to the Ungars' murder they did not allow Hamas to operate in their territory, and did not shelter the Hamas terrorist leadership, and did not provide financial support to Hamas and its members. **But defendants have provided no such specific denials, because they cannot**: It is a matter of undisputed public record that the defendants did indeed allow Hamas to operate bases in PA territory and provided shelter and safe-haven to Hamas and its terrorist leadership:

> Hamas has demonstrated again that it is a murderous group of fanatics who are so poisoned with hate--so obsessed with slaughter--that no innocent life is safe.
>
> Terrorism experts have stated that Hamas and its allies will attempt to inflict this sort of horror on Americans. We must work together with the Israelis in stopping these madmen.
>
> Arafat must also shoulder his share of the blame for this situation. **He has failed to prevent the uses of territory under his administration from being used as a staging area for these plots.**

Remarks of Rep. Ros-Lehtinen, Congressional Record, H1719, March 6, 1996 (emphasis added).

Similarly:

> An important aspect of our resolution calls on Yasser Arafat to recognize that this is his last chance to demonstrate that he has the will and the capability to pulverize **the terrorist infrastructure of**

> **Hamas in territory under his control**. We have had for too long a double-faced approach by Arafat saying the right things to the West but praising to high heaven some of the most brutal terrorists, like the engineer who created the most terrible weapons of destruction in recent times in this terrorist wave.

Remarks of Rep. Lantos, Congressional Record, H2072, March 12, 1996 (emphasis added).

Likewise:

> Mr. President, once again, we have seen the ugly, undeniably brutal, horrific actions of terrorism. We have seen the destructive impact of it in Jerusalem so vividly put forth over the TV screens, but it goes well beyond. We are told that 6 people died, over 150 have been injured, and obviously our sympathy goes out to them and to their families and to the people of that region who are held captive by these kinds of terrorist attacks. **This is the work of Hamas, the Hamas who are given sanctuary, who operate out of the territories under the direct control of Yasser Arafat.**
>
> **Now, make no mistake about it: The responsibility for this terrorist act and the previous bombings lies with Mr. Arafat**. He, Mr. President, has the power to deter these murderers but does nothing. Indeed, **he gives them sanctuary**.

Remarks of Senator D'Amato, Congressional Record, S8782, September 4, 1997 (emphasis added).

Additionally, in late 1996, the Israeli Foreign Ministry government officially published a list of wanted Hamas terrorists being sheltered by the PA. *See* Exhibit CC. [23] Notably, many of these Hamas terrorists had been sheltered by the PA between 1994-1996, and many of them had been given financial support via sinecures – precisely as alleged by the Ungars. *See id*.

Clearly, defendants cannot possibly deny any of these facts in the public record.

So, unable to deny the undeniable fact that they did indeed provide shelter and support to Hamas exactly as alleged in the complaint – i.e., finding themselves unable to properly assert a

[23] Downloaded from http://www.mfa.gov.il/MFA/Archive/Peace+Process/1996/TRANSFER+OF+TERRORIST+SUSPECTS+TO+ISRAEL+BY+THE+PA.htm?DisplayMode=print

meritorious defense – defendants have resorted instead to what Judge Selya has inimitably described as "periphrastic circumlocutions [and] hyperbolic rodomontade." *Teamsters*, 953 F.2d at 18.

The "rodomontade" proffered by defendants in their papers in lieu of an actual meritorious defense takes two forms, both wholly unavailing:

***First***, defendants argue that at certain periods of time they cracked down on Hamas. But this assertion does not rise to a meritorious defense, because even if it were true – i.e. even assuming that there were periods in which defendants reined in Hamas (which plaintiffs dispute) – that would not relieve defendants of liability for a terrorist attack facilitated in some way by defendants' provision of material support and resources to Hamas at other periods of time. Simply put, if defendants provided material support to Hamas in January and February, and cracked down on Hamas in March and April, they will still be liable for terrorism committed by Hamas in May or June which was somehow facilitated by the material support provided before the crackdown. *See generally Boim, id*.

Thus, it is insufficient as a matter of law for defendants to claim as a purported meritorious defense that there were periods in which they fought Hamas; rather, defendants would have to assert that during the years prior to the Ungars' murder (a) they ***never once*** provided any material support to Hamas or (b) that if they provided such support it did not in any way facilitate Hamas' murder of the Ungars. *See Boim* (*sine qua non* causation not required under §2333).

Defendants have not made such denials, because they cannot: it is undisputable that defendants did indeed provide such material support to Hamas.

***Second***, defendants attempt to convince the Court that they have presented an actual "meritorious defense" by arguing breathlessly at length that assertions made by the Ungars in their suit against Iran exculpate defendants from liability in this case.

As an initial matter, many of defendants' characterizations of the Ungars' assertions in the Iran case are pure fiction and bear no resemblance at all to what appears in the record.

More importantly, this argument gets the defendants exactly nowhere under Rule 60(b) because it is based entirely on a specious, unproven and easily refutable assumption:

Defendants argue that since (a) the Ungars' asserted in the Iran suit that Hamas carried out terrorist attacks in order to interfere with the PLO-Israeli peace process, therefore (b) the PA and PLO would never have assisted Hamas to carry out terrorism.

But prong (b) of this syllogism is completely unfounded, for several reasons:

In the first place, if Hamas – in its own black-and-white crackpot worldview – happens to believe that terrorist attacks will disrupt the peace process, it does not necessarily follow that the PA and PLO must share Hamas' assessment. Indeed, defendants' entire argument is circular, because it assumes as a ***given*** that they view terrorism as detrimental under any circumstances, and negates from the outset the possibility – which many Middle East experts would endorse as correct – that the PA and PLO have a much more subtle and sophisticated view of Hamas' terrorism, considering it as a means of advancing their own negotiation position in the peace process and casting themselves as moderates in the eyes of the West.

Simply put, in the papers defendants quote from the Iran suit the Ungars were seeking to describe Hamas' particular view of the world – which is not by any means necessarily congruent with the world as it really is.

More importantly, and dispositively, whatever sundry internal political motivations and considerations they might have it is a matter of empirical fact in the public record that the defendants ***do indeed*** provide Hamas with such assistance. That fact has been repeatedly reflected in the Congressional Record, as discussed above. Likewise, defendants' official, Mohammed Dahlan, expressly admitted that:

> All [Hamas'] military commanders have been protected by the security establishment throughout this Intifada. They were provided with full protection, and Israel has accused us of this several times, and so has the American administration. I was the prominent person to be accused of this - Muhammad Deif was the leading figure (to receive protection). When they left our protection and moved to that of Hamas, half of them were assassinated.

*See* Exhibit J, Declaration of Marwan Abdel-Rahman at ¶ 6, Appendix 4.

Similarly, Jibril Rajoub, another of defendants' officials named as a defendant in this action and whom defendants refused to produce for his deposition, has confirmed as follows:

> We were the ones who fought and kept up the resistance, sir. We never removed the resistance from our platform, and we never will.
> …
> We have never had a dispute with Hamas or anyone else regarding the principle of resistance. In all our agreements our brothers in Hamas and the other factions, we always insist that resistance is our legitimate right.

*See* Exhibit J, Declaration of Marwan Abdel-Rahman at ¶ 7, Appendix 5.

Thus, while the defendants have political disputes with Hamas, on the issue of "resistance" – i.e. terrorism – they are in agreement.

Rajoub's description of the PA/PLO – Hamas relationship was echoed by Hamas leader Khaled Mashaal in an interview with the BBC. Pressed by the BBC reporter to concede that Hamas and the PA/PLO are rivals, Mashaal rejected this simplistic characterization and answered as follows:

> Yes we are different politically but we agree on many other matters. We agreed about the intifada. We agreed about resistance. You see Hamas, Aqsa martyrs, Jihad factions and others, we agree on several issues. We agree on the Palestinian right but disagree in interpretations and some political programs. This is very natural.

*See* BBC interview with Khaled Mashaal, Exhibit DD.

**Indeed, Dr. Reuven Paz, defendants' expert on Hamas in the D.C. suit, specifically testified – in a passage that defendants carefully omit – that in the 1990s the Palestinian Authority was supplying Hamas with weapons**. *See* Defs' Ex. M at p. 80 lines 4-5.

Finally, we note that the quasi-covert cooperation between Hamas and the PA/PLO circa 1996 which resulted in the Ungars' murder, has since become open and unabashed. It is a matter of public record (susceptible to judicial notice) that in early 2007, the PLO and Hamas set up a unity government to run the PA. This arrangement ended only when Hamas decided to expel the PA and PLO from the Gaza Strip.

Defendants' attempt to sell this Court a false and simplistic picture of the PA/PLO – Hamas relationship is therefore highly misleading. The plain fact is that while the defendants and Hamas are political rivals, they often work together – particularly when it comes to "resistance" activities.

***

In sum, notwithstanding their "periphrastic circumlocutions [and] hyperbolic rodomontade," defendants have failed to assert a cognizable meritorious defense.

### b. Additionally or Alternatively, the PA Is Precluded From Asserting a Meritorious Defense

Additionally or alternatively, the PA is precluded from asserting a meritorious defense because the Court has already determined – a determination which it failed to appeal – that the

appropriate sanction for its intentional refusal to conduct discovery is to enter default judgment establishing their liability under Fed.R.Civ.P. 37.[24] As a matter of law, that sanction cannot now be challenged, much less reversed.

Nor could the PA now remedy its prior refusal to do discovery even if it wanted to: as discussed above, four of the PA officers whom the PA was ordered to produce for depositions in 2003 – Arafat, Dahlan, Jabali and al-Hindi – are either dead or no longer employed by the defendants, and many of the documents requested by the plaintiffs – i.e. all responsive documents located in the Gaza Strip, from which the defendants were expelled by Hamas in June 2007 – are now no longer under defendants' control. Since the Court already held that plaintiffs are entitled to depose these witnesses and receive these documents, that holding is the law of the case for the purposes of the instant motion and defendants cannot now argue that these witnesses or documents are unnecessary to plaintiffs' case.

Thus, because the PA's liability was established as a matter of law as a sanction for its refusal to provide discovery, as a matter of law the PA cannot now claim to have a meritorious defense.

## VIII. DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE THEY ARE ACTING IN BAD-FAITH

Defendants are not entitled to equitable relief under Rule 60(b)(6) because they are acting in bad faith in several ways. First of all, as shown above, this motion is founded on the blatantly

[24] While Fed.R.Civ.P. 37 refers to the sanction of "default judgment" it is obvious that a defendant's jurisdictional defenses cannot be impacted by the discovery sanction of "default judgment," nor can a plaintiff's damages be established thereby. *See e.g. Michigan Window Cleaning Co. v. Martino*, 173 F.2d 466, 468 (6th Cir. 1949) (court entering Rule 37 sanction of default judgment must determine separately whether it has subject-matter jurisdiction); *Volkart Bros., Inc. v. M/V Palm Trader*, 130 F.R.D. 285, 288 (S.D.N.Y. 1990) (Rule 37 sanctions may be imposed only if the court has personal jurisdiction over the party that has refused compliance). Indeed, this Court disposed of defendants' jurisdictional defenses and the matter of plaintiffs' damages separately – as a necessary prerequisite to actual entry default judgment – despite having imposed "default judgment" as a sanction. Thus, the effect of a sanction of default judgment under Rule 37 is to establish the defendant's liability.

false claim that defendants "misunderstood" U.S. law. Parties who seek to mislead the court are not entitled to equity, and certainly not to Rule 60(b)(6) relief:

> [I]t is unfathomable that this Defendant would have the audacity to come before this Court seeking to have a default vacated by means of patently false representations . . . It is generally inadvisable to defraud the court from which one seeks relief.

*Boron v. West Texas Exports*, 680 F.Supp. 1532, 1536 (S.D.Fla. 1988) (denying motion to vacate default).

Furthermore, it is pellucid that if the Court were to grant the instant motion and ultimately enter a new judgment in favor of the Ungars after trial, the defendants would not pay it. Not only does defendants' motion nowhere pledge to pay any new judgment, such a pledge would be demonstrably false: defendants continue to refuse to honor the $2 million judgment in the *Bucheit v. Palestinian Authority* case, which was entered years ago, as recently confirmed by counsel for the *Bucheit* plaintiffs. *See* email correspondence between Michael Selter, Esq., and David Strachman, Esq., December 31, 2007, Exhibit EE. Nor have defendants moved to vacate *Bucheit*. They simply refuse to pay, exactly as they have refused to pay the judgment in this action for well over three years now, and exactly as they would refuse to pay a future judgment in the Ungars' favor entered after trial.

Thus, defendants' representation that they have "turned over a new leaf," and are now prepared to respect and comply with the orders of the courts of the United States in good faith, is a full-blown fraud. Defendants are more than happy to invoke the power of our courts for their benefit – the instant motion being a good example – but will not respect the authority of the courts when it comes to paying a judgment.

This entire motion is therefore nothing but a "heads we win tails you lose" proposition, wherein the defendants can only win and the Ungars can only lose.

Since defendants are acting in bad faith, the instant motion should be denied.

## IX. CONCLUSION

Defendants' motion should be denied.

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

## CERTIFICATION

I hereby certify that on February 6, 2008 this document and the attached exhibits were served via ECF to the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/S/ David J. Strachman

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

**INJUNCTION**

Upon consideration of Plaintiffs' Motion For An *Ex Parte* Restraining Order And A Temporary Injunction, and the verified memorandum and exhibits in support thereof, and following the hearing held by this Court on May 5, 2005, the Court finds that an Injunction should be granted for the following reasons:

(i) Plaintiffs have presented evidence that Defendants do not intend to honor the judgment of the Court in this action, that Defendants have recently liquidated assets comprising a significant part of their overall investment portfolio, and that persons holding Defendants' assets in the United States are in the process of returning those assets to Defendants.

(ii) Defendants are foreign entities and the dissipation of their U.S.-based assets is liable to render satisfaction of the judgment entered by this Court impossible. That judgment is intended to compensate Plaintiffs for the murder of their decedent, and Plaintiffs' inability to satisfy the judgment and receive the compensation due to them would therefore cause Plaintiffs severe and irreparable injury.

**WHEREFORE IT IS HEREBY ORDERED AND DECREED THAT:**

1. The Palestinian Authority and The Palestine Liberation Organization and their officers, agents, servants, employees, attorneys, partners, fiduciaries, and any natural or legal persons in privity with them and/or acting on their behalf and/or in active concert and participation with them, are hereby prohibited, restrained and enjoined from withdrawing,

322

selling, transferring, alienating, assigning, pledging, impairing, offsetting, hypothecating, encumbering, concealing, secreting, trading, removing, or in any way disposing of or effecting a disposition in, directly or indirectly, any and all assets of The Palestinian Authority and/or The Palestine Liberation Organization however titled (including without limitation all accounts, deposits, cash, shares, stock, credits, partnership rights or interests, equitable rights or interests, contractual rights, holdings, financial interests or real estate) located within the jurisdiction of the United States or of any State thereof.

2. Notwithstanding the provisions of paragraph 1, Defendants are permitted to withdraw normal expenses necessary for the daily operations of their offices in Washington D.C. and at the United Nations, from existing bank accounts used by Defendants for that purpose as of the date of this Order ("office accounts"). Defendants are prohibited from replenishing or crediting the office accounts except by transfer of funds originating from without the United States.

3. This Injunction shall remain in force until ~~and through July 5, 2005~~ further order of the Court. RRL

**SO ORDERED.**

May 5, 2005

Ronald R. Lagueux
Senior Judge Ronald R. Lagueux
United States District Court
5/5/05

Attest to
True Copy
DAVID A. DIMARZIO
By [signature]
Deputy Clerk

THE SECRETARY OF STATE
WASHINGTON

January 12, 2007

Dear President Abbas:

Thank you for your letter of November 28 setting forth your concerns regarding certain rulings by U.S. courts against the Palestinian Authority (PA), the Palestine Liberation Organization (PLO), and most recently the Palestinian Investment Fund (PIF).

As you know, the U.S. District Court in Rhode Island entered judgment in 2004 against the PA, PLO, and Hamas Islamic Resistance Movement ("Hamas"). This judgment was awarded to the estate of an American citizen who, together with his wife, was murdered in Israel in a June 1996 terrorist attack carried out by the military wing of Hamas. The U.S. Court of Appeals for the First Circuit affirmed that judgment in 2005. Because the U.S. Supreme Court has declined to grant further review, the judgment is final and enforceable in United States courts against property or interests owned by the PA, PLO, or Hamas.

Mr. President, I appreciate how difficult and complex these legal actions are and fully recognize the already significant economic crisis that exists for the Palestinian people. I encourage you, as I would any government, to respond to U.S. legal proceedings in good faith and a timely manner

The United States is not party to these enforcement proceedings, and our role is therefore limited under our adversarial system of justice. In short, the appropriateness of the United States' participation in any particular proceedings depends on the specific circumstances and the extent to which U.S. legal interests or obligations are involved.

Where judgment is entered, it is also possible to meet with the opposing side to explore out of court solutions so as to avoid enforcement actions. The Office of the Legal Adviser of the Department is willing to make its good offices available to facilitate such meetings. Additionally, the attorneys representing the PIF may

Mr. Mahmoud Abbas,
President of the Palestinian Authority.

contact the Office of the Legal Adviser to discuss the pending proceedings further and any issues of particular concern.

I remain hopeful that you may find a way toward a resolution of these cases.

Sincerely,

Condoleezza Rice

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

-----------------------------------------------------------------X

ESTATE OF YARON UNGAR, *et al.*,

Plaintiff,

-against-

THE PALESTINIAN AUTHORITY, *et al.*,

Defendants.

-----------------------------------------------------------------X

C.A. 00-105L

**DECLARATION OF**
**ROBERT J. TOLCHIN**

**ROBERT J. TOLCHIN**, pursuant to 28 U.S.C. § 1746, declares and states as follows subject to the penalties for perjury of the United States of America:

1. I am an attorney licensed to practice law by the State of New York, and am of counsel to the firm Jaroslawicz & Jaros, LLC. We represent the plaintiffs herein ("Ungars") in a series of judgment enforcement proceedings pending in the state and federal courts in which they are seeking to enforce the judgment entered by this Court in the above-captioned matter.

2. In the course of these judgment enforcement proceedings, the Ungars have restrained several large pools of assets, and are currently litigating the amenability of those assets to execution in satisfaction of their judgment.

3. One of these pools of assets is an account at Swiss American Securities, Inc. ("SASI") titled in the name "Palestinian Pension Fund of the State Administrative Employees Represented by the Palestinian National Authority" This account was restrained by the Ungars in late spring 2005 and remains restrained by them today (although in the interim the parties stipulated that trading in the account would be permitted provided that the assets remain

in the account). A listing of the security positions in the account as of December 2005 is attached hereto as Exhibit 1. Although these securities fluctuate in value, and some have been bought and sold since this list was furnished to us, this account has a value in excess of $100 million.

4. The Ungars assert (on the basis of extensive evidence, including sworn testimony from a person previously involved managing these funds) that the name on this SASI account – "Palestinian Pension Fund for State Administrative Employees in the Gaza Strip" – does not denote a legal entity but is simply an alias or d/b/a for judgment debtor Palestinian Authority, and that these assets are owned by the Palestinian Authority.[1] This issue is currently being litigated in *Ungar v. Palestinian Authority, et al.*, a declaratory judgment action pending in Supreme Court, New York County, under index number 102101/06. *See Estate of Yaron Ungar v. Palestinian Auth.*, 44 A.D.3d 176, 841 N.Y.S.2d61 (1st Dep't 2007) (appellate decision addressing discovery issues). The parties have each moved for summary judgment and related relief, which motions were fully submitted several months ago, and are awaiting decision.

5. Another pool of assets that the Ungars have restrained is a debt owed by an Egyptian holding company, Orascom Telecom Holdings ("Orascom"). This debt, which was restrained by the Ungars in late spring 2005, results from an investment that the PA had made through its former investment arm, the Palestine Investment Fund ("PIF"), in an Orascom subsidiary. Pursuant to a settlement agreement between Orascom and the PA/PIF, Orascom is required to pay over to the PA/PIF the sum of $45 million ("Orascom debt").

6. The Ungars are seeking turnover of the Orascom debt in an action pending in the United States District Court for the Southern District of New York captioned *Ungar v.*

---

[1] Notwithstanding the name on the account, there is no dispute between the parties that these funds have never been used to pay any pensions.

*(continued next page)*

*Orascom Telecom Holding, S.A.E.*, docket number 07-CV-2572 (CM).[2] Orascom has appeared in that matter by the New York office of White & Case, and has disputed the Court's jurisdiction. Orascom's motion to dismiss has been fully briefed and was submitted for decision this past September.

7. In mid-2005 the Ungars also initiated proceedings in the United States District Court for the District of Connecticut with respect to limited partnership investments in the Canaan Equity entities held by the PIF and another PA-affiliated offshore company, Becont Ltd. *Estate of Ungar v. Palestinian Auth.*, United States District Court for the District of Connecticut docket number 05-MC-208. The present-day value of these equity investments is unknown, but stood at several million dollars at last report.

8. In the Connecticut case, attorneys purporting to act on behalf of the PIF (but in fact acting on behalf of the former CEO of the PIF, who is none other than the current Economic Advisor to the PA) appeared and advised the Court that in early 2007 the PA had purported to make self-serving changes to the PIF's bylaws in a *post-hoc* effort to defeat the effect of the judgment entered by this Court in September 2006 on the Ungars' creditor's bill conveying ownership of the PIF to the Ungars. *See* "Non-Party The Palestine Investment Fund's Memorandum of Law in Support of Its Claim For Determination of Interests Pursuant to Conn. Gen. Stat. § 52-356c, Its Motion to Dismiss, and Its Motion to Strike the Appearance of Robert

---

[2] This action was preceded by an earlier one in federal court, which was superseded by this action so that the court could consider jurisdictional contacts that had taken place after the filing of the earlier action. Also, there was litigation in state court which was discontinued in favor of the federal court proceedings. Overall, litigation by the Ungars with respect to the Orascom debt commenced in June 2005.

Tolchin," filed as Docket number 98, in the Connecticut proceeding, specifically p. 11 and Exhibit 26 thereto.

9. In all the above proceedings, the Ungars' ability to pursue turnover of these assets is completely dependant on the restraint of these assets by judgment creditor process. These restraints have allowed the assets at issue to be held and maintained subject to the respective courts' jurisdiction, while the Ungars' rights to turnover or execution are decided.

10. If the restraints on any of these pools of assets were to be lifted there is no doubt that the assets at issue would immediately be removed from United States' jurisdiction and/or conveyed to judgment-proof entities. I can state this with certainty since during the past nearly three years, while these enforcement proceedings have been pending, the Ungars have been forced to defend repeated motions and applications to vacate the restraints on all these pools of assets (the SASI account, the Orascom debt and the Canaan investments). Furthermore, Orascom's principals have stated expressly that they will pay out the $45 million debt to the PA/PIF the moment the restraints are lifted. Under Orascom's agreement with the PIF, this sum is not required to be paid in the United States.

11. The Ungars have also brought a turnover proceeding in the United States District Court for the Southern District of New York before the Hon. Colleen McMahon seeking to enforce their judgment as against certain real property located in Manhattan used by the PLO as its "observer mission" in connection its "observer" status at the United Nations. The PLO appeared by counsel and opposed that application in September 2005. In light of the thicket of foreign policy implications raised by that application, Judge McMahon placed it on a suspense docket, to be reactivated if necessary after the Ungars have exhausted other avenues of judgment enforcement.

12. More recently, in November 2007, the Ungars filed a motion in New York State Supreme Court, New York County to execute against a very small sum – about $11,000 – belonging to the defendants and held by the Bank of New York. *Ungar v. Palestinian Authority*, (New York Sup. Ct. Index No. 105521/05). Soon after this motion was filed, attorneys appeared in the case on behalf of the PA and PLO, and announced their intention to contest turnover of even this tiny sum to the Ungars. Because the cost of litigating would have far exceeded the small sum at issue in that matter, the Ungars withdrew their application.

Dated: New York, New York
February 6, 2008

ROBERT J. TOLCHIN

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------x

| | | |
|---|---|---|
| ESTATE OF YARON UNGAR,<br>DVIR UNGAR,<br>YISHAI UNGAR,<br>JUDITH UNGAR,<br>MEIR UNGAR,<br>MICHAL COHEN,<br>AMICHAI UNGAR and<br>DAFNA UNGAR<br><br>Plaintiffs - Judgment Creditors,<br><br><br>THE PALESTINIAN AUTHORITY and<br>THE PALESTINE LIBERATION ORGANIZATION<br><br>Defendants – Judgment Debtors. | : | Index No.: 105521/05 |

---------------------------------------------------------------------x

**SWISS AMERICAN SECURITIES INC.'S AMENDED VERIFIED ANSWERS <u>IN CONNECTION WITH INFORMATION SUBPOENA</u>**

Swiss American Securities Inc. ("SASI"), by and through its undersigned attorneys, hereby submits the following amended Verified Answers in connection with the Information Subpoena served upon SASI in the above-captioned matter pursuant to New York Civil Practice Law and Rules § 5222 (b):

1. Do you and/or any of your branches or subsidiaries have an account or accounts and/or deposit(s) and/or portfolio(s) under any of the following names or permutations thereof: **Palestinian Authority, Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)**?

**ANSWER:**

SASI's records do not directly indicate any "account or accounts and/or deposit(s) and/or portfolio(s)" under any of the entities identified above.

However, SASI recently has been informed that it maintains publicly traded securities and debt instruments, as set forth in detail in Response No. 2 below, belonging to an entity called the Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip.

1.1. If the answer to the previous question is yes, please state: (a) the number(s) of the account(s) deposit(s) or portfolio(s); (b) the identity of the assets in such account(s), deposit(s) or portfolio(s); (c) the market value of the assets in such account(s), deposit(s) or portfolio(s); (d) the dollar amount of cash in such account(s), deposit(s) or portfolio(s); (e) the exact name(s) and/or title(s) of such account(s), deposit(s) or portfolio(s).

**ANSWER:**

Account No. 95577031. Account No. 95509891. See also Response to No. 2 below.

2. Do you and/or any of your branches or subsidiaries have in your possession, custody, or charge, any funds, investments, deposits, goods, chattels, monies, credits or effects belonging or owing or titled to **Palestinian Authority, Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)**?

**ANSWER:**

SASI's records do not directly indicate any "funds, investments, deposits, goods, chattels, monies, credits or effects belonging or owing or titled to" the entities identified above.

1. However, following its review of information provided in May 2005 by representatives of Broadcort, a Division of Merrill Lynch Pierce Fenner and Smith, to SASI representatives in connection with subpoenas issued by the Plaintiffs-Judgment Creditors, SASI has identified the following securities in its possession, concerning which, according to Broadcort, Broadcort, acting as executing broker on behalf of the Palestinian Pension Fund, purchased:

2,400 shares of Anglo American PLC ADR;

7,200 shares of Deutsche Telekom AG SPON ADR; and

3,100 shares of Konink Philips Elect.

2. SASI recently has been informed that the following publicly traded securities and debt instruments in its possession belong to an entity called the Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip:

7,900 shares of ACE Ltd.

11,100 shares of AMDOCS Ltd.

60,800 shares of Quanta Capital Holdings Ltd.

21,400 shares of Scottish Annuity & Life Holding Old/

35,500 shares of Willis Group Holdings Ltd.

2,800 shares of Flextronics International Ltd.

$270,000 bond – AOL Time Warner 6.875% due 05/01/2012

16,445 shares of AT&T Inc.

56,200 shares of Aames Investment Corp/Reit

20,475 shares of Adesa Inc.

5,100 shares of Electrolux AB- Spons ADR-B

3,000 shares of Akzo Nobel N.V. ADR

$260,000 bond – Albertson's Inc. 7.500% due 02/15/2011

15,500 shares of Albertsons Inc.

$395,000 bond – Alcoa Inc. 6.500% due 06/01/2011

17,700 shares of Aloca Inc.

1,836 shares of Alleghany Corp./New/

3,735 shares of Allied Irish Bks P L C Sponsored ADR

1,900 shares of Atlanta AG (ADR)

52,700 shares of Altera Corp.

6,700 shares of Anadarko Pete Corp.

10,800 Anglo American PLC ADR

5,700 AXA Spons ADR

23,625 shares of Axcelis Tech Inc.

6,325 shares of BP PLC – ADR

47,00 shares of BNP Paribas ADR

16,600 shares of Baker Hughes Inc.

$300,000 bond – Bank of America Corp 3.375% due 02/17/2009

11,064 shares of Bank of America Corp./New/

7,200 shares of Bayer AG Sponsored ADR

14,500 shares of Bayerische Hypo – Und Ver – AR

$275,000 bond – Bear Stearns Co. Inc. 6.500% due 05/01/2006

$245,000 bond – Bellsouth Corp. 6.000% due 10/15/2011

7,000 shares of Benchmark Electrs Inc.

$300,000 bond – Boeing Co. 5.125% due 02/15/2013

$300,000 bond – Bottling Group LLC 4.625% due 11/15/2012

2,300 shares of Brasil Telecom Parts.A ADR

16,950 shares of Brinker International Inc.

6,000 shares of CBRL Group Inc.

$290,000 bond – CIT Group Inc. 4.000% due 05/08/2008

3,000,000 shares of Canaan Equity III Offshore

3,400 shares of Canon Inc. ADR New

1,200 Cardinal Health Inc.

31,200 shares of Cendant Corp.

13,500 shares of Champion Enterprises Inc.

6,600 shares of Charles River Labs International Inc.

15,000 shares of Chevron Corp.

8,700 shares of Chubb Corp.

16,100 shares of Circuit City Stores Inc.

$580,000 bond – Citigroup Inc. 3.500% due 02/01/2008

34,566 shares of Citigroup Inc. /New/

$275,000 bond – Comcast Cable Communication N 6.200% due 11/15/2008

1,800 shares of Comcast Corp. CL A

63,600 shares of Comcast Corp. Special CL A

7,000 shares of Comerica Inc.

6,500 shares of Commercial Capital Bancorp

3,1800 shares of Commscope Inc.

6,100 shares of Computer Sciences Corp.

6,300 shares of Comstock Res Inc./New/

16,200 shares of Conocophillips

$240,000 bond – Conoco Funding Co. 6.350% due 10/15/2011

16,150 shares of Constellation Brands Inc. – CL

48,800 shares of Converium Holdings AG ADR

$430,000 bond – Countrywide Home Loan 4.250% due 12/19/2007

$500,000 bond – CS First Boston Mtg Secs 6.520% due 07/17/2007

9,560 shares of Credit Suisse Group ADR

9,000 shares of Crescent Real Estate Equities Inc.

20,800 shares of DSM N.V. Sponsored ADR

3,755 shares of Dai Nippon Print Unspon ADR

$300,000 bond – Daimlerchrysler NA HLDG 4.050% due 06/04/2008

$290,000 bond – John Deer Capital Corp 5.100% due 01/15/2013

31,600 shares of Dell Inc.

58,850 shares of Delphi Corp.

12,800 shares of Dendrite International Inc.

7,500 shares of Diageo PLC Spons ADR

$275,000 bond – Disney (Walt) Co 6.375% due 03/01/2012

14,280 shares of Discovery Holding Co. CL-A

$280,000 bond – Dominion Resources Inc. 6.250% due 06/30/2012

1,400 shares of ENI SPA ADR

$270,000 Bond – EOP Operating LP 7.000% due 07/15/2011

4,980 shares of E ON AG SPON ADR

19,000 shares of Eastman Kodak Co.

$240,000 bond – Ecolab Inc. CB 6.875% due 02/01/2011

6,175 shares of Eisai Co. Ltd. SPON ADR

30,000 shares of Electronic Data SYS Corp.

9,500 shares of Energy Partners Ltd.

25,200 shares of Equity Residential PPTYS TR SI

9,000 shares of Exelon Corporation

$86,261 bond – Federal Home LN MTG Corp 5.500% due 06/01/2013

$33,980 bond – Federal Home Loan Bank 5.500% due 05/01/2011

$101,821 bond – Federal Home Loan MTG Corp 5.500% due 03/01/2013

$57,968 bond – FGLMC (PL# C69600) 6.500% due 08/01/2032

$33,021 bond – FHLMC (PL# C00921) 7.500% due 02/01/2030

$61,518 bond – FGLMC (PL# C55867) 7.500% due 02/01/2030

8,200 shares of Freddie Mac

$1,200,000 bond – Federal National MTG ASSN 5.250% due 06/15/2006

$275,000 bond – Federal National MTG ASSN 5.000% due 01/15/2007

$1,000,000 bond – Federal National MTG ASSN 4.125% due 04/15/2014

$43,245 bond – FNMA (PL #252717) 7.500% due 09/01/2029

$14,514 bond – FNMS (PL# 527423) 7.000% due 01/01/2030

$6,736 bond – FNMA (PL #542557) 7.000% due 08/01/2030

13,800 shares of Federal Signal Corporation

$14,573 bond – FNMA PL # 576328 7.000% due 04/01/2031

$56,836 bond – FNMA (PL# 625183) 5.500% due 01/01/2032

$58,970 bond – FNCL (PL# 631606) 5.500% due 03/01/2017

$240,000 bond – Ford Motor Credit Co. 7.375% due 10/28/2009

5,700 shares of Fortis (NL) ADR

1,400 shares of Fresenius Medical Care ADR

3,300 shares of Fuji Photo Film Ltd. ADR 1 ORD NEW)

$350,000 bond – GE Capital Commercial MTGE CP 5.033% due 12/10/2035

$61,482 bond – GNMA (PL# X577929SF) 6.000% due 08/15/2032

$229,941 bond – GNMA (Pool #473931) 6.000% due 05/15/2013

$75,383 bond – GNMA (Pool #474780) 6.000% due 05/15/2013

5,400 shares of General Electric Co.

$555,000 bond – General Electric CAP Corp. 5.000% due 06/15/2007

$168,000 bond – General Mills Inc. 6.000% due 02/15/2012

$290,000 bond – General Motors ACC 6.875% due 09/15/2011

6,200 shares of Georgia Pac Corp.

9,700 shares of Glaxo Smithkline PLC-ADS

$295,000 bond – Goldman Sachs Group, Inc. 4.125% due 01/15/2008

13,500 shares of Harmony Gold MNG SPON ADR

10,600 shares of Hartford Financial Svcs Group

12,000 shares of Health Net Inc.

3,375 shares of Heinken NV ADR

18,100 shares of Hewlett Packard Co.

25,500 shares of Highland Hospitality Corp.

$290,000 bond – Household Finance Corp 4.125% due 12/15/2008

22,200 shares of Infousa Inc.

11,425 shares of ING Groep N.V. SPON ADR

29,525 shares of Interactive Data Corp.

5,800 shares of International Power PLC – ADR

15,825 shares of Ivax Corp./Contra

24,200 shares of JP Morgan Chase & Co.

37,000 shares of Jacuzzi Brands Inc.

12,700 shares of KV Pharmaceutical Co. CL A

8,450 shares of Kaydon Corp.

17,800 shares of Keycorp /New/

26,575 shares of Kingfisher PLC SPONS (ADR)

29,500 shares of Koninklijke Ahold N.V. ADR/NE

6,500 shares of Konink Philips Elect

5,500 shares of Kookmin Bank SPON ADR

9,200 shares of L-3 Communications HLGGS Inc.

$575,000 bond – Lehman Brothers Holdings 4.000% due 01/22/2008

17,500 shares of Lennox International Inc.

34,620 shares of Liberty Global Inc-A

34,620 shares of Liberty Global Inc. Class C

142,800 shares of Liberty Media Corp. Ser A

12,900 shares of Lloyds TSB Group PLC-SP ADR

22,300 shares of Mc Donalds Corp.

19,550 shares of MCG Capital Corp.

20,950 shares of Meadwestvaco Corp.

11,950 Medco Health Solutions, Inc.

$290,000 bond – Merrill Lynch & Co. 4.125% due 01/15/2009

6,900 shares of Merrill Lynch & Co. Inc.

5,700 shares of Metso Corp. SPON ADR

66,900 shares of Microsoft Corp.

7,600 shares of Millea Holdings Inc./ADR

9,100 shares of Millipore Corp.

44,870 shares of Mitsubishi UFI Financial-AD

21,800 shares of Moneygram International

$500,000 bond – Morgan JP Commercial MTG 6.507% due 10/15/2035

$540,000 bond – Morgan Stanley Dean Witter 5.800% due 04/01/2007

6,700 shares of Morgan Stanley

22,150 shares of Motorola Inc.

12,000 shares of NBTY Inc.

7,425 shares of NCO Group Inc.

2,100 shares of NTL Incorp

24,300 shares of National Instruments Corp.

6,530 shares of Nestle ADR (Backed by Registered SHS)

15,000 shares of Netgear Inc.

$300,000 bond – Newell Rubbermaid Inc. 4.625% due 12/15/2009

21,500 shares of Newell Rubbermaid Inc.

27,400 shares of Newfield Exploration Company

1,595 shares of Nidec Corp/ADR

30,000 shares of Noble Energy Inc.

86,400 shares of Nortel Networks HLDG Co.

12,300 shares of Northrop Grumman Corp.

5,070 shares of Novartis AG ADR

14,600 shares of Office Depot Inc.

5,300 shares of Omron Corp./ADR

27,000 shares of 1-800 Flowers.Com Inc.

15,100 shares of PMI Group Inc.

17,000 shares of PPL Corp.

20,250 shares of Pactiv Corp.

12,200 shares of Pearson PLC SPONS ADR

2,450 shares of Pernod Richard S A SPONSORED DR

2,100 shares of Petrochina ADR

2,200 shares of Petroleo Brasileiros.A ADR

11,200 shares of Pfizer Inc.

16,600 shares of Praxair Inc.

8,500 shares of Progressive Corp. Ohio

6,855 shares of Reed Elsevier PLC (ADR)

$270,000 Bond – Republic Service Inc. 6.750% due 08/15/2011

1,900 shares of Rexam PLC-Sponsored ADR

2,355 shares of RIO Tinto PLC SPON ADR

2,540 shares of Roche Holding Ltd ADR

3,400 shares of Rolls-Royce Group PLC/ADR

2,700 shares of Royal Dutch Shell PLC ADR CL

3,000 shares of Ryanair Holdings PLC SPONS ADR

5,800 shares of SK Telecom Co Ltd. ADR

$290,000 bond – SLM Corp 4.000% due 01/15/2009

6,900 shares of Safeway Inc.

29,500 shares of St Paul Travelers Cos Inc.

3,100 shares of San Paolo IMI SPA SPON ADR

34,523 shares of Sanofi-Aventis SA-ADR

12,500 shares of Sara Lee Corp.

2,486 shares of Sears Holdings Corp.

900 shares of Secom Ltd. ADR

2,850 shares of Siemens AG-ADR

15,600 shares of Societe Generale SPONS ADR

8,130 shares of Sony Corp ADR /NEW/

20,775 shares of Stage Stories Inc.

7,950 shares of Startek Inc.

1,700 shares of Stora Enso OYJ ADR

11,000 shares of Swift Energy Co.

20,000 shares of TTM Technologies

40,611 shares of Taiwan Semiconductor SP ADR

6,250 shares of Tech Data Corp

3,800 shares of Technip – Coflexip – ADR

6,279 shares of Telefonica SA SPON ADR

4,300 shares of Telewest Global Inc.

26,800 shares of Teradyne Inc.

1,740 shares of Total S.A (ADR)

3,830 shares of Toyota Motor Corp. SPON ADR

21,100 shares of TYCO International Ltd.

9,500 shares of URS Corp /NEW/

8,400 shares of Union Pacific Corp.

6,800 shares of United Auto Group Inc.

3,000 shares of United Overseas Bank Ltd. SPON ADR

$300,000 bond – US Bancorp 3.125% due 03/15/2008

$1,500,000 bond – United States Treasury Notes 6.250% due 02/15/2007

$955,000 bond – United States Treasury Notes 4.750% due 11/15/2008

$1,750,000 bond – United States Treasury Notes 4.625% due 05/15/2006

$130,000 bond – United States Treasury Notes 5.000% due 08/15/2011

$165,000 bond – United States Treasury Notes 3.875% due 02/15/2013

$1,135,000 bond – United States Treasury Notes 4.750% due 05/15/2014

16,200 shares of United Technologies Corp.

34,400 shares of Unitedhealth Group Inc.

27,200 shares of Unova Inc.

23,850 shares of Unumprovident Corp.

3,800 shares of UPM-Kymmene Corp. – SPONS ADR

19,700 shares of Verizon Communications

$510,000 bond – Verizon Global Funding Corp. 7.375% due 09/01/2012

2,100 shares of WPP Group PLC SPONS ORED ADR

$310,000 Bond – Wachovia Corp. 3.625% due 02/17/2009

45,650 shares of Wachovia Corp.

$280,000 bond – Washington Mutual, Inc. 4.000% due 01/15/2009

16,400 shares of Washington Mutual Inc.

43,100 shares of Waste Management Inc. (NEW)

9,400 shares Watson Pharmaceuticals Inc.

$300,000 bond – Wells Fargo Co. 3.500% due 04/04/2008

20,075 shares of Wiley John & Sons Inc. CL A

37,600 shares of Williams Companies, Inc. (Delaware)

12,200 shares of Wyeth

SASI has restrained these publicly traded securities and debt instruments identified above.

2.1. If the answer to the previous question is yes, please describe in full the funds, investments, deposits, goods, chattels, monies, credits or effects, including their value, nature title and designation.

**ANSWER:**

See Response to No. 2 above.

3. Are you and/or any of your branches or subsidiaries in any way indebted to **Palestinian Authority, Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)**?

**ANSWER:**

No.

3.1. If the answer to the previous question is yes, state to what extent and in what manner the debt accrued, and if evidenced by an instrument in writing, describe the same and state what has become of the same and under whose custody it is held.

**ANSWER:**

N/A

4. Are you and/or any of your branches or subsidiaries now bound under any contract(s) to pay either of the judgment debtors, directly or to any other party on account of either judgment debtor, any monies, funds or credits of any type?

**ANSWER:**

No.

4.1. If the answer to the previous question is yes, state the nature of said contract, the names of the contracting parties, the nature and amount of the monies, funds or credits to be paid, and when and exactly to whom the same was or is due and payable.

**ANSWER:**

N/A

Do or did you and/or any of your branches or subsidiaries have transactions with either judgment debtor, as of the date of this subpoena or one year prior thereto, directly or indirectly, as a result of which either judgment debtor is/are now, or may in the future, become entitled to money or anything of value?

**ANSWER:**

No.

5.1. As to each such transaction, what is the nature of the transaction, the date of the transaction, and the amount the judgment debtor(s) is/are, or may be, entitled to?

**ANSWER:**

N/A

6. What is the description and value of each item of collateral you hold concerning either judgment-debtor?

**ANSWER:**

N/A

6.1. What interest does either judgment debtor appear to have in each such item of collateral?

**ANSWER:**

N/A

7. Is any of the property in your possession or care, in which either judgment debtor has an interest, subject to liens, attachments or other encumbrances?

**ANSWER:**

See Response to No. 2 above.

7.1. What are the full details of the same in regard to each asset?

**ANSWER:**

See Response to No. 2 above.

The foregoing answers are true and complete.

Dated: New York, New York
December 6, 2005

Respectfully submitted,

Duval & Stachenfeld LLP
Attorneys for Swiss American Securities Inc.

By: ______________________

Allan N. Taffet, Esq.
300 East 42nd Street
New York, New York 10017
Tel. No.: (212) 883-1700

**VERIFICATION**

STATE OF NEW YORK )
) ss.:
COUNTY OF ~~NEW YORK~~ Kings )

ADAM REZAK, being duly sworn, deposes and says:

I am a Vice President for Swiss American Securities Inc. ("SASI") and have read the above amended answers of SASI to the Information Subpoena issued pursuant to CPLR § 5222(b) above. The Answers have been compiled based upon SASI's records and prepared by counsel and are true to the best of my knowledge.

SWISS AMERICAN SECURITIES INC.

By: ______________________
Adam Rezak, Esq.
Vice President

Sworn to before me this 6th day of
December, 2005

______________________
Notary Public

MARY ELLEN INTERNICOLA
Notary Public, State of New York
No. 01IN5014061
Qualified in Kings County
Commission Expires July 15, 2007

C:\Documents and Settings\ARezak\Local Settings\Temporary Internet Files\OLK6E\Ungar Amended Answer120205.doc

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------x

ESTATE OF YARON UNGAR, DVIR UNGAR, YISHAI UNGAR, JUDITH UNGAR, MEIR UNGAR, MICHAEL COHEN, AMICHAI UNGAR and DAFNA UNGAR

Plaintiffs – Judgment Creditors,

-against-

THE PALESTINIAN AUTHORITY and THE PALESTINIAN LIBERATION ORGANIZATION,

Defendants – Judgment Debtors.

---------------------------------------------------------------------x

**AFFIDAVIT OF SERVICE**

Index No.: 105521/05

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

The undersigned being duly sworn, deposes and says:

Deponent is not a party to the within action, or an employee of any party, and is over 18 years of age.

That deponent served a true copy of Swiss American Securities Inc.'s Amended Verified Answers In Connection With Information Subpoena, dated December 6, 2005, in the above action on the attorneys for plaintiffs-judgment creditors, Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Michael Cohen, Amichai Ungar and Dafna Ungar, (i) via overnight delivery to David J. Strachman, Esq., McIntyre, Tate, Lynch & Holt, 321 South Main Street, Suite 400, Providence, RI, 02903; and (ii) via first class mail to Lee Squitieri, Esq., Squitieri & Fearon, 32 East 57th Street, 12th Floor, New York, NY 10022.

Timothy C. Dawe

Sworn to before me this
6th day of December, 2005

Valerie Perez
Notary Public

VALERIE PEREZ
Notary Public, State of New York
No. 01PE6135446
Qualified in Bronx County
Commission Expires October 17, 2009

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

++++++++++++++++++++++++++

EFRAT UNGAR CA No. 00-105 L

v PROVIDENCE, RI
1 APRIL 2003

THE PALESTINIAN LIBERATION ORGANIZATION

+++++++++++++++++++++++++++++

BEFORE MAGISTRATE JUDGE DAVID L. MARTIN

APPEARANCES:

FOR THE PLAINTIFF: DAVID J. STRACHMAN, ESQ.
321 S. Main St
Providence, RI 02903
351-7700

FOR THE DEFENDANT: RAMSEY CLARK, ESQ.
LARRY W. SCHILLING, ESQ.
36 East 12th St.
New York, NY 10003
1-212-475-3232

1 APRIL 2003

THE COURT: This is the matter of the estate of Yaron Ungar, et al vs the Palestinian Authority, et al, Civil Action 00-105 L. Before the Court is the plaintiff's motion to enter default against defendants Palestinian Authority and PLO. The attorneys will identify themselves.

MR. STRACHMAN: David Strachman for the plaintiffs.

MR. CLARK: Ramsey Clark for the defendants. With me is Larry Schilling.

THE COURT: I have also had referred to me the Palestinian defendant's motion for a protective order, and I have received the plaintiff's objection to Palestinian defendant's motion for a protective order. I'll first hear argument on the motion then for default against the defendants Palestinian Authority and PLO, and at that point I will assess what we need to do about the other motion.

Mr. Strachman, I'll hear you on the motion for entry of default.

MR. STRACHMAN: Thank you. Your Honor, just as a preliminary matter, I wasn't aware that the second motion was referred to your Honor for hearing today.

THE COURT: Well, it's not scheduled for



hearing.

MR. STRACHMAN: Okay.

THE COURT: And it was referred to me on March 27th and notice has not been sent to counsel of the pendency of that motion, and if counsel are not prepared -- it's not before me. I just note -- I've had it referred to me, and when I saw it and I looked at the present motion that was scheduled for today's hearing, I thought there may be an interrelationship between the two that one may have an affect on the other, at least this motion may affect the motion for protective order. I'll hear you on what's scheduled for today, which is the motion to enter default.

MR. STRACHMAN: Thank you, your Honor. If your Honor please, this matter has a long history. It is now past the 3 year anniversary of this case.

On November 4, this past year, Judge Lagueux

rendered a very lengthy and detailed decision on the defendant's motion to amend -- excuse me, motion to dismiss the amended complaint. Very simply, pursuant to Rule 12(a)(4)(A), the defendants have 10 days to file an answer, l0 days from November 4, 2002. And just some sort of very simple side history, the Court had a conference with counsel telephonically on 12/2. We had a hearing on 12/12 before your Honor concerning



discovery issues. At the 12/2 -- excuse me, the 12/12 hearing, your Honor made it very clear that a stay that had entered previously was not applicable now that Judge Lagueux had rendered his decision on November 4th. Your Honor followed that up with a letter to counsel, and this case has proceeded in the sense that a series of motions have been filed concerning discovery, and defendant's counsel and I worked out over the course of a month the exact language of a discovery order following your Honor's ruling. We find ourselves now 145 days after the answer was due, and we still have no answer, and it's -- there's just no

excuse for not filing an answer. We're entitled to it under the rules. The defendants have had the amended complaint for 20 months. So for 20 months, because it was filed August of 2001, they had 20 months to prepare an answer. Defendants indicate, I believe somewhat brazenly to this Court, on Page 2 of their objection in the memorandum in support of their objection, they indicate that they "had the abil -- that drafting and filing an answer is within defendant's limited capabilities although inadvisable." So they've admitted to the Court they have the capacity, which I don't think anyone could really plausibly question, to begin with, and we have no answer. We have no answer.



We have no way of knowing what their defenses are, factual, legal or otherwise, other than the defenses that were rejected now twice in a motion to dismiss the complaint and in a motion to dismiss the amended complaint. We have an order of discovery which has not been complied with and is the subject of other motions but clearly contemplates that the case is finally going to get moving and move along a specific track already

ordered by your Honor in terms of discovery, interrogatories and depositions, and we find ourselves without an answer even as yesterday's first deposition was suppose to go forward, after 4 and a half months since the rules require an answer to be filed. Thank you.

THE COURT: Thank you, Mr. Strachman. Mr. Clark.

MR. CLARK: Thank you, sir. Good afternoon, Judge.

THE COURT: Good afternoon.

MR. CLARK: This is, as our presence attests, in both the matter to the defendants and the Palestinian people (inaudible).

The defendants have been anxious, and I think it's been apparent in getting to have a full and final determination and review of their motion to



dismiss, which they think is meritorious. They have a motion for reconsideration pending to Judge Lagueux's order of November 5, all the time that we've been talking about, without knowing that we'll be held to answer in this court. My instructions have been do not

answer, do not take any steps that would replace us here, and we have anxiously awaited the decision on motion for reconsideration. I think in this connection the Papandreo case which we cited to you from the District of Columbia, Court of Appeals -- United States Court of Appeals for the District of Columbia, they have two other courts there, which observed that the importance of determining immunity applies not only to what you're held in court but to all of the burdens of litigation, and it observes that proposed burdens of litigation before that issue is determined can compromise the rights and well-being of the defendant, and that's why the Court of Appeals granted a Writ of Mandamus in that case, prevent the case from going forward.

We've now, of course, had a, I guess it's an order, from Judge Lagueux, on the 27th of, which is now last month, March, setting the hearing not only on the motion for reconsideration but on the other motion we're talking about, the motion for default and the



motion for protective order on discovery. So it would

seriously prejudice the rights of the accused here -- I practice too much criminal law -- to be forced to answer and proceed until their status is clear. I don't want to argue the merits of the jurisdiction, but I will observe that there has been steady development in the legal status of Palestine.

You'll note that (inaudible) doesn't refer anymore to the permanent representative of the PLO, now refers to, this is by vote of the United Nations, the Permanent Representative from Palestine. President Bush has just recently as two weeks ago described his intense interest in a statement in the Rose Garden, in proceeding as quickly as possible, not only with the peace process but with the full recognition of the government of Palestine. You know, (inaudible) because a great majority of the members of the United Nations have recognized Palestine, their Embassies. So the point is that since the Achille Laura and other cases, you have entirely different legal factual status, and we're anxious for Judge Lagueux to reconsider and review his decision on that basis, and we're anxious that the prejudice, irrevocable injury that can flow from trying to get into depositions, that it not occur

prematurely.



THE COURT: Mr. Clark, let me interrupt you with a question. If Judge Lagueux denies your motion for reconsideration, would your client then file an answer at that point, or would your client continue with the position, that I gather from your filings your client takes, which is they are immune from suit, and that they ought to have, if Judge Lagueux won't reconsider his ruling, then they will continue with their present course of action and seek review ultimately by the First Circuit?

MR. CLARK: I hope the answer is clear, but I will make it as clear as I can. The desire to (inaudible) is set forth in Papandreo to have those issues determined before proceeding to answer and all of the discovery and other matters that follow, and burdens of litigation, as they call it, is ripe, and we will seek, we don't know what Judge Lagueux's disposition will be now, but we would seek an opinion from that ruling and process it as quickly as we could.

THE COURT: Thank you for answering.

MR. CLARK: Now the other consideration is

existing conditions which make proceeding essentially impossible. I went to Rhamalla in mid December, the 15th and 16th, maybe the 16th and 17th of December, and met with the leadership, including President Arafat.

9

This was the only business that I had, this case, and several cases, but this is the what we call the lead case. I say that even though there's, as you know, there's a similar case -- I say similar, there's a virtually identical case pending in the District of Columbia (inaudible). In that case claiming that Hamas was controlled by Iran for the Ungars, the same plaintiffs, the same factual claims, only there claiming it's Iran and Hamas while here the claim is Palestine and Hamas, and it's not likely that both can be true, but can observe that there Judge Robertson has refused. There's no appearance there. Iran has failed, if not refused, to appear in a number of cases like that. There have been default judgments up in the billions of dollars entered against it. So, but the conditions, to get in to see the leadership of the PLO, knowing the government's situation there for some time, of all the government buildings that I've ever been in,

in Gaza are destroyed, and and quite often there are tanks out there. Records destroyed. And in many cases, the headquarters to the Palestinian National Guard image, or even in existence during the (inaudible), is rubble. I've (inaudible) break my neck climbing over literally rubble of (inaudible) to get in there. The president has been essentially a prisoner



there, Mr. Arafat, since sometime last March, a year ago, March of 2002. He has not been out. (Inaudible). But that's been his way to try to keep his people alive.

So the ability -- we were generous when we said that with the resources and the opportunities available, we can probably file an answer, but the fact is that to file an answer would cross the line, it would be (inaudible) unnecessary, creates an appearance that we hope will prove to be fallacious. We have a duty under the U.S. law to respond, and then the next day we'd file such an answer. We'd be immediately confronted with an impossibility. Observed it

yesterday, President Araft, (inaudible) testify here in Rhode Island, before a notary public yesterday. (Inaudible). He didn't come here. A default would be based on that theory. So when you're starting down a road, you can only create political usage in the media, appearances that may prove to be misleading, if not will be harmful under any circumstances, and then (inaudible) very tough over there. Six people killed in Bethlehem a couple of days ago, 3 in one little family. American killed by a bulldozer in Gaza last week. So we really -- I (inaudible) when it's impossible to defend because of circumstances beyond



our control. So going forward at this time, I think, would be -- may be terribly unfair. I think it would be contrary at least to the decision in Papandreo where a district judge decided to go ahead and was (inaudible) that it would deny due process. It would make absolutely no progress. We'd be confronted with the same problems the next day. So all of (inaudible), which can't go forward. Can't give discovery. That's why I was pressing to suggest this other motion, as you mentioned, might be discussed today, could be relevant

on this issue. It certainly is.

There's also a question, we don't know, (inaudible) it would seem that it would be improvident, improvident in Providence, to proceed when Judge Lagueux has just announced an intention to consider all these motions. So I would urge, as strong as I can, that the Court defer. If the Judge says go ahead, there would be no need for another argument, as far as I can tell on this motion. (Inaudible)

THE COURT: I'm sorry, if the Judge says go ahead and what, Mr. Clark?

MR. CLARK: If he said after the hearing on the 11th, did he decide, could he say he's going to consider all of these motions, four or five, we assume that you have seen his or her motion, his record



(inaudible).

THE COURT: I'm aware that he has scheduled a hearing on several motions for, I believe, April 13th or thereabouts. Is it the 11th?

MR. CLARK: The 11th.

THE COURT: And among the motions that he's scheduled a hearing on is your motion for

reconsideration. I'm aware of that, Mr. Clark.

MR. CLARK: Yes. Also two motions to dismiss, which would therefore (inaudible).

THE COURT: All right. You're suggesting to me that if he rules favorably on the motion for reconsideration, then that would have an impact on the motion for entry of default here.

MR. CLARK: Well, what I'm concerned is, he's considering all of them. That's what I'm saying, he's considering all of them. He would -- I would (inaudible) naturally, whatever he decides on reconsideration. If he decides no reconsideration, he decides whether -- the last time, you know, he refused a stay pending appeal, and discussed the problem of certification, the issue of certification. It was not clear exactly to me what was intended here, but presumably he would say what he thinks should be done with all of these matters. He already referred this

13

issue to you, your Honor, but that was before the letter of March 27th, which notified all of us that he was going to hear all of these matters on the 11th. So

if he wants to hear all these matters on the 11th, you could take this under advisement, or however you want to do, see what he says on the 11th and then proceed if that's what's indicated. To proceed before that I think might be improvident.

THE COURT: All right, Mr. Clark. Thank you.

MR. STRACHMAN: May I briefly respond?

THE COURT: Yes, Mr. Strachman.

MR. STRACHMAN: Thank you. First in terms of the scheduling, your Honor, as I indicated in the letter Friday, this motion was scheduled and referred to your Honor by Judge Lagueux while all of the other motions were pending before the Court. So he referred this matter, with the docket entry, for all of the other motions having already been made, (inaudible) until the motions were pending.

Second, your Honor, it's even respectfully more brazen now to say that the defendants cannot file an answer after having met with counsel in December, and I'm sort of shocked to hear that counsel would meet with the clients, and as Mr. Clark said, primarily on

this case. That's what primarily (inaudible) to meet with his clients, and then wait 4 and a half months, not file an answer, not ask this Court for additional time, not send a letter or request or stipulation amongst the parties, never having discussion with the Court or counsel about extending the time.

And in response to your Honor's, I think, questions, really gets to the exact nub of the issue, and that is, if the motion for reconsideration is denied, are you going to file an answer? Mr. Clark essentially says no. That means this case is even more so than when we wrote our initial memo within the Conetta case, and that involves a wilful determination of not filing an answer, and now we see it even more so flushed out before the Court.

Also as has been made clear in many cases, as been made clear by your Honor in the discovery matter, the mere filing of a motion to reconsider a, for reconsideration, does not stay the whole case. You can't file a motion for reconsideration and then get out of, sort of get out of jail free pass, from all the rules of civil procedure, and frankly because each and every motion has an order of this case, there's been a

motion to reconsider, we're litigating the litigation in this case, I would fully expect that we would have

15

many more such motions down the road. That doesn't stop the rules of procedure from operating. That doesn't excuse this defendant, these defendants from their obligations.

Also, your Honor, the discussion concerning alleged (inaudible) and all these kinds of things have all been dealt with by Judge Lagueux, and even if they -- at some point there was some different status that happened to the PA, we have two defendants here, the PLO, which is a political organization, and the PA, which is a entity that is clearly not a state, has never been found a state, by any judge, by any court, by any legal treatise.

Lastly, your Honor, the arguments concerning what goes on in Rhamalla, I'm concerned because the Court is inundated with articles from newspapers and testimony from lawyers, and letters from alleged Ambassadors about facts. If those individuals want to submit facts to this Court, there's a proper way to do that and we should have an opportunity to cross-examine

them, and if counsel wants to testify, then we should have a right to cross-examine him, as well. Letters by Mr. Al-Kibla (phonetic spelling) and other newspaper articles from the New York Times are of no concern to this Court, should be of no concern to this Court. The



rule states l0 days. We waited 4 and a half months. We weren't quick with the trigger, and we have the right to proceed with this case. And if we don't nip this type of matter in the bud now, the issue of default, we'll be here forever, because we just passed the 3 year anniversary. I presume there is no case in this district that an answer has not been filed 3 years after litigation. And I would urge your Honor to look at this matter in a very simplistic way, actually, because it's really just a simple application of Rule 12, and the representations by Mr. Clark that he met with his counsel, he's been instructed not to file an answer, and he was instructed in December, even after talking about this specific case, and his response to your Honor's question, that even if the motion to reconsider would be denied, there would be no answer forthcoming because there's some appeal that they may

decide to file.

Just so we're clear, your Honor, there is no motion for an interlocutory decision. No appeal has been taken. No further action has been taken. So the threats about taking appeals, et cetera, cannot give a -- cannot be a carte blanche for just stopping this litigation. Thank you, your Honor.

Oh, I'd just like to add one other thing,



which has been neglected to be mentioned. Tomorrow, in Washington, the PLO is going on trial. The PLO and the PA are going on trial in the case of Burkheit v Palestine Liberation Organization, 00-CV-1455. I have the docket sheet which I'd like to provide to the Court and also to counsel. They're going to trial tomorrow in a case that was scheduled several months ago. They have counsel defending the case, and presumably the PLO is giving instructions in one case how to answer, and the PA, as well, and how to respond to a case and how to litigate a case, and how to show up for trial, and yet we have instructions from allegedly Mr. Arafat suggesting in December he's not going to file an answer

in this case, and that type of conduct can't be sanctioned. And if I could, your Honor, I'd like to provide just the docket sheet that I received --

THE COURT: Have opposing counsel -- do you have a copy for them, please?

MR. STRACHMAN: I presume they have it, but I do have a copy for them.

MR. CLARK: We don't have it.

THE COURT: Mr. Clark, would you like to briefly respond?

MR. CLARK: Very briefly, your Honor.

THE COURT: All right.



MR. CLARK: I will say first I've never -- I'm unaware of this case (inaudible), but what it is, if it's commercial payments, something like that, whatever it is, this case is this case. And April 11th is hardly forever. And the point I said about our instruction was that we were told not to file an answer until the issue of jurisdiction had been finally resolved by "appeals", and that's our right under (inaudible) and it's our right under simple justice. Thank you.

THE COURT: All right. Thank you, Mr. Clark.

The Court is conscious of how long this case has been pending, and of the history that was recited by Mr. Strachman, and of the need for a prompt decision on the pending motion. I am, however, not going to rule from the bench today. I do want to look at the Papandreo case again that Mr. Clark has cited both in the memo and in his oral argument today. I do not know whether I will accede to the request, Mr. Clark, of not ruling prior to the hearing before Judge Lagueux, but I can assure all parties that a decision would be made promptly after Judge Lagueux's hearing at the latest on the present motion before me.

Regarding the motion for a protective order,



since that was not scheduled for hearing, I will not take that up. It seems to the Court that, as I indicated in my remarks at the beginning of the hearing, that the present motion could impact the need to have a hearing on the motion for protective order. That's the reason why I should proceed promptly to

decide this pending motion. I will include a footnote in my decision, or some -- perhaps not a footnote in the decision, but some notice to the parties regarding the status of the motion for a protective order at the time I impact upon the motion for entry of default judgment, which as I say will be done promptly. I thank the attorneys for their arguments. The Court will stand in recess.

(RECESS)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * | | C.A. NO. 00-105L |
| EFRAT UNGAR, by and through the Administrator of his Estate, David Strachman, et al | * | |
| VS. | * | SEPTEMBER 23, 2004 |
| | * | 10:00 A.M. |
| THE PALESTINIAN LIBERATION ORGANIZATION, et al | * | |
| * * * * * * * * * * * * * * * * * | | PROVIDENCE, RI |

BEFORE THE HONORABLE RONALD R. LAGUEUX,

SENIOR DISTRICT JUDGE

(Motion for Stay Pending Appeal)

E X C E R P T

APPEARANCES:

FOR THE PLAINTIFFS: DAVID J. STRACHMAN, ESQ.
McIntyre, Tate, Lynch & Holt
321 South Main Street
Providence, RI 02903

FOR THE DEFENDANTS: DEMING E. SHERMAN, ESQ.
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

Court Reporter: Karen M. Zinni, RPR-RMR-CRR

One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography



23 SEPTEMBER 2004 -- 10:00 A.M.

BEGINNING OF EXCERPT

THE COURT: All right. The Defendants argue essentially that the Court has discretion in granting a stay in these circumstances and rely on cases, however, that do not have a monetary judgment and rely on the four-part test that's used for preliminary injunctions.

The Plaintiffs counter by saying that the First Circuit law is clear on the subject, and it is, that in a case involving a monetary judgment, the only way that a defendant can get a stay is to file a supersedeas bond, and the Court can reduce the bond below the judgment amount in exceptional circumstances.

In this case, starting with the reverse, assuming the four-part tests apply, there is absolutely no reasonable possibility that the Defendants will get a reversal on appeal. This Court has ruled, I think at least three times, that the Defendants do not have sovereign immunity, that they are not a foreign sovereign state under the applicable statutes; and that's been confirmed by the conduct of officials of the Defendants, not only in this case but in other cases where they admit that they are not a sovereign state.

So that issue is clear, and the Court of Appeals

3

indicated as much but sent the case back after an interlocutory appeal so that the Court could consider a 12(b)(1) motion by the Defendant; and the Court did consider that 12(b)(1) motion and ruled extensively that there is no sovereign immunity in this case. So I feel confident in saying that the chances of

of the case that somehow they shouldn't be liable for the actions of the Hamas in this dreadful killing. If that's the position they take, they should have



defended this case on the merits. They are defending other cases of a similar nature on the merits.

So the Defendants have only themselves to blame for the position they're now in, and I can't imagine that the First Circuit Court of Appeals would say at this point even though you don't have sovereign immunity, you should have an opportunity to defend this case on the merits. That's been waived a long time ago, and that's really the only argument that the Defendants have at the appellate level. A number of Courts have ruled the same way.

However, I do have some discretion in the

reversal on appeal are between slim and none.

In any event, it seems to me that the Defendants kept changing their position on this matter, and there is some disingenuous conduct here and some attempts to delay the ultimate resolution of this case. This has been true throughout.

I advised these Defendants a long time ago that the proper way to raise the defense of sovereign immunity was to file an Answer and to raise the affirmative defense of sovereign immunity and then I would have a hearing on that matter. I would stay discovery until that matter was resolved.

Mr. Clark came into court and said unequivocally that Yasser Arafat did not want to file an Answer in this case and did not want to defend this case on the merits. Then it is disingenuous to hear from that side

matter; and because of the size of this judgment and the international implications of this judgment, I'm going to require a supersedeas bond in the amount of $50 million. That's less than half the judgment.

So my order specifically is that there will be a stay for one week until September 30th, 2004, at 12 noon. If the Defendants file a supersedeas bond of $50 million approved by the Court, the stay will continue in effect. If the Defendants do not, the stay ends at 12 noon September 30, 2004.

Are there any questions?

MR. SHERMAN: No, your Honor.

THE COURT: That's the order of the Court.



Prepare an order, Mr. Strachman.

MR. STRACHMAN: Thank you.

(Adjourned)

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Zinni, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Karen M. Zinni, RPR-RMR-CRR

________________________________________

Date

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al | ) |
| Plaintiffs-Appellees | ) |
| v. | ) |
| THE PALESTINIAN AUTHORITY and THE PALESTINE LIBERATION ORGANIZATION, | ) |
| Defendants-Appellants | ) |

DEFENDANTS' MOTION UNDER RULE 8(A)(2)
FOR A STAY PENDING APPEAL

Defendants the PALESTINIAN NATIONAL AUTHORITY ("PNA") named and referred to in the Court below as "The Palestinian Authority," and the PALESTINE LIBERATION ORGANIZATION ("PLO") respectfully move pursuant to FRAP Rule 8(a)(2) for a stay of further proceedings in the District Court pending the disposition of this appeal, and in support of this motion state as follows:

1. This is an interlocutory appeal by defendants who constitute the government of Palestine from the denial of their request for the dismissal of this action on grounds of sovereign and governmental immunity, non justiciability and as barred by 18 U.S.C. sec. 2337. This motion is properly made in this Court under Rule 8(a)(2) because the District Court has denied a stay pending appeal, stating from the bench at a hearing on Friday, April 11, 2003 "...I will deny the...stay pending appeal. This case is going forward whether or not there is an interlocutory

appeal." Transcript of April 11, 2003 hearing, attached hereto as Ex.1, TR9, L.1 reiterated at TR12, L.15.[1]

2. Defendants request that this motion be expedited because in the absence of a stay defendants are threatened with irreparable harm by continued demands for discovery and motions by plaintiffs for entry of default and default judgment and other relief. Indeed within a week after the April 11, 2003 hearing defendants were ready to file their appeal and motion for a stay and repeatedly requested in vain entry of an order in accordance with the District Court's denial of their motion for reconsideration at the April 11, 2003 hearing, TR8-9, L.25 from which they could take this appeal. Despite their efforts, no such appealable order was forthcoming. In the absence of a stay the Magistrate Judge, on Friday, April 18, 2003 granted two of plaintiffs' several pending motions. One motion was for the entry of default against defendants under Rule 55(a) for failure to file an answer to the complaint. The other was a motion to strike portions of defendants' papers on their motion for a protective order against the taking the noticed depositions of President Arafat and other leading Palestinian officials. These rulings and orders of the Magistrate Judge inflicted precisely the kind of irreparable harm that should be stayed pending appeal. As is developed below, they are "burdens of litigation" that should not be imposed before issues of immunity are finally

[1] References beginning "TR" are to pages of the transcript of the hearing before the District Court on April 11, 2003.

resolved.

3. On April 22, 2003 the District Court signed the order from which this appeal is being taken. The order was entered on April 22, 2003 and is attached hereto as Ex.2. The order denies defendants' timely motion filed on November 20, 2002, for reconsideration of the District Court's decision and order entered on November 5, 2002, which denied defendants' motion to dismiss the amended complaint. Defendants' papers on the motion for reconsideration are attached as Ex.3. The District Court's decision and order entered on November 5, 2002 is attached as Ex.4. The decision is reported, 228 F.Supp. 2d 40 (D.R.I. 2002), and is hereinafter referred to as "the Opinion."

4. Defendants' notice of appeal was filed on April 22, 2003 following entry of the order denying defendants' November 20, 2002 motion for reconsideration. A copy of the notice of appeal is attached as Ex.5. The appeal is timely. Defendants' motion for reconsideration tolled the time for appeal from the order and decision entered on November 5, 2002. The time for filing a notice of appeal from the November 5, 2002 order and the order denying the November 20, 2002 motion for reconsideration began to run when the latter order was entered on April 22, 2003. Fed.R.App.P. 4(a)(4); Acevedo-Villalobos v. Hernandez, 22 F.3d 384, 387, 390 (1st Cir. 1994); see also Marrical v. The Detroit News, Inc., 805 F.2d 169, 171 (6th Cir. 1986); Cf. Blair v. Equifax Check Services, Inc., 181 F.3d 832, 837 (7th Cir. 1999).

5. At the end of its Opinion the District Court denied a stay "pending disposition of the application for certification and/or appeal." 228 F.Supp. 2d at 51. An earlier stay issued by the Magistrate Judge ended when the Opinion was issued. The Opinion asserted that the stay was being denied "in accordance with the broad discretion granted to United States district courts under 28 U.S.C. sec. 1292(b)," which overlooked the limiting effect of the law applicable to appeals, or mandamus proceedings involving issues of sovereign immunity, governmental immunity, non justiciability and applicability of 18 U.S.C. sec. 2337, upon the Court's discretion to deny a stay pending appeal.

6. It is well established that issues of immunity are to be finally resolved before a defendant claiming immunity is subjected to further burdens of litigation. See e.g. _In re Papandreou_ 139 F.3d 247, 251 (D.C. Cir. 1998),

> "Sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." The infliction of those burdens may compromise it just as clearly as would an ultimate determination of liability. For that reason a trial court's denial of an immunity defense entitles the defendant to an immediate appeal under Cohen. ("Deprivation of the right not to be tried satisfies the...requirement of being 'effectively unreviewable on appeal from a final judgment'"). The scope of jurisdictional discovery under FSIA poses the same issue, writ slightly smaller. Here too, we think, immediate review is appropriate. (Citations omitted).

Defendants cited three cases to the same effect in their memorandum in support of their motion for reconsideration, at p.5, _Price_ v. _Socialist People's Libyan Arab Jamahiriya_, 294 F.3d 82, 91 (D.C. Cir. 2002); _Foremost-McKesson, Inc._, v. _The Islamic_

Republic of Iran, 905 F.2d 438, 443 (D.C. Cir. 1990); and Jungquist v. Sheikh Sultan Binkhalifa Al Nahyan, 115 F.3d 1020, 1025-27 (D.C. Cir. 1997).

7. The November 20 motion, Ex.3 hereto, in addition to requesting reconsideration of the grounds for dismissal, also:

(a) argued that the grounds on which the Opinion ruled as a matter of law that defendants were not a foreign state, were erroneous as a matter of law, i.e. reliance on Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44 (2d Cir. 1991) was misplaced, because it was based on conditions existing in 1985 at a time when the PLO was headquartered in Tunis and not present in occupied Palestine. The PNA did not exist. The opinion also gave undue weight to defendants' lack of full U.N. membership. Universally recognized states, including Switzerland, have never been Members of the U.N. The grounds relied on by the District Court failed to take into account decisively important changes bearing on the status of Palestine that had occurred since 1985 which required recognition of defendants as a foreign state. The changes included matters defendants requested leave to brief by motion filed on January 30, 2002 which it was necessary for the District Court to consider in order to benefit from submissions of the parties on the subject, but which the Court failed to do.

(b) requested that the motion the defendants filed on January 30, 2002, that was not acted upon, be granted. The motion for reconsideration pointed out that the Opinion did not dispose of or mention this pending motion. The overlooked motion

requested leave to assert defenses and to fully brief the issues of sovereign immunity and the application of 18 U.S.C. sec. 2337 as a bar to maintenance of the action, identifying these as issues of subject matter jurisdiction to be decided before answer. A copy of the January 30, 2002 motion is attached as Ex.6. Despite not having decided this motion, the Judge rejected the statement of defendants' counsel in the April 11 hearing that there were materials bearing on sovereign immunity and statehood that the Court had not considered, asserting: "I beg to differ. The whole issue of sovereign immunity was thoroughly briefed and thoroughly argued on the motion to dismiss and I made a thorough and complete ruling on that subject... I considered every facet of it." TR4, L.8, TR6, L.19.

(c) stated that some discovery bearing on immunity might be necessary. See, In re Papandreou, supra, 139 F.3d at 253 (discovery to determine whether immunity bars jurisdiction must proceed with circumspection). It asked that a stay of further proceedings other than those bearing on immunity, if any, be issued pending the determination of the motion for reconsideration and if the dismissal of the action is denied, that a further stay be issued pending determination of defendants' appeal to the Court of Appeals,

8. The November 20, 2002 motion for reconsideration was pending for a period of almost 5 months before it was decided. During this period defendants were unable to file an effective notice of appeal. Fed.R.Civ.P. 4(a)(4). Defendants wrote to the

Court on March 27, 2003 when they faced an April 1 hearing before the Magistrate Judge on one of plaintiffs' motions for default, asking that the November 20, 2002, motion be decided before other proceedings occurred, so that if it was denied defendants could appeal. The letter is attached as Ex.7. The Court immediately scheduled the motion and others for a hearing on April 11, 2003. At the hearing the Court explained the motion for reconsideration had been "lost in the cracks," and the Court was unaware it was pending. TR3, L.5.

9. During this period of almost 5 months, in the absence of the stay defendants had requested, plaintiffs pressed for discovery and moved first for the entry of default under Fed.R.Civ.P. 55(a) on the grounds that the complaint had not been answered and thereafter made two motions for default judgment, one on February 12, 2003, for not providing discovery and another on April 9, 2003, for not submitting to depositions. Defendants made applications for stays as to each such motion by plaintiffs filed before April 1, 2003, all of which were denied.

10. Plaintiffs proceeded with discovery by demand and motion, pressing for answers to interrogatories, production of documents and admissions. They noticed depositions in Providence, Rhode Island before a notary public of President Arafat and six other prominent Palestinian leaders. Defendants resisted such demands and motions. After plaintiffs obtained an order for discovery, defendants filed a motion before the Magistrate Judge on January 27, 2003 asking that the order be

reconsidered, setting forth grounds and supported by a letter from Palestine Ambassador to the U.N., Nasser Al-Kidwa. The letter is attached as Ex.8. As were others, the motion was denied. Thereafter, plaintiffs moved for the entry of default judgment under Fed.R.Civ.P. 37(b)(2). Plaintiffs' motion for the entry of default under Rule 55(a) had earlier been assigned to Magistrate Judge Martin. The Magistrate Judge held a hearing on the motion on April 1, 2003 after receiving notice of the District Court's Order scheduling a hearing for April 11 on all the motions. The Magistrate Judge reserved decision on the motion for default for failure to file an answer at the April 1, 2003 hearing, stating "that a decision would be made promptly after Judge Lagueux's hearing [on April 11, 2003] at the latest." P.18, L.21. This is the motion for entry of default referred to in para. 2, <u>supra</u> which the Magistrate Judge granted on Friday, April 18, 2003 while defendants were requesting in vain entry of an order which they submitted that would enable them to take this appeal. The Clerk entered the default on Monday, April 21, 2003, again before this appeal could be taken by defendants. The transcript of the April 1, 2003 hearing is attached as Ex.9.

11. The discovery sought by plaintiffs was not limited to issues of immunity or subject matter jurisdiction. Plaintiffs' discovery demands, for answers to interrogatories, production of documents and admissions, are attached hereto as Ex.10. It was directed to the merits of the case and ranged far beyond the issues presented in the complaint. It was intrusive and sought

information on privileged and confidential matters, and was improper in many other ways. Defendants continue to oppose as a matter of right all further proceedings in the case including filing of an answer until the issues of sovereign immunity, subject matter jurisdiction and justiciability, including political questions, and the applicability of 18 U.S.C. sec. 2337 are determined by the Court of Appeals.

12. Defendants' incapacity to defend this case under present conditions which have prevailed for many months is the result of violent conduct in violation of international law and domestic law of Israel and PNA. The violence by Israeli forces targets PNA and PLO officials and offices, as well as other Palestinian organizations in occupied Palestine and includes indiscriminate violence against the Palestinian people. The occupation of Palestine and the Israeli settlements which have illegally seized Palestinian territory, are universally recognized as illegal under the Fourth Geneva Convention and international law generally.

13. The violent conditions and Israeli assaults directed at the PNA and PLO and other circumstances and events that have contributed to the incapacity are a matter of public knowledge susceptible of judicial notice. They are described in part in the letter from Ambassador Al-Kidwa to the District Court. Ex.8. The incapacity is the result of the widely reported chaos and violence in the Palestinian territories including attacks directed at the PNA and PLO political leadership, its police

capacity and ability to function and the destruction of PNA and PLO buildings and records by the Israeli military -- all ongoing for many months and increasing to this date. See among nearly daily newspaper reports, The N.Y. Times article, In Leaderless Gaza, Israeli Forces And Hamas Fight It Out, appearing on March 10, 2003, which was attached as an exhibit to the PNA's motion for a protective order filed on March 12, 2003 against the depositions of President Arafat and other Palestinian leaders, and which is attached hereto as part of Ex.11.

14. Proceedings in this case in which the District Court assumes a stateless condition for the Palestinian people will have important political and governmental ramifications affecting the peace process in the Middle East, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the welfare and plight of the Palestinian people under Israel's illegal occupation of their territories and the ability of defendants to function effectively as a government. The "infliction of those burdens" of litigation will severely compromise defendants' rights and well being even if they are ultimately found to be immune from suit, or the Court to be otherwise without jurisdiction. See Papandreou, supra, p.3. This is the reason an appeal is authorized at this stage and a stay of proceedings is essential to protect important rights and public interests.

15. In assessing these ramifications this case ought to be considered together with other similar civil actions brought

against the PNA and PLO defendants in the District of Columbia, see e.g. Biton v. PA, 01 CV 0382 and Gilmore v. PA, 01 CV 0853, and elsewhere, including Israel, by the same plaintiffs' attorneys. The ramifications of the litigation and its cumulative effect as a whole and the full extent of the harm being threatened are relevant. Much harm will result from requiring defendants to file an answer which implies the absence of immunity and other jurisdictional defenses that will receive widespread media coverage, from the conduct of discovery and judgments of default and other potential proceedings in these cases. Forcing defendants to take positions and assert defenses in an answer needlessly compromises relationships and feeds hostile news coverage. The injuries threatened by subjecting President Arafat and other Palestinian leaders to depositions at such a difficult time in the peace process and in Rhode Island, when the Prime Minister of Israel has threatened to bar their return to Palestine, as proposed by plaintiffs' attorneys in this case, or by any failure, or refusal to depose are severe.

16. The proceedings in the U.S. District Court for the District of Columbia in the case filed there by Ungar counsel herein for the Ungar family against HAMAS and the government of Iran for the same deaths alleged herein without informing either court of the other proceeding, or explaining their action to either court, threatens defendants with political injury, hostility and potential violence by creating material for propaganda associating defendants with Iran in efforts to injure

Israel. See, Ungar v. Iran, 211 F.Supp. 2d 91 (D.D.C. 2002). The threatened irreparable harm to defendants and to the public interests at stake from premature burdens of litigation establish the need for and the appropriateness of the stay pending appeal that defendants are here requesting.

17. These actions individually and in the aggregate constitute a political attack on defendants and Palestinian leadership, charging them in broad terms with terrorism over decades, in allegations going far beyond the bounds of the issues arising from the events that are the subject of these actions, seeking to use the Courts of the U.S. and Israel to place all blame for violence over decades on Palestinian and to bankrupt and destroy the PNA and PLO and its leadership.

18. The allegations of the complaint in Gilmore pending in Washington, D.C., are typical and could not be broader or more extreme:

> 17. ...Under the leadership of defendant ARAFAT, defendant PLO and its Fatah faction have planned and carried out thousands of terrorist hijackings, bombings and shootings, resulting in the deaths of hundreds of civilians and the wounding of thousands more. Dozens of United States citizens have been murdered, and scores more wounded, by terrorist attacks carried out by defendants PLO and its Fatah faction.
>
> * * *
>
> [Paragaraphs 18-24 charge the PLO and President ARAFAT beginning in the 1970's and later the PNA as well, with establishing terrorist and guerilla units and funding and directing their terrorist activities directly and through others.]
>
> 25. On an unknown date in September 2000 or prior thereto, defendants PA, PLO and ARAFAT authorized, ordered, instructed and directed the terrorist factions

and guerrilla leaders under their control and employ, including Force 17, Fatah and Tanzim, and defendants ABU SHARAH, DAMARA and BARGHOUTI, to organize, plan and execute widespread acts of terrorism against civilians in Israel, Gaza and the West Bank. In accordance with this authorization and these directives and instructions, members of Force 17, Fatah and Tanzim have planned and executed, since September 2000 until the present time, numerous shootings, bombings and other acts of terrorist violence against civilians in Israel, Gaza and the West Bank, in which dozens of civilians were murdered and scores injured.

19. The District Court has rejected the suggestion that politically motivated allegations, discovery requests and trial tactics against defendants can harm the peace process, and other public interests, place impediments in the road map to peace, or that there is a judicial interest in addressing repeated assertions by counsel in the media that their motive is to use the courts of the United States and Israel in a political attack against defendants to destroy them. The District Court has threatened counsel with sanctions for raising these issues in the case. It has also rejected the precedents requiring a stay of proceedings pending appeal of issues of immunity.

20. The District Court sees this case as an ordinary tort action, see e.g. its statement at the April 11, 2003 hearing: "This case is a tort case. Pure and simply. It is not a political case." TR13 L.11. This same reasoning has led the District Court to reject defense claims that the case is not justiciable because it involves issues delegated to the political branches of government without briefing as to what those political issues are. These many issues at the heart of the political attack in this case, include whether Palestinians are

responsible for all the decades of violence and the extent to which, if at all, defendants have had the ability and a duty or obligation to prevent violence by HAMAS and other militant and disaffected Palestinian groups and individuals both in Palestine and in Israel and whether Israel had some such duties in Palestinian territories which it unlawfully occupied. That same occupation confronted defendants with a near impossible challenge to maintain political stability and order and necessary popular support for the Palestinian government in the face of the dire impoverishment, discouragement, and anger of the Palestinian people as a result of continuing excessive military force by the IDF, oppressive economic, social and political measures by Israel and aggressive maintenance and expansion of settlements in the occupied Palestinian territories, among many other things.

21. The irreparable injury inflicted by forcing defendants to bear the burdens of litigation which may compromise it at this critical time in the peace process is more that the use of litigation as war by other means. Large default judgments which in similar cases involving Iran, Rwanda, Bosnia and other governments and political movements and leaders have resulted in damages ranging from over one billion dollars to hundreds of millions of dollars. Such judgments can complicate a final settlement between Israel and Palestine which Israel may insist determine the liability of Palestine for them.

22. Palestine is totally impoverished, its economic viability will depend on the terms of the peace agreement, it has

suffered many thousands of deaths and injuries in the last two years alone, its per capital income is less than 10% of the per capital of Israel and the political resolution of this conflict should not be burdened by extra territorial private tort litigation in U.S. courts.

23. At the hearing held on Friday, April 11, 2003, the District Court granted plaintiffs' motion to strike a paragraph and sentence -- all of section 2(c) and the second sentence of 2(d) -- from defendant's memorandum in support of their November 20, 2002, motion for reconsideration on the theory urged by plaintiffs that the attorneys' motives and objectives are irrelevant to the merits, that they constitute a "personal attack on counsel", albeit in the publicly spoken and reported words of those counsel themselves, and warned that further conduct of this kind could result in revocation of the pro hac vice status of two of defendants' attorneys and imposition of monetary sanctions. TR14, L.2. Defendants believe the District Court's concern is clearly erroneous and an abuse of discretion.

24. Selected pleadings filed by defendants that set forth the political agenda of plaintiffs' attorneys potentially in conflict with the interests of their clients, but improper in any case are attached as Ex.11. The same counsel have made the same assertions repeatedly for the media in Israel and the U.S. claiming to have filed as many as 25 cases.

25. In contrast to defendants' citations of counsel for plaintiffs own words to show an improper and harmful political

agenda, plaintiffs' counsel have filed motions and objections in the District Court, which are presently pending and will be decided soon in the absence of a stay, which include allegations that defendants have submitted "false data", "lied," committed "intentional fraud on the Court", and characterized defendants' pleadings as "out right falsehood", "blatantly and facially false", "bizarre", and "rank and grotesque fantasy," and that defendants' and their counsel have committed other improper, if not criminal acts. Selected pleadings of plaintiffs' counsel in which this language and invective appears are attached hereto as Ex.12. More such allegations must be expected if the case goes forward before a final determination of immunity is made by this Court. The District Court has not noted these and other similar charges by plaintiffs' counsel, nor compared them with defendants' submissions on the political motives of plaintiffs' counsel that have been included in the papers defendants have filed. Such language and invective by plaintiffs' attorneys are part of their purpose to use this litigation as they say to destroy defendants and to seek to place the imprimatur of the judiciary on their allegations through further statements to the media. Such actions are hardly intended to enhance the peace process or reconciliation between the peoples of Israel and Palestine.

26. The elements to be considered in assessing a stay pending appeal are (1) the likelihood of success on the merits, (2) irreparable harm to the party seeking a stay if it is denied,

(3) irreparable harm to those opposing the stay and (4) the public interest. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) citing Hilton v. Braunskill, 481 U.S. 770, 776-77 (1987). Success on the merits is a flexible concept, variously stated. See Weaver, supra ("likely to succeed on the merits) and Hilton, supra ("A strong showing of success on the merits"); see also Mohammed v. Reno, 309 F.3d 95, 100-02 (2d Cir. 2002) (collecting cases). The flexibility of the "success" standard depends on the other three of the four factors. See Weaver, supra, citing United Steelworkers of American v. Textron, Inc., 836 F.2d 6, 7 (1st Cir. 1987); See also "the approach expressed by the District of Columbia Circuit: 'The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors." Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 182 U.S. App.D.C. 220, 559 F.2d 841 843 (D.C. Cir. 1977), as quoted with approval in Mohammed v. Reno, supra.

27. Defendants are threatened with irreparable injury and vital public interests would be seriously jeopardized by a denial of a stay pending appeal. There is no comparable threat to plaintiffs, or any public interest, if a stay is granted.

28. On the merits, the District Court erred as a matter of law in its conclusion that defendants are not a foreign state based on the Klinghoffer case and the absence of full UN membership of Palestine.

29. To demonstrate the likelihood that defendants will

prevail on the merits for purposes of a stay, but without presenting its full brief on the merits in its motion for such a stay, defendants state they will show that they satisfy the definitional criteria of the Restatement of the Law Third, The Foreign Relations Law of the United States (1986), for determining whether an entity is a foreign state, including the Restatement's position that statehood does not depend upon recognition. The District Court was incorrect as a matter of law in giving the decisive weight it did to Palestine's less than full U.N. membership, stating: "Close is simply not good enough." 228 F.Supp. 2d at 49, nor did the Court discuss what law should be applied in weighing statehood. Decisive weight should be given to the Restatement's definition of statehood which has repeatedly been accepted as authoritative. See e.g. Kadic v. Karadzic, 70 F.3d 232, 244-45 (2d Cir. 1995).

30. The PNA is a state under the Restatement's definitional criteria because it has a defined territory, a permanent population, the only authority exercising most governmental functions even under its existing violent conditions and is able to represent Palestine in international relations with the capacity to conduct international relations. The PNA has a domestic police force for the public safety and protection of property. Indeed plaintiffs' complaint is based in part on the alleged failure of the PNA to provide police protection for plaintiffs. See the amended complaint, para. 23 alleging defendants "are authorized and responsible, under international

instruments, customary international law and local law applying in the West Bank and Gaza, to exercise law enforcement powers and to maintain public order and security in the territories under their control." In 1985 there was no Palestinian police force. See Restatement sec. 201 State Defined and Comments a.-e. Israel's illegal occupation of the Palestinian territories, oppression of the Palestinian people through the use of excessive military force and oppressive restrictions and mistreatment and heavy military attacks on personnel and destruction of office and facilities and disruption of the PNA's and PLO's capacity to function, do not affect Palestine's entitlement to recognition of its statehood. Cf. Reporters' Notes 3. to sec. 201, Military Occupation. Nor is statehood dependent on recognition. Comments b, sec. 202.

31. The merits of this motion are supported, in addition to the PNA's entitlement to statehood under the Restatement's criteria, and by material in the record, by a large body of governmental actions, agreements and material overwhelmingly susceptible of judicial notice which would have been provided by the briefing of issues of immunity for which defendants sought leave in their motion filed on January 30, 2002. The briefing would establish the PNA's sovereign immunity as a functioning government based on the Oslo Accords from 1993 and subsequent amendments and related diplomatic measures (hereinafter "the Oslo Accords"). This Court can be provided such materials from public sources appropriate for judicial notice.

32. This motion does not attempt to identify or address all of the issues raised by this interlocutory appeal. It would be beyond the motion's function to do so. The motion seeks a stay that defendants submit is necessary, will serve the interests of justice and would do little if any harm to plaintiffs' interests. Without a stay the action would proceed in the District Court and continue to impose upon defendants burdens of litigation that they lack the capacity to bear and which by the overwhelming weight of authority they should not be called upon to bear prior to a final determination of their right to immunity, including especially review by this Court.

Conclusion

Defendants' motion for a stay pending appeal should be granted.

April 22, 2003

Respectfully submitted,

Ramsey Clark
Ramsey Clark (by LWS)

Lawrence W. Schilling
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003
212-475-3232
212-979-1583 (FAX)

Deming E. Sherman
Deming E. Sherman (#1138) (by LWS)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
401-274-9200
401-276-6611 (FAX)

Attorneys for Defendants-Appellants

Palestinian National Authority
Ministry of Finance
Office of the Minister

السلطة الوطنية الفلسطينية
وزارة المالية
مكتب الوزير

No. : MoF/C.G./826/2005 الرقم :

Date : June 18, 2005 التاريخ :

The Honorable Dr. Condoleezza Rice
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Dr. Rice:

I am writing to request your immediate assistance in addressing what has become a serious obstacle to the continued, effective participation of the Palestinian National Authority ("PNA") in the Middle East Peace Process and the PNA's role as a strong and viable partner of the United States of America and the Government of the State of Israel in that process.

It is now apparent that, under the guise of enforcing a default judgment obtained against the PNA in a U.S. Court, the Plaintiffs in that action are attempting to use the United States judicial system to take control over and freeze the assets of the PNA all over the world. *See The Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al.*, Case No. 00-105L (D.R.I.) (the "*Ungar* Case"). We believe that Plaintiffs' attempt to use the United States Courts in this manner is not supported by United States law, and also runs counter to international law and the laws of several foreign states in which the PNA operates. Nevertheless, if Plaintiffs' efforts prove successful, they could completely undermine the PNA's ability to continue to operate as a functioning government. Even now, the enforcement actions being taken by Plaintiffs and the mere *threat* that Plaintiffs may be successful are causing substantial harm to the Palestinian people and the PNA and, thereby, threatening the Peace Process itself.

Background Facts

In the *Ungar* Case, Plaintiffs, representatives of the estate of Yaron Ungar and certain of his relatives, sought to recover damages arising out of the death of Mr. Ungar, an American citizen, who was killed in Israel on June 9, 1996 by three members of the Islamic Resistance Movement ("Hamas"). The defendants named in the *Ungar* Case include Hamas and various individual members of Hamas (the "Hamas Defendants"), the Palestinian Authority and the Palestine Liberation Organization (the "PLO"). Plaintiffs asserted claims under the United States' Anti-Terrorism Act—which we understand provides a right of action in favor of any "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate survivors, or heirs"—as well as claims

Ramallah/ Tel : 00970-2-2400650. Fax: 00970-2-2400595
Gaza / Tel : 00970-8-2826188. Fax: 00970-8-2820696
P.O. Box 795 Ramallah
P.O.Box 4007- Abu-Khadra complex-Gaza
E-mail : cbomof@palnet.com
mofbud@hally.net

under Israeli law. Plaintiffs originally filed the *Ungar* Case in the United States District Court for the District of Rhode Island ("District Court") in March 2000. The Hamas Defendants never appeared in the action and, in September 2000, a default judgment was entered against them. The PNA did appear in the *Ungar* Case, but for the sole purpose of contesting jurisdiction. The PNA ultimately filed three motions to dismiss Plaintiffs' claims—one directed at Plaintiffs' initial complaint, a second directed at Plaintiffs' amended complaint, and a third after Plaintiffs moved for a default judgment. The PNA and the PLO argued to the District Court, *inter alia*, that they were not subject to the personal jurisdiction of the District Court, that the issues asserted by Plaintiffs presented non-justiciable political questions, and that the PNA and the PLO were entitled to the defense of sovereign immunity under the United States' Foreign Sovereign Immunities Act. The District Court denied all three motions to dismiss. To preserve its legal position both in the United States and overseas (with respect to any potential efforts by Plaintiffs to seek enforcement of the default judgment in other countries), the PNA and the PLO continued to maintain that the District Court lacked both personal jurisdiction over them and subject matter jurisdiction over the dispute and, accordingly, did not file an unqualified appearance and answer to Plaintiffs' complaint.
Plaintiffs ultimately moved for a default judgment based on the PNA and the PLO's failure to file an answer and their refusal to subject themselves to open-ended civil discovery. The District Court granted Plaintiffs' motion for a default judgment on July 12, 2004, and entered judgment in the amount of approximately $116,415,000 against the PNA and the PLO on July 13, 2004. The PNA and the PLO appealed, and the First Circuit Court of Appeals affirmed the judgment against them by order dated March 31, 2005.[1]

Enforcement Proceedings

Shortly after the First Circuit affirmed Plaintiffs' judgment against the PNA and the PLO, Plaintiffs began to take aggressive steps to enforce the default judgment entered by the District Court. On April 19, 2005, Plaintiffs obtained an *ex parte* temporary restraining order ("TRO") purportedly in an effort to preserve assets Plaintiffs might seek in satisfaction of that judgment. The TRO was expressly limited to "*assets of The Palestinian Authority and the Palestine Liberation Organization however titled . . . located within the jurisdiction of the United States or of any State thereof.*

On May 5, 2005, the District Court converted that temporary restraining order into a Preliminary Injunction. By its express terms, the Preliminary Injunction was also limited to assets and property of the PNA and the PLO within the United States. The Injunction also expressly provided that the PNA "are permitted to withdraw normal expenses necessary for the daily operations of their offices in Washington D.C. and at the United Nations, from existing bank accounts used by Defendants for that purpose as of the date of this Order."

[1] In addition to the *Ungar* Case, the Plaintiffs' counsel, working with parties in Israel, has filed other actions in the United States seeking millions and millions of dollars from, *inter alia*, the PNA and the PLO. *See, e.g.*, *Knox, et al. v. PLO, et al.*, 1:03-cv-04466 (S.D.N.Y.). We believe that these separate actions are part of a concerted effort to impose crippling financial liability on the PNA, thereby undermining its ability to function as a partner in the Peace Process.

Despite the specificity of the District Court's Orders, however, Plaintiffs' counsel prepared a "Notice of Injunction" (the "Notice") in which they broadly assert that the Injunction

> applies to all assets of the PA and PLO however titled, and that assets of the PA and PLO are held and/or titled under the names Palestinian Authority, Palestine Liberation Organization, Palestinian National Authority (PNA), Palestine Investment Fund (PIF), Palestinian Pension Fund, Palestine Commercial Services Company (PCSC), Palestine Pension Fund, Insurance and Pension General Corporation, Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR and Palestine Monetary Authority (PMA).

The Notice also states that the "Injunction applies to officers, agents, servants, employees, attorneys, partners and fiduciaries of the PA and PLO and any natural or legal person in privity with them and/or acting on their behalf and/or is in active concert and participation with them" and threatens any recipient of the Notice who does not comply with the Injunction with contempt of court and/or monetary damages. Despite the fact that the Notice does not reflect the limited jurisdictional reach of the Court's Preliminary Injunction, Plaintiffs' counsel claims to have sent this Notice to several hundred banks and financial institutions across the United States.

As a result of receiving this Notice, a number of financial institutions have frozen assets of the PNA, including the various bank accounts used by the PNA to operate its offices in Washington, D.C. The PNA's bank in Washington, Wachovia, has attempted to clarify with the Court and the Plaintiffs whether the PNA's accounts can be used to pay the necessary expenses needed to run its office, without success. As a result, the PNA has been unable to pay the employees in its Washington office and satisfy certain other routine obligations of a functioning government. In addition, we have been informed by Arab Bank that it has received a copy of Plaintiffs' Notice and that, as a result, it may have to freeze the PNA assets located anywhere the world. This step, if taken, will completely undermine the PNA's ability to function and its efforts to establish reliable, functioning institutions of government.

In addition, as a direct result of Plaintiffs' enforcement actions, the assets and funds of entities *independent* of the PNA have also been frozen, despite the fact that such assets are not even within the scope of the Preliminary Injunction. These assets have been frozen as a direct result of Plaintiffs' dissemination of the misleading Notice and representation that the assets of these independent entities actually belong to the PNA and, thus, are subject to enforcement and execution in the *Ungar* Case.

For example, the Palestine Monetary Authority ("PMA"), the Central Bank operating in the West Bank and Gaza, has informed us that a substantial portion of its funds has been frozen, including, at least, funds it maintains on deposit with the Bank of New York. In addition to freezing the assets of the PMA, Plaintiffs' enforcement

actions also have resulted in the freezing of the assets of The Palestinian Pension Fund for the State Administrative Employees in the Gaza Strip ("Pension Fund")—assets that, again, clearly are not within the scope of the Preliminary Injunction. The Pension Fund is an entity independent of the PNA, originally created under Egyptian legislation in 1964 for the benefit of civil administration workers in the Gaza Strip and administered by Israel following the 1967 War. As part of the Middle East Peace Process, the PNA assumed the Civil Administration's obligations with respect to the Pension Fund and the assets of the Pension Fund subsequently were transferred from Israel, to be used solely for the purpose of payments of pensions and severance compensation for those Palestinians employed in the civil administration and who contributed to the fund. The pension monies belonging to these Palestinian workers are now frozen.

Request for Intervention

As set forth above, the enforcement actions taken by Plaintiffs and their supporters in the *Ungar* Case already have resulted in the freezing of numerous assets of both the PNA and various independent entities that are *not* subject to the District Court's Preliminary Injunction. The freezing of these assets poses an imminent threat to the continuing operation of critical institutions on which the Palestinian people depend for a functioning civil society. In addition, it also has significantly impaired the ability of the PNA to carry on its governmental function and, in fact, threatens to bankrupt the PNA.

We write to you because the further deterioration of the current state of affairs directly undermines the PNA's continued participation in the Middle East Peace Process and poses a significant obstacle to the PNA's role as a viable partner alongside the United States and Israel. In particular, we believe that the actions of the Plaintiffs in the *Ungar* Case directly interfere with the United States Government's conduct of foreign relations in the Middle East, to the grave detriment of the Palestinian people. More specifically, we believe that actions taken by the Plaintiffs under the authority of the District Court are inconsistent with the United States' longstanding commitment to, and investment in, the Middle East Peace Process. Indeed, we understand the United States' latest financial commitment to the Palestinian people to be part of a broader foreign policy judgment that a strong and viable PNA is a critical part of the road map and lasting peace in the region.

We urgently request that the United States Department of State take whatever action it can, consistent with the Constitution and laws of the United States, to end Plaintiffs' efforts to use the United States Courts to undermine the foreign policy of the United States and interfere in the Middle East Peace Process.

Sincerely,

Salam Fayyad
Minister of Finance

**PLO MISSION**
1320 18th Street NW, Suite 200
Washington, DC 20036
Tel: (202) 974-6360 • Fax: (202) 974-6278

بعثة
منظمة التحرير الفلسطينية
واشنطن

*April 27, 2006*

*The Honorable Condoleezza Rice*
*Secretary of State of the United States*
*Washington, DC*

*Dear Secretary Rice,*

*We are most grateful to President Bush for his new determination, issued on April :5, 2006, to authorize our office to continue to function in Washington, DC as a foreign mission for an additional six months.*

*We are very anxious for there to be this clear and open line of communication between President Abbas and the PLO with the United States at this critical time.*

*While it is an embarrassingly small matter to present to you, we find ourselves to be without assured and sufficient funds to operate the PLO office for two related reasons. Our operating funds on deposit with the Wachovia Bank in Washington have been frozen by a U.S. District Court order and U.S. banks are unwilling to provide us essential banking services under the circumstances.*

*As you may know, approximately $200.000 that were on deposit in our bank accounts in Washington have been held in the Registry of the U.S. District Court for the District of Columbia pursuant to Judge Kessler's order since July 2005. The Wachovia Bank, HSBC and other banks, are unwilling to provide commercial banking services to the PLO under these circumstances even though limited to the purposes of continuing the Mission's official operation. The funds were frozen on the application of private Israeli citizens who hold a default judgment against the PA and PLO of $216 million in a wrongful death action brought in U.S. District Court in Rhode Island for events occurring in Israel in 1996. There are at least seven other similar actions pending in U.S. Courts.*

**PLO MISSION**

1320 18th Street NW, Suite 200
Washington, DC 20036
Tel: (202) 974-6360 • Fax: (202) 974-6278

بعثة
منظمة التحرير الفلسطينية
واشنطن

*For theses reasons I urgently request you to ask the Department of Justice to file a Statement of Interest on behalf of the U.S. in the proceeding before Judge Kessler, your Legal Advisor's office is fully aware of this matter. A similar case based on the same judgment was filed in the U.S. District Court in the Sothern District of New York where the creditors sought to use the judgment as the basis for seizing and selling Palestine's U.N. Mission. A statement of Interest was filed by the U.S. in opposition to this seizure and sale in New York in September 2005 and the Court stopped the proceeding. The Statement of Interest was based on your powers under the Foreign Mission Act and, in part, on a prior determination by President Bush identical to the determination the President has again made on April 13, 2006 with respect to the continued operation of the PLO Mission: "I hereby determine and certify that it is important to the national security interests of the United States to waive the provisions of section 1003 [of Public Law 100-204]".*

*The need to maintain the PLO Mission as one of the few lines of communication between the governments of the U.S. and President Abbas and the PLO is of great importance to the Palestinian people and we believe to America, as well. The office serves vital U.S national interests and longstanding U.S. foreign policy goals in the Middle East.*

*Without the relief we are requesting -the release to the PLO of its frozen funds, and the ability to utilize ordinary commercial banking services limited to the modest needs of the office- the PLO may have to close its office in Washington.*

*We seek your assistance to preserve this vital link of communication under the extremely difficult circumstances of the moment.*

*Respectfully,*

*Afif Safieh*
*Head of the PLO Mission*
*Washington, DC*

# World Donors Pledge $7.4B For Palestine

**Total Exceeds Amount Expected To Help Struggling State**

PARIS, Dec. 17, 2007

**(AP)** World donors pledged US$7.4 billion (euro5.1 billion) over the next three years for the Palestinians at a conference Monday, a massive sum that beats the Palestinians' own expectations, French Foreign Minister Bernard Kouchner said.

"The real winner today is the Palestinian state," Kouchner told a news conference after the gathering of nearly 90 countries and international organizations in Paris. "We wanted US$5.6 billion, we have US$7.4 billion, not bad."

The Palestinian government had asked for US$5.6 billion (euro3.8 billion) in 2008-2010 to shore up its economy amid a renewed push for a Palestinian state.

"Our feeling is great, this is generous. It is a vote of confidence for the program, and a sign of solidarity on the Palestinian question," Palestinian Planning Minister Samir Abdullah told The Associated Press.

He confirmed the overall figure and said the pledges include US$2.9 billion (euro2 billion) for 2008.

Palestinian Prime Minister Salam Fayyad said, "We take it as an endorsement." He called it part of the process for "establishing an independent Palestine."

The Palestinians are seeking to ride on the momentum of resumed peace efforts after a U.S.-sponsored conference in Annapolis, Maryland, last month.

The sum pledged Monday was substantial even compared to the more than US$10 billion (euro7 billion) that donor countries have given to the Palestinians over the past decade, according to the World Bank. Officials have said the Palestinians have received more international aid on a per capita basis than any other nation or group of people in the postwar period.

World leaders at the conference also urged Israel to ease restrictions on movement in the West Bank and Gaza to make a recovery of the Palestinian economy possible.

Some 90 countries and international organizations came together in Paris for the biggest pledging conference in more than a decade.

As numbers trickled in, many donors were focusing their aid on 2008, leaving plans for future budget years hazy. That made it difficult to keep a running tally of overall contributions.

U.S. Secretary of State Condoleezza Rice pledged US$555 million (euro382.5 million) for 2008. However, the money includes about US$400 million (euro275 million) that the White House has already announced but that has not been approved by Congress.

"The Palestinian Authority is experiencing a serious budgetary crisis," Rice said. "This conference is literally the government's last hope to avoid bankruptcy."

The United States provides more than US$2 billion (euro1.4 billion) a year in aid to Israel, its closest Mideast ally and single largest recipient of U.S. foreign aid. Egypt, the first Arab state to make peace with Israel, receives about US$1.3 billion (euro900 million).

© MMVII The Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.

# DECLARATION OF MARWAN ABDEL-RAHMAN

I, Marwan Abdel-Rahman, of 2828 JFK Blvd., Jersey City, New Jersey, DECLARE PURSUANT TO 28 U.S.C. §1746, AS FOLLOWS:

1. I am completely fluent in Arabic and English, and I am capable of translating accurately between those languages.

2. I have been employed as a professional Arabic-English translator for 11 years.

3. The English-language document attached hereto as Appendix 1 and captioned "Summary of Revenues and Expenditures from October to December 2006 (in millions of dollars)" is an accurate translation of an Arabic-language document downloaded from the website of the Palestinian Authority's Finance Ministry, www.mof.gov.ps/monthly-reports/2006/10t012-2006/1.htm, a copy of which is attached hereto immediately following the English translation.

4. The English-language document attached hereto as Appendix 2 is an accurate translation of an Arabic-language news report regarding Ghazi Jabali[1] downloaded from the Voice of Palestine news website at http://www.palvoice.com/index.php?id=3583 a copy of which news report is attached hereto immediately following the English translation.

5. The English-language document attached hereto as Appendix 3 is an accurate translation of an Arabic-language news report regarding Ghazi Jabali downloaded from the Watan news website at http://www.watan.com/index.php?name=News&file=article&sid=3648 a copy of which news report is attached hereto immediately following the English translation.

6. The subtitles appearing on the video recording of an interview of Mohammed Dahlan contained on the DVD submitted herewith as Appendix 4 and marked "Dahlan" constitute an accurate translation of Mr. Dahlan's Arabic-language statements on that recording. I recognize Mohammed Dahlan, who is a well known public figure, and confirm that he is the speaker.

[1] The Arabic name "Ghazi" starts with a guttural consonant which has no equivalent in English, and is sometimes transliterated as "Razi." The family name "Jabali" is often written in Arabic with the direct article "al" – i.e. as "al-Jabali" – and I have followed that convention in the translations.

7. The subtitles appearing on the video recording of an interview of Jibril Rajoub contained on the DVD submitted herewith as Appendix 5 and marked "Rajoub" constitute an accurate translation of Mr. Rajoub's Arabic-language statements on that recording. I recognize Jibril Rajoub, who is a well known public figure, and confirm that he is the speaker.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

February 4, 2008

Marwan Abdel-Rahman

# APPENDIX 1

**Palestinian National Authority**
**Ministry of Finance**

# Summary of Revenues and Expenditures from October to December 2006

**(in millions of dollars)**
**Preliminary**

| | | | |
|---|---|---|---|
| **Gross Revenues** | | | **65.83** |
| **Domestic revenues** | | **65.83** | |
| Tax revenues | 46.73 | | |
| Nontax revenues | 19.11 | | |
| **Clearance revenues** | | **0.00** | |
| **(Tax refunds)** | | | **(0.00)** |
| **Net revenues** | | | **65.83** |
| **Total expenditures and net lending** | | | **432.57** |
| **Total expenditures** | | **421.99** | |
| **Wages and salaries** | **309.49** | | |
| - Civilian | 173.65 | | |
| - Military | 135.84 | | |
| **Other current and capitalistic expenditures** | **109.61** | | |
| **Development expenditures** | **2.89** | | |
| **Net lending** | | **10.58** | |
| **Balance** | | | **-366.74** |
| **External financing** | | | **167.63** |
| **Other sources of financing** | | | **36.60** |
| - Transfer of previously withheld clearance revenue | | 0.00 | |
| - Financing from commercial banks | | 20.71 | |
| - Palestine Investment Fund | | 27.06 | |
| - Monetary Insurances/ Palestine Investment Fund | | 0.00 | |
| - Net change of arrears | | - | |

11.17

**Footnotes :**

1 The dollar average exchange rate from October to December 2006 **USD 1 = NIS <u>4.265101</u>**

**Robert J. Tolchin**

**From:** Saved by Windows Internet Explorer 7
**Sent:** Friday, February 01, 2008 7:26 AM

**السلطة الوطنية الفلسطينية**
**وزارة المالية**

## خلاصة الإيرادات والنفقات من اكتوبر حتى ديسمبر من عام 2006
**(بالمليون دولار)**
**أولـي**

| | | | |
|---|---|---|---|
| **إجمالي الإيرادات** | | | **65.83** |
| **الإيرادات المحلية** | | **65.83** | |
| الإيرادات الضريبية | 4<br>6.73 | | |
| الإيرادات غير الضريبية | 1<br>9.11 | | |
| **إيرادات المقاصة** | | **0.00** | |
| **رديات ضريبية** | | | **(0.00)** |
| **صافي الإيرادات** | | | **65.83** |
| **إجمالي النفقات وصافي الإقراض** | | | **432.57** |
| **إجمالي النفقات** | | **421.99** | |
| **الرواتب والأجور** | **309.49** | | |
| مدنيون | 173.65 | | |
| عسكريون | 135.84 | | |
| **نفقات جارية ورأسمالية أخرى** | **109.61** | | |
| **نفقات تطويرية** | **2.89** | | |
| **صافي الإقراض** | | **10.58** | |
| **الرصيد** | | | **366.74** |

| | | |
|---|---|---|
| **167.63** | | **التمويل الخارجي** |
| **36.60** | | **مصادر تمويل أخرى** |
| | 0.00 | تحويل مقاصة من المتأخرات السابقة |
| | 20.7<br>1 | تمويل من البنوك التجارية |
| | 27.0<br>6 | صندوق الإستثمار الفلسطيني |
| | 0.00 | تأمينات نقدية/ صندوق الإستثمار الفلسطيني |
| | -<br>11.17 | صافي التغير في المتأخرات |

**ملاحظـــــات :**

1 متوسط سعر صرف الدولار خلال اكتوبر حتى ديسمبر 2006 4.265101 شيكل

# APPENDIX 2

**National Center for News and Information**
**Voice of Palestine – Fatah Movement**
**October 6, 2007**

## Deal: Release of Ghazi al-Jabali in Company of Khaled Mashaal at Saudi Airport of Jeddah.

A Palestinian official stated that on Thursday, Saudi security forces arrested the former Commissioner of the Palestinian Police, Ghazi al-Jabali, while he was present on Saudi soil for "*Umrah*".[1]

The official, who refused to identify himself, said that the Saudi security arrested al-Jabali inside the Kingdom. He added that the former Commissioner of the Palestinian Police, who arrived on Thursday in Saudi territory accompanying the Head of Hamas' Political Department, Khaled Mashaal, was arrested after he performed the *Umrah*.

He explained that al-Jabali has lived in Damascus since he fled from Gaza in 2005, and that he works as an advisor to Khaled Mashaal. He added that "negotiations are underway to deport him to Damascus, where he came from."

Palestinian sources said that many parties have mediated with the Saudi security agencies to release him and return him to Damascus.

The same sources added that Khaled Mashaal personally intervened with Saudi Interior Minister Prince Naief to release Ghazi al-Jabali and return him to Damascus. After extensive negotiations, General Ghazi al-Jabali was released as a result of a deal, whose details are unknown at this time.

Preparation is ongoing now to return him to Syria, his safe haven from justice.

---

[1] Translator's note: "*Umrah*" is a form of religious pilgrimage to Mecca performed by Muslims.




شاشة البداية | منتديات الحوار | دردشة الموقع | أرشيف الأخبار | أقسام الأخبار | من نحن | الإتصال بنا
الشهيد أبو عمار | الرئيس أبو مازن | حركة فتح | الحركة الأسيرة | ملف الشهداء | من نحن | الإتصال بنا

تصنيف الخبر : أخبار يومية
بتاريخ : 06-10-2007 - 09:58 PM
تعليقات : 0 | مشاهدة : 200 | + ح - ح |

صفقة : الافراج عن غازي الجبالي بعد إلقاء القبض عليه برفقة خالد مشعل بمطار جدة السعودي

أعلن مسئول فلسطيني أن سلطات الأمن السعودية اعتقلت الخميس قائد الشرطة الفلسطينية الأسبق غازي الجبلي أثناء تواجده داخل السعودية لأداء العمرة.

وقال المسئول، الذي رفض كشف هويته إن الأمن السعودي ألقى القبض على الجبالي داخل المملكة. وأضاف أن قائد الشرطة الفلسطينية الأسبق والذي وصل الخميس إلى السعودية برفقة رئيس المكتب السياسي لحركة (حماس) خالد مشعل تم إلقاء القبض عليه بعدما أدى العمرة.

وأوضح أن الجبالي الذي يقيم في دمشق بعد هربه من غزة في 2005 يعمل مستشاراً لمشعل. وأضاف انه تجري الآن وساطات لترحيله إلى دمشق التي وصل منها.

وذكرت مصادر فلسطينية أن إطراف عديدة تدخلت للتوسط لدي أجهزة الأمن السعودية لإخلاء سبيلة وإعادة الى دمشق.

وأضافت المصادر أن خالد مشعل تدخل شخصيا لدي وزير الداخلية السعودي الامير نايف للافراج عن غازي الجبالي وإعادته الى دمشق وبعد مشاورات كبيرة تم الإفراج عن اللواء غازي الجبالي خلال صفقة غير معلومة حتي اللحظة.

وتجري ألان الاستعدادات لإعادة المتهم إلى سوريا حيث ملاذه الأمن للهروب من العدالة

التعليقات على المقال : 0

**أخي الزائر يمكنك التعليق على الموضوع**

سوف يتم نشر التعليقات بعد مراجعتها من قبل الادارة

**اسم الكاتب:**

**بريد الكتروني:**

أرسل التعليق

حفظ معلوماتي؟

منتديات الحوار »




رمز فلسطين »

مواضيع ومقالات وسيرة الشهيد ياسر عرفات

ملف خاص ...

الرئيس أبو مازن »



ملف خاص ...

ملف حركة فتح »

النظام الداخلي لحركة فتح وشؤون حركية

ملف خاص ...

الحركة الأسيرة »

دردشة ونقاش »




إستطلاع الرأي »

لا يوجد استطلاع هذا اليوم
استطلاعات سابقة

مواضيع ذات صلة »

تيسير خالد : اضراب غير عادل ويخدم الفوضى والفلتان في الوظيفة العمومية



ابو علي شاهين : حماس انقلبت على فلسطين "التاريخ والجغرافيا" والصليب الاخضر لن يقود فتح وابو مازن لا يتخذ القرار المناسب في اللحظة المناسبة



أبو الغيط يؤكد على ضرورة عودة ممثلي السلطة الفلسطينية والاتحاد الأوروبي لتشغيل معبر رفح

الحركة الاسرة وأخبار اسرانا البواسل

ملف خاص ...

حالة ترقب وقلق تعيشها إسرائيل بسبب فينو غراد



قطر ترعى التطبيع الثقافي والسياسي مع الكيان الصهيوني

المـزيــد ...

# Appendix 3

# Watan

## Saudi Arabia Arrests Ghazi al-Jabali

A Palestinian official stated that on Thursday, Saudi security forces arrested the former Commissioner of the Palestinian Police, Razi al-Jabali, when he was present in Saudi territory for *Umrah*.[1]

The official, who refused to identify himself, said that Saudi security arrested al-Jabali inside the Kingdom. He added that the former Commissioner of the Palestinian Police, who arrived on Saudi soil on Thursday accompanying the head of Hamas' Political Department, Khaled Mashaal, was arrested after he performed the *Umrah*.

He explained that al-Jabali has been living in Damascus since fleeing Gaza in 2005, and that he works as an advisor to Khaled Mashaal. He added that "mediation is underway to deport him to Damascus, where he came from."

[1] Translator's note: "*Umrah*" is a form of religious pilgrimage to Mecca performed by Muslims.

وطن :: السعودية تعتقل غازي الجبالي - Windows Internet Explorer
http://www.watan.com/index.php?name=News&file=article&sid=3648

وطن
يغرد خارج السرب
Contact US | About Us

- الصفحة الأولى
- هدهد وطن
- خارج السرب
- كشكول وطن
- مسارات
- أدب و ثقافة
- ديور وطن
- عربيكا في أمريكا
- مقالات
- قالت الكاميرا
- وطن التعارف
- أرسل مشاركة
- بحث

## السعودية تعتقل غازي الجبالي



أعلن مسؤول فلسطيني أمس أن سلطات الأمن السعودية اعتقلت الخميس قائد الشرطة الفلسطينية الأسبق غازي الجبالي أثناء تواجده داخل السعودية لأداء العمرة.

وقال المسؤول، الذي رفض كشف هويته، إن «الأمن السعودي ألقى القبض على الجبالي داخل المملكة». وأضاف أن «قائد الشرطة الفلسطينية الأسبق والذي وصل الخميس إلى السعودية برفقة رئيس المكتب السياسي لحركة (حماس) خالد مشعل تم إلقاء القبض عليه بعدما أدى العمرة».

وأوضح أن «الجبالي الذي يقيم في دمشق بعد هربه من غزة في 2005 يعمل مستشاراً لمشعل». وأضاف انه « تجري الآن وساطات لترحيله إلى دمشق التي وصل منها».

### تعليقات

محمد سلطه وضيعه

إعلانات Google
أغاني مجانا
للتنزيل من سلكوم أغنية ورنة
www.icellcom.co.il
صحة مع كلالت
كل مواضيع الصحة والخدمات الطبية
clalit.co.il/ar
مجلة مبدا
العماره فن التصميم أشترك الآن ووفر 20%
w.meada -magazine.com

Error on page. Internet 125%
3:50 PM

# Appendix 4
# and
# Appendix 5

# DVD's Filed and Served by Hand

**November 11, 2004**

# Arafat Dies at 75; No Successor Set; West Bank Burial

**By JAMES BENNET**
**and STEVEN ERLANGER**

AMALLAH, West Bank, Thursday, Nov. 11 - Yasir Arafat, the Palestinian leader, died early Thursday morning in a Paris hospital, a French military spokesman announced.

Mr. Arafat, who was the symbol of the Palestinian revolution and aspiration for an independent state for some 40 years, died at about 3:30 a.m. Paris time of complications from an unknown disease after lingering in a coma for days, as his wife and closest aides struggled over his political and financial legacy.

Mr. Arafat will be buried in Ramallah, on the West Bank, in the Muqata, an old British fortress he used as his headquarters and where he spent the last three years confined to his compound by the Israelis.

His body will first be flown to Cairo for a memorial service on Friday, a ceremony most Arab and world leaders are expected to attend so that they do not have to pass through Israeli border controls. Then, Palestinian officials said, Mr. Arafat will be buried here later on Friday, near his headquarters, from which he was airlifted to a French hospital on Oct. 29.

Palestinian officials quickly confirmed the death of their leader as small groups gathered outside the Muqata in a reddish dawn to mourn his passing. Early Thursday, Tayeb Abdel Rahim, the secretary general of the presidency, confirmed the death and said that Mr. Arafat "planted the seeds of hope for his people."

"The Palestinian leadership mourns Yasir Arafat," he said.

"We mourn with our people, with the Arab nation, with the whole of humanity," he said, the loss of "the tutor, the leader, the son of Palestine, its symbol, the builder of its modern nationalism and the hero of its battle for freedom and independence."

As he finished, saying: "Glory to you, our leader," Mr. Rahim broke into tears.

Mr. Arafat died with the Palestinians still in a limbo of semistatehood, a final peace with the Israelis unachieved and a lingering intifada against Israel that has seen the deaths of thousands of Israelis and Palestinians over the last four years.

The Israelis regarded him as a terrorist and an obstacle to peace, but Mr. Arafat held all the power of the Palestinians in his hands - the presidency, the leadership of the Palestine Liberation Organization and of its largest movement, Fatah. But he groomed no

successor, and he kept many secrets to himself, including the full range of the billions of dollars in Palestinian assets held in many joint accounts under his name.

Jibril Rajoub, the national security adviser, said: "The Arafat era is over. But the loyalty and commitment to his march, connected to building the state and ending the occupation, are the responsibility of every Palestinian."

Mr. Rajoub, speaking on Al Jazeera television, then sent a further message to Palestinians, asking for stability. "The coming phase should be one of institutions and laws, working through existing institutions, whether strong or not," he said.

Under the rules of the Palestinian Authority, the speaker of the parliament, Rawhi Fattouh, will serve as acting president until new elections are held for the post within the next 60 days.

Saeb Erekat, a Palestinian minister, urged the United States to work with the Palestinians and with Israel to ensure that "free and fair elections" could take place.

Mr. Arafat's lingering death allowed his putative successors, most prominently Mahmoud Abbas, the secretary general of the P.L.O., and Ahmed Qurei, the prime minister of the Palestinian Authority, to organize themselves. They are working in tandem, and are trying to reach out to other, younger Palestinians with more power and street credibility.

Mr. Abbas, known as Abu Mazen, is expected to take over the P.L.O. and Fatah, while Mr. Qurei, known as Abu Ala, will continue as prime minister but with more authority over the day-to-day running of government.

[The Associated Press reported Thursday that Mr. Abbas was elected chairman of the P.L.O. within hours of Mr. Arafat's death.]

But there is bound to be a struggle for the Palestinian leadership over time, with a younger generation of militants and reformers pressing for a larger voice in Palestinian affairs, and hard choices coming about whether to try to absorb militants like Hamas or to confront them and try to make peace with Israel.

Israel's president, Moshe Katsav, expressed hope that Mr. Arafat's death would allow his successors a fresh start with Israel, Agence France-Presse reported. "I hope that the new Palestinian leadership will take a new path with a view to putting an end to terrorism and violence, which would allow a resumption of negotiations," he said.

But Hamas said Mr. Arafat's death would only strengthen its resolve to keep up attacks against Israel, Reuters reported. "The loss of the great leader will increase our determination and steadfastness to continue jihad and resistance against the Zionist enemy until victory and liberation are achieved," it said.

Mr. Abbas and Mr. Qurei will have to move quickly to try to restore credibility in the Palestinians' tattered institutions and provide security on the streets.

Outside the Muqata, Khalik Rimawi, 21, said he had waited all night for news. "I wanted to be in solidarity with my president," he said, trembling. "With the loss of our president we lost all confidence and trust we might have for anyone who might come after him. He personally was the symbol of the Palestinians and the Palestinian cause, and when he spoke, it was as if the whole nation were speaking."

His friend, Muhammad al-Hamoud, also 21, works in a dairy. "I feel there is a big gap, an emptiness," he said. "We'll stay until they bury the president."

In Gaza City, hundreds of people took to the streets after the announcement of Mr. Arafat's death. Some shot volleys of gunfire into the air; others burned tires, and smoke filled the air. Hamas, which considers the Palestinian Authority illegitimate, offered its condolences.

Mr. Arafat's death came after Palestinian leaders spent much of Wednesday planning the succession in meetings in Ramallah.

There was a debate about whether to hold elections to replace Mr. Arafat as president of the authority within 60 days of his death, as the authority's basic law demands.

Some argued that an election would be too difficult and risky and might not be carried out in time, especially with Israeli troops intermittently occupying parts of the West Bank and Gaza. It would be better, they said, for the legislature, the Palestinian Legislative Council, to select a president instead.

But the leadership decided to follow the basic law and hold an election, said Hanan Ashrawi, a Palestinian legislator. American officials favor an election as the best way to establish legitimacy quickly, the State Department spokesman, Richard A. Boucher, said in Washington. He said Secretary of State Colin L. Powell spoke on Tuesday with Nabil Shaath, one of Mr. Arafat's aides, "about the situation as it was and what plans were being made."

President Bush said that with a new Palestinian leadership that asks for help in building a democratic, free society, "there will be an opening for peace."

When that happens, Mr. Bush said, "the United States of America will be more than willing to help build the institutions necessary for a free society to emerge so that the Palestinians can have their own state."

"The vision is of two states, a Palestinian state and Israel living side by side," he said, "and I think we've got a chance to do that, and I look forward to being involved in that process."

Mr. Abbas is expected to run for the presidency as the candidate of Fatah, the largest faction in the P.L.O., said Edward Abington, a former American diplomat and now a consultant to the Palestinian Authority. But Mr. Abbas may face strong challenges from more popular, militant candidates who may have the tacit support of groups like Hamas.

"Even if he wins with 60 percent of the vote," a senior Israeli official said, "and a Hamas-supported candidate gets 40 percent, do you think Hamas will then accept what he says?"

The Israeli government wanted Mr. Arafat to be buried in the Gaza Strip, far from Israel proper and the place where his father and sister are buried. But in the cabinet debate on Wednesday, Prime Minister Ariel Sharon asked if anyone, including the army and the intelligence agencies, objected to the Ramallah burial site. No one did, Israeli officials said.

Instead, there was agreement that the first request of Mr. Abbas as putative heir should be acceded to. An Israeli official said the Americans had urged the Israelis to accept Ramallah for Mr. Abbas's sake.

The Israeli Army will coordinate the burial plans, the cabinet decided, but will stay out of Ramallah. In a statement, the cabinet said: "The responsibility for maintaining security and public order in Ramallah during the funeral and after it falls on the Palestinians.""

## Press Briefing by Ari Fleischer

12:32 P.M. EDT

[redacted]

MR. FLEISCHER**: Let me give you a President's** schedule today, and then I have several announcements for you and a statement by the President I'd like to read to you.

The President began with an intelligence briefing, then an FBI briefing. And then he convened a meeting of the National Security Council. The President also met for 45 minutes earlier today with the elected leadership of the Republican House and the Senate to talk about a series of actions that are pending on the Hill, including the growth and tax plan to create jobs, the importance of getting prescription drugs to senior citizens, the global HIV-AIDS initiative, energy legislation, and a number of other areas they talked about. The President also made remarks, as you know, to the 2003 National and State Teachers of the Year.

Later today the President will have lunch -- or he's actually having lunch now with the Vice President. He will also welcome Congressman Rob Hall to the White House on the occasion of the Congressman's 80th birthday. And then later today, the President will sign into law the National Amber Alert legislation. He will welcome to the White House the families of many of those cases, prominent cases where children have been missing. And later this evening, the President will meet with the President of Colombia in the Oval Office.

President Bush will also welcome Prime Minister Kjell Magne Bondevik of Norway to the White House on May the 16th. Norway is a close ally and good friend of the United States, and the President and the Prime Minister will discuss important challenges on the global agenda, including the war on terrorism, reconstruction of Iraq, and the transatlantic relations.

I have a lengthy statement I want to read to you by the President, which will be distributed immediately after the briefing, on the release of the road map in the Middle East. This is a statement by the President:

**On March 14th, I noted the important** steps taken by the Palestinian Legislative Counsel toward the creation of an empowered, accountable office of Prime Minister. The PLC has now confirmed a new Palestinian Prime Minister and cabinet. Today the road map for peace, developed by the United States over the last several months in close cooperation with Russia, the European Union, and the United Nations, has been presented to the Israelis and to the Palestinians.

The road map represents a starting point toward achieving the vision of two states, a secure state of Israel and a viable, peaceful, democratic Palestine, that I set out on June 24, 2002. It is a framework for progress toward lasting peace and security in the Middle East. Implementing the road map will be dependent upon the good-faith efforts and contributions of both sides. The pace of progress will depend strictly on the performance of the parties.

I urge Israelis and Palestinians to work with us and with other members of the international community, and above all, directly with each other, to immediately end the violence and return to a path of peace, based on the principles and objectives outlined in my statement of June 24, 2002. Both Israelis and Palestinians have suffered from the terror and violence, and from the loss of hope and a better future of peace and security. An opportunity now exists to move forward.

The United States will do all it can to seize this opportunity. To that end, I've asked Secretary Powell to travel to the region to begin working with parties so that we may take advantage of this moment."

End of statement. That will be released in print to you immediately following the meeting.

**And, finally, yesterday, Senate Democrats** announced that they will filibuster another one of President Bush's very qualified nominees -- in this case, Texas Supreme Court Justice Priscilla Owen, who is the nominee for the 5th Circuit. Miguel Estrada has also been the subject of a Senate filibuster. They were both originally nominated on May 9, 2001, and have been waiting almost two years for a vote. Both were rated well-qualified from the American Bar Association. That is the highest possible rating that the American Bar Association gives. It is also, according to Democrats, the gold standard that they would use to judge whether nominees were qualified. Both enjoy strong bipartisan support within their states. Both have majority votes available, bipartisan, on the floor of the Senate if the obstruction were to cease.

The Senate has a constitutional responsibility to hold an up or down vote on all judicial nominees within a reasonable amount of time. But some Democrats have abandoned that responsibility in favor of partisan politics and obstructionism. The Constitution is clear: A majority is required to confirm judicial nominees. A minority of Senate Democrats are effectively changing the law with their obstructionist tactics. The President's nominees are highly-qualified and not only do they deserve a vote, they deserve to be confirmed. The President again calls on the Senate to end these obstructionist tactics and to allow a vote on these two nominees.

And with that, I'm happy to take questions. Helen.

Q **What has been the original** -- not original -- initial reaction to the road map?

MR. FLEISCHER: Well, it's just been received this morning. I would allow the Israelis and the Palestinians to speak for themselves and not express their thoughts for them, they're capable of doing that. From the President's point of view, he welcomes their contributions to this, whatever ideas they have, and he looks forward to working with them on it.

The State Department can give you information about the Secretary's itinerary, future travels. It's not an immediate trip that the Secretary will be taking, but the United States, the President, and the Secretary of State will devote considerable time and energy to helping the parties to achieve peace.

Q **What does he hope to accomplish when** he goes to Syria?

MR. FLEISCHER: I would refer you directly to the State Department on it, but the message to Syria is that Syria is a terrorist country, that Syria has supported terrorists, Syria occupies a considerable portion of Lebanon through the Hezbollah, and Syria needs to reassess its role in the world. We hope that Syria, under the relatively new leadership of a relatively untested leader, will choose a different direction than it has in the past. Syria also -- it's important that they continue to receive the message that they have been receiving in regard to not harboring anybody who is trying to leave Iraq.

Q Does the President support the idea of lifting sanctions against Iraq, vis-a-vis its status as a terrorist state?

MR. FLEISCHER: Yes, and Secretary Powell discussed that up on the Hill today. Iraq no longer is a terrorist state. The chief terrorist and his cronies have been removed.

Q **How quickly can you lift** the sanctions?

MR. FLEISCHER: Through the United Nations you're asking about?

Q No, no, no, terrorist state.

MR. FLEISCHER: That's, I believe -- I don't know if that's a legislative matter or an administrative matter, so I'd have to refer you to the experts at State for that.

Q **You're saying now the President** was trying to build up support for his tax cut with the Republican leadership. Alan Greenspan was on the Hill again expressing opposition to it, saying --

MR. FLEISCHER: That's not what he said.

Q He said his position hasn't changed --

MR. FLEISCHER: That's correct.

Q -- since he testified the last time. The last time he was not encouraging it when it passed. Does the President --

MR. FLEISCHER: That's not a fair characterization of what the Chairman has said about the question of providing tax cuts. He has had a very nuanced statement about it, but certainly he never said he was opposed to it.

Q He's expressed that this is probably not a good time to pass a tax cut of that magnitude, is my understanding of what he said.

MR. FLEISCHER: You have to take a look at what he said in its entirety, because he has expressed his concerns about spending and he has said that tax cuts have a stimulative effect on the economy, and he has expressed support for stimulus of a nature of the tax cut, without defining specifically what should be in it. So, again, I think you have to take a look at what he said in its entirety, but that's not a fair characterization.

Q Does the President feel that his case is somewhat undercut by the Fed Chairman's position, especially since the Fed Chairman, as the President suggested he will reappoint him --

MR. FLEISCHER: No, because that's not the Fed Chairman's position, as you've expressed it. So, no.

Q **Can I go back to the road map** and Helen's question? There has already been some initial reaction. Abu Mazen, the Palestinian Prime Minister, has said he would accept it with no changes. The Israelis have suggested about a dozen changes they would like to see to the document, itself. Is the administration encouraging the Israelis to accept it as is, or are you willing to play with it a little bit to make whatever changes the Israelis want?

MR. FLEISCHER: Well, now the difficult process begins again, in terms of finding a way for the parties who have differing approaches to come together. And what the President is hopeful is there's been such a changed environment because of the last several years, a new, more optimistic, more hopeful environment can take hold.

And so we received preliminary comments from the Israelis; the document has now been formally released to the Israelis. And as the President said, we welcome their contributions to the document. The Palestinians have made similar preliminary comments about it. We look forward to hearing more detailed comments.

If the current comments hold, then it's no surprise, the work will begin of trying to help the Israelis and the Palestinians to bridge their differences about the document. What's important is that they both share the outcome of the document, which is the path to peace and the path to statehood for Palestinians, and security for Israel.

Make no mistake, it will be hard work. There will be a lot of hand-holding required. The President is prepared to invest the time and the energy into it. Still, it does fundamentally come down to the two parties. But nobody would expect that the initial comments one hour after release is going to be the final comments.

Q But fair or not, there has been somewhat of a perception up until this point that the President wasn't really committed to this. Is there a -- well, not willing to send the Secretary of State to the region and show the level of commitment we're seeing now, after the war in Iraq. Is it fair to say that the success in Iraq has given Israel another level of security so that the administration would expect them to be willing to make the sacrifices that both sides are needing to make in order for this to work?

MR. FLEISCHER: I think two points; one is the biggest holdup was the fact that Yasser Arafat was still in charge of the Palestinian Authority. The administration was unequivocal; President Bush said repeatedly that the road map would be released upon a confirmation of Abu Mazen's cabinet and as reforms in the Palestinian Authority move forward. That just took place this very week. So the administration has been timely in its release of the road map.

The fact that one of the lead sponsors of violence has been removed from the scene, Saddam Hussein, is an important piece of the prospects for peace in the Middle East, but it's not the only one. Certainly, there are indigenous issues between the Israelis and the Palestinians. There are root causes of violence and historical differences between the Israelis and Palestinians that have to be resolved, that are, indeed, separate and apart from a successful completion of the war. But make no mistake, the fact that Saddam Hussein has been removed from power does remove one source of instability that paid for suicide homicide bombers to cross into Israel and take innocent lives.

Q When does the President expect to see results as the road map lays out the mutual steps that each side should take, the cracking down on militancy and freeing up of the hold that Israel has had on the Palestinian community?

MR. FLEISCHER: It's a process. And the process began this morning as the parties formally received the road map for the first time in the formal sense. From here, it will be a question now of the willingness of the parties to face a different type of future; the willingness of the Palestinians to forego violence as a way of settling disputes; the willingness of the Israelis to reach out and work with the Palestinians to resolve political disputes, land disputes, and enter into a permanent era where two states can live side-by-side. And that process will now move forward.

I'm not going to put an artificial time on any one element of that process. Certainly not today, the day the plan has just been released to them. But hopefully, today will mark the beginning of a new way of doing business between the Israelis and the Palestinians, with the release of the road map which focuses them on peaceful settlement of disputes, not violent settlement of disputes.

Q **And to follow up on Tom's question** on Greenspan's comments. He wasn't only focusing on the problem of spending. He was saying long-term deficits will impact long-term interest rates, and he said that while he has favored a dividend tax cut, he believes it's very important that there's a pay-as-you-go or discretionary spending restraint in order not to increase the deficit. And the Congressional Budget Office is saying this tax cut and the spending together will cause deficits long, far into the future. Doesn't that undermine the case of a tax cut?

MR. FLEISCHER: Well, the President believes very strongly that we need to reduce the deficit. His budget focuses on doing that. But the President also is very concerned about the state of the economy here and now, today, for the unemployed, for people who are looking for work and can't find it. And certainly, as unemployment still is at about a 5.8 percent level, what we've seen increasingly is people who are leaving the labor force and not even looking for work, which doesn't show up in the unemployment statistics.

The President has a lot of concern about those families, those people who want a job. And there are different issues to be approached, they're both important, about how to make sure there is no deficit. But his first focus is helping people to find a job. And he knows we can reduce the deficit over time. He also knows that the best way to reduce the deficit is to hold the line on spending. And he's very pleased that the budget resolution that was just passed does have a good, tight control over domestic discretionary spending. And the meeting the President had with congressional leaders today, they did talk about adhering to the spending discipline of the budget resolution.

Q So you disagree in the emphasis that Chairman Greenspan has put on get control of the deficit before you do anything on spending or taxes?

MR. FLEISCHER: The President wants to focus on growth, on creation of jobs for the American people, and on deficit reduction.

Q **And then, on the judicial nominations**, where precisely in the Constitution is the Senate required to hold an up or down vote on every judicial nominee?

MR. FLEISCHER: I said that the Constitution is clear, a majority is required to confirm judicial nominees. The Senate process has now moved to a point where it's becoming almost a matter of routine --

Q You said that they were required to hold an up or down vote.

MR. FLEISCHER: I said, the Constitution is clear, a majority is required to confirm --

Q Just prior to that, you said that they are required to hold an up or down vote.

MR. FLEISCHER: You can check the transcript, but when I cited on the Constitution, I said just what I said verbatim on the Constitution.

Q Ari, what would the President like to see the Israelis and the Palestinians do first, now that the road map has been presented?

MR. FLEISCHER: The President would like to see them study the road map. We'd like to see them demonstrate a willingness to work with each other to bridge the differences between their opening points of views about the road map. And he would like to see the Palestinians provide security so that homicide bombings are, indeed and in fact, stopped; a crackdown by the Palestinian Authority on those who would seek to oppose peace from within Palestinian ranks.

And the President would like to see the Israelis work with the Palestinian Authority to promote political agreements and political settlements of disputes.

Q What about settlement activity?

MR. FLEISCHER: Absolutely, the President believes that as security is improved, settlement activity must stop.

Q How much personal time will the President invest in this? And do you see an early Middle East conference?

MR. FLEISCHER: I'm not going to speculate too far down the line. As the President says in his statement, Secretary Powell will travel to the region shortly, so there will be any number of opportunities to have conversations. You may want to talk to the Secretary about any contacts he may have had today in the region.

The Secretary is working the phones. This is important. And this administration, this President are dedicating to helping the parties find a new way.

Q And his own time?

MR. FLEISCHER: The President?

Q Yes.

MR. FLEISCHER: Absolutely, he's going to spend considerable time on it. And I want to remind you that in the run-up to the war, in many of the meetings the President had, he always brought up the subject of Middle East peace with European leaders. And the President has invested considerable time with Arab leaders in the region, working to advance peace between the Israelis and the Palestinians, which also is another hopeful sign, because there are Arab nations in the region that would like to see progress be made and are working, actually, very diligently and quietly to help achieve those goals.

Q Republicans on the Hill are talking about a variety of mechanisms or gimmicks, some might call them, to keep the size of the tax cut down to a level that can pass the Senate. Among them is making some aspects of this temporary. Would the President be prepared to accept a tax cut package that made, for example, the dividend exclusion temporary or less than 100 percent?

MR. FLEISCHER: Well, there are a number of ideas that are now starting to publicly float off of Capitol Hill. I anticipate that there will be a markup in both the Ways and Means Committee and the Finance Committee next week, and so, obviously, this will come to some form of a concrete proposal prior to that. And that's one of the reason the President met today with the leadership. He'll have continued conversations. He's spoken with the leaders; many meetings take place.

And I'm not going to be able to negotiate the President's position publicly, but there are a variety of different ways when it comes to tax policy to achieve the President's goals and the President is going to work productively with the Congress to find those ways.

Q So he's open to these kinds of ideas?

MR. FLEISCHER: I'm not going to negotiate in public, but there are a good variety of ways to accomplish all of the objectives of the President's proposal -- including a 100-percent dividend exclusion.

Q **You talked a moment ago about the** problem of unemployment being an immediate problem and suggested that the deficit is something that would have to be dealt with a little bit further down the road. At what point does the deficit become an immediate problem? It's reaching levels that some economists say over the next year or two could even be 5 percent of GDP, which is typically a level at which other countries would be told they have a huge, major, immediate problem.

MR. FLEISCHER: Well, first of all, the trend line in the deficit is that it is going down. Second of all, you have to examine what caused the deficit. And it still remains numerically and empirically the fact that the deficit has been caused by the recession that took place beginning in January of 2001 as a result of the slowdown in the economy that began in the summer of 2000, or the stock market decline, which began in March of 2000. That, combined with the September 11th attacks and the war and the subsequent spending required to fight the war and to react to September 11th, is what caused the deficit.

That is empirically the case. Even if there had been no tax cut, for example, we would still have a deficit today, without the tax cut. So first things first is what caused the deficit. And clearly, the international situation, as it increasingly improves, helps to reduce the deficit.

But the greatest factor is the economy is emerging from a recession. Nothing hurts revenue growth more than a recession. And what's particularly interesting to note is that the greatest source of revenues from the dramatic upswing in revenues in the late '90s was something that people started to refer to as the market factor. The dramatic surge in the stock market led to a dramatic surge in revenues. And so much of this was the result of factors that are now increasingly fading from the economy. We hope the deficit will react to this.

Q But this, again, is $400 billion, $500 billion an acceptable level for this economy?

MR. FLEISCHER: Well, clearly, when it comes to fighting the war, whatever it took to fight the war was necessary to protect our force, to protect our troops and to achieve our objectives. The war is now -- as the President has said, the major combat operations -- the President has been told major combat operations have ended. So all these factors, the recession and the war and 9/11, have helped to drive the deficit to where it is.

Q **Ari, critics are saying that the** atmosphere for this road map would have happened earlier if President Bush would have sat down with Yasser Arafat a long time ago.

MR. FLEISCHER: No.

Q Why?

MR. FLEISCHER: Because Yasser Arafat was not a party to peace. Yasser Arafat was a part of the problem. I think Yasser Arafat had his chance and he walked away with it -- walked away from it when he walked away from an agreement that President Clinton worked very hard to reach. That was Yasser Arafat's moment of truth. And then the moment of truth became even worse when Yasser Arafat lied to President Bush about the Karine-A and actively worked on behalf of the terrorists, lying to the President of the United States about Palestinian support, led by Yasser Arafat, for terrorism.

Q But once again, the critics are saying Yasser Arafat was reaching out. The White House has said he talked to Colin Powell and talked to other people instead of President Bush. Do you think that interaction with two leaders could have helped at all in anything, resolve any type of --

MR. FLEISCHER: I think the best, most accurate way to describe Yasser Arafat's manner of reaching out was he reached out to terrorists to import weapons for the Palestinian terrorists. That's what the lesson of the Karine-A was.

Q **Another thing, on another subject**. The NRA, Charleton Heston has left. Many are wondering about a statement that was said that the assault weapons ban will not continue once it expires. The administration has said something different. How is this meshing with a group that is friend to the Bush administration?

MR. FLEISCHER: I think the administration is already on record about the assault weapon ban. The President has said that he supports the current assault weapons ban, and he would support the reauthorization of the current assault weapons ban.

Q So the NRA is just out in left field then?

MR. FLEISCHER: The President approaches every issue on the merits of the issue. Sometimes he agrees with different people on different issues, but I think when it comes to virtually all the issues that have been presented, the President has strong agreement with the National Rifle Association. The President's position on the current assault weapons ban is known.

Q **Ari, tomorrow the President is going to announce** that major combat operations are over in Iraq. At what point is it appropriate criteria to meet -- to legally declare that the war with Iraq is over, and in doing so, under international law, meet requirements as an occupying force?

MR. FLEISCHER: Well, number one, as the liberators of Iraq, the administration has, you should note, been releasing POWs. The administration continues to address exactly what the President promised, the security concerns, the health and the welfare concerns of the Iraqi people. All that continues.

I can't make a prediction about the legal matters, about when, from a formal, legal sense, hostilities will be deemed to be over. That will be something the President, again, gets guidance from, from the commanders in the field. So that will be driven by events on the ground, and the reaction of the commanders on the ground to those events.

Q But why isn't this the time to legally declare that it's over?

MR. FLEISCHER: Because as events are very visible, as you all have covered this morning, hostilities remain. There are pockets of resistance. There continue to be Iraqis who shoot at America's Armed Forces. It happened again in Fallajah.

Q **Can you speak to the significance of the capture of** the al Qaeda, half a dozen out of Pakistan, one believed to be responsible for perhaps the bombing of the USS Cole?

MR. FLEISCHER: It's been another strong day of Pakistani cooperation in the war against terror, with a helpful and significant capture. And the President is appreciative to President Musharraf and the Pakistani people for their continued strong efforts to fight terror.

Q Is there any information on this alleged handwritten note from Saddam Hussein in this London Arabic paper, whether it's legitimate or authentic?

MR. FLEISCHER: I have no way -- I've received no evaluations from it. You can take it for what you want.

Q **Ari, on judicial nominations, it seems** the issue is utterly gridlocked. Does the President have some ideas of how to get this thing kind of moving again, beyond just having tantrums?

MR. FLEISCHER: The President will continue to speak out and make the case. He will continue to stand strong, shoulder-to- shoulder, by his nominees, because he believes they are qualified. But if you really want to measure what's going on here, I think you have to measure the will of a bipartisan majority versus the role of a slender obstructionist minority. And that's the problem when people want to employ the 60-vote device that the Senate makes available to its members to force their ideology on a majority.

And what's happening now is that there are a few liberal Democrats who want to enforce their ideology on a bipartisan majority that can govern, that can appoint judicial nominees. There are a bipartisan majority of votes for Priscilla Owen. There are a bipartisan majority of votes for Miguel Estrada. They are being blocked and obstructed by a liberal, partisan, obstructionist minority.

Q **Why is the President giving this** speech now? What significance should we read into this?

MR. FLEISCHER: Well, the President is giving the speech now because of the successful operations that have been carried out, the significant accomplishments in achieving the mission, and because he wants to explain to the American people, having risked lives and treasure in pursuit of our goals in Iraq, what the present results are. And that's something that the President began with his speech to the country about, and he wants to, again, now bring it to a conclusion with a speech to the country. The war on terror will continue. Iraq was a phase in the war on terror. And the President wants to discuss all of this with the American people.

Q Why not just declare victory?

MR. FLEISCHER: Well, I would urge you to listen to the President's words tomorrow night. But the President knows that while major combat operations have ended, and while the next phase has begun with the reconstruction of Iraq, there continue to be threats to the security and the safety of the American people. And he will describe that. There continues to be great progress in protecting the American people from those threats. But threats do indeed remain.

Q Full victory, you've indicated before, I believe, would include all of the President's objectives having been met, including finding weapons of mass destruction and rounding up all the leadership of the previous regime. Is that --

MR. FLEISCHER: Well, I'll let you judge the President's words tomorrow for what they represent, what topics he covers. Certainly Deputy Secretary Armitage's speech this morning about weapons of mass destruction covered much of that ground.

Q But the President's not going all the way.

MR. FLEISCHER: Again, I'll urge you to listen to his remarks tomorrow, and you'll form your own basis.

Q One other thing. Do this have -- do his remarks have any legal impact whatsoever?

MR. FLEISCHER: No, the remarks tomorrow will be -- as the President has a habit of doing -- speaking in direct, plain English to the American people, so they can understand what was at stake, what has been accomplished, and so we can all join together in saying thanks to the men and women of our Armed Forces who helped achieve this remarkable success with so little loss of life. From a legal point of view, the remarks tomorrow do not change any legal matters.

Q Getting **back to the Greenspan testimony**. Greenspan, as Terry pointed out, has said he would like to see offsets for any dividend tax cut. You all did not propose offsets. So getting back to Tom's question, do you think that his testimony today, in the way of not changing his position, has undermined you all's argument on the Hill to pass the dividend tax repeal without offsets?

MR. FLEISCHER: No, I think that members of Congress always enjoy and benefit from hearing from Chairman Greenspan. They use their own independent judgments. And we are -- the President remains confident that at the end of the day a majority will be assembled in the House and the Senate to pass his proposals.

Q Does the President intend now to get -- he's obviously shown that he's -- in the last two meetings, he is getting more personally involved. Are we to see more of that, when it comes to the tax plan?

MR. FLEISCHER: Well, the President has long been directly and personally involved, and he will continue to be. The President met for an hour and a quarter on the Truman Balcony last night with the Speaker of the House and the Majority Leader of the Senate. Then he had the 45-minute meeting today with the elected leadership. I think you can anticipate the President will travel the country to continue to make his case. He will continue to work the phones and meet with members.

Q Did he, in either of those meetings, give the leadership of Congress some insight into whether he wants phase-ins, he would accept phase-ins --

MR. FLEISCHER: No, they didn't get into that level of detail.

Q Why not?

MR. FLEISCHER: Because it's not that type of meeting. They had a broad agenda to cover, including prescription drugs for seniors, Medicare --

Q But aren't we at the point where -- the committees about to meet, these decisions will be made soon. So when will the President tell them what he would like, how he'd like those decisions --

MR. FLEISCHER: It's all part of a process that involves the President, that involves others in the administration working directly with Chairman Thomas and Chairman Grassley, as well as the leadership. So I think you can anticipate that process will continue between now and when the markup is revealed.

Q **Two questions. One a follow on** your colloquy with Terry. Your exact words at the top were, "The Senate has a constitutional responsibility to hold an up or down vote."

Q Thank you.

Q Are you now walking yourself back from that, and saying that you didn't mean to say that? Or are you saying that there is -- are you saying that there is something in the Constitution that requires the Senate to hold an up or down vote on every judicial nomination?

MR. FLEISCHER: I said -- you're correct, I said, the Senate has a constitutional responsibility to hold an up or down vote on all judicial nominees within a reasonable time, and that's because advice and consent is the prerogative of the Senate, and it is to be given.

Q Prerogative of the Senate. They're a co-equal branch of government that interprets their own constitutional responsibility.

MR. FLEISCHER: Clearly, if the Senate made the decision that they do not want to seat anybody in the federal court system, it would be a constitutional crisis.

Q That's not the decision they're making.

MR. FLEISCHER: But there is a vacancy crisis in the Senate. It is uniquely the role of the Senate, under the Constitution, to confirm judges. And if the Senate engages in filibusters for the confirmation of judges, then clearly the nation would not be well served.

Q The question is, is there something in the Constitution that requires an up or down vote on every nomination, because as you know, there are many judicial nominations that --

MR. FLEISCHER: Only the fact that if the Senate doesn't do it, nobody else will. And so, therefore, the President calls on the Senate to exercise its constitutional prerogative to confirm his nominees.

Q But it's not in the Constitution, correct? There's nothing in the Constitution --

MR. FLEISCHER: They have a responsibility to hold an up or down vote. Nobody else, other than the Senate, per the Constitution, has that responsibility. Now, it is certainly the right of the Senate to walk away from their responsibilities. But I don't back off at all from saying that under the Constitution, the Senate has that responsibility.

Q That's different from saying they have to hold an up or down vote on every nomination --

MR. FLEISCHER: They have a responsibility to hold an up or down vote.

Q It all depends on what your definition of the word, "responsibility" is.

Q **On Iraq, the United States went to war** -- this administration went to war in Iraq for the very specific reasons that the President is very clear. One of them was weapons of mass destruction. One of them was alleged links between Saddam Hussein's regime and terrorists. A third reason which the President stated many times was that Iraq's military strength and Hussein's use of it posed a threat to its neighbors in the region. We're now, as you say, at the end of major combat operations. No significant finds of weapons of mass destruction have been found to date. No significant evidence has been found linking Saddam Hussein's regime to al Qaeda beyond what we knew at the start of this war. And Saddam Hussein's military looks like -- hardly looks like a threat to anyone.

Is the President going to address this in his speech tomorrow? And beyond that, is there any sense of embarrassment in the administration that the three major prongs of a policy haven't, at least as yet, haven't really been --

MR. FLEISCHER: Heavens no, on your last point. And certainly the President has said, and you've heard him say it many times, that we continue to have high confidence that the weapons of mass destruction will be found. Iraq is a regime that was a master at hiding it, and there are thousands and thousands of sites where it could be hidden, and they will be pursued as increasing evidence comes along.

On the ties to al Qaeda, I think that's been well-documented and known. And when you talk about the military threat, they may not have been much of a military threat for our Armed Forces as the war was engaged, but for the neighborhood, they were one powerful military threat, and they proved that by attacking their neighbors multiple times.

Again, tomorrow the President will give the speech, and you'll be able to hear it all in its entirety.

Q **Ari, going back to the Middle East, is** there any plan by the President to nominate or name a new Middle East envoy to the peace talks?

MR. FLEISCHER: Nothing that's crossed my radar.

Q General Zinni, is he still the Middle East envoy?

MR. FLEISCHER: Let me try to get an update on that. Nothing has crossed my radar, though.

Q **Ari, back on the judicial nominations, now**. A new controversy may be cropping up because the two Maryland senators are concerned about the Claude Allen nomination. Grant you, they might not have voted for Owen and Estrada anyway, but they're upset about the Claude Allen nomination because he's a Virginian, and they consider that to be a Maryland seat on the 4th Circuit. Does the President have any feeling of obligation to hold to those kinds of gentlemen's agreements?

MR. FLEISCHER: Well, we always try to work with various changing types of requests from senators for consideration. And it's a process that we try to work very collegially with the Senate. So we'll just continue to work on behalf of all the President's nominees with all those involved.

Q Would he not consider that to be a Maryland seat?

MR. FLEISCHER: Let me take a look at the specifics of it to see if I can offer you more on it.

Q Back on the road map, isn't the goal to have the first phase completed by next month? And is that really a realistic expectation considering that you're calling for Israeli withdrawal from Palestinian occupied territories?

MR. FLEISCHER: Well, the framework and the road map does outline certain time periods, the key one being the creation of an independent Palestinian state in 2005 that lives in peace and security with their neighbor, Israel. And all events leading up to that help to support that goal. What's going to happen now is we'll see how actively and how quickly the parties can work together to make all of this happen. We'll see what the exact time table is.

Q So you're not necessarily firm in the insistence that Israel withdraw by next month?

MR. FLEISCHER: Today is the beginning of the process. And let's wait and hear how the parties react to it. Let's see what efforts they undertake. And we're going to continue to work with them toward the achievement of those goals.

Q Was the deadline always the end of May, or was that changed because of the delay in the appointment of Abu Mazen?

MR. FLEISCHER: No, I don't -- this road map was prepared late last year, and it was released today as is from late last year. But this is where we welcome the contributions from the parties to it.

Q **The visit to the ship tomorrow,** can you describe some of the logistics for us, and tell us if the President is looking forward to or dreading his first carrier landing? (Laughter.)

MR. FLEISCHER: The President is eagerly anticipating this trip. I think he's very excited about the process of being directly with many of the sailors and the Marines who helped make the success of the mission possible. He's also looking forward to addressing the nation from the deck of a moving aircraft carrier. That's a wonderful metaphor for the return of our troops from combat back to their families.

The President will fly out to the aircraft carrier on Navy One, after he departs Air Force One, lands in San Diego and then transfers. And it's a very exciting voyage, a very exciting trip, but nowhere near as exciting as the voyage that the sailors and the Marines are taking, because they're coming home to see their families.

Q Obviously, the President's a former pilot. Can you talk about the plane itself and where he's going to be?

MR. FLEISCHER: The President will be sitting in the front seat, next to the pilot of the Navy aircraft. He is a former pilot. For the sake of the landing, I'm sure he will be doing no piloting. (Laughter.) I hope he's not watching today's briefing. (Laughter.)

Q **Ari, two more Colombian journalists** have been assassinated in Colombia. What does the President plan to do to try and restore security in that country?

MR. FLEISCHER: The United States is working directly with the Colombians. And we have a presence in the region authorized by the Congress to help with the narco-terrorist war that the government of Colombia and President Uribe are fighting. The President looks forward to his meeting this evening to talk to President Uribe about the steps that are being taken to fight the terrorism there. And it's important. The people of Colombia have been long -- long been struggling against terrorism there. That's sapping the strength of the country, and they deserve the support of the world.

Q The press secretary in Doha says U.S. forces will be leaving Saudi Arabia by the end of the summer. Will this improve U.S.-Saudi relations?

MR. FLEISCHER: Number one, U.S.-Saudi relations are strong. Saudi Arabia is an ally of the United States, has been a partner with the United States. And that is how this President views our relationship with Saudi Arabia. As for any type of military deployments or basing issues, you need to talk to the Department of Defense for the specifics of them. We regularly review and are undergoing currently a review of our deployments worldwide.

Q **I'd like to follow up on my question** from yesterday about reports of French aid to Saddam's regime. Is there anything new on that, or our relationship with France in general?

MR. FLEISCHER: Well, on the reports, I've noticed many of these reports, different accounts, some relating to documents that were found in Iraq, and I have nothing to offer on that. I think it's something that the French can answer to explain any relationship. That's for France to address.

Q In his Sunday column, Tom Friedman cited the atrocities that occurred in Iraq, and said, "We do not need to find any weapons of mass destruction to justify this war." Does the President agree with that sentiment?

MR. FLEISCHER: Well, the President is confident that we're going to find weapons of mass destruction. So I think it's not an immediate relevant issue to the President because, based on everything that he knows going into the war, he has continued to express that confidence.

Q **And a follow-up. You've** said earlier that -- he used the word "embarrassed," but you indicated that the President is not concerned that a lot of things have not occurred yet, the finding of the weapons of mass destruction. Yet, there does seem to be a feeling in some places, particularly Europe and some of the Arab countries, that the President may have intentionally deceived the public by overstating the threat posed by the Iraqis. Are you at least concerned that this perception is rising in some areas?

MR. FLEISCHER: The statue fell just three weeks ago. And Saddam Hussein has had some 14 years in which he had worked to hide his weapons of mass destruction, and in particularly the four years when the inspectors were out of the country. And so, no, this is not a serious issue or a credible issue. This is an issue that will be addressed over time, and with confidence, because it will be found.

Q **Ari, you talked about Yasser Arafat** and the President's view that he was an impediment for peace. Under the road map, what future is envisioned for Yasser Arafat?

MR. FLEISCHER: The future envisioned for the road map is for the Palestinian people and the Israeli people. And there's a place for all those who will live in peace, and the work to be done by those who believe in peace will be done by others, because he had his chance, he failed to take that chance to lead the way for peace.

Q His day is done?

MR. FLEISCHER: I think that you can refer to what the President said on June 24th, 2002 about his role.

Q **Can I just ask you about the speech tomorrow**, Ari? You said he's not going to say the war is over, but is there not some element of victory inherent in his speech?

MR. FLEISCHER: You know, I've gone probably as far as I can go this far in advance of a speech. The President will address it in its entirety tomorrow.

Q On Iraq, how are you assessing the validity of the statements by Tariq Aziz regarding Saddam Hussein, and regarding Scott Speicher? And do you have any theory on the whereabouts of Baghdad Bob?

MR. FLEISCHER: Well, I'm not going to comment on any of the reports about what we are hearing in the course of our interrogations. Just as a matter of policy, this is not something that we discuss. And Baghdad Bob -- which Baghdad Bob? (Laughter.)

Q The one that wants to replace you if he gets a chance. He's the Information Minister in Iraq.

MR. FLEISCHER: Oh, I wasn't aware. No, I don't -- I have not heard anything other than the President's flavorful description of him.

Q What do you see as the impact of Hamas' rejection of the road map and the latest suicide bombing on prospects for what you described as a new and more optimistic environment? How can such an environment take hold in that kind of an atmosphere?

MR. FLEISCHER: This is the very challenge that the parties face. Hamas, violence, homicide attacks, and the other terrorist groups that operate in the region are the greatest challenge to peace there is. And this is why it's so imperative for the Palestinian people to join together and say that if they want to be a state, if they want a bright, peaceful future, security has got to be brought under control, and these groups have got to be brought under control. Because this type of terrorism is a setback to the cause of the Palestinian people, and a setback to statehood. And that is one of the biggest sources of trouble and concern.

And so, security becomes very quickly an important point in events on the ground and the ability of Israelis and Palestinians to work arrangements and work agreements. The President will continue to fight for this. And it's important now for the Palestinian Authority to take every step possible and to crack down so these type of terrorist attacks cannot be repeated.

Q Do you think this emerging government has a capacity to bring them under control?

MR. FLEISCHER: They certainly, per the Oslo Agreement, per statements that have been made, and per a sense of desire for peace, have an obligation to take every step in that direction, yes.

Q **A different topic. The tobacco** treaty at the U.N., the U.S. wants some changes to it that critics say will weaken it significantly. What's the administration's --

MR. FLEISCHER: Well, this is this is -- if ever there was an issue involving standard language in treaties, this is it. We wanted to be a signatory to this treaty. We have made clear that we want to sign it, we want to ratify it. The language here deals with what's called the reservations clause, which is a standard procedure in treaties. And this reservation -- the reservation clause simply prohibits signatories from making reservations of sections of the treaty. Reservations is a standard part of treaties. So you really haven't seen anything different in our approach to this treaty. It is a treaty we want to sign, we want to ratify with the standard language.

Q I have a question regarding the French papers reporting on chemical weapons in Iraq. They are saying that so far there is nothing there, and the troops there want to find anything. And if they find something, the French media is saying the CIA has -- is going to put it there. Do you have any response to this kind of --

MR. FLEISCHER: Well, just again, I've addressed here earlier, the President has high confidence that it will be found. A mere three weeks after the fall of the statue, it's unreasonable to expect that a decade of Saddam Hussein's ability to deceive and to deny and to build up a giant infrastructure built to hide, can be pierced in three weeks time. Again, Secretary Armitage addressed this at some length this morning.

Q **Ari, now that we're entering phase two** in the Iraqi situation, what is the United States' position on the United Nations and NGOs taking a stronger, or more up-front role in the reconstruction process? Do we still want to have the major say?

MR. FLEISCHER: Well, as a technical matter, it's referred to as phase four. Phase three was the military phase. Phase two was the lead-up phase. I don't remember what phase one was. (Laughter.) But the President believes that the United Nations should have a vital role in reconstruction efforts in Iraq and the humanitarian relief programs in Iraq. And that's important. The United Nations is a major representative to the deliberations inside Iraq.

And I would note that USAID in its granting of contracts, is granting contracts to NGOs who are helping to improve the security situation and the humanitarian situation inside Iraq.

Q Ari, will we defer to the United Nations, though, in terms of what projects to pursue and all that, given the fact that they never supported the war?

MR. FLEISCHER: The lead will continue to be the coalition with the help of all those who want to play a constructive role, including the United Nations.

Q The Washington Post quoted the Associated Press' corporate spokesman, Jack Stokes, in New York as saying with regard to their interview of Senator Santorum, "Any of our reporter's marital status has nothing to do with their stories." And my question is, do you, as the President's chief media spokesman, believe that there would be no conflict of interest seen if AP hired that brilliant writer Lynne Cheney to be their White House Bureau Chief, or to cover Senator Kerry's campaign?

MR. FLEISCHER: Lester, I think these are matters that the media wrestles with, and it's appropriate to let them handle it, not the White House spokesman.

Q The Council on American-Islamic Relations has asked the President to rescind the nomination of Dr. Daniel Pipes to the U.S. Institute of Peace. Does the White House regard this organization with enough respect to withdraw Dr. Pipes' nomination?

MR. FLEISCHER: The nomination continues to stand.

Q **Ari, North Korea has mentioned any intervention** attempted by the United Nations with North Korea nuclear issues will be regarded as a prelude to the war. What is your comment?

MR. FLEISCHER: Well, that's, frankly, absolutely nothing new for North Korea. North Korea has had a history of saying inflammatory statements. In fact, they said that very statement on -- in 1994. So this is a pattern that North Korea has about engaging in rather hot rhetoric, and it does not contribute to advancing the cause for peace on the Peninsula.

Q **Does the President view his speech tomorrow night** as an opportunity to inform the nation about -- specifically about the future course of the war on terrorism, and exactly what his intentions might be towards the other members of the axis of evil?

MR. FLEISCHER: Let me just repeat what I said earlier. The President will talk about the ongoing war against terrorism in his speech tomorrow night.

Thank you.

END 1:19 P.M. EDT

DECLASSIFIED
PA/HO Department of State
E.O. 12958, as amended
May 4, 2006

S[redacted]

NO FORE[redacted]DISSEM/CO[redacted]D DISSEM

# THE SEIZURE OF THE SAUDI ARABIAN EMBASSY IN KHARTOUM

## Summary

In the early evening hours of 1 March 1973, eight Black September Organization (BSO) terrorists seized the Saudi Arabian Embassy in Khartoum as a diplomatic reception honoring the departing United States Deputy Chief of Mission (DCM) was ending. After slightly wounding the United States Ambassador and the Belgian Charge d'Affaires, the terrorists took these officials plus the United States DCM, the Saudi Arabian Ambassador and the Jordanian Charge d'Affaires hostage. In return for the freedom of the hostages, the captors demanded the release of various individuals, mostly Palestinian guerrillas, imprisoned in Jordan, Israel and the United States.

The Khartoum operation was planned and carried out with the full knowledge and personal approval of Yasir Arafat, Chairman of the Palestine Liberation Organization (PLO), and the head of Fatah. Fatah representatives based in Khartoum participated in the attack, using a Fatah vehicle to transport the terrorists to the Saudi Arabian Embassy.

Initially, the main objective of the attack appeared to be to secure the release of Fatah/BSO leader Muhammed Awadh (Abu Da'ud) from Jordanian captivity. Information acquired subsequently reveals that the Fatah/BSO leaders did not expect Awadh to be freed, and indicates that one of the primary goals of the operation was to strike at the United States because of its efforts to achieve a Middle East peace settlement which many Arabs believe would be inimical to Palestinian interests.

Negotiations with the BSO terrorist team were conducted primarily by the Sudanese Ministers of Interior and of Health. No effort was spared, within the capabilities of the Sudanese Government, to secure the freedom of the hostages. The terrorists extended their deadlines three times, but when they became convinced that their demands would not be met and after they reportedly had received orders from Fatah headquarters in Beirut, they killed the two United States officials and the Belgian Charge. Thirty-four hours later, upon receipt of orders from Yasir Arafat in Beirut to surrender, the

N[redacted]

[redacted]

[redacted]

N[redacted]

terrorists released their other hostages unharmed and surrendered to Sudanese authorities.

The Khartoum operation again demonstrated the ability of the BSO to strike where least expected. The open participation of Fatah representatives in Khartoum in the attack provides further evidence of the Fatah/BSO relationship. The emergence of the United States as a primary fedayeen target indicates a serious threat of further incidents similar to that which occurred in Khartoum.



NO [redacted]/CONTROLLED DISSEM

[redacted]

DECLASSIFIED
PA/HO Department of State
E.O. 12958, as amended
May 4, 2006

[redacted]

# Roundtable with Traveling Press

**Secretary Condoleezza Rice**
London, England
January 18, 2007

Secretary Rice Travel to the Middle East and Europe

**SECRETARY RICE:** All right, let me just take a couple of minutes to wrap up the trip and then a few questions. As you know, I came out during this trip to do a couple of things. First, it was important to spend some time with the regional states concerning the President's plan for Iraq and I had an opportunity to talk to people in more detail about what the thinking was, why the decisions have been taken that have been taken, I think to lay some groundwork for future support of the regional states for Iraq's unity government, and also to talk to them about concerns that they have about the course of events in Iraq. And so that was really useful time.

The GCC+2, despite its awkward name, Glenn, is becoming -- (laughter). Remember, Glenn, Germany was unified by the 2+4 so it tends to be the way international bodies are named. But the GCC+2 I think is becoming a very useful forum. It's now met four times since September and people always comment on the usefulness of the discussions, the candidness of the discussions. It's -- as with most things, it's sort of building a kind of momentum of its own as a good forum in which to discuss the complicated issues of the Middle East right now. So in any case, that was part of the trip.

The other major effort was to talk to the Israelis and the Palestinians. I really didn't come out with a preconceived notion of what might be possible. I did think that it was a good opportunity to come and to listen to people as to how they saw the future. I knew that there was momentum that had been generated by the meetings between Abbas and Olmert and, in fact, even before that with the speech that Olmert had given.

But it is a complicated time with all this going on in the Palestinian Authority and so I wanted to see what was possible. And it was really out of the talks with Abu Mazen and then the talks with Prime Minister Olmert that it became clear to me that something along these lines, a sort of informal opportunity to discuss these issues after six years, would be the most useful track to take. And Abu Mazen had mentioned something like this at the time of the Olmert meeting, but I wasn't really clear on what he meant. He talked about a back channel or where the contents weren't known or something like that. And so I was able to get some clarification and I think by talking to people and listening to people we moved the process forward, principally because everybody wants to stay within the context of the roadmap. The roadmap is very important because it's got sequence. Everybody understands the obligations in it. But we had gotten to a place that it was stalled because if they weren't making progress on the first phase of the roadmap they couldn't talk about the end of the roadmap and what might lead to the establishment of a Palestinian state. And I think we broke through that.

The next couple of weeks will be pretty intensive on the diplomatic front. I will obviously have a Quartet on February 2nd and then the next week the Egyptians are coming to Washington, Abu Gheit, and I think that we probably will have others to Washington as well. Undoubtedly, David and Elliott will travel to talk to advisors for Prime Minister Olmert and for President Abbas. I don't know precisely when they'll do that, but obviously we'll want to try and prepare the ground before I go back. And I would anticipate going back sometime in the first half of February. I have some constraints because of budget testimony and a conference that I have to chair on Liberia, but aside from that I plan to try to go back in the first half of February.

We will spend, I think, a good deal of time really trying to think about the agenda for this, to see what the parties want to put on the agenda. It really should be up to them to put anything on the agenda that they'd like, but it's very important to think about the establishment of the Palestinian state as having many different facets. There's a tendency to go to the big three issues right away, but in fact there are many other things that would have to be achieved for a Palestinian state and so I would expect the entire agenda to be there: security, (inaudible) security concerns, the nature of the Palestinian state.

One of the really important (inaudible) of the President on this issue, I think, has been that there has always been a lot of concern about what the borders of a state would be but there wasn't much attention given to its internal composition, democratic processes, institutions. And I find President Abbas more interested in that part of it, in building the institutions as well, and one thing that I think or want to do or will want to do over the next several weeks is to talk about what role others are going to play.

This is not just a process that the United States is going to be able to press forward on its own. I think the Arabs obviously have an important role to play, but also the Quartet, I think, Frank-Walter Steinmeier said yesterday, kind of steering group. By that I think he meant what kinds of efforts might be needed by other actors in the international community. You can imagine, for instance, on the economic side, on the institution building side, that there are other countries, perhaps the EU and others, that might be interested in playing a role there. So I think establishing almost an international team or an international consortium to support movement toward a Palestinian state is also extremely important.

We're not yet at the point where I think we can determine what we would do about formal negotiations when and if. It's really a time to try to get the parties into more of a confidence-building phase and we will see what comes after that.

So with that, let me take your questions.

**QUESTION:** Secretary Rice, I have to ask you about this Maliki interview with a group of reporters in Baghdad where he took exception to your response to Senator Biden -- and the context you recall (inaudible) -- and he said that your comments "give morale boosts for the terrorists and push them toward making an extra effort in making them believe they have defeated the American Administration. But I can tell you that they have not defeated the Iraqi Government." The particular comment that you said, in fact, at your testimony that Maliki knows he's on -- the Maliki government in a sense -- "I saw his resolve. I think he knows that his government is in effect on borrowed time."

**SECRETARY RICE:** First of all --

**QUESTION:** So let me ask you --

**SECRETARY RICE:** Yeah.

**QUESTION:** This is our partner there. We have invested --

**SECRETARY RICE:** Andrea, let me just answer. (Laughter.)

**QUESTION:** She hasn't read it.

**SECRETARY RICE:** I have read it. But first of all, I'm sorry that -- if he took offense, I didn't mean any offense. And what was intended to be said there is, look, there's an urgency to this and he understands the urgency. But I, of all people, who speak a foreign language, should probably understand that sometimes things don't translate very well. And we have a -- we know what "on borrowed time" means. It means there's a sense of urgency, you've got to get it done now, there's not a moment to lose. I don't have any idea how he heard it, but I think we're on the same page. He knows that things are urgent and he's said that things are urgent, and that's how I take it. I don't think it's a major issue.

**QUESTION:** Except that what he has said is to "give morale boosts to the terrorists." I mean, how can he --

**SECRETARY RICE:** Andrea, obviously he read the comment differently than it was intended and I'm not concerned that he means anything more than he wants to get this done in an urgent fashion and I assume that it didn't translate very well. Sometimes these little phrases that for us mean a particular thing mean something quite different when they are read literally by other people.

So I'm sure it's quite fine and I've not heard from anyone, from Zal or anyone else about it, so I'm not concerned about it. We're on the same page. The Maliki government and the United States want the same thing and we have a plan as to how to go about it and, you know, that's what we're going to do.

**QUESTION:** Madame Secretary, so much of the trip was about Iraq, but we only flew over it. I'm assuming you noticed the great view that we had of Baghdad on the way, but I wonder why you decided not to go to Iraq. Are you trying to give Maliki some room, as you suggested before? And you know, given the skepticism that you heard in the Arab world about the Maliki government, are you worried that the U.S. is putting -- is depending too much on the Maliki government to make this plan a success?

**SECRETARY RICE:** Well, obviously, the responsibility that the Iraqis bear for making this plan work is obvious. And it's just -- it's the nature of this struggle that the Iraqis are the ones who have to determine what kind of country they're going to be and carry that out, but the United States is going to be there to support them. I've been to Baghdad, I think six times, and I'm sure I will go again. It seemed to me that it made sense to let the Iraqis have some time to get their plans in order, to get ready to launch those plans. Bob Gates was just there and it just wasn't, from my mind, the right time to go, but I'm sure we'll go sometime in the near future.

**QUESTION:** May I ask about the Middle East peace process?

**SECRETARY RICE:** Sure.

**QUESTION:** Are you willing to basically put your reputation as Secretary of State on the line to get this done in the next two years, to keep going back to the region as often as possible? Because it's hard for I think a lot of us to see how you're going to get this done or anywhere close to that unless you do that. Or are you, in your mind, not quite decided that it's worth that effort?

**SECRETARY RICE:** Well, I will do whatever I can do to try to help establish a Palestinian state. You know, I don't think about it in terms of my reputation. I'm enough of an historian to know that my reputation will be what my reputation is. I just -- and it might be different in five months from five years to 50 years, and so I'm simply not going to worry about that. I'm going to be concerned about what we can get done when and how. And I obviously have been out here a lot and I expect I'll be out a lot again.

I'm aware that it takes not just deal-making and shuttle diplomacy to make it work. It also takes certain circumstances and certain commitments, and I think we've been actually creating those circumstances or helping to create those circumstances over the last several years, not over the last several months. The President's declaration of a two-state solution, the President's decision that he was not going to try to deal with Yasser Arafat, that there needed to be a democratization of a Palestinian political space, the President's support for withdrawal from Gaza -- I mean, there have been a number of steps here on the way to where we are now.

And I just hope that when people look at where we are now, they'll think about that entire evolution, because you don't build the possibility for breakthroughs on something as intractable as the Israeli-Palestinian conflict by five months of shuttle diplomacy. You just don't. There has to be a process of laying groundwork and I think we've been laying groundwork and we'll see if we've laid enough groundwork to actually produce a breakthrough. I do think we've -- there's already been progress.

**QUESTION:** You've said several times on this trip how it's important to (inaudible) that we're looking at the geostrategic stars align. When you look at the situation in the Middle East, Abbas and Olmert are incredibly weak right now. When you look at Iraq, military commanders there with experience in Bosnia, an important Muslim element, say that as horrible as ethnic cleansing was, it at least created a map that was sustainable. Some of them wonder whether you don't have to let the parties in Baghdad do that terrible thing to get to a sustainable map.

So why, with all this effort, do you see the geostrategic stars aligning?

**SECRETARY RICE:** Well, first of all, a lot has happened in the Middle East in the last several years and a lot has clarified in the Middle East. I do think that the removal of Saddam Hussein set in motion a number of

other circumstances, other changes in the Middle East: the removal of an eastern front threat for Israel, for instance; the removal of the repression that, frankly, meant that Iraqis of different groups handled their politics through one group repressing another, and that has led to some deep grievances that have to play out in a political process. But a lot has happened.

And if you look at the Palestinian-Israeli conflict, I think that the realignment in which people understand that perhaps their interests now rest with the creation of a stable two-state solution, that's a pretty dramatic change in and of itself. And again, a lot of groundwork, not -- we tend to forget. You know, I hear people say a two-state solution, Palestinian state, as if that was always what we were driving for, when in fact, when the President said it in 2001 it was considered a very big thing for the President of the United States to do.

In fact, the United States had been, in past times, and not too far in the distant future -- or in the distant past, opposed to the establishment of a Palestinian state. And so when you have a Palestinian state -- the President declared that a Palestinian state is going to be the outcome here, it begins to change the -- it begins to condition the environment. And now you hear everyone, from the successors to Likud, including Prime Minister Sharon, the father of the settlement movement, talking about the two-state solution, accepting the two-state solution, accepting dividing the land, the Arabs saying essentially Israel is going to be here, we might as well learn to live with each other, even those who have not recognized Israel. And I think those conditions then, over the last few years, have now led to the place where these people want to get on about doing it.

Now sometimes, you hear, "Oh, they're this far apart." I don't think that for a minute. I think there are still really, really hard issues here. But you sense that the tectonic plates underneath this conflict have shifted.

**QUESTION:** Madame Secretary, you've talked a lot about the false stability of the Middle East (inaudible) there, and yet you're courting support from three of the longstanding and arguably most authoritarian of those regimes still in power. Do you risk sort of the -- that you're selling out the democracy argument by asking for their help this way?

**SECRETARY RICE:** The processes here are long ones and what is very clear is that there are some young democratic states that have now been established and are at risk. And the support for those young democratic states is coming from a coalition of states that are concerned about the most immediate threat to those young democratic states which are actually playing out their extremism through trying to bring these young states down: Lebanon -- and I put Lebanon in that category because until they got rid of Syrian forces I think you were not talking about a democratic state that could operate in any fashion like that; Iraq and the Palestinian Authority, which is not a state but a democratic entity that could become the basis for a democratic Palestinian state.

Now, that doesn't mean that you don't continue to press for reforms in the states that make up that coalition that are not yet democratic. So I don't think you will ever go completely back in Egypt after the presidential elections that they held when certain taboos about what you could talk about and who you could criticize simply broke.

The Saudis had municipal elections. They've now raised expectations that that process is going to continue and that, in fact, women are going to be included in that process at a point in time. I had very interesting discussions with the Kuwaiti women, who now have the right to vote, about the effect that they think the women's right to vote in Kuwait is having throughout the Gulf. And of course, Jordan has actually been pretty actively reforming its political systems.

So it's -- no one ever expected that there would be a complete democratic revolution throughout the Middle East overnight, but you have had some very important democratic breakthroughs. And part of the goal is to safeguard those as you continue to press for political reform, and we're going to continue to press for political reform.

**QUESTION:** Madame Secretary, coming back to the Arab-Israeli question.

**SECRETARY RICE:** Yes.

**QUESTION:** I mean, you act as thought this is somehow new, but I mean it's -- back in 2000 there was a summit with the leader of -- the Israelis' leader, the Palestinians, who met for all those days and talked about all these issues. Will the U.S. at some point be ready to put down some bridging proposals to have that kind of summitry?

**SECRETARY RICE:** Barbara --

**QUESTION:** What is new and different? It seems to me that Olmert now is weaker, frankly, than Barak was, and certainly Abbas is weaker than Arafat was.

**SECRETARY RICE:** Well, Barbara, let me just go to the premise that 2000 is just like 2007.

**QUESTION:** I'm not saying -- I'm saying that we're actually farther along in --

**SECRETARY RICE:** Yeah, but let's look at where it really was in 2000, all right? You had Yasser Arafat, who I think now who had one foot in terror and one foot in politics. I would submit to you you were never going to get a Palestinian state and peace with Israel under those circumstances. And if you'll remember, we caught him a couple years later taking arms from Iran through the Karine A. So I just don't think that you can make a comparison between Yasser Arafat and Abu Mazen, somebody who's clearly committed to peace and who's prepared to stand on a peace platform. There's a reason Yasser Arafat couldn't make a deal.

It's also the case that you had at that time a Palestinian Authority that was overrun by corruption, overrun by its ties with terrorism. And you -- and strangely, you had Hamas, of course, sitting out as a resistance movement, not at all, by the way, involved in the politics at all. Now, I know that the inclusion of Hamas into the political system for elections has made things in some sense more complicated, but it has also made Hamas contest in the political system, and their inability to govern has led Hamas to, I think, some very -- to a very difficult situation in which they're trying to find their ways out. So the differences on the Palestinian side are very fundamental from 2000.

The differences on the Israeli side are also very fundamental. Do you really think Ariel Sharon was going to support the Camp David Accords -- Likud? Doesn't look like it, does it? Because in fact, the -- what has happened now is that by 2003 Ariel Sharon was able to -- was willing to make a shift for the right of the Israeli political spectrum and to begin to talk about dividing the land. The Herzliya speech was one of the most important speeches in Israeli political -- recent Israeli political history. He starts to talk about dividing the land. He accepts the two-state solution. He accepts the roadmap. And now the breadth of the Israeli political system that is actually united behind a two-state solution is very different than in 2000.

Finally, the Arabs in 2000 -- not really very involved in that process. And so I think you can -- yes, I think on paper there was a lot that was close. But the underlying circumstances, the ones who had to accept it, support it, I think those conditions are better now. But I totally agree that the proof will be in the pudding. We'll see how far they're able to go, given their specific political conditions today.

**QUESTION:** And can you anticipate bringing bridging proposals at some point?

**SECRETARY RICE:** Barbara, I'm not going to get ahead of the discussions I have with --

**QUESTION:** Madame Secretary --

**SECRETARY RICE:** First, I just totally (inaudible).

**QUESTION:** Okay. I'm just curious what you think the next steps might be on the Iranian nuclear front. I mean, it's -- when the 60 days will be up towards the end of next month, I guess. There's the sense out there that you think the Chapter 7 nature of this is sufficient. And I'm just wondering whether there is really the likelihood of yet another attempt at a resolution.

**SECRETARY RICE:** Well, there will be a review after 60 days. And I think at that point we can determine whether it's time for an immediate -- immediately for a new resolution or for -- you know, that augments the

resolution that's already in place, whether or not states are going to take further steps that might not be in the resolution but that might be supportive of the resolution.

I think over the next month or so, we're going to just have some -- have to have consultations about what next steps will be. But I think the achievement of a Chapter 7 resolution is a pretty important step. And I don't really think it's sufficient. I think I made clear that I -- that there are going to have be steps outside of that. But whether or not there are also steps inside the Security Council, I think we just have to evaluate.

**QUESTION:** Is there anything promising about what happened since that was put in place that you think has made a difference?

**SECRETARY RICE:** Well, what's promising is that the Iranians seems to be concerned about the effect that some of the private decisions, private sector decisions that are being made are --those decisions are having on their economy and apparently in their politics. And I think that's good.

**QUESTION:** Thanks. Also underlying -- does it look to you like the Iranians and the U.S. are now drifting -- I mean, I'm sorry, the Iraqi Government and the U.S. are drifting in different directions on that? You probably noticed that Hoshyar Zebari gave an interview this week in which he said: we want to continue to tighten our relations with the Iranians, we want to (inaudible) those offices that the U.S. raided and the consulates, we want to open more border crossings and so on and so forth.

**SECRETARY RICE:** I think there is no problem with the Iraqis increasing normal state-to-state relations with the Iranians. Maybe under those circumstances the Iranians will be more constructive. But when we find them doing things that are not constructive and particularly that are dangerous to our forces, then I think we've been very clear that we're going to go after those activities.

And the Iraqi Government, when they claimed to be diplomats and they were -- the first set claimed to be diplomats, carrying diplomatic passports, the Iraqi Government did the right thing. They were found doing activities that were not consistent with their diplomatic status and they were expelled. And so I think we can work very closely with the Iraqi Government about this. But we've always supported Iraqi diplomacy with their neighbors, both Syria and Iran.

**QUESTION:** Just to follow, can you confirm that those Iranians seized in Irbil will be freed tomorrow?

**SECRETARY RICE:** I can't. I don't have any information for you about it.

**QUESTION:** Yeah. Listening to Chris Hill's speech yesterday, there was something that struck me, not related to nuclear stuff. But he was kind of reminiscing about negotiating with Richard Holbrooke, with Milosevic and actually drinking scotch with Milosevic as they were doing these negotiations. And you know, the Dayton Peace Accords has turned out to actually to work rather well. And not to beat a dead horse on who you talk with or not, but I mean you look at something like the -- you know, those -- (laughter) --

**SECRETARY RICE:** Glenn, you're out there on a limb by yourself. What is it you're --

**QUESTION:** Iran and Syria. (Laughter.)

**QUESTION:** Iran and Syria. (Inaudible.)

**SECRETARY RICE:** Oh, Iran and Syria. I wasn't sure where this was going. Okay, all right. Iran and Syria. (Laughter.)

**QUESTION:** They drank scotch with Milosevic.

**SECRETARY RICE:** Yeah, therefore --

**QUESTION:** He's saying it worked.

**QUESTION:** You know, it was -- he was an indicted war criminal at the time. And why would that --

**SECRETARY RICE:** Let me not call up the obvious historical fact about what they were doing while they were negotiating with Milosevic. Let me not call up what -- the pressure that was put on Milosevic and the first implied threat and then later on what actually got Milosevic out of power. I'm not going to even bring that up because I don't want you to start making analogies. All right? It's like when people tell me about negotiating with the Soviet Union. Right?

**QUESTION:** I know. I've asked the question before. (Laughter.)

**SECRETARY RICE:** All right. With 1.5 million American forces in Europe. Look, I don't -- as I said to Neil the other day, I think history is instructive for what it tells you about how to think about difficult times and whether or not you can really see from within the time how things are unfolding. But it's actually not instructive, I think, when you say, well, you negotiated with them, why not negotiate with him. The circumstances are so different here.

And again, the Iranians have that opportunity. The question really shouldn't be why aren't we willing to talk to Tehran, the question should be why won't Tehran talk to us. Because the suspension of their enrichment and reprocessing capability would give them all kinds of entr'e and yet they can't quite do it. So what does that tell you about their ambitions? And then what does that tell you about the pitfalls of talking to them while those ambitions are continued to be pursued, while they continue to perfect their nuclear technologies, while you're talking to them about trying to improve the situation in Iraq, which they've clearly decided that it's not in their interest to improve the situation in Iraq.

So I often think that the -- when we talk about this, we just say you should talk to them. Well, toward what purpose? At what cost? What are you prepared to give? What is the leverage that exists in those talks? Those are the questions that I think you have to ask because I don't see it as just talking.

**QUESTION:** Didn't the Afghan Contact Group work?

**SECRETARY RICE:** Because I think in Afghanistan, the context for the Iranians was fundamentally different. And by the way, there is a contact -- there is a contact group in the international compact which I think can be used for this purpose.

**MR. MCCORMACK:** We have about five minutes left.

**SECRETARY RICE:** Okay. Let me take these guys real quick then because --

**QUESTION:** Speaking of Chris Hill, actually about North Korea. You said, obviously, many times that this has to be negotiated in any deal reached within the six-party talks.

**SECRETARY RICE:** Right.

**QUESTION:** But meeting for three days in Berlin, of all places, North Koreans and Americans, it just looks like because you could not make any progress in December at the six-party talks, now you're saying you're preparing. But it looks like the main things are being negotiated between the North Koreans and the Americans.

**SECRETARY RICE:** It's just not true, Nick. The United States -- first of all, Chris Hill met for two days with them in Beijing prior to the last six-party talks. And Berlin was handy for the two of them, so they decided to meet in Berlin. And the essential thing to remember here is that we are committed to the six-party framework because we believe that the six-party framework is the only way to get an agreement that is going to stick. If you can get an agreement and the five parties that actually have the right leverage, both negative and positive, are involved in that agreement, then you have the chance to both make an agreement and to make it stick. And so we're not going outside the six-party framework to bilateralize our discussions with the North Koreans. We will use bilateral contacts with the North Koreans when they are useful to prepare for the six-party talks and we've done that several times before.

But the six-party framework is -- and the six-party talks themselves -- are proving themselves to be extremely valuable. The President made the right decision to make that the framework for these negotiations, not bilateral talks, and we're going to stick to that. And the reason that I say they're proving extremely valuable, not just for negotiations but also when the North Koreans tested we already had a ready coalition of states ready to react.

**QUESTION:** But where's the line between bilateral talks to prepare for the six-party talks and the actual talks that would satisfy the North Koreans to help ultimately make a deal? Because many of the issues outstanding are between these two countries, they're not between the South and --

**SECRETARY RICE:** Well, no, of course and, look, there are outstanding issues between the Japanese and the North Koreans. And there are outstanding issues between the United States and the North Koreans. And everybody understands that that's why the joint statement is written as it is. It anticipates that there are going to have to be some things that are resolved on a bilateral basis, but within the context of a six-party agreement. So nothing that is resolved bilaterally is a bilateral agreement; it's a part of a six-party agreement. But it understands that there are certain things that are bilateral between the United States and the DPRK and some things that are bilateral between the DPRK and Japan. That's just the nature of this.

But the six-party framework is really -- I think it's the -- frankly, the best thing that we have done on this issue because it has brought the Chinese in. And I will tell you that the Chinese really are the ones who put forward ideas in the last round of the six-party talks and part of what the North Koreans are responding to is that.

Okay. Last one and then we'll go to --

**QUESTION:** I'm going to take advantage of my status as the new kid --

**SECRETARY RICE:** Okay.

**QUESTION:** -- and ask a newbie question which is, we've now spent a week traveling together in the Middle East and you've told us your vision of what diplomacy can and cannot achieve. And I'm just wondering while it might be a little early to start talking about this, what do you think will be your legacy of diplomacy in the Middle East? And if there is a certain diplomat in history that you would liken yourself to who would it be?

**SECRETARY RICE:** I have -- I really don't know. And I -- I mean, what my legacy will be. Look, I think the Administration and the President and I, as the President's chief diplomat, have clearly staked out a certain position about the Middle East that it was not stable before and that things had to change in the Middle East and that both the nature of the regimes in the Middle East there had to be a push for more openness, for pluralism, for democracy in the Middle East. That's obviously a central pillar of this President's policy in the Middle East.

Now, has it been -- will it be uneven? Yes, that's the nature of international politics. It doesn't move in a straight line. But I suppose, when people look back and they say, now what does the Middle East look like, ten years from now or 20 years from now or 30 years from now, it will be judged -- the policies will be judged on whether or not there are -- democracy has moved forward in the Middle East and has made progress in the Middle East and has footholds in the Middle East and whether or not extremists have been pushed out.

Okay. All right.

**2007/T1-13**

Released on January 18, 2007

**From:** Saved by Windows Internet Explorer 7
**Sent:** Sunday, February 03, 2008 5:32 AM

14:23 , 07.26.07

ynetnews.com newsחדשות

Print

**Dahlan Resigns**



Dahlan Photo: AP

**click here to enlarge text**

**click here to reduce text**

## Abbas security chief Dahlan resigns

**Six weeks after his forces' defeat in Gaza, Fatah security head submits resignation to Palestinian president, citing health problems**
Reuters

Palestinian security chief Mohammad Dahlan resigned on Thursday, six weeks after his forces were routed by Hamas Islamists in the Gaza Strip, two senior officials told Reuters.

"Because of my long absence and health problems, I hope that you accept the end of my mission as a national security adviser. I will always remain a loyal soldier behind you," Dahlan wrote to Abbas, according to a statement.

Dahlan, 46, made the request on medical grounds, a senior official in his office. President Mahmoud Abbas accepted his resignation, another senior Palestinian official said.

Dahlan was heavily criticized within Abbas' secular Fatah faction for the failure of his security forces to prevent Hamas seizing control of the Gaza Strip last month.

During the Gaza fighting, in which more than 100 people were killed, Dahlan was outside his native Gaza, sidelined by surgery on both knees which was performed in Germany.

During an interview with Reuters in the West Bank on June 19, Dahlan acknowledged mistakes and said individuals, including himself, should take responsibility for their errors.

Last month, another senior security official, Rashid Abu Shbak, was dismissed by Abbas.

**AP contributed to the report**

www.haaretz.com

Last update - 03:20 27/07/2007

# Mohammed Dahlan resigns following Fatah's Gaza defeat

By Avi Issacharoff, Haaretz Correspondent, and The Associated Press

Former Gaza strongman Mohammed Dahlan resigned as Palestinian Authority Chairman Mahmoud Abbas' national security adviser Thursday, a month and a half after his men were routed in the Gaza Strip by their rivals from Hamas.

In a statement sent to reporters, Dahlan cited health reasons, but Palestinian Authority sources said he had been asked to resign by a government committee that concluded that he bore much of the responsibility for Fatah's humiliating defeat by Hamas in mid-June.

The committee is expected to publish its report on Friday. Dozens of Fatah security officials may be dismissed after the report is made public, Fatah spokesman Fahmi al-Zaarir said.

The committee, appointed by Abbas, recommended Thursday that 60 members of the Palestinian security forces face trial for their poor performance in Gaza, an official in Abbas' office said.

"Because of my long absence and health problems, I hope that you accept the end of my mission as a national security adviser. I will always remain a loyal soldier behind you," Dahlan wrote to Abbas, according to the statement.

Dahlan was widely blamed for Fatah's surprising collapse in five days of fighting in Gaza. Abbas has already dismissed more than a dozen other Fatah official tarnished by the defeat.

After the Hamas victory, Dahlan justified his men's poor performance by saying they were exhausted and destroyed following years of Israeli-Palestinian violence. But many Fatah loyalists said they felt betrayed by Dahlan, who was often abroad for medical treatment, for not personally leading the battle against Hamas.

# Abbas security chief Dahlan resigns

Thu Jul 26, 2007 7:28am EDT±
By Wafa Amr

RAMALLAH, West Bank (Reuters) - Palestinian security chief Mohammad Dahlan resigned on Thursday, six weeks after his forces were routed by Hamas Islamists in the Gaza Strip, two senior officials told Reuters.

Dahlan, 46, made the request on medical grounds, a senior official in his office. President Mahmound Abbas accepted his resignation, another senior Palestinian official said.

Dahlan was heavily criticized within Abbas's secular Fatah faction for the failure of his security forces to prevent Hamas seizing control of the Gaza Strip last month.

During the Gaza fighting, in which more than 100 people were killed, Dahlan was outside his native Gaza, sidelined by surgery on both knees which was performed in Germany.

During an interview with Reuters in the West Bank on June 19, Dahlan acknowledged mistakes and said individuals, including himself, should take responsibility for their errors.

Last month, another senior security official, Rashid Abu Shbak, was dismissed by Abbas.

© Reuters 2008 All rights reserved

**September 5, 2005**

Palestinian Legislator Pleads Guilty to Assisting Militant Group

By GREG MYRE

JERUSALEM, Sept. 4 - A prominent member of the Palestinian parliament, Husam Khader, pleaded guilty on Sunday in an Israeli military court to charges of assisting an armed Palestinian faction that has carried out many attacks against Israel, the military said.

Before his arrest two years ago, he was best known as a leading critic of Yasir Arafat, the Palestinian leader who died last November.

Mr. Khader frequently accused the Palestinian Authority of corruption and often referred to the Palestinian leadership as a "mafia."

But Israel said Mr. Khader, who is in his mid-40's and comes from the Balata refugee camp in Nablus, also helped finance attacks by the militant group Al Aksa Martyrs Brigades.

The group was responsible for many shootings and bombings in the past several years and is linked to the Fatah movement, which Mr. Arafat led until his death. Mr. Khader was considered a rising figure in Fatah despite his differences with Mr. Arafat and other Fatah leaders.

Israeli officials have often accused Palestinian political leaders of involvement in the violence. However, the arrest and prosecution of such figures has been relatively rare.

As part of a plea agreement, Mr. Khader admitted Sunday to transferring money to Al Aksa for the purpose of buying weapons, the military said in a statement. The cell that received the money attempted a suicide bombing in the West Bank in January 2003, but security forces thwarted the attack, the military said.

Mr. Khader's lawyer, Riad Anis, said his client had given money to a "Fatah activist," but had no knowledge of the plans to carry out an attack, Reuters reported. Mr. Anis said Mr. Khader was innocent, but agreed to the plea arrangement "because he wanted to reduce the duration of the sentence."

Sentencing is set for next month.

Before his arrest, Mr. Khader described himself as a political leader, though he also said he supported attacks on Israeli soldiers and settlers in the West Bank and the Gaza Strip. Many Palestinians support such attacks, regarding them as acts of legitimate resistance, while Israel considers them acts of terrorism.

The most prominent case of a prosecution of a Palestinian leader by Israel in recent years involved a close associate of Mr. Khader, Marwan Barghouti, the West Bank leader of

Fatah and a fellow member of parliament. He was seen as a major figure in the Palestinian uprising against Israel, and remains hugely popular among young militants.

Last year, an Israeli civilian court convicted Mr. Barghouti of involvement in the killings of five Israelis, and he is serving five life sentences.

Prime Minister Ariel Sharon told Israel's Justice Ministry on Sunday to alter a policy denying Arab citizens harmed by Jewish militant attacks the same government aid accorded to victims of Palestinian violence. The issue arose after the families of the four Israeli Arabs killed last month by a Jewish deserter from the army had been judged ineligible for the monthly compensation payments that go to terror victims and their families.

In another development, the Islamic faction Hamas for the first time disclosed the identities of the leaders of its armed wing by posting photos and brief biographies on its Web site on Saturday.

Hamas has carried out the most suicide bombings against Israel and contends that its attacks were responsible for Israel's departure from Gaza. The information on the leaders of its armed wing was seen as part of Hamas's campaign to claim responsibility for the Israeli pullout.

The leader of the armed wing, Muhammad Deif, is already well known as a master bomb maker. He has been in hiding in Gaza for years, and Israel has tried to kill him several times.

Mr. Deif appeared in a video released a week ago, saying Hamas would keep trying to destroy Israel.

PASSIA - Palestinian Academic Society for the Study of International Affairs - Windows Internet Explorer
http://www.passia.org/
File Edit View Favorites Tools Help
PASSIA - Palestinian Academic Soci...



الجمعية الفلسطينية الأكاديمية للشؤون الدولية - القدس

Palestinian Academic Society for the Study of International Affairs, Jerusalem



PERSONALITIES

## AL-HINDI, AMIN FAWZI (1940-)

Born in Gaza in 1940; was appointed a senior security officer in Fateh from 1970s; chief of the Palestinian General Security and Intelligence Service since the establishment of the PA; holds the rank of a General; member of the Palestinian Higher Committee on Negotiations; offered to resign in July 2004, because of the state of chaos and the lack PA reforms but was retained; was replaced in April 2005 by Pres. **Mahmoud Abbas** with his deputy, Tareq Abu Rajab.



Enlarge

Internet 150%
Start http://www... Inbox - Outl... PASSIA - ... untitled - P... EN 8:02 PM

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

vs. C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.

PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT THE PALESTINIAN AUTHORITY

Now come the plaintiffs in the above-entitled matter and pursuant to Fed. R. Civ. P. 34 hereby request defendant, the Palestinian Authority, to produce within thirty (30) days hereof the following documents to plaintiff's counsel.

The word "account" as used herein means any checking, savings, investment, deposit, brokerage account, stock, and/or bond of any nature and kind, in any bank, brokerage, or financial institution.

The word "HAMAS" refers to the Islamic Resistance Movement (a.k.a. "Harakat Al-Muqawama Al Islamiyya") including its Dawa and military wings.

The word "Palestinian Authority" means The Palestinian Authority, Palestine National Authority, Palestinian Interim Self-Government Authority, Palestinian Legislative Council, General Intelligence Services, Preventative Security Services, Palestinian Police, Palestinian National Fund, Department of Finance, Palestine Monetary Fund, Joint Investment Fund, Palestinian National Authority Pension Fund, P.E.C.D.A.R., P.C.S.C., P.A., SAMED, Palestine Monetary Authority, P.M.A., Investment Department, and any agency, instrumentality, and/or subdivision of same.

1. All correspondence, memoranda, notes, letters, communiques, and other written exchanges between Palestinian Authority officials and HAMAS officials and members for the period 1993 to 1997.

2. All written agreements between the Palestinian Authority and/or Palestinian Authority officials, and HAMAS and/or HAMAS officials, including but not limited to those of October 12, 1995, December 22, 1995 and subsequent agreements, modifications, amendments, and joint communiques relating thereto.

3. All records evidencing the registration and licensing of HAMAS by the Palestinian Authority, including but not limited to all files of the Palestinian Authority voluntary organization registry, permits, licenses, and correspondence.

4. Any and all decrees or orders issued by the Palestinian Authority outlawing, banning, or curtailing HAMAS activity.

5. All records and documents pertaining to the provision of financial or other material assistance to persons, or to the families of persons, who were captured or killed while carrying out, or while attempting to carry out, activities on behalf of HAMAS or any other Palestinian organization.

6. Any and all decrees, orders, directives and other documents made, issued or published by the Palestinian Authority which regulate the provision of financial or other material assistance to persons, or to the families of persons, who were captured or killed while carrying out, or while attempting to carry out, activities on behalf of HAMAS or any other Palestinian organization.

7. Any and all records, documents, decrees, orders, directives and other documents pertaining to the operating guidelines, purposes and functions of the "Ministry of Prisoner Affairs" headed by Hisham Abdel Razeq or other persons.

8. Any and all records and documents pertaining to budget and expenditures of the "Ministry of Prisoner Affairs" headed by Hisham Abdel Razeq or other persons, including but not limited to the criteria for the distribution of financial support, the types and amounts of support provided, and the names and addresses of individual recipients of said support.

9. All press statements, press releases, official statements in Arabic, English, Hebrew, and French issued by Palestinian Authority Chairman Yasser Arafat from 1993 to 2000 mentioning HAMAS and/or attacks carried out by HAMAS and or operatives of HAMAS.

10. All advertisements sponsored by the Palestinian Authority soliciting, recruiting, and/or offering financial support or payment to "martyrs."

11. All documents utilized and/or reviewed in answering Plaintiffs' First Set of Interrogatories and First Set of Request for Admissions propounded to the Palestinian Authority.

12. All documents the Palestinian Authority, intends to introduce at trial.

13. The personnel files of Imad Abbas, Abd al-Khader Amar, Raid Bashiti, Adnan al-Gol [aka Adnan al-Rol], Atef Hamadan, Bassam Issa, Sufian Abu Jadian, Kamal Khalifa, Yasser Yusef Khasin, Salaam Abu Maarouf, Yusuf Malhi, Mahmad A. Sanwar, Abd al-Fatah Sitri, and Osama Abu Taha.

14. All agreements executed between Salim Al-Za'nun and Khalid Mash'al.

15. All records indicating the Palestinian Authority's payment of employees and/or staff of Al-Hayat Al-Jadida from 1993 to the present.

16. All written requests made by the governments of the United States and Israel to the Palestinian Authority to act against HAMAS and/or to arrest and/or detain and/or surrender HAMAS members.

17. All records and statements with respect to any and all accounts in the United States standing in the name of the Palestinian Authority or any agency, subdivision and instrumentality under its control in which there were any sums on deposit at any time or from time to time in the past five (5) year period.

18. Regarding Hasan Salameh, all documents pertaining to the Palestinian Authority's grant and/or denial of a license to carry, own, and/or possess a firearm or weapon including but not limited to the application, license, and entire file.

19. All investigative reports, witness statements, and the like pertaining to the murder of Yaron and Efrat Ungar.

20. All documents listing HAMAS members whom the Palestinian Authority has arrested, detained, imprisoned or placed in protective custody.

21. All documents listing all HAMAS members who have been quartered by the Palestinian Authority in barracks or facilities or any type.

22. All documents listing the names and locations of the facilities at which HAMAS members were quartered or detained by the Palestinian Authority.

23. Any and all documents and correspondance relating to requests made by representatives of the United States and Israeli governments to the Palestinian Authority to arrest and imprison HAMAS commander Salah Talachmeh (a.k.a. Nasser Salah Talachmeh).

24. All records and documents relating to the custody and/or detention and/or quartering of Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) in any facility or barracks operated by the Palestinian Authority in Jericho and in any other place.

25. All records and documents relating to the custody and/or detention and/or quartering of Ibrahim Ghanimat in any facility or barracks operated by the Palestinian Authority in Hebron and in any other place.

26. All records and documents relating to the investigation or questioning of Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) by the Palestinian Authority.

27. All records and documents relating to the investigation or questioning of Ibrahim Ghanimat by the Palestinian Authority.

28. All records indicating the dates on which Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) left and entered any facility or barracks operated by the Palestinian Authority.

29. All records indicating the persons who visited and/or met with Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) in any facility or barracks operated by the Palestinian Authority.

30. All records indicating the persons who were quartered and/or detained and/or in custody concurrently with Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) in any facility or barracks operated by the Palestinian Authority.

31. All records indicating the personnel who operated and were employed at any facility or barracks operated by the Palestinian Authority in which Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) was quartered or was detained.

32. All records of conversations between Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) and Abdel Rahman Ghanimat in any facility or barracks operated by the Palestinian Authority in Jericho or elsewhere which were monitored and/or recorded by the Palestinian Authority, including but not limited to audio copies and transcripts of all recordings.

33. All audio copies and transcripts of any recording made by the Palestinian Authority of the conversation between Salah Talachmeh (a.k.a. Nasser Salah Talachmeh) and Abdel Rahman Ghanimat in which they planned the terrorist attack in which Yaron and Efrat Ungar were killed.

Plaintiffs,
By their Attorneys,

David J. Strachman #4404
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700

CERTIFICATION

I hereby certify that on the 24 day of January, 2002, I mailed a true copy of the within to:

Ramsey Clark, Esquire
Lawrence W. Schilling, Esquire
36 East 12th Street
New York, NY 10003

Deming E. Sherman
Edwards & Angell, LLP
2800 Bank Boston Plaza
Providence, RI 02903

Donna A. Collins

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AVIGAIL LEWIS BITON, et al.,

Plaintiffs,

v.

01-00382(RMC)(JMF)

THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY, et al.,

Defendants.

**DECLARATION OF BRIGADIER GENERAL (RES.) YOSEF KUPERWASSER**

I, Yosef Kuperwasser, of Rosh Ha'Ayin, Israel, declare pursuant to 28 U.S.C. § 1746, as follows:

**Professional and Educational Background**

1. For over three decades I have served as an officer in the Israel Defense Forces ("IDF"), primarily in the IDF Intelligence Branch.

2. Between 1992 and 1994 I served as Israel's Assistant Defense Attaché in the United States, and was based at the Israeli Embassy in Washington D.C..

3. Between 1998 and 2001 I was the Chief Intelligence Officer of the IDF Central Command, which is responsible, *inter alia*, for IDF activities in the West Bank.

4. In 2001, I was appointed as the Director of the Research Division of the IDF's Intelligence Branch. I held that position until June 2006, when I retired from active duty in the IDF with the rank of Brigadier General.

5. As Director of the Research Division of the IDF's Intelligence Branch I was responsible, *inter alia*, for providing on-going intelligence reports, surveys and assessments to the IDF General Staff, to Israel's Defense Minister and Prime Minister, to the Israeli Cabinet and to

the Foreign Affairs and Defense Committee of the Knesset (Israel's parliament), and for preparing Israel's annual National Security Assessment.

6. I hold a B.A. in Arabic language and literature from Haifa University and an M.A. in Economics from Tel Aviv University.

7. During 2006-2007 I was a Visiting Fellow at the Saban Center for Middle East Policy at the Brookings Institution in Washington D.C..

8. Though I left active service in the IDF in June 2006, the IDF and other agencies of the Israeli government continue to consult with me about defense and intelligence matters. I am also frequently consulted as an expert on Palestinian and Middle East affairs by Israeli and American news media, and I have researched and published a number of articles and monographs relating to these topics.

9. I have also been consulted as a Subject Matter Expert for the Homeland Security Advisory Council Future of Terrorism Task Force of the United States Department of Homeland Security.

10. In order to be able to provide accurate information to the bodies that consult with me, and as part of my research and publishing activities, I keep abreast of developments in the West Bank and Gaza Strip, and regularly follow the Palestinian print and electronic media.

11. The facts testified to in this Declaration are all public knowledge and are well known (and indeed obvious) to residents of the West Bank and the Gaza Strip, and to many people in Israel. At the same time, by virtue of my professional activities, I have acquired a broad "bird's-eye" knowledge of the facts on the ground in the West Bank and Gaza Strip that are attested to herein. Thus, my testimony herein is based both on direct personal knowledge, and

upon the various sources of information described above, all of which are regularly relied upon by experts in my profession.

**The Gaza Strip Following Israel's Disengagement**

12. In 1994, Israel withdrew its military personnel from approximately 80% of the interior of the Gaza Strip, pursuant to the Oslo Accords.

13. Between 1994 and September 2005, Israeli military personnel remained deployed in the interior of Gaza only in certain military installations and delineated security zones (about 7% of the Gaza Strip), and in the four specific locales containing Jewish communities (comprising together about 13% of the Gaza Strip) and on access roads serving those communities.

14. In 2004, the Israeli government formulated and approved a plan, termed the "Disengagement Plan", to remove the remaining Israeli military personnel from the interior of the Gaza Strip, and to evacuate the Jewish residents of Gaza.[1]

15. The Disengagement Plan was implemented in August-September 2005. The forced evacuation of Jewish residents of Gaza commenced on August 17, 2005, and was completed on August 22, 2005. The remaining Israeli military personnel left the interior of the Gaza Strip shortly thereafter, on September 12, 2005.

16. Though the Israeli government and the IDF hoped that the Palestinian Authority ("PA") would be able to impose authority over the areas of the Gaza Strip evacuated pursuant to the Disengagement Plan, we had serious concerns that the PA would be unable to do so. These concerns arose from the fact that the PA has never been able to assert effective governmental authority even in the areas from which Israel had withdrawn in 1994. On the contrary, since 1994,

[1] The Disengagement Plan also provided for the evacuation of four small settlements in the West Bank. I address that element of the Disengagement Plan in the following section of this Declaration.

much of the power in the Gaza Strip has been wielded not by the PA, but by local clans, organized crime families and various terrorist organizations, particularly Hamas.

17. Unfortunately, our concerns proved well founded. The PA failed to take control over the areas evacuated. Only hours after the last Israeli military personnel left the Gaza interior early on the morning of September 12, 2005, thousands of Palestinian looters, accompanied by criminal gangs and members of the Hamas terrorist group, overran the evacuated areas, destroyed the synagogues (the only buildings left standing) and dismantled and stole components of agricultural greenhouses which had been left intact for the benefit of the Palestinians.

18. Subsequently, terrorist organizations, as well as various organized crime families and gangs, moved into the areas evacuated by Israel, fenced them off and seized control. The PA was unable to prevent this seizure. The terrorist groups set up training bases in these areas.

19. Much more importantly, the implementation of Disengagement Plan triggered a severe deterioration, throughout the entire Gaza Strip, of the already-limited authority exercised in Gaza by the PA.

20. Starting in September 2005, the various terrorist groups, organized crime families and local clan-affiliated militias[2] that had effectively shared power with the PA since 1994, began jockeying to increase their power and control in Gaza.

21. In the context of this power struggle these armed groups battled both one another and the PA for authority at the expense of ordinary Palestinians who were often caught (both literally and figuratively) in the cross-fire. As a result, a state of growing lawlessness and chaos

[2] There are over 50 such extended-family clans scattered throughout the Gaza Strip, each numbering between several hundred and several thousand members, many of which possess their own significant arsenals of weapons.

(which had existed to a lesser extent even prior to September 2005) spread throughout the Gaza Strip.

22. The PA continued to progressively lose power in the Gaza Strip during the rest of 2005. In January 2006, elections were held for the PA's legislative council, and Hamas won a majority of seats. Hamas' takeover of the legislative council further catalyzed Hamas' role in the power struggle in the Gaza Strip, and the PA's authority on the ground in Gaza deteriorated even more, while Hamas' power increased, through 2006 and into the first half of 2007.

23. In June 2007, Hamas launched a wide-scale attack on PA security and police personnel and posts throughout the Gaza Strip. Hamas quickly routed the PA forces, many of whom were killed and captured, and destroyed or took control of all of the PA's security and police posts and the PA's governmental offices throughout the Gaza Strip.

24. Thus, as, of June 2007, the Palestinian Authority exercises no control, authority or power whatsoever in the Gaza Strip.

25. Simply put, the PA does not govern Gaza today in any manner.[3]

26. In summary of this section: (a) even prior to September 2005 the PA had only limited actual power in the areas evacuated by Israel in 1994; (b) the PA failed to take control of the areas evacuated by Israel in September 2005; (c) from September 2005 until June 2007 the PA progressively lost, throughout the entire Gaza Strip, even what little power it had previously had in Gaza; and (d) as of June 2007 the PA no longer exercises any power or control in Gaza.

[3] Though the PA is gone, it would not be accurate to say that the Gaza Strip is controlled today by Hamas. While Hamas is the dominant actor in Gaza, the other armed groups described above (organized crime families and militias associated with the various local clans) retain significant power in many regions of Gaza and are not under Hamas' control or authority.

**The West Bank Following the Disengagement Plan**

27. Any discussion of the state of affairs in the West Bank today necessarily begins in September 2000, when a wave of anti-Israel terrorist violence – which would continue for several years to come – erupted in the West Bank, Gaza and Israel itself. The Palestinian Authority contributed to this violence both actively and passively: actively, the PA and its security forces directly participated in and supported terrorist attacks; passively, the PA allowed terrorist cells to operate freely in areas in which it was responsible for law enforcement (Area A), by refusing to exercise the law enforcement powers granted it under the Oslo Accords. Thus, beginning in fall 2000, the PA ceased to exercise the law enforcement authority granted it in the Oslo Accords.

28. This state of affairs continued through 2001, and into 2002. In March 2002, over 130 Israelis were murdered in a string of terrorist bombings and shootings carried out by Palestinian terrorists. The most horrific of these was a suicide bombing at a Passover holiday *seder* at the Park Hotel in the costal town of Netanya on March 27, 2002, in which 30 people – most of them elderly – were murdered, and another 140 injured.

29. In response to this escalation of terrorism, on March 28, 2007, the Israeli Cabinet authorized the Israel Defense Forces ("IDF") to conduct a wide-ranging military operation against the terrorist infrastructure in the West Bank. That operation, named "Operation Defensive Shield", was launched several days later.

30. Operation Defensive Shield lasted for approximately six weeks and involved tens of thousands of soldiers. In the course of the operation, the IDF deployed and operated freely in the areas of the West Bank that were designated in the Oslo Accords as "Area A" (the areas in which the PA was authorized to exercise the maximum authority granted it under the Oslo

Accords). In other words, during Operation Defensive Shield the situation that had existed prior to the establishment of the PA in 1994, in which the IDF was present and operating freely throughout the entire West Bank, was restored.

31. While Operation Defensive Shield officially ended in early May, 2002, the status quo ante has never been restored. IDF forces (in smaller numbers of course) remain deployed throughout most of the West Bank, and on the perimeters of the large Palestinian cities. The IDF conducts counterterrorism operations at will throughout the West Bank, including in Area A, as the need arises. The PA does not interfere with IDF operations anywhere in the West Bank, including in Area A, and moreover has no ability to do so.

32. I also note that the PA's security and police forces were significantly weakened as a result of Operation Defensive Shield. Though the PA employs security personnel, they are ineffective, and do not operate as more than local patrolmen and security guards.

33. Thus, the PA cannot and does not exercise today even the limited security authority granted it under the Oslo Accords; it has not done so since fall 2000, and has been unable to do so since April 2002.

34. The implementation of the Disengagement Plan has done absolutely nothing to alter this state of affairs.

35. Under the Disengagement Plan, Israel evacuated four small settlements in the northern West Bank (best described as outposts or tiny villages) containing a total of some 200 families.

36. Because the areas on which these evacuated settlements once sat remain defined today as part of "Area C" (in which, pursuant to the Oslo Accords, Israel has full security authority and the PA has none), the evacuation of those settlements has had no effect whatsoever

on the IDF's control and authority over those areas (or over any other area of the West Bank). The IDF did not withdraw from these evacuated areas, and it continues to control them and operate freely therein, just as it did previously. By contrast, PA personnel have no presence in the evacuated areas.

37. In short, any claim that the Disengagement Plan reduced Israel's control of the West Bank is entirely baseless.

38. In summary of this section: (a) in fall 2000 the PA ceased to exercise the security powers granted to it under the Oslo Accords (b) since April 2002 until the present the IDF has been widely deployed throughout the West Bank (c) since April 2002 until the present the PA has been incapable of exercising the security powers granted to it under the Oslo Accords (d) the Disengagement Plan did not reduce Israel's control of the West Bank in any manner.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 10, 2007

Yosef Kuperwasser



2007-09-10 12:05 GLOBAL CST 039277503 >> INTERFAX P 8/8

UNITED NATIONS

E

Economic and Social Council

Distr.
GENERAL

E/CN.4/2006/95/Add.3
10 March 2006

Original: ENGLISH

COMMISSION ON HUMAN RIGHTS
Sixty-second session
Item 17 (b) of the provisional agenda

**PROMOTION AND PROTECTION OF HUMAN RIGHTS**

**HUMAN RIGHTS DEFENDERS**

**Report submitted by the Special Representative of the Secretary-General on the situation of human rights defenders, Hina Jilani**

**Addendum**

**MISSION TO ISRAEL AND THE OCCUPIED PALESTINIAN TERRITORY* ****

---

* The summary of this mission report is being circulated in all official languages. The report itself contained in the annex to the summary is being circulated in the language of submission and in Arabic.

** The reason for the late submission of this report is the need to reflect the latest information.

**Summary**

The Special Representative of the Secretary-General on the situation of human rights defenders conducted a country visit to Israel at the invitation of the Government. She also visited the Occupied Palestinian Territory. She remained in the region from 5 to 11 October and met with senior officials of the Government of Israel and the Palestinian National Authority. She also met a wide range of human rights defenders and representatives of international and intergovernmental organizations. The objective of the visit was to assess the situation of human rights defenders in Israel and the Occupied Palestinian Territory.

The report of the Special Representative describes the context in which human rights defenders operate in Israel and the Occupied Palestinian Territory. She presents her assessment of the situation of defenders in the light of the issues with which they are engaged and the legal framework for the promotion and protection of human rights.

She observes that human rights defenders in Israel and the Occupied Palestinian Territory carry out their activities against a backdrop of occupation, conflict, military operations in Palestinian civilian centres, including refugee camps, and of terrorism. Security-driven laws and practices have created an environment in which activities for the defence of human rights have not escaped suspicion and repression. This has heightened the level of harm and risk that defenders confront in carrying out their activities.

The dominant concern for human rights defenders, even in Israel, is the violation of the human rights of the Palestinian population under Israeli occupation. The solidarity and cooperation between human rights defenders in Israel and in the Occupied Palestinian Territory, despite the tensions surrounding them, is inspiring.

The Special Representative notes that the Government of Israel, generally, respects the rights of Israeli human rights defenders and she has not observed any systematic policy of restraining their activities within Israel. The same human rights organizations and defenders, however, face difficulties in promoting and protecting the rights of minorities, including the Arab and Palestinian communities in Israel. The Government shows even less tolerance for their activities for the protection of the rights of the Palestinian population in the Occupied Palestinian Territory or criticism of the practices of occupation.

Regarding the situation of human rights defenders in the Occupied Palestinian Territory, the Special Representative finds that the practice and policies of the occupation result in conditions which place human rights defenders operating in the Occupied Palestinian Territory at grave risk and present serious obstructions in every aspect of their work. She is concerned that, in the wake of the "disengagement", human rights defenders in Gaza are becoming more vulnerable because of their isolation, imposed by restrictions that continue to obstruct their movement and communication with their networks in the rest of the Palestinian territory as well as the outside world. Human rights monitors and field workers, peace activists, lawyers, journalists, health professionals and those providing humanitarian assistance and care have all been affected by the situation of occupation and militarization.

Restrictions on the freedom of movement resulting from the Wall and other barriers, checkpoints, closures, requirement of permits and bans imposed on defenders to travel; use of excessive force on peaceful action to protest; use of security and anti-terrorism laws to place defenders under administrative detention; unsubstantiated allegations to undermine their credibility and other forms of harassment, intimidation and humiliation of defenders has rendered their situation absolutely incompatible with international norms and standards of human rights or the principles set forth in the Declaration. International human rights organizations and intergovernmental and United Nations agencies working in the Occupied Palestinian Territory are also threatened and their work is obstructed.

The Special Representative observes that the difficulties of human rights defenders are compounded because of the failure of the Palestinian Authority to respect human rights and the rule of law in the areas under its control. Conditions of lawlessness and impunity for human rights violations have affected the security of human rights defenders, especially those who expose violations committed by security personnel. She has identified torture, repression of the freedom of expression and assembly, and a failure to address the threats against women human rights defenders as some of her more serious concerns.

The Special Representative believes that the exceptional conditions resulting from conflict and occupation demand a more active human rights community to address the serious violations faced by the civilian population in the Occupied Palestinian Territory. Instead, the human rights community is being weakened by the risks that they are placed under and by the impunity for violation of their right to life, liberty and physical security. Any prospects for peace and security in the region are being diminished by the constraints placed on freedoms in general and particularly the freedom to defend human rights.

She has recommended to the Government of Israel that it must end the occupation of the Palestinian Territory and until then it must accept and fulfil its obligations under international human rights and humanitarian law and comply with the resolutions of the United Nations. In the context of defenders, Israel's defiance of international norms has caused serious harm, including killings, to human rights defenders and affects, inter alia, their freedom of expression, their access to places of violations, their ability to seek justice for victims and to provide humanitarian assistance.

Affirming that resistance to the occupation is a legitimate right of the Palestinian people, she further recommends that the Government of Israel must ensure that all peaceful activities for the defence of human rights violated or threatened by the occupation are allowed to be conducted free of fear and risk. She has also urged the Government to abandon the use of administrative detention against human rights defenders.

To the Palestinian Authority the Special Representative has recommended that it must ensure respect for human rights and the rule of law, and that fundamental freedoms of the Palestinian population are fully restored and protected in the areas of their authority and control. She recommends immediate measures to end impunity for human rights violations and investigation of all complaints against officials and private entities threatening human rights defenders, including those defending women's rights.

The Special Representative reminds both the Government of Israel and the Palestinian Authority that the “duty to protect” does not override the principle enunciated in the Declaration that the “absence of peace and security does not excuse non-compliance with international human rights norms and international humanitarian law”.

She calls upon the United Nations to take note of the situation of human rights defenders in the Occupied Palestinian Territory and to adopt measures for their protection. She has suggested that international monitoring and reporting mechanisms of the United Nations and those documenting violations with the objective of compensating the victims be given a wider mandate to protect human rights defenders. In consultation with the human rights community and experts, the United Nations must devise concrete action to enforce compliance with international law in the Occupied Palestinian Territory as expounded in the Advisory Opinion of the International Court of Justice, and in accordance with the Charter of the United Nations.

**Annex**

**REPORT OF THE SPECIAL REPRESENTATIVE OF THE SECRETARY-GENERAL ON THE SITUATION OF HUMAN RIGHTS DEFENDERS ON HER VISIT TO ISRAEL AND THE OCCUPIED PALESTINIAN TERRITORY**

**(5-11 October 2005)**

**CONTENTS**


| | *Paragraphs* | *Page* |
|---|---|---|
| Introduction ........................................................................ | 1 - 5 | 7 |
| I. BACKGROUND NOTE .......................................................... | 6 - 17 | 7 |
| A. Background note: A state of fear ....................................... | 6 - 10 | 7 |
| B. The human rights defenders community ............................. | 11 - 17 | 9 |
| II. LEGAL FRAMEWORK AND THE EXERCISE OF 10 FUNDAMENTAL FREEDOMS ............................................... | 18 - 33 | 10 |
| A. International obligations ..................................................... | 18 | 10 |
| B. Domestic legislation and other factors which have a direct impact on the work of human rights defenders .......... | 19 - 26 | 10 |
| C. The Israeli High Court of Justice ......................................... | 27 - 30 | 12 |
| D. Measures taken at national level for the implementation of the Declaration ............................................................... | 31 - 33 | 13 |
| III. MAIN FINDINGS AND CONCERNS ...................................... | 34 - 67 | 13 |
| A. Violations of the fundamental rights of human rights defenders committed by the Israeli authority ...................... | 34 - 58 | 13 |
| 1. Unlawful killings, harassment or threats to physical integrity ......................................................................... | 34 - 35 | 13 |
| 2. Administrative detention of human rights defenders and their ill-treatment .................................................... | 36 - 40 | 14 |
| 3. Restrictions on freedom of movement .......................... | 41 - 47 | 15 |
| 4. Denial of humanitarian access ...................................... | 48 - 50 | 17 |

**CONTENTS (*continued*)**


| | | | *Paragraphs* | *Page* |
|---|---|---|---|---|
| | | 5. Freedom of assembly and the right to protest | 51 - 54 | 17 |
| | | 6. Settler violence | 55 - 58 | 18 |
| | B. | The situation of human rights defenders under the jurisdiction of the Palestinian Authority | 59 - 67 | 19 |
| | | 1. Legal framework | 60 - 61 | 20 |
| | | 2. Measures taken at national level for the implementation of the Declaration | 62 | 20 |
| | | 3. Environment for the functioning of human rights defenders and areas of concern | 63 - 67 | 20 |
| IV. | CONCLUSIONS AND RECOMMENDATIONS | | 68 - 92 | 21 |
| | A. | Main conclusions | 68 - 73 | 21 |
| | B. | Recommendations | 74 - 92 | 22 |
| | | 1. To the Government of Israel | 74 - 85 | 22 |
| | | 2. To the Palestinian Authority | 86 - 89 | 24 |
| | | 3. To the United Nations | 90 - 92 | 25 |

## Introduction

1. Pursuant to Commission on Human Rights resolutions 2000/61 and 2003/64, the Special Representative of the Secretary-General on the situation of human rights defenders conducted an official visit to Israel and the Occupied Palestinian Territory from 5 to 11 October 2005. The Special Representative thanks the Government of Israel for extending this invitation.

2. The purpose of the visit was to examine and assess the situation of human rights defenders, the conditions under which they pursue their activities and the respect for the rights enshrined in the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms (the Declaration) in Israel and the Occupied Palestinian Territory.

3. The Special Representative visited Ramallah, Bethlehem, Nablus, Hebron and Bil'in village in the West Bank, Nazareth and Tel Aviv in Israel. From her base in Jerusalem, she met with the Minister of Public Security, the Minister of Construction and Housing, the Deputy State Attorney and members of Parliament. She regrets that she was unable to meet with many other authorities relevant to her mandate. She also regrets not being able to meet with Justice Barak of the Israeli Supreme Court because the invitation to her was received at too short notice. The Special Representative thanks the Palestinian Authority for its cooperation and for the opportunity to discuss issues of concern with the Minister for Foreign Affairs, the Minister of Justice and the Minister for Women's Affairs.

4. The Special Representative also met non-governmental organizations (NGOs), lawyers, journalists, and health workers engaged with a broad range of human rights issues. She deeply regrets not being able to meet human rights defenders in Gaza in person; she had to rely on a videoconference with some of these defenders in order to inform herself of their situation.

5. The Special Representative met with the United Nations Country Team and the Inter-Agency Human Rights Working Group working in the Occupied Palestinian Territory, including the Office for the Coordination of Humanitarian Affairs (OCHA), the United Nations Development Programme (UNDP), the Office of the United Nations Special Coordinator (UNSCO); the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA); the World Health Organization (WHO); and the civilian observer mission, the Temporary International Presence in Hebron (TIPH). The Special Representative wishes to thank everyone for their generous assistance, and to express her gratitude for the strong support and cooperation extended to her by the staff of the Office of the High Commissioner for Human Rights based in Ramallah and Gaza.

## I. BACKGROUND NOTE

### A. Background note: A state of fear

6. The respect for human rights and the rule of law in Israel and the Occupied Palestinian Territory cannot be evaluated without reference to the occupation and its consequences for the rights and freedoms of both the Israeli and the Palestinian populations. The impact that 38 years of occupation, two Palestinian uprisings, the intifada, and a "war against terrorism", has had on society, the economy and the institutions of State cannot be overestimated. Security-related

injunctions and State policies touch all aspects of the lives of Israeli citizens, and the practices of occupation have deprived the Palestinian population even of the basic right to human dignity. The Special Representative fully endorses the view of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967 that "(t)he regime of occupation by definition results in a violation of human rights".[1] The stark reality of these violations has overshadowed the value of Israel's democracy and the merits of its institutions.

7. The Palestinian Authority is an interim administrative organization established in 1994 pursuant to the Oslo Accords.[2] It gained limited jurisdiction for governance in the Occupied Palestinian Territory. However, the limited scope of authority, weaknesses in the exercise of this authority, lack of resources and the continuous challenges that it faces from the actions of the occupation as well as of the armed Palestinian militants have constrained its capacity to affect the conditions prevailing in its sphere of jurisdiction. Flaws and failures of the Palestinian Authority, nevertheless, add to the repressions suffered by the Palestinian population and increase their vulnerability to abuse. Conditions of lawlessness and violence prevail in some areas of the Gaza Strip and the northern West Bank, placing the right to life and security of the civilian population particularly at risk.

8. The Palestinian Authority, as the representative of the Palestinian people, has the responsibility to promote the rights of its people and to strive for their protection against abuse. However, the nature and extent of its authority deprives it of the capacity to guarantee the enjoyment of rights. The responsibility of the Government of Israel to protect, promote and implement all human rights and fundamental freedoms, on the other hand, is unambiguous. This responsibility includes the adoption of such steps as may be necessary to create all conditions necessary in the social, economic, political and other fields, as well as the legal guarantees required to ensure that all persons under their jurisdiction or control, individually and in association with others, are able to enjoy all those rights and freedoms in practice (article 2 of the Declaration). Palestine has permanent observer status in the United Nations. However, not being a State, it is not in a position to ratify international treaties, nor does it have a de jure obligation to the Declaration. Be that as it may, the Special Representative reminds both the Government of Israel as well as the Palestinian Authority that the "duty to protect" does not override the principle enunciated in the Declaration that the "absence of peace and security does not excuse non-compliance with international human rights norms and international humanitarian law".

9. The Special Representative draws attention to the resolutions of the General Assembly, the Security Council and the Commission on Human Rights, reports of the Special Rapporteurs of the Commission, and in particular to the reports of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967 that depict the conditions under which human rights defenders conduct their daily work. In Israel and the Occupied Palestinian Territory human rights defenders carry out their activities against a backdrop of occupation, conflict, military operations in Palestinian civilian centres, including refugee camps, and an institutionalized fear of terrorism. They work in an environment of fear and suspicion that has heightened the level of harm and risk they confront in defending human rights. Limitations on the freedom of movement between Israel and the Occupied Palestinian Territory and within the West Bank severely hamper the work of human rights defenders.

10. One very positive trend that the Special Representative has noted is the solidarity and cooperation between human rights defenders in Israel and those in the Occupied Palestinian Territory and the relationship of trust which remains unaffected by adverse conditions, political polarization and apparently irreconcilable differences in perceptions of the conflict amongst the Israeli and the Palestinian populations in general.

### B. The human rights defenders community

11. Civil society in the region is characterized by activism and diversity. While human rights defenders in Israel and the Occupied Palestinian Territory share many of the concerns around which they conduct their activities, the Special Representative determined that their situation differed with respect to the response of the Government of Israel to their activities, availability of and access to institutions and forums of redress, legal mechanisms and other tools available for the defence of human rights, the obstacles they confront and the degree of risk that they face in conducting their activities. In order that the situation of defenders in the two areas is better understood, it would be best to separately summarize their concerns and scope of activities.

12. Human rights organizations and defenders in Israel work on a variety of issues encompassing civil and political rights as well as social, economic and cultural rights. There are organizations that monitor and report on prisoners' rights, torture, administrative detention and the right to due process. There is an active peace movement and organizations that carry out programmes on Arab-Jewish partnership and coexistence. Several groups advocate for the rights of minorities in Israel and for the elimination of racism and discrimination. Strong networks on women's rights are actively engaged with issues such as violence against women and the legal status of women under personal laws of the different religious communities. Several child rights organizations work on the rights protected by the Convention on the Rights of the Child.

13. There are many groups and individual defenders who engage with the right to housing and carry out protest action against house demolitions. In addition, defenders are actively engaged in the defence of labour rights, rights of migrant workers, the right to education, health and of persons with disabilities, the rights of lesbians, gays and bisexual and transgender persons, land rights and environmental protection. There are religious groups and organizations that advocate the need for religious pluralism. The Special Representative also met with numerous individual Israeli human rights defenders who do not belong as such to any particular organization, such as lawyers, journalists, pacifists and conscientious objectors who refuse to serve the Israeli occupation.

14. A vast number of organizations and individuals defend the rights of Palestinians affected by the practices of occupation in the Occupied Palestinian Territory: lawyers providing legal assistance to Palestinian prisoners, including human rights defenders in Israeli prisons; activists supporting and defending the right to peaceful protest and the freedom of assembly; volunteers monitoring army checkpoints to report on the violations that Palestinians suffer at the hands of the Israeli Defense Forces, and those who monitor abuse of Palestinians by Israeli settlers and provide accompaniment services to prevent such abuse, especially against schoolchildren; and organizations working on the rights of refugees and providing humanitarian assistance to them.

15. Palestinian human rights defenders, particularly those working in the Occupied Palestinian Territory, are swamped by human rights concerns arising from the regime of occupation and the daily occurrence of serious human rights violations. Defenders have to address situations including military operations that result in civilian casualties; extrajudicial and custodial killings; torture and cruel, inhuman and degrading treatment of prisoners and detainees; administrative detentions in large numbers; severe restrictions on the freedom of movement and other serious violations that result from these restrictions; unfair and discriminatory treatment in the judicial process; lack of citizenship and civil status; confiscation of land and property, and loss of livelihood as a result of Israeli policy of annexation of Palestinian territory; building of the Wall and other barriers; evictions and house demolitions; and the disproportionate and excessive use of force against all forms of protest against the occupation.

16. Despite the daily hindrances and risk of personal harm, the human rights community is active and conducts monitoring, advocacy and reporting activities covering actions of the Israeli civil and military authorities as well as officials of the Palestinian Authority. Both Israeli and Palestinian defenders engage in public action to protest or resist violation of rights, raise awareness of human rights, and provide legal, psychological, medical or other support to victims of violations.

17. There are many international NGOs working in the area that investigate and report on incidents involving human rights violations, make periodic reports on the general human rights situation and join Palestinian and Israeli organizations in peaceful action against violations committed by Israeli authorities.

## II. LEGAL FRAMEWORK AND THE EXERCISE OF FUNDAMENTAL FREEDOMS

### A. International obligations

18. Israel has acceded to a number of international human rights instruments, including to the International Covenant on Civil and Political Rights. The Special Representative notes that Israel is not yet party to the two Optional Protocols to the International Covenant on Civil and Political Rights, the Optional Protocol to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women, and the International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families. In addition, the Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution and child pornography has been signed but not yet ratified by the Government of Israel.

### B. Domestic legislation and other factors which have a direct impact on the work of human rights defenders

19. While Israel is taking steps towards a constitution, it currently has a set of basic laws adopted by the Knesset (Israeli Parliament) that guarantee some of the fundamental rights.[3] Although freedom of expression is not expressly guaranteed in the Basic Law, together with the

freedom of association it is recognized as a fundamental civil right, subject to limitations imposed by law for the maintenance of social order, public security or the integrity of the State.[4] Case law of the Israeli Supreme Court has further developed the application and enforcement of these freedoms.[5]

20. Following changes in the registration process, Israeli organizations are required to register with the Registrar of Non-Profit Organizations at the Ministry of Interior. Organizations must identify their donors, submit a list of their staff, and present a detailed annual report on their activities and their financial assets and management. The Special Representative was informed that the process of registration has become longer and more complex, and there are more instances of administrative delays, forcing NGOs to spend more resources and time in responding to the Registrar's demands for details. So far there have been no known instances of human rights NGOs being barred or closed by the Registrar. However, the Special Representative was informed of some instances in which registration was refused on the ground that names of these organizations contained the words "Palestine" or "Palestinian". It was also reported that the Registrar refused to register a group of conscientious objectors under their preferred name "The Courage to Refuse". Non-governmental organizations for the rights of Palestinians in Israel find it almost impossible to register.

21. Some of the Arab NGOs, in particular, feared that with the function of Registrar now under the Ministry of Interior, the Government was attempting to exercise undue monitoring and control over the functioning and activities of NGOs. Some NGOs complained to the Special Representative that the Israeli Ministry of Interior uses intelligence sources and secret files to block any new registrations. This led to most NGOs registering as non-profit companies, which forces them to relinquish many benefits in the NGO law.

22. In relation to reports of Arab NGOs in Israel facing more challenges than other NGOs, it can be recalled that the Economic and Social Council, in its concluding observations on the second periodic report of Israel to the Council in May 2003, reiterated its concern that "the excessive emphasis upon the State as a 'Jewish State' encourages discrimination and accords a second-class status to its non-Jewish citizens".[6] In this regard the Economic and Social Council mentioned in particular the restricted access to and participation in trade unions for Israeli Arabs/Palestinians.

23. The Special Representative recalls a statement made on 21 May 2003 by the Israeli Minister for Foreign Affairs to the Knesset's Foreign Affairs and Defense Committee, accusing "most human rights offices in the West Bank and Gaza Strip of providing shelter to terrorists". In her communication to the Government of Israel regarding this matter, she pointed out that such general statements against human rights organizations were contrary to the spirit of the Declaration on Human Rights Defenders. She also registered her concern that such public accusations, without presenting any evidence to that effect, can be prejudicial to the safety of all defenders in the context of the conflict and tensions in the region. She received no response to this communication from the Government.

24. The freedom of expression is generally respected and most human rights defenders in Israel are able to express their views in publications, through press conferences, in the media and through other forms of advocacy. However, the consistent policy of restricting travel of Palestinian defenders has restrained their freedom to communicate human rights-related

information. There have also been numerous reports of confiscation of printed and electronic material from defenders at Israeli military checkpoints and the airport, or in army raids against Occupied Palestinian Territory-based NGOs.

25. The media, film and artistic expression is subject to scrutiny by the Israeli military censor on security-related issues, as are Palestinian newspapers in East Jerusalem. The foreign media is not subject to censorship. The Special Representative received reports of harassment of local and foreign journalists who cover or report human rights violations committed by the Israeli military. Many Palestinian journalists have been refused renewal of press cards since 2002, which has effectively barred them from covering many human rights-related events. Several journalists have reportedly been physically attacked, threatened and forcibly deprived of their cameras. Following her visit the Special Representative has been receiving reports of journalists being increasingly targeted at the weekly demonstrations against the illegal construction of the Wall at Bil'in.

26. The Special Representative notes with concern that the Knesset on 25 July 2005 approved an amendment to the Civil Wrongs (Liability of the State) Law, which prevents Palestinians from seeking remedy retroactively for human rights violations committed by Israeli authorities in the Occupied Palestinian Territory since the outbreak of the intifada in 2000. This amendment is contrary to article 9 of the Declaration. As Palestinian courts have no jurisdiction in cases of human rights violations carried out by Israeli authorities in their area of jurisdiction, no effective remedy or the possibility to seek remedy is available.

### C. The Israeli High Court of Justice

27. The jurisdiction of the Israeli High Court extends to the Occupied Palestinian Territory (art. 15 of the Basic Law). In almost every meeting with Government officials, the Special Representative was reminded that the Supreme Court of Israel deliberates on human rights cases filed by human rights activists. Since the April 2002 military invasion of the West Bank (also known as "Operation Defensive Shield"), human rights NGOs have initiated a series of petitions to the High Court challenging Israeli policy and practices in the OPT which constitute grave violations of international humanitarian or human rights law.

28. The extent to which human rights defenders have full access to justice and recourse to a legal remedy within Israel's legal framework is of particular interest to the Special Representative. She recalls the concluding observations and comments of the Committee on Economic, Social and Cultural Rights[7] after its consideration of the second periodic report submitted by Israel, wherein the Committee has welcomed the relaxing of the Supreme Court rules of standing so as to allow any person formal access to the court and to widen opportunities to test the justiciability of ICESCR rights before the courts. "Locus standi" to raise legal issues on human rights or seek their enforcement against violations is a valuable asset for defenders and increases their ability to defend human rights. However, this is not sufficient.

29. Defenders lose the advantage of locus standi if application of human rights norms is restrained by any considerations, including a preoccupation with security. While the court has given important relief in some cases, in the majority of petitions the court has accepted the claims of the occupying power in relation to violation of human rights in the Occupied Palestinian Territory. When the High Court has considered such cases, it has held in most

instances that there was a justified military necessity or a national security need for the action or policy in question. This is reflected in High Court decisions on a wide range of Israeli violations in the Occupied Palestinian Territory, such as land confiscation and settlements,[8] home demolitions,[9] deportation orders[10] and uprooting of trees.[11] Defenders have reservations on the question of impartiality and fairness of the court. They believe that in several cases the Israeli High Court has established legal "justifications" for illegitimate practices, thus obviating any changes in Israeli policy which might have stopped the violation by the occupying power of Palestinian individual and collective rights.

30. The Special Representative also notes that, according to the Israeli High Court case law, when a specific Israeli law contradicts a rule of customary international law, the Israeli law prevails. In the context of violations not recognized under Israeli law, such as many that result from practices of the occupation, defenders can expect no remedy through the court. Some defenders are concerned that seeking to defend the rights of Palestinians in the Israeli High Court might be perceived as giving legitimacy to the occupation.

### D. Measures taken at national level for the implementation of the Declaration

31. During her visit, the Special Representative was informed by representatives of the Government of Israel that an NGO committee had been formed in the Knesset, but that no concrete initiatives have yet been taken by the committee. The Special Representative has expressed hope that this initiative, once developed further, can become a mechanism that can be used by human rights defenders to promote and protect human rights in Israel.

32. The Special Representative received assurances from the Government that there were further plans to design initiatives aimed at giving a greater role to civil society and the human rights community in Israel and for improving their interaction with the Government.

33. During her visit, the Special Representative was also informed that the Government of Israel had recently constituted an inter-ministerial committee to deal with the issue of impunity for settler violence against Palestinians in general and thereby also human rights defenders. The Special Representative has not yet been informed about concrete action taken by this committee to deter these acts of violence through enforcement of appropriate policy or punitive measures.

## III. MAIN FINDINGS AND CONCERNS

### A. Violation of the fundamental rights of human rights defenders committed by the Israeli authority

#### 1. Unlawful killings, harassment or threats to physical integrity

34. The Special Representative expresses deep concern about the many allegations of systematic targeting of peace and human rights activists by the Israeli Defence Forces, particularly volunteers monitoring or resisting gross violations committed against the civilian population in the Occupied Palestinian Territory. She issued a joint press release and communicated her concern to the Government of Israel regarding the killing of civilians holding a peaceful demonstration on 19 May 2004, protesting against house demolitions in Rafah. She received no response to her communication from the Government.

35. In recent years there have been notable instances where international human rights defenders have been targeted and killed in the course of human rights activity. The Special Representative sent three communications to the Government of Israel regarding such cases. **Rachel Corrie**, an International Solidarity Movement (ISM) volunteer, was run over by an Israeli army bulldozer in Rafah refugee camp while attempting to stop the levelling of the camp on 16 March 2003. **Tom Hurndall**, another ISM volunteer, was shot dead, allegedly by a bullet fired at him from an Israeli army watchtower while he was shielding Palestinian children and walking away from a soldier in Rafah on 11 April 2003. **Dr. Khalil Suleiman**, head of the Palestinian Red Cross Society in Jenin, was killed in an attack on his ambulance by the Israeli security forces on 4 March 2002. Three other paramedics were severely injured in the same incident. The Special Representative received no response to these communications. She takes note of several other cases reported by different organizations alleging the killing by the Israeli army of ISM activists, journalists, medical workers and aid workers (one of them working with the United Nations Relief and Works Agency for Palestine Refugees in the Near East.

### 2. Administrative detention of human rights defenders and their ill-treatment

36. The Special Representative has received information on the administrative detention of a number of defenders. This information suggests that administrative detention is being used as a means to deter defenders from carrying out their human rights activities. Human rights field workers associated with human rights organizations have been particularly targeted. Many of these are monitors who investigate and report on violations such as torture, treatment of prisoners and custodial and extrajudicial killings or targeted assassinations.

37. Examination of these cases shows that arrest and detention of these defenders is based on secret evidence, and the detainees or their counsel have no access to information against them. The detention orders do not specify any maximum cumulative period of administrative detention and the initial period can be repeatedly extended by the detaining authority without showing any cause. In many cases this has been done almost at the last minute before the end of the previous period, causing severe anxiety and anguish to the detainee, amounting to psychological torture. In some of the cases brought to the attention of the Special Representative the Israeli High Court had upheld the detention orders, noting that the decisions were based on secret evidence, thus undermining reliance on judicial review as a safeguard against arbitrariness in cases of administrative detention.

38. The Special Representative heard repeated allegations that human rights defenders in prison did not have access to legal assistance, were often ill-treated and sometimes even tortured during their interrogation and detention, and that they were usually held in isolation in remote detention centres, making regular contact with their family difficult. The Special Representative visited one human rights defender under administrative detention in Ansar III/Kedziot, a prison situated at a remote location in the Negev.

39. A few examples from a long list of defenders who are, or have remained, under administrative detention are:

(a) **Ahmad Maslamani**, a doctor working as General Director of the Health Work Committees, and a member of the Coordination committee of the Palestinian National Organizations Network. He is a well-respected activist in civil society and is detained together

with two other activists of civil society in Jerusalem. He has been charged with membership and participation in activities of a terrorist organization. The Special Representative has noted an observation of the judge in the decision of the Supreme Court[12] that "(I)t looks like they execute civic acts but not military or dangerous. But all those acts are connected to an organization that has terrorist military acts … ";[13]

(b) The Special Representative met with **Ziyad Muhammad Shehadeh Hmeidan** at Ansar III/Kedziot prison, upon her request. **Mr. Hmeidan** is a 32-year-old field worker of the Palestinian NGO Al-Haq who has been held under administrative detention since 23 May 2005, and was due to be released on 22 November 2005. A week before his expected release, Mr. Hmeidan was informed that an application for his detention to be extended for a further six months would be made. To date he has never been informed of the reasons for his arrest. However, in one response to the Special Representative's communication in this regard, the Government advised that he is a "threat to State security";

(c) The Special Representative also sent communications regarding the detention of **Daoud Dirawi**, a child rights lawyer working with Defence for Children International (DCI), in November 2004, and of **Abd al-Latif Gheith**, board chairman of Addameer Prisoner's Support and Human Rights Association, in July 2004.

40. According to the information she has received, contact with "suspected" persons, such as interviews recorded in the context of the aforementioned violations, or even possession of a list of names, have been used as reasons for such detention. There are too many such cases for the Special Representative to accept the Government's position that these individuals have not been targeted because of their human rights work but because they are threats to State security. Undefined and vague allegations with no evidence made available to support them, cannot be the basis for the Special Representative to draw any conclusions against persons who are acknowledged as legitimate human rights defenders by the organizations with whom they are associated. These are well-known organizations with respect and good standing in the human rights community and a consistent record of human rights work. Many of those detained have been associated with these organizations for long periods of time and have been involved in human rights activity.

### 3. Restrictions on freedom of movement

41. Human rights defenders' daily work is most notably hindered by the repeated obstacles to their freedom of movement by the Israeli authorities. Freedom of movement throughout the Occupied Palestinian Territory is severely undermined by the construction of the Wall[14] and about 600 military checkpoints as at April 2005,[15] together with greater recourse to temporary military road checkpoints established at random, so-called "flying checkpoints". Although curfews are less frequently imposed than in previous years, this method of restricting freedom of movement is still resorted to. The construction of the Wall by Israel has also been accompanied by the creation of a new administrative regime for the Occupied Palestinian Territory, establishing "closed zones", which hinder and effectively block entrance and passage. This regime restricts the freedom of movement of Palestinian residents and non-residents of the area of the West Bank lying between the "Green Line" and the Wall.

42. The Special Representative consistently heard from defenders, including field workers, lawyers, medical workers, professors and teachers, both Israelis and Palestinians, in addition to international human rights defenders, about how checkpoints and the other physical obstacles described above endanger and delay their work. Governmental policies, such as closures, make human rights defenders residing in the West Bank, along with all residents, dependent on travel permits. These restrictions not only place additional constraints on the time and resources of defenders but also become impediments to their access to information, to victims and to sites of violation, restraining their freedom to monitor and document human rights situations. Restrictions on freedom of movement also affect the work of Palestinian Authority institutions set up for the protection of human rights in its administered areas, such as the Palestinian Independent Commission for Citizen's Rights.

43. The Israeli military's internal closure policy implemented within the Occupied Palestinian Territory results in little or no access to each other for defenders located in different areas and effectively limits the cooperation with Israeli human rights defenders. This has affected the ease with which they can exchange information or coordinate human rights activities. These limits on movement also affect the work of international agencies such as UNRWA, whose field workers face similar difficulties in carrying out their responsibilities. The Special Representative has particularly noted the difficulties faced by international human rights observers, monitors and activists to the Occupied Palestinian Territory, and especially Gaza. The International Solidarity Movement (ISM) has been specifically targeted, with over 93 volunteers deported in the last four years.

44. Israeli NGOs do not usually face obstacles when wanting to travel abroad for conferences and meetings, but they do face problems when wanting to travel into the Occupied Palestinian Territory. Palestinian defenders face severe restrictions on freedom of movement both within the West Bank/Gaza Strip/East Jerusalem, and especially from the Occupied Palestinian Territory into Israel. This causes major difficulties in terms of coordination and interaction between Israeli and Palestinian NGOs working together to promote and protect human rights in both Israel and in the Occupied Palestinian Territory.

45. Every testimony provided by both Israeli and Palestinian defenders to the Special Representative described military checkpoints as sites of daily human rights abuses committed by the Israeli security forces and, in rare instances, eruption of unlawful violence by Palestinians. The Special Representative consistently heard that disclosing a defender's profession ("human rights") to a checkpoint officer is usually met with increased hostility and deeper suspicion. Very often these are prime sites for the arrest/detention of human rights defenders, particularly field caseworkers. Considering these daily scenes of unimaginable tension and ritual humiliation it is remarkable that ordinary Palestinians exercise such considerable restraint.

46. Owing to United Nations security precautions, the Special Representative was not able to visit human rights defenders based in Gaza during this visit. A meeting with defenders had to be conducted via teleconference from Gaza as none were able to exit Gaza to meet with her elsewhere. She has noted the special difficulties faced by defenders in Gaza in terms of access to the area and exit therefrom. She is also aware of apprehensions that Gaza is likely to become more isolated in the aftermath of the "disengagement", increasing the difficulties of defenders as well as their vulnerability.

47. The Special Representative has communicated her concern to the Government with respect to several human rights defenders who were refused permission to travel abroad, prevented from crossing the border out of Israel or arrested and detained at the border. All these defenders were thus prevented from attending human rights activities, including United Nations-organized conferences and the World Social Forum, and in one case prevented from deposing before the Special Committee to Investigate Israeli Practices. Some of these defenders were subsequently allowed to travel. In almost all cases the Government has made allegations of these defenders being “security threats”. Many defenders continue to be refused permission to travel abroad. The list is too long for the Special Representative to mention all by name, and there are many more whose cases were not even forwarded to the Special Representative.

### 4. Denial of humanitarian access

48. It is increasingly difficult for members of humanitarian and development agencies operating in the Occupied Palestinian Territory to carry out their work effectively because of an intensification of Israeli military restrictions on humanitarian access to the civilian populations affected by conflict. The Special Representative was disturbed to hear that, on a daily basis, aid workers are being prevented from carrying out their duties by unacceptable delays at checkpoints, inconsistent and sometimes total refusal to access project sites and beneficiaries, and harassment of, and severe restrictions on, the movements of local staff. Instances where aid workers were targeted, and in some cases killed, were brought to the Special Representative’s attention.

49. The Special Representative remains deeply concerned at the continuing obstruction of humanitarian services. Several incidents have been reported to her of undue delay and denial of access to ambulances, and the killing, wounding, arrest and detention, abuse and humiliation of ambulance drivers, paramedics and medical professionals. These violations had attained serious dimensions in 2002 during Israel’s Operation Defensive Shield. However the incidents continue to occur in clear violation of international humanitarian law.[16] Dozens of unsafe deliveries in which both mothers and infants have died at checkpoints have been documented by the United Nations.

50. Since the beginning of this intifada, there has been one case in which the Government has brought accusations that a Palestinian Red Crescent Society (PRCS) ambulance was being used for purposes other than humanitarian assistance. No evidence was ever brought forward to substantiate this allegation and repeated requests made by the PRCS, through the International Committee of the Red Cross (ICRC), for an independent investigation have been ignored. Yet, this case has been continually referred to by the authorities, to uphold the claim that it is entirely reasonable to delay and deny the passage of ambulances in order to counteract terrorist actions.

### 5. Freedom of assembly and the right to protest

51. Use of disproportionate and excessive force by the Israeli security forces to repress peaceful protests against practices of the occupation continues to illustrate lack of respect for the freedom of assembly. Violent means such as tear gas, rubber-coated metal bullets and stun-grenades are frequently used to disperse peaceful gatherings. The Special Representative has received several reports of arbitrary arrests and detentions of defenders, who have been

accused of committing violence, obstructing the Defence Forces, causing riots or violating decrees on closed military zones. Often bail is granted on condition that the defenders do not return or enter the area. Authorities can deny them entry on the ground that they are "blacklisted".

52. Israeli defenders are in general able to carry out peaceful demonstrations within Israel without hindrance. However, Israeli defenders are prohibited from travelling to Palestinian-controlled areas and are often physically hindered from travelling to the areas still under Israeli control to participate in peaceful assemblies.

53. During her visit the Special Representative observed one event in the village of Bil'in where Palestinian, Israeli and international human rights defenders have been regularly exercising their right to peaceful protest against the violation of Palestinian rights resulting from construction of the Wall. Despite the restraining effect that her presence at the site may have had on the large contingent of security forces deployed there, the Special Representative noted the arrest of defenders, some of whom were dragged towards the waiting police vehicles. She sensed the intimidating environment created by the large number of soldiers with weapons, as compared with the number of protesters. These peaceful demonstrations have been taking place each Friday since February 2005. The Special Representative has received regular accounts of harassment against human rights defenders, who have been arrested and injured during peaceful demonstrations at the same site and elsewhere.

54. The Special Representative also notes the arrest of journalists covering such protests. Video footage shot by journalists has been instrumental in providing evidence to the courts that such demonstrations have been peaceful. The Special Representative underlines that the right to resist occupation is legitimate.[17] She also refers to article 12 of the Declaration that protects the right to peaceful activities against violation of human rights.

### 6. Settler violence

55. Settler violence constitutes a daily threat to Palestinian, Israeli and international human rights defenders, including the civilian observer mission, Temporary International Presence in Hebron (TIPH), established in 1994 with the mandate to monitor and report on the situation in Hebron and to provide a feeling of security to the Palestinian community of about 140,000 who live with a regular reign of terror caused by 600 neighbouring settlers.

56. According to the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, settler violence is on the increase, with 68 incidents reported in May 2005 and 67 in June.[18] Settler violence occurs across the West Bank, and previously Gaza, with Israeli authorities rarely intervening or investigating complaints. In this hostile environment, the role of the human rights defender is to watch over, accompany and shield Palestinians from violence such as being beaten or stoned by groups of settlers. They walk Palestinian children to and from school, assist pregnant women or the elderly gain safe passage to medical facilities. Such basic tasks require considerable courage and determination considering the level of impunity that settlers enjoy for violations of the Palestinians' right to security of person and property.

57. The Special Representative has received numerous reports illustrating the risks that human rights defenders face while trying to protect Palestinians from settler violence. On 29 September 2004 two members of Christian Peacemaker Teams (CPT) were severely beaten with chains by settlers while accompanying Palestinian children on their way to school. On 16 February 2005, a group of international peace activists were attacked by settlers while accompanying Palestinian shepherds as they grazed their flocks on their land near the Havat Maon settlement in the West Bank. Two masked men demanded that they hand over their video camera, which one of them had been using to film an incident minutes earlier, in which settlers pointed a gun at the head of a woman activist from CPT. After they refused, one of the settlers set on the two activists, breaking one activist's jaw with a kick. In October 2005, two CPT activists were badly beaten by settlers from the outpost as they were accompanying a group of children to school. The Special Representative also heard unimpeachable evidence from the Israeli volunteer group Machsom Watch of the daily intimidation they face by settlers at checkpoints and in areas such as Hebron which has been corroborated by members of Breaking the Silence, a group of Israeli ex-soldiers.

58. In her meeting with the Deputy State Attorney-General, the Special Representative was told that claims of settler impunity were unfounded and informed her of two recent indictments of settlers. The Special Representative, while welcoming the Government's action in these two cases, remains concerned by the inaction of the Government in the large number of cases that have been brought to its attention by various sources. The Special Representative was informed that the Government of Israel had recently constituted an inter-ministerial committee to deal with the issue of impunity for settler violence. The Special Representative has not yet been informed about concrete action taken by this committee to deter these acts of violence through enforcement of appropriate policy or punitive measures.

### B. The situation of human rights defenders under the jurisdiction of the Palestinian Authority

59. While the Special Representative visited the region at the invitation of the Government of Israel, the scope of her mission included appraisal of the situation of human rights defenders in the Occupied Palestinian Territory. The formula of authority under the Oslo Accords makes it necessary for the Special Representative to gather information and to examine the policies and practices of the Palestinian Authority, in addition to those of the Israeli occupation for presenting the situation in all its aspects. Therefore, she visited various places in the West Bank and also sought the cooperation of the Palestinian Authority for enhancing her knowledge and understanding of its relationship to the civil society, the level of cooperation between institutions set up by the Authority and civil society organizations, especially those working on human rights. She is grateful to the Palestinian Authority for its cooperation and the courtesy granted to her by Ministers of the Palestinian Authority and other functionaries in meeting with her and allowing her to introduce her mandate and to raise issues of concern with them. The Special Representative communicated her concerns regarding issues that emerged from her consultation with defenders in the Occupied Palestinian Territory during her mission and other information that she has been receiving from time to time regarding the effects of Palestinian Authority administration on activities for the defence of human rights and the security of those who carry them out.

### 1. Legal framework

60. A Basic Law for the National Authority in the Transitional Period was enforced on 29 May 2002. It provides a provisional constitutional framework for the Palestinian State until the peace process is concluded and the Palestinian State is officially declared. The law provides for parliamentary democracy with direct and free elections, guarantees human rights recognized in the major international covenants, including equal protection of the law, protection against torture, forced confession, and arbitrary arrest. The law also safeguards freedom of thought, freedom of expression, and freedom of the press, provided that they do not violate the provisions of the law. Also listed are the right to life and equality of gender. Freedom of belief and worship are guaranteed, subject to non-violation of public order or morality. Freedom of association, including the formation of trade unions, and peaceful assembly are constitutionally protected. In seeking to institutionalize safeguards against violations, the law provides for the independence of the judiciary. During a state of emergency, basic rights may not be infringed, and the legislature may not be suspended. Detainees have the right to a lawyer, and their cases must be reviewed by the Attorney-General or the courts within 15 days.

61. There is considerable overlap of diverse legal institutions in the Palestinian territories. Some of these include Israeli military and civilian law, Jordanian law, and acts, ordinances, and orders-in-council that remain in effect from the time of the British Mandate.

### 2. Measures taken at national level for the implementation of the Declaration

62. The Palestinian Independent Commission for Citizens' Rights (PICCR) was established on 30 September 1993, upon a Presidential Decree issued by the late President Yasser Arafat. The legislative council is now considering passing legislation to recognize it as the national institution for human rights. Article 31 of the Basic Law of 1997 also reiterated the commitment for establishing an independent Commission on Human Rights.

### 3. Environment for the functioning of human rights defenders and areas of concern

63. Protections in the Palestinian law are not implemented effectively and in practice do not serve human rights defenders either in facilitating their work or in providing them with security against abuse and threats. While NGOs are able to register, the regulations and procedures have become more cumbersome than in the past. Most NGOs rely on support from foreign donors, mainly the European Union, USAID and Nordic Governments. So far no attempt by the Palestinian Authority to restrict foreign funding has been observed. The Special Representative is troubled by reports that amendments to the NGO Law of Charitable Associations and Community Organizations have been presented to the Palestinian Legislative Council, proposing provisions that could seriously hamper NGO independence, complicate registration procedures, and restrict their scope of activities, especially with regard to promoting civil and political rights.

64. Most defenders acknowledge that the Palestinian Authority has cooperated with many NGOs in the field of human rights education, training of police and judiciary and law reforms. However, they believe that the results of this cooperation with the civil society were muted because of a lack of genuine commitment on the part of the Palestinian Authority to enforce human rights.

65. Reports of torture and mistreatment of detainees are common but human rights defenders find it difficult to gain access to places of detention. In September 2001 the Special Representative communicated her concern to the Palestinian Authority regarding the alleged comments of the Ramallah police commander justifying torture of detainees, and threatening a defender when his remarks were challenged. Subsequently, the Chief of the Palestinian Police Service reportedly issued an order prohibiting access to the defender and his organization to police centres and prisons.

66. The Special Representative has received credible reports that journalists and human rights defenders are targeted for exposing abuses committed by the Palestinian Authority security apparatus. She has also received reports of arrests and assaults on human rights defenders for participating in peaceful demonstrations and public activities.

67. She is particularly concerned about the culture of impunity that has affected the safety of human rights defenders, particularly women human rights defenders. The Special Representative refers to the report of the Special Rapporteur on violence against women, its causes and consequences[19] that highlights the issues pertaining to women's legal and social rights and the incidence of violence against women in the Occupied Palestinian Territory. Women human rights defenders engaged with these issues have pointed out several difficulties that they confront in promoting and protecting women's rights. Weaknesses in the judicial system and flaws in the legal framework have deprived these defenders of adequate tools for obtaining justice for women. They have been targeted by State and non-State entities for advocating law reform and for assisting and supporting victims of violence.

## IV. CONCLUSIONS AND RECOMMENDATIONS

### A. Main conclusions

68. **The Special Representative notes that the Government of Israel, in general, does respect the rights of Israeli human rights defenders and that she has not observed any systematic policy of restraining their activities within Israel. Human rights organizations and defenders' groups have access to governmental authorities, members of the Knesset and Knesset sub-committees. Defenders have acknowledged that they have opportunities to examine and comment on legislative drafts. This indicates that there is interaction with human rights defenders that could be further developed to increase their input on policies and practices of the State that affect the situation of human rights and the ability of defenders to function.**

69. **The same human rights organizations and defenders, however, face difficulties in promoting and protecting the rights of minorities, including the Arab and Palestinian communities in Israel. While human rights organizations and groups are able to advocate rights and report on violations, defenders regret that their efforts have little or no impact on policies of the Government, especially in relation to security measures that result in serious violations of human rights and fundamental freedoms.**

70. **The Special Representative finds that the practices and policies of the occupation result in conditions which place human rights defenders operating in the Occupied Palestinian Territory at grave risk and present serious obstructions in every aspect of their work. Human rights monitors and field workers, lawyers, journalists, health professionals and those providing humanitarian assistance and care have all been affected by the situation of occupation and militarization.**

71. **Restrictions on the freedom of movement and assembly, administrative detentions and other forms of harassment, intimidation and humiliation of defenders has rendered their situation absolutely incompatible with international norms and standards of human rights and the principles set forth in the Declaration. The Special Representative is concerned that, in the wake of the "disengagement", human rights defenders in Gaza are becoming more vulnerable because of their isolation, imposed by continuing restrictions that obstruct their movement and communication with their networks in the rest of the Palestinian territory as well as the outside world.**

72. **The information she has received indicates that the Palestinian Authority's style of governance is not fully in compliance with human rights norms. Conditions of lawlessness and impunity for human rights violations have affected the security of human rights defenders, especially those who expose violations committed by security personnel. The Special Representative is concerned that these conditions could affect the functioning and safety of election monitors in the forthcoming elections.**

73. **"Security imperatives" have been allowed to deprive a vast population of their very basic rights, and to justify continuation of gross violations of human rights and humanitarian law committed by the occupation. The exceptional conditions resulting from conflict and occupation demand a more active human rights community to address the serious violations faced by the civilian population in the Occupied Palestinian Territory. The human rights community is being weakened by the risks that they are placed under and by the impunity for violation of their right to life, liberty and physical security. Any prospects for peace and security in the region are being diminished by the constraints placed on freedoms in general and, particularly, the freedom to defend human rights.**

## B. Recommendations

### 1. To the Government of Israel

74. **Israel must end the occupation of the Palestinian Territory, as the situation of occupation itself is a gross violation of the human rights of the Palestinian people. Until the end of the occupation, Israel must respect the resolutions of the United Nations bodies, and accept its obligations under international human rights and humanitarian law, in particular the two main International Covenants and the Fourth Geneva Convention relative to the protection of civilian persons in time of war, of 12 August 1949. In the context of defenders, Israel's defiance of international law has caused serious harm, including killings, to human rights defenders and affects their freedom of expression, their access to places of violations and their ability to seek justice for victims and to provide humanitarian assistance.**

75. **Resistance to the occupation is a legitimate right of the Palestinian people. Any peaceful action undertaken in this regard, collectively or individually, is, therefore, protected under article 12 of the Declaration. Article 2 of the Declaration places the Government of Israel under the obligation "to adopt such legislative, administrative and other steps as may be necessary to ensure that the rights and freedoms referred to in the present Declaration are effectively guaranteed". The Government must amend laws, regulations and policies and refrain from taking action that obstructs or punishes the exercising of the freedom of assembly, and the right to protest or resist violations.**

76. **Israel's legal system makes security-related provisions that have been used or abused to prevent the enforcement of the rights of Palestinians brought before the judicial forums. The Government may consider a comprehensive review of the system in order to ensure that its security concerns are met within the boundaries of international law. The Government must show its commitment to human rights, democracy and to peace and security by undertaking this exercise in collaboration with independent experts to give credibility to the results of such examination.**

77. **The Special Representative suggests that the Government also give serious consideration to the incorporation of the principles set out in the Declaration to ensure protection of human rights defenders and strict accountability for violation of their right to defend human rights. In particular, the right of victims of human rights violations to an effective remedy, including compensation, in accordance with article 9 of the Declaration must be protected. In this regard, repeal of the provision of the Civil Wrongs (Liability of the State) Law, as amended in July 2005, should be considered.**

78. **The Special Representative joins other human rights bodies and mechanisms of the United Nations in recommending that the Government abandon the practice of administrative detention. The accuracy of information leading to charges, partiality and transparency of investigation and fairness of procedures in prosecution of these cases is questionable. By not allowing Palestinian lawyers to appear before Israeli courts, many of the Palestinian detainees are deprived of their right to a counsel of their choice. Orders of detention and extension of the period are usually based on secret evidence not disclosed to the accused or, sometimes, even to any judicial authority. Several human rights defenders have been placed under administrative detention in this manner. The bona fides of these detentions on the basis of security is disputed and the Government has not put forward any responses that inspire confidence in the accusations or the procedures employed against the defenders in question.**

79. **In view of the allegation of torture and mistreatment of detainees, the Special Representative recommends that the Government accept independent monitoring of the detention facilities and allow independent observers immediate access to human rights defenders under administrative detention. The Government told the Special Representative that the Israel Bar Association had access to prisons, but other sources, including Israeli lawyers, have informed her that this access is only to clients and not for assessing conformity of practices of the authorities to international human rights and humanitarian law and standards.**

80. **The Special Representatives recommends that the Government issue invitations to the Special Rapporteurs of the Commission on Human Rights mandated by the Commission to carry out immediate missions in the Occupied Palestinian Territory in its resolution of 19 October 2000.**

81. **The Israeli authorities must refrain from imposing restrictions on travel of human rights defenders to or from Israel and the Occupied Palestinian Territory. Other restrictions on freedom of movement must be removed, and access of defenders in order to carry out their work must be ensured. Measures must be adopted, in consultation with human rights organizations both in the Occupied Palestinian Territory and Israel, to facilitate the movement of defenders.**

82. **The executive, judicial and security authorities in Israel must inculcate a better understanding of the application of human rights norms to the situation of occupation and, for this purpose, create opportunities of interaction with defenders who are engaged with the protection of human rights and humanitarian law. The Government must refrain from making statements alleging wrongdoing against human rights or humanitarian operations. The Government must establish its good faith in voicing any suspicions by producing unequivocal evidence to that effect.**

83. **The Government must cooperate with the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967.**

84. **Given the degree of cooperation that exists between the Government and United Nations agencies, the Special Representative recommends that any elements of obstruction to allow these agencies working under different mandates to protect the civil, political, economic, social and cultural rights of the Palestinian people be removed. It must grant opportunities to these agencies to communicate their concerns to the Government and to hold a meaningful dialogue on these issues. In particular, channels of communications with the Office of the High Commissioner for Human Rights in the West Bank should be established. The Office should have the opportunity to discuss its concerns with the Government and to put forward recommendations for the protection of activities for the defence of human rights in the areas of the Occupied Palestinian Territory under Israeli control or on its policies that affect the situation in the "A Areas".**

85. **The Special Representative strongly recommends the Government to address the issue of settler violence and the impunity for such incidents. She requests the Government to keep her informed on initiatives taken by the inter-ministerial committee set up in this regard.**

### 2. To the Palestinian Authority

86. **The Palestinian Authority must ensure respect for human rights and the rule of law. It must also ensure that fundamental freedoms of the Palestinian population are fully restored and protected in the areas of their authority and control. Incorporation of the principles set forth in the Declaration on Human Rights Defenders and their observance in all aspects of governance would be a step forward in this direction.**

87. **The Special Representative urges the Palestinian Authority to maintain a respect for the freedom of association in the law and refrain from any changes that infringe the independence of NGOs or restrict the scope of their activities for the defence of human rights. Likewise, the independence of the media and the freedom to report on human rights violations must be protected, not only in the law but also in practice.**

88. **The Palestinian Authority must take immediate measures to end impunity for human rights violations. Investigation of complaints against officials and private entities threatening human rights defenders, including those defending women's rights, must be conducted with diligence and responsibility. The Special Representative recommends the creation of an independent commission to inquire into all allegations of human rights violations against the security services, including torture, kidnappings and illegal detention of human rights defenders.**

89. **The mandate of the Palestinian Independent Commission on Citizens Rights must be strengthened and reforms of the institution undertaken to improve its capacity to hold accountability for human rights violations by the Authority.**

### 3. To the United Nations

90. **The General Assembly, the Security Council, the Commission on Human Rights and its special procedure mechanisms have taken note of and have largely condemned the practices of the occupation. Nevertheless, concrete measures need to be adopted to secure the rights of the Palestinian population. In consultation with human rights experts and fully utilizing the information documented by its mechanisms, the United Nations must devise concrete action to enforce compliance with international law in the Occupied Palestinian Territory, as expounded in the Advisory Opinion of the International Court of Justice, and in accordance with the Charter of the United Nations.**

91. **The Special Representative calls upon the United Nations to prioritize its support for human rights defenders and the OHCHR with the full cooperation of the Government of Israel and the Palestinian Authority.**

92. **The Special Representative calls upon the Commission to take particular note of the situation of human rights defenders in the Occupied Palestinian Territory and to adopt measures for their protection and for facilitating their work.**

### Notes

[1] See A/60/271.

[2] According to the Accords, the Palestinian Authority was designated to have security and administrative control over Palestinian areas designated as "Area A" (18 per cent of the West Bank), and only administrative control over areas designated as "B" (22 per cent of the West Bank). The remainder of the territories (including Israeli settlements, the Jordan Valley region, and bypass roads between Palestinian communities) were to remain under exclusive Israeli control ("Area C" comprising 60 per cent of the West Bank).

[3] Basic Law: Human Dignity and Liberty 1992.

[4] According to Law of Associations, 5740-1980, the Associations Registrar can refuse to register an association, if “one of its purposes is to negate the existence of the State of Israel or its democratic character, or if there are reasonable grounds to conclude that the association will serve as a cover for illegal activity”. According to the Mandatory Defence (Emergency) Regulations 1945 the Minister of Defence may declare any body or persons to be an “unlawful association” if it incites or encourages the overthrow by force or violence of the political order of the Government of Israel, the bringing into contempt or arousal of disaffection against the Government or its ministers in their official capacity; the destruction of or injury to government property; or acts of terrorism directed against the Government of Israel or its servants. The Prevention of Terrorism Ordinance, 5708-1948 also places prohibitions against creation, membership and operation of a “terrorist organization” as defined in the Ordinance. There are also restrictions regarding professional associations in certain fields, and on the qualifications that may belong to a professional association.

[5] HCJ 507/85, *Tamini v. Minister of Defense* and C.A. 2687/92, *Geva v. Walt Disney Co*.

[6] E/C.12/1/Add.27, para. 10.

[7] See E/C.12/1/Add.90.

[8] HCJ 302/72, *Abu Hilu et al. v. Government of Israel et al. PD* 27 (2) 169; HCJ 606/78 *Ayub et al. v. Minister of Defense et al.* PD 33 (2) 113.

[9] HCJ 6026/94, *Nazal, et al. v. Commander of the IDF in the West Bank* PD 48 (5) 338.

[10] HCJ 97/79, *Abu Awad v. Commander of Judea and Samaria* PD 33 (3) 309, 317-318.

[11] HCJ 7669/03, *Ahmad et al. v. Military Commander of the IDF in the West Bank* (unpublished) referred to in Orna Kohn’s paper, “Litigation before the Israeli Courts”, panellist at Al-Haq’s legal conference, “From Theory to Practice: Upholding International Humanitarian Law in the Occupied Palestinian Territory” (November 2005).

[12] Decision dated 17 August 2005 in *Rasim Obedat etc. v. The State of Israel*.

[13] *Rasim Obedat (6552/05), Ahmed Maslamani (6432/05) and Naser Abukhader (6388/05) v. The State of Israel*, Supreme Court judgement, 8 August 2005, at paragraph 11 (English translation by translator licensed by the Minister of Justice).

[14] In this report the term “Wall” is used pursuant to the International Court of Justice (ICJ) choice of wording in its advisory opinion on the *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (A/es-10/273 and Corr.1). In its advisory opinion the ICJ held that the Wall/barrier is in violation of International Humanitarian Law. The ICJ wrote that “Israel is under an obligation to terminate its breaches of international law; it is under an obligation to cease forthwith the works of construction of the wall being built in the

Occupied Palestinian Territory, including in and around East Jerusalem, to dismantle forthwith the structure therein situated, and to repeal or render ineffective forthwith all legislative and regulatory acts relating thereto […]" (Advisory Opinion of the International Court of Justice, para. 163).

[15] OCHA, "West Bank Closures August 2005".

[16] The Special Representative refers to the Advisory Opinion of the ICJ that international human rights and humanitarian law applies to Israel's actions in the OPT. The Geneva Convention relative to the Protection of Civilian Persons in Time of War obliges the Occupying Power to allow medical personnel of all categories to carry out their duties. The Convention as well as the Protocol Additional (Protocol 1) of the Geneva Conventions prohibit attacks and restrictions on relief personnel and hospitals.

[17] See Commission resolution 2004/10 dated 16 April 2004.

[18] A/60/271 at para. 27, p. 11.

[19] See E/CN.4/2005/72/Add.4.

-----

PALESTINIAN NATIONAL AUTHORITY
MINISTRY OF FOREIGN AFFAIRS



Articles published on 10-3-2003



## Palestinian Legislative Council Debates Appointment of Prime Minister

Palestinian Legislative Council (PLC) will discuss Monday the appointment of Palestinian National Authority's prime minister in light of the Central Council's decision of bringing forward such a position within the Palestinian National Authority, Palestinian informed sources told IPC.

Rawhi Fatouh, Secretary of PLC told reporters that the PLC will be convened Monday to debate an important issue concerning the authorities to be given to the forthcoming Palestinian Prime Minister.

In case the PLC receives a formal letter from the Palestinian Executive Authority regarding the prime minister's authorities, the PLC will discuss such responsibilities after having forwarded them to a legal committee which, in its turn, will take its own decision on the matter, Fatouh said.

He added that given the committee's decision, the PLC will vote on the prime minister new post including his/her responsibilities and authorities.

Palestinian Minister of Planning and International Cooperation, Nabil Sha' ath, told Aljazeera channel that the prime minister will likely share the president of the Palestinian Authority a number of responsibilities as well as a part of the decision-making.

"The prime minister will enjoy wider responsibilities in terms of the executive administration of the Palestinian cabinet, including administrative, security and financial matters", Sha'ath said.

The Palestinian Central Council (PCC) approved Sunday the appointment of a Palestinian Prime Minister, naming Mahmoud Abbas (Abu Mazen), Secretary of Palestine Liberation Organization and Chief of Negotiation Department, as the holder of such an office.

Abu Mazen was nominated by President Yasser Arafat on Saturday, as he met with and given a speech to the PCC's members in the West Bank city of Ramallah.

Arab-Israeli parliament member (Israeli Kenest member), Ahmad Al-tibi was reported as saying, in response to Abu Mazen's appointment, that " if someone thinks that by appointing a prime minister-even with someone as important as Abu Mazen who has had a historic role in the Palestine Liberation Organization- that president Arafat will disappear, is mistaken.", Ha'arets Israeli Daily reported.

Some commentators believe that such a Palestinian move is a part of comprehensive Palestinian reforms in a bid to reform the Palestinian society at political, financial and social levels and son.

Other political analysts believe that the appointment of a prime minister came in response to outside pressure, mainly American and Israeli, so that the Palestinian Authority could be able to make peace with Israel in a way that ensures security for the Israelis at the expense of Palestinian legitimate rights.

Israel over the past several months declared repeatedly dissatisfaction with President Yasser Arafat to the extent; it continues to besiege him in his office compound in the West Bank city of Ramallah for over 13 months.

Arafat has been elected democratically and under international observation by the Palestinain people as their president, since 1996, following the establishment of the Palestinian Authority in 1994.

Date: 2003-03-10

---

## Q & A : The Palestinian Prime Minister

Frequently Asked Questions

On March 10, 2003, the Palestinian Legislative Council ("PLC") approved an amendment tc the Palestinian Basic Law creating the position of a Palestinian Authority Prime Minister.

1. **What is the purpose of creating the post of Prime Minister?**

   Creating a Prime Minister is part of the Palestinian reform process and is intended tc create better governance through a division and balance of powers at the senior levels of the Palestinian Authority executive branch. The post of Prime Minister was createc in response to Palestinian popular demand. Recent Palestinian public opinion polls show popular and increasing support for a Prime Minister. In August 2002, 69% o Palestinians polled supported the appointment or election of a Prime Minister. Ir November 2002, the level of support rose to 73%.

2. **According to the proposed amendment to the Basic Law, what are the powers of the Prime Minister?**

   The powers of the Prime Minister have yet to be approved but, as currently set forth in the PLC amendment to the Basic Law the most important power of the Prime Minister is to oversee the work of all public and governmental institutions, *including the work of every ministry*. In addition, the Cabinet under the authority of the Prime Minster (and not the President), would now be the executive body responsible foi developing the ministerial program to be approved by the PLC Other powers include:

   - forming the Cabinet (including appointment and removal of ministers anc

delineation of ministerial responsibilities),
- appointing a minister to act as a deputy prime minister in the absence of the Prime Minister, and
- calling and presiding over Cabinet sessions.

3. **What else does the amendment to the Basic Law provide?**

Each minister (including the Prime Minister) must obtain a vote of confidence from the PLC before assuming the position. (New Article 64)

The number of ministers in addition to the Prime Minister shall be increased from a maximum of 19 to a maximum of 24. (Amendment to Article 65)

4. **Who is accountable to whom?**

The Prime Minister and his Cabinet must be approved by a PLC vote of confidence. The Cabinet as a whole (including the Prime Minister) reports to the PLC and can only be removed as a body by a PLC vote of no confidence. However, the Prime Minister reports to the President and may be removed by the President. Similarly, each minister reports to the Prime Minister and may only be removed by the Prime Minister (or a PLC vote of no confidence in such minister).

5. **Who is responsible for security?**

Internal security and public order (including preventive security, civil defense and police forces) are a Cabinet function (currently under the Ministry of Interior) and therefore, ultimately under the authority of the Prime Minister. Responsibility over national security resides with the President.

6. **Who is responsible for negotiations with Israel?**

The appointment of the Prime Minister does not directly relate to negotiations with Israel because the Prime Minister is a position within the Palestinian Authority, whereas negotiations with Israel are conducted by the Palestine Liberation Organization.

Negotiations with Israel are led by the PLO's Negotiations Affairs Department, headed by Mahmoud Abbas, operating under the authority of PLO Chairman Arafat.

**6A. So what is the difference between the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO)?**

The Palestinian Authority is a temporary administrative body (intended only to serve during the interim period prior to the establishment of a Palestinian state) established by the Oslo Accords in 1994 to govern those areas of Occupied Palestinian Territories from which Israeli occupation forces

withdraw (currently 17.2% of the Occupied West Bank and approximately 80% of the Occupied Gaza Strip). Yasir Arafat was democratically elected President of the Palestinian Authority on January 20, 1996. To date, Mahmoud Abbas has not held a position within the Palestinian Authority.

The Palestine Liberation Organization, established in 1964, is the Palestinian government in exile and carries out the state functions of the Palestinian people, including negotiations with Israel. As part of the Oslo Accords, the government of Israel "decided to recognize the PLO as the representative of the Palestinian people and to commence negotiations with the PLO. . ." Yasir Arafat is the Chairman of the PLO. Mahmoud Abbas is Secretary General of the PLO Executive Committee and heads the PLO's Negotiations Affairs Department.

7. **What is the process by which the post of Prime Minister will be finalized?**

At the beginning of a PLC meeting on March 10, 2003, President Arafat nominated Mahmoud Abbas as Prime Minister.

The PLC then voted (64-3, 4 abstentions) in favor of creating the post of Prime Minister, a post which did not exist in the Palestinian Basic Law.

Later at the same meeting, the PLC adopted an amendment to the Palestinian Basic Law creating the position of Prime Minister and defining its powers. The draft amendment originated from the PLC Legal Committee.

The amendment was presented to President Arafat for approval on March 11, 2003.

The President has 30 days to (i) sign and publish the amendment in the official gazette, thereby making the amendment law or (ii) send the amendment back to the PLC with comments and the PLC will then debate the amendment in light of the President's comments and may override the President's comments by a two-thirds majority vote.

In the event of the President's approval of the amendment and Abbas' acceptance of the post, Abbas will have three weeks (with a possible two week extension) to submit his cabinet and its program to the PLC for a vote of confidence

Abbas has stated that he will not formally accept the position of Prime Minister prior to an agreement on the position's powers.

8. **Who is Mahmoud Abbas?**

Mahmoud Abbas is a founding member of Fatah, the largest political party of the PLO. He is married to Amina and has three sons: Mazen, Yaser and Tareq. He has seven grand-children and another on the way.

Abbas is also known familiarly as Abu Mazen ("Father of Mazen") in accordance with Arabic tradition which often refers to parents as Abu ("Father of') or Um ("Mother of") the first-born son.

Abbas was born in 1935 in the town of Safad in northeastern Palestine. During Israel's campaign against Palestinian civilians in1948, Abbas and his family, together with most of Safad's Palestinian population, became refugees in Syria - Abbas walking all the way to the Syrian border on the other side of the Jordan River. Abbas worked as a day laborer laying floor tiles and as an elementary school teacher before earning his B.A. in law from the University of Damascus. He later earned a Ph.D. in history from Moscow's Oriental College.

Abbas is the Secretary General of the PLO Executive Committee (the highest PLO executive body). Abbas was the signatory to the 1993 Declaration of Principles that launched the Palestinian-Israeli peace process. In 1995, Abbas was the signatory to the Interim Peace Agreement with Israel.

Abbas heads the PLO's Negotiations Affairs Department, established in 1994 to oversee permanent status negotiations.

Abbas is an avid reader of history and Arabic poetry and enjoys classical Arabic music.

Date: 2003-03-10

---

**UN Secretary-General Anaan :Israel's Separation Wall 'Obstacle' to Two-State Solution**
**" The Secretary-General has repeatedly said 'settlements are a clear breach of the Fourth Geneva Convention and also contradict Israel's commitments under the Quartet's Road Map .."**

NEW YORK - United Nations Secretary-General Kofi Annan expressed deep disquiet today by the Government of Israel's decisions to continue construction of a separation wall on the West Bank and build 600 new houses in the area, a UN spokesman said.

Referring to a statement issued on 26 September by the diplomatic Quartet - the United Nations, United States, European Union and Russian Federation - calling on both Israelis and Palestinians to address each other's core concerns, spokesman Fred Eckhard said the Secretary-General "views both the security wall and settlements in the West Bank built on Palestinian

land as serious obstacles to the achievement of a two-State solution."

"Moreover, the wall continues to cause great hardship to thousands of Palestinian families," Eckhard added.

The Secretary-General has repeatedly said "settlements are a clear breach of the Fourth Geneva Convention and also contradict Israel's commitments under the Quartet's Road Map" peace plan, the spokesman said.

The 1949 Fourth Geneva Convention on the wartime treatment of civilians forbids an occupying power to resettle its own civilians on territory under its military control.

The Road Map calls for a series of parallel and reciprocal steps by Israel and the Palestinians leading to two states living side by side in peace by 2005.

Date: 2003-03-10

# Mideast peace talks advance
## Palestinian state in 2008 is goal; US assumes monitoring role

By Farah Stockman, Globe Staff | November 28, 2007

ANNAPOLIS, Md. - After seven years without progress toward Mideast peace, Israeli Prime Minister Ehud Olmert and Palestinian President Mahmoud Abbas yesterday pledged to launch immediate negotiations aimed at creating a Palestinian state by the end of next year.

They made the announcement at the start of a Mideast peace conference at the US Naval Academy, hosted by President Bush and Secretary of State Condoleezza Rice and attended by delegates from more than 50 countries and global institutions.

US officials expressed hope the negotiations would lead to a historic breakthrough, though they were reluctant to make any predictions, warning that talks would be extremely difficult and that major concessions would be required of both parties.

Olmert, speaking in Hebrew during the announcement ceremony, said Israelis are "not indifferent" to the suffering of the Palestinian people and suggested that it was inevitable that Israel would give back much of the Palestinian land captured in 1967.

"I know it," he said. "Many of my people know it. We are ready for it."

Abbas followed by addressing the Israeli people in Arabic, saying: "We stretch our hands to you as equal partners in peace . . . We should not lose this opportunity, which might not be available once again."

But beyond the strong emotional statements - and a warm, lingering handshake on stage - there were few hints of agreement on substance, even after months of informal, face-to-face talks between the two men.

The most significant new element appeared to be an agreement that the United States will take on the role of monitoring progress of the talks and ensuring that any agreements were honored, something the Bush administration has shied away from for fear of wasting energy on a conflict the parties were not ready to solve.

Olmert and Abbas were to meet again today at the White House to officially begin the talks. Each side also agreed to establish negotiating committees that will meet for the first time on Dec. 12, the same day international donor countries will meet in Paris to pledge funds to assist Abbas's government.

The Annapolis gathering, which included representatives from 16 members of the Arab League along with European and Asian countries, was a turning point, analysts and delegates said, because it represents the first time that the powerbrokers of the Muslim world have sat in the same room as Israelis officials to support a peace process between Israelis and Palestinians.

"One consequence of getting all of these international actors around the table is accountability," said Tamara Wittes, a Middle East scholar at the Brookings Institution, a Washington-based think tank. "They are saying, 'We're supporting you, but we are expecting something to come of this.' "

Analysts say the success of the negotiations will depend on the willingness of the United States to make the issue a priority in the coming months, and to come up with creative diplomatic

solutions if the two sides hit an impasse. Key points of disagreement include the final borders of the Palestinian state, the status of Jerusalem, whether Palestinian refugees will have the right to homes that are now a part of Israel, and measures to guarantee Israel's security.

Bush opened yesterday's meeting by reading a joint statement by Abbas and Olmert and personally committing himself to supporting the peace talks during his final year in office. His own speech couched the need to solve the conflict in stark terms that reflected his worldview of a global, epic struggle between terrorists and moderates.

"The time is right, because the battle is underway for the future of the Middle East and we must not cede victory to the extremists," he said. "The extremists are seeking to impose a dark vision on the Palestinian people . . . If this vision prevails, the future of the region will be endless terror, endless war, and endless suffering."

But despite Bush's pledge to spend political capital on the issue, he caused some consternation among delegates when he mispronounced Abbas's first name and Olmert's last name and left the gathering minutes after the two leaders spoke, without attending the working lunch with the heads of state and foreign ministers who traveled to Annapolis.

"Bush appears to be stuck in a "Star Wars"-like narrative of good versus evil that is excessively divisive and goes down like a lead balloon in the region," said Daniel Levy, a former Israeli negotiator who is now with the New America Foundation, a liberal-leaning Washington think tank. Levy said Bush's worldview could become the "biggest obstacle" to brokering a solution to the conflict.

But US, Palestinian, and Israeli officials praised the president for investing a significant amount of time to ensure the success of new peace talks, including face-to-face meetings earlier in the week with some international delegates to the meeting.

In addition, US officials, including Rice and David Welch, assistant secretary of state for Near Eastern Affairs, spent months trying to help Olmert and Abbas reach agreement on a joint statement to begin the conference.

For example, Israelis had wanted a statement recognizing Israel as a Jewish state, a wording that Palestinians feared would look like a concession on the issue of Palestinian refugees returning to homes in Israel. In the end, they settled on a bare-bones statement that referred only to Israel and Palestine.

"The fact that a simple document took that long to be reached shows us the indispensable role for third parties," said Afif Safieh, the Palestine Liberation Organization's ambassador to Washington.

Despite the Bush administration's reluctance to play such a hands-on role, senior administration officials appeared ready to embrace new responsibilities yesterday, saying they were working on devising the best mechanism for monitoring progress during the peace talks.

"This is a pretty serious responsibility for the United States," a senior administration official told reporters. "We are confident that we can take this on. The United States is probably the only party that could do this."

US officials also said they were carefully studying measures to ensure Israel's security, and suggested that retired Marine Corps General James Jones may be asked to play a role in this task. If Jones took up such a post, he would follow in the footsteps of Anthony Zinni, a retired general who was appointed envoy to the Middle East in Bush's first term. Zinni expressed

skepticism about the Annapolis meeting yesterday.

"I think this is a wild grab at a much-needed positive legacy" for Bush, Zinni wrote in an e-mail. "There is a chance, however, for something good to happen because all sides are desperate."

Still, simply getting the two sides to agree to formal negotiations is a significant step forward, analysts say. For years, both Israeli and US officials have shown little interest in such talks, saying that Palestinians had to prove that they could root out terrorism before Israel would negotiate on the terms of a Palestinian state.

The morning speeches by Bush, Olmert, and Abbas were followed by a rare session chaired by Rice and attended by Israel's foreign minister, in which Arab governments - including Syria and Lebanon - gave speeches about the possibility of beginning separate peace talks with Israel.

Syria's deputy foreign minister said his country was willing to "build normal relations" with Israel if the Israelis made peace with the Palestinians and returned all land captured in the 1967 war.

Saudi Arabia's foreign minister said the Israel-Palestinian talks must be followed by similar negotiations for Syria and Lebanon.

Analysts said the unprecedented involvement of Arab states was crucial to giving Israelis the hope that making peace with the Palestinians would lead to broader recognition from the Arab world.

But they also said the real test of Annapolis will be whether the talks improve the lives of Palestinians and Israelis or political unrest and rejection from hard-liners.

"Today at Annapolis we got nice words," Levy said. "The real test moves to the region. Will the negotiations make progress or be paralyzed?" ■

© Copyright The New York Times Company

**November 28, 2007**

# Israel and Palestinians Set Goal of a Treaty in 2008

By STEVEN LEE MYERS and HELENE COOPER

ANNAPOLIS, Md., Nov. 27 — The Israeli and Palestinian leaders committed themselves on Tuesday to negotiate a peace treaty by the end of 2008, setting a deadline for ending a conflict that has endured for six decades.

The agreement stopped short of the binding negotiating outline that many Palestinians had hoped for, but it revived a peace process that the United States had left dormant for seven years.

Its success, both sides said, will depend in part on how vigorously President Bush pushes Palestinians and Israelis toward resolving the core issues that have bedeviled peace negotiators since 1979: the dismantling of Israeli settlements in the West Bank, the borders of a Palestinian state, the status of Jerusalem and the fate of Palestinian refugees who left, or were forced to leave, their homes in Israel.

In announcing the agreement at an American-sponsored peace conference here, Mr. Bush plunged the United States back into the role of an Arab-Israeli peacemaker — an approach he had previously shunned — at a time when wars in Iraq and Afghanistan have helped bring the American image in the Muslim world to historic lows.

But in Gaza, reaction to the peace conference was far from favorable. Crowds of more than 100,000 protested the conference. A Palestinian man was reported killed at a West Bank protest.

“We meet to lay the foundation for the establishment of a new nation: a democratic Palestinian state that will live side by side with Israel in peace and security,” Mr. Bush told officials from 49 countries gathered at the United States Naval Academy.

Flanked by Prime Minister Ehud Olmert of Israel and the Palestinian president, Mahmoud Abbas, Mr. Bush cast peace between Israelis and Palestinians as part of a broader struggle against extremism in the Middle East.

It was a moment of diplomatic theater, endorsed by the attendance of a member of the Saudi royal family and framed by many participants' concerns over the increasing influence of Iran and Islamic radicalism in the region.

The moment was orchestrated by Mr. Bush, who pledged that the United States would "monitor and judge the fulfillment of the commitment of both sides." The agreement, cast as a "joint understanding" between the Israelis and the Palestinians, fell short of the detailed five-page document that Palestinian officials have been seeking. But it went somewhat further than the Israelis had wanted, calling for an immediate start to wide-ranging talks aimed at reaching a final accord within 13 months.

"We agree to immediately launch good-faith bilateral negotiations in order to conclude a peace treaty, resolving all outstanding issues, including all core issues without exception, as specified in previous agreements," the joint understanding said. "We agree to engage in vigorous, ongoing and continuous negotiations, and shall make every effort to conclude an agreement before the end of 2008."

It was not clear until Mr. Bush, Mr. Olmert and Mr. Abbas stepped onto the podium in the ornate frescoed Memorial Hall at the Naval Academy, near a replica battle flag from the War of 1812 declaring "Don't Give Up the Ship," whether the Israelis and Palestinians had agreed on anything.

Even on Tuesday morning, Mr. Bush held last-minute talks with Mr. Olmert and Mr. Abbas, while outside the room, Secretary of State Condoleezza Rice buttonholed the chief Israeli and Palestinian negotiators, Foreign Minister Tzipi Livni of Israel and Ahmed Qurei, a former Palestinian prime minister, to wring agreement on the wording of the accord.

In making the announcement, Mr. Bush read aloud the joint understanding wearing his glasses, suggesting that there had not been enough time to convert the newly completed document to large type for his speech.

Mr. Abbas shook hands with Mr. Olmert and Mr. Bush and then pointedly and emotionally put all of the most divisive issues squarely at the center of the talks that are scheduled to begin on Dec. 12.

"I am not making an overstatement, Mr. President, if I say that our region stands at a crossroad that separates two historical phases: pre-Annapolis phase and post-Annapolis phase," Mr. Abbas said. "I say that this opportunity might not be repeated. And if it were to be repeated, it might not enjoy the same unanimity and impetus."

When Mr. Olmert spoke, he too was emotional and highly personal. "We want peace," he said. "We demand an end to terror, an end to incitement and to hatred. We are prepared to make a painful compromise, rife with risks, in order to realize these aspirations."

The gathering brought about the highest-level official contacts yet between Israel and Saudi Arabia, which do not have diplomatic relations. Seated across the room and squeezed between the delegates from Senegal and Qatar, Prince Saud al-Faisal, the Saudi foreign minister, took notes during Mr. Olmert's remarks, his head slightly bowed. When he arrived in Washington on Monday for the conference, Prince Saud vowed that he would not shake Mr. Olmert's hand.

Mr. Olmert looked directly across the hall at Prince Saud and said that Israel aspired to "normalization" with the Arab world.

"There's quite a lot that separates us," Mr. Olmert said. "Nevertheless, there is also a great deal that we share. Like us, you know that religious fanaticism and national extremism are a perfect recipe for domestic instability and violence, for bitterness and ultimately for the disintegration of the very foundations of coexistence based on tolerance and mutual acceptance."

When the Israeli leader finished his speech, Prince Saud politely clapped. Later, during remarks to the foreign ministers, Prince Saud said that “the time has come for Israel to put its trust in peace after it has gambled on war for decades without success.” He called on Israel to withdraw from the West Bank.

Palestinian officials said one obstacle to the joint statement had been Israel’s refusal to include a reference to the Arab League peace initiative. That initiative, which was reaffirmed by Arab nations this year, called on Israelis and Palestinians to reach an “agreed” resolution of the refugee issue.

Israeli officials do not like that term and have been adamant that Palestinian refugees have a right of return only to a future Palestinian state, not to Israel. They fear that including the Arab League language in the joint statement could handcuff them later in negotiations.

The two sides resolved the issue by leaving mention of the Arab League initiative out of the joint understanding. But Mr. Abbas and Mr. Olmert mentioned it during their speeches.

Mr. Bush cast the reinvigorated negotiations as a historic moment, an opportunity to advance democracy in a region torn by conflict, with the United States and its troops intricately entwined in it. “And when liberty takes root in the rocky soil of the West Bank and Gaza, it will inspire millions across the Middle East who want their societies built on freedom and peace and hope,” he said.

The significance he assigned to overcoming the Israeli-Palestinian conflict echoes the importance he has previously assigned to efforts in Iraq. That country, and the American war there, went unmentioned in Mr. Bush’s remarks on Tuesday, though he did mention Lebanon’s aspirations for peace and independence from Syrian influence.

Iraq declined to attend the conference here, said the State Department spokesman, Sean McCormack.

The White House said Mr. Bush's role would be as a mediator, willing to weigh in on the negotiations when necessary, but leaving the workaday details of American diplomacy to his secretary of state, Ms. Rice.

"Secretary Rice will be doing a lot of that heavy lifting, in terms of the travel to the region and helping them, as she has been," said the White House press secretary, Dana Perino, describing the difficult diplomacy ahead. "But what the president told the leaders today is that he's only a phone call away."

Middle East experts said that perhaps the best thing to come out of the Annapolis conference was that it had publicly committed Mr. Bush, Mr. Olmert and Mr. Abbas to pressing for peace.

"Annapolis means that everyone has a lot more invested," said Daniel Levy, a former Israeli negotiator. But, he added, "Now there's also a lot more to lose."

**January 11, 2008**

# Bush Outlines Mideast Peace Plan

By STEVEN LEE MYERS

JERUSALEM — President Bush outlined Thursday in the clearest terms so far the shape of a two-state peace treaty he is hoping to broker between Israel and the Palestinians by the end of his term.

He called for redrawing borders and compensating Palestinians and their descendants for homes they left in what is now Israel.

Speaking after two days of meetings with Prime Minister Ehud Olmert of Israel and the Palestinian president, Mahmoud Abbas, Mr. Bush said, “I believe that any peace agreement between them will require mutually agreed adjustments to the armistice lines of 1949 to reflect current realities and to ensure that the Palestinian state is viable and contiguous.”

He added, “I believe we need to look to the establishment of a Palestinian state and new international mechanisms, including compensation, to resolve the refugee issue.”

In the face of deep skepticism from both sides, Mr. Bush expressed confidence that a final treaty would be signed during his last year in office.

“I’m on a timetable,” he said when he met Mr. Abbas in Ramallah in the West Bank, only minutes after saying he would not impose timetables on the negotiators for both sides. “I’ve got 12 months left in office.”

Mr. Bush did not offer specific detailed prescriptions for the core issues he addressed: where to draw new borders, how many Israeli settlements in the West Bank will have to be uprooted in a final deal or how to compensate a Palestinian diaspora numbering in the millions now for homes and lands lost long ago, let alone how to pay for it.

Many of the issues Mr. Bush addressed in his statement, delivered alone at his hotel, have been at the center of previous peace talks that ultimately failed, and reflected American policy long pursued by Mr. Bush and his predecessor, Bill Clinton. But having faced criticism for speaking of peace only in the broadest way, Mr. Bush publicly addressed what are known as the core issues, even if those remain subject to intense negotiations.

By endorsing compensation for refugees, Mr. Bush sided, at least indirectly, with an Israeli view that the return of Palestinians to Israel was unacceptable since it would change the identity of Israel as a Jewish state. Similarly, he endorsed the notion of Israel as "a homeland for the Jewish people," and "Palestine as a homeland for the Palestinian people."

At the same time, he emphasized that a new Palestine would have to be "viable, contiguous, sovereign and independent," a stance somewhat at odds with Israeli desires to retain some security controls even after a treaty.

"Achieving an agreement will require painful political concessions by both sides," he said after spending the day traveling to the West Bank.

On Jerusalem, the city each side claim as its capital, he endorsed no view, calling its status "one of the most difficult challenges on the road to peace."

"But that is the road we have chosen to walk," he said.

Mr. Bush's visit to Israel and the Palestinian territories, his first as president, reflected his deepening involvement in the kind of shuttle diplomacy he once scorned. And in his appearances here he displayed a new urgency for the process he set in motion at an international meeting in Annapolis, Md., in November.

Mr. Bush's national security adviser, Stephen J. Hadley, said Mr. Bush would return to Israel and the region at least once, in all likelihood for

the 60th anniversary of Israel's founding in 1948, to be commemorated in May.

The White House also announced the appointment of a senior Air Force commander, Lt. Gen. William M. Fraser III, to serve as a mediator of disputes between the Israelis and Palestinians over their compliance with their previous agreements. That role was a crucial part of the agreement reached between Mr. Abbas and Mr. Olmert in Annapolis, thrusting the United States squarely in the role of adjudicating between the sides. General Fraser, who accompanied Mr. Bush to Ramallah, serves as an assistant to the chairman of the Joint Chiefs of Staff.

Neither Mr. Olmert, who dined with Mr. Bush after his statement, nor Mr. Abbas, responded publicly to Mr. Bush's statement. An Israeli official, speaking on the condition of anonymity, said the statement was not unexpected and "would serve as the basis for further negotiation." Aides to Mr. Abbas declined to comment, though during their meeting earlier, Mr. Abbas praised Mr. Bush, addressing him in effusive formality.

"Our people will not forget Your Excellency, your invitation and your commitment toward the establishment of an independent Palestinian state," he said.

Mr. Hadley, speaking to reporters afterward, emphasized that details must be ironed out in talks that Mr. Olmert and Mr. Abbas agreed to accelerate earlier this week. But he added that Mr. Bush was articulating terms that the two sides had begun to discuss in their negotiations, though neither leader has been so specific in outlining the shape of a compromise.

Mr. Bush's choice of language was clearly intended to comfort both sides. He declared that it was time "to end the occupation that began in 1967," when Israel seized the West Bank and Gaza in a war. While he has used the word "occupation" before, he does so rarely because of Israeli sensitivities.

He avoided a reference to the "borders of 1967," a mantra of Palestinian and Arab leaders, by referring instead to the armistice lines of 1949. Still, the fundamental point, and one strongly held by Israelis, was that the line dividing Israel from a future state of Palestine would have to change from the current division between Israel and the occupied West Bank.

Appearing with Mr. Abbas in Ramallah, Mr. Bush also expressed strong support for a future state without pockets of Israeli settlements. "Swiss cheese isn't going to work when it comes to the outline of a state," Mr. Bush said.

He also delivered some of his strongest criticism of Israel yet when he responded to a question about what are widely viewed among Palestinians as efforts to undermine Mr. Abbas's government and security forces.

The Israelis, Mr. Bush said, "ought to help, not hinder, the modernization of the Palestinian security force." Mr. Bush also reiterated the requirement by both sides to abide by their agreements in the "road map," including a halt to any Israeli expansion of settlements.

Foul weather brought Mr. Bush unexpectedly in contact with Israel security measures that have become a main grievance for Palestinians and their leaders. His helicopter grounded, Mr. Bush drove in a motorcade to Ramallah, passing through an Israeli checkpoint in the hulking concrete barrier the Israelis have erected along and inside parts of the border with the West Bank.

Asked about his own impressions seeing the barrier for the first time, Mr. Bush acknowledged Israel's security measures and the hardships they cause.

"Checkpoints create frustrations for people," he said. "They create a sense of security for Israel; they create massive frustrations for the Palestinians. You'll be happy to hear that my motorcade of a mere 45

cars was able to make it through without being stopped, but I'm not so exactly sure that's what happens to the average person."

*Isabel Kershner contributed reporting from Ramallah and Jerusalem.*

**בבית המשפט המחוזי בירושלים**

**ה"פ 4318/05**
**קבוע בפני כב' הש' א. פרקש**

**1. הרשות הפלסטינית**
**2. הארגון לשחרור פלסטין**
שניהם ע"י ב"כ עו"ד יוסף ארנון ואח'
מרח' שלומציון המלכה 18, ירושלים 94146
טל' 02-6245245 פקס 02-6250777

**המבקשים**
המשיבים

-נגד-

**ישי אונגר ואח'**
כולם ע"י ב"כ עו"ד מרדכי הלר ושות'
מרח' כורש 10, ירושלים 94144
טל' 02-9999837 פקס 02-6667211

**המשיבים**
המבקשים

בית משפט המחוזי
בירושלים (66)
6-08-2007
נתקבל / נבדק

## בקשה לדחיית מועד מתן פסק הדין

בית המשפט הנכבד יתבקש לדחות את מועד מתן פסק הדין בתיק זה.

**ואלו נימוקי הבקשה :**

1. לאחרונה נודע לח"מ כי בדעת באי כח המבקשים (המשיבים בהמרצת הפתיחה) בארצות הברית להגיש בקשה לבית המשפט שנתן את הפסק (בית המשפט המחוזי ברוד איילנד) - בקשה שאם תתקבל, עשוייה להביא לביטול פסק הדין, למתן הזדמנות למבקשים להתגונן מפני התביעה ולעצירת כל הליכי האכיפה והגבייה.

2. העתק מתצהיר בעניין זה רצ"ב **כנספח א'** וכחלק בלתי נפרד מן הבקשה.

3. כפי העולה מן התצהיר, העילה העיקרית לביטול פסק הדין הינה **העובדה** כי התובעים בארצות הברית **העלימו מעיני בית המשפט** שנתן את הפסק (ברוד איילנד) כי **במקביל ניהלו תביעה** (בבית המשפט בוושינגטון) **בגין אותו ארוע** כנגד איראן, משרד ההגנה שלה ומספר מבכיריה.

4. זאת ועוד, במסגרת התביעה כנגד איראן טענו התובעים כי איראן מימנה ואימנה את חברי החמאס האחראיים לפיגוע. בכתב התביעה כנגד איראן אין זכר לקשר או לאחריות הרשות הפלסטינית ו/או אש"פ - המשיבים דכאן - לפיגוע. כתב התביעה כנגד איראן מייחס את מלוא האחריות לפיגוע על איראן ועל החמאס.

5. מעבר לכך, מומחים מטעם התובעים בתביעה נגד איראן העידו בבית המשפט בוושינגטון כי איראן סייעה לחמאס משום ששאפה להתערב בהליך השלום ולחבל בו, בעוד שהרשות הפלסטינית ואש"פ התנערו במכוון ממעורבות בפעילות טרור וזאת על מנת לקדם את תהליך השלום. עוד נטען במפורש שם כי באותו זמן שררה יריבות בין החמאס ובין הרש"פ ואש"פ.

6. יוזכר כי בבית המשפט בו ניתן פסק הדין שבפנינו טענו התובעים כי יש להטיל אחריות על הרש"פ ועל אש"פ בשל אחריותם ותרומתם לפעילותו של ארגון החמאס.

7. ברור לאור זאת כי טענות התובעים בשתי התביעות אינן יכולות לדור בכפיפה אחת אלו עם אלו ואילו היו מוצגות בפני בית המשפט ברוד איילנד הראיות והטענות שהועלו בבית המשפט בוושינגטון, הדבר היה בוודאות גבוהה מביא לדחיית התביעה כנגד הרש"פ ואש"פ.

8. נדמה כי לא היתה זו טעות שגרמה לתובעים להשמיט לחלוטין את דבר קיומה של התביעה כנגד איראן, בעת שניהלו את ההליך ברוד איילנד.

9. לפני כשלושה חודשים הוחלף ייצוגם של הרש"פ ואש"פ בארצות הברית ומשרד עורכי הדין הנוכחי עומד להגיש בקשה כאמור לעיל לבית המשפט ברוד איילנד בזמן הקרוב, כפי העולה מן התצהיר.

10. משמעות הבקשה, אם תתקבל, כאמור לעיל, ביטול פסק הדין, מתן אפשרות לנתבעים להתגונן מפני התביעה וביטול כל הליכי הגבייה.

11. המבקשים סבורים כי יש להורות על דחיית מועד מתן פסק הדין לאור עובדות אלו ולחילופין על עיכוב ההוצאה לפועל של פסק החוץ - במידה וייקבע כי הוא אכיף במדינת ישראל.

12. כפי העולה מן התצהיר, בכוונת ב"כ המבקשים בארצות הברית להגיש את הבקשה בקרוב כאשר תוצאותיה יכולות להתקבל בטווח הזמן המיידי - עד מספר חודשים.

13. המבקשים מודעים להלכה לפיה המונח "ערעור" שבסעיף 3(2) לחוק אכיפת פסקי חוץ פורש באורח מצמצם כך שאינו כולל גם הליך אחר שנועד להביא לביטולו או שינויו של הפסק על ידי בית המשפט שנתן אותו. אולם, **הבקשה דכאן איננה להמנע מאכיפת הפסק לאור הכוונה להגיש את הבקשה בארצות הברית**, אלא רק לדחות את מועד מתן פסק הדין עד לקבלת תוצאותיה. נדמה למבקשים כי מדובר בתוצאה ראויה והוגנת המאזנת

בין זכויות שני הצדדים, וזאת במיוחד לאור נסיבות ונושא התיק, העובדה כי פסק הדין ניתן בהעדר הגנה, מיהות הצדדים וההשלכות האפשריות של אכיפת הפסק במדינת ישראל (כפי שנדונו בתשובת המשיבים להמרצת הפתיחה ובסיכומים שהוגשו לבית המשפט הנכבד).

14. אשר על כן, יתבקש בית המשפט הנכבד לדחות את מועד מתן פסק הדין בתיק זה עד לאחר קבלת תוצאות הבירור המשפטי המחודש בארצות הברית. המבקשים מתחייבים להודיע לבית המשפט ולמשיבים תוצאותיו של הליך זה מייד כשיתקבלו.

יוסף ארנון, עו"ד
מ.ר. 8005
ב"כ המבקשים

א

**EMBASSY OF ISRAEL**
WASHINGTON, D.C.

שגרירות ישראל
וושינגטון

## אימות תצהיר

אני הח"מ, יוסף עדי, סגן קונסול שגרירות ישראל בוושינגטון, מאשר בזה כי
היום יח' אב תשס"ז
התייצב/ה בפני מר/גב' FERGUSON LAURA GOULD
שזיהה/תה עצמו/ה להנחת דעתי עפ"י דרכון אמריקאי מספר 217171043
שניתן ב- — בו רשום מס' זהות —
ולאחר שהזהרתיו/ה כי עליו/ה להצהיר את האמת וכי יהא/תהא צפוי/ה לעונשים הקבועים בחוק אם לא יעשה/תעשה כן, חתם/ה בפני על תצהירו/ה המצורף והמסומן באות "א".

ולראיה באתי על החתום ביום AUG 02 2007

חתימה

תואר יוסף עדי סגן קונסול JOSEPH ADI VICE CONSUL

חותמת השגרירות

רישום פעולות נוטריוניות

| מס' הספר | מס' הדף | מס' סידורי בדף | שנה |
|---|---|---|---|
| 190 | 14 | 24 | 07 |

3514 INTERNATIONAL DRIVE N.W. • WASHINGTON, D.C. 20008 • TEL: (202) 364-5500 • FAX: (202) 364-5 ... israelemb.org

**Affidavit**

I, Laura G. Ferguson, bearer of United States passport number 217171043, hereby declare as follows:

I am a member of Miller & Chevalier Chartered, which since May 2007 has represented the Palestine Authority and the Palestine Liberation Organization in connection with various civil law suits in the United States including *Ungar v. PLO*, No. 00-105L (D.R.I.), No. 04-2079 (1st Cir.). Miller & Chevalier intends to challenge the default judgments entered against the PA and the PLO, in the matter *Ungar v. PLO*, No. 00-105L (D.R.I.), No. 04-2079 (1st Cir.). We believe there are various grounds for vacating the default judgment. Significantly, at the time the Federal District Court in Rhode Island entered the default judgment against the PA and PLO, plaintiffs had filed suit in Federal District Court in Washington, D.C. against the Republic of Iran, the Iranian Ministry of Information and Security, and three individual Iranian government officials for the same underlying incident at issue in the lawsuit against the PA and PLO in Rhode Island.

In the Washington proceeding, plaintiffs averred that Iran funded and trained the alleged Hamas members responsible for the Ungars' deaths and demanded USD 680,000,000 in damages. The Washington complaint did not reference the PA or the PLO and attributed full responsibility to Hamas and Iran. In fact, plaintiffs' experts testified at a hearing in conjunction with the Washington case that Iran funded Hamas because it interfered with the peace process involving the PA and the PLO and affirmed that Hamas was a rival of the PA and PLO.

Plaintiffs' allegations in the Rhode Island court and the Washington court simply cannot be reconciled. Plaintiffs' theory in Washington was that Hamas sought out Iranian support because the PA and PLO had eschewed terrorist acts in favor of the peace process. In contrast, plaintiffs' theory in Rhode Island was that the PA's and PLO's liability arose out of tacit approval of Hamas' cause and providing material support to Hamas, including support after the incident. Indeed, had plaintiffs' evidence from the Washington case been introduced in the Rhode Island case, it would have exculpated the PA and PLO by showing that the PA's and PLO's negotiations with Israel caused Hamas' turn to Iran. This selective presentation and omission of evidence drew the notice of Judge Robertson in Washington, and we will bring it to the attention of the judge in Rhode Island.

In addition to these grounds, we will also raise other challenges in support of the motion to vacate the default. It is difficult to assess the likelihood of success on the motion as we cannot assess what position, if any, the United States Department of State will take on the Motion, though we are undertaking efforts to gain Department of State support. If the default judgment is vacated, then the PA and PLO will be able to defend the underlying lawsuit. All of the collection actions would have to be dismissed as there would be no judgment to enforce.

Our intent is to raise challenges to the judgment soon. Challenging the default judgment will involve filing pleadings with the Federal District Court in Rhode Island. The Court will then issue an opinion regarding our motion to vacate. The time it would take the Court to rule is dependent on the Judge's schedule and could range from immediately to several months.

I hereby affirm subject to penalty of perjury under the laws of the United States and the State of Israel that the aforesaid is true and correct.

Dated: August 2, 2007

Laura G. Ferguson
Laura G. Ferguson

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs – Judgment Creditors,

v. C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

Defendants – Judgment Debtors.

**DECLARATION OF AVRAHAM COLTHOF**

AVRAHAM COLTHOF, of the City of Jerusalem, Israel, DECLARES PURSUANT TO 28 U.S.C. §1746, AS FOLLOWS:

1. I am a graduate of the Law Faculty of Bar Ilan University in Israel, a member of the Israeli Bar and practice as an attorney in Jerusalem, Israel. I am completely fluent in Hebrew and English, and I am capable of translating accurately between those languages.

2. The English-language document attached hereto and marked as "Translation 1" is a true and accurate copy of the Hebrew-language document attached hereto and marked as "Original 1".

3. The Hebrew language document captioned "Embassy of Israel" attached hereto is a certification that Ms. Laura Gould Ferguson was duly sworn before signing her affidavit of August 2, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

August 10, 2007

AVRAHAM COLTHOF

# Translation 1

**In the Jerusalem District Court**

**H.P. 4318/05**
**Before the Hon. J. A. Farkash**

**1. The Palestinian Authority**
**2. The Palestine Liberation Organization**
Both by their counsel Joseph Arnon, Adv. et al.
18 Shlomtzion Hamalka St., Jerusalem 94146
Tel. 02-6245245 Fax 02-6250777

**Movants**
Respondents

- versus -

**District Court**
**Jerusalem**
(66)
08-06-2007
**Received/Checked**
Hour ________
Signature _____

**Yishai Ungar et al.**
All by their counsel Mordechai Haller Adv. & Co.
10 Coresh St., Jerusalem 94144
Tel. 02-9999837 Fax 02-6667211

**Respondents**
Movants

## MOTION TO POSTPONE ENTRY OF JUDGMENT

The honorable court is requested to postpone entry of judgment in this case.

**These are the grounds for the motion:**

1. The undersigned recently learned that counsel for the movants (the respondents in the underlying motion) in the United States intend to file a motion in the court that entered the judgment (the District Court in Rhode Island) – a motion which if granted, could lead to the vacatur of the judgment, the movants being given the opportunity to defend against the suit and the halting of all the enforcement and collection proceedings.

**Translation 1**

2. A copy of an affidavit in regard to this issue is attached hereto as Exhibit A, as an integral part of this motion.

3. As discussed in the affidavit, the main ground for vacating the judgment is the fact that the plaintiffs in the United States **concealed from the court** that entered the judgment (in Rhode Island) that **in parallel they conducted a suit** (in a court in Washington) **regarding the same incident** against Iran, its Ministry of Defense, and a number of its senior officials.

4. Moreover, in the context of the suit against Iran the plaintiffs argued that Iran funded and trained the members of Hamas liable for the attack. In the complaint against Iran there is no mention of a connection between the Palestinian Authority and/or the PLO – the instant respondents – and the attack, or their liability therefor. The complaint against Iran attributes the full liability for the attack to Iran and Hamas.

5. Furthermore, plaintiffs' experts in the suit against Iran testified in the court in Washington that Iran assisted Hamas because it aspired to meddle in the peace process and to harm it, whereas the Palestinian Authority and the PLO deliberately eschewed involvement in terrorist activity in order to advance the peace process. It was also explicitly claimed there that at that time a rivalry existed between Hamas and the PA and PLO.

6. It should be recalled that in the court in which the instant judgment was entered the plaintiffs asserted that the PA and PLO should be held liable because of their liability for and contribution to the activity of the Hamas organization.

7. In light of this it is clear that plaintiffs' claims in the two suits are incompatible with one another and if the evidence and arguments presented in the court in Washington had been presented to the court in Rhode Island, there is a high

## Translation 1

degree of certainty that the suit against the PA and PLO would have been dismissed.

8. It appears that not by mistake did plaintiffs entirely omit the existence of the suit against Iran, while they conducted the proceeding in Rhode Island.

9. About three months ago the representation of the PA and PLO in the United States was changed and the current law firm will soon file the aforementioned motion in the court in Rhode Island, as discussed in the affidavit.

10. The meaning of the motion, if granted, is vacatur of the judgment, the granting to the defendants of an opportunity to defend the suit and cancellation of all the collection proceedings.

11. The movants believe that the entry of judgment should be postponed in light of these facts and alternatively that enforcement of the foreign judgment should be stayed – if it is found to be enforceable in the State of Israel.

12. As discussed in the affidavit, counsel for the movants in the United States intends to file the motion soon and its disposition will be known in a time frame ranging from immediately – to a few months.

13. The movants are aware of the rule that the term "appeal" in Article 3(2) of the Enforcement of Foreign Judgments Law is narrowly construed and does not include other proceedings seeking to vacate or modify the judgment in the court that entered it, however, **the instant motion does not seek to refrain from enforcing the judgment in light of the intention to file the motion in the United States**, but rather only to postpone entry of judgment pending the disposition of the motion. It appears to movants that this is an appropriate and fair result which balances between the rights of the two sides, particularly in light of the circumstances and subject of the case, the fact that the judgment was given by

**Translation 1**

default, the identity of the parties and the possible ramifications of the enforcement of the judgment in the State of Israel (as discussed in the movants' response to the underlying motion and in the summations that were submitted to the honorable court).

14. Wherefore, the honorable court is requested to postpone entry of judgment in this case until after the disposition of the renewed legal inquest in the United States. The movants undertake to notify the court and the respondents of the results of this proceeding immediately upon their receipt.

Joseph Arnon, Adv.
L.N. 8005
Counsel for the Movants

ISRAEL MINISTRY OF FOREIGN AFFAIRS

# TRANSFER OF TERRORIST SUSPECTS TO ISRAEL BY THE PALESTINIAN COUNCIL - 17-Dec-96

17 Dec 1996

17 December 1996

## TRANSFER OF TERRORIST SUSPECTS TO ISRAEL BY THE PALESTINIAN COUNCIL

The Interim Agreement provides that Israel may request the Palestinian Council to arrest and transfer to Israel any individual suspected of, charged with or convicted of an offense which falls under Israeli criminal jurisdiction who is present in the autonomous areas (Annex IV, Article II.7.b).

On receipt of a formal request, the Palestinian side is obliged to arrest and transfer the suspect to Israel. If the individual requested is detained in custody or serving a prison sentence, the transfer may be delayed for the duration of the detention or imprisonment (Article II.7.f).

The following list, prepared by the Government Press Office, details 27 terrorist suspects who have been requested by Israel for serious security-related offenses. Of these, 16 have been the subject of formal requests while the remaining 11 have been the subject of informal requests. While informal requests are not directly addressed in the agreement, the agreement does require both sides to cooperate in all security matters of mutual concern (Annex I, Article III).

In practice, the Palestinian Council has failed to respond to any of these 27 requests, with the exception of numbers 13 and 14 in which cases they refused to comply.

Of the 27 terrorist suspects included in the list, 10 are either serving in the Palestinian Police or are in the process of joining its ranks. This in

itself is a serious breach of the Interim Agreement which provides that Palestinian policemen to whom Israel objects shall not be recruited, and that policemen who have been found to be involved in terrorist activities will be dismissed immediately, and their weapons confiscated (Annex I Article IV.4).

List of terrorist suspects requested by Israel:

1. Atef a-Wahab Hamadan - resident of Khan Yunis; Hamas member involved in the kidnapping and wounding of an Israeli soldier. Israel informally requested his transfer from the PA on 1 August 1996. The PA arrested him and then released him in September 1996. He has been drafted to serve in the PA's Preventive Security Service.

2. Bassam Subhi Shaaban Issa - resident of Sheikh Radwan, Gaza; involved in a string of serious attacks. He assisted those carrying out attacks, trained Hamas members in the use of weapons and issued instructions to Hamas cells to carry out attacks. He took part in the murder of 3 Israeli soldiers in April 1993. Israel informally requested his transfer on 7 July 1996. He was arrested and then released by the PA police and then drafted to serve in the PA's Preventive Security Service.

3. Said Massoud Salah Arabid - resident of Medinat Nasser; involved in the terror attack which killed Lt. Col Meir Mintz in Gaza in 1993. Israel informally requested his transfer on 1 August 1996. He was arrested and then released by the Palestinian police. Together with Muhammad Deif and Adnan Gohl, he is currently attempting to join the PA's Preventive Security Service.

4 Waleed Fawzi Abu Daka - resident of Khan Yunis; involved in an incident during which an Israeli guard was shot to death in Petah Tikva. Israel informally requested his transfer on 1 August 1996. He was arrested and then freed by the Palestinian police. He currently serves in the Palestinian Military Intelligence Service.

5. Nafez Mahmoud Sabih - resident of Gaza; involved in coordinating suicide bombing attacks in Jerusalem and Ashkelon and in drafting recruits to Hamas. Israel informally requested his transfer on 28 July 1996. Currently held by the Palestinian police.

6. Imad Mahmoud Issa Abbas - resident of Gaza; participated along with two others in the murder of two Israeli civilians near Karni in 1992. Israel informally requested his transfer on 15 July 1996. Currently held by the Palestinian police.

7. Adnan Yihye Mahmoud Jaber al-Gohl - resident of Gaza; member of Islamic Jihad who was involved in a series of attacks starting in the late 1980s. He has trained terrorists, helped conceal the car that was used in the suicide bombing attack at Kfar Darom, and was involved in a shooting attack in August 1987. Israel informally requested his transfer on 31 July 1996. He was arrested and then freed by the Palestinian police, and is currently trying to join the PA's Preventive Security Service.

8. Muhammed Arafat Ibrahim Khawaja - resident of Sheikh Radwan, Gaza; suspected of involvement in an attack at the Erez junction which left 2 Israeli soldiers dead. Israel informally requested his transfer in

May 1996. Currently held by the Palestinian police.

9. Hisham Ashour a-Malic Salam - resident of Gaza; suspected of coordinating the transportation for the terrorist who carried out the suicide bombing at Dizengoff center in Tel Aviv. Israel informally requested his transfer on 14 July 1996. Currently held by the Palestinian police.

10. Bassam Khalil Abdel Rahman Aram - resident of Khan Yunis; suspected of involvement in the murder of Zvi Fixler at Moshav Gan-Or on 10 December 1993. Israel formally requested his transfer in 1995. He was arrested and then set free by the Palestinian police and is now active in the Palestinian security forces.

11. Yasser Muhammad Musa Aram - resident of Khan Yunis; active in Islamic Jihad; suspected of involvement in the murder of Zvi Fixler at Moshav Gan- Or on 10 December 1993. Israel formally requested his transfer on 10 July 1996. He was arrested and then set free by the Palestinian police. There are indications that he may have joined the Palestinian security forces.

12. Ala Ahmed Abd al-Munim Salah - resident of Khan Yunis; member of the DFLP; suspected of involvement in the murder of Yossi Zindani in Beni-Ayish on 31 March 1994. Israel formally requested his transfer on 10 July 1996. He was recently arrested by the Palestinian police, apparently in connection with criminal activity.

13. Rajah Khalil Ali Abu-Sita - resident of Khan Yunis; a Fatah activist who is suspected of involvement in the murder of Uri Megidish of Gan-Or on 9 March 1993. Israel formally requested his transfer on 29 September 1994. On 24 December 1994, the Palestinians rejected Israel's request. He has since been arrested by the Palestinian police for having killed a local Palestinian. He confessed to the crime, was tried, and is currently awaiting sentencing.

14. Amru Abdallah Abu-Sita - resident of Khan Yunis; a Fatah activist who is suspected of involvement in the murder of Uri Megidish of Gan-Or on 9 March 1993. Israel formally requested his transfer on 29 September 1994. On 24 December 1994, the Palestinians rejected Israel's request.

15. Salah Mustafa Othman - resident of Jabalya, Gaza; member of the Hamas military wing, took part in the attack on Bus 25 in Jerusalem on 1 July 1993 (attempted to commandeer the bus with two accomplices, shot and killed one Israeli passenger and wounded several others). Israel formally requested his transfer on several occasions: 26 January 1995, 29 August 1995 and 6 September 1995.

16. Raid Abu Libda - resident of Rafah, Gaza; member of the PFLP, suspected of murdering Natalia Ivanov in Ashdod on 23 September 1994. Israel formally requested his transfer on 30 November 1994. Currently held by the Palestinian police.

17. Iyad Hamdi Abu-Shakafa - resident of Khan Yunis; Fatah member suspected in the attempted murder of Shaul David in Ramle on 9 February 1994. Israel formally requested his transfer on several occasions: 13 September 1994, 13 December 1994, 22 August 1995

and 6 September 1995. Currently serving in the Palestinian police.

18. Iyad Abdelkader Ismail Basheeti - resident of Rafah, Gaza; Hamas member, suspected of involvement in the murder of two Israelis in Ramle on 26 August 1994. Israel formally requested his transfer on several occasions: 28 August 1994, 22 August 1995 and 10 July 1996. He was arrested and then set free by the Palestinian police, who then apparently drafted him to join their ranks.

19. Yusuf Mahmoud Abdelaziz Malahi - resident of Rafiah, Gaza; Hamas member, suspected of involvement in the murder of two Israelis in Ramle on 26 August 1994. Israel formally requested his transfer on several occasions: 28 August 1994, 22 August 1995, and 10 July 1996. He was arrested and then set free by the Palestinian police, and is currently in the process of being drafted to serve in their ranks.

20. Yusuf Muhammad Ahmed Raghi - resident of Kalkilya; participated in the murder of two Israeli hikers, Ohad Bachrach and Uri Shahor in Wadi Kelt on 18 July 1995. Israel formally requested his transfer on 13 September 1995 and 14 November 1995. He was arrested by Palestinian Intelligence in September 1995 and sentenced to seven years in prison.

21. Shaher Ali Ahmed Raghi - resident of Kalkilya; participated in the murder of two Israeli hikers, Ohad Bachrach and Uri Shahor in Wadi Kelt on 18 July 1995. Israel formally requested his transfer on 13 September 1995 and 14 November 1995. He was arrested by Palestinian Intelligence in September 1995 and sentenced to seven years in prison and hard labor. He remains under detention by the Palestinian General Intelligence Service.

22. Khader Saba Yakub Abu Abra - resident of Beit Jallah, Bethlehem; member of the PFLP, suspected of attempts to obtain weapons for the PFLP, and apparently issued instructions to the attackers who killed two Israeli hikers in Wadi Kelt on 18 July 1995. Israel formally requested his transfer on 13 September 1995 and 14 November 1995. He was arrested by the Palestinian police on 15 February 1996 in the wake of a grenade attack on a joint patrol near Beit Jallah. He was held until May 1996, when he was released and placed under house arrest.

23. Muhi a-Din a-Sharif - transported the explosives to the terrorist who carried out the suicide bombing attack against Bus 26 in Jerusalem in August 1995. Four people were killed and 103 injured. Israel formally requested his transfer on 13 March 1996.

24. Abd al-Majid Dudin - resident of Dura; Hamas member, trained people to carry out suicide bombings, including the terrorist who attacked Bus 26 in Jerusalem in August 1995. In that attack, four people were killed and 103 injured. Israel formally requested his transfer on 12 March 1996. He was arrested by the Palestinian police in July 1996 and sentenced to 12 years in prison.

25. Awad Silmi - resident of Gaza; took part in many terror attacks, including the murder of Lt.-Col. Meir Mintz and various shooting attacks, and was connected to at least one suicide bombing attack. Israel formally requested his transfer on 18 January 1995 and 6 September 1995. He is currently being detained by the Palestinian

Preventive Intelligence Service.

26. Nidal Ahmed Mustafa Barakat - resident of Tulkarem, Fatah member wanted for the murder of Labib Latif Shadeed, a suspected collaborator with Israel, on 1 October 1994. He fled to Jericho and is currently under the protection of the Palestinian Preventive Security Service. Israel informally requested his transfer on 18 January 1995 and 6 September 1995. He was arrested by the Palestinian police in October 1996 for car theft.

27. Ibrahim Lateef Shaheed - resident of Tulkarem; Fatah member wanted for the murder of Labib Latif Shadeed, a suspected collaborator with Israel, on 1 October 1994. He fled to Jericho and is currently active under the protection of the Palestinian Preventive Security Service. Israel informally requested his transfer on 18 January 1995 and 6 September 1995. He currently serves in the Palestinian police in Tulkarem.

BBC NEWS

# Hamas: Khaled Meshaal

**This interview was conducted in an undisclosed location in Beirut under intense security.**

**Mr Meshaal spoke in Arabic and his text has been translated to English. This transcript was done from a vhs recording of the interview. We have made every effort but cannot guarantee total accuracy.**

TIM SEBASTIAN'S INTRODUCTION

I'm in the Lebanese capital, Beirut, at the end of an extraordinary day for HARDtalk. We were invited here to meet the leader of the Palestinian group, Hamas, labelled by Europe and America as one of the most dangerous terrorist organisations in the world. It's leader had come here specially from Syria amid meticulous security. We had to change cars, and locations, we ended up travelling in a van that had sealed windows to an undisclosed location. So when we finally caught up with the man in the wake of the assassination of his spiritual leader, Sheikh Yassin, which way is the movement, Hamas heading?

**HARDTALK TITLES**

TIM SEBASTIAN - Khaled Meshaal. A very warm welcome to the programme. In the wake of the Israeli assassination of Sheikh Yassin, is Hamas planning yet another cycle of pointless revenge violence?

KHALED MESHAAL- In the name of God the Compassionate, the Merciful. Bloodshed in Palestine is going on because of the Israeli crimes before and it didn't begin after the assassination of Sheikh Ahmed Yassin. The Zionist crime requests a Palestinian response. This is something very ordinary. This reciprocity is acknowledged by all human and spiritual laws and legislations.

T S - Where does it get you? Where does it get you, this retaliation? It doesn't change anything. It doesn't get you anywhere does it? More people die. More of your people die, more Israelis die. No progress is made. Haven't you got anything else to offer to the process?

KM: Our goal is to end the occupation and not kill people. If the world was able to be fair with us and give us back our land and rights, we won't need anymore fighting and resistance

TS- And when you take this revenge and you see the bodies of Israeli women and children on the streets, does that make you feel better?

KM: We feel better when the occupation ends. We hope that no blood will fall in Palestine but the one who began with aggression is the one to be held responsible for it. Sheikh Ahmed Yassin was a religious cleric paralysed and despite that, he was targeted by Zionist missiles which are American weapons. The Palestinian people have the right to respond to this aggression.

TS- Sheikh Yassin is a man who ordered killings of civilians - Israeli civilians. You can hardly complain when in a war he himself is killed can you?

KM: Sheikh Ahmed Yassin didn't order anyone. The resistance has a military specialised wing that fights on the ground. It is a natural right.

TS - He sanctioned the killings didn't he. He sanctioned them.

KM: The resistance operations don't need anybody's decision. Every Palestinian knows his duty. Any Palestinian who sees the Israeli crimes would act normally. The military wing in Hamas like the military wings in other factions knows their duty. They are doing their job in defending their people, responding to the Israeli aggression and resisting the occupation.

TS- Mr Meshaal, you're not defending anybody are you. Your tactics are not defending your people at all. There is not one single Palestinian you can defend against Israeli attacks from F16's and from tanks, can you?

KM: We are defending our people even if the balance of power is unequal, even if the Israeli weapons are much ore superior. The Israeli occupying enemy must understand that each crime from their end would bring a Palestinian response.

TS- You target women and children. That is terrorism of the most brutal kind.

KM: We are not targeting civilians and we are not targeting children. From the beginning the Palestinian resistance was focusing on military targets and on settlers

TS- So the suicide bombs on buses aren't for civilians? The children and women who die on buses? I don't notice the suicide bombers allowing civilians off the bus before they blow it up.

KM: I didn't complete my answer. I said the Palestinian resistance focused in the beginning on military targets and on settlers. But Israel committed crimes against civilians in the Aqsa mosque in 1990 and in the Ibrahimi mosque in Hebron in 1994 against innocent civilians who were praying in the mosque.

TS- What are the conditions for a ceasefire? A new ceasefire.

KM: Let Israel withdraw first, and after that we will negotiate. This is our land this is our natural right

TS- A withdrawal to the '67 borders.

KM: We consider this positive step but we have the right in all Palestine

TS- You don't say, Sheikh Yassin said that Hamas would agree, he told a German news agency, January 9th, Hamas would agree to a temporary peace with Israel in exchange for the establishment of a Palestinian state on the basis of the 67 borders. Are you saying that doesn't stand anymore? Or it does stand. Would that lead to a permanent ceasefire?

KM: We believe in what Sheikh Ahmed Yassin said in Hamas movement. But the question is does Israel accept to withdraw? Ask the occupying side first. Let it withdraw. Let it says I am ready to withdraw to the 67 borders then ask Hamas to hold a ceasefire...

TS- I'm asking what your conditions are.

KM: I said let Israel withdraw first. It is the one that began the aggression. Let it stop occupation and then everything can be negotiated.

TS- They can withdraw but you promise nothing. You promise nothing. They must withdraw but you promise nothing.

KM: I have said what Sheikh Ahmed Yassin has said. You have quoted Sheikh Ahmed Yassin. What he said concerning the withdrawal to the '67 borders. If this happened we might have a truce with Israel. We believe in this in Hamas.

TS- There could be but you're not saying there definitely would be a truce if Israel withdraws to '67 borders.

KM: Perhaps but Israel has to withdraw first. Israel is refusing it. It didn't abide by Oslo.

TS- It's the other side that has to move first.

KM - Of course

TS- The other side has to move first. You think that's good negotiation? You think that's going to produce some results? You know very well that isn't going to produce any results. You're offering nothing in return. You want the withdrawal but you offer nothing in return.

KM: We offered positive initiatives. We proposed an initiative to put aside civilians. We proposed that Israel withdraws to the borders of 1967 and then there would be a possibility for truce between us and Israel. We offered several initiatives but Israel which is stronger militarily and is backed by America and whose crimes the world refuses to speak about refuses to withdraw. It refuses to recognise the Palestinian rights.

TS- Mr Meshaal the record is different. The record is different. You fought every attempt at peace. You fought Oslo, you were against Madrid, you even condemned the Geneva Accord, you were against the Mitchell document, the Tenet document, your organisation has been against every attempt at peace.

KM: Because those initiatives don't lead to peacemaking and the proof is the factual present. What did Oslo do? Did it achieve peace? You are saying the 67 borders. All those agreements that you have mentioned did not bring peace. On the contrary they legitimise the occupation and give it a chance for expansion. The settlements grew bigger under Oslo

TS- You want a commitment from the international community but you're not giving any commitments at all. You still have a charter dedicated to the destruction of Israel. Your charter says, Palestine in it's entirety alone is an Islamic (INAUDIBLE).An Islamic endowment. Where's the room for Israel?

KM: I want to ask you one question. Arafat gave you clear and repeated commitments and what did you do with him? Did you respect his commitments?

TS- Why are you raising the question of Arafat? You don't care about Arafat at all. In 2002 you said "If we want reform, lets start with the leadership. Most of the leaders in the PA need to be changed. What's the point of having a Palestinian Authority if it's incapable of defending it's people". You don't want the Palestinian Authority anymore than Israel. You're on the same side there aren't you?

KM: On the contrary there is no problem between us and the Palestinian authority. We are different politically but we negotiate and hold talks.

TS- There are huge problems between you and the Palestinian Authority. Huge problems.

KM: The biggest problem is between us and Israel.

TS- So why did you say that? Why say that in 2002 that you wanted them out?

KM: No not at all. This is not true. We have disagreed..

TS- You did say that. In the Daily Star newspaper in Beirut. May 2002 "What's the point of having a Palestinian Authority if it's incapable of defending its people".

KM: Yes we criticised the corruption of the Authority and its surrender of the Palestinian rights but we don't call for a struggle with the authority. We call for reforms and we ask to have Palestinian correctness on all levels and an attachment to the Palestinian right.

TS- Let's face it, this is just a power struggle between you and the Palestinian Authority. You want to push them aside don't you? They offered you a place in the government, you turned them down. They offered you the hand of cooperation, you turned it down . You don't want the Palestinian Authority anymore than the Israelis do.

KM: No, don't put us on the same side with the Israelis. The Palestinian Authority was mistaken when it bargained on the Palestinian rights and when it made mistakes and was hit by corruption. We stood against this because this was against the interest of the Palestinian people.

TS- So you condemn them? You condemn them and then you're prepared to do business with them at the same time? The two don't go together.

KM: To tell them they are mistaken doesn't mean to be in a struggle with them, I hope you understand this. We might disagree with them in the political point of view or program but that doesn't mean a struggle.

TS- Dalal Salama, a member of the Palestinian Legislative Council, member of the West Bank Fatah committee, said on January 7th, "The differences today between PA and Hamas are deeper than they appear. And not just relating to Israeli/ Palestinian questions but also to the character of Palestinian decision making. Deep differences.

KM: Yes we are different politically but we agree on many other matters. We agreed about the intifada. We agreed about resistance. You see Hamas, Aqsa martyrs, Jihad factions and others, we agree on several issues. We agree on the Palestinian right but disagree in interpretations and some political programs. This is very natural.

TS- The proof of your willingness to unite with the Palestinians is the fact that you refuse to serve in Yasser Arafat's cabinet. That's the proof of your intention isn't it? Those are your real intentions.

KM: The way is not to join a cabinet where Yasser Arafat is. We have proposed to the brothers at the authority and in Fatah movement to participate in the decision making, we are one people, common factions in the intifada and resistance and it is our right to participate in decision making. This is the democracy that you want in Europe and that America wants.

TS- If you believed in democracy, if you yourself believed in democracy, why do you get your money from countries, go to countries that have no democracy whatsoever to finance you? Like Saudi Arabia, like Iran, like Syria, not one jot of democracy. What do you care about democracy if you go to these countries?

KM: First we are practicing democracy and consultations inside Hamas by ourselves. Second we are not taking any money from countries. We are taking money from people. And the people are the ones who elect and give decision and legitimacy and give us money as well.

TS- Five million dollars from Saudi Arabia.

KM: Give me the proof. Do you have any proof?

TS- Do you deny it? Do you deny it?

KM: I don't deny anything that does not exist.

TS- You were a guest of King Fahd in Riyadh two years ago. You were personally hosted by King Fahd in Riyadh two years ago.

KM: We are visiting the Arab countries and meeting with Arab leaders because they believe in Hamas line and in the resistance movement and stand by the Palestinian right. But that doesn't mean that we took money.

TS - The EU needs you to denounce violence otherwise they can't help you. They're not going to help you.

KM: The Palestinian resistance is not terrorism neither violence, and therefore we can't surrender our rights.

TS- You're the only one with that view Mr Meshaal. You're the only one who thinks that.

KM: Do you think I am the only one? What about those people who are resisting occupation and condemning Israel and America? Do you know that 43% of the American people consider the US the biggest danger to world peace? There is an international terrorism led by the US and Israel.

TS- A lot of people may be criticising Israel but they're not supporting you. Just because they criticise Israel doesn't mean they support you.

KM: It is enough for me that Arab and Islamic people support us and stand with us and all the free people in the world stand with us and a part of the international official position that supports Israel and shuts up on its crimes is a part of the hypocrisy of this phase. I tell you that Israel will be a burden for you in Europe and a burden even for the US.

TS- You accuse the West of contradictions but look at your contradictions. You say you want democracy in the region, so it's in your interests that America should succeed in Iraq because if Iraq is democratic, then that's presumably what you want so why do you have Abdul Aziz Rantissi, your representative in Gaza, calling for the creation of martyrdom cells in Iraq so that more people can blow themselves up and sabotage the democratic process. Why?

KM: leave Dr Abdul Aziz Rantissi and look to the Iraqi people. Did the Iraqi people accept the US democracy?

TS - I'm asking you why Hamas is not supporting the democratic process in Iraq. That's what I'm asking you. Mr Meshaal, you know perfectly well that this is first chance at democracy the Iraqis have had in decades. They had no chance whatsoever when Saddam Hussein was the leader. This is their first chance. Why don't you do everything you can to help them instead of sabotaging?

KM: What the US is doing in Iraq is not democracy. It is an occupation and there are killings right now.

TS- Do you speak for the Iraqi people?

KM: What is going on in Iraq is not our business. We don't participate in its failure or success. But what is happening in Iraq is not democracy and the proof is that you should go to the Iraqi people and do a survey. Do they accept the US occupation? Do they believe in the US pretended democracy? They do not. The Iraqi people don't trust the US promises and don't trust its democracy. We, as Arabs and Muslims, have a long history in democracy.

TS- Do you speak for the Iraqi people?

KM: I don't speak in their name. I just tell you go to the Iraqi people and ask them. You will hear the true Iraqi position.

TS- What if it succeeds. If democracy succeeds in Iraq, will you apologise?

KM: I hope democracy would succeed. But I tell you no democracy will succeed with the US tanks. The democracy succeeds when...

TS- The voice of doom from Hamas? The voice of doom? Haven't you got anything better to offer than that? No more encouragement than that "It's not going to succeed"? You want the failure, don't you? You want it to fail because the Americans are involved in it. That's why you want it to fail.

KM: Do you want to tell me that the problem in Iraq is caused by Hamas movement? The problem in Iraq is much more complex.

TS- The Israeli's are going to withdraw from Gaza. They say they are going to withdraw. Are you going to allow this to happen peacefully? Are you going to work in cooperation with the Palestinian Authority or make trouble at Gaza?

KM: When Sharon declared that he will withdraw from Gaza, who escalated the violence? Did we or did they? Who killed Sheikh Ahmed Yassin? When did the Apache helicopters assassinate Sheikh Yassin? Wasn't it after Sharon had promised to withdraw from Gaza?

TS- Will you work with the Palestinian Authority? Will you cooperate with the Palestinian Authority?

KM: Yes we will cooperate with the Authority and with Fatah and all the factions. We agreed on a very clear title. We are partners in the decision making and partners in managing Gaza after the Israeli withdrawal

TS- And when the PA condemn suicide bombing, you will just turn away? You won't listen to them. You're not going to obey them are you?

KM: Don't interfere in our internal Palestinian matters, we can agree. The problem is not between us as Palestinians. It is not between Hamas and Fatah or Hamas and Arafat. The problem is between us and Israel. Stop the Israeli aggression; oblige Israel to withdraw from our land

TS- Your problem Mr Meshaal is that the Palestinian Authority is telling you to stop the suicide bombings but you won't do it. That's not an internal problem. That belongs to the rest of the world.

KM: I tell you when the authority asks Hamas or any other faction or Aqsa martyrs to stop it, it knows that the problem doesn't lie in this side, the problem is with Sharon. We stopped several times. We presented more than one truce

TS- You're avoiding the question.

KM: I am not avoiding it. I am answering you. I am saying the problem is not with us. We presented more than a truce. Last year in Cairo we have declared a truce that lasted for 50 days, who destroyed it? Sharon.

TS- How are they supposed to trust an organisation that still has a charter that's dedicated to the destruction of Israel? When you renounce that, when you get rid of that charter, maybe you can create some trust. Why should they do business with someone who is dedicated to destroying them on paper?

KM: If he doesn't trust us how do you ask me to trust him? He is occupying my land and killing my children and destroying houses and stealing lands. He is practicing killings and assassination everyday. Then Arafat gave them such declarations and positions and despite this they didn't stop. Didn't Arafat take those positions? And despite this Arafat doesn't have their confidence.

TS- Answer me just one question. Does Israel have the right to exist in peace? Do you acknowledge the right of Israel to exist in peace?

KM: We consider Palestine our land and this is our natural right and the occupation must end. Occupation cannot be divided.

TS- Answer the question, yes or no, does Israel have the right to exist? It's a very simple question.

KM: I am saying we have the right to our land and we have the right to be freed from occupation. Any occupation even if time goes by doesn't become legitimate.

TS- So the answer is no. Israel does not have the right to exist. That's what you're telling me.

KM: The occupation doesn't become legitimate even after a long time. You are talking about a fair and comprehensive peace. The Palestinian who was forced to leave his land in Haifa and Jafa, if he doesn't return to his land, how do you say this is fair? Why do you stick to your rights in Europe and the whole world while you ask us to drop ours?

TS- So Israel does not have the right to exist. Let's just clarify this once and for all. You're saying Israel does not have the right to exist.

TS- So you're not going to answer my question. Let's just clarify that for the sake of the viewers, you're not going to answer my question because it's too difficult.

KM: This is not difficult. I answered in the spirit of the situation. Occupation must end regardless of the duration. Therefore, it is our right to hold on to our land.

TS- How can anyone negotiate with people who will not give a straight answer to a straight question? How?

KM: Didn't you understand my answer?

TS- I don't think the rest of the world will understand.

KM: People will understand it. I am asking you one question. Before 1948 what was happening on the land of Palestine? There were a people living peacefully on its land.

TS- Mr Meshaal, you want to go backwards when the rest of the world wants to go forward. You always go back.

KM: I am telling the truth, if you want to deal with a present situation you must look to its roots.

TS- Mr Meshaal, you came from Syria to do this interview here in Beirut and a lot of people might expect that you would have something new to offer. Something apart from just the same old cycle of violence. Do you really have nothing new to offer to this process?

KM: I will summarize very clearly Hamas position. First to adopt it in Europe and oblige America to do so. It consists of putting aside civilians in the struggle. If you were pitying the circle of killings in occupied Palestine oblige Israel to accept to put aside civilians in the struggle from both sides.

TS- Put aside the civilians as a first step.

KM: I am telling you let us stop the bloodshed from both sides. Let us put aside civilians in the struggle and let it just be between resistance from the Palestinian side and the Israeli forces and settlers. You are refusing this. When you are refusing our initiative to put aside civilians, you are allowing continuing the bloodshed. Why do you want to make pressure just on us and you can't do any pressure on Israel?

TS- And the second step?

KM: After that if Israel is convinced and sees the necessity to withdraw from the occupied territories, then this is a good step and then I would think the violence and killings in the region would stop even for a period of time, then coming generations would continue their own vision. But at least let us do a first step. Let us stop the struggle between civilians, let Israel withdraw first then tell the Palestinian people we gave you a state.

TS- Khaled Meshaal. Thanks for being on the programme.

**HARDTALK END CREDITS**

**HARDtalk can be seen on BBC World at 03:30 GMT, 08:30 GMT, 11:30 GMT, 15:30 GMT, 18:30 GMT and 23:30 GMT**

**It can also be seen on BBC News 24 at 04:30 and 23:30**

Story from BBC NEWS:
http://news.bbc.co.uk/go/pr/fr/-/2/hi/programmes/hardtalk/3639093.stm

Published: 2004/04/19 11:01:45 GMT

© BBC MMVIII

---

**From:** Michael Selter [mailto:mselter@mdslaw.com]
**Sent:** Monday, December 31, 2007 10:49 AM
**To:** 'David J. Strachman'
**Subject:** RE: PA and PLO

Dave,

They haven't paid.

Mike

Michael Selter
Manelli Denison & Selter PLLC
2000 M Street, N.W., Suite 700
Washington, DC 20036
Tel. No.: 202.261.1026
Fax No.: 202.887.0336

This message may contain confidential or privileged attorney-client information. Unauthorized disclosure or use of this communication is prohibited. If you have received this communication in error, please delete it and any attachments and contact the sender immediately. Thank you.

---

**From:** David J. Strachman [mailto:djs@mtlhlaw.com]
**Sent:** Sunday, December 30, 2007 1:09 PM
**To:** 'Michael Selter'
**Subject:** PA and PLO

Mike,

Can you please confirm that the PA and PLO still haven't paid the Bucheit judgment?

Dave

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com