**UNITED
NATIONS**

**E**



**Economic and Social
Council**

Distr.
GENERAL

E/CN.4/2006/95/Add.3
10 March 2006

Original:  ENGLISH

COMMISSION ON HUMAN RIGHTS
Sixty-second session
Item 17 (b) of the provisional agenda

**PROMOTION AND PROTECTION OF HUMAN RIGHTS**

**HUMAN RIGHTS DEFENDERS**

**Report submitted by the Special Representative of the Secretary-General
on the situation of human rights defenders, Hina Jilani**

**Addendum**

**MISSION TO ISRAEL AND THE OCCUPIED PALESTINIAN TERRITORY\* \*\***

---

\*  The summary of this mission report is being circulated in all official languages. The report itself contained in the annex to the summary is being circulated in the language of submission and in Arabic.

\*\*  The reason for the late submission of this report is the need to reflect the latest information.

GE.06-11743  (E)    160306

E/CN.4/2006/95/Add.3
page 2

## Summary

The Special Representative of the Secretary-General on the situation of human rights defenders conducted a country visit to Israel at the invitation of the Government. She also visited the Occupied Palestinian Territory. She remained in the region from 5 to 11 October and met with senior officials of the Government of Israel and the Palestinian National Authority. She also met a wide range of human rights defenders and representatives of international and intergovernmental organizations. The objective of the visit was to assess the situation of human rights defenders in Israel and the Occupied Palestinian Territory.

The report of the Special Representative describes the context in which human rights defenders operate in Israel and the Occupied Palestinian Territory. She presents her assessment of the situation of defenders in the light of the issues with which they are engaged and the legal framework for the promotion and protection of human rights.

She observes that human rights defenders in Israel and the Occupied Palestinian Territory carry out their activities against a backdrop of occupation, conflict, military operations in Palestinian civilian centres, including refugee camps, and of terrorism. Security-driven laws and practices have created an environment in which activities for the defence of human rights have not escaped suspicion and repression. This has heightened the level of harm and risk that defenders confront in carrying out their activities.

The dominant concern for human rights defenders, even in Israel, is the violation of the human rights of the Palestinian population under Israeli occupation. The solidarity and cooperation between human rights defenders in Israel and in the Occupied Palestinian Territory, despite the tensions surrounding them, is inspiring.

The Special Representative notes that the Government of Israel, generally, respects the rights of Israeli human rights defenders and she has not observed any systematic policy of restraining their activities within Israel. The same human rights organizations and defenders, however, face difficulties in promoting and protecting the rights of minorities, including the Arab and Palestinian communities in Israel. The Government shows even less tolerance for their activities for the protection of the rights of the Palestinian population in the Occupied Palestinian Territory or criticism of the practices of occupation.

Regarding the situation of human rights defenders in the Occupied Palestinian Territory, the Special Representative finds that the practice and policies of the occupation result in conditions which place human rights defenders operating in the Occupied Palestinian Territory at grave risk and present serious obstructions in every aspect of their work. She is concerned that, in the wake of the "disengagement", human rights defenders in Gaza are becoming more vulnerable because of their isolation, imposed by restrictions that continue to obstruct their movement and communication with their networks in the rest of the Palestinian territory as well as the outside world. Human rights monitors and field workers, peace activists, lawyers, journalists, health professionals and those providing humanitarian assistance and care have all been affected by the situation of occupation and militarization.

E/CN.4/2006/95/Add.3
page 3

Restrictions on the freedom of movement resulting from the Wall and other barriers, checkpoints, closures, requirement of permits and bans imposed on defenders to travel; use of excessive force on peaceful action to protest; use of security and anti-terrorism laws to place defenders under administrative detention; unsubstantiated allegations to undermine their credibility and other forms of harassment, intimidation and humiliation of defenders has rendered their situation absolutely incompatible with international norms and standards of human rights or the principles set forth in the Declaration. International human rights organizations and intergovernmental and United Nations agencies working in the Occupied Palestinian Territory are also threatened and their work is obstructed.

The Special Representative observes that the difficulties of human rights defenders are compounded because of the failure of the Palestinian Authority to respect human rights and the rule of law in the areas under its control. Conditions of lawlessness and impunity for human rights violations have affected the security of human rights defenders, especially those who expose violations committed by security personnel. She has identified torture, repression of the freedom of expression and assembly, and a failure to address the threats against women human rights defenders as some of her more serious concerns.

The Special Representative believes that the exceptional conditions resulting from conflict and occupation demand a more active human rights community to address the serious violations faced by the civilian population in the Occupied Palestinian Territory. Instead, the human rights community is being weakened by the risks that they are placed under and by the impunity for violation of their right to life, liberty and physical security. Any prospects for peace and security in the region are being diminished by the constraints placed on freedoms in general and particularly the freedom to defend human rights.

She has recommended to the Government of Israel that it must end the occupation of the Palestinian Territory and until then it must accept and fulfil its obligations under international human rights and humanitarian law and comply with the resolutions of the United Nations. In the context of defenders, Israel's defiance of international norms has caused serious harm, including killings, to human rights defenders and affects, inter alia, their freedom of expression, their access to places of violations, their ability to seek justice for victims and to provide humanitarian assistance.

Affirming that resistance to the occupation is a legitimate right of the Palestinian people, she further recommends that the Government of Israel must ensure that all peaceful activities for the defence of human rights violated or threatened by the occupation are allowed to be conducted free of fear and risk. She has also urged the Government to abandon the use of administrative detention against human rights defenders.

To the Palestinian Authority the Special Representative has recommended that it must ensure respect for human rights and the rule of law, and that fundamental freedoms of the Palestinian population are fully restored and protected in the areas of their authority and control. She recommends immediate measures to end impunity for human rights violations and investigation of all complaints against officials and private entities threatening human rights defenders, including those defending women's rights.

E/CN.4/2006/95/Add.3
page 4

The Special Representative reminds both the Government of Israel and the Palestinian Authority that the "duty to protect" does not override the principle enunciated in the Declaration that the "absence of peace and security does not excuse non-compliance with international human rights norms and international humanitarian law".

She calls upon the United Nations to take note of the situation of human rights defenders in the Occupied Palestinian Territory and to adopt measures for their protection. She has suggested that international monitoring and reporting mechanisms of the United Nations and those documenting violations with the objective of compensating the victims be given a wider mandate to protect human rights defenders. In consultation with the human rights community and experts, the United Nations must devise concrete action to enforce compliance with international law in the Occupied Palestinian Territory as expounded in the Advisory Opinion of the International Court of Justice, and in accordance with the Charter of the United Nations.

**Annex**

**REPORT OF THE SPECIAL REPRESENTATIVE OF THE
SECRETARY-GENERAL ON THE SITUATION OF
HUMAN RIGHTS DEFENDERS ON HER VISIT TO ISRAEL
AND THE OCCUPIED PALESTINIAN TERRITORY**

**(5-11 October 2005)**

# CONTENTS

|  |  |  | Paragraphs | Page |
|---|---|---|---|---|
| Introduction | | ................................................................ | 1 - 5 | 7 |
| I. | BACKGROUND NOTE ................................................ | | 6 - 17 | 7 |
| | A. | Background note: A state of fear .......................... | 6 - 10 | 7 |
| | B. | The human rights defenders community .............. | 11 - 17 | 9 |
| II. | LEGAL FRAMEWORK AND THE EXERCISE OF 10 FUNDAMENTAL FREEDOMS ................................. | | 18 - 33 | 10 |
| | A. | International obligations ...................................... | 18 | 10 |
| | B. | Domestic legislation and other factors which have a direct impact on the work of human rights defenders .......... | 19 - 26 | 10 |
| | C. | The Israeli High Court of Justice ........................ | 27 - 30 | 12 |
| | D. | Measures taken at national level for the implementation of the Declaration .................................. | 31 - 33 | 13 |
| III. | MAIN FINDINGS AND CONCERNS ........................................ | | 34 - 67 | 13 |
| | A. | Violations of the fundamental rights of human rights defenders committed by the Israeli authority ....................... | 34 - 58 | 13 |
| | | 1. Unlawful killings, harassment or threats to physical integrity .......................................................... | 34 - 35 | 13 |
| | | 2. Administrative detention of human rights defenders and their ill-treatment ...................................... | 36 - 40 | 14 |
| | | 3. Restrictions on freedom of movement ........................... | 41 - 47 | 15 |
| | | 4. Denial of humanitarian access ........................ | 48 - 50 | 17 |

