**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**THE ESTATE OF YARON UNGAR, et al.,**

**Plaintiffs – Judgment Creditors**

**v.** **C.A. No. 00 - 105L-DLM**

**THE PALESTINIAN AUTHORITY, et al.,**

**Defendants – Judgment Debtors**

**PLAINTIFFS – JUDGMENT CREDITORS' NOTICE OF NEW DEVELOPMENTS RELEVANT TO DEFENDANTS' RULE 60(b) MOTION**

The Ungars respectfully submit this Notice to inform the Court of two developments which occurred subsequent to the filing of their opposition to defendants' Rule 60(b) motion, which directly support the grounds asserted by the Ungars to deny defendants' motion.

**a. Defendants Have Now Admitted That They Cannot Produce Any Relevant Documents Located in the Gaza Strip**

The Ungars asserted in their opposition that they would be severely prejudiced and unable to fairly litigate the case if defendants' Rule 60(b) motion were granted, because the defendants were expelled from the Gaza Strip in June 2007 and are therefore unable to produce any documents located in the Gaza Strip relevant to their provision of material support and resources to Hamas. *See* Plaintiffs' Memo in Opp. (dkt. # 415) at 34-36.

The PA and PLO are currently defendants in *Parsons v. Palestinian Authority et al.*, No. 07-1847 (JR) (D.D.C.). On February 15, 2008, the PA and PLO filed a motion to dismiss

*Parsons* on grounds, *inter alia*, of laches. *See* Exhibit A, at 42-44. In support of their laches argument the defendants argued as follows:

> Plaintiffs waited nearly four years after the death of Mr. Parsons to file the instant action . . .
>
> There . . . can be no dispute that Defendants are severely prejudiced by the delay. As widely publicized, in June 2007, a Hamas uprising in the Gaza Strip expelled the PA from the territory, and effectively isolated Gaza from the rest of the world. The PA currently has no authority in Gaza, and Israel and Egypt have almost completely sealed all borders with Gaza. Currently, Gaza is a Hamas controlled "no-mans' land" with PA authorities unable to venture into the area due to border controls and grave threats to their individual security. Moreover, Gaza is now inaccessible for the purpose of conducting discovery or otherwise gathering facts and information that may be relevant to defending against Plaintiffs' claims in this case.
>
> The dramatically changed circumstances in Gaza in 2007 will result in immense prejudice to Defendants if this litigation is permitted to proceed. Absent a dramatic change in circumstances in Gaza . . . Defendants will remain unable to conduct any meaningful discovery or investigation within Gaza.

Exhibit A at 43-44 (emphasis added).

Thus, exactly as argued by the Ungars in their opposition papers, defendants have admitted that "Gaza is now inaccessible for the purpose of conducting discovery" – which means that even if the defendants wanted to produce relevant documents located in Gaza (and their Rule 60(b) motion gives no indication whatsoever of such willingness), they are unable to do so.

Defendants will likely argue that this admission is of no moment in this case, because the Ungars were murdered in Israel, and the actual gunmen lived in the West Bank. The Court should reject any such argument because the *situs* of the defendants' provision of material support and resources to Hamas is completely irrelevant. If defendants provided funds, weapons,

training or safe haven to Hamas in the Gaza Strip as plaintiffs alleged[1] – or for that matter in Timbuktu – and that support in some way facilitated Hamas terrorists living in the West Bank to murder the Ungars in Israel, the defendants are liable under 18 U.S.C. §2333(a). *See generally Boim v. Holy Land Foundation*, 511 F.3d 707 (7th Cir. 2007) (analyzing elements of civil liability under §2333(a) in respect to provision of support to Hamas).

Indeed, *Boim* provides a useful analogy in this respect. The *Boim* defendants are "an array of individuals and organizations in the United States" (*id*. at 709) alleged to have transferred funds from the United States to Hamas thereby facilitating the murder of an American teenager. *Id*. Obviously, the evidence of those funds transfers would be located in the United States. So too, here, evidence of the instant defendants' provision of material support to Hamas in Gaza, is located in Gaza.

Significantly, *Boim* held that under §2333(a) the plaintiff is ***not*** required to establish a direct link between the defendant's provision of funds or other material support and the particular terrorist attack in which the decedent was murdered: "[I]n view of the fact that money is fungible and the victims of terrorism are often killed or injured at random . . . no line [need] be drawn linking a particular dollar raised to a particular terrorist act." *Boim*, 511 F.3d at 741. Therefore, a plaintiff can establish liability under §2333 by merely showing that defendant's provision of funds "frees up . . . resources for, or otherwise makes possible . . . terrorist activities." *Id*. at 742.

Notably, even "relatively modest financial contributions to terrorists or other minor acts of support" can suffice "to render the donor liable for the injuries subsequently inflicted by terrorists." *Id*. Moreover, §2333 "does not demand a showing that the defendant's conduct was

[1] Plaintiffs' Amended Complaint repeatedly alleges provision of material support to Hamas in both the West Bank and Gaza Strip without distinction.

the sole cause of the plaintiff's injury; the conduct need only be one of the causes. Nor must the plaintiff show that the defendant's conduct was the predominant or primary cause of the injury." *Id*. at 742-743 (citations omitted).

Clearly, then, documents located in the Gaza Strip evidencing defendants' relationship with Hamas in the Gaza Strip would be absolutely vital to the question of defendants' liability in this case. But as defendants now admit, those documents became unavailable in June 2007. Accordingly, defendants' Rule 60(b) motion must be denied.

**b. Defendants Are Actively Fighting Efforts to Enforce the *Bucheit* Judgment**

The Ungars argued in their opposition that defendants' Rule 60(b) motion was made in bad faith and so should be denied, because even if the motion was granted and a new judgment entered against defendants after a trial on liability, the defendants would not honor it. Opp. Memo at 59-60. As evidence for this assertion plaintiffs cited the fact that defendants still have not paid the judgment entered against them in 2003 in the matter of *Bucheit v. Palestinian Authority*, No. 00-1455(GK) (D.D.C.). *Id.* at 60.

On February 27, 2008, counsel for the *Bucheit* plaintiff notified U.S. District Judge Victor Marrero that the PA and PLO have not merely failed to pay the *Bucheit* judgment, but are actively opposing the enforcement of that judgment. *See* Exhibit B. Thus, notwithstanding their claims to be "repentant," these defendants remain scofflaws.

Since these defendants are fighting the enforcement of even a relatively small judgment entered by a U.S. federal court after trial in a garden-variety commercial matter, it is obvious that they have no intention whatsoever of paying any new judgment that would be entered against them by this Court if their Rule 60(b) motion was granted and they were found liable at trial.

Thus, defendants are invoking this Court's authority under Rule 60(b)(6), but have no intention of obeying the Court's authority when it comes to decisions and orders – such as an order to compensate the Ungars – which are not to their liking. For this reason, too, their Rule 60(b)(6) motion should be denied.[2]

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

[2] It is quite possible that defendants will now race to pay the *Bucheit* judgment in a putative attempt to convince this Court that they have turned over a new leaf. The Court should not credit any such self-serving *post hoc* maneuver: the irreducible fact is that judgment entered in *Bucheit* some five years ago and defendants are "vigorously" fighting Mr. Bucheit's efforts to enforce it even today – i.e. even ***after*** they purportedly "repented." *See* Exhibit B.

CERTIFICATION

I hereby certify that on March 5, 2008 I served this pleading along, with the attached exhibits, via ECF to the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/S/ David J. Strachman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Estate of Mark Parsons, *et al.*, Plaintiffs, | ) | |
| v. | ) | Civil Action No. 07-01847 (JR) |
| The Palestinian Authority, *et al.*, Defendants. | ) | |

**DEFENDANTS THE PALESTINIAN AUTHORITY'S AND PALESTINE LIBERATION ORGANIZATION'S MOTION TO DISMISS**

Defendants The Palestinian Authority and The Palestine Liberation Organization hereby move pursuant to Rule 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. For the reasons stated in the memorandum of points and authorities, and any other appropriate reason, Defendants request dismissal of the Complaint with prejudice.

Respectfully submitted,

Dated: February 15, 2008

/s/ Richard A. Hibey

Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Charles F.B. McAleer, Jr. (D.C. Bar #388681)
Laura G. Ferguson (D.C. Bar # 433648)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com
*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Estate of Mark Parsons, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 07-01847(JR) |
| The Palestinian Authority, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANTS THE PALESTINIAN AUTHORITY'S AND PALESTINE LIBERATION ORGANIZATION'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

Defendants the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") hereby move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Plaintiffs have not established that either the PA or PLO has sufficient contact with the United States to warrant the Court's exercise of jurisdiction. Plaintiffs also fail to state a claim for which relief can be granted under the Anti-Terrorism Act, 18 U.S.C. § 2333 under the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Moreover, Plaintiffs cannot impose liability on either the PA or PLO for alleged failures to provide adequate security in the region. Plaintiffs' supplemental state law tort claims also must be dismissed because the Defendants, as "unincorporated associations," do not have the capacity to be sued in their own name in the District of Columbia. Finally, Plaintiffs claims should be dismissed under the doctrine of laches because Plaintiff waited nearly four years before bringing this lawsuit, despite having filed a similar lawsuit regarding the same incident in

2004, and this delay has prejudiced Defendants' ability to litigate the case, especially in light of recent developments in the Gaza Strip.

**Overview of Parties and Claims**

1. *The Plaintiffs*

Plaintiffs are the estate of Mark Parsons, the estate of Mark Parsons' parents (Agnes and John W. Parsons), and Mark Parson's siblings (Mary Lazin, John J. Parsons, and Catherine Tyokody) (collectively, "Plaintiffs"). Their lawsuit arises from an October 15, 2003 bombing incident in the Gaza Strip in which Mark Parsons was killed. According to the Complaint, "Mark Parsons and two other DynCorp employees were part of a security detail escorting diplomats of the United States government on their way to interview Palestinian applicants for Fulbright scholarships when the vehicle in which they were riding was blown up by a terrorist placed remote controlled bomb near the Beit Hanoun junction in northern Gaza . . . ." Compl. ¶ 14. Plaintiffs bring suit under the civil liability provision of the Anti-Terrorism Act, 18 U.S.C. § 2333, which allows the estate, survivors, or heirs of a U.S. national injured "by reason of an act of international terrorism" to recover treble damages.

In 2004, Plaintiffs filed a lawsuit against the Arab Bank under the Anti-Terrorism Act in connection with the same incident. *Litle v. Arab Bank*, No. 1:04-cv-05449-NG-VVP (E.D.N.Y.) (filed December 15, 2004). That case remains pending.

