UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs,

v.

THE PALESTINIAN AUTHORITY, et al.,

Defendants.

C.A. No. 00-105L

**THE PALESTINIAN AUTHORITY'S AND PALESTINE LIBERATION ORGANIZATION'S REPLY TO PLAINTIFFS' OBJECTION TO MOTION FOR RELIEF FROM DEFAULT JUDGMENT**

Plaintiffs obtained through default a $116 million judgment against Hamas, the Palestinian Authority ("PA"), and the Palestine Liberation Organization ("PLO"). There is no dispute that Hamas operatives carried out the attack that forms the basis for this lawsuit. *Ungar v. PLO*, 402 F.3d 274, 276 (1st Cir. 2005) ("The three occupants of the attacking vehicle were all members of the Hamas Islamic Resistance Movement (Hamas), a group designated as a terrorist organization by the United States Department of State. . . . The authorities apprehended the three assailants and, soon after, arrested a fourth Hamas member as an accessory. An Israeli court convicted all four men."). As their basis for seeking $116 million in damages from the PA and PLO, Plaintiffs alleged that the PA and PLO provided material support or otherwise aided and abetted Hamas in its terrorist activities. Yet, in a separate lawsuit in the District of Columbia, the Ungars sued Iran, not the PA or PLO, for supporting Hamas in connection with the attack on the Ungars. *Ungar v. Islamic Republic of Iran*, Civ. 00-2606 (filed Oct. 27, 2000).

In their suit against Iran, the Ungars sponsored and adopted expert testimony describing Hamas as a "rival" of the PLO and as forming a "partnership" with Iran to undermine the PA and PLO leadership in their efforts to engage in a peace process with Israel. *See* DE 408-13 (Exh. M to Defs' Motion for Relief from Default Judgment) (Testimony of Reuven Paz) at 65:19-20, 66:9-22, 67:16-68:8, 70:13-71:2. According to Plaintiffs' own expert, Iran provided this support to Hamas at a time when the Palestinian Authority was working "to limit Hamas activity" and some of members of Hamas "became wanted either by Israel or the Palestinian Authority." *Id.* at 74:18-24. Based on testimony proffered by the Ungars' expert witnesses, the court concluded: "By the mid 1990s, Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, specifically to disrupt the Israel-PLO peace process." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 94 (D.D.C. 2002). *See also id.* at 95 ("Relations between Iran and HAMAS were particularly close in 1996, the year of the Ungar murders"). Based on the case presented by Plaintiffs in *Ungar v. Iran*, as well as the additional factual background provided by Defendants in their Motion for Relief from Default Judgment regarding the PA/PLO's relationship with Hamas at the time of the attack and the PA/PLO's role in arresting the Ungars' assailants and transferring them to Israeli custody, *see* DE 408 at 20-23, 28-31, and accompanying exhibits F-K, O-U, any objective observer would have grave concerns that the PA/PLO is being saddled with a $116 million judgment for an act for which they had no responsibility. Indeed, even worse, they are being saddled with a $116 million judgment for an act committed by Hamas as an act of defiance of the PA's and PLO's commitment to the Oslo peace process. It is important to note that enforcement of the judgment against the PA and PLO reduces the judgment against Hamas by a commensurate amount. That the PA and PLO should be confronted with this judgment at a time

when Hamas once again is working to subvert President Abbas's and Prime Minister Fayyad's renewed efforts at a peace process is sadly ironic.

The Palestinian leadership of President Abbas and Prime Minister Fayyad seeks only the opportunity to vindicate the Palestinian government by litigating the case on the merits. Granting this Motion will leave the $116 million judgment against Hamas in place. Sympathy for the Plaintiffs' efforts to collect on a massive default judgment against the PA and PLO is merited only if one believes that the PA and PLO are, like Hamas, responsible for Plaintiffs' loss. But, in the *Ungar v. Iran* case, even Plaintiffs did not portray the PA and PLO as responsible. Even in this lawsuit, Plaintiffs deflect attention from the meritorious defense arguments by focusing on the PA/PLO's litigation conduct and on various procedural arguments supposedly precluding the Court's consideration of the merits. In an ordinary case involving a private individual or corporate defendant and a modest judgment, a court would be understandably reluctant to vacate a three-year old judgment that resulted from intentional litigation conduct. This case could not be more extraordinary.

Today, Palestinians are faced with the choice of supporting radical Islamic Hamas or the moderate secular leadership of President Abbas and Prime Minister Fayyad. President Abbas and Prime Minister Fayyad have earned praise from the international community -- including the United States -- for their efforts to fight terrorism, including that perpetrated by Hamas, and to negotiate with Israel for a peaceful resolution of the long-running Israeli-Palestinian conflict. In order to win the hearts and minds of a very beleaguered people, the PA leadership must be able to demonstrate that it can provide financial stability and show tangible signs of progress in dealings with the United States and Israel. It is no exaggeration to say that a U.S. court's imposition of massive judgments on the PA and PLO for acts of Hamas weakens the moderate leadership of the

PA and strengthens Hamas at a critical time. *See* Pls.' Objection (DE 415) at 42 (noting November 2007 Annapolis summit at which Israeli and Palestinian leaders "committed themselves - with the full backing of the United States - to establish a Palestinian state by the end of 2008"). In its February 29, 2008 letter to Judge Marrero in the *Knox v. PLO* case, the United States informed the court that it "remains concerned about the potentially significant impact that these cases may have on the financial and political viability of the defendants." Exh. A at 1. The United States' use of the word "viability" bears emphasis. The current leadership of the PA has a fragile hold on power, having already lost Gaza to Hamas, and is facing bankruptcy. DE 408-3 (Secretary of State Condoleeza Rice describing a recent international aid conference as "literally the [PA] government's last hope to avoid bankruptcy"). Collectively, Anti-Terrorism Act suits pending against the PA and the PLO in the United States seek over $4 billion in damages, nearly double the PA's annual budget. Not only are the damages sought wildly punitive given the relatively small number of deaths and injuries at issue, but they ultimately will serve to bolster extremists who want a moderate, non-militant Palestinian leadership to fail and who will cite the United States' failure to help the Palestinians as a further reason to turn to militancy.

Though Defendants recognize that Rule 60(b)(6) relief is not lightly granted for all of the reasons Plaintiffs cite, the "extraordinary circumstances" standard is inherently flexible and provides the Court the necessary discretion to provide -- in unique, high-stakes cases -- relief that otherwise would not be warranted. This is just such a case. There can be no dispute that the stakes for the PA and PLO in this Motion are high. Nor can there be any doubt that Plaintiffs' loss engenders considerable sympathy. In the end, however, an examination of *all* the pertinent factors makes clear that the law's strong preference for merits litigation outweighs any countervailing considerations under these unique and extraordinary circumstances. There is a

significant difference between the reprehensible and tragic acts committed by Hamas, and the procedural missteps committed by the PA/PLO in this litigation. The instant judgment, however, imposes precisely the same liability for each. The Court should accordingly grant the Motion, with such conditions as the Court considers reasonable and appropriate in the exercise of its discretion.

## ARGUMENT

### I. THE PA'S AND PLO'S EARLIER CONDUCT OF THE LITIGATION DOES NOT AMOUNT TO LEGAL WILLFULNESS AND IN ANY EVENT IS NOT DISPOSITIVE ON THE QUESTION OF RULE 60(b)(6) RELIEF.

On the question of the willfulness of the default, Defendants made two basic arguments. First, Defendants contended that their conduct at the time of the default was not willful as that term is defined in the law because it was mitigated by the PA's and PLO's reasonable failure to understand how the United States courts could hale them into Court to answer for actions of Hamas taken specifically to undermine the peace process. DE 408 at 31-38. Second, Defendants argued that, even if the Court found that the earlier conduct in the litigation amounted to legal willfulness, that determination was not dispositive on the question of Rule 60(b)(6) relief because any willfulness was outweighed in the vacatur calculus by the strength of the underlying defense and the foreign policy consequences of enforcing a massive default judgment against the PA and PLO. DE 408 at 14-44. Plaintiffs' Objection fails to refute either of these points.

#### A. No Further Reply Is Warranted with Regard to Whether Defendants' Earlier Conduct of the Litigation Amounts to Legal Willfulness.

In response to the question of whether the default was willful as that term has been defined in the controlling law, Plaintiffs castigate the Defendants' conduct of the litigation, providing a host of examples about the regrettable behavior of Defendants prior to the default.

DE 415 at 1-12. These arguments, however, fail to engage with Defendants' basic contention, which was not to sugar-coat their prior litigation conduct. Instead, as Defendants made clear, resolution of their contention on willfulness turns on whether the PA and PLO could reasonably fail to understand how an American court could seek to hold them responsible for Hamas's conduct, when Hamas was at odds with the Defendants and striving to undermine Defendants' role in the region. Defendants have fully set forth their reasons they believe their prior conduct was mitigated in such a fashion. DE 408 at 31-41. Because Plaintiffs do not meaningfully engage on the question, Defendants do not believe any further reply is necessary.

### B. The PA/PLO's Earlier Conduct in the Litigation Is Not Dispositive in the Rule 60(b) Analysis -- This Court Must Exercise Its Discretion by Determining Whether Any Willfulness Is Outweighed by the Existence of a Meritorious Defense and the Serious Foreign Policy Consequences Of Denying Vacatur.

The PA and PLO also argue that, regardless of any finding on willfulness, the Court must go on to consider other factors, including the strength of the meritorious defense and the foreign policy consequences of refusing to grant vacatur. Plaintiffs disagree, arguing that a finding of willfulness automatically ends the Rule 60(b)(6) analysis. DE 415 at 12. This contention cannot withstand scrutiny.

If Plaintiffs' absolutist position were correct, then Defendants should not have been able to point to a single case in which a court permitted vacatur under Rule 60(b)(6) in the face of a willful default. But such cases indisputably exist, and the very existence of such cases refutes the notion of any categorical rule forbidding relief. Indeed, many courts have expressly acknowledged this reality, observing that the willfulness factor is "relevant but not dispositive." *ILGWU Nat'l Ret. Fund v. Meredith Grey, Inc.*, 986 F. Supp. 816, 823 (S.D.N.Y. 1997); *accord Wagstaff-El v. Carlton Press Co.,* 913 F.2d 56, 57 (2d Cir. 1990) ("even when defendant's

conduct may be considered willful, a default judgment entered against him may be vacated if he presents valid defenses and plaintiff would not be prejudiced if the default judgment was vacated."); *SEC v. McNulty*, No. 94-civ-7114 (MBM), 1996 U.S. Dist. LEXIS 10649, at *9 (S.D.N.Y. July 26,1996) (relying on *Wagstaff-El* in noting willfulness factor is "relevant but not dispositive; even when defendant's conduct may be considered willful, a default judgment against him may be vacated if he presents valid defenses and plaintiff would not be prejudiced if the default judgment was vacated").

