UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

　　Plaintiffs – Judgment Creditors

　　　　v.　　　　　　　　　　　　　　　C.A. No. 00 – 105 L-DLM

THE PALESTINIAN AUTHORITY, et al.,

　　Defendants – Judgment Debtors

**SURREPLY IN FURTHER OPPOSITION TO
<u>DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT</u>**

**A.　The PA and PLO Believe that Terrorism *Advances* Political Negotiations**

Rather than seeking to present a "meritorious defense" in the normal fashion (i.e. by denying the allegations of the complaint[1]) defendants purport to found their "meritorious defense" on statements made by the Ungars or their witnesses in the action against Iran.

Specifically, defendants argue that the Ungars' position in the Iran case – that Iran and Hamas were carrying out terrorist attacks in order to undermine the political negotiations between Israel and the PA/PLO – renders the Ungars' claims against the PA and PLO in this

---

[1] A careful reading of defendants' ninety pages of briefing on the instant motion reveals that defendants do not explicitly deny any of the allegations of the complaint. Instead, defendants attempt to stitch together a defense using statements made by *others*. Defendants' refusal to simply come right out and deny the factual allegations of this case (a reticence no doubt inspired by the provisions of Fed.R.Civ.P. 11) speaks volumes.

1

action "nonsensical" because the PA and PLO would not have helped Hamas to carry out terrorist attacks harmful to their own negotiations with Israel. Defs' Reply at 12-15.

The fatal problem with this argument is that it first assumes, without any basis, that Hamas and the PA/PLO must necessarily have the identical perspective as to whether terrorism is harmful or helpful to political negotiations, and then proceeds to focus exclusively on what *Hamas believes* terrorism will accomplish, and carefully ignores the *defendants' own perspective*.

Clearly, however, the real question here is not whether Hamas believes that terrorism harms the political negotiations conducted by the PA/PLO, but rather whether *the PA and PLO themselves* believe that terrorism harms their negotiations with Israel. They do *not*.

In fact the PA and PLO view terrorism as a necessary *complement* to political negotiations, which allows them to extract concessions from the West. This is by no means the Ungars' personal opinion but the conclusion of numerous leading academic experts on Palestinian terrorism. For example, Dr. Boaz Ganor, director of the prestigious International Policy Institute for Counter-Terrorism (ICT) has explained as follows:

> **Since the establishment of the Palestinian Authority in 1994**, Yasser Arafat has adopted a policy whereby he refrains from disrupting the military infrastructure of the Palestinian radical groups, Hamas and the Palestinian Islamic Jihad in the areas under his control. Thus, he was free to **preserve the constant threat of terrorism as a bargaining chip to be used against Israel** . . .
>
> [D]uring the seven years that the Palestinian Authority has existed, Arafat never lifted a finger to curtail the ability of the terrorist organizations to carry out attacks. He never took real steps to disrupt the militants' command centers, shut down their bomb factories, or prosecute the leaders of the organizations' military wings. What actions he did take were always carried out "for the cameras," and were rescinded or overturned as soon as the eyes of the world were elsewhere. Nor did Arafat ever do anything about gathering up the thousands of illegal weapons in the hands of

2

>militants, including those of his own Fatah organization – contrary to the terms of numerous agreements signed with Israel. Nor was anything done to prevent radical organizations from engaging in fund-raising or recruitment activities. **On the contrary, the terrorist organizations have been allowed by Arafat to take root and grow in the soil of the Palestinian Authority**. This was not a matter of weakness on the part of the Palestinian leader – it was not that he feared a confrontation with the fundamentalists. **Rather, it was part of a calculated policy, whereby the threat of violence was held in check, to be used to put pressure on Israel at the appropriate time during the negotiations**.

