

**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK          )
                           )   ss
                           )
COUNTY OF NEW YORK         )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Hebrew into English of the attached Verdict in Felony Case

001137/02, dated May 1, 2003.

Ian Kemper, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this _14_ day of _November_, 20_04_ .

EVAN FINCH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FI6134600
Qualified in New York County
My Commission Expires October 03, 2009

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. **tel** 212.631.7432 **fax** 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. **tel** 415.576.9500 **fax** 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom **tel** +44.(0)20.7936.9002 **fax** +44.(0)20.7990.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong **tel** +852.2159.9143 **fax** +852.3010.0082
translations@geotext.com  |  www.geotext.com

## Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

**The Courts**

| Tel Aviv – Jaffa District Court | | | Felony Case 001137/02 |
|---|---|---|---|
| Before: | The Hon. Judge S. Timan – Presiding Judge<br>The Hon. Judge N. Achituv<br>The Hon. Judge O. Solomon-Cherniak | | May 1, 2003 |

In the matter of:     **State of Israel**
                           represented by Counsel:    **Adv. Devora Chen and**
                                                         **Adv. Tamar Anis**

v.

                   **Nasser Mahmoud Ahmad Awis**
                   represented by Counsel:    **Adv. Bulus**

The State of Israel is arguing that these *organizations* are *terrorist organizations*, pursuant to their definition in the Ordinance for the Prevention of Terrorism, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in the Judea and Samaria region, and that his activity included, *inter alia*, the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

### Verdict

#### Judge O. Solomon-Cherniak:

#### The charge

The State of Israel is arguing that, during the period of time that is relevant to the events that are described in the indictment, the Defendant was the Commander of the Nablus and Northern Samaria area of the Tanzim-Fatah organization, as well as the commander of the *Kitaab Shuhadaa al-Aqsa* (al-Aqsa Martyrs' Battalions) organization in that area.

The State of Israel is arguing that these organizations are terrorist organizations, according to the definition thereof in the Ordinance for the Prevention of Terrorism, 5708 – 1948, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in Judea and Samaria, and that his activity included, *inter alia*, the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

The State of Israel is arguing that, as a result of the Defendant's actions, many civilians were murdered, wounded and injured, and it is seeking to convict him, as set forth in the eight counts that are included in the indictment, of the offenses that are attributed to him, which are: Membership and activity in a terrorist organization – offenses in contravention of Sections 2 and 3 of the Ordinance for the Prevention of Terrorism, 5708 – 1948.

Acts of conspiracy to commit a crime – offenses in contravention of Section 499 of the Penal Code, 5737 – 1977.

Acts of murder and attempts to perpetrate such acts – offenses in contravention of Sections 300 (a) (2) and 305 (1) of the Penal Code, 5737 – 1977.

Acts of aggravated assault and attempts to perpetrate such acts – offenses in contravention of Sections 329 (1) and 329 (1) [sic] in combination with Section 25 of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon – offenses in contravention of Section 144 (b) of the Penal Code, 5737 – 1977.

### The Defendant's line of defense

In the initial stage, the Defendant hired the services of Adv. Bulus and cooperated with him.

The defense attorney received all of the investigative material, and even filed a notice that he would raise various preliminary arguments on behalf of the Defendants, including the argument of the absence of jurisdiction.

A first harbinger of the future line of defense of the Defendant is to be found in the transcript of the session which took place on September 10, 2002. At that session, the defense attorney (before another panel of judges) argued, *inter alia*, that: "After I had explained the matter to him, he said that he did not want an attorney, that he was representing himself. We hope that, within a short time, we will be able to push the deliberations forward – a period of at least two weeks."

At the same session – as may be seen in the transcript – the Defendant said to his attorney, and through the interpreter: "Do not speak on my behalf. I am my own lawyer; I am representing myself." Even at that stage, the Court ruled that: "Adv. Bulus' firm will continue to represent the Defendant, even if the latter decides to conduct the hearing on his own."

At the session which took place on January 22, 2003 (before the other panel), the defense attorney gave notice as follows: "We withdraw from the argument of an absence of jurisdiction. I agree that there was a ruling that a summation must be filed within 30 days with regard to the argument of the absence of jurisdiction. However, in light of the developments which took place on the subject of Barghouti and in view of the decision on the part of the District Court to reject that argument, we have decided to withdraw the argument of an absence of jurisdiction in this case."

The defense attorney subsequently filed a petition to release him from representation, and the petition was denied in our ruling of March 2, 2003.

The trial began, continued and concluded in the presence of the Defendant and his attorney, and was fully translated into Arabic. The Defendant and his attorney remained silent throughout. They did not file a response to the indictment (we considered that as tantamount to a plea of not guilty on all counts). They did not raise any preliminary arguments, they did not cross-examine any witnesses and they did not raise any legal arguments. The Defendant did not testify and no witnesses were brought forth on his behalf. They even chose not to present a summation.

This position shall be examined against the background of the notice given in writing by the defense attorney, as follows:

2

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

".. 4. The undersigned spoke with the Defendant on several occasions and attempted to convince him to accept legal representation by an attorney. However, the Defendant has chosen not to be represented by an attorney.

5. The undersigned explained to the Defendant that he is supposed to represent his interests at the trial. In response, the Defendant clarified that he had decided not to take an active part in the trial proceeding. He is entitled to make his own choices and to take the actions which he has chosen for himself, including by means of a passive line of defense of silence throughout his trial.

6. The Defendant has requested that, if the Court forces us to appear at sessions, the only thing that we may do is to remain silent.

7. On March 11, 2003, and following the ruling by the Honorable Court, the undersigned again explained to the Defendant the ruling by Their Honor and his own situation, as well as the fact that, if a legal argument is raised in the course of the session, it is fitting and proper for the undersigned to address it. The Defendant, however, ruled out that possibility and repeated his former statement, to the effect that he is not interested in cooperating and that he does not consider us to be his defense attorneys, and again asked us to remain silent...

10. The Defendant is perfectly well aware of the meaning of all this. He is not legally incompetent and he has the mental and intellectual capacity to choose how to conduct the trial...

13. In the absence of cooperation by the Defendant, and [in view of] his instructions to the defense attorney to remain silent throughout the trial, not to examine witnesses and/or to raise legal and/or other arguments, not to speak on his behalf and/or to raise factual and/or legal arguments, the undersigned has no choice but to hold his tongue, and will be enjoined from doing otherwise, for obvious reasons originating in the rules of ethics which bind any attorney at law..."

We are convinced, on the basis of that which has been set forth in the notice, oral statements made to us in the matter, and the behavior of the Defendant and his attorney prior to and at all times throughout the trial, that the Defendant has adopted a position which reflects a line of defense which he selected knowingly, deliberately and of his own free will.

What is before us is a choice which results from a calculated, deliberate, conscious, intentional and manipulative move made by a Defendant who understands perfectly well, and who is quite aware of, all of the implications thereof.

The Defendant was given, at all times, every possibility of taking an active role in the deliberations. We even attempted to urge his attorney to do his job in any way he could, even in the absence of any cooperation by the Defendant, and at the very least, where purely legal argumentation was involved.

The distinguished defense attorney explained, yet again, that he would not intervene in the deliberations, even where legal argumentation was involved, because he was bound by the line of defense adopted by his client.

In other words, we are not looking at an unintentional failure to act, or at indifference to the consequences, but rather, at a clear and definitive line of defense.

The Defendant and his defense attorney may be presumed to have been aware, from the outset, of the legal consequences of this line of defense.

### The Defendant's confession

The Defendant confessed to the offenses that were attributed to him in the indictment, within the framework of his statements to the police.

Statements P/5 dated April 21, 2002, P/6 dated April 28, 2002, P/7 dated April 30, 2002, P/8 dated May 1, 2002, and P/9 dated May 14, 2002, were written on the basis of the testimony of Prosecution Witness No. 5, an interrogator in the Hostile Activity Unit, Roni Amar, in Arabic, in the handwriting of the Defendant and after he had explained to the Defendant in Arabic the charges that were being attributed to him and had duly warned him. According to the interrogator's testimony, after the Defendant had confirmed to him that he understood the charges and the nature of the warning, he asked to write the statements in his own handwriting and did so of his own free will.

3

According to the interrogator's testimony, the Defendant signed the statements before him. The interrogator translated the statements from Arabic to Hebrew (the translation of each statement into Hebrew, P/5A through P/9A, is attached to the respective statement).

Statement P/22, dated June 27, 2002, was taken by Witness No. 7 for the prosecution, interrogator Hadi Halabi, who explained that he took the testimony in the Arabic language, in which he is fluent, after the Defendant had been duly warned, had understood the nature of the interrogation and the warning, and had given his statements of his own free will and volition. The Defendant signed the statement that the interrogator had recorded in Arabic. The interrogator further translated the statement into Arabic [sic] and the translation is appended to the statement (P/22A).

The circumstances under which the statements were taken down in the manner described above, the fact that the overwhelming majority thereof (five out of six statements) were written by the Defendant in his own handwriting, and the fact that the Defendant again confirmed before a military judge (see the transcript of the Court session at which his arrest was extended, P/23, and the testimony by Witness No. 5 for the prosecution) that "I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do'. I do not object to the extension of my arrest as requested," all indicate that this evidence is admissible. There is no reason to suspect that the Defendant was subjected to any external pressure which led him to confess to the perpetration of acts in which he had no part.

Examination of the content of the statements, including the confessions, indeed shows that what they contain is a true reflection of the actual state of affairs, on the basis of clear, lucid and logical thinking by a person of sound and settled mind. These statements and confessions carry a heavy internal weight which, in and of itself, bears out their veracity.

Obviously, the Defendant's confession before a judge in arrest court, and under the supervision of that judge, was given without any pressure or influence and, as that confession implies severe consequences for the Defendant, it constitutes material corroboration of evidence and carries a special weight, which increases the force of his previous admissions, over and above its strength as an independent item of evidence (see Additional Hearing 3081/91, Kuzali v. the State of Israel, PD 45 (4) 441, Criminal Appeal 6613/99, Stephen Smirek v. the State of Israel, PD 56 (3) 529, and Criminal Appeal 3338/99, PD 54 (5) 667).

The requirement for an additional "item," which allays the suspicion that the Defendant was led to confess by internal pressure, has been completely fulfilled by the assertions that have been made in writing, out of court, by other witnesses, which we accept as admissible and credible evidence, as shall be set forth below.

### The accomplices

Witnesses for the prosecution Ahmad Abu Khadr (Witness No. 6 for the prosecution), Muhammad Yadak (Witness No. 21 for the prosecution), Ahmad Barghouti (Witness No. 23 for the prosecution) and Yasir Abu Bakr (Witness No. 25 for the prosecution), are the Defendant's accomplices in the offenses committed by him (hereinafter: the "Four"). With the exception of Witness No. 6 for the prosecution, Ahmad Abu Khadr, who was convicted and sentenced before he testified (see the respective protocols of his conviction and sentencing, jointly marked as P/11), the other three were called upon to testify before their own trial ended, and the question arose as to whether their testimony was admissible, in view of the Kinzi doctrine (Criminal Appeal 194/75, Menahem Kinzi v. the State of Israel, PD 30 (2) 477), a doctrine which has admitted no flexibility to date (see Criminal Appeal 1774/02, Shimon Kadosh v. the State of Israel, which holds that "one defendant should not be made to testify before another defendant, even if separate indictments were filed against them, as long as there is any suspicion that the witness is likely to expect the benefit of reduction of his sentence, in a trial which is still pending against him.

## Felony Case (Tel Aviv) 1137/02 State of Israel v. Nasser Mahmoud Ahmad Awis

This can be avoided either by completing [the witness's] trial before the testimony is given or by transforming him into a State's witness and arranging for a stay of the proceedings, or a declaration by the prosecution that the trial against him will be canceled upon the conclusion of his testimony..."

The State of Israel mapped out its course in accordance with that which has been set forth in Criminal Appeal 579/88, Suissa v. the State of Israel, PD 44 (1) 529. As the State of Israel would have it, the Defendant did not object to having those witnesses testify, although he knew very well, as did his defense attorney, that their trial was not over. He did not bar – as he could have done, from the procedural standpoint – his accomplices' way to the witness stand. By failing to do so, he knowingly waived his right to object to having their testimony heard, and he can no longer attack the admissibility of this evidence, which is a priori acceptable testimony under law (Section 2 of the Evidence Ordinance (New Version), 5731 – 1971), and all that is left to decide is the weight of that evidence.

This is indeed a foreseeable outcome, in accordance with the line of defense selected by the Defendant, and the Honorable Counsel for the State of Israel should not be found at fault.

Because this is a foreseeable and probable outcome of the line of defense intentionally adopted by the Defendant, the Honorable Counsel for the State of Israel is correct in stating that the responsibility for that outcome rests with the Defendant.

We questioned the Honorable Counsel for the State of Israel in this matter, because we believed that she might raise the matter in order to "open the way." Let us recall, however, that the State of Israel declared, at the beginning of each testimony, that none of the above mentioned witnesses had been promised any benefit whatsoever, and that it did not intend to use their testimony against them in any way whatsoever.

In any event, each of the Four was declared a hostile witness, and with regard to the testimony given by each of the above mentioned witnesses, we were asked to act in accordance with the provisions of Section 10A of the Evidence Ordinance (New Version), 5731 – 1971 (hereinafter: the "Evidence Ordinance") and to give preference to his statement in writing, relative to his oral testimony.

There is accordingly some doubt as to whether the Kinzi doctrine applies under these circumstances, when the risks which underlie the doctrine do not exist.

The manner in which the Four testified in Court, as shall be set forth below, was hostile to the State of Israel.

Witness No. 6 for the prosecution, Ahmad Abu Khadr, entered the courtroom, exchanged smiles with the Defendant and saluted him. From that point on, he expressed, both in words and in his behavior, his intention of not cooperating and not answering questions.

That is what he did, although he addressed us once, on his own initiative, and stated that: "I know the Defendant here and I put him above me." Furthermore, he answered a question by the Honorable Counsel for the State of Israel: "Q. On December 23, 2002, were you in the military court, and did he [did you] confess to this indictment, which I have now filed before this Court, including your involvement in the terrorist attack in Hadera?" "A. We wanted to stop the military operations, and they murdered the leader, Raad al-Karmal, and they murdered Palestinian children, and that is what drove me to do this thing." Previously, he had argued that the indictment against him was falsified.

Witness No. 21 for the prosecution, Muhammad Yadak, began his statement with the words: "I do not want to speak; I do not want to testify." He subsequently answered questions on matters of marginal importance, but did not cooperate with regard to material details. Thus, for example, he answered questions such as "When did you make the acquaintance of the Defendant?" or "In which military operation did you participate together with the

## Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

Defendant?" or "Who was a member of the military squad of which [you were] also a member?" with the following response: "That is my own private business and it is of no concern to the Court." At the same time, after he was declared a hostile witness, he answered the following questions in this manner:

"Q. Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Awis, the person who was in charge of that squad?

A. What is wrong with those things? What is forbidden about those things?

Q. Did you tell the police that Nasser Awis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A. I have no answer.

Q. Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A. That is my right.

Q. Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A. I refuse to stand before this Court and be judged. There is nothing for which I must be judged. Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q. You are not the one being judged. You are testifying here and you have to give answers.

A. I refuse [to allow] Nasser to be judged for these things.

Q. For which things?

A. For his struggle against the occupation.

Q. Did you, on the instructions of Nasser Awis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A. That is of no interest to anyone.

Q. Did you tell the police that you used to help Nasser Awis transfer weapons from this activist to that activist?

A. I did not say those things in order to be judged for them.

Q. For what purpose did you say them?

A. That was what they asked me and that was what I told them."

From that point on, he was silent or refused to answer.

*Witness No. 23 for the prosecution, Ahmad Barghouti,* also clarified, immediately after taking the witness stand, that: "I understood what the interpreter said and I will say nothing." He also made it clear, in the course of his examination – both in words and in his behavior – that he would not cooperate, and that is what he did.

*Witness No. 25 for the prosecution, Yasir Abu Bakr,* did not deviate from the course that was set by the others. In response to every question, he referred the *Honorable Counsel for the State to his attorney,* or alternatively, continued to claim that everything he had said had been forced out of him under pressure by General Security Services personnel, who had spilled tea on him, spit on him, slapped him and kept him tied up for several days.

