# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
LESLYE KNOX et al.,                    :    03 Civ. 4466
                                       :
                                       :
                          Plaintiffs,  :    **DECISION & ORDER**
                                       :
      - against -                      :
                                       :
THE PALESTINE LIBERATION               :
ORGANIZATION et al.,                   :
                                       :
                          Defendants.  :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs, the representative and heirs and survivors of the Estate of Aharon Ellis ("Ellis") (collectively, "Plaintiffs") commenced this action asserting claims arising under the Antiterrorism Act of 1990, 18 U.S.C. § 2331 et seq. (the "ATA"), and other related common law tort causes of action. Plaintiffs allege that Ellis was murdered in a terrorist attack that occurred in Israel in January 2002 and that the shooting was planned and carried out by Abdel Salam Sadek Hassuna ("Hassuna") acting in concert with and under the direction and assistance of the Palestinian Liberation Organization ("PLO") and the Palestinian Authority ("PA") (collectively, "Defendants").[1]

Defendants moved to dismiss the action, asserting that (1) Defendants were entitled to sovereign immunity, (2) the

---

[1] In addition to Defendants, Plaintiffs also originally named individual defendants who have since been terminated from the proceedings, namely Yasser Arafat ("Arafat"), Marwan Barghouti, Nasser Awis ("Awis"), and the estate of Hassuna.

claims raised non-justiciable political questions, and (3) Defendants were not subject to the personal jurisdiction of this Court. The Court rejected Defendants' immunity and non-justiciable defenses but deferred ruling on the personal jurisdiction defense, granting Plaintiffs' request to engage in jurisdictional discovery and referring the parties' discovery disputes to Magistrate Judge Theodore H. Katz. See Knox v. Palestine Liberation Org., 306 F. Supp. 2d 424, 426 & n.1, 449 (S.D.N.Y. 2004) ("Knox I"). After Defendants failed to file an answer and comply with discovery orders, the Court, by an order dated September 7, 2005, directed the Clerk of Court to enter a default judgment against Defendants, which was entered on September 20, 2005 (the "Default Judgment"), and the matter was referred to Magistrate Judge Katz for an inquest on damages. See Knox v. Palestine Liberation Org., 230 F.R.D. 383 (S.D.N.Y. 2005). After a damages hearing, Magistrate Judge Katz submitted a Report and Recommendation (the "Report") to this Court, concluding that Plaintiffs' damages totaled $192,740,660.13. The Court, by order dated July 11, 2006, adopted the Report in full, and the Clerk of Court entered judgment against Defendants on August 1, 2006 in the amount of $192,740,660.13.

Defendants timely appealed the judgement, and on February 26, 2007, the Second Circuit dismissed the appeal for failure

to prosecute. Before the Court is Defendants' motion pursuant to Federal Rule of Civil Procedure 60(b)(6) ("Rule 60(b)(6)") for relief from the judgment entered on August 1, 2006. For the reasons discussed below, Defendants' motion is GRANTED.

## I. <u>BACKGROUND</u>[2]

A.  <u>THE DEATH OF ELLIS</u>

On the night of January 17, 2002, Ellis, an American citizen then 31 years old, was performing as a singer before approximately 180 relatives and guests celebrating the Bat Mitzvah of twelve-year-old Nina Kardoshova ("Kardoshova") at the David's Palace banquet hall in Hadera, Israel. At approximately 10:45 p.m., random violence struck. While Kardoshova, her family and guests were dancing, Hassuna arrived at the banquet hall, burst through the door and, using a machine gun, opened fire into the crowd of celebrants (the "Attack"), killing six people, including Ellis, and wounding more than thirty others.

---

[2] The factual summary presented herein derives primarily from the following documents: the Complaint, filed June 19, 2003 ("Complaint"); Memorandum in Support of Defendants' Motion for Relief From Judgment, dated July 31, 2007 ("Defts.' Mem."); Plaintiffs' Memorandum in Opposition to Defendants' Motion for Relief From Judgment, dated October 2, 2007 ("Pls.' Mem."); Defendants' Reply to Plaintiffs' Memorandum in Opposition, dated November 15, 2007 ("Defts.' Reply"); and Defendants' Supplemental Memorandum Regarding Recent Developments Related to Their Motion For Relief From Default Judgment, dated January 10, 2008. Except where specifically referenced, no further citation to these sources will be made. Additional background information is discussed in <u>Knox I</u>, familiarity with which is presumed.

Plaintiffs claimed that Hassuna and the other individually named and unnamed defendants in the Complaint were employees, agents and/or co-conspirators of Defendants and, as such, planned and carried out the Attack acting in concert with or under instructions or inducements or with the assistance or material support and resources provided by Defendants.

