**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**THE ESTATE OF YARON UNGAR, et al.,**

**Plaintiffs – Judgment Creditors**

**v.** **C.A. No. 00 – 105 L-DLM**

**THE PALESTINIAN AUTHORITY, et al.,**

**Defendants – Judgment Debtors**

## SURREPLY IN FURTHER OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT

### A. The PA and PLO Believe that Terrorism *Advances* Political Negotiations

Rather than seeking to present a "meritorious defense" in the normal fashion (i.e. by denying the allegations of the complaint[1]) defendants purport to found their "meritorious defense" on statements made by the Ungars or their witnesses in the action against Iran.

Specifically, defendants argue that the Ungars' position in the Iran case – that Iran and Hamas were carrying out terrorist attacks in order to undermine the political negotiations between Israel and the PA/PLO – renders the Ungars' claims against the PA and PLO in this

[1] A careful reading of defendants' ninety pages of briefing on the instant motion reveals that defendants do not explicitly deny any of the allegations of the complaint. Instead, defendants attempt to stitch together a defense using statements made by ***others***. Defendants' refusal to simply come right out and deny the factual allegations of this case (a reticence no doubt inspired by the provisions of Fed.R.Civ.P. 11) speaks volumes.

action "nonsensical" because the PA and PLO would not have helped Hamas to carry out terrorist attacks harmful to their own negotiations with Israel. Defs' Reply at 12-15.

The fatal problem with this argument is that it first assumes, without any basis, that Hamas and the PA/PLO must necessarily have the identical perspective as to whether terrorism is harmful or helpful to political negotiations, and then proceeds to focus exclusively on what ***Hamas believes*** terrorism will accomplish, and carefully ignores the ***defendants' own perspective***.

Clearly, however, the real question here is not whether Hamas believes that terrorism harms the political negotiations conducted by the PA/PLO, but rather whether ***the PA and PLO themselves*** believe that terrorism harms their negotiations with Israel. They do ***not***.

In fact the PA and PLO view terrorism as a necessary ***complement*** to political negotiations, which allows them to extract concessions from the West. This is by no means the Ungars' personal opinion but the conclusion of numerous leading academic experts on Palestinian terrorism. For example, Dr. Boaz Ganor, director of the prestigious International Policy Institute for Counter-Terrorism (ICT) has explained as follows:

> **Since the establishment of the Palestinian Authority in 1994**, Yasser Arafat has adopted a policy whereby he refrains from disrupting the military infrastructure of the Palestinian radical groups, Hamas and the Palestinian Islamic Jihad in the areas under his control. Thus, he was free to **preserve the constant threat of terrorism as a bargaining chip to be used against Israel** . . .
>
> [D]uring the seven years that the Palestinian Authority has existed, Arafat never lifted a finger to curtail the ability of the terrorist organizations to carry out attacks. He never took real steps to disrupt the militants' command centers, shut down their bomb factories, or prosecute the leaders of the organizations' military wings. What actions he did take were always carried out "for the cameras," and were rescinded or overturned as soon as the eyes of the world were elsewhere. Nor did Arafat ever do anything about gathering up the thousands of illegal weapons in the hands of

> militants, including those of his own Fatah organization – contrary to the terms of numerous agreements signed with Israel. Nor was anything done to prevent radical organizations from engaging in fund-raising or recruitment activities. **On the contrary, the terrorist organizations have been allowed by Arafat to take root and grow in the soil of the Palestinian Authority**. This was not a matter of weakness on the part of the Palestinian leader – it was not that he feared a confrontation with the fundamentalists. **Rather, it was part of a calculated policy, whereby the threat of violence was held in check, to be used to put pressure on Israel at the appropriate time during the negotiations**.

Dr. Boaz Ganor, *Is Arafat Ready to Take on Hamas?* December 12, 2001, published by the ICT at http://www.ict.org.il/apage/5350.php, Exhibit A (emphasis added).[2]

Similarly, an extraordinarily detailed study of Yasser Arafat's political strategy authored by terrorism experts Professor Jerrold Post, Dr. Shmuel Even and Dr. Shaul Kimhi reached the following conclusion:

> **[Arafat] has chosen the way of political action and the way of armed struggle at the same time**. **Arafat's entry into the Oslo process did not motivate him to abandon the use of violence, but rather, to choose new tools appropriate to the new situation. His choice of diplomacy was perceived by him as a strategy for the attainment of his objectives; when that strategy did not avail, even though for only a limited time, he brought out the tools of violence**. Arafat has two main types of tools of violence. One involves stirring up the Arab masses – sending mobs of Palestinians out into the streets to clash with the Israel Defense Forces. The other involves the use of terror – including refusal to cooperate with Israel on security and defense matters, creating the conditions for terror, encouraging terror by the opposition (e.g., the release of Hamas terrorists, giving a "green light" to opposition members; Alon, 2001a), and even sponsoring acts of terror by his own people (shooting ambushes, explosive charges, mortar fire, and so forth).

[2] Dr. Ganor is one of the experts with whom plaintiffs consulted before bringing the instant action. In addition to his academic positions and publications, Dr. Ganor served as a counterterrorism consultant for the Israeli government, the NYPD and many other entities. *See* Exhibit B.

Professor Jerrold Post, Dr. Shmuel Even and Dr. Shaul Kimhi, *Yasir Arafat - Psychological Profile and Strategic Analysis*, at 28-29, published by the ICT at http://www.ictconference.org/apage/5519.php, Exhibit C (emphasis added).[3]

Likewise, Dr. Dore Gold, a Middle East expert and former senior Israeli diplomat who participated extensively in the negotiation of the Oslo Accords[4] has explained that:

> At the time of the signing of the first Oslo Agreement on September 13, 1993, Israel viewed the Palestine Liberation Organization (PLO) as a bulwark against the militant fundamentalist challenge of Hamas. . . The PLO was . . . expected to ruthlessly fight Palestinian fundamentalist organizations . . .
>
> Indeed, U.S. and Israeli diplomats drew a distinction between their PLO peace partners and the fundamentalist "enemies of peace" whom, it was assumed, were trying to undermine the Palestinian Authority. **Yet, while PLO and Hamas were competitors for influence among the Palestinians, their evolving relations appeared to be characterized by increasing *collusion* rather than *confrontation*,** as described below:
>
> From the very outset of the Oslo process, the PLO refused to assume the role Israel had assigned it vis-a-vis Hamas and other militant Islamic elements. During 1993 the PLO undertook two negotiating efforts with Hamas: in Khartoum, Sudan, in January and in Gaza during September. A six-point agreement was signed between the military wings of the two movements on April 22, 1994, in the Gaza Strip. A third set of talks was held in Cairo on December 17-21, 1995.
>
> ***
>
> **Arafat judged that he benefited from the Hamas and Islamic Jihad attacks on Israel because they provided him with negotiating leverage**.

---

[3] Professor Post and Drs. Even and Kimhi are leading experts in their fields. *See* Exhibit C at 46.

[4] For Dr. Gold's academic and diplomatic credentials *see* Exhibit D.

Dr. Dore Gold, *How Arafat's Palestinian Authority Became an "Entity Supporting Terrorism"* December 9, 2001, published by the Jerusalem Center for Public Affairs at http://www.jcpa.org/art/brief1-11.htm, Exhibit E (emphasis by bold and underline added, emphasis by italics in the original).

A detailed study issued by the Israeli Foreign Ministry reached the identical conclusion:

> Arafat . . . employed terrorism against Israel, in varying intensity, whenever he felt that the Oslo track was diverting from its course - as defined by the Palestinians. This, in the framework of Arafat's strategic concept which views terror as a legitimate tool for obtaining Palestinian national goals. **Arafat, throughout his years of leadership, systematically combined political negotiations and violence**, while determining the balance between the two according to the circumstances.

Israeli Foreign Ministry publication, *The Involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism against Israel, Corruption and Crime*, May 6, 2002, published at http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/5/The%20Involvement%20of%20Arafat-%20PA%20Senior%20Officials%20and, Exhibit F, at 4 (emphasis added).[5]

Further proof that defendants' strategy is one of both "talking and shooting" is contained in an exhibit they themselves submitted in *Knox v. PLO* in the Southern District of New York.

[5] Thus, defendants' claim in their reply brief that the Israeli government absolved them of involvement in violence is blatantly false. Indeed, on November 27, 1996, the Israeli Foreign Ministry published an official statement detailing numerous cases between 1994-1996 where defendants' senior officials "repeatedly called for jihad (holy war) against Israel and threatened a renewal of the intifada. They have praised terrorists who killed Israelis after the signing of the accords, and suggested that the agreements with Israel were a tactical ploy and a prelude to a return to the armed struggle." *See* Exhibit G, *Incitement to Violence Against Israel by the Leadership of the Palestinian Authority*, November 27, 1996, published by the Israeli Foreign Ministry at http://mfa.gov.il/MFA/Archive/Peace+Process/ 1996/ INCITEMENT %20TO%20 VIOLENCE%20AGAINST%20ISRAEL%20BY%20LEADERSHI

Notably, on June 7, 1996 – just 48 hours before the Ungars' murder – Arafat threatened that "If Israel rejects our demands there will be a reaction and we have a 30,000 man armed force". *Id*.

*Knox* arose from a machine-gun attack by terrorists on a bat mitzvah (coming-of-age) ceremony in Hadera, Israel. An Israeli court convicted Nasser Awis, a PA security officer, of planning and funding the attack. *See* Felony Case (Tel Aviv) 1137/02 *State of Israel v. Awis*, Exhibit H.[6]

In Awis' statements to police (which the Israeli court found admissible on the grounds, *inter alia*, that they were written by Awis in his own hand (*id*. at 3-4) and were supported by Awis' confession in open court (*id*. at 4, 15)), he explained that he received instructions to carry out or cease terrorist attacks from senior PA/PLO leader Marwan Barghouti, according to the progress of the political negotiations with Israel:

> [W]hen the political situation deteriorated and we were in a bad way [Barghouti] would ask us to continue the terrorist attacks. When Shimon Peres and Omri Sharon met with leaders in the [Palestinian] Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks.

Exhibit H at 18.

Thus, convicted terrorist Nasser Awis confirms exactly what the experts quoted above unanimously assert: that the PA and PLO use terrorism as a leveraging tool to advance political negotiations in their favor.

***

In light of all the above it is pellucid that there is no contradiction whatsoever between the Ungars' assertions in the case against Iran and those in the instant case. The PA and PLO believe that terrorism is ***beneficial*** to their political negotiations with Israel, and therefore employ a strategy of both "talking and shooting." Hamas' own opinion, beliefs and goals in respect to terrorism and political negotiations are completely irrelevant to those of the PA and

---

[6] This translation was submitted in *Knox* by the defendants themselves. *See Knox v. PLO*, 03-cv-4466 (S.D.N.Y.) dkt. # 111.

PLO. Indeed, the PA and PLO ***use*** Hamas as a sort of "Frankenstein monster" which they carefully feed, shelter and protect so that they can unleash it when they are unhappy with the course of negotiations. Hamas has its own reasons for carrying out terrorism (just as Frankenstein's monster no doubt had its own reasons for attacking people) but Hamas' simplistic goals and worldview are completely irrelevant to the separate, independent and sophisticated strategy adopted by the PA and PLO, which combines both violence and political negotiations.

Plaintiffs respectfully emphasize that the Court does not need to decide whether the PA and PLO do indeed have a policy of both "talking and shooting." Rather, for the purpose of the instant motion, the Court need only note the ***existence*** of the numerous expert opinions cited above that the PA and PLO view terrorism as enhancing their ability to obtain concessions through political negotiations. The very existence of that opinion – expressed by recognized experts and authorities, not merely the plaintiffs – clearly proves that there is no contradiction whatsoever between the Ungars' allegations in this case and those made in their suit against Iran.

Because there is no contradiction between the allegations made in the two cases (much less a necessary contradiction) there is therefore nothing "exculpatory" whatsoever about the assertions made by the Ungars and their witnesses in the Iran suit. And since defendants' have based their "meritorious defense" on the purportedly contradictory and exculpatory assertions in the Iran case – which, as shown above, are neither contradictory nor exculpatory – defendants' "meritorious defense" is therefore non-existent.[7]

---

[7] Defendants appear to believe that because they are purporting to rely on statements made by the Ungars' own expert witnesses in the Iran case, their alleged meritorious defense is particularly "powerful." Defs' Reply at 24. That belief is erroneous because it "smacks of the proposition that every party 'vouches' for its witnesses, a view long departed and little missed in federal practice. *See* Fed.R.Evid. 607 and the Advisory Committee's note. Expert witnesses . . . are free agents." *Metlyn Realty Corp. v. Esmark, Inc.*,

*Footnotes Continued on Next Page...*

## B. The Letter Submitted by the Department of Justice in *Knox* Speaks for Itself

Defendants' demand for Rule 60(b) relief is based primarily on their claim that if the judgment is left intact U.S. foreign policy interests will be harmed. Defendants have submitted as Exhibit A to their Reply the recent letter from the Department of Justice to U.S. District Judge Victor Marrero in the *Knox* matter ("DOJ Letter"), which they claim supports their foreign policy arguments. *See* Defs' Reply at 28-29.

---

763 F.2d 826, 833 (7th Cir. 1985). Thus, even assuming purely *arguendo* that a statement by the Ungars' witnesses in the Iran case somehow supported the defendants' claims of innocence – **and this is absolutely not the case** – such a statement would have no more weight than if the defendants themselves had solicited and submitted the statement from the witness.

Defendants also point to a statement by one of the Ungars' witnesses, Dr. Paz, that the PA was seeking to "limit" Hamas' activities and that some members of Hamas were wanted by the PA, as somehow proving their innocence. Defs' Reply at 2. In fact, of course, Dr. Paz specifically testified that the defendants were **providing weapons to Hamas** during the period prior to the Ungars' murder. *See* dkt. #408 at Exhibit M, 79:22-80:9. Indeed, Dr. Paz' testimony about "limiting" Hamas squares with Dr. Ganor's conclusion that Arafat occasionally acted "to prevent attacks when it served what he saw as the Palestinian national interest" and/or ordered the arrest of Hamas men "for the cameras" – orders which "were rescinded or overturned as soon as the eyes of the world were elsewhere." Exhibit A. Similarly, Secretary of State Albright noted during this period that the defendants have a "revolving door" policy under which terrorists "are arrested and then released." *See* Exhibit I (downloaded from http://telaviv.usembassy.gov/publish/peace/archives/1997/me0911a.htm).

Even assuming *arguendo* that defendants occasionally acted to limit Hamas activities (for their own purposes) from time to time (an assumption which the plaintiffs dispute), that would in no way relieve defendants of civil liability for terrorist attacks facilitated by their provision of material support and resources to Hamas **at other periods of time**. *See generally Boim v. Holy Land Foundation*, 511 F.3d 707 (7th Cir. 2007) (analyzing elements of civil liability under §2333(a) in respect to provision of support to Hamas).

**Rather, in order to present a "meritorious defense," defendants would have to assert facts showing that they never provided material support to Hamas prior to the Ungars' murder (or that any such support in no way facilitated the Ungars' murder). Defendants have utterly failed to make such an assertion, because they cannot, and they have therefore failed to present a meritorious defense.**

Defendants' argument is peculiar at best. The DOJ Letter does express mild concern about the "potential" impact that these cases "may" have on the defendants, but expressly ***declines*** "to file a Statement of Interest concerning the Rule 60 issues." *Id*.

The fact that the government declined to file a Statement of Interest supporting defendants' Rule 60(b) motion in *Knox* speaks for itself.

Moreover, the amount of the judgment in *Knox* is nearly twice the amount of the judgment in this case,[8] defendants filed their Rule 60(b) motion in *Knox* less than a year after the judgment was entered versus the three and a half year delay in this case, the underlying proceedings in *Knox* were far shorter than those in this case and resolved far fewer issues, and the *Knox* judgment was not tested by a court of appeals, unlike the judgment in this case. Thus, by any imaginable parameter, the considerations informing the government's decision not to file a statement of interest in *Knox* would apply *a fortiori* in the instant case.[9]

---

[8] In order to distract the Court from the fact that the Ungars have restrained defendants' funds equal to or in excess of the amount of the judgment for nearly three years now without any deleterious effect whatsoever on defendants or on the peace process, defendants allege – blithely disregarding this Court's previous warnings against *ad hominem* attacks on counsel – that plaintiffs' undersigned counsel "is spearheading litigation seeking nearly $4 billion in damages from the PA" in order to bankrupt defendants. Defs' Reply at 28. This paranoid claim is absurd. The Ungars' counsel is not a "spearhead" but simply a lawyer who has been retained by some of the many American citizens murdered or injured by the defendants (many of whom have hired other lawyers). Neither the Ungars nor their counsel have any intention of bankrupting the defendants (nor do they believe it is even possible to do so especially given defendants' recent multibillion dollar cash influx). Furthermore, defendants have arrived at the fantastic figure of $4 billion by adding up all the ad damnum clauses of all the suits pending against them, many of which are years from judgment (and/or may never reach judgment) and none of which have anything to do with this case.

[9] By contrast, the government has apparently not yet formulated a position regarding the pending motions filed by defendants in the *Gilmore*, *Biton*, *Shatsky* and *Saperstein* cases (in which judgment has **not** entered) to vacate **default** under Rule 55(c) (as opposed to default **judgment** under Rule 60(b)). *See* DOJ Letter at 1 ("The United States has not yet decided whether or not to participate in those other cases.")

## C. Dahlan Admitted Assisting Hamas Circa 1994-1996 and Defendants' Claims to the Contrary Are False

In support of their opposition to defendants' Rule 60(b) motion, plaintiffs submitted a video interview with (now former) senior PA official Mohammed Dahlan, in which he admits that the defendants provided material support and resources (within the meaning of 18 U.S.C. §2339A(b)(1)) to the top terrorist commanders of Hamas. *See* Plaintiffs' Ex. J, Declaration of Marwan Abdel-Rahman at ¶ 6, Appendix 4.[10]

Defendants assert in their reply that Dahlan's statements regarding their provision of support to Hamas are irrelevant to this case, because those admissions refer to "the Intifada, which began in 2000" and not to "the period at issue" in this case, i.e. 1994-1996. Defs' Reply at 23. In other words, defendants argue that the admission that they provided material support and resources to Hamas after 2000 does not constitute an admission that they did so in the years leading up to the murder of the Ungars. *Id*.

But this argument is based on a bold-faced falsehood, because in that interview Dahlan states as follows:

> When the martyr Yahya Ayyash was killed . . . I personally had told our brothers in Hamas that they must hide him, because Israel wanted to assassinate him.

Plaintiffs' Ex. J, at ¶6, Appendix 4.

---

[10] Plaintiffs submitted the Dahlan video in support of their arguments (i) that Dahlan (whom defendants were previously ordered to produce for a deposition but who left defendants' employ in 2007) is a crucial witness whose unavailability as a deponent severely prejudices the plaintiffs and (ii) that, as a matter of empirical fact, defendants unquestionably provide material support to Hamas. *See* Opp. Memo at 33-34, 57.

The "martyr Yahya Ayyash" was Hamas' top bomb maker during 1994-1996, and was assassinated in January 1996, several months ***before*** the Ungars' murder. *See* Exhibit J. Notably, the PA aggressively investigated and attempted to arrest persons suspected of assisting Israel in carrying out the asssasination. *Id*.

Clearly, then, Dahlan's admission that he instructed "our brothers in Hamas" to shelter and protect "the martyr Yahya Ayyash" refers to the years ***prior*** to the murder of the Ungars, i.e. *circa* 1994-1996. **Therefore, defendants' claim that Dahlan's admissions regarding their provision of support to Hamas relate only to the post-2000 period, is nothing less than a brazen attempt to deceive this Court**.

Defendants' attempt to mislead this Court even now, when seeking Rule 60(b) relief, shows how defendants would conduct themselves if judgment was set aside. It also constitutes sufficient reason, standing alone, to deny their motion, since "material bad faith conduct by a defendant subsequent to the entry of default can, if sufficiently egregious, provide the basis for refusing to set aside a default." *Farnese v. Bagnasco*, 687 F.2d 761, 765 (3rd Cir. 1982).

Defendants are seeking to mislead the Court about Ayyash because Dahlan's admission that the defendants were aiding and protecting Ayyash directly supports the allegations of the complaint in this case:

The Ungars alleged that in the period prior to the murder of Yaron Ungar, Hamas terrorists operating from safehouse territories placed at their disposal by the defendants had murdered over a dozen United States citizens. Amended Complaint at ¶¶ 25-26. The defendants ***continued*** to shelter and otherwise assist these Hamas terrorists even ***after*** they had murdered these American citizens, and as the result of this shelter (and other assistance) provided by

defendants, Hamas was able to plan and carry out additional murders of U.S. citizens – including the murder of the Ungars. *Id*. at ¶¶ 25-47.[11]

Among the American citizens identified in the complaint as having been murdered by Hamas during this period was Joan Davenny, who was murdered on August 21, 1995. *Id*. at ¶ 26. Official statements issued by the Foreign Ministry of the State of Israel specifically name Ayyash as responsible for the murder of Joan Davenny. *See* Exhibit K[12] (identifying Ayyash as

---

[11] The cause of action for "international terrorism" under 18 U.S.C. §2333(a) requires that the conduct complained of constitute "a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. §2331(1)(A).

Plaintiffs' complaint alleged that this "criminality" requirement is met here because the "acts of defendants PA and PLO, if committed within the jurisdiction of the United States, would constitute, *inter alia*, without limitation, violations of 18 U.S.C. §3 ("Accessory After the Fact") and of 18 U.S.C. §2339A ("Providing Material Support to Terrorists"). Amended Complaint at ¶ 41.

In an effort to intentionally sow confusion, defendants pretend in their reply that the reference here to 18 U.S.C. §3 constitutes an allegation that the defendants served as accessories after the fact by sheltering the Hamas gunmen who murdered the Ungars. Defs' Reply at 13, 16. But as defendants know full well, the complaint alleged that defendants served as accessories after the fact by shielding from apprehension Hamas terrorists who had murdered U.S. citizens ***prior*** to the murder of the Ungars – which in turn enabled Hamas to ***subsequently*** murder the Ungars.

Thus, defendants' claim that in 1997 they transferred two of the Ungars' murderers to Israeli authorities, a claim which in any case is unsupported by a scintilla of evidence (the Arabic-language piece of paper of unknown provenance submitted by defendants is not evidence) and which defendants do not even assert in their own name (despite the fact that it relates to their own purported conduct) but rather bizarrely attribute to "Hamas members" (Reply at 19) is completely irrelevant to the allegations of the complaint and to the issue of liability. Civil liability can neither be created nor diminished by post-tort conduct.

Defendants similarly attempt to mislead the Court by boasting that they arrested the Hamas murderers of U.S. teenager David Boim. Defs' Reply at 21 n. 6. Defendants "neglect" to inform the Court, however, that they then quickly released Boim's killers, enabling one of them to carry out a suicide bombing in Jerusalem on September 4, 1997, in which five civilians were murdered and 192 injured. *Boim v. Holy Land Foundation*, 291 F.3d 1000, 1002 (7th Cir. 2002). Among those seriously injured in that bombing were a large number of American citizens. *See Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258 (D.D.C. 2003).

[12] Downloaded from

*Footnotes Continued on Next Page...*

having trained the Hamas terrorists who bombed "the #26 bus in Jerusalem on 21 August 1995"); Exhibit L[13] (State Department "Rewards for Justice" webpage identifying Joan Davenny as having been murdered in that bombing).

Thus, Dahlan's admission expressly confirms the allegations of the Ungars' complaint: between 1994-1996 the PA and PLO were aiding, abetting and protecting senior Hamas terrorists responsible for the murder of American citizens such as Ms. Davenny. And but for the protection and assistance provided by the PA and PLO to Hamas' senior terrorist operatives during this period, Hamas would have been unable to subsequently murder U.S. citizen Yaron Ungar.

Little wonder, then, that defendants have attempted to mislead the Court about their assistance to "the martyr Yahya Ayyash" and their other "brothers in Hamas."[14]

### D. The Gaza Documents Which Are Now Unavailable Are Those Which Were in *Defendants*' Possession, Not Hamas' Possession

The Ungars have asserted that they would be severely prejudiced and unable to fairly litigate the case if defendants' Rule 60(b) motion were granted, because the defendants were expelled from the Gaza Strip in June 2007 and are therefore unable to produce any documents located in the Gaza Strip relevant to their provision of material support and resources to Hamas. *See* Plaintiffs' Memo in Opp. (dkt. #415) at 34-36; Plaintiffs' Notice of New Developments Relevant to Defendants' Rule 60(b) Motion (dkt. # 422) at 1-4.

---

http://www.mfa.gov.il/MFA/MFAArchive/1990_1999/1995/8/HAMAS+TERRORISTS+CAPTURED+-+23-Aug-95.htm?DisplayMode=print

[13] Downloaded from http://www.rewardsforjustice.net/english/index.cfm?page=Davenny

[14] Defendants also falsely claim that the interview with their official Jibril Rajoub, in which Rajoub states that defendants have never had a disagreement with Hamas about "resistance" relates to the post-2000 intifada period. Defs' Reply at 23. In fact, Rajoub says nothing indicating that his remarks are limited to the post-2000 period.

Defendants claim that this argument is meritless because it:

> [D]epends on the notion that **Hamas, the supposed possessor of the documents, would have produced them at the request of the PA, had the PA so requested them prior to the default**. It is unclear how Plaintiffs can assert this prejudice with a straight face. The fact is, as Plaintiffs now recognize, that the PA does not have control of Hamas, so any such records would never have been available for litigation of this case.

Defs' Reply at 33 (emphasis added).

This statement is yet another shameless attempt by defendants to mislead the Court. It is perfectly clear that the documents at issue were those in the possession of the ***defendants***, not Hamas. *See* dkt. #415 at 35 ("the Ungars served the PA with requests for production of documents intended to document the defendants' provision of support to Hamas for the commission of terrorism. *See* Exhibit T."); *id*. ("In June 2007, Hamas . . . destroyed or took control of all of the PA's security and police posts and the PA's governmental offices throughout the Gaza Strip.") (emphasis added); *id*. ("since all of the PA's governmental offices in Gaza were seized by Hamas – the PA is utterly incapable of producing any responsive documents located in Gaza.") (emphasis added).

Thus, defendants could not possibly have misread or misunderstood plaintiffs' argument here, and their reference to Hamas as the "possessor of the documents . . . prior to the default" (Defs' Reply at 33) is clearly just another bad-faith sleight-of-hand aimed at misleading the Court.[15]

---

[15] Indeed, as defendants are perfectly well aware, this Court has already held that the PA was required to produce the documents in its possession sought by the Ungars in their request for production of documents (attached as Exhibit T to Plaintiffs' Opp.). *Ungar*, 325 F.Supp.2d at 61-64. Their attempt to now play dumb is thus embarrassingly transparent.

*Footnotes Continued on Next Page...*

Here again, the defendants have proven that they have not changed their litigation tactics one iota, and that if the Court were to grant the Rule 60(b) motion, the Court and the plaintiffs would be facing many more years of the same contumacious conduct that marred the proceedings between 2000-2004.

**E. Plaintiffs Have Not Changed Their Theory of Liability in Any Way**

In discussing the allegations of their complaint, the Ungars' opposition memorandum cites the recent decisions in *Rux v. Republic of Sudan*, 461 F.3d 461, 470-471 (4th Cir. 2006) (holding that Sudan provided material support to al Qaeda within the meaning of 18 U.S.C. §2339A by permitting it to operate within Sudanese territory) and *Boim*, 511 F.3d 707 (holding that provision of material support within the meaning of §2339A is actionable under §2333(a)). *See* Plaintiffs' Opp. at 52.

In response, defendants claim that by citing the recent decisions in *Rux* and *Boim*, the Ungars have "abandoned" their original theory of liability and adopted a "newly-minted theory of liability." Defs' Reply at 16.

---

Defendants also argue that the Ungars' claims of prejudice (in respect to both the lost documents and the missing witnesses) are unfounded because they have not proved their need for the documents or the witnesses. Defs' Reply at 31-33. This argument ignores both the fact that the burden to demonstrate the absence of prejudice is on the defendants and, more importantly, that this Court has already determined that the Ungars are entitled to these documents and witnesses. *Ungar, id.*. Defendants' related claim that the Ungars have not proven that they are unable to compel the appearance of the defendants' former officers is laughable. Aside from the fact that it is not the Ungars' burden to track down defendants' former officers across the Middle East (most or all of whom are almost certainly in countries, like Syria, which would never cooperate with a letter rogatory issued by a U.S. court), and prove that they are not subject to compulsion, as defendants wishfully imagine, their testimony (which the Ungars have no way of obtaining anyway) would be of little value today because these witnesses are now private individuals and their testimony would no longer bind the defendants and any refusal on their part to testify could not be imputed to the defendants.

In fact, precisely the contrary is true. Plaintiffs' complaint alleged that by allowing Hamas to operate in their territory, defendants had provided material support and resources to Hamas within the meaning of §2339A which is actionable under §2333. *See* Amended Complaint at ¶ 35. Subsequently, the Fourth Circuit ruled in *Rux* that plaintiffs' theory is correct, i.e., that by allowing a terror organization to operate in its territory a government provides a "safehouse" to the organization within the meaning of §2339A. *Rux*, 461 F.3d at 470-471. Thereafter, *Boim* ruled that provision of material support under §2339A is civilly actionable under §2333 of the ATA.

Thus, it is not that the Ungars have changed their theory of liability, but rather that two federal courts of appeals have now ***endorsed*** the theory asserted by the Ungars all along.[16]

Defendants also make an attempt to distinguish *Rux* on the facts, because Sudan provided Qaeda with other material support – such as financial services and transportation – in addition to allowing it to operate from Sudanese territory. Defs' Reply at 17-18. Defendants misconstrue *Rux*. The Fourth Circuit expressly held that – **standing alone** – "allegations that Sudan provided Al-Qaeda with locations within the country where its members could meet, engage in business activities and operate terrorist training camps satisfy the 'safehouses' provision of §2339A(b)(1)." *Id*. at 471. Indeed, *Rux* then went on to examine the other types of material support alleged (financial services and transportation) **separately**. *Id*. ("In addition, Plaintiffs' allegations meet the 'financial services' and 'transportation' elements of the definition of material support as well.")

---

[16] Moreover, this Court has already held that the complaint states a claim under §2333. *Ungar v. Palestinian Authority*, 153 F.Supp.2d 76, 96-98 (D.R.I. 2001). Since that issue was already litigated, defendants are precluded from challenging it in a Rule 60(b) motion

Notably, the Ungars have also alleged that – like Sudan and Qaeda – the instant defendants provided financial support to Hamas and its terrorist operatives in various forms. Amended Complaint, ¶¶ 32, 33, 35. Yet, defendants' Rule 60(b) papers utterly fail to deny these allegations.[17]

Plaintiffs, by their Attorney,

<u>/S/ David J. Strachman</u>
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

[17] Defendants also argue that *Rux* is inapposite because the members of Hamas are "indigenous" to the Palestinian territories whereas Qaeda members are foreign to Sudan. This argument fails because the provision of a safe house under §2339A does not relate to merely allowing individual members of Hamas to live in their homes in the West Bank and Gaza, but rather to allowing Hamas **as an organization** to conduct training, maintain arms depots and perform other terrorism-related activities **as an organization** in PA territories. Effectively, defendants are fishing for a ruling which would grant them and all similarly-situated defendants immunity from civil liability for sheltering terrorist groups made up of local residents (e.g. Hizbollah, which is indigenous to Lebanon). The Court should not take the bait.

CERTIFICATION

I hereby certify that on March 13, 2008 I served this document along with the attached and exhibits via ECF to the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/S/ David J. Strachman

# Is Arafat Ready to Take on Hamas?

Boaz Ganor
ICT Executive Director

Whether or not a terror attack will take place is a function of two factors: the motivation of a terrorist organization to perpetrate attacks, and its operational capability of doing so at a given time. Since the establishment of the Palestinian Authority in 1994, Yasser Arafat has adopted a policy whereby he refrains from disrupting the military infrastructure of the Palestinian radical groups, Hamas and the Palestinian Islamic Jihad in the areas under his control. Thus, he was free to preserve the constant threat of terrorism as a bargaining chip to be used against Israel, acting to prevent attacks when it served what he saw as the Palestinian national interest. But whenever such prevention was necessary it was always accomplished through a policy of persuasion and threats—never by direct military action. Arafat managed to convince the leadership of the organizations that terrorist attacks at that time would harm the Palestinian interest—removal of Israeli forces from the territories, and the establishment of a Palestinian state with Jerusalem as its capital—and that he would be obligated to act against anyone attempting to perpetrate attacks, thereby risking civil war. At the same time, Arafat, who controlled the Palestinian media, worked to insure that the popular environment was not conducive to terrorist activity.

However, during the seven years that the Palestinian Authority has existed, Arafat never lifted a finger to curtail the ability of the terrorist organizations to carry out attacks. He never took real steps to disrupt the militants' command centers, shut down their bomb factories, or prosecute the leaders of the organizations' military wings. What actions he did take were always carried out "for the cameras," and were rescinded or overturned as soon as the eyes of the world were elsewhere. Nor did Arafat ever do anything about gathering up the thousands of illegal weapons in the hands of militants, including those of his own Fatah organization—contrary to the terms of numerous agreements signed with Israel. Nor was anything done to prevent radical organizations from engaging in fund-raising or recruitment activities. On the contrary, the terrorist organizations have been allowed by Arafat to take root and grow in the soil of the Palestinian Authority. This was not a matter of weakness on the part of the Palestinian leader—it was not that he feared a confrontation with the fundamentalists. Rather, it was part of a calculated policy, whereby the threat of violence was held in check, to be used to put pressure on Israel at the appropriate time during the negotiations.

The violence and terrorism known as the "al-Aqsa Intifada" is a direct result of Arafat's evaluation that violence and terrorism pays—that in the end, "the Palestinian national interests" will be better served by violence than by negotiations. Israeli governments over the years have been taken in by Arafat's strategy of double-talk, and have time and again fallen into the trap of Palestinian violence laid for them. This has only served to strengthen the feelings of the Palestinians that more concessions can be won from Israel through violence and terrorism than through negotiations. The government of the late Yitzhak Rabin declared that, "negotiations will continue as if there were no terrorism," thus neutralizing any motivation to refrain from terrorism. In fact, some politicians even used the occurrence of terror attacks as a reason for accelerating the negotiations, proving to the Palestinians that terrorism works. Even the much more hardline government of Binyamin Netanyahu fell into this trap, by withdrawing Israeli troops from Hebron only after the "Tunnel riots," and signing the Wye Agreements only after the "Har Homa riots." The government of Ehud Barak did not depart from this tradition of appeasement. This was evident after Arafat refused the far-reaching concessions offered at Camp David—including the establishment of a Palestinian state, a halt to settlement activity and the transfer of most Israeli settlements to Palestinian control, and the division of Jerusalem. When Arafat spurned this offer, choosing instead the path of violence, Barak rewarded him by offering even more at the Taba talks, including permission for a large number of Palestinian refugees to return to Israel within the 1967 borders, rather than to the new Palestinian state.

It's difficult to unlearn the lessons of years all at once, and Israel is now paying for past mistakes. Israel and the Palestinians are now faced with a Catch-22 situation; no Israeli politician can afford to offer Arafat as much as

what Barak was willing to give him. At the same time, Arafat cannot now accept less than what was previously offered him. Realizing this, Arafat's strategy in initiating and directing the current violence is not to obtain further concessions, but to try to get the nations of the world involved, in order to force a solution on the parties. Such a solution would necessarily be based on a compromise, with Israel being forced to give the Palestinians more than what was offered at Camp David and Taba. In other words, from Arafat's viewpoint, terrorism and violence will once more pay off, regardless of how many Palestinian or Israeli lives are lost along the way. In fact, the higher the casualties, the greater the urgency of an imposed solution.

However, Arafat's plan backfired. In retrospect, the costs of his initiation of hostilities far outweigh any gains. The Arab world did not give him the support that he had expected; the European community saw through his double-dealing and refrained from giving him the hoped-for support; and the American administration made it clear that he would be judged by his deeds rather than by his words. What's more, the Israeli society also did not react in the way that he had hoped; rather than collapsing in the face of the constant barrage of terrorism, the populace became more than ever convinced that Arafat had never intended to make peace with Israel. Even the Palestinian populace did not act according to plan. Despite Arafat's attempt to present the hostilities as a "popular uprising," most Palestinians did not take an active part in the violence, leaving the field to the radicals.

Things began to turn against Arafat in recent months. Pressure began being put on him by the United States after the September 11 attacks, by the European Community and by the Arab countries. Israel finally began to use real military pressure after the most recent series of terror attacks. On top of this, Arafat's being grounded in the West Bank and his being declared "irrelevant" by Israel has injured his personal standing. All of this has contributed to Arafat's readiness, for the first time, to call for a halt to terrorism against Israel. With the international community, and not only Israel calling on him to demonstrate his intentions with deeds, rather than empty words, Arafat has finally recognized the need to take concrete steps against the Islamist groups. A few terrorists have been arrested, a few bomb-making labs have been shut down.

This does not mean that Arafat has made a strategic decision to confront the fundamentalist Islamic terror groups. He is still not ready to use his considerable powers to diminish the military capabilities of these organizations in the autonomous territories; he is not willing to risk the civil war that might erupt as a result. For while Arafat would undoubtedly emerge victorious from such a war, he would never again be able to use the threat of Islamic terrorism to pressure Israel or the rest of the world. So Arafat contents himself with dealing the fundamentalist groups a slap in the face, together with a wink and a nod—threats and persuasion. The persuasion rests on the argument that now is not the time for severe terrorism inside Israel; the threat rests on the demonstrated capabilities of the Palestinian Authority to take on Hamas and the PIJ should the need arise.

What can be learned from the recent clashes between the PA and the Islamist organizations? First of all, there is the lthat concerted pressure on Arafat on the part of the U.S., the European Community, and the moderate Arab states, as well as Israel, can in the end, bear fruit. Arafat can be counted upon to act rationally—to choose the course of action whose benefits outweigh the costs. The next question is, will all this bring Arafat to finally destroy the infrastructure of the Palestinian terrorist organizations? If he does, then the policy of pressuring him to take action will have been borne out, and all of his arguments that he is powerless to combat the radicals will have been proved false. Time and again, the Palestinian leader has attempted to portray himself as the underdog, who despite the best of intentions, is simply incapable of tackling the terrorist organizations. This strategy not only allowed Arafat to win the world's sympathy and slacken the pressure, but also enabled him to ask for outside help, from Israel and from other countries, in strengthening his military capabilities so that he could "combat terrorism."

However, if after all this, Arafat chooses not to translate his declarations into deeds, and dismantle the military apparatus of Hamas and the PIJ, then only two conclusions are possible—either he can't, or he doesn't want to. If the answer is the former, and he is not capable of taking the necessary steps, then the Israeli government's characterization of Arafat as "irrelevant" to any future political settlement will have been borne out. He simply cannot deliver the only thing that Israel has been after all these years—an end to Palestinian terrorism.

And if Arafat does not want to deal with the terrorist threat? Then we can only assume that the combined pressure brought to bear by Israel and the rest of the relevant parties has not succeeded in changing the cost-benefit equation enough for him to take the necessary steps. In which case, more will need to be done to motivate him to take the matter seriously.

IDC HERZLIYA | ICT International Institute for Counter-Terrorism



Dr. Boaz Ganor



Dr. Ganor is the founder and executive director of the Institute for Counter-Terrorism (ICT) and deputy dean of the Lauder School of Government and Diplomacy at the Interdisciplinary Center Herzliya. He is a member of Israel's National Committee for Homeland Security Technologies, of the International Advisory Board of Institute of Defense and Strategic Studies, (IDSS), Singapore, and of the International Advisory team of the Manhattan Institute (CTCT) to the New-York Police Department (NYPD).

Dr. Ganor lectures on Terrorism and Counter-Terrorism at the High Command Academic Courses of the Israel's Defense Forces, as well as at the Lauder School of Government and Diplomacy, and other Academic and International forums.

Boaz Ganor obtained his B.A. in Political Sciences from Hebrew University, and his M.A. in Political Studies from Tel-Aviv University. His Ph.D. thesis for the Hebrew University was on "Israel's Counter-Terrorism Strategy". Dr. Ganor served as a consultant to Israeli Government Ministries on Counter-Terrorism. From 1989 to 2003, he was a member of the trilateral - Palestinian, Israeli, American - Committee on Incitement, established under the Wye Accords.

Dr. Boaz Ganor is the author of "The Counter-Terrorism Puzzle" and "Modern and Post Modern Terrorism" as well as numerous articles on counter-terrorism published in Israel and abroad.

Edited with the assistance of the American Jewish Committee.

In the past decade, mainly thanks to the Oslo Accords, Yasir Arafat has gone from being the leader of an organization ostracized by most of the world following the Gulf War to becoming accepted by all the nations. From the status of international terrorist, under whose leadership numerous deadly attacks were committed—among them, the Coastal Road Massacre (March 1978), the Munich Massacre of Olympic athletes (September 1972), and the *Achille Lauro* hijacking (October 1985)—Arafat won a Nobel Peace Prize, before turning once more to terrorism. From the start of the bargaining, when Israel offered the Palestinians "autonomy" (without sovereignty over territory) at the 1991 Madrid Conference, Arafat eventually obtained an Israeli proposal to establish an independent Palestinian state, with East Jerusalem as its capital, in the majority of the territories of Judea, Samaria, and the Gaza Strip. He was even offered alternate territories from within the Green Line to make up for land kept by Israel. This proposal, made during the second Camp David summit and the ensuing negotiations, was also rejected by Arafat.

Furthermore, Arafat is responsible, in large part, for the difficult situation of the Palestinians. He is famous for his tendency to miss historic opportunities and precipitate catastrophe. Such was the case when he caused the expulsion of the Palestinians from Jordan in "Black September" 1970, and again in 1982 when he goaded Israel into the Lebanon War, which eventually led to his expulsion to Tunisia. Similarly, his support of Saddam Hussein during the Gulf War severely damaged the status of the Palestinians and led to the expulsion of hundreds of thousands of them from the Persian Gulf states. It is possible that Arafat's rejection of the Israeli proposals of the second Camp David summit could be considered yet another missed historic opportunity, as it is doubtful that an independent Palestinian state will be established in the near future under better conditions than those offered the Palestinians at Camp David. In any case, many

**Introduction**

**Methodology**

**Psychological Profile**

**I. Outstanding Features**

1. Emotional Stability
2. Independence at All Costs
3. Suspiciousness
4. Need to Demonstrate Excellence and Superiority
5. Interpersonal Relations
6. Authenticity: Dramatic Ability, Double-Talk, Exaggerations, and Lies
7. Symbol of the Palestinian Revolution
8. Honor Above All
9. A Place in History
10. Determination and Tenacity of Purpose, Ability to Survive

**II. Characteristics of Arafat's Functioning**

1. Cognitive Functioning
2. Family Life
3. Lifestyle and Work Habits
4. Health and Age
5. Functioning under Pressure

**III. Leadership Style**

1. Decision-Making
2. Financial Control
3. Personal Appointments and the Policy of Divide-and-Conquer

Palestinians and Israelis have suffered and will suffer as a result of that decision.

Arafat was born in 1929 and has always enjoyed good health. He does not smoke, does not drink alcohol, and watches his weight. Following the airplane accident in the Libyan Desert (April 1992), he sustained a head injury and underwent an operation to drain blood clots. Lip trembling appeared a few years later, without a decline in his working capability or damage to his cognitive abilities. He ignores his advancing age and his health condition, refuses to consider the possibility of retiring from the political arena, and has not indicated any potential successor. Arafat surprised everyone in 1990, when, at age 62, he married Suah Tawil. Despite his marriage, he did not change his daily schedule or lifestyle at all, and does not devote any time to his family.

This study analyzes the behavioral patterns and policies of Arafat, using two tools: psychological analysis and strategic analysis. The psychological analysis attempts to identify Arafat's behavioral patterns and to deduce from them the main characteristics of his personality—his outstanding features, functional characteristics, and leadership style. In addition, the study investigates his psychological development, and presents an analysis of the connection between these and his present behavioral patterns. The strategic analysis attempts to identify Arafat's typical operational patterns, from an understanding of his past actions, and the way he relates to the various "players" in the arena. From these two analyses, the study presents operative conclusions regarding the question of how Israel should deal with Arafat.

**Psychological Analysis**

An analysis of Arafat's behavioral patterns, from the psychologicpoint of view, shows that Arafat has limited emotional stability. This expresses itself, among other things, in a strong need to control his environment, down to the most minor detail, as well as in impulsive behavior and rapid changes of mood. Sometimes he is bundle of nerves, while at other times, he is in high spirits. Arafat is a man of action who requires constant stimulation and finds it difficult to enjoy periods of quiet and relaxation. Owing to his emotional limitations, he is not ready to accept the authority of others and does not tolerate any dispute regarding his status. Arafat is suspicious toward enemies and allies alike. He does not trust anyone, and his suspicions are accompanied by extreme sensitivity to any criticism on the part of his people. He is personally hurt when people in his camp express criticism—even constructive criticism—regarding his political courses of action. Similarly, Arafat has a strong emotional need to demonstrate superiority over his partners as well as his rivals. He perceives himself as a leader of extraordinary historic stature. Arafat's interpersonal skills are


4. Establishment of Dual and Triple Governmental Systems
5. Global Air Travel: "The Frequent-Flyer Club Member"
6. Political and Personal Religiosity

**IV. Developmental Background and General Psychological Hypotheses**

1. A Difficult Childhood: An Orphan
2. Betrayal and Sense of Victimization
3. Arafat as a Survivor: In Constant Struggle
4. Self-Identity
5. On the Verge of the Realization of the Dream
6. Summary of Personality Attributes

**Strategic Analysis of Arafat**

**I. Is Arafat a Strategist or a Leader Acting on Instinct?**

**II. The Basic Premises of Arafat's Strategy**

**III. Characteristics of Arafat's Strategy**

1. The Political Negotiations with Israel
2. The Use of Force against Israel
3. World Opinion and Israeli Opinion
4. Foreign Countries
5. The Palestinian Arena

**IV. Summary of the Features of Arafat's Strategy**

**V. Conclusions**

**Selected bibliography**

**Yasser Arafat: Identities in Conflict**

**About the Authors**

characterized by problems with relationships, stemming from his need to manipulate people, bringing them closer or distancing them as needed. He has neither intimate relationships nor any close friends, and apparently feels no need for them.

It appears that Arafat does not place great importance on authenticity. He has a natural dramatic ability, of which he makes extensive use. With great skill, he adapts his style of speech and his message to his target audience. He uses repetition and exaggeration (some of which he apparently he believes with all his heart). He often uses body language, along with euphemistic language and hints, to say what he is prevented from stating openly. He is able to lie without batting an eye, and without his listeners being the wiser. He tends to accuse Israel of evil intent and conspiracy to persecute him.

Arafat sees himself as the symbol of the Palestinian nation. This is outwardly expressed in his habitual appearance in a military-style uniform. He lacks any of the characteristics of a private life—hobbies, entertainment, going out, etc. One can describe him as a one-dimensional personality—his whole attention and all of his interests bound solely to Palestinian political issues—and he takes a very narrow perspective on congruent topics (such as historical processes, political economy, social processes). Arafat is very sensitive to his honor and takes care that his surroundings demonstrate the appropriate level of respect. He is capable of breaking the rules of the political game when he senses that he is not getting the respect he deserves. Arafat is very sensitive to his place in history. He wants to be remembered as the father of the Palestinian revolution, as the founder of a Palestinian state, and as the Arab leader who returned the holy places in Jerusalem to the rule of the Arab nation. Arafat is characterized by resoluteness and tenacity of purpose; he does not give up, and does not surrender—even when faced with a hopeless situation. He has a surprising ability to recover, and an ability to maintain faith and hope. He also demonstrates great patience, along with an ability to instill faith and hope in the hearts of his people and a superb ability to maneuver.

Arafat has experienced many high-pressure situations and crises throughout the course of his life, some of which were life-threatening, and he functioned well in these situations. One gets the impression that at times of crisis he not only demonstrates an impressive ability to resist, but also feels great satisfaction. When he acts against a stronger power (for example, Israel), he appears to be spiritually elevated and in a great mood; he does not hesitate to make difficult decisions, shows courage, and is ready to sacrifice for the goal. In these situations, he refuses to give in to external dictates and pressure, and demonstrates a lack of readiness to compromise.

Arafat's leadership style is characterized by extreme centralization. He is the source of authority and decides on all issues, minor and major. His style is hierarchical and rigid; he is the final arbiter. Even when he consults with his assistants, he reserves for himself decisions on truly important matters: plotting principal positions and operative plans. He brings decisions to the PLO's forums for debate only when he is guaranteed support in advance.

Prominent among the psychological milestones that have crafted Arafat's personality and world outlook are his becoming orphaned from his mother at a very young age (three or four), his removal from his father's house in Cairo (at around the age of four) to his uncle's house in Jerusalem, then under Jordanian rule. The event, apparently, caused parental depravation, as from a young age he had to learn to get by on his own. These events contributed to the development of an extreme reaction of emotional denial, and taught him that he could rely only on himself and must be better than others in order to survive. From a young age, Arafat lived with the feeling that he had been betrayed on a personal level and on a national level (in his view, betrayal of the Palestinians by the Arab countries and the world). From this experience, Arafat also expresses a strong feeling that the Palestinians are victims, and that the world must understand and compensate him.

**Strategic Analysis**

Strategic analysis shows that Arafat acts with all the characteristics of strategic thought and long-term planning, among them: vision definition and establishment of clear objectives, identification of the principal players, taking advantage of all possible tools to attain his objectives, recognition of constraints, and choice of paths of action based on their relative advantages.

One can see from the Palestinian strategy in political negotiations with Israel that Arafat has set red lines for himself and has stood by them consistently throughout the years. Comparing the red lines that the Palestinians brought to the negotiations at the 1991 Madrid conference to their positions in the negotiations at the second Camp David summit in the year 2000, one can see that Arafat stood by the red lines that he set for himself, and relaxed his positions to a very small extent, in contrast to the erosion that occurred in Israel's positions. Thus, for example, in the interim agreement, the Palestinians did not give in on anything, and in the permanent status negotiations they agreed to allow Israel to maintain settlement blocks on land whose size equals a few percent of the territories, in exchange for alternate land within the boundaries of the Green Line.

An additional strategic characteristic is Arafat's success in shifting the battle to the playing field that suits him. Arafat dragged Israel to Oslo after he had created a deadlock in the negotiations in Washington and undermined the Israeli-American attempt to conduct negotiations with representatives of the disputed territories. Israeli politicians, not taking into consideration the significance of the Palestinian demand in Oslo for the "right of return" and sovereignty over Jerusalem, agreed to include these issues in the permanent status negotiations, and even to defer deliberations on them for a period of five years, in the hope that Arafat would soften his position by then. However, as long as Arafat wins more concessions from Israel, he takes tougher positions on these matters.

In conducting negotiations, Arafat customarily goes to the brink and sometimes beyond. He does not worry about stretching the rope to the limit, changing tactics at the last minute, presenting crises, and reneging on agreements he previously agreed to. Arafat also customarily recycles the concessions that he gives Israel in negotiations. Thus, for example, he gives Israel security cooperation with the Palestinians again and again, and then violates the arrangement afterwards. Each time he issues new demands in exchange for this cooperation. Arafat also always leaves himself an opening for additional demands on Israel. Thus, among otherthings, he did not agree to complete the interim agreement and to compromise on the third withdrawal. From his standpoint, as long as the interim agreement had not been completed, he had a basis for additional demands, without even bringing up permanent status disagreements. In keeping with his internalization of the role of victim, Arafat prefers not to present proposals of his own, but rather to be in a position of reacting to Israeli and U.S. proposals.

Arafat's strategy to achieve his goals is based on political negotiation simultaneous with the continuation of the armed struggle. He saw his choice of the diplomatic path in Oslo as one strategy to attain his objectives, and, when it did not advance him sufficiently within a limited time frame, he took the tool of violence out of his toolbox. Arafat views the intifada both as a tool to exert pressure on Israel, and thus improve his negotiating position, and as a tool likely to bring about Israel's unilateral withdrawal without an agreement.

Arafat's strategy toward public opinion in Israel is aimed at enlisting the aid of large portions of the Israeli public to influence the decision-making process in Israel. He does so via two different paths: On the one hand, he emphasizes his adherence to the path of peace, and, on the other hand, he exacts a price in blood from the citizens of Israel, in order to pressure them to change their political views. Arafat sees the disagreements within Israeli society as a weakness. This contributes to the increasing extravagance of his demands, since he assumes that weakness will bring about a softening of Israel's positions. Thus, for example, mindful of the dispute in Israel regarding control of the disputed territories, Arafat prefers to encourage attacks on settlers and IDF forces in the territories over attacks in the heart of the Israeli population within the Green Line (even if he does not actively prevent such attacks). In addition, Arafat tries to influence the decision-making process by means of Israeli Arabs. Nevertheless, it appears that he did not calculate how much the Al-Aqsa Intifada would negatively influence the left-wing camp in Israel, and, therefore, his gains from this course of action have been minimal.

In the area of foreign relations, Arafat cooperates with the United States, based on his recognition of its power and influence. Nevertheless, he does what he can to reduce American domination of the political process by making an effort to turn the Israeli-Palestinian dispute into an international issue. He strives to include mediators from European countries and to introduce into the territories forces and observers from the UN or from other foreign countries. This policy is aimed at narrowing Israel's range of operation in the territories. The Americans, who brought Arafat closer in previous years, are disappointed in him. After he finished his term as president to the United States, Bill Clinton classified Arafat as an aging leader who lives with a victim mentality and is incapable of reaching a final peace agreement. According to Clinton, what caused negotiations between the Barak government and Arafat to fail was Arafat's demand to specify large numbers of refugees who would be permitted to return to Israel in the framework of the "right of return."

Arafat also attempts to enlist the aid of the Arab establishment. He does so by means of manipulative leverage on

leaders of Arab countries, knowing that bloody demonstrations in the disputed territories will stir up internal agitation in Jordan and Egypt that will require those leaders to consider his position. Regarding the Islamic world, Arafat emphasizes the struggle for Jerusalem, the third most holy Islamic site. Among leaders of the Arab countries, it appears that only Hosni Mubarak, the president of Egypt, exerts considerable influence over Arafat, being the patron of the Palestinians, Arafat's dialogue partner, peer, and partner in the political process. Mubarak is likely to allow Arafat to give in on certain issues in negotiations; however, in many cases, the Egyptian president has caused a hardening of the Palestinian position in the negotiations (for example, on the issue of Jerusalem). On the other hand, Arafat is able to identify with Saddam Hussein, president of Iraq, who is perceived by some Palestinians as a symbol of firm resistance. King Abdullah of Jordan and President Bashar Assad of Syria do not have much influence over Arafat, owing to their young age and residual tension between them.

In the internal arena, Arafat is aware of the constraints placed on him by the Palestinian street. He is aware of the leaning of Palestinian public opinion, which has become more extreme following disappointment in the peace process. The unilateral withdrawal of the IDF from southern Lebanon has apparently toughened his position, since it stirred up expectations among the population that it is possible to bring about IDF withdrawal by means of violent confrontation. Nevertheless, Arafat is capable of going against the flow in the Palestinian camp when he is convinced that it will advance the achievement of his goal of a Palestinian state, and that, eventually, most of the Palestinian public will realize he is right.

Among his people, Arafat adopts a policy of divide and conquer: He does not designate a successor, and takes care to divide the centers of power in the Palestinian Authority. Thus, for example, the control of the various forces are split between the "outsiders"—those who arrived from Tunisia and other locations in the Palestinian diaspora—and "insiders" from the territories. Similarly, a clear separation exists between control of the security apparatus in Gaza and the security apparatus in Judea and Samaria.

Arafat avoids direct confrontation with opposition organizations, as long as they do not directly threaten his rule, since he perceives himself to be the leader of all Palestinians. Additionally, Arafat needs the threat of terrorism on the part of the opposition organizations as a bargaining chip in negotiations with Israel and as reinforcement of the Palestinian war effort. Arafat thereby avoids true security cooperation with Israel.

**Operative Conclusions**

Arafat will prefer negotiations only if he sees that nothing good will come out the continuation of violent struggle. Thus, he must not be allowed to attain political achievements as a result of violence.

Grandiose military operations—such as massive air force bombings and artillery shelling—have little effect on Arafat as long as they do not involve conquest of Palestinian authority territories. Under these conditions, Arafat is at his best, tends more toward taking risks, and is prepared to sacrifice victims. Nevertheless, many limited military operations are likely to be more effective since they undermine Arafat's feeling of control.

Economic pressure on the population, such as closures of access to Israel from the territories for workers, water cutoffs, and electricity cutoffs, will not significantly influence Arafat. He has no difficulty sacrificing victims, and thereby will find it beneficial to present to the world the distress of the Palestinian population. On the other hand, cutting off tax monies collected by Israel and cutting off outside aid do influence him, since money is one of his means of control.

American pressure influences Arafat, but will not change his position on essential issues (Jerusalem, the right of return, etc.). As stated earlier, Arafat prefers that representatives of the UN and Western European countries who support him sit around the table, in order to weaken the American hegemony in negotiations.

It is best not to act against Arafat by means of a public ultimatum, since he will conclude that its aim is to humiliate him. It is best to treat him with respect, using gestures related to his personal status. Such niceties influence his mood, satisfying his desire to win respect and recognition.

Permanent status negotiations must be based on a final and absolute agreement that will not allow Arafat to come up with any additional strategic demands from Israel. Nevertheless, Arafapparently needs more time to digest essential matters, such as a solution to the problem of the Temple Mount and an end to the dispute, and to

reconcile himself to the fact that he cannot demand more of Israel. Thus, when the negotiations resume, Israel must not pressure him too much to reach a quick decision, although at the same time Israel must not give him any additional significant intermediate concessions. Should Israel will give up the ability to bargain with him in the future, there will be no way to convince him to sign an agreement to end the dispute.

It is reasonable to assume that Arafat will not give up on Palestinian sovereignty over the Temple Mount in the framework of a permanent agreement. His insistence on receiving sovereignty in East Jerusalem stems both from his vision of establishing a Palestinian capital there, to which he has committed himself, and from his desire to be an important leader in the eyes of the Arab world, both Muslim and Christian. It appears that Arafat is not ready to go down in history as one who gave in on the Temple Mount. Nevertheless, one should not discount the possibility that Arafat will agree to a compromise formulation, on condition that it be acceptable to the top leaders in the Arab world, such as Egyptian president Mubarak.

If Israel carries out a unilateral separation, which would mean withdrawal without an agreement from most of the territories under its control, Arafat is liable unilaterally to declare the establishment of an independent Palestinian state and to see himself as having brought about Israel's resounding military defeat. It is possible that the Palestinians would then gain for themselves all the rights of a country, in accordance with current international law and treaties, such as the right to self-defense, water rights, and more. In this framework, they would attempt to establish an army, without the limitations involved today, to establish foreign relations, and perhaps even to sign defense treaties with parties hostile to Israel, such as Iraq, Iran, and Libya. Arafat will not rest until the central issues of the negotiations, such as sovereignty over the Temple Mount, right of return, borders, and settlements (those not evacuated via unilateral withdrawal), are resolved. Therefore, unilateral withdrawal and the establishment of a Palestinian state will not end the conflict. Hence, it is better for Israel either to attain separation in an agreement with the Palestinians or to continue to control the territories under its authority by creating a security buffer between the Palestinian population and Israel until an agreement is reached.

## *Introduction*

The personality characteristics of a leader and the degree to which he influences the course of history have been subject to debate from time immemorial in various scientific disciplines. Historians deal with the degree to which an individual leader influences history, as opposed to the influence of the zeitgeist. They ask whether the leader sets the historical narrative, or is only a pawn in the hands of history (Schlesinger, 1986). Among political scientists, the argument has been made that the personality characteristics of a leader, such as the president of the United States, cannot contribute much to our understanding of the political process and its outcome (Skowronek, 1986).

This debate also exists to the study of the behavior of political personalities from a psychological point of view. Some scholars believe that the psychological features of a leader influence the political process, while others criticize any attempt to sketch a psychological profile of a leader. According to these critics, the personality of each person is unique, and there is no possible explanation, based on personality, for a political process. Additionally, there are those who believe that theories of personality are not sufficient to serve as a foundation for political conclusions (Craik, 1986). Despite this criticism, the topic continues to occupy researchers, with the result that a number of outstanding political leaders have been so analyzed. For example, all the recent presidents of the United States have been the subject of psychological evaluations (Feldman and Valenty, 2001).

The present study analyzes the behavioral patterns and policies of Yasir Arafat based on the assumption that such an analysis would be of value in forecasting his future behavior. The analysis utilizes two tools: psychological analysis and strategic analysis. The psychological analysis attempts to identify Arafat's behavioral patterns and to deduce from them his personality traits: outstanding characteristics, functional features, and leadership style. In addition, the study examines the psychological characteristics of his development and attempts to link those characteristics with his current patterns of behavior. The strategic analysis tries to identify Arafat's typical operational patterns based on his past courses of action and the way he relates to the various "players" in the arena. On the basis of these analyses, the study presents operative conclusions regarding the question of how

Israel should deal with Arafat.

**Methodology: Behavioral Analysis**

The building of an objective psychological profile of a political leader is a topic in political psychology (Renshon and Duckit, 2000). A leader's profile is created for the purpose of analyzing diverse psychological characteristics—behavior patterns, outstanding features, character lines, main motivators, personality structure, leadership characteristics—and how these influence his political behavior. Objective analysis is done with psychological tools different from those commonly accepted in psychology (such as interviews and psychological tests). The material available to the investigators is diverse, mostly information publicized in the media. The task requires gathering, sorting, and analyzing the material in an unconventional manner, for the purpose of personality evaluation.

A survey of the professional literature dealing with the personality profiles of political leaders reveals two key methodologies.

*(1) Quantitative methodologies:* such as historiometry (Simonton, 1990); integrated complexities of leaders' expressions (Suedfeld, 1994; Suedfeld and Bluck, 1993; Suedfeld and Granatstein, 1995; Suedfeld, Tetlock, and Thachuk, 1996; Marfleet, 2000; Schafer and Crichlow, 2000; Wallace, Suedfeld, and Thachuk, 1996; Wallace, Suedfeld, and Thachuk, 1993); operational coding of speeches and expressions (Marfleet, 2000; Schaefer and Crichlow, 2000; Walker and Schaefer, 2000); objective measurement of motivators (Dille and Young, 2000; Hermann, 1983; Walker, 1983; Weintraub, 1989; Winter, 1983). These methodologies allow random sampling of material and establishment of quantitative ratings. These studies are less susceptible to the subjective leanings of the investigator and provide a reliable test for comparison of different leaders over different periods of time. Nevertheless, they cover only some of the personality characteristics of a political leader. An important part of the leader's characteristics, including family life, emotions, interpersonal relations, and developmental course, as well as his functional patterns as a leader are not included in these studies.

*(2) Qualitative methodologies*, in which the investigators sketch a psychological profile based on diverse information (biographies, testimonies, newspaper articles, interviews in the media, etc.). These profiles are based on qualitative analysis of content and, to a certain degree, on psychological intuition and interpretation by the investigator. Some of the studies focus on the description and the analysis of outstanding features of the leader, without emphasizing specific personality theories (Choiniere and Keirsey, 1992; Dekleva and Post, 1997; Greenstein, 1994; Heifetz, 1994; Kofodimos, 1990). Other studies, based on analytical personality theories, attempt to explain hidden psychological processes (Muslin and Jobe, 1991; Renshon, 1996; Swansbrough, 1994). Other qualitative studies (as well as quantitative ones) focus on the identificaand the classificatof the personality types of leaders (Barber, 1972; Hermann, 1994; Hermann and Preston, 1994; Lyons, 1997).

The relative advantage of qualitative studies lies in their ability to present a broad picture of the leader's personality, as well as putting forward psychological theories and commentaries, which allow a more profound understanding. This article objectively describes the psychological profile of Yasir Arafat, using the qualitative methodology of behavioral analysis, based on content analysis (Kimhi, 2001). The methodology was developed as a result of an attempt to create a psychological profile derived from both clinical analysis and practical political analysis. Behavioral analysis is based primarily on a wide sample of the leader's behavior, without preconceived notions derived from specific developmental personality theories.

The theoretical psychological approach is based on behavioral analysis methodology described by Maddi (1989). He sees in personality "a stable set of tendencies and characteristics that determine common behavior, and differentiate between psychological behaviors of different people (thoughts, emotions, and actions) that have continuity over the course of time, and cannot be understood to be the result of biological and social pressures at a particular moment."

Behavioral analysis examines a wide variety of behaviors on different levels, as reported in the media, and relates to expressions, thoughts, feelings, and actions that have continuity over the course of time and under different conditions. Moreover, the methodology distinguishes between psychological assumptions and actual findings from data that has been gathered. In this article, psychological assumptions are brought forth at the end of each of the content categories, as well as at the end of the profile, where general psychological assumptions are brought forth.

This study is based on a systematic collection of data whose sources are newspaper reporting inside and outside of Israel and previously published literature about Yasir Arafat. The sources include:

- The database in the University of Haifa Library,
- The database of the International Policy Institute for Counter-Terrorism,
- Published features about Arafat in foreign and local newspapers,
- Books, mainly biographies (Hart, 1994; 1984; Gowers, 1992; Kierman, 1976; Rubinstein, 1995; Sayigh, 1997; Wallach, 1990).

The primary material surveyed is from 1990 onward. A small portion of the material also includes articles and interviews from the years 1985-1990. Among the information gathered, preference was given to information whose source was Arafat himself (interviews with the media and behavior), and to reports of people who know him well.

## *Psychological Profile*

**I. Outstanding Features**

**1. Emotional Stability**

Arafat has a great need to feel that he controls a situation at every moment and that he guides events. This need expresses itself in various ways:

- He zealously reserves the right to have the last word in all political developments (even when his representatives agree to matters with the Israelis).
- He tries to control all the minor details of the Palestinian Authority, even the most peripheral, such as, for example, checking traffic tickets on cars in Gaza (Rubinstein, 1995e).
- He attempts to take the initiative during interviews that he grants, and, when asked uncomfortable questions, he answers with a question or changes the subject, in an attempt to control the direction of the interview (Vitz, 1993).
- He is the only one who sets his daily schedule, and all others must conform to his extraordinary routine (Levitsky, 1993).
- One of the best-known examples of Arafat's uncompromising need to have the last word was his first appearance at the UN General Assembly on November 13, 1974, at which he was requested to appear without his pistol. Forced to accept this limitation, he appeared before the General Assembly wearing an empty holster.

Parallel to his great need for control, Arafat has shown impulsiveness and a tendency toward outbursts of anger (see the testimony of his wife, Suah, in Perry, 1992d). Among other things, this behavior expresses itself in unpredictable outbursts of anger against his partners in dialogue. Occasionally, these outbursts arise from his perception that others are disputing his authority or are not paying him suitable respect. Sometimes the outbursts come during difficult periods when Arafat feels he is cornered (Shaked, 2001). However, they have been known to occur without any discernable reason, and it is possible that in these cases, the outbursts reflect depression (Rosen, 1992). One gets the impression that, as Arafat has grown older, such episodes have become more frequent. During his outbursts, he tends to shout, cry, plead, and retreat into himself, completely ignoring those around him. During these fits of angry, Arafat has a tendency to present unrealistic positions, to exaggerate, to threaten, and to present himself as a victim or as one being threatened. It has been reported that in situations when one of his underlings annoyed him, Arafat reacted with an angry attack and threw the subordinate into jail for a few days (Azulay-Katz, 1993). Nevertheless, in general, Arafat tends "to cool off" quickly, and often even apologizes for his outbursts. Those who have met him describe his changing moods—which rise and fall (Levitsky, December 17 1993)—his tension, nervousness, and suspiciousness. His eyes dart about restlessly (Perry, November 18, 1994), or show signs of deep depression (Kamir, 1998). At other times, he is subject to practically euphoric moods, when he full of vitality, immersed in a strange cheerfulness, and amused by events (Yaari, 2001). At such times, his mood is optimistic (Shaked, June 20, 2001); and generally light-hearted (Marcus, 2001).

Arafat is a man of action who requires constant stimulation. In his book on Arafat, *Arafat: Terrorist or Peacemaker?*, Alan Hart (1984) states that all of the Palestinians with whom he spoke describe the activities of Arafat thus: His eyes dart about all the time, his body moves, his hands move in meaningless motions, and his knees jump (Hart, 1984, p. 26). He seems to have difficulty relaxing for any length of time, or enjoying himself, except for short periods of quiet; he explains this as due to lack of time and the impossible demands of his position. In an interview with a journalist (Sa'id, 1988) Arafat said, "When I don't have too many things to do, I become restless, bored, or depressed." He has been characterized as being excessively active from youth. In a newspaper interview a few years ago, his eldest sister described him: "From the moment he exited the womb, he was already the leader of the neighborhood children. He would divide them into groups and perform with them military-style exercises; he had a stick, and would hit those who didn't obey his orders." (Hart, in Arafat's biography, quoted by Freedman, 1990, p. 104). It is possible that, in professional terms, Arafat would have been classified as a hyperactive child. This hyperactivity continues to characterize him today, despite his advanced age, expressing itself in his many hours of work, in his daily schedule, in his inability to relax, in his frenetic travels throughout the world, and in his nonstop talking (e.g., Colbin, 1990).

**2. Independence at All Costs**

Arafat does not accept the authority of others. He is fearful and very sensitive concerning his independence. This attribute apparently developed at a young age, and has characterized him throughout his life. Arafat's behavior pattern of zealously guarding his independence has been particularly noticeable in the political arena. Several people who have written about Arafat have described this as an obsession for independence from other Arab countries and from oversight on the Palestinian issue (Sayigh, 1977). He tolerates no dispute concerning his positions, and must feel there is no one above him or even on his level. A characteristic example is Arafat's relationship with other leaders of the Palestinian Authority. For example he took steps to humiliate HAshrawi, whit became clear that she had reservations regarding his manner of operation (Rubinstein, 2001, p. 124). This attribute comes out not only in everyday behavior, but also in the more important things. This guarding of his independence sometime takes on a somewhat childish nature: Suah Arafat relates that he even fixes his socks by himself and sews on his own buttons. When she once offered to do the job for him, he answered, "No way!" According to her, he has been accustomed to doing for himself his entire life (Avrech, 1993).

**3. Suspiciousness**

Arafat's striving for independence is accompanied by great suspicion toward enemies and allies alike. This expresses itself, first and foremost, in all matters of his personal security. Arafat relies on no one but himself. He changes his schedule at the very last minute, without even reporting to his bodyguards (Perry, 1992a). He keeps his flight paths secret, customarily changing his pilots' flight plans, including destinations, and reporting to the airport just a short time before takeoff (Egozi, 1992). In light of the numerous attempts on his life, this behavior is understandable; however, his suspiciousness is not limited to personal security. Reports from those close to him describe him as a man who does not believe anyone, to the extent that he himself establishes his bodyguards' schedules, and he takes care that management of all negotiations remains in his hands and is not given over to his assistants. Some of Arafat's assistants have told journalists that his suspicion often borders on paranoia (Azulay-Katz, 1993). A survey of Arafat's behavior indicates a consistent pattern: He trusts only himself and suspects the entire world surrounding him.

Arafat is very sensitive to any criticism from those close to him and or even from well-wishers. He reacts impulsively to such criticism, and has even arrested a Palestinian Authority activist for criticizing him (Sella, 1994). The result is that his underlings limit their criticism (if any), for they can never predict how the "Rais" (big chief) will react. Arafat has been known to react with anger to even a hint of criticism from journalists or strangers, immediately going on the offensive (Shaked , 2001b).

**4. Need to Demonstrate Excellence and Superiority**

Arafat has a strong need to demonstrate excellence and superiority. He ceaselessly tries to show those around him that he is successful and better than they are—his supporters, as well as his enemies. The need to demonstrate excellence expresses itself in astonishingly boastful talk. For example, to a Jordanian reporter in Tunisia, Arafat said, "The Palestinians would have stopped General Schwartzkopf at the gates of Kuwait if they had decided to fight the Americans, just like we stopped Sharon at the gates of Beirut" (Zarai, 1991). In an interview his office in Cairo, he said: "Many times I stood facing death, and I overcame it" (Gabai, 1993a). In a

meeting with Israeli guests, Arafat declared with incomprehensible seriousness: "I am the most important person in the Middle East" (Michael, 2001). In a meeting with the German foreign minister following the Dolphinarium attack, Arafat said, "Sharon and I are the two greatest generals in history. But the difference between us is that I never lost a war" (Tipenbraun and Lior, 2001).

These expressions show Arafat's tendency to present himself as a successful leader with exceptional historical stature. Moreover, Arafat appears to see himself as better than other regional leaders, on the Israeli and the Arab sides—the exception being, apparently, Egypt's President Husni Mubarak (Rubinstein, 1996). Some of Arafat's expressions hint at an occasional lapse into megalomania and self-perceptions unconnected with reality.

Arafat is a man of struggle; he feels a strong need to strive and overcome. This combativeness is so engrained in his nature that his assistants often use it to manipulate him to give his consent, playing a game of "devil's advocate." The following grotesque example illustrates how Arafat's negative-combative behavior brought him to agree to a proposal by Israel's Foreign Minister Shimon Peres (Barnea, 2001d): The technique, used successfully at Oslo, went like this: Abu Allah comes to Arafat, and tells him that Peres is despicable. He presents what he claims to be Peres's proposal to Arafat, and declares that it is not in the Palestinian's interests. He then presents what he claims to be his own different proposal, which he insists, "I forced … upon that despicable Peres." The truth, of course, is that the proposal "forced upon Peres" was first contemplated in the creative mind of Peres. Only in this way would Arafat agree to the proposal.

In addition, one can understand by reading between the lines that Arafat sees himself as sly and superior to his rivals in his ability to manipulate others. This is also how he is perceived by the Palestinian street. Thomas Friedman in his book *From Beirut to Jerusalem* (1989) describes him as follows: "Arafat has the slyness of a merchant in the *shuk* (market), the sleight of hand of a magician, and the balance of a juggler in the circus, and, above all, the skin of a chameleon, which allows him to be painted with all political colors, each in its season" (p. 102). As an example of Arafat's juggling ability, one can cite his sudden invitation to six important Israeli journalists to meet with him at the height of the current intifada. According to journalist Joel Marcus, this was a "classic example of the manipulative ability of the *Galicean* (clever one) of Gaza." The fruits Arafat harvested from this meeting can be found, according to Marcus, in the wide coverage he received in Israeli newspapers. In one place, the meeting was described as a fascinating event. In another, a journalist wrote that Arafat was very alert, focused, and even optimistic. The general thread of the reports was admiration for his vigor, alertness, and good mood (Marcus, 2001). This action should be seen as psychological warfare at its best, reflecting Arafat's ability to manipulate and influence public opinion, in this case, the Israeli public opinion.

**5. Interpersonal Relations**

Various reports, quoting sources close to Arafat, indicate very problematic interpersonal relations between Arafat and those closest to him. The Arab author Mamdoch Nofel, who wrote a book on Arafat, reports a dismal atmosphere and defective personal relations in Arafat's close environment (Mantzur, 1995). Additional testimonies of people close to Arafat indicate that he "maneuvers" a great deal in his relations with those around him. He uses various ploys and tactics, drawing people close to him and distancing them, as he feels necessary. His people do not know in advance how he will react; and therefore they are always tense when asking anything of him (e.g., Rubinstein, 2001, p. 126). Among the tactics he employs with his subordinates are: instilling fear, arrests, outbursts of anger, pleading, presenting himself as a victim and/or a pathetic person, showering praise, meaningless appointments, and even bear hugs. In all cases, the outcome is identical—Arafat gets the last word, and the requester sometimes departs confused and even stunned. Arafat uses some of these tactics (especially presenting himself as a victim of circumstances) in his contacts with Israelis, as well (Barnea, 2001c).

The testimonies about Arafat's interpersonal relations, dating from the beginning of his life as a political activist, indicate a pattern based on the inability to maintain intimate contacts. From a review of several Arafat biographies, one gets the impression that this pattern of relationships was already present at a young age. As a result, he has had travel companions, but no real friends or comrades with whom he shares experiences, emotions, and difficulties. It appears that Arafat has practically no need for confidantes and intimacy, and he has never expressed feelings of loneliness in interviews, writing, or conversation. When a personal issue arises, Arafat always repeats his standard answer—that he has no time to talk about anything besides the revo. His relations with those around him are based principally on the pattern of "divide and conquer."

At the same time, Arafat can be impressive during personal meetings. Journalists and others who have met Arafat

describe him as having the ability to impress and win the heats of his listeners. For example, the Palestinian author Dr. Rashida Maharan, who wrote a book on Arafat, describes her first meeting with him: "A man of hope, very quiet, a bitter revolutionary, but a very attractive man; he captivated me with ease; he controlled me; I could not break free of his influence; he spoke sweetly, with simplicity" (Gabai, 1993a). According to Sa'id (1988), Arafat has an amazing ability to make you feel you love him, not as a politician but as a vulnerable man whom you've missed and are about to converse with in private. In personal meetings, Arafat is wont to shower his guests with food and to seem personally concerned that they eat. He gives them the feeling that he considers them important and cares about them—a feeling that transcends gaps in status and in power.

**6. Authenticity: Dramatic ability, double-talk, exaggerations, and lies**

Arafat has a natural dramatic ability, which he puts to extensive use. He is a natural-born actor. It appears that some of his outbursts of crying were planned in advance (as practiced by experienced actors). Arafat is able to switch character in the blink of an eye, and takes advantage of this ability to advance his goals within the Palestinian movement and in his efforts to win recognition and support among leaders of the world, in Israeli public opinion, and in world public opinion. As an example of his dramatic ability, one can cite his behavior during the signing of the interim agreement maps in Cairo in 1993: While standing on the stage, Arafat refused at the last minute to sign some of the documents, and aroused the anger of President Mubarak (Rubenstein, 2001, p. 125).

Arafat uses his dramatic ability to convey his messages to the world with gestures, metaphors, and symbols. An example was his donation of blood in front of the television cameras, several days after the terrorist attacks on the United States on September 11, 2001. He posed in front of the cameras to donate blood for the many injured, with full knowledge that his donation had no practical significance; there was no way to send fresh blood to the United States from Gaza. Not only had the United States not requested blood donations, but Arafat himself takes medication that makes his blood unacceptable for donation. However, as in other cases, Arafat spoke to his people and to the world through symbols and gestures, not with concrete language (see a similar assessment of Arafat's behavior in the course of the Camp David II talks, by Prof. Shlomo Ben-Ami, foreign minister in the Barak government, in Shavit, 2001).

Arafat is capable of adapting his style of speech to his target audience: the Palestinian national assembly in a refugee camp, the Jewish public in an Israeli television interview, etc. (See, for example, the appeasing, relaxed interview he gave Israeli television's Channel 2 on the eve of elections in Israel in February 2001.) Arafat is capable of changing positions at will. He knows how to "turn on the charm," and to appear as a serious and levelheaded diplomat without allowing his behavior to reflect his true plans and his upcoming course of action. When necessary, he presents himself as a pathetic person, whose life is threatened and who most urgently needs help. In the next breath, he can threaten to burst out in anger–and then invite his listener to appease him (Levitzky, 1993).

An Arab journalist who came to Tunisia to interview Arafat describes his impressions: "I saw him in a national assembly in which he demonstrated unbelievable ability to control. With Arafat, this always starts with friendly courtship, which includes many kisses and handholding. Afterwards, he cuts them off, gets tough, and controls the rules of the ceremony. Finally, when he cannot convince them, he becomes theatrical. He has a variety of expressions that can compete with great actors: amazement, moral outrage, anger, splendor, and clumsy charm. He pulls them out one after the other with amazing speed. Even his performances appear spontaneous" (Sa'id, 1988).

As the result of this dramatic behavior, it is very difficult to predict his reactions. A typical example of his unpredictability was Arafat's speech at the meeting of the World Economic Forum in Davos. After a "good" meeting with Peres, his entourage expected him to make a moderate speech, as he had promised beforehand. However, in front of more than 500 world leaders, he made an aggressive speech, accusing Israel of the destruction of hope (Eichner, 2001).

Arafat's use of double-talk has been well-known for many years, and has attracted widespread journalistic review and analysis. Despite this exposure, Arafat has not changed his ways. He continues to adapt his messages to his target audience and to the situation. When the media pressures and confronts him with the contradictions between his words, he sidesteps the issue and generally blames them for misunderstanding him or taking his words out of context. A salient example of Arafat's double-talk was his speech in a Johannesburg mosque before a

Muslim audience, in which he declared that the Oslo agreement was like the agreement that the Prophet Muhammad signed with the Koresh tribe of Mecca (an agreement based on tactical considerations at a time of weakness, entered with no intention of abiding by it in the long term (Margalit, 1995). Another example was Arafat's declaration upon signing the Wye Plantation agreement: "We shall not return to violence." However, upon his return to the West Bank, he again declared: "Our guns are ready, and we are ready to raise them" (Zuckerman, 1998). In an interview with CNN at the height of the first intifada, Arafat said, "The forces in the field are pressuring me to authorize the use of arms in their possession, but I will not allow them." However, in conversations and in secret documents disseminated to his people in the territories, he urged the escalation of the intifada struggle and the use of live ammunition against the IDF, settlers, and new immigrants (Shaked, 1990). In an appearance on Palestinian television after the elimination of Yehiye Ayyash (nicknamed "the Engineer"), he praised suicide terrorists: "Let us honor the holy ones who rise up from the nation, and, especially, Yehiye Ayyash. Our mutual purpose is to carry on in their footsteps. Obviously, all of us are candidates to sacrifice our lives at the death of the holy ones, in remembrance of the holy noble and brave ones" (Atlas, 1998). In the same breath, Arafat put in a call to Israel's Prime Minister Sharon and President Katzav to convey New Year greetings, and, just afterward, to Saddam Hussein, to request his help to put an end "to the terror of the Zionist entity" (Shaked and Zinger, 2001). He can hug and kiss Israeli leaders, giving an impression of intimacy, friendship, and even a glimmer of hope (Rosenblum, 2001). A review of the vast amount of material gathered indicates a consistent pattern throughout the years of the use of double-talk and even triple-talk.

Another facet of Arafat's character is his strong tendency toward exaggeration. His exaggerations cover many diverse areas. He claims that Israel uses depleted uranium shells and chemical weapons against his people (Barnea, 2001b). He gives completely untenable numbers of dead and wounded on the Palestinian side (Schiff, 2001a), and blames the increase in abortions among Palestinian women on the use of the Israelis' tear gas (Perry, 1989). And this is only a partial list. His exaggerations are often completely untenable, and yet Arafat continues to use them, despite their easy refutation. For example, he continues to spread the myth that a map hanging above the main entrance to the Israeli Knesset shows the Land of Israel stretching from the Nile to the Euphrates (interview with John Afrek, and *Playboy*, August 1998). Similarly, he claims that the two blue stripes othe Israeli flag symbolize the Nile and the Euphrates (Rubenstein, 2001, p. 14). Some journalists have been amazed, on more than one occasion, by the "proofs" upon which his claims are based, which actually appear to be illogical. In general, he pulls notes from his pocket containing newspaper excerpts without distinguishing between facts, assumptions, and estimations, and with disregard for the reliability of the sources.

One gets the impression that Arafat tends to believe partial and unsubstantiated information when it supports his beliefs, accepting them—or at least presenting them—as hard facts. Sometimes it appears that he himself does not perceive his words as lies, but believes them completely. Thus, for example, after a terrorist attack in Israel, in mid-February 2001, Arafat claimed that it was only a traffic accident, despite the terrorist himself having acknowledged that it was a deliberate attack. Arafat thus has tried to evade requests for him to denounce a terrorist act, or to negate Israeli claims regarding Palestinian Authority responsibility for the incitement that led to the attack. The use of polyglot is one of the ways Arafat conveys messages to his people. He makes use of body language, implicit statements, hints, etc. Even his travels abroad at crucial stages of the struggle are meant to convey a message, and are often the occasion of deadly terrorist attacks (Carmel, 2001). Arafat's people know how to read his code of behavior (Shaked, 2001a). In this way, Arafat can later claim that the words were not his responsibility and can place the blame on others. An example of such "subtle hints" was Arafat's appearance (August 25, 2001) with a small submachine gun in his hands during a visit to a site in the Gaza Strip shelled by the IDF. All of this was done with full knowledge that he was being filmed by Palestinian television, and that pictures of him would be transmitted worldwide).

One gets the impression that Arafat is not concerned with telling the truth (to say the least) and has no emotional difficulty with that; his prevarication is not accompanied by any external signs that could give him away. For example, in a meeting with General Moshe Yaalon on October 7, 1995, Arafat was presented with a list of 35 wanted men. When Yaalon reached Muhammad Deif, the number-one wanted man at that time, Arafat put on an innocent face, turned to Muhammad Dachlan, and asked him, "*Muhammad Esh?*" (Muhammad who?) Intelligence information in the Yaalon's hands showed that this same Deif had been in Arafat's office at a personal meeting only three days prior. From some of his utterances, one gets the impression that he assumes that everyone lies. For example, the German foreign minister, Joschka Fischer, became angry when he heard from Arafat that he had no intention of denouncing those who had carried out the terrorist attack at the Dolphinarium. However, he was even more astounded by Arafat's response to his question: "Are you ready, from the depths of your heart, to renounce terror?" Arafat replied, "And the renouncement of the Holocaust by the Germans—are you really going to tell me that it is from the depths of your heart?" (Tipenbraun and Lior, 2001).

This behavior pattern comes into play especially when Arafat is attacked by the media—as, for example, after terrorist attacks. He usually blames the Israelis, claiming that they themselves initiated a particular action. For example, Arafat repeated many times the claim that Israeli security services assisted terrorists in carrying out the lethal attack at Beit Lid junction (January 1995) in which 19 soldiers and civilians were killed. Similarly, after one of many attacks in Netanya (Autumn 1999), Arafat announced that the Palestinians had nothing to do with the action, and that it was an operation of the Israeli mafia (Rubenstein, 2001, p. 13). Owing to Arafat's extensive use of his dramatic ability, double-talk and tendency to exaggerate, it is hard to evaluate whether Arafat truly believes his words, or whether it is all part of the "show," each time targeting a different audience. From a review of the material before us, one gets the impression, that, at least in some cases, Arafat truly believes what he is saying: This is evidence of extreme suspiciousness that borders on paranoia.

From this behavioral pattern, Arafat emerges as utterly unreliable, and it is impossible to rely on his word. His unreliability expresses itself in diverse ways: He does not object to lies, uses half-truths and exaggerations, speaks in double-talk, and conveys double messages. As a result, on the one hand, it is very hard to predict his behavior, since it comes from a man whose manner of thought and behavior is completely different from that recognized and accepted in politics and business in the Western world, and, on the other hand, it is difficult to know what his intentions truly are.

**7. Symbol of the Palestinian Revolution**

Arafat is seen by himself and by those around him as a symbol of the Palestinian revolution. His perception of himself as a revolutionary symbol is expressed in several ways, most outstandingly in his external appearance. Every detail is symbolic: his unshaven face, the kaffiyeh on his head, his military uniform, and his pistol. When he is asked in various interviews about his external appearance, he avoids responding on a personal level, and always gives answers of a political-ideological nature (Rubenstein, 2001, p. 42). For example, he says that he does not want to waste time that he could be dedicating to the Palestinian nation on shaving; or, in the style of a guerilla, he claims that the conditions of his life do not allow luxuries such as shaving. In response to a question concerning his uniform, he answered: "Don't forget that I am the supreme commander of the Palestinian forces. I cannot change my skin. I am not a chameleon. I also said to President Reagan, if you give me a country, I am ready to wear a tuxedo and bow tie" (Avrech, 1993). Similarly, he pays great attention to his uniform, a symbol of the Palestinian collective (Gabai, 1993e), to his pistol (symbol of the armed struggle), and to the kaffiyeh on his head (which creates a profile of the map of Palestine). All of these symbolize his path and the armed struggle, to which he has dedicated his entire life.

He takes care not to change his uniform even in international appearances, and, in this way, broadcasts to the world, and especially to his people, that he is in a constant struggle for the Palestinian revolution. On the wall in his office in Tunisia hung a photograph of himself and his wife, Suah, against a background of the Dome of the Rock—a photomontage, of course. On another wall were two large portraits of Arafat, one as an old guru and the second as a dynamic warrior (Avneri, 1994). In this way, he strengthens the myth surrounding his image, built throughout the years, as the father of the revolution and the creator of its symbols. Despite the apparent sloppiness, Arafat's assistants say that he dedicates much attention to this appearance. All of his external appearance—the theatrical and the provocative—serves to emphasize that he is the symbol of the Palestinian struggle, which stands completely opposed to the diplomatic appearance "acceptable" in the world.

Arafat has a strong tendency to blur every uniquely personal component of his personality and to present himself as "Mr. Palestine." Arafat has cultivated this approach throughout the years in various ways. For example, he has fostered myths about his biography, attempting to present himself as Jerusalem-born, while, as far as is known, he was born in 1929 in Cairo, his family moved to Egypt for economic reasons, and they were never refugees (Rubenstein, 1996). Similarly, his answer to the repeated questions over the years, before he got married, as to why he was not married was: "I am married to the Palestinian revolution" (Araf, 1994). He repeatedly claims that any personal criticism of him is criticism of the Palestinian revolution, and, therefore, not legitimate (Colbin, 1990). After the plane accident in the Libyan Desert, Arafwarded off all attempts to appoint a successor for him, saying, "I am the Palestinian revolution, and there will be no other symbol for the revolution in my lifetime" (Perry, 1992). Even Arafat's birthdays have turned into the birthdays of the Palestinian revolution (Rubenstein, 2001, p. 153), in a manner that indicates a high-level personality cult.

Many components of private life, characteristic of other leaders, practically do not exist for Arafat. He has no hobbies, free time for going out, personal friends, or social engagements; he reads only material connected with

his work and does not read good literature of any kind; as far as is known; he does not go to plays, the theatre, or any other entertainment. He does not travel for pleasure (all of his many travels are solely for purposes of work), and has never been known to visit nature reserves, parks, or museums. His wife testifies that he sometimes watches cartoons and Westerns on television. One gets the impression that even if the blurring of boundaries is done deliberately for political purposes—to merge his personal identity with the Palestinian collective identity, which he symbolizes—Arafat has internalized his being a symbol of the struggle for Palestinian independence, making it part and parcel of his internal identity: "I am the revolution." His personal identity has merged completely with the collective.

This perception helps Arafat, among other things, to see himself throughout the years as a sole leader without a substitute. Therefore, apparently, Arafat has never designated a successor and has not "mentored" any of the people around him to "grab the wheel" when the time comes. Another explanation for this is his never-ending need to strengthen his position as sole leader and only decision-maker among the Palestinians (Perry, 1992b). For example, after signing the principles of agreement in Washington, Abu Mazen (Mahmoud Abbas) won the hearts of the world media—as well as the hearts of the Western leadership—with his openness, moderation, precise formulations, and his leadership ability. In private, there was talk of Abu Mazen as the successor to Arafat. But when this talk reached the ears of the chairman, he immediately took steps to distance Abu Mazen from the stage (Azulay-Katz, 1993).

**8. Honor Above All**

Arafat attaches great importance to his honor. This tendency has characterized him throughout his life and has become more pronounced as his international status has risen. He perceives respect toward him as respect toward the Palestinian nation. His people are also very careful to guard his honor. For example, according to a British newspaper, Naji El-Ali, the Palestinian caricaturist of the Kuwaiti newspaper *El-Kubs*, was murdered in London because he did not hesitate to publicize a caricature that ridiculed Arafat, showing Arafat hiding the existence of a lover. There is no proof that Arafat gave the order to murder the cartoonist. According to the same newspaper, Naji was warned in advance in dozens of telephone conversations "to stop using Arafat in his drawings" (Machanayami, 1987b).

Arafat's sensitivity to his honor is so great that he is capable of halting important political processes if it appears to him that he is not receiving the honor he deserves. From here also stems his sensitivity to formalities—and not only substance—during any negotiations: attitudes toward him, meetings with him, his status as the most veteran politician in the Middle East, relating to him as a de facto president, etc. For example, in conversation just before the Oslo agreement, Jack Nariye, a political adviser of Prime Minister Rabin, mentioned that Arafat was not yet president of a state, and, in reaction, the chairman shouted, "I am a president, I am a president" (Granot, 1993a).

When Arafat senses disrespectful behavior, he tends "to break the rules of the game." The insult to his honor does not have to be direct. He can be offended, for example, when he is not approached at the right time, or, when it appears to him that he is being ignored. For example, in a meeting with Prime Minister Rabin, he was approached last and asked how he (Arafat) explains the celebrations in the Palestinian authority after every murder of Israeli civilians by Hamas and jihad activists. Since Arafat did not have any real answer, "he expressed displeasure that Rabin called him chairman, while the entire world called him president" (Verter, 1994). When Arafat gave a public speech condemning Jordan's position on the peace agreement and regarding Jerusalem, experts attributed the criticism to his not having been invited to the signing of the peace agreement between Israel and Jordan (Sella, October 26, 1994). When asked by journalists, Arafat says that his honor is important to him and adds, "I am a president without land, without a country, so what is left for me? Only honor and etiquette" (Levitzky, 1993).

It is possible to attribute his behavior throughout the years—e.g., forcing many people who wanted to meet with him to wait for days and weeks, without knowing whether they would be called to meet with him—to his high sensitivity to honor, as well as to his tendency toward dramatics and even megalomania (Sa'id, 1988; Rubenstein, 2001, page 121). A list of the journalists who have suffered this treatment is very long. When the meeting actually took place, it was usually after midnight, shrouded under heavy cover of secrecy and mystery. Arafat never bothered to apologize to those who had to wait, nor did he mention the late hour, as if it were obvious that it is not easy to get an interview with such an exalted personage, and the path to meeting with him is long and difficult.

### 9. A Place in History

Arafat is very sensitive to his place in history, i.e., to how he will be remembered and what will be written about him and his leadership in the history books. This sensitivity expressed itself, for example, when his plane was caught in a storm above the Libyan Desert, and was about to make an emergency landing (April 1992). Arafat, who was sitting in his track suit, changed into his official uniform, strapped on his pistol, and carefully arranged his kaffiyeh, with the intent that if he should be found injured or dead—it would be in uniform (Weaver, 1994). Various analysts have argued over what historical image Arafat would like to emulate and how he would like to be perceived by his people. General Amos Gilad, the former head of the Research Section of the IDF Intelligence Unit, reasoned that Arafat sees himself as a second Saladin. The commentator Ehud Ya'ari believes that Arafat sees himself more as a modern reincarnation of the "Sahaba"—friends of the prophet Muhammad, who conquered all of the eastern world on behalf of Islam, and are considered by Muslims to be semiholy. According to Ya'ari, it is no coincidence that Arafat's favorite historical figure is Khalif Omar, who entered the gates of Jerusalem (Yaari, 2001).

From a review of Arafat's statements one may discern three central foundations to his historical self-perception. First, Arafat wants to be remembered as the "Father of the Palestinian Revolution," the man who founded and established the Palestinian movement, achieved after difficult struggle and many sacrifices, and succeeded where all the other Arab countries failed (Araf, 1994). As father of the revolution, he sees himself as a figure representative of all Palestinians, wherever they are (including residents of the refugee camps and Palestinians in the diaspora). Second, Arafat wants to be remembered as the president and founder of a Palestinian state, the man who started with a small organization and succeeded in establishing a country with all the trappings of an independent state, recognized by the entire world. Third, Arafat wants to be remembered as the Arab leader who returned the holy places in Jerusalem to the bosom of the Arab nation (Gabai, 1993b), and thus assured himself a place of honor among Arab leaders forever. In this, he sees himself also as the representative of the Christians, who, according to him, will benefit from his protection by receiving complete fof religion and freedom of ritual practice. The spreading of his protection to Christians will also, according to his understanding, ensure his place in history as a leader of universal stature.

### 10. Determination and Tenacity of Purpose, Ability to Survive

One of Arafat's prominent characteristics is his determination and tenacity of purpose. Arafat does not surrender, even when he finds himself facing a hopeless situation. Throughout his stormy life, full of upheavals, he has held faithfully to his long-term objectives. He has emerged phoenix-like from crushing military and political defeats. He absorbed a severe blow in September 1970, when he was deported from Jordan by King Hussein's Jordanian Legion. He soon moved on to Lebanon with his forces, establishing, in fact, a quasi-government of his own within parts of Lebanon. Expelled from Lebanon by Israel in 1982, he established his new headquarters in Tunisia; he then faced a serious inner mutiny supported by the Syrians (the Abu Mussa mutiny) in 1983. In 1991, he prominently supported Saddam Hussein during the Gulf War, which cost him his economic support from the Gulf emirates and Saudi Arabia. From all these setbacks—and these were only the most outstanding ones—that would have ended most leaders' political careers, he recovered and returned to the arena, ready to resume his struggle.

To withstand all these trials, Arafat obviously is endowed not only with great determination, but also with an astonishing ability to recover, to maintain faith and hope without despairing, to be endlessly patient, to inspire hope and faith in the Palestinian "street" as well as in the top leadership, and to maneuver so as to cope with changing demands. All these have enabled him, despite opponents and criticism, to continue and maintain his position at the head of the Palestinian hierarchy. He is also willing to sacrifice for his goals. For example, on his first visit to Jordan after the Sabra and Shatilla massacre, in an assembly in his honor in the PLO headquarters in Amman, he stood on the stage, and with sweeping motions of rage, he said to thousands of Palestinians who came to salute him: "We have lost 5,000 people in Sabra and Shatilla, and we are ready to lose 50,000 people more to free our homeland" (Friedman, 1990, p.104). In all the enormous quantity of material written about Arafat, not even one incident is recorded in which Arafat engaged in soul-searching regarding his people's sacrifice or questioned the price being paid for their "liberation." On the contrary, Arafat emphasizes and glorifies sacrifice as a way to achieve the Palestinian goal. He sometimes claims that the sacrifices the Palestinians have already made oblige them to continue the struggle with determination, so that past suffering and loss will not be in vain. He regards all Palestinians, including children, as potential fighters in the struggle (Araf, 1994). From his words, one receives the impression that the goal justifies all possible means, or that "there is no other alternative."

To these qualities two prominent behavior patterns should be added: First, Arafat tries— sometimes with success—to turn military and political defeats into victories in the perception of the Palestinian "street." An example from the beginning of his career was the Karame action (March 21, 1968), which he has represented as "the first historical Arab triumph over the state of Israel." (Wallach, 1990, p. 29) An additional example is his characterization of the Israeli siege of Beirut, which ended in the evacuation of Palestinian forces from Lebanon, as an unprecedented victory of "the few against the entire great Israeli army, on its air and sea forces" (Rubinstein, 2001, p.77). In other words, Arafat succeeds in turning defeats into myths of unprecedented victories—and the Palestinian "street" enthusiastically adopts these myths. Second, Arafat reveals personal courage. Even in defeat, he does not abandon his forces but remains with them, refusing opportunities for personal escape. This happened in the siege of Beirut, and again when he entered Tripoli, which was besieged by the Syrians from the sea in order to head off his forces.

Arafat demonstrates very high survival ability, both physical and political. He has survived many attempts on his life (forty such attempts, according to him), battles, accidents, and endeavors by his opponents to depose him. Even if the numbers are exaggerated, there is no denying that he has an uncanny ability to land on his feet.

Arafat has a good ability to identify threats, to adjust himself to changes in his surroundings, and to react quickly to developments. These qualities helped him escape life-threatening dangers, such as his escape from Jordan in 1970, the siege on Beirut in 1982, etc. The Palestinian "street" (with help from Arafat himself) has created myths and folklore surrounding his escapes from danger. The connecting thread in all these stories is Arafat's sixth sense, which guides him to leave a house which is going to be blown up at the very last moment, to change his direction at the last opportunity, to change his lodging, etc. (Bergman, 1998). Thus Arafat's survival turns into a myth of the Palestinian street that he is "a cat with nine lives" (Perry, 1992a), whose many enemies cannot overcome him.

## II. Characteristics of Arafat's Functioning

### 1. Cognitive Functioning

Arafat is "a one-mission person," with the Palestinian issue taking center stage. He himself testifies that "only politics interests me, and I live for it" (Sa'id, 1988). From several reports, it appears that when the subject is not politics, he becomes bored and loses interest and concentration (Levy, 1995). It is possible that this is connected to his hyperactivity, making it hard for him to concentrate on subjects other than those central to his interest. Arafat is one who has only one issue at the center of his life and no other.

His subordinates and those close to him testify that Arafat has a superb memory for details and people, mainly with regard to anything related to their attitude toward him over the years (Araf, 1994). Most of his interviewers report that he maintains vitality during an interview, repeats himself accurately, avoids slips of the tongue, and does not allow himself to be dragged into subjects in which he is not interested (Perry, 1989). Some of those who met him reported that he has a compulsive sense of accuracy and order. For example, he repeats actions in a systematic and precise way, such as a fixed arrangement of the kaffiyeh on his head or emptying his revolver and arranging the bullets in perfect order (Kolbin, 1990). In general, the impression is that Arafat has an obsessive tendency to accuracy and order, but this tendency does not seem to interfere with his everyday life.

Apart from his theatrical behavior, Arafat appears to be accustomed to adapting information that suits his worldview, without any factual basis. One of many examples is his strange fixation that "the wall of the Temple Mount is not the Wailing Wall, but a Moslem mosque" (Zuckerman, 2000). Arafat insists on holding onto these claims even when his assistants try to divert him from the topic, due to the clear inaccuracy of his words, contradicting research-based facts. These claims make his words ridiculous. The impression is that his way of thinking sometimes becomes emotional-intuitive, ignoring the facts.

Arafat is not characterized (in the past as well as in the present) by orderly, bureaucratic work that includes teamwork, listening to various opinions, discussions about long-term policy, clarifying alternatives, determining defined objectives, etc. Arafat's management style includes by tactics that change from one moment to another, according to data. When criticized that it is impossible to work this way, Arafat has dismissed his critics by saying,

"With time, everything will fall into place" (Louise, 1995). Among other things, as a result of this conduct, observers find it hard to understand his desires and intentions, what he is striving for, and they interpret it—mistakenly—as of direction.

**2. Family Life**

Arafatpresents himself to his people as an ascetic who dedicates his entire life to the revolution, at the expense of his private life. At the same time, there have been reports throughout the years that Arafat has had several love affairs (for instance, Araf, 1994; Rubinstein, 2001, p. 111; Kierman, 1976). Arafat himself took the trouble to strongly deny these stories. In the past, there were malicious rumors about his being homosexual (Yon Michay Patzapa, one of Nicolae Ceausescu's Romanian heads of espionage, who defected to the West, wrote about this in his book *Red Horizons*), but there is no additional support for it, and, most probably, the rumors are unfounded.

Arafat surprised all of his acquaintances when he married Suah Tawil in 1990, at the age of 62. Suah, a member of a wealthy Christian family from Ramallah, is 34 years younger than Arafat. Her mother, Ramonda, was active in the 1970s in opposition to the Israeli occupation. When Suah was eighteen years old, the family moved to Paris. Suah worked in Arafat's office in Tunisia, and the two married secretly. She converted to Islam for the marriage; recently she made a hajj, the pilgrimage to Mecca (Perry, 2001). Suah herself claims that she initiated the relationship, courted Arafat, and urged him to marry (Perry, 1992e). Since then and up to the present, there have been rumors concerning a crisis in their marriage and much comment on the fact that Suah and their daughter live for long periods of time in Europe (Kotlovski and Gabai, 1994). Most of the information about Arafat's family life comes from his wife's interviews in the media.

From a psychological point of view, the most prominent fact is that Arafat's schedule and way of life have not changed in the slightest since his marriage. He continues to conduct a lifestyle and daily agenda that is overfilled to the point of exhaustion, and hardly dedicates any time at all to his wife and his only daughter—something that his wife has verified in various interviews (Peperblit, 1992; Perry, 1992e). Suah comments that the daughter, Zoah, knows Arafat mainly from pictures and from television (Perry, 1996). This conduct also indicates the huge gap between the image presented to his people (for example, Suah's description of fifty intifada orphans adopted by her and her husband in Segev, 1994) and Arafat's actual conduct. This gap is probably part of the efforts of Arafat and those close to him to magnify the myth of "the father of the nation." Arafat continues to dedicate his whole being to the Palestinian cause, and even his marriage and the birth of his daughter have not changed his course. Several years ago, it was reported that Arafat gave Suah signatory rights on funds that he distributes among various PLO sectors and in the territories (*Ha'aretz*, 1992), and that she is, in fact, in charge of the PLO's secret bank accounts abroad and holds the secret account numbers (Perry, 1992e; Levin, 1993). If this is true, then it indicates the trust that Arafat has in his wife. There is no information corroborating this from any recent period.

It appears from various reports that Suah leads a completely different lifestyle than that of her husband: She loves shopping, cafes, museums, and Paris. She reports disagreements with Arafat regarding the management of the Palestinian Authority. Suah even has taken upon herself various roles in the Palestinian organizations. With regard to attitude toward Israel, there is, apparently, agreement between the couple: Her words during Hillary Clinton's visit in Gaza, claiming that the Israelis poison the Palestinians, are well remembered. In an interview to the Saudi Arabian newspaper *Saiidati*, she said that she "hates the Israelis, and opposes normalization and the peace process" (Perry, 2001).

**3. Lifestyle and Work Habits**

From the many reports of people connected to Arafat in the past and in the present, a picture emerges of a person whose lifestyle and work habits have hardly changed over the years, despite the many political changes. Arafat works very long hours, day and night. By Western standards he would be called a "workaholic." He himself testifies regarding his concept of work saying, "a competent politician ought to read every piece of paper on his own" (Avrech, 1993). His schedule usually includes getting up late in the morning, breakfast (healthy food), exercise, and then meetings and work well into the late hours of the night (Kolbin, 1990; Raviv, 1995). The morning hours he generally dedicates to requests from individuals, such as women seeking university scholarships for their sons. Important meetings and serious business are conducted at night, until the early morning hours. During the late night hours, Arafat is at his best and is described by his interviewers as vigorous and alert (Avrech, 1993).

Psychologically, the outstanding fact is that, despite the many changes Arafat has undergone (Jordan, Lebanon, Tunisia, the Gaza Strip, and the West Bank), his daily agenda and his basic work habits have hardly changed. He continues to live a lifestyle and keep up a daily schedule much more appropriate for an underground revolutionary or a leader of a secret organization than for a leader of a country. He continues to be occupied with all the details of his organization, from the smallest to the largest, keeping his hands on all the strings. Therefore, he carries excessive assignments and has no time left for anything else (Rubinstein, 1994b). Suah Arafat relates that when she asks him to stay with her more, he answers, "I have no time. I am busy. I need to handle our state affairs" (Perry, 1996). Throughout the years, the people surrounding him have had to adjust themselves to Arafat's daily agenda and his priorities.

**4. Health and Age**

Arafat was born in 1929. Throughout the years, it has been reported that his health was good. He does not smoke, does not drink alcohol, is strict about healthy food, takes care of his health, and exercises. Despite his pressure-filled daily agenda, he devotes very little time to tension-reducing activities such as watching television or comedies, which he loves (Altman, 1989).

The great change in his health occurred in April 1992, following a plane crash. He suffered a head injury and underwent an operation to drain blood clots. After the accident, there were many reports about his tiredness, his poor health (Bechor and Rabin, 1992), and even about his lowered mental condition (Rozen, 1992). Later on, there were medical reports saying he was exhausted, but refuting rumors that he had had a stroke or was suffering from any serious diseases (Bechor, 1996). Nevertheless, after several years, the trembling of his lips appeared. The Palestinian Authority even blamed Israel for spreading false propaganda regarding Arafat's health (Sokol and Hess, 1997). American experts said that Arafat appeared to have Parkinson's disease. According to another assessment, he was suffering from hydrocephalus (Krouse, 1997). An article in *Foreign Report* presented testimonies that Arafat was suffering from deep depression (Kamir, 1998). At the same time, reports continue to maintain that Arafat is relatively healthy, strong in body and soul (Shaked, 2001c). One of the differences recently visible is that one of Arafat's assistants stands next to him during interviews and whispers to him whenever he finds it hard to formulate his words.

So identified is Arafat with the struggle that he has not designated a successor, despite his age (74) and health problems. Palestinian leaders, aware of his advanced age and his medical condition, do not address the absence of an identified successor because of their respect for Arafat and out of fear of his sudden rages, as well as from fear of a war of succession in the Palestinian camp. The Palestinian leader's blunt treatment of Hanan Ashrawi, when she called for an appointment of another Palestinian leader in his stead, after all traces of his plane were lost in the Libyan Desert, is well remembered. He never forgave her (Bechor, 1996).

**5. Functioning under Pressure**

Over the years, Arafat experienced many pressure-filled situations, some of which him in mortal danger. Relying on descriptions of Arafat's conduct in times of crisis, one may conclude that he functions well under pressure. Reports about his mood and manner of functioning during crises corroborate this. Well-remembered are, for example, the interviews Arafat granted reporters, including Israeli journalists, from his bunker in the besieged city of Beirut during the Lebanon War (1982), in which he demonstrated an impressive ability to resist. Similar conduct has recurred during the current crisis. In a speech given on the occasion of Nachba Day (the Palestinian designation for Israeli Independence Day), listeners from the veteran PLO team testified (according to one of his bureau staff), "For years we have not seen such vitality in him; Arafat demonstrates a good mood, is recently absorbed in strange cheerfulness, and is amused by the events" (Ya'ari, 2001)

One of the impressive testimonies to Arafat's ability to cope with difficult situations and threats to his life was an interview granted to a *New Yorker* reporter in 1994, in which he described what he had undergone while his plane was about to crash in the Libyan Desert. Arafat, according to his testimony, was quite and calm. As a religious Moslem, he was absolutely certain that man's fate was in the hands of God, who determines the years of one's life. After whispering verses from the Koran, he said aloud, "Oh, Abu Jihad, wait for me, I am joining you" (Rubinstein, 2001, p. 99). Religious fatalism enables Arafat to feel relaxed in times of stress and strengthens his courage. It is probable that, after so many crises, Arafat's faith has grown stronger because of his feeling that he "is guarded from above."

In addition, it is notable that Arafat feels great satisfaction when he acts against a force greater than himself. Among the abundant examples of this are the Karame action (March 1968), the siege on Beirut (July 1982), and facing the IDF in the territories since October 2000. Psychologically, the impression is that in such situations Arafat is on a kind of "mental high." He appears to be in good spirits, does not hesitate to make difficult decisions, shows courage, and is willing to sacrifice people for the good of the cause. He refuses to submit to the dictates of external pressure and shows an intense unwillingness to compromise. Sometimes, he exhibits a strong religious inclination that allows him to believe he is fulfilling a holy ordinance and so makes him willing to take greater risks. Such a description is fitting when Arafat does not descend into one of his gloomy moods, during which his reactions are diverse: anger, tantrums, excessively dramatic behavior, and expressions of victimization.

## III. Leadership Style

A subject that attracts extensive coverage in the press and in the many books on Arafat is his leadership style. This combines his character traits, although the main factor is extreme centralism.

### 1. Decision-Making

Arafat is at the top of the decision-making pyramid; he is the sole source of authority and makes decisions on all issues, large and small. This is a clearly hierarchical style in which information flows vertically (from the top down) rather than horizontally. Arafat is the final arbiter in the organization (Machanayami, 1987a; Kolbin, 1990), and this pattern has continued to characterize him even after the Oslo Accords and the move to the territories (Rubinstein, 1994b). Yehosafat Harkabi, a Middle East expert, expressed the view that Arafat tends to consult with others, yet reserves decisions on genuinely important matters for himself, including formulating fundamental approaches and practical action plans (Perry, 1992c). Moreover, it appears that most of his advisers tend to offer advice consistent with Arafat's own views (Waller, 2001).

Some of the important decisions made by Arafat are approved by the PLO's official bodies, such as the executive committee, the central council, etc. It appears that in most cases, Arafat brings his decisions up for discussion in these forums only when support is ensured. Experts who follow the political processes in the PLO estimate that Arafat manages to manipulate activists to secure a majority (Bechor, 1993). In other cases, Arafat makes the decision alone without convening other bodies (Granot, 1993). Criticism on this point has sometimes been voiced (behind his back) by various PLO figures. For example, Faisel Husseini and Hanan Ashrawi at one point threatened to resign their public offices, hoping to convince Arafat that decisions could not be made in a democratic society without consultation (Sella, 1994a). Gaza leaders have also expressed harsh criticism at Arafat's behavior as a leader, claiming that he makes decisions alone, shares decision-making with no one, and continues to exhibit the mannerisms of a leader of an underground organization rather than of a head of state. In this context, they mention his demanding the presence of members of his government at two o'clock in the morning—a request no one dares refuse (Verter, 1994; Barel, 1994).

Officially, Arafat's centralization of power is expressed in three primary titles: president of the State of Palestine, chairman of the PLO, and chairman of the Palestine National Authority. This entails extraordinary centralization: an authoritarian government, similar to that typical of most Arab nations (Louise, 1995), without surrendering the illusion of democracy (Ya'ari, 1996b).

### 2. Financial Control

The most prominent expression of Arafat's central rule is his absolute control over the organization's financial resources. For example, a member of the PLO Central Committee once said that if Arafat were to die, the PLO would need 50 years to reorganize because Arafat was the only person who knew all the details relating to finances (Levin, 1993). Even allowing a degree of exaggeration in this statement, it is indicative of his style of financial leadership; Arafat is the sole signatory on checks and the only person who decides what is done with the money (Levitzky, 1993; Levin, 1993). He administers the Fatah Fund, is the treasurer of the PLO's military arm, and, in practice, controls the committee that administers the Palestinian National Fund, the PLO's central financial organization (Levin, 1993). After the Oslo Accords, contributing states announced that Arafat would not see one single cent until the establishment of an organized reporting system and the submission of development and

rehabilitation programs with specific details as to the purpose of the funds. A mechanism was established on paper, but it quickly became apparent to Palestinian economists who enthusiastically joined this effort that programs were made ineffective by Arafat's centralist policy, which indicated clearly to them that he would be the sole decision-maker (Verter, 1994).

In terms of financial control, there have been many reports of inappropriate use of funds and corruption in Arafat's management. There are reports that Arafat granted his wife signatory powers on checks (*Ha'aretz*, 1992; *Globes*, 1993), and reports of "dubious financial management" (Yechezkeli, 1993), as well as unsuccessful financial management (Granot, 1993a). One reporter quotes the London *Sunday Times* as reporting that Arafat and his subordinates made inappropriate use of donations. According to the *Times*, the Palestinians used $20 million donated by European sources expressly for the building of inexpensive housing in Gaza to build luxury apartments for Arafat's bodyguards (Dettmer, 1998). Three years earlier, the same newspaper published a Palestinian document indicating Arafat's diversion of millions of dollars in donations to finance political actions in Israel. This document showed that PECDAR—the Palestinian Economic Council, which is almost completely financed by donations—purchased real estate in East Jerusalem to reinforce Palestinian holdings in the area. The document also reported the use of donations to support Arafat's relatives, including his brother-in-law, in their businesses and to build luxury apartments for them. Another recenexample was the report that Jawad el Husse, the PLO treasurer, was forcefully returned to the PNA from Abu Dhabi (in the United Arab Emirates) in Arafat's plane. According to the report, Arafat became afraid that el Hussein was beginning to "spill the beans." El Hussein was responsible for the monthly transfer of almost $8 million from the National Palestinian Fund to Arafat's private bank account, for what was defined as operational needs of the Palestine Liberation Army, a PLO organization. The bank account in question was never under any supervision and, even today, it seems that only three people know exactly what happens to the money (Bergman and Meltzer, 2001). Arafat was never personally charged with appropriating money for his own personal needs, and his name was apparently never tied to accounts of corruption (Rubinstein, 2001, p. 182). Various reports indicate that Arafat used the funds to bolster his own rule and foster the dependency of his subordinates. There is no doubt that Arafat stands at the head of a corrupt organization, and his administration of affairs points responsibility clearly at him. Despite his declared intention to fight corruption, Arafat has yet to fulfill his promises on this issue.

### 3. Personal Appointments and the Policy of Divide-and-Conquer

An additional central element in Arafat's leadership is the personal appointments he makes, especially the appointment of his family members. Immediately upon his arrival to Gaza and the West Bank, Arafat initiated an accelerated process of appointing men from the movement's leadership who had been with him in Tunisia to key positions. However, he then ignored them, kept distant from them, and brought in various activists close to him, so that no one knew his intentions in advance (Rubinstein, 1994b). For example, Bassam Abu-Sharif, who was one of the people closest to Arafat and his confidante regarding the Oslo Accords, was cut off after several months. One of Arafat's deputies said to a reporter in response to a question on this matter, "On things like that you do not ask 'Why?' The chairman decided that Bassam should go; we don't know why; maybe he spoke too much or voiced criticism when he should not have done so. Nobody here asks unnecessary questions. If you ask too much, you come under suspicion" (Azulai-Katz, 1993). Arafat behaved in a similar manner to Faisal Husseini (Barnea, 2001a). Rubinstein (1995d) explains this policy by claiming that Arafat always appointed two different people to the same office, so they would argue and compete with each other. All the individuals close to Arafat are continuously aware of the precariousness of their position, and they are consequently forced to behave obsequiously toward Arafat. In this manner, Arafat's status is maintained and reinforced through a cynical use of a "divide-and-conquer" policy.

### 4. Establishment of Dual and Triple Governmental Systems

Another attribute of Arafat's style of government is to establish several parallel governmental systems. A reporter of the *U.S. News and World Report* quotes Mansur Showa, former mayor of Gaza, as saying that Arafat disliked the decisions made by the city council and therefore established a small rival council, without informing Showa. This council, administered by Showa's cousin, approved the construction of a 20-story tower, the approval for which had been previously rejected by the city council, despite the fact that water and sewage did not reach the tower's upper floors (Louise, 1995). Ehud Ya'ari (1996b) recounts that, in addition to the existing hierarchy of military command, Arafat established an alleged civil counterpart, subordinate in practice to the Palestinian Ministry of Internal Affairs—a ministry whose portfolio Arafat himself holds. In a similar manner, Arafat circumvents the structural components of the Palestinian Authority, the elected council, and the government

ministries. This pattern places exclusive control in his hands, yet maintains an illusion of democratic rule. In the past, Arafat similarly established multiple agencies and corresponding departments inside the Fatah, fragmenting the foci of power to bolster his own rule. He then replicated this pattern inside the PLO by establishing multiple security organizations (with overlapping areas of autonomy and authority) with the aim of undermining his rivals and rewarding his supporters (Sayigh, 1977).

**5. Global Air Travel: "The Frequent-Flyer Club Member"**

It is almost impossible to refer to Arafat and his leadership style without mention of his practice in recent years of flying all over the world with unprecedented frequency. Masses of commentary have been written to explain this behavior: his need for respect, a reflection of his lack of a home and homeland, his sense of a nomadic existence, his hyperactivity, and his inability to be in one place for an extended period of time. We will add no interpretation to this behavior, as it is reasonable to assume that underlying it are many elements of Arafat's personality, described above. However, it is salient that his pattern of behavior hardly changed (excepted when confined to Ramallah during the winter and spring of 2002), despite the political changes since the Oslo Accords. This point combines with other various behaviors of Arafat that have remained virtually unchanged, despite the shift in status from head of an underground organization to leader of a state-in-the-making.

**6. Religiosity**

Throughout his life, Arafat has exhibited religious faith. Though not extremely religious, Arafat observes a significant part of the five daily prayers of a devout Muslim. He uses religion to help him cope with questions of destiny. ("My destiny is determined by Allah and not by man.") Throughout his life, he has declared himself to be a religious person. In his youth in Cairo, he joined in Muslim Brotherhood activities and was first arrested in 1954 as a result of these connections (Hart, 1984). It appears that this relationship was not rooted in religious fanaticism, but stemmed from his negative attitude toward Arab institutions, which had abandoned the Palestinians. Arafat typically uses religion for political purposes. He frequently mentions the significance of the holy places in Jerusalem and repeats the vision, "Soon we will all return to el-Kuds and conduct a jihad prayer in its mosques," to mobilize the support of the Muslim world (Gabai, 1992). Nonetheless, we can assume that his insistence on Palestinian sovereignty of the places holy to Islam in Jerusalem also stems from his own personal religious motives in addition to political motives.

**IV. Developmental Background and General Psychological Hypotheses**

Much has been written about Arafat's biography from a psychological point of view. This report has no intention of recounting Arafat's development, but will point to significant psychological milestones, which, in its view, shaped his personality and worldview, and we shall attempt to derive general psychological hypotheses on this foundation.

**1. A Difficult Childhood: An Orphan**

The most prominent fact in Arafat's development from a psychological perspective was the death of his mother when he was four years old. After his mother's death, Arafat and a younger brother were sent to their uncle in Jerusalem for several years, far from his father and his close family in Cairo (Friedman, 1990, pp. 100-106). Information on these years is scanty and is primarily based on much later testimonies of his relatives. The existing testimonies are sufficient to assess that Arafat had a "difficult childhood" (Lavi, 1994). It appears that only at the approximate age of eight, did he return to his father's home in Egypt where, as the accounts suggest, his eldest sister Anam played a central role in raising the children. Years later in an interview, Arafat said that she was a mother, a sister, and a best friend to him (Landers, 1994).

Several biographies describe an unfavorable relationship between Arafat and his father. It is known that Arafat did not go to his father's funeral, and did not visit his grave when returning to Gaza after signing the Oslo (Raphael, 1998). Arafat's psychological frameworkconsequently includes the traumatic death of his mother at a tender age and life away from his father (at least during the years he spent in Jerusalem). This may be seen as a life event that forced him to be "a child who raises himself and learns to depend exclusively on himself"—a child who grew up with many emotional deficiencies and, possibly, little emotional support after the death of his

mother.

The death of his mother at a tender age apparently caused an extreme response of emotional denial as a defense mechanism (see the testimony of his brother in Lavi, 1994). This denial of emotions apparently allowed him to cope with the numerous difficulties involved in losing the most significant figure in his life at so young an age. It had a significant affect on his personality: a restricted emotional world, limited ability to establish intimate relations, intense isolation stemming from a lack of emotional need for intimacy (therefore, this isolation is not oppressive), an obsessive need for control, an extreme need for respect and honor from others, and a difficulty in understanding and empathizing with others.

As noted earlier, Arafat learned at a young age that he could depend only on himself. This constant aspiration for independence and self-sufficiency (Sayigh, 1977, p. 697) is probably based on adults having disappointed him in times of need. This trait may be reflected in his inability to collaborate with others or work in a team; he sees himself as the one who knows best; he also has an intense inability to rely on others or delegate authority to others. This perception is later generalized to the state of the Palestinian nation, betrayed by the world and by the Arabs. Arafat's conclusion is to aim for independence at any price, placing no trust in the Arab states or their leaders. He formed a perception that only the Palestinians can help themselves and their actions will "force" the Arab world to rally to their support.

Arafat's struggle for survival taught him that he must be better than others to survive. He developed an approach to life that includes extreme suspicion toward people "on the other side" (Mansur, 1995) and an incessant need to prove to his environment (rivals and well as partners) just how successful and superior he is. On the other hand, this need is accompanied by militarism, expressed in attempts to deceive his rivals, overcome them, and have the last word. This feeling probably explains his leadership style and his belief that he is the only person qualified to administer the policy of the Palestinian movement. This is the source of his adherence to a centralist leadership style.

**2. Betrayal and Sense of Victimization**

As early as his childhood, Arafat became involved in underground political activities and stood out as a leader of Palestinian students in Cairo. From the beginning, he was exceptional in his independent approach that deviated from that of the traditional leadership, which he saw as defeatist. In the 1948 war, when he was a student in Cairo, he joined a small group of students who attempted to reach Israel to take part in the fighting. When they reached Gaza, a regular Egyptian army unit disarmed them and prevented them from joining in the hostilities. Arafat and his colleagues would later state: "The *Nachba* began when we were banished from the battleground in Palestine" (Rubinstein, 2001, p.57). He was an eyewitness to the Arab defeat in the wars with Israel and to the unchanging deplorable situation of the Palestinians resulting from the Arab states' lack of mobilization for their cause. Arafat interpreted this as betrayal of the Palestinian cause by the Arab states, first and foremost (see also Rubinstein, 2001, pp. 53-57). This, inter alia, is the source of his belief that others cannot be relied upon. Arafat expresses this belief in a statement that he frequently repeats, "The truth is that the Arabs betrayed us" (Hart, 1994, p.77). Arafat also experienced personal humiliation at the hands of Arab governments. For example, in 1966, he was imprisoned in Syria for several weeks when the Syrian government attempted to gain control of the Fatah movement. Some of his biographies recount that he was also tortured. A review of Arafat's own statements indicates that this sense of betrayal is a continuous thread throughout his long years of struggle.

This sense of betrayal probably comes in addition to a sense of personal betrayal. The origin of this feeling was in his childhood. A child is likely to perceive the death of a parent at a young age as betrayal and abandonment. This feeling could have been exacerbated after Arafat and his brother were sent away from their father's house in Cairo to their uncle's house in Jerusalem for a few years. This was a double betrayal: the death of his mother and his being sent away from his father's house at a young age, when a child is not yet able to understand and formulate the experience in words (in adult language). These things become imprinted, mainly at the emotional level. One can only surmise that Arafat is very sensitive to this issue, due to his personal background.

A high sensitivity toward betrayal could be one of the psychological explanations of Arafat's obvious reluctance to come to a confrontation with the Palestinian opposition. He is very sensitive to this type of accusation, and will do anything to come to terms with the opposition and to reach a compromise with it, if only to avoid having to fight it and be accused by some of his people as having betrayed them. This is true as long as the opposition does not directly threaten his rule or the realization of his strategic objectives.

As part of the political perception of betrayal of the Palestinians, Arafat also expresses a strong sense of their being the victims. Arafat has a fundamental sense of himself as a victim, which is inseparable from his perception of the Palestinian people as victims. (See President Clinton's evaluation, in *Yediot Aharonot,* 2001). It can be assumed that this stems both from his childhood experiences and from his complete identification with the fate of the Palestinian people. Therefore, he feels that he (in other words, the Palestinian people) is always in the right, and the world must always understand him—even when what is at issue is terrorism and the murder of innocent civilians. It seems that this inclination enables Arafat to lay the blame on Israel, even for severe acts of terrorism and to feel that these acts are the reaction of the weak party, the victim, whom the world has ignored and left to suffer. As a result he has developed a conviction that the terrible wrong that was perpetrated on the Palestinians constitutes a moral justification for any act of opposition, including the use of terrorism, which he regards as both legitimate and moral.

**3. Arafat as a Survivor: In Constant Struggle**

Most of Arafat's life as an adult can be characterized having the stance of the leader of an underground, persecuted by his enemies who wish to kill him and who must wage a constant war with his enemies for his very existence and must struggle over the position of authority with his partners. Despite all the attempts to liquidate him or to oust him from the position of leadership, he overcame his enemies and survived. Moreover, he has brought his organization to impressive achievements: from a marginal, unimportant underground organization, he brought it to the brink of statehood, with most of the world recognizing its right to exist.

Arafat practically doesn't know a pattern of living that is not a struggle. It is reasonable to assume that he sees himself as someone who has overcome all of his opponents—many of whom are no longer alive—and triumphed over them. His survival is probably also connected to his development and to the background that characterized his upbringing. It can be assumed that already as a young boy he was obliged to develop a sophisticated ability to survive, in order to cope with the difficulties of his reality. Among other characteristics, he became highly active, developed an ability to lead and to manipulate the children in his environ, and from a very young age he directed all his resources to political struggle.

It can be surmised that a person who has spent all his life in constant struggle will find it difficult—especially at an advanced age—to make the abrupt switch to a life of peace and cooperation, based on trust. There is no evidence that there were any marked changes in Arafat's behavior when he made the transition from Tunisia to the West Bank and the Gaza Strip in the wake of the Oslo Accords. His style of expression (mainly when directed toward his own people) provides no evidence of any marked change in his outlook. Neither do any other characteristics of his behavior show any evidence of such changes.

**4. Self-Identity**

Arafat's choice at an early stage of his life to devote his whole being to the Palestinian cause can be explained as a circumvention of the need to deal with difficulties and problems on the personal level. The total devotion of his life to the Palestinian cause enables him to minimize his inner emotional and personal world, by being focused only on the political "really important" issues. Thus, Arafat found an efficient way todeal with emotional problems, with development of individual identity (as noted, his personal and collective identity merged) and with individual growth and other developmental tasks. He has paid a price for this in that his personality is one-dimensional, structured totally around the political issue.

**5. On the Verge of Realization of the Dream**

All of his life, Arafat struggled for the Palestinian cause. In recent years he has seen the realization of his dream. For example, at the central gathering of the Palestinian Authority on the occasion of the tenth anniversary of the proclamation of Palestinian independence, Arafat stated: "We want our State in May (1999). The Palestinian people are in the process of realizing the declaration of independence of 1998 and in the process of liberating their land. In the coming days we shall have control over half of the Palestinian land, until we reach Jerusalem, to raise the flag above its mosques and churches" (Hess, 1998).

He began as the head of a small and unknown organization and currently is at the center of the Middle East conflict, a personage famous all over the world, who enjoys extensive international support and is honorably

received by many world leaders. Arafat currently faces a very difficult dilemma: He wants to go down in history as the founder of the Palestinian state and as the father of its revolution. To succeed in the first, he must make difficult concessions that will severely harm, from his point of view, his status as the "father of the revolution" (because it will entail the subjection of his opponents and a difficult struggle to overcome them). This dilemma is exacerbated by his advanced age and the status of his health. So far, there are no signs that he has made a conclusive choice between these two aspirations.

**6. Summary of Personality Attributes**

The characteristic features of Arafat's personality do not indicate, in our opinion, a clearly specific disorder (according to the definitions of the American Psychiatric Association: DSM-IV, 1994). At the same time, it is possible to point out various characteristics that accord with an unspecific personality disorder. The nature of this overview, based mainly on evidence provided by others, does not enable us to determine with certainty whether these characteristics meet the complete criterion necessary for a determination of a personality disorder.

Therefore, we limit ourselves to an enumeration of the characteristics that have been raised here: a large measure of suspicion, including toward his close associates and members of his entourage; distrust of the loyalty of people who are close to him; being unforgiving of people whom he sees as having offended or hurt him (characteristic features of the paranoid personality); lack of emotional stability expressing itself in high spirits alternating with dejection; a difficulty in controlling anger and a tendency to outbursts of rage (characteristic features of the borderline personality); a sense of grandeur and importance, and the expectation that others should recognize him as unique and superior to others; exaggerated sensitivity to criticism; demanding admiration from the people around him; a developed sense of "I deserve"; manipulative interpersonal relationships (a characteristic feature of the narcissistic personality).

Beyond the attempt to diagnose a specific disorder there is another characteristic, which we shall term "a one-dimensional personality." This one-dimensionality is a result of an exclusive preoccupation with the Palestinian issue and is expressed in a narrow perspective on a range of subjects, such as historical processes, political economics, global processes, sociological processes, long-range planning, etc. (See a similar evaluation in Eldar, 2001.) In other words, Arafat lacks a wide base of knowledge based on education, reading, and an acquaintance with cultures, nations, and different people. At the same time, he does not sense any lack of knowledge and regards himself as more qualified and better suited than others.

## *Strategic Analysis of Arafat*

This section will present the strategic characteristics of Yasir Arafat. The components of his strategy are a direct outcome of his personality, his environmental conditions, and the players involved. As Arafat is entirely focused on Palestinian national affairs, his strategy is directed at two principal objectives: preserving his personal status as leader of the Palestinians and achieving a solution to the Palestinian problem.

The players or factors involved with Arafat are as follows: in Israel, the government of Israel, elements from the opposition, Israeli public opinion, and Israeli Arabs; in the international arena, the United States, the Arab countries, Europe, Russia, the United Nations, other countries throughout the world, and worldwide public opinion; in the Arab arena, the rulers of the Arab states (principally Egypt and Jordan) and Arab public opinion; on the domestic front, his intimates in power, opposition organizations, and the entire Palestinian public, both in the areas under his control and in the Palestinian diaspora (Lebanon, Syria, Jordan, the Gulf states, etc.).

**I. Is Arafat a Strategist or a Leader Acting on Instinct?**

A preliminary question with regard to the strategy adopted by Arafat is whether he operates as a strategist, or as a leader reacting instinctively and emotionally to events. The conclusion of this study is that Arafat makes use of all the characteristics of strategic thought and long-term planning: definition of a vision and setting clear goals; identification of the players; utilization of all possible tools for the purpose of attaining his goals; selecting courses of action (including identification of his relative advantages), and the like.

Thanks to the strategy that he has adopted and the existence of certain environmental conditions (such as Israel's willingness to enter into a dialogue with him), Arafat has racked up some impressive achievements in the last decade. Once the head of an organization shunned by the entire world, Arafat has become a leader who is popular across the globe; once an international terrorist (for example: the attack on the bus on Israel's Coastal Road in March 1978, the murder of the Israeli athletes at the Munich Olympics in September 1972, the murder on the *Achille Lauro* in October 1985, and so forth), he became a Nobel Peace Prize laureate – and subsequently returned to the ways of terror. From the early bargaining point at which Israel was offering the Palestinians "autonomy for the population only" (with no sovereignty over the land), Arafat reached the heights of Camp David II, where Israel and the United States proposed that he establish an independent Palestinian state, with East Jerusalem as its capital, extending over approximately 95 percent of Judea and Samaria and the Gaza Strip, as well as alternative territory within the Green L. At the same time, it is possible that Arafat's rejection of Israe's proposal and his contribution to the outbreak of the Al-Aqsa Intifada will prove to be the missed opportunity of all time, because it is doubtful whether an independent Palestinian state can be established in the coming years on better terms than those which were offered to the Palestinians (see interview with Shlomo Ben Ami, Israel's foreign minister at the time of the Camp David II summit, Shavit, 2001).

On the other hand, there are those who believe that Arafat is not a strategist, or that, at times, he does not adopt a course of action that requires profound thought. For example, Palestinian Prof. Yazid Sayagh explained, in August 2001, that, on the eve of the Al-Aqsa Intifada, Arafat was facing a political dilemma, and he ran away from it. In his opinion, this behavior did not reflect the existence of a strategy based on the use of force, but rather, the lack of any strategy whatsoever. Sayagh claims that, in the political area, Arafat's management is characterized by a high level of improvisation and short-term vision. As he sees it, the same pattern was characteristic of Arafat following Sharon's ascent of the Temple Mount: He saw an opportunity to improve his international status, enlist vociferous Arab support, and topple Ehud Barak. Accordingly, he retroactively authorized the use of arms (Eldar, 2001).

**II. The Basic Premises of Arafat's Strategy**

*A. The existence of clear strategic goals toward which the Palestinians are aiming--the establishment of a Palestinian state within the June 1967 borders, with Jerusalem as its capital, and a solution for the problem of the refugees—has been a constant.*

Arafat has consistently and clearly set these goals for himself and his environment. Thus, for example, he has never stopped presenting Jerusalem as the capital of the Palestinian state (Gabai, 1992; *Ha'aretz*, 1989; Hess, 1998; Chalila, 1994; *Ma'ariv*, 1993; Shaked and Raz, 2001). By contrast, Israel has adopted more flexible positions in this matter. At the Camp David II summit, Israel discussed with Arafat the possibility of divided sovereignty over Jerusalem, whereas, in the early stages of the negotiations with the Palestinians, at the Madrid Conference, Israel had not agreed to discuss the question of sovereignty over Jerusalem.

*The clarity of Arafat's objectives serves as a spotlight to light his way.* As a general rule, Arafat supports anything that advances the cause of the establishment of an independent Palestinian state, in the format envisioned by Arafat, and objects to anything that threatens it. His consent so far to defer the declaration of an independent state results, inter alia, from his estimation that such a move would be more harmful than helpful to the chances of actually establishing such a state. In other words, to this day, Arafat has preferred to wait for the declaration of a Palestinian state within the framework of an agreement, understanding that this alternative is preferable from the standpoint of the probability of establishing an independent Palestinian state to quarreling between the United States and Israel. When the situation of inequality reverses itself, Arafat will make haste to declare an independent state, even unilaterally.

*Notwithstanding the clarity of the objective with regard to the establishment of a Palestinian state, Arafat is having a hard time deciding on the conditions for ending the conflict with Israel that has been the purpose of his life.* As was determined at Camp David II, Arafat is having difficulty accepting the Israeli demand to sign a convention ending the conflict with Israel as part of the permanent agreement. Palestinian spokespersons, such as Hanan Ashrawi and Saeb Arekat, have explained, in the past, that the Palestinians made a great concession by agreeing to establish a Palestinian state in the disputed territories only. These explanations, however, were addressed to public opinion in Israel and the West. It appears that, notwithstanding the Palestinians' signature on the Oslo Agreement, Arafat finds it difficult, on both the emotional and the strategic levels, to admit that the Palestinians have renounced their share in the Land of Israel within the Green Line. As one who sees himself, and

is perceived by his people, as the father of the revolution, Arafat cannot admit publicly that he is giving up the dream that has been the main motive of the Palestinian revolution. Accordingly, to date, he has refused to compromise on his claims with regard to the "right of return," claims which have proven to be far more expensive than Israel originally thought. This ambiguity raises the following question: Is a Palestinian state within the June 1967 borders the final objective of the Palestinian struggle, or is it only an interim stage, to be followed by a struggle for the remaining territory of the Land of Israel? It may be estimated that Arafat views the establishment of a Palestinian state within the June 1967 borders as a realistic strategic objective that the Palestinians can attain within this generation. At the same time, he has not closed the book on the ultimate Palestinian dream with regard to the remaining areas of the Land of Israel.

*B. The great gap between the military and political power of the State of Israel and that of the Palestinians has also been a constant factor, dictating Arafat's strategic choices.*

This starting point has been valid ever since Arafat started his activity on behalf of the Palestinian cause, and remains so to this day. Thisdictates the selection of strategies intended to fully exploit his "weak strength"—that is, the use of the tools of violence and terror, and the manipulative enlistment of external forces on his behalf.

*C. Time is on the side of the Palestinians.*

Notwithstanding the military and political power enjoyed by Israel today, Arafat identifies Israel's weak points, which work in favor of the Palestinians. The first weakness is the demographic factor: The rate of natural increase among the Palestinian population is twice that of the Jewish population of Israel. In the course of the years, the Palestinian power in this area will grow even further. Accordingly, there is no reason for the Palestinians to give up on any of the essential points. A second weakness involves the great sensitivity of Israeli society to loss of human life. A third weakness is the divisive, fragmented nature of Israeli society. In light of all this, Arafat believes that, in the course of time, broad cracks will appear in the Israeli armor, meaning that all the Palestinians need is patience.

### III. Characteristics of Arafat's Strategy

#### 1. In the political negotiations with Israel

*Arafat has set red lines for himself with regard to the basic issues of the negotiation for the permanent status—borders, the right of return, sovereignty over Jerusalem, and so forth—and has consistently maintained them throughout the years.* Thus, for example, on the question of Jerusalem, as early as September 1993, in an interview with Radio Monte Carlo, Arafat stated: "If the prime minister of Israel, Yitzhak Rabin, has red lines with regard to the destiny of East Jerusalem, I too have such lines, and they are very hard, because Jerusalem is stamped within the soul of millions of Muslims and Christians throughout the world." He emphasized that the Palestinians would not give up one inch of the soil of Jerusalem. Arafat stated that the Palestinian state, as he had promised in the past, was only a stone's throw away. "At this stage, we are getting the Strip and Jericho; later, we will gradually get the remainder of the territories which were occupied in the June 1967 war" (Gabai, 1993b) In fact, if one compares the red lines which the Palestinians brought with them to the negotiations at the Madrid Conference (1991) and their positions at Camp David II (2000), one sees that Arafat has maintained the red lines which he set for himself and has allowed himself only a very slight degree of flexibility, compared to the erosion of Israel's positions.

With regard to the permanent arrangement, the only essential subject on which the Palestinians showed any flexibility at CamDavid II was their willingness to enable Israel to preserve blocs of settlements in Judea and Samaria, but only to the extent of a very small percentage of the territories, and in return for alternative territory within the Green Line (territory in the area of the Halutza Dunes in the Negev). In other words, Arafat has agreed to transform his demand for full withdrawal to the June 1967 borders into a demand for withdrawal from about 95 percent of the territories, with an exchange of territories as compensation. With regard to the interim agreement, whose principles were set forth in the Oslo Agreement, Israel has not succeeded in getting any flexibility out of Arafat. In this connection, Brigadier General Yaakov Amidror, former head of the Research Division, Israel Defense Forces Intelligence Corps, stated: "It appears that what we [the Intelligence Corps] had defined, a year before [the Oslo Agreement], as the conditions according to which the Palestinians would agree to sign an agreement, is exactly the Oslo Agreement. We did not manage to move the Palestinians one millimeter away from

their red lines." Also: "There was a grave feeling of frustration at the fact that it was immediately obvious that part of what was written in the agreement would not actually take place in the reality of the Middle East. We immediately brought this evaluation to the attention of the minister of defense" (Berkowitz, 1998).

***Arafat tends to move the struggle onto his own playing field.*** Analysis of the historical process that led to the Oslo Agreement indicates that it was not Israel that brought Arafat to Oslo; rather, it was he who dragged Israel there. Arafat did this by creating a blind alley in the negotiations in Washington and frustrating the Israeli-American attempt to conduct negotiations with representatives of the territories. The move to Oslo, from Arafat's point of view, reflected a substantial difference in the negotiations, not only with regard to the Israeli and international recognition granted to himself and to the PLO. In Oslo, Israel agreed, for the first time, to conduct negotiations on the rights of all Palestinians worldwide (the "right of return"), as opposed to the negotiations in Washington, where the representatives of the territories were supposed to represent their own population only. Moreover, in Oslo, Israel consented to conduct negotiations with regard to the sovereignty over East Jerusalem. This is one of the most impressive historical achievements attained by Arafat: He succeeded in exploiting the myopia of the Israeli politicians, who did not give the proper attention to the significance of the Palestinian demand for the "right of return" and belittled the seriousness of Arafat's demands in other areas of the permanent arrangement.

It is now obvious that Israel would have done better to refrain from signing the Oslo Agreement before the problem of the "right of return" had been solved. This is because the realization of Arafat's demands on Israel in this regard amounts to a threat to Israel's existence. It should be noted that the division of the negotiations with the Palestinians into two components—the interim phase and the permanent arrangement—played into Arafat's hands and reduced the assets that could be used by Israel for bargaining purposes toward the permanent arrangement.

*Arafat deflects the campaign from the political arena to the military arena, according to his strategic requirements.* This is reflected in the transition from the negotiating table at Camp David II to the battlefield of the Al-Aqsa Intifada. His present-day ability to act against the settlers in the disputed territories springs, inter alia, from the fact that the Israeli delegation to Oslo agreed to leave most of the territories in Arafat's hands, without considering the need to protect those settlements when a crisis might arise in the negotiations on the permanent arrangement, following which Arafat would result to terror—as, in fact, he has done.

*In conducting the negotiations, Arafat is walking a thin line—and sometimes crossing it.* Arafat considers himself to be better and more shrewd than his opposite numbers and rivals. He is not afraid to push the envelope to the limit, to change tactics at the last moment, to provoke crises and go back on his agreed word. His behavior at the negotiating table is characterized by the creation of crises, in a true "Oriental bazaar" style: creating bargaining sessions in which the party with the better combination of craft and fortitude wins. At times, Arafat approaches the negotiations with an attitude of "I have nothing to lose" (Rubinstein, 1995b). Arafat conveys to all of the other parties to the negotiations—Israel, the United States and international entities—the message that it is incumbent upon them to appease him; if they don't, he just won't play. This is reflected in his negotiations with Israel. One of his tactics is "leaving the table": When Arafat is not satisfied, he walks away from the negotiating table, hoping that the remaining parties, who want the negotiations to go on, will call him back—or, at least, he threatens to leave the table, such as, at the Taba negotiations, (Dayan, 1995a; 1995b). Another tactic is "upsetting the table"—that is, breaking up the negotiations, with a view to changing the rules of the game in his favor (Perry, 1994). An additional tactic is to suggest that, if he accepts the proposals given to him, his domestic opponents may have him killed (Horowitz, 2001).

*Arafat has been "recycling" the considerations that he promised Israel in the course of the negotiations.* For example, he has promised Israel, again and again, cooperation with the Palestinians in matters of security and defense—and, again and again, has gone back on his word. Each time, he has made new demands in return for cooperation. This also applies to the arrest of members of the opposition (the "revolving door," for example, Ya'ari, 1996a) and other issues.

*Arafat is attempting to exploit the "strength of weakness" in the negotiations.* The weakness of the Palestinians vis-e-vis Israel, with its large, strong army and developed technology, has become one of his principal public relations tools. The strong can and should defer to the weak, whereas the weak have no possibility of doing so. Arafat uses this tactical maneuver on both the personal level ("they're threatening me," "the opposition will kill me," "the people in the street will never accept such a concession," and so forth) and the national level ("the

Israelis have to understand; they have to give in").

*Arafat always leaves himself an opening for additional demands from Israel.* Thus, for example, he did not agree to complete the interim agreement and to compromise on a "third stage" of withdrawal. As far as he was concerned, as long as the interim agreement was not completed, he still had a basis for additional claims, even without bringing up the differences with regard to the permanent arrangement. This is also what happened at his meeting with then Prime Minister Ehud Barak at Camp David II: He refused to agree to commit to ending the conflict, even if a consensus was reached on additional points of the permanent arrangement.

*Arafat does not recoil from moves that might endanger his achievements at the negotiating table.* Arafat rejected the proposals advanced by Israel and the United States at Camp David II and set off the Al-Aqsa Intifada. In so doing, he took the risk that he would lose what had already been achieved in the negotiations. Today, he is having difficulty explaining to his people why he sacrificed hundreds of Palestinians in this move; this difficulty makes it harder for him to reach a decision that will lead to the cessation of violence.

*Arafat objects to economic separation from Israel within the framework of the agreement that will be reached.* In a conference on December 5, 1998, in Stockholm, marking the tenth anniversary of the PLO's acceptance of the principle of two states, Arafat expressed his objection to separation between the Israeli and the Palestinian economy. As he put it, following the establishment of thePalestinian state, Israelis and Palestinians would be able to live, work, and travel freely in all parts of Palestine and Israel, while respecting the law and the sovereignty of each party. In April 2000, Palestinian sources stated that Arafat had proposed to President Clinton the establishment of industrial zones common to Israelis and Palestinians within the June 1967 borders. Arafat's approach to separation reflects his recognition of the dilemma of how the Palestinians can detach from Israel politically without losing the advantages of Israel's economy—in the areas of employment, technology, and markets—that are essential to the development of the Palestinian economy. At the same time, Arafat's attitude is also marked by political positions that are not really concerned with the purely economic aspect, such as his attempts at achieving rapprochement with Israeli Arabs and free travel between the Gaza Strip and Judea and Samaria, which he views as a single entity.

In contrast, Muhammad Rashid, Arafat's economic adviser, is convinced that the Palestinians also need economic separation. In an interview in *Ha'aretz* on February 6, 2000, he told the Israelis: "First of all, we need a fair divorce, and only afterwards, a fair economic marriage." As he put it, Israeli politicians are admittedly speaking in terms of the right of separation, and yet, at lower-level meetings, Israel is offering the Palestinians agreement for unified customs duties and the establishment of free trade between the two states. In his opinion, these ideas are not compatible with the requirements of the Palestinian economy. Rashid claims that the high customs duties of Israel are not in line with the needs of the Palestinians, whose level of income is significantly lower than that of the Israelis.

In this matter, Arafat has obtained the support of the United States, which is wary of economic separation, for reasons related to the stability of the Palestinian Authority. Stuart Eisenstadt, the United States undersecretary of finance, stated in October 1999 that it is important for Israel to continue along the lines of the steps it has already taken: keeping the border opening, relaxation of the restrictions on Palestinian foreign trade, and increasing the number of workers from the territories at the expense of foreign workers (Levin, 1999). In any event, in actual practice, the Palestinians are planning and implementing a variety of steps that will reduce their economic dependency on Israel. Such projects are especially prominent in the Gaza Strip: the creation of an electrical power plant, the development of Gaza Port, the establishment of a cargo terminal at Gaza Airport, the intention to establish a fuel terminal in Gaza. These projects are important forArafat, not only because of their economic contribution, but because they constitute characteristics of an independent state. Within the framework of the Al-Aqsa Intifada, the Palestinians are boycotting Israeli goods that have a substitute (local, Arab, or foreign), such as foodstuffs, plastic, medications and iron (Greenbaum, 2001).

**2. With regard to the use of force against Israel**

*Arafat is trying to grab the stick at both ends.* He has chosen the way of political action and the way of armed struggle at the same time. Arafat's entry into the Oslo process did not motivate him to abandon the use of violence, but rather, to choose new tools appropriate to the new situation. His choice of diplomacy was perceived by him as a strategy for the attainment of his objectives; when that strategy did not avail, even though for only a limited time, he brought out the tools of violence. Arafat has two main types of tools of violence. One involves

stirring up the Arab masses—sending mobs of Palestinians out into the streets to clash with the Israel Defense Forces. The other involves the use of terror—including refusal to cooperate with Israel on security and defense matters, creating the conditions for terror, encouraging terror by the opposition (e.g., the release of Hamas terrorists, giving a “green light” to opposition members; Alon, 2001a), and even sponsoring acts of terror by his own people (shooting ambushes, explosive charges, mortar fire, and so forth). The Al-Aqsa Intifada was not the first time that Arafat’s own people have used terror against Israel. On July 14, 1997, three Palestinian officers were captured; they had been sent by the head of the Palestinian police, Ghazi Jibali, to launch a shooting attack in the Har Bracha area (Shaked, 1997).

At the same time, at least until October 2000, Arafat was very careful not to be perceived by the outside world as being involved in the violence. He set the tools of violence in operation by means of an “unspoken dialogue”—that is, by giving signs and hints to the Palestinian opposition, to lead them to understand that terror was permissible. When he began to actively incite terror, he took pains to make it look like a spontaneous response by the Palestinian masses and looked for grounds for such action, so as to cast the blame on Israel (such as the events around the Western Wall Tunnel in September 1996 and Sharon’s ascent of the Temple Mount in September 2000). Nonetheless, the more he uses the tools of violence, the more obvious his involvement is. In March 2001, Prime Minister Ariel Sharon told the members of the Mitchell Committee that “according to information in Israel’s possession, which originates with the intelligence services and with statements made by senior members of the Authority, Yasir Arafat’s decision to make use of violence was a strategic decision and was intended to attain political goals” (Muallem, 2001). In September 2001, Marwan Barghouthi, head of the Tanzim on the West Bank, called on Arafat to take an open stand at the head of the armed struggle against Israel.

It should be noted that that two-stage strategy (going from violent mass demonstrations to use of arms) is not new for Arafat, but had already been applied in the first intifada. In January 1988, Arafat declared, “The large popular uprising will expand and will take on a form with additional waves, such that the enemy will not be able to suppress it even with terror and oppressive steps.” He promised that the PLO would increase the riots in the territories and “in the future, the residents will use arms against soldiers.” In his words, “Although we haven’t yet used arms during the uprisings in the occupied land, the Palestinian leadership will take appropriate steps that will guarantee the escalation of violence against the Zionist occupying forces.” Arafat’s adviser utilized the same opportunity to say that “Arafat uses a cellular phone to stay in contact with the youngsters in Gaza and guide them” (Alkabetz and Cohen, 1988). An additional example: On November 15, 1998, Arafat warned, “Most of us are ready and willing to use arms against anyone who tries to prevent us from praying in Jerusalem” (Tzezna, 1998).

Arafat’s use of terrorism and his willingness to conduct a violent struggle against Israel over a period of years has been given ample expression in reports of security agencies in Israel, based on sources and information collected clandestinely. As early as 1997, army intelligence warned that the terrorist act at the Apropo restaurant in Tel Aviv in March 1997 was carried out as a result of the “green light” that Arafat gave to the opposition parties in a meeting that he had had with them at night (Schiff, 1997). In April 1998, army intelligence warned, “The Palestinian Authority is prepared for an armed conflict with Israel” (Limor and Granot, 1998). This warning, in fact, came true. The head of the investigative unit of army intelligence, Brigadier General Amos Gila’ad, at a conference on national security, clarified that Arafat preferred a political solution, even though he sparked the violence in the territories. He said that Arafat has not lost control of his actions, and cynically and intelligently uses terror in an unprecedented way. Gila’ad added that the political in Israel did not grasp the importance of understanding the other side and did not referto the intelligence that predicted the events (Frisch, 2000). In his appearance before the Knesset’s Security and Foreign Affairs Committee in July 2001, the chief of staff, Major General Shaul Mofaz, said that the Palestinian Authority has turned into “a terrorist entity.” According to him, many of those in the Palestinian security organizations take part in the terror and violence against Israel since the Al-Aksa Intifada began (Alon, 2001b).

General Amos Malka, head of army intelligence, on June 6, 2001, gave this evaluation: “Arafat prefers to continue the conflict with Israel rather than conduct internal conflicts with the Islamic opposition parties, as long as he has not been promised a strategic achievement after more than eight months of fighting.” Malka said that Arafat utilizes terrorism as his primary means of gaining his objectives. He activates some of the Palestinian organizations directly, and they are involved in terrorism, while he activates the Islamic organizations indirectly. In his words, “Arafat is standing with a bomb in his hands. His playing with explosives constitutes a threat to the region’s stability.” In his evaluation he noted, “After eight months of conflict, there is no end in sight. Arafat is preparing his people for an extended conflict, even for one hundred years” (Harel, 2001).

A senior officer in army intelligence who participated in the meeting Knesset's Security and Foreign Affairs Committee on May 14, 2001, said that Arafat was ready for a long and continuing struggle with Israel, and was willing to bequeath the struggle to subsequent generations. Arafat's message to his people has been that they are only at the beginning of the fight. The officer added that Arafat believes that a violent struggle with international support will succeed in bending Israel and will force the acceptance of his conditions. In his words, "Arafat sees himself as the leader of the entire Arab people, and not only of the Palestinians. He has no trouble transmitting soothing messages to his Israeli guests, but, at the same time, the strategic message that he is transmitting to the entire Palestinian public, is to continue to fight" (Alon, 2001a).

Avi Dichter, head of the General Security Services, said in April 2001 that Arafat's security apparatus in Gaza, commanded by Muhammad Dahlan, has turned into a terrorist organization in every way. According to him, Arafat is not interested in giving orders to stop the violence now, out of fear that it would weaken his position, and that Israel does not have a partner in the Palestinian Authority who will prevent terrorism (Harel and Baram, 2001).

*Arafat sees the intifada as a weapon with which to pressure Israel, in order to improve his position in negotiations and as an instrument to bring about the unilateral withdrawal of Israel without an agreement.* It is likely that his perception has been reinforced as more Israeli voices have been raised calling for a unilateral withdrawal, and from conclusions drawn from Hizballah's success in bringing about Israel's withdrawal from southern Lebanon in May 2000. Yet this is not a new perception for Arafat either. At the height of the first intifada, in 1989, he said in a statement from Tunisia: "Israel is losing its lines of defense, one after the other, on every front against the historic conflict with the uprising's leadership. Accordingly, it will not have a choice but to withdraw unconditionally from the West Bank and the Gaza Strip." In a statement then, Arafat called on the Palestinian masses to escalate the uprisings "since we are now in the last quarter of an hour of victory and of establishing an independent, democratic Palestine" (Ya'ari, 1989).

**3. Concerning World Opinion and Israeli Opinion**

*Arafat is trying to mobilize world opinion to help him.* In this framework, Arafat is attempting to utilize propaganda levers and manipulation, including exaggeration and lies concerning Israel's actions and intentions (see the chapter that deals with analyzing his personality). Since the outbreak of the Al-Aqsa Intifada, which he himself ignited, he presents himself to Israeli and world public opinion as a supporter of peace, facing Israel's cruel attacks that prevent the Palestinian civilian population from obtaining their basic needs, lacking rescue and defense - for example, Arafat's meeting with the Israeli journalist Barnea, (2001c) and with foreign consuls, (Ya'ari, 1996a). In order to create a negative image for Israel, he doesn't flinch from sending children to demonstrate violently against Israel, even when he anticipates the expected suffering of the Palestinian population from the closures and actions that the IDF will take.

*Arafat attempts to affect the decision-making process in Israel by means of activities affecting Israeli public opinion.* In this matter, Arafat acts in two extreme ways: On the one hand, he attempts to acquire the trust of the peace camp in Israel by emphasizing the steps he has taken on the way to peace; on the other hand, Arafat acts to extract a price in Israeli blood in order to bring about internal pressure on the Israeli leadership, making its position more flexible. Apparently, Hizballah's success in Lebanon reinforced this strategy. At the same time, it seems that Arafat failed, since he did not understand the "red line" of Israeli society beyond which the society unites and is willing to fight without compromise—for example, the consensus against his demand to return millions of Palestinians to Israel in the framework of the "right of return" and its resolved opposition to violence and terror.

In the matter of the "right of return," Arafat acted late and in an unconvincing way to pacify the Israeli public. For example, when Nachum Barnea asked him (June 2001) if there can be an overall agreement without a million refugees using their right to return, Arafat told him a story about Belize, a country in Central America. According to him, the prime minister of Belize is a member of the Shumaan family, the Palestinian equivalent to the Rothschild family, from Beit Hanina. "Do you think that Shumaan will leave Belize, and return to Beit Hanina?" Arafat asked. After that, he took from his pocket a newspaper clipping reporting that most of the new immigrants to Israel are not Jewish and said to Barnea, "How do you think we feel when hundreds of thousands of non-Jews are allowed to immigrate to Israel? I believe that in the framework of the overall agreement, creative solutions will be found for all of the things mentioned in Oslo: Jerusalem, settlements, borders, army areas, water, refugees. With goodwill, an agreement will be reached" (Barnea, 2001c).

Concerning violence and terror, Arafat did not take into account the negative ramifications of the Al-Aqsa Intifada on the Israeli left, although there were expressions of it in many Israeli surveys and in articles by political journalists. In an interview on Israeli television's Channel Two, on the eve of the Israeli elections, he quoted that the surveys showed that most of the adult Israeli population supports peace, without understanding the change in Israeli public opinion. His lack of understanding of Israeli society can be explained by his tremendous distance (both personally and politically) from democracy and the democratic system. Arafat was never in his life exposed, not even for a short time, to life in a democratic society. His personality traits are very far from a democratic outlook and from understanding the complex dialectics of this type of system. At the same time, Arafat is aided by important Arab Israelis, who advise him on how to act toward the Israeli public and its institutions. His demands after the elections in Israel—to continue the negotiations from the point where they had stopped—evidences his lack of understanding of the changes in Israeli society. Only quite a while after the change of government in Israel did Arafat understand that he had lost the trust of a large part of the Israeli public. In an inwith Barnea in June 2001, he answered positively to the question of whether he was convinced that he had the support of Israeli public opinion. "Yes," he said, "I am not happy with that, and would like to change it. I hope that most Israelis still want peace. Those igniting the fire are the settlers, and they are the minority" (Barnea, 2001c).

*Arafat identifies the arguments and disagreements in Israeli society as a clear sign of its weakness and tries to take advantage of them for his benefit.* This understanding contributes to his demands becoming more extreme, since he assumes that weakness will bring about flexibility in Israeli positions and in the end will tilt the balance into Palestinian hands. For example, among those close to him, Yasir Arafat brags that he already "sees a picture of the future." He speaks of the "demographic decline" that Israel is in, and promises those loyal to him that over time, large cracks will open up in the strong wall facing him. Only "a little patience," he said at the end of his speech on Nachba Day (Yaari, 2001). The obvious disagreement in Israeli society that Arafat identifies concerns the continued Israeli control of the territories. The impression is, therefore, that Arafat prefers to allow and even encourage terrorist acts against the settlers and IDF forces in the territories over terrorist acts against the Israeli population within the green line, even though he does not prevent the latter either.

*Arafat attempts to influence the decision-making process in Israel through Israeli Arabs.* This is not new. For example: In May 1995, Member of Knesset Abdulwahab Darawshe from the Mada Party (United Arab List) argued that "Yasir Arafat is not interested in torpedoing the negotiations with Israel, and so requested of the Mada Party that we not raise or discuss the no-confidence proposal on the issue of expropriation of land in Jerusalem." According to Darawshe, he spoke with Arafat's bureau director, Dr. Ramzi Houri, who clarified that, despite Arafat's anger about the expropriation of land in Jerusalem, he was not interested in toppling the Israeli government, as that might bring about a pause in the negotiations on continuing to implement the Oslo Accords (Baron and Regev, 1995).

**4. Concerning Foreign Countries**

*Arafat cooperates with the United States out of an awareness of its power and its influence on Israel and on Arab countries, but strives to limit its involvement.* From Arafat's position as an untouchable in the United States during the Gulf War, he transformed himself into a desirable visitor to the White House during the Clinton presidency. He even persuaded the U.S. government to go quite a distance in the direction of the Palestinian position during the political process. At the time, he succeeded in convincing the Americans of his striving for peace. For example, during Secretary of State Albright's visit to the Palestinian Authority, he said, "Peace is not only a Palestinian need, but an Israeli and international necessity. We have to continue the discussions toward peace, with the aim of protecting our children and grandchildren" (Atlas, 1998; Druker, 1998).

At the same time, Clinton's ability to influence Arafat turned out to be limited. Despite the heavy pressure that Clinton put on Arafat during Camp David II, Arafat was not flexible at all. Apparently, Arafat did not have a lot of trust in Clinton, in light of his [Clinton's] perceived preference for the Israeli side, the difference in mentalities between the two, the age gap, and Arafat's perception of Clinton as being temporary and soon-to-be-replaced in government, as is every leader of a democratic country. Arafat's position in the United States worsened with the change of government in Washington, and Clinton himself sobered up concerning Arafat's personality. At a party in the Manhattan home of Richard Holbrook, the previous U.S. representative to the UN, former President Clinton candidly told of his frustration over the collapse of the Middle East peace process: "Three days before I left office, Yasir Arafat called me to say goodbye. 'You're an outstanding person,' Arafat said to me. 'Is that what you think?' I answered him. 'I'm a giant failure and you turned me into that.'" Clinton added that he told Arafat that Barak's

proposal was the best peace proposal that the Palestinians could ever achieve, and that, by refusing the proposal, Arafat only guaranteed the election of Sharon as prime minister. Clinton defined Arafat as an aging leader who lives with the sense of being a victim and is incapable of reaching a final peace agreement. "He was only able to reach stage five when he had to get to stage ten," Clinton summarized. In Clinton's opinion, the negotiations failed due to the Palestinian demand for the right of return, because Arafat continued to talk about large numbers of refugees who would be allowed to return to Israel (*Yediot Aharonot,* 2001).

*Arafat attempts to turn the Israeli-Palestinian conflict into an international matter.* In this framework, Arafat strives to reduce the dominance of the United States in the political process. He tries to do this by introducing European brokers, pressuring to include UN observers or observers from foreign countries to the territories, etc. All of this is designed, in his view, to balance the asymmetry of the U.S. support for Israel. He demands bringing in international forces to narrow Israel's freedom of action and to gnaw away at its sovereignty in the territories.

*In the framework of his efforts to enlist forces in his favor, Arafat tries to involve the Arab countries in the conflict with Israel.* Arafat uses manipulative levers with leaders of Arab nations as well, knowing that bloody riots in the territories and Palestinian calls for Arab help will start internal ferment in Jordan and Egypt that will require their leaders to get in line with his position. This is his principal pressure mechanism on them. Toward the Arab world and the Islamic world, Arafat emphasizes the struggle over Jerusalem, considered to be the third holiest site in Islam. It should be noted that this, too, is not new in Arafat's strategy. In August 1989 he said in Amman at the ceremony opening the office of the National Palestinian Fund, which funded the intifada, that his organization would continue the jihad until his flag flies above the Al-Aqsa Mosque and the city of Jerusalem, capital of the democratic Palestinian state (*Ha'aretz,* 1989).

**5. Arafat's Strategy in the Palestinian Arena**

*Arafat takes into account the force that the Palestinian street exerts upon him.* Arafat is well aware of the winds blowing through Palestinian public opinion. In the year 2001, public opinion became more extreme as a result of its disappointment with the peace process and the continued confrontation with Israel, and the ramifications for the Palestinian population's daily life. Arafat identifies pictures of Iraqi president Saddam Hussein and the Hizballah's flags among the Palestinian masses and understands that he cannot swim against the stream. The IDF's unilateral withdrawal from southern Lebanon evidently hardened his position, since among the Palestinian population, it raised the question: If Nasrallah can bring about the withdrawal of the IDF with an organization of 600 fighters, why can't Arafat? Hizballah's demand to release Palestinian prisoners, in the framework of negotiations over prisoners of war with Israel, exposes his helplessness and strengthens the opposition. Saddam Hussein's struggle for survival against the United States, which constitutes a source of pride and identification on the Palestinian street, also makes it difficult for Arafat. Saddam reinforces his image among the Palestinian public by means of material aid to the families of suicide bombers and threats to attack Israel. Possibly, if the pressure on Iraq intensifies, Arafat might harden his positions and even aggravate the confrontation to satisfy his people.

At the same time, Arafat can certainly go against the stream in the Palestinian camp. This happens when he is convinced that it will promote the achievement of his objective, the establishment of a Palestinian state, and that, in the end, the majority of tPalestinian public will recognize the correctness of his position and his great wisdom. An example of his independent action was his signing of the Oslo Accords, which were not supported by the majority of PLO members and the Palestinian public. In other words, Arafat can make decisions concerning the peace process, even if they are not supported by the majority in public opinion surveys. It must be further noted that Arafat has no opposition on the left, calling for him to compromise and accelerate the peace process, but only an opposition demanding that he harden his position opposing Israel. In all likelihood this fact, too, contributes to his hardening positions.

*Arafat uses policies of divide-and-conquer among his people.* Arafat has not appointed an heir or successor to himself, and makes sure to divide foci of power, so that, as a result of the multiple foci in the Palestinian Authority, he better controls the whole. For example, control of the various security forces is divided between "foreign" and "internal" leadership, and there is a clear separation between control of the security apparatus in Gaza and control of the security apparatus in Judea and Samaria. Arafat maximally utilizes his administrative control by calling into session the various leaderships of the Palestinians, Al Fatah, and the Palestinian Authority, to assist him in making decisions. Thus, for example, Arafat will not call a Palestinian forum into session without having a majority that supports his decision, and will seek the forum and timing most appropriate for his needs. In its time, that was how he got the Oslo Accords approved.

*Arafat ensures the personal profits of people close to him.* The economic activities of part of the economy are conducted via monopolies handed over to high-ranking figures in the Authority. The most blatant among these beneficiaries is Muhammad Rashid, Arafat's economic adviser, who manages his investments and those of the Authority. Together with Ramzi Houri, Arafat's bureau chief, Rashid directs the Al-Bahar company, which controls the cement, steel, and sand monopolies in the Authority. Together with Hassan Atzpour, a member of the negotiating team and Arafat's adviser, Rashid is a partner in the firm that operates the gas monopoly. Jamil Tripi, in charge of the Ministry of Citizens Affairs, is an owner of a building contracting and quarries company and sells cars. Mohammed Abass (Abu Mazen) is the owner of the Sky advertising company and of import-export agencies. Ahmed Kria (Abu A'la) is the importer of Marlboro cigarettes and canned goods. Maher Al Matzri, minister of economics, is the owner of gas stations and imports cars. Munrad Tzalach, minister of higher education, is a food importer in the West Bank. Nabil Abu Radina, Arafat's adviser is a partner with Soha in a company that imports cloth and pharmaceuticals, and has the exclusive license to import a number of pharmaceuticals. Jibril Rajub, head of security in the West Bank, owns a farm in the Jericho region, gets commissions from the casino in Jericho, and is responsible for insuring the safe transport of gas. Rajub collects a tax from the gas stations, a regular percentage of their sales. Mahmud Dahlan, commander of the security forces in Gaza, owns many businesses in Gaza (Greenbaum, 2000; 2001). An investigation published in *Newsweek* in May disclosed, "Top-ranking ministers fill their offices with 'their own people,' distribute fat contracts without supervision or control, and establish their own monopolies that crush competing companies and raise prices for the consumer." Moreover, "The courts are powerless, since Arafat ignores uncomfortable verdicts. His fourteen police units, each one functioning separately, meant to protect the average Palestinian, unlawfully enforce the wishes of the Authority's officials" (Dagoni, 2000).

*Arafat avoids direct confrontation with the opposition.* He perceives himself as a leader of all the Palestinians, above differences in opinion and outlook. Therefore, he tries to avoid, as much as possible, direct clashes and conflicts with those in opposition, as long as they do not directly threaten his rule. One can assume that only when he is forced to choose between continuing his rule and conflict with the opposition will he try to reach an agreement or a compromise as quickly as possible—after he proves that he is the leader. In addition, Arafat needs the terror that the opposition organizations conduct as a bargaining card in negotiations with Israel and to strengthen the Palestinian military effort. With that, Arafat is aware that opposition organizations harm Palestinian interests, especially when the Palestinians stand to gain something from Israel. For example: in November 1998, Arafat warned the terrorist organizations, "Do not do anything that will give Israel an excuse to prevent implementation of the Wye agreement. Do not allow them to get involved in our arena" (Tzezna, 1998). Due to his unwillingness to confront the opposition and as a result of his needing them, Arafat has avoided real security cooperation with Israel. An example of the PA's and Arafat's cynical disregard for acts of terror and scorn for fulfilling the agreements for cooperation was their reaction to the terrorist act at the Dolphinarium. Israel passed on the names of the Hamas members who sent the suicide bomber to the Palestinian Authority. The Authority invited them in for a discussion and released them with a warning not to do anything similar. Thus Arafat makes fools of Israel and America. None of this would have taken place without his approval. Administratively, he makes sure he confuses and controls his representatives on the High Security Commission. Each one of his senior representatives are separately responsible directly to Arafat, and he thus prevents real cooperation between them (Schiff, 2001b).

**IV. Summary of the Features of Arafat's Strategy**

| Party | Features of Arafat's Action |
| --- | --- |
| 1. The Israeli Government | Arafat wants to have his cake and eat it: he chooses a strategy of political negotiation or a strategy of violence and terrorism, according to his strategic needs and the chances of achieving success from his perspective. |

| | |
|---|---|
| 2. Israeli Public Opinion | He maintains a manipulative line of propaganda, especially vis-à-vis the left. He presents himself as a peace lover, but at the same time employs violent measures. |
| 3. Israeli Arabs | He integrates them into the Palestinian camp and utilizes their help to influence Israeli positions. |
| 4. The United States | He tries to bring the U.S. administration closer to his positions, but strives to reduce American dominance in the negotiations, because of its support for Israel. |
| 5. Western Europe and the United Nations | He works to strengthen their support for him and to involve them as much as possible in the conflict with Israel, in order to reduce the influence of the U.S. and to put obstacles in Israel's path. |
| 6. World Public Opinion | He implements propaganda moves and manipulates the dissemination of information to advance Palestinian interests |
| 7. Heads of the Palestinian Authority | Arafat uses tactics of "divide and rule," granting economic benefits to his associates to retain their loyalty. |
| 8. Palestinian Public Opinion | Arafat takes into account the trends of public opinion as expressed by the Arab man-on-the-street, but almost totally ignores the economic distress of the population. He regards this as a necessary sacrifice in the short term for the sake of important political gains in the long run. He also encourages the incitement of the population through the media and the educational system. |
| 9. Opposition Organizations | Arafat is helped by opposition organizations to act against Israel, but he warns them not to harm his own interests. He refrains, as much as possible, from confronting them, but will go to war on them if they endanger his rule or his strategic objectives. |
| 10. The Arab States | Arafat is active in recruiting financial and political support through the applicatof pressure on Arab leaders and by indirect threats (mainly toward Egypt and Jordan) of arousing the Arab st. He often stresses the struggle over Jerusalem to harness the Arab and Islamic worlds to help him achieve his ends. |

**V. Conclusions**

1. Arafat may return to the course of negotiations when he sees that he cannot expect any benefits from continuing the violent struggle. Therefore, Arafat must not be allowed to gain any political achievement as a result of his violent measures. The use of violence to advance his aims will continue to be part of Arafat's behavioral repertoire in the future, and he will make more frequent use of this tactic if he feels he can achieve anything in this way.

2. Spectacular military operations—such as air strikes, massive fire directed at targets in the areas of the Palestinian Authority, etc.—have a limited effect on Arafat. He knows the limitations of Israel's power and in situations of confrontation feels at his best, tends to take risks, and is willing to make sacrifices, more so than in normal circumstances. Many pinpointed actions have a better chance of being effective, because they undermine Arafat's sense of being in control of the situation.

3. Economic pressure on the population—such as closures or cutting off the water and electrical supply—will not have any significant effect on Arafat, because he has no problem in making sacrifices and will be better able to present the distress of the Palestinian population to the eyes of the world. Moreover, the distress of the Palestinian population encourages Arafat to harden his position and to develop expectations that the sufferings of the population will lead to international intervention, which is in his interest.

4. Economic pressure on Arafat in the form of withholding of tax funds collected by Israel and curtailment of foreign aid have an effect on Arafat, if they continue over a long period. Money is one of the means through which Arafat wields control. These funds constitute the major bulk of the financial resources of the Palestinian Authority and are required to finance the work of administration and the security forces. In contrast to military closures in the territories, Arafat will find it difficult to demonstrate the damage resulting from a shortage of these funds to the Palestinian people. At the same time, it should be taken into account that a severe damage to the security organs is liable to undermine the stability of the Palestinian Authority.

5. It is possible to influence Arafat through Hosni Mubarak, the Egyptian president. Mubarak is his main partner for dialogue, being a determined Arab leader of the same age as Arafat who goes along with the Palestinian strategy of attaining Palestinian objectives by means of the political process. Mubarak may provide legitimacy to Arafat's concessions on certain issues, but in many cases it was he who was behind the toughening of the Palestinian position in the negotiations. For example, in the negotiations Arafat conducted with the Barak government at the end of its term of office, President Mubarak made it clear to Arafat that he had no right to make concessions on Jerusalem, because the city was holy to all Arabs and Moslems (Mubarak boasted of this in a speech before students, which was broadcast on Egyptian television on August 28, 2001).

Arafat is also capable of identifying with Saddam Hussein, the Iraqi president, whom he perceives as an exemplary model of a proud and staunch Arab with the ability to be steadfast. Abdullah, the Jordanian king, and Bashar Assad, the president of Syria, have minor influence over Arafat because of their young age and the residue of the past history of the relations between their states and the Palestinians. At the same time, Abdullah's position on the issue of Jerusalem could have an effect on Arafat. Therefore, if President Mubarak and King Abdullah were to support a compromise on the Temple Mount, this would make it much easier for Arafat to compromise.

6. American pressure alone will not bring Arafat to change his position on essential issues (e.g., Jerusalem, the right of return, etc.). Apparently, Arafat's attitude toward President Bush is not very different from his ambivalent attitude toward President Clinton. Arafat prefers that the representatives of the UN and Western European countries that support him should have places around the negotiating table so as to weaken the American hegemony in the negotiations.

7. It is best not to utilize ultimatums in dealings with Arafat, and especially not a public ultimatum. Arafat feels that such a demand damages his honor and is intended to humiliate him. Therefore, there are limited chances that he will give in to an Israeli ultimatum, especially if made public. In circumstances in which he feels his position weak, he is liable to try to work within the gray area of the ultimatum to erode it. Therefore, it would be desirable to signal to Arafat if there is no choice—to convey the ultimatum to him discreetly. Alternatively, it would be worthwhile to employ a completely businesslike strategy in dealing with Arafat: "As you give, so you shall receive," or to present him with an equation: "If you give X, you shall receive Y"— and then allow him to make the choice on his own.

8. It would be advisable to deal with Arafat respectfully and to demonstrate gestures of goodwill toward him that have a bearing on his personal status. Such gestures have an effect on his state of mind and feed his desire to be honored and to receive recognition. At the same time, he will not make concessions on essential issues in return for such gestures.

9. The negotiation regarding the permanent settlement should be based on a final and conclusive agreement that will not enable Arafat to make any further strategic demands from Israel. At the same time, Arafat probably needs a longer period of time to digest the essential issues, such as a solution to the problem of the Temple Mount and the termination of the conflict, and to come to terms with not being able to make more demands on Israel. Therefore, if the negotiations resume, Israel must not assert pressure upon him to reach a decision quickly, but at the same time must not give him any more significant interim concessions, because the leverage remaining for bargaining with him in the future might be too short to persuade him to sign an agreement acknowledging the termination of the conflict.

10. It would be reasonable to assume that Arafat will not concede Palestinian sovereignty over the Temple Mount. Arafat's insistence on receiving sovereignty over East Jerusalem stems from his vision of establishing the Palestinian capital there as he promised, and also from his wish to be an important leader in the eyes of the Arab, Islamic, and Christian worlds. Apparently, Arafat is not prepared to go down in history as the one who gave up

the Temple Mount. At the same time, it should not be ruled out that Arafat would agree to a compromise formula on the issue of sovereignty over the Temple Mount (joint sovereignty, division of the area so that the mosques will remain within his sovereignty), on condition that this arrangement be acceptable to the major leaders of the Arab world, such as Mubarak.

11. How will Arafat react if Israel implements a unilateral disengagement, meaning withdrawal from most of the territories under its control without arriving at an agreement, entailing an evacuation of a large number of settlements? It can be assumed that in the wake of a unilateral withdrawal Arafat will instruct the Palestinian Authority to take control of all the areas that are vacated, and afterwards he might make a unilateral proclamation of an independent Palestinian state. Arafat might assume that Israel, in relinquishing its responsibility for the territories and for the Palestinian residents, would not be able to oppose the declaration and that he [Arafat] would be accorded overwhelming international support for a Palestinian state. It would be reasonable to assume that in these circumstances, Arafat would not agree to return to negotiations with Israel under present terms, but insist on an equal status of state vis-à-vis state—in other words, the Palestinians would claim all the rights pto an independent state, such as the right to self-defense, water rights, etc. This would enable the Palestinian state to form an army, maintain diplomatic relations, make treaties, and maybe even enter defense treaties with various states including Iraq, Iran, and Libya.

12. Despite the withdrawal, Arafat would not rest as long as the core disputed issues of the negotiations were not resolved: sovereignty over the Temple Mount, the law of return, borders, and settlements (any not vacated in a unilateral withdrawal). Therefore, the struggle would not be terminated by unilateral withdrawal. In these circumstances, Israel's situation would be complicated and even more problematic. Various Palestinian organizations, such as Hamas, Islamic Jihad, the Tanzim, and the Palestinian security forces would continue to attack Israel and targets within the territories. In addition to squads infiltrating Israeli territory, terrorist elements would also be active in the utilization of artillery, antitank missiles, and anti-aircraft missiles. In the wake of such actions, Israel would be liable to wage war against the Palestinian state, which would then be a sovereign state and a member of the UN, and thus Israel would be exposed to international pressure and maybe even sanctions. Following such an Israeli withdrawal, Arafat would claim to have won an overpowering military victory over Israel, unprecedented in the history of the Arab nation. This would have negative repercussions on the chances of terminating the Arab-Israeli conflict by political means at a future date. It would reduce the motivation of the Arab world to arrive at a peace agreement with Israel; the peace agreements with Egypt and Jordan would be further compromised and the strength of the opposition within the Arab world would be increased. Therefore, in contrast to a unilateral disengagement, it would be better for Israel to wait until the appropriate conditions prevail to enable the implementation of an agreed-upon disengagement—in other words, disengagement in accordance with a political agreement with the Palestinians, either a permanent or a partial agreement. In the meantime Israel could put into place a barrier between Israel and the territories, with the IDF continuing to maintain control over the territories (except for the territory of the Palestinian Authority), as an interim step until a political agreement can be reached. This might continue, except for changes in the deployment of settlements and military bases on the basis of tactical considerations.

13. Arafat's policy of "divide and rule" has prevented the creation of an alternative leadership. Against this background, and due to the multiplicity of forces active in the Palestinian arena, it is necessary to take into account the possibility of the eruption of a crisis in the Palestinian leadership, especially if Arafat suddenly descends from the stage.

***Selected Bibliography***

Aichner, A. (2001). Israel Destroyed the Hope. *Yediot Aharonot*, July 1, p. 2.

Alkabetz, S. and Cohen, A. (1988). The Day of the Fatah: The Security Forces Left with Nothing to Do. *Hadashot*, January 3, p. 4.

Alon, G. (2001a). Mofaz at the Foreign and Safety Committees: The Authority Has Become a Terrorist Entity. *Ha'aretz*, July 25, p. B-2.

Alon, G. (2001b). Senior Officer in the Intelligence Branch: Arafat Gave 'The Bright Green Light' for the Terrorist Attacks in Israel, *Ha'aretz,* May 15, p. G-1.

Altman, T. D. (1989). Honey with Arafat. *Ha'aretz*, February 17, p. 5.

American Psychiatric Association, (1994). *Diagnostic and Statistical Manual of Mental Disorders,* 4th ed., Washington, DC: American Psychiatric Press.

Araf, S. (1994). The Woman Who Was Left Behind. *Ma'ariv*, December 9, p. 18-22.

Atlas, Y. (1998). Albright's Deal and Arafat's Kids. *Insight on the News*, November 2, p. 31-33.

Avneri, A. (1994). Arafat. A Leg Here, a Leg There. *Maariv,* June 15, p. 2.

Avrech, M. (1993). Give Me a Country and I Will Wear a Suit and Tie. *Yediot Aharonot*, September 10, p. 26.

Azulai-Katz, A. (1993). Arafat's Burst of Bitter Cry. *Yediot Aharonot*, December 17, p. 3.

Barber, J. D. (1972). *The Presidential Character: Predicting Performance in the White House.* Englewood Cliffs, NJ: Prentice-Hall.

Barel, Z. (1994). "The President and Needy," *Ha'aretz*, November 9, p. B-1.

Barnea, N. (2001a). They Want War. *Yediot Aharonot*, June 1, 2001, p. 3.

Barnea, N. (2001b). Crazy Uranium. *Yediot Aharonot,* June 24, 2001, p. 3.

Barnea, N. (2001c). Speaking under Fire. *Yediot Aharonot*, June 24, 2001, pp. 2-3.

Barnea, N. (2001d). Three in One Capital. *Yediot Aharonot*, August 17, p. 2-3.

Barron, G., and Regev, D. (1996). Darwashe: Arafat Requested to Remove Untrustworthy Suggestion So That the Government Won't Fall. *Yediot Aharonot*, May 18, p. 7.

Bechor, G. (1993). The PLO Expected to Approve the Agreement through a Unique Democratic Process in Which the Decision-maker Is Arafat. *Ha'aretz*, September 7, p. A-3.

Bechor, G. (1996). Not on Arafat Alone. *Ha'aretz,* June 3, p. B-2.

Bechor, G., and Rabin, A. (1992). Yasser Arafat's Wife: Palestinian Devotion with the Head of the PLO Grew. *Ha'aretz*, January 12, p. D-3.

Bergman, R. (1998). Destroying Arafat. *Ha'aretz*, August 3, p. 20-32.

Bergman R. and Meltzer G. (2001). Arafat's Secret Accounts. *Yediot Aharonot*, June 1, p. 16-17.

Berkovitch, A. (1998). Why Does Everybody Know What his Position Is? An Interview with Amidror.

*Yediot Aharonot*, April 24, p. 10-14.

Carmel, A. (2001). Arafat's Escape. *Yediot Aharonot*, May 16, p. 5.

Carney, Y. (2001). Arafat Instructs: To Help in the Search for Joseph Samir. *Yediot Aharonot*, April 12, p.6.

Chalila, M. (1994). Arafat: The East Jerusalem Will Be the Capital of the Future Palestinian States. *Davar*, August 17, p. 2.

Choiniere, R., and Keirsey, D. (1992). *Presidential Temperament*. Del Mar, CA.: Prometheus Nemesis.

Colbin, M. (1990). Armed with Four Suitcases. *Yediot Aharonot*, June 10, p. 22.

Colbin, M. (1994). *Yasser Arafat.* London: Hamish Hamilton.

Craik, K. H. (1986). Personality Research Methods: An Historical Perspective. *Journal of Personality,* 54, p. 18-51.

Dagoni, R. (2000). Newsweek on the Boycott in the Palestinian Authority: It Is Like the Story of Ali Baba and the Forty Thieves. *Globes,* May 22, p. 2.

Dekleva, K. B., and Post, J. M. (1997). Genocide in Bosnia: The Case of Dr. Radovan Karadizic. *Journal of the American Academy of Psychiatry and the Law*, 25, p. 485-496.

Dettmer, J. (1998). There Is a Fog over Washington. *Insight on the News*, December 28, p. 8-9.

Dille, B., and Young, M. D. (2000). The Conceptual Complexity of Presidents Carter and Clinton: An Automated Content Analysis of Temporal Stability and Source Bias. *Political Psychology*, 21, p. 587-596.

Druker, R. (1998). Arafat: The World Must Impose Economic Sanctions on Israel. *Ma'ariv*, August 13, p. 3.

Dayan, A. (1995b). The Stomachache Disappeared. *Davar*, October 24, p. 7.

Dayan, A. (1995a).The Minimum that Arafat Needs. *Davar*, September 29, p.5.

Egozi, A. (1992). Flight Tracks: Arafat's Big Secret. *Yediot Aharonot*, April 9, p. 2.

Eichner, A. (2001). Israel has Destroyed Hope. Yediot Aharonot, July 1, p. 2.

Eldar, I. (2000). Arafat's Senior Advisor: The Chairman Is Responsible for the Situation. *Ha'aretz,* August 14, p. B-1.

Feldman, O., and Valenty, L. O. (2001), (eds.). *Profiling Political Leaders: Cross-cultural Studies of Personality and Behavior.* Connecticut: Praeger.

Friedman, T. (1989). *From Beirut to Jerusalem.* New York: Farrar, Straus, and Giroux; Israel: Sifriat Ma'ariv, 1990.

Friedman, T. (2001). There Is No Partner for Compromise. *Ha'aretz*, May 25, p. B-1.

Frisch, P. (2000). Brigadier General Gilad: The Leaders Ignored the Intelligence. *Yediot Aharonot*, Internet edition, December 20.

Gabai, S. (1985). The Double Lives of Arafat and his Partners. *Ma'ariv,* September 20, p. 22.

Gabai, S. (1992). Soon We Will Be Praying in Jerusalem, We Will Continue the Journey until the Victory. *Ma'ariv*, April 10, p. 6.

Gabai, S. (1993a). Yasser Arafat: The Wizard of . *Ma'ariv*, May 19, p. 4.

Gabai, S. (1993b). The Palestinians Will Not Give up any Piece of Jerusalem Land. *Ma'ariv,* September 2, p. 9.

Gabai, S. (1993c). A Letter to BirZit. *Ma'ariv*, September 3, p. 5.

Gabai, S. (1993d). Believe in Arafat. *Yediot Aharonot*, September 6, p. 9.

Gabai, S. (1993e). Nevertheless They Shook Hands. *Ma'ariv,* October 8, p. 3.

Globes*,* (1993). Suah Arafat Was Appointed as a Member of the PLO Operating Committee. *Globes*, July 5, p 2.

Gowers, A. (1992). *Behind the Myth: Yasser Arafat and the Palestinian Revolution*. New York: Olive Branch Press.

Granot, A. (1993a). Gaza First or Arafat First? *Ma'ariv,* October 9, p. 11.

Granot, A. (1993b). Arafat: Was He Derailed? *Ma'ariv*, December 17, p. 10-11.

Granot, A., (2001). Intifada," *Ma'ariv*, August 25, p. 7.

Greenbaum, L. (2000). Arafat's Corrupted People," *Globes,* November 23, p. 4.

Greenbaum, L. (2001). The Palestinians Start the Week Executing the Boycott against Israeli Merchandise. *Globes,* January 31, p. 1.

Greenstein, F. I. (1994). The Two Leadership Styles of William Jefferson Clinton. *Political Psychology*, 15, November 23, p. 351-361.

*Ha'aretz,* (1989). Arafat Promises to Continue the Intifada until the PLO's Flag Is Waved on the Al-Aksa Mosque. *Ha'aretz*, August 21, p. D-27.

*Ha'aretz,* (1992). Married, Flesh and Blood. *Ha'aretz*, February 27, p. G-2.

Harel, A., (2001). General Malka: Arafat is a Threat to the Stability in the Region. *Ha'aretz*, June 8, p. G-4.

Harel, A., and Baram, A., (2001). Mortars in Sderot: Firing near the Gilo Neighborhood. *Ha'aretz*, Internet edition, April 16.

Hart, A. (1984). *Arafat: Terrorist or Peacemaker?* London: Sidgwick & Jackson.

Hart, A. (1994). *Arafat: A Political Biography.* London: Sidgwick & Jackson.

Heifetz, R. A. (1994). Some Strategic Implications of William Clinton's Strengths and Weaknesses. *Political Psychology*, 15, p. 763-769.

Hermann, M. G. (1983). Assessing Personality at a Distance: A Portrait of Ronald Reagan. *Mershon Center Quarterly Report* 7:6.

Hermann, M. G., (1994). Presidential Leadership Style, Advisory Systems, and Policy Making: Bill Clinton's Administration after Seven Months. *Political Psychology* 15, p. 363-374.

Hermann, M. G., and Preston, T. (1994). Presidents, Advisers, and Foreign Policy: The Effect of Leadership Style on Executive Arrangements. *Political Psychology* 15, p.75-96.

Hess, A. (1998). Arafat in the 'Celebration on Independence': We Want to Declare our State in May. *Ha'aretz*, November 15, p. A-5.

Horowitz, G. (2001). Clinton: Arafat Wants Peace with Israel. *Ha'aretz*, April 24, p. A-5.

Kamir, A. (1998). Arafat Already Doesn't Want Abu Mazan as a Successor. *Ma'ariv,* June 3, p.1.

Kierman, T. (1976). *Arafat, the Man and the Myth*. New Yourk: W.W. Norton & Company, Inc.

Kimhi, S., (2001). The Psychological Profile of Benjamin Netanyahu Using Behavior Analysis. In: O. Feldman and O. L. Valenty, eds., *Profiling Political Leaders: Cross-cultural Studies of Personality and Behavior*. Connecticut: Praeger.

Kofodimos, J. (1990). Using Biographical Methods to Understand Managerial Style and Character. *The Journal of Applied Behavioral Science*, 26, p. 434-459.

Kolbin, M. (1990). Armed with Four Suitcases. *Yediot Aharonot*, June 10, p. 22.

Kotlovski, R., and Gabai, S. (1994). Suah Arafat: We Are Not Getting Divorced," *Maariv*, May 26, p. 6.

Krouse, A. (1997). Parkinson's - A Degenerative Disease of the Mind. *Ha'aretz*, November 18, p. A7.

Landers, Y. (1994). Chronic Leader. *Davar*, May 13, p. 12-13.

Lavi, D. (1994). My Young Brother Yasser. *Ma'ariv,* May 10, p. 9.

Levi, G. (1995). I Am the Oldest and the Most Knowledgeable. *Ha'aretz*, April 28, p. 14-16.

Levin, A. (1993). How Did Arafat Become a Millionaire? *Globes*, December 7, p. 41.

Levin, A. (1999). The US on the Idea of Separation: The Possibility of Working in Israel is Critical for the Palestinians. *Globes*, Nov. 3, p. 19.

Levitzky, N. (1993). What Happened to the Chairman? *Yediot Aharonot*, December 17, p. 1-2.

Limor, Y. and Granot, A. (1998). The Palestinian Authority Gets Ready for a Confrontation with Israel. *Yediot Aharonot*, April 16, p. 5.

Louise, L. (1995). How Do You Solve a Problem like Arafat? *U.S. News and World Report*, February 20, p. 54.

Lyons, M. (1997). Presidential Character Revisited. *Political Psychology* 18, p. 791-811.

Ma'ariv, (1993). Yasser Arafat: The Palestinian Flag Will Soon Be Waved in Jerusalem. *Ma'ariv*, September 3, p. 5.

Machanayami, A. (1987a). The Wanderer. *Yediot Aharonot*, October 2, p. 26.

Machanayami, A. (1987b). The Punishment of the One who Exposed Arafat's Lover. *Yediot Aharonot,* November 27, p. 26.

Maddi, S. R. (1989). *Personality Theories: A Comparative Analysis,* 5th ed. Chicago, IL: The Dorsey Press.

Mantzur, A. (1995). Everyone Is Trying Knots and is Plotting Schemes. *Al Ha'mishmar*, February 2, p. 11.

Marfleet, B. G. (2000). The Operational Code of John F. Kennedy During the Cuban Missile Crisis: A Comparison of Public and Private Rhetoric. *Political Psychology* 21, p. 545-558.

Margalit, D. 1995). Suspect Him More than Respect Him. *Ha'aretz*, April 26, p.B1.

Markus Y. (2001). The 'Galician' [clever one] from Gaza. *Ha'aretz,* June 20, p, D2.

Michael, S. (2001). Sharon's Era, Arafat's Era. *Yediot Aharonot*, April 6, p. 6.

Muallem, M. (2001). Sharon to Mitchell: The Riots Are the Strategic Decision of the Authority. *Ha'aretz*, March 26, p. G-2.

Muslin, H. L., and Jobe, T. H. (1991). *Lyndon Johnson the Tragic Self: A Psychohistorical Portrait.* Norwell, MA: Insight Books/Kluwer.

Peperblit, S. (1992). Every Time that He Comes Back from a Trip, He Brings Me a Gift. *Yediot Aharonot*, June 19, p. 3.

Perry, S. (1985). Poor Arafat. *Yediot Aharonot,* February 11, p. 4.

Perry, S. (1989). This Man. *Yediot Aharonot,* February 27, p. 33.

Perry, S. (1992a). He Is Always Saved. *Yediot Aharonot*, April 9, p. 17-18.

Perry, S. (1992b). There Will Be Pressure to Appoint a Successor. *Yediot Aharonot*, April 9, p. 3.

Perry, S. (1992c). Arafat Was Saved, but his Time Is Up. *Yediot Aharonot*, April 10, p.1.

Perry, S. (1992d). He Doesn't Want any Successors. *Yediot Aharonot*, June 2, p. 2.

Perry, S. (1992e). Suah Arafat: I Pushed him into Marriage. *Yediot Aharonot*, October 9, p. 7.

Perry, S.(1994). Is his Head at Risk? *Yediot Aharonot*, November 18, p. 7.

Perry, S. (1996). Argues with the Nanny. *Yediot Aharonot*, August 9, p. 14-18.

Perry, S. (2001). The Chairman's Wife Speaks. *Yediot Aharonot*, May 3, p. 2-3.

Raphael, F. (1998). The Man with the Ready Handshake," *Spectator*, London, November 28, p. 8.

Raviv, K. A. (1995). Arafat Played Chess when Israel Invaded Lebanon. *B'Machane*, January 11, p.19.

Renshon, S. A. (1996). *High Hopes: The Clinton Presidency and the Politics of Ambition.* New York: New York University Press.

Renshon, S. A., and Duckit, J. (2000) (eds.). *Political Psychology: Cultural and Crosscultural Foundations*. New York: New York University Press.

Robins, R., and Post, J. (1997). *Political paranoia: The Psychopolitics of Hatred*. New Haven, Conn.: Yale University Press.

Rosenblum, D. (2001). The Kiss of the Spider Woman. *Ha'aretz*, March 23, p. 13.

Rozen, A. (1992). Arafat Is in a Difficult Mental Condition: His Representatives Are Bewildered. *Ma'ariv*, September 20, p. 2.

Rubenstein, D. (1994a). Arafat Fears the Leaders of the Territories. *Ha'aretz*, May 5, p. A5.

Rubenstein, D. (1994b). Like Every Human Being. *Ha'aretz*, December 12, p.B1.

Rubenstein, D. (1995a). *The Mystery of Arafa.t* South Royalton, Vt.: Steerforth Press.

Rubenstein, D. (1995b). Arafat Is Staying Here. *Ha'aretz*, March 6, p. B1.

Rubenstein, D. (1995c) Time-out for Arafat. *Ha'aretz*, June 16, p. B3.

Rubenstein, D. (1995d) The Palestinian Version of Divide and Rule. *Ha'aretz*, June 30, p. B3.

Rubenstein, D. (1995e). Yasser Arafat, Traffic Policeman. *Ha'aretz*, July 7, p. B3.

Rubenstein, D. (1996). Officially from Jerusalem , but in Fact from Cairo," *The Nation*, December 4, p. B3.

Rubenstein, D. (2001). *Arafat— A Portrait,* Zamorah Bitan.

Sa'id, Y. (1988). Arafat Will Arrive at Once, He Is Praying. Y*ediot Aharonot*, December 23, p. 32.

Sayigh, Y. (1997). *Armed Struggle and the Search for State.* Oxford: Clarendon Press.

Schafer, M., and Crichlow, S. (2000). Bill Clin's Operational Code: Assessing Source Material Bias. *Political Psychology*, 21 p. 559-571.

Schiff, Z. (1997). Yaalon: Arafat Will Return to Violence if He Loses the Chance for a State. *Ha'aretz*, 11, p. B2.

Schiff, Z. (2011a) Fewer Killed, More Poverty. *Ha'aretz*, March 23, p. B1.

Schiff, Z. (2001b). Arafat Fools Everyone. *Ha'aretz*, June 22, p. B.

Schlesinger, A. M. (1986). *The Cycles of American History.* Boston: Houghton Mifflin.

Segev, A. (1994). They Never Spoke with Him about his Kaffiyeh. *Ha'aretz*, July 18, p. B2.

Sella, M. (1994a). The First Seedling of Tyranny *Davar*, August 1, p. 9.

Sella, M. (1994b). Our Side of the Celebration Circle. *Davar*, October 26, p. 7.

Sella, M. (1994c). The Kosher Stamps of Arafat. *Davar*, December 12, p. 9.

Shaked, R. (1990). There Are Hot Weapons, only Waiting for Instruction. *Yediot Aharonot*, June 3, p. 24.

Shaked, R. (1997). Hamas Murderers under Arafat's Protection. *Yediot Aharonot*, October 15, p. 4.

Shaked, R. (2001a). Arafat Wants Anarchy. *Yediot Aharonot*, February 16, p. 6-7.

Shaked, R. (2001b). It Is Possible that the Murder in Tekoa not at All of a Criminal Background. *Yediot Aharonot*, May 11, p. 4.

Shaked, R. (2001c). Don't Eulogize Arafat. *Yediot Aahronot*, May 25, p. 9.

Shaked, R. (2001d). Playing on Time. *Yediot Aharonot*, June 8, p. 10.

Shaked, R., Eichner, A., and Auslin, Y. (2001). A Night of Fire in Gaza. *Yediot Aharonot*, April 9, p. 5.

Shaked, R., and Raz, D. (2001). Arafat: Peace Is our Strategic Choice. *Yediot Aharonot*, March 11, p. 4.

Shaked, R. and Zinger, Z. (2001). One Day, One Leader, Three Letters. *Yediot Aharonot*, March 9, p. 2.

Shavit, A. (2001). The Day Peace Died. *Ha'aretz,* Sept. 14, p. 20-32.

Simonton, D. K. (1990). *Psychology, Science, and History: An Introduction to Historiometry*. New Haven: Yale University Press.

Skowronek, S. (1990). Notes on the Presidency in the Political Order. In: K. Orren and S. Skowronek, (eds.), *Studies in American Political Development: An Annual,* Vol. 1. New Haven: Yale University Press.

Sokol, S. and Hess, A. (1997). Arafat Hospitalized in Ramallah for Heart Trouble. He Repeatedly Said: I Feel Good. *Ha'aretz,* October 31, p. G-3.

Suedfeld, P. (1994). President Clinton's Policy Dilemmas: A Cognitive Analysis. *Political Psychology*, 15, p. 337-349.

Suedfeld, P. and Bluck, S. (1993). Changes in Integrative Complexity Accompanying Significant Life Events: Historical Evidence. *Journal of Personality and Social Psychology,* 64, p. 124-130.

Suedfeld, P., & Granatstein, J. L. (1995). Leader Complexity in Personal and Professional Crises: Concurrent and Retrospective Information Processing. *Political Psycholog,y* 16, p. 509-544.

Suedfeld, P., Tetlock, P. E., and Streufert, S. (1992). Conceptual/integrative Complexity. In: C. P. Smith (ed.). *Motivation and Personality: Handbook of Thematic Content Analysis.* Cambridge:

Cambridge Univ. Press, p. 393-400.

Suedfeld, P., Wallace, M. D., and Thachuk, K. L. (1993). Changes in Integrative Complexity among Middle East Leaders during the Persian Gulf Crisis. *Journal of Social Issues*, 49, p. 183-199.

Swansbrough, R. H. (1994). A Kohutian Analysis of President Bush's Personality and Style in the Persian Gulf Crisis. *Political Psychology*, 15, p. 227-275.

Tipenbraun, A., and Lior, G. (2001). The German Foreign Minister Watched the Terrorist Attack from his Hotel and Rushed to Put Pressure on Arafat. *Yediot Aharonot*, June 3, p. 6.

Tzezna, S. (1998). Arafat: We Will Defend Jerusalem with Guns. *Ma'ariv*, November 16, p. 9.

Verter, Y. (1994). Losing Height. *Ma'ariv*, September 12, p. 8-11.

Vitz, S. (1993). Arafat: 'Why Don't You Relate to Me Like a Human Being?' *Yediot Aharonot*, May 19, p. 7.

Walker, S. G. (1983). The Motivational Foundations of Political Belief Systems: A Re-analysis of the Operational Code Construct. *International Studies Quarterly*, 27, p. 179-201.

Walker, S. G., and Schafer, M. (2000). The Political Universe of Lyndon B. Johnson and his Advisors: Diagnostic and Strategic Propensities in their Operational Codes. *Political Psychology*, 21, p. 529-543.

Wallace, M. D., Suedfeld, P., and Thachuk, K. A. (1993). Political Rhetoric of Leaders Under Stress in the Gulf Crisis. *Journal of Conflict Resolution*, 37, p. 94-107.

Wallace, M. D., Suedfeld, P., and Thachuk, K. A. (1996). Failed Leader or Successful Peacemaker? The Cognitive Processes of Mikhail Sergeyevitch Gorbachev. *Political Psychology*, 17, p. 453-472.

Wallach, J. (1990). *Arafat: In the Eyes of his Beholde.r* New York: Carol Pub. Group.

Waller, D. (2001). A Bridge to Peace. *Time,* June 8, p. 42-43

Weaver, M. A. (1994). Arafat. *New Yorker*, May 5, p. 2

Weintraub, W. (1989). *Verbal Behavior in Everyday Life*. New York: Springer.

Winter, D. G. (1993). Leader Appeal, Leader Performance, and the Motive Profiles of Leaders and Followers: A Study of American Presidents and Elections. In: N. J. Kressel, ed., *Political Psychology: Classic and Contemporary Readings*. New York: Paragon House Pub., p. 139-153.

Yaari, E. (1989). Arafat Calls for Uprisings in the Territories. *Ha'aretz*, May 11, p. D-3.

Yaari, E. (1996a). Not a 'Goody-two-shoes' Any More. *Ma'ariv*, August 30, p. 12.

Yaari, E. (1996b). What a State. *Ma'ariv*, September 20, p. 12-13.

Yaari, E. (2001). More or Less. *Globe*s, May 17, p. 68.

Yechezkeli, Z. (1993). The PLO's Funds Are Disappearing Quickly. *Yediot Aharonot*, April 19, p. 6.

Yediot Aharonot, (2001). Clinton: Because of Arafat, I Became a Huge Failure. *Yediot Aharonot*,

June 29, p. 5.

Zarai, A. (1991). We Could Have Stopped Schwartzkoff at the Gates of Kuwait if We Would Have Fought the Americans. *Ha'aretz*, July 26, p. G-2.

Zinger, Z. (1998). Walk on the Threshold of the Abyss. *Ma'ariv*, November 24, p.1.

Zuckerman, M. B. (1998). Actions that Belie Words. *U.S. News & World Report,* December 21, p. 72.

Zuckerman, M. B. (2000). Arafat Torches Peace Editor-in-chief. *U.S. News & World Report,* November 23, p. 75-76 .

## *Yasir Arafat: Identities in Conflict*

***By Prof. Jerrold Post***

A consummate survivor, throughout his revolutionary career, Palestinian leader Yasir Arafat has led with his finger squarely in the wind, extremely sensitive to the tide of public opinion. While he has consistently espoused the goal of an independent Palestinian state, an examination of his career suggests that his highest priority has been securing his role as the leader of the unified Palestinian resistance. On any number of occasions, by recognizing Israel's right to exist, Arafat could have placed unbearable international pressure on Israel for the creation of a Palestinian entity, but Arafat's wish to be the leader of the unified Palestinian resistance, in effect, vetoed the absolutism of the extremist wing of the Palestinian movement.

But this was to change in 1992. When Arafat's plane crashed in the Libyan Desert on April 4, it was initially feared that the PLO leader had been killed. He was found the next day, dazed, by the wreck of the private plane in which his pilot has been killed. In June, suffering from severe headaches, he was rushed to King Hussein Hospital in Amman, Jordan, for emergency neurosurgery to remove two blood clots pressing on the brain, a life-threatening result of the trauma sustained eight weeks earlier. It was after this event that he entered into the secret negotiations that were to result in the Oslo Accords, beginning the peace process that culminated with the Wye River accords. Having confronted his mortality, and seeing that his time was limited, he resolved to take an unprecedented step to achieve his goal of a Palestinian state, to ensure his place in history, to ensure that history books would record Yasir Arafat as the father of the Palestinian nation. In the process, he not only won the Nobel Peace Prize, but also incurred the enmity of the absolutist extremist wing of the Palestinian movement for selling out the cause (for an analysis of the effects of serious and terminal illness upon political behavior, see Robins and Post, 1997).

The task of leading a nation in embryo is very different from leading a resistance movement against an occupying state. When the revolution has succeeded, few revolutionary leaders succeed in leading their new-born nations, for the leadership tasks and abilities of leading a group in opposition against the hated enemy are very different from those required by a nation-builder. To rouse a group against thehated establishment is very different from becoming the establishment. Few have succeeded in making this transition—Fidel Castro being an exception to this general rule, but Castro's success in fending off criticism of his internal leadership has been graciously facilitated by the U.S. economic embargo, which has permitted Castro to continue to be able to externalize, pointing the finger of blame at the enemies in the north for his internal problems.

Arafat has not made this transition well. He has continued to demonstrate an autocratic leadership style more congenial to a fighting revolutionary, and has been criticized by moderate Palestinian leaders for not developing a more participatory democracy, as he strives to develop the infrastructure. Moreover, in dealing with the negotiations during the peace process, he continued to be absolutist in his demands, not offering any compromise in response to the extreme flexibility shown by Israel's Prime Minister Barak. Further, as Barak was preparing the Israeli public for the necessity to make painful concessions and compromises to achieve the long-desired peace, Arafat was not in parallel way preparing the Palestinian public to compromise. To the contrary, he continued to maintain a public posture that total satisfaction of Palestinian demands for East Jerusalem as a capital, control over the holy sites, and the right of return, the most difficult of the issues that are in play, would be required.

At Camp David II, agreement was tantalizingly close. But Arafat's refusal to offer any reciprocal response to Barak's major concessions ultimately doomed the talks to failure, although, in the long run, putting into play the previously taboo issues of Jerusalem and the right of return was a major accomplishment for Arafat.

And now, sadly, we are again in a state of violent conflict, a major step backward from the accomplishments of recent years.. Shelving his Nobel medal, Arafat once again exhorts Palestinian youth to "fight for Jerusalem" and

praises the youthful "martyrs" who have lost their lives in the conflict. It is as if "the leader of the unified Palestinian resistance" template is his default position. Ominously, Arafat has released from Palestinian prisons radical members of Hamas and the Islamic Jihad, some of whom were responsible for the wave of terrorist attacks in the mid-90s, when a suicide bombing campaign claimed 57 lives in 1996. Arafat has now brought a number of these leaders into a decision-making committee to plan and coordinate the violent protest, leading to fear in Israel of a new wave of terrorist attacks. Despite repeated pleas to seek to constrain the violence, Arafat has not done so, placing the entirety of the blame upon Israel, justifying Palestinian violence in terms of a legitimate response to the Israeli occupation and disproportionate violence by the Israeli military, with no acknowledgment of Palestinian participation in the cycle of violence. Once again, in this competition for victimhood, each side justifies its violence as a required response to the aggression of the other. It may be, however, that having unleashed the genie of violence, Arafat is afraid that calls for restraint would now go unheeded, betraying the weakness of his leadership position.

When missiles rained upon Arafat's headquarters in Ramallah in response to a wave of suicide bombings in which 30 were killed, Arafat was reported to be euphoric. Once again, he was in his favored position, the underdog, the innocent victim, calling out to the international community for support against the Israeli aggression, despite the his role in precipitating the attack. His dominant identity as leader of the unified resistance was once again firmly in place.

Arafat is ill and nearing the end of his career. In November 1998, after a conference celebrating the twentieth anniversary of Camp David at Ben-Gurion University of the Negev, with original participants in the Camp David negotiations, we traveled under armed guard to Arafat's headquarters in the occupied territories to have an audience with Arafat. While I knew he had been ailing and was suffering from Parkinson's disease, I was shocked by his appearance. His eyes deeply sunk in his head, he appeared exhausted, and displayed a major tremor around his mouth. Yet, when he spoke, his rhetoric was fiery, as he indicated, "I have kept my promises. The reason for the failure of the peace negotiations is him, Netanyahu. He cannot be trusted and has broken his promises." (We then had an audience with Israeli Prime Minister Netanyahu, who apparently had the same speechwriter, for he stated, "I have kept my promises. He [referring to Arafat] cannot be trusted and has broken his promises.")

The ill-fitting garb of peacemaker has been replaced by the much more familiar battle fatigues of the revolutionary fighter. Can Arafat again return to the path of peace? Each morning as Arafat looks into the mirror, and is confronted with his aging tremulous visage, he is reminded that his time is short and that his goal of achieving a Palestinian state has not yet been accomplished. Thus for Arafat, two clocks are ticking. While the auguries are pessimistic at the present time, in that career-long wish to be the father of the Palestinian state lies the hope that Arafat will yet move back from the brink and return to the role of peace- maker.

**About the Authors**

**Dr. Shaul Kimhi** is. Dr. Kimhi is a member of the American Psychological Association and the International Society of Political Psychology, and is a research associate at the International Policy Institute for Counterterrorism at the Interdisciplinary Center in Herzliya. In the past, he served as special adviser to the Research Unit of the Intelligence Branch of the Israel Defense Forces (IDF). He is also a senior lecturer in Psychology at Tel Hai Academic College.

**Dr. Colonel (Reserves) Shmuel Even** is a strategic, economic, and management consultant, chief executive officer (CEO) of Multi Concept (Consultants), Ltd. Dr. Even is an economist and a member of the Jaffee Center for Strategic Studies at Tel Aviv University. In the past, he served as a senior officer in the Intelligence Branch of the IDF, where his responsibilities included the consolidation of national intelligence evaluations in the Research Unit of the Intelligence Branch.

**Prof. Jerrold Post** is a professor of psychiatry, political psychology, and international affairs and the director of the Political Psychology Program at George Washington University. In the past, he established and headed the U.S. Government Center for the Analysis of Personality and Political Behavior. He wrote psychological profiles of Menahem Begin and Anwar Sadat for President Jimmy Carter before the Camp David summit. His latest book, coauthored with Robert Robins, is *Political Paranoia: The Psychopolitics of Hatred.*

Jerusalem Center for Public Affairs





Articles by Dore Gold

# Ambassador Dore Gold

Ambassador Dore Gold is President of the Jerusalem Center for Public Affairs. He was the eleventh Permanent Representative of Israel to the United Nations (1997-1999). Previously he served as Foreign Policy Advisor to the former Prime Minister of Israel, Benjamin Netanyahu.

Ambassador Gold has served as an advisor to Prime Minister Ariel Sharon, who asked him to accompany his entourage to Washington and to the 2003 Aqaba Summit with President George W. Bush. He was a member of the Israeli delegation at the 1998 Wye River negotiations between Israel and the PLO, outside of Washington. He negotiated the Note for the Record, which supplemented the 1997 Hebron Protocol, and in 1996 concluded the negotiations with the U.S., Lebanon, Syria, and France for the creation of the Monitoring Group for Southern Lebanon. In 1991, he served as an advisor to the Israeli delegation to the Madrid Peace Conference. From 1985 to 1996 he was a senior research associate at the Jaffee Center for Strategic Studies, Tel Aviv University, where he was Director of the U.S. Foreign and Defense Policy Project. Dr. Gold received his BA ('75), MA ('76), and PhD ('84) from Columbia University.

Ambassador Gold has written numerous books and articles on the Middle East, including *U.S. Military Strategy in the Middle East* (Tel Aviv: Ministry of Defense Publications, 1993); ***Hatred's Kingdom: How Saudi Arabia Supports the New Global Terrorism*** (Washington: Regnery, 2003); and ***Tower of Babble: How the United Nations Has Fueled Global Chaos*** (New York: Crown Forum, 2004). His articles have appeared in *Asahi Shinbun, Commentary, Daily Telegraph, Die Zeit, Ha'aretz, Jerusalem Post, New York Times, Washington Post,* and *Wall Street Journal*. He lives in Jerusalem with his wife, Ofra, and their two children, Yael and Ariel.

---

## Articles (Full-Text) by Dore Gold:

### Jerusalem Center Publications:

- **What If Bush Invited Sharon and Abu Mazen to Camp David? The Prospects for Negotiations in the Post-Arafat Era** (Jerusalem Letter/Viewpoints, 2-16 January 2005)

- **Wartime Witch Hunt: Blaming Israel for the Iraq War** (Jerusalem Letter/Viewpoints, 1 June 2004)

- **Bush Erases the Clinton Parameters** (Jerusalem Issue Brief, 15 April 2004)

- **An Answer to the New Anti-Zionists: The Rights of the Jewish People to a Sovereign State in their Historic Homeland**, with Jeff Helmreich (Jerusalem Letter/Viewpoints, 16 November 2003)

- **Saudi Arabia's Dubious Denials of Involvement in International Terrorism** (Jerusalem Letter/Viewpoints, 1 October 2003)

- **Defensible Borders for Israel** (Jerusalem Letter/Viewpoints, 15 June - 1 July 2003)

- **The Suicide Bombing Attacks in Saudi Arabia: A Preliminary Assessment** (Jerusalem Issue Brief, 13 May 2003)

- **The New Arafat-Abu Mazen Cabinet: A Roadblock to Middle East Peace** (Jerusalem Issue Brief, 24 April 2003)

- **Baseless Comparisons: UN Security Council Resolutions on Iraq and Israel** (Jerusalem Issue Brief, 24 September 2002)

- **From "Occupied Territories" to "Disputed Territories"** (Jerusalem Letter/Viewpoints, 16 January 2002)

- **Israel is Not the Issue: Militant Islam and America** (Jerusalem Letter/Viewpoints, 1 October 2001)

- **Untenable Linkages: Tying a Cessation of Palestinian Violence to an Israeli Settlement Freeze** (Jerusalem Letter/Viewpoints, 15 May 2001)

- **Jerusalem in International Diplomacy** (84 pages with maps, May 2001)

- **Jerusalem in International Diplomacy: The 2000 Camp David Summit, the Clinton Plan, and their Aftermath** (Jerusalem Letter/Viewpoints, 1 February 2001)

- **Middle East Missile Proliferation, Israeli Missile Defense, and the ABM Treaty Debate** (Jerusalem Letter, 15 May 2000)
- **Hebrew version of "Middle East Missile Proliferation...":**
  **מירוץ הטילים החדש במזרח התיכון והפולמוס סביב הסכם ABM**

- **The End of the Post-Gulf War Era** (Jerusalem Letter/Viewpoints, 15 March 2000)

- **The U.S.-Israel Relationship: Mounting Misperceptions in**

**Washington** (Jerusalem Letter/Viewpoints, 15 April 1992)

**Non-JCPA Publications:**

- **The UN at Work** (Wall Street Journal, 19 January 2005)
- **To Retain Credibility, UN Must Insist Syria Behave** (Chicago Sun-Times, 7 January 2005)
- **Tower of Babble - Interview with Jamie Glazov** (Front Page Magazine, 7 January 2005)
- **From Arafat to al-Zarqawi** (New York Sun, 19 November 2004)
- **The Arafat Paradox** (Jerusalem Post, 12 November 2004)
- **The War on America is Not Over** (National Review Online, 14 May 2003)
- **The Kingdom of Incitement** (Wall Street Journal, 14 April 2003)
- **Reining in Riyadh** (New York Post, 6 April 2003)
- **Israel Should Not Pay the Price for Iraq** (Financial Times-UK, 31 March 2003)
- **Only Buffer Zones Can Protect Israel** (New York Times, 27 February 2002)
- **The Price of UN Neutrality (in Hebrew)** (Yediot Ahronot, 9 July 2001)
- **The Cease-Fire That Never Was** (Jerusalem Post, 3 November 2000)
- **A New Diplomacy...** (Washington Post, 17 October 2000)
- **The Palestinian Provocation** (Wall Street Journal, 3 October 2000)
- **Jerusalem at the Millennium Summit (in Hebrew)** (Yediot Ahronot, 4 September 2000)
- **An Israeli Jerusalem for All** (New York Jewish Week, 1 September 2000)
- **Why Camp David II Failed** (Wall Street Journal, 27 July 2000)
- **What Happened to Secure Borders for Israel? The U.S., Israel, and the Strategic Jordan Valley** (Project for the New American Century, 23 June 2000)
- **Reshuffled Deck on Syrian-Israeli Negotiations** (Jerusalem Post,

12 June 2000)

- **Conditions of Peace (in Hebrew)** (Haaretz, 25 January 2000)
- **Temporary Advantage (in Hebrew)** (Yediot Ahronot, 17 December 1999)
- **No Security, No Peace** (New York Times, 29 March 1997)
- **Israel and the PLO Now Struggle for Leverage** (Wall Street Journal, 16 September 1993)

---

Jerusalem Center for Public Affairs





# JERUSALEM ISSUE BRIEF

*Vol. 1, No. 11     9 December 2001*

## How Arafat's Palestinian Authority Became an "Entity Supporting Terrorism"

In the aftermath of the December 1-2 Hamas bombings in Jerusalem and Haifa that left 27 Israeli civilians dead and 175 wounded, the Israeli government designated the Palestinian Authority "an entity that supports terrorism." This determination, even if only declaratory, closed a chapter in Israeli-Palestinian relations.

At the time of the signing of the first Oslo Agreement on September 13, 1993, Israel viewed the Palestine Liberation Organization (PLO) as a bulwark against the militant fundamentalist challenge of Hamas -- an offshoot of the Muslim Brotherhood, and Islamic Jihad -- disciples of Iran's Ayatollah Khomeini. In the 1980s and 1990s a region-wide struggle between the older forces of Arab nationalism and the rising forces of Islamic fundamentalism took place in Algeria, Egypt, and Syria. The PLO was similarly expected to ruthlessly fight Palestinian fundamentalist organizations "without Bagatz and without Betselem" (the Israeli Supreme Court and Israeli human rights organizations).

Indeed, U.S. and Israeli diplomats drew a distinction between their PLO peace partners and the fundamentalist "enemies of peace" whom, it was assumed, were trying to undermine the Palestinian Authority. Yet, while PLO and Hamas were competitors for influence among the Palestinians, their evolving relations appeared to be characterized by increasing **collusion** rather than **confrontation,** as described below:

### The PLO Reconciles with Hamas

From the very outset of the Oslo process, the PLO refused to assume the role Israel had assigned it vis-a-vis Hamas and other militant Islamic elements. During 1993 the PLO undertook two negotiating efforts with Hamas: in Khartoum, Sudan, in January and in Gaza during September. A six-point agreement was signed between the military wings of the two movements on April 22, 1994, in the Gaza Strip. A third set of talks was held in Cairo on December 17-21, 1995.

### The Palestinian Authority Prefers to Harbor Hamas Rather than Dismantle its Capabilities

In January 1996, it was reported throughout the Israeli press that the Chief of Israeli Military Intelligence, Major-General Moshe Ya'alon, warned the Knesset

Foreign Affairs and Defense Committee that Yasser Arafat refused to dismantle the military potential of his Islamic opposition: "The organizational infrastructure of Hamas continues to be built, whether with weaponry or the mobilization of activitists." Ya'alon then explained Arafat's motivation: "Arafat is preserving this situation for final-status negotiations with Israel." In other words, Arafat judged that he benefited from the Hamas and Islamic Jihad attacks on Israel because they provided him with negotiating leverage. After 58 Israelis were killed in Hamas and Islamic Jihad bombings during February-March 1996, Arafat briefly imprisoned their operatives, but began releasing them toward the end of 1996.

### Arafat Gives a "Green Light" to Hamas to Attack Israel

In a series of four meetings during March 9-13, 1997, Arafat met with the leaders of Hamas and other militant groups; these opposition elements walked away from the meetings with the clear impression that they had a "green light" to start terrorist attacks against Israel. Summarizing Israel's reading of the March meetings, Chief of Staff Lt. General Amnon Shahak told Israel Radio on March 23: "Organizations such as Hamas and Islamic Jihad have an understanding from the Palestinian Authority to carry out attacks." Ya'alon concluded a year later: "Sadly, I cannot say that at any point since it entered the territory in May 1994, that the Palestinian Authority acted decisively or in a clear-cut way against the operational capability of Hamas and Islamic Jihad" (*Ma'ariv,* April 16, 1998).

### Arafat's Own Security Forces Join Terrorist Attacks Against Israel

Perhaps the most significant military development during the Israeli-Palestinian struggle that began in 2000 was the involvement of forces over which Arafat had direct command in the terrorist violence against Israel. This first occurred in September 1996, when the Palestinian security services suddenly opened fire on Israeli soldiers throughout the West Bank and Gaza, killing 15 Israeli soldiers, some days after Israel opened a narrow wall at the end of a pre-existing archeological tunnel from the Maccabean period, adjacent to the northwestern corner of the Temple Mount. Arafat's forces fired on Israelis again in May 2000 during the al-Naqba riots. But their participation in terrorism became a regular feature of Arafat's intifada since September 2000:

- **Force 17** -- Yasser Arafat's personal bodyguard became regularly involved in sniping attacks against Israeli civilian traffic along main roads crossing the West Bank. Force 17 was initially responsible for mortar attacks on Israeli settlements in the Gaza Strip and on Israeli civilian towns and kibbutzim in the Negev. Force 17 was established during the years of the PLO presence in Lebanon; its name was taken from the last two digits of its Beirut telephone number.

- **Fatah Tanzim Militia** -- Fatah, Yasser Arafat's component of the PLO, became the principal force behind sniping attacks at Israeli civilians living in Hebron and in the southern Jerusalem suburb of Gilo, opposite the Arab town of Beit Jalla. Initially, Fatah and Hamas tried to preserve a

division of responsibility in their attacks against Israelis: Fatah killed Israelis beyond the 1967 boundaries in the West Bank and Gaza Strip while Hamas concentrated on pre-1967 Israel. By September 2001, both engaged in terrorism everywhere, **yet at least fifty percent of terrorist attacks against Israelis were conducted by Force-17 or Tanzim, forces directly loyal to Yasser Arafat.**

- **Other Palestinian Authority Security Agencies Take Part in Attacks** -- Rashid Abu Shabak, Deputy to Gaza Preventive Security Chief Muhammad Dahlan, masterminded the bombing of an Israeli school bus in Kfar Darom on November 20, 2000. Colonel Taufiq Tirawi's General Intelligence Apparatus in the West Bank joined in the sniping incidents against Israeli civilian traffic. **Over the weekend of December 7-8, 2001, Israel destroyed an illegal Palestinian mortar factory that was hidden beneath the offices of Gaza Palestinian Police Chief Brig.-General Ghazi Jabali.**

- **Joint Operations between Arafat Forces and Hamas/Islamic Jihad** -- During the intifada, joint multi-organizational units became common: a joint Hamas/Force-17 unit in Ramallah was formed in March 2001 that planned bomb attacks in northern Jerusalem, while a joint Islamic Jihad/Fatah unit from the Jenin area attacked Israeli civilians in Afula in late November 2001. At the end of June 2001, a spokesman for the "Popular Resistance Committees" of the Fatah organization admitted that there was **operational cooperation** between Fatah, Hamas, Islamic Jihad, and the Popular Front for the Liberation of Palestine (PFLP) (*Sabiron* website, June 30, 2001).

## A Broadening International Consortium of Terrorism

- **Force-17/Hizbullah Cooperation** -- In February 2001, Israeli helicopters struck the car of Lt.-Colonel Masoud Iyyad, an officer in Arafat's Force-17, **who also belonged to the Lebanese terrorist organization, Hizbullah.** Iyyad had ordered mortar attacks on Israeli settlements such as Netzarim. The Gaza branch of Hizbullah was called "Bader Forces." Force-17/Hizbullah connections date back to the 1980s in Beirut when Imad Mughniyeh, the head of special overseas operations for Hizbullah, served in Force-17 before joining Hizbullah.

- **Iraqi Involvement and Collaboration** -- Israeli security services revealed on November 25, 2001, that they had uncovered a 15-man Palestinian cell belonging to the Palestine Liberation Front (PLF) of Abul Abbas, an Iraqi-based component of the PLO. **The members of the cell had been trained in the *al-Quds* military camp outside of Baghdad by Iraqi officers. The PLF unit worked closely with Iraqi intelligence. Its weaponry was smuggled in the car of a key Palestinian Authority Security Chief, General Abdul Razek Yehiye, who also serves as an aide to Yasser Arafat and has benefited from immunity at Israeli checkpoints due to his VIP pass** (*Ma'ariv,* November 26, 2001). The pro-Iraqi unit, whose members came from Ramallah, had been planning bombing attacks at Ben-Gurion Airport, Dizengoff Street in Tel Aviv, and Afula.

## Conclusions

Moving Yasser Arafat to arrest, interrogate, and imprison military operatives of Hamas and Islamic Jihad involves overturning many years of close coordination between the Palestinian Authority and the militant Palestinian fundamentalist organizations. **Given the escalating bombing attacks against Israeli cities emanating from the vast terrorist infrastructure that has grown in the areas under Palestinian jurisdiction, Israel has no choice but to strike directly at the network of terrorism operating within the Palestinian Authority -- including forces loyal to Yasser Arafat.**

President Bush declared on September 20, 2001, that "Every nation, in every region, now has a decision to make. Either you are with us or with the terrorists." Bush specifically stated that "any nation that continues to harbor or support terrorism will be regarded by the U.S. as a **hostile regime**." **Arafat's failure to close down the terrorist organizations that have spread in his domain will require both the U.S. and Israel to follow a very different course of action in dealing with the Palestinian Authority in the months ahead.**

---

Dore Gold, Publisher; Saul Singer and Mark Ami-El, Managing Editors. Jerusalem Center for Public Affairs (Registered Amuta), 13 Tel-Hai St., Jerusalem, Israel; Tel. 972-2-5619281, Fax. 972-2-5619112, Email: jcpa@netvision.net.il. In U.S.A.: Center for Jewish Community Studies, 1515 Locust St., Suite 703, Philadelphia, PA 19102-3726; Tel. (215) 772-0564, Fax. (215) 772-0566. Website: www.jcpa.org. © Copyright.

The opinions expressed herein do not necessarily reflect those of the Board of Fellows of the Jerusalem Center for Public Affairs.

ISRAEL MINISTRY OF FOREIGN AFFAIRS

# The Involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism against Israel- Corruption and Crime - 6-May-2002

**6 May 2002**

## The Involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism against Israel, Corruption and Crime





**Prepared by a team headed by**
**Dani Naveh**
**Minister of Parliamentary Affairs**

**Introduction**

*This report brings some very grave facts to your attention. Israel's military operation "Defensive Shield" has obtained clear-cut hard evidence that the Palestinian Authority under Yasser Arafat is a supporting encouraging and actively operating body of terror. Arafat and his close aides are directly responsible for the cold-blooded murder of Israeli citizens.*

*The main findings of this report are:*

1. Yasser Arafat was personally involved in the planning and execution of terror attacks. He encouraged them ideologically, authorized them financially and personally headed the Fatah Al Aqsa Brigades organization.

2. The closest aides to Arafat responsible for terrorist activity are

head of General Intelligence Tawfik Tirawi and financier Fouad Shubaki, who operated the ongoing logistics of financial aide and support of terrorism actions.

3. The Al Aqsa Brigades organization, headed by Arafat, was put under the direct authority of Marawan Barghouti, who had no compunction in using women and even children to execute terrorist activity, which killed hundreds of Israelis.
4. Arafat and his men used the funds donated to them by other countries, including the European Union, to finance terrorist activity.
5. The Palestinian Authority allocated vast sums of money from its budget to pay salaries to Fatah terrorists (45 million dollars a month from Arab countries, 9 million dollars a month from the European Unity).
6. The Palestinian Authority established close links with the "forces of evil" - Iran and Iraq. These countries supplied funds and terrorist warfare equipment to the Authority.
7. Syria supplied the Hamas and Islamic Jihad with the funds, enabling them to found and operate the terrorist infrastructure in Jenin.
8. Saudi Arabia financially supported the families of terrorists, including families of suicide bombers who carried out mass murder attacks in Israel.
9. The Palestinian Authority armed itself with weapons in complete violation of all agreements signed with Israel. At the head of the arms smuggling stands Fouad Shubaki.
10. Arafat's headquarters took great pains in encouraging the Israeli Arab population to join the war of violence and terror against Israel.
11. The most prominent criminal activity carried out by the Palestinian Authority has been the stealing of Israeli vehicles and forging of documents, in collaboration with Israeli Arab citizens.
12. Arafat's compound in Ramallah became the central command post for the terrorist activity and suicide bombing. The "security forces" headed by Tawfik Tirawi and directly responsible to Arafat himself, initiated, planned and saw to the finest details of every action taken against Israel and Israelis.
13. Corruption in the Palestinian authority. Economic management by means of monopolizing and unjust division of foreign funds among the various stratas of the Palestinians society. Embezzlements of payments and unjust collection of public resources transferred to private accounts of high ranking authority officials.
14. In this activity there has been complete cooperation between all the terror organizations - the Fatah, Hamas and Islamic Jihad.

15. Jenin became the "haven of suicide bombers" in the West Bank, with other towns following its lead.

16. During Israel's campaign to eradicate terrorism, the terrorists used the civilian population as a human shield. They operated within private homes, holding their own people hostage. They blew up houses and property, laid mines and booby-traps, in the hope of afterwards accusing Israel of the devastation and destruction.

17. The Fatah and Arafat's intelligence network intimidated and maltreated the Christian population in Bethlehem. They extorted money from them, confiscated land and property and left them to the mercy of street gangs and other criminal activity, with no protection.

ALL ALLEGATIONS MADE IN THIS REPORT ARE THROUGH ISRAELI INTELLIGENCE AS A RESULT OF THE ISRAELI CAMPAIGN TO ERADICATE THE SOURCES OF TERROR IN THE AREA UNDER THE CONTROL OF THE PALESTINIAN AUTHORITY.

*Dani Naveh*
*Minister of Parliamentary Affairs*

**Table of Contents**

**Executive Summary**

**General**

**Chapter I - The Ideological Dimension - Education, Incitement, and Support by Senior PA officials**

**Chapter II - The Financial Dimension - The Financing of Terrorism by PA Elements**

**Chapter III - The Practical Dimension - PA and Fatah Security Apparatuses Support of Terrorism**

**Chapter IV - The Al Aqsa Martyrs Brigades and Fatah are One and the Same, and Yasser Arafat is their Leader and Commander**

**Chapter V - Arms Procurement by the PA in Violation of International Agreements**

**Chapter VI - Cooperation between the PA and Terror Sponsoring States**

**Chapter VII - Corruption in the PA**

**Appendix - (Partial) Characteristics of the Terrorist Infrastructure which developed in the PA:**

1. **Jenin - The Capital of the Palestinian Suicide Terrorists**
2. **Nablus - The Main Infrastructure of Palestinian Terrorism**
3. **Bethlehem - Mistreatment of the Christian Population**

**Executive Summary**

1. During Operation Defensive Shield, the IDF captured numerous documents (only some of which have so far been examined) and obtained much information from the questioning of captured terrorists. Both the documents and the information point at the direct and indirect involvement of Arafat, the Palestinian Authority (PA) and the Palestinian intelligence apparatuses in the operation of a well oiled system which engaged in the execution of terrorist attacks against Israel.

2. Throughout the years of the political process with Israel, Arafat preserved and developed the tool of violence (the non-eradication of the Hamas terror infrastructure, development of the military capabilities of the security forces and consolidation of the Tanzim as a means for activating the street, arming and preparing it for "D-Day"). Arafat also employed terrorism against Israel, in varying intensity, whenever he felt that the Oslo track was diverting from its course - as defined by the Palestinians. This, in the framework of Arafat's strategic concept which views terror as a legitimate tool for obtaining Palestinian national goals. Arafat, throughout his years of leadership, systematically combined political negotiations and violence, while determining the balance between the two according to the circumstances.

3. During the present confrontation, Arafat's employment of terrorism reached new peaks, while refraining from restraining the terror activity directed by the various organizations (Islamic and Fatah), he gave terrorism "free reign" (by releasing senior terrorists from prison and refrained from carrying out minimal counter-terrorist activity) and even encouraged terrorism (inciting the Palestinian population - the "Shahid speeches", financing and fostering terrorists).

4. The involvement of the PA and its leader Arafat, as evidenced in the documents and from questioning of captured terrorists, has three dimensions: The ideological dimension, which essentially means the sanctioning of lethal terrorist attacks (viewed as quality attacks which serve the PA's goals) and the use of terrorism as an important tool in promoting the Palestinians' goals vis-a-vis Israel; the financial dimension, continuous financing of the terrorist infrastructure, personally approved by Arafat and carried out by the PA civilian institutions, the heads of the PA security apparatuses and Arafat's associate (Fuad Shubaki); the practical dimension, involvement of the PA intelligence apparatuses, led by the General Intelligence, in direct and indirect assistance to the terror infrastructures and activities, including in the perpetration of lethal terrorist attacks inside Israel.

5. The captured documents prove unequivocally that the Fatah organization and the Al Aqsa Martyrs Brigades are one and the same and they cannot be separated. The documents clearly indicate that not only are the Al Aqsa Martyrs Brigades a pseudonym for terrorist attacks carried out by Fatah, but they are also a terrorist apparatus, which up until IDF operation Defensive Shield was in the process of institutionalization and intensification of its suicide and murderous attacks. The captured documents demonstrate that Arafat and other senior Fatah officials (Marwan Barghouti is of note) are the leaders of the Al Aqsa Martyrs Brigades and they finance its terror activities. According to one of the documents, Arafat is well aware of the negative implications of the terrorist attacks carried out by the Al Aqsa Martyrs Brigades at the time of General Zinni's stay in Israel, and the inclusion of the Al Aqsa Martyrs Brigades in the US State Department's list of terror organizations. Therefore, he tried to deny that Fatah and the Al Aqsa Martyrs Brigades are identical, and distanced himself from them.

6. The terror supporting policy adopted by the PA enabled all terror groups, those directed affiliated to Fatah as well as opposition groups, to broaden and consolidate their infrastructure in the PA areas, while exploiting the civilian population for the terror infrastructure.

7. As in the past, now too, the terrorist activities inspired by Arafat are directed first and foremost against defenseless civilians. These attacks are designed to harm Israelis and Jews wherever they are, although there are victims of other nationalities too, including Arabs (such as Israeli Arabs) and foreign citizens of various nationalities.

8. In addition, corruption is rampant in the PA, it includes irregularities in the administration, management of the Palestinian economy by monopolies which enable the financial rewarding of senior PA officials and their families. In addition, the distribution of PA money amongst the Palestinian population was characterized by inequality and created large gaps between the majority of the Palestinian population and senior PA officials who enjoy a high standard of living, the expropriation of lands, and altering verdicts by bribery and threatening the lives of judges.

**The Involvement of Arafat, PA Senior Officials and PA Security Apparatuses in Terrorism against Israel, Corruption and Crime**

**General**

1. During Operation Defensive Shield, the IDF captured numerous documents (most of which have not yet been thoroughly examined) and at the same time, initial information has been obtained from the questioning of terrorists arrested during the operation. From the information which has already accumulated, the clear involvement of some senior PA officials - led by Arafat and the apparatuses - in direct and indirect terror activity has been unveiled. Arafat's strategic choice to take the route of terror for implementation of his political goals, was translated into practice by the formulation of the ideological dimension by Arafat and his senior officials, upon which the terrorist activity was based and thus gave a "license" to terrorism as an important component of PA policy in the struggle against Israel. This, at the same time as ongoing financing of the terror infrastructures with Arafat's personal approval and with the involvement of the PA intelligence apparatuses led by the General Intelligence, in direct and indirect financial aid to the terror infrastructures and activities, including for the perpetration of lethal terrorist attacks inside Israel.

2. The characteristics of this strategy, of the employment of terrorism and the connection between the PA leaders and terror activists are illustrated in the following drawings:







**Chapter I - The Ideological Dimension - Education, Incitement and Support by Senior PA Officials**

1. Arafat and the PA sanction the use of terrorism as an important component in the struggle against Israel. The terrorist attacks, and especially those deep inside Israel, are defined as "quality attacks" that "help and support" the PA and its security apparatuses. Thus, Arafat encourages the use of terrorism as a tool for promoting his goals, not just by the "Fatah" (in its various names: "Al Aqsa Martyrs Brigades", "Tanzim", "Battalions of the Return") of which he is head, but also by the Islamic opposition organizations (the "Palestinian Islamic Jihad" [PIJ], and "Hamas"). The legitimacy given by Arafat enabled the Fatah to become the dominant force leading the terrorism against Israel since the beginning of 2002.

2. The PA did not make any attempt to instill the need for a political process and for consolidating it in practice, in order to achieve the "peace of the brave". Thus, for example, the Palestinian education institutions in the PA not only did they refrain from educating the Palestinian youths for the goals of peace and coexistence, but the messages which they transmitted led to a deepening of hatred and the inflammation of passions. The result was the involvement of Palestinian youths in the Intifada, and in various instances, readiness on their part to carry out suicide attacks. Of significance in this connection are the words of a senior Fatah/Tanzim activist from Jenin refugee camp, Abd Al Karim Aweis, who directed mass murder attacks inside Israel and was arrested by the IDF on 30 March, that as a General Intelligence Apparatus activist in the PA, he felt a need to act and encourage others to act in the "spirit of the words" of Arafat and Marwan Barghouti.

3. A statement of policy published by Arafat's bureau was sent to Arab notables in Israel through the "Liaison Committee" with Israeli Arabs, which operates from Arafat's bureau. The statement, which bears the emblem of the Palestinian Authority (PA) and the President's Bureau, was issued on September 30th 2001 to mark the Intifada's first anniversary, it is concerned mainly with the incitement of Israeli Arabs to take part in the violent events. The statement is full of vile expressions of hatred towards Israel and its citizens, who are called "Zionist gangs", "the robbers of the twentieth century", "the killers of children, women and the elderly", "creators of international terror", "land plunderers" to quote a few examples.

4. Over and beyond that, the statement reflects the absence of willingness by Arafat and the PA to recognize Israel's right to exist, and the PA's aspiration to establish "one homeland" belonging to "one people" on Palestine soil with Jerusalem as its capital. In the statement there is no trace of any mention of aspiration for peace and mutual co-existence, of the peace process, of the Oslo accords or the 1967 borders.

5. This is the language and terminology used by Arafat and the PA vis-a-vis their own people, in total contrast to the "positive" messages directed to the US and to Europe (the content and the style of the article signed by Arafat in the New York Times on February 3rd 2002, are significantly different from those in the statement of policy). It is of note that similar expressions of hatred and incitement that reflect refusal to accept Israel's existence and encouragement of violence and terrorism as a means for advancing the Palestinian strategic aims are strongly imbued in the educational system of the Palestinian Authority (which receives funds from the European Union) as well as in the Palestinian media, in literature and the various Palestinian cultural symbols.

6. Following is a statement transferred from Arafat's bureau to Israeli Arabs.

*The Palestinian Liberation Organization*
*The Palestinian National Authority*
*The President's Bureau*

**In the Name of Allah the Compassionate and Merciful**

**A Statement Made on Behalf of the Liaison Committee, Marking the First Anniversary of the Al Aqsa Intifada.**

Lo, the great crowd of our Palestinian people clutching [its land], standing fast and patient, whose roots are in the land of the fathers and grandfathers. You, with your steadfast determination and adherence [to the land]



**Page 1**
**Click to enlarge original**

**document in Arabic**



**Page 2**
**Click to enlarge original document in Arabic**

ever since Allah ordered so, [for] more than half a century, fighting the conqueror who plunders our land and homeland. It was fated that you and the next generations, until the day of resurrection of the dead, shall keep this homeland. You keep this deposit, which is [hanging] on your neck and the neck of your grandchildren, because you are the defenders and guardians [of the homeland] and live in it, and you are its original and lawful owners, and you are its heirs until the day you are resurrected. With you and with your help, we pay homage to the first anniversary of the spark of the Intifada... the blessed Al Aqsa Intifada in which our people is waging in the liberated territories and occupied territories, and abroad around the world, stressing the strength of the struggle treasured in its soul to explode the spark of anger accumulating at the face of the robbers of the twentieth century, the creators of international terrorism, the killers of children, women and the elderly, plunderers of land and livelihood, who destroy and burn the soil, the seeds and the rocks.

Indeed, the people, with all its sects and groups, started the Intifada everywhere it could. The ties have interlaced, that connect the sons of Jerusalem and the West Bank with those of the Gaza Strip and those of the cities occupied since 1948 [i.e. the Israeli Arab citizens], who have always been and forever will be the natural depth and fortified wall of our Palestinian people and its just cause. The [Palestinian] people has indeed started its Intifada in order to pave, with its pure and stainless blood, the pavements and alleys and squares of the holiest of holy places, the capital of the independent Palestinian state.

The man and the rock, the bird and the tree, have started the Intifada in the allies of Jerusalem and its holy places, the mountains of the West Bank and its valleys, the shores of Gaza and its refugee camps, the planes and hills and peaks of Palestine, the cities and villages of Palestine occupied since 1948 [i.e. Israel], the supreme one, withstanding its bitterness, holding fast and taking roots. Yes, we will draw up with blood the map of the one homeland ["al watan al wahad"] and the one people ["al shaab al wahad"]. We will indeed outline the marks of the nobility and national coping with the policy of discrimination, racism, land appropriation, deportation and intended expulsion, taken against the Palestinian person, in the absence of the international community [and while maintaining] false justice.

Today, we expect absolutely nothing of the rulers of the [Arab] nation, which is overcome with sleepiness and bound by silence and overwhelmed by cowardice. We are expectant and we follow with dreamy nationalist eyes our families and great people in the towns and villages of the steadfast resistance of 1948. For they share the cause and the fate, share the one national dream. The Al Aqsa Intifada and independence have fulfilled the unity and national alliance of all the sons of the determined Palestinian people, despite the blocks created by the occupation, despite all the acts of massacre committed by the Zionist gangs since the 1948 disaster [the "Naqba"]. To commemorate this great memory, we now emphasize, together and equally, the ongoing will of the one people, the life of the noble liberty, despite the policy of

suppression and racial discrimination taken against us by the bullies of the worst of occupiers ever known in history, in order to express in its rage the historical exploitation that came upon us since the beginning of modern history by the stone Intifada, the Intifada of the hidden rage...

Today, no voice can overcome the sound of the Intifada. It will continue to be the Intifada of the one people and one outburst of blood... it will continue to be a prolonged Intifada of rage... a prolonged Intifada of independence... an Intifada of innumerable generations which will continue until our supreme national dream is fulfilled. Since we are the lawful owners of the land and the truth, of the independent homeland and independent state. Therefore, with you and with your help, and by the respectable members of our Arab Islamic nation, and by the people of freedom in the world, we will establish our independent Palestinian state whose capital shall be the holy Jerusalem... with you and with your help we shall liberate our holy places, the Church of the Nativity and the Al Aqsa Mosque, in order for the Palestinian flag to fly free in the sky of Jerusalem, cradle of the heavenly religions, land of the apostles, the land where the people shall convene in the Day of Judgement.

*Glory and eternity to our innocent casualties,*
*Quick recovery to our wounded heroes,*
*Liberty to our imprisoned heroes,*
*Disgrace and contempt to the agents [collaborators] and those who were corrupted,*
*This is a revolution until victory.*

The Liaison Committee
Presidential Bureau

Sunday
30 September 2001

**Chapter II - The Financial Dimension - The Financing of Terrorism by PA Officials**

1. The PA and its leader Arafat engaged in the financing of the terrorist organizations under its patronage and enjoyed its backing, inter alia, by the money of the "donor states", instead of engaging in the construction of the PA and in its preparation towards possible future independence.

2. Since the end of 2000, Arab states have transferred to the PA monthly financial aid of $45 million for financing the current budget (since April 2002 this sum was increased to $55 million). The EU transfers to the PA approx. $9 million (10 million euros) monthly and thus it finances approx. 10% of the PA's current budget. In the PA's budget, which stands at approx. $90 million per month, the salaries constitute the main part - approx. two thirds of the budget. The implication is that most of the salaries of the PA employees earners are financed by foreign elements.

3. A perusal of the files of the General Security Apparatus Organization and Administration Department reveals that the PA leadership gave legitimacy to the granting of salaries to hundreds of activists in the Fatah and in other organizations operating in a new framework in early 2001 in the PLO - in integrating them in the list of National Security employees, despite the fact that in practice they operated in the framework of local branches of the Tanzim, the Al Aqsa Martyrs Brigades and other organizations in the PA. Their integration in the

list of PA employees enabled them to continue to engage in the perpetration of attacks against Israel, without having the worry about problems of livelihood.

4. Moreover, Arafat was personally involved in the allocation of money to terror activists, according to documents captured during Operation Defensive Shield. The money is given to those defined as "fighting brothers", some known to be Fatah activists involved in murderous terror attacks in which Israelis were killed. Many captured documents point to the manner of budget approval. The commander in the field transfers a list of "recommended activists" for receiving of grants, Arafat approves, even though in most occasions, he significantly cuts the requested sum. For example:

a. Arafat approved financial compensation of $4000 to four Tanzim activists who were injured during terrorist activity against Israel.

b. Atef Abayyat (Abu Jala'if) who until his death on 18 October 2001, headed the main terror network in the Bethlehem area was mentioned in a list of 24 Fatah activists, each of which received $300 from Arafat via the Fatah branch secretary in Bethlehem, and in a list of 9 families of Fatah commanders which were killed Arafat gave financial aid via the Bethlehem Fatah branch.

5. All the instructions for carrying out the payments are transferred from Arafat to the PA's "Finance Ministry" and senior intermediaries: Marwan Barghouti (senior Fatah/Tanzim official in the West Bank arrested by Israel in April 2002), Fa'ak Kana'an (head of Fatah in Tulkarm), Hikham Balawi (secretary of the PA's National Security Supreme Committee) and Fuad Shubaki (the PA's main financial official). In addition, the PA utilized extra budgetary funds (created from funds which accumulated from various PA activities, such as the import of oil and tobacco to its areas, for the financing of activities connected to the confrontation with Israel).

6. The documents are decisive proof of the role of Arafat and the PA in the systematic, institutionalized and ongoing financial support of the Fatah/ Tanzim/ Al Aqsa Martyrs Brigades terror infrastructures and activists.

**Examples of Arafat's Financing of Terror Activists**

**Document no. 1**

**The Palestinian Liberation Organization**
**The Palestinian National Authority**
**The President's Bureau**

To the Fighting President
Brother Abu Amar, may the Lord protect you,
Greetings,

I hereby request you to allocate financial aid in the sum of $2500 for the following brethren:
1. Ra'ed el Karmi *(note: former commander of a group in the Fatah/Tanzim Tulkarm that masterminded the attack on the Bat-Mitzvah party in Hadera).*
2. Amar Qadan *(note: a senior activist of Presidential Security/Force 17 in Ramallah, involved in the activities of its operational cell).*

Thank you,



**Click to enlarge original document in Arabic**

Your son, Hussein al Sheikh
*(note: senior Fatah activist in the West Bank)*

*(Note: in Yasser Arafat's handwriting:)*

Treasury/Ramallah
Asslocate $600 to each of them.
Yasser Arafat *(signature)*
(19/9/2001)

**Document no. 2**

20 JAN-02 SUN 16:01 FATAH
OFFICE FAX NO. 022985729
Sep 29'84 17:50 P.001
*(Note: this is a fax that was sent twice: the first time from Ra'ed el Karmi to Marwan Barghouti and the second time from Barghouti to Arafat.)*



**Click to enlarge original document in Arabic**

To fighter brother Abu al Kassam
*(Note: Marwan Barghouti, head of the Fatah/Tanzim in the West Bank)*

Greetings,

**Subject: Urgent Financial Aid**

1. Jamil Hamad Adwan
2. Majid Yussuf Subhi Jarad
3. Mahmud Raleb Mahmud Altahel
4. Mansour Saleh Sharim
5. Subhi Yussuf Jarad
6. Iyad Abed Al Rahim Jarad
7. Hazem Wael Subhi Hetab
8. Ahmed Sameh Al Adrisi
9. Sami Mahmud Dib Sabeh
10. Iyad Nasser
11. Marad Mustafa Abed Al Rahman Abdu
12. Muhamed Sharif Zidan

*(Note: these activists are known Fatah operational activists in Tulkarm, who were involved in lethal attacks.)*

Sincerely,
Your brother,
Ra'ed al Karmi
*(Note: was head of the Fatah/Tanzim infrastructure in Tulkarm)*

To Brother President Abu Amar, may the Lord protect him,
Greetings,

I request of you to order the allocation of a thousand dollars for each of the fighter brethren.

Sincerely,
Marwan Al Barghouti

*(Note: in Yasser Arafat's handwriting:)*
The Treasury/Ramallah
Please allocate $350 to each.
Yasser Arafat (signature)
7/1/2002

**Document no. 3**

**State of Palestine**
***(Fatah insignia)***

*The Supreme Movement Committee*
*Tulkarm Districts Branch*

*The Palestinian National Liberation Movement*
*Fatah*

The Brother President Abu Amar, May God protect you

Please allocate the sum of $2000 to each of the following fighting brothers.

For your handling.



**Click to enlarge original document in Arabic**

(15 names including five who took part in shooting attacks in the Tulkarm district and one activist - Bilal Abu Amsha who participated in lethal attacks, including a shooting attack towards a border guard base on 11 September 2001 [2 border guard policemen killed and one wounded] and the murder of an Israeli in Baqa Al Gharbiyah on 31 May 2001)

Your son, the General Secretary

Fa'ak Kana'an
*(Head of Fatah in Tulkarm)*
*(Signature)*

*Note 1 in Arafat's handwriting and signature*

Finance Ministry/Ramallah

A sum of $800 should be allocated to each one

5.4.2001
*(Signature)*

*Note 2 in handwriting*

The Supreme Movement Committee
The brother Marwan Barghouti
*(Signature)*

The Main Office - Tulkarm - Telefax: 9-2975444

Fatah Office 8.4.2001 15:37, Fax No. 02-2885729

**Financing of Fatah/Tanzim and Al Aqsa Brigades Infrastructures and Activities by Arafat and his Aides**

**(Summary of Captured Documents)**

| **Ser. No.** | Date | **The Requester** | **Nature of the Request** | **The Approving Element** | **The Sum Approved** |
|---|---|---|---|---|---|
| 1 | 9.7.2001 | **Kamal Hamid**, Fatah Bethlehem branch secretary | Allocation of **$2000** to each person on the list of 24 Fatah members in the **Bethlehem** district. The name of Atef Abayat is prominent in this list until his death he headed the main terror cell in the sector which perpetrated terrorist attacks in which Israelis were killed and wounded. | Yasser Arafat with his personal signature. | $350 for each of the 24 members. |
| 2 | 16.9.2001 | An element in the **"Al Aqsa Martyrs Brigades"** (his name does not appear in the document). | Allocation of **38,000 shekels** for current expenses for tending to families of martyrs, acquisition of electrical components and chemical materials for production of | The request is being handled by **Fuad Shubaki**, head of financial directorate of the "General Security Apparatus" and | According to Shubaki's calculations, the real cost of these requests varies between 110,000-150,000 shehels. It can be assumed that a sum of |

| | | | | | |
|---|---|---|---|---|---|
| | | | explosive charges and bombs (5-9 charges per week); procurement of Kalashnikov and M-16 bullets. | Arafat's confidante. It can be assumed that Arafat personally approved the allocation of the sum. | such scope was approved by Arafat. |
| 3 | 19.9.2001 | **Hussein Al-Sheikh**, a senior Fatah official in the West Bank. | Allocation of **$2,500** to 3 Fatah/Tanzim senior commanders involved in many lethal attacks, including the killing attack in the Bat-Mitzvah party in Hadera. | **Yasser Arafat** (in his personal signature). | **$600** for each commander. |
| 4 | 7.11.2001 | **Kamal Hamid**, Fatah Bethlehem branch secretary | Allocation of urgent aid of **$3,000** for each of the 9 families of martyr commanders killed in the battle in Bet Jala. The name of Atef Abayat stands out in the list. | **Yasser Arafat** (in his personal signature). | **$800** for each family |
| 5 | 20.1.2001 | **Marwan Barghouti,** head of the Fatah/Tanzim in the West Bank. | Allocation of urgent financial aid for 12 Fatah/Tanzim terror infrastructure activists in Tulkarm who were involved in lethal attacks. The request was in continuation to an inquiry by **Ra'ed Karmi**, head of the | **Yasser Arafat** (in his personal signature). | **$350** to each of the terror infrastructure activists. |

| | | | | | |
|---|---|---|---|---|---|
| | | | Fatah/Tanzim terror infrastructure in Tulkarm. | | |
| 6 | (?) | An element in the **"Al Aqsa Martyrs Brigades"** (his name does not appear in the document). | Allocation of **$80,000** for construction of a heavy arms production workshop (including a lathe, a milling machine and equipment required for metal processing in the production process of weapons such as rockets and mortars). In addition, allocation of $16,600 for the regular operation of the workshop (salaries, rent, electricity and raw materials) | Fuad Shubaki is dealing with the request. It can be assumed that Arafat personally approved allocation of the sum. | It can be assumed that the request was approved by **Arafat.** |
| 7 | (?) | (?) | Assistance in the acquisition of M-16 rifles for the Fatah/Tanzim terror infrastructure in Tulkarm. | **Yasser Arafat** | **Arafat** approved financial aid (to cover the costs of buying the rifles) |

**Chapter III - The Practical Dimension - PA and Fatah Security Apparatuses Support of Terrorism**

1. Deep involvement of the PA intelligence apparatuses, extensively deployed in the field, in supporting the terrorism: the documents reveal that the PA security apparatuses, directly subordinated to Arafat and highly influential in the "field", directly and indirectly assist the terrorist infrastructures and terrorist activity at various levels of involvement. Of particular note in the documents is the role of the "General Intelligence Apparatus" (GIA) in the West Bank, headed by Tawfiq Tirawi, a clear associate of Arafat. GIA personnel hold close ties with the

"Fatah"/"Al Aqsa Martyrs Brigades"/"Tanzim" terrorist infrastructures and occasionally (in Jenin, for instance) with those of the PIJ and Hamas, and at times lend them practical support (while in parallel, the GIA and other intelligence apparatuses closely watch and keep tabs on those involved in terrorism, but do not use their abundant information to foil terrorist attacks).

2. Many examples are noted in the captured documents for the direct and indirect assistance given to the terrorist organizations by the PA intelligence apparatuses. Thus, for example, a document of the GIA in Jenin demonstrates that the" Fatah" and PA intelligence apparatuses maintain cross-organizational cooperation with the "PIJ" and the "Hamas". This was expressed, inter alia, in a suicide attack in the Israeli city of Afula (27 November 2001) which was financed, according to the document, by funds that came from the "PIJ" secretary in Damascus (2 Israeli civilians were killed and 50 wounded in the attack; the "PIJ" and "Al Aqsa Martyrs Brigades" claimed joint responsibility for the attack).

3. Several expressions of the direct and indirect support of terrorism provided by the GIA and other PA intelligence apparatuses are listed below, as reflected in the captured documents:

a. Participation in terrorist attacks: from several documents it can be learned that intelligence personnel were directly involved in planning, preparing and carrying out terrorist attacks, together with the Fatah / Al Aqsa Martyrs Brigades / Tanzim/ "Battalions of the Return" cells.

b. Procurement of arms: PA intelligence apparatuses personnel were involved in the procurement of arms, their transfer to the terrorist organizations (Fatah, PIJ and Hamas) and in one instance assisting in transferring arms from one area to another (using an ambulance).

c. Refraining from foiling terrorist attacks despite having early warning information: the documents clearly show that no efforts or attempts were made to foil terrorist attacks, not even suicide attacks inside Israel, of which the "GIA" and other apparatuses had early warning information. Thus, the intelligence apparatuses allow the terrorist organizations to continue their regular activity with almost no significant interference.

d. Providing early warning information to the terrorists: according to one of the documents, the "GIA" warned terrorists whose names were included in Israel's Most Wanted List that they received; a computer file shows that the "GIA" has systematic procedures for warning senior activists when IAF aircraft are noted, including senior activists known to be involved in terrorism.

e. Refraining from arresting terrorists who found shelter in the PA areas, even ones who carried out lethal attacks and suicide bombers-to-be: terrorists who carried out lethal attacks inside Israel escape to their homes in the PA areas, without any attempt being made by the intelligence apparatuses to arrest them or to prevent them from additional attacks, not even terrorists known to be potentially preparing to carry out suicide attacks (the common procedure is to make a debriefing and file the 'event' in the intelligence files; occasionally, it is attempted to watch them after they are released or recruit them to the intelligence apparatuses).

f. Assassination of alleged collaborators: a "GIA" document includes a list titled - "Names included in the Tulkarm assassination list" which has been forwarded to the review of Tawfiq Tirawi. The document implies that the GIA is about to assassinate them, after Tirawi's approval. The document ends stating - "the order is ready and the decision regarding the assassination has been made" By assassinating those defined as so-called "collaborators" with Israel, the GIA indirectly assists the activity of

the terrorist organizations, by functioning as their "counter-intelligence" arm.

**Document 1**

1. In a detailed report of the "General Intelligence" Apparatus (GIA) from 4 February 2002 regarding the activity in the Jenin area it was stated that:

a. Cooperation takes place in the Jenin area between the Hamas, the "Palestinian Islamic Jihad" (PIJ) and the Palestinian intelligence apparatuses. "Hamas" and PIJ penetrated the intelligence apparatuses in Jenin by means of payoffs. The document details the names of persons belonging to the GIA and the "Preventive Security Apparatus" (PSA) who operate on behalf of the "PIJ" and "Hamas".

b. Jamal Switat, Deputy Head of the PSA in Jenin, reports on a regular basis to the activist in charge of the "PIJ" on dates of arrests and names of wanted terrorists.

c. Jamal Switat, Deputy Head of the PSA, together with an additional PSA officer, are procuring arms for the "PIJ" and "Hamas", and they constitute the source for most of the arms possessed by these organizations.

d. The suicide terror attack in Afula on 27 November 2001 was a clear expression of the operational cooperation between the intelligence apparatuses and the PIJ. According to the document, one of the suicide bombers who participated in the attack was a GIA member who was recruited by the Deputy Head of the PSA in Jenin (the "PIJ" and "Al Aqsa Martyrs Brigades" took joint responsibility for the attack).

**The underlined lines:**



**Click to enlarge original document in Arabic**

"The Hamas movement and the PIJ have penetrated the security

"The Hamas movement and the PIJ have penetrated the security apparatuses in Jenin by means of payoffs, including into the GIA."

"Jamal Switat (is) Deputy Head of the Preventive (Intelligence Apparatuses) in Jenin and responsible for the (Islamic) Jihad, he often contacts it and reprts to it on the waves of arrests against them, their dates and the names of wanted men. Additionally, he supplies arms to the Hamas and to the (Islamic) Jihad by trading with it."

[First page of the GIA Report, 4 February 2002]

**Document 2**

1. A detailed document by the Head of the GIA in the Tulkarm district dated 6 February 2002 addressed to Tawfiq Tirawi deals with the Fatah and Tanzim terrorist infrastructure in the Tulkarm district. The report states that the Ziad Da'as squad, one of the 3 Fatah/Tanzim squads in the local terrorist infrastructure, planned and coordinated the "Hadera Action" (the lethal attack at

the Batmitzvah party, 17 January 2002). The Head of the GIA in the Tulkarm district notes that the activities of this squad are "qualitative and successful". He adds that "the members (of this squad) are close to us (i.e. to the GIA) and maintain ongoing coordination and contacts with us". Two additional squads of the Fatah/Tanzim terrorist infrastructure in Tulkarm are in contact with Marwan Barghouti, who is involved in the power struggles against the intelligence apparatuses and is trying to deepen his influence on the Tulkarm terrorist infrastructure.

**The underlined lines:**

"The Ziad Da'as squad...

This squad carried out qualitative and successful operations. The last one in this framework was the coordination and planning of the operation in Hadera to avenge the death of the martyr Ra'ed Karmi.Its men are very close to us (i.e. to the GIA) and maintain constant coordination and contact with us."



**Click to enlarge original document in Arabic**

**Document 3**

A GIA document from the Tulkarm district dated 21 May 2001 addressed to the Head of the GIA in the Ramallah district details the names of 232 terrorists wanted by Israel (nearby two names the word "intelligence" has been added by hand, implying that. they are connected to the intelligence apparatuses). The document notes in handwriting "please inform the brothers whose names are mentioned above to take cautionary measures" (and this in addition to the holding of a full security investigation about them).

**The underlined lines:**

"Attached hereto is a form with the names of men wanted by the Israeli occupation who are with you...

Note: Notify the brothers whose name appears above to take precautionary measures..."



**Click to enlarge original document in Arabic**

**Examples of the Involvement of PA Apparatuses in Arms Procurement**

In a letter addressed to Fuad Shubaki (Arafat's crony and confidant) an ambitious plan of the "Al Aqsa Martyrs Battalions" (cover name for the Fatah operational arm in the West Bank) to establish a heavy arms production workshop was uncovered. They intend to procure, among other items, a lathe (for which the organization requires $25,000) and a milling machine ($40,000). These machines are required for metal processing in the production of weapons such as artillery rockets and mortars (forbidden by the PA-Israel signed agreements).

**Document no. 1**

**Al Aqsa Martyrs Brigades**
**Palestine**



**Click to enlarge original document in Arabic**

Construction Materials
1 Lathe - $25,000
2 milling machines - $40,000
3 aircraft canopies (Hood in original document) - $5000
4 welding machines - $2000
5 oxygen machines - $3000
7 working tool kits - $1500
8 tri-phasial electricity infrastructure - $2000
Sum total - $80,000

| | |
|---|---|
| Salaries | 3000 |
| | 700 |
| | 700 |
| | ==== |
| | $4400 - 1 |
| Rent | 1800 |
| Monthly supplies | 5000 |
| Electricity, materials + container trucks | 2000 |
| | ==== |
| | $8800 - 2 |

1 + 2 = 13,200 per month

Lathe Specifications
Blade (?) 75 cm
Meter length
Internal and external screws from 1 mm until 1 inch
Variable speed - Fast-slow)
Engine 5 HP (tri-phasial)
Knives of various shapes and sizes
Drill supports and belt
Main drill cap
Milling Machine Specifications
Vertical and horizontal
Centimeter wide opening in both directions
Blade latch
Various types of knives

**Document no. 2**

**Al Aqsa Martyrs Brigades**
**Palestine**

**Financial Report**

The debts which we have accumulated until now are estimated to be 38000 shekels. The following are the details:

1. The cost of posters of the Al Aqsa Martyrs Brigades: Azam Mazhar, Usama Jubara,

Shadi Afuri, Yasser Badawi, Ahed Fares (addition in handwriting of 2000 shekels).

2. Costs of printed announcements, invitations and mourners shelters for martyrs (addition in handwriting of 1250 shekels).

3. Cost of sticking photos of martyrs on wooden boards and also of the martyrs Thabat Thabet and Mahmud Al Jamil (addition in handwriting of 1000 shekels).

4. Cost of memorial ceremonies for the martyrs. Memorial ceremonies were held for the martyr Azam and the martyr Usama (addition in handwriting of 6000 shekels).



**Click to enlarge original document in Arabic**

5. Costs of electrical parts and various chemical materials (for manufacture of explosive charges and bombs). This is the greatest expenditure (the cost of one ready explosive charge is 700 shekels at least). We need every week 5-9 explosive charges for squads in the various areas (addition in handwriting of shekel per week x 4 = 20000 shekels per month).

6. The cost of bullets
The cost of a Kalashnikov bullet is 7-8 shekels and M-16 bullet 2-2.5 shekels. We need bullets on a daily basis.

7. Note: There are 3000 Kalashnikov bullets at a cost of 2 shekels per bullet. We require that you transfer to us immediately a sum of money to purchase them (addition in handwriting of 22,500 shekels for Kalashnikov bullets and 60,000 shekels for M-16 bullets).

In conclusion, all the glory and pride to those supporting the brave resistance against the oppressive occupation.

From the revolution until victory.

Palestinian Al Aqsa Martyrs Brigades

16 September 2001

**Chapter IV - The "Al Aqsa Martyrs Brigades" and the Fatah Organization are one and the same, and Yasser Arafat is their leader and commander**

1. Documents captured by the IDF during Operation Defensive Shield prove that the Fatah organization and the Al Aqsa Martyrs Brigades are one and the same.

2. The documents clearly indicate that the Al Aqsa Martyrs Brigades are not just a pseudonym for terrorist attacks carried out by the Fatah, but also a dedicated apparatus aimed at perpetrating terror attacks. Until Operation Defensive Shield, this apparatus had been in the process of institutionalization, which is expressed in the correspondence of the brigades with Fatah senior officials, particularly Marwan Barghouti. The Al Aqsa Martyrs Brigades terror activity, their arms

requirements, their structure and organization (in the Jenin area, for instance) and their financial requirements can be learned from this correspondence (the financing of their activity is very central in the correspondence).

3. According to the captured documents, at the head of the pyramid is Yasser Arafat, the leader of the Fatah, in all its various pseudonyms and apparatuses (Al Aqsa Martyrs Brigades, Tanzim). One of the documents, which concerns a request to aid detained or wanted terrorists (belonging to the Fatah and the Palestinian security apparatuses) is addressed by the Fatah and the Al Aqsa Martyrs Brigades to Yasser Arafat personally.

4. It is of note that the Al Aqsa Martyrs Brigades carried out suicide and murder attacks in growing intensity during the six months prior to Operation Defensive Shield, overshadowing the Hamas and PIJ: after perpetrating two attacks at the end of 2001, they proceeded to carry out continuous attacks in early 2002: 4 terror attacks in January (Hadera, Jerusalem, Tel Aviv), 6 in February (Mehola, IDF base, Jerusalem, Maccabim checkpoint), 9 attacks in March (Netanya, Ashdod, Jerusalem, Tel Aviv, Kfar Saba, and Efrat). Most of these terror attacks were directed at civilians in Israeli cities. This was the background for the brigades inclusion in the U.S. terror organizations list (27 March 2002).

**Document 1**



**Click to enlarge original document in Arabic**

"Al Aqsa Martyrs Brigades"
*(Fatah emblem)*
The Palestinian National Liberation Movement "Fatah"

**Letter of Gratitude and Appreciation**

The Palestinian National Liberation Movement, "Fatah" / "Al Aqsa Martyrs Brigades" in the southern area wishes to express its deep gratitude to the fighting brother, Mahmud Jabari *(familiar Fatah activist)* for his cooperation with the fighters of this people and for his loyal bond with the homeland and its revolution.

All of us together on the path towards an independent state and its capital the holy Jerusalem.

Al Aqsa Martyrs Brigades - Southern Area
*(The stamp of "Fatah" and "Al Aqsa Martyrs Brigades")*

**Document 2**

Al Aqsa Martyrs Brigades Palestinian National Liberation Movement "Fatah"

To: The honorable brother commander Abu Amar, President of the State of Palestine - May God protect and preserve him.

Via: The fighting brother, Nabil Amru, the Minister for Parliamentary Affairs - May the Almighty protect him.

**Subject: Request for Financial Aid**



**Click to enlarge original document in Arabic**

The brothers whose names are mentioned below are among the active members of the movement [the Fatah movement] and have played a role during these events. Some of them are wanted and others are held in the prisons of the [Israeli] occupation and they are:

1. The family of the prisoner Nabil Hamad Mustafa al Birawi *(Note: served in the General Intelligence Apparatus. In his interrogation, he admitted to taking part in a shooting attack against an IDF base in Suseya, the southern part of the Hebron mountains and towards the Suseya bypass road.)*
2. The family of the prisoner Nasser Hussein Ud Abu Qubeitah *(Note: served as a policeman. Arrested for shooting at the Israeli settlement of Suseya)*.
3. Muhammad Mahmud Ali al-Najajrah.
4. Jamal Ismail Mustafa Qisiyah.
5. Juad Jamil Khalil Hushiah *(Note: PA National Security Apparatus activist suspected of perpetrating the shooting attack in Suseya)*.
6. Bakhr Khalil Shahadah al-Najar.

With the greatest respect,

Your sons,

Al Aqsa Martyrs Brigades - Southern Area
*(The joint stamp of "Fatah" and "Al Aqsa Martyrs Brigades")*

**Document 3: Poster**




**Click to enlarge original document in Arabic**

Only those who believed in Allah and His emissaries are the righteous who shall rest under their Lord's shadow and will be rewarded with the light of truth. (Koranic verse)

Al Aqsa Martyrs Brigades emblem Fatah emblem

The National Palestinian Liberation Movement, Fatah, and its military wing, the "Al Aqsa Martyrs Brigades" in Palestine, is escorting its casualty, the commander hero on his last trip.

Majdi Musa Tayb Jaradat

*(Hero of the Special Operations, who carried out the Umm el Fahm operation, whom the treacherous Zionist hand murdered on 6 November*

*2001).*

**Document 4**



**Click to enlarge original document in Arabic**

In the Name of the All-merciful Allah

"Al Aqsa Martyrs Brigades"
*(Fatah emblem)*
The Palestinian National Liberation Movement "Fatah"

The fighting brother Marwan Barghouti, secretary of the Fatah movement

We, in the Al Aqsa Martyrs Brigades, Southern Area, request of you to cooperate with the brother carrying this letter, since we have requested him to establish a communications channel between us and yourself, so that we can handle several complicated problems that arose in our sector of the struggle, at this stage of our national struggle.

Together on the path towards an independent state with Jerusalem as its capital.

Your sons,

In the Al Aqsa Martyrs Brigades - Southern Area
*(a stamp of "the Palestinian National Liberation Movement - Fatah" and "Al Aqsa Martyrs Brigades")*

**The Integration of Women and Children in the Perpetration of Terrorist Attacks**

1. The most prominent cases of this phenomenon are the terrorists Wafa Idris, a resident of Ramallah, who carried out a suicide attack in Jerusalem on 27 January 2002 in which one Israeli was killed and 90 wounded, and Darin Abu Aysha from Beit Wazan in Samaria who blew herself up on 27 February 2002 near the Maccabim checkpoint. 2 Israeli policemen were wounded in this attack.

2. An additional case of a woman suicide terrorist is that of Ayyat Al Ahras, aged 18 from the Deheisha refugee camp near Bethlehem, who carried out the suicide attack in a supermarket in the Jerusalem suburb of Kiryat Hayovel on 29 March 2002. 2 Israeli civilians were killed in this attack and 22 wounded.

3. The last suicide attack by a woman was perpetrated on 12 April 2002. The suicide terrorist, Andalib Suleiman, a Tanzim activist aged 21 from Bethlehem, blew herself up in the Machane Yehuda market in Jerusalem. 6 Israeli civilians were killed in the attack, including two foreign workers from China, and over 60 Israelis were wounded.

4. In 2 additional cases, Palestinian women who were about to carry out suicide attacks were arrested by security forces prior to executing their plans.

5. On 11 April 2002, one day after the IDF withdrawal from Tulkarm, the terrorist

Safa Al Qudsi, a Tanzim activist aged 26, divorced and mother to a daughter was found in her parents' home. She was about to carry out a suicide attack in Israel dressed as a pregnant woman.

6. When IDF troops entered Bethlehem during Operation Defensive Shield, Shirin Rabiye, a girl aged 15, was taken in for questioning. She admitted to having been recruited by her uncle, a Tanzim activist, in order to perpetrate a suicide attack inside Israel.

7. These are not the only terrorist attacks in which Palestinian women were involved. On 17 January 2001, an Israeli teenager, Ophir Rahum, was kidnapped and murdered with the involvement of Amana Mona, a journalist from Ramallah who belonged to the Fatah.

8. On 9 August 2001, a suicide attack was carried out in the Sbarro restaurant in downtown Jerusalem. The suicide terrorist was driven to the location by Ahla'am Tamimi, also a journalist of Jordanian descent who resides in Ramallah, and also engaged in intelligence collection for the attack. Ahla'am was also responsible for the laying of an explosive charge which was hidden in a beer bottle in a Jerusalem supermarket on 30 July 2001.

9. On 3 August 2001, there was an attempt to lay an explosive charge in the Tel Aviv Central Bus Station of Iman Asha from Nablus.

10. On 31 August 2001, an explosive charge carried by Abir Hamdan from Nablus exploded during a trip from Tulkarm to Nablus, apparently a "work accident" in the framework of preparations for an attack in a restaurant in Hadera.

11. Recently, the Palestinian terrorist organizations have increased the use of youths in the perpetration of suicide attacks and terrorist acts. In the last nine months, Palestinian children were involved in suicide attacks or in plans to carry out such attacks. Below are a number of examples in which Palestinian youths have been involved in terrorist attacks:

a. Jamil Hamid, a boy aged 15 from Bethlehem who was recruited by the Fatah organization, blew himself up on 31 March 2002 near the clinic in Efrat. 6 Israeli civilians were injured in the explosion.

b. Anwar Hamed, a boy aged 17 from Rafah who was sent to carry out a suicide attack against a vehicle convoy transporting IDF soldiers in the Gaza Strip. Anwar, an uneducated illiterate youth has engaged in drug trafficking, prior to his joining the Fatah.

12. The personal characteristics of the above youths demonstrate once again the cynical exploitation and use made by Palestinian terror organizations of children and unstable persons in order to carry out mass attacks against Israel.

13. It is of note that the PA does not act against this phenomenon and continues persistently to turn a blind eye so that Palestinian boys and girls become a "self-sacrifice" of the whole Palestinian society.

## Chapter V - The Palestinian Authority's Possession of Arms in Violation of International Agreements

1. In the framework of the agreements signed between Israel and the Palestinians, the Palestinian Authority (PA) is committed to maintaining armed forces for internal security purposes and to limiting the arms in its possession.

The PA also signed international agreements which clearly define the types of arms and ammunition which its forces can hold. In practice, PA officials have engaged, under the direct instructions of Arafat, in the violation of these agreements since the second half of the 1990s.

2. According to the interim accords signed between Israel and the PA (on 28 September 1995), Palestinian policemen were permitted to carry rifles, pistols and machine-guns. It was also decided that the Palestinian Police would maintain an updated list of the arms carried by its personnel. Therefore, the PA's security forces are not permitted to possess anti-tank and anti-aircraft weapon systems, mortars and ammunition for these systems.

3. The arms smuggling activities into the PA areas, as well as the indigenous production of various types of weapon systems which are banned according to agreements, were planned from the outset by the PA leadership based on a strategic concept regarding a potential conflict with Israel. This concept was formulated and implemented during the second half of the 1990s, i.e. at least 3 years before the start of the present conflict between Israel and the PA in October 2000.

4. Special emphasis was placed by PA elements on the obtainment of anti-tank, anti-aircraft and artillery weapons. During 2001, and especially following the IDF's entry into the PA areas in March 2002, clear evidence was uncovered regarding this continuing process in which an arms and ammunition arsenal had been amassed in violation of agreements concluded with Israel.

5. Senior PA officials engaged in these activities over a long period. The connecting link in the arms smuggling attempts and the arms build-up is Fuad Shubaki, Arafat's close associate and confidante, whose formal role is Chief Financial Officer. Shubaki's name rose to the headlines at the beginning of 2002 with the exposure of his involvement in the attempt to smuggle arms from Iran aboard the Karine-A ship. Shubaki continued his business dealings as usual in the Mukata'a compound, even after the exposure of his involvement in the Karine-A affair, and he was "arrested" by Arafat following this operation.

6. From documents captured by the IDF in the Mukata'a compound in Ramallah, it is clear that the PA is violating the international agreements which it signed. A computer file containing tables regarding arms and ammunition inventories (dated 1999) which was found in the PA Financial Directorate's offices, details the weapons which are to be found in PA facilities. Among other things, the table clearly mentions 7 RPG-7 launchers and 11 rockets (bombs) for the launchers. In addition, various types of heavy machine-guns which are also prohibited by the agreements are in a storage depot.

7. The second document is an approval for the dispatch in practice of RPG-7 anti-tank launchers from PA facilities to the PA's general security forces. The approval was given in November 2001, on official paper of the Financial Directorate headed by Fuad Shubaki. The person receiving the approval was the officer responsible for administration and arms in the office of Haj Ismail Zarzur, head of the General Security Directorate and Commander of the National Security Forces in the West Bank.

8. During March 2002, the IDF captured many weapon systems in the Mukata'a compound. These arms include 2 RPG-7 anti-tank launchers, 43 rockets (bombs) of various types for these launchers, and counterfeit Israeli currency notes.

9. PA officials in Ramallah succeeded over the past years in amassing launchers and bombs and distributed them to Palestinian Security Forces in order to attack IDF armored tanks and APCs.

**Fuad Shubaki and Arms Smuggling**

10. Shubaki is a close associate and confidante of Arafat, and accompanied him on official visits to Arab states. He also held independent meetings in states willing to support Palestinian terror efforts, such as Iraq, which he visited in November 2001.

11. The arms smuggling network established by Shubaki includes Iran and Iraq (the "axis of evil" states). Shubaki also engaged in other sectors and he is involved in arms smuggling from Jordan and Egypt too, by means of underground tunnels in the Rafah area in the southern Gaza Strip.

12. Fuad Shubaki coordinates the funding of Fatah elements perpetrating terrorist attacks under cover names. In an additional letter addressed to him, an ambitious plan was presented of the "Al Aqsa Martyrs Brigades" (a cover name for Fatah's operational wing in the West Bank) to construct a workshop for heavy weapons production. Among other things, the intention was to acquire a lathe (for this purpose the organization required a sum of $25,000) and a milling machine ($40,000), these two items of machinery are needed for metal processing in the production process of arms such as artillery rockets and mortars.

13. The "Al Aqsa Martyrs Brigades" which is funded by the PA, also engages in the production of artillery rockets which are similar to the QASSAM rockets produced by Hamas. The rockets are banned, as explained above, according to international agreements signed by the PA.

14. The investment required for the arms workshop is approx. $100,000 and the current operation expenses is estimated to be about $15,000. It is no wonder that these requests were forwarded directly to Shubaki, the man personally in charge of acquisition and finance.

15. Palestinian attempts to smuggle significant quantities of arms were exposed and foiled by Israel during the past year. In May 2001, the Santorini ship was captured in the Mediterranean Sea and was found to be carrying, inter alia, SA-7 anti-aircraft missiles, RPG-7 anti-tank launchers, mortars and artillery rockets. The ship sailed from Lebanon in the service of the PFLP-GC organization of Ahmed Jibril (which enjoys Syrian patronage), with a cargo destined for Palestinian elements, including PA elements in the Gaza Strip. The ship previously carried out two smuggling attempts on behalf of the Hizballah organization.

16. In January 2002, the Karine-A ship was intercepted in the Red Sea while sailing from the Iranian coast with a large shipment for the PA. 80 well sealed submergible containers carried a large variety of weapon systems, with an overall weight of approx. 50 tons. This affair also emphasized the PA effort to obtain anti-tank launchers, mortars and artillery rockets. Part of the anti-tank weapons aboard the Santorini, also originated from Iran.

17. It transpires that PA elements were involved in the obtainment of anti-tank launchers and their ammunition, which they are not permitted to possess, and their distribution to the security forces. As it appears from the captured documents, they were most careful in documenting the weapons - but not according to the text of the agreement with Israel, which prohibits the PA from possessing such arms and ammunition.

**Captured PA Document regarding Arms and Ammunition Inventory in PA Facilities**

| **Weapons Type** | **Quantity** |
|---|---|
| Kalashnikov | 727 |
| | |

| | |
|---|---|
| MP-5 | 20 |
| NATO | 52 |
| G-3 | 19 |
| Siminov | 2 |
| Dakatirov | 3 |
| Guryanov | 1 |
| BKC | 2 |
| B-7 | 7 |
| B-7 bombs | 11 |
| M-16 | 20 |
| **Total** | **852** |

Notes:

1. B-7 - The intention is to RPG-7 anti-tank launchers.
2. B-7 bombs - The intention is to rockets for these launchers.
3. Guryanov and PKC are heavy machine-guns which the PA is not permitted to possess.

**The Allocation of Prohibited Arms from PA Offices to its Forces**

The document captured by the IDF in the offices of the Financial Directorate in the Mukata'a in Ramallah is handwritten on paper of the PA - The General Security Financial Directorate of the Northern Districts ("The West Bank"). The following is a translation of the document:

Date: 18 November 2001

I, Mukadem (Lt. Colonel) Abd Al-Latif Abd Al Rahim have received the following items from the Financial Directorate:

R.B.G.-7 bombs - 20 only.

B-7 launcher propellant charge - 7 only.

And thus I am the undersigned - Mukadem Abd Al Latif Naji.

Notes:

1. Mukadem (Lt. Colonel) Abd AL Latif Naji is the person responsible for money and administration in the office of Haj Ismail Tsarzur, the head of the National Security Apparatus in the West Bank. This Lt. Colonel is also responsible for the arms of the National Security Apparatus.

2. The intention is to rockets and propellant charges for RPG-7 anti-tank launchers.

**PA Efforts to Obtain Arms Prohibited by International Agreements**

The following table lists the types and quantities of arms carried aboard ships during 2001/02 whose cargoes were destined for PA elements, as well as additional attempts of PA elements - official elements or elements financed and supported by the PA - to obtain arms banned according to international agreements. The table does not list all the arms captured aboard these ships, but only specific types - anti-tanks weapons, anti-aircraft missiles, mortars and artillery rockets (Katyushas).

| | ***Santorini*** | ***Karine-A*** | **Additional Attempts** |
|---|---|---|---|
| RPG-7 anti-tank launcher | 20 | 51 | Amassed by official PA elements in Ramallah |
| Mortars (60, 81, 120 mm) | 2 | 39 | Mortars produced by PA elements in the Gaza Strip |
| Single barrel rocket launchers (107, 122 mm) | - | 10 | The "Al Aqsa Martyrs Brigades" are trying to produce rockets similar to the QASSAM |
| Bombs for anti-tank launchers | 150 | 328 | |
| Mortar bombs | 98 | 1545 | |
| Artillery rockets | 50 | 345 | |

**Anti-Tank Weapon Systems Banned by International Agreements which were Captured in the Mukata'a Compound in Ramallah**



**30 Units of PG-7 Anti-Tank Rocket**



**5 Units of PG-7M Anti-Tank Rocket**



**8 Units of OG-7 Anti-Personnel Rocket**

**Chapter VI - Cooperation Between the PA and Terror-Sponsoring States**

1. The PA holds contacts with the "axis of evil" states - Iran and Iraq, as well as with Saudi Arabia. The accumulating information, based, inter alia, on captured documents, indicateS that the PA receives money, arms and moral support from these states.

**The Ties with Iran**

2. The major role which the PA and its apparatuses played in the armed struggle against Israel brought about a change in Iran's attitude towards it. If until the Intifada, Iran viewed the PA as a "traitor" which seeks a political settlement with Israel, following the latest confrontation, the Palestinian apparatuses are considered by Tehran as the leaders of the violent struggle. On this background, the Iranian leader published (Al Mastakabal, September 2000), a religious decree permitting cooperation with the PA and Fatah. In our assessment, in the future the Iranian policy towards the PA will depend on its policies and activities towards Israel, and the PA's return to the political track will lead to the severing of the ties established with Iran during the past year.

3. The improved relations was prominently reflected in the cooperation during the Karine-A affair, which constituted only one expression of the continuing Iranian effort, which was significantly enhanced since the outbreak of the Intifada - to smuggle arms and force multipliers into the PA areas. This in order to create a "Lebanonization" of the conflict; escalate the confrontation between Israel and the Palestinians and disrupt any attempt to calm the situation and stabilize a cease fire. All this, in the framework of Iran's call to implement the "Lebanese model" in the PA as an essential stage on the path to Israel's destruction, in the more distant future.

4. On this background, Iran expresses persistent and declared support for suicide attacks (in an interview to Der Spiegel on 24 September 2001, Foreign Minister Kharazi stated that the suicide attack in the Dolphinarium disco in Tel Aviv was not an act of terror since Israel is an "occupying power". Ayatollah Atma Fadal Lankarani - a senior cleric in the Shi'ite world who resides in Qom and is identified with the conservative camp, also published a religious decree on 7 January according to which since the Palestinians have no other choice than to endanger their lives in suicide attacks in order to defend their state, such activities are permitted.

5. The bottom line - Iran draws much encouragement from the PA's turn to the route of terror (according to its method "legitimate resistance") and perceives the situation as an historical "window of opportunities" to achieve its ideological goals (the destruction of Israel, which the Iranian regime continues to espouse) and its strategic goals (Israel's weakening and containment in the framework of Iran's attempts for regional hegemony). Since September 11 2001, the escalation in the conflict serves Iran in an additional aspect, as reflected in the words of Majlis member and Presidential advisor, Mohtashemi Pur (23 April 2002), who claimed that the US will not attack Iran and Iraq as long as the Palestinian crisis

continues; and therefore Iran must "increase the strength" of the Palestinians and "prevent Israel from any possibility of solving the crisis in the Middle East".

**The Ties with Iraq**

## Stronger Iraqi-PA Ties

6. Since the end of 2001, Iraqi-PA ties have expanded. The convergence of their interests generates practical cooperation in both the political and the military realms. The equation appears to be comprised of terrorism, arms and oil.

7. Iraq has a distinct interest in causing an escalation in the Israel-PA confrontation, therefore it rides the latest wave of suicide attacks in Israel. The escalation in the situation serves the Iraqi interest: it draws the attention from the Gulf to the PA, turns the Arab World against Israel and postpones the US-initiated campaign against Iraq.

8. The Iraqis draw a simple equation, and this is how their actions in the present crisis should be viewed: on one side the US and "the Zionist Entity", vs. Iraq and Palestine on the other side.

9. Palestinian speakers describe this similarly:

*"The Palestinian conflict and the Palestinians' steadfastness will affect - if not all of the US' plans - at least those plans directed against Iraq, or at least their timing. This provides us with a safety margin that enables consolidating a more determined Arab stance for protecting Palestine and Iraq".* Nabil Sha'ath (15 March 2002).

10. The Iraqis have done and still do all they can to disrupt the US effort to stabilize the situation in the PA. The Middle East visits made by Vice President Cheney and General Zinni were called by the Iraqis in March 2002 as *"vicious and failing tours having one goal - to deal Iraq and the Palestinian Intifada a blow... These are two facets of one American aggressive action".* According to the Iraqis, Gen. Zinni was sent to the Middle East *"in a false trick by which President Bush wishes to present the US as one interested in reducing the Zionist violence against the Palestinian people... in a miserable attempt to moderate the Arab stance which is growing extreme against the US"* (these descriptions were included in an analytical article in the Al Jamhuriyah newspaper, 13 March 2002).

## Encouraging the Suicide Attacks

11. In recent months, Saddam Hussein has openly praised the suicide terrorists. In 3 consecutive statements - in an Iraqi cabinet meeting (January 2002, cited on Iraqi Television), in meetings he held with chiefs of tribes (December 2001) and clergymen (March 2002) - he praised the suicide actions, including the suicide attack in Jerusalem carried out by Waffa Idris, a 16 year old Palestinian girl. Saddam declared his intention to build a memorial in her name. According to Saddam, these attacks protect the principles of the Arab Nation and the Palestinian People.

12. At the end of the visit in Iraq of Faruq Qadumi, Head of the PLO Political Bureau, (March 2001), it was announced by Tareq Aziz, the Iraqi Foreign Minister, that Saddam Hussein decided to raise the grant given to Intifada 'victims' to $25,000 (instead of the earlier $10,000).

13. The sum to be donated to the family of a killed Palestinian by the Iraqi aid is comparable to an average salary in the PA for 5 years.

14. *To the list of Saddam Hussein's actions and statements in the last decade should be added the fact that he is one of the few Arab leaders to publicly justify the most horrific terrorist attacks, directed against innocent civilians.*

15. In addition to the direct support of the PA, Iraq encourages terrorism by operating pro-Iraqi terrorist organizations in the West Bank. To this end, Baghdad has revived in the last two years the PLF/Abu-Al-Abbas organization in the PA areas - it recruited and trained Al Abbas activists in camps in Iraq, equipped them with arms and sent them to carry out terrorist attacks in Haifa (April 2001) and the West Bank together with Hamas activists (July 2001). The arms smuggling and attempts to infiltrate activists are apparently carried out from Jordanian territory. The PLF/Abu-Al-Abbas is the organization which carried out the terrorist attack on the Achille Lauro passenger ship, in which a US citizen was murdered.

16. The Iraqis openly seek to encourage the waves of terror against Israel, and especially suicide attacks. As long as Arafat does not operate to stop this terrorism he plays into the hands of the Iraqi game.

### Arms for the Palestinians

17. Since the beginning of 2001, the Iraqis openly encourage arms transfers to the PA. The Iraqi proposal to the Arab League conference in Cairo (2 April 2002) included an explicit paragraph concerning "support of the Palestinian Intifada with all types of arms, primarily antitank weapons through Egypt, Jordan, Syria and Lebanon". This proposition continues Saddam Hussein's words (Iraqi News Agency, January 2001) that had the Palestinians had antitank weapons, they would have succeeded to destroy the Israeli armor and prevent it from reaching the Palestinian towns. "If the Arabs had wanted - and that is simple - it would have required only turning a blind eye to the arrival of such weapons".

18. *Since January 2001, the Iraqi President has publicly emphasized the Palestinians' right to procure arms and the duty of Arab states to assist them in this effort. This implies that Iraq openly calls for the violation of the international agreements which the PA signed - agreements forbidding the procurement of antitank arms.* (Recently captured documents clearly indicate that the PA procured RPG-7 antitank rocket launchers, forbidden by the international agreements which the PA had signed).

### Iraqi Oil Finances the Terrorist Activity

19. Iraq is acting diligently to undermine the international sanctions regime imposed on it. In its efforts to export oil outside the international inspection envelope it operates vis-a-vis neighboring states and other Middle East elements.

20. At the same time, Iraq views the oil weapon as a means to aid the Palestinians. Saddam Hussein's declaration is a public expression of this approach. However, we can assume that funds accumulated from oil smuggling in recent years enable the Iraqis to aid the Palestinians with money, smuggled weapons and encouragement of suicide bombers.

21. *Iraq is indeed a state supporting terrorism, and Iraqi oil finances this support.*

### Iraqi Financial Aid to the Palestinians

22. The Ba'ath Party representative (the ruling party in Iraq, has branches in the PA areas) publicly expressed a month ago ("Al Quds", 6 March 2002) the deepening Iraqi support of the PA. According to him, Iraq has transferred to the PA a sum of $12 million as aid.

23. The PA views the Iraqi channel as an important economic support. PA representatives (including Azam Al Ahmed, who is in charge of liaison with Iraq) visited Iraq on numerous occasions in the last two years, in order to obtain financial aid. This aid is given to the families of Palestinians killed and wounded in the Intifada.

24. Ads thanking Saddam Hussein for this support appear in the Palestinian press, and serve the Iraqi propaganda machine, which encourages terrorism and endeavors to inflame the PA.

**Palestinian Ads Praising Iraqi Support**

The family of the Shahid Imad Adib Badr Aldaya expresses gratitude and appreciation to the Chairman Yasser Arafat and President Saddam Hussein, for their respectable stance concerning our Shahid and those wounded in the defense of Al Aqsa *("Al Hayat al Jadidah", December 2000)*




The relatives of the Shahids Amjad Husseina and Fadi Sabaya express gratitude and appreciation to the Iraqi President and his great people.
Jenin - relatives of the Shahids express their utmost gratitude and congratulations to the Mujahed, warrior leader, the President of Iraq Saddam Hussein, may God keep him safe.
*(Al Quds, January 2001)*




**Much gratitude and appreciation to the honorable President Saddam Hussein and members of Arab Liberation Front.**
The father of the Shahid, his brothers and sisters, the Abu Farhah family and his relatives and uncles on the mother and father side, grandfather and mother on behalf of the entire Palestinian people express their deep gratitude to the Iraqi President Saddam Hussein, may God keep him safe, the symbol of nationalism, patriotism and Arab determination, for the honest condolences he offered to our Shahid Palestine Muhammad Raab Qassem Abu Talab and the families of all Shahids, as well as his great help in Palestine. Gratitude to our Iraqi brothers, who give blood and money for the victory of the Palestinian people, the freedom and independence and liberation of Palestine. We also express to our friends in the Arab Liberation Front, Jenin Area much gratitude for their participation and national determination, the condolences they offered, material and moral support. *Together, until the liberation of the holy Jerusalem with the help of Allah.*



### The Ties with Saudi Arabia

26. During Operation Defensive Shield, documents were captured that indicate *direct and systematic Saudi financial support of the families of Palestinian terrorists,* including the families of suicide terrorists who carried out lethal attacks inside Israel. In addition, documents were found that show direct Saudi aid to the Palestinian Islamic Jihad (PIJ) and Hamas, two organizations that have been declared terror organizations by the US.

27. One of the documents captured is a table found in the "Tulkarm Charity Association", detailing the 10th payments cycle to "casualties of Intifada Al Quds" in the West Bank (in total, the payment cycle consisted of 2,040,000 Saudi Riyal, approx. $545,000). The table lists payments made to 102 families of terrorists who died during 2001, each family receiving 20,000 Riyal (approx. $5340). According to the table, the funds were transferred to the families through the Arab Bank. They were handed over to beneficiaries whose names and ID numbers are mentioned in the table.

28. The implication of this document is that a suicide terrorist embarking on a terrorist attack knows that his family will receive continuous aid from the Saudi regime after his death, by means of the Saudi committee for support of the Intifada.

29. It is of note that the Saudi aid does not only include the support of terrorist families. According to additional captured documents (Palestinian intelligence apparatus reports), the Saudis transferred *direct aid to extremist Islamic organizations* (Hamas and PIJ).

### Chapter VII - Corruption in the PA

According to accumulating information, corruption is rampant in the PA's power centers. Below are a number of examples:

a. Administrative irregularities (the Deputy Chairman of the Palestinian legislative council) detailed the PA's shortcomings: "Key officials in the PA suffer from a lack of reliability and talent, many unneeded without need, the appointment of family relations, waste, a policy of monopolies, corruption, the stealing of equipment and money and the phenomenon of "hidden unemployment".

   Sa'eb Arekat "As the raiser of budgets from states contributing to the infrastructure development of the local authorities, I am trying to create total transparency between the donor state and the project taking place, by a direct connection between it and the contractor, without middlemen who put their hands in the money being used".

b. The management of the Palestinian economy by monopolies in order to accumulate financial resources outside the official framework and reward PA senior officials and their families (on the eve of the confrontation, the scope of revenues from the monopolies was estimated to be approx. $300 million, with the business company of Muhammad Rashid, Arafat's economic advisor, controls the major monopolies including cement, fuel, the casino, the flour mill in Gaza and economic projects in the tourist and industrial realms.

c. An unjust distribution of aid funds between the different strata of the population. While the Palestinian population suffers from economic predicament, senior PA officials enjoy a high standard of living. Abu Ala

completed the construction of a villa in Jericho at a cost of $1.5 million. The villa's appearance is ostentatious and stimulated sharp criticism from the local population. Arafat distributes funds to PA senior officials for personal needs, including $50,000 for the wedding of the daughter of "minister" Nabil Amar, the doubling of the living expenses of the son of "minister" Nabil Sha'ath who is studying in France and $100,000 for the deputy in charge of the information portfolio for construction of a home. Residents from Deir El Balah whose homes were destroyed did not receive the Arafat grant of $2,000 promised to them 4 months ago; Arafat's grant of $600 to the unemployed financed by salaries from PA employees was distributed by the Ministry of Labor to cronies who are not unemployed.

d. Salary delays and theft - the payment of salaries to the public sector according to the low exchange rate of the dollar: The salaries of January 2002 were paid according to an exchange rate of 3.7 shekels to the dollar; A Gaza resident: "PA elements demanded $2,000 from me, in order for my daughter who works as a doctor in the European hospital in Khan Yunis will receive her salary in an organized manner, the security apparatuses in the Karni crossing pay carriers working on the Israel side of the border salaries according to rates in the PA territories, while the salaries of the carriers received from Israeli manpower companies, which are calculated according to salary rates in Israel, find their way to their pockets.

e. The levying of taxes and special payments on the population in order to gain profits and supplement income. The money taken for medical treatment in the Sheikh Zayyad hospital in Ramallah is transferred to the pockets of senior PA officials, including the Province Governor; the Palestinian Ministry of Transportation issues licenses for short periods in order to profit from renewal of licenses; the police in Hebron collect from vegetable stall owners sums of money in return for continuing their trade "No one who earns $800 will be hurt by $50".

f. Utilization of humanitarian aid received from abroad for profits (the Palestinian Ministry of Agriculture granted Beduin cattle owners from Ramallah money vouchers, a donation from a European country in order to purchase barley. The ministry concluded with a barley salesman a price of $800 per ton instead of $600, with the difference pocketed by senior officials in the Ministry of Agriculture; Tanzim elements from Bethlehem forcefully seized food distributed by UNRWA and decided by themselves who would receive the aid.

g. Forceful contributions and false arrest of businessmen by the PA security forces and their release in exchange for money and bribes. A senior businessman from Tulkarm was forced to pay $100,000 for the release of his brother who was arrested by the security apparatuses for collaboration with Israel. A Christian businessman paid $5,000 for the release of his brother arrested by counter-intelligence apparatus personnel.

h. The non-payment to PA suppliers. A gas station owner in Jericho stated that the security apparatuses are systematically not paying him for fuel and when they were not permitted to fill up, they began to make threats.

i. The expropriation of lands arbitrarily. PA elements seized lands of the Orthodox Church in the Bethlehem area while using violence, forged documents and bribes. On some occasions, there was cooperation between church officials and the PA.

j. Subversion of justice by bribery of and threats to the lives of judges. A senior Tanzim activist who was involved in the rape and murder of a young woman from Bethlehem was set free after the judge was bribed.

**Appendix**

**(Partial) Characteristics of the Terrorist Infrastructure which developed in the PA**

**Jenin - The Capital of the Palestinian Suicide Terrorists**

1. In Jenin, and especially in the refugee camp in its outskirts, an extensive infrastructure of various terrorist organizations existed prior to the IDF Defensive Wall Operation. These organizations cooperated in "exporting" killing and suicide attacks to Israel. An expression of this can be found in the following excerpt from an internal Fatah document:

2. "(Jenin refugee camp) is characterized by an exceptional presence of fighting men who take the initiative (on behalf of) the national activity. Nothing will beat them and nothing worries them. Therefore, they are ready for self-sacrifice with all the means. And therefore, it is not strange, that Jenin (has been termed) the suiciders capital" (A'simat Al-Istashidin, in Arabic). (From a report of the Fatah movement in Jenin refugee camp addressed to Marwan Barghouti, 25 September 2001)

3. Jenin, "the suiciders capital" "exported during the violent confrontation 28 suicide attacks (most were implemented and some were foiled), and many more terrorist attacks. This terrorism, perpetrated by the Palestinian Islamic Jihad (PIJ), Fatah and Hamas, resulted in the death of many dozens of Israelis and the wounding of hundreds.

4. Previous to the IDF Defensive Shieldl Operation, terror infrastructures of various organizations were concentrated in Jenin, mainly in its refugee camp. Below are general characteristics of the infrastructures of the three leading terrorist organizations:

a. Hamas - In Jenin and the surrounding villages, a Hamas network operated which was responsible for the perpetration of a number of lethal suicide attacks inside Israel (the most recent in Haifa on 31 March 2002 in which 15 Israelis were killed). The Jenin network operated in cooperation with many and diverse operational elements in the Hamas movement, as well as with the leadership abroad. This network was severely damaged following IDF activity in Tubas (on 5 April) in which 6 major operational activists from the Hamas were killed, including Qis Adwan (head of the Hamas infrastructure in Jenin who directed suicide attacks in Israel in which dozens of Israelis were killed, and Sa'ed Awad (head of the QASSAM-2 rocket project in Samaria, whose death impaired the rocket production infrastructure in Samaria). At the same time, additional senior activists such as Nasser Jerar (involved in the planning of spectacular attacks in Israel and the West Bank) and Jamal Abu Al Hija (head of Hamas in Jenin who directs terror activities and is involved is the transfer of money for financing such activities), are still at large and are active.

b. PIJ - Until the IDF operation, the PIJ infrastructure in Jenin was the strongest in the PA territories, mostly due to the massive financial aid it received for its activities from the PIJ leadership in Syria (according to captured documents). The PIJ infrastructure suffered a severe blow with the death of the head of the military infrastructure in Jenin, Mahmud Tu'albe (involved in the perpetration of terrorist attacks, including inside Israel), and the arrest of senior operational activists. Amongst the senior activists arrested, the most prominent are Ali Safuri (involved in the direction of a large number of terrorist attacks, including suicide and killing attacks inside Israel) and Thabet Mardawi (directed a large number

of terrorist attacks, including suicide and killing attacks inside Israel).

c. Fatah/Al Aqsa Brigades/Tanzim - The Fatah network in Jenin (with all its names) served as a central terror focus. Local Fatah activists who according to captured documents were in close contact with Marwan Barghouti, perpetrated many shooting and explosive charges attacks in the West Bank and inside Israel, against the IDF and Israeli civilians. The last of these attacks was the suicide attack in a coffee shop in Tel Aviv on 30 March 2002 (one Israeli civilian killed and 45 wounded). Amongst the senior Fatah activists, the most notable are Jamal Hawil (responsible for direction of lethal terrorist attacks, arrested by the IDF) and Ita Abu Ramila (Fatah and Preventive Security Apparatus activist in Jenin).

5. Expressions of the scope and power of the terror infrastructures in the Jenin refugee camp, in Jenin and in the nearby villages (Qabatiyah and Tubas for example) can be found during Operation Defensive Wall: The intense fighting in the refugee camps which exacted a heavy price from the IDF, the large quantities of arms and explosives laboratories captured (see Appendix A) and the high number of senior and junior terrorist activists arrested or killed - all these are evidence of the depth of the terror infrastructure in the Jenin region.



**Explosives Laboratory found in Jenin**

6. During the fighting, a large number of gunmen in small squads operated in the Jenin refugee camp from inside civilian buildings. Unlike in other towns, senior PIJ activists remained in the camp, stubbornly fighting against the IDF. The instructions they received were clear: There must be no surrender and you must spill as much as blood as possible from the IDF soldiers. Contrary to the Palestinian claims of a massacre ostensibly carried out by IDF soldiers in the camp, in which framework 500-600 innocent civilians were killed, in practice, according to IDF reports (correct for 16 April), 46 bodies were found in the refugee camps, 44 bodies of gunmen/fighters and 2 bodies of civilians).

7. It is important to emphasize that the terror activists who transformed the refugee camp into their "fortress" made cynical use of the local civilian population:

a. They operated from inside populated houses, knowing that this would restrict the IDF reaction and with the hidden hope that severe casualties to civilians will damage Israel's image and lead to international pressure on it. (according to a press report, there were 1,500 civilians in Jenin refugee camp during the fighting and they did not leave the camp.

b. They activated explosive charges whose detonation caused the destruction of homes and property of civilians. Thabet Mardawi, a senior PIJ activist from Jenin, admitted during his interrogation that during the battle with IDF soldiers in Jenin refugee camp, he exploded gas cylinders which destroyed homes in which civilians lived.

**Characteristics of the Terror Infrastructure in Jenin and its Refugee Camp According to Captured Documents**

8. The captured documents unveil the extensive scope of the terror infrastructures of the various organizations and the terrorist attacks originating from the Jenin area, and principally from Jenin refugee camp. Below are the

main characteristics of this terror infrastructure according to captured documents examined so far:

a. The depth of the human terror infrastructure in Jenin. In a Fatah report from Jenin refugee camp addressed to Marwan Barghouti, it is written that from all the districts, Jenin district is "overflowing with fighters of tremendous quality and quantity" who belong to Fatah and the other national and Islamic movements. The report states that Israel defines Jenin as a "hornet's nest" and this name is indeed correct since there are many youths in Jenin who are willing to sacrifice themselves, and therefore Jenin has been called the "Suiciders Capital" (and indeed many suicide and killing attacks which resulted in the deaths of dozens of Israelis and the wounding of hundreds were ""exported" to Israel by the terror infrastructure in Jenin).

b. The mention of terrorist attacks, including killing and suicide attacks which were directed and perpetrated by the terror infrastructure in Jenin in order to weaken Israel. The captured documents mention attacks carried out against soldiers and civilians which originated in Jenin and the names of the organizations and terrorists who planned them. For example:

1) Thabet Azmi Mardawi, a senior activist in the PIJ military arm, of whom it is written that he "participated in the preparation of a few suicide acts" (Mardawi is now under arrest in Israel. He is responsible for a large number of terrorist attacks, including suicide attacks inside Israel such as the suicide attack in Binyamina [16 July 2001] and the bus explosion in Wadi Ara [20 March 2002]).

2) Ali Suleyman Al-Safuri, a senior activist in the PIJ military arm, of whom it is written that he "has a prominent role in the preparation of explosive belts and charges" (Al-Safuri is under arrest in Israel. He is responsible, amongst other things, for the suicide attacks in Binyamina [16 July 2001] and Hadera (28 October 2001).

3) Muhammad Salah Salim Yassin, a senior activist in the PIJ military arm, of whom it is written that he "participated in the perpetration of a few suicide acts" (Yassin was killed by the IDF on 7 March 2002 and was indeed involved in killing attacks inside Israel).

4) Wa'el Ahmad Jalamnah from the PIJ (he is known to have driven his partner to the suicide attack in "Paris Square" in Haifa [26 February 2002] and succeeded in escaping to Jenin refugee camp). According to a captured document, the two activists departed from Jenin refugee camp. According to the document, Jalamnah succeeded in fleeing to Jenin (after the attack in Haifa was foiled and his partner was arrested).

5) A captured document mentions the "mur he der of a settler" and twounding of 20 others during activity of the Al Aqsa Martyrs Brigades originating from Jenin.

6) A captured document mentions the implementation of the "Umm el Fahm act" in "Israel's depth" which was perpetrated by the Al Aqsa Martyrs Brigades (the intention is to the firing carried out on 28 April 2001 at a car in Umm Al Fahm. An Israeli civilian was killed in the attack and another was wounded).

7) An additional captured document mentions a suicide attack in Afula in which PA intelligence apparatus activists from Jenin were involved together with the PIJ (the intention is to the killing attack in Afula on 27 November 2001 perpetrated by the PIJ and Al Aqsa Martyrs Brigades).

c. The existence of a strong terror infrastructure which was built by the PIJ and Hamas, which depends, amongst other things, on intensive use of its financial resources. According to the documents, the large amounts of money flowing to Jenin from Damascus (see below) enable PIJ and Hamas to recruit to their ranks youths with motivation, provide them with a monthly salary and solve their financial problems (while posing a challenge to Fatah which does not have such large financial resources and whose members, as reported in one document, receive financial aid from PIJ). The strength of their financial sources enabled these organizations, inter alia, to penetrate the ranks of the Palestinian intelligence apparatuses, bribe senior commanders of apparatuses in the Jenin area and receive assistance from them in operational activity and in protection against expected PA moves.

d. The existence in Jenin of a terror infrastructure of the Fatah and Al Aqsa Martyrs Brigades/Tanzim which is in contact with Marwan Barghouti, who provides them with money and budgets, and which competes with PIJ and Hamas. A captured document states that Jenin "refugee camp" is considered to be a Fatah "fortress" in the (Jenin) district and the Al Aqsa Martyrs Brigades in the camp are those "who consolidated Fatah's presence and operational capabilities". According to a captured document from May 2001, there are 63 Al Aqsa Martyrs Brigades fighters in the Jenin district divided into four military units (it is assumed that their number has since risen). Their activity, it is written "focuses on the weakening of the Israeli enemy" and the defense of the refugee camp (in cooperation with other elements). The main constraint which blocked their progress (at least in the first half of 2001) was the financial constraint, and the Fatah activists in Jenin expected Marwan Barghouti to assist them in overcoming this problem.

e. Trans-organizational operational cooperation expressed by joint terrorist attacks in Israel and joint preparations to defend Jenin. There are a few expressions of this cooperation in the captured documents:

1) The existence of joint frameworks for all the terrorist organizations. The documents mention the "combined force" which apparently operates in the context of a defense plan for Jenin and whose men belong to all the organizations operating there (it is possible that the units operating in this framework are called "guard units". One document mentions a joint operations room in Jenin.

2) The existence of inter-organizational operational cooperation in the perpetration of terrorist attacks inside Israel. One document notes that the commander of the Al Aqsa Martyrs Brigades in the Jenin area recruited one of the terrorists who took part in the suicide attack in Afula (on 27 November 2001 in which 2 Israeli civilians were killed and approx. 50 wounded). The responsibility for this attack was indeed jointly claimed by the PIJ and Al Aqsa Martyrs Brigades. We are familiar with additional cases of inter-organizational cooperation (Fatah and PIJ) in perpetration of terrorist attacks inside Israel which originated in the Jenin area (see following section).

3) Cooperation in various realms between Fatah and local PA intelligence apparatuses and the PIJ and Hamas. This is expressed not only in joint terrorist attacks but also in warnings of expected activities by the PA which were transferred to the PIJ by the Deputy Chief of the Preventive Security Directorate in Jenin; in early reporting of expected arrests and names of wanted persons by the PA, in the procurement of arms by Preventive Security officers for the PIJ and Hamas in the Jenin area. One captured document states that the Deputy Head of the Preventive Security Directorate supplied Hamas and PIJ with weapons from "the arms depot in northern Palestine whose contents were stolen" (the intention is to the arms stolen from Kibbutz Manara, some of which, according to a press report was found by the IDF in Jenin).

f. The direction of the PIJ terror infrastructure in the Jenin area by the organization's headquarters in Damascus. In this framework, one document states that Dr. Ramadan Shalach, the PIJ secretary, transfers large sums of money to PIJ activists in Jenin, for financial aid to the families of martyrs and also for payment of expenses for suicide and killing attacks. According to this document, he transferred a large sum of money for the suicide and killing attacks in Afula (27 November 2001), whose "sundry expenses" was a sum of $31,000. In addition, a sum of $127,000 is mentioned as aid to support the families of martyrs and activists under arrest (these sums of money also constituted a source for corruption and internal strife amongst PIJ members in Jenin.

g. One captured document indicates ties between senior activists in the Jenin terror infrastructure and Israeli Arabs, while exploiting the fact that the refugees living in the Jenin area originate from the Galilee. The document notes that Bassam Ragheb Al Sa'adi, a senior PIJ activist in Jenin who deals in money transfers, conducts "extensive ties with people inside the green line (areas)". (Bassam Sa'adi is known to be a PIJ senior activist in Jenin who is responsible for the perpetration of a few bomb attacks inside Israel including in Hadera (25 May 2001) and Netanya (30 January 2001).

**Major Attacks Carried out by the Terrorist Infrastructure in Jenin**

**Hamas**

1. 9 September 2001 - A suicide attack in Nahariya, 3 Israelis killed and 48 wounded, the attacker was an Israeli Arab from the Galilee.

2. 19 March 2002 - A shooting attack in Hamam Al Maliach (Jordan Valley), an IDF officer was killed and 3 Israelis were wounded.

3. 31 March 2002 - Suicide attack in Haifa, leaving 15 Israeli civilians dead and 33 wounded. The attacker was from Jenin refugee camp, and had an Israeli ID card.

**PIJ**

1. 16 July 2001 - A suicide attack at the Binyamina railway station killing 2 Israelis and wounding 10.

2. 28 October 2001 -. A shooting attack in Hadera killing 4 Israelis and wounding 42.

3. 29 November 2001 - A suicide attack at a junction near an army base near Pardes Hanna killing 3 Israelis and wounding 9.

4. 25 January 2002 - A suicide attack at the old Central Bus Station in Tel Aviv leaving 23 wounded (in cooperation with Fatah).

5. 5 January 2002 - A suicide attack in Afula, killing one Israeli and wounding 15.

6. 20 March 2002 - A suicide attack in a bus in Wadi Ara, killing 7 Israelis and wounding 28.

7. 10 April 2002 - A suicide attack at the Yagur junction, killing 8 Israelis and wounding 20.

**Fatah**

1. 1 February 2001 - The murder of Lior Ataya.

2. 28 April 2001 - Shooting at a car near Umm al Fahm, killing one Israeli civilian and wounding another (female).

3. 1-3 May 2001 - Test firing of mortar bombs produced by Fatah activists.

4. 28 June 2001 - Shooting at a vehicle near Ganim, one woman was killed.

5. 8 August 2001 - The laying of a charge at Golani Junction, there were no casualties.

6. 11 September 2001 - Shooting at "Bezek" workers near Shaked and detonation of a charge at an IDF force that was carrying out searches in the area. An Israeli civilian and 4 soldiers were wounded.

7. 9 March 2001 - Shooting at an Israeli vehicle near Yabed. An Israeli civilian woman was killed.

8. 4 October 2001 - A terrorist disguised as a soldier fired at Israeli civilians in the central bus station in Afula. 3 civilians were killed and 14 wounded.

9. 27 October 2001 - Infiltration to the settlement of Me Ammi and laying of a charge there. There were no casualties.

10. 27 November 2001 - A joint PIJ and Fatah suicide attack, in which terrorists fired at civilians in the Afula central bus station. 2 Israeli civilians were killed and 50 wounded.

11. 8 February 2002 - Masterminding of a joint PIJ and Fatah suicide attack aimed at Tel Aviv. The attack was prevented when the squad was intercepted in Jenin, when the terrorists detonated the explosive belt in their possession.

12. 7 March 2002 - A terrorist hurls a charge that was hidden in a birds cage during a chase in Karkur.

13. 11 March 2002 - Shooting at a truck. An Israeli Arab incurred medium wounds.

14. 12 March 2002 - Shooting at an Israeli vehicle on the road to the village of Katsir, one Israeli was severely wounded and 2 lightly wounded.

15. 21 March 2002 - A suicide attack in a Jerusalem cafe, killing 3 Israeli civilians and wounding 71.

16. 22 March 2002 - A suicide terrorist blew himself up near an IDF force, near Anin village, a soldier incurred medium wounds.

17. 30 March 2002 - A suicide attack in a Tel Aviv cafe, killing one Israeli civilian and wounding 45.

**Nablus - The Main Infrastructure of Palestinian Terrorism**

1. Nablus constituted the main Palestinian terrorism infrastructure and the headquarters of the terrorist organizations' leaderships in the West Bank. This infrastructure directed and executed suicide attacks in which scores of Israeli citizens were killed and over 400 were wounded. The terrorism operational centers in Nablus instructed terrorist squads in the Jenin, Tulkarm, Qalqilya, and Ramallah areas to perpetrate terror attacks in the West Bank and inside Israel.



**A tunnel that served for concealing and smuggling arms**

2. The operational cooperation between the various terror organizations in Nablus resulted in murderous terror attacks, which were jointly carried out by the planners of the PIJ in Jenin, the Hamas explosives laboratories in Nablus, and Fatah/Tanzim suicide bombers.



**Pipe charges found in an explosives lab in the Nablus Casbah**

3. During Operation Defensive Shield and in previous IDF activities, 18 explosives laboratories, 10 explosive belts, and hundreds of kilos of explosives (some standard high power explosives) were found in Nablus. In addition, 7 Qassam rockets and their production labs were found. Most of the labs and the arms caches were found in the Balata refugee camp (RC) and in the Casbah (the old city) of Nablus. Tunnels were also discovered in the Casbah used for hiding and smuggling arms. Arms caches and wanted terrorists were also found in the homes of the mayor of Nablus and the commander of the Palestinian Police, which attests to the direct involvement of PA officials in terrorist activities in the Nablus area.

4. The continuous IDF activities in the Nablus area, especially Operation Defensive Shieldl, significantly damaged the Hamas and Fatah terror infrastructure. Nevertheless, the activists who escaped from Nablus will attempt to return and execute terror attacks as revenge for the IDF operation, and in order to prove that Israel did not manage to eliminate terrorism.

5. The main terror organizations operating in Nablus were: Hamas, Fatah, and the PFLP. According to captured documents, these organizations cooperated in order to defend the city and the neighboring refugee camps vis-a-vis the IDF troops. At least 30 Fatah activists who operated in Nablus were soldiers in the "National Security Apparatus" and were attached to the Fatah/Tanzim in the city. They received regular salaries from the PA during the entire confrontation with Israel. In our assessment there were hundreds of gunmen in the city.

6. The cooperation network between the organizations was based on geographical sectors - the old city, the refugee camps, etc. Each sector incorporated members of the Fatah, Hamas, the DFLP, PFLP, PDA (a DFLP branch headed by the PA Information Minister Yasser Abd Rabu), the PFLP-

GC/Jibril Front and the "People's HQ" (former Communists).

**The Terror Infrastructures According to Organizations and Subjects**

7. The Hamas

a. The leadership and the heads of the Hamas operational apparatus ("Az-al-Din al-Qassam battalions") in the West Bank resided in Nablus.

b. Most of the explosive charges and explosive belts used for the Hamas suicide bombings in Israel, including the attack in Haifa (December 2001, 15 Israelis killed) and the massacre on Passover Eve in Netanya (27 March, 2002, 28 Israelis killed) were produced in Nablus.

c. The apparatus activists in Nablus directed the Hamas network activities in Tulkarm which perpetrated the suicide attack in Netanya.

d. The Hamas activists in Nablus who constitute in practice the organization's leadership in the West Bank, masterminded and directed from the city areas which served as its main headquarters, most of the murder attacks which the movement carried out in Israel and in the West Bank since the outbreak of the current confrontation with the Palestinians, e.g. Emmanuel (December 2001, 11 Israelis killed, and 27 wounded), Hamra in the Jordan Valley (February 2002, 3 Israelis killed), Elon Moreh (28 March, 2002, 4 Israelis killed).

8. The Qassam rockets

a. In Nablus operated the Hamas infrastructure which produced Qassam 2 rockets (6-7 kilometer range with an enlarged explosives warhead). Nablus constituted the center of knowhow for the production and operation of the rockets in the West Bank.



**A lab for developing Qassam 2 rockets found in Balata refugee camp, where 7 rockets were found.**

b. The rockets were developed in the Gaza Strip by the Hamas infrastructure. The knowhow and operational doctrine were transferred from Gaza to Sa'ed Awad in the West Bank who was in charge of the Qassam program, assembled the activists and established the production labs disposition. Awad made an effort to transfer the knowhow and rockets to other organizations and activists in order to extend the use of rockets as the main weapon against Israel. These infrastructures were led by Sa'ed Awad and Majdi Balasmeh (who were killed in a clash with IDF troops in April 2002).



**Qassam 2 rockets found in Balata refugee camp.**

c. The Nablus infrastructure transferred the operational rockets to Tulkarm, in order to launch them at cities in the center of Israel. In addition, it tried to transfer them to Jenin, an attempt foiled by Israeli forces in January 2002 (8 rockets and launchers were

captured).

d. The infrastructure's core was uncovered and destroyed during an IDF operation in Balata RC on 27-28 February 2002, in which Israeli forces broke into several production laboratories and seized 7 rockets.



**A lab for developing Qassam 2 rockets in Balata refugee camp.**

9. The Fatah

A number of Fatah cells operated in Nablus, and carried out hundreds of shooting and explosive charge attacks. The main Fatah cell in Nablus was headed by Nasser Aweis (arrested April 2002), it was responsible for the following:

a. At least 7 suicide attacks in Israel in which 15 Israeli civilians were killed and over 200 wounded.

b. Served as the center for planning and logistics for Fatah cells in Tulkarm, Qalqilya, and Ramallah, which carried out attacks under the name of "Al Aqsa Martyrs Brigades". It provided the terrorists in these cities with funds, arms and knowhow to produce explosive charges.

c. The network of Fatah cells was supported by Marwan Barghouti (arrested in April 2002), the head of the "Fatah Supreme Council" in the West Bank and the leader of the Fatah/Tanzim in this area.

10. Cooperation between the various terrorist organizations

The various organizations cooperated between them on the basis of the relative advantage of each organization. Thus, the PIJ planners joined forces with the highly lethal Hamas explosive charges and the Fatah suicide bombers. This collaboration led to the following:

a. An attempted double suicide attack at the old central bus station in Tel Aviv (25 January 2002, 26 Israelis injured).

b. The transfer of Qassam rockets and some of the production knowhow to other terrorist organizations, particularly to the Fatah.

11. The PA's involvement in terror

The PA security apparatuses in Nablus were involved in terror both by giving terrorist activists a safe haven and by directly perpetrating terrorist attacks:

a. The head of military intelligence in Nablus, Maher Fares, operated a terrorist cell which placed an explosive charge on a Tel Aviv bus (28 December 2000, 9 Israelis wounded) and carried out various shooting and explosive charge attacks in the sector. Three senior activists of the cell were killed while attempting to prepare a car bomb (30 July 2001). The head of military intelligence in Nablus also operated a terrorist squad in the village of Salfit, which perpetrated over 10 shooting attacks in the Nablus area.

b. Various terror activists joined the PA ranks, which enabled them to receive monthly salaries while continuing their terrorist activities. Nasser

Aweis, a senior Fatah terror activist in the West Bank, was on the PA General Intelligence payroll and later also on the PA National Security payroll. In his interrogation, Aweis confessed that he himself and terror activists of the Fatah/Tanzim carried out attacks in Israel that were financed by Arafat, who would personally sign the approval of aid provided him via Barghouti.

c. Individual PA security apparatus activists joined up to carry out terror attacks. Ibrahim Hasouna, who carried out the "Sea Food Market" restaurant attack in Tel Aviv (5 March 2002, 3 Israelis killed) belonged to the PA Naval Force apparatus in Nablus. Said Ramadan, who carried out the suicide attack in the center of Jerusalem (22 January 2002, 2 Israelis killed) also belonged to the PA Naval Force

**Major Terrorist Attacks that Originated in the Nablus Terrorist Infrastructure**

| Date | Terrorist Attack | No. of Israelis Killed | No. of Israelis Wounded |
|---|---|---|---|
| **Hamas** | | | |
| 1 June 2001 | Tel Aviv "Dolphinarium" discotheque | 21 | 120 |
| 9 August 2001 | Sbarro restaurant, Jerusalem | 15 | 107 |
| 2 December 2001 | Haifa | 15 | 37 |
| 12 December 2001 | Emmanuel | 11 | 27 |
| 6 February 2002 | Hamrah | 3 | 2 |
| 9 February 2002 | Tapuah Jct. | 1 | 1 |
| 28 February 2002 | Elon Moreh | 4 | |
| **Total** | | **70** | **337** |
| | | | |
| **Fatah** | | | |
| 1 April 2001 | Kfar Salem | 1 | |
| 17 June 2001 | Mt. Eival | | 1 |
| 12 July 2001 | Bracha | | 3 |
| 2 August 2001 | Mt. Eival | | |
| 19 September 2001 | Oranit | | 2 |
| 28 September 2001 | Samaritans Neighborhood in Nablus | | |
| 30 September 2001 | Kusin | | 1 |
| 9 October 2001 | Oranit | | 1 |
| 10 October 2001 | Kfar Tzara | | 1 |

| | | | |
|---|---|---|---|
| 22 October 2001 | Burqa | | 1 |
| 31 October 2001 | Kusin | | |
| 31 October 2001 | Ra'anana (home of an IDF officer) | | |
| 11 November 2001 | Kfar Hess | 1 | 1 |
| 19 November 2001 | Shavei Shomron | | 3 |
| 15 December 2001 | Sha'ar Ephraim | | |
| 24 December 2001 | Shavei Shomron | | 1 |
| 17 January 2002 | Hadera | 6 | 25 |
| 22 January 2002 | Jerusalem | 1 | 9 |
| 25 January 2002 | Tel Aviv Central Bus Station | | 26 |
| 27 January 2002 | Jerusalem | 1 | 131 |
| 5 February 2002 | Yitzhar | | 1 |
| 17 February 2002 | IDF Camp (near Pardes Hanna) | | 9 |
| 15 February 2002 | Surda roadblock | 1 | |
| 27 February 2002 | Maccabim roadblock | | 2 |
| 5 March 2002 | Tel Aviv | 3 | 26 |
| 7 March 2002 | Karkur | | |
| 7 March 2002 | Hawarra | | 1 |
| 8 March 2002 | Beit Hananya | | |
| 9 March 2002 | Netanya | 2 | 58 |
| 16 March 2002 | Kfar Saba | 1 | 8 |
| 30 March 2002 | Baq'a al-Sharqiyah | 1 | |
| **Total** | | | |
| | **PFLP** | | |
| 27 August 2001 | Beit Furiq | 1 | |
| 7 March 2002 | Ariel | | 14 |
| **Total** | | **1** | **14** |

**Bethlehem - Mistreatment of the Christian Population**

1. A document captured by the IDF in Bethlehem during Operation Defensive Wall concerns a request by the "Fatah/Al Aqsa Martyrs (and Church of) Nativity Brigades" to the Bethlehem municipality for aid in the form of monetary contributions for its military arm. The request (dated November 7th 2001) is explained by the fact that the Fatah's widening military activity has caused an increase in its military infrastructure's daily expenses (fees for communications

sets, fuel for vehicles and so on).

2. The implications arising from this document:

a. Audacity and brazenness in the very adopting of a Christian religious symbol by a terrorist organization. The "Al Aqsa Martyrs Brigades" (which the document proves are identical to Fatah), which was recently declared a terrorist organization by the US, has adopted in Bethlehem a Christian religious symbol recognized worldwide. This, in our view, in order to try to gain legitimacy among Bethlehem's Christian residents, and portray itself as their protector. It requires no small degree of blatant audacity, brazenness and cynicism to add the Church of the Nativity to the name of an organization that perpetrates suicide attacks against innocent civilians inside Israel, and make a link between the places holy to Islam and Christianity in the context of terrorist activities.

b. The maintaining of a protection racket by armed groups that abuse the local population. It is not known how the Bethlehem municipality responded to the request. However, the request itself for aid from municipal budgets earmarked for the local civilian population's needs is not "innocent" and it is part of a protection racket imposed on the local population, local businessmen and civilian institutions.

c. The transfer of funds from PA civilian institutions to Fatah's terrorist infrastructure. The document gives expression to the various financing channels at the disposal of "Fatah/Al Aqsa Martyrs Brigades". In one of its documents the "Al Aqsa Martyrs Brigades" make a request to Fuad Shubaki, a close associate of Arafat, to finance vital ongoing and infrastructure needs for continuing their terrorist activities. In this document they address a civilian municipal authority that receives its budget from the Palestinian "Finance Ministry" (which receives European Union grants) and from contributions of Christian institutions worldwide.

3. The contents of this document correspond with many reports on extortion, unwarranted arrests, protection and corruption prevailing in Bethlehem, simultaneously with the terrorist campaign waged against Israel. The following are some examples:

a. Extortion and unwarranted arrests of Bethlehem businessmen to gain bribes:

1) Men of the Bedouin Taamra tribe (a tribe that resides in the Bethlehem area from which includes many violent thugs that terrorize Bethlehem's civilian population) extort money from Christian businessmen.

2) After the car of the senior Fatah terrorist activist Atef Abayat exploded (in one of the captured documents Arafat allocates for him a sum of money) he had gold rings on his fingers identified as having been robbed from the Christian businessman George Nissan.

b. Criminal activities by the Fatah/Tanzim:

1) Fatah activists, who are not satisfied with the financial aid they receive from the PA, extort money from businessmen and property owners in the city (souvenir shops, real estate, petrol stations owners). This criminal activity is carried out in cooperation with the Palestinian security apparatuses, which customarily summon the businessmen for "clarifications", on so-called suspicions of cooperation with Israel, and demand payment in return for closing the "file". Security apparatus personnel also collect money from businessmen as "monetary aid" to

cover various expenses.

2) In mid-March 2001 a Bethlehem woman called Saadah Hamidan (formerly a security prisoner who worked in the prisoners club in Bethlehem) was raped and murdered. Involved in the affair was a senior Tanzim official called Iman Ali Azmi al-Kadi, a close friend of Abdallah al-Nu'ura (Abu Hadid) one of the Tanzim's heads in Bethlehem. Al Kadi was brought before a judge for trial, but after the judge was bribed by Fatah activists in Bethlehem, he was acquitted.

c. Appropriation of Christian lands. Moslem personnel - PA personnel and private people, sped up their appropriation of the lands of the Greek Orthodox Church in Bethlehem. This was carried out by violent means, the forging of documents and bribes. In some cases this was carried out in cooperation between church elements and PA elements. In one case a plot of land in Bethlehem was appropriated to build a mosque with the involvement of the commander of Force 17 in the area, in the claim that this was being done by Arafat's orders. Requests to Jibril Rajoub and Haj Ismail to intervene and stop the construction works were in vain.

d. "Protection services" by Fatah/Tanzim for extremist Islamic elements. Protection is imposed not only on the civilian population in Bethlehem. Elements in the Islamic Jihad and the Hamas transferred funds in the sum of 1500-3000 dollars to Tanzim activists and Palestinian intelligence officers in return for intervening on their behalf to prevent their arrest. By this arrangement, Hamas and Islamic Jihad operatives were given early warning by General Intelligence and Preventive Intelligence officers of their imminent arrest. (Such "arrangements" whereby Islamic Jihad and Hamas activists were prewarned of their imminent arrest are noted also in a captured document concerned with the Jenin area)

e. Failure to provide protection to the Christians by the judicial system of the PA that operates in Bethlehem, which is plagued by irregularities and distortion of justice. Of note in this regard is the failure to provide protection to Christian land-owners, which Moslem migrants from Hebron are taking over. The following is one example. The Comtsieh family (a Christian family) has a plot of land with a building that serves as a business center in the city. Several years ago a Moslem family from Hebron took possession of the building and started to use it without permission. The Comtsieh family filed a claim with the judicial system and after long and arduous court hearings, the court ruled in the claimant's favor. However, the verdict was never enforced by the police and representatives of the family from Hebron later appeared with a new court verdict (signed by the same judge who ruled in the claimants' favor previously), canceling the previous verdict and ratifying the Hebron family's ownership of the property.

**Translation of the Original Document**

Emblem of the Al Aqsa Martyrs Brigades
Stamp: Bethlehem Municipalty
17.11.2001

**In the Name of the All-merciful Allah**

To: Brothers, Bethlehem Mayor and Honorable Municipality Members,

Greetings of the Homeland to you..., greetings of the pure blood that has saturated the soil of our beloved province. Our blessings to you and to the tremendous efforts that you invested in order to develop this

province.

Honorable brothers, we intend to put the issue to you, an issue that is of utmost importance for us and will have a deep influence on our moves. The issue is your participation in a small portion (of the expenses) of our daily needs, in the shadow (of expenses) which lie heavily on us, due to the difficult circumstances our people and us especially are in. we wish to draw your attention to the fact and tell you that we pay the LC Public Trade Company, owned by Faez Hazboun a sum which does not exceed 5,000 shekels a month, as fees for the use of communications sets by military arm personnel" *(Note: Faez Hazboun is a businessman from Bethlehem who owns a cellular phone company)*.

In addition, (we also pay) for fuel which is a basic and important component in our movements from place to place and this, in accordance with the demands of the national interest.... your participation in this matter will lead to our glorification and of pride in you.

We request your serious reference to this subject.

Please accept our appreciation and the honor which we have for you.

The Palestinian National Liberation Movement
"Fatah"
Al Aqsa Martyrs (and Church) of the Nativity of the city of Bethlehem Brigades
*(Stamp of the Al Aqsa Martyrs Brigades)*

*Note in handwriting of some clerk in the Bethlehem Municipality:*

Sir, Director of the Municipality
(to be raised) in the meeting

19.11.2001

SEE ALSO ...
- Additional documents connecting Arafat and the PA to terrorists and terrorist activities
- Operation Defensive Shield: Special Update

ISRAEL MINISTRY OF FOREIGN AFFAIRS

# INCITEMENT TO VIOLENCE AGAINST ISRAEL BY LEADERSHIP OF PALESTINIAN AUTHORITY - 27-Nov-96

27 Nov 1996

Jerusalem, 27 November 1996

## INCITEMENT TO VIOLENCE AGAINST ISRAEL BY THE LEADERSHIP OF THE PALESTINIAN AUTHORITY

(Communicated by Government Press Office)

The Agreement

Under the terms of the Oslo Accords, the leadership of the Palestinian Authority (PA) is obligated to refrain from incitement to violence against Israel.

In his exchange of letters with Prime Minister Yitzhak Rabin on September 9, 1993, Chairman Yasser Arafat wrote "The PLO renounces the use of terrorism and other acts of violence and will assume responsibility over all PLO elements and personnel in order to assure their compliance, prevent violations and discipline violators."

The Interim Agreement (Oslo 2) of September 28, 1995 (Article XXII) states that Israel and the PA "shall seek to foster mutual understanding and tolerance and shall accordingly abstain from incitement, including hostile propaganda, against each other." The Gaza-Jericho Agreement of May 1994 contained a similar provision (Article XII).

Thus, statements made by PA officials which incite to violence against Israel are a violation of the accords.

The Violations

Senior Palestinian officials have repeatedly called for jihad (holy war) against Israel and threatened a renewal of the intifada. They have praised terrorists who killed Israelis after the signing of the accords, and suggested that the agreements with Israel were a tactical ploy and a prelude to a return to the armed struggle. In addition, they have falsely accused the Israeli military of plotting terrorist attacks against Israelis by creating, arming and assisting Islamic fundamentalist terrorist groups.

Conclusion

The PA's virulent rhetoric confers legitimacy on the use of violence. It is a fundamental violation of the Oslo accords.

Statements by PA Officials

The following is a selection of statements by PA officials, and particularly Chairman Yasser Arafat, in the three years since the beginning of the Oslo process. The statements appear in reverse chronological order.

1996

* Hani al-Hasan, advisor to Chairman Arafat, at a memorial service for Fathi Shikaki, the slain leader of Islamic Jihad: "Fathi Shikaki is a giant among the giants of the Palestinian people, one of the giants of the nation. He believed in Islam and he spread it. He was the teacher of generations who understood that where there is unity there is victory, and where there is fear there is defeat, without connection to the views that one holds." (An-Nahar, Oct. 29, 1996)

* Arafat in an October 21 speech at the Dehaishe refugee camp: "We know only one word: jihad, jihad, jihad. When we stopped the intifada, we did not stop the jihad for the establishment of a Palestinian state whose capital is Jerusalem. And we are now entering the phase of the great jihad prior to the establishment of an independent Palestinian state whose capital is Jerusalem...We are in a conflict with the Zionist movement and the Balfour Declaration and all imperialist activities." (Yediot Ahronot, Oct. 23, 1996)

* Arafat to a delegation of Hebron Arab notables urging the use of violence: "Have you run out of stones in Hebron? Prepare the stones,"

(Voice of Israel, Oct. 21, 1996).

* Arafat in an October 10 speech before the Palestinian Council: "Negotiations have achieved nothing up until now. As a consequence, we must be ready in every way to confront all possibilities. You must understand what I mean by this." (Near East Report, Oct. 21, 1996)

* Arafat in an interview with the Palestinian newspaper Al-Ayyam, calls for "mass confrontations in all cities and villages to confront the Israeli aggression against Al-Aksa mosque" (cited in the New York Times, Oct. 4, 1996)

* Arafat to Palestinian security forces in Gaza on September 24: "They will fight for Allah, and they will kill and be killed, and this is a solemn oath...Our blood is cheap compared with the cause which has brought us together and which at moments separated us, but shortly we will meet again in heaven...Palestine is our land and Jerusalem is our capital"

(Ma'ariv, Oct. 4, 1996)

* On August 30, Muhammad Dahlan, a senior Gaza PA security official, said: "The Palestinian Authority does not exclude the return to the armed struggle, and it will then use its weapons." (cited in the Jerusalem Report, Nov. 28, 1996)

* On August 6, Arafat called Israel a "demon" and urged Arabs to use "all means" at their disposal to fight Israel (The New York Times, Aug. 7, 1996)

* Arafat to a rally in Gaza: "We are committed to all martyrs who died for the cause of Jerusalem starting with Ahmed Musa until the last martyr Yihye Ayyash." (Jerusalem Post, July 28, 1996) Musa was the first member of Fatah to be killed in 1965, and Ayyash, known as "the Engineer", was the mastermind behind a series of Hamas suicide bombing attacks prior to his death in January 1996.

* PA Grand Mufti of Jerusalem Sheikh Ikram Sabri in a sermon at Al-

Aqsa Mosque: Palestinians should "rise up with all their might against the occupation." (Jerusalem Post, June 14, 1996)

* Arafat threatening Israel with violence: "If Israel rejects our demands there will be a reaction and we have a 30,000 man armed force." (Israel Radio, June 7, 1996)

* Arafat alleging that a secret Israeli military group, OAS, was behind terror attacks against Israelis ; "We have clues that some of the recent operations in Israel were carried out in cooperation with the OAS in Israel." (Jerusalem Post, April 30, 1996)

* PA Ministry of Information, in a statement issued to the media on April 22, comparing Israel's actions with those of the Nazis: "While the Israeli government is speaking about the atrocities committed against the Jews at Auschwitz, Birkenau and Dachau concentration camps...it is directly involved these days in weaving plots and causing two major catastrophes to their neighbors...Our homeland was transformed into a big concentration camp..."

* Arafat claiming Israel supplied weapons to terrorist groups for suicide bombings against Israelis: "These weapons could be obtained only from high authorities with great influence on the Israeli side." (Jerusalem Post, March 22, 1996)

* Arafat asserting that Israel armed Hamas and Islamic Jihad. "We must remember that these organizations were created by Israel, which also distributed arms to them, so are we supposed to collect the arms Israel distributed?" (DPA German News Agency, Feb.28, 1996)

* PA Planning Minister Nabil Shaath at a symposium: "If the negotiations reach a dead end, we shall go back to the struggle and strife, as we did for 40 years. It is not beyond our capabilities...If and when Israel will say, 'That's it, we won't talk about Jerusalem, we won't return refugees, we won't dismantle settlements, and we won't retreat from borders,' then all the acts of violence will return. Except that this time we'll have 30,00 armed Palestinian soldiers who will operate in areas in which we have unprecedented elements of freedom" (Jerusalem Post, March 15, 1996)

* Voice of Palestine on February 28 asserted that suicide bombing attacks against Israelis were the work of Israeli Knesset Member Rehavam Zeevi "and the Israeli extreme right-wing organization Eyal." (cited in the Jerusalem Post, March 15, 1996)

* PA Planning Minister Nabil Shaath, in an interview with Le Monde: "I am, convinced like Arafat, that these attacks could not have been carried out without cooperation from Israeli extremists." (cited in Ha'aretz, March 6, 1996)

* Selim Zaanoun, acting chairman of the Palestinian National Council, at Arafat's inauguration: "We are returning to Palestine, and we are passing from the small Jihad to the great Jihad." (Jerusalem Post, Feb.13,1996)

* Arafat on Yihye Ayyash, Hamas mastermind of suicide bombing attacks against Israel: "a hero of the Palestinian people" and a "martyr." (New York Times, Jan.8, 1996)

1995

* Arafat on the intifada: "Our oath is still in force and our commitment is still valid to continue in the path of the heroes and the dead of the intifada." (Jerusalem Post, Dec. 17, 1995)

* Arafat in a radio address: "The struggle will continue until all of

Palestine is liberated." (Voice of Palestine, Nov. 11, 1995)

* Arafat on pre-1967 Israel: "Be blessed, O Gaza, and celebrate, for your sons are returning after a long celebration. O Gaza your sons are returning. O Lod, O Haifa, O Jerusalem, you are returning, you are returning." (Ma'ariv, Sept. 7, 1995)

* Arafat in a speech on September 3 publicly praising Abir al-Wahidi, involved in the murder of Israeli Zvi Klein in 1991, and Dalal al-Maghrabi, who took part in the coastal Road massacre in 1978 which killed 37 Israelis: "Yes, we are proud of the Palestinian girl, the Palestinian woman and the Palestinian child who fulfilled these miracles. The Palestinian woman participated in the Palestinian revolution. The Palestinian girl participated in the Palestinian revolution. Abir al Wahidi, commander of the central region and Dalal al-Maghrabi, Martryr of Palestine. I bow in respect and admiration to the Palestinian woman who receives her martyred son with joyful cheering. The soul and blood for you, O Palestine!" (Israel Channel Two Television, Sept. 19, 1995).

* Arafat in August 1995: "The Israelis are mistaken if they think we do not have an alternative to negotiations. By Allah I swear they are wrong. The Palestinian people are prepared to sacrifice the last boy and the last girl so that the Palestinian flag will be flown over the walls, the churches, and the mosques of Jerusalem." (Ha'aretz, September 6, 1995; The Jerusalem Post, Sept.7, 1995)

* Arafat in a speech in Gaza: "The soul and the blood we shall sacrifice for thee Palestine." (Jerusalem Post, Aug. 3, 1995)

* Arafat in a speech at Gaza's Al-Azhar University on June 19: "The commitment still stands and the oath is still valid: that we will continue this long jihad, this difficult jihad...via deaths, via sacrifices."

(Jerusalem Post, Aug. 3, 1995) Arafat also praised Dalal al-Maghrabi, one of the perpetrators of the 1978 Coastal Road Massacre in which 37 Israelis were killed: "She was one of the heroes...She commanded the group that established the first Palestinian republic in a bus...This is the Palestinian woman...the woman we are proud of." (Jerusalem Post, Aug. 3, 1995) He further stated, "We are all seekers of martyrdom in the path of truth and right toward Jerusalem, the capital of the State of Palestine."

(Ha'aretz, Aug. 3 1995)

* Faisal Husseini in an interview: "There will be an intifada not just in Jerusalem, but in all the occupied territories and in all the Middle East." (Israel Radio, May 21; Ha'aretz, May 22, 1995)

* PA Justice Minister Freih Abu Middein in a radio interview: "We have a standing committee to follow up on the Jerusalem issue and the latest relevant developments. There will also be popular moves to mobilize resources in Jerusalem, the West Bank, and Gaza, even if this calls for a new intifada, no matter what impact this will have. (Cairo Radio, May 20, cited in FBIS, May 22, 1995)

* PA Justice Minister Freih Abu Middein in a speech read in Arafat's name at Gaza's Shawa Cultural Center: "I say once more that Israel shall remain the principal enemy of the Palestinian people, not only now but also in the future." (Voice of Palestine, May 12, 1995) One month previously at Gaza's Al-Azhar University, Abu Middein said, "We must remember that the main enemy of the Palestinian people, now and forever, is Israel. This is a truth that must never leave our minds." (An-Nahar, April 11, 1995; Jerusalem Post, April 17, 1995)

* Faisal Husseini in an interview with the Egyptian weekly Al-Arabi: "If Israel continues to undermine the path to peace there will be no

other alternative but that called for by the Islamist Palestinian opposition the military option." (Agence France Presse, May 1, 1995)

* Arafat, at a rally in Gaza, compared the Oslo Accord with the temporary truce between Muhammad and the Quraish tribe, which was later broken, and said, "We signed that agreement in Oslo, and if any of you has one objection to it, I have one hundred objections." (Voice of Palestine, April 16, cited in FBIS, April 18, 1995)

* PA Grand Mufti of Jerusalem Sheikh Ikram Sabri: "Jerusalem is under occupation and the Moslems of the world should liberate it by jihad and put in under Islamic and Arabic authority The jihad is not just a war jihad we are talking about all means to get back Jerusalem." (Al-Sharq al-Awsat, April 7, 1995; Jerusalem Post, May 3, 1995)

* Arafat in a message marking Land Day: "We promise you, oh our great nation, and we promise you, oh our pure martyrs, that we will continue the revolution until the victory and until the flag of my country flies over the towers of Jerusalem. This is a revolution until victory." (Voice of Palestine, March 31, 1995)

* PA Planning Minister Nabil Sha'ath in an interview with Al-Watan on February 28: "If it becomes certain that the negotiations process with Israel is ending in failure, there will be no other option other than jihad." (cited in FBIS, March 1 1995)

* Arafat in a speech relayed by telephone to a Hebron rally: "Our nation is a nation of sacrifice, struggle and jihad." (Voice of Palestine, Feb. 14, 1995)

* Arafat in a speech in Gaza: "We are all on our way to die as heroes on the road to Jerusalem, the capital of the state of Palestine." (Jerusalem Post, Jan. 30, 1995)

* Arafat in a speech in Gaza in Jan. 1995: "All of us are willing to be martyrs along the way, until our flag flies over Jerusalem, the capital of Palestine. Let no one think that they can scare us with weapons, for we have mightier weapons the weapon of faith, the weapon of martyrdom, the weapon of jihad." (Parade Magazine, New York Newsday, June 25, 1995)

* Arafat in a speech on the 30th anniversary of Fatah's founding: "We are going to continue the Palestinian revolution until the last martyr to create a Palestinian state." (AFP, Jan. 1, 1995) He further stated, "We are all seekers of martyrdom...I say to the martyrs who died, to the martyrs who are still alive, we hold to the oath, we hold to the commitment to continue the revolution..." (Palestinian TV, Jan. 1, 1995)

1994

* Arafat in an address to the Organization of the Islamic Conference: "The glorious Islamic solidarity together with our people's jihad is an additional inducement for the realization of our hopes." (Voice of Palestine, Dec. 15, 1994)

* Arafat at a rally in Gaza: "Our people will continue with its jihad."

(Ha'aretz, Nov. 22, 1994)

* Arafat during a speech in Gaza: "Today, we are celebrating our independence for the first time on Palestinian land, and we will continue to celebrate on Palestinian lands that will be freed from the Zionist enemy. We will take all open and freed land, and we will

establish our state on those territories from which the Israeli enemy leaves." (Yediot Ahronot, Nov. 16, 1994)

* Arafat in a letter to Hamas spiritual leader Sheikh Yassin and Hamas terrorist Sheikh Hunamn, who killed 14 Israelis in an attack on Bus 405 in 1989: "My brother, Sheikh Yassin, my brother the holy Sheikh Abdelhadi Hunam, I recognize your participation in the struggle to free Palestine. Because of you, Palestine is free." (Ha'aretz, Oct. 5, 1994)

* Arafat in a letter to Saddam Hussein: "The Palestinian people will continue their war until the establishment of a state whose capital will be Jerusalem." (Yediot Ahronot, July 24, 1994)

* Jibril Rajoub in an interview: "We will continue to fight until the creation of a state with Jerusalem as its capital." (Agence France Press, May 31, 1994)

* Rashid Abu Shbak, a senior PA security official, on pre-1967 Israel: "The light which has shone over Gaza and Jericho will also reach the Negev and the Galilee." (Yediot Ahronot, May 29, 1994)

* Jibril Rajoub in a lecture at Bethlehem University: "We sanctify the weapons found in the possession of the national factions which are directed against the occupation ... If there are those who oppose the agreement with Israel, the gates are open to them to intensify the armed struggle." (Yediot Ahronot, May 27, 1994)

* Arafat at a mosque in Johannesburg, South Africa on May 10, 1994: "The jihad will continue ... You have to understand our main battle is Jerusalem ... You have to come and to fight a jihad to liberate Jerusalem, your precious shrine ... No, it is not their capital. It is our capital."

(Israel Radio, May 17, 1994; Jerusalem Post, May 18, 1994) Arafat further stated that the Oslo Accord was akin to the temporary truce between Muhammad and the Quraish tribe, which was later broken: "This agreement, I am not considering it more than the agreement which had been signed between our prophet Muhammad and Quraish, and you remember that the Caliph Omar had refused this agreement and considered it a despicable truce ... But the same way Muhammad had accepted it, we are now accepting this peace effort." (Ha'aretz, May 23, 1994)

* Jibril Rajoub in an interview: "Rabin has to remove all the settlers from the West Bank and Gaza and transfer them to hell." He later warned: "We shall distribute weapons to the Palestinian residents and return to the armed struggle." (Yediot Ahronot, March 4, 1994)

* Arafat during a speech in Gaza: "The heroic intifada, which has entered its seventh year, is an extension of the 29-year old Palestinian revolution and will go on relentlessly ... It is continuing, continuing, continuing." (Associated Press, Jan. 7, 1994)

1993 (after the Oslo Accords were made public)

* Arafat in a radio address: "It is a revolution until victory, until victory, until victory." (Algiers, Voice of Palestine, Dec. 31, 1993)

* Faisal Husseini in a speech at Bir Zeit University on November 22: "Everything you see and hear today is for tactical and strategic reasons. We have not given up the rifle. We still have armed gangs in the areas and if we do not get our state we will take them out of the closet and fight again." (Ma'ariv, Nov. 24, 1993)

* Voice of Palestine report: "Yasser Arafat stressed the continuation of struggle until the Palestinian flag is hoisted over Jerusalem's

walls."

(Voice of Palestine, Oct. 24, 1993)

* Arafat in a speech on Jordanian TV: "Palestine is only a stone's throw away for a small Palestinian boy or girl." (Jordanian TV, Sept. 13, 1993)

* Arafat asserting that the Oslo Accord is part of the PLO's 1974 phased plan for Israel's destruction: "[the agreement] will be a basis for an independent Palestinian state in accordance with the Palestinian National Council resolution issued in 1974 ... The PNC resolution issued in 1974 calls for the establishment of a national authority on any part of Palestinian soil from which Israel withdraws or which is liberated."

(Radio Monte Carlo, Sept. 1, 1993)

GEOTEXT
Translations, Inc.

STATE OF NEW YORK )
) ss
COUNTY OF NEW YORK )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Hebrew into English of the attached Verdict in Felony Case 001137/02, dated May 1, 2003.

Ian Kemper, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this 14 day of November, 20 04.

EVAN EINCH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FI6134600
Qualified In New York County
My Commission Expires October 03, 2009

New York 259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco 220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9500 fax 415.520.0525
London 107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.9909
Hong Kong 20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com | www.geotext.com

The Courts

| Tel Aviv – Jaffa District Court | | Felony Case 001137/02 | |
|---|---|---|---|
| Before: | The Hon. Judge S. Timan – Presiding Judge<br>The Hon. Judge N. Achituv<br>The Hon. Judge O. Solomon-Cherniak | | May 1, 2003 |

**In the matter of:** **State of Israel**
**represented by Counsel:** **Adv. Devora Chen and Adv. Tamar Anis**

**v.**

**Nasser Mahmoud Ahmad Awis**
**represented by Counsel:** **Adv. Bulus**

*The State of Israel is arguing that these organizations are terrorist organizations, pursuant to their definition in the Ordinance for* the Prevention of Terrorism, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in the Judea and Samaria region, and that his activity included, *inter alia*, the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

**Verdict**

**Judge O. Solomon-Cherniak:**

**The charge**

The State of Israel is arguing that, during the period of time that is relevant to the events that are described in the indictment, the Defendant was the Commander of the Nablus and Northern Samaria area of the Tanzim-Fatah organization, as well as the commander of the *Kitaab Shuhadaa al-Aqsa* (al-Aqsa Martyrs' Battalions) organization in that area.

The State of Israel is arguing that these organizations are terrorist organizations, according to the definition thereof in the Ordinance for the Prevention of Terrorism, 5708 – 1948, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in Judea and Samaria, and that his activity included, *inter alia*, the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

The State of Israel is arguing that, as a result of the Defendant's actions, many civilians were murdered, wounded and injured, and it is seeking to convict him, as set forth in the eight counts that are included in the indictment, of the offenses that are attributed to him, which are: Membership and activity in a terrorist organization – offenses in contravention of Sections 2 and 3 of the Ordinance for the Prevention of Terrorism, 5708 – 1948.

Acts of conspiracy to commit a crime – offenses in contravention of Section 499 of the Penal Code, 5737 – 1977.

Acts of murder and attempts to perpetrate such acts – offenses in contravention of Sections 300 (a) (2) and 305 (1) of the Penal Code, 5737 – 1977.

Acts of aggravated assault and attempts to perpetrate such acts – offenses in contravention of Sections 329 (1) and 329 (1) [sic] in combination with Section 25 of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon – offenses in contravention of Section 144 (b) of the Penal Code, 5737 – 1977.

***The Defendant's line of defense***

In the initial stage, the Defendant hired the services of Adv. Bulus and cooperated with him.

The defense attorney received all of the investigative material, and even filed a notice that he would raise various preliminary arguments on behalf of the Defendants, including the argument of the absence of jurisdiction.

A first harbinger of the future line of defense of the Defendant is to be found in the transcript of the session which took place on September 10, 2002. At that session, the defense attorney (before another panel of judges) argued, *inter alia*, that: "After I had explained the matter to him, he said that he did not want an attorney, that he was representing himself. We hope that, within a short time, we will be able to push the deliberations forward – a period of at least two weeks."

At the same session – as may be seen in the transcript – the Defendant said to his attorney, and through the interpreter: "Do not speak on my behalf. I am my own lawyer; I am representing myself." Even at that stage, the Court ruled that: "Adv. Bulus' firm will continue to represent the Defendant, even if the latter decides to conduct the hearing on his own."

At the session which took place on January 22, 2003 (before the other panel), the defense attorney gave notice as follows: "We withdraw from the argument of an absence of jurisdiction. I agree that there was a ruling that a summation must be filed within 30 days with regard to the argument of the absence of jurisdiction. However, in light of the developments which took place on the subject of Barghouti and in view of the decision on the part of the District Court to reject that argument, we have decided to withdraw the argument of an absence of jurisdiction in this case."

The defense attorney subsequently filed a petition to release him from representation, and the petition was denied in our ruling of March 2, 2003.

The trial began, continued and concluded in the presence of the Defendant and his attorney, and was fully translated into Arabic. The Defendant and his attorney remained silent throughout. They did not file a response to the indictment (we considered that as tantamount to a plea of not guilty on all counts). They did not raise any preliminary arguments, they did not cross-examine any witnesses and they did not raise any legal arguments. The Defendant did not testify and no witnesses were brought forth on his behalf. They even chose not to present a summation.

This position shall be examined against the background of the notice given in writing by the defense attorney, as follows:

".. 4. The undersigned spoke with the Defendant on several occasions and attempted to convince him to accept legal representation by an attorney. However, the Defendant has chosen not to be represented by an attorney.

5. The undersigned explained to the Defendant that he is supposed to represent his interests at the trial. In response, the Defendant clarified that he had decided not to take an active part in the trial proceeding. He is entitled to make his own choices and to take the actions which he has chosen for himself, including by means of a passive line of defense of silence throughout his trial.

6. The Defendant has requested that, if the Court forces us to appear at sessions, the only thing that we may do is to remain silent.

7. On March 11, 2003, and following the ruling by the Honorable Court, the undersigned again explained to the Defendant the ruling by Their Honor and his own situation, as well as the fact that, if a legal argument is raised in the course of the session, it is fitting and proper for the undersigned to address it. The Defendant, however, ruled out that possibility and repeated his former statement, to the effect that he is not interested in cooperating and that he does not consider us to be his defense attorneys, and again asked us to remain silent...

10. The Defendant is perfectly well aware of the meaning of all this. He is not legally incompetent and he has the mental and intellectual capacity to choose how to conduct the trial...

13. In the absence of cooperation by the Defendant, and [in view of] his instructions to the defense attorney to remain silent throughout the trial, not to examine witnesses and/or to raise legal and/or other arguments, not to speak on his behalf and/or to raise factual and/or legal arguments, the undersigned has no choice but to hold his tongue, and will be enjoined from doing otherwise, for obvious reasons originating in the rules of ethics which bind any attorney at law..."

We are convinced, on the basis of that which has been set forth in the notice, oral statements made to us in the matter, and the behavior of the Defendant and his attorney prior to and at all times throughout the trial, that the Defendant has adopted a position which reflects a line of defense which he selected knowingly, deliberately and of his own free will.

What is before us is a choice which results from a calculated, deliberate, conscious, intentional and manipulative move made by a Defendant who understands perfectly well, and who is quite aware of, all of the implications thereof.

The Defendant was given, at all times, every possibility of taking an active role in the deliberations. We even attempted to urge his attorney to do his job in any way he could, even in the absence of any cooperation by the Defendant, and at the very least, where purely legal argumentation was involved.

The distinguished defense attorney explained, yet again, that he would not intervene in the deliberations, even where legal argumentation was involved, because he was bound by the line of defense adopted by his client.

In other words, we are not looking at an unintentional failure to act, or at indifference to the consequences, but rather, at a clear and definitive line of defense.

The Defendant and his defense attorney may be presumed to have been aware, from the outset, of the legal consequences of this line of defense.

**The Defendant's confession**

The Defendant confessed to the offenses that were attributed to him in the indictment, within the framework of his statements to the police.

Statements P/5 dated April 21, 2002, P/6 dated April 28, 2002, P/7 dated April 30, 2002, P/8 dated May 1, 2002, and P/9 dated May 14, 2002, were written on the basis of the testimony of Prosecution Witness No. 5, an interrogator in the Hostile Activity Unit, Roni Amar, in Arabic, in the handwriting of the Defendant and after he had explained to the Defendant in Arabic the charges that were being attributed to him and had duly warned him. According to the interrogator's testimony, after the Defendant had confirmed to him that he understood the charges and the nature of the warning, he asked to write the statements in his own handwriting and did so of his own free will.

According to the interrogator's testimony, the Defendant signed the statements before him. The interrogator translated the statements from Arabic to Hebrew (the translation of each statement into Hebrew, P/5A through P/9A, is attached to the respective statement).

Statement P/22, dated June 27, 2002, was taken by Witness No. 7 for the prosecution, interrogator Hadi Halabi, who explained that he took the testimony in the Arabic language, in which he is fluent, after the Defendant had been duly warned, had understood the nature of the interrogation and the warning, and had given his statements of his own free will and volition. The Defendant signed the statement that the interrogator had recorded in Arabic. The interrogator further translated the statement into Arabic [sic] and the translation is appended to the statement (P/22A).

The circumstances under which the statements were taken down in the manner described above, the fact that the overwhelming majority thereof (five out of six statements) were written by the Defendant in his own handwriting, and the fact that the Defendant again confirmed before a military judge (see the transcript of the Court session at which his arrest was extended, P/23, and the testimony by Witness No. 5 for the prosecution) that "I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do'. I do not object to the extension of my arrest as requested," all indicate that this evidence is admissible. There is no reason to suspect that the Defendant was subjected to any external pressure which led him to confess to the perpetration of acts in which he had no part.

Examination of the content of the statements, including the confessions, indeed shows that what they contain is a true reflection of the actual state of affairs, on the basis of clear, lucid and logical thinking by a person of sound and settled mind. These statements and confessions carry a heavy internal weight which, in and of itself, bears out their veracity.

Obviously, the Defendant's confession before a judge in arrest court, and under the supervision of that judge, was given without any pressure or influence and, as that confession implies severe consequences for the Defendant, it constitutes material corroboration of evidence and carries a special weight, which increases the force of his previous admissions, over and above its strength as an independent item of evidence (see Additional Hearing 3081/91, Kuzali v. the State of Israel, PD 45 (4) 441, Criminal Appeal 6613/99, Stephen Smirek v. the State of Israel, PD 56 (3) 529, and Criminal Appeal 3338/99, PD 54 (5) 667).

The requirement for an additional "item," which allays the suspicion that the Defendant was led to confess by internal pressure, has been completely fulfilled by the assertions that have been made in writing, out of court, by other witnesses, which we accept as admissible and credible evidence, as shall be set forth below.

**The accomplices**

Witnesses for the prosecution Ahmad Abu Khadr (Witness No. 6 for the prosecution), Muhammad Yadak (Witness No. 21 for the prosecution), Ahmad Barghouti (Witness No. 23 for the prosecution) and Yasir Abu Bakr (Witness No. 25 for the prosecution), are the Defendant's accomplices in the offenses committed by him (hereinafter: the "Four"). With the exception of Witness No. 6 for the prosecution, Ahmad Abu Khadr, who was convicted and sentenced before he testified (see the respective protocols of his conviction and sentencing, jointly marked as P/11), the other three were called upon to testify before their own trial ended, and the question arose as to whether their testimony was admissible, in view of the Kinzi doctrine (Criminal Appeal 194/75, Menahem Kinzi v. the State of Israel, PD 30 (2) 477), a doctrine which has admitted no flexibility to date (see Criminal Appeal 1774/02, Shimon Kadosh v. the State of Israel), which holds that "one defendant should not be made to testify before another defendant, even if separate indictments were filed against them, as long as there is any suspicion that the witness is likely to expect the benefit of reduction of his sentence, in a trial which is still pending against him.

This can be avoided either by completing [the witness's] trial before the testimony is given or by transforming him into a State's witness and arranging for a stay of the proceedings, or a declaration by the prosecution that the trial against him will be canceled upon the conclusion of his testimony..."

The State of Israel mapped out its course in accordance with that which has been set forth in *Criminal Appeal 579/88*, Suissa v. the State of Israel, PD 44 (1) 529. As the State of Israel would have it, the Defendant did not object to having those *witnesses testify*, although he knew very well, as did his defense attorney, that their trial was not over. He did not bar – as he could have done, from the procedural standpoint – his accomplices' way to the witness stand. By failing to do so, he knowingly waived his right to object to having their testimony heard, and he can no longer attack the admissibility of this evidence, which is *a priori* acceptable testimony under law (Section 2 of the Evidence Ordinance (New Version), 5731 – 1971), and all that is left to decide is the weight of that evidence.

This is indeed a foreseeable outcome, in accordance with the line of defense selected by the Defendant, and the Honorable Counsel for the State of Israel should not be found at fault.

Because this is a foreseeable and probable outcome of the line of defense intentionally adopted by the Defendant, the Honorable Counsel for the State of Israel is correct in stating that the responsibility for that outcome rests with the Defendant.

We questioned the Honorable Counsel for the State of Israel in this matter, because we believed that she might raise the matter in order to "open the way." Let us recall, however, that the State of Israel declared, at the beginning of each testimony, that none of the above mentioned witnesses had been promised any benefit whatsoever, and that it did not intend to use their testimony against them in any way whatsoever.

In any event, each of the Four was declared a hostile witness, and with regard to the testimony given by each of the above mentioned witnesses, we were asked to act in accordance with the provisions of Section 10A of the Evidence Ordinance (New Version), 5731 – 1971 (hereinafter: the "Evidence Ordinance") and to give preference to his statement in writing, relative to his oral testimony.

There is accordingly some doubt as to whether the Kinzi doctrine applies under these circumstances, when the risks which underlie the doctrine do not exist.

The manner in which the Four testified in Court, as shall be set forth below, was hostile to the State of Israel.

Witness No. 6 for the prosecution, Ahmad Abu Khadr, entered the courtroom, exchanged smiles with the Defendant and saluted him. From that point on, he expressed, both in words and in his behavior, his intention of not cooperating and not answering questions.

That is what he did, although he addressed us once, on his own initiative, and stated that: "I know the Defendant here and I put him above me." Furthermore, he answered a question by the Honorable Counsel for the State of Israel: "Q. On December 23, 2002, were you in the military court, and did he [did you] confess to this indictment, which I have now filed before this Court, including your involvement in the terrorist attack in Hadera?" "A. We wanted to stop the military operations, and they murdered the leader, Raad al-Kamal, and they murdered Palestinian children, and that is what drove me to do this thing." *Previously, he had argued that the indictment against him was falsified.*

Witness No. 21 for the prosecution, Muhammad Yadak, began his statement with the words: "I do not want to speak; I do not want to testify." He subsequently answered questions on matters of marginal importance, but did not cooperate with regard to material details. Thus, for example, he answered questions such as "When did you make the acquaintance of the Defendant?" or "In which military operation did you participate together with the

Defendant?" or "Who was a member of the military squad of which [you were] also a member?" with the following response: "That is my own private business and it is of no concern to the Court." At the same time, after he was declared a hostile witness, he answered the following questions in this manner:

"Q. Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Awis, the person who was in charge of that squad?

A. What is wrong with those things? What is forbidden about those things?

Q. Did you tell the police that Nasser Awis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A. I have no answer.

Q. Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A. That is my right.

Q. Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A. I refuse to stand before this Court and be judged. There is nothing for which I must be judged. Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q. You are not the one being judged. You are testifying here and you have to give answers.

A. I refuse [to allow] Nasser to be judged for these things.

Q. For which things?

A. For his struggle against the occupation.

Q. Did you, on the instructions of Nasser Awis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A. That is of no interest to anyone.

Q. Did you tell the police that you used to help Nasser Awis transfer weapons from this activist to that activist?

A. I did not say those things in order to be judged for them.

Q. For what purpose did you say them?

A. That was what they asked me and that was what I told them."

From that point on, he was silent or refused to answer.

Witness No. 23 for the prosecution, Ahmad Barghouti, also clarified, immediately after taking the witness stand, that: "I understood what the interpreter said and I will say nothing." He also made it clear, in the course of his examination – both in words and in his behavior – that he would not cooperate, and that is what he did.

Witness No. 25 for the prosecution, Yasir Abu Bakr, did not deviate from the course that was set by the others. In response to every question, he referred the Honorable Counsel for the State to his attorney, or alternatively, continued to claim that everything he had said had been forced out of him under pressure by General Security Services personnel, who had spilled tea on him, spit on him, slapped him and kept him tied up for several days.

As we have seen, the testimony of the Four fulfills the condition set forth in Section 10A (a) (3) of the Evidence Ordinance.

The Four were witnesses at the trial, and the parties were given the opportunity to examine them. This constitutes compliance with the condition that was set forth in Section 10A (a) (2) of the Evidence Ordinance (see Additional Criminal Hearing 4390/91, State of Israel v. Hajj Yihya, PD 47 (3) 679).

The policemen who had taken the statements testified as to the circumstances under which the testimony by the Four had been taken.

Statements P/12 and P/13 were taken from the witness Abu Khadr by Witness No. 28 for the prosecution, Lutuf Mari. According to testimony by the latter, he interrogated Abu Khadr in Arabic and wrote down the answers in Hebrew, after having duly warned Abu Khadr and after having explained to him the nature of the charges against him. According to Mari's testimony, he offered Abu Khadr the opportunity of writing down the statement himself in Arabic, but Abu Khadr explained to him that he was not good at reading and writing and that he did not object to his statement being taken down in Hebrew. According to Mari's testimony, Abu Khadr's statement was made of his own free will.

Statements P/14 and P/15 were taken from the witness Abu Khadr by Witness No. 34 for the prosecution, Aouni Matar. According to Matar's testimony, he introduced himself to Abu Khadr as a member of the police force. He, like Lutuf Mari, interrogated the witness in Arabic and translated the testimony into Hebrew simultaneously, after having warned Abu Khadr and having explained to him the nature of the offenses that had been attributed to him. The latter's statements were made of his own free will.

The person who took down Statement P/16 was not among the witnesses for the prosecution. We shall discuss this fact below.

Statements P/17, P/18 and P/19 were taken from Abu Khadr by Witness No. 29 for the prosecution, Gamal Shakur. This witness also introduced himself to Abu Khadr as a member of the police force, explained his rights and the nature of the charges against him, duly warned him, and informed him that he was entitled to write down the statement himself in Arabic. This witness as well testified that Abu Khadr told him that he did not know how to write in Arabic, and that he did not have a problem with the statement being taken down in Hebrew.

Statement P/20 was taken from Abu Khadr by Witness No. 33 for the prosecution, Harb Madi. Madi explained that the testimony was taken after he "accused" Abu Khadr of the offenses of which he was suspected, warned him, translated the content of the warning for him, informed him that he was entitled to write down [the statement] in his own handwriting in Arabic. However, because Abu Khadr claimed that he did not know how to write, he took down the statement in Arabic [sic] and then translated what he had written into Arabic.

As Abu Khadr, according to all of the testimony, claimed that he did not know how to read and write in Arabic, the fact that the statements were written down in Hebrew is of no importance whatsoever, because, even had they been written down in Arabic, Abu Khadr would have signed them on the basis of what he was told by the persons who were taking the statements.

We believe the testimony by the policemen who took down statements P/12 through P/20, inclusive, to be credible, and we determine that they were taken from the witness Abu Khadr according to proper legal procedure, with his rights respected, and that Abu Khadr gave his statements of his own free will.

More precisely: Abu Khadr himself does not claim that the process of his interrogation was defective in any way. His answer to the prosecuting attorney's question, "I will tell you about all of the operations which you performed with Nasser Awis, according to instructions by Awis, in the course of the intifada," in the following words: "All of the things you say are falsified," appears, in light of his behavior and his utterances before us, to be a vaguely defiant statement and no more. Moreover, it is diametrically opposed to his full confession with regard to all of the counts of which he was accused in the amended indictment, dated August 7, 2002 before the three judges on the panel of the military court (see P/11).

We shall add to this the fact that the Defendant refrained from the cross examination of these witnesses, and in so doing, augmented the weight of their testimony.

We rule that the making of the assertions that are included in the statements has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions by Abu Khadr constitute admissible evidence.

The circumstances under which statement P/16 was taken have not been proven. The person who took down the statement was not among the witnesses for the prosecution. Notwithstanding that which has been set forth above, the Honorable Counsel for the State of Israel – although we do not understand her actions in doing so – did not refrain from including that statement among the statements which she claimed to be admissible (see pp. 80-81 of the "Summation by the Prosecution – Outline," which was filed before us in writing). We are ignoring this item of evidence (P/16), which has not been proven to be admissible, and are excluding it from the body of evidence which we took into account.

We may assume, with a great degree of certainty, that Abu Khadr's full confession of the offenses that have been attributed to him, before a panel of three judges, substantiates the veracity of his assertions to the police, just as it indicated the admissibility of those assertions, from the standpoint of the circumstances under which they were taken down.

In the course of his testimony in court, insofar as he attempted to distance himself from his assertions in writing, by various means, Abu Khadr's testimony was not consistent. From time to time, for one brief moment, the truth emerged – for example, at the very beginning of his testimony, in response to a question by the prosecuting attorney, he answered: "The things that I did, and what drove me to do them, were because of the war criminals, Sharon and Mofaz." Subsequently, he added: "We wanted to stop the military operations, and they murdered the leader, Raad al-Kamal, and they murdered Palestinian children, and that is what drove me to do this thing," and afterwards: "all of the things that you are saying are fake. Go ask about the causes of these things." And also: "To this very moment, the only people who are under occupation are the Palestinian people, and all of the international laws allow me to struggle against the occupation. Do not exhaust yourself. Do not ask me any questions," and: "I know Hasuna; he is a friend of mine, and he served with me in the Authority, and the occupation is what drove Hasuna to do what he did."

The salute which Abu Khadr gave the Defendant when he entered the courtroom, and his declaration to the effect that he knows the defendant and puts him above himself, attest to the veracity of the Defendant's assertions concerning the hierarchical relationship between them. This relationship is described, *inter alia*, in P/12: "Nasser Awis is a resident of the Balata camp... also known as al-Hajj Rawaq, and he is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah..."

We give preference to the assertions that were made by Abu Khadr in writing, in his above mentioned statements, which were made out of court, over his testimony in the courtroom.

The statements by the witness Muhammad Yadak, P/40A, B, C were taken down by Witness No. 7 for the prosecution, Hadi Halabi. According to Halabi's testimony, the statements were taken down and written in Arabic, after he had explained to Yadak the offenses of which he was suspected and had duly warned him. According to his testimony, the witness made his statements of his own free will and signed every page of each of the statements before him. Halabi testified that he translated the statements in the Hebrew, but that Yadak was asked to sign, and signed, the original only.

Statement P/40D was taken from Muhammad Yadak by Witness No. 35 for the prosecution, Atef Awida, who also testified that he took down the statement in the same way as Halabi.

We believe that both of [the above mentioned witnesses] took down Yadak's statements properly and that the assertions included in those statements were given of Yadak's own free will.

In his testimony before us, Yadak did not argue that his statements had been taken down improperly. He did not want to answer a question as to whether he identified his signature, and did not even want to look at it, but did not deny [that the signature was his]. His negative response to a question as to whether he had been duly warned is not convincing. In this case as well, the fact that the Defendant refrained from examining the persons who had taken the statements reinforces their testimony, and we rule that the making of the assertions has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Yadak's assertions out of court are admissible as evidence in the present proceeding, given that the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled in their entirety.

We give preference to Yadak's assertions, as expressed in his statements P/40A-D, over his testimony in the courtroom. On the basis of Yadak's answers to the questions he was asked, it is easy to discern that his behavior in court reflects his decision not to look like a collaborator, and most of those answers hint at the fact that his assertions as they were made to the police are true.

It would not be superfluous to cite those answers again:

"Q. When did you make the acquaintance of Nasser Awis?

A. That is my own private business and it is of no concern to the Court.

Q. In which military operation did you participate together with the Defendant?

A. That is my own private business and it is of no concern to the Court.

Q. Who was a member of the military squad of which you were also a member?

A. That is of no concern to the Court.

Q. Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Awis, the person who was in charge of that squad?

A. What is wrong with those things? What is forbidden about those things?

Q. Did you tell the police that Nasser Awis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A. I have no answer.

Q. Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A. That is my right.

Q. Those shooting attacks that you talked about were planned by Nasser Awis and he was the one who supplied the weapons for the shooting?

A. I do not wish to answer.

Q. Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A. I refuse to stand before this Court and be judged. There is nothing for which I must be judged. Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q. You are not the one being judged. You are testifying here and you have to give answers.

A. I refuse [to allow] Nasser to be judged for these things.

Q. For which things?

A. For his struggle against the occupation.

Q. Did you, on the instructions of Nasser Awis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A. That is of no interest to anyone.

Q. Did you tell the police that you used to help Nasser Awis transfer weapons from this activist to that activist?

A. I did not say those things in order to be judged for them.

Q. For what purpose did you say them?

A. That was what they asked me and that was what I told them.

Q. All of the weapons, the rifles, the M-16s, which they transferred, were used for shooting attacks against civilians and soldiers.

A. I do not want to say anything, and do not go on..."

Statements P/43A and P/43C by Witness No. 23 for the prosecution, Ahmad Barghouti, were taken by Witness No. 32 for the prosecution, David Mizrahi.

According to Mizrahi's testimony, he identified himself to Barghouti as a policeman, warned him and ascertained that he understood the content of the warning. P/43A was taken in the form of questions and answers and was taken down (as was P/43C) in Hebrew, because the witness Mizrahi cannot write in Arabic. Barghouti refused to sign P/43A, without explaining his refusal, but signed P/43C. Mizrahi explained that there were no exceptional events during the taking of both statements. He did not notice that Barghouti was injured, ill or tired, because, had this been the case, he would have noted those facts. If there had been anything extremely exceptional, the testimony would not have been taken down, and a memorandum to that effect would have been written. During the taking of P/43C, Mizrahi showed Barghouti an eight page manuscript in Arabic, and the latter confirmed that it was in his handwriting, after having studied the document.

Statements P/43B and P/43D were taken from Barghouti by Witness No. 31 for the prosecution, Yitzhak Yaakovoff. According to Yaakovoff's testimony, the two spoke Arabic, but the testimony was taken down in Hebrew. Barghouti was duly warned but refused to sign the warning or statement P/43B, although he signed P/43D. According to Yaakovoff's testimony, during the taking of both statements, manuscripts were shown to Barghouti which he identified as being in his handwriting; the manuscripts had been given toYaakovoff by one of the General Security Services interrogators. Barghouti made the statements of his own free will, and with regard to the manuscript which was shown to him during the taking of P/43D, he even answered: "Yes, this is my handwriting and I wrote what I have just told you now in my testimony."

Statement P/43E was taken from Barghouti by Witness No. 36 for the prosecution, Moshe Moshe.

According to testimony by the latter, he identified himself to Barghouti as a member of the police force and explained to him that he was about to interrogate him and what he was suspected of. Barghouti made his statements in an orderly manner, and subsequently signed the testimony after his words were translated back to him. According to Moshe's testimony, he interrogated Barghouti after having been given a general background in the form of a memorandum from the General Security Services. In his testimony, however, Barghouti told him many details which [Moshe] could not have known from that memorandum. In his words: "If it is about the circumstances of the relationship, how things occurred and progressed, these are things that he said in his testimony. If they went to an ice cream shop, and what the code was and who set it, which does not appear in the memorandum."

We; believe that the statements made by the witnesses Mizrahi, Yaakovoff and Moshe, with regard to the manner in which the interrogation was conducted and the circumstances under which Barghouti's assertions were taken down, are credible. Barghouti, for his part, does not argue that the assertions were taken down improperly. In this case as well, the fact that the Defendant refrained from cross examination strengthens the testimony by those who had taken the statements, and the making of the assertions was proven in the trial as required.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions made by Barghouti in writing and included in his statements P/43A-E, are admissible as evidence in the present proceeding.

We prefer Barghouti's assertions over his testimony in court. Most of his answers were intended to give the message that he does not recognize the jurisdiction of the Court ("I do not recognize the Court, do not you understand? ... I do not recognize the Court, or Israel either... I do not recognize the Court"), and not as denial of his assertions.

Nonetheless, from time to time, signs arose in his testimony which indicate that the assertions are true:

"Q. When did you begin your military activity?

A. That is none of your business...

Q. Is Marwan Barghouti a relative of yours?

A. That is none of your business. Why are you asking me personal questions?

Q. Were you Marwan Barghouti's driver and bodyguard from 1996 and up to the day of your arrest?

A. Nu, what do you want?

Q. Is that correct?

A. How do you ask me such questions? I do not recognize you.

Q. Those are things that you said.

A. That thing is not mine.

Q. You also said that you were arrested together with Marwan Barghouti.

A. I have no answers at all. It would be better if you did not ask...

Q. You [singular] made sure to prepare Said before the terrorist attack. You [singular] made sure that there would be someone to drive him to Jerusalem, to the place where you [plural] bought him clothes and shoes and took him to get a haircut. And you [singular], under the instructions of Nasser Awis, who was the planner and the organizer, you [singular] also made sure to get an M-16 rifle and clips with bullets for Said Ramadan.

A. (The witness remains silent and does not answer)

Q. You yourself told all of those details in your statement.

A. I say what I want to. What I feel like saying, I say.

Q. That is what you felt like saying at the time.

A. That is not from me, that is not my handwriting. If Nasser really did all those things, he only wanted to liberate Palestine for us. That is something to be proud of...

Q. Not only did you tell, in your statements, about many instances of shooting attacks and suicide bombings, [but] with regard to all of the terrorist attacks which you have perpetrated, you are sorry for what you did.

A. If Sharon is sorry for what he did, then I am sorry for what I did.

Q. Aren't you sorry that you sent terrorists to blow themselves up here in Israel and to kill?

A. I want to liberate my country, the one that you are conquering...

Q. I am showing you Statement No. 5 dated September 5. In this statement too, I am showing you the warning, the signature on the warning, and the signature on every page of the statement and the signature at the end of the statement.

A. I do what I want to. There is no one who can stop me. I will write and say whatever I want...."

It may truthfully be said that the response "I want to liberate my country, the one that you are conquering" is the beginning of an admission.

The following statement, which appears in Criminal Appeal 735/80, Abraham Cohen v. the State of Israel, PD 35 (3) 94, also applies to the matter before us: "If Section 10A now states that the Court can prefer the assertion over the testimony in the courtroom, the defense attorney, for his part, could have attempted to strengthen the witness's version in his direct examination, by performing a cross examination with a view to explaining that the assertion made to the police was a false assertion. The defense attorney, however, did not examine the witness at all."

Statements P/47A-C were taken from the witness Yasir Abu Bakr by Witness No. 31 for the prosecution, Yitzhak Yaakovoff. The witness did not remember the occasion when the testimony was taken, and refreshed his memory on the basis of the assertions. According to his testimony, he identified himself to Abu Bakr as a policeman, conversed with Abu Bakr in Arabic and translated the words for him. According to Yaakovoff's testimony, when he translated what he had written in the statements into Arabic, Abu Bakr could have responded, corrected or refused to sign them. According to his testimony, he wrote down only what Abu Bakr told him, and Abu Bakr confirmed to him that the manuscript which had been written down before the General Security Services interrogators was in his handwriting. According to his testimony, had there been exceptional circumstances, he would have noted them, and had any complaints been made, he would have written them down, as he would have written down any visual signs he might have seen. Yaakovoff explained that, when a suspect reports for a police investigation, he is a free man, "and this is his opportunity to give or not to give his version, irrespective of what happened before that in the General Security Services. If there was any problem at all, I would have written it down, because that is my duty. Everything written down in this testimony was said by the subject." Yaakovoff made it clear that, "both in the previous testimonies and in this testimony, I introduced myself as a policeman. That is the first thing. Above and beyond that, they (the reference is to interrogation subjects such as the witness) make the distinction as to who is a policeman and who is a General Security Services interrogator. They encounter us when their arrest is extended, and they cannot make mistakes in this matter..."

Statement P/47D was taken from Abu Bakr by Witness No. 30 for the prosecution, Moshe Levi. According to his testimony, he took down the statement after the suspect had been duly warned, and the statement was taken down in Hebrew, but the interrogation was conducted in Arabic. At the end of the statement, he read Abu Bakr's words back to him and Abu Bakr signed it before him. According to testimony by Levi, who did not remember the specific case, if Abu Bakr had complained to him, it would have been written down. Levi also clarified that he did not have to recall whether he had identified himself as a policeman, because that was his duty and he does that with every suspect. With regard to the connection between his interrogation as a policeman and the memoranda which are provided to him by the General Security Services, he explained that his interrogation is independent, and that he refers to the memoranda "only in a general way, and if a suspect says that no such thing ever happened, that is what will be written down, at the end of the day – in other words, what he says is what will be written down."

Statements P/47E and P/47F were taken by Witness No. 36 for the prosecution, Moshe Moshe. Because Abu Bakr had already argued before us, *inter alia*, that his statements had been taken under pressure by members of the General Security Services, Moshe gave a more extensive explanation (after the learned prosecuting attorney, and we as well, called his attention to Abu Bakr's arguments), not only with regard to the manner in which this statements were taken, but also about his interrogation of Abu Bakr, in light of a previous investigation which had been held for him, as well as for others, by the General Security Services – an investigation performed for counter-intelligence purposes. According to his statement: "When I receive the memorandum of an investigation which comes from the General Security Services personnel, I check the points that come up in it – what that suspect is suspected of having done. After that, we write the content of the warning, the content of the suspicions, we read it out and explain it and make sure that he really has understood the content of the warning and knows what he is being interrogated about. All of this is in Arabic – I speak Arabic fluently. I do not write or read Arabic, but I speak it. Part of the process is that we read it out. I inform him that I am a member of the police force, and he is aware that I am a member of the police force and that he is about to give testimony to the police. After I check the points that were covered by the General Security Services and what he said to them, I construct the suspicions against him – whether it is belonging to an organization or possession of weapons or, alternatively, assistance to wanted persons, or any other offense – and according to that, I make my preparations from the standpoint of the interrogation itself.

The General Security Services is investigating the issue of prevention. The General Security Services is involved in having to thwart future events, that is, future terrorist attacks. My job as a police officer is to be involved only in the subject of the interrogation, which regards the gathering of evidence against the suspect at the time. In other words, if I interrogate someone, I have to work according to the laws of evidence and to understand the law..."

When the prosecuting attorney confronted Abu Bakr with the fact that the statements had been taken from him by a policeman, and not by General Security Services personnel, he answered: "I never saw a policeman that I was supposed to speak with. They're all General Security Services officers."

Our impression is that the policeman Moshe Moshe did indeed identify himself to Abu Bakr as a policeman, as the other policeman had done, and that the wording of the statements taken by Moshe and the other policemen (Yaakovoff and Levi) had come from Abu Bakr, of his own free will, and was not the result of the behavior exhibited by the General Security Services interrogators toward him.

The Defendant and his Counsel did not cross-examine the policeman, nor did they ask to summon the General Security Services personnel who had drawn up the memoranda of the interrogations. The Defendant and his Counsel did not cross-examine the witness Abu Bakr, in an attempt to strengthen his version, to the effect that the statements had been taken from him by unworthy means.

Their refraining from cross examination does not give rise to the presumption that the version given by the policemen is correct. It does, however, further strengthen our impression of the credibility of the witnesses Levi, Yaakovoff and Moshe. Under the circumstances of the case at hand, that is, that the Defendant and his Counsel deliberately and tendentiously refrained – as they emphasized to us, on more than one occasion – from cross examination or from calling relevant witnesses, and given that this cannot be evaluated in light of other, conflicting testimony, and that, in any event, no such testimony was given, we give preference to the policemen's testimony concerning the manner in which Abu Bakr's assertions were taken out of court, over the version by the latter (see Criminal Appeal 38/61, Moshe Ben David Yitzhak v. Attorney General, PD 16 514, Criminal Appeal 639/79, Aslan v. the State of Israel, PD 34 (3) 561, and Criminal Appeal 2603/90, Alfar v. the State of Israel, PD 45 (3) 799).

In any event, as ruled in Criminal Appeal 242/85, Hazan v. the State of Israel, PD 41 (1), the very fact that an assertion made by a defendant to the police is not admissible in his trial cannot lead to the conclusion that the same assertion will not be admissible in another person's trial, which involves the case of that defendant's accomplice, pursuant to the provisions of Section 10 (and, to be precise, we have not ruled that such a possibility ever arose).

The content of Abu Bakr's statements P/47A-F has been proven in the courtroom, and, given that all of the conditions required pursuant to Section 10A (a) of the Ordinance have been fulfilled, we accept them as admissible evidence.

We give preference to Abu Bakr's assertions over his testimony in court. With regard to most of the questions which set forth the actions committed by Abu Bakr together with the Defendant, Abu Bakr referred the prosecuting attorney to the Defendant who was seated opposite him – a Defendant who, as stated above, chose not to cross-examine Abu Bakr or any other witness. Abu Bakr's words are set forth below:

"Q. I refer you to Statement No. 3... where they ask you when you began your military activity and who recruited you for the military activity, and you stated that, at the beginning of 2001, you were in Nasser Awis's house in the Balata refugee camp, and then Nasser Awis suggested that you join the al-Aqsa Martyrs' Battalions for military activity, and you agreed.

A. These things are not correct, and you can ask him. Look, he is here...

Q. I refer you to Statement No. 4... Did you suggest to Nasser Awis, in the course of your activity, to carry out a terrorist attack on Tel Hashomer Hospital in Israel?

A. No such thing. Ask him.

Q. You [plural] planned all of the details, and they [sic] even got hold of a map of the area, and at the end of the day, Nasser said that it would be necessary to wait a while, that it wasn't the right time yet.

A. No such thing. You can ask him.

Q. I refer you to the page in… Another of your roles was to assist Nasser Awis in recruiting more terrorist activists for military activity, so that they would help carry out terrorist attacks.

A. Nothing like that ever happened. Here he is, ask him...

Q. You used to report to Nasser Awis, every time, about a terrorist who you heard was interested in carrying out a terrorist attack.

A. This is the first time that I have ever heard such things. Aside from that, all of those things belong to the General Security Services. Nasser is here; ask him."

When the prosecuting attorney addressed these questions to Abu Bakr, who referred them on to the Defendant, the Defendant did not provide a version of his own, and we are left with the admissions in his statements and with his confession under the discerning eye of the judge in arrest court, which it is only fitting and proper to repeat here:

"I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do'. I do not object to the extension of my arrest as requested."

We shall state that the Defendant himself makes the following statement with regard to Yasir Abu Bakr (see statement P/6 by the Defendant): "After the outbreak of the al-Aqsa intifada, Yasir Abu Bakr enlisted in the *Kitaab Shuhadaa al-Aqsa*, and I asked Yasir to participate in terrorist attacks with us, and Yasir agreed to the proposal, and I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I had given him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir's statement, the vehicle was not hit." In response to a question as to additional terrorist attacks in which Yasir was involved on behalf of the *Kitaab Shuhadaa al-Aqsa*, the Defendant stated: "The terrorist attack in Hadera which was carried out by Said Ramadan... terrorist attacks which were carried out in the Nablus area..."

These facts, in and of themselves, constitute an unimpeachable sign of the accuracy of the assertions made to the police, and accordingly, those assertions should be given considerable weight.

We have found an additional sign of the accuracy of his assertions, in the conflicting versions given by the witness Abu Bakr in court with regard to another assertion which, according to him, had been written down in his own handwriting.

This is a manuscript in Arabic, concerning which Abu Bakr, in his statement P/47A, on page 4, had been asked the following question: "I am showing you a manuscript in Arabic (a total of 10 yellow pages, which I got from the person known as 'Bassam'). Is this your handwriting?

A. Yes, this is my handwriting and I wrote what I have just told you now in my testimony."

On the other hand, in response to a question by the prosecuting attorney: "Q. I am showing you a statement, which was attached to the statement dated April 15, which is a statement in your handwriting, 10 pages," he replied: "They dictate to people [and make them] write against their will. Take them to court, not us." In response to the question, "Q. That is not your handwriting?" he replied: "That is the handwriting of the General Security Services officers. They wrote those things." Generally speaking, his answers to similar questions were as follows: "Q. Are these things which you wrote yourself? A. When you have tea spilled on you, when you are left for four or five days with no food and no sleep, then you say things just to get out of it. Q. Did you write these things? A. I have an attorney. You have to see how the General Security Services treats people. Q. Do you recognize the handwriting? A. I do not want to answer you. You act like them and you shout at me (answers in Hebrew and English)."

**Summary thus far**

We have repeatedly clarified that all of the rules which must be fulfilled in order for the assertions made by the Defendant's accomplices out of court to qualify as evidence under Section 10A of the Evidence Ordinance have been fulfilled

(the above mentioned rules include proving the assertions under law, giving the Defendant an opportunity to examine the witnesses, and the question of whether the testimony in court is substantially different from the words recorded in the statements).

We considered the matter with the requisite care, and we give preference to the assertions made by the four witnesses, the Defendant's accomplices, to the police, over their testimony in the courtroom.

Testimony which requires a supplement may itself serve as a supplement of any kind for any other testimony which requires a supplement. Accordingly, the assertions by the four accomplices can constitute an additional "item" corroborating the Defendant's admissions out of court.

(See Kedmi, *On Evidence*, Part I; Criminal Appeals 6147/92, State of Israel v. Yosef Cohen, PD 48 (1) 62; Criminal Appeal 6214/94, State of Israel v. John Doe, *Supreme Court Rulings*, Volume XXXVIII, 665; Criminal Appeal 5249/98, State of Israel v. Mirilashvili, PD 53 (3) 550.)

Each of these assertions, including assertions made by one or more of the Four in writing – which should be considered as an integral part of those statements, accordingly (see Criminal Appeal 6411/98, Manbar v. the State of Israel, PD 55(2)150) – may be relied upon as corroborative evidence, in the form of an additional "item," to be added to other evidence brought against the Defendant, in the form of his own admissions.

As [the Four were] the Defendant's accomplices, and pursuant to the provisions of Section 54A (a) of the Evidence Ordinance, we were required to find "something to reinforce" their testimony.

We were also required to find such a reinforcement pursuant to the provisions of Section 10A (d) of the Evidence Ordinance, which instructs us that a person shall not be convicted on the basis of an assertion received pursuant to Section 10A of the Evidence Ordnance "unless the evidentiary material contains something to reinforce it."

If we consider the nature of the requirement for reinforcement (the term used is identical in the context of both of the above mentioned sections), it consists of supplementary evidence which verifies [the testimony in question], rather than evidence which embroils [the Defendant]. The reinforcement need not be an independent item of evidence; it may arise from the testimony which requires reinforcement.

We have found such reinforcement, even in excess of that required, and the embroiling evidence which arose from a separate and independent source, as follows:

The Defendant's full confession before the judge in arrest court.

The assertions made by each of the four accomplices with regard to the assertions made by his fellows.

The Defendant's choice to remain silent and to refrain from testifying in the trial, against the background set forth above and against the background of the line of defense selected by the Defendant (which we discussed at the beginning of this ruling), which, in and of itself, constitutes evidence which may stand as corroborative evidence, pursuant to Section 162 of the Criminal Code Law, 5742-1982, which states that "a defendant's refraining from testifying is likely to constitute a reinforcement of the weight of evidence for the prosecution, as well as corroboration of the evidence for the prosecution, where such evidence requires corroboration.drf."

As a *corpus delicti* has been found for us (see the testimony by Witness No. 1 for the prosecution, Brigadier General Moshe Waldman, Witness No. 2 for the prosecution, Brigadier General Aharon Franco, Witness No. 3 for the prosecution, Commander Haggai Dotan, Witness No. 4 for the prosecution, Brigadier General Uri Barlev, Witness No. 8 for the prosecution, Uriel Eliyahu, Witness No. 9 for the prosecution, Staff Sergeant Shai Cohen, Witness No. 10 for the prosecution, G.M., Witness No. 11 for the prosecution, Leon Gorenstein, Witness No. 12 for the prosecution, Konstantin Kardashoff, Witness No. 13 for the prosecution, Adi Maoz, Witness No. 14 for the prosecution, Ben Naim Hanan, Witness No. 15 for the prosecution, Noam Gabbai, Witness No. 16 for the prosecution, Sergeant Major Rami Malka, Witness No. 17 for the prosecution, Efi Yamin, Witness No. 18 for the prosecution, Chief Superintendent Farid Ghanam, Witness No. 19 for the prosecution, Tal Vermot, Witness No. 20 for the prosecution, Superintendent Yehuda Peretz, Witness No. 22 for the prosecution, Avi Ben Ami, Witness No. 24 for the prosecution, Shimon Lugasi, Witness No. 26 for the prosecution, Asaf Azulai, Witness No. 27 for the prosecution, Amir Sher; and see Exhibits P/1 through P/4 inclusive, P/21, P/21A, P/24 through P/37 inclusive, P/48, P/49, P/52 through P/79 inclusive), as the Defendant did not deny the actual making of the admissions before the persons taking his statements or before the Honorable Judge in arrest court, and as the Defendant even confessed again, fully and willingly, before the judge in arrest court, to all of the actions imputed to him, and understood what he was doing and making that confession, and as we have found that the internal

weight of his confessions is heavy, the weight required for the additional "item" which is needed in order to verify them is accordingly reduced.

And now, even with regard to the additional item (which, from the standpoint of its purpose, is only intended to show that the Defendant did not invent his statements out of thin air, and is accordingly not required to constitute corroborative evidence which embroils the Defendant, and may consist of confirmatory evidence only), we have found that it, too, has a real weight of its own and easily complies with the more stringent requirement, as it embroils the Defendant in the perpetration of the offenses imputed to him, comes from a separate and independent source, and refers to a real point which is in dispute.

**Offenses Against the Prevention of Terrorism Ordinance and Conspiracy**

In accordance with a pronouncement pursuant to Section 8 of the Prevention of Terrorism Ordinance, 5708 – 1948, it has been ruled that the Tanzim is a "terrorist organization," as this term is defined in Section 1 of the Ordinance (Compendium of Publications (5762 [2001-2002]), p. 800, dated December 6, 2001.

According to expert opinions which were filed with no objection by the Defendant and his defense attorney (P/50, P/51), the following (among other things) was stated: "From the beginning of the violent incidents in the 'territories,' which began in September 2000, the Tanzim played a major and leading role in the perpetration of terrorist acts. Activists in the organization carried out terrorist attacks in various formats, including acts of mass slaughter, within Israel and in Judea and Samaria... The terrorist organizations of the Tanzim in the Gaza Strip and in Judea and Samaria (which, at times, were joined by additional entities in the field) began (in November 2000) to use the name 'al-Aqsa Martyrs' Battalions' [*Kitaab Shuhadaa al-Aqsa*], especially for the purpose of taking responsibility for terrorist attacks against Israeli targets...

In the course of the violent confrontations, the 'Battalions' took responsibility for many terrorist attacks which were perpetrated in various formats in the 'territories' and within the confines of the 'Green Line,' including fatal terrorist attacks. The terrorist organizations of the 'Battalions' are responsible for thousands of shooting attacks and explosive charges on bypass roads in Judea and Samaria, and for scores of acts of mass slaughter within Israel, in which scores of Israelis were killed... The major characteristics of the acts of mass slaughter include the focus by the perpetrators on crowded places (downtown areas and public places which constitute a source of attraction for the general public, such as cafes and restaurants, bus stops, shopping centers and the like) and the performance of suicide bombings (by means of an explosive belt or an explosive charge carried by the perpetrators arriving on the scene) and sacrifice attacks (terrorist attacks in which the perpetrator's chances of escape are slim; in most of the terrorist attacks in this format, the perpetrators have used assault rifles of various types), in which scores of Israelis were killed..."

The Defendant said, in his statements, that: "After the outbreak of the al-Aqsa intifada, I started to carry out terrorist attacks against Israeli targets, because of the conquest of the Palestinian land... After that, I decided to perpetrate shooting attacks and additional terrorist attacks against Israeli targets in the West Bank and within the Green Line. The terrorist attacks which I perpetrated are as follows:

1. I carried out a shooting attack directed against a guard post of the Israeli army near Joseph's Tomb in Nablus, and that was about two weeks before the army withdrew from the tomb.

2. I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus...

3. I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4. I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata.

5. I gave hand grenades to two people in order to carry out a terrorist attack in Jerusalem.

6. I gave weapons for the perpetration of a terrorist attack in Netanya...

9. I gave weapons for the perpetration of a terrorist attack in Hadera.

10. I gave weapons for the perpetration of a shooting attack, a sacrifice attack which was supposed to be carried out in Hadera, but the attack did not succeed and the people were killed in the vicinity of Baqa al-Gharbiya.

11. I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem.

12. I supplied Abd al-Salaam Hasuna with weapons for the perpetration of a suicide attack within Hadera.

13. I supplied Abd al-Rahman Abdallah with two explosive charges + a Kalashnikov...

14. I supplied Majdi Halus with an explosive charge, which he placed on the road... against an Israeli patrol."

The Defendant answered the questions listed below in the following manner:

"Q. On whose behalf did you carry out the terrorist attacks which you noted above?

A. On behalf of *Kitaab Shuhadaa al-Aqsa*, which belongs to the Fatah.

Q. Who is in charge of the Fatah?

A. Yasser Arafat is in charge, and he is the chairman of the Fatah movement.

Q. Who is in charge of the Tanzim Fatah?

A. The secretary of the Fatah movement in the West Bank, Marwan Barghouti...

Q. Who do the *Kitaab Shuhadaa al-Aqsa* belong to?

A. The *Kitaab Shuhadaa al-Aqsa* belong to the Fatah and the Tanzim Fatah.

Q. What is your relationship with the secretary of the Fatah movement in the West Bank, Marwan Barghouti?

A. My relationship with Marwan Barghouti, the secretary of the Fatah movement, began in 1992, when we lived in the same neighborhood in Amman, when we were deported by the Israeli authorities, and Marwan came back to the West Bank in about 1994, and I came back in 1995. When I came back to the West Bank, my contacts with Marwan were renewed, and I used to meet with Marwan in the Tanzim office in Nablus. I would also meet with him in the office in Ramallah, and after the outbreak of the al-Aqsa intifada, I continued to be in contact with Marwan Barghouti. We used to organize demonstrations on behalf of the Tanzim Fath, and we used to distribute posters on behalf of the (Organizational) Coordination Committee [*al-Fasali*]. The people in charge of the Committee were Yusuf Harb on behalf of the Fatah and Jamal Salim on behalf of Hamas, and after he died, another person was given that position. The Chairman of the Committee was Yusuf Harb, and Marwan Barghouti was a member of the Supreme Coordination Committee, and the Supreme Committee used to guide the Organizational Coordination Committee [*al-Fasali*]...

Q. Who used to provide the money for the perpetration of terrorist attacks against Israeli targets?

A. People in the Tanzim Fatah, in the West Bank and in Lebanon, used to provide me with money.

Q. Who are the people who provided you with money for the purpose of purchasing weapons, in order to perpetrate terrorist attacks against Israeli targets?

A. I took 12,000 shekels from Majed al-Masri, and I took 8000 shekels from Assam Abu Bakr as expenses, and I received from Munir Maqadah in Lebanon, I received $50,000.

Q. What does Majed al-Masri do for a living?

A. [He is] an officer in the Palestinian police in Nablus and a member of the Fatah.

Q. What does Assam Abu Bakr do for a living?

A. [He is] in charge of the Fatah movement in Nablus and affiliated with Marwan Barghouti.

Q. What does Munir Maqadah do for a living?

A. [He is] in charge of the Fatah in Lebanon and affiliated with Yasser Arafat.

Q. Was there contact between you and Marwan Barghouti?

A. I was in contact with Marwan Barghouti all the time.

*Q. Did Marwan Barghouti know that you were carrying out terrorist attacks against Israeli targets?*

A. Yes, he knew, and my name was even published in the press and on television and on the radio. I used to talk with him from time to time, and when the political situation deteriorated and we were in a bad way, he would ask us to continue the terrorist attacks. When Shimon Peres and Omri Sharon met with leaders in the Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks, and I answered him that we would do that. During that period of time, Zini was in the area and Marwan told me that for the time being, because General Zini was meeting with leaders in the Authority, we should not carry out terrorist attacks in the name of *Kitaab Shuhadaa al-Aqsa*. I should note that, when the talks were progressing, no terrorist attacks were carried out.

Q. Who used to finance Assam Abu Bakr, the one who used to provide you with money for the purchase of weapons?

A. Assam Abu Bakr would take money from the Fatah movement, from the budget which was authorized by the Chairman of the Fatah movement, Yasir Arafat.

Q. Who used to finance Majed al-Masri, the one who used to provide you with money for the purchase of weapons in order to carry out terrorist attacks against Israeli targets?

A. Majed al-Masri told me that he took money from Marwan Barghouti, and Majed was aware of, and participated along with me in, a number of shooting attacks against Israeli targets...

Q. Did Marwan Barghouti provide you with money directly?

A. Yes, Marwan Barghouti finances [sic] me twice. The first time, he transferred NIS 3,000 to me by means of a deposit in the bank, and the second time, he transferred NIS 5,000 to me by means of a deposit.

Q. Did Marwan Barghouti know that you were carrying out terrorist attacks against Israeli targets?

A. Yes, he knew, and as I have already stated, my name was even published in the press, and the Israeli authorities told the Palestinian Authority that I was wanted for terrorist attacks, and my name was also published in the Hebrew press and in the local press in the West Bank and the Gaza Strip.

Q. Did Marwan Barghouti assist you in providing money, aside from what you have already stated?

A. Yes. Once I received a check for NIS 2,300 from him, authorized by Chairman Arafat..." (See the Defendant's statement, P/5)

In addition, he answered questions (P/6) in the following manner:

"Yes, I had several *noms de guerre* while I was carrying out the terrorist attacks, such as al-Aam, al-Hajj, al-Sheikh, al-Kabir... and also I took... two old [anti-]tank missiles in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata... I recruited him (the reference is to a person named Luay Odeh) into the *Kitaab Shuhadaa al-Aqsa*, about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attacks [*mustashahids*] into Jerusalem. I also asked Luay to teach us how to manufacture explosives that were stronger than the explosives we were using, and Luay explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already knew how to produce *umm al-abd*... About a month and a half ago, I asked Luay to check out a way of introducing a suicide bomber into Jerusalem... and my role was to coordinate between Mahmoud and Luay, in order to introduce the suicide attacker into Jerusalem. That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack... Jazi Husseini asked me to agree to accept a call from a certain person, and a few days after that, Munir Maqadah, who is known as Abu Hussein, called me and asked us to continue perpetrating terrorist attacks and offered me financing, and I expressed my consent, and I gave Abu Hussein my bank account number in the Arab Bank in Nablus, in order for him to transfer money to me. In fact, Abu Hussein transferred money to me about six times, and deposited $3,000 or $5,000...

Q. What did you do with the money that Munir Maqadah transferred to you?

A. In order to perpetrate terrorist attacks... According to the agreement with him, he used to provide me with money for the perpetration of terrorist attacks, and I would report to him on the attacks in conversations which I held with him by telephone and over the Internet... I spoke with him about many terrorist attacks... and I also reported to him on the suicide attack in Jerusalem and in Hadera, which we carried out...

Q. What military connections existed between you and Yasir Abu Bakr?

*A. After the outbreak of the al-Aqsa intifada, Yasir Abu Bakr enlisted in the Kitaab Shuhadaa al-Aqsa,* and I asked Yasir to participate in terrorist attacks with us, and Yasir agreed to the proposal. I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I gave him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir, the vehicle was not hit...

Q. Did Yasir have any contact with suicide bombers?

A. Yes, Yasir and I worked together to send out suicide attackers with Mahmoud Titi and Ahmad Abu Khadr... If we needed anything, such as photographing the suicide bombers or distributing posters, we would use Yasir. About two weeks before the army came into Nablus, I asked Yasir to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel. Yasir, in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed...

[Q.] What kind of vehicle did the suicide attackers travel in?

*A. I do not know, but I gave Ahmad NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers,* and Ahmad went with them to Tulkarm and showed them the way and came back by public transportation..."

*In his statement, P/7, he answered questions as follows:*

"...And Mahmoud contacted me about this, because we are a military squad, and I expressed my consent to that terrorist attack... It should be noted that Ahmad Abu Khadr contacted me, because I am in charge of *Kitaab Shuhadaa al-Aqsa...* and after I heard on the radio that they were killed, I called the media and I told them that this terrorist attack was carried out by *Kitaab Shuhadaa al-Aqsa...* but when I announced that we were taking responsibility for the terrorist attack, Mahmoud told me the names... I was also involved in the shooting attack in Netanya which was perpetrated by suicide attacks – I do not know their names. Two days before that terrorist attack, Ahmad Abu Khadr called me and told me that he could bring two people into Israel, in order for them to carry out a suicide action, and I called Mahmoud Titi and asked him if he could bring in suicide attackers and he answered in the affirmative. I gave Ahmad two grenades and Mahmoud Titi gave them two M-16 weapons, and Ahmad Abu Khadr photographed them and explained to them about the terrorist attack... Several hours later, we heard on television that fire had been exchanged between the suicide attackers and police forces near a hotel in Netanya, and that civilians and policemen had been wounded in the attack, and two people had been murdered, and two others had been killed by the police. I called the media and took responsibility for the terrorist attack..."

And in statement P/8:

"Q. Did you have contacts with Abd al-Karim Awis?

*A. Yes... and I made contact with him and asked him to carry out military operations...*

Q. What did Mahmoud do with the explosive charges which you gave him?

A. For terrorist attacks, and I do not remember where the attacks were carried out.

Q. Do you know a man named Majdi Samir Halus?

A. I know him... He asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received...

Q. Do you know a man named Hathem Abu Khadr?

*A. ... and I took about 20 pistols and 20 Kalashnikov rifles from Hathem, through Ahmad, and... an M-16, and I used* to pay for those weapons out of my own money..."

*In his confession before the judge in arrest court, and as may be seen from the offenses* imputed to him in the petition to extend the arrest order (P/23), the Defendant confessed to membership in a hostile organization, *Kitaab Shuhadaa al-Aqsa,* which

belongs to Tanzim Fatah; participation in shooting attacks directed against Israeli targets in Samaria; involvement in recruiting suicide bombers; and sending them into Israel – suicide bombers who perpetrated murderous terrorist attacks. He also confessed to recruiting additional activists for the perpetration of terrorist attacks and the manufacture of explosives and explosive charges.

A witness for the prosecution, Ahmad Abu Khadr, sets forth in his statement, P/12: "I confess that, during the month of April 2001, Nasser Awis proposed that I enlist in *Kitaab Shuhadaa al-Aqsa* and I agreed to that proposal, and since then, I have been an active member in the *Shuhadaa al-Aqsa* organization, which belongs to Tanzim Fatah, and [I am still a member] to this day. After I joined that organization, Nasser Awis asked me to distribute posters on behalf of *Shuhadaa al-Aqsa*, and I did it... and after that, I started to be involved in military activity. I participated in shooting attacks directed against the army, and I participated in laying explosive charges, and I also participated in preparing a number of suicide bombers and sending them to Israel to carry out suicide bombings... Nasser Awis is a resident of the Balata camp; he is about 29 years old and is also known as al-Hajj Rawaq, and he is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah... The members of the group which I joined in *Shuhadaa al-Aqsa* are 1. Nasser Awis – who was in charge of the *Kitaab Shuhadaa al-Aqsa*..."

In his statement, P/13, Abu Khadr states as follows: "I confess that, during the month of March, about a month ago, Nasser Awis asked me to transport a suicide bomber from Nablus... in a stolen Pontiac which I received from Nasser... I notified Amar that I do not know how to manufacture explosive charges, and therefore I took him to Nasser Awis in the Balata camp and I asked Nasser to get hold of two explosive charges for him, and then Nasser called Mahmoud Titi... About an hour later, Mahmoud Titi came and brought two explosive charges with him... and after that, Amar received the explosive charges and each of us went home, and three days later, I heard that Amar had carried out a terrorist attack on a military jeep... Because Saadi had contacted me several times, I notified Nasser Awis, who gave his approval for me to go on planning a suicide bombing for Saadi, and therefore I met with Saadi and asked him to carry out a combined attack... A week later, Saadi got back to me and told me that he agreed to my proposal, provided that he would be joined by two of his friends, Alaa and Mahmoud Hamuda. So I contacted Nasser and told him what Saadi had asked, and Nasser asked me to check whether the three of them were serious about their intention of carrying out a suicide attack... After I trained them in firing an M-16, I videotaped Alaa and Saadi in my house, with each one holding an M-16, and with a Palestinian flag and the flag of *Shuhadaa al-Aqsa* behind them, and Saadi read out the will that Nasser had sent... That same day, I reported to Nasser Awis that I had a suicide attacker with me, and Nasser asked to meet that terrorist. The next day, I took Majdi to a studio in Nablus to have his picture taken, and from there to Nasser Awis's house, and I left him there. Two days later, Nasser asked me to purchase a car with Israeli license plates, and I bought a stolen black Mitsubishi for NIS 3,500... I got the money for the car from Nasser Awis. After I bought the car, I went to Nasser's house with the car, and there I met Nasser and Majdi... I was surprised to find another person there, named Fathi Amiri... And then Nasser Awis told me that those two people, Majdi Hanfar and Fathi Amiri, were about to go out and perpetrate a suicide attack in Israel. At that point, Nasser gave Majdi an M-16 weapon, and he gave Fathi two hand grenades... About a year ago, Nasser Awis asked me to buy him two bags of chemical fertilizer for the purpose of preparing explosive charges... I bought them... and I gave them to Nasser Awis for the purpose of preparing explosive charges... About a year ago, I purchased two M-16 rifles... I got the money for those weapons from Nasser Awis...

Q. Where did you used to get the money for expenses for the military activity?

A. Nasser Awis was in charge of me on behalf of *Shuhadaa al-Aqsa*."

In his statement, P/18: "The plan for the perpetrators of the suicide attack inside the central bus station in Hadera was that Ziad and I... and Nasser Awis had the idea of sending one or two suicide bombers to carry out an integrated terrorist attack involving shooting followed by bombing, with an explosive charge that they would carry on their person. This would have a great effect and would cause mass casualties. Nasser Awis took it upon himself to recruit the suicide bomber, and I took it upon myself to find an Israeli who would help introduce the suicide bomber into Israel... In the end, we did not manage to carry out that terrorist attack... Ziad Asasa told me... that he had noticed a number of religious people concentrating in a synagogue [illegible, probably "between"] Baqa al-Gharbiya and Hadera, and he suggested that we should organize a suicide bombing there. I agreed, and I notified Nasser Awis, who was in charge of me, and he said 'OK, we'll take it into account,' but in the end, it did not work out.

In addition, Mahmoud Titi and [illegible, probably "Nasser"] Awis and I talked about the possibility of carrying out a terrorist attack on the main fuel station in Israel, by waiting for a fuel tanker to arrive to distribute fuel in Nablus and placing an explosive charge in the tanker without the driver noticing – an explosive charge connected to a mobile phone – and later, when the tanker re-entered the main station, the explosive charge would be set off by calling the mobile phone connected to it. This was only a plan; it was not carried out... I thought we would carry out a terrorist attack on the Ministry of Defense in Tel Aviv. I talked about it with Nasser Awis and Mahmoud Titi, and we decided to look for skilled activists who would carry out such a terrorist attack... I would bring the weapons from Nasser Awis every time anyone went out to perform a terrorist attack..."

And in statement P/20: ".. I am certain that Yasir (Abu Bakr) knew the rifles were intended for suicide attackers who were going out to perform terrorist attacks within Israel, because Yasir is the confidant of Nasser Awis, and that Yasir was the one who wrote the posters for Nasser Awis – the posters taking responsibility for terrorist attacks which were planned by Nasser Awis..."

The witness Muhammad Yadak states, in statement P/40A: "Mahmoud Titi contacted me and told me that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and Mahmoud said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed [illegible, probably "to this"] and, within the framework of the military squad, I participated in 10 shooting attacks directed against Saqen in the Nablus area. Participating in the shooting attacks along with me was... Nasser Awis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus...

Q. Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

A. Nasser Awis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons..."

And in statement P/40B: "In the beginning of October 2001, Mahmoud Titi and I met with Nasser Awis... and there Nasser offered to teach us how to prepare explosive charges for the purpose of carrying out terrorist attacks and supplying explosive charges to others in the Tanzim Fatah. After Mahmoud and I had consented to this, Nasser Awis came to us, to the apartment where Mahmoud Titi and I live, in Rafidiya, and Nasser Awis had explosives in his possession, in five bags, 10 kg in each bag. He also had about 10 gas cylinders of various sizes in his possession, as well as electric wires and batteries, and in the apartment, Nasser Awis taught us how to prepare an explosive charge and set it off. Nasser also taught us how to prepare explosives from the following materials: 1. Agricultural fertilizer containing potassium, 2. Sulfur, 3. Charcoal... Nasser Awis provides [sic] us with the materials required for preparation of the explosive charges... The apartment in Rafidiya served for the preparation of explosives and charges... We used to give the explosive charges which we prepared to people from Tanzim, for the purpose of carrying out military terrorist attacks against Israeli targets in the West Bank..."

In statement P/40C: "Q. In your first statement, you stated that Nasser Awis was the one who used to plan the perpetration of the terrorist attacks and that he was in charge of Tanzim Fatah in Nablus. Did you use to inform Nasser Awis of the perpetration of the terrorist attacks in which you participated, and of the terrorist attacks which were performed by others with whom you were in contact in Tanzim Fatah?

A. Yes, Mahmoud Titi and I would inform Nasser Awis of every terrorist attack we carried out, as well as other terrorist attacks which were carried out by other people with whom we were in contact...

Q. Were you in contact with Marwan Barghouti?

A. No, I had no contact with him. Nasser Awis had contact with Marwan Barghouti, and he would inform [him] of the terrorist attacks which were carried out against Israeli targets..."

And in statement P/40D: "About a month after the terrorist attack on the settlement of Gidonim, Kamal Abuar came to me and asked me for the M-16 rifle, which I had taken from the guard whom I murdered in Gidonim. I gave the weapon to Kamal Abuar to use in a terrorist attack, and he returned the weapon to me the next day and told me what he had done with the weapon. I would like to add that Nasser Awis took the M-16 weapon from me twice, in order for Tanzim activists to use it, and in September 2001, Nasser Awis took the weapon from me for the purpose of placing an explosive charge... and this was carried out by Abu Shahadi, an activist in Force 17... In October 2001, Nasser Awis took the weapon from me for a shooting [attack]... [on] a military position..."

Case 1:03-cv-04005-MDL-HK Document 431-9 Filed 04/15/2007 Page 24 of 30



The witness Ahmad Barghouti sets forth, in his statement P/43A: "Q. Why did you call Nasser Awis? A. Because he is in charge of *Shuhadaa al-Aqsa* and he does things like that. I asked Nasser Awis if he could help me by bringing me someone who wanted to carry out a terrorist attack, and I would send him to Jerusalem to carry out a terrorist attack there, and Nasser said he would send me someone...

In statement P/43C: "After I telephoned Nasser Awis and told him about the terrorist attack (this was the terrorist attack described in the first count of the indictment, which took place in the Seafood Market restaurant), because Nasser Awis is in charge of *Kitaab Shuhadaa al-Aqsa*... Q. Tell me where the money for the activity came from. A. I gave Nasser Awis my bank account number, and he deposited about 7,000 shekels in my account...

Q. Tell me about your contacts with Nasser Awis.

A. I had Nasser Awis's mobile phone number, and we would talk on the phone about the operations, and Marwan Barghouti knew about those contacts and that we used to talk. One day, Nasser told me that he would send Faiz to me, and that I should prepare him and send him out to carry out a suicide bombing... Then Ali told me that Marwan had told him not to give me money and weapons at that time. I told Nasser Awis that, and he said that that was all right, that we would go all in, and that he would bring the weapons and money. I remember that Nasser Awis told me that he had other people who wanted to carry out suicide bombings, and that he would send them to me..."

And in statement [P/]43D: "That night, when the terrorist attack took place at the event hall in Hadera... I called Nasser Awis, and he told me that he was in charge of that terrorist attack – that is, that *Kitaab Shuhadaa al-Aqsa* had carried out that attack. I agreed with Nasser Awis that, the next day, he would give me a poster stating that he was taking responsibility for the terrorist attack. The next day, Nasser sent me the poster by fax and I photocopied it 1,000 times and distributed it in Ramallah..."

In statement P/43E: "I, Ahmad Barghouti, use the *nom de guerre* of France, and I was responsible for *Kitaab Shuhadaa al-Aqsa*, together with Nasser Awis..."

The witness Yasir Abu Bakr stated, in his statement P/47A: "Nasser Awis is in charge of *Kitaab Shuhadaa al-Aqsa*, and he is wanted in Israel. In September 2001, Nasser Awis called me and asked me to prepare a poster for him, for the first anniversary of the al-Aqsa intifada... I prepared such a poster and I gave it to Nasser, at his house in Balata. In addition, after the death of Raad al-Karami, Nasser Awis used to call me after terrorist attacks and asked me to write posters, in which *Kitaab Shuhadaa al-Aqsa* took responsibility for the terrorist attacks, and I agreed... After a terrorist attack took place, Nasser Awis would call me and tell me where the attack was and who the fellow who carried out the suicide bombing was, and I would prepare the posters and would write that *Kitaab Shuhadaa al-Aqsa* took responsibility for the terrorist attack. After that, I would transfer the poster to Nasser Awis, and he would send it out to journalists by fax. Q. You told me before that Nasser Awis was in charge of *Kitaab Shuhadaa al-Aqsa* in Balata and was wanted in Israel. Can you tell me about Nasser Awis's fellow members of the terrorist squad? A. They are a squad of *Kitaab Shuhadaa al-Aqsa*, and Nasser Awis was in charge of the squad."

And in P/47B: "About three weeks ago, Nasser Awis called me and asked me to get him two explosive belts urgently, for a suicide bombing. Nasser Awis told me to bring explosive belts from another person, and not from Mahmoud Titi, because the explosions produced by explosive belts that Mahmoud Titi prepared were too weak. They had tried out such an explosive belt, and the explosion was weak... I contacted Khaled al-Asmar, because he has a friend who knows how to manufacture explosive belts... Two days later, Khaled al-Asmar told me that Rabia Abu Rub had prepared one explosive belt for us... and I transferred it to Ahmad Abu Khadr..."

In P/47C: "In the beginning of 2001, I was in Nasser Awis's home in the Balata refugee camp, and there, Nasser Awis proposed that I enlist in the al-Aqsa Martyrs' Battalions for military activity, and I agreed. Q. Did Nasser Awis tell you [plural] what military activity you were supposed to carry out? A. Yes, he said that we would be carrying out terrorist attacks against Israeli targets, and then he proposed that we carry out a terrorist attack involving an explosive charge and shooting, against a military vehicle..."

In P/47D: "About a month and a half ago, I called the mobile phone of Nasser Awis, who is in charge of the Tanzim – *Kitaab Shuhadaa al-Aqsa* in Nablus… and I suggested to Nasser that Tel Hashomer Hospital in Israel was a good place for a terrorist attack. I had heard that there were Israeli soldiers in Tel Hashomer Hospital, and therefore I suggested carrying out a terrorist attack there. Nasser told me to forget about that for the time being, and asked me to talk about it with Ahmad Abu Khadr, a man in his twenties, a senior activist in the Tanzim, Nasser Awis's assistant… About two months ago, in the evening, Nasser Awis contacted me – I told you about him – and asked me to contact GAP [sic] activists and check with them about helping to carry out military activity and terrorist attacks. I told Nasser that I knew a GAP [sic] activist… Nasser told me to go to him. I met with… and I told him that I worked with Nasser Awis…"

And in statement P/47E: "…Jalil told me that he had a man who was willing to carry out a suicide attack. So after a few minutes, I called Nasser Awis and told him that there was a suicide attacker who was willing to carry out a suicide attack, and Nasser Awis instructed me that the man should go to Ramallah… After about a week, or five days, I heard on the news that a suicide attacker named Rami Nur, from Nablus, had perpetrated a shooting attack in the area of [illegible]… in Jerusalem, and two Jews had been killed in that terrorist attack and others had been wounded, and Rami Nur had been wounded and was in severe condition, because he had been shot by the soldiers. After the news, on the day of the terrorist attack, Nasser Awis called me and told me that the perpetrator was Rami Nur, an activist in the Tanzim, and instructed me to prepare a poster on behalf of *Kitaab Shuhadaa al-Aqsa, stating that the organization was taking responsibility...*"

Pursuant to Section 1 of the Prevention of Terror Ordinance, 5708 – 1948, a "Terrorist Organization" is an assemblage of persons which, in its operations, makes use of acts of violence which are likely to cause the death or injury of a human being, or threaten such acts of violence" A "Member of a Terrorist Organization" is a person who belongs to that organization, including a person who participates in its operations, who publishes propaganda on behalf of a Terrorist Organization or of its operations."

Pursuant to Section 2 of the above mentioned Ordinance, a person holding, *inter alia*, a position involved in management or instruction in a Terrorist Organization, or involved in the deliberations or the decision making of a Terrorist Organization, is considered to be an activist in such an organization.

The citations appearing above are only one example of the broad and detailed web spread out for us, on the basis of the statements made by the Defendant and his accomplices, on which we relied – a web of facts which properly substantiates the legal conclusion that the foundations for the offenses against Sections 2 and 3 of the Ordinance have been properly made, as well as the conclusion that the organizations to which the Defendant and his accomplices belonged are Terrorist Organizations.

In addition to offenses against the [Prevention of] Terrorism Ordinance, which the State imputes to the Defendant in all of the charges set forth in the indictment, it also imputes to him, in all of the charges, offenses against Section 499 of the Penal Code, 5737 – 1977.

The offense of conspiracy basically consists of an agreement between two or more persons to carry out an illegal act. The engagement must be for the purpose of achieving a common goal, and the engagement must be accompanied by the intention of realizing the common goal. The goal intended, as set forth above, is a goal defined by law as illicit.

The web of facts mentioned above also properly substantiates the conclusion that the Defendant committed the offenses against Section 499 of the Penal Code, 5737 – 1977.

The Defendant's confession with regard to his position, status and activity within the organization to which he belonged – activity which was intended to carry out terrorist operations, which even had murderous and damaging results, as shall be set forth below – is fully supported by an additional, substantial item derived from separate and independent sources: the assertions by each of the accomplices, which – each in its own way – embroil the Defendant in the offenses imputed to him, and which relate to a real point which is in dispute. The supplementary evidence which reinforces the testimony by the accomplices has already been discussed above.

The State has proven the actions which are imputed to the Defendant.

**Count No. 1:**

*On March 5, 2002, the terrorist Ibrahim Hasuna (hereinafter: "Hasuna") came to the Seafood Market restaurant in Tel Aviv,* armed with an M-16 rifle, hand grenades, and a knife, with the intention of carrying out a murderous terrorist attack.

When Hasuna arrived on the scene, the restaurant was full of scores of people. Hasuna started firing at the people in the restaurant from the Maariv House Bridge, threw the hand grenades – which miraculously did not explode – into the restaurant, and immediately thereafter, entered the restaurant and stabbed people sitting inside, which was intended to intentionally cause the death of many persons who were in the restaurant at the time.

In that incident, Sergeant Major Salim Barikat of blessed memory, age 33, who was one of the first policemen to reach the scene of the attack and tackled Hasuna with the intention of arresting him, Yosef Habi of blessed memory, age 52, and Eliyahu Dahan of blessed memory, age 53, were stabbed to death by Hasuna's knife. Scores of other persons were wounded, some of them seriously. After the security forces arrived on the scene of the terrorist attack, Hasuna was shot to death. (See testimony: Witness No. 3 for the prosecution, Commander Haggai Dotan, Witness No. 4 for the prosecution, Brigadier General Uri Barlev (presentation P/4); Witness No. 8 for the prosecution, Uriel Eliyahu, Witness No. 9 for the prosecution, Staff Sergeant Shai Cohen, Witness No. 11 for the prosecution, Leon Gorenstein, Witness No. 13 for the prosecution, Adi Maoz, Witness No. 17 for the prosecution, Efi Yamin; P/32 (activity reports on the preservation of the scene of the crime and the seizure of exhibits); *P/33* (an M-16 rifle); *P/34* (a bloody knife); *P/35* (a board of photographs); *P/24* (an activity report); *P/25* (an activity report); P/52 through P/57 (expert opinions).

*According to an argument that was set forth by the State, the Defendant – who, as set forth above,* was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with other activists in the organization, including Mahmoud Titi and Ahmad Barghouti (Witness No. 23 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, Hasuna was recruited, supplied with equipment and transported to Tel Aviv, to the site of the restaurant. Among other things, the Defendant instructed Mahmoud Titi to film Hasuna before he set out to perpetrate the terrorist attack, as a suicide attack, so that afterward it would be possible to send the [video] cassette, with Hasuna on film, to various television stations. In fact, after the terrorist attack on the restaurant, the Defendant did call the various television stations and other media and informed them that the Terrorist Organization was responsible for the terrorist attack and had even carried it out.

The admission by the Defendant is as follows:

"Q. Did you have any involvement with suicide attacks in Tel Aviv?

A. Yes, Mahmoud Titi told me, early in March 2002, when he came to my home in the Balata camp, that Ahmad Barghouti was asking me to provide a person who would carry out a suicide attack (*istishhad*) in Tel Aviv, and informed me that he was about to contact a person named Ibrahim Hasuna, originally from Gaza, who was serving in the naval force [sic] in Nablus, and Mahmoud gave Ibrahim an M-16 weapon and hand grenades. Mahmoud contacted me in that matter because we are a military squad, and I expressed my consent for that terrorist attack. He sent Ibrahim to Ramallah by public transportation, and we agreed with Ahmad Barghouti that he would meet Ibrahim Hasuna in Ramallah. It was further agreed that Mahmoud would film Ibrahim before the terrorist attack was carried out, and that afterward, we would send the [video] cassette to the television stations. In fact, after that, Ibrahim came to Ramallah, and as far as I know, Ahmad brought him into Israel and Ibrahim came to Tel Aviv, and I saw on the news that he had fired at the Israelis in the restaurant and had been killed. Then I called the television stations, and I called [sic] and told them that the terrorist attack had been carried out by *Kitaab Shuhadaa al-Aqsa*.

Q. As far as you know, how many people were killed in the terrorist attack in Tel Aviv?

A. As far as I know, two or three people were killed and more than 20 people were wounded.

Q. Which television stations did you call to tell them that the terrorist attack had been carried out by [your organization]?

A. Al-Jazeera, Abu Dhabi, Israel, al-Manar, and the local press.

Q. Do you have anything to add about the terrorist attack in Tel Aviv?

A. No, but at about that time, Ahmad Abu Khadr from *Kitaab Shuhadaa al-Aqsa* contacted me and said that there were two people who wanted to carry out a terrorist attack in Israel, and I agreed to that. I informed Ahmad Barghouti of the matter and asked him if he would be able to bring them in, and it was agreed with Ahmad Abu Khadr that Alaa Abu Mustafa and Ayman Badr would take the two *mustashhids* to Ramallah. After that, I called Ahmad Barghouti and told him that the people were on their way to him. I should note that Ahmad Abu Khadr contacted me because I am responsible for *Kitaab Shuhadaa al-Aqsa*."

(See P/7)

The "additional item" is as follows:

The witness Ahmad Barghouti [stated as follows]:

"..Nasser Awis called me and told me that he had another fellow who wanted to carry out a suicide attack, that he was sending him to me, and I said OK. After that, a fellow called me and told me that he was coming to me on behalf of Nasser Awis. I sent al-Nuf to bring him, and I gave al-Nuf NIS 1000 and I told al-Nuf to buy the fellow new clothes and to take him to have a haircut. I also told al-Nuf that, after that, he should bring the man to the rented apartment in Ramallah near the Arab Bank, where Rami Nur had been before that. After that, when I arrived at the rented apartment, I saw the fellow, who told me that his name was Ibrahim Hasuna, that he was 21 years old, and he said he came from Gaza. After that, I told al-Nuf that he should take Ibrahim Hasuna to Israel, so that he could carry out a terrorist attack there, and I told al-Nuf that I would also bring him a weapon, for him to carry out a terrorist attack. After that, al-Nuf bought an M-16 rifle and gave it to Ibrahim Hasuna, and after that, al-Nuf took Ibrahi Hasuna to the Amari refugee camp, to Haloum Abu Hamid, and they stayed there three days. After the three days, al-Nuf called me and told me that he was going out, and after that, I heard that this Ibrahim Hasuna had carried out a terrorist attack in Tel Aviv, in a restaurant, and that he had gone there with Murad Ajluni and Mazen al-Qadi, who had been caught... and after several days, Mahmoud Titi, who is an activist in *Shuhadaa al-Aqsa* and works with Nasser Awis, called me... and Mahmoud told me that he had someone who wanted to carry out a suicide attack, and that he would send him to me, to Ramallah, and I said OK..." (See P/43A).

The witness Ahmad Barghouti, in P/43C: "Q. Tell me about your activity with regard to the terrorist attack in Tel Aviv at the Seafood [Market] restaurant.

A. The one who carried out that terrorist attack was Ibrahim Hasuna, who came from the Nablus area, from Nasser Awis... After that, I called Marwan Barghouti on his mobile phone – I was in contact with him at the time – and I would tell [sic] him that the terrorist attack had gone out for execution. Marwan Barghouti told me that he did not want the terrorist attack to take place inside Israel, and I told him that it would be all right. After that – this was about 3:00 a.m. – Ali Tareq al-Nuf called me and told me that the terrorist attack had been carried out, and he told me to watch it on television. At that point, I called Marwan Barghouti and I told him that the terrorist attack had been carried out, and that he should watch it on television, and Marwan told me that he was watching it on television. Marwan did not say anything to me about having heard that the terrorist attack had been carried out within Israel, and not in the West Bank, as he said it should be. After that, I called Nasser Awis and I told him about the terrorist attack, because Nasser Awis is responsible for *Kitaab Shuhadaa al-Aqsa*."

**Count No. 2:**

On January 17, 2002, the terrorist Abd al-Salaam Hasuna (hereinafter: "Abd al-Salaam") came to the Armon David event hall in Hadera, armed with an M-16 rifle and hand grenades and wearing a vest with ammunition clips, with the intention of carrying out a murderous terrorist attack.

The Bat Mitzvah celebration of a young girl, Nina Kardashov, was taking place in the hall at the time, with dozens of guests. Abd al-Salaam burst into the hall, shooting in all directions, and, before being overcome by some of the guests, succeeded in intentionally causing the death of six of the guests: Anatoly Bakshayev of blessed memory, age 63, Edward Bakshayev of blessed memory, age 48, Boris Malikhov of blessed memory, age 56, Dina Binayev of blessed memory, age 48, Alice Ben Israel (Aharon) of blessed memory, age 32, Avi Yazdi of blessed memory, age 25, and wounding scores of other persons, some of them seriously (see the testimony by Witness No. 1 for the prosecution, Brigadier General Moshe Waldman, Witness No. 24 for the prosecution, Shimon Lugasi, Witness No. 12 for the prosecution, Konstantin Kardashoff, Witness No. 20 for the prosecution, Superintendent Yehuda Peretz, P/1 (presentation), P/27 (medical documents), P/36 (M-16 rifle), P/44 (cassettes), P/58 (expert opinion), P/59 (death certificate of Anatoly Bakshayev of blessed memory), P/60 (death certificate of Avi Yazdi of blessed memory), P/61 (death certificate of Boris Malkihov of blessed memory), P/62 (death certificate of Dina Binayev of blessed memory), P/63 through P/66 (expert opinions).

According to an argument that was set forth by the State, the Defendant – as set forth above, was one of the senior commanders of the Terrorist Organization – conspired with Ahmad Abu Khadr (Witness No. 6 for the prosecution) and additional activists to perpetrate a terrorist attack, which was intended to deliberately cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, Abd al-Salaam was recruited, trained in firing an M-16 rifle, supplied with weaponry and ammunition for the purpose of the training and the perpetration of the deed, and transported to the site of the terrorist attack in Hadera. Prior to the terrorist attack, Abd al-Salaam was photographed on the instructions of the Defendant, reading a will which had been written for him by the Defendant and holding an M-16 rifle which belonged to the Defendant in his hand, so that afterward it would be possible to send the photographs to the media. In fact, after the terrorist attack, the Defendant did instruct Yasir Abu Bakr (Witness No. 25 for the prosecution) to prepare posters which were distributed, and which stated that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

"12. I supplied Abd al-Salaam Hasuna with weapons for carrying out the suicide attack in Hadera."

P/6:

"A. I spoke with him about many terrorist attacks, and I remember that I spoke with him about a shooting attack which I had carried out along with Muayad Jamil and Mahmoud Titi and Baid Abu Mustafa near the Hawara refugee camp, directed against a military vehicle. I also spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in those terrorist attacks along with Muayad Jamil and Muhammad Yadak and Mahmoud Titi and Ahmad Abu Khadr, and I reported to him about the suicide attack in Jerusalem and in Hadera, which we had performed.

Q. Which suicide attack in Hadera?

A. The one carried out by Abd al-Salaam Hasuna."

"[Q.] Can you explain how the terrorist attack was carried out in Hadera and Jerusalem?

A. Yes. Abd al-Salaam Hasuna, a resident of Beit Amrin, contacted Ahmad Abu Khadr (Witness No. 6 for the Prosecution) and told me [sic] that he wanted to commit suicide [*al-laset shahad*] and Ahmad contacted me and told me. And after Raad al-Karami died, we decided to carry out a terrorist attack, and Ahmad photographed Abd al-Salaam Hasuna in the Balata refugee camp, and I gave him weapons: an M-16 and a hand grenade, and we gave Abd al-Salaam NIS 400. He went to Tulkarm by public transportation, where he met with Mahmoud Titi in the home of Mansour Sharim, a resident of Tulkarm. From there, according to the [plan for the] terrorist attack, Mahmoud was responsible for sending him to Hadera, and the terrorist attack was carried out in the hall, and as far as I know, a few people were killed in that attack."

The "additional item" is as follows:

The witness Ahmad Abu Khadr, P/17, p. 3:

"I also confess that I was the one who photographed Abd al-Salaam Hasuna of Beit Amrin before he set out to carry out the suicide attack in Hadera, about six months ago."

P/18, p. 14: "To tell the truth, I was the one who recruited Abd al-Salaam Hasuna, a resident of Beit Amrun [sic]. Abd al-Salaam is a friend of mine and we worked together in Nablus in the National Security. Abd al-Salaam asked me, about six months ago, to arrange for him to carry out a suicide attack... After Abd al-Salaam asked me to arrange for him to perpetrate a suicide attack in Israel, I contacted Nasser Awis and told him about Abd al-Salaam... and then we decided to send him out for a suicide attack in revenge for the death of Raad al-Karami. Nasser asked me to train him in the use of weapons, so that he would be prepared to carry out the terrorist attack successfully. That is what I did: I trained him to use an M-16 rifle... I took the weapon and eight clips of bullets from Nasser Awis. The day after that, I brought Abd al-Salaam to Nasser Awis's house in the Balata refugee camp, and, in Nasser Awis's house and in his presence, I filmed Abd al-Salaam, reading the will written by Nasser and holding an M-16 weapon belonging to Nasser, and making the hand gesture of the *shahadaa*. We filmed him with a video camera and photographed him with an ordinary camera. Nasser took the cassette and the pictures. We gave Abd al-Salaam an M-16 rifle and six clips of bullets and two hand grenades, which Nasser had brought. After the photography session, at about 8:00 p.m., I went out to look for a taxi, and I found Ayman, a taxi driver who lives in Balata, about 26 years old, and I asked him to help us transfer a fellow to Tulkarm, without telling him that he was a suicide attacker. He agreed to do that, and took Abd al-Salaam to Tulkarm. He took the M-16 rifle, the clips of bullets and the hand grenades in a bag, after having disassembled the M-16 into two pieces. When Abd al-Salaam had gone to Tulkarm in Ayman's taxi, Masr called Mahmoud Titi and informed him that the man was on his way to him. I should note that Nasser had spoken with Mahmoud Titi before that and had told him to prepare himself to meet Abd al-Salaam, in order to help him enter Israel. I knew that from Nasser. I was not involved in the conversations between them. I was later told that Mahmoud Titi had received Abd al-Salaam in Tulkarm, and that, when [Abd al-Salaam] reached Hadera, he perpetrated a terrorist attack in an event hall, and that he was killed, and that he killed a few Israelis, I think six in all..."

Ahmad Barghouti, P/43D:

"The night of the terrorist attack in the event hall in Hadera, I was with Marwan Barghouti, Karim Awis and 'Abu Rabia' in the Orthodox restaurant in Ramallah. Suddenly, they announced on television that the terrorist attack had taken place in the event hall in Hadera. I called Nasser Awis and he told me that he was responsible for that terrorist attack – that is, that members of the *Shuhadaa al-Aqsa* Battalions had carried out that terrorist attack. I agreed with Nasser Awis that, the next day, he would give me a poster stating that he was taking responsibility for the terrorist attack. The next day, Nasser sent me the poster by fax and I photocopied it 1,000 times and distributed it in Ramallah."

**<u>Count No. 3</u>:**

On January 22, 2002, the terrorist Said Ramadan came to the corner of Jaffa Road and Lunz Street in downtown Jerusalem, armed with an M-16 rifle and two clips of bullets, with the intention of perpetrating a murderous terrorist attack. Ramadan shot at civilians who were passing there at the time, and intentionally caused the death of Sarah Hamburger of blessed memory, age 79, and Ora (Svetlana) Sandler of blessed memory, age 56, who were innocently walking down the street, and wounded scores of other persons, some of them seriously. Ramadan was shot to death by policemen who reached the scene. (See the testimony by Witness No. 22 for the prosecution, Avi Ben Ami, Witness No. 26 for the prosecution, Asaf Azulai, Witness No. 3 for the prosecution, Commander Haggai Dotan, Witness No. 14 for the prosecution, Ben Naim Hanan, Witness No. 15 for the prosecution, Noam Gabbai, P/30 (presentation), P/48 (M-16), P/48A (report on the seizure of exhibits), P/77 (photographs from the scene of the incident), P/78 (death certificate of Sarah Hamburger of blessed memory), P/79 (death certificate of Ora Sandler of blessed memory).

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Mahmoud Titi and other activists, for the purpose of *perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. In order to promote* and implement the conspiracy, which was headed by the Defendant, Ramadan was recruited, supplied with equipment, photographed as a suicide attacker – all according to the pattern typical of the Organization, as described in the previous counts – and transported to the scene of a terrorist attack. Following the terrorist attack, the terrorist's photograph was distributed to the media.

The admission by the Defendant is as follows:

P/5:

"11. I supplied Said Ramadan with weapons for carrying out the suicide attack in Jerusalem."

P/6:

"Q. Which terrorist attack in Jerusalem?

A. The terrorist attack carried out by Said Ramadan in September 2001."

"... And the terrorist attack in Jerusalem was carried out in such a way that Said Ramadan contacted Mahmoud Titi and said that he had been a friend of Raad Karami and that he wanted to avenge his killing, and Mahmoud told me. I then met with Said and I understood that he wanted to carry out the terrorist attack, and I called Ahmad Barghouti in Ramallah and I asked him to take him to Jerusalem, and Ahmad agreed. Said went to Ramallah by public transportation, where he met with Ahmad Barghouti. The next day, Said went to Jerusalem and shot at a group of policemen and civilians, and in that terrorist attack, two people were killed, and so was Said."

The "additional item" is as follows:

Ahmad Barghouti, P/43A:

"I asked Nasser Awis if he could help me by bringing me someone who wanted to carry out a terrorist attack, and I would send him to Jerusalem to carry out the attack there. Nasser told me that he would send me someone, and after some time, Said Ramadan, from the village of Tel Shekhem, about 25 years old, came to me and said that he would carry out the terrorist attack. I met him next to the movie theater in Ramallah and I called Muhammad Abu Satkha and told him to come too, and from there, we went to the barber shop where Said got a haircut. Then we called Fares Hatawi and asked him if he could bring the man into Jerusalem, because he wanted to carry out a suicide attack, and Fares said that he could do it, and then Fares went out in his car to look at the road and see what was happening. Meanwhile, Ahmad Abu Satra [sic] and I took Said to [illegible, probably "pray"] and eat, and I bought him new clothes and shoes with my own money, for NIS 1,200. After that, I told Muhammad Abu Satra [sic] to bring an M-16 rifle and three clips of bullets and give them to Said, and he did. Then Fares Hatawi and Muhammad Sami arrived in an Isuzu which belonged to Fares, and it was in the afternoon when they went with Said to Jerusalem. We wished them success and they drove off with Said. I did not tell them where to go; they could take him wherever they wanted to.

Q.-A. We did not film Said on video before the terrorist attack, because Nasser Awis had already done so.

Q. At the beginning of your testimony, you told me that you do not know Fares Hatawi, Muhammad Sami, and all the rest, and now I see that you did meet them. How is that?

A. I met them in Raad Karami's mourning tent, and that was when I saw them. At about 4:30 p.m., I heard on the news that there had been a shooting attack in Jaffa Road in Jerusalem, and I knew that was Said's terrorist attack. So I called Fares Hatawi and asked him if they had been the ones... who had taken Said to Jaffa Road, and Fares said that they had dropped him off in Jaffa Road, and that they had heard the shots he fired after he got out of the car. The next day, I took $1,000 from Ali Fares Barghouti and I told him that the people had gone out to perpetrate a terrorist attack, and that the weapons had been lost in the terrorist attack. I gave Fares Hatawi and Muhammad Abu Satria [sic] and Muhammad Sami each $100 for that terrorist attack. After that, Fares Hatawi, Muhammad Sami, al-Nuf, and another man named Husam Shehadeh from Qatanduha came to me and asked me why I had not paid them for the terrorist attacks that they carried out, and I said that I would look into it."

**Count No. 4:**

On March 9, 2002, the terrorists Shahadi al-Najmi and Said Bata arrived in the area of the Jeremy Hotel on Gad Machnes Street in Netanya, armed with M-16 rifles and fragmentation grenades. The two fired bursts into the lobby of the hotel and threw two fragmentation grenades. The two succeeded in intentionally causing the death of a one year old baby, Avia Malka of blessed memory. As the security forces were overcoming the two, Yihya Israel of blessed memory, age 29, who happened to be nearby, was also shot. As a result of the act committed by the two, scores of additional persons were wounded, some of them seriously. (See the testimony by Witness No. 2 for the prosecution, Brigadier General Aharon Franco, Witness No. 10 for the prosecution, G.M., Witness No. 16 for the prosecution, Sergeant Major Malka, P/28 (report), P/26 (medical documents of Witness No. 11 for the prosecution), P/29-P/30 (assault rifles), P/31 (photographs), P/67 (expert opinion), P/68 (death certificate of Avia Malka of blessed memory), P/69-P/71 (expert opinions).

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Mahmoud Titi and Khadr (Witness No. 6 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], Shahadi and Said were recruited, equipped with an M-16 rifle, 10 clips of bullets and two hand grenades, photographed reading their wills and holding an M-16 rifle, and transported to the scene of a terrorist attack. After the terrorist attack and in accordance with the typical pattern, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

"6. I delivered weapons for the perpetration of a terrorist attack in Netanya."

P/7:

"Q. Did you have any involvement with a shooting attack in Netanya?

A. Yes, I was involved with a shooting attack in Netanya, which was carried out by terrorists whose names I do not know. About two days before that terrorist attack, Ahmad Abu Khadr called me and told me that he would be able to bring two people into Israel, in order for them to carry out a suicide attack, and I contacted Mahmoud Titi and asked him if he could bring in suicide attackers, and he answered in the affirmative. Then I gave Ahmad two grenades and Mahmoud Titi gave them two M-16 weapons, and Ahmad Abu Khadr photographed them and explained to them about the terrorist attack. Then Ahmad Abu Khadr went with them as far as Baqa al-Sharqiya and left them, and they walked along a dirt road into Israel and went from there to Netanya, and Ahmad went back to Nablus. After a few hours, we heard on television that there had been an exchange of fire between the suicide attackers and police forces near a hotel in Netanya, and that civilians and policemen had been wounded in the terrorist attack, and that two people had been murdered and two others had been killed by the police. I called the media and took responsibility for the attack.

Q. Do you have anything to add about the terrorist attack in Netanya?

A. No."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), in P/13:

"I confess that, about a month ago, Nasser Awis told me that he intended to send two suicide attackers to the city of Netanya, in order to carry out a suicide attack, and asked me to help transport the suicide attackers from Nablus to Kafr Rai, and of course, I agreed.

Q. Who are those two suicide attackers?

A. The first suicide attacker is Shadi [sic] al-Najmi, a resident of the Ein Beit Alma camp, and the second one's name is Said Bata, a resident of the Ashar camp… and both of them were wounded in a terrorist attack. That day, Nasser Awis told me that Shadi Najmi [sic] had worked in Netanya and was familiar with the area. Q. [A.] Nasser Awis told me that Mukadi Mukaher, a resident of al-Ain, 28 years old and married, was working for the naval police [sic] in Nablus, and that he was an activist in *Kitaab Shuhadaa al-Aqsa*. Mukadi is Nasser's and my accomplice in planning and sending the suicide attackers to Netanya, and Nasser asked me to take the two suicide attackers in the stolen Pontiac with Israeli license plates from Nablus to Kafr Rai, and I agree. On the day of the terrorist attack, I went out at about 3:00 p.m., in a taxi, to the area of Jabal Shamali in Nablus, and there, Mukadi Mukaher and the two suicide attackers were waiting for me in the Pontiac. Shadi was wearing blue jeans and a black shirt, and Said was wearing green pants. There, Mukadi said goodbye to them and I took them to Kafr Rai in the Pontiac. Q. What weapons did the suicide attackers have? A. Each one of them had an M-16 rifle. I saw Shadi holding a black plastic bag with an explosive charge in it, and after we got to Kafr Rai, I called Nasser Awis and told him that we had arrived. Nasser asked to speak to Shadi, and I heard Shadi telling Nasser that he knew the way from there. Then Shadi gave the mobile phone to me, and Nasser instructed me to go back to Nablus in the taxi, and that is what I did. When I got back to Nablus, I heard on the news about the terrorist attack in Netanya, in which the two suicide attackers had been killed, and I remember they talked about a terrorist attack in a hotel in Netanya."

P/18:

"Q. In the second testimony which you gave, you talked about a suicide attack in Netanya, which took place a month before you gave the testimony, and you claimed that your job was to take the two suicide attackers from Nablus to Kafr Rai. Exactly where did you take them from, and do you know whether they were photographed before they went out to perpetrate the terrorist attack?

A. In addition to taking the two suicide attackers, Shadi and Said, I confess that, the day before the terrorist attack, Nasser Awis asked me to come to the town square in Nablus and pick up Shadi and Said, and then to come to his home in the refugee camp, so that he could give me a will which he had prepared for the two suicide attackers. He also asked me to take the two suicide attackers home, photograph them, and wait for instructions.

That is what I did: I picked them up, took the will from Nasser along with a video camera, and when I got home, I filmed the two of them, each holding an M-16 in their hands, with Shadi reading the will.

Q. From whom did they get the weapons?

A. I took the will and the camera from Nasser. He gave me two M-16 weapons and 12 clips full of bullets and a hand grenade, and I gave them to them."

***Count No. 5:***

On March 30, 2002, the terrorists Majdi Hanfar and Fathi Amiri (hereinafter: "Majdi and Fathi") were on their way to carry out a terrorist attack in Israel, armed with an M-16 rifle, hand grenades and an explosive charge. Majdi and Fathi ran into a force of Border Patrol police near Baqa al-Gharbiya, fired on the policeman and threw a fragmentation grenade.

The two succeeded in intentionally causing the death of a Border Patrol policeman, Master Sergeant Konstantin Danilov, and in wounding another policeman, Senior Master Sergeant Amal Ibrahim. (See the testimony by Witness No. 27 for the prosecution, Amir Sher, Witness No. 18 for the prosecution, Chief Superintendent Farid Ghanam, Witness No. 19 for the prosecution, Tal Vermot, P/49 (report on the seizure of exhibits), P/72-P/73 (expert opinions), P/74-P/75 (photographs), P/76 (expert opinion).)

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Titi and Khadr (Witness No. 6 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], Majdi and Fathi were recruited, equipped with an M-16 rifle, hand grenades and an explosive belt. The Defendant also gave instructions to arrange for the arrival of the two in Israel, transferred an amount of money totaling NIS 3500 which was intended for the purchase of a stolen car to be used for transporting them, and instructed Khadr to accompany them part of the way. After the terrorist attack, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

"10. I delivered weapons for the execution of a shooting attack, a sacrifice attack (note by the interrogator: a suicide attack), which was supposed to be carried out in Hadera, but the terrorist attack did not succeed and people were killed in the vicinity of Baqa al-Gharbiya."

P/6:

"Q. Yes, Yasir and I worked together, to send out suicide attackers with Mahmoud Titi and Ahmad abu Khadr from Silat al-Dhaher, and if we needed anything, such as photographing the suicide attackers or distributing posters, we would use Yasir. About two weeks before the army came into Nablus, I asked Yasir to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel. Yasir, in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed, and during these exchanges of fire, a Border Patrol policeman was killed in Baqa.

Q. Where was the terrorist attack that you are talking about supposed to have been carried out?

A. In Hadera, and we did not define a target, and according to the plan, one of the suicide attackers was supposed to shoot and the other was supposed to blow himself up...

Q. What kind of vehicle did the suicide attackers travel in?

A. I do not know, but I gave Ahmad NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers, and Ahmad went with them to Tulkarm and showed them the way and came back by public transportation."

P/7:

"After the four of them were arrested on their way to Ramallah, Mahmoud Titi contacted me and told me that he wanted to carry out a suicide attack next to Israeli soldiers, and he asked me for an M-16 weapon, and I had an explosive belt in my possession, and I did give him an M-16. We agreed that the attack would be carried out within Israel, next to soldiers, and that after [one] suicide attacker blew himself up, another one would fire. According to what Muhammad said, he did succeed in locating two people who would carry out the terrorist attack, one from Nablus and the other one from Jiyus.

Q. How did Mahmoud Titi get to know the two people who were supposed to carry out the terrorist attack next to the soldiers?

A. According to what he told me, Ahmad Abu Khadr was the one who introduced him to the man from Nablus, and Mahmoud Titi already knew the one from Jiyus.

Q. Who brought the suicide attackers into Israel?

A. A man named Mansour Sharim from Tulkarm.

Q. How did they get in, and how was the terrorist attack carried out in Israel?

A. They got in with a stolen car, [with the help of] Mansour Sharim, and after they had entered Israel and were on their way to Hadera in order to carry out the terrorist attack, a few hours later, we heard on the radio that the Israeli police had suspected the car, and that there had been an exchange of fire with the suicide attackers and they had been killed, and two of the police had been wounded, as far as I know.

Q. How did the exchange of fire with the police take place?

A. On the way to Hadera, a police car suspected that the car was stolen and asked them to stop, but they started shooting. After that, the policemen succeeded in killing them. After I heard on the radio that they had been killed, I called the media and I informed them that the terrorist attack had been carried out by *Kitaab al-Aqsa*."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/13:

"... That same day, I reported to Nasser Awis that I had a suicide attacker with me, and Nasser asked to meet that terrorist. The next day, I took Majdi to a studio in Nablus to have his picture taken, and from there to Nasser Awis's house, and I left him there. Two days later, Nasser asked me to purchase a car with Israeli license plates, and I bought a stolen black Mitsubishi for NIS 3,500 from a resident of Tubas. I got the money for the car from Nasser Awis. After I bought the car, I went to Nasser's house with the car, and there I met Nasser and Majdi and Juad Hanfar, and I was surprised to find another person there, named Fathi Amiri, a resident of Nablus, about 20 years old, and that was the first time that I saw that young man. And then Nasser Awis told me that those two people, Majdi Hanfar and Fathi Amiri, were about to go out and perpetrate a suicide attack in Israel. At that point, Nasser gave Majdi an M-16 weapon, and he gave Fathi two hand grenades, and the plan was for the two of them to enter Israel, wherever they could, and to carry out a suicide attack, shooting with the M-16 and throwing grenades, and after we prepared them, I took them to Kafr Rai and I handed them over to Ziad Asasa. This was the same Ziad who had transported the suicide attacker that I talked about before. On that day, I got to Kafr Rai at around 11:00 a.m. ... And an hour later, Ziad called and said that he had heard that the two of them had been killed in Baqa, after wounding a Border Patrol policeman."

**Count No. 6:**

During the al-Aqsa intifada, on an unknown date, two terrorists whose identities are not known were on their way to carry out a terrorist attack in Jerusalem, armed with Kalashnikov rifles and hand grenades. The terrorists were caught at an IDF roadblock by the security forces, thus miraculously avoiding a murderous terrorist attack with multiple casualties, which the two had set out to perpetrate, with the intent of deliberately causing the death of many Israeli civilians.

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Ahmad Abu Khadr and Ahmad Barghouti and additional activists, for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, the terrorists were recruited, equipped with Kalashnikov rifles and hand grenades, and transported on the way to the scene of a terrorist attack.

The admission by the Defendant is as follows:

P/7:

"... At about that time, Ahmad Abu Khadr from *Kitaab Shuhadaa al-Aqsa* contacted me and said that there were two people who wanted to carry out a terrorist attack in Israel, and I agreed to that. I informed Ahmad Barghouti of the matter and asked him if he would be able to bring them in, and it was agreed with Ahmad Abu Khadr that Alaa Abu Mustafa and Ayman Badr would take the two *mustashhids* to Ramallah. After that, I called Ahmad Barghouti and told him that the people were on their way to him. I should note that Ahmad Abu Khadr contacted me because I am responsible for *Kitaab Shuhadaa al-Aqsa*.

Q. Did Ayman Badr and Alaa Abu Mustafa know about the terrorist attack?

A. Ayman works as a driver of a public vehicle, and Alaa is a friend of Ahmad Abu Khadr, and I do not know whether they knew about the terrorist attack.

*Q. Where was it agreed that they would meet in Ramallah?*

A. According to what was agreed, Ahmad Abu Khadr was supposed to be in contact with the four, and when they got to the Ramallah area, he would call me and I would call Ahmad Barghouti and let him know where they were, so that he could meet them.

Q. Which weapons did they take with them, and how was he [sic] supposed to carry out the terrorist attack?

A. A shooting attack which included grenade-throwing, and Ahmad Abu Khadr gave the suicide attackers two hand grenades, and according to what was agreed, Ahmad Barghouti was supposed to give them two Kalashnikov rifles.

Q: Where was he [sic] supposed to carry out the terrorist attack?

A. In West Jerusalem.

Q. Was the terrorist attack carried out?

A. The four of them were arrested at a roadblock on their way to Ramallah.

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/17:

"In addition, we planned to carry out a suicide attack inside Jerusalem, and we sent the suicide attackers to Ramallah to get an explosive belt, but they were arrested on the way. The two who wanted to carry out the suicide attack are (1) Saadi Maqbul of Nablus, about 20 years old, a bachelor and unemployed, (2) Alaa Khalafwad, a resident of Nablus, about 20 years old, a bachelor who worked as a vehicle mechanic. Aswad was his *nom de guerre*. This was about four or five months ago. Nasser Awis planned this terrorist attack along with me... for us to carry out a terrorist attack in the Ministry of Defense in Tel Aviv. I talked about it with Nasser Awis and Mahmoud Titi, and we decided to look for skilled activists who would carry out such a terrorist attack. In the end, we did not look for activists and we did not carry it out. With regard to the two suicide attackers, Saadi Maqbul and Alaa al-Aswad, who were on their way to Ramallah to get explosive belts so that they could go on to Jerusalem and carry out a suicide bombing, I talked about that in my second testimony. I would like to add a few points which I did not mention... As I said, I filmed them with a video camera, reading the will, and I put a flag of the *Kitaab Shuhadaa al-Aqsa* behind them, and during the filming, he [sic] waved a Beretta weapon which I had given him. I gave the cassette [to] Nasser Awis later. That night, the three of us slept in the apartment, and the next morning, I called Ayman the taxi driver – let me correct myself. I called a friend of mine named Awla Mustafa, and I asked him to send me a taxi to the apartment where I was with the young men, and he sent me a taxi driver named Ayman. When he arrived, at 10:00 a.m., the two young men got into the taxi. I asked them to call me the moment they got to Ramallah. According to the plan, I would then call Nasser Awis and he would arrange to send the people who were supposed to supply the explosive belts to them. I forgot to mention that I gave them a hand grenade, which I had received from Nasser Awis for them to use. The intention was to throw the grenade before blowing up the explosive belts. The two young men did not reach Ramallah; they were arrested on the way. As soon as the two young men got into the taxi, I informed Nasser Awis."

**Count No. 7:**

During the al-Aqsa intifada, on an unknown date, a terrorist whose identity is not known was arrested on his way to perpetrating a suicide attack in Jerusalem. The man was armed, with a view to intentionally causing the death of many civilians. While he was on his way to the scene of a terrorist attack, near Beit Hanina, that terrorist was arrested by policemen and shot to death.

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Titi for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], the terrorist was recruited and supplied with weapons.

The admission by the Defendant is as follows:

P/6: "Q. Do you know a man named Luay Odeh?

A. Yes, I met him at the al-Najah University, and he belonged to the Popular Front, and I recruited him into the *Kitaab Shuhadaa al-Aqsa* about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attacks [*mustashahids*] into Jerusalem. I also asked Luay to teach us how to manufacture explosives that were stronger than the explosives we were using, and Luay explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already knew how to produce *umm al-abd*... About a month and a half ago, I asked Luay to check out a way of bringing a suicide bomber into Jerusalem, and he said that he would check it out. According to the plan, Mahmoud Titi was the one who located a suicide attacker, and my role was to coordinate between Mahmoud and Luay, in order to bring the suicide attacker into Jerusalem. That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack, and he was killed at the entrance to Jerusalem from the direction of Ramallah, and I do not know the suicide attacker's name."

The "item":

No direct and separate "item" was found for the admission on this count.

However, the facts which have been proven – the fact that the Defendant was a leader in a Terrorist Organization, with the purpose of perpetrating acts of violence which were intended to cause the death and injury of persons, and the fact that the Defendant had a clear motive for carrying out such acts and had an opportunity to carry them out, and even accomplished many of them, as has been proven in each of the other counts –substantiate a conclusion that the cumulative "items" which were found for each of the admissions of the other counts may be considered as the "item" required for this count. It is necessary to consider the circumstances of the matter, and, for that purpose, the series of offenses in which the Defendant was involved, as a single unit.

**Count No. 8:**

According to an argument that was set forth by the State in Count No. 8:

"A. On an unspecified date after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, in the vicinity of Joseph's Tomb in Nablus.

On unknown dates during the subsequent period of time, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks directed against an IDF position which was located in the vicinity of Joseph's Tomb.

B. Shortly before the month of May 2001, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, on Mt. Gerizim, and against additional IDF positions in adjacent areas.

For the purpose of promoting the objectives of the conspiracy, the Defendant supplied the additional activists who had joined the conspiracy with M-16 rifles.

During the month of May 2001, on a number of occasions, on unknown dates, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks.

The shooting attacks were perpetrated by the Defendant and the additional activists, armed with M-16 rifles, against the military position on Mt. Gerizim, against the Ein Beit camp and against army patrols which were patrolling in the area of the Balata camp, as well as against military targets in the area of the Hawara camp.

C. On an unknown date, after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of terrorist attacks against Israeli citizens and IDF soldiers.

Within the framework of the conspiracy and for the purpose of promotion thereof, the Defendant supplied weapons to the activists in the Terrorist Organization for the purpose of carrying out the terrorist attacks.

The activists in the Terrorist Organization, who joined forces in order to carry out the conspiracy, made use of weapons which were supplied to them by the Defendant, in the terrorist attacks set forth below:

1. The shooting attack on the settlement of Homesh.
2. Placing an explosive charge on the Zuata-Asira bypass road.
3. A shooting attack with an M-16 rifle against a military patrol in Deir Sharaf.
4. Placing an explosive charge in Sara."

The State goes on to claim that, in these actions, the Defendant was unlawfully attempting to cause the death of many persons, and that these actions, *inter alia*, are in the nature of a conspiracy to commit a crime, attempted murder, and unlawfully carrying a weapon.

The admission by the Defendant is as follows:

P/5A: "2. *I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus...*

3. I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4. I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata ..."

"13. I supplied Abd al-Rahman Abdallah with two explosive charges plus a Kalashnikov, which he placed near Kafr Sara, Nablus.

14. I supplied Majdi Halus with an explosive charge, which he placed on the road to Dir Sharan, against an Israeli patrol."

P/6A: "Yes, he participated once, together with me, in carrying out a shooting attack directed against an Israeli military position on Mt. Gerizim..."

"Q. Which terrorist attacks did you speak about with Munir Maqadah?

"A. I spoke with him about many terrorist attacks, and I remember that I spoke with him about a shooting attack which I had carried out along with Muayad Jamil and Mahmoud al-Titi and Qahid Abu Mustafa near the Hawara refugee camp, directed against a military vehicle. I also spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in those terrorist attacks along with Muayad Jamil and Muhammad Yadak and Mahmoud al-Titi and Ahmad Abu Khadr..."

"Q. Do you remember all of the terrorist attacks in which you participated directly?

A. I remember: 1. A shooting attack directed against a military position on Mt. Gerizim. 2. A shooting attack directed against a military vehicle in the vicinity of the Hawara camp. 3. A shooting attack directed at members of the armed forces at Joseph's Tomb. 4. A terrorist attack at Dir Sharan. 5. A shooting attack directed at military vehicles... 7. A shooting attack directed at vehicles.

Q. Can you give details about the shooting attack directed against the military position on Mt. Gerizim?

A. Yes, about seven months ago, I participated, together with Majed al-Masri and Yasir al-Bami, in shooting about three times at a military position on Mt. Gerizim..."

"Q. Do you have any additional details about the shooting attack directed against a military vehicle in the area of the Hawara camp?

A. About six months ago, I participated, together with Yasir al-Badu, in a shooting attack directed at a jeep in the Hawara camp, and each of us fired about half a clip of bullets, and the soldiers fired back at us.

Q. Can you give details about the shooting attack directed against a car, which you mentioned above?

A. Yes, I participated, together with Yasir al-Badu and Muayad Jamil and Qaid Abu Mustafa, in a shooting attack, and we shot at a tank in the area of Hawara (the camp). We were shooting from Kafr Kalil. That day, the attack was carried out at about 4:00 p.m., and each of us fired a clip of bullets at the tank."

"... And I took two old [anti-]tank missiles from Abu Sharar in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata-Asira against military vehicles.

Q. How many charges did you make out of the missiles which Abu Sharar gave you, and how did you use them?

A. After I took the missiles from Abu Sharar, I gave them to Mahmoud Titi from the Balata camp, and Mahmoud made a charge out of them, and he was the one who placed the charge on the bypass road.

Q. Do you remember when he placed the charge and whether people were hurt when the charge exploded?

A. The charge was placed sometime during the al-Aqsa intifada; I do not remember a date, and according to the information which I received, the army blew up the charge before it exploded."

"I sent Mahdi Marqa to transport Muhammad Qassem and Muayad Jamil and Qaid Abu Mustafa, so that they could place a charge on the road, near Kafr Sara, west of Nablus. In the end, however, they did not place the charge, because it was far away. They brought the charge back and they used it in the area of Zuata against a military vehicle, and I do not know if anyone was hurt in that terrorist attack."

"Q. Did you have any contact with Majdi Halus?

A. Yes. About 10 months ago, we took a charge from them, and he placed it on the road in Dir Sharan, and he set off the charge against a military patrol."

"... And I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I gave him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir, the vehicle was not hit."

"Q. Can you explain to me about the terrorist attack in Dir Sharan which you mentioned above?

A. Yes. About eight months ago, Majdi Samir Hulus [sic] from the Balata camp, who was living in Dir Sharan, came to me and asked me for an explosive charge to carry out a terrorist attack, and I gave him a charge that weighed 15 kg which I had received from Muayad Jamil, and the detonation was with wires. According to what I know, Majdi placed the charge on the main road at Dir Sharan, and set off the charge at a military patrol, and caused damage to a jeep, and I do not know if people were hurt."

"A. Yes. A few months ago, Abd al-Rahman Abdallah, a resident of Sara, suggested to me, while he was studying at al-Najah University, that we carry out a terrorist attack in the area of Sara, and he [sic] agreed to this. I gave him two explosive charges and a Kalashnikov, and when I gave him the charges and the weapon, there was a person with him, named Lutfi Abdallah, a resident of Sara, and they set off the charges at a tank in the area of Hawara, and one charge exploded, and after that, they fired at the tank, and after the terrorist attack, they gave me back the weapon."

P/8: "... And another man from Dir Sharan was with him, and Majdi asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received from Muayad Jamil Sansur, and according to the information in my possession, Majdi carried out the terrorist attack against a military patrol in the area of Dir Sharan."

"A. Yes. About five months ago, Muayad Jamil introduced me to a man named Iyad who knew how to make explosives and charges, and I took five charges from him, and Mahmoud Titi and Muayad Jamil placed the charges near Zuata, and once Muayad and I went out to place a charge. The soldiers identified us, and we ran away, and Qaid Abu Mustafa was with us, and we left the charge behind when we ran away."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/12:

"A. I confess that, during the month of May in the year 2001, I went out with all those persons to carry out a shooting attack directed against a military position which is located on Mt. Gerizim. On that day, Nasser Awis gave me an M-16 weapon, and we all set out for the position. We took up a position in the Dahiya area, in Nablus, from where we fired on the [illegible, probably "military"] position, toward Mt. Gerizim. I personally fired [illegible, probably "about 20"] bullets, and each of the other people fired the weapon in his possession, at the position. This was about 10:00 p.m. And then the army started firing at us, and we fled the scene.

Q. Did you participate in additional shooting attacks against that military position or against other positions?

A. I confess that I participated, about six more times, in shooting attacks directed against that position on Mt. Gerizim, with the same people. In addition, I participated, about four times, in shooting attacks directed against an IDF position which is located in Jabal Shamali, above the Ein Beit Alma camp. Also, of course, I participated in shooting attacks directed against army patrols which were patrolling in the area of the Balata camp. All those times, I fired the M-16 that Nasser Awis had given me."

P/13:

"... And on that day, Amar told me that he intended to carry out a terrorist attack, and accordingly, he asked me to get hold of two explosive charges for him, for the benefit of the terrorist attack. I told Amar that I know [sic] how to manufacture explosive charges, and therefore I took him to Nasser Awis, in the Balata camp, and I asked Nasser to obtain two charges for me. Then Nasser called Mahmoud Titi and asked him for two charges, and an hour later, Mahmoud Titi came and brought two charges with him, made out of a pipe 30 cm long and 40 cm wide [sic]. Each charge was closed on both sides, and there were white electric [wires] coming out of one side. After that, Amar received the charges, and each of us went home, and three days later, I heard from Amar that a terrorist attack had been carried out against a military jeep in Silat al-Dakr, during the night, and they had set off the charges against the jeep, but nothing had happened to it."

P/18:

"A. In my second testimony, I confessed that I – together with my friends, Fadi Abu Ali and Yasir Rakhal – we carried out two shooting attacks against the settlement of Homesh, and this... is all true, that the three of us perpetrated shooting attacks, on four or five occasions, against the settlement of Homesh. The fire was directed against the watchtower, at the edge of Homesh, from the direction of Silat al-Dalha, and against the houses in the settlement. This took place in the course of the first three months, at the beginning of the al-Aqsa intifada. In all of those cases, we would arrive in the late hours of the night, after 10:00 p.m., and I remember that, in all of those cases, the soldiers fired back from the watchtower. I confess that I was the one who supplied them with weapons in all of the attacks mentioned above. I fired an M-16, and I gave Fadi a Kalashnikov, and I gave Yasir a Gluck. I would take those weapons from Nasser Awis, before going out on each of the terrorist attacks.

Q: From what distance did you fire at the settlement of Homesh?

A. From about 1 km away.

Q. Which other shooting attacks did you participate in?

A. Approximately in the beginning of 2001, Fadi Abu Ali and Yasir Rakhal and I fired on a security jeep in the settlement of Homesh, from about 500 meters away. This was during the late hours of the night, after 10:00 p.m. I fired an M-16, Fadi fired a Kalashnikov, and Yasir fired a Carlo – the same weapons which we had used in the previous shooting attack against Homesh, the same weapons which I had taken from Nasser Awis. After he fired, the soldiers fired back, and we fled the scene...
A. He and I did not do anything except what I have already mentioned, but I would like to state that Hakim Jizari asked me for a weapon, three months ago, and claimed that he wanted to carry out shooting attacks against IDF soldiers. I agreed to his request and I gave him a Kalashnikov which I had taken from NasserAwis, and a week later, Hakim gave me back the weapon, and I do not know if he used it."

Witness No. 25 for the prosecution, Yasir Abu Bakr, P/47B:

"Mahmoud Fares, about 25 years old, a resident of Nablus, and Asad Ismail, about 27 years old, a resident of Beit Iba – we carried out a terrorist attack involving an explosive charge and shooting, on the bypass road near Beit Iba. When we came to the entrance to Beit Iba, I called Nasser Awis, and he told me that he was sending us people and weapons for the terrorist attack. Half an hour later, Mahmoud Titi and Ahmad Abu Khadr came to the scene. They arrived in a white car. Each of them had an M-16 rifle, and in addition, there was a 250 machine gun in the car, as well as an explosive charge within a fire extinguisher [*atfaya*]. At about 11:30 p.m., we all went out in the white car to carry out the terrorist attack on the bypass road near Beit Iba. Asad Ismail and Ahad Mahmoud Fares placed the explosive charge on the road and connected a wire to the explosive charge. This was a charge which was activated by wires and a battery. As soon as they had connected the wires, suddenly IDF soldiers who were staked out there opened fire on them. Ahad was killed and Asad was wounded in the leg. Mahmoud Titi and Muhammad [sic] Abu Khadr fired at the IDF soldiers. After that, Mahmoud Titi and Muhammad [sic] Abu Khadr and I fled the scene."

Witness. 21 for the prosecution, Muhammad Yadak, P/40A:

"A. In the beginning of the al-Aqsa intifada, [illegible, probably "I participated" or "they participated"] in stone-throwing activity directed at Joseph's Tomb in Nablus, and at the [illegible, probably "military"] forces in Nablus. In June [20]02, *Mahmoud Titi contacted me and said that he was planning to set up a military squad belonging to Tanzim Fatah.* He suggested that I enlist in the military squad, and Mahmoud said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed to this and, within the framework of the military squad, I participated in 10 shooting attacks directed against the army in the Nablus area. Participating in the shooting attacks along with me were (1) Mahmoud Titi, (2) Ahmad Abu Khadr, (3) Nasser Awis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus...

Q. Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

A. Nasser Awis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons.

[Q.] Which Israeli military positions did you shoot at?

A. We carried out shooting attacks directed against a military position on Mt. Altana. We also fired at the settlement of *Elon Moreh, and we also fired at the Saqen roadblock near Hawara...*

The second terrorist attack, in August 2001: Nasser Awis contacted me [and] Mahmoud Titi and told us that young men from the Tanzim wanted to place an explosive charge on the bypass road in the area of Beit Ira, and he asked me and Mahmoud Titi to participate in the terrorist attack and to place the charge along with the young men... The tenth terrorist attack was a shooting attack directed against the funeral... The funeral [procession] went from Hawara to Yitzhar, and when they got to the entry to the Hawara camp, Nasser Awis and Yasir al-Kadawi and Mahmoud Titi and I fired at the participants in the funeral. The army fired back, and Nasser and Mahmoud and Yasir and I fled the scene and headed toward the camp..."

The facts contained in the charges were proven.

**The offenses of murder, attempted murder, causing severe bodily harm and attempt to cause severe bodily harm**

The State describes to the Defendant offenses of murder with malice aforethought in the first five counts; offenses of attempted murder in all of the accounts; offenses of causing bodily harm with aggravated intent in the first five counts; the offenses of attempt to cause severe bodily harm in Counts No. 6 and No. 7.

With regard to these offenses, a question arises as to the status of the Defendant.

Section 29 (a) of the Penal Code, 5737 – 1977, tells us that a person who perpetrates an offense together with or through another person shall also be considered as the perpetrator of the offense.

It has been proven to us that the Defendant's mental attitude to these offenses is beyond all doubt. The Defendant wanted and desired to achieve the results of the criminal actions, with every fiber of his being, and was the motivating force in the implementation of a joint plan, carried out together, to intentionally cause the death and injury of his victims, as has been proven.

There cannot be even the slightest doubt that he is the perpetrator of the offenses (see Criminal Appeal 4389/93, Mordechai Vabudi v. the State of Israel, PD 50 (3) 239 and the rulings mentioned there; see also Criminal Appeal 2796/95, John Doe v. the State of Israel, PD 51 (3) 388).

The factual infrastructure which has been revealed to us attests to the fact that the acts of murder were carried out, from beginning to end, with malicious intent, based on the decision and the purpose of causing death, founded on cold blooded thought, controlled behavior and settled mind, and following precise and scrupulous preparation.

We do not have even the slightest doubt that the fundamental elements for the offenses of murder with malice aforethought have been fulfilled, the offenses have been proven, and – as set forth above – the Defendant carried them out.

Obviously, the fundamental elements for the offenses of attempted murder have also been properly proven.

The Defendant's plan of intentionally causing the death of many civilians, and the implementation of that plan as described above, as it has been proven, substantiates the fundamental elements of the less severe offenses of causing bodily harm with aggravated intent and attempt to cause bodily harm with aggravated intent. These offenses as well have been properly proven.

Unlawfully carrying a weapon

The State also ascribes to the Defendant offenses of unlawfully carrying a weapon, in Counts No. 2, 3 and 8.

It has been proven that the Defendant carried, without a permit under any law, M-16 rifles, ammunition and hand grenades, which are in the nature of "weapons," as this term is defined in Section 144 (c) of the Penal Code, 5737 – 1977. The Defendant has confessed to this, as set forth above, and has also confessed that he used the weapons. It is enough for us to mention that which has been set forth in his statements, as follows:

"I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem... I supplied Abd al-Salaam Hasuna with weapons for the perpetration of a suicide attack within Hadera." (See P/5)

See also the Defendant's confession to the shooting attacks described in detail in Count No. 3, as set forth above.

Because the terrorists Said Ramadan and Abd al Salaam made use of the weapons inside Israel, as has been proven above, and because the fact of Count No. 8 have also been proven, it appears that the fundamental elements of the offenses of possession of weapons have also been proven as required.

**Summary**

Having found that the State has proven all of the actions ascribed to the Defendant in the indictment, according to the burden of proof incumbent upon it to do so beyond all reasonable doubt, we hereby convict the Defendant of the following offenses:

Membership and activity in a terrorist organization, in contravention of Sections 2 and 3 of the Ordinance for the Prevention of Terrorism, 5708 – 1948.

Conspiracy to commit a crime, in contravention of Section 499 of the Penal Code, 5737 – 1977.

Premeditated murder, in contravention of Section 300 (a) (2) of the Penal Code, 5737 – 1977.

Attempted murder, an offense in contravention of Section 305 (1) of the Penal Code, 5737 – 1977.

Causing bodily harm with aggravated intent, in contravention of Section 329 (1) of the Penal Code, 5737 – 1977.

Attempt to cause severe bodily harm, an offense in contravention of Sections 329 (1) and 25 of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon, an offense in contravention of Section 144 of the Penal Code, 5737 – 1977.

**O. Solomon-Cherniak**
**Judge**

**Judge S. Timan, Presiding Judge, and Judge N. Achituv:**

We have read the detailed and well-founded opinion by our colleague, the Honorable Judge Cherniak, and we concur with the conclusion that has been reached by her.

| | |
|---|---|
| ***S. Timan*** | ***N. Achituv*** |
| **Presiding Judge** | **Judge** |

**It has accordingly been decided to convict the Defendant of all of the offenses ascribed to him in the indictment, as set forth in the opinion by the Honorable Judge Cherniak.**

| | | |
|---|---|---|
| **S. Timan, Presiding Judge** | **N. Achituv, Judge** | **O. Cherniak, Judge** |

# TRANSCRIPT: ALBRIGHT SEEKS TOTAL EFFORT ON TERRORISM

*(Israel, Palestinians must shoulder their responsibilities)*

*September 11, 1997*

Jerusalem -- "The Palestinian Authority must take unilateral steps and actions to root out terrorist infrastructure," Secretary of State Madeleine Albright said September 10 at a press conference here with Israeli Prime Minister Benjamin Netanyahu.

"I will be seeing Chairman Arafat tomorrow and my message will be clear," Albright said. "It is essential that Israeli-Palestinian security cooperation be serious, sustained, and effective."

At the same time, she said, "both Israelis and Palestinians must shoulder their responsibilities if we are to emerge from the current crisis. This process cannot succeed with reciprocity."

"Real security depends ultimately on real peace," the Secretary continued. "Achieving this peace turns fundamentally on a political process which meets, through a genuine process of give and take, the needs of both sides. Clearly, Israel also has a responsibility to shape an environment which will give that process a chance to succeed."

Following is the official transcript of Albright and Netanyahu's press statements, providved by USIS in Jerusalem:

(Begin transcript)

PRIME MINISTER NETANYAHU: Ladies and gentlemen, it is a great pleasure and honor to welcome Secretary Albright on her first visit to Israel as a Secretary of State. Secretary Albright is a distinguished world leader, and she represents the abiding kinship between our two peoples and our two countries. It is a bond of deeply shared values of freedom, of democracy and of friendship. This is also the first visit of Madeleine Albright as Secretary of State here and there are so many issues that we need to talk about, but we devoted our time to the most pressing discussion vis-a-vis the Palestinian-Israeli talks. I think that our meeting was truly most cordial and most productive, and Madeleine, we were deeply moved today by your words this morning. I'm sure they touched the hearts of all Israelis -- they certainly touched mine -

- and they showed real empathy with our history, and, I think, a real understanding of our concerns and our desire and our hopes.

I want to emphasize again that we want the peace process to succeed. In fact, I'm convinced that my government is the only government which can bring this process to a successful conclusion. This government is determined to achieve peace -- real peace, peace with security. A peace that will last. A peace that will benefit all the peoples of our region. But obviously, no agreement can work unless both sides live up to their obligations.

The central, and I say the essential, premise of this agreement that was signed by Israel and the Palestinians exactly four years ago was based on a Palestinian commitment to wage an unrelenting war against terrorism. Unfortunately, in the four years that have passed, the Palestinian Authority has done virtually nothing to keep up this central commitment and as a result terrorism grew. It grew by leaps and bounds in the first three years under my predecessors, the late Yitzhak Rabin and Shimon Peres. It continues to grow in the absence of firm Palestinian Authority action against terrorism. We must make it clear to everyone who wants to see peace prevail that terrorism must not be used as an instrument of negotiations and violence is not an option in such negotiations. This is unacceptable. I know it is unacceptable to us and to the United States and it should be unacceptable to every peace- loving government in the world. The only sane way to fight terrorism is to do what was explicitly undertaken by the Palestinian Authority, and was articulated so well by Secretary Albright, that is fighting the terrorists and dismantling their infrastructure. These are the critical components of security in waging war on terrorism. All this is not an item for bargaining. It is not an option. It is as Secretary Albright has put it, "a sine qua non of the Oslo agreements."

We believe the Palestinian Authority must keep its part. It must fight terrorism with no "ifs" and "buts" and it must do so soon if this process is to survive. It must, in short, decide if it wants peace with Hamas or peace with Israel, but it cannot have both.

I want to assure you, Madame Secretary, that we will do everything to make your visit successful because your success is the success of the entire peace process, which we so fervently desire. If you are able to persuade the Palestinian Authority to

wage war against the terrorists, I believe the road will be open to the continuation of the peace process to bring it to a successful conclusion. And I am convinced we can achieve peace. I hope the Palestinian Authority, our Palestinian partners, also desire this peace with the same fervor. And I hope they will prove it soon by fighting terrorism. We can achieve a good life for both our peoples in this small land. And if peace is to win, both sides would want it to win. We certainly do.

SECRETARY ALBRIGHT: Thank you very much. Mr. Prime Minister, it is a great pleasure to be here with you, and I very much appreciate your characterization of our discussions. I do believe that we had very good discussions and reviewed a variety of issues relating to the pursuit of Israeli-Arab peace. Israel and the United States have long been partners in that historic endeavor and it is important that the partnership continue. Clearly, we are at a very difficult moment with negotiations stalled, and Israel and the Palestinians are locked in a crisis of confidence which has threatened the historic gains achieved in recent years. If we are to move forward, Israelis and Palestinians need to restore the partnership and the reciprocity that produced those achievements. The terrorist war being waged against Israel and peace itself has created a severe challenge.

This security is at the center of my agenda. Let me be clear. The enemies of peace are purposely and relentlessly attacking Israelis, so the war against terror being waged by those who support the path of peace must also be purposeful and relentless. There is no way to completely protect any society from the threat of terror, but partners in pursuit of peace have a right to expect a total, sustained and comprehensive effort to preempt terror, to combat it, and to delegitimize those in their midsts who associate themselves with it. There can be no room in this process for those groups who would tolerate or advocate terror and violence. I will be seeing Chairman Arafat tomorrow and my message will be clear: it is essential that Israeli-Palestinian security cooperation be serious, sustained and effective. At the same time, the Palestinian Authority must take unilateral steps and actions to root out the terrorist infrastructure. If we are to create and sustain an invigorated and accelerated negotiating process, there is simply no other way.

The Prime Minister has talked of the importance of reciprocity and he is right. Both Israelis and Palestinians must shoulder their responsibilities if

we are to emerge from the current crisis. This process cannot succeed without reciprocity. But let me be clear. There is no moral equivalence between killing people and building houses. It is simply not possible to address political issues seriously in a climate of intimidation and terror. At the same time, real security depends ultimately on real peace. Achieving this peace turns fundamentally on a political process which meets, through a genuine process of give and take, the needs of both sides. Clearly, Israel also has a responsibility to shape an environment which will give that process a chance to succeed. This means that Israel should be taking steps that build confidence and should refrain from actions that undermine confidence and trust. As I said in my speech last month, it is very difficult to create a serious environment for negotiations when unilateral actions are taken that pre-judge or pre-empt issues reserved for permanent status negotiations. Restoring a sense of partnership will not be accomplished quickly or easily, certainly not on a single visit. At the same time, I firmly believe that there's no alternative to the political pathway Israelis and Palestinians have chosen. The people of this region have seen too much violence. There have been too many victims. They do not deserve and will not accept a future that promises only more of the same. The United States will do all it can to help the parties rediscover the path for a brighter future with real security and real peace. The President of the United States and I are committed to that. And in that effort, as in our deep and abiding friendship with the people of Israel, the United States may be counted upon to persevere.

Thank you very much.

QUESTION: Madame Secretary, did you bring with you any concrete plans for renewing the negotiations and the peace process between Israelis and the Palestinians, and does this plan, if it exists, include freezing or halting of the building of the settlements, especially Har Homa?

SECRETARY ALBRIGHT: I came here, on this, my first visit, with the hope that I will be able to do what I can to restore confidence. As I have said many times, we see a crisis of confidence here and the bonds need to be rebuilt before the process can go forward. I have also said that while it is very evident that the United States is a key player within the Middle East peace process, and our bonds and our interests here are very strong, it is the leaders of this country, and of the Palestinians, that have to

make the hard decisions and to live up to the expectations of the people of this region who want peace.

QUESTION: Mr. Prime Minister, on the reciprocity, or maybe it should be called even-handedness, are you being asked now to implement a further withdrawal and do you think it is safe for Israel, experiencing all this terrorism, to keep pulling back on the West Bank, like now?

PRIME MINISTER NETANYAHU: Well, I think that the Secretary had it right, and indeed President Clinton as well, when he and she put the primacy of security, indispensability and security, in order to move the process forward. I think that we are interested in moving that process forward, but we also understand the crucial importance of stopping the bombs from exploding. We can talk, and you can ask me more questions of this nature, and they'll be largely irrelevant if we don't stop terrorism. So we concentrated much of our discussion on this issue and I think that it's best to focus on this at this time. I think that the Secretary's statement, that it is up to myself and to Mr. Arafat and our colleagues to make those kinds of decisions, is exactly right.

QUESTION: Mrs. Albright, James Rubin, the spokesman of the State Department said today that the nice words that you said this morning at the President's house were the first words, and then you are going to be tough on Netanyahu. Does that mean pressure of the Government of the United States on Israel?

And if you permit a question in Hebrew for the Prime Minister of Israel: (in Hebrew) Mr. Prime Minister, the President of Israel says that Israel does not need to exert economic pressure on the Palestinians. It's dangerous when you have hungry neighbors. Unfortunately, he said this morning, as James Rubin, State Department spokesman, relayed to American journalists, unfortunately, Netanyahu is patronizing Arafat, peers at him from above, and he should not be treated like that.

SECRETARY ALBRIGHT: I'm not sure it's always fair to put words in the mouth of the spokesman, but I think that what I would like to say is that I have come here because of the great priority that the President and I put on the Middle East peace process and on the ever strong relationship that the United States has with the people of Israel and Israel itself, and I have come as a realist. I have

made quite clear before I got here that my value in this process is to be realistic and to do what I can, on behalf of the United States, to help rebuild the confidence and to try to clarify some of the issues. It is not an issue of putting pressure on anybody. It is a matter of being realistic about what we would like to see, getting back on track the Middle East peace process, which is not only crucial to all of you who live here, but to us in the United States also.

INTEREPRETER: To the Prime Minister the following: the Israeli President said this morning that it would be wrong on the part of Israel to exert pressure on the Palestinians, that it would be particularly risky to hungry citizens in the Palestinian Authority. James Rubin, the American spokesman of the White House (sic), said that Netanyahu is patronizing Arafat, not relating to him as his equal, quoting actually the President of the States actually saying these words (sic).

PRIME MINISTER NETANYAHU: Well, I'm not going to comment on the remarks attributed to the President. He has not given me a response, or rather a full detailed account of his conversations with the Secretary, so I'm not going to comment on it. I will say -- I'm supposed to say this in Hebrew. Yes, of course, I just translated (laughter), now the reverse translation.

(in Hebrew) I'm not going to comment on things attributed to the President because the President has not yet been able to report to me completely and wholly on his conversations. In general, I can say that our approach is surely to avoid starving anyone. We take the opposite way. Our concern is not only that there be no hungry Palestinians but also that there be no dead Israelis.

QUESTION: Madame Secretary, in your call for mutual responsibility and reciprocity, you are being very specific in what you're asking Yasser Arafat to do. You're asking him to crack down on terrorism. You're not being nearly as specific in your words as to what you would like the Israelis to do. If and when Chairman Arafat cracks down on terrorism the way you and Prime Minister Netanyahu would like him to do, are you then calling on the Netanyahu government to impose any sort of settlement freeze to carry through with the withdrawals, as stipulated in Oslo, to do these things as part of getting the accelerated final status talks going which you and Prime Minister Netanyahu both support?

SECRETARY ALBRIGHT: Let me say and just repeat that obviously dealing with the problem of terrorism is the sine qua non of moving forward. But what I have said both here and in my previous speeches and remarks is that we believe it is very important to live up to the various aspects of the Oslo process, and we believe that there are mutual responsibilities within that process. We would hope that they would be carried out not only according to the letter but also to the spirit of the Oslo process, and we believe that it is important, because, I think, if I might take a minute longer on this, is because the interim agreements themselves, which were supposed to help create bonds of confidence, have not had that effect. We have suggested having an accelerated final status discussion so that the people who live here could actually see something coming from the peace process. But we also believe that it's important not to abandon the interim agreements in the Oslo process, and therefore the suggestion that I have made is that the interim agreement carried out in mutually responsible ways be married to an accelerated final status process.

QUESTION: You said what you're going to say tomorrow to Mr. Arafat. Can you please reveal some of what you said to Prime Minister Netanyahu? This is the first question. Second question: do you accept Arafat's claims that those terrorists, who made both terrorist attacks in Jerusalem, came from abroad and that actually Israel is responsible for what happened because Israel is responsible for the borders of Israel, and this is why it's her fault?

SECRETARY ALBRIGHT: First of all, let me say that the Prime Minister and I have already in my statement explained what it is that we talked about and the importance of dealing with the terror and our understanding of Israel's need to deal with the issue of terrorism. But at the same time, we did speak about the importance of the Oslo process and generally moving the process forward. I believe that it is very important for Chairman Arafat to be realistic about dealing with the infrastructure of the terrorist organizations and not to try to deal in ways that obfuscate rather than deal specifically with what is the problem here -- which is the infrastructure that exists of the terrorist organizations -- and that he has to deal with that very clearly.

QUESTION: Prime Minister, and also the Secretary, last evening, and overnight, the

Palestinian Authority arrested about 200 people in the Gaza Strip and apparently interrogated them, and are still holding between 50 and 100 people. Do you consider this as serious effort, or part of a serious effort, to do what you're asking them to do? Or do you see it cynically as some sort of strange gift for Mrs. Albright's visit?

PRIME MINISTER NETANYAHU: Well, I've commented on this before as this process was taking place. Unfortunately, much of this is intended for show. It is not a substantive and sweeping effort against Palestinian -- Hamas terrorism and Islamic Jihad terrorism -- that is required. As you know, we have on-going alerts for terrorism, additional attacks. And unless such concerted effort is taken to catch not the sardines, but the sharks, the sharks who organize, who direct, who dispatch the terrorists we will have more terrorist attacks. That has not happened by any stretch of the imagination. I would also say that in the absence of this happening, you cannot really fight terrorism. To give you an illustration: after the first bombing we had in Jerusalem, the Mahane Yehuda bombing a few weeks ago, we did our effort in the areas controlled by us and as a result we discovered additional terrorist cells and additional plans of terrorists directed from Palestinian controlled areas to launch more attacks. Those attacks we neutralized, largely neutralized because we put people in jail. One interrogation led to another. The fact that we were in control in these areas, we were able to stop terrorism that was planned in the Palestinian controlled areas. But that effort is not in the Palestinian territory which has now become a collection of bases and safe heavens for the Hamas and Islamic Jihad terrorist organizations. Before we are asked to give additional territory, we have a right to demand the implementation of that commitment in the existing areas controlled by the Palestinian Authority. And as long as the Palestinian Authority doesn't undertake this vigorous effort to fight terrorism and dismantle their infrastructure, we are not going to go very far. It's going to be impossible to continue the process. I hope they have a change of heart. I hope they have a real policy decision to fight terrorism. I can tell you that so far, as we speak, that has not happened. We want to see a real change, demonstrated over time, because I think it's in our interest, and frankly, I think it's in the Palestinians' interest as well. Terrorism is destructive for both of us, and for peace.

SECRETARY ALBRIGHT: I believe that it is very important for us to see concrete and sustained action, not a revolving door in terms of people who are arrested and then released. And, as I said previously, for Chairman Arafat to go after the infrastructure of the terrorist organizations. And the only gifts I want are concrete actions.

QUESTION: Madame Secretary of State, do you agree with the Israeli Cabinet decision to freeze any further pull-back from the West Bank until the Palestinians will fulfill all their obligations? And may I add, could you promise us that very soon, maybe within two years, the American Embassy will be removed from Tel Aviv to Jerusalem as Congress decided?

SECRETARY ALBRIGHT: Let me say that I think, again, I'm supportive of the Israeli Government's and Prime Minister Netanyahu's specifically calling for firm action against the terrorists, as I have now repeated many times, and will continue to do so. It is essential that terrorist activities be dealt with at their base. At the same time, I do believe it is very important to follow through on the obligations of Oslo, and to make sure that we do everything the Israeli Government also along with us, and with the Palestinians to re-build a web of confidence. I think that is essential. The question on Jerusalem is a final status issue, and that is why we believe it is important to begin to move in that direction.

QUESTION: Based on what we've heard today, there hasn't been any new agreements, or new movement in the peace process other than both of you have talked about the need to fight terror. Are there any possibilities, Mr. Prime Minister, that you might release some of the money withheld from Palestinian Authority tax revenue? Is there any possibility of the resumption of the security talks? Is there any possibility that you might resume negotiations on opening Palestinian air and sea ports in line with what Secretary Albright is saying that you have to have peace in order to have security?

PRIME MINISTER NETANYAHU: I have to say that we enforce closure policy only to prevent the terrorists from reaching our cities, reaching our market places, reaching our schools. In the absence of security cooperation, we have less intelligence, and because we have less intelligence, you have to somehow, create a protective wall to prevent the terrorists from coming in. And that is the purpose of the closure which we

relax periodically as the security situation improves. As far as the money, we have no intention to starve anyone, on the contrary, we released those monies that we could. We didn't really see the kind of activity that we wanted, but I wanted to communicate good faith, so I released a third of the funds that we withheld because the other side of the agreements weren't being kept as well. Unfortunately, about a week or so later, the response I got was an embrace, a kiss that Arafat gave to the leaders of Hamas. You know, you say, "one good deed deserves another," we deserve something else. And I think we all do. And we want to see a change of policy vis-a-vis terrorism, I can assure you, that that will prompt an immediate change from our point of view, as to the measures that we apply. And it would also be possible to relax many of the security measures that we apply.

Well, I want to say Madeleine, that this can be an ongoing event into the night, they are insatiable in their demands of questions they want to ask. But I also want to say that I think that the most difficult part of your visit has been achieved successfully. You have withstood the Israeli press with flying colors, so this augurs well for the continuation of your mission. And we wish you, we wish all of us much success. Thank you very much.

(End transcript)

* * *

The New York Times
nytimes.com

**January 10, 1996**

# Slaying Blended Technology and Guile

**By JOEL GREENBERG**

At about 9 A.M. last Friday, a cellular phone rang in the plain cinder block dwelling where Yahya Ayyash was hiding in this warren of muddy lanes and ramshackle houses near the northern edge of the Gaza Strip.

As Mr. Ayyash, the Palestinian bomb-maker most wanted by Israel, held the phone to his ear, it exploded, shearing off part of his head and blowing off his hand. He died instantly.

New details emerging about the assassination -- widely attributed to Israel's Shin Bet security service -- reveal a combination of digital-era technological wizardry, old-fashioned human intelligence gathering and a precise ability to bring them together.

Mr. Ayyash's killers took advantage of his reliance on a cellular phone because standard phone lines are hard to get and sometimes do not work in the Gaza Strip. The mobile phones come from Israeli dealers, who market them through local agents.

The preparation of the phone itself was technological feat. It was reportedly a small, slim model that fits in a pocket. At some point it was packed with a detonator and an estimated 50 grams of high-grade explosives, nearly two ounces, yet it still functioned without raising suspicions.

Mr. Ayyash also became vulnerable through his dependence on Osama Hamad, a former college roommate and fellow member of the militant Islamic group Hamas, who sheltered the fugitive along with his wife and child in his house in Beit Lahiya.

Palestinians say that the fatal flaw in this arrangement was Mr. Hamad's link to his uncle, Kamal Hamad, who is known locally as a wealthy contractor with a history of ties to the Israeli military government that used to be in charge of Gaza.

Osama Hamad said that after he began working for his uncle four months ago, he was given a cell phone for business use. On several occasions, Mr. Hamad said, his uncle had borrowed the phone.

Last Friday, Mr. Hamad said, his uncle called him on the house phone and told him to turn on the cellular phone in expectation of a call. A half hour later, Mr. Ayyash's father tried to call his son but could not get through: apparently the attackers had blocked the normal phone line to the house.

Forced to dial the cell phone, the father called at about 9 A.M., Mr. Hamad said. Mr. Hamad answered and handed the phone to Mr. Ayyash.

"I told him that we don't want to talk on this telephone," the father recalled, referring to fears of surveillance by the Israelis. "But he said we could talk. When I told him, 'No,' again, he asked, 'How are you?' " Then the phone exploded.

Residents of the neighborhood said they heard nothing but saw an airplane circling above that had been over the area a few days before.

Israeli press and television reports said that the phone-bomb was detonated by a radio signal from the plane. The signal was sent after Mr. Ayyash was identified as the man speaking on the cellular phone, the reports said. There has been no confirmation from Israeli officials, who have not acknowledged responsibility for the killing.

Osama Hamad's uncle has since disappeared, and his family asserted today that he was in the United States, though they did not know where, helping a son living there who has been jailed for a traffic offense. The relatives denied that the uncle was connected to the killing, contending that he had left for the United States three days days before the assassination. But the Palestinian Authority put out a warrant for the uncle's arrest and said it would demand that Israel hand him over. The police searched the uncle's house in Gaza today and said they had rounded up several other suspects.

Copyright 2008 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work

# HAMAS TERRORISTS CAPTURED - 23-Aug-95

23 Aug 1995

Jerusalem, 23 August 1995

## HAMAS TERRORISTS CAPTURED

(Government Press Office)

Following a prolonged and focused intelligence effort, the GSS has uncovered a group which served as the infrastructure of HAMAS' military wing in Judea and Samaria, and the Gaza Strip.

Members of the group are responsible for two suicide attacks the explosion on the #20 bus in Ramat Gan on 24 July 1995, in which 6 civilians were killed and 31 were wounded, and the explosion on the #26 bus in Jerusalem on 21 August 1995, in which 4 people were killed and 107 were wounded.

Questioning of detainees revealed that the Ramat Gan attack was carried out by Labib Anwar Farid Azem (born 1973), a resident of Karyut in the Nablus district, and the Jerusalem attack by Sufiyan Salam Abdel Rabbo Sabiah Jabarin (born 1969), a resident of Dahariya in the Hebron district.

The group was guided by two veteran HAMAS fugitives: Abdel Nasser Shaker Issa of the Balata refugee camp, and Hatem Ismail, a Gazan student at A-Najah University in Nablus.

Until recently, the two resided in the Gaza Strip, where they were briefed and trained by Yihye Ayash, known as the "Engineer".

Upon their recent arrival in Judea and Samaria, using forged identity cards, they began to set up an infrastructure in the area based upon HAMAS members, whose aim was to initiate and carry out attacks against the civilian population of Israel.

Abdel Nasser Issa, who was responsible for the group's activities in Judea and Samaria, rented an apartment in the Nablus area, from which he conducted his operations. During the first stages of activity, and on the instructions of Yihya Ayash, he sought to identify potential candidates to carry out suicide attacks.

On the basis of previous acquaintance, Issa approached Labib Azem, who was known to have participated in numerous incidents at A-Najah University in Nablus, and proposed that he make the transition to military action, within the framework of Iz a-Din al-Kassam.

After Labib Azem agreed to carry out a suicide attack, Issa prepared, in the rented apartment, the bomb used in the Ramat Gan bus attack.

Yihye Ayash directed Issa to additional HAMAS members in the

Judea region and, through them, he was introduced to Sufiyan Sabiah, who also expressed his willingness to carry out a suicide attack.

Abdel Nasser Issa prepared another bomb, which was placed in a case and delivered to Sufiyan Sabiah by Muhhi a-Din Sharif, a resident of Jerusalem, shortly before the attack was carried out. Sufiyan was instructed to carry out an attack in the Jerusalem area within two days of receiving the explosives.

Authorization for the attack came from Muhammad Diff, a long-sought HAMAS fugitive from the Gaza Strip, who was responsible (among other terrorist attacks) for the abduction and murder of three soldiers Frankenthal, Simani and Wachsman and for the murder of seven other Israelis.

The investigation also brought out that Hatem Ismail, with the aid of Iman Sidar, head of a large HAMAS group member from the Jerusalem uncovered last May, were responsible for the attempted suicide attack at the bus stop near Binyanei Ha'uma in Jerusalem.

During the course of the investigation, a hide-out was discovered in the Nablus district. The apartment served members of the group as a laboratory and workshop for the manufacture and storage of materials used in preparing explosives. Other weapons were found in the apartment, including automatic weapons and prepared explosives, with which squad members planned to carry out additional attacks in the very near future. Other findings include chemicals used in the preparation of bombs, as well as elbow joints and numerous electronic components used to build fuses and triggers for explosive charges.

A videotape was found in the apartment, on which suicide attacker Labib Azem takes leave of his family and friends before the attack. Also found were forged identity cards, used to enable squad members to move more freely in the field, wigs, a number of "kippot" and large quantities of written material.

So far, 30 people mostly from the Samaria area, and some from the Jerusalem area and from the Hebron district have been arrested.

In addition to the intention of group members to carry out more suicide attacks, there were also plans to use car-bombs and to abduct IDF soldiers in order to negotiate for the release of imprisoned HAMAS members.

SUBMIT A TIP

# Rewards for Justice

SEEKING INFORMATION AGAINST INTERNATIONAL TERRORISM

Rewards for Justice

Home
Program Overview
Success Stories
FAQ

Reward Offers

Wanted Terrorists
Acts of Terror
Regime Elements
War Crimes

Fighting Terrorism

Terrorism Financing
WMD Terrorism
Submit a Tip

Links

Dept of State
Diplomatic Security
FBI Most Wanted
RFJ Fund

Search the RFJ Site:

Search

Languages

| | |
|---|---|
| **english** | اردو |
| francais | فارسي |
| espanol | ह दी |
| عربي | درى |
| 中文 | 한국말 |
| deutsch | ไทย |
| русски | پتو |
| Српски | italiano |
| bosanski | tagalog |
| hrvatski | melayu |
| kiSwahili | turkce |

## Joan Davenny



Joan Davenny, age 47, from Woodbridge, Connecticut was killed in the suicide bombing of a bus on 21 August 1995.

**1948 - 1995**

Rewards for Justice, Washington, D.C. 20522-0303, USA.
1-800-US REWARDS (1-800-877-3927) | RFJ@state.gov