1                    IN THE UNITED STATES DISTRICT COURT

2

3                    FOR THE DISTRICT OF RHODE ISLAND

4

     * * * * * * * * * * * * * * *        C.A. NO. 00-105L
5                                    *
     EFRAT UNGAR, et al              *
6                                    *    APRIL 4, 2008
              VS.                    *    2:08 P.M.
7                                    *
     THE PALESTINIAN LIBERATION      *
8    ORGANIZATION, et al             *
                                     *
9    * * * * * * * * * * * * * * *        PROVIDENCE, RI

10

11              BEFORE THE HONORABLE RONALD R. LAGUEUX,

12                         SENIOR JUDGE

13           (Defendants' Motion to Set Aside Default)

14

15   FOR THE PLAINTIFFS:

16

                     DAVID J. STRACHMAN, ESQ.
17                   McIntyre, Tate, Lynch & Holt
                     321 South Main Street, Suite 400
18                   Providence, RI   02903

19

     FOR THE DEFENDANTS:
20

                     DEMING E. SHERMAN, ESQ.
21                   Edwards Angell Palmer & Dodge
                     2800 Financial Plaza
22                   Providence, RI   02903

23                   MARK J. ROCHON, ESQ.
                     RICHARD A. HIBEY, ESQ.
24                   Miller & Chevalier Chartered
                     655 Fifteenth St. NW
25                   Suite 900
                     Washington, DC   20005

```
 1    FOR THE INTERESTED
      PARTY, CANAAN EQUITY
 2    OFFSHORE CV:

 3                              JAMES R. OSWALD, ESQ.
                               Adler Pollock & Sheehan P.C.
 4                             One Citizens Plaza, 8th Floor
                               Providence, RI  02903
 5

 6
      Court Reporter:          Debra D. Lajoie, RPR, FCRR, CRI
 7

 8           Proceeding reported and produced by computer-aided
                               stenography
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      4 APRIL 2008--2:08 P.M.

 2              THE COURT:  Good afternoon, everyone.

 3              We have here today Naval Officers from some 34 or

 4      35 nations who are studying at the Naval War College,

 5      studying the American Governmental system, taking a look at

 6      the Federal Judicial system.  They've traveled all over the

 7      country looking at various things, and they are not only

 8      studying how to make war, but how to make peace.  And so

 9      they're observing today, after I've given them a lecture on

10      the American Judicial system, the proceedings here today.

11              The case before the Court is the Estate of

12      Yaron Ungar, et al, vs. The Palestinian Authority, et al.

13      It is Civil Action No. 00-105L.  And the matter is here on

14      Defendant's motion for relief from a default judgment

15      entered some three and a half years ago.

16              Will the attorneys identify themselves for the

17      record, please.

18              MR. STRACHMAN:  David Strachman for the Plaintiffs.

19              MR. ROCHON:  Good afternoon, Your Honor.

20      Mark Rochon on behalf of the Palestinian Authority and the

21      PLO.

22              MR. HIBEY:  Good afternoon, Your Honor.

23      Richard Hibey for the Defendants.

24              MR. SHERMAN:  Deming Sherman for the Defendants.

25              THE COURT:  All right.  Who will argue on
```

1    Defendants' side?

2              MR. ROCHON:  I will, Your Honor.

3              THE COURT:  All right.  Mr. Rochon, you may

4    proceed.

5              MR. ROCHON:  Thank you.  Good afternoon,

6    Your Honor.

7              As indicated, my name is Mark Rochon.  I'm with the

8    law firm Miller & Chevalier in Washington, D.C.  The first

9    thing I'd like to do is-- of course I haven't been in front

10   of the Court before, and thank you for granting our

11   admission pro hac vice in this matter so that I can be heard

12   before you today.

13             We are here on Defendants' motion to vacate a

14   default judgment.  And, as we've indicated in our papers, I

15   hope we've conveyed to the Court that we do understand the

16   extraordinary nature of the relief we request, the

17   procedural history inflicted on this case by our clients in

18   connection with the entry of the default judgment.

19             And I'm going to proceed this afternoon, if I may,

20   by doing something that is not usually recommended in the

21   oral advocacy handbooks, which is to start with what is

22   apparently perceived to be our weakest arguments, instead of

23   what we believe to be our strongest arguments.

24             Therefore, I will not reach the issues of

25   meritorious defense until I attempt to address some of the

1    other issues that are raised by the Plaintiffs in suggestion

2    that the Court ought not even reach the question of

3    meritorious defenses in this case.

4         And let me start with the fundamental question of

5    whether or not the default here was willful.  And let me say

6    to the Court that, after a moment or so, I'll get to what I

7    believe are some nuanced aspects of that question.  But,

8    fundamentally, Your Honor, we recognize in our pleadings and

9    before you that it would be within the ambit of your

10   discretion to find that it was a willful default.

11        So I've given that first answer.  But I think it is

12   important to note, after saying so, that the Court consider

13   the circumstances as of the time of the default.  And the

14   parties agree that the relevant inquiry, the relevant time

15   point for you to make that inquiry, is as of the default,

16   not as to conduct subsequent to the default.  In Footnote 2

17   of the Plaintiffs' objection to our motion, they note that,

18   that is the relevant time frame for you to make that

19   inquiry.

20        When the default-- and I distinguish between the

21   default and the default judgment-- when the default was

22   entered, it was entered-- recommended below by the

23   Magistrate Judge even prior to the time that you had ruled

24   on the issues of sovereign immunity, and you eventually

25   ruled on the sovereign immunity and accepted the

1    recommendation as to default, as of that moment, the

2    willfulness of the Defendants was not as culpable as it

3    might otherwise have been.

4         And let me rush to say, Your Honor, I'm not

5    suggesting that the Defendants would not have defaulted in

6    light of subsequent events.  The Defendants defaulted in

7    other cases, even after you reached your decision as to

8    sovereign immunity, that the Palestinian Authority is not

9    sovereign.

10        But the law does say that you ought to look at the

11   consciousness of the Defendants as of the time of the

12   default, as of that very moment, the Defendants' culpability

13   in regard to the procedural history of this case, and the

14   entry of the default is not what it is sometimes portrayed

15   to be by the Plaintiffs.

