UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

Plaintiffs – Judgment Creditors,

v. C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

Defendants – Judgment Debtors.

**PLAINTIFFS – JUDGMENT CREDITORS' NOTICE OF FILING RELEVANT TO DEFENDANTS' RULE 60(b) MOTION**

Defendants' Rule 60(b)(6) motion to vacate is currently pending before the Court.

The Ungars opposed that motion on the grounds, *inter alia*, that if the judgment were vacated, the assets against which the Ungars have been seeking to enforce the judgment for the past several years would be removed from the United States, thereby rendering collection of any future judgment extremely difficult if not impossible, and so severely prejudicing the Ungars. *See* dkt. #415 at 36-40 (citing numerous cases holding that increased risk of difficulty in enforcing future judgment constitutes "prejudice" for purposes of Rule 60(b)).

In reply, the defendants argued (i) that risk to future collection is not cognizable "prejudice" under the Rule 60(b) standard, (ii) that the Ungars' ability to enforce the judgment would not be at risk, and (iii) that if the Court nonetheless found such a risk it could shield the Ungars from any prejudice by ordering defendants to deposit a bond. *See* dkt. #423 at 30-31.

Defendants have now flatly contradicted all of these arguments in papers filed by them last week in *Knox v. Palestine Liberation Organization et al.*, Civ. No. 03-4466(VM) (S.D.N.Y).

On March 26, 2008, the *Knox* court ordered that the defendants' Rule 60(b) motion to vacate the judgment in that case would be granted on the condition (*inter alia*) that the defendants post security in the full amount of the judgment. *Knox v. Palestine Liberation Organization*, __ F.R.D. __, 2008 WL 878213 (S.D.N.Y. 2008).

The defendants then moved for a 45-day extension of time to post the security, which the court granted. *Knox*, dkt. #123.

On May 9, 2008 – the 44th day – defendants filed a motion seeking to reduce the security to $15 million (about 7.5% of the amount ordered by the district court). Exhibit A.

In that motion, defendants contradict their argument in this Court that "[t]he relevant question … is whether litigation of the case – not collection – is impaired by vacating default" (dkt. #423 at 31), and freely concede and cite cases holding that risk of difficulty in enforcing a future judgment constitutes prejudice to the plaintiff which must be considered in the context of a Rule 60(b) motion. *Id*. at 5, 23-24.

Defendants also argue in their motion that the fractional security proffered by them is adequate, because the Knox family would **in any case** have little chance of locating assets of defendants against which they could enforce a judgment, and the security should not be used to **improve** the family's prospects of recovery. *Id*. at 23-24. (Notably, this claim takes for granted that defendants would not voluntarily honor such a judgment.).

Thus, defendants' filing in *Knox* confirms that if the judgment in this case were vacated (thereby releasing the existing post-judgment restraints on defendants' U.S. assets), the Ungars would have little prospect of ever enforcing a future judgment.

Finally, defendants claim in their motion in *Knox* that the absolute maximum amount of security they are able to post is $15 million. *Id. passim*. It is irrelevant whether this claim is true

or false (as the Ungars believe) – the point is that ordering the defendants to post a bond in this case would be futile, because defendants' course of conduct in *Knox* makes clear that they would not post it.

The Ungars respectfully file this Notice merely to alert the Court to the positions taken by these defendants in the *Knox* case, and nothing herein should be construed as implying that even security in the full amount of the judgment would protect the Ungars from prejudice if the judgment were vacated – on the contrary, the Ungars have demonstrated other irreducible forms of prejudice (e.g. loss of key witnesses and evidence) which would leave them unable to litigate the case and which could not be cured by **any** form of security.

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

CERTIFICATION

I hereby certify that on May 15, 2008 I served this pleading along, with the attached exhibit, via ECF to the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/S/ David J. Strachman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LESLYE KNOX, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 03 CV 4466 (VM) |
| THE PALESTINE LIBERATION ORGANIZATION, THE PALESTINIAN AUTHORITY, et al., | ) | |
| Defendants. | ) | |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REDUCE AMOUNT OF BOND

Richard A. Hibey
E-mail: rhibey@milchev.com
Mark J. Rochon
E-mail: mrochon@milchev.com
MILLER & CHEVALIER CHARTERED
655 15th St., N.W. Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202) 626-5801

*Attorneys for Defendants the Palestine Liberation Organization and the Palestinian Authority*

# TABLE OF CONTENTS

Page

ARGUMENT ....4

I. PERTINENT CASELAW DEMONSTRATES THAT A BOND NEED NOT BE IN THE FULL AMOUNT OF THE VACATED JUDGMENT AND THAT A DEFENDANT'S FINANCIAL CONDITION MUST BE CONSIDERED IN DETERMINING THE AMOUNT OF A BOND. ....5

A. The Second Circuit's Powerserve International, Inc. Decision Provides the Appropriate Framework for Determining the Bond in this Case. ....5

B. Abundant Caselaw Demonstrates that the Defendants' Financial Condition Must be Considered in Determining the Amount of the Bond. ....8

II. THE PALESTINIAN AUTHORITY AND THE PALESTINE LIBERATION ORGANIZATION ARE NOT FINANCIALLY ABLE TO POST A BOND IN THE FULL AMOUNT OF THE DEFAULT JUDGMENT ....11

A. Recent Reports and Statements by the International Monetary Fund, World Bank, and U.S. Confirm that the PA Has a Staggering Deficit and Is Entirely Dependent on Foreign Aid ....12

B. The Declaration of the PA's Finance Minister and Accompanying Financial Statements Confirm the PA's Inability to Post a Bond in the Full Amount of the Judgment. ....15

C. The PLO Is Not Able To Post A Bond In The Full Amount Of The Judgment ....20

III. A Bond of $15,000,000 Will Sufficiently Protect Plaintiffs Against A Subsequent Default and Any Other Cognizable Prejudice. ....21

CONCLUSION ....25

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Chesapeake, Potomac, and Tidewater Books, Inc.*, 190 F.R.D. 190 (E.D. Va. 1999) ........ 10, 11, 22

*Allen v. S. County Hospital*, No. 2006-6-Appeal, 2008 R.I. LEXIS 42 (Apr. 14, 2008) ........ 8

*Continental Data Corp. v. Old Colony Group Leasing, Inc.*, 1993 Mass. App. Div. 44 (1993) ........ 8

*Defoe v. Lesley*, Civil No. 1080/34, 1981 U.S. Dist. LEXIS 9368 (V.I. Jan. 27, 1981) ........ 8, 9

*Estate of Yaron Ungar v. Palestinian Authority*, 841 N.Y.S.2d 61 (N.Y. App. Div. 2007) ........ 23

*First Fidelity Bank v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189 (2d Cir. 1989) ........ 6

*Henry v. First National Bank of Clarksdale*, 424 F. Supp. 633 (N.D. Miss. 1976) ........ 11

