# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs – Judgment Creditors,

v.                                                                   C.A. No. 00 – 105 L

THE PALESTINIAN AUTHORITY, et al.,

    Defendants – Judgment Debtors.

## NOTICE OF RECENT DEVELOPMENTS RELEVANT TO DEFENDANTS' RULE 60(b)(6) MOTION

Defendants' Rule 60(b)(6) motion to vacate is currently pending before the Court. Plaintiffs respectfully file this notice in order to inform the Court of several recent developments which are relevant to, and provide further grounds to deny, defendants' motion.

### A. A New York Appellate Court Has Found That the PA Stymied Enforcement of this Court's Judgment by Committing a Fraudulent Conveyance

Defendants' Rule 60(b) motion is predicated on the claim that in the post-Arafat era, under the leadership of Mahmoud Abbas and Salam Fayyad, the PA and PLO are prepared to obey the decisions of the courts of the United States and to act in good faith. Dkt. # 408 at 33-35.

In fact, however, the Appellate Division of the New York Supreme Court has recently issued a decision finding that **the PA committed a fraudulent conveyance** to the Palestine Monetary Authority ("PMA"), which prevented the Ungars from enforcing the judgment entered

in this matter. *See Palestine Monetary Authority v. Strachman*, 873 N.Y.S.2d 281, 289-290 (N.Y.A.D. 1 Dept.) (February 17, 2009).

Notably, Mr. Abbas himself personally signed the document executing the fraudulent conveyance on behalf of the PA. *See* Declaration of Robert J. Tolchin (Exhibit A) at ¶¶ 2-3.

Clearly, then, defendants' claims of having turned over a new leaf under Mr. Abbas' leadership are baseless.

### B. Defendants Have Attempted to Exploit the Pendency of the Rule 60(b)(6) Motion to Obtain a Stay of Enforcement Not Authorized by This Court

On the basis of the ruling in *Palestine Monetary Authority*, the Ungars filed a motion in the New York state trial court seeking turnover of the funds fraudulently conveyed by the PA. On March 12, 2009, the New York court held a hearing on that motion. The PMA's counsel, who was joined at the hearing by counsel for the PA and PLO, Amy Rothstein, argued that the turnover motion (and the Ungars' entire enforcement proceeding against the PMA) should be stayed pending the resolution of defendants' Rule 60(b)(6) motion in this Court.

In further support of the request for a stay of enforcement pending resolution of their Rule 60(b)(6) motion before this Court, counsel for the PA and PLO, Ms. Rothstein, submitted to the New York court on March 16, 2009, an order issued by the U.S. District Court for the District of Connecticut, staying enforcement proceedings in that court pending the outcome of the Rule 60(b)(6) motion in this Court. *See* Exhibit B.[1]

It is black-letter law that the filing of a Rule 60(b) motion "does not affect the judgment's finality or suspend its operation" absent a stay of enforcement. Fed.R.Civ.P. 60(c)(2).

---

[1] The stay in Connecticut (which is currently on appeal to the Second Circuit) was issued at the request of the garnishees, the Canaan funds, which have been managing defendants' assets for years. It appears (though the Ungars unfortunately have no means of proving it) that Canaan's motion for a stay was made at the behest of the defendants (who have not appeared in the Connecticut proceeding).

Defendants have not sought, much less received, a stay of enforcement from this Court. On the contrary, defendants have refrained from moving for a stay of enforcement from this Court, because to obtain such a stay they would have to both provide security for the Ungars (as required by Rule 62(b)) and persuade this Court that their Rule 60(b)(6) motion is likely to succeed. *See e.g. Frankel v. ICD Holdings S.A.*, 168 F.R.D. 19, 22 (S.D.N.Y. 1996) (a court considering a stay of enforcement pending a Rule 60(b) motion should examine the likelihood that the motion will be granted); *U.S. v. Moyer*, 2008 WL 3478063 (N.D.Cal. 2008) (stay of enforcement is appropriate only when Rule 60(b) motion has a "strong likelihood of success").

The defendants' efforts to stay proceedings to enforce the judgment issued by this Court without seeking a stay from *this* Court – i.e. their attempt to bypass and negate the authority and discretion vested in this Court under Rule 62(b) – are completely illegitimate and constitute further proof of defendants' continuing bad-faith.[2]

### C. Defendants' Claims of Financial Collapse If the Judgment Is Not Vacated Have Been Further Soundly Refuted

Defendants' Rule 60(b)(6) motion relies heavily on the claim that the judgment in this matter threatens their financial stability. Plaintiffs already thoroughly refuted this argument in their opposition papers.

However, a recent development in the proceedings brought by the Ungars to domesticate their judgment in Israel provides further, overwhelming proof that defendants' claim is baseless:

On August 31, 2008, after more than three years of intensive litigation, the Jerusalem District Court issued a 53-page judgment finding that the judgment issued by this Court is enforceable in Israel. Exhibit A at ¶ 4. Following the August 31 judgment, the Ungars moved the

---

[2] The New York state court rejected the defendants' request to stay the Ungars' turnover proceedings against the PMA, and on April 1, 2009, entered a judgment against the PMA for the amount of the funds fraudulently conveyed to it by the PA. *See* Exhibit C. Counsel for the PMA has indicated to the Ungars' counsel that the PMA does not intend to pay that judgment.

