UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

The ESTATES OF Yaron UNGAR and
Efrat UNGAR by and Through the
Administrator of Their Estates David
STRACHMAN; Dvir Ungar, Minor, by his
Guardians and Next Friend, Professor
Meyer Ungar; Judith Ungar; Rabbi Uri
Dasberg; Judith Dasberg (Individually
and in Their Capacity as Legal Guardians
of Plaintiffs Dvir Ungar and Yishai Ungar);
Amichai Ungar; Dafna Ungar; and Michael
Cohen,

Plaintiffs,

vs.                                                    C.A. No. 00-105L

The PALESTINIAN AUTHORITY (a.k.a. "the
Palestinian Interim Self-Government
Authority"); the Palestine Liberation
Organization; Yasser Arafat; Jibril Rajoub;
Muhammed Dahlan; Amin Al-Hindi; Tawfik
Tirawi; Razi Jabali; Hamas-Islamic
Resistance Movement (a.k.a. "Harakat Al-
Muqawama Al-Islamiyya"); Abdel Rahman
Ismail Abdel Rahman Ghanimat; Jamal Abdel
Fatah Tzabich Al Hor; Raed Fakhri Abu
Hamdiya; Ibrahim Ghanimat; and Iman Mahmud
Hassan Fuad Kafishe,

Defendants.

MEMORANDUM AND ORDER

This matter is before the Court on the Motion of Defendants

the Palestinian Authority ("the PA") and the Palestine Liberation

Organization ("the PLO") to set aside the default judgment that

was entered against them by this Court in 2004.

In 1996, U.S. citizen Yaron Ungar and his Israeli wife,

Efrat Ungar, were murdered in Israel by Hamas terrorists. Plaintiffs, who are their surviving family members and the administrator of their estates, brought this action pursuant to the Antiterrorism Act of 1991, 18 U.S.C. § 2333 *et seq.*  This federal statute provides a cause of action for American nationals injured in their person, property or business by an act of international terrorism.  18 U.S.C.A. § 2333(a)(1992). Plaintiffs named as defendants the Palestinian Authority ("the PA"), the Palestine Liberation Organization ("the PLO"), the Hamas-Islamic Resistance Movement (a.k.a. "Harakat Al-Muqama Al-Islamiyya") (hereinafter "Hamas"), various officials of the PA and the PLO including Yasser Arafat, and individual Hamas members who participated in the deadly attack on the Ungars.

No Defendant has answered Plaintiffs' Amended Complaint, and appearances have been entered only on behalf of Defendants PA and PLO.  Nevertheless, this matter has generated no small amount of legal activity, resulting in five previous decisions written by this Court, several Reports written by Magistrate Judge David Martin of this Court, as well as one published decision, and one unpublished, from the First Circuit Court of Appeals.  Eight years of legal wrangling culminated in a default judgment in the amount of $116,409,123.00, which was entered jointly and severally against Defendants Hamas, the PLO and the PA.  Citing Federal Rules of Civil Procedure Rule 60(b)(6), the PLO and PA

now seek to have this judgment vacated, on the grounds that exceptional circumstances warrant such relief.  The Court has heard oral arguments, reviewed the parties' written submissions and examined the pertinent law, and now determines that Defendants' Motion must be denied for reasons explained below.

### Factual background

On June 9, 1996, Yaron and Efrat Ungar were traveling home from a wedding with their nine-month old son, Plaintiff Yishai Ungar, in the back seat, when a group of men in another vehicle pulled up along side of them and opened fire.  Yaron and Efrat were killed, but their baby was unharmed.  Their assailants included Defendants Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, and Raed Fakhri Abu Hamdiya, all members of Hamas.  Two of the assailants, along with co-conspirator Defendant Iman Mahmud Hassan Fuad Kafishe, were convicted in an Israeli court on charges related to this incident.  The third assailant remains at large.  In 1999, Rhode Island attorney David Strachman was appointed Administrator of the estates of Yaron and Efrat Ungar, by the appropriate Israeli court.  Strachman filed the present lawsuit on behalf of the estates in 2000.  Other Plaintiffs include the Ungar's firstborn child, Dvir Ungar, who was not in the car during the shooting, as well as the couple's parents and siblings.

