# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs – Judgment Creditors,

v.                                                                                                                                                                      C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

    Defendants – Judgment Debtors.

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS – JUDGMENT CREDITORS' MOTION FOR A PAYMENT DECREE

### Introduction

    Plaintiffs-judgment creditors ("Ungars") are the orphaned children, parents, siblings and administrator of the estate of United States citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat Ungar in a terrorist machine-gun attack on June 9, 1996, in Israel.

    In March 2000, the Ungars filed the above-captioned action against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") under the civil provisions of the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.*. On July 13, 2004, this Court entered final judgment for the Ungars and against the PA and PLO, jointly and severally, in the amount of $116,409,123.00 in damages plus attorneys fees. *Ungar v. PA*, 325 F. Supp. 2d 15 (D.R.I. 2004).

    The PA and PLO appealed to the First Circuit, which affirmed the judgment, and a petition for certiorari was denied by the Supreme Court. *PLO v. Ungar* 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005).

    Judge Lagueux recently denied a motion by the PA and PLO for relief from judgment under Fed.R.Civ.P. 60(b)(6). *Ungar v. PA*, 613 F.Supp.2d 219 (D.R.I. 2009).

Upon entering final judgment, this Court emphasized the importance that it attached to the judgment being honored and enforced:

> The PA and PLO … are responsible for and must bear the ultimate burden of providing compensation, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to June 9, 1996. This Court hopes that in keeping with the ATA's purpose to deter acts of international terrorism, its judgment will "interrupt or at least imperil the flow of terrorism's lifeblood, money," and thus, prevent the PA and PLO from funding future terrorist acts such as the one that resulted in the Ungars' horrific deaths.

*Ungar*, 325 F. Supp. 2d at 25.

Well over *five years* have passed since this Court penned this powerful statement, but the PA and PLO have refused to satisfy the Ungars' judgment.

Upon the application of the Ungars, on December 7, 2009 this Court issued citations in supplementary proceedings to the PA and PLO pursuant to R.I.G.L. 9-28-3 (applicable here by operation of Fed.R.Civ.P. 69) which require the PA and PLO to appear before the Court on January 13, 2010, and show cause why an order should not be entered directing them to pay the judgment in this action in full or by installments.

For the reasons set forth below, at the January 13 hearing the Court should order defendants-judgment creditors PA and PLO to pay the judgment in full by February 1, 2010.

## ARGUMENT

The PA and PLO will likely respond to this motion by asserting that they do not have the funds to pay the judgment. Claiming indigency has been a favorite theme of the PA and PLO before the federal courts for many years. But those courts that have examined this claim have found it without merit. For example, in *Knox v. PLO et al.*, Civ. No. 04466 (S.D.N.Y.), the court required the PA and PLO to post security in the amount of $193 million as a condition of

2

vacating their default judgment in that action. *Knox v. PLO*, 248 F.R.D. 420 (S.D.N.Y. 2008). The PA and PLO moved to reduce the security on grounds of indigency, claiming that they could afford no more than $15 million. After conducting extensive discovery the *Knox* court found this claim to be untrue, and that the PA and PLO were able to post security in the amount of $120 million in installments. *See Knox v. PLO*, 2009 WL 1591404 at 10-12 (S.D.N.Y. 2009) *aff'd* 628 F.Supp.2d 507, 509 (S.D.N.Y. 2009) (finding that payment of $120 million security in installments reflects a "reasonable recognition of the Defendants' current financial condition.").

Fortunately, no discovery or fact-finding whatsoever is necessary in the instant case in order to show that the PA and PLO can satisfy the entire judgment, as explained below:

On August 31, 2008, after more than three years of litigation, the Jerusalem District Court issued a decision finding that the July 13 2004 judgment entered by this Court against the PA and PLO is enforceable in Israel. Exhibit A at ¶ 2. Following that decision the Ungars moved the Jerusalem court for a post-judgment attachment on tax payments transferred each month by the Israeli government to the PA. *Id.* at ¶ 3. The Ungars requested a post-judgment attachment in the full amount of their now-domesticated judgment, to accumulate in monthly installments in the amount of 18 million NIS (in current terms[1] equal to about $4.74 million) per month. *Id.*[2]

The Jerusalem District Court granted the Ungars' motion for the post-judgment attachment on September 7, 2008. *Id.* at ¶ 4.

---

[1] The dollar-NIS exchange rate presently stands at 3.7970 NIS to the dollar. *See* http://www.bankisrael.gov.il/firsteng.htm.

