UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                            )
THE ESTATE OF YARON UNGAR, et al.,          )
                                            )
        Plaintiffs,                         )
                                            )
             v.                             )   C.A. No. 00-105L
                                            )
THE PALESTINIAN AUTHORITY, et al.,          )
                                            )
        Defendants.                         )
                                            )
_____ )

## OPPOSITION TO PLAINTIFFS' MOTION FOR A PAYMENT DECREE

Defendants Palestinian Authority and Palestine Liberation Organization ("PA" and "PLO," respectively) hereby submit this Opposition to Plaintiffs' Motion for A Payment Decree. For the reasons that follow, Plaintiffs' Motion for a Payment Decree should be denied.

## FACTS AND PROCEDURAL HISTORY

### A.   The Default Judgment

In 1996, members of Hamas shot and killed U.S. national and Israeli resident Yaron Ungar and his Israeli wife Efrat Ungar near Beit Shemesh, Israel as they were traveling home in their car. There is no dispute that Hamas was responsible for the attack. Nor is there any dispute that, when the attack occurred, Hamas was actively trying to disrupt the Israeli-Palestinian peace process begun a few years earlier with the Oslo Accords, a peace process which led to the creation of the PA and to which the PLO was deeply committed, despite violent opposition from rejectionist groups such as Hamas.

Following the tragic shooting, Rhode Island attorney David Strachman was appointed Administrator of the Ungars' estates and, in 2000, filed this lawsuit on behalf of Plaintiffs

1018555.4

(hereinafter "the Ungars") under the Anti-Terrorism Act, 18 U.S.C. § 2333(a), which provides a cause of action where U.S. nationals are killed or injured abroad in acts of international terrorism. If a party is found liable, the statute requires an automatic trebling of the damages. *Id.*

The Ungars named as defendants the four Hamas members responsible for the attack, Hamas, the PA, the PLO, and various officials of the PA and PLO. Hamas did not take any steps to defend this action. Ultimately, Magistrate Judge Martin recommended that a final default judgment be entered against Hamas, and, after three days of testimony at an uncontested hearing, further recommended a damage award of $116,409,123.00. Dkt. No. 183 at 64. The district court adopted these recommendations and entered final judgment in the recommended amount against Hamas on January 27, 2004. Dkt. No. 253.

The PA/PLO moved to dismiss the complaint in June 2000. Dkt. No. 22. In July 2001, the district court granted in part and denied in part the PA/PLO's motion. Dkt. No. 40. After that ruling, the PA and PLO intermittently filed briefs in the case arguing that the U.S. courts should not exercise jurisdiction over them and arguing that the case should be dismissed on political question grounds. However, the PA and PLO did not file an answer or participate in discovery. On March 31, 2004, Magistrate Judge Martin issued a report recommending that a default judgment be entered against the PA and PLO applying his damage findings from July 2003 (regarding Hamas) to the PA and PLO. Dkt. No. 269. On July 12, 2004, Judge Lagueux adopted the report and recommendation, Dkt. No. 279, and entered a final judgment against the PA and PLO in the amount of approximately $116 million. Dkt. No. 280.

In 2005, the First Circuit affirmed the final judgment against the PA and PLO. *Ungar v. PLO*, 402 F.3d 274 (1st Cir. 2005). Writing for the panel, Judge Selya observed that the appeal raised "exceptionally important questions of justiciability and sovereignty, emblematic of

1018555.4

unsettled political conditions that have plagued the Middle East for many years." *Id.* at 276. The Supreme Court denied the PA/PLO's petition for a writ of certiorari. *PLO v. Ungar*, 546 U.S. 1034 (2005).

**B.    The Pending Appeal**

In mid-2007, PA President Mahmuod Abbas directed PA Finance Minister and, subsequently also PA Prime Minister, Dr. Salam Fayyad to exercise oversight over the PA/PLO's defense of the U.S. terrorism litigation. The PA/PLO retained the Washington, D.C. litigation firm of Miller & Chevalier to represent them, with the understanding that the PA/PLO would actively defend the cases, including by participating in discovery.

