# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs – Judgment Creditors,

  v.            C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

    Defendants – Judgment Debtors.

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## PLAINTIFFS – JUDGMENT CREDITORS' MOTION FOR A PAYMENT DECREE

### Introduction

The Ungars respectfully submit this Reply in further support of their motion for a payment decree. As shown below, the arguments asserted by the PA and PLO in their opposition brief are all meritless, and the instant motion should be granted.

### ARGUMENT

### I. The Ungars Have Complied With Local Civil Rule 69

Defendants argue that the instant motion should be denied because the Ungars' request for issuance of an execution was not supported by an affidavit and so did not comport with Local Civil Rule 69. Defs' Opp. at 6, n. 2.

In fact, the Ungars' request for an execution was supported by an affidavit, exactly as required by Local Civil Rule 69. *See* Exhibit A.

## II.    This Court Is Authorized to Grant the Relief Sought

Defendants next argue that this Court is not authorized to grant the relief sought, because they have no assets in Rhode Island and R.I.G.L. § 9-28-3 does not permit a court to order an out-of-state judgment debtor to transfer out-of-state assets into Rhode Island. Defs' Opp at 7-11.

This argument fails for numerous reasons:

*First*, the Ungars' motion does not seek an order directing defendants to transfer funds into Rhode Island. Rather, the motion requests only that defendants be directed to transfer the amount owed on the judgment "to the Ungars' undersigned counsel." *See* dkt. # 467.

Therefore, even assuming defendants' claim that § 9-28-3 does not permit this Court to order defendants to transfer funds into Rhode Island had any merit (which, as shown below, it certainly does not), this Court could order defendants to pay the judgment to the Ungars' counsel (or other representative) in another jurisdiction (e.g. a jurisdiction where they do have assets).

*Second*, the fact that the defendants are not Rhode Island residents is a red-herring, because this Court unquestionably has personal jurisdiction over them. This Court's personal jurisdiction over defendants was thoroughly litigated in the underlying action and this Court found by a preponderance of the evidence that it has personal jurisdiction over the defendants. *See Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 48-59 (D.R.I. 2004).

Moreover, upon appeal to the First Circuit, the defendants did not challenge this Court's finding that it has personal jurisdiction over them. *See Ungar v. PLO*, 402 F.3d 274, 276 (1st Cir. 2005) (listing the three points of error raised by defendants on appeal, none of which challenged this Court's finding of personal jurisdiction).

Thus, not only is this Court's *in personam* jurisdiction over the defendants the law of the case, but by failing to appeal the jurisdictional finding the defendants have forever waived any

jurisdictional challenges and submitted themselves to the personal jurisdiction of this Court. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) ("Unlike subject matter jurisdiction, a party waives the right to dispute personal jurisdiction by failing to contest it on appeal.").

This waiver is effective even where, as here, the original challenge to personal jurisdiction was made on constitutional (and not merely statutory) grounds. *See e.g. Travelers Indem. Co. v. Atlantic Exp. Line*, 837 F.2d 187, 188 (5th Cir. 1988) ("Appellants raised the due process issue at trial but did not 'get to it' during trial. The issue was not raised by appellant either in its brief or oral argument on appeal. Consequently, any due process claim based upon a lack of minimum contacts has been waived.").

Since defendants are subject, and submitted themselves to, the personal jurisdiction of this Court, defendants' lack of Rhode Island residency is utterly irrelevant.[1]

***Third***, defendants' claim that because § 9-28-3 permits service of a citation, *inter alia*, by leaving a copy at the debtor's abode, a citation may only issue to a judgment debtor with a Rhode Island abode (Defs' Opp. at 10) is plainly frivolous for at least two reasons:

In the first place, § 9-28-3 does not require service at the judgment debtor's abode – it merely permits such service as an option in addition to allowing service on the judgment debtor irrespective of his abode. Numerous other provisions of Rhode Island law provide a similar option for service at a party's abode, but there is no precedent holding that a court's exercise of

---

[1]    Indeed, even in their opposition to the instant motion, the defendants do not dispute the Court's personal jurisdiction over them, but argue only that this Court is not statutorily "authorized" by R.I.G.L. § 9-28-3 to order them to transfer assets into Rhode Island.

authority under those provisions is conditioned on the existence of such an abode. Thus, clearly, a citation may be served on a judgment debtor without a Rhode Island abode.

