|

                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND


EFRAT UNGAR, et al        CA NO 00-105 L


vs.



THE PALESTINIAN           JANUARY 13, 2010

LIBERATION ORG.           PROVIDENCE, RI



    BEFORE MAGISTRATE JUDGE DAVID L. MARTIN



APPEARANCES:


FOR THE JUDGMENT        DAVID J. STRACHMAN, ESQ.
CREDITORS:              321 S. Main St.
                        Suite 400
                        Providence, RI 02903
                        351-7700


FOR THE DEFENDANTS:     RICHARD A. HIBEY, ESQ.
                        655 Fifteenth St. NW
                        Suite 900
                        Washington, DC 20005
                        202-626-5800

                        BRIAN HILL, ESQ.


FOR THE PLO:            DEMING E. SHERMAN, ESQ.
                        Edwards Angell
                        2800 Financial Plaza
                        Providence, RI 02903
                        401-274-9200

1

2    JANUARY 13, 2010

3            THE COURT:  This is the matter of the estate of

4    Yaron Ungar, et al vs the Palestinian Authority, et al,

5    Civil Action No. 00-105 L.  This matter is before the

6    Court this morning on plaintiffs' judgment creditors

7    motion for a payment decree.  That's docket number 467

8    in the clerk's file.  The attorneys will identify

9    themselves, please.

10           MR. STRACHMAN:  Good morning, your Honor.  David

11   Strachman for the judgment creditors.

12           MR. SHERMAN:  Your Honor, Deming Sherman for the

13   Palestinian Authority.

14           MR. HILL:  Brian Hill for the defendants.

15           MR. HIBEY:  Good morning, your Honor.  Richard

16   Hibey for the defendants.

17           THE COURT:  Thank you, Counsel.  Mr. Hill, I have

18   your motion for admission pro hac vice and I'm advised

19   that a certificate which was missing previously has been

20   now filed, so I'll be granting that.  So YOU will be

21   admitted.

22           MR. HILL:  Thank you, your Honor.

23           THE COURT:  All right, Mr. Strachman, this is

24   your motion.  I'll hear you, sir.

25           MR. STRACHMAN:  Good morning, your Honor.

1          THE COURT:  Good morning.

2          MR. STRACHMAN:  This matter is now verging on the

3     tenth year anniversary of the date our complaint was

4     filed in March of 2002.  Judgment entered.  As the Court

5     knows, after 289 docket entries, in July of 2005 the

6     Court issued the better part of a dozen decisions

7     between your Honor and Judge Lagueux, with two appeals,

8     a motion to vacate which was denied in the spring, and

9     we now find ourselves, the Ungar orphans and their

10    family, find themselves ten years -- or five and a half

11    years after the judgment without having the judgment

12    satisfied with the PLO and the PA informing us

13    repeatedly that they will not pay the judgment, never

14    coming to this Court telling your Honor in the present

15    pleadings, and the round of pleadings with Judge Lagueux

16    last year, or at anytime in the post judgment period

17    where we've been back to this Court several times in

18    front of Judge Lagueux, never once saying, "we will

19    honor and pay this judgment".  As a result of that, my

20    clients have been forced to expend tremendous amounts of

21    sums litigating collection proceedings in several

22    different courts in New York, several different types of

23    proceedings there, state and federal courts, several

24    foreign countries, Connecticut, Washington.  We had the

25    judgment debtors fight us over $11,000 that we

1    identified.  We had them litigate for over a year

2    $180,000, I believe, in Washington.  We have had

3    extensive litigation in Israel domesticating our

4    judgment.  The judgment debtors even there failing to

5    pay the attorney's fees that were ordered of a quarter

6    of a million dollars.  That was over a year ago.

7        We now find ourselves in the unique situation in that

8    as a result of both a stipulation between the parties in

9    Israel and a subsequent ruling by the District Court

10   judge in Israel, there now is over a hundred million

11   dollars that is, as of this month, that is restrained

12   from the Palestinian Authorities' monthly income from

13   the Israeli government.  That money is being held by the

14   Israeli treasury.  It accrues at a rate of approximately

15   4 and a half million dollars per month.  It will

16   continue for the next couple of months, and then will

17   terminate once the judgment amount is -- total judgment

18   is restrained.  That money is clearly income.  It has

19   been identified by the judgment debtors as their income.

20   It is shown on their books as income.  It was as part of

21   funds that are transferred on a monthly basis, a small

22   fraction of the funds that are transferred on a monthly

23   basis from the Government of Israel to the Palestinian

24   Authority to fund their operations.

25            THE COURT:  Mr. Strachman, you're saying the

1    4.5 million which is being restrained, withheld, held by

2    the Israeli treasury, is being shown by the Palestinian

3    Authority as income even though they're not receiving

4    it?  Did I understand you to say that?

5        MR. STRACHMAN:  The totality of the monthly

6    payments is considered their income.  They receive a

7    penny on several different factors, but they receive

8    tens of millions of dollars a month as income from the

9    Israeli government.  A portion of this 4 and a half

10    million dollars is set aside pursuant to the District

11    Court order in Israel to, as a condition of a stay of

12    enforcing the 2008 ruling of the Court in Israel

13    domesticating the judgment.  This is a stream of income,

14    and the 4 and a half million is a subset of that stream

15    of income that they see each month.  They catalogue it,

16    they identify it, quantify it, and everyone refers to it

17    as their income on their yearly balance sheets.  Whether

18    they're -- how they're accounting for this 4 and a half

19    million that they're not actually realizing or seeing

20    right now is something else, but it's clearly a stream

21    of income that they receive, and it was intended right

22    from the very beginning of the Oslo Accord to help fund

23    their operations.  This is a 3 and a half billion dollar

24    a year operation.  Their records clearly indicate as

25    much.  Their balance sheets are made public, and it is

1   -- in fact, that's what is made public.  Whether there

2   are additional sums that are off budget, there are all

3   kinds of issues and allegations with respect to that

4   but, in general, it is clear that they themselves have

5   acknowledged that they have a 3 and a half billion

6   dollar a year budget.  This is a tiny fraction of that.

7       The litigation, in the Knox case, is important for

8   this Court to be aware of because in that case, the

9   District Court Judge ordered the same judgment debtors

10  to submit bond in the amount of $192 million as a

11  condition of vacating the judgment.  They then moved and

12  said, "We cannot put up 192".  They themselves

13  acknowledged, and this is important, that they could put

14  up $15 million as a bond.  That was a sum that they

15  acknowledged they were able and ready and willing to put

16  up as security.  After almost a year of intensive

17  discovery supervised by Magistrate Judge Katz through a

18  series of telephonic hearings from all over the world

19  and with different multiple submissions of evidence,

20  repeated submissions of evidence, I believe Prime

21  Minister Fayyad himself submitted four affidavits, each

22  time documenting more and more of the Palestinian

23  Authority's assets and income, including the transfers

24  between these two defendants.  The Palestinian Authority

25  gives the PLO approximately $7 million a quarter to fund

1    its terrorist operation.

2        Once that was all documented, the Court issued a

3    ruling, Judge Katz issued a ruling, indicating that the

4    Palestinian Authority had the ability to submit bond in

5    the amount of $120 million, eight times what they

6    proposed to the Court, and obviously a third less than

7    what the Court had originally indicated.

