UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATES OF YARON UNGAR and          :
EFRAT UNGAR by and through the          :
Administrator of their estates          :
David Strachman, DVIR UNGAR, minor,     :
by his guardians and next friend,       :
YISHAI UNGAR, minor, by his             :
guardians and next friend,              :
PROFESSOR MEYER UNGAR, JUDITH           :
UNGAR, RABBI URI DASBERG, JUDITH        :
DASBERG (individually and in their      :
capacity as legal guardians of          :
plaintiffs Dvir Ungar and Yishai        :
Ungar); AMICHAI UNGAR, DAFNA UNGAR      :
and MICHAL COHEN,                       :
                       Plaintiffs,      :
        v.                              :          CA 00-105L
                                        :
THE PALESTINIAN AUTHORITY               :
(A.K.A."THE PALESTINIAN INTERIM         :
SELF-GOVERNMENT AUTHORITY"),            :
THE PALESTINE LIBERATION                :
ORGANIZATION, YASSER ARAFAT,            :
JIBRIL RAJOUB, MUHAMMED DAHLAN,         :
AMIN AL-HINDI, TAWFIK TIRAWI,           :
RAZI JABALI, HAMAS -- ISLAMIC           :
RESISTANCE MOVEMENT (A.K.A.             :
"HARAKAT AL-MUQAWAMA AL-ISLAMIYYA"),    :
ABDEL RAHMAN ISMAIL ABDEL RAHMAN        :
GHANIMAT, JAMAL ABDEL FATAH             :
TZABICH AL HOR, RAED FAKHRI ABU         :
HAMDIYA, IBRAHIM GHANIMAT, and          :
IMAN MAHMUD HASSAN FUAD KAFISHE,        :
                       Defendants.      :

**MEMORANDUM AND ORDER**

**GRANTING MOTION FOR A PAYMENT DECREE**

Before the Court is Plaintiffs – Judgment Creditors' Motion for a Payment Decree (Doc. #467) ("Motion for Payment Decree" or "Motion").

## I.  Background[1]

Plaintiffs-judgment creditors ("Plaintiffs" or "the Ungars") are the orphaned children, parents, siblings, and administrator of the estate of Yaron Ungar, a United States citizen who was murdered with his pregnant wife, Efrat Ungar, in a terrorist machine-gun attack on June 9, 1996, in Israel.  In March 2000, the Ungars filed the above captioned action pursuant to 18 U.S.C. § 2333[2] against numerous defendants, including the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively "Defendants").[3]

On June 13, 2004, the Court entered a default judgment in this matter against the PA and the PLO.  See Docket; see also Estates of Ungar v. Palestinian Auth., 325 F.Supp.2d 15, 28 (D.R.I. 2004) ("Ungar II") (adopting report and recommendation

---

[1] The Court provides only that background needed to understand the instant Motion.  For the complete history of this action, the reader may consult: Estates of Ungar v. Palestinian Auth., 153 F.Supp.2d 76 (D.R.I. 2001) ("Ungar I"); Estates of Ungar v. Palestinian Auth., 325 F.Supp.2d 15 (D.R.I. 2004) ("Ungar II"); Ungar v. Palestine Liberation Org., 402 F.3d 274 (1st Cir. 2005) ("Ungar III"); Estates of Ungar v. Palestinian Auth., 613 F.Supp.2d 219 (D.R.I. 2009) ("Ungar IV"), rev'd by Ungar v. Palestine Liberation Org., 599 F.3d 79 (1st Cir. 2010) ("Ungar V").

[2] "Enacted as part of the Antiterrorism Act of 1991 ("ATA"), 18 U.S.C. § 2333 provides a cause of action for American nationals injured in their person, property, or business by reason of an act of international terrorism."  Ungar I, 153 F.Supp.2d at 82.

[3] The original complaint was brought by numerous plaintiffs against numerous defendants.  See Ungar III, 402 F.3d at 276-77. However, by 2005 the case had "boil[ed] down to a suit involving the estate and heirs of Yaron Ungar as plaintiffs and the PA and the PLO as defendants."  Id. at 277.

and ordering clerk to enter final judgment).  The amount of the judgment exceeds $116,000,000.00.[4]  <u>See id.</u>  Defendants appealed to the First Circuit, but their appeal was rejected.  <u>See Ungar v. Palestine Liberation Org.</u>, 402 F.3d 274, 294 (1st Cir. 2005) ("<u>Ungar III</u>").

On December 28, 2007, Defendants, represented by new counsel, moved under Fed. R. Civ. P. 60(b)(6) to vacate the default judgment.  <u>See</u> Docket; <u>see also</u> Defendants' Motion for Relief from Default Judgment (Doc. #408).  Senior Judge Ronald R. Lagueux denied the motion to vacate on May 13, 2009, finding that Defendants' willful default precluded relief under Rule 60(b)(6) as a matter of law.  <u>See Estates of Ungar v. Palestinian Auth.</u>, 613 F.Supp.2d 219, 231 (D.R.I. 2009) ("<u>Ungar IV</u>") (noting "Defendants' litigation strategy ... not to file an answer or defend this case on the merits ..." flowed from "the intentional, deliberate and binding decisions made by the PA's dictatorial leader"); <u>see also Ungar v. Palestine Liberation Org.</u>, 599 F.3d 79, 84 (1st Cir. 2010) ("<u>Ungar V</u>") ("The decision, read as a whole, leaves no doubt ... that the court denied the Rule 60(b)(6) motion on the basis that the defendants' willful default precluded relief as a matter of law.")(citing <u>Ungar IV</u>, 613

---

[4] The Court entered a judgment of $116,421,048 against the PA and of $116,415,468 against the PLO.  <u>See Ungar II</u>, 325 F.Supp.2d at 28.  Although the PA and PLO are jointly and severally liable for the damage award, each is liable for a different amount of attorney's fees.  <u>See id.</u>

F.Supp.2d at 231).

Defendants appealed the denial to the First Circuit.  On March 25, 2010, the Court of Appeals vacated Judge Lagueux's order and remanded the case with directions to consider multiple factors, including "the timing of the request for relief, the extent of any prejudice to the opposing party, the existence or non-existence of meritorious claims of defense, and the presence or absence of exceptional circumstances," Ungar V, 599 F.3d at 83, in deciding the Rule 60(b)(6) motion, id. at 86-87 (describing Defendants' arguments as "substantial" and "deserv[ing] full-throated consideration").[5]

In the meantime, Plaintiffs filed the instant Motion on December 9, 2009.  See Docket.  The Court conducted a hearing on January 13, 2010, and, thereafter, took the matter under advisement.

