# McINTYRE, TATE, & LYNCH LLP

### Counsellors at Law

JERRY L. McINTYRE †
DEBORAH MILLER TATE *Δ
WILLIAM J. LYNCH
DAVID J. STRACHMAN *
ROBERT S. PARKER *
ROBERT J. SGROI †

Also member
† New York Bar
* Massachusetts Bar
Δ Florida Bar

April 13, 2010

**_BY HAND DELIVERY_**

Hon. David L. Martin
United States Magistrate Judge
United States District Court
District of Rhode Island
John O. Pastore Federal Building
Two Exchange Terrance
Providence, Rhode Island 02903-1779

Re: _Ungar v. Palestinian Authority et al._, Civ. No. 00-105L

Dear Magistrate Judge Martin,

I write to reply briefly to Mr. Hibey's letter of April 9, 2010.

Mr. Hibey's request that Your Honor "table" the Ungars' motion (which is a camouflaged request for an unsecured stay) effectively seeks to countermand Judge Lagueux's referral of the motion to Your Honor for a decision. Defendants are free to move for a stay of enforcement under Rule 62(b)(4), and if they do so Judge Lagueux will either decide that motion himself or refer it to Your Honor. But unless and until defendants make and the Court grants a motion for a stay, they have no legal basis to challenge Judge Lagueux's referral of the Ungars' motion to Your Honor for a decision.

Mr. Hibey's assertion that the Ungars are "adequately protected" by their existing enforcement proceedings is utterly false. There is not the slightest guarantee that the Ungars will ever see a penny of the funds now restrained by them. The Ungars will receive the funds in Israel only if they convince the Israeli Supreme Court to reject both (1) defendants' appeal of the decision domesticating their judgment and (2) defendants' assertions that the restrained tax funds are not subject to attachment. Since the Israeli Supreme Court has never ruled whether a treble damages judgment is enforceable in Israel or whether the tax funds are subject to execution, the Ungars' chance of receiving those funds is questionable at best – and would require many more years of litigation.

Likewise, the Ungars' chances of executing against the funds restrained in New York are wholly speculative and depend on the resolution of sharply contested factual

disputes regarding the ownership of the funds.[1] Indeed, the Ungars have just suffered a major set-back in one of their New York proceedings.[2]

Moreover, defendants should not even be heard to argue that the Ungars are "adequately protected" by the existing enforcement proceedings, considering that the defendants are aggressively fighting and seeking to extinguish those very proceedings (and causing the Ungars enormous expenses in the process).

Mr. Hibey's claim that it would be "difficult to unwind" – i.e. to recoup – the installment payments in the event of vacatur is just as baseless. The Ungars have already acknowledged that defendants could make the payments into the registry of the Court in order to obtain a stay under Rule 62(b)(4), and the funds would therefore be returned to the defendants instantly and in full if and when the Court so directed.

Mr. Hibey's claim that the First Circuit called for "exercise of caution" regarding enforcement is also incorrect. The First Circuit did not imply, much less say, any such thing. Nor is there anything "incautious" in the relief requested by the Ungars. On the contrary, granting that relief would result in the full amount of the judgment resting safely in the Court's registry, the other funds restrained by the Ungars being released and their multiple enforcement proceedings being mooted. Nothing could be more sensible.

Finally, Mr. Hibey's argument that the Ungars' motion should be "tabled" because the amount of the judgment (which Your Honor calculated on the basis of a detailed analysis and comparison to precedents in other terrorism cases[3]) would not withstand "adversarial testing" is a non sequitur. The defendants could seek to challenge the amount of the judgment only if their Rule 60(b) motion is granted. Thus, defendants' plan to challenge the amount of the judgment if the Rule 60(b) motion is granted cannot constitute grounds to stay the Ungars' motion. This argument also makes no sense, considering that the full amount of the judgment has already been restrained.

Indeed, in light of the fact that the full judgment amount is already restrained (though, as discussed *supra*, by no means ultimately available to the Ungars) it is clear that the defendants oppose the Ungars' motion for one reason only: they do not intend to

---

[1] *See e.g. Strachman v. Palestinian Authority*, --- N.Y.S.2d ----, 2010 WL 1203662 (N.Y.A.D. 1 Dept. March 30, 2010).

[2] *See Palestine Monetary Authority v. Strachman*, --- N.Y.S.2d ----, 2010 WL 1286809 (1st Dept. April 6, 2010) (vacating turnover judgment obtained by the Ungars).

[3] Larger awards have been given in contested terrorism cases. *See Boim v. QLI*, 2005 WL 433463 (N.D.Ill. 2005) (Court denied motion to set aside a jury award of $156 million to the parents of an American teenager murdered by Hamas and found that it "simply cannot agree [that] the damages award was excessive" considering "the nature of the case (one seeking damages for the murder of a son in a brutal and senseless terrorist act), and given the nature of the relationship between the victim and the plaintiffs (child/parent)." *Id*. at 5.

honor the judgment if their Rule 60(b) motion is denied. But Rule 60(b) was not intended to facilitate "heads-I-win-tails-you-lose" gamesmanship of this sort, and defendants should not be permitted to abuse it for that purpose.

Sincerely,

David J. Strachman

cc:    Richard Hibey (via fax 202-628-0850)
       Mark Rochon (via fax 202-628-0850)
       Brian A. Hill (via fax 202-626-5801)
       Deming E. Sherman (via fax 401-276-6611)