# EXHIBIT 1

798192.1

LEXSEE 402 F.3D 274, AT 281


Positive
As of: Apr 30, 2007

EFRAT UNGAR ET AL., Plaintiffs, Appellees, v. THE PALESTINE LIBERATION ORGANIZATION ET AL., Defendants, Appellants.

No. 04-2079

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

402 F.3d 274; 2005 U.S. App. LEXIS 5153

March 31, 2005, Decided

**SUBSEQUENT HISTORY:** As Amended May 20 2005. Related proceeding at *Biton v. Palestinian Interim Self-Government Auth.*, 412 F. Supp. 2d 1, 2005 U.S. Dist. LEXIS 17784 (D.D.C., 2005)
US Supreme Court certiorari denied by *PLO v. Ungar*, 126 S. Ct. 715, 163 L. Ed. 2d 575, 2005 U.S. LEXIS 8637 (U.S., 2005)
Related proceeding at *Estate of Ungar v. Palestinian Auth.*, 2006 U.S. Dist. LEXIS 27384 (D.D.C., May 9, 2006)

**PRIOR HISTORY:** [**1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND. [Hon. Ronald R. Lagueux, Senior U.S. District Judge]. *Estates of Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15, 2004 U.S. Dist. LEXIS 12823 (D.R.I., 2004)

**DISPOSITION:** Affirmed.

**COUNSEL:** Ramsey Clark, with whom Lawrence W. Schilling, Deming E. Sherman, and Edwards & Angell, LLP were on brief, for appellants.

David J. Strachman, with whom McIntyre, Tate, Lynch & Holt was on brief, for appellees.

Daniel J. Popeo, Richard A. Samp, Joel J. Sprayregen, and Jared M. Wayne on consolidated brief for Washington Legal Foundation and Allied Educational Foundation, amici curiae.

**JUDGES:** Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Lipez, Circuit Judge.

**OPINION BY:** SELYA

**OPINION:**

[*276] **SELYA, Circuit Judge.** This appeal raises exceptionally important questions of justiciability and sovereignty, emblematic of unsettled political conditions that have plagued the Middle East for many years. In it, the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) ask us to countermand the district court's refusal to dismiss the action [**2] against them. They contend that the case hinges on a nonjusticiable political question and that, at any rate, the defendants enjoy sovereign immunity. In the event that these arguments do not carry the day, the defendants seek vacation of two $ 116,000,000-plus default judgments, one entered against each of them, on the ground that they were entitled to a binding determination of sovereign immunity (including appellate review of any unfavorable decision) before being forced to bear the burdens of litigation.

After careful consideration of the relevant legal authorities and perscrutation of an amplitudinous record, we conclude that this case is justiciable; that the defendants have not established an entitlement to sovereign immunity; and that the defendants' strategic litigation choices undercut their arguments as to the sequencing of the litigation. Consequently, we affirm the judgment below.

## I. BACKGROUND

appellate review) before being required either to answer the complaint or to submit to discovery.

> n3 The amounts differed slightly. The recommended judgment against the PA was for $ 116,421,048 and the recommended judgment against the PLO was for $ 116,415,468. The reasons for this minor disparity are not material to the issues on appeal.

[**12]

Meanwhile, the district court had been pursuing the course charted by the defendants. On April 23, 2004, it denied the defendants' renewed motion to dismiss the amended complaint. *Estates of Ungar v. Palestinian Auth.*, 315 F. Supp. 2d 164, 187 (D.R.I. 2004) (Ungar III). The court hewed to its earlier rejection of the defendants' nonjusticiability thesis. See *id.* at 173-74 (referencing *Ungar II*, 228 F. Supp. 2d at 44-47). Next, the court held that the FSIA and *section 2337(2)* of the ATA were two sides of the same coin with respect to sovereign immunity. *Id.* at 174-75. This left only a single question: "whether the PA and/or the PLO represent or constitute a foreign State and are thus entitled to sovereign immunity." *Id.* at 175. The court answered that question in the negative. *Id.* at 176-87. The plaintiffs immediately moved to amend the court's order pursuant to *Fed. R. Civ. P. 59(e)*, arguing that the sovereign immunity defense had been waived. The defendants did nothing.

On July 12, 2004, the district court went down the plaintiffs' path. It adopted the magistrate judge's [**13] "default judgment" report and recommendation in its totality, overruled the defendants' objections thereto, and denied the plaintiffs' motion to amend Ungar III. See *Estates of Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15, 21-22, 26-28 (D.R.I. 2004) (Ungar IV). In the course of that decision, the court rebuffed the defendants' claim that they were entitled to a full review of their sovereign immunity defense before being required to answer the complaint or proceed further. *Id.* at 23-24. The court then ordered judgment for the plaintiffs in the recommended amounts. *Id.* at 28. This appeal ensued.

