UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

---------------------------------------------------------x
:
THE ESTATE OF YARON UNGAR, *et al.*,  :     CA 00-105L (RRL)
:
        Plaintiffs,  :
   v.  :
:
THE PALESTINIAN AUTHORITY, *et al.*,  :
:
        Defendants.  :
:
:
---------------------------------------------------------x

**DECLARATION OF MARK DAVID McPHERSON IN SUPPORT OF THIRD-PARTY INTERVENOR THE PALESTINIAN PENSION FUND FOR THE STATE ADMINISTRATIVE EMPLOYEES IN THE GAZA STRIP'S MOTION TO INTERVENE, AND TO VACATE OR MODIFY THE PRELIMINARY INJUNCTION**

I, MARK DAVID McPHERSON, declare:

1. I am a member of the law firm Morrison & Foerster LLP, counsel for Third-Party Intervenor The Palestinian Pension Fund for the State Administrative Employees in the Gaza Strip (the "Pension Fund" or "Fund"). I submit this Declaration in support of the Pension Fund's motion to intervene in this action (the "*Ungar* proceeding") and to vacate the preliminary injunction issued by this Court on May 5, 2005 (the "Injunction"), or, in the alternative, to modify the Injunction and to require that the Ungar plaintiffs post a bond. Unless otherwise stated, the facts in this Declaration are based on my personal knowledge.

**I.    BACKGROUND OF THE PENSION FUND.**

2. The Pension Fund is a distinct legal entity that was created by statute more than forty years ago. It is currently responsible for managing a pension system for the benefit of certain categories of municipal employees who work in the Palestinian Territories. It has over 50,000 participants and between 5,000 and 6,000 current beneficiaries. Managed by its Board of

Directors and a professional, administrative staff, the Pension Fund has its own independent budget and manages its own funds and assets.

3. A detailed discussion of the Pension Fund's history and operation is set forth in the attached affidavit of the Fund's Director General, Farouk M. A-Franji, sworn to on April 4, 2007. That affidavit was submitted in support of the Pension Fund's motion for summary judgment in a related proceeding pending before the New York State Supreme Court, *Ungar v. The Palestinian Authority*, Index No. 102101/06. A true and correct copy of Mr. A-Franji's affidavit, along with certain attachments to that affidavit, is attached as Exhibit A. (To avoid diluting the record with voluminous documents that are largely unnecessary for the present motion, I have attached only the Exhibits to Mr. A-Franji's Affidavit that are relevant to this motion.)

## II. PROCEDURAL BACKGROUND.

### A. The Rhode Island Litigation.

4. The Pension Fund's motion and request to intervene in this action arise out of Plaintiffs' efforts to satisfy the default judgment entered in this action. On July 14, 2004, this Court entered a final default judgment against the Palestinian Authority (the "PA") and the Palestine Liberation Organization (the "PLO"); the judgment was affirmed on appeal on March 31, 2005. The PA and the PLO's motion to vacate that default judgment is currently pending before the Court.

5. Plaintiffs have used a number of procedural mechanisms to try to enforce that judgment against a variety of entities, including the Pension Fund.

6. First, Plaintiffs attempted to unilaterally expand a preliminary injunction issued by this Court. On May 5, 2005, the Rhode Island District Court entered a preliminary injunction (the "Injunction") prohibiting the transfer of the Judgment Debtors' assets located in the United

States. A true and correct copy of the Injunction is attached as Exhibit B; a true and correct copy of the transcript of the hearing during which this Court granted the Injunction is attached as Exhibit C.

7. By its plain terms, the Injunction is limited to the assets of Judgment Debtors:

> WHEREFORE IT IS HEREBY ORDERED AND DECREED THAT:
>
> 1. The Palestinian Authority and the Palestine Liberation Organization and their officers, agents, servants, employees, attorneys, partners, fiduciaries, and any natural agent or legal persons in privity with them, and/or in active concert and participation with them, are hereby prohibited, restrained and enjoined from withdrawing selling, transferring, alienating, assigning, pledging, impairing, offsetting, hypothecating, encumbering, concealing, secreting, trading, removing, or in any way disposing or effecting a disposition in, directly or indirectly, any assets of The Palestinian Authority and/or The Palestine Liberation Organization however titled (including without limitation all accounts, deposits, cash, shares, stock, credits, partnership rights or interests, equitable interests, contractual rights, holdings, financial interests or real estate) located within the jurisdiction of the United States or any State thereof.

(Ex. B at 1-2.)

