## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

        Plaintiffs – Judgment Creditors,

v.                                                                    C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

        Defendants – Judgment Debtors.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS' MOTION TO PRECLUDE, TO COMPEL AND FOR RELATED RELIEF

### Introduction and Travel

The Court entered judgment against Defendants-Judgment Debtors Palestinian Authority ("PA") and Palestinian Liberation Organization ("PLO") (collectively "Defendants") on July 12, 2004.  The judgment was affirmed on appeal in 2005.  Defendants filed a motion to vacate the judgment on December 28, 2007.  The Court denied that motion on May 13, 2009.  That denial was vacated by the U.S. Court of Appeals for the First Circuit on March 25, 2010 and remanded for further consideration of all relevant factors:

> Although Rule 60(b)(6) applies to motions that seek to relieve parties from judgments taken by default, a decision about whether to vacate a default judgment involves a unique "blend of centrifugal and centripetal forces." . . .  Such decisions tend to rest on fact-specific considerations informed by the nature and circumstances of the particular case.
>
> A variety of factors can help an inquiring court to strike the requisite balance. Such factors include the timing of the request for relief, the extent of any prejudice to the opposing party, the existence or non-existence of meritorious claims of defense, and the presence or absence of exceptional circumstances.  This compendium is neither exclusive nor rigidly applied. Rather, the

> listed factors are incorporated into a holistic appraisal of the circumstances. In a particular case, that appraisal may-or may not-justify the extraordinary remedy of vacatur.

*Ungar v. Palestine Liberation Organization*, 599 F.3d 79, 83-84 (1st Cir. 2010) (citations omitted).  On remand, by order dated April 1, 2010 (attached as Exhibit A), the Court determined that it would "hold an evidentiary hearing to determine precisely what the facts are concerning the deliberate decision to default and the factual circumstances surrounding that matter":

> In view of the fact that the Court of Appeals has stated that when a party is moving to set aside a judgment that was secured by intentional and deliberate default the matter is fact specific, the Court will hold an evidentiary hearing to determine precisely what the facts are concerning the deliberate decision to default and the factual circumstances surrounding that matter.
>
> The defendants will have the burden of proving the variety of factors set forth by the Court of Appeals which would justify a vacation of the judgment under these circumstances, including exceptional circumstances.

*Inter alia*, Defendants had claimed the existence of exceptional circumstances involving supposed "foreign policy consequences" as discussed herein.

By scheduling order dated June 1, 2010 (attached as Exhibit B), the hearing was set for January 18, 2011, with pre-hearing discovery to be completed by November 19, 2010.  As part of this pre-hearing discovery, Salam Fayyad, who is both PA Prime Minister and Head of the Economic Affairs Department in the PLO,[1] was deposed by counsel for the Plaintiffs-Judgment Creditors ("Ungars") on July 28, 2010 in East Jerusalem.  At various points during the course of this deposition, counsel for the Defendants interposed objections on grounds of "diplomatic privilege" and attorney-client privilege, and instructed Fayyad not to answer questions regarding (a) his communications with the U.S. government and (b) the authorship of the declaration

---

[1] *See* Declaration of Salam Fayyad filed in support of Defendants' motion to vacate (dkt. # 408, Exhibit B) (attached hereto as Exhibit C) at ¶¶ 7, 9.

provided by Fayyad in support of Defendants' Motion to Vacate and Fayyad's understanding of the positions taken and the statements contained in that declaration.

As discussed below, because they have invoked "diplomatic privilege" regarding Fayyad's communications with the U.S. government, Defendants should be precluded from asserting that the judgment in this action has foreign policy implications.

Furthermore, Defendants' assertion of the attorney-client privilege in respect to the authorship of Fayyad's declaration and his understand thereof was baseless, and Defendants should be compelled to produce Fayyad for further testimony regarding these issues.

