SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------ X

THE ESTATE OF YARON UNGAR by and through its
Administrator, DAVID STRACHMAN; DVIR UNGAR,
minor, by his guardians and next friends, YISHAI UNGAR,
minor, by his guardians and next friends, PROFESSOR
MEIR UNGAR, JUDITH UNGAR, individually and in
their capacity as legal guardians of Petitioners DVIR
UNGAR and YISHAI UNGAR; RABBI URI DASBERG,
JUDITH DASBERG, in their capacity as legal guardians of
Petitioners DVIR UNGAR and YISHAI UNGAR;
AMICHAI UNGAR, DAFNA UNGAR
and MICHAL COHEN,

                Plaintiffs,

   -against-

THE PALESTINIAN AUTHORITY (a/k/a "The
Palestinian National Authority") (d/b/a "Palestinian Pension
Fund of the State Administrative Employees" and/or
"Palestinian Pension Fund for the State Administrative
Employees of the Gaza Strip"), and THE INSURANCE
AND PENSION FUND

                Defendants.
------------------------------------------------------------ X

Index No: 102101 / 06

**AFFIDAVIT OF COLONEL
(RET.) SHLOMO POLITIS**

I, Col. (ret.) Shlomo Politis, of Jerusalem, Israel, bearer of Israeli identification no. 13192414, after being cautioned to testify truthfully and that failure to do so will subject me to the penalties for perjury under the laws of the State of Israel and the State of New York, hereby declare as follows:

### A.    Professional Background

1. I hold a law degree from the Law Faculty of the Hebrew University in Jerusalem (1976) and I have been a member of the Israeli Bar since 1983.

2. Between 1977 and 2005 I served in a wide variety of legal positions in the Judge Advocate General Corps of the Israel Defense Forces ("IDF").

3. I served, *inter alia*, as the Prosecutor of the IDF Central Command, the (chief) IDF Legal Advisor in the Gaza Strip, and the (chief) IDF Legal Advisor in the West Bank.

4. In 2005 I retired from the IDF with the rank of Colonel.

5. During the course of my service in the IDF I spent a total of 19 years in various positions rendering a wide range of legal advice in the Israeli military government and civil administrations in the West Bank and the Gaza Strip. In the context of this work, I provided on-going legal counsel and advice on both military and civilian issues to all of the various departments and agencies of the Israeli military government and civil administrations in the West Bank and the Gaza Strip.

6. My fields of professional responsibility during this period included, *inter alia*: drafting and preparing IDF legislation in the West Bank and Gaza; researching and interpreting local law (i.e. the Egyptian and Jordanian laws that were in force in these areas prior to Israeli rule); working together with the Office of the State Attorney in representing the IDF before the Israel's Supreme Court and in civil litigation; and dealing with various administrative, municipal and civil law issues.

7. From 1994 until shortly prior to my retirement in 2005, I was engaged in providing legal advice on behalf of the IDF on issues relating to the peace negotiations between Israel and the

2

Palestinians, and in providing the IDF with analyses and interpretation of provisions of the peace agreements that were signed (the various agreements that make up the "Oslo Accords").

8.  During my service in the Gaza Strip I served as a member of and legal advisor for the administration of the insurance and pension fund for employees of the Israeli civil administration in the Gaza Strip.

### B. The Israeli Legal Regime in the Gaza Strip

9.  On June 5, 1967, the Six-Day War broke out. During the course of the hostilities, the IDF captured the Gaza Strip as well as the West Bank (usually referred to in Israeli legislation as "Judea and Samaria"). The legal regime adopted for both areas after the war was the same.

10.  The Israeli government and Supreme Court treated Israel's occupation of the Gaza Strip as subject to the rules of international public law governing "belligerent occupation". *See generally* HCJ 393/82 *Jami'at Ascan el-Malmun el-Mahdudeh el-Masauliyeh, Communal Society Registered at the Judea and Samaria Area Headquarters v. The Commander of IDF Forces in the Judea and Samaria Area*, 37(4) P.D. 785, 792.

