SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------X

THE ESTATE OF YARON UNGAR, et al.,

                Plaintiffs,

        -against-

THE PALESTINIAN AUTHORITY, et al.,

                Defendants.

------------------------------------------------------------------X

Index No: 102101 /06

**NOTICE OF MOTION**

COUNSEL:

        PLEASE TAKE NOTICE that upon the annexed affirmation of Robert J. Tolchin, Esq., dated September 7, 2010; the exhibits annexed thereto; and upon the pleadings and proceedings heretofore had herein, the plaintiffs will move this Court, at the Courthouse located at 60 Centre Street, New York, New York, at the Motion Submission Part thereof, Room 130, on September 21, 2010 at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for an order:

        a)      APPOINTING a temporary receiver, pursuant to C.P.L.R. § 6401, selected by the Court, authorized and empowered to locate and retain a custodian for the assets that are the subject of this action, pending the disposition of this action; and

        b)      GRANTING such other and further relief as is just and proper under the circumstances.

Dated: New York, New York
        September 7, 2010

Respectfully submitted,

JAROSLAWICZ & JAROS, ESQS.
*Attorneys for the plaintiff*

by:

Robert J. Tolchin,
Counsel

225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

TO:   Miller & Chevalier
*Attorneys for the defendant*
*Palestinian Authority*
655 Fifteenth Street, NW Suite 900
Washington, DC 20005-5701
(202) 626-5800

MORRISON & FOERSTER, LLP
*Attorneys for the defendant*
*Insurance and Pension Fund*
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------ X

THE ESTATE OF YARON UNGAR, et al.,

                Plaintiffs,

        -against-

THE PALESTINIAN AUTHORITY, et al.,

                Defendants.

------------------------------------------------------------------ X

Index No: 102101 / 06

**AFFIRMATION IN
SUPPORT**

**ROBERT J. TOLCHIN**, an attorney licensed to practice law in the State of New York, affirms as follows subject to the penalties of perjury:

1.      I am an attorney licensed to practice before the courts of the State of New York. I am of counsel to the firm Jaroslawicz & Jaros, attorneys for the plaintiffs herein. I am making this affirmation in support of plaintiffs' motion for an order:

      a)      APPOINTING a temporary receiver, pursuant to C.P.L.R. § 6401, selected by the Court, authorized and empowered to locate and retain a custodian for the assets that are the subject of this action, pending the disposition of this action; and

      b)      GRANTING such other and further relief as is just and proper under the circumstances.

2.      This is a declaratory judgment action to determine the ownership of a securities portfolio held in an account titled "**Palestinian Pension Fund of the State Administrative Employees Represented by the Palestinian National Authority.**"

3.    The two defendants in this action are the Palestinian Authority and The Insurance and Pension Fund.

4.    Plaintiffs, who hold an unsatisfied judgment against defendant Palestinian Authority in the amount of approximately $116 million entered by the United States District Court for the District of Rhode Island, assert in this action that the securities at issue are owned by defendant Palestinian Authority.

5.    For its part, defendant Insurance and Pension Fund claims to own the securities at issue, on the sole grounds that it is sometimes also known by the name the "Palestinian Pension Fund of the State Administrative Employees."

6.    On June 5, 2008, this Court denied the Insurance and Pension Fund's motion for summary judgment after finding, *inter alia*, that the Insurance and Pension Fund had "not presented evidence that adequately explains the use of different names for what they now say is the same Pension Fund," that its "evidence does not clarify to what extent the PA or the Insurance and Pension Fund control the [portfolio at issue], whether the latter is even being used as a *pension* fund, and the sources of the funds" and that it had "provide[d] conflicting explanations of how the funds have been and will be used and for whose benefit." Decision and Order, 6/5/08 at pp. 8-10.[1]

-----

[1] As the Court may recall, plaintiffs' opposition to the motion for summary judgment showed, *inter alia*, (on the basis of the actual documents themselves) that the Insurance and Pension Fund and the so-called "Palestinian Pension Fund of the State Administrative Employees" have two completely separate boards of directors, readily demonstrating that the Insurance and Pension Fund's claim that it is also known by the name "Palestinian Pension Fund of the State Administrative Employees" is pure fiction.

7.    On March 30, 2010, the Appellate Division affirmed the decision of this Court that this case should be tried by a jury. *See Strachman v. Palestinian Authority*, 73 A.D.3d 124, 901 N.Y.S.2d 582 (1st Dept. 2010).

8.    Today, and since the outset of this litigation (and for years prior) the securities at issue are and have been controlled – as a practical matter – by attorneys at the firm of Morrison Foerster, who both represent defendant Insurance and Pension Fund in this action and provide services to defendant Palestinian Authority.

9.    Since the commencement of their enforcement proceedings against the securities portfolio at issue, the plaintiffs have been constrained to take steps to ensure that the portfolio is being actively and responsibly managed and invested, so that the securities do not decrease, and hopefully increase, in value.

10.    Indeed, as long ago as March 2006, the plaintiffs were compelled to bring an order to show cause in this Court demanding that securities continue to be traded, after the Morrison Foerster attorneys threatened that trading would halt if the plaintiffs did not discontinue their enforcement proceedings. (Exhibit A).

11.    Similarly, in 2006 and 2007, after further threats about a halt in trading, the Ungars entered into stipulations providing that the asset managers can and should continue to trade the portfolio, on the condition that the principal and any profits remain in New York. (Exhibits B and C).

12.    However, to plaintiffs' shock and consternation, late last month the Morrison Foerster attorneys who have practical control over the securities portfolio at issue filed papers in the U.S. District Court for the District of Rhode Island admitting –

for the first time – that the portfolio has lost **millions** in value, and may lose **millions** more, due to their own failure to find a securities custodian willing to hold the portfolio. Exhibit D at ¶¶ 28-35. [2]

13.     Particularly astonishing is the admission that this state of affairs has obtained for **years**. *Id.*

14.     While the Morrison Foerster attorneys seek to blame their failure to find a custodian on the federal injunction currently restraining the assets, a careful reading of their papers shows clearly that there are **other reasons** – reasons which they intentionally decline to reveal or identify – underlying their failure. *See id.* at ¶ 30 ("[E]ach potential custodian cited the Notice of Injunction **as one of the reasons** for their refusal to serve as custodian.") (emphasis supplied).

15.     Whether these attorneys are actually **incapable** of finding a custodian or **unwilling** to make a serious effort to do so (as plaintiffs suspect) is immaterial at the moment: what matters right now is that due to their nonfeasance (or malfeasance) the value of the securities at issue in this case has (according to their own admission) plummeted and will continue to plummet.

16.     The notion that **no** securities custodian can be found for the securities portfolio at issue – a portfolio which has a current value of some **$122 million** (*see* Exhibit D at ¶ 32) – is patently absurd.

---

[2] At this time the plaintiffs have no means of verifying these claims of loss and are thus compelled to accept them as true for the purpose of the instant motion. Plaintiffs reserve the right to examine and challenge the accuracy of these claims.

17.    Indeed, over just the past few days, since the filing of the papers in the Rhode Island federal court asserting difficulties in finding a custodian, plaintiffs' counsel have contacted several securities custodians which have expressed serious interest in holding the portfolio.

18.    Moreover, it is reasonable to assume that if the attorneys currently in control of the portfolio have truly been **unable** (as opposed to unwilling) to retain a securities custodian, that failure stems in great if not sole part from the fact that these attorneys are associated with the Palestinian Authority, which is perceived by many as tainted with a history of corruption and terrorism.

19.    By contrast, it is highly likely that if the approach to the potential custodians were to be made by persons not associated with the Palestinian Authority, the reaction of the potential custodians would be far more receptive and positive.

20.    Unfortunately, however, plaintiffs' counsel have no means of unilaterally retaining a custodian because they have no control over the portfolio.

21.    The simple and obvious solution, therefore, is to appoint a temporary receiver to fulfill this task.

22.    Indeed, it is likely that if the potential custodians are approached by a **receiver** – i.e. an officer of the Court – rather than by private attorneys, any concerns they might have had about holding these assets will be alleviated.

23.    Accordingly, given this state of affairs, **and with $122 million at stake**, the Court should appoint a temporary receiver forthwith (to be selected by the

Court itself) who is authorized and empowered to retain a custodian for the securities at issue and thereby preserve their value, pending the outcome of this litigation.

24.     Section 6401 of the C.P.L.R. authorizes this Court to appoint a receiver over property that is the subject of any action "where there is danger that the property will be … lost, materially injured or destroyed." § 6401.

25.     Here, the attorneys for the Insurance and Pension Fund openly admit that the assets at issue have lost value, and are in danger of declining further, due to their failure to find a securities custodian. Exhibit D at ¶¶ 28-35.

26.     Moreover, since the Court has already found (in denying its motion for summary judgment) that the Insurance and Pension Fund's claim to own the securities at issue is subject to numerous material disputed factual questions, the attorneys for the Insurance and Pension Fund have no right to continue to (mis)manage and dissipate these securities, to the potential detriment of the plaintiffs, who seek to ultimately satisfy their judgment from these assets.

27.     Therefore, the appointment of a temporary receiver selected by the Court and authorized to find and retain a securities custodian pending the final disposition of this action is clearly warranted. *See e.g. Chaline Estates, Inc. v. Furcraft Associates*, 278 A.D.2d 141, 718 N.Y.S.2d 53 (1st Dept. 2000); *Somerville House Management, Ltd. v. American Television Syndication Co., Inc.*, 100 A.D.2d 821, 474 N.Y.S.2d 756 (1st Dept. 1984); *Lefebvre v. Shea* 212 A.D.2d 884, 622 N.Y.S.2d 151. (3rd Dept. 1995).

**WHEREFORE**, the instant motion should be granted.

Dated: New York, New York
      September 7, 2010

Robert J. Tolchin

EXHIBIT A

JAROSLAWICZ & JAROS

ms#2
other

At an IAS Part ~~~ of the Supreme Court of the
State of New York, held and for the County of New
York, located at 111 Centre Street, New York, New
York, on the 2~ day of ~~February~~, 2006.

005279

EX PARTE MOTION OFFICE
APPROVED
FOR THE PAYMENT
OF MOTION FEE
ONLY

PRESENT:

HON. _____

Justice.

-------------------------------------------------- X

In the matter of the Application of:

THE ESTATE OF YARON UNGAR by and through its
Administrator, DAVID STRACHMAN; DVIR UNGAR,
minor, by his guardians and next friends, YISHAI
UNGAR, minor, by his guardians and next friends,
PROFESSOR MEIR UNGAR, JUDITH UNGAR,
individually and in their capacity as legal guardians of
Petitioners DVIR UNGAR and YISHAI UNGAR; RABBI
URI DASBERG, JUDITH DASBERG, in their capacity as
legal guardians of Petitioners DVIR UNGAR and YISHAI
UNGAR; AMICHAI UNGAR, DAFNA UNGAR
and MICHAL COHEN,

               Petitioners,

For an order and judgment pursuant to CPLR §§ 5225
and 5228

           -against-

SWISS AMERICAN SECURITIES, INC.,

              Respondent.

-------------------------------------------------- X

Index No: 102106/ 06

ORDER TO SHOW CAUSE

UPON reading and filing the annexed affirmation of ROBERT J. TOLCHIN, ESQ., dated the 1st day of March, 2006, upon the exhibits annexed thereto; and upon all the pleadings and proceedings heretofore had herein,

LET, the Respondent SWISS AMERICAN SECURITIES, INC., judgment-debtor THE PALESTINIAN AUTHORITY, and THE INSURANCE AND PENSION FUND, show cause before this Court at an IAS Part 49 ~~room 23c~~ hereof, on the 20 day of March, 2006 at 2 : 01 o'clock ~~A.M.~~ / P.M. that day, or as soon thereafter as counsel can be heard,

WHY, an Order should not be made and entered:

a)        COMMANDING, DIRECTING and REQUIRING the Respondent SWISS AMERICAN SECURITIES, INC. to continue managing and investing the assets held by Respondent which are currently the subject of a Restraining Notice, a Sheriff's Levy of Execution, and the within Turnover Proceeding, pursuant to existing management and investment guidelines, provided that Respondent does not release or transfer the assets, including any proceeds, dividends, interest and/or other returns thereon, to the possession or control of any party other than Respondent, until further order of the Court; and

b)        GRANTING such other and further relief as is just and proper under the circumstances.

AND IT IS FURTHER ORDERED that service of this order to show cause and supporting papers on Respondent SWISS AMERICAN SECURITIES INC. by ~~Federal Express or~~ Hand Delivery to their counsel of record, Duval & Stachenfeld, LLP, 300 East 42nd St., New York, New York 10017, on or before March 6, 2006, shall be deemed good and sufficient service thereof;

AND IT IS FURTHER ORDERED that service of this Order to Show Cause and supporting papers upon judgment-debtor THE PALESTINIAN AUTHORITY, by certified mail,



return receipt requested and overnight courier to its office at 1320 18th Street N.W., Suite 200, Washington D.C. 20036, on or before March 6, 2006, shall be deemed good and sufficient service thereof;

AND IT IS FURTHER ORDERED that service of this order to show cause and supporting papers on THE INSURANCE AND PENSION FUND, by ~~Federal Express or~~ Hand Delivery to its counsel of record, Morrison & Foerster, LLP, 1290 Avenue of the Americas, New York, New York 10104 on or before March 6, 2006, shall be deemed good and sufficient service thereof.

ENTER:

_____
J.S.C.

-3-


EXHIBIT A    EXHIBIT B    EXHIBIT C    EXHIBIT D    EXHIBIT E 

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------- X
In the matter of the Application of:

THE ESTATE OF YARON UNGAR by and through its
Administrator, DAVID STRACHMAN; DVIR UNGAR,
minor, by his guardians and next friends, YISHAI
UNGAR, minor, by his guardians and next friends,
PROFESSOR MEIR UNGAR, JUDITH UNGAR,
individually and in their capacity as legal guardians of
Petitioners DVIR UNGAR and YISHAI UNGAR; RABBI
URI DASBERG, JUDITH DASBERG, in their capacity as
legal guardians of Petitioners DVIR UNGAR and YISHAI
UNGAR; AMICHAI UNGAR, DAFNA UNGAR
and MICHAL COHEN,

        Index No: 102106/ 06

        **AFFIRMATION IN SUPPORT**
        <u>OF ORDER TO SHOW CAUSE</u>

        Petitioners,

For an order and judgment pursuant to CPLR §§ 5225
and 5228

      -against-

SWISS AMERICAN SECURITIES, INC.,

        Respondent.

------------------------------------------------------------------------- X

      **ROBERT J. TOLCHIN**, an attorney licensed to practice law in the State of New

York, affirms as follows subject to the penalties of perjury:

      1.     I am an attorney licensed to practice before the courts of the State of New

York. I am of counsel to the firm Jaroslawicz & Jaros, attorneys for the plaintiff herein. I am

making this affirmation in support of the within application by Order to Show Cause, which

seeks an order:

a)       COMMANDING, DIRECTING and REQUIRING the Respondent SWISS AMERICAN SECURITIES, INC. to continue managing and investing the assets held by Respondent which are currently the subject of a Restraining Notice, a Sheriff's Levy of Execution, and the within Turnover Proceeding, pursuant to existing management and investment guidelines, provided that Respondent does not release or transfer the assets, including any proceeds, dividends, interest and/or other returns thereon, to the possession or control of any party other than Respondent, until further order of the Court; and

b)       GRANTING such other and further relief as is just and proper under the circumstances.

## OVERVIEW

2.       The respondent, Swiss American Securities Inc. ("SASI"), a Manhattan securities firm, has informed the Plaintiffs-Judgment Creditors ("Ungars") that it holds stocks and bonds under the name "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip."

3.       The Ungars assert that the name "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" is merely an alias used by Defendant-Judgment Debtor Palestinian Authority ("PA") and that the stocks and bonds held by SASI are owned by the PA and subject to execution in satisfaction of the Ungars' judgment against the PA.

4.       The "Insurance and Pension Fund" ("IPF"), a pension fund operating in the PA, asserts that the name "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" is an alias for the IPF itself, and that the IPF is the owner of the stocks and bonds held by SASI.

5.       Thus, there is <u>no</u> dispute that the name "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" is an <u>alias</u>. The sole question at issue is whether that name is an alias for the IPF (as the IPF asserts) or for the PA (as the Ungars assert).

6.      The Ungars have served SASI with a restraining notice, and have filed a petition against SASI for turnover of the stocks and bonds, as well as a complaint seeking declaratory judgment that the stocks and bonds belong to the PA and not to the IPF. Additionally the New York City Sheriff has served a Levy and Execution on SASI.

7.      The IPF has filed a motion to vacate the restraining notice on SASI.[1]

8.      Thus, the petition and complaint filed by the Ungars, and the motion to vacate filed by the IPF, all raise the identical question: do the assets held by SASI belong to the PA or to the IPF?

9.      The Ungars therefore have moved to consolidate and/or join these three proceedings.

10.      In the meanwhile, while these issues are pending before the Court, counsel for SASI and for the Insurance and Pension Fund have taken the position that their clients are being damaged by the very existence of the Restraining Notice since, they contend, the Restraining Notice prohibits SASI from buying and selling securities in their account.

11.      In fact, however, the Restraining Notice does not prohibit the continued management or investment of the securities. The Ungars have repeatedly demanded that SASI continue to manage and invest the securities pursuant to extant investment guidelines (provided that the securities and any profits remain in SASI's sole possession) in order to preserve and maximize their value pending turnover to the Ungars (*E.g.,* Exhibits L and M). SASI has ignored these demands, apparently in coordination with IPF and/or its counsel.

---

[1] As detailed below, though the IPF itself openly states that its statutory legal name is "The Insurance and Pension Fund" and refers to itself as such throughout its motion papers, it has misleadingly and bizarrely captioned its motion to vacate in the name of its claimed alias (the "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip") rather than in its admitted legal name ("The Insurance and Pension Fund"). CPLR § 3015(b) requires that pleadings accurately identify the status of corporate parties, and does not contemplate prosecution of claims under pseudonyms.

12.     Simply put, SASI appears to be refraining from managing the assets at the urging of IPF or its counsel, in order to manufacture an artificial claim of "harm" against the Ungars. The instant application seeks both to put an end to this bad-faith ploy and preserve the value of the assets.

## A.     The Underlying Judgment

13.     Petitioners are the orphaned children, parents, siblings and administrator of the estate of U.S. citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat Ungar in a terrorist machine-gun attack on June 9, 1996 in Israel. The machine-gun attack in which the Ungars were murdered was carried out by members of the HAMAS terrorist group acting under the command and pursuant to the instructions of The Palestinian Authority ("PA") and The Palestine Liberation Organization ("PLO"). A 25 year-old New York native, Yaron was a schoolteacher studying for rabbinical ordination when he was murdered. The Ungars were ambushed while returning from a wedding. Efrat shielded their ten month-old son Yishai from the bullets and he survived the attack. The Ungars' other son Dvir, then two years old, was not in the vehicle.

14.     In March 2000, the Ungar family filed suit against the PA, the PLO, and other defendants, in the United States District Court for the District of Rhode Island under the Antiterrorism Act ("ATA") 18 U.S.C. § 2331 *et seq.. Ungar et al. v. The Palestinian Authority et al.,* Civil Action 00-105L (D.R.I.). Section 2333(a) of the ATA creates a cause of action for a U.S. national, or his estate, survivors and heirs, injured by reason of an act of "international terrorism" as defined in § 2331 of the ATA.

15.     On July 12, 2004, the United States District Court in Rhode Island issued a Memorandum and Order ordering entry of final judgment for the Petitioners and against the PA and PLO, jointly and severally, in the amount of $116,409,123.00 in damages, and for attorney's fees in the amount of $11,925.00 against the PA and $6,345.00 against PLO. *Ungar v. Palestinian Authority,* 325 F.Supp.2d 15 (D.R.I. 2004). (Exhibit A).

-4-

16.    Final judgment as ordered in the Memorandum and Order of July 12, 2004, was entered by the Rhode Island District Court on July 13, 2004 (the "Judgment"). (Exhibit B). The Court of Appeals for the First Circuit has affirmed the Judgment, and the United States Supreme Court has denied a petition by the PA and PLO for a writ of certiorari. *Ungar v. Palestinian Authority*, 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005). (Exhibits C, D).

17.    The PA and PLO have refused to satisfy Petitioners' Judgment, and have informed the Ungars' trial counsel that they "will never pay" the Judgment.

18.    On April 21, 2005, Petitioners domesticated their Judgment pursuant to CPLR § 5402 by filing it in the office of the Clerk of the County of New York and the Judgment was then entered in this Court as Index Number 105521/05. (Exhibit E).

