# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

        Plaintiffs – Judgment Creditors,

    v.                                                        C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

        Defendants – Judgment Debtors.

## PLAINTIFFS' NOTICE
## OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)

**DEPONENT:**        **The Palestinian Authority**

**DATE:**              **September 28, 2010**

**TIME:**               **10:00 a.m.**

       **PLEASE TAKE NOTICE** that pursuant to Fed.R.Civ.P. Rule 30(b)(6), counsel for Plaintiffs-Judgment Creditors in the above-captioned matter will take the deposition of the Palestinian Authority ("PA") which examination will continue from day to day until completed, the same to commence on the date and time above stated at the offices of Plaintiffs' counsel Wistow & Barylick, Inc., 61 Weybosset Street, Providence, Rhode Island.

       The deposition shall be taken before a court reporter or any other officer authorized to take depositions. This deposition is being taken for the purpose of discovery, for use at the hearing scheduled in this matter, or for such other purposes as are permitted under the Federal Rules of Civil Procedure and the Local Rules of this Court.

       The deposition will be recorded by stenographic and audiovisual means.

The PA must designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf regarding the Deposition Topics set forth below.

The PA is requested to serve on counsel for Plaintiffs-Judgment Creditors, prior to the deposition, a written designation which identifies the officers, directors, or managing agents, or other persons who consent to testify on its behalf regarding the Deposition Topics set forth below, setting forth, for each person so designated (i) the Topics on which the witness will testify (ii) how each witness was selected to testify (iii) the efforts made to inform and/or educate each witness about the subject matter of his or her testimony and (iv) whether any other witness was asked to testify but refused to consent to testify.

## DEPOSITION TOPICS

1.  **Regarding the PA's burden to demonstrate absence of prejudice:**

    a.  The full basis for the PA's claims that vacating the Judgment will not cause prejudice to the Plaintiffs.

    b.  The basis on which the PA "vigorously disput[es]" that evidence and witnesses have been irreparably compromised.[1]

2.  **Regarding Mahmoud Abbas's November 28, 2006 letter to Secretary of State Condolezza Rice, referred to in Rice's letter dated January 12, 2007 (copy attached as Exhibit A):**

    a.  Whether other drafts of Mahmoud Abbas's November 28, 2006 letter to Secretary of State Condolezza Rice, referred to in Rice's letter dated January 12, 2007 ("Abbas Letter") were prepared and if they still exist.

    b.  The name, title, and present whereabouts of any person involved in writing the Abbas Letter.

    c.  The name, title, and present whereabouts of any person involved in translating the Abbas Letter.

    d.  The name, title, and present whereabouts of any person who had and/or received copies of the Abbas Letter.

---

[1] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("They [Defendants] vigorously dispute the plaintiffs' claim that evidence and witnesses have been irreparably compromised.").

     e.   The computers and/or data bases where electronic copies of the Abbas Letter were stored or should have been stored, and the storage methods used.

     f.   The locations where paper copies of the Abbas Letter were filed or should have been filed, and the archival methods used.

     g.   When it was first determined that the Abbas Letter was not within the PA's "possession, custody, or control".[2]

     h.   Any and all any efforts made to locate the Abbas Letter after determining it was not within the PA's possession, custody or control.

     i.   Any and all any efforts made to obtain the Abbas Letter from the United States after determining it was not within the PA's possession, custody, or control.

     j.   The basis for the PA's characterization of the Abbas Letter as a request for "guidance."[3]

**3.     Regarding Dr. Nasser Al-Kidwa's January 2003 letter to Magistrate Judge Martin[4]:**

     a.   The name, title, and present whereabouts of any person involved in writing Nasser Al-Kidwa's January 2003 letter to Magistrate Judge Martin ("Al Kidwa Letter").

     b.   The name, title, and present whereabouts of any person who directed or asked that the Al Kidwa Letter be written.

     c.   The name, title, and present whereabouts of any person who supplied any information contained or referenced within the Al Kidwa Letter.

**4.     Regarding the PA's strategic litigation choices leading to and subsequent to its default:**

     a.   The PA's "mindset" during the period when it decided to default.[5]

---

[2] See Objections and Responses of Defendants the Palestine Liberation Organization and the Palestinian Authority to Plaintiffs-Judgment Creditors' Second Request for Production of Documents and Things Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion at 8.

[3] See 9/14/2009 Brief for Appellants at 20 ("In Late 2006, President Abbas sent a letter to then Secretary of State Condoleeza Rice requesting guidance with respect to the ongoing Anti-Terrorism Act litigation.").

