# EXHIBIT 8

798192.1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs – Judgment Creditors,

v.                                                                   C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

    Defendants – Judgment Debtors.

**PLAINTIFFS-JUDGMENT CREDITORS' THIRD REQUEST OF
DEFENDANT-JUDGMENT DEBTOR THE PALESTINIAN AUTHORITY
FOR PRODUCTION OF DOCUMENTS AND THINGS RELEVANT TO
DEFENDANTS-JUDGMENT DEBTORS' RULE 60(b)(6) MOTION**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs–Judgment Creditors, by counsel, request that Defendant–Judgment Debtor the Palestinian Authority ("PA") produce, within thirty (30) days of the service of these requests, the following documents, things and electronically stored information as described in Fed.R.Civ.P. 34(a)(1)(A) (collectively hereinafter: "documents").

1. **Regarding the Defendants' burden to demonstrate absence of prejudice:**

    a. All documents supporting the Defendants' claims that vacating the Judgment will not cause prejudice to the Plaintiffs.

    b. All documents on the basis of which the Defendants "vigorously disput[e]" that evidence and witnesses have been irreparably compromised.[1]

---

[1] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("They [Defendants] vigorously dispute the plaintiffs' claim that evidence and witnesses have been irreparably compromised.").

2. **Regarding Mahmoud Abbas's November 28, 2006 letter to Secretary of State Condolezza Rice, referred to in Rice's letter dated January 12, 2007 (copy attached as Exhibit A):**

   a. All documents constituting earlier drafts of Mahmoud Abbas's November 28, 2006 letter to Secretary of State Condolezza Rice, referred to in Rice's letter dated January 12, 2007 ("Abbas Letter").

   b. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in writing the Abbas Letter.

   c. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in translating the Abbas Letter.

   d. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person who had and/or received copies of the Abbas Letter.

   e. All documents relating to, referring to and/or evidencing the computers and/or data bases where electronic copies of the Abbas Letter were stored or should have been stored, and the storage methods used.

   f. All documents relating to, referring to and/or evidencing where paper copies of the Abbas Letter were filed or should have been filed, and the archival methods used.

   g. All documents relating to, referring to and/or evidencing when it was first determined that the Abbas Letter was not within the Defendants' "possession, custody, or control".[2]

   h. All documents relating to, referring to and/or evidencing any efforts made to locate the Abbas Letter after determining it was not within the Defendants' possession, custody or control.

   i. All documents relating to, referring to and/or evidencing any efforts made to obtain the Abbas Letter from the United States after determining it was not within the Defendants' possession, custody, or control.

   j. All documents supporting the Defendants' characterization of the Abbas Letter as a request for "guidance."[3]

---

[2] See Objections and Responses of Defendants the Palestine Liberation Organization and the Palestinian Authority to Plaintiffs-Judgment Creditors' Second Request for Production of Documents and Things Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion at 8.

[3] See 9/14/2009 Brief for Appellants at 20 ("In Late 2006, President Abbas sent a letter to then Secretary of State Condoleeza Rice requesting guidance with respect to the ongoing Anti-Terrorism Act litigation.").

2

3. **Regarding Dr. Nasser Al-Kidwa's January 2003 letter to Magistrate Judge Martin[4]:**

   a. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in writing Nasser Al-Kidwa's January 2003 letter to Magistrate Judge Martin ("Al Kidwa Letter").

   b. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person who directed or asked that the Al Kidwa Letter be written.

   c. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person who supplied any information contained or referenced within the Al Kidwa Letter.

4. **Regarding the Defendants' strategic litigation choices leading to and subsequent to their default:**

   a. All documents relating to, referring to and/or evidencing the PA's "mindset" during the period when it decided to default.[5]

   b. All documents relating to, referring to and/or evidencing the PLO's "mindset" during the period when it decided to default.[6]

   c. All documents relating to, referring to and/or evidencing any advice of the PA's counsel to interpose "non-merits based defenses" in the *Ungar* litigation prior to 2005.[7]

---

[4] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 24 ("Indeed, in January 2003, Dr. Nasser Al-Kidwa wrote to Magistrate Judge Martin to assert that the PA and PLO should not be forced to undergo the burdens of participation in discovery prior to disposition of the sovereign immunity question because the 'high level of violence' in the region made it impossible to proceed with a defense at the time, and because the PA and PLO could not 'understand how plaintiffs can claim the PNA and PLO are responsible for what HAMAS does.'").

