# EXHIBIT 14

798192.1

```
              IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * *
THE ESTATE OF YARON UNGAR, ET AL.,     Case No:

     Plaintiffs                        00-105L

vs.

THE PALESTINIAN AUTHORITY;
ET AL.,

     Defendants
* * * * * * * * * * * * * * * * * *

-----------------------------------------------------------
               VIDEOTAPED RULE 30 DEPOSITION OF:
                        SALAM FAYYAD
                      EAST JERUSALEM
                      JULY 28, 2010
-----------------------------------------------------------
```

Videotaped Rule 30 deposition of SALAM FAYYAD, taken in the above-entitled cause pending in the United States District Court, District of Rhode Island, pursuant to notice, before ISABELLE KLEBANOW, RPR, CT No. 311, Stenographer, at the Ambassador Hotel, East Jerusalem, on Wednesday, the 28th day of July, 2010, at 4:15 p.m. Jerusalem time.

REPORTED BY:   ISABELLE KLEBANOW, RPR, CT NO. 311

Page 38

1   And so, if I'm really pressed to give you a
2   yes-or-no answer this afternoon here as we're doing
3   this, I can't but tell you no, I don't remember.
4   Q. Mr. Fayyad, let me explain something, if I might.
5   A. Yes.
6   Q. Well, I won't explain anything. I'll ask a
7   question.
8   A. Okay.
9   Q. Do you understand that you have told the United
10  States District Court that the PLO and the PA would
11  participate in discovery in the case?
12      You understand that?
13  A. I do.
14  Q. Okay. That means discovery under the American
15  rules, however strange they may be.
16      Do you understand that?
17  A. I'm not objecting to the rules.
18  Q. Okay.
19  A. I'm objecting to the form in which this
20  deposition is being conducted. These are two different
21  matters.
22  Q. Do you feel that I'm being rude to you?
23  A. I didn't say that. It's just, basically, that I
24  do not feel I'm given -- I'm being given the space to
25  recollect what I'm being pushed to say yes or no.

Page 39

1   That's basically what it is.
2       I'm familiar with this system as much as one can
3   be. I'm not a citizen of the United States. I lived
4   there long enough to know how it works. But I know the
5   difference between doing it right and not doing it --
6   and doing it not so right.
7       That's basically what I'm saying.
8   Q. Mr. Fayyad, are you saying that I'm asking the
9   questions too quickly and not giving you time to answer?
10  A. Maybe it's not really that as much as it is when
11  you say, Yes or no, yes or no, yes or no. It's as if,
12  you know, I just came from a cramming room where I went
13  over -- where I've just gone over all these documents.
14  Q. Did you?
15  A. Fact of the matter is that I didn't. I run a
16  government. I have a lot of things to worry about. And
17  this is one of them. It's an important issue for me.
18      But I am not here to suggest to you in any
19  manner, shape or form, sir, that I can answer quickly
20  yes or no questions related to whether or not I read
21  certain documents three or four years ago.
22      That's basically what I'm saying, with all due
23  respect.
24  Q. With all due respect to you, Mr. Fayyad, you're
25  not the first witness that I've asked questions of. And

Page 40

1   I want to ask you a very straightforward -- I think --
2   question.
3       Were you aware of Judge Marrero's order? If you
4   don't know, you can say you don't know. If you say you
5   were aware of it, you can say you were. If you weren't
6   aware of it, you can say you weren't.
7   A. The truth, sir, is that I do not know.
8       All I'm really trying to do here is to get you to
9   see things from my own perspective as I communicate to
10  you my answers to questions you raise.
11      This has been a long process. There is constant
12  discussion going on, and it's not really the only case.
13  There are several cases here. So, at the time certain
14  significant things happened along the way, I'm sure I
15  was informed. You know what I'm saying?
16      But here we are months, years, after certain
17  things have happened. I cannot really be so certain. I
18  do not really want to tell you something yes or no when
19  I'm not really a hundred percent certain.
20      You know what I'm saying? That's what I'm really
21  trying to do here.
22  Q. That's fine. That's not unusual. That happens
23  to every witness.
24      MR. ROCHON: May we take a break at this
25  point, given -- is that agreeable?

