# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

      Plaintiffs – Judgment Creditors,

    v.

                                    C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

      Defendants – Judgment Debtors.

## PLAINTIFFS-JUDGMENT CREDITORS' THIRD REQUEST OF DEFENDANT-JUDGMENT DEBTOR THE PALESTINIAN AUTHORITY FOR PRODUCTION OF DOCUMENTS AND THINGS RELEVANT TO DEFENDANTS-JUDGMENT DEBTORS' RULE 60(b)(6) MOTION

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs–Judgment Creditors, by counsel, request that Defendant–Judgment Debtor the Palestinian Authority ("PA") produce, within thirty (30) days of the service of these requests, the following documents, things and electronically stored information as described in Fed.R.Civ.P. 34(a)(1)(A) (collectively hereinafter: "documents").

1. **Regarding the Defendants' burden to demonstrate absence of prejudice:**

    a. All documents supporting the Defendants' claims that vacating the Judgment will not cause prejudice to the Plaintiffs.

    b. All documents on the basis of which the Defendants "vigorously disput[e]" that evidence and witnesses have been irreparably compromised.[1]

---

[1] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("They [Defendants] vigorously dispute the plaintiffs' claim that evidence and witnesses have been irreparably compromised.").

2.   **Regarding Mahmoud Abbas's November 28, 2006 letter to Secretary of State Condolezza Rice, referred to in Rice's letter dated January 12, 2007 (copy attached as Exhibit A):**

   a.   All documents constituting earlier drafts of Mahmoud Abbas's November 28, 2006 letter to Secretary of State Condolezza Rice, referred to in Rice's letter dated January 12, 2007 ("Abbas Letter").

   b.   All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in writing the Abbas Letter.

   c.   All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in translating the Abbas Letter.

   d.   All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person who had and/or received copies of the Abbas Letter.

   e.   All documents relating to, referring to and/or evidencing the computers and/or data bases where electronic copies of the Abbas Letter were stored or should have been stored, and the storage methods used.

   f.   All documents relating to, referring to and/or evidencing where paper copies of the Abbas Letter were filed or should have been filed, and the archival methods used.

   g.   All documents relating to, referring to and/or evidencing when it was first determined that the Abbas Letter was not within the Defendants' "possession, custody, or control".[2]

   h.   All documents relating to, referring to and/or evidencing any efforts made to locate the Abbas Letter after determining it was not within the Defendants' possession, custody or control.

   i.   All documents relating to, referring to and/or evidencing any efforts made to obtain the Abbas Letter from the United States after determining it was not within the Defendants' possession, custody, or control.

   j.   All documents supporting the Defendants' characterization of the Abbas Letter as a request for "guidance."[3]

---

[2] See Objections and Responses of Defendants the Palestine Liberation Organization and the Palestinian Authority to Plaintiffs-Judgment Creditors' Second Request for Production of Documents and Things Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion at 8.

[3] See 9/14/2009 Brief for Appellants at 20 ("In Late 2006, President Abbas sent a letter to then Secretary of State Condoleeza Rice requesting guidance with respect to the ongoing Anti-Terrorism Act litigation.").

3.    **Regarding Dr. Nasser Al-Kidwa's January 2003 letter to Magistrate Judge Martin[4]:**

    a.  All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in writing Nasser Al-Kidwa's January 2003 letter to Magistrate Judge Martin ("Al Kidwa Letter").

    b.  All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person who directed or asked that the Al Kidwa Letter be written.

    c.  All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person who supplied any information contained or referenced within the Al Kidwa Letter.

4.    **Regarding the Defendants' strategic litigation choices leading to and subsequent to their default:**

    a.  All documents relating to, referring to and/or evidencing the PA's "mindset" during the period when it decided to default.[5]

    b.  All documents relating to, referring to and/or evidencing the PLO's "mindset" during the period when it decided to default.[6]

    c.  All documents relating to, referring to and/or evidencing any advice of the PA's counsel to interpose "non-merits based defenses" in the *Ungar* litigation prior to 2005.[7]

---

[4] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 24 ("Indeed, in January 2003, Dr. Nasser Al-Kidwa wrote to Magistrate Judge Martin to assert that the PA and PLO should not be forced to undergo the burdens of participation in discovery prior to disposition of the sovereign immunity question because the 'high level of violence' in the region made it impossible to proceed with a defense at the time, and because the PA and PLO could not 'understand how plaintiffs can claim the PNA and PLO are responsible for what HAMAS does.'").

[5] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("To present the Court with a fuller picture of the Defendants' mindset during the relevant timeframes, Defendants have submitted the declaration of Ahmad Abdel-Rahman, which was recently filed in another case against the PA and PLO in the Southern District of Florida, Saperstein v. Palestine Authority, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.).") (emphasis added).

[6] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("To present the Court with a fuller picture of the Defendants' mindset during the relevant timeframes, Defendants have submitted the declaration of Ahmad Abdel-Rahman, which was recently filed in another case against the PA and PLO in the Southern District of Florida, Saperstein v. Palestine Authority, No. 04-20225-CIV-Seitz/Turnoff (S.D. Fla.).") (emphasis added).

[7] See Ungar v. Palestine Liberation Organization, 599 F.3d 79, 82 (1st Cir. 2010) ("The defendants neither answered the complaint nor participated in discovery. Instead, at various times from 2000 to 2005 they interposed motions asserting non-merits-based defenses of sovereign immunity, lack of jurisdiction, nonjusticiability, and the

    d.   All documents relating to, referring to and/or evidencing any advice of the PA's counsel to interpose "non-merits based defenses" in the *Ungar* litigation prior to 2005.[8]

    e.   All documents relating to, referring to and/or evidencing the PA's "deliberate choice" to delay asserting a sovereign immunity defense in this litigation, and the name, title, and present whereabouts of any person participating in that deliberate choice.[9]

    f.   All documents relating to, referring to and/or evidencing the PLO's "deliberate choice" to delay asserting a sovereign immunity defense in this litigation, and the name, title, and present whereabouts of any person participating in that deliberate choice.[10]

    g.   All documents relating to, referring to and/or evidencing how, why, and when the PA came to realize its "deliberate choice" was "misguided", and the name, title, and present whereabouts of any person participating in that realization.[11]

    h.   All documents relating to, referring to and/or evidencing how, why, and when the PLO came to realize its "deliberate choice" was "misguided", and the name, title, and present whereabouts of any person participating in that realization.[12]

---

like. As the defendants now concede, the decision to stonewall in this fashion was a deliberate stratagem driven by the advice of their then-counsel and their unwillingness to recognize the authority of the federal courts.") (emphasis added).

    [8] See Ungar v. Palestine Liberation Organization, 599 F.3d 79, 82 (1st Cir. 2010) ("The defendants neither answered the complaint nor participated in discovery. Instead, at various times from 2000 to 2005 they interposed motions asserting non-merits-based defenses of sovereign immunity, lack of jurisdiction, nonjusticiability, and the like. As the defendants now concede, the decision to stonewall in this fashion was a deliberate stratagem driven by the advice of their then-counsel and their unwillingness to recognize the authority of the federal courts.") (emphasis added).

    [9] See Ungar v. Palestine Liberation Organization, 402 F.3d 274, 294 (1st Cir. 2005) ("The defendants deliberately chose to hold off on asserting a sovereign immunity defense-and they must live with the consequences of that choice.").

    [10] See Ungar v. Palestine Liberation Organization, 402 F.3d 274, 294 (1st Cir. 2005) ("The defendants deliberately chose to hold off on asserting a sovereign immunity defense-and they must live with the consequences of that choice.").

    [11] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 85-86 (1st Cir. 2010) ("The defendants say, however, that they have come to regard their deliberate choice as misguided and that exceptional circumstances warrant relieving them from the judgment upon such terms as the court may deem just.").

