UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| THE ESTATE OF YARON UNGAR, et al., ) | |
| Plaintiffs, ) | |
| v. ) | C.A. No. 00-105L |
| THE PALESTINIAN AUTHORITY, et al., ) | |
| Defendants. ) | |

**OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE,
TO COMPEL, AND FOR RELATED RELIEF**

Defendants The Palestinian Authority ("PA") and The Palestine Liberation Organization ("PLO") oppose the Plaintiffs' Motion to Preclude, to Compel, and for Related Relief. For the reasons set forth below, Plaintiffs are not entitled to further examination of PA Prime Minister Salam Fayyad, who sat for a close to seven-hour deposition and has answered all proper questions posed to him. To the extent that Plaintiffs felt during the deposition that certain questions were meeting improper objections, they failed to seek an appropriate and timely resolution of those issues and should not now be allowed to impose the drastic and burdensome remedy which they seek upon the Prime Minister and the Defendants.

**Introduction and Factual Background**

On June 1, 2010, this Court issued a Pre-Hearing Order setting January 18, 2011 as the hearing date for Defendants' pending Motion for Relief from Final Judgment ("Vacatur Motion") and directing the parties to complete pre-hearing discovery by November 19, 2010. Dkt. No. 489. In short order, and prior to the exchange of any information pursuant to written discovery requests, Plaintiffs noticed the deposition of Palestinian Authority Prime Minister

Salam Fayyad for a date less than three weeks hence. In response to a defense inquiry expressing concerns about abuse of the deposition process given previous experience in other cases litigated by plaintiffs' counsel's colleagues, Plaintiffs' counsel offered to conduct the hearing at a time when a Magistrate Judge in Rhode Island could be available in the event that issues were to arise. Attachment A. Despite Plaintiffs' later change in position during a July 21, 2010 telephone conference, Magistrate Judge Martin agreed to make himself available during the deposition to resolve disputes that might arise. The Prime Minister's deposition was conducted on July 28, 2010 in East Jerusalem. Consistent with the Magistrate Judge's availability and the demands of the Prime Minister's schedule of governmental activities, the deposition began at 4 p.m. East Jerusalem time, 9 a.m. Providence, Rhode Island time.

During the course of a near seven-hour deposition filled with argumentative and repetitious questioning, Plaintiffs' counsel asked a number of questions designed to discover privileged communications the Prime Minister had with diplomatic officials within the United States government and with lawyers for the PA, PLO, and in one instance the Palestinian Pension Fund for the State Administrative Employees in the Gaza Strip ("Pension Fund"). Defense counsel objected to these questions and repeatedly suggested that the parties take issues to the Magistrate Judge for resolution. Plaintiffs' counsel agreed to do so, but then made the choice to conclude the deposition without seeking the Magistrate Judge's resolution of issues and, in one instance, without posing the question to the Prime Minister and eliciting a refusal to answer. Yet, now the Plaintiffs come to the Court with claims of "prejudice" belied by the record and propose that the Court order a further deposition of the Prime Minister at a location over five-thousand miles from where the government he leads is located.

Plaintiffs' Motion reflects the continuation of a strategy to misuse the discovery process. Plaintiffs' actions are more fully briefed in Defendants' pending motions for protective orders in response to Plaintiffs' overbroad and burdensome discovery requests (Dkt. No. 526) and notice of deposition for a witness with no relevant knowledge (Dkt. No. 528) and will not be repeated here. Clearly, however, Plaintiffs are attempting to manufacture grounds to support an oft-repeated argument that the PA and PLO remain recalcitrant litigants who have "[not] turned over a new leaf." *See e.g.* Dkt. No. 487 at 1; Dkt. No. 490 at 4.

