# ATTACHMENT C

798192.1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * *

THE ESTATE OF YARON UNGAR, ET AL.,    Case No:

     Plaintiffs    00-105L

vs.

THE PALESTINIAN AUTHORITY;
ET AL.,

     Defendants

* * * * * * * * * * * * * * * * * * *

-----------------------------------------------

VIDEOTAPED RULE 30 DEPOSITION OF:
SALAM FAYYAD
EAST JERUSALEM
JULY 28, 2010

-----------------------------------------------

Videotaped Rule 30 deposition of SALAM FAYYAD, taken in

the above-entitled cause pending in the United States

District Court, District of Rhode Island, pursuant to

notice, before ISABELLE KLEBANOW, RPR, CT No. 311,

Stenographer, at the Ambassador Hotel, East Jerusalem,

on Wednesday, the 28th day of July, 2010, at 4:15 p.m.

Jerusalem time.

REPORTED BY:  ISABELLE KLEBANOW, RPR, CT NO. 311

Fayyad

## Page 114

1   this in private.
2        THE WITNESS: Yes, because I just need to
3   take this phone.
4        THE VIDEOGRAPHER: Going off the record at
5   6:37.
6        (Exhibit No. 5 marked for identification.)
7        (Short recess taken.)
8        THE VIDEOGRAPHER: Going on the record at
9   6:38.
10       MR. ROCHON: Just for the record, so it was
11  about a one-minute break.
12       MR. WISTOW: Okay.
13       MR. ROCHON: Thank you.
14       Q. I take it you're familiar with the document that
15  I just handed you, Exhibit 5?
16       A. Yes.
17       Q. And do you know what that is?
18       (Witness peruses document.)
19       A. Yes. It's a declaration that I made.
20       Q. Right. Do you remember signing it?
21       A. Just give me a second while I just --
22       (Witness peruses document.)
23       A. Yes. That's my signature on it.
24       Q. No, no. I'm not asking if it's your signature.
25  I hope it is. I'm asking if you remember signing it.

## Page 115

1        A. Yes. I remember the document. Yes.
2        Q. Okay. I take it you didn't prepare the document?
3        A. Pardon?
4        Q. Did you prepare the document?
5        MR. ROCHON: Objection. We're going to get
6   into privileged areas.
7        MR. WISTOW: How can it be privileged. All
8   I'm asking him is -- I'm looking at all the information.
9   I'm just asking who prepared it.
10       Q. I assume your lawyer prepared it?
11       MR. ROCHON: Objection. Don't answer the
12  question.
13       MR. WISTOW: Okay.
14       Q. Did you prepare this declaration?
15       A. Isn't that the same question you asked before?
16       Q. I don't think so.
17       MR. ROCHON: Counsel, the declaration speaks
18  for itself. The preparation of it --
19       MR. WISTOW: Whatever you say. Just
20  instruct him not to answer. I don't care.
21       MR. ROCHON: Because it intrudes on matters
22  of privilege, and only for that reason, I'm instructing
23  the witness not to answer.
24       MR. WISTOW: Okay. So I just want to be
25  clear. The question is did you prepare the declaration,

## Page 116

1   and he's being told not to answer, correct?
2        MR. ROCHON: But only because, counsel, I
3   know the answer, and it would implicate privilege
4   because it could not be yes or no. And you don't --
5        MR. WISTOW: Sure, it could be. It could be
6   an assistant prepared it. It doesn't --
7        First of all, there's no privilege even if
8   it was you. And second of all, saying he didn't prepare
9   it doesn't mean necessarily a lawyer did.
10       But I don't want to fight. I don't want to
11  waste time. I'll live with the instruction at this
12  point.
13       Q. All right. Did you understand the declaration
14  when you signed it?
15       A. Yes.
16       Q. Okay. I'm going to ask you some questions about
17  it. I'm going to go to page 2.
18       And you'll see, on the second line, it begins, On
19  June 18, 2005, I accordingly sent a letter to Secretary
20  of State Rice requesting her assistance in these cases
21  "consistent with the Constitution and laws of the United
22  States."
23       I emphasized in my letter that the attempt by
24  Plaintiffs' counsel to interfere with the actions of the
25  Palestinian government around the world was "not

## Page 117

1   supported by United States law and also ran counter to
2   international law and the laws of several foreign states
3   in which the PNA operates."
4        Have I read that correctly?
5        A. Yes, you have.
6        Q. Okay. Now, what laws were you referring -- what
7   was the basis for your statement that the attempts by
8   Plaintiffs' counsel to interfere with the actions of the
9   Palestinian government was not supported by United
10  States law?
11       What knowledge did you have at the time?
12       MR. ROCHON: Mr. Prime Minister -- I didn't
13  want to interrupt your question -- I would object and
14  tell you that it's the same privilege, attorney-client
15  privilege -- not with my law firm, but with counsel to
16  the Pension Fund -- upon whose behalf the letter was
17  being written.
18       MR. WISTOW: I just want it to be clear on
19  the record what we're talking about.
20       There's a letter, June 18, 2005, where he
21  says that the Plaintiffs' efforts to interfere was "not
22  supported by United States law."
23       MR. ROCHON: Yes.
24       MR. WISTOW: I'm just asking what knowledge
25  he had with regard to that statement.

Fayyad

## Page 118

1    MR. ROCHON: Okay.
2    MR. WISTOW: If you want -- I just want to
3  make that clear.
4    MR. ROCHON: I understand.
5    MR. WISTOW: If he's got any basis to
6  support the statement whatever.
7    MR. ROCHON: Because the answer would be
8  premised on advice of counsel, I'm going to instruct the
9  witness not to answer.
10    MR. WISTOW: He could say I don't know.
11    MR. ROCHON: He could say many things.
12  Because the answer is based --
13    MR. WISTOW: Okay. I accept the
14  instruction.
15    When I say I accept the instruction, I don't
16  mean that I agree with it. I mean I don't want to fight
17  about it.
18    MR. ROCHON: I understand.
19    MR. WISTOW: Okay.
20  Q. It goes on to say that it ran counter to
21  international law.
22    Did you have any knowledge at the time of what
23  international law was being referred to?
24    MR. ROCHON: Same objection. Any knowledge
25  would have been based on advice of counsel.

## Page 119

1  Q. Then it says, And the laws of several foreign
2  states in which the PNA operates.
3    Did you have any knowledge which foreign states
4  were being referred to?
5    MR. ROCHON: Same objection, and the answer
6  would be based on the advice of counsel.
7    MR. WISTOW: Okay.
8  Q. Now, you go on to say in your affidavit, I
9  further explained to Secretary Rice my understanding at
10  the time that the PNA's failure to "file an unqualified
11  appearance in answer to Plaintiffs' complaint" had
12  occurred in order to preserve our legal position both in
13  the United States and overseas with respect to potential
14  efforts by Plaintiffs to seek enforcement of the default
15  judgment in other countries.
16    Have I read that correctly?
17  A. Yes, you have.
18  Q. Okay. Now, do you know if anybody told you of
19  any risks associated with taking that legal position?
20  And I -- well, okay.
21    (Witness peruses document.)
22    MR. ROCHON: Counsel, could you show the
23  witness the full letter that you're asking him about
24  parts of it.
25    MR. WISTOW: Sure.

## Page 120

1    MR. ROCHON: Thank you.
2    MR. WISTOW: (Indicating).
3    MR. ROCHON: We should probably have it
4  marked.
5    MR. WISTOW: Well, all right.
6    MR. ROCHON: I'm not insisting.
7    MR. WISTOW: Let's not mark it now. I
8  promise you we're going to get into it and we'll mark
9  it.
10    MR. ROCHON: Thank you.
11    MR. WISTOW: Okay.
12    (Witness peruses document.)
13    MR. ROCHON: And the section that's quoted
14  there, do you mind if I note where it is, counsel, in
15  the letter?
16    MR. WISTOW: No. I don't mind.
17    MR. ROCHON: It's at the top of page 2 of
18  the letter, Mr. Prime Minister.
19    THE WITNESS: Top of page 2?
20    MR. ROCHON: Yes. That paragraph
21  (indicating).
22    (Witness peruses document.)
23  A. Okay.
24  Q. Okay. Do you have my question in mind, or would
25  you like me to repeat it?

## Page 121

1  A. You asked me if I recall if somebody told me what
2  this is about in terms of implications.
3  Q. If anybody ever told you there was any risk
4  associated with the position set forth in the letter.
5  That's what I'm asking you.
6  A. All I can tell you is I must have had good reason
7  to really include this. This is a June 18, 2005 letter,
8  so I must have been aware of that risk at the time I
9  sent that letter.
10  Q. What risk?
11  A. That you're referring to.
12  Q. What am I referring to?
13  A. In terms of why it is we acted the way we did,
14  not filing an unqualified appearance before the Court.
15  That's what I thought you asked.
16  Q. Okay. Well, I'm glad you said that because you
17  misunderstood me. It's my fault probably. I didn't ask
18  the question very well.
19    What I'm trying to find out is whether you
20  understood that any risk was associated with taking that
21  position with the Court.
22  A. Any risk?
23  Q. If anything bad could happen by taking that
24  position. That's what I'm asking.
25  A. But that's how I understood the question.

Fayyad

## Page 122

1  Q. Okay. Can you answer it?
2  A. Basically, what I said. I must have been aware
3  of that risk for me to refer to it.
4  Q. What was that risk?
5  A. As I explained to you.
6  Q. That you would be defaulted?
7  A. Yes.
8  Q. So you were aware of that risk?
9  A. Basically, I was afraid -- basically, the concern
10 that we had is that this could form a basis for
11 collection against us everywhere.
12 Q. I'm not talking about that. Slow down for a
13 second, okay?
14 A. Yes.
15 Q. You explained to her --
16 A. Yes.
17 Q. -- that -- take a look at it -- that you failed
18 to file an unqualified appearance in answer to the
19 Plaintiffs' complaints, right?
20    You told her that?
21 A. Yes. Here it is. To preserve our legal
22 position, both in the United States and overseas, with
23 respect to any potential efforts by Plaintiffs to seek
24 enforcement of the default judgment in other countries.
25    The PNA and the PLO continued to maintain that

## Page 123

1  the District Court lacked both personal jurisdiction
2  over them and subject matter jurisdiction over the
3  dispute; and according -- and, accordingly, did not file
4  an unqualified appearance in answer to the Plaintiffs.
5  Q. I understand. What I'm asking you is, you
6  understood that a possible risk of not filing an
7  unqualified answer was that you could be defaulted,
8  correct?
9  A. Yes. That's basically -- yes. I see that as a
10 risk.
11 Q. Okay. Fair enough.
12    And now, in your declaration, you say, My focus,
13 as Finance Minister for the PA, was solely on the
14 immediate financial implications of the litigation.
15    You see that?
16 A. Where?
17 Q. In your declaration, towards the end of
18 paragraph 5. Do you see that?
19 A. Toward the end -- My focus, as Finance Minister
20 for the PA, was solely on the immediate financial
21 implications of the litigation and, as noted, my role as
22 Finance Minister ended not long -- yes -- not long after
23 I sent the correspondence to Secretary Rice. Yes.
24 Q. All right. May I have the letter?
25 A. The letter? Yes (indicating).

## Page 124

1  Q. Yes. The letter that you just handed me is the
2  letter referred to in your declaration, is it not?
3  A. Yes. Yes, it is.
4     MR. WISTOW: Can we mark that. Did I give
5  you guys copies?
6     MR. ROCHON: No. You gave the Prime
7  Minister the one the court reporter will mark once I
8  stop talking.
9     (Exhibit No. 6 marked for identification.)
10 Q. Now, you left -- well, strike that.
11    Did you get an answer to the letter?
12 A. I don't remember if I got an answer to the letter
13 because, you know, I left not long after that.
14 Q. Well, this letter was sent in June of 2005. When
15 did you leave?
16 A. I believe November 2005.
17 Q. Wasn't it December of 2005?
18 A. Yes.
19 Q. Could be?
20 A. Yes. Exact date? Yes. Maybe early December
21 probably. Yes.
22 Q. Okay. So that's -- I don't know --
23 A. I mean, officially, it's like one's resignation
24 goes into effect and what have you.
25 Q. Okay. Well, how many months between the time you

## Page 125

1  sent this letter and your leaving?
2  A. I left in early December. This is June 18.
3  Five, six months.
4  Q. So you're unable to tell me whether or not you
5  got a response?
6  A. Written -- written response on this, I'm not sure
7  exists. I don't remember receiving a written response
8  to this letter.
9  Q. Okay. Did you get an oral response?
10 A. I probably did, in the sense of, you know,
11 communication that the matter is under consideration, or
12 something like that.
13 Q. Are you speculating?
14 A. In the nature of things, I am, because that's how
15 business is done usually on matters like this. It's not
16 -- and it's in line with practice.
17 Q. Yes. But what I'd like to do is -- you're under
18 oath. It's a very serious matter.
19    I'm asking you, did you have an oral discussion
20 with Condoleezza Rice about the contents of your letter.
21 A. Something to the effect of what I just said.
22 Cannot be more than that.
23 Q. I don't know what you just said, to be honest.
24 A. What I said before. Something to the effect that
25 the matter was under consideration.

Fayyad

**Page 126**

1  Q. So she did not say that to you?
2  A. Not she personally. I don't remember who
3  actually communicated this.
4  Q. Somebody did?
5  A. Yes. Somebody did.
6  Q. Where were you when they communicated this? Were
7  you in Washington?
8  A. No. You know, there are always contacts between
9  us and the United States. I don't have to be physically
10  present nor does the Secretary have to be physically
11  here.
12  Q. I'm aware there are telephones.
13  A. In addition, they have representation as well
14  here.
15  Q. But here's what I'm trying to find out, okay?
16  A. Yes.
17  Q. You wrote a letter in June. I'm trying to find
18  out if there was ever any kind of response to it,
19  whether it was oral, whether it was written.
20  Can you tell me?
21  A. I am trying to remember now.
22  Q. And if you don't remember, just say that. Please
23  don't speculate.
24  A. I'm not speculating. I'm just trying to
25  remember.

