# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THE ESTATE OF YARON UNGAR, ET AL.,       Case No:

      Plaintiffs                                00-105L

vs.

THE PALESTINIAN AUTHORITY;
ET AL.,

      Defendants

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---------------------------------------------------

VIDEOTAPED RULE 30 DEPOSITION OF:
SALAM FAYYAD
EAST JERUSALEM
JULY 28, 2010

---------------------------------------------------

Videotaped Rule 30 deposition of SALAM FAYYAD, taken in

the above-entitled cause pending in the United States

District Court, District of Rhode Island, pursuant to

notice, before ISABELLE KLEBANOW, RPR, CT No. 311,

Stenographer, at the Ambassador Hotel, East Jerusalem,

on Wednesday, the 28th day of July, 2010, at 4:15 p.m.

Jerusalem time.

REPORTED BY:  ISABELLE KLEBANOW, RPR, CT NO. 311

Fayyad

## Page 14

1  You can't tell him how to answer a question.
2      MR. WISTOW: Then instruct him not to
3  answer.
4      MR. ROCHON: I'm not going to instruct him
5  not to answer, but you can't instruct him how to answer.
6      MR. WISTOW: What you're doing now is the
7  very colloquy that's prohibited. I'm going to ask him
8  one more time, and I ask you to please -- I moved to
9  strike his answer, and I'm asking him --
10  Q. -- is it your desire to see the judgment by
11  default vacated, for whatever reason?
12  A. Yes, for the reason I mentioned. For the reasons
13  I mentioned.
14      MR. WISTOW: I move to strike everything
15  after yes.
16  Q. Now, I'm going to read you --
17      MR. ROCHON: Mr. Wistow, we'll have an
18  agreement we'll deal with your motions to strike at some
19  later time, not now? You don't want me to argue them
20  now, do you?
21      MR. WISTOW: To whom?
22      MR. ROCHON: Well, that's what I mean.
23      MR. WISTOW: I just want the Court to know
24  that I moved to strike.
25  A. Can I ask a question myself?

## Page 15

1  Q. Sure.
2  A. Is it part of my right to actually explain what
3  it is that I'm saying?
4  Q. I think that's best left to the Court to decide.
5  I take the position that --
6      MR. WISTOW: Is it okay if I answer him?
7      MR. ROCHON: (Indicating).
8  A. The Court is not going to be able to decide if he
9  just sees yes to an answer without understanding the
10  motive.
11  Q. Why don't you assume --
12  A. Yes.
13  Q. -- that a Court is capable of handling a case
14  appropriately. Could you do that, please?
15      MR. ROCHON: Objection. Mr. Wistow, you're
16  arguing with the witness.
17      MR. WISTOW: No, I'm not. I'm not trying to
18  argue. Let me just read to him something from the
19  motion. Did you say you want to look over my shoulder
20  or accept my representation?
21      MR. ROCHON: I didn't say anything. Go
22  ahead.
23  Q. All right. This is from page 38 of the motion
24  that was filed on December 28, 2007, by your counsel in
25  the case.

## Page 16

1      So, on page 38, and it says, "As Prime Minister
2  Fayyad's declaration makes clear, this judgment has
3  already been the subject of diplomatic communications at
4  the highest levels between our country's representatives
5  in the State Department and the governing officials in
6  the occupied territories.
7      If left intact, the judgment threatens to
8  undermine the relationship between the United States and
9  the Palestinian government, a relationship that the
10  executive branch of the United States government has
11  categorized as being crucial to the Israeli-Palestinian
12  peace process."
13      You understand what I've just read?
14  A. I do.
15  Q. Okay. Now, I want to talk a little bit about the
16  contacts that are referred to there -- that is, between
17  our country's representatives and the governing
18  officials in the occupied territories.
19      Have you discussed this -- by the way, the
20  governing officials in the occupied territories, I
21  assume are Israeli officials? Is that's what meant by
22  that?
23  A. I did not understand it that way.
24  Q. Okay. How did -- tell me what you understand.
25  A. I understood it as communications between us in

## Page 17

1  the Palestinian Authority and the United States.
2  Q. Okay. Fair enough.
3      Now, would you tell me whether or not you've
4  reviewed any documents prior to coming here to help you
5  recollect anything about those contacts.
6  A. I have not reviewed any documents.
7  Q. At all?
8  A. Not at all.
9  Q. Nothing whatever?
10  A. No.
11  Q. When is the last time you've looked at any
12  documents that relate to this case?
13  A. Probably around the time I made the declaration
14  in connection with the motion. Probably.
15  Q. In 2007?
16  A. That's probably true.
17  Q. Do you know when the motion was made?
18  A. It must have been the second half of the year,
19  towards the end of the year probably.
20  Q. Of 2007?
21  A. 2007, yes.
22  Q. Okay. So that's the last time you would have
23  looked at any of these documents, is that fair?
24  A. I'm thinking, because I just need to make sure
25  that I'm answering you truthfully.

Fayyad

**Page 22**

1    Q. -- where you're not absolutely sure of my
2    meaning, please tell me --
3    A. Yes.
4    Q. -- and I'll try to rephrase it so that you and I
5    are sure we're talking about the same thing at all
6    times.
7        Is that agreeable?
8    A. Sure.
9    Q. Okay. What I'm asking you about is any documents
10   you looked at -- at any time now --
11   A. Yes.
12   Q. -- between the PLO, the PA, and the American
13   government with regard to the Ungar case. Any
14   documents.
15   A. Yes. The document that I recall seeing around
16   that time is a document that I myself sent to then
17   Secretary of State Condoleezza Rice, when I was Minister
18   of Finance in 2005. Yes.
19   Q. Okay. And is that the only document you recall?
20   A. I'm aware that there are other documents.
21   Q. You are aware?
22   A. I'm aware there are other documents. I do not
23   recall seeing them --
24   Q. Okay.
25   A. -- or reading them. What I say is that this must

**Page 23**

1    have happened sometime in 2006, when I was not in the
2    government.
3    Q. All right. I'm a little bit confused. It's not
4    your fault. It's mine.
5    A. Yes.
6    Q. When you say you know there are other
7    documents --
8    A. Yes.
9    Q. -- first of all, what documents do you believe --
10   A. Correspondence.
11   Q. What are they? Letters to Condoleezza Rice? Are
12   they --
13   A. That was my understanding. There was further
14   communication between the PA and the US administration
15   in the form of letters.
16   Q. Would one of those letters be a letter from
17   President Abbas?
18   A. Probably, yes.
19   Q. Do you recollect seeing such a letter?
20   A. No.
21   Q. Do you recollect hearing that there was such a
22   letter?
23   A. Yes, I do. Yes.
24   Q. Okay. But you never saw it?
25   A. I don't believe I saw it, no.

**Page 24**

1    Q. Up to today, you haven't seen it?
2    A. No, I haven't.
3    Q. Okay. Do you understand -- how did you learn
4    about this letter?
5    A. You know, because, actually, when I rejoined the
6    government in the spring of 2007, we were in the process
7    of trying to actually find representation and all.
8        And I knew that we had to do this and give it --
9    treat it as a matter of priority. And, in the process,
10   you know, I learned that there was communication like
11   that.
12   Q. How did you learn? What was the mechanism?
13   A. Well, let me remember now as to how it happened.
14   Q. Please.
15   A. This takes us back to early 2007, around the time
16   when I joined the government in the spring of that year.
17       I know that there was an effort made by the
18   President's staff at the time to try to find legal
19   representation for the PA in the United States.
20   Q. President Mustafa?
21   A. President Abbas.
22   Q. Oh, I'm sorry. I misheard you. Okay. So --
23   A. The staff of the President.
24   Q. I see. I'm sorry. Okay.
25       What I'm trying to focus on right now is

**Page 25**

1    correspondence with the American government.
2    A. Okay.
3    Q. Are you with me?
4    A. I am.
5    Q. Okay. You told me you believe there was a
6    letter --
7    A. Yes.
8    Q. You've got to let me finish.
9        You told me that you believe there was a letter
10   from President Abbas. Yes?
11   A. I said I believe so. Now I'm trying to remember.
12   I know there was communication between the PA and the US
13   administration.
14   Q. Do you believe there was a letter from President
15   Abbas to Condoleezza Rice?
16   A. It must have been at that level, yes.
17   Q. And you believe it, correct?
18   A. I have no reason not to believe so.
19   Q. Did you ever ask anybody if you could see that
20   letter?
21   A. I mean it's not that I could not see it if I
22   wanted to.
23   Q. That's not my question.
24       MR. ROCHON: You wanted him to finish his
25   answer, I'm sure.

Fayyad

**Page 38**

1    And so, if I'm really pressed to give you a
2 yes-or-no answer this afternoon here as we're doing
3 this, I can't but tell you no, I don't remember.
4    Q. Mr. Fayyad, let me explain something, if I might.
5    A. Yes.
6    Q. Well, I won't explain anything. I'll ask a
7 question.
8    A. Okay.
9    Q. Do you understand that you have told the United
10 States District Court that the PLO and the PA would
11 participate in discovery in the case?
12    You understand that?
13    A. I do.
14    Q. Okay. That means discovery under the American
15 rules, however strange they may be.
16    Do you understand that?
17    A. I'm not objecting to the rules.
18    Q. Okay.
19    A. I'm objecting to the form in which this
20 deposition is being conducted. These are two different
21 matters.
22    Q. Do you feel that I'm being rude to you?
23    A. I didn't say that. It's just, basically, that I
24 do not feel I'm given -- I'm being given the space to
25 recollect what I'm being pushed to say yes or no.

**Page 39**

1 That's basically what it is.
2    I'm familiar with this system as much as one can
3 be. I'm not a citizen of the United States. I lived
4 there long enough to know how it works. But I know the
5 difference between doing it right and not doing it --
6 and doing it not so right.
7    That's basically what I'm saying.
8    Q. Mr. Fayyad, are you saying that I'm asking the
9 questions too quickly and not giving you time to answer?
10    A. Maybe it's not really that as much as it is when
11 you say, Yes or no, yes or no, yes or no. It's as if,
12 you know, I just came from a cramming room where I went
13 over -- where I've just gone over all these documents.
14    Q. Did you?
15    A. Fact of the matter is that I didn't. I run a
16 government. I have a lot of things to worry about. And
17 this is one of them. It's an important issue for me.
18    But I am not here to suggest to you in any
19 manner, shape or form, sir, that I can answer quickly
20 yes or no questions related to whether or not I read
21 certain documents three or four years ago.
22    That's basically what I'm saying, with all due
23 respect.
24    Q. With all due respect to you, Mr. Fayyad, you're
25 not the first witness that I've asked questions of. And

**Page 40**

1 I want to ask you a very straightforward -- I think --
2 question.
3    Were you aware of Judge Marrero's order? If you
4 don't know, you can say you don't know. If you say you
5 were aware of it, you can say you were. If you weren't
6 aware of it, you can say you weren't.
7    A. The truth, sir, is that I do not know.
8    All I'm really trying to do here is to get you to
9 see things from my own perspective as I communicate to
10 you my answers to questions you raise.
11    This has been a long process. There is constant
12 discussion going on, and it's not really the only case.
13 There are several cases here. So, at the time certain
14 significant things happened along the way, I'm sure I
15 was informed. You know what I'm saying?
16    But here we are months, years, after certain
17 things have happened. I cannot really be so certain. I
18 do not really want to tell you something yes or no when
19 I'm not really a hundred percent certain.
20    You know what I'm saying? That's what I'm really
21 trying to do here.
22    Q. That's fine. That's not unusual. That happens
23 to every witness.
24    MR. ROCHON: May we take a break at this
25 point, given -- is that agreeable?

**Page 41**

1    THE WITNESS: Yes.
2    THE VIDEOGRAPHER: Going off record at 4:55.
3    (Short recess taken.)
4    THE VIDEOGRAPHER: Going on record at 5:00.
5    Q. Mr. Fayyad --
6    A. Yes.
7    Q. -- do you understand, one of the things that I'm
8 trying to find out is what you know about the case?
9    Do you understand that?
10    A. I understand that this is the nature of a
11 deposition, yes.
12    Q. But my question to you is, do you understand that
13 one of the things I'm trying to find out is how much you
14 know about different aspects of the case.
15    Do you understand that?
16    A. You're telling me that, and I take your word for
17 it.
18    Q. Okay. Now, what I'm trying to find out is, did
19 you ever learn of Judge Marrero's order to the United
20 States, to your recollection.
21    A. I don't remember.
22    Q. Okay. Fair enough. You have no recollection of
23 learning of it at this point. Is that fair?
24    A. I just don't remember really.
25    Q. You have no recollection of learning of it, is

11 (Pages 38 to 41)

Fayyad

Page 46

1  You see that?
2  A. The third line --
3  (Witness peruses document.)
4  A. I see that, yes.
5  Q. Okay. So did you ever learn from any source that
6  the United States had declined to issue a Statement of
7  Interest in the Knox case or in any of the other cases
8  pending in other districts against the PLO and the PA?
9  MR. ROCHON: Objection.
10  Q. Did you ever learn that from any source?
11  MR. ROCHON: Objection. Don't answer yet.
12  You have to exclude conversations --
13  MR. WISTOW: No. I don't exclude
14  conversations. It's not a privileged communication.
15  It's not confidential information. It's relating --
16  MR. ROCHON: Let me just -- I'm not arguing.
17  MR. WISTOW: I don't want any fighting. I
18  don't exclude anything.
19  MR. ROCHON: We're agreeing. The answer to
20  the question will not be deemed to be a waiver of
21  privilege.
22  MR. WISTOW: That's right. I believe
23  privilege has been waived for other reasons we'll get
24  into. But I stipulate that an answer to this will not
25  represent a waiver.

Page 47

1  MR. ROCHON: Mr. Prime Minister, you can
2  answer the question.
3  A. Well, I remember that there was a process.
4  And, as I told you myself, I myself communicated
5  on this with the Secretary of State at the time,
6  Condoleezza Rice, seeking help. And I understood what
7  the Statement of Interest meant -- Statement of Interest
8  -- a term mentioned on several occasions in my
9  discussions with US officials.
10  Now -- and I understood, at some point -- whether
11  in connection with this letter or some other
12  communication I can't remember right now -- that the US
13  did not submit, or did not want to submit, a Statement
14  of Interest.
15  But I also recall that it did not mean -- that
16  representation done by the United States, it does not
17  mean that the administration was --
18  (Mr. Haller enters the room.)
19  Q. I'm sorry. I didn't hear the end.
20  A. That it did not mean that the administration was
21  indifferent as to what was going on.
22  In other words, I understood that -- the way I
23  understood it was, in a formal sense of a Statement of
24  Interest, there was not acceptance of it. There was not
25  a submission of it. But, at the same time, there was a

Page 48

1  Statement of Interest in a generic sense.
2  And that actually is what's borne out if you read
3  a couple of lines down from where that reference which
4  you just cited, where the letter says, At the same time,
5  the United States remains concerned about the potential
6  significant impact of these cases -- significant impact
7  these cases may have on the financial and political
8  viability of the Defendants.
9  Q. Have you finished your answer?
10  A. Yes.
11  MR. WISTOW: I move to strike.
12  THE COURT REPORTER: Could you identify the
13  person who came in the room.
14  MR. WISTOW: Could you identify yourself for
15  the record, please.
16  MR. HALLER: Mordechai Haller.
17  THE COURT REPORTER: Spell it for me,
18  please.
19  MR. HALLER: M O R D E C H A I, H A L L E R.
20  Plaintiffs' Israeli counsel.
21  Q. Have you finished your answer, Mr. Fayyad?
22  A. Yes.
23  Q. Do you remember the question?
24  A. I remember the question.
25  The question was that -- were you aware that

Page 49

1  there was -- or does this not say that the United States
2  did not want to submit a Statement of Interest.
3  Q. No. I'm not asking you about what the letter
4  says.
5  A. Oh, okay.
6  Q. I'm not. I'm asking you if you ever became aware
7  of whether or not the United States responded to Judge
8  Marrero by saying -- let me finish, please --
9  A. Yes.
10  Q. -- by saying they declined to state -- to file a
11  Statement of Interest at that time.
12  Did you ever become aware of that?
13  A. As I indicated, I'm aware that there were
14  discussions, communications, on this matter. I was
15  aware that there was not a straightforward Statement of
16  Interest submitted by the US government to the Court.
17  But I also remember being told that that
18  statement or that communication or those communications
19  where Statement of Interest was not filed did not mean
20  that the administration was indifferent as to the
21  proceedings.
22  That's my answer.
23  Q. Okay. I'm going to press it a little bit.
24  A. Okay.
25  Q. I'm really not asking you to interpret what the

Fayyad

## Page 50

1  intent of the government was, the American government.
2      I'm asking you only if you were aware that, on
3  February 29, 2008, the United States said to Judge
4  Marrero, and I quote, "The United States respectfully
5  informs the Court that it declines to file a Statement
6  of Interest concerning the Rule 60 issues presented by
7  this case, but will continue to monitor this and other
8  cases like it.
9      Did you ever become aware of that declination?
10     A. What I'm really trying to communicate to you, and
11  through you to the Court, is my understanding of the
12  nature of that communication; and, specifically, that
13  the administration did not file a Statement of Interest
14  in the way a Statement of Interest is technically
15  defined.
16     But I remember, in the context of communications,
17  suggesting that it was not not interested in what was
18  going on. That's basically my recollection of the
19  exercise.
20     Q. Mr. Fayyad, I'm going to ask you to try not to
21  communicate with the Court, as you just suggested you're
22  doing.
23     Try to just answer my questions. The Court will
24  hear my questions, will hear your answers. Under our
25  system, I get to ask questions and, hopefully, you

## Page 51

1  answer them.
2      I'm not trying to tell half the story. You have
3  lawyers. They can bring out what they want.
4      Do you understand?
5      A. I respect the system, and I am doing my best to
6  answer your questions, sir.
7      Q. Okay. My question is, did you ever learn that
8  Judge Marrero was informed that the United States
9  declined to file a Statement of Interest.
10         MR. ROCHON: Objection.
11     Q. Can you answer that either yes, no, or I don't
12  remember?
13         MR. ROCHON: Objection.
14     Q. Can you?
15         MR. ROCHON: You can answer the question.
16     A. As I said, you know, I'm aware that there was
17  activity along those lines, but I do not remember each
18  and specific case or specific communication.
19     But the substance of what I recall is what I told
20  you.
21     Q. Okay. Did you learn, in substance —
22     A. Yes.
23     Q. — that the United States declined to file a
24  Statement of Interest? Did you learn that?
25         MR. ROCHON: Objection. You may answer.

## Page 52

1      A. I learned that. But, at the same time, I learned
2  that the United States was not disinterested, and that
3  that view of the United States was communicated as well.
4      Q. Okay. The United States also expressed sympathy
5  for the victims, did it not?
6      A. It did.
7      Q. And it expressed sympathy and interest in the PLO
8  and PA, did it not?
9      A. It did.
10     Q. So it wasn't indifferent to either side, was it?
11     A. No. But that's not what the letter said. It's
12  not indifferent to either side.
13     Q. That's right.
14     A. Yes.
15     Q. But the letter says they declined to file a
16  Statement of Interest.
17     A. That's what the letter said.
18     Q. Right. Did you ever learn of that decision?
19     A. Whether in this specific case or another case, I
20  really cannot tell you right now.
21     But I'm aware of the fact that the United States
22  did not file a Statement of Interest in the way a
23  Statement of Interest is construed to mean in a legal
24  sense.
25     Q. How did you learn that?

## Page 53

1          MR. ROCHON: Objection.
2      A. I've had discussions on this with US officials
3  all the time.
4      Q. Really?
5      A. Yes.
6      Q. When was the last time you had a discussion with
7  a US official about this?
8      A. Not the recent period.
9      Q. Well, you said all the time. I'm just asking you
10  when the last time was.
11     A. I'm trying to remember now. All the time when
12  this was being activated and all.
13     Q. Take your time, Mr. Fayyad. There's no rush.
14     A. I can actually give you a precise date if I can
15  remember when it is that I visited the State Department
16  and met with lawyers at the State Department.
17     I'd have to go back to my itinerary, my travel
18  records, and I'd be able to provide you with that.
19     Q. Please understand —
20     A. In other words, it's not — I know that I did
21  discuss it.
22     Q. Okay. Please understand. I don't expect you to
23  have exact dates.
24     A. Okay.
25     Q. Can you give me an approximate date?

14 (Pages 50 to 53)

Fayyad

## Page 54

1  A. Yes. That I can.
2  Q. What is that?
3  A. Let me — not necessarily in connection with this
4  case, but generally, you know, cases filed against us in
5  the United States.
6  So I believe it must have been a year ago.
7  That's when I believe I officially visited the United
8  States. A year ago.
9  Again, I can look it up and provide with you the
10  records.
11  Q. I'm only asking you for your best recollection.
12  A. Yes.
13  Q. And I understand all you can give me, without
14  checking your records, is your best recollection.
15  A. My best recollection is that the last time I had
16  a discussion on cases -- on litigation against us in the
17  United States in connection with these matters --
18  general matters. Not necessarily this case -- was a
19  year ago --
20  Q. Okay.
21  A. -- or thereabouts.
22  Q. Okay. When we say litigation generally and not
23  necessarily these cases --
24  A. Yes.
25  Q. -- we're talking about the so-called terrorist

## Page 55

1  claims, correct?
2  A. Yes.
3  Q. Claims against the PLO and PA that they were
4  involved somehow in terrorist activities?
5  A. Yes.
6  Q. So you spoke to somebody at the State Department
7  about a year ago?
8  A. Yes.
9  Q. Who was that?
10  A. I don't -- lawyers.
11  Q. Can you help me out a little bit?
12  A. I can't remember the names right now.
13  Q. Okay. Do you remember their titles?
14  A. I can't.
15  Q. Do you remember how many there were?
16  A. Maybe three, four. I really don't remember.
17  Q. So did you make -- were you accompanied by
18  anybody on your side?
19  A. I really was there by myself.
20  Q. Okay. And so these three or four lawyers, you
21  don't remember anybody's name?
22  A. No. Not right now.
23  Q. And do you remember if you were -- you had
24  written to set up an appointment, or how it came to be?
25  Do you remember?

## Page 56

1  A. Precisely, I do not remember. In connection with
2  this particular trip, I don't really remember now.
3  Q. Okay. Would it be fair to say you were asking
4  them to see if a Statement of Interest could be filed?
5  MR. ROCHON: Objection. Form and content.
6  In have a substantive objection on this.
7  You may want to take it outside the presence
8  of the witness so you don't think I'm engaging in
9  speaking objections. But I need to discuss it with you
10  first before I take it to the judge.
11  MR. WISTOW: Some kind of diplomatic
12  privilege?
13  MR. ROCHON: Yes.
14  MR. WISTOW: I have a -- it says, This
15  judgment has already been the subject of diplomatic
16  communications at the highest levels between our
17  country's representatives and the State Department.
18  You've told the Court about this, both the
19  Circuit Court and the Federal Court. And, you know,
20  you're flaunting this issue. Now you tell me that I
21  can't ask him about it? Okay. Just tell him not to
22  answer. It's okay with me.
23  MR. ROCHON: Well, we can take it to the
24  Magistrate Judge. That's why we have him available, so
25  you can get a ruling on it.

