# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

        Plaintiffs – Judgment Creditors,

    v.                                        C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

        Defendants – Judgment Debtors.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS' MOTION TO STRIKE AND TO COMPEL AND IN OPPOSITION TO DEFENDANTS-JUDGMENT DEBTORS' MOTION FOR A PROTECTIVE ORDER

### Introduction

The Plaintiffs-Judgment Creditors ("Ungars") respectfully submit this memorandum:

(1)    In support of their motion for an order: (i) striking all the objections asserted by Defendants-Judgment Debtors Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") (collectively: "Defendants") to Request No. 1 of the Ungars' Second Request for Production of Documents and Things Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion ("Request No. 1"); (ii) striking all the objections asserted by Defendants to Interrogatory No. 2 of the Ungars' First Set of Interrogatories Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion ("Interrogatory No. 2"); and (iii) compelling the Defendants to comply in full with Request No. 1 and Interrogatory No. 2 within seven business days; and

(2)    In opposition to Defendants' Motion for Entry of a Protective Order Regarding Plaintiffs' Requests for Discovery of Certain Third-Party Communications (dkt. # 526), which seeks to excuse Defendants from compliance with Request No. 1 and Interrogatory No. 2.

For the reasons set forth below, the Ungars' motion should be granted and the Defendants' motion should be denied.

## RELEVANT BACKGROUND

### I.     The Posture of Defendants' Rule 60(b)(6) Motion After Remand

On December 28, 2007, Defendants filed a motion pursuant to Fed. R. Civ. P. 60(b)(6) seeking to vacate the final judgment entered against them in this matter in July 2004. Dkt. # 408.

This Court denied Defendants' motion on the grounds that Rule 60(b)(6) relief was unavailable to Defendants because they had willfully defaulted the action. *Ungar v. Palestinian Authority*, 613 F.Supp.2d 219 (D.R.I. 2009).

On appeal, the First Circuit held that while Defendants' willful default "weighs heavily" against granting Rule 60(b)(6) relief, it does not "*categorically* bar[]" such relief because Rule 60(b)(6) requires courts to perform "holistic analyses" and examine "the totality of the circumstances." *Ungar v. PLO*, 599 F.3d 79, 86-87 (1st Cir. 2010).

The First Circuit explained that "[a] variety of factors can help an inquiring court to strike the requisite balance. Such factors include the timing of the request for relief, the extent of any prejudice to the opposing party, the existence or non-existence of meritorious claims of defense, and the presence or absence of exceptional circumstances. **This compendium is neither exclusive** nor rigidly applied. Rather, the listed factors are incorporated into **a holistic appraisal of the circumstances**." *Id.* at 83-84 (emphasis added).

The First Circuit declined to review the record de novo because "[t]he district court enjoys a long familiarity with the case, and that court's factfinding capabilities put it in a better position to construct the fact-specific balance that Rule 60(b)(6) demands" and therefore remanded the motion so that this Court can "analyze the totality of the circumstances." *Id.* at 87.

After remand, this Court entered an order scheduling an evidentiary hearing on the Rule 60(b)(6) motion on January 18, 2011, and authorizing pre-hearing discovery. *See* dkt. # 489.

## II.    The Defendants Are Refusing to Provide Highly Relevant Discovery

### A.    *Defendants' Post-Judgment Conduct, and Specifically Their Efforts to Block Enforcement of the Judgment, Are Highly Relevant to the Rule 60(b)(6) Analysis*

As noted *supra*, on remand the First Circuit directed this Court to consider Defendants' Rule 60(b)(6) motion using a holistic approach in light of the totality of the circumstances.

One factor long recognized as salient in considering a motion to set aside default is whether the movant's post-default and/or post-judgment conduct was equitable and in good faith. *See e.g. Farnese v. Bagnasco*, 687 F.2d 761, 765 (3rd Cir. 1982) ("We think that as a general rule material bad faith conduct by a defendant subsequent to the entry of default can, if sufficiently egregious, provide the basis for refusing to set aside a default."); *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 127 (2nd Cir. 2009) ("The discretionary relief available under Rule 60(b) is equitable."); 12 James Wm. Moore et al., *Moore's Federal Practice* § 60.22[5] (3rd ed. 2008) ("The relief provided by Rule 60(b) is equitable in nature and, in exercising its discretion under Rule 60(b), a court may always consider whether the moving party has acted equitably.").

Specifically, if the Rule 60(b) movant has taken actions to block enforcement of the judgment, then that fact will weigh heavily against a grant of relief under Rule 60(b) because such behavior demonstrates the movant's bad-faith. For example, in *Motorola Credit Corp. v. Uzan*, the Second Circuit affirmed a denial of Rule 60(b) relief because the judgment debtors had taken steps to thwart enforcement of the judgment and were thus not entitled to Rule 60(b) relief:

> Relying on their vast personal wealth, the Uzans have time and again deployed their lawyers to raise legal roadblocks to the enforcement of the judgment against them.

> ***

3

> Despite their flat-out refusal to comply with the District Court's lawful orders, the Uzans now have the chutzpah to seek post-judgment, equitable relief from complying with those orders. However, their conduct before this Court, and especially before the District Court, weighs heavily against granting the relief they seek. As the Supreme Court stated long ago, the "clean hands" doctrine "is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co.*, 324 U.S. at 814, 65 S.Ct. 993. We therefore conclude that the Uzans' utter disregard for the District Court's orders precludes the relief that they are seeking, and the District Court did not err in denying it.

*Motorola Credit Corp.*, 561 F.3d at 127-129 (footnotes omitted).[1]

Moreover, the question of whether the instant Defendants' post-judgment conduct has been equitable and in good-faith is especially crucial in this case, since their Rule 60(b) motion is based in great part on the claim that they have abandoned their previous recalcitrant attitude toward the American courts and have "turned over a new leaf." *See* dkt. # 408, *passim*; *Ungar*, 599 F.3d at 86 ("[Defendants] insist that they have had a good-faith change of heart.").

Accordingly, the Ungars have argued all along (i.e. since the filing of Defendants' motion to vacate in December 2007) that the motion should be denied, *inter alia*, because of Defendants' bad-faith interference in the Ungars' enforcement proceedings. *See* dkt. # 415 at 27, 38-99.[2]

---

[1] Notably, the district court had denied the Rule 60(b) motion on different grounds. *See Motorola Credit Corp.*, 561 F.3d at 129. Thus, the Second Circuit went out of its way to base its affirmation of the denial solely on the judgment debtors' interference with enforcement of the judgment.

[2] Thus, Defendants' claim (dkt. # 527 at 13) that the Ungars are improperly seeking discovery regarding Defendants' efforts to block the collection actions in order to advance *those* actions and not for the purpose of opposing the Rule 60(b) motion is utterly baseless. The Ungars have been citing Defendants' enforcement misconduct as grounds to deny the Rule 60(b) motion *for two and a half years*.

###### B.    *Enforcement Proceedings Relevant to This Motion*

Because Defendants have refused to honor the judgment entered by this Court over six years ago, the Ungars have been constrained to initiate extremely expensive and time-consuming enforcement proceedings in various U.S. jurisdictions and overseas.

