# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAVID STRACHMAN, Administrator of the   :
Estate of Yaron Ungar, et al.,           :   Case No. 3:05-mc-00208-PCD

                        :

                  Plaintiffs,    :

     -against-               :

                        :

THE PALESTINIAN AUTHORITY, et al.,   :

                        :

               Defendants.   :  July 17, 2007

                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NON-PARTY THE PALESTINE INVESTMENT FUND'S MEMORANDUM OF LAW IN SUPPORT OF ITS CLAIM FOR DETERMINATION OF INTERESTS PURSUANT TO CONN. GEN. STAT. § 52-356c, ITS MOTION TO DISMISS, AND ITS MOTION TO STRIKE THE APPEARANCE OF ROBERT TOLCHIN**

Non-party The Palestine Investment Fund ("PIF"), by and through its counsel, LeBoeuf, Lamb, Greene & MacRae LLP, respectfully submits this memorandum of law in support of its Claim for Determination of Interests in Disputed Property pursuant to Conn. Gen. Stat. § 52-356c, in support of its motion to dismiss this action as against the PIF for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and to strike the appearance of Robert Tolchin. The PIF contests the claim of David Strachman, as the Administrator of the Estate of Yaron Ungar, and the other Ungars to acquire any interest the PIF may hold in assets managed by Canaan Partners on the following grounds: 1) the District Court for the District of Rhode Island ("the Rhode Island Court") entered a default judgment against judgment-debtors the Palestinian Authority ("PA") and the Palestinian Liberation Organization ("PLO"), but the Rhode Island Court never had personal jurisdiction over the PIF; 2) the PIF did not receive notice of the proceedings as required by Rhode Island law and the Due Process Clause of the Constitution; 3) the default judgment the Ungars obtained in Rhode Island against the PA and

PLO could not constitutionally convey to the Ungars full ownership of the PIF which has assets in excess of the amount of the default judgment against the PA and PLO ($116,000,000); and 4) any assets of Canaan Partners in which the PIF holds an interest are located outside the United States.

While a final and valid judgment of another court is entitled to full faith and credit, an unconstitutional decision over a party not before the court is not entitled to such full faith and credit. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 ("A judgment rendered in violation of due process is void in the rendering State and is not entitled to full faith and credit elsewhere."); *Vanderbilt v. Vanderbilt*, 354 U.S. 416, 419 (1957) ("Therefore, the Nevada decree, to the extent it purported to affect the wife's right to support, was void and the Full Faith and Credit Clause did not obligate New York to give it recognition."); *Hanson v. Denckla*, 357 U.S. 235, 255 (1958) ("Delaware is under no obligation to give full faith and credit to a Florida judgment invalid in Florida because offensive to the Due Process Clause of the Fourteenth Amendment.").

## **PROCEDURAL HISTORY**

### **The Rhode Island Court's Initial Order Regarding the PIF**

In *Estate of Yaron Ungar v. Palestinian Authority*, No. 00-105L (D.R.I.), the United States District Court for the District of Rhode Island entered a default judgment against defendant PA and the PLO in the approximate amount of $116,000,000.  As part of his effort to levy against assets of the PA and PLO, the Ungars' Administrator, David Strachman, presented a Creditor's Bill pursuant to Section 9-28-1 of the Rhode Island General Laws and Rule 69 of the Federal Rules of Civil Procedure, asking the Court to convey to the Ungars full ownership of the PIF.  *See* Exhibit 1.

The PIF, however, was not a party to that proceeding.  Moreover, the Rhode Island Court recognized that the PIF was not before the Court and that there were no assets in Rhode Island:

> And I have limited jurisdiction because none of those entities are before this Court.  The only jurisdiction I have is over the PA and the PLO, which I determined a long time ago.  So there's certainly a question about any judgment that I enter in this case as to its territorial effect.
>
> *          *          *
>
> I'm satisfied that whatever judgment I enter here today has no bearing on the Connecticut case.  If I enter a judgment assigning to the plaintiffs all the rights that the PA has in these two entities, that's the limit of the order of the Court, the judgment of the Court, then that has to be executed somewhere where these two entities are doing business.  They're not doing business in Rhode Island. . . . [T]here are no assets in this jurisdiction of the PA and the PLO.
>
> *          *          *
>
> You can make those arguments before the federal judge in Connecticut.  . . . And one of the orders or judgments that I'm going to enter is that any assets that the PA owns, or any interest that it owns, in those two entities is assigned to these plaintiffs.  And then you'll have to deal with them down in Connecticut.
>
> *          *          *
>
> And the Connecticut court will decide who owns these assets.

Transcript of September 13, 2006 Argument at 5, 10-11, 12-13, 14 (Exhibit 2).

Notwithstanding the fact that the PIF was not a party before the Court and that there were admittedly no assets in Rhode Island, the Court entered Final Judgment purporting to transfer ownership of the PIF:

> all of the Palestinian Authority's ownership rights in the Palestine Investment Fund Company…that are evidenced by the certificate attached hereto as Appendix 3, and
>
> all rights, benefits and interests of the Palestinian Authority in all property, assets and credits, of any type, that are titled and/or owed to…the Palestine Investment Fund Company…,

> are hereby assigned, transferred and conveyed to The Estate of
> Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir
> Ungar, Michael Cohen, Amichai Ungar and Dafna Ungar.

