# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

            Plaintiffs – Judgment Creditors,

      v.                                      C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

            Defendants – Judgment Debtors.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS'
MOTION TO COMPEL THE DEPOSITION OF AHMED QUREI
_AND_ IN OPPOSITION TO THE PLO'S MOTION FOR A PROTECTIVE ORDER**

## Introduction

The Plaintiffs-Judgment Creditors (the "Ungars") respectfully submit this Memorandum (a) in support of their motion to compel Defendant-Judgment Debtor the Palestine Liberation Organization ("PLO") to produce Ahmed Qurei for a deposition and (b) in opposition to the PLO's Motion for Entry of a Protective Order Regarding Plaintiffs' Notice of Taking the Deposition of Ahmed Qurei. Dkt. # 528.

It is well established that a party seeking a protective order barring a deposition faces an extremely high burden of showing "extraordinary circumstances" based on "specific facts," and that such motions are "rarely granted":

> A party seeking a protective order must demonstrate particular and specific facts to establish "good cause" for the order. _Anderson v. Cryovac, Inc._, 805 F.2d 1, 7 (1st Cir. 1986). Prohibiting the taking of depositions is an extraordinary measure. The moving party has a heavy burden of showing "extraordinary circumstances" based on "specific facts" that would justify such an order. S_ee, e.g., Salter v. Upjohn Co._, 593 F.2d 649, 651 (5th Cir. 1979); _Investment Properties Int'l, Ltd. v. IOS, Ltd._, 459 F.2d 705, 708 (2d Cir.1972); _Bucher v. Richardson Hospital Authority_, 160 F.R.D. 88, 92

(N.D.Tex. 1994) (protective orders prohibiting depositions are "rarely granted," and then only if movant shows a "particular and compelling need" for such an order).

*Prozina Shipping Co., Ltd. v. Thirty-Four Automobiles*, 179 F.R.D. 41, 48 (D.Mass. 1998).

As shown below, the PLO's motion does not come close to meeting this standard. Therefore, the Ungars' motion should be granted and the PLO's motion should be denied.

## I.    Ahmed Qurei

Ahmed Qurei served as Prime Minister of Defendant-Judgment Debtor Palestinian Authority ("PA") between October 2003 and January 2006. *See* dkt. # 529 at 9.

As discussed *infra*, Qurei currently serves as a member of the PLO Executive Committee and as the Head of the PLO's Jerusalem Affairs Department and on this basis was recently found by the U.S. District Court for Southern District of Florida to be an officer of the PLO whom the PLO can be compelled to produce for a deposition regarding any matter within his knowledge. *See* Exhibit A. Qurei continues to serve in this post today. *See* Exhibit B.[1]

Because Qurei served as the Prime Minister of the PA (i.e. as the second-in-command in the PA, subordinate only to Presidents Yasser Arafat and Mahmoud Abbas) between October 2003 and January 2006 – a period straddling the entry of judgment in this action in July 2004 – the Ungars noticed Qurei's deposition as officer of the PLO in order to question him about the reasons for, and the circumstances underlying, both defendants' default and their failure to seek relief from judgment until December 2007.

---

[1] Downloaded from http://www.maannews.net/eng/ViewDetails.aspx?ID=314495.

As shown below, both of these topics are relevant to Defendants' pending Rule 60(b)(6) motion to vacate the judgment.[2]

## II.    The Reason(s) for Defendants' Default

The PLO argues that deposing Qurei regarding the reasons for Defendants' default would be pointless for three reasons, none which have merit:

*First*, the PLO asserts that the "Court affirmed Magistrate Judge Martin's April 18, 2003 order granting Plaintiffs a default judgment against Defendants on August 5, 2003, prior to Mr. Qurei becoming Prime Minister in October 2003. Any decisions or circumstances surrounding the willful default had therefore already been made well before Mr. Qurei assumed that position." Dkt. 529 at 9 (citation omitted).

The claim is erroneous as a matter of fact. Magistrate Judge Martin's April 18, 2003 order, which was affirmed on August 5, 2003, did not grant a "default judgment" but merely directed entry of ***default*** under Rule 55(a). Defendants could have moved to vacate default under Rule 55(c) – a far less demanding standard that Rule 60(b) – at any time between August 2003 and July 13, 2004, when default judgment was entered.

Since Qurei was Prime Minister between October 2003-July 2004 (and subsequently), the Ungars seek to question him about why Defendants did not seek to vacate default during this period, and instead proceeded to allow entry of default judgment against them.

