UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 00-105L |
| ) | |
| THE PALESTINIAN AUTHORITY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' RULE 35(a) MOTION TO COMPEL
## MENTAL EXAMINATIONS OF PLAINTIFFS

Defendants The Palestinian Authority ("PA") and The Palestine Liberation Organization

("PLO") (collectively, "Defendants") move pursuant to Federal Rule of Civil Procedure 35(a) to

compel mental examinations of each of the Plaintiffs who were previously awarded damages in

this matter.  Because these Plaintiffs have claimed damages relating to their respective mental

conditions, and because Plaintiffs claim that the damages awarded in the default judgment can

withstand adversarial testing, there is good cause for a mental examination of each of these

Plaintiffs, and the Court should grant Defendants' motion.

## BACKGROUND

Presently pending before this Court is Defendants' Motion to Vacate Default Judgment,

filed on December 28, 2007.  Dkt. No. 408.  The Court initially denied Defendants' motion on

May 13, 2009 (Dkt. No. 442), and Defendants appealed that ruling to the United States Court of

Appeals for the First Circuit.  On March 25, 2010, the First Circuit reversed and remanded,

instructing this Court to reconsider the Motion to Vacate.  *Ungar v. Palestine Liberation Org.,*

1090604.6

599 F.3d 79, 87 (1st Cir. 2010). In outlining what circumstances might inform this Court's judgment in resolving Defendants' vacatur motion, the Court of Appeals indicated that several "potentially relevant factors," including whether "the amount of the judgment" was "unlikely to withstand adversarial testing," were "deserv[ing of] full-throated consideration" on remand. *Id.* at 86, 87. In compliance with the Court of Appeals' mandate, this Court set a hearing date of January 18, 2011 to re-assess the merits of Defendants' Motion to Vacate, and has permitted pre-hearing discovery, which closes on November 19, 2010. Dkt. No. 489.

Following remand, the Court initially intimated that the amount of the damage award would not be a proper subject of dispute at the upcoming hearing on the Motion to Vacate because the Court recollected that the First Circuit had "upheld the size of this judgment" in its 2005 opinion. The Court made such statements both during an off-the-record June 1, 2010 in-chambers conference and at the June 15, 2010 hearing on Plaintiffs' motion for a payment decree. *See* Exh. 1 (June 15, 2010 Hearing Tr.) at 29:15-17. As a result, on July 7, 2010, Defendants filed a Motion for Leave to Take Discovery on Whether the Damage Award Would Withstand Adversarial Testing. Dkt. No. 497. Defendants' supporting brief demonstrated that "[c]ontrary to the Court's recollection, the First Circuit did not uphold the size of the judgment, but rather held only that the size of the judgment did not create a non-justiciable political question," and ultimately "*t[ook] no view*" on whether "the court erred on the side of generosity." Dkt. No. 498 at 2 (quoting *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 282 (1st Cir. 2005) (emphasis added)). Defendants' brief also quoted the "extensive discussion about whether the $116 million award would survive adversarial testing and whether the propriety of the award was a proper consideration in the Rule 60(b)(6) context" which had taken place at the 2009 oral argument before the First Circuit. *Id.* at 2-4.

2

On July 26, 2010, Plaintiffs filed a "Response" to Defendants' Motion. Dkt. No. 503. Plaintiffs' Response noted their position that Defendants had previously "waived any challenge to the assessment of damages" other than those asserted in 2004, and that, even if there was no such waiver, defendants were not entitled to discovery. *Id.* at 1. However, Plaintiffs' response went on to state that "the Ungars will not oppose (without waiving or derogating from their position as set forth above) defendants' motion to permit them to take some damages discovery." *Id.* at 2. On August 18, 2010, the Court granted Defendants' Motion because, "[i]n light of this response, the Court finds that the motion is unopposed." Dkt. No. 506.

Following the Court's decision, Defendant PA propounded its Second Set of Interrogatories (19-21) to Plaintiffs dated August 25, 2010. Interrogatory No. 21 asked: "If you contend that the amount of the judgment is likely to withstand adversarial testing, state the factual basis for that contention." *See* Exh. 2 at 4. On September 27, 2010, Plaintiffs responded and, after posing several objections, stated that the "factual basis for this contention includes, *inter alia*, (a) the evidence and testimony submitted by the plaintiffs in the context of the damages hearing held by this Court." *See* Exh. 2 at 6. Thus, Plaintiffs intend to rely upon the "evidence and testimony" at the July 12 and 15, 2002 damages hearings to support their contention that the damages award is likely to withstand adversarial testing.

