UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE ESTATE OF YARON UNGAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 00-105L |
| | ) | |
| THE PALESTINIAN AUTHORITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR ENTRY
OF A PROTECTIVE ORDER REGARDING PLAINTIFFS' REQUESTS FOR
DISCOVERY OF CERTAIN THIRD-PARTY COMMUNICATIONS**

**I.    Overview of Discovery Dispute and Parties' Positions**

As explained in Defendants' motion for protective order, Plaintiffs are attempting to use

the limited discovery period set aside for the pending Rule 60(b)(6) motion as an opportunity to

conduct extensive discovery into communications between Defendants and seven different third

parties, each of which are the subject of various enforcement actions brought by Plaintiffs.[1] *See*

Dkt. No. 527 (Defendants' supporting memorandum) at 11-13 (discussing relationship between

third party communications sought in Rule 60(b)(6) discovery and pending enforcement actions).

*See also* Dkt. No. 553 (Plaintiffs' opposition) at 5-8 (describing "enforcement proceedings

relevant to this motion").

---

[1] The discovery seeks Palestinian Authority and PLO communications with (1) Orascom Telecom Holdings S.A.E. ("Orascom"), (2) the Palestine Monetary Authority ("PMA"), (3) the Palestinian Pension Fund for the State and Administrative Employees of the Gaza Strip ("Palestinian Pension Fund"), (4) various related investment entities known as "Canaan," (5) Becont Ltd., (6) the Palestine Investment Fund ("PIF"), and (7) the Palestinian Commercial Services Company, a subsidiary of PIF. *See* Dkt. No. 527 at 7-8.

Plaintiffs seek "[i]n respect to all verbal communications, relating to the instant case, the Judgment and/or the 2006 [Creditor's Bill] Judgment," the date of each communication, the identities of all persons and entities who participated in each communication, the purpose of each communication, and "all topics relating to the instant case, the Judgment and/or the 2006 Judgment discussed in each such communication." Dkt. 527 at 7 (quoting Interrogatory No. 2 of Plaintiffs' First Set of Interrogatories). Plaintiffs also seek all written communications between the Palestinian Authority ("PA") and/or Palestine Liberation Organization ("PLO") and the seven third party entities "relating to the instant case, the Judgment and/or the 2006 Judgment." *Id.* at 8 (quoting Document Request No. 1 of Plaintiffs' Second Request for Documents). [2]

Defendants PA and PLO have sought protective order relief on the ground that their communications with entities that are the subject of the *Ungar* enforcement actions are not relevant to the Court's consideration of their Rule 60(b)(6) motion. In their motion for a protective order, Defendants also argued that the disputed discovery targets confidential communications between non-adverse parties (including their counsel) regarding the ongoing *Ungar* litigation and thus seeks non-discoverable work product. Defendants further argued that they did not "waive" any work product claims by seeking a ruling on whether the communications are "otherwise discoverable" before going to the burden of locating and logging all communications with seven different entities over several years regarding the Ungars' efforts to enforce their judgment in multiple jurisdictions as to various Palestinian institutions.

---

[2] The discovery seeks communications about the *Ungar* case and related judgments between "any office-holder, employee, attorney and/or agent" of the PA and/or PLO and any one of the seven entities, including any "office-holder, employee, attorney and/or agent" of each such entity. Dkt. No. 527 at 7, 8 (emphasis in Plaintiffs' discovery requests).

In their opposition brief, Plaintiffs argue they are entitled to the discovery so they can explore whether "Defendants have been acting from behind the scenes and using improper and unlawful means to thwart the Ungars' enforcement proceedings." Dkt. No. 553 at 8. The sole example Plaintiffs offer of Defendants' allegedly "inequitable" behavior -- variously characterized as "bad faith," "unclean hands," or "unlawful interference" -- is occasional and quite public receipt of loans, advances or dividends from the Palestine Investment Fund ("PIF"). But, as explained in Part II.B. *infra*, these transfers were neither "behind the scenes" nor unlawful. With respect to the other six entities, Plaintiffs offer no examples of the purported use of "unlawful means to thwart the Ungars' enforcement proceedings."

The more fundamental problem with this discovery, however, is that it could potentially result in a finding of "unclean hands" or "unlawful interference" *only* if Plaintiffs could show that the third-party entities that are the subject of the discovery request are in fact alter egos of the PA or PLO or are holding PA or PLO assets -- in other words, that the PA or PLO do in fact have assets within the United States and are in league with these other entities to keep these hypothetical PA/PLO assets from the Ungars. But this Court has consistently ruled -- in response to separate actions brought by the Palestine Monetary Authority, PIF's counsel, and, most recently the Palestinian Pension Fund -- that it will not entertain such discovery or engage in such fact finding because these issues are the subject of enforcement proceedings in jurisdictions where the assets allegedly are located.

As recently as a few weeks ago, the Court denied a motion to intervene filed by the Palestinian Pension Fund because granting the motion would require "a lot of discovery" and fact-finding as to the ownership of the Palestinian Pension Fund and the New York assets subject to the Ungars' New York state court enforcement proceeding, would raise issues that "should be

decided in the Courts in New York," and would waste "judicial time" and lead to potentially "inconsistent results" by "duplicating" fact-finding being undertaken by the New York court. Exh. 1 (excerpts of Tr. of Sept. 21, 2010, hearing) at 23:25-25:6.

As to Defendants' work product claims, Plaintiffs do not take issue with Defendants' characterization of the discovery as communications and documents "prepared in anticipation of litigation." *See* Fed. R. Civ. P. 26(b)(3). Nor, with the exception of Canaan and Orascom (with whom Plaintiffs contend Defendants have an "adverse" relationship), do Plaintiffs argue that Defendants or the third party entities waived their work product claims by communicating with one another. Instead, Plaintiffs argue the following: (1) Defendants waived their work product claims by not producing a privilege log; (2) the crime-fraud exception applies because there is a "'reasonable basis to suspect' that the Defendants have been taking action to hinder or delay enforcement of the judgment and that 'the communications [sought by the Ungars] were in furtherance thereof'" (Dkt. No. 553 at 30); (3) Rule 26(b)(3)(A)'s "substantial need/undue hardship" exception applies; and (4) the PA/PLO cannot claim work product for communications regarding the *Ungar* litigation and *Ungar* judgment because they are not a "party" to the enforcement actions.

