UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

      Plaintiffs – Judgment Creditors,

v.                                                      C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

      Defendants – Judgment Debtors.

### REPLY IN FURTHER SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS' MOTION TO PRECLUDE, TO COMPEL AND FOR RELATED RELIEF

### Introduction

The Plaintiffs-Judgment Creditors ("Ungars") respectfully submit this Memorandum in further support of their Motion to Preclude, to Compel and for Related Relief (dkt. # 518) and in reply to the Amended[1] Opposition (dkt. # 538) to the Ungars' motion filed by Defendants-Judgment Debtors PA and PLO (collectively: "Defendants").

**I.    Defendants' Failure to Seek Real-Time Relief from the Court**

Much of Defendants' opposition to the instant motion seeks to persuade the Court that the Ungars are not entitled to the relief sought in their motion because they failed to seek relief from this Court during the course of Mr. Fayyad's deposition.

---

[1] Defendants moved to amend their opposition to the Ungars' motion. Dkt. # 537. The Ungars consented to that motion (dkt. # 557) and the Court granted it on October 5, 2010. Accordingly, the instant Reply addresses Defendants' amended opposition (dkt. # 538 at Attachment A).

In fact, as shown below, Defendants demanded that the Fayyad deposition take place at a time that Magistrate Judge Martin was available (late afternoon Israel-time) – but failed to seek any rulings from him regarding issues that were contested during the course of the deposition.

Accordingly, before responding to the specific arguments raised by Defendants, the Ungars will address and refute the Defendants' general claim that the Ungars were remiss in not contacting the Court to seek rulings during the course of the deposition.

### A. Defendants' Unilateral Imposition of Conditions on the Fayyad Deposition

The "star" actor and witness prominently featured by Defendants in their motion to vacate is current PA Prime Minister Salam Fayyad. *See* dkt. # 408, *passim*.[2]

Accordingly, soon after the Court issued its order authorizing the parties to conduct discovery regarding Defendants' motion, the Ungars noticed Fayyad's deposition.

Defendants responded to the notice of Fayyad's deposition by raising various and sundry obstacles and objections intended to delay it, including the claim that Fayyad's time had been wasted by irrelevant questions in a deposition in an unrelated case. Exhibit B.

Solely in order to deny Defendants any pretexts[3] with which to delay the deposition, the Ungars' counsel offered assurances and mechanisms to resolve the putative "issues" raised by

---

[2] Because Defendants elected to make Fayyad their main witness no heed should be paid to their complaints about impositions on his time. Moreover, in *Saperstein v. PA*, Civ. No. 04-20225 (S.D.Fla.), Defendants *voluntarily* produced Fayyad for deposition both as a Rule 30(b)(6) witness and as a witness in lieu of a lower-ranking PLO official. Yet, the *Saperstein* court found that Defendants "***didn't even bother***" to educate Fayyad about the subjects of the deposition, that Fayyad was "***not familiar at all***" with the topics in the deposition notice and that Defendants' use of Fayyad as witness in lieu of the lower-ranking official was "***specious***," and ordered Defendants to produce the PLO official originally sought and a knowledgeable Rule 30(b)(6) witness. *See* Exhibit A at 57:6 – 60:14 and at 78:1-13.

The fact that Defendants ***voluntarily*** produced Fayyad to be deposed instead of a lower-ranking PLO official and as a Rule 30(b)(6) witness – when he had no knowledge of the deposition topics, as the *Saperstein* court found – constitutes further grounds to disregard Defendants' fulsome griping before this Court about Fayyad being too busy to be re-deposed.

2

Defendants including, *inter alia*, an offer "to hold the deposition in the afternoon Jerusalem-time, on a day that the Court is available, ***so that you can phone the Court*** and seek to bar lines of questioning that you believe are irrelevant." Exhibit C (emphasis added).

Defendants accepted the Ungars' offer to start the deposition in the afternoon Jerusalem-time (which is morning EDT), and on July 21, 2010, the parties conferred telephonically with Magistrate Judge Martin to inform him of their plan and to ascertain his availability.

Accordingly, pursuant to the Defendants' request, Mr. Fayyad's deposition began at 4 p.m. Jerusalem time, which is 9 a.m. EDT, on July 28, 2010.

