IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * *
THE ESTATE OF YARON UNGAR, ET AL.,      Case No:

        Plaintiffs                      00-105L

vs.

THE PALESTINIAN AUTHORITY;
ET AL.,

        Defendants
* * * * * * * * * * * * * * * * * *

-------------------------------------------------------
VIDEOTAPED RULE 30 DEPOSITION OF:
SALAM FAYYAD
EAST JERUSALEM
JULY 28, 2010
-------------------------------------------------------


Videotaped Rule 30 deposition of SALAM FAYYAD, taken in

the above-entitled cause pending in the United States

District Court, District of Rhode Island, pursuant to

notice, before ISABELLE KLEBANOW, RPR, CT No. 311,

Stenographer, at the Ambassador Hotel, East Jerusalem,

on Wednesday, the 28th day of July, 2010, at 4:15 p.m.

Jerusalem time.


REPORTED BY:  ISABELLE KLEBANOW, RPR, CT NO. 311

## Page 2

1  APPEARANCE OF COUNSEL:
2  FOR PLAINTIFFS:
3    WISTOW & BARYLICK
     By:  MAX WISTOW, ESQ.
4    61 Weybosset Street
     Providence, Rhode Island 02903
5    (401) 831-2700
     mw@wistbar.com
6
7  McINTYRE, TATE & LYNCH
     By:  DAVID J. STRACHMAN, ESQ.
8    321 South Main Street
     Providence, Rhode Island 02903
9    (401) 351-7700
10 FOR DEFENDANTS:
11   MILLER & CHEVALIER CHARTERED
     By:  MARK J. ROCHON, ESQ.
12   By:  LAURA G. FERGUSON, ESQ.
     By:  ANDREW WISE, ESQ.
13   655 Fifteenth Street, N.W., Suite 900
     Washington, D.C. 20005-5701
14   (202) 626-5800 / Fax (202) 626-5801
     Mrochon@milchev.com
15   Lferguson@milchev.com
     Awise@milchev.com
16
17
   ALSO PRESENT:
18
     Mark Coopersmith, Videographer
19   Mordechai Haller
     Nitsana Darshan-Leitner
20   Osama Saadi
     George Salem
21
22
23
24
25

## Page 3

1              INDEX
2
3
4  DEPONENT     DIRECT  CROSS  REDIRECT  RECROSS
5  SALAM FAYYAD
6  BY ATTORNEY WISTOW  8        369, 399
7  BY ATTORNEY ROCHON       357        397
8
9
10
11           EXHIBITS
12 NO.   DESCRIPTION              PAGE
13  1   Judge Marrero's Order, Knox Case    34
14  2   Letter, 2-29-08         43
15  3   Letter, 8-15-05      66
16  4   Letter, 4-27-06        101
17  5   Fayyad Declaration       114
18  6   Letter, June 18, 2005      124
19  7   Letter, 1-12-07        266
20  8   Power of Attorney        301
21  9   New York Times Article, 12-18-07   305
22 10   Order by Judge Lagueux    331
23 11   Download from UK Foreign Office   338
24 12   Israel Ministry of Foreign Affairs
25       Document

## Page 4

1              P R O C E E D I N G S
2       THE COURT REPORTER:  This is the videotape
3  deposition of Salam Fayyad taken by the Plaintiffs in
4  the matter of Ungar, et al. versus the Palestinian
5  Authority, et al., US District Court, District of Rhode
6  Island, Case No. 00-1056, held at the Ambassador Hotel
7  in East Jerusalem on July 27, 2010, at 4:00 p.m.
8       The court reporter is Isabelle Klebanow,
9  Post Office box 29077, East Talpiot, Jerusalem 91290.
10 The videotape specialist is Mark Coopersmith.
11      And counsel will now state their appearance.
12      MR. ROCHON:  Thank you.  On behalf of the
13 Palestinian Authority and the PLO, you have Mark Rochon,
14 Laura Ferguson, Andrew Wise.  Also here are George Salem
15 and Osama Saadi, who are counsel for the Prime Minister.
16      MR. WISTOW:  Max Wistow for the Plaintiffs.
17      MR. STRACHMAN:  David Strachman for the
18 Plaintiffs.
19      MS. LASHNER-LEITNER:  Nitsana Lashner-
20 Leitner.
21      THE COURT REPORTER:  Okay.  I need to --
22      MR. WISTOW:  -- swear the witness.
23      THE COURT REPORTER:  Do you swear to tell
24 the truth, the whole truth, and nothing but the truth,
25 so help you God?

## Page 5

1       MR. FAYYAD:  I do.
2       THE COURT REPORTER:  Thank you very much.
3  DIRECT EXAMINATION BY MR. WISTOW:
4    Q.  Firstly, I wanted to ask you, how should I
5  address you?  Is it all right if I call you Mr. Fayyad?
6    A.  That's fine.  Yes.
7    Q.  I understand that, at the present time, you are
8  overseeing the American cases involving victims under
9  the American Anti-Terrorism Act on behalf of the PLO and
10 the PA, is that true?
11   A.  As part of my over-all responsibility as Prime
12 Minister and Minister of Finance.
13   Q.  I'm not suggesting that's your sole duty.  But
14 that is part of your duties, is it not?
15   A.  Part of what I do, yes.
16   Q.  And you've tried to familiarize yourself with the
17 Ungar case, have you not?
18   A.  Yes.
19   Q.  And do you understand where the Ungar case sits
20 at the present time in the Federal Court?  What its
21 status is?
22   A.  Yes, I do.
23   Q.  Would you tell me what your understanding is.
24   A.  My understanding is that I am being deposed here
25 in connection with our attempt to have the case

Fayyad

Page 6

1  litigated.
2      Q.  You understand that, at the moment, there's what
3  we call a default judgment?  Do you understand that
4  term?
5      A.  I do.
6      Q.  Okay.  Is there something comparable in
7  Palestinian law?
8      A.  Yes.  There is.
9      Q.  What is it called in English?  Can you translate
10  in English the term you would use?
11      A.  Default judgment --
12      Q.  Okay.
13      A.  -- or judgment in absentia.  Something like that.
14  In Arabic, I think that's the translation.
15      Q.  Okay.  So, obviously, I'm not familiar with
16  Palestinian law -- and I suppose you're not an expert in
17  it -- but you have some general knowledge, do you not?
18      A.  Yes.  Also in terms of familiarity with the case.
19  The fact that, as part of my over-all responsibilities,
20  I follow up on this case, it doesn't mean that I will
21  know all the details associated with it.
22      Q.  Of course.  I understand.  But what I'd like to
23  explore with you just a little bit --
24      A.  Yes.
25      Q.  -- is, in -- there are lawsuits brought under the

Page 7

1  authority of the Palestinian Authority, are there not?
2  Under the laws in Palestine?
3      A.  There are, yes.
4      Q.  Yes.  And I assume that the person who's bringing
5  the lawsuit serves some kind of papers on the person
6  that's being sued?
7      A.  Yes.
8      Q.  And the person who's being sued is required by
9  the laws of Palestine to answer the case --
10      A.  Correct.
11      Q.  -- to respond?
12      A.  Correct, yes.
13      Q.  And if they don't, then one of the risks is
14  ultimately a default judgment?
15      A.  Yes.  That's correct.
16      Q.  Okay.  Now, I don't know how familiar you are
17  with the particular steps that this case has gone
18  through, so let me just ask you.
19      Have you ever read the motion that was filed on
20  behalf of the PLO and the PA -- let me stop and withdraw
21  that.
22      If I use the terms PLO for the Palestine
23  Liberation Organization --
24      A.  Yes.
25      Q.  -- and PA for the Palestinian Interim

Page 8

1  Authority -- frankly, I'm not even sure that --
2      A.  Palestinian Authority.
3      Q.  All right.  If I use PLO and PA, we're going to
4  understand each other?
5      A.  Yes.
6      Q.  Are you familiar with the motion itself
7  that was filed on behalf of the PLO and the PA to vacate
8  the default judgment?
9      A.  I'm familiar of the fact that actually there is
10  such a motion, but not -- you know, I'm not too familiar
11  with the details of it.
12      Q.  Have you ever read it?
13      A.  No.
14      Q.  Okay.  You know that you submitted a declaration
15  in support of the motion?
16      A.  Yes.
17      Q.  Okay.  And I'm going to read you from a small
18  portion of the motion.
19      MR. WISTOW:  I'm not going to make it an
20  exhibit because I don't think it's appropriate to make
21  exhibits out of pleadings in the case.
22      I'm happy to -- if you don't have the
23  motion, I'm happy to --
24      MR. ROCHON:  We'll take a copy.
25      MR. WISTOW:  I don't have a copy.  I didn't

Page 9

1  bring copies of the motions.  I thought you would have
2  them.
3      Does anybody have your own motion?
4      MR. ROCHON:  We don't have the motion here.
5      MR. WISTOW:  If you want to look over my
6  shoulder to see that I'm not misreading it, or you'll
7  take my representation that I'm reading it correctly,
8  whichever you like.
9      MR. ROCHON:  Now that we started colloquy,
10  I'll be objecting on a form basis to leading questions.
11  And I didn't want to interrupt you before, and you
12  started with a leading matter.
13      But I just want to let you know I will be
14  objecting.  I'm sure you'll make a decision as to
15  whether you wish to correct that or not.
16      MR. WISTOW:  Yes.
17      Q.  Well, let me just see if I understand your
18  relationship to this lawsuit.
19      A.  Yes.
20      Q.  You understand there's a judgment against the PA,
21  correct?
22      A.  I do.
23      Q.  And that's for -- do you know approximately how
24  much?
25      A.  Originally $116 million, if I remember correctly.

Fayyad

## Page 10

1  Q. And you know it's accrued interest?
2      MR. ROCHON:  Objection to form.
3  A. Pardon me?
4  Q. You know it's accrued interest?
5      MR. ROCHON:  Objection to form.
6  A. No, I don't.
7  Q. Okay.  You know it's at least $116 million?
8      MR. ROCHON:  Objection to form.
9  Q. Do you?  Keep going.  Do you?
10     MR. ROCHON:  Objection to form.
11  Q. Yes.  But would you please answer the question?
12  A. Can you please repeat the question, because I was
13 distracted.
14  Q. Okay.  Do you understand that there's a judgment
15 against the PA for approximately $116 million?
16  A. I do.
17  Q. All right.  And you are the Prime Minister of the
18 Palestinian Authority, are you not?
19  A. Yes, I am.
20  Q. And you would like to see that judgment vacated,
21 would you not?
22     MR. ROCHON:  Objection to form.
23     MR. WISTOW:  I'm trying to establish
24 adversity.  I mean I think this is kind of silly, and
25 that's why I want to lead because I think he's an

## Page 11

1 adverse witness.
2      I really -- I don't want to get into
3 colloquy with you.  I don't want to get into a fight.
4 But I think we're wasting time to suggest that this is
5 an adverse witness -- not an adverse witness -- and I
6 can't lead him.  But --
7      MR. ROCHON:  You know, that's what I'm
8 suggesting.  You could have -- give me a standing
9 objection to leading questions, and we can argue at a
10 later date.
11     MR. WISTOW:  Of course.
12     MR. ROCHON:  But I -- so that I --
13     MR. WISTOW:  I don't want to -- if the only
14 objection is that it's leading, you don't have to make
15 it.  I'll agree to that.
16     MR. ROCHON:  So a standing objection to all
17 leading questions?
18     MR. WISTOW:  Yes.  Yes.  I don't have any
19 problem with that.
20     MR. ROCHON:  And you don't need me to tell
21 you when I think you've led or not.  We'll decide that
22 later.
23     MR. WISTOW:  I'm going to tell you right now
24 that almost everything I do, with relatively few
25 exceptions, is going to be leading questions.  Okay?

## Page 12

1      MR. ROCHON:  Okay.
2  Q. You do want to see the default vacated, do you
3 not?
4  A. I would like to see us able to defend ourselves.
5  Q. Can you possibly answer my question directly?
6  A. I have.
7  Q. No.  With all due respect --
8  A. Yes.
9  Q. -- would you like to see the default vacated?
10 Could you please answer that yes or no.
11     MR. ROCHON:  Objection to form.
12  A. As part of our effort to try to have ourselves
13 defense in the court of law in the United States, yes.
14  Q. I'm going to try again.
15  A. Yes.
16  Q. We're going to be here a long time, and I'm going
17 to ask --
18  A. -- and I'll ask the same way, with all due
19 respect.
20     MR. ROCHON:  Objection.
21  Q. If necessary, I'm going to ask the US court to
22 allow additional time.
23  A. Yes.
24  Q. I'm asking you, very simply, for whatever the
25 reason, would you like to see the default judgment

## Page 13

1 vacated --
2      MR. ROCHON:  Objection.
3  Q. -- yes or no?
4  A. I would like to see us able to defend ourselves
5 in the courts of law.
6  Q. Are you unwilling to answer my question yes or
7 no, sir?
8  A. The objective is to have a chance to defend
9 ourselves.
10     MR. WISTOW:  Move to strike.
11  Q. Are you unwilling to answer my question yes or
12 no?
13  A. In the sense of what I have just said to you, the
14 answer is yes, because my understanding is that it's a
15 process we have to go through in order for us to be able
16 to defend ourselves.
17  Q. So I'm going to try yet again.
18  A. Yes.
19     MR. ROCHON:  Mr. Wistow --
20     MR. WISTOW:  I'm going --
21     MR. ROCHON:  -- we're going to need to get
22 the Magistrate Judge earlier.
23     MR. WISTOW:  Well, just instruct him not to
24 answer.
25     MR. ROCHON:  He's answered enough times.

Fayyad

Page 14

1  You can't tell him how to answer a question.
2      MR. WISTOW:  Then instruct him not to
3  answer.
4      MR. ROCHON:  I'm not going to instruct him
5  not to answer, but you can't instruct him how to answer.
6      MR. WISTOW:  What you're doing now is the
7  very colloquy that's prohibited.  I'm going to ask him
8  one more time, and I ask you to please -- I moved to
9  strike his answer, and I'm asking him --
10     Q. -- is it your desire to see the judgment by
11 default vacated, for whatever reason?
12     A. Yes, for the reason I mentioned.  For the reasons
13 I mentioned.
14     MR. WISTOW:  I move to strike everything
15 after yes.
16     Q. Now, I'm going to read you --
17     MR. ROCHON:  Mr. Wistow, we'll have an
18 agreement we'll deal with your motions to strike at some
19 later time, not now?  You don't want me to argue them
20 now, do you?
21     MR. WISTOW:  To whom?
22     MR. ROCHON:  Well, that's what I mean.
23     MR. WISTOW:  I just want the Court to know
24 that I moved to strike.
25     A. Can I ask a question myself?

Page 15

1      Q. Sure.
2      A. Is it part of my right to actually explain what
3  it is that I'm saying?
4      Q. I think that's best left to the Court to decide.
5  I take the position that --
6      MR. WISTOW:  Is it okay if I answer him?
7      MR. ROCHON:  (Indicating).
8      A. The Court is not going to be able to decide if he
9  just sees yes to an answer without understanding the
10 motive.
11     Q. Why don't you assume --
12     A. Yes.
13     Q. -- that a Court is capable of handling a case
14 appropriately.  Could you do that, please?
15     MR. ROCHON:  Objection.  Mr. Wistow, you're
16 arguing with the witness.
17     MR. WISTOW:  No, I'm not.  I'm not trying to
18 argue.  Let me just read to him something from the
19 motion.  Did you say you want to look over my shoulder
20 or accept my representation?
21     MR. ROCHON:  I didn't say anything.  Go
22 ahead.
23     Q. All right.  This is from page 38 of the motion
24 that was filed on December 28, 2007, by your counsel in
25 the case.

Page 16

1      So, on page 38, and it says, "As Prime Minister
2  Fayyad's declaration makes clear, this judgment has
3  already been the subject of diplomatic communications at
4  the highest levels between our country's representatives
5  in the State Department and the governing officials in
6  the occupied territories.
7      If left intact, the judgment threatens to
8  undermine the relationship between the United States and
9  the Palestinian government, a relationship that the
10 executive branch of the United States government has
11 categorized as being crucial to the Israeli-Palestinian
12 peace process."
13     You understand what I've just read?
14     A. I do.
15     Q. Okay.  Now, I want to talk a little bit about the
16 contacts that are referred to there -- that is, between
17 our country's representatives and the governing
18 officials in the occupied territories.
19     Have you discussed this -- by the way, the
20 governing officials in the occupied territories, I
21 assume are Israeli officials?  Is that's what meant by
22 that?
23     A. I did not understand it that way.
24     Q. Okay.  How did -- tell me what you understand.
25     A. I understood it as communications between us in

Page 17

1  the Palestinian Authority and the United States.
2      Q. Okay.  Fair enough.
3      Now, would you tell me whether or not you've
4  reviewed any documents prior to coming here to help you
5  recollect anything about those contacts.
6      A. I have not reviewed any documents.
7      Q. At all?
8      A. Not at all.
9      Q. Nothing whatever?
10     A. No.
11     Q. When is the last time you've looked at any
12 documents that relate to this case?
13     A. Probably around the time I made the declaration
14 in connection with the motion.  Probably.
15     Q. In 2007?
16     A. That's probably true.
17     Q. Do you know when the motion was made?
18     A. It must have been the second half of the year,
19 towards the end of the year probably.
20     Q. Of 2007?
21     A. 2007, yes.
22     Q. Okay.  So that's the last time you would have
23 looked at any of these documents, is that fair?
24     A. I'm thinking, because I just need to make sure
25 that I'm answering you truthfully.

Fayyad

Page 18

1   Q. Take your time. Take your time.
2   A. Apart from flow of work -- usually
3  communications, telephone calls that I got on this
4  matter -- I believe that's true.
5       So apart from whatever things that happened
6  in the context of briefing me as to what was going on, I
7  believe that's the last time I saw the documentation
8  related to this case.
9   Q. I want to make sure I understand you.
10  A. Yes.
11  Q. When is the last time you remember looking at any
12 documents? That's all I'm asking you. The last time
13 you remember.
14      MR. ROCHON: Objection to form.
15  A. It was around the time of filing. Around the
16 time of filing.
17  Q. So what you're saying --
18  A. Yes.
19  Q. -- is there may be other times, but you don't
20 remember?
21  A. I don't really remember. I don't believe that to
22 have been the case.
23  Q. Okay.
24  A. As I said, just to make sure that I'm telling you
25 what I know about this and that I'm answering correctly.

Page 19

1   Q. Okay.
2   A. Apart from briefings that I got from time to time
3  in the course of work via lawyers, but that's about it.
4   Q. I'm confused. You said apart from briefings?
5   A. Yes.
6   Q. Do you remember seeing any --
7   A. No, no, no.
8   Q. You must --
9   A. But, you know --
10  Q. Please.
11  A. Okay.
12  Q. Please.
13  A. Yes.
14  Q. As a courtesy to the stenographer, we can't both
15 talk at once.
16  A. I understand. Okay.
17  Q. So if you'll let me finish the question, it would
18 be good; and I'll try to not interrupt and let you
19 finish the answer.
20      Fair enough?
21  A. Absolutely.
22  Q. Okay. So the way it stands is, the last time you
23 have an actual recollection of seeing any documents
24 which represent communications between the PA and PLO
25 and the American government regarding the Ungar lawsuit

Page 20

1  was back in 2007, is that fair?
2   A. That's my recollection, yes.
3   Q. Okay. Now, can you tell me what documents you
4  recollect seeing back then, before you wrote your
5  declaration?
6   A. Well, I believe those letters that I myself, as a
7  matter of fact, wrote to the Secretary of State,
8  Condoleezza Rice, on this matter.
9       There was also -- there was also some
10 communication later when I was outside of government.
11 But I'm not really sure -- I'm not believing that.
12      But I know of the existence of other
13 correspondence during the period when I was outside the
14 government. Sometime in 2006, it must have been.
15  Q. When you say outside of the government, is that
16 when you were with the Palestine Legislation --
17 Legislative Council?
18  A. That's correct. That's correct.
19  Q. And the document you're referring to when
20 you were with the Palestine Legislative Council, what
21 was that document?
22  A. No. If I may correct --
23  Q. Sure.
24  A. -- I don't know if that's what you meant to ask.
25      If you're asking about the document I myself

Page 21

1  wrote, or letter I myself wrote, that happened before.
2   Q. No, no. That's not what I'm asking.
3   A. Okay.
4   Q. I'm asking -- by the way, let me just back up
5  just a little bit.
6   A. Yes.
7   Q. You obtained a Ph.D. in the United States at the
8  University of Texas, correct?
9   A. That's correct.
10  Q. And they do speak -- I shouldn't be facetious --
11 and you're fluent in English, are you not?
12  A. You be the judge of that. I don't know.
13  Q. Well, how do you feel about it?
14  A. Fairly comfortable.
15  Q. Good. It was discussed -- whether you know this
16 or not -- it was discussed whether or not you need a
17 translator, and it was represented you could do the
18 deposition in English.
19      Are you aware of that?
20  A. I am not really aware of that.
21  Q. Okay. But you're comfortable doing this in
22 English?
23  A. I am.
24  Q. Okay. If I ask you any question --
25  A. Yes.

Fayyad

| Page 22 |
| --- |

1    Q. -- where you're not absolutely sure of my
2    meaning, please tell me --
3    A. Yes.
4    Q. -- and I'll try to rephrase it so that you and I
5    are sure we're talking about the same thing at all
6    times.
7        Is that agreeable?
8    A. Sure.
9    Q. Okay. What I'm asking you about is any documents
10   you looked at -- at any time now --
11   A. Yes.
12   Q. -- between the PLO, the PA, and the American
13   government with regard to the Ungar case. Any
14   documents.
15   A. Yes. The document that I recall seeing around
16   that time is a document that I myself sent to then
17   Secretary of State Condoleezza Rice, when I was Minister
18   of Finance in 2005. Yes.
19   Q. Okay. And is that the only document you recall?
20   A. I'm aware that there are other documents.
21   Q. You are aware?
22   A. I'm aware there are other documents. I do not
23   recall seeing them --
24   Q. Okay.
25   A. -- or reading them. What I say is that this must

| Page 23 |
| --- |

1    have happened sometime in 2006, when I was not in the
2    government.
3    Q. All right. I'm a little bit confused. It's not
4    your fault. It's mine.
5    A. Yes.
6    Q. When you say you know there are other
7    documents --
8    A. Yes.
9    Q. -- first of all, what documents do you believe --
10   A. Correspondence.
11   Q. What are they? Letters to Condoleezza Rice? Are
12   they --
13   A. That was my understanding. There was further
14   communication between the PA and the US administration
15   in the form of letters.
16   Q. Would one of those letters be a letter from
17   President Abbas?
18   A. Probably, yes.
19   Q. Do you recollect seeing such a letter?
20   A. No.
21   Q. Do you recollect hearing that there was such a
22   letter?
23   A. Yes, I do. Yes.
24   Q. Okay. But you never saw it?
25   A. I don't believe I saw it, no.

| Page 24 |
| --- |

1    Q. Up to today, you haven't seen it?
2    A. No, I haven't.
3    Q. Okay. Do you understand -- how did you learn
4    about this letter?
5    A. You know, because, actually, when I rejoined the
6    government in the spring of 2007, we were in the process
7    of trying to actually find representation and all.
8        And I knew that we had to do this and give it --
9    treat it as a matter of priority. And, in the process,
10   you know, I learned that there was communication like
11   that.
12   Q. How did you learn? What was the mechanism?
13   A. Well, let me remember now as to how it happened.
14   Q. Please.
15   A. This takes us back to early 2007, around the time
16   when I joined the government in the spring of that year.
17       I know that there was an effort made by the
18   President's staff at the time to try to find legal
19   representation for the PA in the United States.
20   Q. President Mustafa?
21   A. President Abbas.
22   Q. Oh, I'm sorry. I misheard you. Okay. So --
23   A. The staff of the President.
24   Q. I see. I'm sorry. Okay.
25       What I'm trying to focus on right now is

| Page 25 |
| --- |

1    correspondence with the American government.
2    A. Okay.
3    Q. Are you with me?
4    A. I am.
5    Q. Okay. You told me you believe there was a
6    letter --
7    A. Yes.
8    Q. You've got to let me finish.
9        You told me that you believe there was a letter
10   from President Abbas. Yes?
11   A. I said I believe so. Now I'm trying to remember.
12   I know there was communication between the PA and the US
13   administration.
14   Q. Do you believe there was a letter from President
15   Abbas to Condoleezza Rice?
16   A. It must have been at that level, yes.
17   Q. And you believe it, correct?
18   A. I have no reason not to believe so.
19   Q. Did you ever ask anybody if you could see that
20   letter?
21   A. I mean it's not that I could not see it if I
22   wanted to.
23   Q. That's not my question.
24       MR. ROCHON: You wanted him to finish his
25   answer, I'm sure.

Fayyad

Page 26

1      MR. WISTOW: I did. Forgive me.
2    A. Yes.
3    Q. Have you finished your answer?
4    A. You know, I'm really trying to really think now,
5  with all that I have to worry about and think about it.
6      I know what this case is generally about. I know
7  generally what we're trying to do. And I know there was
8  this filing on our behalf for the purpose I mentioned,
9  and there was an effort under way.
10     I know -- I'm aware that actually there was
11  correspondence, and probably between President Abbas and
12  the Secretary. But I cannot tell you for sure right
13  now, you know, exactly what happened what day, as we
14  were doing that at the time.
15    Q. Do you have my question in mind? Do you remember
16  my question?
17    A. I do. Yes.
18    Q. What was my question?
19    A. Your question was do you believe there was the
20  letter -- ask it again.
21    Q. No, Mr. Fayyad. My question was, did you ever
22  ask anybody if you could see the letter.
23    A. I don't remember.
24    Q. Okay. Now, did you ever learn of any American
25  court asking the State Department whether they wanted to

Page 27

1  take any position in the cases against the PLO and the
2  PA?
3    A. Can you say that again, please.
4    Q. I'll withdraw it and I'll try to rephrase it.
5      Are you familiar with the term Statement of
6  Interest?
7    A. I am.
8    Q. Can you tell us, for the record, what that means?
9    A. My understanding of it is a statement made by the
10  State Department representing interests of the United
11  States in the proceedings of a certain litigation.
12     That's my understanding.
13    Q. All right. And did you have an understanding
14  whether or not, if -- you know, strike that. Let me
15  withdraw it.
16     You knew that the Statements of Interest would
17  come from the State Department?
18    A. Yes.
19    Q. And you knew that the State Department was part
20  of the executive branch of the government?
21    A. Yes.
22    Q. And these Statements of Interest would be
23  addressed to the judiciary, correct?
24    A. That's my understanding, yes.
25    Q. And you were long enough in the United States to

Page 28

1  know that we have three branches of government in the
2  United States?
3    A. I'm familiar with the system, yes.
4    Q. Right. The executive, the judiciary, and the
5  legislative?
6    A. I'm familiar with the system.
7    Q. Okay. And you understand that, in the United
8  States, the various branches are supposed to be
9  independent of each other?
10    A. I'm aware of that.
11    Q. That's one of the things we pride ourselves on.
12  Are you aware of that?
13    A. Yes.
14    Q. Okay. Now, did you understand the Statement of
15  Interest was binding on the judiciary, or was it a
16  recommendation, or did you have any understanding at
17  all?
18    A. No. Given my understanding of the system of
19  government in the United States and the relationship
20  between the various branches of government, that the
21  executive branch of government was not in a position to
22  tell the judicial what to do.
23     I understand that to be an indication or a
24  representation of certain interests.
25    Q. Okay. So you would understand that, if the

Page 29

1  judiciary refused to vacate this judgment, that that
2  necessarily would not mean that the executive branch had
3  any responsibility, correct?
4      MR. ROCHON: Objection to form.
5    A. Can you paraphrase. There are too many parts in
6  this.
7    Q. Okay.
8    A. Yes. If you can.
9    Q. You understand that all the executive branch can
10  do is make a recommendation to the judiciary, correct?
11    A. Yes. But I also -- can I add something?
12    Q. Sure.
13    A. Okay. I also understood that to be an option
14  available to the executive branch and in the expectation
15  of it having an effect.
16     I understand the difference between the executive
17  branch telling the judiciary what to do on the one hand,
18  and the executive indicating interest in certain
19  proceeding on the other, in the expectation that that
20  representation would have an effect.
21    Q. Some effect.
22    A. That's my understanding.
23    Q. It would be taken into consideration. Is that
24  your understanding?
25      MR. ROCHON: Objection. It's outside the

Fayyad

Page 30

1  scope of this witness's expertise.  Come on.
2         MR. WISTOW:  Well, he's corresponding with
3  the United States.
4         MR. ROCHON:  Understood.
5         MR. WISTOW:  You know what?  What you just
6  did -- you did it very well -- is you made a speaking
7  objection.
8         And what I'd ask you to do is either just
9  object or tell him not to answer.  Please don't say why
10  the question's no good.
11         MR. ROCHON:  I'm trying to get you to -- I
12  haven't objected very much.  I'm trying to get you to
13  questions that aren't, and I think you're doing a pretty
14  good job of it.  I'm trying to do that.
15         MR. WISTOW:  Okay.
16  Q.  I'm going to try again.
17  A.  Okay.
18  Q.  Okay.  The bottom line is you understood, and you
19  understand, that the executive can only make
20  recommendations to the judiciary, isn't that so?
21  A.  That's my understanding, with the qualification I
22  added.
23      It's an instrument, an option, a certain action
24  available to the executive in cases like this where an
25  indication or a representation of interest was going to

Page 31

1  have an effect, some effect.
2      Otherwise, it would not be there as an
3  instrument.
4  Q.  Did you believe -- did you believe that the
5  judiciary could not disregard the Statement of Interest
6  if it wished?
7  A.  Within my understanding of it, number one, that
8  definitely was a possibility at this.
9      But, at the same time, my understanding was that,
10  when the executive branch makes such a recommendation --
11  not a -- such a representation, that it was going to be
12  taken seriously and with a good probability of being
13  given adequate weight in the outcome of these things.
14      So that was my understanding.
15  Q.  Okay.
16  A.  And let me add, if I may, that, actually, in all
17  discussions that I had on litigation against us in the
18  United States cases pending --
19         MR. ROCHON:  One second.
20         MR. WISTOW:  No, no.
21         MR. ROCHON:  I'm going to instruct the
22  witness.  I am instructing the witness.
23         And the instruction is, just make sure you
24  don't refer to any conversations with counsel as you
25  answer, because you were referencing discussions about

Page 32

1  the cases.
2         MR. WISTOW:  Until I lay a proper framework
3  for it.
4         MR. ROCHON:  No.  He'll follow my
5  instructions on the privilege, not yours.  So he won't
6  reveal any --
7         MR. WISTOW:  That was directed to you.
8         MR. ROCHON:  All right.
9  Q.  So do you want to venture into that place where
10  he's asked you not to go?
11         MR. ROCHON:  Objection.
12  A.  No.  Basically, let me tell you --
13  Q.  There's no question pending, and I want to get
14  out of here on time.
15  A.  Okay.
16         MR. ROCHON:  Objection.  There was a
17  question.
18         MR. WISTOW:  What was the question?
19         MR. ROCHON:  You said, Do you want to
20  venture into that place where he told you not to go.
21  You're asking him to violate his counsel's instructions.
22         Do you want to take that to Magistrate Judge
23  Martin?
24         MR. WISTOW:  No.
25         MR. ROCHON:  Where I had a privilege

Page 33

1  objection and you ask him if he wants to follow my
2  advice?
3         MR. WISTOW:  Do you want to get excited?
4         MR. ROCHON:  I just did.
5         MR. WISTOW:  Okay.  Let's calm down.
6         MR. ROCHON:  No.  You had a question.
7  You're withdrawing it, I take it.
8         MR. WISTOW:  I am.
9         MR. ROCHON:  Fine.  Then I have nothing else
10  to say.
11  Q.  Are you aware of any American courts that asked
12  the State Department for a Statement of Interest?
13  A.  I don't know if I remember now.
14  Q.  Okay.  Maybe I can refresh your recollection.
15  Maybe not.
16      I'm going to show you a copy of an order entered
17  by Judge Marrero in Knox versus the PLO and the PA and
18  others.
19      Do you know that case?
20  A.  Knox?  Yes, I do.
21         MR. ROCHON:  If you want stipulations on the
22  court --
23         MR. WISTOW:  No.  I don't want anything,
24  okay?  I want to take this man's deposition.
25         MR. ROCHON:  If you want a stipulation --

Fayyad

Page 34

1      MR. WISTOW:  I don't want any stipulations.
2    Q.  I'm going to show you a document which I
3  represent is a true copy of an order entered by Judge
4  Marrero (indicating).
5      MR. ROCHON:  Is this Exhibit A?
6      MR. WISTOW:  It's marked as Exhibit A as it
7  appears in the motion that you filed on 12-28-077.
8      MR. ROCHON:  For the purpose of this
9  hearing, I just want to make sure --
10      MR. WISTOW:  I'd like to make it Exhibit 1,
11  so we don't have confusion.
12      MR. ROCHON:  Sure.
13      MR. WISTOW:  What I did was I took exactly
14  what you submitted.
15      (Exhibit No. 1 marked for identification.)
16  Q.  So let me clarify this, if I might.
17    What you're looking at, Mr. Fayyad, is a copy of
18  a document that your counsel submitted to the United
19  States District Court when they filed the motion to
20  vacate the judgment.
21    Do you understand that?
22    A.  I understand.
23    Q.  Okay.  Now, you want to take a look at it?
24    A.  Which part?  All of it?
25    Q.  All of it.

Page 35

1      (Witness peruses document.)
2      MR. WISTOW:  Can I get one of those back?
3  I'm sorry.
4      MS. FERGUSON:  I've marked on it.
5      MR. WISTOW:  Can I get yours back?
6      MR. ROCHON:  I've marked mine as well, but
7  it just says Exhibit 1 on it.
8      MR. WISTOW:  All right.  Can we just --
9      MR. ROCHON:  (Indicating.)
10      MR. WISTOW:  Thank you.
11    Q.  Tell me when you've finished looking at the
12  document, Mr. Fayyad.
13    A.  I do.
14    Q.  All right.  All right.  I would suggest that the
15  most important part is the order which appears at the
16  bottom --
17    A.  So let me read that.
18    Q.  I'm sorry.  I thought you had.
19    A.  No, I haven't finished.  But let me -- that's why
20  I --
21    Q.  No, no, no.  Just tell me when you've finished.
22    A.  Okay.
23    Q.  Would it be all right if I took my jacket off?
24    A.  Sure.
25      (Witness peruses document.)

Page 36

1    A.  I think I understand it.
2    Q.  Okay.  The order, in effect, says that the judge,
3  Judge Marrero, is ordering the United States to tell him
4  whether or not they're contemplating issuing a
5  suggestion (sic) of interest in the resolution of the
6  Knox case.
7      And then it says, "Or in any of the other cases
8  pending in other juris- -- in other districts against
9  the Defendants in this action, raising similar issues as
10  to the appropriateness of reopening default judgments
11  against the Defendants.
12      I've read that correctly, have I not?
13    A.  Yes.
14    Q.  Okay.  So did you know that Judge Marrero ordered
15  the United States to tell him whether or not they were
16  going to file Statements of Interest?
17      Did you know that?
18    A.  I have to tell you, I really do not recall
19  details of the motions and various orders made along the
20  way.  I really don't.
21      But I understand that this was the order anyway.
22    Q.  No, no.  We're at cross purposes.  I'm not asking
23  you to agree with me on was this the order or not.  I'm
24  just asking if you knew about it.
25      That's all I'm asking.

Page 37

1    A.  You know, can I really tell you something?  I'm
2  here to really answer your questions.
3    Q.  I can see that.
4    A.  I really want to answer your questions.
5    Q.  I know you do.
6    A.  But, you know, I haven't prepared for this in the
7  sense of really having brought all kinds of
8  documentations, reviewed motions, or anything like that.
9      So you'll have to please give me little bit of
10  space and time in order to think as to what -- because I
11  don't want to misrepresent, overrepresent or under-
12  represent.
13    Q.  Mr. Fayyad --
14    A.  I feel I'm being pushed a little bit --
15    Q.  I'm sorry.
16    A.  -- the way that you're conducting this
17  deposition.
18    Q.  Forgive me.  Take all the time you want.
19    A.  All right.  So let's --
20    Q.  Take all the time you want.
21    A.  Let's calm down here a little bit.
22    Q.  Sure.
23    A.  And what I'm really telling you, once and for
24  all, I do not remember each and -- you know, each and
25  every step taken along the way of this process.

Page 38

1    And so, if I'm really pressed to give you a
2 yes-or-no answer this afternoon here as we're doing
3 this, I can't but tell you no, I don't remember.
4    Q. Mr. Fayyad, let me explain something, if I might.
5    A. Yes.
6    Q. Well, I won't explain anything. I'll ask a
7 question.
8    A. Okay.
9    Q. Do you understand that you have told the United
10 States District Court that the PLO and the PA would
11 participate in discovery in the case?
12    You understand that?
13    A. I do.
14    Q. Okay. That means discovery under the American
15 rules, however strange they may be.
16    Do you understand that?
17    A. I'm not objecting to the rules.
18    Q. Okay.
19    A. I'm objecting to the form in which this
20 deposition is being conducted. These are two different
21 matters.
22    Q. Do you feel that I'm being rude to you?
23    A. I didn't say that. It's just, basically, that I
24 do not feel I'm given -- I'm being given the space to
25 recollect what I'm being pushed to say yes or no.

Page 39

1 That's basically what it is.
2    I'm familiar with this system as much as one can
3 be. I'm not a citizen of the United States. I lived
4 there long enough to know how it works. But I know the
5 difference between doing it right and not doing it --
6 and doing it not so right.
7    That's basically what I'm saying.
8    Q. Mr. Fayyad, are you saying that I'm asking the
9 questions too quickly and not giving you time to answer?
10    A. Maybe it's not really that as much as it is when
11 you say, Yes or no, yes or no, yes or no. It's as if,
12 you know, I just came from a cramming room where I went
13 over -- where I've just gone over all these documents.
14    Q. Did you?
15    A. Fact of the matter is that I didn't. I run a
16 government. I have a lot of things to worry about. And
17 this is one of them. It's an important issue for me.
18    But I am not here to suggest to you in any
19 manner, shape or form, sir, that I can answer quickly
20 yes or no questions related to whether or not I read
21 certain documents three or four years ago.
22    That's basically what I'm saying, with all due
23 respect.
24    Q. With all due respect to you, Mr. Fayyad, you're
25 not the first witness that I've asked questions of. And

Page 40

1 I want to ask you a very straightforward -- I think --
2 question.
3    Were you aware of Judge Marrero's order? If you
4 don't know, you can say you don't know. If you say you
5 were aware of it, you can say you were. If you weren't
6 aware of it, you can say you weren't.
7    A. The truth, sir, is that I do not know.
8    All I'm really trying to do here is to get you to
9 see things from my own perspective as I communicate to
10 you my answers to questions you raise.
11    This has been a long process. There is constant
12 discussion going on, and it's not really the only case.
13 There are several cases here. So, at the time certain
14 significant things happened along the way, I'm sure I
15 was informed. You know what I'm saying?
16    But here we are months, years, after certain
17 things have happened. I cannot really be so certain. I
18 do not really want to tell you something yes or no when
19 I'm not really a hundred percent certain.
20    You know what I'm saying? That's what I'm really
21 trying to do here.
22    Q. That's fine. That's not unusual. That happens
23 to every witness.
24    MR. ROCHON: May we take a break at this
25 point, given -- is that agreeable?

Page 41

1    THE WITNESS: Yes.
2    THE VIDEOGRAPHER: Going off record at 4:55.
3    (Short recess taken.)
4    THE VIDEOGRAPHER: Going on record at 5:00.
5    Q. Mr. Fayyad --
6    A. Yes.
7    Q. -- do you understand, one of the things that I'm
8 trying to find out is what you know about the case?
9    Do you understand that?
10    A. I understand that this is the nature of a
11 deposition, yes.
12    Q. But my question to you is, do you understand that
13 one of the things I'm trying to find out is how much you
14 know about different aspects of the case.
15    Do you understand that?
16    A. You're telling me that, and I take your word for
17 it.
18    Q. Okay. Now, what I'm trying to find out is, did
19 you ever learn of Judge Marrero's order to the United
20 States, to your recollection.
21    A. I don't remember.
22    Q. Okay. Fair enough. You have no recollection of
23 learning of it at this point. Is that fair?
24    A. I just don't remember really.
25    Q. You have no recollection of learning of it, is

Fayyad

Page 42

1  that fair?
2       MR. ROCHON:  Objection.  Asked and answered.
3       MR. WISTOW:  That's one of the things you're
4  not supposed to do under our local rules.  You just
5  object, okay?  Or instruct him not to answer, if you
6  wish.
7       MR. ROCHON:  Thank you for the suggestions.
8       Q.  Is it fair to say that, as you sit here now,
9  under oath, you have no present recollection of learning
10 of this order?
11      It may be you've forgotten it -- you knew it and
12 forgot it -- but you have no recollection?  Is that
13 fair?
14      A.  That's exactly what I meant when I said I don't
15 remember really.
16      Q.  Okay.  So, as we sit here today, you have no
17 recollection of ever learning of the order?
18      MR. ROCHON:  Objection.
19      Q.  Is that fair?
20      MR. ROCHON:  Objection.
21      MR. WISTOW:  I'm entitled to get a straight
22 answer.
23      MR. ROCHON:  Objection.
24      A.  I just gave you one.
25      Q.  Is it fair --

Page 43

1       A.  If what you said means I don't remember, then
2  that's what I really mean to say.
3       Q.  Okay.  Now, did you ever learn whether or not the
4  United States complied with Judge Marrero's order?
5       A.  I don't remember either.
6       Q.  Maybe I can refresh your recollection.
7       A.  Okay.
8       MR. ROCHON:  If we show the witness the one
9  that gets marked, we'll have two on our side --
10      MR. WISTOW:  Okay.  Sure.
11      MR. ROCHON:  -- if that's agreeable.
12      MR. WISTOW:  That's fine.
13      MR. ROCHON:  If that's okay with the court
14 reporter.
15      (Off-the-record discussion while exhibit is
16 marked).
17      (Exhibit No. 2 marked for identification.)
18      Q.  Now, do you know --
19      MR. ROCHON:  That's how this -- by doing it
20 that way, then we do get the two copies, so he's got
21 one.  We've got two.
22      The court reporter doesn't read them.  She
23 marks them.
24      MR. WISTOW:  That's fine.
25      Q.  Have you ever, to your recollection, seen this

Page 44

1  document before?
2       (Witness peruses document.)
3       A.  I don't know if I remember seeing this document
4  specifically.  I mean this very document.
5       Q.  Okay.  I would like to direct your attention --
6       A.  Yes.
7       Q.  -- to eight lines from the bottom of the first
8  page where it starts to read, The United States
9  respectfully informs the Court that it declines to file
10 a Statement of Interest concerning the Rule 60 issues
11 presented by this case, but will continue to monitor
12 this and other cases like it.
13      MR. ROCHON:  (Indicating).
14      MR. WISTOW:  Did you just point something to
15 him?
16      MR. ROCHON:  Yes.  The sentence we're
17 reading so he could find it on the page.  He was asking
18 for help.
19      MR. WISTOW:  Okay.
20      Q.  If you need assistance in finding something, I'd
21 ask you to tell me that you can't find it.
22      A.  Fine.
23      Q.  Is that fair?
24      A.  Fair.
25      Q.  Okay.  Have you located it?

Page 45

1       A.  I have.
2       Q.  Okay.  Have I read it correctly?
3       A.  You have.
4       Q.  Okay.  Do you understand that to mean that, in
5  response to Judge Marrero's order to the United States
6  to state whether or not it would file a Statement of
7  Interest, the United States responded by saying they
8  would not file a Statement of Interest in this case --
9  the Knox case -- or any similar cases.
10      Do you understand that to mean that?
11      A.  I understood that to be the case.  I'd have to
12 read through the rest of the letter, or to continue that
13 sentence where it says, But will continue to monitor
14 this and other cases like it.
15      Q.  Yes.  Right.  I'm only talking about at the time.
16      A.  Yes.
17      Q.  I mean anything could happen after this.
18      A.  I understand.
19      Q.  But at that time --
20      A.  Yes.
21      Q.  -- which was February 29, 2008, if this document
22 is authentic, then the United States declined to give a
23 suggestion (sic) of interest in the Knox case -- and you
24 see, third line from the top -- or in any other of the
25 cases pending in other districts.

Fayyad

Page 46

1    You see that?
2    A. The third line --
3        (Witness peruses document.)
4    A. I see that, yes.
5    Q. Okay. So did you ever learn from any source that
6 the United States had declined to issue a Statement of
7 Interest in the Knox case or in any of the other cases
8 pending in other districts against the PLO and the PA?
9        MR. ROCHON: Objection.
10   Q. Did you ever learn that from any source?
11       MR. ROCHON: Objection. Don't answer yet.
12 You have to exclude conversations --
13       MR. WISTOW: No. I don't exclude
14 conversations. It's not a privileged communication.
15 It's not confidential information. It's relating --
16       MR. ROCHON: Let me just -- I'm not arguing.
17       MR. WISTOW: I don't want any fighting. I
18 don't exclude anything.
19       MR. ROCHON: We're agreeing. The answer to
20 the question will not be deemed to be a waiver of
21 privilege.
22       MR. WISTOW: That's right. I believe
23 privilege has been waived for other reasons we'll get
24 into. But I stipulate that an answer to this will not
25 represent a waiver.

Page 47

1        MR. ROCHON: Mr. Prime Minister, you can
2 answer the question.
3    A. Well, I remember that there was a process.
4        And, as I told you myself, I myself communicated
5 on this with the Secretary of State at the time,
6 Condoleezza Rice, seeking help. And I understood what
7 the Statement of Interest meant -- Statement of Interest
8 -- a term mentioned on several occasions in my
9 discussions with US officials.
10       Now -- and I understood, at some point -- whether
11 in connection with this letter or some other
12 communication I can't remember right now -- that the US
13 did not submit, or did not want to submit, a Statement
14 of Interest.
15       But I also recall that it did not mean -- that
16 representation done by the United States, it does not
17 mean that the administration was --
18       (Mr. Haller enters the room.)
19   Q. I'm sorry. I didn't hear the end.
20   A. That it did not mean that the administration was
21 indifferent as to what was going on.
22       In other words, I understood that -- the way I
23 understood it was, in a formal sense of a Statement of
24 Interest, there was not acceptance of it. There was not
25 a submission of it. But, at the same time, there was a

Page 48

1 Statement of Interest in a generic sense.
2        And that actually is what's borne out if you read
3 a couple of lines down from where that reference which
4 you just cited, where the letter says, At the same time,
5 the United States remains concerned about the potential
6 significant impact of these cases -- significant impact
7 these cases may have on the financial and political
8 viability of the Defendants.
9    Q. Have you finished your answer?
10   A. Yes.
11       MR. WISTOW: I move to strike.
12       THE COURT REPORTER: Could you identify the
13 person who came in the room.
14       MR. WISTOW: Could you identify yourself for
15 the record, please.
16       MR. HALLER: Mordechai Haller.
17       THE COURT REPORTER: Spell it for me,
18 please.
19       MR. HALLER: M O R D E C H A I, H A L L E R.
20 Plaintiffs' Israeli counsel.
21   Q. Have you finished your answer, Mr. Fayyad?
22   A. Yes.
23   Q. Do you remember the question?
24   A. I remember the question.
25       The question was that -- were you aware that

Page 49

1 there was -- or does this not say that the United States
2 did not want to submit a Statement of Interest.
3    Q. No. I'm not asking you about what the letter
4 says.
5    A. Oh, okay.
6    Q. I'm not. I'm asking you if you ever became aware
7 of whether or not the United States responded to Judge
8 Marrero by saying -- let me finish, please --
9    A. Yes.
10   Q. -- by saying they declined to state -- to file a
11 Statement of Interest at that time.
12       Did you ever become aware of that?
13   A. As I indicated, I'm aware that there were
14 discussions, communications, on this matter. I was
15 aware that there was not a straightforward Statement of
16 Interest submitted by the US government to the Court.
17       But I also remember being told that that
18 statement or that communication or those communications
19 where Statement of Interest was not filed did not mean
20 that the administration was indifferent as to the
21 proceedings.
22       That's my answer.
23   Q. Okay. I'm going to press it a little bit.
24   A. Okay.
25   Q. I'm really not asking you to interpret what the

Fayyad

Page 50

1    intent of the government was, the American government.
2        I'm asking you only if you were aware that, on
3    February 29, 2008, the United States said to Judge
4    Marrero, and I quote, "The United States respectfully
5    informs the Court that it declines to file a Statement
6    of Interest concerning the Rule 60 issues presented by
7    this case, but will continue to monitor this and other
8    cases like it.
9        Did you ever become aware of that declination?
10       A. What I'm really trying to communicate to you, and
11   through you to the Court, is my understanding of the
12   nature of that communication; and, specifically, that
13   the administration did not file a Statement of Interest
14   in the way a Statement of Interest is technically
15   defined.
16       But I remember, in the context of communications,
17   suggesting that it was not not interested in what was
18   going on. That's basically my recollection of the
19   exercise.
20       Q. Mr. Fayyad, I'm going to ask you to try not to
21   communicate with the Court, as you just suggested you're
22   doing.
23       Try to just answer my questions. The Court will
24   hear my questions, will hear your answers. Under our
25   system, I get to ask questions and, hopefully, you

Page 51

1    answer them.
2        I'm not trying to tell half the story. You have
3    lawyers. They can bring out what they want.
4        Do you understand?
5        A. I respect the system, and I am doing my best to
6    answer your questions, sir.
7        Q. Okay. My question is, did you ever learn that
8    Judge Marrero was informed that the United States
9    declined to file a Statement of Interest.
10           MR. ROCHON: Objection.
11       Q. Can you answer that either yes, no, or I don't
12   remember?
13           MR. ROCHON: Objection.
14       Q. Can you?
15           MR. ROCHON: You can answer the question.
16       A. As I said, you know, I'm aware that there was
17   activity along those lines, but I do not remember each
18   and specific case or specific communication.
19       But the substance of what I recall is what I told
20   you.
21       Q. Okay. Did you learn, in substance --
22       A. Yes.
23       Q. -- that the United States declined to file a
24   Statement of Interest? Did you learn that?
25           MR. ROCHON: Objection. You may answer.

Page 52

1        A. I learned that. But, at the same time, I learned
2    that the United States was not disinterested, and that
3    that view of the United States was communicated as well.
4        Q. Okay. The United States also expressed sympathy
5    for the victims, did it not?
6        A. It did.
7        Q. And it expressed sympathy and interest in the PLO
8    and PA, did it not?
9        A. It did.
10       Q. So it wasn't indifferent to either side, was it?
11       A. No. But that's not what the letter said. It's
12   not indifferent to either side.
13       Q. That's right.
14       A. Yes.
15       Q. But the letter says they declined to file a
16   Statement of Interest.
17       A. That's what the letter said.
18       Q. Right. Did you ever learn of that decision?
19       A. Whether in this specific case or another case, I
20   really cannot tell you right now.
21       But I'm aware of the fact that the United States
22   did not file a Statement of Interest in the way a
23   Statement of Interest is construed to mean in a legal
24   sense.
25       Q. How did you learn that?

Page 53

1            MR. ROCHON: Objection.
2        A. I've had discussions on this with US officials
3    all the time.
4        Q. Really?
5        A. Yes.
6        Q. When was the last time you had a discussion with
7    a US official about this?
8        A. Not the recent period.
9        Q. Well, you said all the time. I'm just asking you
10   when the last time was.
11       A. I'm trying to remember now. All the time when
12   this was being activated and all.
13       Q. Take your time, Mr. Fayyad. There's no rush.
14       A. I can actually give you a precise date if I can
15   remember when it is that I visited the State Department
16   and met with lawyers at the State Department.
17       I'd have to go back to my itinerary, my travel
18   records, and I'd be able to provide you with that.
19       Q. Please understand --
20       A. In other words, it's not -- I know that I did
21   discuss it.
22       Q. Okay. Please understand. I don't expect you to
23   have exact dates.
24       A. Okay.
25       Q. Can you give me an approximate date?

Fayyad

Page 54

1    A. Yes. That I can.
2    Q. What is that?
3    A. Let me -- not necessarily in connection with this
4  case, but generally, you know, cases filed against us in
5  the United States.
6       So I believe it must have been a year ago.
7  That's when I believe I officially visited the United
8  States. A year ago.
9       Again, I can look it up and provide with you the
10 records.
11   Q. I'm only asking you for your best recollection.
12   A. Yes.
13   Q. And I understand all you can give me, without
14 checking your records, is your best recollection.
15   A. My best recollection is that the last time I had
16 a discussion on cases -- on litigation against us in the
17 United States in connection with these matters --
18 general matters. Not necessarily this case -- was a
19 year ago --
20   Q. Okay.
21   A. -- or thereabouts.
22   Q. Okay. When we say litigation generally and not
23 necessarily these cases --
24   A. Yes.
25   Q. -- we're talking about the so-called terrorist

Page 55

1  claims, correct?
2    A. Yes.
3    Q. Claims against the PLO and PA that they were
4  involved somehow in terrorist activities?
5    A. Yes.
6    Q. So you spoke to somebody at the State Department
7  about a year ago?
8    A. Yes.
9    Q. Who was that?
10   A. I don't -- lawyers.
11   Q. Can you help me out a little bit?
12   A. I can't remember the names right now.
13   Q. Okay. Do you remember their titles?
14   A. I can't.
15   Q. Do you remember how many there were?
16   A. Maybe three, four. I really don't remember.
17   Q. So did you make -- were you accompanied by
18 anybody on your side?
19   A. I really was there by myself.
20   Q. Okay. And so these three or four lawyers, you
21 don't remember anybody's name?
22   A. No. Not right now.
23   Q. And do you remember if you were -- you had
24 written to set up an appointment, or how it came to be?
25 Do you remember?

Page 56

1    A. Precisely, I do not remember. In connection with
2  this particular trip, I don't really remember now.
3    Q. Okay. Would it be fair to say you were asking
4  them to see if a Statement of Interest could be filed?
5       MR. ROCHON: Objection. Form and content.
6  In have a substantive objection on this.
7       You may want to take it outside the presence
8  of the witness so you don't think I'm engaging in
9  speaking objections. But I need to discuss it with you
10 first before I take it to the judge.
11      MR. WISTOW: Some kind of diplomatic
12 privilege?
13      MR. ROCHON: Yes.
14      MR. WISTOW: I have a -- it says, This
15 judgment has already been the subject of diplomatic
16 communications at the highest levels between our
17 country's representatives and the State Department.
18      You've told the Court about this, both the
19 Circuit Court and the Federal Court. And, you know,
20 you're flaunting this issue. Now you tell me that I
21 can't ask him about it? Okay. Just tell him not to
22 answer. It's okay with me.
23      MR. ROCHON: Well, we can take it to the
24 Magistrate Judge. That's why we have him available, so
25 you can get a ruling on it.

Page 57

1       THE VIDEOGRAPHER: Excuse me. I have to
2  change the tape.
3       MR. WISTOW: Well, you know what?
4       MR. ROCHON: We're going to go off the
5  record.
6       MR. WISTOW: You know what? I'm perfectly
7  happy with an instruction not to answer. I don't want
8  to wait -- I have limited time today. I want to get
9  this thing moving.
10      MR. ROCHON: We have to go off the tape.
11 You can finish, but your tape's running out and you
12 won't be on the record.
13      THE VIDEOGRAPHER: Going off the record at
14 5:18.
15      (Short recess taken.)
16      THE VIDEOGRAPHER: Going on record at 5:20.
17      MR. WISTOW: I'd ask you to reconsider.
18      You have affirmatively told the Court in
19 your pleadings that one of the reasons to vacate the
20 motion -- 60(b)6 motion -- is that -- and I quote from
21 your pleadings -- "This judgment has already been the
22 subject of diplomatic communications at the highest
23 levels between our country's representatives and the
24 State Department and the governing officials in the
25 Occupied Territories.

Fayyad

Page 58

1    If left intact, the judgment threatens to
2  undermine the relationship between the United States and
3  the Palestinian government, a relationship that the
4  executive branch of the United States government has
5  categorized as being crucial to the Israeli-Palestinian
6  peace process."
7        I don't know how anything could become more
8  relevant, if you're urging that as a reason. So I'm
9  asking him to tell me about all these high-level
10  conversations.
11        MR. ROCHON: The fact of a communication
12  being made known to the Court does not waive any
13  privilege associated with it.
14        MR. WISTOW: I'll tell you what? Why don't
15  we do this? If you could just let him answer this
16  question, if it involved asking for a Statement of
17  Interest, I'll agree that, in and of itself, that answer
18  doesn't waive any kind of privilege.
19        MR. ROCHON: You know, you'll be leading me
20  down the primrose path. I either object or I don't.
21  You mean you'll be done in this area?
22        MR. WISTOW: I don't know. If he says, no,
23  we didn't talk about that, then I certainly --
24        MR. ROCHON: The problem is this. The Prime
25  Minister has a portfolio that includes things other than

Page 59

1  this case. So he doesn't communicate only about this
2  case.
3        MR. WISTOW: Oh, Please. I don't want to
4  ask him anything that's not related to this case. That
5  would be inappropriate, and I certainly wouldn't do it.
6        MR. ROCHON: The problem is either -- see, I
7  asked the witness to step out because I don't want you
8  suggest I'm making speaking objections.
9        MR. WISTOW: Why don't you step out.
10        MR. ROCHON: Just escort the Prime Minister
11  out.
12        (The witness leaves the room.)
13        MR. WISTOW: No. I don't want --
14        MR. ROCHON: I'll take the time. I'll eat
15  the time.
16        MR. WISTOW: I know. But we have to keep
17  track of the time.
18        MR. ROCHON: It's all right. We can just
19  note when we start this discussion. I'll eat the whole
20  time.
21        MR. WISTOW: Why don't you do it. Why don't
22  we -- you're the one who's --
23        MR. ROCHON: What time is it now,
24  Mr. Coopersmith?
25        THE VIDEOGRAPHER: The time is 5:22.

Page 60

1        MR. ROCHON: Thank you. It's now my time.
2  We're on the record. I'm just eating the
3  time. It doesn't count on the seven hours. Sometimes
4  lawyers try to use up the other guy's time.
5        (The witness leaves the room.)
6        MR. ROCHON: The Prime Minister is out of
7  the room.
8        So, look, when he communicates, it's not
9  like he goes to the State Department only about these
10  cases. He's there about a host of things. He's trying
11  to get money. He's trying to get security. He's trying
12  to --
13        And so none of these things are seen in
14  isolation. So you can't, you know, discuss what did you
15  tell them about this because it's all part of a unified
16  conversation.
17        MR. WISTOW: I didn't even ask him that.
18  All I said to him was, did you ask them if they would
19  file a Statement of Interest in these cases.
20        That's all I asked. That's pretty
21  straightforward.
22        MR. ROCHON: If your question is that, and
23  you're not going to claim it's a waiver of diplomatic
24  privilege --
25        MR. WISTOW: I will not.

Page 61

1        MR. ROCHON: As long as we're on my time, do
2  you want to tell me -- he's out of the room. Do you
3  want to tell me where else you're going to go, and we
4  can hash out the diplomatic issues now on my nickel?
5        MR. WISTOW: I'd rather not --
6        MR. ROCHON: All right.
7        MR. WISTOW: -- because I don't know where
8  I'm going, if you haven't figured that out yet. It's a
9  little loosey-goosey.
10        MR. ROCHON: I'm offering it to you because
11  we'll be back on your time soon.
12        MR. WISTOW: I guess, in fairness to you, if
13  he says yes, he did ask them for it, I'm going to ask
14  him did they say yes, did they say no, did they say
15  maybe. That's all.
16        MR. ROCHON: Well, then -- well, I know
17  that's all that you -- that's what implicates diplomatic
18  privilege.
19        MR. WISTOW: I'm just asking a narrow issue.
20        MR. ROCHON: I'm going to have to take this
21  to the Magistrate Judge.
22        I'm not going to instruct him not to answer
23  because you're trying to set me up for some kind of
24  sanctions if I instruct him not to answer. I've got a
25  Magistrate Judge available because we started so late.

Fayyad

Page 62

1    That's why we have him, so I don't instruct him and have
2    you complain about it.
3         MR. WISTOW:  You know what I'd prefer doing,
4    because I'd like to brief this, because this is
5    fundamentally important.
6         MR. ROCHON:  We're not going to convene here
7    again.
8         MR. WISTOW:  Well, I'm going to brief it.
9         MR. ROCHON:  We got a Magistrate Judge --
10        MR. WISTOW:  And then what happens -- first
11   of all, the case was not referred to him for discovery
12   on this.  It was not, okay?
13        So what happens if he rules the way you like
14   it?  Then you take an appeal.  Or he rules, then I take
15   an appeal, or vice versa, right?
16        MR. ROCHON:  If he rules --
17        MR. WISTOW:  If he rules in your favor,
18   we'll take an appeal.  I guarantee it.
19        MR. ROCHON:  That's fine.  Then we might, in
20   that case, over my objection, have to reconvene.  But
21   I'm not going to set up something where we automatically
22   have to reconvene.
23        MR. WISTOW:  Why don't you find out if he
24   asked.  If he says no, he didn't ask --
25        MR. ROCHON:  I don't anticipate --

Page 63

1         MR. WISTOW:  He's going to say yes?
2         MR. ROCHON:  I'm not going to tell you what
3    he's going to say.  You know, I can't.
4         MR. WISTOW:  Why don't we do this?  Why
5    don't we get an answer just to that question so that we
6    can talk to the Magistrate.
7         MR. ROCHON:  All right.  Well, you're not
8    going to --
9         MR. WISTOW:  All I'm asking is did he ever
10   ask for a Statement of Interest.
11        MR. ROCHON:  I'm not going to let him answer
12   that now on diplomatic privilege grounds.  We'll take it
13   now.  You're setting me up to lose.  I said I'd do it if
14   that was all you were going to --
15        MR. WISTOW:  See if you can get the
16   Magistrate.
17        You know what I'd rather do?  You know what
18   I'd rather do?  Let's set this question aside and let's
19   go forward and let's get a whole list of questions to
20   ask the Magistrate at once.  Otherwise --
21        MR. ROCHON:  We're fine with that.
22        MR. WISTOW:  -- it's going to be a disaster.
23        MR. ROCHON:  Mr. Coopersmith, can I ask you
24   what time it is?
25        THE VIDEOGRAPHER:  5:25.

Page 64

1         MR. ROCHON:  5:25.  I just used three
2    minutes.
3         (Witness re-enters the room.)
4         MR. WISTOW:  Did you ask --
5         MR. ROCHON:  I need to put the provisions
6    regarding the confidentiality that we agreed to before
7    on the record.  I don't want to interrupt your -- tell
8    me when you'd like me to do that.  Next break?  Now?
9         MR. WISTOW:  Are we on my time or your time?
10        MR. ROCHON:  You have to eat this one.
11        MR. WISTOW:  No.  I'm not eating anything,
12   okay.  I'm giving you a courtesy.  Now, let's just --
13   we're not back on my time.
14        MR. ROCHON:  Yes, we are.
15        MR. WISTOW:  Then why don't you wait.
16        MR. ROCHON:  Mr. Coopersmith, what time is
17   it, please?
18        THE VIDEOGRAPHER:  5:26.
19        MR. ROCHON:  5:26.  For the record, the time
20   from 5:22 until we next give the time is mine.  So I'll
21   do it now, Mr. Wistow, on my time.
22        Just for the record, we have agreed,
23   Mr. Wistow, Mr. Strachman and myself, the parties have
24   agreed that this deposition will remain confidential and
25   under a protective order -- essentially embargo -- for a

Page 65

1    two-week period after the time that both the written and
2    video transcript is made available for counsel for
3    review.
4         However, you can certainly use this
5    transcript if you need to for some purposes in the
6    litigation.  Just file it under seal.  We're not trying
7    to keep you from using it for any purpose, should that
8    be relevant.
9         MR. WISTOW:  I agree.  I don't have any
10   problem with that.
11        MR. ROCHON:  Thank you.
12        MR. WISTOW:  And what we -- we've also, I
13   think off the record, agreed to is that --
14        MR. ROCHON:  It was on the record, the
15   agreement about the Magistrate Judge and accumulating
16   issues.
17        MR. WISTOW:  Good.  Let's move on then.
18        MR. ROCHON:  We need to get the time so we
19   get back to you.
20        Sorry, Mr. Coopersmith.  What time is it,
21   please?
22        THE VIDEOGRAPHER:  5:27.
23        MR. ROCHON:  So the period that we were on
24   my time was 5:22 to 5:27.
25        MR. WISTOW:  Could you mark this, please.

Fayyad

Page 66

1        (Exhibit No. 3 marked for identification.)
2        Q.  Have you ever seen that letter, August 15, 2005,
3    from Ramsey Clark to Victor Marrero?
4        MR. ROCHON:  Just for the record, that's
5    referring to Exhibit No. 3?
6        MR. WISTOW:  Yes.
7        Q.  Have you ever seen that before?
8        A.  I don't recall seeing this letter, no.
9        Q.  Okay.  Have you read through it?  It's quite
10    short.  Why don't you take a minute and read through it
11    to yourself.
12        (Witness peruses document.)
13        A.  Yes.  I've just read it.
14        Q.  You've read it?
15        A.  Yes.
16        Q.  All right.  Basically, you understand this is a
17    letter from counsel for the PLO and PA in the Knox case?
18    Do you see where it says Knox versus PLO?
19        A.  Yes.  I see that.  Yes.
20        Q.  And you know Judge Marrero was the judge in the
21    Knox case, yes?
22        A.  I don't remember the name, but I assume.
23        Q.  Let's assume for the moment that Judge Marrero
24    was the judge in the Knox case.
25        A.  Yes.

Page 67

1        Q.  This letter is basically telling the judge that
2    the PLO and the PA have instructed him to only present
3    their position that the US courts have no jurisdiction
4    over them and they would not answer the case.
5        Do you understand that?
6        A.  I understand that.
7        Q.  Okay.  Even though you don't recall whether you
8    ever saw this letter or not -- let me strike that one.
9        At the time this letter was written, you were the
10    Finance Minister?
11        A.  I was.
12        Q.  Okay.  At that time, or subsequent, at any time
13    have you learned that Ramsey Clark told Judge Marrero
14    that he was instructed by the PLO and the PA not to
15    answer the case in front of Judge Knox (sic)?
16        Did you ever learn that?
17        A.  I am aware of that having been taken as a
18    position, but not in 2005.  I don't remember this at
19    all.
20        Q.  Okay.  When did you first learn that that was the
21    position that was taken?  Approximately.
22        A.  Well before 2005.  Not 2005.
23        Q.  Well before?
24        A.  Yes.  Yes.
25        Q.  Well before.  What does well before mean?

Page 68

1        A.  I mean, since it came to my attention, to my
2    knowledge that, as a matter of fact, that there was
3    legal action pending against us in the United States.
4        Q.  Right.  What I mean by my question --
5        A.  Yes.
6        Q.  -- is when you say well before 2005, do you mean
7    two years?  Ten years?  Thirty years?
8        A.  No.  No.  It cannot be that.
9        Q.  What do you mean?
10        A.  It can't be that.  As far as I remember now,
11    these cases started in 2000, 2001, something like that.
12    I don't remember now a precise date but -- so it cannot
13    be a decade before, you know what I'm saying?
14        Q.  Of course.
15        A.  I'm aware of the fact that this was the position
16    communicated at the time, yes.  But not as recently as
17    August 2005.
18        Q.  You knew it before?
19        A.  That is generally the position taken, yes.
20        Q.  Okay.  What I'm trying to find out is
21    approximately how long before.  We know that you became
22    the Finance Minister in what year?
23        A.  2002.
24        Q.  So presumably it was not before 2002 that you
25    were aware of it, or maybe it was?

Page 69

1        A.  Oh, no.  It cannot have been before 2002.  Cannot
2    be.
3        Q.  Was it relatively soon after you became Finance
4    Minister?
5        A.  That time period.  But 2005 is too soon.
6        Q.  You mean too late?
7        A.  Too late I mean, in that sense.  So it must have
8    happened before.  I'm not aware of this particular
9    communication, this particular letter.
10        Q.  I understand.
11        A.  But I understand that was the position.
12        Q.  That was the position in all the terrorist cases,
13    correct?
14        A.  Yes.
15        Q.  All right.  And you became Finance Minister
16    around 2002?
17        A.  Correct.
18        Q.  And would it be closer to 2002 that you learned
19    of this rather than 2005?
20        A.  Probably.  And I want to expand on this, if I
21    may.
22        Q.  Sure.
23        A.  Just to give you a little bit of -- you know, the
24    world as was happening then as I saw it, and the kind of
25    challenges that we really faced at the time, and maybe

Fayyad

Page 70

1  this will help you better understand where I'm coming
2  from as I try to answer your questions as best as I can.
3     Q. I think I understand where you're coming from.
4     A. When I first became Finance Minister, I was
5  immediately preoccupied with similar cases filed against
6  us in Israel, Israeli courts.
7        And I learned, shortly after I became Minister of
8  Finance, that the defense taken or the position taken
9  vis-à-vis those cases was similar to what is contained
10 in this letter -- meaning that there was no
11 jurisdiction, etc., on jurisdictional grounds.
12       And I was, you know, at the time, preoccupied
13 with trying to deal with that particular situation.
14    Q. Okay.
15    A. So it must have been, you know, a bit later after
16 that I became aware of legal action against us in the
17 United States.
18       And that position taken, as reflected in this
19 letter, is consistent with what I know was happening in
20 Israeli courts when I became Minister of Finance.
21    Q. So sometime in 2003 anyway?
22    A. Maybe.  Maybe something like that.
23    Q. That's your best recollection?
24    A. That would not be an unreasonable guess, sir.
25 I'm trying to do the best I can.

Page 71

1     Q. That's all I'm asking, and I appreciate you doing
2  that.
3     A. Yes.
4     Q. So your best recollection would be around 2003?
5        MR. ROCHON:  Objection.  Objection.
6     Q. Is that fair?
7     A. As I said, you know, I really cannot be precise
8  with dates on this.  I mean it's a process.
9        And that's why I did expand to tell you that this
10 was the line taken and the position.  And I assume that
11 it was really the position taken in US courts and in
12 this case.
13    Q. Right.
14    A. But I -- I mean it's really a continuum.  I
15 cannot really, you know, tell you precise dates when I
16 became aware of it.
17       But I certainly do not remember this letter.
18    Q. Okay.  That's fine.
19       Now, I'm going to -- you first heard of the Ungar
20 case around 2003, 2004?  Is that fair?
21    A. Probably.
22    Q. Okay.  And when you first heard of the Ungar
23 case, you knew that that was what we've been calling a
24 terrorist case?
25    A. Yes.

Page 72

1     Q. And by the time you heard of the Ungar case -- by
2  the way, 2003-2004, you were Finance Minister?
3     A. Yes, I was.
4     Q. Okay.  And by the time you heard of the Ungar
5  case, you were aware that the position that Mr. Clark
6  was conveying to Judge Marrero was the position also in
7  the Ungar case.
8        It was in all of the cases, right?
9     A. Yes.  As I said to you, I was aware that that was
10 the position generally taken in those cases, yes.
11    Q. Okay.  You knew that when you first became aware
12 of Ungar?
13    A. I was -- yes.  I was -- when I first became aware
14 of Ungar as a case pending against us, I -- that was my
15 understanding, that that was the position taken.
16    Q. That there was no jurisdiction over the PLO or
17 the PA?
18    A. Yes.
19    Q. And the case would not be answered?
20    A. That basically the position was that there was a
21 case of sovereign immunity.
22    Q. Okay.  And were you aware that there was also a
23 position taken that the case involved a so-called
24 "political question"?
25       Or, if you're unfamiliar with that concept, tell

Page 73

1  me.
2     A. No.  I'm not.
3     Q. Okay.  And were you aware that the PLO and PA was
4  also taking the position that, not only was there
5  sovereign immunity, but they were not subject to suit in
6  the United States?
7        Were you aware of that?
8     A. I didn't understand the distinction.
9     Q. Okay.  So all you recollect at this point is the
10 sovereign immunity issue?
11    A. Yes.
12    Q. Okay.  You're not saying these other issues
13 didn't come up.  You just don't recall?
14    A. I don't remember really.
15    Q. Okay.  Now, you know that, in March of this year,
16 the First Circuit Court of Appeals sent the case back to
17 Judge Lagueux for further consideration.
18       You're aware of that, aren't you?
19    A. I'm aware, yes.
20    Q. And you understand that that's really why we're
21 here today?
22    A. I think I said this at the outset, yes.
23    Q. Now, have you ever read the decision of the First
24 Circuit Court of Appeals?
25    A. I don't recall reading the decision per se, but I

Fayyad

Page 74

1  understand what's going on.
2    Q.  Okay.  I want to ask you if --
3    MR. WISTOW:  -- and, again, I'm not going to
4  mark it because it's a published opinion from the First
5  Circuit.  And if you want to look over my shoulder --
6    MR. ROCHON:  Actually, if you're going to
7  read it to him, you might just want him to be able to
8  see what you're reading because you're going to be
9  asking him questions.
10    MR. WISTOW:  Okay.  Do you mind if I come
11  next to him?
12    MR. ROCHON:  Well, you could read it and
13  give it to him, is what I'd prefer.
14    MR. WISTOW:  Well, I'd like to -- yes.  I'll
15  read it and I'll give it to him.
16    MR. ROCHON:  That would be great.
17    MR. WISTOW:  So I don't have to --
18    THE WITNESS:  I don't mind if you want to
19  sit next to me.
20    MR. WISTOW:  If he doesn't mind, with your
21  permission, I'll just point to it.
22    THE WITNESS:  Go ahead.
23    MR. ROCHON:  Fine.  You see, the problem is
24  it will mess up your record with the videographer.  So,
25  actually, it might be better if --

Page 75

1    Q.  See the bracketed areas?
2    A.  Yes.
3    Q.  Why don't you read that, and you tell me when
4  you're finished.
5    (Witness peruses document.)
6    A.  I read it.
7    Q.  Okay.  May I?
8    A.  (Indicating).
9    Q.  I'm going to read it into the record, the part
10  that I put the brackets around.  This appears on page 4.
11    As the Defendants now concede -- you know who the
12  Defendants are, right?
13    A.  We are the Defendants.
14    Q.  The PLO and the PA?
15    A.  Yes.
16    Q.  As the Defendants now concede, the decision to
17  stonewall in this fashion was a deliberate strategem
18  driven by the advice of their then counsel and their
19  unwillingness to recognize the authority of the federal
20  courts.
21    You read that?
22    A.  I read that.
23    Q.  Okay.  Now, who is the counsel that's referred to
24  as giving you advice?  When I say you, PLO, PA.  Who is
25  that?

Page 76

1    A.  I was not, you know, that involved, because this
2  was really more of a continuation of something that
3  started to happen before I joined the PA.  And before I
4  joined the PA, I was not even aware of the legal action
5  against the PA in the US court.
6    So I don't know who was telling whom what at the
7  time, and who in any particular case was representing
8  the PA and PLO.  I have Ramsey Clark here in this
9  particular case, and I'm aware that actually, at
10  different points, he did represent the PA/ PLO.
11    So this is consistent with what I generally know
12  about the case now.
13    I mean I don't know to whom the statement is
14  attributed here.
15    Q.  That's what I'm trying to find out.
16    A.  Yes.  The statement that you read, you know, my
17  understanding is that it really was basically a good
18  faith understanding of, you know, how, you know, this
19  case could be dealt with, that it was not stonewalling
20  or anything like that.
21    I mean as best as I know.
22    Q.  So you don't consider it was stonewalling?
23    A.  No.
24    Q.  You think it was the right thing to do?
25    A.  At the time, that was the judgment.  Basically,

Page 77

1  it was a good faith understanding of options available
2  under US law, or law generally -- a basic question of
3  jurisdiction.
4    And, in fact, I'm familiar with the argument
5  because, as I said, I first became involved in
6  litigation against us in Israeli courts, and that was
7  the position taken then.
8    So the position you're referring to here, in
9  terms of claiming sovereign immunity, was not something
10  that I heard about for the first time, because that was
11  the position taken by lawyers representing the
12  Palestinian Authority in the Israeli courts at the time.
13    It's consistent with that general proposition,
14  and that position was not, in the way that it's stated
15  here, taken as an instrument or a way to stonewall or
16  something like that.
17    Q.  Okay.
18    A.  It was -- basically, I don't agree with the
19  characterization.
20    Q.  Okay.  I guess that's what I'm trying to find out
21  is, I'm just saying what the First Circuit said.
22    A.  Yes.
23    Q.  And you don't agree with it.  That's what you
24  just said?
25    A.  Yes.  I mean I --

Fayyad

Page 78

1    Q. Okay. That's fine.
2    A. I don't agree that that's what was going on. I
3  mean it's a remedy, logically speaking, when you're sued
4  that a question that is asked is does the court have
5  jurisdiction over the matter. And I suppose the first
6  question was asked.
7       I don't know. I'm not a lawyer myself. But I,
8  you know, find it, therefore, logical to, you know, take
9  that position when, in fact, there was no jurisdiction.
10   Q. Have you finished your answer?
11   A. I have.
12   Q. Good. All right.
13   Q. Is it fair to say that it's the position of the
14 PLO and the PA that the murders -- the murder -- of
15 Yaron Ungar was caused by Hamas? Is that fair?
16   A. Can you say that again, please.
17   Q. All right. Is it the position of the PLO and the
18 PA that Yaron Ungar was murdered by Hamas?
19   A. You know, as best as I know, this says what this
20 record now says. I mean that's been proven that this is
21 what happened.
22   Q. So that's the position of the PLO and the PA in
23 this case. Is that fair?
24   A. It's not the position. It's a question of fact.
25 It's not a question of opinion.

Page 79

1    Q. I'm asking, is that what you're contending.
2    A. I'm not contending anything on the substance of
3  the case, sir.
4       All I'm telling you here is that, you know, the
5  facts, as I know them, the records say or suggest
6  strongly, and basically the evidence and what is known
7  about the case, is that, you know, Hamas was involved in
8  this.
9       That's -- it's not a position.
10   Q. Are you aware that representations were made to
11 the United States District Court by the PLO and the PA
12 as follows -- and this is on the motion to vacate
13 default.
14      I'm reading from the Palestinian Authority's and
15 the Palestinian Liberation Organization's reply to
16 Plaintiff's objection to motion for relief and default
17 judgment. And I'll just read you what it says.
18      There is no dispute that Hamas operatives carried
19 out the attack that forms the basis for this lawsuit.
20      Do you believe that?
21   A. Yes. I believe that.
22   Q. Okay. That's all I'm asking.
23   A. Okay.
24   Q. Now, have you learned from any source up to today
25 that, after a default was entered -- let me withdraw

Page 80

1  that.
2       Do you understand the difference between a
3  default and a default judgment?
4    A. You tell me.
5    Q. Okay. Is the answer you don't?
6    A. I don't know exactly.
7    Q. Okay. Fair enough.
8       A default is where the Court, in effect, says the
9  Defendant is liable because they haven't answered the
10 case or have done something else that the Court feels is
11 inappropriate.
12      A default judgment is where the Court takes it a
13 step further and puts an amount of money on it. Okay?
14   A. Okay.
15   Q. Are you aware today that that was a two-step
16 process with the PLO and the PA?
17   A. I'm aware that there is a judgment in a certain
18 amount, so that's a default judgment. Yes, I'm aware of
19 that.
20   Q. Are you aware that, at one time, there was merely
21 a default? If you were, you were. If you weren't, you
22 weren't.
23   A. I'm not sure I really was, or I knew what the
24 distinction was, or when, right now, when that happened
25 precisely.

Page 81

1       But I mean, to me, as soon as I learned of it, it
2  was in the form of a certain amount for which the Court
3  found us liable.
4    Q. Okay.
5    A. That's --
6    Q. All right. Did you ever become aware from any
7  source up to today that, after the PLO and the PA were
8  defaulted, but before the amount of money was decided
9  upon, the Court asked the PLO and the PA if they wanted
10 to participate in the hearing on damages?
11   A. Between the time there was default and --
12   Q. No, no. Have you ever learned that -- up to
13 today, have you ever learned that, in between the
14 default and the default judgment, the PLO and PA were
15 invited to participate in the hearing as to how much
16 money it would be put on the judgment?
17      Have you ever learned that?
18   A. I don't remember really. I don't remember.
19   Q. Okay. To the best of --
20   A. To the best of my knowledge, I don't remember,
21 no.
22   Q. Okay. Now, your lawyers on your behalf, in their
23 motion to vacate --
24   A. Yes.
25   Q. -- the default, which was filed in December of

Fayyad

Page 82

1  2007 -- which was about three and a half years after the
2  default, does that sound right?
3      You know the default was in June or July of 2004?
4      A. Well, okay.
5      Q. Sounds about right?
6      A. Sounds about right, yes, because, as I told
7  you --
8      Q. It's a matter of record. We don't need to spend
9  time.
10     A. It's a matter of record. But, again, just to
11 underscore what I just said before, and that is, you
12 know, I personally became seized with this as a case
13 involving payment, it appears, after it became a default
14 judgment.
15     And that must have happened in 2005. So 2000 --
16 there's a different -- 2004 -- probably.
17     Q. You found out about this in 2005?
18     A. When apparently it became a default judgment.
19     Q. Well, it became a default judgment in the middle
20 of 2004.
21     A. I don't remember.
22     Q. What?
23     A. I don't remember.
24     Q. You don't remember what?
25     A. I don't remember really. I mean I thought it was

Page 83

1  2005, but you're telling me 2004. Okay.
2      Q. I'm representing that to you. And if I gave you
3  the wrong date, your lawyer would be all over me.
4      MR. ROCHON: I've offered you stipulations
5  when you want them.
6      MR. WISTOW: I'm trying to find out what he
7  knows about this.
8      A. All right.
9      Q. Now, in the motion filed by your lawyers, they
10 told Judge Lagueux -- and I quote -- "The failure to
11 establish such lines of authority had created
12 conflicting instructions and confusion in the litigation
13 to the Defendants' detriment."
14     I'm going to ask you to accept, for the moment,
15 that that's in the motion and it's on page 35.
16     What were the conflicting instructions?
17     MR. ROCHON: I'm going to object just --
18     Q. If you know.
19     MR. ROCHON: No, no. Because you referenced
20 the term lines of authority and that has not been
21 discussed before. So if you'd give the witness a little
22 more before you ask him the question, that's all I'm
23 asking.
24     MR. WISTOW: Okay.
25     Q. I'll read the beginning of the paragraph.

Page 84

1      By the end of 2006, however, "It became clear the
2  Palestinian government urgently needed an institutional
3  framework for responding comprehensively to the
4  litigation in the United States.
5      As Mr. Abdul Rahman notes, The failure to
6  establish such lines of authority had created
7  conflicting instructions and confusion in the litigation
8  to the Defendants' detriment."
9      Okay. Do you understand the reference?
10     A. I understand.
11     Q. Do you have any knowledge whatever -- any -- as
12 to these so-called conflicting instructions?
13     A. I don't know precisely, you know, what it really
14 refers to other than, if I understood what you have read
15 correctly, in terms of evolution in the position taken
16 by the Palestinian Authority in terms of how to pursue
17 this matter and how to defend ourselves, if that's
18 what's being referred to in what you read here, then I
19 believe, you know, consistent with what I know happened
20 around that time, 2005-2006, there was a discussion.
21     And I, you know, certainly cannot rule it out
22 that, during that period, you know, there were different
23 views expressed on this in terms of how to do this as a
24 matter of evolution in the direction which we ended up
25 taking eventually by wanting to defend ourselves

Page 85

1  actively in those cases.
2      Q. Mr. Fayyad, in English, I think conflicting
3  instructions means one person gives instructions to
4  somebody. Another person gives conflicting instructions
5  to somebody.
6      Do you have that same understanding?
7      A. Yes. That's what conflicting instructions means.
8  I mean --
9      Q. Okay. What I'm trying to find out -- I'm not
10 asking you to rule out --
11     A. Yes.
12     Q. -- that that happened. I'm not asking you to
13 rule it in. I'm just asking if you have any knowledge
14 of such conflicting instructions.
15     That's all I'm asking.
16     A. That's what I'm really trying to say to you here,
17 again, trying to project, you know, the mindset, what
18 was going then is what I just described, in all
19 candor.
20     Q. What were the conflicting instructions? Some
21 people told -- who were the instructions to, by the way?
22     A. I mean I understand this to be those involved.
23 Probably lawyers to lawyers. I do not know.
24     Q. You really don't know what the conflicting
25 instructions are, do you?

Page 86

1    A. I honestly do not know.
2    Q. All right.
3    A. If I may finish --
4    Q. Sure.
5    A. -- all I am really trying to suggest to you here
6    is this does not sound like way out of line with what I
7    knew was happening around that time in the process of
8    evolution which took us to where we are today.
9    Q. I'm not asking you whether it sounds way out of
10   line. I'm asking for your knowledge about it.
11       And if you have no knowledge about it, all you
12   have to say is say I don't know.
13       MR. ROCHON: I'm going to object only in
14   terms of, counsel, the time frame.
15       MR. WISTOW: 2006.
16       MR. ROCHON: Thank you. You may answer,
17   Mr. Prime Minister.
18       THE WITNESS: Pardon?
19       MR. ROCHON: I said it's okay to answer. I
20   just asked for the time frame about what Mr. Wistow was
21   asking.
22       THE WITNESS: Okay.
23   Q. Sir, do you have any knowledge about what the
24   specifics are as to the conflicting instructions?
25   A. No. Specifics, no.

Page 87

1    Q. What?
2    A. The specifics of what the conflicting
3    instructions were --
4    Q. Yes.
5    A. -- well, I can tell you my own understanding what
6    this refers to. I can tell you what my own
7    understanding was.
8    Q. I'm only interested, if I may, sir, to save
9    time -- because what's going to happen is -- I'm going
10   to say this in fairness, and it's up to the Court to
11   decide -- I had originally anticipated that the material
12   that I've covered so far would take no more than about
13   twenty minutes.
14       And we're taking an enormous amount of time
15   because, with all due respect -- and I have to leave it
16   to the Court -- I'm not getting responsive answers.
17       I'm asking you, please -- and I'm going to ask
18   that you be brought back --
19       MR. WISTOW: -- and I'm going to be ask that
20   he be brought to the United States, because I don't feel
21   like coming out here again.
22       Now -- and I don't think that's an
23   unreasonable request. You're -- there's a default
24   judgment. You've expressed total cooperation with our
25   discovery here.

Page 88

1        And all I'm asking is, let me get out of
2    here today. Let me try to finish this.
3    Q. Mr. Fayyad, do you know what the conflicting
4    instructions that are referred to are? Do you?
5    A. I'm trying to understand. I'm trying to
6    understand. That's why I'm answering you the way I am.
7    It's not I'm really not wishing to answer. I just don't
8    want to be misunderstood. That's all.
9    Q. You do not what?
10   A. I do not wish to be misunderstood.
11   Q. Do you know what the conflicting instructions
12   are?
13   A. That's really why I answered you the way I did,
14   in terms of trying to relate this statement here to what
15   I knew was happening around that time.
16   Q. Do you know of any conflicting instructions, yes
17   or no, or you don't know?
18   A. How can I really answer it? You know, how --
19   I guess I'm at a loss to understand the problem.
20   A. You know, I'm trying to tell you -- and I'm eager
21   to really get through this as soon as we possibly can.
22       But the one thing I do not want to happen is for
23   me to be quoted as having said something that does not
24   reflect what I knew about the situation or I did not
25   know about it.

Page 89

1    Q. I'm asking about what you know today.
2    A. When you say --
3    Q. I'm asking about what you know today as you sit
4    here.
5    A. Sir --
6    Q. Do you know of any conflicting instructions as
7    referred to in the papers submitted to Judge Lagueux?
8    That's all I'm asking.
9        If you don't, you don't. If you do, please tell
10   me what they are.
11   A. With all due respect, when you say conflicting
12   instructions, if I do not know what those conflicting
13   instructions were about, given the statement you just
14   read to me, I do not know what the context is.
15   Q. I don't either. That's why I'm asking the
16   questions.
17       MR. ROCHON: Mr. Wistow, you've interrupted
18   the witness.
19       MR. WISTOW: You're quite right. You're
20   absolutely right. I apologize.
21   A. Do you understand what I'm saying?
22   Q. I do.
23   A. I'm being asked to answer either yes or no in
24   relation to a statement, a three-line sentence, that you
25   just read --

Fayyad

Page 90

1    Q. Right.
2    A. -- are you aware of conflicting instructions as
3  to this matter.  What conflicting instructions?  You
4  just read to me something out of an over-all context.  I
5  do not know what that is.  And I do not know --
6    Q. That's fine.  That's fine.
7    A. I do not know what conflicting instructions are.
8  If you tell me what they are, I can answer you.
9    Q. I can't.  If I knew what they were --
10   A. That's why I cannot say yes or no.  That's all.
11   Q. If I knew what the conflicting instructions were,
12  I would suggest them to you.  All I know is what your
13  counsel told Judge Lagueux, and I'm trying to find out
14  is there substance to the statement or is there not.
15   A. I believe --
16   Q. That's what I'm trying to do.
17   A. If I may add something.
18     That is exactly why I was saying to you
19  something, sir, about the environment, what was going on
20  around that time in connection with those cases.
21     There was a process of evolution going on in
22  terms of how best to proceed.  There were people who
23  were saying the best thing to do is just basically to
24  really stick to the same line of defense that we had
25  before; and there were others who were saying, no, those

Page 91

1  should be actively pursued.
2    Q. Good.
3    A. To the extent that's what this refers to, I guess
4  that would be a first statement.
5    Q. Okay.  That would be good, and we're making
6  progress.  Thank you.
7      So who was saying stand on the position and who
8  was saying no, answer the case?
9    A. I do not know the answer to this question.  I was
10  outside of the government at the time.
11   Q. But you believe some people were saying answer it
12  and some people were saying no?
13   A. You know --
14   Q. Is that true?
15   A. Yes.  That's consistent with what I said, yes.
16   Q. Okay.  But you don't know who these people are?
17   A. I honestly don't.
18   Q. Okay.  Fair enough.
19   A. Yes.
20   Q. One of things that I want to say, and I say this
21  in sincerity --
22   A. Yes.
23   Q. -- if you don't know the answer to something, I
24  won't press you.  I'll accept that answer.
25     Do you understand?

Page 92

1    A. I understand.
2    Q. Okay.  Now, Mr. Abdul Rahman, do you know who he
3  is?
4    A. Can you give me his full name.
5    Q. Yes.  Is that because there are two Abdul
6  Rahmans?
7    A. It's a common name.
8    Q. I see.  Okay.
9      MR. ROCHON:  There maybe 200,000.
10     MR. WISTOW:  Well, there are two involved in
11  this case that I know of.  Bear with me.
12       (Counsel peruses documents.)
13     MR. ROCHON:  We can make a proffer if you
14  want, counsel.
15     MR. WISTOW:  Yes.  That would save me a
16  little time.
17     MR. ROCHON:  Ahmed Abdul Rahman.
18     MR. WISTOW:  Okay.
19   Q. Do you know who he is?
20   A. I know who Ahmed Abdul Rahman is.
21   Q. Who is he?
22   A. He is part of the leadership.  I do not know if
23  he right now has a position.  At the time he made the
24  statement he made, he was in the leadership, but I do
25  not know what specific position he held.

Page 93

1    Q. I'm a little bit confused.  You say he's part of
2  the leadership, or you don't know?
3    A. I know that he was in the sense --
4    Q. I'm talking about today.
5    A. Today?  No.
6    Q. He's not part of -- -
7    A. Right now, today, he doesn't have -- I haven't
8  seen him participate in any leadership meetings
9  recently.
10   Q. Okay.  So, when he was in the leadership, what
11  was his job?
12   A. I believe -- I believe he was Secretary General
13  of the Cabinet.  I believe.  I believe.  That's --
14   Q. What was your function at the time?
15     MR. ROCHON:  Counsel, just the time frame
16  again.  At the time.
17   Q. At the time that he was -- that Ahmed Abdul
18  Rahman -- whatever his name is -- was in this position,
19  what was your position at that time?
20   A. I mean he was -- I think he was there a long
21  time.  I mean probably since the inception of the
22  Palestinian Authority.  I can't really give you an
23  answer right now.
24   Q. Were you there --
25   A. No.  I joined the PA in mid-2002 only.

Fayyad

Page 94

1  Q. So he was gone?
2  A. No. I don't know if he was there. You know, I
3  used to see him at leadership meetings, you know, when I
4  was a member of Cabinet.
5  Q. Okay. So he would show up at leadership meetings
6  when you were the Finance Minister?
7  A. Yes.
8  Q. Well, what was his job?
9  A. You know, the reason -- if you just give me a
10 little bit of time --
11 Q. Sure.
12 A. -- to try to give you the best answer I can.
13 Q. Take your time.
14 A. The reason I'm having a hard time now remembering
15 is, over the period June, let's say 2002, to early
16 spring 2003, subsequent to that, the position of Prime
17 Minister was introduced and different personnel were
18 introduced at the time.
19    So if I have an overlap with Mr. Abdul Rahman in
20 an official capacity in matters related to Cabinet, it
21 must have been over that brief period between June-July
22 2002 and early 2003.
23 Q. What was his job?
24 A. Probably -- I am trying to translate now --
25 Secretary General.

Page 95

1  Q. Of?
2  A. The Cabinet.
3  Q. Okay. Now --
4  A. Or President. I really don't know. Because the
5  Presidency and the Cabinet -- you understand, we did not
6  have a Prime Minister position at the time.
7  Q. Okay. By the way, what is the difference today
8  between the duties of the President Abbas and you, sir?
9  Are you below him?
10 A. Yes.
11 Q. He's your boss?
12 A. For sure. Yes.
13 Q. Okay. All right. What are you authorized to do
14 and what is he authorized to do in kind of a nutshell,
15 so we can understand?
16 A. I don't know if this can be answered in a
17 nutshell.
18 Q. Do the best you can. We don't need it in
19 excruciating detail. Just so we have some general
20 understanding.
21 A. Well, you know, to -- related to something that
22 is better known around the world, I mean he's like the
23 chief executive of the Palestinian Authority. And he
24 got --
25    Under our Basic Law, a Prime Minister, who runs a

Page 96

1  government, that is considered to be the President's
2  government. So he executes the duties of his office as
3  CEO of the whole PA through a government which I head.
4    In a nutshell, this is what it is.
5  Q. What can he do that you can't?
6  A. He can appoint a Prime Minister. He can fire
7  one.
8  Q. Other than that? Other than that?
9  A. That's why I said it cannot be answered in a
10 nutshell.
11 Q. Are there things that he can do -- I'm not trying
12 to give you a difficult time.
13 A. I just gave you two examples.
14 Q. Are there things that he can do, other than
15 appoint you or fire you, that you can't do? Other than
16 that.
17 A. Well, under the Constitution -- our Basic Law is
18 a Constitution -- he's also Commander in Chief of
19 Security Services.
20 Q. I see.
21 A. But that, too, is delegated.
22 Q. To you?
23 A. Yes. To the government, in certain areas as a
24 matter of law written in the Basic Law.
25    And areas which -- and other areas of security,

Page 97

1  he actually has delegated that to the government as
2  well.
3  Q. Okay. So, again, I'm not trying to give you a
4  hard time on this. I'm just trying to understand --
5  A. Fine. Sure.
6  Q. -- because there are letters to and from
7  President Abbas and letters to and from you. And you
8  understand how, in the United States, we may not be as
9  familiar with this situation --
10 A. I understand.
11 Q. -- as you are. So I'm trying to -- is it --
12    Are you telling me that he's basically delegated
13 all his powers to you, but he can exercise a veto and
14 tell you not to do something or instruct you to do
15 something?
16 A. I mean it's a bit more complicated than that.
17 Q. Okay. Help me out.
18 A. But possibly, if we talk about 2006 --
19 Q. Let's talk about today.
20 A. Well --
21    MR. ROCHON: Objection.
22 Q. We can work backwards, if it's --
23    MR. ROCHON: Objection. Relevance.
24 A. Yes. You know, the reason I choose to talk about
25 2006, it may help, as a matter of fact, better --

Fayyad

Page 98

1    Q. Okay. Whatever you think would be --
2    A. Yes. Probably. I mean it's not that I'm, you
3  know, answering a different question.
4      If this were to happen today, you know, letters
5  like this would be written by me.
6    Q. Letters like what?
7    A. Anything related to -- I mean any involvement by
8  the President, if you really are talking about these
9  cases, would be done by the Prime Minister.
10     The President was involved, if he was involved in
11 2006, is because, at the time, we had a government
12 headed by Hamas, as a matter of fact. And Hamas was not
13 in a position to communicate with internationals on
14 anything.
15   Q. Is that because they were terrorists?
16   A. Technically, it was really they have not
17 fulfilled the requirements under the Road Map stipulated
18 at the time by the Quartet.
19   Q. Were they declared to be terrorists by the United
20 States?
21   A. They were declared to be terrorists by the United
22 States. But, officially, the position taken, if I
23 remember well, by the United States -- as other players
24 on the international scene who took that position of
25 boycotting the government at the time -- it was because

Page 99

1  of noncompliance with requirements stipulated by the
2  Quartet.
3    Q. Was there a list of terrorist organizations put
4  out by the United States executive?
5    A. I'm aware there is something like that.
6    Q. Was not Hamas on that list?
7    A. I believe it.
8    Q. Okay. Still is, is that so?
9    A. I don't know that for sure. You're telling me.
10 I mean if you know it to be the case.
11   Q. You're the Prime Minister. You don't know if
12 Hamas is currently designated as a terrorist
13 organization by the United States?
14     Is that your testimony?
15   A. I am the Prime Minister of the Palestinian
16 Authority, and I'm not here to profess that I know
17 everything --
18   Q. That's fine.
19     MR. ROCHON: Let the witness finish his
20 answer, please.
21   A. So I can't tell you. I mean I know that they
22 were. No reason to believe they're not anymore. It's
23 not something that I follow up on every day.
24     As a practical matter, I know the position taken
25 by the United States on Hamas is that failure by Hamas

Page 100

1  to accept the Quartet conditions is what's getting in
2  the way of the US communicating with Hamas.
3      That's the position as I understand it.
4    Q. You know there was a time, for sure, that they
5  were designated as terrorists by the United States?
6    A. Yes, yes.
7    Q. Did that ever change, to your knowledge?
8    A. No.
9    Q. What?
10   A. To my knowledge, no, it didn't.
11   Q. To the best of your knowledge, they're still
12 designated as a terrorist organization?
13   A. Yes, to the best of my knowledge.
14   Q. Okay. Now, Afif Safieh, do you know who that is?
15   A. Former Ambassador or representative at the UN of
16 the PLO to the United States.
17   Q. Okay. I'm going to show you a letter he wrote to
18 Condoleezza Rice which was filed with the Federal
19 Court -- I can't make out the date. You'll see why I
20 can't make it out in a second.
21     Could you make that out?
22     MR. ROCHON: Would you like that marked
23 as -- what is that? Exhibit 5.
24     THE WITNESS: I don't have it.
25     MR. WISTOW: I'm going to give it to you in

Page 101

1  a moment.
2      MR. ROCHON: I'm sorry, Mr. Prime Minister.
3      THE COURT REPORTER: I think this is going
4  to be 4.
5      (Exhibit No. 4 marked for identification.)
6      THE VIDEOGRAPHER: Going off record at 6:11.
7      (Short recess taken.)
8      THE VIDEOGRAPHER: Going on the record at
9  6:21.
10   Q. Have you had an opportunity, Mr. Fayyad, to read
11 the letter to Condoleezza Rice dated April 27, 2006,
12 from Afif Safieh?
13     MR. WISTOW: What exhibit was that?
14     THE COURT REPORTER: 4.
15     MR. WISTOW: Exhibit 4.
16   A. I just saw it now. I mean I --
17   Q. No. I know. But have you had an opportunity to
18 read it?
19   A. No. I just saw that.
20   Q. I'm talking about this moment. I just gave it to
21 you. Have you finished reading it?
22   A. No.
23     MR. ROCHON: We didn't have it with us in
24 the break. We left everything here.
25     MR. WISTOW: Okay. Fair enough.

Fayyad

Page 102

1    Q. Take your time.
2        (Witness peruses document.)
3    A. Okay.
4    Q. All right. Now, this letter refers, in part, to
5    the Ungar case, does it not?
6    A. I didn't see -- oh, there's a reference to that
7    there. Yes. Okay.
8    Q. I don't blame you for being confused a little bit
9    perhaps. It says it's $216 million?
10   A. I saw that.
11   Q. But it was only $116 million, a more modest
12   amount. In any event, that is a reference, as you
13   understand it, to the Ungar case.
14       Then it goes on apparently -- first of all, did
15   you ever see this letter before?
16   A. No.
17   Q. Were you aware of its contents generally?
18   A. I don't know.
19   Q. Okay. Were you aware that an attempt was made to
20   sell the PLO Mission in New York?
21   A. No.
22   Q. This is the first you've heard of that, is
23   reading this letter?
24   A. Yes. I wasn't aware of it.
25   Q. Okay. So, according to this letter, if

Page 103

1    Mr. Safieh is accurate, there was an attempt made to
2    sell the UN Mission in a proceeding in New York State to
3    pay the judgment.
4        And, in that case, the United States did put a
5    Statement of Interest in to prevent the sale of the
6    Mission.
7        Is that how you read the letter?
8    A. That's what's in the letter there, but I was not
9    aware.
10   Q. This is the first you've ever heard of that?
11   A. Yes. As a matter of fact, this is 2006,
12   April 22, 2006. I was not in the government at that
13   time.
14   Q. I'm not faulting you.
15   A. No, no.
16   Q. I'm just asking did you ever become aware of
17   that.
18       Now, this -- for example, when you came here to
19   testify today, is there something called an Ungar file
20   that your government maintains?
21   A. Not an Ungar file per se. I mean we have, you
22   know, legal action against us in the United States in
23   connection with the Ungar case, but others as well.
24       And we have, you know, we have actually lawyers
25   who do this on our behalf. That's why we have them.

Page 104

1    It's not something that I do every day.
2        It's not that it's not important. It is. But
3    because it is so important, we have hired ourselves
4    legal counsel to represent us in those cases.
5    Q. Right. But does the PA have a file on the Ungar
6    case?
7        Whether it's important, whether it's unimportant,
8    whether you have lawyers, does it have a file?
9    A. If you're really talking about matters pertaining
10   to this litigation being present somewhere, the answer
11   is yes.
12   Q. Okay. Are you telling me it's mixed up with the
13   other terrorist cases, or don't you know?
14   A. I mean I know that they're present, I mean
15   matters pertaining to litigation against us in these
16   cases.
17   Q. Do you understand what I mean -- forgive me. I
18   didn't mean to interrupt. Finish your answer. I'm
19   sorry.
20   A. I finished.
21   Q. Okay. Do you understand what I mean by a
22   discrete file, a file that only deals with, say the
23   Ungar case, and another file that deals with the Knox
24   case, and another file that deals with the Bitan case?
25       Do you understand what I mean by that?

Page 105

1    A. Yes. I understand what you mean by that --
2    Q. Does the PA --
3    A. -- I mean --
4    Q. Does the PA have such files, separate files for
5    each of these cases?
6    A. There definitely are on file. I do not know
7    they've got, for sure, if I've got Ungar file, such and
8    such file, such and such file.
9        I know there is a file that pertains to this case
10   and other cases as well.
11   Q. Okay. So what you're saying to me is you don't
12   know if there is a separate file for Ungar, or whether
13   it's incorporated into a bigger file with a lot of other
14   terrorist cases.
15       Is that fair?
16   A. If I may explain --
17   Q. Is that a fair statement?
18   A. I'm trying to really answer your question. I'm
19   really trying to answer your question.
20       And given my job and what I have to do, if there
21   is something I need to do as to what's going on, then,
22   you know, contact is made with our counsel to ask a
23   question.
24       Now, I am sure, if I really tried hard enough and
25   spent the time needed, I myself would be able to do it.

Fayyad

| Page 106 |
| --- |

1  The material does exist.  But that's how I handle these
2  cases.
3      It's not that I'm not interested in them.  It's
4  that I manage this through our lawyers.  That's why we
5  have them.
6    Q.  Mr. Fayyad, please, I don't mean to suggest that
7  I think there's any fault if you have one kind of file
8  or another.  I'm not.
9      I'm just asking you if you know is there a
10  separate file for the Ungar case, if you know.  And if
11  you don't know, you don't know.
12    A.  I do not know if there is a separate case called
13  Ungar file.  I know that matters pertaining to the Ungar
14  case do exist on file.
15    Q.  Okay.
16    A.  Do you know what I'm saying?
17    Q.  I would hope so.  I mean it would be impossible
18  not to have a file dealing with the Ungar case, wouldn't
19  it?
20    A.  You're asking the question.
21    Q.  That's the question.  I said, Isn't it?  It would
22  be impossible.  You must have a file, right?
23    A.  I guess you're right, yes.
24    Q.  Okay.  Did you look at that file in preparation
25  to come here?

| Page 107 |
| --- |

1    A.  That's what I'm --
2    Q.  Yes or no.  Did you?
3    A.  No.
4    Q.  Okay.  Who maintains that file?
5    A.  You know, it's a file that's available to the
6  Prime Minister's office, like other files that we have.
7    Q.  Who maintains it?  Do you understand?
8      I assume that every file, from the Sewer
9  Commission to the Fire Districts to the Bridge
10  Authority, I assume every file is available to you as
11  Prime Minister, right?
12    A.  Yes, yes.  Right.
13    Q.  But they're all maintained in different offices?
14    A.  Yes.
15    Q.  Okay.  Who maintains the Ungar file?
16    A.  In terms of person?
17    Q.  First let's start with bureau or department.
18    A.  Yes.  Prime Minister's office.
19    Q.  So it's in your office?
20    A.  Yes.  Prime Minister's office, yes.
21    Q.  Okay.  Now, and is there a section of your -- I'm
22  not familiar with your office, obviously.  So do you
23  have subsections?
24      Like is there a legal department in the Prime
25  Minister's office?

| Page 108 |
| --- |

1    A.  Yes.  There is a legal department in the
2  secretariat of the Council of Ministers.
3    Q.  Yes.  But forgive me.  Maybe I misunderstood.  I
4  thought you said that there's a file --
5    A.  Yes.
6    Q.  -- in the --
7    A.  -- yes.
8    Q.  I haven't finished.
9      I thought you told me there's a file in the Prime
10  Minister's office, right?
11    A.  Yes.
12    Q.  Okay.  Now, we're trying to find out the
13  subsection, what it's called.
14      There are different departments in the Prime
15  Minister's office?  Yes?  Are there different
16  departments?
17    A.  Yes.
18    Q.  Okay.  And one of those departments maintains the
19  file that has the Ungar papers in it?
20    A.  But that's what I'm trying to explain to you,
21  sir.
22      As a matter of fact, what we have, we have files
23  for business of the Prime Minister in the Prime
24  Minister's office.  It's not that it is with a
25  department within the Prime Minister's office.

| Page 109 |
| --- |

1      Do you see what I'm saying?
2    Q.  So this is directly in the Prime Minister's
3  office?
4    A.  Yes.  It is in the Prime Minister's office.
5    Q.  Okay.  So there are various subdivisions?
6    A.  Exactly.
7    Q.  Give me just -- like, for an example, give me
8  another subdivision?
9    A.  You know, external relations.
10    Q.  External relations --
11    A.  External relations.
12    Q.  Okay.  So external relations has files --
13    A.  Yes.
14    Q.  -- that are available to you?
15    A.  Yes.
16    Q.  But the Ungar papers would be in a file, not in
17  one of these separate departments within the Prime
18  Minister's office, but directly in the Prime Minister's
19  office?
20    A.  Yes.
21    Q.  Okay.  Fine.  Who has custody of them?  What
22  human being has custody of the files today?
23    A.  My secretary.
24    Q.  Your secretary?
25    A.  Yes.  My secretary.

Fayyad

Page 110

1    Q. So these files are really in your custody, right?
2    And you have a secretary who handles them for you?
3    Right?
4    A. You know --
5    Q. I'll withdraw the question. I'll withdraw the
6    question.
7    A. Okay.
8    Q. What's your secretary's name?
9    A. Right now?
10   Q. Yes.
11   A. His name is Mohammed Jarrad.
12   Q. Mohammed Jarrad?
13   A. Mohammed Jarrad. Yes.
14   Q. Okay. Could you spell that?
15   A. Mohammed -- M O --
16   Q. Well, I got Mohammed.
17   A. Jarrad -- J A R R A D.
18   Q. Okay. So if you wanted to look at the files that
19   have the Ungar papers in them, you would ask Mohammed
20   Jarrad to get it for you?
21   A. If I needed that, then I would ask him, I would
22   say get me such and such. I remember seeing
23   correspondence on such and such generally. I would say
24   bring me that piece of paper, not the whole file.
25   Q. If you said, Mr. Jarrad, bring me all of the

Page 111

1    papers on the Ungar file, he's the guy you'd expect to
2    bring them, right?
3    A. He's my office director, yes.
4    Q. He has the physical files?
5    A. Then he would do something to actually bring that
6    file.
7    Q. What would he do? Would he get the file or would
8    he ask somebody else?
9    A. He would ask one of his assistants to do so.
10   Q. Okay. So who -- is there somebody else who
11   actually keeps the files below him?
12   A. Yes. I mean he doesn't do filing himself.
13   Q. Okay. I don't know that. I don't mean to insult
14   Mr. Jarrad. Do you understand?
15   A. Yes. I understand.
16   Q. Okay. So do you know who maintains the file
17   physically?
18   A. I know that there are individual staffers who
19   handle different chores in my office. I do not know
20   each one of them.
21   Q. Do you know who does the filing for the American
22   terrorist cases?
23   A. No. I cannot tell you that. See, I'm trying to
24   explain to you. I do not have someone specialized in
25   filing these cases only.

Page 112

1    Q. Okay.
2    A. We have general filing, you know, for everything,
3    and it's not segregated in this way.
4    Q. Okay. So it would vary from day to day who would
5    do it?
6    A. All I know, if I wanted something, I get it.
7    That's all.
8    Q. All you know is you ask Jarrad for it?
9    A. Yes.
10   Q. How he gets it, you don't know?
11   A. No, I don't.
12   Q. Okay. Fair enough.
13      Now, do you know -- probably there was some money
14   that was held in the registry of the United States
15   District Court for the District of Columbia, according
16   to Exhibit 4.
17      And Afif Safieh -- am I pronouncing that right?
18   A. Close. Safieh.
19   Q. Safieh. -- was asking Condoleezza Rice to assist
20   in freeing up that $200,000, correct?
21   A. That's what he's asking for, yes.
22   Q. You don't know if that happened, it didn't
23   happen? You don't know what happened?
24   A. I'm not aware about that. I don't know.
25   Q. Okay. Also, the Wachovia Bank was unwilling to

Page 113

1    provide commercial banking services, according to this?
2       MR. ROCHON: Counsel, I'm going to object on
3    foundation, I mean for the obvious reasons given the
4    earlier answers.
5       You don't like speaking objections so I'm
6    not making one, but --
7       MR. WISTOW: It's okay. I'm going to move
8    on in just a second.
9    Q. So you don't know about that either?
10      MR. WISTOW: I just don't want to be
11   surprised later. That's all.
12      MR. ROCHON: He said he'd never seen it.
13      MR. WISTOW: He never saw the letter.
14      MR. ROCHON: And didn't know anything about
15   the substance. That's what he said.
16      MR. WISTOW: Just, please --
17      MR. ROCHON: All right. You know.
18      MR. WISTOW: Please. Indulge me.
19      THE WITNESS: Excuse me. I have to take
20   this phone.
21      MR. WISTOW: Sure. Do you want to step
22   outside?
23      MR. ROCHON: We'll do that off the record,
24   Mr. Prime Minister. Go off the record.
25      MR. WISTOW: Yes. You probably want to do

Fayyad

Page 114

1  this in private.
2       THE WITNESS:  Yes, because I just need to
3  take this phone.
4       THE VIDEOGRAPHER:  Going off the record at
5  6:37.
6       (Exhibit No. 5 marked for identification.)
7       (Short recess taken.)
8       THE VIDEOGRAPHER:  Going on the record at
9  6:38.
10      MR. ROCHON:  Just for the record, so it was
11 about a one-minute break.
12      MR. WISTOW:  Okay.
13      MR. ROCHON:  Thank you.
14   Q.  I take it you're familiar with the document that
15 I just handed you, Exhibit 5?
16   A.  Yes.
17   Q.  And do you know what that is?
18      (Witness peruses document.)
19   A.  Yes.  It's a declaration that I made.
20   Q.  Right.  Do you remember signing it?
21   A.  Just give me a second while I just --
22      (Witness peruses document.)
23   A.  Yes.  That's my signature on it.
24   Q.  No, no.  I'm not asking if it's your signature.
25 I hope it is.  I'm asking if you remember signing it.

Page 115

1   A.  Yes.  I remember the document.  Yes.
2   Q.  Okay.  I take it you didn't prepare the document?
3   A.  Pardon?
4   Q.  Did you prepare the document?
5       MR. ROCHON:  Objection.  We're going to get
6  into privileged areas.
7       MR. WISTOW:  How can it be privileged.  All
8  I'm asking him is -- I'm looking at all the information.
9  I'm just asking who prepared it.
10   Q.  I assume your lawyer prepared it?
11      MR. ROCHON:  Objection.  Don't answer the
12 question.
13      MR. WISTOW:  Okay.
14   Q.  Did you prepare this declaration?
15   A.  Isn't that the same question you asked before?
16   Q.  I don't think so.
17      MR. ROCHON:  Counsel, the declaration speaks
18 for itself.  The preparation of it --
19      MR. WISTOW:  Whatever you say.  Just
20 instruct him not to answer.  I don't care.
21      MR. ROCHON:  Because it intrudes on matters
22 of privilege, and only for that reason, I'm instructing
23 the witness not to answer.
24      MR. WISTOW:  Okay.  So I just want to be
25 clear.  The question is did you prepare the declaration,

Page 116

1  and he's being told not to answer, correct?
2       MR. ROCHON:  But only because, counsel, I
3  know the answer, and it would implicate privilege
4  because it could not be yes or no.  And you don't --
5       MR. WISTOW:  Sure, it could be.  It could be
6  an assistant prepared it.  It doesn't --
7       First of all, there's no privilege even if
8  it was you.  And second of all, saying he didn't prepare
9  it doesn't mean necessarily a lawyer did.
10      But I don't want to fight.  I don't want to
11 waste time.  I'll live with the instruction at this
12 point.
13   Q.  All right.  Did you understand the declaration
14 when you signed it?
15   A.  Yes.
16   Q.  Okay.  I'm going to ask you some questions about
17 it.  I'm going to go to page 2.
18      And you'll see, on the second line, it begins, On
19 June 18, 2005, I accordingly sent a letter to Secretary
20 of State Rice requesting her assistance in these cases
21 "consistent with the Constitution and laws of the United
22 States."
23      I emphasized in my letter that the attempt by
24 Plaintiffs' counsel to interfere with the actions of the
25 Palestinian government around the world was "not

Page 117

1  supported by United States law and also ran counter to
2  international law and the laws of several foreign states
3  in which the PNA operates."
4       Have I read that correctly?
5   A.  Yes, you have.
6   Q.  Okay.  Now, what laws were you referring -- what
7  was the basis for your statement that the attempts by
8  Plaintiffs' counsel to interfere with the actions of the
9  Palestinian government was not supported by United
10 States law?
11      What knowledge did you have at the time?
12      MR. ROCHON:  Mr. Prime Minister -- I didn't
13 want to interrupt your question -- I would object and
14 tell you that it's the same privilege, attorney-client
15 privilege -- not with my law firm, but with counsel to
16 the Pension Fund -- upon whose behalf the letter was
17 being written.
18      MR. WISTOW:  I just want it to be clear on
19 the record what we're talking about.
20      There's a letter, June 18, 2005, where he
21 says that the Plaintiffs' efforts to interfere was "not
22 supported by United States law."
23      MR. ROCHON:  Yes.
24      MR. WISTOW:  I'm just asking what knowledge
25 he had with regard to that statement.

Fayyad

Page 118

1      MR. ROCHON: Okay.
2      MR. WISTOW: If you want -- I just want to
3  make that clear.
4      MR. ROCHON: I understand.
5      MR. WISTOW: If he's got any basis to
6  support the statement whatever.
7      MR. ROCHON: Because the answer would be
8  premised on advice of counsel, I'm going to instruct the
9  witness not to answer.
10     MR. WISTOW: He could say I don't know.
11     MR. ROCHON: He could say many things.
12 Because the answer is based --
13     MR. WISTOW: Okay. I accept the
14 instruction.
15     When I say I accept the instruction, I don't
16 mean that I agree with it. I mean I don't want to fight
17 about it.
18     MR. ROCHON: I understand.
19     MR. WISTOW: Okay.
20  Q. It goes on to say that it ran counter to
21 international law.
22     Did you have any knowledge at the time of what
23 international law was being referred to?
24     MR. ROCHON: Same objection. Any knowledge
25 would have been based on advice of counsel.

Page 119

1   Q. Then it says, And the laws of several foreign
2  states in which the PNA operates.
3      Did you have any knowledge which foreign states
4  were being referred to?
5      MR. ROCHON: Same objection, and the answer
6  would be based on the advice of counsel.
7      MR. WISTOW: Okay.
8   Q. Now, you go on to say in your affidavit, I
9  further explained to Secretary Rice my understanding at
10 the time that the PNA's failure to "file an unqualified
11 appearance in answer to Plaintiffs' complaint" had
12 occurred in order to preserve our legal position both in
13 the United States and overseas with respect to potential
14 efforts by Plaintiffs to seek enforcement of the default
15 judgment in other countries.
16     Have I read that correctly?
17  A. Yes, you have.
18  Q. Okay. Now, do you know if anybody told you of
19 any risks associated with taking that legal position?
20     And I -- well, okay.
21     (Witness peruses document.)
22     MR. ROCHON: Counsel, could you show the
23 witness the full letter that you're asking him about
24 parts of it.
25     MR. WISTOW: Sure.

Page 120

1      MR. ROCHON: Thank you.
2      MR. WISTOW: (Indicating).
3      MR. ROCHON: We should probably have it
4  marked.
5      MR. WISTOW: Well, all right.
6      MR. ROCHON: I'm not insisting.
7      MR. WISTOW: Let's not mark it now. I
8  promise you we're going to get into it and we'll mark
9  it.
10     MR. ROCHON: Thank you.
11     MR. WISTOW: Okay.
12     (Witness peruses document.)
13     MR. ROCHON: And the section that's quoted
14 there, do you mind if I note where it is, counsel, in
15 the letter?
16     MR. WISTOW: No. I don't mind.
17     MR. ROCHON: It's at the top of page 2 of
18 the letter, Mr. Prime Minister.
19     THE WITNESS: Top of page 2?
20     MR. ROCHON: Yes. That paragraph
21 (indicating).
22     (Witness peruses document.)
23  A. Okay.
24  Q. Okay. Do you have my question in mind, or would
25 you like me to repeat it?

Page 121

1   A. You asked me if I recall if somebody told me what
2  this is about in terms of implications.
3   Q. If anybody ever told you there was any risk
4  associated with the position set forth in the letter.
5  That's what I'm asking you.
6   A. All I can tell you is I must have had good reason
7  to really include this. This is a June 18, 2005 letter,
8  so I must have been aware of that risk at the time I
9  sent that letter.
10  Q. What risk?
11  A. That you're referring to.
12  Q. What am I referring to?
13  A. In terms of why it is we acted the way we did,
14 not filing an unqualified appearance before the Court.
15 That's what I thought you asked.
16  Q. Okay. Well, I'm glad you said that because you
17 misunderstood me. It's my fault probably. I didn't ask
18 the question very well.
19     What I'm trying to find out is whether you
20 understood that any risk was associated with taking that
21 position with the Court.
22  A. Any risk?
23  Q. If anything bad could happen by taking that
24 position. That's what I'm asking.
25  A. But that's how I understood the question.

Fayyad

<table>
<tr><td>

Page 122

1  Q. Okay. Can you answer it?
2  A. Basically, what I said. I must have been aware
3  of that risk for me to refer to it.
4  Q. What was that risk?
5  A. As I explained to you.
6  Q. That you would be defaulted?
7  A. Yes.
8  Q. So you were aware of that risk?
9  A. Basically, I was afraid -- basically, the concern
10 that we had is that this could form a basis for
11 collection against us everywhere.
12 Q. I'm not talking about that. Slow down for a
13 second, okay?
14 A. Yes.
15 Q. You explained to her --
16 A. Yes.
17 Q. -- that -- take a look at it -- that you failed
18 to file an unqualified appearance in answer to the
19 Plaintiffs' complaints, right?
20   You told her that?
21 A. Yes. Here it is. To preserve our legal
22 position, both in the United States and overseas, with
23 respect to any potential efforts by Plaintiffs to seek
24 enforcement of the default judgment in other countries.
25   The PNA and the PLO continued to maintain that

</td><td>

Page 124

1  Q. Yes. The letter that you just handed me is the
2  letter referred to in your declaration, is it not?
3  A. Yes. Yes, it is.
4    MR. WISTOW: Can we mark that. Did I give
5  you guys copies?
6    MR. ROCHON: No. You gave the Prime
7  Minister the one court reporter will mark once I
8  stop talking.
9    (Exhibit No. 6 marked for identification.)
10 Q. Now, you left -- well, strike that.
11   Did you get an answer to the letter?
12 A. I don't remember if I got an answer to the letter
13 because, you know, I left not long after that.
14 Q. Well, this letter was sent in June of 2005. When
15 did you leave?
16 A. I believe November 2005.
17 Q. Wasn't it December of 2005?
18 A. Yes.
19 Q. Could be?
20 A. Yes. Exact date? Yes. Maybe early December
21 probably. Yes.
22 Q. Okay. So that's -- I don't know --
23 A. I mean, officially, it's like one's resignation
24 goes into effect and what have you.
25 Q. Okay. Well, how many months between the time you

</td></tr>
<tr><td>

Page 123

1  the District Court lacked both personal jurisdiction
2  over them and subject matter jurisdiction over the
3  dispute; and according -- and, accordingly, did not file
4  an unqualified appearance in answer to the Plaintiffs.
5  Q. I understand. What I'm asking you is, you
6  understood that a possible risk of not filing an
7  unqualified answer was that you could be defaulted,
8  correct?
9  A. Yes. That's basically -- yes. I see that as a
10 risk.
11 Q. Okay. Fair enough.
12   And now, in your declaration, you say, My focus,
13 as Finance Minister for the PA, was solely on the
14 immediate financial implications of the litigation.
15   You see that?
16 A. Where?
17 Q. In your declaration, towards the end of
18 paragraph 5. Do you see that?
19 A. Toward the end -- My focus, as Finance Minister
20 for the PA, was solely on the immediate financial
21 implications of the litigation and, as noted, my role as
22 Finance Minister ended not long -- yes -- not long after
23 I sent the correspondence to Secretary Rice. Yes.
24 Q. All right. May I have the letter?
25 A. The letter? Yes (indicating).

</td><td>

Page 125

1  sent this letter and your leaving?
2  A. I left in early December. This is June 18.
3  Five, six months.
4  Q. So you're unable to tell me whether or not you
5  got a response?
6  A. Written -- written response on this, I'm not sure
7  exists. I don't remember receiving a written response
8  to this letter.
9  Q. Okay. Did you get an oral response?
10 A. I probably did, in the sense of, you know,
11 communication that the matter is under consideration, or
12 something like that.
13 Q. Are you speculating?
14 A. In the nature of things, I am, because that's how
15 business is done usually on matters like this. It's not
16 -- and it's in line with practice.
17 Q. Yes. But what I'd like to do is -- you're under
18 oath. It's a very serious matter.
19   I'm asking you, did you have an oral discussion
20 with Condoleezza Rice about the contents of your letter.
21 A. Something to the effect of what I just said.
22 Cannot be more than that.
23 Q. I don't know what you just said, to be honest.
24 A. What I said before. Something to the effect that
25 the matter was under consideration.

</td></tr>
</table>

Page 126

1    Q. So she did not say that to you?
2    A. Not she personally. I don't remember who
3  actually communicated this.
4    Q. Somebody did?
5    A. Yes. Somebody did.
6    Q. Where were you when they communicated this? Were
7  you in Washington?
8    A. No. You know, there are always contacts between
9  us and the United States. I don't have to be physically
10  present nor does the Secretary have to be physically
11  here.
12    Q. I'm aware there are telephones.
13    A. In addition, they have representation as well
14  here.
15    Q. But here's what I'm trying to find out, okay?
16    A. Yes.
17    Q. You wrote a letter in June. I'm trying to find
18  out if there was ever any kind of response to it,
19  whether it was oral, whether it was written.
20      Can you tell me?
21    A. I am trying to remember now.
22    Q. And if you don't remember, just say that. Please
23  don't speculate.
24    A. I'm not speculating. I'm just trying to
25  remember.

Page 127

1      First of all, there was no letter that I can
2  recall on this one, on this issue, other than letters
3  which had different things in them.
4      In terms of, you know, communication on the
5  substance of what this was about, I can't be a hundred
6  percent certain, but it is most unlikely, given the
7  importance of the case, that there was no, you know,
8  communication to the effect that I just told you.
9      Exactly when it happened, do I think for sure, I
10  cannot tell you.
11    Q. What you're saying is, by custom and usage --
12    A. Yes.
13    Q. -- it would be very unusual --
14    A. Yes.
15    Q. -- for the Finance Minister to write to the
16  Secretary of State of the United States and not get the
17  courtesy of a reply?
18      Is that what you're saying?
19    A. Well, you know, not necessarily in those precise
20  terms that you use. But in the way business is done
21  between governments --
22    Q. Yes?
23    A. -- you submit a letter, because there are so many
24  facts to it. And I do not know the extent to which, at
25  the time, the Secretary was aware of any of this, being

Page 128

1  it was important to do it in this expansive fashion at
2  the time.
3      Now, again, given the way business is done,
4  matters like this and others, there would be subsequent
5  communication in the sense of, you know, something is
6  being done about this. It's being looked at.
7      I can't really tell you for sure. I know
8  something like that must have happened.
9    Q. You expect you got some kind of reply?
10    A. But not anything more than I told you.
11    Q. You don't even remember that?
12    A. I don't.
13    Q. Maybe they said they'll take it under
14  consideration? Maybe --
15    A. Not anything more than that.
16    Q. That's the most?
17    A. Yes.
18    Q. But even that may not have happened?
19    A. You know --
20    Q. It's unlikely, but --
21    A. It's unlikely. It's unlikely. It's unlikely.
22    Q. But you can say --
23    A. It's unlikely.
24    Q. -- you'd expect to get something. But you don't
25  remember it at all?

Page 129

1    A. And if, for no other reason, because of, you
2  know, my own interest in it. I mean there's just no way
3  that I would not really have asked again, you know, as
4  to what happened and where things were.
5      But I, sitting here now several years later --
6  five years later -- I cannot tell you exactly.
7    Q. So you agree with me this was important to you?
8    A. Oh, it was.
9    Q. Okay. But you don't remember the follow-up? You
10  don't remember the follow-up?
11    A. It was a matter of a few months only.
12    Q. Whether it was a few months or a few years, you
13  don't remember any follow-up, correct?
14    A. In the months -- in the months that followed, and
15  while I was still in government, there was not anything
16  beyond what I told you --
17    Q. Okay.
18    A. -- you know.
19    Q. So did you speak to anybody in government before
20  you left and say, look, we need to follow up with
21  Condoleezza Rice, or something to that effect?
22      Did you do that?
23    A. You know, in the nature of -- this is something,
24  this particular -- this particular letter, as a matter
25  of fact, I remember personally handing it over to the

Fayyad

---

Page 130

1  Secretary in a meeting by both sides, Palestinian and
2  American delegation, headed Condoleezza Rice.  And also
3  there were several ministers in the room.
4      And, when I left, it was basically left with my
5  successor, everything that was there.
6      Q. Let me make sure I understood what you just said.
7      You said you physically handed this letter to
8  Condoleezza Rice?
9      A. I remember that.  I explained it verbally; and
10  then I said, I have a letter to give you.
11     Q. Okay.  And you didn't get an answer right then
12  and there, did you?
13     A. No.  I did not, no.
14     Q. So -- and you don't recollect ever hearing a
15  response before you left government, correct?
16     A. I do not have exact or specific recollection of
17  that happening.
18     Q. You think, by custom and usage --
19     A. Yes.
20     Q. -- it probably happened?
21     A. Yes.  But to the extent I explained to you.
22     Q. Okay.  Fair enough.  So, at most, somebody said,
23  We're thinking about it?
24     A. Yes.
25     Q. Okay.  Now, when you left and you handed your

---

Page 131

1  portfolio over to somebody, who was that you handed the
2  portfolio to?
3      A. My deputy at the time.
4      Q. What was his name?
5      A. Jihad Al-Wazir.
6      Q. What?
7      A. Jihad Al-Wazir.
8      Q. How do you spell that?
9      A. J I H A D, A L W A Z I R.
10     Q. Okay.  Now --
11     A. Can I explain this so this is placed in context?
12     This was something that lasted only three months
13  or so, because, after that, there was total government
14  change and Hamas came in power.
15     Well, you know, just so you know.
16     Q. Right.
17     A. It was a period of transition, in other words.
18     Q. Mr. Fayyad, have I not displayed to you that, if
19  I want to know something, I'll ask.  Haven't you figured
20  that out, with all due respect?
21         MR. WISTOW:  I'll withdraw the comment.
22     Q. Mr. Fayyad, did you ask anybody to follow up with
23  Condoleezza Rice on this letter?
24     A. No.  I did not specifically ask --
25     Q. Okay.

---

Page 132

1      A. -- somebody to follow up on this letter to
2  Secretary Rice.
3      But, by then, you know, it was known that there
4  was an important issue to be pursued by whoever took
5  over the portfolio.
6      Q. How did you know that it was known that there was
7  an important issue to take over?  How do you know that
8  this was just not a piece of paper filed in a file?
9      Did you talk to people about it?
10         MR. ROCHON:  Objection.  Those are three
11  questions, and you have to pick which one you want him
12  to answer.
13         MR. WISTOW:  Okay.
14     Q. How do you know that anybody was aware of this
15  issue?
16     A. That is why I told you -- actually I remembered,
17  as I tried to understand basically what it is you're
18  looking for and asking about -- is that this was a
19  matter of importance to us, and not just an individual.
20     And that's why I remember handing it over in a
21  meeting, official meeting, attended by several officers
22  on both sides, as a matter of fact.
23     Q. Is this meeting when you gave it to Condoleezza
24  Rice?
25     A. Yes.

---

Page 133

1      Q. I'm not talking about that.
2      A. Yes.
3      Q. I'm talking about before you left --
4      A. Yes.
5      Q. -- months later --
6      A. Yes.
7      Q. -- did you ask anybody in government, Follow up
8  with Condoleezza Rice on this, what you've said, very
9  important matter?
10     A. Yes.  No.  I did not specifically on this very
11  matter.
12     Q. Okay.
13     A. But, you know, it was understood this is an
14  important matter.
15     Q. How -- that's what I'm trying to find out.  How
16  do you know -- who knew it was an important matter?  Who
17  are the human beings you're talking about?
18         MR. ROCHON:  That's the question you started
19  answering when you said he wasn't answering the
20  question.
21     Q. Who knew about this important matter?
22     A. Everybody who was in that room.  Everybody -- I
23  mean --
24     Q. Who was that?
25     A. There were several ministers at the time at that

---

Fayyad

---

Page 134

1  meeting.
2     Q. Who?
3     A. I don't remember for sure, but probably the
4  Minister of Foreign Affairs was there.
5     Q. What was his name?
6     A. The Prime Minister then was there for sure. I
7  mean, there were several ministers attending.
8       This is something that was, by that time, you
9  know, discussed widely. I mean it's --
10    Q. It was a big deal?
11    A. Yes. It was a big deal. Definitely, it was a
12  big deal. For sure it was a big deal.
13    Q. Okay. When you came back into government --
14    A. Yes.
15    Q. -- did you, because it was such a big deal, try
16  to find out what happened?
17    A. Yes.
18    Q. What did you find out?
19    A. I found out that, as a matter of fact, that the
20  President's office was seeing to the matter, and that
21  they were in the process of trying to find legal
22  representation.
23      And, you know, then I took over and I basically
24  carried this forward, and took -- and played an active
25  role in actually finding us legal representation to

---

Page 135

1  pursue these cases.
2     Q. I'm not talking about that. I'm talking about,
3  you asked Condoleezza Rice to do something, right?
4     A. Yes.
5     Q. Okay. Up to the time you left --
6     A. Yes.
7     Q. -- you don't know if you ever heard from her
8  again, right?
9       MR. ROCHON: Objection. Asked and answered.
10    A. Well, as I told you --
11      MR. WISTOW: I'm trying to put him back
12  on --
13    A. I really don't remember. I told you that.
14    Q. You don't remember hearing from her. So, at
15  best, you told me before, you were told that the whole
16  issue was under advisement.
17      Do you remember that?
18    A. Oh, yes. What I'm really saying to you is I do
19  not remember specific, you know, communication on this
20  matter.
21      Given the importance that we attached to this at
22  the time, it is most unlikely that I did not follow up
23  on it. Even if I did, the customary answer would have
24  been -- most likely something given as an answer was
25  that, you know, it was something that was being

---

Page 136

1  considered.
2     Q. So you followed up?
3     A. Yes. Yes.
4     Q. How did you follow up? What did you do?
5     A. I don't know. Typically, generally, first thing
6  you do when you have something like this --
7     Q. Yes?
8     A. -- is to actually talk to the US representative
9  here.
10    Q. To the what?
11    A. To the US representative here.
12    Q. In Palestine?
13    A. The Consul General in Jerusalem, yes.
14    Q. Did you do that?
15    A. Well, now, I really --
16    Q. Did you do that?
17      MR. ROCHON: Let him finish the answer.
18    A. I can tell you, in all likelihood, given the
19  importance of the matter, I must have done.
20    Q. Okay. Where were you? In his consulate?
21    A. Pardon?
22    Q. Was it in his consulate?
23    A. Or in my office, or over the phone.
24    Q. You don't remember?
25    A. I don't remember.

---

Page 137

1     Q. Do you remember what he said?
2       MR. ROCHON: Counsel, you're repeating. I'm
3  not getting upset, because you don't like it, but it's
4  been several times. Let him finish.
5       MR. WISTOW: Okay.
6       THE WITNESS: Yes.
7     A. You know, as I tried to explain --
8     Q. Please, what did the US Consulate say?
9     A. Let me try to really say this -- I hope the last
10  time -- in a way that is clear or adequately and
11  sufficiently understood.
12      The matter is of importance to us. I submitted
13  this letter to the Secretary. In all likelihood, given
14  the importance of that matter to us, I must have, at the
15  time, followed up by asking, you know, questions as to
16  where do we stand on the matter, given what was
17  involved, given the importance of the issues.
18      Typically, those communications first take place
19  through and with the US Consul General in Jerusalem.
20  This could have happened at his office, at my office,
21  his office, my office, or telephone call. You know,
22  things like this happen all the time.
23      I mean this is in the nature of on-going concern.
24  To not have gotten a written response to a letter like
25  this which is saying, you know, we have a problem, is

---

Fayyad

|                               | Page 138 |
|-------------------------------|----------|

1  not out of the ordinary, to not have gotten a response
2  in writing.
3      So I think all of this is within the realm of
4  what is most likely to have happened.
5      Q.  Okay.  Do you have any recollection -- a real
6  memory -- of anything happening?
7      A.  Memo?
8         MR. ROCHON:  No, no.  He didn't say memo.
9  He said memory.
10     Q.  Memory.
11     A.  Memory.  All I'm telling you --
12     Q.  Do you have any memory, sir?
13     A.  What kind of question is this?
14     Q.  What kind of question?
15     A.  Yes.
16     Q.  Do you know what memory is?
17        MR. ROCHON:  Your question wasn't specific.
18  You said, Do you have any memory.
19     Q.  Do you have any memory of getting a response from
20  the American Consulate?  Yes or no.
21     A.  I'm not, you know, with all due respect, counsel,
22  I mean I told you everything I know about this in the
23  way it must have happened.
24     This is five years ago.  Try to please understand
25  my world.

|                               | Page 140 |
|-------------------------------|----------|

1      Q.  I'm going to ask you yet again.
2      Do you remember it happening, or are you saying
3  it must have happened?
4      A.  It must have happened.
5      Q.  But you don't remember it, is that fair?  You
6  believe it happened?
7      A.  Yes.
8      Q.  You believe it?
9      A.  Yes.
10     Q.  But you don't remember it, true?
11        MR. ROCHON:  Counsel, it's been asked and
12  answered.
13        MR. WISTOW:  No.  I never got an answer that
14  he has no memory.
15     A.  I mean if it settles it if I were to say no, I
16  don't remember, I don't remember.  If it settles it.
17  Thank you.
18     Q.  If it's true.  I don't want you to --
19     A.  I know.  But you're pushing me so much.  You want
20  to really end this line of questioning.  I'm compelled
21  to say no, I don't remember, to move on.  I mean really.
22     Q.  No.  You're compelled to answer the truth.  You
23  swore an oath.
24     A.  I am trying.  Honest to God, all I'm trying to do
25  is to answer most faithfully all the questions that you

|                               | Page 139 |
|-------------------------------|----------|

1      Q.  Okay.
2      A.  You know, here I am dealing with all kinds of
3  things, and I have been over the past three years.
4  Something that happened five years ago, in all
5  likelihood this is what has happened.
6      I've given you a scenario.  I talk to the
7  Americans all the time about just about everything,
8  about all aspects of bilateral relations, on an ongoing
9  basis.  That is one of them.
10     Q.  Mr. Fayyad, I'm not suggesting there's anything
11  wrong if you don't remember.
12     A.  Yes.
13     Q.  I'm just trying to find out whether or not you do
14  remember.  That's all I'm trying to find out.
15     Do you remember?
16     A.  And what I'm really trying to tell you is that
17  this is something that must have happened really.
18     Q.  Do you have a memory of it happening?
19     A.  I cannot imagine it not having happened.
20     Q.  Do you have a memory of it happening?
21     A.  I'm trying, you know.  What you're asking me, I
22  mean I really -- there is no other way in which I can
23  answer this question.
24     It must have happened.  That's what I'm really
25  trying to tell you.

|                               | Page 141 |
|-------------------------------|----------|

1  are putting to me.
2      And I am trying to provide you with some
3  contextual remarks as to what has happened to try to
4  really project it as best as I can.
5      Q.  All I'm asking -- it's very simple --
6      A.  Yes.
7      Q.  -- is whether you have a memory of getting a
8  response from the American Consulate.  That's all I'm
9  asking.
10     And you said, a moment ago --
11     A.  The answer is no.  Let's move on, please.  And I
12  accept that as a matter of record, whatever happens,
13  just so we can move on really.
14     I feel I am being badgered here.
15     Q.  I apologize if you feel that way.  I feel like
16  I'm doing my job, and I intend to proceed.
17        MR. WISTOW:  If you want to take a moment to
18  take a break?
19        MR. ROCHON:  Can I just do this?
20        MR. WISTOW:  Yes.
21        MR. ROCHON:  It's maybe that there's a
22  suggestion that is being perceived that, when you say
23  somebody doesn't have a memory, that therefore it didn't
24  happen.
25        MR. WISTOW:  But that's not my fault.  I

Fayyad

Page 142

1    mean I don't -- look --
2           MR. ROCHON: If we could clear --
3           MR. WISTOW: I don't want to get into this
4    speaking thing. I don't want to get into a discussion
5    with you. I was told that he doesn't need a translator.
6    I told he's fluent in English.
7           MR. ROCHON: There's no issue with
8    translation.
9           MR. WISTOW: That's right. It's not an
10   issue. It's a common thing. I've asked this kind of
11   question hundreds, if not thousands, of times. It's
12   very symbol. Do you remember it? Not do you believe it
13   happened because that's the custom, but do you remember
14   it.
15          MR. ROCHON: But you're connecting --
16          MR. WISTOW: And you understand. Let's just
17   move on. We're wasting time. He's answered the
18   question.
19          MR. ROCHON: I don't understand, but I'll
20   move on if you wish.
21          MR. WISTOW: I don't mind if you want to
22   take him out and talk to him now. It's okay with me.
23          MR. ROCHON: I'm actually trying to talk to
24   you, but you don't want to talk to me. So let's go.
25          MR. WISTOW: Okay.

Page 143

1           MR. ROCHON: I don't need to talk to the
2    Prime Minister about your questions.
3           MR. WISTOW: Okay.
4    Q.  Now, I want to go to your letter. Before I do
5    that, just a couple more questions about your
6    declaration.
7    A.  Okay.
8    Q.  You affirmatively stated --
9    A.  Which page, please?
10   Q.  Well, let me finish.
11       You affirmatively stated, in paragraph 12, that
12   you decided to retain new counsel for the PA and PLO.
13       Do you see that? Paragraph 12?
14   A.  Paragraph 12, yes.
15   Q.  Why did you decide to retain new counsel for the
16   PA and PLO?
17   A.  Yes. Because of, again, two things.
18       Number one, the importance of this matter, which
19   I definitely felt.
20       And, secondly, that, by that time, as I indicated
21   to you before, that there was this discussion and
22   evolution in the direction of actively defending
23   ourselves in this case, and other cases as well, which
24   required retaining lawyers, you know, to do this on our
25   behalf.

Page 144

1    Q.  Mr. Clark couldn't defend the case?
2    A.  I never met Mr. Clark. But I know that
3    Mr. Clark -- or I'm aware -- that he had a role in this
4    at the time. The position was there was no jurisdiction
5    or this was a matter of sovereign immunity.
6        And certainly, by early 2007, the view was that
7    this was definitely not going to stand, and that we
8    really needed to, you know, defend ourselves.
9    Q.  Were you disappointed with his performance? Is
10   that why you discharged him?
11   A.  You know, all I know is that I take matters like
12   this very seriously, lawsuits filed against us.
13       There was a position taken at the time, a case of
14   sovereign immunity. There was a judgment made at the
15   time, as it was when I was first exposed to litigation
16   against us first in the Israeli courts.
17       And my only view at that time, because that had
18   immediate bearing on our finances early on in my career,
19   the best thing to do actually was hire legal counsel to
20   really defend ourselves in those cases in our Israel.
21   Q.  That was your decision?
22   A.  That was my disposition.
23   Q.  It was actually your decision?
24   A.  Yes. I'm talking about the earlier cases in
25   Israel.

Page 145

1    Q.  Yes. But you decided to discharge --
2    A.  That was my decision.
3    Q.  -- Ramsey Clark, correct?
4    A.  It was my decision to have new lawyers.
5    Q.  Well, to get a new lawyer means to get rid of the
6    old one?
7    A.  I don't know if I had the authority to fire or
8    discharge lawyers or do something like that. What I
9    knew was we needed new counsel.
10   Q.  In addition to Ramsey Clark?
11   A.  Yes, for sure. I mean I did not analyze --
12   Q.  What happened to Ramsey Clark?
13   A.  I honestly don't know.
14   Q.  You don't know?
15   A.  I don't.
16   Q.  You don't know if he was discharged or not?
17   A.  Ramsey Clark does not represent us anymore. I
18   may have actually done something about this, but I don't
19   remember. I mean but, for sure, he's not -- he doesn't
20   represent us in these cases.
21   Q.  No, no. I understand. That's why I'm asking the
22   question what happened.
23       Was he discharged?
24   A.  Yes. There was -- some formal process no doubt
25   must have happened, again.

Fayyad

---

Page 146

1    Q. Again, you don't remember?
2    A. I don't remember for sure. But that is most
3  likely what has happened.
4    Q. What's most likely happened?
5    A. To have a --
6    Q. -- a formal process?
7    A. Yes, I mean in the sense of notifying him. And,
8  as a matter of fact, it may have been me who did it.
9    Q. But you don't remember?
10   A. But I don't remember for sure.
11   Q. Okay. Were you dissatisfied with him?
12   A. Well, how can you be -- I mean you never know,
13 when you're on a path of, you know, pursuing something a
14 certain way, the judgment is that this is the right
15 approach to take, it's difficult to know exactly how
16 things were going to go.
17     For sure, you know, with the benefit of what we
18 knew at the time we -- there was enough support for
19 moving forward with a new strategy. I believe it was
20 definitely the right course.
21   Q. I'm asking whether or not you were dissatisfied
22 with him as a lawyer.
23   A. You know, I can't really now, you know, sit here
24 and pass judgment on, if I can say legal counsel, in
25 this matter or any other matter.

---

Page 147

1    Q. I'm not asking you to pass judgment.
2      I'm asking, in your mind at the time -- let me
3  finish -- in your mind, at the time, were you
4  dissatisfied with him.
5      MR. ROCHON: Objection, counsel, to the form
6  of the question.
7    A. Well, I guess, given what I also told you about
8  my position on the other cases, you know, I had my
9  doubts. So, therefore, I really wanted us to move
10 forward, move forward with a new strategy.
11   Q. Were you dissatisfied with him?
12   A. I can't say I was dissatisfied with the person
13 here, with the lawyer. All I can tell you is that
14 obviously was a strategy that did not work out.
15   Q. Did you consider telling him about the new
16 strategy and instructing him to go forward with the new
17 strategy?
18   A. I was not involved in the litigation early on. I
19 wasn't.
20   Q. I'm talking about the retaining of new counsel.
21 Weren't you the person who did that?
22   A. I can't tell you for sure it was.
23   Q. Weren't you the person who did that?
24   A. I can't tell you for sure it was.
25   Q. Okay.

---

Page 148

1    A. But then, you know, here we are -- I mean, the
2  way I decide things, you know, you're running a certain
3  strategy today and you have certain individuals --
4  lawyers and non-lawyers -- doing it for you, and then
5  you pursue an entirely different strategy.
6      Common sense, as far as I'm concerned, you know,
7  required that I retain services of new lawyers to pursue
8  the new strategy, not the outgoing one.
9      How can a lawyer, who was yesterday arguing on
10 our behalf a certain key defense on grounds of
11 jurisdiction so emphatically and categorically, go the
12 next day and say -- I don't know --
13   Q. So you weren't dissatisfied?
14   A. It's just a natural thing for me to do.
15   Q. So you weren't dissatisfied?
16     MR. ROCHON: Objection.
17   A. I don't think in those terms really, honestly. I
18 mean I'm a practical person. I mean we're moving on.
19 Different strategy, different lawyers.
20     THE VIDEOGRAPHER: Excuse me. I'd like to
21 change the tape.
22     MR. ROCHON: Yes. Please. Off the record.
23     THE VIDEOGRAPHER: Going off record at 7:16.
24     (Short recess taken.)
25     THE VIDEOGRAPHER: Going on record at 7:30.

---

Page 149

1    Q. Paragraph 13 of your declaration, line 4 -- well,
2  why don't you just read paragraph 13 to yourself, up to
3  and including the sentence beginning, I personally
4  commit.
5      (Witness peruses document.)
6    A. Yes. I have.
7    Q. Okay. When you say you personally commit to
8  sustain this instruction, obviously you can be voted out
9  of office at any time, yes?
10   A. Yes.
11   Q. Okay. I'm trying to find out what this means, I
12 personally commit.
13     If the instructions are changed somehow, do you
14 submit to the jurisdiction of the Federal Court in
15 Providence? Does your commitment extend to that?
16     MR. ROCHON: Objection, counsel. Three
17 questions that time. Again, just try to ask one at a
18 time.
19     MR. WISTOW: Okay.
20   Q. I'm trying to find out what I personally commit
21 means.
22   A. Okay.
23   Q. If there's a departure from this commitment, do
24 you personally submit to the jurisdiction of the court
25 in Rhode Island?

---

Fayyad

Page 150

1    A. I meant for the statement to be an emphatic
2 expression of commitment that the whole system is
3 stating. When I say I personally, I meant it in that
4 way.
5    Q. I'm not clear. It says, I personally commit.
6 I'm trying to find out what happens if that commitment
7 is somehow not fulfilled.
8       Will you agree to submit to the Federal Court in
9 Providence?
10       MR. ROCHON: Objection. Mr. Prime Minister,
11 do not answer that question. It's an argument.
12       MR. WISTOW: It's not an argument. It's a
13 question. I'm asking him if he's willing to do that.
14 I'm trying to test the personal commitment. That's all.
15       MR. ROCHON: You don't want speaking
16 objections.
17       MR. WISTOW: Okay. Okay. Okay.
18       MR. ROCHON: If you clarify your question.
19 What are you asking him? You want to ask that question,
20 you want to --
21       MR. WISTOW: What does the personal
22 commitment amount to? What happens if you violate your
23 commitment?
24       MR. ROCHON: By you, counsel, you mean you
25 meaning --

Page 151

1       MR. WISTOW: Yes.
2       MR. ROCHON: Meaning who?
3       MR. WISTOW: You. Mr. Fayyad.
4       MR. ROCHON: The Prime Minister?
5       MR. WISTOW: Yes.
6    A. You know, I mean I think there's a responsibility
7 in all of its components and stages and phases. I take
8 what I say very seriously. I'm a man of my word. And I
9 say I'm responsible and I'm committed means I'm
10 committed.
11       And so, therefore, if I act in a manner that is
12 inconsistent with that commitment, I do not know exactly
13 what will happen, but I understand liability. I mean I
14 understand I'll be liable for failing to fulfill a
15 commitment.
16    Q. You understand you will be liable?
17    A. I, you know -- let me tell you, first of all, you
18 know, my state of mind when I signed this declaration,
19 what it means. Certainly, my role, you know, knowledge
20 and involvement in the way that is described here.
21       But when I say I'm personally committed, I
22 personally commit myself to pursuing these things, and I
23 certainly mean that, but I mean more than that.
24       I mean more than just a personal commitment made
25 by me. I'm doing it really in my capacity as Prime

Page 152

1 Minister of Palestinian Authority, expecting fully well
2 the commitment to be honored by whoever proceeds me.
3    Q. What if Hamas comes into power again?
4    A. And then, if I'm sued on the basis of a
5 representation that I made here, I'd find that
6 reasonable.
7    Q. So you're saying you do feel that you would have
8 personal liability?
9       MR. ROCHON: Counsel --
10    Q. Is that what you're saying?
11       MR. ROCHON: Mr. Prime Minister, and
12 counsel, when you talk about personal liability,
13 counsel, you're -- you know you're -- I'll have to ask
14 Mr. Prime Minister -- I'll have to ask him to step out.
15       You know we need to discuss this. This is a
16 ridiculous line of inquiry. I'll ask the witness to
17 step out and we can argue about it and you can move on.
18       I don't want to argue about it in front of
19 the witness because you'll get upset.
20       So, Ms. Ferguson --
21       MR. WISTOW: No. I'm not going to get
22 upset. You know what --
23       MR. ROCHON: You're not going to get upset
24 if I tell you why it's ridiculous?
25       MR. WISTOW: Well, no. I'm getting upset

Page 153

1 because you say it's ridiculous, okay? You can say it's
2 improper. But, you know what?
3       MR. ROCHON: Improper and --
4       MR. WISTOW: Let's just move on.
5       MR. ROCHON: Okay.
6       MR. WISTOW: I got an answer from him that I
7 like, and I'll move on.
8       MR. ROCHON: Counsel --
9       MR. WISTOW: I'll move on. I got an answer
10 and I'll move on.
11       MR. ROCHON: You move on.
12       MR. WISTOW: Okay.
13    Q. Now, the last lines of that paragraph says,
14 Moreover, it is important to the PA's role in the
15 international community to participate in the legal
16 process, even when it is process brought in the United
17 States for actions by others that occurred far from the
18 United States.
19       Do you see that? Do you see that?
20    A. It is important -- yes, I do.
21    Q. I've read that correctly?
22    A. Yes, you have.
23    Q. Okay. Now, the next line says, The importance of
24 this was not fully appreciated by the PA government, as
25 a whole, until recently.

Fayyad

---

Page 154

1    Have I read that correctly?
2    A. You have, yes.
3    Q. First of all, when is recently? What do you mean
4  by that? You wrote this declaration.
5    A. Yes. You know, I meant actually around the time
6  when we moved to defend ourselves and took practical
7  steps toward beginning to.
8    Q. When was that?
9    A. This must have been early 2007, late 2006.
10   Q. Okay. Now, you say it was not fully appreciated
11 by the PA government as a whole. What do you mean, as a
12 whole?
13   A. I make reference here to what I had told you
14 before about differing views within the PA as to how
15 this would be approached, and the process of evolution
16 that really took us through the point of seeking to
17 defend ourselves actively.
18   Q. Who were the people that were involved in these
19 discussions?
20   A. Just about everybody.
21   Q. Just about everybody?
22   A. Yes. I mean --
23   Q. Can you help me out a little bit? What you're
24 indicating is there were a lot of people involved,
25 right?

---

Page 155

1    A. A lot of people involved in the sense of people
2  in government, you know. Not a lot of people outside
3  the government.
4    Q. I understand, Mr. Fayyad. Who were the people in
5  government you're talking about?
6    A. Now, you know, the issue would come up from time
7  to time. Sometimes in formal settings, sometimes in
8  discussion.
9    Q. Who are the people you're talking about?
10   A. Various ministers, Cabinet officers.
11   Q. Let's name some names. President Abbas?
12   A. From time to time.
13   Q. Yes?
14   A. Yes.
15   Q. Okay.
16   A. He certainly.
17   Q. How about the --
18      MR. ROCHON: Counsel --
19      MR. WISTOW: Sorry. I didn't mean to
20 interrupt. I didn't mean to interrupt.
21      MR. ROCHON: I know. But you have to
22 control yourself and not interrupt, even if you don't
23 mean to.
24      MR. WISTOW: Okay. Well taken. Fair point.
25   Q. Continue.

---

Page 156

1    A. I forgot where I was.
2    Q. We were talking about the members of government
3  who participated in these discussions where it was not
4  at first fully appreciated by the government as a whole.
5       We mentioned President Abbas. And,
6  unfortunately, I interrupted you while you were
7  continuing.
8       Who else?
9    A. People involved in this in terms of expressing a
10 view on, there were several of those actually.
11   Q. Who?
12   A. And when I say government here, I mean I do not
13 really necessarily mean, you know, government to be
14 technically defined to be only Cabinet officers. You
15 know, when you say United States government, for
16 example, in that sense.
17      Certainly Cabinet officers, but others as well.
18   Q. Fine. I'm willing to accept whatever you meant
19 by this. Who are the people? Tell me the names of the
20 people.
21      We got one. We got President Abbas. And
22 certainly you also, right?
23   A. Yes.
24   Q. Okay. Who else?
25   A. I don't -- you know, people within the Ministry

---

Page 157

1  of Finance, for example.
2    Q. Which one?
3    A. People who --
4    Q. No. Which Minister of Finance?
5    A. Ministry of Finance.
6    Q. How about, can you give me the name of a human
7  being?
8    A. Deputy Minister of Finance.
9    Q. Okay.
10   A. Treasurer. Legal counsel, Ministry of Finance.
11 It's just one agency. Similarly, Ministry of Justice.
12   Q. What?
13   A. Ministry of Justice, Ministry of Foreign Affairs.
14   Q. Okay. So these were the people who did not
15 appreciate it until recently?
16   A. No, no. I didn't -- I thought I was answering a
17 different question, when you asked about who was
18 involved regardless of what, you know, position was
19 taken by whom.
20   Q. I'm asking you -- it says here, The importance of
21 this was not fully appreciated by the PA government as a
22 whole.
23      Who are the people we're talking about that
24 didn't fully appreciate it?
25   A. Oh, I was answering a different question. Thank

---

Fayyad

Page 158

1  you for giving an opportunity to clarify.
2      I did not mean any of these individuals that I
3  referred as having been of the view that the case should
4  not be pursued in the way that it's being pursued right
5  now, which is to actively defend ourselves.
6      I thought I was answering a question as to who
7  may have been involved in the discussion with different
8  views and different takes, and not necessarily with the
9  same degree of depth or seriousness, if you will.
10      I mean there could be a casual comment on this by
11  someone.
12      Q. Okay. You said, and I quote yet again, The
13  importance of this was not fully appreciated by the PA
14  government as a whole.
15      A. Yes.
16      Q. You wrote that, correct?
17      A. Fine. Yes.
18      Q. You believed it?
19      A. It's in my declaration. I know it to be true.
20      Q. Okay. Now, what I'm trying to find out is what
21  human beings are you referring to.
22      A. You know, I'm referring actually not only to the
23  period of time that I was talking to you about in
24  2006-2007, because the line of questioning that took us
25  to that was really that time line.

Page 159

1      But, historically, when the action was brought
2  against us first in the United States -- going back, I
3  believe, to 2000 -- clearly, you know, the opinion was
4  that the strategy ought to be what it was up until we
5  changed it.
6      Q. Right.
7      A. So I would say, you know, consistent with this
8  having happened, clearly, to the extent there was any
9  debate, you know, it was that.
10      Q. Right.
11      A. You know, over time, that, you know, strategy was
12  beginning to be second-guessed in the sense of whether
13  or not it was the right strategy.
14      Q. Right.
15      A. And it was in the nature of any evolutionary
16  process. I cannot tell you there was a point in time
17  when before -- it was not really a watershed here in the
18  sense of before and after. It was just an evolutionary
19  process.
20      And you would find that people thinking a certain
21  way yesterday, that way yesterday, they're thinking
22  differently today.
23      So there's not anyone I know who was always
24  against or continued to be against or anything like
25  that. It's just in the nature, if you will, of a

Page 160

1  political process.
2      Q. Yes. But you wrote, The importance of this was
3  not fully appreciated by the PA government as a whole.
4      A. Yes.
5      Q. I'm looking for the names of any people, any
6  human beings, that you can identify as not fully
7  appreciating as you used the term. Anybody.
8      A. You know --
9      Q. Is there any human being you can identify?
10      A. No. What I can tell you is what I told you
11  about. I'm not really going to, you know, maybe
12  unfairly characterize someone as having taken a position
13  which he or she may not have taken at the time.
14      This is a statement of fact. I meant it in the
15  same way it appears here, and I still believe in it.
16      Q. Right.
17      A. There was not really uniformity of view on this,
18  clearly.
19      For the most part, the overwhelming view was
20  that, you know, those cases ought to be really dealt
21  with on the basis of, well, jurisdiction. So there was
22  that debate.
23      I do not know if there was any one individual I
24  can point to who was of that view, continued to be of
25  that view. So that's the sense in which I meant the

Page 161

1  sentence.
2      Q. I'm not asking you who continued to be of the
3  view. I understand it evolved.
4      A. Yes.
5      Q. It started out one way and it gradually --
6      A. Yes.
7      Q. -- ended up somewhere else.
8      A. Yes.
9      Q. Right?
10      A. Yes.
11      Q. Okay. Here's what I'm doing. You're asking the
12  Federal Court to vacate --
13      A. Yes.
14      Q. -- the default judgment. Yes?
15      A. Yes.
16      Q. You understand that?
17      A. Yes, yes.
18      Q. You have put in a declaration under oath. And
19  the purpose of this declaration is what? Do you know?
20      The purpose of the declaration is in support of
21  the motion to vacate the default.
22      A. Yes.
23      Q. You know that, right?
24      A. So we give ourselves the chance to defend
25  ourselves.

Fayyad

Page 162

1    Q. Yes. But the purpose of this declaration is to
2  vacate the default, yes?
3    A. To be able to defend ourselves.
4    Q. I am aware that this declaration is being filed
5  in support of a motion by the PA and the PLO to vacate
6  the default, okay? For whatever purpose.
7    A. For the purpose I stated.
8    Q. You understand it's to vacate a default, yes?
9    A. To defend ourselves.
10   Q. To vacate the default?
11   A. In order to defend ourselves.
12   Q. Okay. Fine. All right. You understand that we
13 oppose that, correct?
14   A. I do.
15   Q. Okay. And do you understand that I'm trying to
16 test the meaningfulness of your declaration? Do you
17 understand that?
18   A. I take its face value.
19   Q. I want to see if you can support any of these
20 statements.
21   A. Yes.
22   Q. That's what -- do you understand that?
23   A. Fine.
24   Q. Okay. Now, I'm asking you to support the
25 statement that, The importance of this was not fully

Page 163

1  appreciated by the PA government as a whole.
2    And I'm asking you to name anybody -- anybody --
3  who did not fully appreciate --
4    MR. ROCHON: Counsel, do you want him to
5  support the statement or -- which of the two questions
6  do you want him to answer? You've asked him two again.
7    MR. WISTOW: Okay.
8    Q. I want you to support the statement by supplying
9  names of people.
10   MR. ROCHON: Counsel, you can't tell him how
11 to answer your questions.
12   MR. WISTOW: Here's what I'm going to do.
13 I'm just going to ask this.
14   Q. Do you know the names of anybody who did not
15 fully appreciate the importance of participating in the
16 legal process, as you've set forth here? The names of
17 anybody at any time.
18   A. I cannot really give you the names now.
19   Q. Okay. Fair enough.
20   A. I haven't finished.
21   What I can tell you is that, for a long time --
22 this is really what this sentence is supposed to mean.
23 When I say, Was not fully appreciated, in the sense of
24 my feeling that probably this change of strategy should
25 have happened sooner.

Page 164

1    It is in that sense that I really meant this
2  declaratory statement to be. That is what it is
3  intended to say. That's the meaning of fully
4  appreciated, in that sense. Not in the sense of a
5  certain individual against or for.
6    Q. Okay. So you don't know of any person --
7    A. No. I meant it precisely in the way I just
8  stated.
9    Q. So you don't know the name of any person that you
10 can say that person in the government did not appreciate
11 the importance of participating in -- you can't name
12 anybody.
13   Is that fair?
14   MR. ROCHON: You've got it already.
15   MR. WISTOW: I want it again.
16   Q. Is that fair?
17   A. As I said, you asked me what's the meaning of the
18 sentence.
19   MR. WISTOW: There's a reason for this.
20   A. You know, going back to your --
21   MR. WISTOW: I'll withdraw the question.
22   A. Okay.
23   Q. I want to go to your letter.
24   A. Fine.
25   MR. ROCHON: That's -- just for the record,

Page 165

1  that is No. 6.
2    Q. And this, indeed, is the letter referred to in
3  your declaration, is it not?
4    A. It is.
5    Q. Okay. Now, one of the things you said in your
6  declaration is your focus, when you sent this letter,
7  was as a Finance Minister.
8    A. Yes.
9    Q. Now, in the letter, you refer to some really
10 important issues, don't you?
11   A. That was the intention.
12   Q. And, for example, you point out, in the
13 very first paragraph, that you're writing for immediate
14 assistance, right?
15   A. Yes.
16   Q. Immediate meaning right away, yes?
17   A. Yes. Yes. That's what immediate means.
18   Q. Okay. And what you say there is -- in the first
19 paragraph, you're talking about, to use your words, A
20 serious obstacle to the continued effective
21 participation of the PNA --
22   That's the Palestinian Authority, right?
23   A. Yes.
24   Q. What we've been calling the PA?
25   A. Yes.

Fayyad

Page 166

1     Q. -- in the Middle East peace process and the PNA's
2 role as a strong and viable partner of the United States
3 of America and the government of the State of Israel in
4 that process.
5         So that's a major major concern, isn't it?
6     A. It is.
7     Q. Very important?
8     A. Yes.
9     Q. Okay. And then you go on in the second paragraph
10 and you say, Even now -- at the very end of the second
11 paragraph -- Even now, the enforcement actions being
12 taken by Plaintiffs, and the mere threat that Plaintiffs
13 may be successful, are causing substantial harm to the
14 Palestinian people and the PNA, and thereby threatening
15 the peace process itself.
16         Yes?
17     A. Correct.
18     Q. That goes beyond just money. We're talking about
19 threatening the peace process, aren't we?
20     A. Yes.
21     Q. Okay.
22     A. You want me to explain?
23     Q. No. I don't want you to explain.
24     A. But I really would want to --
25     Q. Did you believe -- did you believe that these

Page 167

1 enforcement actions threatened the peace process?
2     A. In the following sense --
3     Q. Go ahead.
4     A. Did you want to ask me that, or --
5     Q. No. Here's what I want to do. I want to ask the
6 questions. If your counsel wants to follow up later
7 with you, I don't have any problem.
8     A. Yes.
9     Q. I want to finish up in my allotted time, and I
10 don't want to have to file motions saying that I ask a
11 question and I get speeches. That's -- forgive me.
12         MR. ROCHON: Counsel, counsel. You ask
13 questions that invite them. So --
14         MR. WISTOW: Well, I don't think so.
15     Q. Now, you also go on to say, in the footnote on
16 page 2 --
17     A. Yes.
18     Q. -- In addition to the Ungar case, the Plaintiffs'
19 counsel -- that means the Plaintiffs' counsel in the
20 Ungar case, right?
21     A. Yes.
22     Q. -- working with parties in Israel, has filed
23 other actions in the United States seeking millions and
24 millions of dollars from, inter alia, the PNA and the
25 PLO. See, for example, Knox, et al. versus PLO.

Page 168

1         Now, it goes on to say, We believe that these
2 separate actions are part of a concerted effort to
3 impose crippling financial ability -- excuse me --
4 crippling financial liability on the PNA, thereby
5 undermining its ability to function as a partner in the
6 peace process.
7         Yes?
8     A. That's what it states.
9     Q. That's a very big deal, isn't it?
10     A. The whole thing is a big deal.
11     Q. Sorry?
12     A. The whole thing is a big deal, which I
13 consider --
14     Q. It goes way beyond the money. We're talking
15 about endangering the peace of the region, correct?
16     A. Yes. But money is important in this.
17     Q. Money is important. And peace is more important,
18 isn't it?
19     A. Yes. But there is a causal link between what I
20 said here and the cause and the effect. It acts through
21 the PA's capacity to continue to exist.
22     Q. You believe --
23     A. That's my view. That was my view then, and
24 continues to be my view today.
25         The PA, with this liability, you know, cannot

Page 169

1 function. And I regard the PA as a chief partner in
2 this political process.
3         And if the PA is disabled or otherwise unable to
4 continue to exist and function, clearly the process is
5 damaged irreparably.
6         That's what I meant. That's my view.
7     Q. I understand. I understand. I understand
8 exactly what you're saying. So this is an
9 extraordinarily important issue?
10     A. It is.
11     Q. Okay. Did you follow up on this letter?
12         MR. ROCHON: Counsel, you've asked --
13         MR. WISTOW: I'm pointing out to him now --
14 he's indicated how important this is. I want to see if,
15 with that recollection, see if his recollection is
16 refreshed now that he focuses on this.
17     A. Yes.
18     Q. Does that refresh your recollection that you
19 followed up?
20     A. I'll tell you what I told you before.
21     Q. Okay. Fair enough.
22     A. There's no question in my mind that I did. In
23 terms of specific occurrences of that --
24     Q. Okay.
25     A. -- is the stuff that I cannot really refer to

Fayyad

---

Page 170

1  specifically.  But there is no question that it
2  happened.
3      Q.  Okay.  What happened?
4      A.  That the follow-up happened.
5      Q.  What follow-up?  What did you do?
6          MR. ROCHON:  Counsel --
7      A.  In the sense of asking where things stood, asking
8  where things stood on this very important matter.
9          MR. ROCHON:  Counsel.  Redundant.
10         MR. WISTOW:  He brought it up.
11         MR. ROCHON:  Because you asked him to.
12         MR. WISTOW:  All right.  You know what?
13  We'll leave the record the way it is.
14     A.  Okay.  Okay.
15     Q.  Did you talk to President Abbas about this very
16  serious situation, now that you see the references to
17  undermining the whole peace process?
18     A.  Yes.  I have on numerous occasions.
19     Q.  I'm talking about this letter.
20     A.  This letter?  He was the President, as he is
21  today, and I'm sure I did.
22     Q.  Do you recollect it?
23     A.  No.
24     Q.  Okay.
25     A.  This has been coming up way too often -- do you

---

Page 171

1  recollect a specific time and place, all this and that.
2      In the same way I must have had something on a
3  week ago.  I do not work, you know, that close on.  You
4  ask me what it is you had on that day.  I can't remember
5  in that sense.
6      But it is no natural for me to have told the
7  President on numerous occasions, you know, about this
8  case.
9      Q.  About this letter?
10     A.  About this letter too.
11     Q.  Okay.  So we'll accept that.
12     A.  Okay.
13     Q.  So you spoke to -- you're confident --
14     A.  Yes.
15     Q.  -- that you talked to President Abbas about this
16  letter?
17     A.  Yes.  Absolutely.  Yes.
18     Q.  Okay.  Now, when you wrote this letter, you were
19  aware -- this is June of 2005?
20     A.  Okay.
21     Q.  You were aware that the First Circuit Court of
22  Appeals affirmed the judgment, correct?
23     A.  Now that I see the letter again, now that I see
24  the letter again, I understand that basically this was
25  basically final.

---

Page 172

1      Q.  Did you read this letter before you signed it?
2      A.  Yes.  I mean what I'm saying to you, I obviously
3  read the letter before I signed it.
4      Q.  Okay.
5      A.  But I did not see it before -- you asked me the
6  question, did you see this letter before this
7  deposition.  I haven't -- do you see what I'm saying?
8      Q.  Can we agree that, when you wrote this letter --
9      A.  Yes.
10     Q.  -- you knew that the First Circuit Court of
11  Appeals affirmed the judgment?
12     A.  Yes.
13     Q.  Yes?
14     A.  Whatever is in this letter I knew, for sure.
15     Q.  Do you remember this, or are you just saying?
16     A.  Five years later?  I'm certain I do not really
17  put my signature on something I do not believe to be
18  true.
19     Q.  No doubt, none, that you knew that the First
20  Circuit had affirmed this?
21     A.  The best that I could ascertain at the time.  I
22  would not sign a letter that I did not believe that what
23  was in it was factual.
24     Q.  Okay.  So let me rephrase the question.
25         There is no doubt at all that you believed the

---

Page 173

1  First Circuit had affirmed it?  No doubt of that?
2      A.  There was no doubt, at the time I signed this
3  letter, that there was anything in it that was factually
4  incorrect.
5      Q.  So you believed it all, correct?
6      A.  Yes.  When I signed this letter, there was
7  nothing in it that I did not regard as factually
8  correct.
9      Q.  Now, did you discuss with anyone what to do now
10  that there had been an affirmance by an Appeals Court?
11     A.  In terms of follow-up you mean?  In terms of
12  process?  What do we do?
13     Q.  Yes.  We have a situation --
14     A.  Yes.
15     Q.  -- where the peace process --
16     A.  Yes.
17     Q.  -- the peace process is imperiled?
18     A.  Yes.
19     Q.  Did you have discussions with anybody about what
20  to do?
21     A.  You know, when this happened, this was, as you
22  could tell -- as you could tell from the letter, this
23  appears to have been the first time the issue was raised
24  formally with the US administration in terms of, you
25  know, this being seen as a serious problem by us, you

---

Fayyad

Page 174

1   know, trying to, you know, find a way as to how to deal
2   with this very important, very serious issue.
3       And we're talking about the second half of June
4   of 2005.  Two months later I was outside of government.
5   In the interim, there's no question that this was a
6   matter that was being pursued and followed up on.
7       Now, you know, going back to when the case was
8   filed -- 2000, 2001 -- I do not recall exactly --
9   Q.  2000.
10  A.  2000.  Okay.  We're talking about five years up
11  to that point in time before we actually wrote the
12  letter, before we approached anyone on it.
13      And so what is a matter of few months time to
14  suggest that it was not actually being pursued or this
15  was not something that was taken seriously.
16  Q.  Mr. Fayyad, I'm not suggesting anything.  I'm
17  just asking questions.
18      My question was, did you discuss the situation
19  with anyone within government after you learned that the
20  First Circuit had affirmed the judgment.
21  A.  No.
22  Q.  What?
23  A.  Like, you know, this other question that you
24  asked me before, I'm sure I did, in terms of what do we
25  do.  The nature of things, what kind of discussion would

Page 175

1   you have against a backdrop of something like this?
2       Are we doing this right, is it really not time to
3   do something, what else can we do.  You know, questions
4   like this.
5   Q.  To whom?
6   A.  People like I mentioned to you.
7   Q.  What people?
8   A.  People in government.
9   Q.  What people?
10  A.  Various Cabinet officers.
11  Q.  Will you name them, please.
12  A.  Minister of Foreign Affairs.
13  Q.  What's his name?
14  A.  At the time, I believe it was Nabil Sha'ath.
15  Q.  You spoke to him?  You remember?
16  A.  I mean most likely, you know, he was there and we
17  had conversations.  He was there at the meeting that
18  this letter was handed.  And I had discussions with
19  various officials.  Most likely he was one of them, for
20  sure.
21      The President himself for certain, on more than
22  one occasion.
23  Q.  So what did you decide to do, other than write to
24  Condoleezza Rice?
25  A.  Look into what it is that can be done.

Page 176

1   Q.  What else did you do?
2   A.  As I told you, you know, a process of
3   deliberation must have started then, as evidenced by the
4   fact that, in the course of the months that followed,
5   including in the course of 2006, there was, you know,
6   the beginning of definition of a new strategy as to how
7   to handle this and other cases, as evidenced by the fact
8   that, ultimately, there was, indeed, a shift in that
9   strategy.
10  Q.  Okay.
11  A.  Yes.
12  Q.  Have you finished?
13  A.  Yes.
14  Q.  Okay.  On June 18, 2005 --
15  A.  Yes.
16  Q.  -- you, at least by that point, knew the Court of
17  Appeals had affirmed the judgment, correct?
18  A.  Yes.
19  Q.  Can you identify any person that you spoke with,
20  after this letter was given to Condoleezza Rice, to talk
21  with them about what do we do now?  Anybody.
22  A.  I talked to several people, you know, including
23  lawyers, including people not necessarily in government
24  either.
25      This is such a big deal.  I meant every word, you

Page 177

1   know, in this letter when I wrote it, when I signed that
2   letter.  And I still do believe, you know, it definitely
3   reflected my state of mind at the time I signed it.
4   Q.  I'm sorry?
5   A.  It reflected my state of mind at the time I
6   signed it in terms of the importance in which we viewed
7   this issue.  So yes, it was definitely on our mind.  We
8   were trying to find a way.
9       It's not, you know -- you have to understand, I
10  do not know if the PA was sued in the United States
11  before.  I mean I don't know the history.
12      This is -- you know, the whole PA is new.  It's
13  not like every day something like this happened and we
14  have been in existence forever and, you know, there's a
15  book that tells you what to do in situations like this.
16      So, basically, we're trying to find our way.
17  Q.  Right.  So you talked to people?
18  A.  Yes.  I talked to people.
19  Q.  Who?
20  A.  People around me at the time.
21  Q.  Can you identify one?
22  A.  I mentioned you some.  The President.
23  Q.  Okay.  So you asked President Abbas --
24  A.  Yes.  I mean --
25  Q.  Let me finish.

Fayyad

Page 178

1    A. Yes.
2    Q. So you said you were talking with President Abbas
3  about, We got a bigger problem now. We've got a
4  judgment that was affirmed by Court of Appeals, right?
5         MR. ROCHON: Objection, counsel.
6         MR. WISTOW: Okay.
7         MR. ROCHON: The leading is -- I know I've
8  got a standing objection. And just because I'm --
9         MR. WISTOW: You do. You do.
10        MR. ROCHON: -- mentioning it now, it
11  doesn't matter. But you're going way too far.
12        MR. WISTOW: Well, I don't think so. You
13  know, thank you for trying to preserve my deposition.
14  Why don't you just let it go and these questions will be
15  stricken.
16        MR. ROCHON: I don't mind if you're aware of
17  it.
18        MR. WISTOW: Okay. I'm aware of it. I'm
19  doing it at my risk.
20    Q. So, in substance, in substance -- I'm not
21  pretending that I know the exact words -- you said to
22  President Abbas, Look, the First Circuit has affirmed
23  this judgment. We need to do something.
24        Is that a fair statement of the substance of what
25  you would have said?

Page 179

1    A. You know, I cannot tell you that, you know, the
2  words could have been anywhere near what you have
3  suggested in your statement by way of specificity, First
4  District Court having decided to do this, that or the
5  other thing.
6        But, you know, in substance, that this was a
7  situation that required that it be dealt with --
8    Q. Okay.
9    A. -- without, you know, getting into various
10  technical issues associated with it.
11        You know, we knew there was an issue to be dealt
12  with. And here is the President, and I had a
13  conversation with him.
14    Q. Okay. We know that you considered this to be a
15  matter of such grave importance --
16    A. Yes.
17    Q. -- threatening regional peace. Maybe world
18  peace, right?
19    A. I'm waiting for the question.
20    Q. I said, Right? I mean that was your state of
21  mind at the time?
22    A. That was my state of mind.
23    Q. So that convinces you that you would have talked
24  to President Abbas about it, correct?
25    A. Yes. That's right.

Page 180

1    Q. So what you're saying is that it was such a huge
2  issue, you would have done that, even though you don't
3  remember a particular discussion with him.
4        Is that fair?
5    A. Very fair.
6    Q. Okay. Do you have any idea what the result of
7  that discussion was? Any idea?
8    A. It often happens.
9    Q. I'm sorry?
10    A. Oftentimes it happens that, regardless how
11  important issues are -- including a political matter --
12  that those discussions would take place and ideas are
13  put forward without conclusion in any given session,
14  say, when they should discuss as to exactly, you know,
15  what was going to happen afterwards.
16        And that is -- I am really trying to project to
17  you as close to the way I believed it happen as it did.
18  You know, over time, there were discussions. All I know
19  is we, in the nature of things, ended up on this new
20  path.
21    Q. Sometime in 2007?
22    A. Yes. Or late 2006, early 2007. That's when I
23  really got involved in this again.
24    Q. Yes?
25    A. Yes.

Page 181

1    Q. So we're talking about a period of almost three
2  years?
3    A. Little less. Anyway, if you take June 2007 as
4  starting point --
5        MR. ROCHON: Excuse me.
6    Q. No. Take --
7    A. June 2007. I'm sorry. June 2005.
8    Q. No.
9    A. If you take June 2005 as --
10    Q. No. We'll take March 31, 2005.
11        Well, let me ask you this. When did you learn
12  about the decision of March 31?
13    A. It must have been, you know, during that time
14  period, between the time I wrote the letter and the time
15  it happened.
16    Q. Well, I know that.
17    A. I mean this is -- we're talking about a couple of
18  months here between the time, you know --
19    Q. Do you remember learning of it?
20    A. Obviously. That's why --
21    Q. Do you remember learning -- in other words, did
22  you get a phone call where you were shocked?
23        Can you remember anything about your reaction
24  when you learned about it?
25        MR. ROCHON: Counsel, four questions.

Fayyad

Page 182

1    MR. WISTOW: All right. Fine. I'll take
2 the risk.
3    A. No, sir. I don't remember.
4    MR. ROCHON: Counsel, we'll move on. We
5 don't have to take the risk. He actually gets to get
6 just one at a time even if you're willing to take the
7 risk.
8    MR. WISTOW: Okay. I'll do it one at a
9 time. I'll do it one at a time.
10    Q. Do you remember your reaction when you learned of
11 the fact that an Appeals Court has sustained this
12 judgment?
13    A. You know, I do not know exactly how I reacted.
14 All I know is that I viewed this -- and I continue to
15 view it -- as a very serious matter.
16    Q. Okay. Other than President --
17    A. I am this way.
18    Q. You're what?
19    A. I am this way.
20    Q. What way?
21    A. You know, I'm just --I do not just jump up and
22 down whenever something happens, however important it
23 is.
24    I took it. I understood there was an issue to be
25 dealt with, took that position, and since then, I've

Page 183

1 been working on it.
2    Q. Okay. When was the first time --
3    A. Except for that time period when I wasn't in the
4 government.
5    Q. Okay. When was the first time it was dealt with
6 after you wrote this letter?
7    A. At various discussions leading to the time when
8 we adopted, eventually, this new strategy.
9    Q. When was any action taken to implement the new
10 strategy?
11    A. You know, I can't tell you. There was a period
12 of time subsequently when the PA was vigorously seeking
13 legal representation on this matter, without much
14 success, in the course of 2006.
15    This came to my attention after I rejoined the
16 government in March of 2007.
17    Q. Okay. You're telling me now the PA was trying to
18 get --
19    A. Yes.
20    Q. -- new lawyers in 2006?
21    A. Yes. Yes.
22    Q. Couldn't find anybody?
23    A. I understand that they were having difficulties.
24    Q. Who did they contact?
25    A. I don't know.

Page 184

1    Q. Who told you this?
2    A. You know, people who were handling this at the
3 time. Probably the head of the President's bureau.
4    Q. What's his name?
5    A. At the time, Rafiq Al-Husseini.
6    Q. What?
7    A. Rafiq Al-Husseini.
8    Q. Can you spell that?
9    A. R A F I Q. That's his first name. Al-Husseini.
10 A L - H U S S E I N I.
11    Q. Okay. And where is he now?
12    A. He's not in the office anymore.
13    Q. Where is he?
14    A. I don't know if he's in the country now as we
15 speak.
16    Q. Okay. So are you telling me that this guy,
17 Husseini -- am I pronouncing it right?
18    A. Yes.
19    Q. -- he told you they were trying to find lawyers
20 in 2006?
21    A. They were -- you know --
22    Q. Did he tell you that?
23    A. If you'd just give me a second to try to answer.
24    Q. Okay.
25    A. All I know is that he was the President's office

Page 185

1 director at the time, and he had some people work for
2 him who were trying to help find legal representation in
3 the United States at the time.
4    Q. He told you that?
5    A. I can't tell you for sure if he did himself tell
6 me that, but I learned that that was actually what was
7 happening.
8    Q. When did you learn that?
9    A. In early 2007, around the time I joined the
10 government, because I know that I personally was seized
11 with this immediately after I joined the government.
12    And I know that, as early as April, a little
13 about a month after the formation of the new government,
14 you know, we had legal representation.
15    Q. So you tried to find out what had gone on
16 before --
17    A. Yes.
18    Q. -- correct? And you found out that really
19 nothing --
20    A. Not quite nothing.
21    Q. All right. I'll withdraw that. Let me try it
22 again.
23    A. Yes.
24    Q. Let's focus on the other lawyers that --
25    A. Yes.

Fayyad

Page 186

1    Q. -- were contacted. Husseini told you that other
2  lawyers had been contacted and refused the case?
3        Is that what he said?
4    A. I do not know if Rafiq Al-Husseini himself told
5  me this.
6        All I know is that he, and people working for
7  him, were in the process of finding legal representation
8  in the United States in connection with these cases in
9  the course of 2006.
10       Now, exactly when in 2006 I cannot tell you, but
11 I know -- all I know is that I'm aware of the fact that
12 the PA was actively seeking legal representation within
13 that time frame.
14   Q. How do you know that?
15   A. It's not exactly true that nothing was happening.
16   Q. How do you know that?
17   A. I became Finance Minister again.
18   Q. I know you had to know as Finance Minister.
19   A. Yes.
20   Q. You either saw a piece of paper or somebody told
21 you, right?
22   A. Yes. Something -- I don't know if somebody gave
23 me a piece of paper. Somebody must have told me this.
24 I asked because, you know, it's something that I felt we
25 really need to deal with.

Page 187

1        You know, in my position as Minister of Finance
2  then, it's something that really we were interested in.
3  And you ask about it and somebody tells you. It doesn't
4  really matter.
5        I ended up leading the effort actually to find
6  legal representation for us. I did it against the
7  backdrop of knowing there was an effort by the PA to do
8  so, and I just continued with it.
9    Q. Okay. Did you find out any details about the
10 effort? Anything?
11   A. That it was serious and it was being made.
12   Q. But did you find out any details whatever? For
13 example, was one law firm contacted? Two? Three?
14 Five? Ten?
15   A. No. What I recall about it is that there was a
16 serious attempt made at finding legal representation,
17 without much success.
18   Q. Okay. How do you know it was serious?
19   A. Well, in the way, you know, this issue was talked
20 about.
21   Q. Well, what did they do to find legal counsel?
22 You said it was serious.
23   A. They must have -- I mean I don't know exactly
24 what they did.
25       All I know is that, given basically the manner in

Page 188

1  which I felt they were dealing with it, you know, when I
2  took over as Minister of Finance again, and the
3  seriousness with which they were talking to me about
4  it -- I mean, for example, somebody like
5  Mr. Al-Husseini -- I figured that this was for sure that
6  they were really serious about this.
7        And it is just that that they got to that point
8  in time having not succeeded in finding suitable legal
9  representation. That's all.
10   Q. Did you ask him what efforts they made?
11   A. No. I don't remember, you know, if I asked or
12 they told me specifically what they did.
13       But I got the distinct sense that they were
14 really serious about. They were really desperate. They
15 really wanted to do that.
16   Q. And did you get a distinct sense of how long they
17 had been trying?
18   A. I'm guessing now. I mean I just don't know for
19 sure. But it cannot be a matter of just a few weeks, in
20 the way that I now remember it.
21       Probably more like a few months.
22   Q. Maybe a few months? Maybe a month or two? You
23 don't know, do you?
24   A. I really don't know for sure.
25   Q. All right. And you don't know who's telling you

Page 189

1  this, correct?
2    A. Most likely --
3    Q. Is it -- is that correct?
4    A. Most likely Hussseini. Most likely.
5    Q. But you don't remember it?
6    A. I don't remember for sure.
7    Q. Okay. Now, do you remember who, if anybody, told
8  Husseini to find new lawyers? It wasn't you, right?
9    A. No. I wasn't in the government at the time.
10   Q. Right. So it wasn't you?
11   A. No.
12   Q. Who was it who told Husseini to do it?
13   A. It was probably the President.
14   Q. It probably was --
15   A. Probably. Probably. He worked for the
16 President.
17   Q. So if I wanted to know the answer, I'd have to
18 ask President Abbas?
19   A. I could ask him for you. But I suppose, you
20 know, that Rafiq would not have done it on his own. I
21 mean he was the Director of the President's office.
22   Q. Well, what was the guy's title? Husseini?
23   A. Director of the President's office.
24   Q. Okay. Could he have gotten instructions from the
25 Finance Minister at the time?

Fayyad

Page 190

1    A. You know, the Director of the President's office
2  does not -- I wish he did -- take instructions from the
3  Minister of Finance.
4    Q. So what you're telling me is this was somebody
5  who really would not respond to orders from you?
6    A. He doesn't work for the Minister of Finance. He
7  wouldn't. We talked. We talked.
8    Q. So you're telling me --
9    A. There is no line of authority between the
10  Minister of Finance and the Director of the President's
11  office.
12    Q. So if Husseini did this, it would be on
13  instructions of Abbas?
14    A. Probably.
15    Q. Okay. So Abbas would know when and where?
16    A. You know --
17    Q. Well, maybe he doesn't remember either. But the
18  only way we'd know is to ask him. All right.
19    A. I don't know if --
20    MR. ROCHON: There's no question pending,
21  Mr. Prime Minister.
22    THE WITNESS: Pardon?
23    MR. ROCHON: There's no question pending.
24    THE WITNESS: Okay.
25    Q. How hard was it for you to find a lawyer? What

Page 191

1  did you have to do?
2    A. Basically, I worked with these guys.
3    Q. With what?
4    A. With the people I mentioned to you.
5    Q. What people?
6    A. Rafiq Al-Husseini and his team, in terms of the
7  search that they had made.
8    And I remember, you know, taking a trip to the
9  United States, in April of 2007, when we had discussions
10  with lawyers whom we ended up retaining.
11    Q. Now, you became -- you came back into government
12  when?
13    A. March 2007.
14    Q. Okay. And so this conversation with Husseini --
15  if that's who it was -- had to be between March 2007 and
16  April of 2007, correct?
17    A. Between March 2007?
18    Q. Yes. And April?
19    A. April of 2007?
20    Q. Yes.
21    A. What about that?
22    Q. The conversation, if any, with Husseini had to be
23  in that period, correct?
24    A. Yes. Probably right. Fair guess, yes. Maybe
25  before because -- let me really backtrack a little bit.

Page 192

1    It took a while to really put this government
2  together, the one that I joined actually in March.
3  There was a lot of discussion on it, and it became known
4  well before it actually happened I was going to be
5  rejoining it as Minister of Finance.
6    So during that period before the formation of the
7  government, it is conceivable that this conversation
8  took place before, before March actually.
9    Q. Okay. And as we said before --
10    A. Yes.
11    Q. -- even before putting the government together,
12  you were mindful this was a very important issue?
13    A. Oh, yes. Yes.
14    Q. Okay. So it would have been important to you to
15  know precisely what had taken place up to then, wouldn't
16  it?
17    A. Yes, yes.
18    Q. Okay. And you've told me everything you can
19  recollect at this point, correct?
20    A. As best as I can.
21    Q. Okay. Now, when you were Finance Minister and
22  wrote the letter to Condoleezza Rice --
23    A. Yes.
24    Q. -- you determined -- I shouldn't say you
25  determined.

Page 193

1    You knew, at the time that you wrote it, that the
2  case had been lost in the Court of Appeals, right?
3    MR. ROCHON: Counsel. Four times.
4    MR. WISTOW: I'm trying to bring it -- it's
5  preliminary to where we're going. Okay?
6    Q. You knew that?
7    A. I must have.
8    Q. Yes. All right.
9    Did you -- do you remember anything about an
10  attempt to go to the United States Supreme Court, in the
11  period before you left government?
12    A. That could have come up. I can't be sure right
13  now, but it could have come up.
14    Q. I understand it could have. Do you remember
15  anything about it?
16    A. If it did -- see, I'm trying to remember, piece
17  things together now, because I know that, during that
18  period of time, there was an attempt at collecting or
19  opposing that judgment by, as a matter of fact, taking
20  remedy in Israel.
21    And maybe, in the course of that period -- I
22  really do not know for sure now. I mean there were lots
23  of things, lots of developments -- that issue came up.
24    But I can't really be sure now. I cannot really
25  tell you I remember this specifically.

Fayyad

| Page 194 |
|---|

1    Q. Okay. Bottom line is maybe you knew about the
2  possible appeal to the Supreme Court, maybe not.
3        Is that what we're saying?
4    A. Or thinking about it. I do not know. Thinking
5  about going to Supreme Court. Whether or not that
6  actually happened, I do not know.
7    Q. Did you ever authorize anybody to do that?
8    A. I don't recall.
9    Q. Okay. I'm going to talk my lessons from
10  Mr. Rochon.
11        MR. ROCHON: Go off the record for a bit?
12        MR. WISTOW: Yes.
13        THE VIDEOGRAPHER: Going off the record at
14  8:18.
15        (Short recess taken.)
16        THE VIDEOGRAPHER: Going on record at 8:27.
17    Q. I want to explore with you a little more the
18  letter that you wrote to Condoleezza Rice on June 18,
19  2005.
20    A. Okay.
21    Q. Now, you indicated to Ms. Rice that the
22  Plaintiffs in the Ungar case were sending out misleading
23  notices?
24        MR. ROCHON: Do you have a page first?
25        MR. WISTOW: Yes. Page 3.

| Page 195 |
|---|

1    Q. The second paragraph from the bottom. Do you see
2  that?
3    A. Second paragraph?
4    Q. Yes.
5        MR. ROCHON: Do you mean -- that's the one
6  that starts, As a result of receiving?
7        MR. WISTOW: No. In addition.
8        THE WITNESS: In addition.
9        (Witness peruses document.)
10    Q. Do you see that?
11    A. Yes. I see it, yes.
12    Q. Okay. Do you understand what that refers to?
13    A. Yes.
14    Q. Could you explain it to me?
15    A. In the sense of, for example, entities like the
16  Pension Fund and the PMA.
17    Q. And, in fact, if you go to the top of the page --
18    A. Yes.
19    Q. -- the letter says, Despite the specificity of
20  the District Court's orders, however, Plaintiffs'
21  counsel prepared a Notice of Injunction (the Notice) in
22  which they broadly assert that the injunction -- and it
23  goes on to quote the Notice.
24        Do you see that?
25    A. I see it, yes.

| Page 196 |
|---|

1    Q. Okay. So what you believed was happening is the
2  Plaintiffs were using the judgment they obtained in
3  court improperly, correct?
4    A. Can you say this again. I was looking here.
5  Yes.
6    Q. What you were trying to tell Condoleezza Rice --
7    A. Yes.
8    Q. -- is that you believed that the Plaintiffs had
9  obtained an injunction from the Court and were using it
10  improperly, correct?
11    A. That -- yes. I mean, basically, in the sense of
12  it referring to entities that are independent of the PA
13  or the PLO, that I felt then -- and I feel now --
14  basically that, you know, that the enforcement action
15  that was being pursued by the Plaintiffs exceeded what
16  the remedy would be in terms of, you know, where to
17  collect and what is collectible.
18    Q. Right.
19    A. Yes. Yes.
20    Q. I think we're saying the same thing.
21    A. Okay. That's fine.
22    Q. That they had gone to court, obtained an
23  injunction from the court --
24    A. Yes.
25    Q. -- which was specific. And, in your mind, the

| Page 197 |
|---|

1  Plaintiffs were using it in a much too broad way --
2    A. Yes.
3    Q. -- and were sending it out naming all kinds of
4  inappropriate entities?
5    A. That's what I meant to say.
6    Q. Right. Okay.
7    A. But, if I may, in the sense that I have just
8  described, in the sense of those entities being
9  independent --
10    Q. Yes?
11    A. -- of the PA and the PLO. So, therefore, my view
12  is that they should not be, you know, pursued in
13  collection.
14    Q. Yes. I understand.
15    A. Okay.
16    Q. You thought -- do you -- are you familiar with
17  the English expression "fast one"? You felt that the
18  Plaintiffs were pulling a "fast one"?
19        If you're not familiar with the expression, they
20  were doing something they shouldn't be doing, right?
21    A. That's a better way. I'd rather put it that way.
22    Q. Okay. It was unfair, inappropriate, and misusing
23  the injunction?
24    A. Going beyond, you know, what could be pursued, is
25  how I'd put it.

Fayyad

Page 198

1    Q. They were misusing the injunction, in your mind?
2         MR. ROCHON: Counsel. Objection. He's
3    answered.
4         MR. WISTOW: Can I get a yes?
5         MR. ROCHON: You can't tell him what to say.
6         MR. WISTOW: Can I get a no? Can I get an I
7    don't know?
8         MR. ROCHON: You got an answer.
9    Q. Did you believe they were misusing the
10   injunction?
11   A. All I know is that they were acting in a manner
12   that went beyond what would be pursued in this action.
13   I'll just say this the same way every time I've asked.
14   Q. Okay.
15   A. That's just the way I go about doing things. I
16   just don't tend to really add top much color one way or
17   the other.
18   Q. Okay. They were doing something which you
19   believed they had no right to do. Is that fair?
20        MR. ROCHON: Counsel, you --
21        MR. WISTOW: No, no. I do it my way. I
22   don't know what they do in Washington. This is how I've
23   been making a living for a while, and I'm going to
24   persist.
25        MR. ROCHON: I understand. But you're

Page 199

1    trying to make him say a particular word that you want.
2         MR. WISTOW: That's exactly what I'm trying
3    to do. That's exactly right. He's an adverse witness.
4         MR. ROCHON: He's not. But, counsel --
5         MR. WISTOW: I didn't say hostile. I said
6    adverse. I have a right to try to do it the way I'd
7    like to if I can possibly.
8         MR. ROCHON: Go ahead.
9    Q. Can we agree to this, that you felt that they
10   were using the injunction beyond what they were entitled
11   to do with it.
12        Is that fair?
13   A. I felt that they were going beyond what could
14   have been pursued.
15   Q. With the injunction?
16   A. Yes.
17   Q. Okay. Did you consider having your lawyers go
18   back to the District Court in Rhode Island and say
19   they're abusing the court's injunction?
20        Did you think about that?
21        MR. ROCHON: Objection. Assumes a fact not
22   in evidence.
23        MR. WISTOW: What?
24        MR. ROCHON: His lawyers. You haven't
25   established --

Page 200

1         MR. WISTOW: Okay.
2    Q. The PLO and the PA's lawyers, did you think of
3    going back to the District Court in Rhode Island and
4    making it aware of this perceived abuse of its
5    injunction?
6         Did you?
7    A. You know, at the time, you know, those cases were
8    not being pursued in the same way that they are being
9    pursued now.
10        As I told you, this letter essentially was a
11   beginning of our formal involvement in the process in
12   the sense of really trying to find a way as to how to
13   best deal with it.
14   Q. Have you finished your answer?
15   A. I have.
16   Q. Okay. You wrote this letter?
17   A. Yes.
18   Q. I'm asking you, did you consider going back to
19   the District Court and saying that its injunction was
20   being misused.
21        That's all I'm asking.
22   A. I don't know if I considered a certain, you know,
23   course of action, considered specifically or precisely
24   what to do, as much as I believe I was in the mode of
25   really trying to find out how best to deal with, you

Page 201

1    know, this and other cases.
2    Q. Well, didn't you talk to your lawyers at the time
3    about this?
4    A. I was not really in direct communication with the
5    lawyers on this or other cases.
6    Q. But you could have been?
7    A. You know, the issue, as I told you, in this
8    particular case became one of immediate relevance to me,
9    in my capacity as Minister of Finance, only after
10   essentially, effectively, enforcement action began in
11   ways that involved freezing assets and other aspects of
12   actions taken in a manner that very much affected the
13   way we did business.
14        And so, therefore, you know, just really
15   basically trying to find out -- find a way as to how to
16   best to deal with this.
17        I cannot tell you exactly what sort of measures,
18   you know, are contemplated, are considered, actions that
19   we thought we should take, other than, at the time,
20   trying to really find a way, you know, considering the
21   line of defense that was adopted as strategy by the
22   PA/PLO's lawyers in the previous period.
23        That's all.
24   Q. Okay. We've already established that this was
25   not only a matter of a big financial problem, but

Fayyad

Page 202

1  threatened regional -- perhaps world -- peace.
2      We've already established that, have we not?
3      A. Because it was a big financial problem. That's
4  what I would add. Because it was a big financial
5  problem, a very serious financial problem. That's the
6  causal link.
7      Q. Okay.
8      A. That's the channel of influence, if you will.
9      Q. All right. But you were saying that, because of
10 this, the Palestinian government could fall down --
11     A. Yes.
12     Q. -- collapse, which would threaten regional and
13 world peace.
14     Yes? Didn't you say that?
15     A. I said that, and I --
16     Q. Did you believe it?
17     A. I did.
18     Q. Okay. Now, there's more financial problems being
19 caused by this injunction, correct?
20     A. What do you mean?
21     Q. You're telling Condoleezza Rice about the
22 problems with this injunction, aren't you?
23     A. Yes, I am.
24     Q. Okay.
25     A. Yes.

Page 203

1      Q. So that injunction is also affecting the
2  finances, isn't it?
3      A. Of course.
4      Q. Okay.
5      A. In the sense of it having led to, resulted in,
6  freezing of our assets.
7      Q. Exactly.
8      A. Definitely.
9      Q. Exactly. Threatening the financial collapse of
10 the PA. Yes?
11     A. I don't know. Grossly undermining the PA's
12 capacity to function. That was how I would put it.
13     Q. Well, let's see how you put it.
14     If Plaintiffs' efforts prove successful, they
15 could completely undermine the PNA's ability to continue
16 to operate as a functioning government.
17     Correct?
18     A. Amazing. I mean I just said to you now what I
19 said in the letter, and really I did not look at the
20 sentence now.
21     Q. Okay. Because you really believe this?
22     A. That's my state of mind.
23     Q. Right. Your state of mind was this could cause
24 the -- effectively the collapse of the PNA, correct?
25     MR. ROCHON: Counsel, you've asked it a

Page 204

1  dozen times.
2      MR. WISTOW: I'd like to get it all in one
3  place, kind of bookend it.
4      I'm sorry I'm amusing you.
5      A. What I said --
6      Q. Can you please --
7      A. What I said --
8      Q. Yes.
9      A. What I said was it threatened to grossly
10 undermine the capacity of the PA to function. That's
11 what I just told you now.
12     Q. To operate as a functioning government?
13     A. And what you actually recited from the letter,
14 which I wrote in June of 2005 in English, is exactly
15 identical then to what I just said to you right now.
16     Q. I accept that.
17     A. That impresses me.
18     Q. I accept that. I salute you. I salute you, sir.
19     A. Thank you.
20     Q. I want to take it a step further.
21     A. Okay.
22     Q. So with this threat, did you consider --
23     A. Yes.
24     Q. -- going to the Rhode Island court and saying
25 they're abusing the injunction?

Page 205

1      Can you answer that?
2      A. I think I did.
3      Q. I don't think you did, with all due respect.
4      A. I told you, you know, we were at the time -- we
5  had not, at the time, gotten to the point of actively
6  pursuing those cases in the sense of defending ourselves
7  against every motion or injunction.
8      It was the over-all strategy. It was just
9  basically something that had just happened in the sense
10 of this ruling, this judgment, if you will, and the
11 entering of final judgment of a certain amount, freezing
12 of assets.
13     And so, basically, you ask what is it that got
14 you there in the first instance. The inadequacy of the
15 defense on the grounds of jurisdiction or sovereign
16 immunity, that's what we were looking at at the time, or
17 that's what I recall was on my mind, not that particular
18 injunction.
19     In other words, you know, what we were doing then
20 was we were taking it step by step, action by action,
21 motion by motion. It was just a different paradigm
22 altogether.
23     You know, the lawyers showed up and said, Well,
24 no jurisdiction. And so, basically, that's just the way
25 it was.

Fayyad

Page 206

1    Q. But you had lost that in the Court of Appeals?
2    A. I know. We were just --
3        MR. ROCHON: Counsel.
4    A. We were just in the midst of trying to deal with
5    it. That's basically what [I'am trying to talk to you
6    about.
7    Q. This is June 2005?
8    A. It is June of 2005, yes.
9    Q. Now, in June of 2005, you have a situation that
10   you claimed to Condoleezza Rice is threatening to
11   completely undermine the PNA's ability to continue to
12   operate as a functioning government?
13   A. Yes, yes.
14   Q. Correct?
15   A. Correct.
16   Q. And you really believed that?
17   A. I did.
18   Q. Okay. Whatever else you were doing, did you give
19   any consideration whatever to going back to Judge
20   Lagueux and explaining to him that they were misusing
21   the injunction?
22       Did you consider it?
23   A. You know, I never said -- and I'm not here to
24   suggest -- that I'm actually, or I ever, micro-managed
25   this process in the sense of me, you know, deciding

Page 207

1    every step of this litigation. That's what we have
2    lawyers for now, thankfully, and we're pursuing this
3    strategy.
4        We were not doing it this way then. And even
5    today, with active, you know, counsel on our behalf, it
6    isn't the case that I just sit and decide in a
7    micro-management sense the steps that need to be taken.
8    Q. Okay.
9    A. I honestly don't.
10   Q. So, in June of 2005 --
11   A. If it's true today, it was a lot more true then.
12   Q. In June of 2005, you were content to leave this
13   issue in the hands of your then lawyers.
14       Is that what you're saying?
15       MR. ROCHON: Objection to form.
16   A. I was not really involved in it then in the same
17   way that I'm involved in it today.
18   Q. I'm not asking you to compare the two.
19       I'm saying, in June of 2005 --
20   A. Yes.
21   Q. -- when you were telling Condoleezza Rice that
22   this injunction threatened to collapse the PNA, you were
23   content not to micro-manage it.
24       That was your expression, correct?
25   A. Yes. I never micro-managed it then, and I'm not

Page 208

1    micro-managing it now.
2    Q. So who was managing it in June of 2005?
3    A. It was -- as I told you, the issue became one
4    that preoccupied me definitely when I basically found
5    myself having to deal with the financial consequence of
6    this.
7    Q. Listen to me.
8        MR. ROCHON: Counsel, don't tell the Prime
9    Minister to listen to you. Just because you don't get
10   the answer you want, don't tell him to listen to you.
11   He's been listening to you patiently for four hours.
12       MR. WISTOW: All right.
13   Q. Forgive me. I apologize.
14       You indicated you didn't want to micro-manage
15   this problem, correct?
16   A. I didn't. And I'm not doing it now either.
17   Q. Okay. Fair enough.
18   A. It's not because I didn't want -- this is just
19   basically how I do business, whether this case or other
20   cases. I'm not a lawyer. That's what we have lawyers
21   for.
22   Q. I'm not being critical. I'm just asking the
23   question.
24   A. Okay.
25   Q. Okay. Who was managing the situation, this

Page 209

1    litigation, in June of 2005?
2    A. I do not know if I can really tell you there was
3    one individual or portfolio that was solely in charge of
4    this operation. I really can't.
5    Q. That's not what I'm asking you. I'm asking if
6    you know anybody who was involved in the management of
7    it. Anybody.
8        MR. ROCHON: When you say "it," counsel, the
9    litigation?
10       MR. WISTOW: The litigation. Yes.
11   Q. In June of 2005.
12   A. I believe it was just counsel doing it, you know,
13   at the time, on the basis of the strategy that they
14   began, and basically continuing on with it.
15   Q. So did you try to determine if there was anybody
16   else in the government that was involved in this?
17   A. All I remember is when I actually, you know,
18   started to deal with it. I did not really, at the time,
19   feel I was intruding on somebody's turf at the time.
20   Q. I don't understand that. In June of 2005 --
21   A. Yes.
22   Q. -- you were not managing this litigation?
23   A. No, I wasn't.
24   Q. Okay. Did you believe somebody else in the
25   government was, or some kind of combination of people in

Fayyad

Page 210

1  the government?
2      A. I had assumed that to be the case. But it looked
3  to me to be more, you know, the lawyers doing it on an
4  on-going inertia basis, if you will, on the basis of
5  strategy that they adopted early on.
6      Q. Okay. In June of 2005 then, you assumed somebody
7  else in the government was managing it?
8          That is what you said?
9      A. June 2005?
10     Q. Yes. When you wrote this letter.
11     A. As I told you, in the way that I described to
12 you.
13         You know, again, we're really talking about a
14 fairly nascent authority --
15     Q. What?
16     A. Young authority, new authority, without well-
17 established systems of governance in various matters.
18         I mean it's not like, you know, an authority
19 that's been in existence forever, with everybody knowing
20 what they're supposed to be doing.
21     Q. Did you assume someone was managing it --
22     A. Yes.
23     Q. -- or did you assume someone wasn't?
24         That's all I'm asking.
25     A. I assumed it was being managed in the way that I

Page 211

1  described -- namely, on the basis of strategy which was
2  based on the notion that there was no jurisdiction in
3  this particular case.
4          And when a deposition is taken, this does not
5  need day-to-day maintenance. It's a paradigm that says
6  we need not be involved in the details here basically.
7          So, in the nature of it, I did not assume there
8  was anyone actively involved in managing this process on
9  a day-to-day basis.
10     Q. Okay. But, in June of 2005, when you wrote the
11 letter, you had already known that you lost on sovereign
12 immunity in Court of Appeals. You knew that.
13     A. I think that was on the table at the time. I
14 mean if I had not known that, I would not have been --
15     Q. It's in your letter?
16     A. Yes.
17     Q. So you knew that.
18         Now, did you -- again, did you assume that
19 somebody in government was involved in managing this, or
20 did you not assume that?
21         That's all I'm asking.
22         MR. ROCHON: Asked and answered.
23         MR. WISTOW: For the life of me, I don't
24 know what the answer is.
25     A. You know, I did not know if there was anybody

Page 212

1  actively managing the case on a day-to-day basis.
2      Q. Okay?
3      A. For the reasons I mentioned. So --
4      Q. Did you assume there was?
5          MR. ROCHON: Counsel. You just asked it.
6          MR. WISTOW: No. He said -- he said, I
7  didn't know. I'm asking, did you believe there was
8  somebody.
9          He said he didn't know. I'm now asking him
10 did he believe somebody was managing it.
11     A. You know, I don't know if I really went through
12 this thinking, assuming anything.
13         All I know is, when I found out about this, and
14 it came to my knowledge this was what was involved, this
15 was what a thing that was a priority issue for me, I
16 started to act on it.
17         Basically, that's what I'm trying to tell you.
18     Q. Okay. What I'm trying to ask you, when you
19 started to act, you wrote a letter?
20     A. Yes.
21     Q. Okay. And that's the last thing before you left
22 government, right?
23     A. Yes.
24     Q. Okay. Now, what I'm trying to get at though, is
25 did you believe that somebody else would be taking care

Page 213

1  of this?
2      A. If I did, I would not have written the letter
3  probably.
4      Q. I'm sorry. What?
5      A. If I did, I probably would not have written the
6  letter I did. I mean I probably would have gone to the
7  person I had assumed was managing this.
8      Q. So you believe nobody was managing it?
9      A. I didn't really make an effort to find out. I
10 just decided to deal with it myself.
11     Q. Okay. Fair enough. Okay.
12         Now, you were aware, when you wrote this letter,
13 that there was a problem with the Wachovia Bank?
14         MR. ROCHON: Page, counsel?
15         MR. WISTOW: Yes. Page 3, third paragraph
16 from the bottom.
17     A. Page 3?
18     Q. Yes.
19     A. Yes. The letter itself, right?
20     Q. Yes. Yes.
21     A. Yes.
22         (Witness peruses document.)
23     A. Yes. Here I don't read through all of it, but I
24 believe I'm talking only about the Pension Fund and the
25 PNA.

Fayyad

## Page 214

1    Q.  Well, no.  It seems to be more than that because
2  it's talking about paying your employees salaries.
3        Do you see?
4    A.  Let me just continue.
5        (Witness peruses document.)
6    Q.  Where do I talk about salaries?
7    Q.  Well, it says, Expenses needed to run its office.
8  Maybe I shouldn't have assumed that would be --
9        What expenses were you talking about?
10   A.  Are we talking about the Pension Fund here?
11   Q.  No.  It says -- I'll just -- I don't know what
12  we're talking about.  I'll just read what it says.
13   A.  Okay.
14   Q.  The PNA's bank in Washington --
15   A.  Where?  I mean I'm reading the wrong paragraph.
16   Q.  Oh, okay.  Fair enough.  Page 3, third paragraph
17  from the bottom.
18       MR. ROCHON: (Indicating).
19   A.  This one?
20   Q.  Yes.
21   A.  As a result of receiving notice?
22   Q.  Yes.  Exactly.  Take a minute, read it, tell me
23  when you're finished.
24   A.  Okay.
25       (Witness peruses document.)

## Page 215

1    Q.  And, incidentally, I do apologize for saying
2  before, Listen, it was an appropriate response from
3  Mr. Rochon.
4    A.  Yes.  Okay.
5    Q.  Okay?
6    A.  Yes.
7    Q.  When you say necessary expenses needed to run, I
8  assume that includes payroll and rent?
9    A.  All expenses, yes.
10   Q.  Yes.  Whatever?
11   A.  Yes.
12   Q.  Okay.  So this was a kind of an immediate crisis,
13  was it not?
14   A.  Yes.  I mean in the sense of it having led to a
15  situation where our Mission was not able to use its
16  resources available to pay salaries of employees and
17  other operating expenses.
18   Q.  Yes.  It's an immediate crisis?
19   A.  I mean not only in the sense it was a big
20  problem.  It was a huge problem.
21   Q.  It's immediate crisis, is it not?
22   A.  Immediate crisis --
23   Q.  Is it that difficult to agree with me?
24   A.  I don't know.  Basically, I would have to be --
25  I'm responsible for things I say, not for things you

## Page 216

1  say, with all due respect.
2    Q.  If you disagree with me --
3    A.  I can't -- I mean, I'm just --
4        MR. ROCHON:  Counsel --
5    A.  Look.  I'm prepared to sit here as long as is
6  necessary.  But I'm not really going to be forced into
7  saying things not the way I want to say them.
8    Q.  Okay.
9    A.  I think it's fair enough.
10   Q.  I'll ask you this --
11   Q.  Please feel free to ask me however many questions
12  you like, and I am prepared to sit with you for as long
13  as it takes.
14       But I am not comfortable being framed in the way
15  to answer questions.
16   Q.  I can see that.  I can see that.
17       Did you consider it to be an immediate crisis?
18   A.  I considered it to be a very very big problem for
19  the Palestinian Authority.
20       In this particular paragraph, we're referring --
21  we're talking about the operation of our Mission.  And
22  that's the PA in its entirety.
23       Remember this.  I regarded the whole case as one
24  that's posing serious threat to the capacity of the PA
25  to continue to function as a government.  That's

## Page 217

1  basically --
2    Q.  Well --
3    A.  -- you know, and this -- reading through this
4  now, it's coming back to me -- basically, looking at the
5  myriad of actions, sequence of steps, a lot of things
6  happening at the same time, you know.
7        So anyone, you know, kind of sitting there having
8  to deal with the consequences of this, clearly could not
9  but have viewed this as a very very serious problem, for
10  sure.
11   Q.  Clearly could what?
12   A.  Not but have viewed this as a very serious
13  problem.
14   Q.  Now, you've seen about the bank thing.  And
15  that's yet another element of seriousness, right?
16   A.  I tell you, it's in there -- you know, the
17  reference to -- maybe in the subsequent paragraph which
18  I was reading before, thinking that was the paragraph
19  that interested you -- talking, for example, about
20  assets of the PMA, Palestine Monetary Authority, being
21  frozen.
22       Well, in fact, that was commercial bank money
23  they were dealing with.  For me, knowing what I know
24  about financial flows and check-clearing matters and the
25  rest of that, I knew this was debilitating way

Fayyad

Page 218

1   beyond, you know, the capacity to pay salaries.
2       Q. Right.
3       A. Here is an institution that is independent of the
4   PA, in every sense of the word, unable to function.
5       Q. Right.
6       A. So our banking system would be basically shut
7   down. I mean that's what we're looking at, beyond
8   salaries. So a serious problem.
9       Q. You're talking Palestine Monetary --
10      A. -- Monetary Authority, yes.
11      Q. That's another problem that I'll talk to you
12  about in a minute. But I'd like to do one at a time.
13      MR. ROCHON: Counsel --
14      Q. I want to talk about the bank in Washington,
15  Wachovia --
16      A. Yes.
17      Q. -- correct? So that was an immediate serious
18  problem because the checking accounts that you paid
19  expenses, like salaries and rent, was frozen?
20      A. You know, not as serious, for example, you know,
21  as PMA assets or assets handled by the PMA being frozen.
22      There are grades of problems here. I mean --
23      MR. ROCHON: Counsel, may I suggest that
24  leading questions may not be as advantageous in this
25  situation as you think.

Page 219

1       MR. WISTOW: You may suggest, and I will
2   disregard your suggestion.
3       A. And I'll have to deal with the consequences.
4       Q. I beg your pardon. I'm going to continue.
5       A. Okay. Continue.
6       Q. Whether it was the most serious problem, the
7   least serious problem, or some problem in the middle, it
8   was a problem that threatened --
9       A. Problem.
10      Q. -- to close down the offices in Washington of the
11  PNA.
12      At least that's what you told Condoleezza Rice,
13  correct?
14      A. Yes.
15      Q. Okay. Now, you said that, The PNA's bank in
16  Washington has attempted to clarify with the Court and
17  the Plaintiffs whether the PNA's account can be used to
18  pay the necessary expenses needed to run its office,
19  without success.
20      Do you see that?
21      A. Yes.
22      Q. Can you tell me about that? Do you know anything
23  about it?
24      A. I don't really remember the details of this. I
25  really don't.

Page 220

1       Q. Do you remember anything about it?
2       A. You know, just as a consequence of the case, and
3   as information that was brought to my attention in the
4   context of writing the Secretary.
5       Q. Well, was it clarified with the Court?
6       A. I do not know.
7       Q. Was that account freed up at some point?
8       A. Yes. At the time --
9       Q. Was the account freed up?
10      A. You know, basically the letter is a statement of
11  the way things were at the time the letter was written.
12  Then what happened afterwards --
13      Q. Of course.
14      A. -- I really do not know.
15      Q. That's what I'm trying to find out.
16      A. Yes.
17      Q. So you don't know --
18      A. I don't know.
19      Q. -- if that serious problem got solved?
20      A. I know it's solved now. I mean I know we have an
21  office that's functioning now. I mean for sure.
22      Q. Now is five years later.
23      A. It's been functioning since then.
24      Q. Do you know how it was resolved?
25      A. No, I don't.

Page 221

1       Q. Do you know when it was resolved?
2       A. I don't know for sure.
3       Q. Okay. Do you know if you -- you -- I checked,
4   and it appears that you left your post as Finance
5   Minister on December 12 of 2005.
6       Does that refresh your recollection?
7       A. Probably. Well, if we're talking about days
8   making a difference here, I believe it was December 5.
9   That's my recollection I mean.
10      Q. Fine. Okay. It's not worth fighting about.
11      A. Yes. I just say, for the record, that I don't
12  know. I can check it out, but I sort of recall it was
13  5th of December, not 12th of December.
14      Q. The -- you say here, in that second paragraph, In
15  addition, we have been informed by Arab Bank that it has
16  received a copy of Plaintiffs' notice and that, as a
17  result, it may have to freeze the PNA assets located
18  anywhere in the world.
19      You wrote that, correct?
20      A. Yes.
21      Q. Did that actually happen, that you got such a
22  notice?
23      A. Yes. It must have happened. I mean I was not
24  really making it up. I mean we were, at the time,
25  informed by Arab Bank that they did receive such a

Fayyad

Page 222

1  notice.
2      Q.  Okay.  You know that from your own personal
3  knowledge?
4      A.  I cannot tell you right now.  I really don't
5  recall.
6      Q.  Okay.  Do you know if, before you left, some five
7  months later, this was resolved with the Arab Bank in
8  any way?
9      A.  I'll tell you, what I remember is that we were
10  having a hard time.  We were very anxious.  We were
11  worried about assets being frozen.  It was just one
12  thing happening after another.
13      I was worried especially about, in addition to
14  PMA, I was worried about pension funds.  I mean these
15  are rights of pensioners who really have nothing to do
16  with anything I mean.  So that was really, you know, our
17  immediate worry, you know, at the time.
18      So there was a lot to worry about during that
19  period.  There was a really a lot of commotion.
20      Q.  Right.  There was a lot to worry about.
21      What I'm trying to find out is, on this
22  particular issue with the Arab Bank, did you follow up
23  with that at all before you left six months later.
24      A.  Yes.
25      Q.  What did you do?

Page 223

1      A.  I do not know if that situation led to assets
2  being frozen.  I'm not sure I can say that.
3      But, at the time, yes.  I believe the bank was
4  put on notice that there is this action against us, and
5  that it could possibly lead to having our assets frozen.
6      Q.  Well, during the six months that you stayed on as
7  Finance Minister --
8      A.  Yes.
9      Q.  -- did you learn whether or not --
10      A.  No.  I don't believe assets were frozen at the
11  time.
12      Q.  You weren't sure?
13      A.  You know, if you give me a little bit of time to
14  scratch my head over this.  I just want -- what I don't
15  want to do is to give you some information that's not
16  accurate.
17      Look, I don't believe assets were frozen in
18  connection with what you have just referred to with Arab
19  Bank.  I don't believe so.
20      Q.  Was the Pension Fund frozen?
21      A.  Yes.
22      Q.  Okay.  That was a serious concern?
23      A.  That was serious, and it continues to be.
24      Q.  What?
25      A.  And it continues to be.

Page 224

1      Q.  Okay.
2      A.  For obvious reasons.  This is not our money.
3  This is not PA money.
4      Q.  So I want to go for the request for intervention.
5  Do you see that paragraph?
6      A.  Which one?
7      Q.  Page 4.
8      A.  Which one?
9      Q.  The paragraph --
10      A.  Yes.
11      Q.  Why don't you read that to yourself silently.
12          (Witness peruses document.)
13      A.  Yes.
14      Q.  And principally, at that time, the freezing was
15  caused by the injunction, is that fair?
16      A.  Yes.  It was freezing assets.
17      Q.  Okay.  And, at the top of the page, you note, and
18  you tell Condoleezza Rice -- third line down --
19      A.  Yes.
20      Q.  -- that these actions, the freezing of the assets
21  of the Palestinian Pension Fund, are clearly not within
22  the scope of the preliminary injunction, correct?
23          That's what you told her?
24          MR. ROCHON:  Are you under Request for
25  Intervention, counsel?

Page 225

1          MR. WISTOW:  I'm sorry.  I went to the top
2  of the page.  I didn't do that very elegantly.
3      Q.  Let's go to the top of the page.
4          (Witness peruses document.)
5      Q.  Do you see what I'm referring to?
6      I guess, in fairness, if you want to start the
7  beginning of the sentence -- which probably is
8  appropriate -- let me take you back to 3, the last line,
9  which says, In addition to freezing the assets --
10      A.  Okay.
11      Q.  -- of the PMA, Plaintiffs' enforcement actions
12  also resulted in the freezing of the assets of the
13  Palestinian Pension Fund.
14      You see?
15      A.  Yes.
16      Q.  And you say, Assets that, again, clearly are not
17  within the scope of the preliminary injunction.  Okay?
18      A.  Yes.
19      Q.  And you believed that at the time?
20      A.  Yes.
21      Q.  Okay.  And you're asking Condoleezza Rice --
22      A.  Yes.
23      Q.  -- to intervene, to the extent that she can
24  within the Constitution and the laws of the United
25  States?

Page 226

1    A. Yes.
2    Q. But you don't ask Judge Lagueux to intervene in
3  any way on this issue of the misuse of the preliminary
4  injunction.
5        Is that fair?
6    A. Not quite this way of, you know, one or the
7  other. It's just basically as I told you. We -- you
8  know, it was really the first official action, if you
9  will, on my part in this case.
10        And I thought it appropriate, given the enormity
11  of it, given how important it was, given how threatening
12  it was to our ability to continue to function, that I
13  thought it appropriate to raise it at that level.
14        You know, so basically it was not really a
15  question should I go to the Judge or to the Secretary of
16  State. It was not really that. And, again --
17    Q. You could have done both?
18    A. Again, I could have done both. I mean maybe we
19  would have been in a different place had we done that.
20    Q. Have you today --
21    A. I mean we could have done many things, but we
22  didn't.
23    Q. Have you, even today, gone to the Judge and asked
24  him to stop the abuse of the injunction? Do you know?
25    A. What I know today is that we are pursuing this

Page 227

1  very closely and methodically, and doing what one should
2  do to defend one's self.
3    Q. I'm asking you specifically if you know whether
4  or not you've gone to Judge Lagueux and tried to inform
5  him that his injunction is being abused.
6    A. I don't --
7        MR. ROCHON: Objection.
8    Q. If you know.
9        MR. ROCHON: There's an objection, Mr. Prime
10  Minister.
11        Are you asking on behalf of the PMA, the
12  PNF, the PA?
13        MR. WISTOW: On behalf of anybody.
14    A. Okay. Well, I do know there were different
15  lawyers who were doing different things here.
16        The PMA definitely was pursuing that line of
17  defense, for sure. And also the Pension Fund.
18    Q. Has gone to Judge Lagueux?
19    A. I don't know exactly what they're doing.
20    Q. That's what I'm trying to find out. If you know.
21    A. What I know is that definitely they're
22  challenging it.
23    Q. Let me try this again, Mr. Fayyad.
24        Do you know whether or not anybody has gone to
25  Judge Lagueux to say that the injunction he issued is

Page 228

1  being abused?
2        That's all I'm asking.
3    A. I assume this is what has happened in both of
4  these cases, both the PMA and the Pension.
5    Q. You assume that?
6    A. Yes.
7    Q. Okay. Why do you assume that?
8    A. I mean if I were actually representing either
9  entity against the backdrop of, you know, the action to
10  freeze assets, it seems to me that would be the first
11  thing I would try, as a point of logic I mean.
12    Q. It makes sense, right?
13    A. I would think so.
14    Q. Okay. Now, your position is that the Plaintiffs
15  were using the injunction inappropriately to freeze
16  assets of the PNA also, not just these other entities,
17  isn't that so?
18    A. Here I'm talking about PMA, with an M as in
19  Michael.
20    Q. Well, PNA is what?
21    A. PNA is Palestinian National Authority.
22    Q. Which we've said is the PA?
23    A. It is the same as PA.
24    Q. Okay. Go down to the next paragraph, Request for
25  Intervention.

Page 229

1    A. Yes.
2    Q. As set forth above --
3    A. Yes.
4    Q. -- the enforcement actions taken by Plaintiffs
5  and their supporters in the Ungar case already have
6  resulted in the freezing of numerous assets of both the
7  PNA -- that's the PA, right?
8    A. Yes. It's the same.
9    Q. -- and various independent entities that are not
10  subject to the District Court's preliminary injunction?
11    A. Yes.
12    Q. Okay. Did you try to go back and say there were
13  assets that were frozen that shouldn't be?
14    A. Did I?
15    Q. When I say you, either the PLO or the PA.
16    A. Yes.
17    Q. Did you?
18    A. Do what? I'm sorry.
19    Q. Go back to Judge Lagueux and say the injunction
20  was being abused.
21    A. Again, I believe, in those cases of PMA and the
22  Pension Fund -- PMA, Palestine Monetary Authority -- and
23  Pension Fund, that that was the case, yes.
24    Q. Okay. Now, what about the PNA? Did they go to
25  Judge Lagueux and say the injection was being abused?

Fayyad

Page 230

1    A. I do not know for sure.
2    Q. Okay.
3    A. I don't know for sure.
4    Q. Okay. Now, tell me about these efforts that
5   these other entities made to go see Judge Lagueux. What
6   happened?
7    A. I know that these cases continue to be pursued.
8   Determination is made or a finding is made in at least
9   one of them, and then an appeal. And then, you know, I
10  know that it's still under way.
11   Q. So there's somebody appearing before Judge
12  Lagueux talking about the injunction being abused?
13      Who is that?
14   A. There is legal counsel --
15   Q. What?
16   A. There is legal counsel acting on behalf of the
17  Palestine Monetary Authority, and there is legal counsel
18  acting on behalf of the Pension Fund, in all aspect of
19  those cases.
20   Q. Have they gone to Judge Lagueux?
21   A. I'm not aware of that. I don't know.
22   Q. Okay. That's all I'm asking.
23   A. I don't know.
24   Q. And you're the person at the PA that's in charge
25  of the Ungar case, correct?

Page 231

1    A. You know, I can tell you -- I am here to tell you
2   that I consider myself to be in charge of this case.
3       But please understand, that does not really mean
4   that I manage this on a day-to-day basis or I
5   micro-manage it. That's why we have lawyers for the
6   PNA. That why we have lawyers for the PMA. There are
7   lawyers for the Pension Fund.
8       It's their job to do this. I'm seized with this,
9   but that does not really mean I micro-manage the
10  process.
11   Q. You trust your lawyers?
12   A. No, no. If what you're trying to establish, sir,
13  is that here you are -- you're telling me, You're in
14  charge of the Ungar case at the PMA, at the PNA, and you
15  don't know any of these things.
16      I know enough to really be satisfied that we are
17  pursuing this in the way it should be pursued to give
18  ourselves a chance to defend ourselves in all these
19  cases.
20      That's all I can say.
21   Q. Have you finished your answer?
22   A. I have.
23   Q. Okay. I did not suggest to you --
24   A. It sounded to me you have.
25   Q. Well, you drew an inference.

Page 232

1       All I'm asking is, are you the person at the PA
2   who's responsible for the Ungar case.
3       MR. ROCHON: Objection.
4    A. I am the person where the buck stops in this
5   particular case in the way that I described it.
6    Q. Okay. Who else in the PA --
7    A. I am.
8    Q. Well, no. Who else --
9    A. I am in charge. I told you.
10   Q. I haven't finished the question. You said the
11  buck stops here?
12   A. Yes.
13   Q. You're in charge?
14   A. I am.
15   Q. Who else is involved in this case in the PA, if
16  anybody?
17      MR. ROCHON: I'm going to object because
18  there are three different entities you've been talking
19  about so far -- the PMA --
20      MR. WISTOW: No. I'm only talking about PA.
21  I was very careful.
22      MR. ROCHON: When you said the Ungar case,
23  you were talking about the PA Ungar case, not PMA or
24  Pension Fund, is that right?
25      MR. WISTOW: That's right.

Page 233

1       MR. ROCHON: Thank you.
2    Q. Who else in the PA has anything to do with the
3   Ungar case?
4    A. In an executive capacity, I am in charge of this.
5    Q. No, no. I understand you're in charge. I'm just
6   asking is anybody else doing any work on it.
7    A. Doing any work? Our lawyers are doing work.
8    Q. Outside lawyers or inside lawyers?
9    A. Outside lawyers are working on it.
10   Q. Okay. I'm not asking about outside. I'm talking
11  about, within the PA, is there anybody working on this
12  case, other than you?
13   A. I mean, basically, I am overseeing the effort.
14  The lawyers are doing what they're supposed to do in
15  terms of pursuing, you know, the case in the United
16  States in all of the aspects of discovery and all.
17      And, you know, staff is involved in this to the
18  extent they are involved in facilitating the work of the
19  lawyers.
20      But they are the experts -- the lawyers are the
21  experts in this. We are not.
22   Q. Okay. But, Mr. Fayyad, please. All I'm trying
23  to find out -- I understand you've got lawyers.
24   A. Yes.
25   Q. I do. And I understand that you're in charge in

Fayyad

---

Page 234

1  the PA of the case.
2      A. Yes.
3      Q. What I'm trying to find out is if there's anybody
4  else in the PA -- in the PA -- who's got any
5  responsibility for the case.
6      I'm not talking about typists or file clerks, but
7  who's got any kind of responsibility, other than you.
8  Anybody.
9      A. You know, collectively, when I say I, I just
10  don't mean in my personal capacity as Prime Minister.
11  So therefore, basically, it's a Cabinet issue.  It is
12  something that we talk about in the Cabinet.
13      There are various agencies involved.  The
14  Ministry of Justice is involved, for example.  So it's
15  not that this is something without record or a trail in
16  the PA.
17      Q. Okay.
18      A. But, you know --
19      Q. Thank you.
20      A. -- as I suggested to you, sir, this is something
21  that is definitely being pursued by our lawyers.  This
22  is not something that the PA is itself doing.
23      Q. With all due respect, all I'm asking is who else
24  in the PA has any responsibilities for the case, other
25  than you.

---

Page 235

1      MR. ROCHON:  Same objection.
2      MR. WISTOW:  I am excluding --
3      MR. ROCHON:  By responsibilities, can you
4  clarify what you mean.
5      MR. WISTOW:  Working on the case.  Doing
6  anything on the case.
7      MR. ROCHON:  Let me explain the objection.
8  I don't think you'll mind the talking objection.
9      In order to get information, you have to go
10  to numerous people that you get information from.  They
11  might be working on the case in the sense of
12  facilitating the flow of information.
13      Is your question who else makes decisions or
14  implements strategy or who gives, you know, I mean --
15      MR. WISTOW:  Okay.  Thank you.
16      MR. ROCHON:  If you're going to subpoena
17  records from a department, the Prime Minister doesn't go
18  get the records.  But that doesn't mean those people
19  have responsibility.  That's --
20      Q. Well, all the records regarding this case are in
21  your office.
22      MR. ROCHON:  I said if you subpoena records.
23  You know, Mr. Strachman, before you got in this case, in
24  other matters has subpoenaed records when he's -- or
25  sought them in discovery.

---

Page 236

1      When he does that, the Prime Minister
2  doesn't go down and search the records.  So if you could
3  clarify your question --
4      MR. WISTOW:  Okay.  Fine.  I have no
5  problem.
6      Q. We indicated that the Minister of Justice --
7  Minister of Justice -- has some involvement in the Ungar
8  case.
9      That's what you said a moment ago?
10      A. Yes.
11      Q. Okay.
12      A. In the nature of things, you know, here we are.
13  We -- as I said, we have a discussion of this in the
14  Cabinet.  This is something that comes up from time to
15  time.
16      Q. Right.
17      A. The Minister of Justice, given its purview, is
18  naturally involved and concerned with this.
19      In terms of management and over-all direction, I
20  am the one who actually communicates that in my capacity
21  as Prime Minister.
22      Q. To make decisions?
23      A. To the lawyers.  Yes.
24      Q. Okay.  But what I'm -- you said the Minister of
25  Justice is naturally involved in this.

---

Page 237

1      A. Yes.  Naturally.
2      Q. What does he do in this?
3      A. Basically, you know, follows up in terms of
4  what's going on.
5      But, you know, he is not, nor has he been tasked,
6  with making decisions on this particular case.
7      Q. I wasn't asking who's making decisions.  I'm just
8  asking you who's involved in the case.
9      Now, you said the Minister of Justice --
10      A. Many people are involved in this.
11      Q. Okay.  Many people.  Well, the Minister of
12  Justice, you said, is involved in the follow-up.
13      Do you remember that?
14      A. And different agencies of government.  Several
15  agencies of government also.
16      Q. I just want to talk about the Minister of
17  Justice.  One at a time.  Okay?
18      A. Okay.
19      Q. What follow-up is he involved in?
20      A. If you are a Minister of Justice, you basically
21  follow up in terms of what litigation is outstanding
22  against the PA, whether domestic or internationally, in
23  that sense.
24      But the Ministry of Justice is not involved in
25  managing this process.  It, like other agencies of the

---

Fayyad

| Page 238 |
| --- |

1  government, has been approached on different occasions
2  in the process of producing documentation, testimony,
3  evidence in connection with the discovery, whether in
4  this case or other cases, basically.
5      Q. Mr. Fayyad --
6      A. Yes.
7      Q. -- the Minister of Justice follows up on what?
8  Frankly, I didn't understand.
9      In the Ungar case, what is his involvement?
10     A. You know, generally speaking, in all litigation
11  against the PA --
12     Q. Yes.
13     A. -- or in which the PA is a party -- to which the
14  PA is party --
15     Q. Yes.
16     A. -- the Minister of Justice is involved in that
17  sense.
18     Q. Domestic or --
19     A. Domestic or international. Domestic or
20  international.
21     Now, in the case of Ungar and other litigation
22  cases against us in the United States, the Minister of
23  Justice is not involved in decision-making.
24     The Minister of Justice and his ministry, as
25  other agencies of government, have, at some point or

| Page 239 |
| --- |

1  another, played a role in this process -- and not only
2  Ungar, but these other cases of pending litigation in
3  the United States.
4      Again, the process of discovery, producing
5  evidence, what you call it, from time to time, producing
6  witnesses.
7      There are various agencies that were involved, a
8  lot of officials. I'm not talking about Ungar alone,
9  but I'm talking about other cases as well.
10     Q. So what you're saying, for example, if
11  interrogatories come in on a case, they're answered by
12  the Ministry of Justice in conjunction with your outside
13  lawyers?
14         MR. ROCHON: Objection.
15     A. If what comes?
16     Q. Say interrogatories -- do you know what that is?
17     A. Yes. Some inquiry.
18     Q. Interrogatories means questions asked by your
19  adversary in the case.
20     A. Basically then, depending on who has to testify
21  or produce evidence, we -- my office -- approaches them,
22  and then they do what they have to do.
23     Q. Approaches them? The Ministry of Justice?
24     A. Whether it's the Ministry of Justice or other
25  agencies or individuals.

| Page 240 |
| --- |

1      Q. I'm trying to find out what the Ministry of
2  Justice does.
3      Let's -- we're breaking the tape, so let's go off
4  the record. Why don't you think about it --
5         MR. ROCHON: Objection. We're either on the
6  record or off. Either we're stopping talking or --
7         MR. WISTOW: Okay. You got me.
8         MR. ROCHON: Which one do you want?
9         MR. WISTOW: We're off.
10        MR. ROCHON: I don't mind being on if you
11  want to --
12        MR. WISTOW: We're off.
13        MR. ROCHON: Okay. We're off.
14        THE VIDEOGRAPHER: Going off record at 9:17.
15        (Short recess taken.)
16        THE VIDEOGRAPHER: Going on record at 9:29.
17     Q. Mr. Fayyad, we were talking, before the break,
18  about the function of the Minister of Justice, do you
19  recall?
20     A. Yes.
21     Q. I want to make sure I understand.
22     You understand that, in the United States, we
23  have forms of discovery we go through. Are you familiar
24  with that term?
25     A. I am familiar with the term discovery.

| Page 241 |
| --- |

1      Q. Right.
2      A. I do not know about various forms of discovery,
3  what it means.
4      Q. Well, for example, what we're doing now, a
5  deposition, is a form of discovery.
6      A. Yes.
7      Q. We have written questions we send to people. We
8  call them interrogatories.
9      A. Okay.
10     Q. And we request documents.
11     A. Yes.
12     Q. We call those requests for production. So those
13  are the common forms of discovery.
14     I get the impression that one of the functions of
15  the Ministry of Justice for these kinds of cases is that
16  the, say, request for production of documents or a
17  request for answers to interrogatories are initially
18  worked on by the Minister of Justice Department?
19     Certainly not by you, right?
20     A. In general, in general, that is the case.
21     However, in this particular case, as in other
22  cases being litigated in the United States, you know,
23  the process goes through my office.
24     Whether it's a document that's required, an
25  individual being deposed, or any other thing that is of

Fayyad

Page 242

1  interest to the attorneys, the court generally, the
2  request comes to my office.
3      And then it goes to, you know, the head of the
4  department concerned.  And if it's an individual, you
5  know, they appear.  If it's a document, they produce it
6  if it's available.
7      And that's the way it works.
8      Q.  So the Minister of Justice has not been involved
9  in these cases?
10     A.  In these cases, did not have that involvement
11 which the Ministry of Justice generally has in cases of
12 litigation.
13     Q.  When you say cases of litigation, you mean --
14     A.  -- against the PA.
15     Q.  Right.
16     A.  To which the PA is a party.  Let's put it that
17 way.
18     Q.  For domestic cases?
19     A.  For domestics cases.
20     You know, it's not -- you know, there are
21 actually, as best as I can tell you right now, actually
22 two jurisdictions outside of Palestine where there are
23 cases in which the PA is involved.  One is in Israel.
24 The other is in the United States.
25     In both of these cases, you know, the point of

Page 243

1  management is my office, and the process is managed
2  similarly by and through my office, and directly going
3  to various agencies of government as may be required.
4      That's just -- that's how, you know, those two
5  classes of cases are being handled.
6      Q.  So let me see if I understand.
7      When you say two cases, one in the United
8  States --
9      A.  Two classes of cases.
10     Q.  Two groups of cases?
11     A.  Two groups of cases.  Two categories.  Yes.
12     Q.  Right.  And are there other international cases?
13     A.  That's what I just said.  No.  I don't think
14 there is pending litigation.
15     Q.  I'm sorry?
16     A.  I do not believe there is pending litigation on
17 other cases in which the PA is involved internationally,
18 other than in the United States and in Israel.
19     Q.  And if there were, if one of those cases came up,
20 it would go --
21     A.  Depending.  Depending.  I mean, clearly, these
22 are cases that are clearly significant, for obvious
23 reasons, and after a period in which I do not believe
24 they were given the attention that they should have
25 required.

Page 244

1      But also all of this is to be seen against the
2  backdrop of a very young structural institution that the
3  PA generally --
4      Q.  I'm sorry.  The what?  The what kind of
5  structure?
6      A.  Weak, young, new.
7      Q.  Okay.
8      A.  -- where you do not have really established
9  systems of government structures that are clear with
10 clear mandates and all, you know, these two classes or
11 categories of cases, therefore, we decided to manage
12 them as well.
13     Q.  Okay.  We're talking about terrorist cases in the
14 US and Israel, or any kind of cases in the US and
15 Israel?
16     A.  I'm talking about cases in which the PA
17 officially is involved, not, say, a commercial entity
18 or --
19     I mean maybe there's a merchant in Palestine that
20 has dealings and there are cases for or against
21 somewhere else in the world.  But that's not, you know,
22 the business of government.
23     I'm talking to you about cases where, you know,
24 we are officially involved.
25     Q.  I'm not following you.

Page 245

1      Let's say there's a commercial case in the United
2  States.  Somebody sues the Palestinian Authority for
3  breach of contract.
4      Does that get handled by your office?
5      A.  We don't have, you know, cases like that now
6  anyway.
7      And, as I said, you know, the whole -- I mean the
8  PA is relatively new.  It's not that we have a long
9  history or tradition in which these cases are managed.
10 There is not anything that's fixed or structured if it
11 comes to this.
12     Q.  I see.
13     A.  It evolves out of necessity.  I find it very
14 important to really deal with these cases as matters of
15 very high priority.
16     You have systems of government that are not
17 mature enough where, you know, ministries and agencies
18 know what they should do and follow up and etc.
19     So, basically, in the nature of things, I just
20 happened to be there, and I knew those required serious
21 attention.  And you know, we manage them this way.
22     Q.  All right.  My question to you, though, is, if
23 there is a commercial case -- if there is -- that arises
24 in the United States, do you have an existing policy as
25 to who handles that.

Fayyad

Page 246

1      A.  I guess that's what I was really trying to say.
2      Q.  What is the policy?
3      A.  There is no such thing as an existing policy.
4      Q.  Okay.
5      A.  What we have is a situation that evolved out of
6   necessity in these particular cases, given the
7   ramifications and significance of those cases.
8      Q.  Okay.  So is it you that makes the judgment call
9   as to who's going to handle the case?
10         For example, let's say there's a commercial case
11  arising in the United States.  Do you make the decision,
12  today, as to what law firm is going to handle it and
13  what entity in the PA is going to work on it?
14         Is that your decision?
15     A.  We are, as I said, you know, not as a matter of
16  fixed rule or anything like that.  I'm just talking
17  about these two classes of cases.  I make a rule, and
18  the managers managed in the way they did.
19         Now, you know, something else happens, yes, the
20  PA is young.  Yes, we did not -- and we don't have
21  tradition in terms of how to handle these things.
22         But, certainly, it is my hope that we're mature
23  enough now where something like this goes to the
24  Ministry of Justice, as in other issues and other areas.
25         Matters are brought to my attention on a

Page 247

1   need-to-act basis.  If something, you know, for whatever
2   reason, is not being resolved because the Minister of
3   Justice can't resolve it or because there is dispute as
4   to the charge, it usually is brought to my attention.
5   Otherwise, it isn't.
6      Q.  I guess I'm -- I really do want to move on, but
7   I'm having trouble understanding this.
8         If a case comes in to the PA's headquarters, and
9   you're being sued, say, in New York for some commercial
10  situation, who decides --
11     A.  Yes.
12     Q.  -- who decides what department handles it, since
13  there's no policy, you're telling me?
14     A.  If it is not clear outright, you know, who is to
15  decide it, usually it comes to my office in these cases
16  and others, and not necessarily matters of litigation.
17         Mail comes to me every day, and I just basically
18  direct that traffic to relevant agencies, agencies that
19  are in charge.
20         If an event, something like what you have just
21  suggested happened, happened, and tomorrow I go to my
22  office and there is a piece of mail that somebody has
23  filed a suit against the PA -- commercial or something
24  like this -- I probably would refer it to the Ministry
25  of Justice to handle it.

Page 248

1      Q.  But it's your call?
2      A.  Yes.  It's my call.
3      Q.  That's all I'm trying to find out.
4      A.  Yes.
5      Q.  Okay.  So there's no set policy.  It's up to you
6   to decide who would get it.  Is that fair?
7      A.  Now, I can tell you that there is policy in the
8   sense of there are ministries with clear mandates and
9   agencies as to what they're supposed to be doing.
10         What is not really established, what is not
11  there, is established pattern, practice, tradition.  But
12  not policy or mandate.
13         Do you see what I'm saying?
14     Q.  No, I don't.  Forgive me.
15     A.  Okay.
16     Q.  Let me try it a slightly different way, because I
17  know you're trying to answer.
18     A.  Yes.  Thank you.
19     Q.  Is there any written policy, procedure, protocol,
20  or whatever you want to call it, that tells the people
21  who work for the PA where to send any kind of lawsuit?
22  Any kind.
23     A.  You know, there is.  Of course.  There is.  For
24  example, there are cases, you know, filed against us in
25  local courts on a variety of matters.

Page 249

1         What happens is that the Attorney-General,
2   Prosecutor-General, acting on behalf of the PA, informs
3   us, informs the relevant agency of the executive branch,
4   of the existence of an action against it.
5         Then he would ask, in that communication, as to
6   what response that agency may have to that particular
7   complaint that's been filed against the PA.
8      Q.  So --
9      A.  Then he proceeds in filing, etc., etc.
10     Q.  So there is written policy?
11     A.  Yes.  Insofar as that is concerned, there is.
12     Q.  How long has there been a written policy?
13     A.  I cannot tell you for sure, you know.
14         In terms of, you know, when the PA came into
15  existence, it did not really have a Minister of Justice.
16  It did not have an Attorney-General.  It did not have
17  these things.
18     Q.  I understand.
19     A.  Now, it happens to be the case that, early on --
20  and I know that this is what happened -- certain records
21  started to be produced as to the mandate and purview of
22  each agency of government.
23         Now, it's one thing to have this written
24  somewhere.  But it's quite another for that to translate
25  into an established pattern of practice, if you will.

Fayyad

Page 250

1    Q.  Okay.
2    A.  We are there in terms of what I described to you,
3  in the event that there is a motion and there is a
4  complaint against the PA, not only typically, but
5  always, it's the Prosecutor-General, acting on behalf of
6  the government, who gets to know first.
7      And then his office directs traffic to the agency
8  affected by this complaint, and the agency is supposed
9  to correspond with us through the attorney -- or the
10  Prosecutor-General as we call him -- and so on and so
11  forth.
12      In this case -- again, going back to when this
13  happened -- at the time, the PA was what?  Less than ten
14  years old, I guess.  And I believe, at least in part,
15  you know, we are where we are --
16    Q.  I believe it was 16 years old when this suit was
17  brought, wasn't it?
18    A.  No.
19    Q.  Wasn't the PA --
20    A.  The PA came into being in 1994.
21    Q.  The suit was in 2000.
22    A.  That's six, not 16.
23    Q.  Six years.  I'm sorry.
24    A.  You're off by ten.
25    Q.  By the way -- forgive me.

Page 251

1    A.  Yes.
2    Q.  My only question was, is there a written policy.
3  That was my only question.
4      The answer seems to be -- but I'm not sure --
5  yes, there is a written policy.
6    A.  Insofar as this is concerned, yes.
7    Q.  There is a written policy on lawsuits?
8    A.  Yes.
9    Q.  Okay.  Now, my next question is, for how long has
10  there been a written policy.
11    A.  You know, it may be -- and my answer, that, given
12  this day and date, back to, you know, early on after the
13  PA came into existence --
14    Q.  Okay.
15    A.  -- in the terms of manuals --
16    Q.  Okay.
17    A.  -- having been, you know, copied from other
18  jurisdictions, if you will, on the basis of what was
19  thought then to be suitable.
20      Now, the extent to which --
21    Q.  All I'm asking is -- I don't want to interrupt,
22  but, you know, we're using up time.
23      All I'm asking you is, how old is the policy.
24  That's all.  And, again, I acknowledge I interrupted.
25  But, you know, we're going to run out of time here.

Page 252

1    A.  Okay.
2    Q.  So the policy -- there may have been a written
3  policy as early as the beginnings of this, is that
4  right?
5    A.  Probably.
6    Q.  All right.  Who has copies of these policies?
7    A.  Various agencies in terms of organizational
8  structures.
9      There's -- I can tell you that there was an
10  attempt made at formalizing this at -- you know, PA --
11    Q.  Again, I'm going to do it.
12      All I'm asking is who has them.  That's all I'm
13  asking.
14      MR. ROCHON:  You can't --
15    A.  You know, this is not --
16    Q.  All I want to know -- forgive me --
17    A.  Let me --
18      MR. ROCHON:  We can't all three talk.
19      MR. WISTOW:  I know.  We can't all three
20  talk.  I just want to say --
21      MR. ROCHON:  Are you withdrawing your
22  question?
23      MR. WISTOW:  I'm withdrawing my question.
24      MR. ROCHON:  He's withdrawn the question.
25      THE WITNESS:  Okay.

Page 253

1      MR. WISTOW:  I want to state on the record
2  what's happening here.
3      I am asking questions that require a two- or
4  three-word answer -- maybe a sentence -- and I'm getting
5  long, long answers.  And I'm am certainly going to run
6  out of time as a consequence.
7      And I'm mindful of the fact that, as a
8  common courtesy, I shouldn't interrupt witnesses.  But I
9  don't know what else to do here, because all I'm trying
10  to find out is who has the written policy.
11      That's all I'm asking.
12    A.  And my answer is that, today -- today -- that
13  would be the Secretary General of the Cabinet.  He would
14  have records, you know, of everything.
15      But, you see --
16    Q.  Okay.  That's all I'm asking.
17    A.  I know that's what you're asking.  I mean I know
18  that's all you're asking.
19      But it is really my duty to really provide clear
20  and comprehensive answers to the fullest extent I can to
21  really place this in the context of an authority that is
22  not firmly established in terms of structures,
23  governance, processes and set-up.  That's all.
24    Q.  Please.
25      MR. WISTOW:  I move to strike everything

Fayyad

Page 254

1  after the identity of the person.  And I don't mind that
2  much because that was a relatively short answer, even
3  the unresponsive part.
4     Q.  Now, do you have copies of the policies and
5  procedures?
6     A.  Do I have them on me?
7     Q.  No, no.  Do you have them in your office?
8     A.  The Secretary General of the Cabinet would have
9  them.
10    Q.  Is the Secretary General of the Cabinet in your
11  office?
12    A.  In general, the Secretary of the Cabinet is
13  supposed to serve all ministries in the Prime Minister's
14  office.
15    Q.  Is he part of your office?
16    A.  If I want -- he's not part of my office, but if I
17  wanted, for example, a mandate of a minister --
18    Q.  -- you can get them?
19    A.  -- I can get it from the Secretary General.
20    Q.  So we know this.  Right now, the Secretary
21  General --
22    A.  Yes.
23    Q.  -- of the -- what is it called?
24    A.  Of the Cabinet.
25    Q.  The Secretary General of the Cabinet has the

Page 255

1  policies and procedures regarding the handling of
2  lawsuits?
3     A.  Mission statements, if you will, purviews,
4  mandates of various agencies of government are there,
5  yes.
6     Q.  Including how to handle lawsuits, correct?
7     A.  In the way that I described to you.  It being the
8  responsibility of the Prosecutor General in the case of
9  the PA to act on its behalf in legal matters, yes.
10    Q.  Let me try one more time.
11    A.  Yes.
12    Q.  The Secretary General of the Cabinet has the
13  policies and procedures for how to handle lawsuits.
14  Yes?
15    A.  The Secretary General of the Cabinet has material
16  on the mission statements, purviews, and mandates of all
17  agencies of government.
18       So if it's Ministry of Justice, of which the
19  Prosecutor General, is a part, yes, he would have that
20  material for sure.
21    Q.  Okay.  Fine.  And we're saying that that material
22  might go back, as far as you know, to the beginnings of
23  the PA?
24    A.  Not in its present form.
25    Q.  I understand that.  I understand that.

Page 256

1     A.  Yes.
2     Q.  But in some form?
3     A.  In some form.  In some form or other.
4     Q.  Okay.  Fair enough.
5     A.  When you interrupted me --
6     Q.  Fair enough.
7     A.  You don't want me to add anything?
8     Q.  No?
9     A.  Okay.  Fine.
10    Q.  I really don't.
11       Now, the -- right now, you -- we've established
12  that you're the one who decides how to handle
13  international terror suits, right?
14    A.  Many cases that are pending, yes.
15    Q.  Okay.  Who served that function before you?
16  Immediately before you.
17    A.  Yes.  I do not know if I can give you a precise
18  answer to that beyond what I have testified to before.
19    Q.  Well, is there a person?
20    A.  No.  As I mentioned to you before, I, as a matter
21  of fact, assumed responsibility for this.
22    Q.  I'm talking about before you.
23    A.  Before me?
24    Q.  Did anybody serve that function?
25    A.  Before me?  Before me meaning?

Page 257

1     Q.  Before you were --
2     A.  Before I joined the PA?  Before 2002?
3     Q.  Yes.
4     A.  I do not know.
5     Q.  Okay.
6     A.  I do not know.
7     Q.  Fair enough.
8     A.  Yes.
9     Q.  Fair enough.  All right.  Now, the -- do you know
10  who Muhannad Jaouni is?
11    A.  Yes.  I know who Muhannad Jaouni is?
12    Q.  I know I butchered that.
13    A.  Muhannad Jaouni was my office director at some
14  point.
15    Q.  He worked for you personally?
16    A.  He worked as my personal assistant when I was
17  Minister of Finance, I believe in 2002, 2003.  Around
18  that time period probably.
19       THE COURT REPORTER:  Can you spell that,
20  please.
21       THE WITNESS:  M U H A N N A D, and then
22  J A O U N I.
23    Q.  And he was your principal assistant?
24    A.  He was my personal assistant.
25    Q.  Did you say personal?

Fayyad

Page 258

1    A. Personal assistant.
2    Q. Okay.
3    A. 2002, 2003 probably. Then he left. And I
4  brought him back as director of my office of the Prime
5  Minister for a period of time. Not long ago, as a
6  matter of fact. This is last year.
7        And then he moved on again. He no longer works
8  for me.
9    Q. Do you know where he is now?
10    A. I believe he works at the US Consulate.
11    Q. And who is Nadim Barahmeh?
12    A. He is currently head of the Land Authority.
13  Previously he was legal counsel of the Ministry of
14  Finance.
15    Q. He was what?
16    A. Previously --
17    Q. Yes?
18    A. -- he was legal counsel at the Ministry of
19  Finance.
20    Q. Okay.
21    A. Now he is head of the Land Authority.
22    Q. Okay. So, as legal counsel in the Ministry of
23  Finance, did he have any involvement at all in the Ungar
24  case at any point, if you know?
25    A. I'm sure he did. I'm sure he did.

Page 259

1    Q. Okay. And during what period of time are you
2  sure he would have been involved?
3    A. You know, around 2005 probably. But not before.
4    Q. Okay.
5    A. And in the way that I described to you. In the
6  way that, you know, different departments and different
7  agencies were involved in this. But not -- never in a
8  decision-making capacity.
9        And, to the best of my recollection, never that
10  involved in that anyway, beyond discussions that I, as a
11  matter of fact, led at the ministry at the time.
12    Q. Okay. Wasn't he -- he was the legal advisor to
13  the Ministry of Finance, wasn't he?
14    A. Yes. That's when I --
15    Q. Okay.
16    A. When I said legal counsel to the Ministry of
17  Finance, I meant -- we have terms for legal department
18  in the Ministry of Finance.
19        He was head of that department. That's basically
20  what he was.
21    Q. Did you ever discuss the Ungar case with him?
22    A. Probably.
23    Q. Do you remember one way or another?
24    A. No. I mean, in all likelihood, you know, we
25  discussed it. But not really in an extensive way or

Page 260

1  anything like that.
2        I mean in the sense of what's going on, in terms
3  of the relationship between that litigation and
4  enforcement action in Israel, because it's more involved
5  in the letter.
6    Q. He's a trained lawyer?
7    A. Pardon?
8    Q. He's a trained lawyer?
9    A. He has a law degree.
10    Q. Do you regard him as a competent lawyer?
11    A. He's a competent head of the legal department of
12  the Ministry of Finance. I mean I don't think he does
13  any lawyering.
14        The legal counsel of the Ministry of Finance is
15  not actually involved in litigation or acting as a
16  lawyer as much as, you know, giving advice, giving
17  advice on various matters that come through the
18  Ministry.
19    Q. Would that be legal advice that he would be
20  giving?
21    A. Yes. Yes.
22    Q. That's why it's called legal advisor?
23    A. I suppose so, yes.
24    Q. Okay. And did he ever give you any advice on the
25  Ungar case?

Page 261

1    A. I don't believe he did on the Ungar case per se.
2    Q. Per se?
3    A. Yes. I don't believe so.
4    Q. When you say per se, he may have given advice on
5  international terror cases?
6    A. He was involved in these other cases in Israel.
7    Q. Was he involved in any of the international
8  terror cases?
9    A. Not that I remember really, beyond what I just
10  said in terms of the interface between, you know, cases
11  in the United States and those in Israel in connection
12  with enforcement action.
13    Q. Now, if you wanted to talk to somebody within the
14  PA about the American terrorist cases, was there anybody
15  with any kind of legal background within the PA you
16  could talk to, say in the period 2002 to 2005?
17        MR. ROCHON: Objection to form. Could talk
18  to or did talk to?
19        MR. WISTOW: No. Could. That's what I
20  said.
21        MR. ROCHON: Okay.
22    A. You know, I just -- during that period of time,
23  as I mentioned to you, no, I didn't.
24    Q. I'm not asking if you did. I'm saying was there
25  anybody available.

Fayyad

Page 262

1    A.  As I mentioned to you before, I was not really
2  involved in this particular litigation.  But in the
3  other cases I was, and there were people I talked to,
4  for sure.
5       You know, this did not really become an issue for
6  me at the time, as Minister of Finance, long before this
7  letter was written, meaning, you know, shortly after the
8  default judgment was entered against us --
9    Q.  Please.
10   A.  -- when the assets-freezing began.
11   Q.  Mr. Fayyad, all I'm asking is, if you had wanted
12 to, was there somebody in the PA with a legal background
13 that you could have talked about these cases to.
14      That's all I'm asking.
15   A.  I suppose there probably was.  There probably
16 were people competent enough to talk to about this, yes.
17   Q.  There were quite a few lawyers who worked for the
18 Palestinian Authority in 2005, for example, weren't
19 there?
20   A.  I don't know if there were that many lawyers
21 working for the Palestinian Authority.  Actually, we
22 don't have enough lawyers.
23   Q.  I'm sorry?
24   A.  Today even, we don't have enough lawyers.
25   Q.  How many do you have?

Page 263

1    A.  I mean I cannot really give you a number.
2    Q.  Roughly.
3    A.  I mean I can't really give you a number.
4    Q.  Can you give me any kind of number?
5    A.  I can't give you a number.
6    Q.  You don't know if it's more than a hundred?
7    A.  I really would not want to really speculate.  All
8  I know is we are still building up in that area.
9    Q.  What?
10   A.  We are still building up capacity in this area,
11 whether in terms of judges, in terms of district
12 attorneys, in terms of --
13   Q.  How many people work in the Ministry of Finance
14 today?
15   A.  About 2,200 people.
16   Q.  How many?
17   A.  2,200 people.
18   Q.  2,200 people.
19      Now, when you first came in to the Ministry of
20 Finance -- which would be in 2000, I guess?
21   A.  2002.
22   Q.  I'm sorry.  2002.  -- approximately how many
23 people worked there?  Approximately.
24   A.  I really would have to -- I mean I would not
25 really want to venture a guess.

Page 264

1       But I mean I know that the Ministry did not grow
2  that much in terms of numbers since I became Minister of
3  Finance.
4    Q.  So maybe the same number?  2000?
5    A.  Little less.  Maybe -- yes.  A little less.
6    Q.  All right.  How many -- going back to the period,
7  say 2000-2002, do you have an idea about the approximate
8  number of employees of the Palestinian Authority?
9  Approximately.
10   A.  I can provide you with that information.
11   Q.  I'm sorry?
12   A.  I can provide you with that information.
13   Q.  I just would like just an estimate.
14   A.  You know, probably -- probably -- but I could be
15 off -- about 100,000 people.  Maybe.
16      Again, it's something I can provide you
17 information on later, if you like.
18   Q.  Okay.
19   A.  But around that time, about 100,000 people, both
20 Civil Service and security 100,000.  But this is both
21 Civil Service and security personnel.
22   Q.  When -- at the time of Yasser Arafat's death --
23   A.  Yes.
24   Q.  -- was there a Ministry of Justice?
25   A.  Yes, there was.

Page 265

1    Q.  And was there a Ministry of Finance?
2    A.  There was.
3    Q.  Was there any Cabinet positions that have been
4  created since Arafat's death?
5    A.  Real Cabinet?  Just minimally, really.  For
6  example -- minimally, not -- for example, we do have a
7  portfolio --
8    Q.  I'm sorry?
9    A.  -- a portfolio in the Cabinet that's called
10 Administrative Development that was not there before.
11 It's within, you know, Ministry of Planning.  It's
12 Ministry of Planning and Administrative Development.  We
13 have that.
14      I'm just trying to remember if we have any new
15 portfolios.
16      No.  I cannot think of any right now that were
17 added.
18   Q.  Were there any departments, that you know of,
19 that have been created in the government since Arafat's
20 death?
21   A.  The effort really has been more in the nature of
22 building up capacity, I think, in existing departments
23 than creating new ones.
24      So, in terms of -- for example -- I mean I can
25 give you examples of what I'm really talking about.

Fayyad

| Page 266 |
| --- |

1    Q. You don't have to. I'm just trying to find out
2  if there's any new departments that were created --
3    A. Not beyond what I just told you.
4    Q. Okay.
5        MR. ROCHON: Did you want to have this
6  marked?
7        MR. WISTOW: Yes.
8        MR. ROCHON: Okay. Let the court reporter
9  take a second.
10       (Exhibit No. 7 marked for identification.)
11       THE VIDEOGRAPHER: Going off the record at
12  9:58.
13       (Short recess taken.)
14       THE VIDEOGRAPHER: Going on record at 10:01.
15   Q. Okay. Do you recognize this letter I'm showing
16  you? It appears to be from Condoleezza Rice to
17  President Abbas.
18       MR. WISTOW: Is that No. 7?
19       THE COURT REPORTER: No. 7.
20   Q. Do you recognize that?
21   A. I haven't seen it before.
22   Q. This is the very first time you've ever seen it?
23   A. Yes. First time I've seen it.
24   Q. Have you heard about it before?
25   A. I heard that there was, you know, correspondence

| Page 267 |
| --- |

1  and communication between the President and the
2  Secretary. But I -- actually, this is the first time I
3  see the letter.
4    Q. Well --
5    A. This is January 2007.
6    Q. Right.
7    A. Yes.
8    Q. Didn't the letter have something to do with
9  taking the new tack?
10   A. Well, the letter is from the Secretary to the
11  President.
12   Q. Right.
13   A. And it's saying to him -- I read it quickly.
14   Q. Well, you don't have to read it quickly. Read it
15  slowly. Read it slowly to yourself.
16   A. All right.
17   Q. I don't want you to be surprised.
18   A. Okay. Go ahead.
19   Q. Well, no. I want to wait -- do you want to read
20  it?
21   A. Yes. So can I just basically finish the
22  sentence, and if --
23   Q. Go ahead.
24   A. Okay. What I was going to say, based on this
25  letter -- which is from Secretary to the President --

| Page 268 |
| --- |

1    Q. Yes.
2    A. -- she is encouraging the President to respond to
3  the legal proceedings in good faith, and in response to
4  a letter which he appears to have sent to her earlier
5  raising concerns about, you know, the effects -- the
6  adverse effects -- financially of those cases on the
7  PA --
8    Q. Right.
9    A. -- which I suppose is not that different from the
10  substance of what I tried to do a couple of years
11  before.
12   Q. Okay. Well, what we're doing now is you're
13  trying to guess what President Abbas's letter of
14  November 28 says, right?
15   A. Essentially, yes.
16   Q. Did you ever see his letter?
17   A. No.
18   Q. Did you know he sent one?
19   A. As I mentioned it to you, I was aware there was
20  communication on this issue between the President and
21  the Secretary.
22       And, you know, I've just seen this letter now.
23   Q. Right.
24   A. And it is in response to a letter that was sent
25  to her before.

| Page 269 |
| --- |

1    Q. Right. Now, when you became aware of the
2  correspondence between President Abbas and Condoleezza
3  Rice, when was that?
4    A. Probably around the time when I joined the
5  government again, in the spring of 2007. As I mentioned
6  to you before, that process took a long time to come to
7  fruition.
8    Q. You joined -- I'm sorry?
9    A. I joined in March of 2007.
10   Q. Yes. Okay.
11   A. But -- but getting there took a long time. I
12  mean the process of government-formation took a long
13  time.
14       So ahead of joining the government formally, you
15  know, I started to really familiarize myself with what
16  was going on then. And this was one area, obviously,
17  that was of great interest.
18   Q. What?
19   A. An area of great interest.
20   Q. Right.
21   A. And that's around the time I learned of the PA's
22  effort to try to actually find representation, legal
23  representation and all.
24   Q. Right. So the -- President Abbas asked you to
25  take charge of this serious matter, correct?

Fayyad

Page 270

1    A. I don't know if he really specifically or
2    explicitly asked me.
3        But because I was handling it -- I mean, as
4    Minister of Finance, I mean I'm expecting to be handling
5    it.
6        And when he actually acted in the way he did, he
7    did because the government that was sitting then was not
8    a government that could communicate with the Secretary
9    of State of the United States.
10       So he was doing what the government should be
11   doing at the time, as President, which was something I
12   tried to suggest or say to you before, which is he did
13   what he did only because the government that was sitting
14   at the time was not in position to do the job that the
15   government should do.
16       Whether the Minister of Finance or the Prime
17   Minister, it didn't matter. But this is, typically --
18   you asked me about what the President did, what the
19   Prime Minister did -- this is typically an issue for the
20   government to handle, not the President.
21       Q. Right. But the government was dominated by
22   Hamas?
23       A. It was all Hamas at the time. It was a
24   Hamas-only government.
25       Q. I thought the election was something like 72 out

Page 271

1    of 134 seats or something. Am I wrong?
2        A. That sounds about right.
3        Q. So that's not all Hamas, is it? Oh, when you say
4    government, you mean Cabinet?
5        A. I mean Cabinet.
6        Q. All right. So, in this period of time, Hamas has
7    got all the Cabinet seats?
8        A. Yes.
9        Q. But Abbas is still the President?
10       A. Abbas was President, yes.
11       Q. He's not Hamas?
12       A. He's not Hamas.
13       Q. Never was Hamas?
14       A. He never was Hamas.
15       Q. Okay. And so let me see if I've got this
16   straight.
17       So, apparently, President Abbas -- is he also
18   called Abu Mazen?
19       A. Yes. Same person, yes.
20       Q. Okay. So do you have a name like that also?
21       A. No.
22       Q. Okay? Okay. So, in any rate, President Abbas
23   writes --
24       A. I'm not known by another name, in other words.
25       Q. Okay.

Page 272

1    A. It's not that -- I'm Abu Zambali, after my eldest
2    son's name. But I'm not known by it. I mean so it's
3    not --
4        Q. So if I wanted to -- what's your oldest son's
5    name?
6        A. My eldest son's name is Khalid.
7        Q. Khali?
8        A. Khalid.
9        Q. Khale?
10       A. Khalid.
11       Q. So you would be Abu Khalid?
12       A. I would be, but I'm not known by it.
13       Q. All right.
14       A. For better or worse I mean.
15       Q. In any event, it appears that President Abbas
16   wrote to Condoleezza Rice -- it says November 28. We'll
17   assume it was November 28, 2006.
18       A. Yes.
19       Q. We don't really know.
20       And in going through the files -- did you go
21   through the files at all at any time?
22       A. No.
23       Q. Never. So where would we expect to find
24   President Abbas's letter?
25       That would be something that wouldn't be tossed

Page 273

1    out on purpose. You would expect to find that. This is
2    a letter from the President of the PA to the Secretary
3    of State of the United States.
4        You'd expect that to be maintained, wouldn't you?
5        A. Yes. I would think so.
6        Q. Yes. Where would that letter be if you wanted to
7    find it?
8        A. You know, I really do not know who actually is in
9    charge of the archives of the President's office, or
10   files. I don't know.
11       Q. The President would know presumably?
12       A. I'm not certain. I mean the President is the
13   President. I honestly do not know if he is involved in
14   details of management of his own office.
15       I'm not sure he does.
16       Q. Okay. In any event --
17       A. This is something typically his office director
18   would know.
19       Q. Okay.
20       A. Yes.
21       Q. What's the office director's name?
22       A. Rafiq Husseini.
23       Q. Husseini?
24       A. Yes.
25       Q. All right.

Page 274

1    THE WITNESS: Pardon?
2    MR. WISTOW: I ask my co-counsel be
3  sanctioned and my opposition be sanctioned.
4    MR. ROCHON: Just to correct the record, was
5  your question as to who is in that position now, or
6  then?
7    MR. WISTOW: Yes. Now.
8    A. Oh, I thought the question was then.
9    Q. No. Now.
10   A. Now it's not -- it's vacant.
11   Q. Vacant?
12   A. Vacant, yes.
13   Q. So who does the maintenance of his archives?
14   A. I honestly do not know.
15   Q. Okay. Somebody's doing it?
16   A. No doubt somebody's doing it. I don't know.
17   Q. All right. Now, let's get back to this.
18     It was known certainly, certainly in June of
19  2005, that the Circuit had affirmed the judgment.
20     Do you remember that's in your letter?
21   A. Yes.
22   Q. And let me represent to you that certiorari --
23  that's a technical term. I'll call it, with your
24  permission, an appeal -- to the Supreme Court was
25  denied.

Page 275

1    MR. WISTOW: I want to ask Mr. Rochon's
2  permission to use that term. Technically, obviously,
3  it's not an appeal.
4    MR. ROCHON: Use whatever you want.
5    MR. WISTOW: Okay.
6    Q. And you know that the appeal to the Supreme Court
7  was denied. You know that?
8    A. You're telling me. I don't know.
9    Q. You don't know that even today?
10   A. As I told you, when you asked me about the
11  Supreme Court, I did say that, you know, something like
12  this may have happened.
13     I did not know exact knowledge of it or what the
14  fate of it was.
15   Q. Okay. I thought maybe -- you know, you're
16  reading the letter from Condoleezza Rice, that maybe
17  refreshes your recollection.
18   A. Oh, okay.
19   Q. Do you see it?
20   A. Yes. The US Court of Appeals for the First
21  Circuit affirmed that judgment in 2005. Because the US
22  Supreme Court has declined to grant further review, the
23  judgment is final.
24     Oh, okay. Fine.
25   Q. Does that refresh your recollection?

Page 276

1    A. Not beyond what I just told you.
2    Q. Okay. I'm not sure I understand.
3     Do you now remember that there was an attempt
4  made to go to the US Supreme Court that was declined, or
5  you don't remember?
6    A. What I remember is that -- you know, I'm aware
7  that, you know, the issue came up.
8     Now whether actually it was filed with the
9  Supreme Court and what the Supreme Court did is not
10  something I knew. But there was discussion of it.
11   Q. So you never found out what happened?
12   A. No. I never found out.
13   Q. All right. Fair enough?
14   A. This is the first time I see this letter anyway.
15   Q. Okay. Well, I mean do you agree there's other
16  ways to find out about the Supreme Court result other
17  than the letter?
18   A. I mean it's knowable.
19   Q. It's knowable?
20   A. Yes, it's knowable.
21   Q. But you didn't know it?
22   A. As I said, I was just aware that there was
23  discussion of it. What actually happened and what the
24  fate of it was is not something I knew at the time.
25   Q. Okay. You had previously, when you wrote in

Page 277

1  June, described to Ms. Rice --
2    A. June 2005.
3    Q. June 2005, which was, you know, roughly a year
4  and a half before this letter, right?
5    A. Yes. Yes.
6    Q. You knew, in 2005, that this was -- I'll use the
7  colloquial expression -- big deal, these judgments?
8    A. Yes.
9    Q. Okay. Now, apparently, we don't have President
10  Abbas's letter, but, apparently, he was looking for some
11  kind of help from Condoleezza Rice with regard to this
12  judgment.
13     Is that -- would you assume that?
14   A. Yes. Basically -- I mean I have no way of
15  telling for sure.
16     But, you know, the fact is that this letter
17  acknowledges about the matter. But precisely what the
18  President was asking for is not really self-evident from
19  the letter before me.
20   Q. Right. But, presumably, he's looking for some
21  kind of help of some sort?
22   A. Yes. That was not out of the ordinary.
23   Q. I'm not suggesting there's anything wrong with
24  it.
25   A. If that's what he was asking for, yes.

Fayyad

Page 278

1    Q.  Now, Condoleezza Rice writes back.  And she
2   says -- she gives the history of what happened --
3    A.  Yes.
4    Q.  -- in the second paragraph.
5        And she says that, The judgment is final and
6   enforceable in the United States courts against property
7   or interests owned by the PA, PLO or Hamas.
8        Right?
9    A.  That's what the letter says.
10    Q.  That's what she says?
11    A.  Yes.  That's what it says.
12    Q.  All right.  Then she goes on to say that she,
13   Encourages you -- I guess President Abbas -- as I would
14   any government, to respond to US legal proceedings in
15   good faith and in timely manner.
16        Yes?  Have I read that correctly?
17    A.  You did.
18    Q.  Okay.  How much -- how long after this letter
19   were you first aware that the Ungar case was still
20   alive -- strike alive.
21        How long after the date of this letter were you
22   first asked by President Abbas to do something about the
23   Ungar case?
24    A.  I was not -- I don't recall being asked
25   specifically by President Abbas to do this.  This is

Page 279

1   November 2006, and --
2    Q.  No, no.  I'm talking about January 12, 2007.
3    A.  Oh, yes.  January 12, 2007.
4    Q.  So how long after that -- you joined the
5   government about six weeks later, right?
6    A.  March 2007 -- a few weeks later.
7    Q.  About six weeks?
8    A.  Yes.  Yes.
9    Q.  So do you learn from President Abbas that he got
10   a letter from Condoleezza Rice?
11    A.  I don't recall having been told about that by the
12   President, no.  Nor -- nor do I recall him specifically
13   instructing me or tasking me with following up on these
14   cases.
15        But I do remember, you know, telling him that I
16   was going to be doing it, for sure.
17    Q.  Okay.  So you -- sorry.  Forgive me.  I didn't
18   mean to interrupt.
19    A.  Yes, for sure, because I mean, in a formal way,
20   as a matter of fact, I led the effort to actually get
21   the process on the track it is today --
22    Q.  Right.
23    A.  -- in the context of a visit I made to Washington
24   I remember, in April of that year, 2007.
25        So yes, I must have known enough about the need

Page 280

1   to go in a certain direction.  And, you know, typically,
2   in cases like this, I would tell the President what I
3   was going to be doing in the United States and, you
4   know, this was definitely on the agenda.
5        It was not the only thing I did.  It was part of
6   what I did.
7    Q.  I know you're a very busy man.  I'm not being
8   sarcastic.  I know you did many many other things.
9        But it was in the spring of 2007, you testified,
10   that you first got back into this Ungar case?
11    A.  That is correct, yes.
12    Q.  So -- and we can't give a precise date?
13    A.  During that narrow window.  I guess January to
14   March sometime.
15    Q.  Okay.  That's fair enough.
16    A.  Yes.
17    Q.  So you've been testifying, at various times,
18   about custom and usage and what you would expect --
19    A.  Yes.
20    Q.  -- would happen.
21        If President Abbas had gotten a letter from
22   Condoleezza Rice saying that the Ungar case is final and
23   unenforceable -- final -- the judgment -- let me start
24   over.
25        The judgment in the Ungar case is final and

Page 281

1   enforceable in United States courts against property or
2   interests of PA or PLO, you would expect he would have
3   told you about that letter, wouldn't you?
4    A.  Yes.  I wasn't there when he got that letter.
5    Q.  No, no.  I understand that.  But you were there
6   like six weeks later?
7    A.  Yes.
8    Q.  And you were talking to him?
9        MR. ROCHON:  Just for the record, make it
10   eight weeks, January 12 to mid-March, by my calculation.
11        MR. WISTOW:  Okay.  Fair enough.
12    Q.  You were there about eight weeks later?
13    A.  All right.
14    Q.  Okay.  And so you spoke with him in that period
15   you told me, January to March --
16    A.  Yes.
17    Q.  -- about the Ungar case?
18    A.  Yes.
19    Q.  Okay.  And something's got to be done, right?
20    A.  Yes.
21    Q.  So you'd expect he would have told you, in that
22   conversation, of the letter from Condoleezza Rice,
23   because basically she said, I can't help, right?
24        MR. ROCHON:  Objection.  Calls for
25   speculation.  You can answer.

Page 282

1     MR. WISTOW:  It's not speculation when he
2  tells me what the custom and usage is.  But when I
3  ask what it is --
4     MR. ROCHON:  If you want to argue for the
5  Judge, that means I'm going to have objections.
6     MR. WISTOW:  Okay.  Fair point.  I'll
7  withdraw.
8     MR. ROCHON:  Mr. Prime Minister, you can
9  answer the question.
10    A.  Okay.
11    Q.  Okay.  You would expect that a letter from the
12  Secretary of State dealing with the case you're about to
13  get involved in, where, effectively, she says, We can't
14  do anything -- the Secretary of State can't do
15  anything -- you would expect that he would tell you
16  about, wouldn't you?
17    A.  You know, all of this, what this tells me really,
18  in terms of trying to piece it together as best as I
19  can --
20    Q.  I'm sorry?
21    A.  As I try to piece it together as best as I can --
22    Q.  Yes?
23    A.  -- all this tells me is that this was a matter
24  that was definitely in discussion at the President's
25  level around the time of this already, and even before.

Page 283

1     What I testified to before, and I repeat now, is
2  that I'm aware, based on my subsequent involvement in
3  this case, that the PA was making a serious effort
4  trying to identify an adequately suitable legal
5  representation in the United States before January of
6  2007.  I know this.
7     Q.  Oh, good.  Okay.
8     A.  I know that to be the case.  I testified to that,
9  and I repeat it now.
10    Q.  So that's --
11    A.  -- in 2006.
12    Q.  -- in 2006.  Unsuccessfully.
13    A.  Unsuccessfully, as I mentioned before.
14    Q.  Okay.  And if I wanted to get the details about
15  those efforts, who would I depose?
16       MR. ROCHON:  Objection.  Asked and answered.
17    Q.  If you know.
18       MR. ROCHON:  You've asked before.
19       MR. WISTOW:  I know.
20    A.  You know, the only person I know who, as a matter
21  of fact, was involved in this -- I mean probably had
22  people also help him -- was the director of the
23  President's office at the time.
24    Q.  Was that Husseini?
25    A.  Husseini.  Yes.

Page 284

1     Q.  Okay.  So, if I understand what we're saying
2  here, you believe that you were told about Condoleezza
3  Rice's response to the letter of President Abbas, or you
4  were not?
5     Which do you believe?
6     A.  You know, in the course of many discussions on
7  this issue over time, it's really hard for me now to
8  tell you what happened when and which happened before
9  which.
10    I became aware of the President's involvement in
11  the sense of communications with the Secretary of State
12  of the United States, Condoleezza Rice, on this matter.
13    Q.  When?
14    A.  But I really cannot tell you.  I don't know.  I
15  don't remember.
16    Q.  He had heard back from the Secretary of State
17  apparently on or about January 12, okay?
18    A.  Okay.
19    Q.  So early on in your involvement with Ungar, you
20  had this discussion?
21    A.  No, no.  What I'm saying is that -- I'm sorry if
22  I was not really clear.  Let me clarify.
23    I meant to say that there were numerous
24  discussions on this case over an extended period of
25  time.  Part of that period, I was not in government.

Page 285

1  It's true.
2     Q.  You were what?
3     A.  Part of this period, you know, I was not in
4  government.
5     Q.  Okay.  That's the period.
6     A.  Nevertheless -- yes.  Nevertheless, there was
7  constantly discussion of that.
8     Now, subsequently, I can tell you, for example,
9  in more recent periods, since, you know, the filing of a
10  motion to vacate, there were several discussions with
11  our lawyers on this.
12    So I can't tell you now, with all of these
13  events, what happened when, to be honest with you, in
14  terms of when it is that I became aware precisely that
15  there was this communication between the President and
16  the Secretary.
17    Q.  Okay.  You were out of government --
18    A.  Yes.
19    Q.  -- from mid-December?
20    A.  A little before that.
21    Q.  Well, 12-12.  That's what we agreed.
22       MR. ROCHON:  No, no, you didn't.  He said
23  December 5.
24       MR. WISTOW:  Okay.  Sorry.  You're right.
25  Absolutely right.

Fayyad

Page 286

1    Q. December 5?
2    A. Yes.
3    Q. Okay. So you were out of government from
4    December 5, 2005 to when?
5    A. March 2007.
6    Q. Okay. And during that whole period, you were
7    with the Palestinian Legislative Council?
8    A. I was in the government. I mean I was not a
9    minister. I was not a Cabinet officer.
10   Q. Okay. But you were in the Palestinian
11   Legislative Council?
12   A. I was a member. And, technically, I still am
13   today.
14   Q. Okay. Fine.
15   A. Yes.
16   Q. So we know that -- what you've just said is, even
17   when you were in the Palestinian Legislative Council --
18   A. Yes.
19   Q. -- you were talking to somebody about the Ungar
20   case?
21   A. I didn't say I was during that period. No, I
22   didn't.
23   Q. I thought you, said even when you were out of
24   government, you had these discussions?
25   A. No. I said these discussions were taking place.

Page 287

1    I didn't say I was having the discussions.
2    Q. I see.
3    A. I said these discussions were taking place,
4    obviously, as evidenced by the fact of what I knew
5    subsequently --
6    Q. Okay.
7    A. -- of the President's office's involvement in
8    trying to find legal representation, which reflects to
9    me, which suggests to me -- or suggested to me then --
10   that it was being discussed before the letter that the
11   Secretary wrote to the President.
12   I mean, the PA is in the process of trying to
13   find legal representation in earnest in 2006 --
14   Q. Right.
15   A. -- and this clearly pre-dates the letter of the
16   Secretary.
17   Q. Were you in the --
18   A. You know, it may be, therefore, you know -- I
19   mean I do not know. I really cannot tell.
20   It may be that the letter that the President sent
21   included reference to the efforts on the part of PA to
22   find lawyers.
23   Q. You just don't know?
24   A. I don't know.
25   Q. Okay. When you were in the Legislative

Page 288

1    Council -- by the way, what is that Legislative Council?
2    A. That's another term for Parliament, if you will.
3    Q. Parliament?
4    A. Yes.
5    Q. When you were in that group, were you on the
6    Economics Committee?
7    A. I was head of the Budget Committee.
8    Q. Budget Committee?
9    A. I may have also been on the Economic Committee.
10   I've forgotten.
11   Q. So was part of your job on the Budget Committee
12   to know how much money is coming in and how much is
13   going out and what's owed?
14   A. Except that, during that period, there was a
15   boycott of the PA, and the public finance system pretty
16   much broke down, with no capacity for the government of
17   the Palestinian Authority to deal with the banking
18   system.
19   So reporting capabilities of the Palestinian
20   Authority -- and specifically of the Ministry of
21   Finance -- were substantially impaired.
22   So during that time period, there was not really
23   a lot of flow of information in terms of what's coming
24   in and going out. And that's a fact.
25   Q. So you performed no duties on the committee?

Page 289

1    A. Some. We tried. We kept asking for information.
2    We were sort of opposition at the time. We were asking
3    government for information in terms of what was going
4    on. Government was not forthcoming with information.
5    At least in part, they couldn't.
6    It took a long time, but we did have some
7    sessions.
8    Q. So Hamas was not giving you the kind of data you
9    wanted? Is that what you're saying?
10   A. You know, the whole system broke down. I mean
11   this was a period of serious commotion within the PA
12   politically. There was a serious breakdown.
13   The council that you referred to, the PNC -- or
14   the Legislative Council, if you will -- was not really
15   that functional. I mean it didn't really meet as often
16   as it should have. Its committees were not that
17   functional.
18   It was very difficult to operate.
19   Q. Did you threaten to resign in March of 2009?
20   A. March of 2009. As Prime Minister?
21   Q. Yes.
22   A. I mean I did. It's not that I tried to. I
23   actually submitted a resignation.
24   Q. That was because you were attempting to form the
25   unity government?

Fayyad

---

Page 290

1    A.  Well, to give way to the effort.
2       I mean basically to indicate that, you know, that
3    the time has come for a different kind of government if
4    there was going to be -- the hope was -- success in the
5    effort of achieving reconciliation, which would have
6    required, obviously, the formation of a different kind
7    of government.
8    Q.  A unity government, I think.  Is that fair?  No?
9    A.  A government reflecting, you know, post-
10   reconciliation essentially.
11   Q.  A government including Hamas?
12   A.  Not necessarily.
13      I mean a government can govern in the Palestinian
14   Authority that is made up of independents without one's
15   affiliation whatsoever, Hamas or Fatah or any other
16   party.
17      It's not a requirement.
18   Q.  The New York Times reported something -- that
19   doesn't mean it's true.  I'll just read you --
20   A.  If the New York Times reported it, it must be
21   true.
22   Q.  Well, not necessarily.  So you can tell me if
23   it's not.
24   A.  Okay.
25   Q.  This was on March 7, 2009.

---

Page 291

1       Jerusalem.  Salam Fayyad, the Prime Minister of
2    the western-backed Palestinian Authority, on Saturday
3    submitted his government's resignation, saying he hoped
4    that it would help efforts to form a Palestinian unity
5    government with the Islamic group Hamas.
6    A.  That's phraseology.  But, basically, I don't
7    remember using, you know, those terms, but -- in this
8    way -- but, basically, the substance of it -- the
9    substance --
10   Q.  What?
11   A.  -- the substance of it is, if there was
12   reconciliation, there was going to be a new government
13   now -- call it unity government, consensus government.
14      Whatever it was, it did not have to be a
15   factional government.  It never had to be a factional
16   government.  It doesn't have to be a factional
17   government today.
18   Q.  It quotes you as saying that, He hoped that it
19   would help efforts to form a Palestinian unity
20   government with the Islamic group Hamas.
21      You don't think you said that?
22   A.  I don't remember, you know, exactly what I said
23   then.
24   Q.  Okay.
25   A.  But what I can tell you is that this was -- there

---

Page 292

1    was some kind of announcement that was supposed to be a
2    decisive session in the process of dialogue between the
3    factions, with high expectation that it was going to be
4    concluded within a month or something like that.
5       To indicate willingness, readiness, to really get
6    out of the way in a manner that would not be perceived
7    as getting in the way of that happening, I tendered a
8    resignation to basically -- and there is a letter on
9    this, and I can make it available to the Court.
10      I mean to you.  Sorry.
11   Q.  Would you do that, through counsel?
12   A.  I have no problem.
13      MR. WISTOW:  Can I get it, say within two
14   weeks?
15      MR. ROCHON:  Why don't you ask me the
16   questions, but not on the record.  He's not going to
17   answer that question for you.
18      MR. WISTOW:  Okay.
19      THE WITNESS:  Well, whatever.
20      THE VIDEOGRAPHER:  Excuse me.  I'd like to
21   change the tape.  Going off record at 10:28.
22      (Short recess taken.)
23      THE VIDEOGRAPHER:  Going on record at 10:29.
24   Q.  The letter from Condoleezza Rice to President
25   Abbas says, When judgement is entered, it is also

---

Page 293

1    possible to meet with the opposing side to explore
2    adequate solutions so as to avoid enforcement actions.
3       The office of the legal advisor of the Department
4    is willing to make its good offices available to
5    facilitate such meetings.
6       Did you ever learn that Condoleezza Rice was
7    offering her "good offices"?  Did you ever learn that?
8    A.  No.  As I mentioned, I really --
9    Q.  I'm sorry?
10   A.  As I mentioned before, I'm aware there was, you
11   know, communication.  But I was not really -- I didn't
12   know what the substance of it was about.
13   Q.  No.  I'm not talking about the letter.
14      I'm talking about, did you ever learn, from any
15   source in any way, that Condoleezza Rice had offered the
16   office of the legal advisor of the Department of State
17   to help try to resolve the matter.
18      Did you ever learn that?
19   A.  No.
20   Q.  Okay.
21   A.  I don't remember this specifically being said to
22   me, or mentioned.
23   Q.  Okay.  That's fine.  I accept it.
24      Then it says, Additionally, the attorneys
25   representing the PIF -- representing the PIF --

---

Fayyad

Page 294

1    A. Yes.
2    Q. -- may contact the office of the legal advisor to
3  discuss the pending procedures.
4      Do you know if that was ever conveyed to them?
5    A. I don't know.
6    Q. Okay. Now, I think we agreed earlier that you
7  had first learned of the Ungar case in 2003-2004?
8    A. I don't know about 2003.
9    Q. But certainly by 2004, right?
10   A. I mean -- I mean I suppose really the thing that
11 I would say on this is, when there was a judgment
12 against us, it became known to me that there was --
13   Q. So you learned about the judgment right away?
14   A. Pretty much, yes.
15   Q. Okay. On page 24 of your deposition that was
16 taken on March 9, 2010 --
17      MR. ROCHON: Are you going to show him a
18 copy?
19      MR. WISTOW: Yes. I thought by now he'd
20 figured out I wouldn't make it up.
21      MR. ROCHON: No. My goal isn't that I don't
22 trust you. I want the witness to see the words before
23 he answers. That's all.
24      MR. WISTOW: Okay.
25   Q. Take a look at the --

Page 295

1      MR. WISTOW: Actually, the way I think it's
2  more often done is the lawyer reads it. But that's
3  okay.
4    Q. Do you see that?
5    A. Yes. I'm answering in this way. I do not recall
6  precisely when I became aware of this particular case.
7      All I can tell you --
8    Q. This particular case is the Saperstein case,
9  right?
10   A. All I can tell you is that, maybe 2003, 2004, it
11 came to my knowledge that there were cases --
12   Q. Wait. You're going too fast and I can't
13 understand you. And I don't think the stenographer can.
14      MR. ROCHON: She seems to be doing all
15 right.
16   A. I repeat. I do not recall precisely when I
17 became aware of this particular case.
18      All I can tell you is that, maybe 2003, 2004, it
19 came to my knowledge that there were cases -- at least
20 one against -- one case I remember at this time -- that
21 was pending against us in the United States, and that
22 was being handled by lawyers.
23      And, at that time, the defense attitude was to
24 assert sovereign immunity.
25   Q. I didn't hear you mention the name of the case.

Page 296

1    A. It's not mentioned here. It's not written here.
2    Q. Can I see this, please?
3    A. Yes (indicating).
4    Q. Do you know what case that was?
5    A. I mean the position -- I give the position in the
6  Saperstein case.
7    Q. Now, did you read this answer?
8    A. I just did.
9    Q. Didn't you say it doesn't have the name of the
10 case?
11   A. Let's see.
12   Q. (Indicating).
13      (Witness peruses document.)
14   A. I do not precisely --
15   Q. Take a look at the very end of the answer.
16   A. Oh, the end. I haven't read through enough of
17 that.
18      MR. ROCHON: You interrupted him before he
19 finished it.
20   A. Why don't you read it to yourself, in that case.
21   Q. Okay. I'm happy to do that.
22   A. I mean I was stopped while mid-sentence. And
23 then up until the point there was reference to this
24 case --
25   Q. Shame on me. I apologize. No fault of yours.

Page 297

1  Let's try it the way we normally do it in our
2  jurisdiction.
3    A. Okay.
4    Q. You were asked the following question --
5    A. Okay. Good.
6    Q. Can you tell me what year it was that you first
7  learned about the Saperstein case?
8      Answer. I do not recall precisely when I became
9  aware of this particular case. All I can tell you is
10 that, maybe 2003, 2004, it came to my knowledge that
11 there were cases -- at least one case I can remember at
12 this time -- that was pending against us in the United
13 States and that was being handled by lawyers.
14      And at the time that the defense attitude was to
15 assert sovereign immunity, and there was not really much
16 attention paid to that. The case I'm referring to is
17 the Ungar case.
18   A. Okay.
19   Q. Okay. And -- here. Just take a look
20 (indicating).
21   A. Yes. That's an accurate reading of what it says
22 here. And that, I believe, I just testified before
23 reading it.
24   Q. Okay. Now, in 2003-2004, we already know you
25 were the Finance Minister?

Fayyad

Page 298

1      MR. ROCHON:  Objection.  You had two dates
2  in there.
3          MR. WISTOW:  In those two years, 2003 and
4  2004.
5      A.  No.  I was --
6      Q.  -- for the entire period, the Finance Minister.
7      A.  I was Finance Minister beginning June 2003
8  through early December 2005.
9      Q.  So that means --
10     A.  Inclusive of those three years, yes.
11     Q.  Now, you specifically hired lawyers to defend
12  Israeli terrorist cases, did you not?
13     A.  Are you talking about the case that we're talking
14  about today?
15     Q.  No, no.  Israeli terrorist cases.  The PA and PLO
16  were sued in Israeli courts?
17     A.  Yes.  Of course.
18     Q.  Sued in Israeli courts?
19     A.  Yes.
20     Q.  Okay.  And were those considered domestic cases?
21     A.  No.
22     Q.  No.  Very far from it, correct?
23     A.  I explicitly --
24     Q.  Withdraw that.  They were not domestic cases.
25     A.  I explicitly cited cases in Israel and the United

Page 299

1  States as cases the PA was involved in internationally.
2          That's what I said in earlier testimony.
3      Q.  Right.  Right.  So you consider Israeli cases to
4  be international?
5      A.  Yes.
6      Q.  And you consider American cases to be
7  international?
8      A.  Yes.
9      Q.  And you were involved personally --
10     A.  Yes.
11     Q.  -- in selecting counsel in the Israeli terrorist
12  cases because they were international, correct?
13     A.  Because the case was -- or the cases were --
14  important at the time.
15     Q.  Okay.  Fair enough.
16     A.  Yes.
17     Q.  They were important?
18     A.  As I told you, the matter just evolved in an
19  evolving Palestinian Authority.  And it was important --
20  I was the one that actually retained the Israeli
21  lawyers.
22     Q.  Because these were important cases?
23     A.  Very important, yes.
24     Q.  So you actually were involved in the decision --
25  you actually decided --

Page 300

1      A.  I was the one that selected the lawyers, yes.
2      Q.  And you were the one who signed the
3  power-of-attorney?
4      A.  I did, probably.  Yes.
5      Q.  Okay.  Well, do you know what I'm referring to
6  when I say power-of-attorney?
7      A.  Yes.
8      Q.  Okay.  Could you explain what you understand?
9      A.  I mean it's delegation of authority to represent
10  us, if that's what you --
11     Q.  That was the Carmeli and Arnon law offices?
12     A.  That's correct.
13     Q.  When did you first hire lawyers at Carmeli and
14  Arnon to defend Israeli terrorist cases?
15     A.  You know, this must have happened either in late
16  2002 or early 2003.  I can't -- I don't remember for
17  sure, but I can look it up.
18     Q.  You can look it up?
19     A.  Yes.
20     Q.  Okay.  Is this your signature (indicating)?
21         MR. ROCHON:  Are you having that document
22  marked.
23         MR. WISTOW:  Yes.  Well, I'm not going to
24  mark that one.  Let me get that one back.
25         You know what I've managed to do?  I only

Page 301

1  have one copy of the Hebrew, which I made at home, so I
2  used scrap paper on the back.
3          It is attached?  I'll find it.  Forgive me.
4  You're right.
5          I'm going to mark the document, the
6  power-of-attorney, along with an English translation
7  from the Hebrew.  So can we mark that.
8          (Exhibit No. 8 marked for identification.)
9          (Off-the-record discussion.)
10         MR. ROCHON:  We have enough (indicating).
11  Fine.
12         MR. WISTOW:  Okay.
13     Q.  Can you go to the Hebrew document, which is the
14  very last page.
15     A.  Yes.
16     Q.  Does that appear to be your signature?
17     A.  It appears to be, yes.
18     Q.  Okay.  You recognize it as your signature, don't
19  you?
20     A.  Looks like my signature, yes.
21     Q.  Okay.  And can you read the date?
22     A.  24 February 2003.
23     Q.  Okay.
24     A.  And I -- and this is the power-of-attorney, I
25  told you, latter part of 2002, early 2003, that appears

Fayyad

| Page 302 |
| --- |

1  to have been --
2      Q.  Right.  I'm not challenging you.  I just --
3      A.  I'm just doing this from recollection.
4      Q.  Right.  Right.  And whether or not there was an
5  earlier power-of-attorney or not, we don't know.
6      But certainly by February 24, 2003, you were
7  hiring Carmeli and Arnon law offices on these terrorist
8  cases, yes?
9      A.  As I mentioned to you.  But this is something
10  that came to my attention early on after I became
11  Finance Minister.
12      I had a lot of things to worry about, seriously.
13  This was one of them.  And I decided --
14      Q.  As you testified earlier, because it was
15  important?
16      A.  It was very important.
17      Q.  All right.
18      A.  I assume this is the power-of-attorney that
19  you're talking about?  Is that what it is?
20  Power-of-attorney.
21      Q.  I'm going to tell you that I don't read Hebrew.
22      A.  I don't either.  So that's why I'm asking.  If it
23  is the power-of-attorney, then yes.
24      Q.  All I can tell you is that we have had it
25  translated, and it seems to be a power-of-attorney.  But

| Page 303 |
| --- |

1  don't rely on me.
2      Do you often sign documents that you don't know
3  what they mean?
4      A.  I have people who actually read them for me and
5  tell me what they're about, for sure.
6      Q.  Okay.  Is there any doubt that you hired Carmeli
7  and Arnon?
8      A.  No.
9      Q.  And you know that, under the Israeli practice,
10  the client has to sign powers-of-attorney?
11      A.  I mean I do what I am told by lawyers when
12  they're pursuing due process.  And they know what the
13  law is and they know what the requirement are.
14      They come to me and say, You're required to do
15  this, and I do it.
16      Q.  All right.  But I'm asking if you recollect that
17  you did this many many times.
18      A.  Well, I can tell you, in cases like this, given
19  what I do, I rely on advice of counsel.  I mean they're
20  hired to really help me out.
21      They come to me.  I say, These papers we have to
22  sign today in order to do these tasks.  And, you know, I
23  have people read them for me say this is what they are,
24  and I sign.
25      Q.  You don't sign them without knowing what they

| Page 304 |
| --- |

1  are?
2      A.  Oh, no.  I never sign without --
3      Q.  Okay.  So all I'm asking you is, do you remember
4  signing many powers-of-attorney.
5      A.  I don't know how many is many.  But I do remember
6  signing quite a few papers, you know, in connection with
7  legal proceedings in Israel.
8      Q.  Okay.  More than one power-of-attorney?
9      A.  I've signed more than one document, I believe.
10      Q.  You indicated that these terrorist cases in
11  Israel were important cases to you, right?
12      A.  Yes.  Definitely.
13      Q.  Approximately how many were there that you signed
14  powers-of-attorney for?
15      A.  You know, maybe tens of them.  There were tens of
16  those cases.
17      Q.  Tens meaning like 40, 50, 60?
18      A.  Maybe in that range.  In that range.
19      Q.  Maybe more?
20      A.  In that range, 40, 50.  Something like that.
21      Q.  Okay.  Now, I want to show you a document that
22  was filed by your lawyers -- your current lawyers --
23      A.  Yes.
24      Q.  -- in the Federal Court in support of the motion
25  to vacate (indicating).

| Page 305 |
| --- |

1      I'm sorry.  Forgive me.  I'm getting a little
2  groggy.  It's Exhibit C to the original motions.
3      (Exhibit No. 9 marked for identification.)
4      MR. ROCHON:  Thank you.
5      Q.  Did you know that your lawyers filed this in the
6  Federal Court?
7      (Witness peruses document.)
8      A.  They may have.
9      Q.  I know they may have.  I know they did.  I
10  represent they did.
11      I'm asking you if you know -- if you knew they
12  did.
13      A.  I don't know if I remember, you know, that they
14  did.  But I know that they were active representing us,
15  and this is something that they may have done.
16      Q.  Okay.  So you don't know if you knew or not?  You
17  may have known or not.
18      A.  I cannot tell you that I did not know when it
19  happened, but I don't really remember now exactly what
20  happened when.
21      Q.  Okay.  I'm going to represent to you -- what I
22  mean by that is I'm going to give you my word --
23      A.  Okay.
24      Q.  -- that your lawyers filed this for Judge Lagueux
25  to read.

Fayyad

Page 306

1    A.  Okay.
2    Q.  Now, go to the second paragraph.
3    A.  Yes.
4    Q.  Actually.  I'm sorry.  Go to the first paragraph,
5  which is Paris.
6    And it says, 87 countries and international
7  organizations pledged 7.4 billion in aid to the
8  Palestinians on Monday, in the most ambitious
9  fund-raising effort in more than a decade, to help
10  Palestinians create a viable peaceful and secure state
11  of their own.
12    Now, does that refresh your recollection that
13  that's what -- something that happened?
14    A.  Oh, yes.
15    Q.  Okay.  And the pledge of the 7.4 billion was
16  against a budgetary plan that you submitted, is that
17  right?
18    A.  That's correct.
19    Q.  And you were only asking, for the three-year
20  period, for $5.6 billion, is that true?
21    A.  I knew that the pledge was I mean an over-
22  subscription to what we had asked for.  Yes.  I mean the
23  7.4 billion.
24    Q.  Read the next paragraph.
25    A.  Okay.

Page 307

1    Q.  Read the next paragraph.
2    (Witness peruses document.)
3    A.  Yes.  That sounds right.
4    Q.  That sounds right, being that you asked for
5  5.6 billion?
6    A.  Yes.
7    Q.  So you got pledges of roughly 1.8 billion more
8  than you asked for to take care of the budget?
9    A.  In terms of pledge, yes.
10    Q.  By the way, I understand not all pledges are
11  fulfilled.
12    A.  That's the difference between a pledge and --
13    Q.  I notice it says, Many countries -- looking at
14  the second-to-the-bottom paragraph, it says, Many
15  countries do not fulfill pledges that they make at such
16  conferences.
17    Egypt and other Arab countries are known for
18  pledging funds to the Palestinian Authority that they do
19  not deliver.
20    Is that true?
21    A.  It is always the case -- almost always the
22  case -- that there is a difference between that which is
23  pledged and that which is actually disbursed.
24    Q.  Right.
25    A.  And, you know, we Palestinians do not have a

Page 308

1  corner on that.  Our case is just typical.
2    So, yes.  It's not unique.  It happens.  This is
3  the way it usually happens --
4    Q.  I'm just asking you if you agree --
5    A.  -- for a variety of reasons.
6    Q.  I'm asking if you agree with the statement that,
7  Egypt and other Arab countries are known for pledging
8  funds --
9    A.  I wouldn't really state it this way.
10    Q.  You wouldn't?
11    A.  No.
12    Q.  Do you disagree with it?
13    A.  Yes, because it's not -- this is what?  2007?
14  Yes.  This December 18, 2007.
15    We'd have to go back to the record, and I do not
16  know if it would be fair to state it in the way it is
17  stated here -- are known to not fulfill -- I just -- I
18  wouldn't say that.
19    Q.  All right.
20    A.  From time to time, this happens in actual
21  performance relative to a pledge made by a donor
22  country.  And not only in the case of Palestine.  Others
23  as well.
24    Q.  Okay.  Now, you're currently not only the Prime
25  Minister, but the Minister of Finance?

Page 309

1    A.  Yes.
2    Q.  So you're the immediate head of the Ministry of
3  Finance, is that right?
4    A.  Yes.
5    Q.  Okay.  And I guess you guys -- strike that.  I'm
6  being too informal.
7    I guess the Ministry of Finance puts out
8  quarterly reports?
9    A.  It does.
10    Q.  Right.  And it also puts out reviews of annual
11  performance?
12    A.  It does.
13    Q.  So do you know when the last time -- when -- do
14  you know if there was a review of the 2009 performance?
15    A.  Oh, yes.
16    Q.  Okay.  When was that published?
17    A.  On our web site, probably you'll find it in the
18  first quarter of this year.
19    When we say published, it basically -- the
20  reference is made to dissemination on our web site.
21    Q.  That's what I mean by published.
22    A.  Right.
23    Q.  Okay.  So did you review it before it went out?
24    A.  I tend to -- I mean I had tended to do so more,
25  you know, when we had started to do this than I do it

| | |
|---|---|
| Page 310 | Page 312 |

**Page 310**

1  right now.
2      I do not spend as much time on it as I used to
3  before.
4      Q. That's not what I'm asking you.
5      A. I'm really trying to give you a sense of the
6  extent to which I'm involved in this. I'm much less
7  involved in this these days than I used to be.
8      Q. Right.
9      A. Which means I do not read them as carefully --
10     Q. Do you read them?
11     A. -- these days, before they're published, as I did
12  in earlier days.
13     Q. Do you read them?
14     A. Oh, yes. I do.
15     Q. Do you think you read the one in March?
16     A. As I said, I do, you know, read our reports
17  before they're actually put out. I used to, as a matter
18  of fact, clear them before they are disseminated.
19         But as I started to gain confidence in the
20  capacity of staff and integrity of the system, I
21  basically felt, so far as monthly reports are concerned,
22  without prior authorization, they could be published
23  without me really clearing them for publication.
24         And similarly, of course, the quarterly reports.
25  So I don't really clear them beforehand.

**Page 311**

1      Q. I didn't ask you --
2      A. Now, two or three weeks later, I may leaf through
3  them and I read something. But, certainly, annual
4  reviews, I will.
5      Q. Okay. You do read the annual reports?
6      A. Yes, because that comes in the context of budget
7  preparation submission.
8      Q. Okay. So what we're saying is that the annual
9  review for 2009, which came out in March of 2010, is
10  something you would have read?
11     A. No. That's not what I really meant. I meant the
12  -- basically, the material that goes into preparing the
13  budget circular for the year after, because that really
14  is important. That forms the basis for projecting next
15  year's budget.
16         Those reports I tend to spend more time on
17  because they provide a basis of your direction, as
18  Minister of Finance, to the rest of the PA in terms of
19  what their submissions can be -- or the ceilings, so to
20  speak.
21         That's the material I spend more time on. The
22  rest, no. I don't anymore.
23     Q. I'm totally confused. I know it's my fault.
24         I'm trying to find out if -- first of all, we
25  agreed that, every March or thereabouts, there's an

**Page 312**

1  annual review of the prior year's performance.
2      Is that true?
3      A. What I can tell you is, since spring of 2008, the
4  commitment we made was to publish monthly information on
5  different fields of each month, because you say March.
6         There is not a date certain, you know, by which
7  or on which other type of material or data would be
8  disseminated, you know. It is what it is really.
9         But it happens to be March. I said that because
10  that would be a long enough time period for a full
11  annual report from the preceding year to have been
12  published.
13         It could have come out in April. It could have
14  come out in February.
15     Q. Mr. Fayyad, was there a review of 2009's economic
16  performance?
17     A. Yes.
18     Q. Was it published?
19     A. For the year, there was a report covering the
20  year. If it came out in March, it came out in March.
21     Q. I suggest to you -- you don't have to adopt
22  this -- I suggest to you it came out on March 23, 2010.
23     A. It makes sense.
24     Q. You don't have to adopt it.
25     A. Makes sense.

**Page 313**

1      Q. It did come out?
2      A. Yes.
3      Q. Okay. Did you read it?
4      A. I read many reports.
5      Q. What?
6      A. I read many reports that come on my desk.
7      Q. That's very helpful. I'm asking if you read this
8  one.
9      A. We have so many reports that come out. Every
10  three months we publish a report.
11     Q. Do you have my question in mind?
12     A. I know --
13     Q. Can you tell me whether or not --
14     A. You're holding a piece of paper and I've not see
15  it. I don't know what it is. You're telling me what it
16  is. And you've asked me --
17     Q. No, I'm not.
18     A. That's what I thought you're doing.
19     Q. Well, I could be looking at --
20     A. That's the point.
21     Q. -- at anything. So forget what I'm looking at.
22  We've established on the record --
23     A. Yes.
24     Q. -- that sometime in the first quarter --
25     A. Yes.

Fayyad

Page 314

1    Q. -- of 2010, the Ministry of Finance published an
2  annual performance evaluation for 2009.
3       You agreed with that, right?
4    A. Yes. I mean --
5    Q. Okay. All I'm asking you is, that document, was
6  it something you read.
7    A. It's likely that I have looked at it, to the
8  extent to which -- I mean most of these reports look
9  alike. Do you understand what I'm really trying to tell
10 you?
11      It's not something that stands out and I would
12 remember for sure what it said or anything like that I
13 mean, you know. This is routine.
14      That's why I told you the difference between
15 those annual reviews and the reviews that form the
16 relationship for budget preparation annually.
17      So yes, I mean --
18   Q. So yes what?
19   A. I probably looked at the report. But the extent
20 to which I read it, went through it or something like
21 that, I cannot really tell you now. I mean I don't
22 know.
23   Q. Okay. I don't want you to -- I don't want you to
24 assume anything about what I'm looking at, okay?
25   A. I thought you were looking at it. You're

Page 315

1  saying --
2    Q. I'm just going to ask you some questions without
3  respect to this document (indicating). This could be my
4  notes. Who knows?
5       I just want to ask you if the PA had any bank
6  borrowings that it incurred in the year 2009.
7    A. I'm sure we borrowed in 2009, yes.
8    Q. Do you have any sense of how much?
9    A. I mean our indebtedness in the banking system
10 through the year fluctuated in the range of $400 million
11 up to $735 million --
12   Q. Okay.
13   A. -- in the course of 2009.
14   Q. That's fine.
15   A. In that range.
16      MR. ROCHON: Counsel, let him finish his
17 answer. If you're going to do a memory test, let him
18 finish the test.
19      MR. WISTOW: It's not a memory test. Trust
20 me.
21   Q. So we're talking hundreds of millions --
22   A. Yes. Hundreds of millions.
23   Q. -- of bank loans.
24      How many different banks roughly? Roughly.
25   A. We pretty much deal with all of them, which

Page 316

1  means -- not all of them completely -- but maybe 12, 13
2  banks.
3    Q. Okay. Now, when you -- you have to apply for the
4  loan, right?
5    A. Yes.
6    Q. And you have to tell them what your assets and
7  liabilities are, right?
8    A. Yes. Although, you know, we're a customer that
9  is known to the banks.
10   Q. Assets and liabilities can change from year to
11 year?
12   A. They do. I mean --
13   Q. Did you tell any of these banks about the
14 judgments that are outstanding against you?
15   A. It's a well-known fact that there is.
16   Q. Did you tell them?
17   A. You know, let me go back. That's why I told you,
18 you know, we are a customer that is well known to the
19 banks.
20      And when you say do you apply for the loan, I can
21 tell you what form that takes. You know, it takes us
22 basically writing a letter to the bank saying we need to
23 borrow such and such amount of money.
24      As the Palestinian Authority that's borrowing,
25 the Ministry of Finance, we do not fill a detailed

Page 317

1  application.
2    Q. You fill in no application?
3    A. Just what I told you.
4    Q. Just a letter --
5    A. Just a letter saying we need this much money.
6    Q. So you did not tell these banks --
7    A. We do not really submit an application for when
8  we borrow --
9    Q. Okay.
10   A. -- in the detailed form, say an individual
11 customer or business would. I mean we're the
12 government.
13   Q. Okay. I understand.
14   A. Yes.
15   Q. Now, there was an Israeli incursion or
16 invasion -- whatever word you'd like -- into Gaza that
17 resulted in damage to electricity, to water systems, to
18 sanitation, to a lot of things in Gaza, right?
19   A. Yes.
20   Q. All right. And did the PA spend monies, in 2009,
21 to repair any of the damages sustained by the
22 electricity, water, and sanitation networks in Gaza?
23   A. Some. To the extent that we could.
24   Q. Okay.
25   A. Yes.

Fayyad

Page 318

```
1     Q. And how is that money -- at this point in time,
2  Gaza is under the control of Hamas?
3     A. That's correct, yes.
4     Q. So how does that work? How do you send the money
5  to take care of the water networks, for example? To
6  whose account is the money sent?
7     A. This work is basically done by the Water
8  Authority, which is a body of government that reports to
9  us, acting through contractors who are paid directly.
10     Similar to the Energy Authority that's in charge
11  of -- Energy Authority -- or Power Authority, if you
12  like -- that's in charge of direct electricity in Gaza.
13     So they report to us, and they are under our
14  control. Those two particular agencies are.
15     Q. So even though Hamas is occupying Gaza --
16     A. Yes.
17     Q. -- you control the electrical system?
18     A. We -- you know, the entity that is in charge of
19  the power, if you will --
20     Q. Yes?
21     A. -- the power sector or electricity sector in
22  Gaza, and in the case of water, yes.
23     Q. And also the sanitation system?
24     A. Water, sanitation, it's the same authority.
25     Q. So what you do is you send money to agencies in
```

Page 319

```
1  Gaza?
2     A. Under our control, as we do for health, the
3  health sector.
4     As a matter of fact, we fund, you know, supplies
5  and medical equipment and things like that, and
6  treatment. We do.
7     Q. So these are expenditures --
8     A. Yes.
9     Q. -- that the Hamas government doesn't have to
10  make, isn't that true?
11     A. Well, it is something that we do because it's our
12  responsibility to do, and we are a diligent government.
13  We act on behalf of the Palestinian people, both in Gaza
14  and the West Bank -- in Gaza where we can. And in those
15  cases where we can, we do it.
16     Q. I understand. I'm not suggesting anything by it.
17     I'm just saying that, to the extent your
18  government pays for electricity and the repairs to the
19  damage, Hamas doesn't have to pay, correct?
20     A. There's a lot of damage to be fixed. I mean --
21     Q. I understand that. But, to the extent you pay
22  for any of it, to that extent Hamas doesn't. Isn't that
23  so?
24     MR. ROCHON: Objection. That assumes facts
25  not in evidence.
```

Page 320

```
1     MR. WISTOW: What?
2     MR. ROCHON: Assumes facts not in evidence.
3     MR. WISTOW: Sorry?
4     MR. ROCHON: Assumes facts not in evidence.
5     MR. WISTOW: Well, he's already told me that
6  they take care of --
7     MR. ROCHON: That's not evidence that Hamas
8  pays for these things if they don't.
9     MR. WISTOW: Who said they can pay? Maybe
10  they can.
11     MR. ROCHON: If the PA does, then they don't
12  have to.
13     MR. WISTOW: Okay.
14     Q. Let's put it this way.
15     That obligation to repair the electrical work --
16     A. Yes.
17     Q. -- damaged by the Israeli incursion --
18     A. Yes.
19     Q. -- somebody's got to fix it?
20     A. That's correct.
21     Q. You fix it?
22     A. As I told you --
23     Q. The PA?
24     A. -- our policy is to fix damage where we can. If
25  we are in a position to do it, we will do it.
```

Page 321

```
1     Q. Same for water? Same for sanitation?
2     A. That's true.
3     Q. And also the medical system, the medical delivery
4  system?
5     A. That's correct.
6     Q. Okay. In an area that is dominated and
7  controlled by Hamas, yes?
8     A. Yes. But not these agencies, as I mentioned to
9  you.
10     Q. Hamas allows you to send the money in?
11     A. What we, you know, pay our civil servants through
12  individual bank accounts to them directly, and not
13  through -- not through --
14     Q. -- Hamas?
15     A. -- not through structures controlled by Hamas.
16     Q. Hamas has the physical ability to stop you
17  sending that money in, don't they?
18     A. I suppose they could. But why would they do
19  something like that?
20     Q. Exactly. They don't want to.
21     A. But the issue is, you know, are we going to get
22  in the way of somebody getting their allowance, their
23  salary, or their dues from the government that
24  represents them.
25     We're the government in charge, both in Gaza and
```

Fayyad

## Page 322

1  the West Bank.
2       I know we're not in control of Gaza, but there
3  are agencies that still report to us -- we feel
4  adequately -- and there are areas where we feel we
5  definitely have to continue to intervene.
6       Q. Definitely what?
7       A. We definitely need to continue to intervene on
8  behalf of our people to help them out.
9       And there is no guarantee -- or expectation even,
10  for that matter -- that, if we didn't, Hamas would. I
11  mean there is not really that assumption. We just don't
12  act on that basis.
13      Q. So Hamas just doesn't have to spend any money on
14  water, on electricity, or on sanitation, to the extent
15  that you pay for it. Isn't that true?
16      A. I'm not really sure Hamas would have paid if we
17  didn't pay. I mean I just don't know.
18      Q. Okay.
19      A. All I know is we approach Gaza the same way we
20  approach the West Bank. We move where we can as soon as
21  we can do it. I mean --
22      Q. So Hamas --
23      A. We could do these things in Gaza when we did
24  that. That's what we could do, and that's why we do it.
25      Q. Hamas doesn't stop you from sending the money,

## Page 323

1  correct?
2       A. Hamas -- you know, this would involve, as a
3  matter of fact, interfering with the banking system.
4       Q. Okay.
5       A. This would be very very serious. This could lead
6  to the banks being shut down.
7       We would do it. We have the capacity to do it
8  if, in fact, there is that undue interference in the
9  banking system.
10      Q. Okay. So do you know whether or not there was a
11  rise in revenue of the PA between 2008 and 2009?
12      A. Yes. There was.
13      Q. And do you have any idea of how big the rise was
14  in percentage?
15      A. I know what it is like this year, what we have
16  been doing this year.
17      Q. I'd like you to answer my question.
18      A. I'm trying to really. I'm trying to really
19  project backwards. Please bear with me.
20      Q. You don't have to project.
21      MR. ROCHON: Let him think aloud.
22      Q. Why don't you think to yourself.
23      A. I'm really trying -- please. I've been sitting
24  here trying, most faithfully and dutifully and
25  respectfully, to answer questions that you raise.

## Page 324

1       It's not that I sat down, before coming here, to
2  read volumes of material to prepare for this. You ask
3  me questions. I did not come here knowing what you're
4  going to ask me.
5       You're asking me a question. I cannot tell you,
6  in 2009. What I'm trying to really give you -- let me
7  finish.
8       Q. All you have to do is say you don't know the
9  answer.
10      A. Don't tell me what to say or how to say it. I am
11  here to answer question. You ask questions. I answer
12  the way I want. And let the Court be the judge of the
13  adequacy of my answers, sir, if I may.
14      I am required to really work myself into a mind
15  set of trying to give you an answer as best as I can do,
16  and you're preventing me from doing it. That's what I
17  can tell you. Will you please help me answer you as
18  best as I can.
19      Now, this is current data. I know that, through
20  the first half of the year, our revenues have grown by
21  about 20 percent. It may be the case that, last year,
22  for 2009, the growth was somewhere around seven, eight,
23  nine percent, then period.
24      I don't know for certain. This is the best sense
25  I can give you.

## Page 325

1       Q. Okay. That's fair enough.
2       A. Thank you.
3       Q. And do you know whether or not the Palestinian
4  Authority Ministry of Finance described the growth in
5  gross revenue, between 2008 and 2009, as being the
6  result of reforms in domestic tax administration and
7  robust economic growth?
8       A. That's a fair statement, yes.
9       Q. Okay. And if I suggested to you -- and you don't
10  have to accept it -- that the income tax receipts in the
11  second half of 2009 were 58 percent over the same period
12  as in 2008, does that sound about right?
13      A. Yes, it does.
14      Q. Okay.
15      A. This is something I remember because it's
16  extraordinary.
17      Q. Okay. And the value-added tax receipts as for
18  the second half of 2009 compared to the second half of
19  2008 were up about 35 percent.
20      Does that sound right?
21      A. Yes. The domestic VAT.
22      Q. Yes. Value-added tax.
23      A. Yes. Not the clearance, but the domestic side of
24  this.
25      Q. Okay.

Fayyad

Page 326

1      A. And those are, you know, small components of the
2  total. That's why extraordinary growth in those
3  components doesn't mean correspondingly large growth in
4  over-all revenue.
5      Q. In any event, you've already indicated that the
6  increase in revenues was the result of reforms in
7  domestic tax administration and robust economic growth.
8      A. Yes. That's a fair statement, yes.
9      Q. Okay. What are clearance revenues?
10     A. Revenues collected by the government of Israel on
11  behalf of the Palestinian Authority under the customs
12  union arrangement that governs the economic relationship
13  between the two sides, Israelis and Palestinians.
14     Q. Okay. So let me see if I understand this.
15         The Israeli government collects taxes in -- I
16  don't want to offend you. I don't know what to call it.
17  The West Bank?
18     A. Let me explain.
19     Q. I just want to get a geographical denomination
20  that you can agree with.
21         Is it okay to call it the West Bank?
22     A. The West Bank and Gaza.
23     Q. Okay. Well, Israel is not collecting taxes in
24  Gaza, is it?
25     A. But let me explain to you what the principle is.

Page 327

1  You asked me what clearance revenues meant.
2      Q. Fair enough.
3      A. And clearance revenues are revenues collected by
4  the government of Israel on behalf of the Palestinian
5  Authority.
6         And the way this happens is, under the protocol
7  that governs economic relations between the PA and
8  Israel, it says that taxes are collected at point of
9  entry.
10         You know, the economic relationship between us
11  and Israel is described as a customs union. Under a
12  customs union arrangement, the entity that is in control
13  of point of entry collects taxes, and then apportions
14  them to the sides on the basis of destination of use or
15  consumption.
16         So let's say, you know, a shipment of cars is
17  imported through Haifa airport destined to the West Bank
18  or Gaza. The collection is made at the point of entry.
19         Each month, there is a meeting between the
20  Palestinian side and the Israeli side to exchange
21  invoices as to where goods were consumed.
22         If they're consumed in Palestinian territory,
23  then the customs and dues collected by Israel in this
24  case would be transferred to the Palestinian Authority.
25         Since we import from Israel a lot more than

Page 328

1  Israel imports from us, we are recipients in that
2  clearance process. Hence the term clearance.
3         They come into the meeting with invoices. We go
4  to the meeting with invoices. We exchange invoices.
5  And he who imports more from the other guy gets more
6  revenue.
7         That's why they're called clearance revenues.
8      Q. In any event, those revenues which you've just
9  described --
10     A. Yes.
11     Q. -- had a very substantial increase in the fourth
12  quarter of 2009, as compared no the fourth quarter of
13  2008, in the order of 24 percent. Is that true?
14     A. Probably true.
15     Q. Okay. And -- oh, I just wanted to get an idea of
16  the -- please understand. I'm asking you this because,
17  in the United States, very few of us have very much
18  knowledge about the PA.
19         The employment by the PA in 2009 was roughly
20  147,000 employees?
21     A. Yes. That's about right.
22     Q. That sounds right?
23     A. That's about right.
24     Q. And the security personnel represented about
25  63,000?

Page 329

1      A. About right, yes.
2      Q. Okay. So it's roughly about 84,000 --
3      A. -- civilians.
4      Q. -- civil employees?
5      A. Yes.
6      Q. Let's go back to, say 2004, when you were Finance
7  Minister.
8      A. Yes.
9      Q. Would those numbers be sort of roughly the same?
10     A. No. On a net basis, minimally, public sector
11  employment grows by 3,000 to 4,000 new personnel every
12  year.
13         So, in fact, if we're talking about how many
14  years now?
15     Q. Six years.
16     A. Yes.
17     Q. Say 20,000 difference?
18     A. Yes. Probably.
19     Q. Okay. So we're still talking about 120,000
20  employees or thereabouts?
21     A. Yes. Maybe something like that.
22     Q. Okay. I want to talk just a little bit about
23  what's been happening in the West Bank --
24     A. Yes.
25     Q. -- in terms of, well, let's say households with

Fayyad

| Page 330 |
| --- |

1   computers.
2       That's something that you, as Finance Minister,
3   would be interested in, right?
4       A.  Yes.  This is a matter of general interest, I
5   should say.
6       Q.  Right.  It's a measurement of economic progress.
7       A.  Yes.
8       Q.  Okay.  Do you have any idea whether or not there
9   were increases in households with computers, say from
10  2007 to 2008?
11      A.  Yes.  I think there was.
12      Q.  All right.  And if I suggested it was around
13  49 percent --
14      A.  About right.
15      Q.  -- that sounds right?
16      A.  Yes.
17      Q.  And let's take households with satellite dish.
18  So the increase from 2007 to 2008, maybe about
19  92 percent.  Does that sound right?
20      A.  Yes.  My sense is that the substantial majority
21  of people have that kind of access to satellite
22  television.
23      Q.  I'm talking about growth since 2007.
24      A.  Yes.
25      Q.  92 percent sounds about right?

| Page 331 |
| --- |

1       A.  It wouldn't surprise me.
2       Q.  And about almost 96 percent of the households
3   have TV's.  Does that sound right?
4       A.  Probably.
5       Q.  Now, did you know that there was an order that
6   was entered by Judge Lagueux, in September of 2006,
7   transferring the ownership interest in the Palestine
8   Investment Fund Company?
9           Did you know that?
10      A.  I heard something like that, yes.
11      Q.  When did you hear that?
12      A.  Did you say 2006?
13      Q.  Yes.  Yes.
14          MR. WISTOW:  Can you mark this, please.
15          (Exhibit No. 10 marked for identification.)
16          (Witness peruses document.)
17      Q.  Are you aware -- let me make it simple because
18  it's really getting late.
19          Are you aware that Judge Lagueux not only entered
20  a default judgment for $116 million, but also ordered
21  the transfer of certain assets belonging to the
22  Palestinian Authority to the Plaintiffs?
23      A.  Yes.  I remember hearing something about that,
24  something that suggested to me an assertion or claim to
25  ownership of PA assets.  Something to this effect, yes.

| Page 332 |
| --- |

1       Q.  Okay.  But what I'm talking about is not an
2   assertion of claim, but an order by the Court.
3       A.  Oh, yes.  Okay.  I said -- something to the
4   effect, I said.  Yes.
5       Q.  Okay.  So how did you become aware of that?
6       A.  Probably around the time when I was beginning to
7   be involved again in these cases in early 2007.
8       Q.  Now --
9       A.  And probably that's not unrelated to what I told
10  you before, in terms of the PA's effort to try to seek
11  remedy and find legal representation because of that
12  year.
13          As I mentioned to you, this really took the form,
14  as best as I could conceive of the numbers now, a
15  succession of events one after the other --
16      Q.  Right.
17      A.  -- and this was one of them.
18      Q.  This galvanized everybody, right?
19      A.  Seems to have, yes.
20      Q.  Yes.  I mean this was a pretty dramatic event?
21      A.  I would say.
22      Q.  And that's part of what spurred the activity at
23  that point, correct?
24      A.  Probably did.  I don't know what I can tell you.
25  It's something that one would expect it to have that

| Page 333 |
| --- |

1   kind of effect.  One would expect it to have had that
2   kind of effect.
3       Q.  Kind of a wake-up call?
4       A.  Well, I don't know if one can call it a wake-up
5   call.  I mean, as I said, the whole thing took a form of
6   succession of events.  It was not, you know, all at
7   once.
8           It was several things.  Different things happened
9   at different points in time.  This was one of them.
10          I must have learned about it, or something like
11  it, having taken place in the time frame I mentioned
12  before, in early 2007.
13      Q.  Now, there was also an injunction issued by the
14  Court enjoining the Palestinian Liberation Organization
15  and the PA from transferring any assets?
16      A.  Yes.
17      Q.  You're aware of that?
18      A.  Injunction?
19      Q.  An injunction.  Remember, you wrote to
20  Condoleezza Rice?
21      A.  Yes.  An injunction to freeze assets.
22      Q.  Exactly.
23      A.  Yes.  Yes.  Okay.
24      Q.  Okay.  Now, that injunction was issued on May 5
25  of 2005.  I'm going to ask you to just accept my

Fayyad

| Page 334 |
| --- |

1  representation that's so. Okay?
2      A. You know, I remember we discussed that there was
3  an injunction. And we took issue with the way in which
4  it was interpreted or used in the letter that I wrote to
5  the Secretary of State then.
6      Q. Yes.
7      A. Okay. If that's what you're talking about.
8      Q. Yes. That's what I'm talking about.
9      A. Okay.
10      Q. Now, after that injunction issued, do you know
11  whether or not money was taken out of the Palestinian
12  Investment Fund by the PA?
13          MR. ROCHON: Counsel -- I withhold the
14  comment. Go ahead, Mr. Prime Minister.
15          MR. WISTOW: Well, you know what? I'm just
16  going to leave the question as is for a moment.
17      Q. Do you know?
18      A. I really cannot tell you. I mean I don't
19  remember. What I know --
20      Q. Okay.
21      A. All I know is -- I mean I don't remember money
22  going from the PIF to the government in that time frame.
23  I don't remember.
24      Q. Okay. You wouldn't deny it? You just don't
25  remember?

| Page 335 |
| --- |

1      A. I just don't remember.
2      Q. Who would have authorized such a transfer?
3      A. Transfer?
4      Q. From the PIF to the PA?
5      A. Depends on when it happened.
6      Q. Well, let's assume for a moment that $27 million
7  was transferred from the PIF to the PA.
8      A. When?
9      Q. In October through December -- sometime between
10  October and December of 2006.
11      A. October -- well, I really cannot tell you. I was
12  not in government at the time.
13      Q. Who would have the authority to make such an
14  order, if you know?
15      A. I rely honestly do not.
16      Q. Okay. Fine. Then we'll move on.
17          Who is Muhammad Mustafa?
18      A. CEO of the PIF. I believe Chairman of the Board
19  as well.
20          MR. ROCHON: Counsel, we're about done with
21  the five minutes. Do you want to --
22          MR. WISTOW: Oh, I'm sorry.
23          MR. ROCHON: Can we go off the record.
24          THE VIDEOGRAPHER: Going off the record at
25  11:21.

| Page 336 |
| --- |

1          (Short recess taken.)
2          THE VIDEOGRAPHER: Going on the record at
3  11:36.
4          MR. ROCHON: Before we begin, this will be
5  my time. So 11:36 is my time until I say it's not.
6          In the break, I offered the possibility of,
7  after a period of time, whichever you wanted, I would do
8  my examination, leaving you some time for redirect, or
9  whatever you wish to call it. I understand that you
10  don't want to take me on it.
11          I've also represented that I believe my
12  examination will be relatively short. You never know
13  for sure. I don't think it will be more than 15
14  minutes, 20 minutes. Probably less.
15          But I understand that's, from your
16  standpoint, not an attractive offer, and you'd rather go
17  through to the end of your seven, and then have me
18  conduct my examination, is that right?
19          MR. WISTOW: What I'm going to do -- here's
20  my problem. We're not on my time.
21          MR. ROCHON: We're on my time.
22          MR. WISTOW: Okay. How much time do you
23  get?
24          MR. ROCHON: It's a matter of some debate.
25  But well more than I'm going to use.

| Page 337 |
| --- |

1          MR. WISTOW: Here's my problem, and I don't
2  mean to start anything fracas.
3          What I'm concerned about is, even if you do
4  15 minutes, and I need -- and there's time to do a
5  recross, if we have a representation -- I'm going to get
6  a reaction over here -- if we have a repetition of what
7  happened before, I'm going to get to ask like one
8  question and it's going to take me 20 minutes to get an
9  answer. That's what I am worried about.
10          So I'm actually willing to telescope down
11  what I'm doing to save some time. But I'm just worried
12  about the responsiveness of the witness on redirect.
13  There's nothing you can do or say about this. I think
14  I'm --
15          MR. ROCHON: We both have views as to why
16  this has taken long. My views are different than yours.
17  But I'm not going to try to debate them with you. I
18  believe this could have gone much more quickly on your
19  part.
20          MR. WISTOW: We'll go to the Court.
21          MR. ROCHON: Bottom line is I've offered to
22  do my examination before you're done with your time, if
23  you want me to.
24          (Off-the-record discussion.)
25          MR. ROCHON: Mr. Strachman, thank you. But

Fayyad

Page 338

1  your colleague has shown an ability to ask questions for
2  an infinite period of time.  And even the Prime Minister
3  isn't ready to offer an infinite period of time.  He has
4  shown the ability to ask questions for two hours about a
5  three-page letter.
6      So, given that, I can't rely on any
7  representation that we would finish in this lifetime,
8  let alone this day or tomorrow.
9      MR. WISTOW:  Okay.  I don't know what we'll
10 do.  Let's see how I --
11     MR. ROCHON:  What we'll do first is go back
12 on your time.  If we could, please, have the time,
13 Mr. Coopersmith.
14     THE VIDEOGRAPHER:  Time is 11:39.
15     MR. ROCHON:  Thank you.
16     MR. WISTOW:  Mark this.
17     (Exhibit No. 11 marked for identification.)
18  Q.  Now, this is something that your counsel -- your
19 present counsel -- submitted with the motion to vacate
20 the judgment that it filed on 12-28-07, and asked Judge
21 Lagueux to take this exhibit into consideration in
22 deciding the motion.
23     And I'd like to refer you to -- and, by the way,
24 what this document is is a download from the United
25 Kingdom government's Foreign Office.  Again, as

Page 339

1  submitted by your lawyers to the Court.
2      And I'd like to take you to the last page.
3  A.  Okay.
4  Q.  And I'm going to read something in the record,
5  and I'm going to ask you if you're aware that this was
6  submitted to the Court.
7      Human Rights.  On several occasions, the
8  Palestinian Authority has stated its commitment to
9  respecting all internationally recognized human rights
10 standards and to incorporating them fully into
11 Palestinian law.
12  A.  Yes.
13  Q.  I suppose you agree with that?
14  A.  Yes, I do.
15  Q.  Okay.  Then it goes on to say, The practice of
16 detention without trial or charge continues to be used,
17 and beatings and torture are not uncommon in Palestinian
18 detention centers.  The death penalty still exists, and
19 was used as recently as 2006.
20     The Palestinian Authority has also refused to
21 condemn the use of violence for political purposes and
22 the targeting of civilians.
23     Were you aware this was submitted to Judge
24 Lagueux?
25  A.  No.

Page 340

1      MR. ROCHON:  Just objection, counsel.  You
2  suggested that that portion was upon which we relied.
3      MR. WISTOW:  No.  I didn't say you relied on
4  anything.  I said you submitted this document, which I
5  put in in its entirety, to the Court.
6  Q.  Let's move on.
7      I'm going to show you another document that was
8  submitted by your counsel for Judge Lagueux's reading in
9  support of the motion to dismiss.
10     I'm giving you the entire document as we mark it
11 (indicating).
12     (Exhibit No. 12 marked for identification.)
13     (Off-the-record discussion.)
14  Q.  The document, in part, says -- on page 1, it
15 says, The Agreement.
16     The Interim Agreement, Oslo 2, states that Israel
17 may request from the Palestinian Authority the
18 transfer -- extradition -- of an individual located in
19 the autonomous areas who is suspected of an offense that
20 falls under Israeli criminal jurisdiction.  And then it
21 cites a reference.
22     The PA is obligated to comply with all formal
23 requests and to arrest and transfer the suspect to
24 Israel.
25     Do you agree that that's in the Oslo Accords?

Page 341

1  A.  If this is a direct quote of the Oslo Accords, I
2  wouldn't dispute it.  But I, you know, cannot tell you
3  independently that I recall every provision that is in
4  here as something I have personally independently read
5  or have verified.
6      But if it's a direct quote, it's a direct quote.
7  Q.  All right.  It also says that the Palestinian
8  Authority refuses to hand over the four terrorists
9  involved in the murder of four Americans.
10     Do you see that?
11  A.  Where?
12  Q.  Right above it.
13     MR. ROCHON:  May I point the witness to the
14 portion you're talking about?
15     MR. WISTOW:  Yes.
16  Q.  Right above where we just read.
17  A.  Oh.  Here in the title?
18  Q.  No.  Below the title.  Do you see it?
19     MR. ROCHON:  I just object to whether it's
20 above or below the title, given the line that's
21 underneath.
22  Q.  It says, PA refuses to hand over four terrorists
23 involved in the murder of four Americans.  Do you see
24 that?
25  A.  I see that, yes.

Fayyad

---

Page 342

1    Q.  Below that, it says, The Violations.  Go down
2  about three paragraphs?
3    A.  Yes.
4    Q.  On September 17, 1997, Israel submitted five new
5  requests to the PA for the transfer of terror suspects.
6  Previously, on March 31, 1997, Israel submitted
7  31 formal requests for the transfer of terror suspects.
8        Thus far, the PA not responded to any of Israel's
9  36 requests, except for two cases in December 1994, when
10  the PA rejected Israel's requests.
11       First, did you know that this was submitted to
12  Judge Lagueux?
13    A.  No.  I'm not aware of it.
14    Q.  Do you have any knowledge regarding if this is a
15  true or false statement?
16    A.  I do not know that.  I don't know that.
17    Q.  Okay.  The next paragraph says, Of the 36 terror
18  suspect whose transfer is being sought by Israel, 12 are
19  either serving in the Palestinian police or are in the
20  process of joining its ranks.
21       Do you know whether that's true or not?
22    A.  I don't know.
23    Q.  Do you remember the --
24       MR. ROCHON:  Are we done with that document,
25  counsel?

---

Page 343

1        MR. WISTOW:  Yes.
2    Q.  Do you remember the hostage-taking in the Church
3  of the Nativity?
4    A.  Yes, I remember.  I remember.  2002 probably.
5  Yes.
6    Q.  What can you tell me about it from memory?
7    A.  Basically, that there were people who actually
8  sought refuge there for a long period of time, and at
9  least some of them gunmen.
10    Q.  Sorry.  Some of them were gunmen?
11    A.  Gunmen, yes.  That's what I recall about the
12  incident, and they were there for an extended period of
13  time.
14       But this was, I believe, before I joined the PA.
15  I think it was.
16    Q.  Okay.
17    A.  Yes.
18    Q.  Now, you say they sought refuge there.  This was
19  a Christian church --
20    A.  Yes.
21    Q.  -- right?
22    A.  Yes.
23    Q.  And there were monks there?
24    A.  I assume.  I suppose there were.
25    Q.  This was a big news story, wasn't it?

---

Page 344

1    A.  It was a big story.
2    Q.  Yes.  Don't you remember that the monks were not
3  allowed to leave?  They were kept as hostages?
4    A.  I don't remember all aspects of the case.  All I
5  know is that it was, you know, a big event at the time.
6  There were just too many aspects to it, and it went on
7  for an extended period of time.
8    Q.  Yes.  And the monks were not allowed to leave.
9  Do you remember that?
10    A.  I don't remember that.
11    Q.  You don't deny it?
12    A.  I cannot -- I wouldn't deny it.  I'm not here to
13  really defend anything, to be honest.
14    Q.  Sorry?
15    A.  I'm not here to defend a certain action.
16    Q.  No.  I'm just asking you whether or not -- you
17  just don't know whether they were held as hostages?
18    A.  I just don't recall that.  I don't recall all
19  aspects of it.
20       All I know is that, you know, there was this
21  situation that lasted a long period of time.  It was
22  problematic.  It took a lot of effort to disentangle it.
23  That much I know.
24    Q.  When you say a lot of effort to disentangle it,
25  to break up the hostage-taking?

---

Page 345

1    A.  To really get those people who were in the --
2    Q.  Right.
3    A.  -- church to actually leave.
4    Q.  Right.
5    A.  And they did leave, under certain arrangements.
6    Q.  Right.  And one of them was Abdallah Daoud?
7    A.  I don't know.
8    Q.  You don't know?
9    A.  No.  I don't.
10    Q.  He headed the Palestinian Intelligence Service in
11  Bethlehem?  Does that ring a bell?
12    A.  What?
13    Q.  I say does that ring a bell.
14    A.  The head of intelligence?
15    Q.  Yes.
16    A.  In Bethlehem?
17    Q.  The Palestinian Intelligence Services in
18  Bethlehem.
19    A.  When was that?  I mean at the time of this
20  incident.
21    Q.  In the past.  I don't have the date.  If you
22  don't know, you don't know.
23    A.  Well, I don't know.
24    Q.  Okay.  Do you remember that the terrorists --
25  people in the church -- were deported to foreign

---

Fayyad

Page 346

1  countries?
2      A. I'm aware that that was probably the arrangement.
3      Q. Right.  Israel agreed to let them just leave?
4      A. Yes.
5      Q. And they were deported to foreign countries and
6  to Gaza?  Does that ring a bell?
7      A. Yes.
8      Q. Okay.  And one of them -- Abdullah Daoud -- died
9  fairly recently.  Yes?
10     A. Yes.  I now know -- I now remember that one who
11  was associated with that particular incident died
12  recently, yes.
13     Q. Right.  Right.  So you remember somebody who was
14  involved in that hostage-taking in the Church of the
15  Nativity died recently?
16     A. Yes.
17     Q. Okay.  Was that Abdullah Daoud?
18     A. I don't remember the name for sure, but I
19  remember it happening recently.  But I don't remember
20  the name for sure, for certain, probably because people
21  are known by more than one name.
22         The name you mentioned, Abu something -- I don't
23  know.
24     Q. Abdullah Daoud.
25     A. That could have been the name.

Page 347

1      Q. Do you remember when this was, this funeral?
2      A. No, I don't remember.
3      Q. Was it a couple of months ago?
4      A. Maybe.  Maybe more.  I really don't remember for
5  sure.
6      Q. Was it like in April of 2010?
7      A. It could have been.
8      Q. Okay.  And did you pay a condolence visit to the
9  family of Daoud?
10     A. Again, you know, the name now I do not remember
11  well.  I mean I did pay condolence visits in a number of
12  instances.  This may have been one of them.
13     Q. Did you make a public statement about Daoud?  Did
14  you say he was a shahid?
15     A. I don't know.  I don't remember, you know, what I
16  said in all of these instances.  But it's something that
17  I may have done, may have said.
18     Q. What's a shahid -- S H A H I D in English, I
19  guess?  It's close enough.  Shahid.
20     A. Yes.  I understand what you're referring to.
21     Q. Right.  I wanted to spell it for --
22     A. Okay.
23     Q. That means a martyr?
24     A. Yes.
25     Q. Okay.  And you may have called him a martyr?

Page 348

1      A. It's possible.  I do not recall for sure.
2      Q. Okay.  And did you, in a public statement, note
3  his "suffering from the injustice of his expulsion"?
4      A. It's possible.  It's possible I may have said
5  something like that.  It's possible, but I do not recall
6  exactly.
7      Q. Okay.  And do you know if President Abbas sent an
8  emissary to the funeral?
9      A. He may have.
10     Q. Wasn't there a lot of news stories in Palestine
11  about this?
12     A. Yes.  You know, I did not immediately make the
13  association when you started asking questions.
14         But I remember now, as you went into the story
15  and questioning about it, that there was one who -- one
16  deportee -- who died, I believe in Algeria, recently.
17         And I just did not associate the name with that
18  particular incident.  And it could have been the person
19  you mentioned.
20     Q. Right.  But you referred to him as a shahid?
21     A. You said that there is a statement to this
22  effect.
23     Q. I'm just asking you?
24     A. Yes.  I may have.  I do not recall putting out a
25  statement as much as it is something I -- in the way I

Page 349

1  usually do things, when I go to places like this, houses
2  of mourning, I usually get up and say a few things.
3         And that's probably what you're referring to
4  here, as is customary.
5      Q. Right.  Would it be customary to refer to the
6  injustice of his expulsion?
7      A. I think the aspect of it, if that's what I had
8  said, what would have been on my mind is somebody who
9  was deported and who died in exile, so to speak.
10         There is that dimension of it that I think was
11  significant.
12     Q. And unjust?
13     A. I mean, when somebody is deported away from their
14  home and they die away from their family and relatives
15  and all those, there is a human dimension to that story
16  that touched a lot of people in a certain way.
17     Q. And were you aware, at the time, that he was one
18  of the people who stormed the Church of the Nativity?
19     A. I wasn't aware.  And, as I said, the incident --
20  all the events leading to the Nativity Church incident,
21  my recollection of it, my knowledge of the situation is
22  not one where those people, including some gunmen,
23  stormed or took over the church, as much as having taken
24  refuge in it.
25     Q. They took refuge and kept the monks there, didn't

Fayyad

| Page 350 |
| --- |

1   they?
2       A. I don't remember that part of it.
3       I mean what I know about it, what I recall, is
4   that the situation was they came under pressure by the
5   Israeli army, and they sought refuge in the church.
6       Q. You knew he was expelled to Algeria, you said?
7       A. I mean I know that there was an individual who
8   passed away in Algeria, and he was deported.
9       Q. Right.
10      A. That -- and I knew of it after the fact, not
11  before.
12      Q. Well, when you talked about the injustice of his
13  expulsion --
14      MR. ROCHON: Objection.
15      A. You know --
16      MR. ROCHON: Mr. Prime Minister, there's an
17  objection.
18      The objection is, the witness having said
19  that he wasn't sure that said, now you're assuming he
20  did. That's even worse than assuming facts not --
21      MR. WISTOW: This is a speaking objection.
22  All you've got to do is object or instruct him not to
23  answer. This is a speaking objection.
24      And this is what I call cross-examination,
25  okay? He's an adverse witness. And that is possibly

| Page 351 |
| --- |

1   the most classic example of a speaking objection I've
2   ever heard.
3       Q. Now, do you know whether President Abbas sent an
4   emissary to the funeral?
5       MR. ROCHON: Asked and answered.
6       A. Yes. As I said, I do not recall specifically in
7   this particular case, but it's something that he may
8   have done.
9       Q. Maybe this will refresh your recollection, maybe.
10      Do you recall the spokesman saying, We must
11  maintain the way of the shahid Daoud, who always
12  believed in the struggle and love of the homeland and
13  the realization of national unity?
14      Does that ring a bell?
15      A. Not necessarily.
16      Q. Okay.
17      A. Or specifically.
18      Q. Okay. Do you know -- are you aware of the murder
19  of an Israeli, Rabbi Meir Avshalom Hai, in a drive-by
20  shooting?
21      There was a lot of newspaper coverage about that.
22      A. When was that?
23      Q. In December of 2009.
24      A. Oh, yes. Yes. Yes.
25      Q. Okay. That was a big story?

| Page 352 |
| --- |

1       A. Yes. Yes. Yes.
2       Q. Okay. It was a drive-by shooting, yes?
3       A. It was a shooting in the north, near Nablus.
4       Q. And there were three alleged terrorists arrested?
5       A. I do not know if there were arrests in this case.
6       Q. They were in a fire fight?
7       A. No, no, no. What happened, there was an Israeli
8   incursion into Nablus, and three were actually killed --
9   not arrested -- by the Israeli army.
10      Q. They were assassinated?
11      A. I mean there were eye-witnesses, including
12  children, that suggested that it was -- that they
13  actually were shot, at least -- I mean I'm trying to
14  really remember now, each one of them how it happened.
15      But the description that was given by eye-
16  witnesses was that they were fired at when they were not
17  resisting, or they were not firing at anyone. In one
18  instance, a guy was coming down the stairs, as it was
19  described to me, and he was shot.
20      So they were assassinated. They were not
21  arrested. They were killed.
22      Q. They were murdered?
23      A. Yes.
24      Q. You investigated, looked into it, came to that
25  conclusion?

| Page 353 |
| --- |

1       A. I mean this is a matter of great interest and
2   concern to us. And we tried, as best as we can, to find
3   out what happened, and there was a lot of discussion on
4   this with Israeli counterparts.
5       And we definitely protested that whole operation,
6   the raid -- the incursion, if you will -- leading to
7   those killings of the three individuals. I mean there
8   was no trial or anything like that.
9       We don't know for sure, you know, if, in fact,
10  they're the ones who were involved in the killing of the
11  rabbi.
12      Q. Do you recall this was big story? We've said
13  that.
14      A. It was.
15      Q. Do you recall President Abbas honoring the three
16  people who were killed, who allegedly were the murderers
17  of the rabbi, saying that they were shahids of the
18  Palestinian revolution?
19      Does that sound right? Do you remember that?
20      A. I don't remember a statement made by the
21  President in connection with this.
22      But it was, as I mentioned to you, something that
23  really caused a great deal of difficulty at the time it
24  happened in the way it happened.
25      I know that we were actively involved and engaged

Fayyad

Page 354

1  in an effort to try to find who -- those who may have
2  been responsible for the shooting and the killing of the
3  rabbi, and this was acknowledged by Israeli
4  counterparts.
5      And we were stunned, actually, when, in the midst
6  of that discussion that was going on and we were trying
7  the best we can to piece it together, by this raid,
8  incursion by the Israeli army, which led to the killing
9  of these three individuals.
10     Q. So you came to the conclusion the actions of the
11 Israeli army were unjustified, correct?
12     A. That was my position then. It is my position
13 today.
14     And the Israeli government knows about my
15 position. It's not a question of statement. I mean
16 it's a question of my position conveyed to them
17 officially, formally, in an open way.
18     Q. Okay.
19         MR. WISTOW: How much time is left?
20         MR. ROCHON: First we have to know what time
21 it is. Mr. Coopersmith?
22         THE VIDEOGRAPHER: The time is midnight,
23 twelve midnight. And there's 24 minutes up on the
24 table.
25         MR. STRACHMAN: What did you say? There's

Page 355

1  24 minutes?
2          THE VIDEOGRAPHER: 24 and a half minutes.
3          (Off-the-record discussion.)
4          MR. WISTOW: How much time is left?
5          MR. WISTOW: Oh, excuse me. There's time
6  left on the tape is what Mr. Coopersmith is talking
7  about, not time left in your deposition.
8          MR. WISTOW: That's what I'm asking.
9          MR. STRACHMAN: Mr. Coopersmith, how much
10 time is left?
11         MR. WISTOW: So I'll figure out whether to
12 stop, because I do have some other stuff.
13         THE VIDEOGRAPHER: There's approximately 30,
14 32 minutes left on the tape.
15         MR. WISTOW: No, no. How much time is left
16 for the deposition? How close are we -- can we go off?
17         THE VIDEOGRAPHER: That's approximately the
18 same amount of time. When we started this, there was an
19 hour left. So there's 35 minutes left on the time.
20         MR. WISTOW: Could we go off the time for a
21 minute while we're talking?
22         MR. ROCHON: Go off the record?
23         MR. WISTOW: Okay. Off the record.
24         MR. ROCHON: Let's go off the record,
25 Mr. Coopersmith.

Page 356

1          THE VIDEOGRAPHER: Going off the record at
2  12:02.
3          (Off-the-record discussion.)
4          THE VIDEOGRAPHER: Going back on the record
5  at 12:03.
6          MR. WISTOW: In order to avoid further
7  motions -- and which there will definitely be some -- we
8  have a controversy about what the seven hours means.
9          And the suggestion has been made to me by
10 Mr. Rochon that all I get is seven hours, no matter
11 what, no matter how much time he takes on direct, in
12 effect.
13         And I don't agree with that.
14         MR. ROCHON: Fine.
15         MR. WISTOW: What's that?
16         MR. ROCHON: That's fine. I'm just talking
17 to counsel.
18         MR. WISTOW: And so, in order to try to
19 avoid that issue, and on the representation that your
20 best judgment is you only need 15, I'm going to stop
21 asking some questions that I had so we can avoid that
22 controversy.
23         MR. ROCHON: We can now -- the time will go
24 on my time, please.
25         THE VIDEOGRAPHER: Time is 12:04.

Page 357

1          MR. ROCHON: I did you a favor. I'm going
2  to make my argument while we're on the time, not yours.
3          Our position is you've got seven hours. Do
4  with it as you please. You can go to seven hours, stop
5  at our cross. You can stop now.
6          If you decide to stop now, you've said it's
7  based on 15 minutes. I think that's what it will be. I
8  put the 15 minutes think it will be on the record. And
9  I'm prepared to go.
10         MR. WISTOW: Good.
11         MR. ROCHON: So thank you.
12 CROSS-EXAMINATION BY MR. ROCHON:
13     Q. Mr. Prime Minister, just a few questions for you.
14 The first is this.
15         There came a period of time when counsel was
16 asking you questions about the finance report that had
17 been issued in March of 2010.
18     Do you remember those questions?
19     A. Yes, I do.
20     Q. And that was a document that he may or may not
21 have in his hand, but he certainly did not show you,
22 correct?
23     A. He didn't. Yes.
24     Q. Okay. What I want to ask you is, in light of the
25 questions about numbers of TV's and the tax transfer

Fayyad

Page 358

1  money and the increase of domestic tax revenue and all
2  the other questions that he asked, can you indicate for
3  the Court what was the financial position of the
4  Palestinian Authority, during 2009, regarding its
5  over-all deficit funding.
6       Give us a sense of where it was during 2009.
7       A. All those numbers and statistics are indicative
8  of a significant recovery in economic activity beginning
9  in the third quarter of 2007 onward.
10       But, you know, that does not really mean,
11  notwithstanding the improvement and government
12  involvement that was referred to, that the Authority was
13  out of the hole in terms of its financial position.
14       Our deficit this year, on the current side of the
15  budget, is still projected, notwithstanding all of the
16  improvements that were cited in the discussion before,
17  is projected still at $1.2 billion this year, 2010.
18       Q. If you could, Mr. Prime Minister, is that 1.2 --
19       A. -- billion.
20       Q. With a B?
21       A. With a B.  It's $1.2 billion on the current
22  budget.  This is just current expenditure minus
23  revenues.  It does not include development expenditure.
24  When you include development expenditure, the over-all
25  deficit.  Hence, the need for aid is more than

Page 359

1  $1.9 billion, with a B.
2       So yes, notwithstanding the improvement in
3  revenue performance, we are still highly dependent on
4  foreign aid.  The deficit is very large.
5       And, right now, as a matter of fact, given what
6  we have received in terms of aid during the first six
7  months of the year, we have received less than was
8  projected for this year, and we're currently undergoing
9  very very great difficulty.
10       In fact, in the past few days, I've been
11  completely preoccupied trying to find the money needed
12  to make the bills for the month of July, which is not
13  assured as of yet.
14       So the fact there was recovery doesn't mean that
15  we are out of the woods in terms of our financial
16  position, which is still very precarious and highly
17  dependent on aid goals which have not surfaced and, so
18  far, not have been actually in line with commitments of
19  budgets made this rear.
20            MR. WISTOW:  Move to strike.  Not
21  responsive.
22       Q. The next question, sir, relates to Exhibit 9.
23  I'm not going to show it you right now, unless you need
24  to see it to refresh your recollection.
25       But that's the exhibit that talked about the

Page 360

1  commitment that had been made by 87 countries and
2  international organizations that had pledged $7.4
3  billion.  And that was the article from December 18,
4  2007.
5       Roughly, sir, of the $7.4 billion that had been
6  pledged, how much actually came in?
7       A. That amount was to cover the three-year period
8  2008-2010.  I can tell you what we have received in
9  budget support, and we can add them up.
10       We received $1.8 billion in 2008, we received
11  $1.345 billion in 2009, and we are projected to receive
12  $1.2 billion this year.  The sum total of those three
13  components would represent the largest chunk of aid
14  actually received, you know.
15       On top of that, you need to add what we got in
16  terms of development expenditure aid over-all by the end
17  of the year.
18       My projection is that what we will have received
19  over the three-year period, 2008-2010, would be that
20  amount less than the $7.4 billion.
21       Q. Thank you.  How much of the funding that you get
22  outside of the budgetary support is from donors?  I mean
23  give us a sense.
24       A. You know, for example, this year 2010, we -- our
25  revenues, our own revenues -- revenues that we collect

Page 361

1  to be distinguished from aid that we need -- are
2  projected to amount to $2 billion at the close of 2010.
3       I mentioned to you that we needed -- we would
4  need about $1.9 billion.  So about 50/50.  You know,
5  50 percent of our over-all need is covered by our own
6  revenues, 50 percent is covered by donor assistance, for
7  both current expenditure and development expenditure.
8       I mean it's been declining, and the need for it
9  has been declining, but it's still very large.  We still
10  have very large aid dependency in Palestine.
11       Q. Over-all, without the donors, would the PA budget
12  be in deficit?
13       A. Oh, substantial deficit.  Substantial deficit.
14       In fact, I can tell you, even this year, I mean
15  when revenues have been growing firmly at that pace,
16  2010, 2009, and all, if we did not get aid, we would
17  barely be able to pay just salaries and not anything
18  else.
19       I mean this is how bad it would be.  I mean there
20  is no way we'd be able to run the PA without that
21  assistance.
22       Q. You were asked about this -- a relatively smaller
23  question -- at one point, you were asked about the legal
24  advisors in the Palestinian Authority at the time that
25  you were engaged in the process of working through the

Fayyad

Page 362

1  solution of hiring counsel in these cases.
2      These legal advisors in the Palestinian
3  Authority, as far as you know, were they trained or
4  sophisticated in United States litigation matters?
5      MR. WISTOW: Objection.
6  A. No. I don't believe so. If any, very limited.
7  And I know this is the case because we are really keen
8  in developing our capability in this important area.
9      And I personally have taken an interest in
10 looking for adequately trained people in this area, and
11 I have not been successful finding.
12     So no. Lawyers we have are not well versed in US
13 law.
14 Q. You were asked some questions about the funding
15 of sewer, health, medical, and electrical and other
16 power in the Gaza after the Israeli incursion there.
17     If you could explain, why does the Palestinian
18 Authority support Gazans in that regard, and not do --
19 let Hamas take care of them, as the questions suggested.
20 A. Because it's our responsibility. I mean you had
21 it right when you said support Gazans.
22     THE COURT REPORTER: You had what?
23     THE WITNESS: Pardon me?
24     THE COURT REPORTER: I didn't hear you.
25     THE WITNESS: And then I forgot what I said.

Page 363

1      MR. ROCHON: You had it right when you
2  support Gazans.
3      THE WITNESS: Yes.
4  A. We view it as our responsibility, as the
5  Palestinian Authority acting on behalf of the
6  Palestinian people throughout the occupied Palestinian
7  territory, both in the West Bank and Gaza.
8      And so we do what we do because we are trying to
9  do the best we can for and on behalf of our people in
10 Gaza.
11     I tell you, you have it right when you said we're
12 doing this for Gazans. Gazans are citizens, Palestinian
13 citizen. They're our citizens. So we do it as a matter
14 of duty, responsibility.
15     Where we could, we did. And those were areas we
16 found it necessary to intervene and, in fact, we were
17 able to intervene on behalf of the people. And we did.
18 They're our people.
19     We were not doing it for Hamas or on behalf of
20 Hamas. We obviously wouldn't.
21 Q. I'd like to ask you -- you were asked some
22 questions about the decision to proceed and litigate
23 these cases. Is that -- and you were asked about your
24 personal commitment on specific questions in one of the
25 declarations.

Page 364

1      Is the commitment to litigate these cases yours,
2  the government's, no one's? Whose commitment is it
3  we're talking about?
4  A. It's a PA commitment. I believe I answered the
5  question when it was raised. I meant to actually
6  project a full sense of commitment, and deep commitment
7  in the fullest extent of the word and the term.
8      This is a commitment that the PA takes very
9  seriously. It is definitely our intention to do the
10 best we can to give ourselves a chance to defend
11 ourselves in this and other cases, in accordance with
12 what US law provides for.
13     And we'll be -- we are completely committed to be
14 respectful of the process in all of its components. And
15 the commitment extends well beyond me personally. This
16 is a commitment that we take upon ourselves as a system,
17 as a polity.
18     MR. WISTOW: Move to strike.
19 Q. If you could describe for us the cases -- and
20 what this motion is about is to vacate the default
21 judgment and to give the Palestinian Authority an
22 opportunity to litigate these cases.
23     Why is that important?
24 A. I'm sorry?
25 Q. Why is it important -- or is it important -- to

Page 365

1  have an opportunity to defend the Ungar case itself?
2  A. It is very important, you know, to defend
3  ourselves as a state.
4      A certain action was brought against us in a
5  court of law in the United States, an action we do not
6  feel that we'll be found liable for if there's due
7  process, and if we go through a process that provides us
8  with an opportunity to defend ourselves.
9      It is our belief that if, in fact, that was to
10 happen, that if we're given a chance to defend
11 ourselves, that it is likely that we will not be found
12 liable in this particular case.
13     That's why we feel strongly about being given a
14 chance to defend ourselves.
15 Q. The impact of the default -- excuse me.
16     The impact of the cases brought in the United
17 States under the ATA -- the Anti-Terrorism Act -- what
18 is the potential impact of those cases on the
19 Palestinian Authority taken as a whole? That is, those
20 cases taken as a whole.
21     MR. WISTOW: Objection.
22     MR. ROCHON: Basis.
23     MR. WISTOW: I don't care to state it.
24 Q. Please answer the question.
25     MR. WISTOW: I will state it. Relevance.

Fayyad

Page 366

1   What difference does it make what the impact of the
2   other cases are.
3          MR. ROCHON:  Thank you.
4      Q.  You can answer the question, Mr. Prime Minister?
5      A.  It would be substantial.  It would be
6   debilitating.  These are large sums of money.
7          I mean, in the case at hand here, we're talking
8   about a very large sum of money relative to our over-all
9   revenue base and what we can collect and the aid that
10  we've been getting.
11         And when we factor in other cases, most
12  definitely it's something that would be highly
13  destabilizing.  It is something that we cannot afford.
14         In this particular case, at this juncture, all
15  we're looking for is an opportunity to defend ourselves.
16     Q.  What is the potential impact on the donor
17  committee of these large judgments in these cases, if
18  they were to occur?
19         MR. WISTOW:  Objection.
20     Q.  I said donor committee.  I meant donor community.
21     A.  Yes.
22         MR. WISTOW:  Objection.
23     Q.  You may answer the question this time.  This time
24  I don't care what it is.  You can answer the question.
25     A.  I think it would be a chilling effect on the

Page 367

1   donor community's attitude to provide us with the aid
2   that is needed.
3          I mean, as it is, it's not really so easy to get
4   the assistance that we need, particularly for what we
5   call the current side of the budget, meaning current
6   expenditure, operational expenditure -- like wages and
7   salaries and other operational expenditures.
8          To really factor in the possibility of having to
9   pay substantial amounts of money in connection with
10  these lawsuits, I don't believe the donors would be okay
11  with it in the terms of them feeling that their
12  resources that they are committing or making available
13  for development purposes are being siphoned off to be
14  used in connection with this litigation, with these
15  lawsuits.
16     Q.  Last question.
17     A.  That's what I think, I mean, that that would be
18  the case.
19     Q.  Last question, Mr. Prime Minister.
20         The commitment that was referenced to litigate
21  these cases that was made by you in the declaration in
22  December of 2007, have you followed through on that
23  commitment in connection with all of the other cases in
24  which the -- ATA cases in the United States?
25         MR. WISTOW:  Objection.

Page 368

1      A.  It is a commitment, you know, across the board in
2   connection with all the cases where there's pending
3   action in the United States.
4          And it's a commitment that we have demonstrated.
5   This is not a matter of words.  This is not something
6   that I would make a declaratory statement on only.
7          It is something that is backed fully by actions
8   that we have taken, not only in connection with the fact
9   that we have hired legal counsel to really pursue this
10  and other matters in this area in a serious and
11  competent way, but also in the extent to which we
12  demonstrated to the process, in all of its aspects, all
13  of its phases, and throughout -- whether talking about
14  discovery in connection with production of evidentiary
15  material required, and also in various discussions and
16  other aspects of litigation, including settlement in
17  some -- which clearly demonstrates commitment to process
18  as foreseen and provided for under US law.
19     Q.  Thank you, sir.
20         MR. ROCHON:  May I ask the time,
21  Mr. Coopersmith?
22         THE VIDEOGRAPHER:  12:19.
23         MR. WISTOW:  All right.
24         MR. ROCHON:  That was 16 minutes, not 15.
25  And I do apologize.

Page 369

1          MR. WISTOW:  I don't want to use the word
2   smarmy, but I can't think of another adjective.
3          Can we --
4          MR. STRACHMAN:  We'll take a break.
5          MR. ROCHON:  Go off the record?
6          MR. WISTOW:  Yes.  Please.
7          THE VIDEOGRAPHER:  Going off the record at
8   12:19.
9          (Short recess taken.)
10         THE VIDEOGRAPHER:  On the record at 12:30.
11         MR. ROCHON:  As I indicated off the record,
12  one quick thing to put on the record, which is that,
13  when you summarized my position on the length of the
14  time for depositions, you may have gotten it wrong.
15         I'm not saying my time eats into yours.  You
16  have your seven hours.  You do with it as you wish.
17  Mine doesn't --
18         MR. WISTOW:  It looks like it's going to be
19  moot anyway.
20         MR. ROCHON:  Okay.  Go ahead.
21         MR. WISTOW:  It looks like we're not going
22  to have a problem.
23         MR. ROCHON:  Okay.  Go ahead.
24  REDIRECT EXAMINATION BY MR. WISTOW:
25     Q.  I want to talk with you just a little bit,

Fayyad

Page 370

1  Mr. Fayyad, about the -- I think you talked about a
2  devastating effect paying the judgment in this case
3  would have on the PA's financial situation, correct?
4      A.  Yes.
5      Q.  I'm focusing you on that.
6          Now, do you know how much money is tied up in
7  reference to the Ungar case?  Roughly.
8      A.  I mean I know there's Pension Fund money tied up.
9  Probably $50 million.
10     Q.  If I told you that more than $116 million was
11 tied up, would that be a surprise?
12     A.  It probably is within the realm of what I would
13 expect, yes.
14     Q.  If I told you it's significantly more than
15 $116 million, would that surprise you?
16     A.  Maybe not.
17     Q.  Okay.  Whatever's been tied up is totally
18 unavailable to you at the present time, right?
19     A.  It isn't available to us for use at the present
20 time.
21     Q.  Right.  And it's not affecting your ability to
22 fund anything one way or another at the moment, because
23 you don't have access to it?
24     A.  But it has affected our ability already.
25     Q.  In the past.

Page 371

1      A.  No.  In the following sense.
2          You know, we always had a deficit, a substantial
3  need for foreign assistance to fund that deficit
4  throughout the period this was litigated -- and, in
5  recent years, actually substantial deficit.
6          And what it meant is that, by not having access
7  to those funds, at least part of them, because they do
8  not all fall in the same category, the point is we had
9  to resort to bank borrowing in order to be able to make
10 end meets.
11         And this is way beyond what banks would -- you
12 know, whatever recourse to the banking system we would
13 have made in the absence of that attachment or the
14 freezing of those assets.
15     Q.  There's no question that getting the money would
16 be a benefit to you.  Getting it unfrozen and handed
17 over would be a benefit.
18         We all agree with that, correct?
19     A.  It definitely would be a benefit because we have
20 substantial liabilities, corresponding liabilities,
21 given the absence from our income stream of the assets
22 frozen.
23     Q.  All I'm doing is agreeing with you.  We're saying
24 it's a benefit if you get the money, correct?
25     A.  It's more than can be reflected by just saying

Page 372

1  it's a benefit.
2      Q.  It's a substantial benefit if you get the money,
3  correct?
4      A.  I certainly believe it would be great relief if
5  those funds were unfrozen, for sure.
6      Q.  But --
7      A.  Not to mention, if I may, that some of those
8  assets actually do not belong to the Palestinian
9  Authority.
10         And I feel very bad about, in particular, for
11 example, Pension Fund money being frozen.  I mean that
12 money belongs to pensioners.
13     Q.  May I suggest that you consider --
14     A.  And if that money does not become available, with
15 the Pension Fund running out of money, it's a liability
16 of the government.  So I mean the tale on this has not
17 really all been written.  That's one.
18         And, secondly, we're talking about substantial
19 sums of money, not only in connection with this case,
20 but other cases.
21         MR. WISTOW:  You know, I just -- you've
22 given me a limited amount of time.  We're trying to
23 accommodate.
24         MR. ROCHON:  I haven't given you a limited
25 amount of time.  The rules give you your time.

Page 373

1          MR. WISTOW:  I don't agree with that.
2      Q.  Is this the kind of cooperation we can expect in
3  future, the way you're responding to my questions?
4          MR. ROCHON:  Objection.
5      Q.  Is it?
6      A.  What do you mean by cooperation?
7      Q.  Withdraw that.
8          MR. ROCHON:  Mr. Prime Minister, don't
9  answer that.
10     Q.  May I suggest, if you feel badly about what's
11 happening with --
12         MR. ROCHON:  Counsel, do you have a
13 question?
14         MR. WISTOW:  Yes.
15         MR. ROCHON:  What is it?
16     Q.  Have you considered, to mollify your feelings
17 about the Palestinian Investment Fund, that somebody
18 goes to court and tells Judge Lagueux, Something's
19 wrong?
20         Have you thought about that?  Yes or no.
21         MR. ROCHON:  Asked and answered.
22     A.  Can you please paraphrase.
23     Q.  I'll withdraw the question.
24         You were talking about deficits --
25     A.  Yes.

Fayyad

Page 374

1  Q. -- that you have. Do you know whether the United
2  States is running a deficit?
3  A. Yes. The United States --
4  Q. Very very substantial?
5  A. Yes.
6  Q. How about Spain?
7  A. I imagine a substantial deficit.
8  Q. How about Greece?
9  A. Yes.
10  Q. How about the UK?
11  A. Yes.
12  Q. How about Italy?
13  A. Okay.
14  Q. How about the European Union?
15  A. What is the point, sir?
16  Q. What?
17  A. What is the point?
18  Q. I don't have to tell you the point. I'm just
19  asking you, doesn't the European Union have all kinds of
20  deficits.
21  A. The Palestinian Authority is not the European
22  Union. Nor is it the United States. The capacity of
23  the United States to run deficits is enormous. Ours is
24  very very limited.
25  Q. Sir -- sir --

Page 375

1  A. No, no. But you're asking me a question with
2  that implication.
3  Q. There is no implication.
4  MR. WISTOW: I'm running out of time. I'm
5  asking that he just answer my questions.
6  A. I am.
7  Q. We're running out of time.
8  All I asked is whether or not the United States
9  has a recession. That's all I asked.
10  A. I am aware that the United States is running
11  deficits, but the United States is not seeking foreign
12  assistance to bridge the gap in its finances. We are.
13  Q. Is the United States borrowing money overseas?
14  A. Borrowing is different from getting grants.
15  Q. Okay. It's a lot better to get grants than to
16  borrow, I suggest to you.
17  The question, sir, is, is the United States --
18  MR. ROCHON: Counsel, is that a question?
19  Q. The question is, is the United States running a
20  deficit.
21  A. It is running a deficit.
22  Q. Okay. That's all I'm asking.
23  A. And it can finance it by borrowing. We cannot
24  borrow.
25  Q. Mr. Fayyad, if you want to come back after I

Page 376

1  finish and clarify, that's fine. I would like to get a
2  straightforward answer to a question.
3  Let me ask you this, sir.
4  A. Yes.
5  Q. We were talking about what kind of growth did you
6  have in your gross domestic product last year. Do you
7  know?
8  A. Seven to eight percent.
9  Q. Seven to eight percent. What was the US --
10  A. Not 78.
11  Q. No. Seven to eight.
12  A. Yes.
13  Q. I heard it.
14  A. In that range, yes.
15  Q. Okay. And do you know, roughly, what the United
16  States was?
17  A. About three percent maybe.
18  Q. How about negative two and a half percent?
19  A. When?
20  Q. Last year.
21  A. That may have been the case.
22  Q. Okay. That's all I'm asking.
23  A. Okay.
24  Q. You're an economist, a Finance Minister. How
25  about the European Union? What did they do in terms of

Page 377

1  their gross domestic product?
2  A. The world went into deep financial crisis during
3  2010 and 2009. There was negative growth in several
4  areas of the world, yes. Okay.
5  Q. That's right. And you had -- the West Bank had
6  seven to eight percent increase in gross domestic
7  product, correct?
8  A. After nearly ten years of recession conditions or
9  outright recession, acting at a very low on the strength
10  of the stimulus.
11  Q. Let me try it one more time.
12  A. Yes.
13  Q. The West Bank had an increase, in 2009, in its
14  gross domestic product of seven to eight percent?
15  A. Correct.
16  Q. Okay. And, actually, that was better than
17  expected, correct?
18  Withdraw the question. I want to move on.
19  A. But you're asking me --
20  Q. I withdraw the question.
21  A. You're asking me questions and I have to answer
22  you analytically. I mean the West Bank --
23  Q. I withdraw the question.
24  A. -- because you're starting from a very weak base.
25  The US economy --

Fayyad

Page 378

1    Q. I am going to ask you to stop.
2        MR. WISTOW: There is no question pending
3  and he's using up my time. I withdrew the question.
4        MR. ROCHON: Certainly, the court
5  reporter --
6    A. If I may just clarify one thing.
7        MR. WISTOW: This is not going to count on
8  my time. This is unconscionable.
9    A. I want to relieve you of that.
10      If you feel that I'm really taking part of your
11 time, I am prepared to offer the amount that you think I
12 am using of your time unproductively.
13      MR. WISTOW: Is that agreeable?
14      MR. ROCHON: We're not going to -- let's --
15      MR. WISTOW: Is that agreeable?
16      MR. ROCHON: We'll deal with it. Just ask
17 your next question.
18      MR. WISTOW: Okay. And I move to strike
19 everything when there was no question pending.
20   Q. Now, you said there were no lawyers that you had
21 availability for who had training in American law.
22      Do you remember that testimony?
23   A. Yes, I did.
24      MR. ROCHON: Objection. Mischaracterizes
25 the testimony.

Page 379

1    A. I did testify to the effect that --
2    Q. You already said, Yes, I did.
3    A. Look, what I said was our lawyers are not well
4  versed in United States law. That was precisely what I
5  said.
6    Q. Do you know any lawyers who are consultants to
7  the PA who were trained as lawyers in the United States?
8    A. I don't know.
9    Q. Do you know who Omar Dajani is?
10   A. I don't believe I know Omar Dajani.
11   Q. Do you know that he's a legal consultant to the
12 PA?
13      MR. ROCHON: Objection. He just said he
14 didn't know him.
15      MR. WISTOW: I'm saying, do you know that.
16 I'm trying to help him.
17   A. I don't know.
18   Q. Do you know a legal consultant named Hiba
19 Husseini?
20   A. I know Hiba Husseini.
21   Q. Where was he trained?
22   A. She is a lawyer.
23   Q. Where was she trained?
24   A. I do not know where she was trained.
25   Q. Well, you said there were none available to you

Page 380

1  who were trained in the United States that were familiar
2  with American law.
3    A. I don't know if she was trained in the United
4  States. I don't know that. I know who she is.
5    Q. Okay. And how about Michael Tarazi?
6    A. I know Michael Tarazi, not that well. But I do
7  not know if he -- I do not know if he's a lawyer, to
8  begin with, much less if he was trained in the United
9  States.
10   Q. Wasn't he a legal consultant to the PA?
11   A. If I remember well, he worked for or at the
12 negotiations support unit. He provided technical
13 support for the negotiations team of the PLO.
14   Q. Was he not a legal consultant?
15   A. I do not know if he was.
16   Q. Was he not trained in the United States?
17   A. I do not know.
18   Q. Okay. Now, you were saying that there's a
19 question about the commitments from donors if you have
20 to pay this.
21      Have you spoken to individual donors,
22 representatives of donor nations, and discussed this
23 issue?
24   A. You know, my sense is, what I described it to be
25 in terms of the chilling impact this would have on

Page 381

1  donors, came from discussions that from time to time
2  happened, including around the time of that donor
3  conference in Paris, on which there was -- which you
4  showed me, in December 2007.
5    Q. Who did you speak to that indicated this would
6  have a chilling effect?
7    A. Representatives of various donors.
8    Q. Who?
9    A. I don't remember individuals per se.
10   Q. How about the countries?
11   A. European Union.
12   Q. There was a representative of the European Union
13 who commented?
14   A. Several of them. When I say European Union,
15 within the European Union, the EU itself as an
16 organization -- the Commission, that is.
17   Q. Yes?
18   A. There were about 80 or 90 members of the
19 international community attending that conference, a
20 large number of European Union countries participating.
21      The total number of countries in the European
22 Union is 27. So there are many of them.
23   Q. Would you name one person, please. Just one --
24   A. I can't.
25   Q. Let me finish the question.

Fayyad

Page 382

1    Would you name one person who indicated to you
2  that there would be a chilling effect if the judgment in
3  this case was paid.  One person.
4    A. I cannot really give you a name.
5    Q. Okay.
6    A. All I can tell you is, based on those discussions
7  that I had and which came up from time to time -- and
8  not only at that donor conference -- my sense is that,
9  you know, it would have a chilling effect on them if
10  they knew effectively their money was going to be used
11  in connection with such payments.
12    Q. So that's your surmise?
13    A. Based on those discussions.
14    Q. But those discussions which you can't identify
15  for me at all --
16    A. You know --
17    Q. -- is that true?
18    A. -- I have lots of discussions.
19    MR. ROCHON: Counsel, stop interrupting.
20    A. I have discussions with donor country
21  representatives on an on-going basis.  We have a very
22  active relationship with the international donor
23  community where all issues of relevance are brought up.
24    And these are periodic.  They happen all the
25  time.  Issues come up.  And I cannot tell you

Page 383

1  individually whom I spoke to, who said to me what when.
2  But I know it's an issue of relevance to them, for sure.
3    Q. I'm not asking you when.  I'm just asking you
4  who.
5    This is a matter of importance to you, isn't it?
6    A. It's a matter of huge importance.
7    Q. And you don't remember one single person you can
8  identify.  Is that true?
9    A. I can tell you --
10    Q. Is that true?
11    A. I can tell you representatives of the EU did
12  raise the issue with me.
13    Now, at this particular donor conference, it
14  doesn't tend to be the same representatives all the
15  time.  I'd have to go back and see who was in attendance
16  at that particular donor conference or meeting to tell
17  you.
18    But I am certain that that sentiment was
19  communicated to me in more form than one.
20    Q. As you sit here now, Mr. Fayyad --
21    A. Yes.
22    Q. -- can you name one person who discussed this
23  with you and indicated it would have a chilling effect?
24  Just one.
25    A. I can't give you --

Page 384

1    Q. Okay.
2    A. -- a name right away.  But it doesn't mean those
3  conversations did not take place.
4    I am here to testify definitely that those
5  discussions came up.
6    Q. Somebody has to decide whether or not your
7  statements are supportable.  I'm trying to find out --
8    A. I'm comfortable with that.  Yes.
9    Q. Fine.
10    You indicated, in response to questions put to
11  you by Mr. Rochon, that you considered it important to
12  defend this case now.
13    A. Yes.
14    Q. And you explained the reasons?
15    A. Yes.
16    Q. Why didn't you defend it earlier?  For example,
17  in 2005, when you were involved?
18    A. As I told you in previous testimony earlier on in
19  this session, that, you know, our position here, in this
20  particular case, in terms of where we are today, has
21  evolved into what it is today, beginning with a position
22  where the defense was -- it's not that the PA or the PLO
23  did not try to defend themselves.  They did.
24    And the strategy that challenged the
25  appropriateness or adequacy in terms of jurisdictional

Page 385

1  issues, in terms of sovereign immunity, I regard that as
2  a line of defense.  I mean it's not true that the PLO
3  did not try to defend themselves.  It was the line of
4  defense that they used.
5    There was evolution away from that, over a period
6  of time, in the direction of seeking an opportunity to
7  have this litigated so it would be an opportunity to
8  defend ourselves against the specific charges made.
9    The way I understand the system is that
10  challenging the jurisdiction in a specific case on a
11  specific submission is a part of the defense.  That's my
12  understanding of it.  I mean it's not --
13    The way I see it, it's not that the PLO did not
14  try to defend itself.  It did, under the strategy that
15  we moved away from over time in an evolutionary way.
16    Q. In fact, you decided to defend it on the merits
17  after you lost in the District Court, in the Circuit
18  Court, in the US Supreme Court, and immediately after
19  Condoleezza Rice said to President Abbas, This judgment
20  is valid and enforceable against all the PLO's and PA's
21  assets in the United States, and she could not do
22  anything about it.
23    And that's when you decided to defend it on the
24  merits.  Isn't that so?
25    MR. ROCHON: Objection.

Page 386

1    Q.  Isn't that so?
2    A.  What you just said, sir, does not seem to be
3  substantiated by the evidence discussed in the course of
4  this deposition.
5       The testimony will show, and statements read and
6  pieces of material evidence cited, strongly indicate
7  that the Palestinian Authority was trying to, in
8  earnest, to find adequate and competent legal
9  representation before that letter by the Secretary of
10  State was sent to President Abbas.
11      Looking for competent legal counsel in order to
12  represent it and to have this litigated on merits, as
13  you say, I mean before the letter from Secretary of
14  State Condoleezza Rice was sent to the President.
15    Q.  But it was a matter of a few months after that
16  letter from Condoleezza Rice that it was decided to do
17  it on the merits.  Isn't that so?
18      MR. ROCHON:  Objection.
19    A.  It is not true, based on testimony actually
20  discussed today and presented today, and material read.
21    Q.  And also --
22    A.  It is clear, and I said, and I repeat, and I
23  know -- and this is substantiated by evidence -- that
24  the PA was definitely seeking to recruit, to employ, to
25  hire, to retain the services of legal counsel in 2006.

Page 387

1       And the letter sent by Secretary of State Rice to
2  President Abbas, that was presented to me which I saw
3  for the first time here at this deposition, was a letter
4  that was sent in January of 2007.
5    Q.  Name one lawyer -- one -- who was contacted by
6  the PLO or PA to come into this case.  Just one.
7      MR. ROCHON:  Asked and answered.
8    A.  I mean I don't know.
9    Q.  Okay.
10    A.  But I know that definitely was the case --
11    Q.  Okay.
12    A.  -- that the PLO was looking in the course of --
13    Q.  Do you know who Demming Sherman is?
14    A.  Pardon me?
15    Q.  Demming Sherman.
16    A.  I don't remember.
17    Q.  He was co-counsel --
18    A.  Oh, okay.
19    Q.  -- in this case.
20    A.  Okay.
21    Q.  Does that ring a bell?
22    A.  Co-counsel?  You mean with Ramsey Clark?
23    Q.  Yes.
24    A.  Possibly.
25    Q.  Possibly?  You don't know that?

Page 388

1    A.  I mean I -- I mean I don't know if Ramsey Clark
2  was working on his own.  He probably had associates,
3  yes.
4    Q.  I'm not talking about associates.  Ramsey Clark
5  was not admitted to practice in Rhode Island.
6    A.  Okay.
7    Q.  He had co-counsel who signed all the pleadings,
8  went to hearings.  Are you aware of that?
9    A.  I'm not aware.  I do not know how the proceedings
10  went.
11    Q.  Okay.
12    A.  All I know is that that was the position taken
13  and that was the submission made by the legal counsel
14  there.
15    Q.  Did anyone contact --
16    A.  Exactly who did it, I don't know.
17    Q.  Did anyone contact Demming Sherman or his firm to
18  see if they would represent the PLO and PA in 2006?
19    A.  That may have been the case.  I do not know.
20    Q.  Anything could have been.  Did you ask?
21    A.  I was not --
22    Q.  Did you ask?
23      MR. ROCHON:  Counsel, counsel, you're just
24  badgering.
25    Q.  All right.  I want to talk about the Mecca

Page 389

1  agreement.
2    A.  Yes.
3    Q.  Okay.  Payments were made, and are to be made,
4  directly for Hamas security forces under the Mecca
5  agreement, are they not?
6    A.  Can you please repeat the question.
7    Q.  Payments are made by the PA, under the Mecca
8  agreement, for Hamas security forces.
9    A.  That's not true.
10    Q.  That's absolutely false?
11    A.  There's not a provision in the Mecca accord that
12  has something specific pertaining to payments to
13  security forces or anything like that.
14    Q.  But there are payments made that end up
15  supporting security forces, aren't there?
16    A.  I mean --
17    Q.  Aren't there?
18    A.  Payments made available -- or donations, donor
19  assistance -- made available to the Palestinian
20  Authority is used to, among other things, pay salaries
21  and wages for PA employees, civilians and security
22  personnel.
23      That's not to say Hamas.
24    Q.  Well, the security personnel in Gaza, yes?
25    A.  Yes.

Fayyad

Page 390

1    Q. Who are they under the control of?
2    A. Palestinian security in Gaza, at the time this
3  all happened --
4    Q. Today.
5    A. Today?
6    Q. Yes.
7    A. I mean they're not working.  Security services
8  who are on our payroll right now are not doing anything.
9  I mean they're not functioning.
10    Q. So you're still sending money into Gaza for
11  security forces?
12    A. Our own.  Our own people.  People on our payroll.
13  They're not working for Hamas.
14    Q. How do you determine that?
15    A. We know that.
16    Q. How do you know that?
17    A. We know that.
18    Q. How?
19    A. If we --
20    Q. How do you know that?
21       MR. ROCHON:  Would you let him answer the
22  question.
23    A. Let me tell you.
24       If we -- as a matter of fact, if you review the
25  record in terms of what we did since 2007, after the

Page 391

1  violent take-over by Hamas in Gaza, you'll find that we
2  had a policy -- and we still do have a policy, standing
3  policy -- on not -- on interrupting, on stopping the
4  payment of anyone who is actually affiliated with Hamas.
5       I mean it's a matter of policy.  And it's
6  challenged.  And it's a point on which we were
7  criticized and continue to be criticized.  But it's
8  standing policy.
9    Q. How do you determine if somebody works for Hamas
10  or not?
11    A. You know, this is not really a large country, and
12  people know each other.  We have our way of knowing.
13       I mean, what I'm really telling you here is
14  something that can be substantiated very easily.
15    Q. How?
16    A. We have -- number one, I mean we have clear
17  decisions on this, Cabinet decisions, decrees and all.
18       Anyone who, as a matter of fact, is involved in
19  working for Hamas after the separation took place, after
20  the violent take-over by Hamas in Gaza, is somebody
21  whose wage payment is interrupted, for certain.
22    Q. All I'm asking you is how you determine, if you
23  know.
24    A. Information.
25    Q. Well, how do you get information?

Page 392

1    A. We get information.  We have access to
2  information.  We know people in Gaza, and we do get
3  reports and we come to that determination.
4       We have a committee set up to review that
5  information consisting of various security branches.
6  They come to a determination, based on reports we
7  receive, as to the authenticity of the information we
8  receive.  And we make the best judgment, determination,
9  as to whether or not somebody's in compliance.
10       Somebody in compliance, the definition of
11  somebody in compliance is someone who is not, even
12  though they're in Gaza, who is not working with Hamas.
13  Most certainly in security.
14    Q. Is there a hearing?  What happens?  How do you do
15  this?
16    A. Those are challenged from time to time.  We look
17  into them again.  We try to verify.  We seek more
18  information.  We try as best we can.
19       And we have been challenged in courts of law on
20  more than one occasion, as a matter of fact.  We defend
21  ourselves on the allegations I described to you.
22       There is something that happened in Gaza, in the
23  summer of 2007, that was a violent take-over of power
24  illegally by Hamas.
25       And, on that basis, people affiliate d with Hamas

Page 393

1  and their military way, clearly, you know, are outside
2  of the law.  And so, therefore, cannot be on our
3  payroll.  That's policy.
4       It's subject to challenge.  It's being challenged
5  in Palestinian courts, and we answer this way.  But I
6  mean it happens all the time.
7    Q. How much money do you send into Gaza each year
8  approximately?
9    A. About $120 million a month for all categories.
10    Q. About $1.4 billion a year?
11    A. About -- yes.  $1.4 billion annually.
12    Q. Okay.
13       MR. WISTOW:  I have nothing further.
14       MR. ROCHON:  Thank you.  This concludes the
15  deposition, correct?  You're done.
16       MR. WISTOW:  Subject to the motions I'm
17  filing.
18       MR. ROCHON:  He will review the transcript,
19  and we can go off the record.
20       THE VIDEOGRAPHER:  Going off the record at
21  12:54.
22       MR. WISTOW:  There is one --
23       MR. ROCHON:  We have to go back on record --
24  I'm sorry --
25       MR. WISTOW:  Please.

Fayyad

Page 394

1    MR. ROCHON:  To ask the witness?
2    MR. WISTOW:  Yes.  I'm just confused about
3    something.
4    MR. ROCHON:  Okay.
5    THE VIDEOGRAPHER:  Back on the record at
6    12:54.
7    MR. WISTOW:  Okay.
8    CONTINUED REDIRECT EXAMINATION BY MR. WISTOW:
9    Q.  Of the $7.4 billion pledged for the three-year
10   period, how much did you actually receive from donors
11   for that three years?
12   A.  Let me just add them up so I can give you a
13   number.
14   2.4 -- I mean I'll just speak out as I do this.
15   Q.  Fine.
16   A.  And I'm talking about budget support, category of
17   assistance called budget support.
18   Q.  I'm not familiar with that.  I'm talking about
19   the payments made by donors to the PA.
20   A.  I know.  If you'd just allow me to work through
21   this because I do not have a ready answer for you.
22   I'm trying to add this up so, in case this is
23   submitted to someone who's familiar with what I'm
24   talking about, they'll know what I'm talking about, and
25   it will be accurate.

Page 395

1    Q.  Fair enough.
2    A.  The category that I'm really adding up now
3    represents the budget -- so-called budget component of
4    donor assistance.  $2.4 billion in 2008, $1.34 billion
5    in 2009, and this year we haven't received it, but it's
6    projected, what we needed out of that $7.4 billion, was
7    $1.24 billion in 2010.
8    Now, let's see.  That adds up to -- eight, ten,
9    three, four, five -- this add up to about $5.08 billion
10   for the three years, emphasizing, as I must, that the
11   figure for 2010 is still a projection.  The year is not
12   up, as you know.
13   In addition to that, you need to add the
14   component of donor assistance that's called development
15   assistance.
16   Q.  Okay.
17   A.  And there was not really much of that in 2008.
18   Maybe about $200 million, something of that order, or
19   maybe even less.  About that much, a little bit more, in
20   2009.  And it's still early in 2010.  This is a lot
21   slower.
22   So maybe, all in all, at least so far in 2007 --
23   from 2008 onwards -- we're talking about maybe $500
24   million, $600 million, for the three years.
25   Q.  So if you add that --

Page 396

1    A.  So $5.6 billion, $5.7 billion.  Something like
2    that.  Something like that.
3    Q.  How much did you ask for?
4    A.  I am emphasizing that what we're really talking
5    about here is something that is in the nature of a
6    projection.
7    Q.  I understand.  How much did you ask for?
8    A.  Probably around that much.
9    Q.  Okay.  Thank you.
10   A.  And -- except that what was promised was supposed
11   to cover not only those areas, but others as well,
12   including money for UNRWA and other such institutions.
13   Q.  How much did you ask for?
14   A.  We asked for this much.
15   Q.  How much?
16   A.  About this much, $5.6 billion.  And what donors
17   pledged was 7.4, and what we're likely to get, from the
18   best figures I gave you, is what I've just added.
19   Q.  Pretty much what you asked for?
20   A.  But it's less than what was pledged.
21   Q.  Fine.
22   A.  And we ended up --
23   MR. ROCHON:  Counsel, the witness is still
24   testifying.  You're welcome to leave.  We're still on
25   the record.

Page 397

1    A.  And we ended up needing more money in 2009 than
2    was projected, because of the war in Gaza.
3    MR. ROCHON:  If I could, Mr. Prime Minister,
4    what's the time, please?
5    THE VIDEOGRAPHER:  12:58.
6    MR. ROCHON:  Thank you.
7    RECROSS-EXAMINATION BY MR. ROCHON:
8    Q.  On the numbers he was just asking you about,
9    Mr. Prime Minister, you mentioned the war in Gaza?
10   A.  Yes.
11   Q.  And how much -- the numbers you'd asked for, the
12   $5.6 billion, that was in 2007.
13   When was the incursion, the war in Gaza?
14   A.  It was late 2008, early 2009.
15   Q.  And, obviously, these numbers could not take into
16   consideration that?
17   A.  Definitely not.  Definitely not.
18   Q.  How much has the PA paid in connection with the
19   war in Gaza, that was not originally budgeted for that?
20   A.  We had to request supplemental, in 2009, in the
21   amount of $300 million.  And that was not the over-all
22   need.  It was just as much money as we thought we might
23   be able to get.  It was substantially below what was
24   required.
25   So, minimally, $300 million additional to what

Fayyad

Page 398

1    was projected before, in addition to the fact that we
2    used less of what was available for other sources.
3        In other words, we diverted or reclassified or
4    recommitted funds that were originally committed for
5    other purposes in order to be able to deal with the
6    immediate needs of our people in Gaza in the immediate
7    aftermath of that war.
8        Q. You were asked questions about the $5.6 billion
9    that you roughly got.
10       Was the 5.6 billion number that was sought, was
11   that money sufficient, as it turns out, to address the
12   deficit shortages or the economic problems faced by the
13   PA?
14       A. No. In addition, there's something I really need
15   to make absolutely clear.
16       Even if we got everything that we were looking
17   for, remember it's foreign taxpayers' money. It's not
18   our money. You know, even if we get everything we're
19   looking for from donors today, I mean it doesn't really
20   mean that we're healthy.
21       I mean we rely on our very existence on donor
22   assistance. And the fact that we're getting it does not
23   mean that we're in good condition. You see what I'm
24   saying?
25       Q. Yes.

Page 399

1        A. Even if we get every penny that we're looking for
2    from donors, it doesn't mean that we're well. We're
3    not. Because we're so reliant on aid.
4        Q. Thank you.
5            MR. ROCHON: I have no further questions.
6            MR. WISTOW: One more.
7    REDIRECT EXAMINATION BY MR. WISTOW:
8        Q. If you settle this case, how much money will you
9    free up?
10       A. With the amount that's frozen?
11       Q. You don't know the amount that's frozen, do you?
12       A. I mean we talked about it. You mentioned the
13   figure before.
14       Q. You don't know the number?
15       A. I don't know with precision how much it is.
16       Q. Do you know what the judgment is today?
17       A. The judgment was $116 million in this particular
18   case.
19       Q. If you're so concerned about it, have you tried
20   to find out if there's interest?
21       A. I mean we're trying to defend ourselves, because
22   I do not believe that we'll be found liable if we get a
23   chance to defend ourselves.
24       Q. Did you hear my question?
25       A. I heard your question, yes.

Page 400

1        Q. It's important to know how much you owe.
2        A. I mean I know that the judgment was $116 million.
3        Q. Have you tried to find out if there's interest
4    that's added to that by law in the United States?
5        A. $116 million is large enough for me.
6        Q. It's good enough. The rest of it's immaterial.
7            MR. ROCHON: Counsel --
8        A. It's not immaterial. It's large enough. I mean
9    I said it's a very large sum of money for us.
10       Q. It's even bigger than you think.
11       A. I didn't say that that's the full extent of what
12   it may be. I said that this is the judgment that was
13   entered at the time it was entered.
14       And, usually, interest accrues and fees accrue to
15   original judgments. I'm generally aware of that. How
16   much precisely it is, I cannot tell you right now. But
17   I know it's large enough.
18       Q. Okay. Thank you.
19           MR. ROCHON: I have no further questions.
20   We can go off the record.
21           THE VIDEOGRAPHER: Going off the record at
22   1:02.
23           (Deposition concluded at 1:02 a.m. Israel
24   time.)
25

Page 401

1            CERTIFICATE OF DEPONENT
2
3        I, SALAM FAYYAD, do hereby certify that the foregoing
4    testimony is true and accurate to the best of my
5    knowledge and belief.
6
7
8
9
10   DATE            SALAM FAYYAD
11
12
13
14   This      day of        , 2010, personally
15   appeared SALAM FAYYAD, and he made oath to the truth of
16   the foregoing answers by him subscribed.
17
18
19
20   Before me,           , Notary Public.
21   My commission expires:
22
23
24
25

Fayyad

Page 402

1          CERTIFICATE OF REPORTER
2          I, Isabelle Klebanow, a Notary Public duly
3     commissioned and qualified, do hereby certify that
4     pursuant to notice, there came before me, on the 28th
5     day of July, 2010, at 4:15 p.m. Israel time, the
6     following named person, to wit:  SALAM FAYYAD, who was
7     by me duly sworn to testify to the truth and nothing but
8     the truth; that he was thereupon carefully examined upon
9     his oath and his examination reduced to writing under my
10    supervision; that this deposition is a true record of
11    the testimony given by the witness.
12         I further certify that I'm neither attorney nor
13    counsel for, nor related to, nor employed by any of the
14    parties to the action in which this deposition is taken
15    and further that I'm not a relative or employee of any
16    attorney or counsel employed by the parties hereto, or
17    financially interested in the action.
18         IN WITNESS THEREOF, I have hereunto set my hand
19    and affixed my seal this 2nd day of August, 2010.
20
21
22
              ISABELLE KLEBANOW
23            NOTARY PUBLIC
24    My commission expires:  8/31/2012
25