No. 09-1778

_____

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

_____

EFRAT UNGAR, *et al.*,

*Plaintiffs-Appellees,*

v.

THE PALESTINE LIBERATION ORGANIZATION, *et al.*,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____

BRIEF FOR APPELLANTS

Mark J. Rochon
(1st Cir. Bar No. 97714)
   *Counsel of Record*
**Miller & Chevalier Chartered**
655 Fifteenth St., N.W.
Washington, D.C. 20005
(202) 626-5800

Deming E. Sherman
(1st Cir. Bar No. 31908)
**Edwards Angell Palmer & Dodge LLP**
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200

September 14, 2009          *Counsel for Defendants-Appellants*

## RULE 26.1 STATEMENT

Defendants-Appellants the Palestinian Authority and Palestine Liberation Organization are not corporations.  There is therefore no parent corporation nor any publicly held corporation that owns 10% or more of their stock.

# TABLE OF CONTENTS

Page

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ................. xi

JURISDICTIONAL STATEMENT ............................................... 1

ISSUE PRESENTED .................................................................. 1

STATEMENT OF THE CASE ...................................................... 2

STATEMENT OF FACTS ........................................................... 11

    A.    Circumstances Leading to the Default Judgment ..................... 11

    B.    The Financial Impact of the Default Judgment ........................ 16

    C.    The PA/PLO's Decision to Engage in the U.S. Litigation Following Request for Guidance from the U.S. Department of State and Subsequent Good Faith Participation in the U.S. Litigation ................................................................ 20

SUMMARY OF THE ARGUMENT .......................................... 23

STANDARD OF REVIEW ...................................................... 25

ARGUMENT .......................................................................... 26

I.    The District Court Abused Its Discretion by Basing Its Denial of the Rule 60(b)(6) Motion on an Incorrect Legal Standard. ................. 26

    A.    The District Court Had Ample Discretion to Grant Relief from the Default Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6). .................................................. 26

    B.    The District Court Applied the Wrong Legal Standard When It Treated Arafat's Refusal to Recognize the Jurisdiction of the U.S. Courts as the Sole, Determinative Factor in Denying the Rule 60(b)(6) Motion ........................................... 29

        1.    First Circuit Precedent Does Not Preclude Relief Here .. 29

2.    Where Extraordinary Circumstances Are Present,
Especially in Cases Involving Foreign Governments,
Courts Have Discretion to Vacate Even Those Default
Judgments that Resulted from Deliberate Conduct
of the Movant.................................................................. 35

3.    Two Other District Courts Vacated Defaults Against the
PA and PLO Despite Finding that the Defaults Were the
Result of Deliberate Conduct ......................................... 40

II.    Taking All of the Relevant Factors Into Account, the PA and PLO
Are Entitled to Relief Under Rule 60(b)(6) ........................................ 43

A.    Foreign and Public Policy Concerns Favor Vacatur ................. 43

B.    Recognition of the Changing PA/PLO Political Dynamics
Favors Vacatur ......................................................................... 48

C.    The Size of the Judgment and Its Impact on the PA/PLO
Favor Vacatur .......................................................................... 49

D.    The PA/PLO's Strong Meritorious Defenses Favor Vacatur .... 51

E.    The Lack of Legally Cognizable Prejudice to Plaintiffs
Favors Vacatur ......................................................................... 54

1.    Neither Arafat's Death Nor the Gaza Situation Creates
Legally Cognizable Prejudice to the Ungars .................. 54

2.    Risk of Asset Flight or of an Unenforceable Judgment
Can Be Addressed by Imposing Conditions on the
Vacatur ........................................................................... 57

CONCLUSION ........................................................................................ 59

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ackermann v. United States*,
340 U.S. 193 (1950)..................................................................28, 33

*Biton v. Palestinian Interim Self-Government Auth.*,
239 F.R.D. 1 (D.D.C. 2006 ) ...........................................................16

*Biton v. Palestinian Interim Self-Government Auth.*,
252 F.R.D. 1 (D.D.C. 2008) ............................................................41

*C.K.S. Eng'rs, Inc. v. White Mountain Gypsum*,
726 F.2d 1202 (7th Cir. 1984)........................................................50

*Carl Marks & Co. v. Union of Soviet Socialist Republics*,
665 F. Supp. 323 (S.D.N.Y. 1987) ..................................................39

*Claremont Flock Corp. v. Alm*,
281 F.3d 297 (1st Cir. 2002) .......................................... 32, 33, 34, 35

*Cmty. Dental Serv. v. Tani*,
282 F.3d 1164 (9th Cir. 2002)........................................................58

*Coon v. Grenier*,
867 F.2d 73 (1st Cir. 1989) ...................................................*passim*

*FDIC v. Francisco Inv. Corp.*,
873 F.2d 474 (1st Cir. 1989) ..........................................................55

*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*,
447 F.3d 835 (D.C. Cir. 2006) ........................................................37

*First Fidelity Bank v. Gov't of Antigua & Barbuda--Permanent Mission*,
877 F.2d 189 (2d Cir. 1989)................................................29, 36, 58

*First Nat'l Bank v. Ryder Truck Rental Inc.*,
Civ. No. 82-0045-B, 1985 U.S. Dist. LEXIS 21565 (D. Me. 1985)..................50

*Gregorian v. Izvestia*,
871 F.2d 1515 (9th Cir. 1989)....................................................................39

*Hester Int'l Corp v. Fed. Republic of Nigeria*,
879 F.2d 170 (5th Cir. 1989)..........................................................37, 40, 50

*Hugel v. McNell*,
886 F.2d 1 (1st Cir. 1989)........................................................................29

*Hutton v. Fisher*,
359 F.2d 913 (3d Cir. 1966)......................................................................50

*Independent Oil & Chem. Workers v. Procter & Gamble Mfg. Co.*,
864 F.2d 927 (1st Cir. 1988)....................................................................26

*Info. Sys. & Networks Corp. v. United States*,
994 F.2d 792 (Fed. Cir. 1993)..................................................................25

*Jackson v. People's Republic of China*,
794 F.2d 1490 (11th Cir. 1986)......................................................29, 37, 38, 39

*KPS & Assos. Inc. v. Designs by FMC, Inc.*,
318 F.3d 1 (1st Cir. 2003)........................................................................55

*Klapprott v. United States*,
335 U.S. 601 (1949)..........................................................................27, 29

*Knox v. PLO*,
230 F.R.D. 383 (S.D.N.Y. 2005)................................................................16

*Knox v. PLO*,
248 F.R.D. 420 (S.D.N.Y. 2008)..........................................................*passim*

*Knox v. PLO*,
628 F. Supp. 2d 507 (S.D.N.Y. 2009) .........................................................42

*Knox v. PLO*,
No.1:03-cv-4466-VM-THK, 2009 U.S. Dist. LEXIS 52610 (S.D.N.Y.
Mar. 26, 2009) ...........................................................................*passim*

*Lawton v. Republic of Iraq*,
No. 02-0474, 2006 U.S. Dist. LEXIS 94335 (D.D.C. Dec. 6, 2006)................49

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988)...................................................................................28

*Lubben v. Selective Service System Local Board*,
453 F.2d 645 (1st Cir. 1972) ...........................................................33, 34, 35

*Magness v. Russian Fed'n*,
247 F.3d 609 (5th Cir. 2001)....................................................................39, 40

*NLRB v. Reg'l Home Care Servs.*,
237 F.3d 62 (1st Cir. 2001) .........................................................................26

*PLO v. Ungar*,
546 U.S. 1034 (2005)....................................................................................7

*Palestinian Monetary Auth. v. Strachman*,
837 N.Y.S.2d 828 (N.Y. Sup. Ct. 2007), *rev'd and remanded*, 873
N.Y.S.2d 281 (N.Y. App. Div. 2009).............................................................18

*Paul Revere Variable Annuity Ins. Co. v. Zang*,
248 F.3d 1 (1st Cir. 2001).....................................................................*passim*

*Plaut v. Spendthrift Farm*,
514 U.S. 211 (1995).....................................................................................27

*Powerserve Int'l Inc. v. Lavi*,
239 F.3d 508 (2d Cir. 2001).........................................................................57

*Practical Concepts, Inc. v. Republic of Bolivia*,
811 F.2d 1543 (D.C. Cir. 1987) ....................................................................37

*Saldana-Sanchez v. Lopez-Gerena*,
256 F.3d 1 (1st Cir. 2001).............................................................................26

*Saperstein v. Palestinian Auth.*,
No. 04-20225-CIV, 2008 WL 4467535 (S.D. Fla. Sept. 29, 2008)...........*passim*

*Seven Elves, Inc. v. Eskenazi,*
    635 F.2d 396 (5th Cir. 1981)..............................................................29, 30, 40, 58

*Sony Corp. v. Elm State Elecs., Inc.,*
    800 F.2d 317 (2d Cir. 1986)............................................................................50

*Strachman v. Palestinian Auth.,*
    No. 10201/2006, 2008 N.Y. Misc. LEXIS 3735 (N.Y. Sup. Ct. 2008).............17

*Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline
    Transp. Co.,*
    953 F.2d 17 (1st Cir. 1992)......................................................................*passim*

*Ungar v. Islamic Republic of Iran,*
    211 F. Supp. 2d 91 (D.D.C. 2002) .......................................................4, 53, 57

*Ungar v. PLO,*
    402 F.3d 274 (1st Cir. 2005) ...............................................................................7

*Estate of Ungar v. Orascom Telecom Holding S.A.E.,*
    578 F. Supp. 2d 536 (S.D.N.Y. 2008) ..............................................................18

*Estate of Ungar v. Palestinian Auth.,*
    No. 05-m-2006 U.S. Dist. LEXIS 27384 (D.D.C. May 9, 2006) .....................19

*Estate of Ungar v. Palestinian Auth.,*
    No. 08-2475-cv, 2009 U.S. App. LEXIS 12758 (2d Cir. June 16, 2009)..........19

*United Coin Meter Co. v. Seabord Coastline R.R.,*
    705 F.2d 839 (6th Cir. 1983)............................................................................58

*United States v. Baus,*
    834 F.2d 1114 (1st Cir. 1987) ....................................................................25, 29

*United States v. Parcel of Land with Building, Appurtenances etc.,*
    928 F.2d 1 (1st Cir. 1991)................................................................................35

*United States v. Schofield,*
    197 F.R.D. 6 (D.D.C. 2000).............................................................................49

*Velazquez-Rivera v. Sea-Land Serv., Inc.*,
   920 F.2d 1072 (1st Cir. 1990) ...................................................................26

## DOCKETED CASES

*Biton v. Palestinian Interim Self-Government Auth.*,
   No. 1:01-cv-00382-RMC-JMF (D.D.C.)...................................................23, 41

*Bucheit v. PLO*,
   No. 1:00-cv-01455-GK (D.D.C.) ....................................................................24

*Gilmore v. Palestinian Interim Self-Government Auth.*,
   No. 1:01-cv-00853-GK-DAR (D.D.C.)......................................................16, 23

*Estate of Klieman v. Palestinian Authority*,
   No. 1:04-cv-01173 (D.D.C.) ...........................................................................23

*Knox v. PLO*,
   No.1:03-cv-4466-VM-THK (S.D.N.Y.) ............................................................9

*Palestinian Authority v. Ungar*,
   No. 8751/08 (S. Ct. of Israel)...........................................................................20

*Estate of Parsons v. Palestinian Auth.*,
   No. 1:07-cv-01847-JR (D.D.C.)..................................................................23, 56

*Saperstein v. Palestinian Auth.*,
   No. 1:04-cv-20225-PAS (S.D. Fla.) .................................................................23

*Shatsky v. Syrian Arab Republic*,
   No. 1:02-cv-02280-RJL (D.D.C.) ..............................................................16, 23

*Sokolow v. PLO*,
   No. 1:04-cv-00397-GBD-RLE (S.D.N.Y.).................................................20, 23

*Strachman v. Palestinian Authority*,
   No. 3:05-mc-208-00-PCD (D. Conn.) ..............................................................19

*Ungar v. Islamic Republic of Iran,*
    Civ. No. 1:00-cv-02606 (D.D.C.) .............................................................52, 53

*Ungar v. Palestinian Auth.,*
    No. 102101/2006 (N.Y. Sup. Ct.).................................................................17

*Estate of Ungar v. Palestinian Auth.,*
    No. 1:00-cv-105-L-DLM (D.R.I.) .................................................................18

*Estate of Ungar v. Palestinian Auth.,*
    No. 1:05-mc-00180-GK (D.D.C.) .................................................................19

## STATUTES

18 U.S.C. § 2333 ..................................................................................................1, 3

18 U.S.C. § 2336 .....................................................................................................3

18 U.S.C. § 2337 .....................................................................................................3

28 U.S.C. § 1291 .....................................................................................................1

28 U.S.C. § 1331 .....................................................................................................1

28 U.S.C. § 1608 .....................................................................................................4

28 U.S.C. § 517 ...........................................................................................9, 45, 48

## MISCELLANEOUS

Fed. R. Civ. P. 60...........................................................................................*passim*

10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2700
    (1998) ......................................................................................................57

11 Charles Alan Wright, et al., *Federal Practice and Procedure* § 2857 (2d
    ed. 1995)..............................................................................................29, 30

Thomas L. Friedman, Op-Ed, *Green Shoots in Palestine*, New York Times, Aug. 4, 2009, http://www.nytimes.com/2009/08/05/opinion/05friedman.html (last visited Sept. 13, 2009) .................................................................................22

http://www.israellawcenter.org/About-Us.html (last visited Sept. 13, 2009) ........20

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The $116 million default judgment at issue in this appeal interferes with the efforts of the Palestinian Authority ("PA") to normalize its relations with the United States and undermines the PA's efforts at institution and state building. Moreover, the $116 million judgment reflects a treble damage award against the PA and Palestine Liberation Organization ("PLO") for a terrorist attack carried out by Hamas extremists, not by individuals acting with the support or under the direction of the PA or PLO.

In denying the PA's and PLO's motion to vacate the default judgment, the district court erroneously focused solely on the "willfulness" of the default and refused to consider the extraordinary circumstances presented by the motion to vacate and the PA/PLO's strong meritorious defenses.  The district court's denial stands in contrast to decisions by two other federal courts, who have granted similar vacatur motions in favor of the PA and PLO.  Given the significance of the issues raised on the appeal to the PA and the to United States' peace-building efforts in the Middle East and the conflict between this denial and the decisions of two other district courts, the PA and PLO should have an opportunity to be heard at oral argument.

## JURISDICTIONAL STATEMENT

This is an appeal from a final order of the district court denying the motion of Defendants the Palestinian Authority (the "PA") and the Palestine Liberation Organization (the "PLO") to set aside a default judgment entered against them. The district court issued its memorandum and order on May 13, 2009. The PA and PLO filed a timely notice of appeal on June 2, 2009.

The district court had federal question jurisdiction under 28 U.S.C. § 1331 because the plaintiffs' claims were brought under 18 U.S.C. § 2333(a). Because the PA and PLO are appealing a final decision of a United States district court, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether the district court applied the incorrect legal standard and thus abused its discretion in denying the PA/PLO's motion to vacate the default judgment where the court (1) focused solely on former PA and PLO head Yasser Arafat's refusal to acknowledge the jurisdiction of the U.S. courts; (2) ignored the good-faith efforts of the current PA and PLO leadership to normalize relations with the United States by participating in the U.S. litigation; (3) disregarded the PA/PLO's substantial meritorious defenses; (4) declined to seek the United States' views of the foreign policy impact of continued enforcement of a $116 million default judgment against the PA and PLO; and (5) failed to consider whether

measures could be taken to alleviate any prejudice to the plaintiffs resulting from the default.

## STATEMENT OF THE CASE

In 1996, members of Hamas shot and killed U.S. national and Israeli resident Yaron Ungar and his Israeli wife Efrat Ungar near Beit Shemesh, Israel as they were traveling home in their car.  Add.3.[1]  There is no dispute that Hamas was responsible for the attack.  *See id.*; JA49.6-49.7.  Nor is there any dispute that, when the attack occurred, Hamas was actively trying to disrupt the Israeli-Palestinian peace process begun a few years earlier with the Oslo Accords, a peace process which led to the creation of the PA and to which the PLO was deeply committed, despite violent opposition from rejectionist groups such as Hamas. *See* JA133; JA141, 144-45.

