# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs – Judgment Creditors,

v.                                                                                     C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

    Defendants – Judgment Debtors.

## REPLY IN FURTHER SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS' MOTION TO STRIKE AND TO COMPEL

### Preliminary Statement

Defendants have informed the Court that their Reply in support of their motion for a protective order (dkt. # 561) constitutes their Opposition to the instant motion. *See* dkt. # 564 at 1 ("As Defendants have already responded to Plaintiffs' motion to strike and to compel in their reply to Plaintiffs' opposition to Defendants' motion for a protective order … that reply should be treated as constituting Defendants' opposition to Plaintiffs' motion to strike and to compel.").

Defendants argue, however, that the Ungars should not be permitted to file a reply in further support of the instant motion, because their filing of both a motion to strike and compel and an opposition to Defendants' motion for a protective order was an improper attempt to "create an opportunity for the 'last word.'" *Id*.

This argument is frivolous. As explained in their opening motion papers the Ungars had no choice but to file a motion to strike and compel in addition to their opposition to Defendants' motion because Defendants first served objections and then filed a motion for a protective order reiterating some but not all of Defendants' objections. Dkt. # 552 at 21-22 and n. 19.

Thus, denial of the motion for a protective order will not dispose of all Defendants' objections and so will not automatically entitle the Ungars to the discovery sought.

Therefore, it was the Defendants – not the Ungars – who created "needless complexity and delay" (dkt. # 564 at 1) by bizarrely choosing to both serve objections and file a motion for a protective order, and the instant motion, and this Reply in support thereof, are perfectly proper.[1]

For their reasons set forth below and in the Ungars' opening motion papers, the instant motion should be granted.

## ARGUMENT

While Defendants' memorandum is somewhat meandering and repetitive, their arguments can fairly be divided into two main topics: (a) whether Defendants' post-judgment conduct is relevant to their Rule 60(b)(6) motion and entitles the Ungars to discovery in respect thereto; and (b) whether and to what extent the discovery sought is privileged.

The Ungars will address these topics in turn.

**I. Defendants' Efforts to Thwart Enforcement of the Judgment Are Relevant to the Rule 60(b)(6) Motion and the Ungars Are Entitled to Discovery in Respect Thereto**

### A. *The Ungars Do Not Seek Discovery About Mere <u>Non-Payment</u> of the Judgment*

In an effort to confuse issues, Defendants' memorandum expends much ink arguing that a Rule 60(b)(6) movant's failure to pay the judgment is not a factor to be weighed in considering whether to grant the motion. While the Ungars disagree with this argument, the Court need not address it, because none of the discovery sought relates to Defendants' passive non-payment.

---

[1] The Ungars' motion to compel is proper for a second and unrelated reason: absent an express affirmative order compelling discovery pursuant to Rule 37, the Defendants could ignore the Ungars' requests with impunity because Rule 37 does not permit sanctions absent a prior court order to produce.

Indeed, Defendants' deadbeat failure to pay is not disputed, and no discovery is necessary in respect thereto. The discovery at issue here relates not to Defendants' *nonfeasance*, but to their *malfeasance* – i.e. their active siphoning of funds from a corporation (the PIF) the ownership of which was transferred to the Ungars by this Court (dkt. #381) in an attempt to satisfy their judgment and Defendants' active efforts to interfere with the Ungars' other enforcement actions.

Thus, Defendants' entire discussion of their passive non-payment is a blatant straw man which can and should be ignored by this Court.

### B.  *Defendants Grossly Misrepresent the Effect of the Creditor's Bill Judgment*

The Ungars' opening papers clearly showed, and Defendants do not deny because they cannot, that the PA has been systematically siphoning – i.e. stealing – funds from the PIF since this Court entered final judgment on the creditor's bill judgment in September 2006 awarding ownership of the PIF to the Ungars, and that the PA is continuing to do so even today. Additionally, the PA has purported to amend the PIF's articles of association and has caused the PIF to bring actions in Ramallah, Cairo and Amman, all of which actions were aimed at negating the effect of the creditor's bill judgment and thwarting the Ungars' enforcement proceedings.