E/CN.4/2006/95/Add.3
page 6

# CONTENTS (*continued*)

|  |  |  | *Paragraphs* | *Page* |
|---|---|---|---|---|
|  | 5. | Freedom of assembly and the right to protest ............... | 51 - 54 | 17 |
|  | 6. | Settler violence ................................................. | 55 - 58 | 18 |
| B. | | The situation of human rights defenders under the jurisdiction of the Palestinian Authority ............................ | 59 - 67 | 19 |
|  | 1. | Legal framework ............................................. | 60 - 61 | 20 |
|  | 2. | Measures taken at national level for the implementation of the Declaration ............................................ | 62 | 20 |
|  | 3. | Environment for the functioning of human rights defenders and areas of concern ..................................... | 63 - 67 | 20 |
| IV. | | CONCLUSIONS AND RECOMMENDATIONS ..................... | 68 - 92 | 21 |
|  | A. | Main conclusions ................................................ | 68 - 73 | 21 |
|  | B. | Recommendations ............................................... | 74 - 92 | 22 |
|  | 1. | To the Government of Israel ......................................... | 74 - 85 | 22 |
|  | 2. | To the Palestinian Authority ......................................... | 86 - 89 | 24 |
|  | 3. | To the United Nations .................................... | 90 - 92 | 25 |

**Introduction**

1.      Pursuant to Commission on Human Rights resolutions 2000/61 and 2003/64, the Special Representative of the Secretary-General on the situation of human rights defenders conducted an official visit to Israel and the Occupied Palestinian Territory from 5 to 11 October 2005.  The Special Representative thanks the Government of Israel for extending this invitation.

2.      The purpose of the visit was to examine and assess the situation of human rights defenders, the conditions under which they pursue their activities and the respect for the rights enshrined in the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms (the Declaration) in Israel and the Occupied Palestinian Territory.

3.      The Special Representative visited Ramallah, Bethlehem, Nablus, Hebron and Bil'in village in the West Bank, Nazareth and Tel Aviv in Israel.  From her base in Jerusalem, she met with the Minister of Public Security, the Minister of Construction and Housing, the Deputy State Attorney and members of Parliament.  She regrets that she was unable to meet with many other authorities relevant to her mandate.  She also regrets not being able to meet with Justice Barak of the Israeli Supreme Court because the invitation to her was received at too short notice. The Special Representative thanks the Palestinian Authority for its cooperation and for the opportunity to discuss issues of concern with the Minister for Foreign Affairs, the Minister of Justice and the Minister for Women's Affairs.

4.      The Special Representative also met non-governmental organizations (NGOs), lawyers, journalists, and health workers engaged with a broad range of human rights issues.  She deeply regrets not being able to meet human rights defenders in Gaza in person; she had to rely on a videoconference with some of these defenders in order to inform herself of their situation.

5.      The Special Representative met with the United Nations Country Team and the Inter-Agency Human Rights Working Group working in the Occupied Palestinian Territory, including the Office for the Coordination of Humanitarian Affairs (OCHA), the United Nations Development Programme (UNDP), the Office of the United Nations Special Coordinator (UNSCO); the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA); the World Health Organization (WHO); and the civilian observer mission, the Temporary International Presence in Hebron (TIPH).  The Special Representative wishes to thank everyone for their generous assistance, and to express her gratitude for the strong support and cooperation extended to her by the staff of the Office of the High Commissioner for Human Rights based in Ramallah and Gaza.

**I.  BACKGROUND NOTE**

**A.  Background note:  A state of fear**

6.      The respect for human rights and the rule of law in Israel and the Occupied Palestinian Territory cannot be evaluated without reference to the occupation and its consequences for the rights and freedoms of both the Israeli and the Palestinian populations.  The impact that 38 years of occupation, two Palestinian uprisings, the intifada, and a "war against terrorism", has had on society, the economy and the institutions of State cannot be overestimated.  Security-related

E/CN.4/2006/95/Add.3
page 8

injunctions and State policies touch all aspects of the lives of Israeli citizens, and the practices of occupation have deprived the Palestinian population even of the basic right to human dignity. The Special Representative fully endorses the view of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967 that "(t)he regime of occupation by definition results in a violation of human rights".[1]  The stark reality of these violations has overshadowed the value of Israel's democracy and the merits of its institutions.

7.    The Palestinian Authority is an interim administrative organization established in 1994 pursuant to the Oslo Accords.[2]  It gained limited jurisdiction for governance in the Occupied Palestinian Territory.  However, the limited scope of authority, weaknesses in the exercise of this authority, lack of resources and the continuous challenges that it faces from the actions of the occupation as well as of the armed Palestinian militants have constrained its capacity to affect the conditions prevailing in its sphere of jurisdiction.  Flaws and failures of the Palestinian Authority, nevertheless, add to the repressions suffered by the Palestinian population and increase their vulnerability to abuse.  Conditions of lawlessness and violence prevail in some areas of the Gaza Strip and the northern West Bank, placing the right to life and security of the civilian population particularly at risk.

8.    The Palestinian Authority, as the representative of the Palestinian people, has the responsibility to promote the rights of its people and to strive for their protection against abuse. However, the nature and extent of its authority deprives it of the capacity to guarantee the enjoyment of rights.  The responsibility of the Government of Israel to protect, promote and implement all human rights and fundamental freedoms, on the other hand, is unambiguous.  This responsibility includes the adoption of such steps as may be necessary to create all conditions necessary in the social, economic, political and other fields, as well as the legal guarantees required to ensure that all persons under their jurisdiction or control, individually and in association with others, are able to enjoy all those rights and freedoms in practice (article 2 of the Declaration).  Palestine has permanent observer status in the United Nations.  However, not being a State, it is not in a position to ratify international treaties, nor does it have a de jure obligation to the Declaration.  Be that as it may, the Special Representative reminds both the Government of Israel as well as the Palestinian Authority that the "duty to protect" does not override the principle enunciated in the Declaration that the "absence of peace and security does not excuse non-compliance with international human rights norms and international humanitarian law".

9.    The Special Representative draws attention to the resolutions of the General Assembly, the Security Council and the Commission on Human Rights, reports of the Special Rapporteurs of the Commission, and in particular to the reports of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967 that depict the conditions under which human rights defenders conduct their daily work.  In Israel and the Occupied Palestinian Territory human rights defenders carry out their activities against a backdrop of occupation, conflict, military operations in Palestinian civilian centres, including refugee camps, and an institutionalized fear of terrorism.  They work in an environment of fear and suspicion that has heightened the level of harm and risk they confront in defending human rights.  Limitations on the freedom of movement between Israel and the Occupied Palestinian Territory and within the West Bank severely hamper the work of human rights defenders.

10.    One very positive trend that the Special Representative has noted is the solidarity and cooperation between human rights defenders in Israel and those in the Occupied Palestinian Territory and the relationship of trust which remains unaffected by adverse conditions, political polarization and apparently irreconcilable differences in perceptions of the conflict amongst the Israeli and the Palestinian populations in general.