2. *The Defendants*

The Complaint does not identify the individuals directly responsible for the incident, nor does the Complaint even identify the organization with which the perpetrators are affiliated. According to the Complaint, the "attack that murdered Mark Parsons . . . was committed, upon information and belief, by the Popular Resistance Committees *or some other involved terrorist*

*organization(s)* (collectively "*The Terrorists*")." *Id.* ¶ 15 (emphasis added). Lacking any specific information about the group behind the attack, the Complaint offers up a variety of organizations, including Hamas, Palestinian Islamic Jihad, and Al-Aqsa Martyrs Brigades as potentially implicated in the incident. *Id.* ¶ 13; *see also id.* ¶ 31.

Despite the absence of concrete information regarding responsibility for the attack, the Plaintiffs name the PLO and Palestinian Authority as the sole Defendants in this Complaint. Although the Complaint treats the PA and PLO as if they are interchangeable, they in fact are entirely different entities with different constituents, roles, and responsibilities. The PLO is a large umbrella group representing all of the Palestinian people, including those in the diaspora. The PLO is a coalition of a diverse group of political parties, many with widely divergent views and agendas. The PLO has no role in the civil or security administration within the Occupied Palestinian Territories, other than by virtue of the fact that the PLO's ruling party, Fatah, often (but not always) is also the ruling party of the PA.

The PA was created during the mid-1990s in a series of agreements known as the Oslo Accords. In 1993, in a peace agreement brokered by the United States, Israel agreed to accept the PLO as the representative of the Palestinian people -- including in negotiations on behalf of the Palestinian people -- and the PLO acknowledged Israel's statehood. This rapprochement culminated in the signing of the first of the Oslo Accords -- the Declaration of Principles on Interim Self-Government Arrangements (DOP), Sept. 19, 1993, Isr.-PLO, 32 I.L.M. 1525. The Declaration of Principles called for the establishment of the PA as an interim government pending recognition of a permanent Palestinian state. The Declaration of Principles also set forth a timeline and framework for transferring to the PA certain authority over the West Bank and Gaza Strip. Of particular relevance to this litigation, the 1994 Agreement on the Gaza Strip and

the Jericho Area, transferred responsibility for civil and security administration of the Gaza Strip to the PA. *See* Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, Isr.-PLO, 33 I.L.M. 622; *see also* Interim Agreement on the West Bank & the Gaza Strip, Sept. 28, 1995, Isr.-PLO, 36 I.L.M. 551. The PA continued to maintain that role in the Gaza Strip until June 2007, when Hamas forcibly took control over Gaza and, as of this filing, remains in de facto control.[1]

By attempting to pursue damages from the PA and PLO rather than the culprits who actually caused Mr. Parson's death or even the "terrorist organizations" with which the individual actors are affiliated, the Plaintiffs are suing the wrong defendants. Without relying on this fact for purposes of the motion to dismiss, Defendants note that its current denial of liability is consistent with comments made by the PA and PLO leadership shortly after the attack, in which they condemned the attack as an act of "aggression against the Palestinian people and the Palestinian Authority." Ex A (Jerusalem Post, *Eyes on Gaza* (Oct. 24, 2003)) (quoting then Prime Minister Qurei and then PA President and PLO Chairman Yasser Arafat). Plaintiffs' Complaint offers no plausible motive for why the PA or PLO would authorize or support an attack on an American diplomatic convoy, when such an attack would inevitably only serve to undermine the PA's and PLO's efforts to build U.S. support for ending the Israeli occupation.

3. *Plaintiffs' Claims*

On October 12, 2007, just days before the Anti-Terrorism Act's four-year statute of limitations was to expire, *see* 18 U.S.C. § 2335(a), Plaintiffs filed the instant lawsuit. Although

[1] The Court may consider in connection with the motion to dismiss the facts alleged in the complaint, any documents attached to the complaint as exhibits, and matters about which the Court may take judicial notice. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997). All of the facts discussed herein are either within the scope of the complaint or subject to judicial notice. *See* Fed. R. Evid. 201(b)(2) (a judicially noticeable fact is "not reasonably subject to dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

the Complaint lists six counts, it boils down to two causes of action -- a claim for relief under the civil liability provision of the federal Anti-Terrorism Act, 18 U.S.C. § 2333 (Counts 1-4), and a claim for relief under unspecified state tort law for intentional infliction of emotional distress (Count 5). Plaintiffs also seek treble (punitive) damages (Count 6), which are automatically provided under ATA section 2333.

With respect to their ATA claim, Plaintiffs offer a bewildering variety of alternative unsubstantiated theories under which they seek to hold the Defendants liable: Defendants failed to carry out their duty to provide adequate security in the Gaza Strip (Compl. ¶¶ 19, 22); the Palestinian Preventive Security apparatus maintained factories and workshops in the Gaza Strip for the manufacturing of bombs and "instrumentalities of terrorism" and distributed these bombs and weapons to numerous terrorist organizations, including the bomb that killed Mr. Parsons (*id.* ¶¶ 13, 16); unnamed "agents" of the PA and PLO conspired to produce the bomb and carry out the attack (*id.* ¶ 18); the PA and PLO joined a conspiracy to manufacture and distribute bombs used in terrorist attacks (*id.* ¶ 42); Defendants aided and abetted acts of international terrorism that resulted in the death of Mr. Parsons (*id.* ¶ 37); Defendants provided "material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the Plaintiffs" (*id.* ¶¶ 46, 50).

Such confused pleading grounds leaves Defendants decidedly unclear on Plaintiffs' basis for the imposition of liability. It is, in fact, impossible to tell whether Plaintiffs contend Defendants are primarily/directly liable for the murder of Mr. Parsons, secondarily/indirectly liable by virtue of conspiracy or aiding and abetting theories, or vicariously liable for the acts of others through theories of agency or respondeat superior. The Complaint reads as though Plaintiffs had no factual basis for linking the PA or PLO to the incident, so instead offered up as

many theories as possible in the hopes that one of them will eventually stick. As the Supreme Court recently reminded litigants, a Complaint cannot withstand a motion to dismiss unless it alleges "plausible facts" and includes "more than labels and conclusions[.]" *Twombly*, 127 S.Ct. 1964-65. Here, with respect to the PA's and PLO's role in Mr. Parsons' death, Plaintiffs offer only "labels and conclusions."

It is especially appropriate to hold these Plaintiffs to the *Twombly* standard. Plaintiffs have had almost four years to develop their case and have been actively litigating another case involving the same incident for over three years. *Litle v. Arab Bank*, No. 1:04-cv-05449-NG-VVP (E.D.N.Y.). Moreover, this was a high-profile international incident, which was investigated by a variety of authorities. Yet Plaintiffs cannot offer any specific allegations linking the PA or PLO to Mr. Parsons' death. Plaintiffs also are asking the Court to exercise jurisdiction over the Palestinian Authority and PLO for an incident that occurred in the Gaza Strip four years ago. They do so only now when the PA leadership is now fully occupied with fighting the very extremist elements Plaintiffs allege are potentially responsible for Mr. Parsons death and are actively involved in peace negotiations with Israel under the auspices of the United States. Such litigation will be extremely burdensome, distracting, an irritant in U.S.-Palestinian relations, and disruptive to the peace process. Bare allegations that the PA and PLO aided, supported, or conspired with unknown individuals associated with unspecified terrorist organizations are insufficient, as a matter of law, to hale the PA and PLO into U.S. courts. Defendants acknowledge Plaintiffs' frustration that those responsible for the bombing attack have not been identified and brought to justice. Suing the PA and PLO, however, for an attack on a U.S. diplomatic convoy -- an attack they condemned and would never have authorized or supported -- is not the path to a just result.

## ARGUMENT

### I. THE COMPLAINT MUST BE DISMISSED UNDER RULE 12(b)(2) BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS

#### A. As to Each Defendant, Plaintiffs Must Allege Specific Facts Upon Which Personal Jurisdiction Can Be Based.

Under Fed. R. Civ. P. 12(b)(2), a plaintiff has the "burden of proving that the court has personal jurisdiction over the defendant by showing that the defendant purposefully availed himself of the benefits of the forum state by establishing minimum contacts and that the exercise of jurisdiction would comport with notions of fair play and substantial justice." *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 229 (D.D.C. 2007) (citations omitted). However, "[b]are allegations and conclusory statements are insufficient' to establish personal jurisdiction" and the plaintiff must "allege specific facts connecting *each* defendant with the forum state." *Id.* (emphasis added) (*citing Capital Bank Int'l, Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003); *Schwartz v. CDI Japan*, 938 F. Supp. 1, 7 (D.D.C. 1996)). As the court explained in *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003), "Plaintiff[s] bears the burden of establishing personal jurisdiction over each individual defendant. In order to meet [their] burden, plaintiff[s] must allege specific facts on which personal jurisdiction can be based; [they] cannot rely on conclusory allegations." Furthermore, Plaintiffs may not "aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any single defendant." *Estate of Klieman v. Palestinian Authority*, 467 F.Supp. 2d 107, 111 (D.D.C. 2006).

Here, Plaintiffs' Complaint is noticeably thin on factual allegations supporting the Court's exercise of personal jurisdiction. Under the heading "Jurisdiction and Venue," Plaintiffs conclusorily assert: "This Court has jurisdiction over this matter and over defendants pursuant to

18 U.S.C. § 2333 and § 2334 and the rules of supplemental jurisdiction." Compl. ¶ 2. Neither section 2333 nor section 2334 address personal jurisdiction. In discussing the venue provision, section 2334, Plaintiffs conclusorily assert that the PA and PLO "maintain offices, agents, representatives, and conduct business in this District." *Id.* ¶ 3. *See also id.* ¶ 6 (asserting that the PA "maintains offices and has designated agents . . . in the District of Columbia"); *id.* ¶ 9 (asserting that the PLO "maintains offices and designated agents . . . in the District of Columbia").

### B. Plaintiffs Have Not Established That Defendants Have Sufficient Minimum Contacts with the United States to Support a Finding of Personal Jurisdiction.

Federal Rule of Civil Procedure 4(k)(2) "permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani v. Bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). Whether the exercise of jurisdiction is consistent with the Constitution for purposes of Rule 4(k)(2) "turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process." *Id.* at 11.