Thus, in *Sales v. Republic of Uganda*, No. 90-Civ.-2972, 1992 U.S. Dist. LEXIS 19932, at *8-10 (S.D.N.Y. Dec. 28, 1992), the court applied this rule in the face of a Defendant's "displayed indifference to the power of United States Courts." As the court explained, "the question of defendants' willfulness need not be resolved squarely in [defendants'] favor, especially where defendants present meritorious defenses and plaintiff has failed to demonstrate prejudice." *Id.* at 9-10 (internal quotations omitted); *accord Walpex Trading Co. v. Yacimientos Petroliferos*, 109 F.R.D. 692, 696 (S.D.N.Y. 1986).

To be sure, the discretionary power of Rule 60(b)(6) is not "ordinarily" to be used for the purpose of relieving defendants from willful defaults, *Paul Revere Variable Annuity Ins. Co., v. Zang*, 248 F.3d 1, 6 (1st Cir. 2001). But because exceptional cases indisputably exist, it is clear that willfulness does not always end the inquiry. The real question is what factors courts look to when finding that vacatur is warranted despite the existence of a willful default.

Likely recognizing this point, Plaintiffs go to great lengths to distinguish those exceptional cases in which courts have granted relief from willful defaults -- arguing that those cases are distinguished by the PA/PLO's supposedly more egregious conduct in the underlying litigation, or the fact that the exceptional cases involved foreign sovereigns, or were not of recent vintage. DE

415 at 12-18. Of course, these purported distinctions themselves require the Court to look to factors other than willfulness -- thereby demonstrating that willfulness itself cannot be the only factor in the vacatur analysis. In any event, the distinctions proposed by Plaintiffs cannot withstand scrutiny because the cases permitting vacatur in the face of willful defaults expressly rely on factors that are fundamentally indistinguishable from the ones Defendants are seeking to have this Court apply here.

For example, *Carl Mark & Co., Inc. v. Union of Soviet Socialist Republics*, 665 F. Supp. 323, 331-32 (S.D.N.Y. 1987), involved a default judgment entered against the Soviet Union after four years of extensive damages litigation in which the USSR intentionally refused to participate. *Id.* at 330-31. In addressing the USSR's vacatur motion, the Court rejected any contention the default was not willful:

> [A]s the procedural history just detailed makes clear, this Court went well out of its way to give notice of the progress of these lawsuits not only to the Soviet Union but also to the Executive Branch of our own Government, apprising both the State Department and the United States Attorney for the Southern District of New York of all developments, although it was not obliged to do so under the FSIA. This Court took these actions because of its own concern at the time to spare itself, the plaintiffs, the United States, and the Soviet Union the embarrassment and waste of effort that the entry of a default judgment, and the proceedings to determine its validity that would eventually but necessarily follow, might occasion. This Court is convinced that the USSR at all times knew that it was necessary to answer and appear . . . .

*Id.* at 332. Nonetheless, the court granted vacatur under Rules 60(b)(6) and 60(b)(4) based on the strength of the underlying defense, explaining that "[b]ut for the fact that the USSR seems to present singularly compelling grounds for the relief requested, on the merits, we would leave the defendant to its laches, its neglect, and its studied and intentional default." *Id.*

*Carl Marks* thus relied heavily on the existence of a meritorious defense and foreign policy consequences in permitting relief from an intentional default. In *Jackson*, the Court relied on these very same factors to vacate a default judgment against a defendant whose conduct in the litigation was at least as serious as the conduct by Defendants here. There, the Chinese government (PRC) had refused to participate in the district court litigation for years despite full knowledge of the process. *Jackson v. People's Republic of China*, 794 F.2d 1490, 1492-93 (11th Cir. 1986). After a default judgment was entered, a damages hearing held, and execution on the judgment was underway, the PRC sent a diplomatic note to the district court threatening that, if enforcement proceedings continued, it would take "corresponding measures" against the United States. *Id.* at 1496. The PRC thus not only refused to participate, it also refused to pay the judgment and threatened retaliatory action in response to collection actions.

Several months later, the PRC filed a vacatur motion under Rule 60(b)(6) and other provisions of the vacatur rule. *Id.* at 1492. The district court granted vacatur, based largely on the foreign policy implications that would have resulted from enforcing the judgment, and scheduled a motion on the PRC's motion to dismiss in order to assess any defense on the merits. *Id.* Despite the fact that the PRC refused to participate in the litigation of its own motion to dismiss, the district court granted the dismissal motion as well. *Id.*

After the Plaintiffs appealed, the PRC filed a brief but "instructed its counsel not to appear for the oral argument" before the Eleventh Circuit. *Id.* Nonetheless, the Eleventh Circuit affirmed vacatur, holding that the district court had properly afforded substantial weight to "the foreign policy implications of the default judgment" and the meritorious defense. *Id.* at 1496. The Eleventh Circuit also expressly found that the PRC was entitled to equitable relief despite its

threats to take "corresponding measures" in response to the enforcement litigation. *Id.* at 1496-97.

*Jackson* thus permitted vacatur based on the foreign policy consequences and the existence of a meritorious defense -- against a defendant that willfully refused to participate in the litigation at various periods *after* vacatur and that had threatened retaliatory action in response to collection actions. But *Jackson* involved only a default judgment. In *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 174-75 (5th Cir. 1989), the judgment in question had resulted from a trial on the merits, during which the defendant had willfully chosen "not [to] present any of the numerous defenses available to it." Nonetheless, the Fifth Circuit affirmed a grant of vacatur, relying on the size of the underlying judgment and the foreign policy considerations of enforcing it. *Id.*

A more recent example of these principles can be found in *Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001). There, the Russian Federation appeared at the initial stages of the litigation to contest a temporary restraining order. After the district court denied the TRO, the Russian Federation avoided service of process and did not appear in later proceedings. The district court entered a default judgment for $234.5 million and refused to vacate the default based on the defendants' actual notice of the litigation and participation in the TRO proceeding. The Fifth Circuit found that vacatur was required as a matter of law under Rule 60(b) in light of a number of factors, including the underlying merits of defendants' legal claims and "the diplomatic implications of this case." *Magness*, 247 F.3d at 618.[1]

[1] Although *Magness* appears to have been decided under Rule 60(b)(3) or 60(b)(4), the court applied a multi-factor test applicable to all "Rule 60(b)" motions, pursuant to *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401-02 (5th Cir. 1981). *Magness*, 247 F.3d at 618-19.

These cases refute the notion that some blanket rule exists permitting vacatur only where a willful defendant sits out the proceedings entirely. Instead, in all of these cases, the courts held that stark examples of willfulness were outweighed by a combination of meritorious defenses, foreign policy concerns and the serious consequences of forcing a defendant to pay a default judgment. In short, these cases balanced any willfulness against other factors -- the same factors Defendants are asking this Court to weigh in the balance here.

It is true, as Plaintiffs point out in their Objection, that these cases have involved sovereign nations. DE 415 at 12. This is hardly surprising. Foreign policy concerns almost uniformly arise in the context of sovereign nations. But the cases themselves describe foreign policy interests more broadly, and do not purport to limit their application to cases involving sovereign nations or defenses of sovereign immunity. Where significant foreign policy concerns arise in the unique context of a governing entity, as they do here, the language and reasoning of those cases provide every indication that foreign policy concerns will similarly weigh strongly in favor of vacatur.

This is particularly so given the critical nature of *this* governing entity, which performs its functions in a part of the world that is critical to United States foreign policy. The PA may not be sovereign, but there can be no doubt that the relationship between the Palestinian government and the United States is an important one. There can similarly be no doubt that enforcement of default judgments can disrupt the PA's relationship with the United States, every bit as much as enforcement of the default judgments in *Jackson*, *Marks* and *Magness* could interfere with United States' relations with the Chinese and Russian governments. Similarly, where a compelling defense arises in the context of such foreign policy concerns, it can and should be considered in the Rule 60(b)(6) context, even in the face of a "studied and intentional default." *Carl Marks,* 665 F. Supp. at 331-32.

## II. THE PA AND PLO HAVE STRONG MERITORIOUS DEFENSES.

The most compelling feature of this motion -- the one that takes this case into the realm of extraordinary circumstances -- is the strength of the meritorious defense. The available evidence, most of it presented by Plaintiffs in a parallel proceeding filed in federal court in Washington D.C., suggests not only that Hamas committed the offense but that it did so for the express purpose of undermining the Defendants' interest in the peace process. Although this factor was a primary focus of Defendants' motion, Plaintiffs do not address it until the end of their Objection, almost as an afterthought. The Plaintiffs seek to justify this treatment of the issue by musing that the meritorious defense standard is so low that it would be easily satisfied in any vacatur case. This argument, however, ignores the factual basis for a meritorious defense set forth in *this* case, which is not simply a pro forma showing of the type described by Plaintiffs but a powerful presentation taken from the Plaintiffs' own mouth.

### A. Plaintiffs' Parallel Litigation in Washington Generated Significant Evidentiary Support for the PA and PLO's Defense, Which the Plaintiffs Cannot Walk Away From Now.

When they finally confront the meritorious defense issue head-on, Plaintiffs' seek to downplay the importance of the Washington D.C. litigation by suggesting that the PA's and PLO's characterizations are "pure fiction and bear[s] no resemblance at all to what appears in the records." DE 415 at 56. But "what appears in the records" conclusively refutes Plaintiffs' arguments, not Defendants'. The Plaintiffs' were not simply presenting "Hamas' . . . own black-and-white crackpot worldview," *id.*, unrelated to the PA and PLO. The Plaintiffs' theory of Iran's liability was that it and Hamas partnered because of shared opposition to the PA/PLO-Israeli peace process and that Hamas committed the shooting of the Ungars in order to disrupt the PA and PLO. Having created such a record, Plaintiffs cannot walk away from it now.

The record made by Plaintiffs in the Washington D.C. litigation renders virtually nonsensical Plaintiffs' attempt in this litigation to argue that that the PA and PLO "supported" Hamas. To be sure, Plaintiffs' Complaint made boilerplate allegations that the PA and PLO supported Hamas and served as accessories after the fact to the shooting, but they have never even begun to come up with any facts to support these allegations. Plaintiffs would no doubt attribute that lapse to the default, but in the parallel case, which was also litigated in the default context (and thus in the absence of discovery), Plaintiffs went into great detail regarding the Hamas cell's establishment, funding, and training. Plaintiffs also relied on the confessions of the shooters in the parallel case, which they notably fail to do here. Most importantly, Plaintiffs relied on the testimony of Dr. Reuven Paz -- testimony that unambiguously supports the PA and PLO's defense here. In addition, Plaintiffs' Washington D.C. litigation generated substantial evidence of Hamas's motive to commit violent acts in order to undermine the PA and PLO -- a motive that is fundamentally inconsistent with holding the PA and PLO legally responsible for the shooting.

1. *Dr. Paz's Testimony Unambiguously Supports the PA's and PLO's Defense.*

One of Plaintiffs' most important witnesses in the Washington D.C. case was Dr. Reuven Paz, whom Plaintiffs called as an expert on Palestinian terrorism and terrorist groups.[2] In their Objection, Plaintiffs argue that Dr. Paz testified "in the 1990s, the Palestinian Authority was supplying Hamas with weapons." DE 415 at 58. That is not a fair characterization of even the isolated passage of Dr. Paz' testimony cited by Plaintiffs, and it completely ignores Dr. Paz's testimony as a whole. As appears in the transcript attached as Exhibit M to *Defendants'* Motion

[2] Plaintiffs identify Dr. Paz as Defendants' expert in the D.C. suit. This is likely a typographical error, as it is unlikely that Plaintiffs would dispute that Dr. Paz was called to the stand and examined by Mr. Strachman as their witness.