Dr. Boaz Ganor, *Is Arafat Ready to Take on Hamas?* December 12, 2001, published by the ICT at http://www.ict.org.il/apage/5350.php, Exhibit A (emphasis added).[2]

Similarly, an extraordinarily detailed study of Yasser Arafat's political strategy authored by terrorism experts Professor Jerrold Post, Dr. Shmuel Even and Dr. Shaul Kimhi reached the following conclusion:

>**[Arafat] has chosen the way of political action and the way of armed struggle at the same time. Arafat's entry into the Oslo process did not motivate him to abandon the use of violence, but rather, to choose new tools appropriate to the new situation. His choice of diplomacy was perceived by him as a strategy for the attainment of his objectives; when that strategy did not avail, even though for only a limited time, he brought out the tools of violence**. Arafat has two main types of tools of violence. One involves stirring up the Arab masses – sending mobs of Palestinians out into the streets to clash with the Israel Defense Forces. The other involves the use of terror – including refusal to cooperate with Israel on security and defense matters, creating the conditions for terror, encouraging terror by the opposition (e.g., the release of Hamas terrorists, giving a "green light" to opposition members; Alon, 2001a), and even sponsoring acts of terror by his own people (shooting ambushes, explosive charges, mortar fire, and so forth).

---

[2] Dr. Ganor is one of the experts with whom plaintiffs consulted before bringing the instant action. In addition to his academic positions and publications, Dr. Ganor served as a counterterrorism consultant for the Israeli government, the NYPD and many other entities. *See* Exhibit B.

Professor Jerrold Post, Dr. Shmuel Even and Dr. Shaul Kimhi, *Yasir Arafat - Psychological Profile and Strategic Analysis*, at 28-29, published by the ICT at http://www.ictconference.org/apage/5519.php, Exhibit C (emphasis added).[3]

Likewise, Dr. Dore Gold, a Middle East expert and former senior Israeli diplomat who participated extensively in the negotiation of the Oslo Accords[4] has explained that:

> At the time of the signing of the first Oslo Agreement on September 13, 1993, Israel viewed the Palestine Liberation Organization (PLO) as a bulwark against the militant fundamentalist challenge of Hamas. . . The PLO was . . . expected to ruthlessly fight Palestinian fundamentalist organizations . . .
>
> Indeed, U.S. and Israeli diplomats drew a distinction between their PLO peace partners and the fundamentalist "enemies of peace" whom, it was assumed, were trying to undermine the Palestinian Authority. **Yet, while PLO and Hamas were competitors for influence among the Palestinians, their evolving relations appeared to be characterized by increasing *collusion* rather than *confrontation*,** as described below:
>
> From the very outset of the Oslo process, the PLO refused to assume the role Israel had assigned it vis-a-vis Hamas and other militant Islamic elements. During 1993 the PLO undertook two negotiating efforts with Hamas: in Khartoum, Sudan, in January and in Gaza during September. A six-point agreement was signed between the military wings of the two movements on April 22, 1994, in the Gaza Strip. A third set of talks was held in Cairo on December 17-21, 1995.
>
> \*\*\*
>
> **Arafat judged that he benefited from the Hamas and Islamic Jihad attacks on Israel because they provided him with negotiating leverage**.

---

[3] Professor Post and Drs. Even and Kimhi are leading experts in their fields. *See* Exhibit C at 46.

[4] For Dr. Gold's academic and diplomatic credentials *see* Exhibit D.

Dr. Dore Gold, *How Arafat's Palestinian Authority Became an "Entity Supporting Terrorism" December 9, 2001*, published by the Jerusalem Center for Public Affairs at http://www.jcpa.org/art/brief1-11.htm, Exhibit E (emphasis by bold and underline added, emphasis by italics in the original).

A detailed study issued by the Israeli Foreign Ministry reached the identical conclusion:

> Arafat . . . employed terrorism against Israel, in varying intensity, whenever he felt that the Oslo track was diverting from its course - as defined by the Palestinians. This, in the framework of Arafat's strategic concept which views terror as a legitimate tool for obtaining Palestinian national goals. **Arafat, throughout his years of leadership, systematically combined political negotiations and violence**, while determining the balance between the two according to the circumstances.

Israeli Foreign Ministry publication, *The Involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism against Israel, Corruption and Crime*, May 6, 2002, published at http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/5/The%20Involvement%20of%20Arafat-%20PA%20Senior%20Officials%20and, Exhibit F, at 4 (emphasis added).[5]

Further proof that defendants' strategy is one of both "talking and shooting" is contained in an exhibit they themselves submitted in *Knox v. PLO* in the Southern District of New York.