As we have seen, the testimony of the Four fulfills the condition set forth in Section 10A (a) (3) of the Evidence Ordinance.

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

The Four were witnesses at the trial, and the parties were given the opportunity to examine them. This constitutes compliance with the condition that was set forth in Section 10A (a) (2) of the Evidence Ordinance (see Additional Criminal Hearing 4390/91, State of Israel v. Hajj Yihya, PD 47 (3) 679).

The policemen who had taken the statements testified as to the circumstances under which the testimony by the Four had been taken.

Statements P/12 and P/13 were taken from the witness Abu Khadr by Witness No. 28 for the prosecution, Lutuf Mari. According to testimony by the latter, he interrogated Abu Khadr in Arabic and wrote down the answers in Hebrew, after having duly warned Abu Khadr and after having explained to him the nature of the charges against him. According to Mari's testimony, he offered Abu Khadr the opportunity of writing down the statement himself in Arabic, but Abu Khadr explained to him that he was not good at reading and writing and that he did not object to his statement being taken down in Hebrew. According to Mari's testimony, Abu Khadr's statement was made of his own free will.

Statements P/14 and P/15 were taken from the witness Abu Khadr by Witness No. 34 for the prosecution, Aouni Matar. According to Matar's testimony, he introduced himself to Abu Khadr as a member of the police force. He, like Lutuf Mari, interrogated the witness in Arabic and translated the testimony into Hebrew simultaneously, after having warned Abu Khadr and having explained to him the nature of the offenses that had been attributed to him. The latter's statements were made of his own free will.

The person who took down Statement P/16 was not among the witnesses for the prosecution. We shall discuss this fact below.

Statements P/17, P/18 and P/19 were taken from Abu Khadr by Witness No. 29 for the prosecution, Gamal Shakur. This witness also introduced himself to Abu Khadr as a member of the police force, explained his rights and the nature of the charges against him, duly warned him, and informed him that he was entitled to write down the statement himself in Arabic. This witness as well testified that Abu Khadr told him that he did not know how to write in Arabic, and that he did not have a problem with the statement being taken down in Hebrew.

Statement P/20 was taken from Abu Khadr by Witness No. 33 for the prosecution, Harb Madi. Madi explained that the testimony was taken after he "accused" Abu Khadr of the offenses of which he was suspected, warned him, translated the content of the warning for him, informed him that he was entitled to write down [the statement] in his own handwriting in Arabic. However, because Abu Khadr claimed that he did not know how to write, he took down the statement in Arabic [sic] and then translated what he had written into Arabic.

As Abu Khadr, according to all of the testimony, claimed that he did not know how to read and write in Arabic, the fact that the statements were written down in Hebrew is of no importance whatsoever, because, even had they been written down in Arabic, Abu Khadr would have signed them on the basis of what he was told by the persons who were taking the statements.

We believe the testimony by the policemen who took down statements P/12 through P/20, inclusive, to be credible, and we determine that they were taken from the witness Abu Khadr according to proper legal procedure, with his rights respected, and that Abu Khadr gave his statements of his own free will.

More precisely: Abu Khadr himself does not claim that the process of his interrogation was defective in any way. His answer to the prosecuting attorney's question, "I will tell you about all of the operations which you performed with Nasser Awis, according to instructions by Awis, in the course of the intifada," in the following words: "All of the things you say are falsified," appears, in light of his behavior and his utterances before us, to be a vaguely defiant statement and no more. Moreover, it is diametrically opposed to his full confession with regard to all of the counts of which he was accused in the amended indictment, dated August 7, 2002 before the three judges on the panel of the military court (see P/11).

We shall add to this the fact that the Defendant refrained from the cross examination of these witnesses, and in so doing, augmented the weight of their testimony.

7

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

We rule that the making of the assertions that are included in the statements has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions by Abu Khadr constitute admissible evidence.

The circumstances under which statement P/16 was taken have not been proven. The person who took down the statement was not among the witnesses for the prosecution. Notwithstanding that which has been set forth above, the Honorable Counsel for the State of Israel – although we do not understand her actions in doing so – did not refrain from including that statement among the statements which she claimed to be admissible (see pp. 80-81 of the "Summation by the Prosecution – Outline," which was filed before us in writing). We are ignoring this item of evidence (P/16), which has not been proven to be admissible, and are excluding it from the body of evidence which we took into account.

We may assume, with a great degree of certainty, that Abu Khadr's full confession of the offenses that have been attributed to him, before a panel of three judges, substantiates the veracity of his assertions to the police, just as it indicated the admissibility of those assertions, from the standpoint of the circumstances under which they were taken down.

In the course of his testimony in court, insofar as he attempted to distance himself from his assertions in writing, by various means, Abu Khadr's testimony was not consistent. From time to time, for one brief moment, the truth emerged – for example, at the very beginning of his testimony, in response to a question by the prosecuting attorney, he answered: "The things that I did, and what drove me to do them, were because of the war criminals, Sharon and Mofaz." Subsequently, he added: "We wanted to stop the military operations, and they murdered the leader, Raad al-Karmal, and they murdered Palestinian children, and that is what drove me to do this thing," and afterwards: "all of the things that you are saying are fake. Go ask about the causes of these things." And also: "To this very moment, the only people who are under occupation are the Palestinian people, and all of the international laws allow me to struggle against the occupation. Do not exhaust yourself. Do not ask me any questions," and: "I know Hasuna; he is a friend of mine, and he served with me in the Authority, and the occupation is what drove Hasuna to do what he did."

The salute which Abu Khadr gave the Defendant when he entered the courtroom, and his declaration to the effect that he knows the defendant and puts him above himself, attest to the veracity of the Defendant's assertions concerning the hierarchical relationship between them. This relationship is described, *inter alia*, in P/12: "Nasser Awis is a resident of the Balata camp… also known as al-Hajj Rawaq, and he is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah…"

We give preference to the assertions that were made by Abu Khadr in writing, in his above mentioned statements, which were made out of court, over his testimony in the courtroom.

The statements by the witness Muhammad Yadak, P/40A, B, C were taken down by Witness No. 7 for the prosecution, Hadi Halabi. According to Halabi's testimony, the statements were taken down and written in Arabic, after he had explained to Yadak the offenses of which he was suspected and had duly warned him. According to his testimony, the witness made his statements of his own free will and signed every page of each of the statements before him. Halabi testified that he translated the statements in the Hebrew, but that Yadak was asked to sign, and signed, the original only.

Statement P/40D was taken from Muhammad Yadak by Witness No. 35 for the prosecution, Atef Awida, who also testified that he took down the statement in the same way as Halabi.

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

We believe that both of [the above mentioned witnesses] took down Yadak's statements properly and that the assertions included in those statements were given of Yadak's own free will.

In his testimony before us, Yadak did not argue that his statements had been taken down improperly. He did not want to answer a question as to whether he identified his signature, and did not even want to look at it, but did not deny [that the signature was his]. His negative response to a question as to whether he had been duly warned is not convincing. In this case as well, the fact that the Defendant refrained from examining the persons who had taken the statements reinforces their testimony, and we rule that the making of the assertions has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Yadak's assertions out of court are admissible as evidence in the present proceeding, given that the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled in their entirety.

We give preference to Yadak's assertions, as expressed in his statements P/40A-D, over his testimony in the courtroom. On the basis of Yadak's answers to the questions he was asked, it is easy to discern that his behavior in court reflects his decision not to look like a collaborator, and most of those answers hint at the fact that his assertions as they were made to the police are true.

It would not be superfluous to cite those answers again:

"Q. When did you make the acquaintance of Nasser Awis?

A. That is my own private business and it is of no concern to the Court.

Q. In which military operation did you participate together with the Defendant?

A. That is my own private business and it is of no concern to the Court.

Q. Who was a member of the military squad of which you were also a member?

A. That is of no concern to the Court.

Q. Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Awis, the person who was in charge of that squad?

A. What is wrong with those things? What is forbidden about those things?

Q. Did you tell the police that Nasser Awis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A. I have no answer.

Q. Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A. That is my right.

Q. Those shooting attacks that you talked about were planned by Nasser Awis and he was the one who supplied the weapons for the shooting?

A. I do not wish to answer.

Q. Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A. I refuse to stand before this Court and be judged. There is nothing for which I must be judged. Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q. You are not the one being judged. You are testifying here and you have to give answers.

A. I refuse [to allow] Nasser to be judged for these things.

9

Q. For which things?

A. For his struggle against the occupation.

Q. Did you, on the instructions of Nasser Awis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A. That is of no interest to anyone.

Q. Did you tell the police that you used to help Nasser Awis transfer weapons from this activist to that activist?

A. I did not say those things in order to be judged for them.

Q. For what purpose did you say them?

A. That was what they asked me and that was what I told them.

Q. All of the weapons, the rifles, the M-16s, which they transferred, were used for shooting attacks against civilians and soldiers.

A. I do not want to say anything, and do not go on..."

Statements P/43A and P/43C by Witness No. 23 for the prosecution, Ahmad Barghouti, were taken by Witness No. 32 for the prosecution, David Mizrahi.

According to Mizrahi's testimony, he identified himself to Barghouti as a policeman, warned him and ascertained that he understood the content of the warning. P/43A was taken in the form of questions and answers and was taken down (as was P/43C) in Hebrew, because the witness Mizrahi cannot write in Arabic. Barghouti refused to sign P/43A, without explaining his refusal, but signed P/43C. Mizrahi explained that there were no exceptional events during the taking of both statements. He did not notice that Barghouti was injured, ill or tired, because, had this been the case, he would have noted those facts. If there had been anything extremely exceptional, the testimony would not have been taken down, and a memorandum to that effect would have been written. During the taking of P/43C, Mizrahi showed Barghouti an eight page manuscript in Arabic, and the latter confirmed that it was in his handwriting, after having studied the document.

Statements P/43B and P/43D were taken from Barghouti by Witness No. 31 for the prosecution, Yitzhak Yaakovoff. According to Yaakovoff's testimony, the two spoke Arabic, but the testimony was taken down in Hebrew. Barghouti was duly warned but refused to sign the warning or statement P/43B, although he signed P/43D. According to Yaakovoff's testimony, during the taking of both statements, manuscripts were shown to Barghouti which he identified as being in his handwriting; the manuscripts had been given to Yaakovoff by one of the General Security Services interrogators. Barghouti made the statements of his own free will, and with regard to the manuscript which was shown to him during the taking of P/43D, he even answered: "Yes, this is my handwriting and I wrote what I have just told you now in my testimony."

Statement P/43E was taken from Barghouti by Witness No. 36 for the prosecution, Moshe Moshe.

According to testimony by the latter, he identified himself to Barghouti as a member of the police force and explained to him that he was about to interrogate him and what he was suspected of. Barghouti made his statements in an orderly manner, and subsequently signed the testimony after his words were translated back to him. According to Moshe's testimony, he interrogated Barghouti after having been given a general background in the form of a memorandum from the General Security Services. In his testimony, however, Barghouti told him many details which [Moshe] could not have known from that memorandum. In his words: "If it is about the circumstances of the relationship, how things occurred and progressed, these are things that he said in his testimony. If they went to an ice cream shop, and what the code was and who set it, which does not appear in the memorandum."

We believe that the statements made by the witnesses Mizrahi, Yaakovoff and Moshe, with regard to the manner in which the interrogation was conducted and the circumstances under which Barghouti's assertions were taken down, are credible. Barghouti, for his part, does not argue the assertions were taken down improperly. In this case as well, the fact that the Defendant refrained from cross examination strengthens the testimony by those who had taken the statements, and the making of the assertions was proven in the trial as required.

## Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions made by Barghouti in writing and included in his statements P/43A-E, are admissible as evidence in the present proceeding.

We prefer Barghouti's assertions over his testimony in court. Most of his answers were intended to give the message that he does not recognize the jurisdiction of the Court ("I do not recognize the Court, do not you understand? ... I do not recognize the Court, or Israel either... I do not recognize the Court"), and not as denial of his assertions.

Nonetheless, from time to time, signs arose in his testimony which indicate that the assertions are true:

"Q. When did you begin your military activity?

A. That is none of your business...

Q. Is Marwan Barghouti a relative of yours?

A. That is none of your business. Why are you asking me personal questions?

Q. Were you Marwan Barghouti's driver and bodyguard from 1996 and up to the day of your arrest?

A. Nu, what do you want?

Q. Is that correct?

A. How do you ask me such questions? I do not recognize you.

Q. Those are things that you said.

A. That thing is not mine.

Q. You also said that you were arrested together with Marwan Barghouti.

A. I have no answers at all. It would be better if you did not ask...

Q. You [singular] made sure to prepare Said before the terrorist attack. You [singular] made sure that there would be someone to drive him to Jerusalem, to the place where you [plural] bought him clothes and shoes and took him to get a haircut. And you [singular], under the instructions of Nasser Awis, who was the planner and the organizer, you [singular] also made sure to get an M-16 rifle and clips with bullets for Said Ramadan.

A. (The witness remains silent and does not answer)

Q. You yourself told all of those details in your statement.

A. I say what I want to. What I feel like saying, I say.

Q. That is what you felt like saying at the time.

A. That is not from me, that is not my handwriting. If Nasser really did all those things, he only wanted to liberate Palestine for us. That is something to be proud of...

Q. Not only did you tell, in your statements, about many instances of shooting attacks and suicide bombings, [but] with regard to all of the terrorist attacks which you have perpetrated, you are sorry for what you did.

A. If Sharon is sorry for what he did, then I am sorry for what I did.

Q. Aren't you sorry that you sent terrorists to blow themselves up here in Israel and to kill?

A. I want to liberate my country, the one that you are conquering...

Q. I am showing you Statement No. 5 dated September 5. In this statement too, I am showing you the warning, the signature on the warning, and the signature on every page of the statement and the signature at the end of the statement.

11

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

A. *I do what I want to. There is no one who can stop me. I will write and say whatever I want...."*

It may truthfully be said that the response "I want to liberate my country, the one that you are conquering" is the beginning of an admission.

The following statement, which appears in *Criminal Appeal 735/80, Abraham Cohen v. the State of Israel, PD 35 (3) 94*, also applies to the matter before us: "If Section 10A now states that the Court can prefer the assertion over the testimony in the courtroom, the defense attorney, for his part, could have attempted to strengthen the witness's version in his direct examination, by performing a cross examination with a view to explaining that the assertion made to the police was a false assertion. The defense attorney, however, did not examine the witness at all."

Statements P/47A-C were taken from the witness Yasir Abu Bakr by Witness No. 31 for the prosecution, Yitzhak Yaakovoff. *The witness did not remember the occasion when the testimony was taken,* and refreshed his memory on the basis of the assertions. According to his testimony, he identified himself to Abu Bakr as a policeman, conversed with Abu Bakr in Arabic and translated the words for him. According to Yaakovoff's testimony, when he translated what he had written in the statements into Arabic, Abu Bakr could have responded, corrected or refused to sign them. According to his testimony, he wrote down only what Abu Bakr told him, and Abu Bakr confirmed to him that the manuscript which had been written down before the General Security Services interrogators was in his handwriting. *According to his testimony, had there been exceptional circumstances,* he would have noted them, and had any complaints been made, he would have written them down, as he would have written down any visual signs he might have seen. Yaakovoff explained that, when a suspect reports for a police investigation, he is a free man, "and this is his opportunity to give or not to give his version, irrespective of what happened before that in the General Security Services. If there was any problem at all, I would have written it down, because that is my duty. Everything written down in this testimony was said by the subject." Yaakovoff made it clear that, "both in the previous testimonies and in this testimony, *I introduced myself as a policeman.* That is the first thing. Above and beyond that, they (the reference is to interrogation subjects such as the witness) make the distinction as to who is a policeman and who is a General Security Services interrogator. They encounter us when their arrest is extended, and they cannot make mistakes in this matter..."

Statement P/47D was taken from Abu Bakr by Witness No. 30 for the prosecution, Moshe Levi. According to his testimony, he took down the statement after the suspect had been duly warned, and the statement was taken down in Hebrew, but the interrogation was conducted in Arabic. At the end of the statement, he read Abu Bakr's words back to him and Abu Bakr signed it before him. According to testimony by Levi, who did not remember the specific case, if Abu Bakr had complained to him, *it would have been written down.* Levi also clarified that he did not have to recall whether he had identified himself as a policeman, because that was his duty and he does that with every suspect. With regard to the connection between his interrogation as a policeman and the memoranda which are provided to him by the General Security Services, he explained that his interrogation is independent, and that he refers to the memoranda "only in a general way, and if a suspect says that no such thing ever happened, that is what will be written down, at the end of the day – in other words, what he says is what will be written down."