B.   DEFENDANTS' CHANGING POLITICAL DYNAMICS AND THEIR ASSERTED IMPACT ON DEFENDANTS' LEGAL STRATEGY

After Knox I, the Court, by order dated July 15, 2005 ("July 15, 2005 Order"), ordered Defendants to answer the Complaint by no later than August 15, 2005. In response to the July 15, 2005 Order, Defendants' prior counsel submitted a letter to the court dated August 15, 2005 ("August 15, 2005 Letter"), stating that "[c]onsistent with [Defendants'] position in several cases pending in the U.S. courts" Defendants submit that the "U.S. courts have no jurisdiction over them" and have instructed counsel "not to answer on the merits." (Letter from Ramsey Clark, Esq. to Honorable Victor Marrero, United States District Judge, attached as Ex. B to Pls.' Mem.)

Defendants assert that subsequent to their August 15, 2005 Letter, they have undergone significant changes in political leadership, and as a result, they have adjusted their legal strategies and are now committed to defending

-4-

cases brought against them in United States courts in a good faith and in a timely manner. As the Palestinian government experienced significant political changes with the election of Hamas, Mahmoud Abbas, President of the PA ("President Abbas"), submitted a letter dated November 28, 2006 to Condoleezza Rice, United States Secretary of State ("Secretary Rice"), requesting guidance with respect to the ongoing ATA litigation. Secretary Rice responded to President Abbas's inquiries by a letter dated January 12, 2007 ("January 12, 2007 Letter"), encouraging Defendants to "respond to U.S. legal proceedings in a good faith and a timely manner." (Letter from Secretary Rice to President Abbas, attached as Ex. 1 to Defts.' Mem.) Defendants assert that after receipt of the January 12, 2007 Letter, President Abbas and Salam Fayyad, who was then the PA's Minister of Finance and is now the PA's Prime Minister, acted immediately on Secretary Rice's request by discharging predecessor legal counsel, retaining new counsel, and modifying their previously-held legal strategies by committing to good faith and timely defenses to the ATA claims brought against them in United States courts, including the instant action. Defendants' counsel asserts that Defendants have given them a clear directive to participate fully and in good faith in the litigation process, including cooperative and complete compliance with lawful

discovery.

## II. DISCUSSION

Although vacating a default judgment is within the sound discretion of district courts, the Second Circuit has expressed a "strong preference for resolving disputes on the merits" because default judgments are "the most severe sanction which [courts] may apply." New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005) (citations and quotation marks omitted). "[I]n ruling on a motion to vacate a default judgment, all doubts must be resolved in favor of the party seeking relief from the judgment in order to ensure that to the extent possible, disputes are resolved on their merits." Id. (citation omitted). The moving party has the burden of proof to demonstrate that such exceptional circumstances exist warranting relief from judgment. See United States v. International Bhd. of Teamsters, 247 F.3d 370, 391 (2d Cir. 2001).

A.    FEDERAL RULE OF CIVIL PROCEDURE 60(B)

Federal Rule of Civil Procedure 60(b) ("Rule 60(b)") enumerates the reasons for which a court may relieve a party from a final judgment. See Fed. R. Civ. P. 60(b). Rule 60(b) provides an equitable remedy that "preserves a balance between serving the ends of justice and ensuring that litigation reaches an end within a finite period of time." Paddington

-6-

<u>Partners v. Bouchard</u>, 34 F.3d 1132, 1144 (2d Cir. 1994) (citation and quotation marks omitted). As an equitable remedy, Rule 60(b) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular case." <u>Matarese v. LeFevre</u>, 801 F.2d 98, 106 (2d Cir. 1986) (citations and quotation marks omitted).

Defendants bring the instant motion under Rule 60(b)(6), which provides that a court may relieve a party from a final judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Courts have granted relief under Rule 60(b)(6) "where there are extraordinary circumstances or where the judgment may work an extreme and undue hardship." <u>DeWeerth v. Baldinger</u>, 38 F.3d 1266, 1272 (2d Cir. 1994) (citation and quotation marks omitted). When determining whether Rule 60(b)(6) relief is appropriate, courts are primarily guided by three factors: (1) whether the default was willful; (2) whether the defendant demonstrates the existence of a meritorious defense; and (3) whether, and to what extent, vacating the default judgment will cause the non-defaulting party prejudice (collectively, the "Factors"). <u>See</u> <u>New York</u>, 420 F.3d at 108 & n.3. In addition to the Factors, courts may also take other exceptional circumstances

-7-

warranting relief into account.  See id.

    1.   Willfulness

        a.   Default at Trial

A court's determination that a defendant willfully defaulted may be sufficient to deny defendant relief under Rule 60(b).  See Compania Interamericana Export-Import, S.A. v. Companie Dominicana De Aviacion, 88 F.3d 948, 951-52 (11th Cir. 1996) (affirming the denial of a motion to set aside an order of default under Federal Rule of Civil Procedure 55(c) because "if a party willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, the court need make no other findings in denying relief"); cf. United States v. Bank of New York, 14 F.3d 756, 759 (2d Cir. 1994) (finding Rule 60(b) relief is not available to a party who made deliberate, strategic choice to settle merely because that party's assessment of the consequences was incorrect).  Although a determination that Defendants willfully defaulted may be sufficient to deny their Rule 60(b)(6) motion, such willfulness does not necessarily require denial.  See Wagstaff-El v. Carlton Press Co., 913 F.2d 56, 57 (2d Cir. 1990) (affirming vacatur of default judgment despite determination that default was willful because defendant established meritorious defenses and that plaintiff would not be prejudiced); Kumar v. Ford, 111 F.R.D. 34, 40 (S.D.N.Y.