16        The real question as to the culpability of the

17   Defendants in that regard goes, I think, more to the timing

18   of the raising of the motion to vacate the default, as

19   opposed to what the mental state was at that moment.

20        Having admitted that it would be within the ambit

21   of your discretion to say that the default was willful, the

22   next question that's raised by the Plaintiffs is they

23   suggest that, therefore, that ends the inquiry, that this

24   Court may not, in the exercise of its discretion,

25   nonetheless, consider the other factors relevant to a motion

1    to vacate under Rule 60(b).  As to that, we disagree with

2    the Plaintiffs.  And, in fact, I think the First Circuit has

3    indicated that it does not agree with the Plaintiffs.

4         The case law of this jurisdiction recognizes that,

5    ordinarily, and I quote, "Willfulness is, by itself,

6    dispositive."  But by the very use of the word ordinarily,

7    the First Circuit has allowed for a situation that would be

8    extraordinary.

9         The Plaintiffs have argued before you that there's

10   an entire series of cases and Supreme Court holdings that

11   establish beyond any doubt whatsoever that willfulness alone

12   ends the inquiry.

13        That cannot be so, as we have referred the Court to

14   many cases where trial courts and appellate courts have

15   found willfulness but then, nonetheless, vacated

16   a default.

17        Indeed, the case upon which the Plaintiffs rely

18   most strongly for the notion that you ought not even

19   consider anything after a finding of willfulness is out of

20   the 11th Circuit, and subsequent to that, they decided the

21   Jackson case, upon which we have argued at some length in

22   our pleadings, where the Court found a willful default but

23   vacated it, nonetheless, as to China.

24        Recently, another Federal Judge, in the Knox case--

25   and the Knox case is another case against the Defendants for

1    similar allegations in the Southern District of New York,

2    and, on occasion, in your rulings in this case, you've noted

3    similar rulings made by the Court in the Knox case.

4         Recently, Judge Marrero, in the Knox case, had to

5    address the very question, is a willful default, by itself,

6    an inquiry-ender, and concluded, in vacating a default

7    judgment entered against the same Defendants as are before

8    you today, that willfulness was not an inquiry-ender and

9    went on to consider the extraordinary circumstances and the

10   meritorious defenses in that case in ordering the vacator of

11   a default judgment of $192 million.

12        We would suggest to the Court that the inquiry by

13   Judge Marrero, which I realize is not binding on you as a

14   fellow United States District Court Judge in another

15   jurisdiction, it is, hopefully, somewhat persuasive to you

16   but certainly doesn't control the exercise of your

17   discretion, but we think the analysis that is laid out there

18   as to this legal point is the correct analysis.  All of this

19   is simply to say that it is within your discretion to

20   consider the meritorious defenses and the extraordinary

21   circumstances presented in this case.

22        The Plaintiffs have also argued, Your Honor, that

23   we are precluded from raising this motion by virtue of the

24   prior litigation in this Court and in the First Circuit.

25   They have argued that, in essence, prior rulings by you or

 1    by the First Circuit preclude the Defendants from arguing a

 2    motion to vacate default whatsoever or, in the context of so

 3    arguing, raising meritorious defenses.  On that point, we,

 4    again, disagree with the Plaintiffs on that question of law.

 5    There was not before the First Circuit any motion to vacate

 6    a judgment.

 7         Judge Marrero addressed the same argument raised in

 8    the same way in his recent opinion and noted that the

 9    appellate, in that instance, terminated appellate litigation

10    in the Second Circuit, had not involved a motion to vacate,

11    that it would have been inapposite to raise the issues on

12    that appeal that were raised by the motion to vacate.

13         Similarly, the issue of whether or not we have a

14    meritorious defense was not litigated before the First

15    Circuit.  The question of whether or not you ought to vacate

16    this default judgment was not litigated before the First

17    Circuit.  And your discretion is not circumscribed

18    whatsoever in that regard in addressing this motion by the

19    First Circuit opinion, given that we are not raising any

20    issues in our motion that were litigated before the First

21    Circuit.

22         The arguments by the Defendants before the First

23    Circuit dealt with sovereign immunity.  We're not claiming

24    we're sovereign.  It dealt with whether or not the amount of

25    the judgment created a political question under the

1    Political Question Doctrine.  We're not arguing that it

2    does.  They argued that you should not have entered default

3    judgment prior to ruling upon sovereign immunity.  We're

4    certainly not arguing that point again here.  In short, the

5    efforts to preclude us from raising these arguments and

6    these defenses fall short.

7         What I would suggest, Your Honor, therefore, is

8    that the Court does need to reach the other factors under

9    Rule 60(b)(6) in addressing this motion.  And I'd like to

10   move on to those other factors after first referencing in a

11   slightly more extended way the recent Knox opinion, with

12   which I assume that the Court is familiar.  We brought it to

13   the Court's attention last week, if the Court had not

14   already, in its research, been made aware of it.

15        The Knox opinion addresses several points that are

16   relevant here.  The first I've mentioned, Is willfulness

17   dispositive?  No.  Is litigation precluded?  Also previously

18   addressed.  No.  The question of the importance of merits

19   litigation in a situation such as this is discussed

20   extensively there.  The question of prejudice in connection

21   with the granting of a motion is discussed there.  And the

22   exceptional circumstances and the importance of foreign

23   policy issues are all discussed there.

24        And the Court addressed those, even in the face of

25   the United States not filing a formal suggestion of interest

 1     in that case.  They filed a letter with the Court expressing

 2     concern about the judgments and their potential impact on

 3     the viability of our client's continuing governance, but

 4     they did not file a formal suggestion of interest.

 5            In his opinion, Judge Marrero noted the-- on the

 6     issue of prejudice, I want to turn to that because the

 7     Plaintiffs there argued that, because the Gaza Strip has

 8     been taken over by HAMAS, that they were prejudiced in their

 9     ability to defend the case, arguments that are similar to

10     the ones that are raised before you now.  We would suggest

11     that careful analysis by this Court of those arguments would

12     yield a result similar to that taken by Judge Marrero in the

13     Knox case.  So we recommend it to the Court, while we

14     recognize that it is certainly not binding on you.

15            Your Honor, I'd like to turn, if I may, to the

16     meritorious defenses that we have raised here, that the

17     Plaintiffs have suggested do not warrant relief here and,

18     after that, address what we believe are the additional

19     extraordinary circumstances.