*Morgan Guaranty Trust Company of New York v. Republic of Palau*, 702 F. Supp. 60 (S.D.N.Y. 1988) ........ 9-10, 11

*Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538 (9th Cir. 1988) ........ 5-6

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794 (7th Cir. 1986) ........ 10

*Philips Medical Systems International B.V. v. Bruetman*, 8 F.3d 600 (7th Cir. 1993) ........ 5

*Poplar Grove Planting & Refining Co., v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189 (5th Cir. 1979) ........ *passim*

*Powerserve International, Inc. v. Lavi*, 239 F.3d 508 (2d Cir. 2001) ........ *passim*

*Sales v. Republic of Uganda*, 828 F. Supp. 1032 (S.D.N.Y. 1993) ........ 2

*Strachman v. Palestinian Authority*, Case No. 3:05-mc-00208 (PCD) ............................23

*Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133 (2d Cir. 1986),
*rev'd on other grounds*, 481 U.S. 1 (1987) ..................................................................9

*Thorpe v. Thorpe*, 364 F.2d 692 (D.C. Cir. 1966) .....................................................6, 8, 9

*Triboro Entertainment Group, Inc. v. Filmcat Inc.*, No. 93-civ-6798 (JFK),
1996 U.S. Dist. LEXIS 9754 (S.D.N.Y. July, 12, 1996) ..........................................8, 9

*Ungar v. Palestinian Authority*, 00-105L (D.R.I. May 5, 2005) .....................................23

*Ungar v. Palestinian Authority*, No. H/P 4318/05)
(Jerusalem District Court)..........................................................................................23

*Wokan v. Alladin International Inc.*, 485 F.2d 1232 (3d Cir. 1973).................................22

## FEDERAL RULE

Federal Rules of Civil Procedure 60...................................................1, 22, 23

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REDUCE AMOUNT OF BOND

On March 26, 2008, the Court entered a decision and order conditionally granting *vacatur* of the default judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure. DE 122. The Court found *vacatur* warranted in light of the proffered meritorious defense, the public policy interests at stake, and the law's strong preference for merits litigation. The Court, however, imposed the following conditions on its order: (1) that Defendants stipulate the Southern District of New York is an appropriate venue for the case; (2) that Defendants reimburse Plaintiffs for reasonable costs and expenses incurred as a result of the default; (3) that Defendants agree, if Plaintiffs successfully prove liability, not to object to the admission of the Ellis family's prior testimony in any damages hearing; and (4) that Defendants post a bond or other form of adequate security covering the total amount of the judgment entered August 1, 2006 of $192,740,660.13, including interest. DE 122 at 32-33. On March 31, 2008, Defendants informed the Court that they will meet the first three conditions, but requested an additional 45 days from the date of the March 26 decision to post the bond, given the Defendants' current financial situation and the difficulties and complexities of securing a bond for approximately $193 million. DE 123. The Court granted the request. DE 123.

Over the past 45 days, the Defendants and their counsel have worked diligently to meet the bond condition set by the Court, including holding discussions in the region at the highest levels of the Palestinian government to explore the manner in which the bond condition could be met. Unfortunately, as Defendants will document extensively in this motion and supporting documents, Defendants' current financial condition makes posting a $193,000,000 bond a practical impossibility.

Respectfully, Defendants request that the Court reduce the amount of the bond to $15,000,000. Such a bond is more than sufficient to meet the legitimate purposes of a bond in a situation such as this, where the Court has found that Defendants otherwise deserve a trial on the merits. Indeed, a $15,000,000 bond would serve to adequately protect the Plaintiffs in this case from another default, and it ensures that in the highly unlikely event of any future default, that the Plaintiffs' collection efforts are in fact improved from their current posture.

In its March 26, 2008, decision, the Court raised the issue of a bond *sua sponte* and formulated a bond amount of approximately $193,000,000 -- to match the amount of the vacated judgment plus interest -- in the absence of any evidence concerning Defendants' current financial situation and the effect that the posting of such a large bond would have on Defendants' ongoing viability. DE 122 at 28-32. Indeed, in the briefings on the *vacatur* motion, there was no argument from the Plaintiffs whatsoever as to what bond would be appropriate or as to what standards should be applied to the setting of any financial condition. To be clear, Defendants do not argue herein that the Court could not impose a bond *sua sponte*, nor do Defendants question, on this record, whether it is reasonable for the Court to impose some bond to alleviate the Court's concerns about Defendants' participation in the case going forward. However, Defendants' do challenge the *amount* of the bond, which will impose an undue financial burden on Defendants, which will force Defendants to curtail critical governmental functions, and which exceeds the amount necessary to accomplish the Court's legitimate goals. Defendants urge the Court to determine the amount of the *vacatur* bond as a plenary matter after full consideration of the evidence presented in this motion, which will make clear that a bond amount of $15,000,000 is reasonable under the circumstances. *see Sales v. Republic of Uganda*, 828 F. Supp. 1032, 1035 (S.D.N.Y. 1993) ("Because this Court added that [bond] condition *sua sponte*, the parties

had not briefed the issue prior to the . . . opinion. Accordingly the usual strictures on motions for reargument contained in Civil Rule 3(j) of this Court may be relaxed. I have considered the question *de novo*."),

As a purely legal matter, the parties appear to agree as to the importance of Defendants' financial condition in formulating any bond requirement. Plaintiffs themselves have already suggested, in a letter dated April 23, 2008, to undersigned counsel, that Defendants' financial situation should be dispositive in formulating the proper amount of the bond.[1] With that letter, Plaintiffs sought to propound discovery related to the PA and PLO financial condition, in anticipation that Defendants would move to reduce or eliminate the bond requirement due to the Defendants' financial limitations; they claim to seek the discovery to refute this anticipated argument. Of course, the Plaintiffs could have instead waited to make an argument that financial condition is irrelevant, but Plaintiffs implicitly recognize that such an argument is contrary to caselaw, common sense, and fairness. To be sure, Plaintiffs' letter disputes Defendants' factual contentions concerning their financial situation without ever having seen those contentions. However, the sworn declarations and other detailed financial materials submitted in support of this motion demonstrate beyond reasonable dispute Defendants' inability to meet the current bond amount. As these materials make clear, there is a good reason the international community uniformly recognizes that Defendants are teetering on the verge of bankruptcy. In the past year, the Palestinian government has run a deficit that amounts to 27% of its Gross Domestic Product, and it depends on massive support from foreign countries for its survival. Defendants have recently been forced to go months without paying the full salaries of government workers and, while in the midst of a rigorous austerity program, have nonetheless been compelled to subsidize

[1] A copy of the letter from Plaintiffs' counsel is attached as Exhibit 7.

hundreds of millions of dollars of utility payments for the Palestinian people, many of whom cannot afford to pay for basic electrical and sewage services. The Palestinian government is effectively forced by this precarious situation to scrape together its finances from crisis to crisis.