3

Jerusalem court for a post-judgment attachment on tax payments transferred each month by the Israeli government to the PA. *Id*. at ¶ 5.[3] The Ungars requested a post-judgment attachment in the full amount of their now-domesticated U.S. judgment, to accumulate in monthly installments in the amount of 18 million NIS (about $4.5 million) per month. *Id*.[4]

The Jerusalem District Court granted the Ungars' post-judgment attachment motion *ex parte* on September 7, 2008. *Id*. at ¶ 6.

The PA and PLO then moved for a stay of execution pending appeal of the August 31 judgment of the Jerusalem District Court to the Israeli Supreme Court. *Id*. at ¶ 7.

On October 29, 2008, the Jerusalem District Court issued a decision granting the motion for a stay pending appeal, on the condition that the post-judgment attachment on the tax transfers in the amount of 18 million NIS per month remain in force, such that the funds accumulated during the pendency of the appeal (i.e. 18 million NIS per month, up to the full amount of the judgment) would be held by the Israeli Treasury until the conclusion of the defendants' appeal, and thereby be available to satisfy the Ungars' judgment if the appeal is denied. *Id*. at ¶¶ 8-9.[5]

As the PA itself explained in a declaration submitted recently in the *Knox v. PLO* action:

> Beginning with the transfers for September 2008, the State of Israel began withholding ... NIS 18 million per month from the tax transfers pending the Israel Supreme Court decision on whether a U.S. judgment in the Ungar litigation

---

[3] These transfers consist of income tax withheld by Israeli employers on the salaries of PA residents working in Israel, import duties collected at Israeli ports on merchandise destined for the PA, and value-added-tax payments on transactions involving residents of the PA. Exhibit A. at p. 2 n. 1.

[4] The Ungars made clear in their motion to the Jerusalem court that they were seeking installment payments, rather than an immediate attachment in the full amount of the judgment, purely *ex gratia*, in order to neutralize in advance any (false) claim by the PA that an immediate attachment in the full amount would cause the PA a financial crisis. *See* Exhibit A at p. 2 n. 2.

[5] However, the Jerusalem court denied the motion for a stay in respect to the sum of 1 million NIS (about $250,000) which it had awarded the Ungars in its August 31 judgment for costs and attorney's fees. *See* Exhibit A at p. 3 n. 4. Despite the absence of any stay in respect to this sum, the defendants have refused to pay it. *Id*.

> is enforceable in Israel. **NIS 18 million (or $4.5 million) will be withheld until the full $116 million is attached** or until the Supreme Court rules favorably for the PNA.

Exhibit D at ¶ 10 (emphasis added).

Thus, pursuant to the Israeli attachment, between September 7, 2008 and today, attached PA funds amounting to about 126 million NIS (18 million NIS x 7 months) have accumulated at the Israeli Treasury. Separately, earlier in the Israeli proceeding, the Jerusalem court ordered an attachment on tax transfers to the PA in the amount of 100 million NIS. Exhibit A at ¶¶ 10-11.

In sum, therefore, as of today, at total of some 226 million NIS – about $56.5 million – of the PA's funds are attached and being held by the Israeli Treasury, and this sum will continue to grow at a rate of 18 million NIS ($4.5 million) every month, until the full sum of the judgment entered by this Court has accumulated. Id.

Oral argument on the defendants' appeal to the Israeli Supreme Court is set for January 14, 2010. Exhibit A at ¶ 12. By that time, another $40 million dollars of PA funds (9 months x $4.5 million) will have accumulated pursuant to the Ungars' attachment.

Thus, by the time the Israeli appeal is heard and decided, the entire amount of this Court's judgment will have been attached and withheld by the Israeli Treasury.

This attachment on the PA's funds, which already equals about half the judgment, has not caused the defendants to financially collapse. Moreover – having concluded that they could live with the terms of the October 29 decision conditioning a stay pending appeal on an accumulating attachment of the PA's funds in the amount of $4.5 million per month up to the full amount of the judgment – defendants expressly waived any appeal of that decision. Exhibit A at ¶ 13.

In light of the above it is clear, as a matter of simple empirical fact, that defendants' claims that the judgment entered in this action will cause their financial collapse are baseless.[6]

Of course, nothing herein should be construed as implying that the imposition of a bond in the full amount of the judgment would be a sufficient condition for vacating the defendants' intentional default of this action. As shown in the Ungars' opposition papers, litigating this action now is impossibility due to the loss of crucial witnesses and evidence.

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

---

[6] Until the Israeli Supreme Court decides the defendants' appeal of the Jerusalem District Court ruling finding the judgment of this Court enforceable in Israel, there is no way to know whether the Ungars will ultimately **receive** the attached funds. The point is, however, that notwithstanding the shrill claims of fiscal ruin contained in their Rule 60(b)(6) motion, more than half the amount of the judgment has already been attached by the Israeli Treasury, and by waiving any appeal of the October 29 decision the defendants have effectively agreed to the attachment of the balance of the judgment.

## CERTIFICATION

I hereby certify that on April 7, 2009 I served this document along with the attached exhibits via ECF on the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/S/ David J. Strachman