**Travel**

The court will briefly summarize the litigation in this case to date.  For more detailed treatments, the reader is advised to examine the Court's prior written decisions in this matter.

### *Ungar I*

In 2001, this Court addressed the PA and PLO's Motion to Dismiss, brought pursuant to Federal Rules of Civil Procedure Rule 12(b), arguing that the Court lacked both subject matter jurisdiction over this case and personal jurisdiction over these Defendants, that there was insufficient service of process, improper venue, inconvenient forum, and that the Complaint failed to state a claim for which relief could be granted.

In its decision, this Court concluded that subject matter jurisdiction was present because the cause of action was properly based on federal statute, 18 U.S.C. § 2333.  Estates of Ungar ex rel. Strachman v. Palestinian, 153 F. Supp. 2d 76, 86 (D.R.I. 2001) ("Ungar I").  Moreover, the Court's exercise of personal jurisdiction over the PA and the PLO was proper based upon these organizations' contacts with the United States.  Id. at 88.  Defendants' arguments based on venue, service of process and the convenience of the forum were likewise deemed without merit.  Id. at 95, 100.

This Court found that it lacked personal jurisdiction over the individual PA and PLO officials named as Defendants, and

-4-

claims against them were dismissed. Id. at 95. All claims brought on behalf of Efrat Ungar and her estate pursuant to the Antiterrorism Act were dismissed because her status as an Israeli citizen excluded her from the scope of the Act. Id. at 97, see 18 U.S.C. § 2333. Tort claims based on Rhode Island state law were also dismissed, because the Court determined that Israeli law would control any non-federal claims. Id. at 99. Plaintiffs were granted leave to amend the complaint to add properly-pled tort claims. Id. at 100.

Plaintiffs revised their Complaint, dropping claims on behalf of Efrat Ungar from Count I, the claim brought under the Antiterrorism Act, and adding claims for negligence, assault and breach of statutory obligation under the Israeli Civil Wrongs Ordinances. The Amended Complaint retains allegations against all original Defendants.

At the conclusion of these proceedings, counsel for the PA and the PLO, former United States Attorney General Ramsey Clark, stated in open court that he had spoken personally to Yasser Arafat, the leader of both the PA and the PLO, and was instructed not to file an answer or defend this case on the merits because Arafat would not recognize the jurisdiction of this or any American court over the PA or PLO.

### *Ungar II*

In 2002, the PA and the PLO filed a second Motion to

-5-

Dismiss.  This Motion alleged that the Amended Complaint failed
to state claims for which relief could be granted because the
ultimate resolution of the claims would require an analysis of
non-justiciable issues.  Specifically, Defendants argued that
Plaintiffs' claims could not be properly litigated in this Court
because of the complex and sensitive political issues involved,
the difficulty in obtaining information from the war-torn region,
and the lack of manageable judicial standards. To strengthen
their argument, Defendants asserted that they were entitled to
sovereign immunity because Palestine was very close to gaining
full membership to the United Nations.  These arguments were
rejected by this Court and the Motion was denied.  Estates of
Ungar ex rel. Strachman v. Pales. Auth., 228 F. Supp. 2d 40, 49
(D.R.I. 2002) ("Ungar II").

     Along with their Motion, Defendants petitioned the Court to
reconsider its ruling in Ungar I.  In the alternative, Defendants
requested the right to file an interlocutory appeal of Ungar I,
and called for the matter to be stayed while such appeal was
heard.  These requests were also denied by the Court.  Ungar II,
228 F. Supp. 2d at 51.

     Following the release of this Court's decision, the PA and
the PLO then filed a Motion for Reconsideration of Ungar II,
which was denied.  Next, these Defendants filed an interlocutory
appeal of the denial of the Motion for Reconsideration.  In an

unpublished decision, the First Circuit denied the Motion and affirmed this Court's rulings in <u>Ungar II</u>.  At the same time, the First Circuit indicated that Defendants' opportunity to develop a sovereign immunity defense was still available because Defendants had not yet answered the complaint.  <u>Ungar, et al., v. The Palestinian Liberation Organization, et al.</u>, 2003 WL 21254790 (C.A. 1).