[2] The Ungars made clear in their motion to the Jerusalem court that they were seeking installment payments, rather than an immediate attachment in the full amount of the judgment, purely *ex gratia*, in order to neutralize in advance any (false) claim by the PA that an immediate attachment in the full amount would cause the PA a financial crisis. *See* Exhibit A at p. 2 n. 2.

3

The PA and PLO then moved for a stay of execution pending appeal of the August 31 decision of the Jerusalem District Court to the Israeli Supreme Court. *Id.* at ¶ 5.

On October 29, 2008, the Jerusalem District Court issued a decision granting the motion for a stay pending appeal, on the condition that the monthly post-judgment attachment on the tax transfers in the amount of 18 million NIS remain in force, such that the funds accumulated during the pendency of the appeal (i.e. 18 million NIS per month, up to the full amount of the judgment) would be held by the Israeli Treasury until defendants' appeal is decided. *Id.* at ¶¶ 6-7.

As the PA and PLO themselves explained in a declaration recently submitted by them in the *Knox v. PLO* action:

> Beginning with the transfers for September 2008, the State of Israel began withholding … NIS 18 million per month from the tax transfers pending the Israel Supreme Court decision on whether a U.S. judgment in the Ungar litigation is enforceable in Israel. **NIS 18 million (or $4.5 million) will be withheld until the full $116 million is attached** or until the Supreme Court rules favorably for the PNA.

Exhibit B at ¶ 10 (emphasis added).

Thus, pursuant to the Israeli attachment, between September 7, 2008 and today, attached PA funds amounting to 270 million NIS (18 million NIS x 15 months) have accumulated at the Israeli Treasury. Separately, earlier in the Israeli proceeding, the Jerusalem court ordered an attachment on tax transfers to the PA in the amount of 100 million NIS. Exhibit A at ¶¶ 8-9.

Therefore, as of today, a total of 370 million NIS – about **$97.5 million** – of PA funds are attached and held by the Israeli Treasury pursuant to the Ungars' attachment. *Id.* at ¶ 10.

Since an additional 18 million NIS (about $4.74 million) is being attached and added to this sum every month, by the time of the January 13, 2010 citation hearing, the total amount of attached PA funds will be about **$102 million**.

4

Unfortunately, however, it is impossible to know whether, and if so when, the Ungars will ultimately *receive* these attached PA funds via their Israeli enforcement proceedings. Unlike the U.S. Supreme Court, the Israeli Supreme Court does not sit in terms, and a decision in a civil appeal can take anywhere from several months to several years.

If the Israeli Supreme Court ultimately reverses the Jerusalem District Court decision finding the Ungars' judgment enforceable in Israel the attachment will be vacated and the funds released to the PA. But even if the Israeli Supreme Court rejects the appeal (which, as noted, may take some time), the Ungars cannot execute against these funds without further proceedings. Specifically, the Ungars will have to bring a motion to "confirm" the attachment in the Jerusalem District Court – which the PA will certainly seek to contest – and even if the Ungars prevail on that motion the PA can appeal any decision confirming the attachment to the Supreme Court.

In sum, whether the Ungars will ever receive these funds is in question, and it will take years to do so even if the Ungars are successful at every stage.

Fortunately, however, the existence of this pool of attached PA funds provides a simple solution enabling the *immediate* and full satisfaction of the Ungars' judgment:

These funds were attached at the request of the Ungars, and the Ungars can lift the attachment and thereby release the funds – today some $100 million – to the PA at any time.

Moreover, if the judgment is paid in full the Ungars would be *obligated* to release these funds – and they are more than willing to do so immediately.

Accordingly, the Court should reject any claim by the PA and PLO that they lack funds to pay the judgment: if the judgment is satisfied in full by February 1, 2010, as sought in this motion, the Ungars will immediately lift the attachment and thereby release to the PA the attached funds, which will then equal about $107 million – virtually the entire judgment debt.

For the reasons above, the Court should enter an order at the January 13, 2010 hearing[3] commanding the PA and PLO to pay the judgment in full by February 1, 2010 and directing the Ungars to lift the attachment on the PA funds in Israel within 3 business days thereafter.

**WHEREFORE**, the instant motion should be granted.

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

---

[3] In light of the nature of the relief sought in this motion no examination of the PA and PLO regarding their assets need take place at the January 13, 2010 hearing; rather, that hearing should be utilized simply for oral argument on the instant motion.

## **CERTIFICATION**

      I hereby certify that on December 9, 2009 I served this memorandum along with the attached exhibits via ECF on the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

                                                      /S/ David J. Strachman