The PA and PLO then returned to the U.S. District Court in Rhode Island. On December 28, 2007, new counsel for the PA/PLO filed a motion for relief from the default judgment under Federal Rule of Civil Procedure 60(b)(6). Dkt. No. 408. On May 13, 2009, Judge Lagueux denied the motion to vacate. Dkt. No. 442. The PA and PLO filed a notice of appeal on June 2, 2009. Briefing on that appeal is now complete, and oral argument before the First Circuit is scheduled to take place on January 7, 2010.

**C.    Enforcement Proceedings**

In May 2005, following the First Circuit's affirmance of the entry of the default judgment, Judge Lagueux granted the Ungars' request for an injunction prohibiting the PA and PLO from selling, transferring, or disposing of any U.S. assets. With virtually no PA or PLO assets in the United States, the Ungars then sought to enforce their judgment by trying to reach assets of third parties they claimed were related to the PA or PLO.

The Ungars' attorney annexed a "Notice of Injunction" to Judge Lagueux's May 2005 restraining order and sent it to a number of financial institutions. The Notice of Injunction,

drafted by Plaintiffs counsel, represented that Judge Lagueux's restraining order applied to "all assets of the PA and the PLO however titled," and asserted that such assets "are held and/or titled under the names" of other Palestinian institutions, including the Palestine Investment Fund, "Palestinian Pension Fund," and Palestine Monetary Authority. *See Strachman v. Palestinian Auth.*, No. 102101/2006, 2008 N.Y. Misc. LEXIS 3735, at *3-4 (N.Y. Sup. Ct. June 5, 2008) (quoting Notice of Injunction).

Following receipt of the Notice of Injunction, Swiss American Securities, Inc., froze over $100 million in securities and debt instruments held in a custodial account belonging to the Palestinian Pension Fund for State Administrative Employees in the Gaza Strip ("Palestinian Pension Fund"). *See id.* at *4. These funds are the subject of an ongoing enforcement action. *Ungar v. Palestinian Auth.*, No. 102101/2006 (N. Y. Sup. Ct., County of New York). The Ungars also served the Notice of Injunction on the Bank of New York, who subsequently placed over $30,000,000 of wire transfers relating to the Palestine Monetary Authority (the PA's central bank) in a suspense account, and those funds also are the subject of an ongoing enforcement action. *Palestinian Monetary Auth. v. Strachman*, 837 N.Y.S.2d 828, 832 (N.Y. Sup. Ct. 2007), *rev'd and remanded*, 873 N.Y.S.2d 281 (N.Y. App. Div. 2009).

In an effort to reach the assets of the Palestine Investment Fund ("PIF"), the Ungars initiated a "Creditor's Bill" proceeding in the underlying matter. *See* Dkt. No. 370. In September 2006, Judge Lagueux entered a final judgment on the Creditor's Bill. Dkt. No. 381. Although PIF was not a party to either the original *Ungar* action or the Creditor's Bill proceeding and its assets greatly exceeded the value of the $116 million judgment, Judge Lagueux "assigned, transferred and conveyed" to the Ungars all of the PA's "ownership rights" in PIF and all rights of the PA that are "titled and/or owed to" PIF. *Id.* at 2.

4

1018555.4

Having initiated an enforcement action in Connecticut seeking turnover of PIF's interest in a Connecticut-based equity fund ("Canaan"), the Ungars then reappeared in the Connecticut action as the purported new owners of PIF and consented, on PIF's behalf, to the turnover of PIF's assets. *See Estate of Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536, 540 (S.D.N.Y. 2008) (describing Connecticut litigation involving PIF). Litigation over ownership and control of PIF, as well as whether PIF's interest in Canaan can be used to satisfy a judgment against the PA and PLO, are the subject of an ongoing enforcement action in the federal court in Connecticut. *Strachman v. Palestinian Authority*, No. 3:05-mc-208-00-PCD (D. Conn.).[1]

The Ungars also succeeded in obtaining the turnover of funds of the PLO Mission to the United States on deposit at Wachovia Bank. *See Estate of Ungar v. Palestinian Auth.*, No. 05-mc-180 (GK), 2006 U.S. Dist. LEXIS 27384, (D.D.C. May 9, 2006). The Ungars' writ of attachment relating to $70 million in humanitarian aid from the League of Arab States to the PA was dismissed in April 2007, following the United States' submission of a Statement of Interest. *See Estate of Ungar v. Palestinian Auth.*, No. 1:05-mc-00180-GK (D.D.C.), Dkt. Nos. 74, 84.