Moreover, defendants' interpretation would enable a Rhode Island judgment debtor to thwart a citation simply by moving out of state after entry of a judgment. Indeed, under defendants' absurd theory, a judgment debtor who works daily in Providence but lives in Attleboro would be immune from a citation since he lacks a Rhode Island abode.

Such a conclusion would be particularly ludicrous considering that Rhode Island courts may exercise personal jurisdiction to the full reach permitted by the Constitution. *See* R.I.G.L § 9-5-33; *KVH Industries, Inc. v. Moore*, 789 F.Supp. 69, 70 (D.R.I. 1992) (Rhode Island long-arm statute permits jurisdiction to the fullest extent permitted by the Constitution.).

Accordingly, out-of-state residents are haled into Rhode Island courts every day – yet, under defendants' theory, all such defendants would be immune from citation proceedings because they lack a Rhode Island abode.

There is no logical basis, much less any authority, in support of such a conclusion.

***Fourth***, defendants' claim that § 9-28-3 should be interpreted to exclude out-of-state assets has no basis whatsoever and, frankly, is preposterous. Consider the practical result of such a construction: a Rhode Island resident judgment debtor could foil a citation proceeding simply by keeping assets out of Rhode Island. Defendants' proffered construction of § 9-28-3 therefore must be rejected, since in interpreting Rhode Island law, a court should "not attribute to the Legislature an intent that would result in absurdities or would defeat the underlying purpose of legislation." *Landrigan v. McElroy*, 457 A.2d 1056, 1060-1061 (R.I. 1983).

Moreover, there is nothing at all in the plain language of § 9-28-3 that so much as hints at the existence of such a geographical limitation.

4

To the contrary, if the Rhode Island legislature had sought to limit a court's authority to order a judgment debtor to transfer funds into Rhode Island, it would have limited the scope of the inquiry regarding the judgment debtor's ability to pay to his in-state income.

Yet, R.I.G.L. § 9-28-4 explicitly directs the court to set the amount of the payment decree on the basis of the judgment debtor's "income from any source." *Id.* (emphasis added).

Clearly, then, the legislature intended that the court take into account out-of-state income. Defendants' theory thus flies in the face of the plain language of § 9-28-4.

The interpretation of § 9-28-3 that defendants urge on the Court is also contradicted by Rhode Island precedent construing a sister provision in the same chapter, R.I.G.L. § 9-28-1. Section 9-28-1 empowers a Rhode Island court to "reach and apply and subject to the payment and satisfaction of [a] judgment any equitable estate, any equitable assets, or any choses in action of the judgment debtor." *Id.*

The Rhode Island Supreme Court has specifically held that § 9-28-1 empowers a Rhode Island court to assign and order the transfer of the judgment debtor's rights in out-of-state assets to the judgment creditor. *See Desper v. Talbot*, 727 A.2d 1233 (R.I. 1999) (directing the transfer of judgment debtor's rights in a Massachusetts property to the judgment creditor).

Since the Rhode Island legislature empowered Rhode Island courts to direct the disposition of out-of-states assets under § 9-28-1, the same authority was granted under § 9-28-3:

> It is [a] well-settled principle that statutes relating to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope. Such statutes are considered to be *in pari materia*, which stands for the simple proposition that statutes on the same subject are, when enacted by the same jurisdiction, to be read in relation to each other.

*Such v. State*, 950 A.2d 1150, 1156 (R.I. 2008) (internal citations, quotes and ellipsis omitted).

Moreover, the provisions of § 9-28-3 and § 9-28-1 require that an execution be returned unsatisfied as a condition of utilizing those statutes. Thus, by definition, §§ 9-28-3 and 9-28-1 were intended by the Rhode Island legislature to enable enforcement of judgments against judgment debtors without property, or without sufficient property, in Rhode Island. *Cf. In re Gaming Lottery Securities Litigation*, 2001 WL 123807 at *2 (S.D.N.Y. 2001) ("GalaxiWorld also argues that this Court does not have jurisdiction to enter a turnover order or an installment order pursuant to CPLR § 5225(a) or 5226 because the assets of GalaxiWorld are located outside of New York. This argument is also unavailing. The very purpose of CPLR § 5225 is to reach funds that are beyond the reach of a sheriff's levy.").