8        And that's very significant because the Court, after

9    making very detailed findings, also indicated that this

10   past September, the first payment toward that $120

11   million, would be paid.  I believe it was September 26th

12   they were obligated to post the first $20 million, and

13   then $10 million a month thereafter until the entire

14   $120 million was reached.  Judge Marrero upheld

15   Magistrate Judge Katz's ruling, and that became the law

16   of the case.  Shortly thereafter, sometime thereafter,

17   the parties reached an agreement with respect to all the

18   issues pending in that case.  But what's significant for

19   us is that two federal judges already ruled that they

20   have the ability to make monthly payments, and they have

21   the ability to put $20 million as collateral, for a

22   bond, toward the end of September, just a few months

23   ago, and that was after extensive discovery.  As I said,

24   it took the better part of a year, hundreds of thousands

25   of documents -- not hundreds of thousands, but thousands

1   of documents were transmitted back and forth with

2   respect to the Palestinian Authority's assets and

3   income, land holdings, multiple affidavits submitted by

4   many people up and down the Palestinian Authority's

5   administration, including their president -- excuse me,

6   their Prime Minister, Mr. Fayyad, who is an economist.

7       So, that shows the background as to where we are

8   right now.  We have asked this Court to treat this case

9   like any other collection matter at this stage, and any

10  other collection matter, whether it be in federal court

11  or the Rhode Island District Court, or the Rhode Island

12  Superior Court, a judgment debtor would be hauled in for

13  examination, and would be ordered to show cause why it

14  has not paid this 5 and a half year old judgment.

15      This case, and the posture of this case, is

16  significantly advanced even from that of the

17  standardized, if you will, or the standard type of

18  procedure because we have already identified a source of

19  income that they are not using that can be used to fund

20  the payment of this judgment.  We also have an advance

21  ruling by two federal judges --

22          THE COURT:  Mr. Strachman, when you say a source

23  of income that can be used, are you referring to the

24  money being held in the Israeli treasury?

25          MR. STRACHMAN:  Correct.

THE COURT: All right. Please continue.

MR. STRACHMAN: So that $100 million amount of their income, which they have not been able to use for the last several years but is accruing, would allow this judgment debtor very simply to effectively fund the payment of this judgment. So what we have proposed is that the Court order them to make the payment on the judgment and then we would immediately release the hold over the funds in Israel effectively making a cash neutral transaction for them. Because they have hemmed and hawed, and because throughout this litigation we have had to provide solutions, we believe, offered solutions to the Court, to deal with their intransigent and belligerence, what we have suggested is that even if they don't have $100 million to pay us today and then 48 hours later we would release $100 million from the Israeli funds, for example, that they do so in installments, and we did that as a prophylactic. We did that in order to defeat their contention that they can't make the entire payment. But what we have proposed is that, in our response brief, that they make a $20 million payment, or a payment that the Court deems appropriate, immediately release that same amount of money from the Israeli -- funds that the Israeli treasury is holding, and continue to do that on a serial

basis until the judgment is paid. And what that would
do is provide virtually no inconvenience to them. It
would be completely consistent with the findings of the
Knox court, their own references that we've provided in
our pleadings to their budget, their income and their
assets, and would finally provide a mechanism to have
this judgment satisfied and detangled from all these
years of litigation.

Now, in response, they still don't come to this Court
and say we can pay a single penny for this judgment.
They have not offered and have not indicated, either in
the pleadings here or in the pleadings with Judge
Lagueux, that they will pay the judgment, they will
honor the judgment. What they have done, and they'll
continue to do, is raise two types of argument. One,
the world is falling in the Middle East. We heard that
for years with Ramsey Clark in this courtroom and in
front of Judge Lagueux, and twice the Court of Appeals.
The world is falling. They have no assets. They can't
respond. This judgment is going to interfere with their
operations. It's going to interfere with the funding of
the Palestinian Society. Obviously this judgment is
against two terrorist organizations, not the Palestinian
people, and obviously what we have done is we have
proposed effectively a mechanism to have this judgment

paid that will have no immediate impact on them at all,
none whatsoever.  Unlike every other debtor that comes
into the district court on a collection case, on a
$2,000 collection case across the street, he has to
reach into his pocket and grab $2,000.  This defendant
will have to reach into his pocket, grab some money,
whatever sum the Court deems appropriate, we've
suggested, say $20 million, and then within 48 hours we
would release $20 million on the Israeli hold, and they
will receive that, within 48 hours, absent no
ramifications, no effect on their day-to-day
operations.

   Now the second type of argument, and it's detailed,
and we've provided details and the cites, obviously in
our response brief, are a series of red herring
procedural types of arguments about service of process,
about the nature of Chapter 9-28, about the rights of a
federal court to enforce a judgment of a debtor who does
not reside in Rhode Island.  We believe each of those
procedural arguments are just another red herring,
another opportunity for the defendants to do what
they've done throughout this litigation, which does not
address the merits, does not address what's really
before this Court.  To say that, for instance, that a
debtor who could be in this Court for 289 pleadings, a

dozen written decisions and two appeals, 4 and a half years of litigation, wait 5 and a half years after the judgment, file a motion to vacate, never once volunteering to pay this judgment, forcing the Ungar family to go literally all over this world to try to enforce their judgment, and then simply get out of having this Court order them to pay the judgment because maybe they moved across state lines into Attleboro, is preposterous. It's an absurdity. It would make a mockery of the entire proceedings. Judge Lagueux years ago restrained them nationally. He issued a restraining order in May of 2005 from utilizing any bank or financial operation or enterprise in the entire United States. To now say that this Court doesn't have authority to tell them to make a payment toward this judgment just would make a mockery of the entire proceeding. At the same time, come into this Court and never once saying they do have funds and they are willing to comply with the court order.

The burden of proof argument they raise is equally absurd. The case they rely on, the Ciccone case, says nothing at all about the burden of proof. It has to do with simply a judgment, a debtor who offered no evidence in his own behalf and simply relied and argued about the evidence that the judgment creditor submitted.

1    The statute 9-28, the Rhode Island rule, Rule 69,

2    which isn't obviously directly applicable in this

3    proceeding, but both of those provisions say very

4    clearly the citation is law, that the Court already

5    issued.  It puts the burden on the judgment debtors to

6    explain and to show cause why they haven't paid this

7    judgment.  What they have done in the last 5 and a half

8    years to satisfy this judgment.  Under their analysis,

9    the issuance of a judgment is no different than any

10   other ruling of the Court.  They don't have any

11   obligation to comply with it.  They have no obligation

12   to come to this Court in good faith with either a plan,

13   an offer, a proposal.  They did none of that.  To argue

14   that there are local governments and therefore are

15   immune from an attachment, the Foreign Sovereign

16   Immunities Act says that foreign states are subject to

17   execution.  How could an entity like the Palestinian

18   Authority escape the machinations of the state and

19   federal collection proceedings when a foreign state

20   couldn't.  It's absurd.  This Court heard ad nauseam the

21   three motions to dismiss their allegations about the

22   statehood.  No court has ever said they are a state,

23   that they -- no court ever, the United States or in

24   Israel, or anywhere else in the world that I'm aware of,

25   has ever said the Palestinian Authority is a state, yet

1   they seek to invoke rights that even foreign states

2   don't have.

3      So, in sum, I know the Court's familiar with our

4   response brief.  I think that these two kinds of

5   arguments suggest that this is just yet another stalling

6   mechanism, a suggestion that this Court now should

7   certify this matter to the Rhode Island Supreme Court

8   and send this there for what could be another year and a

9   half of delay is just -- is almost macabre, it's

10   cynical, and the Court shouldn't entertain that kind of

11   suggestion.  The tone of the brief, the tone of the

12   filings, the suggestion that we're here now

13   approximately 200 docket entries after judgment, when

14   Judge Lagueux himself found almost 4 years ago, excuse

15   me, almost 5 years ago, I think it was May of 2005, he

16   found that they were not paying the judgment, that they

17   were transferring assets out of the United States, and

18   we're still no better off than we were from the

19   perspective of having this judgment satisfied, further

20   torturing the Ungars to expend funds and emotional

21   effort and resources to have the judgment enforced and

22   satisfied in other jurisdictions when they have a

23   3 and a half billion dollar judgment and they have the

24   very funds available to satisfy virtually the entirety

25   of this judgment right on hand, that they haven't used,

1    in a restrained account, partially restrained, with

2    their own consent, that was the first order of the

3    district court, would just make a mockery of this

4    proceeding.  Thank you, your Honor.