## II.  Relief Sought

To understand the relief which Plaintiffs seek by the Motion, some additional facts are necessary.  On August 31, 2008,

---

[5] In compliance with the directive from the Court of Appeals, Judge Lagueux has issued an order advising the parties that he will conduct a scheduling conference with the attorneys to establish a schedule for discovery and the filing of pre-hearing memoranda in advance of "an evidentiary hearing to determine precisely what the facts are concerning the deliberate decision to default and the factual circumstances surrounding that matter."  Order (Doc. #482) at 2.  Judge Lagueux has further advised the parties that Defendants "will have the burden of proving the variety of factors set forth by the Court of Appeals which would justify a vacation of the judgment under these circumstances, including exceptional circumstances."  Id.

the Jerusalem District Court issued a decision finding that the July 13, 2004, judgment entered by this Court against the PA and the PLO is enforceable in Israel. See Memorandum in Support of Plaintiffs – Judgment Creditors' Motion for a Payment Decree ("Plaintiffs' Mem."), Ex. A (Declaration of Robert J. Tolchin ("Tolchin Decl.")) ¶ 2; see also id., Attachment ("Att.") 1 (Decision of Jerusalem District Court ("Decision")) ¶ 1 (referencing August 31, 2008, decision of Jerusalem District Court that the judgment is enforceable in Israel). Following that decision, the Ungars moved the Jerusalem court for a post-judgment attachment on tax payments transferred each month by the Israeli government to the PA. Plaintiffs' Mem. at 3 (citing Tolchin Decl. ¶ 3). The Ungars requested a post-judgment attachment in the full amount of their domesticated judgment, to accumulate in monthly installments in the amount of 18 million NIS (in current terms equal to about $4.74 million) per month.[6]

---

[6] Plaintiffs represent that:

The Ungars made clear in their motion to the Jerusalem court that they were seeking installment payments, rather than an immediate attachment in the full amount of the judgment, purely *ex gratia*, in order to neutralize in advance any (false) claim by the PA that an immediate attachment in the full amount would cause the PA a financial crisis.

Plaintiffs' Mem. at 3 n.2; see also Tolchin Decl., Att. 1 (Decision of Jerusalem District Court ("Decision")) ¶ 3 (noting that "the [Ungars] agreed ... in the framework of the motion for an attachment filed by them ... to set a monthly collection ceiling of only 18 million NIS, so that practically, the amount attached constitutes only a few percent of the total monthly amount transferred to the Palestinian Authority").

_Id._  The Jerusalem District Court granted the Ungars' motion for a post-judgment attachment on September 7, 2008.  _Id._  The PA and PLO moved for a stay of execution pending appeal of the August 31, 2008, decision of the Jerusalem District Court to the Israeli Supreme Court.  _Id._ at 4; _see also_ Tolchin Decl. ¶ 5.

On October 29, 2008, the Jerusalem District Court issued a decision granting the motion for a stay pending appeal on the condition that the monthly post-judgment attachment on the tax transfers in the amount of 18 million NIS remain in force, such that the funds accumulated during the pendency of the appeal (i.e., 18 million NIS per month, up to the full amount of the judgment) would be held by the Israeli Treasury until Defendants' appeal is decided.  Plaintiffs' Mem. at 4; _see also_ Tolchin Decl. ¶¶ 6-7.  Plaintiffs note that the PA and PLO explained the effect of this decision in a declaration which they submitted in _Knox v. The Palestine Liberation Org._, Civil Action No. 03 Civ. 4466 (VM)(THK) (S.D.N.Y.):

> Beginning with the transfers for September 2008, the State of Israel began withholding ... NIS 18 million per month from the tax transfers pending the Israel Supreme Court decision on whether a U.S. judgment in the Ungar litigation is enforceable in Israel.  NIS 18 million (or $4.5 million) will be withheld until the full $116 million is attached or until the Supreme Court rules favorably for the PNA.

Plaintiffs' Mem. at 4 (quoting Ex. B (Declaration of Hatem Yousef ("Yousef Decl.")) ¶ 10)(bold omitted).

Thus, Plaintiffs represent that pursuant to the Israeli

6

attachment between September 7, 2008, and December 9, 2009,
attached PA funds amounting to 270 million NIS (18 million NIS x
15 months) accumulated at the Israeli Treasury.  <u>See</u> Plaintiffs'
Mem. at 4.  Separately, earlier in the Israeli proceeding, the
Jerusalem court ordered an attachment on tax transfers to the PA
in the amount of 100 million NIS.  <u>Id.</u> (citing Tolchin Decl. ¶
9).  Since an additional 18 million NIS (about $4.74 million) is
being attached and added to this sum every month, <u>see id.</u>, the
total amount of the attached PA funds is now approximately
$116,000,000.[7]

Nevertheless, according to Plaintiffs, it is impossible to
know whether, and if so when, the Ungars will ultimately receive
these attached PA funds via their Israeli enforcement
proceedings.  <u>See id.</u> at 5.  They note that the Israeli Supreme
Court, unlike the U.S. Supreme Court, does not sit in terms, and
a decision in a civil appeal can take anywhere from several
months to several years.  <u>See id.</u>

Plaintiffs state that if the Israeli Supreme Court
ultimately reverses the Jerusalem District Court decision finding
the Ungars's judgment enforceable in Israel, the attachment will
be vacated and the funds released to the PA.  <u>See id.</u>  Even if

---

[7] The Court reaches this conclusion based on Plaintiffs'
statements that "by the time of the January 13, 2010[,] citation
hearing, the total amount of attached PA funds will be about $102
million," Plaintiffs' Mem. at 4 (bold omitted), and that "an
additional 18 million NIS (about $4.74 million) is being attached and
added to this sum every month ...," <u>id.</u>

the Israeli Supreme Court denies the appeal, Plaintiffs represent that they cannot execute against these funds without further proceedings.  See id.  Specifically, Plaintiffs avow that the Ungars will have to bring a motion to "confirm" the attachment in the Jerusalem District Court, which they predict the PA will certainly seek to contest, and even if the Ungars prevail on that motion the PA can appeal any decision confirming the attachment to the Israeli Supreme Court.  See id.