## II. JUSTICIABILITY

The defendants maintain that the complaint against them should have been dismissed because it presents a non-justiciable political question. We find this argument unconvincing.

In *Baker v. Carr, 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962)*, the Supreme Court provided guidance as to the [*280] attributes of a nonjusticiable political question. The Court explained that "it is the relationship between the judiciary and the coordinate branches of the Federal Government [**14] . . . which gives rise to the 'political question.'" *Id.* at 210. Withal, not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211. Determining justiciability requires an "analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id.* at 211-12. The Court then set forth six tests designed to confirm or negate the existence of a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political [**15] decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. The Court explained, in a later case, that "these tests are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer, 541 U.S. 267, 124 S. Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004)*.

The defendants assert with little elaboration that the central issue in this case fails each of the six tests. Most of their argumentation presumes that the district court intruded into forbidden territory when it interpreted an array of United Nations resolutions and Israeli-PLO agreements in a politically controversial manner. To this they add that the default judgment entered by the district court was so huge that it amounted to a political statement.

The defendants' position rests on a misunderstanding of the fundamental nature of this action. This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism. The defendants are organizations that [**16]

allegedly violated the statute. They have attempted to avoid liability by wrapping themselves in the cloak of sovereign immunity. The question we must answer, then, is whether the defendants have set forth sufficient evidence to support their claim of immunity -- no more and no less.

On this view of the case, the plaintiffs easily clear the six *Baker* hurdles. To begin, the lower court's immunity decision neither signaled an official position on behalf of the United States with respect to the political recognition of Palestine nor amounted to the usurpation of a power committed to some other branch of government. After all, Congress enacted the ATA, and the President signed it. The very purpose of the law is to allow the courts to determine questions of sovereign immunity under a legal, as opposed to a political, regime. n4 Seen in this light, the [*281] district court's decision denying immunity did not impede the constitutional prerogatives of the political branches over foreign policy. See generally *Baker, 369 U.S. at 211 & n.31* (noting that the Constitution commits foreign relations to the executive and legislative branches, thus permitting them to determine what [**17] "may be done in the exercise of this political power").

> n4 The FSIA operates in the same fashion. See *28 U.S.C. § 1602* ("The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts."); H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6606 ("A principle purpose of [the FSIA] is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds . . . .").

The second and third *Baker* hurdles present no insuperable obstacles here. The district court had access to judicially manageable standards for resolving the issue before it, see infra Part [**18] III(A), and those standards did not require the court to make nonjudicial policy determinations. Both sides agreed that the definition of a "state" under the relevant statutes was informed by an objective test rooted in international law and articulated in the Restatement (Third) of Foreign Relations. Under these circumstances, the determination of whether the defendants have adduced sufficient evidence to satisfy that definition is quintessentially appropriate for a judicial body. See *Kadic v. Karadzic, 70 F.3d 232, 249 (2d Cir. 1995)*

The final three hurdles need not concern us. These tests are "relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." Id. Here, the political branches have enacted a law that leaves undiminished their ability either to recognize or withhold recognition from foreign states, while leaving to the courts the responsibility of determining the existence vel non of statehood for jurisdictional purposes. Moreover, the district court's resolution of that question [**19] is not incompatible with any formal position thus far taken by the political branches. By the same token, its jurisdictional decision does not turn a blind eye to any position expressed by those responsible for conducting the nation's foreign relations. Cf. *Republic of Austria v. Altmann, 541 U.S. 677, 124 S. Ct. 2240, 2255, 159 L. Ed. 2d 1 (2004)* (noting that the State Department has retained authority to file "statements of interest suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity"). As a result, the decision did not signify a lack of respect for, or conflict with, the wishes of the political branches. No more is exigible for this purpose. See *Baker, 369 U.S. at 212-13* (endorsing judicial competence in matters touching on foreign relations in the absence of any "conclusive governmental action" or "recognizedly authoritative executive declaration") (citation and internal quotation marks omitted).

The defendants make a number of specific arguments, but these are largely derivative of their disagreement with the result reached by the district court. Their unhappiness is understandable, [**20] but legally irrelevant. The reality is that, in these tempestuous times, any decision of a United States court on matters relating to the Israeli-Palestinian conflict will engender strong feelings. Be that as it may, the capacity to stir emotions is not enough to render an issue nonjusticiable. For jurisdictional purposes, courts must be careful to distinguish between political questions and cases having political overtones. See *Klinghoffer, 937 F.2d at 49*.