8. On May 6, 2005, Plaintiffs' counsel sent out by facsimile a "Notice of Injunction/Pursuant to Fed. R. Civ. P. 65(d)" to a number of entities, including Swiss American Securities Inc. ("SASI") and other entities with which the Pension Fund had established business relations. A true and correct copy of the Notice of Injunction that Plaintiffs' counsel faxed to SASI is attached as Exhibit D. In the Notice of Injunction, Plaintiffs' counsel represented that the Injunction applied to assets of, among others, the Palestinian Pension Fund, the Palestine Pension Fund and the Insurance and Pension General Corporation:

> TAKE FURTHER NOTICE that the Injunction applies to all assets of the PA and PLO however titled, and that the assets of the PA and PLO are held and/or titled under the names . . . *Palestinian Pension Fund*, . . . *Palestine Pension Fund*, [and] *Insurance and Pension General Corporation*, . . .

(Ex. D at 1 (emphasis added).) The Notice of Injunction warned the recipient that it "will be liable" if any assets or funds were transferred in violation of the Injunction. (*Id.*)

9.   This broadly worded Notice of Injunction spurred Credit Suisse and SASI to freeze the Pension Fund's assets—even though SASI represented at a hearing in New York that "[w]e have no assets of the PLO and the PA" and despite SASI's acknowledgment that the Injunction was "far more narrowly drawn" than the "broadly drafted notice." (*See* Ex. E, a true and correct copy of a transcript dated March 7, 2006, at 5:23-24, 41:9-10.) SASI clarified that it would "honor a notice of injunction in Rhode Island. . . unless and until Judge Lagueux vacated that notice of injunction as applied to the monies at SASI." (*Id.* at 41:2-14.)

**B.   The New York Proceedings.**

10.   On or about April 21, 2005, Plaintiffs domesticated the *Ungar* Judgments in New York.

11.   Thereafter, Plaintiffs proceeded to serve Information Subpoenas with Restraining Notices (under the 105521/05 index number) upon a number of entities with which the Pension Fund had established business relations, including SASI. Similar to the Notice of Injunction, Plaintiffs represented in the Information Subpoena and Restraining Notice that the Judgment Debtors' assets were titled under various names. A true and correct copy of the Information Subpoena and Restraining Notice that Plaintiffs' counsel faxed to SASI on April 21, 2005, is attached as Exhibit F.

12.   SASI responded to that Information Subpoena and Restraining Notice on May 23, 2005, and served an Amended Response on December 6, 2005. A true and correct copy of SASI's Amended Verified Answers in Connection with Information Subpoena is attached as Exhibit G. In its Amended Verified Answers, SASI stated that it did not maintain any accounts or deposits and did not have in its possession, custody or charge any funds, investments,

deposits, goods chattels, monies, credits or effects belonging or owing or titled to the PA and/or the PLO. (See Exhibit G at 1-3.) In its Amended Verified Answers, however, SASI identified more than $100 million in publicly traded securities and debt instruments in its possession belonging to "The Palestinian Pension Fund for the State Administrative Employees in the Gaza Strip." (*Id*. at 3-15.) According to SASI's Amended Answers, as a result of having been served with Plaintiffs' Notice of Injunction and Restraining Notice, SASI froze the more than $100 million in assets it was holding for the benefit of the Pension Fund. (*Id*. at 15.) Those assets remain frozen today.[1]

13.   On December 7, 2005, the Pension Fund moved to vacate the Restraining Notice served upon SASI on the grounds that, among other things, the Pension Fund was separate and distinct from the Judgment Debtors and that the assets held at SASI belonged to the Pension Fund alone. Plaintiffs did not respond to the Pension Fund's motion to vacate the Restraining Notice by February 10, 2006, the Court-ordered date for responsive papers, and later withdrew the Restraining notice by letter dated March 6, 2006—one day before the hearing was scheduled to occur. A true and complete copy of plaintiffs' March 6, 2006 letter is attached as Exhibit H.

14.   On February 14, 2006, Plaintiffs filed two new actions: First, Plaintiffs filed a turnover proceeding against SASI pursuant to C.P.L.R. § 5225 (the "Turnover Proceeding"). Second, Plaintiffs filed a declaratory judgment action pursuant to C.P.L.R. § 3001 (the "Declaratory Judgment Action").