## ARGUMENT

I. **Plaintiffs Were Justified in Seeking to Depose Mr. Fayyad on Issues of Alleged "Significant Foreign Policy Consequences" Raised by Defendants in Their Motion to Vacate Default Judgment and in Their Appellate Briefs**

In their Motion to Vacate Default Judgment, Defendants repeatedly asserted that vacatur was warranted by purported significant foreign policy consequences attributable to the judgment:

> D.     Vacatur Is Also Warranted Because the Default Judgment Has Already Had Significant Foreign Policy Consequences and Will Continue to Do So.
>
> Vacatur is also warranted because of the significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case. As Prime Minister Fayyad's declaration makes clear, this judgment has already been the subject of diplomatic communications at the highest levels between our country's representatives in the State Department and the governing officials in the Occupied Territories. If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian government -- a relationship that the Executive Branch of the United States government has characterized as being crucial to the Israeli-Palestinian peace process.

> It is precisely because of these sorts of delicate concerns that courts are generally more lenient in setting aside default judgments obtained against foreign governing entities.

Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default

Judgment, dkt # 408, at 38-39 (emphasis supplied).

As Exhibit B to its Motion to Vacate, Defendants also attached Mr. Fayyad's December

24, 2007 Declaration, which quoted extensively from a June 18, 2005 letter Mr. Fayyad had sent

to Secretary of State Condoleezza Rice:

> During my service as Finance Minister, I became concerned about the manner in which cases like the instant one were affecting the finances of the Palestinian government, particularly the finances of the Palestinian Pension Fund for the State Administrative Employees in the Gaza Strip.  On June 18, 2005, I accordingly sent a letter to Secretary of State Rice requesting her assistance in these cases "consistent with the Constitution and laws of the United States."  I emphasized in my letter that the attempt by plaintiffs' counsel to interfere with the actions of the Palestinian government around the world was "not supported by United States law, and also ran counter to international law and the laws of several foreign states in which the PNA operates."  I further explained to Secretary Rice my understanding at the time that the PNA's failure to "file an unqualified appearance and answer to plaintiffs' complaint" had occurred in order "to preserve our legal position both in the United States and overseas (with respect to potential efforts by Plaintiffs to seek enforcement of the default judgment in other countries)." . . . I have attached a copy of my letter to Secretary Rice to this declaration.

12/24/2007 Declaration of Salam Fayyad, dkt. # 408-2, at ¶ 5 (attached hereto as Exhibit C).

The June 18, 2005 letter to Secretary Rice, which was before the Court as an attachment to

Fayyad's Declaration, fulsomely asserted that the judgment would have serious consequences on

the foreign policy of the United States and on the Middle East Peace Process:

> I am writing to request your immediate assistance in addressing what has become a serious obstacle to the continued, effective participation of the Palestinian National Authority ("PNA") in the Middle East Peace Process and the PNA's role as a

strong and viable partner of the United States of America and the Government of the State of Israel in that process.

> . . .

> We write to you because the further deterioration of the current state of affairs directly undermines the PNA's continued participation in the Middle East Peace Process and poses a significant obstacle to the PNA's role as a viable partner alongside the United States and Israel.  In particular, we believe that the actions of the Plaintiffs in the *Ungar* Case directly interfere with the United States Government's conduct of foreign relations in the Middle East, to the grave detriment of the Palestinian people.  More specifically, we believe that actions taken by the Plaintiffs under the authority of the District Court are inconsistent with the United States' longstanding commitment to, and investment in, the Middle East Peace Process. . . .

> We urgently request that the United States Department of State take whatever action it can, consistent with the Constitution and laws of the United States to end Plaintiffs' efforts to use the United States Courts to undermine the foreign policy of the United States and interfere in the Middle East Peace Process.

6/18/2007 Fayyad Letter to Rice at 1-4, dkts # 408-2 & # 415-7 (attached hereto as Exhibit D).

Defendants further reiterated these points in their appellate briefs before the Court of Appeals for

the First Circuit:

> Here, the $116m default judgment has been a recurring issue in the PA's and PLO's interaction with the U.S. Department of State.  *See* . . . JA501-04 (June 18, 2005, letter from Finance Minister Fayyad to Secretary of State Rice) . . . . In his letter to the U.S. Secretary of State, Dr. Fayyad explained that the Ungars' efforts to "use the United States judicial system to take control over and freeze the assets of the PNA all over the world" has become "a serious obstacle to the continued, effective participation of the Palestinian National Authority ("PNA") in the Middle East Peace Process and the PNA's role as a strong and viable partner of the United States of America and the Government of the State of Israel in that process."  JA501.