11.  Thus, the structure of Israeli rule in the Gaza Strip was based upon a military government (*See* HCJ 390/70 *Duikat v. The Government of Israel*, 34(1) PD 1, 12) subject to the rules of public international law, specifically the rules governing belligerent occupation. (*See* HCJ 69/81 *Abu A'ita v. The Commander of the Judea and Samaria Area*, 37(2) PD 197, 228).

12.  The supreme authority in the Israeli military government in the Gaza Strip was a military commander (an IDF officer) whose official title was "Commander of IDF Forces in the Area" (hereinafter: "IDF Commander").

13. The powers and authority of the IDF Commander were also drawn from the rules of public international law governing military occupations. *See* HCJ 2056/04 *The Beit Sourik Village Council v. The Government of Israel*, 58(5) PD 817.

14. Pursuant to the rules of public international law governing military occupations, all governmental and administrative authority in the Gaza Strip was vested in the IDF Commander. This included all governmental and administrative authority granted under local law (i.e. the law that was in force in the Gaza Strip prior to the war) and all governmental and administrative authority granted in new legislation promulgated by the IDF Commander. *See Jami'at Ascan, id.*, at 792.

15. On June 6, 1967, following the Israeli capture of the Gaza Strip, the IDF Commander issued a "Proclamation Regarding Assumption of Control by the IDF" which provided, in Article 1, that:

> The Israel Defense Forces entered the Area today and assumed control and maintenance of public security and order in the Area.

16. On June 8, 1967, the IDF Commander issued Proclamation No. 2, entitled "Proclamation Regarding Government and Law". Article 2 of this proclamation was captioned "Force of Existing Law" and provided that:

> The law that was in force in the Area on 27 Iyar 5727 (June 6, 1967) shall remain in force to the extent that it does not conflict with this Proclamation or with any proclamation or order which may be issued by me and subject to such modifications as flow from the establishment of the government of the Israel Defense Forces in the Area.

17. Article 3 of Proclamation No. 2 was captioned "Assumption of Powers" and provided in relevant part that:

> All power of government, legislation, appointment and administration in respect to the Area or its residents shall from now on vest exclusively in me and shall be exercised solely by me or by a person appointed by me for that purpose or acting on my behalf.

18. In exercising his powers, the IDF Commander generally applied the law in force prior to June 6, 1967, as reflected in Article 2 of Proclamation No. 2. Therefore, Jordanian law was maintained in the West Bank, and the law applied by the Egyptian administration in the Gaza Strip was maintained in Gaza subject to the conditions set forth by Proclamation No. 2.

19. However, the IDF Commander was entitled, for the welfare of the locale population or out of military or security considerations, to modify the existing law. This authority is recognized under the rules of public international law governing military occupation (*see* Article 43 of the Regulations Concerning the Laws and Customs of War of 1907, annexed to the Fourth Hague Convention of 1907; Article 64 of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War (1949)). On the basis of this authority, the IDF Commander promulgated a large number of legislative enactments in a broad range of spheres (hereinafter: "Israeli Legislation in Gaza").

20. The IDF Commander was an organ of the State of Israel, and all actions of the IDF Commander – including his promulgation of Israeli Legislation in Gaza – were therefore subject to judicial review by the Israeli Supreme Court (sitting as the High Court of Justice). *See e.g.* HCJ 358/88 *The Association for Civil Rights v. Central District Commander*, 43(2) P.D. 529, 537; H.C.J. 2717/96 *Wafa v. Minister of Defense*, 50(2) P.D. 848, 855; *Jami'at Ascan, id.*, at 810.

21. In 1981, the Israeli government decided to restructure the military government in the Gaza Strip and West Bank, by separating the exercise of the civil powers of the military

5

government from the exercise of its military powers. Accordingly, a "Civil Administration" was established within the military government, which was empowered by the IDF Commander to exercise his authority and powers in a broad range of civil spheres. However, this internal organizational change within the Israeli military government in the Gaza Strip – i.e. the establishment of the Civil Administration – did not change the legal structure or status of the Israeli military government in the Gaza Strip.