**B.     The PA and PLO Hold and Manage Their Assets Under
          Various Aliases and Pseudonyms**

19.    The Ungars have expended massive and extraordinary efforts and resources in order to enforce their judgment, but, as the U.S. District Court for the Southern District of New York recently found, the Ungars are faced with "an elusive and amorphous judgment debtor," *Ungar v. Palestinian Auth.*, ___ F. Supp. 2d. ___, 2006 WL 225839 (S.D.N.Y. Jan. 5, 2006).

20.    The elusiveness and amorphousness of judgment-debtors PA and PLO are reflected in the fact that for decades, the PA and PLO have systematically held and managed their assets under various fictitious names and aliases in order to hide the PA's and PLO's involvement in financial activities from parties who would not otherwise do business with them, and to shield the financial activities and assets of the PA and PLO from law-enforcement and tax authorities and from creditors such as the Ungars.

21.    Worse still, the fictitious names and aliases used by the PA and PLO to shield their assets are specifically designed to create an impression of legitimacy, respectability and innocence, and include, for example, names falsely connoting charities, social

service/welfare funds, or prestigious commercial enterprises. Thus, for example, the PA and PLO have hidden their assets under names such as the "Palestine Martyrs Works Society" or the "Palestine Commercial Services Company." Contrary to their charitable or business-like connotations, the funds held under these names were nothing but PA and PLO slush-funds.

22.    Thus, in virtually all of the numerous pending proceedings brought by them to enforce their judgment, the Ungars face the daunting task of peeling back the deceptive façade carefully laid by the PA and PLO, and demonstrating that the assets in question belong not to widows, orphans or legitimate businesses, but to the PA and/or PLO themselves.

C.    SASI Holds Securities and Debt Instruments Owned By
       Judgment Debtor PA

23.    In April, 2005, Petitioners served SASI with an Information Subpoena and Restraining Notice pursuant to CPLR § 5222 ("Exhibit F").

24.    In response to Petitioners' Information Subpoena and Restraining Notice of May 2005, SASI first submitted to Petitioners' counsel, in May 2005, "Verified Answers in Connection With Information Subpoena" which listed only 3 securities of limited value which SASI claimed were purchased by something it called the "Palestinian Pension Fund." (Exhibit G).

25.    Subsequently—and    inexplicably—without    solicitation,    SASI    sent Plaintiff's counsel in December 2005 an "Amended Verified Answers in Connection With Information Subpoena" ("SASI's Amended Verified Answers") (Exhibit H). SASI's Amended Verified Answers lists over 250 additional securities and debt instruments, worth millions of dollars, in SASI's possession, none of which were listed in SASI's original Verified Answers.[2]

---

[2] In a telephone conversation with the undersigned, SASI's counsel, Allan Taffet, Esq., was unable to explain why these assets were not previously identified by SASI, nor was he able to explain what had happened in the interim that had precipitated the amended response.

26.     In its Amended Verified Answers, SASI obscurely states that it "has been informed" that the securities and debt instruments in SASI's possession and listed therein "belong to an entity called the Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip." Exhibit H, p. 3.

27.     After several months of careful and extensive research in both the United States and Israel,[3] the Ungars' have concluded that that the names "Palestinian Pension Fund" and "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" (or similar permutations thereof) do not denote entities with legal, juridical or factual existence.

28.     On the contrary, plaintiffs' research indicates that (consistent with the PA's and PLO's *modus operandi*) these names are fictitious names invented and used by the PA to shield the PA assets held under those names from creditors, law enforcement agencies and tax authorities, and to mislead banks, brokerages and other financial and/or investment institutions which would not otherwise hold, handle or invest those assets.

29.     Plaintiffs' research further indicates that the stocks and bonds held by SASI under the fictitious names "Palestinian Pension Fund" and "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" (or similar permutations thereof), are the sole and exclusive property of the PA, and were purchased using PA funds held in PA accounts at a Zurich branch of Credit Suisse Asset Management and/or Credit Suisse First Boston.

30.     The Ungars have therefore filed a petition in this Court pursuant to CPLR §§ 5225 and 5228, seeking turnover of the PA stocks and bonds held by SASI and their sale by a receiver. *Matter of Ungar v. Swiss American Securities Inc.*, Index No. 102106/ 06. (Exhibit I).

---

[3] At great expense, the Ungars' counsel and researchers in the United States and in Israel have reviewed thousands of documents, in English, Hebrew, and Arabic, and have interviewed numerous relevant witnesses, including senior past and current Israeli officials who possess direct, detailed knowledge of the assets at issue.

**D.**    **The "Insurance and Pension Fund" Has Asserted a Claim
to the PA Stocks and Bonds Held by SASI**

31.    In December 2005 (one day after SASI served its Amended Verified Answers) an entity known as "The Insurance and Pension Fund" ("IPF") filed a motion in this Court under Index No: 105521 / 05, seeking to vacate the Restraining Notice served by Plaintiffs on SASI ("Motion to Vacate") (Exhibit J).[4]

32.    In its Motion to Vacate, the IPF asserts that it is a pension and insurance fund established by and operating pursuant to an Egyptian statute (as subsequently modified by Israeli military orders and enactments of the PA) in areas under the jurisdiction of the PA.

33.    The IPF claims in its Motion to Vacate that it (and not the PA) owns the stocks and bonds which SASI holds and which SASI "has been informed" belong to the "Palestinian Pension" fund and the "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip."

34.    The IPF bases its claim to ownership of the SASI-held assets on the *ipse dixit* assertion that, in addition to the name "The Insurance and Pension Fund" it is also known by the alias "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" and by the alias "Palestinian Pension Fund of the State Administrative Employees", and that these three names are fully interchangeable synonyms and all refer to the IPF. *See* Memo in Support of Motion to Vacate, footnote 6.

35.    In a crude attempt to "front-load" its alias claim—and despite the fact that the IPF itself expressly states that its statutory legal name is "The Insurance and Pension Fund" (*id.*) and refers to itself as such throughout its motion papers—the IPF improperly styled its Motion to Vacate as being made under the name of its claimed alias (the "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip"), rather than in its admitted

---

[4] The Motion to Vacate is currently returnable in the Motion Submission Part (Room 130) on March 9, 2006.

legal name ("The Insurance and Pension Fund"). Aside from being embarrassingly transparent, this pointless is misleading and deceptive. A party asserting a claim in court must proceed in the party's legal name, not its claimed alias, and certainly not an alias without elaboration (such as a formal d/b/a).

36.     The Ungars believe, based upon all their research, that the IPF is not and never has been known by the names "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" or "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip," and that the IPF has no rights whatsoever to the assets held by SASI. In short, the Ungars believe that the IPF's claims are false. [5]

37.     The Ungars believe based on all available evidence that the Motion to Vacate and the claims therein are simply one more "disingenuous" effort by the PA to prevent the Ungars from receiving redress for the murder of Yaron and Efrat at the hands of the PA and its agents.

---

[5] Unfortunately, this is not the first time that the PA has made false assertions in a U.S. court in an effort to defeat the Ungars' proceedings. For example, the PA attempted to dismiss the underlying action in Rhode Island federal court on grounds of ineffective service of process and lack of personal jurisdiction, and in support of those claims submitted a declaration (sworn under penalty of perjury) from Hasan Abdel Rahman, the top Palestinian official in the United States, asserting that he was _not_ a representative of the PA, (but only of the PLO). *Ungar*, 325 F. Supp. 2d at 56. The PA's counsel repeated these assertions to the federal court, on the record. *Id*. Yet, the federal court found that these assertions by PA under oath and representations by its counsel on the record were in fact blatant falsehoods, since (*inter alia*) Mr. Rahman had identified himself in own biography, and in submissions personally signed and made by him to the Department of Justice, as the Chief Representative of the PA in the United States. *Id. See also id*. at 57 ("Given what the recently submitted documentary evidence has revealed regarding Mr. Abdel Rahman's status and the veracity of his declaration  the court dismisses [the PA's and PLO's] arguments as unworthy of discussion."); *Id*. at 59 (Noting the "apparent falsity of Mr. Abdel Rahman's declaration"). *Cf. id*. at 24 (finding other assertions of the PA and PLO to be "disingenuous").

38.     Accordingly, the Ungars have filed an action against the PA and the IPF seeking a declaratory judgment that the assets held by SASI belong to the PA and not to the IPF. *Ungar v. Palestinian Authority and The Insurance and Pension Fund*, Index No. 102101 / 06. (Exhibit K).

E.     **This Court Should Order SASI To Continue to Manage the Portfolio As Before Provided No Funds Are Released**

39.     The IPF and its counsel (at least one of whom, James Tanenbaum, Esq., has been registered with the Department of Justice as official foreign agent of judgment debtor PA) have attempted to intimidate the Ungars and to frighten them into abandoning their claims to the funds held by SASI, by threatening to seek damages against the Ungars for alleged losses caused by the Restraining Notice. As the IPF would have it, the SASI account cannot be managed because of the Ungars' Restraining Notice.

40.     But the Ungars have never taken this position, and, on the contrary, have repeatedly informed both SASI and the IPF's counsel that SASI should continue trading as before, as long as the stocks and bonds and any profits remain with SASI. The Ungars could not have made their position clearer: see, for example, two recent communications with SASI's and IPF's counsel, Exhibits L and M.

41.     Despite having this repeatedly clarified by the Ungars, SASI, apparently acting in concert with IPF's counsel, has insisted on stubbornly asserting that the account cannot be managed because of the restraining notices.

42.     Accordingly, the Ungars now seek to have the Court enter an order directing that SASI continue trading, as long as the assets and profits remain with SASI.

43.     NO PRIOR REQUEST FOR THE RELIEF REQUESTED HEREIN HAS PREVIOUSLY BEEN MADE.

WHEREFORE, it is respectfully requested that the Court enter an order:

a)     COMMANDING, DIRECTING and REQUIRING the Respondent SWISS AMERICAN SECURITIES, INC. to continue managing and investing the assets held by Respondent which are currently the subject of a Restraining Notice, a Sheriff's Levy of Execution, and the within Turnover Proceeding, pursuant to existing management and investment guidelines, provided that Respondent does not release or transfer the assets, including any proceeds, dividends, interest and/or other returns thereon, to the possession or control of any party other than Respondent, until further order of the Court; and

b)     GRANTING such other and further relief as is just and proper under the circumstances.

Dated: New York, New York
          March 1, 2006

_____
Robert J. Tolchin

# EXHIBIT A

THE ESTATES OF YARON UNGAR AND EFRAT UNGAR BY AND THROUGHTHE ADMINISTRATOR OF THEIR ESTATES DAVID STRACHMAN; DVIR UNGAR, MINOR, BY HISGUARDIANS AND NEXT FRIEND, PROFESSOR MEYER UNGAR; JUDITH UNGAR; RABBI URIDASBERG; JUDITH DASBERG (INDIVIDUALLY AND IN THEIR CAPACITY AS LEGAL GUARDIANSOF PLAINTIFFS DVIR UNGAR AND YISHAI UNGAR); AMICHAI UNGAR; DAFNA UNGAR; ANDMICHAL COHEN, Plaintiffs, n1 v. THE PALESTINIAN AUTHORITY (A.K.A. "THEPALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY"); THE PALESTINE LIBERATIONORGANIZATION; YASSER ARAFAT; JIBRIL RAJOUB; MUHAMMED DAHLAN; AMIN AL-HINDI;TAWFIK TIRAWI; RAZI JABALI; HAMAS -- ISLAMIC RESISTANCE MOVEMENT (A.K.A."HARAKAT AL-MUQAWAMA AL-ISLAMIYYA") ABDEL RAHMAN ISMAIL ABDEL RAHMAN GHANIMAT;JAMAL ABDEL FATAH TZABICH AL HOR; RAED FAKHRI ABU HAMDIYA; IBRAHIM GHANIMAT; ANDIMAN MAHMUD HASSAN FUAD KAFISHE, Defendants. n2

n1 On July 24, 2001, this Court dismissed all claims arising out of EfratUngar's death because they were brought under 18 U.S.C. § 2333, and theComplaint did not allege that Efrat Ungar was an American national. Estates ofUngar ex rel. Strachman v. Palestinian Auth., 153 F. Supp. 2d 76, 97 (D.R.I.2001) (hereinafter, Ungar I). This included the claims of Efrat Ungar's Estate,those filed by Rabbi Uri Dasberg and Judith Dasberg in their individualcapacities, and claims on behalf of Davir and Yishai Ungar. Id.

n2 On July 24, 2001, this Court dismissed Defendants Yasser Arafat, JibrilRajoub, Muhammed Dahlan, Amin Al-Hindi, Twfik Tirawi, and Razi Jabali due to alack of personal jurisdiction. Ungar I, 153 F. Supp. 2d at 100. Similarly, onJanuary 27, 2004, this Court dismissed Defendants Abdel Rahman Ismail AbdelRahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya,Ibrahim Ghanimat, and Iman Mahmud Hassan Faud Kafishe due to a lack of personaljurisdiction. Estates of Ungar ex rel. Strachman v. Palestinian Authority, 304F. Supp. 2d 232, 241 (D.R.I. 2004) (hereinafter, Ungar III). This Court alsoentered final judgment against Defendant, Hamas - Islamic Resistence Movement(A.K.A. "Harakat Al-Muqawama Al-Islamiyya") for a total amount of $116,409,123.00 plus attorneys' fees and court costs. Id. at 242-43.

C.A.No. 00-105L

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODEISLAND

325 F. Supp. 2d 15; 2004 U.S. Dist. LEXIS 12823

July 12, 2004, Decided
July 12, 2004, Filed

SUBSEQUENT HISTORY: Subsequent appeal at *Ungar v. PLO, 2005 U.S. App. LEXIS 5153 (1st Cir. R.I., Mar. 31, 2005)*

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

PRIOR HISTORY: *Estates of Ungar v. Palestinian Auth., 325 F. Supp. 2d 15, 2004 U.S. Dist. LEXIS 12824 (D.R.I., 2004)*

DISPOSITION: Magistrate Judge's Report and Recommendation adopted. Defendant's appeal of separate order with respect to plaintiffs' request for attorneys' fees and plaintiffs' motion to amend denied. Default judgment entered against defendants Palestinian Authority and Palestine Liberation Organization.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiffs, the estates and survivors of murder victims, brought an action under the Anti-Terrorism Act of 1991, *18 U.S.C.S. § 2337*(2) (1992) against defendants, three pro-Palestinian groups. After the groups defaulted, plaintiffs' claims were referred to a magistrate. The groups filed objections to the magistrate's report. Plaintiffs filed a motion to alter or amend an earlier judgment.

OVERVIEW: The magistrate found a default and recommended that the groups make certain payments to plaintiffs. The magistrate also found that two of the groups were liable for attorneys fees for failure to respond to discovery. The groups objected on the grounds that they were entitled to sovereign immunity under the Foreign Sovereign Immunities Act of 1976, *28 U.S.C.S. § 1604*, and under *18 U.S.C.S. § 2337*(2) of the Anti-Terrorism Act. The court held that the groups were not sovereigns and therefore were not entitled to claim the defense. Other objections raised by the groups, such as their claim that their activities were not related to the victims' murders, could not be addressed because of their default. The court rejected the groups' claims that the case presented non-justiciable political questions. The court approved of the magistrate's imposition of sanctions on the groups who failed to make discovery. Plaintiffs' motion to alter or amend the judgment to reflect that the groups had waived their claim to sovereign immunity was denied; the court reiterated that the groups had no immunity to waive.

OUTCOME: The court overruled the groups' objections to the magistrate's report and recommendation and denied one group's appeal from the magistrate's order with respect to attorneys' fees. The court denied plaintiffs' motion to amend the order regarding sovereign immunity. The court directed the clerk to enter judgment for plaintiffs in the amounts recommended by the magistrate.

LexisNexis(R) Headnotes

Civil Procedure: Magistrates: Pretrial Orders
[HN1] A dispositive motion is one that extinguishes a party's claim or defense and is reviewed by a district court de novo where that court may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

International Law: Immunity: Sovereign Immunity
[HN2] Neither the Palestinian Authority, the Palestine Liberation Organization, nor the entity called Palestine is or represents a foreign State and therefore, is not entitled to sovereign immunity.

International Law: Immunity: Foreign Sovereign Immunities Act
[HN3] The defense of sovereign immunity provided for in the Foreign Sovereign Immunities Act of 1976 is now codified at *28 U.S.C.S. § 1604* (1976), which provides in part that a foreign State shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in *28 U.S.C.S. §§ 1605* to 1607.

International Law: Immunity: Sovereign Immunity
Criminal Law & Procedure: Criminal Offenses: Crimes Against the Person: Terrorism
[HN4] See *18 U.S.C.S. § 2337*(2).

Criminal Law & Procedure: Criminal Offenses: Crimes Against the Person: Terrorism
[HN5] See *18 U.S.C.S. § 2331.*

Civil Procedure: Early Pretrial Judgments: Default: Entry of Default & Default Judgment

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

[HN6] When a default is entered, a court must consider that all of the plaintiff's allegations of fact are true and that his or her claims are established as a matter of law.

Civil Procedure: Sanctions: Discovery Misconduct
[HN7] Fed. R. Civ. P. 37(b) allows a court to order the payment of attorneys' fees as a sanction for failing to obey an order to provide or permit discovery.

Civil Procedure: Sanctions: Discovery Misconduct
Civil Procedure: Magistrates: Pretrial Orders
[HN8] A magistrate judge's determination to award attorneys' fees as a discovery sanction pursuant to Fed. R. Civ. P. 37(b) is a non-dispositive matter, which the district court reviews under the clearly erroneous standard. A determination is clearly erroneous when, although there is evidence to support it, the court, after reviewing all the evidence, is left with the definite and firm conviction that the magistrate judge made a mistake. In conducting this review, the district court must refrain from second guessing the magistrate judge's pre-trial discovery rulings.

Civil Procedure: Relief From Judgment: Motions to Alter & Amend
[HN9] Fed. R. Civ. P. 59(e) allows a court to alter or amend its judgment if a motion to do so is filed no later than 10 days after the original judgment is entered. A court has broad discretion in deciding a motion brought pursuant to this rule. The most common grounds for granting a Rule 59(e) motion are a manifest error of law or fact or newly discovered evidence. In order to show a manifest error of law or fact, the moving party must present a substantial reason that the court is in error.

International Law: Immunity: Foreign Sovereign Immunities Act
Evidence: Procedural Considerations: Judicial Admissions
[HN10] The Foreign Sovereign Immunities Act (FSIA) provides an exception to sovereign immunity when a foreign State waives its immunity either explicitly or by implication. *28 U.S.C.S. § 1605*(a)(1). Explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign. An express waiver under the FSIA must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity. In creating the waiver exception to sovereign immunity, Congress anticipated that at a minimum, a waiver would not be found absent a State's conscious decision to take part in the litigation and failure to raise the sovereign immunity defense despite an opportunity to do so. A foreign State's indication that it does not intend to participate in the litigation does not constitute the conscious decision required to explicitly waive a sovereign immunity defense. However, Federal courts have found an explicit waiver of sovereign immunity where a foreign State is a party to an agreement whose terms include specific language that the parties waive any right to sovereign immunity. In contrast to an explicit waiver, an admission is an adversary's position which is contrary to and inconsistent with a contention made later in the litigation.

International Law: Immunity: Sovereign Immunity
[HN11] The issue of waiver of sovereign immunity only arises if and when a court is satisfied that the party claiming sovereign immunity is a foreign State or an agent or instrumentality of a foreign State.

COUNSEL: [**1] For Plaintiff: David J. Strachman, Esq., McIntyre, Tate, Lynch & Holt, Providence, RI.

For Defendant: Deming E. Sherman, Esq., Annemarie M. Carney, Esq., Edwards & Angell, Providence, RI. Ramsey Clark, Esq., Lawrence W. Schilling, New York, NY.

JUDGES: Ronald R. Lagueux, Senior United States District Judge.

OPINIONBY: Ronald R. Lagueux

OPINION: [*20] MEMORANDUM AND ORDER

Ronald R. Lagueux, Senior United States District Judge

There are three matters before this Court: 1) the objections filed by Defendants, the Palestinian Authority ("PA"), and the Palestine Liberation Organization ("PLO"), to a Report and Recommendation issued by Magistrate Judge David L. Martin on March 31, 2004 ("Report and Recommendation"); 2) the PA's appeal of a separate Order issued by Judge

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

Martin granting Plaintiffs' request for attorneys' fees as a sanction for the PA's failure to provide any discovery in the instant case; and 3) Plaintiffs' motion, pursuant to *Rule 59(e) of the Federal Rules of Civil Procedure*, to alter and amend this Court's April 23, 2004 Decision and Order relating to sovereign immunity. *The Estates of Yaron Ungar ex rel Strachman v. The Palestinian Authority, 315 F. Supp. 2d 164 (D.R.I. 2004)* [**2](hereinafter, Ungar IV).