[4] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 24 ("Indeed, in January 2003, Dr. Nasser Al-Kidwa wrote to Magistrate Judge Martin to assert that the PA and PLO should not be forced to undergo the burdens of participation in discovery prior to disposition of the sovereign immunity question because the 'high level of violence' in the region made it impossible to proceed with a defense at the time, and because the PA and PLO could not 'understand how plaintiffs can claim the PNA and PLO are responsible for what HAMAS does.'").

b. Any and all any advice of the PA's counsel to interpose "non-merits based defenses" in the *Ungar* litigation prior to 2005.[6]

c. The PA's "deliberate choice" to delay asserting a sovereign immunity defense in this litigation, and the name, title, and present whereabouts of any person participating in that deliberate choice.[7]

d. How, why, and when the PA came to realize its "deliberate choice" was "misguided", and the name, title, and present whereabouts of any person participating in that realization.[8]

e. The presence of "political extremism" within the PA and the role of such "political extremism" in the PA's decision to default.[9]

f. The PA's "regrets" concerning its "procedural missteps" in this litigation.[10]

g. The adoption by the PA of the positions expressed by Prime Minister Fayyad in his December 24, 2007 Declaration concerning the PA's commitment to future participation in this litigation, as well as the PA's involvement in any efforts to

---

[5] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("To present the Court with a fuller picture of the Defendants' mindset during the relevant timeframes, Defendants have submitted the declaration of Ahmad Abdel-Rahman, which was recently filed in another case against the PA and PLO in the Southern District of Florida, Saperstein v. Palestine Authority, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.).") (emphasis added).

[6] See Ungar v. Palestine Liberation Organization, 599 F.3d 79, 82 (1st Cir. 2010) ("The defendants neither answered the complaint nor participated in discovery. Instead, at various times from 2000 to 2005 they interposed motions asserting non-merits-based defenses of sovereign immunity, lack of jurisdiction, nonjusticiability, and the like. As the defendants now concede, the decision to stonewall in this fashion was a deliberate stratagem driven by the advice of their then-counsel and their unwillingness to recognize the authority of the federal courts.") (emphasis added).

[7] See Ungar v. Palestine Liberation Organization, 402 F.3d 274, 294 (1st Cir. 2005) ("The defendants deliberately chose to hold off on asserting a sovereign immunity defense-and they must live with the consequences of that choice.").

[8] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 85-86 (1st Cir. 2010) ("The defendants say, however, that they have come to regard their deliberate choice as misguided and that exceptional circumstances warrant relieving them from the judgment upon such terms as the court may deem just.").

[9] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("But the defendants tell a different tale. They blame political extremism within the PLO and the PA for their earlier decision to default.").

[10] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 1 ("Defendants do not take these concerns lightly and will not attempt to condone or justify many of the earlier actions in this litigation.  We regret these procedural missteps . . . .") (emphasis added).

transmit such commitment to United States political or governmental agencies or entities, including, without limitation, the United States courts.[11]

h. Any and all PA Cabinet meetings from any time at which the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action were discussed and the substance of such discussions.

i. Any and all PA Cabinet decisions, orders and/or directives from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

j. All and all meetings of PA ministry, agency, department, division, bureau and/or other government body from any time at which the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action were discussed and the substance of such discussions.

k. Any and all decisions, orders and/or directives made or issued at any time by any PA ministry, agency, department, division, bureau and/or other government body, which reference and/or relate to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

**5.    Regarding the PA's understanding or misunderstanding of the U.S. legal system:**

a. The PA's "basic misunderstanding" of the U.S. legal system.[12]

b. The PA's subjective understanding about the ability of U.S. courts to "hale [it] into court".[13]

---

[11] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 4 ("In his declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward.  In his declaration, Prime Minister Fayyad states: 'I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process.  I have further instructed new counsel to transmit this commitment to the United States courts.'").

[12] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[T]he default here arose as a result of a foreign government's basic misunderstanding of the United States legal system."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("C.  The Default Judgment in This Case Arose from the PA's and PLO's Basic Misunderstanding of the United States Legal System, but Their Efforts to Remedy That Misunderstanding Have Now Come to Full Fruition Despite Significant Political Turmoil and Institutional Obstacles.").

[13] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 5 ("First, Defendants contended that their conduct at the time of the default was not willful as that term is defined in the law because it was mitigated by the PA's and PLO's reasonable failure to understand how the United States courts could hale them into Court to answer for actions of Hamas taken specifically to undermine the peace process.").

    c.   The PA's "perplexity" about the ability of the U.S. courts to hale it into court and why the PA believes such perplexity is understandable.[14]

    d.   Any and all factors resulting in the PA's failure to apprehend the "logic" of being haled into U.S. court, and why the PA no longer perceives being haled into U.S. court as illogical.[15]

    e.   Any and all efforts of the PA's counsel to educate the PA about or disabuse the PA of the "illogicality" it perceived in being haled into U.S. court.[16]

    f.   The PA's contemporaneous knowledge of the "politically charged tort" litigation arising out of the death of Leon Klinghoffer, and the name, title, and present whereabouts of any individual or individuals who acted as contact with defense counsel with respect to such litigation and/or made any decisions or gave instructions in regard to such litigation.[17]

---

[14] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("At the time of the default in this case, Defendants were understandably perplexed about the ability of the United States courts to hale them into Court to answer for the actions of HAMAS. . . .").