[5] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("To present the Court with a fuller picture of the Defendants' mindset during the relevant timeframes, Defendants have submitted the declaration of Ahmad Abdel-Rahman, which was recently filed in another case against the PA and PLO in the Southern District of Florida, Saperstein v. Palestine Authority, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.).") (emphasis added).

[6] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("To present the Court with a fuller picture of the Defendants' mindset during the relevant timeframes, Defendants have submitted the declaration of Ahmad Abdel-Rahman, which was recently filed in another case against the PA and PLO in the Southern District of Florida, Saperstein v. Palestine Authority, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.).") (emphasis added).

[7] See Ungar v. Palestine Liberation Organization, 599 F.3d 79, 82 (1st Cir. 2010) ("The defendants neither answered the complaint nor participated in discovery. Instead, at various times from 2000 to 2005 they interposed motions asserting non-merits-based defenses of sovereign immunity, lack of jurisdiction, nonjusticiability, and the

3

d. All documents relating to, referring to and/or evidencing any advice of the PA's counsel to interpose "non-merits based defenses" in the *Ungar* litigation prior to 2005.[8]

e. All documents relating to, referring to and/or evidencing the PA's "deliberate choice" to delay asserting a sovereign immunity defense in this litigation, and the name, title, and present whereabouts of any person participating in that deliberate choice.[9]

f. All documents relating to, referring to and/or evidencing the PLO's "deliberate choice" to delay asserting a sovereign immunity defense in this litigation, and the name, title, and present whereabouts of any person participating in that deliberate choice.[10]

g. All documents relating to, referring to and/or evidencing how, why, and when the PA came to realize its "deliberate choice" was "misguided", and the name, title, and present whereabouts of any person participating in that realization.[11]

h. All documents relating to, referring to and/or evidencing how, why, and when the PLO came to realize its "deliberate choice" was "misguided", and the name, title, and present whereabouts of any person participating in that realization.[12]

---

like. As the defendants now concede, the decision to stonewall in this fashion was a deliberate stratagem driven by the advice of their then-counsel and their unwillingness to recognize the authority of the federal courts.") (emphasis added).

[8] See Ungar v. Palestine Liberation Organization, 599 F.3d 79, 82 (1st Cir. 2010) ("The defendants neither answered the complaint nor participated in discovery. Instead, at various times from 2000 to 2005 they interposed motions asserting non-merits-based defenses of sovereign immunity, lack of jurisdiction, nonjusticiability, and the like. As the defendants now concede, the decision to stonewall in this fashion was a deliberate stratagem driven by the advice of their then-counsel and their unwillingness to recognize the authority of the federal courts.") (emphasis added).

[9] See Ungar v. Palestine Liberation Organization, 402 F.3d 274, 294 (1st Cir. 2005) ("The defendants deliberately chose to hold off on asserting a sovereign immunity defense-and they must live with the consequences of that choice.").

[10] See Ungar v. Palestine Liberation Organization, 402 F.3d 274, 294 (1st Cir. 2005) ("The defendants deliberately chose to hold off on asserting a sovereign immunity defense-and they must live with the consequences of that choice.").

[11] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 85-86 (1st Cir. 2010) ("The defendants say, however, that they have come to regard their deliberate choice as misguided and that exceptional circumstances warrant relieving them from the judgment upon such terms as the court may deem just.").