Page 41

1       THE WITNESS: Yes.
2       THE VIDEOGRAPHER: Going off record at 4:55.
3       (Short recess taken.)
4       THE VIDEOGRAPHER: Going on record at 5:00.
5   Q. Mr. Fayyad --
6   A. Yes.
7   Q. -- do you understand, one of the things that I'm
8   trying to find out is what you know about the case?
9       Do you understand that?
10  A. I understand that this is the nature of a
11  deposition, yes.
12  Q. But my question to you is, do you understand that
13  one of the things I'm trying to find out is how much you
14  know about different aspects of the case.
15      Do you understand that?
16  A. You're telling me that, and I take your word for
17  it.
18  Q. Okay. Now, what I'm trying to find out is, did
19  you ever learn of Judge Marrero's order to the United
20  States, to your recollection.
21  A. I don't remember.
22  Q. Okay. Fair enough. You have no recollection of
23  learning of it at this point. Is that fair?
24  A. I just don't remember really.
25  Q. You have no recollection of learning of it, is

Fayyad

Page 42

1  that fair?
2  　　　MR. ROCHON: Objection. Asked and answered.
3  　　　MR. WISTOW: That's one of the things you're
4  not supposed to do under our local rules. You just
5  object, okay? Or instruct him not to answer, if you
6  wish.
7  　　　MR. ROCHON: Thank you for the suggestions.
8  Q. Is it fair to say that, as you sit here now,
9  under oath, you have no present recollection of learning
10 of this order?
11 　　　It may be you've forgotten it -- you knew it and
12 forgot it -- but you have no recollection? Is that
13 fair?
14 A. That's exactly what I meant when I said I don't
15 remember really.
16 Q. Okay. So, as we sit here today, you have no
17 recollection of ever learning of the order?
18 　　　MR. ROCHON: Objection.
19 Q. Is that fair?
20 　　　MR. ROCHON: Objection.
21 　　　MR. WISTOW: I'm entitled to get a straight
22 answer.
23 　　　MR. ROCHON: Objection.
24 A. I just gave you one.
25 Q. Is it fair --

Page 43

1  A. If what you said means I don't remember, then
2  that's what I really mean to say.
3  Q. Okay. Now, did you ever learn whether or not the
4  United States complied with Judge Marrero's order?
5  A. I don't remember either.
6  Q. Maybe I can refresh your recollection.
7  A. Okay.
8  　　　MR. ROCHON: If we show the witness the one
9  that gets marked, we'll have two on our side --
10 　　　MR. WISTOW: Okay. Sure.
11 　　　MR. ROCHON: -- if that's agreeable.
12 　　　MR. WISTOW: That's fine.
13 　　　MR. ROCHON: If that's okay with the court
14 reporter.
15 　　　(Off-the-record discussion while exhibit is
16 marked).
17 　　　(Exhibit No. 2 marked for identification.)
18 Q. Now, do you know --
19 　　　MR. ROCHON: That's how this -- by doing it
20 that way, then we do get the two copies, so he's got
21 one. We've got two.
22 　　　The court reporter doesn't read them. She
23 marks them.
24 　　　MR. WISTOW: That's fine.
25 Q. Have you ever, to your recollection, seen this

Page 44

1  document before?
2  　　　(Witness peruses document.)
3  A. I don't know if I remember seeing this document
4  specifically. I mean this very document.
5  Q. Okay. I would like to direct your attention --
6  A. Yes.
7  Q. -- to eight lines from the bottom of the first
8  page where it starts to read, The United States
9  respectfully informs the Court that it declines to file
10 a Statement of Interest concerning the Rule 60 issues
11 presented by this case, but will continue to monitor
12 this and other cases like it.
13 　　　MR. ROCHON: (Indicating).
14 　　　MR. WISTOW: Did you just point something to
15 him?
16 　　　MR. ROCHON: Yes. The sentence we're
17 reading so he could find it on the page. He was asking
18 for help.
19 　　　MR. WISTOW: Okay.
20 Q. If you need assistance in finding something, I'd
21 ask you to tell me that you can't find it.
22 A. Fine.
23 Q. Is that fair?
24 A. Fair.
25 Q. Okay. Have you located it?