    [12] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 85-86 (1st Cir. 2010) ("The defendants say, however, that they have come to regard their deliberate choice as misguided and that exceptional circumstances warrant relieving them from the judgment upon such terms as the court may deem just.").

    i.    All documents relating to, referring to and/or evidencing the presence of "political extremism" within the PA and the role of such "political extremism" in the PA's decision to default.[13]

    j.    All documents relating to, referring to and/or evidencing the presence of "political extremism" within the PLO and the role of such "political extremism" in the PLO's decision to default.[14]

    k.    All documents relating to, referring to and/or evidencing the PA's "regrets" concerning its "procedural missteps" in this litigation.[15]

    l.    All documents relating to, referring to and/or evidencing the PLO's "regrets" concerning its "procedural missteps" in this litigation.[16]

   m.  All documents relating to, referring to and/or evidencing the adoption by the PA of the positions expressed by Prime Minister Fayyad in his December 24, 2007 Declaration concerning the PA's commitment to future participation in this litigation, as well as the PA's involvement in any efforts to transmit such commitment to United States political or governmental agencies or entities, including, without limitation, the United States courts; and any documents reflecting such commitment.[17]

    n.    All documents relating to, referring to and/or evidencing the adoption by the PLO of the positions expressed by Prime Minister Fayyad in his December 24, 2007 Declaration concerning the PLO's commitment to future participation in this litigation, as well as the PLO's involvement in any efforts to transmit such commitment to United States political or governmental agencies or entities,

---

[13] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("But the defendants tell a different tale. They blame political extremism within the PLO and the PA for their earlier decision to default.").

[14] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 86 (1st Cir. 2010) ("But the defendants tell a different tale. They blame political extremism within the PLO and the PA for their earlier decision to default.").

[15] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 1 ("Defendants do not take these concerns lightly and will not attempt to condone or justify many of the earlier actions in this litigation. We regret these procedural missteps . . . .") (emphasis added).

[16] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 1 ("Defendants do not take these concerns lightly and will not attempt to condone or justify many of the earlier actions in this litigation. We regret these procedural missteps . . . .") (emphasis added).

[17] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 4 ("In his declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward. In his declaration, Prime Minister Fayyad states: 'I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts.'").

including, without limitation, the United States courts; and any documents reflecting such commitment.[18]

o.  Authentic copies of all PA Cabinet minutes, protocols and/or records from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

p.  Authentic copies of all PLO Executive Committee minutes, protocols and/or records from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

q.  Authentic copies of all PA Cabinet decisions, orders and/or directives from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

r.  Authentic copies of all PLO Executive Committee decisions, orders and/or directives from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

s.  All minutes, protocols and/or records generated by any PA ministry, agency, department, division, bureau and/or other government body from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

t.  Authentic copies of all minutes, protocols and/or records generated by any PLO agency, department, division, bureau and/or other subordinate body from any time referencing and/or relating to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

u.  Authentic copies of all decisions, orders and/or directives made or issued at any time by any PA ministry, agency, department, division, bureau and/or other government body, which reference and/or relate to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

v.  Authentic copies of all decisions, orders and/or directives made or issued at any time by any PLO agency, department, division, bureau and/or other subordinate body, which reference and/or relate to the Judgment, any proceedings brought to enforce the Judgment, the 2006 Judgment and/or the instant action.

---

[18] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 4 ("In his declaration, Prime Minister Fayyad discusses the misunderstandings that existed at the time of the prior default and makes a firm, personal commitment to the litigation going forward. In his declaration, Prime Minister Fayyad states: 'I have instructed new counsel that the Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process. I have further instructed new counsel to transmit this commitment to the United States courts.'").

5.     **Regarding the Defendants' understanding or misunderstanding of the U.S. legal system:**

   a.   All documents relating to, referring to and/or evidencing the PA's "basic misunderstanding" of the U.S. legal system.[19]

   b.   All documents relating to, referring to and/or evidencing the PLO's "basic misunderstanding" of the U.S. legal system.[20]

   c.   All documents relating to, referring to and/or evidencing the PA's subjective understanding about the ability of U.S. courts to "hale [it] into court".[21]

   d.   All documents relating to, referring to and/or evidencing the PLO's subjective understanding about the ability of U.S. courts to "hale [it] into court".[22]

   e.   All documents relating to, referring to and/or evidencing the PA's "perplexity" about the ability of the U.S. courts to hale it into court and why the PA believes such perplexity is understandable.[23]

---

[19] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[T]he default here arose as a result of a foreign government's basic misunderstanding of the United States legal system."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("C. The Default Judgment in This Case Arose from the PA's and PLO's Basic Misunderstanding of the United States Legal System, but Their Efforts to Remedy That Misunderstanding Have Now Come to Full Fruition Despite Significant Political Turmoil and Institutional Obstacles.").

[20] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[T]he default here arose as a result of a foreign government's basic misunderstanding of the United States legal system."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("C. The Default Judgment in This Case Arose from the PA's and PLO's Basic Misunderstanding of the United States Legal System, but Their Efforts to Remedy That Misunderstanding Have Now Come to Full Fruition Despite Significant Political Turmoil and Institutional Obstacles.").

[21] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 5 ("First, Defendants contended that their conduct at the time of the default was not willful as that term is defined in the law because it was mitigated by the PA's and PLO's reasonable failure to understand how the United States courts could hale them into Court to answer for actions of Hamas taken specifically to undermine the peace process.").

[22] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 5 ("First, Defendants contended that their conduct at the time of the default was not willful as that term is defined in the law because it was mitigated by the PA's and PLO's reasonable failure to understand how the United States courts could hale them into Court to answer for actions of Hamas taken specifically to undermine the peace process.").

[23] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("At the time of the default in this case, Defendants were understandably perplexed about the ability of the United States courts to hale them into Court to answer for the actions of HAMAS. . . .").

    f.    All documents relating to, referring to and/or evidencing the PLO's "perplexity" about the ability of the U.S. courts to hale it into court and why the PLO believes such perplexity is understandable.[24]

    g.    All documents relating to, referring to and/or evidencing all factors resulting in the PA's failure to apprehend the "logic" of being haled into U.S. court, and why the PA no longer perceives being haled into U.S. court as illogical.[25]

    h.    All documents relating to, referring to and/or evidencing all factors resulting in the PLO's failure to apprehend the "logic" of being haled into U.S. court, and why the PLO no longer perceives being haled into U.S. court as illogical.[26]

    i.    All documents relating to, referring to and/or evidencing efforts of the PA's counsel to educate the PA about or disabuse the PA of the "illogicality" it perceived in being haled into U.S. court.[27]

---

[24] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("At the time of the default in this case, Defendants were understandably perplexed about the ability of the United States courts to hale them into Court to answer for the actions of HAMAS. . . .").

[25] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[26] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[27] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and

j.  All documents relating to, referring to and/or evidencing efforts of the PLO's counsel to educate the PLO about or disabuse the PLO of the "illogicality" it perceived in being haled into U.S. court.[28]

k.  All documents relating to, referring to and/or evidencing the PA's contemporaneous knowledge of the "politically charged tort" litigation arising out of the death of Leon Klinghoffer, and the name, title, and present whereabouts of any individual or individuals who acted as contact with defense counsel with respect to such litigation and/or made any decisions or gave instructions in regard to such litigation.[29]

l.  All documents relating to, referring to and/or evidencing the PLO's contemporaneous knowledge of the "politically charged tort" litigation arising out of the death of Leon Klinghoffer, and the name, title, and present whereabouts of any individual or individuals who acted as contact with defense counsel with respect to such litigation and/or made any decisions or gave instructions in regard to such litigation.[30]

**6.    Regarding HAMAS:**

a.  All documents relating to, referring to and/or evidencing the Defendants' claim that there is "no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss." [31]

---

at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[28] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 31 ("From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away, where the victims were not targeted because of their American citizenship, and where the act itself had been committed by a rival group that was actively trying to undermine the PA and PLO."); 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Nor do we understand how plaintiffs can sue the PNA and PLO for this death and at the same time sue the government of Iran in a separate case in Washington, D.C. for the same death claiming Iran is responsible for what Hamas does. Yet we've been advised plaintiffs are doing this.").

[29] See Estates of Ungar ex rel. Strachman v. Palestinian Authority, 228 F.Supp.2d 40, 45 (D.R.I. 2002) ("The Second Circuit in _Klinghoffer_ spoke directly to the issue of non justiciability in the context of the PLO and politically charged tort claims."); Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44 (2d Cir. 1991).