Events of the last three years demonstrate the speciousness of such an argument. When the undersigned entered this case, there were 10 other pending suits against the PA. One, *Biton v. The Palestinian Interim Self-Government Authority, et al.*, 01cv00382 (D.D.C.), was voluntarily dismissed with prejudice in December 2008. Another, *Knox v. PLO*, 03cv4466 (S.D.N.Y.), was settled after a default judgment was conditionally vacated. In *Saperstein v PA*, 04cv20225 (S.D. Fla), a default was vacated and, following extensive discovery, plaintiff has announced his intention to dismiss the case with prejudice. In *Gilmore v. Palestinian Interim Authority*, 01cv853 (D.D.C.), a default was vacated and discovery is active. In the remaining case where default was entered, *Shatsky v. Syrian Arab Republic*, 02cv2280 (D.D.C), Defendants' motion to vacate the default remains pending. Defense motions to dismiss were granted in two cases, *Mohammed v. Rajoub*, 08cv1800 (D.D.C.), and *Shafi v. PA*, 09cv006 (D.D.C.), and a defense summary judgment motion was granted in a third, *Parsons v. PA*, 07cv1847 (D.D.C.), following completion of fact discovery. Finally, *Kleiman v. PA*, 04cv1173 (D.D.C.), is in active discovery and in *Sokolow v. PLO*, 04cv397 (S.D.N.Y.), Defendants' motion to dismiss for lack of personal jurisdiction is pending following the completion of personal jurisdiction discovery. The history and status of these cases are relevant because, when the

Vacatur Motion was filed, the Prime Minister's promise to participate in good faith was the only evidence available to this Court of the Defendants' commitment to litigate.  Now the Court has before it the PA/PLO's three-year track record of defending numerous U.S. lawsuits in good faith.

I.  THE PA AND PLO CANNOT BE PROPERLY PRECLUDED FROM ASSERTING THE FOREIGN POLICY IMPLICATIONS OF THE JUDGMENT GIVEN THE LIMITED INVOCATION OF THE DIPLOMATIC PRIVILEGE AND THE ENTIRETY OF THE RECORD

Plaintiffs seek to preclude the PA and PLO from asserting that the judgment in this action has foreign policy implications because Defendants' counsel indicated the defense would invoke diplomatic privilege[1] in response to questions about conversations the Prime Minister had with United States diplomats.  In advancing their argument, however, Plaintiffs ignore a number of relevant facts.  First, after Plaintiffs' counsels question prompted an objection from defense counsel (but not an instruction not to answer), counsel engaged in an extensive discussion, at the end of which Plaintiffs' counsel chose not to pursue the line of questioning.  Second, Plaintiffs' counsel never sought the Magistrate Judge's resolution of the issue after defense counsel indicated that the proposed line of questioning would implicate diplomatic privilege.  Third, the general subject about which the Plaintiffs' claim questioning was precluded was, in fact,

---

[1] In their Motion, Plaintiffs do not take issue with the basic principle that communications with diplomatic officials and foreign leaders may be privileged and entitled to protection from discovery. *See, e.g., Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) ("Possibly because the state secrets doctrine pertains generally to national security concerns, the privilege has been viewed as both expansive and malleable.  The various harms, against which protection is sought by invocation of the privilege, include . . . disruption of diplomatic relations with foreign governments."); *Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004) ("[W]e agree with the district court that the state secrets doctrine applies because a reasonable danger exists that disclosing the information in court proceedings would harm national security interests, or would impair national defense capabilities, disclose intelligence-gathering methods or capabilities, or disrupt diplomatic relations with foreign governments."); *Sterling v. Tenet*, 416 F.3d 338, 346 (4th Cir. 2005) ("There is no question that 'information that would result in "disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments"' falls squarely within the definition of state secrets.")

4

ultimately addressed by the Prime Minister during the deposition. Finally, the PA and PLO have not relied on the substance of confidential conversations between the Prime Minister and those diplomats in support of their Motion to Vacate Default. Given these circumstances, Plaintiffs are not entitled to the relief they seek.