**Page 127**

1  First of all, there was no letter that I can
2  recall on this one, on this issue, other than letters
3  which had different things in them.
4  In terms of, you know, communication on the
5  substance of what this was about, I can't be a hundred
6  percent certain, but it is most unlikely, given the
7  importance of the case, that there was no, you know,
8  communication to the effect that I just told you.
9  Exactly when it happened, do I think for sure, I
10  cannot tell you.
11  Q. What you're saying is, by custom and usage --
12  A. Yes.
13  Q. -- it would be very unusual --
14  A. Yes.
15  Q. -- for the Finance Minister to write to the
16  Secretary of State of the United States and not get the
17  courtesy of a reply?
18  Is that what you're saying?
19  A. Well, you know, not necessarily in those precise
20  terms that you use. But in the way business is done
21  between governments --
22  Q. Yes?
23  A. -- you submit a letter, because there are so many
24  facts to it. And I do not know the extent to which, at
25  the time, the Secretary was aware of any of this, being

**Page 128**

1  it was important to do it in this expansive fashion at
2  the time.
3  Now, again, given the way business is done,
4  matters like this and others, there would be subsequent
5  communication in the sense of, you know, something is
6  being done about this. It's being looked at.
7  I can't really tell you for sure. I know
8  something like that must have happened.
9  Q. You expect you got some kind of reply?
10  A. But not anything more than I told you.
11  Q. You don't even remember that?
12  A. I don't.
13  Q. Maybe they said they'll take it under
14  consideration? Maybe --
15  A. Not anything more than that.
16  Q. That's the most?
17  A. Yes.
18  Q. But even that may not have happened?
19  A. You know --
20  Q. It's unlikely, but --
21  A. It's unlikely. It's unlikely. It's unlikely.
22  Q. But you can say --
23  A. It's unlikely.
24  Q. -- you'd expect to get something. But you don't
25  remember it at all?

**Page 129**

1  A. And if, for no other reason, because of, you
2  know, my own interest in it. I mean there's just no way
3  that I would not really have asked again, you know, as
4  to what happened and where things were.
5  But I, sitting here now several years later --
6  five years later -- I cannot tell you exactly.
7  Q. So you agree with me this was important to you?
8  A. Oh, it was.
9  Q. Okay. But you don't remember the follow-up? You
10  don't remember the follow-up?
11  A. It was a matter of a few months only.
12  Q. Whether it was a few months or a few years, you
13  don't remember any follow-up, correct?
14  A. In the months -- in the months that followed, and
15  while I was still in government, there was not anything
16  beyond what I told you --
17  Q. Okay.
18  A. -- you know.
19  Q. So did you speak to anybody in government before
20  you left and say, look, we need to follow up with
21  Condoleezza Rice, or something to that effect?
22  Did you do that?
23  A. You know, in the nature of -- this is something,
24  this particular -- this particular letter, as a matter
25  of fact, I remember personally handing it over to the

Fayyad

## Page 130

1  Secretary in a meeting by both sides, Palestinian and
2  American delegation, headed Condoleezza Rice. And also
3  there were several ministers in the room.
4      And, when I left, it was basically left with my
5  successor, everything that was there.
6      Q. Let me make sure I understood what you just said.
7      You said you physically handed this letter to
8  Condoleezza Rice?
9      A. I remember that. I explained it verbally; and
10 then I said, I have a letter to give you.
11     Q. Okay. And you didn't get an answer right then
12 and there, did you?
13     A. No. I did not, no.
14     Q. So -- and you don't recollect ever hearing a
15 response before you left government, correct?
16     A. I do not have exact or specific recollection of
17 that happening.
18     Q. You think, by custom and usage --
19     A. Yes.
20     Q. -- it probably happened?
21     A. Yes. But to the extent I explained to you.
22     Q. Okay. Fair enough. So, at most, somebody said,
23 We're thinking about it?
24     A. Yes.
25     Q. Okay. Now, when you left and you handed your

## Page 131

1  portfolio over to somebody, who was that you handed the
2  portfolio to?
3      A. My deputy at the time.
4      Q. What was his name?
5      A. Jihad Al-Wazir.
6      Q. What?
7      A. Jihad Al-Wazir.
8      Q. How do you spell that?
9      A. J I H A D, A L W A Z I R.
10     Q. Okay. Now --
11     A. Can I explain this so this is placed in context?
12     This was something that lasted only three months
13 or so, because, after that, there was total government
14 change and Hamas came in power.
15     Well, you know, just so you know.
16     Q. Right.
17     A. It was a period of transition, in other words.
18     Q. Mr. Fayyad, have I not displayed to you that, if
19 I want to know something, I'll ask. Haven't you figured
20 that out, with all due respect?
21     MR. WISTOW: I'll withdraw the comment.
22     Q. Mr. Fayyad, did you ask anybody to follow up with
23 Condoleezza Rice on this letter?
24     A. No. I did not specifically ask --
25     Q. Okay.

## Page 132

1      A. -- somebody to follow up on this letter to
2  Secretary Rice.
3      But, by then, you know, it was known that there
4  was an important issue to be pursued by whoever took
5  over the portfolio.
6      Q. How did you know that it was known that there was
7  an important issue to take over? How do you know that
8  this was just not a piece of paper filed in a file?
9      Did you talk to people about it?
10     MR. ROCHON: Objection. Those are three
11 questions, and you have to pick which one you want him
12 to answer.
13     MR. WISTOW: Okay.
14     Q. How do you know that anybody was aware of this
15 issue?
16     A. That is why I told you -- actually I remembered,
17 as I tried to understand basically what it is you're
18 looking for and asking about -- is that this was a
19 matter of importance to us, and not just an individual.
20     And that's why I remember handing it over in a
21 meeting, official meeting, attended by several officers
22 on both sides, as a matter of fact.
23     Q. Is this meeting when you gave it to Condoleezza
24 Rice?
25     A. Yes.

## Page 133

1      Q. I'm not talking about that.
2      A. Yes.
3      Q. I'm talking about before you left --
4      A. Yes.
5      Q. -- months later --
6      A. Yes.
7      Q. -- did you ask anybody in government, Follow up
8  with Condoleezza Rice on this, what you've said, very
9  important matter?
10     A. Yes. No. I did not specifically on this very
11 matter.
12     Q. Okay.
13     A. But, you know, it was understood this is an
14 important matter.
15     Q. How -- that's what I'm trying to find out. How
16 do you know -- who knew it was an important matter? Who
17 are the human beings you're talking about?
18     MR. ROCHON: That's the question you started
19 answering when you said he wasn't answering the
20 question.
21     Q. Who knew about this important matter?
22     A. Everybody who was in that room. Everybody -- I
23 mean --
24     Q. Who was that?
25     A. There were several ministers at the time at that

Fayyad

### Page 134

1  meeting.
2      Q.  Who?
3      A.  I don't remember for sure, but probably the
4  Minister of Foreign Affairs was there.
5      Q.  What was his name?
6      A.  The Prime Minister then was there for sure.  I
7  mean, there were several ministers attending.
8          This is something that was, by that time, you
9  know, discussed widely.  I mean it's --
10     Q.  It was a big deal?
11     A.  Yes.  It was a big deal.  Definitely, it was a
12  big deal.  For sure it was a big deal.
13     Q.  Okay.  When you came back into government --
14     A.  Yes.
15     Q.  -- did you, because it was such a big deal, try
16  to find out what happened?
17     A.  Yes.
18     Q.  What did you find out?
19     A.  I found out that, as a matter of fact, that the
20  President's office was seeing to the matter, and that
21  they were in the process of trying to find legal
22  representation.
23          And, you know, then I took over and I basically
24  carried this forward, and took -- and played an active
25  role in actually finding us legal representation to

### Page 135

1  pursue these cases.
2      Q.  I'm not talking about that.  I'm talking about,
3  you asked Condoleezza Rice to do something, right?
4      A.  Yes.
5      Q.  Okay.  Up to the time you left --
6      A.  Yes.
7      Q.  -- you don't know if you ever heard from her
8  again, right?
9          MR. ROCHON:  Objection.  Asked and answered.
10     A.  Well, as I told you --
11         MR. WISTOW:  I'm trying to put him back
12  on --
13     A.  I really don't remember.  I told you that.
14     Q.  You don't remember hearing from her.  So, at
15  best, you told me before, you were told that the whole
16  issue was under advisement.
17         Do you remember that?
18     A.  Oh, yes.  What I'm really saying to you is I do
19  not remember specific, you know, communication on this
20  matter.
21         Given the importance that we attached to this at
22  the time, it is most unlikely that I did not follow up
23  on it.  Even if I did, the customary answer would have
24  been -- most likely something given as an answer was
25  that, you know, it was something that was being

### Page 136

1  considered.
2      Q.  So you followed up?
3      A.  Yes.  Yes.
4      Q.  How did you follow up?  What did you do?
5      A.  I don't know.  Typically, generally, first thing
6  you do when you have something like this --
7      Q.  Yes?
8      A.  -- is to actually talk to the US representative
9  here.
10     Q.  To the what?
11     A.  To the US representative here.
12     Q.  In Palestine?
13     A.  The Consul General in Jerusalem, yes.
14     Q.  Did you do that?
15     A.  Well, now, I really --
16     Q.  Did you do that?
17         MR. ROCHON:  Let him finish the answer.
18     A.  I can tell you, in all likelihood, given the
19  importance of the matter, I must have done.
20     Q.  Okay.  Where were you?  In his consulate?
21     A.  Pardon?
22     Q.  Was it in his consulate?
23     A.  Or in my office, or over the phone.
24     Q.  You don't remember?
25     A.  I don't remember.

### Page 137

1      Q.  Do you remember what he said?
2          MR. ROCHON:  Counsel, you're repeating.  I'm
3  not getting upset, because you don't like it, but it's
4  been several times.  Let him finish.
5          MR. WISTOW:  Okay.
6          THE WITNESS:  Yes.
7      A.  You know, as I tried to explain --
8      Q.  Please, what did the US Consulate say?
9      A.  Let me try to really say this -- I hope the last
10  time -- in a way that is clear or adequately and
11  sufficiently understood.
12         The matter is of importance to us.  I submitted
13  this letter to the Secretary.  In all likelihood, given
14  the importance of that matter to us, I must have, at the
15  time, followed up by asking, you know, questions as to
16  where do we stand on the matter, given what was
17  involved, given the importance of the issues.
18         Typically, those communications first take place
19  through and with the US Consul General in Jerusalem.
20  This could have happened at his office, at my office,
21  his office, my office, or telephone call.  You know,
22  things like this happen all the time.
23         I mean this is in the nature of on-going concern.
24  To not have gotten a written response to a letter like
25  this which is saying, you know, we have a problem, is

Fayyad

**Page 138**

1 not out of the ordinary, to not have gotten a response
2 in writing.
3    So I think all of this is within the realm of
4 what is most likely to have happened.
5    Q. Okay. Do you have any recollection -- a real
6 memory -- of anything happening?
7    A. Memo?
8       MR. ROCHON: No, no. He didn't say memo.
9 He said memory.
10    Q. Memory.
11    A. Memory. All I'm telling you --
12    Q. Do you have any memory, sir?
13    A. What kind of question is this?
14    Q. What kind of question?
15    A. Yes.
16    Q. Do you know what memory is?
17       MR. ROCHON: Your question wasn't specific.
18 You said, Do you have any memory.
19    Q. Do you have any memory of getting a response from
20 the American Consulate? Yes or no.
21    A. I'm not, you know, with all due respect, counsel,
22 I mean I told you everything I know about this in the
23 way it must have happened.
24    This is five years ago. Try to please understand
25 my world.

**Page 139**

1    Q. Okay.
2    A. You know, here I am dealing with all kinds of
3 things, and I have been over the past three years.
4 Something that happened five years ago, in all
5 likelihood this is what has happened.
6    I've given you a scenario. I talk to the
7 Americans all the time about just about everything,
8 about all aspects of bilateral relations, on an ongoing
9 basis. That is one of them.
10    Q. Mr. Fayyad, I'm not suggesting there's anything
11 wrong if you don't remember.
12    A. Yes.
13    Q. I'm just trying to find out whether or not you do
14 remember. That's all I'm trying to find out.
15    Do you remember?
16    A. And what I'm really trying to tell you is that
17 this is something that must have happened really.
18    Q. Do you have a memory of it happening?
19    A. I cannot imagine it not having happened.
20    Q. Do you have a memory of it happening?
21    A. I'm trying, you know. What you're asking me, I
22 mean I really -- there is no other way in which I can
23 answer this question.
24    It must have happened. That's what I'm really
25 trying to tell you.