## Page 57

1  THE VIDEOGRAPHER: Excuse me. I have to
2  change the tape.
3  MR. WISTOW: Well, you know what?
4  MR. ROCHON: We're going to go off the
5  record.
6  MR. WISTOW: You know what? I'm perfectly
7  happy with an instruction not to answer. I don't want
8  to wait -- I have limited time today. I want to get
9  this thing moving.
10  MR. ROCHON: We have to go off the tape.
11  You can finish, but your tape's running out and you
12  won't be on the record.
13  THE VIDEOGRAPHER: Going off the record at
14  5:18.
15  (Short recess taken.)
16  THE VIDEOGRAPHER: Going on record at 5:20.
17  MR. WISTOW: I'd ask you to reconsider.
18  You have affirmatively told the Court in
19  your pleadings that one of the reasons to vacate the
20  motion -- 60(b)6 motion -- is that -- and I quote from
21  your pleadings -- "This judgment has already been the
22  subject of diplomatic communications at the highest
23  levels between our country's representatives and the
24  State Department and the governing officials in the
25  Occupied Territories.

Fayyad

## Page 66

1       (Exhibit No. 3 marked for identification.)
2     Q. Have you ever seen that letter, August 15, 2005,
3 from Ramsey Clark to Victor Marrero?
4     MR. ROCHON: Just for the record, that's
5 referring to Exhibit No. 3?
6     MR. WISTOW: Yes.
7     Q. Have you ever seen that before?
8     A. I don't recall seeing this letter, no.
9     Q. Okay. Have you read through it? It's quite
10 short. Why don't you take a minute and read through it
11 to yourself.
12     (Witness peruses document.)
13     A. Yes. I've just read it.
14     Q. You've read it?
15     A. Yes.
16     Q. All right. Basically, you understand this is a
17 letter from counsel for the PLO and PA in the Knox case?
18 Do you see where it says Knox versus PLO?
19     A. Yes. I see that. Yes.
20     Q. And you know Judge Marrero was the judge in the
21 Knox case, yes?
22     A. I don't remember the name, but I assume.
23     Q. Let's assume for the moment that Judge Marrero
24 was the judge in the Knox case.
25     A. Yes.

## Page 67

1     Q. This letter is basically telling the judge that
2 the PLO and the PA have instructed him to only present
3 their position that the US courts have no jurisdiction
4 over them and they would not answer the case.
5     Do you understand that?
6     A. I understand that.
7     Q. Okay. Even though you don't recall whether you
8 ever saw this letter or not -- let me strike that one.
9     At the time this letter was written, you were the
10 Finance Minister?
11     A. I was.
12     Q. Okay. At that time, or subsequent, at any time
13 have you learned that Ramsey Clark told Judge Marrero
14 that he was instructed by the PLO and the PA not to
15 answer the case in front of Judge Knox (sic)?
16     Did you ever learn that?
17     A. I am aware of that having been taken as a
18 position, but not in 2005. I don't remember this at
19 all.
20     Q. Okay. When did you first learn that that was the
21 position that was taken? Approximately.
22     A. Well before 2005. Not 2005.
23     Q. Well before?
24     A. Yes. Yes.
25     Q. Well before. What does well before mean?

## Page 68

1     A. I mean, since it came to my attention, to my
2 knowledge that, as a matter of fact, that there was
3 legal action pending against us in the United States.
4     Q. Right. What I mean by my question --
5     A. Yes.
6     Q. -- is when you say well before 2005, do you mean
7 two years? Ten years? Thirty years?
8     A. No. No. It cannot be that.
9     Q. What do you mean?
10     A. It can't be that. As far as I remember now,
11 these cases started in 2000, 2001, something like that.
12 I don't remember now a precise date but -- so it cannot
13 be a decade before, you know what I'm saying?
14     Q. Of course.
15     A. I'm aware of the fact that this was the position
16 communicated at the time, yes. But not as recently as
17 August 2005.
18     Q. You knew it before?
19     A. That it was generally the position taken, yes.
20     Q. Okay. What I'm trying to find out is
21 approximately how long before. We know that you became
22 the Finance Minister in what year?
23     A. 2002.
24     Q. So presumably it was not before 2002 that you
25 were aware of it, or maybe it was?

## Page 69

1     A. Oh, no. It cannot have been before 2002. Cannot
2 be.
3     Q. Was it relatively soon after you became Finance
4 Minister?
5     A. That time period. But 2005 is too soon.
6     Q. You mean too late?
7     A. Too late I mean, in that sense. So it must have
8 happened before. I'm not aware of this particular
9 communication, this particular letter.
10     Q. I understand.
11     A. But I understand that was the position.
12     Q. That was the position in all the terrorist cases,
13 correct?
14     A. Yes.
15     Q. All right. And you became Finance Minister
16 around 2002?
17     A. Correct.
18     Q. And would it be closer to 2002 that you learned
19 of this rather than 2005?
20     A. Probably. And I want to expand on this, if I
21 may.
22     Q. Sure.
23     A. Just to give you a little bit of -- you know, the
24 world as was happening then as I saw it, and the kind of
25 challenges that we really faced at the time, and maybe

Fayyad

Page 70

1   this will help you better understand where I'm coming
2   from as I try to answer your questions as best as I can.
3       Q. I think I understand where you're coming from.
4       A. When I first became Finance Minister, I was
5   immediately preoccupied with similar cases filed against
6   us in Israel, Israeli courts.
7       And I learned, shortly after I became Minister of
8   Finance, that the defense taken or the position taken
9   vis-à-vis those cases was similar to what is contained
10  in this letter -- meaning that there was no
11  jurisdiction, etc., on jurisdictional grounds.
12      And I was, you know, at the time, preoccupied
13  with trying to deal with that particular situation.
14      Q. Okay.
15      A. So it must have been, you know, a bit later after
16  that I became aware of legal action against us in the
17  United States.
18      And that position taken, as reflected in this
19  letter, is consistent with what I know was happening in
20  Israeli courts when I became Minister of Finance.
21      Q. So sometime in 2003 anyway?
22      A. Maybe. Maybe something like that.
23      Q. That's your best recollection?
24      A. That would not be an unreasonable guess, sir.
25  I'm trying to do the best I can.

Page 71

1       Q. That's all I'm asking, and I appreciate you doing
2   that.
3       A. Yes.
4       Q. So your best recollection would be around 2003?
5           MR. ROCHON: Objection. Objection.
6       Q. Is that fair?
7       A. As I said, you know, I really cannot be precise
8   with dates on this. I mean it's a process.
9       And that's why I did expand to tell you that this
10  was the line taken and the position. And I assume that
11  it was really the position taken in US courts and in
12  this case.
13      Q. Right.
14      A. But I -- I mean it's really a continuum. I
15  cannot really, you know, tell you precise dates when I
16  became aware of it.
17      But I certainly do not remember this letter.
18      Q. Okay. That's fine.
19      Now, I'm going to -- you first heard of the Ungar
20  case around 2003, 2004? Is that fair?
21      A. Probably.
22      Q. Okay. And when you first heard of the Ungar
23  case, you knew that that was what we've been calling a
24  terrorist case?
25      A. Yes.

Page 72

1       Q. And by the time you heard of the Ungar case -- by
2   the way, 2003-2004, you were Finance Minister?
3       A. Yes, I was.
4       Q. Okay. And by the time you heard of the Ungar
5   case, you were aware that the position that Mr. Clark
6   was conveying to Judge Marrero was the position also in
7   the Ungar case.
8       It was in all of the cases, right?
9       A. Yes. As I said to you, I was aware that that was
10  the position generally taken in those cases, yes.
11      Q. Okay. You knew that when you first became aware
12  of Ungar?
13      A. I was -- yes. I was -- when I first became aware
14  of Ungar as a case pending against us, I -- that was my
15  understanding, that that was the position taken.
16      Q. That there was no jurisdiction over the PLO or
17  the PA?
18      A. Yes.
19      Q. And the case would not be answered?
20      A. That basically the position was that there was a
21  case of sovereign immunity.
22      Q. Okay. And were you aware that there was also a
23  position taken that the case involved a so-called
24  "political question"?
25      Or, if you're unfamiliar with that concept, tell

Page 73

1   me.
2       A. No. I'm not.
3       Q. Okay. And were you aware that the PLO and PA was
4   also taking the position that, not only was there
5   sovereign immunity, but they were not subject to suit in
6   the United States?
7       Were you aware of that?
8       A. I didn't understand the distinction.
9       Q. Okay. So all you recollect at this point is the
10  sovereign immunity issue?
11      A. Yes.
12      Q. Okay. You're not saying these other issues
13  didn't come up. You just don't recall?
14      A. I don't remember really.
15      Q. Okay. Now, you know that, in March of this year,
16  the First Circuit Court of Appeals sent the case back to
17  Judge Lagueux for further consideration.
18      You're aware of that, aren't you?
19      A. I'm aware, yes.
20      Q. And you understand that that's really why we're
21  here today?
22      A. I think I said this at the outset, yes.
23      Q. Now, have you ever read the decision of the First
24  Circuit Court of Appeals?
25      A. I don't recall reading the decision per se, but I

Fayyad

**Page 74**

1  understand what's going on.
2  Q. Okay. I want to ask you if --
3  MR. WISTOW: -- and, again, I'm not going to
4  mark it because it's a published opinion from the First
5  Circuit. And if you want to look over my shoulder --
6  MR. ROCHON: Actually, if you're going to
7  read it to him, you might just want him to be able to
8  see what you're reading because you're going to be
9  asking him questions.
10  MR. WISTOW: Okay. Do you mind if I come
11  next to him?
12  MR. ROCHON: Well, you could read it and
13  give it to him, is what I'd prefer.
14  MR. WISTOW: Well, I'd like to -- yes. I'll
15  read it and I'll give it to him.
16  MR. ROCHON: That would be great.
17  MR. WISTOW: So I don't have to --
18  THE WITNESS: I don't mind if you want to
19  sit next to me.
20  MR. WISTOW: If he doesn't mind, with your
21  permission, I'll just point to it.
22  THE WITNESS: Go ahead.
23  MR. ROCHON: Fine. You see, the problem is
24  it will mess up your record with the videographer. So,
25  actually, it might be better if --

**Page 75**

1  Q. See the bracketed areas?
2  A. Yes.
3  Q. Why don't you read that, and you tell me when
4  you're finished.
5  (Witness peruses document.)
6  A. I read it.
7  Q. Okay. May I?
8  A. (Indicating).
9  Q. I'm going to read it into the record, the part
10  that I put the brackets around. This appears on page 4.
11  As the Defendants now concede -- you know who the
12  Defendants are, right?
13  A. We are the Defendants.
14  Q. The PLO and the PA?
15  A. Yes.
16  Q. As the Defendants now concede, the decision to
17  stonewall in this fashion was a deliberate strategem
18  driven by the advice of their then counsel and their
19  unwillingness to recognize the authority of the federal
20  courts.
21  You read that?
22  A. I read that.
23  Q. Okay. Now, who is the counsel that's referred to
24  as giving you advice? When I say you, PLO, PA. Who is
25  that?

**Page 76**

1  A. I was not, you know, that involved, because this
2  was really more of a continuation of something that
3  started to happen before I joined the PA. And before I
4  joined the PA, I was not even aware of the legal action
5  against the PA in the US court.
6  So I don't know who was telling whom what at the
7  time, and who in any particular case was representing
8  the PA and PLO. I have Ramsey Clark here in this
9  particular case, and I'm aware that actually, at
10  different points, he did represent the PA/ PLO.
11  So this is consistent with what I generally know
12  about the case now.
13  I mean I don't know to whom the statement is
14  attributed here.
15  Q. That's what I'm trying to find out.
16  A. Yes. The statement that you read, you know, my
17  understanding is that it really was basically a good
18  faith understanding of, you know, how, you know, this
19  case could be dealt with, that it was not stonewalling
20  or anything like that.
21  I mean as best as I know.
22  Q. So you don't consider it was stonewalling?
23  A. No.
24  Q. You think it was the right thing to do?
25  A. At the time, that was the judgment. Basically,

**Page 77**

1  it was a good faith understanding of options available
2  under US law, or law generally -- a basic question of
3  jurisdiction.
4  And, in fact, I'm familiar with the argument
5  because, as I said, I first became involved in
6  litigation against us in Israeli courts, and that was
7  the position taken then.
8  So the position you're referring to here, in
9  terms of claiming sovereign immunity, was not something
10  that I heard about for the first time, because that was
11  the position taken by lawyers representing the
12  Palestinian Authority in the Israeli courts at the time.
13  It's consistent with that general proposition,
14  and that position was not, in the way that it's stated
15  here, taken as an instrument or a way to stonewall or
16  something like that.
17  Q. Okay.
18  A. It was -- basically, I don't agree with the
19  characterization.
20  Q. Okay. I guess that's what I'm trying to find out
21  is. I'm just saying what the First Circuit said.
22  A. Yes.
23  Q. And you don't agree with it. That's what you
24  just said?
25  A. Yes. I mean I --

Fayyad

Page 78

1  Q. Okay. That's fine.
2  A. I don't agree that that's what was going on. I
3  mean it's a remedy, logically speaking, when you're sued
4  that a question that is asked is does the court have
5  jurisdiction over the matter. And I suppose the first
6  question was asked.
7  I don't know. I'm not a lawyer myself. But I,
8  you know, find it, therefore, logical to, you know, take
9  that position when, in fact, there was no jurisdiction.
10  Q. Have you finished your answer?
11  A. I have.
12  Q. Good. All right.
13  Is it fair to say that it's the position of the
14  PLO and the PA that the murders -- the murder -- of
15  Yaron Ungar was caused by Hamas? Is that fair?
16  A. Can you say that again, please.
17  Q. All right. Is it the position of the PLO and the
18  PA that Yaron Ungar was murdered by Hamas?
19  A. You know, as best as I know, this says what the
20  record now says. I mean that's been proven that this is
21  what happened.
22  Q. So that's the position of the PLO and the PA in
23  this case. Is that fair?
24  A. It's not the position. It's a question of fact.
25  It's not a question of opinion.

Page 79

1  Q. I'm asking, is that what you're contending.
2  A. I'm not contending anything on the substance of
3  the case, sir.
4  All I'm telling you here is that, you know, the
5  facts, as I know them, the records say or suggest
6  strongly, and basically the evidence and what is known
7  about the case, is that, you know, Hamas was involved in
8  this.
9  That's -- it's not a position.
10  Q. Are you aware that representations were made to
11  the United States District Court by the PLO and the PA
12  as follows -- and this is on the motion to vacate
13  default.
14  I'm reading from the Palestinian Authority's and
15  the Palestinian Liberation Organization's reply to
16  Plaintiff's objection to motion for relief and default
17  judgment. And I'll just read you what it says.
18  There is no dispute that Hamas operatives carried
19  out the attack that forms the basis for this lawsuit.
20  Do you believe that?
21  A. Yes. I believe that.
22  Q. Okay. That's all I'm asking.
23  A. Okay.
24  Q. Now, have you learned from any source up to today
25  that, after a default was entered -- let me withdraw

Page 80

1  that.
2  Do you understand the difference between a
3  default and a default judgment?
4  A. You tell me.
5  Q. Okay. Is the answer you don't?
6  A. I don't know exactly.
7  Q. Okay. Fair enough.
8  A default is where the Court, in effect, says the
9  Defendant is liable because they haven't answered the
10  case or have done something else that the Court feels is
11  inappropriate.
12  A default judgment is where the Court takes it a
13  step further and puts an amount of money on it. Okay?
14  A. Okay.
15  Q. Are you aware today that that was a two-step
16  process with the PLO and the PA?
17  A. I'm aware that there is a judgment in a certain
18  amount, so that's a default judgment. Yes, I'm aware of
19  that.
20  Q. Are you aware that, at one time, there was merely
21  a default? If you were, you were. If you weren't, you
22  weren't.
23  A. I'm not sure I really was, or I knew what the
24  distinction was, or when, right now, when that happened
25  precisely.

Page 81

1  But I mean, to me, as soon as I learned of it, it
2  was in the form of a certain amount for which the Court
3  found us liable.
4  Q. Okay.
5  A. That's --
6  Q. All right. Did you ever become aware from any
7  source up to today that, after the PLO and the PA were
8  defaulted, but before the amount of money was decided
9  upon, the Court asked the PLO and the PA if they wanted
10  to participate in the hearing on damages?
11  A. Between the time there was default and --
12  Q. No, no. Have you ever learned that -- up to
13  today, have you ever learned that, in between the
14  default and the default judgment, the PLO and PA were
15  invited to participate in the hearing as to how much
16  money it would be put on the judgment?
17  Have you ever learned that?
18  A. I don't remember really. I don't remember.
19  Q. Okay. To the best of --
20  A. To the best of my knowledge, I don't remember,
21  no.
22  Q. Okay. Now, your lawyers on your behalf, in their
23  motion to vacate --
24  A. Yes.
25  Q. -- the default, which was filed in December of

21 (Pages 78 to 81)

Fayyad

## Page 82

1  2007 -- which was about three and a half years after the
2  default, does that sound right?
3      You know the default was in June or July of 2004?
4      A. Well, okay.
5      Q. Sounds about right?
6      A. Sounds about right, yes, because, as I told
7  you --
8      Q. It's a matter of record. We don't need to spend
9  time.
10     A. It's a matter of record. But, again, just to
11 underscore what I just said before, and that is, you
12 know, I personally became seized with this as a case
13 involving payment, it appears, after it became a default
14 judgment.
15     And that must have happened in 2005. So 2000 --
16 there's a different -- 2004 -- probably.
17     Q. You found out about this in 2005?
18     A. When apparently it became a default judgment.
19     Q. Well, it became a default judgment in the middle
20 of 2004.
21     A. I don't remember.
22     Q. What?
23     A. I don't remember.
24     Q. You don't remember what?
25     A. I don't remember really. I mean I thought it was

## Page 83

1  2005, but you're telling me 2004. Okay.
2      Q. I'm representing that to you. And if I gave you
3  the wrong date, your lawyer would be all over me.
4      MR. ROCHON: I've offered you stipulations
5  when you want them.
6      MR. WISTOW: I'm trying to find out what he
7  knows about this.
8      A. All right.
9      Q. Now, in the motion filed by your lawyers, they
10 told Judge Lagueux -- and I quote -- "The failure to
11 establish such lines of authority had created
12 conflicting instructions and confusion in the litigation
13 to the Defendants' detriment."
14     I'm going to ask you to accept, for the moment,
15 that that's in the motion and it's on page 35.
16     What were the conflicting instructions?
17     MR. ROCHON: I'm going to object just --
18     Q. If you know.
19     MR. ROCHON: No, no. Because you referenced
20 the term lines of authority and that has not been
21 discussed before. So if you'd give the witness a little
22 more before you ask him the question, that's all I'm
23 asking.
24     MR. WISTOW: Okay.
25     Q. I'll read the beginning of the paragraph.

## Page 84

1      By the end of 2006, however, "It became clear the
2  Palestinian government urgently needed an institutional
3  framework for responding comprehensively to the
4  litigation in the United States.
5      As Mr. Abdul Rahman notes, The failure to
6  establish such lines of authority had created
7  conflicting instructions and confusion in the litigation
8  to the Defendants' detriment.
9      Okay. Do you understand the reference?
10     A. I understand.
11     Q. Do you have any knowledge whatever -- any -- as
12 to these so-called conflicting instructions?
13     A. I don't know precisely, you know, what it really
14 refers to other than, if I understood what you have read
15 correctly, in terms of evolution in the position taken
16 by the Palestinian Authority in terms of how to pursue
17 this matter and how to defend ourselves, if that's
18 what's being referred to in what you read here, then I
19 believe, you know, consistent with what I know happened
20 around that time, 2005-2006, there was a discussion.
21     And I, you know, certainly cannot rule it out
22 that, during that period, you know, there were different
23 views expressed on this in terms of how to do this as a
24 matter of evolution in the direction which we ended up
25 taking eventually by wanting to defend ourselves

## Page 85

1  actively in those cases.
2      Q. Mr. Fayyad, in English, I think conflicting
3  instructions means one person gives instructions to
4  somebody. Another person gives conflicting instructions
5  to somebody.
6      Do you have that same understanding?
7      A. Yes. That's what conflicting instructions means.
8  I mean --
9      Q. Okay. What I'm trying to find out -- I'm not
10 asking you to rule out --
11     A. Yes.
12     Q. -- that that happened. I'm not asking you to
13 rule it in. I'm just asking if you have any knowledge
14 of such conflicting instructions.
15     That's all I'm asking.
16     A. That's what I'm really trying to say to you here,
17 again, trying to project, you know, the mindset, what
18 was going on then is what I just described, in all
19 candor.
20     Q. What were the conflicting instructions? Some
21 people told -- who were the instructions to, by the way?
22     A. I mean I understand this to be those involved.
23 Probably lawyers to lawyers. I do not know.
24     Q. You really don't know what the conflicting
25 instructions are, do you?

Fayyad

## Page 86

1   A. I honestly do not know.
2   Q. All right.
3   A. If I may finish --
4   Q. Sure.
5   A. -- all I am really trying to suggest to you here
6   is this does not sound like way out of line with what I
7   knew was happening around that time in the process of
8   evolution which took us to where we are today.
9   Q. I'm not asking you whether it sounds way out of
10  line. I'm asking for your knowledge about it.
11  And if you have no knowledge about it, all you
12  have to say is say I don't know.
13  MR. ROCHON: I'm going to object only in
14  terms of, counsel, the time frame.
15  MR. WISTOW: 2006.
16  MR. ROCHON: Thank you. You may answer,
17  Mr. Prime Minister.
18  THE WITNESS: Pardon?
19  MR. ROCHON: I said it's okay to answer. I
20  just asked for the time frame about what Mr. Wistow was
21  asking.
22  THE WITNESS: Okay.
23  Q. Sir, do you have any knowledge about what the
24  specifics are as to the conflicting instructions?
25  A. No. Specifics, no.

## Page 87

1   Q. What?
2   A. The specifics of what the conflicting
3   instructions were --
4   Q. Yes.
5   A. -- well, I can tell you my own understanding what
6   this refers to. I can tell you what my own
7   understanding was.
8   Q. I'm only interested, if I may, sir, to save
9   time -- because what's going to happen is -- I'm going
10  to say this in fairness, and it's up to the Court to
11  decide -- I had originally anticipated that the material
12  that I've covered so far would take no more than about
13  twenty minutes.
14  And we're taking an enormous amount of time
15  because, with all due respect -- and I have to leave it
16  to the Court -- I'm not getting responsive answers.
17  I'm asking you, please -- and I'm going to ask
18  that you be brought back --
19  MR. WISTOW: -- and I'm going to be ask that
20  he be brought to the United States, because I don't feel
21  like coming out here again.
22  Now -- and I don't think that's an
23  unreasonable request. You're -- there's a default
24  judgment. You've expressed total cooperation with our
25  discovery here.

## Page 88

1   And all I'm asking is, let me get out of
2   here today. Let me try to finish this.
3   Q. Mr. Fayyad, do you know what the conflicting
4   instructions that are referred to are? Do you?
5   A. I'm trying to understand. I'm trying to
6   understand. That's why I'm answering you the way I am.
7   It's not I'm really wishing to answer. I just don't
8   want to be misunderstood. That's all.
9   Q. You do not what?
10  A. I do not wish to be misunderstood.
11  Q. Do you know what the conflicting instructions
12  are?
13  A. That's really why I answered you the way I did,
14  in terms of trying to relate this statement here to what
15  I knew was happening around that time.
16  Q. Do you know of any conflicting instructions, yes
17  or no, or you don't know?
18  A. How can I really answer it? You know, how --
19  Q. I guess I'm at a loss to understand the problem.
20  A. You know, I'm trying to tell you -- and I'm eager
21  to really get through this as soon as we possibly can.
22  But the one thing I do not want to happen is for
23  me to be quoted as having said something that does not
24  reflect what I knew about the situation or I did not
25  know about it.