Indeed, this Court recently found that "Defendants have made it abundantly clear that they will <u>never satisfy the judgment</u>." *Ungar v. Palestinian Authority*, --- F.Supp.2d ----, 2010 WL 2040255 at \*12 (D.R.I. May 12, 2010) (emphasis added, internal quotations and brackets omitted). Similarly, at the June 15, 2010 hearing in this matter, this Court found that the Ungars "have for a long enough time been <u>stonewalled by these Defendants</u> in attempting to collect on this judgment." Tr. 6/15/10 at 28:9-11 (emphasis added). Relevant pages attached as Exhibit A.

The Ungars' enforcement proceedings relevant to this motion[3] are the following:

**<u>The Palestine Investment Fund</u>**

The Palestine Investment Fund ("PIF") is a corporation registered in the Palestinian Authority that was established to hold and invest the commercial assets of the PA. The Ungars have initiated a number of enforcement proceedings to reach PA assets held by the PIF:

In 2005, the Ungars began turnover proceedings in the U.S. District Court for the Southern District of New York against Orascom Telecom Holding SAE ("Orascom"), an Egyptian corporation that owes \$45 million to the PIF as the result of investments in Orascom subsidiaries made by Yasser Arafat using PA funds. After years of intensive litigation over

---

[3] The Ungars are **briefly** describing their various enforcement proceedings simply to provide the Court with the background information necessary to place their discovery requests and the entities named therein into context for the purposes of this motion. The ultimate merits of the Ungars' claims that these assets are subject to execution in satisfaction of their judgment against the Defendants are of course irrelevant to the instant motion, and the Ungars do not purport here to argue the merits of those claims.

jurisdictional discovery this proceeding was dismissed without prejudice for lack of subject-matter jurisdiction,[4] and the Ungars refiled their enforcement proceedings against Orascom in New York State Supreme Court[5] and in the U.S. District Court for the District of Columbia.[6]

Also in 2005, the Ungars initiated execution proceedings in federal district court in Connecticut against PIF investments in partnerships known as Canaan Equity Offshore. *Ungar v. Palestinian Authority*, 05-mc-00208-PCD (D.Conn.). This proceeding remains pending.

On July 3, 2006, the Ungars filed a creditor's bill against the PA pursuant to R.I.G.L. § 9-28-1 requesting that this Court assign to the Ungars the PA's ownership of the PIF. Dkt. # 370.

On September 19, 2006, this Court entered judgment on the creditor's bill, transferring to the Ungars, *inter alia*, ownership of the PIF. *See* Exhibit B; dkt. # 381.

The Ungars then exercised their rights as the sole owners of the PIF to dismiss the directors and officers of the PIF and appoint themselves as the new directors and officers of PIF. *See* Exhibits C, D.[7] The Court discussed the change in the control of the PIF during a September 18, 2007, hearing concerning whether to modify a prior confidentiality order involving the PIF:

> THE COURT: All right. The situation has changed drastically since this stipulation was filed and the confidentiality order was executed by the Court in the spring of 2005.
>
> Since that time, the Court has entered judgment in the petition to reach and apply the assets of the Palestinian Authority in the

---

[4] *Ungar v. Orascom Telecom Holding S.A.E*, 578 F.Supp.2d 536 (S.D.N.Y. 2008).

[5] *Ungar v. Orascom Telecom Holding S.A.E*, Index No. 12145/10 (Kings County). Service of process in this case was perfected on September 15, 2010.

[6] *Ungar v. Palestinian Authority et al*, 05-mc-00180-GK (D.D.C.). This proceeding was recently dismissed for lack of personal jurisdiction and the Ungars have appealed this dismissal.

[7] *See also* dkt. # 383.

Palestine Investment Fund. And the Palestinian Authority defaulted, and the Court entered judgment and transferred to the Plaintiffs all interests of the Palestinian Authority in that Fund, that separate corporation. So the Plaintiffs became the stockholders, the sole stockholders of the Palestine Investment Fund.

***

So, essentially, the Plaintiffs are standing in the position of the Palestine Investment Fund at this point, and there's no now sound basis for the confidentiality agreement. They should be able to use their own documents in any way they see fit.

Tr. 9/18/2007 at 13:4-14:18. Relevant portions attached as Exhibit E.

### The Palestine Commercial Services Company

The Palestine Commercial Services Company ("PCSC") was the predecessor of the PIF, and like the PIF was wholly-owned by the PA and used by it as an investment vehicle for PA assets. The judgment in the creditor's bill proceeding assigned the PA's ownership of the PCSC to the Ungars. *See* Exhibit B; dkt. # 381.

### Becont Ltd.

Becont Ltd. is an offshore investment vehicle controlled by the PA's long-time asset manager Walid Najjab that has extensively commingled funds with the PIF. For example, in 2004, the PIF transferred over $1 million into Becont's account at Canaan. *See* Exhibit F. Likewise, according to a wire instructions list prepared by Canaan, the dividends paid by Caanan to PIF were paid into a Becont account at Interaudi Bank in New York. *See* Exhibit G.

Like PIF, Becont has investments in the Canaan Equity Offshore funds, and is a subject of the Ungars' enforcement proceedings in Connecticut. *Ungar*, 05-mc-00208-PCD (D.Conn.).

### The Insurance and Pension Fund

In May 2005, the Ungars restrained a securities portfolio in New York titled in the name "Palestinian Pension Fund of the State Administrative Employees Represented by the Palestinian

National Authority." The Ungars maintain, on the basis of extensive evidence, that these securities are owned by the PA. An entity known as the Insurance and Pension Fund claims that it owns the securities at issue. In 2006 the Ungars brought a declaratory judgment action against the PA and the Insurance and Pension Fund seeking to establish that these assets are owned by the PA and not by the Insurance and Pension Fund.[8] This action is awaiting a jury trial.

**The Palestine Monetary Authority**

The Palestine Monetary Authority ("PMA") is a PA governmental agency against which the Ungars brought enforcement proceedings in New York in 2005 that are still pending.[9]

### C.   *Defendants Are Unlawfully Interfering with the Ungars' Enforcement Actions*

There is clear evidence that the Defendants have been acting from behind the scenes and using improper and unlawful means to thwart the Ungars' enforcement proceedings.

For example, the publicly published reports of the PA Ministry of Finance show that ***subsequent*** to entry of this Court's judgment on the creditor's bill in September 2006, which transferred ownership of the PIF to the Ungars, the Defendants flouted the Court's judgment and improperly siphoned funds from the PIF and transferred them to the PA:

- During October-December 2006 the PA took $27.06 million dollars from the PIF. *See* Exhibit H at ¶ 3, Appendix 1.[10]

---

[8] *Ungar v. Palestinian Authority, et al*, Index No: 102101/06 (New York County).

[9] *Palestine Monetary Authority v. Strachman*, Index No: 107777/05 (New York County). In the course of these proceedings, the Appellate Division of the Supreme Court found that "evidence and testimony at the hearings tended to support the contention that the PMA is legally indistinguishable from the PA" and that the "burden … lies with the PMA to show that it is a separate entity and not the alter ego of the PA." *PMA v. Strachman*, 62 A.D.3d 213, 223873 N.Y.S.2d 281 (1st Dept. 2009).

[10] *See also* dkt. # 415 at Exhibit J.