Final Judgment, p. 2 (Exhibit 3). Even though the Administrator had represented to the Court that the net unencumbered value of the assets of the PIF and the PCSC was less than the amount of the Ungars' judgment (Creditor's Bill, ¶ 17), the Administrator's own exhibit clearly showed that the assets of the PIF were far in excess of the amount of the Ungars' judgment. *See* Exhibit H to Creditor's Bill (Exhibit 4). In addition, the Administrator's Creditor's Bill failed to provide notice to the PIF, as required by Rhode Island law and Due Process.

### **LeBoeuf Is Retained By the PIF and "Fired" By the Administrator**

Shortly after the Rhode Island Court purported to transfer ownership of the PIF to the Ungars, the PIF asked LeBoeuf to represent the PIF in two separate federal court actions in which the Administrator was seeking to levy against assets of the PIF. One action was in Connecticut, and one was in New York. On October 16, 2006, LeBoeuf submitted a letter to this Court informing the Court that LeBoeuf had been asked to represent the PIF and wished to be heard on its behalf. LeBoeuf requested permission to file papers on behalf of the PIF relating to Canaan Partners' pending motion in that action, reserving all rights, including the right to contest jurisdiction. *See* Exhibit 5.

On October 20, 2006, LeBoeuf received a letter from counsel to the Administrator, Robert Tolchin ("Tolchin"), stating that the Ungars now owned the PIF, that he now represented the PIF, and that LeBoeuf had been discharged. *See* Exhibit 6. According to Tolchin, after seeing the LeBoeuf letter of October 16, 2006, the Ungars claim to have held a meeting without notice at an undisclosed location in "Khabla" on October 19, 2006. According to Tolchin, the Ungars elected themselves to be the new directors of the PIF, discharged the existing directors for cause, hired Tolchin as counsel, and discharged LeBoeuf.

In addition to the October 20, 2006 letter to LeBoeuf, the Administrator's counsel also faxed a letter to the directors and officers of the PIF on October 20, 2006.  *See* Exhibit A to the Declaration of Dr. Mohammed Mustafa ("Mustafa Declaration") (Exhibit 7).  In that letter, Tolchin notified the directors and officers directly -- and not through LeBoeuf, which he knew at the time was representing the PIF -- that they had been dismissed.  In addition, counsel to the Administrator ended each letter with a threat:

> I would caution you in the strongest terms, in light of your close relationship with the former owner of the PIF, the Palestinian Authority, that any interference by you with the new owners' and the new directors' control and management of the PIF, and/or any attempt by you to withdraw, transfer or secrete assets, or property, will render you <u>personally liable under the laws of the United States</u> for the full amount of new owners' judgment against the Palestinian Authority, which exceeds $116 million dollars, plus treble damages.  *See, e.g., Wooten v. Loshbough*, 649 F. Supp. 531 (N.D. Ind. 1986); *Cadle Co. v. Schultz*, 779 F. Supp. 392 (N.D. Tex. 1991).

Tolchin letter dated October 20, 2006, Mustafa Declaration, Exhibit A (emphasis in original). For good measure, the Administrator's counsel punctuated this threat with a footnote: "Such conduct may also potentially subject you to criminal prosecution in the United States."  *Id.*

### Threatened RICO Action

On October 24, 2006, Rohback wrote back to Tolchin explaining that LeBoeuf could not simply abandon a legal representation that it had been asked to undertake and that LeBoeuf's intention was to obtain guidance from the Court.  *See* Exhibit 8.  In response to that letter, Tolchin sent a letter to Rohback dated October 24, 2006 in which Tolchin threatened $350,000,000 in trebled RICO damages against LeBoeuf if it filed any papers with any Court on behalf of the PIF.  *See* Exhibit 9.  In this letter, Tolchin stated that LeBoeuf's "claim to continue to represent the PIF is absolutely fraudulent."  *Id.*  Tolchin then threatened "if you or LeBoeuf Lamb takes any further action purporting to act on behalf of the PIF (including without

limitations filing any court papers purporting to be from the PIF), the Ungars and the PIF will take all measures the law permits against you and your firm" including seeking $350,000,000 in RICO damages.  *Id.*  Based on the Administrator's RICO threat, LeBoeuf did not file any papers on behalf of the PIF even though it believed that it had an obligation to represent the PIF's interests.

**The Ungars' Counsel Claims to Represent Both
the Ungars and the PIF in This Action**

On October 25, 2006, Stephen Wright ("Wright"), the Administrator's Connecticut counsel, with Tolchin, filed on behalf of the Ungars a Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests of the PIF in the Canaan Funds in the action at bar.  *See* Exhibit 10.  On October 25, 2006, on behalf of the PIF (which supposedly did not exist), Wright, with Tolchin, filed a "Statement of the Palestine Investment Fund" in which they stated that the PIF "consents to all the relief sought in Plaintiffs' Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests"-- the very motion that he filed on the same day on behalf of the Plaintiffs.  *See* Exhibit 11.  On October 26, 2006, Wright and Tolchin filed a Motion for Determination of Interests with this Court (*see* Exhibit 12) purporting to consent to all the relief sought in the Ungars' Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests -- the motion that Wright and Tolchin had filed on behalf of the Ungars on October 25, 2006.[1]