---

[2] Though the Ungars' counsel currently have no plans to question Qurei about any other topics (except for the usual questions regarding background, etc.), between now and the deposition other relevant topics may occur to them and/or arise during the deposition itself. Accordingly, nothing herein should be construed as a waiver of the Ungars' right to question Qurei regarding any relevant topic.

*Second*, Defendants assert that Qurei does not possess any relevant information since, "between October 2003 and January 2006 (when Mr. Qurei ceased being Prime Minister of The Palestinian Authority), Mr. Qurei had no responsibility or authority regarding the conduct of the *Ungar* litigation. He did not have any responsibility for determining or deciding whether the PA or the PLO would seek to vacate any default or default judgment entered by the Court. Thus, the deposition would consist of a series of 'I don't know' and 'It was not within my responsibility' answers to any questions about the conduct of this litigation." Dkt. # 529 at 9.

The Ungars do not doubt that these assertions reflect what Defendants' counsel were informed by Defendants – but that does not make them ***accurate***. The Ungars cannot and the Court should not simply take Defendants' word for it that former Prime Minister Qurei had no authority over litigation and has no knowledge of Defendants' litigation policies.

Moreover, even if Qurei had no responsibility over Defendants' litigation policies, that does mean that he has no knowledge of the policies underlying Defendants' failure to move for vacatur and/or the identities of those persons who had such authority and/or made the decisions.

Also, if Qurei had no authority over litigation policies and/or has no knowledge thereof, the Ungars are entitled to know ***why*** not. Whether Qurei, as second in command in the PA, knew about the proceedings but could not be bothered to request to take some action in respect thereto – or if he asked for such authority but was denied it – and if so ***why*** and by ***whom***? – are all relevant questions to the circumstances of defendants' default.

*Third*, Defendants assert that the fact that their default was intentional is not in dispute. However, defendants have provided at least three different versions of their reasons for default.

Originally, Mr. Fayyad stated in June 2005 that the reason for the default was *strategic*. When "The District Court denied all three motions to dismiss," the PA and PLO purposely

decided not to contest the entry of default in order be shield themselves from the Ungar's foreign collection proceedings,

> *To preserve its legal position both in the United States and overseas (with respect to any potential efforts by Plaintiffs to seek enforcement of the default judgment in other countries)*, the PNA and the PLO continued to maintain that the District Court lacked both personal jurisdiction over them and subject matter jurisdiction over the dispute and, accordingly, did not file an unqualified appearance and answer to Plaintiffs' complaint.
>
> Plaintiffs ultimately moved for a default judgment based on the PNA and the PLO's failure to file an answer and their refusal to subject themselves to open-ended civil discovery.

Exhibit C, p. 2 (emphasis added).

Next, in 2007 in their motion to vacate, Defendants asserted that in the underlying litigation, they intentionally defaulted because of their belief in the propriety of their sovereign immunity defense and "acted to protect what they reasonably perceived to be their rights under international law by asserting only jurisdictional and justiciability defenses." Dkt. 408, p. 31.

Two years later in 2009, Defendants raised a third reason in their appellate brief in the Court of Appeals. There for the first time they argue that they intentionally defaulted because they disdained the U.S legal system and they had intense beliefs,

> . . .the PA's and PLO's reaction to being sued in Rhode Island for an attack on Israeli residents by Hamas was inevitably dismissive, hyper-politicized, and infused with a fox-hole mentality.  Represented by activist and U.S. foreign policy critic Ramsey Clark, the PA and PLO intermittently filed briefs in the case arguing that the U.S. courts should not exercise jurisdiction over them and arguing that the case should be dismissed on political question grounds.  With Arafat refusing to recognize the U.S. court's jurisdiction over him, the PA and PLO did not file an answer or participate in discovery.

Exhibit D, p. 6.

Obviously, the Ungars are entitled to discover the true reason for the default.

### III.    Defendants' Failure to Move to Vacate the Judgment for Three and Half Years

Final judgment was entered in this action on July 13, 2004, and Defendants' Rule 60(b)(6) motion to vacate that judgment was filed only on December 28, 2007.

Rule 60(c)(1) provides in relevant part that "[a] motion under Rule 60(b) must be made within a reasonable time." Fed.R.Civ.P. 60(c)(1).

In their opposition to Defendants' Rule 60(b)(6) motion, the Ungars argued in considerable detail that Defendants' motion should be denied, *inter alia*, because it was not made "within a reasonable time" as required by Rule 60(c)(1). *See* dkt. # 415 at 43-49.