As the Court will recall, and as discussed in greater detail below, that "evidence and testimony" included fact testimony from each of the adult Plaintiffs concerning how their own, and their family members', mental conditions were affected by the death of Yaron Ungar, as well as expert testimony from a child psychologist about how the mental health of the minor Plaintiffs Dvir and Yishai Ungar would be affected by their father's death. Thus, in light of Plaintiffs' contention that "the amount of the judgment is likely to withstand adversarial testing" because it

3

is based, in significant part, on fact and expert testimony regarding how Plaintiffs' mental conditions were affected by Yaron Ungar's death, it is both appropriate and necessary for Defendants to test that prior fact and expert testimony through Rule 35(a) mental examinations of each of the Plaintiffs who were awarded damages on that basis.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 35(a) provides that

> The court where the action is pending may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. . . . The order may be made only on motion for good cause and on notice to all parties and the person to be examined; and must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it.

Fed. R. Civ. P. 35(a). Thus, Rule 35(a) requires that before a mental examination is ordered that the mental condition of a plaintiff be "in controversy" and that a defendant show "good cause" for the mental examination. *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964); *Eckman v. Univ. of Rhode Island*, 160 F.R.D. 431, 433 (D.R.I. 1994) (Lovegreen, J.). The trial court must decide as an initial matter whether Defendants have adequately demonstrated these requirements, which "are necessarily related." *Schlagenhauf*, 379 U.S. at 118-19. In its analysis, the trial court may consult a variety of information, including the pleadings and other documents in the court file, documents submitted at any hearings, and information from and argument of counsel. *Ali v. Wang Laboratories, Inc.*, 162 F.R.D. 165, 167 (M.D. Fla. 1995). This does not mean, however, that Defendants must prove their case on the merits in order to meet the requirements for a mental examination. *Schlagenhauf*, 379 U.S. at 119.

In interpreting Rule 35(a), the Supreme Court has emphasized that, as with all the discovery rules, this rule is "to be accorded a broad and liberal treatment." *Id.* at 114. This is

4

because "civil trials in the federal courts no longer need be carried on in the dark." *Id.* at 114-15;

*see also Simpson v. Univ. of Colo.*, 220 F.R.D. 354, 363 (D. Colo. 2004) ("The purpose of the

Rule 35 examination is to 'level the playing field' for the parties."). Notably, the entry of default

judgment against a defendant does not extinguish defendant's right to challenge the award

requested by the plaintiffs. *Shepherd v. Am. Broadcasting Co., Inc.*, 151 F.R.D. 194, 212

(D.D.C. 1993), *rev'd and vacated on other grounds* 62 F.3d 1469 (1995). And part of a

defendant's post-default discovery regarding a plaintiff's damages claims can include mental

examinations. *Id.*[1]

## ARGUMENT

## I. PLAINTIFFS' MENTAL CONDITIONS ARE IN CONTROVERSY

### A. The Court's Prior Damage Award Is Expressly Based On Plaintiffs' Mental Conditions

As the Court will recall, on July 12 and 15, 2002, Magistrate Judge Martin held a

damages hearing on Plaintiffs' motion for a default judgment against the Hamas defendants. *See*

*generally Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 272-76 (D.R.I. 2004). At the

hearing, each of the adult Plaintiffs testified concerning how their individual mental conditions

had been affected by the death of Yaron Unger, as well as how Mr. Ungar's death had affected

the mental health of the other Plaintiffs, including Mr. Ungar's minor sons Dvir and Yishai

Ungar. *See* Exh. 3 (July 12, 2002 Hearing Tr.) at 89-152. Plaintiffs also presented expert

testimony from Dr. Allan Brenman, a child psychologist, concerning the likely impact of Yaron

Ungar's death on the mental health of his sons. *See* Exh. 4 (July 15, 2002 Hearing Tr.) at 3-28.

---

[1] The District of Columbia Circuit reversed and remanded the district court's granting of default judgment in favor of the plaintiffs in *Shepherd* because Rule 37(b) could not support the sanctions, but did not reverse or rule on the district court's decision to allow defendants to conduct discovery including Rule 35(a) examinations of the plaintiffs in a post-default judgment context. *Shepherd*, 62 F.3d at 1484.