As discussed in Part III, Plaintiffs' efforts to invoke the "substantial need/undue hardship" exception and crime-fraud exception fail for the same reason their relevancy argument fails. Obviously, one cannot show a "substantial need" for discovery that is not likely to lead to admissible evidence relevant to the Rule 60(b)(6) motion. With respect to the crime-fraud exception, Plaintiffs have not made the necessary showing to assert that exception. A party cannot invoke the crime-fraud exception to obtain discovery to establish the existence of the alleged crime or fraud that is the predicate for invoking the exception. The sole examples

Plaintiffs offer of purportedly unlawful conduct demonstrate only that PIF does not recognize the Ungars as its owners and continues to operate as usual in the West Bank. The Court's 2006 creditor's bill judgment, on which the Plaintiffs rely for their claim of ownership of PIF, has no legal effect as to PIF, over whom the Court lacks personal jurisdiction, and as to whose assets the Court lacks subject matter jurisdiction. In any event, PIF's conduct may not be imputed to the PA or PLO absent a finding that PIF is an alter ego of the PA or PLO, a fact intensive question this Court has declined to undertake and which is the subject of an ongoing enforcement action brought by the Ungars in Connecticut.

With respect to the privilege log issue, Defendants are not required to prepare a privilege log to preserve work product objections where they have filed a motion for protective order arguing that the information sought is not properly subject to Rule 60(b)(6) discovery. Defendants' relevance and overbreadth arguments must be resolved before any need for a privilege log is established. Finally, Plaintiffs' notion that the communications and documents sought are not work product because Defendants are not parties to the enforcement proceedings ignores that Defendants are parties to the litigation that gave rise to the judgment that is the subject of the discovery Plaintiffs seek and that the third party entities also subject to the discovery are parties to those actions. If Plaintiffs' argument is that Defendants lack standing to assert work product claims for documents or communications initiated by the non-adverse third parties, then the third parties should be allowed to intervene to assert their work product claims on their own behalf. But, as the Court has already indicated it has "enough to deal with in this case right now" without addressing issues involving the third party targets of the enforcement actions, Exh. 1 at 25:5-6, such a step is unnecessary, especially in light of Plaintiffs' inability to

show these communications will lead to a finding relevant to the resolution of the Rule 60(b)(6) motion.

**II.    Communications with Entities Subject to the Ungars' Enforcement Actions Regarding the Ungar Judgment Are Not Relevant to the Court's Resolution of the Rule 60(b)(6) Motion.**

In their opening brief, Defendants argued they are entitled to a protective order because -- among other reasons -- they have made a good cause showing that Plaintiffs intend to use the discovery for a purpose unrelated to preparation for the Rule 60(b)(6) hearing. *See* Dkt. No. 527 at 13-14, citing 6 James W. Moore et al., *Moore's Federal Practice and Procedure* § 26.01[1][c] (2010), for the proposition that "courts are empowered to issue protective orders on a good cause showing that a party intends to use the discovery for a purpose unrelated to settlement or trial preparation of the case in which the discovery is taken or requested." Here, Plaintiffs' "unrelated" purpose is to gain information for use in various federal and state court actions brought to enforce the *Ungar* default judgment.

In their opposition to Defendants' motion for protective order -- also styled a motion to compel and motion to strike[3] -- Plaintiffs insist that the third party communications are "highly relevant" to the Rule 60(b)(6) motion. According to Plaintiffs, any actions by Defendants to "block enforcement" of the judgment "will weigh heavily against a grant of relief under Rule 60(b) because such behavior demonstrates the movant's bad-faith." Dkt. No. 553 at 3. *See also id.* at 4 (the "Ungars have argued all along (i.e. since the filing of Defendants' motion to vacate in December 2007) that the motion should be denied, *inter alia*, because of Defendants' bad-faith

---

[3] Plaintiffs have a disappointing habit of reacting to Defendants' discovery motions with an opposition also captioned as a motion of their own. This approach lets them seek to have the last work on every issue, but it also leads to duplicative filings, unnecessary delay, and needless procedural complexity. Defendants would move to strike the unnecessary motions but that would only exacerbate the problem. Instead, Defendants separately will file a one-page opposition to Plaintiffs' superfluous filings.

interference in the Ungars' enforcement proceedings."). Plaintiffs further argue that Defendants' post-judgment conduct is especially relevant in this case, since Defendants' Rule 60(b)(6) motion is "based in great part on the claim that they have abandoned their previous recalcitrant attitude toward the American courts . . . ." *Id.*

Plaintiffs' claims of relevancy are based on two assumptions: (1) there is something inherently unlawful or indicative of "bad faith" or "unclean hands" when a party seeking Rule 60(b)(6) relief from default judgment has failed to pay the judgment; and (2) the assets at issue in the various enforcement actions are in fact PA or PLO assets -- and not those of the Palestine Investment Fund ("PIF"), the Palestine Monetary Authority ("PMA"), Palestinian Pension Fund, or Becont -- such that any PA or PLO communication with those entities or other third party entities holding the assets (such as Orascom or Canaan) potentially provide evidence of what Plaintiffs' characterize as "unlawful interference" with the enforcement of their judgment.

As discussed in Part II.A., the first assumption is false as a matter of law. As discussed in Part II.B., establishing the validity of the second assumption would require the Court to engage in extensive discovery and fact finding as to the relationship between the PA/PLO and the PIF, PMA, the Pension Fund, and Becont and the history of the assets at issue. As the Court is well aware, these issues are the subject of enforcement proceedings ongoing in numerous state and federal court actions brought by the Ungars in the jurisdictions where the assets allegedly are located. This Court has consistently taken the position that it will not engage in parallel, duplicative litigation of the ownership of assets at issue in the enforcement actions. The abbreviated Rule 60(b)(6) discovery period is not the time to start down this collateral road. Absent a finding that the assets at issue in the enforcement action should be deemed PA or PLO assets -- a finding this Court has said it will not make -- Plaintiffs cannot establish bad faith,

unclean hands, or unlawful interference. Plaintiffs' interrogatory and document requests seeking third party communications thus are not likely to lead to the discovery of admissible evidence relevant to the Rule 60(b)(6) motion.