### B. Defendants Fail to Seek Relief

As Exhibits B and C clearly reflect, the sole purpose of holding the deposition at 4 p.m. Jerusalem-time was to enable the Defendants to seek rulings from the Court in real time to resolve any disagreements. Moreover, throughout the course of the deposition, Defendants frankly recognized that it was their burden to contact the Court. *See* Exhibit D at 56:5-10 ("MR. Rochon: . . . I need to discuss it with you first before I take it to the judge."); *Id*. at 61:20-61:21 ("MR. ROCHON: I'm going to have to take this to the Magistrate Judge.").

---

[3] Defendants claim in their opposition memorandum that their participation in the various terrorism cases pending against them since hiring new counsel in 2007 proves that they have abandoned their recalcitrant litigation tactics. Defs' Memo at 3-4. In fact, ***at least four federal courts*** have found that Defendants have ***persisted*** in their bad-faith litigation conduct even ***after*** changing counsel in 2007. *See Biton v. PA*, 510 F.Supp.2d 144, 146 (D.D.C. 2007) (finding that a filing by Defendants via their new counsel "represents only an effort to derail conclusion of this hoary litigation."); *Gilmore v. PA*, 675 F.Supp.2d 104, 114 n.10 (D.D.C. 2009) (terming positions asserted by Defendants via their new counsel "unmitigated 'chutzpah'" which "cast[s] doubt upon the many pages Defendants spent in their Motion and Reply assuring the Court that they had truly 'changed their spots' and would be litigating in an efficient, professional, and good faith manner."); *Knox v. PLO*, 628 F.Supp.2d 507, 509 (S.D.N.Y. 2009) ("[S]ubstantial disputed questions exist as to ... whether Defendants concealed relevant information during discovery."); *Saperstein v PA*, Civ. No. 04-20225 (S.D.Fla.), Order 8/6/09 (dkt. # 320) (finding that the Defendants have "not been cooperative" in responding to plaintiff's discovery requests).

Nevertheless, when the Ungars concluded their direct examination of Fayyad at 5:02 p.m. Rhode Island time (12:02 a.m. Israel time), *see id*. at 356:2, Defendants made no effort to contact the Court and seek an adjudication of their privilege objections. Instead, Defendants proceeded to conduct their own cross-examination of Fayyad. *See id*. at 357:24. Similarly, when the entire deposition concluded at 6:02 p.m. Rhode Island time (1:02 a.m. Israel time), *see id*. at 400:23, Defendants again made no effort to obtain a ruling from the Court on their objections.

As the Ungars' counsel made clear at the deposition, their preference was to brief any objections rather than preliminarily, and without any briefing, seek a ruling from the Court that would itself be subject to appeal. *See* id. at 62:3-62:18. Nonetheless, under the agreed deposition ground rules, which were set at Defendants' insistence, Defendants were entitled to seek rulings from the Court during the course of the deposition. Defendants failed to do so and therefore cannot now be hard to complain that none was sought.

## II. Defendants' Agreement to Limit the Substance and the Evidence to Be Offered in Support of Their "Foreign Policy Implications" Argument Is a Sufficient Solution – Provided That It Is Anchored in a Court Order

The Ungars' motion showed that Mr. Fayyad refused to answer questions relating to the substance of his conversations with U.S. government officials regarding this case on grounds of diplomatic privilege, and therefore sought an order precluding Defendants from continuing to assert their "foreign policy implications" argument in support of their Rule 60(b)(6) motion or from introducing any evidence or testimony in putative support of that argument.

While Defendants oppose this prong of the Ungars' motion they have effectively met it half-way by agreeing both to limit the substance of their "foreign policy implications" argument and limit the evidence they will present in support of that argument to materials in the public record. *See* dkt. # 538, Attachment A at 11-12.

4

Defendants' agreement to limit their evidence in support of this argument is not a *concession*; rather, it is the result *mandated* by the well established rule that when a party relies on the "state secrets privilege" (which has been construed as including "diplomatic privilege"[4]) the court is precluded from considering arguments based on the privileged information and in extreme cases – i.e. where an action or a defense to an action cannot be fairly maintained without access to the secret information – it must dismiss the action entirely. *See e.g. White v. Raytheon Co.*, 2008 WL 5273290 at *5 (D.Mass. 2008) ("While I accept plaintiffs' assertion that a prima facie case could be made against Raytheon based on information in the public domain, I see no practical means by which Raytheon could be permitted to mount a fair defense without revealing state secrets. Therefore, I have no alternative but to order the case dismissed.").