Following the tragic shooting, Rhode Island attorney David Strachman was appointed Administrator of the Ungars' estates and, in 2000, filed a lawsuit on behalf of the estates.  The Ungars' two children, parents, and siblings also participated as plaintiffs.  *See* Add.3.  The plaintiffs (hereinafter "the Ungars")

---

[1] References to "Add." are to the Addendum to Appellants' brief.  References to "JA" are to the Joint Appendix.  References to "Dkt. No." are to the district court's docket in this action, unless otherwise noted.

brought suit in the U.S. District Court for Rhode Island under the Anti-Terrorism Act, 18 U.S.C. § 2333(a), which provides a cause of action where U.S. nationals are killed or injured abroad in acts of international terrorism.  If a party is found liable, the statute requires an automatic trebling of the damages.  *Id.*  The cause of action may not be pursued under section 2333(a) against foreign states, 18 U.S.C. § 2337(2), nor may it be pursued for injury "by reason of an act of war."  18 U.S.C. § 2336(a).

The Ungars named as defendants the four Hamas members responsible for the attack, Hamas, the PA, the PLO, and various officials of the PA and PLO. Add.2-Add.3.  In the course of the litigation, the district court dismissed claims relating to Efrat Ungar, because she was not a U.S. national, and also dismissed claims against the various individual defendants (including the Hamas members) for lack of personal jurisdiction.  Add.4-Add.5, Add.9.  Yaron's estate, his parents and siblings, and the couple's children remained as plaintiffs.  Hamas, the PA, and the PLO remained as defendants.

The Ungars' first amended complaint offered a variety of theories for subjecting the PA and PLO to liability for a Hamas attack.  In broad terms, the Ungars alleged that the PA and PLO supported and authorized Hamas attacks on Israeli civilians.  *See* JA49.3 - 49.21.  Although the Ungars' Rhode Island action alleged that the PA and PLO supported Hamas in the attack, the Ungars filed a

3

separate lawsuit in the U.S. District Court for the District of Columbia, in which they sought to obtain a default judgment against *Iran* on the theory that Iran and Hamas "were cooperating for purposes of jihad, or violent struggle, *specifically to disrupt the Israel-PLO peace process*." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 94 (D.D.C. 2002) (emphasis added). The Ungars suit against Iran in the District of Columbia continued on an entirely separate track from the suit against Hamas, the PA, and PLO in Rhode Island.[2]

In the Rhode Island action, Hamas did not take any steps to defend. Ultimately, Magistrate Judge Martin recommended that a final default judgment be entered against Hamas and, after three days of testimony at an uncontested hearing, further recommended a damage award of $116,409,123.00. Dkt. No. 183 at 64. The district court adopted these recommendations and entered final judgment in the recommended amount against Hamas on January 27, 2004. Dkt. No. 253.

---

[2] Because Iran is a sovereign state, it was entitled to the protections of Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(e), which provides that, in those instances in which a foreign state is not immune from suit, a foreign state may be held liable by default only if the claimant "establishes his claim or right to relief by evidence satisfactory to the court." The district court in Washington, D.C. denied the Ungars' motion to enter default judgment against Iran because plaintiffs had not sufficiently shown that Iran knowingly and substantially assisted in the Ungars' murder, nor did they establish that the Hamas cell that murdered the Ungars was engaged in a co-conspiracy with Iran to carry out the attack. *Ungar*, 211 F. Supp. 2d at 98-101. However, the court did find that Iran and Hamas were "cooperating for purposes of jihad, or violent struggle, specifically to disrupt the Israel-PLO peace process." *Id.* at 94.

The PA/PLO's defense took a more complicated but only slightly longer path to the same result -- a $116 million default judgment entered in July 2004. The PA/PLO moved to dismiss the complaint in June 2000. Dkt. No. 22. In July 2001, the district court granted in part and denied in part the PA/PLO's motion. The court rejected the PA/PLO's jurisdictional and immunity arguments, but granted the motion to dismiss as to the claims relating to Efrat Ungar and also granted the motion to dismiss for failure to state a claim as to four of the counts in the complaint, though granting the Ungars leave to amend. Dkt. No. 40. The Ungars filed their amended complaint at the end of August 2001. Dkt. No. 41.

It was at this time that the PA/PLO's defense of the litigation veered off the rails. As of August 2001, the PA and PLO had entered a period of instability and upheaval. Palestinians were in the throes of the Second Intifada, an uprising against Israel's occupation of the West Bank and Gaza. As time passed, the uprising became increasingly lawless and violent, with various competing militant groups vying to garner headlines by carrying out attacks on Israeli civilians. Israel struck back, and the cycle of reprisals and counter-reprisals played out on the world stage. *See generally* JA120-25; JA166-67.

By March 2002, the Palestinian-Israeli conflict had escalated to the point that Arafat was under siege at the Muqata'a, the Government headquarters in Ramallah. After repeated Israeli Defense Force incursions and shellings in the

West Bank and Gaza, Arafat's nascent government structures were literally and figuratively in ruins, and his security services were hobbled by targeted assassinations, arrests, and defections to non-government militant groups. *See generally* JA166-67; JA120-25.

Against this backdrop, the PA's and PLO's reaction to being sued in Rhode Island for an attack on Israeli residents by Hamas was inevitably dismissive, hyper-politicized, and infused with a fox-hole mentality.   Represented by activist and U.S. foreign policy critic Ramsey Clark, the PA and PLO intermittently filed briefs in the case arguing that the U.S. courts should not exercise jurisdiction over them and arguing that the case should be dismissed on political question grounds.   With Arafat refusing to recognize the U.S. court's jurisdiction over him, the PA and PLO did not file an answer or participate in discovery.

By 2004, the PA and PLO had exhausted their jurisdictional, immunity and political question defenses and the court's patience.  On March 31, 2004, Magistrate Judge Martin issued a report recommending that a default judgment be entered against the PA and PLO.  Dkt. No. 269.  Ramsey Clark had previously informed the court during an August 22, 2003, hearing that the PA and PLO did not intend to participate in a hearing on damages.  Dkt. No. 226.  Magistrate Judge Martin therefore concluded that the PA and PLO had waived a hearing on damages and recommended applying his damage findings from July 2003 (regarding

Hamas) to the PA and PLO.  Dkt. No. 269.  On July 12, 2004, Judge Lagueux

adopted the report and recommendation, Dkt. No. 279, and entered a final

judgment against the PA and PLO in the amount of approximately $116 million.

Dkt. No. 280.  Four months later, Arafat died in a hospital in France, following an

extended illness.

 Ramsey Clark appealed the entry of the final default judgment on behalf of

the PA and PLO, arguing that the district court erred in disregarding the PA's and

PLO's sovereign immunity claims, exercising personal jurisdiction over them, and

rejecting the non-justiciability (political question) defense.  In 2005, Judges Selya,

Cambell, and Lipez affirmed.  *Ungar v. PLO*, 402 F.3d 274 (1st Cir. 2005).

Writing for the panel, Judge Selya observed that the appeal raised "exceptionally

important questions of justiciability and sovereignty, emblematic of unsettled

political conditions that have plagued the Middle East for many years."  *Id.* at 276.

The Supreme Court denied the PA/PLO's petition for a writ of certiorari.  *PLO v.

Ungar*, 546 U.S. 1034 (2005).

 The PA/PLO's non-defense of the *Ungar* suit and the resulting large damage

award led to a proliferation of lawsuits against them, as well as a number of

enforcement actions related to the *Ungar* judgment.  *See* JA501-04.  In mid-2007,

President Abbas directed Finance Minister and, subsequently also Prime Minister,

Dr. Salam Fayyad to exercise oversight over the PA/PLO's defense of the U.S.

terrorism litigation.  JA110-11.  The PA/PLO retained Washington, D.C. litigation

firm Miller & Chevalier to represent them, with the understanding that the PA/PLO

would actively defend the cases, including by participating in discovery.  *See*

JA109-12.

The PA and PLO then returned to the U.S. District Court in Rhode Island.

On December 28, 2007, new counsel for the PA/PLO filed a motion for relief from

the default judgment.   Dkt. No. 408; JA50-360.  The PA and PLO sought relief

under Federal Rule of Civil Procedure 60(b)(6), which authorizes courts to vacate

final judgments where "extraordinary circumstances" warrant relief.

The PA/PLO began by acknowledging the extraordinary nature of the relief

they were seeking, made no "attempt to condone or justify many of the earlier

actions in this litigation," and indeed expressed "regret" for their 2001-2004

defense of the litigation.  JA53-54.  The motion credited the district court with

having been "extraordinarily patient," and explained that they had returned to the

court "repentant" and "ready and prepared to litigate this matter fully and

responsibly going forward."  JA55-56.

The motion was accompanied by a declaration from Prime Minister Fayyad,

JA109-12, in which he explained the evolution in the PA's and PLO's response to

the litigation and the importance of participating in the U.S. legal proceedings to

the PA's role in the international community.  *Id.*  The PA/PLO also urged the

court to seek the United States' views on whether allowing the PA/PLO another

opportunity to litigate would further the United States' foreign policy interests.

The federal district court in *Knox v. PLO*, No.1:03-cv-4466-VM-THK (S.D.N.Y.),

had asked the United States whether it planned to file a Statement of Interest,

pursuant to 28 U.S.C. § 517, in a similar case in which the PA and PLO had moved

to vacate a $193 million default judgment. *See* JA105-07.[3]  The United States

responded by letter dated February 29, 2008, stating that, although it was not filing

a Statement of Interest in the *Knox* case, it was continuing to monitor *Knox* "and

other cases like it."  JA685.  The letter also stated that the United States "remains

concerned about the potentially significant impact that these cases may have on the

financial and political viability of the defendants."  *Id.*

On April 4, 2008, the district court held a hearing on the motion to vacate.

JA928-69.  Judge Lagueux asked few questions, and his comments to the

PA/PLO's counsel largely focused on Arafat's refusal to recognize the U.S. court's

jurisdiction:  "[Arafat] made a very deliberate choice not to defend this case on the

merits and to put all his eggs in one basket, sovereign immunity.  He made that

---

[3] On March 26, 2008, shortly before the hearing on the PA/PLO's motion to vacate
in *Ungar*, the *Knox* court issued a Decision and Order conditionally vacating the
$193 million default judgment in that case.  JA706-38.

decision, and it was reported right here in open Court by his counsel, Ramsey Clark." JA947 (Tr. at 20:16-20).

A little over a year after the hearing, in May 2009, Judge Lagueux issued his decision denying the motion to vacate. Dkt No. 442. Roughly two-thirds of the decision was devoted to the procedural history leading to the default judgment and the First Circuit's affirmance. *See* Add.1-Add.19. The court's discussion of the merits of the motion was brief and dismissive.

Judge Lagueux interpreted the First Circuit precedent as imposing an absolute bar to relief under Rule 60(b)(6) where a litigant has made a "strategic choice to default." Add.22. According to the district court, "analysis of the prejudice to the plaintiffs and . . . other factors is not determinative to the Court's decision herein because, in the First Circuit, a litigant's strategic choice to default *precludes* a finding of exceptional circumstances under Rule 60(b)(6)." *Id.* (emphasis added). Referring again to Ramsey Clark's "monumental judicial admission that Yasser Arafat had instructed him not to file an answer or defend this case on the merits because Arafat would not recognize the jurisdiction of this or any American court," Judge Lagueux concluded that the PA "must now accept the consequences of these decisions" by its "dictatorial leader." Add.26.

10

## STATEMENT OF FACTS

Because this appeal concerns whether the PA and PLO should be given another opportunity to defend, the facts relevant to the appeal are those relating to (A) the circumstances leading to the default judgment; (B) the impact of the default judgment; and (C) the PA/PLO's decision to engage in the U.S. litigation and ensuing conduct of the U.S. litigation, including in those cases where the courts have vacated defaults or default judgments.

### A.    Circumstances Leading to the Default Judgment

The district court's decision details the procedural history of the default judgment. *See* Add.4-Add.19. The critical period begins with the filing of the Ungars' first amended complaint in August 2001 and ends with Magistrate Judge Martin's March 2004 Report and Recommendation recommending that the district court grant the Ungars' motion for default judgment. *See* Add.5-Add.16. The conduct leading to the default judgment occurred in the 2002 to mid-2003 period, a period that corresponded with a period of intense turmoil in the Palestinian Authority.

A January 27, 2003, letter from the Head of the Permanent Observer Mission of Palestine to the United Nations, Dr. Nasser Al-Kidwa, to Magistrate Judge Martin (JA166-67), and the December 20, 2007, Declaration of Ahmad Abdel-Rahman, former political advisor to President Arafat (JA120-25), provide

11

insight into the PA/PLO's reaction to the litigation and the reasons the fledgling, struggling government was not up to the task of fully participating in the U.S. litigation during the period leading up to the *Ungar* default.

At the beginning of 2002, the Ungars initiated discovery, serving a number of deposition notices on senior Palestinian officials, including Yasser Arafat and his security chiefs, Jibril Rajoub, Muhammad Dahlan, Amin Al-Hindi, and Tawfiq Tirawi. *See* Dkt. Nos. 49-54. Additional discovery, including extensive document requests, followed. *See, e.g.*, JA559-63. In his January 27, 2003, letter to Magistrate Judge Martin, Dr. Al-Kidwa expressed the difficulty of responding to U.S. discovery in the midst of the Second Intifada:

> As you know there has been intense violence throughout occupied Palestine for more than two years. The offices of the PNA in Gaza City have been destroyed. Offices in Ramallah have been attacked and partially destroyed and left under continuing siege. Other offices of both the PNA and the PLO have been damaged. Records have been destroyed, damaged, dispersed and lost. Personnel responsible for record keeping have been separated from their offices and records and unable to perform their assigned tasks. . . .
>
> Government offices and officials cannot work effectively or organize even on matters of extreme urgency.

JA166.

In his Declaration, provided to the district court in support of the Rule 60(b)(6) motion, Ahmad Abdel-Rahman explained the failure, at the institutional level, to respond adequately to the litigation. Mr. Abdel-Rahman was Secretary-

General of the Palestinian Authority Cabinet of Ministers from 1996-2003 and political advisor to President Arafat from 2003 until Arafat's death in November 2004. JA120. Mr. Abdel-Rahman noted that, by 2000, the PA was "still in the beginning stages of developing the sort of institutional structure characteristic of mature governments like that of the United States." JA121. In late 2000, "violence broke out in the region," and, by 2002, the "security situation in the Occupied Palestinian Territories approached lawlessness and anarchy, and the organizational structure of the entire government had deteriorated significantly." *Id.* As Mr. Abdel-Rahman stated, the "upshot of this escalation in violence was the destruction and/or paralysis of many fledgling institutions of the Palestinian governing system." *Id.*

This period of intense turmoil corresponded with the Ungars' efforts to initiate discovery and depose the PA's senior leaders. President Arafat's deposition was noticed for March 18, 2002. Dkt. No. 49. As Dr. Al-Kidwa noted in his letter to Magistrate Judge Martin, "President Arafat has been virtually trapped in the ruins of his office in Ramallah since March of 2002." JA166 Moreover, "[o]ther officials and administrators have had similar difficulties. More than 2100 Palestinians have been killed by the Israeli occupying forces on [PA] soil during the last 28 months, affecting everyone's life." *Id.*

Dr. Al-Kidwa also expressed concern that the scope of the discovery seemed "to be incredibly broad and often unrelated to the claims being made by plaintiffs. Much of it seems politically motivated, and seeks records usually deemed confidential including communications between the PNA, or the PLO with foreign states, even with the United States government." JA166. The fact that the Ungars were suing the PA and PLO for the actions of Hamas and had initiated their discovery by noticing the depositions of President Arafat and the leaders of the PA's security forces did nothing to dispel the PA/PLO's impression that the suits were politically motivated. *See* Dkt. Nos. 49-54.