In a lame effort to excuse this shocking bad-faith conduct – which utterly collapses Defendants' claim that they now honor the decisions of the U.S. courts and constitutes sufficient grounds, standing alone, to deny their Rule 60(b)(6) motion – the Defendants attempt to argue that the geographical effect of the creditor's bill judgment is limited to Rhode Island.

This claim is ludicrous. By its plain language, the creditor's bill judgment is an *in personam* judgment directed at the PA, which transferred the PA's **ownership** of the PIF (and the PCSC) to the Ungars:

3

> [A]ll of the Palestinian Authority's ownership rights in the Palestine Investment Fund Company…that are evidenced by the certificate attached hereto to as Appendix 3… are hereby assigned, transferred and conveyed to The Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Michal Cohen, Amichai Ungar and Dafna Ungar.

*See* dkt. # 381 and dkt. # 552 at Exhibit B.

As noted in the Ungars' opening papers, Judge Lagueux has expressly confirmed that the effect of the creditor's bill judgment was to transfer ownership of the PIF to the Ungars:

> THE COURT: … the Court has entered judgment in the petition to reach and apply the assets of the Palestinian Authority in the Palestine Investment Fund. And the Palestinian Authority defaulted, and the Court entered judgment and transferred to the Plaintiffs all interests of the Palestinian Authority in that Fund, that separate corporation. ***So the Plaintiffs became the stockholders, the sole stockholders of the Palestine Investment Fund***.

Dkt. # 552 at Exhibit E (emphasis added).

Thus, the Ungars own the PIF, plain and simple.

Obviously, there is not and cannot be any geographical limitation on ownership. It is not the case, as the Defendants absurdly assert, that that the Ungars only own the PIF in Rhode Island (or in the United States) but do not own the PIF in other locations. Ownership is a personal right invested in the owner; it is not and cannot be geographically restricted.

Indeed, if the Defendants and the former PIF leadership really believed that the creditor's bill judgment had no force outside of Rhode Island (or the United States) they would not have filed proceedings in Ramallah and Amman aimed at countering the effect of that judgment.

Thus, any and all actions by the Defendants aimed at undermining the creditor's bill judgment – irrespective of where they were performed – constitute gross misconduct.

### C. Defendants' Attack on the Validity of the Creditor's Bill Should be Rejected

In a further effort to excuse their egregious misconduct regarding the creditor's bill judgment, the Defendants argue that they were free to ignore the creditor's bill judgment because it was entered in error. Dkt. # 561 at 15-17.

But Defendants have never filed a motion to vacate the creditor's bill judgment, and that judgment remains in full force until today. What Defendants are actually arguing here, therefore, is that they are free to ignore the judgment because they *disagree* with it.[2]

The Court should firmly and summarily reject this line of argument.

Moreover, Judge Lagueux has already ruled, contrary to Defendants' claim, that the judgment is invalid because the PIF was not a party to the proceedings:

> MR. MEDEIROS: … I'd like to quote from Page 12, where the [Ungars] argue, quote, "As a matter of law, the PIF had no right or standing whatsoever to participate in the creditor's bill proceeding. That proceeding, and the judgment entered thereon, affected only the rights and assets of the PA, not the PIP, and therefore, the only party that had standing to oppose the creditor's bill, or to appeal the judgment, was the PA itself. But the PA intentionally defaulted the creditor's bill and failed to appeal the judgment thereon," close quote.

---

[2] By even making this argument Defendants have completely undermined their Rule 60(b)(6) motion. In essence, Defendants are asserting here that they are free to ignore judgments of this Court with which they disagree. That means that if the judgment in this case were vacated and a new judgment entered against the Defendants after trial, the Defendants would simply ignore it, just as they have ignored the original 2004 judgment and the 2006 creditor's bill judgment.

5

>THE COURT: That's absolutely accurate.
>
>MR. MEDEIROS: It is not, Your Honor, and I'd like to explain—
>
>THE COURT: Yes, it is.

Exhibit A at p. 25:1-14.