## B.  The human rights defenders community

11.    Civil society in the region is characterized by activism and diversity.  While human rights defenders in Israel and the Occupied Palestinian Territory share many of the concerns around which they conduct their activities, the Special Representative determined that their situation differed with respect to the response of the Government of Israel to their activities, availability of and access to institutions and forums of redress, legal mechanisms and other tools available for the defence of human rights, the obstacles they confront and the degree of risk that they face in conducting their activities.  In order that the situation of defenders in the two areas is better understood, it would be best to separately summarize their concerns and scope of activities.

12.    Human rights organizations and defenders in Israel work on a variety of issues encompassing civil and political rights as well as social, economic and cultural rights.  There are organizations that monitor and report on prisoners' rights, torture, administrative detention and the right to due process.  There is an active peace movement and organizations that carry out programmes on Arab-Jewish partnership and coexistence.  Several groups advocate for the rights of minorities in Israel and for the elimination of racism and discrimination.  Strong networks on women's rights are actively engaged with issues such as violence against women and the legal status of women under personal laws of the different religious communities.  Several child rights organizations work on the rights protected by the Convention on the Rights of the Child.

13.    There are many groups and individual defenders who engage with the right to housing and carry out protest action against house demolitions.  In addition, defenders are actively engaged in the defence of labour rights, rights of migrant workers, the right to education, health and of persons with disabilities, the rights of lesbians, gays and bisexual and transgender persons, land rights and environmental protection.  There are religious groups and organizations that advocate the need for religious pluralism.  The Special Representative also met with numerous individual Israeli human rights defenders who do not belong as such to any particular organization, such as lawyers, journalists, pacifists and conscientious objectors who refuse to serve the Israeli occupation.

14.    A vast number of organizations and individuals defend the rights of Palestinians affected by the practices of occupation in the Occupied Palestinian Territory:  lawyers providing legal assistance to Palestinian prisoners, including human rights defenders in Israeli prisons; activists supporting and defending the right to peaceful protest and the freedom of assembly; volunteers monitoring army checkpoints to report on the violations that Palestinians suffer at the hands of the Israeli Defense Forces, and those who monitor abuse of Palestinians by Israeli settlers and provide accompaniment services to prevent such abuse, especially against schoolchildren; and organizations working on the rights of refugees and providing humanitarian assistance to them.

E/CN.4/2006/95/Add.3
page 10

15.     Palestinian human rights defenders, particularly those working in the Occupied Palestinian Territory, are swamped by human rights concerns arising from the regime of occupation and the daily occurrence of serious human rights violations.  Defenders have to address situations including military operations that result in civilian casualties; extrajudicial and custodial killings; torture and cruel, inhuman and degrading treatment of prisoners and detainees; administrative detentions in large numbers; severe restrictions on the freedom of movement and other serious violations that result from these restrictions; unfair and discriminatory treatment in the judicial process; lack of citizenship and civil status; confiscation of land and property, and loss of livelihood as a result of Israeli policy of annexation of Palestinian territory; building of the Wall and other barriers; evictions and house demolitions; and the disproportionate and excessive use of force against all forms of protest against the occupation.

16.     Despite the daily hindrances and risk of personal harm, the human rights community is active and conducts monitoring, advocacy and reporting activities covering actions of the Israeli civil and military authorities as well as officials of the Palestinian Authority.  Both Israeli and Palestinian defenders engage in public action to protest or resist violation of rights, raise awareness of human rights, and provide legal, psychological, medical or other support to victims of violations.

17.     There are many international NGOs working in the area that investigate and report on incidents involving human rights violations, make periodic reports on the general human rights situation and join Palestinian and Israeli organizations in peaceful action against violations committed by Israeli authorities.

## II.   LEGAL FRAMEWORK AND THE EXERCISE OF FUNDAMENTAL FREEDOMS

### A.  International obligations

18.     Israel has acceded to a number of international human rights instruments, including to the International Covenant on Civil and Political Rights.  The Special Representative notes that Israel is not yet party to the two Optional Protocols to the International Covenant on Civil and Political Rights, the Optional Protocol to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women, and the International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families.  In addition, the Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution and child pornography has been signed but not yet ratified by the Government of Israel.

### B.  Domestic legislation and other factors which have a direct impact on the work of human rights defenders

19.     While Israel is taking steps towards a constitution, it currently has a set of basic laws adopted by the Knesset (Israeli Parliament) that guarantee some of the fundamental rights.[3] Although freedom of expression is not expressly guaranteed in the Basic Law, together with the

freedom of association it is recognized as a fundamental civil right, subject to limitations imposed by law for the maintenance of social order, public security or the integrity of the State.[4] Case law of the Israeli Supreme Court has further developed the application and enforcement of these freedoms.[5]

20.     Following changes in the registration process, Israeli organizations are required to register with the Registrar of Non-Profit Organizations at the Ministry of Interior.  Organizations must identify their donors, submit a list of their staff, and present a detailed annual report on their activities and their financial assets and management.  The Special Representative was informed that the process of registration has become longer and more complex, and there are more instances of administrative delays, forcing NGOs to spend more resources and time in responding to the Registrar's demands for details.  So far there have been no known instances of human rights NGOs being barred or closed by the Registrar.  However, the Special Representative was informed of some instances in which registration was refused on the ground that names of these organizations contained the words "Palestine" or "Palestinian".  It was also reported that the Registrar refused to register a group of conscientious objectors under their preferred name "The Courage to Refuse".  Non-governmental organizations for the rights of Palestinians in Israel find it almost impossible to register.

21.     Some of the Arab NGOs, in particular, feared that with the function of Registrar now under the Ministry of Interior, the Government was attempting to exercise undue monitoring and control over the functioning and activities of NGOs.  Some NGOs complained to the Special Representative that the Israeli Ministry of Interior uses intelligence sources and secret files to block any new registrations.  This led to most NGOs registering as non-profit companies, which forces them to relinquish many benefits in the NGO law.

22.     In relation to reports of Arab NGOs in Israel facing more challenges than other NGOs, it can be recalled that the Economic and Social Council, in its concluding observations on the second periodic report of Israel to the Council in May 2003, reiterated its concern that "the excessive emphasis upon the State as a 'Jewish State' encourages discrimination and accords a second-class status to its non-Jewish citizens".[6]  In this regard the Economic and Social Council mentioned in particular the restricted access to and participation in trade unions for Israeli Arabs/Palestinians.

23.     The Special Representative recalls a statement made on 21 May 2003 by the Israeli Minister for Foreign Affairs to the Knesset's Foreign Affairs and Defense Committee, accusing "most human rights offices in the West Bank and Gaza Strip of providing shelter to terrorists".  In her communication to the Government of Israel regarding this matter, she pointed out that such general statements against human rights organizations were contrary to the spirit of the Declaration on Human Rights Defenders.  She also registered her concern that such public accusations, without presenting any evidence to that effect, can be prejudicial to the safety of all defenders in the context of the conflict and tensions in the region.  She received no response to this communication from the Government.

24.     The freedom of expression is generally respected and most human rights defenders in Israel are able to express their views in publications, through press conferences, in the media and through other forms of advocacy.  However, the consistent policy of restricting travel of Palestinian defenders has restrained their freedom to communicate human rights-related

E/CN.4/2006/95/Add.3
page 12

information.  There have also been numerous reports of confiscation of printed and electronic
material from defenders at Israeli military checkpoints and the airport, or in army raids against
Occupied Palestinian Territory-based NGOs.

25.     The media, film and artistic expression is subject to scrutiny by the Israeli military censor
on security-related issues, as are Palestinian newspapers in East Jerusalem.  The foreign media is
not subject to censorship.  The Special Representative received reports of harassment of local
and foreign journalists who cover or report human rights violations committed by the Israeli
military.  Many Palestinian journalists have been refused renewal of press cards since 2002,
which has effectively barred them from covering many human rights-related events.  Several
journalists have reportedly been physically attacked, threatened and forcibly deprived of their
cameras.  Following her visit the Special Representative has been receiving reports of journalists
being increasingly targeted at the weekly demonstrations against the illegal construction of the
Wall at Bil'in.