Where, as here, the cause of action does not arise out of Defendants' contacts with the forum (the United States), Plaintiffs must establish that the PA's and PLO's contacts with the United States are sufficiently "continuous and systematic" that the Court may exercise general jurisdiction over them. *Nibkin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 71 (D.D.C. 2007). *Id.* at 71. Notably, sporadic and insubstantial contact with the United States is insufficient to give rise to general jurisdiction. *Helicopeteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416-18 (1984). As *Nibkin* explains, "acts of terror acts of terror or torture

committed against American citizens abroad, *standing alone*, can support personal jurisdiction only if the defendant expressly intended the effects of the act to be felt in the United States." *Id.* at 73 (emphasis added) (holding that Plaintiffs' allegations of torture of a U.S. citizen, which took place entirely in Iran, did not support the exercise of specific personal jurisdiction in the absent of sufficient allegations that the acts were directed at the United States). Here, Plaintiffs' conclusorily allege that the bombing was "intended to directly target the United States," Compl. ¶ 6, but this allegation is inconsistent with the other allegations in the Complaint describing alleged conspiracies and terrorist organizations whose activities are focused on ending the Israeli occupation. In any event, whatever the motive of the unknown assailant and unknown organization with which the assailant was affiliated, there is no allegation that the PA or PLO intended to "directly target the United States." Plaintiffs have not alleged facts establishing that the PA's and PLO's own actions were such that the PA and PLO had "fair warning" that those actions could subject them to U.S. jurisdiction, *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring), or that their conduct and connection with the forum were such that they "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

With regard to their attempt to base jurisdiction over the PA and PLO based on continuous and systematic contacts with the U.S., Plaintiffs assert the same boilerplate jurisdictional basis for each defendant -- that the PA and PLO each "maintain[] offices and has designated agents in, and can be sued in, the United States District Court situated in the District of Columbia, United States of America." Comp. ¶¶ 6, 9. Though Plaintiffs' Complaint does not specifically identify a single "office" or "agent" the PA and PLO maintain in the United States that would give rise to jurisdiction, there are only two possible locations the Complaint could be

referring to. The first is the PLO Mission to the United States, in Washington D.C. This is not a PA office. Similarly, the office of the Permanent Observer Mission of Palestine to the United Nations is located in New York City. Neither is this a PA office. Indeed, the PA does not have an official diplomatic relationship with the United States, and is, in fact, prohibited from engaging in foreign relations under the Oslo Accords. *See Ungar v. PLO*, 402 F.3d 274, 287 (1st Cir. 2005).

The Permanent Observer Mission in New York City cannot be invoked as a basis for jurisdiction over the PLO. As the Second Circuit noted in *Klinghoffer v. S.N.C. Achille Lauro Lines*, "basing jurisdiction on the PLO's participation in UN-related activities would put an undue burden on the ability of foreign organizations to participate in the UN's affairs." 937 F.2d 44, 51 (2d Cir. 1991).

Similarly, jurisdiction over the PLO should not be based on the Washington, D.C. office of the PLO Mission to the United States. The PLO Mission serves the important function of representing the interests of the Palestinian people in matters before the U.S. Government. Under the government contact exception, a court may not assert personal jurisdiction over a non-resident based on the non-resident's contacts with Congress or a federal agency. *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 235 (D.D.C. 2005). As the court explained in *Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 50 (D.D.C. 1994), the "District of Columbia's unique character as the home of the federal government requires this exception in order to maintain unobstructed access to the instrumentalities of the federal government." Although this government contact exception is "based in part on the constitutional right to petition the Government for redress of grievances, . . . it also appears to be based on non-constitutional policy considerations, such as the Judiciary's reluctance to interfere with the smooth functioning

of other governmental entities." *Klinghoffer*, 937 F.2d at 51 (internal citation and quotation omitted). Thus, the *Klinghoffer* decision and the overriding policy considerations underlying the closely analogous government contacts exception preclude basing personal jurisdiction on the PLO's activities in the U.S. related to the United Nations and the PLO Mission to the United States.[2]

In sum, the Complaint has not identified any U.S. offices or agents of the PA or any business the PA conducts in the United States. With regard to the PLO, Plaintiffs have not identified sufficient contacts (i.e., contacts that do not fall under the government contacts exception) to warrant the Court's exercise of the PLO based on the PLO's UN and United States missions in New York and Washington, respectively.

In opposing this Motion, Plaintiffs will undoubtedly point to three cases in which courts have found the PA's and PLO's contacts with the United States sufficient to support general jurisdiction. *See Ungar v. Palestinian Authority*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F.Supp. 2d 172, 179 (D.D.C. 2004); *Estate of Klieman v. Palestinian Authority*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006).[3] However, it is well established that "[t]he Court must resolve personal jurisdiction issues on a case-by-case basis, noting in each the particular activities relied upon by the resident plaintiff as providing the

[2] Defendants acknowledge that speaking and fundraising activities unrelated to the United Nations and to contacts with the United States Government arguably would count as contacts with the United States (*see Klinghoffer*, 937 F.2d at 52) for personal jurisdiction purposes (though not necessarily sufficient for due process), but Plaintiffs have not identified any such activities.

[3] The Court's finding of personal jurisdiction in *Klieman* is the subject of a pending Motion for Reconsideration. *See Estate of Klieman v. The Palestinian Authority,* No. 04-1173 (D.D.C.) (PLF), Dkt. # 77.

supposed basis for jurisdiction." *Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 49 (D.D.C. 1994) (citations and quotations omitted).

Moreover, the Court must look to the PA and PLO's contacts with the United States at the time *this* Complaint was filed. *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 236 (D.D.C. 2005). Plaintiffs filed their complaint in 2007. Contacts relevant to the *Ungar* and *Biton* cases, in which complaints were filed in 2000 and 2001, respectively, cannot form the basis for the exercise of personal jurisdiction here. *See Klinghoffer*, 937 F. 2d at 52 (holding that, "on remand, the court should determine whether the PLO's non-UN-related contacts with New York provided a sufficient basis for jurisdiction at the time each of the complaints was filed").

### C. Even If the Court Finds the PA and PLO Have Sufficient Minimum Contacts with the United States, the Exercise of Personal Jurisdiction Would Not Comport with Traditional Notions of Fair Play and Substantial Justice.

After a minimum contacts analysis, the second prong of any jurisdictional inquiry requires the Court to determine whether it is "reasonable under the circumstances of the particular case" to exercise personal jurisdiction. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). In conducting such an inquiry, the Court must apply the five-factor test first set forth in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987). Under that test, the Court evaluates the "reasonableness" of its exercise of jurisdiction by balancing: 1) the burden that the exercise of jurisdiction will impose on the defendant; 2) the interests of the forum state in adjudicating the case; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of a controversy; and 5) the shared interest of the states in furtherance of substantive social policies. *Id.* Considered as a whole, enough of the factors

weigh in Defendants' favor that this Court should decline to exercise personal jurisdiction over the PA and PLO.

For example, any exercise of personal jurisdiction will impose a substantial burden on Defendants. Defendants are located in the West Bank of the Palestinian Territories and must attend to pressing affairs of state, especially given the developments in the Gaza Strip in 2007 and the renewed international efforts at peace and reconciliation highlighted by President Bush's recent trip to the region and the recent Annapolis conference. Moreover, the events giving rise to the Complaint took place exclusively in the Gaza Strip, and evidence and witnesses are necessarily located in this Hamas-controlled region, effectively depriving Defendants of any access to meaningful discovery. Given the political pressures on the PA and PLO to work towards a peaceful resolution of the Israeli-Palestinian conflict, and the current inaccessibility of the Gaza Strip, it will be highly disruptive for the Defendants to be haled into a U.S. Court and defend against a case where discovery of crucial facts and witnesses will be nearly impossible.

Similarly, the efficient resolution of the dispute generally turns on the location of witnesses and the evidence. *Panterra Engineered Plastics, Inc. v. Transp. Sys. Solutions, LLC*, 455 F. Supp. 2d 104 (D. Conn. 2006). As noted, the witnesses and evidence relating to Mr. Parsons death appear to be located almost exclusively in the Palestinian Territories (notably, Gaza) and Israel.

Finally, the social policies at issue weigh in favor of Defendants. Under *Asahi*, the Court must look to whether resolution of the claim in one forum (here, the United States) will have any effect on another forum's social policies. *See Am. Builders & Contrs. Supply Co. v. Lyle*, No. 05-2461, 2006 U.S. Dist. LEXIS 88803, 10-11 (D. Kan. Dec. 7, 2006). The attack in question occurred in the Palestinian Territory of the Gaza Strip. Setting aside the question of who is

responsible for security and law enforcement in the region, either the PA or Israel (or both) have a substantial interest in providing a forum for the resolution of claims arising from violence in the region. The U.S. courts have no stake in this incident but for the U.S. citizenship of the Plaintiffs. Given Israel's and the Palestinian Territories' connection to this dispute, the Court should decline to exercise jurisdiction over the PA and PLO in this instance.

## II. THE COMPLAINT MUST BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED UNDER THE ANTI-TERRORISM ACT

In assessing whether the Complaint states a cause of action, this Court must first determine the required elements of an Anti-Terrorism Act claim. This is especially essential where, as here, Plaintiffs seek to impose liability not on the individuals or organizations that planned or carried out the terrorist attack, but on other parties based on theories of indirect or vicarious liability. Thus, before turning to why the Plaintiffs' Complaint fails to state a claim for relief against the PA and PLO under the Anti-Terrorism Act, it is important to explore the contours of the Act and recent case law narrowing the scope of the Act.

### A. The ATA Imposes Civil Liability Only for Intentional, Knowing Acts that Were Reasonably Foreseeable to Cause Plaintiffs' Injury and in Fact Caused Plaintiffs' Injury.

#### 1. *The Civil Liability Provision of the ATA*

Plaintiffs seek recovery under the civil liability provision of the Anti-Terrorism Act, 18 U.S.C. § 2333(a), which became law in 1992. Section 2333(a) provides, in its entirety:

> Any national of the United States injured in his or her person, property, or business *by reason of an act of international terrorism*, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

28 U.S.C. § 2333(a) (emphasis added). "International terrorism," in turn, is defined by section 2331(1) to mean activities that --

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended-- (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1).[4]

The civil liability statute thus creates a cause of action on behalf of any American national injured "by reason of" an act of "international terrorism," which includes certain activities that "involve" violent acts. By failing to identify the classes of defendants who can be sued under the Act and by failing to define to what extent "involve" imposes liability on secondary actors, the statute fails to clearly delineate the conduct it proscribes. *Cf. Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1134-36 (9th Cir. 2007) (invalidating for vagueness the ATA to the extent it imposes, under 18 U.S.C. § 2339B, criminal liability for those criminal law provisions that prohibit American citizens from providing "training," "personnel" and "expert advice or assistance" to designated foreign terrorist organizations).