(contrary to Plaintiffs' suggestion that Dr. Paz's testimony was "carefully omit[ted]," *see* DE 415 at 58), Dr. Paz testified in response to a question concerning where Hamas secured their weapons:

> Well, they have difference sources. There is -- first of all, there is a difference between the period of prior to '94 and after '94. When I say '94, I mean the establishment of the Palestinian authority and the amount of weapons that the Palestinian authority was actually given by Israel as a legitimate weapon during that period. So I mentioned it because after '94, there was a lot of weapons in the territories; so their sources were either from the Palestinian authority or weapons stolen from Israel, either from civilians or from the Israeli military forces; and weapons smuggled from outside the Palestinian territories either from Egypt to the Gaza Strip or from Jordan or through Jordan to the West Bank.

DE 408-13, at 79:22-80:9.

On its face, this isolated passage appears to reflect Dr. Paz's musing as to the potential sources in the Occupied Territories from which Hamas could have conceivably secured weapons. No matter how one reads this vague passage, however, one thing is clear. Dr. Paz did not, nor could he, say that he had any evidence that the PA was providing Hamas with weapons in the post-1994 period. In any event, this statement was made in the context of a larger discussion of Hamas's continuous efforts to smuggle weapons into the Occupied Territories in order to facilitate and further its efforts to disrupt the PA and PLO by committing acts of violence. The unambiguous point of this violence was to undermine the PA and PLO's role in the peace process, and as such, Hamas pointedly attempted to avoid detection by the PA and PLO.

As to this overarching point, Dr. Paz's testimony was clear and detailed. Dr. Paz testified that the cell that performed the shooting was likely trained by a senior Hamas official, Hassan Salame, because the cell's leader Nassar Salah Talachmeh, was detained in a Palestinian jail (by the PA) in Jericho. *Id.* at 73-77. The cell received specialized training in shooting from moving

cars, a skill taught only in training camps in Iran. *Id.* at 76. The training, which was necessary because cell members were "wanted" targets either by Israel or by the PA, improved the operation of the cell in particular and was an important factor in Hamas's successful performance of terrorist strikes during 1996. *Id.* at 74-75, 79, 89.

2. *The Parallel Litigation Generated Strong Evidence Concerning Hamas's Motive to Commit the Shooting to Disrupt the Peace Process and Undermine the Defendants -- Evidence That Is Inconsistent with Plaintiffs' Theory of Liability Here.*

Another compelling contrast between this litigation and parallel litigation is with regard to the question of motive. In this litigation, Plaintiffs completely fail to articulate any sort of plausible motive why the PA and PLO would have supported Hamas in the commission of the shooting. Indeed, as Defendants' demonstrated in the vacutur motion, such a motive simply did not exist because at the time of the shooting Israeli and U.S. leaders were *commending* Yasir Arafat for the PA's and PLO's renewed and serious efforts to crack-down on Hamas. DE 408 at 22. By contrast, the Plaintiffs had no problem in the Washington, D.C. litigation presenting detailed evidence on the subject of motive, eliciting testimony that the shooting occurred just as Hamas and Iran were cultivating a relationship based on shared interest in undermining the PA/PLO. The goal of Iran and Hamas was to use violent attacks against Israelis, like the one in this case, to raise Hamas's profile as an alternative to the PA/PLO in the region and thereby thwart both the PA/PLO leadership and their role in the peace process. DE 408-13 at 70-71, 85. Such evidence is completely inconsistent with Plaintiffs' theory that the PA and PLO supported Hamas or participated in any way in the attack. Instead, the Plaintiffs' motive evidence strongly suggests that attack was designed to undermine the PA and PLO, which is the polar opposite of support.

**B. Plaintiffs' New Theories Of Liability Fare No Better Than the Ones Plaintiffs Abandoned.**

Given that record, much of it self-created, the Plaintiffs are forced to abandon the already bare-bones theory of liability alleged in the operative complaint and start anew. Thus, they disavow the relevance of Hamas's motivations in perpetrating the shooting. DE 415 at 56-57. They minimize the PA/PLO's pursuit, arrest, and transfer of the perpetrators, notwithstanding their explicit allegation that the PA/PLO's actions violated the criminal "accessory after the fact" statute. Amended Complaint (DE 41) ¶ 41; DE 415 at 52 n.22. Now, Plaintiffs suggest that notwithstanding the PA/PLO's specific efforts to eradicate Hamas and prevent the acts such as the one that gives rise to the complaint, the PA and PLO are liable because they "allow[ed] [Hamas] to operate within PA territories," DE 415 at 52, at a time prior to those efforts. They claim this allowance constituted "material support" to Hamas pursuant to the Fourth Circuit's decision in *Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006) and then cite to the Seventh Circuit's decision in *Boim v. Holy Land Found. for Relief and Dev.*, 511 F.3d 707 (7th Cir. 2007) as standing for the proposition that material support gives rise to their action under 18 U.S.C. § 2333(a). *Id.*

This newly-minted theory of liability is just as flawed as the ones that Plaintiffs abandoned. First, the PA/PLO's failure, despite active efforts, to root out an imbedded, native organization from territory it tenuously controls is not comparable to Sudan's welcome and assistance of a foreign, nomadic terrorist organization. Second, the Plaintiffs' theory grossly over-simplifies *Boim* and improperly reads-out of that opinion three critical elements that a plaintiff must prove: (1) knowledge and intent by the PA/PLO to assist Hamas's terrorist activities, (2) some act by the

PA/PLO that helped those activities, and (3) a causal link between the PA/PLO's assistance and the murder of the Ungars.

1. *Plaintiffs' "Safe Harbor" Allegation Does Not State a Claim of Material Support, As Plaintiffs' Own Authority Demonstrates.*

The allegation that Hamas's continued operation from within the territory the PA and PLO were supposed to control constitutes the provision of "safe-harbor" by the PA and PLO is unfounded. Indeed, the case relied on by Plaintiffs to support this revamped allegation itself demonstrates just how flawed Plaintiffs' theory is. *Rux* involved an allegation that Sudan provided sufficient "material support" to Al-Qadea to satisfy the statutory definition under 18 U.S.C. § 1605(a)(7) of the Foreign Sovereign Immunities Act (FSIA). To support this allegation, Plaintiffs provided detailed allegations of assistance and support, including specific "financial services" Sudan provided to Al-Qaeda through tax and customs allowances and joint establishment and maintenance of a trading company and bank. *Rux*, 461 F.3d at 471. Plaintiffs in *Rux* alleged that Sudan facilitated "transportation" for Al-Qaeda by authorizing entry of Al-Qaeda members into Sudan, allowing Al-Qaeda to use Sudan's diplomatic pouch to transport explosives outside the country, and by allowing Al-Qaeda unrestricted shipping, including shipping of explosives to the country where the alleged terrorist act occurred. Finally, the *Rux* plaintiffs alleged that Sudan not only allowed Al-Qaeda members to enter the country, but then provided "locations within the country where its members could meet, engage in business activities and operate terrorist training camps." *Id.* In the face of those specific allegations, the Court rejected Sudan's argument that the allegations were insufficient because the term "safehouses" should be limited to discrete building or structures. *Id.* at 470.

Here, the Plaintiffs' allegations against the PA and PLO are a faint shadow of those in *Rux.*[3] The Plaintiffs cannot allege that the PA and PLO allowed entry to Hamas as Sudan allowed to Al-Qaeda. Hamas was long-imbedded in territory that the PA and PLO were assigned to control at the time of the Oslo Accords. As noted in the Motion, the cell that planned and carried out the shooting of the Ungars consisted of residents from the West Bank town of Surif. As the Plaintiffs established in the Washington, D.C. litigation, Hamas was established around December 1987 and its rivalry with and opposition to the PLO was cemented in 1991 -- even before the PA came into existence. *See* DE 408-13 at 65.

Nor can the Plaintiffs even plausibly allege that the PA and PLO allowed Hamas to openly operate terrorist training camps as Sudan allowed Al-Qaeda. Indeed, in the Washington, D.C. litigation, the Plaintiffs established that Hamas sought and received training for its cells, including the Surif cell, in Iran beginning in 1994, *id.* at 71, and that the cells became more organized and clandestine because of training by the Iranians and other terrorist groups such as Hizbollah. *Id.* at 77. It bears repeating that the Plaintiffs' argument throughout the Washington, D.C. litigation was that Iran provided this training in order to strengthen Hamas as a committed opponent to the PA/PLO-Israel peace negotiations.

In the absence of evidence that the PA and PLO provided active support to Hamas, the Plaintiffs suggest the PA and PLO failed to sufficiently root out Hamas from an area the PA and PLO controlled and failed to take what the Plaintiffs deem effective measures to prevent terrorist attacks by Hamas. Aside from being vague and lacking any temporal proximity to Hamas's

[3] The Court in *Rux* analyzed whether facts alleged in the complaint established subject matter jurisdiction against the backdrop of the U.S. Department of State's prior designation of Sudan as a "state sponsor of terrorism." The PA and PLO have never been so designated.

shooting of the Ungars, many of the allegations are simply false.[4] For example, the Plaintiffs suggest that the PA and PLO "refused and/or ignored" demands by Israel and the United States to criminalize membership in Hamas or to apprehend and prosecute Hamas members. Amended Complaint (DE 41) ¶¶ 27, 28. But as Defendants demonstrated in the Motion, in the months before the shooting, the PA's and PLO's efforts to crack-down on Hamas were lauded by the United States and Israel. DE 408 at 22. And in the months after the shooting, the PA and PLO arrested two of the individuals *involved in this very shooting* and, according to Hamas members, collaborated with Israel to secure the transfer of those two individuals to the Israeli security forces.[5] *Id.* at 29-30.

What is left are allegations at some earlier time, prior to the crack-down and therefore long before the shooting, the PA and PLO provided some amorphous form of support to Hamas. Those are nothing like the allegations found sufficient in *Rux*, and on their face cannot rise to the level that would give rise to liability -- even if Plaintiffs' could establish the other elements of liability under the ATA, which they cannot.

---

[4] Plaintiffs cite to statements of three Congressmen as support for the argument that the PA and PLO "provided shelter and safe-haven to Hamas." DE 415 at 53-54. Presumably, the Court will not give weight to this sort of "proof." In any event, the statement of Senator D'Amato post-dates the events in question by over a year. And the statements of Representatives Ros-Lehtinen and Lantos are sharply contradicted by the statements of Israeli Prime Minister Shimon Peres and the dispatch of the U.S. State Department presented in detail in the Motion. *See* DE 408 at 22.

[5] Plaintiffs cite to a December 1996 document of the Israeli Foreign Ministry (MFA) and call it a "list of wanted Hamas terrorists being sheltered by the PA." DE 415 at 54 n.23. There are significant grounds upon which to question the validity of the MFA's conclusion that each of the listed individuals were involved in terrorist activities and a cursory review of the list reveals that many of the individuals were arrested and/or detained by the PA. More importantly, however, the list does not include the names of two individuals involved in the shooting of the Ungars, who were, according to Hamas, detained by the PA and then turned over to Israel. DE 408 at 29-30. Even if Plaintiffs could prove the veracity of the December 1996 list, therefore, they could not prove its relevance to this case.