---

[5] Thus, defendants' claim in their reply brief that the Israeli government absolved them of involvement in violence is blatantly false. Indeed, on November 27, 1996, the Israeli Foreign Ministry published an official statement detailing numerous cases between 1994-1996 where defendants' senior officials "repeatedly called for jihad (holy war) against Israel and threatened a renewal of the intifada. They have praised terrorists who killed Israelis after the signing of the accords, and suggested that the agreements with Israel were a tactical ploy and a prelude to a return to the armed struggle." *See* Exhibit G, *Incitement to Violence Against Israel by the Leadership of the Palestinian Authority*, November 27, 1996, published by the Israeli Foreign Ministry at http://mfa.gov.il/MFA/Archive/Peace+Process/ 1996/ INCITEMENT%20TO%20 VIOLENCE%20AGAINST%20ISRAEL%20BY%20LEADERSHI

Notably, on June 7, 1996 – just 48 hours before the Ungars' murder – Arafat threatened that "If Israel rejects our demands there will be a reaction and we have a 30,000 man armed force". *Id*.

5

*Knox* arose from a machine-gun attack by terrorists on a bat mitzvah (coming-of-age) ceremony in Hadera, Israel. An Israeli court convicted Nasser Awis, a PA security officer, of planning and funding the attack. *See* Felony Case (Tel Aviv) 1137/02 *State of Israel v. Awis*, Exhibit H.[6]

In Awis' statements to police (which the Israeli court found admissible on the grounds, *inter alia*, that they were written by Awis in his own hand (*id*. at 3-4) and were supported by Awis' confession in open court (*id*. at 4, 15)), he explained that he received instructions to carry out or cease terrorist attacks from senior PA/PLO leader Marwan Barghouti, according to the progress of the political negotiations with Israel:

> [W]hen the political situation deteriorated and we were in a bad way [Barghouti] would ask us to continue the terrorist attacks. When Shimon Peres and Omri Sharon met with leaders in the [Palestinian] Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks.

Exhibit H at 18.

Thus, convicted terrorist Nasser Awis confirms exactly what the experts quoted above unanimously assert: that the PA and PLO use terrorism as a leveraging tool to advance political negotiations in their favor.

***

In light of all the above it is pellucid that there is no contradiction whatsoever between the Ungars' assertions in the case against Iran and those in the instant case. The PA and PLO believe that terrorism is ***beneficial*** to their political negotiations with Israel, and therefore employ a strategy of both "talking and shooting." Hamas' own opinion, beliefs and goals in respect to terrorism and political negotiations are completely irrelevant to those of the PA and

---

[6] This translation was submitted in *Knox* by the defendants themselves. *See Knox v. PLO*, 03-cv-4466 (S.D.N.Y.) dkt. # 111.

6

PLO. Indeed, the PA and PLO *use* Hamas as a sort of "Frankenstein monster" which they carefully feed, shelter and protect so that they can unleash it when they are unhappy with the course of negotiations. Hamas has its own reasons for carrying out terrorism (just as Frankenstein's monster no doubt had its own reasons for attacking people) but Hamas' simplistic goals and worldview are completely irrelevant to the separate, independent and sophisticated strategy adopted by the PA and PLO, which combines both violence and political negotiations.

Plaintiffs respectfully emphasize that the Court does not need to decide whether the PA and PLO do indeed have a policy of both "talking and shooting." Rather, for the purpose of the instant motion, the Court need only note the *existence* of the numerous expert opinions cited above that the PA and PLO view terrorism as enhancing their ability to obtain concessions through political negotiations. The very existence of that opinion – expressed by recognized experts and authorities, not merely the plaintiffs – clearly proves that there is no contradiction whatsoever between the Ungars' allegations in this case and those made in their suit against Iran.