Statements P/47E and P/47F were taken by Witness No. 36 for the prosecution, Moshe Moshe. Because Abu Bakr had already argued before us, *inter alia,* that his statements had been taken under pressure by members of the General Security Services, Moshe gave a more extensive explanation (after the learned prosecuting attorney, and we as well, called his attention to Abu Bakr's arguments), not only with regard to the manner in which this statements were taken, but also about his interrogation of Abu Bakr, in light of a previous investigation which had been held for him, as well as for others, by the General Security Services – an investigation performed for counter-intelligence purposes. According to his statement: "When I receive the memorandum of an investigation which comes from the General Security Services personnel, I check the points that come up in it – what that suspect is suspected of having done. After that, we write the content of the warning, the content of the suspicions, we read it out and explain it and make sure that he really has understood the content of the warning and knows what he is being interrogated about. All of this is in Arabic – I speak Arabic fluently. I do not write or read Arabic, but I speak it. Part of the process is that we read it out. I inform him that I am a member of the police force, and he is aware that I am a member of the police force and that he is about to give testimony to the police. After I check the points that were covered by the General Security Services and what he said to them, I construct the suspicions against him – whether it is belonging to an organization or possession of weapons or, alternatively, assistance to wanted persons, or any other offense – and according to that, I make my preparations from the standpoint of the interrogation itself.

The General Security Services is investigating the issue of prevention. The General Security Services is involved in having to thwart future events, that is, future terrorist attacks. My job as a police officer is to be involved only in the subject of the interrogation, which regards the gathering of evidence against the suspect at the time. In other words, if I interrogate someone, I have to work according to the laws of evidence and to understand the law..."

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

When the prosecuting attorney confronted Abu Bakr with the fact that the statements had been taken from him by a policeman, and not by General Security Services personnel, he answered: "I never saw a policeman that I was supposed to speak with. They're all General Security Services officers."

Our impression is that the policeman Moshe Moshe did indeed identify himself to Abu Bakr as a policeman, as the other policeman had done, and that the wording of the statements taken by Moshe and the other policemen (Yaakovoff and Levi) had come from Abu Bakr, of his own free will, and was not the result of the behavior exhibited by the General Security Services interrogators toward him.

The Defendant and his Counsel did not cross-examine the policeman, nor did they ask to summon the General Security Services personnel who had drawn up the memoranda of the interrogations. The Defendant and his Counsel did not cross-examine the witness Abu Bakr, in an attempt to strengthen his version, to the effect that the statements had been taken from him by unworthy means.

Their refraining from cross examination does not give rise to the presumption that the version given by the policemen is correct. It does, however, further strengthen our impression of the credibility of the witnesses Levi, Yaakovoff and Moshe. Under the circumstances of the case at hand, that is, that the Defendant and his Counsel deliberately and tendentiously refrained – as they emphasized to us, on more than one occasion – from cross examination or from calling relevant witnesses, and given that *this cannot be evaluated in light of other, conflicting testimony*, and that, in any event, no such testimony was given, we give preference to the policemen's testimony concerning the manner in which Abu Bakr's assertions were taken out of court, over the version by the latter (see Criminal Appeal 38/61, Moshe Ben David Yitzhak v. Attorney General, PD 16 514, Criminal Appeal 639/79, Aslan v. the State of Israel, PD 34 (3) 561, and Criminal Appeal 2603/90, Alfar v. the State of Israel, PD 45 (3) 799).

In any event, as ruled in Criminal Appeal 242/85, Hazan v. the State of Israel, PD 41 (1), the very fact that an assertion made by a defendant to the police is not admissible in his trial cannot lead to the conclusion that the same assertion will not be admissible in another person's trial, which involves the case of that defendant's accomplice, pursuant to the provisions of Section 10 (and, to be precise, we have not ruled that such a possibility ever arose).

The content of Abu Bakr's statements P/47A-F has been proven in the courtroom, and, given that all of the conditions required pursuant to Section 10A (a) of the Ordinance have been fulfilled, we accept them as admissible evidence.

We give preference to Abu Bakr's assertions over his testimony in court. With regard to most of the questions which set forth the actions committed by Abu Bakr together with the Defendant, Abu Bakr referred the prosecuting attorney to the Defendant who was seated opposite him – a Defendant who, as stated above, chose not to cross-examine Abu Bakr or any other witness. Abu Bakr's words are set forth below:

"Q. I refer you to Statement No. 3... where they ask you when you began your military activity and who recruited you *for the military activity, and you stated that, at the beginning of 2001, you were in Nasser Awis's house in the Balata refugee camp, and then Nasser Awis suggested that you join the al-Aqsa Martyrs' Battalions for military activity, and you agreed.*

A. These things are not correct, and you can ask him. Look, he is here...

Q. I refer you to Statement No. 4... Did you suggest to Nasser Awis, in the course of your activity, to carry out a terrorist attack on Tel Hashomer Hospital in Israel?

A. No such thing. Ask him.

Q. You [plural] planned all of the details, and they [sic] even got hold of a map of the area, and at the end of the day, Nasser said that it would be necessary to wait a while, that it wasn't the right time yet.

A. No such thing. You can ask him.

Q. I refer you to the page in... Another of your roles was to assist Nasser Awis in recruiting more terrorist activists for *military activity, so that they would help carry out terrorist attacks.*

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

A. Nothing like that ever happened. Here he is, ask him...

Q. You used to report to Nasser Awis, every time, about a terrorist who you heard was interested in carrying out a terrorist attack.

A. This is the first time that I have ever heard such things. Aside from that, all of those things belong to the General Security Services. Nasser is here; ask him."

When the prosecuting attorney addressed these questions to Abu Bakr, who referred them on to the Defendant, the Defendant did not provide a version of his own, and *we are left with the admissions in his statements and with his confession under the discerning eye of the judge in arrest court, which it is only fitting and proper to repeat here:*

"I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do'. I do not object to the extension of my arrest as requested."

*We shall state that the Defendant himself makes the following statement with regard to Yasir Abu Bakr (see statement P/6 by the Defendant):* "After the outbreak of the al-Aqsa intifada, Yasir Abu Bakr enlisted in the *Kitaab Shuhadaa al-Aqsa*, and I asked Yasir to participate in terrorist attacks with us, and Yasir agreed to the proposal, and I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I had given him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir's statement, the vehicle was not hit." In response to a question as to additional terrorist attacks in which Yasir was involved on behalf of the *Kitaab Shuhadaa al-Aqsa*, the Defendant stated: "The terrorist attack in Hadera which was carried out by Said Ramadan... terrorist attacks which were carried out in the Nablus area..."

These facts, in and of themselves, constitute an unimpeachable sign of the accuracy of the assertions made to the police, and accordingly, those assertions should be given considerable weight.

We have found an additional sign of the accuracy of his assertions, in the conflicting versions given by the witness Abu Bakr in court with regard to another assertion which, according to him, had been written down in his own handwriting.

This is a manuscript in Arabic, concerning which Abu Bakr, in his statement P/47A, on page 4, had been asked the following question: "I am showing you a manuscript in Arabic (a total of 10 yellow pages, which I got from the person known as 'Bassam'). Is this your handwriting?

A. Yes, this is my handwriting and I wrote what I have just told you now in my testimony."

On the other hand, in response to a question by the prosecuting attorney: "Q. I am showing you a statement, which was attached to the statement dated April 15, which is a statement in your handwriting, 10 pages," he replied: "They dictate to people [and make them] write against their will. Take them to court, not us." In response to the question, "Q. That is not your handwriting?" he replied: "That is the handwriting of the General Security Services officers. They wrote those things." *Generally speaking, his answers to similar questions were as follows:* "Q. Are these things which you wrote yourself? A. When you have tea spilled on you, when you are left for four or five days with no food and no sleep, then you say things just to get out of it. Q. Did you write these things? A. I have an attorney. You have to see how the General Security Services treats people. Q. Do you recognize the handwriting? A. I do not want to answer you. You act like them and you shout at me (answers in Hebrew and English)."

### Summary thus far

We have repeatedly clarified that all of the rules which must be fulfilled in order for the assertions made by the Defendant's accomplices out of court to qualify as evidence under Section 10A of the Evidence Ordinance have been fulfilled

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

(the above mentioned rules include proving the assertions under law, giving the Defendant an opportunity to examine the witnesses, and the question of whether the testimony in court is substantially different from the words recorded in the statements).

We considered the matter with the requisite care, and we give preference to the assertions made by the four witnesses, the Defendant's accomplices, to the police, over their testimony in the courtroom.

Testimony which requires a supplement may itself serve as a supplement of any kind for any other testimony which requires a supplement. Accordingly, the assertions by the four accomplices can constitute an additional "item" corroborating the Defendant's admissions out of court.

(See Kedmi, On Evidence, Part I; Criminal Appeals 6147/92, State of Israel v. Yosef Cohen, PD 48 (1) 62; Criminal Appeal 6214/94, State of Israel v. John Doe, Supreme Court Rulings, Volume XXXVIII, 665; Criminal Appeal 5249/98, State of Israel v. Miritashvili, PD 53 (3) 550.)

Each of these assertions, including assertions made by one or more of the Four in writing – which should be considered as an integral part of those statements, accordingly (see Criminal Appeal 6411/98, Manbar v. the State of Israel, PD 55(2)150) – may be relied upon as corroborative evidence, in the form of an additional "item," to be added to other evidence brought against the Defendant, in the form of his own admissions.

As [the Four were] the Defendant's accomplices, and pursuant to the provisions of Section 54A (a) of the Evidence Ordinance, we were required to find "something to reinforce" their testimony.

We were also required to find such a reinforcement pursuant to the provisions of Section 10A (d) of the Evidence Ordinance, which instructs us that a person shall not be convicted on the basis of an assertion received pursuant to Section 10A of the Evidence Ordnance "unless the evidentiary material contains something to reinforce it."

If we consider the nature of the requirement for reinforcement (the term used is identical in the context of both of the above mentioned sections), it consists of supplementary evidence which verifies [the testimony in question], rather than evidence which embroils [the Defendant]. The reinforcement need not be an independent item of evidence; it may arise from the testimony which requires reinforcement.

We have found such reinforcement, even in excess of that required, and the embroiling evidence which arose from a separate and independent source, as follows:

The Defendant's full confession before the judge in arrest court.

The assertions made by each of the four accomplices with regard to the assertions made by his fellows.

The Defendant's choice to remain silent and to refrain from testifying in the trial, against the background set forth above and against the background of the line of defense selected by the Defendant (which we discussed at the beginning of this ruling), which, in and of itself, constitutes evidence which may stand as corroborative evidence, pursuant to Section 162 of the Criminal Code Law, 5742-1982, which states that "a defendant's refraining from testifying is likely to constitute a reinforcement of the weight of evidence for the prosecution, as well as corroboration of the evidence for the prosecution, where such evidence requires corroboration.drf."

As a corpus delicti has been found for us (see the testimony by Witness No. 1 for the prosecution, Brigadier General Moshe Waldman, Witness No. 2 for the prosecution, Brigadier General Aharon Franco, Witness No. 3 for the prosecution, Commander Haggai Dotan, Witness No. 4 for the prosecution, Brigadier General Uri Barlev, Witness No. 8 for the prosecution, Uriel Eliyahu, Witness No. 9 for the prosecution, Staff Sergeant Shai Cohen, Witness No. 10 for the prosecution, G.M., Witness No. 11 for the prosecution, Leon Gorenstein, Witness No. 12 for the prosecution, Konstantin Kardashoff, Witness No. 13 for the prosecution, Adi Maoz, Witness No. 14 for the prosecution, Ben Naim Hanan, Witness No. 15 for the prosecution, Noam Gabbai, Witness No. 16 for the prosecution, Sergeant Major Rami Malka, Witness No. 17 for the prosecution, Efi Yamin, Witness No. 18 for the prosecution, Chief Superintendent Farid Ghanam, Witness No. 19 for the prosecution, Tal Vermot, Witness No. 20 for the prosecution, Superintendent Yehuda Peretz, Witness No. 22 for the prosecution, Avi Ben Ami, Witness No. 24 for the prosecution, Shimon Lugasi, Witness No. 26 for the prosecution, Asaf Azulai, Witness No. 27 for the prosecution, Amir Sher; and see Exhibits P/1 through P/4 inclusive, P/21, P/21A, P/24 through P/37 inclusive, P/48, P/49, P/52 through P/79 inclusive), as the Defendant did not deny the actual making of the admissions before the persons taking his statements or before the Honorable Judge in arrest court, and as the Defendant even confessed again, fully and willingly, before the judge in arrest court, to all of the actions imputed to him, and understood what he was doing and making that confession, and as we have found that the internal

15

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

*weight of his confessions is heavy, the weight required for the additional "item" which is needed in order to verify them is accordingly reduced.*

And now, even with regard to the additional item (which, from the standpoint of its purpose, is only intended to show that the Defendant did not invent his statements out of thin air, and is accordingly not required to constitute corroborative evidence which embroils the Defendant, and may consist of confirmatory evidence only), we have found that it, too, has a real weight of its own and easily complies with the more stringent requirement, as it embroils the Defendant in the perpetration of the offenses imputed to him, comes from a separate and independent source, and refers to a real point which is in dispute.

### Offenses Against the Prevention of Terrorism Ordinance and Conspiracy

In accordance with a pronouncement pursuant to Section 8 of the Prevention of Terrorism Ordinance, 5708 – 1948, it has been ruled that the Tanzim is a "terrorist organization," as this term is defined in Section 1 of the Ordinance (Compendium of Publications (5762 [2001-2002]), p. 800, dated December 6, 2001.

According to expert opinions which were filed with no objection by the Defendant and his defense attorney (P/50, P/51), the following (among other things) was stated: "From the beginning of the violent incidents in the 'territories,' which began in September 2000, the Tanzim played a major and leading role in the perpetration of terrorist acts. Activists in the organization carried out terrorist attacks in various formats, including acts of mass slaughter, within Israel and in Judea and Samaria... The terrorist organizations of the Tanzim in the Gaza Strip and in Judea and Samaria (which, at times, were joined by additional entities in the field) began (in November 2000) to use the name 'al-Aqsa Martyrs' Battalions' [*Kitaab Shuhadaa al-Aqsa*], especially for the purpose of taking responsibility for terrorist attacks against Israeli targets...

In the course of the violent confrontations, the 'Battalions' took responsibility for many terrorist attacks which were perpetrated in various formats in the 'territories' and within the confines of the 'Green Line,' including fatal terrorist attacks. The terrorist organizations of the 'Battalions' are responsible for thousands of shooting attacks and explosive charges on bypass roads in Judea and Samaria, and for scores of acts of mass slaughter within Israel, in which scores of Israelis were killed... The major characteristics of the acts of mass slaughter include the focus by the perpetrators on crowded places (downtown areas and public places which constitute a source of attraction for the general public, such as cafes and restaurants, bus stops, shopping centers and the like) and the performance of suicide bombings (by means of an explosive belt or an explosive charge carried by the perpetrators arriving on the scene) and sacrifice attacks (terrorist attacks in which the perpetrator's chances of escape are slim; in most of the terrorist attacks in this format, the perpetrators have used assault rifles of various types), in which scores of Israelis were killed..."

The Defendant said, in his statements, that: "After the outbreak of the al-Aqsa intifada, I started to carry out terrorist attacks against Israeli targets, because of the conquest of the *Palestinian land*... After that, I decided to perpetrate shooting attacks and additional terrorist attacks against Israeli targets in the West Bank and within the Green Line. The terrorist attacks which I perpetrated are as follows:

1. I carried out a shooting attack directed against a guard post of the Israeli army near Joseph's Tomb in Nablus, and that was about two weeks before the army withdrew from the tomb.

2. I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus...

3. I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4. I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata.

5. I gave hand grenades to two people in order to carry out a terrorist attack in Jerusalem.

6. I gave weapons for the perpetration of a terrorist attack in Netanya...

9. I gave weapons for the perpetration of a terrorist attack in Hadera.

16

## Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

10. I gave weapons for the perpetration of a shooting attack, a sacrifice attack which was supposed to be carried out in Hadera, but the attack did not succeed and the people were killed in the vicinity of Baqa al-Gharbiya.