1986) (vacating default judgment, notwithstanding defendant's willful failure to answer the complaint because he demonstrated meritorious defenses and lack of prejudice to plaintiff); Tecnart Industria E Comercio Ltda. v. Nova Fasteners Co., 107 F.R.D. 283, 285 (E.D.N.Y. 1985) (vacating default judgment despite a finding of willfulness).

Defendants assert that their default was not willful because, at the time of default, they reasonably believed that United States courts lacked jurisdiction over them and the events underlying Plaintiffs' ATA claim. The Court is not persuaded, however, that Defendants' belief was reasonable. Defendants are not a foreign state, see Knox I at 434, but even if they were, a foreign state's belief that it was immune from United States jurisdiction would be considered "reasonable" under Rule 60(b) only "until [the defaulting foreign state] has received a definitive indication to the contrary from the United States courts." Gregorian v. Izvestia, 871 F.2d 1515, 1525 (9th Cir. 1989).

Prior to the August 15, 2005 Letter expressly conveying Defendants' intent to default, United States courts had issued multiple determinations extending jurisdiction over both Defendants and their actions within the Israeli-Palestinian conflict. See, e.g., Knox I; Ungar v. Palestinian Auth., 315 F. Supp. 2d 164 (D.R.I. 2004), aff'd, 402 F.3d 274 (1st Cir.

-9-

2005). The Court concludes that, at the time of Defendants'
default in the instant case, their belief of immunity from the
jurisdiction of United States courts was not reasonable.
Despite Defendants' willful default, however, the Court may
nonetheless grant Defendants relief under Rule 60(b).

> b.   Abandoned Appeal

In Knox I, the Court denied Defendants' motion to
dismiss, finding that the Court had proper subject matter
jurisdiction over Plaintiffs' claims. See Knox I, 306 F.
Supp. 2d at 449. After Defendants subsequently defaulted and
an inquest on damages was held, the Default Judgment was
entered against Defendants. Defendants then filed a timely
appeal, which they ultimately abandoned.

Plaintiffs assert that because Defendants abandoned their
appeal, they are foreclosed from relying on Rule 60(b) as a
substitute for the appeal. See, e.g., United States v.
Borchers, 163 F.2d 347, 350 (2d Cir. 1947) ("Motions to open
and vacate do not lie as a substitute for a deliberately
abandoned appeal."); Nemaizer v. Baker, 793 F.2d 58, 61 (2d
Cir. 1986) (Rule 60(b) "may not be used as a substitute for a
timely appeal"); see also GenCorp, Inc. v. Olin Corp., 477
F.3d 368, 373 (6th Cir. 2007) (finding that arguments that
were, or should have been, presented on appeal are not
reviewable pursuant to a Rule 60(b) motion). Plaintiffs

-10-

assert that Defendants cannot be relieved from the Default Judgment because all of the arguments Defendants made in the instant motion could have been raised in their abandoned appeal. The Court is not persuaded.

Rule 60(b) is the appropriate procedural vehicle for vacating the Default Judgment. Direct appeals involve a review of the underlying judgment for error. See Standard Oil Co. v. United States, 429 U.S. 17, 18-19 (1976); Massaro v. United States, 538 U.S. 500 (2003). Had Defendants faithfully prosecuted their appeal, they would have been limited to making factual and legal arguments related to the appellate record. To the extent that the exceptional circumstances that Defendants are asserting in support of their Rule 60(b) motion were not a part of the appellate record, those circumstances could not have been a part of, or relevant to, any appeal. Further, the Federal Rules of Civil Procedure expressly provide for vacating default judgments using Rule 60(b). See Burda Media, Inc. v. Viertel, 417 F.3d 292, 298 (2d Cir. 2005) (finding that Federal Rule of Civil Procedure 55(c) "provid[es] that default judgments may be set aside in accordance with Rule 60(b)"). Accordingly, Defendants' decision to abandon their appeal of the Default Judgment does not foreclose relief pursuant to Rule 60(b).