20            This is a case-- and the parties agree on a very

21     few things in this case, but they agree that the killings

22     here were committed by HAMAS terrorists.  The parties agree

23     there's a judgment against HAMAS for their actions issued by

24     this Court for $116 million.  The parties agree that nothing

25     we're asking you to do affects that judgment for what they

1    did.

2             The parties actually come close to agreeing that

3    HAMAS did that to thwart the peace process in which the

4    Palestinian Authority and the PLO were engaged in 1996.

5    Certainly without regard to whether the Plaintiffs agree

6    with that today, in connection with parallel litigation in

7    the District of Columbia, they have presented extensive

8    testimony and argued that HAMAS killed the Ungars to stop

9    the peace process in which our clients were then engaged.

10            In fact, the historical record, including records

11   relied on by the Plaintiffs, show that HAMAS engaged in a

12   series of acts of terroristic violence to thwart that peace

13   process.  And, sadly, the evidence in the record is they

14   succeeded, that, as a result of their actions, Israel took

15   action to try to stop that activity.  A Government was

16   elected in Israel that pulled back from the peace process,

17   and we're now 12 years later getting to about where they

18   were in 1996 in regards to the peace process.

19            HAMAS, according to the Plaintiffs' experts,

20   opposed what the PA and PLO were doing and, according to the

21   testimony from the Plaintiffs' experts in Washington, D.C.,

22   went to Iran because it was the only place they could go to

23   get support for their actions.  They went there to stop the

24   Defendants, at that time, from doing what we would like them

25   to do and what their-- the process in which they're engaged

1    today.

2         That action of HAMAS continues to affect the peace

3    process in connection with this judgment that has been

4    entered against our clients.  The Palestinian Authority and

5    the PLO paying $116 million to the very deserving Plaintiffs

6    in this case for their losses will not assist the peace

7    process.  It will give HAMAS exactly, in essence, that which

8    they were seeking to do, further destabilizing the PA and

9    the PLO.  The unfortunate reality of this case is that the

10   meritorious defense that the PA and the PLO have was not

11   adequately asserted, but it is critical that it be asserted.

12        Judge Marrero, in his opinion, also discussed the

13   importance of issues like this receiving an airing in a

14   public forum, a trial, because of the serious allegations

15   that a governing entity, particularly one with which the

16   United States is engaged in close diplomatic relationships

17   moving towards peace, the allegation that they supported and

18   were aiders and abetters of terrorism is a critical

19   allegation that ought to be tried, if it can be, as opposed

20   to being resolved without the benefit of litigation.

21        The PA and the PLO, as you know-- and this is

22   partly for the benefit of our audience, I guess-- we don't

23   seek to have this default judgment go away and have the PA

24   and PLO walk out of here and not owe a dime or ever have to

25   try this case.  What we seek is the opportunity to have the

1    Plaintiffs prove their case and us have the opportunity to

2    defend it.

3            We recognize that our clients did not pursue that

4    adequately.  That's why there's a default judgment against

5    them.  We recognize that, that litigation behavior that

6    resulted in that is not the fault of the Plaintiffs.  It is

7    the responsibility of the Defendants, but there are

8    extenuating circumstances that are relevant to evaluating

9    that, Your Honor.

10           This governing entity, this fledgling governing

11   entity called the Palestinian Authority, does not have all

12   the infrastructure of the governments of which we're

13   familiar and maybe the governments of which so many others

14   are familiar.  It has been in a position of not achieving as

15   much of an organizational structure as other governments.

16   It does not-- has not responded well to foreign litigation.

17   It is not surprising that, at least at some point, they were

18   surprised to be brought in to United States Courts for

19   actions that occurred in the Middle East, in Israel, or

20   Palestine or Jerusalem.

21           It is not surprising that, at first, they resisted

22   the idea that, that matter would be brought here.  But that

23   is where it was brought, and that is where you ruled it

24   belonged, and that's where the First Circuit ruled that it

25   belonged, and we know that.

1          But the reality that they had initially a failure

2     to contemplate that is also something that you should

3     consider.  The fact that they have been in disarray for a

4     period of time is something that you should consider as you

5     evaluate whether they're to be given the opportunity to

6     defend or not.  We've supplied information about the

7     problems that, that government has faced, and we've supplied

8     information about the potential impact of this judgment and

9     others to the Court.

10         The Plaintiffs have argued that the impact of this

11    judgment is not great, that it can be paid readily by this

12    entity.  They have suggested that the money is readily

13    available, though the Secretary of State of the United

14    States of America says we're tottering on bankruptcy.  They

15    have focused on the fact that people have committed to

16    pledge money as if the money has been received.  They have

17    spoken about the Palestinian Authority and the PLO to

18    suggest that somehow this was a willful failure to bring the

19    defense to the attention of the Court in a timely manner.

20         And I would suggest to the Court that-- and the

21    Court is a sophisticated Court-- that it's a very-- as you

22    stand here-- as I stand here before you to argue on behalf

23    of the PLO and the Palestinian Authority, that HAMAS

24    committed the act of terror for which we're held liable now.

25    It is, obviously, something that is politically, itself,

1    charged for our clients.

2        HAMAS is trying, according to what the United

3    States of America and its diplomatic communications says, is

4    trying to thwart our client and the Government from the

5    peace process.  They are threatening the very

6    representatives that are speaking for peace.

7        In that context, to bring to the United States

8    Court and try those issues and to expect this kind of

9    governing entity, this kind of fledgling governing entity,

10   to just walk in to Court and present those defenses asks an

11   awful lot.

12       HAMAS does kill people and did kill these people.

13   I'm going to present, if I have the chance, the defense that

14   they killed the Ungars without involvement of my clients,

15   but that is a complicated and difficult defense that is not

16   just raised as if it's a-- some contract dispute.  This is

17   an extraordinary case, if ever there was one.  It cries out

18   for an extraordinary response by this Court to the motion to

19   vacate.

20       I recognize that, that will require us to try the

21   case.  I emphasize that it doesn't free HAMAS for its

22   responsibility and the judgment against HAMAS.  And I point

23   out that, as judgment is collected against the Palestinian

24   Authority, it is reduced against HAMAS.  They will get away

25   scot-free if the Palestinian Authority pays this judgment.

1    Every million dollars that we pay is a million dollars they

2    don't have to pay.