A bond of approximately $193 million would represent nearly two-thirds of the entire revenues generated by Defendants for the past fiscal quarter, and nearly 10% of the yearly budget for the entire Palestinian Authority. When viewed in this light, it is not an overstatement to say that the current bond requirement would force Defendants to choose between their ongoing viability and defending themselves in this case. By contrast, a reduction of the bond to $15,000,000 will appropriately balance all of the competing interests at stake.

The $15,000,000 bond will fulfill the goals set forth by the Court in the portion of its decision and order discussing the bond. Such a bond still would require Defendants to post approximately 5% of the quarterly revenues of the Palestinian Authority as the cost of defending themselves on the merits. As such, it would fully ensure that Defendants take the litigation seriously and participate in it fully. This amount would itself strain Defendants' resources to produce, and Defendants' would strain those resources even further if they were to forfeit such an amount through any subsequent default. The Court should reduce the amount of the bond to $15,000,000, direct the posting of the bond in compliance with Local Rule 65.1.1 forthwith, and direct that the case management conference called for by the Court's March 26, 2008 order occur within 10 days of the posting of the $15,000,000 bond.

## ARGUMENT

As is discussed below, the caselaw makes clear that a defendant's ability to pay a bond is a relevant--indeed a necessary--consideration for a court determining the amount of a bond, payment of which determines whether or not that defendant receives a trial. In the instant case,

the Court did not have the benefit of briefing on the issues of the Defendants' financial condition, but now that that issue is squarely before the Court, the record clearly demonstrates that the Defendants are impoverished, that they can only afford a $15 million bond, and that such a bond is more than sufficient to meet the appropriate purposes of a bond.

## I. PERTINENT CASELAW DEMONSTRATES THAT A BOND NEED NOT BE IN THE FULL AMOUNT OF THE VACATED JUDGMENT AND THAT A DEFENDANT'S FINANCIAL CONDITION MUST BE CONSIDERED IN DETERMINING THE AMOUNT OF A BOND.

There is a host of caselaw upholding Defendants' position that financial condition is a pertinent consideration for a court setting bond in the *vacatur* context. Moreover there is no presumption that a bond should equal the full amount of the vacated judgment.

### A. The Second Circuit's *Powerserve International, Inc.* Decision Provides the Appropriate Framework for Determining the Bond in this Case.

This Court's March 26, 2008, decision and order appropriately identified *Powerserve International, Inc. v. Lavi*, 239 F.3d 508, 515-16 (2d Cir. 2001), as the controlling legal authority with regard to the imposition of a bond requirement as a condition of *vacatur*. DE 122 at 28-29. There, the Second Circuit held that a court granting a motion to vacate a default or a default judgment has discretion to condition the grant of *vacatur* on the posting of a bond. *Powerserve*, 239 F.3d at 515-16.

In so holding, the Second Circuit cited approvingly cases from other Circuits that had upheld and/or approved of bond conditions that were far less than the full amount of the judgment. First, the Court of Appeals cited to *Philips Medical Systems International B.V. v. Bruetman*, 8 F.3d 600, 602-04 (7th Cir. 1993), which affirmed an order requiring the Defendant to post an $800,000 bond as a condition of vacating a $19 million judgment (i.e., a bond of 4% of the judgment). Second, the Court of Appeals cited *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1546-47 (9th Cir. 1988), which upheld

an order directing the payment only of fees and expenses as a condition of *vacatur*, but also approved the theoretical possibility of a bond in appropriate cases. Third, the Second Circuit cited *Thorpe v. Thorpe,* 364 F.2d 692, 694-95 (D.C. Cir. 1966), which also reversed and remanded a bond that had been entered for the full amount of Plaintiffs' claimed damages (which bond was more than the original $30,000 judgment), and noted that "if appellant's claim that he simply is unable to comply with the condition imposed is true, serious questions are raised, questions having an aura of denial of due process of law."

These cases make clear there is no hard and fast rule equating the size of the bond with the amount of the original default judgment, particularly in a case like this one where the original damages award was nearly $200,000,000. To be sure, *Powerserve* also noted with approval that, in *First Fidelity Bank v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989), the Court had conditioned its appellate decision directing *vacatur* on "Antigua post[ing] a bond covering the amount claimed by First Fidelity, including interest," which was approximately $200,000. By the same token, however, *Powerserve* cautioned that "[n]ot every case will warrant conditioning *vacatur* on the posting of such a substantial bond." 239 F.3d at 515. The touchstone, the Court of Appeals emphasized, is reasonableness and it is "incumbent on the district court to make findings sufficient to permit appellate review of the condition's reasonableness." *Id.* at 515-16.

The Second Circuit's analysis of the bond condition in *Powerserve* illustrates the sort of factors that warrant consideration in the "reasonableness" calculus. The bond condition at issue in *Powerserve* was not for the full amount of the judgment. The district court there had conditioned *vacatur* of an approximately $1,000,000 judgment on the posting of a $500,000 bond. *Id.* at 513. On appeal, defendants argued that they were financially unable to satisfy the

bond condition. *Id.* at 514. The Second Circuit rejected the argument, concluding that defendants' "protestations of inability to post a bond were entirely conclusory." *Id.* at 516. As the Court of Appeals explained, the defendants failed to present "a shred of evidence" to support their claimed financial condition and failed even to reply to the plaintiff's "documentary evidence" showing $5 million in assets. *Id.* In addition, the defendants in *Powerserve* had acknowledged they could have secured the bond by paying a $5000 premium, *id.* at 515, and yet defendants had made no effort to show that the posting of such a premium was beyond their means. *Id.* at 516. Thus *Powerserve* stands for the proposition that, on the facts of that case, a bond condition involving an outlay of less than 1% of the judgment at issue was sufficient.

The Second Circuit's reasonableness analysis in *Powerserve* also closely scrutinized the purpose of the bond condition. The district court had held that the bond was needed because there was evidence that the defendants were removing assets then in the jurisdiction and available to pay the judgment to a place outside the plaintiff's reach. *Id.* After carefully reviewing the supporting evidence, the court held that imposing a bond under such circumstances was reasonable. *Id.*

In determining a reasonable bond amount in the first instance, this Court should conduct an analysis similar to that of the Second Circuit in *Powerserve*. First, the Court should determine whether the amount of the bond is reasonable in light of the Defendants' financial situation. As the Court will quickly determine, Defendants here have made the sort of evidentiary showing that was lacking in *Powerserve* by demonstrating that the current bond amount is far beyond their reach and that even the proposed $15,000,000 bond will tax their already-strapped financial resources. Second, after taking Defendants' financial situation into account, the Court should determine whether a $15,000,000 bond will sufficiently protect Plaintiffs against the risk the

Court identified in its decision and order here -- "the concern of a subsequent default." DE 122 at 28. Because a $15,000,000 bond will suffice to ensure that Defendants will participate in the case, and because such a bond will amply protect Plaintiffs from cognizable prejudice in light of the other conditions already imposed, the Court should reduce the amount of the bond to $15,000,000 and direct the immediate commencement of merits litigation.