### Default

Just before the First Circuit issued its judgment, Judge Martin, in April 2003, directed the Clerk of this Court to enter a default against the PA and the PLO for their failure to answer the Amended Complaint.  In a subsequent Report and Recommendation,[1] Judge Martin recounts that he had determined, at this juncture, that "the Palestinian Defendants' failure to file an answer to the Amended Complaint was the result of a deliberate choice and not due to an inability to file an answer."  <u>Estates of Ungar & Ungar v. Palestinian Authority</u>, 325 F. Supp. 2d 15, 40 (D.R.I. 2004) ("<u>Ungar V</u>").

In February and April of 2003, Plaintiffs twice moved for the entry of default judgment against these Defendants, citing Defendants' repeated refusal to comply with discovery requests

---

[1] Judge Martin's Report and Recommendation was issued on March 31, 2004, and is incorporated in its entirety in this Court's fifth decision, referred to herein as <u>Ungar V</u>, <u>Estates of Ungar & Ungar v. Palestinian Authority</u>, 325 F. Supp. 2d 15 (D.R.I. 2004).

and discovery orders.   These motions were referred to Judge
Martin.   In May 2003, Judge Martin declined to hear arguments on
the motions, "electing instead to explicitly warn Defendants that
their continued failure to comply with discovery could result in
the entry of default judgment against them." Ungar V at 41.

Later in May 2003, Plaintiffs again moved for the entry of
default judgment against Defendants PA and the PLO pursuant to
Federal Rules of Civil Procedure Rule 55(b)(2), this time citing
their failure to answer the complaint.   Defendants followed up
with three consecutive motions for extension of time, all of
which were granted by Judge Martin.   In July 2003, Judge Martin
held a hearing on the Plaintiffs' motions for default judgment,
and took these motions under advisement.   Ungar V, 325 F. Supp.
2d at 44.

### *Ungar III*

The Court next reviewed and accepted in part Judge Martin's
July 2003 Report and Recommendation ("R & R") on Plaintiffs'
motion to enter final judgment against Hamas and the individual
Hamas Defendants.   No objection had been filed to Judge Martin's
R & R, the text of which is incorporated in its entirety in Ungar
ex rel. Strachman v. Palestinian Authority, 304 F. Supp. 2d 232,
279 (D.R.I. 2004) ("Ungar III").

Because Hamas and the five individual Hamas Defendants had
not answered or otherwise defended against the Complaint, Judge

Martin extensively analyzed the Court's exercise of personal and subject matter jurisdiction over these Defendants.  He determined that jurisdiction was properly exercised over Hamas, and that the organization had been properly served.  Id., 304 F. Supp. 2d at 250-258.  However, he recommended the dismissal of the five individual Hamas Defendants on jurisdictional grounds, due to their lack of contact with or activity within the United States. Id. at 260.  In addition, Judge Martin calculated damages for Plaintiffs on Count I of the Amended Complaint in the amount of $116,409,123.00.

These recommendations were adopted by this Court, which ruled further that final judgment could be entered against Defendant Hamas without delay.  Id. at 241.  Judge Martin's additional recommendation, that Plaintiffs be awarded prejudgment interest, was rejected by this Court on the grounds that the treble damage award mandated by 18 U.S.C. § 2333 was sufficiently punitive.  Id. at 237.

### *Ungar IV*

In June 2003, Defendants PA and PLO moved to dismiss the claims against them pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the grounds that they were entitled to sovereign immunity.  Defendants also argued that the jurisdictional bar imposed by 18 U.S.C. § 2337, which excludes sovereign states from the scope of the Antiterrorism Act,

prevented the Court from properly exercising jurisdiction.
Finally, Defendants again argued, as they had in _Ungar II_, that
the claims were not appropriate for judicial review because they
were political in nature.  These arguments were rejected by this
Court, and Defendants' Motion was denied.

### _Doctrine of Non-justiciability_

Because the arguments concerning the region's ongoing
political upheaval that are presently before the Court resemble
so closely the non-justiciability arguments previously made by
Defendants in _Ungar II_ and _Ungar IV_, the Court will briefly
reiterate its prior reasoning. Explaining in _Ungar IV_ that the
Antiterrorism Act provides judicially-discoverable standards for
deciding Plaintiffs' claims because the Act creates a cause of
action, and supplies a precise definition, for acts of
international terrorism, this Court wrote,

> The fact that the PA and PLO's alleged
> terrorist acts may have arisen in a
> politically charged context and were
> committed in an area where the United States
> has a strong foreign policy interest does not
> convert the present tort claims into non-
> justiciable political questions.