Finally, as mentioned in Plaintiffs' memorandum in support of the instant motion, the Ungars have now domesticated their judgment in Israel. On August 31, 2008, the Jerusalem District Court issued a decision finding that the *Ungar* judgment is enforceable in Israel. Several days later, the court granted the Plaintiffs' motion for an initial attachment of approximately $25 million dollars and monthly attachments of approximately $4.5 million in tax transfer revenue due to the PA. *See Knox v. PLO*, No.1:03-cv-4466, 2009 U.S. Dist. LEXIS 52610, at *11-12

---

[1] At the request of Canaan, the district court in Connecticut stayed the enforcement action pending the current appeal to the First Circuit and any appeal to the Supreme Court. *Strachman v. Palestinian Auth.*, No. 3:05-mc-00208-PCD (D. Conn.) (Dkt. No. 158). The Ungars' appeal of that stay was dismissed. *Estate of Ungar v. Palestinian Auth.*, No. 08-2475-cv, 2009 U.S. App. LEXIS 12758 (2d Cir. June 16, 2009). No other *Ungar* enforcement actions are stayed.

1018555.4

(S.D.N.Y. Mar. 26, 2009). The PA has appealed the judgment to Israel's Supreme Court. *Palestinian Auth. v. Ungar*, CA 8751/08 (S. Ct. of Israel). The Jerusalem District Court stayed the execution of the judgment pending appeal on the condition that the attachments by Israel of tax transfer revenue due the PA remain in the Israeli Treasury. *See Knox*, 2009 U.S. Dist. LEXIS 52610, at *32. Israel's Supreme Court has requested that Israel's Attorney General provide his opinion on the case, and has set oral argument in that matter for January 14, 2010.

**D.    The Instant Motion**

On November 9, 2009, the Deputy Clerk of this Court executed a Writ of Execution to the Marshal. Dkt. No. 460. On November 12, 2009, the U.S. Marshal's office executed a Process Receipt and Return form indicating that it was returning the Writ without service because there were "No Assets identified on Writ of Execution." Dkt. No. 461. On November 16, 2009, these two documents were entered on the docket in this matter.[2]

Sometime thereafter, Plaintiffs' submitted two separate Applications for Citations in Supplementary Proceedings against the PA and PLO respectively to Magistrate Judge Martin, who executed them on a date or dates unknown to Defendants. Dkt. Nos. 462 & 463. The Applications indicate that the Citations are returnable on January 13, 2010 at 10:00 a.m.

On December 7, 2009, the Deputy Clerk executed two separate Citations in Supplementary Proceedings against the PA and PLO respectively. Dkt. Nos. 464 & 465. On

---

[2] It is worth noting that, in addition to proceeding *ex parte*, Plaintiffs apparently failed to comply with Local Civil Rule 69 before requesting the Writ of Execution and bringing the instant motion. Local Rule 69 provides that "A request for a writ of execution shall be accompanied by an affidavit that states: (1) the amount due on the judgment and an explanation of how that amount has been calculated; (2) that a demand for payment has been made and refused; and (3) what efforts have been made to recover the judgment." LCvR 69(b). No such affidavit has been docketed in this matter in connection with the Writ of Execution at issue. This failure to comply with the Local Rule provides an independent ground on which to deny Plaintiffs' Motion for a Payment Decree.

1018555.4

December 8, 2009, a Rhode Island constable served the Citations on Deming Sherman, counsel of record for the PA and PLO. Dkt. No. 466. On December 9, 2009, the Applications, Citations, and Affidavit of Service for the Citations were entered on the docket in this matter.

That same day Plaintiffs filed the instant Motion for a Payment Decree and a supporting Memorandum. Plaintiffs' Motion seeks an Order requiring the PA and PLO to pay the full amount of the default judgment plus statutory interest on or before February 1, 2010.