At bottom, defendants' argument rests on the proposition that permitting a court to direct the disposition of a judgment debtor's out-of-state assets is some sort of extraordinary remedy that would require a special and explicit grant of authority in the text of § 9-28-3.

But "[i]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Moore v. Ballard*, 914 A.2d 487, 490 (R.I. 2007) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I. 1996)).

Thus, since the plain text of § 9-28-3 contains no geographical limitation, there is none.

Moreover, contrary to the impression defendants seek to create, numerous jurisdictions permit their courts to compel a judgment debtor to bring assets into the jurisdiction – including even tangible assets – to satisfy a judgment. *See e.g. Koehler v. Bank of Bermuda Ltd.*, 544 F.3d 78, 85 (2nd Cir. 2008) (A "court sitting in New York, that has personal jurisdiction over a judgment debtor, may order the judgment debtor himself to deliver property into New York."); *Gryphon Domestic VI, LLC v. APP Int'l. Fin. Co.*, B.V., 41 A.D.3d 25, 836 N.Y.S.2d 4, 9 (1st

Dep't 2007) (holding that a court in New York can order a judgment debtor, over whom it has personal jurisdiction, to turn over out-of-state assets); *Starbare II Partners, L.P. v. Sloan*, 216 A.D.2d 238, 629 N.Y.S.2d 23 (1st Dep't 1995) (holding that a New York court was entitled to order a judgment debtor to deliver artwork in his possession, although the artwork was located outside New York, because it had personal jurisdiction over him); *In re Gaming Lottery Securities Litigation*, 2001 WL 123807 at *2 (ordering judgment debtor to pay to judgment creditors funds located overseas); *In re Martin*, 145 B.R. 933, 948 (Bkrtcy.N.D.Ill. 1992) ("Where property is located out of state, an Illinois court would have *in personam* jurisdiction to order a judgment debtor to apply that property to satisfy the judgment."); *In re Feit & Drexler v. Drexler*, 760 F.2d 406, 414 (2nd Cir. 1985) (collecting cases and holding that under federal law, a court has the power to compel the debtor to deliver property from outside the court's territorial jurisdiction when the court has personal jurisdiction over the debtor); *Clark v. Allen*, 139 F.3d 888 (Table) at *7 (4th Cir. 1998) ("In West Virginia, a money judgment may be enforced by a writ of fieri facias … The debtor may ... be required to deliver property in his possession, including real estate located outside West Virginia, to an officer possessing the writ."); *World Fuel Svcs. Corp. v. Moorehead*, 229 F.Supp.2d 584, 587 (N.D.Tex. 2002) ("Texas courts ... have applied the turnover statute to reach a wide variety of property, including, corporate stock in the hands of third parties and held out of state, shares of stock and accounts receivable, and promissory notes.") (internal citations omitted). *Dalton v. Meister*, 71 Wis.2d 504, 513, 239 N.W.2d 9, 14 (1976) (Wisconsin courts have power to order party to transfer property located in another state if the court has jurisdiction over the party).

Indeed, the New York Court of Appeals recently held that a New York court is empowered to direct even a third-party <u>garnishee</u> (not the judgment debtor), over which it has

personal jurisdiction, to transfer out-of-state assets of the judgment debtor into the jurisdiction. Significantly, the New York Court of Appeals reached this conclusion on the grounds that the plain language of the turnover statute contains no geographical limitation:

> The Court of Appeals explained that "CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires a garnishee to transfer money or property into New York from another state or country." *Id*. at 539, 883 N.Y.S.2d 763, 911 N.E.2d 825.

*Koehler v. Bank of Bermuda Ltd.*, 577 F.3d 497, 499 (2nd Cir. 2009) (quoting *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009)) (emphasis added).

Exactly so here, since § 9-28-3 contains no geographical limitation, there is none.