5        THE COURT:  Mr. Strachman, you say that the

6    defendants incorrectly cite or rely upon the Ciccone

7    case on the issue of burden of proof, that they suggest

8    it's your burden and you say, in fact, it's their burden

9    to show they do not have the ability to pay the

10   judgment, is that correct?

11       MR. STRACHMAN:  Correct.

12       THE COURT:  Are you suggesting that at this

13   hearing today they have the burden of demonstrating they

14   do not have the ability to pay the judgment?  And if you

15   are, what about the fact that in your memorandum on

16   Page 6 you have the footnote which states, "In light of

17   the nature of the relief sought in this motion, no

18   examination of the PA and the PLO regarding their assets

19   need take place at the January 13, 2010 hearing", and

20   the telephone conference call that I conducted with

21   counsel approximately 2 weeks ago to clarify whether or

22   not the defendants would be required to have someone

23   present for purposes of an examination?  So my question

24   to you is that if you take the position that they have

25   the burden of showing that they can't pay the judgment

1  and yet at the same time before the hearing you

2  indicated they didn't need to produce anyone to testify,

3  I see something of a conflict there in the sense that if

4  you're asking the Court to make a finding that they have

5  the ability to pay, or they fail to show at this hearing

6  this morning, that they do not have the ability to pay,

7  how do I reconcile that with what's transpired in terms

8  of what's communicated to them as to what they were

9  obligated to do for this hearing in terms of presenting

10 evidence or testimony?  Could you respond to that?

11      MR. STRACHMAN:  Certainly.  First, Judge, with

12 respect to the burden, the statute says very clearly

13 that the burden is on the judgment debtors.  It says

14 they are cited to show cause why they haven't paid, why

15 an order should not enter against them with respect to

16 their income and their assets.  They provide no

17 indication that they have not one red cent to pay this

18 judgment.  It would be absurd.  If they came to court

19 and say we don't have a hundred million but we have

20 $20 million a month, we have X, they haven't done that.

21 This is a 3 and a half billion dollar budget.  We

22 submitted their own budget.  We submitted their own

23 affiant's statement.  And the facts of their financial

24 circumstances are really not at issue.  But they are

25 especially not at issue in this case at this junction is

because their own income has been set aside to pay this
judgment. So we have a pool of their income that has
been set aside, that they have not been able to use,
that they have not used, that has not interfered with
their operation which is almost at this point
surplusage, and they're not coming to this Court and
denying that they have this huge 3 and a half billion
dollar yearly operation. They're not saying that they
don't have their income already set aside by one Judge
to pay this very judgment. This is their income. They
have over $100 million in income to pay this judgment
which was specifically dedicated to pay this judgment.
The only question is that the machinations of their
appeal and their recently asked to delay oral argument
on their appeal in Israel, which was granted, will take
possibly another few more years. So this is a very
different case than the typical --

        THE COURT: Mr. Strachman, are you saying they
sought to delay their appeal of the 2008 judgment by the
Israeli district court?

        MR. STRACHMAN: Right. They're scheduled for
oral arguments for tomorrow.

        THE COURT: Before the Supreme Court.

        MR. STRACHMAN: Before the Supreme Court of
Israel, correct. They filed a motion, I think it was --

1    I think it was last Sunday or Monday.  They filed a

2    motion requesting that oral argument be delayed until

3    the First Circuit rules on Judge Lagueux's motion for --

4    motion to vacate.

5            THE COURT:  When is argument scheduled in the

6    First Circuit?

7            MR. STRACHMAN:  It was last week.  Last Thursday.

8            THE COURT:  And the Israeli Supreme Court granted

9    the motion that they filed to delay the oral arguments

10   on their appeal of the Israeli District Court?

11           MR. STRACHMAN:  Correct, correct.  And as I

12   understand it, it is ordered to occur approx -- I don't

13   know the exact text of the order but it's my

14   understanding that the order says something like 30 days

15   after the First Circuit ruled oral argument will be

16   rescheduled in Israel.

17           THE COURT:  All right.

18           MR. STRACHMAN:  So this is a very different

19   situation.  This is not a typical judgment debtor who

20   comes in and either the chase is on or, you know, claims

21   an exemption.  These funds have already been segregated

22   specifically for this judgment.  Some of them, the

23   original attachment of these funds, was with their own

24   consent.  We moved for an attachment in Israel while the

25   domestication proceeding was ongoing.  The Judge,

Judge Farkosh, and I was there, I was in the courtroom,
he arranged a consent order between the parties to take
a portion of the funds each and every month until the
judgment was domesticated, and then he continued that
afterwards as a condition of staying enforcement in
Israel. So this is a very different situation. In
other words, we don't have the funds not identified.
And we said very forthrightly right at the beginning we
didn't need them to come in here and to testify with
respect to their income and assets. What we need to
know about their income and assets is not at issue. We
submitted their affidavit of Hatam Yousef. He explained
what their budget is, and he attaches their budget.
We've explained to the Court and showed the Court Judge
Farkosh's ruling. So this need not turn into a, you
know, a circus as it was in the Knox case.

Also, we have the rulings of the Knox case, which was
just from several months ago, indicating that as of
September 26th they had the ability to post $20 million
as of September 26th, and after a thorough review of all
their income and assets, and multiple proceedings, we
must have had 6 or 8 telephone conferences, counsel was
in Washington, I believe, and overseas sometimes, I was
in Rhode Island, the Judge was in New York, and we had
multiple conferences about this discovery, about the

1  information that they would need to submit so that we

2  could determine whether their representation that they

3  could submit a bond for $15 million, or the 192.  We

4  also have their own offer, they offered in Knox, and

5  they said, "We have the ability to present a bond of $15

6  million".  So we have a series of representations that's

7  not really at issue.

8          THE COURT:  Well, it sounds to me, Mr. Strachman,

9  that you're asking me to either infer or find that

10  because they had at the time of the Knox case the

11  ability to say, "We can post the $20 million bond", that

12  they still have that ability, it sounds to me that

13  that's your argument.  And, I mean, you indicate there's

14  been a settlement in the Knox case, and you didn't --

15  perhaps it's not known what the nature of the settlement

16  is, but, I mean, is it not possible that the $20 million

17  which was available to be posted which they said, "We

18  could post as a bond in the Knox case", has since been

19  utilized for other purposes, potentially the settlement

20  of the Knox case and therefore the $20 million that was

21  available at the time they made that statement or

22  representation is no longer available?  So how can I

23  take the fact that a few months ago they said they could

24  post $20 million to make a finding now they have the

25  ability to pay $20 million?