Plaintiffs, however, posit that the existence of this pool of attached PA funds provides a simple solution enabling the immediate and full satisfaction of the Ungars' judgment.  See id. According to Plaintiffs, because the funds were attached at the request of the Ungars, the Ungars can lift the attachment and thereby release the funds to the PA at any time.  See id. Therefore, Plaintiffs seek an order which: a) directs Defendants to pay the Ungars the sum of $20 million by a specified date[8] and directs the Ungars to release $20 million of the funds attached in Israel within three days after receipt of this payment; b) directs Defendants to pay the Ungars another $20 million within three days after receiving from the Israeli Treasury the $20 million released by the Ungars and directing the Ungars to release an additional $20 million of the funds attached in Israel

---

[8] The date specified in the Motion is February 1, 2010.  See Motion at 1.

within three days after receipt of this payment; and c) directs the parties to continue making payments and releases in this manner until the entire judgment has been satisfied.  See Reply Memorandum in Further Support of Plaintiffs – Judgment Creditors' Motion for a Payment Decree ("Reply Mem.") at 16.

## III.  Ripeness

In an April 9, 2010, letter to this Magistrate Judge, counsel for Defendants suggested that the Court should "table the issues raised in the motion for a payment decree pending Judge Lagueux's resolution of the vacatur motion."  Letter from Hibey to Martin, M.J., of 4/9/10 at 2.  The Court has considered this suggestion, but concludes that it should be rejected.  Rule 60(c)(2) makes clear that the filing of a motion for relief from judgment "does not affect the judgment's finality or suspend its operation."  Fed. R. Civ. P. 60(c)(2).  Defendants have not sought a stay of enforcement under Rule 62(b)(4), and in the absence of such a motion the Court sees no basis to defer action on the instant Motion.  In addition, Plaintiffs argue persuasively that they will be forced to expend resources in enforcement actions brought in other jurisdictions unless they obtain the relief sought by the instant Motion.  See Letter from Strachman to Martin, M.J., of 4/2/10 at 2-3.  Accordingly, to the extent that Defendants seek to have the Court defer ruling upon the Motion until after Judge Lagueux decides the pending motion

9

for vacatur, their request is denied.

## IV. Authority to Enter Order

Defendants argue first that this Court lacks the authority to enter the order requested by Plaintiffs. See Opposition to Plaintiffs' Motion for a Payment Decree (Doc. #469) ("Opposition") at 7. Noting that the Motion requests an order "[p]ursuant to Fed. R. Civ. P. 69 and R.I.G.L. § 9-28-3," Opposition at 7 (quoting Motion at 1)(alteration in original), Defendants contend that "[n]either that Rule nor that statute provides the Court with the authority to enter an order requiring non-resident judgment debtors with no assets located in the state such as Defendants to pay the judgment in this action," id.

### A. Does R.I. Gen. Laws § 9-28-3 Authorize the Relief Sought?

"Where a money judgment has been entered in federal court, enforcement of the judgment is governed by Fed. R. Civ. P. 69, which provides that the procedures to be used are those of the state in which the district court sits, unless there is an applicable federal statute." Aetna Cas. & Sur. Co. v. Markarian, 114 F.3d 346, 349 (1st Cir. 1997). Rule 69(a) provides:

> A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution--and in proceedings supplementary to and in aid of judgment or execution--must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

Fed. R. Civ. P. 69(a). As Plaintiffs do not claim that any federal statute is "appli[cable]," id., the procedure for

executing on the instant judgment is governed by Rhode Island law, see Milliken & Co. v. Haima Group Corp., CASE NO. 08-22891-MC-KING/TURNOFF, 2009 U.S. Dist. LEXIS 72911, at *17 (S.D. Fla. June 25, 2009)("[T]his Court is bound by the procedure of the state in which the district court is located and the state court's interpretation of same.")(citing Fed. R. Civ. P. 69) (internal quotation marks omitted); F.D.I.C. v. Consol. Mortgage & Fin. Corp., 735 F.Supp. 456, 458 n.6 (D.P.R. 1990)("Under our Rule 69, we are to apply local law on execution of federal district court judgments.").

Rhode Island Gen. Laws § 9-28-3 provides:

> On the filing of an application by a judgment creditor, execution on whose judgment has been returned either wholly or in part unsatisfied and unpaid, the clerk or a justice of the court rendering the judgment, or if the judgment is rendered in the superior court in a case in which the writ was returnable to a district court, then and in such case the clerk or justice of the district court to which the writ was returnable, if the papers in the case shall have been transmitted to the district court as hereinafter provided, shall issue a citation to the judgment debtor to appear at a time and place named therein to show cause why an examination into his or her circumstances should not be made and a decree be entered ordering him or her to pay the judgment in full or by instalment, weekly, monthly, or otherwise. The citation shall be made returnable to the court by which it was issued and shall be served by delivering a copy to the debtor or by leaving a copy at the last and usual place of abode of the debtor with some person living there at least six (6) days before the return day named therein.

R.I. Gen. Laws § 9-28-3 (1997 Reenactment).

Defendants argue initially that "[n]othing in § 9-28-3 or the Rhode Island decisions that have construed it empower this

Court to order relief against non-US debtors and assets located outside of the United States." Opposition at 9. Defendants assert that in order for such relief to be proper Rhode Island would have to enact legislation to confer that authority on Rhode Island courts. See id. As support for their position, Defendants cite the text of § 9-28-3, which they contend "clearly presumes that the 'debtor' will be physically present in the state or possess an 'abode' here." Id. at 10.

The Court is not so persuaded. While the statute permits service the citation by leaving a copy at a debtor's abode, see R.I. Gen. Laws § 9-28-3, such service is merely an option in addition to allowing service on the debtor irrespective of his abode, see id. Under Defendants' reading of the statute, a judgment debtor who works in Rhode Island but lives in Massachusetts or Connecticut would be immune to the supplementary proceedings authorized by § 9-28-3. This Court declines to attribute such an unreasonable meaning to the statute. See Landrigan v. McElroy, 457 A.2d 1056, 1060-61 (R.I. 1983)("This court will not attribute to the Legislature an intent that would result in absurdities or would defeat the underlying purpose of legislation.").[9]

_____

[9] Defendants argue in a footnote that service of the citations was not proper because it was made on their counsel of record and not upon Defendants themselves. See Opposition at 10 n.3 (asserting that "because the statute does not by its own terms allow service upon counsel, the Court lacks authority to enter the Plaintiffs' requested order ..."). The Court finds this argument unpersuasive. See