[*282] The one remaining argument that warrants particularized attention is the defendants' assertion that the district court made a political statement in calibrating the size of the award. That assertion is wholly unsupported. The judgment reflects the wrongful death of a youthful man and includes a trebling of damages as mandated by law. See *18 U.S.C. § 2333(a)*. It also includes attorneys' fees. See id. The defendants have not challenged either the measure of damages utilized by the lower court or the integrity of its mathematical computations. We add, moreover, that even if the court erred on

the side of generosity -- a matter on which we take no view -- a mere error in the calculation [\*\*21] of a damages award would not implicate the propriety of federal subject matter jurisdiction. We therefore reject the defendants' "political statement" assertion as meritless.

To say more on this aspect of the case would be supererogatory. The short of it is that the political question doctrine does not preclude judicial resolution of the plaintiffs' case. We turn, therefore, to the merits of the sovereign immunity defense.

### III. SOVEREIGN IMMUNITY

We divide our discussion of the defendants' sovereign immunity defense into segments, starting with the legal framework and historical background. We then proceed to the merits.

#### A. The Legal Landscape.

The FSIA, with exceptions not relevant here, provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States." *28 U.S.C. § 1604*. Although the statute does not define the term "foreign state," it makes pellucid that the term includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id. § 1603 (a)*. It also defines what constitutes an agency or instrumentality of a foreign state. *Id. § 1603(b)*.

The [\*\*22] ATA contains analogous language. It provides that no civil action thereunder may be maintained against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority." *18 U.S.C. § 2337(2)*. Like the FSIA, the ATA contains no definition of the term "foreign state."

Because the two statutory regimes use language that is similar but not identical, the first -- and most obvious -- question is whether there are substantive differences in the meaning of the term "foreign state" as used in the FSIA and the ATA, respectively. The district court concluded that the two statutes were to be read in pari materia. See *Ungar III, 315 F. Supp. 2d at 175*. We agree with that conclusion.

We recognize, of course, that even identical terms can have divergent meanings when used in different statutes. See, e.g., *Hanover Ins. Co. v. United States, 880 F.2d 1503, 1504 (1st Cir. 1989)*; *United States v. Sterling Nat. Bank & Trust Co., 494 F.2d 919, 923 (2d Cir. 1974)*. Generally speaking, however, [\*\*23] that phenomenon occurs only when the purpose, history, and structure of the statutes make manifest a principled basis for interpreting the words differently. See, e.g., *Perez-Arellano v. Smith, 279 F.3d 791, 794 (9th Cir. 2002)*.

Here, however, the Supreme Court has observed that "the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 102 L. Ed. 2d 818, 109 S. Ct. 683 (1989)*. Nothing in either the language or legislative history of the ATA gives any indication [\*283] that Congress intended the newer statute to supercede, rather than to mirror, the detailed jurisdictional framework described in the FSIA. To cinch matters, the Supreme Court, in a post-ATA case, recently repeated its admonition that "courts should decide claims of sovereign immunity in conformity with the [FSIA's] principles." *Altmann, 124 S. Ct. at 2249*. Consequently, we regard an assertion of sovereign immunity under the ATA, *18 U.S.C. § 2337(2)*, as being functionally equivalent [\*\*24] to an assertion of sovereign immunity under the FSIA, *28 U.S.C. § 1604*.

This brings a second question into focus. Since neither the FSIA nor the ATA define the term "foreign state" as it relates to a sovereign power, we must determine the intended meaning of that term. There is no controlling precedent in this circuit as to the essential attributes of statehood in this context. The parties, however, find common ground in their shared conviction that the definition should be derived by application of the standard set forth in the Restatement (Third) of Foreign Relations. This standard deems a state to be "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." *Restatement (Third) of Foreign Relations § 201 (1987)*. Under the Restatement standard, political recognition -- typically thought of as "a formal acknowledgment by a nation that another entity possesses the qualifications for nationhood," *N.Y. Chinese TV Programs, Inc. v. U.E. Enters., Inc., 954 F.2d 847, 853 (2d Cir. 1992)* [\*\*25] -- is not a prerequisite to a finding of statehood. See *Restatement (Third) of Foreign Relations § 202 cmt. b* (explaining that "an entity that satisfies the requirements of § 201 is a state whether or not its statehood is formally recognized by other states").

Using the Restatement standard as the rule of decision is a colorable position. In this regard, the Restatement tracks the historical standard found in international law. See *Nat'l Petrochem. Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 553 (2d Cir. 1988)*; see also Convention on Rights and Duties of States (Montevideo Convention), Dec. 26, 1933, art. 1, 49 Stat. 3097, 3100, 165 L.N.T.S. 19, 25. n5 In addition, the FSIA's legislative history is itself replete with congressional references to sovereign immunity's roots in international law. See, e.g., *H.R. Rep. No. 94-1487, at 7 (1976)*, reprinted in 1976 U.S.C.C.A.N. 6604, 6605 (noting that the objective of