---

[1] As detailed, *infra*, at ¶ 29, SASI is no longer the sub-custodian of the Pension Fund's assets held in New York. Because SASI was closed in late 2008, Credit Suisse, the Global Custodian of the Pension Fund's assets at issue, has moved the assets to a new sub-custodial account at Credit Suisse Securities LLC New York (Investment Banking Unit) ("CSSU NY").

ny-933538                                    5

15. One week after they commenced the Turnover Proceeding and the Declaratory Judgment Action, Plaintiffs caused the Sheriff of the City of New York to serve a levy upon SASI (the "Sheriff's Levy"). On the evening before the hearing on the Pension Fund's motion to vacate the original Restraining Notice served on SASI, Plaintiffs' counsel sent to our firm and to SASI's counsel a letter claiming that the Sheriff's Levy "superseded" the Restraining Notice and, therefore, the Restraining Notice was "withdrawn." (Ex. H.) Mr. Tolchin stated:

> By operation of CPLR 5232(a) (levy expires after 90 days 'unless a proceeding under sections 5225 or 5227 has been brought'), the Sheriff's Levy and Execution will remain in effect until the conclusion of the Ungar's turnover proceeding against SASI.
>
> Inasmuch as the Restraining Notice (which was due to expire in any case on April 20, 2006) has been superseded by the Sheriff's Levy and Execution, the Ungars' hereby withdraw the Restraining Notice.

(*Id.*)

16. The Pension Fund promptly moved to dismiss the Turnover Proceeding, again on the grounds that, among other things, the Pension Fund was separate and distinct from the Judgment Debtors and that the assets held at SASI belonged to the Pension Fund alone. On May 18, 2006, the New York court granted that motion and dismissed the Turnover Proceeding. A true and complete copy of the May 18, 2006 transcript and Order dismissing the Turnover Proceeding is attached as Exhibit I. In its Decision, read from the bench, the Court specifically found that Plaintiffs had "no basis" for commencing the Turnover Proceeding against SASI:

> Reading through all these papers, it seems to me that the petitioner in the turnover proceeding had commenced a turnover proceeding based purely on information and belief there was *absolutely nothing at all to support their allegations that the Pension Fund is something other than a Pension Fund for the employees*.
>
> In response to the motion to dismiss, there is credible, very credible affidavits and evidence indicating that this in fact is money that belonged to the employees of, and not of the different municipalities and governments of the Palestinian Authority.

> On its face, it totally indicates, clearly indicates I must say, and I think if anything proves, it clearly proves based upon these documents that in fact *there is no basis for the turnover proceeding*.
>
> I'm going to grant the motion to dismiss.

(*Id.* at 44-45 (emphasis added); *see also id.* at 48 ("It seems to me at this point that there was absolutely no evidence at all, nothing, which should have given rise to this turnover proceeding, . . .").)[2]

17.   In light of the Court's dismissal of the Turnover Proceeding and the Plaintiffs' withdrawal of the Restraining Notice, the only remaining action addressing the Pension Fund is Plaintiffs' Declaratory Judgment Action.  Plaintiffs have never sought an order for any pre-judgment restraint in that Action.  In their Declaratory Judgment Complaint, Plaintiffs alleged that the Pension Fund is nothing but a fictitious entity without any legal existence.  A true and correct copy of Plaintiffs' Verified Complaint in the Declaratory Judgment Action, dated February 14, 2006 (the "Declaratory Judgment Complaint"), is attached (without exhibits) as Exhibit J.  They contended that the assets frozen at SASI do not belong to the Pension Fund at all and, instead, are secretly "the sole and exclusive property" of the Palestinian Authority (the "PNA") as the result of some elaborate fraud.  (*See* Ex. J ¶¶ 39-60.)[3]  Accordingly, Plaintiffs sought a declaratory judgment that "the securities and debt instruments held by SASI . . . are the sole property of Defendant [PNA]" and that Pension Fund "has no rights to the securities and debt instruments held by SASI and listed its Amended Verified Answers; . . ." (*Id.* ¶ 79.)

---

[2] Given the dismissal of the Turnover Proceeding, the Sheriff's Levy expired by its own terms on May 22, 2006. (*See* C.P.L.R. § 5232(a); Ex. I at 47.) Thus, as the Declaratory Judgment Action proceeded, SASI continued to restrain the Pension Fund's assets based solely upon the Injunction issued by the Rhode Island District Court and the Notice of Injunction served by Plaintiffs' counsel claiming that that Injunction applied to Pension Fund assets.

[3] All of Plaintiffs' allegations in the Declaratory Judgment Complaint concerning the Pension Fund and the assets frozen at SASI are made solely on "information and belief." (Ex. J ¶¶ 30-73.)

18.     On May 26, 2006, the Pension Fund served its Verified Answer in the Declaratory Judgment Action, and on August 31, 2006, the Pension Fund served its Verified Bill of Particulars as to its Affirmative Defenses.