> Moreover, the PA and PLO are integral to the Israeli-Palestinian peace process.  Actions of the U.S. courts that impact them and their relationship with the U.S. Government should not be taken lightly.

9/14/2009 Brief for Appellants, *Ungar v. The Palestine Liberation Organization*, No. 09-1778, at 43-44; *see also* 11/5/2009 Reply Brief for Appellants at 19 ("The opening brief also showed that foreign and public policy considerations . . . should have been factored into the Rule 60(b) analysis . . . .").

Defendants ultimately convinced the Court of Appeals of the need for further consideration of these purported exceptional circumstances—the impetus for January's hearing and the present pre-hearing discovery:

> [Defendants] posited that exceptional circumstances justified this relief, mentioning among other things their own political transformation; the large size of the judgment (on which interest was accruing); the potential impact of further collection efforts on the Israeli-Palestinian peace process; and the delicate nature of this nation's foreign relations in the Middle East.
>
> . . .
>
> [Defendants] blame political extremism within the PLO and the PA for their earlier decision to default. . . . They emphasize the special nature of the cause of action, the uniqueness of the case, its political ramifications, and its potential effect on international relations. Taken in the ensemble, these justifications, in the defendants' view, add up to exceptional circumstances.

*Ungar v. Palestine Liberation Organization*, 599 F.3d 79, 82-83, 86 (1st Cir. 2010); *see also id*. at 84 (directing a ***holistic appraisal*** of the circumstances, including exceptional circumstances).

Given that predicate, Plaintiffs were well within their rights to depose Mr. Fayyad about these very issues and communications, which Defendants themselves heavily relied on and placed both before the Court in their motion to vacate the default judgment and before the Court of Appeals in their appellate briefs.

**II.     Because Defendants Invoked "Diplomatic Privilege" During Fayyad's Deposition They Should Now Be Precluded from Asserting in Support of Their Motion to Vacate That the Judgment Has Foreign Policy Consequences**

Nevertheless, despite having presented the Court in their motion and the Court of Appeals in their appellate briefs with their side of conversations with the State Department and the alleged effects of the judgment on U.S. foreign policy and the Middle East Peace Process, Defendants interposed a "diplomatic privilege" when Plaintiffs sought to question Mr. Fayyad on these matters:

> Q.  Okay.  Now, did you ever learn whether or not the United States complied with Judge Marrero's order?[2]
>
> A.  I don't remember either.
>
> Q.  Maybe I can refresh your recollection.
>
> . . .
>
> (Exhibit No. 2 marked for identification.)
>
> . . .
>
> Q.  Okay.  Do you understand that to mean that, in response to Judge Marrero's order to the United States to state whether or not it would file a Statement of Interest, the United States responded by saying they would not file a Statement of Interest in this case -- the Knox case -- or any similar cases.  Do you understand that to mean that?
>
> A.  I understood that to be the case. . . .
>
>  . . .
>
> Q.  But the letter says they declined to file a Statement of Interest.
>
> A.  That's what the letter said.
>
> Q.  Right.  Did you ever learn of that decision?
>
> A.  Whether in this specific case or another case, I really cannot tell you right now.  But I'm aware of the fact that the United States

---

[2] The reference is to the December 11, 2007 order issued in *Knox v. PLO*, Civ. No. 03-4466-VM (S.D.N.Y.) requesting that the United States inform that court "whether the Government contemplates issuing a suggestion of interest in the resolution of this case, ***or in any of the other cases pending in other Districts against the defendants in this action raising similar issues as to the appropriateness of reopening default judgments entered against the defendants***." *See* 28 U.S.C § 517 (interests of United States in pending suits). Defendants submitted this order to the Court as Exhibit A to their motion to vacate, and a copy is attached hereto as Exhibit G. By letter dated February 29, 2008, the United States informed the *Knox* court that it declined to issue a Statement of Interest. Defendants submitted this letter as Exhibit A to their reply papers on the motion to vacate, and a copy is attached hereto as Exhibit H.

did not file a Statement of Interest in the way a Statement of Interest is construed to mean in a legal sense.