### C. Public Sector Employee Pensions in the Gaza Strip Under the Egyptian Administration

22. Prior to the Six-Day War, the Gaza Strip was administered by Egypt, under a military government.

23. Under the Egyptians, pension arrangements for public sector workers in the Gaza Strip were governed by Egyptian law no. 8 of 1964 (hereinafter: "Law No. 8").

24. Law No. 8 established an Insurance and Pension Fund, in place of the insurance and savings funds of the employees of the General Administration that had been established by Egyptian order no. 311 of 1954. The rights and obligations of the Insurance Fund and Savings Account that had been established by order no. 311 were assigned to the Insurance and Pension Fund established by Law No. 8. In that manner, the continuity of legal rights and obligations was preserved.

25. Under Law No. 8, the pension regime created was applied to numerous categories of civil servants in governmental and public service. These included *inter alia*: employees of the central Egyptian administration in Gaza; police officers and policemen; employees whose salaries were paid under any provision of the budget; employees of the municipal and village councils; employees of the *Wakf* (Muslim religious trusts); and employees of the Insurance and Pension Fund itself.

26.  Law No. 8 creates an Insurance and Pension Fund within the framework of the Egyptian Government General in Gaza. The administration of the Insurance and Pension Fund was conducted by a body known as the Insurance and Pension Fund Administration which was supported through a special budget.

### D.  Public Sector Employee Pensions in the Gaza Strip Under the Israeli Administration

27.  As discussed above, following the Six-Day War, Israeli established its own military government in the Gaza Strip.

28.  The question therefore arises whether the new regime – the Israeli military government – became liable for the pension debt of the old regime – the Egyptian military government – to the public sector employees in Gaza. The answer to this question turns on whether there exists a rule of public international law that requires an occupying state to assume the debts of the former government to the residents of the occupied territory.

29.  No such rule of international law exists. An occupying sovereign does not become liable for the debts of the previous sovereign to the residents of the territory. *See e.g. West Rand Central Gold Mining Co. v. The King (1905)* 2 KB 391 (King's Bench Division); CApp 41/49 *Simshon Palestine Portland Cement Factory LTD. v. Attorney-General*, 4 P.D. 143, 148; Shamgar, Meir (ed.), *Military Government in the Territories Administered by Israel, 1967-1980: The Legal Aspects* (1982) (vol. 1, pg. 46).

30.  Accordingly, the Israeli military government did not inherit the pension debts of the Egyptian administration to the public sector employees under Law No. 8.

31.  Moreover, for the same reason, the Israeli military government did not inherit the contractual obligations of the Egyptian administration toward its employees. At the moment that

7

Israel took control of the Gaza Strip, the employees of the Egyptian military government became unemployed as a matter of law.

32. Under international law, the primary duty of the occupier is to continue governing the occupied territory, and in a manner which preserves public order and safety. *See e.g. Jami'at Ascan, id.,* at 798. The Israeli military government in Gaza therefore had a clear interest in recruiting and hiring civil servants who had been employed by the Egyptian government, to staff analogous positions in the Israeli military government. By hiring Gazans previously employed by the Egyptian administration, the Israeli military government ensured a smooth and efficient change of power and restoration of services to the public. *See* Shamgar *id.* at 46. Accordingly, in order to attract such employees, the Israeli military government decided to establish pension arrangements for its employees.

33. The pension arrangements for employees of the Israeli military government (and later, Civil Administration) were created through a *new* pension apparatus, that was legally distinct and separate from the Insurance and Pension Fund that existed under the Egyptian administration, as explained below:

34. On January 12, 1969, the IDF Commander issued the "Order Regarding Pensions Law (Gaza Strip and North Sinai) (No. 255) 5729-1969" (hereinafter "Order No. 255").

35. Order No. 255 created a new pension apparatus for employees of the Israeli military government in Gaza. Order No. 255 incorporates most of the provisions of Law No. 8 (which is termed "The Pension Law" in the definitional section of Order 255) and adopts the name used by Law No. 8 ("Insurance and Pension Fund"), but at the same time provides in Article 3 that:

> Every appointment, every authority and every position granted under the Pension Law **prior to the determinant date are void**, however the Administration may give them new effect.