The facts of this case are described at length in this writer's previous opinions. See *Ungar IV, 315 F. Supp. 2d at 168-171; Estates of Yaron Ungar v. Palestinian Auth., Ungar III, 304 F. Supp. 2d 232 at 244-47; The Estates of Ungar ex rel. Strachman v. The Palestinian Auth., 228 F. Supp. 2d 40, 41-43 (D.R.I. 2002)* (hereinafter, Ungar II); *Estates of Ungar v. Palestinian Auth., Ungar I, 153 F. Supp. 2d 76 at 82-85*; and the attached Report and Recommendation. Therefore, there is no need to repeat the tragic events and extensive procedural history underlying this litigation. It suffices to say here that on April 29, 2003, this writer referred Plaintiffs' three motions for default judgment against the PA and PLO to Magistrate Judge David L. Martin for preliminary review, findings, and recommended disposition pursuant to *28 U.S.C. § 636(b)(1)(B)* and Local Rule 32(a). Judge Martin held hearings on the motions last summer and took the matters under advisement.

Judge Martin reviewed the submitted memoranda and exhibits, performed independent research, and then issued an extensive Report and Recommendation on March 31, 2004, which is attached [**3] hereto. Judge Martin recommended that this Court enter default judgment against the PA in the amount of $116,421,048.00 and against the PLO in the amount of $116,415,468.00. Both recommended amounts include attorneys' fees.

The PA and PLO filed objections to Judge Martin's Report and Recommendation on April 19, 2004, before the time period for filing objections set forth in *Rule 72(b) of the Federal Rules of Civil Procedure* and Local Rule 32 elapsed later that day. The PA and PLO assert the following six grounds for their objections: 1) this Court lacks subject matter jurisdiction because the PA and PLO are entitled to sovereign and governmental immunity [*21] under the Foreign Sovereign Immunities Act, *28 U.S.C. § 1604 (1976)* ("FSIA"), and the Anti-Terrorism Act of 1991, *18 U.S.C. § 2337(2) (1992)* ("ATA"), n3 and because the claims asserted against them present non-justiciable political questions; 2) Plaintiffs' claims are legally insufficient and do not support an entry of default judgment; 3) the Report and Recommendation fails to give effect to the PA's and PLO's position that they are entitled [**4] to a final determination of their claims to sovereign immunity, including appellate review, before being required to answer the Amended Complaint or participate in discovery; 4) the Report and Recommendation fails to recognize and give effect to the adverse conditions facing the Palestinian government and the PA and PLO, which have made discovery difficult and contrary to Palestinian national interests; 5) this Court lacks personal jurisdiction over the PA and PLO; and 6) the law should not require the "disproportionate compensation" recommended by Judge Martin. Objections of Defs. Palestinian Auth. & Palestine Liberation Organization to the Mag. Judge's Report & Recommendation, (hereinafter, Objections), at 1-3. That same day, the PA appealed Judge Martin's March 31, 2004 Order that granted Plaintiffs' request for attorneys' fees pursuant to *Rule 37(b)(2) of the Federal Rules of Civil Procedure* as a sanction for the PA's failure to provide any discovery in the instant case. The PA's arguments with respect to this appeal are identical to its objections to the Report and Recommendation. See Notice of Appeal, at 2.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -



n3 Congress originally enacted *Sections 2331-2338* as part of the Antiterrorism Act of 1990. Pub.L. No. 101-519, § 132, 104 Stat. 2250-2253 (1990). However, that Public Law has no currently effective sections. Congress re-enacted these sections as part of the Federal Courts Administration Act of 1992. Pub.L. No. 102-572, Title X, § 1003(a)(1) - (5), 106 Stat. 4521-4524 (1992), which was amended on October 31, 1994 to Pub.L.No. 103-429, § 2(1), 108 Stat. 4377. *Ungar II, 228 F. Supp. 2d at 41 n.1.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[**5]

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

Also on April 19, 2004, Plaintiffs filed their own objections to the Report and Recommendation. Plaintiffs later withdrew these objections so as not to impede this Court from entering a final judgment. Notice of Withdrawal of Pls.' Objections to Portions of the Report & Recommendation Issued on Mar. 31, 2004, at 2. Thereafter, Plaintiffs responded to the PA's and PLO's objections and argued that the objections did not present anything new and were "hopelessly vague, frivolous, or irrelevant." Pls.' Resp. to Objections of the Palestinian Auth. & Palestine Liberation Organization to the Mag. Judge's Report & Recommendation, at 1. Plaintiffs requested that this Court make a de novo determination that rejects each of the objections, adopts the Report and Recommendation, and enters a final judgment against the PA and PLO. Id. at 2.

On April 27, 2004, Plaintiffs filed a motion, pursuant to *Rule 59(e) of the Federal Rules of Civil Procedure*, to alter and amend this Court's Decision and Order in Ungar IV regarding sovereign immunity. *315 F. Supp. 2d at 164*. Plaintiffs request that this Court reconsider and reverse [**6] its holding that the PA and PLO did not waive claims to sovereign immunity, and hold instead that "even assuming arguendo that Defendants were 'foreign States,' they have waived any claims to sovereign immunity." Mem. in Supp. of Pls.' Mot. Pursuant to *Fed. R. Civ. P. 59(e)*, at 4. The PA and PLO did not file any objections to Plaintiffs' motion.

The parties briefed and later argued these three matters on June 23, 2004, and they are now in order for decision. For the reasons that follow, this Court overrules each of the PA's and PLO's objections to Judge Martin's Report and Recommendation, adopts that Report and [*22] Recommendation in toto and attaches it hereto. The PA's appeal of Judge Martin's separate Order with respect to Plaintiffs' request for attorneys' fees and Plaintiffs' motion to amend this Court's decision in Ungar IV are denied. Furthermore, this Court directs the Clerk to enter default judgment against the PA and PLO as indicated below.

### The Objections to the Report and Recommendation

The PA and PLO raise six objections to Judge Martin's recommendation that this Court grant Plaintiffs' motions [**7] to enter default judgment. Since these motions are dispositive of the claims presented in the Amended Complaint, this Court must conduct a de novo review of Judge Martin's Report and Recommendation. See *Harvard Pilgrim Health Care of New England v. Thompson, 318 F. Supp. 2d 1, 2004 U.S. Dist. LEXIS 9399, No. 02-354L, 2004 WL 1166500 at *4 (D.R.I. May 26, 2004)* (noting that [HN1] a dispositive motion is one that extinguishes a party's claim or defense and is reviewed by a district court de novo where that court may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions). Therefore, although the PA and PLO do not present this Court with any new arguments, this writer will consider each objection in turn.

The PA's and PLO's first objection is that this Court lacks subject matter jurisdiction over the Amended Complaint due to the existence of non-justiciable political questions and the sovereign immunity provided in *Section 2604 of the FSIA* n4 and *Section 2337(2) of the ATA* n5. Objections, at para. 1. The PA and PLO raised and this Court rejected the same arguments in Ungar II and Ungar IV and does so again now. For [**8] the reasons set forth in those opinions, this writer reiterates that the Amended Complaint does not present any non-justiciable political questions and [HN2] neither the PA, the PLO, nor the entity called Palestine is or represents a foreign State and therefore, is not entitled to sovereign immunity. See *Ungar IV, 315 F. Supp. 2d at 174-187; Ungar II, 228 F. Supp. 2d at 44-49*. Therefore, the PA's and PLO's first objection to the Report and Recommendation is overruled.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -



n4 *28 U.S.C. § 2604* has been repealed. [HN3] The defense of sovereign immunity provided for in the FSIA is now codified at *28 U.S.C. § 1604 (1976)*, which provides, in part, that "a foreign State shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in *sections 1605 to 1607* of this chapter."

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

n5 Section 2337(2) of the Anti Terrorism Act states that [HN4] "no action shall be maintained under *Section 2333* against a foreign state, an agency of a foreign state, an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority." *18 U.S.C. § 2337(2)*.

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

[**9]

The second objection raised by the PA and PLO is that this Court should not enter a default judgment because Plaintiffs' claims are legally insufficient. Objections, at para. 2. The PA and PLO argue that they "legitimately sought to protect and promote Palestinian interests" and lacked the intent required to engage in acts of international terrorism as defined by the ATA. n6 Id. Furthermore, these Defendants [*23] argue that their conduct was not proximately related to Yaron Ungar's murder. Id.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6 Section 2331(1) of the ATA defines the term international terrorism to mean activities that:

[HN5] A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that  would be a criminal violation if committed within the jurisdiction of the United States or of any State;
B) appear to be intended -
(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion; or
(iii) to affect the conduct of a government by assassination or kidnaping; and
(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

*18 U.S.C. § 2331(1).*

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

[**10]

Similar to their claims to sovereign immunity, the above are arguments that should have been raised in an answer to the Amended Complaint or through Defendants' participation in the present litigation. However, these Defendants decided and instructed their counsel not to answer the Amended Complaint or participate in discovery and therefore, were defaulted. See Report & Recommendation, at 69, n.46 & at 70. The First Circuit has repeatedly held that [HN6] when a default is entered, a court must consider that all of the plaintiff's allegations of fact are true and that his or her claims are established as a matter of law. *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985)*; accord *Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002)* (per curiam) (quoting *Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir. 1992)* and *Brockton, 771 F.2d at 13*); In *Re The Home Restaurants Inc., 285 F.3d 111, 114 (1st Cir. 2002)* (citing *Franco v. Selective Ins. Co., 184 F.3d 4, 9 at n.3* (1st Cir. 1999)); *Libertad v. Sanchez, 215 F.3d 206, 208 (1st Cir. 2000)*. [**11]

This Court previously concluded that Plaintiffs would be entitled to relief if the allegations in the Amended Complaint were true when it denied the Defendants' motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure. Ungar II, 228 F. Supp. 2d at 47*. Given the PA's and PLO's default and fact that the allegations in the Amended Complaint must now be deemed true, there is no merit in the second objection, which essentially challenges

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

the ATA claims asserted in the Amended Complaint. Therefore, for these and the reasons set forth in Ungar II, the second objection is also overruled. See *228 F. Supp. 2d at 47.*

The PA's and PLO's third objection is that the Report and Recommendation fails to give effect to their argument that they are entitled to a final determination of their claim to sovereign immunity before the burdens of litigation are imposed on them. Objections, at para. 3. To support this argument, the Defendants cite In re Papandreou, which dealt with a defendant's petition for a writ of mandamus to vacate an Order compelling discovery related to a sovereign [**12] immunity defense. *329 U.S. App. D.C. 210, 139 F.3d 247, 249-50 (D.C. Cir. 1998).* The Circuit Court found that this discovery should not have been authorized without a showing of need and before the district court considered the alternate, non-merits routes to dismissal of standing, forum non conveniens, personal jurisdiction, and the act of state doctrine that were asserted by the defendants. *Id. at 254-56.* The Court noted that an assertion of immunity should not increase litigation costs at the expense and neglect of swifter routes to dismissal. See *id. at 254.*

Aside from the fact that *Papandreou* does not directly support the Defendants' argument, their continued flawed assertions of sovereign immunity, despite their own admissions that they are not a foreign State as defined by the FSIA, have increased the costs borne by Plaintiffs and prolonged this litigation unnecessarily. Unlike the situation presented in *Papandreou,* the PA and PLO refused to participate in discovery even after this Court heard and rejected the alternate, non-merits routes to dismissal of personal jurisdiction, insufficient service of process, improper venue, and forum non [**13] conveniens. *[*24]Ungar I, 153 F. Supp. 2d at 87-100.* Moreover, when Judge Martin heard, considered, and ultimately rejected the Defendants' objection during hearings in July of 2003, this writer had already determined that the PA was not a foreign State or a representative thereof as defined by the FSIA and consequently, was not immune from suit under the ATA. See Report & Recommendation, at 28-29; *Ungar II, 228 F. Supp. 2d at 49.* This Court has since determined that there is no basis whatsoever for the PA or PLO to claim sovereign immunity. *Ungar IV, 315 F. Supp. 2d at 179, n.7.* Therefore, for all of these reasons and those set forth in the portions of Ungar II and Ungar IV referred to above, the Defendants' third objection is also overruled.

The fourth objection asserts that the Report and Recommendation fails to recognize and give effect to the adverse conditions facing the Palestinian government and the PA and PLO, which made discovery difficult and contrary to Palestinian national interests. Objections, at para. 4. This assertion is disingenuous, especially in light of the fact that such conditions have not prevented [**14] the PA and PLO from making the extensive filings reflected throughout the procedural history of this case. See *Ungar IV, 315 F. Supp. 2d at 169-171.* As Judge Martin points out, this objection, although repeatedly raised by the PA and PLO, remains unsupported by affidavit or other admissible evidence. See Report & Recommendation, at 21-22. Furthermore, this Court has granted the PA and PLO numerous indulgences in the form of extensions of time for filing papers and continuances of scheduled hearings. See id. at 25 & 64. Yet, these Defendants made the deliberate choice not participate in this litigation and have not answered a single interrogatory or request for admission or produced a single document sought by Plaintiffs. Therefore, the Defendants' fourth objection to the Report and Recommendation has no merit and is also overruled.

Next, the PA and PLO object to Judge Martin's conclusion that this Court has personal jurisdiction in the instant case. Objections, at para. 5. This Court dealt with the issue of personal jurisdiction at length and rejected this same argument in *Ungar I. 153 F. Supp. 2d at 86.* This writer sees no need [**15] to revisit that decision and overrules the Defendants' fifth objection based on the authorities and reasoning set forth in that opinion. See *Ungar I, 153 F. Supp. 2d at 86-91.*

The final objection raised by the PA and PLO is that the law should not require the "disproportionate compensation" recommended by the Magistrate Judge "for the death of one person in the context of an ongoing conflict in which thousands of innocent civilians on both sides have been killed without any hope of compensation." Objections, at para. 6. These Defendants argue that the ultimate burden of this compensation will be borne by an impoverished and oppressed Palestinian people who currently suffer from a continuing humanitarian crisis. Id. Defendants are hard pressed to succeed with this argument given the fact that they deliberately stated their intentions not to participate in and thus, waived a hearing on damages. See Report and Recommendation, at 72 (internal citations omitted).

Defendants' arguments are offensive at best, especially given this Court's adoption of Judge Martin's extensive recommendations relating to the damages owed by Defendant Hamas for the [**16] brutal murders that are the subject of this litigation. See *Ungar III, 304 F. Supp. 2d at 267-277.* Judge Martin applied those same findings in making his recommendations as to the damages to be assessed against the PA and PLO and this writer finds no error in those conclusions. See Report & Recommendation, [*25] at 72-73. The PA and PLO, and not an impoverished and oppressed

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

Palestinian people, are responsible for and must bear the ultimate burden of providing compensation, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to June 9, 1996. This Court hopes that in keeping with the ATA's purpose to deter acts of international terrorism, its judgment will "interrupt or at least imperil the flow of terrorism's lifeblood, money," and thus, prevent the PA and PLO from funding future terrorist acts such as the one that resulted in the Ungars' horrific deaths. *Ungar III, 304 F. Supp. 2d at 239* (citing Antiterrorism Act of 1990: Hearing on S2465 Before the Subcomm. on Cts. and Admin. Practice of the Comm. on the Judiciary U.S. S., 101st Cong., at 85 (1990) (statement of Joseph Morris)). For **[**17]** all of these reasons, the Defendants' final objection to the Report and Recommendation is also hereby, overruled.

In sum, this Court overrules each of the PA's and PLO's objections for the reasons stated above. This Court adopts in toto Judge Martin's March 31, 2004 Report and Recommendation and publishes it with this Memorandum and Order. Judgment shall be entered against the PA and PLO as directed below.

The PA's Appeal of Judge Martin's Order Imposing Sanctions for their Delays and Refusal to Participate in Discovery

The PA appeals a separate Order issued by Judge Martin on March 31, 2004, which granted Plaintiffs' request for attorneys' fees pursuant to *Rule 37(b)(2) of the Federal Rules of Civil Procedure.* Judge Martin ordered the PA to pay attorneys' fees as a sanction for its delays and ultimate refusal to comply with Plaintiffs' discovery requests and this Court's discovery orders. Report & Recommendation, at 75. Judge Martin imposed this sanction separately and independently from his recommendation that this Court award attorneys' fees pursuant to the ATA and in the event that this writer declined to **[**18]** enter a default judgment in this case. Id. The PA argues that: 1) the grant of attorneys' fees is unauthorized and excessive in amount; 2) their position with respect to discovery was taken in good faith; and 3) the discovery demanded was unreasonable for essentially the same reasons as those offered in its objections to the Report and Recommendation. Notice of Appeal, at 1-2. Once again, this Court does not find any of those arguments persuasive.

*Rule 37(b) of the Federal Rules of Civil Procedure* [HN7] allows a court to order the payment of attorneys' fees as a sanction for failing to obey an  order to provide or permit discovery. *Fed. R. Civ. P. 37(b)* (West 2004). [HN8] A magistrate judge's determination to award attorneys' fees as a discovery sanction pursuant to this Rule is a non-dispositive matter, which the district court reviews under the clearly erroneous standard. *Thomas E. Hoar Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990)* (citations omitted). See also, *Hutchinson v. Pfeil, 105 F.3d 562, 566 (10th Cir. 1997)* (noting that discovery orders are non-dispositive **[**19]** and magistrate judges have the authority to order discovery sanctions). A determination is "clearly erroneous" when, although there is evidence to support it, the court, after reviewing all the evidence, is left with the definite and firm conviction that the magistrate judge made a mistake. *Harvard Pilgrim, 2004 U.S. Dist. LEXIS 9399, 2004 WL at *4* (citing *United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948)*). In conducting this review, the district court must refrain from second guessing the magistrate judge's pre-trial discovery rulings. Id. (citing *Mutual Fire, Marine & Inland Ins. Co. v. Jenckes Mach. Co., 1986 U.S. Dist. LEXIS 29193, No. 85-0586, [*26] 1986 WL 9717, at *1 (D.R.I. Feb. 19, 1986)*).

As defense counsel conceded during oral arguments, this Court's adoption of Judge Martin's Report and Recommendation disposes of the present appeal. Given the PA's history of refusing to comply with this Court's orders and the rules of procedure governing depositions, interrogatories, and requests for the production of documents and for admissions, this Court finds Judge Martin's conclusion to sanction the PA for its deliberate actions to delay the completion of this litigation **[**20]** to be clearly correct. Therefore, for these and the reasons previously mentioned with regard to the other objections to the Report and Recommendation, the PA's appeal of Judge Martin's Order hereby, is denied.

Plaintiffs' Motion to Amend this Court's Decision and Order Regarding Sovereign Immunity

The final matter before this Court is Plaintiffs' Motion, pursuant to *Rule 59(e) of the Federal Rules of Civil Procedure*, to amend this Court's Decision and Order regarding sovereign immunity. *Ungar IV, 315 F. Supp. 2d 164*. In that decision, this Court noted that the PA and PLO had not waived sovereign immunity, even though it ultimately held that those Defendants were not entitled to such immunity. *Id. at 173*. Plaintiffs request that this Court amend its judgment to hold instead that even assuming that the defendants were "foreign States," they have waived any claims to sovereign immunity. Mem. in Supp. of Pls.' Mot. Pursuant to *Fed. R. Civ. P. 59(e)*, at 4. Neither the PA nor the PLO have filed any objections to this motion.

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

*Rule 59(e)* [HN9] allows [**21] a court to alter or amend its judgment if a motion to do so is filed no later than ten days after the original judgment is entered. See *Commercial Assoc. v. Tilcon Gammino, Inc., 801 F. Supp. 939, 942 (D.R.I. 1992)*; Fed. R. Civ. P. 59(e) (West 2004). A court has broad discretion in deciding a motion brought pursuant to this Rule. *DeSenne v. Jamestown Boat Yard Inc., 781 F. Supp. 866, 869 (D.R.I. 1991)* (citing *United States v. Parcel of Land, 896 F.2d 605, 611* (1st Cir. 1990)). See also *Commercial Assoc., 801 F. Supp. at 942* (citing *White v. N.H. Dep't. of Employment. Sec., 455 U.S. 445, 450-51, 71 L. Ed. 2d 325, 102 S. Ct. 1162 (1982)* (quoting the Advisory Committee's notes on the 1946 Amendments to the Federal Rules)). The most common grounds for granting a *Rule 59(e)* motion are a manifest error of law or fact or newly discovered evidence. *DeSenne, 781 F. Supp. at 869* (citing *Kalman v. Berlyn Corp., 706 F. Supp. 970, 974 (D.Mass. 1989))*. In order to show a manifest error of law or fact, the moving party must present a substantial reason that the court is in error. [**22] Id. Since Plaintiffs have not presented any newly discovered evidence, this Court will confine its discussion to whether or not its conclusion that the PA and PLO did not waive sovereign immunity was a manifest error of law or fact.