[15] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[16] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[17] See Estates of Ungar ex rel. Strachman v. Palestinian Authority, 228 F.Supp.2d 40, 45 (D.R.I. 2002) ("The Second Circuit in Klinghoffer spoke directly to the issue of non justiciability in the context of the PLO and politically charged tort claims."); Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44 (2d Cir. 1991).

6.    **Regarding HAMAS:**

    a.   The full basis for the PA's claim that there is "no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss." [18]

    b.   The full basis for the PA's claim that that HAMAS "indisputably" committed the shooting. [19]

    c.   HAMAS's active efforts to "undermine" or derail the peace process. [20]

    d.   The PA's active efforts to "quash" HAMAS's influence in the West Bank and Gaza and to cut off funding to HAMAS from international sources. [21]

    e.   The "Concrete evidence" that the PA was actively working against HAMAS during the period when the shooting occurred. [22]

    f.   The PA's "facilitation" of the arrest of the gunmen, including its impact on relations with HAMAS. [23]

---

[18] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 2 ("While the Defendants' manner of conducting the litigation previously did not develop this important fact, there can be no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss, at a time when the PA and PLO were working with the United States and Israeli governments in actively seeking to prevent anti-Israeli attacks. Hamas, in fact, likely committed the attack precisely to injure the interest of the PA and the PLO by disrupting the peace process that those entities were working so hard to support.").

[19] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.").

[20] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.").

[21] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("Contrary to the Complaint's suggestion, the PA and PLO were actively seeking to quash HAMAS' influence in West Bank and Gaza and to cut off funding to HAMAS from international sources.").

[22] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 19 ("[T]he Complaint seeks to assign liability to the PA and PLO for HAMAS' actions on a theory that the PA and PLO provided material support to HAMAS and acted as accessories after the fact to the Ungar shooting. To support that theory, the Plaintiffs cobble together a set of vague and conclusory allegations that ignore concrete evidence that the PA and PLO were actively working against HAMAS at the very time events giving rise to this lawsuit occurred.").

g.  Any and all communications and written agreements, accords and/or pacts to which Hamas and the PA were parties at any time between September 1, 1993 and June 9, 1996.

h.  Any and all communications and written agreements, accords and/or pacts to which Hamas and Fatah were parties at any time between September 1, 1993 and June 9, 1996.

i.  All requests to the PA from the State of Israel for the extradition, transfer and/or rendition of any member of HAMAS.

j.  All members of HAMAS hired by the PA at any time prior to June 9, 1996.

7.  **Regarding international relations and the peace process:**

a.  The details and circumstances of the PA's "active engagement" in pursuit of peace with Israel at the time of the shooting.[24]

b.  The foreign policy consequences that have flowed from the Judgment in this case.[25]

c.  The political and governmental ramifications of this litigation and its effect on the Middle East peace process, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the "welfare and plight" of the Palestinian people, and the PA's ability to function effectively as a government.[26]

---

[23] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 30 ("Moreover, facilitating the apprehension and prosecution of the two triggermen in the attack would directly contradict the Plaintiffs' theory that the PA and PLO acted as accessories of HAMAS after the fact of the shooting.").

[24] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("There is ample evidence that the shooting at issue occurred during a period in which the PA and PLO were actively engaged in pursuit of peace with Israel following the Oslo Accords.").

[25] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 38 ("Vacatur is also warranted because of the significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case.").

[26] See Defendants' 2/6/08 Motion under Rule 8(A)(2) for a Stay Pending Appeal at ¶ 14 ("Proceedings in this case in which the District Court assumes a stateless condition for the Palestinian people will have important political and governmental ramifications affecting the peace process in the Middle East, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the welfare and plight of the Palestinian people under Israel's illegal occupation of their territories and the ability of defendants to function effectively as a government.").

    d.   The impact of this litigation on relations between the U.S. government and the current Palestinian leadership.[27]

    e.   How the Plaintiffs' actions in this litigation "directly interfere" with the United States government's conduct of foreign relations in the Middle East.[28]

    f.   Interference with the efforts of the PA to normalize its relations with the United States caused by the Judgment in this case, as well as undermining of the PA's efforts at institution and state building.[29]

    g.   The "threat" to the peace process caused by Plaintiffs' enforcement actions and by the "mere threat" that Plaintiffs will succeed.[30]

    h.   The potential impact of collection efforts in this litigation on the Israeli-Palestinian Peace Process and on U.S. foreign relations in the Middle East.[31]

    i.   Communications and education at the highest levels of American and Palestinian leadership leading to the PA's efforts to vacate the Judgment, including the name,

---

[27] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 38 ("In cases like this one, which involve a meritorious defense to charges of government-sponsored terrorism, which raise highly nuanced foreign policy issues that endanger the developing relationship between the United States government and the new Palestinian leadership. . . ."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 39 ("If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian government".); 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 11 ("There can similarly be no doubt that enforcement of default judgments can disrupt the PA's relationship with the United States, every bit as much as enforcement of the default judgments in *Jackson, Marks* and *Magness* could interfere with United States' relations with the Chinese and Russian governments.").