[12] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 85-86 (1st Cir. 2010) ("The defendants say, however, that they have come to regard their deliberate choice as misguided and that exceptional circumstances warrant relieving them from the judgment upon such terms as the court may deem just.").

i. All documents relating to, referring to and/or evidencing the presence of "political extremism" within the PA and the role of such "political extremism" in the PA's decision to default.[13]

j. All documents relating to, referring to and/or evidencing the presence of "political extremism" within the PLO and the role of such "political extremism" in the PLO's decision to default.[14]

k. All documents relating to, referring to and/or evidencing the PA's "regrets" concerning its "procedural missteps" in this litigation.[15]

l. All documents relating to, referring to and/or evidencing the PLO's "regrets" concerning its "procedural missteps" in this litigation.[16]

m. All documents relating to, referring to and/or evidencing the adoption by the PA of the positions expressed by Prime Minister Fayyad in his December 24, 2007 Declaration concerning the PA's commitment to future participation in this litigation, as well as the PA's involvement in any efforts to transmit such commitment to United States political or governmental agencies or entities, including, without limitation, the United States courts; and any documents reflecting such commitment.[17]

n. All documents relating to, referring to and/or evidencing the adoption by the PLO of the positions expressed by Prime Minister Fayyad in his December 24, 2007 Declaration concerning the PLO's commitment to future participation in this litigation, as well as the PLO's involvement in any efforts to transmit such commitment to United States political or governmental agencies or entities,

---

[13] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("But the defendants tell a different tale. They blame political extremism within the PLO and the PA for their earlier decision to default.").

[14] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("But the defendants tell a different tale. They blame political extremism within the PLO and the PA for their earlier decision to default.").

[15] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 1 ("Defendants do not take these concerns lightly and will not attempt to condone or justify many of the earlier actions in this litigation. We regret these procedural missteps . . . .") (emphasis added).

[16] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 1 ("Defendants do not take these concerns lightly and will not attempt to condone or justify many of the earlier actions in this litigation. We regret these procedural missteps . . . .") (emphasis added).

[17] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 4 ("In his declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward. In his declaration, Prime Minister Fayyad states: 'I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts.'").

including, without limitation, the United States courts; and any documents reflecting such commitment.[18]

o. Authentic copies of all PA Cabinet minutes, protocols and/or records from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

p. Authentic copies of all PLO Executive Committee minutes, protocols and/or records from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

q. Authentic copies of all PA Cabinet decisions, orders and/or directives from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

r. Authentic copies of all PLO Executive Committee decisions, orders and/or directives from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

s. All minutes, protocols and/or records generated by any PA ministry, agency, department, division, bureau and/or other government body from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

t. Authentic copies of all minutes, protocols and/or records generated by any PLO agency, department, division, bureau and/or other subordinate body from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

u. Authentic copies of all decisions, orders and/or directives made or issued at any time by any PA ministry, agency, department, division, bureau and/or other government body, which reference and/or relate to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

v. Authentic copies of all decisions, orders and/or directives made or issued at any time by any PLO agency, department, division, bureau and/or other subordinate body, which reference and/or relate to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

---

[18] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 4 ("In his declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward. In his declaration, Prime Minister Fayyad states: 'I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts.'").

6

5.  Regarding the Defendants' understanding or misunderstanding of the U.S. legal system:

    a.  All documents relating to, referring to and/or evidencing the PA's "basic misunderstanding" of the U.S. legal system.[19]

    b.  All documents relating to, referring to and/or evidencing the PLO's "basic misunderstanding" of the U.S. legal system.[20]

    c.  All documents relating to, referring to and/or evidencing the PA's subjective understanding about the ability of U.S. courts to "hale [it] into court".[21]

    d.  All documents relating to, referring to and/or evidencing the PLO's subjective understanding about the ability of U.S. courts to "hale [it] into court".[22]

    e.  All documents relating to, referring to and/or evidencing the PA's "perplexity" about the ability of the U.S. courts to hale it into court and why the PA believes such perplexity is understandable.[23]

---

[19] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[T]he default here arose as a result of a foreign government's basic misunderstanding of the United States legal system."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("C. The Default Judgment in This Case Arose from the PA's and PLO's Basic Misunderstanding of the United States Legal System, but Their Efforts to Remedy That Misunderstanding Have Now Come to Full Fruition Despite Significant Political Turmoil and Institutional Obstacles.").