Page 45

1  A. I have.
2  Q. Okay. Have I read it correctly?
3  A. You have.
4  Q. Okay. Do you understand that to mean that, in
5  response to Judge Marrero's order to the United States
6  to state whether or not it would file a Statement of
7  Interest, the United States responded by saying they
8  would not file a Statement of Interest in this case --
9  the Knox case -- or any similar cases.
10 　　　Do you understand that to mean that?
11 A. I understood that to be the case. I'd have to
12 read through the rest of the letter, or to continue that
13 sentence where it says, But will continue to monitor
14 this and other cases like it.
15 Q. Yes. Right. I'm only talking about at the time.
16 A. Yes.
17 Q. I mean anything could happen after this.
18 A. I understand.
19 Q. But at that time --
20 A. Yes.
21 Q. -- which was February 29, 2008, if this document
22 is authentic, then the United States declined to give a
23 suggestion (sic) of interest in the Knox case -- and you
24 see, third line from the top -- or in any other of the
25 cases pending in other districts.

Fayyad

Page 134

1  meeting.
2      Q. Who?
3      A. I don't remember for sure, but probably the
4  Minister of Foreign Affairs was there.
5      Q. What was his name?
6      A. The Prime Minister then was there for sure. I
7  mean, there were several ministers attending.
8         This is something that was, by that time, you
9  know, discussed widely. I mean it's --
10     Q. It was a big deal?
11     A. Yes. It was a big deal. Definitely, it was a
12 big deal. For sure it was a big deal.
13     Q. Okay. When you came back into government --
14     A. Yes.
15     Q. -- did you, because it was such a big deal, try
16 to find out what happened?
17     A. Yes.
18     Q. What did you find out?
19     A. I found out that, as a matter of fact, that the
20 President's office was seeing to the matter, and that
21 they were in the process of trying to find legal
22 representation.
23        And, you know, then I took over and I basically
24 carried this forward, and took -- and played an active
25 role in actually finding us legal representation to

Page 135

1  pursue these cases.
2      Q. I'm not talking about that. I'm talking about,
3  you asked Condoleezza Rice to do something, right?
4      A. Yes.
5      Q. Okay. Up to the time you left --
6      A. Yes.
7      Q. -- you don't know if you ever heard from her
8  again, right?
9         MR. ROCHON: Objection. Asked and answered.
10     A. Well, as I told you --
11        MR. WISTOW: I'm trying to put him back
12 on --
13     A. I really don't remember. I told you that.
14     Q. You don't remember hearing from her. So, at
15 best, you told me before, you were told that the whole
16 issue was under advisement.
17        Do you remember that?
18     A. Oh, yes. What I'm really saying to you is I do
19 not remember specific, you know, communication on this
20 matter.
21        Given the importance that we attached to this at
22 the time, it is most unlikely that I did not follow up
23 on it. Even if I did, the customary answer would have
24 been -- most likely something given as an answer was
25 that, you know, it was something that was being

Page 136

1  considered.
2      Q. So you followed up?
3      A. Yes. Yes.
4      Q. How did you follow up? What did you do?
5      A. I don't know. Typically, generally, first thing
6  you do when you have something like this --
7      Q. Yes?
8      A. -- is to actually talk to the US representative
9  here.
10     Q. To the what?
11     A. To the US representative here.
12     Q. In Palestine?
13     A. The Consul General in Jerusalem, yes.
14     Q. Did you do that?
15     A. Well, now, I really --
16     Q. Did you do that?
17        MR. ROCHON: Let him finish the answer.
18     A. I can tell you, in all likelihood, given the
19 importance of the matter, I must have done.
20     Q. Okay. Where were you? In his consulate?
21     A. Pardon?
22     Q. Was it in his consulate?
23     A. Or in my office, or over the phone.
24     Q. You don't remember?
25     A. I don't remember.