[30] See Estates of Ungar ex rel. Strachman v. Palestinian Authority, 228 F.Supp.2d 40, 45 (D.R.I. 2002) ("The Second Circuit in _Klinghoffer_ spoke directly to the issue of non justiciability in the context of the PLO and politically charged tort claims."); Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44 (2d Cir. 1991).

[31] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 2 ("While the Defendants' manner of conducting the litigation previously did not develop this important fact,

    b.  All documents relating to, referring to and/or evidencing the Defendants' claim that that HAMAS "indisputably" committed the shooting.[32]

    c.  All documents relating to, referring to and/or evidencing HAMAS's active efforts to "undermine" or derail the peace process.[33]

    d.  All documents relating to, referring to and/or evidencing the PA's active efforts to "quash" HAMAS's influence in the West Bank and Gaza and to cut off funding to HAMAS from international sources.[34]

    e.  All documents relating to, referring to and/or evidencing the PLO's active efforts to "quash" HAMAS's influence in the West Bank and Gaza and to cut off funding to HAMAS from international sources.[35]

    f.  All documents relating to, referring to, evidencing and/or constituting "Concrete evidence" that the PA was actively working against HAMAS during the period when the shooting occurred.[36]

---

there can be no doubt that HAMAS, not the PA and PLO, caused Plaintiffs' loss, at a time when the PA and PLO were working with the United States and Israeli governments in actively seeking to prevent anti-Israeli attacks. Hamas, in fact, likely committed the attack precisely to injure the interest of the PA and the PLO by disrupting the peace process that those entities were working so hard to support.").

[32] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.").

[33] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters.").

[34] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("Contrary to the Complaint's suggestion, the PA and PLO were actively seeking to quash HAMAS' influence in West Bank and Gaza and to cut off funding to HAMAS from international sources.").

[35] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("Contrary to the Complaint's suggestion, the PA and PLO were actively seeking to quash HAMAS' influence in West Bank and Gaza and to cut off funding to HAMAS from international sources.").

[36] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 19 ("[T]he Complaint seeks to assign liability to the PA and PLO for HAMAS' actions on a theory that the PA and PLO provided material support to HAMAS and acted as accessories after the fact to the Ungar shooting. To support that theory, the Plaintiffs cobble together a set of vague and conclusory allegations that ignore concrete

g. All documents relating to, referring to, evidencing and/or constituting "Concrete evidence" that the PLO was actively working against HAMAS during the period when the shooting occurred.[37]

h. All documents relating to, referring to and/or evidencing the PA's "facilitation" of the arrest of the gunmen, including its impact on relations with HAMAS.[38]

i. All documents relating to, referring to and/or evidencing the PLO's "facilitation" of the arrest of the gunmen, including its impact on relations with HAMAS.[39]

j. All documents relating to, referring to and/or evidencing any communications and written agreements, accords and/or pacts to which Hamas and the PA were parties at any time between September 1, 1993 and June 9, 1996.

k. All documents relating to, referring to and/or evidencing any communications and written agreements, accords and/or pacts to which Hamas and the PLO were parties at any time between September 1, 1993 and June 9, 1996.

---

evidence that the PA and PLO were actively working against HAMAS at the very time events giving rise to this lawsuit occurred.").

[37] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 19 ("[T]he Complaint seeks to assign liability to the PA and PLO for HAMAS' actions on a theory that the PA and PLO provided material support to HAMAS and acted as accessories after the fact to the Ungar shooting. To support that theory, the Plaintiffs cobble together a set of vague and conclusory allegations that ignore concrete evidence that the PA and PLO were actively working against HAMAS at the very time events giving rise to this lawsuit occurred.").

[38] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 30 ("Moreover, facilitating the apprehension and prosecution of the two triggermen in the attack would directly contradict the Plaintiffs' theory that the PA and PLO acted as accessories of HAMAS after the fact of the shooting.").

[39] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 15 ("First and foremost, a compelling defense exists in this case that as never litigated on the merits as a result of the default. . . . That defense is also strongly supported by the objective circumstances surrounding the incident, where HAMAS indisputably committed the shooting at a time when it was actively attempting to undermine the PA's and PLO's role in the peace process and where the PA and PLO Defendants facilitated the arrest of the perpetrators of the incident despite threats and protests from HAMAS supporters."); Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 30 ("Moreover, facilitating the apprehension and prosecution of the two triggermen in the attack would directly contradict the Plaintiffs' theory that the PA and PLO acted as accessories of HAMAS after the fact of the shooting.").

l.   All documents relating to, referring to and/or evidencing any communications and written agreements, accords and/or pacts to which Hamas and Fatah were parties at any time between September 1, 1993 and June 9, 1996.

**7.   Regarding international relations and the peace process:**

a.   All documents relating to, referring to and/or evidencing the details and circumstances of the PA's "active engagement" in pursuit of peace with Israel at the time of the shooting.[40]

b.   All documents relating to, referring to and/or evidencing the details and circumstances of the PLO's "active engagement" in pursuit of peace with Israel at the time of the shooting.[41]

c.   All documents relating to, referring to and/or evidencing the foreign policy consequences that have flowed from the Judgment in this case.[42]

d.   All documents relating to, referring to and/or evidencing the political and governmental ramifications of this litigation and its effect on the Middle East peace process, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the "welfare and plight" of the Palestinian people, and the PA's ability to function effectively as a government.[43]

e.   All documents relating to, referring to and/or evidencing the impact of this litigation on relations between the U.S. government and the current Palestinian leadership.[44]

---

[40] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("There is ample evidence that the shooting at issue occurred during a period in which the PA and PLO were actively engaged in pursuit of peace with Israel following the Oslo Accords.").

[41] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 18 ("There is ample evidence that the shooting at issue occurred during a period in which the PA and PLO were actively engaged in pursuit of peace with Israel following the Oslo Accords.").

[42] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 38 ("Vacatur is also warranted because of the significant foreign policy consequences that have flowed from the $116 million default judgment entered in this case.").

[43] See Defendants' 2/6/08 Motion under Rule 8(A)(2) for a Stay Pending Appeal at ¶ 14 ("Proceedings in this case in which the District Court assumes a stateless condition for the Palestinian people will have important political and governmental ramifications affecting the peace process in the Middle East, the Palestinian-Israeli conflict and violence, the security of the people of Israel, the welfare and plight of the Palestinian people under Israel's illegal occupation of their territories and the ability of defendants to function effectively as a government.").

[44] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 38 ("In cases like this one, which involve a meritorious defense to charges of government-sponsored terrorism, which raise highly nuanced foreign policy issues that endanger the developing relationship between the United States government and the new Palestinian leadership. . . ."); Defendants' 12/28/07 Memorandum in Support of

f.  All documents relating to, referring to and/or evidencing how the Plaintiffs' actions in this litigation "directly interfere" with the United States government's conduct of foreign relations in the Middle East.[45]

g.  All documents relating to, referring to and/or evidencing interference with the efforts of the PA to normalize its relations with the United States caused by the Judgment in this case, as well as undermining of the PA's efforts at institution and state building.[46]

h.  All documents relating to, referring to and/or evidencing interference with the efforts of the PLO to normalize its relations with the United States caused by the Judgment in this case.

i.  All documents relating to, referring to and/or evidencing the "threat" to the peace process caused by Plaintiffs' enforcement actions and by the "mere threat" that Plaintiffs will succeed.[47]

j.  All documents relating to, referring to and/or evidencing the potential impact of collection efforts in this litigation on the Israeli-Palestinian Peace Process and on U.S. foreign relations in the Middle East.[48]

---

Defendants' Motion to Vacate Default Judgment at 39 ("If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian government".); 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 11 ("There can similarly be no doubt that enforcement of default judgments can disrupt the PA's relationship with the United States, every bit as much as enforcement of the default judgments in *Jackson*, *Marks* and *Magness* could interfere with United States' relations with the Chinese and Russian governments.").