> A. **The Prime Minister was never instructed not to answer, and Plaintiffs' never sought the Magistrate Judge's resolution of the issue.**

As an initial matter, Plaintiffs failed to preserve any issue that is ripe for the Court's consideration. In their Memorandum, Plaintiffs excerpt a portion of counsel's exchange regarding questioning about diplomatic communications but omit other relevant portions, including sections[2] where defense counsel indicated he would consider allowing the Prime Minister to answer the limited question of whether he sought a Statement of Interest so long as it was not argued to be a waiver of diplomatic privilege:

> MR. ROCHON: The fact of a communication being made known to the Court does not waive any privilege associated with it.
>
> MR. WISTOW: I'll tell you what? Why don't we do this? If you could just let him answer this question, if it involved asking for a Statement of Interest, I'll agree that, in and of itself, that answer doesn't waive any kind of privilege.
>
> MR. ROCHON: You know, you'll be leading me down the primrose path. I either object or I don't. You mean you'll be done in this area?
>
> MR. WISTOW: I don't know. If he says, no, we didn't talk about that, then I certainly --

Tr. 58:11- 23

> MR. ROCHON: The Prime Minister is out of the room. So, look, when he communicates, it's not like he goes to the State Department only about these cases. He's there about a host of things. He's trying to get money. He's trying to get security. He's trying to -- And so none of these things are seen in isolation.

---

[2] The entire section of the deposition was attached to Plaintiffs' Memorandum as exhibit E but much of what is included in this Opposition was omitted from the body of the Memorandum itself.

>So you can't, you know, discuss what did you tell them about this because it's all part of a unified conversation.
>
>MR. WISTOW:  I didn't even ask him that.  All I said to him was, did you ask them if they would file a Statement of Interest in these cases.  That's all I asked.  That's pretty straightforward.
>
>MR. ROCHON:  If your question is that, and you're not going to claim it's a waiver of diplomatic privilege --
>
>MR. WISTOW:  I will not.
>
>MR. ROCHON:  As long as we're on my time, do you want to tell me -- he's out of the room.  Do you want to tell me where else you're going to go, and we can hash out the diplomatic issues now on my nickel?
>
>MR. WISTOW:  I'd rather not --
>
>MR. ROCHON:  All right.
>
>MR. WISTOW:  -- because I don't know where I'm going, if you haven't figured that out yet.  It's a little loosey-goosey.
>
>MR. ROCHON:  I'm offering it to you because we'll be back on your time soon.
>
>MR. WISTOW:  I guess, in fairness to you, if he says yes, he did ask them for it, I'm going to ask him did they say yes, did they say no, did they say maybe.  That's all.
>
>MR. ROCHON:  Well, then -- well, I know that's all that you -- that's what implicates diplomatic privilege.

Tr. 60:6 - 61:18.

Plaintiffs also omitted sections where Defense counsel suggested the parties take the issue to the Magistrate Judge and where Plaintiff's counsel chose to wait on making the call to the Magistrate Judge.  Indeed, in part of this discussion, Defense counsel explicitly stated that he was not going to instruct the Prime Minister not to answer in light of the Magistrate Judge's availability and urged a call for the purposes of resolving the issue:

>MR. ROCHON:  Well, we can take it to the Magistrate Judge.  That's why we have him available, so you can get a ruling on it.

Tr. 56:23-25.

6

MR. ROCHON:  I'm going to have to take this to the Magistrate Judge.  <u>I'm not going to instruct him not to answer because you're trying to set me up for some kind of sanctions if I instruct him not to answer.  I've got a Magistrate Judge available because we started so late.  That's why we have him, so I don't instruct him and have you complain about it.</u>

MR. WISTOW:  You know what I'd prefer doing, because I'd like to brief this, because this is fundamentally important.

MR. ROCHON:  We're not going to convene here again.

MR. WISTOW:  Well, I'm going to brief it.