**Page 140**

1    Q. I'm going to ask you yet again.
2    Do you remember it happening, or are you saying
3 it must have happened?
4    A. It must have happened.
5    Q. But you don't remember it, is that fair? You
6 believe it happened?
7    A. Yes.
8    Q. You believe it?
9    A. Yes.
10    Q. But you don't remember it, true?
11       MR. ROCHON: Counsel, it's been asked and
12 answered.
13       MR. WISTOW: No. I never got an answer that
14 he has no memory.
15    A. I mean if it settles it if I were to say no, I
16 don't remember, I don't remember. If it settles it.
17 Thank you.
18    Q. If it's true. I don't want you to --
19    A. I know. But you're pushing me so much. You want
20 to really end this line of questioning. I'm compelled
21 to say no, I don't remember, to move on. I mean really.
22    Q. No. You're compelled to answer the truth. You
23 swore an oath.
24    A. I am trying. Honest to God, all I'm trying to do
25 is to answer most faithfully all the questions that you

**Page 141**

1 are putting to me.
2    And I am trying to provide you with some
3 contextual remarks as to what has happened to try to
4 really project it as best as I can.
5    Q. All I'm asking -- it's very simple --
6    A. Yes.
7    Q. -- is whether you have a memory of getting a
8 response from the American Consulate. That's all I'm
9 asking.
10    And you said, a moment ago --
11    A. The answer is no. Let's move on, please. And I
12 accept that as a matter of record, whatever happens,
13 just so we can move on really.
14    I feel I am being badgered here.
15    Q. I apologize if you feel that way. I feel like
16 I'm doing my job, and I intend to proceed.
17       MR. WISTOW: If you want to take a moment to
18 take a break?
19       MR. ROCHON: Can I just do this?
20       MR. WISTOW: Yes.
21       MR. ROCHON: It's maybe that there's a
22 suggestion that is being perceived that, when you say
23 somebody doesn't have a memory, that therefore it didn't
24 happen.
25       MR. WISTOW: But that's not my fault. I

Fayyad

**Page 142**

1  mean I don't -- look --
2      MR. ROCHON: If we could clear --
3      MR. WISTOW: I don't want to get into this
4  speaking thing. I don't want to get into a discussion
5  with you. I was told that he doesn't need a translator.
6  I told he's fluent in English.
7      MR. ROCHON: There's no issue with
8  translation.
9      MR. WISTOW: That's right. It's not an
10  issue. It's a common thing. I've asked this kind of
11  question hundreds, if not thousands, of times. It's
12  very symbol. Do you remember it? Not do you believe it
13  happened because that's the custom, but do you remember
14  it.
15      MR. ROCHON: But you're connecting --
16      MR. WISTOW: And you understand. Let's just
17  move on. We're wasting time. He's answered the
18  question.
19      MR. ROCHON: I don't understand, but I'll
20  move on if you wish.
21      MR. WISTOW: I don't mind if you want to
22  take him out and talk to him now. It's okay with me.
23      MR. ROCHON: I'm actually trying to talk to
24  you, but you don't want to talk to me. So let's go.
25      MR. WISTOW: Okay.

**Page 143**

1      MR. ROCHON: I don't need to talk to the
2  Prime Minister about your questions.
3      MR. WISTOW: Okay.
4      Q. Now, I want to go to your letter. Before I do
5  that, just a couple more questions about your
6  declaration.
7      A. Okay.
8      Q. You affirmatively stated --
9      A. Which page, please?
10      Q. Well, let me finish.
11      You affirmatively stated, in paragraph 12, that
12  you decided to retain new counsel for the PA and PLO.
13      Do you see that? Paragraph 12?
14      A. Paragraph 12, yes.
15      Q. Why did you decide to retain new counsel for the
16  PA and PLO?
17      A. Yes. Because of, again, two things.
18      Number one, the importance of this matter, which
19  I definitely felt.
20      And secondly, that, by that time, as I indicated
21  to you before, that there was this discussion and
22  evolution in the direction of actively defending
23  ourselves in this case, and other cases as well, which
24  required retaining lawyers, you know, to do this on our
25  behalf.

**Page 144**

1      Q. Mr. Clark couldn't defend the case?
2      A. I never met Mr. Clark. But I know that
3  Mr. Clark -- or I'm aware -- that he had a role in this
4  at the time. The position was there was no jurisdiction
5  or this was a matter of sovereign immunity.
6      And certainly, by early 2007, the view was that
7  this was definitely not going to stand, and that we
8  really needed to, you know, defend ourselves.
9      Q. Were you disappointed with his performance? Is
10  that why you discharged him?
11      A. You know, all I know is that I take matters like
12  this very seriously, lawsuits filed against us.
13      There was a position taken at the time, a case of
14  sovereign immunity. There was a judgment made at the
15  time, as it was when I was first exposed to litigation
16  against us first in the Israeli courts.
17      And my only view at that time, because that had
18  immediate bearing on our finances early on in my career,
19  the best thing to do actually was hire legal counsel to
20  really defend ourselves in those cases in our Israel.
21      Q. That was your decision?
22      A. That was my disposition.
23      Q. It was actually your decision?
24      A. Yes. I'm talking about the earlier cases in
25  Israel.

**Page 145**

1      Q. Yes. But you decided to discharge --
2      A. That was my decision.
3      Q. -- Ramsey Clark, correct?
4      A. It was my decision to have new lawyers.
5      Q. Well, to get a new lawyer means to get rid of the
6  old one?
7      A. I don't know if I had the authority to fire or
8  discharge lawyers or do something like that. What I
9  knew was we needed new counsel.
10      Q. In addition to Ramsey Clark?
11      A. Yes, for sure. I mean I did not analyze --
12      Q. What happened to Ramsey Clark?
13      A. I honestly don't know.
14      Q. You don't know?
15      A. I don't.
16      Q. You don't know if he was discharged or not?
17      A. Ramsey Clark does not represent us anymore. I
18  may have actually done something about this, but I don't
19  remember. I mean but, for sure, he's not -- he doesn't
20  represent us in these cases.
21      Q. No, no. I understand. That's why I'm asking the
22  question what happened.
23      Was he discharged?
24      A. Yes. There was -- some formal process no doubt
25  must have happened, again.

Fayyad

**Page 146**

1    Q. Again, you don't remember?

2    A. I don't remember for sure. But that is most

3    likely what has happened.

4    Q. What's most likely happened?

5    A. To have a --

6    Q. -- a formal process?

7    A. Yes, I mean in the sense of notifying him. And,

8    as a matter of fact, it may have been me who did it.

9    Q. But you don't remember?

10   A. But I don't remember for sure.

11   Q. Okay. Were you dissatisfied with him?

12   A. Well, how can you be -- I mean you never know,

13   when you're on a path of, you know, pursuing something a

14   certain way, the judgment is that this is the right

15   approach to take, it's difficult to know exactly how

16   things were going to go.

17   For sure you know, with the benefit of what we

18   knew at the time we -- there was enough support for

19   moving forward with a new strategy. I believe it was

20   definitely the right course.

21   Q. I'm asking whether or not you were dissatisfied

22   with him as a lawyer.

23   A. You know, I can't really now, you know, sit here

24   and pass judgment on, if I can say legal counsel, in

25   this matter or any other matter.

**Page 147**

1    Q. I'm not asking you to pass judgment.

2    I'm asking, in your mind at the time -- let me

3    finish -- in your mind, at the time, were you

4    dissatisfied with him?

5    MR. ROCHON: Objection, counsel, to the form

6    of the question.

7    A. Well, I guess, given what I also told you about

8    my position on the other cases, you know, I had my

9    doubts. So, therefore, I really wanted us to move

10   forward, move forward with a new strategy.

11   Q. Were you dissatisfied with him?

12   A. I can't say I was dissatisfied with the person

13   here, with the lawyer. All I can tell you is that

14   obviously was a strategy that did not work out.

15   Q. Did you consider telling him about the new

16   strategy and instructing him to go forward with the new

17   strategy?

18   A. I was not involved in the litigation early on. I

19   wasn't.

20   Q. I'm talking about the retaining of new counsel.

21   Weren't you the person who did that?

22   A. I can't tell you for sure it was.

23   Q. Weren't you the person who did that?

24   A. I can't tell you for sure it was.

25   Q. Okay.

**Page 148**

1    A. But then, you know, here we are -- I mean, the

2    way I decide things, you know, you're running a certain

3    strategy today and you have certain individuals --

4    lawyers and non-lawyers -- doing it for you, and then

5    you pursue an entirely different strategy.

6    Common sense, as far as I'm concerned, you know,

7    required that I retain services of new lawyers to pursue

8    the new strategy, not the outgoing one.

9    How can a lawyer, who was yesterday arguing on

10   our behalf a certain key defense on grounds of

11   jurisdiction so emphatically and categorically, go the

12   next day and say -- I don't know --

13   Q. So you weren't dissatisfied?

14   A. It's just a natural thing for me to do.

15   Q. So you weren't dissatisfied?

16   MR. ROCHON: Objection.

17   A. I don't think in those terms really, honestly. I

18   mean I'm a practical person. I mean we're moving on.

19   Different strategy, different lawyers.

20   THE VIDEOGRAPHER: Excuse me. I'd like to

21   change the tape.

22   MR. ROCHON: Yes. Please. Off the record.

23   THE VIDEOGRAPHER: Going off record at 7:16.

24   (Short recess taken.)

25   THE VIDEOGRAPHER: Going on record at 7:30.

**Page 149**

1    Q. Paragraph 13 of your declaration, line 4 -- well,

2    why don't you just read paragraph 13 to yourself, up to

3    and including the sentence beginning, I personally

4    commit.

5    (Witness peruses document.)

6    A. Yes. I have.

7    Q. Okay. When you say you personally commit to

8    sustain this instruction, obviously you can be voted out

9    of office at any time, yes?

10   A. Yes.

11   Q. Okay. I'm trying to find out what this means, I

12   personally commit.

13   If the instructions are changed somehow, do you

14   submit to the jurisdiction of the Federal Court in

15   Providence? Does your commitment extend to that?

16   MR. ROCHON: Objection, counsel. Three

17   questions that time. Again, just try to ask one at a

18   time.

19   MR. WISTOW: Okay.

20   Q. I'm trying to find out what I personally commit

21   means.

22   A. Okay.

23   Q. If there's a departure from this commitment, do

24   you personally submit to the jurisdiction of the court

25   in Rhode Island?

Fayyad

## Page 150

1  A. I meant for the statement to be an emphatic
2  expression of commitment that the whole system is
3  stating. When I say I personally, I meant it in that
4  way.
5  Q. I'm not clear. It says, I personally commit.
6  I'm trying to find out what happens if that commitment
7  is somehow not fulfilled.
8  Will you agree to submit to the Federal Court in
9  Providence?
10  MR. ROCHON: Objection. Mr. Prime Minister,
11  do not answer that question. It's an argument.
12  MR. WISTOW: It's not an argument. It's a
13  question. I'm asking him if he's willing to do that.
14  I'm trying to test the personal commitment. That's all.
15  MR. ROCHON: You don't want speaking
16  objections.
17  MR. WISTOW: Okay. Okay. Okay.
18  MR. ROCHON: If you clarify your question.
19  What are you asking him? You want to ask that question,
20  you want to --
21  MR. WISTOW: What does the personal
22  commitment amount to? What happens if you violate your
23  commitment?
24  MR. ROCHON: By you, counsel, you mean you
25  meaning --

## Page 151

1  MR. WISTOW: Yes.
2  MR. ROCHON: Meaning who?
3  MR. WISTOW: You. Mr. Fayyad.
4  MR. ROCHON: The Prime Minister?
5  MR. WISTOW: Yes.
6  A. You know, I mean I think there's a responsibility
7  in all of its components and stages and phases. I take
8  what I say very seriously. I'm a man of my word. And I
9  say I'm responsible and I'm committed means I'm
10  committed.
11  And so, therefore, if I act in a manner that is
12  inconsistent with that commitment, I do not know exactly
13  what will happen, but I understand liability. I mean I
14  understand I'll be liable for failing to fulfill a
15  commitment.
16  Q. You understand you will be liable?
17  A. I, you know -- let me tell you, first of all, you
18  know, my state of mind when I signed this declaration,
19  what it means. Certainly, my role, you know, knowledge
20  and involvement in the way that is described here.
21  But when I say I'm personally committed, I
22  personally commit myself to pursuing these things, I
23  certainly mean that, but I mean more than that.
24  I mean more than just a personal commitment made
25  by me. I'm doing it really in my capacity as Prime

## Page 152

1  Minister of Palestinian Authority, expecting fully well
2  the commitment to be honored by whoever proceeds me.
3  Q. What if Hamas comes into power again?
4  A. And then, if I'm sued on the basis of a
5  representation that I made here, I'd find that
6  reasonable.
7  Q. So you're saying you do feel that you would have
8  personal liability?
9  MR. ROCHON: Counsel --
10  Q. Is that what you're saying?
11  MR. ROCHON: Mr. Prime Minister, and
12  counsel, when you talk about personal liability,
13  counsel, you're -- you know you're -- I'll have to ask
14  Mr. Prime Minister -- I'll have to ask him to step out.
15  You know we need to discuss this. This is a
16  ridiculous line of inquiry. I'll ask the witness to
17  step out and we can argue about it and you can move on.
18  I don't want to argue about it in front of
19  the witness because you'll get upset.
20  So, Ms. Ferguson --
21  MR. WISTOW: No. I'm not going to get
22  upset. You know what --
23  MR. ROCHON: You're not going to get upset
24  if I tell you why it's ridiculous?
25  MR. WISTOW: Well, no. I'm getting upset

## Page 153

1  because you say it's ridiculous, okay? You can say it's
2  improper. But, you know what?
3  MR. ROCHON: Improper and --
4  MR. WISTOW: Let's just move on.
5  MR. ROCHON: Okay.
6  MR. WISTOW: I got an answer from him that I
7  like, and I'll move on.
8  MR. ROCHON: Counsel --
9  MR. WISTOW: I'll move on. I got an answer
10  and I'll move on.
11  MR. ROCHON: You move on.
12  MR. WISTOW: Okay.
13  Q. Now, the last lines of that paragraph says,
14  Moreover, it is important to the PA's role in the
15  international community to participate in the legal
16  process, even when it is process brought in the United
17  States for actions by others that occurred far from the
18  United States.
19  Do you see that? Do you see that?
20  A. It is important -- yes, I do.
21  Q. I've read that correctly?
22  A. Yes, you have.
23  Q. Okay. Now, the next line says, The importance of
24  this was not fully appreciated by the PA government, as
25  a whole, until recently.