## Page 89

1   Q. I'm asking about what you know today.
2   A. When you say --
3   Q. I'm asking about what you know today as you sit
4   here.
5   A. Sir --
6   Q. Do you know of any conflicting instructions as
7   referred to in the papers submitted to Judge Lagueux?
8   That's all I'm asking.
9   If you don't, you don't. If you do, please tell
10  me what they are.
11  A. With all due respect, when you say conflicting
12  instructions, if I do not know what those conflicting
13  instructions were about, given the statement you just
14  read to me, I do not know what the context is.
15  Q. I don't either. That's why I'm asking the
16  questions.
17  MR. ROCHON: Mr. Wistow, you've interrupted
18  the witness.
19  MR. WISTOW: You're quite right. You're
20  absolutely right. I apologize.
21  A. Do you understand what I'm saying?
22  Q. I do.
23  A. I'm being asked to answer either yes or no in
24  relation to a statement, a three-line sentence, that you
25  just read --

Fayyad

**Page 90**

1    Q. Right.
2    A. — are you aware of conflicting instructions as
3    to this matter. What conflicting instructions? You
4    just read to me something out of an over-all context. I
5    do not know what that is. And I do not know —
6    Q. That's fine. That's fine.
7    A. I do not know what conflicting instructions are.
8    If you tell me what they are, I can answer you.
9    Q. I can't. If I knew what they were —
10    A. That's why I cannot say yes or no. That's all.
11    Q. If I knew what the conflicting instructions were,
12    I would suggest them to you. All I know is what your
13    counsel told Judge Lagueux, and I'm trying to find out
14    is there substance to the statement or is there not.
15    A. I believe —
16    Q. That's what I'm trying to do.
17    A. If I may add something.
18    That is exactly why I was saying to you
19    something, sir, about the environment, what was going on
20    around that time in connection with those cases.
21    There was a process of evolution going on in
22    terms of how best to proceed. There were people who
23    were saying the best thing to do is just basically to
24    really stick to the same line of defense that we had
25    before; and there were others who were saying, no, those

**Page 91**

1    should be actively pursued.
2    Q. Good.
3    A. To the extent that's what this refers to, I guess
4    that would be a first statement.
5    Q. Okay. That would be good, and we're making
6    progress. Thank you.
7    So who was saying stand on the position and who
8    was saying no, answer the case?
9    A. I do not know the answer to this question. I was
10    outside of the government at the time.
11    Q. But you believe some people were saying answer it
12    and some people were saying no?
13    A. You know —
14    Q. Is that true?
15    A. Yes. That's consistent with what I said, yes.
16    Q. Okay. But you don't know who these people are?
17    A. I honestly don't.
18    Q. Okay. Fair enough.
19    A. Yes.
20    Q. One of things that I want to say, and I say this
21    in sincerity —
22    A. Yes.
23    Q. — if you don't know the answer to something, I
24    won't press you. I'll accept that answer.
25    Do you understand?

**Page 92**

1    A. I understand.
2    Q. Okay. Now, Mr. Abdul Rahman, do you know who he
3    is?
4    A. Can you give me his full name.
5    Q. Yes. Is that because there are two Abdul
6    Rahmans?
7    A. It's a common name.
8    Q. I see. Okay.
9    MR. ROCHON: There maybe 200,000.
10    MR. WISTOW: Well, there are two involved in
11    this case that I know of. Bear with me.
12    (Counsel peruses documents.)
13    MR. ROCHON: We can make a proffer if you
14    want, counsel.
15    MR. WISTOW: Yes. That would save me a
16    little time.
17    MR. ROCHON: Ahmed Abdul Rahman.
18    MR. WISTOW: Okay.
19    Q. Do you know who he is?
20    A. I know who Ahmed Abdul Rahman is.
21    Q. Who is he?
22    A. He is part of the leadership. I do not know if
23    he right now has a position. At the time he made the
24    statement he made, he was in the leadership, but I do
25    not know what specific position he held.

**Page 93**

1    Q. I'm a little bit confused. You say he's part of
2    the leadership, or you don't know?
3    A. I know that he was in the sense —
4    Q. I'm talking about today.
5    A. Today? No.
6    Q. He's not part of — -
7    A. Right now, today, he doesn't have — I haven't
8    seen him participate in any leadership meetings
9    recently.
10    Q. Okay. So, when he was in the leadership, what
11    was his job?
12    A. I believe — I believe he was Secretary General
13    of the Cabinet. I believe. I believe. That's —
14    Q. What was your function at the time?
15    MR. ROCHON: Counsel, just the time frame
16    again. At the time.
17    Q. At the time that he was — that Ahmed Abdul
18    Rahman — whatever his name is — was in this position,
19    what was your position at that time?
20    A. I mean he was — I think he was there a long
21    time. I mean probably since the inception of the
22    Palestinian Authority. I can't really give you an
23    answer right now.
24    Q. Were you there —
25    A. No. I joined the PA in mid-2002 only.

Fayyad

## Page 94

1    Q. So he was gone?
2    A. No. I don't know if he was there. You know, I
3    used to see him at leadership meetings, you know, when I
4    was a member of Cabinet.
5    Q. Okay. So he would show up at leadership meetings
6    when you were the Finance Minister?
7    A. Yes.
8    Q. Well, what was his job?
9    A. You know, the reason -- if you just give me a
10   little bit of time --
11   Q. Sure.
12   A. -- to try to give you the best answer I can.
13   Q. Take your time.
14   A. The reason I'm having a hard time now remembering
15   is, over the period June, let's say 2002, to early
16   spring 2003, subsequent to that, the position of Prime
17   Minister was introduced and different personnel were
18   introduced at the time.
19       So if I have an overlap with Mr. Abdul Rahman in
20   an official capacity in matters related to Cabinet, it
21   must have been over that brief period between June-July
22   2002 and early 2003.
23   Q. What was his job?
24   A. Probably -- I am trying to translate now --
25   Secretary General.

## Page 95

1    Q. Of?
2    A. The Cabinet.
3    Q. Okay. Now --
4    A. Or President. I really don't know. Because the
5    Presidency and the Cabinet -- you understand, we did not
6    have a Prime Minister position at the time.
7    Q. Okay. By the way, what is the difference today
8    between the duties of the President Abbas and you, sir?
9    Are you below him?
10   A. Yes.
11   Q. He's your boss?
12   A. For sure. Yes.
13   Q. Okay. All right. What are you authorized to do
14   and what is he authorized to do in kind of a nutshell,
15   so we can understand?
16   A. I don't know if this can be answered in a
17   nutshell.
18   Q. Do the best you can. We don't need it in
19   excruciating detail. Just so we have some general
20   understanding.
21   A. Well, you know, to -- related to something that
22   is better known around the world, I mean he's like the
23   chief executive of the Palestinian Authority. And he
24   got --
25       Under our Basic Law, a Prime Minister, who runs a

## Page 96

1    government, that is considered to be the President's
2    government. So he executes the duties of his office as
3    CEO of the whole PA through a government which I head.
4        In a nutshell, this is what it is.
5    Q. What can he do that you can't?
6    A. He can appoint a Prime Minister. He can fire
7    one.
8    Q. Other than that? Other than that?
9    A. That's why I said it cannot be answered in a
10   nutshell.
11   Q. Are there things that he can do -- I'm not trying
12   to give you a difficult time.
13   A. I just gave you two examples.
14   Q. Are there things that he can do, other than
15   appoint you or fire you, that you can't do? Other than
16   that.
17   A. Well, under the Constitution -- our Basic Law is
18   a Constitution -- he's also Commander in Chief of
19   Security Services.
20   Q. I see.
21   A. But that, too, is delegated.
22   Q. To you?
23   A. Yes. To the government, in certain areas as a
24   matter of law written in the Basic Law.
25       And areas which -- and other areas of security,

## Page 97

1    he actually has delegated that to the government as
2    well.
3    Q. Okay. So, again, I'm not trying to give you a
4    hard time on this. I'm just trying to understand --
5    A. Fine. Sure.
6    Q. -- because there are letters to and from
7    President Abbas and letters to and from you. And you
8    understand how, in the United States, we may not be as
9    familiar with this situation --
10   A. I understand.
11   Q. -- as you are. So I'm trying to -- is it --
12       Are you telling me that he's basically delegated
13   all his powers to you, but he can exercise a veto and
14   tell you not to do something or instruct you to do
15   something?
16   A. I mean it's a bit more complicated than that.
17   Q. Okay. Help me out.
18   A. But possibly, if we talk about 2006 —
19   Q. Let's talk about today.
20   A. Well --
21       MR. ROCHON: Objection.
22   Q. We can work backwards, if it's --
23       MR. ROCHON: Objection. Relevance.
24   A. Yes. You know, the reason I choose to talk about
25   2006, it may help, as a matter of fact, better --

Fayyad

## Page 98

1  Q. Okay. Whatever you think would be --
2  A. Yes. Probably. I mean it's not that I'm, you
3  know, answering a different question.
4      If this were to happen today, you know, letters
5  like this would be written by me.
6  Q. Letters like what?
7  A. Anything related to -- I mean any involvement by
8  the President, if you really are talking about these
9  cases, would be done by the Prime Minister.
10     The President was involved, if he was involved in
11  2006, is because, at the time, we had a government
12  headed by Hamas, as a matter of fact. And Hamas was not
13  in a position to communicate with internationals on
14  anything.
15  Q. Is that because they were terrorists?
16  A. Technically, it was really they have not
17  fulfilled the requirements under the Road Map stipulated
18  at the time by the Quartet.
19  Q. Were they declared to be terrorists by the United
20  States?
21  A. They were declared to be terrorists by the United
22  States. But, officially, the position taken, if I
23  remember well, by the United States -- as other players
24  on the international scene who took that position of
25  boycotting the government at the time -- it was because

## Page 99

1  of noncompliance with requirements stipulated by the
2  Quartet.
3  Q. Was there a list of terrorist organizations put
4  out by the United States executive?
5  A. I'm aware there is something like that.
6  Q. Was not Hamas on that list?
7  A. I believe it.
8  Q. Okay. Still is, is that so?
9  A. I don't know that for sure. You're telling me.
10  I mean if you know it to be the case.
11  Q. You're the Prime Minister. You don't know if
12  Hamas is currently designated as a terrorist
13  organization by the United States?
14      Is that your testimony?
15  A. I am the Prime Minister of the Palestinian
16  Authority, and I'm not here to profess that I know
17  everything --
18  Q. That's fine.
19      MR. ROCHON: Let the witness finish his
20  answer, please.
21  A. So I can't tell you. I mean I know that they
22  were. No reason to believe they're not anymore. It's
23  not something that I follow up on every day.
24      As a practical matter, I know the position taken
25  by the United States on Hamas is that failure by Hamas

## Page 100

1  to accept the Quartet conditions is what's getting in
2  the way of the US communicating with Hamas.
3      That's the position as I understand it.
4  Q. You know there was a time, for sure, that they
5  were designated as terrorists by the United States?
6  A. Yes, yes.
7  Q. Did that ever change, to your knowledge?
8  A. No.
9  Q. What?
10  A. To my knowledge, no, it didn't.
11  Q. To the best of your knowledge, they're still
12  designated as a terrorist organization?
13  A. Yes, to the best of my knowledge.
14  Q. Okay. Now, Afif Safieh, do you know who that is?
15  A. Former Ambassador or representative at the UN of
16  the PLO to the United States.
17  Q. Okay. I'm going to show you a letter he wrote to
18  Condoleezza Rice which was filed with the Federal
19  Court -- I can't make out the date. You'll see why I
20  can't make it out in a second.
21      Could you make that out?
22      MR. ROCHON: Would you like that marked
23  as -- what is that? Exhibit 5.
24      THE WITNESS: I don't have it.
25      MR. WISTOW: I'm going to give it to you in

## Page 101

1  a moment.
2      MR. ROCHON: I'm sorry, Mr. Prime Minister.
3      THE COURT REPORTER: I think this is going
4  to be 4.
5      (Exhibit No. 4 marked for identification.)
6      THE VIDEOGRAPHER: Going off record at 6:11.
7      (Short recess taken.)
8      THE VIDEOGRAPHER: Going on the record at
9  6:21.
10  Q. Have you had an opportunity, Mr. Fayyad, to read
11  the letter to Condoleezza Rice dated April 27, 2006,
12  from Afif Safieh?
13      MR. WISTOW: What exhibit was that?
14      THE COURT REPORTER: 4.
15      MR. WISTOW: Exhibit 4.
16  A. I just saw it now. I mean I --
17  Q. No. I know. But have you had an opportunity to
18  read it?
19  A. No. I just saw that.
20  Q. I'm talking about this moment. I just gave it to
21  you. Have you finished reading it?
22  A. No.
23      MR. ROCHON: We didn't have it with us in
24  the break. We left everything here.
25      MR. WISTOW: Okay. Fair enough.

Fayyad

Page 102

1    Q. Take your time.
2        (Witness peruses document.)
3    A. Okay.
4    Q. All right. Now, this letter refers, in part, to
5    the Ungar case, does it not?
6    A. I didn't see -- oh, there's a reference to that
7    there. Yes. Okay.
8    Q. I don't blame you for being confused a little bit
9    perhaps. It says it's $216 million?
10    A. I saw that.
11    Q. But it was only $116 million, a more modest
12    amount. In any event, that is a reference, as you
13    understand it, to the Ungar case.
14        Then it goes on apparently -- first of all, did
15    you ever see this letter before?
16    A. No.
17    Q. Were you aware of its contents generally?
18    A. I don't know.
19    Q. Okay. Were you aware that an attempt was made to
20    sell the PLO Mission in New York?
21    A. No.
22    Q. This is the first you've heard of that, is
23    reading this letter?
24    A. Yes. I wasn't aware of it.
25    Q. Okay. So, according to this letter, if

Page 103

1    Mr. Safieh is accurate, there was an attempt made to
2    sell the UN Mission in a proceeding in New York State to
3    pay the judgment.
4        And, in that case, the United States did put a
5    Statement of Interest in to prevent the sale of the
6    Mission.
7        Is that how you read the letter?
8    A. That's what's in the letter there, but I was not
9    aware.
10    Q. This is the first you've ever heard of that?
11    A. Yes. As a matter of fact, this is 2006,
12    April 22, 2006. I was not in the government at that
13    time.
14    Q. I'm not faulting you.
15    A. No, no.
16    Q. I'm just asking did you ever become aware of
17    that.
18        Now, this -- for example, when you came here to
19    testify today, is there something called an Ungar file
20    that your government maintains?
21    A. Not an Ungar file per se. I mean we have, you
22    know, legal action against us in the United States in
23    connection with the Ungar case, but others as well.
24        And we have, you know, we have actually lawyers
25    who do this on our behalf. That's why we have them.

Page 104

1    It's not something that I do every day.
2        It's not that it's not important. It is. But
3    because it is so important, we have hired ourselves
4    legal counsel to represent us in those cases.
5    Q. Right. But does the PA have a file on the Ungar
6    case?
7        Whether it's important, whether it's unimportant,
8    whether you have lawyers, does it have a file?
9    A. If you're really talking about matters pertaining
10    to this litigation being present somewhere, the answer
11    is yes.
12    Q. Okay. Are you telling me it's mixed up with the
13    other terrorist cases, or don't you know?
14    A. I mean I know that they're present, I mean
15    matters pertaining to litigation against us in these
16    cases.
17    Q. Do you understand what I mean -- forgive me. I
18    didn't mean to interrupt. Finish your answer. I'm
19    sorry.
20    A. I finished.
21    Q. Okay. Do you understand what I mean by a
22    discrete file, a file that only deals with, say the
23    Ungar case, and another file that deals with the Knox
24    case, and another file that deals with the Bitan case?
25        Do you understand what I mean by that?

Page 105

1    A. Yes. I understand what you mean by that --
2    Q. Does the PA --
3    A. -- I mean --
4    Q. Does the PA have such files, separate files for
5    each of these cases?
6    A. There definitely are on file. I do not know
7    they've got, for sure, if I've got Ungar file, such and
8    such file, such and such file.
9        I know there is a file that pertains to this case
10    and other cases as well.
11    Q. Okay. So what you're saying to me is you don't
12    know if there is a separate file for Ungar, or whether
13    it's incorporated into a bigger file with a lot of other
14    terrorist cases.
15        Is that fair?
16    A. If I may explain --
17    Q. Is that a fair statement?
18    A. I'm trying to really answer your question. I'm
19    really trying to answer your question.
20        And given my job and what I have to do, if there
21    is something I need to do as to what's going on, then,
22    you know, contact is made with our counsel to ask a
23    question.
24        Now, I am sure, if I really tried hard enough and
25    spent the time needed, I myself would be able to do it.

Fayyad

## Page 114

1   this in private.
2         THE WITNESS: Yes, because I just need to
3   take this phone.
4         THE VIDEOGRAPHER: Going off the record at
5   6:37.
6         (Exhibit No. 5 marked for identification.)
7         (Short recess taken.)
8         THE VIDEOGRAPHER: Going on the record at
9   6:38.
10        MR. ROCHON: Just for the record, so it was
11  about a one-minute break.
12        MR. WISTOW: Okay.
13        MR. ROCHON: Thank you.
14     Q. I take it you're familiar with the document that
15  I just handed you, Exhibit 5?
16     A. Yes.
17     Q. And do you know what that is?
18        (Witness peruses document.)
19     A. Yes. It's a declaration that I made.
20     Q. Right. Do you remember signing it?
21     A. Just give me a second while I just --
22        (Witness peruses document.)
23     A. Yes. That's my signature on it.
24     Q. No, no. I'm not asking if it's your signature.
25  I hope it is. I'm asking if you remember signing it.

## Page 115

1      A. Yes. I remember the document. Yes.
2      Q. Okay. I take it you didn't prepare the document?
3      A. Pardon?
4      Q. Did you prepare the document?
5         MR. ROCHON: Objection. We're going to get
6   into privileged areas.
7         MR. WISTOW: How can it be privileged. All
8   I'm asking him is -- I'm looking at all the information.
9   I'm just asking who prepared it.
10     Q. I assume your lawyer prepared it?
11        MR. ROCHON: Objection. Don't answer the
12  question.
13        MR. WISTOW: Okay.
14     Q. Did you prepare this declaration?
15     A. Isn't that the same question you asked before?
16     Q. I don't think so.
17        MR. ROCHON: Counsel, the declaration speaks
18  for itself. The preparation of it --
19        MR. WISTOW: Whatever you say. Just
20  instruct him not to answer. I don't care.
21        MR. ROCHON: Because it intrudes on matters
22  of privilege, and only for that reason, I'm instructing
23  the witness not to answer.
24        MR. WISTOW: Okay. So I just want to be
25  clear. The question is did you prepare the declaration,

## Page 116

1   and he's being told not to answer, correct?
2         MR. ROCHON: But only because, counsel, I
3   know the answer, and it would implicate privilege
4   because it could not be yes or no. And you don't --
5         MR. WISTOW: Sure, it could be. It could be
6   an assistant prepared it. It doesn't --
7         First of all, there's no privilege even if
8   it was you. And second of all, saying he didn't prepare
9   it doesn't mean necessarily a lawyer did.
10        But I don't want to fight. I don't want to
11  waste time. I'll live with the instruction at this
12  point.
13     Q. All right. Did you understand the declaration
14  when you signed it?
15     A. Yes.
16     Q. Okay. I'm going to ask you some questions about
17  it. I'm going to go to page 2.
18        And you'll see, on the second line, it begins, On
19  June 18, 2005, I accordingly sent a letter to Secretary
20  of State Rice requesting her assistance in these cases
21  "consistent with the Constitution and laws of the United
22  States."
23        I emphasized in my letter that the attempt by
24  Plaintiffs' counsel to interfere with the actions of the
25  Palestinian government around the world was "not

## Page 117

1   supported by United States law and also ran counter to
2   international law and the laws of several foreign states
3   in which the PNA operates."
4         Have I read that correctly?
5      A. Yes, you have.
6      Q. Okay. Now, what laws were you referring -- what
7   was the basis for your statement that the attempts by
8   Plaintiffs' counsel to interfere with the actions of the
9   Palestinian government was not supported by United
10  States law?
11        What knowledge did you have at the time?
12        MR. ROCHON: Mr. Prime Minister -- I didn't
13  want to interrupt your question -- I would object and
14  tell you that it's the same privilege, attorney-client
15  privilege -- not with my law firm, but with counsel to
16  the Pension Fund -- upon whose behalf the letter was
17  being written.
18        MR. WISTOW: I just want it to be clear on
19  the record what we're talking about.
20        There's a letter, June 18, 2005, where he
21  says that the Plaintiffs' efforts to interfere was "not
22  supported by United States law."
23        MR. ROCHON: Yes.
24        MR. WISTOW: I'm just asking what knowledge
25  he had with regard to that statement.

Fayyad

## Page 118

1    MR. ROCHON: Okay.
2    MR. WISTOW: If you want -- I just want to
3  make that clear.
4    MR. ROCHON: I understand.
5    MR. WISTOW: If he's got any basis to
6  support the statement whatever.
7    MR. ROCHON: Because the answer would be
8  premised on advice of counsel, I'm going to instruct the
9  witness not to answer.
10    MR. WISTOW: He could say I don't know.
11    MR. ROCHON: He could say many things.
12  Because the answer is based --
13    MR. WISTOW: Okay. I accept the
14  instruction.
15    When I say I accept the instruction, I don't
16  mean that I agree with it. I mean I don't want to fight
17  about it.
18    MR. ROCHON: I understand.
19    MR. WISTOW: Okay.
20    Q. It goes on to say that it ran counter to
21  international law.
22    Did you have any knowledge at the time of what
23  international law was being referred to?
24    MR. ROCHON: Same objection. Any knowledge
25  would have been based on advice of counsel.

## Page 119

1    Q. Then it says, And the laws of several foreign
2  states in which the PNA operates.
3    Did you have any knowledge which foreign states
4  were being referred to?
5    MR. ROCHON: Same objection, and the answer
6  would be based on the advice of counsel.
7    MR. WISTOW: Okay.
8    Q. Now, you go on to say in your affidavit, I
9  further explained to Secretary Rice my understanding at
10  the time that the PNA's failure to "file an unqualified
11  appearance in answer to Plaintiffs' complaint" had
12  occurred in order to preserve our legal position both in
13  the United States and overseas with respect to potential
14  efforts by Plaintiffs to seek enforcement of the default
15  judgment in other countries.
16    Have I read that correctly?
17    A. Yes, you have.
18    Q. Okay. Now, do you know if anybody told you of
19  any risks associated with taking that legal position?
20    And I -- well, okay.
21    (Witness peruses document.)
22    MR. ROCHON: Counsel, could you show the
23  witness the full letter that you're asking him about
24  parts of it.
25    MR. WISTOW: Sure.

## Page 120

1    MR. ROCHON: Thank you.
2    MR. WISTOW: (Indicating).
3    MR. ROCHON: We should probably have it
4  marked.
5    MR. WISTOW: Well, all right.
6    MR. ROCHON: I'm not insisting.
7    MR. WISTOW: Let's not mark it now. I
8  promise you we're going to get into it and we'll mark
9  it.
10    MR. ROCHON: Thank you.
11    MR. WISTOW: Okay.
12    (Witness peruses document.)
13    MR. ROCHON: And the section that's quoted
14  there, do you mind if I note where it is, counsel, in
15  the letter?
16    MR. WISTOW: No. I don't mind.
17    MR. ROCHON: It's at the top of page 2 of
18  the letter, Mr. Prime Minister.
19    THE WITNESS: Top of page 2?
20    MR. ROCHON: Yes. That paragraph
21  (indicating).
22    (Witness peruses document.)
23    A. Okay.
24    Q. Okay. Do you have my question in mind, or would
25  you like me to repeat it?