- In 2007 the PA took $78 million in "advances" from the PIF. *See* Exhibit I at "Total Other Financing: Palestinian Investment Fund advances."[11]

- In 2008 the PA took over $252 million in "dividends" from the PIF. *See* Exhibit J at footnote 2.[12]

- In the first quarter of 2010 the PA took further "dividends" from the PIF, and plans to continue to siphon funds from the PIF through 2010. *See* Exhibit K at 3.[13]

Notably, the PIF-PA transfers in 2008 and 2010 were made ***after*** the Defendants filed their motion to vacate in December 2007. As such, they clearly show that Defendants still have unclean hands and are undeserving of the equitable relief they seek in their motion to vacate.

Similarly, in early 2007, months after the entry of this Court's judgment on the creditor's bill, and in response thereto, the PA purported to modify the PIF's Articles of Association in such a manner as to thwart the Ungars' ability to exercise their rights over the PIF. Exhibit M.[14]

---

[11] Downloaded from:
www.pmof.ps/news/plugins/spaw/uploads/files/table4%20comparison%20english%202007.pdf

[12] Downloaded from:
www.pmof.ps/news/plugins/spaw/uploads/files/table5_eng_3.pdf

[13] Downloaded from:
www.pmof.ps/en/news/plugins/spaw/uploads/files/First%20quarter%20fiscal%20report%20_6_%20%20May%2010_%202010.pdf

[14] That the putative "modification" of the Articles of Association was intended to block the Ungars' enforcement proceedings is proven by the fact that the 2007 "Articles" were relied upon by attorneys representing the former officers of the PIF (who had been dismissed by the Ungars) in opposing the Ungars' Connecticut enforcement proceedings. *See* Exhibit L at 11 (citing the 2007 "Articles" as providing that the PIF's shares "*are fully owned by the Palestinian people represented by the President of the PNA*" – this, despite the fact that the original Articles provided that the PIF was owned ***by the PA itself*** and that this Court had assigned the PA's ownership of the PIF to the Ungars in September 2006).

Additionally, the former officers of the PIF – who were dismissed by the Ungars following entry of the creditor's bill judgment by this Court[15] but who refuse to recognize that judgment or relinquish their control over the PIF – have brought legal actions in Ramallah, Amman and Cairo, putatively on behalf of the PIF, seeking to prevent the Ungars from exercising their rights to the PIF under the creditor's bill judgment. *See* Exhibits N, O, P and Q.[16]

Significantly, the Cairo proceeding, which was brought by the former officers of the PIF against Orascom and seeks to force Orascom to transfer its $45 million debt to the PIF despite the creditor's bill judgment entered by this Court and despite the fact that Orascom is restrained from paying this debt by process issued by U.S. courts, was maintained even ***after*** the Defendants filed their motion to vacate in this action in December 2007. Indeed, this proceeding is still being litigated ***at this moment***. *See* Exhibits P, Q.

Nor is there any question that the PA itself is behind these proceedings brought by the former officers of the PIF. Mohammad Mustafa, who purports to be both the CEO and Chairman of the PIF despite his dismissal, and who as a practical (but not legal) matter continues to control the PIF and its holdings, also serves as the "Economic Adviser" to the President of the PA, which is "a Ministerial level ranking". *See* Exhibit R.[17]

Thus, the person who, practically but not legally, runs the PIF today, is none other than the Economic Adviser to the PA President, and holds a Ministerial rank in the PA.

───────────────

[15] As discussed *supra*, the Ungars dismissed the prior directors and officers of the PIF following the Court's transfer of ownership of the PIF.

[16] It will not be disputed that the Ungars have never been served with process in any of these proceedings, and in any event the courts in Ramallah, Amman and Cairo lack any jurisdiction over the Ungars or the subject-matter.

[17] Downloaded from www.pif.ps/print.php?page=124558849291&lang=en.

Indeed, correspondence obtained by the Ungars between Mohammad Mustafa and Orascom's principals shows clearly that Mustafa – the PA's Economic Advisor – is leading this litigation effort. Exhibits S, T, and U. [18]

Notably, in a letter sent to Mohammed Mustafa on May 28, 2006, Orascom stated that it "appreciates <u>the financial difficulties the **_Palestinian Authority_** is currently experiencing</u>, and we have consistently desired to meet our obligation to pay the PIF the $45 million (less legal fees)." Exhibit T at 2 (emphasis supplied).

Clearly, then, not only is the PA's Economic Advisor personally behind this litigation to force Orascom to pay the debt attached by the Ungars, but the purpose of the litigation is **_to transfer the funds to the PA_** to alleviate its purported "financial difficulties."

The PA's resort to foreign litigation to block the Ungars' enforcement proceedings constitutes powerful additional grounds to deny Defendants' motion – indeed, this was precisely the conduct of the judgment debtors in _Motorola Credit Corp. v. Uzan_, whose motion for Rule 60(b) relief was denied on that ground. _See Motorola Credit Corp._, 561 F.3d at 128 (citing the fact that the judgment debtors had taken "secret steps … in Turkey to obtain ex parte orders undercutting the prior orders of this Court.").

### D.   The Ungars' Discovery Requests and the Defendants' Objections, Responses and Motion for a Protective Order

In light of all the above, and in order to obtain further information regarding the Defendants' interference with the judgment entered by this Court – which, as shown herein, is a topic highly relevant to the Rule 60(b)(6) motion – the Ungars served the Defendants with a

---

[18] The Ungars obtained this correspondence from the Egyptian court file.

request for production and an interrogatory seeking all written and oral communications relating to this action, to the judgment entered by this Court in July 2004 and/or to the 2006 creditor's bill judgment, between the Defendants and Orascom, the PMA, the Insurance and Pension Fund, the Canaan Equity funds, Becont Ltd., the PIF and/or the PCSC.

### Request No. 1 and Defendants' Response and Objections Thereto

On June 30, 2010, the Ungars served Defendants with Plaintiffs-Judgment Creditors' Second Request for Production of Documents and Things Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion ("Ungars' 2nd RPD"). Exhibit V.

This request for production included Request No. 1, which seeks:

> Authentic copies of all written communications, relating to the instant case, the Judgment and/or the 2006 Judgment, between the PA and/or the PLO (including any officeholder, employee, attorney and/or agent of the PA and/or the PLO) and the following entities: (a) Orascom Telecom Holding S.A.E. (including any office-holder, employee, attorney and/or agent of Orascom Telecom Holding S.A.E.); (b) the Palestine Monetary Authority (including any office-holder, employee, attorney and/or agent of the Palestine Monetary Authority); (c) the Insurance and Pension Fund (including any office-holder, employee, attorney and/or agent of the Insurance and Pension Fund); (d) Canaan Equity Offshore C.V., Canaan Equity II Offshore C.V. and Canaan Equity III Offshore C.V., Canaan Offshore Management N.V. and Canaan Partners (collectively "Canaan") (including any office-holder, employee, attorney and/or agent of Canaan); (e) Becont Limited (including any office-holder, employee, attorney and/or agent of Becont Limited); (f) the Palestine Investment Fund (including any person purporting to be an office-holder, employee, and/or agent of the Palestine Investment Fund); and, (g) the Palestinian Commercial Services Company (a/k/a Palestine Commercial Services Company) (hereinafter "PCSC") (including any office-holder, employee, attorney and/or agent of PCSC).