---

[1] On October 24, 2006, Tolchin filed a Notice of Appearance on behalf of the PIF in an action he had previously filed on behalf of the Ungars, captioned *The Estate of Yaron Ungar v. Orascom Telecom Holding S.A.E.*, No. 05-CV-7765 (CM) (S.D.N.Y. filed Sept. 2, 2005) ("*Ungar v. Orascom* action").  A copy of that Notice is attached as Exhibit 13.  In that case, Tolchin also filed an Answer on behalf of the PIF to the complaint he had filed on behalf of the Ungars.  A copy of that Answer is attached as Exhibit 14.  In that Answer, Tolchin, claiming to be representing the PIF, purported to admit all the allegations that required an answer by the PIF

**<u>LeBoeuf Files Motions to Intervene</u>**

Given the Administrator's threatened RICO claims, LeBoeuf was unwilling to expose itself to a $350,000,000 lawsuit by filing any papers in any of these actions on behalf of the PIF, even though LeBoeuf believed that it had an obligation to represent the PIF.  On October 27, 2006, LeBoeuf filed a motion to intervene on its own behalf in this action to determine who is counsel to the PIF.  *See* Exhibit 15.  An exchange between LeBoeuf's counsel and the Court in this action reflects the issue:

> MR. ROHBACK:  * * *  The PIF was not a party to the Rhode Island proceeding.  It was not on notice of what was going on in Rhode Island, and what happened there, Your Honor, would be akin to the following.
>
> If the Ungars filed a case against Bill Gates, and said, "We're suing you for a hundred million dollars" or "seventy-five thousand dollars," and Gates said, "I'm gonna default on that," the judge in Rhode Island could enter a default up to the amount of the judgment, $75,000.  He could not say, "You now own MicroSoft." He went way too far and --
>
> THE COURT:  Well, of course that raises some serious questions as to the legal efficacy, including the binding quality of a sister district court, as to which I'm open to a discussion, because although I obviously respect the judge up there in Rhode Island, I'm not bound to agree with him, let's put it that way.
>
> MR. ROHBACK:  Absolutely, Your Honor, and in truth, I say this with great respect and with some trepidation, because I'm sure that my words will be quoted back to me in a few weeks if I appear before Judge Lagueux in Rhode Island by Mr. Strachman, but nothwithstanding --
>
> THE COURT:  Just go around Rhode Island --
>
> MR. ROHBACK:  I'm gonna say the same thing eventually, if I appear before him, as I will say to the Court here.  He went too far. That is an improper order --

---

and consented "to all the relief sought by the Plaintiffs in the First Amended Complaint" -- the very pleading that Tolchin had filed on behalf of the plaintiffs in that action in January 2006.

      THE COURT:  Okay,  Well, that will go to the merits of the question of the alternative representation.

      MR. ROHBACK:  Exactly.

Transcript of November 29, 2006 Hearing at 33-34 (Exhibit 16).  After fully exploring the various issues, the Court determined that it would wait for the Rhode Island Court to address the representation of the PIF issue that stems from its prior order.  *See Id.* at 44-45.[2]

### LeBoeuf's Declaratory Judgment Action in Rhode Island

      As part of its effort to clarify the threshold question of who represents the PIF, LeBoeuf filed a declaratory judgment action in the United States District Court for the District of Rhode Island giving that Court an opportunity to correct its prior judgment which plainly exceeded the Rhode Island Court's jurisdiction.  *See* Complaint (Exhibit 19).  Among other things, LeBoeuf sought an order declaring that LeBoeuf has been retained by the PIF to act as the PIF's legal counsel; that the Administrator and the Ungars could not discharge LeBoeuf as counsel to the PIF; and that the Administrator and the Ungars could not retain Tolchin as counsel to the PIF. *Id.* at 16.

### The Ungars Move to Dismiss LeBoeuf's Action in Rhode Island

      Rather than allowing the Rhode Island Court to resolve the merits of the dispute, the Ungars moved to dismiss LeBoeuf's declaratory judgment action in Rhode Island for lack of

---

[2] On October 27, 2006, LeBoeuf also filed a motion to intervene on its own behalf in the *Ungar v. Orascom* action to determine who is counsel to the PIF.  *See* Exhibit 17.  On November 1, 2006, Judge McMahon held a telephone conference in the *Ungar v. Orascom* action.  Judge McMahon denied LeBoeuf's motion to intervene without prejudice and subject to renewal at an appropriate time, after LeBoeuf was afforded an opportunity to present its position to the Rhode Island Court.  In an Order dated November 2, 2006, Judge McMahon stated that "The Court has advised the parties that <u>NO</u> final judgment will be signed until the RELEVANT courts have sorted out the corporate control matters."  Order at 1 (emphasis and capitalization in the original), a copy of which is attached as Exhibit 18.

jurisdiction and lack of standing. *See* Motion to Dismiss (Exhibit 20). To bolster their position that LeBoeuf had no standing, the Administrator and the Ungars withdrew their threat of a RICO action against LeBoeuf. *See* Letter at 1-2 (Exhibit 21) ("the Ungars and the PIF will not sue LeBoeuf or any of its attorneys under RICO or any other cause of action, for any past or future action taken by LeBoeuf . . . on behalf of any person or entity which LeBoeuf believes to be its client;").