Judge Lagueux did not reach the Ungars' timeliness argument in his decision denying Defendants' motion to vacate, since he denied that motion on the grounds that Defendants' default was willful. *See Ungar v. PA*, 613 F.Supp.2d 219 (D.R.I. 2009), *passim*.

On appeal, the First Circuit held that while Defendants' willful default "weighs heavily" against granting Rule 60(b)(6) relief, it does not "*categorically* bar[]" such relief because Rule 60(b)(6) requires courts to perform "holistic analyses" and examine "the totality of the circumstances," *Ungar v. PLO*, 599 F.3d 79, 86-87 (1st Cir. 2010), and therefore remanded the motion to this Court for consideration of all relevant factors.

Significantly here, the First Circuit expressly cited the ***timing*** of the motion as one of the factors to be considered by this Court on remand. Indeed, the First Circuit listed the timeliness of the motion as ***the very first item*** in its (non-exhaustive) list of factors to be examined by this Court: "A variety of factors can help an inquiring court to strike the requisite balance. Such factors include ***the timing of the request for relief*** …" *Id.* at 83-84 (emphasis added).

Notwithstanding the plain fact that neither this Court nor the First Circuit ever reached – much less rejected – the Ungars' Rule 60(c)(1) timeliness argument, the PLO's motion for a

protective order makes the astounding claim that: "both this Court and the First Circuit have faced and rejected Plaintiffs' arguments about timeliness. Both courts have reached the merits of Defendants' Rule 60(b)(6) motion. In fact, the First Circuit thereby rejected the Plaintiffs' timeliness argument when it held that the motion was properly brought under Rule 60(b)(6) and vacated the district court's denial of the motion to vacate. Plaintiffs may not re-litigate the timeliness issue and, in any event, should not be permitted to conduct depositions as to this stale issue." Dkt. # 529 at 11 (internal citations omitted). *See also id*. at 3.

This argument is not only baseless, but frivolous. It is simply an empirical fact that neither Judge Lagueux nor the First Circuit ever addressed the Ungars' Rule 60(c)(1) argument. Indeed, the First Circuit expressly ***refused*** the Ungars' request that it "review the record de novo" and consider the arguments raised by the Ungars that were not addressed by Judge Lagueux (including, of course, the issue of timeliness), finding that "[t]he district court enjoys a long familiarity with the case, and that court's factfinding capabilities put it in a better position to construct the fact-specific balance that Rule 60(b)(6) demands." *Ungar*, 599 F.3d at 87.

What the PLO appear to be arguing here (its argument is not very clear) is that because Rule 60(c)(1)'s timeliness requirement is a threshold condition of any Rule 60(b) motion, this Court and the First Circuit must ***necessarily*** have concluded, *sub silentio*, that Defendants' motion was timely – because otherwise they could not have considered the motion at all. *See* dkt. # 529 at 11 ("The timeliness of a motion to vacate is a threshold question.").[3]

---

[3] The Ungars agree with the Defendants' frank concession that Rule 60(c)(1) establishes a threshold condition for Rule 60(b) relief and will argue that Defendants' failure to move within a reasonable time, standing alone, is grounds to deny their motion.

Aside from the speciousness of attempting to infer an affirmative ruling regarding a dispositive question from the **_silence_** of this Court and the First Circuit, the PLO's argument fails for the simple reason that Judge Lagueux denied Defendants' motion on a ground that he considered a threshold condition for Rule 60(b) relief: namely, the willfulness of the default.

Obviously, as a matter of logic, a Court's decision to deny relief for failure to meet **_one_** sine qua non condition for relief says nothing about whether the Court believes that the movant has met a **_different_** sine qua non condition for relief.

Thus, the timeliness of Defendants' motion under Rule 60(c)(1) remains a very live issue. Moreover, as Defendants now admit, timeliness is a "threshold" condition of Rule 60(b) relief.

Whether a Rule 60(b) motion was filed within a "reasonable time" within the meaning of Rule 60(c)(1) "depends upon the circumstances of the particular case." *Farm Credit Bank of Baltimore v. Ferrera-Goitia*, 316 F.3d 62, 66 (1st Cir. 2003) (citation omitted).

Accordingly, the Ungars are entitled to obtain discovery from Defendants regarding the circumstances of and the reasons for Defendants' failure to seek Rule 60(b) relief for some three and a half years, between July 2004 and December 2007.