Based on that testimony and related exhibits, the Magistrate Judge made the following findings about the Plaintiffs' mental conditions:

- Dvir and Yishai Ungar (Yaron Ungar's sons):

  o their "mental anguish over the murder of their father, while likely to diminish somewhat over time, *will always be with them even into old age*" (*Ungar*, 304 F. Supp. 2d at 272) (emphasis added);

  o the loss of their parents had caused them "psychic trauma" (*id.* at 273);

  o going forward, they are susceptible to developing depression, anxiety, and post-traumatic stress disorder, and might require psychotherapy (*id.*); and

  o they are at increased risk for developing problems in the future as a result of the loss of both their parents (*id.*).

- Judith and Meir Ungar (Yaron Ungar's parents):

  o they "have suffered and will continue to suffer severe grief and loneliness from Yaron's death" (*id.* at 275);

  o their family life has suffered, as everyone is "more nervous" (*id.* at 275);

  o Meir Ungar no longer participates in activities and feels he no longer has the "right to be happy" (*id.* at 274-75); and

  o Judith Ungar "can never enjoy anything, even happy occasions, because the memory of Yaron is always with her," her "pain was compounded by the knowledge of the 'cold, cruel and horrible way' in which Yaron had died," and she will not go to sleep at night until her son Amichai comes home (*id.* at 275-76).

- Michal Cohen (Yaron Ungar's sister):

  o the loss of her brother "was always with her" (*id.* at 276);

  o she could not help but think about her grief when her twins were born because Yaron was not there (*id.* at 275);

  o she became "paralyzed" when hearing Yaron's favorite song at the mall (*id.* at 275-76); and

  o seeing a tall blond guy in the distance "would cause her to think for a split second that it was Yaron even though it was illogical" (*id.* at 276).

- Amichai Ungar (Yaron Ungar's brother):

  o he "refrain[s] from participating in activities he formerly enjoyed, such as climbing and running on the hills, if there is an element of risk," because he fears his parents losing another son (*id.*); and

6

- o he cried at a wedding when seeing the groom and the groom's brother dancing together "because he realized that when he got married Yaron would not be there to dance with him" (*id.*).

- Dafna Ungar (Yaron Ungar's sister):

  - o Yaron's death "deeply affected her" (*id.*); and

  - o after his death, she "felt the need to talk with Yaron and…she would have a 'conversation' with his photograph every night before she went to sleep" (*id.*).

The Magistrate Judge also found that Plaintiffs were "very tense," and while Plaintiffs did not always walk around in deep sorrow, "in every act that [they did]" they had Yaron Ungar's death on their minds, "reminding [them] all the time what has happened." *Id.*

As a result, the Magistrate Judge recommended that substantial damages be awarded to each of the following Plaintiffs based on, *inter alia*, his or her "mental anguish" resulting from Yaron Ungar's death. *See id.* at 274 (recommending award of $10 million each to Dvir and Yishai Ungar for "the loss of parental society, companionship, and guidance and *mental anguish caused by their father's death*") (emphasis added); *id.* at 275 (recommending award of $5 million each to Judith and Meir Ungar for "the loss of society and companionship and *mental anguish caused them by the death of their son*) (emphasis added); *id.* at 276 (recommending award of $2.5 million each to Michal Cohen, Amichai Ungar, and Dafna Ungar for "the loss of society and companionship and *mental anguish caused by the death of their brother*") (emphasis added). The District Court subsequently adopted these damage amounts and descriptions in entering final judgment against Hamas. *Id.* at 242.

When the Magistrate Judge subsequently recommended entry of default judgment against the PA and PLO, he expressly relied upon the factual findings that he had previously made based upon the evidence taken at the July 12 and 15, 2002 hearing. *Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15, 67 (D.R.I. 2004). The District Court subsequently adopted those damage

7

recommendations without alternation. *Id.* at 27-28. Thus, the Court's ultimate award of damages against the PA and PLO included significant compensation to the Plaintiffs based on the "mental anguish" they each suffered as a result of Mr. Ungar's death. *Id.*

**B.    Plaintiffs Have Expressly Placed Their Mental Conditions "In Controversy"**

The First Circuit has not had occasion to analyze the circumstances under which a party has put his or her mental or physical condition "in controversy" for the purposes of Rule 35, and lower federal district courts differ somewhat in their approach: some require only a claim of emotional distress, while others require a showing of more than "garden variety" emotional distress. Under either standard, however, Plaintiffs have clearly put their respective mental conditions in controversy in this case. Indeed, Plaintiffs' express reliance upon the testimony about their mental conditions that they and their expert psychologist provided at the 2002 damages hearing to argue that the default damages award "is likely to withstand adversarial testing" effectively requires Defendants to test that assertion through Rule 35(a) examinations.