**A.     Defendants' Supposed "Refusal to Honor the Judgment" Is Not a Basis for Denying Rule 60(b)(6) Relief and Therefore Is Not the Proper Subject for Rule 60(b)(6) Discovery.**

With one exception, Plaintiffs' broad allegations of post-judgment bad faith and post-vacatur motion "recalcitrant attitude toward the American courts" reduce to the following ongoing complaint: "Because Defendants have refused to honor the judgment entered by this Court over six years ago the Ungars have been constrained to initiate extremely expensive and time-consuming enforcement proceedings in various U.S. jurisdictions and overseas." Dkt. No. 553 at 5. *See also id.* (quoting Court's statement at June 15, 2010, hearing, that the Ungars "have for a long enough time been stonewalled by these Defendants in attempting to collect on this judgment") (emphasis added by Plaintiffs).

But Defendants' failure to pay the $116 million default judgment cannot provide a basis for denying relief under Rule 60(b)(6). Rule 60(b)(6) motions inevitably involve unpaid judgments because another provision of Rule 60(b) -- Rule 60(b)(5) -- provides relief from a judgment where the judgment has been satisfied, released, or discharged. *See* Fed. R. Civ. P. 60(b)(5); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988) (with respect to Rule 60(b), "clause (6) and clauses (1) through (5) are mutually exclusive"). Moreover, the premise of Rule 60(b)(6) motions seeking to vacate final *default* judgments is that the movant seeks to avoid paying any judgment until liability has been established through merits litigation. It would be fruitless to seek to litigate a case as to which the judgment already has been paid.

Plaintiffs cannot unilaterally amend Rule 60(b)(6) to require that a litigant pay a judgment in order to invoke its provisions.

Where the Rule 60(b)(6) movant is seeking relief from a final default judgment, courts have not treated the failure to pay the judgment as relevant. In *Knox v. PLO*, 248 F.R.D. 420 (S.D.N.Y. 2008), for example, the district court conditionally vacated a $193 million default judgment against the PA and PLO even though that judgment also had not been paid. In deciding whether to grant the PA/PLO's Rule 60(b)(6) motion, rather than castigating Defendants' for not paying the judgment, the *Knox* court instead pragmatically considered whether a grant or denial of the motion would be more likely to timely provide Plaintiffs any compensation:

> If the proof at trial bears out Plaintiffs' claims, as they earnestly are convinced it can, Plaintiffs would emerge no worse off from a reopening of the Default Judgment, except for some delay entailed in obtaining an ultimate verdict -- delay that they are likely to encounter in any event as long as Defendants continue to contest the Default Judgment. A judgment in Plaintiffs' favor on the merits, however, would represent a greater vindication for Plaintiffs. Depending on the soundness of the evidence, such an outcome perhaps may provide Defendants with compelling grounds to accept the verdict or to pursue other means of resolution of the dispute that will ensure compensation for Plaintiffs' injuries sooner than may be the case under the Default Judgment.

*Knox*, 248 F.R.D. at 432. [4]

Indeed, not only has the failure to pay a judgment not disqualified a party from Rule 60(b)(6) relief, but, in a seminal Rule 60(b)(6) case, relief was granted to a defendant who

---

[4] The parties subsequently settled the *Knox* case. *See* Exh. 2 (Jan. 21, 2010, Stipulation and Final Order of Dismissal with Prejudice, *Knox v. PLO*, No. 1:03cv4466 (S.D.N.Y.), Dkt. No. 215). The settlement in *Knox* belies Plaintiffs' notion that Defendants are scofflaws who will not resolve matters when given an opportunity to defend.

threatened reprisal if its assets were attached to satisfy a default judgment against it.   In *Jackson v. People's Republic of China*, 794 F.2d 1490, 1496 (11th Cir. 1986), the U.S. Court of Appeals for the Eleventh Circuit held that the district court did not abuse its discretion in setting aside a default judgment under Rule 60(b)(6) against the People's Republic of China ("PRC") even though "the district court had been notified by the PRC that if China's property in the United States was attached it reserved its right to take 'corresponding measures.'"   Such retaliatory conduct goes well beyond the "stonewalling" alleged here.   Yet, the Eleventh Circuit did not treat the PRC's threat of retaliation against the United States for efforts to enforce the judgment as relevant to the Rule 60(b)(6) analysis.

Plaintiffs have not presented this Court with any authority for their novel theory that they are entitled to discovery on post-judgment, enforcement related conduct.   Though Plaintiffs cite *Farnese v. Bagnasco*, 687 F.2d 761, 765 (3d Cir. 1982), and *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 127 (2d Cir. 2009), neither case, in fact, involved discovery.   Moreover, in *Farnese*, the Third Circuit vacated the district court's decision not to set aside the default because of the alleged bad faith conduct.   *Farnese*, 687 F.2d at 766.   In *Farnese*, the district court concluded that the defendant's alleged post-default refusal to turn over a letter agreement to plaintiff's counsel to have its authenticity tested constituted an act of bad faith and relied on that refusal in denying defendant's vacatur motion.   On appeal, the Third Circuit held:   "Based on the record before us, we cannot uphold the district court's decision that defendant acted in bad faith.   The record is, at best, ambiguous as to whether defendant acted in bad faith with respect to production of the letter agreement.   Findings that are not based on evidence of record do not provide a proper basis for the district court to exercise its discretion."   *Id.* at 765.   The holding of *Farnese*, therefore, does not support Plaintiffs' efforts to obtain discovery here.

*Motorola*, the other case on which Plaintiffs rely, did not involve an effort to vacate a default judgment so that the defendants could litigate on the merits. Instead, pursuant to Rule 60(b)(5), defendants (the Uzans) sought to use plaintiffs' partial recovery from other sources as a set-off against the judgment against them. The Second Circuit concluded that the Uzans' "conduct before this Court, and especially before the District Court, weighs heavily against granting the relief they seek." *Motorola*, 561 F.3d at 129. The court then provided a long list of specific court orders the Uzans had disregarded, conduct that went far beyond a refusal to pay the judgment. *See id.* at 127-28 (citing, inter alia, willful failure to comply with court orders to provide post-judgment discovery and contempt of court orders to transfer collateral to the court's registry).