Even where the unavailability of the secret evidence does not require actual dismissal, when the governmental entity asserting the privilege is the plaintiff or the movant, the court must provide relief to the party seeking the evidence by making any "orders which the interests of justice require, including striking the testimony of a witness [and/or] finding against the government upon an issue as to which the evidence is relevant." Proposed Rule 509(e), Revised Draft of the Proposed Rules of Evidence, 51 F.R.D. 315, 375-376 (1971).[5] *See also* Wright & Graham, 26A *Fed. Prac. & Proc. Evid.* § 5691 (2010) *passim* and at n. 62 (collecting

---

[4] *See In re Grand Jury Subpoena dated August 9, 2000*, 218 F.Supp.2d 544, 559 (S.D.N.Y. 2002) ("The state secrets privilege is rarely invoked, and the branch of the privilege that concerns diplomatic or international matters is the subject of even fewer cases."); *U.S. Steel Corp. v. U.S.*, 578 F.Supp. 409, 412 (CIT 1983) (citing *Republic of China v. Nat'l Union Fire Insurance Co.*, 142 F.Supp. 551 (D.Md. 1956) as the "only case which actually discussed [the diplomatic] aspect of the privilege, comparatively free of military or intelligence implications."),

[5] While this Proposed Rule was not adopted it reflects common law. *See* Wright & Graham, 26A *Fed. Prac. & Proc. Evid.* § 5691 (2010).

5

authorities); *U.S. v. Reynolds*, 345 U.S. 1, 12 (1953) ("The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. Such rationale has no application in ***a civil forum where the Government is not the moving party***, but is a defendant only on terms to which it has consented.") (emphasis supplied).

Thus, where, as here, the governmental entity asserting the privilege is "the moving party" (*Reynolds, id.*) "it is unconscionable to allow it to … invoke … governmental privileges to deprive the [Ungars] of anything which might be material to [their] defense" of the motion. *Id*.

Therefore, Defendants' agreement to limit the substance of their "foreign policy implications" argument and limit the evidence they will present in support of that argument to materials in the public record is required by their invocation of diplomatic privilege, and the Ungars have no objection to withdrawing this prong of their motion provided that Defendants' agreement to so limit their argument and evidence is expressly anchored in a court order.

A formal court order is necessary in light of Defendants' implicit claim that once discovery is completed they will be free to abandon their privilege claim and rely at the hearing in this matter on the communications that they are currently shielding as privileged. *See* dkt. # 538, Attachment A at 12 ("[C]ases where a party invoked a Fifth Amendment privilege to avoid being deposed or providing discovery only later to seek to defend through use of information withheld pursuant to that earlier invocation have no application here.").[6]

---

[6] Defendants also claim that Fayyad was never instructed not to answer questions regarding his communications with U.S. officials and that at points during the deposition he did answer *other* questions on this topic. Dkt. # 538, Attachment A at 8-11. Neither claim is true. Defendants' counsel expressly instructed Fayyad not to answer. *See* Exhibit D at 63:4-63:22 ("I'm not going to let him answer that now

6

### III. Defendants' Should Be Required to Produce Fayyad for Further Examination Regarding the Authorship of His Declaration

The second prong of the Ungars' motion seeks to compel Fayyad to testify regarding the assistance he received in preparing his December 24, 2007 declaration, and the June 18, 2005 letter attached thereto, that were submitted by Defendants in support of their Rule 60(b) motion.

Defendants are seeking to block further questioning on this topic by filing an errata sheet containing a telegraphic attorney-crafted answer to the questions that Fayyad refused to answer.

This tactic is wholly inappropriate and constitutes an attempted end-run around the Federal Rules of Civil Procedure and the Ungars' right to depose Fayyad.  Although Rule 30(e) permits changes of "substance," "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000); *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, --- F.Supp.2d ----, 2010 WL 1779911 (N.D. Ind. April 20, 2010).  As the Tenth Circuit has stated:

> [Rule 30(e)] cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

*Burns v. Board of County Com'rs of Jackson County*, 330 F.3d 1275, 1282 (10th Cir. 2003).