Of course, some of the PA/PLO's concerns, such as overly burdensome or irrelevant discovery requests, could have been managed by the court. Other concerns, such as any political motivations of the plaintiffs, did not provide a basis for non-participation in discovery. The PA/PLO's lack of an institutional mechanism for responding to overseas litigation and discovery as well as their lack of sophistication about the extraterritorial scope of U.S. jurisdiction contributed to the misguided reaction. That being said, no other foreign government would have agreed to produce its President and security leaders in U.S. litigation during a period of such intense conflict, nor would they produce documents containing law enforcement files or state secrets. Here the combination of an inexperienced

14

government in conflict and discovery requests unprecedented in their intrusiveness proved to be the perfect recipe for default.

By 2004, as Mr. Abdel-Rahman explained, with many of "its buildings and official documents looted or destroyed" by the Israeli Defense Forces, "no permanent institutional structure of Palestinian government existed for handling domestic and foreign legal actions brought against the Palestinian government." JA122. Furthermore, no one within the Palestinian governmental structure had "primary responsibility for monitoring the lawsuits in the United States or keeping records related to those lawsuits, and there was no organizational entity within the Palestinian government that exercised such responsibility." *Id.* In sum, 'there was no institutional structure in place for making critical decisions with respect to [the U.S.] lawsuits." *Id.*

In July 2004, the court entered a $116 million final default judgment against the PA and PLO. Dkt. No. 280. Following the entry of the *Ungar* default judgment, the Ungars' attorneys secured a series of defaults against the PA and PLO on behalf of other plaintiffs. *See Knox v. PLO*, 230 F.R.D. 383 (S.D.N.Y. 2005) (default judgment); *Shatsky v. Syrian Arab Republic*, No. 1:02-cv-02280-RJL (D.D.C.) (Dkt. No. 52) (April 12, 2005, entry of default); *Biton v. Palestinian Interim Self-Government Auth.*, 239 F.R.D. 1, 2 (D.D.C. 2006 ) (referencing November 22, 2005 entry of default); *Gilmore v. Palestinian Interim Self-Gov't*

*Auth.*, No. 1:01-cv-00853-GK-DAR (D.D.C.) (Dkt. No. 93) (January 29, 2007, entry of default). *See also Saperstein v. Palestinian Auth.,* No. 04-20225-CIV, 2008 WL 4467535, at *1 (S.D. Fla. Sept. 29, 2008) (referencing April 20, 2005, entry of default) (the *Saperstein* plaintiff retained the Ungars' attorneys after the default was vacated).

### B.    The Financial Impact of the *Ungar* Default Judgment

In May 2005, following this Court's affirmance of the entry of the default judgment, Judge Lagueux granted the Ungars' request for an injunction prohibiting the PA and PLO from selling, transferring, or disposing of any U.S. assets.  JA422-23.  With virtually no PA or PLO assets in the United States, the Ungars then sought to enforce their judgment by trying to reach assets of third parties they claimed were related to the PA or PLO.  *See* JA501-04 (June 18, 2005, letter from PA Finance Minister Salam Fayyad to Secretary of State Rice describing *Ungar* enforcement actions).

The Ungars' attorney David Strachman annexed a "Notice of Injunction" to Judge Lagueux's May 2005 restraining order and sent it to a number of financial institutions.  The Notice of Injunction, drafted by Mr. Strachman, represented that Judge Lagueux's restraining order applied to "all assets of the PA and the PLO however titled," and asserted that such assets "are held and/or titled under the names" of other Palestinian institutions, including the Palestine Investment Fund,

"Palestinian Pension Fund," and Palestine Monetary Authority. *See Strachman v. Palestinian Auth.*, No. 10201/2006, 2008 N.Y. Misc. LEXIS 3735, at *3-4 (N.Y. Sup. Ct. 2008) (quoting Notice of Injunction).

Following receipt of the Notice of Injunction, Swiss American Securities, Inc., froze over $100 million in securities and debt instruments held in a custodial account belonging to the Palestinian Pension Fund for State Administrative Employees in the Gaza Strip ("Palestinian Pension Fund"). *See id.* at *4. These funds are the subject of an ongoing enforcement action. *Ungar v. Palestinian Auth.*, No. 102101/2006, N. Y. Sup. Ct., County of New York). The Ungars also served the Notice of Injunction on the Bank of New York, who subsequently placed over $30,000,000 of wire transfers relating to the Palestine Monetary Authority (the PA's central bank) in a suspense account, and those funds also are the subject of an ongoing enforcement action. *Palestinian Monetary Auth. v. Strachman*, 837 N.Y.S.2d 828, 832 (N.Y. Sup. Ct. 2007), *rev'd and remanded*, 873 N.Y.S.2d 281 (N.Y. App. Div. 2009).

In an effort to reach the assets of the Palestine Investment Fund ("PIF"), the Ungars initiated a "Creditor's Bill" proceeding in the underlying *Estate of Ungar v. Palestinian Auth.*, No. 1:00-cv-105-L-DLM (D.R.I.) matter. *See* Dkt. No. 370. In September 2006, Judge Lagueux entered a final judgment on the Creditor's Bill. Dkt. No. 381. Although PIF was not a party to either the original *Ungar* action or

the Creditor's Bill proceeding and its assets greatly exceeded the value of the $116 million judgment, Judge Lagueux "assigned, transferred and conveyed" to the Ungars all of the PA's "ownership rights" in PIF and all rights of the PA that are "titled and/or owed to" PIF.  *Id.* at 2.[4]

Having initiated an enforcement action in Connecticut seeking turnover of PIF's interest in a Connecticut-based equity fund ("Canaan"), the Ungars then reappeared in the Connecticut action as the purported new owners of PIF and consented, on PIF's behalf, to the turnover of PIF's assets.  *See Estate of Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536, 540 (S.D.N.Y. 2008) (describing Connecticut litigation involving PIF).  Litigation over ownership and control of PIF as well as whether PIF's interest in Canaan can be used to satisfy a judgment against the PA and PLO are the subject of an ongoing enforcement action in the federal court in Connecticut.  *Strachman v. Palestinian Authority*, No. 3:05-mc-208-00-PCD (D. Conn.). [5]

---

[4] PIF's Consolidated Balance Sheet for December 31, 2006, listed PIF's "Total Assets" as $892,123,850 in 2006.  JA355, JA357.

[5] At the request of Canaan, the district court in Connecticut stayed the enforcement action pending this appeal and any appeal to the Supreme Court.  *Strachman v. Palestinian Authority*, No. 3:05-mc-00208-PCD (D. Conn.) (Dkt. No. 158).  The Ungars' appeal of that stay was dismissed.  *Estate of Ungar v. Palestinian Auth.*, No. 08-2475-cv, 2009 U.S. App. LEXIS 12758 (2d Cir. June 16, 2009).  No other *Ungar* enforcement actions are stayed.

The Ungars succeeded in obtaining the turnover of funds of the PLO Mission to the United States on deposit at Wachovia Bank, *see Estate of Ungar v. Palestinian Auth.*, No. 05-mc-180 (GK), 2006 U.S. Dist. LEXIS 27384, (D.D.C. May 9, 2006), significantly interfering with the mission's ability to operate. *See* JA505-06 (April 27, 2006 letter from head of PLO Mission to the Untied States to Secretary of State Rice). The Ungars' writ of attachment relating to $70 million in humanitarian aid from the League of Arab States to the PA was dismissed in April 2007, following the United States' submission of a Statement of Interest. *See Estate of Ungar v. Palestinian Auth.*, No. 1:05-mc-00180-GK (D.D.C.), Dkt. Nos. 74, 84.

Finally, the Ungars domesticated their judgment in Israel. On August 31, 2008, the Jerusalem District Court issued a decision finding that the *Ungar* judgment is enforceable in Israel. *See Knox v. PLO*, No.1:03-cv-4466, 2009 U.S. Dist. LEXIS 52610, at *11-12 (S.D.N.Y. Mar. 26, 2009). The PA has appealed to Israel's Supreme Court. *Palestinian Auth. v. Ungar*, No. 8751/08 (S. Ct. of Israel). The Jerusalem District Court stayed the enforcement of the judgment pending appeal but required the monthly attachment by Israel of approximately $4.5 million in tax transfer revenue due the PA, with the funds to be deposited in an account of the Israeli Treasury. *See Knox*, 2009 U.S. Dist. LEXIS 52610, at *32.

In sum, as a result of the $116 *Ungar* default judgment, the Ungars have (1) attached $100 million of assets of the Palestinian Pension Fund, (2) attached over $30 million of Palestine Monetary Assets and interfered with its ability to clear U.S. dollar denominated transactions, (3) attempted to exert control over the Palestine Investment Fund; (4) intercepted donor funds from the League of Arab States; (5) interfered with the operations of the PLO's office in the United States; and (6) obtained monthly attachments in Israel of $4.5 million in PA tax transfer revenue. In addition, the U.S. and Israel-based attorneys for the Ungars have brought numerous other suits against the PA and PLO in both the U.S. and Israel. *See supra* pp. 15-16; *see also Sokolow v. PLO*, No. 1:04-cv-00397 (S.D.N.Y.) (seeking $3 billion in damages after trebling for seven separate incidents); *http://www.israellawcenter.org/About-Us.html* (last visited Sept. 13, 2009) (describing efforts to "bankrupt" organizations such as the Palestinian Authority "one lawsuit at a time").

### C.    The PA/PLO's Decision to Engage in the U.S. Litigation Following Request for Guidance from the U.S. Department of State and Subsequent Good Faith Participation in the Litigation

In late 2006, President Abbas sent a letter to then Secretary of State Condoleeza Rice requesting guidance with respect to the ongoing Anti-Terrorism Act litigation. *See* JA424. Secretary Rice replied to President Abbas's inquiries

by a letter dated January 12, 2007, encouraging Defendants to "respond to U.S. legal proceedings in good faith and a timely manner." *Id.*

Shortly thereafter, President Abbas asked then Finance Minister Salam Fayyad to manage the PA/PLO's involvement in the U.S. litigation. As Finance Minister, Dr. Fayyad had received praise from the international community for his efforts to bring economic reform and greater financial transparency to the PA. *See* JA341, JA344 (praise for Dr. Fayyad's efforts from President Bush). As Prime Minister, Dr. Fayyad continues to receive praise for his efforts at security sector reform and building the institutions necessary for a viable Palestinian state. *See* JA309-10 (July 16, 2007, speech by President Bush); JA688 (December 17, 2007, remarks by Secretary of State Rice); *see also* Thomas L. Friedman, Op-Ed, *Green Shoots in Palestine*, New York Times, Aug. 4, 2009.[6]

Viewing participation in the U.S. litigation as important to the PA's efforts at establishing itself as a responsible, viable member of the community of nations, Prime Minister Fayyad responded to Secretary Rice's letter by "retain[ing] new counsel for the PA and PLO to handle all of the United States lawsuits." *See* JA111. Prime Minister Fayyad then instructed new counsel that the PA and PLO "will participate fully in this and other litigation, in a cooperative manner,

---

[6] http:www.nytimes.com/2009/08/05/opinion/05friedman.html (last visited Sept. 13, 2009).

21

including complete participation in the discovery process" and "further instructed

new counsel to transmit this commitment to the United States courts." *Id.*

     In his declaration, Prime Minister Fayyad provides his personal commitment

to "sustain this instruction throughout the effort to litigate these cases." *Id.* Prime

Minister Fayyad informed the district court:

> It is my belief that there are meritorious defenses to the claims
> brought in the United States and it is important to the PA to present
> those defenses. Moreover, it is important to the PA's role in the
> international community to participate in the legal process, even when
> it is process brought in the United States for actions by others that
> occurred far from the United States. The importance of this was not
> fully appreciated by the PA government, as a whole, until recently.
> Now we can act on that understanding, and we therefore seek to
> contest this litigation, fully and responsively.

*Id.* at 111-12.

     Now, two years after retaining new counsel, the PA and PLO have

established through their actions their commitment to litigate and their respect for

the U.S. litigation process. Of the nine Anti-Terrorism Act cases that have been

brought against the PA and PLO in the United States, they are actively

participating in discovery in four cases. *See Saperstein v. Palestinian Auth.,* No.

1:04-cv-20225-PAS (S.D. Fla.); *Estate of Klieman v. Palestinian Auth.*, No. 1:04-

cv-01173 (D.D.C.); *Estate of Parsons v. Palestinian Auth.*, No. 1:07-cv-1847

(D.D.C.); *Sokolow v. PLO*, No. 1:04-cv-00397 (S.D.N.Y.). Motions to vacate are

pending in another two: *Shatsky v. Syrian Arab Republic*, No. 1:02-cv-02280

(D.D.C.); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, No. 1:01-cv-00853

(D.D.C.). In December 2008, a voluntary dismissal with prejudice was entered in

*Biton v. Palestinian Interim Self-Government Auth.*, No. 1:01-cv-00382 (D.D.C.)

(Dkt. No. 115). The remaining two cases are the instant case and the *Knox* case, in

which the PA/PLO participated in extensive discovery over their assets in

connection with litigation over the amount of the vacatur bond. *See Knox*, 2009

U.S. Dist. LEXIS 52610.[7]

## SUMMARY OF THE ARGUMENT

In denying Defendants' motion to vacate the default judgment, the district

court abused its discretion by applying the wrong legal standard. The court looked

to a single factor (namely, the deliberate PA/PLO actions giving rise to the

default), when instead Rule 60(b) requires a consideration of the movant's

meritorious defenses and Rule 60(b)(6) additionally requires consideration of

---

[7] In addition, in mid-2008, the PA/PLO satisfied an outstanding judgment against them in a commercial dispute, *Bucheit v. PLO*, No. 1:00-cv-01455 (D.D.C.). *See* JA1005-10. In *Saperstein*, the PA/PLO satisfied the conditions imposed by the court for vacatur, which included the payment of plaintiff's costs and attorneys fees associated with the default. *See* JA1021, JA1052. When alerted by the Ungars' counsel that court costs associated with the earlier appeal to this Court remained unpaid, *see* the Ungars' Opposition to the PA/PLO's Motion for Enlargement at 2 (1st Cir. Aug. 14, 2009), the PA/PLO subsequently remitted the amount due to the Ungars' counsel.

multiple factors relating to whether extraordinary circumstances are present meriting relief.

The district court erroneously concluded that its sole-factor approach was supported by First Circuit precedent when, in fact, the First Circuit requires, at the least, consideration of meritorious defenses.  Moreover, the district court's decision conflicts with the approaches taken by two other district courts, which granted the PA/PLO's motions for vacatur in related Anti-Terrorism Act lawsuits.  In those cases, the district courts concluded that vacatur was justified notwithstanding the willfulness of the PA/PLO's actions giving rise to the defaults.

Here, relevant factors weighing in favor of vacatur include:  the PA's status as a foreign government, the public policy implications of having a terrorism lawsuit against the PA and PLO resolved through a default judgment rather than on the merits, the size of the judgment, the potential impact of the judgment on the political and financial viability of the PA, the PA/PLO's strong meritorious defenses, and the their commitment to litigate the case on the merits as part of their efforts to further normalize relations with the United States.  When all of these factors are taken into account, the interests of justice dictate that the PA/PLO be given another opportunity to defend.

## STANDARD OF REVIEW

A district court's decision to deny relief under Rule 60(b)(6) is reviewed for abuse of discretion. *United States v. Baus*, 834 F.2d 1114, 1121 (1st Cir. 1987) (reversing denial of motion under Rule 60(b)(6)). Because of the strong policy interests favoring disposition of cases on the merits, "[w]hen a court has denied a party's motion to be relieved from default judgment, a 'glaring abuse' of discretion has not been required for reversal of a court's refusal to relieve a party of the harsh sanction of default." *Info. Sys. & Networks Corp. v. United States*, 994 F.2d 792, 795 (Fed. Cir. 1993) (citations and internal quotation marks omitted); *see also Velazquez-Rivera v. Sea-Land Serv., Inc.*, 920 F.2d 1072, 1079 (1st Cir. 1990) ("abuse of discretion does not need to be glaring to justify reversal" of dismissal for failure to prosecute) (citations omitted).