Likewise:

>MR. MEDEIROS: The reason why this second grievous noncompliance with the Rhode Island Statute is important—it's not a mere technicality—if Plaintiffs—if the Ungars had complied, as they were required to, with 9-28-1, instituting a new reach-and-apply statute, they would have been obligated to name the PIF as a Defendant in that action.
>
>THE COURT: They do not. They did not have the requirement of naming the PIF. The PIF had no interest, had no interest in that proceeding.
>
>MR. MEDEIROS: It absolutely did, Your Honor.
>
>THE COURT: No, it did not.
>
>MR. MEDEIROS: It was the entity whose assets the Ungars—
>
>THE COURT: No.
>
>MR. MEDEIROS: — are trying to get their hands on to satisfy their judgment.
>
>THE COURT: No, no, no. What the Ungars were trying to get hold of was the assets, the ownership

>           interests of the PA, and the PA defaulted. The PIF
>           was not an indispensable party or even a required
>           party to that creditor's bill.

*Id*. at p. 38:5-25 – 39:1.[3]

In any event, it is obvious that Defendants are not entitled to disregard and seek to thwart a judgment because they disagree with it, and their efforts to do so constitute misconduct.

### D.   *Defendants Cannot Shift Blame to the PIF for Their Own Conduct*

In yet another effort to paper over their theft of PIF funds and their other misconduct relating to the creditor's bill judgment, Defendants attempt to shift all the blame to the PIF. Dkt. # 561 at 5 ("PIF's conduct may not be imputed to the PA or PLO absent a finding that PIF is an alter ego of the PA or PLO").

---

[3] This ruling is supported by the well-established rule that a corporation has no standing to object to its assignment to new owners since the corporation is merely the ***object*** of the ownership rights, ***the thing owned***, and it has no say as to whether and to whom those rights may be assigned. *See Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1050 (8th Cir. 2002) ("a corporation has no standing to assert rights belonging to its shareholders"); *Silesian Am. Corp. v. Clark*, 332 U.S. 469, 740 (1947) (same); *Matter of Calamity Jane's, Inc.,* 22 B.R. 5, 7 (D.N.J. 1982) (same); *Victor v. Riklis*, 1992 WL 122911 at *4 (S.D.N.Y. 1992) (same); *Matter of Paso Del Norte Oil Co.*, 755 F.2d 421 (5th Cir. 1985) (same); *In re Hirsch*, 339 B.R. 18, 30 (E.D.N.Y. 2006) (same); *King v. Barnes*, 109 N.Y. 267, 282 (1888) (same); *Coleman v. Johnston*, 532 F.Supp. 370, 371 (S.D.N.Y. 1981) (same); *Perkins v. Benguet Cons. Min. Co.*, 55 Cal.App.2d 720, 738-739 (1942) ("It is well settled that a corporation is not a necessary party to an action between rival claimants to shares of its stock.").

Thus the only party with standing to oppose the creditor's bill was the (former) owner of the PIF – i.e. the PA itself. "Individual rights of shareholders and injuries against shareholders individually cannot be enforced or redressed in an action by the corporation, but the action must be by the shareholders individually." 12B Fletcher Cyc. Corp. § 5934 (2006).

This argument can be swiftly disposed of. *First*, the PA has received huge transfers of funds from the PIF. Surely Defendants cannot claim with a straight face that these transfers were carried out without the active participation of the PA. *Second*, as shown in the Ungars' opening papers, the person in effective control of the PIF and its portfolio today is Mohammed Mustafa, who also serves as the PA's Economic Advisor with the rank of PA Minister. Obviously, then, the PA is directly involved in and responsible for the actions taken in the name of the PIF.

Indeed, in a November 28, 2006 letter, Defendants leader, Mahmoud Abbas expressly stated that he had tasked Mustafa with fighting the creditor's bill judgment. Exhibit B at 2.

### E.   *The Amenability of the Assets at Issue to Execution Is Irrelevant*

Defendants also argue at length that unless and until the Ungars demonstrate that the assets against which they seek to enforce their judgment are indeed subject to execution by them Defendants' efforts to prevent enforcement of the judgment against those assets are legitimate and therefore irrelevant to their Rule 60(b)(6) motion and so not a proper subject of discovery.