26.     The Special Representative notes with concern that the Knesset on 25 July 2005
approved an amendment to the Civil Wrongs (Liability of the State) Law, which prevents
Palestinians from seeking remedy retroactively for human rights violations committed by Israeli
authorities in the Occupied Palestinian Territory since the outbreak of the intifada in 2000.  This
amendment is contrary to article 9 of the Declaration.  As Palestinian courts have no jurisdiction
in cases of human rights violations carried out by Israeli authorities in their area of jurisdiction,
no effective remedy or the possibility to seek remedy is available.

## C.  The Israeli High Court of Justice

27.     The jurisdiction of the Israeli High Court extends to the Occupied Palestinian Territory
(art. 15 of the Basic Law).  In almost every meeting with Government officials, the Special
Representative was reminded that the Supreme Court of Israel deliberates on human rights cases
filed by human rights activists.  Since the April 2002 military invasion of the West Bank (also
known as "Operation Defensive Shield"), human rights NGOs have initiated a series of petitions
to the High Court challenging Israeli policy and practices in the OPT which constitute grave
violations of international humanitarian or human rights law.

28.     The extent to which human rights defenders have full access to justice and recourse to a
legal remedy within Israel's legal framework is of particular interest to the Special
Representative.  She recalls the concluding observations and comments of the Committee on
Economic, Social and Cultural Rights[7] after its consideration of the second periodic report
submitted by Israel, wherein the Committee has welcomed the relaxing of the Supreme Court
rules of standing so as to allow any person formal access to the court and to widen opportunities
to test the justiciability of ICESCR rights before the courts.  "Locus standi" to raise legal issues
on human rights or seek their enforcement against violations is a valuable asset for defenders and
increases their ability to defend human rights.  However, this is not sufficient.

29.     Defenders lose the advantage of locus standi if application of human rights norms is
restrained by any considerations, including a preoccupation with security.  While the court has
given important relief in some cases, in the majority of petitions the court has accepted the
claims of the occupying power in relation to violation of human rights in the Occupied
Palestinian Territory.  When the High Court has considered such cases, it has held in most

instances that there was a justified military necessity or a national security need for the action or policy in question. This is reflected in High Court decisions on a wide range of Israeli violations in the Occupied Palestinian Territory, such as land confiscation and settlements,[8] home demolitions,[9] deportation orders[10] and uprooting of trees.[11] Defenders have reservations on the question of impartiality and fairness of the court. They believe that in several cases the Israeli High Court has established legal "justifications" for illegitimate practices, thus obviating any changes in Israeli policy which might have stopped the violation by the occupying power of Palestinian individual and collective rights.

30.     The Special Representative also notes that, according to the Israeli High Court case law, when a specific Israeli law contradicts a rule of customary international law, the Israeli law prevails. In the context of violations not recognized under Israeli law, such as many that result from practices of the occupation, defenders can expect no remedy through the court. Some defenders are concerned that seeking to defend the rights of Palestinians in the Israeli High Court might be perceived as giving legitimacy to the occupation.

### D.  Measures taken at national level for the implementation of the Declaration

31.     During her visit, the Special Representative was informed by representatives of the Government of Israel that an NGO committee had been formed in the Knesset, but that no concrete initiatives have yet been taken by the committee. The Special Representative has expressed hope that this initiative, once developed further, can become a mechanism that can be used by human rights defenders to promote and protect human rights in Israel.

32.     The Special Representative received assurances from the Government that there were further plans to design initiatives aimed at giving a greater role to civil society and the human rights community in Israel and for improving their interaction with the Government.

33.     During her visit, the Special Representative was also informed that the Government of Israel had recently constituted an inter-ministerial committee to deal with the issue of impunity for settler violence against Palestinians in general and thereby also human rights defenders. The Special Representative has not yet been informed about concrete action taken by this committee to deter these acts of violence through enforcement of appropriate policy or punitive measures.

### III.  MAIN FINDINGS AND CONCERNS

#### A.  Violation of the fundamental rights of human rights defenders committed by the Israeli authority

##### 1.  Unlawful killings, harassment or threats to physical integrity

34.     The Special Representative expresses deep concern about the many allegations of systematic targeting of peace and human rights activists by the Israeli Defence Forces, particularly volunteers monitoring or resisting gross violations committed against the civilian population in the Occupied Palestinian Territory. She issued a joint press release and communicated her concern to the Government of Israel regarding the killing of civilians holding a peaceful demonstration on 19 May 2004, protesting against house demolitions in Rafah. She received no response to her communication from the Government.

E/CN.4/2006/95/Add.3
page 14

35.     In recent years there have been notable instances where international human rights defenders have been targeted and killed in the course of human rights activity.  The Special Representative sent three communications to the Government of Israel regarding such cases. **Rachel Corrie**, an International Solidarity Movement (ISM) volunteer, was run over by an Israeli army bulldozer in Rafah refugee camp while attempting to stop the levelling of the camp on 16 March 2003.  **Tom Hurndall**, another ISM volunteer, was shot dead, allegedly by a bullet fired at him from an Israeli army watchtower while he was shielding Palestinian children and walking away from a soldier in Rafah on 11 April 2003.  **Dr. Khalil Suleiman**, head of the Palestinian Red Cross Society in Jenin, was killed in an attack on his ambulance by the Israeli security forces on 4 March 2002.  Three other paramedics were severely injured in the same incident.  The Special Representative received no response to these communications.  She takes note of several other cases reported by different organizations alleging the killing by the Israeli army of ISM activists, journalists, medical workers and aid workers (one of them working with the United Nations Relief and Works Agency for Palestine Refugees in the Near East.

### 2.  Administrative detention of human rights defenders and their ill-treatment

36.     The Special Representative has received information on the administrative detention of a number of defenders.  This information suggests that administrative detention is being used as a means to deter defenders from carrying out their human rights activities.  Human rights field workers associated with human rights organizations have been particularly targeted.  Many of these are monitors who investigate and report on violations such as torture, treatment of prisoners and custodial and extrajudicial killings or targeted assassinations.

37.     Examination of these cases shows that arrest and detention of these defenders is based on secret evidence, and the detainees or their counsel have no access to information against them. The detention orders do not specify any maximum cumulative period of administrative detention and the initial period can be repeatedly extended by the detaining authority without showing any cause.  In many cases this has been done almost at the last minute before the end of the previous period, causing severe anxiety and anguish to the detainee, amounting to psychological torture. In some of the cases brought to the attention of the Special Representative the Israeli High Court had upheld the detention orders, noting that the decisions were based on secret evidence, thus undermining reliance on judicial review as a safeguard against arbitrariness in cases of administrative detention.

38.     The Special Representative heard repeated allegations that human rights defenders in prison did not have access to legal assistance, were often ill-treated and sometimes even tortured during their interrogation and detention, and that they were usually held in isolation in remote detention centres, making regular contact with their family difficult.  The Special Representative visited one human rights defender under administrative detention in Ansar III/Kedziot, a prison situated at a remote location in the Negev.