---

4 Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub. L. No. 101-519, § 132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency. They were subsequently reenacted as part of the Federal Courts Administration Act of 1992, Pub. L. No. 102-572, 106 Stat. 4506 (1992).

2. *Boim I*

As of 2002, "no court ha[d] yet considered the meaning or scope of sections 2331 and 2333." *Boim v. Quranic Literacy Institute* (*Boim I*), 291 F.3d 1000, 1009 (7th Cir. 2002). The 2002 *Boim* decision from the Seventh Circuit was thus the first to grapple with defining the scope of liability to avoid vagueness infirmities. After noting the limits of the statutory text, specifically the statute's failure to define the class of defendants (*id.* at 1010), the Seventh Circuit looked to the legislative history for guidance. Relying on its review of the legislative history, as well as an amicus brief from the United States, the court concluded: "That history, in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law." *Id.*

With regard to "who may be held liable for injuries covered by the statute," the *Boim I* court looked to tort law as well as the legislative history for guidance. *Id.* Reviewing the legislative history, the court concluded that the "statute clearly is meant to reach beyond those persons who themselves commit the violent act that directly causes the injury." *Id.* at 1011. But, in order for a defendant's act to constitute an "act of international terrorism," the defendant must have, at the very least, been engaged in activities that "involve violent acts or acts dangerous to human life that are a violation of [ ] criminal laws . . . ." 18 U.S.C. § 2331(1)(A) (defining "international terrorism" for purposes of § 2333(a)). As the Court of Appeals explained, an expansive application of the statute to any defendant arguably "involved" with the underlying act would "give the statute an almost unlimited reach." *Boim I*, 291 F.3d at 1011.

> Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actor's intent, could be construed to "involve" terrorism. *Without also requiring the plaintiffs to show knowledge of and intent to further the [principal]'s*

> *violent criminal acts, such a broad definition might also lead to constitutional infirmities* by punishing mere association with groups that engage in terrorism . . .

*Id.* (emphasis added).

Because of the potential constitutional infirmities with such a construction, the *Boim* I court concluded that the statute must be read as limited to those defendants whose conduct meets traditional causation and culpability requirements. *Id.* at 1011-12.[5] The court expressly rejected the notion that section 2333(a) imposes strict liability on those who provide support to the individuals or organizations that carried out the terrorist act causing the plaintiffs' injuries. "To hold the defendants liable for donating money without knowledge of the donee's intended criminal use of the funds would impose strict liability. Nothing in the language of the statute or its structure or history supports that formulation." *Id.* at 1012. In addition to requiring "knowledge of and intent to further" the violent act, the Seventh Circuit held that an ATA defendant "will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions." *Id.* at 1012. In this respect, the court noted that the "by reason of" language in the statute required a showing of proximate cause. *Id.* at 1012. The Court further explained: "Foreseeability is the cornerstone of proximate cause, and in traditional tort law." *Id.* at 1012.

With regard to secondary liability for aiding and abetting, the *Boim I* court noted that aiding and abetting a criminal act is itself a criminal act, *see* 18 U.S.C. § 2. The court therefore concluded that aiding and abetting a terrorist act fell within the definition of an act of "international terrorism" because it "involves" a violent act that is in violation of U.S. criminal

---

[5] Such a construction was in keeping with the venerable principle that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895).

laws. *See id.* at 1020. The court was quick to emphasize, however, that aiding and abetting liability can be imposed only where the plaintiff establishes that the defendant (1) had actual knowledge of the illegal activity that is being aided and abetted, (2) intended to help that illegal activity succeed; and (3) engaged in some act of helping that illegal activity. *Id.* at 1020-21.

In a portion of the court's opinion that was dicta, the *Boim I* court also construed section 2333(a) to impose liability on defendants who violate 18 U.S.C. § 2339A, which makes it a crime to provide "material support . . . knowing or intending that [it is] to be used in preparation for, or in carrying out," specified, violent criminal acts." The court concluded that providing material support for specified violent crimes associated with terrorism, which is by itself a criminal act, is an activity that "involves" violent acts or acts dangerous to human life, and thus falls within the section 2331(1)(A)'s definition of "international terrorism." *Id.* at 1014-15. As with aiding and abetting liability, the court emphasized that violation of 18 U.S.C. § 2339A would create civil liability under section 2333(a) only "so long as knowledge and intent are also shown [as with] aiding and abetting." *Id.* at 1015. The Court reached a similar conclusion with respect to violations of 18 U.S.C. § 2339B which imposes criminal liability for knowingly providing material support to designated foreign terrorist organizations.

In sum, to avoid constitutional infirmities associated with the vagueness of section 2333, specifically its imposing liability for activities that "involve" violent acts or acts dangerous to human life, *Boim* construed section 2333 to require plaintiffs to show the following as to defendants who are secondary actors, *i.e.*, those not directly responsible for the U.S. national's injury or death: (1) the defendant must have acted with *knowledge and intent* that its actions are supporting terrorist activity, of which the U.S. nationals death was a part; and (2) it must have

been *reasonably foreseeable* to the defendant that its actions would result in the death or injury to the U.S. national.

3. *Boim II*

The Seventh Circuit recently elaborated on this analysis in *Boim v. Holy Land Foundation for Relief & Development* (*Boim II*), 511 F.3d 707 (7th Cir. 2007). The Seventh Circuit first reaffirmed its holding in *Boim I* that secondary actors are liable under the ATA only where Plaintiffs can establish that the Defendants "knowingly and intentionally aid[ed] terrorist acts by providing funds or other support to those who commit the acts . . . " *Id.* at *22. To establish aiding and abetting liability, "plaintiff would have to show that the defendant knew of [the primary actor's] illegal activities, that the defendant desired to help those activities succeed, and that the defendant engaged in some act of helping the illegal conduct." *Id.* *See also id.* at *24 ("plaintiffs could not prevail on an aiding and abetting theory without proving that the defendants' intent was to help Hamas succeed in its terrorist aims").

After reaffirming the mens rea / culpability requirement of section 2333, the Seventh Circuit then turned to the causation requirement. The court explained: "implicit if not explicit throughout *Boim I*'s analysis is the notion that there must be a causal link between the defendant's actions and the plaintiff's injury." *Id.* at *95. Although *Boim I*'s discussion focused on the "foreseeability component of proximate cause (or legal cause), *Boim II* emphasized that plaintiffs also must establish causation in fact.

> The foreseeability component of proximate cause (or legal cause), which we discussed in *Boim I*, is not a replacement for or an alternative to cause in fact, but rather confines an actor's responsibility to injuries that were both factually caused by this tortious conduct and were the type of injuries that he foreseeably risked by his conduct. Put another way, factual causation is a necessary but not a sufficient basis for liability.

*Id.* at * 97-98. Leaving no room for ambiguity, the court then clarified that "[n]either the aiding and abetting theory of liability . . . nor civil consipiracy . . . obviates the need for a showing of cause in fact." *Id.* at *99.

The *Boim* decisions thus construe the statutory terms by limiting their application to those cases in which Plaintiffs can allege and prove traditional elements of causation and culpability. It is imperative that this Court, at a minimum, apply the *Boim* standard here when assessing whether the Complaint states a cause of action against the PA and PLO.

**B. Plaintiffs' Complaint Must Be Dismissed Because It Fails to Allege Facts Sufficient to State a Claim for Relief.**

As this Court has explained, "given the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of plaintiffs' allegations as to any particular defendant to ensure that he -- or it -- does indeed have fair notice of what the plaintiffs' claim is and the grounds upon which it rests, and that no inferences are accepted that are unsupported by the facts set out in the" complaint. *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F. Supp. 2d 86, 103-04 (D.D.C. 2003). Applying such scrutiny here, as enhanced by the Supreme Court's recent decision in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007), Plaintiffs' allegations that Defendants were actively involved in the death of Mr. Parsons cannot pass muster.

1. *As Twombly Clarifies, Rule 8(a)(2) Requires Plaintiffs to Plead Sufficient Facts to Render It "Plausible" (i.e., More than "Conceivable") that They Will Be Able to State a Claim for Relief.*

Federal Rule of Civil Procedure 8(a) directs that a complaint shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court recently revisited Rule 8(a)'s pleading standard and emphasized that the complaint must provide sufficient factual allegations to provide the defendants fair notice not only of the *nature* of the

claim but also of the *grounds* on which the claim against them rests. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 n.3 (2007). The Court explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 1964-65 (citations omitted). The Court concluded that plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974 (dismissing plaintiff's complaint because they "have not nudged their claims across the line from conceivable to plausible"). The Court referred to this newly-clarified standard as "the plausibility standard." *Id.* at 1968 (abandoning the "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In addressing the Rule 8(a) pleading standard, the Court was attuned to the necessity of weeding out groundless complaints before the parties and court waste their resources. According to the Court, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 1966 (internal citation and quotation omitted).

> It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries"; the threat of discovery expense will push cost-

> conscious defendants to settle even anemic cases before reaching those proceedings.

*Bell Atl. Corp. v. Twombly*, 124 S. Ct. at 1967 (internal citations and quotations omitted).

Even before *Twombly*, courts had expressed concern about speculative claims of terrorism supported only by formulaic recitation of the necessary elements. For example, in *In re Terrorist Attacks on Sept. 11, 2001*, 464 F. Supp. 2d 335, 340-41 (S.D.N.Y. 2006), the district court dismissed claims based on tenuous allegations of material support allegedly provided to Al Qaeda. The Plaintiffs there had alleged that the Defendants "provided banking services to Islamic charities and invested in other Islamic banks with knowledge of the downstream support these activities provided al Qaeda . . . ." The district court, however, dismissed the complaint on the ground that "Plaintiffs' assertions in this regard are conclusory and purely speculative." *Id.* at 340. The district court reached the same conclusion with regard to a different defendant who had allegedly made investments that supported terrorism, explaining that "Plaintiffs offer mere speculation, rather than factual allegations, in support of their assertion that [the defendant] knew or should have known that his investment activity was supporting terrorism." *Id.* at 340-41.