2. *Plaintiffs' "Safe Harbor" Allegation Also Fails to Meet ATA, 18 U.S.C. § 2333's Causation Requirement.*

Even assuming that Plaintiffs' vague "safe harbor" allegation would suffice to support a material support claim, it has at least one other failing: Plaintiffs' theory cannot withstand scrutiny under the Seventh Circuit's two *Boim* decisions, which interpreted the Anti-Terrorism Act's civil liability provision, under which Plaintiffs seek relief, as imposing traditional tort law causation requirements, including requiring a showing of causation in fact.

In *Boim I*, the Seventh Circuit held that, to state a claim for relief under the ATA for aiding and abetting the attack of a terrorist organization through the provision of material support, the plaintiffs needed to show the defendant knew of the terrorist organization's illegal activities, desired to help those activities succeed, and engaged in some act of helping. *Boim v. Quaranic Literacy Inst.*, 291 F.3d 1000, 1028 (7th Cir. 2002). Five years later, in *Boim II*, the Seventh Circuit held that in addition to those requirements, a plaintiff must also prove that a defendant's acts of support were the "cause in fact" of plaintiff's injuries. *Boim v. Holy Land Found. for Relief and Dev.*, 511 F.3d 707, 710 (7th Cir. 2007). The Court of Appeals noted the Restatements' repeated citation of such a requirement and Congress' intent to embrace traditional tort principles in enacting 18 U.S.C. § 2333. *Id.* at 739 (citing Restatement (Third) § 26 for the proposition that "[t]ortious conduct must be a factual cause of physical harm for liability to be imposed); *see also id.* ("in order that a particular act or omission may be the legal cause of an invasion of another's interest, the act or omission must [inter alia] be a substantial factor in bringing about the harm.") (quoting Restatement (Second) § 9 *comment b*).

A plaintiff's burden to allege and prove factual causation applies regardless of the plaintiff's theory of a defendant's liability, *id.* at 740-41, and stands in addition to, rather than in

lieu of, the requirement that the plaintiff prove that the defendant was the legal cause of the plaintiff's injury. *Id.* at 740. "In short, a tortfeasor cannot be held liable for any injury that his acts foreseeably might have caused without there also being proof that his conduct *did* cause that injury." *Id.* (emphasis in original). The Court reasoned that uncoupling these requirements would "give section 2333 a far broader sweep than traditional tort principles would allow." *Id.* at 742. Finally, it recognized "Congress, when it enacted section 2333, no doubt meant to further particular national security and foreign policy interests by allowing those injured by acts of international terrorism to seek recompense in federal court. But it gave no sign that it meant to abandon the rules, rights, and procedures that have long governed civil litigation." *Id.* at 733.

Applying those principles, the Seventh Circuit reversed the entry of partial summary judgment as to liability against three defendants accused of providing material support to Hamas.[6] The district court found, and the appellate court accepted, that one of the defendants clearly knew of Hamas's illegal activity and actively worked to facilitate it. *Id.* at 733-36. Yet, the Court held that was not enough: "without *some* evidence of a causal link between a defendant's conduct and Boim's murder, proof that a defendant supported, aided and abetted, or conspired with Hamas (or an intermediary…) will not suffice to render that defendant liable to the Boims." *Id.* at 742.

Plaintiffs' "safe harbor" theory is flawed under both *Boim* I and *Boim II*. As to the mens rea allegations under *Boim I*, Plaintiffs' theory is extremely vague and conclusory. In their Objection, Plaintiffs cite to various statements, some ten years after the shooting of the Ungars, and argue the statements prove the PA and PLO shared ideological goals with Hamas and provided undefined support at unidentified times. But even if Plaintiffs could define specific acts

---

[6] David Boim was shot and killed one month prior to the shooting of the Ungars by two members of the military wing of Hamas. Both men were later apprehended by the PA. *Boim II*, 511 F.3d at 711.

of the PA and PLO from those statements (a proposition far from clear from the content of the statements), Plaintiffs cannot satisfy *Boim* II's causation requirement.

*Boim* made clear that a defendant's conduct in support of a terrorist group must be "within a reasonable time" of the group's act to be a "cause in fact" of the plaintiff's injury. *Id.* at 742. The Court then reversed the entry of summary judgment against a defendant who had been in Israeli custody prior to the shooting of David Boim. *Id.* at 747. The Court rejected the suggestion that the defendant could be liable simply due to allegations that he participated in a civil conspiracy with Hamas, and held that he was entitled to summary judgment "[u]nless the plaintiffs can identify evidence that would permit a reasonable factfinder to find that [defendant's] actions on behalf of Hamas in some way caused or contributed to David Boim's death." *Id.* at 748.

The linchpin of Plaintiffs' "safe harbor" theory seems to be videotaped statements of Mohammed Dahlan and Jibril Rajoub, which Plaintiffs claim prove that the PA/PLO provide Hamas with assistance and are in agreement on the use of terrorism. DE 415 at 57. As an initial matter, the Plaintiffs' characterization of the clips is misleading and the argument Plaintiffs make through extrapolation from the clips is unfounded.[7] But aside from the inaccuracies, the clips are

[7] For example, Plaintiffs suggest that the PA agrees with Hamas that terrorism is a legitimate means of "resistance." DE 415 at 57. President Abbas's speech on July 16, 2005, underscores the fallacy of this assertion:

> I emphasized our national principles and our adherence to our inalienable rights. We also emphasized our adherence to the option of resistance and of self-defense, which is supported by international conventions. We were very clear in our absolute rejection and our strong condemnation of acts that violate these conventions, and contradict our traditions and principles, acts that inflict the worst kind of damage on our cause and on our supreme national interest, and distort our national struggle and its advanced position in the course of the human struggle. We were clear in our rejection of bombing operations that

so removed in time from the events at issue in the Amended Complaint that they are of no relevance to the issues before the Court.

The interview clips submitted by Plaintiffs in support of their argument that the PA and PLO supported Hamas in 1996 ignore *Boim*'s holding and reasoning. The interviews were conducted in 2006 -- ten years after the shooting at issue in this case. None refer back to the event at issue or even to the period at issue. Two of the interviews explicitly referenced the Intifada, which began in 2000, four years after the shooting at issue in this case. None of the statements inform the issue of whether the PA and PLO were the "cause in fact" of the shooting of the Ungars. Nor does the Plaintiffs' final allegation that in 2007 the PLO and Hamas set up a unity government to run the PA, undercut the fact that in 1996, Hamas and the PA/PLO were bitter rivals at strategic odds. Events in 2007 cannot, as a matter of law, suffice to establish causation under *Boim* for an incident that occurred in 1996. But assuming arguendo it is relevant to consider the establishment of a unity government, it is even more important to consider the rapid disintegration of that government followed by Hamas's violent occupation of Gaza. Such facts underscore the depth and breadth of the long-standing division between Hamas and the PA/PLO.

The preceding discussion completely refutes Plaintiffs' contentions in its Objection with respect to meritorious defenses. There is no question that Defendants meet the Rule 60(b)(6)

---

> cause heavy damage to the supreme interest of our people. We rejected the launching of mortars and missiles, which constitute futile acts that have brought, and still bring, disasters upon our citizens. We have rejected the attempt of any camp to impose its private agenda on our people.

http://www.memritv.org/clip/en/767.htm.

standard on this subject. At this stage, "a party's averments need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense." *Coon v. Grenier*, 867 F.2d 73, 77(1st Cir. 1989). Defendants greatly exceeded that standard in their motion, and Plaintiffs' Objection is unable to refute this argument even after abandoning old theories of liability and pursuing new ones. At the end of the day, powerful evidence exists that would establish the PA and PLO's active opposition to Hamas's violent tactics, efforts to prevent acts such as the shooting of the Ungars, and participation in the apprehension and arrest of the shooters. The facts would establish that Hamas perpetrated the shooting in order to undermine the PA and PLO and derail the on-going peace process. They would prove that Hamas turned to Iran because the PA and PLO were not only *not* supporting Hamas, or providing it "safe haven" but were actively and aggressively "fight[ing] terror" in the words of the Israeli Prime Minister. DE 408 at 22. The Plaintiffs' argument that the PA and PLO cannot advance meritorious defenses -- especially in light of their own Washington, D.C litigation -- is devoid of factual basis or legal support.

## III. THE FOREIGN POLICY IMPLICATIONS OF ENFORCING MASSIVE DEFAULT JUDGMENTS AGAINST THE PA/PLO FOR ACTS COMMITTED BY HAMAS AT A TIME WHEN HAMAS IS AGAIN THREATENING TO UNDERMINE THE PEACE PROCESS AND DESTABILIZE THE MODERATE LEADERS OF THE PA/PLO PRESENTS "EXTRAORDINARY CIRCUMSTANCES" WARRANTING GRANTING VACATUR.

In June 2007, following Hamas's violent takeover of the Gaza Strip, President Abbas dissolved the short-lived Fatah-Hamas coalition government, and appointed Dr. Salam Fayyad as Prime Minister. The United States and the international community has recognized the necessity of supporting the moderate PA government in its efforts to achieve financial and political stability, combat terrorism, and engage in meaningful peace negotiations with Israel. *See* DE 408 at 41-44

and Exhs. C, X-Z. At the international Palestinian Donors' Conference in December 2007, Secretary of State Rice told President Abbas and Prime Minister Fayyad: "the international community is grateful to have leaders of your caliber, your experience, and your talent, representing and working on behalf of the Palestinian people." Exh. B (Transcript of Dec. 17, 2007, Remarks of Secretary Rice). Secretary Rice further noted: "This is the most promising opportunity to seek peace that we have had in nearly seven years. And we need to seize it. Progress requires tangible financial assistance for Prime Minister Fayyad's government." *Id.* As Secretary Rice explained, efforts to achieve peace hinge on helping the PA avert bankruptcy and implement an economic reform and development plan:

> For these [peace] efforts to succeed, the continued and unwavering support of the international community is absolutely vital. . . .The Palestinian Authority is experiencing a serious budgetary crisis. This conference is literally the government's last hope to avoid bankruptcy. **The vitality of the Palestinian Authority and the success of the Palestinian people are in the interest of all who seek peace, and security, and a two-state solution in the Middle East.**

*Id.* (emphasis added). At the same conference, Israel's Foreign Minister Tzipi Livni echoed the United States' remarks, stating that Israel "welcome[s] the renewed efforts, determination and leadership of President Abbas and Prime Minister Fayyad in this crucial endeavor." Exh. C at 3 (Transcript of remarks of Minister Livni at the Dec. 17, 2007 conference). Foreign Minister Livni also noted that the "establishment of a peaceful and prosperous Palestinian state that respects law and order and fulfills the legitimate national aspirations of its people is not just a Palestinian dream - it is also an Israeli interest." *Id.* at 1.