Because there is no contradiction between the allegations made in the two cases (much less a necessary contradiction) there is therefore nothing "exculpatory" whatsoever about the assertions made by the Ungars and their witnesses in the Iran suit. And since defendants' have based their "meritorious defense" on the purportedly contradictory and exculpatory assertions in the Iran case – which, as shown above, are neither contradictory nor exculpatory – defendants' "meritorious defense" is therefore non-existent.[7]

---

[7] Defendants appear to believe that because they are purporting to rely on statements made by the Ungars' own expert witnesses in the Iran case, their alleged meritorious defense is particularly "powerful." Defs' Reply at 24. That belief is erroneous because it "smacks of the proposition that every party 'vouches' for its witnesses, a view long departed and little missed in federal practice. *See* Fed.R.Evid. 607 and the Advisory Committee's note. Expert witnesses . . . are free agents." *Metlyn Realty Corp. v. Esmark, Inc.*,

*Footnotes Continued on Next Page...*

### B. The Letter Submitted by the Department of Justice in *Knox* Speaks for Itself

Defendants' demand for Rule 60(b) relief is based primarily on their claim that if the judgment is left intact U.S. foreign policy interests will be harmed. Defendants have submitted as Exhibit A to their Reply the recent letter from the Department of Justice to U.S. District Judge Victor Marrero in the *Knox* matter ("DOJ Letter"), which they claim supports their foreign policy arguments. *See* Defs' Reply at 28-29.

---

763 F.2d 826, 833 (7th Cir. 1985). Thus, even assuming purely *arguendo* that a statement by the Ungars' witnesses in the Iran case somehow supported the defendants' claims of innocence – **and this is absolutely not the case** – such a statement would have no more weight than if the defendants themselves had solicited and submitted the statement from the witness.

Defendants also point to a statement by one of the Ungars' witnesses, Dr. Paz, that the PA was seeking to "limit" Hamas' activities and that some members of Hamas were wanted by the PA, as somehow proving their innocence. Defs' Reply at 2. In fact, of course, Dr. Paz specifically testified that the defendants were **providing weapons to Hamas** during the period prior to the Ungars' murder. *See* dkt. #408 at Exhibit M, 79:22-80:9. Indeed, Dr. Paz' testimony about "limiting" Hamas squares with Dr. Ganor's conclusion that Arafat occasionally acted "to prevent attacks when it served what he saw as the Palestinian national interest" and/or ordered the arrest of Hamas men "for the cameras" – orders which "were rescinded or overturned as soon as the eyes of the world were elsewhere." Exhibit A. Similarly, Secretary of State Albright noted during this period that the defendants have a "revolving door" policy under which terrorists "are arrested and then released." *See* Exhibit I (downloaded from http://telaviv.usembassy.gov/publish/peace/archives/1997/me0911a.htm).

Even assuming *arguendo* that defendants occasionally acted to limit Hamas activities (for their own purposes) from time to time (an assumption which the plaintiffs dispute), that would in no way relieve defendants of civil liability for terrorist attacks facilitated by their provision of material support and resources to Hamas **at other periods of time**. *See generally Boim v. Holy Land Foundation*, 511 F.3d 707 (7th Cir. 2007) (analyzing elements of civil liability under §2333(a) in respect to provision of support to Hamas).

**Rather, in order to present a "meritorious defense," defendants would have to assert facts showing that they <u>never</u> provided material support to Hamas prior to the Ungars' murder (or that any such support in no way facilitated the Ungars' murder). Defendants have utterly failed to make such an assertion, because they cannot, and they have therefore failed to present a meritorious defense.**

8

Defendants' argument is peculiar at best. The DOJ Letter does express mild concern about the "potential" impact that these cases "may" have on the defendants, but expressly *declines* "to file a Statement of Interest concerning the Rule 60 issues." *Id*.

The fact that the government declined to file a Statement of Interest supporting defendants' Rule 60(b) motion in *Knox* speaks for itself.