11. I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem.

12. I supplied Abd al-Salaam Hasuna with weapons for the perpetration of a suicide attack within Hadera.

13. I supplied Abd al-Rahman Abdallah with two explosive charges + a Kalashnikov...

14. I supplied Majdi Halus with an explosive charge, which he placed on the road... against an Israeli patrol."

The Defendant answered the questions listed below in the following manner:

"Q. On whose behalf did you carry out the terrorist attacks which you noted above?

A. On behalf of *Kitaab Shuhadaa al-Aqsa*, which belongs to the Fatah.

Q. Who is in charge of the Fatah?

A. Yasser Arafat is in charge, and he is the chairman of the Fatah movement.

Q. Who is in charge of the Tanzim Fatah?

A. The secretary of the Fatah movement in the West Bank, Marwan Barghouti...

Q. Who do the *Kitaab Shuhadaa al-Aqsa* belong to?

A. The *Kitaab Shuhadaa al-Aqsa* belong to the Fatah and the Tanzim Fatah.

Q. What is your relationship with the secretary of the Fatah movement in the West Bank, Marwan Barghouti?

A. My relationship with Marwan Barghouti, the secretary of the Fatah movement, began in 1992, when we lived in the same neighborhood in Amman, when we were deported by the Israeli authorities, and Marwan came back to the West Bank in about 1994, and I came back in 1995. When I came back to the West Bank, my contacts with Marwan were renewed, and I used to meet with Marwan in the Tanzim office in Nablus. I would also meet with him in the office in Ramallah, and after the outbreak of the al-Aqsa intifada, I continued to be in contact with Marwan Barghouti. We used to organize demonstrations on behalf of the Tanzim Fath, and we used to distribute posters on behalf of the (Organizational) Coordination Committee [*al-Fasali*]. The people in charge of the Committee were Yusuf Harb on behalf of the Fatah and Jamal Salim on behalf of Hamas, and after he died, another person was given that position. The Chairman of the Committee was Yusuf Harb, and Marwan Barghouti was a member of the Supreme Coordination Committee, and the Supreme Committee used to guide the Organizational Coordination Committee [*al-Fasali*]...

Q. Who used to provide the money for the perpetration of terrorist attacks against Israeli targets?

A. People in the Tanzim Fatah, in the West Bank and in Lebanon, used to provide me with money.

Q. Who are the people who provided you with money for the purpose of purchasing weapons, in order to perpetrate terrorist attacks against Israeli targets?

A. I took 12,000 shekels from Majed al-Masri, and I took 8000 shekels from Assam Abu Bakr as expenses, and I received from Munir Maqadah in Lebanon, I received $50,000.

Q. What does Majed al-Masri do for a living?

A. [He is] an officer in the Palestinian police in Nablus and a member of the Fatah.

Q. What does Assam Abu Bakr do for a living?

A. [He is] in charge of the Fatah movement in Nablus and affiliated with Marwan Barghouti.

Q. What does Munir Maqadah do for a living?

A. [He is] in charge of the Fatah in Lebanon and affiliated with Yasser Arafat.

Q. Was there contact between you and Marwan Barghouti?

A. I was in contact with Marwan Barghouti all the time.

17

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

> Q. Did Marwan Barghouti know that you were carrying out terrorist attacks against Israeli targets?

A. Yes, he knew, and my name was even published in the press and on television and on the radio. I used to talk with him from time to time, and when the political situation deteriorated and we were in a bad way, he would ask us to continue the terrorist attacks. When Shimon Peres and Omri Sharon met with leaders in the Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks, and I answered him that we would do that. During that period of time, Zini was in the area and Marwan told me that for the time being, because General Zini was meeting with leaders in the Authority, we should not carry out terrorist attacks in the name of *Kitaab Shuhadaa al-Aqsa*. I should note that, when the talks were progressing, no terrorist attacks were carried out.

> Q. Who used to finance Assam Abu Bakr, the one who used to provide you with money for the purchase of weapons?

A. Assam Abu Bakr would take money from the Fatah movement, from the budget which was authorized by the Chairman of the Fatah movement, Yasir Arafat.

> Q. Who used to finance Majed al-Masri, the one who used to provide you with money for the purchase of weapons in order to carry out terrorist attacks against Israeli targets?

A. Majed al-Masri told me that he took money from Marwan Barghouti, and Majed was aware of, and participated along with me in, a number of shooting attacks against Israeli targets...

> Q. Did Marwan Barghouti provide you with money directly?

A. Yes, Marwan Barghouti finances [sic] me twice. The first time, he transferred NIS 3,000 to me by means of a deposit in the bank, and the second time, he transferred NIS 5,000 to me by means of a deposit.

> Q. Did Marwan Barghouti know that you were carrying out terrorist attacks against Israeli targets?

A. Yes, he knew, and as I have already stated, my name was even published in the press, and the Israeli authorities told the Palestinian Authority that I was wanted for terrorist attacks, and my name was also published in the Hebrew press and in the local press in the West Bank and the Gaza Strip.

> Q. Did Marwan Barghouti assist you in providing money, aside from what you have already stated?

A. Yes. Once I received a check for NIS 2,300 from him, authorized by Chairman Arafat..." (See the Defendant's statement, P/5)

In addition, he answered questions (P/6) in the following manner:

"Yes, I had several *noms de guerre* while I was carrying out the terrorist attacks, such as al-Aam, al-Hajj, al-Sheikh, al-Kabir... and also I took... two old [anti-]tank missiles in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata... I recruited him (the reference is to a person named Luay Odeh) into the *Kitaab Shuhadaa al-Aqsa*, about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attacks [*mustashahids*] into Jerusalem. I also asked Luay to teach us how to manufacture explosives that were stronger than the explosives we were using, and Luay explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already knew how to produce *umm al-abd*... About a month and a half ago, I asked Luay to check out a way of introducing a suicide bomber into Jerusalem... and my role was to coordinate between Mahmoud and Luay, in order to introduce the suicide attacker into Jerusalem. That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack... Jazi Husseini asked me to agree to accept a call from a certain person, and a few days after that, Munir Maqadah, who is known as Abu Hussein, called me and asked us to continue perpetrating terrorist attacks and offered me financing, and I expressed my consent, and I gave Abu Hussein my bank account number in the Arab Bank in Nablus, in order for him to transfer money to me. In fact, Abu Hussein transferred money to me about six times, and deposited $3,000 or $5,000...

> Q. What did you do with the money that Munir Maqadah transferred to you?

A. In order to perpetrate terrorist attacks... According to the agreement with him, he used to provide me with money for the perpetration of terrorist attacks, and I would report to him on the attacks in conversations which I held with him by telephone and over the Internet... I spoke with him about many terrorist attacks... and I also reported to him on the suicide attack in Jerusalem and in Hadera, which we carried out...

> Q. What military connections existed between you and Yasir Abu Bakr?

18

## Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

*A. After the outbreak of the al-Aqsa intifada, Yasir Abu Bakr enlisted in the* Kitaab Shuhadaa al-Aqsa, *and I asked Yasir to participate in terrorist attacks with us, and Yasir agreed to the proposal. I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I gave him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir, the vehicle was not hit...*

Q. Did Yasir have any contact with suicide bombers?

*A. Yes, Yasir and I worked together to send out suicide attackers with Mahmoud Titi and Ahmad Abu Khadr... If we needed anything, such as photographing the suicide bombers or distributing posters, we would use Yasir. About two weeks before the army came into Nablus, I asked Yasir to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel. Yasir, in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed...*

[Q.] What kind of vehicle did the suicide attackers travel in?

*A. I do not know, but I gave Ahmad NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers, and Ahmad went with them to Tulkarm and showed them the way and came back by public transportation..."*

*In his statement, P/7, he answered questions as follows:*

"...And Mahmoud contacted me about this, because we are a military squad, and I expressed my consent to that terrorist attack... It should be noted that Ahmad Abu Khadr contacted me, because I am in charge of *Kitaab Shuhadaa al-Aqsa*... and after I heard on the radio that they were killed, I called the media and I told them that this terrorist attack was carried out by *Kitaab Shuhadaa al-Aqsa*... but when I announced that we were taking responsibility for the terrorist attack, Mahmoud told me the names... I was also involved in the shooting attack in Netanya which was perpetrated by suicide attacks – I do not know their names. Two days before that terrorist attack, Ahmad Abu Khadr called me and told me that he could bring two people into Israel, in order for them to carry out a suicide action, and I called Mahmoud Titi and asked him if he could bring in suicide attackers and he answered in the affirmative. I gave Ahmad two grenades and Mahmoud Titi gave them two M-16 weapons, and Ahmad Abu Khadr photographed them and explained to them about the terrorist attack... Several hours later, we heard on television that fire had been exchanged between the suicide attackers and police forces near a hotel in Netanya, and that civilians and policemen had been wounded in the attack, and two people had been murdered, and two others had been killed by the police. I called the media and took responsibility for the terrorist attack..."

And in statement P/8:

"Q. Did you have contacts with Abd al-Karim Awis?

*A. Yes... and I made contact with him and asked him to carry out military operations...*

Q. What did Mahmoud do with the explosive charges which you gave him?

A. For terrorist attacks, and I do not remember where the attacks were carried out.

Q. Do you know a man named Majdi Samir Halus?

*A. I know him... He asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received...*

Q. Do you know a man named Hathem Abu Khadr?

*A. ... and I took about 20 pistols and 20 Kalashnikov rifles from Hathem, through Ahmad, and... an M-16, and I used to pay for those weapons out of my own money..."*

*In his confession before the judge in arrest court, and as may be seen from the offenses imputed to him in the petition to extend the arrest order (P/23), the Defendant confessed to membership in a hostile organization,* Kitaab Shuhadaa al-Aqsa, *which*

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

belongs to Tanzim Fatah; participation in shooting attacks directed against Israeli targets in Samaria; involvement in recruiting suicide bombers; and sending them into Israel – suicide bombers who perpetrated murderous terrorist attacks. He also confessed to recruiting additional activists for the perpetration of terrorist attacks and the manufacture of explosives and explosive charges.

A witness for the prosecution, Ahmad Abu Khadr, sets forth in his statement, P/12: "I confess that, during the month of April 2001, Nasser Awis proposed that I enlist in *Kitaab Shuhadaa al-Aqsa* and I agreed to that proposal, and since then, I have been an active member in the *Shuhadaa al-Aqsa* organization, which belongs to Tanzim Fatah, and [I am still a member] to this day. After I joined that organization, Nasser Awis asked me to distribute posters on behalf of *Shuhadaa al-Aqsa*, and I did it... and after that, I started to be involved in military activity. I participated in shooting attacks directed against the army, and I participated in laying explosive charges, and I also participated in preparing a number of suicide bombers and sending them to Israel to carry out suicide bombings... Nasser Awis is a resident of the Balata camp; he is about 29 years old and is also known as al-Hajj Rawaq, and he is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah... The members of the group which I joined in *Shuhadaa al-Aqsa* are 1. Nasser Awis – who was in charge of the *Kitaab Shuhadaa al-Aqsa*..."

In his statement, P/13, Abu Khadr states as follows: "I confess that, during the month of March, about a month ago, Nasser Awis asked me to transport a suicide bomber from Nablus... in a stolen Pontiac which I received from Nasser... I notified Amar that I do not know how to manufacture explosive charges, and therefore I took him to Nasser Awis in the Balata camp and I asked Nasser to get hold of two explosive charges for him, and Nasser called Mahmoud Titi... About an hour later, Mahmoud Titi came and brought two explosive charges with him... and after that, Amar received the explosive charges and each of us went home, and three days later, I heard that Amar had carried out a terrorist attack on a military jeep... Because Saadi had contacted me several times, I notified Nasser Awis, who gave his approval for me to go on planning a suicide bombing for Saadi, and therefore I met with Saadi and asked him to carry out a combined attack... A week later, Saadi got back to me and told me that he agreed to my proposal, provided that he would be joined by two of his friends, Alaa and Mahmoud Hamuda. So I contacted Nasser and told him what Saadi had asked, and Nasser asked me to check whether the three of them were serious about their intention of carrying out a suicide attack... After I trained them in firing an M-16, I videotaped Alaa and Saadi in my house, with each one holding an M-16, and with a Palestinian flag and the flag of *Shuhadaa al-Aqsa* behind them, and Saadi read out the will that Nasser had sent... That same day, I reported to Nasser Awis that I had a suicide attacker with me, and Nasser asked to meet that terrorist. The next day, I took Majdi to a studio in Nablus to have his picture taken, and from there to Nasser Awis's house, and I left him there. Two days later, Nasser asked me to purchase a car with Israeli license plates, and I bought a stolen black Mitsubishi for NIS 3,500... I got the money for the car from Nasser Awis. After I bought the car, I went to Nasser's house with the car, and there I met Nasser and Majdi... I was surprised to find another person there, named Fathi Amiri... and then Nasser Awis told me that those two people, Majdi Hanfar and Fathi Amiri, were about to go out and perpetrate a suicide attack in Israel. At that point, Nasser gave Majdi an M-16 weapon, and he gave Fathi two hand grenades... About a year ago, Nasser Awis asked me to buy him two bags of chemical fertilizer for the purpose of preparing explosive charges... I bought them... and I gave them to Nasser Awis for the purpose of preparing explosive charges... About a year ago, I purchased two M-16 rifles... I got the money for those weapons from Nasser Awis...

Q. Where did you used to get the money for expenses for the military activity?

A. Nasser Awis was in charge of me on behalf of *Shuhadaa al-Aqsa*."

In his statement, P/18: "The plan for the perpetrators of the suicide attack inside the central bus station in Hadera was that Ziad and I... and Nasser Awis had the idea of sending one or two suicide bombers to carry out an integrated terrorist attack involving shooting followed by bombing, with an explosive charge that they would carry on their person. This would have a great effect and would cause mass casualties. Nasser Awis took it upon himself to recruit the suicide bomber, and I took it upon myself to find an Israeli who would help introduce the suicide bomber into Israel... In the end, we did not manage to carry out that terrorist attack... Ziad Asasa told me... that he had noticed a number of religious people concentrating in a synagogue [illegible, probably "between"] Baqa al-Gharbiya and Hadera, and he suggested that we should organize a suicide bombing there. I agreed, and I notified Nasser Awis, who was in charge of me, and he said 'OK, we'll take it into account,' but in the end, it did not work out.

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

In addition, Mahmoud Titi and [illegible, probably "Nasser"] Awis and I talked about the possibility of carrying out a terrorist attack on the main fuel station in Israel, by waiting for a fuel tanker to arrive to distribute fuel in Nablus and placing an explosive charge in the tanker without the driver noticing – an explosive charge connected to a mobile phone – and later, when the tanker re-entered the main station, the explosive charge would be set off by calling the mobile phone connected to it. This was only a plan; it was not carried out... I thought we would carry out a terrorist attack on the Ministry of Defense in Tel Aviv. I talked about it with Nasser Awis and Mahmoud Titi, and we decided to look for skilled activists who would carry out such a terrorist attack... I would bring the weapons from Nasser Awis every time anyone went out to perform a terrorist attack..."

And in statement P/20: ".. I am certain that Yasir (Abu Bakr) knew the rifles were intended for suicide attackers who were going out to perform terrorist attacks within Israel, because Yasir is the confidant of Nasser Awis, and that Yasir was the one who wrote the posters for Nasser Awis – the posters taking responsibility for terrorist attacks which were planned by Nasser Awis..."

The witness Muhammad Yadak states, in statement P/40A: "Mahmoud Titi contacted me and told me that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and Mahmoud said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed [illegible, probably "to this"] and, within the framework of the military squad, I participated in 10 shooting attacks directed against Saqen in the Nablus area. Participating in the shooting attacks along with me was... Nasser Awis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus...

Q. Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

A. Nasser Awis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons..."

And in statement P/40B: "In the beginning of October 2001, Mahmoud Titi and I met with Nasser Awis... and there Nasser offered to teach us how to prepare explosive charges for the purpose of carrying out terrorist attacks and supplying explosive charges to others in the Tanzim Fatah. After Mahmoud and I had consented to this, Nasser Awis came to us, to the apartment where Mahmoud Titi and I live, in Rafidiya, and Nasser Awis had explosives in his possession, in five bags, 10 kg in each bag. He also had about 10 gas cylinders of various sizes in his possession, as well as electric wires and batteries, and in the apartment, Nasser Awis taught us how to prepare an explosive charge and set it off. Nasser also taught us how to prepare explosives from the following materials: 1. Agricultural fertilizer containing potassium, 2. Sulfur, 3. Charcoal... Nasser Awis provides [sic] us with the materials required for preparation of the explosive charges... The apartment in Rafidiya served for the preparation of explosives and charges... We used to give the explosive charges which we prepared to people from Tanzim, for the purpose of carrying out military terrorist attacks against Israeli targets in the West Bank..."