2.   <u>Meritorious Defenses</u>

-11-

To establish meritorious defenses in support of Rule 60(b) motions, Defendants need not prove that they will ultimately prevail in order to receive vacatur, but rather, Defendants "must present evidence of facts that, if proven at trial, would constitute a complete defense." <u>State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada</u>, 374 F.3d 158, 167-69 (2d Cir. 2004) (citation and quotation marks omitted). Because default judgments "are generally disfavored," the meritorious defense factor "should be construed generously." <u>Id.</u> at 167-68 (citation and quotation marks omitted).

    a.   <u>Defense on Personal Jurisdiction Grounds</u>

Defendants assert, as a defense to Plaintiffs' claims, that they lack sufficient minimum contacts with the forum and that the Court's exercise of personal jurisdiction does not comport with traditional notions of fair play and substantial justice. However, prior to the entries of default and Default Judgment, the Court concluded that it had proper personal jurisdiction over Defendants. <u>See Knox v. Palestine Liberation Org.</u>, 229 F.R.D. 65, 68-70 (S.D.N.Y. 2005). Accordingly, Defendants are foreclosed from further challenging the Court's exercise of personal jurisdiction.

    b.   <u>Defense Based on Objection to Forum</u>

Defendants assert, as a defense to Plaintiffs' claims, that Israel, not the United States, is the more appropriate

-12-

forum.  Courts may dismiss actions pursuant to the ATA if: (1) the "action may be maintained in a foreign court that has jurisdiction over the subject matter and all the defendants;" (2) that foreign court is "significantly more convenient and appropriate;" and (3) that foreign court offers a remedy "which is substantially the same as the one available in the courts of the United States."  18 U.S.C. § 2334(d) ("§ 2334(d)"); see also State St. Bank and Trust Co. v. Inversiones Errazuriz, Limitada, 230 F. Supp. 2d 313, 319 (S.D.N.Y. 2002) ("The plaintiff's choice of forum should rarely be disturbed.") (citations and quotation marks omitted).  The Court is not persuaded.  Even assuming that Defendants could establish the other factors, they cannot demonstrate that litigating in Israeli courts will be significantly more convenient and appropriate.  A majority of Plaintiffs — including Aharon Ellis's widow, Leslye Knox, and her six children — were forced to relocate to the United States after the Attack.  To litigate effectively in Israel would impose greater personal and financial hardship on the individual Plaintiffs than on the institutional Defendants. Accordingly, Defendants' § 2334(d) defense is not a meritorious defense pursuant to Rule 60(b), and any relief from the Default Judgment will be conditioned upon Defendants' stipulating that the Southern District of New York is the

-13-

appropriate forum for the instant action.

      c.   <u>Defense on the Merits</u>

Defendants assert, as a defense on the merits of Plaintiffs' aiding and abetting theory of liability,[3] that Plaintiffs cannot demonstrate the Defendants <u>knowingly</u> and <u>intentionally</u> aided and abetted those who committed the terrorist act. See <u>Boim v. Quranic Literacy Inst.</u>, 291 F.3d 1000, 1021 (7th Cir. 2002) (stating that, through the ATA, Congress intended to impose liability on those who knowingly and intentionally aided and abetted terrorists). At a trial, Plaintiffs would have to prove by a preponderance of the evidence that Defendants met the scienter requirements.

Plaintiffs, relying on Israeli police reports and court documents related to the investigation and prosecution of the Attack,[4] assert that Defendants knowingly and intentionally aided and abetted the Attack. Plaintiffs assert that Awis, who was serving as a Captain in the PA security services and as the leader of an armed unit of the PLO at the time of the Attack, initiated, planned, and carried out the Attack. Plaintiffs claim that senior PA and PLO officials, based on

---

[3] Defendants asserted, and Plaintiffs did not dispute, that aiding and abetting has been the only theory of liability relied on by Plaintiffs.

[4] Plaintiffs, for the purposes of opposing Defendants' Rule 60(b) motion, rely on the Declaration of Dr. Leonard M. Hammer, attached as Ex. A to Pls.' Mem., for the factual background related to their assertion that Defendants aided and abetted the Attack.

-14-

political needs of the PA, actively planned and executed terrorist operations similar to the Attack, including ordering Awis to carry out terrorist attacks and funding those attacks, with some payments personally approved by Arafat. Plaintiffs assert that Ahmed Khader ("Khader"), who was serving as an officer in the PA security services at the time of the Attack, had often assisted Awis in planning and executing terrorist attacks.

Plaintiffs further assert that Hassuna, who was a PA security officer at the time of the Attack, informed Khader that he was willing to execute a terrorist attack in Israel. Plaintiffs claim that Khader relayed this information to Awis, who provided Khader with the weapons used in the Attack and directed Khader to train Hassuna. Plaintiffs assert that after Hassuna completed training, Mahmoud al-Titi ("al-Titi"), another PA security officer, assisted Hassuna's infiltration into Hadera, Israel, where Hassuna executed the Attack.

Plaintiffs assert that Israeli courts convicted Awis and Khader as accomplices in the Attack. Plaintiffs conclude that the chain of events clearly establishes that Defendants knowingly and intentionally aided and abetted Awis, Khader, and Hassuna, facilitating the Attack.