3         So where we are, 12 years after this terrible

4    event, is HAMAS committed the act to thwart the peace

5    process, succeeded in doing so, and now the enforcement of

6    this judgment against our clients has the capability of

7    letting them win again.  In the opinion of the Palestinian

8    Authority and the PLO, it would be much more important and

9    appropriate to try the case.

10        THE COURT:  Well, if you have to pay this judgment,

11   don't you have a right of contribution against the HAMAS?

12        MR. ROCHON:  We would have a right, under the law,

13   for contribution against HAMAS.  It would be difficult for

14   us.  It's also difficult for the Plaintiffs.  We recognize

15   that.  But if there is ever a seizure of funds going to

16   HAMAS by the Israelis, we'll make efforts to interdict those

17   funds, those funds could be given to the Ungars but not if

18   the judgment is extinguished.

19        THE COURT:  You have a right to indemnification, if

20   what you say is true, complete indemnification under our

21   law.  I don't know what the law is out in Israel, but, under

22   our law, you would have the right to complete

23   indemnification, if what you say is true.

24        MR. ROCHON:  If the Court-- an indemnification

25   action, to the degree HAMAS would ever appear in Court to

```
 1    defend it, the argument would be, of course, that we're late

 2    for that, as well.

 3            THE COURT:  A cause of action for indemnification

 4    doesn't arise until you've paid, you've paid the judgment.

 5    It hasn't accrued it.  You pay this judgment, you've got a

 6    right of indemnification that accrues at that time.

 7            MR. ROCON:  Yes.

 8            THE COURT:  That's the law of here.  I don't know

 9    what it is elsewhere.

10            MR. ROCHON:  It is certainly undeniable that, as to

11    the Plaintiffs' collections against HAMAS, they would end

12    with the payment of the judgment by the PA and the PLO, and

13    that would put the PA and the PLO litigating collection

14    action against HAMAS--

15            THE COURT:  That's right.

16            MR. ROCHON:  -- which, obviously, poses, in some

17    ways, as many complications and more than any current effort

18    to collect against HAMAS.

19            The reality, Judge, is that the reason that the

20    collection efforts are focused on our clients instead of on

21    HAMAS is because we are perceived to have the money, despite

22    the fact that HAMAS engaged in the action, according to the

23    Plaintiffs, with the assistance of Iran, not with the PA.

24    And Iran was doing that to thwart the peace process.  That's

25    also the reality of the case.
```

        THE COURT:  I don't know about any of those factual
assertions.

        MR. ROCHON:  Well, the factual assertions about the
Plaintiffs saying that the-- that HAMAS did this with the
assistance of Iran are taken from what the Plaintiffs
alleged in Washington, D.C.  They sued Iran on that theory.

        So those allegations come from the Plaintiffs, not
from me.  They also come from me, but they originally come
from the Plaintiffs.

        The suggestion that they did that to thwart the
peace process comes from me, but it comes from me quoting
the Plaintiffs, that they did that because they couldn't get
support from the PA or PLO so they went to Iran comes from
the Plaintiffs' expert under oath in Washington, D.C.,
Reuvan Paz, and quoted in our brief.  Those aren't-- that's
not my client making those statements because we'd like it
to be so.  It's the Plaintiffs making those statements
because they believe it to be so, and they'd be admissions.

        The factual scenario of HAMAS's involvement and
responsibility for this comes by full accord.  The question
in this case is whether or not the Plaintiffs would be able
to establish before you that, despite the fact that HAMAS
was doing this to thwart the process of peace in which our
clients were engaged, that our clients, nonetheless, for
some reason, aided and abetted that process and they came to

1    us for aiding and abetting of that process.

2         We would like to suggest to the Court, and we do

3    suggest to the Court, that there is a tension between the

4    theories advanced by the Plaintiffs before this Court and

5    the District of Columbia.

6         THE COURT:  There's no question that the-- there

7    are factual issues as to whether the Palestinian Authority

8    and the PLO would be liable in this case if the case were

9    heard on the merits.

10        But that was an opportunity that your clients

11   had a long time ago, to file an answer in this case and

12   dispute these allegations and submit the discovery, and

13   Yasser Arafat did not want to subject himself to a

14   deposition, along with the other six or seven officials that

15   were noted for depositions, and to make discovery.

16        He made a very deliberate choice not to defend

17   this case on the merits and to put all his eggs in one

18   basket, sovereign immunity.  He made that decision, and it

19   was reported right here in open Court by his counsel,

20   Ramsey Clark.

21        It's right here in the record, my hearing in

22   September, 2004.  I stated, "I advised these Defendants a

23   long time ago that the proper way to raise the defense of

24   sovereign immunity was to file an answer and to raise the

25   affirmative defense of sovereign immunity, and then I would

1    have a hearing on the matter.  I would stay discovery until

2    that matter was resolved."

3         Mr. Clark came in to Court and said unequivocally

4    that Yasser Arafat did not want to file an answer in this

5    case and did not want to defend this case on the merits.

6         MR. ROCHON:  I certainly agree with your

7    characterization of what Mr. Clark said and that, that was

8    the strategy that, together with their counsel, Mr. Clark,

9    that Mr. Arafat and the Palestinian Authority pursued.

10        That's why we're here on a motion to vacate default

11   judgment.  If it weren't for that kind of behavior, we

12   wouldn't have a default judgment.  Some of the other cases

13   that we've cited involve Defendants being equally resistant

14   to participating in the U.S. Court process but Courts, in

15   the exercise of their discretion, granting motions to vacate

16   default.

17        It is the case, Your Honor, that the Plaintiffs

18   have suggested that they would be prejudiced from the

19   inability to depose those people at this point.  In our

20   response to that, in our briefs, is, first of all, as to

21   many of those individuals, the idea that they had evidence

22   that would have been helpful to the Plaintiffs' case is

23   purely speculative.  But then, in addition, if there's a

24   particular circumstance in which they're prejudiced, we can

25   address that by way of conditions in connection with the

1    trial.

2         THE COURT:  Arafat is dead.  He can't be deposed,

3    and he was the key witness.  He could have subjected himself

4    to a deposition and answered truthfully and refuted all

5    these allegations that they were giving safe haven to the

6    HAMAS and was supporting HAMAS and so forth.  He could have

7    fought this case, and he chose not to, for whatever reasons.