**B. Abundant Caselaw Demonstrates that the Defendants' Financial Condition Must be Considered in Determining the Amount of the Bond.**

As *Powerserve* demonstrates, and as the parties apparently agree, the Defendants' current financial situation is a primary factor in determining the proper size of the bond. In addition to *Powerserve*, a host of cases rely on the Defendants' financial status in formulating a reasonable bond in the *vacatur* context. In *Thorpe v. Thorpe*, 364 F.2d at 695, for example, the District of Columbia Circuit vacated a bond condition and remanded for reconsideration in light of Defendant's representation that he was financially unable to comply. Similarly, in *Triboro Entertainment Group, Inc. v. Filmcat Inc.*, No. 93-civ-6798 (JFK), 1996 U.S. Dist. LEXIS 9754, at *3-4 (S.D.N.Y. July, 12, 1996), a judge on this Court modified a bond condition as a result of defendant's practical inability to post the amount of the original bond. Likewise, in *Defoe v. Lesley*, Civil No. 1080/34, 1981 U.S. Dist. LEXIS 9368, *7-11 (V.I. Jan. 27, 1981), the court overturned a bond condition imposed as part of a *vacatur* order, directing that "on remand ...the focus will be on appellant's financial status."[2]

[2] *Accord Allen v. S. County Hosp.*, No. 2006-6-Appeal, 2008 R.I. LEXIS 42, *17-20 (Apr. 14, 2008) (overturning bond condition of defendant who was financially unable to pay, and noting that "the requirement for all practical purposes deprives her of a right to a trial on the merits"); *Cont'l Data Corp. v. Old Colony Group Leasing, Inc.*, 1993 Mass. App. Div. 44, 47 (1993) (overturning bond imposed as a condition of *vacatur* where defendant's financial condition made compliance a practical impossibility).

These cases demonstrate the necessity of providing the defendant with "a realistic opportunity to defend on the merits" by setting a bond amount the defendant can afford to pay. *Defoe*, 1981 U.S. Dist. LEXIS 9368, at *11. Indeed, as *Thorpe* explained, the imposition of an unreasonably high bond raises serious due process questions since a defendant should not be prevented from defending the case by an inability to meet a financial condition. *Thorpe*, 364 F.2d at 695.

Other courts have identified this same due process concern. *E.g., Triboro Entm't Group,* 1996 U.S. Dist. LEXIS 9754, at *3-4 (modifying original bond award of $200,000 in light of "due process concerns presented by penalizing a defendant for its financial inability to comply with a court order"); *Defoe*, 1981 U.S. Dist. LEXIS 9368, at *7-10 (noting due process implication of bond condition imposed on party unable to pay because it "effectively foreclosed [the defendant's] opportunity to be heard on the merits of this case" and "withdrew with one hand what it gave with the other."); *Cont'l Data Corp.*, 1993 Mass. App. Div. at 47 ("Constitutional issues of fair access to the courts may arise when a party's opportunity to present a valid claim or defense is precluded by its financial inability to satisfy the amount of the security ordered.").

Courts, in fact, have emphasized the necessity of tailoring the amount of the bond to the party's practical ability to pay even in the context of supersedeas bonds. As the Second Circuit has explained, requiring a supersedeas bond in the full amount of the judgment can have constitutional implications in some circumstances if the appellant is financially unable to meet it or it would drive the appellant into bankruptcy. *Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1154 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987). Thus, in *Morgan Guaranty Trust Company of New York v. Republic of Palau*, 702 F. Supp. 60, 65-66 (S.D.N.Y. 1988), the

district court permitted the government of Palau to appeal after posting a bond reflecting only the *interest* on the judgment, observing that the Palau government's finances were already strained (its national revenues of $28.5 million were almost equal to its expenditures of $31 million) and a bond in the full amount of the judgment would have required it to curtail practically all of its usual functions during the pendency of the appeal. Similarly, in *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794, 796-97 (7th Cir. 1986), the Seventh Circuit held that reducing the size of the bond was appropriate because of the defendant's precarious financial status and the practical difficulties faced by the defendant in securing a bond for the full amount of the judgment. And, in *Alexander v. Chesapeake, Potomac, and Tidewater Books, Inc.*, 190 F.R.D. 190, 193 (E.D. Va. 1999) (quoting in part *Poplar Grove Planting & Refining Co., v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979)), the district court surveyed federal decisions from around the country and concluded that a supersedeas bond should be reduced when requiring the full amount of the judgment "would impose an undue financial burden" on the appellant.

These supersedeas cases are important because if financial ability is a critical factor in setting a supersedeas bond -- which it clearly is -- the importance of that factor is heightened when a trial on the merits, rather than an appeal, is at stake. In the case of supersedeas bond, an appellant who fails to post the bond will simply be forced to face collection actions during the pendency of the appeal. In the case of a *vacatur* bond, however, a defendant who cannot meet a bond condition will be deprived of any ability to defend the case at all.

The size of a reasonable bond accordingly turns heavily on Defendants' financial status. In *Powerserve*, the Second Circuit emphasized defendants' failure to support its contentions with evidence. 239 F.3d at 516. Mindful of this holding, Defendants present below substantial

evidence concerning their financial status, including detailed reports from the World Bank and IMF, as well as specific and detailed sworn declarations from PA Prime Minister (and Finance Minister) Salam Fayyad and PLO Secretary-General Rabbo. In considering this evidence, the question is not whether the Defendants could conceivably produce the funds by ignoring their other vital governmental functions. Rather the appropriate question is whether, considering the entirety of Defendants' assets and liabilities, the bond amount will require the Defendants "to curtail practically all of its usual functions" during the pendency of this litigation. *Morgan Guaranty Trust Co.*, 702 F. Supp. at 66 (*quoting Henry v. First National Bank of Clarksdale*, 424 F. Supp. 633, 638-39 (N.D. Miss. 1976)). In other words, this Court's task is to set a bond amount that will impose a financial burden, but not an "*undue* financial burden" in light of the evidence presented. *Alexander,* 190 F.R.D. at 193 (emphasis added); *Poplar Grove Planting & Refining Co.*, 600 F.2d at 1191.