_Estates of Ungar v. Palestinian Authority_, 315 F. Supp. 2d 164,
174 (D.R.I. 2004) ("_Ungar IV_").  Citing the case that resulted
from a previous, notorious act of terrorism, _Klinghoffer v._
_S.N.C. Achille Lauro_, 937 F.2d 44 (2d Cir. 1991), this Court
stated that, like the _Klinghoffer_ Court, it "would not give its

-10-

views on the broader political questions forming the backdrop of the lawsuit and would only determine whether and to what extent the plaintiffs could recover in tort for the acts of violence committed against them." *Ungar IV*, 315 F. Supp. 2d at 174.

### *Sovereign immunity*

In response to Defendant's assertion that they are entitled to sovereign immunity, Plaintiffs argued that Defendants had waived their right to use this defense when they failed to answer the Amended Complaint. Any affirmative defense, Plaintiffs argued, must be specifically set forth in the answer, as required by Federal Rules of Civil Procedure Rule 8(c). However, the Court rejected Plaintiffs' waiver argument:

> The current posture of this case presents a procedural irregularity because the PA and the PLO failed to file an answer and have been defaulted. These Defendants have chosen not to challenge the merits of Plaintiffs' case and decided instead to place all of their eggs in one basket: this present motion. Unfortunately for Defendants, as will be discussed below, that basket is porous. However, procedurally, sovereign immunity is a jurisdictional defense, which a defendant may raise at any point in the litigation. Therefore, the PA and PLO Defendants' failure to file an answer and thus default do not affect their ability to now raise a sovereign immunity defense.

*Id.*, 315 F. Supp. 2d at 176.

In order to determine whether the PA and the PLO were entitled to sovereign immunity, this Court analyzed the legal

requirements for statehood, as established by the 1933 Montevideo
Convention on the Rights and Duties of States, codified in the
United States in Section 201 of the Restatement Third on Foreign
Relations Law.   Pursuant to these standards, an entity may be
defined as a state, and invoke sovereign immunity, when it is
characterized by: 1) a permanent population; 2) a defined
territory; 3) a government; and 4) the capacity to enter into
relations with other states.  Id. at 177.  This Court found that
neither the PA nor the PLO met these criteria for statehood.  Id.
at 183.  The Court determined further that the criteria for
sovereignty included in the Antiterrorism Act, 18 U.S.C. § 2337,
coincided with those of the Montevideo Convention.  Consequently,
Defendants' motion to dismiss on the basis of sovereign immunity
was denied.

### *Ungar V*

On March 31, 2004, Judge Martin issued another Report and
Recommendation ("R & R"),[2] in response to Plaintiffs' motions,
advising this Court to enter default judgment against the PA and
the PLO in the amount of $116,409,123.00.  Judge Martin found
that Defendants' failure to comply with discovery had been
willful, and attributable to the PA, rather than its counsel.
Estates of Ungar & Ungar v. Palestinian Authority, 325 F. Supp.

---

[2] Judge Martin's March 31, 2004, R & R is incorporated in
its entirety into Ungar V.

2d 15, 61-63 (D.R.I. 2004) ("<u>Ungar V</u>").  He wrote,

> By refusing to answer any interrogatories,
> admit any facts, produce any documents, or
> produce any officers or employees for
> depositions, the PA effectively frustrates
> the Plaintiffs' ability to prove their
> claims.  This is not a case where default
> judgment is sought as a sanction for one or
> two discovery failings...Here, in contrast, I
> find that the blanket refusal of the PA to
> provide *any* discovery is extremely
> prejudicial.

<u>Id.</u> at 62.