As will be demonstrated below, the Court lacks the authority to enter such an order under the relevant Rhode Island statute. Indeed, even if the Court had such authority, Plaintiffs' have not met their initial burden of demonstrating their entitlement to such an order; accordingly, Plaintiffs' Motion should be denied.

## ARGUMENT

### I. THE COURT LACKS THE AUTHORITY TO ENTER THE ORDER REQUESTED BY PLAINTIFFS

Plaintiffs' Motion requests an order "[p]ursuant to Fed.R.Civ.P. 69 and R.I.G.L. § 9-28-3." Dkt. No. 467 at 1. Neither that Rule nor that statute provides the Court with the authority to enter an order requiring non-resident judgment debtors with no assets located in the state such as Defendants to pay the judgment in this action. Accordingly, Plaintiffs' Motion should be denied.

"Where a money judgment has been entered in federal court, enforcement of the judgment is governed by Fed. R. Civ. P. 69, which provides that the procedures to be used are those of the state in which the district court sits, unless there is an applicable federal statute." *Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d 346, 349 (1st Cir. 1997). Rule 69(a) specifically provides that:

> A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution--and in proceedings supplementary to and in aid of judgment or execution-

7

> -must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

Fed. R. Civ. P. 69(a). Plaintiffs do not claim that any federal statute is "applicable" here. Thus, under Rule 69(a), reference must be made to Rhode Island law to determine the procedure for executing on the instant judgment.

The Supreme Court has held that where, as here, Plaintiffs seek to avail themselves under Rule 69 of a state statutory process, it necessarily follows that the federal Court's jurisdiction is limited to the authority provided by the relevant state statute. *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944) (holding that in proceedings under Rule 69 "[s]tate law is the controlling rule of decision in this case as to both substantive and procedural rights of the parties"). For example, in *Dwyer*, "judgment creditors in a federal forum attempted to compel municipal officials to levy a tax in order to pay their federal judgment," but because, "[t]he law of the forum did not permit such practice or procedure . . . the Court held that the federal judgment creditors could not execute their judgment in contravention of state law." *Bruno v. New Orleans*, 724 F. Supp. 1222, 1224 (E.D. La. 1989) (citing *id.*). *See also Milliken & Co. v. Haima Group Corp.*, No. 08-22891, 2009 U.S. Dist. LEXIS 72911, at *17 (S.D. Fla. June 25, 2009) ("[T]his Court is bound by the 'procedure of the state in which the district court is located' and the state court's interpretation of same.") (quoting Fed. R. Civ. P. 69(a)); *Mortg. Elec. Registration Sys. v. Anastasio*, No. 3:CV-04-2691, 2006 U.S. Dist. LEXIS 40086, at *13 (M.D. Pa. June 16, 2006) ("Under Fed.R.Civ.P. 69, we look to the Pennsylvania Rules and state court precedent to determine the Commonwealth's willingness to vacate or alter judicial sales."); *Harris Custom Builders, Inc. v. Hoffmeyer*, No. 90 C 741, 2001 U.S. Dist. LEXIS 10032, at *29 (N.D. Ill. July 17, 2001) ("since Federal Rule of Civil Procedure 69, dealing with judgment enforcement proceedings, conforms collection proceedings to state law, Illinois courts have the final say");

*Federal Deposit Ins. Corp. v. Consolidated Mortg. & Finance Corp.*, 735 F. Supp. 456, 458 n.6 (D.P.R. 1990) ("Under our Rule 69, we are to apply local law on execution of federal district court judgments.").

Plaintiffs' Motion relies exclusively upon Rhode Island General Law § 9-28-3 which provides that

> On the filing of an application by a judgment creditor, execution on whose judgment has been returned either wholly or in part unsatisfied and unpaid, the clerk or a justice of the court rendering the judgment, or if the judgment is rendered in the superior court in a case in which the writ was returnable to a district court, then and in such case the clerk or justice of the district court to which the writ was returnable, if the papers in the case shall have been transmitted to the district court as hereinafter provided, shall issue a citation to the judgment debtor to appear at a time and place named therein to show cause why an examination into his or her circumstances should not be made and a decree be entered ordering him or her to pay the judgment in full or by installment, weekly, monthly, or otherwise. The citation shall be made returnable to the court by which it was issued and shall be served by delivering a copy to the debtor or by leaving a copy at the last and usual place of abode of the debtor with some person living there at least six (6) days before the return day named therein.