Significantly as well, the New York Court of Appeals found that the existence of personal jurisdiction is the key issue:

> It further explained that "the key to the reach of the turnover order is personal jurisdiction over a particular defendant," *id*. at 540, 883 N.Y.S.2d 763, 911 N.E.2d 825, and that in rem jurisdiction over the property is not required if there is personal jurisdiction over the defendant. *Id*. The Court of Appeals held "that a New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property regardless of whether the defendant is a judgment debtor or a garnishee." *Id*. at 541, 883 N.Y.S.2d 763, 911 N.E.2d 825.

*Koehler*, 577 F.3d at 499 (quoting and summarizing *Koehler*, 12 N.Y.3d 533).

Since, as discussed above, this Court unquestionably has personal jurisdiction over the defendants, it is empowered under § 9-28-3 to order them to transfer funds into Rhode Island.

The cases cited above clearly show that numerous jurisdictions permit their courts to order a judgment debtor to bring assets into the state to satisfy a judgment. Thus, there is no basis for defendants' assumption that an express statutory provision is required to enable such relief.

On the contrary, underlying the cases above is the long and well established common law principle, set forth in the Restatement (Second) of Conflict of Laws (1971), that a "state has power to exercise judicial jurisdiction to order a person, who is subject to its judicial jurisdiction, to do an act, or to refrain from doing an act, in another state." *Id*. at § 53.

Rhode Island unquestionably follows this rule. *See Brown v. Brown*, 120 R.I. 340, 387 A.2d 1051, 1053-1054 (R.I. 1978) (Holding, in reliance *inter alia* on § 53 of the Restatement, that a court having personal jurisdiction over a party may order the party to act in a different jurisdiction, even when party was not a resident of Rhode Island).

Defendants argue that this Court should interpret R.I.G.L. § 9-28-3 in light of the decision in *Baxter State Bank v. Bernhardt*, 186 F.R.D. 621 (D. Kan. 1999). Defs' Opp. at 10. *Baxter* is of no help to the defendants. *Baxter* relies solely on the decision of an intermediate-level Kansas appellate court in *Elkhart Coop. Equity Exch. v. Hicks*, 16 Kan.App.2d 336, 823 P.2d 223 (1991). *Baxter*, 186 F.R.D. at 624-625.

*Elkhart* contains no reasoning or analysis whatsoever, and bases its decision solely on cases from New York, Ohio and Pennsylvania. *See Elkhart*, 823 P.2d at 226.

Respectfully, however, the *Elkhart* court misconstrued the law of New York, Ohio and Pennsylvania. As shown *supra*, New York courts are authorized to order both judgment debtors and garnishees over which they have personal jurisdiction to transfer assets into the jurisdiction.

And the case cited by *Elkhart* from Ohio, *Wilson v. Columbia Casualty Co.*, 118 Ohio St. 319, 160 N.E. 906 (1928), expressly held that the Ohio court "could and did order the defendant in Cleveland, Ohio, to take such action that the fund in Pennsylvania could be applied to the satisfaction of the judgment. The jurisdiction of the court over the defendant was undoubted." *Id*. at 908.

Thus, *Wilson* is another in the long line of cases from across the country holding that a court <u>can</u> order a judgment debtor to use out-of-state assets to satisfy a judgment.

Lastly, the Pennsylvania case cited by *Elkhart* ruled as it did <u>only</u> because the judgment creditor had relied on the <u>wrong statute</u> and, moreover, specifically held that a procedure is available under Pennsylvania law that permits a judgment creditor to obtain "a mandatory injunction [against the judgment debtor] <u>requiring securities with a foreign situs to be brought into the Commonwealth</u>." *See Chadwin v. Krouse*, 254 Pa.Super. 445, 386 A.2d 33, 36-37 (1978) (emphasis added).

Thus, the <u>sole case</u> cited by the defendants has no weight or persuasive value at all.

In sum, defendants' claim that § 9-28-3 has a geographical limitation is wholly meritless. On the contrary, in light of all the above it is clear that if the Rhode Island legislature had sought to limit § 9-28-3 to in-state assets, it would have said so expressly.

***Fifth***, defendants argue that service of the citations was ineffective because § 9-28-3 purportedly requires "personal service" and the instant citations were served on defendants' counsel. Defs' Opp. at 10 n. 3.