1          MR. STRACHMAN:  They never said they could post

2     $20 million.  It was two federal judges who said on

3     September 26th they would have $20 million, and in

4     October 26th they would have another $10 million to post

5     for the bond, and each and every month.  That issue has

6     already been litigated, and that was in the context,

7     because it was obviously the Knox case, and not this

8     case, it was with full recognition that some of their

9     tax money had been segregated for the Ungars.  Here, all

10    we're saying is this case is even better than Knox

11    because now we're taking, effectively, we're suggesting,

12    pay 20, you're going to get 20.  There's no way out of

13    that.  There's no way they could come to this Court with

14    honesty and say "We don't have that ability", because

15    with the 3 and a half billion dollar a year budget,

16    there's all of the payments to prisoners, terrorists who

17    are sitting in Israeli prisons, all the other payments

18    that they're making each month, the monthly influx of

19    between 250 and 300 million, that's from their own

20    affiant, per month, in Israeli shekels, approximately 4

21    and a half shekels per dollar, they have no way out of,

22    I think, a finding, and that's why we suggest we don't

23    need to do fact-finding and turn this into a whole

24    circus again and run another year of discovery because

25    we have the Knox case but only far better, much better,

1  because these funds are right there and segregated.  And
2  at the same time, the issue at some level in a citation
3  proceeding is not whether they have the ability to pay
4  the entire judgment right this second, but what can they
5  pay right now.  They would have the Court believe they
6  don't have to do anything.  They don't come with any
7  suggestion as to how to pay this 5 and a half year old
8  judgment, and I suggest that in light of their own
9  affiant's statements, that's bad faith.  This is not an
10  enterprise with no funds.  They have 3 and a half
11  billion dollars a year.  They don't want to pay this
12  judgment.  They have told me personally, three separate
13  lawyers have told me they will never pay this judgment,
14  and they have attempted to stall the proceedings in
15  Israel.  They've attempted to stall the proceedings in
16  other jurisdictions with their partners, with business
17  partners, their fronts.  Judge Lagueux, several years
18  ago, ordered their, we call it their Christmas fund
19  account, the Palestine Investment Fund, transferred over
20  to us.  They refused to comply with that.  They refused
21  to -- in fact, it's worse than that.  With counsel
22  present, with counsel in the courtroom, they refused to
23  even respond to Judge Lagueux's order that they respond
24  to a creditor's bill, asking that the Palestine
25  Investment Fund be transferred to us, and then we find

that the Ungars were sued several times by the Palestine
Investment Fund and others, and the Palestinian Monetary
Authority, and other entities that they're associated
with, and their sort of sub-entities, if you will. We
find ourselves defending suits and being sued. They
worked with their investment outfit in Connecticut to
work a stay, and the district court in Connecticut said
we're going to -- it would grant a stay on the
collection proceedings in Connecticut. We appealed
that, and the Second Circuit said that it would continue
the stay until all appeals are resolved.

So not only are they acting to further avoid this
judgment, and sort of playing dead, they're working
aggressively to undermine the judgment. I've written
repeated letters to counsel, when will this judgment be
paid. We provided some of those letters to the Court.
When will this judgment be paid? No response. Not a
single response, and there is no response, and you will
have no response today. No one will step up to this
podium and say, "We can't pay a hundred million today
but here's what we can do, here's the schedule". They
won't do it. The Court has no other, I think,
legitimate position, which is to order them to pay
especially when we have gone out of our way to come up
with, as we did for the first 4 and a half years of

litigation, to help them out of their own problems, and here we proposed a solution to the Court which is revenue neutral, which at one level, a rational observer might say this is the perfect way for them to get out of it, release these funds that they haven't used for several years, pay the judgment, we're on our way.  I hope I've answered your Honor's question.

THE COURT:  You have, Mr. Strachman. Mr. Strachman, ballpark, how much have the plaintiffs recovered of the judgment at this point?  Anything?

MR. STRACHMAN:  It's approximately $5 million.

THE COURT:  That you've recovered so far?

MR. STRACHMAN:  That we've recovered, right. Again, just to be clear, it's not funds that were given to us.  We had to go throughout the country, and the defendants actively -- $11,000 they were fighting us. They fought us for $180,000 in Washington for two years. So, 18 months, I forget exactly.  Several years ago.  So we have recovered a small portion.  That's less than the interest that has accrued on the judgment in 5 and a half years, and certainly with the interest and with our enormous collection costs, does not make a dent at all into the judgment.

THE COURT:  All right.  Thank you, Mr. Strachman.

MR. STRACHMAN:  Thank you.

1    THE COURT:  Excuse me, counsel.  (Pause)

2 Thank you, Mr. Hibey.  You may proceed.

3    MR. HIBEY:  Hibey, yes.

4    THE COURT:  Hibey, thank you.

5    MR. HIBEY:  Thank you, your Honor.  Good morning.

6    THE COURT:  Good morning.

7    MR. HIBEY:  Your Honor, I think that I'd like to

8 begin my remarks by addressing the recitation of

9 Mr. Strachman regarding the procedural history of the

10 case because in our view much of what we heard today was

11 either missing or utterly revisionist in its

12 characterization of what has been going on in this

13 litigation.

14    He began by saying that the motion to vacate under

15 Rule 60, which was argued by my colleague before Judge

16 Lagueux, was denied this spring, past spring, and that

17 that becomes the point of departure for many of the

18 statements that he speaks to regarding the procedural

19 posture of the case.

20    The procedural posture of the case is informed

21 further by recent developments.  I'm not sure whether

22 the Court is aware of them.  These recent developments,

23 in the Ungar case, the support in our view, the

24 prematurity of this, and argue against stampeding this

25 Court into any consideration of the issue of -- painted

1    as put before the Court in Mr. Strachman's papers.

2       This case was domesticated in Israel where that money

3    that he was referring to was attached by order of the

4    Court, and the judgment of, enforcement of the judgment

5    here was recognized, but it was stayed.  The Israeli

6    court stayed the enforceability of the judgment, imposed

7    the condition that the attachment should continue to

8    accrue but not be distributed, hence this accumulation

9    of funds.  The attorney general of Israel is suppose to

10   give an opinion to the Supreme Court regarding the legal

11   issues of the enforceability of the Ungar judgment, and

12   the attachability of that, and it will address, we're

13   told, if they (inaudible) to issue an opinion, their own

14   concern about this money not being available because it

15   is money that derives from the arsenal of the courts

16   themselves.

17      Now, indeed, the Supreme Court of Israel was to take

18   hearing on these issues with both the plaintiffs and the

19   defendants present and making argument, but also the

20   Office of the Attorney General of the Government of

21   Israel, which the Court had invited to provide its input

22   into this complicated problem.  Instead, the Supreme

23   Court hearing and the position of the attorney general,

24   which was due January 14th, tomorrow, was postponed for

25   -- until September 1, 2010 and afterwards, according to

the translation of this resolution that the court

registrar signed under the egis of the Supreme Court in

Jerusalem.

Now, the information with respect to who made the

motion, I will tell you is based upon the information I

received.  It was not my understanding that that request

to put off the argument was made by the defendants, but

I cannot stand here before you and tell you that the

papers aren't constructed that way.  My understanding

was that the Office of the Attorney General prevailed

upon the parties, and all parties consented to the

continuation of the appeal process in Israel that would

address the very question of the enforceability of the

Ungar Rhode Island judgment here and the attachability

of the funds over there.

My understanding further is, it is because of one

very significant development that Mr. Strachman has

failed to tell you about here, and that is that last

Thursday the appeal of the denial of the Rule 60 motion,

which was filed on behalf of the Palestinian Authority

and the PLO was heard in the First Circuit by Justice

Souter, Judge Lippez, and Judge Selya, in an argument,

which Mr. Strachman represented and advocated on behalf

of his clients.  My understanding is that Israel is

waiting for the First Circuit to decide this case.  I

respectfully suggest that you should wait until the
First Circuit has decided this case. I suggest further,
respectfully, that perhaps you would wish to hear the
argument as it is taped, apparently, and available on
the First Circuit web site for the proposition, your
Honor, that this is an important issue whether there
will be a vacatur of the very judgment that you're being
asked to address today.