Defendants also cite <u>Baxter State Bank v. Bernhardt</u>, 186 F.R.D. 621 (D. Kan. 1999), as supporting their contention that this Court lacks authority to enter the relief requested by Plaintiffs.  <u>See</u> Opposition at 10 (citing <u>Baxter State Bank</u>, 186 F.R.D. at 624)("Kansas courts have no jurisdictional authority to order a non-resident judgment debtor to bring out-of-state property into Kansas to satisfy a judgment."); <u>see also</u> <u>Baxter State Bank</u>, 186 F.R.D. at 625 (concluding that the court "has no power to order defendant .... to bring out-of-state property before this court in satisfaction of the presently unpaid judgment").  However, <u>Baxter State Bank</u> relies solely on the decision of an intermediate Kansas appellate court in <u>Elkhart Cooperative Equity Exchange v. Hicks</u>, 823 P.2d 223 (Kan. Ct. App. 1991), <u>see</u> <u>Baxter State Bank</u>, 186 F.R.D. at 624-25, and it

---

<u>Plushner v. Mills</u>, 429 A.2d 444, 445-46 (R.I. 1981)(rejecting defendant's claim that state district court lacked jurisdiction over him because of plaintiff's failure to serve him with process in the manner provided by district court rules where "actual notice was received by both defendant and his attorney shortly after the original service and ... defendant was not prejudiced by [the] method of service"); <u>Toy v. Toy</u>, 276 A.2d 754, 489 (R.I. 1971)(holding that "the Family Court, having jurisdiction of the parties, had the authority to order petitioner to pay counsel fees" and that "service on [petitioner's] counsel was sufficient to bind petitioner and actual service on petitioner was not required"); <u>see also</u> <u>Greenfield Hill Invs., LLC v. Miller</u>, 934 A.2d 223, 225-26 (R.I. 2007)(rejecting contention that plaintiff was required to serve and file a copy of amended complaint after motion to amend was granted where it was "an undisputed fact that defendant's attorney of record was served by mail with the amended complaint").  The Court is satisfied that it has jurisdiction over Defendants, that Defendants have notice of the Motion, and that they have not been prejudiced by the lack of personal service upon them.  Accordingly, service upon Defendants' counsel is sufficient.

appears that the Elkhart court's conclusion that "[r]ecent case law in other jurisdictions limits judgment creditors to obtaining property located in the situs jurisdiction," Elkhart, 823 P.2d at 226, is no longer valid. The Elkhart court cited Gavilanes v. Matavosian, 475 N.Y.S.2d 987, 989-90 (N.Y. Civ. Ct. 1984), for the proposition that an "examination in aid of attachment must be limited to property within the jurisdiction," Elkart, 823 P.2d at 226 (citing Gavilanes). While this precise proposition continues to be true under New York law, see Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., 836 N.Y.S.2d 4, 10 (N.Y. App. Div. 2007)("In order to be subject to attachment, property must be within the court's jurisdiction.")(quoting Matter of Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Advanced Empl. Concepts, 703 N.Y.S.2d 3, 4 (N.Y. App. Div. 2000)), New York case law does not, as the Elkart court erroneously believed, support the proposition that judgment creditors are limited to obtaining property located in the situs jurisdiction, see Elkart, 823 P.2d at 226. In fact, New York case law is directly at odds with this proposition. See Gryphon Domestic VI, LLC, 836 N.Y.S.2d at 4 (rejecting contention that a turnover order cannot reach property outside of New York); id. at 4-5 ("In Miller v. Doniger [814 N.Y.S.2d 141 (N.Y. App. 2006)] and Starbare II Partners v. Sloan [629 N.Y.S.2d 23 (N.Y. App. 1995)], this Court squarely held that the defendant judgment debtors could be ordered to turn over out-of-state assets to a

New York Sheriff."); <u>see also</u> <u>id.</u> at *5 (rejecting contention "that <u>Miller</u> and <u>Starbare</u> should be limited to situations where a judgment debtor removes property from New York" since "the explicit rationale was that the court could order the defendant judgment debtor to turn over property because it had personal jurisdiction over the defendant"); <u>id.</u> ("[A] turnover order merely directs a defendant, over whom the New York court has jurisdiction, to bring its own property into New York.");[10] <u>In re Gaming Lottery Sec. Litig.</u>, No. 96 CIV.5567(RPP), 2001 WL 123807, at *2 (S.D.N.Y. Feb. 13, 2001)(rejecting argument that "this Court does not have jurisdiction to enter a turnover order or an installment payment order because the assets of [judgment debtor] are not located in the Southern District of New York"); <u>id.</u> at *3 (holding that funds held in judgment debtor's "name in an account at the Royal Bank of Scotland are on their face subject to the

---

[10] The <u>Gryphon Domestic VI, LLC v. APP International Finance Co.</u>, 836 N.Y.S.2d 4 (N.Y. App. Div. 2007), court drew a distinction between attaching a bank account located outside of New York, an act for which a New York court lacked authority, <u>see id.</u> at *10 ("the court was without authority to *attach* bank accounts outside of New York") (quoting <u>Matter of Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Advanced Empl. Concepts</u>, 703 N.Y.S.2d 3, 4 (N.Y. App. Div. 2000)); <u>see also</u> <u>id.</u> ("In order to be subject to *attachment*, property must be within the court's jurisdiction."), and ordering defendants to turn over bank accounts, property, and stock certificates which were not located in New York, <u>see id.</u> at *8 (stating that the lower court's "turnover order properly should have included bank accounts"); <u>id.</u> ("the turnover order should have included the defendants' property in Indonesia"); <u>id.</u> at *10-11 (directing defendant "to turn over stock certificates wherever located, execute appropriate documents transferring ownership of its subsidiaries to plaintiffs if such ownership is evidenced in some form other than stock certificates, and turn over the bank accounts ...").

full possession and control of [the judgment debtor] and thereby available to judgment creditors ...").

In addition, case law decided since the Elkart decision casts further doubt on the correctness of the court's conclusion that case law in other jurisdictions limits judgment creditors to obtaining property located in the situs jurisdiction. See World Fuel Servs. Corp. v. Moorehead, 229 F.Supp.2d 584, 587 (N.D. Tex. 2002)("Texas courts ... have applied the turnover statute to reach a wide variety of property, including[] corporate stock in the hands of third parties and held out of state, D.A. Childre v. Great Southwest Life Ins. Co., 700 S.W.2d 284, 288 (Tex. App.-Dallas 1985, no writ); shares of stock and accounts receivable, Arndt v. National Supply Co., 650 S.W.2d 547, 549 (Tex. App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.); and promissory notes, Matrix, Inc. v. Provident Am. Ins. Co., 658 S.W.2d 665, 668 (Tex. App.-Dallas 1983, no writ).")(alteration in original).