19.     The parties conducted extensive discovery in the Declaratory Judgment Action for almost one year. Discovery closed in February 2007, and the parties subsequently submitted cross-motions for summary judgment in April and May of 2007. Both motions for summary judgment were denied on June 5, 2008. A true and correct copy of the New York Supreme Court's June 5, 2008 decision and order denying summary judgment is attached as Exhibit K.

### C.     Status of the Declaratory Judgment Action.

20.     On October 18, 2009 — shortly before the final pretrial conference — Plaintiffs filed an order to show cause demanding that the burden of proof in the Declaratory Judgment Action be shifted from Plaintiffs to the Pension Fund and that the order of trial be reversed (with the Fund being required to put on its case first). The trial court denied Plaintiffs' motion on November 5, 2009 (Ex. L), and trial was stayed pending Plaintiffs' appeal of the decision. On April 15, 2010, the New York Appellate Division affirmed the trial court's order denying Plaintiffs' motion to reverse the burden of proof and order of trial. (Ex. M).

21.     In their appeal on that burden of proof issue, Plaintiffs argued that they no longer have any claim against the PA pending in the Declaratory Judgment Action. (Ex. N, at 8 n. 4 ("this action is now proceeding solely against the [Pension Fund] because service on the PA was evidently never perfected and because even if service had been made default judgment against the PA was not timely sought.").) Plaintiffs argue, therefore, that they have abandoned their claim that the PA owns the assets at issue, though they still apparently intend to seek a declaration that the Pension Fund does not own the assets. (*Id.*, at 19 ("the trial in this action will

therefore decide *one and one question only*: the claim of the [Pension Fund] to own the assets at issue . . .") (emphasis in original).)

22. In a previous appeal, as well, Plaintiffs attempted to re-frame the nature of the dispute in the Declaratory Judgment Action. On May 30, 2007, the Fund moved to strike Plaintiffs' jury demand, arguing that their claim was an equitable cause of action to which no jury right attached. The trial court denied that motion. The Pension Fund appealed, and the New York Appellate Division affirmed the trial court's decision. In that decision, the Appellate Division accepted Plaintiffs' analogy of their claim not to a claim to settle ownership of the securities at issue, but to a claim for tortious interference with the enforcement of a judgment, against the Pension Fund only.

### D. Rhode Island Complaint by the Palestine Monetary Authority.

23. In 2005, the Palestine Monetary Authority ("PMA") filed a complaint in the United States District Court for the District of Rhode Island against the Ungars. (Ex. O). The Complaint sought declaratory and injunctive relief, seeking an "order declaring the rights of the parties in this matter and to further declare that Strachman has improperly expanded the scope of the Injunction Order in this case without proper basis, and for such further relief as the Court deems just and proper." (*Id.*)

24. At a hearing on June 16, 2005, this Court refused to grant the PMA relief, citing the fact that the Bank of New York ("BONY") froze the assets, and BONY was not a party to the proceeding the PMA initiated:

> [T]he proper place for all these arguments are in New York where the judgment has been registered and where this action has been taken in order to collect the judgment. And it is pending. It's pending in the Supreme Court of New York with all the parties before the court, and it's not a question of the interpretation of my order. My order is clear. What has to be determined now are the

>       facts. . . . [T]hose facts . . . ought to be presented to the Supreme
>       Court judge in New York.

(Ex. P (Tr., June 16, 2005, at 15:8-18).)

25. The PMA later voluntarily dismissed its action without Prejudice. (Ex. Q).

26. Guided by this Court's direction to the PMA, the Pension Fund has diligently litigated the Declaratory Judgment Action in New York with the understanding that it would resolve the question of ownership to the frozen assets. As detailed above, however, Plaintiffs' recent positions in the Declaratory Judgment Action threaten to undermine the efficacy of that Action, and distinguish the current procedural status of proceedings against the Pension Fund from those involving the PMA. (*See supra* ¶¶ 20-22; Ex. N.)

### III. THE RESTRAINT OF THE PENSION FUND'S ASSETS HAS SEVERELY PREJUDICED THE FUND.

27. The Pension Fund's damages from Plaintiffs' extended — and unilateral — restraint of the Fund's assets are significant. Since Credit Suisse received the Notice of Injunction and froze the Fund's assets, the Pension Fund has been unable to manage the assets held by Credit Suisse. While Plaintiffs agreed to the entry of court orders permitting the Fund to manage its assets during the pendency of this litigation (*see* Exs. R, S), Plaintiffs' restraint of the Fund's assets has itself hindered the Pension Fund's ability to find asset managers and custodians willing to assist in managing the Fund.