Q. How did you learn that?

MR. ROCHON:  Objection.

A. I've had discussions on this with US officials all the time.

Q. Really?

A. Yes.

Q. When was the last time you had a discussion with a US official about this?

A. Not the recent period.

. . .

Q. So you spoke to somebody at the State Department about a year ago?

A. Yes.

Q. Who was that?

A. I don't -- lawyers.

Q. Can you help me out a little bit?

A. I can't remember the names right now.

Q. Okay.  Do you remember their titles?

A. I can't.

Q. Do you remember how many there were?

A. Maybe three, four.  I really don't remember.

Q. So did you make -- were you accompanied by anybody on your side?

A. I really was there by myself.

Q. Okay.  And so these three or four lawyers, you don't remember anybody's name?

A. No.  Not right now.

Q. And do you remember if you were -- you had written to set up an appointment, or how it came to be?  Do you remember?

A. Precisely, I do not remember.  In connection with this particular trip, I don't really remember now.

Q. Okay.  Would it be fair to say you were asking them to see if a Statement of Interest could be filed?

MR. ROCHON:  Objection. . . .

. . .

 (The witness leaves the room.)

MR. ROCHON:  The Prime Minister is out of the room. So, look, when he communicates, it's not like he goes to the State Department only about these cases.  He's there about a host of things.  He's trying to get money.  He's trying to get security.  He's trying to -- And so none of these things are seen in isolation.  So you can't, you know, discuss what did you tell them about this because it's all part of a unified conversation.

MR. WISTOW:  I didn't even ask him that. All I said to him was, did you ask them if they would file a Statement of Interest in these cases. That's all I asked.  That's pretty straightforward.

MR. ROCHON:  If your question is that, and you're not going to claim it's a waiver of diplomatic privilege --

MR. WISTOW:  I will not.

MR. ROCHON:  As long as we're on my time, do you want to tell me -- he's out of the room.  Do you want to tell me where else you're going to go, and we can hash out the diplomatic issues now on my nickel?

MR. WISTOW:  I'd rather not --

MR. ROCHON:  All right.

MR. WISTOW:  -- because I don't know where I'm going, if you haven't figured that out yet.  It's a little loosey-goosey.

MR. ROCHON:  I'm offering it to you because we'll be back on your time soon.

MR. WISTOW:  I guess, in fairness to you, if he says yes, he did ask them for it, I'm going to ask him did they say yes, did they say no, did they say maybe.  That's all.

MR. ROCHON:  Well, then -- well, I know that's all that you -- that's what implicates diplomatic privilege.

Fayyad Dep. 43:3-61:18, July 28, 2010 (relevant portions attached hereto as Exhibit E).

Defendants cannot have it both ways: they cannot claim in support of their motion to vacate that leaving the judgment intact would have foreign policy implications and then refuse to enable the Ungars to test those claims by asserting a claim of "diplomatic privilege."

Such conduct is particularly improper given that Rule 60(b)(6) relief is equitable in nature and demands that the movant have clean hands. *See Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 127 (2nd Cir. 2009) ("The discretionary relief available under Rule 60(b) is equitable."); 12 James Wm. Moore et al., *Moore's Federal Practice* § 60.22[5] (3d ed. 2008) ("The relief provided by Rule 60(b) is equitable in nature and, in exercising its discretion under Rule 60(b), a court may always consider whether the moving party has acted equitably.").