(Emphasis added).

36.   The term "determinant date" is defined in the "Order Regarding Interpretation (Gaza Strip and North Sinai) (No. 300), 5729-1969" as June 6, 1967 – i.e. the date that the IDF took control of the Gaza Strip.

37.   The "Administration" referenced in Article 3 of Order 255 is discussed in Article 2 of Order 255. Article 2 provides for the appointment of an Administration of the Insurance and Pension Fund <u>by the IDF Commander</u>, and vests in the Administration all powers and authority granted under or pursuant to Law No. 8.

38.   Thus, Article 3 of Order 255, by voiding "Any appointment, any authority and any position granted under" under Law No. 8, operated to extinguish the legal effect of Law No. 8. At the same time, Order 255 created a new pension apparatus for employees of the Israeli military government, by creating a new Administration – appointed by the IDF Commander – and vesting that Administration with all the powers described in Law No. 8.

39.   It is important to distinguish carefully between the force of Law No. 8 before versus after the promulgation of Order 255. Before Order 255 was issued, Law No. 8 had independent legislative force. But Order 255 negated the independent effect of Law No. 8, and simultaneously created a new pension apparatus <u>governed by Order 255 itself</u>, under which all powers available under Rule No. 8 were vested in the IDF-appointed Administration. Thus, once Order 255 was issued <u>Order 255 became the sole statutory source of authority for the existence and operation of the Insurance and Pension Fund.</u>

40.   In fact, over the years the IDF Commander made numerous further modifications to this pension regime. *See e.g.* Order No. 463 from 1973, Order No. 515 from 1975, Order No. 593

9

from 1978, Order No. 596 from 1979, Order No. 636 from 1980, Order No. 796 from 1983, Order No. 802 from 1983, Order No. 835 from 1983, Order No. 840 from 1984.

41. Accordingly, there was no legal continuity or connection between the Insurance and Pension Fund which existed under the Egyptian administration in Gaza, and the Insurance and Pension Fund created by the IDF Commander for the employees of the Israeli military government. Notwithstanding the fact that Israeli pension regime adopted the same name ("Insurance and Pension Fund") and (at the outset) most of the same operating provisions as the Insurance and Pension Fund that existed under the Egyptians, the latter entity was legally extinguished by operation of Order 255.

42. As discussed above, in 1981 a Civil Administration was created within the Israeli military government in the Gaza Strip. The Civil Administration was established and empowered by operation of the "Order Regarding Establishment of the Civil Administration (Gaza Strip and North Sinai Region) (No. 725), 5742 – 1981" (hereinafter: "Order No. 725").

43. Pursuant to the Second Appendix to Order No. 725, powers and authority relating to the pension regime established by Order 255 were vested in the Civil Administration.

44. Thus, from 1981 on, the new Israeli "Insurance and Pension Fund" created by Order 255 was under the Civil Administration.

45. Moreover, the Israeli "Insurance and Pension Fund" in Gaza, which as discussed above was operated by an Israeli-staffed and appointed Administration, functioned as an organizational department within the Civil Administration. (Indeed, the Insurance and Pension Fund was run by Israeli "Staff Officers" of the Civil Administration). Under this arrangement <u>the Civil Administration itself</u> was liable to the employees for payment of pension benefits. Thus, the employees had *in personam* pension rights vis-à-vis the Civil Administration.

46. Accordingly, and because the Civil Administration was merely an organ of the Israeli Ministry of Defense and funded from Israel's central Treasury, the pension contributions were withheld at the source and accumulated on the books of the Israeli Treasury.

### E. The Palestinian Authority Assumes the Pension Debt of the Civil Administration and Receives Cash Compensation

47. On May 4, 1994, Israel and the Palestine Liberation Organization ("PLO") signed the Agreement on the Gaza Strip and the Jericho Area (hereinafter: "Gaza-Jericho Agreement").

48. The Gaza-Jericho Agreement was intended to implement the Declaration of Principles on Interim Self-Government Arrangements signed by Israel and the PLO on September 13, 1993, and "in particular the Protocol on withdrawal of Israeli forces from the Gaza Strip and the Jericho Area". *See* Gaza-Jericho Agreement, Preamble.