This writer made no such error for two reasons. First, the statements of the PA and PLO cited by Plaintiffs are admissions that they do not satisfy the criteria for statehood required by United States' and international law rather than the explicit waiver of sovereign immunity contemplated by the FSIA exception. Second, this Court's discussion in Ungar IV regarding the issue of waiver is dictum and ancillary to its holding that the PA and PLO were not and did not represent a foreign State that is entitled to sovereign immunity.

As this Court noted in Ungar IV, [HN10] the FSIA provides an exception to sovereign immunity when a foreign State waives its immunity either explicitly or by implication. *315 F. Supp. 2d at 173* (citing *28 U.S.C.A. § 1605(a)(1)*). The Supreme [*27] Court has directed that explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign. *Library of Cong. v. Shaw, 478 U.S. 310, 318, 92 L. Ed. 2d 250, 106 S. Ct. 2957 (1986)*. [**23] An express waiver under the FSIA must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity. *World Wide Minerals, Ltd. v. Republic of Kazakhstan, 353 U.S. App. D.C. 147, 296 F.3d 1154, 1162 (D.C. Cir. 2002)* (citing *Aquamar S.A. Del Monte Fresh Produce N.A. Inc., 179 F.3d 1279, 1292 (11th Cir. 1999))*. In creating the waiver exception to sovereign immunity, Congress anticipated that at a minimum, a waiver would not be found absent a State's conscious decision to take part in the litigation and failure to raise the sovereign immunity defense despite an opportunity to do so. *Haven v. Rzeczpospolita Polska, 215 F.3d 727, 733 (7th Cir. 2000)* (citing *Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 378 (7th Cir. 1985)* (per curiam)). A foreign State's indication that it does not intend to participate in the litigation does not constitute the conscious decision required to explicitly waive a sovereign immunity defense. Id. However, Federal Courts have found an explicit waiver of sovereign immunity where a foreign State is a party to an agreement [**24] whose terms include specific language that the parties waive any right to sovereign immunity. See *World Wide Minerals, 296 F.3d at 1163*; *Libra Bank Ltd. v. Banco Nacional de Costa Rica, 676 F.2d 47, 49 (2d Cir. 1982)* (both noting the express provisions of various agreements containing explicit waivers of sovereign immunity). In contrast to an explicit waiver, an admission is an adversary's position which is contrary to and inconsistent with a contention made later in the litigation. *Cox v. Esso Shipping Co., 247 F.2d 629, 632 (5th Cir. 1957)*; *Vockie v. Gen. Motors Corp., 66 F.R.D. 57, 60 (E.D. Pa. 1975)*. See also, Black's Law Dictionary, 48 (7th ed. 1999) (admission is a voluntary acknowledgment of the existence of facts relevant to an adversary's case).

Plaintiffs point to the PA's and PLO's statements that their status is "unusual," "particular," and "undefined," as indicating that those Defendants have waived any defense of sovereign immunity. Mem. in Support of Pls.' Mtn. Pursuant to *Fed. R. Civ. P. 59(e)*, at 2. These statements are contrary to and inconsistent [**25] with the PA's and PLO's position that they satisfy the criteria for statehood discussed in Ungar IV. See *315 F. Supp. 2d at 177* (noting that an entity is a State when it possesses a permanent population, defined territory, a government, and the capacity to enter into relations with other States). Therefore, the statements are, as Plaintiffs point out, express admissions that neither Defendant satisfies the criteria for statehood and thus, each Defendant is not a foreign State that is entitled to immunity under the FSIA. See Mem. in Support of Pls.' Mtn. Pursuant to *Fed. R. Civ. P. 59(e)*, at 1 (emphasis added). Furthermore, the PA's and PLO's decision and instructions to counsel not to participate in the instant litigation until this Court ruled on their sovereign immunity defense did not constitute a complete, unambiguous, and unmistakable manifestation of an intent to waive any purported sovereign immunity defense. See *Haven, 215 F.3d at 733*. Therefore, this Court sees no manifest error in its conclusion that the PA and PLO did not waive the sovereign immunity defense.

325 F. Supp. 2d 15, *; 2004 U.S. Dist. LEXIS 12823, **

Alternatively, this Court's [**26] conclusion that neither the PA, the PLO, nor the entity called Palestine was a foreign State entitled to sovereign immunity disposed of Plaintiffs' waiver argument and rendered this Court's discussion of that issue dictum. See *McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 160 (D.R.I. 2003)* (citing Black's Law Dictionary, 454 (6th ed. 1990)) (dicta constitutes "opinions of a [*28] judge which do not embody the resolution or determination of the specific case before the court"). As this Court noted in Ungar IV, [HN11] the waiver issue only arises if and when a court is satisfied that the party claiming sovereign immunity is a foreign State or an agent or instrumentality of a foreign *State. 315 F. Supp. 2d at 176.* See also, *Sotheby's Inc. v. Garcia, 802 F. Supp. 1058, 1062-63 (S.D.N.Y. 1992)* (noting that it was undisputed that the Phillippines was a foreign State as defined in the FSIA and then proceeding to assess whether or not the waiver exception applied). The specific issue before this Court in Ungar IV was whether or not the PA, PLO, or the entity called Palestine were or represented a foreign State that was protected by sovereign [**27] immunity. See *315 F. Supp. 2d at 173, 175 & 178.* This writer answered that question in the negative and any observations regarding waiver were not part of the determination of the specific issue of sovereign immunity. See *id. at 187.* Simply put, the PA and PLO never had a valid defense of sovereign immunity to waive. For all of these reasons, Plaintiffs' motion to amend this Court's decision in Ungar IV, hereby, is denied.

As stated above, the Defendants' objections to Judge Martin's March 31, 2004 Report and Recommendation are overruled and the PA's appeal of Judge Martin's Order with respect to attorneys' fees is denied. Plaintiffs' motion to amend this Court's Decision and Order regarding sovereign immunity is also denied. For the aforementioned reasons, and those set forth in the Report and Recommendation attached hereto, this Court adopts said Report and Recommendation and orders the Clerk to enter final judgment for the specific Plaintiffs listed below against Defendants, the Palestinian Authority and the Palestine Liberation Organization, who are jointly and severally liable for the following amounts with respect to each Plaintiff: [**28]

| | |
|---|---|
| The Estate of Yaron Ungar | $ 2,932,158.00 |
| Dvir Ungar | $ 30,488,482.50 |
| Yishai Ungar | $ 30,488,482.50 |
| Judith Ungar | $ 15,000,000.00 |
| Meir Ungar | $ 15,000,000.00 |
| Michal Cohen | $ 7,500,000.00 |
| Amichai Ungar | $ 7,500,000.00 |
| Dafna Ungar | $ 7,500,000.00 |

The Clerk shall also enter judgment for Plaintiffs as a group awarding them attorneys' fees against the Palestinian Authority in the amount of $11,925.00 and against the Palestine Liberation Organization in the amount of $6,345.00. The total amount of judgment, including attorneys' fees, shall be $116,421,048.00 against the Palestinian Authority and $116,415,468.00 against the Palestine Liberation Organization.

The Clerk shall enter judgment as indicated forthwith.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
July 12, 2004

EXHIBIT B

SDNY#05,0868

18 MS 0302

~AO 451 (Rev.12/93) Certification of Judgment

# UNITED STATES DISTRICT COURT

### DISTRICT OF RHODE ISLAND

The Estate of Yaron Ungar

V.

The Palestinian Authority, et

**CERTIFICATION OF JUDGMENT
FOR REGISTRATION IN
ANOTHER DISTRICT**

Case Number:  00-105L

I, _____David A. DiMarzio_____, Clerk of the United States district court certify that the

attached judgment is a true and correct copy of the original judgment entered in this action   July 13, 2004  , as it
Date

appears in the records of this court, and that

\*   see attached order

_____

_____

**IN TESTIMONY WHEREOF,** I sign my name and affix the seal of this Court.

_____May 5, 2005_____
Date

David A. DiMarzio
Clerk

_Xxxxx Baldwell_
(By) Deputy Clerk

\*Insert the appropriate language: ..."no notice of appeal from this judgment has been filed, and no motion of any kind listed in Rule 4(a) of the Federal
Rules of Appellate Procedure has been filed." ..."no notice of appeal from this judgment has been filed, and any motions of the kinds listed in Rule 4(a)
of the Federal Rules of Appellate Procedure (†) have been disposed of, the latest order disposing of such a motion having been entered on [date]." ..."an
appeal was taken from this judgment and the judgment was affirmed by mandate of the Court of Appeals issued on [date]. ..."an appeal was taken from
this judgment and the appeal was dismissed by order entered on [date]."

(†Note: The motions listed in Rule 4(a), Fed. R. App. P., are motions: for judgment notwithstanding the verdict; to amend or make additional findings
of fact; to alter or amend the judgment; for a new trial; and for an extension of time for filing a notice of appeal.)

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

Plaintiffs,

v.

THE PALESTINIAN AUTHORITY, et al.                    C.A. No. 00 - 105L

Defendants

## ORDER

Upon consideration of Plaintiffs' Motion For an Order Pursuant to 28 U.S.C. §1963 Permitting Immediate Registration of Their Judgment Against Defendants PA and PLO in Other Federal Districts, and for the reasons set forth in the Memorandum submitted in support thereof, it is hereby

ORDERED, pursuant to 28 U.S.C. §1963, that the judgment entered in this action on July 13, 2004, against defendants The Palestinian Authority and The Palestine Liberation Organization may be registered instanter in any federal district.

**SO ORDERED**

Date: 5/5/00

Ronald R. Lagueux
Senior United States District Judge

Attest to
True Copy
DAVID A. DIMARZIO
By
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATES OF YARON UNGAR AND          )
EFRAT UNGAR BY AND THROUGH THE          )
ADMINISTRATOR OF THEIR ESTATES          )
DAVID STRACHMAN;                        )
DVIR UNGAR, MINOR, BY HIS               )
GUARDIANS AND NEXT FRIEND,              )
PROFESSOR MEYER UNGAR;                  )
JUDITH UNGAR;                           )
RABBI URI DASBERG;                      )
JUDITH DASBERG (INDIVIDUALLY AND        )
IN THEIR CAPACITY AS LEGAL              )
GUARDIANS OF PLAINTIFFS DVIR            )
UNGAR AND YISHAI UNGAR);                )
AMICHAI UNGAR;   DAFNA UNGAR; AND       )
MICHAL COHEN,                           )
                        Plaintiffs,     )
        V.                              )          C.A.No. 00-105L
THE PALESTINIAN AUTHORITY               )
(A.K.A. "THE PALESTINIAN INTERIM        )
SELF-GOVERNMENT AUTHORITY");            )
THE PALESTINE LIBERATION                )
ORGANIZATION; YASSER ARAFAT;            )
JIBRIL RAJOUB; MUHAMMED DAHLAN;         )
AMIN AL-HINDI; TAWFIK TIRAWI;           )
RAZI JABALI; HAMAS - ISLAMIC            )
RESISTANCE MOVEMENT (A.K.A.             )
"HARAKAT AL-MUQAWAMA AL-ISLAMIYYA")     )
ABDEL RAHMAN ISMAIL ABDEL RAHMAN        )
GHANIMAT; JAMAL ABDEL FATAH             )
TZABICH AL HOR; RAED FAKHRI ABU         )
HAMDIYA; IBRAHIM GHANIMAT; AND          )
IMAN MAHMUD HASSAN FUAD KAFISHE,        )
                                        )
                        Defendants.     )

## FINAL JUDGMENT

Final judgment for the Plaintiffs listed below against
Defendants, the Palestinian Authority and the Palestine
Liberation Organization, who are jointly and severally liable for
the following amounts with respect to each Plaintiff:

|                           |                  |
| ------------------------- | ---------------- |
| The Estate of Yaron Ungar | $ 2,932,158.00   |
| Dvir Ungar                | $30,488,482.50   |
| Yishai Ungar              | $30,488,482.50   |
| Judith Ungar              | $15,000,000.00   |
| Meir Ungar                | $15,000,000.00   |
| Michal Cohen              | $ 7,500,000.00   |
| Amichai Ungar             | $ 7,500,000.00   |
| Dafna Ungar               | $ 7,500,000.00   |



Judgment for Plaintiffs as a group awarding them attorneys'
fees against the Palestinian Authority in the amount of
$11,925.00 and against the Palestine Liberation Organization in
the amount of $6,345.00.  The total amount of judgment, including
attorneys' fees, shall be $116,421,048.00 against the Palestinian
Authority and $116,415,468.00 against the Palestine Liberation
Organization.

Deputy Clerk
July 13, 2004

# Exhibit C

EFRAT **UNGAR** ET AL., Plaintiffs, Appellees, v. THE PALESTINE LIBERATION ORGANIZATION ET AL., Defendants, Appellants.

No. 04-2079

UNITED STATES COURT OF APPEALS FOR THE **FIRST** CIRCUIT

402 F.3d 274; 2005 U.S. App. LEXIS 5153

March 31, 2005, Decided

**SUBSEQUENT HISTORY:** As Amended May 20 2005.

**PRIOR HISTORY:** [**1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND. [Hon. Ronald R. Lagueux, Senior U.S. District Judge]. *Estates of Ungar v. Palestinian Auth., 325 F. Supp. 2d 15, 2004 U.S. Dist. LEXIS 12823 (D.R.I., 2004)*

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff administrator of the estates of terrorism victims filed suit in the United States District Court for the District of Rhode Island pursuant to the Anti-Terrorism Act (ATA), *18 U.S.C.S. §§ 2331-2338*, against defendants Palestinian Authority (PA) and Palestine Liberation Organization (PLO). When their third motion to dismiss was denied, defendants PA and PLO appealed, claiming, inter alia, they were entitled to sovereign immunity.

**OVERVIEW:** The court rejected defendants' argument that the complaint should have been dismissed because it presented a non-justiciable political question. The court held that it regarded an assertion of sovereign immunity under *18 U.S.C.S. § 2337*(2) of the ATA, as being functionally equivalent to an assertion of sovereign immunity under *28 U.S.C.S. § 1604* of the Foreign Sovereign Immunities Act. The court also held that defendants had not carried their burden of showing that Palestine satisfied the requirements for statehood. That Israel did not dismantle the local governmental institutions in lands previously occupied by Jordan and Egypt was wholly inadequate to show that there was a Palestinian state. The territory went directly from Jordanian/Egyptian control to Israeli control, thus undermining the defendants' statehood argument. The United Nation's 1974 recognition of the PLO was not

sufficient to prove statehood. Although the PA had been vested with some autonomy, Israel's reserved powers were incompatible with the notion that the PA had independent governmental control over the defined territory.

**OUTCOME:** The judgment was affirmed.

**CORE TERMS:** sovereign immunity, territory, statehood, immunity, foreign state, international law, interim agreement, discovery, foreign relations, entity, permanent, region, default, occupation, motion to dismiss, establishment, territorial, political question, jurisdictional, nonjusticiable, occupied, foreign sovereign, heirs, sovereignty, legislative history, default judgment, transferred, immune, recommended, sovereign

LexisNexis(R) Headnotes

Criminal Law & Procedure: Criminal Offenses: Crimes Against the Person: Terrorism
[HN1] The Anti-Terrorism Act (ATA), *18 U.S.C.S. §§ 2331-2338*, provides a cause of action in favor of any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs. *18 U.S.C.S. § 2333*(a). Venue for such an action may be laid in, inter alia, any district where any plaintiff resides, *18 U.S.C.S. § 2334*(a), and the plaintiff(s) may recover treble damages, costs, and attorneys' fees, *18 U.S.C.S. § 2333*(a).

Civil Procedure: Appeals: Appellate Jurisdiction: Interlocutory Orders
[HN2] See *28 U.S.C.S. § 1292*(b).

Civil Procedure: Justiciability: Political Questions
Constitutional Law: The Judiciary: Case or Controversy: Political Questions
[HN3] It is the relationship between the judiciary and the coordinate branches of the Federal Government which gives rise to the political question. Withal, not every case

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

or controversy which touches foreign relations lies beyond judicial cognizance. Determining justiciability requires an analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action.

Civil Procedure: Justiciability: Political Questions
Constitutional Law: The Judiciary: Case or Controversy: Political Questions
[HN4] The United States Supreme Court has set forth six tests designed to confirm or negate the existence of a political question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. The Court has explained that these tests are probably listed in descending order of both importance and certainty.

Civil Procedure: Justiciability: Political Questions
Constitutional Law: The Judiciary: Case or Controversy: Political Questions
[HN5] For jurisdictional purposes, courts must be careful to distinguish between political questions and cases having political overtones.

International Law: Immunity: Foreign Sovereign Immunities Act
[HN6] See 28 U.S.C.S. § 1604.

International Law: Immunity: Foreign Sovereign Immunities Act
[HN7] Although the Foreign Sovereign Immunities Act does not define the term "foreign state," it makes pellucid that the term includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state. 28 U.S.C.S. § 1603(a). It also defines what constitutes an agency or instrumentality of a foreign state. 28 U.S.C.S. § 1603(b).

Criminal Law & Procedure: Criminal Offenses: Crimes Against the Person: Terrorism
International Law: Immunity: Foreign Sovereign Immunities Act

[HN8] The Anti-Terrorism Act (ATA), 18 U.S.C.S. §§ 2331-2338, provides that no civil action thereunder may be maintained against a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority. 18 U.S.C.S. § 2337(2). Like the Foreign Sovereign Immunities Act, the ATA contains no definition of the term "foreign state."

Criminal Law & Procedure: Criminal Offenses: Crimes Against the Person: Terrorism
Governments: Legislation: Interpretation
International Law: Immunity: Foreign Sovereign Immunities Act
[HN9] The Anti-Terrorism Act (ATA), 18 U.S.C.S. §§ 2331-2338, and the Foreign Sovereign Immunities Act (FSIA) are to be read in pari materia.

Criminal Law & Procedure: Criminal Offenses: Crimes Against the Person: Terrorism
International Law: Immunity: Foreign Sovereign Immunities Act
[HN10] The United States Supreme Court has observed that the text and structure of the Foreign Sovereign Immunities Act (FSIA) demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in United States courts. Nothing in either the language or legislative history of the Anti-Terrorism Act (ATA), 18 U.S.C.S. §§ 2331-2338, gives any indication that Congress intended the newer statute to supercede, rather than to mirror, the detailed jurisdictional framework described in the FSIA. Courts should decide claims of sovereign immunity in conformity with the FSIA's principles. Consequently, the United States Court of Appeals for the First Circuit regards an assertion of sovereign immunity under the ATA, 18 U.S.C.S. § 2337(2), as being functionally equivalent to an assertion of sovereign immunity under the FSIA, 28 U.S.C.S. § 1604.

International Law: Immunity: Foreign Sovereign Immunities Act
[HN11] Courts should look to international law to determine statehood for purposes of the Foreign Sovereign Immunities Act.

Civil Procedure: Appeals: Standards of Review: Clearly Erroneous Review
Civil Procedure: Appeals: Standards of Review: De Novo Review
International Law: Immunity: Foreign Sovereign Immunities Act
[HN12] In scrutinizing a district court's resolution of a foreign sovereign immunity issue, we review factual findings for clear error and legal conclusions de novo.

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

Evidence: Procedural Considerations: Burdens of Proof
International Law: Immunity: Foreign Sovereign Immunities Act

[HN13] The party who alleges sovereign immunity has the burden of proving that status.

International Law: Immunity: Sovereign Immunity
International Law: Sovereign States & Individuals

[HN14] Under international law, a state will maintain its statehood during a belligerent occupation but it would be anomalous indeed to hold that a state may achieve sufficient independence and statehood in the first instance while subject to and laboring under the hostile military occupation of a separate sovereign.

Civil Procedure: Appeals: Appellate Jurisdiction: Collateral Order Doctrine
International Law: Immunity: Foreign Sovereign Immunities Act

[HN15] A district court's denial of a motion to dismiss a complaint on the ground of foreign sovereign immunity is immediately appealable under the collateral order doctrine. And such an appeal ordinarily divests the district court of jurisdiction to proceed with the litigation pending its resolution.