[28] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 4 ("[T]he further deterioration of the current state of affairs directly undermines the PNA's continued participation in the Middle East Peace Process and poses a significant obstacle to the PNA's role as a viable partner alongside the United States and Israel. In particular, we believe that the actions of the Plaintiffs in the *Ungar* Case directly interfere with the United States Government's conduct of foreign relations in the Middle East, to the grave detriment of the Palestinian people.").

[29] See 9/14/2009 Brief for Appellants at xi ("The $116 million default judgment at issue in this appeal interferes with the efforts of the Palestinian Authority ('PA') to normalize its relations with the United States and undermines the PA's efforts at institution and state building.").

[30] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 1 ("Even now, the enforcement actions being taken by Plaintiffs and the mere *threat* that Plaintiffs may be successful are causing substantial harm to the Palestinian people and the PNA and, thereby, threatening the Peace Process itself.").

[31] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 82-83 (1st Cir. 2010) ("On December 28, 2007, the defendants, represented by new lead counsel, moved in the district court under Rule 60(b)(6) to vacate the default judgment. They posited that exceptional circumstances justified this relief, mentioning among other things their own political transformation; the large size of the judgment (on which interest was accruing); the potential impact of further collection efforts on the Israeli-Palestinian peace process; and the delicate nature of this nation's foreign relations in the Middle East.")

title, and present whereabouts of any individuals participating in those communications and when and where they occurred.[32]

8.   **Regarding Yasser Arafat:**

    a.   Yasser Arafat's refusal to acknowledge the jurisdiction of the U.S. courts.[33]

    b.   The circumstances and impact on Yasser Arafat and the PA of any "besiegement" of Yasser Arafat, during the period 2002-2004.[34]

    c.   Plaintiff's January 24, 2003 notice of Yasser Arafat's deposition and the PA's response and reasons for their response to that notice.[35]

    d.   The details and circumstances of Yasser Arafat's extended and ultimately fatal illness and its impact on the Defendants and their participation in this litigation.[36]

    e.   The name, title, and present whereabouts of any individual or individuals who took over Yasser Arafat's responsibilities at any time between 2000 and the present, including during Arafat's illness and subsequent to his death, and including but not limited to management and operations supervision within the PA, interfacing with U.S. legal counsel, payment of legal bills, and any other responsibilities or tasks relating to foreign or U.S. litigation.

---

[32] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[E]fforts to cure the default occurred only after diplomatic communications and education at the highest levels of American and Palestinian leadership. . . .").

[33] See 9/14/2009 Brief for Appellants at 1 ("former PA and PLO head Yasser Arafat's refusal to acknowledge the jurisdiction of the U.S. courts").

[34] See Declaration of Ahmad Abdel-Rahman, Ex. E to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 3 ("By 2004, two years after Yasser Arafat was besieged in Government Headquarters (Muqata'a) with most of its buildings and official documents looted or destroyed by the besieging Israeli Army, no permanent institutional structure of Palestinian government existed for handling domestic and foreign legal actions brought against the Palestinian government.").

[35] See Estates of Ungar and Ungar ex rel. Strachman v. Palestinian Authority, 325 F.Supp.2d 15, 40 (D.R.I. 2004) ("Nine days later, on March 12, 2003, they [Defendants] moved for a protective order to bar the taking of the depositions, which had been noticed by Plaintiffs on January 24, 2003, of President Yasser Arafat and six other Palestinian leaders.").

[36] See Declaration of Ahmad Abdel-Rahman, Ex. E to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 3 ("In the Fall of 2004, President Arafat became ill and died. Between 2000 and 2004, and as a result of the siege on him and his office as well as the re-occupation of the PA areas by the Israeli military forces, President Arafat's power progressively lost what institutionalization it previously had. After he died, there was significant disarray and instability in the government. This void in governmental decision-making persisted well after his death."); 9/14/2009 Brief for Appellants at 7 ("Four months later, Arafat died in a hospital in France, following an extended illness.").

9.   **Regarding the evolution of the PA's institutional capacity for conducting foreign litigation:**

    a.   The organizational and institutional structures and individuals within the PA responsible for monitoring and making decisions regarding lawsuits filed against PA in the United States and in Israel between 1993 and December 2007.[37]

    b.   The "considerable obstacles" that the PA faced in responding to U.S. litigation from the time of Arafat's death until December 2007.[38]

    c.   The specific organizational and institutional structures and lines of authority the PA has developed to adequately respond to this litigation, as well as how such institutional structures and lines of authority differ from earlier institutional structures and lines of authority.[39]

    d.   The PA's "misguided" reaction to this litigation stemming from its lack of institutional mechanisms and lack of sophistication.[40]

    e.   The involvement, duties, responsibilities and efforts of the persons who served as the PA's Minister of Justice from 2000 - present to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

    f.   The involvement, duties, responsibilities and efforts of the persons who served as the PA's Prosecutor General from 2000 - present to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

---

[37] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("By 2004, many governmental buildings and official documents had been destroyed by the violence, and '[n]o person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits.").