[20] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[T]he default here arose as a result of a foreign government's basic misunderstanding of the United States legal system."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("C. The Default Judgment in This Case Arose from the PA's and PLO's Basic Misunderstanding of the United States Legal System, but Their Efforts to Remedy That Misunderstanding Have Now Come to Full Fruition Despite Significant Political Turmoil and Institutional Obstacles.").

[21] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 5 ("First, Defendants contended that their conduct at the time of the default was not willful as that term is defined in the law because it was mitigated by the PA's and PLO's reasonable failure to understand how the United States courts could hale them into Court to answer for actions of Hamas taken specifically to undermine the peace process.").

[22] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 5 ("First, Defendants contended that their conduct at the time of the default was not willful as that term is defined in the law because it was mitigated by the PA's and PLO's reasonable failure to understand how the United States courts could hale them into Court to answer for actions of Hamas taken specifically to undermine the peace process.").

[23] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("At the time of the default in this case, Defendants were understandably perplexed about the ability of the United States courts to hale them into Court to answer for the actions of HAMAS. . . .").

    f. All documents relating to, referring to and/or evidencing the PLO's "perplexity" about the ability of the U.S. courts to hale it into court and why the PLO believes such perplexity is understandable.[24]

    g. All documents relating to, referring to and/or evidencing all factors resulting in the PA's failure to apprehend the "logic" of being haled into U.S. court, and why the PA no longer perceives being haled into U.S. court as illogical.[25]

    h. All documents relating to, referring to and/or evidencing all factors resulting in the PLO's failure to apprehend the "logic" of being haled into U.S. court, and why the PLO no longer perceives being haled into U.S. court as illogical.[26]

    i. All documents relating to, referring to and/or evidencing efforts of the PA's counsel to educate the PA about or disabuse the PA of the "illogicality" it perceived in being haled into U.S. court.[27]

---

[24] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("At the time of the default in this case, Defendants were understandably perplexed about the ability of the United States courts to hale them into Court to answer for the actions of HAMAS. . . .").

[25] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[26] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[27] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and

  j. All documents relating to, referring to and/or evidencing efforts of the PLO's counsel to educate the PLO about or disabuse the PLO of the "illogicality" it perceived in being haled into U.S. court.[28]

  k. All documents relating to, referring to and/or evidencing the PA's contemporaneous knowledge of the "politically charged tort" litigation arising out of the death of Leon Klinghoffer, and the name, title, and present whereabouts of any individual or individuals who acted as contact with defense counsel with respect to such litigation and/or made any decisions or gave instructions in regard to such litigation.[29]

  l. All documents relating to, referring to and/or evidencing the PLO's contemporaneous knowledge of the "politically charged tort" litigation arising out of the death of Leon Klinghoffer, and the name, title, and present whereabouts of any individual or individuals who acted as contact with defense counsel with respect to such litigation and/or made any decisions or gave instructions in regard to such litigation.[30]

6. **Regarding HAMAS:**

  a. All documents relating to, referring to and/or evidencing the Defendants' claim that there is "no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss."[31]

---

at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[28] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[29] See Estates of Ungar ex rel. Strachman v. Palestinian Authority, 228 F.Supp.2d 40, 45 (D.R.I. 2002) ("The Second Circuit in *Klinghoffer* spoke directly to the issue of non justiciability in the context of the PLO and politically charged tort claims."); Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44 (2d Cir. 1991).

[30] See Estates of Ungar ex rel. Strachman v. Palestinian Authority, 228 F.Supp.2d 40, 45 (D.R.I. 2002) ("The Second Circuit in *Klinghoffer* spoke directly to the issue of non justiciability in the context of the PLO and politically charged tort claims."); Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44 (2d Cir. 1991).