Page 137

1      Q. Do you remember what he said?
2         MR. ROCHON: Counsel, you're repeating. I'm
3  not getting upset, because you don't like it, but it's
4  been several times. Let him finish.
5         MR. WISTOW: Okay.
6         THE WITNESS: Yes.
7      A. You know, as I tried to explain --
8      Q. Please, what did the US Consulate say?
9      A. Let me try to really say this -- I hope the last
10 time -- in a way that is clear or adequately and
11 sufficiently understood.
12        The matter is of importance to us. I submitted
13 this letter to the Secretary. In all likelihood, given
14 the importance of that matter to us, I must have, at the
15 time, followed up by asking, you know, questions as to
16 where do we stand on the matter, given what was
17 involved, given the importance of the issues.
18        Typically, those communications first take place
19 through and with the US Consul General in Jerusalem.
20 This could have happened at his office, at my office,
21 his office, my office, or telephone call. You know,
22 things like this happen all the time.
23        I mean this is in the nature of on-going concern.
24 To not have gotten a written response to a letter like
25 this which is saying, you know, we have a problem, is

Fayyad

Page 282

1    MR. WISTOW: It's not speculation when he
2    tells me what the custom and usage is. But when I
3    ask what it is --
4    MR. ROCHON: If you want to argue for the
5    Judge, that means I'm going to have objections.
6    MR. WISTOW: Okay. Fair point. I'll
7    withdraw.
8    MR. ROCHON: Mr. Prime Minister, you can
9    answer the question.
10   A. Okay.
11   Q. Okay. You would expect that a letter from the
12   Secretary of State dealing with the case you're about to
13   get involved in, where, effectively, she says, We can't
14   do anything -- the Secretary of State can't do
15   anything -- you would expect that he would tell you
16   about that, wouldn't you?
17   A. You know, all of this, what this tells me really,
18   in terms of trying to piece it together as best as I
19   can --
20   Q. I'm sorry?
21   A. As I try to piece it together as best as I can --
22   Q. Yes?
23   A. -- all this tells me is that this was a matter
24   that was definitely in discussion at the President's
25   level around the time of this already, and even before.

Page 283

1    What I testified to before, and I repeat now, is
2    that I'm aware, based on my subsequent involvement in
3    this case, that the PA was making a serious effort
4    trying to identify an adequately suitable legal
5    representation in the United States before January of
6    2007. I know this.
7    Q. Oh, good. Okay.
8    A. I know that to be the case. I testified to that,
9    and I repeat it now.
10   Q. So that's --
11   A. -- in 2006.
12   Q. -- in 2006. Unsuccessfully.
13   A. Unsuccessfully, as I mentioned before.
14   Q. Okay. And if I wanted to get the details about
15   those efforts, who would I depose?
16   MR. ROCHON: Objection. Asked and answered.
17   Q. If you know.
18   MR. ROCHON: You've asked before.
19   MR. WISTOW: I know.
20   A. You know, the only person I know who, as a matter
21   of fact, was involved in this -- I mean probably had
22   people also help him -- was the director of the
23   President's office at the time.
24   Q. Was that Husseini?
25   A. Husseini. Yes.

Page 284

1    Q. Okay. So, if I understand what we're saying
2    here, you believe that you were told about Condoleezza
3    Rice's response to the letter of President Abbas, or you
4    were not?
5    Which do you believe?
6    A. You know, in the course of many discussions on
7    this issue over time, it's really hard for me now to
8    tell you what happened when and which happened before
9    which.
10   I became aware of the President's involvement in
11   the sense of communications with the Secretary of State
12   of the United States, Condoleezza Rice, on this matter.
13   Q. When?
14   A. But I really cannot tell you. I don't know. I
15   don't remember.
16   Q. He had heard back from the Secretary of State
17   apparently on or about January 12, okay?
18   A. Okay.
19   Q. So early on in your involvement with Ungar, you
20   had this discussion?
21   A. No, no. What I'm saying is that -- I'm sorry if
22   I was not really clear. Let me clarify.
23   I meant to say that there were numerous
24   discussions on this case over an extended period of
25   time. Part of that period, I was not in government.

Page 285

1    It's true.
2    Q. You were what?
3    A. Part of this period, you know, I was not in
4    government.
5    Q. Okay. That's the period.
6    A. Nevertheless -- yes. Nevertheless, there was
7    constantly discussion of that.
8    Now, subsequently, I can tell you, for example,
9    in more recent periods, since, you know, the filing of a
10   motion to vacate, there were several discussions with
11   our lawyers on this.
12   So I can't tell you now, with all of these
13   events, what happened when, to be honest with you, in
14   terms of when it is that I became aware precisely that
15   there was this communication between the President and
16   the Secretary.
17   Q. Okay. You were out of government --
18   A. Yes.
19   Q. -- from mid-December?
20   A. A little before that.
21   Q. Well, 12-12. That's what we agreed.
22   MR. ROCHON: No, no, you didn't. He said
23   December 5.
24   MR. WISTOW: Okay. Sorry. You're right.
25   Absolutely right.