[45] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 4 ("[T]he further deterioration of the current state of affairs directly undermines the PNA's continued participation in the Middle East Peace Process and poses a significant obstacle to the PNA's role as a viable partner alongside the United States and Israel. In particular, we believe that the actions of the Plaintiffs in the *Ungar* Case directly interfere with the United States Government's conduct of foreign relations in the Middle East, to the grave detriment of the Palestinian people.").

[46] See 9/14/2009 Brief for Appellants at xi ("The $116 million default judgment at issue in this appeal interferes with the efforts of the Palestinian Authority ('PA') to normalize its relations with the United States and undermines the PA's efforts at institution and state building.").

[47] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 1 ("Even now, the enforcement actions being taken by Plaintiffs and the mere *threat* that Plaintiffs may be successful are causing substantial harm to the Palestinian people and the PNA and, thereby, threatening the Peace Process itself.").

[48] See Ungar v. The Palestine Liberation Organization, 599 F.3d 79, 82-83 (1st Cir. 2010) ("On December 28, 2007, the defendants, represented by new lead counsel, moved in the district court under Rule 60(b)(6) to vacate the default judgment. They posited that exceptional circumstances justified this relief, mentioning among other things their own political transformation; the large size of the judgment (on which interest was accruing); the potential impact of further collection efforts on the Israeli-Palestinian peace process; and the delicate nature of this nation's foreign relations in the Middle East.")

k.  All documents relating to, referring to, evidencing and/or constituting diplomatic communications and education at the highest levels of American and Palestinian leadership leading to the PA's efforts to vacate the Judgment, including all documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any individuals participating in those communications and when and where they occurred.[49]

l.  All documents relating to, referring to, evidencing and/or constituting diplomatic communications and education at the highest levels of American and Palestinian leadership leading to the PLO's efforts to vacate the Judgment, including all documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any individuals participating in those communications and when and where they occurred.[50]

**8.  Regarding Yasser Arafat:**

a.  All documents relating to, referring to and/or evidencing Yasser Arafat's refusal to acknowledge the jurisdiction of the U.S. courts.[51]

b.  All documents relating to, referring to and/or evidencing the details, circumstances, and impact on Yasser Arafat and the Defendants of any "besiegement" of Yasser Arafat, during the period 2002-2004.[52]

c.  All documents relating to, referring to and/or evidencing Plaintiff's January 24, 2003 notice of Yasser Arafat's deposition and the Defendants' response and reasons for their response to that notice.[53]

---

[49] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[E]fforts to cure the default occurred only after diplomatic communications and education at the highest levels of American and Palestinian leadership. . . .").

[50] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("[E]fforts to cure the default occurred only after diplomatic communications and education at the highest levels of American and Palestinian leadership. . . .").

[51] See 9/14/2009 Brief for Appellants at 1 ("former PA and PLO head Yasser Arafat's refusal to acknowledge the jurisdiction of the U.S. courts").

[52] See Declaration of Ahmad Abdel-Rahman, Ex. E to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 3 ("By 2004, two years after Yasser Arafat was besieged in Government Headquarters (Muqata'a) with most of its buildings and official documents looted or destroyed by the besieging Israeli Army, no permanent institutional structure of Palestinian government existed for handling domestic and foreign legal actions brought against the Palestinian government.").

[53] See Estates of Ungar and Ungar ex rel. Strachman v. Palestinian Authority, 325 F.Supp.2d 15, 40 (D.R.I. 2004) ("Nine days later, on March 12, 2003, they [Defendants] moved for a protective order to bar the taking of the depositions, which had been noticed by Plaintiffs on January 24, 2003, of President Yasser Arafat and six other Palestinian leaders.").

d. All documents relating to, referring to and/or evidencing the details and circumstances of Yasser Arafat's extended and ultimately fatal illness and its impact on the Defendants and their participation in this litigation.[54]

e. All documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any individual or individuals who took over Yasser Arafat's responsibilities at any time between 2000 and the present, including during Arafat's illness and subsequent to his death, and including but not limited to management and operations supervision within the PA and PLO, interfacing with U.S. legal counsel, payment of legal bills, and any other responsibilities or tasks relating to foreign or U.S. litigation.

9. **Regarding the evolution of the Defendants' institutional capacity for conducting foreign litigation:**

a. All documents relating to, referring to and/or evidencing the organizational and institutional structures and individuals within the PA responsible for monitoring and making decisions regarding lawsuits filed against PA in the United States and in Israel between 1993 and December 2007.[55]

b. All documents relating to, referring to and/or evidencing the organizational and institutional structures and individuals within the PLO responsible for monitoring and making decisions regarding lawsuits filed against PLO in the United States and in Israel at all times prior to December 2007.[56]

---

[54] See Declaration of Ahmad Abdel-Rahman, Ex. E to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 3 ("In the Fall of 2004, President Arafat became ill and died. Between 2000 and 2004, and as a result of the siege on him and his office as well as the re-occupation of the PA areas by the Israeli military forces, President Arafat's power progressively lost what institutionalization it previously had. After he died, there was significant disarray and instability in the government. This void in governmental decision-making persisted well after his death."); 9/14/2009 Brief for Appellants at 7 ("Four months later, Arafat died in a hospital in France, following an extended illness.").

[55] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("By 2004, many governmental buildings and official documents had been destroyed by the violence, and '[n]o person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits.").

[56] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 33 ("By 2004, many governmental buildings and official documents had been destroyed by the violence, and '[n]o person within the Palestinian governmental structure had primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility. Simply, there was no institutional structure in place for making critical decisions with respect to these lawsuits.").

c. All documents relating to, referring to and/or evidencing the "considerable obstacles" that the PA faced in responding to U.S. litigation from the time of Arafat's death until December 2007.[57]

d. All documents relating to, referring to and/or evidencing the "considerable obstacles" that the PLO faced in responding to U.S. litigation from the time of Arafat's death until December 2007.[58]

e. All documents relating to, referring to and/or evidencing the specific organizational and institutional structures and lines of authority the PA has developed to adequately respond to this litigation, as well as how such institutional structures and lines of authority differ from earlier institutional structures and lines of authority.[59]

f. All documents relating to, referring to and/or evidencing the specific organizational and institutional structures and lines of authority the PLO has developed to adequately respond to this litigation, as well as how such institutional structures and lines of authority differ from earlier institutional structures and lines of authority.[60]

g. All documents relating to, referring to and/or evidencing the PA's "misguided" reaction to this litigation stemming from its lack of institutional mechanisms and lack of sophistication.[61]

---

[57] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("The attached declaration of Mr. Abdel-Rahman, former Secretary-General of the Palestinian Authority Cabinet of Ministers and political advisor to President Abbas, describes the considerable obstacles that the Post-Arafat government faced in responding to the United States litigation during that time period.").

[58] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("The attached declaration of Mr. Abdel-Rahman, former Secretary-General of the Palestinian Authority Cabinet of Ministers and political advisor to President Abbas, describes the considerable obstacles that the Post-Arafat government faced in responding to the United States litigation during that time period.").

[59] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("It was only after high-level communications between President Abbas and the State Department, and President Abbas' delegation of authority for the litigation to Prime Minister Fayyad, that the PA developed the institutional structure and lines of authority necessary to adequately respond to the litigation.").

[60] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 16 ("It was only after high-level communications between President Abbas and the State Department, and President Abbas' delegation of authority for the litigation to Prime Minister Fayyad, that the PA developed the institutional structure and lines of authority necessary to adequately respond to the litigation.").