MR. ROCHON:  We got a Magistrate Judge --

MR. WISTOW:  And then what happens -- first of all, the case was not referred to him for discovery on this.  It was not, okay?  So what happens if he rules the way you like it?  Then you take an appeal.  Or he rules, then I take an appeal, or vice versa, right?

MR. ROCHON:  If he rules --

MR. WISTOW:  If he rules in your favor, we'll take an appeal.  I guarantee it.

MR. ROCHON:  That's fine.  Then we might, in that case, over my objection, have to reconvene.  But I'm not going to set up something where we automatically have to reconvene.

MR. WISTOW:  Why don't you find out if he asked.  If he says no, he didn't ask -

MR. ROCHON:  I don't anticipate --

MR. WISTOW:  He's going to say yes?

MR. ROCHON:  I'm not going to tell you what he's going to say.  You know, I can't.

MR. WISTOW:  Why don't we do this?  Why don't we get an answer just to that question so that we can talk to the Magistrate.

MR. ROCHON:  All right.  Well, you're not going to --

MR. WISTOW:  All I'm asking is did he ever ask for a Statement of Interest.

MR. ROCHON:  I'm not going to let him answer that now on diplomatic privilege grounds.  We'll take it now.  You're setting me up to lose.  I said I'd do it if that was all you were going to --

7

>   MR. WISTOW:  See if you can get the Magistrate.  You know what I'd rather do?  You know what I'd rather do?  Let's set this question aside and let's go forward and let's get a whole list of questions to ask the Magistrate at once.  Otherwise --
>
>   MR. ROCHON:  We're fine with that.
>
>   MR. WISTOW:  -- it's going to be a disaster.

Tr. 61:20 - 63:22 (emphasis added).

Plaintiffs' counsel concluded the deposition with time remaining in his allotted seven hours, *see* Fed. R. Civ. P. 30(d)(1), yet chose not raise the issue of diplomatic privilege to the Magistrate Judge and not to re-ask the question to the Prime Minister to elicit a refusal to answer following the defense's specific disclaimer of an intent to instruct the witness not to answer the question.  Where the Plaintiffs made those strategic choices, they cannot legitimately be heard to argue that the Prime Minister "refuse[d] to enable the Ungars to test …claims be asserting a claim of 'diplomatic privilege.'"  Dkt. No. 519 at 10.  Indeed, the circumstances surrounding the posing of the question and the Plaintiffs' instant motion suggest that their goal was to create an issue rather than to truly explore the subject matter of the Prime Minister's communications with United States diplomats.

>   B.   **The Prime Minister in fact testified about what he was told regarding the United States' refusal to submit a Statement of Interest.**

Plaintiffs suggest in their Motion that they were precluded from questioning the Prime Minister about "the alleged effects of the judgment on U.S. foreign policy and the Middle East Peace Process", Dkt. no. 519 at 7, but as is clear from the portions of the deposition transcript cited above, the contested question -- whether the Prime Minister asked an unnamed U.S. State Department official about a Statement of Interest -- was much more narrow.  Moreover, the question of whether the PA and PLO wanted the United States to file a Statement of Interest in connection with this and other similar cases is not in dispute.  Indeed, the Defendants urged this

8

Court to seek the United States' submission of a Statement of Interest in this case. Dkt. No. 408 at 3. That the United States declined to file a Statement of Interest in this case and others also is not in dispute. Indeed, Defendants attached the United States' letter to Judge Marrero in *Knox v. PLO*, No. 03cv4466 (S.D.N.Y.) to their Reply in connection with the pending Motion for Relief from Default Judgment. *See*, Dkt. No. 423, exh. A (United States letter declining to file a Statement of Interest while expressing concern "about the potentially significant impact that these cases may have on the financial and political viability of the defendants.") Separate and apart from the diplomatic privilege issues implicated by the objected-to question, the subject matter of the question was already established in the record.