Fayyad

| Page 154 |
|---|

1    Have I read that correctly?
2    A. You have, yes.
3    Q. First of all, when is recently? What do you mean
4    by that? You wrote this declaration.
5    A. Yes. You know, I meant actually around the time
6    when we moved to defend ourselves and took practical
7    steps toward beginning to.
8    Q. When was that?
9    A. This must have been early 2007, late 2006.
10    Q. Okay. Now, you say it was not fully appreciated
11    by the PA government as a whole. What do you mean, as a
12    whole?
13    A. I make reference here to what I had told you
14    before about differing views within the PA as to how
15    this would be approached, and the process of evolution
16    that really took us through the point of seeking to
17    defend ourselves actively.
18    Q. Who were the people that were involved in these
19    discussions?
20    A. Just about everybody.
21    Q. Just about everybody?
22    A. Yes. I mean --
23    Q. Can you help me out a little bit? What you're
24    indicating is there were a lot of people involved,
25    right?

| Page 155 |
|---|

1    A. A lot of people involved in the sense of people
2    in government, you know. Not a lot of people outside
3    the government.
4    Q. I understand, Mr. Fayyad. Who were the people in
5    government you're talking about?
6    A. Now, you know, the issue would come up from time
7    to time. Sometimes in formal settings, sometimes in
8    discussion.
9    Q. Who are the people you're talking about?
10    A. Various ministers, Cabinet officers.
11    Q. Let's name some names. President Abbas?
12    A. From time to time.
13    Q. Yes?
14    A. Yes.
15    Q. Okay.
16    A. He certainly.
17    Q. How about the --
18    MR. ROCHON: Counsel --
19    MR. WISTOW: Sorry. I didn't mean to
20    interrupt. I didn't mean to interrupt.
21    MR. ROCHON: I know. But you have to
22    control yourself and not interrupt, even if you don't
23    mean to.
24    MR. WISTOW: Okay. Well taken. Fair point.
25    Q. Continue.

| Page 156 |
|---|

1    A. I forgot where I was.
2    Q. We were talking about the members of government
3    who participated in these discussions where it was not
4    at first fully appreciated by the government as a whole.
5    We mentioned President Abbas. And,
6    unfortunately, I interrupted you while you were
7    continuing.
8    Who else?
9    A. People involved in this in terms of expressing a
10    view on, there were several of those actually.
11    Q. Who?
12    A. And when I say government here, I mean I do not
13    really necessarily mean, you know, government to be
14    technically defined to be only Cabinet officers. You
15    know, when you say United States government, for
16    example, in that sense.
17    Certainly Cabinet officers, but others as well.
18    Q. Fine. I'm willing to accept whatever you meant
19    by this. Who are the people? Tell me the names of the
20    people.
21    We got one. We got President Abbas. And
22    certainly you also, right?
23    A. Yes.
24    Q. Okay. Who else?
25    A. I don't -- you know, people within the Ministry

| Page 157 |
|---|

1    of Finance, for example.
2    Q. Which one?
3    A. People who --
4    Q. No. Which Minister of Finance?
5    A. Ministry of Finance.
6    Q. How about, can you give me the name of a human
7    being?
8    A. Deputy Minister of Finance.
9    Q. Okay.
10    A. Treasurer. Legal counsel, Ministry of Finance.
11    It's just one agency. Similarly, Ministry of Justice.
12    Q. What?
13    A. Ministry of Justice, Ministry of Foreign Affairs.
14    Q. Okay. So these were the people who did not
15    appreciate it until recently?
16    A. No, no. I didn't -- I thought I was answering a
17    different question, when you asked about who was
18    involved regardless of what, you know, position was
19    taken by whom.
20    Q. I'm asking you -- it says here, The importance of
21    this was not fully appreciated by the PA government as a
22    whole.
23    Who are the people we're talking about that
24    didn't fully appreciate it?
25    A. Oh, I was answering a different question. Thank

Fayyad

## Page 158

1  you for giving an opportunity to clarify.
2      I did not mean any of these individuals that I
3  referred as having been of the view that the case should
4  not be pursued in the way that it's being pursued right
5  now, which is to actively defend ourselves.
6      I thought I was answering a question as to who
7  may have been involved in the discussion with different
8  views and different takes, and not necessarily with the
9  same degree of depth or seriousness, if you will.
10      I mean there could be a casual comment on this by
11  someone.
12      Q. Okay. You said, and I quote yet again, The
13  importance of this was not fully appreciated by the PA
14  government as a whole.
15      A. Yes.
16      Q. You wrote that, correct?
17      A. Fine. Yes.
18      Q. You believed it?
19      A. It's in my declaration. I know it to be true.
20      Q. Okay. Now, what I'm trying to find out is what
21  human beings are you referring to.
22      A. You know, I'm referring actually not only to the
23  period of time that I was talking to you about in
24  2006-2007, because the line of questioning that took us
25  to that was really that time line.

## Page 159

1      But, historically, when the action was brought
2  against us first in the United States -- going back, I
3  believe, to 2000 -- clearly, you know, the opinion was
4  that the strategy ought to be what it was up until we
5  changed it.
6      Q. Right.
7      A. So I would say, you know, consistent with this
8  having happened, clearly, to the extent there was any
9  debate, you know, it was that.
10      Q. Right.
11      A. You know, over time, that, you know, strategy was
12  beginning to be second-guessed in the sense of whether
13  or not it was the right strategy.
14      Q. Right.
15      A. And it was in the nature of any evolutionary
16  process. I cannot tell you there was a point in time
17  when before -- it was not really a watershed here in the
18  sense of before and after. It was just an evolutionary
19  process.
20      And you would find that people thinking a certain
21  way yesterday, that way yesterday, they're thinking
22  differently today.
23      So there's not anyone I know who was always
24  against or continued to be against or anything like
25  that. It's just in the nature, if you will, of a

## Page 160

1  political process.
2      Q. Yes. But you wrote, The importance of this was
3  not fully appreciated by the PA government as a whole.
4      A. Yes.
5      Q. I'm looking for the names of any people, any
6  human beings, that you can identify as not fully
7  appreciating as you used the term. Anybody.
8      A. You know --
9      Q. Is there any human being you can identify?
10      A. No. What I can tell you is what I told you
11  about. I'm not really going to, you know, maybe
12  unfairly characterize someone as having taken a position
13  which he or she may not have taken at the time.
14      This is a statement of fact. I meant it in the
15  same way it appears here, and I still believe in it.
16      Q. Right.
17      A. There was not really uniformity of view on this,
18  clearly.
19      For the most part, the overwhelming view was
20  that, you know, those cases ought to be really dealt
21  with on the basis of, well, jurisdiction. So there was
22  that debate.
23      I do not know if there was any one individual I
24  can point to who was of that view, continued to be of
25  that view. So that's the sense in which I meant the

## Page 161

1  sentence.
2      Q. I'm not asking you who continued to be of the
3  view. I understand it evolved.
4      A. Yes.
5      Q. It started out one way and it gradually --
6      A. Yes.
7      Q. -- ended up somewhere else.
8      A. Yes.
9      Q. Right?
10      A. Yes.
11      Q. Okay. Here's what I'm doing. You're asking the
12  Federal Court to vacate --
13      A. Yes.
14      Q. -- the default judgment. Yes?
15      A. Yes.
16      Q. You understand that?
17      A. Yes, yes.
18      Q. You have put in a declaration under oath. And
19  the purpose of this declaration is what? Do you know?
20      The purpose of the declaration is in support of
21  the motion to vacate the default.
22      A. Yes.
23      Q. You know that, right?
24      A. So we give ourselves the chance to defend
25  ourselves.

Fayyad

**Page 162**

1    Q. Yes. But the purpose of this declaration is to
2   vacate the default, yes?
3    A. To be able to defend ourselves.
4    Q. I am aware that this declaration is being filed
5   in support of a motion by the PA and the PLO to vacate
6   the default, okay? For whatever purpose.
7    A. For the purpose I stated.
8    Q. You understand it's to vacate a default, yes?
9    A. To defend ourselves.
10    Q. To vacate the default?
11    A. In order to defend ourselves.
12    Q. Okay. Fine. All right. You understand that we
13   oppose that, correct?
14    A. I do.
15    Q. Okay. And do you understand that I'm trying to
16   test the meaningfulness of your declaration? Do you
17   understand that?
18    A. I take its face value.
19    Q. I want to see if you can support any of these
20   statements.
21    A. Yes.
22    Q. That's what -- do you understand that?
23    A. Fine.
24    Q. Okay. Now, I'm asking you to support the
25   statement that, The importance of this was not fully

**Page 163**

1   appreciated by the PA government as a whole.
2    And I'm asking you to name anybody -- anybody --
3   who did not fully appreciate --
4    MR. ROCHON: Counsel, do you want him to
5   support the statement or -- which of the two questions
6   do you want him to answer? You've asked him two again.
7    MR. WISTOW: Okay.
8    Q. I want you to support the statement by supplying
9   names of people.
10    MR. ROCHON: Counsel, you can't tell him how
11   to answer your questions.
12    MR. WISTOW: Here's what I'm going to do.
13   I'm just going to ask this.
14    Q. Do you know the names of anybody who did not
15   fully appreciate the importance of participating in the
16   legal process, as you've set forth here? The names of
17   anybody at any time.
18    A. I cannot really give you the names now.
19    Q. Okay. Fair enough.
20    A. I haven't finished.
21    What I can tell you is that, for a long time --
22   this is really what this sentence is supposed to mean.
23   When I say, Was not fully appreciated, in the sense of
24   my feeling that probably this change of strategy should
25   have happened sooner.

**Page 164**

1    It is in that sense that I really meant this
2   declaratory statement to be. That is what it is
3   intended to say. That's the meaning of fully
4   appreciated, in that sense. Not in the sense of a
5   certain individual against or for.
6    Q. Okay. So you don't know of any person --
7    A. No. I meant it precisely in the way I just
8   stated.
9    Q. So you don't know the name of any person that you
10   can say that person in the government did not appreciate
11   the importance of participating in -- you can't name
12   anybody.
13    Is that fair?
14    MR. ROCHON: You've got it already.
15    MR. WISTOW: I want it again.
16    Q. Is that fair?
17    A. As I said, you asked me what's the meaning of the
18   sentence.
19    MR. WISTOW: There's a reason for this.
20    A. You know, going back to your --
21    MR. WISTOW: I'll withdraw the question.
22    A. Okay.
23    Q. I want to go to your letter.
24    A. Fine.
25    MR. ROCHON: That's -- just for the record,

**Page 165**

1   that is No. 6.
2    Q. And this, indeed, is the letter referred to in
3   your declaration, is it not?
4    A. It is.
5    Q. Okay. Now, one of the things you said in your
6   declaration is your focus, when you sent this letter,
7   was as a Finance Minister.
8    A. Yes.
9    Q. Now, in the letter, you refer to some really
10   important issues, don't you?
11    A. That was the intention.
12    Q. Yes. And, for example, you point out, in the
13   very first paragraph, that you're writing for immediate
14   assistance, right?
15    A. Yes.
16    Q. Immediate meaning right away, yes?
17    A. Yes. Yes. That's what immediate means.
18    Q. Okay. And what you say there is -- in the first
19   paragraph, you're talking about, to use your words, A
20   serious obstacle to the continued effective
21   participation of the PNA --
22    That's the Palestinian Authority, right?
23    A. Yes.
24    Q. What we've been calling the PA?
25    A. Yes.

Fayyad

**Page 166**

1     Q. -- in the Middle East peace process and the PNA's
2 role as a strong and viable partner of the United States
3 of America and the government of the State of Israel in
4 that process.
5     So that's a major major concern, isn't it?
6     A. It is.
7     Q. Very important?
8     A. Yes.
9     Q. Okay. And then you go on in the second paragraph
10 and you say, Even now -- at the very end of the second
11 paragraph -- Even now, the enforcement actions being
12 taken by Plaintiffs, and the mere threat that Plaintiffs
13 may be successful, are causing substantial harm to the
14 Palestinian people and the PNA, and thereby threatening
15 the peace process itself.
16     Yes?
17     A. Correct.
18     Q. That goes beyond just money. We're talking about
19 threatening the peace process, aren't we?
20     A. Yes.
21     Q. Okay.
22     A. You want me to explain?
23     Q. No. I don't want you to explain.
24     A. But I really would want to --
25     Q. Did you believe -- did you believe that these

**Page 167**

1 enforcement actions threatened the peace process?
2     A. In the following sense --
3     Q. Go ahead.
4     A. Did you want to ask me that, or --
5     Q. No. Here's what I want to do. I want to ask the
6 questions. If your counsel wants to follow up later
7 with you, I don't have any problem.
8     A. Yes.
9     Q. I want to finish up in my allotted time, and I
10 don't want to have to file motions saying that I ask a
11 question and I get speeches. That's -- forgive me.
12     MR. ROCHON: Counsel, counsel. You ask
13 questions that invite them. So --
14     MR. WISTOW: Well, I don't think so.
15     Q. Now, you also go on to say, in the footnote on
16 page 2 --
17     A. Yes.
18     Q. -- In addition to the Ungar case, the Plaintiffs'
19 counsel -- that means the Plaintiffs' counsel in the
20 Ungar case, right?
21     A. Yes.
22     Q. -- working with parties in Israel, has filed
23 other actions in the United States seeking millions and
24 millions of dollars from, inter alia, the PNA and the
25 PLO. See, for example, Knox, et al. versus PLO.