## Page 121

1    A. You asked me if I recall if somebody told me what
2  this is about in terms of implications.
3    Q. If anybody ever told you there was any risk
4  associated with the position set forth in the letter.
5  That's what I'm asking you.
6    A. All I can tell you is I must have had good reason
7  to really include this. This is a June 18, 2005 letter,
8  so I must have been aware of that risk at the time I
9  sent that letter.
10    Q. What risk?
11    A. That you're referring to.
12    Q. What am I referring to?
13    A. In terms of why it is we acted the way we did,
14  not filing an unqualified appearance before the Court.
15  That's what I thought you asked.
16    Q. Okay. Well, I'm glad you said that because you
17  misunderstood me. It's my fault probably. I didn't ask
18  the question very well.
19    What I'm trying to find out is whether you
20  understood that any risk was associated with taking that
21  position with the Court.
22    A. Any risk?
23    Q. If anything bad could happen by taking that
24  position. That's what I'm asking.
25    A. But that's how I understood the question.

Fayyad

Page 122

1   Q. Okay. Can you answer it?
2   A. Basically, what I said. I must have been aware
3   of that risk for me to refer to it.
4   Q. What was that risk?
5   A. As I explained to you.
6   Q. That you would be defaulted?
7   A. Yes.
8   Q. So you were aware of that risk?
9   A. Basically, I was afraid — basically, the concern
10  that we had is that this could form a basis for
11  collection against us everywhere.
12  Q. I'm not talking about that. Slow down for a
13  second, okay?
14  A. Yes.
15  Q. You explained to her —
16  A. Yes.
17  Q. — that — take a look at it — that you failed
18  to file an unqualified appearance in answer to the
19  Plaintiffs' complaints, right?
20      You told her that?
21  A. Yes. Here it is. To preserve our legal
22  position, both in the United States and overseas, with
23  respect to any potential efforts by Plaintiffs to seek
24  enforcement of the default judgment in other countries.
25      The PNA and the PLO continued to maintain that

Page 123

1   the District Court lacked both personal jurisdiction
2   over them and subject matter jurisdiction over the
3   dispute; and according — and, accordingly, did not file
4   an unqualified appearance in answer to the Plaintiffs.
5   Q. I understand. What I'm asking you is, you
6   understood that a possible risk of not filing an
7   unqualified answer was that you could be defaulted,
8   correct?
9   A. Yes. That's basically — yes. I see that as a
10  risk.
11  Q. Okay. Fair enough.
12      And now, in your declaration, you say, My focus,
13  as Finance Minister for the PA, was solely on the
14  immediate financial implications of the litigation.
15      You see that?
16  A. Where?
17  Q. In your declaration, towards the end of
18  paragraph 5. Do you see that?
19  A. Toward the end — My focus, as Finance Minister
20  for the PA, was solely on the immediate financial
21  implications of the litigation and, as noted, my role as
22  Finance Minister ended not long — yes — not long after
23  I sent the correspondence to Secretary Rice. Yes.
24  Q. All right. May I have the letter?
25  A. The letter? Yes (indicating).

Page 124

1   Q. Yes. The letter that you just handed me is the
2   letter referred to in your declaration, is it not?
3   A. Yes. Yes, it is.
4       MR. WISTOW: Can we mark that. Did I give
5   you guys copies?
6       MR. ROCHON: No. You gave the Prime
7   Minister the one the court reporter will mark once I
8   stop talking.
9       (Exhibit No. 6 marked for identification.)
10  Q. Now, you left — well, strike that.
11      Did you get an answer to the letter?
12  A. I don't remember if I got an answer to the letter
13  because, you know, I left not long after that.
14  Q. Well, this letter was sent in June of 2005. When
15  did you leave?
16  A. I believe November 2005.
17  Q. Wasn't it December of 2005?
18  A. Yes.
19  Q. Could be?
20  A. Yes. Exact date? Yes. Maybe early December
21  probably. Yes.
22  Q. Okay. So that's — I don't know —
23  A. I mean, officially, it's like one's resignation
24  goes into effect and what have you.
25  Q. Okay. Well, how many months between the time you

Page 125

1   sent this letter and your leaving?
2   A. I left in early December. This is June 18.
3   Five, six months.
4   Q. So you're unable to tell me whether or not you
5   got a response?
6   A. Written — written response on this, I'm not sure
7   exists. I don't remember receiving a written response
8   to this letter.
9   Q. Okay. Did you get an oral response?
10  A. I probably did, in the sense of, you know,
11  communication that the matter is under consideration, or
12  something like that.
13  Q. Are you speculating?
14  A. In the nature of things, I am, because that's how
15  business is done usually on matters like this. It's not
16  — and it's in line with practice.
17  Q. Yes. But what I'd like to do is — you're under
18  oath. It's a very serious matter.
19      I'm asking you, did you have an oral discussion
20  with Condoleezza Rice about the contents of your letter.
21  A. Something to the effect of what I just said.
22  Cannot be more than that.
23  Q. I don't know what you just said, to be honest.
24  A. What I said before. Something to the effect that
25  the matter was under consideration.

Fayyad

## Page 126

1  Q. So she did not say that to you?
2  A. Not she personally. I don't remember who
3  actually communicated this.
4  Q. Somebody did?
5  A. Yes. Somebody did.
6  Q. Where were you when they communicated this? Were
7  you in Washington?
8  A. No. You know, there are always contacts between
9  us and the United States. I don't have to be physically
10 present nor does the Secretary have to be physically
11 here.
12 Q. I'm aware there are telephones.
13 A. In addition, they have representation as well
14 here.
15 Q. But here's what I'm trying to find out, okay?
16 A. Yes.
17 Q. You wrote a letter in June. I'm trying to find
18 out if there was ever any kind of response to it,
19 whether it was oral, whether it was written.
20   Can you tell me?
21 A. I am trying to remember now.
22 Q. And if you don't remember, just say that. Please
23 don't speculate.
24 A. I'm not speculating. I'm just trying to
25 remember.

## Page 127

1    First of all, there was no letter that I can
2  recall on this one, on this issue, other than letters
3  which had different things in them.
4    In terms of, you know, communication on the
5  substance of what this was about, I can't be a hundred
6  percent certain, but it is most unlikely, given the
7  importance of the case, that there was no, you know,
8  communication to the effect that I just told you.
9    Exactly when it happened, do I think for sure, I
10 cannot tell you.
11 Q. What you're saying is, by custom and usage --
12 A. Yes.
13 Q. -- it would be very unusual --
14 A. Yes.
15 Q. -- for the Finance Minister to write to the
16 Secretary of State of the United States and not get the
17 courtesy of a reply?
18   Is that what you're saying?
19 A. Well, you know, not necessarily in those precise
20 terms that you use. But in the way business is done
21 between governments --
22 Q. Yes?
23 A. -- you submit a letter, because there are so many
24 facts to it. And I do not know the extent to which, at
25 the time, the Secretary was aware of any of this, being

## Page 128

1  it was important to do it in this expansive fashion at
2  the time.
3    Now, again, given the way business is done,
4  matters like this and others, there would be subsequent
5  communication in the sense of, you know, something is
6  being done about this. It's being looked at.
7    I can't really tell you for sure. I know
8  something like that must have happened.
9  Q. You expect you got some kind of reply?
10 A. But not anything more than I told you.
11 Q. You don't even remember that?
12 A. I don't.
13 Q. Maybe they said they'll take it under
14 consideration? Maybe --
15 A. Not anything more than that.
16 Q. That's the most?
17 A. Yes.
18 Q. But even that may not have happened?
19 A. You know --
20 Q. It's unlikely, but --
21 A. It's unlikely. It's unlikely. It's unlikely.
22 Q. But you can say --
23 A. It's unlikely.
24 Q. -- you'd expect to get something. But you don't
25 remember it at all?

## Page 129

1  A. And if, for no other reason, because of, you
2  know, my own interest in it. I mean there's just no way
3  that I would not really have asked again, you know, as
4  to what happened and where things were.
5    But I, sitting here now several years later --
6  five years later -- I cannot tell you exactly.
7  Q. So you agree with me this was important to you?
8  A. Oh, it was.
9  Q. Okay. But you don't remember the follow-up? You
10 don't remember the follow-up?
11 A. It was a matter of a few months only.
12 Q. Whether it was a few months or a few years, you
13 don't remember any follow-up, correct?
14 A. In the months -- in the months that followed, and
15 while I was still in government, there was not anything
16 beyond what I told you --
17 Q. Okay.
18 A. -- you know.
19 Q. So did you speak to anybody in government before
20 you left and say, look, we need to follow up with
21 Condoleezza Rice, or something to that effect?
22   Did you do that?
23 A. You know, in the nature of -- this is something,
24 this particular -- this particular letter, as a matter
25 of fact, I remember personally handing it over to the

Fayyad

## Page 130

1  Secretary in a meeting by both sides, Palestinian and
2  American delegation, headed Condoleezza Rice. And also
3  there were several ministers in the room.
4      And, when I left, it was basically left with my
5  successor, everything that was there.
6      Q. Let me make sure I understood what you just said.
7      You said you physically handed this letter to
8  Condoleezza Rice?
9      A. I remember that. I explained it verbally; and
10  then I said, I have a letter to give you.
11     Q. Okay. And you didn't get an answer right then
12  and there, did you?
13     A. No. I did not, no.
14     Q. So -- and you don't recollect ever hearing a
15  response before you left government, correct?
16     A. I do not have exact or specific recollection of
17  that happening.
18     Q. You think, by custom and usage --
19     A. Yes.
20     Q. -- it probably happened?
21     A. Yes. But to the extent I explained to you.
22     Q. Okay. Fair enough. So, at most, somebody said,
23  We're thinking about it?
24     A. Yes.
25     Q. Okay. Now, when you left and you handed your

## Page 131

1  portfolio over to somebody, who was that you handed the
2  portfolio to?
3      A. My deputy at the time.
4      Q. What was his name?
5      A. Jihad Al-Wazir.
6      Q. What?
7      A. Jihad Al-Wazir.
8      Q. How do you spell that?
9      A. J I H A D, A L W A Z I R.
10     Q. Okay. Now --
11     A. Can I explain this so this is placed in context?
12     This was something that lasted only three months
13  or so, because, after that, there was total government
14  change and Hamas came in power.
15     Well, you know, just so you know.
16     Q. Right.
17     A. It was a period of transition, in other words.
18     Q. Mr. Fayyad, have I not displayed to you that, if
19  I want to know something, I'll ask. Haven't you figured
20  that out, with all due respect?
21     MR. WISTOW: I'll withdraw the comment.
22     Q. Mr. Fayyad, did you ask anybody to follow up with
23  Condoleezza Rice on this letter?
24     A. No. I did not specifically ask --
25     Q. Okay.

## Page 132

1      A. -- somebody to follow up on this letter to
2  Secretary Rice.
3      But, by then, you know, it was known that there
4  was an important issue to be pursued by whoever took
5  over the portfolio.
6      Q. How did you know that it was known that there was
7  an important issue to take over? How do you know that
8  this was just not a piece of paper filed in a file?
9      Did you talk to people about it?
10     MR. ROCHON: Objection. Those are three
11  questions, and you have to pick which one you want him
12  to answer.
13     MR. WISTOW: Okay.
14     Q. How do you know that anybody was aware of this
15  issue?
16     A. That is why I told you -- actually I remembered,
17  as I tried to understand basically what it is you're
18  looking for and asking about -- is that this was a
19  matter of importance to us, and not just an individual.
20     And that's why I remember handing it over in a
21  meeting, official meeting, attended by several officers
22  on both sides, as a matter of fact.
23     Q. Is this meeting when you gave it to Condoleezza
24  Rice?
25     A. Yes.

## Page 133

1      Q. I'm not talking about that.
2      A. Yes.
3      Q. I'm talking about before you left --
4      A. Yes.
5      Q. -- months later --
6      A. Yes.
7      Q. -- did you ask anybody in government, Follow up
8  with Condoleezza Rice on this, what you've said, very
9  important matter?
10     A. Yes. No. I did not specifically on this very
11  matter.
12     Q. Okay.
13     A. But, you know, it was understood this is an
14  important matter.
15     Q. How -- that's what I'm trying to find out. How
16  do you know -- who knew it was an important matter? Who
17  are the human beings you're talking about?
18     MR. ROCHON: That's the question you started
19  answering when you said he wasn't answering the
20  question.
21     Q. Who knew about this important matter?
22     A. Everybody who was in that room. Everybody -- I
23  mean --
24     Q. Who was that?
25     A. There were several ministers at the time at that

Fayyad

## Page 134

1 meeting.
2    Q. Who?
3    A. I don't remember for sure, but probably the
4 Minister of Foreign Affairs was there.
5    Q. What was his name?
6    A. The Prime Minister then was there for sure. I
7 mean, there were several ministers attending.
8        This is something that was, by that time, you
9 know, discussed widely. I mean it's --
10    Q. It was a big deal?
11    A. Yes. It was a big deal. Definitely, it was a
12 big deal. For sure it was a big deal.
13    Q. Okay. When you came back into government --
14    A. Yes.
15    Q. -- did you, because it was such a big deal, try
16 to find out what happened?
17    A. Yes.
18    Q. What did you find out?
19    A. I found out that, as a matter of fact, that the
20 President's office was seeing to the matter, and that
21 they were in the process of trying to find legal
22 representation.
23        And, you know, then I took over and I basically
24 carried this forward, and took -- and played an active
25 role in actually finding us legal representation to

## Page 135

1 pursue these cases.
2    Q. I'm not talking about that. I'm talking about,
3 you asked Condoleezza Rice to do something, right?
4    A. Yes.
5    Q. Okay. Up to the time you left --
6    A. Yes.
7    Q. -- you don't know if you ever heard from her
8 again, right?
9        MR. ROCHON: Objection. Asked and answered.
10    A. Well, as I told you --
11        MR. WISTOW: I'm trying to put him back
12 on --
13    A. I really don't remember. I told you that.
14    Q. You don't remember hearing from her. So, at
15 best, you told me before, you were told that the whole
16 issue was under advisement.
17        Do you remember that?
18    A. Oh, yes. What I'm really saying to you is I do
19 not remember specific, you know, communication on this
20 matter.
21        Given the importance that we attached to this at
22 the time, it is most unlikely that I did not follow up
23 on it. Even if I did, the customary answer would have
24 been -- most likely something given as an answer was
25 that, you know, it was something that was being

## Page 136

1 considered.
2    Q. So you followed up?
3    A. Yes. Yes.
4    Q. How did you follow up? What did you do?
5    A. I don't know. Typically, generally, first thing
6 you do when you have something like this --
7    Q. Yes?
8    A. -- is to actually talk to the US representative
9 here.
10    Q. To the what?
11    A. To the US representative here.
12    Q. In Palestine?
13    A. The Consul General in Jerusalem, yes.
14    Q. Did you do that?
15    A. Well, now, I really --
16    Q. Did you do that?
17        MR. ROCHON: Let him finish the answer.
18    A. I can tell you, in all likelihood, given the
19 importance of the matter, I must have done.
20    Q. Okay. Where were you? In his consulate?
21    A. Pardon?
22    Q. Was it in his consulate?
23    A. Or in my office, or over the phone.
24    Q. You don't remember?
25    A. I don't remember.

## Page 137

1    Q. Do you remember what he said?
2        MR. ROCHON: Counsel, you're repeating. I'm
3 not getting upset, because you don't like it, but it's
4 been several times. Let him finish.
5        MR. WISTOW: Okay.
6        THE WITNESS: Yes.
7    A. You know, as I tried to explain --
8    Q. Please, what did the US Consulate say?
9    A. Let me try to really say this -- I hope the last
10 time -- in a way that is clear or adequately and
11 sufficiently understood.
12        The matter is of importance to us. I submitted
13 this letter to the Secretary. In all likelihood, given
14 the importance of that matter to us, I must have, at the
15 time, followed up by asking, you know, questions as to
16 where do we stand on the matter, given what was
17 involved, given the importance of the issues.
18        Typically, those communications first take place
19 through and with the US Consul General in Jerusalem.
20 This could have happened at his office, at my office,
21 his office, my office, or telephone call. You know,
22 things like this happen all the time.
23        I mean this is in the nature of on-going concern.
24 To not have gotten a written response to a letter like
25 this which is saying, you know, we have a problem, is

Fayyad

## Page 138

1  not out of the ordinary, to not have gotten a response
2  in writing.
3      So I think all of this is within the realm of
4  what is most likely to have happened.
5      Q. Okay. Do you have any recollection -- a real
6  memory -- of anything happening?
7      A. Memo?
8          MR. ROCHON: No, no. He didn't say memo.
9  He said memory.
10     Q. Memory.
11     A. Memory. All I'm telling you --
12     Q. Do you have any memory, sir?
13     A. What kind of question is this?
14     Q. What kind of question?
15     A. Yes.
16     Q. Do you know what memory is?
17         MR. ROCHON: Your question wasn't specific.
18  You said, Do you have any memory.
19     Q. Do you have any memory of getting a response from
20  the American Consulate? Yes or no.
21     A. I'm not, you know, with all due respect, counsel,
22  I mean I told you everything I know about this in the
23  way it must have happened.
24      This is five years ago. Try to please understand
25  my world.

## Page 139

1      Q. Okay.
2      A. You know, here I am dealing with all kinds of
3  things, and I have been over the past three years.
4  Something that happened five years ago, in all
5  likelihood this is what has happened.
6      I've given you a scenario. I talk to the
7  Americans all the time about just about everything,
8  about all aspects of bilateral relations, on an ongoing
9  basis. That is one of them.
10     Q. Mr. Fayyad, I'm not suggesting there's anything
11  wrong if you don't remember.
12     A. Yes.
13     Q. I'm just trying to find out whether or not you do
14  remember. That's all I'm trying to find out.
15      Do you remember?
16     A. And what I'm really trying to tell you is that
17  this is something that must have happened really.
18     Q. Do you have a memory of it happening?
19     A. I cannot imagine it not having happened.
20     Q. Do you have a memory of it happening?
21     A. I'm trying, you know. What you're asking me, I
22  mean I really -- there is no other way in which I can
23  answer this question.
24      It must have happened. That's what I'm really
25  trying to tell you.

## Page 140

1      Q. I'm going to ask you yet again.
2      Do you remember it happening, or are you saying
3  it must have happened?
4      A. It must have happened.
5      Q. But you don't remember it, is that fair? You
6  believe it happened?
7      A. Yes.
8      Q. You believe it?
9      A. Yes.
10     Q. But you don't remember it, true?
11         MR. ROCHON: Counsel, it's been asked and
12  answered.
13         MR. WISTOW: No. I never got an answer that
14  he has no memory.
15     A. I mean if it settles it if I were to say no, I
16  don't remember, I don't remember. If it settles it.
17  Thank you.
18     Q. If it's true. I don't want you to --
19     A. I know. But you're pushing me so much. You want
20  to really end this line of questioning. I'm compelled
21  to say no, I don't remember, to move on. I mean really.
22     Q. No. You're compelled to answer the truth. You
23  swore an oath.
24     A. I am trying. Honest to God, all I'm trying to do
25  is to answer most faithfully all the questions that you

## Page 141

1  are putting to me.
2      And I am trying to provide you with some
3  contextual remarks as to what has happened to try to
4  really project it as best as I can.
5      Q. All I'm asking -- it's very simple --
6      A. Yes.
7      Q. -- is whether you have a memory of getting a
8  response from the American Consulate. That's all I'm
9  asking.
10      And you said, a moment ago --
11     A. The answer is no. Let's move on, please. And I
12  accept that as a matter of record, whatever happens,
13  just so we can move on really.
14      I feel I am being badgered here.
15     Q. I apologize if you feel that way. I feel like
16  I'm doing my job, and I intend to proceed.
17         MR. WISTOW: If you want to take a moment to
18  take a break?
19         MR. ROCHON: Can I just do this?
20         MR. WISTOW: Yes.
21         MR. ROCHON: It's maybe that there's a
22  suggestion that is being perceived that, when you say
23  somebody doesn't have a memory, that therefore it didn't
24  happen.
25         MR. WISTOW: But that's not my fault. I

Fayyad

## Page 142

1 mean I don't -- look --
2 MR. ROCHON: If we could clear --
3 MR. WISTOW: I don't want to get into this
4 speaking thing. I don't want to get into a discussion
5 with you. I was told that he doesn't need a translator.
6 I told he's fluent in English.
7 MR. ROCHON: There's no issue with
8 translation.
9 MR. WISTOW: That's right. It's not an
10 issue. It's a common thing. I've asked this kind of
11 question hundreds, if not thousands, of times. It's
12 very symbol. Do you remember it? Not do you believe it
13 happened because that's the custom, but do you remember
14 it.
15 MR. ROCHON: But you're connecting --
16 MR. WISTOW: And you understand. Let's just
17 move on. We're wasting time. He's answered the
18 question.
19 MR. ROCHON: I don't understand, but I'll
20 move on if you wish.
21 MR. WISTOW: I don't mind if you want to
22 take him out and talk to him now. It's okay with me.
23 MR. ROCHON: I'm actually trying to talk to
24 you, but you don't want to talk to me. So let's go.
25 MR. WISTOW: Okay.

## Page 143

1 MR. ROCHON: I don't need to talk to the
2 Prime Minister about your questions.
3 MR. WISTOW: Okay.
4 Q. Now, I want to go to your letter. Before I do
5 that, just a couple more questions about your
6 declaration.
7 A. Okay.
8 Q. You affirmatively stated --
9 A. Which page, please?
10 Q. Well, let me finish.
11 You affirmatively stated, in paragraph 12, that
12 you decided to retain new counsel for the PA and PLO.
13 Do you see that? Paragraph 12?
14 A. Paragraph 12, yes.
15 Q. Why did you decide to retain new counsel for the
16 PA and PLO?
17 A. Yes. Because of, again, two things.
18 Number one, the importance of this matter, which
19 I definitely felt.
20 And, secondly, that, by that time, as I indicated
21 to you before, that there was this discussion and
22 evolution in the direction of actively defending
23 ourselves in this case, and other cases as well, which
24 required retaining lawyers, you know, to do this on our
25 behalf.

## Page 144

1 Q. Mr. Clark couldn't defend the case?
2 A. I never met Mr. Clark. But I know that
3 Mr. Clark -- or I'm aware -- that he had a role in this
4 at the time. The position was there was no jurisdiction
5 or this was a matter of sovereign immunity.
6 And certainly, by early 2007, the view was that
7 this was definitely not going to stand, and that we
8 really needed to, you know, defend ourselves.
9 Q. Were you disappointed with his performance? Is
10 that why you discharged him?
11 A. You know, all I know is that I take matters like
12 this very seriously, lawsuits filed against us.
13 There was a position taken at the time, a case of
14 sovereign immunity. There was a judgment made at the
15 time, as it was when I was first exposed to litigation
16 against us first in the Israeli courts.
17 And my only view at that time, because that had
18 immediate bearing on our finances early on in my career,
19 the best thing to do actually was hire legal counsel to
20 really defend ourselves in those cases in our Israel.
21 Q. That was your decision?
22 A. That was my disposition.
23 Q. It was actually your decision?
24 A. Yes. I'm talking about the earlier cases in
25 Israel.

## Page 145

1 Q. Yes. But you decided to discharge --
2 A. That was my decision.
3 Q. -- Ramsey Clark, correct?
4 A. It was my decision to have new lawyers.
5 Q. Well, to get a new lawyer means to get rid of the
6 old one?
7 A. I don't know if I had the authority to fire or
8 discharge lawyers or do something like that. What I
9 knew was we needed new counsel.
10 Q. In addition to Ramsey Clark?
11 A. Yes, for sure. I mean I did not analyze --
12 Q. What happened to Ramsey Clark?
13 A. I honestly don't know.
14 Q. You don't know?
15 A. I don't.
16 Q. You don't know if he was discharged or not?
17 A. Ramsey Clark does not represent us anymore. I
18 may have actually done something about this, but I don't
19 remember. I mean but, for sure, he's not -- he doesn't
20 represent us in these cases.
21 Q. No, no. I understand. That's why I'm asking the
22 question what happened.
23 Was he discharged?
24 A. Yes. There was -- some formal process no doubt
25 must have happened, again.