Exhibit V at Request no. 1.

On August 2, 2010, Defendants served Objections and Responses to the Ungars' 2nd RPD, which contained a bevy of general and specific objections to all of the Ungars' document requests, including Request No. 1. Exhibit W.

**Interrogatory No. 2 and Defendants' Objections Thereto**

On June 30, 2010, the Ungars served Defendants with Plaintiffs-Judgment Creditors' First Set of Interrogatories Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion on Defendants ("Ungars' 1st Set of Interrogatories"). Exhibit X.

These interrogatories included Interrogatory No. 2, which sought information regarding oral communications concerning the same topics as Request No. 1 of the Ungars' 2nd RPD:

> In respect to all verbal communications, relating to the instant case, the Judgment and/or the 2006 Judgment, between the PA and/or the PLO (including any office-holder, employee, attorney and/or agent of the PA and/or PLO) and the following entities and persons: (a) Orascom Telecom Holding S.A.E. (including any office-holder, employee, attorney and/or agent of Orascom Telecom Holding S.A.E.); (b) the Palestine Monetary Authority (including any office-holder, employee, attorney and/or agent of the Palestine Monetary Authority); (c) the Insurance and Pension Fund (including any office-holder, employee, attorney and/or agent of the Insurance and Pension Fund); (d) Canaan Equity Offshore C.V., Canaan Equity II Offshore C.V. and Canaan Equity III Offshore C.V., Canaan Offshore Management N.V. and Canaan Partners (collectively "Canaan") (including any office-holder, employee, attorney and/or agent of Canaan); (e) Becont Limited (including any office-holder, employee, attorney and/or agent of Becont Limited); (f) the Palestine Investment Fund (including any office-holder, employee, attorney and/or agent of the Palestine Investment Fund); and (g) the Palestinian Commercial Services Company (a/k/a Palestine Commercial Services Company) (hereinafter "PCSC") (including any office-holder, employee, attorney and/or agent of PCSC) – please identify: (a) the date of each such communication (b) the identities of all such persons and entities who participated in each such communication (d) [sic] the purpose of each such communication and (e) all topics relating to

the instant case, the Judgment and/or the 2006 Judgment discussed in each such communication.

Exhibit X.

On August 2, 2010, Defendants served Objections and Answers to the Ungars' 1st Set of Interrogatories which, like their responses to the Ungars' 2nd RPD, contained a raft of general and specific objections to the Ungars' interrogatories, including Interrogatory No. 2. Exhibit Y.

Notably, despite the fact that they asserted general and specific objections on the basis of privilege, and expressly stated that they would "identify the information or documents in the manner and to the extent required by the Federal Rules of Civil Procedure and the Local Rules of this Court" (Exhibit W at Preliminary Statement § 3; Exhibit Y at Preliminary Statement § 3), the Defendants failed to produce any privilege log whatsoever in response to the Ungars' 2nd RPD or the Ungars' 1st Set of Interrogatories.

Because the Ungars' counsel considered the Defendants' responses to the Ungars' 2nd RPD and the Ungars' 1st Set of Interrogatories inadequate, and Defendants' failure to produce a privilege log unacceptable, the parties "met and conferred" by telephone on August 12, 2010. During that conference, the Ungars' counsel pointed out to Defendants' counsel that Defendants had failed to provide any privilege log – timely or at all. In response, Defendants' counsel proposed producing "a privilege log and any non-privileged documents responsive to Request 1 of Plaintiff's [sic] Second Request for Production of Documents and Interrogatory Number 2 in three weeks." *See* Exhibit Z at ¶ 4.

The Ungars agreed to accept the "proposal to extend defendants' time to produce privilege logs and any non-privileged documents and answers … responsive to Request 1 of Plaintiffs' Second Request for Production of Documents and Plaintiffs' Interrogatory Number 2 until September 2, 2010, provided that defendants agree to an expedited briefing schedule on any

motion to strike objections/compel that the plaintiffs file in respect to these discovery requests, such that defendants' opposition to any such motion must be filed within 7 business days of the filing of such a motion." *See* Exhibit AA. The Ungars' counsel requested Defendants' counsel to "[p]lease advise whether you agree to the above proposal." *Id*.

However, Defendants completely ignored this generous *ex gratia* proposal to enlarge their time to submit privilege logs.

On August 17, 2010, the Defendants served Supplemental Objections and Responses to the Ungars' 2nd RPD and Supplemental Objections and Answers to the Ungars' 1st Set of Interrogatories. Exhibits BB, CC.

These Supplemental Objections were not accompanied by any production of non-privileged documents (the existence of which was conceded by Defendants, *see* Exhibit Z) – nor any privilege logs – and simply repeated Defendants' earlier multiple, sweeping objections to Request No. 1 and to Interrogatory No. 2.

Thus, Defendants' Supplemental Objections and Responses to the Ungars' 2nd RPD stated in relevant part as follows:

<u>PRELIMINARY STATEMENT</u>

\*\*\*

3. To the extent that any of the Requests seek the disclosure of information or documents protected from disclosure by any applicable privilege (including, but not limited to, the attorney-client privilege, the work product doctrine, the joint defense privilege, the common interest doctrine, state secrets, deliberative process, or other statutory or common law privileges), Defendants object to such Requests and will identify the information or documents in the manner and to the extent required by the Federal Rules of Civil Procedure and the Local Rules of this Court.

\*\*\*

15

<u>GENERAL OBJECTIONS</u>

1.  Defendants object to the Requests to the extent that the definitions or instructions set forth therein seek to impose requirements for production beyond those contained in the Federal Rules of Civil Procedure and the Local Rules of this Court.

2. Defendants object to the Requests to the extent that they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest doctrine, state secrets, deliberative process, or any other applicable statutory or common law privilege. With respect to those Requests to which Defendants do not specifically object and which seek the identification or disclosure of privileged information or documents, Defendants will identify such information and documents in the manner and to the extent required under Fed. R. Civ. P. 26(b)(5) and the Local Rules of this Court.

3. Defendants object to the Requests to the extent that they seek information and documents which are not relevant to this action and that are not reasonably calculated to lead to the discovery of admissible evidence.

4. Defendants object to the Requests to the extent that they are oppressive, overly burdensome, and/or would involve undue financial expense to Defendants. In addition, Defendants object to each and every request which seeks "all" documents when the relevant information may be supplied with fewer than "all" documents.

5. Defendants object to the Requests to the extent they seek the identification, disclosure, or production of information or documents that are not within Defendants' possession, custody, or control, including, without limitation, any Request that was intended, or could be construed, to impose a requirement and/or burden on Defendants, in excess of the Federal Rules of Civil Procedure, to search for and/or produce documents or information possessed by a separate, non-party entity.

6. Defendants object to the Requests to the extent that they are vague or ambiguous or fail to describe the information or

16

documents sought with sufficient particularity to allow for a meaningful response by Defendants.

7. Defendants object to the Requests to the extent they seek the production of any confidential, proprietary, intelligence, trade secret or other protected information or documents prior to, or in the absence of, an appropriate protective order or confidentiality agreement placing proper limitations and restrictions on the post-production use or disclosure of such information or documents by Plaintiffs.