## Without Ruling on the Merits, The Rhode Island Court Dismissed LeBoeuf's Declaratory Judgment Action for Lack of Standing

Without reaching the merits, the Rhode Island Court held that LeBoeuf did not have standing and dismissed the action. *See* Transcript of June 19, 2007 hearing (Exhibit 22) at 48-51; *see also Id.* at 16, 17, 22-24, 26, 27, 30, 36, 37, 40 (stating that LeBoeuf did not have standing). Although it did not -- and could not -- reach the merits, the Rhode Island Court recognized that it "readily concedes that it has no jurisdiction over the PIF." *Id.* at 49. In addition, the Rhode Island Court determined that the issues presented by LeBoeuf's declaratory judgment action "should be asserted elsewhere, not in this Court." *Id.* Following that court's determination that these issues should be resolved "elsewhere," and now free from the Ungars' RICO threat, LeBoeuf has returned to this Court -- not as a party or as an intervener -- but as counsel to the PIF asking for a Determination of Interests. Recognizing that counsel for the Ungars has filed an appearance on behalf of the PIF, we also move to strike that appearance because it is based on a constitutionally defective judgment.[3]

_____

[3] This Court previously suggested that "if an appearance is entered on the basis of your contention . . . and noting that the conflict between your representation and the representation in the alternative, based upon the Rhode Island order, why can't that be resolved by a simple motion, maybe cross-motion, to strike the opposing appearance, on the basis that yours is bona fide, genuine, and not vitiated by the final judgment in Rhode Island, pursuant to which your

## ARGUMENT

**I.      The PIF is Legal Entity Separate and Distinct from the Judgment Debtors.**

The PIF is a legal entity that is separate and distinct from the PA and PLO.  Indeed, counsel to the Ungars is estopped from asserting the opposite since they now purport to represent the PIF, and the Ungars purport to have issued a resolution, as owners of the PIF, replacing the board of directors of the PIF and appointing themselves as directors of the PIF and further purport to have held a PIF board of directors meeting.  *See* Exhibit 23; Exhibit A to Mustafa Declaration (Exhibit 7).  In *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), the Supreme Court concluded that such separate and distinct juridical entities "should normally be treated as such" and were presumed to have "separate legal status" from the government.  *Bancec*, 462 U.S. at 627, 628.  *See also Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1069-74 (9th Cir. 2002) (applying *Bancec* to determine liability of wholly-owned subsidiary of Iranian bank for default judgment against Islamic Republic of Iran), *cert. denied*, 538 U.S. 944 (2003); *Flatow v. Alavi Found.*, 225 F.3d 653 (Table), No. 99-2409, 2000 U.S. App. LEXIS 17753, at *15-*21 (4th Cir. July 24, 2000) (applying *Bancec* to determine liability of alleged "front" for Iranian government for default judgment against the Islamic Republic of Iran); *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1284-88 (11th Cir. 1999) (applying *Bancec* to determine liability of Cuban telecommunications company for judgment against, *inter alia*, Cuban government); *De Letelier v. Republic of Chile*, 748 F.2d 790, 793-95 (2d Cir. 1984) (applying *Bancec* to determine liability of Chilean national airline for judgment against Chile); *Palestine Monetary Auth. v. Strachman*, No. 107777/05, 2005 N.Y. Misc. LEXIS 3517, at *40 (N.Y. Sup. Ct., New York Cty Nov. 9,

_____

opposition surfaces and contests your representation of the PIF . . . ."  Transcript at 28-29 (Exhibit 16).

2005) (applying *Bancec* and finding that Palestine Monetary Authority was a separate and distinct entity).

Here, the PIF is separate and distinct juridical entity, incorporated in Ramallah in March 2003 under the laws of the Palestinian National Authority. *See* Exhibit 24. The purpose of the PIF is to make investments "that promote economic growth and infrastructure development in Palestine and stimulate private sector investment, both domestic and foreign, to achieve sustainable long-term economic prosperity for Palestine . . . ." 2002 Articles of Association at 13, Article 3.1 (Exhibit 25). The PIF's shares "are fully owned by the Palestinian people represented by the President of the PNA." 2007 Articles of Association at 3, Article 6 (Exhibit 26). *See also* 2002 Articles of Association at 2, Article 2.3 (the PIF "shall be a separate legal entity"); 2007 Articles of Association at 2, Article 2 (the PIF "is considered an independent legal person"). The PIF is managed by a seven member Board of Directors comprised of individuals from the Palestinian private sector. *See* 2007 Articles of Association at 8, Article 10. The PIF has the power to hold and sell property, and to sue and be sued. See 2002 Articles of Association at 13, Article 3.2; 2007 Articles of Association at 4-7.

The PIF is responsible for its own finances. The PIF "has an independent financial account, and thus has complete financial independence from the Palestinian National Authority ("PNA") budget, and the other different governmental agencies." 2007 Articles of Association at 2, Article 2.2. The PIF's financial resources consist of grants, donations, and loans it obtains; profits and revenues from its investment activities; and profits and revenues obtained from its affiliate companies. *See* 2007 Articles of Association at 3, Article 3. Its net profits are to be "utilized in implementing, enhancing, and supporting the economic development plans, the Company investment projects which benefits are awarded to the Palestinian people." 2007

Articles of Association at 17, Article 31.  *See also* 2007 Articles of Association at Article 2 (PIF "has complete financial independence from the Palestinian National Authority ("PNA") budget"). The PIF has a separate budget; has its own offices; and has its own employees.  *See* 2007 Articles of Association at 17, Article 30 (relating to payment of employees from PIF funds); *LNC Inv's, Inc. v. Republic of Nicar.*, 115 F. Supp. 2d 358, 364 (S.D.N.Y. 2000) (holding that Nicaragua Central Bank is a "separate and independent legal entity" under *Bancec* based on, *inter alia*, fact that it "maintains its own operating facilities").  Certainly, counsel to the Ungars, who have filed an appearance as counsel to the PIF, cannot dispute the existence of the PIF as a separate legal entity.