As noted, Qurei was the Prime Minister of the PA – second in command only to President Arafat and after Arafat's death – between October 2003 and January 2006. Thus, by virtue of his position, Qurei has – or should have– knowledge of the reasons for the Defendants' failure to move to vacate the judgment between July 2004 and February 2006.[4]

---

[4] Assuming, as Defendants argue (dkt. # 529 at 9), that the relevant point in time for assessing Defendants' failure to act was the date of the entry of **_default_** under Rule 55(a) rather than the date of the default judgment, then Qurei also has, or should have, knowledge of why Defendants did not seek to vacate the entry of the Rule 55(a) default between October 2003 and July 2004.

Here, too, the PLO claims that Qurei does not possess any relevant information since, "between October 2003 and January 2006 (when Mr. Qurei ceased being Prime Minister of The Palestinian Authority), Mr. Qurei had no responsibility or authority regarding the conduct of the *Ungar* litigation. He did not have any responsibility for determining or deciding whether the PA or the PLO would seek to vacate any default or default judgment entered by the Court. Thus, the deposition would consist of a series of 'I don't know' and 'It was not within my responsibility' answers to any questions about the conduct of this litigation." Dkt. # 529 at 9.

Again, while the Ungars have no doubt that these assertions reflect what Defendants' counsel were ***told*** by Defendants that does not make them ***true***. The Ungars cannot and the Court should not "take Defendants' word for it" that former Prime Minister Qurei had no authority over litigation during his tenure and has no knowledge of Defendants' litigation policies.

Moreover, even if Qurei personally had no responsibility or authority over Defendants' litigation policies, it does not follow – as the PLO implies – that he has no ***knowledge*** of the policies underlying and the reasons for Defendants' failure to move for vacatur and/or the identities of those persons who had such authority and/or made the decisions.

Additionally, if Qurei really had no authority over Defendants' litigation policies and/or has no knowledge thereof, the Ungars are entitled to know ***why*** not. Whether Qurei, as the number two executive in the PA, knew about the outstanding judgment but could not be bothered to request authority to do take some action in respect thereto – or if he sought such authority but was denied it – and if so ***why*** and by ***whom***? – are all questions salient to "the circumstances of the particular case," *Farm Credit Bank*, 316 F.3d at 66, which must be examined by this Court in order to determine whether Defendants' motion was filed within a "reasonable time."

Finally, the necessity for Qurei's deposition is highlighted by the declaration submitted by current Prime Minister Salam Fayyad in support of Defendants' Rule 60(b) motion. In his declaration, Fayyad asserts that he had no authority over litigation during his tenure as Finance Minister in 2005, and received such authority only when he became PA Prime Minister in 2007. *See* dkt. # 408, Ex. B. at ¶¶ 5, 9-10.

Clearly, then, since Fayyad states that he had no authority over litigation when he was Finance Minister in 2005 – i.e. when Qurei was Prime Minister – and that he (Fayyad) received such authority only when he became Prime Minister – it is more than reasonable to assume that Qurei, as Prime Minister, had such authority or could have obtained it if he had so requested.

For this reason, too, the Ungars should be permitted to depose Qurei.

## IV.    Organizational Parties Can Be Compelled to Produce Their Officers for a Deposition, and Qurei is an Officer of the PLO Whom the PLO Can Be Compelled to Produce for a Deposition Regarding Any Topic Within His Knowledge

The PLO argues that organizational parties cannot be compelled to produce their officers for deposition by means of a deposition notice on the organization, that even if such depositions can be compelled the witness cannot be required to testify regarding matters unrelated to his current position and that Qurei is not an officer of the PLO. *See* dkt. # 529 at 12-21.

These very same arguments were all raised by the PLO – and resoundingly rejected – in a recent decision of the U.S. District Court for the Southern District of Florida in the matter of *Saperstein v. PA*, which found that Qurei is indeed an officer of the PLO whom the PLO can be compelled to produce for a deposition regarding any topic within his knowledge. *See* Exhibit A.

Because Qurei remains in the same position today (*see* Exhibit B) and because the PLO's arguments were thoroughly litigated and rejected in *Saperstein*, the PLO is collaterally estopped from attempting to relitigate them here. *See e.g. Biton v. PA*, 412 F.Supp.2d 1, 4-5 (D.D.C. 2005)

10

(finding that the PLO and PA were collaterally estopped from relitigating their claims to sovereign immunity by the decision in this action rejecting their sovereign immunity claims). [5]

Alternatively, in the event that the Court finds for some reason that the Defendants' are not collaterally estopped by the decision in *Saperstein* and that the Court must consider Defendants' arguments on the merits, the Ungars hereby incorporate by reference, in opposition to the Defendants' arguments, all of the findings and conclusions made by the *Saperstein* court.