**1.    Because Plaintiffs Have Claimed Emotional Distress, They Have Put Their Mental Condition "In Controversy"**

Some courts have held that a plaintiff puts her mental condition in controversy when she seeks compensatory damages for the emotional pain she claims to have suffered as a result of a defendant's actions. *See, e.g., Nuskey v. Lambright*, 251 F.R.D. 3, 7-8 (D.D.C. 2008). Imposing a more stringent standard that distinguishes between claims alleging only

> "garden variety" emotional distress and those that allege a specific or severe form of emotional distress is no more than a game of semantics and has nothing whatsoever to do with defendant's obligation to show good cause for the ordering of an [independent mental examination ("IME")]. In other words, no matter what changes plaintiff makes to the wording of her two complaints, the underlying truth remains: plaintiff seeks compensatory damages for the emotional pain she claims to have suffered as a result of defendant's actions.

8

*Id.* at 7. In *Nuskey*, the court reasoned that the imposition of a higher standard was unreasonable, because "[w]ithout the information obtained through a court-ordered IME, defendant would have no means to rebut plaintiff's claims." *Id.* The court held that the defendant had "the right to challenge plaintiff's claim that she was harmed and that defendant was the source of that harm. To preclude defendant from being able to mount its defense in this manner would be to allow plaintiff to unilaterally determine which evidence will and which evidence will not be admissible." *Id.*

Numerous other courts have held that a plaintiff puts his or her mental condition in controversy solely by seeking damages for emotional distress. *See, e.g., Jansen v. Packaging Corp. of Am.*, 158 F.R.D. 409, 410 (N.D. Ill. 1994) ("There is no question that by advancing such intangible harms as a component of her damages claim, Jansen has . . . placed her mental condition 'in controversy.'"); *Shepherd v. Am. Broadcasting Co., Inc.*, 151 F.R.D. 194, 212 (D.D.C. 1993) ("Both plaintiffs have placed their mental conditions in controversy by demanding damages to compensate them for emotional distress."); *Smedley v. Capps, Staples, Ward, Hastings & Dodson*, 820 F. Supp. 1227, 1232 (N.D. Cal. 1993) (holding that plaintiff's intent to present evidence of "normal" emotional distress warrants the ordering of a mental examination so that defendants can refute such evidence); *Zabkowicz v. West Bend Co.*, 585 F. Supp. 635, 636 (E.D. Wisc. 1984) ("Because the plaintiffs allege emotional distress, an examination by a nominee of the defendants is appropriate.").

In this case, Plaintiffs asserted in the Amended Complaint that Defendants' alleged acts have caused them "severe injury," including "emotional distress." Amended Complaint ¶ 47. Then, with the testimony of Dr. Allan Brenman and each of the adult Plaintiffs at the July 12 and 15, 2002 hearings, they described at length the emotional distress Plaintiffs claim to have

9

suffered because of Defendants' alleged actions. *See Ungar*, 304 F. Supp. 2d at 272-76.

Because Plaintiffs not only alleged emotional distress in their Amended Complaint, but also

affirmatively placed the issue of their respective mental conditions on the record in support of

their motion for default judgment, there can be no question that Plaintiffs have put their

respective mental conditions in controversy in this matter. *See, e.g., Shepherd*, 151 F.R.D. at 212

(holding that plaintiffs had placed the existence and extent of their mental injuries in controversy

by demanding damages to compensate them for emotional distress, and submitting affidavits

"that describe at great length the emotional distress that each claims to have suffered because of

[defendant's] actions").