In contrast to the conduct of the Uzans described in the *Motorola* case, there is nothing "bad faith," "recalcitrant" or otherwise nefarious about the PA/PLO's position that they will not voluntarily pay a $116 million default judgment for an act of Hamas pending resolution of the PA/PLO's nearly three-year effort to vacate the default judgment so that they can litigate the case on the merits. But even assuming, for argument's sake, that Defendants' refusal to pay the $116 million default judgment pending resolution of their vacatur motion were relevant to their entitlement to Rule 60(b)(6) relief, Plaintiffs have not shown why the discovery they seek is necessary to that showing. The Defendants' failure to pay the judgment is not subject to dispute. Plaintiffs are not entitled to conduct burdensome overseas discovery of communications between the PA/PLO and other Palestinian institutions solely to establish the obvious.

**B.    Plaintiffs' Unsupported Claims of "Unlawful Interference" with the Judgment Do Not Provide Grounds for Expanding Rule 60(b)(6) Discovery to Include Defendants' Communications with Third-Party Targets of the Enforcement Actions.**

.    Plaintiffs' ostensibly seek the third party communications at issue in this discovery dispute in an effort to prove their otherwise unsupported allegation that "Defendants are unlawfully interfering with the Ungars' enforcement actions." Dkt. No. 553 at 8.  To counter the claim that they are engaged in a fishing expedition, Plaintiffs assert that "[t]here is clear evidence that the Defendants have been acting from behind the scenes and using improper and unlawful means to thwart the Ungars' enforcement proceedings." *Id.*

Aside from citation to a few dividends and advances the PA received from the Palestine Investment Fund ("PIF"), *see id.* at 8-9, the Plaintiffs can identify no examples of alleged "unlawful interfere[ence]" with the Ungars' judgment.  With respect to the PIF payments, they were neither "behind the scenes" nor were they improper or unlawful.  Plaintiffs place particular emphasis on the 2008 and 2010 "PIF-PA" transfers because they "were made *after* the Defendants filed their motion to vacate in December 2007" and, as such, "they clearly show that Defendants still have unclean hands and are undeserving of the equitable relief they seek in their motion to vacate." Dkt. No. 553 at 9 (emphasis in original).  Plaintiffs' however know about these transfers because the PA is transparent about the fact that has received occasional advances or dividend payments from PIF.  As part of its fiscal transparency, the PA's Ministry of Finance regularly posts financial statements on its website, including English versions, which is how the Plaintiffs apparently learned of the transfers.  *See* Dkt. No. 553 at 9 and nn. 12, 13.

It also bears emphasis that the *only* examples Plaintiffs can offer of the type of information they hope to obtain through the discovery would not even be responsive to their discovery requests.  Documents, for example, reflecting PIF payment of dividends to the PA in

2008 and 2010 are not "communications, relating to the instant case, the Judgment and/or the 2006 [Creditor's Bill] Judgment." *See* Dkt. No. 553 at 8-9.  Thus, the discovery requests do not even reach the documents Plaintiffs now argue would be most relevant -- documents showing asset transfers.

Plaintiffs' claim of "unlawful interference" as to PIF assets rests on their position that the court transferred ownership of PIF to the Ungars and transferred PIF's assets to the Ungars when it entered judgment on Plaintiffs' creditor's bill in September 2006.  *See* Dkt. No. 381. According to Plaintiffs, any transfer of funds from PIF to the PA after entry of the creditor's bill judgment constitutes "flout[ing] the Court's judgment" and "improperly siphon[ing] funds from the PIF." Dkt. No. 553 at 8.  Plaintiffs also characterize the officers of PIF as the "former officers" of PIF and charge the "former officers" with refusing to "relinquish their control over the PIF" and bringing "legal actions in Ramallah, Amman and Cairo, putatively on behalf of the PIF, seeking to prevent the Ungars from exercising their rights to the PIF under the creditor's bill judgment." *Id.* at 10.  Equally nefarious, in Plaintiffs' view, is PIF's amendment of its Articles of Incorporation in early 2007, an act Plaintiffs attribute to the PA without explanation. *Id.* at 9.

The Plaintiffs' arguments, however, are based on the false premise that the creditor's bill judgment has force and effect beyond the scope of the Court's jurisdiction.  The Rhode Island creditor's bill statute, R.I. Gen. Laws § 9-28-1 (2010), does not reach into the West Bank to control how the Palestine Investment Fund operates, and thus cannot control its decision to amend its articles of incorporation, declare dividends, or initiate legal actions.  Nor can the actions of PIF be attributed to the PA or PLO absent fact finding by the Court that PIF is an alter ego of the PA or PLO.

The creditor's bill judgment purported to "assign, transfer and convey" to the *Ungar*
plaintiffs all of the PA's "ownership rights" in PIF and also purported to "assign, transfer, and
convey" all rights of the PA that are "titled and/or owed to" PIF.   Dkt. No. 381 at 2.  As the
Court subsequently recognized, however, at the June 19, 2007 hearing in *LeBoeuf, Lamb, Greene
& Macrae LLP v. Strachman*, No. 06-501 L, the legitimacy of the Ungars' claim of ownership of
PIF "should be asserted elsewhere, not in this Court." Exh. 3 (Tr., June 19, 2007) at 49:12-13.
The Court continued:  "The Court readily concedes it that it has no jurisdiction over the PIF.
The PIF has no connection to Rhode Island, so far as we know.  And the proper venue for the
directors and officers of the PIF to make those claims is obviously where the PIF is located."  *Id.*
at 49:13-17.

The Court's position as to PIF was consistent with a June 2005 ruling as to the PMA,
when the PMA sought the Court's clarification that the Court's May 2005 injunction as to
PA/PLO U.S. assets (Dkt. No. 322) did not reach the assets of the PMA.   In 2005, the PMA filed
an action in this Court seeking an "order declaring the rights of the parties in this matter and to
further declare that Strachman has improperly expanded the scope of the Injunction Order in this
case without proper basis, and for such further relief as the Court deems just and proper." *See
Palestine Monetary Authority v. Strachman*, No. 1:05-cv-261-l, Dkt. No. 1 (Complaint) at 9.  At
a hearing on June 16, 2005, this Court denied the PMA relief.  According to the Court, fact-
intensive issues involving whether assets held by the PMA can be treated as assets of the PA
must be decided in New York, where the assets were restrained.