Defendants' errata sheet is "considerably more than a mere explanation or correction of the videotaped deposition." *See Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 629 (1st Cir. 1988). Moreover, Defendants' errata sheet deprives the Ungars of their right to cross-

---

on diplomatic privilege grounds."). And the "responses" to *other* questions by Fayyad were both empty of substance (i.e. amnesiacal) and irrelevant to the *contested* question that he was instructed not to answer.

In any event, given the limitations to which Defendants have agreed regarding their "foreign policy implications" argument, these points are moot.

examine Fayyad regarding his response. *See id.* at 629 (citing *Rogers v. Roth*, 477 F.2d 1154 (10th Cir. 1973) for "permitting written changes in a witness's deposition because the witness gave another deposition after the changes were made, and he was examined at length as to the reasons for the changes").

Even in the two district court opinions Defendants have cited for the proposition that broader substantive changes may be made to deposition testimony, *Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F.Supp.2d 95 (D. Mass. 2001) and *Allen & Co. v. Occidental Petroleum Corp.*, 49 F.R.D. 337, 340 (S.D.N.Y. 1970), the courts did not permit substantive changes to be made without an opportunity for cross-examination of the deponent on the changes. *See Tingley*, 152 F.Supp.2d at 121 (ordering deposition reconvened); *Allen & Co.*, 49 F.R.D. at 341 (finding deponent had already been cross-examined on the subject of his changed answer, since that change merely conformed the deponent's sometimes inconsistent testimony).

The plain fact, confirmed by Defendants' submission of the errata sheet, is that Defendants baselessly claimed attorney-client privilege. Since Defendants have withdrawn that claim of privilege and supplied certain answers the Ungars are now entitled to cross-examine Fayyad about those answers. Defendants should not be allowed to use the errata sheet to unilaterally transform Fayyad's Rule 30 oral deposition into a Rule 31 deposition on written questions, without the opportunity for the spontaneous colloquy that an oral deposition provides. *See Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 549 (S.D.N.Y. 1989) (inadequacies of depositions on written questions as substitutes substitute for oral depositions).

In their wisdom, the Federal Rules "specifically give a party the right to question a witness by oral deposition" and give "the party, not the witness, the option of conducting a

deposition by written questions." *National Life Ins. Co. v. Hartford Acc. and Indem. Co.*, 615 F.2d 595, 599 (3rd Cir. 1980). Defendants should not be allowed to circumvent this Rule.[7]

### IV.  Defendants Mischaracterize the Law Relevant to Their Assertion of Attorney-Client Privilege As to Fayyad's Understanding of His Own Declaration

Even as Defendants waive certain assertions of attorney-client privilege by way of errata sheet, they persist in maintaining unjustified assertions of attorney-client privilege as to Fayyad's understanding of the statements he made in his own Declaration, citing *Thurmond v. Compaq Computer Corp.*, 198 F.R.D. 475 (E.D. Tex. 2000). In that case, the court observed:

> Defendant's privilege claim as to these matters should also be rejected in accordance with the many cases cited above that hold the attorney-client privilege does not reach facts within the client's knowledge, even if the client learned those facts through communications with counsel. Mr. Newcomb could have answered the questions posed above-about what he knew-without ever volunteering that he learned the facts from counsel. The questions were aimed at determining the level of Mr. Newcomb's knowledge, not the source of the knowledge. The fact that some (but not all) of the cited cases appear to require disclosure only of those facts that counsel obtained independent of confidential client communications is of no consequence here. Even if this limitation is observed, defendant offered no evidence regarding the source of counsel's information, and thus failed to meet its burden of establishing the applicability of the privilege.

*Thurmond*, 198 F.R.D. at 483.

How and why Defendants believe that *Thurmond* "supports the invocation of the privilege in this circumstance and counsel's instruction not to answer the question" (dkt. # 538, Attachment A at 14) beggars belief.

---

[7] Defendants claim they find it "difficult to imagine" what sort of follow-up questions the Ungars may have. Defendants are entitled to their paucity of imagination, but they are not entitled to a preview of the Ungars' questions nor to curtail the Ungars' right to examine Fayyad without obstruction.

## V. Conclusion

Accordingly, the Ungars' motion should be granted.

Dated: October 15, 2010    Plaintiffs-Judgment Creditors,
by their Attorneys,


/s/ David J. Strachman
David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com


Max Wistow #0330
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)
mw@wistbar.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on October 15, 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically serve:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/s/ David J. Strachman