A district court abuses its discretion if its decision is based on an incorrect legal standard. *See Saldana-Sanchez v. Lopez-Gerena*, 256 F.3d 1, 8 (1st Cir. 2001); *NLRB v. Reg'l Home Care Servs.*, 237 F.3d 62, 67 (1st Cir. 2001). Abuse of discretion also "'occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.'" *Coon v. Grenier*, 867 F.2d 73, 78 (1st Cir. 1989) (reversing denial of motion to set aside entry of default where the district court disregarded or failed to

make findings on several factors relevant to the vacatur) (quoting *Indep. Oil &*

*Chem. Workers v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir. 1988)).

## ARGUMENT

**I.    The District Court Abused Its Discretion by Basing Its Denial of the Rule 60(b)(6) Motion on a Single Factor.**

A district court abuses its discretion when it applies the wrong legal

standard, ignores material factors, or applies improper weight to certain factors.

Here, all these errors converge.  In considering whether to grant relief under Rule

60(b)(6), the district court applied the incorrect legal standard when it treated a

single factor as dispositive and disregarded all other relevant factors.  Specifically,

the district court erroneously interpreted First Circuit precedent as creating an

absolute bar to Rule 60(b)(6) relief from a default judgment where the default

resulted from earlier deliberate choices of the litigant.  First Circuit precedent does

not create such a rule, and other jurisdictions which have considered

"extraordinary circumstances" comparable to those presented here have granted

relief even from deliberate defaults.

**A.    The District Court Had Ample Discretion to Grant Relief from the Default Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6).**

In seeking to vacate the final default judgment, the PA and PLO invoked

Federal Rule of Civil Procedure ("Rule") 60(b)(6).  Rule 60(b) "invested the

federal courts, in certain carefully delimited situations, with the power to 'vacate

26

judgments whenever such action is appropriate to accomplish justice.'" *Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transport. Co.* ("*Superline*"), 953 F.2d 17, 19 (1st Cir. 1992) (quoting *Klapprott v. United States*, 335 U.S. 601, 614-15 (1949)). *See also Plaut v. Spendthrift Farm*, 514 U.S. 211, 233-34 (1995) (Rule 60(b) confirms the courts' longstanding "inherent and discretionary power . . . to set aside a judgment whose enforcement would work inequity.").

Rule 60(b) lists six reasons justifying relief from a final judgment. If the motion is filed within one year of the entry of the final judgment, the district court may vacate the judgment for reasons of "mistake, inadvertence, surprise, or excusable neglect" (Rule 60(b)(1)), "newly discovered evidence" (Rule 60(b)(2)), or "fraud . . . , misrepresentation, or misconduct by an opposing party" (Rule 60(b)(3)). The other three reasons -- "the judgment is void" (Rule 60(b)(4)), the "judgment has been satisfied, released or discharged" (Rule 60(b)(5)), and "any other reason that justifies relief (Rule 60(b)(6)), are not subject to the one-year time limit. *See* Fed. R. Civ. P. 60(c).

Rule 60(b)(6), at issue in this case, "grants federal courts broad authority to relieve a party from a final judgment 'upon such terms as are just,' provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health*

*Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988).  Thus, a district court may grant relief even though more than one year has passed since the entry of the final judgment and even though the moving party cannot establish mistake, excusable neglect, fraud, misrepresentation, or newly discovered evidence.

Courts have interpreted Rule 60(b)(6)'s "any other reason justifying relief" language as generally requiring "extraordinary circumstances."  *Ackermann v. United States,* 340 U.S. 193, 199 (1950).  In *Superline*, this Court noted the additional requirements that the motion not prejudice the opposing party, and that the moving party establish that a meritorious defense exists so that vacating the judgment would not be an empty exercise.  953 F.2d at 19-20.

Although the "extraordinary circumstances" standard, by its very terms, is unlikely to be met in most circumstances, Rule 60(b)(6) does not create an unattainable standard.  Indeed, "it is well settled that Rule 60(b)(6) allows a district judge to grant relief when equitable considerations so counsel." *Hugel v. McNell*, 886 F.2d 1, 6 (1st Cir. 1989).  Rule 60(b)(6) relief thus is not merely of theoretical availability; courts from a variety of circuits have endorsed vacatur of final judgments applying this standard.  *See, e.g., Klapprott*, 335 U.S. at 614-15; *United States v. Baus*, 834 F.2d 1114, 1123 (1st Cir. 1987); *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986); *First Fidelity Bank v. Gov't of Antigua & Barbuda--Permanent Mission*, 877 F.2d 189 (2d Cir. 1989).

Rule 60(b)(6) relief is not limited to judgments resulting from defaults, but courts justifiably have construed the requirements of Rule 60(b)(6) more liberally when a party seeks relief from a default judgment. *See* 11 Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 2857 at 257 (2d ed. 1995) ("The cases calling for great liberality in granting Rule 60(b) motions, for the most part, have involved default judgments."). This is because "[t]here is much more reason for liberality in reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits." *Id.* at 257-58. As stated by the Fifth Circuit,

> [A]lthough the desideratum of finality is an important goal, the justice-function of the courts demands that it must yield, in appropriate circumstances, to the equities of the particular case in order that the judgment might reflect the true merits of the cause.

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401(5th Cir. 1981). *Accord Superline*, 953 F.2d at 19 (Rule 60(b)(6) "must be construed so as to recognize the desirability of deciding disputes on their merits").

**B.    The District Court Applied the Wrong Legal Standard When It Treated Arafat's Refusal to Recognize the Jurisdiction of the U.S. Courts as the Sole, Determinative Factor in Denying the Rule 60(b)(6) Motion.**

1.    *First Circuit Precedent Did Not Preclude Relief Here.*

In denying the PA/PLO's motion, the district court focused on one factor and one factor only: the PA/PLO's purported deliberateness in causing the default.

29

According to the district court:  "analysis of the prejudice to plaintiffs and the other *Superline* factors is not determinative to the Court's decision herein because, in the First Circuit, a litigant's strategic choice to default *precludes* a finding of exceptional circumstances under Rule 60(b)(6)."  Add.22 (emphasis added).

The three First Circuit cases cited by the district court, do not, however, create a rule that Rule 60(b)(6) precludes relief from judgments resulting from deliberate defaults even in the presence of extraordinary circumstances.  The first case on which the district court relied, *Paul Revere Variable Annuity Insurance Co. v. Zang*, 248 F.3d 1 (1st Cir. 2001), is not even a default judgment case, and states only that "ordinarily" Rule 60(b)(6) cannot be used to relieve parties from deliberate choices made as part of a litigation strategy.  *See id.* at 6.

*Paul Revere* involved a breach of contract claim brought against multiple parties.  After a district court determined that the claim was subject to arbitration as a result of the plaintiffs' relationship with one of the defendants, plaintiffs voluntarily dismissed that defendant and sought vacatur of the order compelling arbitration under Rule 60(b)(6).  This Court affirmed the district court's denial, concluding that "[t]he reasons for relief advanced by [plaintiffs] are not so compelling as to require the district court to grant their Rule 60(b) motion."  *Id.*  In fact, the plaintiffs did not establish any "extraordinary circumstances," but instead simply stated their position "that the fact that the only petitioner with standing

under the NASD Code to compel arbitration[] is no longer party to the case justifies relief from the arbitration order issued by the district court." *Id.* at 5.

As the First Circuit explained, the case involved "strategic decision made by parties in an attempt to obtain a benefit from a particular ruling; when the court issued a contrary order, those parties attempted to reverse course and get the district court to reach a different result under Rule 60(b)." *Id.* at 2. It was in this context that the First Circuit stated: "*Ordinarily*, the discretionary power granted by Rule 60(b)(6) is not for the purpose of relieving a party from such 'free, calculated, and deliberate' choices made as part of a strategy of litigation." *Id.* at 6 (emphasis added).

The second case cited by the district court, *Claremont Flock Corp. v. Alm*, 281 F.3d 297 (1st Cir. 2002), though involving a motion to vacate a default judgment, also is inapposite. In *Claremont*, a pro se defendant filed an "Answer" in the form of a letter to the court. The defendant then took no further action in the litigation, and a default judgment was entered against him in the amount of $250,000. *Id.* at 298. In seeking Rule 60(b)(6) relief, the defendant argued that, after changing his residence, he did not receive any of the court orders, motions, correspondence, or discovery requests mailed to him at a prior address. He took no action to monitor the litigation because he understood his letter to the court to have ended the litigation. *Id.* at 298-99. Concluding that the default was attributable to

31

the defendant's "own negligence and not to extraordinary circumstances beyond the party's control," the district court held that the motion must be characterized as one seeking relief under Rule 60(b)(1) for excusable neglect. *See id.* at 300. Because the one-year statute of limitations for a motion under Rule 60(b)(1) had passed, the district court further concluded that such a motion was time-barred. *Id.* The First Circuit affirmed.

The third case on which the district court relied is *Lubben v. Selective Service System Local Board*, 453 F.2d 645 (1st Cir. 1972). *Lubben*, like *Paul Revere*, does not involve a motion to vacate a default judgment. During the Vietnam War, Lubben, a graduate student, sued the local draft board, and obtained a permanent injunction precluding his induction until the local board complied with certain conditions. The draft board appealed, but then stipulated to the dismissal of the appeal. Subsequently, the First Circuit ruled in the local draft board's favor in a similar case. Relying on the First Circuit decision, the local draft board then sought to vacate the *Lubben* injunction. The district court granted the motion to vacate, and the First Circuit reversed. The appellate court held that, "in all but exceptional circumstances," the failure to prosecute an appeal will bar relief" under Rule 60(b)(6).

Similarly, the *Ackermann v. United States* Supreme Court decision cited by the district court (Add.24-Add.25) also involves a failure to file an appeal

following an adverse decision on the merits, not a default judgment.  And, like *Claremont*, *Ackermann* involves a Rule 60(b)(1) motion dressed up as a Rule 60(b)(6) motion to avoid the one-year time limit.  340 U.S. 193 (1950).  The Supreme Court did not create an iron-clad rule prohibiting any Rule 60(b)(6) relief where the movant seeks relief from their own deliberate choice:  the Court held only that, in the facts of that case, "[n]either the circumstances of petitioner nor his excuse for not appealing is so extraordinary as to bring him within . . . Rule 60(b)(6)."  *Id.* at 202.

These cases do not support the district court's decision that the PA/PLO's initial decision to not file answers or participate in discovery precluded consideration of the extraordinary circumstances presented in their Rule 60(b)(6) motion.  Two of the three First Circuit cases were not default judgment cases, and thus did not warrant the more liberal approach to Rule 60(b)(6) accorded such cases, and the movant in the third case was treated as seeking relief under Rule 60(b)(1).  Thus, *none* of the cases involved the situation presented here -- a Rule 60(b)(6) motion to vacate a default judgment.

Moreover, there was not even a whiff of an "extraordinary circumstance" in the cases on which the district court relied.  *Paul Revere*, *Claremont*, and *Lubben* were not high-stakes cases, either in terms of the amounts at issue or the nature of the dispute.  The movant in *Claremont*, who was seeking to vacate a $250,000

default judgment, had the most at stake.  The movants in *Paul Revere* were left with pursuing their claims through arbitration, and the local draft board in *Lubben* lost only one potential inductee.  Both the financial and reputational stakes are dramatically greater here -- a $116 million default judgment against the Palestinian Authority premised on the allegation that the PA and PLO supported Hamas terrorists.  This is not a garden variety breach of contract or administrative agency dispute, but rather a case that goes to the heart of the ongoing Israeli-Palestinian conflict and threatens to create further financial hardship for a government "deeply in debt and reliant on the international donor community to fund basic operations." *Knox v. PLO*, No. 1:03-cv-4466, 2009 U.S. Dist. LEXIS 52610, at *29 (S.D.N.Y. Mar. 26, 2009).

Finally, the deliberate decisions at issue in the three First Circuit cases were materially different those at issue here.  Add.26.  Withdrawing an appeal (*Claremont*), initiating a suit against a party covered by a mandatory arbitration provision (*Paul Revere*), and essentially ignoring a lawsuit (*Lubben*) are materially different kinds of choices than the PA/PLO's initial conclusion, made from the rubble of the Muqata'a, that participation in intrusive U.S. discovery was both unachievable and contrary to the PA's national or security interests.

In sum, the First Circuit cases cited by the district court do not support the sole-factor approach to Rule 60(b)(6) and such an approach is, in fact, at odds with

other First Circuit authority.  Specifically, in *United States v. Parcel of Land with Building, Appurtenances etc.*, 928 F.2d 1 (1st Cir. 1991), the court stated: "we must recognize that the merits of the case *inevitably* come into the picture when a Rule 60(b)(6) motion is considered.  In exercising its discretion under Rule 60(b), the district court *must look*, *inter alia*, to whether the party seeking relief has a potentially meritorious claim or defense." *Id.* at 6 (emphasis added).  *Coon v. Grenier*, 867 F.2d 73, 77 (1st Cir. 1989) (reversing the district court's denial of a Rule 55(c) vacatur motion for abuse of discretion where district court failed to take into account the movant's meritorious defenses).  Here, the district court did not examine the PA/PLO's meritorious defenses, nor did it consider any of the other factors relevant to the Rule 60(b)(6) analysis.

> 2.    *Where Extraordinary Circumstances Are Present, Especially in Cases Involving Foreign Governments, Courts Have Discretion to Vacate Even Those Default Judgments that Resulted from Deliberate Conduct of the Movant.*

The district court's single-factor approach stands in stark contrast to the approaches taken by other courts that have considered cases involving default judgments against foreign governments.  These cases demonstrate that the liberal application of Rule 60(b)(6) to default judgments is amplified in cases involving a foreign government.  Indeed, "[c]ourts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside."

*First Fidelity Bank v. Gov't of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989).

The enhanced concern over default judgments involving foreign governments stems in part from a recognition that such default judgments may affect the United States' foreign relations.  As stated by the U.S. Court of Appeals for the District of Columbia Circuit:  "Intolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework."  *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo,* 447 F.3d 835, 838-39 (D.C. Cir. 2006).

Other courts have similarly noted the potential impact of default judgments on the United States' foreign relations, generally, and the importance of resolving disputes involving foreign governments on their merits:

> It is in the "interest of United States' foreign policy to encourage foreign states to appear before our courts in cases brought under the FSIA.  When a defendant foreign state has appeared and asserts legal defenses, albeit after a default judgment has been entered, it is important that those defenses be considered carefully, and if possible, that the dispute be resolved on the basis of *all* relevant legal arguments."

*Hester Int'l Corp v. Fed. Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989)

(quoting *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551-52

(D.C. Cir. 1987)).

This greater willingness to vacate default judgments against foreign

governments applies even where the default was the result of a deliberate choice.

In *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986), for

example, the Eleventh Circuit affirmed a Rule 60(b)(6) vacatur of a default

judgment against the People's Republic China ("PRC") despite the PRC's

deliberate refusal to participate in the district court litigation for years.  *Id.* at

1492.  Representatives from the State Department urged the PRC to participate in

the litigation, but, in light of its belief that international law controlled the

immunity inquiry, the PRC continued to avoid participation in the case.

Almost four years after the complaint was filed, the district court entered a

default judgment of more than $41 million dollars against the PRC.  *Id*.  The

district court subsequently granted the PRC's vacatur motion.  The Eleventh

Circuit affirmed vacatur, holding that the district court had properly afforded

substantial weight to "the foreign policy implications of the default judgment" and

the PRC's meritorious defense.  *Id.* at 1496.  The Eleventh Circuit also found that

the PRC was entitled to equitable relief despite its threats to take "corresponding

measures" in response to the enforcement litigation.  *Id.* at 1496-97.