Effectively, Defendants are claiming that unless and until the Ungars have finally prevailed on their enforcement proceedings, Defendants are free to scheme and conspire with the various entities involved to delay, thwart or disrupt the proceedings.

This argument is plainly absurd. Attempts to interfere with or delay judgment enforcement proceedings just for the sake of delay unquestionably constitute misconduct. *See e.g. Overmyer v. Fidelity & Deposit Co. of Maryland*, 554 F.2d 539, 543 n. 4 (2nd Cir. 1977) ("The use of this court solely as a dilatory tactic to avoid paying a judgment is a serious breach of professional ethics" and a violation of Fed.R.Civ.P. 11).

Thus, if Defendants assisted the various third parties to delay the proceedings for the sake of delay, they are guilty of misconduct irrespective of whether the Ungars ultimately prevail.

### F. Defendants "Amenability to Execution" Argument Is Irrelevant to the Proceedings Involving the PIF, the PCSC and the PMA

Even assuming *arguendo* that, as Defendants claim, until the Ungars prove that the assets against which they seek to enforce their judgment are subject to execution Defendants are entitled to assist the various entities holding the assets to delay or stymie the proceedings, the proceedings involving the PIF, the PSCS and the PMA would not be included in that proposition.

That is because this Court has granted the Ungars ownership of the PA and the PSCS in the creditor's bill judgment, and because the Appellate Division of the New York Supreme Court has expressly ruled that the PMA is presumptively legally identical with the PA and it is the PMA's burden to prove otherwise. *See PMA v. Strachman*, 62 A.D.3d 213, 223873 N.Y.S.2d 281 (1st Dept. 2009) (Finding that the "evidence and testimony at the hearings tended to support the contention that the PMA is legally indistinguishable from the PA" and that the "burden … lies with the PMA to show that it is a separate entity and not the alter ego of the PA.").

Thus, even under Defendants' theory, the Ungars are entitled to discover Defendants communications regarding the PIF, the PCSC and the PMA. This includes communications with the PMA, the PIF and PCSC (and with persons purporting to act for the PIF and PCSC) as well as communications with Orascom, the Canaan entities and Becont, all of which are involved in proceedings relating to PIF assets.

In fact, the ***only*** entity listed in the Ungars discovery requests that would be excluded under Defendants' theory would be the PIF.

## II. Defendants' Arguments in Respect Privilege Should Be Rejected

### A. Defendants Have Waived Privilege by Failing to Produce a Privilege Log

In support of their high-handed refusal to produce a privilege log after repeatedly recognizing their duty to do so, Defendants belatedly cite to *United States v. Philip Morris, Inc.*,

9

347 F.3d 951, 954 (D.C. Cir. 2003), which held that a party asserting other privileges is exempt from producing a privilege log until its other objections are ruled upon. Unfortunately for Defendants, the holding in *Philip Morris* is not the law in this Circuit. Furthermore, even the D.C. federal courts have warned parties not to unilaterally rely on the holding in *Philip Morris:*

> [A]n accurate summary of the existing case law would have been that federal courts are insistent upon the timely production of a privilege log [and] have enforced waivers when the production was not timely …
>
> That case law would have alerted ***any lawyer with a healthy respect for his own skin*** to either produce the privilege log with the documents her client was producing, negotiate some other arrangement with opposing counsel, ***or seek judicial relief from the obligation to produce a privilege log until a date certain or until some other event, such as the resolution of its objections to the document requests***.

*Banks v. Office of the Senate Sergeant-at-Arms and Doorkeeper*, 226 F.R.D. 113, 117 (D.D.C. 2005) (emphasis added).

Here, Defendants have unilaterally refused to produce a privilege log despite their repeated promises to do so and the Ungars' repeated requests, and without obtaining leave of this Court to delay production until after resolution of its other objections.