39.     A few examples from a long list of defenders who are, or have remained, under administrative detention are:

        (a)     **Ahmad Maslamani**, a doctor working as General Director of the Health Work Committees, and a member of the Coordination committee of the Palestinian National Organizations Network.  He is a well-respected activist in civil society and is detained together

with two other activists of civil society in Jerusalem.  He has been charged with membership and participation in activities of a terrorist organization.  The Special Representative has noted an observation of the judge in the decision of the Supreme Court[12] that "(I)t looks like they execute civic acts but not military or dangerous.  But all those acts are connected to an organization that has terrorist military acts … ";[13]

(b)      The Special Representative met with **Ziyad Muhammad Shehadeh Hmeidan** at Ansar III/Kedziot prison, upon her request.  **Mr. Hmeidan** is a 32-year-old field worker of the Palestinian NGO Al-Haq who has been held under administrative detention since 23 May 2005, and was due to be released on 22 November 2005.  A week before his expected release, Mr. Hmeidan was informed that an application for his detention to be extended for a further six months would be made.  To date he has never been informed of the reasons for his arrest.  However, in one response to the Special Representative's communication in this regard, the Government advised that he is a "threat to State security";

(c)      The Special Representative also sent communications regarding the detention of **Daoud Dirawi**, a child rights lawyer working with Defence for Children International (DCI), in November 2004, and of **Abd al-Latif Gheith**, board chairman of Addameer Prisoner's Support and Human Rights Association, in July 2004.

40.      According to the information she has received, contact with "suspected" persons, such as interviews recorded in the context of the aforementioned violations, or even possession of a list of names, have been used as reasons for such detention.  There are too many such cases for the Special Representative to accept the Government's position that these individuals have not been targeted because of their human rights work but because they are threats to State security.  Undefined and vague allegations with no evidence made available to support them, cannot be the basis for the Special Representative to draw any conclusions against persons who are acknowledged as legitimate human rights defenders by the organizations with whom they are associated.  These are well-known organizations with respect and good standing in the human rights community and a consistent record of human rights work.  Many of those detained have been associated with these organizations for long periods of time and have been involved in human rights activity.

### 3.  Restrictions on freedom of movement

41.      Human rights defenders' daily work is most notably hindered by the repeated obstacles to their freedom of movement by the Israeli authorities.  Freedom of movement throughout the Occupied Palestinian Territory is severely undermined by the construction of the Wall[14] and about 600 military checkpoints as at April 2005,[15] together with greater recourse to temporary military road checkpoints established at random, so-called "flying checkpoints".  Although curfews are less frequently imposed than in previous years, this method of restricting freedom of movement is still resorted to.  The construction of the Wall by Israel has also been accompanied by the creation of a new administrative regime for the Occupied Palestinian Territory, establishing "closed zones", which hinder and effectively block entrance and passage.  This regime restricts the freedom of movement of Palestinian residents and non-residents of the area of the West Bank lying between the "Green Line" and the Wall.

E/CN.4/2006/95/Add.3
page 16

42.     The Special Representative consistently heard from defenders, including field workers, lawyers, medical workers, professors and teachers, both Israelis and Palestinians, in addition to international human rights defenders, about how checkpoints and the other physical obstacles described above endanger and delay their work.  Governmental policies, such as closures, make human rights defenders residing in the West Bank, along with all residents, dependent on travel permits.  These restrictions not only place additional constraints on the time and resources of defenders but also become impediments to their access to information, to victims and to sites of violation, restraining their freedom to monitor and document human rights situations. Restrictions on freedom of movement also affect the work of Palestinian Authority institutions set up for the protection of human rights in its administered areas, such as the Palestinian Independent Commission for Citizen's Rights.

43.     The Israeli military's internal closure policy implemented within the Occupied Palestinian Territory results in little or no access to each other for defenders located in different areas and effectively limits the cooperation with Israeli human rights defenders.  This has affected the ease with which they can exchange information or coordinate human rights activities.  These limits on movement also affect the work of international agencies such as UNRWA, whose field workers face similar difficulties in carrying out their responsibilities. The Special Representative has particularly noted the difficulties faced by international human rights observers, monitors and activists to the Occupied Palestinian Territory, and especially Gaza.  The International Solidarity Movement (ISM) has been specifically targeted, with over 93 volunteers deported in the last four years.

44.     Israeli NGOs do not usually face obstacles when wanting to travel abroad for conferences and meetings, but they do face problems when wanting to travel into the Occupied Palestinian Territory.  Palestinian defenders face severe restrictions on freedom of movement both within the West Bank/Gaza Strip/East Jerusalem, and especially from the Occupied Palestinian Territory into Israel.  This causes major difficulties in terms of coordination and interaction between Israeli and Palestinian NGOs working together to promote and protect human rights in both Israel and in the Occupied Palestinian Territory.

45.     Every testimony provided by both Israeli and Palestinian defenders to the Special Representative described military checkpoints as sites of daily human rights abuses committed by the Israeli security forces and, in rare instances, eruption of unlawful violence by Palestinians. The Special Representative consistently heard that disclosing a defender's profession ("human rights") to a checkpoint officer is usually met with increased hostility and deeper suspicion.  Very often these are prime sites for the arrest/detention of human rights defenders, particularly field caseworkers.  Considering these daily scenes of unimaginable tension and ritual humiliation it is remarkable that ordinary Palestinians exercise such considerable restraint.

46.     Owing to United Nations security precautions, the Special Representative was not able to visit human rights defenders based in Gaza during this visit.  A meeting with defenders had to be conducted via teleconference from Gaza as none were able to exit Gaza to meet with her elsewhere.  She has noted the special difficulties faced by defenders in Gaza in terms of access to the area and exit therefrom.  She is also aware of apprehensions that Gaza is likely to become more isolated in the aftermath of the "disengagement", increasing the difficulties of defenders as well as their vulnerability.

47.     The Special Representative has communicated her concern to the Government with respect to several human rights defenders who were refused permission to travel abroad, prevented from crossing the border out of Israel or arrested and detained at the border.  All these defenders were thus prevented from attending human rights activities, including United Nations-organized conferences and the World Social Forum, and in one case prevented from deposing before the Special Committee to Investigate Israeli Practices.  Some of these defenders were subsequently allowed to travel.  In almost all cases the Government has made allegations of these defenders being "security threats".  Many defenders continue to be refused permission to travel abroad.  The list is too long for the Special Representative to mention all by name, and there are many more whose cases were not even forwarded to the Special Representative.

### 4.  Denial of humanitarian access

48.     It is increasingly difficult for members of humanitarian and development agencies operating in the Occupied Palestinian Territory to carry out their work effectively because of an intensification of Israeli military restrictions on humanitarian access to the civilian populations affected by conflict.  The Special Representative was disturbed to hear that, on a daily basis, aid workers are being prevented from carrying out their duties by unacceptable delays at checkpoints, inconsistent and sometimes total refusal to access project sites and beneficiaries, and harassment of, and severe restrictions on, the movements of local staff.  Instances where aid workers were targeted, and in some cases killed, were brought to the Special Representative's attention.

49.     The Special Representative remains deeply concerned at the continuing obstruction of humanitarian services.  Several incidents have been reported to her of undue delay and denial of access to ambulances, and the killing, wounding, arrest and detention, abuse and humiliation of ambulance drivers, paramedics and medical professionals.  These violations had attained serious dimensions in 2002 during Israel's Operation Defensive Shield.  However the incidents continue to occur in clear violation of international humanitarian law.[16]  Dozens of unsafe deliveries in which both mothers and infants have died at checkpoints have been documented by the United Nations.

50.     Since the beginning of this intifada, there has been one case in which the Government has brought accusations that a Palestinian Red Crescent Society (PRCS) ambulance was being used for purposes other than humanitarian assistance.  No evidence was ever brought forward to substantiate this allegation and repeated requests made by the PRCS, through the International Committee of the Red Cross (ICRC), for an independent investigation have been ignored.  Yet, this case has been continually referred to by the authorities, to uphold the claim that it is entirely reasonable to delay and deny the passage of ambulances in order to counteract terrorist actions.

### 5.  Freedom of assembly and the right to protest

51.     Use of disproportionate and excessive force by the Israeli security forces to repress peaceful protests against practices of the occupation continues to illustrate lack of respect for the freedom of assembly.  Violent means such as tear gas, rubber-coated metal bullets and stun-grenades are frequently used to disperse peaceful gatherings.  The Special Representative has received several reports of arbitrary arrests and detentions of defenders, who have been

E/CN.4/2006/95/Add.3
page 18

accused of committing violence, obstructing the Defence Forces, causing riots or violating decrees on closed military zones.  Often bail is granted on condition that the defenders do not return or enter the area.  Authorities can deny them entry on the ground that they are "blacklisted".