After *Twombly*, the scrutiny of formulaic complaints has become even more rigorous, and the U.S. District Court for the District of Columbia has not hesitated to dismiss complaints that fail to meet the *Twombly* standard. For example, in *Aktieselskabet Af 21 v. Fame Jeans, Inc. ("Fame Jeans")*, 511 F. Supp. 2d 1, 16-18 (D.D.C. 2007), the court dismissed a misrepresentation claim that contained all of the necessary elements but failed to provide any plausible factual grounds to support it. After noting that *Twombly's* pleading rules apply outside of the anti-trust context in which *Twombly* arose, *id.* at 16, the court acknowledged that the complaint may have survived scrutiny prior to *Twombly*, but could not do so now. *Id.* at 17-18. Dismissing the plaintiff's misrepresentation claim, the court noted that the complaint "merely

recites a formula," and "lacks the factual allegations necessary to clarify the 'grounds' on which that claim rests." *Id.* at 19. The district court also noted that the barebones nature of plaintiffs' complaint was particularly troubling given plaintiff's supposedly "revelatory investigation" prior to filing. *Id.* at 18-19. *See also Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 72 (D.D.C. 2007) (applying *Twombly* to support dismissal of discrimination claims because the complaint does not "state a claim to relief that is plausible on its face"); *Shane v. United States*, No. 07-577, 2008 U.S. Dist. LEXIS 1253, *29 (D.D.C., January 9, 2008) (citing *Twombly* and dismissing the complaint under Rule 12(b)(6) for failure to allege sufficient facts where the complaint contained "just the sort of 'labels and conclusions' proscribed by the Supreme Court").

Turning to the complaint here, Plaintiffs' allegations fare no better than those described above. Just as in those cases, Plaintiffs seek to survive a motion to dismiss with a complaint that consists entirely of formulaic recitations that are unsupported by any supporting factual grounds. Moreover, like the plaintiff in *Fame Jeans*, this dearth of facts exists despite substantial time and a parallel investigation that should have revealed such facts, if any existed. Given the lack of supporting grounds under such circumstances, Plaintiffs' complaint here similarly warrants dismissal, especially when measured against the *Twombly's* plausibility standard.

2. *Plaintiffs Fail to Plead Facts Sufficient to Support a Claim that Defendants Directly Participated In, or Conspired to Cause, the Death of Mr. Parsons.*

At various points in their Complaint, Plaintiffs contend that the PA or PLO was directly involved in the attack killing Mr. Parsons. *See* Compl. at ¶¶ 16, 18, 42, 43. However, Plaintiffs' broad and conclusory allegations are insufficient to state a claim for relief under *Twombly.* The most Plaintiffs offer is that "on information and belief" the bomb used in the attack that killed Mr. Parsons was made by the Palestinian Preventive Security apparatus and provided to the

"Terrorists" who undertook the attack. Comp. ¶ 16. Notably, the Complaint lacks *any* factual allegations regarding when, where, or how the bomb was manufactured and provided to the "Terrorists" who carried out the attack. Indeed, it is telling that the Complaint cannot even identify the terrorists or even terrorist organizations who engaged in the attack, but surmises that the attack was carried out by the "Popular Resistance Committees *or some other involved terrorist organization(s)* (collectively "The Terrorists")." *Id.* ¶ 15.

The Complaint's allegations set forth no facts upon which this Court could conclude that Defendants undertook overt acts that resulted in the death of Mr. Parsons. Unable to identify the terrorist organization responsible for Mr. Parson's death, the Complaint would have this Court simply assume Defendants must somehow be responsible for the attack. The Complaint is glaringly thin on any specific allegations as to Defendants' *acts*. It does not allege when the PA and PLO decided to undertake the attack that killed Mr. Parsons. It does not identify a single individual responsible for the attack on Mr. Parson's or anyone within the PA and PLO who authorized, encouraged, or supported such an attack.

Similarly, with regards to their conspiracy allegations, Plaintiffs offer no factual allegations beyond the bare elements of such a claim. To state a claim for civil conspiracy, Plaintiffs must allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful over act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of a common scheme." *Burnett*, 174 F. Supp. 2d at 105 (*citing Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). "Merely mouthing the word 'conspiracy' is not enough to render a defendant liable for the acts of a third party." *Boim II*, 2007 U.S. App. LEXIS 29864, at *122. As the *Twombly* Court held, "[t]he need at the pleading stage for

allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'show that the pleader is entitled to relief.'" 127 S. Ct. at 1966. Citing *DM Research, Inc. v. College of American Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999), the Court noted that "terms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation -- for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint." 127 S. Ct. at 1966.

Here, Plaintiffs simply engage in the "formulaic recitation" of certain elements of a conspiracy, contending that Defendants "conspired with" the Popular Resistance Committees, HAMAS, and Palestinian Islamic Jihad, Compl. ¶¶ 18, 44, committed the "overt act" of manufacturing bombs to be used in "terrorist attacks," *id.* ¶ 42, and "knowingly and purposefully" provided resources to terrorist organizations, *id.* ¶ 43. There are several problems with Plaintiffs' conspiracy claim. First, with respect to the elements of the claim actually plead, Plaintiffs provide only a formulaic recitation of the element, with labels and conclusions, rather than facts establishing the grounds for the claim. For example, the Complaint does not specifically identify the members of the conspiracy, the scope of the conspiracy, or any specific overt acts taken by Defendants in furtherance of the conspiracy. Second, Plaintiffs cannot plead a necessary element of a conspiracy claim, namely that the bombing attack that killed Mr. Parsons was accomplished by a member of such conspiracy. Given that Plaintiffs do not know who carried out the attack, they cannot establish that it was in furtherance of the supposed conspiracy in which the PA or PLO allegedly were members. Third, Plaintiffs have not sufficiently plead causation. As *Boim II* held, the ATA requires that Plaintiffs establish both that

the Mr. Parson's death was a foreseeable result of the *Defendants*' actions and that *Defendants'* actions in fact caused Mr. Parsons' death. 2007 U.S. App. LEXIS 29864, at *97-99. Here, the most Plaintiffs even attempt to allege is that "but for the actions of the PA and PLO . . . the terrorist acts which killed Mark Parsons *would have been substantially more difficult to implement* or would not have occurred." Compl. ¶ 43 (emphasis added). In addition to not even adequately pleading a "but for" allegation, Plaintiff fails to account for the *Boim II* holding that a "but for" standard does not suffice to show liability. 2007 U.S. App. LEXIS 29864, *98 (but for causation is "never enough for liability") (citing *Carris v. Marriott Int'l, Inc.*, 466 F.3d 558, 560 (7th Cir. 2006)).

3 *Plaintiffs Fail to Plead Facts Sufficient to Support a Claim that Defendants Aided and Abetted or Materially Supported Actions that Caused the Death of Mr. Parsons.*

Though the Complaint offers a variety of liability theories, fairly read, it is primarily directed at seeking to impose liability under an aiding and abetting or material support theory.

*Boim* held that civil liability may be imposed under section 2333 for aiding and abetting an act of international terrorism, *Boim I*, 291 F.3d at 1021, and Defendants assume arguendo that *Boim*'s construction of the statute is correct.[6] To state an aiding and abetting claim under section 2333, Plaintiffs must set forth allegations sufficient to show that the PA and PLO "knew of" the unknown terrorists' "illegal activities and desired to help those activities succeed, and they engaged in some act of helping the illegal activities," in this case, the killing of Mr. Parsons. *Id.*

[6] In *American Isuzu Motors Inc. v. Ntsebeza*, Supreme Court Docket No. 07-919, the Supreme Court is currently considering a petition for certiorari presenting the question of whether aiding and abetting liability is permissible under the Alien Tort Statute, 28 U.S.C. § 1350. On February 11, 2008, the Solicitor General filed an amicus curiae brief on behalf of the United States supporting a grant of certiorari on this issue. Depending on the outcome of the *Ntsebeza case*, Defendants reserve the right to challenge the propriety of aiding and abetting liability here. At the current time, however, Defendants assume arguendo that *Boim* correctly decided this point.

at 1023 (citations omitted). Further, as *Boim II* instructs, Plaintiffs must establish that Mr. Parsons' death was the foreseeable result of Defendants' actions and that Defendants' actions were a cause in fact of Mr. Parsons' death.

Similarly, with respect to material support, *Boim I* construed section 2333(a) to impose liability on defendants who violate 18 U.S.C. § 2339A, which makes it a crime to provide "material support . . . knowing or intending that [it is] to be used in preparation for, or in carrying out," specified, violent criminal acts." 291 F.3d at 1014-15. The Court reached a similar conclusion with respect to violations of 18 U.S.C. § 2339B which imposes criminal liability for knowingly providing material support to designated foreign terrorist organizations. Defendants question whether sections 2339A and 2339B can serve as the predicate for civil liability under section 2333 given that a defendant who has provided "material support" arguably has not engaged in activities that involve "violent acts or acts dangerous to human life."[7] Even assuming that such a theory might be theoretically viable, however, a claim for civil liability based on a predicate act of material support requires that Plaintiffs establish both culpability and causation. As with aiding and abetting liability, the *Boim I* court emphasized that violations of 18 U.S.C. § 2339A or § 2339B would create civil liability under section 2333(a) only "so long as knowledge and intent are also shown [as with] aiding and abetting." *Id.* at 1015. As *Boim II*, made clear, section 2333's causation requirement applies regardless of the theory of liability under which plaintiffs are proceeding, so would apply to claims based on violations of § 2339A

[7] This is particularly so when the alleged material involves purely foreign transactions, given the strong presumption against extra-territoriality and the fact that § 2339A and § 2339B include their own extraterritoriality provisions limiting their reach. *See Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746, 1758 (2007) ("the presumption [against extra-territoriality] is not defeated . . . just because a statute specifically addresses an issue of extraterritorial application, it remains instructive in determining the extent of the statutory exception") (internal quotations and citations omitted).

or § 2339B, just as they would to aiding and abetting claims. 2007 U.S. App. LEXIS 29864, at *97-99.

Plaintiffs' allegations regarding aiding and abetting and material support are hampered by the same lack of detail as their allegations that the PA and PLO were directly involved in the death of Mr. Parsons. Plaintiffs fail to provide sufficient factual allegations to establish that the meet the culpability and causation requirements. With respect to Plaintiffs' section 2339B claim, which is predicated on providing material support to a designated foreign terrorist organization, Plaintiffs' inability to even identify the terrorist organization responsible for the attack is fatal to their claim.