Though the international community fully acknowledges that the economic viability of the PA is crucial to the success of the moderate Palestinian leadership, which in turn is crucial to

achieving real progress in the peace process, Plaintiffs dismiss the destabilizing effect of the default judgment and other default judgments Plaintiffs' counsel is seeking to secure. Plaintiffs assert that "defendants have been sounding the tocsin of doom for the peace process and the U.S.-Palestinian relationship for years now . . ." DE 415 at 25. Plaintiffs' argument entirely ignores the United States' views that this moment in history represents "the most promising opportunity to seek peace that we have had in nearly several years." Exh. B (Secretary of State Rice's remarks at Dec. 17, 2007 conference). Given the rise of radical Islamic extremism -- embodied in part by Hamas -- and its threat to U.S. security interests, it has never been more important for the peace process to succeed. As the daily headlines reflect, Hamas is actively working to undermine peace efforts and the current moderate leaders of the PA in an effort to obtain broader control over the Occupied Palestinian Territories.

Plaintiffs also assert that the default judgment "has done nothing whatsoever to harm either the peace process or defendants' relationship with the United States, both of which have newly flourished in recent months." DE 415 at 25. One can fairly assume that, if the Plaintiffs succeed in their efforts to take control of the $1 billion Palestine Investment Fund, seize $100 million of Pension Fund assets of Palestinian government employees, and siphon off one of the PA's few sources of revenue (namely, the Value Added Taxes collected by Israel), that the judgments will in fact have a damaging impact on U.S.-Palestinian relationships and the Palestinian's ability and willingness to secure popular support for the concessions sought by Israel and the U.S. in the peace process. *See* DE 408 at 43-44. The lack of any substantial impact to date from the default judgment reflects only the current status of the enforcement proceedings.

In response to Defendants' argument that the PA must have an opportunity to avoid the massive default judgments in large part due to their impact on the financial stability of the PA,

Plaintiffs flippantly argue that "defendants' entire claim of financial run is completely unsupported by any evidence, or any hard facts or figures about their current financial state." DE 415 at 27. In their opening brief, Defendants cited remarks by Secretary of State Rice made just ten days before the brief was filed that the PA was "experiencing a significant budgetary crisis" and needed massive donor aid as its "last hope to avoid bankruptcy." DE 408 at 4 (quoting Exh. C).[8] Certainly Plaintiffs are not suggesting Secretary of State was lying or exaggerating when she described the current financial state of the PA. The CIA's up-to-date online "factbook" on the PA's financial state similarly presents a bleak picture:

> The West Bank - the larger of the two areas comprising the Palestinian Authority (PA) - has experienced a general decline in economic conditions since the second intifada began in September 2000. The downturn has been largely a result of Israeli closure policies - the imposition of closures and access restrictions in response to security concerns in Israel - which disrupted labor and trading relationships. In 2001, and even more severely in 2002, Israeli military measures in PA areas resulted in the destruction of capital, the disruption of administrative structures, and widespread business closures. International aid of at least $1.14 billion to the West Bank and Gaza Strip in 2004 prevented the complete collapse of the economy and allowed some reforms in the government's financial operations. In 2005, high unemployment and limited trade opportunities - due to continued closures both within the West Bank and externally - stymied growth. Israel's and the international community's financial embargo of the PA when HAMAS ran the PA during March 2006 - June 2007 has interrupted the provision of PA social services and the payment of PA salaries. **Since June the Fayyad government in the West Bank has restarted salary payments and the provision of services but would be unable to operate absent high levels of international assistance.**

[8] Plaintiffs assert that the December 2007 Paris donor conference at which $7.4 billion was pledged over three years in an effort to save the PA from bankruptcy created a budget surplus for the PA. This is absurd. As contemporaneous news accounts noted, much of the pledged aid will not be delivered. For example, the large "American pledge was misleading, because much of it had been announced previously by the White House but has not been approved by Congress." DE 408-3 (New York Times, "$7.4 Billion Pledged for Palestinians," Dec. 18, 2007) at 1.

https://www.cia.gov/library/publications/the-world-factbook/geos/we.html.

Nor can Plaintiffs' counsel profess ignorance about the potential impact of the judgments on the PA when he is spearheading litigation seeking nearly $4 billion in damages from the PA, with the backing of the Israel Law Center, whose stated goal is to bankrupt the PA and PLO. Exh. D (John Turley-Ewart, "Fighting Terrorism in Court, Israeli Lawyer Sues in Bid to Cut Off Funds to Palestinian Authority," National Post, Nov. 23, 2002, reproduced on www.israellawcenter.org website).

If there were any lingering doubt about the impact of the default judgments related to the Anti-Terrorism Act litigation against the PA/PLO, the United States recent letter to Judge Marrero in the related *Knox v. PLO*, No. 03cv4466 (S.D.N.Y.), case should resolve any doubts in the PA/PLO's favor. In the *Knox* case, the PA and PLO also have moved for relief from a default judgment. As the PA and PLO noted in their motion for relief pending before this Court, Judge Marrero had asked the U.S. whether it planned to file a statement of interest. DE 408 at 3. On February 28, 2008, the Department of Justice responded that, after "carefully consider[ing] the significant issues presented by this case and its procedural posture, as well as the cases pending in other districts," the "United States respectfully informs the Court that it declines to file a Statement of Interest concerning the Rule 60 issues presented by this case, but will continue to monitor this and other cases like it." Exh. A at 1. The letter emphasizes that the "United States has not yet decided whether or not to participate in those other cases." *Id.* After explaining that the "United States supports just compensation for victims of terrorism from those responsible for their losses," the letter concludes that the "United States remains concerned about the potentially significant impact that these cases may have on the financial and political viability of the defendants." *Id.*

Defendants contend that a $116 million judgment for the shooting death of Yaron Ungar is excessively punitive and therefore not "just." More importantly, the PA and PLO cannot fairly be characterized as "responsible for [Plaintiffs'] losses" in the absence of merits litigation. Plaintiffs will no doubt dispute these assertions and any favorable connotations the PA and PLO associate with the letter's use of the terms "just" and "responsible." What is indisputable is the United States' stated concern about the potential significant impact the cases may have "on the financial and political **viability** of the defendants." *Id.* (emphasis added). The United States could have chosen the word "strength" or "stability." Instead, it used the term "viability," underscoring that the very survival of the moderate PA leadership could be at stake. If the U.S. courts turn over the pension fund assets of Palestinian government workers and the ownership of the Palestine Investment Fund in satisfaction of this judgment, support for the moderate leadership of the PA will be severely eroded and its efforts to achieve economic stability compromised. Who succeeds if President Abbas and Prime Minister Fayyad fail? Hamas -- the very group who committed the attack on the Ungars in an effort to thwart the PA's and PLO's participation in the Oslo peace process at another important turning point in Middle East history. Although Plaintiffs' counsel may want to ignore the fact that Hamas is a PLO rejectionist group and that many members of the ruling party of the PA have died fighting Hamas, it is vital that Hamas and the PA/PLO not be lumped together as "those terrorists." Though the Plaintiffs and those who support them may not be able to differentiate among various Palestinian groups, it is vital that the rest of have a more nuanced, discerning view. Destabilizing the moderate leaders of the PA by making the PA and PLO pay for the acts of Hamas at a time when Hamas is waiting for the moderate leadership to fail strengthens our enemies and weakens our allies. Defendants previously demonstrated in their opening brief that foreign policy consequences can present the

sort of "extraordinary circumstance" contemplated by Rule 60(b)(6). DE 408 at 38-43. One can hardly imagine a case presenting a more "extraordinary circumstance" warranting giving the Defendants another opportunity to defend on the merits.

## IV. THE PLAINTIFFS' CLAIMS OF PREJUDICE ARE EITHER NOT SUPPORTED BY PERTINENT CASE LAW OR ARE WITHOUT BASIS IN FACT.

The Plaintiffs argue at some length that they would be prejudiced if the Court were to grant vacatur. DE 415 at 27-43. The claims of prejudice must be examined very carefully both to determine whether such claims are legally cognizable and to determine whether any asserted prejudice has a basis in fact, given the already discussed meritorious defenses and the potential impact of these cases on the Palestinian Authority. Because, when examined, the Plaintiffs' claims of prejudice do not stand up, this Court should grant the motion.

Broadly speaking, Plaintiffs offer two species of prejudice: (1) they argue that assets that are currently under restraint pursuant to collection efforts will no longer be under such restraint, and might depart the country, should the vacatur be granted, and (2) they argue that if the case were to now be litigated, evidence will be unavailable to them that would have been available had the case not gone to default. The first of these points is not an issue of prejudice; it is an issue that is relevant to what conditions this court might place on vacating the default. The second of these points, on examination, shows more imagination than substance. The Plaintiffs make out no case whatsoever that they have lost any evidence that they can reasonably claim would have assisted their case.

### A. The Claim That Assets Will Become Unavailable Is Not a Cognizable Basis Upon Which to Assert Prejudice.

Plaintiffs cite the appropriate standards and cases for prejudice in their Objection, DE 415 at 28, but then ignore those precedents when they argue that potential asset flight creates

prejudice warranting denial of the vacatur motion. The Plaintiffs admit that "[p]rejudice is demonstrated where 'circumstances have changed since the entry of the default such that plaintiff's ability to litigate its claim is now impaired in some material way or if evidence has become lost or unavailable.'" *Id.* (quoting *Reilly v. Keystone Health Plan East, Inc.,* No. 98-cv-1648, 1998 WL 422037, at *2 (E.D. Pa. July 27, 1998)) (internal citation omitted). The relevant question, as Plaintiffs' admit, is whether litigation of the case -- not collection -- is impaired by vacating default.

Defendants do not agree that there is any likelihood of capital flight should the default judgment be vacated. However, even if the Court were to have concern about that issue, the Court has available appropriate conditions that the Court could impose to mitigate that prejudice, through the imposition of a cost bond or through other means. The appropriate question for prejudice is whether the vacatur would affect Plaintiffs' prosecution of their case.

**B. Plaintiffs' Imagined Loss of Evidence Is Insufficiently Concrete to Warrant Denial of the Motion to Vacate Default Judgment.**

Plaintiffs spend most of their time pointing out that various people will not be available for deposition and then posit that this unavailability affects their ability to present their case. Thus, Plaintiffs discuss Yasser Arafat, Razi Jabali, Muhammed Dahlan and Amin al-Hindi, the first of whom is deceased and the latter three of which are not currently employed by the Palestinian Authority or the PLO. Obviously, Mr. Arafat is not available for deposition. However, the Plaintiffs are free to spin out their theories about his alleged role in the incident that led to the Ungars' death. They cite to various statements about Arafat, and if they have proof of his involvement, nothing precludes the admission of such evidence. However, the notion that he would have somehow supported the Plaintiffs' theories is entirely speculative. In order for his

death to be cognizable prejudice, the Plaintiffs would have to make some kind of showing as to why they thought that they would have obtained his deposition (despite his illness) prior to the default and that any such deposition would have yielded admissible testimony. They have failed utterly to make any such showing.