Moreover, the amount of the judgment in *Knox* is nearly twice the amount of the judgment in this case,[8] defendants filed their Rule 60(b) motion in *Knox* less than a year after the judgment was entered versus the three and a half year delay in this case, the underlying proceedings in *Knox* were far shorter than those in this case and resolved far fewer issues, and the *Knox* judgment was not tested by a court of appeals, unlike the judgment in this case. Thus, by any imaginable parameter, the considerations informing the government's decision not to file a statement of interest in *Knox* would apply *a fortiori* in the instant case.[9]

---

[8] In order to distract the Court from the fact that the Ungars have restrained defendants' funds equal to or in excess of the amount of the judgment for nearly three years now without any deleterious effect whatsoever on defendants or on the peace process, defendants allege – blithely disregarding this Court's previous warnings against *ad hominem* attacks on counsel – that plaintiffs' undersigned counsel "is spearheading litigation seeking nearly $4 billion in damages from the PA" in order to bankrupt defendants. Defs' Reply at 28. This paranoid claim is absurd. The Ungars' counsel is not a "spearhead" but simply a lawyer who has been retained by some of the many American citizens murdered or injured by the defendants (many of whom have hired other lawyers). Neither the Ungars nor their counsel have any intention of bankrupting the defendants (nor do they believe it is even possible to do so especially given defendants' recent multibillion dollar cash influx). Furthermore, defendants have arrived at the fantastic figure of $4 billion by adding up all the ad damnum clauses of all the suits pending against them, many of which are years from judgment (and/or may never reach judgment) and none of which have anything to do with this case.

[9] By contrast, the government has apparently not yet formulated a position regarding the pending motions filed by defendants in the *Gilmore*, *Biton*, *Shatsky* and *Saperstein* cases (in which judgment has **not** entered) to vacate **default** under Rule 55(c) (as opposed to default **judgment** under Rule 60(b)). *See* DOJ Letter at 1 ("The United States has not yet decided whether or not to participate in those other cases.")

### C.  Dahlan Admitted Assisting Hamas Circa 1994-1996 and Defendants' Claims to the Contrary Are False

In support of their opposition to defendants' Rule 60(b) motion, plaintiffs submitted a video interview with (now former) senior PA official Mohammed Dahlan, in which he admits that the defendants provided material support and resources (within the meaning of 18 U.S.C. §2339A(b)(1)) to the top terrorist commanders of Hamas. *See* Plaintiffs' Ex. J, Declaration of Marwan Abdel-Rahman at ¶ 6, Appendix 4.[10]

Defendants assert in their reply that Dahlan's statements regarding their provision of support to Hamas are irrelevant to this case, because those admissions refer to "the Intifada, which began in 2000" and not to "the period at issue" in this case, i.e. 1994-1996. Defs' Reply at 23. In other words, defendants argue that the admission that they provided material support and resources to Hamas after 2000 does not constitute an admission that they did so in the years leading up to the murder of the Ungars. *Id.*

But this argument is based on a bold-faced falsehood, because in that interview Dahlan states as follows:

> When the martyr Yahya Ayyash was killed . . . I personally had told our brothers in Hamas that they must hide him, because Israel wanted to assassinate him.

Plaintiffs' Ex. J, at ¶6, Appendix 4.

---

[10] Plaintiffs submitted the Dahlan video in support of their arguments (i) that Dahlan (whom defendants were previously ordered to produce for a deposition but who left defendants' employ in 2007) is a crucial witness whose unavailability as a deponent severely prejudices the plaintiffs and (ii) that, as a matter of empirical fact, defendants unquestionably provide material support to Hamas. *See* Opp. Memo at 33-34, 57.

The "martyr Yahya Ayyash" was Hamas' top bomb maker during 1994-1996, and was assassinated in January 1996, several months *before* the Ungars' murder. *See* Exhibit J. Notably, the PA aggressively investigated and attempted to arrest persons suspected of assisting Israel in carrying out the asssasination. *Id*.

Clearly, then, Dahlan's admission that he instructed "our brothers in Hamas" to shelter and protect "the martyr Yahya Ayyash" refers to the years *prior* to the murder of the Ungars, i.e. *circa* 1994-1996. **Therefore, defendants' claim that Dahlan's admissions regarding their provision of support to Hamas relate only to the post-2000 period, is nothing less than a brazen attempt to deceive this Court**.