In statement P/40C: "Q. In your first statement, you stated that Nasser Awis was the one who used to plan the perpetration of the terrorist attacks and that he was in charge of Tanzim Fatah in Nablus. Did you use to inform Nasser Awis of the perpetration of the terrorist attacks in which you participated, and of the terrorist attacks which were performed by others with whom you were in contact in Tanzim Fatah?

A. Yes, Mahmoud Titi and I would inform Nasser Awis of every terrorist attack we carried out, as well as other terrorist attacks which were carried out by other people with whom we were in contact...

Q. Were you in contact with Marwan Barghouti?

A. No, I had no contact with him. Nasser Awis had contact with Marwan Barghouti, and he would inform [him] of the terrorist attacks which were carried out against Israeli targets..."

And in statement P/40D: "About a month after the terrorist attack on the settlement of Gidonim, Kamal Abuar came to me and asked me for the M-16 rifle, which I had taken from the guard whom I murdered in Gidonim. I gave the weapon to Kamal Abuar to use in a terrorist attack, and he returned the weapon to me the next day and told me what he had done with the weapon. I would like to add that Nasser Awis took the M-16 weapon from me twice, in order for Tanzim activists to use it, and in September 2001, Nasser Awis took the weapon from me for the purpose of placing an explosive charge... and this was carried out by Abu Shahadi, an activist in Force 17... In October 2001, Nasser Awis took the weapon from me for a shooting [attack]... [on] a military position..."

Nevo Publishing Ltd.   nevo.co.il   The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

The witness Ahmad Barghouti sets forth, in his statement P/43A: "Q. Why did you call Nasser Awis? A. Because he is in charge of *Shuhadaa al-Aqsa* and he does things like that. I asked Nasser Awis if he could help me by bringing me someone who wanted to carry out a terrorist attack, and I would send him to Jerusalem to carry out a terrorist attack there, and Nasser said he would send me someone...

In statement P/43C: "After I telephoned Nasser Awis and told him about the terrorist attack (this was the terrorist attack described in the first count of the indictment, which took place in the Seafood Market restaurant), because Nasser Awis is in charge of *Kitaab Shuhadaa al-Aqsa*... Q. Tell me where the money for the activity came from. A. I gave Nasser Awis my bank account number, and he deposited about 7,000 shekels in my account...

Q. Tell me about your contacts with Nasser Awis.

A. I had Nasser Awis's mobile phone number, and we would talk on the phone about the operations, and Marwan Barghouti knew about those contacts and that we used to talk. One day, Nasser told me that he would send Faiz to me, and that I should prepare him and send him out to carry out a suicide bombing... Then Ali told me that Marwan had told him not to give me money and weapons at that time. I told Nasser Awis that, and he said that that was all right, that we would go all in, and that he would bring the weapons and money. I remember that Nasser Awis told me that he had other people who wanted to carry out suicide bombings, and that he would send them to me..."

And in statement [P/]43D: "That night, when the terrorist attack took place at the event hall in Hadera... I called Nasser Awis, and he told me that he was in charge of that terrorist attack -- that is, that *Kitaab Shuhadaa al-Aqsa* had carried out that attack. I agreed with Nasser Awis that, the next day, he would give me a poster stating that he was taking responsibility for the terrorist attack. The next day, Nasser sent me the poster by fax and I photocopied it 1,000 times and distributed it in Ramallah..."

In statement P/43E: "I, Ahmad Barghouti, use the *nom de guerre* of France, and I was responsible for *Kitaab Shuhadaa al-Aqsa*, together with Nasser Awis..."

The witness Yasir Abu Bakr stated, in his statement P/47A: "Nasser Awis is in charge of *Kitaab Shuhadaa al-Aqsa*, and he is wanted in Israel. In September 2001, Nasser Awis called me and asked me to prepare a poster for him, for the first anniversary of the al-Aqsa intifada... I prepared such a poster and I gave it to Nasser, at his house in Balata. In addition, after the death of Raad al-Karami, Nasser Awis used to call me after terrorist attacks and asked me to write posters, in which *Kitaab Shuhadaa al-Aqsa* took responsibility for the terrorist attacks, and I agreed... After a terrorist attack took place, Nasser Awis would call me and tell me where the attack was and who the fellow who carried out the suicide bombing was, and I would prepare the posters and would write that *Kitaab Shuhadaa al-Aqsa* took responsibility for the terrorist attack. After that, I would transfer the poster to Nasser Awis, and he would send it out to journalists by fax. Q. You told me before that Nasser Awis was in charge of *Kitaab Shuhadaa al-Aqsa* in Balata and was wanted in Israel. Can you tell me about Nasser Awis's fellow members of the terrorist squad? A. They are a squad of *Kitaab Shuhadaa al-Aqsa*, and Nasser Awis was in charge of the squad."

And in P/47B: "About three weeks ago, Nasser Awis called me and asked me to get him two explosive belts urgently, for a suicide bombing. Nasser Awis told me to bring explosive belts from another person, and not from Mahmoud Titi, because the explosions produced by explosive belts that Mahmoud Titi prepared were too weak. They had tried out such an explosive belt, and the explosion was weak... I contacted Khaled al-Asmar, because he has a friend who knows how to manufacture explosive belts... Two days later, Khaled al-Asmar told me that Rabia Abu Rub had prepared one explosive belt for us... and I transferred it to Ahmad Abu Khadr..."

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

In P/47C: "In the beginning of 2001, I was in Nasser Awis's home in the Balata refugee camp, and there, Nasser Awis proposed that I enlist in the al-Aqsa Martyrs' Battalions for military activity, and I agreed. Q. Did Nasser Awis tell you [plural] what military activity you were supposed to carry out? A. Yes, he said that we would be carrying out terrorist attacks against Israeli targets, and then he proposed that we carry out a terrorist attack involving an explosive charge and shooting, against a military vehicle..."

In P/47D: "About a month and a half ago, I called the mobile phone of Nasser Awis, who is in charge of the Tanzim – *Kitaab Shuhadaa al-Aqsa* in Nablus... and I suggested to Nasser that Tel Hashomer Hospital in Israel was a good place for a terrorist attack. I had heard that there were Israeli soldiers in Tel Hashomer Hospital, and therefore I suggested carrying out a terrorist attack there. Nasser told me to forget about that for the time being, and asked me to talk about it with Ahmad Abu Khadr, a man in his twenties, a senior activist in the Tanzim, Nasser Awis's assistant... About two months ago, in the evening, Nasser Awis contacted me – I told you about him – and asked me to contact GAP [sic] activists and check with them about helping to carry out military activity and terrorist attacks. I told Nasser that I knew a GAP [sic] activist... Nasser told me to go to him. I met with... and I told him that I worked with Nasser Awis..."

And in statement P/47E: "...Jalil told me that he had a man who was willing to carry out a suicide attack. So after a few minutes, I called Nasser Awis and told him that there was a suicide attacker who was willing to carry out a suicide attack, and Nasser Awis instructed me that the man should go to Ramallah... After about a week, or five days, I heard on the news that a suicide attacker named Rami Nur, from Nablus, had perpetrated a shooting attack in the area of [illegible]... in Jerusalem, and two Jews had been killed in that terrorist attack and others had been wounded, and Rami Nur had been wounded and was in severe condition, because he had been shot by the soldiers. After the news, on the day of the terrorist attack, Nasser Awis called me and told me that the perpetrator was Rami Nur, an activist in the Tanzim, and instructed me to prepare a poster on behalf of *Kitaab Shuhadaa al-Aqsa*, stating that the organization was taking responsibility..."

Pursuant to Section 1 of the Prevention of Terror Ordinance, 5708 – 1948, a "Terrorist Organization" is an assemblage of persons which, in its operations, makes use of acts of violence which are likely to cause the death or injury of a human being, or threaten such acts of violence" A "Member of a Terrorist Organization" is a person who belongs to that organization, including a person who participates in its operations, who publishes propaganda on behalf of a Terrorist Organization or of its operations."

Pursuant to Section 2 of the above mentioned Ordinance, a person holding, *inter alia*, a position involved in management or instruction in a Terrorist Organization, or involved in the deliberations or the decision making of a Terrorist Organization, is considered to be an activist in such an organization.

The citations appearing above are only one example of the broad and detailed web spread out for us, on the basis of the statements made by the Defendant and his accomplices, on which we relied – a web of facts which properly substantiates the legal conclusion that the foundations for the offenses against Sections 2 and 3 of the Ordinance have been properly made, as well as the conclusion that the organizations to which the Defendant and his accomplices belonged are Terrorist Organizations.

In addition to offenses against the [Prevention of] Terrorism Ordinance, which the State imputes to the Defendant in all of the charges set forth in the indictment, it also imputes to him, in all of the charges, offenses against Section 499 of the Penal Code, 5737 – 1977.

23

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

The offense of conspiracy basically consists of an agreement between two or more persons to carry out an illegal act. The engagement must be for the purpose of achieving a common goal, and the engagement must be accompanied by the intention of realizing the common goal. The goal intended, as set forth above, is a goal defined by law as illicit.

The web of facts mentioned above also properly substantiates the conclusion that the Defendant committed the offenses against Section 499 of the Penal Code, 5737 – 1977.

The Defendant's confession with regard to his position, status and activity within the organization to which he belonged – activity which was intended to carry out terrorist operations, which even had murderous and damaging results, as shall be set forth below – is fully supported by an additional, substantial item derived from separate and independent sources: the assertions by each of the accomplices, which – each in its own way – embroil the Defendant in the offenses imputed to him, and which relate to a real point which is in dispute. The supplementary evidence which reinforces the testimony by the accomplices has already been discussed above.

The State has proven the actions which are imputed to the Defendant.

**Count No. 1:**

On March 5, 2002, the terrorist Ibrahim Hasuna (hereinafter: "Hasuna") came to the Seafood Market restaurant in Tel Aviv, armed with an M-16 rifle, hand grenades, and a knife, with the intention of carrying out a murderous terrorist attack.

When Hasuna arrived on the scene, the restaurant was full of scores of people. Hasuna started firing at the people in the restaurant from the Maariv House Bridge, threw the hand grenades – which miraculously did not explode – into the restaurant, and immediately thereafter, entered the restaurant and stabbed people sitting inside, which was intended to intentionally cause the death of many persons who were in the restaurant at the time.

In that incident, Sergeant Major Salim Barikat of blessed memory, age 33, who was one of the first policemen to reach the scene of the attack and tackled Hasuna with the intention of arresting him, Yosef Habi of blessed memory, age 52, and Eliyahu Dahan of blessed memory, age 53, were stabbed to death by Hasuna's knife. Scores of other persons were wounded, some of them seriously. After the security forces arrived on the scene of the terrorist attack, Hasuma was shot to death. (See testimony: Witness No. 3 for the prosecution, Commander Haggai Dotan, Witness No. 4 for the prosecution, Brigadier General Uri Barlev (presentation P/4); Witness No. 8 for the prosecution, Uriel Eliyahu, Witness No. 9 for the prosecution, Staff Sergeant Shai Cohen, Witness No. 11 for the prosecution, Leon Gorenstein, Witness No. 13 for the prosecution, Adi Maoz, Witness No. 17 for the prosecution, Efi Yamin; P/32 (activity reports on the preservation of the scene of the crime and the seizure of exhibits); P/33 (an M-16 rifle); P/34 (a bloody knife); P/35 (a board of photographs); P/24 (an activity report); P/25 (an activity report); P/52 through P/57 (expert opinions).

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with other activists in the organization, including Mahmoud Titi and Ahmad Barghouti (Witness No. 23 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, Hasuna was recruited, supplied with equipment and transported to Tel Aviv, to the site of the restaurant. Among other things, the Defendant instructed Mahmoud Titi to film Hasuna before he set out to perpetrate the terrorist attack, as a suicide attack, so that afterward it would be possible to send the [video] cassette, with Hasuna on film, to various television stations. In fact, after the terrorist attack on the restaurant, the Defendant did call the various television stations and other media and informed them that the Terrorist Organization was responsible for the terrorist attack and had even carried it out.

The admission by the Defendant is as follows:

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

"Q. Did you have any involvement with suicide attacks in Tel Aviv?

A. Yes, Mahmoud Titi told me, early in March 2002, when he came to my home in the Balata camp, that Ahmad Barghouti was asking me to provide a person who would carry out a suicide attack (*istishhad*) in Tel Aviv, and informed me that he was about to contact a person named Ibrahim Hasuna, originally from Gaza, who was serving in the naval force [sic] in Nablus, and Mahmoud gave Ibrahim an M-16 weapon and hand grenades. Mahmoud contacted me in that matter because we are a military squad, and I expressed my consent for that terrorist attack. He sent Ibrahim to Ramallah by public transportation, and we agreed with Ahmad Barghouti that he would meet Ibrahim Hasuna in Ramallah. It was further agreed that Mahmoud would film Ibrahim before the terrorist attack was carried out, and that afterward, we would send the [video] cassette to the television stations. In fact, after that, Ibrahim came to Ramallah, and as far as I know, Mahmoud filmed him into Israel and Ibrahim came to Tel Aviv, and I saw on the news that he had fired at the Israelis in the restaurant and had been killed. Then I called the television stations, and I called [sic] and told them that the terrorist attack had been carried out by *Kitaab Shuhadaa al-Aqsa*.

Q. As far as you know, how many people were killed in the terrorist attack in Tel Aviv?

A. As far as I know, two or three people were killed and more than 20 people were wounded.

Q. Which television stations did you call to tell them that the terrorist attack had been carried out by [your organization]?

A. Al-Jazeera, Abu Dhabi, Israel, al-Manar, and the local press.

Q. Do you have anything to add about the terrorist attack in Tel Aviv?

A. No, but at about that time, Ahmad Abu Khadr from *Kitaab Shuhadaa al-Aqsa* contacted me and said that there were two people who wanted to carry out a terrorist attack in Israel, and I agreed to that. I informed Ahmad Barghouti of the matter and asked him if he would be able to bring them in, and it was agreed with Ahmad Abu Khadr that Alaa Abu Mustafa and Ayman Badr would take the two *mustashhids* to Ramallah. After that, I called Ahmad Barghouti and told him that the people were on their way to him. I should note that Ahmad Abu Khadr contacted me because I am responsible for *Kitaab Shuhadaa al-Aqsa*."

(See P/7)

The "additional item" is as follows:

The witness Ahmad Barghouti [stated as follows]:

"..Nasser Awis called me and told me that he had another fellow who wanted to carry out a suicide attack, that he was sending him to me, and I said OK. After that, a fellow called me and told me that he was coming to me on behalf of Nasser Awis. I sent al-Nuf to bring him, and I gave al-Nuf NIS 1000 and I told al-Nuf to buy the fellow new clothes and to take him to have a haircut. I also told al-Nuf that, after that, he should bring the man to the rented apartment in Ramallah near the Arab Bank, where Rami Nur had been before that. After that, when I arrived at the rented apartment, I saw the fellow, who told me that his name was Ibrahim Hasuna, that he was 21 years old, and he said he came from Gaza. After that, I told al-Nuf that he should take Ibrahim Hasuna to Israel, so that he could carry out a terrorist attack there, and I told al-Nuf that I would also bring him a weapon, for him to carry out a terrorist attack. After that, al-Nuf bought an M-16 rifle and gave it to Ibrahim Hasuna, and after that, al-Nuf took Ibrahi Hasuna to the Amari refugee camp, to Haloum Abu Hamid, and they stayed there three days. After the three days, al-Nuf called me and told me that he was going out, and after that, I heard that this Ibrahim Hasuna had carried out a terrorist attack in Tel Aviv, in a restaurant, and that he had gone there with Murad Ajluni and Mazen al-Qadi, who had been caught... and after several days, Mahmoud Titi, who is an activist in *Shuhadaa al-Aqsa* and works with Nasser Awis, called me... and Mahmoud told me that he had someone who wanted to carry out a suicide attack, and that he would send him to me, to Ramallah, and I said OK..." (See P/43A).