Defendants assert that they did not knowingly and intentionally aid and abet the Attack, but rather, Awis,

Khader, al-Titi, and Hassuna were operating as rogue individuals, not under the direction and/or guidance of Defendants. Defendants assert that the circumstances surrounding Awis and Khader's interrogations diminish the reliability of any statements made by Awis and Khader to Israeli police, including any statements made implicating Defendants in the Attack. More specifically, Defendants allege that the interrogations took place during the same week that Israeli defense forces had the entire West Bank under siege and Arafat confined to his office building, and that under these circumstances, the Israeli police officials were politically motivated to tie Arafat to anti-Israeli violence. Further, Defendants assert that Awis and Khader's interrogations were unduly coercive, including 16-hour overnight sessions, that created what Awis later described as a willingness to tell interrogators what he thought they wanted to hear.

Defendants also assert that, during their respective interrogations, both Awis and Khader expressly disclaimed any involvement by Defendants in the Attack, and that both men stated that they were "wanted" by the PA and subject to arrest. Defendants allege that during Khader's interrogation, Khader admitted that the PA had suspended his salary for the previous five months, and that at Awis's interrogation, Awis

-16-

described that the PA arrested a man who had provided him with funding.

Further, Defendants dispute that Awis and Khader were part of a team of PA security officers and PLO operatives, asserting instead that Plaintiffs reached that conclusion by conflating all Palestinian groups. Defendants assert that, for example, Awis was the Commander of the Nablus and Northern Samaria area of the Tanzim-Fatah organization, as well as the Commander of al-Aqsa Martyrs' Battalions organized in that area, and not as closely tied to Defendants as Plaintiffs assert.

Defendants further assert that even if it can be established that the PA had a direct connection with Awis and Khader, the PA security forces at the time of the Attack were in a state of near collapse because of repeated bombing attacks. Defendants allege that because of the general security situation at the time of the Attack, it would have been easier for Awis and Khader to actively hide their rogue activities from PA officials and obtain the weapons used in the Attack without intentional and knowing support of Defendants.

The Court concludes that Defendants have sufficiently demonstrated evidence of facts that, if proven at a trial, would constitute a complete defense to Plaintiffs' aiding and

abetting theory of liability. Accordingly, Defendants have established the existence of a meritorious defense.

### 3. Prejudice

In determining whether a plaintiff would be prejudiced by a court granting relief under Rule 60(b), delay alone is not a sufficient basis for establishing prejudice. See Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983). "Rather, it must be shown that the delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunities for fraud and collusion." Id. (citation omitted). The burden is on the movant to show a lack of prejudice to the non-moving party, and to present evidence showing that the non-moving party would not suffer significant prejudice. See New York, 420 F.3d at 110; Mazzone v. Stamler, 157 F.R.D. 212, 214 (S.D.N.Y. 1994) (granting the plaintiff's Rule 60(b) motion to vacate the stipulated dismissal because, in addition to other circumstances, plaintiff demonstrated that defendants would not be significantly prejudiced).

Plaintiffs assert that vacatur of the judgment would cause them significant prejudice. First, Plaintiffs assert that because it has been over six years since the Attack, memories fade and documents are sometimes lost or destroyed. For example, Plaintiffs assert that Arafat, who they claim personally authorized payments to the terrorists responsible

-18-

for the Attack, has passed away and could not be deposed or produced as a witness at trial. Further, Plaintiffs assert that, as of June 2007, Defendants no longer control the Gaza Strip, and thus, Defendants cannot ensure production of any documents or witnesses located in that area. Second, Plaintiffs assert that they have expended hundreds of attorney hours and tens of thousands of dollars litigating matters stemming from the Attack only to have Defendants default and move to vacate the Default Judgment. Third, Plaintiffs assert that their testifying at the damages inquest was a traumatic and agonizing experience, which they should not be forced to repeat.

In response Defendants assert that Plaintiffs would not be prejudiced by the delay caused by their default. Defendants argue that Arafat passed away on November 11, 2004, prior to Defendants' default in September 2005, and thus, Arafat would have been unavailable to Plaintiffs even if the default had never occurred. Defendants also assert that the situation in the Gaza Strip would not significantly impact Defendants' ability to defend its actions or engage in discovery because much of the alleged activities occurred outside of the Gaza Strip, including the Attack, many of the witnesses and most of the evidence, which are not yet under the parties' control, could be obtained. Further, Defendants

-19-

assert that because of the active litigation that occurred prior to Defendants' default, it is less likely that Plaintiffs would suffer any prejudice from delay because Plaintiffs and Defendants had a duty to preserve evidence. See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.") (citations and quotation marks omitted).

Additionally, Defendants concede that, as a condition of vacating the Default Judgment, Plaintiffs should receive reasonable costs and expenses incurred as a result of the default. See Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508, 515-16 (2d Cir. 2001). Defendants further concede that, as a condition of vacating the judgment, the Ellis family should not be required to testify again about the incident, and that if Plaintiffs successfully prove liability, Defendants agree to stipulate to the admissibility of the Ellis family's prior testimony in any damages hearing.