8         MR. ROCHON:  The notion that he's the key witness

9    I'm not as sure about, Your Honor.  He could have said that

10   he didn't support it, but the Plaintiffs would say, so it

11   was some other person within the Palestinian Authority or

12   the PLO who did it.

13        I can tell you the contemporaneous record, which is

14   even better than what's speculated about what he might have

15   said or would have said, for me to say what he would have

16   said or Mr. Strachman to say what he would have said, it's

17   uncontested that the Palestinian Authority arrested the--

18   two of the individuals who were involved in this action

19   shortly after it occurred, hardly consistent with desiring

20   it to occur and aiding and abetting it.

21        HAMAS rioted when those individuals were turned

22   over to the Israelis because they said that the very people

23   that the Plaintiffs want to depose, Jibril Rajoub, they

24   accused him of turning these people over to the Israelis for

25   trial, and there was a riot in that regard, again, hardly

```
 1   behavior that's consistent with us wanting this to be
 2   brought about.
 3         That's as opposed me trying to tell you what
 4   Yasser Arafat, who I never met, would have or would not have
 5   said.  I won't do that.  But I can tell you the
 6   contemporaneous factual record is that two of the people who
 7   killed the Ungars were arrested by my client shortly
 8   afterwards.  That cries out against what you would normally
 9   expect from a government that's accused of sponsoring
10   terror.  If we had actively pursued this act, would we have
11   provided the perpetrators to the Israelis?
12         I apologize.  I'm not supposed to ask you
13   questions, Your Honor.  That was inappropriate.  It was a
14   rhetorical question, but it's no--
15               THE COURT:  It's all right.
16               MR. ROCHON:  -- no way for me to argue to the
17   Court.
18               THE COURT:  I'm trying to get to the bottom of
19   this, and what troubles me about this is that I can't think
20   of a more willful, deliberate decision on the part of the
21   President of the Palestinian Authority and the head of the
22   PLO.  He made that deliberate decision.  He did not want to
23   recognize the authority of this Court.  I had decided that I
24   had jurisdiction in this case, and, therefore, it was
25   necessary at that time for the PA and the PLO to file an
```

 1    answer, and they kept saying, "Sovereign immunity," so I

 2    told them, "File an answer, claim sovereign immunity.  I'll

 3    stay any discovery that's outstanding, and I'll decide that

 4    issue, then you can make a decision as to where you want to

 5    go from there."

 6         But he chose this route.  So I can't think of a

 7    more deliberate, intentional act on his part, with the

 8    assistance of his counsel, a former Attorney General of the

 9    United States.

10         MR. ROCHON:  Your Honor, all I can say in response

11    is that it is the case that foreign governments sometimes do

12    not fully appreciate the importance of these matters.  When

13    a foreign government is run by more or less a single person,

14    there is even probably a graver danger that those decisions

15    are reached in a way that is less than satisfactory, that

16    when the new President of the Palestinian Authority wrote to

17    the Secretary of State and asked for guidance in these

18    cases, she recommended working with the U.S. Court system.

19    He initiated the steps that resulted in new counsel entering

20    the case, and we have been working to convey to Courts

21    throughout the country that our client desires to have

22    merits litigation to address these matters.

23         THE COURT:  I understand your position, and I will

24    make a determination, write an opinion in this case, make a

25    determination of whether the equities are on your side to

1    have this judgment that's been in effect for more than three

2    and a half years vacated and have a trial on the merits of

3    this case.

4         MR. ROCHON:  Yes, sir.  Barring anything that I

5    might say in reply, I only had two other things that I wish

6    to say before sitting down.

7         THE COURT:  All right.

8         MR. ROCHON:  The first is, as we have indicated to

9    the Court, we believe there are significant foreign policy

10   issues here.  We're aware the United States did not enter

11   the Knox case.  We, nonetheless, encourage you to seek the

12   views of the United States of the foreign policy

13   implications here.  This matter's quite a bit different than

14   Knox in terms of the role of HAMAS and the potential impact

15   on the peace process.  So we would ask the Court to do that.

16   It's, obviously, another one of your discretionary calls.

17        Secondly, and unrelated, we have pending before you

18   an effort for us to satisfy the judgment in the Bucheit

19   matter, and I did assure Plaintiffs' counsel in that case

20   I'd raise that in my argument with you to ask that in an

21   effort to get that done, and now I've done so.

22        THE COURT:  All right.

23        MR. ROCHON:  Thank you, sir.

24        MR. STRACHMAN:  Good afternoon, Your Honor.

25   Because of the numerous issues here, I'm going to rely, in

1    large measure, on our brief-- briefs.  They were fairly

2    extensive and involve a lot of details and citations.

3         What is particularly salient to me here is a few

4    facts that were omitted by the Defendants here.  One, they

5    have never represented to Your Honor, in their presentation

6    today or in almost 100 pages of briefing, that they would

7    comply with the judgment of this Court.  And, in fact, the--

8    they have never complied with the payment of any judgment

9    that has entered against them.

10        So the Bucheit case, for instance, which is a

11   million dollar judgment that they fully litigated for five--

12   that is five years old, is only now being paid because it

13   was brought to the attention of the Judge in Knox that they

14   were not complying with judgments and yet seeking the equity

15   powers of the Court.  I think that speaks volumes.

16        It speaks volumes here that, even now, even after

17   their new attorneys allegedly were hired a year ago, they

18   still haven't paid 20,000-- almost $20,000 in attorneys'

19   fees that were ordered by Judge Martin almost four years to

20   the day ago.

21        They have not voluntarily made any payment in this

22   case at all.  And, in fact, as you know, we have been here

23   for years in post-judgment collection proceedings with

24   Your Honor, a creditor's bill, for instance, that we filed

25   and that they have defended collection actions against us.

1          Your Honor's argument with respect to

2     indemnification is right on the money because, during this

3     litigation and prior to this litigation, HAMAS members were

4     part of the governing coalition of the Palestinian

5     Authority, and we brought all that to the Court's attention.

6     There was a HAMAS minister in the Palestinian government.

7          They operate right now in the West Bank very

8     openly, notoriously, they have banks, institutions, their

9     own schools.  The HAMAS is right there, and they could have

10    sought, for the last four years, indemnification from the

11    HAMAS, and they chose not to do that.

12         In fact, as the Court knows, what they did do, and

13    as the Court is aware of this through a parallel proceeding,

14    they have sued the Ungars several times, including in

15    Palestine, including in Rhode Island, including in another

16    Court, another Federal Court.  So they have chosen just the

17    opposite.