## II. THE PALESTINIAN AUTHORITY AND THE PALESTINE LIBERATION ORGANIZATION ARE NOT FINANCIALLY ABLE TO POST A BOND IN THE FULL AMOUNT OF THE DEFAULT JUDGMENT

The information summarized below and reflected in the attachments establishes, beyond contest, that the PA/PLO are in a desperate financial condition. Though Plaintiffs' counsel has already intimated that he will challenge that assertion, in so doing he will stand alone, and argue contrary to the United States government, the world community, and reason itself.[3]

---

[3] Given the worldwide consensus on this issue and the sworn declarations in this motion confirming that consensus, Plaintiffs have no good faith basis for disputing Defendants' financial situation. In any event, it would be wasteful to conduct discovery on Defendants' financial situation until after this Court has reviewed the pleadings of both sides and determined whether it desires additional factual development. In light of the detailed presentation contained herein, which Plaintiffs obviously had not seen when they propounded their requests, Defendants intend to confer with Plaintiffs to determine whether they still intend to dispute Defendants' financial situation. If so, Defendants will also inquire whether the parties can reach agreement on postponing factual development at least until a threshold determination is made by this Court regarding whether it believes factual development on the motion is necessary. Should

(footnote continued on next page)

### A. Recent Reports and Statements by the International Monetary Fund, World Bank, and U.S. Confirm that the PA Has a Staggering Deficit and Is Entirely Dependent on Foreign Aid.

As a result of years of conflict, a foreign aid embargo and financial sanctions imposed from 2006 through June 2007, and Government of Israel restrictions on movement and access, the Palestinian economy is desperately struggling and the Palestinian Authority is dependent on foreign aid to avoid total collapse.

As shown in a May 2, 2008, International Monetary Fund ("IMF") report on the PA, a snapshot of the key economic indicators presents a bleak picture. Unemployment in 2007 averaged 30 percent in Gaza and 18 percent in the West Bank. Exhibit 1 at 2.[4] "According to the United Nations Development Programme, as of mid-2007, about 70 percent of households in Gaza and 56 percent in the West Bank live below the poverty line." *Id.* Inflation is rising, "reaching 11 percent in the year to March 2008 from 4 percent in September 2007." *Id.* Real GDP in the West Bank and Gaza is estimated to have contracted by about 5 percent in 2006, with a further contraction in the first half of 2007. *Id.* Although the "end of financial sanctions and improved private sector confidence following the advent of Prime Minister Fayyad's government have led to some rebound in growth since June 2007," real GDP growth is estimated to be about

---

(footnote continued from previous page)
Plaintiffs insist on their propounded discovery nonetheless, Defendants will move for protective order with the Court before the May 23, 2008, response date set forth in Plaintiffs' discovery requests. In connection with any motion for protective order, Defendants welcome the opportunity to appear before the Court to address (1) why Plaintiffs' have no good faith basis for disputing the representations made in this motion; (2) why the Court should immediately set a bond of $15,000,000 rather than postponing the setting of such a bond pending discovery and additional briefing.

[4] Attached as Exhibit 1 is: IMF, "Macroeconomic and Fiscal Framework for the West Bank and Gaza First Review of Progress," Staff Report for the Meeting of the Ad-Hoc Liaison Committee, London, dated May 2, 2008.

zero in 2007, in part due to the Gaza conflict and "the impact of the tightening of Israeli restrictions in the West Bank and Gaza." *Id.*

A May 2008 World Bank report presents a similarly stark picture, characterizing the "Palestinian economy since 2000" as deteriorating "from one driven by investment and private sector productivity to one sustained by government spending and donor aid." Exhibit 2 at 2.[5]

> After a good performance in the latter 1990s, the fragile Palestinian economy entered a gradual downward cycle of crisis and dependence, as it was confounded by political and security events in the West Bank and Gaza (WB&G) and the continued growth in settlements, Israeli restrictions on movement and access since the Second Intifadah, and finally the 2006 drop in donor aid.

*Id.* The decline in the Palestinian economy from 2000-2007 is best captured in this statistic: "per capital GDP in 2007 fell to 60% of its levels in 1999." *Id.* at 4.

The dramatic decline in the Palestinian economy has had a predictably negative impact on the Palestinian Authority. As the World Bank report explains, "[u]nable to find opportunities in the shrinking private sector, a young and rapidly-expanding labor force has turned to the public sector to create jobs and increase spending to alleviate poverty . . . ." *Id.* With tax revenues as its principal source of revenues and public sector salaries as its principal expenditure item, shrinking tax revenues and growing salary and public assistance expenditures have left the PA with staggering budget deficits. As reported by the IMF, the Palestinian Authority's "2007 recurrent fiscal deficit reached an unsustainable 27 percent of GDP." Exh. 1 at 4. By way of comparison, the apparently massive U.S. budget deficit was 1.2% of GDP for fiscal year 2007. http://www.treas.gov/press/releases/hp603.htm. The IMF report further explains that the PA's

---

5 Attached as Exhibit 2 is: "Implementing the Palestinian Reform and Development Agenda: Economic Monitoring Report to the Ad Hoc Liaison Committee," World Bank, dated May 2, 2008.

budget deficit was "financed through exceptional means, including large donor support of about $1 billion . . . ." Exh. 1 at 4.

Consistent with the IMF's and World Bank assessments of the PA's financial situation, assessments by U.S. monitors are equally dire. According to the Central Intelligence Agency's ("CIA's") on-line "Factbook" on the West Bank (Exhibit 3), last updated May 1, 2008, the West Bank and Gaza GDP-per capita is $1,100 and the PA government "would be unable to operate absent high levels of international assistance." Exhibit 3 at 7. The CIA's West Bank Factbook provides a concise overview of the reasons for the economic decline in the West Bank and the PA's increasing reliance on foreign aid:

> The West Bank - the larger of the two areas comprising the Palestinian Authority (PA) - has experienced a general decline in economic conditions since the second intifada began in September 2000. The downturn has been largely a result of Israeli closure policies - the imposition of closures and access restrictions in response to security concerns in Israel - which disrupted labor and trading relationships. In 2001, and even more severely in 2002, Israeli military measures in PA areas resulted in the destruction of capital, the disruption of administrative structures, and widespread business closures. International aid of at least $1.14 billion to the West Bank and Gaza Strip in 2004 prevented the complete collapse of the economy and allowed some reforms in the government's financial operations. In 2005, high unemployment and limited trade opportunities - due to continued closures both within the West Bank and externally - stymied growth. Israel's and the international community's financial embargo of the PA when HAMAS ran the PA during March 2006 - June 2007 has interrupted the provision of PA social services and the payment of PA salaries. **Since June the Fayyad government in the West Bank has restarted salary payments and the provision of services but would be unable to operate absent high levels of international assistance.**

*Id.* at 6-7 (emphasis added). In addition to this assessment from the CIA, the Secretary of State was equally blunt in her assessment of the PA's current financial state. At the end of 2007, Secretary of State Rice observed that the PA was "experiencing a significant budgetary crisis"

and needed massive donor aid as "literally the government's last hope to avoid bankruptcy." Exh. 4.[6]

Understanding that Plaintiffs' counsel has already shown that he will challenge the assessment of the PA's financial state, the Court should understand that any finding of solvency and an ability to pay such a massive bond will be contradicted by the assessments of the U.S. government, including the CIA, the State Department, as well as the assessments of every known independent international financial institution.