Plaintiffs' made a third motion for entry of default judgment pursuant to Federal Rules of Civil Procedure Rule 55(b)(2), based on Defendants' failure to answer or otherwise defend against the Amended Complaint.  In recommending that the motion be granted, Judge Martin noted that Defendants undeniably had received notice of the Complaint; that Defendants, rather than their counsel, were responsible for the failure to answer; that Defendants had adequate time in which to answer; and, finally, that Defendants' failure to answer was willful.  <u>Id.</u>, 325 F. Supp. 2d at 65. In a footnote to the R & R, Judge Martin also cited language from his earlier order granting Plaintiffs' Motion to Enter Default, discounting Defendants' argument that volatile circumstances in the Mid-East prevented them from answering the Complaint:

> ...it is clear that their failure to file an
> answer to Plaintiffs' Amended Complaint is
> the result of a deliberate choice and not due

-13-

> to an inability to file an answer.  The
> Palestinian Defendants acknowledge that
> '[t]he drafting and filing of an answer is
> within defendants' limited capacities...'
> Indeed, it would be almost impossible for
> them to contend otherwise given their
> extensive filings as reflected in
> the...travel.

Id., 325 F. Supp. 2d at 65, fn. 52 (citation to Defendants'

memorandum omitted.)

Defendants objected to the R & R, and also appealed a

separate order made by Judge Martin requiring them to pay

Plaintiffs attorneys' fees as a sanction for their failure to

provide Plaintiffs with any discovery throughout the duration of

the litigation.  Plaintiffs, for their part, moved the Court to

amend a portion of its order on sovereign immunity included in

Ungar IV.  These three motions were the subjects of Ungar V.

### *Objections to the R & R*

Defendants objected to Judge Martin's R & R on six grounds,

many of which will resonate with familiarity even to a newcomer

to this matter.  First, Defendants argued that the Court lacked

subject matter jurisdiction over this litigation because the

issues herein are non-justiciable, and because Defendants are

entitled to sovereign immunity. Citing its previous analysis,

this Court overruled this objection.  Id., 325 F. Supp. 2d at 22.

Next, Defendants argued that their objective is to protect

and promote the interest of the Palestinian people and that they

lack the intent to engage in terrorism as it is defined by the Antiterrorism Act.  Explaining that it was compelled to consider all of Plaintiffs' allegations as true in light of Defendants' failure to answer the complaint or comply with discovery, this Court overruled this objection as well.  Id. at 23.

Third, Defendants argued that the effect of the R & R is to impose the burdens of litigation on them before they have received a final determination on their claim of sovereign immunity.  Noting that Defendants had "increased the costs borne by Plaintiffs and prolonged this litigation unnecessarily" with their repetitive claims of sovereign immunity, the Court rejected this argument.  Id. at 23.

Defendants' fourth objection was similarly overruled. Defendants asserted that the R & R failed to consider the difficult conditions endured by the Palestinian government, the PA and the PLO, which conditions made discovery difficult and adverse to Palestinian national interests.  Defendants' assertion is belied by the extent of the filings they were able to make throughout the litigation.  Moreover, both this Court and Judge Martin gave Defendants repeated opportunities to present affidavits or other evidence, extending time limits and continuing hearings.

> Yet, these Defendants made the deliberate
> choice not to participate in this litigation
> and have not answered a single interrogatory
> or request for admission or produced a single

document sought by Plaintiffs.

Id. at 24.  Defendants' fifth objection was that Judge Martin erred in finding that the Court could exercise personal jurisdiction over the PA and the PLO.  The Court overruled this objection as well, citing the reasoning set forth in Ungar I.

Defendants' final objection to the R & R was that the damages award for the death of only one person was disproportionate in light of the thousands of civilians who have died in the ongoing conflict in the disputed territories of Israel and the Gaza Strip.  Moreover, Defendants argued, the burden of paying the award would fall on the already-impoverished and oppressed Palestinian people.  In rejecting this argument, this Court pointed out that it was a deliberate and strategic decision on the part of Defendants to refuse to participate in either a trial which would have assessed their liability or in the hearing on damages.  Id., 325 F. Supp. 2d at 24. Overruling all six objections made by Defendants, this Court adopted Judge Martin's second R & R in its entirety.  Id. at 25.