R. I. Gen. Law § 9-28-3. Thus, the initial issue presented is whether the Rhode Island statute authorizes the relief sought by Plaintiffs here. It clearly does not.

In the instant case, Plaintiffs are seeking an order compelling Defendants to pay the judgment against them pursuant to the authority of § 9-28-3 even though it is beyond dispute that neither Defendants, nor any of Defendants' assets, are, or ever have been, physically present in Rhode Island. *See, e.g.,* Dkt. No. 461 (containing Plaintiffs' notation that Defendants have "no assets in R.I."). Nothing in § 9-28-3 or the Rhode Island decisions that have construed it empower this Court to order relief against non-US debtors and assets located outside of the United States. In order for such relief to be proper, Rhode Island would have to enact legislation to confer that authority on Rhode Island courts. No Rhode Island case that Defendants have

1018555.4

been able to locate confers such extraterritorial authority. This is not surprising as such authority would obviously be contrary to the text of § 9-28-3 itself which clearly presumes that the "debtor" will be physically present in the state or possesses an "abode" here.[3]

For this reason, the Court lacks the authority to enter the relief requested by Plaintiffs, and their Motion should be denied. *See Baxter State Bank v. Bernhardt*, 186 F.R.D. 621, 624, 625 (D. Kan. 1999) (because "Kansas courts have no jurisdictional authority to order a non-resident judgment debtor to bring out-of-state property into Kansas to satisfy a judgment. . . . the court concludes that it has no power to order defendant Bernhardt to bring out-of-state property before this court in satisfaction of the presently unpaid judgment") (internal citation omitted).

While § 9-28-3 is clear on its face, if the Court has any doubt about its ability to reach non-resident debtors, the proper course would be not to decide the issue in the first instance, but to certify the question to the Rhode Island Supreme Court pursuant to Rule 6 of the Rhode Island Supreme Court Rules of Appellate Procedure because "[t]he U. S. Supreme Court has held . . . that in determining what is the practice and procedure relative to execution and supplementary proceedings, the decisions of the highest court of the state are controlling." *Bruno*, 724 F. Supp. at 1224 (citing *Dwyer*, 322 U.S. at 236). This is the process routinely utilized by federal courts confronting similar state collection law issues. *See, e.g., FTC v. Olmstead*, 528 F.3d 1310, 1314

---

[3] For this same reason service of the citations was not properly effectuated on the PA and PLO. The plain language of § 9-28-3 requires that the citations "be served by delivering a copy to the debtor or by leaving a copy at the last and usual place of abode of the debtor with some person living there." Here no such personal service was effectuated on either the PA or PLO who have neither a physical presence in the state nor an "abode" here. Rather, service was attempted upon the PA and PLO's counsel of record. However, because the statute does not by its own terms allow service upon counsel, the Court lacks authority to enter the Plaintiffs' requested order for this reason as well. *See Hilao v. Estate of Marcos*, 95 F.3d 848, 853 (9th Cir. 1996) (holding that under Rule 69, "the manner in which service shall be made (e.g., personally, by mail, etc.) or upon whom service shall be made . . . [is] provided by state law").

1018555.4

(11th Cir. 2008) ("[G]iven the absence of controlling case law on point, we conclude that Florida law is not sufficiently well-established for us to determine with confidence whether the district court's surrender order is permissible . . . . Because we have found no such controlling precedent, we certify the . . . question to the Florida Supreme Court."); *Koehler v. Bank of Bermuda Ltd.*, 544 F.3d 78, 86, 87 (2d Cir. 2008) ("[W]e perceive nothing in the text of N.Y. C.P.L.R. 5225 that would limit the power of a court to order a party within its personal jurisdiction to deliver property to New York.  However, we acknowledge that the issue is unsettled in New York, and that it must be resolved by the New York State Court of Appeals, before we can determine whether the district court correctly vacated the turnover order . . . We therefore certify [the question] to the New York State Court of Appeals.").  Accordingly, Plaintiffs Motion should be denied because the Court lacks the authority to order the relief sought.