The glaring problem with this argument is that, contrary to defendants' claim, § 9-28-3 says nothing whatsoever about "personal service." Rather, § 9-28-3 provides in relevant part only that the citation "shall be served by delivering a copy to the debtor." *Id.*

But when Rhode Island law requires personal service, it says so <u>explicitly</u>. *See e.g.* R.I.G.L. § 5-38.3-5(d) ("Service of any notice, demand, or subpoena under this chapter shall be made <u>personally</u> ..."); § 5-40-14(a)(1) ("[T]the director ... shall serve a copy of the charges together ... <u>personally</u> upon the accused ..."); § 5-44-19(b)(1) ("[T]he board ... shall serve a copy of the charges ... <u>personally</u> upon the accused ..."); § 6-13.1-7(d) ("Service of any notice,

demand, or subpoena under this chapter shall be made <u>personally</u> ...”); § 8-8.1-4.2(a) (“The complaint and any order issued under this chapter shall be <u>personally served</u> upon the defendant ...”); § 15-15-4.1(a) (“The complaint and any order issued under this chapter shall be <u>personally served</u> upon the defendant ...”); § 15-7-8 (“[T]he court shall order a copy of the petition and order that copy, subsequently referred to as the notice, to be served on him or her <u>personally</u> ...”); § 23-27.3-122.1.2 (“Every notice or order authorized by this code ... shall be served ... by serving a copy of the order or notice <u>personally</u> upon the owner or person responsible ...”); § 23-28.2-20.1(a) (“The notice will be deemed properly served upon a person if a copy thereof is served him or her <u>personally</u> ...”).; § 33-15-17.1 (“…notice of the petition for the appointment of a limited guardian or guardian…shall be served upon the respondent <u>in person</u>…); § 33-15.1-10 (“…notice of the application for the appointment has been served upon the intended ward <u>in person</u>…”) *See also* R.I. Super.R.Civ.P. Rule 4(e) (“Service shall be made ... by delivering a copy of the summons and complaint to the individual <u>personally</u> ...”).

Since, unlike other provisions of Rhode Island law, § 9-28-3 does not specifically require personal service, it is clear that personal service is not required.

Accordingly, the Ungars were entitled to serve defendants by serving their attorney of record, pursuant to both R.I. Super.R.Civ.P. Rule 5(b)(1) and Fed.R.Civ.P. 5(b)(1).

Service of the citations on defendants’ counsel was therefore effective.

Additionally, solely out of an extreme (over)abundance of caution, and to narrow the issues before the Court, the Ungars have additionally served the defendants with the citations personally, at their offices in the District of Columbia.[2] *See* dkt. ## 470-471.

Consistent with their baseless theory that § 9-28-3 relief is available only against residents of Rhode Island, defendants may argue at the hearing scheduled in this matter that the service of a citation outside of Rhode Island is ineffective.

The Court should reject any such argument for all the reasons stated above, because the plain language of § 9-28-3 contains no geographical limitation on service of the citation and because this Court has personal jurisdiction over the defendants.

## III.    Certification Is Unnecessary and Would Be Improper

Defendants urge the Court, in the alternative, to certify their lack-of-authority argument to the Rhode Island Supreme Court. Defs' Opp. at 10.

The Court should reject this request for three reasons:

***First***, as noted in the first section of Part II, the relief sought in the instant motion can be granted without requiring the defendants to transfer assets into Rhode Island.

***Second***, for all the reasons set forth above, defendants' argument is clearly baseless. This Court is not required to certify every meritless new argument conjured up by a litigant. On the contrary, a federal court should not certify a question of state law where, as here: "There is no split of authority, the words of the statute itself provide sufficient guidance [and the question is not] particularly close." *Boston Car Co. v. Acura Auto*, 971 F.2d 811, 817 n. 3 (1st Cir. 1992).

---

[2]    This Court has already found that the D.C. office is the office of both the PA and the PLO. *See Ungar*, 325 F.Supp.2d at 48-59.