I have, since I am not experienced in this district
or this circuit, I don't have a good idea as to when the
opinion in that case will issue, and I think that the
Israelis feel the same way and that's why they put the
thing off until September, thinking that between now and
then they might expect a ruling. And the order that was
signed here by the registrar of the Israeli court
provides for perhaps the matter being put off even
further in aid of receiving the developments that are of
interest to the parties.

Now, therefore, that would be the first thing I would
like to tell you with respect to what I consider a, at
this moment in time, in the history of the case, when
the appellate courts in two jurisdictions are grappling
with these problems we are stampeded in here before you
in dubious procedural circumstances to address the
request that shifted from what it was on the original

1  motion to what it became in the reply after our

2  opposition.

3     The motion originally filed here before you seeks

4  payment, in full, in the amount of $116 million, plus

5  interest.  We opposed.  Now they come in and argue about

6  an installment plan that they had devised with their,

7  the plaintiffs' releasing money from the (inaudible) vat

8  attachment upon each payment.  I don't even believe it's

9  clear that that is something that they are capable of

10  doing, but I'm not going to go further into it.  I just

11  want to note that what we were hailed into court for

12  originally changed when we got here.

13     Indeed, your questions to Mr. Strachman are most

14  appropriate.

15          THE COURT:  Mr. Hibey?

16          MR. HIBEY:  Please.

17          THE COURT:  I understand your point that between

18  what the motion, originally requested and the relief

19  that was expressed in the reply memorandum differs, but

20  the -- well, I'm going to withdraw my question.  You

21  proceed.

22          MR. HIBEY:  Fine.  Now, I think the questions

23  that you put to Mr. Strachman were appropriate ones as

24  to what is the status of the ability of the judgment

25  debtor to honor the judgment, and as far as I'm

1   concerned, those answers are wanting in many different

2   regards.  I'd like to now focus on those reasons.  There

3   has to come a time in this case, and in this particular

4   proceeding, when we have to understand what the legal

5   basis is for this proceeding at all, and my

6   understanding of the law in that regard is that

7   notwithstanding that we are in a federal court, the

8   federal court is being asked to apply the law of the

9   State of Rhode Island and, therefore, to apply whatever

10  statutes are appropriate to the issues before it.

11      This case is brought under 9-28-3 which is the

12  citation proceeding, and the citation proceeding is

13  administered, if you will, through a series of statutes

14  that run from 9-28-3 to 9-28-7.  We respectfully suggest

15  that the Collins case, which is a Rhode Island state

16  case, is an important precedent that should govern your

17  consideration here, a case which we cited in our

18  opposition, but which was not responded to in the reply.

19  In that case, six months before suit was filed, a man

20  named Collins transferred title to his home to a

21  corporation in which he was the sole shareholder.  And a

22  case was brought under 9-28-3 seeking a, on citation, a

23  payment decree.  The Court, the highest court of Rhode

24  Island, held that the sole source for the payment of

25  judgment would be the debtor's income, not his assets.

1   And so when the lower court ordered that the title to

2   the property be recovered, the high court of Rhode

3   Island said you can't do that because that is not

4   possible or available to you under 9-28-3.  That is

5   distinguished from 9-28-1 in which a creditor files a

6   civil action, obtains a creditor's bill, and has the

7   right to seek, if you will, assets within the

8   jurisdiction of Rhode Island to satisfy the judgment.

9   You cannot go after any assets or anything outside the

10  State of Rhode Island.

11      Now the characteristics of 9-28-3 which were brought

12  here, which is the action brought here, undeniably raise

13  the question of whether 9-28-3 is appropriate against

14  anyone other than an individual, a person, not a non

15  person entity.  The language of 9-28-3 speaks to a show

16  cause why an examination of the debtor's, his or her

17  circumstances, his or her circumstances, should not be

18  made.  A decree ordering him to, or her, to pay the

19  judgment, delivering a copy to the debtor, or by leaving

20  it at his last place of abode, this is not the language

21  of a statute that is designed to apply to a non person

22  entity.

23          THE COURT:  Such as a corporation.

24          MR.  HIBEY:  Such as a corporation.  Indeed,

25  corporations are not covered by 9-28, 1 thru 7.  You

1    need to go to 9-26, Section 25 and following, to examine

2    the provisions of Rhode Island creditors law, as it

3    applies to the levy and execution on a corporation in

4    satisfaction of its adjudicated debts.

5        So, in the first instance, therefore, we don't think

6    9-28-3 applies to our clients.

7        Secondly, Mr. Strachman has, in his usual fashion,

8    used cavalierly words to strengthen his position.  One

9    comes immediately to mind that in the same breath he

10   speaks to the PLO as a terrorist operation.  You should

11   know that notwithstanding the media's demonization of

12   the PLO, the United States government executive branch

13   has never designated the PLO as a foreign terrorist

14   organization.  But in this immediate instance, his

15   question under 9-28-4 when he talks about -- where the

16   statute talks about the recovery of income from any

17   source, and basically what he's attempting to do there

18   is extra territorialize a recovery device that we

19   respectfully believe under 9-28-3 is limited to the

20   borders of this state.  When it says you can recover

21   from any source, by itself, does not make a case for

22   tracking the money that is not in Rhode Island.

23       We received these papers --

24          THE COURT:  You're arguing, Mr. Hibey, that if a

25   -- let's take a hypothetical case, we have a resident of

1   Rhode Island against whom there is a monetary judgment,

2   and he has funds on deposit in a bank in California, and

3   that bank in California has no branches here in Rhode

4   Island, that those funds are not reachable, is that

5   correct?

6           MR. HIBEY:  That's right.  Yes.

7           THE COURT:  All right.

8           MR. HIBEY:  What you do is you domesticate your

9   judgment here and you take it to California and you get

10  the money there, and that's what they've been doing, or

11  attempting to do in other collection and turnover

12  actions against various entities that they claim are

13  alter egos of the Palestinian Authority.  So it's not as

14  though they're without remedy.  It is that the remedy

15  they're seeking is utterly misplaced here.  And the idea

16  that under 28-4 inquiry can be made by examination of

17  the debtor as to his or her circumstances or her income

18  from any source.  They take the word "any" and attempt

19  to extraterratorialize it.  I just made that word up, I

20  think, but what I'm trying to say is, they're trying to

21  take any and apply it, shall we say, grossly, beyond the

22  recognized limits of the state.  I'd like to identify

23  for you a case called Small vs the United States.  These

24  days I have so many cites, 544 US 385, 2005; US Lexis

25  3700.  It's a case in the Supreme Court decided in 2005.

THE COURT: The first name was Small, S-M-A-L-L, Small vs United States?

MR. HIBEY: Yes, your Honor. I have copies of that.

THE COURT: All right. After the hearing you can give it to my clerk. Thank you.

MR. HIBEY: There was the question of the applicability of a statute that made reference to a certain consequence flowing to a person who was convicted under the statute, "convicted in any court." Justice Breyer, speaking for the majority, wrote at considerable length about the word "any", and concluded that the Congress ordinarily intended statutes to have domestic not extraterritorial application, and found that the word "any" could have such elasticity to it as to swallow up everything when that certainly cannot be the intention of the framers of the language. So the word "any" considered alone cannot answer the question of whether it includes a foreign court when you talk about a conviction in any court. And we think that that's an important factor here, that the statute that's being cited, or relied upon for the very predicate of this proceeding, when it speaks to income from any source, cannot and should not, within the scheme of the entire statutory framework, mean any, anywhere in the

1   world.  It was interesting to me as Mr. Strachman

2   recited the injunction that Judge Lagueux entered with

3   respect to the movement of Palestinian Authority and PLO

4   assets.  He'd never attempted to restrict that beyond

5   the federal jurisdiction of the United States.  I should

6   think that it is not a stretch at all, especially after

7   you read Justice Breyer in the Small case to suggest

8   that any income, assuming for the moment that the VAT

9   money is income and I don't agree to that at all, that

10  any income includes income outside of the state.