The Elkart court also acknowledged the contrary authority of Wilson v. Columbia Cas. Co., 160 N.E. 906, 908 (Ohio 1928) (holding that an Ohio court could order a judgment debtor over whom it had jurisdiction to take such action as was necessary to have funds held in trust for defendant in Pennsylvania applied to satisfaction of the judgment). See Elkart, 823 P.2d at 226. The Elkart court distinguished Wilson on the basis that in Wilson the debtor had sent the funds outside the state to avoid collection

16

and that there was no evidence that the defendant in Elkart had removed property from Kansas to Oklahoma to avoid having the funds used to satisfy the plaintiff's judgment.  See id.  While it is true that the defendant in Wilson initially received the sum in question and then sent it to his brother in Pennsylvania "to hold in trust for him," Wilson, 160 N.E. at 907, and the court commented on this circumstance, see id. at 908 ("It would indeed be a strange theory of the law which would hold that a judgment debtor could exonerate himself from obligation to apply his property to the satisfaction of his judgment debts by merely sending it out of the state and placing it in the hands of other persons."), this Court does not read Wilson as turning on that fact.  Rather, the determinative fact appears to have been, as in the instant case, that "[t]he jurisdiction of the court over the defendant was undoubted."  Wilson, 160 N.E. at 908; cf. Gryphon Domestic VI, LLC, 836 N.Y.S.2d at 5 (rejecting argument that power to order defendant judgment debtors to turn over out-of-state assets to a New York sheriff is limited to situations where the judgment debtor removes property from New York).

In light of the thinness of the support for the Elkart court's conclusion, this Court does not find the Baxter State Bank opinion (upon which Elkart relies) to be persuasive authority.  Far more persuasive are the cases which point in the opposite direction.  See Koehler v. Bank of Bermuda Ltd., 544

17

F.3d 78, 85 (2nd Cir. 2008)("It seems clear that a court sitting in New York, that has personal jurisdiction over a judgment debtor, may order the judgment debtor himself to deliver property into New York.")(citing Gryphon Domestic VI, LLC, 836 N.Y.S.2d at 9; Starbare II Partners, L.P., 629 N.Y.S.2d at 23); Dalton v. Meister, 239 N.W.2d 9, 14 (Wis. 1976)("A state has power to exercise judicial jurisdiction to order a person, who is subject to its judicial jurisdiction, to do, or not to do, an act in the state, although the carrying out of the decree may affect a thing in another state.")(quoting Restatement 2d, Conflict of Laws 2d, p. 189, sec. 55);[11] id. ("Wisconsin courts may issue in personam orders which may operate on out-of-state property."); see also Clark v. Allen, 139 F.3d 888, 1998 WL 110160, at *7 (4th Cir. 1998)(unpublished opinion)("Under West Virginia law, [judgment debtors] could be required to turn over property in their possession, including the deed to [judgment debtor]'s home in Florida."); In re Martin, 145 B.R. 933, 948 (N.D. Ill. 1992) ("Where property is located out of state, an Illinois court would have *in personam* jurisdiction to order a judgment debtor to apply that property to satisfy the judgment.").

---

[11] It bears noting that the Rhode Island Supreme Court also cited the Restatement (Second) Conflict of Laws (1971), in holding that once the Rhode Island family court obtained jurisdiction over a defendant for purposes of a suit, "that jurisdiction continued (and still continues) ... for any proceeding arising out of the original cause of action." Brown v. Brown, 387 A.2d 1051, 1054 (R.I. 1978). Therefore, the family court had authority to prohibit the defendant from proceeding with a suit for divorce in another state. Id. at 1056.

This Court also finds support for its conclusion that § 9-28-3 authorizes the relief sought by Plaintiffs in the opinions of the Rhode Island Supreme Court which recognize the broad power of Rhode Island courts to compel or prohibit actions by defendants who are subject to jurisdiction in this state.  See Matarese v. Calise, 305 A.2d 112, 117 (R.I. 1973)(agreeing "with the trial justice's conclusion that the court had jurisdiction over the person of defendant and, therefore, had power to order a conveyance even though the land was situated outside the territorial limits of this state[12]"); see also Brown v. Brown, 387 A.2d 1051, 1054 (R.I. 1978)(finding that the Rhode Island family court had power to prohibit a respondent, who was subject to its personal jurisdiction, from proceeding with divorce proceeding in another state); id. ("the court had already obtained jurisdiction over his person for purposes of this suit, and that jurisdiction continued (and still continues), regardless of respondent's place of domicile")(internal citation omitted). The state supreme court has also drawn a distinction between orders which operate directly upon a defendant who is subject to a court's jurisdiction and orders which attempt to operate indirectly upon real estate in another jurisdiction.  See Christensen v. Christensen, 397 A.2d 900, 901-02 (R.I. 1979)

---

[12] In fact, the land in question was located in Italy.  See Matarese v. Calise, 305 A.2d 112, 114 (R.I. 1973).

(vacating family court order placing lien on out-of-state real property owned by husband and distinguishing "those judgments which indirectly act on foreign real estate through the court's jurisdiction over the parties before it")(citing <u>United States v. Ross</u>, 302 F.2d 831, 834 (2nd Cir. 1962)); <u>see also</u> <u>United States v. Ross</u>, 302 F.2d at 834 ("Personal jurisdiction gave the court power to order Ross to transfer property whether that property was within or without the limits of the court's territorial jurisdiction."); <u>cf.</u> <u>Desper v. Talbot</u>, 727 A.2d 1233, 1235 (R.I. 1999)(holding that § 9-28-1 permits the superior court to order a defendant executrix to execute a quit-claim deed conveying the decedent's equity interest in Massachusetts real estate to plaintiff); <u>id.</u> (holding that trial justice "erred in concluding that the Superior Court lacked subject matter jurisdiction over [plaintiff]'s civil action in the nature of creditor's bill seeking to reach and apply [defendant]'s equity in the [Massachusetts] property in order to satisfy her judgment upon which an execution had been returned wholly unsatisfied.").