28. On April 13, 2006, the Pension Fund's investment advisor of eight years, Smith Barney, resigned. On behalf of the Pension Fund, I and my colleagues met with a number of different potential investment advisors, but each of them declined to manage the funds, citing the Injunction and pending litigation. Ultimately, the Fund was able to secure the services of WaterStreet Investment Consultants, LLC ("WaterStreet"), on May 1, 2009.

29. By the time the Fund was able to secure the services of a new investment advisor, however, Credit Suisse had closed its affiliate SASI. In January of 2008, Credit Suisse publicly announced that SASI would cease operating as a broker-dealer. Shortly thereafter, Credit Suisse informed the Pension Fund that SASI would no longer be able to serve as sub-custodian of the Fund's assets. On October 23, 2008, Credit Suisse transferred the Pension Fund's assets from SASI to another affiliate, Credit Suisse Securities LLC New York (Investment Banking Unit) ("CSSU NY"). CSSU NY is not able to provide the custodial services that the Pension Fund and/or its investment advisor needs to manage the assets.

30. Since October of 2008, the Pension Fund has been unable to retain a suitable custodian for its assets. Despite interviewing a number of firms that offer custodial services, each potential custodian cited the Notice of Injunction as one of the reasons for their refusal to serve as custodian. Without a custodian, WaterStreet cannot actively manage the assets of the Pension Fund.

31. As a result of the restraint, therefore, the Pension Fund's assets have lost substantial value. As the Pension Fund's investment consultant, WaterStreet has analyzed the impact to the Pension Fund's assets as a result of the Fund's inability to manage the frozen assets since WaterStreet was retained as an Investment Consultant in May 2009. WaterStreet's analysis of the impact to the Pension Fund's assets is set out fully in Exhibit T, which is a true and correct copy of a Report WaterStreet prepared, entitled "Investment Policy Implementation" (the "Report"). Based on this analysis, the Fund has lost approximately $7 million in gains that it would have earned had WaterStreet's asset allocation recommendations been implemented in May 2009. In addition, the Fund risks losing more than $17 million over the next five years if it is unable to implement WaterStreet's asset allocation recommendations immediately.

32.     Page Four of the Report sets out WaterStreet's 2009 target asset allocation recommendations for the Pension Fund, based on WaterStreet's review of the Pension Fund's investment portfolio as it existed in May 2009. Page Seven of the Report compares the current value of the Pension Fund's assets based on its existing mix of securities and cash equivalents with what the Pension Fund's assets would have been worth if WaterStreet's asset allocation recommendations had been implemented in May 2009. As shown, the actual value of the Pension Fund's assets frozen at Credit Suisse was $121,819,891 as of July 31, 2010, and the expected value of the Pension Fund's assets would have been approximately $129,093,050 as of July 31, 2010, if WaterStreet's asset allocation recommendations had been implemented in May 2009. Thus, I understand from WaterStreet that, for the period between May 1, 2009, and July 31, 2010, the Pension Fund lost approximately $7,273,159 in gains that it would have earned had it been able to implement WaterStreet's asset allocation recommendations.

33.     Page Eight of the Report reflects WaterStreet's new asset allocation recommendations, if it were able to manage the Pension Fund's assets starting today. I understand that using an industry-recognized computer software program for modeling future investment returns, Zephyr AllocationADVISOR, WaterStreet made projections of expected returns from the Pension Fund's assets based on WaterStreet's asset allocation recommendations. I understand that AllocationADVISOR is a program that WaterStreet uses for most, if not all of its clients, as a way of gauging projected rates of return based on various asset allocation strategies. I understand that based on asset allocations and other data, the program simulates thousands of scenarios to make reasonable projections of rates of return.

34.     Page Twelve of the Report shows the projected rates of return on the Pension Fund's investment portfolio, using WaterStreet's asset allocation recommendations. The

highlighted figures show the median projected portfolio values based on 5-year expected returns. As shown, the Pension Fund's portfolio, using its current asset allocations, is expected to generate only a 5.51% mean return, compared to a 7.97% mean return if WaterStreet were able to implement its asset allocation recommendations for the Pension Fund's portfolio.

35. As with any financial modeling, I understand that the figures on page Twelve of the Report are merely projections of potential future gains, and no guarantees of future performance can be made from these projections. Nevertheless, these projections are based on computer-modeling techniques and historical data — techniques and data that WaterStreet uses to plan and manage numerous institutional clients' investment portfolios. Thus, if the Pension Fund's assets continue to go unmanaged and continue to be frozen with their current asset allocation, I understand that WaterStreet estimates that the Pension Fund risks losing approximately $17,000,000 in projected gains over the next five years.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed:   August 17, 2010
            New York, New York

_____
Mark David McPherson