Accordingly, if in responding to the instant motion Defendants continue to assert their claim of privilege regarding Fayyad's communications with the U.S. government, the Court should preclude Defendants from asserting in support of their Motion to Vacate that the judgment in this case has foreign policy implications and/or that the denial of their Motion to Vacate will have foreign policy implications, and preclude Defendants from introducing any evidence or testimony in putative support of any such assertion.[3]

---

[3] Notably, if defendants stand on their claim of privilege to avoid discovery they cannot repudiate it later. *See, e.g.*, *U.S. v. Parcels of Land*, 903 F.2d 36, 43-44 (1st Cir. 1990) (affirming order striking affidavit opposing government's summary judgment motion when witness "shielded his account of the 'facts' from scrutiny by invoking the Fifth Amendment at his deposition."); *U.S. v. Certain Real Property and Premises Known as 4003-4005 5th Ave., Brooklyn, NY*, 55 F.3d 78, 85 (2d Cir. 1995) (noting that if litigant's waiver of privilege comes at "eleventh hour" and "appears to be part of a manipulative, 'cat-and-mouse' approach to the litigation, a trial court may be fully entitled ... to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege"); *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991) ("Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion."); *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 857 (S.D.N.Y. 1997) (noting that defendant's waiver of privilege three months after SEC moved for summary judgment was "convenient" and that defendant "simply may not invoke his privilege against self-incrimination to impede the government's discovery efforts and then seek to waive the privilege when faced with the consequences of

III.    **Attorney-Client Privilege**

A.    **The Authorship of Mr. Fayyad's Declaration Is Not Privileged**

At his deposition, Defendants' counsel also instructed Mr. Fayyad not to answer

questions concerning whether anyone assisted Mr. Fayyad in preparing his December 24, 2007

Declaration (attached as Exhibit C) ("Fayyad's Declaration"), on attorney-client privilege

grounds:

> Q.  I take it you're familiar with the document that I just handed you, Exhibit 5?
>
> A.  Yes.
>
> Q.  And do you know what that is?
>
> (Witness peruses document.)
>
> A.  Yes.  It's a declaration that I made.
>
> Q.  Right.  Do you remember signing it?
>
> A.  Just give me a second while I just --
>
> (Witness peruses document.)
>
> A.  Yes.  That's my signature on it.
>
> Q.  No, no.  I'm not asking if it's your signature.  I hope it is.  I'm asking if you remember signing it.
>
> A.  Yes.  I remember the document.  Yes.
>
> Q.  Okay.  I take it you didn't prepare the document?
>
> A.  Pardon?
>
> Q.  Did you prepare the document?
>
> MR. ROCHON:  Objection.  We're going to get into privileged areas.
>
> MR. WISTOW:  How can it be privileged.  All I'm asking him is -- I'm looking at all the information.  I'm just asking who prepared it.
>
> Q.  I assume your lawyer prepared it?

---

his refusal to testify."); *S.E.C. v. Grossman*, 887 F.Supp. 649, 660 (S.D.N.Y. 1995) (precluding evidence at summary judgment stage on the issues for which the defendants had "declined to provide discovery for several years" under the guise of the Fifth Amendment privilege against self-incrimination); *SEC v. Zimmerman*, 854 F.Supp. 896, 899 (N.D. Ga. 1993) ("The Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions.").

MR. ROCHON:  Objection.  Don't answer the question.

MR. WISTOW:  Okay.

Q.  Did you prepare this declaration?

A.  Isn't that the same question you asked before?

Q.  I don't think so.

MR. ROCHON:  Counsel, the declaration speaks for itself.  The preparation of it --

MR. WISTOW:  Whatever you say.  Just instruct him not to answer.  I don't care.

MR. ROCHON:  Because it intrudes on matters of privilege, and only for that reason, I'm instructing the witness not to answer.

Fayyad Dep. 114:14-115:23, July 28, 2010 (relevant portions attached hereto as Exhibit F).

Whether Mr. Fayyad wrote his own Declaration does not itself implicate attorney-client privilege.  The mere fact that he received assistance in writing the Declaration, if he did so receive, is not privileged.  Only communications between Defendants and their counsel, if any, are privileged.  *See Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002) (reciting the elements of attorney-client privilege).  The circumstances under which Mr. Fayyad may have received assistance from non-counsel, including members of his staff or other lay officers and/or employees of the Defendants are wholly non-privileged.  Numerous potential lines of questioning having no bearing whatsoever on privileged attorney-client communications were cut short by these premature objections, lines of questioning that go directly to important issues in this case.