49. The Gaza-Jericho Agreement established a "Palestinian Authority" to which Israel agreed to transfer various powers and responsibilities, and provided that Israel would withdraw its military forces from Jericho and most of the Gaza Strip. *Id.* at Article III(1); Article II(1).

50. Article III(4) of the Gaza-Jericho Agreement provided that:

> Upon the completion of the Israeli withdrawal and the transfer of powers and responsibilities ... ***the Civil Administration in the Gaza Strip and the Jericho Area will be dissolved*** and the Israeli military government will be withdrawn. The withdrawal of the military government shall not prevent it from continuing to exercise the powers and responsibilities specified in this Agreement.

*Id.* (emphasis added).

51. Thus, under the Gaza-Jericho Agreement, the Israeli Civil Administration in Gaza was dissolved.

11

52. Article III(2) of the Gaza-Jericho Agreement provides that the powers and responsibilities transferred to the Palestinian Authority are those set out in the Protocol Concerning Civil Affairs attached as Annex II to the Gaza-Jericho Agreement (hereinafter: "Annex II").

53. I am quite familiar with the provisions of the Gaza-Jericho Agreement in general, and of Annex II in particular, because in the course of my professional legal duties in the IDF I was responsible for interpreting the Gaza-Jericho Agreement and formulating the military legislation necessary to effectuate the transfer of powers to the Palestinian Authority.

54. Section 16 of Annex II contains provisions regarding the transfer of the Civil Administration's pension debts to its employees. Section 16 provides in relevant part as follows:

> b) As part of its powers and responsibilities, *the Palestinian Authority shall assume the Civil Administration's statutory and contractual obligations to Palestinian employees, regarding pensions and their payment.*
>
> c) In the Gaza Strip, upon the transfer of powers and responsibilities, the Palestinian Authority shall assume prevailing powers and obligations, according to the existing pension system. *Israel shall transfer to the Palestinian Authority*, or to a Pension and Insurance Fund if established, the net income of the Fund (all payments plus interest after deduction of pension payments and running expenses) *as accumulated at the Israel Ministry of Finance.*
>
> ....
>
> e) After the transfer of authorities in this sphere, if Israel is sued by any employee or his/her heirs for any sums due to him/her as a pension, *the Palestinian Authority shall reimburse Israel* the full amount awarded the employee or his/her heirs by any court or tribunal.
>
> f) Where legal proceedings are brought in respect of such a claim, Israel will *notify the Palestinian Authority and enable it to participate* in defending the claim.

*Id.* (emphasis added).

12

55. By operation of Section 16 of Annex II, quoted above, the following occurred:

   a. The Civil Administration's *in personam* pension debts to the employees were assigned to and assumed by the Palestinian Authority;

   b. The Palestinian Authority both assumed this debt to the employees and undertook to indemnify and reimburse the Israeli government for any future pension claim brought by a former employee;

   c. In order to imburse the Palestinian Authority for the assumption of the Civil Administration's *in personam* debt to the employees Israel transferred to the Palestinian Authority a cash sum equal to the net amount of pension contributions withheld over the years from the employees' salaries on the books of the Israeli Treasury.

56. Since the funds transferred to the Palestinian Authority pursuant to Section 16 of Annex II were intended to imburse the Palestinian Authority for its assumption of the Israeli Civil Administration's intangible personal debt to the employees, it is clear that those funds are the property of the Palestinian Authority.

Date: May 21, 2007

Col. (ret.) Shlomo Politis, Adv.

### Certification

I, attorney Avraham Colthof, Adv., Israeli Bar no. 35153 hereby certify that on May 21, 2007, Shlomo Politis, bearer of Israeli identification no. 13192414, whom I identified by his Israeli picture identification card bearing that number, appeared before me and signed the affidavit above after I cautioned him to testify truthfully and that failure to do so will subject him to the penalties for perjury under the laws of the State of Israel and the State of New York.

Avraham Colthof, Adv.