International Law: Immunity: Sovereign Immunity

[HN16] In exchange for the defendant's right to interrupt the judicial process, the court may expect a reasonable modicum of diligence in the exercise of that right. Demanding such diligence is virtually essential to orderly judicial management of the vexing procedural problems that accompany assertions of sovereign immunity.

Civil Procedure: Jurisdiction: Subject Matter Jurisdiction: Federal Question Jurisdiction
Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Waiver & Preservation
International Law: Immunity: Sovereign Immunity

[HN17] The existence vel non of foreign sovereign immunity implicates federal subject matter jurisdiction. Thus, the failure to raise the defense in a timely manner cannot result in a waiver. Nevertheless, a failure of that kind can appropriately affect the trial court's management of the litigation.

COUNSEL: Ramsey Clark, with whom Lawrence W. Schilling, Deming E. Sherman, and Edwards & Angell, LLP were on brief, for appellants.

David J. Strachman, with whom McIntyre, Tate, Lynch & Holt was on brief, for appellees.

Daniel J. Popeo, Richard A. Samp, Joel J. Sprayregen, and Jared M. Wayne on consolidated brief for

Washington Legal Foundation and Allied Educational Foundation, amici curiae.

JUDGES: Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Lipez, Circuit Judge.

OPINIONBY: SELYA

OPINION: [*276] SELYA, Circuit Judge. This appeal raises exceptionally important questions of justiciability and sovereignty, emblematic of unsettled political conditions that have plagued the Middle East for many years. In it, the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) ask us to countermand the district court's refusal to dismiss the action [**2]against them. They contend that the case hinges on a nonjusticiable political question and that, at any rate, the defendants enjoy sovereign immunity. In the event that these arguments do not carry the day, the defendants seek vacation of two $116,000,000-plus default judgments, one entered against each of them, on the ground that they were entitled to a binding determination of sovereign immunity (including appellate review of any unfavorable decision) before being forced to bear the burdens of litigation.

After careful consideration of the relevant legal authorities and perscrutation of an amplitudinous record, we conclude that this case is justiciable; that the defendants have not established an entitlement to sovereign immunity; and that the defendants' strategic litigation choices undercut their arguments as to the sequencing of the litigation. Consequently, we affirm the judgment below.

I. BACKGROUND

This case had its genesis in a terrorist attack that occurred in Israel on June 9, 1996. On that date, Yaron Ungar (a citizen of the United States), his wife Efrat, and their infant son Yishai were driving home from a wedding. Near Beit Shemesh, a car approached the[**3] Ungars' vehicle and loosed a salvo of machine-gun fire, killing both Yaron and Efrat. The three occupants of the attacking vehicle were all members of the Hamas Islamic Resistance Movement (Hamas), a group designated as a terrorist organization by the United States Department of State. See 8 U.S.C. § 1189; Redesignation of Foreign Terrorist Organizations, 68 Fed. Reg. 56,860, 56,861 (Oct. 2, 2003). The authorities apprehended the three assailants and, soon after, arrested a fourth Hamas member as an accessory. An Israeli court convicted all four men.

David Strachman was appointed as the administrator of the estates of Yaron and Efrat Ungar. On March 13,

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

2000, Strachman and other plaintiffs filed suit in the United States District Court for the District of Rhode Island pursuant to [HN1] the Anti-Terrorism Act (ATA), *18 U.S.C. §§ 2331-2338*. That statute provides a cause of action in favor of any "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." Id. *§ 2333(a)*. Venue for such an action may be laid in, [**4] inter alia, "any district where any plaintiff resides," id. *§ 2334(a)*, and the plaintiff(s) may recover treble damages, costs, and attorneys' fees, id. *§ 2333(a)*.

The original complaint set forth both ATA and state law claims. It was brought by numerous plaintiffs against numerous [*277] defendants. We need not call the roll; for all practical purposes, the case boils down to a suit involving the estate and heirs of Yaron Ungar as plaintiffs and the PA and the PLO as defendants. n1 The centerpiece of the complaint was an allegation that the defendants had engaged in international terrorism within the purview of the ATA. See id. *§ 2331(1)*.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

N1 On the plaintiffs' side, the claims brought by the estate and heirs of Efrat Ungar were dismissed because she was not a United States national. *Estates of Ungar ex rel. Strachman v. Palestinian Auth., 153 F. Supp. 2d 76, 97 (D.R.I. 2001)*. On the defendants' side, a number of Hamas defendants were sued, but none of them entered an appearance and, accordingly, the district court defaulted them. See *id. at 85 n.2*. The court dismissed the action as to several other defendants for want of in personam jurisdiction. *Id. at 95*. For present purposes, then, it simplifies matters to think of this case as a suit by Yaron Ungar's estate and heirs against the PA and the PLO.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[**5]

On an ensuing motion to dismiss, the district court rejected an assertion that the PA and the PLO were immune from service of process. *Estates of Ungar ex rel. Strachman v. Palestinian Auth., 153 F. Supp. 2d 76, 90-91 (D.R.I. 2001)* (Ungar I). However, the court dismissed the state law claims, finding that Rhode Island

choice-of-law principles favored the application of Israeli law. *Id. at 98-99*.

The plaintiffs served an amended complaint on August 23, 2001, asserting one claim under the ATA and three Israeli law claims, all on behalf of the estate and heirs of Yaron Ungar. The PA and the PLO moved to dismiss the amended complaint on essentially the same grounds as previously urged, adding only that the claims were nonjusticiable. Alternatively, they sought to have the district court certify, pursuant to *28 U.S.C. § 1292(b)*, n2 various questions, including a question as to whether the defendants were entitled to a non-specific "functional" immunity "arising from the peculiar status of the PA as a functioning governmental entity." At that point, the defendants were not claiming statehood; they argued only that the policy[**6] considerations underlying the ATA's recognition of immunity for foreign states "applied equally" to them.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 This statute provides in pertinent part: [HN2]

When a district judge, in making in a civil action an order not otherwise appealable . . ., shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals . . . may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

*28 U.S.C. § 1292(b)*.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

The PA and the PLO later changed their position. On January 30, 2002 -- during the pendency of their motion to dismiss the amended complaint -- they jointly moved for "leave to assert defenses." In the memorandum accompanying that motion, [**7] they for the first time claimed an immunity from suit based on sovereignty. They explained that they initially had chosen not to seek

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

immunity on the basis of statehood and suggested that emergent political events in their region had caused a change of plan. The motion for leave to assert defenses was a curiosity -- the defendants had not yet answered the amended complaint and were free to assert, by motion to dismiss or otherwise, any colorable defense -- and the district court never acted on it.

In the same time frame, the defendants moved for a stay of discovery and the plaintiffs moved for an order compelling discovery. The court granted the requested stay pending resolution of the motion to [*278] dismiss the amended complaint. On November 4, 2002, the district court denied the dismissal motion and dissolved the stay. The court flatly rejected the claim of nonjusticiability. *Estates of Ungar ex rel. Strachman v. Palestinian Auth., 228 F. Supp. 2d 40, 44-47 (D.R.I. 2002)* (Ungar II). It also determined that the amended complaint stated claims upon which relief could be granted both under the ATA and under Israeli law. *Id. at 47-48.* Finally, the[**8] court reiterated its earlier rejection of the defendants' claim of immunity from service of process and added that the PA, as a governmental entity, was not a sovereign state immune from suit under the ATA. *Id. at 48-49.* Finally, the court declined the defendants' invitation to certify questions for interlocutory review. *Id. at 49-51* (citing *Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 47-49 (2d Cir. 1991)).*

The PA and the PLO moved for reconsideration and again asked for a stay. Some two months later, the district court granted the plaintiffs' outstanding motion to compel discovery, giving the defendants additional time to respond due to their overseas location. The defendants nonetheless moved for reconsideration of the discovery order and submitted a letter from Palestine's permanent observer at the United Nations, which stated that the defendants could not be expected to respond to discovery due to the unremitting violence in the region. The letter suggested that the defendants should be allowed to wait until there was a final decision on the jurisdictional question before being forced to attend to the discovery requests. [**9]

On February 7, 2003, the plaintiffs moved for an entry of default based on the defendants' failure to answer the amended complaint. Six weeks later, the district court denied the defendants' pending motion to reconsider the order compelling discovery. On April 11, the court held a hearing on the defendants' outstanding motion to reconsider its decision in Ungar II. The court indicated from the bench that it would deny both that motion and the concomitant request for a stay, but it did not actually enter such an order until April 22, 2003. Meanwhile, a magistrate judge entered the requested default,

concluding that the defendants' failure to answer the amended complaint and their refusal to participate in discovery were the result of a deliberate strategic choice. The default was posted on the docket on April 21, 2003.

The defendants filed a notice of appeal to this court on April 23, 2003, in which they sought interlocutory review of both the lower court's decision in Ungar II and that court's refusal to reconsider that decision. They averred that they had been deprived of the opportunity to make a showing of sovereign immunity because the district court failed to take action[**10] on their motion for leave to assert a sovereign immunity defense, yet proceeded to determine that the defendants had no entitlement to immunity. We summarily affirmed the orders appealed from, noting that the defendants had neither moved to dismiss on the ground of sovereign immunity nor attempted, in the lower court, to make the evidentiary showing required to sustain such a defense. *Ungar v. Palestinian Liberation Org., 2003 U.S. App. LEXIS 27782, No. 03-1544, 2003 WL 21254790, at *1 (1st Cir. May 27, 2003)* (per curiam) (unpublished). We added that the defendants' motion for leave to assert a defense was wholly gratuitous, as they did not need the court's permission to raise the sovereign immunity issue at that stage of the case. See id.

We issued our order without prejudice to the defendants' future efforts to press their newly asserted sovereign immunity defense in an appropriate fashion. See id. (admonishing that the defendants "must [*279] adhere to the rules that govern all litigants"). The next pleading, however, came from the plaintiffs, who moved for a default judgment. The defendants responded by filing their third motion to dismiss. This time, they predicated the motion on three [**11] bases, namely, (i) that the case centered around nonjusticiable political questions; (ii) that the defendants were entitled to sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), *28 U.S.C. §§ 1602-1611*; and (iii) that *section 2337(2) of the ATA*, which provides that a suit under *section 2333* may not be maintained against "a foreign state [or] an agency of a foreign state," independently divested the district court of jurisdiction.

The parties were like ships passing in the night. Pursuing the plaintiffs' path, the magistrate judge, on March 31, 2004, recommended the entry of default judgments against the PA and the PLO in amounts exceeding $116,000,000. n3 The defendants interposed timely objections to the report and recommendation, reasserting their nonjusticiability and sovereign immunity points and contending, for the first time, that they were entitled to a final determination on sovereign immunity (including appellate review) before being

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

required either to answer the complaint or to submit to discovery.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 The amounts differed slightly. The recommended judgment against the PA was for $116,421,048 and the recommended judgment against the PLO was for $116,415,468. The reasons for this minor disparity are not material to the issues on appeal.

- - - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

[**12]

Meanwhile, the district court had been pursuing the course charted by the defendants. On April 23, 2004, it denied the defendants' renewed motion to dismiss the amended complaint. *Estates of Ungar v. Palestinian Auth., 315 F. Supp. 2d 164, 187 (D.R.I. 2004)* (Ungar III). The court hewed to its earlier rejection of the defendants' nonjusticiability thesis. See *id. at 173-74* (referencing *Ungar II, 228 F. Supp. 2d at 44-47*). Next, the court held that the FSIA and *section 2337(2)* of the ATA were two sides of the same coin with respect to sovereign immunity. *Id. at 174-75*. This left only a single question: "whether the PA and/or the PLO represent or constitute a foreign State and are thus entitled to sovereign immunity." *Id. at 175*. The court answered that question in the negative. *Id. at 176-87*. The plaintiffs immediately moved to amend the court's order pursuant to *Fed. R. Civ. P. 59(e)*, arguing that the sovereign immunity defense had been waived. The defendants did nothing.

On July 12, 2004, the district court went down the plaintiffs' path. It adopted the magistrate judge's [**13] "default judgment" report and recommendation in its totality, overruled the defendants' objections thereto, and denied the plaintiffs' motion to amend Ungar III. See *Estates of Ungar v. Palestinian Auth., 325 F. Supp. 2d 15, 21-22, 26-28 (D.R.I. 2004)* (Ungar IV). In the course of that decision, the court rebuffed the defendants' claim that they were entitled to a full review of their sovereign immunity defense before being required to answer the complaint or proceed further. *Id. at 23-24*. The court then ordered judgment for the plaintiffs in the recommended amounts. *Id. at 28*. This appeal ensued.

II. JUSTICIABILITY

The defendants maintain that the complaint against them should have been dismissed because it presents a non-justiciable political question. We find this argument unconvincing.

In *Baker v. Carr, 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962)*, the Supreme Court provided guidance as to the [*280] attributes of a nonjusticiable political question. The Court explained that [HN3] "it is the relationship between the judiciary and the coordinate branches of the Federal Government[**14] . . . which gives rise to the 'political question.'" *Id. at 210*. Withal, not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id. at 211*. Determining justiciability requires an "analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id. at 211-12*. [HN4] The Court then set forth six tests designed to confirm or negate the existence of a political question:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political [**15]decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id. at 217*. The Court explained, in a later case, that "these tests are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer, 541 U.S. 267, 124 S. Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004)*.

The defendants assert with little elaboration that the central issue in this case fails each of the six tests. Most of their argumentation presumes that the district court intruded into forbidden territory when it interpreted an array of United Nations resolutions and Israeli-PLO agreements in a politically controversial manner. To this they add that the default judgment entered by the district court was so huge that it amounted to a political statement.

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

The defendants' position rests on a misunderstanding of the fundamental nature of this action. This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism. The defendants are organizations that[**16] allegedly violated the statute. They have attempted to avoid liability by wrapping themselves in the cloak of sovereign immunity. The question we must answer, then, is whether the defendants have set forth sufficient evidence to support their claim of immunity -- no more and no less.

On this view of the case, the plaintiffs easily clear the six *Baker* hurdles. To begin, the lower court's immunity decision neither signaled an official position on behalf of the United States with respect to the political recognition of Palestine nor amounted to the usurpation of a power committed to some other branch of government. After all, Congress enacted the ATA, and the President signed it. The very purpose of the law is to allow the courts to determine questions of sovereign immunity under a legal, as opposed to a political, regime. n4 Seen in this light, the [*281] district court's decision denying immunity did not impede the constitutional prerogatives of the political branches over foreign policy. See generally *Baker, 369 U.S. at 211 & n.31* (noting that the Constitution commits foreign relations to the executive and legislative branches, thus permitting them to determine what[**17] "may be done in the exercise of this political power").

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n4 The FSIA operates in the same fashion. See *28 U.S.C. § 1602* ("The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts."); H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6606 ("A principle purpose of [the FSIA] is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds . . . .").

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

The second and third *Baker* hurdles present no insuperable obstacles here. The district court had access to judicially manageable standards for resolving the issue before it, see infra Part[**18] III(A), and those standards did not require the court to make nonjudicial policy determinations. Both sides agreed that the definition of a "state" under the relevant statutes was informed by an objective test rooted in international law and articulated in the Restatement (Third) of Foreign Relations. Under these circumstances, the determination of whether the defendants have adduced sufficient evidence to satisfy that definition is quintessentially appropriate for a judicial body. See *Kadic v. Karadzic, 70 F.3d 232, 249 (2d Cir. 1995)*

The final three hurdles need not concern us. These tests are "relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." Id. Here, the political branches have enacted a law that leaves undiminished their ability either to recognize or withhold recognition from foreign states, while leaving to the courts the responsibility of determining the existence vel non of statehood for jurisdictional purposes. Moreover, the district court's resolution of that question[**19] is not incompatible with any formal position thus far taken by the political branches. By the same token, its jurisdictional decision does not turn a blind eye to any position expressed by those responsible for conducting the nation's foreign relations. Cf. *Republic of Austria v. Altmann, 541 U.S. 677, 124 S. Ct. 2240, 2255, 159 L. Ed. 2d 1 (2004)* (noting that the State Department has retained authority to file "statements of interest suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity"). As a result, the decision did not signify a lack of respect for, or conflict with, the wishes of the political branches. No more is exigible for this purpose. See *Baker, 369 U.S. at 212-13* (endorsing judicial competence in matters touching on foreign relations in the absence of any "conclusive governmental action" or "recognizedly authoritative executive declaration") (citation and internal quotation marks omitted).

The defendants make a number of specific arguments, but these are largely derivative of their disagreement with the result reached by the district court. Their unhappiness is understandable, [**20] but legally irrelevant. The reality is that, in these tempestuous times,

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

any decision of a United States court on matters relating to the Israeli-Palestinian conflict will engender strong feelings. Be that as it may, the capacity to stir emotions is not enough to render an issue nonjusticiable. [HN5] For jurisdictional purposes, courts must be careful to distinguish between political questions and cases having political overtones. See *Klinghoffer, 937 F.2d at 49*.

[*282] The one remaining argument that warrants particularized attention is the defendants' assertion that the district court made a political statement in calibrating the size of the award. That assertion is wholly unsupported. The judgment reflects the wrongful death of a youthful man and includes a trebling of damages as mandated by law. See *18 U.S.C. § 2333(a)*. It also includes attorneys' fees. See id. The defendants have not challenged either the measure of damages utilized by the lower court or the integrity of its mathematical computations. We add, moreover, that even if the court erred on the side of generosity -- a matter on which we take no view -- a mere error in the calculation[**21] of a damages award would not implicate the propriety of federal subject matter jurisdiction. We therefore reject the defendants' "political statement" assertion as meritless.

To say more on this aspect of the case would be supererogatory. The short of it is that the political question doctrine does not preclude judicial resolution of the plaintiffs' case. We turn, therefore, to the merits of the sovereign immunity defense.

III. SOVEREIGN IMMUNITY

We divide our discussion of the defendants' sovereign immunity defense into segments, starting with the legal framework and historical background. We then proceed to the merits.

A. The Legal Landscape.

The FSIA, with exceptions not relevant here, provides that [HN6] "a foreign state shall be immune from the jurisdiction of the courts of the United States." *28 U.S.C. § 1604*. [HN7] Although the statute does not define the term "foreign state," it makes pellucid that the term includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." Id. *§ 1603 (a)*. It also defines what constitutes an agency or instrumentality of a foreign state. Id. *§ 1603(b)*.

The[**22] ATA contains analogous language. [HN8] It provides that no civil action thereunder may be maintained against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official

capacity or under color of legal authority." *18 U.S.C. § 2337(2)*. Like the FSIA, the ATA contains no definition of the term "foreign state."

Because the two statutory regimes use language that is similar but not identical, the first -- and most obvious -- question is whether there are substantive differences in the meaning of the term "foreign state" as used in the FSIA and the ATA, respectively. The district court concluded that [HN9] the two statutes were to be read in pari materia. See *Ungar III, 315 F. Supp. 2d at 175*. We agree with that conclusion.

We recognize, of course, that even identical terms can have divergent meanings when used in different statutes. See, e.g., *Hanover Ins. Co. v. United States, 880 F.2d 1503, 1504 (1st Cir. 1989)*; *United States v. Sterling Nat. Bank & Trust Co., 494 F.2d 919, 923 (2d Cir. 1974)*. Generally speaking, however, [**23] that phenomenon occurs only when the purpose, history, and structure of the statutes make manifest a principled basis for interpreting the words differently. See, e.g., *Perez-Arellano v. Smith, 279 F.3d 791, 794 (9th Cir. 2002)*. Here, however, [HN10] the Supreme Court has observed that "the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 102 L. Ed. 2d 818, 109 S. Ct. 683 (1989)*. Nothing in either the language or legislative history of the ATA gives any indication [*283] that Congress intended the newer statute to supercede, rather than to mirror, the detailed jurisdictional framework described in the FSIA. To cinch matters, the Supreme Court, in a post-ATA case, recently repeated its admonition that "courts should decide claims of sovereign immunity in conformity with the [FSIA's] principles." *Altmann, 124 S. Ct. at 2249*. Consequently, we regard an assertion of sovereign immunity under the ATA, *18 U.S.C. § 2337(2)*, as being functionally equivalent[**24] to an assertion of sovereign immunity under the FSIA, *28 U.S.C. § 1604*.

This brings a second question into focus. Since neither the FSIA nor the ATA define the term "foreign state" as it relates to a sovereign power, we must determine the intended meaning of that term. There is no controlling precedent in this circuit as to the essential attributes of statehood in this context. The parties, however, find common ground in their shared conviction that the definition should be derived by application of the standard set forth in the Restatement (Third) of Foreign Relations. This standard deems a state to be "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

relations with other such entities." *Restatement (Third) of Foreign Relations § 201* (1987). Under the Restatement standard, political recognition -- typically thought of as "a formal acknowledgment by a nation that another entity possesses the qualifications for nationhood," *N.Y. Chinese TV Programs, Inc. v. U.E. Enters., Inc., 954 F.2d 847, 853 (2d Cir. 1992)*[**25] -- is not a prerequisite to a finding of statehood. See *Restatement (Third) of Foreign Relations § 202 cmt. b* (explaining that "an entity that satisfies the requirements of § 201 is a state whether or not its statehood is formally recognized by other states").