[38] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("The attached declaration of Mr. Abdel-Rahman, former Secretary-General of the Palestinian Authority Cabinet of Ministers and political advisor to President Abbas, describes the considerable obstacles that the Post-Arafat government faced in responding to the United States litigation during that time period.").

[39] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("It was only after high-level communications between President Abbas and the State Department, and President Abbas' delegation of authority for the litigation to Prime Minister Fayyad, that the PA developed the institutional structure and lines of authority necessary to adequately respond to the litigation.").

[40] See 9/14/2009 Brief for Appellants at 14 ("The PA/PLO's lack of an institutional mechanism for responding to overseas litigation and discovery as well as their lack of sophistication about the extraterritorial scope of U.S. jurisdiction contributed to the misguided reaction.").

11

g.  The involvement, duties, responsibilities and efforts of the persons who served as the PA's Attorney General from 2000 - present to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

h.  The "Other pressing problems" facing the PA that complicated the creation of an organizational entity for defending foreign lawsuits brought against the PA.[41]

i.  The difficulty of PA decision-makers in understanding the complete picture of the litigation and the importance of full and complete participation in the process; any and all efforts made to understand the importance of full and complete participation in the process; and any and all discussions or communications with counsel concerning the importance of full and complete participation in the process.[42]

j.  The conflicting instructions and confusion caused by the PA's failure to establish lines of authority for handling foreign litigation.[43]

k.  The policies, procedures and/or guidelines for the handling of lawsuits brought against the PA.

**10.  Regarding the Palestine Investment Fund:**

a.  The relationship between the Palestinian Investment Fund and the PA.[44]

b.  The PA's knowledge of, and when the PA first became aware of, the 2006 Judgment.

---

[41] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("With the support of President Abbas, Dr. Husseini began the process of creating an organizational entity within the President's Office responsible for defending domestic and foreign lawsuits brought against the Palestinian government, but it was a complicated task compounded by both a lack of familiarity in the Palestinian legal community with the American legal system, and by the fact that the Palestinian government had many other pressing problems to address.").

[42] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit.").

[43] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 35 ("As Mr. Abdel-Rahman notes, '[t]he failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment.'").

[44] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 44.

c.  The transfer and/or payment of any funds, monies or assets from the Palestine Investment Fund to the PA from the date the 2006 Judgment was entered until the present day, and the amounts of such transfers and/or payments.

d.  Any and all decisions to carry out the transfers and/or payments referred to in the previous subsection (c), including the name, title, and present whereabouts of any person involved in making, participating in and/or authorizing such transfers and/or payments.

e.  The Palestine Investment Fund's articles of association and/or by-laws at any time.

f.  The Palestine Investment Fund's governing structure and decision-making procedures.

g.  Any and all efforts to change the articles of association of the Palestine Investment Fund at any time subsequent to the date that the 2006 Judgment was entered, including the name, title, and present whereabouts of any person involved in making, participating in and/or authorizing such changes. [45]

h.  The impairment of the PA's ability to carry on its governmental function caused by the freezing of assets of the PA and of various "independent entities", including but not limited to the Palestine Investment Fund. [46]

i.  Erosion of support for the PA's leadership and compromise of the efforts of the PA to achieve economic stability caused by the turning over of ownership of the Palestine Investment Fund. [47]

---

[45] See Declaration of Robert J. Tolchin, Ex. C to Plaintiffs-Judgment Creditors' Memorandum in Opposition to Defendants' Motion for Relief from Default Judgment, at ¶ 8 ("In the Connecticut case, attorneys purporting to act on behalf of the PIF (but in fact acting on behalf of the former CEO of the PIF, who is none other than the current Economic Advisor to the PA) appeared and advised the Court that in early 2007 the PA had purported to make self-serving changes to the PIF's bylaws in a post-hoc effort to defeat the effect of the judgment entered by this Court in September 2006 on the Ungars' creditor's bill conveying ownership of the PIF to the Ungars.").

[46] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 4 ("As set forth above, the enforcement actions taken by Plaintiffs and their supporters in the *Ungar* Case have already resulted in the freezing of numerous assets of both the PNA and various independent entities that are *not* subject to the District Court's Preliminary Injunction. The freezing of these assets poses an imminent threat to the continuing operation of critical institutions on which the Palestinian people depend for a functioning civil society. In addition, it also has significantly impaired the ability of the PNA to carry on its governmental function and, in fact, threatens to bankrupt the PNA.").

[47] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 29 ("If the U.S. courts turn over the pension fund assets of Palestinian government workers and the ownership of the Palestine Investment Fund in satisfaction of this judgment, support for the moderate leadership of the PA will be severely eroded and its efforts to achieve economic stability compromised.").

j.  Any and all actions carried by Mohammed Mustafa on behalf of the PA and all services rendered by Mohammed Mustafa to or on behalf of the PA between July 2004 and the present day.

k.  Any and all papers, pleadings, affidavits and declarations submitted by the PA in the Israeli Proceedings, at any time, that reference the Palestine Investment Fund.

l.  Any and all legal actions and/or proceedings brought against Orascom Telecom Holding S.A.E. by persons purporting to represent the Palestine Investment Fund, including without limitation all such actions and/or proceeding brought in Egypt.

m.  Any and all legal actions and/or proceedings brought against Orascom Telecom Holding S.A.E. by persons purporting to represent the Palestine Investment Fund, and authentic copies of all transcripts, orders and decisions from such proceedings.