[31] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 2 ("While the Defendants' manner of conducting the litigation previously did not develop this important fact,

b. All documents relating to, referring to and/or evidencing the Defendants' claim that that HAMAS "indisputably" committed the shooting.[32]

c. All documents relating to, referring to and/or evidencing HAMAS's active efforts to "undermine" or derail the peace process.[33]

d. All documents relating to, referring to and/or evidencing the PA's active efforts to "quash" HAMAS's influence in the West Bank and Gaza and to cut off funding to HAMAS from international sources.[34]

e. All documents relating to, referring to and/or evidencing the PLO's active efforts to "quash" HAMAS's influence in the West Bank and Gaza and to cut off funding to HAMAS from international sources.[35]

f. All documents relating to, referring to, evidencing and/or constituting "Concrete evidence" that the PA was actively working against HAMAS during the period when the shooting occurred.[36]

---

there can be no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss, at a time when the PA and PLO were working with the United States and Israeli governments in actively seeking to prevent anti-Israeli attacks. Hamas, in fact, likely committed the attack precisely to injure the interest of the PA and the PLO by disrupting the peace process that those entities were working so hard to support.").

[32] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.").

[33] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.").

[34] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("Contrary to the Complaint's suggestion, the PA and PLO were actively seeking to quash HAMAS' influence in West Bank and Gaza and to cut off funding to HAMAS from international sources.").

[35] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("Contrary to the Complaint's suggestion, the PA and PLO were actively seeking to quash HAMAS' influence in West Bank and Gaza and to cut off funding to HAMAS from international sources.").

[36] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 19 ("[T]he Complaint seeks to assign liability to the PA and PLO for HAMAS' actions on a theory that the PA and PLO provided material support to HAMAS and acted as accessories after the fact to the Ungar shooting. To support that theory, the Plaintiffs cobble together a set of vague and conclusory allegations that ignore concrete

g. All documents relating to, referring to, evidencing and/or constituting "Concrete evidence" that the PLO was actively working against HAMAS during the period when the shooting occurred.[37]

h. All documents relating to, referring to and/or evidencing the PA's "facilitation" of the arrest of the gunmen, including its impact on relations with HAMAS.[38]

i. All documents relating to, referring to and/or evidencing the PLO's "facilitation" of the arrest of the gunmen, including its impact on relations with HAMAS.[39]

j. All documents relating to, referring to and/or evidencing any communications and written agreements, accords and/or pacts to which Hamas and the PA were parties at any time between September 1, 1993 and June 9, 1996.

k. All documents relating to, referring to and/or evidencing any communications and written agreements, accords and/or pacts to which Hamas and the PLO were parties at any time between September 1, 1993 and June 9, 1996.

---

evidence that the PA and PLO were actively working against HAMAS at the very time events giving rise to this lawsuit occurred.").

[37] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 19 ("[T]he Complaint seeks to assign liability to the PA and PLO for HAMAS' actions on a theory that the PA and PLO provided material support to HAMAS and acted as accessories after the fact to the Ungar shooting. To support that theory, the Plaintiffs cobble together a set of vague and conclusory allegations that ignore concrete evidence that the PA and PLO were actively working against HAMAS at the very time events giving rise to this lawsuit occurred.").

[38] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 30 ("Moreover, facilitating the apprehension and prosecution of the two triggermen in the attack would directly contradict the Plaintiffs' theory that the PA and PLO acted as accessories of HAMAS after the fact of the shooting.").

[39] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 30 ("Moreover, facilitating the apprehension and prosecution of the two triggermen in the attack would directly contradict the Plaintiffs' theory that the PA and PLO acted as accessories of HAMAS after the fact of the shooting.").

l. All documents relating to, referring to and/or evidencing any communications and written agreements, accords and/or pacts to which Hamas and Fatah were parties at any time between September 1, 1993 and June 9, 1996.