72 (Pages 282 to 285)

Page 350

1  they?
2  A. I don't remember that part of it.
3     I mean what I know about it, what I recall, is
4  that the situation was they came under pressure by the
5  Israeli army, and they sought refuge in the church.
6  Q. You knew he was expelled to Algeria, you said?
7  A. I mean I know that there was an individual who
8  passed away in Algeria, and he was deported.
9  Q. Right.
10 A. That -- and I knew of it after the fact, not
11 before.
12 Q. Well, when you talked about the injustice of his
13 expulsion --
14    MR. ROCHON: Objection.
15 A. You know --
16    MR. ROCHON: Mr. Prime Minister, there's an
17 objection.
18    The objection is, the witness having said
19 that he wasn't sure he said that, now you're assuming he
20 did. That's even worse than assuming facts not --
21    MR. WISTOW: This is a speaking objection.
22 All you've got to do is object or instruct him not to
23 answer. This is a speaking objection.
24    And this is what I call cross-examination,
25 okay? He's an adverse witness. And that is possibly

Page 351

1  the most classic example of a speaking objection I've
2  ever heard.
3  Q. Now, do you know whether President Abbas sent an
4  emissary to the funeral?
5     MR. ROCHON: Asked and answered.
6  A. Yes. As I said, I do not recall specifically in
7  this particular case, but it's something that he may
8  have done.
9  Q. Maybe this will refresh your recollection, maybe.
10    Do you recall the spokesman saying, We must
11 maintain the way of the shahid Daoud, who always
12 believed in the struggle and love of the homeland and
13 the realization of national unity?
14    Does that ring a bell?
15 A. Not necessarily.
16 Q. Okay.
17 A. Or specifically.
18 Q. Okay. Do you know -- are you aware of the murder
19 of an Israeli, Rabbi Meir Avshalom Hai, in a drive-by
20 shooting?
21    There was a lot of newspaper coverage about that.
22 A. When was that?
23 Q. In December of 2009.
24 A. Oh, yes. Yes. Yes.
25 Q. Okay. That was a big story?

Page 352

1  A. Yes. Yes. Yes.
2  Q. Okay. It was a drive-by shooting, yes?
3  A. It was a shooting in the north, near Nablus.
4  Q. And there were three alleged terrorists arrested?
5  A. I do not know if there were arrests in this case.
6  Q. They were in a fire fight?
7  A. No, no, no. What happened, there was an Israeli
8  incursion into Nablus, and three were actually killed --
9  not arrested -- by the Israeli army.
10 Q. They were assassinated?
11 A. I mean there were eye-witnesses, including
12 children, that suggested that it was -- that they
13 actually were shot, at least -- I mean I'm trying to
14 really remember now, each one of them how it happened.
15    But the description that was given by eye-
16 witnesses was that they were fired at when they were not
17 resisting, or they were not firing at anyone. In one
18 instance, a guy was coming down the stairs, as it was
19 described to me, and he was shot.
20    So they were assassinated. They were not
21 arrested. They were killed.
22 Q. They were murdered?
23 A. Yes.
24 Q. You investigated, looked into it, came to that
25 conclusion?

Page 353

1  A. I mean this is a matter of great interest and
2  concern to us. And we tried, as best as we can, to find
3  out what happened, and there was a lot of discussion on
4  this with Israeli counterparts.
5     And we definitely protested that whole operation,
6  the raid -- the incursion, if you will -- leading to
7  those killings of the three individuals. I mean there
8  was no trial or anything like that.
9     We don't know for sure, you know, if, in fact,
10 they're the ones who were involved in the killing of the
11 rabbi.
12 Q. Do you recall this was big story? We've said
13 that.
14 A. It was.
15 Q. Do you recall President Abbas honoring the three
16 people who were killed, who allegedly were the murderers
17 of the rabbi, saying that they were shahids of the
18 Palestinian revolution?
19    Does that sound right? Do you remember that?
20 A. I don't remember a statement made by the
21 President in connection with this.
22    But it was, as I mentioned to you, something that
23 really caused a great deal of difficulty at the time it
24 happened in the way it happened.
25    I know that we were actively involved and engaged