[61] See 9/14/2009 Brief for Appellants at 14 ("The PA/PLO's lack of an institutional mechanism for responding to overseas litigation and discovery as well as their lack of sophistication about the extraterritorial scope of U.S. jurisdiction contributed to the misguided reaction.").

h.   All documents relating to, referring to and/or evidencing the PLO's "misguided" reaction to this litigation stemming from its lack of institutional mechanisms and lack of sophistication.[62]

i.   All documents relating to, referring to and/or evidencing the involvement, duties, responsibilities and efforts of Mahmoud Abbas to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

j.   All documents relating to, referring to and/or evidencing the involvement, duties, responsibilities and efforts of Ahmed Qurei to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

k.   All documents relating to, referring to and/or evidencing the involvement, duties, responsibilities and efforts of Salam Fayyad to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

l.   All documents relating to, referring to and/or evidencing the involvement, duties, responsibilities and efforts of the persons who served as the PA's Minister of Justice from 2000 - present to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

m.   All documents relating to, referring to and/or evidencing the involvement, duties, responsibilities and efforts of the persons who served as the PA's Prosecutor General from 2000 - present to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

n.   All documents relating to, referring to and/or evidencing the involvement, duties, responsibilities and efforts of the persons who served as the PA's Attorney General from 2000 - present to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

o.   All documents relating to, referring to and/or evidencing the "Other pressing problems" facing the PA that complicated the creation of an organizational entity for defending foreign lawsuits brought against the PA.[63]

---

[62] See 9/14/2009 Brief for Appellants at 14 ("The PA/PLO's lack of an institutional mechanism for responding to overseas litigation and discovery as well as their lack of sophistication about the extraterritorial scope of U.S. jurisdiction contributed to the misguided reaction.").

[63] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("With the support of President Abbas, Dr. Husseini began the process of creating an organizational entity within the President's Office responsible for defending domestic and foreign lawsuits brought against the Palestinian government, but it was a complicated task compounded by both a lack of familiarity in the Palestinian legal

p.  All documents relating to, referring to and/or evidencing the "Other pressing problems" facing the PLO that complicated the creation of an organizational entity within responsible for defending foreign lawsuits brought against the PLO.[64]

q.  All documents relating to, referring to and/or evidencing the difficulty of PA decision-makers in understanding the complete picture of the litigation and the importance of full and complete participation in the process; all documents relating to, referring to and/or evidencing the any efforts made to understand the importance of full and complete participation in the process; and all documents relating to, referring to and/or evidencing the any discussions or communications with counsel concerning the importance of full and complete participation in the process.[65]

r.  All documents relating to, referring to and/or evidencing the difficulty of PLO decision-makers in understanding the complete picture of the litigation and the importance of full and complete participation in the process; all documents relating to, referring to and/or evidencing the any efforts made to understand the importance of full and complete participation in the process; and all documents relating to, referring to and/or evidencing the any discussions or communications with counsel concerning the importance of full and complete participation in the process.[66]

---

community with the American legal system, and by the fact that the Palestinian government had many other pressing problems to address.").

[64] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("With the support of President Abbas, Dr. Husseini began the process of creating an organizational entity within the President's Office responsible for defending domestic and foreign lawsuits brought against the Palestinian government, but it was a complicated task compounded by both a lack of familiarity in the Palestinian legal community with the American legal system, and by the fact that the Palestinian government had many other pressing problems to address.").

[65] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit.").

[66] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit.").

s.  All documents relating to, referring to and/or evidencing the conflicting instructions and confusion caused by the PA's failure to establish lines of authority for handling foreign litigation.[67]

t.  All documents relating to, referring to and/or evidencing the conflicting instructions and confusion caused by the PLO's failure to establish lines of authority for handling foreign litigation.[68]

u.  All documents, from any time prior to December 2007, relating to, referring to, evidencing, containing and/or constituting policies, procedures and/or guidelines for the handling of lawsuits brought against the PA.

v.  All documents, from any time prior to December 2007, relating to, referring to, evidencing, containing and/or constituting policies, procedures and/or guidelines for the handling of lawsuits brought against the PLO.

10.  **Regarding the Palestine Investment Fund:**

a.  All documents relating to, referring to and/or evidencing the relationship between the Palestinian Investment Fund and the PA.[69]

b.  All documents relating to, referring to and/or evidencing the PA's knowledge of, and when the PA first became aware of, the 2006 Judgment.

c.  All documents relating to, referring to and/or evidencing the transfer and/or payment of any funds, monies or assets from the Palestine Investment Fund to the PA from the date the 2006 Judgment was entered until the present day, including all documents relating to, referring to and/or evidencing the amounts of such transfers and/or payments.

d.  All documents relating to, referring to and/or evidencing all decisions to carry out the transfers and/or payments referred to in the previous subsection (c), including all documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in making, participating in and/or authorizing such transfers and/or payments.

e.  All documents constituting the Palestine Investment Fund's articles of association and/or by-laws at any time.

---

[67] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 35 ("As Mr. Abdel-Rahman notes, '[t]he failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment.'").

[68] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 35 ("As Mr. Abdel-Rahman notes, '[t]he failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment.'").

[69] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 44.

f. All documents relating to, referring to and/or evidencing the Palestine Investment Fund's governing structure and decision-making procedures.

g. All documents relating to, referring to and/or evidencing any efforts to change the articles of association of the Palestine Investment Fund at any time subsequent to the date that the 2006 Judgment was entered, including all documents relating to, referring to and/or evidencing the name, title, and present whereabouts of any person involved in making, participating in and/or authorizing such changes. [70]

h. All documents relating to, referring to and/or evidencing the impairment of the PA's ability to carry on its governmental function caused by the freezing of assets of the PA and of various "independent entities", including but not limited to the Palestine Investment Fund. [71]

i. All documents relating to, referring to and/or evidencing erosion of support for the PA's leadership and compromise of the efforts of the PA to achieve economic stability caused by the turning over of ownership of the Palestine Investment Fund. [72]

j. All documents relating to, referring to and/or evidencing all actions carried by Mohammed Mustafa on behalf of the PA and all services rendered by Mohammed Mustafa to or on behalf of the PA between July 2004 and the present day.

k. Authentic copies of all papers, pleadings, affidavits and declarations submitted by the PA and/or PLO in the Israeli Proceedings, at any time, that reference the Palestine Investment Fund.

---

[70] See Declaration of Robert J. Tolchin, Ex. C to Plaintiffs-Judgment Creditors' Memorandum in Opposition to Defendants' Motion for Relief from Default Judgment, at ¶ 8 ("In the Connecticut case, attorneys purporting to act on behalf of the PIF (but in fact acting on behalf of the former CEO of the PIF, who is none other than the current Economic Advisor to the PA) appeared and advised the Court that in early 2007 the PA had purported to make self-serving changes to the PIF's bylaws in a post-hoc effort to defeat the effect of the judgment entered by this Court in September 2006 on the Ungars' creditor's bill conveying ownership of the PIF to the Ungars.").

[71] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 4 ("As set forth above, the enforcement actions taken by Plaintiffs and their supporters in the *Ungar* Case have already resulted in the freezing of numerous assets of both the PNA and various independent entities that are *not* subject to the District Court's Preliminary Injunction. The freezing of these assets poses an imminent threat to the continuing operation of critical institutions on which the Palestinian people depend for a functioning civil society. In addition, it also has significantly impaired the ability of the PNA to carry on its governmental function and, in fact, threatens to bankrupt the PNA.").

[72] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 29 ("If the U.S. courts turn over the pension fund assets of Palestinian government workers and the ownership of the Palestine Investment Fund in satisfaction of this judgment, support for the moderate leadership of the PA will be severely eroded and its efforts to achieve economic stability compromised.").

l.  All documents relating to, referring to and/or evidencing all legal actions and/or proceedings brought against Orascom Telecom Holding S.A.E. by persons purporting to represent the Palestine Investment Fund, including without limitation all such actions and/or proceeding brought in Egypt.

m.  Authentic copies of all papers and pleadings submitted by any party to legal actions and/or proceedings brought against Orascom Telecom Holding S.A.E. by persons purporting to represent the Palestine Investment Fund, and authentic copies of all transcripts, orders and decisions from such proceedings.