Moreover, questions about what the Prime Minister was told by United States officials about whether the United States would file a Statement of Interest were repeatedly asked *and answered* during the deposition. For example, the following exchange followed the question about "whether [the Prime Minister] ever learn[ed] that the United States had declined to issue a Statement of Interest in the Knox case or in any of the other districts pending against the PLO and PA":

> A. Well, I remember that there was a process. And, as I told you myself, I myself communicated on this with the Secretary of State at the time, Condoleezza Rice, seeking help. And I understood what the Statement of Interest meant -- Statement of Interest -- a term mentioned on several occasions in my discussions with US officials. Now -- and I understood, at some point -- whether in connection with this letter or some other communication I can't remember right now -- that the US did not submit, or did not want to submit, a Statement of Interest. But I also recall that it did not mean -- that representation done by the United States, it does not mean that the administration was --(Mr. Haller enters the room.)
>
> Q. I'm sorry. I didn't hear the end.
>
> A. That it did not mean that the administration was indifferent as to what was going on. In other words, I understood that -- the way I understood it was, in a formal sense of a Statement of Interest, there was not acceptance of it. There was not a submission of it. But, at the same time, there was a Statement of Interest in a generic sense. And that actually is what's borne out if you read a couple of lines

> down from where that reference which you just cited, where the letter says, At the same time, the United States remains concerned about the potential significant impact of these cases -- significant impact these cases may have on the financial and political viability of the Defendants.

Tr. 47:2-48:8.

Apparently displeased with the Prime Minister's answer, Plaintiffs' counsel moved to strike. Tr. 48:9-11. Shortly thereafter, Plaintiffs' counsel asked the same question and the following exchanged ensued:

> A. As I indicated, I'm aware that there were discussions, communications, on this matter. I was aware that there was not a straightforward Statement of Interest submitted by the US government to the Court. But I also remember being told that that statement or that communication or those communications where Statement of Interest was not filed did not mean that the administration was indifferent as to the proceedings. That's my answer.
>
> Q. Okay. I'm going to press it a little bit.
>
> A. Okay.
>
> Q. I'm really not asking you to interpret what the intent of the government was, the American government. I'm asking you only if you were aware that, on February 29, 2008, the United States said to Judge Marrero, and I quote, "The United States respectfully informs the Court that it declines to file a Statement of Interest concerning the Rule 60 issues presented by this case, but will continue to monitor this and other cases like it. Did you ever become aware of that declination?
>
> A. What I'm really trying to communicate to you, and through you to the Court, is my understanding of the nature of that communication; and, specifically, that the administration did not file a Statement of Interest in the way a Statement of Interest is technically defined. But I remember, in the context of communications, suggesting that it was not not interested in what was going on. That's basically my recollection of the exercise.
>
> Q. Mr. Fayyad, I'm going to ask you to try not to communicate with the Court, as you just suggested you're doing. Try to just answer my questions. The Court will hear my questions, will hear your answers. Under our system, I get to ask questions and, hopefully, you answer them. I'm not trying to tell half the story. You have lawyers. They can bring out what they want. Do you understand?
>
> A. I respect the system, and I am doing my best to answer your questions, sir.

10

> Q. Okay. My question is, did you ever learn that Judge Marrero was informed that the United States declined to file a Statement of Interest.
>
> MR. ROCHON: Objection.
>
> Q. Can you answer that either yes, no, or I don't remember?
>
> MR. ROCHON: Objection.
>
> Q. Can you?
>
> MR. ROCHON: You can answer the question.
>
> A. As I said, you know, I'm aware that there was activity along those lines, but I do not remember each and specific case or specific communication. But the substance of what I recall is what I told you.

Tr. 49:13 - 51:20.