**Page 168**

1     Now, it goes on to say, We believe that these
2 separate actions are part of a concerted effort to
3 impose crippling financial ability -- excuse me --
4 crippling financial liability on the PNA, thereby
5 undermining its ability to function as a partner in the
6 peace process.
7     Yes?
8     A. That's what it states.
9     Q. That's a very big deal, isn't it?
10     A. The whole thing is a big deal.
11     Q. Sorry?
12     A. The whole thing is a big deal, which I
13 consider --
14     Q. It goes way beyond the money. We're talking
15 about endangering the peace of the region, correct?
16     A. Yes. But money is important in this.
17     Q. Money is important. And peace is more important,
18 isn't it?
19     A. Yes. But there is a causal link between what I
20 said here and the cause and the effect. It acts through
21 the PA's capacity to continue to exist.
22     Q. You believe --
23     A. That's my view. That was my view then, and
24 continues to be my view today.
25     The PA, with this liability, you know, cannot

**Page 169**

1 function. And I regard the PA as a chief partner in
2 this political process.
3     And if the PA is disabled or otherwise unable to
4 continue to exist and function, clearly the process is
5 damaged irreparably.
6     That's what I meant. That's my view.
7     Q. I understand. I understand. I understand
8 exactly what you're saying. So this is an
9 extraordinarily important issue?
10     A. It is.
11     Q. Okay. Did you follow up on this letter?
12     MR. ROCHON: Counsel, you've asked --
13     MR. WISTOW: I'm pointing out to him now --
14 he's indicated how important this is. I want to see if,
15 with that recollection, see if his recollection is
16 refreshed now that he focuses on this.
17     A. Yes.
18     Q. Does that refresh your recollection that you
19 followed up?
20     A. I'll tell you what I told you before.
21     Q. Okay. Fair enough.
22     A. There's no question in my mind that I did. In
23 terms of specific occurrences of that --
24     Q. Okay.
25     A. -- is the stuff that I cannot really refer to

Fayyad

Page 170

1  specifically. But there is no question that it
2  happened.
3  Q. Okay. What happened?
4  A. That the follow-up happened.
5  Q. What follow-up? What did you do?
6      MR. ROCHON: Counsel --
7  A. In the sense of asking where things stood, asking
8  where things stood on this very important matter.
9      MR. ROCHON: Counsel. Redundant.
10      MR. WISTOW: He brought it up.
11      MR. ROCHON: Because you asked him to.
12      MR. WISTOW: All right. You know what?
13  We'll leave the record the way it is.
14  A. Okay. Okay.
15  Q. Did you talk to President Abbas about this very
16  serious situation, now that you see the references to
17  undermining the whole peace process?
18  A. Yes. I have on numerous occasions.
19  Q. I'm talking about this letter.
20  A. This letter? He was the President, as he is
21  today, and I'm sure I did.
22  Q. Do you recollect it?
23  A. No.
24  Q. Okay.
25  A. This has been coming up way too often -- do you

Page 171

1  recollect a specific time and place, all this and that.
2      In the same way I must have had something on a
3  week ago. I do not work, you know, that close on. You
4  ask me what it is you had on that day. I can't remember
5  in that sense.
6      But it is no natural for me to have told the
7  President on numerous occasions, you know, about this
8  case.
9  Q. About this letter?
10  A. About this letter too.
11  Q. Okay. So we'll accept that.
12  A. Okay.
13  Q. So you spoke to -- you're confident --
14  A. Yes.
15  Q. -- that you talked to President Abbas about this
16  letter?
17  A. Yes. Absolutely. Yes.
18  Q. Okay. Now, when you wrote this letter, you were
19  aware -- this is June of 2005?
20  A. Okay.
21  Q. You were aware that the First Circuit Court of
22  Appeals affirmed the judgment, correct?
23  A. Now that I see the letter again, now that I see
24  the letter again, I understand that basically this was
25  basically final.

Page 172

1  Q. Did you read this letter before you signed it?
2  A. Yes. I mean what I'm saying to you, I obviously
3  read the letter before I signed it.
4  Q. Okay.
5  A. But I did not see it before -- you asked me the
6  question, did you see this letter before this
7  deposition. I haven't -- do you see what I'm saying?
8  Q. Can we agree that, when you wrote this letter --
9  A. Yes.
10  Q. -- you knew that the First Circuit Court of
11  Appeals affirmed the judgment?
12  A. Yes.
13  Q. Yes?
14  A. Whatever is in this letter I knew, for sure.
15  Q. Do you remember this, or are you just saying?
16  A. Five years later? I'm certain I do not really
17  put my signature on something I do not believe to be
18  true.
19  Q. No doubt, none, that you knew that the First
20  Circuit had affirmed this?
21  A. The best that I could ascertain at the time. I
22  would not sign a letter that I did not believe that what
23  was in it was factual.
24  Q. Okay. So let me rephrase the question.
25      There is no doubt at all that you believed the

Page 173

1  First Circuit had affirmed it? No doubt of that?
2  A. There was no doubt, at the time I signed this
3  letter, that there was anything in it that was factually
4  incorrect.
5  Q. So you believed it all, correct?
6  A. Yes. When I signed this letter, there was
7  nothing in it that I did not regard as factually
8  correct.
9  Q. Now, did you discuss with anyone what to do now
10  that there had been an affirmance by an Appeals Court?
11  A. In terms of follow-up you mean? In terms of
12  process? What do we do?
13  Q. Yes. We have a situation --
14  A. Yes.
15  Q. -- where the peace process --
16  A. Yes.
17  Q. -- the peace process is imperiled?
18  A. Yes.
19  Q. Did you have discussions with anybody about what
20  to do?
21  A. You know, when this happened, this was, as you
22  could tell -- as you could tell from the letter, this
23  appears to have been the first time the issue was raised
24  formally with the US administration in terms of, you
25  know, this being seen as a serious problem by us, you

Fayyad

**Page 174**

1 know, trying to, you know, find a way as to how to deal
2 with this very important, very serious issue.
3     And we're talking about the second half of June
4 of 2005. Two months later I was outside of government.
5 In the interim, there's no question that this was a
6 matter that was being pursued and followed up on.
7     Now, you know, going back to when the case was
8 filed -- 2000, 2001 -- I do not recall exactly --
9   Q. 2000.
10   A. 2000. Okay. We're talking about five years up
11 to that point in time before we actually wrote the
12 letter, before we approached anyone on it.
13     And so what is a matter of few months time to
14 suggest that it was not actually being pursued or this
15 was not something that was taken seriously.
16   Q. Mr. Fayyad, I'm not suggesting anything. I'm
17 just asking questions.
18     My question was, did you discuss the situation
19 with anyone within government after you learned that the
20 First Circuit had affirmed the judgment.
21   A. No.
22   Q. What?
23   A. Like, you know, this other question that you
24 asked me before, I'm sure I did, in terms of what do we
25 do. The nature of things, what kind of discussion would

**Page 175**

1 you have against a backdrop of something like this?
2     Are we doing this right, is it really not time to
3 do something, what else can we do. You know, questions
4 like this.
5   Q. To whom?
6   A. People like I mentioned to you.
7   Q. What people?
8   A. People in government.
9   Q. What people?
10   A. Various Cabinet officers.
11   Q. Will you name them, please.
12   A. Minister of Foreign Affairs.
13   Q. What's his name?
14   A. At the time, I believe it was Nabil Sha'ath.
15   Q. You spoke to him? You remember?
16   A. I mean most likely, you know, he was there and we
17 had conversations. He was there at the meeting that
18 this letter was handed. And I had discussions with
19 various officials. Most likely he was one of them, for
20 sure.
21     The President himself for certain, on more than
22 one occasion.
23   Q. So what did you decide to do, other than write to
24 Condoleezza Rice?
25   A. Look into what it is that can be done.

**Page 176**

1   Q. What else did you do?
2   A. As I told you, you know, a process of
3 deliberation must have started then, as evidenced by the
4 fact that, in the course of the months that followed,
5 including in the course of 2006, there was, you know,
6 the beginning of definition of a new strategy as to how
7 to handle this and other cases, as evidenced by the fact
8 that, ultimately, there was, indeed, a shift in that
9 strategy.
10   Q. Okay.
11   A. Yes.
12   Q. Have you finished?
13   A. Yes.
14   Q. Okay. On June 18, 2005 --
15   A. Yes.
16   Q. -- you, at least by that point, knew the Court of
17 Appeals had affirmed the judgment, correct?
18   A. Yes.
19   Q. Can you identify any person that you spoke with,
20 after this letter was given to Condoleezza Rice, to talk
21 with them about what do we do now? Anybody.
22   A. I talked to several people, you know, including
23 lawyers, including people not necessarily in government
24 either.
25     This is such a big deal. I meant every word, you

**Page 177**

1 know, in this letter when I wrote it, when I signed that
2 letter. And I still do believe, you know, it definitely
3 reflected my state of mind at the time I signed it.
4   Q. I'm sorry?
5   A. It reflected my state of mind at the time I
6 signed it in terms of the importance in which we viewed
7 this issue. So yes, it was definitely on our mind. We
8 were trying to find a way.
9     It's not, you know -- you have to understand, I
10 do not know if the PA was sued in the United States
11 before. I mean I don't know the history.
12     This is -- you know, the whole PA is new. It's
13 not like every day something like this happened and we
14 have been in existence forever and, you know, there's a
15 book that tells you what to do in situations like this.
16     So, basically, we're trying to find our way.
17   Q. Right. So you talked to people?
18   A. Yes. I talked to people.
19   Q. Who?
20   A. People around me at the time.
21   Q. Can you identify one?
22   A. I mentioned you some. The President.
23   Q. Okay. So you asked President Abbas --
24   A. Yes. I mean --
25   Q. Let me finish.

Fayyad

**Page 178**

1    A. Yes.
2    Q. So you said you were talking with President Abbas
3    about, We got a bigger problem now. We've got a
4    judgment that was affirmed by Court of Appeals, right?
5        MR. ROCHON: Objection, counsel.
6        MR. WISTOW: Okay.
7        MR. ROCHON: The leading is -- I know I've
8    got a standing objection. And just because I'm --
9        MR. WISTOW: You do. You do.
10        MR. ROCHON: -- mentioning it now, it
11    doesn't matter. But you're going way too far.
12        MR. WISTOW: Well, I don't think so. You
13    know, thank you for trying to preserve my deposition.
14    Why don't you just let it go and these questions will be
15    stricken.
16        MR. ROCHON: I don't mind if you're aware of
17    it.
18        MR. WISTOW: Okay. I'm aware of it. I'm
19    doing it at my risk.
20    Q. So, in substance, in substance -- I'm not
21    pretending that I know the exact words -- you said to
22    President Abbas, Look, the First Circuit has affirmed
23    this judgment. We need to do something.
24        Is that a fair statement of the substance of what
25    you would have said?

**Page 179**

1    A. You know, I cannot tell you that, you know, the
2    words could have been anywhere near what you have
3    suggested in your statement by way of specificity, First
4    District Court having decided to do this, that or the
5    other thing.
6        But, you know, in substance, that this was a
7    situation that required that it be dealt with --
8    Q. Okay.
9    A. -- without, you know, getting into various
10    technical issues associated with it.
11        You know, we knew there was an issue to be dealt
12    with. And here is the President, and I had a
13    conversation with him.
14    Q. Okay. We know that you considered this to be a
15    matter of such grave importance --
16    A. Yes.
17    Q. -- threatening regional peace. Maybe world
18    peace, right?
19    A. I'm waiting for the question.
20    Q. I said, Right? I mean that was your state of
21    mind at the time?
22    A. That was my state of mind.
23    Q. So that convinces you that you would have talked
24    to President Abbas about it, correct?
25    A. Yes. That's right.

**Page 180**

1    Q. So what you're saying is that it was such a huge
2    issue, you would have done that, even though you don't
3    remember a particular discussion with him.
4        Is that fair?
5    A. Very fair.
6    Q. Okay. Do you have any idea what the result of
7    that discussion was? Any idea?
8    A. It often happens.
9    Q. I'm sorry?
10    A. Oftentimes it happens that, regardless how
11    important issues are -- including a political matter --
12    that those discussions would take place and ideas are
13    put forward without conclusion in any given session,
14    say, when they should discuss as to exactly, you know,
15    what was going to happen afterwards.
16        And that is -- I am really trying to project to
17    you as close to the way I believed it happen as it did.
18    You know, over time, there were discussions. All I know
19    is we, in the nature of things, ended up on this new
20    path.
21    Q. Sometime in 2007?
22    A. Yes. Or late 2006, early 2007. That's when I
23    really got involved in this again.
24    Q. Yes?
25    A. Yes.

**Page 181**

1    Q. So we're talking about a period of almost three
2    years?
3    A. Little less. Anyway, if you take June 2007 as
4    starting point --
5        MR. ROCHON: Excuse me.
6    Q. No. Take --
7    A. June 2007. I'm sorry. June 2005.
8    Q. No.
9    A. If you take June 2005 as --
10    Q. No. We'll take March 31, 2005.
11        Well, let me ask you this. When did you learn
12    about the decision of March 31?
13    A. It must have been, you know, during that time
14    period, between the time I wrote the letter and the time
15    it happened.
16    Q. Well, I know that.
17    A. I mean this is -- we're talking about a couple of
18    months here between the time, you know --
19    Q. Do you remember learning of it?
20    A. Obviously. That's why --
21    Q. Do you remember learning -- in other words, did
22    you get a phone call where you were shocked?
23        Can you remember anything about your reaction
24    when you learned about it?
25        MR. ROCHON: Counsel, four questions.

46 (Pages 178 to 181)

Fayyad

| Page 182 | Page 184 |
|---|---|

**Page 182**

1  MR. WISTOW: All right. Fine. I'll take
2  the risk.
3  A. No, sir. I don't remember.
4  MR. ROCHON: Counsel, we'll move on. We
5  don't have to take the risk. He actually gets to get
6  just one at a time even if you're willing to take the
7  risk.
8  MR. WISTOW: Okay. I'll do it one at a
9  time. I'll do it one at time.
10  Q. Do you remember your reaction when you learned of
11  the fact that an Appeals Court has sustained this
12  judgment?
13  A. You know, I do not know exactly how I reacted.
14  All I know is that I viewed this -- and I continue to
15  view it -- as a very serious matter.
16  Q. Okay. Other than President --
17  A. I am this way.
18  Q. You're what?
19  A. I am this way.
20  Q. What way?
21  A. You know, I'm just --I do not just jump up and
22  down whenever something happens, however important it
23  is.
24  I took it. I understood there was an issue to be
25  dealt with, took that position, and since then, I've

**Page 183**

1  been working on it.
2  Q. Okay. When was the first time --
3  A. Except for that time period when I wasn't in the
4  government.
5  Q. Okay. When was the first time it was dealt with
6  after you wrote this letter?
7  A. At various discussions leading to the time when
8  we adopted, eventually, this new strategy.
9  Q. When was any action taken to implement the new
10  strategy?
11  A. You know, I can't tell you. There was a period
12  of time subsequently when the PA was vigorously seeking
13  legal representation on this matter, without much
14  success, in the course of 2006.
15  This came to my attention after I rejoined the
16  government in March of 2007.
17  Q. Okay. You're telling me now the PA was trying to
18  get --
19  A. Yes.
20  Q. -- new lawyers in 2006?
21  A. Yes. Yes.
22  Q. Couldn't find anybody?
23  A. I understand that they were having difficulties.
24  Q. Who did they contact?
25  A. I don't know.