Fayyad

## Page 146

1  Q. Again, you don't remember?
2  A. I don't remember for sure. But that is most
3  likely what has happened.
4  Q. What's most likely happened?
5  A. To have a --
6  Q. -- a formal process?
7  A. Yes, I mean in the sense of notifying him. And,
8  as a matter of fact, it may have been me who did it.
9  Q. But you don't remember?
10  A. But I don't remember for sure.
11  Q. Okay. Were you dissatisfied with him?
12  A. Well, how can you be -- I mean you never know,
13  when you're on a path of, you know, pursuing something a
14  certain way, the judgment is that this is the right
15  approach to take, it's difficult to know exactly how
16  things were going to go.
17     For sure, you know, with the benefit of what we
18  knew at the time we -- there was enough support for
19  moving forward with a new strategy. I believe it was
20  definitely the right course.
21  Q. I'm asking whether or not you were dissatisfied
22  with him as a lawyer.
23  A. You know, I can't really now, you know, sit here
24  and pass judgment on, if I can say legal counsel, in
25  this matter or any other matter.

## Page 147

1  Q. I'm not asking you to pass judgment.
2     I'm asking, in your mind at the time -- let me
3  finish -- in your mind, at the time, were you
4  dissatisfied with him.
5     MR. ROCHON: Objection, counsel, to the form
6  of the question.
7  A. Well, I guess, given what I also told you about
8  my position on the other cases, you know, I had my
9  doubts. So, therefore, I really wanted us to move
10  forward, move forward with a new strategy.
11  Q. Were you dissatisfied with him?
12  A. I can't say I was dissatisfied with the person
13  here, with the lawyer. All I can tell you is that
14  obviously was a strategy that did not work out.
15  Q. Did you consider telling him about the new
16  strategy and instructing him to go forward with the new
17  strategy?
18  A. I was not involved in the litigation early on. I
19  wasn't.
20  Q. I'm talking about the retaining of new counsel.
21  Weren't you the person who did that?
22  A. I can't tell you for sure it was.
23  Q. Weren't you the person who did that?
24  A. I can't tell you for sure it was.
25  Q. Okay.

## Page 148

1  A. But then, you know, here we are -- I mean, the
2  way I decide things, you know, you're running a certain
3  strategy today and you have certain individuals --
4  lawyers and non-lawyers -- doing it for you, and then
5  you pursue an entirely different strategy.
6     Common sense, as far as I'm concerned, you know,
7  required that I retain services of new lawyers to pursue
8  the new strategy, not the outgoing one.
9     How can a lawyer, who was yesterday arguing on
10  our behalf a certain key defense on grounds of
11  jurisdiction so emphatically and categorically, go the
12  next day and say -- I don't know --
13  Q. So you weren't dissatisfied?
14  A. It's just a natural thing for me to do.
15  Q. So you weren't dissatisfied?
16     MR. ROCHON: Objection.
17  A. I don't think in those terms really, honestly. I
18  mean I'm a practical person. I mean we're moving on.
19  Different strategy, different lawyers.
20     THE VIDEOGRAPHER: Excuse me. I'd like to
21  change the tape.
22     MR. ROCHON: Yes. Please. Off the record.
23     THE VIDEOGRAPHER: Going off record at 7:16.
24     (Short recess taken.)
25     THE VIDEOGRAPHER: Going on record at 7:30.

## Page 149

1  Q. Paragraph 13 of your declaration, line 4 -- well,
2  why don't you just read paragraph 13 to yourself, up to
3  and including the sentence beginning, I personally
4  commit.
5     (Witness peruses document.)
6  A. Yes. I have.
7  Q. Okay. When you say you personally commit to
8  sustain this instruction, obviously you can be voted out
9  of office at any time, yes?
10  A. Yes.
11  Q. Okay. I'm trying to find out what this means, I
12  personally commit.
13     If the instructions are changed somehow, do you
14  submit to the jurisdiction of the Federal Court in
15  Providence? Does your commitment extend to that?
16     MR. ROCHON: Objection, counsel. Three
17  questions that time. Again, just try to ask one at a
18  time.
19     MR. WISTOW: Okay.
20  Q. I'm trying to find out what I personally commit
21  means.
22  A. Okay.
23  Q. If there's a departure from this commitment, do
24  you personally submit to the jurisdiction of the court
25  in Rhode Island?

Fayyad

## Page 150

1    A. I meant for the statement to be an emphatic
2  expression of commitment that the whole system is
3  stating. When I say I personally, I meant it in that
4  way.
5    Q. I'm not clear. It says, I personally commit.
6  I'm trying to find out what happens if that commitment
7  is somehow not fulfilled.
8    Will you agree to submit to the Federal Court in
9  Providence?
10    MR. ROCHON: Objection. Mr. Prime Minister,
11  do not answer that question. It's an argument.
12    MR. WISTOW: It's not an argument. It's a
13  question. I'm asking him if he's willing to do that.
14  I'm trying to test the personal commitment. That's all.
15    MR. ROCHON: You don't want speaking
16  objections.
17    MR. WISTOW: Okay. Okay. Okay.
18    MR. ROCHON: If you clarify your question.
19  What are you asking him? You want to ask that question,
20  you want to --
21    MR. WISTOW: What does the personal
22  commitment amount to? What happens if you violate your
23  commitment?
24    MR. ROCHON: By you, counsel, you mean you
25  meaning --

## Page 151

1    MR. WISTOW: Yes.
2    MR. ROCHON: Meaning who?
3    MR. WISTOW: You. Mr. Fayyad.
4    MR. ROCHON: The Prime Minister?
5    MR. WISTOW: Yes.
6    A. You know, I mean I think there's a responsibility
7  in all of its components and stages and phases. I take
8  what I say very seriously. I'm a man of my word. And I
9  say I'm responsible and I'm committed means I'm
10  committed.
11    And so, therefore, if I act in a manner that is
12  inconsistent with that commitment, I do not know exactly
13  what will happen, but I understand liability. I mean I
14  understand I'll be liable for failing to fulfill a
15  commitment.
16    Q. You understand you will be liable?
17    A. I, you know -- let me tell you, first of all, you
18  know, my state of mind when I signed this declaration,
19  what it means. Certainly, my role, you know, knowledge
20  and involvement in the way that is described here.
21    But when I say I'm personally committed, I
22  personally commit myself to pursuing these things, I
23  certainly mean that, but I mean more than that.
24    I mean more than just a personal commitment made
25  by me. I'm doing it really in my capacity as Prime

## Page 152

1  Minister of Palestinian Authority, expecting fully well
2  the commitment to be honored by whoever proceeds me.
3    Q. What if Hamas comes into power again?
4    A. And then, if I'm sued on the basis of a
5  representation that I made here, I'd find that
6  reasonable.
7    Q. So you're saying you do feel that you would have
8  personal liability?
9    MR. ROCHON: Counsel --
10    Q. Is that what you're saying?
11    MR. ROCHON: Mr. Prime Minister, and
12  counsel, when you talk about personal liability,
13  counsel, you're -- you know you're -- I'll have to ask
14  Mr. Prime Minister -- I'll have to ask him to step out.
15    You know we need to discuss this. This is a
16  ridiculous line of inquiry. I'll ask the witness to
17  step out and we can argue about it and you can move on.
18    I don't want to argue about it in front of
19  the witness because you'll get upset.
20    So, Ms. Ferguson --
21    MR. WISTOW: No. I'm not going to get
22  upset. You know what --
23    MR. ROCHON: You're not going to get upset
24  if I tell you why it's ridiculous?
25    MR. WISTOW: Well, no. I'm getting upset

## Page 153

1  because you say it's ridiculous, okay? You can say it's
2  improper. But, you know what?
3    MR. ROCHON: Improper and --
4    MR. WISTOW: Let's just move on.
5    MR. ROCHON: Okay.
6    MR. WISTOW: I got an answer from him that I
7  like, and I'll move on.
8    MR. ROCHON: Counsel --
9    MR. WISTOW: I'll move on. I got an answer
10  and I'll move on.
11    MR. ROCHON: You move on.
12    MR. WISTOW: Okay.
13    Q. Now, the last lines of that paragraph says,
14  Moreover, it is important to the PA's role in the
15  international community to participate in the legal
16  process, even when it is process brought in the United
17  States for actions by others that occurred far from the
18  United States.
19    Do you see that? Do you see that?
20    A. It is important -- yes, I do.
21    Q. I've read that correctly?
22    A. Yes, you have.
23    Q. Okay. Now, the next line says, The importance of
24  this was not fully appreciated by the PA government, as
25  a whole, until recently.

Fayyad

| Page 154 |
|---|
| 1  Have I read that correctly? |
| 2  A. You have, yes. |
| 3  Q. First of all, when is recently? What do you mean |
| 4  by that? You wrote this declaration. |
| 5  A. Yes. You know, I meant actually around the time |
| 6  when we moved to defend ourselves and took practical |
| 7  steps toward beginning to. |
| 8  Q. When was that? |
| 9  A. This must have been early 2007, late 2006. |
| 10  Q. Okay. Now, you say it was not fully appreciated |
| 11  by the PA government as a whole. What do you mean, as a |
| 12  whole? |
| 13  A. I make reference here to what I had told you |
| 14  before about differing views within the PA as to how |
| 15  this would be approached, and the process of evolution |
| 16  that really took us through the point of seeking to |
| 17  defend ourselves actively. |
| 18  Q. Who were the people that were involved in these |
| 19  discussions? |
| 20  A. Just about everybody. |
| 21  Q. Just about everybody? |
| 22  A. Yes. I mean -- |
| 23  Q. Can you help me out a little bit? What you're |
| 24  indicating is there were a lot of people involved, |
| 25  right? |

| Page 155 |
|---|
| 1  A. A lot of people involved in the sense of people |
| 2  in government, you know. Not a lot of people outside |
| 3  the government. |
| 4  Q. I understand, Mr. Fayyad. Who were the people in |
| 5  government you're talking about? |
| 6  A. Now, you know, the issue would come up from time |
| 7  to time. Sometimes in formal settings, sometimes in |
| 8  discussion. |
| 9  Q. Who are the people you're talking about? |
| 10  A. Various ministers, Cabinet officers. |
| 11  Q. Let's name some names. President Abbas? |
| 12  A. From time to time. |
| 13  Q. Yes? |
| 14  A. Yes. |
| 15  Q. Okay. |
| 16  A. He certainly. |
| 17  Q. How about the -- |
| 18  MR. ROCHON: Counsel -- |
| 19  MR. WISTOW: Sorry. I didn't mean to |
| 20  interrupt. I didn't mean to interrupt. |
| 21  MR. ROCHON: I know. But you have to |
| 22  control yourself and not interrupt, even if you don't |
| 23  mean to. |
| 24  MR. WISTOW: Okay. Well taken. Fair point. |
| 25  Q. Continue. |

| Page 156 |
|---|
| 1  A. I forgot where I was. |
| 2  Q. We were talking about the members of government |
| 3  who participated in these discussions where it was not |
| 4  at first fully appreciated by the government as a whole. |
| 5  We mentioned President Abbas. And, |
| 6  unfortunately, I interrupted you while you were |
| 7  continuing. |
| 8  Who else? |
| 9  A. People involved in this in terms of expressing a |
| 10  view on, there were several of those actually. |
| 11  Q. Who? |
| 12  A. And when I say government here, I mean I do not |
| 13  really necessarily mean, you know, government to be |
| 14  technically defined to be only Cabinet officers. You |
| 15  know, when you say United States government, for |
| 16  example, in that sense. |
| 17  Certainly Cabinet officers, but others as well. |
| 18  Q. Fine. I'm willing to accept whatever you mean |
| 19  by this. Who are the people? Tell me the names of the |
| 20  people. |
| 21  We got one. We got President Abbas. And |
| 22  certainly you also, right? |
| 23  A. Yes. |
| 24  Q. Okay. Who else? |
| 25  A. I don't -- you know, people within the Ministry |

| Page 157 |
|---|
| 1  of Finance, for example. |
| 2  Q. Which one? |
| 3  A. People who -- |
| 4  Q. No. Which Minister of Finance? |
| 5  A. Ministry of Finance. |
| 6  Q. How about, can you give me the name of a human |
| 7  being? |
| 8  A. Deputy Minister of Finance. |
| 9  Q. Okay. |
| 10  A. Treasurer. Legal counsel, Ministry of Finance. |
| 11  It's just one agency. Similarly, Ministry of Justice. |
| 12  Q. What? |
| 13  A. Ministry of Justice, Ministry of Foreign Affairs. |
| 14  Q. Okay. So these were the people who did not |
| 15  appreciate it until recently? |
| 16  A. No, no. I didn't -- I thought I was answering a |
| 17  different question, when you asked about who was |
| 18  involved regardless of what, you know, position was |
| 19  taken by whom. |
| 20  Q. I'm asking you -- it says here, The importance of |
| 21  this was not fully appreciated by the PA government as a |
| 22  whole. |
| 23  Who are the people we're about that |
| 24  didn't fully appreciate it? |
| 25  A. Oh, I was answering a different question. Thank |

Fayyad

Page 158

1  you for giving an opportunity to clarify.
2      I did not mean any of these individuals that I
3  referred as having been of the view that the case should
4  not be pursued in the way that it's being pursued right
5  now, which is to actively defend ourselves.
6      I thought I was answering a question as to who
7  may have been involved in the discussion with different
8  views and different takes, and not necessarily with the
9  same degree of depth or seriousness, if you will.
10      I mean there could be a casual comment on this by
11  someone.
12      Q. Okay. You said, and I quote yet again, The
13  importance of this was not fully appreciated by the PA
14  government as a whole.
15      A. Yes.
16      Q. You wrote that, correct?
17      A. Fine. Yes.
18      Q. You believed it?
19      A. It's in my declaration. I know it to be true.
20      Q. Okay. Now, what I'm trying to find out is what
21  human beings are you referring to.
22      A. You know, I'm referring actually not only to the
23  period of time that I was talking to you about in
24  2006-2007, because the line of questioning that took us
25  to that was really that time line.

Page 159

1      But, historically, when the action was brought
2  against us first in the United States -- going back, I
3  believe, to 2000 -- clearly, you know, the opinion was
4  that the strategy ought to be what it was up until we
5  changed it.
6      Q. Right.
7      A. So I would say, you know, consistent with this
8  having happened, clearly, to the extent there was any
9  debate, you know, it was that.
10      Q. Right.
11      A. You know, over time, that, you know, strategy was
12  beginning to be second-guessed in the sense of whether
13  or not it was the right strategy.
14      Q. Right.
15      A. And it was in the nature of any evolutionary
16  process. I cannot tell you there was a point in time
17  when before -- it was not really a watershed in the
18  sense of before and after. It was just an evolutionary
19  process.
20      And you would find that people thinking a certain
21  way yesterday, that way yesterday, they're thinking
22  differently today.
23      So there's not anyone I know who was always
24  against or continued to be against or anything like
25  that. It's just in the nature, if you will, of a

Page 160

1  political process.
2      Q. Yes. But you wrote, The importance of this was
3  not fully appreciated by the PA government as a whole.
4      A. Yes.
5      Q. I'm looking for the names of any people, any
6  human beings, that you can identify as not fully
7  appreciating as you used the term. Anybody.
8      A. You know --
9      Q. Is there any human being you can identify?
10      A. No. What I can tell you is what I told you
11  about. I'm not really going to, you know, maybe
12  unfairly characterize someone as having taken a position
13  which he or she may not have taken at the time.
14      This is a statement of fact. I meant it in the
15  same way it appears here, and I still believe in it.
16      Q. Right.
17      A. There was not really uniformity of view on this,
18  clearly.
19      For the most part, the overwhelming view was
20  that, you know, those cases ought to be really dealt
21  with on the basis of, well, jurisdiction. So there was
22  that debate.
23      I do not know if there was any one individual I
24  can point to who was of that view, continued to be of
25  that view. So that's the sense in which I meant the

Page 161

1  sentence.
2      Q. I'm not asking you who continued to be of the
3  view. I understand it evolved.
4      A. Yes.
5      Q. It started out one way and it gradually --
6      A. Yes.
7      Q. -- ended up somewhere else.
8      A. Yes.
9      Q. Right?
10      A. Yes.
11      Q. Okay. Here's what I'm doing. You're asking the
12  Federal Court to vacate --
13      A. Yes.
14      Q. -- the default judgment. Yes?
15      A. Yes.
16      Q. You understand that?
17      A. Yes, yes.
18      Q. You have put in a declaration under oath. And
19  the purpose of this declaration is what? Do you know?
20      The purpose of the declaration is in support of
21  the motion to vacate the default.
22      A. Yes.
23      Q. You know that, right?
24      A. So we give ourselves the chance to defend
25  ourselves.

Fayyad

## Page 162

1    Q. Yes. But the purpose of this declaration is to
2  vacate the default, yes?
3    A. To be able to defend ourselves.
4    Q. I am aware that this declaration is being filed
5  in support of a motion by the PA and the PLO to vacate
6  the default, okay? For whatever purpose.
7    A. For the purpose I stated.
8    Q. You understand it's to vacate a default, yes?
9    A. To defend ourselves.
10    Q. To vacate the default?
11    A. In order to defend ourselves.
12    Q. Okay. Fine. All right. You understand that we
13  oppose that, correct?
14    A. I do.
15    Q. Okay. And do you understand that I'm trying to
16  test the meaningfulness of your declaration? Do you
17  understand that?
18    A. I take its face value.
19    Q. I want to see if you can support any of these
20  statements.
21    A. Yes.
22    Q. That's what -- do you understand that?
23    A. Fine.
24    Q. Okay. Now, I'm asking you to support the
25  statement that, The importance of this was not fully

## Page 163

1  appreciated by the PA government as a whole.
2      And I'm asking you to name anybody -- anybody --
3  who did not fully appreciate --
4      MR. ROCHON: Counsel, do you want him to
5  support the statement or -- which of the two questions
6  do you want him to answer? You've asked him two again.
7      MR. WISTOW: Okay.
8    Q. I want you to support the statement by supplying
9  names of people.
10      MR. ROCHON: Counsel, you can't tell him how
11  to answer your questions.
12      MR. WISTOW: Here's what I'm going to do.
13  I'm just going to ask this.
14    Q. Do you know the names of anybody who did not
15  fully appreciate the importance of participating in the
16  legal process, as you've set forth here? The names of
17  anybody at any time.
18    A. I cannot really give you the names now.
19    Q. Okay. Fair enough.
20    A. I haven't finished.
21      What I can tell you is that, for a long time --
22  this is really what this sentence is supposed to mean.
23  When I say, Was not fully appreciated, in the sense of
24  my feeling that probably this change of strategy should
25  have happened sooner.

## Page 164

1      It is in that sense that I really meant this
2  declaratory statement to be. That is what it is
3  intended to say. That's the meaning of fully
4  appreciated, in that sense. Not in the sense of a
5  certain individual against or for.
6    Q. Okay. So you don't know of any person --
7    A. No. I meant it precisely in the way I just
8  stated.
9    Q. So you don't know the name of any person that you
10  can say that person in the government did not appreciate
11  the importance of participating in -- you can't name
12  anybody.
13      Is that fair?
14      MR. ROCHON: You've got it already.
15      MR. WISTOW: I want it again.
16    Q. Is that fair?
17    A. As I said, you asked me what's the meaning of the
18  sentence.
19      MR. WISTOW: There's a reason for this.
20    A. You know, going back to your --
21      MR. WISTOW: I'll withdraw the question.
22    A. Okay.
23    Q. I want to go to your letter.
24    A. Fine.
25      MR. ROCHON: That's -- just for the record,

## Page 165

1  that is No. 6.
2    Q. And this, indeed, is the letter referred to in
3  your declaration, is it not?
4    A. It is.
5    Q. Okay. Now, one of the things you said in your
6  declaration is your focus, when you sent this letter,
7  was as a Finance Minister.
8    A. Yes.
9    Q. Now, in the letter, you refer to some really
10  important issues, don't you?
11    A. That was the intention.
12    Q. Yes. And, for example, you point out, in the
13  very first paragraph, that you're writing for immediate
14  assistance, right?
15    A. Yes.
16    Q. Immediate meaning right away, yes?
17    A. Yes. Yes. That's what immediate means.
18    Q. Okay. And what you say there is -- in the first
19  paragraph, you're talking about, to use your words, A
20  serious obstacle to the continued effective
21  participation of the PNA --
22      That's the Palestinian Authority, right?
23    A. Yes.
24    Q. What we've been calling the PA?
25    A. Yes.

Fayyad

## Page 166

1  Q. -- in the Middle East peace process and the PNA's
2  role as a strong and viable partner of the United States
3  of America and the government of the State of Israel in
4  that process.
5  So that's a major major concern, isn't it?
6  A. It is.
7  Q. Very important?
8  A. Yes.
9  Q. Okay. And then you go on in the second paragraph
10  and you say, Even now -- at the very end of the second
11  paragraph -- Even now, the enforcement actions being
12  taken by Plaintiffs, and the mere threat that Plaintiffs
13  may be successful, are causing substantial harm to the
14  Palestinian people and the PNA, and thereby threatening
15  the peace process itself.
16  Yes?
17  A. Correct.
18  Q. That goes beyond just money. We're talking about
19  threatening the peace process, aren't we?
20  A. Yes.
21  Q. Okay.
22  A. You want me to explain?
23  Q. No. I don't want you to explain.
24  A. But I really would want to --
25  Q. Did you believe -- did you believe that these

## Page 167

1  enforcement actions threatened the peace process?
2  A. In the following sense --
3  Q. Go ahead.
4  A. Did you want to ask me that, or --
5  Q. No. Here's what I want to do. I want to ask the
6  questions. If your counsel wants to follow up later
7  with you, I don't have any problem.
8  A. Yes.
9  Q. I want to finish up in my allotted time, and I
10  don't want to have to file motions saying that I ask a
11  question and I get speeches. That's -- forgive me.
12  MR. ROCHON: Counsel, counsel. You ask
13  questions that invite them. So --
14  MR. WISTOW: Well, I don't think so.
15  Q. Now, you also go on to say, in the footnote on
16  page 2 --
17  A. Yes.
18  Q. -- In addition to the Ungar case, the Plaintiffs'
19  counsel -- that means the Plaintiffs' counsel in the
20  Ungar case, right?
21  A. Yes.
22  Q. -- working with parties in Israel, has filed
23  other actions in the United States seeking millions and
24  millions of dollars from, inter alia, the PNA and the
25  PLO. See, for example, Knox, et al. versus PLO.