8. By subsequently responding to and/or producing documents in response to the Requests, Defendants are not conceding that they agree with the definition and/or characterization of any terms used by Plaintiffs in propounding those Requests.

9. Defendants incorporate by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific responses does not waive any general objection to that request.

<u>SPECIFIC RESPONSES AND OBJECTIONS</u>

***

<u>OBJECTIONS</u>:
Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections. In addition, Defendants specifically object to Request No. 1 on the grounds: (a) that the Request is overly broad and unduly burdensome (e.g. "all written communications"; "any office-holder, employee, attorney and/or agent"); (b) that, as potentially construed, the phrase "relating to the instant case, the Judgment and/or the 2006 Judgment" is vague and ambiguous; (c) that, as potentially construed, the Request requires a legal conclusion (e.g., "office-holder, employee, attorney and/or agent" of entities other than Defendants); (d) that the Request seeks information beyond that reasonably known or reasonably knowable by Defendants; (e) that the Request seeks disclosure of information that is irrelevant to any of the issues presented by Defendants' motion to vacate the default judgment, as set out by the First Circuit in its March 25, 2010 Order, and the

Request is not reasonably calculated to lead to the discovery of admissible evidence, but is instead calculated to lead to discovery for use in other proceedings; (f) that, as potentially construed, the Request imposes obligations beyond what the Federal Rules of Civil Procedure allow, as Defendants have no obligation under the Federal Rules to authenticate documents on Plaintiffs' behalf; and (g) that, as potentially construed, the Request seeks documents protected by the work-product doctrine, the common-interest privilege, and other applicable privileges and protections.

RESPONSE:

Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing General and Specific Objections. On the basis of the foregoing General and Specific Objections, and without prejudice to Defendants' right to modify or amend their position, Defendants do not intend to produce any documents in response to this Request. Defendants are available at a mutually agreeable date and time to conduct a meet and confer concerning Defendants' Objections to Request No. 1.

Exhibit BB.

Similarly, Defendants' Supplemental Objections and Answers to the Ungars' 1st Set of Interrogatories stated in relevant part:

PRELIMINARY STATEMENT

\*\*\*

3. To the extent that the Interrogatories seek the disclosure of information or documents protected from disclosure by any applicable privilege (including, but not limited to, the attorney-client privilege, the work product doctrine, the joint defense privilege, the common interest doctrine, state secrets, deliberative process, or other statutory or common law privileges), Defendants object to the Interrogatories and will identify the information or documents in the manner and to the extent required by the Federal Rules of Civil Procedure and the Local Rules of this Court.

\*\*\*

## GENERAL OBJECTIONS

1. Defendants object to the Interrogatories to the extent that the definitions or instructions set forth therein seek to impose requirements for production beyond those contained in the Federal Rules of Civil Procedure and the Local Rules of this Court.

2. Defendants object to the Interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest doctrine, state secrets, deliberative process, or any other applicable statutory or common law privilege.

3. Defendants object to the Interrogatories to the extent that they seek information and documents which are not relevant to this action and that are not reasonably calculated to lead to the discovery of admissible evidence.

4. Defendants object to the Interrogatories to the extent that they are oppressive, overly burdensome, and/or would involve undue financial expense to Defendants. In addition, Defendants object to Interrogatory Nos. 1-2 seeking "all" information or documents when the relevant information may be supplied with less than "all" information or documents.

5. Defendants object to the Interrogatories to the extent they seek the identification, disclosure, or production of information or documents that are not within Defendants' possession, custody, or control, including, without limitation, to the extent that Interrogatory Nos. 1-2 were intended, or could be construed, to impose a requirement and/or burden on Defendants, in excess of the Federal Rules of Civil Procedure, to search for and/or produce documents or information possessed by a separate, non-party entity.

6. Defendants object to the Interrogatories to the extent that they are vague or ambiguous or fail to describe the information or documents sought with sufficient particularity to allow for a meaningful response by Defendants.

7. Defendants object to the Interrogatories to the extent that they seek the disclosure or production of any confidential, proprietary,

intelligence, trade secret or other protected information or documents prior to, or in the absence of, an appropriate protective order or confidentiality agreement placing proper limitations and restrictions on the post-production use or disclosure of such information or documents by Plaintiffs.

8. By subsequently responding to and/or producing documents in response to the Interrogatories, Defendants are not conceding that they agree with the definition and/or characterization of any terms used by Plaintiffs in propounding these Interrogatories.

9. Defendants incorporate by reference every general objection set forth above into the specific responses set forth below. The failure to include any general objection in the specific responses does not waive any general objection to the Interrogatories.

SPECIFIC OBJECTIONS

\*\*\*

INTERROGATORY NO.2:

\*\*\*

OBJECTIONS:

Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections. In addition, Defendants specifically object to Interrogatory No. 2 on the grounds: (a) that the Interrogatory is overly broad and unduly burdensome (e.g., "all verbal communications"; "any office-holder, employee, attorney and/or agent"); (b) that, as potentially construed, the phrase "relating to the instant case, the Judgment and/or the 2006 Judgment" is vague and ambiguous; (c) that, as potentially construed, the Interrogatory requires a legal conclusion (e.g., "office-holder, employee, attorney and/or agent" of entities other than Defendants); (d) that the Interrogatory requests information beyond that reasonably known or reasonably knowable by Defendants; (e) that the Interrogatory seeks disclosure of information that is irrelevant to any of the issues presented by Defendants' motion to vacate the default judgment, as set out by the First Circuit in its March 25, 2010 Order, and the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence, but is instead calculated to lead to discovery for use in other proceedings; and (f) that, as potentially construed, the Interrogatory seeks documents protected by the work-product

20

doctrine, the common-interest privilege, and other applicable privileges and protections.

ANSWER:
Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing General and Specific Objections. On the basis of the foregoing General and Specific Objections, and without prejudice to Defendants' right to modify or amend their position, Defendants do not intend to provide an answer in response to this Interrogatory. Defendants are available at a mutually agreeable date and time to conduct a meet and confer concerning Defendants' Objections to Interrogatory No. 2.

Exhibit CC.

**In sum: Defendants refused to provide any documents or information whatsoever – or even a privilege log – in response to the Request No. 1 and to Interrogatory No. 2.**

Subsequently, the Defendants filed a Motion for Entry of a Protective Order, which seeks to excuse Defendants from compliance with Request No. 1 and Interrogatory No. 2. Dkt. # 526.

For the reasons below, Defendants' objections to Request No. 1 and Interrogatory No. 2 should be stricken, their Motion for a Protective Order should be denied, and Defendants should be ordered to comply fully with Request No. 1 and to Interrogatory No. 2 within 7 business days.

## **ARGUMENT**

As discussed *supra*, Defendants filed objections to Request No. 1 and Interrogatory No. 2 and then later moved for a protective order exempting them from complying with Request No. 1 and Interrogatory No. 2. Defendants' motives[19] in filing both objections and a motion for a protective order are unclear, particularly as their objections are founded on multiple grounds (*see*

---

[19] Defendants may be planning to seek to fall back on their objections if their motion is denied. Accordingly, the Ungars have no choice but to move to strike those objections.

Exhibits BB and CC) while their motion is based only three grounds only: relevancy, burden and the work-product privilege. *See* dkt. # 527 at 11-18.