## II.    The Rhode Island Judgment Could Not Constitutionally Convey to the Ungars Full Ownership of the PIF.

The Rhode Island Court did not have jurisdiction or authority to convey to the Ungars full ownership of the PIF.  The undisputed fact, introduced as an exhibit by the Ungars, and taken as true on a default, was that the PIF had net assets in excess of the default judgment.  *See* Exhibit H to Creditor's Bill (Exhibit 4).  To be sure, the Rhode Island Court had the authority to enter a default judgment against the PA and PLO, up to the amount of the Ungars' judgment -- but not for more than the amount of that judgment.  These issues were explored by this Court at our last conference.  *See* Exhibit 16 at 33-34.  Here, the Rhode Island Court unconstitutionally transferred to the Ungars full ownership of a Palestinian company worth several times more than the amount of the Ungars' judgment.  The Court did not have the jurisdiction or the constitutional authority to convey assets (which were not before the Court) in excess of the amount of the judgment.

Further, the Rhode Island Court did not order the PA to transfer its ownership interest in the PIF.  Instead, the Rhode Island Court purported to decree a change in the stock ownership of

the PIF.  *See* Rhode Island Order at 2 (Exhibit 3).  The Rhode Island Court, however, did not

have jurisdiction to transfer ownership of the PIF, shares which were not before the Rhode Island

Court or within its jurisdiction.  The PIF is incorporated in Palestine.  It is governed by

Palestinian law.  Its offices are located in Ramallah, Gaza, and Amman.  It has no presence in the

United States.  Its Articles of Association state that its funds are to be used for the benefit of the

Palestinian people.  The Rhode Island Court has conceded that it lacked jurisdiction over the PIF:

"The Court readily concedes that it has no jurisdiction over the PIF.  The PIF has no connection

to Rhode Island . . . ."  *See* Transcript at 49 (Exhibit 22).  By purporting to transfer full

ownership of the PIF to the Ungars in an action to which the PIF was not a party, and in which

the Court could not constitutionally exercise personal jurisdiction over the PIF, the Rhode Island

Court exceeded its jurisdiction and denied the PIF due process.  *See Fall v. Eastin*, 215 U.S. 1,

11 (1909), *Taylor v. Taylor*, 218 P. 756, 759 (Cal. 1923), *Barber v. Barber*, 331 P.2d 628, 630-

31 (Cal. 1958), *Rozan v. Rozan*, 129 N.W.2d 694, 700 (N.D. 1964).

**III.    The PIF Was Not Provided With Notice in Violation of the Due Process Clause of the Constitution and the Rhode Island Creditor's Bill Statute.**

The Ungars failed to comply with the Rhode Island Creditor's Bill Statute, Rhode Island

General Laws, Title 9, Chapter 2, in two significant ways.  Had they complied with the Rhode

Island creditor's bill statute, they would have been required to provide the PIF with notice of

their attempt to obtain full ownership of the PIF from the Rhode Island Court and would have

been required to establish personal jurisdiction over the PIF in Rhode Island.  As a result of the

Ungars' failure to comply with the notice and jurisdiction requirements of the creditor's bill

statute, the Ungars denied the PIF its due process right to notice and the opportunity to be heard.

In addition, had the Ungars complied with the requirements of the Creditor's Bill Statute, they

would not have been able to obtain an order transferring full ownership of the PIF to them

because, as the Rhode Island Court has conceded, the PIF was not subject to personal jurisdiction in Rhode Island.  *See* Exhibit 22 at 41, 49.  The Rhode Island Court exceeded its jurisdiction and denied the PIF its due process right to notice of the proceeding by entering the Final Judgment based on the Ungars' fatally flawed Creditor's Bill which failed to comply with Rhode Island law.

The Ungars' Creditor's Bill was constitutionally and statutorily defective and void under Rhode Island law.  Pursuant to Rule 69 of the Federal Rules of Civil Procedure, Rhode Island Court was required to follow Rhode Island state law in the Ungars' proceedings in aid of execution.  Fed. R. Civ. P. 69.  In obtaining their Creditor's Bill, the Ungars proceeded under Section 9-28-1 of the Rhode Island General Laws, which expressly requires as a statutory prerequisite to filing a creditor's bill that an execution first be returned unsatisfied.  The Ungars have conceded that they did not attempt to execute against the PA.  *See* Creditor's Bill at 4 n.2 (Exhibit 1).  In their Creditor's Bill, the Ungars sought to excuse their failure to issue an execution, calling it "a frivolous waste of resources."  *Id.*[4]  That excuse, however, was flatly rejected by the Rhode Island Supreme Court in *Plantations Indus. Supply v. O'Brien*, 379 A.2d 365 (R.I. 1977).  There, the creditor argued that an execution would be futile because he would