In this respect, the Ungars would note that the *Saperstein* court's factual conclusion that Qurei is an officer of the PLO was strengthened by Qurei himself during his deposition, where he confirmed that he is the Head of the Jerusalem Department of the PLO and in that capacity is **generally** authorized to meet with foreign officials on behalf of the PLO and does not require permission from the PLO for each such meeting. *See* Exhibit E at 218-15-17; 219:20-24.

## V.    The Deposition Should Take Place in Providence

Generally, if the deponent lives a great distance from the deposing party, then the deposition takes place near the location of the out-of-state deponent. *O'Sullivan v. Rivera*, 229 F.R.D. 187, 189 (D.N.M. 2004).

However, the general rule should not be followed in this case because of the special nature of these proceedings. Judgment was entered against the Defendants and affirmed on appeal over five years ago, and they have now come before the Court seeking extraordinary,

---

[5] There can be no doubt that all the conditions for application of collateral estoppel are all present, i.e. "the issue[s] previously adjudicated" in *Saperstein* are "identical with th[ose] now present," that the issues were "actually litigated in" *Saperstein*, that the *Saperstein* court's "determination of th[e] issue[s] was necessary to the end-decision" and that the Defendants' were "fully represented" in the *Saperstein* action. *Biton*, 412 F.Supp.2d at 4-5.

equitable relief from that judgment under Rule 60(b)(6). Since Defendants bear the burden on their motion to vacate, they may properly be analogized to plaintiffs for purposes of determining where they should be deposed. Courts have looked past the formal designation of a party as defendant in similar situations. *See e.g. Continental Federal Sav. and Loan Ass'n v. Delta Corp. of America*, 71 F.R.D. 697, 700 (W.D. Okl. 1976) (treating defendant as a plaintiff for purposes of determining the place of deposing its corporate officers on its permissive counterclaim).

The matter of the location of depositions is ultimately within the discretion of the Court, and instances of defendants having to appear for depositions at the place of trial are not unusual. *See e.g. Financial General Bankshares, Inc. v. Lance*, 80 F.R.D. 22, 23 (D.D.C. 1978). Accordingly, the PLO should be compelled to Qurei in Rhode Island.

## VI. Defendants' Attempt to Impugn the Motives of the Ungars' Counsel Are Scandalous and Their Claims Regarding the *Saperstein* Deposition Are Irrelevant and Baseless

Lacking any substantive grounds for their motion, the PLO resorts to an ad hominem attack on the Ungars' counsel, accusing counsel of seeking Qurei's deposition in order "to attempt to precipitate defaulting conduct," which accusation the PLO purports to "support" with the claim that in the *Saperstein* case "Qurei was subjected to multiple lines of wasteful questions completely irrelevant to the issues in that matter." Dkt. # 529 at 22-23.

This entire "argument" is frivolous and outrageous for several reasons. *First*, Qurei is clearly a highly relevant and important witness as discussed above. *Second*, Defendants' entire accusation makes no sense on its face: Qurei ***appeared*** for his deposition in Saperstein, so why would the Ungars believe that he will not appear in this case? *Third*, notwithstanding their claims of misconduct during the Qurei deposition in *Saperstein*, defendants never sought any sanctions

12

or other relief in respect thereto from the *Saperstein* court – which they no doubt would have if there was any basis therefore. [6]

      The Court should dismiss the PLO's irresponsible accusation out of hand.

## VII.   Conclusion

      The instant motion should be granted and the PLO's motion should be denied.

---

[6] The Ungars' counsel were informed by attorney Norman Steiner, who conducted the Qurei deposition in *Saperstein*, that he questioned Qurei about the topics cited by the Defendants as "irrelevant" (Qurei's involvement with the PA/PLO-controlled "Samed" corporation and Qurei's views on terrorism and his statements about the "Judaization" of Jerusalem) in an effort to determine whether the PA or PLO had been funneling money to terrorist groups via Samed and in order to test Qurei's bias as a witness. Mr. Steiner intended to provide the Ungars with an affidavit addressing these issues, as well as misconduct *by Defendants'* at the deposition, but unfortunately had a death in his close family earlier this week and was unable to provide the affidavit at this time. However, if Defendants persist in this line of "argument" the Ungars will obtain and submit such an affidavit from Mr. Steiner with their reply brief.

Dated: September 29, 2010

Plaintiffs-Judgment Creditors,
by their Attorneys,


/s/ David J. Strachman
David J. Strachman (#4404)
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

Max Wistow (#0330)
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)
mw@wistbar.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 29, 2010, the foregoing was filed by ECF

which served Defendants' counsel of record listed below:


Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/s/ David J. Strachman

14