> **2.   Even if Defendants Are Required to Show that Plaintiffs Have Alleged More than "Garden Variety" Emotional Distress, Plaintiffs Have Still Put Their Mental Conditions "In Controversy"**

Other courts have required more than a claim of emotional distress to support a finding

that a plaintiff has put his mental condition in controversy. Instead, such cases have involved,

for example, claims of "unusually severe emotional distress," or the plaintiff's use of expert

testimony to support the plaintiff's claim of emotional distress. *Turner v. Imperial Stores*, 161

F.R.D. 89, 95 (S.D. Cal. 1995). Such cases have also involved a specific mental injury that the

plaintiff claims is a result of the defendant's alleged conduct. *Greenhorn v. Marriott Int'l, Inc.*,

216 F.R.D. 649, 651 (D. Kan. 2003).

Each of these factors is present here. First, Plaintiffs' own allegations in their Amended

Complaint make clear that their claimed emotional distress is "severe." Amended Complaint ¶

47. Second, at least Dvir and Yishai Ungar have employed expert testimony to support their

claims of emotional distress. *Ungar*, 304 F. Supp. 2d at 273. Finally, each of the Plaintiffs has

claimed at least one specific mental injury as a result of Defendants' alleged conduct. *See, e.g.,*

*id.* (Dr. Brenman testifying on behalf of Dvir and Yishai Ungar that the loss of their parents had

caused them "psychic trauma"); *id.* at 274-75 (Meir Ungar testifying that he no longer participates in activities and feels he no longer has the "right to be happy"); *id.* at 275-76 (Judith Ungar testifying that she "can never enjoy anything, even happy occasions, because the memory of Yaron is always with her"); *id.* at 275-76 (Michal Cohen testifying that the loss of her brother "was always with her" and that she became "paralyzed" when hearing his favorite song at the mall); *id.* at 276 (Amichai Ungar testifying that as a result of his brother's death, he "refrain[s] from participating in activities he formerly enjoyed, such as climbing and running on the hills, if there is an element of risk"); *id.* (Dafna Ungar testifying that her brother's death so "deeply affected her" that she "felt the need to talk with Yaron and…she would have a 'conversation' with his photograph every night before she went to sleep.").

Thus, regardless of the applicable standard, because Plaintiffs' allegations "extend far beyond a mere 'garden variety' claim for emotional distress," they have put their respective mental conditions in controversy. *See Greenhorn*, 216 F.R.D. at 651. Moreover, Plaintiffs expressly contend that the pending Motion to Vacate should be denied because, *inter alia*, "the amount of the judgment would withstand any other adversarial testing," and expressly base that contention upon "the evidence and testimony submitted by the plaintiffs in the context of the damages hearing held by this Court." Exh. 2 at 6. The mental conditions of these Plaintiffs are therefore expressly "in controversy" for purposes of the pending Motion to Vacate.

## II.   THERE IS GOOD CAUSE FOR RULE 35(a) MENTAL EXAMINATIONS OF EACH PLAINTIFF

When the severity of a plaintiff's emotional problems play a central role in the case, "[t]his alone supplies the necessary 'good cause' for a Rule 35(a) mental examination." *Eckman*, 160 F.R.D. at 434. This is because the defendants "obviously have substantial questions concerning the extent of plaintiff's emotional injuries and causation therefor. They should have

an opportunity to explore these issues." *Id.*; *see also Shepherd*, 151 F.R.D. at 213 (finding good cause for a mental examination where the plaintiff "strongly emphasized the severity of her emotional problems, so much so that the gravity of her mental distress seems central to her overall damage claim."). Courts have also found good cause for a mental examination where the plaintiff has asserted "substantial damages." *See, e.g., Ali*, 162 F.R.D. at 168.

It is apparent that Plaintiffs' emotional injuries and the causation thereof play a central role in this case. At the July 12, 2002 hearing, the Plaintiffs all "strongly emphasized the severity of [their] emotional problems," *see Shepherd*, 151 F.R.D. at 213, and there is no reason to believe that they will not continue to do so going forward.[2] Moreover, Plaintiffs sought -- and this Court awarded -- substantial damages on the basis of their alleged emotional injuries. *See supra* at Section I.A. Plaintiffs have recently stated their intent to rely on their and their expert's testimony concerning their emotional and mental distress at the damages hearing to support their argument that the damages award would withstand adversarial testing. Exh. 2 at 6. As a result, Defendants should be given the opportunity to test the extent and severity of each Plaintiff's claimed emotional injuries, which form the basis for more than $100 million of the damages award. Thus, mental examinations of the Plaintiffs relate directly to whether Plaintiffs' claim for damages is "unlikely to withstand adversarial testing." *Ungar*, 599 F.3d at 86.