> [T]he proper place for all these arguments are in New York where
> the judgment has been registered and where this action has been
> taken in order to collect the judgment.  And it is pending.  It's
> pending in the Supreme Court of New York with all the parties
> before the court, and it's not a question of the interpretation of my
> order.  My order is clear.  What has to be determined now are the

> facts. . . . [T]hose facts . . . ought to be presented to the Supreme
> Court judge in New York.

Exh. 4 (Tr., June 16, 2005), at 15:8-18; *see also* id. at 20:12:20 ("And that's where this case belongs, because I've done my job. I've entered the judgment. There are no funds in Rhode Island. . . . And Mr. Strachman will have to go to New York, Washington and other places and institute proceedings there to collect on the judgment. And that's where this litigation belongs at this point.").

Thus, the Court has consistently maintained that whether Palestinian assets found in the U.S. are subject to attachment and turnover to satisfy the Ungars' judgment against the PA and PLO are matters to be resolved by the courts having jurisdiction over the asset-specific enforcement actions. The ownership of PIF and of assets titled or owed to PIF is the subject of an enforcement action brought by the Ungars in federal court in Connecticut. *See Strachman, et al. v. Palestinian Authority, et al.*, No. 3:05-mc-00208-PCD (D. Conn.).

The Court should be particularly reluctant to consider Plaintiffs' claims of "unclean hands" or "unlawful interference" that rest on the Ungars' contention that they own PIF as a result of the creditor's bill judgment. As the Court has acknowledged, the Court lacked personal jurisdiction over PIF. Moreover, the provision of the Rhode Island law under which the Ungars purported to act, R.I. Gen. Laws § 9-28-1, required them to initiate a new civil action to reach PIF assets, name PIF as the defendant, provide notice to PIF, and establish the Court's personal jurisdiction over PIF -- none of which Plaintiffs did. When PIF's counsel LeBoeuf Lamb raised this issue with the Court in June 2007, the Court acknowledged that this was an "excellent argument," but that LeBoeuf lacked the standing to raise it. Exh. 3 at 30:10-18. Equally troubling, the creditor's bill purported to transfer all assets "titled and/or owed" to PIF, i.e. all PIF assets, in satisfaction of a $116 million judgment against the PA and PLO when PIF, at the

time, had assets of approximately $800 million.  *See* Exh. 5 (Ernst & Young Audited Financial Statement for PIF for Year Ending December 31, 2006) at 1.

A presumptively separate juridical entity should never be deprived of its assets in the absence of constitutional and statutory safeguards.  *See North Atlantic Distrib., Inc. v. Teamsters Local Union No. 430*, 497 F. Supp. 2d 315, 326-27 (D.R.I. 2007) ("In this case, the requirements of due process make it impossible for this Court to extend a default judgment to a non-party, regardless of the non-party's relationship to the original party.").  If the creditor's bill judgment were to be given effect as to PIF, the due process violations would be particularly serious because the *Ungar* plaintiffs seek to hold a foreign development instrumentality answerable for the actions of its foreign government.

As the Supreme Court has recognized, development corporations like PIF have "become an essential instrument of economic development," and their "separate legal personality" is "an almost indispensable aspect" of such organizations because it allows third parties to contract freely and safely with them.  *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624-25 (1983).  *See also* Exh. 6 (Declaration of Dr. Mohammad Mustafa) at 4-5, 6-7 (describing July 2007 agreement among PIF, the Overseas Private Investment Corporation and the Aspen Institute launching the Middle East Investment Initiative loan fund and describing other major PIF development projects); Exh. 7 (July 24, 2007, U.S. Department of State press release describing the Middle East Investment Initiative program as a "close collaboration between OPIC, the PIF and the Aspen Institute for over two years" that will "use funds from the U.S. Government entity OPIC and the PIF to leverage $228 million in loans to small business"). To the degree that Plaintiffs persist in the notion they own PIF, their position is inconsistent with the actions of the United States, which through one of its overseas investment arms, has

contracted with PIF, not through the Ungars, but through the allegedly former officers of PIF, including its CEO Dr. Mustafa.

In addition to the court's lack of personal jurisdiction over PIF and the due process defects as to PIF, the Court also lacked subject matter jurisdiction to adjudicate whether assets "titled and/or owed" to PIF can be used to satisfy the Ungars' judgment against the PA or PLO. A federal court's ancillary jurisdiction to enforce its judgments does not extend to enforcement proceedings against entities not a party to the original judgment and against whom enforcement is sought on veil-piercing or alter ego theories. *See Peacock v. Thomas*, 516 U.S. 349 (1996); *Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536 (S.D.N.Y. 2008); *Knox v. Orascom Telecom Holding, S.A.E.*, 477 F. Supp. 2d 642, 647-48 (S.D.N.Y. 2007).[5]

In sum, the creditor's bill judgment could not, and presumably was never intended to, have effect outside the reach of the Court's jurisdiction, and PIF and assets titled to PIF were, and remain, inarguably beyond the reach of the Court's personal and subject matter jurisdiction. Thus (1) any PIF actions inconsistent with the creditor's bill judgment cannot be imputed to the PA or PLO, and (2) such actions are not "unlawful" because the creditor's bill is not enforceable as to PIF. Plaintiffs therefore have <u>no</u> examples of any instance in which the PA or PLO has unlawfully interfered with the enforcement of the judgment.

---

[5] Indeed in *Strachman v. Palestinian Authority*, No. 3:05-mc-208-PCD (D. Conn.), the principal enforcement action involving PIF, the Ungars have essentially acknowledged that federal courts lack of ancillary subject-matter jurisdiction to enforce the PA/PLO judgment against PIF absent their ability to get the court to adopt a novel legal theory -- not previously adopted by any court -- that *Peacock* does not apply to assets titled to a trust of which the judgment debtor is both the settlor and beneficiary -- the factual predicate for which the Ungars have not established. *See* Exh. 7 (Memorandum in Support of Plaintiffs-Judgment Creditors' Motion for Partial Summary Judgment Regarding Subject-Matter Jurisdiction and Related Relief) at 1-3.