While recognizing that the PRC's decision not to participate in the litigation gave rise to the default judgment against it, the Eleventh Circuit did not conclude that this fact was dispositive.  Rather, the court additionally considered the potential implications of the judgment to the United States' foreign policy interests in China and around the world.  Noting that the judgment had been raised at several meetings between U.S. officials and Chinese leader Deng Xiaoping, the court agreed that the judgment was a "serious matter and a major irritant in bilateral relations" and accordingly that the existence of extraordinary circumstances warranted vacatur of the default judgment.  *Id.* at 1495.

Similarly, in *Gregorian v. Izvestia*, 871 F.2d 1515, 1523 (9th Cir. 1989), the Ninth Circuit held that a district court abused its discretion by denying a Russian ministry's motion to set aside a default judgment.  The district court had based its decision on a finding that the defendants had been "culpable" in the default because they had refused to participate in the litigation, instead resting on claims of sovereign immunity.  Citing *Jackson*, the Ninth Circuit reversed, concluding that the defendant's "reasonable belief that it is immune from suit" should not preclude relief under Rule 60(b)(6).  *Id.* at 1525.  *Carl Marks & Co. v. Union of Soviet Socialist Republics*, 665 F. Supp. 323, 331-32 (S.D.N.Y. 1987), is to the same effect.  In *Marks*, the District Court for the Southern District of New York vacated a default judgment entered against the Soviet Union after four years of extensive

damages litigation in which the USSR knew about but intentionally refused to participate despite significant efforts by the Court. *Id.* at 330-32.

A more recent example of these principles can be found in *Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001). There, the Russian Federation appeared at the initial stages of the litigation to contest a temporary restraining order. After the district court denied the TRO, the Russian Federation avoided service of process and did not appear in later proceedings. The district court entered a default judgment for $234.5 million and refused to vacate the default based on the defendants' actual notice of the litigation and participation in the TRO proceeding. The Fifth Circuit found that vacatur was required as a matter of law under Rule 60(b) in light of a number of factors, including the underlying merits of defendants' legal claims and "the diplomatic implications of this case." *Magness*, 247 F.3d at 618.[8]

The liberal application of Rule 60(b)(6) to foreign governments is further highlighted in *Hester*, 879 F.2d at 174-75. There, the judgment against Nigeria had resulted *from a trial on the merits*, during which Nigeria had willfully chosen "not [to] present any of the numerous defenses available to it." *Id.* at 174. The

---

[8] Although *Magness* appears to have been decided under Rule 60(b)(3) or 60(b)(4), the court applied a multi-factor test applicable to all "Rule 60(b)" motions, pursuant to *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401-02 (5th Cir. 1981). *Magness*, 247 F.3d at 618-19.

Fifth Circuit nonetheless affirmed the grant of vacatur, citing the size of the judgment and the foreign policy considerations of enforcing it. *Id.* at 175.

Appellees will emphasize that these cases involve sovereign nations. This is inevitable given that foreign policy concerns almost uniformly arise in the context of sovereign nations. But the cases themselves describe foreign policy interests more broadly, and do not purport to limit their application to cases involving sovereign nations or defenses of sovereign immunity. The rationale supporting vacatur in those cases applies with equal force to the Palestinian Authority, a government "responsible for providing basic services and security to millions of people (many of whom are unemployed) living in areas scarred by years of war." *Knox v. PLO*, No. 1:03-cv-4466, 2009 U.S. Dist. LEXIS 52610, at *29 (S.D.N.Y. Mar. 26, 2009). Moreover, denial of the vacatur motion would undermine the State Department's continuing efforts to encourage the PA to resolve disputes within the United States' legal framework.

   3. *Two Other District Courts Vacated Defaults Against the PA and PLO Despite Finding that the Defaults Were the Result of Deliberate Conduct.*

Three other district courts have considered similar vacatur motions by the PA/PLO. *See Biton v. Palestinian Interim Self-Government Auth.*, 252 F.R.D. 1 (D.D.C. 2008); *Knox v. PLO*, 248 F.R.D. 420 (S.D.N.Y. 2008); *Saperstein v. Palestinian Auth.,* No. 1:04-cv-20225, 2008 WL 4467535, at *13 (S.D. Fla. Sept.

29, 2008). The vacatur motions in *Biton* and *Saperstein* sought to vacate defaults under Rule 55(c)'s "for good cause shown" standard. Like the motion at issue here, the vacatur motion in *Knox* sought relief under Rule 60(b)(6). The *Biton* court denied the PA/PLO's vacatur motion; the case ultimately was voluntarily dismissed with prejudice. *See Biton*, No. 1:01-cv-00382 (D.D.C.) (Dkt. No. 115). The courts in *Knox* and *Saperstein* granted the vacatur motions, subject to certain conditions, and did so despite finding that the PA/PLO had "willfully" defaulted.

In *Knox*, the district court noted that courts had "issued multiple determinations extending jurisdiction over both Defendants and their actions within the Israeli-Palestinian conflict" and accordingly found that "at the time of Defendants' default[,] . . . their belief of immunity from the jurisdiction of the United States courts was not reasonable." 248 F.R.D. at 426. Although noting that "a determination that Defendants willfully defaulted may be sufficient to deny their Rule 60(b)(6) motion," such willfulness "does not necessarily require denial." *Id.* at 425, 426. The court then turned to a consideration of the other relevant factors -- the PA/PLO's meritorious defenses, prejudice to plaintiffs, the PA/PLO's changing political dynamics, the size of the judgment, and historical and public

interest concerns -- and concluded that these factors weighed in favor of vacating the default judgment, subject to conditions.  *See id.* at 427-32, 433.[9]

The *Saperstein* court similarly found that the PA/PLO's conduct in that litigation had been willful, noting its earlier finding that Defendants' actions under prior counsel had "evinced an intentional disregard" for the court's proceedings. 2008 WL 4467535, at *12 (quotation marks omitted).  Like the court in *Knox*, the *Saperstein* court then concluded that its "finding that the Defendants' failure to participate in these proceedings was willful, does not by itself render Defendants' motion to set aside without merit."  *Id.*  The court noted that the PA and PLO "are not a recognized, much less typical, foreign state plus the changing political dynamics and volatility in the area create realities that have non-standard effects in this litigation."  *Id.*  The court further recognized that, since "new defense counsel's appearance, Defendants have stated a desire to proceed with merits litigation in good faith."  *Id.*

---

[9] The condition that Defendants post a bond or other adequate security covering the entire amount of the judgment, including interest, *see* 248 F.R.D. at 433, was subsequently modified.  The bond amount is now set at $120 million, to be paid in installments.  *Knox v. PLO*, 628 F. Supp. 2d 507 (S.D.N.Y. 2009).  The first installment is due September 21, 2009.

The *Saperstein* court concluded that the following factors supported vacatur: (1) the "strong preference for deciding cases on their merits"; (2) "Defendants have come forward with a meritorious defense"; (3) plaintiffs "will not be significantly prejudiced by vacating the default"; (4) the size of the potential default judgment ($48 million); and (5) "resolution of some of the issues in this case have broad and significant ramifications from a historical and public interest standpoint that default judgment cannot address." *Id.* at *13-16. The *Saperstein* court then noted one last factor favoring vacatur, which bears particular emphasis: "It is essential that in our zeal to thwart terrorism and compensate its victims, we do not trample on the fundamental principles of our judicial system." *Id.* at *16. One of those fundamental principles is providing "all litigants, even unpopular ones," the "right to their day in court" and providing all litigants "equal justice under our laws without sympathy or prejudice for either side." *Id.*

## II. Taking All of the Relevant Factors into Account, the PA and PLO Are Entitled to Relief Under Rule 60(b)(6).

### A. Foreign and Public Policy Concerns Favor Vacatur.

As discussed in *supra* Part I.B.2, a number of courts have cited potential foreign policy repercussions when vacating default judgments entered against foreign governments. Here, the $116 million default judgment has been a recurring issue in the PA's and PLO's interaction with the U.S. Department of State. *See* JA424-25 (January 12, 2007, letter from Secretary of State Rice to

President Abbas, referencing President Abbas's letter setting forth concerns about the U.S. litigation); JA501-04 (June 18, 2005, letter from Finance Minister Fayyad to Secretary of State Rice); JA505-06 (April 27, 2006, letter from Head of PLO Mission to the United States to Secretary of State Rice). In his letter to the U.S. Secretary of State, Dr. Fayyad explained that the Ungars' efforts to "use the United States judicial system to take control over and freeze the assets of the PNA all over the world" has become "a serious obstacle to the continued, effective participation of the Palestinian National Authority ("PNA") in the Middle East Peace Process and the PNA's role as a strong and viable partner of the United States of America and the Government of the State of Israel in that process." JA501.

Moreover, the PA and PLO are integral to the Israeli-Palestinian peace process. Actions of the U.S. courts that impact them and their relationship with the U.S. Government should not be taken lightly. At the 2007 Annapolis Conference, President Bush robustly praised the Palestinian leadership, reiterating that both President Abbas and Prime Minister Fayyad were "opposed to terrorism and committed to peace," giving Israeli leaders "the confidence they need to reach out to Palestinians in true partnership." JA342 (Text of President Bush's November 27, 2007, Remarks at the Annapolis Conference). Shortly before the PA and PLO filed their motion to vacate the default judgment, then Secretary of State Condoleeza Rice described the effort to establish a Palestinian state and to achieve

44

a peaceful resolution of the Israel-Palestinian conflict as one of then President

Bush's "highest priorities of his Administration and of his time in office."  JA346,

JA347 (October 15, 2007, "Remarks with Palestinian Authority President

Mahmoud Abbas").

Despite evidence that the *Ungar* default judgment has significant foreign

policy ramifications, the district court declined the PA/PLO's request that it invite

the United States to file a Statement of Interest pursuant to 28 U.S.C. § 517.  *See*

JA50, JA55.  Although the United States ultimately declined to file a Statement of

Interest in the *Knox* case, the U.S. Department of Justice informed the *Knox* court

that it was continuing to monitor *Knox* "and other cases like it" and "remains

concerned about the potentially significant impact that these cases may have on the

financial and political viability of the defendants."  JA685.  *Ungar*, was of course,

one of the "other cases like it," but posed more immediate danger to the PA/PLO's

"financial and political viability."  *Ungar*, unlike *Knox*, resulted in the attachment

of PA tax revenues in Israel, efforts to gain control of the Palestine Investment

Fund, and the attachment of assets held on behalf of Palestinian government

workers; prevented the PA and the central bank (the PMA) from engaging in U.S.

dollar-denominated transactions; and interfered with the operations of the PLO

Mission to the United States.  *See supra* pp. 17-20.  The district court should not,

therefore, have assumed that the U.S. had no interest in allowing the PA/PLO another opportunity to defend the *Ungar* case.

But, even in the absence of a U.S. expression of public support for a Rule 60(b)(6) vacatur, the foreign and public policy implications of a $116 million default judgment against the PA in a terrorism case are undeniable.  Thus, in *Knox*, the court construed the "silence of the executive branch here as manifesting a view that at this time it has no compelling interest in suggesting that there are issues implicating current United States foreign policy," but instead found that the "historical and public interest concerns" raised by the case warranted vacatur.  248 F.R.D. at 431.  The court noted that the allegations against the PA and PLO "are all weighty matters with far-reaching implications," "touch upon interests beyond those of the immediate parties to this litigation," and "warrant[] more reliable, concrete substantiation than a default judgment provides."  *Id.*  The court cited the U.S. Government's stated concern about the "impact that a sizable judgment in this action may have on the financial viability of Defendants," the Palestinian people's right to know whether their government has abused their authority, the international community's interest in ensuring that the donor funds they provide to the Palestinian Authority were used for their intended purposes, and the interests of "many other persons who for various personal or professional reasons may have some valid stake in the truth of the historical record . . . including the general

46

public's right to know the facts relating to matters of great moment that may affect their own public or private interests."  *Id.*

Similarly, the court in *Saperstein* noted that "[t]here is a strong public interest in learning the truth of the Plaintiff's allegations" regarding whether the PA and PLO "contributed to terrorist activities" and concluded that "[t]hese important issues warrant a decision on the merit rather than a resolution by default." 2008 WL 4467535, at *15.

The historical and public policy concerns that resulted in the vacaturs in *Saperstein* in *Knox* apply with equal force here.  The Ungars allege that the "PA and PLO and their officials, employees and agents knew that [Hamas] had committed hundreds of serious offenses against the Untied States, including the murder of the aforementioned U.S. citizens, and that [Hamas] planned to continue committing such offenses" and yet "openly and consistently provided [Hamas] and its members with safe haven, a base of operations, shelter, financial support and other material support . . . ." JA49.11.  As Judge Marrero observed in *Knox*, "[g]iven the transcendental scope of these issues . . . , a judgment concerning such questions, involving liability assessed in hundreds of millions of dollars, ordinarily should not be decided by default." 248 F.R.D. at 431.

Finally, if this Court has any doubts about the United States' foreign policy interests in allowing the PA/PLO an opportunity to defend the case on the merits, it should invite the United States to file a statement of interest. *See* 28 U.S.C. § 517.

### B.     Recognition of the Changing PA/PLO Political Dynamics Favor Vacatur.

Both the *Knox* and *Saperstein* courts took into account the commitment of the new leadership of the PA and PLO to cooperate with the U.S. courts and defend the U.S. lawsuits on the merits. The "principal defaulting officials are no longer on the scene and their litigation strategies have been rejected by successors." *Knox*, 248 F.R.D. at 431. In *Knox*, this development militated in favor of giving the PA/PLO another opportunity to "set the record straight." *Id.* at 431-32. Similarly, the court in Saperstein, after noting the *sui generis* nature of the PA and the "changing political dynamics and volatility in the area," concluded that the new leadership's "desire to proceed with merits litigation in good faith" provided a counterbalance to the earlier willful failure to participate. 2008 WL 4467535, at *12.

Here, the PA/PLO's motion to vacate the default judgment was supported by a sworn declaration from Prime Minister Fayyad in which he expressed the PA/PLO's commitment to "participate fully in this and other litigation in a cooperative manner, including complete participation in the discovery process." JA109, JA111. Prime Minister Fayyad's declaration deserves the Court's serious

consideration, particularly in light of his representations concerning the manner in which the litigation will be conducted going forward, representations that have been borne out by the actual conduct of litigation in the related cases. *See United States v. Schofield*, 197 F.R.D. 6, 8 (D.D.C. 2000) (vacating default largely because Defendant was "now vigorously mounting a defense," explaining that "[s]uch an act cuts strongly against any willfulness of the defendant's previous delay"); *Lawton v. Republic of Iraq*, No. 02-0474, 2006 U.S. Dist. LEXIS 94335, at *7 (D.D.C. Dec. 6, 2006) (vacating entry of default and refusing to find willfulness in a case alleging that Iraq should be held responsible for the 1995 bombing of a federal building in Oklahoma City in light of political turmoil and based on representations that new leadership was "committed to defending fully against Plaintiffs' alleged claims, on all available grounds, in accordance with the laws, procedures and Court directives applicable to this litigation").

## C.    The Size of the Judgment and Its Impact on the PA/PLO Favor Vacatur.

Courts have been particularly sensitive to the need to reopen default judgments where significant amounts of money are at stake and where judgments require payments from public funds. *Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986); *see also Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989).  As one district court explained in a case involving a $325,000 judgment, "[t]he large amount of money at stake must be

considered 'since relief under rule 60(b) is essentially equitable in nature and is to be administered on equitable principles.'" *First Nat'l Bank v. Ryder Truck Rental Inc.*, Civ. No. 82-0045-B, 1985 U.S. Dist. LEXIS 21565, at *16 (D. Me. 1985) (quoting *C.K.S. Engineers, Inc. v. White Mountain Gypsum*, 726 F.2d 1202, 1208 (7th Cir. 1984); *Hutton v. Fisher*, 359 F.2d 913, 916 (3d Cir. 1966)).

Both the *Knox* and *Saperstein* courts identified the treble damages awarded in Anti-Terrorism Act cases and the size of the default judgments or, in the case of *Saperstein*, potential default judgment, as a factor weighing in favor of default. *Knox v. PLO*, 248 F.R.D. 420, 430 (S.D.N.Y. 2008); *Saperstein v. Palestinian Auth.*, No. 1:04-cv-20225, 2008 WL 4467535, at *15 (S.D. Fla. Sept. 29, 2008).