Accordingly, Defendants could not take refuge in *Philip Morris* even if it was good law in this Circuit, which it is not. Indeed, in litigation pending in the District of Columbia, Defendants' counsel in this proceeding, Mr. Hill of Miller & Chevalier, recently sought to compel production of documents claimed to be privileged on the grounds that the opposing party

had failed to produce a complete privilege log. *See Trustees of Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc.*, 266 F.R.D. 1, 9 at n. 8 (D.D.C. 2010).[4]

Defendants are therefore well aware of their duty to produce a privilege log, and well aware that by refusing to do so they risked a finding of waiver.

Given Defendants' contumacious refusal to provide a privilege log, and the limited period available for discovery the Court should find that Defendants have waived all privileges.

## B. The Crime-Fraud Exception

Defendants argue that the Ungars have failed to present a basis for application of the crime fraud exception. Defendants are mistaken. In respect to the PIF, Defendants' admitted actions – stealing money from a corporation the ownership of which was transferred to the Ungars – clearly fit into the crime-fraud exception.

In respect to the other entities, determining whether the crime-fraud exception applies would require the production of a privilege log and likely *in camera* review by the Court.

Such a review would not be difficult: the case law cited by the Ungars in their opening papers clearly shows that any attempts by the Defendants to delay the Ungars' enforcement actions for the sake of delay, and any attempts to shelter or shield assets from enforcement,

---

[4] The First Circuit has found Defendants' counsel's experience in other cases relevant to their missteps in this action. *See Ungar v. PLO*, 2003 WL 21254790 at * 1 (1st Cir. 2003) ("The appellants had ample opportunity to file a properly supported motion under Fed.R.Civ.P. 12(b)(1) seeking dismissal on sovereign immunity grounds … Indeed, they did just that, ***through the same counsel***, in unrelated litigation thirteen years ago. *See Klinghoffer v. S.N.C. Achille Lauro*, 739 F.Supp. 854, 856-58 (S.D.N.Y. 1990), vacated on other grounds, 937 F.2d 44 (2d Cir. 1991). That course of conduct belies their present complaint.") (emphasis added).

would fall squarely into the crime-fraud exception. If the Court finds any communications reflecting such conduct upon *in camera* review, it should find that they are not privileged.

And if Defendants oppose such a review it is only because they have something to hide.

### C. Production Pursuant to Rule 26(b)(3)(A)(i)-(ii)

In response to the Ungars' request that production be ordered pursuant to Rule 26(b)(3)(A)(i)-(ii), Defendants make only two anemic arguments, both of them meritless.

*First*, Defendants claim that the Ungars have not shown "substantial need" because the discovery sought is irrelevant to the Rule 60(b)(6) motion. But as shown in the Ungars' opening papers, Defendants' post-judgment misconduct and inference with enforcement of the judgment is indeed highly relevant to their motion.

*Second*, Defendants assert that even if the Ungars have shown substantial need in respect to regular work product, they would need to make an even higher showing of need for work product constituting "mental impressions" of counsel.

Effectively, then, Defendants have proffered no substantive response at all to the Ungars' request for production under Rule 26(b)(3)(A)(i)-(ii), and effectively conceded this point.

Thus, the Court could simply bypass the parties' disputes regarding waiver and the crime-fraud exception, and order production under Rule 26(b)(3)(A)(i)-(ii).[5]

---

[5] Defendants' proposal that the Court should issue invitations to the various third parties involved to intervene to protect their work-product privileges is preposterous. The Court can be certain that the Defendants and their counsel have made all these entities fully aware of these discovery requests and if they had wanted to intervene they could, would and should have done so already. Any motion to intervene would therefore be untimely at this point and moreover, the Defendants adequately represent the interests of the various entities because they are already asserting the selfsame privileges.

12

**WHEREFORE** the instant motion should be granted.

Dated: October 22, 2010

Plaintiffs-Judgment Creditors,
by their Attorneys,

/s/ David J. Strachman
David J. Strachman (#4404)
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

Max Wistow (#0330)
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)
mw@wistbar.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on October 22, 2010, a true and genuine copy of the foregoing was served by ECF on Defendants' counsel of record listed below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/s/ David J. Strachman