52.     Israeli defenders are in general able to carry out peaceful demonstrations within Israel without hindrance.  However, Israeli defenders are prohibited from travelling to Palestinian-controlled areas and are often physically hindered from travelling to the areas still under Israeli control to participate in peaceful assemblies.

53.     During her visit the Special Representative observed one event in the village of Bil'in where Palestinian, Israeli and international human rights defenders have been regularly exercising their right to peaceful protest against the violation of Palestinian rights resulting from construction of the Wall.  Despite the restraining effect that her presence at the site may have had on the large contingent of security forces deployed there, the Special Representative noted the arrest of defenders, some of whom were dragged towards the waiting police vehicles.  She sensed the intimidating environment created by the large number of soldiers with weapons, as compared with the number of protesters.  These peaceful demonstrations have been taking place each Friday since February 2005.  The Special Representative has received regular accounts of harassment against human rights defenders, who have been arrested and injured during peaceful demonstrations at the same site and elsewhere.

54.     The Special Representative also notes the arrest of journalists covering such protests. Video footage shot by journalists has been instrumental in providing evidence to the courts that such demonstrations have been peaceful.  The Special Representative underlines that the right to resist occupation is legitimate.[17]  She also refers to article 12 of the Declaration that protects the right to peaceful activities against violation of human rights.

### 6. Settler violence

55.     Settler violence constitutes a daily threat to Palestinian, Israeli and international human rights defenders, including the civilian observer mission, Temporary International Presence in Hebron (TIPH), established in 1994 with the mandate to monitor and report on the situation in Hebron and to provide a feeling of security to the Palestinian community of about 140,000 who live with a regular reign of terror caused by 600 neighbouring settlers.

56.     According to the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, settler violence is on the increase, with 68 incidents reported in May 2005 and 67 in June.[18]  Settler violence occurs across the West Bank, and previously Gaza, with Israeli authorities rarely intervening or investigating complaints.  In this hostile environment, the role of the human rights defender is to watch over, accompany and shield Palestinians from violence such as being beaten or stoned by groups of settlers.  They walk Palestinian children to and from school, assist pregnant women or the elderly gain safe passage to medical facilities.  Such basic tasks require considerable courage and determination considering the level of impunity that settlers enjoy for violations of the Palestinians' right to security of person and property.

57.     The Special Representative has received numerous reports illustrating the risks that human rights defenders face while trying to protect Palestinians from settler violence. On 29 September 2004 two members of Christian Peacemaker Teams (CPT) were severely beaten with chains by settlers while accompanying Palestinian children on their way to school. On 16 February 2005, a group of international peace activists were attacked by settlers while accompanying Palestinian shepherds as they grazed their flocks on their land near the Havat Maon settlement in the West Bank.  Two masked men demanded that they hand over their video camera, which one of them had been using to film an incident minutes earlier, in which settlers pointed a gun at the head of a woman activist from CPT.  After they refused, one of the settlers set on the two activists, breaking one activist's jaw with a kick.  In October 2005, two CPT activists were badly beaten by settlers from the outpost as they were accompanying a group of children to school.  The Special Representative also heard unimpeachable evidence from the Israeli volunteer group Machsom Watch of the daily intimidation they face by settlers at checkpoints and in areas such as Hebron which has been corroborated by members of Breaking the Silence, a group of Israeli ex-soldiers.

58.     In her meeting with the Deputy State Attorney-General, the Special Representative was told that claims of settler impunity were unfounded and informed her of two recent indictments of settlers.  The Special Representative, while welcoming the Government's action in these two cases, remains concerned by the inaction of the Government in the large number of cases that have been brought to its attention by various sources.  The Special Representative was informed that the Government of Israel had recently constituted an inter-ministerial committee to deal with the issue of impunity for settler violence.  The Special Representative has not yet been informed about concrete action taken by this committee to deter these acts of violence through enforcement of appropriate policy or punitive measures.

### B.  The situation of human rights defenders under the jurisdiction of the Palestinian Authority

59.     While the Special Representative visited the region at the invitation of the Government of Israel, the scope of her mission included appraisal of the situation of human rights defenders in the Occupied Palestinian Territory.  The formula of authority under the Oslo Accords makes it necessary for the Special Representative to gather information and to examine the policies and practices of the Palestinian Authority, in addition to those of the Israeli occupation for presenting the situation in all its aspects.  Therefore, she visited various places in the West Bank and also sought the cooperation of the Palestinian Authority for enhancing her knowledge and understanding of its relationship to the civil society, the level of cooperation between institutions set up by the Authority and civil society organizations, especially those working on human rights.  She is grateful to the Palestinian Authority for its cooperation and the courtesy granted to her by Ministers of the Palestinian Authority and other functionaries in meeting with her and allowing her to introduce her mandate and to raise issues of concern with them.  The Special Representative communicated her concerns regarding issues that emerged from her consultation with defenders in the Occupied Palestinian Territory during her mission and other information that she has been receiving from time to time regarding the effects of Palestinian Authority administration on activities for the defence of human rights and the security of those who carry them out.

E/CN.4/2006/95/Add.3
page 20

### 1. Legal framework

60.     A Basic Law for the National Authority in the Transitional Period was enforced on 29 May 2002.  It provides a provisional constitutional framework for the Palestinian State until the peace process is concluded and the Palestinian State is officially declared.  The law provides for parliamentary democracy with direct and free elections, guarantees human rights recognized in the major international covenants, including equal protection of the law, protection against torture, forced confession, and arbitrary arrest.  The law also safeguards freedom of thought, freedom of expression, and freedom of the press, provided that they do not violate the provisions of the law.  Also listed are the right to life and equality of gender.  Freedom of belief and worship are guaranteed, subject to non-violation of public order or morality.  Freedom of association, including the formation of trade unions, and peaceful assembly are constitutionally protected.  In seeking to institutionalize safeguards against violations, the law provides for the independence of the judiciary.  During a state of emergency, basic rights may not be infringed, and the legislature may not be suspended.  Detainees have the right to a lawyer, and their cases must be reviewed by the Attorney-General or the courts within 15 days.

61.     There is considerable overlap of diverse legal institutions in the Palestinian territories.  Some of these include Israeli military and civilian law, Jordanian law, and acts, ordinances, and orders-in-council that remain in effect from the time of the British Mandate.

### 2. Measures taken at national level for the implementation of the Declaration

62.     The Palestinian Independent Commission for Citizens' Rights (PICCR) was established on 30 September 1993, upon a Presidential Decree issued by the late President Yasser Arafat.  The legislative council is now considering passing legislation to recognize it as the national institution for human rights.  Article 31 of the Basic Law of 1997 also reiterated the commitment for establishing an independent Commission on Human Rights.

### 3. Environment for the functioning of human rights defenders and areas of concern

63.     Protections in the Palestinian law are not implemented effectively and in practice do not serve human rights defenders either in facilitating their work or in providing them with security against abuse and threats.  While NGOs are able to register, the regulations and procedures have become more cumbersome than in the past.  Most NGOs rely on support from foreign donors, mainly the European Union, USAID and Nordic Governments.  So far no attempt by the Palestinian Authority to restrict foreign funding has been observed.  The Special Representative is troubled by reports that amendments to the NGO Law of Charitable Associations and Community Organizations have been presented to the Palestinian Legislative Council, proposing provisions that could seriously hamper NGO independence, complicate registration procedures, and restrict their scope of activities, especially with regard to promoting civil and political rights.