While Plaintiffs' Complaint is replete with buzzword hooks such as "knowingly" and "purposefully," these are but legal conclusions couched as allegations of fact, and this Court need not accept such allegations. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). *Twombly* makes clear that such hollow recitations of the elements of a claim are insufficient to state a claim upon which relief may be granted. 127 S. Ct. 1964-65. While the Complaint generically alleges that the PA and PLO supported broadly defined "terrorist activities," it lacks any allegations giving rise to a plausible set of facts from which a fact-finder could find or infer that the PA or PLO knowingly and intentionally aided and abetted, or materially supported, the terrorists responsible for the attack which killed Mr. Parsons. While the Complaint mentions that Defendants "worked together" with terrorists to plan and execute "acts of violence, murder, and terrorism" and that the "Popular Resistance Committees, Hamas and Palestinian Islamic Jihad and other terrorist groups carried out scores of terrorist attacks . . . including . . . the murder of Mark Parsons" (Compl ¶ 21), the Complaint lacks any factual allegations linking the PA or PLO to these terrorist organizations, setting forth the alleged acts of

"aiding and abetting," or demonstrating how any actions by the PA or PLO led to the death of Mr. Parsons. "It is not enough to show simply that a defendant generally aided and abetted [a terrorist organization]; there must be proof that the defendant aided and abetted them in the commission of the tortious acts that have some demonstrable link [to Mr. Parson's] death." *Boim II*, 2007 U.S. App. LEXIS 29864, *99-100. While Plaintiffs make broad allegations that Defendants "solicited" or "encouraged" terrorism or acted in concert with "terrorist organizations," none of Plaintiffs' allegations set forth any facts sufficient to even infer the requisite causal link between Defendants' alleged aiding and abetting and the death of Mr. Parsons. Compl. ¶¶ 27, 31.

With respect to Plaintiffs' material support claim, even if Plaintiffs could prove a mere association between Defendants and alleged terrorist groups, it is well-established that "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a *specific intent* to further those illegal aims." *Boim I*, 291 F.3d at 1023 (emphasis added). Simply alleging, without more, that the Defendants "praised, lauded, encouraged, enable, and support terrorist organizations" is not enough to give rise to a claim under section 2333 for providing material support. Rather, there must be some "causal link between the defendant's actions and plaintiff's injury." *Boim II*, 2007 U.S. App. LEXIS 28964, at *95.

### C. To the Extent Plaintiffs Seek to Impose Liability on the PA or PLO for Allegedly Failing to Provide Adequate Security in the Gaza Strip, Plaintiffs Fail to State a Claim for Which Relief Can Be Granted.

#### 1. *Plaintiffs' Claim Regarding the PA/PLO's Alleged Failure to Maintain Public Order Must Be Dismissed Under Rule 12(b)(6).*

Plaintiffs make a variety of statements in an effort to establish that the PA and PLO are responsible for providing security and maintaining order in the Gaza Strip. For example, the Complaint alleges that the PA and PLO "are authorized and responsible, under international instruments, customary international law and local law applying in the West Bank and Gaza Strip, to exercise law enforcement powers and to maintain public order and security in the territories under their control and responsibility." Compl. ¶ 19. *See also id.* ¶ 10 (the PA and PLO exercise "*de jure* and *de facto* control of territories in the Gaza Strip and West Bank"). Therefore, according to Plaintiffs, the PA and PLO have a duty to exercise judicial, prosecutorial and law enforcement powers and maintain public order in these territories. *Id.* ¶¶ 19, 20.

Plaintiffs also allege that the United States, Israel and the international community has "repeatedly demanded from Defendants PA and PLO that they take effective measures to prevent every terrorist attack by terrorist organizations and groups operating within the Palestinian territories." *Id.* ¶ 22. Plaintiffs maintain that the PA and PLO failed in their duty to protect individuals within the Palestinian Territories (as evidenced by the attack that killed Mr. Parsons), and further sheltered and permitted numerous terrorist groups to operate in the territories. *See id.* at ¶¶ 23-28. Under this "omission" theory, Plaintiffs appear to allege that the PA and PLO failed to take adequate steps to prevent the attack that killed Mr. Parsons and/or bring the culprits to justice, even if they are not directly responsible for the attack. *See id.* ¶ 28 ("[t]he acts and omissions of Defendant PA and PLO described herein…").

On its face, Plaintiffs' "omissions" theory -- their allegations that the PA and PLO can be held liable because of their failure to perform their public safety functions well enough to prevent the incident -- does not state sufficient facts or grounds to meet the plausibility standard of *Twombley*. This allegation is vague and conclusory, and ultimately fails to allege any sort of causal relationship between the purported omissions and Plaintiff's injuries. While this is true generally, it is particularly true for the claims against the PLO, which acquired no policing or public safety functions under the Gaza-Jericho agreement. Despite this indisputable fact, Plaintiffs' Complaint lumps the PLO in with the PA as the de facto policing authority at the time, without providing any non-speculative grounds for doing so. Such a pleading could never pass muster under the plausibility standard of *Twombley*.

But even if properly alleged, such a theory would fail to state a claim under the ATA because it would be foreclosed under traditional tort law. Nearly a century ago, the Supreme Court described the common law rule this way in an opinion by Justice Brandeis:

> The claimant contends that, by the general law, the Creek Nation is liable in damages for the action of the mob which resulted in the destruction of his property and prevented him from securing the benefits of the contract entered into between him as grantee and the Creek Nation . . . No such liability existed by the general law. The Creek Nation was recognized by the United States as a distinct political community, with which it made treaties and which within its own territory administered its internal affairs. Like other governments, municipal as well as state, the Creek Nation was free from liability for injuries to persons or property due to mob violence or failure to keep the peace. . . . The fundamental obstacle to recovery is not the immunity of a sovereign to suit, but the lack of a substantive right to recover the damages resulting from failure of a government or its officers to keep the peace. And the participation in the injuries of an officer acting, not *colore officii*, but in open and known violation of law, cannot alter the case.

*Turner v. United States*, 248 U.S. 354, 357-58 (1919) (Brandeis, J.).[8]

Similarly, in *Westminster Investing Corp. v. G.C. Murphy Co.*, 434 F.2d 521 (D.C. Cir. 1970), the victims of rioting in the District of Columbia sued the government for its failure to maintain public order. The D.C. Circuit held that the claim failed to state a cause of action, explaining that under the common law there was "no substantive right to recover the damages resulting from failure of a government or its officers to keep the peace." *Id.* at 526. The Court of Appeals also denied leave to amend because the Plaintiffs' could not plead around the doctrine merely by alleging that the District government "intentionally abandoned its duties and obligations to prevent and suppress rioting by restricting and restraining the proper exercise of its powers." *Id.* at 525. In rejecting this contention, the D.C. Circuit held that the common law forbids recovery because whether the failure to provide security is intentional or negligent, "[h]ard and serious choices have to be made" as to the allocation of resources and the potential risks and consequences of both action and inaction. *Id.*

This remains traditional tort law today. *See, e.g., Boone v. Office of the Chief of Police*, No. 07-5048, 2007 U.S. App. LEXIS 13173 (D.C. Cir. June 5, 2007) (summarily affirming district court dismissal of lawsuit against police under public duty doctrine); *Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) (affirming dismissal of lawsuit under public duty doctrine); *Joy v. Bell Helicopter Textron*, 999 F.2d 549, 561 (D.C. Cir. 1993) (noting public duty doctrine creates no general duty for government even to respond to calls for emergency rescue services); *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C. 1983) (noting that

---

[8] Despite resting its holding squarely on the public duty doctrine, *Turner* was apparently construed by later courts as establishing the proposition of tribal sovereign immunity. The Supreme Court recently made clear that the public duty doctrine holding was the "heart of *Turner*." *Kiowa Tribe v. Mfg. Techs.*, 523 U.S. 751, 756-57 (1998).

absent public duty doctrine "police officials would be placed in the position of insuring the personal safety of every member of the community, notwithstanding limited resources and the inescapable choices of allocation that must be made").

These same principles require dismissal of Plaintiffs' "omissions" theory of liability. At bottom, Plaintiffs' challenge is to the Defendants' alleged failure to keep the peace. Such a theory fails to state a traditional tort claim, and there can be no dispute that such a lawsuit would constrain the judgment of governmental officials with regard to the "hard and serious choices that need to be made" concerning how best to protect public safety in a turbulent region. To permit American juries to micro-manage critical judgments about the proper level of security in the Gaza Strip, based on inevitably incomplete information, would strain the bounds of judicial competence, to say the least. There is simply no way to present, several years after the fact, all of the various factors involved in determining how best to prevent attacks such as this one, and how to investigate, prosecute and punish acts given a governmental system with limited resources. The Court should dismiss those portions of Plaintiffs' claims that challenged the manner in which the PA and PLO exercised their "*de jure* and *de facto* control of the territories in the Gaza Strip and West Bank" as they are not cognizable under the ATA.

2. *In Any Event, Plaintiffs' "Public Duty" Claim Must Be Dismissed Under Rule 12(b)(1) Pursuant to the Political Question Doctrine.*

Assuming *arguendo* that Plaintiffs' "omissions" claims are cognizable under the ATA, they should be dismissed under Rule 12 (b)(1) pursuant to the political question doctrine. The United States Court of Appeals for the District of Columbia Circuit has held that "the courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary." *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) (internal citation and quotation omitted). Where a case presents a political question, courts lack

subject matter jurisdiction to resolve it; dismissal is required under Federal Rule of Civil Procedure 12(b)(1). *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1262 (D.C. Cir. 2006).

"Contemporary application of the Political Question Doctrine . . . draws on the analysis set forth in *Baker v. Carr*, 369 U.S. 186 (1962)." *Schneider v. Kissinger*, 412 F.3d at 193. In *Baker*, the Supreme Court enumerated six factors that may render a case nonjusticiable under the Political Question Doctrine:

> Prominent on the surface of any case held to involve a political question is found a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

Courts have rejected earlier arguments by the PA and PLO invoking the political question doctrine. *See*, *e.g.*, *Ungar v. Palestinian Liberation Org.,* 402 F.3d 274, 280 (1st Cir. 2005); *Biton v. Palestinian Interim Self-Government Auth.,* 310 F. Supp. 2d 172, 183-85 (D.D.C. 2004). But those cases involved very different arguments, which asserted that the federal courts lacked subject matter jurisdiction to adjudicate any claims arising out of the Palestinian-Israeli conflict. Here, by contrast, Defendants argue only this Court cannot adjudicate general questions involving the proper level of security provided by Defendants in exercise of their public safety powers.

Whether a political question is present must be analyzed on a case-by-case basis in light of "the particular question posed, in terms of the history of its management by the political

branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Baker,* 369 U.S. at 211-12. Thus the earlier political question decisions in cases involving the PA and PLO have no bearing on the issue presented here.