As to the other three individuals, who are all alive, the Plaintiffs' claim of prejudice also does not withstand scrutiny. The Plaintiffs have no basis upon which to assume that any relevant or material evidence would come from the mouths of these individuals. Upon examination, the notion that the Plaintiffs would bring in the individuals that they claim committed this tortious action and that they would agree with the Plaintiffs' claims is mere imagination. Hence, the Plaintiffs can only assert this speculative brand of prejudice if the Court allows them to assume that the respectively unavailable witnesses would have admitted to the Plaintiffs' theories. Before the Plaintiffs are heard to make this argument, they ought to be held to some kind of convincing demonstration as to why they would have ever been able to produce such testimony. This is not an unreasonable request, given that Plaintiffs have already made a substantial evidentiary presentation in the parallel litigation in Washington D.C. in connection with the same incident. Thus, this is not a case where Plaintiffs could credibly contend that the default prevented them from fully investigating or securing whatever evidence existed to support their claims of liability.

In the event of vacatur, moreover, Plaintiffs will remain free to secure these individuals' testimony, and their claim that they cannot do so is utter speculation at this stage. If the Court vacates the default judgment and it turns out that the Plaintiffs in fact are unable to secure the testimony of these individuals, Plaintiffs will be free to seek traditional evidentiary remedies upon a proper demonstration of foundation and relevance. Obviously, Plaintiffs can also present other documentary and/or testimonial evidence showing these individuals' involvement in bringing

about the particular incident at stake here if any exists. If such independent evidence exists, the absence of these individuals will prevent them from denying the charges or providing an innocent explanation and thus may resound to Plaintiffs' benefit.

The Plaintiffs also argue the Hamas takeover in Gaza precludes the PA from now producing documents located in Gaza. This claim of prejudice is even more unlikely than the imagined deposition testimony. First of all, it is of some note that Plaintiffs concede that relations between Hamas and the PA are such that the PA has no authority or ability to control Hamas. That would seem consistent with the position that the PA and PLO are asserting here: they should not be held liable for the actions of Hamas. Second, this prejudice argument turns on the notion that documents exist in Gaza that might support the Plaintiffs' theories. There is no basis for this supposition. Third, the argument depends on the notion that Hamas, the supposed possessor of the documents, would have produced them at the request of the PA, had the PA so requested them prior to the default. It is unclear how Plaintiffs can assert this prejudice with a straight face. The fact is, as Plaintiffs now recognize, that the PA does not have control of Hamas, so any such records would never have been available for litigation of this case. Moreover, the notion that Hamas would have any such records is also entirely speculative. Finally, the notion that the records, if they existed, would only be in the Gaza Strip is also made up out of whole cloth.

The fact is that the Plaintiffs' efforts to show prejudice depend on the misguided notion that they would prove their case entirely with witnesses and evidence from those who would admit their involvement in a crime and save and produce documentation of it. There is nothing in these claims of prejudice that warrants the Court's denial of the vacatur motion.

## V. PROCEDURAL IMPEDIMENTS SHOULD NOT PREVENT PLENARY CONSIDERATION OF WHETHER EXTRAORDINARY CIRCUMSTANCES EXIST UNDER RULE 60(b)(6).

Much of Plaintiffs' Objection rests on constructing procedural impediments to review of the Defendants' arguments for vacatur. Plaintiffs' main procedural argument for denying relief is that the First Circuit already reviewed the questions presented by this motion when it affirmed the underlying judgment, and that the relief is accordingly forbidden by the First Circuit's mandate. DE 415 at 21-23. Plaintiffs' secondary procedural argument is that Defendants' motion is foreclosed because they are really seeking relief under Rule 60(b)(1) rather than 60 (b)(6) and therefore were required to bring their motion within one year. DE 415 at 18-20. Each contention lacks merit.

### A. The First Circuit's Decision on Appeal Cannot Prevent Plenary Consideration of the Extraordinary Circumstances Presented in this Rule 60(b)(6) Motion.

Plaintiffs' spend substantial space arguing that the First Circuit's decision on appeal is dispositive on the questions presented by Defendants' Motion. Plaintiffs' contention, however, glosses over the basic difference between an appeal from the judgment and the post-judgment procedures contained in Rule 60(b). The Supreme Court made clear in *Standard Oil Co. v. United States*, 429 U.S. 17, 18-19 (1976) (*per curiam*), that an appellate court's affirmance of the judgment says nothing about whether the trial court can grant relief based on a post-judgment showing sufficient to satisfy Rule 60(b). As the Court explained:

> Like the original district court judgment, the appellate mandate *relates to the record and issues then before the court, and does not purport to deal with possible later events*. Hence, the district judge is not flouting the mandate by acting on the motion.

*Id.* at 18 (emphasis added).

It is true Rule 60(b) cannot be used to circumvent the First Circuit's ruling. *Ramirez-Zayas v. Puerto Rico*, 225 F.R.D. 396, 398-99 (D.P.R. 2005) (granting vacatur while noting that Rule 60(b) cannot be used as "loophole to circumvent an unfavorable ruling . . . in the First Circuit."). But that is not what Defendants seek to do here. Defendants' arguments have acknowledged and accounted for the First Circuit's ruling on appeal, including its specific determination that this Court acted within its discretion when it entered a default judgment prior to the completion of Defendants' sovereign immunity litigation. DE 408 at 1, 6, 8-9, 15. Defendants have argued, however, that vacatur is nonetheless warranted in light of the "extraordinary circumstances" that *currently* exist -- namely, the strength of the meritorious defense and the current effect of granting or denying vacatur on the foreign policy of the United States. DE 408 at 15-17. This argument relies heavily on the current relationship between the United States and the Palestinian Authority, a relationship that has evolved considerably in the two years since the judgment was affirmed on appeal and certiorari was denied.

Such a question is altogether different from the one the First Circuit decided. The First Circuit began its opinion by observing that "[t]his appeal raises exceptionally important questions of justiciability and sovereignty . . . ." *Ungar v. Palestine Liberation Organization*, 402 F.3d 274, 276 (1st Cir. 2005). After spending the bulk of its opinion addressing those questions, the Court turned at the end of the opinion "to the defendants' protest that they were entitled to a final determination on the sovereign immunity question (including appellate review) before they could be required to bear any of the burdens of litigation." *Id.* at 292. The Court concluded that, pursuant to *In re Pampandreou*, 139 F.3d 247 (D.C. Cir. 1998), the proper course in most cases would be to resolve the sovereign immunity issue on appeal before proceeding to default judgment. *Ungar*, 402 F.3d at 293. However, the First Circuit concluded that because the

defendants did not raise their sovereign immunity argument until after the denial of two motions to dismiss and an order from this Court to proceed with discovery, this Court acted "well-within the encincture of its discretion" when it ordered defendants to proceed with an answer and discovery, and entered a default judgment when they refused to do so. *Id.* at 293-94. In sum, the First Circuit explained, the record before it did not demonstrate that this Court "acted precipitously either in entering a default or in reducing the default to judgment." *Id.* at 294.

Defendants agree that this Court did not act precipitously in entering the default judgment. But the current question has nothing to do with whether this Court acted precipitously at the time it entered the judgment. Instead, Defendants contend that assuming that entry of default judgment was proper on the record as it is existed in 2005 vacatur is warranted *now* on *this* record -- based on the "extraordinary circumstances" presented in this motion. That question turns entirely on evidence and facts not before the First Circuit and involves issues that could not conceivably have been part of its appellate mandate.

The earlier litigation never reached the merits, and the First Circuit thus did not have before it expressly or implicitly whether a meritorious defense existed sufficient to satisfy the Rule 60(b) standard. The First Circuit also did not have before it any information involving the new Palestinian leadership, including the unique foreign policy concerns related to United States support for that leadership at this critical juncture, the resumption of serious peace negotiations in the Middle East, and the priority that the current administration has afforded to those negotiations. There simply can be no reasonable argument that First Circuit's ruling either expressly or implicitly addressed these matters. *See DeWeerth v. Baldinger*, 38 F.3d 1266, 1271 (2d Cir. 1994) (Rule 60(b) motion based on changed circumstances permissible unless appellate court expressly or implicitly addressed those changed circumstances in its ruling).

Under the Supreme Court's decision in *Standard Oil*, the First Circuit's decision on appeal thus cannot prevent plenary consideration of the extraordinary circumstances presented in this Rule 60(b) motion. *Standard Oil* makes clear that the only limitation on relief imposed by the appellate court litigation is that the Rule 60(b) motion must be supported by circumstances not before the appellate court in the direct appeal. That is precisely the situation here. Plaintiffs' arguments asking for denial of the motion on this ground accordingly lack merit. *LSLJ Partnership, v. Frito-Lay, Inc.,* 920 F.2d 476, 478-79 (7th Cir. 1990) (district court abused discretion by refusing to consider vacatur motion based on incorrect belief that affirmance of judgment made Rule 60(b) relief improper).

**B. The Circumstances Presented by This Motion Are Properly Considered Under Rule 60(b)(6), not Rule 60(b)(1).**

Plaintiffs' secondary procedural hurdle to relief fares no better. According to Plaintiffs, Defendants' motion is also foreclosed because Defendants are really seeking relief under Rule 60(b)(1), rather than Rule 60(b)(6), and therefore were required to bring their motion within a year of the judgment. DE 415 at 18-20. The line between the two procedures is admittedly fuzzy. As a leading treatise has observed, "no clear line can be drawn between factual situations that would be characterized as "excusable neglect" and those that might present an "other reason" under Rule 60(b)(6). 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2695 at 140. The only constant is that it is "Rule 60(b)(6) requires a demonstration of a much more extraordinary circumstance than does Rule 60(b)(1)." *Id.*

Regardless of where the line between "excusable neglect" and "extraordinary circumstances" is drawn, however, Defendants' motion clearly falls on the Rule 60(b)(6) side of the ledger here. As Defendants noted in the motion itself, DE 408 at 38, "neglect" is not the

pertinent issue before this Court. This is plainly not a case where a foreign defendant is seeking relief from a default judgment in a contract dispute based solely on a claim that any failure to participate was caused by service to an out-of-date post office box in Sweden. *Claremont Flock Corp. v. Alm*, 281 F.3d 297, 299-300 (1st Cir. 2002). Nor is this a case where vacatur is being sought based on an allegation that political turmoil delayed any response to a writ of execution on a diplomatic residence. *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo,* 447 F.3d 835, 838-39 (D.C. Cir. 2006). Such cases involved classic claims of excusable neglect -- "I didn't participate because I didn't know about the lawsuit" -- cognizable only under Rule 60(b)(1).

This motion involves a very different contention. The pertinent question before the Court is whether the totality of exceptional circumstances presented -- the meritorious defense, the significant foreign policy implications of the judgment and the strengthening relationship between the United States and the new Palestinian leadership -- warrant setting traditional finality concerns aside in a case where maintaining the judgment would clearly be proper otherwise. Even if a portion of these extraordinary circumstances may also arise in Rule 60(b)(1) cases, that does not magically transform the PA and PLO's ground for vacatur into one of "neglect." *See FG Hemisphere Assocs., LLC,* 447 F.3d at 838-39 (foreign policy considerations properly considered in vacatur motion brought under any Rule 60(b) provision).