Defendants' attempt to mislead this Court even now, when seeking Rule 60(b) relief, shows how defendants would conduct themselves if judgment was set aside. It also constitutes sufficient reason, standing alone, to deny their motion, since "material bad faith conduct by a defendant subsequent to the entry of default can, if sufficiently egregious, provide the basis for refusing to set aside a default." *Farnese v. Bagnasco*, 687 F.2d 761, 765 (3rd Cir. 1982).

Defendants are seeking to mislead the Court about Ayyash because Dahlan's admission that the defendants were aiding and protecting Ayyash directly supports the allegations of the complaint in this case:

The Ungars alleged that in the period prior to the murder of Yaron Ungar, Hamas terrorists operating from safehouse territories placed at their disposal by the defendants had murdered over a dozen United States citizens. Amended Complaint at ¶¶ 25-26. The defendants *continued* to shelter and otherwise assist these Hamas terrorists even *after* they had murdered these American citizens, and as the result of this shelter (and other assistance) provided by

11

defendants, Hamas was able to plan and carry out additional murders of U.S. citizens – including the murder of the Ungars. *Id*. at ¶¶ 25-47.[11]

Among the American citizens identified in the complaint as having been murdered by Hamas during this period was Joan Davenny, who was murdered on August 21, 1995. *Id*. at ¶ 26. Official statements issued by the Foreign Ministry of the State of Israel specifically name Ayyash as responsible for the murder of Joan Davenny. *See* Exhibit K[12] (identifying Ayyash as

---

[11] The cause of action for "international terrorism" under 18 U.S.C. §2333(a) requires that the conduct complained of constitute "a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. §2331(1)(A).

Plaintiffs' complaint alleged that this "criminality" requirement is met here because the "acts of defendants PA and PLO, if committed within the jurisdiction of the United States, would constitute, *inter alia*, without limitation, violations of 18 U.S.C. §3 ("Accessory After the Fact") and of 18 U.S.C. §2339A ("Providing Material Support to Terrorists"). Amended Complaint at ¶ 41.

In an effort to intentionally sow confusion, defendants pretend in their reply that the reference here to 18 U.S.C. §3 constitutes an allegation that the defendants served as accessories after the fact by sheltering the Hamas gunmen who murdered the Ungars. Defs' Reply at 13, 16. But as defendants know full well, the complaint alleged that defendants served as accessories after the fact by shielding from apprehension Hamas terrorists who had murdered U.S. citizens ***prior*** to the murder of the Ungars – which in turn enabled Hamas to ***subsequently*** murder the Ungars.

Thus, defendants' claim that in 1997 they transferred two of the Ungars' murderers to Israeli authorities, a claim which in any case is unsupported by a scintilla of evidence (the Arabic-language piece of paper of unknown provenance submitted by defendants is not evidence) and which defendants do not even assert in their own name (despite the fact that it relates to their own purported conduct) but rather bizarrely attribute to "Hamas members" (Reply at 19) is completely irrelevant to the allegations of the complaint and to the issue of liability. Civil liability can neither be created nor diminished by post-tort conduct.

Defendants similarly attempt to mislead the Court by boasting that they arrested the Hamas murderers of U.S. teenager David Boim. Defs' Reply at 21 n. 6. Defendants "neglect" to inform the Court, however, that they then quickly released Boim's killers, enabling one of them to carry out a suicide bombing in Jerusalem on September 4, 1997, in which five civilians were murdered and 192 injured. *Boim v. Holy Land Foundation*, 291 F.3d 1000, 1002 (7th Cir. 2002). Among those seriously injured in that bombing were a large number of American citizens. *See Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258 (D.D.C. 2003).

[12] Downloaded from

*Footnotes Continued on Next Page...*

12

having trained the Hamas terrorists who bombed "the #26 bus in Jerusalem on 21 August 1995"); Exhibit L[13] (State Department "Rewards for Justice" webpage identifying Joan Davenny as having been murdered in that bombing).

Thus, Dahlan's admission expressly confirms the allegations of the Ungars' complaint: between 1994-1996 the PA and PLO were aiding, abetting and protecting senior Hamas terrorists responsible for the murder of American citizens such as Ms. Davenny. And but for the protection and assistance provided by the PA and PLO to Hamas' senior terrorist operatives during this period, Hamas would have been unable to subsequently murder U.S. citizen Yaron Ungar.