The witness Ahmad Barghouti, in P/43C: "Q. Tell me about your activity with regard to the terrorist attack in Tel Aviv at the Seafood [Market] restaurant.

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

A. The one who carried out that terrorist attack was Ibrahim Hasuna, who came from the Nablus area, from Nasser Awis... After that, I called Marwan Barghouti on his mobile phone – I was in contact with him at the time – and I would tell [sic] him that the terrorist attack had gone out for execution. Marwan Barghouti told me that he did not want the terrorist attack to take place inside Israel, and I told him that it would be all right. After that – this was about 3:00 a.m. – Ali Tareq al-Nuf called me and told me that the terrorist attack had been carried out, and he told me to watch it on television. At that point, I called Marwan Barghouti and I told him that the terrorist attack had been carried out, and that he should watch it on television, and Marwan told me that he was watching it on television. Marwan did not say anything to me about having heard that the terrorist attack had been carried out within Israel, and not in the West Bank, as he said it should be. After that, I called Nasser Awis and I told him about the terrorist attack, because Nasser Awis is responsible for *Kitaab Shuhadaa al-Aqsa*."

### Count No. 2:

On January 17, 2002, the terrorist Abd al-Salaam Hasuna (hereinafter: "Abd al-Salaam") came to the Armon David event hall in Hadera, armed with an M-16 rifle and hand grenades and wearing a vest with ammunition clips, with the intention of carrying out a murderous terrorist attack.

The Bat Mitzvah celebration of a young girl, Nina Kardashov, was taking place in the hall at the time, with dozens of guests. Abd al-Salaam burst into the hall, shooting in all directions, and, before being overcome by some of the guests, succeeded in intentionally causing the death of six of the guests: Anatoly Bakshayev of blessed memory, age 63, Edward Bakshayev of blessed memory, age 48, Boris Malikhov of blessed memory, age 56, Dina Binayev of blessed memory, age 48, Alice Ben Israel (Aharon) of blessed memory, age 32, Avi Yazdi of blessed memory, age 25, and wounding scores of other persons, some of them *seriously (see the testimony by Witness No. 1 for the prosecution, Brigadier General Moshe Waldman, Witness No. 24 for the* prosecution, Shimon Lugasi, Witness No. 12 for the prosecution, Konstantin Kardashoff, Witness No. 20 for the prosecution, Superintendent Yehuda Peretz, P/1 (presentation), P/27 (medical documents), P/36 (M-16 rifle), P/44 (cassettes), P/58 (expert opinion), P/59 (death certificate of Anatoly Bakshayev of blessed memory), P/60 (death certificate of Avi Yazdi of blessed memory), P/61 (death certificate of Boris Malkihov of blessed memory), P/62 (death certificate of Dina Binayev of blessed memory), P/63 through P/66 (expert opinions).

According to an argument that was set forth by the State, the Defendant – as set forth above, was one of the senior commanders of the Terrorist Organization – conspired with Ahmad· Abu Khadr (Witness No. 6 for the prosecution) and additional activists to perpetrate a terrorist attack, which was intended to deliberately cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, Abd al-Salaam was recruited, trained in firing an M-16 rifle, supplied with weaponry and ammunition for the purpose of the training and the perpetration of the deed, and transported to the site of the terrorist attack in Hadera. Prior to the terrorist attack, Abd al-Salaam was photographed on the instructions of the Defendant, reading a will which had been written for him by the Defendant and holding an M-16 rifle which belonged to the Defendant in his hand, so that afterward it would be possible to send the photographs to the media. In fact, after the terrorist attack, the Defendant did instruct Yasir Abu Bakr (Witness No. 25 for the prosecution) to prepare posters which were distributed, and which stated that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

"12. I supplied Abd al-Salaam Hasuna with weapons for carrying out the suicide attack in Hadera."

P/6:

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

"A. I spoke with him about many terrorist attacks, and I remember that I spoke with him about a shooting attack which I had carried out along with Muayad Jamil and Mahmoud Titi and Baid Abu Mustafa near the Hawara refugee camp, directed against a military vehicle. I also spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in those terrorist attacks along with Muayad Jamil and Muhammad Yadak and Mahmoud Titi and Ahmad Abu Khadr, and I reported to him about the suicide attack in Jerusalem and in Hadera, which we had performed.

Q. Which suicide attack in Hadera?

A. The one carried out by Abd al-Salaam Hasuna."

"[Q.] Can you explain how the terrorist attack was carried out in Hadera and Jerusalem?

A. Yes. Abd al-Salaam Hasuna, a resident of Beit Amrin, contacted Ahmad Abu Khadr (Witness No. 6 for the Prosecution) and told me [sic] that he wanted to commit suicide [*al-laset shahad*] and Ahmad contacted me and told me. And after Raad al-Karami died, we decided to carry out a terrorist attack, and Ahmad photographed Abd al-Salaam Hasuna in the Balata refugee camp, and I gave him weapons: an M-16 and a hand grenade, and we gave Abd al-Salaam NIS 400. He went to Tulkarm by public transportation, where he met with Mahmoud Titi in the home of Mansour Sharim, a resident of Tulkarm. From there, according to the [plan for the] terrorist attack, Mahmoud was responsible for sending him to Hadera, and the terrorist attack was carried out in the hall, and as far as I know, a few people were killed in that attack."

The "additional item" is as follows:

The witness Ahmad Abu Khadr, P/17, p. 3:

"I also confess that I was the one who photographed Abd al-Salaam Hasuna of Beit Amrin before he set out to carry out the suicide attack in Hadera, about six months ago."

P/18, p. 14: "To tell the truth, I was the one who recruited Abd al-Salaam Hasuna, a resident of Beit Amrun [sic]. Abd al-Salaam is a friend of mine and we worked together in Nablus in the National Security. Abd al-Safaam asked me, about six months ago, to arrange for him to carry out a suicide attack... After Abd al-Salaam asked me to arrange for him to perpetrate a suicide attack in Israel, I contacted Nasser Awis and told him about Abd al-Salaam... and then we decided to send him out for a suicide attack in revenge for the death of Raad al-Karami. Nasser asked me to train him in the use of weapons, so that he would be prepared to carry out the terrorist attack successfully. That is what I did: I trained him to use an M-16 rifle... I took the weapon and eight clips of bullets from Nasser Awis. The day after that, I brought Abd al-Salaam to Nasser Awis's house in the Balata refugee camp, and, in Nasser Awis's house and in his presence, I filmed Abd al-Salaam, reading the will written by Nasser and holding an M-16 weapon belonging to Nasser, and making the hand gesture of the shahadaa. We filmed him with a video camera and photographed him with an ordinary camera. Nasser took the cassette and the pictures. We gave Abd al-Salaam an M-16 rifle and six clips of bullets and two hand grenades, which Nasser had brought. After the photography session, at about 8:00 p.m., I went out to look for a taxi, and I found Ayman, a taxi driver who lives in Balata, about 26 years old, and I asked him to help us transfer a fellow to Tulkarm, without telling him that he was a suicide attacker. He agreed to do that, and took Abd al-Salaam to Tulkarm. He took the M-16 rifle, the clips of bullets and the hand grenades in a bag, after having disassembled the M-16 into two pieces. When Abd al-Salaam had gone to Tulkarm in Ayman's taxi, Masr called Mahmoud Titi and informed him that the man was on his way to him. I should note that Nasser had spoken with Mahmoud Titi before that and had told him to prepare himself to meet Abd al-Salaam, in order to help him enter Israel. I knew that from Nasser. I was not involved in the conversations between them. I was later told that Mahmoud Titi had received Abd al-Salaam in Tulkarm, and that, when [Abd al-Salaam] reached Hadera, he perpetrated a terrorist attack in an event hall, and that he was killed, and that he killed a few Israelis, I think six in all..."

Ahmad Barghouti, P/43D:

27

## Felony Case (Tel Aviv) 1137/02  State of Israel v. Nasser Mahmoud Ahmad Awis

"The night of the terrorist attack in the event hall in Hadera, I was with Marwan Barghouti, Karim Awis and 'Abu Rabia' in the Orthodox restaurant in Ramallah. Suddenly, they announced on television that the terrorist attack had taken place in the event hall in Hadera. I called Nasser Awis and he told me that he was responsible for that terrorist attack – that is, that members of the *Shuhadaa al-Aqsa* Battalions had carried out that terrorist attack. I agreed with Nasser Awis that, the next day, he would give me a poster stating that he was taking responsibility for the terrorist attack. The next day, Nasser sent me the poster by fax and I photocopied it 1,000 times and distributed it in Ramallah."

### Count No. 3:

On January 22, 2002, the terrorist Said Ramadan came to the corner of Jaffa Road and Lunz Street in downtown Jerusalem, armed with an M-16 rifle and two clips of bullets, with the intention of perpetrating a murderous terrorist attack. Ramadan shot at civilians who were passing there at the time, and intentionally caused the death of Sarah Hamburger of blessed memory, age 79, and Ora (Svetlana) Sandler of blessed memory, age 56, who were innocently walking down the street, and wounded scores of other persons, some of them seriously. Ramadan was shot to death by policemen who reached the scene. (See the testimony by Witness No. 22 for the prosecution, Avi Ben Ami, Witness No. 26 for the prosecution, Asaf Azulai, Witness No. 3 for the prosecution, Commander Haggai Dotan, Witness No. 14 for the prosecution, Ben Naim Hanan, Witness No. 15 for the prosecution, Noam Gabbai, P/30 (presentation), P/48 (M-16), P/48A (report on the seizure of exhibits), P/77 (photographs from the scene of the incident), P/78 (death certificate of Sarah Hamburger of blessed memory), P/79 (death certificate of Ora Sandler of blessed memory).

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Mahmoud Titi and other activists, for the purpose of *perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. In order to promote* and implement the conspiracy, which was headed by the Defendant, Ramadan was recruited, supplied with equipment, photographed as a suicide attacker – all according to the pattern typical of the Organization, as described in the previous counts – and transported to the scene of a terrorist attack. Following the terrorist attack, the terrorist's photograph was distributed to the media.

The admission by the Defendant is as follows:

P/5:

"11. I supplied Said Ramadan with weapons for carrying out the suicide attack in Jerusalem."

P/6:

"Q. Which terrorist attack in Jerusalem?

A. The terrorist attack carried out by Said Ramadan in September 2001."

".. And the terrorist attack in Jerusalem was carried out in such a way that Said Ramadan contacted Mahmoud Titi and said that he had been a friend of Raad Karami and that he wanted to avenge his killing, and Mahmoud told me. I then met with Said and I understood that he wanted to carry out the terrorist attack, and I called Ahmad Barghouti in Ramallah and I asked him to take him to Jerusalem, and Ahmad agreed. Said went to Ramallah by public transportation, where he met with Ahmad Barghouti. The next day, Said went to Jerusalem and shot at a group of policemen and civilians, and in that terrorist attack, two people were killed, and so was Said."

The "additional item" is as follows:

28

Felony Case (Tel Aviv) 1137/02 State of Israel v. Nasser Mahmoud Ahmad Awis

Ahmad Barghouti, P/43A:

"I asked Nasser Awis if he could help me by bringing me someone who wanted to carry out a terrorist attack, and I would send him to Jerusalem to carry out the attack there. Nasser told me that he would send me someone, and after some time, Said Ramadan, from the village of Tel Shekhem, about 25 years old, came to me and said that he would carry out the terrorist attack. I met him next to the movie theater in Ramallah and I called Muhammad Abu Satkha and told him to come too, and from there, we went to the barber shop where Said got a haircut. Then we called Fares Hatawi and asked him if he could bring the man into Jerusalem, because he wanted to carry out a suicide attack, and Fares said that he could do it, and then Fares went out in his car to look at the road and see what was happening. Meanwhile, Ahmad Abu Satra [sic] and I took Said to [illegible, probably "pray"] and eat, and I bought him new clothes and shoes with my own money, for NIS 1,200. After that, I told Muhammad Abu Satra [sic] to bring an M-16 rifle and three clips of bullets and give them to Said, and he did. Then Fares Hatawi and Muhammad Sami arrived in an Isuzu vehicle, equipped with the shots he got out of the car. The next day, I took $1,000 from Ali Fares Barghouti and I told him that the people had gone out to perpetrate a terrorist attack, and that the weapons had been lost in the terrorist attack. I gave Fares Hatawi and Muhammad Abu Satria [sic] each $100 for that terrorist attack. After that, Fares Hatawi, Muhammad Sami, al-Nuf, and another man named Husam Shehadeh from Qatanduha came to me and asked me why I had not paid them for the terrorist attacks that they carried out, and I said that I would look into it."

Q.-A. We did not film Said on video before the terrorist attack, because Nasser Awis had already done so.

Q. At the beginning of your testimony, you told me that you do not know Fares Hatawi, Muhammad Sami, and all the rest, and now I see that you did meet them. How is that?

A. I met them in Raad Karami's mourning tent, and that was when I saw them. At about 4:30 p.m., I heard on the news that there had been a shooting attack in Jaffa Road in Jerusalem, and I knew that was Said's terrorist attack. So I called Fares Hatawi and asked him if they had been the ones... who had taken Said to Jaffa Road, and Fares said that they had dropped him off in Jaffa Road, and that they had heard the shots he fired after he got out of the car. The next day, I took $1,000 from Ali Fares Barghouti and I told him that the people had gone out to perpetrate a terrorist attack, and that the weapons had been lost in the terrorist attack. I gave Fares Hatawi and Muhammad Abu Satria [sic] each $100 for that terrorist attack. After that, Fares Hatawi, Muhammad Sami, al-Nuf, and another man named Husam Shehadeh from Qatanduha came to me and asked me why I had not paid them for the terrorist attacks that they carried out, and I said that I would look into it."

**Count No. 4:**

On March 9, 2002, the terrorists Shahadi al-Najmi and Said Bata arrived in the area of the Jeremy Hotel on Gad Machnes Street in Netanya, armed with M-16 rifles and fragmentation grenades. The two fired bursts into the lobby of the hotel and threw two fragmentation grenades. The two succeeded in intentionally causing the death of a one year old baby, Avia Malka of blessed memory. As the security forces were overcoming the two, Yihya Israel of blessed memory, age 29, who happened to be nearby, was also shot. As a result of the act committed by the two, scores of additional persons were wounded, some of them seriously. (See the testimony of Witness No. 2 for the prosecution, Brigadier General Aharon Franco, Witness No. 10 for the prosecution, G.M., Witness No. 16 for the prosecution, Sergeant Major Malka, P/28 (report), P/26 (medical documents of Witness No. 11 for the prosecution), P/29-P/30 (assault rifles), P/31 (photographs), P/67 (expert opinion), P/68 (death certificate of Avia Malka of blessed memory), P/69-P/71 (expert opinions).

According to an argument that was set forth by the State, the Defendant — who, as set forth above, was one of the senior commanders of the Terrorist Organization — entered into a conspiracy with Mahmoud Titi and Khadr (Witness No. 6 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], Shahadi and Said were recruited, equipped with an M-16 rifle, 10 clips of bullets and two hand grenades, photographed reading their wills and holding an M-16 rifle, and transported to the scene of a terrorist attack. After the terrorist attack and in accordance with the typical pattern, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

29

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

The admission by the Defendant is as follows:

P/5:

"6. I delivered weapons for the perpetration of a terrorist attack in Netanya."

P/7:

"Q. Did you have any involvement with a shooting attack in Netanya?

A. Yes, I was involved with a shooting attack in Netanya, which was carried out by terrorists whose names I do not know. About two days before that terrorist attack, Ahmad Abu Khadr called me and told me that he would be able to bring two people into Israel, in order for them to carry out a suicide attack, and I contacted Mahmoud Titi and asked him if he could bring in suicide attackers, and he answered in the affirmative. Then I gave Ahmad two grenades and Mahmoud Titi gave them two M-16 weapons, and Ahmad Abu Khadr photographed them and explained to them about the terrorist attack. Then Ahmad Abu Khadr went with them as far as Baqa al-Sharqiya and left them, and they walked along a dirt road into Israel and went from there to Netanya, and Ahmad went back to Nablus. After a few hours, we heard on television that there had been an exchange of fire between the suicide attackers and police forces near a hotel in Netanya, and that civilians and policemen had been wounded in the terrorist attack, and that two people had been murdered and two others had been killed by the police. I called the media and took responsibility for the attack.