The Court concludes that Defendants have sufficiently established that the delay caused by Defendants' default in September 2005 has not caused significant loss of evidence, created undue difficulties regarding discovery, or provided

-20-

greater opportunities for fraud and collusion.   The Court agrees with Defendants concessions, and will condition any vacatur upon Plaintiffs' receiving reasonable costs and expenses incurred as a result of Defendants' default and that Defendants must stipulate to the admissibility of the Ellis family's prior testimony in any future damages hearing.   To further minimize the potential emotional impact of these proceedings on Plaintiffs and facilitate resolution, the Court contemplates bifurcation of the trial into separate phases for liability and damages.    Accordingly, Defendants have established sufficient evidence that Plaintiffs would not be significantly prejudiced by granting Defendants relief from the judgment.

    4.   <u>Other Potential Exceptional Circumstances</u>

In addition to the Factors, courts may take into account other exceptional circumstances when determining whether to exercise its equitable authority to vacate a default judgment. <u>See</u>, <u>e.g.</u>, <u>New York</u>, 420 F.3d at 108 n.3 (determining that in addition to an insufficient demonstration of relief based on the Factors, "there [were also] no other allegations of 'exceptional circumstances' that would warrant relief under Rule 60(b)(6)").

    a.   <u>Defendants' Changing Political Dynamics</u>

Plaintiffs here charge that Defendants, essentially

-21-

pursuing a strategy to advance their political cause in the Israeli-Palestinian conflict, engaged in acts of terrorism involving planned, cold-blooded murder of innocent civilians. These are grave accusations, among the most serious that could be leveled against a governmental entity and its public officials. In the case of these Defendants, the allegations are not new; they have been made repeatedly in connection with numerous other old and recent incidents spanning many years. See, e.g., Biton v. Palestinian Interim Self-Gov't Auth., 239 F.R.D. 1, 4 (D.D.C. 2006); Ungar v. Palestinian Auth., 325 F. Supp. 2d 15 (D.R.I. 2004); Klinghoffer v. S.N.C. Achille Lauro Ed, 795 F. Supp. 112 (S.D.N.Y. 1992). But, largely by reason of the tactical, legal and political choices of the former leadership of Defendants, the extent of any direct or indirect complicity in particular acts of terrorism that could be traced back definitively to the minds, hands, funds or commands of Defendants in these cases, has yet to be established in a court of law. Similarly, another question now raised by Defendants has not been put to the test. The new leadership of Defendants, following the death of Arafat, represents that it has repudiated the legal strategy of its predecessors in these judicial proceedings, and that Defendants are now prepared to cooperate with the courts and defend these actions on the merits. Thus, the purported good

-22-

faith of Defendants, whether they truly mean what they say in
this regard, also remains to be seen. The Court regards a
resolution of these uncertainties as a pertinent consideration
in assessing how the ends of justice would best be served, and
what circumstances in their totality should be taken into
account, in deciding whether the Default Judgment should be
reopened.

        b.   Size of the Judgment

        Although not controlling, courts have considered the size
of a default judgment when determining whether to vacate under
Rule 60(b), particularly where attorneys' fees are awarded and
damages are to be trebled. See Bieganek v. Taylor, 801 F.2d
879, 881 (7th Cir. 1986) (finding the treble damages, award
of attorneys' fees, and the default judgment in excess of
$250,000 weighed in favor of vacating pursuant to Rule 60(b));
C.K.S. Eng'rs, Inc. v. White Mountain Gypsum Co., 726 F.2d
1202 (7th Cir. 1984) (recognizing that under some
circumstances the size of the default judgment might be a
legitimate factor because Rule 60(b) is essentially equitable
in nature, but that the $600,000 judgment in that case was not
significant enough to warrant vacatur). In the instant
action, the Plaintiffs' damages were trebled and they were
entitled to attorneys' fees pursuant to the ATA, 18 U.S.C. §
2333, resulting in a default judgment in excess of

                              -23-

$192,000,000.  The Court concludes that the size of the Default Judgment weighs in favor of granting Defendants equitable relief under Rule 60(b).

c.  Impact on United States Foreign Policy

Defendants assert at length that the foreign policy implications affiliated with the instant action weigh in favor of granting them relief under Rule 60(b).  More specifically, Defendants assert that refusing to vacate the judgment will cripple the Palestinian economy and destroy peace efforts, thereby threatening interests of the United States in the Middle East.  The Court is not persuaded.