18         Also, I think what's-- what was missing is an

19    excuse as to where they've been for the last year.

20    Allegedly they're taking instructions now from an economist

21    by the name of Fayyad.  Mr. Fayyad was the Finance Minister

22    several years ago.  He became the Prime Minister of the

23    Palestinian Authority some time ago.

24         All of a sudden, now he claims that he has the

25    portfolio of dealing with lawsuits.  They waited almost a

1    year to file this motion to vacate.  And, in fact, as we

2    showed the Court in our exhibits, they strategically planned

3    the filing of this motion after they informed the Court in

4    Israel we were seeking collection actions, or we have a

5    collection action pending, that they were specifically

6    waiting to time this very motion because they were pleading

7    with the State Department to come to their rescue, which, of

8    course, has never happened.

9          The statement that the HAMAS has a separate

10   interest from the PLO is simply inaccurate, and it simply

11   includes a series of misstatements that we pointed out in

12   our brief.  Missing in their presentation is the quote from

13   Dr. Paz, where he says the HAMAS gets weapons from the PA.

14   They forget to tell you that.  They forget to tell you that

15   HAMAS people are employed by the PA.  And, in fact, as we've

16   showed in the exhibits that we filed here, the very leaders

17   of the PA and PLO that we sought to depose have a direct

18   connection with the HAMAS.

19         So, for instance, we asked to depose, and we were

20   ordered, we were allowed to depose Razi Jabali.  Well, at

21   the time, he was the head of the PA police force.  They

22   don't have an army, so their police force is sort of the

23   highest level of sort of military over there, if you will.

24   They were ordered to produce him for a deposition here.

25         Lo and behold, a couple of years later, after they

1    have waited almost four years-- we're almost now four years

2    since the judgment entered in this case-- Mr. Jabali, as we

3    point out in our brief, is a senior advisor to the leader of

4    HAMAS, protected in Syria.  He works for the HAMAS himself,

5    Khaled Mashal.  He's his advisor.

6           We asked to depose Mr. Dahlan.  We were ordered and

7    granted the right to depose Dahlan, and the Court gave

8    repeated-- Judge Martin gave repeated opportunities and

9    warnings that they had to produce these witnesses.

10          Mr. Dahlan, as we showed to the Court, and we

11   brought a video to the Court in our recent filing, that in

12   January of 20-- in January, 2006, Mr. Dahlan appeared on

13   TV-- we showed the transcript and the actual video-- and

14   where he says, "We sheltered HAMAS people."

15          Now, they misquote the statement, and they would

16   have you believe that it was post the murder of the Ungars.

17   But, in fact, that very statement refers to a master HAMAS

18   terrorist by the name of Yihye Ayash, and Mr. Ayash, of

19   course, they say, "We protected Mr. Ayash."  Well, he was

20   killed by the Israelis several months prior to the Ungar

21   murder.  So, clearly, Mr. Dahlan admitted, their own

22   employees admitted that they were harboring and they were

23   sheltering HAMAS people.

24          And that brings me to the issue of the prejudice

25   that the Plaintiffs would suffer.  The prejudice in this

1    case is overwhelming, and not only is it overwhelming

2    because of time and because of the loss of witnesses, but

3    this Court has already ruled that there would be prejudice

4    to the Plaintiffs.  The Court has already said that their

5    actions in defying Judge Martin's orders and your orders

6    with respect to interrogatories, requests for production of

7    documents, requests for admissions, depositions, prejudices

8    our ability to prove our case.

9         Now, they would have us rewind the clock, not just

10   four years, but eight years, going back to March of 2000

11   when we filed this case.  Since then, we know that, as

12   Your Honor indicated, the very key witness, the person who

13   himself pulls the strings of terrorism, who all the experts

14   that we showed in our briefs, from the Israeli experts, the

15   academic experts, the State Department, U.S. Congressmen,

16   U.S. Senators, everyone up and down the line, to Secretary

17   of State Rice herself, we showed her statement, all say the

18   same thing, they all say that it was Arafat himself who

19   turned on terrorism when he wanted and turned it off.

20        And what he did was he kept the HAMAS like a caged

21   dog.  And he knew they wanted terrorism, and they knew that

22   at some times he wanted terrorism, so he used the HAMAS as a

23   tool, and he opened the cage and unleashed the dog when he

24   wanted an attack.  Now, just because the dog wants to attack

25   and the PLO wants to attack doesn't mean they necessarily

1    have the same goals and ideas, but they clearly want an

2    attack, and that's what happened.  That's what everybody

3    said straight down the line from the Israelis, the

4    academics, the State Department, Secretary of State Rice.

5    And they don't deny that.

6         What they try to do is selectively quote from

7    statements from Dr. Paz, leaving out the most salient ones,

8    leaving out the statement where he says, "The HAMAS gets

9    guns from the PA," for instance.

10        So now we have-- they would have us be faced in a

11   situation where we don't have Mr. Arafat, we don't have Gaza

12   because all of the PLO and PA documents, their own

13   documents, that are in Gaza were taken over by HAMAS, and

14   they've acknowledged in another case, and we have showed and

15   we provided their brief to Your Honor as an exhibit, where

16   they acknowledge, We can't do discovery in Gaza.  All the

17   documents that we had-- now, I'm paraphrasing, but all the

18   documents that we had in our own PA police force, at our own

19   operations in Gaza, are now gone.

20        And we allege repeatedly in our complaint that the

21   support, material support and assistance provided by the PA

22   and the PLO to the HAMAS includes actions that were taken in

23   Gaza.  So they would have us handicapped in that respect.

24   They would have us handicapped because Razi Jabali's hiding

25   in Syria with the HAMAS, literally, as an advisor to them.

1    Mr. Dahlan is nowhere to be found.

2            Mr. Al-Hindi, another one of the witnesses that we

3    were allowed to depose and they were ordered to produce and

4    that we allege, like all of the witnesses, was personally

5    involved in providing material support and assistance to the

6    HAMAS.  These aren't incidental witnesses.  These are the

7    crux of our case.  These witnesses were the main witnesses.