### B. The Declaration of the PA's Finance Minister and Accompanying Financial Statements Confirm the PA's Inability to Post a Bond in the Full Amount of the Judgment.

In support of this motion, Prime Minister Salam Fayyad, who also serves as the PA's Finance Minister, has provided a declaration describing the current financial situation of the PA, and attesting to the PA's inability to post a bond in the full amount of the judgment. Prime Minister Fayyad's Declaration is attached as Exhibit 5. The Prime Minister describes the roots of the PA's (or "PNA's") current budget crisis as follows:

> When Hamas won the legislative elections in January 2006, most donor countries imposed an embargo on foreign aid and boycotted the PNA and the Palestinian banking system. In addition, the Government of Israel withheld the transfer of clearance revenues, which account for over two-thirds of the PNA's tax revenues. These measures, which did not end until shortly after I became Prime Minister in June 2007, combined with the economic deterioration caused by the Government of Israel's tightening restrictions on trade and movement within the West Bank and the virtual lockdown of the Gaza Strip, deepened the PNA's economic crisis.

*Id.* ¶21. With the resulting severe budget shortfalls, the PA was unable to pay government employees their full salaries on time. *Id.* This, in turn, "resulted in a protracted strike which damaged performance in education, heath and social services." *Id.* The budget crisis also led to

---

6 Attached as Exhibit 4 is: Elaine Sciolino, "$7.4 Billion Pledged for Palestinians," New York Times, Dec. 18, 2007.

"major shortfalls in payments to the unemployed and the poor as well as to the government employees' pension funds." *Id.* In addition to these shortfalls, the government fell behind in its payments to the private sector, such as to suppliers and lenders. *Id.* The general downturn in economic activity, in turn, reduced the PNA's tax revenues. *Id.* According to Prime Minister Fayyad, "PNA's financial situation was further exacerbated during 2006 as a result of a collapse in the financial discipline governing relations between the central government and the municipalities. Municipalities either failed to collect, or turned over only partial collections of, electric and other utility payments due the Government of Israel, with the result that the PNA was forced to pay $535 million (over 10% of GDP) in what amounted to an unintended massive subsidy to the municipalities and electricity consumers." *Id.*[7]

The PA's worsening financial situation is reflected in the financial statements attached to Prime Minister Fayyad's Declaration. The PA's deficit (excluding external financing) continued to increase over the 2005-2008 period, growing from $1.049 billion for calendar year 2005 to $1.660 billion for calendar year 2007. *Id.* ¶14 (citing Exh. B). The projected deficit for 2008 (excluding external financing) is $1.851 billion. *Id.* ¶16.

As shown in the financial statement for calendar year 2007, the PA had total revenues of $1.194 billion and total expenditures and net lending of $2.544 billion, of which $1.283 billion was for gross wages and salaries of government employees. Exh. 5.E, Table 1. Thus, the PA's revenues (before foreign aid) were insufficient even to pay the salaries of the PA's employees. Exh. 5 at ¶18. Even after external budgetary support (foreign aid) of $1.012 billion in 2007, the PNA still had a 2007 budget deficit of $338 million. Exh. 5.E., Table 1; Exh. 5 at ¶16. The 2008 budget for the PA projects total revenues of $1.486 billion, and total current expenditures

[7] The PNA has to pay Israel for utility service for those areas on Israel's utility "grid."

and net lending of $2.845 billion. Exh. 5.G. The first quarter 2008 financial report shows that "[b]udgetary operations on a cash basis during the first quarter of 2008 (Q1) resulted in recurrent deficit, before external budget support, of $317 million . . . . While this deficit is expected to increase in the second quarter and stabilize thereafter, it is well within the PNA annual budget deficit projection of $1.36 billion, when annualized ($1.27 billion)." Exh. 5 at ¶19 (quoting Exh. 5.F. at 2 and Table 6).

The 2007 and 2008 financial statements highlight PA's heavy dependence on foreign aid to finance basic government operations. In 2007, the PNA received $1.012 billion in external budgetary support, nearly as much as its total 2007 revenues of $1.194 billion. Exh. 5.E, Table 1. In the first quarter of 2008, the largest source of funding for the PA was aid from donor countries ($526 million in donor aid, compared to $332 million total net revenue). Exh. 5.F, Table 1. For the first quarter of 2008, the largest donor was the European Union ($180 million), followed by Arab Countries ($153 million, mostly from the UAE and Saudi Arabia) and the United States ($152 million). Exh. 5.F at 2 and Table 7. *See also* Exh. 5 at ¶22.

As a result of the PA's budgetary crisis, an international conference of donors met in Paris in December 2007 to pledge financial assistance. At the December 2007 Paris donors' conference, donor countries pledged $7.7 billion for 2008-2010, the vast majority of which is allocated to particular uses, such as budget support, development, and humanitarian aid. *See* Exh. 1 at 10; Exh. 2 at 10. Of course, not all of the "pledged" money will actually be disbursed. Funds pledged by the U.S., for example, must be approved by Congress. As of the end of the first quarter of 2008, the PNA had received only $720 million of the pledged funds. Exh. 5 at ¶23. *See also* Exh. 2 at 10 ("As of the time of this report, [published May 2, 2008], approximately $600 million in recurrent budget support alone was transferred to the PA.").

In addition, the significant depreciation of the U.S. Dollar since the Paris donors' conference has added to the gap between "pledged" dollars and actual New Israeli Shekels available to pay the budget. That development alone has increased the amount of projected support needed to keep the current government afloat over the next three years from $5.6 billion to $6.2 billion. Exh. 1 at 10. Pledges for recurrent budget support, including amounts already disbursed as of mid-April, are estimated at $1.2 billion, leaving a shortfall of $400 million for 2008. *Id.* at 1, 10. According to the May 2008 IMF report, "[a]dequate and timely disbursements from donors, and close coordination with the PA, are essential to prevent liquidity problems and expenditures arrears." *Id.*

As Prime Minister Fayyad explains in his declaration, a "substantial amount of the foreign aid received since the Paris donors' conference has been used to address the public sector salary arrears and private sector arrears that built up during the January 2006-June 2007 period." Exh. 5 at ¶24. In the first quarter 2008, the PNA repaid $146 million in expenditure arrears. Exh. 5.F at 3. An additional $74 million was used to repay the banking system some advances and overdue amounts. *Id.* As shown in the final 2008 budget, Exh. 5.G, the PNA plans to spend a total of $217 million in 2008 on the net arrears accumulation.