### Attorneys' fees

Defendants further objected to Judge Martin's order of March 31, 2004, granting Plaintiffs' request for attorneys' fees as a sanction for its many delays and ultimate refusal to comply with discovery requests and orders, pursuant to Federal Rules of Civil Procedure Rule 37(b)(2).  Defendants argued that the award of

-16-

$116,409,123.00 was excessive, that the discovery requests were unreasonable, and that their position on discovery had been taken in good faith.  This Court, however, affirmed Judge Martin's ruling:

> Given the PA's history of refusing to comply with this Court's orders and the rules of procedure governing depositions, interrogatories, and requests for the production of documents and for admissions, this Court finds Judge Martin's conclusion to sanction the PA for its deliberate actions to delay the completion of this litigation to be clearly correct.

Id. at 26.

### Waiver of sovereign immunity

Finally, Ungar V also addressed Plaintiffs' Motion, brought pursuant to Federal Rules of Civil Procedure Rule 59(e), for this Court to reconsider its ruling in Ungar IV that Defendants had not waived their right to assert a sovereign immunity defense by failing to advance the defense in an answer.  Plaintiffs also pointed to statements, or admissions, made by Defendants as to their "undefined" status to support their argument that Defendants had waived the sovereign immunity defense.  Reviewing the Ungar IV analysis, this Court pointed out that its determination that Defendants had not waived the defense was essentially dicta because the Court's ruling was that Defendants were not entitled to sovereign immunity – rendering the waiver argument moot.  Id. at 27.  Moreover, the Court concluded, in

-17-

<u>Ungar V</u>, that Defendants had never made the "clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity" which was required by the Foreign Sovereign Immunities Act, 28 U.S.C.A. § 1605(a)(1) in order to make a valid waiver. <u>Id.</u> at 27. Consequently, Plaintiffs' Motion to Amend was denied. <u>Id.</u> at 28.

### First Circuit appeal

Defendants PA and PLO appealed this ruling to the First Circuit Court of Appeals. In <u>Ungar v. Palestine Liberation Organization</u>, 402 F.3d 274 (1st Cir. 2005), the First Circuit held that the case was justiciable, and that the sovereign immunity defense was unavailing. <u>Id.</u> at 282, 292.

Defendants argued that the default judgment should be overturned because they were entitled to have received a final determination on their sovereign immunity defense before being required to participate in the litigation. In response, the Court noted that this Court's jurisdiction indeed would have lapsed had Defendants moved to dismiss the complaint on the basis of sovereign immunity and then timely appealed the denial. <u>Id.</u> at 293. However, the Court went on to point out the flaw in Defendants' reasoning:

> None of the cited cases stand for the
> proposition that sovereign immunity is a
> trump card that may be held in reserve until
> a defendant sees fit to play it, thus
> enabling the defendant to stop the litigation
> in its tracks at a time of its choosing. ...

> The defendants, for whatever reason, elected
> not to assert sovereign immunity in either of
> their first two motions to dismiss. By the
> time that the district court ordered the
> entry of default, the defendants still had
> not moved to dismiss on the grounds of
> sovereign immunity.

402 F.3d at 293. Concluding that Defendants "have failed to show that the district court acted precipitously either in entering default or in reducing the default to judgment," the First Circuit affirmed <u>Ungar V</u> in its entirety.[3]

### Defendants' Motion to Vacate Default Judgment

Now Defendants PA and the PLO come before the Court years later seeking to set aside the $116 million default judgment entered against them by this Court's ruling in <u>Ungar V</u>, 325 F. Supp. 2d 15 (D.R.I. 2004). Arguing that extraordinary circumstances exist that compel vacatur, Defendants make their motion pursuant to Federal Rule of Civil Procedure 60(b)(6). Defendants argue that their previous litigation strategy failed to develop important distinctions between them and their Hamas co-defendants. In fact, Hamas not only carried out the attack against the Ungars at a time when the PA and the PLO assert that they were actively engaged in cooperative efforts with Israel and the United States to prevent anti-Israel violence, but, indeed,

---

[3] Defendants then appealed the First Circuit's ruling to the Supreme Court, which denied the petition for certiorari at 546 U.S. 1034 (2005).