## II.     EVEN IF THE COURT HAD THE AUTHORITY, PLAINTIFFS HAVE NOT DEMONSTRATED THEIR ENTITLEMENT TO THE REQUESTED ORDER

Alternatively, even if the Court had the authority to issue the order requested by Plaintiffs, it should not do so because the Plaintiffs have not demonstrated that they are entitled to such an order.  The citations have set a show cause hearing for January 13, 2010.  Section 9-28-4 describes what is supposed to happen at the citation hearing:

> A judgment debtor upon whom the citation shall be served as provided in § 9-28-3 shall be obliged to appear in court in person in response to the citation as therein commanded, and for failure to so appear, may be proceeded against as provided by chapter 17 of this title in the case of a witness duly summoned who fails to appear as commanded. At the hearing on the citation, the court shall make inquiry by examination of the judgment debtor, or otherwise, as to his or her circumstances, his or her income from any source, and his or her ability to pay the judgment; and if the debtor fails to appear at the time and place fixed the inquiry may proceed in his or her absence.

1018555.4

R. I. Gen. Law § 9-28-4.

It is clear, however, that Plaintiffs have no intention of proceeding in the fashion required by § 9-28-4. To the contrary, Plaintiffs' Memorandum states that "no discovery or fact-finding is necessary in the instant case," and that "[i]n light of the nature of the relief sought in this motion no examination of the PA and PLO regarding their assets need take place at the January 13, 2010 hearing; rather, that hearing should be utilized simply for oral argument on the instant motion." Dkt. No. 468 at 3, 6 n.3. Accordingly, counsel will appear at the January 13, 2010 hearing on behalf of the PA and PLO for argument on the instant motion.

The PA and PLO also will not attempt to present here, or at the show cause hearing, the extensive and detailed evidence demonstrating their inability to pay the judgment. Indeed, were they to be required to do so, a substantial amount of time would be required to compile and present current information about the PA and PLO's financial status akin to that which was presented in the *Knox* litigation, a portion of which is referenced in the Declaration of Hatem Yousef which was filed by Plaintiffs as an exhibit to their memorandum in support of the instant motion. *See* Dkt. No. 468-3. Instead, Defendants will simply demonstrate how, assuming *arguendo* that the Court has the authority to issue Plaintiffs' requested order, Plaintiffs have failed to meet their initial burden of demonstrating their entitlement to such an order.

Section 9-28-5 describes how the court may issue a decree setting the manner in which Defendants must pay Plaintiffs' judgment after determining Defendants' ability to pay all at once or by installment payments:

> If the court finds that the debtor is able to pay the judgment in full or by partial payments, from time to time, it shall, after first allowing the debtor out of his or her income a reasonable sum for the support of himself or herself or the support of himself or herself and family, if he or she has a family, enter a decree fixing the time, place, and amount of payments to be made by the debtor

> on the judgment out of his or her income in excess of the allowance. If the court entering the decree finds that the debtor is not able at the time to pay the judgment in full or by partial payments, from time to time, it shall enter a finding to that effect which shall be subject to revision on like notice and inquiry and on proof of changed circumstances of the debtor; but no subsequent citation to the debtor shall issue until the creditor or some one in his or her behalf has filed in court an affidavit setting forth evidence of such a change in the circumstances of the debtor as shall satisfy the court that a new inquiry as to the debtor's ability to pay the judgment shall be made.

R. I. Gen. Law § 9-28-5.

A judgment creditor has the initial burden of demonstrating to the Court that the debtor has the ability to pay the judgment, which the debtor can rebut by demonstrating its inability to pay. *Ciccone v. Ciccone*, 204 A.2d 819 (R.I. 1964). Because Plaintiffs have failed to meet their initial burden of proof under the statute, their motion must be denied.