*See also In re Citigroup, Inc.*, 535 F.3d 45, 62 (1st Cir. 2008) ("When state law is sufficiently clear to allow a federal court to predict its course, <u>certification is both inappropriate and an unwarranted burden</u> on the state court.") (citations and ellipsis omitted, emphasis added); *In re Engage, Inc.*, 544 F.3d 50, 53 (1st Cir. 2008) ("[E]ven in the absence of controlling precedent, certification would be inappropriate where state law is sufficiently clear to allow us to predict its course."); *Fischer v. Bar Harbor Banking and Trust Co.*, 857 F.2d 4, 7 (1st Cir. 1988) (Certification is unnecessary even "[i]n the absence of a definitive ruling by the highest state court [since] a federal court may consider analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.").

*Third*, it is pellucid, in light of both defendants' history of dilatory conduct during nearly a decade of litigation and the clearly meritless nature of their argument, that defendants' request for certification is just their latest tactic to delay enforcement of the judgment.

## IV.    This Court Should Grant the Relief Sought

Defendants next argue that this Court should not grant the relief sought even if it has the authority to do so, because the Ungars purportedly "have failed to meet their initial burden of proof under the statute." Defs' Opp. 11-17. As a preliminary matter, defendants' assertion that the Ungars have the initial burden of proof is mistaken. Section 9-28-3, and the citations served on them, require the defendants "to show cause why … a decree [should not] be entered ordering [them] to pay the judgment in full or by installment, weekly, monthly, or otherwise." § 9-28-3.

Thus, like any other recipient of an order to show cause, a judgment debtor served with a § 9-28-3 citation bears the burden of proof and persuasion. Furthermore:

> Rhode Island case law repeatedly places the burden on a
> party alleging inability to pay … This Court held that

> before a body execution may be issued against a defendant who is a judgment debtor, the defendant must be given a hearing to determine ability to pay. *Landrigan v. McElroy*, 457 A.2d 1056, 1062 (R.I. 1983). At such a hearing it is the defendant's obligation to demonstrate an inability to pay the judgment by a preponderance of the evidence. *Id.* In addition, with regard to a defendant's inability to pay court fees, this Court has held that "[i]n every instance the burden of proving indigence in relation to the payment of the required filing fee or other element of cost is upon the party seeking such relief." *Silvestro v. Almonte*, 484 A.2d 900, 903 (R.I. 1984).

*State v. LaRoche*, 883 A.2d 1151, 1155 (R.I. 2005).

Defendants' claim that *Ciccone v. Ciccone*, 204 A.2d 819 (R.I. 1964) places the initial burden on the judgment creditor is meritless. *Ciccone* held only that a judgment debtor is permitted to adopt evidence presented by the judgment creditor, and is not required to present additional evidence of his own. *Ciccone* says nothing about the burdens of proof or persuasion.

In any event, even assuming *arguendo* that the Ungars had the initial burden, they have easily met it and defendants' arguments to the contrary are baseless.

Defendants argue that the Ungars have failed to show that defendants have income sufficient to pay the judgment. This claim is frivolous. The declaration provided by defendants' own affiant, Hatem Yousef, attached as Exhibit to B to the instant motion, explains that:

> The State of Israel collects a variety of taxes on behalf of the Palestinian National Authority. These taxes include import taxes, petroleum taxes, value added taxes, and local purchase taxes. In 2008, the average amount of the monthly taxes collected by the State of Israel was approximately NIS 326 million. Before, however, these tax revenues are transferred to the PNA, Israel makes significant deductions for water, electricity, and sewage services provided to the PNA. In 2008, these deductions averaged approximately NIS 95 million per month, resulting in an average net transfer of approximately NIS 231 of [sic] 2008.

14

Dkt. # 468, Ex. B at ¶ 9.

Likewise, the October 28, 2009 decision of the Jerusalem District Court submitted as an exhibit to this motion notes that "every month tax monies are transferred from the State of Israel to the Palestinian Authority (250-300 million NIS)." Dkt. # 468, Ex. A, internal Ex. 1 at ¶ 2.

Because § 9-28-4 requires the Court to look to "income from <u>any</u> source" (emphasis added) it is clear that these tax revenues are cognizable "income" for the purpose of § 9-28-4.

As shown in the Ungars' opening motion papers (and defendants do not dispute this fact), as the result of attachments imposed by the Jerusalem District Court, approximately $102 million of this PA tax income has accumulated in the Israeli Treasury as of today, and the balance of the judgment will soon accumulate, at a rate of 18 million NIS (about $4.7 million) monthly.