11      Now, let me go on.  I would suggest to the Court that

12  the points I have made with respect to 9-28-3 and 4 run

13  all the way through to 7, and if the Court wishes to

14  have further explication on that, I'm happy to provide

15  it.  But I think in the end, it is that 9-28-3 applies

16  to a natural person, that the extraterritorial reach of

17  it does not go to outside the United States, and that

18  the reliance on other cases in other jurisdictions does

19  not inform the question.  Now what they do in New York

20  and how they do it there has no applicability to the

21  question of how this statute works here.  A statute, the

22  section of which they're relying on, goes well beyond

23  where it should.

24      Now, I don't know what we accomplish here today,

25  respectfully, beyond what I have discussed with you

because, like you, we were told in no uncertain terms both in writing and orally that there would be no discussion about the ability of the Palestinian Authority to be able to pay toward any judgment of the sort that is before in the Rhode Island litigation. So I'm not totally prepared because I wasn't required to come in and produce evidence for you. But I think it's very important for me to clear the air about a few things.

Mr. Strachman calls this a 3 and a half billion dollar operation. Unless there's a piece of paper in front of me, I'm not prepared to subscribe specifically to any set of numbers. I think all of that must be very precise, and I didn't come into court today with those kinds of numbers. But what I can tell you is that whatever the number is that he would use to characterize the governmental operation of the Palestinian Authority, you must understand that it is a deficit operation. Its obligations to the people of Palestine and to its creditors vastly exceeds whatever income they enjoy, and I will use that word income because that's good parlance here, but understand that the sources of their receipt of money, are through donor countries and through the VAT, and when he says that somehow the VAT can be tapped for the payment of a bond, therefore the VAT can be

1    available for other uses connected with the litigation,

2    or that the VAT is holding upwards to a hundred and $2

3    million in U.S. equivalent under an order of attachment,

4    that, you know, doesn't even begin to explain what the

5    consequences are of any kind of holdback of any amount

6    of funds respecting the lives of several million

7    Palestinian people living in Palestine.  And so I don't

8    think it's a very easy -- I think it's too easy and too

9    fascial to suggest that because he characterizes it as a

10   $3 billion operation, and they haven't had the use of

11   these funds because they've been frozen, that they're

12   fresh enough to do anything.  The issues are far more

13   complicated than that, and they have not been developed

14   as of this time before this Court, because we were not

15   required to, and the idea that you have found at another

16   point in time to be able to put up a bond translates

17   into the idea that someone found we can put up $120

18   million is fanciful.  As you well know, bonds are put up

19   in different ways that do not involve a dollar for

20   dollar posting of the funds if there is a surety or

21   other guarantor available.  I can't tell you there is or

22   isn't.  We did not have to broach that subject because

23   the Knox case was disposed of before any of that had to

24   happen.

25           THE COURT:  But did the Knox court make a finding

1   that the Palestinian Authorities had the ability to make

2   payments of $10,000 a month?

3       MR. HIBEY:  No.  The order for the bond was $120

4   million payable $20 million in a first (inaudible) trang

5   and then $5 million a month for 20 months, so it would

6   be 20 plus a hundred, with the hundred over 5.

7       THE COURT:  Did the Court make a finding that the

8   Palestinian Authority had the ability to make a payment

9   of $5 million a month?

10      MR. HIBEY:  Yes, he made a finding that that's

11   the order he would make, and that is what the Magistrate

12   Judge did.  That issue was contested.

13      THE COURT:  And determined unfavorably to the

14   Palestinian Authority.

15      MR. HIBEY:  Well, that's my -- my recollection

16   obviously, because it's just not refreshed well enough

17   right now, I can't recall whether precisely Judge

18   Lagueux ruled on our Rule 72 objection to that finding,

19   and the only reason why I'm having trouble with that is

20   because it was in that same time frame that Knox was

21   disposed of, but if indeed Mr. Strachman has a document

22   that says that the matter actually was ruled upon by

23   Judge Marrero, I would not be surprised, but I just

24   don't have that recollection.  I don't think it makes a

25   difference because there's a difference between putting

up a bond and having a surety assist in that regard, a
bond that can come back to you in the event the
conditions associated with the bond are met, and I
cannot remember whether it was performance and don't
default again or whether it was money that would be
there to secure a recovery in the event at trial we lost
the case. I don't remember. But it's very different
from what we're hearing here where it started with $116
million payment in full. An astonishing proposition
when you know but don't tell that in fact the case is on
appeal. The case has been argued. There's a tape of
the argument. The matter has been put off in Israel
where in the end not only does the judicial branch have
to decide whether the judgment here is enforceable and
attachable but the executive branch of the Israeli
government must also be in agreement with respect to
that. The idea that somehow that doesn't have an impact
on my clients is fanciful. One need only look at
letters which have been written to the District Courts
in two cases, one most recently where vacatur under Rule
55 was granted, but the United States Government has
stated to the District Court that while it is not going
to articulate a suggestion of interest per se, nothing
is to be inferred from that as evidence that they have
no interest in what's going on in these cases, but then

they go on to say, importantly, that they are concerned
about the financial and political viability of the
Palestinian Authority as a result of these cases and the
specter of a judgment being finalized and imposed upon
them.  So this is very momentous and consequential
business that we're about in these various cases.

So in the end, your Honor, we're here under the wrong
statute.  The predicate for being here at all must be
understood in the context of these very recent
developments.  We're being told that we don't have to
come in here and put up any kind of case today in front
of you.  So it begs the question, what is this all
about?  Well, it seems -- this is pure advocacy and I'll
keep it short because that's what it is, this is a
motion to scandalize us.  This is a motion to influence
a court in Israel that somehow a Judge in Rhode Island
has most recently said that which has been the case all
along, that we have an obligation under a judgment, and
that this is still another occasion where we can get up
and resist.  Well, we are engaged fully in the process
of litigating our rights as provided for by law, and
we're not ashamed of that.  There came a time in January
of 2007 when the Secretary of State responded to
President Abbas who had earlier asked for some kind of
assistance in connection with the cases.  Ten lawsuits

1   against the Palestinian Authority in the United States

2   by Israelis who happened to be American citizens.  And

3   the Secretary of State wrote back and said you should

4   engage in these cases.  You should not sit back and just

5   let them unfold and continue without participation on

6   your part.  The Palestinian Authority took that advice

7   to heart.  We were retained.  We've been trying ever

8   since to advance our legal positions in various courts

9   where these cases are pending.  We have had three

10  vacaturs that have been granted conditionally.  We have

11  on appeal the denial of this judgment, and imminently

12  we're going to be getting a ruling.  The Israeli court

13  system is anticipating that ruling, and the parties over

14  there, including Mr. Strachman's clients, have consented

15  to the matter being put off.  There are many procedural

16  defects in what is before you.

17          THE COURT:  Mr. Hibey, if the First Circuit rules

18  in your favor?

19          MR. HIBEY:  Yes.

20          THE COURT:  Does that put this case in the

21  posture equivalent to the Knox case?

22          MR. HIBEY:  It depends on what they say.  They

23  could remand it, merely remand, or they could vacate it

24  and take a decision up there, or they could affirm it

25  outright.  So those, I think, are the possibilities that

1   we're dealing with, and that's the sense of what I

2   witnessed when listening to the arguments last Thursday.