In sum, because Defendants are subject to the jurisdiction of this Court, <u>see</u> <u>Ungar II</u>, 325 F.Supp.2d at 48-59 (finding personal jurisdiction over Defendants), it has the authority to enter the order requested by Plaintiffs.[13]  Defendants' complaint

---

[13] It bears noting that Defendant did not challenge on appeal this Court's finding that it has personal jurisdiction over them.  <u>See</u> <u>Ungar III</u>, 402 F.3d at 276 (listing three points of error raised by

that neither they, nor any of their assets, are, or ever have been, physically present in Rhode Island, is immaterial.  So long as Defendants are subject to the Court's jurisdiction, they may be ordered to take the requested action to satisfy the judgment. See Koehler, 544 F.3d at 85; Dalton, 239 N.W.2d at 14; Clark, 1998 WL 110160, at *7; In re Martin, 145 B.R. at 948; see also Matarese, 305 A.2d at 117; Desper, 727 A.2d at 1235; Christensen, 397 A.2d at 902 (citing Ross, 302 F.2d at 834).

**B.  Should the Question Be Certified?**

Defendants alternatively suggest that the question of whether this Court has authority to enter the order requested by Plaintiffs should be certified to the Rhode Island Supreme Court. See Opposition at 10.  The Court agrees with Plaintiffs that certification is unnecessary.  "When state law is sufficiently clear ... to allow a federal court to predict its course, certification is both inappropriate and an unwarranted burden on the state court."  In re Citigroup, Inc., 535 F.3d 45, 62 (1st Cir. 2008)(quoting Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 14 (1st Cir. 2002))(alteration in original); accord In re Engage, Inc., 544 F.3d 50, 53 (1st Cir. 2008)("[E]ven in the absence of

---

Defendants on appeal).  Accordingly, the finding has been conclusively established, and Defendants may not dispute it here.  See World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1164 (D.C. Cir. 2002)("Unlike subject matter jurisdiction, a party waives the right to dispute personal jurisdiction by failing to contest it on appeal.").

controlling precedent, certification would be inappropriate where state law is sufficiently clear to allow us to predict its course."); see also In re Citigroup, Inc., 535 F.3d at 62-63 ("Although the Supreme Courts of Florida and Georgia have not addressed the precise questions before us today, the state law on these issues is clear and well-established."); Fischer v. Bar Harbor Banking & Trust Co., 857 F.2d 4, 7 (1st Cir. 1988) (explaining that "[t]he decision whether to certify a state law issue to the state's high court in a given case rests in the sound discretion of the federal court" and that "[i]n the absence of a definitive ruling by the highest state court, a federal court may consider analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand")(internal quotation marks and citations omitted)(second alteration in original); cf. Boston Car Co. v. Acura Auto. Div., Am. Honda Motor Co., 971 F.2d 811, 817 n.3 (1st Cir. 1992) (rejecting suggestion for certification made for first time on appeal where "[t]here is no split of authority, the words of the statute itself provide sufficient guidance that our decision will not be merely conjectural, and we do not find the question particularly close").  Here, although the Rhode Island Supreme Court has not addressed the precise legal issue presented by the instant Motion, this Court is satisfied that it is able to

predict with reasonable confidence the resolution of that issue.

In addition, certification would unduly delay this matter. Plaintiffs obtained their judgment in 2004, and they have been battling to collect it since that time. Plaintiffs' complaint that "defendants' request for certification is just their latest tactic to delay enforcement of the judgment," Reply Mem. at 13, is not without justification. Accordingly, the Court rejects Defendants' alternative request for certification.

## V. Entitlement to Relief

Defendants next argue that even if the Court has the authority to issue the order requested by Plaintiffs, it should not do so because Plaintiffs have not demonstrated that they are entitled to such an order. See Opposition at 11.

### A. Burden of Proof

In particular, Defendants contend that Plaintiffs have not met their burden of demonstrating that Defendants have the ability to pay the judgment. See id. at 13 (citing Ciccone v. Ciccone, 204 A.2d 819 (R.I. 1964)); see also Ciccone, 204 A.2d at 820 (rejecting contention that R.I. Gen. Laws § 9-28-4[14] imposes

---

[14] R.I. Gen. Laws § 9-28-4 states:

A judgment debtor upon whom the citation shall be served as provided in § 9-28-3 shall be obliged to appear in court in person in response to the citation as therein commanded, and for failure to so appear, may be proceeded against as provided by chapter 17 of this title in the case of a witness duly summoned who fails to appear as commanded. At the hearing on the citation, the court shall make inquiry by examination of the judgment debtor, or otherwise, as to his or her

an obligation on judgment debtor to offer affirmative evidence as to what his financial needs are for the support of himself and family). Plaintiffs dispute that <u>Ciccone</u> places an initial burden on them to show that Defendants have the ability to pay the judgment and contend that the converse is true. <u>See</u> Reply Mem. at 14. In support of their contention, Plaintiffs quote the following language from <u>State v. LaRoche</u>, 883 A.2d 1151 (R.I. 2005):

> Rhode Island case law repeatedly places the burden on a party alleging inability to pay in other contexts. This Court held that before a body execution may be issued against a defendant who is a judgment debtor, the defendant must be given a hearing to determine ability to pay. <u>Landrigan v. McElroy</u>, 457 A.2d 1056, 1062 (R.I. 1983). At such a hearing it is the defendant's obligation to demonstrate an inability to pay the judgment by a preponderance of the evidence. <u>Id.</u> In addition, with regard to a defendant's inability to pay court fees, this Court has held that "[i]n every instance the burden of proving indigence in relation to the payment of the required filing fee or other element of cost is upon the party seeking such relief." <u>Silvestro v. Almonte</u>, 484 A.2d 900, 903 (R.I. 1984).

<u>Id.</u> at 1155 (alteration in original); <u>see also</u> <u>id.</u> (finding that hearing justice did not err in requiring defendant, accused of violating his probation by failing to pay restitution, "to satisfy the court that he made sufficient bona fide efforts to

---

circumstances, **his or her income** from any source, and his or her ability to pay the judgment; and if the debtor fails to appear at the time and place fixed the inquiry may proceed in his or her absence.

R.I. Gen. Laws § 9-28-4 (1997 Reenactment) (bold added).

pay restitution").

While the LaRoche decision constitutes substantial support for Plaintiffs' position, the Court finds it unnecessary to resolve this precise disagreement because, even if Defendants are correct, the Court is satisfied that Plaintiffs have met their burden based on the following evidence.