Therefore, Fayyad should be compelled to answer questions regarding any assistance he received in preparing his December 24, 2007 declaration.

**B.    Mr. Fayyad's Understanding of the Contents of His Declaration Is Not Privileged**

Defendants' counsel also instructed Mr. Fayyad not to answer questions concerning his own understanding of various positions he took in his Declaration:

Q.  All right.  Did you understand the declaration when you signed it?

A.  Yes.

Q.  Okay.  I'm going to ask you some questions about it.  I'm going to go to page 2.  And you'll see, on the second line, it begins, On June 18, 2005, I accordingly sent a letter to Secretary of State Rice requesting her assistance in these cases "consistent with the Constitution and laws of the United States."  I emphasized in my letter that the attempt by Plaintiffs' counsel to interfere with the actions of the Palestinian government around the world was "not supported by United States law and also ran counter to international law and the laws of several foreign states in which the PNA operates."  Have I read that correctly?

A.  Yes, you have.

Q.  Okay.  Now, what laws were you referring -- what was the basis for your statement that the attempts by Plaintiffs' counsel to interfere with the actions of the Palestinian government was not supported by United States law?  What knowledge did you have at the time?

MR. ROCHON:  Mr. Prime Minister -- I didn't want to interrupt your question -- I would object and tell you that it's the same privilege, attorney-client privilege -- not with my law firm, but with counsel to the Pension Fund -- upon whose behalf the letter was being written.

MR. WISTOW:  I just want it to be clear on the record what we're talking about. There's a letter, June 18, 2005, where he says that the Plaintiffs' efforts to interfere was "not supported by United States law."

MR. ROCHON:  Yes.

MR. WISTOW:  I'm just asking what knowledge he had with regard to that statement.

MR. ROCHON:  Okay.

MR. WISTOW:  If you want -- I just want to make that clear.

MR. ROCHON:  I understand.

MR. WISTOW:  If he's got any basis to support the statement whatever.

MR. ROCHON:  Because the answer would be premised on advice of counsel, I'm going to instruct the witness not to answer.

MR. WISTOW:  He could say I don't know.

MR. ROCHON:  He could say many things. Because the answer is based --

MR. WISTOW:  Okay.  I accept the instruction. When I say I accept the instruction, I don't mean that I agree with it.  I mean I don't want to fight about it.

MR. ROCHON:  I understand.

MR. WISTOW:  Okay.

Fayyad Dep. 116:13-118:19, July 28, 2010 (Exhibit F, <u>supra</u>).

As with the authorship of his Declaration, Mr. Fayyad's own understanding of the statements he set forth in his Declaration, <u>declared under penalty of perjury and submitted by Defendants to the Court in support of their motion to vacate and to the Court of Appeals in support of their appeal</u>, is not subject to attorney-client privilege.  A proper Declaration contains only facts within the personal knowledge of the declarant.  The attorney-client privilege does not reach the facts within Mr. Fayyad's personal knowledge, even if he learned those facts through communications with counsel.  <u>See</u> *Thurmond v. Compaq Computer Corp.*, 198 F.R.D. 475, 483 (E. D. Tex. 2000) ("Defendant's privilege claim as to these matters should also be rejected in accordance with the many cases cited above that hold the attorney-client privilege does not reach facts within the client's knowledge, even if the client learned those facts through communications with counsel.").

In swearing to his Declaration, which Defendants submitted to the Court on their motion to vacate. as well as to the Court of Appeals, Mr. Fayyad presented himself as knowledgeable about these subjects.  Plaintiffs must be allowed to explore these issues with Mr. Fayyad if there is to be a complete determination of "precisely what the facts are concerning the deliberate decision to default and the factual circumstances surrounding that matter".  *See* April 1, 2010 Order of the Court.

Therefore, Fayyad should be compelled to answer questions regarding his own understanding of the positions he took and the statements he made in his declaration.