Using the Restatement standard as the rule of decision is a colorable position. In this regard, the Restatement tracks the historical standard found in international law. See *Nat'l Petrochem. Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 553 (2d Cir. 1988)*; see also Convention on Rights and Duties of States (Montevideo Convention), Dec. 26, 1933, art. 1, 49 Stat. 3097, 3100, 165 L.N.T.S. 19, 25. n5 In addition, the FSIA's legislative history is itself replete with congressional references to sovereign immunity's roots in international law. See, e.g., H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605 (noting that the objective of the bill was to codify sovereign immunity doctrine as recognized by international law and to ensure that this international standard would be applied in federal litigation). The legislative[**26] history goes on to recount that the very foundation of foreign sovereign immunity in federal jurisprudence rests on the Supreme Court's recognition of that doctrine in *The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 3 L. Ed. 287 (1812)*. There, the Court established that the federal courts generally have no jurisdiction over suits involving foreign sovereigns with whom the United States is at peace, deriving such an immunity from the custom and practice of international law. *Id. at 135-46*.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n5 The Montevideo Convention is still in effect and the United States is a party to it. See United States Dep't of State, Treaties in Force 480 (2004).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Over time, the federal courts came to rely less on international law and more on the actions of the State Department in determining whether to grant immunity in individual cases. H.R. Rep. No. 94-1487, at 8, reprinted in 1976 U.S.C.C.A.N. at 6606. The committee report that accompanied the FSIA noted that this practice [**27] [*284] was generally at odds with the views of the international community; indeed, in "virtually every country . . . sovereign immunity is a question of international law to be determined by the courts." *Id. at* 9, reprinted in 1976 U.S.C.C.A.N. at 6607-08. To that end, Congress endeavored to bring the United States back into conformity with the world community by taking immunity decisions out of the hands of the executive branch and depositing them in the judicial branch. *Id. at 12*, reprinted in 1976 U.S.C.C.A.N. at 6610. The committee report unequivocally restates the "central premise of the bill" as being that "decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law." *Id. at 14*, reprinted in 1976 U.S.C.C.A.N. at 6613 (emphasis supplied).

This legislative history offers strong support for the proposition that [HN11] courts should look to international law to determine statehood for purposes of the FSIA. The case law that has evolved in the lower federal courts, while scanty, pushes in the same direction. See, e.g., *Morgan Guar. Trust Co. v. Republic of Palau, 924 F.2d 1237, 1243-47 (2d Cir. 1991)*[**28] (using Restatement standard to determine whether Palau qualified as a foreign state); *Klinghoffer, 937 F.2d at 47-49* (same with respect to PLO). Consequently, for purposes of this case, we accept the parties' agreement that the Restatement standard controls the statehood question. n6

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6 We caution that the Restatement standard, though embraced by both sides in this case, is not inevitably correct. It may be argued that a foreign state, for purposes of the FSIA, is an entity that has been recognized as a sovereign by the United States government. See, e.g., *Ungar III, 315 F. Supp. 2d at 186-87* (alternate holding); cf. 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 3604 (2d ed. 1984) (noting that for purposes of former *28 U.S.C. § 1332(a)(2)(1970)* -- a statute modified by the FSIA -- federal courts generally had held that a foreign state was one that had been recognized as such by the

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

United States government, in either a de jure or de facto capacity (collecting cases)). Here, however, all roads lead to Rome. The defendants' sovereign immunity defense fails the Restatement test. See infra Part III(C). If recognition were the test, the result would be the same. After all, the United States has not recognized Palestine as a sovereign nation. Thus, we need not probe the point too deeply.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[**29]

B. The Historical Background.

Following World War I, the League of Nations placed the region of Palestine, formerly a part of the Ottoman Empire, under a mandate. The mandate system grew out of the idea that some former colonies of nations defeated in World War I were "not yet able to stand by themselves" and should be placed under the tutelage of "advanced nations." League of Nations Covenant art. 22, paras. 1, 2. Palestine was among those territories deemed to "have reached a stage of development where their existence as independent nations [could] be provisionally recognized," subject to "administrative advice and assistance" from more mature governments. Id. at para. 4. The United Kingdom held the mandate over Palestine. Rather than "advice and assistance," however, the powers conferred were more akin to rule. Subject to implicit limitations not relevant here, the mandate gave the United Kingdom "full powers of legislation and of administration" over the region, as well as "control of the foreign relations of Palestine." Mandate for Palestine arts. 1, 12, League of Nations Doc. C.529 M.314 1922 VI (1922). The mandate also made the United Kingdom responsible [**30]for "placing [Palestine] under such political, administrative and economic conditions as will secure [*285] the establishment of the Jewish national home." Id. art. 2.

Heavy Jewish immigration to the region followed, owing in large part to the persecution of Jews in Europe. Tension between the Jewish and Arab populations led to violence and civil unrest. See United Nations Dep't of Pub. Info., The Question of Palestine & The United Nations at 3, U.N. Doc. DPI/2276, U.N. Sales No. 04.I.15 (2003) (Question of Palestine). By 1947, the United Kingdom's patience had worn thin. It took steps to divest itself of the mandate and dump the problem into the lap of the United Nations. Id.

The United Nations rose to the occasion. It formulated a plan that involved the creation of two independent states within the mandate territory: one Jewish, the other Arab. This plan also purposed to make Jerusalem an international enclave administered by the United Nations. See Future Gov't of Palestine, G.A. Res. 181(II), U.N. GAOR, 2d Sess., at 131, U.N. Doc. A/519 (1947). The plan delineated the boundaries of the two states and the Jerusalem enclave, id. at 142-46; established a timetable[**31] for the withdrawal of British forces; and proposed to end the existing mandate no later than August 1, 1948. Id. at 132-33. As the British withdrew, power would temporarily vest in a United Nations commission pending the establishment of provisional governments by each of the two putative states. Id. at 133. At that point, the provisional governments would "progressively receive" full administrative responsibility. Id. at 134. When the independence of a state had "become effective," that state would be accorded "sympathetic consideration" for admission to the United Nations. Id. at 142.

The plan never took effect. Although Jewish leaders accepted it, Palestinian leaders did not. See Question of Palestine at 10. The Palestinians, still representing two-thirds of the population of the affected territory, argued vociferously against partition. Id. at 7, 10. Faced with a steadily deteriorating situation, the British abandoned the mandate and withdrew from the region. Id. at 11. On the same date -- May 14, 1948 -- Jewish leaders announced the establishment of the State of Israel, using the territorial boundaries delineated in G.A. Res. 181(II) to demarcate its[**32] borders. Id.

The next day, armed forces of the surrounding Arab states entered the former mandate territory. Id. The Arab League notified the U.N.'s Secretary-General that they intended to fill the vacuum left by the abrupt departure of the British forces and to restore law and order in the region. See United Nations, The Origins and Evolution of the Palestine Problem 137-38 (1990).

The Arab invasion precipitated the first Arab-Israeli war. Question of Palestine at 11. During the conflict, nearly three-quarters of a million Palestinian refugees fled Israeli-controlled territory. Id. at 81. By the time of the eventual armistice, Egypt had taken control of the Gaza Strip, Jordan was in control of the West Bank (including East Jerusalem), and Israel had taken control of the remainder of the former mandate territory. Id. at 12.

This division persisted until 1967, when war again broke out between Israel, on the one hand, and Egypt, Jordan, and Syria, on the other hand. Id. at 18. Israel prevailed. Its spoils included occupation of the Gaza

Strip and the West Bank, as well as the Sinai peninsula (previously under Egyptian rule) and the Golan Heights region of Syria. [**33] Id.

The U.N.'s Security Council attempted to undo these gains by diplomatic means. It issued a resolution that called for the "withdrawal of Israeli armed forces from [*286] territories occupied in the recent conflict" and beseeched the protagonists to respect and acknowledge "the sovereignty, territorial integrity and political independence of every State in the area." S.C. Res. 242, U.N. SCOR, 22d Sess., Resolutions and Decisions, at 8, U.N. Doc. S/INF/22/Rev.2 (1967). The document did not directly address the question of Palestine. The PLO, which had been formed in 1964, strongly criticized the resolution for that reason. Question of Palestine at 19.

In 1968, the PLO declared that the international community had failed to secure the rights of Palestinian Arabs and vowed to take up the struggle. Id. at 31. In 1973, a third Arab-Israeli war led the Security Council to renew its call for implementation of the terms of Resolution 242. See S.C. Res. 338, U.N. SCOR, 28th Sess., Resolutions and Decisions, at 10, U.N. Doc. S/INF/29 (1973). The following year, the United Nations General Assembly adopted two resolutions: one affirming the rights of Palestinians to "self-determination[**34] without external interference" and to "national independence, and sovereignty," and the other granting the PLO observer status at the United Nations. G.A. Res. 3236 & 3237, U.N. GAOR, 29th Sess., Supp. No. 31, at 4, U.N. Doc. A/9631 (1974).

Over the next decade, the PLO provided municipal services to Palestinians in the West Bank and other refugee-dominated areas. By the early 1980s, these activities had put into place "an extensive rival bureaucratic structure." 25 Encyclopaedia Britannica 423 (15th ed. 2003). PLO attacks against Israel grew in intensity, eventually leading to Israel's invasion of Lebanon and the expulsion of a large PLO contingent. Question of Palestine at 26-28.

On July 31, 1988, Jordan gave up its claims to the West Bank. See Jordan: Statement Concerning Disengagement from the West Bank and Palestinian Self-Determination, *27 I.L.M. 1637 (1988)*. Within a few weeks thereafter, the PLO, speaking from exile in Algeria, issued a "Declaration of Independence" that proclaimed the "establishment of the State of Palestine in the land of Palestine with its capital at Jerusalem." Palestine Nat'l Council: Political Communique & Decl. of Indep., *27 I.L.M. 1660, 1670 (1988)*.[**35] In response, the United Nations decided to use the term "Palestine" instead of "Palestine Liberation Organization" within the United Nations system, but

expressly stated that this redesignation did not enhance the group's observer status. G.A. Res. 43/177, U.N. GAOR, 43d Sess., Supp. No. 49, at 62, U.N. Doc. A/43/49 (1988).

In 1993, the United States helped to broker the first agreement between Israel and the PLO. Under its terms, Israel accepted the PLO as the representative of the Palestinian people and the PLO acknowledged Israel's statehood. Question of Palestine at 47. This rapprochement culminated in the signing of the first of the Oslo Accords: the Declaration of Principles on Interim Self-Government Arrangements (DOP), Sept. 19, 1993, Isr.-P.L.O., *32 I.L.M. 1525*. The DOP's stated purposes included the establishment of a Palestinian interim self-governing authority (the PA) as a precursor to a permanent arrangement based on Security Council Resolutions 242 and 338. Id. art. I, *32 I.L.M. at 1527*. The DOP treated the West Bank and the Gaza Strip as a single territorial unit and stated that, when certain conditions had been achieved, Israel would[**36] transfer authority over "education and culture, health, social welfare, direct taxation, and tourism" in those areas to the PA. Id. art. VI, *32 I.L.M. at 1529*. The DOP also set forth a framework for negotiating the structure of the PA. Id. art. VII, *32 I.L.M. at 1530-31*. [*287]And, it specified that while the PA, when created, would be responsible for self-policing, Israel would remain responsible for external security (including the overall safety of Israelis), in the affected territory. Id. art. VIII, *32 I.L.M. at 1531*.

The protagonists reached agreement as to the structure of the PA in 1994, and the PA then became a reality. See Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, Isr.-PLO, art. IV, *33 I.L.M. 622, 628*. On September 28, 1995, Israel and the PLO signed the interim agreement called for in the DOP, aspiring to reach a permanent agreement within five years. See Interim Agreement on the West Bank & the Gaza Strip, Sept. 28, 1995, Isr.-P.L.O., pmbl., *36 I.L.M. 551, 558*. The interim agreement enumerated those powers and responsibilities to be transferred to the PA. For example, it[**37] granted executive responsibility to the PA with respect to "all matters within its jurisdiction," including the formulation of policies, the issuance of rules and regulations, and the making of contracts. Id. art. IX, *36 I.L.M. at 560-61*. The PA was, however, denied authority over foreign relations, including the establishment of embassies, the hiring of diplomatic staff, and the exercise of diplomatic functions. n7 Id. Moreover, the interim agreement took pains to note that Israel would "continue to exercise powers and responsibilities not so transferred." Id. art. I, *36 I.L.M. at 558*.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n7 The interim agreement permitted the PLO to conduct limited foreign affairs activities on behalf of the PA. Those activities pertained only to economic, cultural, scientific, and educational matters. Interim Agreement on the West Bank & the Gaza Strip art. IX, *36 I.L.M. at 560-61.*

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The drafters of the interim agreement considered the West Bank and the Gaza Strip as a single[**38] territorial unit. Nevertheless, they subdivided the land within that unit into three main zones, each under a different level of PA control. Id. art. XI, *36 I.L.M. at 561-62.* The overall framework required the PA to police the Palestinian populace but continued Israeli responsibility over external threats and border defense. Id. arts. XII-XIV, *36 I.L.M. at 562-63.* Israel also retained jurisdiction over all Israeli settlers living in the territory. Id.

The PA's legislative powers were similarly restricted. The interim agreement specified that any law that "amends or abrogates existing laws or military orders, which exceeds the jurisdiction of the Council or which is otherwise inconsistent with the provisions of the DOP, this Agreement, or of any other agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio." Id. art. XVIII, *36 I.L.M. at 564-65.*

In January of 1996, the PA held an election. Question of Palestine at 51. Negotiations on a permanent settlement began shortly thereafter, but terrorist attacks stalled the process. Id. at 51-52. The events[**39] giving rise to this case occurred during this period.

In August of 1998, the United Nations enhanced the PLO's observer status, granting it the right to participate in General Assembly debate, albeit without a vote. G.A. Res. 52/250, U.N. GAOR, 52d Sess., Supp. No. 49, at 4, U.N. Doc. A/52/49 (1998). That October, Israel and the PLO signed the Wye River Memorandum (a document expressly subject to the terms of both the DOP and the interim agreement). See Wye River Memorandum (Interim Agreement), Oct. 23, 1998, Isr.-P.L.O., *37*

*I.L.M. 1251.* This marked a restarting of the peace process. The following year, the parties negotiated a similar [*288] sort of interim agreement. See Sharm El-Sheikh Memorandum, Sept. 4, 1999, Isr.-P.L.O., *38 I.L.M. 1465.* In 2000, however, the two sides failed in an effort to reach a final agreement. Question of Palestine at 54. A firestorm of Palestinian attacks and Israeli reprisals ensued. Id. at 55.

In 2003, the Quartet -- a group comprised of representatives of the United States, the European Union, the Russian Federation, and the United Nations -- presented a "road map" setting forth a series of aspirational steps designed [**40]to break the impasse and move toward a permanent two-state solution in the region. See Letter Dated 7 May 2003 from the Secretary-General Addressed to the President of the Security Council, U.N. Doc. S/2003/529 (2003).

To date, Israel and the PLO have not traveled down the newly mapped road. Peace negotiations have been virtually non-existent since 2000, and the violence continues. There is, however, a glimmer of hope: the recent election of a new PA president has thawed relations between the two sides and created a sense of anticipation that a meaningful peace process will resume. See Steven Erlanger, Abbas Declares War With Israel Effectively Over, N.Y. Times, Feb. 14, 2005, at A1.

C. The Merits.

We now reach the merits of the sovereign immunity defense. [HN12] In scrutinizing a district court's resolution of a foreign sovereign immunity issue, we review factual findings for clear error and legal conclusions de novo. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 80 (2d Cir. 2002).* Here, the defendants' claim to sovereign immunity derives from their assertion that Palestine is a state, and the evidence[**41] presented to the district court in support of that assertion consisted entirely of indisputably authentic international legal documents. The district court's determination that Palestine was not a state was premised on a legal conclusion: the court determined that the defendants' documentary proffer did not satisfy the legal standard derived from international law. Our review of that decision is de novo. Id.

International law defines a state as "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." *Restatement (Third) of Foreign Relations § 201.* This definition derives from the Montevideo Convention of 1933. See supra Part III(A). In applying

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

this definition, some courts have subdivided the analysis into four parts, asking whether the putative state (i) has a defined territory and (ii) a permanent population, which (iii) is under the control of its own government, and (iv) has the capacity to engage in foreign relations. See, e.g., *Klinghoffer, 937 F.2d at 47-48.*[**42]

In practice, the third element is the most salient factor in the statehood calculus. See *Knox v. PLO, 306 F. Supp. 2d 424, 434 (S.D.N.Y. 2004)*; see also James Crawford, The Creation of States in International Law 42 (1979) (Creation of States). The Restatement's explanation of this element is rather sparse; it notes only that "[a] state need not have any particular form of government, but there must be some authority exercising governmental functions and able to represent the entity in international relations." *Restatement (Third) of Foreign Relations § 201 cmt. d.* To satisfy these requirements, a state's government must, at a bare minimum, be independent and in general control of its territory, maintaining at least a modicum [*289] of law and order. n8 See *Creation of States at 45-46*; see also Nii Lante Wallace-Bruce, Claims to Statehood in International Law 54 (1994) (explaining that what is required "is a coherent system of authority structures regulating . . . the territory under that government's control"). In short, the existence of a state demands a community integrated and organized as a political unit. [**43] See 1 Robert Jennings & Arthur Watts, Oppenheim's International Law 122 (9th ed. 1992). Its government must speak for the state as a whole; the mere presence of independent tribes or factions within a territory, lacking common institutions, cannot constitute a government in control. See Western Sahara, 1975 I.C.J. 12, 63 (Oct. 16).

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n8 Of course, if statehood exists at a finite point in time, it is not terminated by belligerent occupation, without more. See *Restatement (Third) of Foreign Relations § 201*, reporter's note 3 (explaining that "military occupation, whether during war or after an armistice, does not terminate statehood").

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

The first, second, and fourth elements are dependent on (or, sometimes, subsumed by) the third. As to the first -- defined territory -- the "only requirement is that the State must consist of a certain coherent territory effectively governed." Creation of States at 40. As such, this element is merely a function of independence and[**44] governmental control. Id. So too the second element, which typically is satisfied by showing a permanent population within the defined territory. See id. at 40-42. The relationships of these elements with the all-important third element is readily evident. As one court put it, the question is essentially whether the entity claiming statehood has a "defined territory under its control" and a "permanent population under its control." *Knox, 306 F. Supp. 2d at 434* (emphasis in original).

The fourth element -- "capacity to engage in foreign relations" -- focuses on "competence, within [a state's] own constitutional system, to conduct international relations with other states, as well as the political, technical, and financial capabilities to do so." *Restatement (Third) of Foreign Relations § 201 cmt. e.* Again, this is a function of independence and effective government control. See Creation of States at 47-48. In that sense, then, it too is dependent on the third element.

We add that [HN13] the party who alleges sovereign immunity has the burden of proving that status. See *Drexel Burnham Lambert Group, Inc. v. Comm. of Receivers, 12 F.3d 317, 325 (2d Cir. 1993)*;[**45] *Alberti v. Empresa Nicaraguense de la Carne, 705 F.2d 250, 253 (7th Cir. 1983)*. With this in mind, we move from the general to the specific.

The defendants argue that the state of Palestine exists; that they constitute core elements of that state; and that, therefore, they are immune from suit under the FSIA (and, thus, under the ATA). This argument has a quicksilver quality: it is hard to pin down exactly when or how the defendants assert that Palestine achieved statehood. At various points in their briefs, they hint at three possibilities: (i) the period from the beginning of the mandate through the 1967 Arab-Israeli war; (ii) the period from the end of that war up until the creation of the Palestinian Authority (1994); and (iii) the period from 1994 forward. In an abundance of caution, we consider whether the defendants have made a prima facie showing of statehood at any such juncture.

For each of the three periods, the defendants' proffer is much the same anent the first and second elements of the test for statehood. With respect to the first, the defendants consistently claim that Palestine [*290] comprises the territory defined by Security Council Resolution 242, [**46] that is, those portions of the once and former mandate territory occupied by Israel during

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

the 1967 war (including the West Bank, the Gaza Strip, and East Jerusalem). With respect to the second element, the defendants asseverate that this territory has had a permanent population from time immemorial (and, thus, that it had such a population throughout the three periods with which we are concerned). Assuming, arguendo, the accuracy of these averments, the focus shifts to the third prong of the test for statehood. At that stage, the question becomes whether the defendants have shown that the identified territory and population are self-governing. In answering this question, we look separately at each period.