**11.    Regarding the PA's ability to participate in discovery**

a.  The PA's difficulties finding documents and responding to requests for discovery between 2000 and December 2007.[48]

b.  The present ability of the PA to produce documents and respond to discovery requests, and how its current ability differs from that which obtained in 2000, 2001, 2002, 2003, and 2004.[49]

c.  The nature, type, contents and identity of the PA's records in Gaza that no are longer accessible.[50]

d.  The names, titles, and present whereabouts of any individuals involved in preparing responses and answers to all discovery requests propounded by Plaintiffs in this matter subsequent to June 1, 2010.

---

[48] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 1 ("Government offices and officials cannot work effectively or organize even on matters of extreme urgency. It has been impossible under such circumstances to locate people who could seek and find documents, who could gather information and prepare answers to interrogatories and could respond to requests for admissions.").

[49] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Only the achievement of a level of stability, free from the threat of daily attacks in our territory can make it possible to free personnel to gather the materials and information needed to proceed with a defense.").

[50] See Defendants' 2/15/2008 Motion to Dismiss in Parsons v. Palestinian Authority, No 07-1847 (JR) (D.D.C.) ("Gaza is now inaccessible for the purpose of conducting discovery or otherwise gathering facts and information that may be relevant to defending against [the Parsons] Plaintiffs' claims in this case [*Parsons v. PA*]. The dramatically changed circumstances in Gaza in 2007 will result in immense prejudice to Defendants if this litigation is permitted to proceed.").

12.    **Regarding the PA's relationship, interactions, and discussions with their counsel:**

   a.    Any and all communications between the PA and its U.S. lawyers between Arafat's death and the filing of the Motion in December 2007.

   b.    The PA's removal of Ramsey Clark as counsel and the reasons therefor.

   c.    Any and all actions taken by the PA between July 2004 and April 2007 to find new counsel to represent them in the instant action and/or in any other actions brought against them in the United States.

   d.    Any and all reasons for the delay in filing the Motion between July 2004 and December 2007.

   e.    The "substantial" efforts of the Defendants' counsel to vacate all defaults against the PA between May 2007 and December 2007.[51]

   f.    The handling of the "proliferation of lawsuits" and enforcement actions following entry of the Judgment and the assignment of counsel to represent the PA in those actions.[52]

   g.    The PA's understanding reached with Miller & Chevalier concerning its active defense and participation in discovery.[53]

   h.    The reason or reasons that the PA engaged in proceedings related to proof of damages in *Biton v. Palestinian Authority* and *Gilmore v. Palestinian Authority* before filing motions to vacate default in those actions.

13.    **Regarding related or other cases:**

   a.    When the PA first became aware of the Creditor's Bill proceeding in this case and what actions the PA took as a result of that awareness.[54]

---

[51] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 46 ("New counsel was retained in May 2007, and immediately began the task of moving to vacate defaults and default judgments in various courts around the country. At the same time, counsel was required to defend on-going damages proceedings, respond to discovery in these cases, and to investigate the availability of meritorious defenses. This investigation was complicated by the existence of multiple parallel cases, such as the one filed in the District of Columbia by Plaintiffs here. Given the cultural, linguistic and logistical hurdles involved, it took substantial efforts to move to vacate all of the defaults and default judgments in less than eight months.").

[52] See 9/14/2009 Brief for Appellants at 7 ("The PA/PLO's non-defense of the *Ungar* suit and the resulting large damage award led to a proliferation of lawsuits against them, as well as a number of enforcement actions related to the Ungar judgment.").

[53] See 9/14/2009 Brief for Appellants at 8 ("The PA/PLO retained Washington, D.C. litigation firm Miller & Chevalier to represent them, with the understanding that the PA/PLO would actively defend the cases, including by participating in discovery.").

b.    The names, titles, and present whereabouts of any individuals who were responsible for or involved in retaining counsel to defend proceedings brought by the Plaintiffs to enforce the Judgment in any jurisdiction and the details and circumstances of such efforts to retain counsel.

c.    The "extensive" discovery the PA participated in for the *Knox* case.[55]

d.    The PA's "actual conduct" in the "related cases."[56]

e.    All attachments on funds owed to the PA obtained by the Plaintiffs in Israel.

f.    The organizational and institutional structures and individuals within the PA responsible for monitoring and making decisions regarding the Israeli Proceedings at any time prior to December 2007.

g.    The organizational and institutional structures and individuals within the PA responsible for monitoring and making decisions regarding the Bucheit Proceedings and regarding the Danish Road Contractors Proceedings.

h.    Any legal and/or arbitration proceedings, other than those explicitly referred to in this Request for Production, brought by or against the PA in any place outside the West Bank and Gaza Strip at any time prior to December 2007.