7. **Regarding international relations and the peace process:**

   a. All documents relating to, referring to and/or evidencing the details and circumstances of the PA's "active engagement" in pursuit of peace with Israel at the time of the shooting.[40]

   b. All documents relating to, referring to and/or evidencing the details and circumstances of the PLO's "active engagement" in pursuit of peace with Israel at the time of the shooting.[41]

   c. All documents relating to, referring to and/or evidencing the foreign policy consequences that have flowed from the Judgment in this case.[42]

   d. All documents relating to, referring to and/or evidencing the political and governmental ramifications of this litigation and its effect on the Middle East peace process, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the "welfare and plight" of the Palestinian people, and the PA's ability to function effectively as a government.[43]

   e. All documents relating to, referring to and/or evidencing the impact of this litigation on relations between the U.S. government and the current Palestinian leadership.[44]

---

[40] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("There is ample evidence that the shooting at issue occurred during a period in which the PA and PLO were actively engaged in pursuit of peace with Israel following the Oslo Accords.").

[41] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("There is ample evidence that the shooting at issue occurred during a period in which the PA and PLO were actively engaged in pursuit of peace with Israel following the Oslo Accords.").

[42] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 38 ("Vacatur is also warranted because of the significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case.").

[43] See Defendants' 2/6/08 Motion under Rule 8(A)(2) for a Stay Pending Appeal at ¶ 14 ("Proceedings in this case in which the District Court assumes a stateless condition for the Palestinian people will have important political and governmental ramifications affecting the peace process in the Middle East, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the welfare and plight of the Palestinian people under Israel's illegal occupation of their territories and the ability of defendants to function effectively as a government.").

[44] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 38 ("In cases like this one, which involve a meritorious defense to charges of government-sponsored terrorism, which raise highly nuanced foreign policy issues that endanger the developing relationship between the United States government and the new Palestinian leadership. . . ."); Defendants' 12/28/07 Memorandum in Support of

 f. All documents relating to, referring to and/or evidencing how the Plaintiffs' actions in this litigation "directly interfere" with the United States government's conduct of foreign relations in the Middle East.[45]

 g. All documents relating to, referring to and/or evidencing interference with the efforts of the PA to normalize its relations with the United States caused by the Judgment in this case, as well as undermining of the PA's efforts at institution and state building.[46]

 h. All documents relating to, referring to and/or evidencing interference with the efforts of the PLO to normalize its relations with the United States caused by the Judgment in this case.

 i. All documents relating to, referring to and/or evidencing the "threat" to the peace process caused by Plaintiffs' enforcement actions and by the "mere threat" that Plaintiffs will succeed.[47]

 j. All documents relating to, referring to and/or evidencing the potential impact of collection efforts in this litigation on the Israeli-Palestinian Peace Process and on U.S. foreign relations in the Middle East.[48]

---

Defendants' Motion to Vacate Default Judgment at 39 ("If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian government".); 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 11 ("There can similarly be no doubt that enforcement of default judgments can disrupt the PA's relationship with the United States, every bit as much as enforcement of the default judgments in *Jackson*, *Marks* and *Magness* could interfere with United States' relations with the Chinese and Russian governments.").

[45] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 4 ("[T]he further deterioration of the current state of affairs directly undermines the PNA's continued participation in the Middle East Peace Process and poses a significant obstacle to the PNA's role as a viable partner alongside the United States and Israel. In particular, we believe that the actions of the Plaintiffs in the *Ungar* Case directly interfere with the United States Government's conduct of foreign relations in the Middle East, to the grave detriment of the Palestinian people.").

[46] See 9/14/2009 Brief for Appellants at xi ("The $116 million default judgment at issue in this appeal interferes with the efforts of the Palestinian Authority ('PA') to normalize its relations with the United States and undermines the PA's efforts at institution and state building.").

[47] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 1 ("Even now, the enforcement actions being taken by Plaintiffs and the mere *threat* that Plaintiffs may be successful are causing substantial harm to the Palestinian people and the PNA and, thereby, threatening the Peace Process itself.").