Fayyad

Page 370

1  Mr. Fayyad, about the -- I think you talked about a
2  devastating effect paying the judgment in this case
3  would have on the PA's financial situation, correct?
4      A. Yes.
5      Q. I'm focusing you on that.
6      Now, do you know how much money is tied up in
7  reference to the Ungar case? Roughly.
8      A. I mean I know there's Pension Fund money tied up.
9  Probably $50 million.
10     Q. If I told you that more than $116 million was
11 tied up, would that be a surprise?
12     A. It probably is within the realm of what I would
13 expect, yes.
14     Q. If I told you it's significantly more than
15 $116 million, would that surprise you?
16     A. Maybe not.
17     Q. Okay. Whatever's been tied up is totally
18 unavailable to you at the present time, right?
19     A. It isn't available to us for use at the present
20 time.
21     Q. Right. And it's not affecting your ability to
22 fund anything one way or another at the moment, because
23 you don't have access to it?
24     A. But it has affected our ability already.
25     Q. In the past.

Page 371

1      A. No. In the following sense.
2      You know, we always had a deficit, a substantial
3  need for foreign assistance to fund that deficit
4  throughout the period this was litigated -- and, in
5  recent years, actually substantial deficit.
6      And what it meant is that, by not having access
7  to those funds, at least part of them, because they do
8  not all fall in the same category, the point is we had
9  to resort to bank borrowing in order to be able to make
10 end meets.
11     And this is way beyond what banks would -- you
12 know, whatever recourse to the banking system we would
13 have made in the absence of that attachment or the
14 freezing of those assets.
15     Q. There's no question that getting the money would
16 be a benefit to you. Getting it unfrozen and handed
17 over would be a benefit.
18     We all agree with that, correct?
19     A. It definitely would be a benefit because we have
20 substantial liabilities, corresponding liabilities,
21 given the absence from our income stream of the assets
22 frozen.
23     Q. All I'm doing is agreeing with you. We're saying
24 it's a benefit if you get the money, correct?
25     A. It's more than can be reflected by just saying

Page 372

1  it's a benefit.
2      Q. It's a substantial benefit if you get the money,
3  correct?
4      A. I certainly believe it would be great relief if
5  those funds were unfrozen, for sure.
6      Q. But --
7      A. Not to mention, if I may, that some of those
8  assets actually do not belong to the Palestinian
9  Authority.
10     And I feel very bad about, in particular, for
11 example, Pension Fund money being frozen. I mean that
12 money belongs to pensioners.
13     Q. May I suggest that you consider --
14     A. And if that money does not become available, with
15 the Pension Fund running out of money, it's a liability
16 of the government. So I mean the tale on this has not
17 really all been written. That's one.
18     And, secondly, we're talking about substantial
19 sums of money, not only in connection with this case,
20 but other cases.
21     MR. WISTOW: You know, I just -- you've
22 given me a limited amount of time. We're trying to
23 accommodate.
24     MR. ROCHON: I haven't given you a limited
25 amount of time. The rules give you your time.

Page 373

1      MR. WISTOW: I don't agree with that.
2      Q. Is this the kind of cooperation we can expect in
3  future, the way you're responding to my questions?
4      MR. ROCHON: Objection.
5      Q. Is it?
6      A. What do you mean by cooperation?
7      Q. Withdraw that.
8      MR. ROCHON: Mr. Prime Minister, don't
9  answer that.
10     Q. May I suggest, if you feel badly about what's
11 happening with --
12     MR. ROCHON: Counsel, do you have a
13 question?
14     MR. WISTOW: Yes.
15     MR. ROCHON: What is it?
16     Q. Have you considered, to mollify your feelings
17 about the Palestinian Investment Fund, that somebody
18 goes to court and tells Judge Lagueux, Something's
19 wrong?
20     Have you thought about that? Yes or no.
21     MR. ROCHON: Asked and answered.
22     A. Can you please paraphrase.
23     Q. I'll withdraw the question.
24     You were talking about deficits --
25     A. Yes.