**11.  Regarding the Defendants' ability to participate in discovery**

a.  All documents relating to, referring to and/or evidencing the PA's difficulties finding documents and responding to requests for discovery between 2000 and December 2007.[73]

b.  All documents relating to, referring to and/or evidencing the PLO's difficulties finding documents and responding to requests for discovery between 2000 and December 2007.[74]

c.  All documents relating to, referring to and/or evidencing the present ability of the PA to produce documents and respond to discovery requests, and how its current ability differs from that which obtained in 2000, 2001, 2002, 2003, and 2004.[75]

d.  All documents relating to, referring to and/or evidencing the present ability of the PLO to produce documents and respond to discovery requests, and how its current ability differs from that which obtained in 2000, 2001, 2002, 2003, and 2004.[76]

---

[73] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 1 ("Government offices and officials cannot work effectively or organize even on matters of extreme urgency. It has been impossible under such circumstances to locate people who could seek and find documents, who could gather information and prepare answers to interrogatories and could respond to requests for admissions.").

[74] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 1 ("Government offices and officials cannot work effectively or organize even on matters of extreme urgency. It has been impossible under such circumstances to locate people who could seek and find documents, who could gather information and prepare answers to interrogatories and could respond to requests for admissions.").

[75] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Only the achievement of a level of stability, free from the threat of daily attacks in our territory can make it possible to free personnel to gather the materials and information needed to proceed with a defense.").

[76] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Only the achievement of a level of stability, free from the threat of daily attacks in our territory can make it possible to free personnel to gather the materials and information needed to proceed with a defense.").

e.    All documents relating to, referring to and/or evidencing the nature, type, contents and identity of the PA's records in Gaza that no are longer accessible.[77]

f.    All documents relating to, referring to and/or evidencing the nature, type, contents and identity of the PLO's records in Gaza that no are longer accessible.[78]

g.    All documents relating to, referring to and/or evidencing the names, titles, and present whereabouts of any individuals involved in preparing responses and answers to all discovery requests propounded by Plaintiffs in this matter subsequent to June 1, 2010.

**12.    Regarding the Defendants' relationship, interactions, and discussions with their counsel:**

a.    All documents relating to, referring to, evidencing and/or constituting communications between the Defendants and their U.S. lawyers between Arafat's death and the filing of the Motion in December 2007.

b.    All documents relating to, referring to and/or evidencing Defendants removal of Ramsey Clark as counsel and the reasons therefor.

c.    All documents relating to, referring to and/or evidencing any actions taken by Defendants between July 2004 and April 2007 to find new counsel to represent them in the instant action and/or in any other actions brought against them in the United States.

d.    All documents relating to, referring to and/or evidencing any and all reasons for the delay in filing the Motion between July 2004 and December 2007.

e.    All documents relating to, referring to and/or evidencing the "substantial" efforts of the Defendants' counsel to vacate all defaults against the PA between May 2007 and December 2007.[79]

---

[77] See Defendants' 2/15/2008 Motion to Dismiss in Parsons v. Palestinian Authority, No 07-1847 (JR) (D.D.C.) ("Gaza is now inaccessible for the purpose of conducting discovery or otherwise gathering facts and information that may be relevant to defending against [the Parsons] Plaintiffs' claims in this case [*Parsons v. PA*]. The dramatically changed circumstances in Gaza in 2007 will result in immense prejudice to Defendants if this litigation is permitted to proceed.").

[78] See Defendants' 2/15/2008 Motion to Dismiss in Parsons v. Palestinian Authority, No 07-1847 (JR) (D.D.C.) ("Gaza is now inaccessible for the purpose of conducting discovery or otherwise gathering facts and information that may be relevant to defending against [the Parsons] Plaintiffs' claims in this case [*Parsons v. PA*]. The dramatically changed circumstances in Gaza in 2007 will result in immense prejudice to Defendants if this litigation is permitted to proceed.").

[79] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 46 ("New counsel was retained in May 2007, and immediately began the task of moving to vacate defaults and default judgments in various courts around the country. At the same time, counsel was required to defend on-going

f.   All documents relating to, referring to and/or evidencing the handling of the
     "proliferation of lawsuits" and enforcement actions following entry of the
     Judgment, including all documents relating to, referring to and/or evidencing
     assignment of counsel to represent the Defendants in those actions.[80]

g.   All documents relating to, referring to and/or evidencing the Defendants'
     understanding reached with Miller & Chevalier concerning its active defense and
     participation in discovery.[81]

h.   All documents relating to, referring to and/or evidencing the reason or reasons
     that the Defendants engaged in proceedings related to proof of damages in *Biton
     v. Palestinian Authority* and *Gilmore v. Palestinian Authority* before filing
     motions to vacate default in those actions.

**13.   Regarding related or other cases:**

a.   All documents relating to, referring to and/or evidencing when the PA first
     became aware of the Creditor's Bill proceeding in this case and what actions the
     PA took as a result of that awareness.[82]

b.   All documents relating to, referring to and/or evidencing proceedings brought
     by the Plaintiffs to enforce the Judgment in any jurisdiction, including all
     documents relating to, referring to and/or evidencing the names, titles, and
     present whereabouts of any individuals who were responsible for or involved in
     retaining counsel to defend such enforcement proceedings and the details and
     circumstances of such efforts to retain counsel.

c.   All documents relating to, referring to and/or evidencing the "extensive"
     discovery the PA participated in for the *Knox* case.[83]

---

damages proceedings, respond to discovery in these cases, and to investigate the availability of meritorious defenses.
This investigation was complicated by the existence of multiple parallel cases, such as the one filed in the District of
Columbia by Plaintiffs here. Given the cultural, linguistic and logistical hurdles involved, it took substantial efforts
to move to vacate all of the defaults and default judgments in less than eight months.").

[80] See 9/14/2009 Brief for Appellants at 7 ("The PA/PLO's non-defense of the *Ungar* suit and the resulting
large damage award led to a proliferation of lawsuits against them, as well as a number of enforcement actions
related to the Ungar judgment.").

[81] See 9/14/2009 Brief for Appellants at 8 ("The PA/PLO retained Washington, D.C. litigation firm Miller
& Chevalier to represent them, with the understanding that the PA/PLO would actively defend the cases, including
by participating in discovery.").

[82] See 9/14/2009 Brief for Appellants at 17 ("In an effort to reach the assets of the Palestine Investment
Fund ('PIF'), the Ungars initiated a 'Creditor's Bill' proceeding in the underlying Estate of *Ungar v. Palestinian
Auth.*, No. 1:00-cv-105-L-DLM (D.R.I.) matter. See Dkt. No. 370. In September 2006, Judge Lagueux entered a
final judgment on the Creditor's Bill.").

d.   All documents relating to, referring to and/or evidencing the "extensive" discovery the PLO participated in for the *Knox* case.[84]

e.   All documents relating to, referring to and/or evidencing the PA's "actual conduct" in the "related cases."[85]

f.   All documents relating to, referring to and/or evidencing the PLO's "actual conduct" in the "related cases."[86]

g.   All documents relating to, referring to and/or evidencing all attachments on funds owed to the PA obtained by the Plaintiffs in Israel, including all documents relating to, referring to and/or evidencing the current amount of such attachments.

h.   Authentic copies of all discovery requests of any kind served and/or propounded by the PA in the Israeli Proceedings at any time prior to December 2007.

i.   Authentic copies of all discovery requests of any kind served and/or propounded by the PLO in the Israeli Proceedings at any time prior to December 2007.

j.   Authentic copies of all responses, answers and/or objections served or made by the PA to any discovery requests of any kind served on and/or propounded to the PA in the Israeli Proceedings at any time prior to December 2007.

---

[83] See 9/14/2009 Brief for Appellants at 23 ("The remaining two cases are the instant case and the *Knox* case, in which the PA/PLO participated in extensive discovery over their assets in connection with litigation over the amount of the vacatur bond.").

[84] See 9/14/2009 Brief for Appellants at 23 ("The remaining two cases are the instant case and the *Knox* case, in which the PA/PLO participated in extensive discovery over their assets in connection with litigation over the amount of the vacatur bond.").

[85] See 9/14/2009 Brief for Appellants at 48-49 ("Here, the PA/PLO's motion to vacated the default judgment was supported by a sworn declaration from Prime Minister Fayyad in which he expressed the PA/PLO's commitment to 'participate fully in this and other litigation in a cooperative manner, including complete participation in the discovery process.' Prime Minister Fayyad's declaration deserves the Court's serious consideration, particularly in light of his representations concerning the manner in which the litigation will be conducted going forward, representations that have been borne out by the actual conduct of litigation in the related cases.").