Plaintiffs' counsel continued in the same vein through the portion of the transcript cited in the Plaintiffs' Motion, and received the same answers from the Prime Minister -- that he recalled learning that the United States declined to file a Statement of Interest but was not disavowing interest in the resolution of the cases. Tr. 51:19 - 55:5. In light of that extensive discussion, Plaintiffs cannot reasonably be heard to argue that they were somehow thwarted in their attempt to explore this area.

    C.    **The PA and PLO have not relied on the substance of conversations between Dr. Fayyad and United States diplomats in support of their Motion.**

Finally, Plaintiffs' argument that the PA and PLO should be precluded from asserting that the judgment in this case raises foreign policy implications is based on the fictitious premise that the PA and PLO have somehow relied upon diplomatic conversations in support of the Motion for Relief from Default Judgment. In the Vacatur Motion, and again in the Reply, the PA and PLO cited to the significant foreign policy effects that have flowed from the default judgment entered in this case. Dkt. No. 408 at 38-42; Dkt No. 423 at 23-30. In that context, Defendants referenced and attached a 2005 letter from then Finance Minister Fayyad to then-Secretary of

11

State Condoleezza Rice regarding the impact of the judgment and seeking the Secretary's assistance. They also urged this Court to seek a Statement of Interest from the United States regarding this and other litigation against the PA and PLO. Dkt. No. 408 at 41.

What the PA and PLO did <u>not</u> do in their Vacatur Motion or at any other time in this litigation, was advance or rely upon conversations between Dr. Fayyad and Dr. Rice (or between other PA or PLO officials and other United States diplomats) as evidence of the foreign policy implications of the judgment. Nor did the Defendants suggest that the United States government had indicated a position favorable to the Defendants in any such diplomatic communications. The PA and PLO have not, at any time, advanced the contents of sensitive diplomatic communications in support of their request for relief from the default judgment. Accordingly, Plaintiffs' numerous citations to cases where a party invoked a Fifth Amendment privilege to avoid being deposed or providing discovery only later to seek to defend through use of information withheld pursuant to that earlier invocation have no application here. Defendants' foreign policy implication arguments have been grounded in the ample public record of the importance of a viable and stable moderate governing body such as that of Prime Minister Fayyad during this tenuous economic and political period. That evidence is wholly independent from any diplomatic conversations between any PA or PLO representative and any United States diplomat. Plaintiffs' attempt to tether the two should be rejected.

II. THE QUESTION REGARDING WHO ASSISTED THE PRIME MINISTER IN PREPARING HIS DECLARATION HAS BEEN ANSWERED

The Plaintiffs' second complaint is that the Prime Minister was instructed not to answer a question concerning whether anyone assisted him in preparing a declaration submitted as an exhibit to the Motion for Relief from Default Judgment. Dkt. No. 519 at 11. The record makes clear that defense counsel's objection and instruction were based upon the fear (which proved

12

well-founded) that the question was the start of an effort to delve into protected communications. Tr. 115:5-6 ("Mr. Rochon: Objection.  We're going to get into privileged areas.")

To the extent that Plaintiffs' complaint is that the Prime Minister was instructed not to answer the narrow question who, if anyone, assisted his preparation of a declaration submitted in support of the Vacatur Motion, that question has now been answered in the Prime Minister's errata.  Attachment B.  *See Bay State HMO Mgmt. v. Tingley Sys.,* 152 F. Supp. 2d 95, 120-121 (D. Mass. 1995) (Fed. R. Civ. P. 30(e) allows a deponent to make changes in form or substance to a deposition transcript); *Allen & Co. v. Occidental Petroleum Corp.*, 49 F.R.D. 337, 340 (S.D.N.Y. 1970) (Rule 30(e) places no limits on the types of changes that may be made by a witness before signing the deposition.).  The Prime Minister will execute the errata under the same oath as governed the deposition, and the answer contained in the errata therefore has the same force and legal effect as a deposition answer.