**Page 184**

1  Q. Who told you this?
2  A. You know, people who were handling this at the
3  time. Probably the head of the President's bureau.
4  Q. What's his name?
5  A. At the time, Rafiq Al-Husseini.
6  Q. What?
7  A. Rafiq Al-Husseini.
8  Q. Can you spell that?
9  A. R A F I Q. That's his first name. Al-Husseini.
10  A L - H U S S E I N I.
11  Q. Okay. And where is he now?
12  A. He's not in the office anymore.
13  Q. Where is he?
14  A. I don't know if he's in the country now as we
15  speak.
16  Q. Okay. So are you telling me that this guy,
17  Husseini -- am I pronouncing it right?
18  A. Yes.
19  Q. -- he told you they were trying to find lawyers
20  in 2006?
21  A. They were -- you know --
22  Q. Did he tell you that?
23  A. If you'd just give me a second to try to answer.
24  Q. Okay.
25  A. All I know is that he was the President's office

**Page 185**

1  director at the time, and he had some people work for
2  him who were trying to help find legal representation in
3  the United States at the time.
4  Q. He told you that?
5  A. I can't tell you for sure if he did himself tell
6  me that, but I learned that that was actually what was
7  happening.
8  Q. When did you learn that?
9  A. In early 2007, around the time I joined the
10  government, because I know that I personally was seized
11  with this immediately after I joined the government.
12  And I know that, as early as April, a little
13  about a month after the formation of the new government,
14  you know, we had legal representation.
15  Q. So you tried to find out what had gone on
16  before --
17  A. Yes.
18  Q. -- correct? And you found out that really
19  nothing --
20  A. Not quite nothing.
21  Q. All right. I'll withdraw that. Let me try it
22  again.
23  A. Yes.
24  Q. Let's focus on the other lawyers that --
25  A. Yes.

Fayyad

Page 186

1    Q. -- were contacted. Husseini told you that other
2    lawyers had been contacted and refused the case?
3        Is that what he said?
4    A. I do not know if Rafiq Al-Husseini himself told
5    me this.
6        All I know is that he, and people working for
7    him, were in the process of finding legal representation
8    in the United States in connection with these cases in
9    the course of 2006.
10        Now, exactly when in 2006 I cannot tell you, but
11    I know -- all I know is that I'm aware of the fact that
12    the PA was actively seeking legal representation within
13    that time frame.
14    Q. How do you know that?
15    A. It's not exactly true that nothing was happening.
16    Q. How do you know that?
17    A. I became Finance Minister again.
18    Q. I know you had to know as Finance Minister.
19    A. Yes.
20    Q. You either saw a piece of paper or somebody told
21    you, right?
22    A. Yes. Something -- I don't know if somebody gave
23    me a piece of paper. Somebody must have told me this.
24    I asked because, you know, it's something that I felt we
25    really need to deal with.

Page 187

1        You know, in my position as Minister of Finance
2    then, it's something that really we were interested in.
3    And you ask about it and somebody tells you. It doesn't
4    really matter.
5        I ended up leading the effort actually to find
6    legal representation for us. I did it against the
7    backdrop of knowing there was an effort by the PA to do
8    so, and I just continued with it.
9    Q. Okay. Did you find out any details about the
10    effort? Anything?
11    A. That it was serious and it was being made.
12    Q. But did you find out any details whatever? For
13    example, was one law firm contacted? Two? Three?
14    Five? Ten?
15    A. No. What I recall about it is that there was a
16    serious attempt made at finding legal representation,
17    without much success.
18    Q. Okay. How do you know it was serious?
19    A. Well, in the way, you know, this issue was talked
20    about.
21    Q. Well, what did they do to find legal counsel?
22    You said it was serious.
23    A. They must have -- I mean I don't know exactly
24    what they did.
25        All I know is that, given basically the manner in

Page 188

1    which I felt they were dealing with it, you know, when I
2    took over as Minister of Finance again, and the
3    seriousness with which they were talking to me about
4    it -- I mean, for example, somebody like
5    Mr. Al-Husseini -- I figured that this was for sure that
6    they were really serious about this.
7        And it is just that that they got to that point
8    in time having not succeeded in finding suitable legal
9    representation. That's all.
10    Q. Did you ask him what efforts they made?
11    A. No. I don't remember, you know, if I asked or
12    they told me specifically what they did.
13        But I got the distinct sense that they were
14    really serious about. They were really desperate. They
15    really wanted to do that.
16    Q. And did you get a distinct sense of how long they
17    had been trying?
18    A. I'm guessing now. I mean I just don't know for
19    sure. But it cannot be a matter of just a few weeks, in
20    the way that I now remember it.
21        Probably more like a few months.
22    Q. Maybe a few months? Maybe a month or two? You
23    don't know, do you?
24    A. I really don't know for sure.
25    Q. All right. And you don't know who's telling you

Page 189

1    this, correct?
2    A. Most likely --
3    Q. Is it -- is that correct?
4    A. Most likely Husseini. Most likely.
5    Q. But you don't remember it?
6    A. I don't remember for sure.
7    Q. Okay. Now, do you remember who, if anybody, told
8    Husseini to find new lawyers? It wasn't you, right?
9    A. No. I wasn't in the government at the time.
10    Q. Right. So it wasn't you?
11    A. No.
12    Q. Who was it who told Husseini to do it?
13    A. It was probably the President.
14    Q. It probably was --
15    A. Probably. Probably. He worked for the
16    President.
17    Q. So if I wanted to know the answer, I'd have to
18    ask President Abbas?
19    A. I could ask him for you. But I suppose, you
20    know, that Rafiq would not have done it on his own. I
21    mean he was the Director of the President's office.
22    Q. Well, what was the guy's title? Husseini?
23    A. Director of the President's office.
24    Q. Okay. Could he have gotten instructions from the
25    Finance Minister at the time?

48 (Pages 186 to 189)

Fayyad

**Page 190**

1    A. You know, the Director of the President's office
2    does not -- I wish he did -- take instructions from the
3    Minister of Finance.
4    Q. So what you're telling me is this was somebody
5    who really would not respond to orders from you?
6    A. He doesn't work for the Minister of Finance. He
7    wouldn't. We talked. We talked.
8    Q. So you're telling me --
9    A. There is no line of authority between the
10   Minister of Finance and the Director of the President's
11   office.
12   Q. So if Husseini did this, it would be on
13   instructions of Abbas?
14   A. Probably.
15   Q. Okay. So Abbas would know when and where?
16   A. You know --
17   Q. Well, maybe he doesn't remember either. But the
18   only way we'd know is to ask him. All right.
19   A. I don't know if --
20   MR. ROCHON: There's no question pending,
21   Mr. Prime Minister.
22   THE WITNESS: Pardon?
23   MR. ROCHON: There's no question pending.
24   THE WITNESS: Okay.
25   Q. How hard was it for you to find a lawyer? What

**Page 191**

1    did you have to do?
2    A. Basically, I worked with these guys.
3    Q. With what?
4    A. With the people I mentioned to you.
5    Q. What people?
6    A. Rafiq Al-Husseini and his team, in terms of the
7    search that they had made.
8    And I remember, you know, taking a trip to the
9    United States, in April of 2007, when we had discussions
10   with lawyers whom we ended up retaining.
11   Q. Now, you became -- you came back into government
12   when?
13   A. March 2007.
14   Q. Okay. And so this conversation with Husseini --
15   if that's who it was -- had to be between March 2007 and
16   April of 2007, correct?
17   A. Between March 2007?
18   Q. Yes. And April?
19   A. April of 2007?
20   Q. Yes.
21   A. What about that?
22   Q. The conversation, if any, with Husseini had to be
23   in that period, correct?
24   A. Yes. Probably right. Fair guess, yes. Maybe
25   before because -- let me really backtrack a little bit.

**Page 192**

1    It took a while to really put this government
2    together, the one that I joined actually in March.
3    There was a lot of discussion on it, and it became known
4    well before it actually happened I was going to be
5    rejoining it as Minister of Finance.
6    So during that period before the formation of the
7    government, it is conceivable that this conversation
8    took place before, before March actually.
9    Q. Okay. And as we said before --
10   A. Yes.
11   Q. -- even before putting the government together,
12   you were mindful this was a very important issue?
13   A. Oh, yes. Yes.
14   Q. Okay. So it would have been important to you to
15   know precisely what had taken place up to then, wouldn't
16   it?
17   A. Yes, yes.
18   Q. Okay. And you've told me everything you can
19   recollect at this point, correct?
20   A. As best as I can.
21   Q. Okay. Now, when you were Finance Minister and
22   wrote the letter to Condoleezza Rice --
23   A. Yes.
24   Q. -- you determined -- I shouldn't say you
25   determined.

**Page 193**

1    You knew, at the time that you wrote it, that the
2    case had been lost in the Court of Appeals, right?
3    MR. ROCHON: Counsel. Four times.
4    MR. WISTOW: I'm trying to bring it -- it's
5    preliminary to where we're going. Okay?
6    Q. You knew that?
7    A. I must have.
8    Q. Yes. All right.
9    Did you -- do you remember anything about an
10   attempt to go to the United States Supreme Court, in the
11   period before you left government?
12   A. That could have come up. I can't be sure right
13   now, but it could have come up.
14   Q. I understand it could have. Do you remember
15   anything about it?
16   A. If it did -- see, I'm trying to remember, piece
17   things together now, because I know that, during that
18   period of time, there was an attempt at collecting or
19   opposing that judgment by, as a matter of fact, taking
20   remedy in Israel.
21   And maybe, in the course of that period -- I
22   really do not know for sure now. I mean there were lots
23   of things, lots of developments -- that issue came up.
24   But I can't really be sure now. I cannot really
25   tell you I remember this specifically.

Fayyad

**Page 194**

1     Q. Okay. Bottom line is maybe you knew about the
2  possible appeal to the Supreme Court, maybe not.
3        Is that what we're saying?
4     A. Or thinking about it. I do not know. Thinking
5  about going to Supreme Court. Whether or not that
6  actually happened, I do not know.
7     Q. Did you ever authorize anybody to do that?
8     A. I don't recall.
9     Q. Okay. I'm going to talk my lessons from
10 Mr. Rochon.
11       MR. ROCHON: Go off the record for a bit?
12       MR. WISTOW: Yes.
13       THE VIDEOGRAPHER: Going off the record at
14 8:18.
15       (Short recess taken.)
16       THE VIDEOGRAPHER: Going on record at 8:27.
17    Q. I want to explore with you a little more the
18 letter that you wrote to Condoleezza Rice on June 18,
19 2005.
20    A. Okay.
21    Q. Now, you indicated to Ms. Rice that the
22 Plaintiffs in the Ungar case were sending out misleading
23 notices?
24       MR. ROCHON: Do you have a page first?
25       MR. WISTOW: Yes. Page 3.

**Page 196**

1     Q. Okay. So what you believed was happening is the
2  Plaintiffs were using the judgment they obtained in
3  court improperly, correct?
4     A. Can you say this again. I was looking here.
5  Yes.
6     Q. What you were trying to tell Condoleezza Rice --
7     A. Yes.
8     Q. -- is that you believed that the Plaintiffs had
9  obtained an injunction from the Court and were using it
10 improperly, correct?
11    A. That -- yes. I mean, basically, in the sense of
12 it referring to entities that are independent of the PA
13 or the PLO, that I felt then -- and I feel now --
14 basically that, you know, that the enforcement action
15 that was being pursued by the Plaintiffs exceeded what
16 the remedy would be in terms of, you know, where to
17 collect and what is collectible.
18    Q. Right.
19    A. Yes. Yes.
20    Q. I think we're saying the same thing.
21    A. Okay. That's fine.
22    Q. That they had gone to court, obtained an
23 injunction from the court --
24    A. Yes.
25    Q. -- which was specific. And, in your mind, the

**Page 195**

1     Q. The second paragraph from the bottom. Do you see
2  that?
3     A. Second paragraph?
4     Q. Yes.
5        MR. ROCHON: Do you mean -- that's the one
6  that starts, As a result of receiving?
7        MR. WISTOW: No. In addition.
8        THE WITNESS: In addition.
9        (Witness peruses document.)
10    Q. Do you see that?
11    A. Yes. I see it, yes.
12    Q. Okay. Do you understand what that refers to?
13    A. Yes.
14    Q. Could you explain it to me?
15    A. In the sense of, for example, entities like the
16 Pension Fund and the PMA.
17    Q. And, in fact, if you go to the top of the page --
18    A. Yes.
19    Q. -- the letter says, Despite the specificity of
20 the District Court's orders, however, Plaintiffs'
21 counsel prepared a Notice of Injunction (the Notice) in
22 which they broadly assert that the injunction -- and it
23 goes on to quote the Notice.
24       Do you see that?
25    A. I see it, yes.

**Page 197**

1  Plaintiffs were using it in a much too broad way --
2     A. Yes.
3     Q. -- and were sending it out naming all kinds of
4  inappropriate entities?
5     A. That's what I meant to say.
6     Q. Right. Okay.
7     A. But, if I may, in the sense that I have just
8  described, in the sense of those entities being
9  independent --
10    Q. Yes?
11    A. -- of the PA and the PLO. So, therefore, my view
12 is that they should not be, you know, pursued in
13 collection.
14    Q. Yes. I understand.
15    A. Okay.
16    Q. You thought -- do you -- are you familiar with
17 the English expression "fast one"? You felt that the
18 Plaintiffs were pulling a "fast one"?
19       If you're not familiar with the expression, they
20 were doing something they shouldn't be doing, right?
21    A. That's a better way. I'd rather put it that way.
22    Q. Okay. It was unfair, inappropriate, and misusing
23 the injunction?
24    A. Going beyond, you know, what could be pursued, is
25 how I'd put it.