## Page 168

1  Now, it goes on to say, We believe that these
2  separate actions are part of a concerted effort to
3  impose crippling financial ability -- excuse me --
4  crippling financial liability on the PNA, thereby
5  undermining its ability to function as a partner in the
6  peace process.
7  Yes?
8  A. That's what it states.
9  Q. That's a very big deal, isn't it?
10  A. The whole thing is a big deal.
11  Q. Sorry?
12  A. The whole thing is a big deal, which I
13  consider --
14  Q. It goes way beyond the money. We're talking
15  about endangering the peace of the region, correct?
16  A. Yes. But money is important in this.
17  Q. Money is important. And peace is more important,
18  isn't it?
19  A. Yes. But there is a causal link between what I
20  said here and the cause and the effect. It acts through
21  the PA's capacity to continue to exist.
22  Q. You believe --
23  A. That's my view. That was my view then, and
24  continues to be my view today.
25  The PA, with this liability, you know, cannot

## Page 169

1  function. And I regard the PA as a chief partner in
2  this political process.
3  And if the PA is disabled or otherwise unable to
4  continue to exist and function, clearly the process is
5  damaged irreparably.
6  That's what I meant. That's my view.
7  Q. I understand. I understand. I understand
8  exactly what you're saying. So this is an
9  extraordinarily important issue?
10  A. It is.
11  Q. Okay. Did you follow up on this letter?
12  MR. ROCHON: Counsel, you've asked --
13  MR. WISTOW: I'm pointing out to him now --
14  he's indicated how important this is. I want to see if,
15  with that recollection, see if his recollection is
16  refreshed now that he focuses on this.
17  A. Yes.
18  Q. Does that refresh your recollection that you
19  followed up?
20  A. I'll tell you what I told you before.
21  Q. Okay. Fair enough.
22  A. There's no question in my mind that I did. In
23  terms of specific occurrences of that --
24  Q. Okay.
25  A. -- is the stuff that I cannot really refer to

Fayyad

## Page 170

1  specifically. But there is no question that it
2  happened.
3  Q. Okay. What happened?
4  A. That the follow-up happened.
5  Q. What follow-up? What did you do?
6     MR. ROCHON: Counsel --
7  A. In the sense of asking where things stood, asking
8  where things stood on this very important matter.
9     MR. ROCHON: Counsel. Redundant.
10    MR. WISTOW: He brought it up.
11    MR. ROCHON: Because you asked him to.
12    MR. WISTOW: All right. You know what?
13 We'll leave the record the way it is.
14 A. Okay. Okay.
15 Q. Did you talk to President Abbas about this very
16 serious situation, now that you see the references to
17 undermining the whole peace process?
18 A. Yes. I have on numerous occasions.
19 Q. I'm talking about this letter.
20 A. This letter? He was the President, as he is
21 today, and I'm sure I did.
22 Q. Do you recollect it?
23 A. No.
24 Q. Okay.
25 A. This has been coming up way too often -- do you

## Page 171

1  recollect a specific time and place, all this and that.
2     In the same way I must have had something on a
3  week ago. I do not work, you know, that close on. You
4  ask me what it is you had on that day. I can't remember
5  in that sense.
6     But it is not natural for me to have told the
7  President on numerous occasions, you know, about this
8  case.
9  Q. About this letter?
10 A. About this letter too.
11 Q. Okay. So we'll accept that.
12 A. Okay.
13 Q. So you spoke to -- you're confident --
14 A. Yes.
15 Q. -- that you talked to President Abbas about this
16 letter?
17 A. Yes. Absolutely. Yes.
18 Q. Okay. Now, when you wrote this letter, you were
19 aware -- this is June of 2005?
20 A. Okay.
21 Q. You were aware that the First Circuit Court of
22 Appeals affirmed the judgment, correct?
23 A. Now that I see the letter again, now that I see
24 the letter again, I understand that basically this was
25 basically final.

## Page 172

1  Q. Did you read this letter before you signed it?
2  A. Yes. I mean what I'm saying to you, I obviously
3  read the letter before I signed it.
4  Q. Okay.
5  A. But I did not see it before -- you asked me the
6  question, did you see this letter before this
7  deposition. I haven't -- do you see what I'm saying?
8  Q. Can we agree that, when you wrote this letter --
9  A. Yes.
10 Q. -- you knew that the First Circuit Court of
11 Appeals affirmed the judgment?
12 A. Yes.
13 Q. Yes?
14 A. Whatever is in this letter I knew, for sure.
15 Q. Do you remember this, or are you just saying?
16 A. Five years later? I'm certain I do not really
17 put my signature on something I do not believe to be
18 true.
19 Q. No doubt, none, that you knew that the First
20 Circuit had affirmed this?
21 A. The best that I could ascertain at the time. I
22 would not sign a letter that I did not believe that what
23 was in it was factual.
24 Q. Okay. So let me rephrase the question.
25    There is no doubt at all that you believed the

## Page 173

1  First Circuit had affirmed it? No doubt of that?
2  A. There was no doubt, at the time I signed this
3  letter, that there was anything in it that was factually
4  incorrect.
5  Q. So you believed it all, correct?
6  A. Yes. When I signed this letter, there was
7  nothing in it that I did not regard as factually
8  correct.
9  Q. Now, did you discuss with anyone what to do now
10 that there had been an affirmance by an Appeals Court?
11 A. In terms of follow-up you mean? In terms of
12 process? What do we do?
13 Q. Yes. We have a situation --
14 A. Yes.
15 Q. -- where the peace process --
16 A. Yes.
17 Q. -- the peace process is imperiled?
18 A. Yes.
19 Q. Did you have discussions with anybody about what
20 to do?
21 A. You know, when this happened, this was, as you
22 could tell -- as you could tell from the letter, this
23 appears to have been the first time the issue was raised
24 formally with the US administration in terms of, you
25 know, this being seen as a serious problem by us, you

Fayyad

## Page 174

1  know, trying to, you know, find a way as to how to deal
2  with this very important, very serious issue.
3       And we're talking about the second half of June
4  of 2005. Two months later I was outside of government.
5  In the interim, there's no question that this was a
6  matter that was being pursued and followed up on.
7       Now, you know, going back to when the case was
8  filed -- 2000, 2001 -- I do not recall exactly --
9       Q. 2000.
10      A. 2000. Okay. We're talking about five years up
11 to that point in time before we actually wrote the
12 letter, before we approached anyone on it.
13      And so what is a matter of few months time to
14 suggest that it was not actually being pursued or this
15 was not something that was taken seriously.
16      Q. Mr. Fayyad, I'm not suggesting anything. I'm
17 just asking questions.
18      My question was, did you discuss the situation
19 with anyone within government after you learned that the
20 First Circuit had affirmed the judgment.
21      A. No.
22      Q. What?
23      A. Like, you know, this other question that you
24 asked me before, I'm sure I did, in terms of what do we
25 do. The nature of things, what kind of discussion would

## Page 175

1  you have against a backdrop of something like this?
2       Are we doing this right, is it really not time to
3  do something, what else can we do. You know, questions
4  like this.
5       Q. To whom?
6       A. People like I mentioned to you.
7       Q. What people?
8       A. People in government.
9       Q. What people?
10      A. Various Cabinet officers.
11      Q. Will you name them, please.
12      A. Minister of Foreign Affairs.
13      Q. What's his name?
14      A. At the time, I believe it was Nabil Sha'ath.
15      Q. You spoke to him? You remember?
16      A. I mean most likely, you know, he was there and we
17 had conversations. He was there at the meeting that
18 this letter was handed. And I had discussions with
19 various officials. Most likely he was one of them, for
20 sure.
21      The President himself for certain, on more than
22 one occasion.
23      Q. So what did you decide to do, other than write to
24 Condoleezza Rice?
25      A. Look into what it is that can be done.

## Page 176

1       Q. What else did you do?
2       A. As I told you, you know, a process of
3  deliberation must have started then, as evidenced by the
4  fact that, in the course of the months that followed,
5  including in the course of 2006, there was, you know,
6  the beginning of definition of a new strategy as to how
7  to handle this and other cases, as evidenced by the fact
8  that, ultimately, there was, indeed, a shift in that
9  strategy.
10      Q. Okay.
11      A. Yes.
12      Q. Have you finished?
13      A. Yes.
14      Q. Okay. On June 18, 2005 --
15      A. Yes.
16      Q. -- you, at least by that point, knew the Court of
17 Appeals had affirmed the judgment, correct?
18      A. Yes.
19      Q. Can you identify any person that you spoke with,
20 after this letter was given to Condoleezza Rice, to talk
21 with them about what do we do now? Anybody.
22      A. I talked to several people, you know, including
23 lawyers, including people not necessarily in government
24 either.
25      This is such a big deal. I meant every word, you

## Page 177

1  know, in this letter when I wrote it, when I signed that
2  letter. And I still do believe, you know, it definitely
3  reflected my state of mind at the time I signed it.
4       Q. I'm sorry?
5       A. It reflected my state of mind at the time I
6  signed it in terms of the importance in which we viewed
7  this issue. So yes, it was definitely on our mind. We
8  were trying to find a way.
9       It's not, you know -- you have to understand, I
10 do not know if the PA was sued in the United States
11 before. I mean I don't know the history.
12      This is -- you know, the whole PA is new. It's
13 not like every day something like this happened and we
14 have been in existence forever and, you know, there's a
15 book that tells you what to do in situations like this.
16      So, basically, we're trying to find our way.
17      Q. Right. So you talked to people?
18      A. Yes. I talked to people.
19      Q. Who?
20      A. People around me at the time.
21      Q. Can you identify one?
22      A. I mentioned you some. The President.
23      Q. Okay. So you asked President Abbas --
24      A. Yes. I mean --
25      Q. Let me finish.

Fayyad

| Page 178 |
|---|

1   A. Yes.

2   Q. So you said you were talking with President Abbas

3   about, We got a bigger problem now. We've got a

4   judgment that was affirmed by Court of Appeals, right?

5       MR. ROCHON: Objection, counsel.

6       MR. WISTOW: Okay.

7       MR. ROCHON: The leading is -- I know I've

8   got a standing objection. And just because I'm --

9       MR. WISTOW: You do. You do.

10      MR. ROCHON: -- mentioning it now, it

11  doesn't matter. But you're going way too far.

12      MR. WISTOW: Well, I don't think so. You

13  know, thank you for trying to preserve my deposition.

14  Why don't you just let it go and these questions will be

15  stricken.

16      MR. ROCHON: I don't mind if you're aware of

17  it.

18      MR. WISTOW: Okay. I'm aware of it. I'm

19  doing it at my risk.

20   Q. So, in substance, in substance -- I'm not

21  pretending that I know the exact words -- you said to

22  President Abbas, Look, the First Circuit has affirmed

23  this judgment. We need to do something.

24      Is that a fair statement of the substance of what

25  you would have said?

| Page 179 |
|---|

1   A. You know, I cannot tell you that, you know, the

2   words could have been anywhere near what you have

3   suggested in your statement by way of specificity, First

4   District Court having decided to do this, that or the

5   other thing.

6       But, you know, in substance, that this was a

7   situation that required that it be dealt with --

8   Q. Okay.

9   A. -- without, you know, getting into various

10  technical issues associated with it.

11      You know, we knew there was an issue to be dealt

12  with. And here is the President, and I had a

13  conversation with him.

14  Q. Okay. We know that you considered this to be a

15  matter of such grave importance --

16  A. Yes.

17  Q. -- threatening regional peace. Maybe world

18  peace, right?

19  A. I'm waiting for the question.

20  Q. I said, Right? I mean that was your state of

21  mind at the time?

22  A. That was my state of mind.

23  Q. So that convinces you that you would have talked

24  to President Abbas about it, correct?

25  A. Yes. That's right.

| Page 180 |
|---|

1   Q. So what you're saying is that it was such a huge

2   issue, you would have done that, even though you don't

3   remember a particular discussion with him.

4       Is that fair?

5   A. Very fair.

6   Q. Okay. Do you have any idea what the result of

7   that discussion was? Any idea?

8   A. It often happens.

9   Q. I'm sorry?

10  A. Oftentimes it happens that, regardless how

11  important issues are -- including a political matter --

12  that those discussions would take place and ideas are

13  put forward without conclusion in any given session,

14  say, when they should discuss as to exactly, you know,

15  what was going to happen afterwards.

16      And that is -- I am really trying to project to

17  you as close to the way I believed it happen as it did.

18  You know, over time, there were discussions. All I know

19  is we, in the nature of things, ended up on this new

20  path.

21  Q. Sometime in 2007?

22  A. Yes. Or late 2006, early 2007. That's when I

23  really got involved in this again.

24  Q. Yes?

25  A. Yes.

| Page 181 |
|---|

1   Q. So we're talking about a period of almost three

2   years?

3   A. Little less. Anyway, if you take June 2007 as

4   starting point --

5       MR. ROCHON: Excuse me.

6   Q. No. Take --

7   A. June 2007. I'm sorry. June 2005.

8   Q. No.

9   A. If you take June 2005 as --

10  Q. No. We'll take March 31, 2005.

11      Well, let me ask you this. When did you learn

12  about the decision of March 31?

13  A. It must have been, you know, during that time

14  period, between the time I wrote the letter and the time

15  it happened.

16  Q. Well, I know that.

17  A. I mean this is -- we're talking about a couple of

18  months here between the time, you know --

19  Q. Do you remember learning of it?

20  A. Obviously. That's why --

21  Q. Do you remember learning -- in other words, did

22  you get a phone call where you were shocked?

23      Can you remember anything about your reaction

24  when you learned about it?

25      MR. ROCHON: Counsel, four questions.

Fayyad

| Page 182 | Page 184 |
|---|---|

**Page 182**

1    MR. WISTOW: All right. Fine. I'll take
2  the risk.
3    A. No, sir. I don't remember.
4    MR. ROCHON: Counsel, we'll move on. We
5  don't have to take the risk. He actually gets to get
6  just one at a time even if you're willing to take the
7  risk.
8    MR. WISTOW: Okay. I'll do it one at a
9  time. I'll do it one at time.
10   Q. Do you remember your reaction when you learned of
11 the fact that an Appeals Court has sustained this
12 judgment?
13   A. You know, I do not know exactly how I reacted.
14 All I know is that I viewed this -- and I continue to
15 view it -- as a very serious matter.
16   Q. Okay. Other than President --
17   A. I am this way.
18   Q. You're what?
19   A. I am this way.
20   Q. What way?
21   A. You know, I'm just -- I do not just jump up and
22 down whenever something happens, however important it
23 is.
24     I took it. I understood there was an issue to be
25 dealt with, took that position, and since then, I've

**Page 184**

1    Q. Who told you this?
2    A. You know, people who were handling this at the
3  time. Probably the head of the President's bureau.
4    Q. What's his name?
5    A. At the time, Rafiq Al-Husseini.
6    Q. What?
7    A. Rafiq Al-Husseini.
8    Q. Can you spell that?
9    A. R A F I Q. That's his first name. Al-Husseini.
10 A L - H U S S E I N I.
11   Q. Okay. And where is he now?
12   A. He's not in the office anymore.
13   Q. Where is he?
14   A. I don't know if he's in the country now as we
15 speak.
16   Q. Okay. So are you telling me that this guy,
17 Husseini -- am I pronouncing it right?
18   A. Yes.
19   Q. -- he told you they were trying to find lawyers
20 in 2006?
21   A. They were -- you know --
22   Q. Did he tell you that?
23   A. If you'd just give me a second to try to answer.
24   Q. Okay.
25   A. All I know is that he was the President's office

**Page 183**

1  been working on it.
2    Q. Okay. When was the first time --
3    A. Except for that time period when I wasn't in the
4  government.
5    Q. Okay. When was the first time it was dealt with
6  after you wrote this letter?
7    A. At various discussions leading to the time when
8  we adopted, eventually, this new strategy.
9    Q. When was any action taken to implement the new
10 strategy?
11   A. You know, I can't tell you. There was a period
12 of time subsequently when the PA was vigorously seeking
13 legal representation on this matter, without much
14 success, in the course of 2006.
15     This came to my attention after I rejoined the
16 government in March of 2007.
17   Q. Okay. You're telling me now the PA was trying to
18 get --
19   A. Yes.
20   Q. -- new lawyers in 2006?
21   A. Yes. Yes.
22   Q. Couldn't find anybody?
23   A. I understand that they were having difficulties.
24   Q. Who did they contact?
25   A. I don't know.

**Page 185**

1  director at the time, and he had some people work for
2  him who were trying to help find legal representation in
3  the United States at the time.
4    Q. He told you that?
5    A. I can't tell you for sure if he did himself tell
6  me that, but I learned that that was actually what was
7  happening.
8    Q. When did you learn that?
9    A. In early 2007, around the time I joined the
10 government, because I know that I personally was seized
11 with this immediately after I joined the government.
12     And I know that, as early as April, a little
13 about a month after the formation of the new government,
14 you know, we had legal representation.
15   Q. So you tried to find out what had gone on
16 before --
17   A. Yes.
18   Q. -- correct? And you found out that really
19 nothing --
20   A. Not quite nothing.
21   Q. All right. I'll withdraw that. Let me try it
22 again.
23   A. Yes.
24   Q. Let's focus on the other lawyers that --
25   A. Yes.

Fayyad

## Page 186

1    Q. -- were contacted. Husseini told you that other
2  lawyers had been contacted and refused the case?
3       Is that what he said?
4    A. I do not know if Rafiq Al-Husseini himself told
5  me this.
6       All I know is that he, and people working for
7  him, were in the process of finding legal representation
8  in the United States in connection with these cases in
9  the course of 2006.
10      Now, exactly when in 2006 I cannot tell you, but
11  I know -- all I know is that I'm aware of the fact that
12  the PA was actively seeking legal representation within
13  that time frame.
14   Q. How do you know that?
15   A. It's not exactly true that nothing was happening.
16   Q. How do you know that?
17   A. I became Finance Minister again.
18   Q. I know you had to know as Finance Minister.
19   A. Yes.
20   Q. You either saw a piece of paper or somebody told
21  you, right?
22   A. Yes. Something -- I don't know if somebody gave
23  me a piece of paper. Somebody must have told me this.
24  I asked because, you know, it's something that I felt we
25  really need to deal with.

## Page 187

1       You know, in my position as Minister of Finance
2  then, it's something that really we were interested in.
3  And you ask about it and somebody tells you. It doesn't
4  really matter.
5       I ended up leading the effort actually to find
6  legal representation for us. I did it against the
7  backdrop of knowing there was an effort by the PA to do
8  so, and I just continued with it.
9    Q. Okay. Did you find out any details about the
10  effort? Anything?
11   A. That it was serious and it was being made.
12   Q. But did you find out any details whatever? For
13  example, was one law firm contacted? Two? Three?
14  Five? Ten?
15   A. No. What I recall about it is that there was a
16  serious attempt made at finding legal representation,
17  without much success.
18   Q. Okay. How do you know it was serious?
19   A. Well, in the way, you know, this issue was talked
20  about.
21   Q. Well, what did they do to find legal counsel?
22  You said it was serious.
23   A. They must have -- I mean I don't know exactly
24  what they did.
25      All I know is that, given basically the manner in

## Page 188

1  which I felt they were dealing with it, you know, when I
2  took over as Minister of Finance again, and the
3  seriousness with which they were talking to me about
4  it -- I mean, for example, somebody like
5  Mr. Al-Husseini -- I figured that this was for sure that
6  they were really serious about this.
7       And it is just that that they got to that point
8  in time having not succeeded in finding suitable legal
9  representation. That's all.
10   Q. Did you ask him what efforts they made?
11   A. No. I don't remember, you know, if I asked or
12  they told me specifically what they did.
13      But I got the distinct sense that they were
14  really serious about. They were really desperate. They
15  really wanted to do that.
16   Q. And did you get a distinct sense of how long they
17  had been trying?
18   A. I'm guessing now. I mean I just don't know for
19  sure. But it cannot be a matter of just a few weeks, in
20  the way that I now remember it.
21      Probably more like a few months.
22   Q. Maybe a few months? Maybe a month or two? You
23  don't know, do you?
24   A. I really don't know for sure.
25   Q. All right. And you don't know who's telling you

## Page 189

1  this, correct?
2    A. Most likely --
3    Q. Is it -- is that correct?
4    A. Most likely Husseini. Most likely.
5    Q. But you don't remember it?
6    A. I don't remember for sure.
7    Q. Okay. Now, do you remember who, if anybody, told
8  Husseini to find new lawyers? It wasn't you, right?
9    A. No. I wasn't in the government at the time.
10   Q. Right. So it wasn't you?
11   A. No.
12   Q. Who was it who told Husseini to do it?
13   A. It was probably the President.
14   Q. It probably was --
15   A. Probably. Probably. He worked for the
16  President.
17   Q. So if I wanted to know the answer, I'd have to
18  ask President Abbas?
19   A. I could ask him for you. But I suppose, you
20  know, that Rafiq would not have done it on his own. I
21  mean he was the Director of the President's office.
22   Q. Well, what was the guy's title? Husseini?
23   A. Director of the President's office.
24   Q. Okay. Could he have gotten instructions from the
25  Finance Minister at the time?

Fayyad

## Page 190

1    A. You know, the Director of the President's office
2  does not -- I wish he did -- take instructions from the
3  Minister of Finance.
4    Q. So what you're telling me is this was somebody
5  who really would not respond to orders from you?
6    A. He doesn't work for the Minister of Finance. He
7  wouldn't. We talked. We talked.
8    Q. So you're telling me --
9    A. There is no line of authority between the
10  Minister of Finance and the Director of the President's
11  office.
12    Q. So if Husseini did this, it would be on
13  instructions of Abbas?
14    A. Probably.
15    Q. Okay. So Abbas would know when and where?
16    A. You know --
17    Q. Well, maybe he doesn't remember either. But the
18  only way we'd know is to ask him. All right.
19    A. I don't know if --
20        MR. ROCHON: There's no question pending,
21  Mr. Prime Minister.
22        THE WITNESS: Pardon?
23        MR. ROCHON: There's no question pending.
24        THE WITNESS: Okay.
25    Q. How hard was it for you to find a lawyer? What

## Page 191

1  did you have to do?
2    A. Basically, I worked with these guys.
3    Q. With what?
4    A. With the people I mentioned to you.
5    Q. What people?
6    A. Rafiq Al-Husseini and his team, in terms of the
7  search that they had made.
8      And I remember, you know, taking a trip to the
9  United States, in April of 2007, when we had discussions
10  with lawyers whom we ended up retaining.
11    Q. Now, you became -- you came back into government
12  when?
13    A. March 2007.
14    Q. Okay. And so this conversation with Husseini --
15  if that's who it was -- had to be between March 2007 and
16  April of 2007, correct?
17    A. Between March 2007?
18    Q. Yes. And April?
19    A. April of 2007?
20    Q. Yes.
21    A. What about that?
22    Q. The conversation, if any, with Husseini had to be
23  in that period, correct?
24    A. Yes. Probably right. Fair guess, yes. Maybe
25  before because -- let me really backtrack a little bit.

## Page 192

1      It took a while to really put this government
2  together, the one that I joined actually in March.
3  There was a lot of discussion on it, and it became known
4  well before it actually happened I was going to be
5  rejoining it as Minister of Finance.
6      So during that period before the formation of the
7  government, it is conceivable that this conversation
8  took place before, before March actually.
9    Q. Okay. And as we said before --
10    A. Yes.
11    Q. -- even before putting the government together,
12  you were mindful this was a very important issue?
13    A. Oh, yes. Yes.
14    Q. Okay. So it would have been important to you to
15  know precisely what had taken place up to then, wouldn't
16  it?
17    A. Yes, yes.
18    Q. Okay. And you've told me everything you can
19  recollect at this point, correct?
20    A. As best as I can.
21    Q. Okay. Now, when you were Finance Minister and
22  wrote the letter to Condoleezza Rice --
23    A. Yes.
24    Q. -- you determined -- I shouldn't say you
25  determined.

## Page 193

1      You knew, at the time that you wrote it, that the
2  case had been lost in the Court of Appeals, right?
3        MR. ROCHON: Counsel. Four times.
4        MR. WISTOW: I'm trying to bring it -- it's
5  preliminary to where we're going. Okay?
6    Q. You knew that?
7    A. I must have.
8    Q. Yes. All right.
9      Did you -- do you remember anything about an
10  attempt to go to the United States Supreme Court, in the
11  period before you left government?
12    A. That could have come up. I can't be sure right
13  now, but it could have come up.
14    Q. I understand it could have. Do you remember
15  anything about it?
16    A. If it did -- see, I'm trying to remember, piece
17  things together now, because I know that, during that
18  period of time, there was an attempt at collecting or
19  opposing that judgment by, as a matter of fact, taking
20  remedy in Israel.
21      And maybe, in the course of that period -- I
22  really do not know for sure now. I mean there were lots
23  of things, lots of developments -- that issue came up.
24      But I can't really be sure now. I cannot really
25  tell you I remember this specifically.