The Ungars' position is that because Defendants' motion for a protective order abandons most of the grounds for non-production asserted in their earlier objections, any grounds other than those asserted in the motion should be deemed waived.

However, out of an abundance of caution, and without derogating from their claim of waiver, the Ungars will address below both Defendants' motion and their objections.

## I. Defendants Bear – But Have Failed to Meet – Their Burden

As an initial matter, the "burden of demonstrating good cause [for a protective order] rests on the proponent of the protective order" (*Haemonetics Corp. v. Baxter Healthcare Corp.*, 593 F.Supp.2d 298, 301 (D.Mass. 2009)) and a "party seeking a protective order must demonstrate particular and specific facts to establish 'good cause' for the order." *Prozina Shipping Co., Ltd. v. Thirty-Four Automobiles*, 179 F.R.D. 41, 48 (D.Mass. 1998).

Likewise, "[t]he burden is on the objecting parties to demonstrate in specific terms why a discovery request is improper." *Lyons v. Beard*, 2010 WL 890009 at *2 (M.D.Pa. March 8, 2010) (citing cases). *See also E.E.O.C. v. Klockner H & K Machines, Inc.*, 168 F.R.D. 233, 235 (E.D. Wis. 1996) ("The burden is on the objecting party to show why a particular discovery request is improper.") (citing 8 Wright and Miller, Federal Practice and Procedure, § 2173).

Thus, Defendants bear the burden to show "particular and specific facts to establish 'good cause' for" a protective order regarding Request No. 1 and Interrogatory No. 2 and to "demonstrate in specific terms why [Request No. 1 and Interrogatory No. 2 are] improper."

Defendants have failed to meet these burdens; indeed, as shown *infra*, Defendants' challenges to Request No. 1 and Interrogatory No. 2 are meritless and/or have been waived.

## II.    The Documents and Information Sought Are Highly Relevant

The Defendants assert in their motion for a protective order and in their objections that the documents and information sought in Request No. 1 and Interrogatory No. 2 are irrelevant to their Rule 60(b)(6) motion. *See* dkt. # 527 at 11-15; Exhibit BB, Specific Objections to Request No. 1; Exhibit CC, Specific Objections to Interrogatory No. 2.

However, as discussed *supra*, the First Circuit expressly held on remand that Rule 60(b)(6) requires courts to perform "holistic analyses" and examine "the totality of the circumstances." *Ungar v. PLO*, 599 F.3d at 86-87. *See also id.* at 83-84 (noting that the list of relevant factors is open-ended and that a holistic appraisal of the circumstances is required).

As also shown above, the post-judgment conduct of a Rule 60(b) movant, particularly any conduct directed at inferring with enforcement of the judgment, is one of the factors to be considered in weighing whether to grant relief. *See e.g. Farnese*, 687 F.2d at 765; *Motorola Credit Corp.*, 561 F.3d at 127; 12 *Moore's Federal Practice* § 60.22[5] (3rd ed. 2008).

Plainly, then, the documents and information sought by the Ungars in Request No. 1 and Interrogatory No. 2 are extremely relevant.[20]

Therefore, Defendants' irrelevancy arguments should be rejected.

---

[20] As noted above, the Ungars have been asserting for over two and a half years, since Defendants filed the motion to vacate, that the motion should be denied, *inter alia*, because of Defendants' interference in the Ungars' enforcement proceedings (*see* dkt. # 415 at 27, 38-99), and Defendants' claim (dkt. # 527 at 13) that the Ungars are improperly seeking discovery regarding Defendants' efforts to block the enforcement actions in order to advance those actions and not for the purpose of opposing the Rule 60(b) motion is thus demonstrably a pure fiction conjured out of thin air by Defendants.

### III.   Request No. 1 and Interrogatory No. 2 Are Not Unduly Burdensome

Defendants also assert in their motion and in their objections that requiring them to respond to Request No. 1 and Interrogatory No. 2 would impose an undue burden upon them. *See* dkt. # 527 at 15-16; Exhibit BB, Specific Objections to Request No. 1; Exhibit CC, Specific Objections to Interrogatory No. 2.

This argument should be rejected for numerous reasons.

*First*, it is entirely bald and vague. Defendants fail to give the Court any clue as to the quantity of the communications involved. Are there scores of communications? Hundreds? Thousands? It is difficult to believe that there could have been more than several hundred communications that meet the criteria set forth in Request No. 1 and Interrogatory No. 2. Defendants' unarticulated claim of "burden" fail to "demonstrate particular and specific facts to establish 'good cause' for [a protective] order" (*Prozina Shipping*, 179 F.R.D. at 48) or to "demonstrate in specific terms why [Request No. 1 and Interrogatory No. 2. are] improper." *Lyons*, 2010 WL 890009 at *2. Accordingly, this claim should be rejected.

*Second*, Defendants' claim that the communications at issue extend over a ten-year period (dkt. # 527 at 16) is blatantly exaggerated. Prior to April 2005, when the Ungars initiated their enforcement proceedings, there was simply no reason for the Defendants to have communicated with any of the entities at issue ***about this case***. Thus, it is extremely unlikely that any relevant communications exist prior to April 2005, and if such communications do exist they could not amount to more than a handful. Thus, the real period at issue is just over five years.

*Third*, Request No. 1 and Interrogatory No. 2 are narrowly focused. The Ungars seek only communications relating to the instant case, the 2004 judgment and the creditor's bill judgment – criteria which naturally limit both the temporal scope and quantity of the responses.

As shown above, the Ungars are entitled to discover these communications. The only way the Ungars could describe the communications with greater specificity would be if they already knew what they were – in which case there would be no need for discovery.

"Burden is inherent in all discovery requests." *Capacchione v. Charlotte-Mecklenburg Schools*, 182 F.R.D. 486, 490-91 (W.D.N.C. 1998). Requiring a responding party to perform extensive research or to compile substantial amounts of data and information does not automatically constitute an undue burden. *Id.* The Ungars' requests here are no broader than necessary to obtain this necessary and highly relevant discovery.

*Fourth*, Defendants' claims of burden are particularly unpersuasive, if not galling, in light of the fact their Rule 60(b)(6) motion is based in great part on their pledge to cooperatively conduct discovery. Defendants should be held to this representation.

Accordingly, Defendants' claims of "burden" should be rejected.

## IV.    The Discovery Sought Is Not Subject to the Work-Product Privilege

Defendants also challenge Request No. 1 and Interrogatory No. 2 on the basis of work-product privilege. *See* dkt. # 527 at 16-18; Exhibit BB, Specific Objections to Request No. 1; Exhibit CC, Specific Objections to Interrogatory No. 2.

Defendants' attempt to take shelter in the work-product privilege is without merit and should be rejected for multiple reasons, as shown below.

### A.    Defendants Have Waived Any Privileges by Refusing to Produce a Privilege Log

Defendants have waived any and all claims of privilege by failing to produce a privilege log. Rule 26(b)(5)(A) requires a party to produce a privilege log whenever it asserts a privilege to resist discovery requests: "When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material,

the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that … will enable other parties to assess the claim." Fed.R.Civ.P. 26(b)(5)(A).