---

[4] In a letter to the Rhode Island Court in response to a submission by the Canaan Funds, the Administrator again acknowledged that he had failed to issue an execution.  *See* Exhibit 27.  In that letter, the Administrator cited to *U.S. v. Russell*, 241 F.2d 879, 881-82 (1st Cir. 1957), for the proposition that the Ungars were excused from complying with the Rhode Island statutory prerequisite of an execution being returned unsatisfied.  The *Russell* case, however, does not provide authority for the position advanced by the Ungars.  *Russell* did not involve the Rhode Island Creditor's Bill Statute, and that statute is not mentioned in the opinion.  *Russell* involved a suit to enforce and IRS tax lien alleging a fraudulent transfer by a parent to a daughter in which the daughter argued exhaustion of remedies, specifically that the IRS was required to go against the parent first and exhaust its remedies against the parent before it could proceed against the daughter transferee.  *Russell*, 241 F.2d at 881.  There was no statutory prerequisite in the IRS statute like the prerequisite in the Rhode Island Creditor's Bill Statute for an unsatisfied execution being returned.

not be able to identify for the sheriff any assets to be levied upon. *Plantations Indus. Supply*, 379 A.2d at 366. The Rhode Island Supreme Court squarely rejected that futility argument, stating: "This Court has repeatedly stressed that legislative enactments relating to the service of process are to be followed and construed strictly." *Id.* at 367. The Rhode Island Supreme Court held that an execution returned unsatisfied was an absolute prerequisite to the judgment creditor proceeding further.[5]

Moreover, the provision of the Rhode Island law under which the Ungars purported to act (Section 9-28-1) required them to institute a new civil action to reach assets in which the debtor has an interest. The Ungars, however, did not bring a new civil action, as required by Section 9-28-1. If the Ungars had complied with the requirements of Section 9-28-1, they would have been required to serve the PIF thereby providing it with notice of the new action. *See Berard v. Blake*, 186 A. 475, 476 (R.I. 1936) (Rhode Island Supreme Court taking as a given, without needing discussion, that third party whose assets are sought to satisfy a judgment against the debtor must be named as a defendant in a reach and apply suit under Section 9-28-1). *See also In re Fraden*, 317 B.R. 24, 38 (D. Mass. 2004) (holding that Massachusetts reach and apply statute required third party whose assets were sought to satisfy a judgment against the debtor to be named as a defendant). If the Ungars had complied with Section 9-28-1, they also would have been required to obtain personal jurisdiction over the PIF in Rhode Island, which they would not have been able to do. It is undisputed that the PIF is not subject to personal jurisdiction in Rhode Island. The Rhode Island Court has acknowledged that the PIF has no presence in Rhode Island and no assets in Rhode Island. *See* Transcript at 41, 49 (Exhibit 22). As a result of the Ungars'

---

[5] At the oral argument on the Ungars' motion to dismiss LeBoeuf's complaint, the Rhode Island Court acknowledged that this was "an excellent argument," but held that LeBoeuf lacked the standing to raise it. Transcript (Exhibit 22) at 30.

failure to comply with the Rhode Island Creditor's Bill Statute, the PIF was deprived of Due

Process.  The Rhode Island Court's order transferring full ownership of the PIF is not entitled to

full faith and credit because the Rhode Island Court did not have the necessary jurisdiction over

the PIF and the PIF was denied due process.

**IV.    The PIF's Interests in the Canaan Offshore Partnerships Are Not Being Held for the Judgment Debtors.**

The limited partnership interests in the Canaan Offshore Partnerships are owned by the

PIF.  "Ownership is evidenced by title, possession, or right of possession, control, and

responsibility."  *Mechanics Bank v. Yale Univ.*, 150 A. 526, 530 (Conn. 1930).  The limited

partnership interests in the Canaan Offshore Partnerships are not "being held" for the PA or the

PLO.  To the contrary, the assets of the PIF are required to be used for the benefit of the

Palestinian people.  The PIF's Articles of Association require funds to be used for the creation of

jobs and the development of economic infrastructure in Palestine.  *See* 2007 Articles at 17,

Article 31 (Exhibit 26).  Reflecting that purpose, the shares of the PIF are now owned by the

Palestinian people.  *See Id.* at 3, Article 6.

**V.    The Ungars Cannot Prove That the PIF is an "Alter Ego" of the Judgment Debtors.**

As discussed above, the Ungars are not entitled to the PIF's investments in the Canaan

Offshore Partnerships because the PIF is a legal entity that is separate and distinct from the

Judgment Debtors, and because the PIF's interests in the Canaan Offshore Partnerships are

owned by the PIF and are not "being held" for the PA or the PLO.  Therefore, in order to execute

upon the PIF's limited partnership interests in the Canaan Offshore Partnerships in order to

satisfy their judgment against the PA and PLO in the Rhode Island action, the Ungars would

have to demonstrate that the PIF is merely an "alter ego" of the Judgment Debtors.  *See Bancec*,

462 U.S. at 629; *see also LNC Invs.*, 115 F. Supp. 2d at 366; *Islamic Republic of Iran*, 308 F.3d

at 1070.  The Ungars cannot make that showing.  Moreover, by now purporting to represent the PIF, counsel to the Ungars is estopped from making an "alter ego" argument.