This case also presents unique circumstances warranting a finding of good cause. More than fourteen years have passed since Yaron Ungar's death. More than ten years have passed since Plaintiffs filed their Amended Complaint alleging "severe" emotional distress. And more

---

[2] Whether Plaintiffs intend to introduce further expert testimony on their mental conditions is not controlling on the issue of good cause. *Bethel v. Dixie Homecrafters, Inc.*, 192 F.R.D. 320, 323 (N.D. Ga. 2000); *see also Nuskey*, 251 F.R.D. at 8 ("It is [plaintiff's] claim of damages, not her presentation of evidence, that triggers [defendant's] interest in an [independent medical examination].").

than eight years have passed since Plaintiffs testified about their emotional injuries at the hearing on their motion for default judgment. Given this passage of time, Defendants should be given the opportunity to assess any changes over the intervening years in the existence or extent of Plaintiffs' asserted mental injuries. This is true for all of the Plaintiffs, but has special relevance for Dvir and Yishai Ungar, who were infants at the time of their father's death and relatively young children at the time of the prior damages hearing. Dr. Brenman testified eight years ago that Dvir and Yishai Ungar's "mental anguish over the murder of their father, while likely to diminish somewhat over time, will always be with them even into old age," and that going forward, they are susceptible to developing depression, anxiety, and post-traumatic stress disorder, and might require psychotherapy, and that they are at increased risk for developing problems in the future as a result of the loss of both their parents. *Ungar*, 304 F. Supp. 2d at 272-73. This Court is tasked with determining now, following review and consideration of current relevant information, whether the $60 million in non-economic compensation awarded these two minor Plaintiffs "is likely to withstand adversarial testing." If, in fact, the mental conditions Dr. Brenman predicted, and on which the Court predicated its damage award, have not manifested themselves in the minor Plaintiffs, that fact will obviously be relevant to this issue.

Accordingly, because Defendants have met their burden under Rule 35(a), the Court should grant the instant motion and order the Plaintiffs to submit to mental examinations at the time and location set forth below.

## III.    DEFENDANTS' PROPOSED PROCEDURE FOR THE EXAMINATIONS OF PLAINTIFFS PURSUANT TO RULE 35(a)(2)(B)

Defendants respectfully propose the following procedure for the examinations in accordance with Fed. R. Civ. P. 35(a)(2)(B). Dr. Eileen P. Ryan, D.O., whose *curriculum vitae*

13

is attached as Exhibit 5, is an Associate Professor of Psychiatry and Neurobehavioral Sciences at the University of Virginia School of Medicine and is board certified in general (adult) psychiatry, child and adolescent psychiatry, and forensic psychiatry, and is a "suitably licensed or certified examiner" within the meaning of Rule 35(a). Dr. Ryan is prepared to examine the Plaintiffs concerning their claims of severe emotional and psychological distress as alleged in their Amended Complaint, and as described during the July 12 and 15, 2002 hearings, and is available to conduct the examinations at the law offices of Edwards, Angell, Palmer & Dodge LLP in Providence, Rhode Island commencing at 9:00 a.m. on November 9, 10 and 11.

The proposed location, which lies in the district where Plaintiffs chose to file suit, is both reasonable and appropriate. *See Jones v. Greyhound Lines, Inc.*, Case No. 08-1185-MLB-DWB, 2009 U.S. Dist. LEXIS 106393, at *12 (D. Kan. Nov. 13, 2009) (holding that the forum state, Kansas, "is an appropriate location for the IME"). Defendants are, of course, willing to discuss the timing of these examinations with Plaintiffs and adjust the schedule if necessary consistent with Dr. Ryan's or other suitable examiners' availability.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel Mental Examinations of Plaintiffs should be granted. A proposed order is submitted herewith.

14

Respectfully submitted,

Dated:  October 4, 2010

/s/ Mark J. Rochon
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Brian A. Hill (D.C. Bar #456086)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
mrochon@milchev.com
rhibey@milchev.com
bhill@milchev.com

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 4th day of October, 2010, a true and genuine copy of

the foregoing was filed by ECF, which will automatically send notification and a copy of such

filing to:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI  02903
Djs@mtlhlaw.com

Max Wistow
Wistow and Barylick Incorporated
61 Weybosset Street
Providence, RI 02903
mwistow@wistbar.com

*Attorneys for Plaintiffs*


        /s/ Mark J. Rochon
        Mark J. Rochon