Contrary to Plaintiffs' position, there is nothing "unlawful" or "unethical" with the PA/PLO sharing a common litigation interest with the entities that are the subject of the Ungars' enforcement action. *See* Dkt. No. 553 at 30-31. Plaintiffs have no entitlement to satisfy their judgment using the assets of Palestinian entities who were not a party to the judgment and who are legally separate entities from the PA and PLO. Defendants are under no obligation to facilitate Plaintiffs' efforts to disrupt the operation of Palestinian institutions and seize their U.S. assets. Plaintiffs' assertion that communications between the PA/PLO and the targets of the enforcement actions could lead to evidence of "unlawful interference" assumes that the entities are alter egos of the PA or PLO or are holding assets of the PA or PLO, but no court has yet made that finding and this Court has declined to engage in such fact finding.

Finally, in regard to Plaintiffs' PIF theories, even if the Court does not agree with all of the arguments herein about the propriety of the creditor's bill judgment and the Ungars' interpretation of it, it is inescapable that the Court would need to resolve these issues before deciding this discovery issue. That is an unnecessary side-show, not contemplated by the First Circuit, to the proper resolution of Defendants' vacatur motion.

## III. Plaintiffs' Discovery Requests Target Protected Work Product.

Defendants also demonstrated in their motion that the Court should preclude or limit Plaintiffs' request for communications and documents between Defendants and seven enforcement targets on the additional ground that any such communications and documents would be protected from disclosure as work-product material. Dkt. No. 527 at 16-19. Plaintiffs do not argue in their Opposition, and have not presented this Court with any basis for finding, that Defendants' characterization of such potentially responsive communications and documents as work-product "prepared in anticipation of litigation" is incorrect. Nor, except as to Orascom

and Canaan, do Plaintiffs argue that the exchange of any such communications and documents between Defendants and the enforcement targets would result in a waiver of any work product protection. *See* Dkt. No. 553 at 31 (arguing that Canaan and Orascom are "adverse" to the PA and PLO).[6] Instead, Plaintiffs argue the following: (1) Defendants' failure so far to provide a privilege log results in a waiver of their work product claims; (2) the work product at issue was not prepared "by or for a party" to the litigation; (3) the crime-fraud exception applies; and (4) Rule 26(b)(3)(A)'s "substantial need" exception applies. As discussed below, Plaintiffs' contentions do not provide a basis for invasion of the work product protection for any responsive communications and documents the Court ultimately deems relevant.

### A.    Defendants Have Not Waived Work Product Protection by Not Submitting a Privilege Log.

Plaintiffs first argue that Defendants waived any entitlement to work product protection for communications and documents between Defendants and the seven enforcement targets by "intentionally refus[ing]" to identify all responsive information in a privilege log. *See* Dkt. No. 553 at 25-27. This argument is wrong in several respects.

First, contrary to Plaintiffs' assertion, Defendants *never* refused to produce a privilege log of responsive discovery material. In fact, in their Objections and Responses to the discovery requests at issue, Defendants specifically stated they would identify responsive material "in the

---

6 Plaintiffs' argument that Defendants are "adverse" to Orascom and Canaan depends on treating the PA and PIF as alter egos, because the alleged adversity is between PIF and those entities, not between the PA or PLO and those entities. *See* Dkt. No. 553 at 10, 31. Moreover, Plaintiffs fail to explain how Defendants' communications with allegedly adverse parties regarding the Ungar litigation is relevant to the Court's resolution of the Rule 60(b)(6) vacatur motion. The premise for Plaintiffs' claim of relevance is that the Defendants are in league with the targets of the enforcement actions to interfere with the Ungars' efforts to enforce their judgment. *See* Dkt. No. 553 at 8, 30.

manner and *to the extent required* under Fed. R. Civ. P. 26(b)(5) and the Local Rules of this Court." *See* Dkt. No. 553 at 16 (quoting General Objection No 2) (emphasis added).

The Federal Rules of Civil Procedure, however, only require the logging of privileged material that is "otherwise discoverable" (*see* Fed. R. Civ. P. 26(b)(5)(A)), which, in turn, means privileged material that is responsive to a discovery request that is "reasonably calculated to lead to the discovery of admissible evidence," (*see* Fed. R. Civ. P. 26(b)(1)) and that is consistent with any limits imposed by the Court pursuant to Fed. R. Civ. P. 26(b)(2)(C). *See* Wright & Miller, *Federal Practice and Procedure* Civil 3d § 2016.1 ("The requirement that specifics be provided [in a privilege log] should not always apply with respect to materials that are withheld on additional grounds other than privilege, such as that production would be unduly burdensome or that they are irrelevant, since those materials are not 'otherwise discoverable.'").[7]

As the D.C. Circuit explained on this very issue:

> Rule 26(b)(5) requires the party to note its privilege objection and to describe the document only when the document is "otherwise discoverable." This means, as the 1993 Advisory Committee Notes to Rule 26(b)(5) explain, that if a broad discovery request includes an allegedly privileged document, and if there is an objection to the scope of the request, the court should first decide whether the objection covers the document. If the court finds that the document is within the scope of the objection, and the court overrules the objection, it must then give the party an opportunity to list the document on a privilege log pursuant to Rule 26(b)(5). In short, if a party's pending objections apply to allegedly privileged documents, the party need not log the document until the court rules on its objections.

---

[7] *See also ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 233 F.R.D. 209, 213 (D.D.C. 2006) (recognizing that defendants were not obligated to list documents in a privilege log until after their responsiveness objection was ruled on); *Williams v. City of Dallas*, 178 F.R.D. 103, 115 (N.D. Tex. 1998) (holding that there was no obligation to undertake the task of lodging objections to a potentially vast array of protected materials that technically fell within the scope of facially overbroad subpoenas).

*United States v. Philip Morris, Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003) (internal quotation

omitted).  The rationale for this rule is simple:  If a party had to review and log all privileged or

protected materials responsive to an irrelevant and unduly burdensome discovery request, "the

burden protection would be undermined."  Wright & Miller, *Federal Practice and Procedure*

Civil 3d § 2016.1.

After Plaintiffs refused during meet and confer discussions to withdraw or limit their

irrelevant and overly broad discovery requests, Defendants filed the present motion seeking

protective relief and specifically challenging Plaintiffs' definition of what was "otherwise

discoverable" in this vacatur proceeding.  Fully consistent with the case law they have cited in

their motion (Dkt. 527 at 18-19) and herein, Defendants properly deferred the production of a log

pending the Court's ruling on Defendants' request for protective relief.