Here, there can be no doubt that the massive default judgment creates a severe hardship for the PA and its citizens. As previously noted, the United States has expressed "concern[] about the potentially significant impact that these cases may have on the financial and political viability of the [PA and PLO]." JA685.

The 2007 Palestinian donors conference was held in Paris shortly before the PA/PLO filed their vacatur motion. At the conference, Secretary of State Condoleeza Rice stated: "The Palestinian Authority is experiencing a serious budgetary crisis. This conference is literally the government's last hope to avoid bankruptcy." JA688.

In the *Knox* case, after extensive discovery on the PA's and PLO's financial condition in connection with the setting of the bond amount, Magistrate Judge Katz provided this stark assessment:  "[I]t is apparent that the economic situation in the Palestinian territories is dire. . . . Reports of the International Monetary Fund, the World Bank, and the PA itself confirm that the PA is deeply in debt and reliant on the international donor community to fund basic operations." *Knox v. PLO*, No. 1:03-cv-4466, 2009 U.S. Dist. LEXIS 52610, at *29 (S.D.N.Y. Mar. 26, 2009).

### D.    The PA/PLO's Strong Meritorious Defenses Favor Vacatur.

Because one primary function of Rule 60(b)(6) is to ensure that a judgment reflects the true merits of the case, the First Circuit has required a litigant to demonstrate the existence of a meritorious defense, and has described this requirement as a "sentry that guards the gateway to Rule 60(b) relief."  *Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co.*, 953 F.2d 17, 20 (1st Cir. 1992).  As the Court of Appeals has explained, "a litigant, as a precondition to relief under Rule 60(b), must give the trial court reason to believe that vacating the judgment will not be an empty exercise."  *Id.*

In defining the scope of a litigant's burden to ensure the Court that vacatur will not be an "empty exercise," the First Circuit has relied on cases from the prejudgment default context.  *See Superline*, 953 F.2d at 20 (citing *Coon v. Grenier*, 867 F.2d 73, 76 (1st Cir. 1989)).  Those cases make clear that the

"meritorious defense" component of the test for setting aside a default does not go so far as to require that the movant demonstrate a likelihood of success on the merits, particularly in a default judgment case where the merits have never before been explored. Rather, "a party's averments need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense." *Coon*, 867 F.2d at 77.

The PA/PLO easily satisfy that standard here. The available evidence, most of it presented by the Ungars in a parallel proceeding filed in federal court in Washington D.C., suggests not only that Hamas committed the offense but that it did so for the express purpose of undermining the PA/PLO's interest in the peace process. In their suit against Iran, *Ungar v. Islamic Republic of Iran*, Civ. No. 1:00-cv-02606 (D.D.C.), the Ungars sponsored and adopted expert testimony describing Hamas as a "rival" of the PLO and as forming a "partnership" with Iran to undermine the PA and PLO leadership in their efforts to engage in a peace process with Israel. *See* JA169-220 (Testimony of Dr. Reuven Paz) (Tr. at 65:19-20, 66:9-22, 67:16-68:8, 70:13-71:2) (Jan. 15, 2002). According to the Ungars' own expert, Iran provided this support to Hamas at a time when the Palestinian Authority was working "to limit Hamas activity" and some members of Hamas "became wanted either by Israel or the Palestinian Authority." *Id.* at 74:18-24 (JA181). Based on testimony proffered by the Ungars' expert witnesses, the court

concluded: "By the mid 1990s, Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, specifically to disrupt the Israel-PLO peace process." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 94 (D.D.C. 2002). *See also id.* at 95 ("Relations between Iran and HAMAS were particularly close in 1996, the year of the Ungar murders").

In the Iran litigation, the Ungars thus pursued the theory that the attack at issue was intended to harm the interests of the PA and PLO, directly contradicting the theory advanced in the present case. Based on the case presented by Plaintiffs in *Ungar v. Iran*, as well as the additional factual background provided by the PA/PLO in their motion for relief from the default judgment regarding the PA/PLO's relationship with Hamas at the time of the attack and the PA/PLO's role in arresting the Ungars' assailants and transferring them to Israeli custody, *see* JA72-75, JA80-83, JA126-64, JA232-307, any objective observer would have grave concerns that the PA/PLO is being saddled with a $116 million judgment for an act for which they had no responsibility. At the hearing on the motion to vacate, even the district court acknowledged: "There's no question that . . . there are factual issues as to whether the Palestinian Authority and the PLO would be liable in this case if the case were heard on the merits." JA928, 947 (Tr. at 20:6-9).

Vacatur thus would not be an empty exercise, and to the contrary, would permit the PA and PLO to vigorously contest the Ungars' assertions, including

through the use of the Plaintiffs' own statements in the Iran litigation. Given the importance of the issues presented, these are issues that deserve to be litigated on their merits.

### E. The Lack of Prejudice to Plaintiffs Favors Vacatur.

1. *Neither Arafat's Death Nor the Gaza Situation Creates Legally Cognizable Prejudice to the Ungars.*

In determining whether vacatur should be granted pursuant to Rule 55(c) or Rule 60(b), courts consider whether the opposing party will be prejudiced by the vacatur. In order to establish prejudice, the opposing party must demonstrate tangible harm from any delay caused by the default such as "loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." *KPS & Assocs. Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 15 (1st Cir. 2003) (quoting in part, *FDIC v. Francisco Inv. Corp.*, 873 F.2d 474, 479 (1st Cir. 1989)).

Although treating the willfulness of the default as the only determinative factor, the district court noted that, "if it were to grant the motion to vacate the default, this would be extremely prejudicial to the Plaintiffs. . . ." Add.22. According the district court, the Ungars would be "unable to conduct much of the crucial discovery that would have been possible years ago" because Yasser Arafat had died and because unspecified "important documents, which were located in PA

54

offices in the Gaza Strip, are no longer accessible to the PLO or the PA since Hamas has taken control of this area." *Id.*

In order for the prejudice factor to weigh against vacatur, however, the opposing party must indentify with greater particularity any prejudice they face from the delay caused by the vacatur.  Here, it is entirely speculative that Arafat would have been subject to a deposition and that any deposition testimony would have supported plaintiffs.  With respect to any "important documents in Gaza," this assertion also is highly speculative, especially given that the incident occurred in Beit Shemesh, Israel (JA49.7), not in Gaza.  Moreover, during the March 2002 "Operation Defensive Shield" and a related incursion in Gaza, the Israeli Defense Forces raided PA governmental offices and the offices of various PA security apparatuses and seized documents.  *See* JA564, JA569-70 (Kuperwasser Declaration) (describing Operation Defensive Shield); JA814-61 (Naveh report) (analyzing documents seized in Operation Defensive Shield).[10]

The district court made no effort to reconcile its speculation that the Ungars would be unfairly prejudiced with the fact that other U.S. plaintiffs currently are

---

[10] The PA/PLO dispute the allegations made against them in both the Kuperwasser declaration and the Naveh report.  These exhibits, on which Ungars rely, are cited only to show that Israeli Defense Forces seized many PA/PLO documents in 2002.  These documents are now publicly available, and the Ungars already are relying on them.

litigating cases against the PA/PLO, without any apparent prejudice, relating to terrorism attacks from the 2000-2004 period, including attacks that -- unlike the one at issue in this case -- occurred in Gaza. *See*, e.g., *Saperstein v. Palestinian Auth.,* No. 1:04-cv-20225, 2008 WL 4467535, at *13 (S.D. Fla. Sept. 29, 2008) (holding that prejudice factor weighs in favor or vacating default); *see also Estate of Parsons v. Palestinian Auth.*, No. 1:07-cv-01847 (D.D.C.) (Anti-Terrorism Act case arising out of 2003 bombing attack in Gaza).

In granting the vacatur in *Saperstein*, the court rejected plaintiff's claims that he would be prejudiced by loss of evidence resulting from the passage of time and the unrest in Gaza. Instead, the court found that the prejudice factor weighed in favor of vacatur: it is "undisputable that most discovery difficulties that might arise in this case will be attributable not to the delay caused by the default, but to the difficulties that inevitably arise in cases involving incidents occurring, and involving parties residing, in foreign lands. Exacerbating these difficulties in this case, is not the fact of default, but the on-going political instability and strife in the area."). *Saperstein*, 2008 WL 4467535, at *13.

Finally, this is not a case where plaintiffs could credibly contend that the default prevented them from fully investigating or securing whatever evidence existed to support their claims of liability. Plaintiffs have already made a substantial evidentiary presentation in the parallel litigation in Washington D.C. in

56

connection with the same incident.  *See Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 94 (D.D.C. 2002).

> 2.  *Risk of Asset Flight or an Unenforceable Judgment Can Be Addressed by Imposing Conditions on the Vacatur.*

Any additional concerns about prejudice, such as the risk of an unenforceable judgment, are properly addressed by imposing reasonable conditions on the vacatur rather than by treating them as a basis for denying vacatur.  *See Powerserve Int'l Inc. v. Lavi*, 239 F.3d 508, 515-16 (2d Cir. 2001); *cf.* 10A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 2700, at 170-71 (1998) ("The imposition of conditions as part of granting a *Rule 55(c)* motion can be used to rectify any prejudice suffered by the nondefaulting party as a result of the default and the subsequent reopening of the litigation.").  *See also Knox*, 248 F.R.D. at 432 (imposing conditions on vacatur); *Saperstein*, 2008 WL 4467535, at *16-17 (same).

* * *

Because the district court abused its discretion by denying the PA/PLO's motion to vacate based on consideration of a single factor and because consideration of all of the factors weighs heavily in favor of vacatur, the court should reverse and remand the case to the district court for determination of the appropriate conditions of vacatur (taking into account that assets already are attached in the U.S. and Israel in connection with the judgment) and for proceedings on the merits.  *See Coon v. Grenier*, 867 F.2d 73, 79 (1st Cir. 1989) (remanding with directions to "vacate the default judgment, remove the default, and permit the action to proceed in the normal course"); *Community Dental Serv. v. Tani*, 282 F.3d 1164 (9th Cir. 2002) (reversing the district court's denial of a Rule 60(b)(6) motion and remanding for reinstatement of the action); *First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda -- Permanent Mission*, 877 F.2d 189 (2d Cir. 1989) (same); *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396 (5th Cir. 1981) (same); *United Coin Meter Co. v. Seabord Coastline R.R.*, 705 F.2d 839, 846 (6th Cir. 1983) (same).

## CONCLUSION

The district court's denial of the PA/PLO's motion to for relief from the final default judgment should be reversed, and the matter should be remanded to the district court for proceedings on the merits.

Respectfully submitted,

_____

Mark J. Rochon (1st Cir. Bar No. 97714)
  *Counsel of Record*
Miller & Chevalier Chartered
655 Fifteenth St., N.W.
Washington, D.C. 20005
(202) 626-5800

Deming E. Sherman (1st Cir. Bar No. 31908)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200

September 14, 2009

*Counsel for Defendants-Appellants*
*The Palestinian Authority and the Palestine*
*Liberation Organization*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

<u>XX</u>   this brief contains 13.682 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

___ this brief uses a monospaced typeface and contains [*state the number of lines*] of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because:

<u>XX</u>   this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point font in Times New Roman, or

___ this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


September 14, 2009                    _____

                                     Mark J. Rochon

                                     *Counsel for the Palestinian Authority and the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on September 14, 2009, I caused two true and correct copies of the attached Brief for Appellant, one copy of the Joint Appendix, and a copy of the Brief for Appellant on CD in PDF format, to be served via U.S. Mail, first class, postage pre-paid upon the parties listed below:

David J. Strachman
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903


_____
Mark J. Rochon

# Addendum

# Table of Contents

Memorandum and Order (D.R.I. May 13, 2009) (Dkt. No. 442) ........... Add.1

Fed. R. Civ. P. 60 ................................................................................. Add.27

Case 1:00-cv-00105-L-DLM   Document 569-1   Filed 10/21/10   Page 76 of 103 PageID
Case 1:00-cv-00105-L-DLM   Document 442   Filed 05/13/2009   Page 1 of 26
#: 6295

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

The ESTATES OF Yaron UNGAR and
Efrat UNGAR by and Through the
Administrator of Their Estates David
STRACHMAN; Dvir Ungar, Minor, by his
Guardians and Next Friend, Professor
Meyer Ungar; Judith Ungar; Rabbi Uri
Dasberg; Judith Dasberg (Individually
and in Their Capacity as Legal Guardians
of Plaintiffs Dvir Ungar and Yishai Ungar);
Amichai Ungar; Dafna Ungar; and Michael
Cohen,

Plaintiffs,

vs.                                         C.A. No. 00-105L

The PALESTINIAN AUTHORITY (a.k.a. "the
Palestinian Interim Self-Government
Authority"); the Palestine Liberation
Organization; Yasser Arafat; Jibril Rajoub;
Muhammed Dahlan; Amin Al-Hindi; Tawfik
Tirawi; Razi Jabali; Hamas-Islamic
Resistance Movement (a.k.a. "Harakat Al-
Muqawama Al-Islamiyya"); Abdel Rahman
Ismail Abdel Rahman Ghanimat; Jamal Abdel
Fatah Tzabich Al Hor; Raed Fakhri Abu
Hamdiya; Ibrahim Ghanimat; and Iman Mahmud
Hassan Fuad Kafishe,

Defendants.

MEMORANDUM AND ORDER

        This matter is before the Court on the Motion of Defendants

the Palestinian Authority ("the PA") and the Palestine Liberation

Organization ("the PLO") to set aside the default judgment that

was entered against them by this Court in 2004.

        In 1996, U.S. citizen Yaron Ungar and his Israeli wife,

**Add.1**

Efrat Ungar, were murdered in Israel by Hamas terrorists.
Plaintiffs, who are their surviving family members and the
administrator of their estates, brought this action pursuant to
the Antiterrorism Act of 1991, 18 U.S.C. § 2333 *et seq.*  This
federal statute provides a cause of action for American nationals
injured in their person, property or business by an act of
international terrorism.  18 U.S.C.A. § 2333(a) (1992).
Plaintiffs named as defendants the Palestinian Authority ("the
PA"), the Palestine Liberation Organization ("the PLO"), the
Hamas-Islamic Resistance Movement (a.k.a. "Harakat Al-Muqama Al-
Islamiyya") (hereinafter "Hamas"), various officials of the PA
and the PLO including Yasser Arafat, and individual Hamas members
who participated in the deadly attack on the Ungars.

No Defendant has answered Plaintiffs' Amended Complaint, and
appearances have been entered only on behalf of Defendants PA and
PLO.  Nevertheless, this matter has generated no small amount of
legal activity, resulting in five previous decisions written by
this Court, several Reports written by Magistrate Judge David
Martin of this Court, as well as one published decision, and one
unpublished, from the First Circuit Court of Appeals.  Eight
years of legal wrangling culminated in a default judgment in the
amount of $116,409,123.00, which was entered jointly and
severally against Defendants Hamas, the PLO and the PA.  Citing
Federal Rules of Civil Procedure Rule 60(b)(6), the PLO and PA

now seek to have this judgment vacated, on the grounds that
exceptional circumstances warrant such relief.  The Court has
heard oral arguments, reviewed the parties' written submissions
and examined the pertinent law, and now determines that
Defendants' Motion must be denied for reasons explained below.

### Factual background

On June 9, 1996, Yaron and Efrat Ungar were traveling home
from a wedding with their nine-month old son, Plaintiff Yishai
Ungar, in the back seat, when a group of men in another vehicle
pulled up along side of them and opened fire.  Yaron and Efrat
were killed, but their baby was unharmed.  Their assailants
included Defendants Abdel Rahman Ismail Abdel Rahman Ghanimat,
Jamal Abdel Fatah Tzabich Al Hor, and Raed Fakhri Abu
Hamdiya, all members of Hamas.  Two of the assailants, along with
co-conspirator Defendant Iman Mahmud Hassan Fuad Kafishe, were
convicted in an Israeli court on charges related to this
incident.  The third assailant remains at large.  In 1999, Rhode
Island attorney David Strachman was appointed Administrator of
the estates of Yaron and Efrat Ungar, by the appropriate Israeli
court.  Strachman filed the present lawsuit on behalf of the
estates in 2000.  Other Plaintiffs include the Ungar's firstborn
child, Dvir Ungar, who was not in the car during the shooting, as
well as the couple's parents and siblings.