64.     Most defenders acknowledge that the Palestinian Authority has cooperated with many NGOs in the field of human rights education, training of police and judiciary and law reforms.  However, they believe that the results of this cooperation with the civil society were muted because of a lack of genuine commitment on the part of the Palestinian Authority to enforce human rights.

65.     Reports of torture and mistreatment of detainees are common but human rights defenders find it difficult to gain access to places of detention.  In September 2001 the Special Representative communicated her concern to the Palestinian Authority regarding the alleged comments of the Ramallah police commander justifying torture of detainees, and threatening a defender when his remarks were challenged.  Subsequently, the Chief of the Palestinian Police Service reportedly issued an order prohibiting access to the defender and his organization to police centres and prisons.

66.     The Special Representative has received credible reports that journalists and human rights defenders are targeted for exposing abuses committed by the Palestinian Authority security apparatus.  She has also received reports of arrests and assaults on human rights defenders for participating in peaceful demonstrations and public activities.

67.     She is particularly concerned about the culture of impunity that has affected the safety of human rights defenders, particularly women human rights defenders.  The Special Representative refers to the report of the Special Rapporteur on violence against women, its causes and consequences[19] that highlights the issues pertaining to women's legal and social rights and the incidence of violence against women in the Occupied Palestinian Territory. Women human rights defenders engaged with these issues have pointed out several difficulties that they confront in promoting and protecting women's rights.  Weaknesses in the judicial system and flaws in the legal framework have deprived these defenders of adequate tools for obtaining justice for women.  They have been targeted by State and non-State entities for advocating law reform and for assisting and supporting victims of violence.

## IV.  CONCLUSIONS AND RECOMMENDATIONS

### A.  Main conclusions

68.     **The Special Representative notes that the Government of Israel, in general, does respect the rights of Israeli human rights defenders and that she has not observed any systematic policy of restraining their activities within Israel.  Human rights organizations and defenders' groups have access to governmental authorities, members of the Knesset and Knesset sub-committees.  Defenders have acknowledged that they have opportunities to examine and comment on legislative drafts.  This indicates that there is interaction with human rights defenders that could be further developed to increase their input on policies and practices of the State that affect the situation of human rights and the ability of defenders to function.**

69.     **The same human rights organizations and defenders, however, face difficulties in promoting and protecting the rights of minorities, including the Arab and Palestinian communities in Israel.  While human rights organizations and groups are able to advocate rights and report on violations, defenders regret that their efforts have little or no impact on policies of the Government, especially in relation to security measures that result in serious violations of human rights and fundamental freedoms.**

E/CN.4/2006/95/Add.3
page 22

70.     The Special Representative finds that the practices and policies of the occupation result in conditions which place human rights defenders operating in the Occupied Palestinian Territory at grave risk and present serious obstructions in every aspect of their work.  Human rights monitors and field workers, lawyers, journalists, health professionals and those providing humanitarian assistance and care have all been affected by the situation of occupation and militarization.

71.     Restrictions on the freedom of movement and assembly, administrative detentions and other forms of harassment, intimidation and humiliation of defenders has rendered their situation absolutely incompatible with international norms and standards of human rights and the principles set forth in the Declaration.  The Special Representative is concerned that, in the wake of the "disengagement", human rights defenders in Gaza are becoming more vulnerable because of their isolation, imposed by continuing restrictions that obstruct their movement and communication with their networks in the rest of the Palestinian territory as well as the outside world.

72.     The information she has received indicates that the Palestinian Authority's style of governance is not fully in compliance with human rights norms.  Conditions of lawlessness and impunity for human rights violations have affected the security of human rights defenders, especially those who expose violations committed by security personnel.  The Special Representative is concerned that these conditions could affect the functioning and safety of election monitors in the forthcoming elections.

73.     "Security imperatives" have been allowed to deprive a vast population of their very basic rights, and to justify continuation of gross violations of human rights and humanitarian law committed by the occupation.  The exceptional conditions resulting from conflict and occupation demand a more active human rights community to address the serious violations faced by the civilian population in the Occupied Palestinian Territory.  The human rights community is being weakened by the risks that they are placed under and by the impunity for violation of their right to life, liberty and physical security.  Any prospects for peace and security in the region are being diminished by the constraints placed on freedoms in general and, particularly, the freedom to defend human rights.

## B.  Recommendations

### 1.  To the Government of Israel

74.     Israel must end the occupation of the Palestinian Territory, as the situation of occupation itself is a gross violation of the human rights of the Palestinian people.  Until the end of the occupation, Israel must respect the resolutions of the United Nations bodies, and accept its obligations under international human rights and humanitarian law, in particular the two main International Covenants and the Fourth Geneva Convention relative to the protection of civilian persons in time of war, of 12 August 1949.  In the context of defenders, Israel's defiance of international law has caused serious harm, including killings, to human rights defenders and affects their freedom of expression, their access to places of violations and their ability to seek justice for victims and to provide humanitarian assistance.

75.     **Resistance to the occupation is a legitimate right of the Palestinian people.  Any peaceful action undertaken in this regard, collectively or individually, is, therefore, protected under article 12 of the Declaration.  Article 2 of the Declaration places the Government of Israel under the obligation "to adopt such legislative, administrative and other steps as may be necessary to ensure that the rights and freedoms referred to in the present Declaration are effectively guaranteed".  The Government must amend laws, regulations and policies and refrain from taking action that obstructs or punishes the exercising of the freedom of assembly, and the right to protest or resist violations.**

76.     **Israel's legal system makes security-related provisions that have been used or abused to prevent the enforcement of the rights of Palestinians brought before the judicial forums.  The Government may consider a comprehensive review of the system in order to ensure that its security concerns are met within the boundaries of international law.  The Government must show its commitment to human rights, democracy and to peace and security by undertaking this exercise in collaboration with independent experts to give credibility to the results of such examination.**

77.     **The Special Representative suggests that the Government also give serious consideration to the incorporation of the principles set out in the Declaration to ensure protection of human rights defenders and strict accountability for violation of their right to defend human rights.  In particular, the right of victims of human rights violations to an effective remedy, including compensation, in accordance with article 9 of the Declaration must be protected.  In this regard, repeal of the provision of the Civil Wrongs (Liability of the State) Law, as amended in July 2005, should be considered.**

78.     **The Special Representative joins other human rights bodies and mechanisms of the United Nations in recommending that the Government abandon the practice of administrative detention.  The accuracy of information leading to charges, partiality and transparency of investigation and fairness of procedures in prosecution of these cases is questionable.  By not allowing Palestinian lawyers to appear before Israeli courts, many of the Palestinian detainees are deprived of their right to a counsel of their choice.  Orders of detention and extension of the period are usually based on secret evidence not disclosed to the accused or, sometimes, even to any judicial authority.  Several human rights defenders have been placed under administrative detention in this manner.  The bona fides of these detentions on the basis of security is disputed and the Government has not put forward any responses that inspire confidence in the accusations or the procedures employed against the defenders in question.**

79.     **In view of the allegation of torture and mistreatment of detainees, the Special Representative recommends that the Government accept independent monitoring of the detention facilities and allow independent observers immediate access to human rights defenders under administrative detention.  The Government told the Special Representative that the Israel Bar Association had access to prisons, but other sources, including Israeli lawyers, have informed her that this access is only to clients and not for assessing conformity of practices of the authorities to international human rights and humanitarian law and standards.**

E/CN.4/2006/95/Add.3
page 24

80.     The Special Representatives recommends that the Government issue invitations to
the Special Rapporteurs of the Commission on Human Rights mandated by the
Commission to carry out immediate missions in the Occupied Palestinian Territory in its
resolution of 19 October 2000.

81.     The Israeli authorities must refrain from imposing restrictions on travel of human
rights defenders to or from Israel and the Occupied Palestinian Territory.  Other
restrictions on freedom of movement must be removed, and access of defenders in order to
carry out their work must be ensured.  Measures must be adopted, in consultation with
human rights organizations both in the Occupied Palestinian Territory and Israel, to
facilitate the movement of defenders.