Many of the *Baker* factors are implicated by Plaintiffs' "omissions" claims. "The first *Baker* factor is undeniably implicated here. It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades." *Doe v. Israel*, 400 F. Supp. 2d 86, 111-12 (D.D.C. 2005). In addition, there are no judicially-manageable standards for assessing the adequacy of PA and PLO security arrangements; the ATA was not designed with governmental functions in mind, and the security arrangements themselves involve complex questions of resource allocation. To resolve such questions would require a detailed inquiry into what other security measures were being taken in Gaza at the time, what resources were available to the PA and PLO to allocate, and the totality of security threats facing the PA and PLO in Gaza and the West Bank.

While this is a difficult question for the Courts to resolve generally, it is impossible to resolve given the vague guidelines provided by the ATA for deciding such claims. The PA and PLO are likely the only government actors subject to scrutiny under the ATA rather than the Foreign Sovereign Immunities Act ("FSIA"). For political question purposes, the distinction is critical because the FSIA permits lawsuits only against governments that have been designated as state-sponsors of terrorism. 28 U.S.C. § 1605(a)(7)(A) & 28 U.S.C. § 1605A; *Mwani v. Bin Laden*, 417 F.3d at 15 n.15. Thus, such cases cannot even be brought until a threshold "state sponsor" determination is made by the Executive Branch, which is far better suited to addressing

the general security situation and the manner in which governmental powers are being exercised. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004) (noting additional protections provided by State Sponsor requirement). No Executive Branch involvement is required in cases brought under the ATA.

Resolving such questions would also implicate the third *Baker* factor, as it would require an initial policy determination by the Court as to precisely what level of public security protection would have been required under the circumstances. Whether the PA and PLO have provided sufficient security protection against anti-Israeli attacks has been at the heart of the diplomatic negotiations throughout the peace process. Such a question is "peculiarly volatile, undeniably political, and ultimately nonjusticiable." *Matar v. Dichter*, 500 F. Supp. 2d 284, 295 (S.D.N.Y. 2007), *citing Doe, 400 F. Supp. 2d at 112*. This Court should dismiss Plaintiffs' "omissions" claim on this ground, if it determines it is cognizable under the ATA at all.

### D. Plaintiffs' Complaint Fails to State a Claim for Which Relief Can Be Granted to the Extent Plaintiff Is Relying on Other Theories of Secondary or Vicarious Liability.

Plaintiffs generically alleged that "the acts and omissions" of the PA and PLO "were committed by and through their officials, employees and agents acting within the scope and course of their employment and agency . . . ." Compl. ¶ 28. These allegations also fail to meet *Twombly's* plausibility standard. Plaintiffs, for example, fail to identify any "officials, employees and agents" by name, do not attempt to identify the scope of the alleged agency or employment, and do not allege specifically what acts were taken and how those acts fell within the scope of the agency and employment.

Leaving aside the pleading deficiencies, even if Plaintiffs could sufficiently plead and establish some of these allegations, Defendants cannot be treated as a private employer. Indeed,

Defendants maintain that they possess sufficient indicia of statehood to be entitled to sovereign immunity. Absent a recognition of sovereign immunity, the PA is the only foreign government subject to liability under the ATA. *See* 18 U.S.C. § 2337(2) (providing immunity from suit to "foreign states"). Defendants, recognize however, that courts so far have rejected the PA's and PLO's sovereignty claim, so will not pursue the argument here, but only wish to preserve it in the event developing facts related to the peace process necessitate revisiting the analysis. If the PA is not treated as a state, then -- given its functions as the governing authority of the West Bank and Gaza Strip -- it at least should be afforded the same vicarious liability standard as municipalities.

In interpreting the federal civil rights laws, the Supreme Court has long held that municipal governments cannot be sued under a vicarious liability theory; instead, such organizations are subject to liability only where Plaintiffs can establish that their actions rise to the level of a policy or custom. *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997) (under the federal civil rights laws, "[w]e have consistently refused to hold municipalities liable under a theory of respondeat superior. . . . [t]hat is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). This principle has been applied in the terrorism context as well. In *Tracy v. Islamic Republic of Iran*, 2003 U.S. Dist. LEXIS 15844, at *23-24 (D.D.C. Aug. 21, 2003), a case brought under the state-sponsor of terrorism provision of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7), the court held: "In order for an agent, official, or employee's unlawful conduct to be imputed to a government, however, the government must share a degree of responsibility for the wrongful conduct. The government must have engaged in the wrongful

conduct, either deliberately or permissively, as a matter of policy or custom. *Id.* at *23-24 (citing *Monell v. N. Y. Dept. of Social Services*, 436 U.S. 658, 694-95, (1978)).

Even if the PA and PLO are treated as associations rather than municipalities, Plaintiffs would still not be able to impose vicarious liability on them for the acts of members of the association absent a showing that the PA and PLO supported and ratified the terrorist activity. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 920 (1982) ("[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims") (*quoted* in *Boim II*, 2007 U.S. App. LEXIS 29864, at *23); *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 218 (1979) (holding that an international union cannot be held liable for the acts of its local under an agency theory absent evidence that the international "instigated, supported, ratified or encouraged the local's activity, or that the local acted pursuant to an agreement with the international").

## III. PLAINTIFFS' SUPPLEMENTAL TORT CLAIM MUST BE DISMISSED BECAUSE THE PA AND PLO LACK THE CAPACITY TO BE SUED UNDER D.C. LAW

Count Five of Plaintiffs' Complaint seeks to hold Defendants liable for the common-law tort of intentional infliction of emotional distress. Compl. ¶¶ 52-58. This claim also must be dismissed for failure to state a claim because the PA and PLO cannot be sued in their own name in the District of Columbia for non-federal law claims.

### A. Under Fed. R. Civ. P. 17(b), the Capacity to Sue the PNA/PLO Is Governed by District of Columbia Law.

A number of suits have been filed against the PNA/PLO under the Anti-Terrorism Act, including four in the U.S. District Court for the District of Columbia. The courts consistently have treated the PNA and PLO as unincorporated associations. Most recently, Judge Friedman

held that the PNA and PLO are unincorporated associations for purposes of Fed. R. Civ. P. 4(h). *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107 (D.D.C. 2006). Judge Friedman explained:

> It has . . . been determined by other federal courts that the PLO qualifies as an unincorporated association under Rule 4(h) of the Federal Rules of Civil Procedure for purposes of service of process, because it is "composed of individuals, without a legal identity apart from its membership, formed for specific objectives." *Ungar v. Palestinian Authority*, 153 F. Supp. 2d [76,] 89 [D.R.I. 2001]; *see also Klinghoffer v. S.N.C. Achille Lauro Ed*, 739 F. Supp. 854, 858 (S.D.N.Y. 1990). The PA, which is "not presently recognized as a foreign state by the United States" therefore "also may be categorized as an organization composed of individuals seeking to achieve specific objectives, and which has no legal identity in the United States apart from its membership." *Ungar v. Palestinian Authority*, 153 F. Supp. 2d at 89.

*Id.* at 113-14.

Federal Rule of Civil Procedure 17(b) provides that the capacity of an unincorporated association to be sued "*shall be determined by the law of the state in which the district court is held*, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may . . . be sued in its common name for the purpose of enforcing . . . against it a substantive right existing under the Constitution or laws of the United States." Fed. R. Civ. P. 17(b) (emphasis added). Unlike Plaintiffs' Anti-Terrorism Act claims, Plaintiffs' pendent non-federal law claims do not fall under Rule 17(b)'s exception because they do not arise under the "Constitution or laws of the United States." Therefore, the general rule applies, namely that the law of the forum state (here, the District of Columbia) must recognize the capacity of unincorporated associations with respect to the non-federal claims.

The only case to address the PNA's or PLO's capacity to be sued under Rule 17(b) acknowledged that, for non-federal claims brought in federal courts in New York, the PLO could not be sued in its own name. *Klinghoffer v. S.N.C. Achille Lauro*, 739 F. Supp. 854, 866

(S.D.N.Y. 1990) ("Under New York law, the PLO cannot be sued in its own name, but only in the name of its president or treasurer. However, since plaintiffs and third-party plaintiffs assert claims under federal law, Rule 17(b)(1) permits them to sue the PLO in its own name.").

**B. Under Controlling District of Columbia Law, Unincorporated Associations, Such as the PNA/PLO, May Not Be Sued in Their Own Name.**

The District of Columbia does not recognize the capacity of unincorporated associations to be sued. *See Pritchett v. Stillwell*, 604 A.2d 886, 889 (D.C. 1992) ("The common law of this jurisdiction is that neither a partnership nor an unincorporated association may be sued in its own name."); *Kauffmann v. Anglo-American Sch. of Sofia*, 28 F.3d 1223, 1225 (D.C. Cir. 1994) (same); *Sisso v. Islamic Republic. of Iran*, 448 F. Supp. 2d 76, 91 (D.D.C. 2006) ("D.C. law does not permit an unincorporated association to sue or be sued directly"); *Catalyst & Chemical Servs. v. Global Ground Support*, 350 F. Supp. 2d 1, 22 n.19 (D.D.C. 2004) (under District of Columbia law, "unincorporated associations may not sue or be sued in their own names").

Judge Bates' recent decision in *Sisso* is squarely on point. There, the plaintiffs brought an Anti-Terrorism Act suit against Iran and Hamas. Only one of the plaintiffs was a U.S. citizen and thus a proper plaintiff under the Anti-Terrorism Act. The other plaintiffs were Israeli citizens who brought claims under the Israeli Civil Wrongs Ordinance. 448 F. Supp. 2d at 79. Ruling on the plaintiffs' motion for entry of default judgment, the court dismissed the plaintiffs' Israeli law claims against Hamas for failure to state a claim for which relief may be granted. *Id.* at 91. Citing cases concluding that the PNA and PLO should be treated as unincorporated associations, the court concluded that Hamas also should be treated as an unincorporated association. *Id.* Relying on Fed. R. Civ. P. 17(b), the court then found that the law of the District of Columbia determines Hamas's capacity to be sued for the non-ATA / Israeli law claims. After reviewing District of Columbia law on capacity of unincorporated associations to

be sued, the court held that Hamas could not be sued in its own name for the Israeli law claims. *Id.*

The court also rejected any notion of "pendent capacity," holding that the capacity of Hamas to be sued for the federal Anti-Terrorism Act claim did not create pendent capacity to be sued over the non-federal law claims: "[A]s far as this Court is aware, there is no recognized exception to that rule [prohibiting unincorporated associations from being sued in the District of Columbia] for situations such as this, where there is a *non-federal claim* against the unincorporated association that arises out of the same core of operative facts as a *federal claim* against the organization and capacity to be sued exists for the latter but not the former." *Sisso* 448 F. Supp. 2d at 91-92 (emphasis in original).