Thus, while any consideration of the totality of the circumstances should *include* the international and foreign policy implications of the litigation, as well as the political turmoil in the region, those are only pieces of a decidedly larger picture. As the Eleventh Circuit explained in *Jackson v. People's Republic of China*, in rejecting the contention that similar arguments were within the ambit of Rule 60(b)(1):

> Here much more is involved than mistake, inadvertence, surprise or excusable neglect. The concerns extend to the misconception by an ancient and proud sovereign of its responsibility to reply to the demand of a United States court whose authority it does not recognize . . . .The issues arise in the highly sensitive area of relations of our government with another sovereign with whom tolerable relations have been restored after many years.

*Jackson*, 794 F.2d at 1496.

Here too, "much more is involved than mistake, inadvertence, surprise or excusable neglect." This case presents a variety of unique and important factors warranting vacatur, including a meritorious defense to terrorism charges and significant foreign policy consequences of adhering to the judgment. As in *Jackson*, these factors are more properly considered under Rule 60(b)(6), not Rule 60(b)(1).

## CONCLUSION

This case presents extraordinary circumstances sufficient to warrant granting relief from the default judgment under Federal Rule of Civil Procedure 60(b)(6). Defendants respectfully urge the Court to vacate the judgment in order to permit litigation on the merits.

Dated: March 6, 2008

_/s/ Richard A. Hibey____________________
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

_/s/Deming E. Sherman__
Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 6th day of March 2008, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

**Raymond A. Marcaccio**
ram@om-rilaw.com

**James R. Oswald**
joswald@apslaw.com

**Karen Ann Pelczarski**
kap@blishcavlaw.com

**David J. Strachman**
djs@mtlhlaw.com

and mailed to the following counsel of record:

Robert A. Alessi, Esq.
Mary McCann, Esq.
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, NY 10005-1702

_/s/ Richard A. Hibey___________

# EXHIBIT A

U.S. Department of Justice

Civil Division

Office of the Assistant Attorney General

Washington, D.C. 20530

February 29, 2008

BY FACSIMILE

The Honorable Victor Marrero
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Room 660
New York, New York 10007

Re: *Knox v. Palestine Liberation Organization*, No. 03 Civ. 4466

Dear Judge Marrero:

On December 11, 2007, this Court issued an order directing the United States to inform the Court "whether the Government contemplates issuing a suggestion of interest in the resolution of this case, or in any of the other cases pending in other Districts against the defendants in this action raising similar issues as to the appropriateness of reopening default judgments entered against the defendants." The Court thereafter granted the United States' request for additional time to consider the matter. The United States has carefully considered the significant issues presented by this case and its procedural posture, as well as the cases pending in other districts. The United States respectfully informs the Court that it declines to file a Statement of Interest concerning the Rule 60 issues presented by this case, but will continue to monitor this and other cases like it. The United States has not yet decided whether or not to participate in those other cases. The United States supports just compensation for victims of terrorism from those responsible for their losses and has encouraged all parties to resolve these cases to their mutual benefit. At the same time, the United States remains concerned about the potentially significant impact that these cases may have on the financial and political viability of the defendants.

The Honorable Victor Marrero
February 29, 2008
Page 2

The United States appreciates the Court's invitation and the additional time that the Court afforded the United States to consider this matter.

Respectfully,

JEFFREY S. BUCHOLTZ
*Acting Assistant Attorney General*

MICHAEL J. GARCIA
*United States Attorney for the Southern District of New York*

[signature]

CARL J. NICHOLS
*Deputy Assistant Attorney General*

JOSEPH H. HUNT
*Branch Director*

VINCENT M. GARVEY
*Deputy Branch Director*

JEFFREY M. SMITH
*Trial Attorney*

cc: David J. Strachman, Esq. (via facsimile)
Counsel for Plaintiffs
Fax Number: (401) 331-6095

Richard A. Hibey, Esq. (via facsimile)
Counsel for Defendants Palestinian Authority
and Palestine Liberation Organization
Fax Number: (202) 626-5801

# EXHIBIT B

Case 1:00-cv-00105-L-DLM Document 423-3 Filed 03/06/2008 Page 2 of 2

U.S. DEPARTMENT *of* STATE

## Remarks at the Palestinian Donors Conference

**Secretary Condoleezza Rice**
Paris, France
December 17, 2007

I am very pleased to be here in Paris today. I would like to thank President Sarkozy for hosting this important conference, and I would like to thank the co-chairs of this event: our friends from Norway, the European Commission, and Former Prime Minister Blair, the Quartet's Special Representative. All of you have been steadfast and supportive partners of the Palestinian people. Thank you very much.

Let me also recognize the presence here of Palestinian President Mahmoud Abbas and Prime Minister Salam Fayyad. As I have said before, the international community is grateful to have leaders of your caliber, your experience, and your talent, representing and working on behalf of the Palestinian people.

I am also pleased that Foreign Minister Livni and her colleagues from Israel are here with us today.

We now have a real opportunity to make progress toward the goal of two democratic states living side by side in peace and security. Last month, the international community answered President Bush's call to meet in Annapolis. There, with full international support, President Abbas and Prime Minister Olmert agreed to immediately implement the Roadmap. They also inaugurated negotiations on all of the core issues of the conflict. Both parties have created negotiating teams, and they are now beginning to carry out serious negotiations.

For these efforts to succeed, the continued and unwavering support of the international community is absolutely vital. That is why we are here today, and not a moment too soon. The Palestinian Authority is experiencing a serious budgetary crisis. This conference is literally the government's last hope to avoid bankruptcy.

The vitality of the Palestinian Authority and the success of the Palestinian people are in the interest of all who seek peace, and security, and a two-state solution in the Middle East. Now is the time for the international community to make good on its promises of support for these goals, and for the Palestinians who share them.

Prime Minister Fayyad has created the Palestinian Reform and Development Plan – an ambitious but realistic plan to improve life for his fellow citizens, and to lay the foundations of a successful, responsible state. This is a good and responsible plan. It balances the immediate budgetary needs of the Palestinian Authority with the reforms and development assistance needed to build a future state, and expands economic opportunities for all Palestinians.

We are here today to support the Palestinian Authority's plan with real offers of tangible assistance. So on behalf of the United States, I am proud to pledge $555 million to support the Palestinian Authority and the Palestinian people in the coming year, including $150 million in budget support. This is a significant increase in our assistance from last year, and I hope that other donors will follow suit today by providing a substantial increase from their previous support.

Our planned contribution is subject to the approval of our Congress, and it includes support for projects directly linked to the development and security sector reform efforts that are identified in the Palestinian Reform and Development Plan. We also plan to continue our annual support for the UN Relief and Works Agency, because we are committed to helping meet the needs of the most vulnerable Palestinians.

We also recognize the need to support Palestinian efforts to develop private sector projects that can create jobs and hope. We appreciate and fully support Quartet Special Representative Tony Blair's efforts on this front, and we are developing a new initiative of our own.

Earlier this month, President Bush announced a partnership with the U.S. private sector to support Prime Minister's Fayyad's ambitious development agenda, and to complement Mr. Blair's work. We now have a real opportunity to spur private investment and create jobs, especially for Palestinian youth, and I encourage all of you to invite your business communities to look for ways to support the Palestinian's development and economic growth efforts.

Ladies and Gentlemen: This is the most promising opportunity to seek peace that we have had in nearly seven years. And we need to seize it. We need to support both parties in their efforts to end the conflict and to make peace. Words and promises of support are helpful, but that alone is insufficient. Progress requires action, and it requires tangible financial assistance for Prime Minister Fayyad's government. I hope that we will meet that goal today.

Palestinians have waited too long for the dignity that will come with a state of their own. Israelis have waited too long for the security and for an end to the conflict that will come with a responsible, democratic neighbor. We have all waited too long for peace and security in the Middle East. And we should wait no longer. Thank you very much.

**2007/T20-2**

Released on December 17, 2007

BACK TO TOP

# EXHIBIT C

ISRAEL MINISTRY OF FOREIGN AFFAIRS

# Address by FM Livni to the Paris Donors Conference

17 Dec 2007

To restore faith in the peace process we must not only build the foundations for the future, we must improve the economic and security reality in the present.



**FM Livni with participants at the Paris Donors Conference (Photo: Guillaume Bureau)**

**Address by Vice Prime Minister and Minister of Foreign Affairs Tzipi Livni to the Paris Donors Conference**
**17 December 2007**

His Excellency the President of France Nicholas Sarkozy, Foreign Minister Kouchner, President Abbas and Prime Minister Fayyad, distinguished co-chairs, colleagues, ladies and gentlemen,

Just a few weeks ago, in Annapolis, Maryland, with the initiative of President Bush and Secretary Rice, the Israeli-Palestinian peace process was re-launched and today we meet to re-energize efforts to advance the Palestinian reform agenda. Today's meeting is testament to the support for the bilateral process and to the understanding of the need to create the foundations for the future Palestinian State that will live side by side with Israel in peace and security.

Those gathered here share a common vision of a peaceful future. But, at the same time, we understand that to restore faith in the peace process we must not only build the foundations for the future, we must improve the economic and security reality in the present.

I am here because the establishment of a peaceful and prosperous Palestinian state that respects law and order and fulfills the legitimate national aspirations of its people is not just a Palestinian dream - it is also an Israeli interest. But I also know that the road before us will not be easy.

On the political front, we have launched negotiations in order to bridge the gaps between us and reach a peace agreement. I believe that there are those on the Palestinian side and in the Arab world that understand, like Israel, both the importance of the hour and the imperative of compromise. This is the obligation of the two parties alone. As Israelis and Palestinians, we must share ownership of this process and share responsibility for its resolution.

As the head of the Israeli negotiating team I enter the room with a sense of great

Case 1:00-cv-00105-L-DLM Document 423-4 Filed 03/06/2008 Page 3 of 5

responsibility and with deep faith to reach an agreement, and we are determined to do so.

But there is another gap whose closure is no less important, and for which your help is critical. It is the gap between the vision and reality. No dialogue or understanding about the future can take hold, unless it is matched by real changes on the ground. Elaborating a common vision of a peaceful future, and changing reality so that we can reach that future, are mutually reinforcing.

This is the principle that lies at the heart of the Annapolis understandings and it is the principle that should guide this gathering. Its adoption was not self-evident.

Under the Roadmap, fundamental reform and the renunciation of terror are a precondition for political dialogue. And the logic of this principle remains valid. But we have agreed with our Palestinian partners that our peoples deserve a more concrete vision of peace, while understanding that true peace can never be achieved unless we create the conditions on the ground for it to take root. On this basis, we have chosen to launch peace negotiations even at this stage - provided that implementation of the future peace agreement will be subject to the changes that the Roadmap requires.

Our decision to launch this dual process, of negotiation alongside Roadmap implementation, offers new hope for peace, but we must acknowledge that it also involves potential complications. It may seem easier to negotiate a peace treaty when the difficulties we face on the ground are behind us. Changing the reality on the ground takes more than a political decision. It requires constant effort in the face of daily difficulties, and it can lead to frustration on both sides. The temptation to engage in mutual accusations or to find reasons for halting our dialogue will appear, at times, difficult to resist. But ultimately it is self-defeating.

Together, we must find the courage to rise above this - and together we must convince our peoples of the promise of peace and the need to confront its challenges.