Little wonder, then, that defendants have attempted to mislead the Court about their assistance to "the martyr Yahya Ayyash" and their other "brothers in Hamas."[14]

### D.   The Gaza Documents Which Are Now Unavailable Are Those Which Were in *Defendants*' Possession, Not Hamas' Possession

The Ungars have asserted that they would be severely prejudiced and unable to fairly litigate the case if defendants' Rule 60(b) motion were granted, because the defendants were expelled from the Gaza Strip in June 2007 and are therefore unable to produce any documents located in the Gaza Strip relevant to their provision of material support and resources to Hamas. *See* Plaintiffs' Memo in Opp. (dkt. #415) at 34-36; Plaintiffs' Notice of New Developments Relevant to Defendants' Rule 60(b) Motion (dkt. # 422) at 1-4.

---

http://www.mfa.gov.il/MFA/MFAArchive/1990_1999/1995/8/HAMAS+TERRORISTS+CAPTURED+-+23-Aug-95.htm?DisplayMode=print

[13]  Downloaded from http://www.rewardsforjustice.net/english/index.cfm?page=Davenny

[14] Defendants also falsely claim that the interview with their official Jibril Rajoub, in which Rajoub states that defendants have never had a disagreement with Hamas about "resistance" relates to the post-2000 intifada period. Defs' Reply at 23. In fact, Rajoub says nothing indicating that his remarks are limited to the post-2000 period.

Defendants claim that this argument is meritless because it:

> [D]epends on the notion that **Hamas, the supposed possessor of the documents, would have produced them at the request of the PA, had the PA so requested them prior to the default**. It is unclear how Plaintiffs can assert this prejudice with a straight face. The fact is, as Plaintiffs now recognize, that the PA does not have control of Hamas, so any such records would never have been available for litigation of this case.

Defs' Reply at 33 (emphasis added).

This statement is yet another shameless attempt by defendants to mislead the Court. It is perfectly clear that the documents at issue were those in the possession of the *defendants*, not Hamas. *See* dkt. #415 at 35 ("the Ungars served the PA with requests for production of documents intended to document the defendants' provision of support to Hamas for the commission of terrorism. *See* Exhibit T."); *id*. ("In June 2007, Hamas . . . destroyed or took control of all of the PA's security and police posts and the PA's governmental offices throughout the Gaza Strip.") (emphasis added); *id*. ("since all of the PA's governmental offices in Gaza were seized by Hamas – the PA is utterly incapable of producing any responsive documents located in Gaza.") (emphasis added).

Thus, defendants could not possibly have misread or misunderstood plaintiffs' argument here, and their reference to Hamas as the "possessor of the documents . . . prior to the default" (Defs' Reply at 33) is clearly just another bad-faith sleight-of-hand aimed at misleading the Court.[15]

---

[15] Indeed, as defendants are perfectly well aware, this Court has already held that the PA was required to produce the documents in its possession sought by the Ungars in their request for production of documents (attached as Exhibit T to Plaintiffs' Opp.). *Ungar*, 325 F.Supp.2d at 61-64. Their attempt to now play dumb is thus embarrassingly transparent.

*Footnotes Continued on Next Page...*

Here again, the defendants have proven that they have not changed their litigation tactics one iota, and that if the Court were to grant the Rule 60(b) motion, the Court and the plaintiffs would be facing many more years of the same contumacious conduct that marred the proceedings between 2000-2004.

### E. Plaintiffs Have Not Changed Their Theory of Liability in Any Way

In discussing the allegations of their complaint, the Ungars' opposition memorandum cites the recent decisions in *Rux v. Republic of Sudan*, 461 F.3d 461, 470-471 (4th Cir. 2006) (holding that Sudan provided material support to al Qaeda within the meaning of 18 U.S.C. §2339A by permitting it to operate within Sudanese territory) and *Boim,* 511 F.3d 707 (holding that provision of material support within the meaning of §2339A is actionable under §2333(a)). *See* Plaintiffs' Opp. at 52.