Q. Do you have anything to add about the terrorist attack in Netanya?

A. No."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), in P/13:

"I confess that, about a month ago, Nasser Awis told me that he intended to send two suicide attackers to the city of Netanya, in order to carry out a suicide attack, and asked me to help transport the suicide attackers from Nablus to Kafr Rai, and of course, I agreed.

Q. Who are those two suicide attackers?

A. The first suicide attacker is Shadi [sic] al-Najmi, a resident of the Ein Beit Alma camp, and the second one's name is Said Bata, a resident of the Ashar camp... and both of them were wounded in a terrorist attack. That day, Nasser Awis told me that Shadi Najmi [sic] had worked in Netanya and was familiar with the area. Q. [A.] Nasser Awis told me that Mukadi Mukaher, a resident of al-Ain, 28 years old and married, was working for the naval police [sic] in Nablus, and that he was an activist in *Kitaab Shuhadaa al-Aqsa*. Mukadi is Nasser's and my accomplice in planning and sending the suicide attackers to Netanya, and Nasser asked me to take the two suicide attackers in the stolen Pontiac with Israeli license plates from Nablus to Kafr Rai, and I agree. On the day of the terrorist attack, I went out at about 3:00 p.m., in a taxi, to the area of Jabal Shamali in Nablus, and there, Mukadi Mukaher and the two suicide attackers were waiting for me in the Pontiac. Shadi was wearing blue jeans and a black shirt, and Said was wearing green pants. There, Mukadi said goodbye to them and I took them to Kafr Rai in the Pontiac. Q. What weapons did the suicide attackers have? A. Each one of them had an M-16 rifle. I saw Shadi holding a black plastic bag with an explosive charge in it, and after we got to Kafr Rai, I called Nasser Awis and told him that we had arrived. Nasser asked to speak to Shadi, and I heard Shadi telling Nasser that he knew the way from there. Then Shadi gave the mobile phone to me, and Nasser instructed me to go back to Nablus in the taxi, and that is what I did. When I got back to Nablus, I heard on the news about the terrorist attack in Netanya, in which the two suicide attackers had been killed, and I remember they talked about a terrorist attack in a hotel in Netanya."

P/18:

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

"Q. In the second testimony which you gave, you talked about a suicide attack in Netanya, which took place a month before you gave the testimony, and you claimed that your job was to take the two suicide attackers from Nablus to Kafr Rai. Exactly where did you take them from, and do you know whether they were photographed before they went out to perpetrate the terrorist attack?

A. In addition to taking the two suicide attackers, Shadi and Said, I confess that, the day before the terrorist attack, Nasser Awis asked me to come to the town square in Nablus and pick up Shadi and Said, and then to come to his home in the refugee camp, so that he could give me a will which he had prepared for the two suicide attackers. He also asked me to take the two suicide attackers home, photograph them, and wait for instructions.

That is what I did: I picked them up, took the will from Nasser along with a video camera, and when I got home, I filmed the two of them, each holding an M-16 in their hands, with Shadi reading the will.

Q. From whom did they get the weapons?

A. I took the will and the camera from Nasser. He gave me two M-16 weapons and 12 clips full of bullets and a hand grenade, and I gave them to them."

### Count No. 5:

On March 30, 2002, the terrorists Majdi Hanfar and Fathi Amiri (hereinafter: "Majdi and Fathi") were on their way to carry out a terrorist attack in Israel, armed with an M-16 rifle, hand grenades and an explosive charge. Majdi and Fathi ran into a force of Border Patrol police near Baqa al-Gharbiya, fired on the policeman and threw a fragmentation grenade.

The two succeeded in intentionally causing the death of a Border Patrol policeman, Master Sergeant Konstantin Danilov, and in wounding another policeman, Senior Master Sergeant Amal Ibrahim. (See the testimony by Witness No. 27 for the prosecution, Amir Sher, Witness No. 18 for the prosecution, Chief Superintendent Farid Ghanam, Witness No. 19 for the prosecution, Tal Vermot, P/49 (report on the seizure of exhibits), P/72-P/73 (expert opinions), P/74-P/75 (photographs), P/76 (expert opinion).)

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Titi and Khadr (Witness No. 6 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], Majdi and Fathi were recruited, equipped with an M-16 rifle, hand grenades and an explosive belt. The Defendant also gave instructions to arrange for the arrival of the two in Israel, transferred an amount of money totaling NIS 3500 which was intended for the purchase of a stolen car to be used for transporting them, and instructed Khadr to accompany them part of the way. After the terrorist attack, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

P/5:

"10. I delivered weapons for the execution of a shooting attack, a sacrifice attack (note by the interrogator: a suicide attack), which was supposed to be carried out in Hadera, but the terrorist attack did not succeed and people were killed in the vicinity of Baqa al-Gharbiya."

P/6:

"Q. Yes, Yasir and I worked together, to send out suicide attackers with Mahmoud Titi and Ahmad abu Khadr from Silat al-Dhaher, and if we needed anything, such as photographing the suicide attackers or distributing posters, we would use Yasir. About two weeks before the army came into Nablus, I asked Yasir to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel. Yasir, in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed, and during these exchanges of fire, a Border Patrol policeman was killed in Baqa.

Q. Where was the terrorist attack that you are talking about supposed to have been carried out?

A. In Hadera, and we did not define a target, and according to the plan, one of the suicide attackers was supposed to shoot and the other was supposed to blow himself up...

Q. What kind of vehicle did the suicide attackers travel in?

A. I do not know, but I gave Ahmad NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers, and Ahmad went with them to Tulkarm and showed them the way and came back by public transportation."

P/7:

"After the four of them were arrested on their way to Ramallah, Mahmoud Titi contacted me and told me that he wanted to carry out a suicide attack next to Israeli soldiers, and he asked me for an M-16 weapon, and an explosive belt in my possession, and I did give him an M-16. We agreed that the attack would be carried out within Israel, next to soldiers, and that after [one] suicide attacker blew himself up, another one would fire. According to what Muhammad said, he did succeed in locating two people who would carry out the terrorist attack, one from Nablus and the other one from Jiyus.

Q. How did Mahmoud Titi get to know the two people who were supposed to carry out the terrorist attack next to the soldiers?

A. According to what he told me, Ahmad Abu Khadr was the one who introduced him to the man from Nablus, and Mahmoud Titi already knew the one from Jiyus.

Q. Who brought the suicide attackers into Israel?

A. A man named Mansour Sharim from Tulkarm.

Q. How did they get in, and how was the terrorist attack carried out in Israel?

A. They got in with a stolen car, [with the help of] Mansour Sharim, and after they had entered Israel and were on their way to Hadera in order to carry out the terrorist attack, a few hours later, we heard on the radio that the Israeli police had suspected the car, and that there had been an exchange of fire with the suicide attackers and they had been killed, and two of the police had been wounded, as far as I know.

Q. How did the exchange of fire with the police take place?

A. On the way to Hadera, a police car suspected that the car was stolen and asked them to stop, but they started shooting. After that, the policemen succeeded in killing them. After I heard on the radio that they had been killed, I called the media and I informed them that the terrorist attack had been carried out by Kitaab al-Aqsa."

The "additional item" is as follows:

32

Felony Case (Tel Aviv) 1137/02  State of Israel v. Nasser Mahmoud Ahmad Awis

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/13:

"... That same day, I reported to Nasser Awis that I had a suicide attacker with me, and Nasser asked to meet that terrorist. The next day, I took Majdi to a studio in Nablus to have his picture taken, and from there to Nasser Awis's house, and I left him there. Two days later, Nasser asked me to purchase a car with Israeli license plates. After I bought a stolen black Mitsubishi for NIS 3,500 from a resident of Tubas. I got the money for the car from Nasser Awis. After I bought the car, I went to Nasser's house with the car, and there I met Nasser and Majdi and Juad Hanfar, and I was surprised to find another person there, named Fathi Amiri, a resident of Nablus, about 20 years old, and that was the first time that I saw that young man. And then Nasser Awis told me that those two people, Majdi Hanfar and Fathi Amiri, were about to go out and perpetrate a suicide attack in Israel. At that point, Nasser gave Majdi an M-16 weapon, and he gave Fathi two hand grenades, and the plan was for the two of them to enter Israel, wherever they could, and to carry out a suicide attack, shooting with the M-16 and throwing grenades, and after we prepared them, I took them to Kafr Rai and I handed them over to Ziad Asasa. This was the same Ziad who had transported the suicide attacker that I talked about before. On that day, I got to Kafr Rai at around 11:00 a.m. ... And an hour later, Ziad called and said that he had heard that the two of them had been killed in Baqa, after wounding a Border Patrol policeman."

### Count No. 6:

During the al-Aqsa intifada, on an unknown date, two terrorists whose identities are not known were on their way to carry out a terrorist attack in Jerusalem, armed with Kalashnikov rifles and hand grenades. The terrorists were caught at an IDF roadblock by the security forces, thus miraculously avoiding a murderous terrorist attack with multiple casualties, which the two had set out to perpetrate, with the intent of deliberately causing the death of many Israeli civilians.

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Ahmad Abu Khadr and Ahmad Barghouti and additional activists, for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, the terrorists were recruited, equipped with Kalashnikov rifles and hand grenades, and transported on the way to the scene of a terrorist attack.

The admission by the Defendant is as follows:

P/7:

"... At about that time, Ahmad Abu Khadr from *Kitaab Shuhadaa al-Aqsa* contacted me and said that there were two people who wanted to carry out a terrorist attack in Israel, and I agreed to that. I informed Ahmad Barghouti of the matter and asked him if he would be able to bring them in, and it was agreed with Ahmad Abu Khadr that Alaa Abu Mustafa and Ayman Badr would take the two *mustashhids* to Ramallah. After that, I called Ahmad Barghouti and told him that the people were on their way to him. I should note that Ahmad Abu Khadr contacted me because I am responsible for *Kitaab Shuhadaa al-Aqsa*.

Q. Did Ayman Badr and Alaa Abu Mustafa know about the terrorist attack?

A. Ayman works as a driver of a public vehicle, and Alaa is a friend of Ahmad Abu Khadr, and I do not know whether they knew about the terrorist attack.

Q. Where was it agreed that they would meet in Ramallah?

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

A. According to what was agreed, Ahmad Abu Khadr was supposed to be in contact with the four, and when they got to the Ramallah area, he would call me and I would call Ahmad Barghouti and let him know where they were, so that he could meet them.

Q. Which weapons did they take with them, and how was he [sic] supposed to carry out the terrorist attack?

A. A shooting attack which included grenade-throwing, and Ahmad Abu Khadr gave the suicide attackers two hand grenades, and according to what was agreed, Ahmad Barghouti was supposed to give them two Kalashnikov rifles.

Q: Where was he [sic] supposed to carry out the terrorist attack?

A. In West Jerusalem.

Q. Was the terrorist attack carried out?

A. The four of them were arrested at a roadblock on their way to Ramallah.

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/17:

"In addition, we planned to carry out a suicide attack inside Jerusalem, and we sent the suicide attackers to Ramallah to get an explosive belt, but they were arrested on the way. The two who wanted to carry out the suicide attack are (1) Saadi Maqbul of Nablus, about 20 years old, a bachelor and unemployed, (2) Alaa Khalafwad, a resident of Nablus, about 20 years old, a bachelor who worked as a vehicle mechanic. Aswad was his *nom de guerre*. This was about four or five months ago. Nasser Awis planned this terrorist attack along with me… for us to carry out a terrorist attack in the Ministry of Defense in Tel Aviv. I talked about it with Nasser Awis and Mahmoud Titi, and we decided to look for skilled activists who would carry out such a terrorist attack. In the end, we did not look for activists and we did not carry it out. With regard to the two suicide attackers, Saadi Maqbul and Alaa al-Aswad, who were on their way to Ramallah to get explosive belts so that they could go on to Jerusalem and carry out a suicide bombing, I talked about that in my second testimony. I would like to add a few points which I did not mention… As I said, I filmed them with a video camera, reading the will, and I put a flag of the *Kitaab Shuhadaa al-Aqsa* behind them, and during the filming, he [sic] waved a Beretta weapon which I had given him. I gave the cassette [to] Nasser Awis later. That night, the three of us slept in the apartment, and the next morning, I called Ayman the taxi driver – let me correct myself. I called a friend of mine named Awla Mustafa, and I asked him to send me a taxi to the apartment where I was with the young men, and he sent me a taxi driver named Ayman. When he arrived, at 10:00 a.m., the two young men got into the taxi. I asked them to call me the moment they got to Ramallah. According to the plan, I would then call Nasser Awis and he would arrange to send the people who were supposed to supply the explosive belts to them. I forgot to mention that I gave them a hand grenade, which I had received from Nasser Awis for them to use. The intention was to throw the grenade before blowing up the explosive belts. The two young men did not reach Ramallah; they were arrested on the way. As soon as the two young men got into the taxi, I informed Nasser Awis."

<u>Count No. 7:</u>

During the al-Aqsa intifada, on an unknown date, a terrorist whose identity is not known was arrested on his way to perpetrating a suicide attack in Jerusalem. The man was armed, with a view to intentionally causing the death of many civilians. While he was on his way to the scene of a terrorist attack, near Beit Hanina, that terrorist was arrested by policemen and shot to death.

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Titi for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], the terrorist was recruited and supplied with weapons.

34

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

The admission by the Defendant is as follows:

P/6: "Q. Do you know a man named Luay Odeh?

A. Yes, I met him at the al-Najah University, and he belonged to the Popular Front, and I recruited him into the *Kitaab Shuhadaa al-Aqsa* about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attacks [*mustashahids*] into Jerusalem. I also asked Luay to teach us how to manufacture explosives that were stronger than the explosives we were using, and Luay explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already knew how to produce *umm al-abd*... About a month and a half ago, I asked Luay to check out a way of bringing a suicide bomber into Jerusalem, and he said that he would check it out. According to the plan, Mahmoud Titi was the one who located a suicide attacker, and my role was to coordinate between Mahmoud and Luay, in order to bring the suicide attacker into Jerusalem. That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack, and he was killed at the entrance to Jerusalem from the direction of Ramallah, and I do not know the suicide attacker's name."

The "item":

No direct and separate "item" was found for the admission on this count.

However, the facts which have been proven – the fact that the Defendant was a leader in a Terrorist Organization, with the purpose of perpetrating acts of violence which were intended to cause the death and injury of persons, and the fact that the Defendant had a clear motive for carrying out such acts and had an opportunity to carry them out, and even accomplished many of them, as has been proven in each of the other counts –substantiate a conclusion that the cumulative "items" which were found for each of the admissions of the other counts may be considered as the "item" required for this count. It is necessary to consider the circumstances of the matter, and, for that purpose, the series of offenses in which the Defendant was involved, as a single unit.

### Count No. 8:

According to an argument that was set forth by the State in Count No. 8:

"A. On an unspecified date after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, in the vicinity of Joseph's Tomb in Nablus.

On unknown dates during the subsequent period of time, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks directed against an IDF position which was located in the vicinity of Joseph's Tomb.

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

B. Shortly before the month of May 2001, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, on Mt. Gerizim, and against additional IDF positions in adjacent areas.

For the purpose of promoting the objectives of the conspiracy, the Defendant supplied the additional activists who had joined the conspiracy with M-16 rifles.

During the month of May 2001, on a number of occasions, on unknown dates, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks.

The shooting attacks were perpetrated by the Defendant and the additional activists, armed with M-16 rifles, against the military position on Mt. Gerizim, against the Ein Beit camp and against army patrols which were patrolling in the area of the Balata camp, as well as against military targets in the area of the Hawara camp.

C. On an unknown date, after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of terrorist attacks against Israeli citizens and IDF soldiers.

Within the framework of the conspiracy and for the purpose of promotion thereof, the Defendant supplied weapons to the activists in the Terrorist Organization for the purpose of carrying out the terrorist attacks.

The activists in the Terrorist Organization, who joined forces in order to carry out the conspiracy, made use of weapons which were supplied to them by the Defendant, in the terrorist attacks set forth below:

1. The shooting attack on the settlement of Homesh.

2. Placing an explosive charge on the Zuata-Asira bypass road.

3. A shooting attack with an M-16 rifle against a military patrol in Deir Sharaf.

4. Placing an explosive charge in Sara."

The State goes on to claim that, in these actions, the Defendant was unlawfully attempting to cause the death of many persons, and that these actions, *inter alia*, are in the nature of a conspiracy to commit a crime, attempted murder, and unlawfully carrying a weapon.