Other than Defendants' conclusory statements, Defendants have not provided sufficient evidence establishing such negative foreign policy consequences.  The Court, by an order dated December 11, 2007, directed the United States (the "Government") to inform the Court whether the Government contemplated issuing a suggestion of interest as to the appropriateness of reopening the Default Judgment entered against Defendants.  The Government responded by a letter dated February 29, 2008, stating that, although the United States supports just compensation for victims of terrorism and remains concerned about the potentially significant impact that Plaintiffs' case may have on the financial and political viability of the Defendants, the United States has declined to

-24-

file a Statement of Interest concerning the Rule 60(b) issues before the Court. "[T]he Court construes the silence of the executive branch here as manifesting a view that at this time it has no compelling interest in suggesting that there are issues implicating current United States foreign policy" as to whether the Default Judgment should be vacated. Knox I, 306 F. Supp. 2d at 445-46. Accordingly, Defendants have not established sufficient evidence demonstrating that failure to grant them relief under Rule 60(b) would significantly impact United States' foreign policy.

        d.   <u>Historical and Public Interest Concerns</u>

Certain larger historical and public interest concerns merit some weight in this inquiry. Whether, as Plaintiffs contend, Arafat and other high ranking PLO and PA officials harbored terrorism and murder as official policy; whether they personally issued the orders, knew of the plans or provided financing for the acts of murder they stand charged with having committed in this action and others like it; or whether, as Defendants counter, they knew nothing about and provided no support for the independent acts of rogue agents, are all weighty matters with far-reaching implications. The answers to such questions touch upon interests beyond those of the immediate parties to this litigation that are worthy of regard in the Court's determination. First are the interests

of the people whose welfare Defendants supposedly serve as
empowered representatives.  In the interest of accountability
to Defendants' constituents, whether in fact, as Plaintiffs
claim, Defendants have masked criminal acts with official
duties and thus abused their authority, warrants more
reliable, concrete substantiation than a default judgment
provides.  Also meriting consideration are potential concerns
of members of the international community — including this
country — which have recognized Defendants as legitimate
leaders of a governmental entity.  They would be interested in
knowing whether the public institutions and officials they
have accorded their recognition and have dealt with at arms
length are what they purport to be, and that any funds they
provided Defendants to support valid public purposes in the
areas within Defendants' authority have been employed solely
for the intended use, and not, as Plaintiffs' allegations
suggest, to finance terrorism.  As it pertains to the United
States, though the Government, as noted above, declined to
interpose a Statement of Interest in this case, the Court
notes that the Government's response does express concern
about the impact that a sizable judgment in this action may
have on the financial viability of Defendants.  Finally, there
are many other persons who for various personal or
professional reasons may have some valid stake in the truth of

the historical record as regards the issues raised by Plaintiffs' allegations in this case, including the general public's right to know the facts relating to matters of great moment that may affect their own public or private interests.

Given the transcendental scope of these issues and interests, a judgment concerning such questions, involving liability assessed in hundreds of millions of dollars, ordinarily should not be decided by default. This conclusion follows all the more where, as is now the case here, the principal defaulting officials are no longer on the scene and their litigation strategies have been rejected by successors. Rather, if fair means exist, without causing undue prejudice to Plaintiffs' rights, to reach the truth and set the record straight in respect of Plaintiffs' claims, such a course would better comport with the ends of justice that reflect the greater range of relevant concerns.

If the proof at trial bears out Plaintiffs' claims, as they earnestly are convinced it can, Plaintiffs would emerge no worse off from a reopening of the Default Judgment, except for some delay entailed in obtaining an ultimate verdict — delay that they are likely to encounter in any event as long as Defendants continue to contest the Default Judgment. A judgment in Plaintiffs' favor on the merits, however, would represent a greater vindication for Plaintiffs. Depending on

-27-

the soundness of the evidence, such an outcome perhaps may provide Defendants with compelling grounds to accept the verdict or to pursue other means of resolution of the dispute that will ensure compensation for Plaintiffs' injuries sooner than may be the case under the Default Judgment.

B.    <u>CONCERNS OF SUBSEQUENT DEFAULT</u>

Defendants assert that they intend to fully and faithfully litigate Plaintiffs' claims. Plaintiffs, however, remain skeptical, asserting that Defendants have a history of defaulting and that they doubt Defendants have completely eschewed their prior legal tactics. The Court finds Plaintiffs' concerns valid and will condition any vacatur on Defendants posting sufficient security to cover the judgment amount of $192,740,660.13, including interest. The Court will also direct an expedited discovery and trial schedule that will assure a final resolution on the merits, absent extraordinary circumstances mutually specified, within nine months of the date of this Order.

"[A] number of circuits have approved conditioning the vacatur of ... default judgments on the posting of security for payment of all or part of an eventual adjudicated judgment." <u>Powerserve</u>, 239 F.3d 508 at 515 (citations omitted). The Second Circuit has held that, when it appears necessary for protecting the plaintiff's rights, district

courts may condition vacatur on the defendant agreeing to post a bond covering the amount claimed, including interest.  <u>See First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission</u>, 877 F.2d 189, 196 (2d Cir. 1989); <u>Powerserve</u>, 239 F.3d at 515; <u>Sales v. Republic of Uganda</u>, 828 F. Supp. 1032, 1048 (S.D.N.Y. 1993) (stating that granting conditional security was first raised by the Court <u>sua sponte</u> and granted security in the amount determined by the magistrate judge after an inquest on damages).  "Whether there is justification for such a condition will depend on the circumstances of the case, and it is incumbent on the district court to make findings sufficient to permit appellate review of the condition's reasonableness."  <u>Powerserve</u>, 239 F.3d at 515-16.