8    Lo and behold, Mr. Al-Hindi is no longer a PA employee, so

9    he can't be produced.  So the risk to us and the inability

10   to litigate this case on the facts now, eight years after--

11   they'd like to start all over again, like it was the day

12   after we filed the complaint or 21 days after we filed the

13   complaint-- is enormous.

14           Next, Your Honor, is the overwhelming risk that the

15   PA and the PLO will hide their assets.  We've shown the

16   Court how they have fought us over $196,000 in Washington.

17   They have fought us in several places here in the United

18   States regarding larger pots of money.  They've fought us

19   over $11,000 with this judgment, in enforcing this judgment.

20           When Your Honor granted our creditor's bill and

21   transferred to the Ungars the Palestine Investment Fund

22   while their counsel was in the room, while they were

23   present, within 90 days of that, they depleted $27 million,

24   as we've shown in our brief, in defiance of Your Honor's

25   Court order.

1          Now, they have-- then they also, retroactively and

2     deceptively, tried to amend the Articles of Incorporation.

3     That was the subject of the other suit that was pending in

4     this Court.  I believe it was last spring Your Honor

5     dismissed the-- where their purported lawyer sued the

6     Ungars, and we showed in that case that they cooked the

7     books, they cooked the documents, and I don't think it was

8     any of the lawyers' fault.  I think they were duped and

9     misled themselves.  So they are defying every order of the

10     Court with respect to collection of judgments, as well.

11          And then we have, of course, the $20,000 that

12     they-- it's less than 20, I think it's like 18, 19,000 they

13     were ordered four years ago to pay for discovery abuses,

14     still hasn't been paid voluntarily.  We have collected a

15     small sum.  We have had to go places to find assets.  They

16     have never voluntarily paid, and they still haven't paid

17     that sum.

18          And, lastly, Your Honor, one of the most

19     significant prejudices that we would suffer is that-- and

20     they fail to acknowledge this, and it's surprising because,

21     as their own website states, the PA is a temporary body, and

22     Your Honor knows as well as anyone else, because you fleshed

23     out all the Oslo Accords and all the documents that created

24     the Palestinian Authority, the Palestinian Authority's legal

25     name is called-- is the interim authority.  The Oslo Accords

1    repeatedly refer to it as an interim, temporary body.  By

2    its own definition, it should have expired already.

3         In November, there was a conference in Annapolis,

4    and the U.S. Government, the Israeli Government and the

5    Palestinian Authority all committed to creating a

6    Palestinian state by the year-- by the end of this year that

7    would supersede the PA, the PA would evaporate.  And that's

8    what they've said on their website.  That's what the PA

9    website, as we quoted in our brief, said specifically, that

10   it will no longer exist.

11        So, therefore, a judgment that we might get years

12   from now in this Court would be ephemeral because there

13   would be no ability at all to collect it because the entity

14   that we are suing would go away.

15        And, lastly, with respect to Your Honor's

16   suggestion about or discussion about the strategy that they

17   chose, one thing also missing from the Defendants'

18   presentation is the selectivity that they have chosen with

19   respect to litigation.

20        As this case was going on, exactly at the same time

21   frame that this case was going on, and, in fact, we showed

22   Judge Martin that they were litigating a parallel case in

23   Washington, the Bucheit case in which they brought over

24   witnesses, they had a trial, they appealed, they had

25   separate counsel in Washington.

1       So they decided not just-- they decided

2   specifically, knowing full well that there were certain

3   opportunities that they wanted to exploit to defend cases,

4   but there were others that they decided, for a lot of

5   reasons-- and we know the reasons.  One of the reasons is

6   because they would be too embarrassed to bring all this

7   evidence in Court but-- and to submit to depositions and

8   have to answer questions.  And, of course, they haven't

9   answered a single question, responded to a single

10  interrogatory, a single request for admission or provided a

11  single document.

12      And glaringly missing from the Defendants'

13  presentation today and in their 100 pages of briefs is the--

14  is all that discovery.  They've never provided that

15  discovery.  They still haven't provided discovery.  And in

16  the last year since, allegedly, this new-- the economist who

17  was appointed to allegedly run their litigation office still

18  hasn't provided any of that discovery or even offered to do

19  any of the discovery that the Court ordered, even if it were

20  permissible.

21      But the point that I was making is that they

22  selectively chose to litigate the Bucheit case and to not

23  litigate this case, and the statements that they made to

24  Your Honor about personally meeting the-- when we look back

25  at the transcript, the decisions of the Court, I think you

 1    were, if anything, very generous to them.

 2            Mr. Clark stood in Court and said, "I personally

 3    met with Yasser Arafat in his office in Ramallah, and he

 4    told me what to do."  They later submitted a series of

 5    letters in this case and in other cases saying, We take this

 6    position.  It's not a one-off position, it's not a mistake,

 7    and it's not deliberate just with respect to this case.

 8    It's a global deliberate position that they had with respect

 9    to these cases.

10            So, for those reasons and the others that we

11    allege-- that we argue, Your Honor, in our brief, I suggest

12    that there's absolutely no basis for vacating this judgment.

13    Their arguments are offensive not just to the Ungars but to

14    the Court and to our judicial system, and to ask for a redo

15    at this late date is in defiance of virtually all of the

16    First Circuit decisions that we show and that we bring.

17            They are now asking this Court to import and to

18    pretend that we're in New York and look at Second Circuit

19    decisions, some of which were the decisions that the--

20    Judge Marrero in the Knox case decided on, but I guess they

21    didn't realize that we are in the First Circuit, and the

22    First Circuit has very clear decisions with respect to the

23    deliberateness, the issue of deliberateness in default

24    judgments.