Despite the recent influx of foreign aid, the people in the Occupied Palestinian Authority continue to struggle financially and have significant unmet needs. *See* Exh. 5 at ¶25. The May 2008 World Bank paper reports that the "formation of the Caretaker Government in mid-2007, and the resumption of aid have reversed the impacts of the aid boycott in 2006 and 2007, but only partially. . . . The contributing effects of the closures and movement restrictions cannot be overestimated. Moreover, economic indicators have not changed considerably, despite the resumption in aid." Exh. 2 at 2. After underscoring the "attendant risks to economic growth and

reforms" resulting from the Government of Israel's "tightened restrictions on movement and access," the IMF report advises that "progress toward restoring fiscal sustainability will require continued restraint on government employment and wage rates and measures to contain net lending and further tighten controls on nonwage spending," while noting that "[s]ocial and political pressures against austerity measures have recently increased, conveyed through protests and strikes by trade unions." Exh. 1 at 1, 4. The IMF cautions: "These pressures could grow if household incomes and employment opportunities remain constrained, posing significant risks to fiscal adjustment." *Id.* at 1. Thus, faced with an economy that is being constricted by Israel's restrictions on movement and access, the PA must try to reduce the deficit by further reducing government spending, which -- in a society with little private sector opportunities and increasing dependence on public sector jobs and assistance -- leads to greater civil unrest.

With a massive deficit and growing dependence on foreign aid to provide basic government services and pay salaries, the PA lacks the financial resources to post a bond in the full amount of the judgment. In his declaration, Prime Minister (and Finance Minister) Salam Fayyad states:

> As reflected in the attached financial statements of the PNA, and based on my knowledge of the current financial condition of the PNA, the PNA does not have the financial wherewithal to post the bond that the Court has ordered, and the PNA does not have the ability to secure financing for such a bond, whether through the use of current assets or from any projected net income.

Exh. 5 at ¶26.[8] Prime Minister Fayyad further explains: "Based on my extensive efforts over the past year in attempting to obtain donations and financing for the PNA for budgetary support,

---

[8] The assets of the Palestinian Investment Fund, Palestine Monetary Authority, and the Palestinian Pension Fund for State Administrative Employees in the Gaza Strip are the subject of numerous state and federal suits in the U.S. in connection with the *Ungar* and *Knox* plaintiffs' efforts to enforce their judgments against the PA and PLO. Those entities, which are separately represented, are defending those actions in part on the basis that they are sufficiently legally separate from the PA/PLO that their assets

(footnote continued on next page)

development projects, and humanitarian aid, I am confident that the PNA cannot obtain financing from private lenders for a $193 million bond. Even if it were possible to secure such financing, the terms would be so onerous that the PNA would not be able to service the debt given its budget deficit." *Id.* ¶28.

The staggering consequences of requiring such a bond are clear, but if there were any lingering doubt about the Defendants' financial status, the United States' recent letter to this Court should resolve any doubts in the PA/PLO's favor. On February 29, 2008, the Department of Justice informed this Court that the "United States remains concerned about the potentially significant impact that these cases may have on the financial and political viability of the defendants."[9] The United States could have chosen the word "strength" or "stability." Instead, it used the term "viability," underscoring that the financial situation in the Occupied Palestinian Territory threatens the very survival of the moderate PA leadership. This "viability" is important to take into account in considering the size of an appropriate bond. As the Prime Minister attests, even the proposed $15 million bond "will pose substantial hardships on the current Government and the Palestinian people." Exh. 5 at ¶29.

**C. The PLO is not Able to Post a Bond in the Full Amount of the Judgment.**

Yasser Abed Rabbo, the Secretary General of the PLO, has submitted a declaration, attached hereto, attesting to the inability of the PLO to post a bond in the full amount of the judgment. Exh. 6 at ¶¶ 12-13. Secretary General Rabbo is perfectly situated to provide

---

(footnote continued from previous page)
may not be treated as PA/PLO assets. Given that litigation, undersigned counsel do not consider those assets as usable for purposes of collateralizing any bond, and Prime Minister Fayyad was not asked to comment on those assets in his affidavit.

[9] A copy of the letter is attached as Exhibit 8.

historical information about the PLO's funding and current financial status. He has been on the PLO Executive Committee since 1971 and currently serves as the PLO Secretary General. Moreover, he helped implement the Oslo accords, in which the assets of the PLO were transferred to the PA. He is also a vibrant voice for peace, as demonstrated by his co-founding the Palestinian Peace Coalition.

The PLO's inability to post a bond is even clearer than that of the PA. The fact is, the PLO gets its financing from the PA, and it no longer has independent funding or substantial assets. This is different than in decades past. Prior to the creation of the PA, the PLO was, in essence, the Palestinian governing entity and the recipient of funding from the international community. As Mr. Rabbo explains, before the creation of the PA, the PLO received revenue in the form of donations from Arab states and from taxes collected by Arab states on wages earned by all Palestinians living in them. *Id.* at ¶7. However, from the the invasion of Kuwait by Iraq in August 1990 through the signing of the Oslo Accords in 1993, donations to the PLO from Arab states declined significantly. *Id.* ¶ 8. After the creation of the PA, the PLO ceased collecting taxes on the wages of Palestinians living in Arab states. *Id.* ¶10. Since 1993, the PA has been the primary revenue source for the PLO, and the PLO is dependent on the monetary support of the PA. *Id. See also* Exh. 5 (Fayyad Declaration) at ¶ 20 (noting that "the PNA is the primary revenue source for the PLO"). *See also* Exh. 5.F, Table 5 (showing that the PA expended $7.2 million on PLO wages and salaries and operational expenses during the first quarter of 2008 alone). As such, the PLO will not be able to play any role in the posting of a bond in this case.

**III. A Bond of $15,000,000 Will Sufficiently Protect Plaintiffs Against A Subsequent Default and Any Other Cognizable Prejudice.**

A $15,000,000 bond will also sufficiently protect Plaintiffs against a subsequent default.

The section of this Court's decision and order imposing the bond requirement appears under the heading "CONCERNS OF SUBSEQUENT DEFAULT," DE 122 at 28, and Defendants do not dispute that this Court could properly have concerns about a subsequent default in light of the prior history of the case. Nonetheless, a $15,000,000 bond will suffice to address these concerns. As discussed in the previous section, Defendants' financial condition is extremely precarious. A bond of $15,000,000 represents a sizeable portion of Defendants' yearly revenues and to forfeit such a bond will cause substantial hardship to Defendants who are already struggling to avoid bankruptcy. As Prime Minister Fayyad states in his Declaration, the $15 million bond is "more than sufficient to ensure that the PNA and the PLO will defend this case on its merits through its conclusion." Exh. 5 at ¶29.