Hamas carried out the attacks _in order_ to disrupt these peace
efforts.   The PA and PLO assert that they share no culpability
for the attack on the Ungars; the judgment against them reflects
only their former misunderstanding of the Court's proceedings and
their consequent procedural mistakes.   They are now fully
committed to litigate the matter on the merits, in good faith.
They argue that the already-impoverished Palestinian people will
endure further suffering if Defendants are forced to pay the
judgment for acts of terrorism for which they bear no
responsibility.   Moreover, Defendants argue that the Ungars'
remedy should be limited to the judgment they have already
secured against Hamas, the actual perpetrators of the attack.

In response to these arguments, Plaintiffs assert that
Defendants' Motion is another tactic in a consistent pattern
aimed at derailing the litigation and frustrating Plaintiffs,
through deliberate delays and refusal to cooperate with the
Court.   Plaintiffs allege that Defendants have stated that they
"will never pay" the judgment.   Moreover, because the default was
the result of Defendants' willful and deliberate conduct, they
are barred from relief under Rule 60(b)(6).

Federal Rule of Civil Procedure 60(b) empowers federal
courts "in certain carefully delimited situations . . . to
'vacate judgments whenever such action is appropriate to
accomplish justice.'" Teamsters, Local No. 59 v. Superline

Transp. Co., 953 F.2d 17, 19 (1st Cir. 1992)(quoting Klapprott v.
United States, 335 U.S. 601, 614-15 (1949)).  Courts applying
Rule 60(b) seek to balance competing priorities: resolving
disputes on their merits, on the one hand, and, on the other,
recognizing the finality of judgments.  Superline, 953 F.2d at
19.

In Rule 60(b)(1)-(5), the Rule provides five specific
reasons for which relief may be granted, ranging from fraud,
mistake to newly-discovered evidence.  The final section,
60(b)(6), adds a catch-all category for "any other reason that
justifies relief."  Fed. R. Civ. P. 60(b)(6).  This section
operates exclusively of the other five categories; relief is only
appropriate when subsections (1) through (5) do not apply.  Cotto
v. United States, 993 F.2d 274, 278 (1st Cir. 1993).

In general, courts are reluctant to disturb judgments under
Rule 60(b) unless the movant can demonstrate that certain
criteria have been achieved, including timeliness, the existence
of exceptional circumstances justifying extraordinary relief, and
the absence of unfair prejudice to the opposing party.
Superline, 953 F.2d at 19 -20.  In addition, in order to obtain
relief under Rule 60(b), a litigant "must give the trial court
reason to believe that vacating the judgment will not be an empty
exercise."  Id.  Although the movant need not show "an ironclad
claim or defense which will guarantee success at trial," it must

at least demonstrate that it possesses "a potentially meritorious claim or defense which, if proven, will bring success in its wake." Id. at 21.

The Court notes that, if it were to grant the motion to vacate the default, this would be extremely prejudicial to the Plaintiffs because they would be unable to conduct much of the crucial discovery that would have been possible years ago when they first requested it. Chief among key witnesses who are no longer available is Yasser Arafat, who died four months after the entry of the default judgment. In addition, important documents, which were located in PA offices in the Gaza Strip, are no accessible to the PLO or the PA since Hamas has taken control of this area.

However, analysis of the prejudice to plaintiffs and the other Superline factors is not determinative to the Court's decision herein because, in the First Circuit, a litigant's strategic choice to default precludes a finding of exceptional circumstances under Rule 60(b)(6). In Paul Revere Variable Annuity Ins. Co. v. Zang, 248 F.3d 1, 5 (1st Cir. 2001), the First Circuit affirmed the trial court's denial of plaintiffs' 60(b)(6) motion, explaining that district courts have broad discretion to determine whether or not a case presents exceptional circumstances which would justify such extraordinary relief. Citing operative language from the Supreme Court's

decision in Ackermann v. U.S., 340 U.S. 193, 198 (1950), the
First Circuit described the Paul Revere plaintiffs' litigation
decision as a "free, calculated, and deliberate" one.   The
purpose of the Rule, the Court went on, is not to relieve a party
from calculated decisions made in the course of formulating
litigation strategy.

> Where a party makes a considered choice,
> though it may involve some calculated risk,
> he "cannot be relieved of such a choice
> because hindsight seems to indicate to him"
> that, as it turns out, his decision was
> "probably wrong."