Plaintiffs assert that this Court can compel Defendants to pay Plaintiffs' outstanding judgment because Plaintiffs purportedly have the ability to release to Defendants certain value-added tax ("VAT") funds and other tax transfer revenues which are being held by the Government of Israel once they receive payment. Dkt. No. 468 at 3-6. Regardless of whether Plaintiffs are correct in characterizing their purported control over the tax transfer revenue in question, this Court is barred by Rhode Island law from considering these funds when determining whether to issue the payment decree that Plaintiffs request.

As the Rhode Island Supreme Court has made clear, proceedings initiated under § 9-28-3 may only be used to compel payment from a judgment debtors' presently available income, and no other resources potentially obtainable by a judgment debtor may be considered when a court determines whether to issue a payment decree through the process available under 9-28-3. *Rhode Island Hospital v. Collins*, 368 A.2d 1225 (R.I. 1977).

13

1018555.4

In *Collins*, the judgment debtor had transferred title to his home from himself to a corporation of which he was the sole stockholder. *Id.* at 1226. The judgment creditor initiated proceedings under 9-28-3 to compel payment of its outstanding judgment, during which the creditor argued that the debtor should be ordered to endorse over his stock certificate in the corporation to satisfy the judgment against him, and the trial court ordered the debtor to do so. *Id.* On appeal, the judgment debtor argued that the trial court had exceeded its authority under the Rhode Island statute, and the Rhode Island Supreme Court agreed. *Id.*

The Rhode Island Supreme Court explained that "Chapter 28 of title 9 affords a judgment creditor with two remedies when an execution is returned unsatisfied." *Id.* "Section 9-28-1 specifically provides" in such instance that "a judgment creditor may institute a civil action to reach and apply and subject to the payment and satisfaction of his judgment any 'equitable assets or any choses in action of the judgment debtor' except those that are statutorily exempt from attachment." *Id.* at 1226-27 (quoting R. I. Gen. Law § 9-28-1). "On the other hand," Sections "9-28-3 through 9-28-7 permit a creditor to apply to the court for a citation which directs the debtor to appear in court and show cause why an inquiry cannot be made into his ability to satisfy the judgment by either making payment in full or a series of installment payments." *Id.* at 1227. However, "[w]hen a creditor chooses the 'citation' path, the sole source to which a trial justice can look in seeking to satisfy the outstanding judgment is the debtor's income." *Id.* The *Collins* court then explained why the lower court had exceeded its authority under the statute:

> In the *Barber* case we ruled that a trial justice exceeded his jurisdiction when he ordered an employed debtor to obtain a second or another job so that he could pay off a $ 10,000 plus judgment at the rate of $ 8 a week. Here the trial justice's order directing Collins to endorse his stock certificate over to the hospital's attorney suffers from the same infirmity. If the hospital wishes to go the route delineated in § 9-28-1 and bring an independent civil action to reach and apply Collins' interest in the corporation, it may do so, but the order now under review finds no support whatsoever in the law.

*Id.* (citing *Barber v. Jemery*, 288 A.2d 497 (R.I. 1972)).

Thus, *Collins* establishes that a court may not use the process provided in Section 9-28-3 to order a judgment debtor to take affirmative steps to pay the judgment against it beyond what the debtor's existing sources of income would allow, even where such steps are entirely within the power of the debtor to take.

Here Plaintiffs argue that "the Court should reject any claim by the PA and PLO that they lack funds to pay the judgment" because "by the time of the January 13, 2010 citation hearing, the total amount of attached PA funds" from tax transfer revenue held by the Government of Israel "will be about $102 million." Dkt. No. 468 at 4, 5. This argument fails because the tax transfer revenue Plaintiffs have encumbered in Israel is not part of either Defendants' presently available income. As an initial matter, and as Plaintiffs moving papers note, those monies are not due to the PLO, and therefore provide the PLO with no ability to pay the judgment. Rather they are "attached PA funds." *Id.* at 4. Plaintiffs make no attempt to demonstrate that the PLO has "income" sufficient to pay the judgment. For that reason alone, the motion must be denied as to the PLO.