The fact that the vast majority of the judgment has already accumulated out of this income stream, with the remainder to come in the next few months, proves empirically, beyond all doubt, that the defendants are able to pay the judgment from their income.

**Indeed, effectively, <u>defendants have already "paid" the judgment</u> (or at least $102 million thereof with the rest on the way) <u>out of their income</u>, except that the Ungars will receive the funds, if at all, only after several additional years of litigation in Israel.**[3]

Defendants nonetheless argue that these attached funds are not available "income" for purposes of § 9-28-4 because (1) they are presently encumbered, (2) the Ungars propose to

---

[3]    This income stream has continued until today. The latest financial statement published by the PA finance ministry shows that between January and November 2009, the PA received $982 million in tax income from Israel, which equals a monthly average of $81.3 million. *See* http://www.pmof.ps/news/plugins/spaw/uploads/files/accounts/2009/12/table3_eng.pdf at "Clearance Revenue"; *see also* http://www.pmof.ps/en/index.php?pagess=monreportx_2 (explaining that the line item term "Clearance Revenue" refers to the tax transfers from Israel).

release the encumbrance only after the judgment is paid, and (3) the defendants are unable to front the sum of the judgment before the attachment is lifted. Defs' Opp. at 13-16.

But this argument is purely <u>logistical</u>, not substantive, and is easily and simply resolved: Even assuming that defendants are unable to pay the entire sum of the judgment from their income before the attachment is lifted,[4] there is no question that they are able to front the sum of $20 million from their income. *See Knox v. PLO*, 2009 WL 1591404 at 10-12 (S.D.N.Y. 2009) (Finding that, in addition to the 18 million NIS per month being deducted from the PA's tax income by the Ungars, the defendants are able to post $120 million in security, in payments of $20 million up front and $5 million per month) *aff'd* 628 F.Supp.2d 507, 509 (S.D.N.Y. 2009). Since the *Knox* case has settled (*see Knox,* C.A. 03-4466 (S.D.N.Y.) at dkt. # 214), the defendants have been relieved of posting this security.

Therefore, this Court can and should issue an order (a) directing the defendants to pay the Ungars the sum of $20 million by February 1, 2010 and directing the Ungars to release $20 million of the funds attached in Israel within three days after receipt of this payment (b) directing the defendants to pay the Ungars another $20 million within three days after receiving from the Israeli Treasury the $20 million released by the Ungars and directing the Ungars to release an additional $20 million of the funds attached in Israel within three days after receipt of this payment and (c) directing the parties to continue making payments and releases in this manner, until the entire judgment is satisfied.

---

[4]      The Ungars do not believe this assumption is true, but are willing to proceed in accordance therewith solely in order to realize the solution which they now propose.

This solution is perfectly workable, and will result in the entire judgment being satisfied out of the defendants' income as required by § 9-28-4.

Defendants also argue that there is no guarantee that Israel will release the funds to the PA even if the Ungars lift the attachment because Israel has withheld tax funds in the past. Defs' Opp. at 16-17. This claim should be rejected for three reasons:

**First**, it is affirmatively misleading. Israeli halted tax payments to the PA when Hamas won the elections in the PA. But in July 2007, after Hamas took over the Gaza Strip and Mahmoud Abbas and Salam Fayyad established a new government, Israeli resumed the transfers to the Abbas-Fayyad government. *See* Exhibit B.[5] Indeed, Prime Minister Netanyahu recently approved the transfer of 50 million NIS in PA funds to the Gaza Strip to pay the salaries of PA employees there – over the objections of many in Israel. *See* Exhibit C. [6] Indeed, the Declaration of Hatem Yousef (submitted as Exhibit B to the Ungars' opening papers) and the PA's most recent financial report[7] make clear that Israel has been making these tax transfers consistently.

**Second**, the defendants made the identical argument in *Knox* (using the very declaration from Mr. Fayyad that they have now submitted to this Court) but the *Knox* court properly paid it no heed. *See Knox,* 628 F.Supp.2d 507.