3   So those are the possibilities.

4           THE COURT:  Well, in the Knox case, as I recall,

5   the judgment had been vacated but the defendants were

6   required to post a bond.

7           MR. HIBEY:  Right.

8           THE COURT:  And the issue was how much that bond

9   was going to be.

10          MR. HIBEY:  That's right.

11          THE COURT:  And my question to you is, that if

12  you are successful on your appeal to the First Circuit

13  --

14          MR. HIBEY:  Yes.

15          THE COURT:  -- and the judgment is vacated, does

16  it seem likely to you that the issues that were

17  addressed in the Knox case will then be before this

18  Court?

19          MR. HIBEY:  Yes, only because at one point in the

20  oral argument, my recollection is we were asked whether

21  a bond might be imposed as a condition of vacatur, and

22  we answered that question in the affirmative, yes.  I

23  don't purport to project as to what they're going to do.

24  That's why I encouraged you to listen to the argument

25  and make up your own mind if there's anything to be

1  derived from listening to an argument. So I don't want

2  to indulge in any speculation other than to say what the

3  possibilities are, not what the likelihood is going to

4  be.

5       THE COURT: I guess my point, Mr. Hibey, was that

6  you are saying that it's premature for this Court to

7  act, that this Court should wait until the First Circuit

8  decides the pending appeal, and I'm saying, all right,

9  let's assume that the First Circuit rules in your favor,

10  doesn't that get us to the situation in the Knox case

11  which --

12       MR. HIBEY: I don't know. It depends on what

13  they set for a bond. I can recall, also, that Justice

14  Souter posed a series of questions that might have been

15  joined in by Judge Selya, I can't be certain about that,

16  about the amount of the judgment, and the consequence

17  associated with a judgment of that size. And I know

18  that the questions were asked and that in one of those

19  questions, the $116 million was recognized to be a large

20  sum of money. I want to be careful with the adjectives

21  because I might import some of my own sense of that into

22  it, but that's what was said. We argued, and I should

23  argue here, by the way, that we're confronted with this

24  horrific irony that we're being found liable for the

25  acts of Hamas. In the real politic of the region,

anybody who reads any newspaper, even newspapers here in the United States, recognize that Hamas and the Palestinian Authority have been at complete conflict with each other.  Hamas was thrown out of the Palestinian Authority government structure.  Hamas retreated to Gaza.  Hamas engaged in the takeover of Gaza, resulting in the deaths of many Palestinians who supported the Palestinian Authority.  Hamas is roundly blamed for much of the violence that emanated from Gaza, and yet we're here having to pay, or being called upon to pay for the acts of Hamas.  This was when there were questions about the bond.  There was a response that attempted to capture a bit of this horrific irony associated with us having to perhaps be required to honor a $116 million judgment for the conduct of Hamas.

As you can see, we have an argument for a meritorious defense.  That's part of trying to get the judgment set aside.  Our argument in the Court of Appeals was the Judge didn't consider it.  He focused, just as Mr. Strachman does here because it's such an easy thing to do, on the willfulness of the default during the time when our predecessor counsel were present in the courthouse.  That's the situation.  So there are many moving parts in this thing, all of which could easily be impacted -- strike easily -- will be impacted by a

1    decision from the Court of Appeals.  Certainly Israelis

2    understand it.  And the others over there, with their

3    lawyers over there, who are in league with this man,

4    Mr. Strachman, appear to appreciate those circumstances

5    because they consented to this motion.

6        So, respectfully, your Honor, especially in a

7    proceeding when we're being called in here and told we

8    don't have to put on any witnesses, do anything but

9    simply play off some kind of record that's not really

10   before you, that we should be doing business here today.

11   I respectfully suggest that that is not a prudent action

12   to take, and that any action predicated on the legal

13   propositions that were advanced here by the plaintiffs

14   are flawed.

15       Rhode Island law is not well-developed as this kind

16   of creditors rights law is in other jurisdictions that

17   have other statutes and other legislative regimes.  We

18   really think that there's great uncertainty about the

19   applicability of these statutes if they don't hit you

20   the same way they hit us at the outset, that they don't

21   really apply to a non-person entity.  And so in our

22   papers we suggested you might have to certify if you

23   wanted to really understand what was going on with these

24   statutes.  But I think all of that suggests a great deal

25   of activity, which we believe is appropriate here, that

1    all of it could be put off until such time as the First

2    Circuit brings some clarity to the picture.  That's what

3    we're asking for, no action be taken today.

4       If your Honor has any questions, I'd be happy to

5    answer them.  I'm grateful for the time you've given me.

6             THE COURT:  I have no questions, Mr. Hibey.

7    Thank you.

8             MR. HIBEY:  Thank you, your Honor.

9             MR. STRACHMAN:  If I may respond?

10            THE COURT:  Yes, Mr. Strachman.  I would be

11   interested in hearing your response on the Collins case,

12   and the argument that the statute 9-28-3 under which

13   this action has come before the Court, the defendants

14   argue the Supreme Court has said you can't get the

15   relief you're seeking under that statute.  Would you

16   address that part of their argument?

17            MR. STRACHMAN:  Certainly, your Honor.  The

18   Collins case, as I recall, references income.  This is

19   income.  This is a stream of income that flows to the

20   Palestinians.  It does not ask this Court to transfer a

21   piece of real estate, as the Supreme Court authorized in

22   the Desper case where it authorized a Massachusetts

23   property to be transferred, et cetera.  This is income.

24   This is a red herring to suggest that maybe it is

25   income.  It's described all over as income.  Income is

1    cash that you get each month.  That's what this is as

2    opposed to an asset.

3         THE COURT:  What about the contention that 9-28-3

4    has no applicability to anyone other than a natural

5    person given the references in the statute to his and

6    her income, his or her ability to pay?

7         MR. STACHMAN:  Well, there's no case that's ever

8    held that, and although the statute is what it is in

9    terms of the language that it uses, there's no case that

10   I'm aware of that has ever held that it does not apply

11   to corporations, number 1.  Number 2, I know that each

12   and every day in the district court and the superior

13   courts of Rhode Island, corporations are hauled into

14   court every day.  I've seen the citations to

15   corporations.  I'm aware of it being done.  I've seen

16   them being called, you know, called on the calendar, to

17   be sure a witness may have to come in to answer

18   questions on behalf of a corporation, but a judgment

19   debtor, that is a corporation, is brought into the

20   supplementary proceedings all the time, and I have never

21   seen anywhere other than in this brief a suggestion that

22   corporations cannot.  I think it is crystal clear in

23   terms of the practices of the Judges of Rhode Island and

24   the case law.

25       I'd also like to address, if I could, something.  I

1   did misspeak.  In our brief we indicated that in Knox
2   the Court ordered a $5 million a month monthly payment.
3   I think I said $10 million.  After the first payment was
4   to be made in September of 20 million each month
5   thereafter it would be they were ordered to pay 5
6   million.  I believe that I said 10 million.

7          To start off an argument, and to come close to the
8   end and say that this proceeding is some sort of a
9   stampede, 5 and a half years after judgment, after my
10  clients have been sued for enforcing this judgment by
11  the Palestinian Authority cohorts and business partners
12  and some entities, when they still, as I predicted after
13  a half hour presentation made no indication at all that
14  they would honor this judgment, that they were coming to
15  this court with clean hands, and would respect this
16  court, and all the work that the Court put into this
17  case over 4 and a half years, and several years of post
18  judgment proceedings, is shocking.  This isn't a
19  stampede.  This isn't day 1.  Judge Lagueux made a
20  finding that they were transferring assets and they were
21  not honoring the judgments.  That was four years ago.
22  They failed to contest the fact that they have not
23  complied with the creditor's bill that was granted by
24  Judge Lagueux, approximately three years ago.  Had it
25  been complied with, had they complied, as I suggested,

the judgment would have been satisfied.  They don't
contest that they have fought us to collect this
judgment in Washington, New York, elsewhere, fought us
in Israel.  To suggest this is a stampede is really
disingenuous.