**B. Ability to Pay**

Plaintiffs have submitted a copy of the March 11, 2009, declaration of Hatem Yousef, an official of the PA,[15] which Defendants filed in Knox v. The Palestine Liberation Organization, et al., Civil Action No. 03 CV 4466 (VM)(THK) (S.D.N.Y.).  See Yousef Decl.  In his declaration, Yousef states, among other things, that:

> 9.  The State of Israel collects a variety of taxes on behalf of the Palestinian National Authority. These taxes include import taxes, petroleum taxes, value added taxes, and local purchase taxes.  In 2008, the average amount of the monthly taxes collected by the State of Israel was approximately NIS 326 million. Before, however, these tax revenues are transferred to the PNA, Israel makes significant deductions for water, electricity, and sewage services provided to the PNA.  In 2008, these deductions averaged approximately NIS 95 million per month, resulting in an average net transfer of approximately NIS 231 million of [sic] 2008.  Because the NIS-U.S. dollar exchange rate is about four NIS to one dollar, the average monthly transfer, after these deductions, is approximately $57.75 million.

---

[15] Hatem Yousef states that he has worked at the Ministry of Finance of the Palestinian National Authority since 1995 and that his "current position is that of Director General of Customs, Excise and VAT for the Ministry of Finance."  Plaintiffs' Mem., Ex. B (Declaration of Hatem Yousef ("Yousef Decl.") ¶ 4.

> 10.    Beginning with the transfers for September 2008, the State of Israel began withholding an additional NIS 18 million per month from the tax transfers pending the Israel Supreme Court decision on whether a U.S. judgment in the *Ungar* litigation is enforceable in Israel.  NIS 18 million (or 4.5 million) will be withheld until the full $116 million is attached or until the Supreme Court rules favorably for the PNA.  After the NIS 18 million deduction for the *Ungar* case, the PNA receives an average net transfer of approximately NIS 213 million per month (NIS 231 million less NIS 18 million), or approximately $53.25 million.

Yousef Decl. ¶¶ 9-10.

Plaintiffs additionally cite the October 28, 2009, decision of the Jerusalem District Court wherein that court noted that "every month tax monies are transferred from the State of Israel to the Palestinian Authority (250-300 million NIS)."  Reply Mem. at 15 (quoting Decision ¶ 2).

The Court is satisfied that these transfers to the PA by the State of Israel are cognizable income for the purpose of R.I. Gen. Laws § 9-28-4.[16]  Accordingly, the Court finds that Plaintiffs have demonstrated that Defendants have income.[17]  In

------

[16] <u>See</u> n.14.

[17] Defendants argue that the tax transfer revenues from Israel "are not due to the PLO, and therefore provide the PLO with no ability to pay the judgment.  Rather they are attached PA funds."  Opposition at 15 (internal quotation marks omitted).  Defendants further argue that Plaintiffs have not demonstrated "that the PLO has 'income' sufficient to pay the judgment," <u>id.</u>, and that "[f]or that reason alone, the motion must be denied as to the PLO," <u>id.</u>  However, Plaintiffs are seeking installment payments, not a single payment of the entire judgment, and there is evidence that the PLO has some income and assets from which it could make such payments.  <u>See</u> <u>Knox v. Palestine Liberation Org.</u>, No. 03 Civ. 4466(VM)(THK), 2009 WL 1591404, at *7 (S.D.N.Y. Mar. 26, 2009)(noting that "since the creation of the

making this finding, the Court notes that a similar finding was made by Magistrate Judge Theodore H. Katz in <u>Knox v. The Palestine Liberation Organization</u>, No. 03 Civ. 4466(VM)(THK), 2009 WL 1591404, at *10 (S.D.N.Y. Mar. 26, 2009)("There can be little doubt that the PA has a revenue stream derived from, among other sources, tariffs and taxes, some of which are collected by Israel and then paid to the Palestinian government.").

The Court further finds that from this income Defendants have the ability to make installment payments in the amount of $15 million.  <u>See</u> Opposition, Ex. A (Fourth Supplemental Declaration of Prime Minister Salam Fayyad ("Fayyad Decl.") ¶ 15 (stating that "[w]e cannot ... post more than the $15 million bond I previously offered"[18]); <u>see also</u> <u>Knox</u>, 2009 WL 1591404, at *12 (finding that "because Defendants retain significant assets and annual revenues notwithstanding their budget deficit,

_____

PA, in 1993, the PA has been the primary source of revenue for the PLO" and that "in the first quarter of 2008, the PA expended $7.2 million on PLO wages, salaries, and operating expenses"); <u>id.</u> ("Prime Minster Fayyad conceded ... that in addition to the PLO's operations account maintained by the PA, the PLO holds $10.7 million in two bank accounts in Jordan.").  Accordingly, this Court rejects Defendants' argument that there is no basis for the Court to find that the PLO has some income and assets out of which to make installment payments.

    [18] The Fourth Supplemental Declaration of Prime Minster Salam Fayyad was submitted in the <u>Knox</u> case in support of Defendants' objection to Magistrate Judge Katz's report and recommendation requiring Defendants to post as a condition of vacatur cash security in the amount of $120 million in installments.  <u>See</u> <u>Knox</u>, 2009 WL 1591404, at *11 (recommending as a condition of vacatur that "Defendants be required to post security in the amount of $20 million, with additional deposits of $5 million per month, up to a maximum of $120 million in total security").

requiring them to [post cash security in the amount of $20 million, with additional deposits of $5 million per month, up to a maximum of $120 million] should not pose an impossible or unreasonable burden on them").[19]

## C. Governmental Body Exemption

Defendants' final argument is that the PA is a governmental body akin to a municipality and that "[g]overnmental bodies generally enjoy the privilege of exemption of property from execution."  Opposition at 17 (quoting Adler v. Lincoln Hous. Auth., 623 A.2d 20, 22 (R.I. 1993))(alteration in original); see also Richmond v. Kettelle, 106 A. 292, 298 (R.I. 1919)("As a general rule, the property of a municipal corporation necessary to the exercise of its functions, such as markets, prisons, town halls, etc., or property which has been destined and set apart by statute as a source of permanent revenue for the corporation, cannot be seized or sold on execution against it.").  Therefore, according to Defendants, the Motion should be denied.