## IV.    Defendants Should Produce Mr. Fayyad for Further Testimony in Rhode Island or Pay the Ungars' Costs Incurred in Re-Deposing Him in East Jerusalem

Generally, if the deponent lives a great distance from the deposing party, then the deposition takes place near the location of the out-of-state deponent.  *O'Sullivan v. Rivera*, 229 F.R.D. 187, 189 (D.N.M. 2004).  Nevertheless, Plaintiffs request that Defendants be compelled to produce Mr. Fayyad for further testimony, as discussed in Part III *supra*, here in Rhode Island (or in East Jerusalem as discussed *infra*).  The matter of the location of depositions of defendants ultimately is within the discretion of the Court, and instances of defendants having to appear for depositions at the place of trial are not unusual.  *Financial General Bankshares, Inc. v. Lance*, 80 F.R.D. 22, 23 (D.D.C. 1978).  Accordingly, it would be proper to compel the Defendants to produce Mr. Fayyad for further testimony here in Rhode Island.

The general rule should also not be followed in this case because of the special nature of these proceedings.  Judgment was entered against the Defendants/movants and affirmed on appeal, but they have now come before the Court, sitting in equity, attacking the judgment and asking that it be vacated.  With the burden on their motion to vacate, therefore, the Defendants/movants are more properly considered plaintiffs for purposes of determining where they should be deposed about the allegations they raise in their motion.  Courts have been willing to look past the formal designation of a party as defendant in situations like this.  *See, e.g., Continental Federal Sav. and Loan Ass'n v. Delta Corp. of America*, 71 F.R.D. 697, 700 (W.D.

Okl. 1976) (treating the defendant as a plaintiff for purposes of determining the place of deposing its corporate officers on its permissive counterclaim).[4]

Moreover, since the need to reconvene Fayyad's deposition is due solely to Defendants' counsel's improper instructions to Fayyad not to answer, the burdens and costs of the second deposition should be borne solely by the Defendants.

Plaintiffs recognize that Mr. Fayyad is a senior official in the PA and PLO, and Plaintiffs anticipate that Defendants will likely argue that he should not be forced to travel to Rhode Island for a deposition. Rather than litigate this issue, the Ungars respectfully request that the Court direct the Defendants to produce Fayyad for further testimony within two weeks in Rhode Island, or, at their election, in East Jerusalem, provided that if Defendants choose to reconvene the deposition in East Jerusalem they bear the attorneys fees and costs incurred by the Ungars as a result of holding the deposition in East Jerusalem rather than Rhode Island.

## V.    Conclusion

For all of the foregoing reasons, the instant motion should be granted.

Dated: September 1, 2010                                    Plaintiffs-Judgment Creditors,
                                                            by their Attorneys,


                                                            /s/ Max Wistow
                                                            Max Wistow #0330
                                                            Wistow & Barylick, Inc.
                                                            61 Weybosset Street
                                                            Providence, RI 02903
                                                            (401) 831-2700
                                                            (401) 272-9752 (fax)
                                                            mw@wistbar.com

---

[4] Indeed, under the circumstances, Mr. Fayyad should have submitted to examination in Rhode Island in the first instance.  In an effort to avoid controversy and to expedite the proceedings, Plaintiffs agreed to travel to the Middle East at great expense and inconvenience.

David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 1, 2010, a true and genuine copy of the foregoing was sent by electronic mail to Defendants' counsel of record listed below:

       Deming E. Sherman
       Edwards Angell Palmer & Dodge LLP
       2800 Bank Boston Plaza
       Providence, RI 02903

       Richard A. Hibey
       Mark J. Rochon
       Brian Hill
       Miller & Chevalier Chartered.
       655 Fifteenth Street, N.W., Suite 900
       Washington, DC 20005-5701

                           /s/ Max Wistow


I HEREBY FURTHER CERTIFY that, on September 1, 2010, a true and genuine copy of the foregoing was hand delivered to Defendants' counsel of record listed below:

       Deming E. Sherman
       Edwards Angell Palmer & Dodge LLP
       2800 Bank Boston Plaza
       Providence, RI 02903

                           /s/ Max Wistow

18