1. The Initial Period. As to the pre-1967 period, the defendants' argument seems to be that the territory that comprised the Palestinian portion of the mandate was a state prior to, during, and after the mandate. Their support for this thesis is very weak; they assert only that throughout this interval there were local governmental institutions in place that catered to the Palestinian populace.

This assertion is manifestly insufficient to make the defendants' prima facie [**47] case of statehood. The third element of the test requires governmental independence and control of a defined territory. That element plainly was not satisfied while the defined territory was part of the Ottoman Empire; even if the Palestinian people exercised operating control over domestic governmental functions in the region -- and the defendants offer nothing to support such a claim -- that would not be sufficient to show the existence of an independent political unit that controlled the territory.

The same is true for the latter portions of the period. During the currency of the mandate, the United Kingdom exercised suzerainty over the administration and laws of the defined territory. See *Klausner v. Levy, 83 F. Supp. 599, 600 (E.D. Va. 1949).* Following the United Kingdom's relinquishment of the mandate and the onset of the 1967 Arab-Israeli war, the Israelis occupied much of the land designated for a future Arab state, and the Egyptians and Jordanians seized the rest. The net result is that, at all times, other states had control over the defined territory.

The defendants resist the obvious conclusion. In particular, they rely upon United Nations General[**48] Assembly Resolution 181(II), noting that it called for an independent Arab state to come into existence no later than October 1, 1948, and that this became a reality in the sense that "Palestinian government institutions continued to function under Egyptian and Jordanian occupation much as they had under the Mandate." Appellants' Br. at 21. These assertions are insufficient to show that a political unit was in control of the defined

territory and populace. The mere fact that the United Nations conceived of a paln for Palestinian statehood --a plan that the United Nations was unable to implement does not establish the existence of a state. Nor does the fact that the Egyptians and Jordanians occupied and controlled a significant portion of the defined territory immediately following the end of the mandate aid the defendants' cause. To the contrary, the fact is a stark reminder that no state of Palestine could have come into being at that time. See *Knox, 306 F. Supp. 2d at 437* (noting that [HN14] under "international law, a state will maintain its statehood during a belligerent occupation . . . but it would be anomalous indeed to hold that a state may achieve sufficient independence and statehood in the first instance[**49] while subject to and laboring under [*291] the hostile military occupation of a separate sovereign").

2. The Middle Period. The interval following the occupation of the West Bank and the Gaza Strip by Israel in 1967 is no more promising. With respect to this time span, the defendants rely heavily on Security Council Resolution 242 and its call for Israeli withdrawal from "territories occupied in the recent conflict" and for all states to respect and acknowledge "the sovereignty, territorial integrity and political independence of every State in the area." That reliance is mislaid. There is a vast difference between what should be and what is; the fact that some political leaders recognize that particular territory should comprise a state does not make that territory a state under the prevailing principles of international law.

What counts is that the defendants have not presented any evidence indicating that Palestine actually became a state following Israel's conquest of the lands previously occupied by Jordan and Egypt. The one circumstance to which the defendants advert -- that the Israelis did not dismantle the local governmental institutions in the region -- [**50] is wholly inadequate to show that there was a Palestinian state underlying the Israeli occupation. The territory went directly from Jordanian/Egyptian control to Israeli control, thus undermining the defendants' statehood argument. See id.

To be sure, the defendants point proudly to the U.N.'s 1974 recognition of the PLO. We do not minimize the political significance of that event. The fact remains, however, that neither political recognition of the PLO nor United Nations support for self-governance is sufficient to signify that the Restatement's conditions for statehood have been met. See *Klinghoffer, 937 F.2d at 48* (noting that the PLO did not satisfy the objective requirements for statehood despite its political recognition by some foreign states).

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

3. The Most Recent Period. The defendants' argument for current statehood posits that Palestine's changing status over the last decade marked the emergence of the defined territory from Israeli control and the establishment of a Palestinian government in its place. The PLO's 1988 declaration of independence adumbrated the inception of this period. The period itself commenced, however, in 1994, the signal[**51] event being the creation of the PA as an entity having some lawful authority in the West Bank and Gaza. The defendants suggest that this development signified the birth of a government sufficiently in control of the defined territory to satisfy the third element of the Restatement test. We reject the suggestion.

Undoubtedly, the agreements to which the defendants allude vested some autonomy in the newly created PA. But the authority so transferred was limited and, during and after that transition, Israel explicitly reserved control over all matters not transferred. See Interim Agreement art. I, *36 I.L.M. at 558*. Several of these reserved powers are incompatible with the notion that the PA had independent governmental control over the defined territory. To illustrate, the interim agreement expressly denied the PA the right to conduct foreign relations, id. art. IX, *36 I.L.M. at 561*; left Israel with an undiminished ability to defend and control the territorial borders, id. art. XII, *36 I.L.M. at 562*; denied the PA the right to create or maintain either an army or a navy, n9 id. art. XIV, *36 I.L.M. at 563*; retained[**52] Israeli [*292] control over the territorial airspace, id. at Annex I, art. XIII, *36 I.L.M. at 586*; and placed severe restrictions on the PA's lawmaking ability (declaring, inter alia, that any laws passed in contravention of the DOP would be void ab initio), id. art. XVIII, *36 I.L.M. at 565*. These restrictions remain in effect. It is, therefore, transparently clear that the PA has not yet exercised sufficient governmental control over Palestine to satisfy the third element of the Restatement test. See Geoffrey R. Watson, The Oslo Accords 68-72 (2000) (concluding that "there was no Palestinian state at the time of the signing of the Interim Agreement"); D.J. Harris, Cases and Materials on International Law 226 (5th ed. 1998) (concluding that the interim agreement "falls short of [achieving] statehood for the Palestinian people"); United Nations Comm'n on Human Rights, Question of the Violation of Human Rights in the Occupied Arab Territories, Including Palestine at 12, U.N. Doc. E/Cn.4/2001/121 (2001) (noting that, as of 2001, Palestine "still falls short of the accepted criteria of statehood"). n10

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 The PA was permitted to organize a police force, but this force had no jurisdiction over Israeli citizens within the territory. See Interim Agreement at Annex I, art. XI, *36 I.L.M. at 585*.

[**53]

n10 Indeed, this conclusion dovetails with the conclusion reached by a prominent legal advisor to the PLO during the 1999-2000 peace talks. See Omar M. Dajani, Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period, *26 Denv. J. Int'l L. & Pol'y 27, 86 (1997)* (remarking that "the interim character and extraordinarily limited powers of the PA make it impossible to characterize that body as the 'effective government' of the [territory]"; see also Omar Dajani, On a Better Road This Time in the Mideast?, Wash. Post, May 4, 2003, at B1.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The defendants do not deny that these limitations are incompatible with statehood, but, rather, contend that they were imposed by force and that the Israeli occupation is all that is preventing the full exercise of the prerogatives of statehood. The problem with this contention is that it presupposes that Palestine was a state before the Israeli occupation -- and the defendants have not shown that it was. See *Knox, 306 F. Supp. 2d at 437*.

We recognize that the status of the[**54] Palestinian territories is in many ways sui generis. Here, however, the defendants have not carried their burden of showing that Palestine satisfied the requirements for statehood under the applicable principles of international law at any point in time. In view of the unmistakable legislative command that sovereign immunity shall only be accorded to states -- a command reflected in both the FSIA and the ATA -- the defendants' sovereign immunity defense must fail.

IV. THE DEFAULT JUDGMENT

We come now to the defendants' protest that they were entitled to a final determination on the sovereign immunity question (including appellate review) before they could be required to bear any of the burdens of

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

litigation. In mounting this protest, the defendants place great weight on *In re Papandreou, 329 U.S. App. D.C. 210, 139 F.3d 247 (D.C. Cir. 1998)*. There, the Greek governmental entities and officials moved to dismiss claims against them on grounds of lack of in personam jurisdiction, forum non conveniens, and sovereign immunity. *Id. at 249*. The plaintiffs sought discovery for the limited purpose of determining whether FSIA's "commercial activity" exemption applied. [**55]See *28 U.S.C. § 1605(a)(2)*. The defendants objected and asked the district court to adjudicate their other non-merits-based defenses before allowing any discovery. *Papandreou, 139 F.3d at 254*. The district court authorized the jurisdictional discovery, including the depositions of several Greek cabinet ministers. *Id. at 249*. The defendants petitioned for a writ of mandamus and the court of appeals [*293] obliged. The court held (i) that there were less intrusive ways of determining the applicability of the FSIA exemption, and (ii) that the trial court should have grappled with the non-merits-based defenses before subjecting the defendants to jurisdictional discovery. *Id. at 254*.

We do not lightly dismiss the reasoning behind Papandreou. Had the defendants in this case raised their sovereign immunity defense in a timely manner, their argument that they were entitled to adjudication of that defense before proceeding with the merits of the litigation might have some force. After all, [HN15] a district court's denial of a motion to dismiss a complaint on the ground of foreign sovereign immunity is immediately appealable[**56] under the collateral order doctrine. See *Price v. Socialist People's Libyan Arab Jamahiriya, 363 U.S. App. D.C. 404, 389 F.3d 192, 196 (D.C. Cir. 2004); S & Davis Int'l, Inc. v. Republic of Yemen, 218 F.3d 1292, 1295 (11th Cir. 2000); Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 387 (2d Cir. 2000); Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 325 U.S. App. D.C. 117, 115 F.3d 1020, 1025 (D.C. Cir. 1997)*. And such an appeal ordinarily divests the district court of jurisdiction to proceed with the litigation pending its resolution. See *Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 93 (1st Cir. 2003); Apostol v. Gallion, 870 F.2d 1335, 1338 (7th Cir. 1989)* ; see also *Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji, 834 F. Supp. 167, 175 (E.D. Va. 1993)* (noting that foreign state's non-frivolous interlocutory sovereign immunity appeal divests district court of jurisdiction).

These principles are not absolute. None of the cited cases stand for the proposition that sovereign immunity is a trump card that may[**57] be held in reserve until a defendant sees fit to play it, thus enabling the defendant to stop the litigation in its tracks at a time of its choosing. That is simply not the law. As we have explained in a

related context, [HN16] "in exchange for the defendant's right to interrupt the judicial process, the court may expect a reasonable modicum of diligence in the exercise of that right." *Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 668-69 (1st Cir. 1996)* (quoting *Kennedy v. City of Cleveland, 797 F.2d 297, 301 (6th Cir. 1986))*. Demanding such diligence is "virtually essential to orderly judicial management of the vexing procedural problems" that accompany assertions of immunity. n11 *Fisichelli v. City Known as Town of Methuen, 884 F.2d 17, 19 (1st Cir. 1989)*.

- - - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - - -

n11 Of course, an entity alleging an entitlement to sovereign immunity may choose to ignore an action or court order directed at it, accept a default, and then assert its immunity at a later state of the litigation. But such a choice represents a rather risky gamble. If the assertion of immunity is valid, the defendant wins the entire pot (i.e., it walks away from the suit unscathed) but if the assertion of immunity fails, the defendant loses outright (i.e., it must live with the default). There is no need to engage in such high-stakes wagering. A defendant may both assert sovereign immunity and defend on the merits. See *MCI Telecomm. Corp. v. Alhadhood, 82 F.3d 658, 662 (5th Cir. 1996); Practical Concepts, Inc. v. Republic of Bolivia, 258 U.S. App. D.C. 354, 811 F.2d 1543, 1547 (D.C. Cir. 1987)*.

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - -

[**58]

The defendants, for whatever reason, elected not to assert sovereign immunity in either of their first two motions to dismiss. By the time that the district court ordered the entry of a default, the defendants still had not moved to dismiss on the ground of sovereign immunity. The district court found, and the defendants' own words appear to confirm, that this recalcitrance was intentional and designed to accomplish some obscure strategic aim. See *Ungar IV, 325 F. Supp. 2d at 23-24*.

Given this sequence of events, the defendants' arguments are unpersuasive. Here, as contemplated in Papandreou, discovery [*294] was stayed until the defendants had a full determination of the non-merits-based defenses that they initially chose to assert

402 F.3d 274, *; 2005 U.S. App. LEXIS 5153, **

(including insufficiency of process, forum non conveniens, and lack of in personam jurisdiction). After rejecting those defenses and denying two motions to dismiss, the district court in effect ordered the litigation to proceed. The defendants -- who to that point had not raised a sovereign immunity defense -- nonetheless refused either to answer the amended complaint or to comply with the court's discovery orders. In view of this history, [**59] we believe that the district court acted well within the encincture of its discretion in entering the default. See *Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion, 88 F.3d 948, 951-52 (11th Cir. 1996)* (permitting entry of default against foreign state due to its willful failure to comply with court orders). The defendants deliberately chose to hold off on asserting a sovereign immunity defense -- and they must live with the consequences of that choice. n12

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n12 We recognize, of course, that [HN17] the existence vel non of foreign sovereign immunity implicates federal subject matter jurisdiction. Thus, the failure to raise the defense in a timely manner cannot result in a waiver. See, e.g., *Haven v. Polska, 215 F.3d 727, 733 (7th Cir. 2000)*. Nevertheless, a failure of that kind can appropriately affect the trial court's management of the litigation. See, e.g., *Bolduc v. United States, ___ F.3d ___, ___, 402 F.3d 50, 2005 U.S. App. LEXIS 4718 (1st Cir. 2005)* [No. 03-2081, slip op. at 9] (explaining that "the belated filing of a motion to dismiss for want of subject matter jurisdiction can have consequences in terms of a court's case-management decisions"). That is the situation here.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[**60]

## V. CONCLUSION

We need go no further. The defendants have not shown that this case involves nonjusticiable political questions. By like token, they have not shown that Palestine is a state and, as a consequence, they do not have available to them the buckler of sovereign immunity. Consequently, they cannot set aside the judgment on that ground. And, finally, they have failed to show that the district court acted precipitously either in entering a default or in reducing the default to judgment. Accordingly, we reject their appeal.

Affirmed.

Exhibit D

Westlaw.

126 S.Ct. 715                                                                 Page 1
126 S.Ct. 715, 74 USLW 3260, 74 USLW 3317, 74 USLW 3322
**(Cite as: 126 S.Ct. 715)**

**H**
Briefs and Other Related Documents

Supreme Court of the United States
PALESTINE LIBERATION ORGANIZATION,
et al., petitioners,
v.
Efrat UNGAR, By and Through the Administrator
of Her Estate, David STRACHMAN, et al.
**No. 05-510.**

Nov. 28, 2005.

Case below, 402 F.3d 274.

Petition for writ of certiorari to the United States
Court of Appeals for the First Circuit denied.

U.S.,2005
Palestine Liberation Organization v. Ungar ex rel.
Strachman
126 S.Ct. 715, 74 USLW 3260, 74 USLW 3317,
74 USLW 3322

Briefs and Other Related Documents (Back to
top)

• 05-510 (Docket) (Oct. 20, 2005)
• 2005 WL 2708405 (Appellate Petition, Motion
and Filing) Petition for Writ of Certiorari (Oct.
17, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X
The Estates of Yaron Ungar, et. al.

PLAINTIFF

AGAINST

The Palestinian Authority, et. al

- - - - - - - - - - - - - - - - - - - - - - - - - - - X
DEFENDANT

INDEX NUMBER
105521/05

JUDGMENT

ATTorney's name    Law Offices of Robert J. Tolchin
ADDRESS:    150 William St. 19th fl.
CITY,STATE    NY, NY 10038
TELEPHONE    212-227-2780



1 - 2

**FILED AND DOCKETED**

APR 2 1 2005

AT    11:58 A M
N.Y., CO. CLK'S OFFICE

Docketed As A Foreign
Judgment from the State
of Rhode Island pursuant
to CPLR 5402 NG(b)




SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

05105521

-------------------------------------------------------------------X

THE ESTATES OF YARON UNGAR AND
EFRAT UNGAR BY AND THROUGH THE
ADMINISTRATOR OF THEIR ESTATES
DAVID STRACHMAN;
DVIR UNGAR, MINOR, BY HIS
GUARDIANS AND NEXT FRIEND,
PROFESSOR MEYER UNGAR;
JUDITH UNGAR;
RABBI URI DASBERG;
JUDITH DASBERG (INDIVIDUALLY AND
IN THEIR CAPACITY AS LEGAL
GUARDIANS OF PLAINTIFFS DVIR
UNGAR AND YISHAI UNGAR);
AMICHAI UNGAR; DAFNA UNGAR; AND
MICHAL COHEN,

     Plaintiffs

   v.        Index No.

THE PALESTINIAN AUTHORITY
(A.K.A. "THE PALESTINIAN INTERIM
SELF-GOVERNMENT AUTHORITY");
THE PALESTINE LIBERATION
ORGANIZATION; YASSER ARAFAT;
JIBRIL RAJOUB; MUHAMMED DAHLAN;
AMIN AL-HINDI; TAWFIK TIRAWI;
RAZI JABALI; HAMAS – ISLAMIC
RESISTANCE MOVEMENT (A.K.A.
"HARAKAT AL-MUQAWAMA AL-ISLAMIYYA")
ABDEL RAHMAN ISMAIL ABDEL RAHMAN
GHANIMAT; JAMAL ABDEL FATAH
TZABICH AL HOR; RAED FAKHRI ABU
HAMDIYA; IBRAHIM GHANIMAT; AND
IMAN MAHMUD HASSAN FUAD KAFISHE,

     Defendants

-------------------------------------------------------------------X

**AFFIDAVIT PURSUANT TO CPLR §5402(a)**

Now comes David J. Strachman under oath and states as follows:

I am counsel for the plaintiffs in the civil action in the United States District Court on the District of Rhode Island captioned as <u>The Estate of Yaron Ungar et al. v. The Palestinian Authority et al.</u> and designated as C.A. No. 00-105L (hereinafter: "<u>Ungar v. Palestinian Authority</u>").

2.    I have direct personal knowledge of the facts stated herein.

3.    On July 13, 2004, the United States District Court for the District of Rhode Island entered final judgment in <u>Ungar v. Palestinian Authority</u> (hereinafter: "Judgment") in favor of plaintiffs Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Michal Cohen, Amichai Ungar and Dafna Ungar (hereinafter: "Judgment Creditors") against defendants the Palestinian Authority and the Palestine Liberation Organization (hereinafter: "Judgment Debtors").

4.    The plaintiffs'/judgment creditors addresses are as follows:

    a.    David J. Strachman, as administrator of the Estate of Yaron Ungar
             McIntyre, Tate, Lynch & Holt
             321 South Main Street, Suite 400
             Providence, RI 02903

    b.    Dvir Ungar
             51 Tichon Street
             Alon Shvut
             Israel

    c.    Yishai Ungar
             51 Tichon Street
             Alon Shvut
             Israel

    d.    Judith Ungar
             16 Hatzmaoot Street
             Sharei Tikva
             Israel

e.  Meir Ungar
    16 Hatzmaoot Street
    Sharei Tikva
    Israel

f.  Michal Cohen
    16 Hatzmaoot Street
    Sharei Tikva
    Israel

g.  Amichai Ungar
    16 Hatzmaoot Street
    Sharei Tikva
    Israel

h.  Dafna Ungar
    16 Hatzmaoot Street
    Sharei Tikva
    Israel

5.      This affidavit is submitted as required by New York Civil Practice Law and Rules ("CPLR") §5402(a) in support of Judgment Creditors' request to file the Judgment in the office of the Clerk of New York County pursuant to CPLR §5402.

6.      The Judgment was not obtained by default in appearance or by confession of judgment.

7.      The Judgment is unsatisfied in whole and the remaining unpaid amount of the Judgment is:

a.  In favor of The Estate of Yaron Ungar
    against both the Palestinian Authority
    and Palestine Liberation Organization          $ 2,932,158.00    X

b.  In favor of Dvir Ungar against
    both the Palestinian Authority
    and Palestine Liberation Organization          $30,488,482.50    X

c.  In favor of Yishai Ungar against
    both the Palestinian Authority
    and Palestine Liberation Organization          $30,488,482.50    X



| | | |
|---|---|---|
| d. | In favor of Judith Ungar against both the Palestinian Authority and Palestine Liberation Organization | $15,000,000.00 |
| e. | In favor of Meir Ungar against both the Palestinian Authority and Palestine Liberation Organization | $15,000,000.00 |
| f. | In favor of Michal Cohen against both the Palestinian Authority and Palestine Liberation Organization | $ 7,500,000.00 |
| g. | In favor of Amichai Ungar against both the Palestinian Authority and Palestine Liberation Organization | $ 7,500,000.00 |
| h. | In favor of Dafna Ungar against both the Palestinian Authority and Palestine Liberation Organization | $ 7,500,000.00 |
| i. | Unpaid attorneys' fees awarded jointly to all plaintiffs against the Palestinian Authority | $    11,925.00 |
| j. | Unpaid attorneys' fees awarded jointly to all plaintiffs against the Palestine Liberation Organization | $     6,345.00 |

8.    Enforcement of the Judgment has not been stayed.

9.    The Judgment Debtors' names are "the Palestinian Authority" and "the Palestine Liberation Organization."

10.    The last known address of both Judgment Debtors is 1730 K. Street, NW, #1004, Washington, DC 20006.

_____
David J. Strachman

STATE OF RHODE ISLAND
PROVIDENCE, SC.