**14.    Regarding various individuals:**

a.    In respect of Yasser Arafat:

i.    Any and all positions, titles and/or jobs held by Yasser Arafat in the PA between January 1, 1994 and June 6, 1996;

ii.    Any and all positions, titles and/or jobs held by Yasser Arafat in the PA between March 12, 2000 and July 13, 2004;

---

[54] See 9/14/2009 Brief for Appellants at 17 ("In an effort to reach the assets of the Palestine Investment Fund ('PIF'), the Ungars initiated a 'Creditor's Bill' proceeding in the underlying Estate of *Ungar v. Palestinian Auth.*, No. 1:00-cv-105-L-DLM (D.R.I.) matter. See Dkt. No. 370. In September 2006, Judge Lagueux entered a final judgment on the Creditor's Bill.").

[55] See 9/14/2009 Brief for Appellants at 23 ("The remaining two cases are the instant case and the *Knox* case, in which the PA/PLO participated in extensive discovery over their assets in connection with litigation over the amount of the vacatur bond.").

[56] See 9/14/2009 Brief for Appellants at 48-49 ("Here, the PA/PLO's motion to vacated the default judgment was supported by a sworn declaration from Prime Minister Fayyad in which he expressed the PA/PLO's commitment to 'participate fully in this and other litigation in a cooperative manner, including complete participation in the discovery process.' Prime Minister Fayyad's declaration deserves the Court's serious consideration, particularly in light of his representations concerning the manner in which the litigation will be conducted going forward, representations that have been borne out by the actual conduct of litigation in the related cases.").

  iii. The exact time periods during which Yasser Arafat held the positions, titles and/or jobs described in subsections (i)-(ii) above;

  iv. The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Yasser Arafat at the times and/or during the time periods described in subsections (i)-(iii) above; and

 b. In respect of Mohammed Dahlan:

  i. Any and all positions, titles and/or jobs held by Mohammed Dahlan in the PA between January 1, 1994 and June 6, 1996;

  ii. Any and all positions, titles and/or jobs held by Mohammed Dahlan in the PA between March 12, 2000 and July 13, 2004;

  iii. Any and all positions, titles and/or jobs held by Mohammed Dahlan in the PA on the date that you produce a witness in response to this request;

  iv. The exact time periods during which Mohammed Dahlan held the positions, titles and/or jobs described in subsections (i)-(iii) above;

  v. The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Mohammed Dahlan at the times and/or during the time periods described in subsections (i)-(iv) above; and

  vi. Mohammed Dahlan's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce a witness in response to this request.

 c. In respect of Jibril Rajoub:

  i. Any and all positions, titles and/or jobs held by Jibril Rajoub in PA between January 1, 1994 and June 6, 1996;

  ii. Any and all positions, titles and/or jobs held by Jibril Rajoub in the PA between March 12, 2000 and July 13, 2004;

  iii. Any and all positions, titles and/or jobs held by Jibril Rajoub in the PA on the date that you produce a witness in response to this request;

  iv. The exact time periods during which Jibril Rajoub held the positions, titles and/or jobs described in subsections (i)-(iii) above;

  v. The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Jibril Rajoub at the times and/or during the time periods described in subsections (i)-(iv) above; and

      vi. Jibril Rajoub's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce a witness in response to this request.

d. In respect of Razi Jabali:

      i. Any and all positions, titles and/or jobs held by Razi Jabali in the PA between January 1, 1994 and June 6, 1996;

      ii. Any and all positions, titles and/or jobs held by Razi Jabali in the PA between March 12, 2000 and July 13, 2004;

      iii. Any and all positions, titles and/or jobs held by Razi Jabali in the PA on the date that you produce a witness in response to this request;

      iv. The exact time periods during which Razi Jabali held the positions, titles and/or jobs described in subsections (i)-(iii) above;

      v. The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Razi Jabali at the times and/or during the time periods described in subsections (i)-(iv) above; and

      vi. Razi Jabali's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce a witness in response to this request.

e. In respect of Tewfik Tirawi:

      i. Any and all positions, titles and/or jobs held by Tewfik Tirawi in the PA between January 1, 1994 and June 6, 1996;

      ii. Any and all positions, titles and/or jobs held by Tewfik Tirawi in the PA between March 12, 2000 and July 13, 2004;

      iii. Any and all positions, titles and/or jobs held by Tewfik Tirawi in the PA on the date that you produce a witness in response to this request;

      iv. The exact time periods during which Tewfik Tirawi held the positions, titles and/or jobs described in subsections (i)-(iii) above;

      v. The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Tewfik Tirawi at the times and/or during the time periods described in subsections (i)-(iv) above; and

      vi. Tewfik Tirawi's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce a witness in response to this request.

    f.   In respect of Amin Al-Hindi:

          i.   Any and all positions, titles and/or jobs held by Amin Al-Hindi in the PA between January 1, 1994 and June 6, 1996;

          ii.   Any and all positions, titles and/or jobs held by Amin Al-Hindi in the PA between March 12, 2000 and July 13, 2004;

          iii.   The exact time periods during which Amin Al-Hindi held the positions, titles and/or jobs described in subsections (i)-(ii) above;

          iv.   The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Amin Al-Hindi at the times and/or during the time periods described in subsections (i)-(iv) above;

### GENERAL DEFINITIONS

1.    "Relate to" or "relating to" shall mean and include constituting, discussing, mentioning, containing, embodying, reflecting, identifying, incorporating, referring to, dealing with, or pertaining to in any way.