[48] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 82-83 (1st Cir. 2010) ("On December 28, 2007, the defendants, represented by new lead counsel, moved in the district court under Rule 60(b)(6) to vacate the default judgment. They posited that exceptional circumstances justified this relief, mentioning among other things their own political transformation; the large size of the judgment (on which interest was accruing); the potential impact of further collection efforts on the Israeli-Palestinian peace process; and the delicate nature of this nation's foreign relations in the Middle East.")

    k. All documents relating to, referring to, evidencing and/or constituting diplomatic communications and education at the highest levels of American and Palestinian leadership leading to the PA's efforts to vacate the Judgment, including all documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any individuals participating in those communications and when and where they occurred.[49]

    l. All documents relating to, referring to, evidencing and/or constituting diplomatic communications and education at the highest levels of American and Palestinian leadership leading to the PLO's efforts to vacate the Judgment, including all documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any individuals participating in those communications and when and where they occurred.[50]

8. **Regarding Yasser Arafat:**

    a. All documents relating to, referring to and/or evidencing Yasser Arafat's refusal to acknowledge the jurisdiction of the U.S. courts.[51]

    b. All documents relating to, referring to and/or evidencing the details, circumstances, and impact on Yasser Arafat and the Defendants of any "besiegement" of Yasser Arafat, during the period 2002-2004.[52]

    c. All documents relating to, referring to and/or evidencing Plaintiff's January 24, 2003 notice of Yasser Arafat's deposition and the Defendants' response and reasons for their response to that notice.[53]

---

[49] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[E]fforts to cure the default occurred only after diplomatic communications and education at the highest levels of American and Palestinian leadership. . . .").

[50] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[E]fforts to cure the default occurred only after diplomatic communications and education at the highest levels of American and Palestinian leadership. . . .").

[51] See 9/14/2009 Brief for Appellants at 1 ("former PA and PLO head Yasser Arafat's refusal to acknowledge the jurisdiction of the U.S. courts").

[52] See Declaration of Ahmad Abdel-Rahman, Ex. E to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 3 ("By 2004, two years after Yasser Arafat was besieged in Government Headquarters (Muqata'a) with most of its buildings and official documents looted or destroyed by the besieging Israeli Army, no permanent institutional structure of Palestinian government existed for handling domestic and foreign legal actions brought against the Palestinian government.").

[53] See Estates of Ungar and Ungar ex rel. Strachman v. Palestinian Authority, 325 F.Supp.2d 15, 40 (D.R.I. 2004) ("Nine days later, on March 12, 2003, they [Defendants] moved for a protective order to bar the taking of the depositions, which had been noticed by Plaintiffs on January 24, 2003, of President Yasser Arafat and six other Palestinian leaders.").

    d. All documents relating to, referring to and/or evidencing the details and circumstances of Yasser Arafat's extended and ultimately fatal illness and its impact on the Defendants and their participation in this litigation.[54]

    e. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any individual or individuals who took over Yasser Arafat's responsibilities at any time between 2000 and the present, including during Arafat's illness and subsequent to his death, and including but not limited to management and operations supervision within the PA and PLO, interfacing with U.S. legal counsel, payment of legal bills, and any other responsibilities or tasks relating to foreign or U.S. litigation.

9. **Regarding the evolution of the Defendants' institutional capacity for conducting foreign litigation:**

    a. All documents relating to, referring to and/or evidencing the organizational and institutional structures and individuals within the PA responsible for monitoring and making decisions regarding lawsuits filed against PA in the United States and in Israel between 1993 and December 2007.[55]

    b. All documents relating to, referring to and/or evidencing the organizational and institutional structures and individuals within the PLO responsible for monitoring and making decisions regarding lawsuits filed against PLO in the United States and in Israel at all times prior to December 2007.[56]

---

[54] See Declaration of Ahmad Abdel-Rahman, Ex. E to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 3 ("In the Fall of 2004, President Arafat became ill and died. Between 2000 and 2004, and as a result of the siege on him and his office as well as the re-occupation of the PA areas by the Israeli military forces, President Arafat's power progressively lost what institutionalization it previously had. After he died, there was significant disarray and instability in the government. This void in governmental decision-making persisted well after his death."); 9/14/2009 Brief for Appellants at 7 ("Four months later, Arafat died in a hospital in France, following an extended illness.").

[55] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("By 2004, many governmental buildings and official documents had been destroyed by the violence, and '[n]o person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits.").

[56] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("By 2004, many governmental buildings and official documents had been destroyed by the violence, and '[n]o person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits.").