Fayyad

Page 386

1  Q. Isn't that so?
2  A. What you just said, sir, does not seem to be
3  substantiated by the evidence discussed in the course of
4  this deposition.
5     The testimony will show, and statements read and
6  pieces of material evidence cited, strongly indicate
7  that the Palestinian Authority was trying to, in
8  earnest, to find adequate and competent legal
9  representation before that letter by the Secretary of
10 State was sent to President Abbas.
11    Looking for competent legal counsel in order to
12 represent it and to have this litigated on merits, as
13 you say, I mean before the letter from Secretary of
14 State Condoleezza Rice was sent to the President.
15 Q. But it was a matter of a few months after that
16 letter from Condoleezza Rice that it was decided to do
17 it on the merits. Isn't that so?
18     MR. ROCHON: Objection.
19 A. It is not true, based on testimony actually
20 discussed today and presented today, and material read.
21 Q. And also --
22 A. It is clear, and I said, and I repeat, and I
23 know -- and this is substantiated by evidence -- that
24 the PA was definitely seeking to recruit, to employ, to
25 hire, to retain the services of legal counsel in 2006.

Page 387

1  And the letter sent by Secretary of State Rice to
2  President Abbas, that was presented to me which I saw
3  for the first time here at this deposition, was a letter
4  that was sent in January of 2007.
5  Q. Name one lawyer -- one -- who was contacted by
6  the PLO or PA to come into this case. Just one.
7     MR. ROCHON: Asked and answered.
8  A. I mean I don't know.
9  Q. Okay.
10 A. But I know that definitely was the case --
11 Q. Okay.
12 A. -- that the PLO was looking in the course of --
13 Q. Do you know who Demming Sherman is?
14 A. Pardon me?
15 Q. Demming Sherman.
16 A. I don't remember.
17 Q. He was co-counsel --
18 A. Oh, okay.
19 Q. -- in this case.
20 A. Okay.
21 Q. Does that ring a bell?
22 A. Co-counsel? You mean with Ramsey Clark?
23 Q. Yes.
24 A. Possibly.
25 Q. Possibly? You don't know that?

Page 388

1  A. I mean I -- I mean I don't know if Ramsey Clark
2  was working on his own. He probably had associates,
3  yes.
4  Q. I'm not talking about associates. Ramsey Clark
5  was not admitted to practice in Rhode Island.
6  A. Okay.
7  Q. He had co-counsel who signed all the pleadings,
8  went to hearings. Are you aware of that?
9  A. I'm not aware. I do not know how the proceedings
10 went.
11 Q. Okay.
12 A. All I know is that that was the position taken
13 and that was the submission made by the legal counsel
14 there.
15 Q. Did anyone contact --
16 A. Exactly who did it, I don't know.
17 Q. Did anyone contact Demming Sherman or his firm to
18 see if they would represent the PLO and PA in 2006?
19 A. That may have been the case. I do not know.
20 Q. Anything could have been. Did you ask?
21 A. I was not --
22 Q. Did you ask?
23     MR. ROCHON: Counsel, counsel, you're just
24 badgering.
25 Q. All right. I want to talk about the Mecca

Page 389

1  agreement.
2  A. Yes.
3  Q. Okay. Payments were made, and are to be made,
4  directly for Hamas security forces under the Mecca
5  agreement, are they not?
6  A. Can you please repeat the question.
7  Q. Payments are made by the PA, under the Mecca
8  agreement, for Hamas security forces.
9  A. That's not true.
10 Q. That's absolutely false?
11 A. There's not a provision in the Mecca accord that
12 has something specific pertaining to payments to
13 security forces or anything like that.
14 Q. But there are payments made that end up
15 supporting security forces, aren't there?
16 A. I mean --
17 Q. Aren't there?
18 A. Payments made available -- or donations, donor
19 assistance -- made available to the Palestinian
20 Authority is used to, among other things, pay salaries
21 and wages for PA employees, civilians and security
22 personnel.
23    That's not to say Hamas.
24 Q. Well, the security personnel in Gaza, yes?
25 A. Yes.