[86] See 9/14/2009 Brief for Appellants at 48-49 ("Here, the PA/PLO's motion to vacated the default judgment was supported by a sworn declaration from Prime Minister Fayyad in which he expressed the PA/PLO's commitment to 'participate fully in this and other litigation in a cooperative manner, including complete participation in the discovery process.' Prime Minister Fayyad's declaration deserves the Court's serious consideration, particularly in light of his representations concerning the manner in which the litigation will be conducted going forward, representations that have been borne out by the actual conduct of litigation in the related cases.").

k.     Authentic copies of all responses, answers and/or objections served or made by the PLO to any discovery requests of any kind served on and/or propounded to the PLO in the Israeli Proceedings at any time prior to December 2007.

l.     Authentic copies of all pleadings and/or papers filed in an Israeli court by the PA in the Israeli Proceedings at any time prior to December 2007 relating to discovery requests of any kind served on and/or propounded to the PA and/or to discovery requests of any kind served and/or propounded by the PA.

m.     Authentic copies of all pleadings and/or papers filed in an Israeli court by the PLO in the Israeli Proceedings at any time prior to December 2007 relating to discovery requests of any kind served on and/or propounded to the PLO and/or to discovery requests of any kind served and/or propounded by the PLO.

n.     Authentic copies of the transcripts from all court hearings at any time prior to December 2007 in the Israeli Proceedings in which discovery requests of any kind served on and/or propounded to the PA and/or to discovery requests of any kind served and/or propounded by the PA were referred to or discussed.

o.     Authentic copies of the transcripts from all court hearings at any time prior to December 2007 in the Israeli Proceedings in which discovery requests of any kind served on and/or propounded to the PLO and/or to discovery requests of any kind served and/or propounded by the PLO were referred to or discussed.

p.     Authentic copies of all court orders and decisions issued in the Israeli Proceedings at any time prior to December 2007 in which discovery requests of any kind served on and/or propounded to the PA and/or to discovery requests of any kind served and/or propounded by the PA were referred to or discussed.

q.     Authentic copies of all court orders and decisions issued in the Israeli Proceedings at any time prior to December 2007 in which discovery requests of any kind served on and/or propounded to the PLO and/or to discovery requests of any kind served and/or propounded by the PLO were referred to or discussed.

r.     Authentic copies of all answers, counterclaims and crossclaims filed by the PA in the Israeli Proceedings at any time prior to December 2007.

s.     Authentic copies of all answers, counterclaims and crossclaims filed by the PLO in the Israeli Proceedings at any time prior to December 2007.

t.     Authentic copies of all pleadings and/or papers filed by the PA in the Israeli Proceedings at any time prior to December 2007 in which the PA asserted sovereign immunity from suit.

u.     Authentic copies of all pleadings and/or papers filed by the PLO in the Israeli Proceedings at any time prior to December 2007 in which the PLO asserted sovereign immunity from suit.

v.   All documents relating to, referring to and/or evidencing the organizational and institutional structures and individuals within the PA responsible for monitoring and making decisions regarding the Israeli Proceedings at any time prior to December 2007.

w.   All documents relating to, referring to and/or evidencing the organizational and institutional structures and individuals within the PLO responsible for monitoring and making decisions regarding the Israeli Proceedings at any time prior to December 2007.

x.   Authentic copies of all powers of attorney submitted by the PA to the Israeli courts and/or served by the PA on the opposing parties in the Israeli Proceedings at any time prior to December 2007.

y.   Authentic copies of all powers of attorney submitted by the PLO to the Israeli courts and/or served by the PLO on the opposing parties in the Israeli Proceedings at any time prior to December 2007.

z.   Authentic copies of all contracts, retainer agreements and/or other instruments executed prior to December 2007 through which the PA retained counsel to represent it in the Israeli Proceedings.

aa.  Authentic copies of all contracts, retainer agreements and/or other instruments executed prior to December 2007 through which the PLO retained counsel to represent it in the Israeli Proceedings.

bb.  An authentic copy of the affidavit of Mohanad Jaouni dated February 22, 2005, submitted by the PA in the Jerusalem District Court in Civil Case 3326/01 *Stella Nurzhitz v. The Palestinian Authority et al.* and Civil Case 2538/00 *Irena Litvak Nurzhitz v. The Palestinian Authority et al.*.

cc.  An authentic copy of the transcript of the June 19, 2005 examination of Mohanad Jaouni in the Jerusalem District Court in Civil Case 3326/01 *Stella Nurzhitz v. The Palestinian Authority et al.* and Civil Case 2538/00 *Irena Litvak Nurzhitz v. The Palestinian Authority et al.*.

dd.  Authentic copies of all discovery requests of any kind served and/or propounded by the PLO in the Achille Lauro Proceedings.

ee.  Authentic copies of all responses, answers and/or objections served or made by the PLO to any discovery requests of any kind served on and/or propounded to the PLO in the Achille Lauro Proceedings, including without limitation authentic copies of the transcripts of any and all depositions of any officer, employee and/or representative of the PLO conducted in the Achille Lauro Proceedings.

ff.  Authentic copies of all pleadings and/or papers filed by the PLO in the Achille Lauro Proceedings relating to discovery requests of any kind served on and/or

propounded to the PLO and/or to discovery requests of any kind served and/or propounded by the PLO.

gg.  Authentic copies of the transcripts from all court hearings in the Achille Lauro Proceedings in which discovery requests of any kind served on and/or propounded to the PLO and/or to discovery requests of any kind served and/or propounded by the PLO were referred to or discussed.

hh.  Authentic copies of all court orders and decisions issued in the Achille Lauro Proceedings in which discovery requests of any kind served on and/or propounded to the PLO and/or to discovery requests of any kind served and/or propounded by the PLO were referred to or discussed.

ii.  Authentic copies of all answers, counterclaims and crossclaims filed by the PLO in the Achille Lauro Proceedings

jj.  Authentic copies of all pleadings and papers, and all exhibits thereto, filed and/or served by the PLO, by Zuhdi Labib Terzi, by Riyad H. Mansour, by Nasser Al-Kidwa and/or by Veronica Kanaan Pugh in the matter of *U.S. v. PLO*, No. 88 Civ. 1962 (ELP) (S.D.N.Y.).

kk.  Authentic copies of all pleadings and papers, and all exhibits thereto, filed and/or served by the PLO, by Riyad H. Mansour, by Ibraham Abu-Lughod, by Victor A. Ajlouny and/or by Nubar Hovsepian in the matter of *Mendelsohn v. Meese*, No. 88 Civ. 2005 (ELP) (S.D.N.Y.).

ll.  Authentic copies of all pleadings and papers, and all exhibits thereto, filed and/or served by the PLO, by the Palestine Information Office ("PIO") and by any officer, employee or representative of the PLO or PIO, in the matter of *Palestine Information Office v. Shultz*, Civ. A. No. 87-3085 (D.D.C.) (both in the federal district court and the federal court of appeals).

mm.  Authentic copies of all discovery requests of any kind served and/or propounded by the PA and/or PLO in the Bucheit Proceedings.

nn.  Authentic copies of all responses, answers and/or objections served or made by the PA and/or PLO to any discovery requests of any kind served on and/or propounded to the PA and/or PLO in the Bucheit Proceedings, including without limitation authentic copies of the transcripts of any and all depositions of any officer, employee and/or representative of the PA and/or PLO conducted in the Bucheit Proceedings.

oo.  Authentic copies of all pleadings and/or papers filed by the PA and/or PLO in the Bucheit Proceedings relating to discovery requests of any kind served on and/or propounded to the PA and/or PLO and/or to discovery requests of any kind served and/or propounded by the PA and/or PLO.

pp.   Authentic copies of the transcripts from all court hearings in the Bucheit
      Proceedings in which discovery requests of any kind served on and/or
      propounded to the PA and/or PLO and/or to discovery requests of any kind
      served and/or propounded by the PA and/or PLO were referred to or discussed.