Plaintiffs' Motion included the conclusory assertion that "[n]umerous potential lines of questioning having no bearing whatsoever on privilege attorney-client communications were cut short by these premature objections, lines of questioning that go directly to important issues in this case."  Dkt. No. 519 at 12.  It is difficult to imagine what legitimate, non-privileged "lines of questioning" could arise out of the simple question of whether anyone assisted the Prime Minister in preparing his declaration.  As to the contents of the declaration, the Prime Minister was asked, and answered, questions about whether he remembered signing the declaration (Tr. 114:20-115:1), whether he understood it when he signed it (Tr. 116:13-15), and answered numerous question about portions of the Declaration in response to questions that did not implicate privileged communications or seek the disclosure of attorney opinion work product.

13

*See* section III, infra.  Therefore, any further remedy should be denied as unreasonably cumulative and duplicative and unduly burdensome.  Fed. R. Civ. P. 26(b)(2)(C)(i).

III.    PLAINTIFFS' QUESTIONS SEEKING DISCLOSURE OF PRIVILEGED COMMUNICATIONS WERE IMPROPER AND THE INSTRUCTION NOT TO ANSWER WAS WARRANTED

Plaintiffs' final complaint is that the Prime Minister was instructed "not to answer questions concerning his own understanding of various positions he took in his Declaration." Dkt. No. 519 at 12.  But that assertion mischaracterizes the question that triggered the instruction not to answer.  In fact, the Prime Minister answered dozens of questions about his understanding of various provisions of the Declaration he signed in support of the Vacatur Motion.  *See* Attachment C (Tr. 114:14-225:25).  The questions he refused to answer, on counsel's instruction, asked the Prime Minister to explain the basis for a statement in a letter he signed while serving as the PA's Finance Minister claiming that certain actions "w[ere] not supported by United States law."  Tr. 116:23-117:3.  Because the questions sought to have the Prime Minister disclose attorney-client privileged communications and disclose attorney work product, the refusal to answer was legitimate.

Plaintiffs suggest that they were merely seeking "facts" known to the Prime Minister. Dkt. No. 519 at 14, *citing Thurmond v. Compaq Computer Corp*., 198 F.R.D. 475, 483 (E.D. Tex 2000).  However, the very case the Plaintiffs cite supports the invocation of the privilege in this circumstance and counsel's instruction not to answer the question.

The question posed to the Prime Minister did not merely seek facts but instead sought to have the Prime Minister identify how facts established a legal theory:

> Q.  Okay.  Now, what laws were you referring -- what was the basis for your statement that the attempts by Plaintiffs' counsel to interfere with the actions of the Palestinian government <u>was not supported by United States law</u>?  What knowledge did you have at the time?

14

> MR. ROCHON:  Mr. Prime Minister -- I didn't want to interrupt your question -- I would object and tell you that it's the same privilege, attorney-client privilege -- not with my law firm, but with counsel to the Pension Fund -- upon whose behalf the letter was being written.
>
> MR. WISTOW:  I just want it to be clear on the record what we're talking about. There's a letter, June 18, 2005, where he says that the Plaintiff's efforts to interfere was "<u>not supported by United States law</u>."
>
> MR. ROCHON:  Yes
>
> MR. WISTOW:  I'm just asking what knowledge he had with regard to that statement.

Tr. 117:6-25 (underline added.)

In *Thurmond*, the Court distinguished between communications and facts in observing that "while it is not proper to ask, 'What did you tell your lawyer about the accident,' it is quite proper to ask, 'What do you know about the accident?'"  *Thurmond*, 198 F.R.D. at 479.  But this situation presents a third variation, because here, the question was not "what do you know about the accident" but instead "what supports your legal claim that the accident was a tortious act." That is a legal conclusion and if the witness' knowledge or understanding of what supports that conclusion was derived from communications with counsel, it is protected by the attorney-client privilege.  Indeed, in *Thurmond*, the Court held that where a question sought disclosure of a lawyer-to-client communication where the substance of the communication constituted legal advice, attorney-client privilege protected that communication from disclosure.  *Id.* at 482.