Fayyad

Page 198

1    Q. They were misusing the injunction, in your mind?
2        MR. ROCHON: Counsel. Objection. He's
3    answered.
4        MR. WISTOW: Can I get a yes?
5        MR. ROCHON: You can't tell him what to say.
6        MR. WISTOW: Can I get a no? Can I get an I
7    don't know?
8        MR. ROCHON: You got an answer.
9    Q. Did you believe they were misusing the
10   injunction?
11   A. All I know is that they were acting in a manner
12   that went beyond what would be pursued in this action.
13   I'll just say this the same way every time I've asked.
14   Q. Okay.
15   A. That's just the way I go about doing things. I
16   just don't tend to really add top much color one way or
17   the other.
18   Q. Okay. They were doing something which you
19   believed they had no right to do. Is that fair?
20       MR. ROCHON: Counsel, you --
21       MR. WISTOW: No, no. I do it my way. I
22   don't know what they do in Washington. This is how I've
23   been making a living for a while, and I'm going to
24   persist.
25       MR. ROCHON: I understand. But you're

Page 199

1    trying to make him say a particular word that you want.
2        MR. WISTOW: That's exactly what I'm trying
3    to do. That's exactly right. He's an adverse witness.
4        MR. ROCHON: He's not. But, counsel --
5        MR. WISTOW: I didn't say hostile. I said
6    adverse. I have a right to try to do it the way I'd
7    like to if I can possibly.
8        MR. ROCHON: Go ahead.
9    Q. Can we agree to this, that you felt that they
10   were using the injunction beyond what they were entitled
11   to do with it.
12       Is that fair?
13   A. I felt that they were going beyond what could
14   have been pursued.
15   Q. With the injunction?
16   A. Yes.
17   Q. Okay. Did you consider having your lawyers go
18   back to the District Court in Rhode Island and say
19   they're abusing the court's injunction?
20       Did you think about that?
21       MR. ROCHON: Objection. Assumes a fact not
22   in evidence.
23       MR. WISTOW: What?
24       MR. ROCHON: His lawyers. You haven't
25   established --

Page 200

1        MR. WISTOW: Okay.
2    Q. The PLO and the PA's lawyers, did you think of
3    going back to the District Court in Rhode Island and
4    making it aware of this perceived abuse of its
5    injunction?
6        Did you?
7    A. You know, at the time, you know, those cases were
8    not being pursued in the same way that they are being
9    pursued now.
10       As I told you, this letter essentially was a
11   beginning of our formal involvement in the process in
12   the sense of really trying to find a way as to how to
13   best deal with it.
14   Q. Have you finished your answer?
15   A. I have.
16   Q. Okay. You wrote this letter?
17   A. Yes.
18   Q. I'm asking you, did you consider going back to
19   the District Court and saying that its injunction was
20   being misused.
21       That's all I'm asking.
22   A. I don't know if I considered a certain, you know,
23   course of action, considered specifically or precisely
24   what to do, as much as I believe I was in the mode of
25   really trying to find out how best to deal with, you

Page 201

1    know, this and other cases.
2    Q. Well, didn't you talk to your lawyers at the time
3    about this?
4    A. I was not really in direct communication with the
5    lawyers on this or other cases.
6    Q. But you could have been?
7    A. You know, the issue, as I told you, in this
8    particular case became one of immediate relevance to me,
9    in my capacity as Minister of Finance, only after
10   essentially, effectively, enforcement action began in
11   ways that involved freezing assets and other aspects of
12   actions taken in a manner that very much affected the
13   way we did business.
14       And so, therefore, you know, just really
15   basically trying to find out -- find a way as to how
16   best to deal with this.
17       I cannot tell you exactly what sort of measures,
18   you know, are contemplated, are considered, actions that
19   we thought we should take, other than, at the time,
20   trying to really find a way, you know, considering the
21   line of defense that was adopted as strategy by the
22   PA/PLO's lawyers in the previous period.
23       That's all.
24   Q. Okay. We've already established that this was
25   not only a matter of a big financial problem, but

Fayyad

Page 202

1  threatened regional -- perhaps world -- peace.
2      We've already established that, have we not?
3      A. Because it was a big financial problem. That's
4  what I would add. Because it was a big financial
5  problem, a very serious financial problem. That's the
6  causal link.
7      Q. Okay.
8      A. That's the channel of influence, if you will.
9      Q. All right. But you were saying that, because of
10  this, the Palestinian government could fall down --
11      A. Yes.
12      Q. -- collapse, which would threaten regional and
13  world peace.
14      Yes? Didn't you say that?
15      A. I said that, and I --
16      Q. Did you believe it?
17      A. I did.
18      Q. Okay. Now, there's more financial problems being
19  caused by this injunction, correct?
20      A. What do you mean?
21      Q. You're telling Condoleezza Rice about the
22  problems with this injunction, aren't you?
23      A. Yes, I am.
24      Q. Okay.
25      A. Yes.

Page 203

1      Q. So that injunction is also affecting the
2  finances, isn't it?
3      A. Of course.
4      Q. Okay.
5      A. In the sense of it having led to, resulted in,
6  freezing of our assets.
7      Q. Exactly.
8      A. Definitely.
9      Q. Exactly. Threatening the financial collapse of
10  the PA. Yes?
11      A. I don't know. Grossly undermining the PA's
12  capacity to function. That was how I would put it.
13      Q. Well, let's see how you put it.
14      If Plaintiffs' efforts prove successful, they
15  could completely undermine the PNA's ability to continue
16  to operate as a functioning government.
17      Correct?
18      A. Amazing. I mean I just said to you now what I
19  said in the letter, and really I did not look at the
20  sentence now.
21      Q. Okay. Because you really believe this?
22      A. That's my state of mind.
23      Q. Right. Your state of mind was this could cause
24  the -- effectively the collapse of the PNA, correct?
25      MR. ROCHON: Counsel, you've asked it a

Page 204

1  dozen times.
2      MR. WISTOW: I'd like to get it all in one
3  place, kind of bookend it.
4      I'm sorry I'm amusing you.
5      A. What I said --
6      Q. Can you please --
7      A. What I said --
8      Q. Yes.
9      A. What I said was it threatened to grossly
10  undermine the capacity of the PA to function. That's
11  what I just told you now.
12      Q. To operate as a functioning government?
13      A. And what you actually recited from the letter,
14  which I wrote in June of 2005 in English, is exactly
15  identical then to what I just said to you right now.
16      Q. I accept that.
17      A. That impresses me.
18      Q. I accept that. I salute you. I salute you, sir.
19      A. Thank you.
20      Q. I want to take it a step further.
21      A. Okay.
22      Q. So with this threat, did you consider --
23      A. Yes.
24      Q. -- going to the Rhode Island court and saying
25  they're abusing the injunction?

Page 205

1      Can you answer that?
2      A. I think I did.
3      Q. I don't think you did, with all due respect.
4      A. I told you, you know, we were at the time -- we
5  had not, at the time, gotten to the point of actively
6  pursuing those cases in the sense of defending ourselves
7  against every motion or injunction.
8      It was the over-all strategy. It was just
9  basically something that had just happened in the sense
10  of this ruling, this judgment, if you will, and the
11  entering of final judgment of a certain amount, freezing
12  of assets.
13      And so, basically, you ask what is it that got
14  you there in the first instance. The inadequacy of the
15  defense on the grounds of jurisdiction or sovereign
16  immunity, that's what we were looking at the time, or
17  that's what I recall was on my mind, not that particular
18  injunction.
19      In other words, you know, what we were doing then
20  was we were taking it step by step, action by action,
21  motion by motion. It was just a different paradigm
22  altogether.
23      You know, the lawyers showed up and said, Well,
24  no jurisdiction. And so, basically, that's just the way
25  it was.

Fayyad

## Page 206

1   Q. But you had lost that in the Court of Appeals?
2   A. I know. We were just --
3      MR. ROCHON: Counsel.
4   A. We were just in the midst of trying to deal with
5   it. That's basically what [I'm am trying to talk to you
6   about.
7   Q. This is June 2005?
8   A. It is June of 2005, yes.
9   Q. Now, in June of 2005, you have a situation that
10  you claimed to Condoleezza Rice is threatening to
11  completely undermine the PNA's ability to continue to
12  operate as a functioning government?
13  A. Yes, yes.
14  Q. Correct?
15  A. Correct.
16  Q. And you really believed that?
17  A. I did.
18  Q. Okay. Whatever else you were doing, did you give
19  any consideration whatever to going back to Judge
20  Lagueux and explaining to him that they were misusing
21  the injunction?
22     Did you consider it?
23  A. You know, I never said -- and I'm not here to
24  suggest -- that I'm actually, or I ever, micro-managed
25  this process in the sense of me, you know, deciding

## Page 207

1   every step of this litigation. That's what we have
2   lawyers for now, thankfully, and we're pursuing this
3   strategy.
4      We were not doing it this way then. And even
5   today, with active, you know, counsel on our behalf, it
6   isn't the case that I just sit and decide in a
7   micro-management sense the steps that need to be taken.
8   Q. Okay.
9   A. I honestly don't.
10  Q. So, in June of 2005 --
11  A. If it's true today, it was a lot more true then.
12  Q. In June of 2005, you were content to leave this
13  issue in the hands of your then lawyers.
14     Is that what you're saying?
15     MR. ROCHON: Objection to form.
16  A. I was not really involved in it then in the same
17  way that I'm involved in it today.
18  Q. I'm not asking you to compare the two.
19     I'm saying, in June of 2005 --
20  A. Yes.
21  Q. -- when you were telling Condoleezza Rice that
22  this injunction threatened to collapse the PNA, you were
23  content not to micro-manage it.
24     That was your expression, correct?
25  A. Yes. I never micro-managed it then, and I'm not

## Page 208

1   micro-managing it now.
2   Q. So who was managing it in June of 2005?
3   A. It was -- as I told you, the issue became one
4   that preoccupied me definitely when I basically found
5   myself having to deal with the financial consequence of
6   this.
7   Q. Listen to me.
8      MR. ROCHON: Counsel, don't tell the Prime
9   Minister to listen to you. Just because you don't get
10  the answer you want, don't tell him to listen to you.
11  He's been listening to you patiently for four hours.
12     MR. WISTOW: All right.
13  Q. Forgive me. I apologize.
14     You indicated you didn't want to micro-manage
15  this problem, correct?
16  A. I didn't. And I'm not doing it now either.
17  Q. Okay. Fair enough.
18  A. It's not because I didn't want -- this is just
19  basically how I do business, whether this case or other
20  cases. I'm not a lawyer. That's what we have lawyers
21  for.
22  Q. I'm not being critical. I'm just asking the
23  question.
24  A. Okay.
25  Q. Okay. Who was managing the situation, this

## Page 209

1   litigation, in June of 2005?
2   A. I do not know if I can really tell you there was
3   one individual or portfolio that was solely in charge of
4   this operation. I really can't.
5   Q. That's not what I'm asking you. I'm asking if
6   you know anybody who was involved in the management of
7   it. Anybody.
8      MR. ROCHON: When you say "it," counsel, the
9   litigation?
10     MR. WISTOW: The litigation. Yes.
11  Q. In June of 2005.
12  A. I believe it was just counsel doing it, you know,
13  at the time, on the basis of the strategy that they
14  began, and basically continuing on with it.
15  Q. So did you try to determine if there was anybody
16  else in the government that was involved in this?
17  A. All I remember is when I actually, you know,
18  started to deal with it. I did not really, at the time,
19  feel I was intruding on somebody's turf at the time.
20  Q. I don't understand that. In June of 2005 --
21  A. Yes.
22  Q. -- you were not managing this litigation?
23  A. No, I wasn't.
24  Q. Okay. Did you believe somebody else in the
25  government was, or some kind of combination of people in

Fayyad

## Page 210

1  the government?
2      A. I had assumed that to be the case. But it looked
3  to me to be more, you know, the lawyers doing it on an
4  on-going inertia basis, if you will, on the basis of
5  strategy that they adopted early on.
6      Q. Okay. In June of 2005 then, you assumed somebody
7  else in the government was managing it?
8      That is what you said?
9      A. June 2005?
10     Q. Yes. When you wrote this letter.
11     A. As I told you, in the way that I described to
12  you.
13     You know, again, we're really talking about a
14  fairly nascent authority --
15     Q. What?
16     A. Young authority, new authority, without well-
17  established systems of governance in various matters.
18     I mean it's not like, you know, an authority
19  that's been in existence forever, with everybody knowing
20  what they're supposed to be doing.
21     Q. Did you assume someone was managing it --
22     A. Yes.
23     Q. -- or did you assume someone wasn't?
24     That's all I'm asking.
25     A. I assumed it was being managed in the way that I

## Page 211

1  described -- namely, on the basis of strategy which was
2  based on the notion that there was no jurisdiction in
3  this particular case.
4      And when a deposition is taken, this does not
5  need day-to-day maintenance. It's a paradigm that says
6  we need not be involved in the details here basically.
7      So, in the nature of it, I did not assume there
8  was anyone actively involved in managing this process on
9  a day-to-day basis.
10     Q. Okay. But, in June of 2005, when you wrote the
11  letter, you had already known that you lost on sovereign
12  immunity in Court of Appeals. You knew that.
13     A. I think that was on the table at the time. I
14  mean if I had not known that, I would not have been --
15     Q. It's in your letter?
16     A. Yes.
17     Q. So you knew that.
18     Now, did you -- again, did you assume that
19  somebody in government was involved in managing this, or
20  did you not assume that?
21     That's all I'm asking.
22     MR. ROCHON: Asked and answered.
23     MR. WISTOW: For the life of me, I don't
24  know what the answer is.
25     A. You know, I did not know if there was anybody