Fayyad

Page 194

1     Q. Okay. Bottom line is maybe you knew about the
2   possible appeal to the Supreme Court, maybe not.
3       Is that what we're saying?
4     A. Or thinking about it. I do not know. Thinking
5   about going to Supreme Court. Whether or not that
6   actually happened, I do not know.
7     Q. Did you ever authorize anybody to do that?
8     A. I don't recall.
9     Q. Okay. I'm going to talk my lessons from
10  Mr. Rochon.
11      MR. ROCHON: Go off the record for a bit?
12      MR. WISTOW: Yes.
13      THE VIDEOGRAPHER: Going off the record at
14  8:18.
15      (Short recess taken.)
16      THE VIDEOGRAPHER: Going on record at 8:27.
17     Q. I want to explore with you a little more the
18  letter that you wrote to Condoleezza Rice on June 18,
19  2005.
20     A. Okay.
21     Q. Now, you indicated to Ms. Rice that the
22  Plaintiffs in the Ungar case were sending out misleading
23  notices?
24      MR. ROCHON: Do you have a page first?
25      MR. WISTOW: Yes. Page 3.

Page 195

1     Q. The second paragraph from the bottom. Do you see
2   that?
3     A. Second paragraph?
4     Q. Yes.
5      MR. ROCHON: Do you mean -- that's the one
6   that starts, As a result of receiving?
7      MR. WISTOW: No. In addition.
8      THE WITNESS: In addition.
9      (Witness peruses document.)
10     Q. Do you see that?
11     A. Yes. I see it, yes.
12     Q. Okay. Do you understand what that refers to?
13     A. Yes.
14     Q. Could you explain it to me?
15     A. In the sense of, for example, entities like the
16  Pension Fund and the PMA.
17     Q. And, in fact, if you go to the top of the page --
18     A. Yes.
19     Q. -- the letter says, Despite the specificity of
20  the District Court's orders, however, Plaintiffs'
21  counsel prepared a Notice of Injunction (the Notice) in
22  which they broadly assert that the injunction -- and it
23  goes on to quote the Notice.
24      Do you see that?
25     A. I see it, yes.

Page 196

1     Q. Okay. So what you believed was happening is the
2   Plaintiffs were using the judgment they obtained in
3   court improperly, correct?
4     A. Can you say this again. I was looking here.
5   Yes.
6     Q. What you were trying to tell Condoleezza Rice --
7     A. Yes.
8     Q. -- is that you believed that the Plaintiffs had
9   obtained an injunction from the Court and were using it
10  improperly, correct?
11     A. That -- yes. I mean, basically, in the sense of
12  it referring to entities that are independent of the PA
13  or the PLO, that I felt then -- and I feel now --
14  basically that, you know, that the enforcement action
15  that was being pursued by the Plaintiffs exceeded what
16  the remedy would be in terms of, you know, where to
17  collect and what is collectible.
18     Q. Right.
19     A. Yes. Yes.
20     Q. I think we're saying the same thing.
21     A. Okay. That's fine.
22     Q. That they had gone to court, obtained an
23  injunction from the court --
24     A. Yes.
25     Q. -- which was specific. And, in your mind, the

Page 197

1   Plaintiffs were using it in a much too broad way --
2     A. Yes.
3     Q. -- and were sending it out naming all kinds of
4   inappropriate entities?
5     A. That's what I meant to say.
6     Q. Right. Okay.
7     A. But, if I may, in the sense that I have just
8   described, in the sense of those entities being
9   independent --
10     Q. Yes?
11     A. -- of the PA and the PLO. So, therefore, my view
12  is that they should not be, you know, pursued in
13  collection.
14     Q. Yes. I understand.
15     A. Okay.
16     Q. You thought -- do you -- are you familiar with
17  the English expression "fast one"? You felt that the
18  Plaintiffs were pulling a "fast one"?
19      If you're not familiar with the expression, they
20  were doing something they shouldn't be doing, right?
21     A. That's a better way. I'd rather put it that way.
22     Q. Okay. It was unfair, inappropriate, and misusing
23  the injunction?
24     A. Going beyond, you know, what could be pursued, is
25  how I'd put it.

Fayyad

**Page 198**

1  Q. They were misusing the injunction, in your mind?

2      MR. ROCHON: Counsel. Objection. He's

3  answered.

4      MR. WISTOW: Can I get a yes?

5      MR. ROCHON: You can't tell him what to say.

6      MR. WISTOW: Can I get a no? Can I get an I

7  don't know?

8      MR. ROCHON: You got an answer.

9  Q. Did you believe they were misusing the

10 injunction?

11 A. All I know is that they were acting in a manner

12 that went beyond what would be pursued in this action.

13 I'll just say this the same way every time I've asked.

14 Q. Okay.

15 A. That's just the way I go about doing things. I

16 just don't tend to really add top much color one way or

17 the other.

18 Q. Okay. They were doing something which you

19 believed they had no right to do. Is that fair?

20     MR. ROCHON: Counsel, you --

21     MR. WISTOW: No, no. I do it my way. I

22 don't know what they do in Washington. This is how I've

23 been making a living for a while, and I'm going to

24 persist.

25     MR. ROCHON: I understand. But you're

**Page 199**

1  trying to make him say a particular word that you want.

2      MR. WISTOW: That's exactly what I'm trying

3  to do. That's exactly right. He's an adverse witness.

4      MR. ROCHON: He's not. But, counsel --

5      MR. WISTOW: I didn't say hostile. I said

6  adverse. I have a right to try to do it the way I'd

7  like to if I can possibly.

8      MR. ROCHON: Go ahead.

9  Q. Can we agree to this, that you felt that they

10 were using the injunction beyond what they were entitled

11 to do with it.

12 Is that fair?

13 A. I felt that they were going beyond what could

14 have been pursued.

15 Q. With the injunction?

16 A. Yes.

17 Q. Okay. Did you consider having your lawyers go

18 back to the District Court in Rhode Island and say

19 they're abusing the court's injunction?

20 Did you think about that?

21     MR. ROCHON: Objection. Assumes a fact not

22 in evidence.

23     MR. WISTOW: What?

24     MR. ROCHON: His lawyers. You haven't

25 established --

**Page 200**

1      MR. WISTOW: Okay.

2  Q. The PLO and the PA's lawyers, did you think of

3  going back to the District Court in Rhode Island and

4  making it aware of this perceived abuse of its

5  injunction?

6  Did you?

7  A. You know, at the time, you know, those cases were

8  not being pursued in the same way that they are being

9  pursued now.

10 As I told you, this letter essentially was a

11 beginning of our formal involvement in the process in

12 the sense of really trying to find a way as to how to

13 best deal with it.

14 Q. Have you finished your answer?

15 A. I have.

16 Q. Okay. You wrote this letter?

17 A. Yes.

18 Q. I'm asking you, did you consider going back to

19 the District Court and saying that its injunction was

20 being misused.

21 That's all I'm asking.

22 A. I don't know if I considered a certain, you know,

23 course of action, considered specifically or precisely

24 what to do, as much as I believe I was in the mode of

25 really trying to find out how best to deal with, you

**Page 201**

1  know, this and other cases.

2  Q. Well, didn't you talk to your lawyers at the time

3  about this?

4  A. I was not really in direct communication with the

5  lawyers on this or other cases.

6  Q. But you could have been?

7  A. You know, the issue, as I told you, in this

8  particular case became one of immediate relevance to me,

9  in my capacity as Minister of Finance, only after

10 essentially, effectively, enforcement action began in

11 ways that involved freezing assets and other aspects of

12 actions taken in a manner that very much affected the

13 way we did business.

14 And so, therefore, you know, just really

15 basically trying to find out -- find a way as to how

16 best to deal with this.

17 I cannot tell you exactly what sort of measures,

18 you know, are contemplated, are considered, actions that

19 we thought we should take, other than, at the time,

20 trying to really find a way. you know, considering the

21 line of defense that was adopted as strategy by the

22 PA/PLO's lawyers in the previous period.

23 That's all.

24 Q. Okay. We've already established that this was

25 not only a matter of a big financial problem, but

Fayyad

## Page 202

1  threatened regional -- perhaps world -- peace.
2      We've already established that, have we not?
3      A. Because it was a big financial problem. That's
4  what I would add. Because it was a big financial
5  problem, a very serious financial problem. That's the
6  causal link.
7      Q. Okay.
8      A. That's the channel of influence, if you will.
9      Q. All right. But you were saying that, because of
10  this, the Palestinian government could fall down --
11      A. Yes.
12      Q. -- collapse, which would threaten regional and
13  world peace.
14      Yes? Didn't you say that?
15      A. I said that, and I --
16      Q. Did you believe it?
17      A. I did.
18      Q. Okay. Now, there's more financial problems being
19  caused by this injunction, correct?
20      A. What do you mean?
21      Q. You're telling Condoleezza Rice about the
22  problems with this injunction, aren't you?
23      A. Yes, I am.
24      Q. Okay.
25      A. Yes.

## Page 203

1      Q. So that injunction is also affecting the
2  finances, isn't it?
3      A. Of course.
4      Q. Okay.
5      A. In the sense of it having led to, resulted in,
6  freezing of our assets.
7      Q. Exactly.
8      A. Definitely.
9      Q. Exactly. Threatening the financial collapse of
10  the PA. Yes?
11      A. I don't know. Grossly undermining the PA's
12  capacity to function. That was how I would put it.
13      Q. Well, let's see how you put it.
14      If Plaintiffs' efforts prove successful, they
15  could completely undermine the PNA's ability to continue
16  to operate as a functioning government.
17      Correct?
18      A. Amazing. I mean I just said to you now what I
19  said in the letter, and really I did not look at the
20  sentence now.
21      Q. Okay. Because you really believe this?
22      A. That's my state of mind.
23      Q. Right. Your state of mind was this could cause
24  the -- effectively the collapse of the PNA, correct?
25      MR. ROCHON: Counsel, you've asked it a

## Page 204

1  dozen times.
2      MR. WISTOW: I'd like to get it all in one
3  place, kind of bookend it.
4      I'm sorry I'm amusing you.
5      A. What I said --
6      Q. Can you please --
7      A. What I said --
8      Q. Yes.
9      A. What I said was it threatened to grossly
10  undermine the capacity of the PA to function. That's
11  what I just told you now.
12      Q. To operate as a functioning government?
13      A. And what you actually recited from the letter,
14  which I wrote in June of 2005 in English, is exactly
15  identical then to what I just said to you right now.
16      Q. I accept that.
17      A. That impresses me.
18      Q. I accept that. I salute you. I salute you, sir.
19      A. Thank you.
20      Q. I want to take it a step further.
21      A. Okay.
22      Q. So with this threat, did you consider --
23      A. Yes.
24      Q. -- going to the Rhode Island court and saying
25  they're abusing the injunction?

## Page 205

1      Can you answer that?
2      A. I think I did.
3      Q. I don't think you did, with all due respect.
4      A. I told you, you know, we were at the time -- we
5  had not, at the time, gotten to the point of actively
6  pursuing those cases in the sense of defending ourselves
7  against every motion or injunction.
8      It was the over-all strategy. It was just
9  basically something that had just happened in the sense
10  of this ruling, this judgment, if you will, and the
11  entering of final judgment of a certain amount, freezing
12  of assets.
13      And so, basically, you ask what is it that got
14  you there in the first instance. The inadequacy of the
15  defense on the grounds of jurisdiction or sovereign
16  immunity, that's what we were looking at the time, or
17  that's what I recall was on my mind, not that particular
18  injunction.
19      In other words, you know, what we were doing then
20  was we were taking it step by step, action by action,
21  motion by motion. It was just a different paradigm
22  altogether.
23      You know, the lawyers showed up and said, Well,
24  no jurisdiction. And so, basically, that's just the way
25  it was.

Fayyad

## Page 206

1    Q. But you had lost that in the Court of Appeals?
2    A. I know. We were just --
3        MR. ROCHON: Counsel.
4    A. We were just in the midst of trying to deal with
5    it. That's basically what [I'm am trying to talk to you
6    about.
7    Q. This is June 2005?
8    A. It is June of 2005, yes.
9    Q. Now, in June of 2005, you have a situation that
10   you claimed to Condoleezza Rice is threatening to
11   completely undermine the PNA's ability to continue to
12   operate as a functioning government?
13   A. Yes, yes.
14   Q. Correct?
15   A. Correct.
16   Q. And you really believed that?
17   A. I did.
18   Q. Okay. Whatever else you were doing, did you give
19   any consideration whatever to going back to Judge
20   Lagueux and explaining to him that they were misusing
21   the injunction?
22       Did you consider it?
23   A. You know, I never said -- and I'm not here to
24   suggest -- that I'm actually, or I ever, micro-managed
25   this process in the sense of me, you know, deciding

## Page 207

1    every step of this litigation. That's what we have
2    lawyers for now, thankfully, and we're pursuing this
3    strategy.
4        We were not doing it this way then. And even
5    today, with active, you know, counsel on our behalf, it
6    isn't the case that I just sit and decide in a
7    micro-management sense the steps that need to be taken.
8    Q. Okay.
9    A. I honestly don't.
10   Q. So, in June of 2005 --
11   A. If it's true today, it was a lot more true then.
12   Q. In June of 2005, you were content to leave this
13   issue in the hands of your then lawyers.
14       Is that what you're saying?
15       MR. ROCHON: Objection to form.
16   A. I was not really involved in it then in the same
17   way that I'm involved in it today.
18   Q. I'm not asking you to compare the two.
19       I'm saying, in June of 2005 --
20   A. Yes.
21   Q. -- when you were telling Condoleezza Rice that
22   this injunction threatened to collapse the PNA, you were
23   content not to micro-manage it.
24       That was your expression, correct?
25   A. Yes. I never micro-managed it then, and I'm not

## Page 208

1    micro-managing it now.
2    Q. So who was managing it in June of 2005?
3    A. It was -- as I told you, the issue became one
4    that preoccupied me definitely when I basically found
5    myself having to deal with the financial consequence of
6    this.
7    Q. Listen to me.
8        MR. ROCHON: Counsel, don't tell the Prime
9    Minister to listen to you. Just because you don't get
10   the answer you want, don't tell him to listen to you.
11   He's been listening to you patiently for four hours.
12       MR. WISTOW: All right.
13   Q. Forgive me. I apologize.
14       You indicated you didn't want to micro-manage
15   this problem, correct?
16   A. I didn't. And I'm not doing it now either.
17   Q. Okay. Fair enough.
18   A. It's not because I didn't want -- this is just
19   basically how I do business, whether this case or other
20   cases. I'm not a lawyer. That's what we have lawyers
21   for.
22   Q. I'm not being critical. I'm just asking the
23   question.
24   A. Okay.
25   Q. Okay. Who was managing the situation, this

## Page 209

1    litigation, in June of 2005?
2    A. I do not know if I can really tell you there was
3    one individual or portfolio that was solely in charge of
4    this operation. I really can't.
5    Q. That's not what I'm asking you. I'm asking if
6    you know anybody who was involved in the management of
7    it. Anybody.
8        MR. ROCHON: When you say "it," counsel, the
9    litigation?
10       MR. WISTOW: The litigation. Yes.
11   Q. In June of 2005.
12   A. I believe it was just counsel doing it, you know,
13   at the time, on the basis of the strategy that they
14   began, and basically continuing on with it.
15   Q. So did you try to determine if there was anybody
16   else in the government that was involved in this?
17   A. All I remember is when I actually, you know,
18   started to deal with it. I did not really, at the time,
19   feel I was intruding on somebody's turf at the time.
20   Q. I don't understand that. In June of 2005 --
21   A. Yes.
22   Q. -- you were not managing this litigation?
23   A. No, I wasn't.
24   Q. Okay. Did you believe somebody else in the
25   government was, or some kind of combination of people in

Fayyad

## Page 210

1  the government?
2      A. I had assumed that to be the case. But it looked
3  to me to be more, you know, the lawyers doing it on an
4  on-going inertia basis, if you will, on the basis of
5  strategy that they adopted early on.
6      Q. Okay. In June of 2005 then, you assumed somebody
7  else in the government was managing it?
8          That is what you said?
9      A. June 2005?
10     Q. Yes. When you wrote this letter.
11     A. As I told you, in the way that I described to
12  you.
13          You know, again, we're really talking about a
14  fairly nascent authority --
15     Q. What?
16     A. Young authority, new authority, without well-
17  established systems of governance in various matters.
18          I mean it's not like, you know, an authority
19  that's been in existence forever, with everybody knowing
20  what they're supposed to be doing.
21     Q. Did you assume someone was managing it --
22     A. Yes.
23     Q. -- or did you assume someone wasn't?
24          That's all I'm asking.
25     A. I assumed it was being managed in the way that I

## Page 211

1  described -- namely, on the basis of strategy which was
2  based on the notion that there was no jurisdiction in
3  this particular case.
4          And when a deposition is taken, this does not
5  need day-to-day maintenance. It's a paradigm that says
6  we need not be involved in the details here basically.
7          So, in the nature of it, I did not assume there
8  was anyone actively involved in managing this process on
9  a day-to-day basis.
10     Q. Okay. But, in June of 2005, when you wrote the
11  letter, you had already known that you lost on sovereign
12  immunity in Court of Appeals. You knew that.
13     A. I think that was on the table at the time. I
14  mean if I had not known that, I would not have been --
15     Q. It's in your letter?
16     A. Yes.
17     Q. So you knew that.
18          Now, did you -- again, did you assume that
19  somebody in government was involved in managing this, or
20  did you not assume that?
21          That's all I'm asking.
22          MR. ROCHON: Asked and answered.
23          MR. WISTOW: For the life of me, I don't
24  know what the answer is.
25     A. You know, I did not know if there was anybody

## Page 212

1  actively managing the case on a day-to-day basis.
2      Q. Okay?
3      A. For the reasons I mentioned. So --
4      Q. Did you assume there was?
5          MR. ROCHON: Counsel. You just asked it.
6          MR. WISTOW: No. He said -- he said, I
7  didn't know. I'm asking, did you believe there was
8  somebody.
9          He said he didn't know. I'm now asking him
10  did he believe somebody was managing it.
11     A. You know, I don't know if I really went through
12  this thinking, assuming anything.
13          All I know is, when I found out about this, and
14  it came to my knowledge this was what was involved, this
15  was what a thing that was a priority issue for me, I
16  started to act on it.
17          Basically, that's what I'm trying to tell you.
18     Q. Okay. What I'm trying to ask you, when you
19  started to act, you wrote a letter?
20     A. Yes.
21     Q. Okay. And that's the last thing before you left
22  government, right?
23     A. Yes.
24     Q. Okay. Now, what I'm trying to get at though, is
25  did you believe that somebody else would be taking care

## Page 213

1  of this?
2      A. If I did, I would not have written the letter
3  probably.
4      Q. I'm sorry. What?
5      A. If I did, I probably would not have written the
6  letter I did. I mean I probably would have gone to the
7  person I had assumed was managing this.
8      Q. So you believe nobody was managing it?
9      A. I didn't really make an effort to find out. I
10  just decided to deal with it myself.
11     Q. Okay. Fair enough. Okay.
12          Now, you were aware, when you wrote this letter,
13  that there was a problem with the Wachovia Bank?
14          MR. ROCHON: Page, counsel?
15          MR. WISTOW: Yes. Page 3, third paragraph
16  from the bottom.
17     A. Page 3?
18     Q. Yes.
19     A. Yes. The letter itself, right?
20     Q. Yes. Yes.
21     A. Yes.
22          (Witness peruses document.)
23     A. Yes. Here I don't read through all of it, but I
24  believe I'm talking only about the Pension Fund and the
25  PNA.

Fayyad

## Page 214

1    Q.  Well, no.  It seems to be more than that because
2    it's talking about paying your employees salaries.
3           Do you see?
4    A.  Let me just continue.
5           (Witness peruses document.)
6    Q.  Where do I talk about salaries?
7    Q.  Well, it says, Expenses needed to run its office.
8    Maybe I shouldn't have assumed that would be --
9           What expenses were you talking about?
10   A.  Are we talking about the Pension Fund here?
11   Q.  No.  It says -- I'll just -- I don't know what
12   we're talking about.  I'll just read what it says.
13   A.  Okay.
14   Q.  The PNA's bank in Washington --
15   A.  Where?  I mean I'm reading the wrong paragraph.
16   Q.  Oh, okay.  Fair enough.  Page 3, third paragraph
17   from the bottom.
18         MR. ROCHON: (Indicating.)
19   A.  This one?
20   Q.  Yes.
21   A.  As a result of receiving notice?
22   Q.  Yes.  Exactly.  Take a minute, read it, tell me
23   when you're finished.
24   A.  Okay.
25         (Witness peruses document.)

## Page 215

1    Q.  And, incidentally, I do apologize for saying
2    before, Listen, it was an appropriate response from
3    Mr. Rochon.
4    A.  Yes.  Okay.
5    Q.  Okay?
6    A.  Yes.
7    Q.  When you say necessary expenses needed to run, I
8    assume that includes payroll and rent?
9    A.  All expenses, yes.
10   Q.  Yes.  Whatever?
11   A.  Yes.
12   Q.  Okay.  So this was a kind of an immediate crisis,
13   was it not?
14   A.  Yes.  I mean in the sense of it having led to a
15   situation where our Mission was not able to use its
16   resources available to pay salaries of employees and
17   other operating expenses.
18   Q.  Yes.  It's an immediate crisis?
19   A.  I mean not only in the sense it was a big
20   problem.  It was a huge problem.
21   Q.  It's immediate crisis, is it not?
22   A.  Immediate crisis --
23   Q.  Is it that difficult to agree with me?
24   A.  I don't know.  Basically, I would have to be --
25   I'm responsible for things I say, not for things you

## Page 216

1    say, with all due respect.
2    Q.  If you disagree with me --
3    A.  I can't -- I mean, I'm just --
4         MR. ROCHON:  Counsel --
5    A.  Look.  I'm prepared to sit here as long as is
6    necessary.  But I'm not really going to be forced into
7    saying things not the way I want to say them.
8    Q.  Okay.
9    A.  I think it's fair enough.
10   Q.  I'll ask you this --
11   Q.  Please feel free to ask me however many questions
12   you like, and I am prepared to sit with you for as long
13   as it takes.
14         But I am not comfortable being framed in the way
15   to answer questions.
16   Q.  I can see that.  I can see that.
17         Did you consider it to be an immediate crisis?
18   A.  I considered it to be a very very big problem for
19   the Palestinian Authority.
20         In this particular paragraph, we're referring --
21   we're talking about the operation of our Mission.  And
22   that's the PA in its entirety.
23         Remember this.  I regarded the whole case as one
24   that's posing serious threat to the capacity of the PA
25   to continue to function as a government.  That's

## Page 217

1    basically --
2    Q.  Well --
3    A.  -- you know, and this -- reading through this
4    now, it's coming back to me -- basically, looking at the
5    myriad of actions, sequence of steps, a lot of things
6    happening at the same time, you know.
7         So anyone, you know, kind of sitting there having
8    to deal with the consequences of this, clearly could not
9    but have viewed this as a very very serious problem, for
10   sure.
11   Q.  Clearly could what?
12   A.  Not but have viewed this as a very serious
13   problem.
14   Q.  Now, you've seen about the bank thing.  And
15   that's yet another element of seriousness, right?
16   A.  I tell you, it's in there -- you know, the
17   reference to -- maybe in the subsequent paragraph which
18   I was reading before, thinking that was the paragraph
19   that interested you -- talking, for example, about
20   assets of the PMA, Palestine Monetary Authority, being
21   frozen.
22         Well, in fact, that was commercial bank money
23   they were dealing with.  For me, knowing what I know
24   about financial flows and check-clearing matters and the
25   rest of that, I knew this was debilitating way

Fayyad

## Page 362

1  solution of hiring counsel in these cases.
2      These legal advisors in the Palestinian
3  Authority, as far as you know, were they trained or
4  sophisticated in United States litigation matters?
5      MR. WISTOW: Objection.
6      A. No. I don't believe so. If any, very limited.
7  And I know this is the case because we are really keen
8  in developing our capability in this important area.
9      And I personally have taken an interest in
10  looking for adequately trained people in this area, and
11  I have not been successful finding.
12      So no. Lawyers we have are not well versed in US
13  law.
14      Q. You were asked some questions about the funding
15  of sewer, health, medical, and electrical and other
16  power in the Gaza after the Israeli incursion there.
17      If you could explain, why does the Palestinian
18  Authority support Gazans in that regard, and not do --
19  let Hamas take care of them, as the questions suggested.
20      A. Because it's our responsibility. I mean you had
21  it right when you said support Gazans.
22      THE COURT REPORTER: You had what?
23      THE WITNESS: Pardon me?
24      THE COURT REPORTER: I didn't hear you.
25      THE WITNESS: And then I forgot what I said.