It is well settled in the First Circuit that failure to produce a privilege log waives the privilege. *See In re Grand Jury Subpoena*, 274 F.3d 563, 576 (1st Cir. 2001) ("A party that fails to submit a privilege log is deemed to waive the underlying privilege claim."); *Consorzio Del Prosciutto Di San Daniele v. Daniele, Inc.*, 2010 WL 2196069 at *6 (D.R.I. June 1, 2010) ("Moreover, it is undisputed that Daniele never produced a privilege log to support its privilege claims, highlighting further that the privilege was not sufficiently guarded.") (affirming order of Magistrate Judge David L. Martin clarifying that defendant had waived its attorney-client privilege). *See also Ruran v. Beth El Temple*, 226 F.R.D. 165, 169 (D.Conn. 2005) ("Moreover, because Beth El failed to produce a privilege log, and consequently to perfect its claim of privilege, the court finds that the privilege, if it ever existed vis-à-vis the documents at issue, has been waived and all responsive documents must be produced."); *United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 235 F.R.D. 521, 523 (D.D.C. 2006) (challenge to interrogatory foreclosed by failure to provide privilege log as required by Rule 26(b)(5)).

Defendants' failure to produce a privilege log is particularly egregious – and inexcusable – given that Defendants have repeatedly acknowledged their obligation to do so.

For example, in ¶ 3 of the "Preliminary Statement" prefacing ***all four*** of their discovery responses to the Ungars' 2nd RPD and the Ungars' 1st Set of Interrogatories, the Defendants' expressly conceded that they are required to produce a privilege log. *See* Exhibits W, Y, BB and CC at "Preliminary Statement" ¶ 3 ("Defendants object [on grounds of privilege] **and will**

identify the information or documents in the manner and to the extent required by the Federal Rules of Civil Procedure and the Local Rules of this Court.") (emphasis added).

Moreover, in their August 12, 2010 email to the Ungars' counsel, Defendants expressly recognized their duty to provide a privilege log – yet, they failed to do so and, most astonishingly, then proceeded to blithely ignore (and so reject) the Ungars' proposal to extend Defendants' time to produce such a log on certain conditions. Exhibit Z at ¶ 4; Exhibit AA.

Thus, Defendants' failure to produce a privilege log and to thereby flout the Federal Rules is *clearly calculated and willful* – and so no different at all than the recalcitrant conduct that resulted in entry of default judgment against them in the first place.

Because Defendants have intentionally refused to produce a privilege log, it is effectively impossible for Ungars or the Court to evaluate Defendants' claims of privilege. "[T]he court's task [of determining the existence, *vel non*, of a privilege] is nearly impossible absent a detailed privilege log and, if necessary, evidentiary submissions that fill in factual gaps." *Alleyne v. New York State Educ. Dept.*, 248 F.R.D. 383, 386 (N.D.N.Y. 2008)

Rule 26 does not tolerate this result and therefore does not tolerate Defendants' refusal to produce a privilege log. Their refusal to do so is "fatal" to Defendants' claims of privilege. *In re Grand Jury Subpoena*, 274 F.3d 563, 576 (1st Cir. 2001).

Therefore, Defendants' claims of privilege should be deemed waived.

### B.    The Documents and Information Sought Are Not Work-Product Under Rule 26

Even assuming *arguendo* that Defendants had not waived any claims of privilege by refusing to produce a privilege log, their assertion of a work-product privilege would fail because the documents and information sought are not work-product as defined in Rule 26.

27

Rule 26(b)(3)(A) provides in relevant party that: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial **by or for another party** …". Fed.R.Civ.P. 26(b)(3)(A) (emphasis added).

It is well established that Rule 26(b)(3)(A) applies only to work-product prepared by or for a party to the litigation. *See e.g. Loustalet v. Refco*, 154 F.R.D 243, 247 (C.D.Cal. 1993)(work-product doctrine does not protect from discovery documents prepared for one who is not a party to the present suit, even if the person may be a party closely related to the lawsuit in which he will be disadvantaged if he must disclose in present suit); *Ostrowski v. Holem*, 2002 WL 31956039 at *3 (N.D.Ill. 2002) (same); 8 Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* § 2024, at 354 ("Documents prepared for one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely related lawsuit in which he will be disadvantaged.").

Neither Defendant is a party to any of the pending enforcement actions brought by the Ungars against Orascom, Canaan, the PIF, the IPF, Becont and the PMA.[21] Nor are any of those entities a party to the instant action. Therefore, the communications sent and received by the Defendants regarding the Ungars' enforcement actions are not protected work-product under the definition set forth in Rule 26(b)(3)(A).

Accordingly, Defendants' reliance on the work-product privilege would have to be rejected, even if Defendants had not waived any privileges by refusing to provide a privilege log.

---

[21]   The PA was named in the action against the IPF but was never served and the time to do so under New York law has long expired. *See* Declaration of Mark David McPherson, dkt. # 511, at ¶ 21.

### C.    The Crime-Fraud Exception Applies to the Documents and Information Sought

Assuming that they had not waived their claims of privilege (which they have) and that the documents and information sought met the definition of work-product under Rule 26(b)(3)(A) (which they do not), Defendants' claim of privilege would have to be rejected under the crime-fraud exception.

It is well established that the crime-fraud exception applies where, as here, the documents and information are sought to prove an attempt to hinder or delay enforcement of a judgment. *See e.g. In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1041 (2nd Cir. 1984) (legal advice sought to enable corporation to take steps "to hinder or delay the government's collection of moneys owing or about to be due from it" was subject to crime-fraud exception to attorney-client privilege); *Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D.Conn. 2007) (Crime-fraud exception to attorney-client privilege applied to permit deposition of defendant's former attorneys regarding formation and operation of trust and limited partnership that were allegedly used by defendant as vehicles to hinder, delay or defraud creditors); *U.S. v. Gasparik*, 141 F.Supp.2d 361 (S.D.N.Y. 2001) (same).

A party seeking to overcome a claim of privilege on the basis of the crime-fraud exception need not show that the documents or information sought ***definitely*** evidence an attempt to hinder or delay enforcement of a judgment (or some other crime or fraud). Rather, "all that is required for the crime-fraud exception to apply is 'that a prudent person have a reasonable basis to suspect the perpetration of a crime or fraud, and that the communications were in furtherance thereof.'" *In re Grand Jury Subpoena*, 220 F.R.D. 130, 153 (D.Mass. 2004) (quoting *In re Grand Jury Subpoena*, 731 F.2d at 1039).

Here, there is far more than "a reasonable basis to suspect" that the Defendants have been taking actions to hinder or delay enforcement of the judgment and that "the communications [sought by the Ungars] were in furtherance thereof."

As shown above, the PA siphoned many millions of dollars from the PIF subsequent to entry of the creditor's bill judgment awarding ownership of the PIF to the Ungars – and intends to continue to do so this year. *See* Exhibits H-K. The PA also purported to amend the PIF's Articles of Association in order to block the Ungars' enforcement efforts. *See* Exhibits L, M.

Indeed, Defendants' motion effectively admits that the documents and information sought will show that the Defendants have been coordinating with the entities at issue to hinder or delay enforcement of the Ungars' judgment:

> Here, the PA/PLO and Palestinian Pension Fund, PIF, PMA, and Becont have ***a common litigation interest in the PA/PLO having an opportunity to litigate the Ungar case on the merits*** and in avoiding a default judgment being enforced as to Palestinian entities who had no role in the underlying attack and whose assets should not be used to satisfy a judgment as to the PA or PLO.