Nor does the Court's ancillary jurisdiction[6] permit it to impose an obligation to pay an existing federal judgment on a third party that was not involved in the proceeding in which the judgments were entered.  *See Peacock v. Thomas*, 516 U.S. 349, 357 (1996); *see also Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 104-6 (2d Cir. 2001); *Futura Dev. of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico*, 144 F.3d 7, 10-12 (1st Cir. 1998).  A federal court cannot exercise ancillary jurisdiction over a judgment-creditor's attempt to enforce a prior federal judgment against a third party as an "alter ego" of the judgment debtor.  *See Futura Dev.*, 144 F.3d at 10-12; *see also Peacock*, 516 U.S. at 356-59; *Knox v. Orascom Telecom Holding S.A.E.*, 477 F. Supp. 2d 642, 647 (S.D.N.Y. 2007) (relying on *Peacock* and holding that court lacked ancillary jurisdiction over enforcement action that raised alter-ego or veil-piercing claims not before the judgment court because "once the Court is required to engage in a veil-piercing or alter ego analysis as to this question, an independent basis for jurisdiction is required").[7]

For all these reasons, the Ungars' Writ of Execution should be quashed and this enforcement proceeding should be dismissed to the extent it implicates the PIF's interests in the Canaan Offshore Partnerships.

---

[6] The Ungars registered the judgments they obtained from the Rhode Island Court in this Court, thereby invoking this Court's ancillary jurisdiction to enforce judgments.

[7] The *Knox* plaintiffs are represented by Tolchin and Strachman.  In *Knox*, the Court also recognized that the plaintiffs' claim that the debt at issue was "nominally titled" to the PIF required "a finding by the Court that the PIF is an alter ego of the PA."  *Knox v. Orascom Telecom Holding S.A.E.*, No. 06 Civ. 6824, 2007 U.S. Dist. LEXIS 29486, at *6 (S.D.N.Y. April 19, 2007).

**VI.     The Court Lacks Jurisdiction Over the PIF's Investment in the Canaan Offshore Partnerships Because They Are Located Outside of the United States.**

Even if this Court had subject matter jurisdiction to determine whether the PIF is an "alter ego" of the PA or PLO, which it does not, the Court lacks jurisdiction to attach the PIF's interests in the Canaan Offshore Partnerships, which are located outside of the United States and thus are beyond the territorial jurisdiction of this Court.

"It is well settled that stock in a corporation, for the purpose of an attachment, has a *situs* where the corporation is located." *Barber v. Morgan*, 80 A. 791, 792 (Conn. 1911). *See Jellenik v. Huron Copper Mining Co.*, 177 U.S. 1, 13 (1900) ("As the habitation or domicil of the Company is and must be in the State that created it, the property represented by its certificates of stock may be deemed to be held by the Company within the State whose creature it is, whenever it is sought by suit to determine who is its real owner."); *Winslow v. Fletcher*, 4 A. 250, 252 (Conn. 1886) (stating the "familiar and well-settled rule, that stock in a corporation, for the purposes of an attachment has its situs where the corporation is located").

The PIF's limited partnership interests in the Canaan Offshore Partnerships should not be treated differently. The New York Court of Appeals has explained that "[t]he right of a shareholder is derived from the corporation under its charter, or the laws of the State which created it." *Holmes v. Camp*, 114 N.E. 841, 843 (N.Y. 1916). Here, the PIF's rights with respect to the Canaan Offshore Partnerships are based on Netherlands Antilles law, which is the law under which the limited partnerships are organized and exist, and the Canaan Agreements, which are governed by and construed in accordance with Netherlands Antilles law. *See* Canaan Equity II Offshore C.V. ("Canaan II") Agreement, §§ 2.01, 19.04 (Exhibit 28); Canaan Equity III Offshore C.V. ("Canaan III") Agreement, §§ 2.01, 19.04 (Exhibit 29).

Further demonstrating that the PIF's interests in the Canaan Offshore Partnerships are situated in the Netherlands Antilles are the following:  1) The Canaan Offshore Partnerships are domiciled and reside in the Netherlands Antilles and the registered and principal office of the Canaan Offshore Partnerships is Pietermaai 15, Curacao, Netherlands Antilles.  *See* Canaan II Agreement, § 2.02, Schedule A; Canaan III Agreement, § 2.02, Schedule A;  2) The original executed copies of the Canaan II Agreement and Canaan III Agreement and charter documents of the Canaan Offshore Partnerships are required to be maintained at their principal offices in the Netherlands Antilles.  *See* Canaan II Agreement, §17.02; Canaan III Agreement, § 17.02; 3) Canaan Offshore Management, the General Partner of the Canaan Offshore Partnerships, is a Netherlands Antilles corporation and has its principal office at Pietermaai 15, Curacao, Netherlands Antilles.  *See* Canaan II Agreement, § 3.01, Schedule A; Canaan III Agreement, § 3.01, Schedule A;  4)  Legal title to the assets acquired for or contributed to the account of the Canaan Offshore Partnerships is held by Canaan Offshore Management in the Netherlands Antilles.  *See* Canaan II Agreement, § 19.06; Canaan III Agreement, § 19.06;  5) "Certificates" setting forth information regarding the Canaan Offshore Partnerships and amendments thereto, required pursuant to Netherlands Antilles law, are filed in the Commercial Register of the Chamber of Commerce and Industry at Curacao, Netherlands, Antilles.  *See* Canaan II Agreement, §3.04; Canaan III Agreement, § 3.04.