Rather than addressing a single case on which Defendants have relied, Plaintiffs instead

cite four cases which are wholly inapposite and do not support a finding of waiver against

Defendants.  *See* Dkt No. 553 at 26.  None of those cases involves a situation where, as here, a

party has filed a motion for protective order seeking a determination regarding the propriety and

scope of discovery requests propounded under Rule 33 or 34 and merely deferred the production

of a privilege log pending a ruling by the court on the scope of the discovery requests at issue.  *In

re Grand Jury Subpoena*, 274 F.3d 563, 567 (1st Cir. 2001), for example, involved a claim of

privilege by non-party intervenors as to which "the intervenors failed *without justification* to

produce a privilege log" to support their claim or otherwise provide the very basic "description

of the nature of the documents, communications or things not produced that is sufficient to

enable the demanding party to contest the claim.'").  *See Pub. Serv. Co. v. Portland Natural Gas*,

218 F.R.D. 361, 363-64 (D.N.H. 2003) (noting the inapplicability of *In re Grand Jury Subpoena*

to discovery requests propounded under Rules 33 and 34).  Nor do Plaintiffs' cases involve a

situation in which the court was asked to strike or limit the discovery requests at issue, which

would fundamentally affect the nature and scope of the search for responsive material and the

resulting subset of responsive material as to which privilege protection would be claimed.

Moreover, a privilege log is unnecessary to resolve Defendants' argument that the

communications Plaintiffs are seeking are work-product protected because the Plaintiffs already

have a description "sufficient to enable [them] to contest the claim." *In re Grand Jury*

*Subpoena*, 274 F.3d at 575.  *See also ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 233

F.R.D. 209, 213 (D.D.C. 2006) ("I do not see how additional information [in a privilege log]

would better enable plaintiffs to evaluate the applicability of work product protection to the

documents at issue.").  Plaintiffs' discovery requests target communications between Defendants

and Palestinian  targets of Plaintiffs' enforcement actions (including their counsel) regarding the

*Ungar* litigation and the *Ungar* judgment.  Where the discovery targets protected

communications, the party opposing the discovery is not required to log all potentially

responsive documents before challenging the discovery.  *See Jackson v. County of Sacramento*,

175 F.R.D. 653, 656 (E.D. Cal. 1997) ("It would be a rare case, for instance, that an attorney

could not withhold a file of correspondence with his client on the ground that it was privileged

without providing a bibliographic 'log' of the entire contents.").

**B.     The Work Product at Issue Was Prepared "by or for Another Party."**

According to Plaintiffs, "[n]either Defendant is a party to any of the pending enforcement

actions brought by the Ungars against Orascom, Canaan, the PIF, the [Pension Fund], Becont

and the PMA.  Nor are any of those entities a party to the instant action." Dkt. No. 553 at 28.

Plaintiffs then argue that, because Rule 26(b)(3)(A) "applies only to work-product prepared by or

for a party to the litigation," the "communications sent and received by the Defendants regarding the Ungars' enforcement actions are not protected work-product . . . ." *Id.*

But any work product "prepared in anticipation of [this] litigation or for trial" of the instant *Ungar* litigation by the PA or PLO falls squarely within the ambit of Rule 26(b)(3)(A) even if shared with non-adverse parties to the related enforcement proceedings. *See* Dkt. No. 527 at 17-18 (citing case law that work product is not waived through disclosure to non-adverse parties under an expectation of confidentiality). Similarly, any work product prepared by or for the parties to the enforcement actions (PIF, PMA, etc.) in anticipation of those actions or in preparation for trial of those actions was not waived through disclosure to the PA or PLO.

Of course, if the Court were to accept Plaintiffs' apparent argument that Defendants lack standing to assert work product protection for some categories of potentially responsive communications with the enforcement targets, Plaintiffs' argument, and the Court's inquiry, would not be complete. The Court should provide the enforcement targets with notice of these proceedings to allow them to intervene and assert work-product protection on their own behalf. *United States v. AT&T*, 642 F.2d 1285, 1292 (D.C. Cir. 1980) ("Without the right to intervene in discovery proceedings, a third party with a claim of privilege in otherwise discoverable materials could suffer the obvious injustice of having his claim erased or impaired by the court's adjudication without ever being heard.") (internal quotation omitted).

### C.    The Crime-Fraud Exception Is Inapplicable Here.

Plaintiffs' attempt to invade the claimed work product protection by invoking the "crime-fraud" exception (Dkt. No. 553 at 29) lacks substance and would necessarily require the Court to engage in unnecessary and irrelevant collateral litigation.

As Plaintiffs' own cases make clear, a party seeking protected material on the basis of the crime-fraud exception bears the burden to present a prima facie factual and legal case regarding

the alleged "crime" or "fraud" to which the protected material supposedly relates. *See In re*

*Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1041 (2d Cir. 1984).

Specifically, to establish that an otherwise privileged or protected communication is subject to

the crime-fraud exception, a movant must establish that there is a "reasonable basis" to conclude:

"(1) that [a party] was engaged in (or was planning) criminal or fraudulent activity when the

[privileged or protected] communications took place; and (2) that the communications were

intended by the [party] to facilitate or conceal the criminal or fraudulent activity." *In re Grand*

*Jury Proceedings*, 417 F.3d 18, 22-23 (1st Cir. 2005). Moreover, "the 'proper reach of the

crime-fraud exception when applicable does not extend to all communications made in the

course of the attorney-client relationship, but rather is limited to those communications and

documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct.'"

*Cendant Corp. v. Shelton*, 246 F.R.D. 401, 407 (D. Conn. 2007) (quoting *In re Grand Jury*

*Subpoena*, 419 F.3d 329, 343 (5th Cir. 2005)).