-3-

Add.3

### Travel

The court will briefly summarize the litigation in this case to date.  For more detailed treatments, the reader is advised to examine the Court's prior written decisions in this matter.

### *Ungar I*

In 2001, this Court addressed the PA and PLO's Motion to Dismiss, brought pursuant to Federal Rules of Civil Procedure Rule 12(b), arguing that the Court lacked both subject matter jurisdiction over this case and personal jurisdiction over these Defendants, that there was insufficient service of process, improper venue, inconvenient forum, and that the Complaint failed to state a claim for which relief could be granted.

In its decision, this Court concluded that subject matter jurisdiction was present because the cause of action was properly based on federal statute, 18 U.S.C. § 2333.  Estates of Ungar ex rel. Strachman v. Palestinian, 153 F. Supp. 2d 76, 86 (D.R.I. 2001) ("Ungar I").  Moreover, the Court's exercise of personal jurisdiction over the PA and the PLO was proper based upon these organizations' contacts with the United States.  Id. at 88. Defendants' arguments based on venue, service of process and the convenience of the forum were likewise deemed without merit.  Id. at 95, 100.

This Court found that it lacked personal jurisdiction over the individual PA and PLO officials named as Defendants, and

-4-

**Add.4**

Case 1:00-cv-00105-L-DLM    Document 569-1    Filed 10/21/10    Page 80 of 103 PageID
Case 1:00-cv-00105-L-DLM    Document 242    Filed 05/13/2009    Page 5 of 26
#: 9242

claims against them were dismissed.  Id. at 95.  All claims

brought on behalf of Efrat Ungar and her estate pursuant to the

Antiterrorism Act were dismissed because her status as an Israeli

citizen excluded her from the scope of the Act. Id. at 97, see 18

U.S.C. § 2333.  Tort claims based on Rhode Island state law were

also dismissed, because the Court determined that Israeli law

would control any non-federal claims.  Id. at 99. Plaintiffs were

granted leave to amend the complaint to add properly-pled tort

claims.  Id. at 100.

Plaintiffs revised their Complaint, dropping claims on

behalf of Efrat Ungar from Count I, the claim brought under the

Antiterrorism Act, and adding claims for negligence, assault and

breach of statutory obligation under the Israeli Civil Wrongs

Ordinances.  The Amended Complaint retains allegations against

all original Defendants.

At the conclusion of these proceedings, counsel for the PA

and the PLO, former United States Attorney General Ramsey Clark,

stated in open court that he had spoken personally to Yasser

Arafat, the leader of both the PA and the PLO, and was instructed

not to file an answer or defend this case on the merits because

Arafat would not recognize the jurisdiction of this or any

American court over the PA or PLO.

### *Ungar II*

In 2002, the PA and the PLO filed a second Motion to

-5-

**Add.5**

Dismiss.  This Motion alleged that the Amended Complaint failed
to state claims for which relief could be granted because the
ultimate resolution of the claims would require an analysis of
non-justiciable issues.  Specifically, Defendants argued that
Plaintiffs' claims could not be properly litigated in this Court
because of the complex and sensitive political issues involved,
the difficulty in obtaining information from the war-torn region,
and the lack of manageable judicial standards. To strengthen
their argument, Defendants asserted that they were entitled to
sovereign immunity because Palestine was very close to gaining
full membership to the United Nations.  These arguments were
rejected by this Court and the Motion was denied.  <u>Estates of
Ungar ex rel. Strachman v. Pales. Auth.</u>, 228 F. Supp. 2d 40, 49
(D.R.I. 2002) ("<u>Ungar II</u>").

Along with their Motion, Defendants petitioned the Court to
reconsider its ruling in <u>Ungar I</u>.  In the alternative, Defendants
requested the right to file an interlocutory appeal of <u>Ungar I</u>,
and called for the matter to be stayed while such appeal was
heard.  These requests were also denied by the Court.  <u>Ungar II</u>,
228 F. Supp. 2d at 51.

Following the release of this Court's decision, the PA and
the PLO then filed a Motion for Reconsideration of <u>Ungar II</u>,
which was denied.  Next, these Defendants filed an interlocutory
appeal of the denial of the Motion for Reconsideration.  In an

Case 1:00-cv-00105-L-DLM   Document 569-1   Filed 10/21/10   Page 82 of 103 PageID
Case 1:00-cv-00105-L-DLM   Document 442   Filed 05/13/2009   Page 7 of 26
#: 6299

unpublished decision, the First Circuit denied the Motion and
affirmed this Court's rulings in Ungar II.  At the same time, the
First Circuit indicated that Defendants' opportunity to develop a
sovereign immunity defense was still available because Defendants
had not yet answered the complaint.  Ungar, et al., v. The
Palestinian Liberation Organization, et al., 2003 WL 21254790
(C.A. 1).

## Default

Just before the First Circuit issued its judgment, Judge
Martin, in April 2003, directed the Clerk of this Court to enter
a default against the PA and the PLO for their failure to answer
the Amended Complaint.  In a subsequent Report and
Recommendation,[1] Judge Martin recounts that he had determined, at
this juncture, that "the Palestinian Defendants' failure to file
an answer to the Amended Complaint was the result of a deliberate
choice and not due to an inability to file an answer."  Estates
of Ungar & Ungar v. Palestinian Authority, 325 F. Supp. 2d 15, 40
(D.R.I. 2004) ("Ungar V").

In February and April of 2003, Plaintiffs twice moved for the
entry of default judgment against these Defendants, citing
Defendants' repeated refusal to comply with discovery requests

---

[1]  Judge Martin's Report and Recommendation was issued on
March 31, 2004, and is incorporated in its entirety in this
Court's fifth decision, referred to herein as Ungar V, Estates of
Ungar & Ungar v. Palestinian Authority, 325 F. Supp. 2d 15
(D.R.I. 2004).

**Add.7**

and discovery orders.  These motions were referred to Judge

Martin.  In May 2003, Judge Martin declined to hear arguments on

the motions, "electing instead to explicitly warn Defendants that

their continued failure to comply with discovery could result in

the entry of default judgment against them."  <u>Ungar V</u> at 41.

Later in May 2003, Plaintiffs again moved for the entry of

default judgment against Defendants PA and the PLO pursuant to

Federal Rules of Civil Procedure Rule 55(b)(2), this time citing

their failure to answer the complaint.  Defendants followed up

with three consecutive motions for extension of time, all of

which were granted by Judge Martin.  In July 2003, Judge Martin

held a hearing on the Plaintiffs' motions for default judgment,

and took these motions under advisement.  <u>Ungar V</u>, 325 F. Supp.

2d at 44.

### <u>*Ungar III*</u>

The Court next reviewed and accepted in part Judge Martin's

July 2003 Report and Recommendation ("R & R") on Plaintiffs'

motion to enter final judgment against Hamas and the individual

Hamas Defendants.  No objection had been filed to Judge Martin's

R & R, the text of which is incorporated in its entirety in <u>Ungar</u>

<u>ex rel. Strachman v. Palestinian Authority</u>, 304 F. Supp. 2d 232,

279 (D.R.I. 2004) ("<u>Ungar III</u>").

Because Hamas and the five individual Hamas Defendants had

not answered or otherwise defended against the Complaint, Judge

-8-

Case 1:00-cv-00105-L-DLM   Document 569-1   Filed 10/21/10   Page 84 of 103 PageID
Case 1:00-cv-00105-L-DLM   Document 442   Filed 05/13/2009   Page 9 of 26
#: 6504

Martin extensively analyzed the Court's exercise of personal and subject matter jurisdiction over these Defendants. He determined that jurisdiction was properly exercised over Hamas, and that the organization had been properly served. <u>Id.</u>, 304 F. Supp. 2d at 250-258. However, he recommended the dismissal of the five individual Hamas Defendants on jurisdictional grounds, due to their lack of contact with or activity within the United States. <u>Id.</u> at 260. In addition, Judge Martin calculated damages for Plaintiffs on Count I of the Amended Complaint in the amount of $116,409,123.00.

These recommendations were adopted by this Court, which ruled further that final judgment could be entered against Defendant Hamas without delay. <u>Id.</u> at 241. Judge Martin's additional recommendation, that Plaintiffs be awarded prejudgment interest, was rejected by this Court on the grounds that the treble damage award mandated by 18 U.S.C. § 2333 was sufficiently punitive. <u>Id.</u> at 237.

### <u>*Ungar IV*</u>

In June 2003, Defendants PA and PLO moved to dismiss the claims against them pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the grounds that they were entitled to sovereign immunity. Defendants also argued that the jurisdictional bar imposed by 18 U.S.C. § 2337, which excludes sovereign states from the scope of the Antiterrorism Act,

-9-

prevented the Court from properly exercising jurisdiction. Finally, Defendants again argued, as they had in Ungar II, that the claims were not appropriate for judicial review because they were political in nature. These arguments were rejected by this Court, and Defendants' Motion was denied.

### Doctrine of Non-justiciability

Because the arguments concerning the region's ongoing political upheaval that are presently before the Court resemble so closely the non-justiciability arguments previously made by Defendants in Ungar II and Ungar IV, the Court will briefly reiterate its prior reasoning. Explaining in Ungar IV that the Antiterrorism Act provides judicially-discoverable standards for deciding Plaintiffs' claims because the Act creates a cause of action, and supplies a precise definition, for acts of international terrorism, this Court wrote,

> The fact that the PA and PLO's alleged terrorist acts may have arisen in a politically charged context and were committed in an area where the United States has a strong foreign policy interest does not convert the present tort claims into non-justiciable political questions.

Estates of Ungar v. Palestinian Authority, 315 F. Supp. 2d 164, 174 (D.R.I. 2004) ("Ungar IV"). Citing the case that resulted from a previous, notorious act of terrorism, Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44 (2d Cir. 1991), this Court stated that, like the Klinghoffer Court, it "would not give its

-10-

views on the broader political questions forming the backdrop of
the lawsuit and would only determine whether and to what extent
the plaintiffs could recover in tort for the acts of violence
committed against them."  <u>Ungar IV</u>, 315 F. Supp. 2d at 174.

### *Sovereign immunity*

In response to Defendant's assertion that they are entitled
to sovereign immunity, Plaintiffs argued that Defendants had
waived their right to use this defense when they failed to answer
the Amended Complaint.  Any affirmative defense, Plaintiffs
argued, must be specifically set forth in the answer, as required
by Federal Rules of Civil Procedure Rule 8(c).  However, the
Court rejected Plaintiffs' waiver argument:

> The current posture of this case presents
> a procedural irregularity because the PA and
> the PLO failed to file an answer and have
> been defaulted.  These Defendants have chosen
> not to challenge the merits of Plaintiffs'
> case and decided instead to place all of
> their eggs in one basket: this present
> motion.  Unfortunately for Defendants, as
> will be discussed below, that basket is
> porous.  However, procedurally, sovereign
> immunity is a jurisdictional defense, which a
> defendant may raise at any point in the
> litigation.  Therefore, the PA and PLO
> Defendants' failure to file an answer and
> thus default do not affect their ability to
> now raise a sovereign immunity defense.

<u>Id.</u>, 315 F. Supp. 2d at 176.

In order to determine whether the PA and the PLO were
entitled to sovereign immunity, this Court analyzed the legal

-11-

requirements for statehood, as established by the 1933 Montevideo
Convention on the Rights and Duties of States, codified in the
United States in Section 201 of the Restatement Third on Foreign
Relations Law.    Pursuant to these standards, an entity may be
defined as a state, and invoke sovereign immunity, when it is
characterized by: 1) a permanent population; 2) a defined
territory; 3) a government; and 4) the capacity to enter into
relations with other states.    Id. at 177.    This Court found that
neither the PA nor the PLO met these criteria for statehood.    Id.
at 183.    The Court determined further that the criteria for
sovereignty included in the Antiterrorism Act, 18 U.S.C. § 2337,
coincided with those of the Montevideo Convention.    Consequently,
Defendants' motion to dismiss on the basis of sovereign immunity
was denied.

### Ungar V

On March 31, 2004, Judge Martin issued another Report and
Recommendation ("R & R"),[2] in response to Plaintiffs' motions,
advising this Court to enter default judgment against the PA and
the PLO in the amount of $116,409,123.00.    Judge Martin found
that Defendants' failure to comply with discovery had been
willful, and attributable to the PA, rather than its counsel.
Estates of Ungar & Ungar v. Palestinian Authority, 325 F. Supp.

---

[2] Judge Martin's March 31, 2004, R & R is incorporated in
its entirety into Ungar V.

2d 15, 61-63 (D.R.I. 2004) ("<u>Ungar V</u>").  He wrote,

> By refusing to answer any interrogatories,
> admit any facts, produce any documents, or
> produce any officers or employees for
> depositions, the PA effectively frustrates
> the Plaintiffs' ability to prove their
> claims.  This is not a case where default
> judgment is sought as a sanction for one or
> two discovery failings...Here, in contrast, I
> find that the blanket refusal of the PA to
> provide *any* discovery is extremely
> prejudicial.

<u>Id.</u> at 62.

Plaintiffs' made a third motion for entry of default

judgment pursuant to Federal Rules of Civil Procedure Rule

55(b)(2), based on Defendants' failure to answer or otherwise

defend against the Amended Complaint.  In recommending that the

motion be granted, Judge Martin noted that Defendants undeniably

had received notice of the Complaint; that Defendants, rather

than their counsel, were responsible for the failure to answer;

that Defendants had adequate time in which to answer; and,

finally, that Defendants' failure to answer was willful.  <u>Id.</u>,

325 F. Supp. 2d at 65. In a footnote to the R & R, Judge Martin

also cited language from his earlier order granting Plaintiffs'

Motion to Enter Default, discounting Defendants' argument that

volatile circumstances in the Mid-East prevented them from

answering the Complaint:

> ...it is clear that their failure to file an
> answer to Plaintiffs' Amended Complaint is
> the result of a deliberate choice and not due

-13-

Add.13

> to an inability to file an answer.  The
> Palestinian Defendants acknowledge that
> '[t]he drafting and filing of an answer is
> within defendants' limited capacities...'
> Indeed, it would be almost impossible for
> them to contend otherwise given their
> extensive filings as reflected in
> the...travel.

<u>Id.</u>, 325 F. Supp. 2d at 65, fn. 52 (citation to Defendants'
memorandum omitted.)

Defendants objected to the R & R, and also appealed a
separate order made by Judge Martin requiring them to pay
Plaintiffs attorneys' fees as a sanction for their failure to
provide Plaintiffs with any discovery throughout the duration of
the litigation.  Plaintiffs, for their part, moved the Court to
amend a portion of its order on sovereign immunity included in
<u>Ungar IV</u>.  These three motions were the subjects of <u>Ungar V</u>.

### *Objections to the R & R*

Defendants objected to Judge Martin's R & R on six grounds,
many of which will resonate with familiarity even to a newcomer
to this matter.  First, Defendants argued that the Court lacked
subject matter jurisdiction over this litigation because the
issues herein are non-justiciable, and because Defendants are
entitled to sovereign immunity. Citing its previous analysis,
this Court overruled this objection.  <u>Id.</u>, 325 F. Supp. 2d at 22.

Next, Defendants argued that their objective is to protect
and promote the interest of the Palestinian people and that they

-14-

Case 1:00-cv-00105-L-DLM   Document 569-1   Filed 10/21/10   Page 90 of 103 PageID
Case 1:00-cv-00105-L-DLM   Document 442   Filed 05/13/2009   Page 15 of 26
#: 6302

lack the intent to engage in terrorism as it is defined by the
Antiterrorism Act.  Explaining that it was compelled to consider
all of Plaintiffs' allegations as true in light of Defendants'
failure to answer the complaint or comply with discovery, this
Court overruled this objection as well.  Id. at 23.