82.     The executive, judicial and security authorities in Israel must inculcate a better
understanding of the application of human rights norms to the situation of occupation and,
for this purpose, create opportunities of interaction with defenders who are engaged with
the protection of human rights and humanitarian law.  The Government must refrain from
making statements alleging wrongdoing against human rights or humanitarian operations.
The Government must establish its good faith in voicing any suspicions by producing
unequivocal evidence to that effect.

83.     The Government must cooperate with the Special Rapporteur on the situation of
human rights in the Palestinian territories occupied since 1967.

84.     Given the degree of cooperation that exists between the Government and
United Nations agencies, the Special Representative recommends that any elements of
obstruction to allow these agencies working under different mandates to protect the civil,
political, economic, social and cultural rights of the Palestinian people be removed.  It must
grant opportunities to these agencies to communicate their concerns to the Government
and to hold a meaningful dialogue on these issues.  In particular, channels of
communications with the Office of the High Commissioner for Human Rights in the
West Bank should be established.  The Office should have the opportunity to discuss its
concerns with the Government and to put forward recommendations for the protection of
activities for the defence of human rights in the areas of the Occupied Palestinian Territory
under Israeli control or on its policies that affect the situation in the "A Areas".

85.     The Special Representative strongly recommends the Government to address the
issue of settler violence and the impunity for such incidents.  She requests the Government
to keep her informed on initiatives taken by the inter-ministerial committee set up in this
regard.

### 2.  To the Palestinian Authority

86.     The Palestinian Authority must ensure respect for human rights and the rule of law.
It must also ensure that fundamental freedoms of the Palestinian population are fully
restored and protected in the areas of their authority and control.  Incorporation of the
principles set forth in the Declaration on Human Rights Defenders and their observance in
all aspects of governance would be a step forward in this direction.

87.    **The Special Representative urges the Palestinian Authority to maintain a respect for the freedom of association in the law and refrain from any changes that infringe the independence of NGOs or restrict the scope of their activities for the defence of human rights. Likewise, the independence of the media and the freedom to report on human rights violations must be protected, not only in the law but also in practice.**

88.    **The Palestinian Authority must take immediate measures to end impunity for human rights violations. Investigation of complaints against officials and private entities threatening human rights defenders, including those defending women's rights, must be conducted with diligence and responsibility. The Special Representative recommends the creation of an independent commission to inquire into all allegations of human rights violations against the security services, including torture, kidnappings and illegal detention of human rights defenders.**

89.    **The mandate of the Palestinian Independent Commission on Citizens Rights must be strengthened and reforms of the institution undertaken to improve its capacity to hold accountability for human rights violations by the Authority.**

### 3. To the United Nations

90.    **The General Assembly, the Security Council, the Commission on Human Rights and its special procedure mechanisms have taken note of and have largely condemned the practices of the occupation. Nevertheless, concrete measures need to be adopted to secure the rights of the Palestinian population. In consultation with human rights experts and fully utilizing the information documented by its mechanisms, the United Nations must devise concrete action to enforce compliance with international law in the Occupied Palestinian Territory, as expounded in the Advisory Opinion of the International Court of Justice, and in accordance with the Charter of the United Nations.**

91.    **The Special Representative calls upon the United Nations to prioritize its support for human rights defenders and the OHCHR with the full cooperation of the Government of Israel and the Palestinian Authority.**

92.    **The Special Representative calls upon the Commission to take particular note of the situation of human rights defenders in the Occupied Palestinian Territory and to adopt measures for their protection and for facilitating their work.**

### Notes

[1]  See A/60/271.

[2]  According to the Accords, the Palestinian Authority was designated to have security and administrative control over Palestinian areas designated as "Area A" (18 per cent of the West Bank), and only administrative control over areas designated as "B" (22 per cent of the West Bank). The remainder of the territories (including Israeli settlements, the Jordan Valley region, and bypass roads between Palestinian communities) were to remain under exclusive Israeli control ("Area C" comprising 60 per cent of the West Bank).

E/CN.4/2006/95/Add.3
page 26

[3] Basic Law:  Human Dignity and Liberty 1992.

[4] According to Law of Associations, 5740-1980, the Associations Registrar can refuse to register an association, if "one of its purposes is to negate the existence of the State of Israel or its democratic character, or if there are reasonable grounds to conclude that the association will serve as a cover for illegal activity".  According to the Mandatory Defence (Emergency) Regulations 1945 the Minister of Defence may declare any body or persons to be an "unlawful association" if it incites or encourages the overthrow by force or violence of the political order of the Government of Israel, the bringing into contempt or arousal of disaffection against the Government or its ministers in their official capacity; the destruction of or injury to government property; or acts of terrorism directed against the Government of Israel or its servants.  The Prevention of Terrorism Ordinance, 5708-1948 also places prohibitions against creation, membership and operation of a "terrorist organization" as defined in the Ordinance.  There are also restrictions regarding professional associations in certain fields, and on the qualifications that may belong to a professional association.

[5] HCJ 507/85, *Tamini v. Minister of Defense* and C.A. 2687/92, *Geva v. Walt Disney Co*.

[6] E/C.12/1/Add.27, para. 10.

[7] See E/C.12/1/Add.90.

[8] HCJ 302/72, *Abu Hilu et al. v. Government of Israel et al. PD* 27 (2) 169; HCJ 606/78 *Ayub et al. v. Minister of Defense et al.* PD 33 (2) 113.

[9] HCJ 6026/94, *Nazal, et al. v. Commander of the IDF in the West Bank* PD 48 (5) 338.

[10] HCJ 97/79, *Abu Awad v. Commander of Judea and Samaria* PD 33 (3) 309, 317-318.

[11] HCJ 7669/03, *Ahmad et al. v. Military Commander of the IDF in the West Bank* (unpublished) referred to in Orna Kohn's paper, "Litigation before the Israeli Courts", panellist at Al-Haq's legal conference, "From Theory to Practice:  Upholding International Humanitarian Law in the Occupied Palestinian Territory" (November 2005).

[12] Decision dated 17 August 2005 in *Rasim Obedat etc. v. The State of Israel*.

[13] *Rasim Obedat (6552/05), Ahmed Maslamani (6432/05) and Naser Abukhader (6388/05) v. The State of Israel*, Supreme Court judgement, 8 August 2005, at paragraph 11 (English translation by translator licensed by the Minister of Justice).

[14] In this report the term "Wall" is used pursuant to the International Court of Justice (ICJ) choice of wording in its advisory opinion on the *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (A/es-10/273 and Corr.1).  In its advisory opinion the ICJ held that the Wall/barrier is in violation of International Humanitarian Law.  The ICJ wrote that "Israel is under an obligation to terminate its breaches of international law; it is under an obligation to cease forthwith the works of construction of the wall being built in the

E/CN.4/2006/95/Add.3
page 27

Occupied Palestinian Territory, including in and around East Jerusalem, to dismantle forthwith the structure therein situated, and to repeal or render ineffective forthwith all legislative and regulatory acts relating thereto […]" (Advisory Opinion of the International Court of Justice, para. 163).

**15**  OCHA, "West Bank Closures August 2005".

**16**  The Special Representative refers to the Advisory Opinion of the ICJ that international human rights and humanitarian law applies to Israel's actions in the OPT.  The Geneva Convention relative to the Protection of Civilian Persons in Time of War obliges the Occupying Power to allow medical personnel of all categories to carry out their duties.  The Convention as well as the Protocol Additional (Protocol 1) of the Geneva Conventions prohibit attacks and restrictions on relief personnel and hospitals.

**17**  See Commission resolution 2004/10 dated 16 April 2004.

**18**  A/60/271 at para. 27, p. 11.

**19**  See E/CN.4/2005/72/Add.4.

-----