As with *Sisso*, Plaintiffs here seek to hold the PA and PLO liable as unincorporated associations for a D.C. common-law tort arising from the same set of "core operative facts" as their § 2333 claim. Under Federal Rule of Civil Procedure 17(b) and operative D.C. law, Defendants may not be sued for non-federal law claims, and Plaintiffs' Count 5 must therefore be dismissed.

The intentional infliction of emotional distress ("IIED) claim also should be dismissed because the PA's and PLO's alleged role in the incident is "too removed to support common law claims for intentional infliction of emotional distress." *Linde v. Arab Bank*, 384 F. Supp. 2d 571, 590 (S.D.N.Y. 2005) (holding in case involving same plaintiffs that IIED claims will not lie against secondary actors in terrorism cases because, unlike the conduct of the primary actors who actively committed the violent act, any allegations of monetary support do not constitute the sort of outrageous conduct necessary to state common law claim).

## IV. PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF LACHES

The complaint must also be dismissed on laches grounds because it is clear from the face of the complaint and judicially noticeable facts that such a defense exists as a matter of law. *Smith-Haynie v. District of Columbia*, 155 F.2d 575, 578 (D.C. Cir. 1998) (holding that affirmative defense may be raised under 12(b) where facts giving rise to defense apparent on face of complaint). The doctrine of laches contains two elements: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47-8 (D.C. Cir. 2005) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002)). While laches originally arose as solely an equitable defense, "some federal courts hold that, after the Federal Rules of Civil Procedure merged legal and equitable claims into a single civil action, the Rules specifically recognized the right to interpose the equitable defense of laches in a civil action and laches became part of the general body of rules governing relief in the federal court system, extending to suits at law as well as suits brought in equity." 27 Am.Jur. 2d Equity § 150 (citing, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1031 (Fed. Cir. 1992) (applying laches to patent lawsuit for damages based on abolition of law equity distinction embodied by Fed. R. Civ. P. 2); *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 6-8 (Fed. Cir. 1985) (discussing rule generally); *see also Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 233-34 (6th Cir. 2007) (discussing split of authority on whether laches can be applied to damages claims and adopting as sounder approach rule that laches can be argued "regardless of whether the suit is at law or in equity, because, as with many equitable defenses, the defense of laches is equally available in suits at law.")). The D.C. Circuit has not squarely addressed the question. It has, however, ruled on a related issue, finding that the merger of law and equity through the creation of a single

"civil action" abolished the rule in which statutes of limitations were generally deemed purely legal defenses, inapplicable to equitable claims. *Walters v. Secretary of Defense*, 725 F.2d 107, 111-14 (D.C. Cir. 1983).

Laches exists here as a matter of law and provides grounds for dismissal. There can be no dispute as to a lack of diligence. Plaintiffs waited nearly four years after the death of Mr. Parsons to file the instant action. Plaintiffs offer no reason for this delay. Plaintiffs were aware of their rights under the ATA as early as 2004, bringing suit against a different defendant under the same statute based on the same incident. *See Litle v. Arab Bank*, No. 1:04-cv-05449-NG-VVP (E.D.N.Y.). Indeed, Plaintiffs' factual allegations in this Complaint are essentially the same as in the *Litle* Complaint filed in 2004, reflecting the same lack of specificity then as they do now. There thus can be no argument that Plaintiffs were spending the 2004-2007 period securing evidence or developing their factual theories.

There also can be no dispute that Defendants are severely prejudiced by the delay. As widely publicized, in June 2007, a Hamas uprising in the Gaza Strip expelled the PA from the territory, and effectively isolated Gaza from the rest of the world. The PA currently has no authority in Gaza, and Israel and Egypt have almost completely sealed all borders with Gaza. Currently, Gaza is a Hamas controlled "no-mans' land" with PA authorities unable to venture into the area due to border controls and grave threats to their individual security. Moreover, Gaza is now inaccessible for the purpose of conducting discovery or otherwise gathering facts and information that may be relevant to defending against Plaintiffs' claims in this case.

The dramatically changed circumstances in Gaza in 2007 will result in immense prejudice to Defendants if this litigation is permitted to proceed. Absent a dramatic change in circumstances in Gaza, even were Plaintiffs to re-file sustainable claims against the PA or PLO

relating to the death of Mark Parsons, Defendants will remain unable to conduct any meaningful discovery or investigation within Gaza. While Plaintiffs have had over four years to research and prepare their claims, they waited until after Gaza was firmly out of the control of the Defendants prior to filing their claims. Had Plaintiffs brought suit in 2004, Defendants could have conducted an investigation of their claims in the Gaza strip with an eye toward identifying the witnesses and collecting the evidence necessary to present a defense. As a matter of law, Defendants have been severely prejudiced by Plaintiffs' lack of diligence in filing their claims, and dismissal under 12(b)(6) is accordingly required.

Even if the Court declines to dismiss the case on laches grounds, it should grant Defendants' motion to dismiss on Rule 12(b)(2) and 12(b)(6) grounds *with prejudice*. This Court should not permit Plaintiffs, who sat on their rights for nearly four years, to re-plead such claims against Defendants where Defendants will continue to face insurmountable obstacles to effectively defending against such claims.

Respectfully submitted,

Dated: February 15, 2008

/s/ Richard A. Hibey
Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Charles F.B. McAleer, Jr. (D.C. Bar #388681)
Laura G. Ferguson (D.C. Bar # 433648)
Timothy P. O'Toole (D.C. Bar # 469800)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858

*Attorneys for Defendants the Palestinian Authority and Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 15th day of February, 2008, a true and genuine copy of the foregoing was filed by ECF, which automatically provided service to the following:

**Richard D. Heideman**
HEIDEMAN NUDELMAN & KALIK, P.C.
1146 19th Street, NW
5th Floor
Washington, DC 20036
(202) 463-1818
Email: rdheideman@heidemanlaw.com
*Attorneys for Plaintiffs*

/s/ Charles F. B. McAleer, Jr.

2000 M Street, N.W. 7th Floor
Washington, D.C. 20036-3307
Tel 202.261.1000
Fax 202.887.0336

**MANELLI DENISON & SELTER PLLC**
ATTORNEYS

DID: (202) 261-1026
Email: mselter@mdslaw.com
www.mdslaw.com

February 27, 2008

**VIA FAX (212-805-6382)**
**AND OVERNIGHT DELIVERY**

Honorable Victor Marrero
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
Room 660
New York, New York 10007

Re: Knox v. Palestine Liberation Organization, No. 03-4466
Defendants' Motion For Relief From Judgment

Dear Judge Marrero:

I am counsel for Bernard J. Bucheit in his lawsuit against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA"), No. 00-1455 (D.D.C.).

I have become aware of the Defendants' motion for relief from judgment in the referenced case. Counsel for the Defendants represent that they have an understanding that their clients will engage in a good faith course of responding to the action in a cooperative and complete manner. Memorandum in support of Defendants' Motion for Relief from Judgment, p. 4 (July 31, 2007). As evidence that Defendants intend to comport themselves in accordance with the rules of the Court, Defendants point to their paying a long-outstanding discovery sanction. *Id.* p. 2 n.2. They also agreed to post a bond in the amount of $1 million, payable to the Plaintiffs if the Court grants their motion and they then default.

I am writing to call the Court's attention to the PLO's and PA's conduct in Mr. Bucheit's lawsuit that is inconsistent with their representations here. That action was fully litigated and contested on the merits. After a bench trial, on August 15, 2003, Judge Gladys Kessler of the U.S. District Court for the District of Columbia found the PLO and PA liable for conversion relating to Mr. Bucheit's cement plant in Gaza. The District Court awarded Mr. Bucheit damages in the amount of $1,531,053.34. Upon appeal by both sides, the D.C. Circuit affirmed the District Court's judgment. *Bucheit v. Palestine Liberation Organization*, 388 F.3d 346 (D.C. Cir. 2004). The PLO and PA have not made any effort to pay the judgment. Mr. Bucheit has filed a proceeding in Israel to enforce the judgment, which the PLO and PA are vigorously contesting.

Upon learning of the Defendants' motion for relief from the judgment in this case, I spoke with counsel for Defendants and told him that I thought it was inconsistent for Defendants to represent that they would honor the rules of this Court if the judgment were vacated while at the same time refusing to honor a valid and fully contested judgment of the U.S. District Court of the District of Columbia. Counsel for the Defendants said that the scope of his representation does not extend to the *Bucheit* case.

I respectfully request that the Court take into account the PLO's and PA's failure to honor the judgment in *Bucheit* in considering their motion for relief in this case.

I will be happy to submit this letter in the form of a more formal filing if the Court so requests.

Respectfully yours,

Michael H. Selter
of
Manelli Denison & Selter P.L.L.C.

Counsel for Bernard J. Bucheit

cc: David J. Strachman, Esq. (via facsimile)
Counsel for Plaintiffs
Fax. No.: 401-331-6095

Richard A. Hibey, Esq. (via facsimile)
Counsel for Defendants Palestinian Authority
And Palestine Liberation Organization
Fax. No.: 202-626-5888

2000 Street, NW Suite 700 Tel 202.261.1000
Washington, D.C. 20036-3307 Fax 202.887.0336

# MANELLI DENISON & SELTER PLLC

FACSIMILE TRANSMISSION

TO: David Strachman FAX: 401.331.6095

FROM: Michael H. Selter PHONE: 202.261.1026

DATE: February 27, 2008 CLIENT NO: 59712

NUMBER OF PAGES: 3 (including cover)

---

MESSAGE:

THIS MESSAGE MAY CONTAIN PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED SOLELY FOR THE INDIVIDUALS OR ENTITIES TO WHICH IT IS ADDRESSED. IF YOU ARE NOT THE ADDRESSEE OR THE EMPLOYEE OF THE ADDRESSEE RESPONSIBLE FOR THE DELIVERY OF THIS MESSAGE, PLEASE NOTE THAT ANY DISSEMINATION OR COPYING OF THIS MESSAGE OR DISCLOSURE OF ITS CONTENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS MESSAGE IN ERROR, PLEASE NOTIFY US BY PHONE FOR INSTRUCTIONS ON ITS RETURN OR DISPOSAL.

THANK YOU.