This does not mean, of course, that we can ignore the obstacles before us. We must address them, but we cannot be held hostage by them. The situation created by Hamas's takeover of Gaza which brings daily terror to Israeli families and daily hardship to Palestinians, while Gilad Shalit remains captive, weighs heavily on us. Lawlessness, incitement, weapons smuggling and terror have not ended.

All of this could be an excuse for inaction. But while the obstacles posed by present reality may be great, our joint determination not to surrender to that reality must be greater. It is in this context that today's meeting is of such importance. It is in this spirit also that we welcome the Palestinian reform plan as a serious effort to build the basis for a responsible Palestinian state that the Palestinian people so deserve and that peace so needs.

This is neither the time nor the forum to address the plan in detail, or to refer to those political and other elements that are subject to direct Israeli-Palestinian discussions. I hope and believe that, with your assistance, these efforts can help produce effective, transparent and accountable Palestinian governance, security forces that fight terrorism comprehensively, bring law and order and ensure the principle of "one authority, one gun," and educational institutions that end incitement and prepare the next generation for co-existence and economic progress. I hope also that, while ensuring the humanitarian welfare, we can work to rid Gaza of terror, and restore it to the control of the legitimate Palestinian government so that reform and economic development can be possible there as well.

We all have a responsibility to help bring these changes about, Israel included. And, despite the difficulties, we are ready to do so and are committed to meet our Roadmap

obligations, including in relation to the settlement activities. Waiting on the sidelines, hoping for change to come, is not an option for an Israeli leader. We must act to bring change, together with our Palestinian colleagues. We welcome the renewed efforts, determination and leadership of President Abbas and Prime Minister Fayyad in this crucial endeavor.

The states and institutions gathered here also have a vital role to play. Your assistance is greatly needed, as is your insistence on mechanisms that ensure that all economic support is properly used, so that the mistakes of the past are not repeated.

To my Arab colleagues I would like to say that your attendance at Annapolis was of critical importance, but your attendance here is perhaps even more so.

Palestinians and Israelis, and their leaders, need to know that they are not alone in the risks they take or the challenges they work to overcome. The region as a whole must be with them, taking practical measures to progress together with them - step by step - towards a genuine and lasting peace. Israel needs and wants a prosperous and peaceful neighbor and we will act in cooperation with the Palestinian government to achieve these goals. In this spirit we are committed to continuing the regular transfer of tax and customs revenues collected on behalf of the PA to a Palestinian government committed to the three Quartet principles.

We have agreed with the Palestinian Authority to renew the dialogue in the Joint Economic Committee (JEC), which represents the most high-level bilateral forum for addressing economic issues. And I am pleased to announce that agreement has been reached, in principle, on the terms of reference for the EUCOPPS mission to help train and prepare the Palestinian police force, and we hope to sign an agreement on this issue in the coming days.

These steps supplement other measures that Israel has taken to assist in Palestinian development, including:

- Ongoing co-operation with Quartet's special envoy Tony Blair, especially in relation to quick impact projects and other capacity building initiatives;
- Enhancing the working relationship with the Palestinian government at all levels including welfare, health, agriculture and tourism;
- Boosting cooperation between the business sectors of both parties and the wider region; and
- Training Palestinian customs officials, accountants, pension fund directors, doctors, nurses, teachers and farmers for work in a functioning state.

These measures are just the beginning, and there is much more that Israel needs to do. Our status in this forum is a special one. We are not here as a donor state, but our influence on this process is clear, as is the dramatic influence of this process on us - for better or for worse. For us, this is about day-to-day actions. For us, the words access and movement must be translated to practice. Each day we must examine how best to advance peace and security and, at the end, it comes down to the details, checkpoint by checkpoint, step by step for a better future.

I have said before that for peace to succeed Israeli security must be a Palestinian interest, just as a Palestinian state is an Israeli interest. I believe that President Abbas and Prime Minister Fayyad are our partners in this understanding, and today, we need you - the members of the international community - to share it too. We need you to know that Palestinian welfare and Israeli security are not competing interests they are interconnected ones.

Israel is committed to the building of a viable Palestinian state. We want the obstacles to

Palestinian economy and daily life to be removed. We have no desire to control Palestinian lives. We do not want the image of Israel in the Palestinian mind to be a soldier at a checkpoint. But we know that making every effort to improve quality of life, also means making every effort to end the threat to life posed by terror and violence.

To end this conflict, the era of zero-sum logic must also end. Economic advancement and personal security must be advanced together. Each are deserving of your passion and your commitment. And I believe that, with your help, we can build on the success of Annapolis and today's donor's meeting, to make the fulfillment of both a reality.

Thank you.

# EXHIBIT D

שורת הדין
Shurat HaDin
Israel Law Center

Home | About Us | In The News | On the Barricades | Donations | Contact Us

NATIONAL POST

**Fighting terrorism in court**
Israeli lawyer sues in bid to cut off funds to Palestinian Authority

John Turley-Ewart
November 23, 2002

"Can Palestinians sue the state of Israel?" Such a question is not often posed to Nitsana Darshan-Leitner, a 29-year-old, high-powered legal crusader for Israeli and U.S. victims of Palestinian terrorism. Without so much as a pause, the petite Israeli advocate told the assembled law students at the University of Toronto this month that Palestinians can sue the state of Israel and some do. She added when Israel has mistakenly injured or killed innocent Palestinians in its war against terrorism, it "takes responsibility and pays."

Darshan-Leitner is now trying to make the Palestinian Authority do the same and cut off the money she believes it uses to fund terrorism.

A pioneer in this legal war against terrorism who would be as comfortable posing for Glamour magazine as she is using the courts to stop terrorism, Darshan-Leitner gave the future lawyers a small dose of the drive and determination that has helped to shake up Israel's legal establishment and break new ground in international law.

Her latest legal triumph came recently when the international legal team she works with won a landmark decision in Rhode Island. For the first time in the United States, a federal district court declared the Palestinian Authority cannot claim sovereign immunity under the U.S. Antiterrorism Act of 1991. A US$250-million lawsuit against the PA by the U.S. family of Yaron and Efrat Ungar, who Darshan-Leitner says was killed in a Palestinian-sponsored terrorist attack perpetrated by Hamas, can proceed.

Darshan-Leitner has three objectives in what seems to be her own war against terrorism: Win compensation for terror's casualties, bankrupt terrorist organizations in the process and expose what she describes as the European Union's reckless US$10-million monthly payment to the PA, which she says helps fund terrorism.

"Sixty years after the Holocaust," she alleges, "Europe has once again the blood of Jews on its hands."

Darshan-Leitner's pique at the EU was palpable as she explained the heart-wrenching case of Steven Bloomberg, a British citizen and physicist who lost his wife, Techiya, a mother of five and five-months pregnant, in a terrorist attack carried out, Darshan-Leitner said, by Palestinian policemen in August, 2001, in the West Bank settlement of Ginot Shomron.

Bloomberg and one of his daughters sustained severe spinal injuries in the attack and must now use wheelchairs. Darshan-Leitner has brought a US$20-million suit against the EU in an Israeli court and is arguing the salaries of the PA policemen involved were paid by the EU, the police car they were driving was bought with EU money and "the bullets that were shot into the [Bloomberg] car were purchased with the EU's money."

Darshan-Leitner believes the EU knows or should have known this and that the US$1.5-billion it has donated to the PA since 1994 has paid for terror attacks on Israel.

The Bloomberg case has been bolstered by evidence uncovered this year in Operation Defensive Shield by the Israeli army, which found what Israel says is very strong evidence showing Yasser Arafat and his government were using EU money to support terrorism.

In the past, the European Union has claimed there is no proof its funding has gone to support terror but in response to Bloom-berg's case, EU representatives refuse to defend that stand in court, claiming diplomatic immunity. This response has only strengthened Darshan-Leitner's resolve. She says the EU should "go to court if it has nothing to hide; it should go to court if it knows how its money is being spent and show us its hands are clean."

Among her many cases, Darshan-Leitner is representing the family of Vadim Nordizh, one of two Israeli military reservists who were beaten to death in a Ramallah police station in October, 2000, after they lost their way trying to reach their unit.

Those involved in the killing of the two reservists have been arrested by the Israelis and Darshan-Leitner wants compensation for Nordizh's family. It should come, she thinks, from the near US$400-million Israel has collected on behalf of the PA in the form of various taxes and which Israel stopped paying over to the PA when the intifada began in the fall of 2000.

Recently, Darshan-Leitner won another landmark decision, this time in an Israeli court, which granted a pre-emptive lien on Palestinian assets. This ensures that if the PA is found to share responsibility in the death of Nordizh, there will be PA assets available as compensation.

In an interview, Darshan-Leitner, stylishly dressed in a well-cut black suit, explained in greater detail the legal inspiration behind her use of the courts to try to root out terrorism. It comes from Morris Dee and the Southern Poverty Law Center. Dee, a white lawyer from Alabama, founded the centre in 1967 and has used it to go after the wallets of racists. He eventually won the largest judgment awarded against a hate group, a US$37.9-million award, after successfully suing the Christian Knights of Ku Klux Klan for conspiracy to burn a black church.

This example, Darshan-Leitner said, showed how the courts could be used to preserve human rights.

Besides cases involving victims of terrorism, the lawyer, who operates out of her office in the Israeli city of Modi'in, has also represented clients in politically explosive cases. Her first case involved an Israeli belly dancer who accused the Egyptian ambassador to Israel of sexual assault. The case was dismissed when the ambassador allegedly claimed diplomatic immunity. She also represented Samuel Sheinbein, who fled to Israel after he murdered an acquaintance in Maryland. The U.S. government wanted Sheinbein extradited to face justice in Maryland, but Darshan-Leitner successfully argued against his extradition, although an Israeli court did find him guilty of the murder. That case prompted changes in Israeli laws allowing for the extradition of criminals.

These changes led to the extradition of Daniel Weiz to Canada from Israel in October, 2000. Weiz is charged along with two teens with second-degree murder in the 1999 beating death of Dmitri (Matti) Baranovski by a group of masked youths who approached him and his friends for cigarettes and money.

Darshan-Leitner fought for nearly a year to prevent the extradition of Weiz, who was in Canada visiting his father at the time of the murder and returned to Israel where he lived.

Darshan-Leitner condemned Canadian officials during the Israeli court proceedings that led to Weiz's extradition, saying police in Toronto withheld information. While she does not condemn the Canadian justice system, she stood by her client's claim of innocence and told the Post, "if he receives a fair trial in Canada, [Weiz] will be found not guilty."

When she has the time, Darshan-Leitner plays the piano and is enthralled by a particularly fitting sport given her work -- boxing.

Before leaving the lecture hall and the law students, the determined lawyer cited a passage from the Torah: "Don't stand idly by your brothers' blood." Darshan-Leitner has taken this to heart, and through the courts in Israel and the United States has launched her own war to stop terrorism against Israel.

Shurat HaDin - Israel Law Center is a registered not-for-profit organization whose work is made possible thanks to the support of individuals and foundations in Israel, the United States and Europe.
© 2006 Shurat HaDin - Israel Law Center. All rights reserved.

Designed and developed by PBCS Technology