In response, defendants claim that by citing the recent decisions in *Rux* and *Boim*, the Ungars have "abandoned" their original theory of liability and adopted a "newly-minted theory of liability." Defs' Reply at 16.

---

Defendants also argue that the Ungars' claims of prejudice (in respect to both the lost documents and the missing witnesses) are unfounded because they have not proved their need for the documents or the witnesses. Defs' Reply at 31-33. This argument ignores both the fact that the burden to demonstrate the absence of prejudice is on the defendants and, more importantly, that this Court has already determined that the Ungars are entitled to these documents and witnesses. *Ungar, id.*. Defendants' related claim that the Ungars have not proven that they are unable to compel the appearance of the defendants' former officers is laughable. Aside from the fact that it is not the Ungars' burden to track down defendants' former officers across the Middle East (most or all of whom are almost certainly in countries, like Syria, which would never cooperate with a letter rogatory issued by a U.S. court), and prove that they are not subject to compulsion, as defendants wishfully imagine, their testimony (which the Ungars have no way of obtaining anyway) would be of little value today because these witnesses are now private individuals and their testimony would no longer bind the defendants and any refusal on their part to testify could not be imputed to the defendants.

15

In fact, precisely the contrary is true. Plaintiffs' complaint alleged that by allowing Hamas to operate in their territory, defendants had provided material support and resources to Hamas within the meaning of §2339A which is actionable under §2333. *See* Amended Complaint at ¶ 35. Subsequently, the Fourth Circuit ruled in *Rux* that plaintiffs' theory is correct, i.e., that by allowing a terror organization to operate in its territory a government provides a "safehouse" to the organization within the meaning of §2339A. *Rux*, 461 F.3d at 470-471. Thereafter, *Boim* ruled that provision of material support under §2339A is civilly actionable under §2333 of the ATA.

Thus, it is not that the Ungars have changed their theory of liability, but rather that two federal courts of appeals have now ***endorsed*** the theory asserted by the Ungars all along.[16]

Defendants also make an attempt to distinguish *Rux* on the facts, because Sudan provided Qaeda with other material support – such as financial services and transportation – in addition to allowing it to operate from Sudanese territory. Defs' Reply at 17-18. Defendants misconstrue *Rux*. The Fourth Circuit expressly held that – **standing alone** – "allegations that Sudan provided Al-Qaeda with locations within the country where its members could meet, engage in business activities and operate terrorist training camps satisfy the 'safehouses' provision of §2339A(b)(1)." *Id*. at 471. Indeed, *Rux* then went on to examine the other types of material support alleged (financial services and transportation) **separately**. *Id*. ("In addition, Plaintiffs' allegations meet the 'financial services' and 'transportation' elements of the definition of material support as well.")

---

[16] Moreover, this Court has already held that the complaint states a claim under §2333. *Ungar v. Palestinian Authority*, 153 F.Supp.2d 76, 96-98 (D.R.I. 2001). Since that issue was already litigated, defendants are precluded from challenging it in a Rule 60(b) motion

16

Notably, the Ungars have also alleged that – like Sudan and Qaeda – the instant defendants provided financial support to Hamas and its terrorist operatives in various forms. Amended Complaint, ¶¶ 32, 33, 35. Yet, defendants' Rule 60(b) papers utterly fail to deny these allegations.[17]

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman  #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

---

[17] Defendants also argue that *Rux* is inapposite because the members of Hamas are "indigenous" to the Palestinian territories whereas Qaeda members are foreign to Sudan. This argument fails because the provision of a safe house under §2339A does not relate to merely allowing individual members of Hamas to live in their homes in the West Bank and Gaza, but rather to allowing Hamas **as an organization** to conduct training, maintain arms depots and perform other terrorism-related activities **as an organization** in PA territories. Effectively, defendants are fishing for a ruling which would grant them and all similarly-situated defendants immunity from civil liability for sheltering terrorist groups made up of local residents (e.g. Hizbollah, which is indigenous to Lebanon). The Court should not take the bait.

## CERTIFICATION

      I hereby certify that on March 13, 2008 I served this document along with the attached and exhibits via ECF to the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701

                                               /S/ David J. Strachman