The admission by the Defendant is as follows:

P/5A: "2. I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus...

3. I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4. I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata ..."

"13. I supplied Abd al-Rahman Abdallah with two explosive charges plus a Kalashnikov, which he placed near Kafr Sara, Nablus.

14. I supplied Majdi Halus with an explosive charge, which he placed on the road to Dir Sharan, against an Israeli patrol."

P/6A: "Yes, he participated once, together with me, in carrying out a shooting attack directed against an Israeli military position on Mt. Gerizim..."

"Q. Which terrorist attacks did you speak about with Munir Maqadah?

"A. I spoke with him about many terrorist attacks, and I remember that I spoke with him about a shooting attack which I had carried out along with Muayad Jamil and Mahmoud al-Titi and Qahid Abu Mustafa near the Hawara refugee camp, directed against a military vehicle. I also spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in those terrorist attacks along with Muayad Jamil and Muhammad Yadak and Mahmoud al-Titi and Ahmad Abu Khadr..."

36

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

"Q. Do you remember all of the terrorist attacks in which you participated directly?

A. I remember: 1. A shooting attack directed against a military position on Mt. Gerizim. 2. A shooting attack directed *against a military vehicle in the vicinity of the Hawara camp. 3. A shooting attack directed at members of the armed forces at* Joseph's Tomb. 4. A terrorist attack at Dir Sharan. 5. A shooting attack directed at military vehicles... 7. A shooting attack directed at vehicles.

Q. Can you give details about the shooting attack directed against the military position on Mt. Gerizim?

A. Yes, about seven months ago, I participated, together with Majed al-Masri and Yasir al-Bami, in shooting about three times at a military position on Mt. Gerizim..."

"Q. Do you have any additional details about the shooting attack directed against a military vehicle in the area of the Hawara camp?

A. About six months ago, I participated, together with Yasir al-Badu, in a shooting attack directed at a jeep in the Hawara camp, and each of us fired about half a clip of bullets, and the soldiers fired back at us.

Q. Can you give details about the shooting attack directed against a car, which you mentioned above?

A. Yes, I participated, together with Yasir al-Badu and Muayad Jamil and Qaid Abu Mustafa, in a shooting attack, and we shot at a tank in the area of Hawara (the camp). We were shooting from Kafr Kalil. That day, the attack was carried out at about 4:00 p.m., and each of us fired a clip of bullets at the tank."

"... And I took two old [anti-]tank missiles from Abu Sharar in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata-Asira against military vehicles.

Q. How many charges did you make out of the missiles which Abu Sharar gave you, and how did you use them?

A. After I took the missiles from Abu Sharar, I gave them to Mahmoud Titi from the Balata camp, and Mahmoud made a charge out of them, and he was the one who placed the charge on the bypass road.

Q. Do you remember when he placed the charge and whether people were hurt when the charge exploded?

A. The charge was placed sometime during the al-Aqsa intifada; I do not remember a date, and according to the information which I received, the army blew up the charge before it exploded."

"I sent Mahdi Marqa to transport Muhammad Qassem and Muayad Jamil and Qaid Abu Mustafa, so that they could place a charge on the road, near Kafr Sara, west of Nablus. In the end, however, they did not place the charge, because it was far away. They brought the charge back and they used it in the area of Zuata against a military vehicle, and I do not know if anyone was hurt in that terrorist attack."

"Q. Did you have any contact with Majdi Halus?

A. Yes. About 10 months ago, we took a charge from them, and he placed it on the road in Dir Sharan, and he set off the charge against a military patrol."

"... And I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I gave him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir, the vehicle was not hit."

"Q. Can you explain to me about the terrorist attack in Dir Sharan which you mentioned above?

A. Yes. About eight months ago, Majdi Samir Hulus [sic] from the Balata camp, who was living in Dir Sharan, came to me and asked me for an explosive charge to carry out a terrorist attack, and I gave him a charge that weighed 15 kg which I had received from Muayad Jamil, and the detonation was with wires. According to what I know, Majdi placed the charge on the main road at Dir Sharan, and set off the charge at a military patrol, and caused damage to a jeep, and I do not know if people were hurt."

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

"A. Yes. A few months ago, Abd al-Rahman Abdallah, a resident of Sara, suggested to me, while he was studying at al-Najah University, that we carry out a terrorist attack in the area of Sara, and he [sic] agreed to this. I gave him two explosive charges and a Kalashnikov, and when I gave him the charges and the weapon, there was a person with him, named Lutfi Abdallah, a resident of Sara, and they set off the charges at a tank in the area of Hawara, and one charge exploded, and after that, they fired at the tank, and after the terrorist attack, they gave me back the weapon."

P/8: "… And another man from Dir Sharan asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received from Muayad Jamil Sansur, and according to the information in my possession, Majdi carried out the terrorist attack against a military patrol in the area of Dir Sharan."

"A. Yes. About five months ago, Muayad Jamil introduced me to a man named Iyad who knew how to make explosives and charges, and I took five charges from him, and Mahmoud Titi and Muayad Jamil placed the charges near Zuata, and once Muayad and I went out to place a charge. The soldiers identified us, and we ran away, and Qaid Abu Mustafa was with us, and we left the charge behind when we ran away."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/12:

"A. I confess that, during the month of May in the year 2001, I went out with all those persons to carry out a shooting attack directed against a military position which is located on Mt. Gerizim. On that day, Nasser Awis gave me an M-16 weapon, and we all set out for the position. We took up a position in the Dahiya area, in Nablus, from where we fired on the [illegible, probably "military"] position, toward Mt. Gerizim. I personally fired [illegible, probably "about 20"] bullets, and each of the other people fired the weapon in his possession, at the position. This was about 10:00 p.m. And then the army started firing at us, and we fled the scene.

Q. Did you participate in additional shooting attacks against that military position or against other positions?

A. I confess that I participated, about six more times, in shooting attacks directed against that position on Mt. Gerizim, with the same people. In addition, I participated, about four times, in shooting attacks directed against an IDF position which is located in Jabal Shamali, above the Ein Beit Alma camp. Also, of course, I participated in shooting attacks directed against army patrols which were patrolling in the area of the Balata camp. All those times, I fired the M-16 that Nasser Awis had given me."

P/13:

"… And on that day, Amar told me that he intended to carry out a terrorist attack, and accordingly, he asked me to get hold of two explosive charges for him, for the benefit of the terrorist attack. I told Amar that I know [sic] how to manufacture explosive charges, and therefore I took him to Nasser Awis, in the Balata camp, and I asked Nasser to obtain two charges for me. Then Nasser called Mahmoud Titi and asked him for two charges, and an hour later, Mahmoud Titi came and brought two charges with him, made out of a pipe 30 cm long and 40 cm wide [sic]. Each charge was closed on both sides, and there were white electric [wires] coming out of one side. After that, Amar received the charges, and each of us went home, and three days later, I heard from Amar that a terrorist attack had been carried out against a military jeep in Silat al-Dakr, during the night, and they had set off the charges against the jeep, but nothing had happened to it."

38

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

P/18:

"<u>A</u>. In my second testimony, I confessed that I – together with my friends, Fadi Abu Ali and Yasir Rakhal – we carried out two shooting attacks against the settlement of Homesh, and this... is all true, that the three of us perpetrated shooting attacks, on four or five occasions, against the settlement of Homesh. The fire was directed against the watchtower, at the edge of Homesh, from the direction of Silat al-Dalha, and against the houses in the settlement. This took place in the course of the first three months, at the beginning of the al-Aqsa intifada. In all of those cases, we would arrive in the late hours of the night, after 10:00 p.m., and I remember that, in all of those cases, the soldiers fired back from the watchtower. I confess that I was the one who supplied them with weapons in all of the attacks mentioned above. I fired an M-16, and I gave Fadi a Kalashnikov, and I gave Yasir a Gluck. I would take those weapons from Nasser Awis, before going out on each of the terrorist attacks.

<u>Q</u>: From what distance did you fire at the settlement of Homesh?

<u>A</u>. From about 1 km away.

<u>Q</u>. Which other shooting attacks did you participate in?

<u>A</u>. Approximately in the beginning of 2001, Fadi Abu Ali and Yasir Rakhal and I fired on a security jeep in the settlement of Homesh, from about 500 meters away. This was during the late hours of the night, after 10:00 p.m. I fired an M-16, Fadi fired a Kalashnikov, and Yasir fired a Carlo – the same weapons which we had used in the previous shooting attack against Homesh, the same weapons which I had taken from Nasser Awis. After he fired, the soldiers fired back, and we fled the scene... <u>A</u>. He and I did not do anything except what I have already mentioned, but I would like to state that Hakim Jizari asked me for a weapon, three months ago, and claimed that he wanted to carry out shooting attacks against IDF soldiers. I agreed to his request and I gave him a Kalashnikov which I had taken from NasserAwis, and a week later, Hakim gave me back the weapon, and I do not know if he used it."

Witness No. 25 for the prosecution, Yasir Abu Bakr, P/47B:

"Mahmoud Fares, about 25 years old, a resident of Nablus, and Asad Ismail, about 27 years old, a resident of Beit Iba – we carried out a terrorist attack involving an explosive charge and shooting, on the bypass road near Beit Iba. When we came to the entrance to Beit Iba, I called Nasser Awis, and he told me that he was sending us people and weapons for the terrorist attack. Half an hour later, Mahmoud Titi and Ahmad Abu Khadr came to the scene. They arrived in a white car. Each of them had an M-16 rifle, and in addition, there was a 250 machine gun in the car, as well as an explosive charge within a fire extinguisher [*affaya*]. At about 11:30 p.m., we all went out in the white car to carry out the terrorist attack on the bypass road near Beit Iba. Asad Ismail and Ahad Mahmoud Fares placed the explosive charge on the road and connected a wire to the explosive charge. This was a charge which was activated by wires and a battery. As soon as they had connected the wires, suddenly IDF soldiers who were staked out there opened fire on them. Ahad was killed and Asad was wounded in the leg. Mahmoud Titi and Muhammad [sic] Abu Khadr fired at the IDF soldiers. After that, Mahmoud Titi and Muhammad [sic] Abu Khadr and I fled the scene."

Witness. 21 for the prosecution, Muhammad Yadak, P/40A:

"<u>A</u>. In the beginning of the al-Aqsa intifada, [illegible, probably "I participated" or "they participated"] in stone-throwing activity directed at Joseph's Tomb in Nablus, and at the [illegible, probably "military"] forces in Nablus. In June [20]02, Mahmoud Titi contacted me and said that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and Mahmoud said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed to this and, within the framework of the military squad, I participated in 10 shooting attacks directed against the army in the Nablus area. Participating in the shooting attacks along with me were (1) Mahmoud Titi, (2) Ahmad Abu Khadr, (3) Nasser Awis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus...

<u>Q</u>. Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

<u>A</u>. Nasser Awis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons.

39

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

[Q.] Which Israeli military positions did you shoot at?

A. We carried out shooting attacks directed against a military position on Mt. Altana. We also fired at the settlement of Elon Moreh, and we also fired at the Saqen roadblock near Hawara...

The second terrorist attack, in August 2001: Nasser Awis contacted me [and] Mahmoud Titi and told us that young men from the Tanzim wanted to place an explosive charge on the bypass road in the area of Beit Ira, and he asked me and Mahmoud Titi to participate in the terrorist attack and to place the charge along with the young men... The tenth terrorist attack was a shooting attack directed against the funeral... The funeral [procession] went from Hawara to Yitzhar, and when they got to the entry to the Hawara camp, Nasser Awis and Yasir al-Kadawi and Mahmoud Titi and I fired at the participants in the funeral. The army fired back, and Nasser and Mahmoud and Yasir and I fled the scene and headed toward the camp..."

The facts contained in the charges were proven.

### The offenses of murder, attempted murder, causing severe bodily harm and attempt to cause severe bodily harm

The State describes to the Defendant offenses of murder with malice aforethought in the first five counts; offenses of attempted murder in all of the accounts; offenses of causing bodily harm with aggravated intent in the first five counts; the offenses of attempt to cause severe bodily harm in Counts No. 6 and No. 7.

With regard to these offenses, a question arises as to the status of the Defendant.

Section 29 (a) of the Penal Code, 5737 – 1977, tells us that a person who perpetrates an offense together with or through another person shall also be considered as the perpetrator of the offense.

It has been proven to us that the Defendant's mental attitude to these offenses is beyond all doubt. The Defendant wanted and desired to achieve the results of the criminal actions, with every fiber of his being, and was the motivating force in the implementation of a joint plan, carried out together, to intentionally cause the death and injury of his victims, as has been proven.

There cannot be even the slightest doubt that he is the perpetrator of the offenses (see Criminal Appeal 4389/93, Mordechai Vabudi v. the State of Israel, PD 50 (3) 239 and the rulings mentioned there; see also Criminal Appeal 2796/95, John Doe v. the State of Israel, PD 51 (3) 388).

The factual infrastructure which has been revealed to us attests to the fact that the acts of murder were carried out, from beginning to end, with malicious intent, based on the decision and the purpose of causing death, founded on cold blooded thought, controlled behavior and settled mind, and following precise and scrupulous preparation.

We do not have even the slightest doubt that the fundamental elements for the offenses of murder with malice aforethought have been fulfilled, the offenses have been proven, and – as set forth above – the Defendant carried them out.

Obviously, the fundamental elements for the offenses of attempted murder have also been properly proven.

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

The Defendant's plan of intentionally causing the death of many civilians, and the implementation of that plan as described above, as it has been proven, substantiates the fundamental elements of the less severe offenses of causing bodily harm with aggravated intent and attempt to cause bodily harm with aggravated intent. These offenses as well have been properly proven.

Unlawfully carrying a weapon

The State also ascribes to the Defendant offenses of unlawfully carrying a weapon, in Counts No. 2, 3 and 8.

It has been proven that the Defendant carried, without a permit under any law, M-16 rifles, ammunition and hand grenades, which are in the nature of "weapons," as this term is defined in Section 144 (c) of the Penal Code, 5737 – 1977. The Defendant has confessed to this, as set forth above, and has also confessed that he used the weapons. It is enough for us to mention that which has been set forth in his statements, as follows:

"I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem... I supplied Abd al-Salaam Hasuna with weapons for the perpetration of a suicide attack within Hadera." (See P/5)

See also the Defendant's confession to the shooting attacks described in detail in Count No. 3, as set forth above.

Because the terrorists Said Ramadan and Abd al Salaam made use of the weapons inside Israel, as has been proven above, and because the fact of Count No. 8 have also been proven, it appears that the fundamental elements of the offenses of possession of weapons have also been proven as required.

Nevo Publishing Ltd.     nevo.co.il     The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Awis

## Summary

Having found that the State has proven all of the actions ascribed to the Defendant in the indictment, according to the *burden of proof incumbent upon it to do so beyond all reasonable doubt, we hereby convict the Defendant of the following* offenses:

Membership and activity in a terrorist organization, in contravention of Sections 2 and 3 of the Ordinance for the Prevention of Terrorism, 5708 – 1948.

Conspiracy to commit a crime, in contravention of Section 499 of the Penal Code, 5737 – 1977.

Premeditated murder, in contravention of Section 300 (a) (2) of the Penal Code, 5737 – 1977.

Attempted murder, an offense in contravention of Section 305 (1) of the Penal Code, 5737 – 1977.

Causing bodily harm with aggravated intent, in contravention of Section 329 (1) of the Penal Code, 5737 – 1977.

Attempt to cause severe bodily harm, an offense in contravention of Sections 329 (1) and 25 of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon, an offense in contravention of Section 144 of the Penal Code, 5737 – 1977.

O. Solomon-Cherniak
Judge

### Judge S. Timan, Presiding Judge, and Judge N. Achituv:

We have read the detailed and well-founded opinion by our colleague, the Honorable Judge Cherniak, and we concur with the conclusion that has been reached by her.

| S. Timan | N. Achituv |
|---|---|
| Presiding Judge | Judge |

It has accordingly been decided to convict the Defendant of all of the offenses ascribed to him in the indictment, as set forth in the opinion by the Honorable Judge Cherniak.

S. Timan, Presiding Judge   N. Achituv, Judge   O. Cherniak, Judge

42