The Court finds that granting vacatur on condition that Defendants provide sufficient security covering the amount of the current judgment, including interest, is necessary to protect Plaintiffs' rights.  As stated above, Defendants' willfully defaulted in the instant case, which was not an isolated occurrence, but rather, part of Defendants' legal strategy.  <u>See</u>, <u>e.g.</u>, <u>Biton</u>, 239 F.R.D. at 4.  Further, Defendants, as foreign entities, likely have a substantial portion of their assets beyond the jurisdiction of United States courts, potentially making Plaintiffs' satisfaction of

any future judgment more difficult — especially when considered with the Defendants' history of defaults.

Additionally, it has come to the Court's attention that Defendants, in an unrelated case, did faithfully litigate on the merits, but were reticent to satisfy a judgment entered against them by a United States court. See Bucheit v. Palestine Liberation Org., 388 F.3d 346 (D.C. Cir. 2004). In Bucheit, the plaintiff brought suit alleging that Defendants unlawfully converted plaintiff's cement plant in Gaza. In August of 2003, after a bench trial, the district court found Defendants liable, awarding plaintiff over $1,500,000 (the "Bucheit Judgment") and entered a judgment accordingly on October 17, 2003. Both parties appealed, and on November 2, 2004, the appellate court affirmed the district court's decision.

Plaintiff's counsel in Bucheit, by letter to the Court dated February 27, 2008 ("February 27, 2008 Letter"), asserted that Defendants had not yet satisfied the Bucheit Judgment, and a review of the docket sheet as of March 20, 2008 (No. 00 CV 1455 (D.D.C.)) confirms that Defendants have yet to satisfy the Bucheit Judgment. By letter to the Court dated March 19, 2008, Defendants' counsel asserted that as of March 17, 2008, the parties in Bucheit have reached an agreement in principle (the "Bucheit Agreement") to fully and finally resolve the

-30-

matter according to an agreed upon time frame.

While Defendants' actions with regard to the Bucheit Agreement possibly demonstrates a measure of good faith on the part of Defendants, the Court remains concerned that, after a trial on the merits in the instant action, Defendants may again default and refuse to satisfy any judgment rendered against them. In Bucheit, Defendants did not employ a strategy or establish a pattern of defaulting and blatantly ignoring court orders. Rather, Defendants vigorously litigated the Bucheit matter on the merits without defaulting. Also, Defendants had over three years to satisfy the Bucheit Judgment after the appellate court's affirmance, but they did not initiate discussions leading to the Bucheit Agreement until after the February 27, 2008 Letter brought Defendants' delay in satisfying the Bucheit Judgment to this Court's attention. Thus, some risk exists that should Plaintiffs prevail at trial, Defendants will not have a similar impetus to satisfy Plaintiffs' judgment. Additionally, the Court finds that the monetary and political implications involved in Bucheit and the instant matter further distinguish the two cases. Bucheit, which involved a roughly $1,500,000 judgment for unlawful conversion, is not comparable in size and scope to the roughly $192,000,000 judgment in the instant ATA claim, which involves the potentially significant political

-31-

ramifications from being found liable of aiding and abetting terrorists. While the Court acknowledges Defendants' commendable efforts in entering into the Bucheit Agreement, those actions alone do not fully and unequivocally demonstrate Defendants' willingness to litigate the instant action in good faith and honor a future judgment if Plaintiffs prevail at trial.

Accordingly, the Court concludes that it is necessary to protect the rights of Plaintiffs by conditioning any vacatur on the Defendants posting a bond or other form of adequate security covering the entire $192,740,660.13 Default Judgment award, including interest.

### III. <u>ORDER</u>

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 96) of defendants Palestine Liberation Organization and the Palestine Authority (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 60(b)(6) is GRANTED, provided that Defendants meet the following conditions: post a bond or other form of adequate security covering the total amount of the judgment entered August 1, 2006 of $192,740,660.13, including interest; stipulate that the Southern District of New York is an appropriate venue; reimburse the representative and heirs and survivors of the Estate of Aharon Ellis (collectively,

"Plaintiffs") for reasonable costs and expenses incurred as a result of Defendants' August 15, 2005 default; and stipulate that if Plaintiffs successfully prove liability, Defendants will not object to the admission of the Ellis family's prior testimony in any damages hearing; and it is further

**ORDERED** that the parties are directed to confer and submit to the Court within fifteen days of the date of this Order a stipulated Case Management Plan and Scheduling Order that sets a date for trial on the merits of this action not later than nine months from the date of this Order.


**SO ORDERED.**


Dated:     New York, New York
           26 March 2008

                                    _____
                                         Victor Marrero
                                           U.S.D.J.

-33-