25            Thank you.

```
 1              THE COURT:  All right.  How about freeing up those

 2     funds to pay that judgment?

 3              MR. STRACHMAN:  Your Honor, we had submitted a

 4     response and a proposed order agreeing.  What we objected to

 5     was the nature of the original order and the attempt to sort

 6     of undermine Your Honor's restraining order.  We submitted a

 7     response order, and I know now that the rules suggest we

 8     should not be giving orders, but we wanted to give an order

 9     because we have no objection if the Court signs our order

10     and those funds are provided to Bucheit.  They deserve to be

11     paid, finally.

12              THE COURT:  Your proposed order and the proposed

13     order of the Defendants seem to me to be virtually the same.

14              MR. ROCHON:  Your Honor, I'll save Mr. Strachman

15     arguing.  We don't oppose you signing his instead of ours,

16     if that's what he prefers.

17              THE COURT:  All right.

18              MR. ROCHON:  Our goal is to accomplish the payment.

19              THE COURT:  All right.

20              MR ROCHON:  We're not interested in debating the

21     point.

22              THE COURT:  All right.  I will sign his proposed

23     order.

24              MR. STRACHMAN:  Thank you, Your Honor.

25              THE COURT:  All right.  I'll take this matter under
```

```
 1   advisement.
 2            MR. ROCHON:  Your Honor, may I have brief reply
 3   or--
 4            THE COURT:  All right.
 5            MR. ROCHON:  Thank you, Your Honor.
 6            THE COURT:  Yes, go ahead.  Make it very brief--
 7            MR. ROCHON:  I will.
 8            THE COURT:  -- because I've heard about everything
 9   I need to hear in this case.
10            MR. ROCHON:  Yes, sir.  I understand.
11            THE COURT:  And I've done all the reading--
12            MR. ROCHON:  But, first, and I'll--
13            THE COURT:  And I'm going to write an opinion.
14            MR. ROCHON:  Thank you.  -- I'll go through about
15   five points.  The suggestion that there's a separate
16   attorneys' fees judgment in this case, if Mr. Strachman
17   brings it to our attention, we'll try to address it.
18            There was a sanctions order in Knox for attorney
19   misconduct by predecessor counsel.  Please let me tell you,
20   that's been paid.  If Mr. Strachman brings something
21   involving attorney conduct, we will make arrangements for
22   that to be satisfied.
23            Second, the suggestion of where we have been for
24   the last year, we got in this case in May.  We knew when we
25   filed vacator motions they would be read extremely carefully
```

1    by very capable counsel, and we didn't rush in-- these are

2    complicated matters.  There's 12 different cases that we had

3    to analyze and file these motions in.  The fact that it took

4    us six and a half to seven months to get them all in, after

5    we were fully engaged, you know, it was an extraordinary

6    effort that we had to file these motions in.

7         On Mr. Paz's testimony about where these people get

8    their guns, I object to counsel's reference, and let me

9    bring the transcript up because the suggestion that we're

10   playing fast and loose with the facts, Mr. Paz was asked by

11   Mr. Strachman in the United States District Court for the

12   District of Columbia where the terrorists in this case got

13   their guns.

14        And on Page 78 of the transcript that we provided

15   as Exhibit M, he, Mr. Strachman, elicited the testimony that

16   the guns in this case were provided by Talachmeh, not from

17   the Palestinian Authority, a HAMAS figure who trained the

18   shooters who killed the Ungars.

19        Later in that man's testimony, he asked,

20   Generally, where does HAMAS get the guns, not as to this

21   incident, but just in general?  And he said they'd get them

22   from a variety of places and suggested they get them from

23   the PA, not because they're given; they steal guns.  And

24   that's at Page 80, same transcript.

25        As far as the First Circuit standards, Paul Revere

```
 1    is the case that says that, ordinarily, willfulness is not
 2    dispositive.  It's a-- I'm familiar with what Circuit I'm
 3    in.  The Courts of this Circuit recognize that, ordinarily,
 4    willfulness is not dispositive.  The Plaintiffs' counsel
 5    cited as many Second Circuit and 11th circuit cases as we
 6    have.
 7            On the question of-- there was one other record
 8    reference I wanted to bring to your attention, Your Honor.
 9    The notion that our client is working secretly with HAMAS in
10    1996, that we're-- that they're a dog and we're a dog owner
11    is all very colorful, but I'd suggest that the Court refer
12    to the people who actually established the foreign policy
13    for the United States in these matters, not Mr. Strachman,
14    but the Department of State, which said, and I quote, "The
15    Palestinian Authority"-- and this is on Page 27 of our
16    original motion-- "The Palestinian Authority, which is
17    responsible for security in the Gaza Strip and most
18    West Bank towns continued, in 1996, its effort to reign in
19    Palestinian violence aimed at undermining the peace
20    process."
21            The fact that sometimes the dog of HAMAS was not
22    controllable doesn't mean that we wanted it to be out of
23    control.  The State Department decides these issues, not the
24    kind of representations from Congressmen on the floor of the
25    House trying to, you know, get some votes from their
```

district for saying something that they think is going to be palatable.  Foreign policy and the evaluation of our client comes from the Executive Branch in the State Department, not from Plaintiffs' counsel.

We would urge the Court to consider asking the State Department for their views as to whether our clients are dogs working with HAMAS or what is, in fact, the case, face assassination threats for trying to work towards peace.

Your Honor, the-- with that, and given what the Court has said, I would only add that, on any discovery, since we've come in the case, we actually are working with Plaintiff, and we've argued with courts in the District of Columbia to have reciprocal discovery in the cases down there.  He's opposed it.

We were asked to provide documents in this case. We worked with Mr. Strachman in this case to provide documents related to the British gas deal our client is engaged in so that, apparently, he could seek collection efforts in that regard.  We, and I now refer to ourselves personally, have done what we can to comply with discovery orders since we've come in the case, and there certainly is no motion to compel discovery before this Court from Mr. Strachman.

Your Honor, we would ask the Court to recognize that, in fact, the Palestinian Authority ought to have the

1  day to counter the allegations made by Plaintiffs' counsel

2  regarding our client's behavior.  Thank you very much for

3  your patience.

4       THE COURT:  All right.  Thank you for your

5  arguments.  And, as I said, I'll take this matter under

6  advisement, and I'll write yet another opinion in this long

7  case that was filed in the year 2000.  We'll take a recess.

8       (The proceeding was concluded at 3:03 p.m.)

9

10            C E R T I F I C A T I O N

11

12

13       I, Debra D. Lajoie, RPR-FCRR-CRI, do hereby

14  certify that the foregoing pages are a true and accurate

15  transcript of my stenographic notes in the above-entitled

16  case.

17

18

19  _____

20  Debra D. Lajoie, RPR-FCRR-CRI

21

22

23  _____4/24/08_____

    Date

24

25