The $15,000,000 bond condition will also protect Plaintiffs against any other form of cognizable prejudice. In making this assessment, it is important to remember that Defendants have committed to reimburse reasonable costs and expenses incurred as a result of the default, and that the Court's task in setting a bond is to put Plaintiffs in the same position they were in at the time of the Rule 60(b) decision, not to put them in a better one. *Wokan v. Alladin International Inc.*, 485 F.2d 1232, 1234 (3d Cir. 1973) ("[I]t is difficult to imagine what set of circumstances would justify the imposition of a condition that the now disputed claim be made more secure than it was prior to the court's action on the Rule 60(b) motion."); *Alexander v. Chesapeake, Potomac, & Tidewater Books*, 190 F.R.D. 190, 193-94 (E.D. Va. 1999) (stating "any security or bond offered by defendants in this case should simply reflect and preserve defendants' current ability to satisfy the judgment"). Thus, the Court must realistically assess Plaintiffs' position at the time the Rule 60(b) motion was granted, and the reality of the matter is

that Plaintiffs' $193,000,000 default judgment was against foreign defendants experiencing serious financial difficulties with many assets encumbered by other collection efforts.

Had the Court not granted *vacatur* under Rule 60(b), Plaintiffs' collection prospects would have been extremely uncertain, in light of Defendants' financial status and the competing collection actions in other related cases brought by Plaintiffs' counsel against Defendants. *See, e.g.*, *Strachman v. Palestinian Authority*, Case No. 3:05-mc-00208 (PCD) (D.Conn.) (action seeking ownership of Palestine Investment Fund in satisfaction of judgment entered in *Ungar* litigation *Ungar v. PA*, No. H/P 4318/05 (Jerusalem District Court) (action to domesticate *Ungar* judgment in Israel and attach VAT funds collected by Israel for the benefit of the PA); *Estate of Yaron Ungar v. PA*, 841 N.Y.S.2d 61 (N.Y. App. Div. 2007) (discussing plaintiffs' actions with regard to Palestinian Pension Fund). The total amount sought in all of the alleged terror cases against the PA, most handled by Plaintiffs' counsel in the present case, amounts to more than $4 billion, an amount that exceeds Defendants' entire yearly budget. Given that figure, and given Defendants' other financial problems, it is fair to say that Plaintiffs faced substantial uncertainty in collecting $193,000,000 prior to the *vacatur* ruling.

Nor is a figure higher than $15,000,000 needed to prevent the risk of asset flight, which was at the heart of the Court's decision in *Powerserve,* 239 F.3d at 516. As noted, many of Defendants' potentially-available assets, and even assets that do not belong to the Defendants, are tied up in collection litigation in related cases. There is, in fact, a nationwide injunction in place in the *Ungar* litigation that prevents the Defendants from transferring assets out of the country. *Ungar v. Palestinian Authority*, 00-105L (D.R.I. May 5, 2005), DE 322 & 359.[10] Under these circumstances, the risk of asset flight as the result of the *vacatur* decision is minimal

[10]A copy of the injunction is attached as Exhibit 9.

compared to the risk presented in *Powerserve,* where the defendants were alleged to have created a false debt to a family member in order to fraudulently convey assets out of their names.

The posting of a $15,000,000 bond will thus ensure that Plaintiffs will be at least as well off in the unlikely event of another default as they were at the time the Court granted the *vacatur* motion. To be sure, the proffered bond will not guarantee collection of a $193,000,000 judgment going forward. But, as noted, Plaintiffs' collection prospects on the vacated judgment were uncertain, and there is no suggestion from the caselaw that guaranteeing a future judgment in the exact amount of the vacated one -- as opposed to preventing deterioration in the Plaintiffs' prior collection position -- is the proper role of a *vacatur* bond.

Assuming *arguendo* it is proper to consider the prospects of collecting against any future judgment at all in the reasonableness calculus, the amount of the vacated judgment should not serve as a touchstone. There is certainly no guarantee Plaintiffs will again secure a judgment for $193,000,000 after adversarial litigation. Defendants do not mean to suggest any improprieties with the earlier damages amount. Defendants have confidence that Magistrate Judge Katz and this Court exercised the utmost of impartiality in calculating the damages award. Nonetheless, it would be unfaithful to our legal system's belief in the importance of adversarial process to suggest that that process would make no difference in the formulation of a damages award going forward. Defendants believe that, if a damages proceeding becomes necessary, the adversarial process will generate a substantially lesser award than the earlier, non-adversarial process did.

Any bond that ensures collection of a significant amount in the event Plaintiffs prevail after adversarial litigation will protect Plaintiffs from being cognizably prejudiced by the *vacatur* order. A bond of $15,000,000 amply fulfills that function. Such an amount would be substantially more than other payments actually made to families in other cases involving

demonstrated acts of international terrorism. For example, Libya ultimately agreed to pay $10 million to each victim's family for sponsoring the bombing of Pan Am Flight 103 over Lockerbie, Scotland in which 270 people died. United States Department of State, Office of the Coordinator of Counterterrorism, "Country Reports on Terrorism 2004," (April 2005), at 89-90, attached as Exhibit 10. The average award for families of victims killed in the September 11, 2001, attack was $2,082,035. Final Report of the Special Master for the September 11th Victim's Compensation Fund of 2001, at 110, attached as Exhibit 11.

In short, the proffered $15,000,000 bond fulfills the function identified by this Court, as it provides Defendants with significant incentives not to default again. Such a bond also provides Plaintiffs with substantial protection from prejudice caused by any future default by placing them in at least as strong a position as they were in prior to this Court's *vacatur* order.

## CONCLUSION

Defendants are grateful for the opportunity to litigate this case on the merits and have worked diligently to meet the conditions imposed by the Court's order. Defendants can meet three of the conditions, and Defendants agree that the posting of a sizeable bond is warranted. However, the sworn declarations of Prime Minister Fayyad and Secretary-General Rabbo concerning Defendants' financial situation, as well as supporting evidence from recognized international financial institutions, demonstrate that posting a $193 million bond is a practical impossibility and exceeds the amount necessary to accomplish the Court's legitimate goals. The Court should reduce the amount of the bond to $15,000,000, direct the posting of the bond in compliance with Local Rule 65.1.1 forthwith, and direct that the case management conference called for by the Court's March 26, 2008 order occur within 10 days of the posting of the $15,000,000 bond.

Respectfully Submitted,

May 9, 2007

/s/ Richard A. Hibey
Richard A. Hibey
E-mail: rhibey@milchev.com
Mark J. Rochon
E-mail: mrochon@milchev.com
MILLER & CHEVALIER CHARTERED
655 15th St., N.W. Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202)626-5801

*Attorneys for Defendants the Palestine Liberation Organization and the Palestinian Authority*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 9th day of May, 2008, a true and genuine copy of the foregoing was sent by electronic mail and first class mail, postage prepaid to the following:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
Djs@mtlhlaw.com
*Attorneys for Plaintiffs*

Olimpio Lee Squitieri
Squitieri & Fearon, LLP
32 East 57th Street, 12th Floor
New York, NY 10022
Phone: (212) 421-6492
Fax: (212) 421-6553
Lee@sfclasslaw.com
*Attorneys for Plaintiffs*

Robert J. Tolchin
Jaroslawicz & Jaros LLC
225 Broadway, 24th Floor
New York, NY 10007
*Attorneys for Plaintiffs*

/s/ Mark J. Rochon