248 F.3d at 6 (quoting from Ackermann, 340 U.S. at 198).

In Claremont Flock Corp. v. Alm, 281 F.3d 297 (1st Cir.
2002), the First Circuit affirmed the denial of a motion for
relief from a default judgment entered against a Swedish
businessman, who claimed that he thought the litigation had ended
after he filed his answer.   Pointing out that Alm had done
nothing to confirm that the lawsuit had been dismissed, the Court
went along with the trial court's determination that the default
was a result of Alm's own negligence and not extraordinary
circumstances beyond his control.   281 F.3d at 300.   Citing
often-quoted *dicta* from Pioneer Inv. Serv. Co. v. Brunswick
Assoc., 507 U.S. 380, 393 ("To justify relief under subsection
(6), a party must show extraordinary circumstances suggesting
that the party is faultless in the delay."), the First Circuit

concluded that, "The district court did not abuse its discretion in drawing this inference of fault from the evidence in the record." Id. at 300.

And, in an earlier case, Lubben v. Selective Service System Local Bd. No. 27, 453 F.2d 645, 651 (1st Cir. 1972), the First Circuit held that the government's failure to file an appeal was a bar to its subsequent decision to seek relief from a judgment via a 60(b)(6) motion.

> We do not speculate on the reasons why the
> government did not pursue its direct attack
> on the Lubben injunction; it was sufficient
> that the decision to do so was one of
> unfettered choice and free will.  Having made
> that choice, the government must now live
> with its decision.

453 F.2d at 652.

Supreme Court jurisprudence provides ample support for the First Circuit's rulings.  The Ackermann case, frequently cited by the First Circuit, involved German immigrants whose certificates of naturalization were cancelled during the Second World War. Because they had no money and the U.S. immigration officer who was detaining them advised them that they would be released when the war ended, they did not pursue an appeal.  Later, in the face of deportation, they sought relief from the judgment.  Rejecting Ackermann's request, the Court wrote,

> His choice was a risk, but calculated and
> deliberate and such as follows a free choice.
> Petitioner cannot be relieved of such a

-24-

> choice because hindsight seems to indicate to
> him that his decision not to appeal was
> probably wrong, considering the outcome of
> the Keilbar case.  There must be an end to
> litigation someday, and free, calculated,
> deliberate choices are not to be relieved
> from.

Ackermann v. U.S., 340 U.S. 193, 198 (1950).  This language was
recently cited approvingly by the Supreme Court in a criminal
case, Gonzalez v. Crosby, 545 U.S. 524, 538 (2005).

In the present case, "someday" has arrived, and it is time
for this litigation to end.  Defendants participated extensively
in all phases of the litigation to this point, and they are now
suffering the consequences of their strategic decisions.  When
default was entered against them, Judge Martin noted that
Defendants' "failure to file an answer was the result of a
deliberate choice and not due to an inability to file an answer."
Ungar V, 325 F. Supp. 2d at 40.  When Plaintiffs subsequently
twice moved for an entry of default judgment, Judge Martin
declined to hear arguments and instead took the opportunity to
warn Defendants of the risks they were taking and to give them
another opportunity to comply with discovery.  Ungar V at 41.
Throughout the eight-year span of this litigation, time limits
were extended and continuances granted as this Court repeatedly
provided Defendants with the chance to defend themselves against
Plaintiffs' allegations.  The First Circuit indicated its accord
with the conclusions of both Judge Martin and this writer, when

-25-

it wrote, "The district court found, and the defendants' own words appear to confirm, that this recalcitrance was intentional and designed to accomplish some obscure strategic aim." <u>Ungar v. Palestine Liberation Organization</u>, 402 F.3d 274, 293 (1st Cir. 2005). Early in the litigation, former United States Attorney General Ramsey Clark revealed that this was Defendants' litigation strategy when he made his monumental judicial admission that Yasser Arafat had instructed him not to file an answer or defend this case on the merits because Arafat would not recognize the jurisdiction of this or any American court over the PA or PLO. These choices were the intentional, deliberate and binding decisions made by the PA's dictatorial leader. Defendants must now accept the consequences of these decisions.

### Conclusion

For these reasons, Defendants' Motion to Vacate the Default Judgment is denied.

It is so ordered.

_Ronald R. Lagueux_
Ronald R. Lagueux
Senior United States District Judge
May 13 , 2009