While the PA may have some interest in the tax transfer revenue Plaintiffs have encumbered in Israel, those funds are obviously not "income" currently available to the PA. As Plaintiffs note, they have encumbered those funds though an action in Israel, and those funds are

15

therefore, *ipso facto*, not current "income" the PA can pay over to Plaintiffs.  While Plaintiffs propose that they be ordered to release their interdiction of these funds in the instant Motion, the release of these funds would be required under the Plaintiffs' proposal only *after* the PA had paid the judgment.  Dkt. No. 467 ¶ 2.  Plaintiffs make no attempt to show that the PA has sufficient income other than the tax transfer revenue with which it can pay the judgment *before* Plaintiffs release the tax transfer revenue.

Moreover, even if the PA could devise some extraordinary means of securing and paying $116 million before Plaintiffs release the tax transfer revenue, this Court could still not compel the PA to do so through the proceedings that Plaintiffs have initiated.  This is the case because the Rhode Island Supreme Court has held that a court exceeds its authority under the statute when it orders a judgment debtor to engage in means of raising money over and above what the debtor's regular income provides.  *See Collins*, 368 A.2d at 1227 ("In the *Barber* case we ruled that a trial justice exceeded his jurisdiction when he ordered an employed debtor to obtain a second or another job so that he could pay off a $10,000 plus judgment at the rate of $8 a week.  Here the trial justice's order directing Collins to endorse his stock certificate over to the hospital's attorney suffers from the same infirmity.").  For similar reasons an order directing the PA to pay the judgment from funds other than its current income would exceed the authority provided by the Rhode Island statute.

Furthermore, the Government of Israel retains ultimate authority and discretion over whether the tax revenues it collects on behalf of the PA will in fact be transferred to the PA.  The Government of Israel could decide at any time not to turn over those funds even if they were not subject to the Ungar attachment.  Indeed, Israel has withheld such tax revenue from the PA at various times since the Oslo accords were executed.  *See* Exhibit A hereto, Fourth Supplemental

Declaration of Prime Minister Salam Fayyad, submitted to the court in *Knox* on April 27, 2009, at ¶ 14 (explaining that "the tax transfer revenue is vulnerable to disruption" because "[t]he Government of Israel maintains discretion to suspend the tax transfers and indeed has done so in the past"). Consequently, this Court cannot find that the PA has sufficient unencumbered funds constituting "income" to pay Plaintiffs' judgment based on the attached tax transfer revenues.

Finally, even if the encumbered tax transfer revenues were somehow properly viewed as PA "income," the Court still could not enter Plaintiffs' requested Payment Decree because of the PA's governmental status. While the PA may not enjoy sovereign immunity under the terms of the Oslo Accords, it is, at the very least, a governmental body akin to a municipality, and the Supreme Court of Rhode Island has held that "[g]overnmental bodies generally enjoy the privilege of exemption of property from execution." *Adler v. Lincoln Hous. Auth.*, 623 A.2d 20, 22 (R.I. 1993). Thus, "[a]s a general rule, the property of a municipal corporation necessary to the exercise of its functions . . . or property which has been destined and set apart by statute as a source of permanent revenue for the corporation, cannot be seized or sold on execution against it." *Richmond v. Kettelle,* 106 A. 292, 298 (R.I. 1919). "The 'long-standing principle of exemption of public property' is justified by the public purpose for which municipalities and other public corporations are created." *Adler*, 623 A.2d at 22 (citation omitted).

> The reason for the exemption is obvious. Municipal corporations are created for public purposes and for the good of the citizens in their aggregate or public capacity. That they may properly discharge such public functions corporate property and revenues are essential, and to deny them these would impede and in some instances practically destroy the purposes of their creation.

*Id.* While governments, like the PA in this case, might be subject to mandamus actions to collect a judgment, *id.,* Plaintiffs have not brought such an action here. Accordingly, Plaintiffs' Motion must be denied.

1018555.4

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs' Motion for a Payment Decree should be denied.

Dated:  December 28, 2009

      /s/ Richard A. Hibey_____
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

      /s/Deming E. Sherman_____
Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

1018555.4