**Third**, this entire argument is mooted under the proposal outlined above, pursuant to which the defendants would pay the judgment in increments of $20 million. If, after the Ungars lift the attachment on one of the $20 million tranches, the Israeli government fails to release the

---

[5]      Downloaded from www.haaretz.com/hasen/objects/pages/PrintArticleEn.jhtml?itemNo=876935.

[6]      Downloaded from www.haaretz.com/hasen/objects/pages/PrintArticleEn.jhtml?itemNo=108391.

[7]      See footnote 3.

funds to the PA, the defendants would not be required to make the next payment required by the order of the Court until the funds are released to them by Israel.

Finally, defendants argue that the relief sought in this motion cannot be granted against the PA because it is a local government and so not subject to execution. Defs' Opp. at 17.

This argument, too, fails for multiple reasons:

***First***, this argument is a *non sequitur*. This is <u>not</u> an execution proceeding but a citation proceeding. Indeed, the inability to utilize execution is a prerequisite for use of a citation proceeding. There is no authority that a citation procedure cannot be used against a local government. In fact, the payment decree sought here is substantively a form of mandamus.

***Second***, the PA does not meet the statutory definition of any form of local government under Rhode Island law.

***Third***, the doctrine upon which the PA seeks to rely is inapplicable to <u>foreign</u> governments. Executions are regularly issued by U.S. courts against foreign states and their political subdivisions. Since foreign states are not protected from execution, all the less so the PA, which is not a foreign state.

***Fourth***, where, as here, funds have already been set aside for the creditor, the rule against execution against government property does not apply. *See Merritt-Chapman & Scott Corp. v. Public Utility Dist. No. 2 of Grant County, Wash.*, 319 F.2d 94, 109-112 (2nd Cir. 1963).

***Fifth***, it is well established that state-law rules prohibiting execution against local governments are preempted when there is a federal interest in enforcing the judgment:

> This court has held that when there is a federal interest in the remedy, we may trump a state's anti-seizure provision and enforce a money judgment against a public entity. *See Specialty Healthcare Mgmt., Inc. v. St. Mary Parish Hosp.*, 220 F.3d 650, 653 (5th Cir. 2000). For example, this court has recognized that in a civil rights action, such as an action

18

> filed pursuant to 28 U.S.C. § 1988, there is a federal
> interest in the remedy sufficient to trump a state's anti-
> seizure provision. *E.g., Bowman v. City of New Orleans*,
> 914 F.2d 711 (5th Cir. 1990); *Gates v. Collier*, 616 F.2d
> 1268 (5th Cir. 1980); Gary W. v. Louisiana, 622 F.2d 804
> (5th Cir. 1980). This court has also recognized a sufficient
> federal interest when a state makes abundantly clear that it
> will never satisfy the judgment. *See Gates*, 616 F.2d at
> 127172.

*Freeman Decorating Co. v. Encuentro Las Americas Trade Corp.*, 2009 WL 3698036 at *1 (5th

Cir. 2009). *See also Bennett v. City of New Orleans*, 2004 WL 60316 (E.D.La. 2004).

Both of the factors cited in *Freeman Decorating* are present here. First, there is an

extremely strong federal interest in enforcing judgments, like the Ungars' judgment, entered

under the civil provisions of the Antiterrorism Act ("ATA"):

> Congress … explicitly granted private parties the right to
> pursue common tort claims against terrorist organizations
> and those that provide material support or financing to
> terrorist organizations [such] private tort actions directed at
> compensating victims of terrorism and thwarting the
> financing of terrorism <u>vindicate the national and
> international public interest</u>.

*Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 50 (E.D.N.Y. 2007) (emphasis added).

Second, the defendants have made it "abundantly clear that [they] will never satisfy the

judgment." *Freeman Decorating,* 2009 WL 3698036.

Thus, even if the Rhode Island rule relied upon by the PA was applicable here, which it is

not, that rule would be trumped and preempted by the overwhelming federal interests in

enforcing the Ungars' ATA judgment.

**WHEREFORE**, the instant motion should be granted.

Plaintiffs, by their Attorney,

/S/ David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

## CERTIFICATION

I hereby certify that on January 7, 2010 I served this Reply along with the attached exhibits via ECF on the following counsel of record:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/S/ David J. Strachman