In terms of the proceedings at the First Circuit, yet
another red herring introduced for the first time here,
and it's particularly problematic because Rule 60 says
very clearly, the filing of a motion to vacate does not
stay the enforcement of the judgment.  They have
directly never come to this Court, sought a stay of the
enforcement of the judgment.  They did not at the Court
of Appeals.  Mr. Hibey said three times today, orally,
that he was requesting the Court to orally stay this
proceeding and stay the enforcement of this judgment
because he knows that he can't get it under Rule 60.  No
cases that I'm aware of say that once a Rule 60 motion
is denied a then appellant judgment debtor can obtain a
stay.  And even more egregious is that 5 and a half
years ago when this Court entered final judgment, they
asked for a stay, and Judge Lagueux said you can have a
stay if you place, submit a bond in the amount of
$50 million.  They said they can get it right at the
beginning, on appeal, before the First Circuit upheld
Judge Lagueux's entry of judgment.  And, of course, they

1    did not submit the bond, and never obtained a stay.  So

2    to come now orally through the back door and to try to

3    wrangle a stay, when they certainly don't want to come

4    through the front door, and they don't want to file a

5    motion, and they've never filed a motion directly for a

6    stay, should be denied and should be seen as yet another

7    attempt to delay and obfuscate.

8        The difference in the suggestions that were made in

9    our reply brief and our initial brief are only a matter

10   of magnitude, not of kind.  We have suggested remedies,

11   suggested ways out of the situation.  We have not

12   changed the nature of the motion, as Mr. Hibey would

13   suggest.  We have simply said there's a couple of

14   different ways to do it and here are some other ways, to

15   do effectively the same thing, which is order payment

16   toward this judgment.

17       Mr. Hibey made much of out of Rhode Island or the

18   territorialization, I believe, in his word of the

19   statute and this judgment.  In light of the jurisdiction

20   of federal courts, in light of the plethora of cases

21   that we submitted from many different jurisdictions,

22   showing that courts all the time do exactly what we've

23   asked this Court to do, is also shocking.  How could a

24   court that hears diversity cases enter judgments but

25   never have control over, in personam over the

defendant's post-judgment?  The suggestion that there's some sort of in rem remedy here is completely missing the mark.  This Court found repeatedly it has jurisdiction over the defendants.  That jurisdiction continues.  The defendants have appeared repeatedly post-judgment.  They have filed enough pleadings that we are now in the mid four hundreds of docket entries over the last 5 and a half years.  They have sought relief from this Court, and to suggest that the Court can't tell them what to do in terms of satisfying this judgment, is not only outrageous but it's just a continuation of the posture that they commenced right from the very first pleading signed in July of 2000.

They've suggested that we're seeking some sort of alter ego theory against the defendants in other cases. It's not true.  We never once used the word alter ego theory.  They come to this Court with very extreme type of claims, these extreme type of arguments that would nullify the ability of this Court to effectively render judgments of people who just work across state lines, and in light of a statute which this Court knows very well that allows for nationwide service of process, et cetera, we had all kinds of venue issues and jurisdictional issues early on in this litigation, on multiple occasions, but to suggest that they can now

1  hide behind these red-herrings when the Weiss court, as

2  we cited in, I think it was page 19 of our brief, and as

3  Judge Lagueux had indicated on several occasions, the

4  payment of terrorism judgments serves a vital national

5  interest.  That's what the Weiss court said.  Judge

6  Lagueux made similar kinds of statements about this

7  judgment, and that vital national interest is not being

8  served.

9     Mr. Hibey is fond of quoting a letter that he did not

10  submit to the Court from Condoleezza Rice in January of

11  2007.  It said a few things in it, but one thing that

12  letter said in January of 2007 to the President of the

13  Palestinian Authority, and to the Chairman of the PLO,

14  Mr. Abbas, it said virtually verbatim:  This judgment is

15  final.  It's enforceable.  And you either have to pay it

16  or come to terms with the Ungars.  And nothing has

17  changed in the last three years.  The U.S. Government,

18  the Israeli Government, all these government interests,

19  we heard that for years.  Nothing has changed,

20  post-judgment, other than to suggest that two years

21  after the judgment the executive, the president,

22  secretary of state, rather, has told these defendants,

23  pay the judgment because it's enforceable, and yet they

24  come to court, and again are saying that they're not

25  willing to pay it.  Never once, in all the statements

about my clients, how horrible they are, and the lawyers

are in league together, and what horrible people,

everyone's horrible, but they're the ones who haven't

honored what the Court ordered to be done five and a

half years ago, all at the same time attempting to

obtain a stay from your Honor, and through a back door

that is not permitted, either through Rule 60, through

the cases, or any other manner, and would violate Judge

Lagueux's ruling that if they wanted a stay early on

prior to the First Circuit upholding the judgment, which

it did in, I believe it was March of 2005, they could

submit a bond, which they did not do.  Thank you.

        THE COURT:  All right, thank you, Mr. Strachman.

Mr. Hibey, I'm not looking for additional argument but

Mr. Strachman just took ten minutes.  If you want ten

minutes, I'll give you ten minutes, but if you choose

not to, I'm not going to infer that that means his

arguments are unanswerable and simply decided to rest on

what you've already said.

        MR. HIBEY:  I appreciate that, your Honor.  I

won't take up any more of the Court's time.  I think

you've listened to me very carefully and I'm grateful

for that.

        THE COURT:  All right, thank you.  Mr. Strachman,

I do have one question.  Your motion, as I recall, asks

1  for the Court to act by February 10th, and I'd like you

2  to tell me why that action is necessary by that date.

3  I'm sure you'd prefer it as soon as possible, but I

4  think I recall seeing some reference to February 10th,

5  and I think when I saw it, I wasn't fully sure of the

6  reason why that date was being selected.  It may have

7  related to the fact that that's the date by which you

8  think the amount being held in the Israeli treasury will

9  equal the amount of the judgment?

10      MR. STRACHMAN:  I believe so, your Honor.  In

11  other words, I believe that that's how to calculate what

12  the amount would be.  Obviously there's an issue with

13  change in currency values, but on page 1 of our motion

14  we ask that the Court enter an order before February 1.

15  The Court knows, without having to say yet again how

16  long this case has endured, lasted, and we believe that

17  it's ripe now for decision on this issue, and the

18  payment, and that the transfer that would be made in

19  February, the 1st day of the month in February, the

20  Court makes an order and then they obtain the funds and

21  then we release the funds by mid February, we would

22  finally bring some closure to this matter.

23      THE COURT:  Thank you, Mr. Strachman.  I misspoke

24  when I said February 10th.  It's February 1st that's

25  actually stated.

1    I'll certainly try to render a decision as soon as

2  possible.  I do have a matter already in progress that's

3  going to take some time, but I will try to immediately

4  thereafter turn my attention to this case.  I thank the

5  attorneys for their arguments.  The Court will stand in

6  recess.

7  (RECESS)

1

2

3          C E R T I F I C A T I O N

4

5    I, court approved transcriber, certify that the

6    foregoing is a correct transcript from the official

7    electronic sound recording of the proceedings in the

8    above-entitled matter.

9

10

11   /sJOSEPH A. FONTES/

12   COURT REPORTER

13   JANUARY 16, 2010

14   DATE

15

16

17

18

19

20

21

22

23

24

25