_____

[19] To the extent that Defendants may contend they have no ability to make installment payments in any amount, such contention is flatly rejected.  Defendants have already offered to post a $1 million bond in this action as a condition of vacatur.  See Memorandum in Support of Defendants' Motion to Vacate Default Judgment (filed in support of Defendants' Motion for Relief from Default Judgment) at 48.

Under Plaintiffs' requested payment schedule all installments after the first payment are contingent upon Plaintiffs releasing an equivalent amount from the attached funds in Israel.  While the Court has found that Defendants have the ability to make installment payments of $15 million (and has also concluded that payments of substantially less than $15 million would be tedious and cumbersome), Defendants' offer of $1 million is noted for Senior Judge Lagueux's information.

The Court finds this argument unpersuasive.  The instant proceeding is not an execution proceeding but a citation proceeding.  It is Plaintiffs' inability to utilize execution which is a prerequisite for use of a citation proceeding. Defendants cite no authority that a citation procedure cannot be used against a local government.  Thus, the rule which Defendants cite is inapplicable to the instant Motion.  Moreover, the Court agrees with Plaintiffs that the payment decree sought by the Motion is substantively a form of mandamus.  <u>See</u> Reply Mem. at 18; <u>see also</u> <u>Adler</u>, 623 A.2d at 24 ("'[M]andamus [is] the proper proceeding to compel payment of [a] judgment' against a municipality.")(quoting <u>Richmond</u>, 106 A. at 297)(alterations in original).

Even if the state rule which Defendants cite were applicable to the PA, state laws prohibiting execution against local governments may be preempted when there is a federal interest in enforcing the judgment:

> This court has held that when there is a federal interest in the remedy, we may trump a state's anti-seizure provision and enforce a money judgment against a public entity. <u>See</u> <u>Specialty Healthcare Mgmt.,</u> <u>Inc. v. St. Mary Parish Hosp.</u>, 220 F.3d 650, 653 (5th Cir. 2000). For example, this court has recognized that in a civil rights action, such as an action filed pursuant to 42 U.S.C. § 1988, there is a federal interest in the remedy sufficient to trump a state's anti-seizure provision. <u>E.g.</u>, <u>Bowman v. City of New Orleans</u>, 914 F.2d 711 (5th Cir. 1990); <u>Gates v. Collier</u>, 616 F.2d 1268 (5th Cir. 1980); <u>Gary W. v. Louisiana</u>, 622 F.2d 804 (5th Cir. 1980). This court has also recognized a sufficient federal interest when a state makes abundantly clear that

it will never satisfy the judgment. <u>See</u> <u>Gates</u>, 616 F.2d at 1271-72.

<u>Freeman Decorating Co. v. Encuentro Las Americas Trade Corp.</u>, 352 Fed.Appx. 921, 923, 2009 WL 3698036, at *1 (5th Cir. 2009) (unpublished opinion).

Both of the factors cited in <u>Freeman Decorating</u> are present here.  First, there is an extremely strong interest in enforcing judgments, like the Ungars' judgment, entered under the civil provisions of the Antiterrorism Act ("ATA"):

> Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations ... . [P]rivate tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism vindicate the national and international public interest.

<u>Weiss v. Nat'l Westminster Bank, PLC</u>, 242 F.R.D. 33, 50 (E.D.N.Y. 2007); <u>id.</u> at 53 ("the United States[] has a strong national interest in enforcing domestic and international anti-terrorism laws"); <u>see also</u> <u>In re Islamic Republic of Iran Terrorism Litig.</u>, 659 F.Supp.2d 31, 79 (D.D.C. 2009)(noting "the federal interest in deterring terrorist attacks and compensating victims").

Second, Defendants have made it "abundantly clear that [they] will never satisfy the judgment." <u>Freeman Decorating</u>, 2009 WL 3698036, at *1.  Accordingly, both conditions for trumping the Rhode Island law (or policy) of which Defendants seek to avail themselves are present.  Thus, even if it were applicable, this Court finds that it should be preempted.

## VI.    Summary

The Court declines to defer action on the Motion until after
Judge Lagueux's decision on the pending motion for vacatur
because Defendants have not sought a stay of enforcement under
Rule 62(b)(4) and Plaintiffs will be forced to expend additional
resources in enforcement actions in other jurisdictions unless
they obtain relief here.  Defendants' argument that the Court
lacks authority under R.I. Gen. Laws § 9-28-3 to grant the relief
requested is rejected because Defendants are subject to personal
jurisdiction.  There is no need to certify the question of such
authority to the Rhode Island Supreme Court as the way in which
that court would answer the question can be reasonably predicted
from its prior decisions.  Even if Plaintiffs bear the burden of
demonstrating that Defendants have the ability to make
installment payments, the Court finds that they have met that
burden.  Based on the Fayyad Decl., Defendants have the ability
to make an initial installment payment of $15 million.  Because
the Court has the ability to make all subsequent installment
payments contingent on Plaintiffs' release of an equivalent
amount of funds, Defendants have the ability to continue making
installment payments until the entire amount of the judgment has
been paid.  Lastly, the rule that municipalities are exempt from
executions is inapplicable to the PA because the instant
proceeding is not an execution.  Even if it were applicable, the

31

rule would be preempted because of the strong federal interest in deterring terrorist attacks and compensating the victims of such attacks.

## VII.  Conclusion

For the reasons stated above, the Motion for Payment Decree is GRANTED.  Defendants are ordered to make an initial installment payment to the Ungars of $15 million by June 1, 2010. The Ungars are ordered to release $15 million of the funds attached in Israel within three days after receipt of the initial installment of $15 million from Defendants.  Defendants are ordered to make a second installment payment of $15 million to the Ungars within three days of receiving the funds released from attachment in Israel.  The Ungars are ordered to release an addition $15 million of the funds attached in Israel within three days after receipt of the second installment.  Thereafter, Defendants and the Ungars are ordered to continue this process with Defendants making installment payments of $15 million[20] and the Ungars releasing that amount of attached funds within three days of receiving each installment until the full amount of the judgment against the PA ($116,421,048) has been paid to the Ungars.

---

[20] After seven installments of $15 million, the unpaid balance of the judgment against the PA will be $11,421,048 million ($116,421,048 - $105,000,000 (7 x $15 million = $105 million) = $11,421,048).  Thus, the final installment payment will be $11,421,048, and the final release of attached funds will be $11,421,048.

So Ordered.

ENTER:

/s/ David L. Martin
David L. Martin
United States Magistrate Judge
May 12, 2010