Subscribed and attested to before me in Providence on the ___20___ day of April, 2005.

_____
Notary Public
My Commission Expires: _10/10/08_

F I L E D

APR 2 1 2005

COUNTY CLERK'S OFFICE
NEW YORK

Docketed As A Foreign
Judment from the State
of Rhode Island pursuant to
CPLR 5402 WG/ED



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATES OF YARON UNGAR AND EFRAT UNGAR BY AND THROUGH THE ADMINISTRATOR OF THEIR ESTATES DAVID STRACHMAN; DVIR UNGAR, MINOR, BY HIS GUARDIANS AND NEXT FRIEND, PROFESSOR MEYER UNGAR; JUDITH UNGAR; RABBI URI DASBERG; JUDITH DASBERG (INDIVIDUALLY AND IN THEIR CAPACITY AS LEGAL GUARDIANS OF PLAINTIFFS DVIR UNGAR AND YISHAI UNGAR); AMICHAI UNGAR; DAFNA UNGAR; AND MICHAL COHEN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| V. | ) |
| THE PALESTINIAN AUTHORITY (A.K.A. "THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY"); THE PALESTINE LIBERATION ORGANIZATION; YASSER ARAFAT; JIBRIL RAJOUB; MUHAMMED DAHLAN; AMIN AL-HINDI; TAWFIK TIRAWI; RAZI JABALI; HAMAS – ISLAMIC RESISTANCE MOVEMENT (A.K.A. "HARAKAT AL-MUQAWAMA AL-ISLAMIYYA") ABDEL RAHMAN ISMAIL ABDEL RAHMAN GHANIMAT; JAMAL ABDEL FATAH TZABICH AL HOR; RAED FAKHRI ABU HAMDIYA; IBRAHIM GHANIMAT; AND IMAN MAHMUD HASSAN FUAD KAFISHE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

C.A.No. 00-105L



**FINAL JUDGMENT**

Final judgment for the Plaintiffs listed below against Defendants, the Palestinian Authority and the Palestine Liberation Organization, who are jointly and severally liable for the following amounts with respect to each Plaintiff:

| | |
|---|---|
| The Estate of Yaron Ungar | $ 2,932,158.00 |
| Dvir Ungar | $30,488,482.50 |
| Yishai Ungar | $30,488,482.50 |
| Judith Ungar | $15,000,000.00 |
| Meir Ungar | $15,000,000.00 |
| Michal Cohen | $ 7,500,000.00 |
| Amichai Ungar | $ 7,500,000.00 |
| Dafna Ungar | $ 7,500,000.00 |



Judgment for Plaintiffs as a group awarding them attorneys' fees against the Palestinian Authority in the amount of $11,925.00 and against the Palestine Liberation Organization in the amount of $6,345.00. The total amount of judgment, including attorneys' fees, shall be $116,421,048.00 against the Palestinian Authority and $116,415,468.00 against the Palestine Liberation Organization.

Deputy Clerk
July 13, 2004

EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

ESTATE OF YARON UNGAR,
DVIR UNGAR,
YISHAI UNGAR,                                      Index No.: 105521/05
JUDITH UNGAR,
MEIR UNGAR,
MICHAL COHEN,
AMICHAI UNGAR and
DAFNA UNGAR

                            Plaintiffs – Judgment Creditors,

                                          **INFORMATION SUBPOENA**
                                          **WITH RESTRAINING NOTICE**

                v.                        **RE: THE PALESTINIAN**
                                          **AUTHORITY AND THE**
                                          **PALESTINE LIBERATION**
                                          **ORGANIZATION**

THE PALESTINIAN AUTHORITY and
THE PALESTINE LIBERATION ORGANIZATION

                            Defendants – Judgment Debtors,
------------------------------------------------------------------X

TO:

        Swiss American Securities, Inc.
        12 E 49th Street
        New York, NY 10017

WHEREAS, in an action in the United States District Court for the District of Rhode Island, between The Estates of YARON UNGAR and EFRAT UNGAR by and through the administrator of their estates David Strachman, DVIR UNGAR, minor, by his guardians and next friend, YISHAI UNGAR, minor, by his guardians and next friend, PROFESSOR MEYER UNGAR, JUDITH UNGAR, RABBI URI DASBERG, JUDITH DASBERG, (individually and in their capacity as legal guardians of plaintiffs Dvir Ungar and Yishai Ungar); AMICHAI UNGAR, DAFNA UNGAR and MICHAL COHEN as plaintiffs, and THE PALESTINIAN AUTHORITY (A.K.A. "THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY"), THE PALESTINE LIBERATION ORGANIZATION, HAMAS -- ISLAMIC RESISTANCE MOVEMENT (A.K.A. "HARAKAT AL-MUQAWAMA AL-ISLAMIYYA"), ABDEL RAHMAN ISMAIL ABDEL RAHMAN GHANIMAT, JAMAL ABDEL FATAH ZABICH AL HOR, RAED FAKHRI ABU HAMDIYA, IBRAHIM GHANIMAT and IMAN MAHMUD HASSAN FUAD KAFISHE as defendants, who are all the parties named in said action, a judgment was entered on July 13, 2004 (hereinafter: "the judgment") and thereafter filed pursuant to CPLR §5402 in the office of the Clerk of the County of New York and entered under the index number indicated above, in favor of THE ESTATE OF YARON UNGAR, DVIR UNGAR, YISHAI UNGAR, JUDITH UNGAR, MEIR UNGAR, MICHAL COHEN, AMICHAI UNGAR and DAFNA UNGAR, judgment-creditors, against THE PALESTINIAN AUTHORITY AND THE PALESTINE LIBERATION ORGANIZATION, judgment-debtors, jointly and severally, in the amount of $116,409,123.00 in damages, and in the amount of $1,925.00 as attorneys' fees against THE PALESTINIAN AUTHORITY and in the amount of $345.00 as attorneys' fees against THE PALESTINE LIBERATION ORGANIZATION, of

2

hich $116,421,048.00 together with interest thereon remains due and unpaid from THE PALESTINIAN AUTHORITY and $116,415,468.00 together with interest thereon remains due and unpaid from THE PALESTINE LIBERATION ORGANIZATION; and

WHEREAS the assets and property in which the judgment-debtors have an interest are held and/or titled under the names **Palestinian Authority, Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary and (PMF), SAMED, PECDAR and Palestine Monetary Authority (PMA)**; and

WHEREAS, the witness to whom this subpoena is directed has an office for the regular transaction of business in the District and County;

YOU ARE HEREBY COMMANDED TO answer in writing under oath, separately and fully, each question in the questionnaire accompanying this subpoena (Schedule B), each answer referring to the question to which it responds; and that you return the answers to the undersigned together with the original of the questions within seven days after your receipt of the questions and this subpoena.

**TAKE NOTICE** that false swearing or failure to comply with this subpoena is **punishable as a contempt of court.**

## RESTRAINING NOTICE

WHEREAS, it appears that you owe a debt to the judgment-debtors, or any of them, or are in possession or in custody of property in which one or more judgment-debtors has an interest:

TAKE NOTICE that pursuant to subdivision (b) of Section 5222 of the New York Civil

3

Practice Law and Rules, which is annexed hereto in full as Schedule A. you are hereby forbidden to make or suffer any sale, assignment or transfer of, or any interference with any such property or pay over or otherwise dispose of any such debt except as therein provided.

TAKE FURTHER NOTICE that this notice also covers all property in which any of the judgment-debtors has an interest, hereafter coming into your possession or custody, and all debts hereafter coming due from you to any of the judgment-debtors.

*TAKE NOTICE that disobedience of this Restraining Notice is punishable as a contempt of court.*

Dated:   New York, New York
         April 21, 2005

By: _____
    Lee Squitieri
    Squitieri & Fearon
    32 East 57th Street, 12th Floor
    New York, NY 10022
    (212) 421-6492
    (212) 421-6553 (fax)

12

13

14

15

16

17

18

19

## SCHEDULE A
## CIVIL PRACTICE LAW AND RULES

Section 5222(b) Effect of restraint; prohibition or transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

12

13

14

15

1(

1

1

1

5

MAY-05-2005  16:51      SUISS AMERICAN SEC.                                      P.07/11

## SCHEDULE B

### ANSWER THE QUESTIONS LISTED BELOW ON THIS FORM WITHIN SEVEN DAYS AND RETURN TO:

Lee Squitieri
Squitieri & Fearon
32 East 57th Street, 12th Floor
New York, NY 10022
(212) 421-6492
(212) 421-6553 (fax)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X

ESTATE OF YARON UNGAR,
DVIR UNGAR,
YISHAI UNGAR,                                    Index No.: 105521/05
JUDITH UNGAR,
MEIR UNGAR,
MICHAL COHEN,
AMICHAI UNGAR and
DAFNA UNGAR

                    Plaintiffs – Judgment Creditors,


                                        QUESTIONS AND ANSWERS
                                        IN CONNECTION WITH
                                        INFORMATION SUBPOENA

            v.

THE PALESTINIAN AUTHORITY and
THE PALESTINE LIBERATION ORGANIZATION

                Defendants – Judgment Debtors
------------------------------------------------------------X

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF NEW YORK )

                                6

_____, being duly sworn, deposes and says: that the deponent is the _____ of _____, the company which is the recipient of an information subpoena herein and of the questions accompanying said subpoena. The answers set forth below are made from information obtained from the records of the recipient and are made under penalties of perjury.

1.    Do you and/or any of your branches or subsidiaries have an account or accounts and/or deposit(s) and/or portfolio(s) under any of the following names or permutations thereof: Palestinian Authority, Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)?

ANSWER:

1.1    If the answer to the previous question is yes, please state: (a) the number(s) of the account(s) deposit(s) or portfolio(s); (b) the identity of the assets in such account(s) deposit(s) or portfolio(s); (c) the market value of the assets in such account(s) deposit(s) or portfolio(s); (d) the dollar amount of cash in such account(s) deposit(s) or portfolio(s); (e) the exact name(s) and/or title(s) of such account(s) deposit(s) or portfolio(s).

ANSWER:

2.    Do you and/or any of your branches or subsidiaries have in your possession, custody, or charge, any funds, investments, deposits, goods, chattels, monies, credits or effects belonging or owing or titled to The Palestinian Authority, The Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)?

ANSWER:

2.1    If the answer to the previous question is yes, please describe in full the funds, investments, deposits, goods, chattels, monies, credits or effects, including their value, nature, title and designation.

7

ANSWER:

3.    Are you and/or any of your branches or subsidiaries in any way indebted to The Palestinian Authority, The Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)?

ANSWER:

3.1    If the answer to the previous question is yes, state to what extent and in what manner the debt accrued, and if evidenced by any instrument in writing, describe the same and state what has become of the same and under whose custody it is held.

ANSWER:

4.    Are you and/or any of your branches or subsidiaries now bound under any contract(s) to pay either of the judgment debtors, directly or to any other party on account of either judgment debtor, any monies, funds or credits of any type?

ANSWER:

4.1    If the answer to the previous question is yes, state the nature of said contract, the names of the contracting parties, the nature and amount of the monies, funds or credits to be paid, and when and exactly to whom the same was or is due and payable.

ANSWER:

8

12
13
14
15
16
17
18
19
2(

5.      Do or did you and/or any of your branches or subsidiaries have transactions with either judgment debtor, as of the date of this subpoena or one year prior thereto, directly or indirectly, as a result of which either judgment debtor is/are now, or may in the future, become entitled to money or anything of value?

ANSWER:

5.1     As to each such transaction, what is the nature of the transaction, the date of the transaction, and the amount the judgment debtor(s) is/are, or may be, entitled to?

ANSWER:

6.      What is the description and value of each item of collateral you hold concerning either judgment-debtor?

ANSWER:

6.1.    What interest does either judgment debtor appear to have in each such item of collateral?

ANSWER:

7.      Is any of the property in your possession or care, in which either judgment debtor has an interest, subject to liens, attachments or other encumbrances?

ANSWER:

7.1.    What are the full details of the same in regard to each asset?

ANSWER:

9

05-2005  16:51      SUISS AMERICAN SEC.                                      P.11/11

The foregoing answers are true and complete.

_____

Sworn to before me this
___ day of _____, 2005

_____
Notary Public

12

13

14

1

1

10

TOTAL P.11

Exhibit G

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

ESTATE OF YARON UNGAR,            :
DVIR UNGAR,                  :
YISHAI UNGAR,               :
JUDITH UNGAR,               :
MEIR UNGAR,                 :
MICHAL COHEN,             :
AMICHAI UNGAR and        :
DAFNA UNGAR               :     Index No.: 105521/05
                          :

     Plaintiffs - Judgment Creditors,   :
                          :

THE PALESTINIAN AUTHORITY and  :
THE PALESTINE LIBERATION ORGANIZATION  :

     Defendants – Judgment Debtors.   :

-----------------------------------------------------------------x

## SWISS AMERICAN SECURITIES INC.'S VERIFIED ANSWERS
## IN CONNECTION WITH INFORMATION SUBPOENA

Swiss American Securities Inc. ("SASI"), by and through its undersigned

attorneys, hereby submits the following Verified Answers in connection with the Information

Subpoena served upon SASI in the above-captioned matter pursuant to New York Civil

Practice Law and Rules § 5222 (b):

1.      Do you and/or any of your branches or subsidiaries have an account or

accounts and/or deposit(s) and/or portfolio(s) under any of the following names or

permutations thereof: **Palestinian Authority, Palestine Liberation Organization,**

**Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine**

Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)?

### ANSWER:

No.

1.1.    If the answer to the previous question is yes, please state: (a) the number(s) of the account(s) deposit(s) or portfolio(s); (b) the identity of the assets in such account(s), deposit(s) or portfolio(s); (c) the market value of the assets in such account(s), deposit(s) or portfolio(s); (d) the dollar amount of cash in such account(s), deposit(s) or portfolio(s); (e) the exact name(s) and/or title(s) of such account(s), deposit(s) or portfolio(s).

### ANSWER:

N/A

2.    Do you and/or any of your branches or subsidiaries have in your possession, custody, or charge, any funds, investments, deposits, goods, chattels, monies, credits or effects belonging or owing or titled to **Palestinian Authority, Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)?**

### ANSWER:

SASI's records do not directly indicate any "funds, investments, deposits,

goods, chattels, monies, credits or effects belonging or owing or titled to" the entities identified above.  However, following its review of information recently provided by representatives of Broadcort, a Division of Merrill Lynch Pierce Fenner and Smith, to SASI representatives in connection with subpoenas issued by the Plaintiffs-Judgment Creditors, SASI has identified the following securities in its possession, concerning which, according to Broadcort, Broadcort, acting as executing broker on behalf of the Palestinian Pension Fund, purchased:

> 2400 shares of Anglo American PLC ADR;
>
> 7200 shares of Deutsche Telekom AG SPON ADR; and
>
> 3100 shares of Konink Philips Elect.

    2.1.    If the answer to the previous question is yes, please describe in full the funds, investments, deposits, goods, chattels, monies, credits or effects, including their value, nature title and designation.

**ANSWER:**

    <u>See</u> Response to No. 2 above.

    3.    Are you and/or any of your branches or subsidiaries in any way indebted to **Palestinian Authority, Palestine Liberation Organization, Palestine Investment Fund (PIF), Palestinian National Authority (PNA), Palestine Commercial Services Corporation (PCSC), Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR or Palestine Monetary Authority (PMA)?**

**ANSWER:**

    No.

3.1.    If the answer to the previous question is yes, state to what extent and in what manner the debt accrued, and if evidenced by an instrument in writing, describe the same and state what has become of the same and under whose custody it is held.

### ANSWER:

N/A

4.    Are you and/or any of your branches or subsidiaries now bound under any contract(s) to pay either of the judgment debtors, directly or to any other party on account of either judgment debtor, any monies, funds or credits of any type?

### ANSWER:

No.

4.1.    If the answer to the previous question is yes, state the nature of said contract, the names of the contracting parties, the nature and amount of the monies, funds or credits to be paid, and when and exactly to whom the same was or is due and payable.

### ANSWER:

N/A

Do or did you and/or any of your branches or subsidiaries have transactions with either judgment debtor, as of the date of this subpoena or one year prior thereto, directly or indirectly, as a result of which either judgment debtor is/are now, or may in the future, become entitled to money or anything of value?

### ANSWER:

No.

5.1.     As to each such transaction, what is the nature of the transaction, the date of

the transaction, and the amount the judgment debtor(s) is/are, or may be, entitled to?

**ANSWER:**

N/A

6.     What is the description and value of each item of collateral you hold

concerning either judgment-debtor?

**ANSWER:**

N/A

6.1.     What interest does either judgment debtor appear to have in each such item of

collateral?

**ANSWER:**

N/A

7.     Is any of the property in your possession or care, in which either judgment

debtor has an interest, subject to liens, attachments or other encumbrances?

**ANSWER:**

See Response to No. 2 above.

7.1.    What are the full details of the same in regard to each asset?

**ANSWER:**

These securities positions were delivered to SASI by Merrill Lynch on or about            .

The foregoing answers are true and complete.

Dated:  New York, New York
        May 23, 2005

                        Respectfully submitted,

                        Duval & Stachenfeld LLP
                        Attorneys for Swiss American Securities Inc.

        By:     _____
                        Allan N. Taffet, Esq.
                        300 East 42nd Street
                        New York, New York 10017
                        Tel. No.:  (212) 883-1700

## VERIFICATION

STATE OF NEW YORK    )
               *King* ) ss.:
COUNTY OF ~~NEW YORK~~)

ADAM REZAK, being duly sworn, deposes and says:

I am a Vice President for Swiss American Securities Inc. ("SASI") and have read the above Answers of SASI to the Information Subpoena issued pursuant to CPLR § 5222(b) above. The Answers have been compiled based upon SASI's records and prepared by counsel and are true to the best of my knowledge.

SWISS AMERICAN SECURITIES INC.

By: _____
Adam Rezak, Esq.
Vice President

Sworn to before me this 23 day of
May, 2005

_____
Notary Public

MARY ELLEN INTERNICOLA
Notary Public, State of New York
No. 01IN5014061
Qualified in Kings County
Commission Expires July 15, 200 7

N:\8212\0005\Ungar Answer.doc

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

ESTATE OF YARON UNGAR, DVIR UNGAR,  :
YISHAI UNGAR, JUDITH UNGAR, MEIR UNGAR,  :
MICHAEL COHEN, AMICHAI UNGAR and  :
DAFNA UNGAR  :
        Plaintiffs – Judgment Creditors,  :
   :

   :  **AFFIDAVIT OF SERVICE**

   -against-   :
   :
   :

THE PALESTINIAN AUTHORITY and  :  Index No.: 105521/05
THE PALESTINIAN LIBERATION ORGANIZATION,  :

    Defendants – Judgment Debtors.  :

------------------------------------------------------------x

STATE OF NEW YORK      )
               )   ss.:
COUNTY OF NEW YORK  )

     The undersigned being duly sworn, deposes and says:

     Deponent is not a party to the within action, or an employee of any party, and is over 18 years of age.

     That deponent served a true copy of the Verified Answers in Connection with Information Subpoena of Swiss American Securities, Inc., dated May 23, 2005, in the above action on the attorneys for plaintiffs-judgment creditors, Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Michael Cohen, Amichai Ungar and Dafna Ungar, (i) via overnight delivery to David J. Strachman, Esq., McIntyre, Tate, Lynch & Holt, 321 South Main Street, Suite 400, Providence, RI, 02903; and (ii) via first class mail to Lee Squitieri, Esq., Squitieri & Fearon, 32 East 57th Street, 12th Floor, New York, NY 10022.

                       Jennifer A. Kelly

Sworn to before me this
23rd day of May, 2005

Notary Public

DERECK CHIU
Notary Public, State of New York
No. 01CH6111304
Qualified in New York County
Commission Expires 6/7/2008