### SPECIFIC DEFINITIONS

1.    "PA" shall mean and refer to defendant The Palestinian Authority.

2.    "PLO" shall mean and refer to defendant The Palestine Liberation Organization.

3.    "Defendants" shall mean and refer to Defendants PA and PLO, both individually and collectively.

4.    "Judgment" shall mean and refer to the judgment entered in this action on July 13, 2004.

5.    "2006 Judgment" shall mean and refer to the judgment entered in this action on September 19, 2006.

6.    "The Motion" shall mean and refer to Defendants' motion to vacate the Judgment.

7.    "Israeli Proceedings" shall mean and refer to and include collectively all legal proceedings brought by, or against, the PA and/or PLO in any Israeli court at any time.

8.  "Achille Lauro Proceedings" shall mean, refer to and include collectively all legal proceedings in any court in the United States resulting and/or arising from the October 1985 seizure of the Italian passenger liner Achille Lauro to which the PLO was a party at any time.

9.  "Danish Road Contractors Proceedings" shall mean, refer to and include collectively all arbitration and legal proceedings in Europe to which the Danish Road Contractors and the PA were parties.

10.  "Bucheit Proceedings" shall mean, refer to and include collectively all proceedings in the matter of *Bucheit v. PLO*, Civ. No. 00-1455GK (D.D.C.).


Dated: August 31, 2010

Plaintiffs-Judgment Creditors,
by their Attorneys,

Max Wistow #0330
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)
mw@wistbar.com

David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on August 31, 2010, a true and genuine copy of the foregoing

was sent by first class mail and electronic mail to Defendants' counsel of record listed below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

I HEREBY FURTHER CERTIFY that, on August 31, 2010, a true and genuine copy of

the foregoing was hand delivered to Defendants' counsel of record listed below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

# EXHIBIT A

Case 1:00-cv-00105-L-DLM    Document 527-2    Filed 09/09/10    Page 24 of 25 PageID
#: 3705
Case 1:00-cv-00105-L-DLM    Document 415-2    Filed 02/06/08    Page 1 of 2

Case 1:04-cv-20225-PAS    Document 175-3    Entered on FLSD Docket 11/02/2007    Page 2 of 3

THE SECRETARY OF STATE
WASHINGTON

January 12, 2007

Dear President Abbas:

Thank you for your letter of November 28 setting forth your concerns regarding certain rulings by U.S. courts against the Palestinian Authority (PA), the Palestine Liberation Organization (PLO), and most recently the Palestinian Investment Fund (PIF).

As you know, the U.S. District Court in Rhode Island entered judgment in 2004 against the PA, PLO, and Hamas Islamic Resistance Movement ("Hamas"). This judgment was awarded to the estate of an American citizen who, together with his wife, was murdered in Israel in a June 1996 terrorist attack carried out by the military wing of Hamas. The U.S. Court of Appeals for the First Circuit affirmed that judgment in 2005. Because the U.S. Supreme Court has declined to grant further review, the judgment is final and enforceable in United States courts against property or interests owned by the PA, PLO, or Hamas.

Mr. President, I appreciate how difficult and complex these legal actions are and fully recognize the already significant economic crisis that exists for the Palestinian people. I encourage you, as I would any government, to respond to U.S. legal proceedings in good faith and a timely manner

The United States is not party to these enforcement proceedings, and our role is therefore limited under our adversarial system of justice. In short, the appropriateness of the United States' participation in any particular proceedings depends on the specific circumstances and the extent to which U.S. legal interests or obligations are involved.

Where judgment is entered, it is also possible to meet with the opposing side to explore out of court solutions so as to avoid enforcement actions. The Office of the Legal Adviser of the Department is willing to make its good offices available to facilitate such meetings. Additionally, the attorneys representing the PIF may

Mr. Mahmoud Abbas,
    President of the Palestinian Authority.

Case 1:00-cv-00105-L-DLM    Document 527-2    Filed 09/09/10    Page 25 of 25 PageID
#: 3706
Case 1:00-cv-00105-L-DLM    Document 415-2    Filed 02/06/08    Page 2 of 2

Case 1:04-cv-20225-PAS    Document 175-3    Entered on FLSD Docket 11/02/2007    Page 3 of 3

-2-

contact the Office of the Legal Adviser to discuss the pending proceedings further
and any issues of particular concern.

I remain hopeful that you may find a way toward a resolution of these cases.

Sincerely,

Condoleezza Rice