qq.   Authentic copies of all court orders and decisions issued in the Bucheit
      Proceedings in which discovery requests of any kind served on and/or
      propounded to the PA and/or PLO and/or to discovery requests of any kind
      served and/or propounded by the PA and/or PLO were referred to or discussed.

rr.   Authentic copies of all answers, counterclaims and crossclaims filed by the PA
      and/or PLO in the Bucheit Proceedings.

ss.   All documents relating to, referring to and/or evidencing the Danish Road
      Contractors Proceedings, and all documents filed and/or served by any party to
      the Danish Road Contractors Proceedings.

tt.   All documents relating to, referring to and/or evidencing the organizational and
      institutional structures and individuals within the PLO responsible for
      monitoring and making decisions regarding the Achille Lauro Proceedings,
      regarding the Bucheit Proceedings, regarding the matter of *U.S. v. PLO*, No. 88
      Civ. 1962 (ELP) (S.D.N.Y.), regarding the matter of *Mendelsohn v. Meese*, No.
      88 Civ. 2005 (ELP) (S.D.N.Y.) and regarding the matter of *Palestine
      Information Office v. Shultz*, Civ. A. No. 87-3085 (D.D.C.) (both in the federal
      district court and the federal court of appeals).

uu.   All documents relating to, referring to and/or evidencing the organizational and
      institutional structures and individuals within the PA responsible for monitoring
      and making decisions regarding the Bucheit Proceedings and regarding the
      Danish Road Contractors Proceedings.

vv.   All documents relating to, referring to and/or evidencing any legal and/or
      arbitration proceedings, other than those explicitly referred to in this Request for
      Production, brought by or against the PA and PLO in any place outside the West
      Bank and Gaza Strip at any time prior to December 2007.

14.   **Regarding various individuals:**

a.    An authentic copy of the letter of resignation referred to by Salam Fayyad on pp.
      289-292 of the transcript of his July 28, 2010 deposition.

b.    All documents relating to, referring to and/or evidencing:

      i.    Any and all positions, titles and/or jobs held by Mohammed Dahlan in the
            PA and/or PLO between January 1, 1994 and June 6, 1996;

      ii.   Any and all positions, titles and/or jobs held by Mohammed Dahlan in the
            PA and/or PLO between March 12, 2000 and July 13, 2004;

iii. Any and all positions, titles and/or jobs held by Mohammed Dahlan in the PA and/or PLO on the date that you produce documents in response to this request;

iv. The exact time periods during which Mohammed Dahlan held the positions, titles and/or jobs described in subsections (i)-(iii) above;

v. The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Mohammed Dahlan at the times and/or during the time periods described in subsections (i)-(iv) above; and

vi. Mohammed Dahlan's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce documents in response to this request.

c. All documents relating to, referring to and/or evidencing:

i. Any and all positions, titles and/or jobs held by Jibril Rajoub in the PA and/or PLO between January 1, 1994 and June 6, 1996;

ii. Any and all positions, titles and/or jobs held by Jibril Rajoub in the PA and/or PLO between March 12, 2000 and July 13, 2004;

iii. Any and all positions, titles and/or jobs held by Jibril Rajoub in the PA and/or PLO on the date that you produce documents in response to this request;

iv. The exact time periods during which Jibril Rajoub held the positions, titles and/or jobs described in subsections (i)-(iii) above;

v. The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Jibril Rajoub at the times and/or during the time periods described in subsections (i)-(iv) above; and

vi. Jibril Rajoub's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce documents in response to this request.

d. All documents relating to, referring to and/or evidencing:

i. Any and all positions, titles and/or jobs held by Razi Jabali in the PA and/or PLO between January 1, 1994 and June 6, 1996;

ii. Any and all positions, titles and/or jobs held by Razi Jabali in the PA and/or PLO between March 12, 2000 and July 13, 2004;

29

    iii.  Any and all positions, titles and/or jobs held by Razi Jabali in the PA and/or PLO on the date that you produce documents in response to this request;

    iv.  The exact time periods during which Razi Jabali held the positions, titles and/or jobs described in subsections (i)-(iii) above;

    v.  The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Razi Jabali at the times and/or during the time periods described in subsections (i)-(iv) above; and

    vi.  Razi Jabali's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce documents in response to this request.

e.  All documents relating to, referring to and/or evidencing:

    i.  Any and all positions, titles and/or jobs held by Tewfik Tirawi in the PA and/or PLO between January 1, 1994 and June 6, 1996;

    ii.  Any and all positions, titles and/or jobs held by Tewfik Tirawi in the PA and/or PLO between March 12, 2000 and July 13, 2004;

    iii.  Any and all positions, titles and/or jobs held by Tewfik Tirawi in the PA and/or PLO on the date that you produce documents in response to this request;

    iv.  The exact time periods during which Tewfik Tirawi held the positions, titles and/or jobs described in subsections (i)-(iii) above;

    v.  The nature, purposes, responsibilities and duties of any and all positions, titles and/or jobs held by Tewfik Tirawi at the times and/or during the time periods described in subsections (i)-(iv) above; and

    vi.  Tewfik Tirawi's home and work addresses, position(s), title(s), job(s) and employer(s) on the date that you produce documents in response to this request.

f.  All documents relating to, referring to and/or evidencing:

    i.  Any and all positions, titles and/or jobs held by Amin Al-Hindi in the PA and/or PLO between January 1, 1994 and June 6, 1996;

    ii.  Any and all positions, titles and/or jobs held by Amin Al-Hindi in the PA and/or PLO between March 12, 2000 and July 13, 2004;

    iii.  The exact time periods during which Amin Al-Hindi held the positions, titles and/or jobs described in subsections (i)-(ii) above;

iv.  The nature, purposes, responsibilities and duties of any and all positions,
titles and/or jobs held by Amin Al-Hindi at the times and/or during the
time periods described in subsections (i)-(iv) above.

## GENERAL DEFINITIONS

1.      "Relate to" or "relating to" shall mean and include constituting, discussing,
mentioning, containing, embodying, reflecting, identifying, incorporating, referring to, dealing
with, or pertaining to in any way.

## SPECIFIC DEFINITIONS

1.      "PA" shall mean and refer to defendant The Palestinian Authority.

2.      "PLO" shall mean and refer to defendant The Palestine Liberation Organization.

3.      "Defendants" shall mean and refer to Defendants PA and PLO, both individually
and collectively.

4.      "Judgment" shall mean and refer to the judgment entered in this action on July 13,
2004.

5.      "2006 Judgment" shall mean and refer to the judgment entered in this action on
September 19, 2006.

6.      "The Motion" shall mean and refer to Defendants' motion to vacate the Judgment.

7.      "Israeli Proceedings" shall mean and refer to and include collectively all legal
proceedings brought by, or against, the PA and/or PLO in any Israeli court at any time.

8.      "Achille Lauro Proceedings" shall mean, refer to and include collectively all legal
proceedings in any court in the United States resulting and/or arising from the October 1985
seizure of the Italian passenger liner Achille Lauro to which the PLO was a party at any time.

9.      "Danish Road Contractors Proceedings" shall mean, refer to and include
collectively all arbitration and legal proceedings in Europe to which the Danish Road
Contractors and the PA were parties.

31

10.    "Bucheit Proceedings" shall mean, refer to and include collectively all

proceedings in the matter of *Bucheit v. PLO*, Civ. No. 00-1455GK (D.D.C.)

Dated: August 26, 2010                     Plaintiffs-Judgment Creditors,
                                           by their Attorney,

                                           David J. Strachman #4404
                                           McIntyre, Tate & Lynch LLP
                                           321 South Main Street, Suite 400
                                           Providence, RI 02903
                                           (401) 351-7700
                                           (401) 331-6095 (fax)
                                           djs@mtlesq.com


                                           Max H. Wistow #0330
                                           Wistow & Barylick
                                           61 Weybosset Street
                                           Providence, RI 02903
                                           (401) 831-2700
                                           (401) 272-9752 (fax)
                                           mw@wistbar.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 26, 2010, a true and genuine copy of the foregoing was sent by first class mail and electronic mail to Defendants' counsel of record listed below and hand delivered to Deming E. Sherman at the address below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701



33