In addition to seeking disclosure of an attorney-client communication, Plaintiffs' question sought to compel disclosure of the legal theories of the Pension Fund attorneys with whom the Prime Minister communicated in his capacity as Chairman of the Pension Fund.  An attorney's mental impressions and legal theories constitute core attorney opinion work product is subject to protection from disclosure.  Fed. R. Civ. P. 26(b)(3)(B); *see In re Grand Jury Subpoena*, 220 F.R.D. 130, 145 (D. Mass. 2004).  To the extent that Plaintiffs' goal was to determine the legal

basis for certain contentions, the issuance of a properly-worded interrogatory was the appropriate discovery device. *See* Fed. R. Civ. P. 33(a)(2); *SEC v. Morelli*, 143 F.R.D. 42, 47 (S.D.N.Y. 2002).

IV.     THE REMEDY SOUGHT BY THE PLAINTIFFS IS UNJUSTIFIED

For the reasons set forth above, Plaintiffs were not precluded from obtaining answers to any proper questions during the Prime Minister's July 28, 2010 deposition. Plaintiffs chose to notice the Prime Minister's deposition first, prior to the completion of written discovery. Plaintiffs chose to reject the suggestion that the parties confer about the subject areas to be covered in the deposition to resolve disputes prior to the deposition. *See* Attachment A. Plaintiffs chose not to consult the Magistrate Judge, who had made himself available throughout the deposition, to resolve issues that unsurprisingly arose when Plaintiffs sought to inquire about privileged communications. The suggestion that any need to "reconvene" the Prime Minister's deposition is due solely to Defense counsel's instructions to the witness is contradicted by the events leading up to the deposition and by Plaintiffs' counsel's actions during the deposition.

The Prime Minister's position as the head of a government would heighten the burden of the Plaintiffs' proposed remedy, even without the current challenges facing the government, which include significant domestic economic and security issues and simultaneous international peace negotiations. To pull the Prime Minister away from his governing responsibilities due to Plaintiffs' strategic choices would be unreasonable and unnecessary. This is especially true in light of the fact that Plaintiffs used all but twenty minutes[3] of their allotted seven hours during the July 28, 2010 deposition. *See*, Fed. R. Civ. P. 30(d)(1).

---

[3] That time calculation does not include much of the time devoted to arguing the privilege issues related to the disputed questions or the time taken by the Defense's examination of the Prime Minister; Defense counsel agreed to have that time not attributed to Plaintiffs. Tr. 60:1-3.

16

                                                  Respectfully submitted,

Dated:  September 15, 2010         /s/ Mark J. Rochon
                                           Mark J. Rochon (D.C. Bar #376042)
                                           Admitted *pro hac vice*
                                           Richard A. Hibey (D.C. Bar #74823)
                                           Admitted *pro hac vice*
                                           MILLER & CHEVALIER CHARTERED
                                           655 Fifteenth Street, N.W., Suite 900
                                           Washington, DC  20005-5701
                                           Tel. (202) 626-5800
                                           Fax. (202) 626-5801
                                           rhibey@milchev.com

                                           Deming E. Sherman (#1138)
                                           EDWARDS ANGELL PALMER
                                           & DODGE LLP
                                           2800 Financial Plaza
                                           Providence, Rhode Island 02903
                                           Tel. (401) 274-9200
                                           Fax. (401) 276-6611
                                           dsherman@eapdlaw.com

                                           *Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 15th day of September, 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

>David J. Strachman
>McIntyre, Tate & Lynch, LLP
>321 South Main Street, Suite 400
>Providence, RI  02903
>djs@mtlhlaw.com
>
>Max Wistow
>Wistow and Barylick Incorporated
>61 Weybosset Street
>Providence, RI 02903
>mwistow@wistbar.com
>
>*Attorneys for Plaintiffs*

/s/ Mark J. Rochon