## Page 212

1  actively managing the case on a day-to-day basis.
2      Q. Okay?
3      A. For the reasons I mentioned. So --
4      Q. Did you assume there was?
5      MR. ROCHON: Counsel. You just asked it.
6      MR. WISTOW: No. He said -- he said, I
7  didn't know. I'm asking, did you believe there was
8  somebody.
9      He said he didn't know. I'm now asking him
10  did he believe somebody was managing it.
11     A. You know, I don't know if I really went through
12  this thinking, assuming anything.
13     All I know is, when I found out about this, and
14  it came to my knowledge this was what was involved, this
15  was what a thing that was a priority issue for me, I
16  started to act on it.
17     Basically, that's what I'm trying to tell you.
18     Q. Okay. What I'm trying to ask you, when you
19  started to act, you wrote a letter?
20     A. Yes.
21     Q. Okay. And that's the last thing before you left
22  government, right?
23     A. Yes.
24     Q. Okay. Now, what I'm trying to get at though, is
25  did you believe that somebody else would be taking care

## Page 213

1  of this?
2      A. If I did, I would not have written the letter
3  probably.
4      Q. I'm sorry. What?
5      A. If I did, I probably would not have written the
6  letter I did. I mean I probably would have gone to the
7  person I had assumed was managing this.
8      Q. So you believe nobody was managing it?
9      A. I didn't really make an effort to find out. I
10  just decided to deal with it myself.
11     Q. Okay. Fair enough. Okay.
12     Now, you were aware, when you wrote this letter,
13  that there was a problem with the Wachovia Bank?
14     MR. ROCHON: Page, counsel?
15     MR. WISTOW: Yes. Page 3, third paragraph
16  from the bottom.
17     A. Page 3?
18     Q. Yes.
19     A. Yes. The letter itself, right?
20     Q. Yes. Yes.
21     A. Yes.
22     (Witness peruses document.)
23     A. Yes. Here I don't read through all of it, but I
24  believe I'm talking only about the Pension Fund and the
25  PNA.

Fayyad

**Page 214**

1    Q. Well, no. It seems to be more than that because
2    it's talking about paying your employees salaries.
3        Do you see?
4    A. Let me just continue.
5        (Witness peruses document.)
6    Q. Where do I talk about salaries?
7    Q. Well, it says, Expenses needed to run its office.
8    Maybe I shouldn't have assumed that would be --
9        What expenses were you talking about?
10   A. Are we talking about the Pension Fund here?
11   Q. No. It says -- I'll just -- I don't know what
12   we're talking about. I'll just read what it says.
13   A. Okay.
14   Q. The PNA's bank in Washington --
15   A. Where? I mean I'm reading the wrong paragraph.
16   Q. Oh, okay. Fair enough. Page 3, third paragraph
17   from the bottom.
18       MR. ROCHON: (Indicating.)
19   A. This one?
20   Q. Yes.
21   A. As a result of receiving notice?
22   Q. Yes. Exactly. Take a minute, read it, tell me
23   when you're finished.
24   A. Okay.
25       (Witness peruses document.)

**Page 215**

1    Q. And, incidentally, I do apologize for saying
2    before, Listen, it was an appropriate response from
3    Mr. Rochon.
4    A. Yes. Okay.
5    Q. Okay?
6    A. Yes.
7    Q. When you say necessary expenses needed to run, I
8    assume that includes payroll and rent?
9    A. All expenses, yes.
10   Q. Yes. Whatever?
11   A. Yes.
12   Q. Okay. So this was a kind of an immediate crisis,
13   was it not?
14   A. Yes. I mean in the sense of it having led to a
15   situation where our Mission was not able to use its
16   resources available to pay salaries of employees and
17   other operating expenses.
18   Q. Yes. It's an immediate crisis?
19   A. I mean not only in the sense it was a big
20   problem. It was a huge problem.
21   Q. It's immediate crisis, is it not?
22   A. Immediate crisis --
23   Q. Is it that difficult to agree with me?
24   A. I don't know. Basically, I would have to be --
25   I'm responsible for things I say, not for things you

**Page 216**

1    say, with all due respect.
2    Q. If you disagree with me --
3    A. I can't -- I mean, I'm just --
4        MR. ROCHON: Counsel --
5    A. Look. I'm prepared to sit here as long as is
6    necessary. But I'm not really going to be forced into
7    saying things not the way I want to say them.
8    Q. Okay.
9    A. I think it's fair enough.
10   Q. I'll ask you this --
11   Q. Please feel free to ask me however many questions
12   you like, and I am prepared to sit with you for as long
13   as it takes.
14       But I am not comfortable being framed in the way
15   to answer questions.
16   Q. I can see that. I can see that.
17       Did you consider it to be an immediate crisis?
18   A. I considered it to be a very very big problem for
19   the Palestinian Authority.
20       In this particular paragraph, we're referring --
21   we're talking about the operation of our Mission. And
22   that's the PA in its entirety.
23       Remember this. I regarded the whole case as one
24   that's posing serious threat to the capacity of the PA
25   to continue to function as a government. That's

**Page 217**

1    basically --
2    Q. Well --
3    A. -- you know, and this -- reading through this
4    now, it's coming back to me -- basically, looking at the
5    myriad of actions, sequence of steps, a lot of things
6    happening at the same time, you know.
7        So anyone, you know, kind of sitting there having
8    to deal with the consequences of this, clearly could not
9    but have viewed this as a very very serious problem, for
10   sure.
11   Q. Clearly could what?
12   A. Not but have viewed this as a very serious
13   problem.
14   Q. Now, you've seen about the bank thing. And
15   that's yet another element of seriousness, right?
16   A. I tell you, it's in there -- you know, the
17   reference to -- maybe in the subsequent paragraph which
18   I was reading before, thinking that was the paragraph
19   that interested you -- talking, for example, about
20   assets of the PMA, Palestine Monetary Authority, being
21   frozen.
22       Well, in fact, that was commercial bank money
23   they were dealing with. For me, knowing what I know
24   about financial flows and check-clearing matters and the
25   rest of that, I knew this was debilitating way

Fayyad

Page 218

1 beyond,you know, the capacity to pay salaries.
2    Q. Right.
3    A. Here is an institution that is independent of the
4 PA, in every sense of the word, unable to function.
5    Q. Right.
6    A. So our banking system would be basically shut
7 down. I mean that's what we're looking at, beyond
8 salaries. So a serious problem.
9    Q. You're talking Palestine Monetary --
10    A. -- Monetary Authority, yes.
11    Q. That's another problem that I'll talk to you
12 about in a minute. But I'd like to do one at a time.
13       MR. ROCHON: Counsel --
14    Q. I want to talk about the bank in Washington,
15 Wachovia --
16    A. Yes.
17    Q. -- correct? So that was an immediate serious
18 problem because the checking accounts that you paid
19 expenses, like salaries and rent, was frozen?
20    A. You know, not as serious, for example, you know,
21 as PMA assets or assets handled by the PMA being frozen.
22       There are grades of problems here. I mean --
23       MR. ROCHON: Counsel, may I suggest that
24 leading questions may not be as advantageous in this
25 situation as you think.

Page 219

1       MR. WISTOW: You may suggest, and I will
2 disregard your suggestion.
3    A. And I'll have to deal with the consequences.
4    Q. I beg your pardon. I'm going to continue.
5    A. Okay. Continue.
6    Q. Whether it was the most serious problem, the
7 least serious problem, or some problem in the middle, it
8 was a problem that threatened --
9    A. Problem.
10    Q. -- to close down the offices in Washington of the
11 PNA.
12       At least that's what you told Condoleezza Rice,
13 correct?
14    A. Yes.
15    Q. Okay. Now, you said that, The PNA's bank in
16 Washington has attempted to clarify with the Court and
17 the Plaintiffs whether the PNA's account can be used to
18 pay the necessary expenses needed to run its office,
19 without success.
20       Do you see that?
21    A. Yes.
22    Q. Can you tell me about that? Do you know anything
23 about it?
24    A. I don't really remember the details of this. I
25 really don't.

Page 220

1    Q. Do you remember anything about it?
2    A. You know, just as a consequence of the case, and
3 as information that was brought to my attention in the
4 context of writing the Secretary.
5    Q. Well, was it clarified with the Court?
6    A. I do not know.
7    Q. Was that account freed up at some point?
8    A. Yes. At the time --
9    Q. Was the account freed up?
10    A. You know, basically the letter is a statement of
11 the way things were at the time the letter was written.
12 Then what happened afterwards --
13    Q. Of course.
14    A. -- I really do not know.
15    Q. That's what I'm trying to find out.
16    A. Yes.
17    Q. So you don't know --
18    A. I don't know.
19    Q. -- if that serious problem got solved?
20    A. I know it's solved now. I mean I know we have an
21 office that's functioning now. I mean for sure.
22    Q. Now is five years later.
23    A. It's been functioning since then.
24    Q. Do you know how it was resolved?
25    A. No, I don't.

Page 221

1    Q. Do you know when it was resolved?
2    A. I don't know for sure.
3    Q. Okay. Do you know if you -- you -- I checked,
4 and it appears that you left your post as Finance
5 Minister on December 12 of 2005.
6       Does that refresh your recollection?
7    A. Probably. Well, if we're talking about days
8 making a difference here, I believe it was December 5.
9 That's my recollection I mean.
10    Q. Fine. Okay. It's not worth fighting about.
11    A. Yes. I just say, for the record, that I don't
12 know. I can check it out, but I sort of recall it was
13 5th of December, not 12th of December.
14    Q. The -- you say here, in that second paragraph, In
15 addition, we have been informed by Arab Bank that it has
16 received a copy of Plaintiffs' notice and that, as a
17 result, it may have to freeze the PNA assets located
18 anywhere in the world.
19       You wrote that, correct?
20    A. Yes.
21    Q. Did that actually happen, that you got such a
22 notice?
23    A. Yes. It must have happened. I mean I was not
24 really making it up. I mean we were, at the time,
25 informed by Arab Bank that they did receive such a

56 (Pages 218 to 221)

Fayyad

Page 222

1    notice.
2        Q. Okay. You know that from your own personal
3    knowledge?
4        A. I cannot tell you right now. I really don't
5    recall.
6        Q. Okay. Do you know if, before you left, some five
7    months later, this was resolved with the Arab Bank in
8    any way?
9        A. I'll tell you, what I remember is that we were
10   having a hard time. We were very anxious. We were
11   worried about assets being frozen. It was just one
12   thing happening after another.
13       I was worried especially about, in addition to
14   PMA, I was worried about pension funds. I mean these
15   are rights of pensioners who really have nothing to do
16   with anything I mean. So that was really, you know, our
17   immediate worry, you know, at the time.
18       So there was a lot to worry about during that
19   period. There was a really a lot of commotion.
20       Q. Right. There was a lot to worry about.
21       What I'm trying to find out is, on this
22   particular issue with the Arab Bank, did you follow up
23   with that at all before you left six months later.
24       A. Yes.
25       Q. What did you do?

Page 223

1        A. I do not know if that situation led to assets
2    being frozen. I'm not sure I can say that.
3        But, at the time, yes. I believe the bank was
4    put on notice that there is this action against us, and
5    that it could possibly lead to having our assets frozen.
6        Q. Well, during the six months that you stayed on as
7    Finance Minister --
8        A. Yes.
9        Q. -- did you learn whether or not --
10       A. No. I don't believe assets were frozen at the
11   time.
12       Q. You weren't sure?
13       A. You know, if you give me a little bit of time to
14   scratch my head over this. I just want -- what I don't
15   want to do is to give you some information that's not
16   accurate.
17       Look, I don't believe assets were frozen in
18   connection with what you have just referred to with Arab
19   Bank. I don't believe so.
20       Q. Was the Pension Fund frozen?
21       A. Yes.
22       Q. Okay. That was a serious concern?
23       A. That was serious, and it continues to be.
24       Q. What?
25       A. And it continues to be.

Page 224

1        Q. Okay.
2        A. For obvious reasons. This is not our money.
3    This is not PA money.
4        Q. So I want to go for the request for intervention.
5    Do you see that paragraph?
6        A. Which one?
7        Q. Page 4.
8        A. Which one?
9        Q. The paragraph --
10       A. Yes.
11       Q. Why don't you read that to yourself silently.
12           (Witness peruses document.)
13       A. Yes.
14       Q. And principally, at that time, the freezing was
15   caused by the injunction, is that fair?
16       A. Yes. It was freezing assets.
17       Q. Okay. And, at the top of the page, you note, and
18   you tell Condoleezza Rice -- third line down --
19       A. Yes.
20       Q. -- that these actions, the freezing of the assets
21   of the Palestinian Pension Fund, are clearly not within
22   the scope of the preliminary injunction, correct?
23       That's what you told her?
24           MR. ROCHON: Are you under Request for
25   Intervention, counsel?

Page 225

1            MR. WISTOW: I'm sorry. I went to the top
2    of the page. I didn't do that very elegantly.
3        Q. Let's go to the top of the page.
4            (Witness peruses document.)
5        Q. Do you see what I'm referring to?
6        I guess, in fairness, if you want to start the
7    beginning of the sentence -- which probably is
8    appropriate -- let me take you back to 3, the last line,
9    which says, In addition to freezing the assets --
10       A. Okay.
11       Q. -- of the PMA, Plaintiffs' enforcement actions
12   also resulted in the freezing of the assets of the
13   Palestinian Pension Fund.
14       You see?
15       A. Yes.
16       Q. And you say, Assets that, again, clearly are not
17   within the scope of the preliminary injunction. Okay?
18       A. Yes.
19       Q. And you believed that at the time?
20       A. Yes.
21       Q. Okay. And you're asking Condoleezza Rice --
22       A. Yes.
23       Q. -- to intervene, to the extent that she can
24   within the Constitution and the laws of the United
25   States?