## Page 363

1      MR. ROCHON: You had it right when you
2  support Gazans.
3      THE WITNESS: Yes.
4      A. We view it as our responsibility, as the
5  Palestinian Authority acting on behalf of the
6  Palestinian people throughout the occupied Palestinian
7  territory, both in the West Bank and Gaza.
8      And so we do what we do because we are trying to
9  do the best we can for and on behalf of our people in
10  Gaza.
11      I tell you, you have it right when you said we're
12  doing this for Gazans. Gazans are citizens, Palestinian
13  citizen. They're our citizens. So we do it as a matter
14  of duty, responsibility.
15      Where we could, we did. And those were areas we
16  found it necessary to intervene and, in fact, we were
17  able to intervene on behalf of the people. And we did.
18  They're our people.
19      We were not doing it for Hamas or on behalf of
20  Hamas. We obviously wouldn't.
21      Q. I'd like to ask you -- you were asked some
22  questions about the decision to proceed and litigate
23  these cases. Is that -- and you were asked about your
24  personal commitment on specific questions in one of the
25  declarations.

## Page 364

1      Is the commitment to litigate these cases yours,
2  the government's, no one's? Whose commitment is it
3  we're talking about?
4      A. It's a PA commitment. I believe I answered the
5  question when it was raised. I meant to actually
6  project a full sense of commitment, and deep commitment
7  in the fullest extent of the word and the term.
8      This is a commitment that the PA takes very
9  seriously. It is definitely our intention to do the
10  best we can to give ourselves a chance to defend
11  ourselves in this and other cases, in accordance with
12  what US law provides for.
13      And we'll be -- we are completely committed to be
14  respectful of the process in all of its components. And
15  the commitment extends well beyond me personally. This
16  is a commitment that we take upon ourselves as a system,
17  as a polity.
18      MR. WISTOW: Move to strike.
19      Q. If you could describe for us the cases -- and
20  what this motion is about is to vacate the default
21  judgment and to give the Palestinian Authority an
22  opportunity to litigate these cases.
23      Why is that important?
24      A. I'm sorry?
25      Q. Why is it important -- or is it important -- to

## Page 365

1  have an opportunity to defend the Ungar case itself?
2      A. It is very important, you know, to defend
3  ourselves as a state.
4      A certain action was brought against us in a
5  court of law in the United States, an action we do not
6  feel that we'll be found liable for if there's due
7  process, and if we go through a process that provides us
8  with an opportunity to defend ourselves.
9      It is our belief that if, in fact, that was to
10  happen, that if we're given a chance to defend
11  ourselves, that it is likely that we will not be found
12  liable in this particular case.
13      That's why we feel strongly about being given a
14  chance to defend ourselves.
15      Q. The impact of the default -- excuse me.
16      The impact of the cases brought in the United
17  States under the ATA -- the Anti-Terrorism Act -- what
18  is the potential impact of those cases on the
19  Palestinian Authority taken as a whole? That is, those
20  cases taken as a whole.
21      MR. WISTOW: Objection.
22      MR. ROCHON: Basis.
23      MR. WISTOW: I don't care to state it.
24      Q. Please answer the question.
25      MR. WISTOW: I will state it. Relevance.

Fayyad

| Page 366 |
|---|

1  What difference does it make what the impact of the
2  other cases are.
3      MR. ROCHON: Thank you.
4      Q. You can answer the question, Mr. Prime Minister?
5      A. It would be substantial. It would be
6  debilitating. These are large sums of money.
7      I mean, in the case at hand here, we're talking
8  about a very large sum of money relative to our over-all
9  revenue take and what we can collect and the aid that
10  we've been getting.
11      And when we factor in other cases, most
12  definitely it's something that it's highly
13  destabilizing. It is something that we cannot afford.
14      In this particular case, at this juncture, all
15  we're looking for is an opportunity to defend ourselves.
16      Q. What is the potential impact on the donor
17  committee of these large judgments in these cases, if
18  they were to occur?
19      MR. WISTOW: Objection.
20      Q. I said donor committee. I meant donor community.
21      A. Yes.
22      MR. WISTOW: Objection.
23      Q. You may answer the question this time. This time
24  I don't care what it is. You can answer the question.
25      A. I think it would be a chilling effect on the

| Page 367 |
|---|

1  donor community's attitude to provide us with the aid
2  that is needed.
3      I mean, as it is, it's not really so easy to get
4  the assistance that we need, particularly for what we
5  call the current side of the budget, meaning current
6  expenditure, operational expenditure -- like wages and
7  salaries and other operational expenditures.
8      To really factor in the possibility of having to
9  pay substantial amounts of money in connection with
10  these lawsuits, I don't believe the donors would be okay
11  with it in the terms of them feeling that their
12  resources that they are committing or making available
13  for development purposes are being siphoned off to be
14  used in connection with this litigation, with these
15  lawsuits.
16      Q. Last question.
17      A. That's what I think, I mean, that that would be
18  the case.
19      Q. Last question, Mr. Prime Minister.
20      The commitment that was referenced to litigate
21  these cases that was made by you in the declaration in
22  December of 2007, have you followed through on that
23  commitment in connection with all of the other cases in
24  which the -- ATA cases in the United States?
25      MR. WISTOW: Objection.

| Page 368 |
|---|

1      A. It is a commitment, you know, across the board in
2  connection with all the cases where there's pending
3  action in the United States.
4      And it's a commitment that we have demonstrated.
5  This is not a matter of words. This is not something
6  that I would make a declaratory statement on only.
7      It is something that is backed fully by actions
8  that we have taken, not only in connection with the fact
9  that we have hired legal counsel to really pursue this
10  and other matters in this area in a serious and
11  competent way, but also in the extent to which we
12  demonstrated to the process, in all of its aspects, all
13  of its phases, and throughout -- whether talking about
14  discovery in connection with production of evidentiary
15  material required, and also in various discussions and
16  other aspects of litigation, including settlement in
17  some -- which clearly demonstrates commitment to process
18  as foreseen and provided for under US law.
19      Q. Thank you, sir.
20      MR. ROCHON: May I ask the time,
21  Mr. Coopersmith?
22      THE VIDEOGRAPHER: 12:19.
23      MR. WISTOW: All right.
24      MR. ROCHON: That was 16 minutes, not 15.
25  And I do apologize.

| Page 369 |
|---|

1      MR. WISTOW: I don't want to use the word
2  smarmy, but I can't think of another adjective.
3      Can we --
4      MR. STRACHMAN: We'll take a break.
5      MR. ROCHON: Go off the record?
6      MR. WISTOW: Yes. Please.
7      THE VIDEOGRAPHER: Going off the record at
8  12:19.
9      (Short recess taken.)
10      THE VIDEOGRAPHER: On the record at 12:30.
11      MR. ROCHON: As I indicated off the record,
12  one quick thing to put on the record, which is that,
13  when you summarized my position on the length of the
14  time for depositions, you may have gotten it wrong.
15      I'm not saying my time eats into yours. You
16  have your seven hours. You do with it as you wish.
17  Mine doesn't --
18      MR. WISTOW: It looks like it's going to be
19  moot anyway.
20      MR. ROCHON: Okay. Go ahead.
21      MR. WISTOW: It looks like we're not going
22  to have a problem.
23      MR. ROCHON: Okay. Go ahead.
24  REDIRECT EXAMINATION BY MR. WISTOW:
25      Q. I want to talk with you just a little bit,

Fayyad

## Page 370

1  Mr. Fayyad, about the -- I think you talked about a
2  devastating effect paying the judgment in this case
3  would have on the PA's financial situation, correct?
4      A. Yes.
5      Q. I'm focusing you on that.
6      Now, do you know how much money is tied up in
7  reference to the Ungar case? Roughly.
8      A. I mean I know there's Pension Fund money tied up.
9  Probably $50 million.
10     Q. If I told you that more than $116 million was
11 tied up, would that be a surprise?
12     A. It probably is within the realm of what I would
13 expect, yes.
14     Q. If I told you it's significantly more than
15 $116 million, would that surprise you?
16     A. Maybe not.
17     Q. Okay. Whatever's been tied up is totally
18 unavailable to you at the present time, right?
19     A. It isn't available to us for use at the present
20 time.
21     Q. Right. And it's not affecting your ability to
22 fund anything one way or another at the moment, because
23 you don't have access to it?
24     A. But it has affected our ability already.
25     Q. In the past.

## Page 371

1      A. No. In the following sense.
2      You know, we always had a deficit, a substantial
3  need for foreign assistance to fund that deficit
4  throughout the period this was litigated -- and, in
5  recent years, actually substantial deficit.
6      And what it meant is that, by not having access
7  to those funds, at least part of them, because they do
8  not all fall in the same category, the point is we had
9  to resort to bank borrowing in order to be able to make
10 end meets.
11     And this is way beyond what banks would -- you
12 know, whatever recourse to the banking system we would
13 have made in the absence of that attachment or the
14 freezing of those assets.
15     Q. There's no question that getting the money would
16 be a benefit to you. Getting it unfrozen and handed
17 over would be a benefit.
18     We all agree with that, correct?
19     A. It definitely would be a benefit because we have
20 substantial liabilities, corresponding liabilities,
21 given the absence from our income stream of the assets
22 frozen.
23     Q. All I'm doing is agreeing with you. We're saying
24 it's a benefit if you get the money, correct?
25     A. It's more than can be reflected by just saying

## Page 372

1  it's a benefit.
2      Q. It's a substantial benefit if you get the money,
3  correct?
4      A. I certainly believe it would be great relief if
5  those funds were unfrozen, for sure.
6      Q. But --
7      A. Not to mention, if I may, that some of those
8  assets actually do not belong to the Palestinian
9  Authority.
10     And I feel very bad about, in particular, for
11 example, Pension Fund money being frozen. I mean that
12 money belongs to pensioners.
13     Q. May I suggest that you consider --
14     A. And if that money does not become available, with
15 the Pension Fund running out of money, it's a liability
16 of the government. So I mean the tale on this has not
17 really all been written. That's one.
18     And, secondly, we're talking about substantial
19 sums of money, not only in connection with this case,
20 but other cases.
21     MR. WISTOW: You know, I just -- you've
22 given me a limited amount of time. We're trying to
23 accommodate.
24     MR. ROCHON: I haven't given you a limited
25 amount of time. The rules give you your time.

## Page 373

1      MR. WISTOW: I don't agree with that.
2      Q. Is this the kind of cooperation we can expect in
3  future, the way you're responding to my questions?
4      MR. ROCHON: Objection.
5      Q. Is it?
6      A. What do you mean by cooperation?
7      Q. Withdraw that.
8      MR. ROCHON: Mr. Prime Minister, don't
9  answer that.
10     Q. May I suggest, if you feel badly about what's
11 happening with --
12     MR. ROCHON: Counsel, do you have a
13 question?
14     MR. WISTOW: Yes.
15     MR. ROCHON: What is it?
16     Q. Have you considered, to mollify your feelings
17 about the Palestinian Investment Fund, that somebody
18 goes to court and tells Judge Lagueux, Something's
19 wrong?
20     Have you thought about that? Yes or no.
21     MR. ROCHON: Asked and answered.
22     A. Can you please paraphrase.
23     Q. I'll withdraw the question.
24     You were talking about deficits --
25     A. Yes.

Fayyad

| Page 374 |
|---|

1  Q. -- that you have. Do you know whether the United
2  States is running a deficit?
3  A. Yes. The United States --
4  Q. Very very substantial?
5  A. Yes.
6  Q. How about Spain?
7  A. I imagine a substantial deficit.
8  Q. How about Greece?
9  A. Yes.
10  Q. How about the UK?
11  A. Yes.
12  Q. How about Italy?
13  A. Okay.
14  Q. How about the European Union?
15  A. What is the point, sir?
16  Q. What?
17  A. What is the point?
18  Q. I don't have to tell you the point. I'm just
19  asking you, doesn't the European Union have all kinds of
20  deficits.
21  A. The Palestinian Authority is not the European
22  Union. Nor is it the United States. The capacity of
23  the United States to run deficits is enormous. Ours is
24  very limited.
25  Q. Sir -- sir --

| Page 376 |
|---|

1  finish and clarify, that's fine. I would like to get a
2  straightforward answer to a question.
3     Let me ask you this, sir.
4  A. Yes.
5  Q. We were talking about what kind of growth did you
6  have in your gross domestic product last year. Do you
7  know?
8  A. Seven to eight percent.
9  Q. Seven to eight percent. What was the US --
10  A. Not 78.
11  Q. No. Seven to eight.
12  A. Yes.
13  Q. I heard it.
14  A. In that range, yes.
15  Q. Okay. And do you know, roughly, what the United
16  States was?
17  A. About three percent maybe.
18  Q. How about negative two and a half percent?
19  A. When?
20  Q. Last year.
21  A. That may have been the case.
22  Q. Okay. That's all I'm asking.
23  A. Okay.
24  Q. You're an economist, a Finance Minister. How
25  about the European Union? What did they do in terms of

| Page 375 |
|---|

1  A. No, no. But you're asking me a question with
2  that implication.
3  Q. There is no implication.
4     MR. WISTOW: I'm running out of time. I'm
5  asking that he just answer my questions.
6  A. I am.
7  Q. We're running out of time.
8     All I asked is whether or not the United States
9  has a deficit. That's all I asked.
10  A. I am aware that the United States is running
11  deficits, but the United States is not seeking foreign
12  assistance to bridge the gap in its finances. We are.
13  Q. Is the United States borrowing money overseas?
14  A. Borrowing is different from getting grants.
15  Q. Okay. It's a lot better to get grants than to
16  borrow, I suggest to you.
17     The question, sir, is, is the United States --
18     MR. ROCHON: Counsel, is that a question?
19  Q. The question is, is the United States running a
20  deficit.
21  A. It is running a deficit.
22  Q. Okay. That's all I'm asking.
23  A. And it can finance it by borrowing. We cannot
24  borrow.
25  Q. Mr. Fayyad, if you want to come back after I

| Page 377 |
|---|

1  their gross domestic product?
2  A. The world went into deep financial crisis during
3  2010 and 2009. There was negative growth in several
4  areas of the world, yes. Okay.
5  Q. That's right. And you had -- the West Bank had
6  seven to eight percent increase in gross domestic
7  product, correct?
8  A. After nearly ten years of recession conditions or
9  outright recession, acting at a very low on the strength
10  of the stimulus.
11  Q. Let me try it one more time.
12  A. Yes.
13  Q. The West Bank had an increase, in 2009, in its
14  gross domestic product of seven to eight percent?
15  A. Correct.
16  Q. Okay. And, actually, that was better than
17  expected, correct?
18     Withdraw the question. I want to move on.
19  A. But you're asking me --
20  Q. I withdraw the question.
21  A. You're asking me questions and I have to answer
22  you analytically. I mean the West Bank --
23  Q. I withdraw the question.
24  A. -- because you're starting from a very weak base.
25  The US economy --

Fayyad

## Page 382

1  Would you name one person who indicated to you
2  that there would be a chilling effect if the judgment in
3  this case was paid. One person.
4  A. I cannot really give you a name.
5  Q. Okay.
6  A. All I can tell you is, based on those discussions
7  that I had and which came up from time to time -- and
8  not only at that donor conference -- my sense is that,
9  you know, it would have a chilling effect on them if
10  they knew effectively their money was going to be used
11  in connection with such payments.
12  Q. So that's your surmise?
13  A. Based on those discussions.
14  Q. But those discussions which you can't identify
15  for me at all --
16  A. You know --
17  Q. -- is that true?
18  A. -- I have lots of discussions.
19  MR. ROCHON: Counsel, stop interrupting.
20  A. I have discussions with donor country
21  representatives on an on-going basis. We have a very
22  active relationship with the international donor
23  community where all issues of relevance are brought up.
24  And these are periodic. They happen all the
25  time. Issues come up. And I cannot tell you

## Page 383

1  individually whom I spoke to, who said to me what when.
2  But I know it's an issue of relevance to them, for sure.
3  Q. I'm not asking you when. I'm just asking you
4  who.
5  This is a matter of importance to you, isn't it?
6  A. It's a matter of huge importance.
7  Q. And you don't remember one single person you can
8  identify. Is that true?
9  A. I can tell you --
10  Q. Is that true?
11  A. I can tell you representatives of the EU did
12  raise the issue with me.
13  Now, at this particular donor conference, it
14  doesn't tend to be the same representatives all the
15  time. I'd have to go back and see who was in attendance
16  at that particular donor conference or meeting to tell
17  you.
18  But I am certain that that sentiment was
19  communicated to me in more form than one.
20  Q. As you sit here now, Mr. Fayyad --
21  A. Yes.
22  Q. -- can you name one person who discussed this
23  with you and indicated it would have a chilling effect?
24  Just one.
25  A. I can't give you --

## Page 384

1  Q. Okay.
2  A. -- a name right away. But it doesn't mean those
3  conversations did not take place.
4  I am here to testify definitely that those
5  discussions came up.
6  Q. Somebody has to decide whether or not your
7  statements are supportable. I'm trying to find out --
8  A. I'm comfortable with that. Yes.
9  Q. Okay. Fine.
10  You indicated, in response to questions put to
11  you by Mr. Rochon, that you considered it important to
12  defend this case now.
13  A. Yes.
14  Q. And you explained the reasons?
15  A. Yes.
16  Q. Why didn't you defend it earlier? For example,
17  in 2005, when you were involved?
18  A. As I told you in previous testimony earlier on in
19  this session, that, you know, our position here, in this
20  particular case, in terms of where we are today, has
21  evolved into what it is today, beginning with a position
22  where the defense was -- it's not that the PA or the PLO
23  did not try to defend themselves. They did.
24  And the strategy that challenged the
25  appropriateness or adequacy in terms of jurisdictional

## Page 385

1  issues, in terms of sovereign immunity, I regard that as
2  a line of defense. I mean it's not true that the PLO
3  did not try to defend themselves. It was the line of
4  defense that they used.
5  There was evolution away from that, over a period
6  of time, in the direction of seeking an opportunity to
7  have this litigated so it would be an opportunity to
8  defend ourselves against the specific charges made.
9  The way I understand the system is that
10  challenging the jurisdiction in a specific case on a
11  specific submission is a part of the defense. That's my
12  understanding of it. I mean it's not --
13  The way I see it, it's not that the PLO did not
14  try to defend itself. It did, under the strategy that
15  we moved away from over time in an evolutionary way.
16  Q. In fact, you decided to defend it on the merits
17  after you lost in the District Court, in the Circuit
18  Court, in the US Supreme Court, and immediately after
19  Condoleezza Rice said to President Abbas, This judgment
20  is valid and enforceable against all the PLO's and PA's
21  assets in the United States, and she could not do
22  anything about it.
23  And that's when you decided to defend it on the
24  merits. Isn't that so?
25  MR. ROCHON: Objection.

Fayyad

| Page 386 | Page 388 |
|---|---|

**Page 386**

1  Q. Isn't that so?
2  A. What you just said, sir, does not seem to be
3  substantiated by the evidence discussed in the course of
4  this deposition.
5    The testimony will show, and statements read and
6  pieces of material evidence cited, strongly indicate
7  that the Palestinian Authority was trying to, in
8  earnest, to find adequate and competent legal
9  representation before that letter by the Secretary of
10  State was sent to President Abbas.
11    Looking for competent legal counsel in order to
12  represent it and to have this litigated on merits, as
13  you say, I mean before the letter from Secretary of
14  State Condoleezza Rice was sent to the President.
15  Q. But it was a matter of a few months after that
16  letter from Condoleezza Rice that it was decided to do
17  it on the merits. Isn't that so?
18    MR. ROCHON: Objection.
19  A. It is not true, based on testimony actually
20  discussed today and presented today, and material read.
21  Q. And also --
22  A. It is clear, and I said, and I repeat, and I
23  know -- and this is substantiated by evidence -- that
24  the PA was definitely seeking to recruit, to employ, to
25  hire, to retain the services of legal counsel in 2006.

**Page 388**

1  A. I mean I -- I mean I don't know if Ramsey Clark
2  was working on his own. He probably had associates,
3  yes.
4  Q. I'm not talking about associates. Ramsey Clark
5  was not admitted to practice in Rhode Island.
6  A. Okay.
7  Q. He had co-counsel who signed all the pleadings,
8  went to hearings. Are you aware of that?
9  A. I'm not aware. I do not know how the proceedings
10  went.
11  Q. Okay.
12  A. All I know is that that was the position taken
13  and that was the submission made by the legal counsel
14  there.
15  Q. Did anyone contact --
16  A. Exactly who did it, I don't know.
17  Q. Did anyone contact Demming Sherman or his firm to
18  see if they would represent the PLO and PA in 2006?
19  A. That may have been the case. I do not know.
20  Q. Anything could have been. Did you ask?
21  A. I was not --
22  Q. Did you ask?
23    MR. ROCHON: Counsel, counsel, you're just
24  badgering.
25  Q. All right. I want to talk about the Mecca

| Page 387 | Page 389 |
|---|---|

**Page 387**

1    And the letter sent by Secretary of State Rice to
2  President Abbas, that was presented to me which I saw
3  for the first time here at this deposition, was a letter
4  that was sent in January of 2007.
5  Q. Name one lawyer -- one -- who was contacted by
6  the PLO or PA to come into this case. Just one.
7    MR. ROCHON: Asked and answered.
8  A. I mean I don't know.
9  Q. Okay.
10  A. But I know that definitely was the case --
11  Q. Okay.
12  A. -- that the PLO was looking in the course of --
13  Q. Do you know who Demming Sherman is?
14  A. Pardon me?
15  Q. Demming Sherman.
16  A. I don't remember.
17  Q. He was co-counsel --
18  A. Oh, okay.
19  Q. -- in this case.
20  A. Okay.
21  Q. Does that ring a bell?
22  A. Co-counsel? You mean with Ramsey Clark?
23  Q. Yes.
24  A. Possibly.
25  Q. Possibly? You don't know that?

**Page 389**

1  agreement.
2  A. Yes.
3  Q. Okay. Payments were made, and are to be made,
4  directly for Hamas security forces under the Mecca
5  agreement, are they not?
6  A. Can you please repeat the question.
7  Q. Payments are made by the PA, under the Mecca
8  agreement, for Hamas security forces.
9  A. That's not true.
10  Q. That's absolutely false?
11  A. There's not a provision in the Mecca accord that
12  has something specific pertaining to payments to
13  security forces or anything like that.
14  Q. But there are payments made that end up
15  supporting security forces, aren't there?
16  A. I mean --
17  Q. Aren't there?
18  A. Payments made available -- or donations, donor
19  assistance -- made available to the Palestinian
20  Authority is used to, among other things, pay salaries
21  and wages for PA employees, civilians and security
22  personnel.
23    That's not to say Hamas.
24  Q. Well, the security personnel in Gaza, yes?
25  A. Yes.