Dkt. # 527 at 18 (emphasis added).

In plain English, the Defendants are arguing that they have the right to work together with the IPF, PIF, PMA and Becont in order to seek to delay enforcement of the Ungars' judgment until after resolution of their Rule 60(b)(6) motion.

In fact, however, (aside from the fact that this argument is inapplicable to communications prior to the filing of the Rule 60(b) motion) the Defendants **have no such right**. The Defendants have not sought much less obtained a stay of enforcement pending resolution of their motion. Accordingly, Defendants have no right whatsoever to delay or hinder enforcement of the judgment. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) (Judgment debtor "may be *able* as a practical matter to ... avoid execution of ... judgment,

but it has no *right* to do so.") (emphasis in the original). Moreover, Defendants' attempts to do so are unlawful and unethical. "The use of this court solely as a dilatory tactic to avoid paying a judgment is a serious breach of professional ethics" and a violation of Fed.R.Civ.P. 11. *Overmyer v. Fidelity & Deposit Co. of Maryland*, 554 F.2d 539, 543 n. 4 (2nd Cir. 1977)

Accordingly, the crime-fraud exception overrides any privilege asserted by Defendants.

### D.   *Orascom and Canaan Equity Are Adverse to Defendants*

In addition to the reasons set forth above, Defendants' claims of work-product privilege in respect to Orascom and Canaan Equity fail because Orascom and Canaan Equity are adverse to the Defendants.

Indeed, as shown above, the PA, via the former officers of the PIF such as PA Economic Advisor Mohammed Mustafa, is suing Orascom.

Likewise, Canaan Equity, which is merely a stakeholder with no interest in whether the judgment is paid or from whom, has threatened to dilute the Palestinian investments in its funds for failure to make contributions. *See* Exhibit DD at p. 6 n. 2. Thus, Canaan too is adverse.

### E.   *Alternatively, the Defendants Should Be Directed to Produce the Documents and Answer the Interrogatories Pursuant to Rule 26(b)(3)(A)(i)-(ii)*

Alternatively, if the Court finds that some or all of the documents and information sought are privileged, it should nonetheless order their production under Rule 26(b)(3)(A).

Rule 26(b)(3)(A) provides in relevant part that work-product materials are discoverable if: "(i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed.R.Civ.P. 26(b)(3)(A)(i)-(ii).

Both of these conditions are met here. First, the documents and information are relevant and not subject to any other privilege, and are therefore "discoverable under Rule 26(b)(1)."

Second, as shown above, the documents and information are extremely important to the Ungars' defense of the Rule 60(b)(6) motion, and the Ungars have no means of obtaining the documents and information without undue hardship, considering that all of the entities at issue (except Canaan) are located overseas.

## V.    Alternatively, the Court Should Direct Defendants to Provide the Ungars with a Privilege Log and to Provide the Court with the Documents and Interrogatory Answers at Issue So the Court Can Conduct an *In Camera* Examination Thereof

In the alternative, i.e. if the Court does not find that Defendants' motion should be denied and their objections stricken for the reason set forth above, it should order the Defendants to provide the Ungars with a privilege log and to provide the Court with the documents and interrogatory answers sought so that the Court can conduct an *in camera* examination thereof.

It would be fundamentally unfair to grant Defendants' motion or uphold their objections without allowing the Ungars' to challenge their claims on the basis of a privilege log and without the Court conducting an in camera review to determine which, if any, materials are privileged and whether the crime-fraud exception applies to any otherwise privileged materials.

## VI.    Defendants' Remaining Objections Are Meritless

Defendants' supplemental objections (Exhibits BB and CC) contain additional general and specific objections to Request No. 1 and Interrogatory No. 2, all of which are meritless.

*First*, Defendants' all of "general" objections are conclusory and boilerplate and so ineffective. *See Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005) ("boilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production of documents are insufficient to assert a privilege"); *Miller v. Pruneda*, 236 F.R.D. 277, 281 (N.D. W. Va. 2004) ("The advisory committee notes to Rule 26(b)(5) of the Federal Rules of Civil Procedure make clear that failure to comply with the

32

rule may constitute a waiver of privilege. When a party files a boiler plate objection, refuses to comply with the rule and the Court finds the request is not patently improper, finding waiver of privilege is appropriate."); St. *Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 514 (N.D. Iowa 2000) (boilerplate objections insufficient to resist discovery requests). *See also California Native Plant Society v. U.S. E.P.A.*, 251 F.R.D. 408, 413 (N.D. Cal. 2008) (conclusory boilerplate statements insufficient to assert deliberative process privilege); *Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) ("Objections, in such boilerplate terms as those stated by Defendants, are improper and therefore 'no claim of privilege at all.'") (citing *International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 94 (D. Del. 1974)); *Pham v. Hartford Fire Ins. Co.*, 193 F.R.D. 659, 662 (D. Colo. 2000) (boilerplate assertion of attorney-client privilege without privilege log waived objection to discovery requests).

*Second*, Defendants' specific objections that the documents and information sought are covered by the "the common-interest privilege, and other applicable privileges and protections" are also bald and conclusory and so waived.

*Third*, Defendants' specific objection that "as potentially construed, the phrase 'relating to the instant case, the Judgment and/or the 2006 Judgment' is vague and ambiguous" also fails. Defendants do not explain what is vague or ambiguous about this phrase, and the Ungars submit that there is nothing vague or ambiguous about it.

*Fourth*, Defendants' specific objection that "as potentially construed" Request No. 1 and Interrogatory No. 2 "require[] a legal conclusion (*e.g.*, 'office-holder, employee, attorney and/or agent' of entities other than Defendants)" is also unavailing. There is no need for Defendants to so construe these requests, and this is not valid grounds for refusal to produce or identify any communications whatsoever between Defendants and the enumerated entities.

*Fifth*, Defendants object to Request No. 1 and Interrogatory No. 2 on the additional grounds that both requests "seek[] information beyond that reasonably known or reasonably knowable by Defendants." The Ungars cannot imagine why Defendants are incapable of knowing of their own communications with certain enumerated entities during a finite period.

Finally, Defendants object to Request No. 1 on the grounds "that, as potentially construed, the Request imposes obligations beyond what the Federal Rules of Civil Procedure allow, as Defendants have no obligation under the Federal Rules to authenticate documents on Plaintiffs' behalf." There is nothing objectionable about requesting "authentic" copies of these documents, as opposed to "inauthentic" copies.

In sum, all of Defendants' objections are meritless and/or waived. Those objections should therefore be stricken and Defendants should be compelled to comply with Request No. 1 and Interrogatory No. 2 forthwith.

## VII.    Conclusion

The instant motion should be granted and Defendants' motion should be denied.

Dated: September 27, 2010

Plaintiffs-Judgment Creditors,
by their Attorneys,


/s/ David J. Strachman
David J. Strachman (#4404)
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

Max Wistow (#0330)
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 27, 2010, a true and genuine copy of the foregoing was served by ECF on Defendants' counsel of record listed below:


Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/s/ David J. Strachman
David J. Strachman