Even if the Court were to treat the PIF's limited partnership interests in the Canaan Offshore Partnerships differently than corporate interests, it must still conclude that the PIF's interests are located outside of the United States.  For example, were the domicile of the limited partner controlling, the PIF is located and organized under the laws of Palestine. *See Blodgett v. Silberman*, 277 U.S. 1, 10 (1928) (finding for purposes of estate tax that partnership interest has

situs of domicile of its owner).  To the extent that the trade or business of the Canaan Offshore Partnerships is relevant, the General Partner is required to use its best efforts to conduct the affairs of the Canaan Offshore Partnerships in a manner that does not cause them to be treated as engaging within a trade or business within the United States for purposes of the United States tax code.  *See* Canaan II Agreement, § 3.06 (Exhibit 28); Canaan III Agreement, § 3.06 (Exhibit 29).[8]  As the situs of the PIF's interests in the Canaan Offshore Partnerships is outside of the United States, it is beyond the scope of the Rhode Island Court's Injunction, which covers "assets located within the jurisdiction of the United States or any State thereof."  *See* Injunction at 1 (Exhibit 30).

Further, as the PIF's assets are located outside of the United States, they are beyond the territorial jurisdiction of this Court.  *See Barna v. Schreck*, No. CV 990336194S, 2000 Conn. Super. LEXIS 1965, at *4 (Conn. Super. July 26, 2000) (court cannot order attachment of non-resident's property located outside the state); *Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guar. Corp.*, 921 F. Supp. 1113, 1120 (S.D.N.Y. 1996) ("Although [plaintiff] argues that nothing more than a valid money judgment is necessary for the issuance of a restraining order and an order of execution, the law in fact does require more: it requires that the property sought to be levied against exist within the jurisdiction."), *aff'd sub nom. Fidelity Partners, Inc. v. First Trust Co. of N.Y.*, No. 99-7839, 2000 U.S. App. LEXIS 12559 (2d Cir. June 7, 2000).

This territorial limitation on the Court's jurisdiction over a garnishee's property applies even if the Court has personal jurisdiction over the potential garnishee.  *See, e.g. Mones v.*

---

[8] In addition, Canaan Offshore Management is prohibited from moving the domicile and residence of the Canaan Offshore Partnerships to the United States, its territories or possessions. *See* Canaan II Agreement, 19.07 (Exhibit 28); Canaan III Agreement, 19.07 (Exhibit 29).

*Commercial Bank of Kuwait*, 399 F. Supp. 2d 310, 316 (S.D.N.Y. 2005) ("Even if the Court had jurisdiction over [financial intermediary] CBK, the Court lacked authority to order CBK to transfer assets from Kuwait into the Southern District of New York."), *vacated on other grounds*, 204 Fed. Appx. 988 (2d Cir. 2006); *Koehler v. Bank of Berm.*, No. M18-302 (CSH), 2005 U.S. Dist. LEXIS 3760, at *35-*38, *47 (S.D.N.Y. Mar. 9, 2005) (holding court had no jurisdiction over shares located in Bermuda and that that even if court had personal jurisdiction over garnishee, a financial intermediary, court did not have authority to order the financial intermediary to transfer property of the judgment debtor located outside the jurisdiction into the jurisdiction); *cf. Palestine Monetary Auth. v. Strachman*, No. 107777/05, 2007 NY Misc. LEXIS 2362, at ***22 (NY Sup. Ct., NY Cty, April 2, 2007) ("Nor may the court attach PA funds allegedly held by the PMA in the Palestinian territories, since those funds are not within this court's jurisdiction.  The fact that the court has obtained personal jurisdiction over PMA through PMA's commencement of the instant lawsuit does not change this result.") (internal citations omitted).

Accordingly, the proper jurisdiction for the Ungars to attempt to execute against the PIF's interests in the Canaan Offshore Partnerships is in the Netherlands Antilles.  The Ungars cannot circumvent enforcement in the Netherlands Antilles simply because it is more convenient to attempt to execute in Connecticut.[9]

---

[9] The Ungars have been criticized by another court for their improper enforcement efforts against parties other than the Judgment Debtors:  "Finally, the process employed here by the Strachman parties in restraining the PMA troubles the Court.  . . . PMA was never a party to the underlying lawsuit and was not mentioned in the Federal Injunction.  Rather, the Strachman parties added it to the Notice of Injunction. . . .  Procedural due process concerns are raised."  *Palestine Monetary Auth. v. Strachman*, No. 107777/05, 2005 N.Y. Misc. LEXIS 3517, at *41-*42 (N.Y. Sup. Ct., N.Y. Cty, Nov. 9, 2005) (internal citation omitted).

## <u>CONCLUSION</u>

For the reasons set forth above, the PIF respectfully requests that the Court issue an Order granting its Motion and declaring that the PIF is separate and distinct from the Judgment Debtors, dismissing the Ungars' claim that the PIF is liable for the judgment against the Judgment Debtors, and striking the appearance of Robert Tolchin, and awarding the PIF such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated:  Hartford, Connecticut
        July 17, 2007

By:     s/ Thomas G. Rohback
           Thomas G. Rohback  (CT-01096)
           Gail L. Gottehrer  (CT-19346)
           LEBOEUF, LAMB, GREENE & MACRAE LLP
           225 Asylum Street
           Hartford, CT  06103
           Telephone: (860) 293-3500
           Fax: (860) 293-3730
           E-mail: trohback@llgm.com
           E-mail: glgotteh@llgm.com

           Counsel for The Palestine Investment Fund

271090