    Plaintiffs have failed to satisfy their evidentiary and legal burden to establish the

elements of the crime-fraud exception. First, Plaintiffs do not even attempt to make a

particularized showing regarding six of the seven enforcement targets (i.e., PMA, the Palestinian

Pension Fund, Becont, Orascom, Canaan and PCSC), which is fatal to Plaintiffs' reliance on the

crime-fraud exception as to any responsive communications or documents involving those

entities. In a wholly vague manner, Plaintiffs simply argue that alleged coordination between

Defendants and those enforcement targets based on this common interest is illegitimate because

"Defendants have **no** [] **right**" to "work together with the [Pension Fund], PIF, PMA and Becont

in order to seek to delay enforcement of the Ungars' judgment until after resolution of their Rule

60(b)(6) motion," and their efforts to do so are "unlawful and unethical." Dkt. No. 553 at 30, 31.

To support these sweeping contentions, Plaintiffs cite two inapposite cases. *See id.* (citing *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992), which held that the Foreign Sovereign Immunities Act did not foreclose enforcement of a judgment against a foreign judgment debtor); *see also id.* at 31 (citing *Overmyer v. Fidelity & Deposit Co.*, 554 F.2d 539, 543 n.4 (2d Cir. 1977), which held that it was an abuse of the legal process for a judgment debtor to bring a "sham suit and appeal" that had absolutely no legal support solely to delay payment).

Even assuming the existence of communications between Defendants and those enforcement targets, there would be nothing unlawful or unethical about a judgment debtor communicating with third-parties whose assets have been wrongly attached in an unwarranted attempt to satisfy the obligations of a judgment debtor, particularly when the underlying "obligation" is a judgment which is the subject of a Rule 60(b)(6) vacatur motion.[8]  Accordingly, Plaintiffs have presented no basis, let alone a "reasonable basis," for the Court to conclude that the crime-fraud exception would apply to communications with any of these other enforcement targets.

Plaintiffs' assertion of the crime-fraud exception as to communications between Defendants and PIF also fails.  Leaving aside the Plaintiffs' attempted application of the crime-fraud exception to all communications between Defendants and PIF, Plaintiffs have failed to provide a factual or legal basis on which to conclude that any possible communications between

---

[8]  In this regard, it cannot be ignored that Plaintiffs manufactured the need for such communications by improperly arrogating to themselves the power to expand this Court's injunction order when they filed their Notice of Injunction in other jurisdictions specifically naming such third-parties and implying that this Court had already adjudicated Plaintiffs' entitlement to the assets of those third-parties.  Having employed such improper self-help measures, Plaintiffs are hardly in a position now to claim that communications between Defendants and such improperly enjoined third-parties give rise to some sort of actionable crime or fraud.

Defendants and PIF regarding the enforcement of the underlying judgment regarding the assets of PIF outside this jurisdiction relate to or constitute a "crime" or a "fraud."

For the reasons described in Part II.B. above, the legal and factual bases for Plaintiffs' collection efforts against PIF are highly questionable and are the subject of litigation outside of this jurisdiction. Having previously encouraged this Court to issue the creditor's bill judgment in the absence of PIF and without any assets of PIF within this jurisdiction at the time, Plaintiffs have the temerity to ask this Court to conclude that a "crime" or a "fraud" has been committed outside of this jurisdiction (indeed, according to Plaintiffs, in foreign countries) involving PIF and Defendants and relating to a creditor's bill judgment that is being challenged by PIF in another jurisdiction -- all for purposes of a vacatur proceeding that, if successful, would lead to the elimination of the underlying obligation on which the creditor's bill judgment is dependent. It would not be legally sound or a proper use of judicial resources for this Court to accept this new invitation from Plaintiffs.

Accordingly, because Plaintiffs have utterly failed to particularize a reasonable basis to suspect Defendants' communications with any of the enforcement targets are in furtherance of a "crime or a fraud," there is no basis on which to find that they lost their work-product protection.[9]

---

[9] If this Court were to conclude that Plaintiffs somehow satisfied their initial evidentiary and legal basis for application of the crime-fraud exception, the Court should refrain from reaching any final determination regarding the discovery at issue until all interested parties, including the enforcement targets, have received notice of Plaintiffs' allegations and have been provided an opportunity to defend their interests, including the protected communications and documents.

**D.    Rule 26(b)(3)(A)(ii) Does Not Provide Grounds to Compel Production of the Work Product that Plaintiffs Seek.**

Lacking any other basis for challenging the work product protection for the requested communications and documents, Plaintiffs claim "substantial need" for the protected material pursuant to Rule 26(b)(3)(A)(ii).  As noted above, however, there is no basis for invoking the "substantial need" exception when the requested materials would not lead to the discovery of admissible evidence for the vacatur hearing and would submerge this Court in collateral litigation involving the rights of non-parties which are currently being adjudicated in other jurisdictions.  Moreover, a generic claim of "substantial need" certainly would not entitle Plaintiffs to all responsive communications and documents.  For example, any responsive material revealing the mental impressions of attorneys regarding ongoing litigation is a type of work product that is almost never discoverable, even in the face of a claim of substantial need. *Axler v. Scientific Ecology Group, Inc.*, 196 F.R.D. 210, 213 (D. Mass. 2000) ("Rule 26(b)(3) admonishes courts ordering the discovery of work-product 'to protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney . . . the litigation.' Thus, before disclosure of attorneys' opinion work-product is ordered a 'far stronger showing of necessity and unavailability by other means is required.'") (quoting Fed. R. Civ. P. 26(b)(3) and *Upjohn Co. v. United States*, 449 U.S. 383, 401-02, (1981)).

For all of the reasons set forth above, Plaintiffs have failed to demonstrate entitlement to the requested communications and documents under the "substantial need" factor set forth in Rule 26(b)(3)(A)(ii).

In sum, on the basis of the present record, and without the need for the production of a privilege log or any *in camera* review, the Court should disallow the discovery requests at issue

on the additional ground that the potentially responsive communications and documents would constitute protected work product material.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Entry of a Protective Order Regarding Plaintiffs' Requests for Discovery of Certain Third-Party Communications should be granted.

Respectfully submitted,

Dated:  October 7, 2010

/s/ Mark J. Rochon
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Brian A. Hill (D.C. Bar #456086)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
mrochon@milchev.com
rhibey@milchev.com
bhill@milchev.com

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 7th day of October 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> djs@mtlhlaw.com
>
> Max Wistow
> Wistow and Barylick Incorporated
> 61 Weybosset Street
> Providence, RI 02903
> mwistow@wistbar.com
>
> *Attorneys for Plaintiffs*

/s/ Mark J. Rochon