Third, Defendants argued that the effect of the R & R is to
impose the burdens of litigation on them before they have
received a final determination on their claim of sovereign
immunity.  Noting that Defendants had "increased the costs borne
by Plaintiffs and prolonged this litigation unnecessarily" with
their repetitive claims of sovereign immunity, the Court rejected
this argument.  Id. at 23.

Defendants' fourth objection was similarly overruled.
Defendants asserted that the R & R failed to consider the
difficult conditions endured by the Palestinian government, the
PA and the PLO, which conditions made discovery difficult and
adverse to Palestinian national interests.  Defendants' assertion
is belied by the extent of the filings they were able to make
throughout the litigation.  Moreover, both this Court and Judge
Martin gave Defendants repeated opportunities to present
affidavits or other evidence, extending time limits and
continuing hearings.

> Yet, these Defendants made the deliberate
> choice not to participate in this litigation
> and have not answered a single interrogatory
> or request for admission or produced a single

**Add.15**

document sought by Plaintiffs.

Id. at 24. Defendants' fifth objection was that Judge Martin erred in finding that the Court could exercise personal jurisdiction over the PA and the PLO. The Court overruled this objection as well, citing the reasoning set forth in Ungar I.

Defendants' final objection to the R & R was that the damages award for the death of only one person was disproportionate in light of the thousands of civilians who have died in the ongoing conflict in the disputed territories of Israel and the Gaza Strip. Moreover, Defendants argued, the burden of paying the award would fall on the already-impoverished and oppressed Palestinian people. In rejecting this argument, this Court pointed out that it was a deliberate and strategic decision on the part of Defendants to refuse to participate in either a trial which would have assessed their liability or in the hearing on damages. Id., 325 F. Supp. 2d at 24. Overruling all six objections made by Defendants, this Court adopted Judge Martin's second R & R in its entirety. Id. at 25.

### Attorneys' fees

Defendants further objected to Judge Martin's order of March 31, 2004, granting Plaintiffs' request for attorneys' fees as a sanction for its many delays and ultimate refusal to comply with discovery requests and orders, pursuant to Federal Rules of Civil Procedure Rule 37(b)(2). Defendants argued that the award of

-16-

Add.16

Case 1:00-cv-00105-L-DLM   Document 569-1   Filed 10/21/10   Page 92 of 103 PageID
Case 1:00-cv-00105-L-DLM   Document 302   Filed 05/13/2009   Page 17 of 26
#: 8692

$116,409,123.00 was excessive, that the discovery requests were unreasonable, and that their position on discovery had been taken in good faith. This Court, however, affirmed Judge Martin's ruling:

> Given the PA's history of refusing to comply
> with this Court's orders and the rules of
> procedure governing depositions,
> interrogatories, and requests for the
> production of documents and for admissions,
> this Court finds Judge Martin's conclusion to
> sanction the PA for its deliberate actions to
> delay the completion of this litigation to be
> clearly correct.

Id. at 26.

### Waiver of sovereign immunity

Finally, Ungar V also addressed Plaintiffs' Motion, brought pursuant to Federal Rules of Civil Procedure Rule 59(e), for this Court to reconsider its ruling in Ungar IV that Defendants had not waived their right to assert a sovereign immunity defense by failing to advance the defense in an answer. Plaintiffs also pointed to statements, or admissions, made by Defendants as to their "undefined" status to support their argument that Defendants had waived the sovereign immunity defense. Reviewing the Ungar IV analysis, this Court pointed out that its determination that Defendants had not waived the defense was essentially dicta because the Court's ruling was that Defendants were not entitled to sovereign immunity – rendering the waiver argument moot. Id. at 27. Moreover, the Court concluded, in

-17-

<u>Ungar V</u>, that Defendants had never made the "clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity" which was required by the Foreign Sovereign Immunities Act, 28 U.S.C.A. § 1605(a)(1) in order to make a valid waiver.  <u>Id.</u> at 27.  Consequently, Plaintiffs' Motion to Amend was denied.  <u>Id.</u> at 28.

### First Circuit appeal

Defendants PA and PLO appealed this ruling to the First Circuit Court of Appeals.  In <u>Ungar v. Palestine Liberation Organization</u>, 402 F.3d 274 (1st Cir. 2005), the First Circuit held that the case was justiciable, and that the sovereign immunity defense was unavailing.  <u>Id.</u> at 282, 292.

Defendants argued that the default judgment should be overturned because they were entitled to have received a final determination on their sovereign immunity defense before being required to participate in the litigation.  In response, the Court noted that this Court's jurisdiction indeed would have lapsed had Defendants moved to dismiss the complaint on the basis of sovereign immunity and then timely appealed the denial. <u>Id.</u> at 293.  However, the Court went on to point out the flaw in Defendants' reasoning:

> None of the cited cases stand for the
> proposition that sovereign immunity is a
> trump card that may be held in reserve until
> a defendant sees fit to play it, thus
> enabling the defendant to stop the litigation
> in its tracks at a time of its choosing. ...

-18-

Case 1:00-cv-00105-L-DLM   Document 569-1   Filed 10/21/10   Page 94 of 103 PageID
Case 1:00-cv-00105-L-DLM   Document 442   Filed 05/13/2009   Page 19 of 26
#: 8311

> The defendants, for whatever reason, elected
> not to assert sovereign immunity in either of
> their first two motions to dismiss. By the
> time that the district court ordered the
> entry of default, the defendants still had
> not moved to dismiss on the grounds of
> sovereign immunity.

402 F.3d at 293. Concluding that Defendants "have failed to show

that the district court acted precipitously either in entering

default or in reducing the default to judgment," the First

Circuit affirmed Ungar V in its entirety.[3]

### Defendants' Motion to Vacate Default Judgment

Now Defendants PA and the PLO come before the Court years

later seeking to set aside the $116 million default judgment

entered against them by this Court's ruling in Ungar V, 325 F.

Supp. 2d 15 (D.R.I. 2004). Arguing that extraordinary

circumstances exist that compel vacatur, Defendants make their

motion pursuant to Federal Rule of Civil Procedure 60(b)(6).

Defendants argue that their previous litigation strategy failed

to develop important distinctions between them and their Hamas

co-defendants. In fact, Hamas not only carried out the attack

against the Ungars at a time when the PA and the PLO assert that

they were actively engaged in cooperative efforts with Israel and

the United States to prevent anti-Israel violence, but, indeed,

---

[3] Defendants then appealed the First Circuit's ruling to the
Supreme Court, which denied the petition for certiorari at 546
U.S. 1034 (2005).

-19-

Add.19

Hamas carried out the attacks <u>in order</u> to disrupt these peace efforts. The PA and PLO assert that they share no culpability for the attack on the Ungars; the judgment against them reflects only their former misunderstanding of the Court's proceedings and their consequent procedural mistakes. They are now fully committed to litigate the matter on the merits, in good faith. They argue that the already-impoverished Palestinian people will endure further suffering if Defendants are forced to pay the judgment for acts of terrorism for which they bear no responsibility. Moreover, Defendants argue that the Ungars' remedy should be limited to the judgment they have already secured against Hamas, the actual perpetrators of the attack.

In response to these arguments, Plaintiffs assert that Defendants' Motion is another tactic in a consistent pattern aimed at derailing the litigation and frustrating Plaintiffs, through deliberate delays and refusal to cooperate with the Court. Plaintiffs allege that Defendants have stated that they "will never pay" the judgment. Moreover, because the default was the result of Defendants' willful and deliberate conduct, they are barred from relief under Rule 60(b)(6).

Federal Rule of Civil Procedure 60(b) empowers federal courts "in certain carefully delimited situations . . . to 'vacate judgments whenever such action is appropriate to accomplish justice.'" <u>Teamsters, Local No. 59 v. Superline</u>

-20-

**Add.20**

Transp. Co., 953 F.2d 17, 19 (1st Cir. 1992)(quoting Klapprott v.

United States, 335 U.S. 601, 614-15 (1949)).  Courts applying

Rule 60(b) seek to balance competing priorities: resolving

disputes on their merits, on the one hand, and, on the other,

recognizing the finality of judgments.  Superline, 953 F.2d at

19.

     In Rule 60(b)(1)-(5), the Rule provides five specific

reasons for which relief may be granted, ranging from fraud,

mistake to newly-discovered evidence.  The final section,

60(b)(6), adds a catch-all category for "any other reason that

justifies relief."  Fed. R. Civ. P. 60(b)(6).  This section

operates exclusively of the other five categories; relief is only

appropriate when subsections (1) through (5) do not apply.  Cotto

v. United States, 993 F.2d 274, 278 (1st Cir. 1993).

     In general, courts are reluctant to disturb judgments under

Rule 60(b) unless the movant can demonstrate that certain

criteria have been achieved, including timeliness, the existence

of exceptional circumstances justifying extraordinary relief, and

the absence of unfair prejudice to the opposing party.

Superline, 953 F.2d at 19 -20.  In addition, in order to obtain

relief under Rule 60(b), a litigant "must give the trial court

reason to believe that vacating the judgment will not be an empty

exercise."  Id.  Although the movant need not show "an ironclad

claim or defense which will guarantee success at trial," it must

-21-

**Add. 21**

at least demonstrate that it possesses "a potentially meritorious claim or defense which, if proven, will bring success in its wake." Id. at 21.

The Court notes that, if it were to grant the motion to vacate the default, this would be extremely prejudicial to the Plaintiffs because they would be unable to conduct much of the crucial discovery that would have been possible years ago when they first requested it. Chief among key witnesses who are no longer available is Yasser Arafat, who died four months after the entry of the default judgment. In addition, important documents, which were located in PA offices in the Gaza Strip, are no accessible to the PLO or the PA since Hamas has taken control of this area.

However, analysis of the prejudice to plaintiffs and the other Superline factors is not determinative to the Court's decision herein because, in the First Circuit, a litigant's strategic choice to default precludes a finding of exceptional circumstances under Rule 60(b)(6). In Paul Revere Variable Annuity Ins. Co. v. Zang, 248 F.3d 1, 5 (1st Cir. 2001), the First Circuit affirmed the trial court's denial of plaintiffs' 60(b)(6) motion, explaining that district courts have broad discretion to determine whether or not a case presents exceptional circumstances which would justify such extraordinary relief. Citing operative language from the Supreme Court's

-22-

**Add.22**

Case 1:00-cv-00105-L-DLM    Document 569-1    Filed 10/21/10    Page 98 of 103 PageID
Case 1:00-cv-00105-L-DLM    Document 442    Filed 05/13/2009    Page 23 of 26
#: 3442

decision in <u>Ackermann v. U.S.</u>, 340 U.S. 193, 198 (1950), the
First Circuit described the <u>Paul Revere</u> plaintiffs' litigation
decision as a "free, calculated, and deliberate" one.  The
purpose of the Rule, the Court went on, is not to relieve a party
from calculated decisions made in the course of formulating
litigation strategy.

> Where a party makes a considered choice,
> though it may involve some calculated risk,
> he "cannot be relieved of such a choice
> because hindsight seems to indicate to him"
> that, as it turns out, his decision was
> "probably wrong."

248 F.3d at 6 (quoting from <u>Ackermann</u>, 340 U.S. at 198).

In <u>Claremont Flock Corp. v. Alm</u>, 281 F.3d 297 (1st Cir.
2002), the First Circuit affirmed the denial of a motion for
relief from a default judgment entered against a Swedish
businessman, who claimed that he thought the litigation had ended
after he filed his answer.  Pointing out that Alm had done
nothing to confirm that the lawsuit had been dismissed, the Court
went along with the trial court's determination that the default
was a result of Alm's own negligence and not extraordinary
circumstances beyond his control.  281 F.3d at 300.  Citing
often-quoted *dicta* from <u>Pioneer Inv. Serv. Co. v. Brunswick
Assoc.</u>, 507 U.S. 380, 393 ("To justify relief under subsection
(6), a party must show extraordinary circumstances suggesting
that the party is faultless in the delay."), the First Circuit

-23-

concluded that, "The district court did not abuse its discretion in drawing this inference of fault from the evidence in the record." Id. at 300.

And, in an earlier case, Lubben v. Selective Service System Local Bd. No. 27, 453 F.2d 645, 651 (1st Cir. 1972), the First Circuit held that the government's failure to file an appeal was a bar to its subsequent decision to seek relief from a judgment via a 60(b)(6) motion.

> We do not speculate on the reasons why the government did not pursue its direct attack on the *Lubben* injunction; it was sufficient that the decision to do so was one of unfettered choice and free will. Having made that choice, the government must now live with its decision.

453 F.2d at 652.

Supreme Court jurisprudence provides ample support for the First Circuit's rulings. The Ackermann case, frequently cited by the First Circuit, involved German immigrants whose certificates of naturalization were cancelled during the Second World War. Because they had no money and the U.S. immigration officer who was detaining them advised them that they would be released when the war ended, they did not pursue an appeal. Later, in the face of deportation, they sought relief from the judgment. Rejecting Ackermann's request, the Court wrote,

> His choice was a risk, but calculated and deliberate and such as follows a free choice. Petitioner cannot be relieved of such a

-24-

Add.24

> choice because hindsight seems to indicate to
> him that his decision not to appeal was
> probably wrong, considering the outcome of
> the Keilbar case.  There must be an end to
> litigation someday, and free, calculated,
> deliberate choices are not to be relieved
> from.

Ackermann v. U.S., 340 U.S. 193, 198 (1950).  This language was

recently cited approvingly by the Supreme Court in a criminal

case, Gonzalez v. Crosby, 545 U.S. 524, 538 (2005).

     In the present case, "someday" has arrived, and it is time

for this litigation to end.  Defendants participated extensively

in all phases of the litigation to this point, and they are now

suffering the consequences of their strategic decisions.  When

default was entered against them, Judge Martin noted that

Defendants' "failure to file an answer was the result of a

deliberate choice and not due to an inability to file an answer."

Ungar V, 325 F. Supp. 2d at 40.  When Plaintiffs subsequently

twice moved for an entry of default judgment, Judge Martin

declined to hear arguments and instead took the opportunity to

warn Defendants of the risks they were taking and to give them

another opportunity to comply with discovery.  Ungar V at 41.

Throughout the eight-year span of this litigation, time limits

were extended and continuances granted as this Court repeatedly

provided Defendants with the chance to defend themselves against

Plaintiffs' allegations.  The First Circuit indicated its accord

with the conclusions of both Judge Martin and this writer, when

Add.25

it wrote, "The district court found, and the defendants' own words appear to confirm, that this recalcitrance was intentional and designed to accomplish some obscure strategic aim." <u>Ungar v. Palestine Liberation Organization</u>, 402 F.3d 274, 293 (1st Cir. 2005). Early in the litigation, former United States Attorney General Ramsey Clark revealed that this was Defendants' litigation strategy when he made his monumental judicial admission that Yasser Arafat had instructed him not to file an answer or defend this case on the merits because Arafat would not recognize the jurisdiction of this or any American court over the PA or PLO. These choices were the intentional, deliberate and binding decisions made by the PA's dictatorial leader. Defendants must now accept the consequences of these decisions.

Conclusion

For these reasons, Defendants' Motion to Vacate the Default Judgment is denied.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
May 13 , 2009

-26-

Add.26

## Fed. R. Civ. P. 60.  Relief from a Judgment or Order

(a) Corrections Based on Clerical Mistakes; Oversights and Omissions.  The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
   (1) mistake, inadvertence, surprise, or excusable neglect;
   (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
   (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
   (4) the judgment is void;
   (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
   (6) any other reason that justifies relief.

(c) Timing and Effect of the Motion.
   (1) *Timing.* A motion under Rule 60(b) must be made within a reasonable time--and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.
   (2) *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

(d) Other Powers to Grant Relief.  This rule does not limit a court's power to:
   (1) entertain an independent action to relieve a party from a judgment, order, or proceeding;
   (2) grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or
   (3) set aside a judgment for fraud on the court.

Add.27

(e) Bills and Writs Abolished.  The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.