1                    IN THE UNITED STATES DISTRICT COURT

2

3                    FOR THE DISTRICT OF RHODE ISLAND

4

5        * * * * * * * * * * * * * * *    C.A. NO. 06-501L

6                                    *

         LEBOEUF, LAMB, GREENE &       *

7        MACRAE LLP                    *    JUNE 19, 2007

                                       *    2:04 P.M.

8            VS.                       *

                                       *

9        DAVID STRACHMAN, et al        *

                                       *

10       * * * * * * * * * * * * * * *    PROVIDENCE, RI

11

12            BEFORE THE HONORABLE RONALD R. LAGUEUX,

13                        SENIOR JUDGE

14              (Defendants' Motion to Dismiss)

15    FOR THE PLAINTIFF:

16                         MATTHEW F. MEDEIROS, ESQ.

                           Little, Medeiros, Kinder, Bulman &

17                         Whitney

                           72 Pine Street

18                         Providence, RI   02903

19    FOR THE DEFENDANTS:

20                         DAVID J. STRACHMAN, ESQ.

                           McIntyre, Tate, Lynch & Holt

21                         321 South Main Street

                           Suite 400

22                         Providence, RI   02903

23

      Court Reporter:      Debra D. Lajoie, RPR, FCRR, CRI

24

25                Proceeding reported and produced by

                  computer-aided stenography

```
 1    19 JUNE 2007--2:04 P.M.
 2            THE COURT:  Good afternoon, everyone.
 3            The matter before the Court is Civil
 4    Action 06-5011, Leboeuf, Lamb, Greene & Macrae, LLP, vs.
 5    David Strachman, as the Administrator of the Estate of
 6    Yaron Unger, and others.  The matter is here on the motion
 7    of the Defendants to dismiss this case under Rule 12(b).
 8            Will the attorneys interested in this matter
 9    identify themselves for the record, please.
10            MR. MEDEIROS:  Good afternoon, Your Honor.
11    Matthew Medeiros, representing the Plaintiff.  My colleague
12    here at counsel table is Gail Gottehrer of the Leboeuf-Lamb
13    law firm.
14            MR. STRACHMAN:  David Strachman for the Ungars.
15            THE COURT:  All right.  It's your motion,
16    Mr. Strachman, so I'll hear you first.
17            MR. STRACHMAN:  Thank you, Your Honor.
18            Your Honor, we're here in a context that would be
19    almost comical if it wasn't such a tragedy and such a
20    travesty of justice.
21            This Court lived with this case, as the Court has
22    indicated on several prior occasions, for years.  There are
23    300 pleadings in this file.  The Court endured three
24    motions to dismiss, eight written decisions, two appeals,
25    numerous delays by the PLO and the PA, caused by their
```

1    attorneys in large measure.

2         And after two years of their refusal to satisfy

3    their judgment and to comply with the order of this Court

4    to pay the Ungars, after the matter had gone to the First

5    Circuit Court of Appeals for the second time, after the

6    Supreme Court declined to review this case further, we

7    filed a motion for a creditor's bill, having been stymied

8    for two years in collecting the judgment, after the PLO's

9    lawyers in Rhode Island, New York and Washington all

10   indicated that, in their words, quote, unquote, they will

11   never pay this judgment, when we filed the creditor's bill

12   in the spring or late spring of 2006, the Defendants

13   failed to respond to the case, and this Court, Your Honor

14   sua sponte ordered them to provide an answer to that

15   creditor's bill.

16        They declined, and they appeared at a hearing on

17   September 13th.  Mr. Sherman, Deming Sherman, was here on

18   their behalf indicating that he was taking no position with

19   respect to the creditor's bill.

20        The Court, after reviewing the extensive materials

21   that we provided along with our brief, granted the relief

22   sought.  And I want to review that very briefly,

23   Your Honor, because I think it's extremely important.

24        We submitted to the Court an affidavit of an

25   attorney in Israel who had reviewed a series of files that

1    were pending in the Israeli courts involving these very

2    same Defendants, the PA and the PLO.

3          In four of those cases at the time,

4    Attorney Coltof, who prepared the affidavit, found that the

5    PA and the PLO had pledged assets contained in their piggy

6    bank, which was the subject of other litigation in this

7    Court, called the PIF, to pay for judgments against them in

8    the terrorist context, cases in Israel by terrorism victims

9    against the PA and the PLO.

10         The PA and the PLO, through counsel, came to

11   Court, filed affidavits, we produced the affidavit, we

12   translated one of them for Your Honor, and they say there

13   is no need for prejudgment security for these cases in

14   Israel because the PA has tons of money.  It has so much

15   money, it can satisfy these judgments.  There is no need

16   for prejudgment security in the form of a prejudgment

17   attachment.  Thus, the very asset, or assets, that are at

18   issue in this case were literally pledged by the PA and the

19   PLO to satisfy terrorism judgments.

20         We asked this Court for very simple relief that

21   was not opposed by the PA or the PLO, and that was, very

22   simply, to give us any rights that the PA has in the PIF,

23   Palestine Investment Fund, its piggy bank, where it

24   corralled all of their assets.  And we filed a report by

25   the World Bank indicating what they did.  We filed their

1    own affidavits, we filed their own listing of assets,

2    et cetera.

3          And the Court reviewed the record and said very

4    carefully on the record that it had reviewed our filing,

5    and based on the filing, there was sufficient information

6    and evidence to grant the relief requested.

7          We also asked the Court, as a second measure in

8    the creditor's bill, second measure of relief, to turn over

9    to us whatever interest or whatever assets that the PA has

10    in the underlying assets owned by the PIF.  And the Court

11    was cautious, and the Court said, "I am not going to get

12    into whether a specific asset belongs to the PIF or not.

13    That will be dealt with elsewhere."

14          But the Court was very clear with respect to the

15    PIF itself, just like any other judgment of creditor, any

16    other scofflaw, who by then was over two years

17    post-judgment, I mean not once volunteered a payment toward

18    the judgment, just like in any other judgment context, or

19    post-judgment context, this Court transferred PA's

20    interests in the PIF.

21          It's no different than if an individual defendant

22    or judgment debtor owned shares of stock in General Motors.

23    General Motors need not be a party to the case, General

24    Motors need not be notified of the case or brought into the

25    case or impleaded.  The debtor owns General Motors stock,

1    this Court has jurisdiction over the debtor and could

2    easily transfer the interests of that debtor to the

3    creditors, and that's exactly what the Court did.

4        At the very end of the hearing, Mr. Oswald, who

5    was here representing one of the PA and PLO's business

6    parters in Connecticut, an investment firm, Canaan Equity,

7    and various entities that they invest their funds in, he

8    came to this Court, and there was a discussion at the end

9    of the hearing.  And at the end of the hearing, I asked the

10   Court to clarify exactly what Your Honor was ruling because

11   I knew at that time, a year ago, that Your Honor's words

12   had been misquoted by various entities in New York,

13   previously the Palestine Monetary Authority, who came to

14   this Court a couple of years ago.

15       Your Honor's transcript was taken, given to a

16   judge and misquoted and manipulated in New York, and I

17   asked the Court, "Please clarify exactly the relief that's

18   being granted."  And Mr. Oswald tried to clarify on behalf

19   of his client, who was not a party to the case at that

20   time, or really not part of the proceedings at that time,

21   but the Court allowed had him to speak.  And,

22   unfortunately, everything that I predicted came true.  The

23   concerns that we had about the manipulation of this

24   transcript and the relief requested came true.

25       We, following the creditor's-- following the

1    granting of the creditor's bill and the entering of final

2    judgment, without opposition by the PA or the PLO, the

3    Ungars attempted to take control of the Palestine

4    Investment Fund.  As they were doing that for the first

5    time, the Palestine Investment Fund retained a law firm,

6    the Leboeuf law firm, threatening to sue the Ungars.

7         The audacity of attempting to sue the Ungars, the

8    adults, the orphans, their attorney for complying with your

9    Court's order, for effectuating the terms of that Court

10   order.  But they did.  They threatened us, and they

11   threatened the orphans, and they threatened the entire

12   family.  Why?  Because they believed they had a right to

13   represent this entity, the PIF.

14        They said that Your Honor's ruling was effectively

15   interrupting their right to their client.  They went to

16   New York, in a proceeding we have against a company called

17   Orascom-- Orascom is a business partner of the PLO, and

18   Orascom owes money to the PA and the PLO via the PIF.  They

19   went to the proceeding that we have pending there in

20   New York, and they asked Federal Judge McMahon to

21   intervene.  The Court rebuffed them and said it was

22   inappropriate.

23        They then went-- a few weeks later, they went to

24   Connecticut with respect to a hearing that we have in

25   Connecticut with the Canaan entities, Mr. Oswald's clients,

1    and again, they attempted to do the same thing.  And they

2    said very clearly, "This Court went too far," quote,

3    unquote, Thomas Rohback from the Leboeuf firm, that's what

4    he said.

5            He also said very clearly, and we've quoted it in

6    full on Page 10 of our brief, he said, quote, "The PIF, if

7    it were to appear, might consent to personal jurisdiction,

8    and if the PIF were to intervene in its own name, it might

9    place itself before the Court."

10           And that was in response to a question of

11   Judge Dorsey, "Why are you, law firm-- a law firm,

12   attempting to intervene in a collection proceeding between

13   two private parties?"

14           And he said, "We can't-- our client can't do this

15   directly because that is going to place us before the

16   Court.  So what we're going to do"-- and he was very clear,

17   very explicitly clear.  They created an artifice.  The

18   artifice is that this law firm now is somehow at risk in

19   its business dealings with the PIF.

20           Of course, they had just been hired a couple of

21   weeks earlier.  And, in fact, at the hearing, and the Court

22   will see, if the Court reviews the transcript, the Court

23   will see that Mr. Rohback himself couldn't even identify

24   the names of the individuals who he was allegedly

25   corresponding with-- or communicating with, rather, because

1    other partners of his had been called, and no one knew

2    exactly, and it was all in a flux.

3           So what we have here now is, ten months after the

4    hearing in September, we have no more Ramsey Clark-- he's

5    off-- he's not involved in this proceeding anymore, but

6    what we have is another group attempting-- or entity

7    attempting to disrupt the collection proceedings, and I

8    would say in a similar fashion to the way this four years

9    of litiga-- four and a half years of litigation was

10   attempted to be interrupted and delayed by Mr. Clark.

11          We can't go forward in New York, in part.  We

12   can't go forward in Connecticut, in whole.  And sort of by,

13   in large measure, the parties had discussed with the Judge

14   a proceeding, so it's partly by agreement, and that is

15   because this Leboeuf firm now asserts this right that it

16   has, no different than the PIF's janitor or the copying

17   service or anyone else who provided a service for the PIF.

18          They claim, because they represent the PIF-- and

19   as Mr. Rohback told us, the PIF can't come to Court because

20   they would place themself in the Court's jurisdiction, they

21   have effectively hijacked our post-judgment collection

22   proceedings.

23          And everything that Your Honor did last September

24   and last summer leading up to the September 13th judgment

25   has effectively been put on hold as a result of, not even

```
 1    the judgment creditor-- debtors directly, but the law firm
 2    who purports to represent the judgment debtors' wholly
 3    owned, self-created piggy bank called the PIF.  And that's
 4    a travesty, and that effects a tremendous injustice to the
 5    Ungars, who've had to search throughout this country and
 6    overseas to satisfy this judgment.
 7            They come to this Court, and they would have this
 8    Court believe that this-- Your Honor went too far, quote,
 9    unquote, in its ruling.  It would have this Court believe
10    that they have standing to actually even bring this lawsuit
11    and to sue the orphans and to sue the family and to sue me
12    for attempting to comply with Your Honor's ruling of last
13    September.
14            None of the-- the PIF itself is not in this Court.
15    It hasn't come to New York, it hasn't come to Connecticut,
16    the other jurisdictions where the PIF has attempted this
17    type of ruse.  And of course they did that-- and they have
18    not done that because, as Mr. Rohback explicitly said, they
19    don't want to do that.  That will place them before the
20    jurisdiction of the Court.
21            The law firm comes in, and the law firm comes in
22    and says, well, we're going to represent our clients,
23    although the real clients here are the officers and the
24    directors of the PIF, and possibly the PIF itself.  Where
25    are they?  They're not here.  So what they do is they have
```

1    their law firm come and attempt to disrupt this collection

2    proceeding.

3           And just as they would be rebuffed in taking this

4    action-- they would be rebuffed in taking this action to

5    disrupt this proceeding and disrupt the collection

6    proceedings because the PIF itself has no standing.

7    General Motors can't come into Court in a collection

8    proceeding and say, Judge, I don't want you to transfer the

9    interests of the judgment debtor, Mr. Smith, to the

10   collection agency that sued him.

11          They have no standing to determine who owns their

12   shares.  This is a matter between two parties.  And now we

13   don't even have the third-party piggy bank.  We have the

14   fourth-party service provider, a law firm hired only after,

15   a month after Your Honor gave this final judgment in the

16   creditor's bill.  Only now do they come forward and are

17   they attempting to sort of highjack and disrupt this

18   litigation, and that's wrong and should not be sanctioned.

19          Now, the underlying merits of this case, the

20   issue, if you will, of the merits, not necessarily in this

21   case, but the merits of the-- with respect to the issue of

22   the nature of the PIF and the Ungars' successful takeover,

23   if you will, of the PIF post the September final judgment

24   is going to be the subject of another proceeding that's

25   already on hold by agreement of the parties, and that is in

1    the context of the original litigation.

2          In that original litigation, post-judgment, we

3    served a subpoena on the Canaan entities.  There is a

4    confidentiality agreement in that case that was executed

5    approximately two years ago.

6          In the context of the Ungars filing a motion to

7    modify that confidentiality agreement, because they need to

8    release some of those documents, they need to get out of

9    that confidentiality agreement, in part, in order to

10   effectuate the terms of the final judgment with respect to

11   the creditor's bill, they filed a motion in this Court.

12   This Court will have to determine some of those underlying

13   issues with respect to the control of the PIF.

14          That's not going to be determined and can't be

15   determined in this case.  This Court has no standing,

16   there's no jurisdiction, as we've said very clearly,

17   there's no diversity between the parties.  To now raise in

18   their reply that it wasn't clear what Judge Martin ruled,

19   whether Yaron Ungar had been a domiciliary of the United

20   States, is grasping at straws.

21          I was at that hearing when Judge Martin, on his

22   own, asked Yaron Ungar's father, "When was the last time he

23   was in the United States?"  And he said, "12 years-- 12 or

24   14"-- I think it was 12 years-- "earlier," hadn't lived

25   here.  Your Honor so ruled, and Your Honor adopted in full

1    Judge Martin's rulings with respect to that very same

2    issue.

3          Now you'd have the law firm-- or they would have

4    the law firm attempt to do discovery against the victims in

5    this case as to whether Mr. Ungar attempted or had an

6    interest in moving back to the United States after not

7    living here for 12 years?  It's an absurdity.  It ends up

8    making a mockery of this proceeding and the last seven

9    years of litigation here.

10          In response to our motion to dismiss, for the

11    first time, other than basically a single sentence in their

12    complaint, they allege that they need this suit brought

13    because there is an allegation by one of the Ungars'

14    New York attorneys that they may be liable under RICO for

15    interfering with the collection proceedings.

16          Clearly, the argument raised in their response to

17    our motion to dismiss was-- brought a whole cloth and

18    invented, in response to our motion, not with respect to

19    the complaint itself because the complaint itself mentions

20    the word RICO once, never says that the underlying

21    predicate acts for RICO are not exigent, asking for a

22    declaratory relief with respect to this alleged RICO claim,

23    and as their own affidavit of Mr.-- Dr. Mustafa indicates,

24    the genesis of the proceedings and the machinations that

25    they set in motion are really with Dr. Mustafa.

1              Because their complaint itself does not lay out a

2       proper RICO claim, it must be denied as being defective.

3       Having read Dr. Mustafa's affidavit, we learned that the

4       law firm is not entirely the leader of this ruse and this

5       excursion, but it's the PIF and the former directors who

6       are now pushing to hide behind-- pushing this litigation,

7       hiding behind the shield of their law firm.

8              This case cries out for this Court to write a

9       decision dealing with the underlying issues in this case so

10      that we don't have to come back here two years again and

11      ask this Court to do the very same thing.  And it's

12      unfortunate that we're here.  The Court was very clear

13      about what it was ordering and how it was handling and/or

14      not handling certain post-judgment proceedings in this

15      case.  And it's unfortunate, but we keep coming back here

16      because of the subterfuge, the ruse, the shields, the sort

17      of offensive defense that has been created by the PA,

18      through its investment arm, the PIF.

19             So I would urge the Court to issue an order with

20      respect to these underlying issues so, once and for all,

21      the courts in Connecticut can allow us to proceed to deal

22      with the assets that are there that are quite substantial,

23      as well as the assets in New York, and that would-- by

24      allowing us to proceed there and resolving these issues,

25      we probably would not need to return back to this Court

1      again.

2              THE COURT:  I thought you wanted me to dismiss

3      this case.

4              MR. STRACHMAN:  We want you to dismiss this case,

5      but I would like you to dismiss it with an order, please,

6      describing the facts and circumstances, so that there can

7      be no misunderstanding again, as we predicted last year, as

8      to what exactly this Court has done and is doing, has done

9      in the past, last September, and is doing now with respect

10     to these underlying issues.

11             Thank you.

12             THE COURT:  All right.  Mr. Medeiros?

13             MR. MEDEIROS:  Thank you, Your Honor.

14             May it please the Court, the sole matter for

15     discussion and resolution on this motion today is whether

16     this Court has jurisdiction to entertain this suit.  And I

17     will attempt to confine my remarks to the issues pertinent

18     to that motion.

19             I do agree with Mr. Strachman on one thing, that,

20     for the reasons I will get to in my argument, but not the

21     reasons that Mr. Strachman thinks, this case does cry out

22     for a written decision, if Your Honor has the time, because

23     it raises serious issues of the improprieties in

24     obtaining the creditor's bill, as I will outline in a

25     moment, that underlies one of our grounds for jurisdiction

 1  in this case.

 2          The issue at the heart of this controversy, the

 3  issue of whether Leboeuf-Lamb has the right to represent

 4  the PIF, is before three different Federal judges.  That

 5  issue is going to be resolved by some judge some place.

 6          Judges Dorsey down in Connecticut and McMahon down

 7  in the Southern District of New York have deferred to

 8  Your Honor to have the opportunity to resolve that issue

 9  first by taking a fresh look at the validity of the

10  assignment of the PIF to the Ungars in the final judgment

11  entered by this Court on September 19, 2006.

12          Neither of those Judges has rebuffed Leboeuf's

13  arguments.  Your Honor can see in the exhibits that we

14  submitted the marginal notations the Judges placed on their

15  orders deferring decision, not rebuffing our arguments.

16          We believe that Your Honor has subject matter

17  jurisdiction here, as I'll discuss in a moment, but if

18  Your Honor were to decide otherwise, this controversy will

19  not disappear, it simply will get resolved in a different

20  place, in a different forum.

21          THE COURT:  Maybe that's what should happen.

22          MR. MEDEIROS:  That's up to Your Honor,

23  Your Honor.

24          THE COURT:  Well, I have a big problem with your

25  standing to bring this suit.

1          MR. MEDEIROS:  I'm going to get to that,

2     Your Honor, if I may.

3          THE COURT:  You'd better get to it because that's

4     the key issue.  I don't see that Leboeuf has any standing

5     to bring these two causes of actions that are contained in

6     the complaint.

7          MR. MEDEIROS:  There are, we believe, Your Honor,

8     four, actually, independent bases for jurisdiction over

9     this declaratory judgment action.

10         First is the threatened RICO claim against

11    Leboeuf-Lamb, not against the PIF, against Leboeuf-Lamb

12    directly.

13         THE COURT:  That's a red herring.

14         MR. MEDEIROS:  I will try to explain why that-- I

15    disagree with that, respectfully, Your Honor, in a moment.

16         The second basis for jurisdiction is our request

17    to vacate or modify the final judgment for reasons, again,

18    that I will get to.

19         THE COURT:  You have no standing.

20         MR. MEDEIROS:  I believe we do, Your Honor, as

21    I'll try to explain.

22         THE COURT:  Well, you'd better get to it real fast

23    because it's not going to take me long to dispose of this

24    case.

25         MR. MEDEIROS:  Your Honor, the third ground is our

1    Federal Constitutional claim.  And the fourth is diversity.

2         Any single one of those grounds, Your Honor, is

3    sufficient to defeat Defendants' motion to dismiss.  The

4    first three are ripe for a decision today.  The fourth is

5    not.  And only if the Court rejects all of the first three

6    grounds, we assert, would jurisdictional discovery be

7    necessary in order to be able to resolve the diversity

8    ground.  And even there, discovery would be unnecessary if

9    the Court agrees with our position that Yaron Ungar and

10   Amichai Ungar can be dropped as dispensible parties,

11   thereby preserving diversity.

12        So let me get to the first ground, if I may,

13   Federal question jurisdiction.  Some eight months-- and,

14   why, to answer Your Honor's question, hopefully answer

15   Your Honor's question, that is not a red herring.

16        Some eight months ago, on October 24th, 2006, one

17   of the Ungars' counsel, Mr. Tolchin, sent Mr. Rohback of

18   Leboeuf the letter threatening legal action against

19   Leboeuf, against the law firm itself, under RICO and

20   otherwise.

21        The threat made in that letter was explicit and

22   unconditional, quote, "We hereby caution you in the

23   strongest terms that, if you or Leboeuf takes any further

24   action purporting to act on behalf of the PIF, including,

25   without limitation, filing any court papers purporting to

1    be from the PIF, the Ungars and the PIF will take all

2    measures the law permits against you and your firm.

3    Interference with enforcement of a judgment is actionable,

4    both under State law and under RICO," citing cases.

5         "I remind you that the underlying judgment here

6    exceeds $116 million, which, trebled under RICO, comes to

7    some $350 million.  Leboeuf would not be the first law firm

8    to be misled and then left in the lurch by the Palestinian

9    Authority and the PLO," close quote.

10        And as if to underscore the seriousness of that

11   threat against Leboeuf, Mr. Tolchin concluded his letter

12   with the accusation that, quote, "Finally, Leboeuf's

13   threats against the Ungars are shocking, unconscionable and

14   unethical," close quote.

15        After Leboeuf found itself-- after receiving that

16   letter and Leboeuf found itself in the untenable position

17   of being threatened with a $350 million damage claim if it

18   carried out its professional obligations to the client that

19   had retained it, the PIF, we brought this suit just three

20   weeks later, November 16, 2006.

21        The Defendants asked for, and we assented to, a

22   substantial extension of time for them to respond to the

23   complaint.  And, finally, some four months later, on

24   March 20, 2007, Defendants filed their motion to dismiss

25   and supporting materials.  That submission contained no

1    retraction of the RICO threat letter.

2         If anything, the Ungars' position became even more

3    entrenched, accusing Leboeuf in those filings, of, quote,

4    "abusing the process of the Federal Courts by filing

5    baseless proceedings, such as the instant action."  That's

6    Mr. Strachman's memorandum at Page 19.

7         We filed our opposition papers on May 9, 2007.

8    There was still no retraction by the other side of the

9    threat letter.

10        Finally, on June 12, 2007, as part of its final

11   day reply papers in support of its dismissal motion, it

12   produced another letter from Mr. Tolchin to Leboeuf.  The

13   new letter says, in effect, never mind.  We didn't really

14   mean what we've been saying the past eight months.  We're

15   not going to sue you.  So forget everything we said about

16   you.  We're retracting this-- we're retracting all of those

17   statements we made in that threat letter, and we want this

18   suit to go away as moot.

19        And as authority for their mootness argument, they

20   now cite-- the Ungars rely upon Judge Nelson's decision

21   from the District Court of Massachusetts in a case called

22   Hudson Valley News, which we had actually brought to

23   Your Honor's attention in our opening memo in opposition to

24   the motion to dismiss.

25        That case does not support our adversary's

1    position as to mootness.  Unlike in that case, Federal

2    question jurisdiction, by reason of the RICO threat letter,

3    existed here as of the day we filed suit, and it continued

4    to exist at least right up to the Defendants' last-second

5    change of position on June 12.

6         In Hudson Valley News, by contrast, the Court held

7    that, because the initial communication, the initial threat

8    letter had simply said that the seller was, quote, "merely

9    considering," close quote, filing suit, the potential of

10   such a suit was, in the Court's words, quote, "attenuated

11   to the point of being hypothetical," close quote.

12        The Court ruled that quite a different outcome

13   would apply if the declaratory judgment Plaintiff had,

14   quote, "a reasonable apprehension," close quote, of being

15   sued, such that the threat of suit was, quote, "likely to

16   chill the declaratory judgment Plaintiff's activities,"

17   close quote.

18        That is this case.  That distinction fits this

19   case to a tee.

20        The Hudson Valley News case does not authorize a

21   party's, such as the Defendants here, manipulation of the

22   Court's existing jurisdiction when that party suddenly

23   decides, for whatever reason, that it wants to deprive the

24   Court of ruling on the issues presented.

25        Leboeuf, of course, since the new letter arrived

1    on June 12, takes solace in Mr. Tolchin's seemingly

2    air-tight retraction letter.  But given the entire history

3    of this controversy, it is not inconceivable that the

4    retraction letter potentially could give rise to a host of

5    enforceability issues that could consume significant time

6    and resources of the Court and the parties to work through.

7         Rather than starting down that road, Your Honor,

8    the Court should simply ignore the suspicious, last-minute

9    attempt to deprive the Court of Federal question

10   jurisdiction and proceed to the merits.

11        Our second ground for subject matter jurisdiction

12   here is--

13        THE COURT:  That hasn't been asserted as a cause

14   of action in this case.  There are only two causes of

15   action asserted in this case:  One of them is that the

16   District Court could not properly convey ownership in the

17   PIF.  And the second one is that the Ungars' purported

18   takeover of the PIF was ineffective under applicable

19   corporate law and under the Articles of Association of the

20   PIF.

21        Those are the two causes of action that you've

22   asserted in this case, and you don't have standing to

23   assert either.

24        MR. MEDEIROS:  Your Honor, respectfully, we

25   specifically cite in the complaint Federal question

1    jurisdiction, and we cite 13--

2           THE COURT:  It's not a question of Federal

3    question jurisdiction.  It's a question of standing.  You

4    don't have standing to bring this case.

5           MR. MEDEIROS:  Your Honor, Leboeuf was the object

6    of the threat letter.

7           THE COURT:  I don't care about the threat letter.

8    As I said, that's-- that's a red herring.  That's not

9    before this Court.  This Court had jurisdiction over the PA

10   throughout this litigation, despite what the PA was doing,

11   and entered judgment against the PA.

12          And this Court had jurisdiction over the

13   creditor's bill, had jurisdiction over the PA, had

14   jurisdiction to issue that order transferring whatever

15   interests the PA had to the Ungar Plaintiffs.

16          And you don't have standing to contest that.

17          MR. MEDEIROS:  Let me continue to try to persuade

18   Your Honor not only that we have standing, but that the

19   creditor's bill was simply unauthorized and void under

20   Rhode Island law.

21          THE COURT:  It's not a question of Rhode Island

22   law.  It's a question of who has standing to raise that

23   issue, and the PA and the PLO did not.  They defaulted, as

24   they defaulted throughout this-- these proceedings.  You

25   don't have standing to take their place.

```
 1              MR. MEDEIROS:  I'm not seeking to take their place
 2    at all, Your Honor.
 3              THE COURT:  That's the only way you can be heard.
 4              MR. MEDEIROS:  I don't represent the PA.
 5              THE COURT:  That's right.
 6              MR. MEDEIROS:  I don't represent the PLO.  I've
 7    brought a brand new lawsuit on behalf of an entity,
 8    Leboeuf, that absolutely is harmed by not only the RICO
 9    letter, but by the creditor's bill that was improperly
10    entered in the underlying case, and that's our standing,
11    Judge.
12              THE COURT:  You don't have that standing, and I'm
13    going to so rule today.  I'm going to throw you out of
14    Court.  This case right now looks to me to be frivolous,
15    and I might consider sanctions.
16              MR. MEDEIROS:  I need to proceed with my argument
17    and hopefully persuade Your Honor to the contrary.
18              THE COURT:  Go ahead.
19              MR. MEDEIROS:  The second basis for this Court's
20    subject matter jurisdiction is that-- the well-established
21    principle that a Federal Court has jurisdiction in the same
22    case, or in a subsequent case, such as this one, to correct
23    its own errors.  The Defendants' reply memo in support of
24    their motion to dismiss provides all the foundation needed
25    for such jurisdiction.
```

1    I'd like to quote from Page 12, where the

2    Defendants argue, quote, "As a matter of law, the PIF had

3    no right or standing whatsoever to participate in the

4    creditor's bill proceeding.  That proceeding, and the

5    judgment entered thereon, affected only the rights and

6    assets of the PA, not the PIF, and therefore, the only

7    party that had standing to oppose the creditor's bill, or

8    to appeal the judgment, was the PA itself.  But the PA

9    intentionally defaulted the creditor's bill and failed to

10   appeal the judgment thereon," close quote.

11       THE COURT:  That's absolutely accurate.

12       MR. MEDEIROS:  It is not, Your Honor, and I'd like

13   to explain--

14       THE COURT:  Yes, it is.

15       MR. MEDEIROS:  -- I'd like to explain why.

16       In fact, it is now apparent, Your Honor, that the

17   Court was unquestionably led into several serious legal

18   errors in the creditor's bill procedure that the Ungars

19   presented to it, and it's framed exactly by the quote that

20   I just read from Mr. Strachman's memorandum.

21       We submit in this case that those errors are so

22   fundamental, that they obligate Your Honor to vacate the

23   judgment assigning the PIF to the Ungars, which, after all,

24   is the basis on which the other side purports to claim that

25   Leboeuf does not have any standing because it is not

1      counsel to the PIF.

2            THE COURT:  You have no standing to make that

3      argument.  You have no standing to bring that proceeding.

4      The Court had jurisdiction over the PA and jurisdiction

5      over this matter, and the Court's judgment is entitled to

6      full faith and credit in every other court in this land.

7            MR. MEDEIROS:  Let me try to explain why not,

8      Your Honor.

9            The analysis begins with Rule 69 of the Federal

10     Rules of Civil Procedure.  Rule 69 says, quote, "The

11     procedure on execution, in proceedings supplementary to and

12     in aid of a judgment, and in proceedings on and in aid of

13     execution, shall be in accordance with the practice and

14     procedure of the state in which the District Court is held

15     existing at the time the remedy is sought," close quote.

16           That wasn't done here.  The Ungars proceeded

17     before Your Honor under Rhode Island General Laws,

18     Section 9-28-1, which expressly requires, as a statutory

19     prerequisite to filing a creditor's bill, that an execution

20     first be returned unsatisfied.

21           The Ungars have to concede that they did not seek

22     an execution at all against the PA.  That will not be

23     contested.  They didn't even try.  In Footnote 2--

24           THE COURT:  That's because there are no assets in

25     this State.

```
 1              MR. MEDEIROS:  It makes no difference, Your Honor,
 2     as I'll explain.
 3              THE COURT:  Yes, it does make a difference.
 4              MR. MEDEIROS:  The Rhode Island Supreme Court has
 5     already held, Your Honor, expressly it doesn't make a
 6     difference.
 7              THE COURT:  You have no right to make that
 8     argument.  The PA didn't make that argument.  You have no
 9     right to make it.  You have no standing.  Can't you get
10     that through, through your head?  You have no standing.
11              MR. MEDEIROS:  Your Honor's order, final judgment,
12     gave, in words, the entire rights of the PA and the PIF to
13     the Ungars.
14              THE COURT:  That's correct.  That was the judgment
15     of the Court.  I have jurisdiction to do it, and I did it,
16     and that judgment is entitled to full faith and credit
17     everywhere in this country.  And you have no standing to
18     contest it.
19              MR. MEDEIROS:  It is that final judgment,
20     Your Honor, that aggrieved the PIF and also aggrieves
21     Leboeuf and gives them standing to bring this case, and let
22     me try to explain why.
23              In Footnote 2, on Page 4 of their creditor's bill,
24     the Ungars sought to excuse issuing an execution, calling
25     it, quote, "a frivolous waste of resources," close quote.
```

1           But they did not cite to the Court, as they were

2     obligated to, particularly in a circumstance where their

3     adversary-- their then adversary was mute, a controlling

4     precedent from the Rhode Island Supreme Court that

5     expressly rejected the identical contention in another case

6     30 years ago that is still good law today, as I'll discuss

7     in a moment.

8           Then, in a letter to Your Honor dated September 1,

9     2006, which is ECF Document No. 378, in response to a

10    submission by the Canaan funds, Mr. Strachman acknowledged

11    that he had failed to execute-- failed to issue an

12    execution at all, citing U.S. vs. Russell, 241 F.2d, 879,

13    at 881-82, First Circuit 1957, for the proposition that the

14    Ungars were excused from complying with the Rhode Island

15    Statutory prerequisite of an execution being returned

16    unsatisfied.

17          The Russell case is no authority whatsoever for

18    that proposition.  Russell didn't involve the Rhode Island

19    Creditor's Bill Statute at all, which isn't even mentioned

20    in the opinion.  It was a suit to enforce an IRS tax lien

21    alleging a fraudulent transfer by a parent to a daughter in

22    which the daughter simply argued exhaustion of remedies,

23    that the IRS was required to go against the parent first

24    and exhaust remedies against the parent before they could

25    proceed against the child transferee.  There was no

1    statutory prerequisite in the IRS Statute like there is

2    here in the Rhode Island Creditor's Bill Statute for an

3    unsatisfied execution being returned.

4        The fact that Russell has no bearing whatsoever on

5    this issue was made crystal clear by the Rhode Island

6    Supreme Court in a decision 20 years after Russell,

7    Plantations Industrial Supply vs. O'Brien, 379 A.2d 365, a

8    1977 case, was a supplementary proceeding under the

9    Rhode Island Creditor's Bill Statute.  Your Honor doubtless

10   remembers the inimitable Aram Berberian, whose actions gave

11   rise to the decision in that case.

12       Mr. Berberian, on behalf of the judgment creditor,

13   argued that an unsatisfied execution was not a prerequisite

14   where an examination of municipal and state records showed

15   that the debtor owned no real property here, no motor

16   vehicles here, where the creditor didn't know of any other

17   assets owned by the debtor, and therefore, the creditor

18   would not be able to identify for the sheriff any assets to

19   be levied upon, and therefore, an execution would be

20   futile.

21       The Supreme Court squarely rejected that futility

22   argument.  The Court said, quote, "This Court has

23   repeatedly stressed that legislative enactments relating to

24   the service of process are to be followed and construed

25   strictly," close quote.  That's 379 A.2d at 367.

```
1          The Supreme Court held that an execution returned

2     unsatisfied was an absolute prerequisite to the judgment

3     creditor proceeding further.  That's actually not a very

4     surprising result, I submit, because Chapter 28 of Title IX

5     is even entitled, "Proceedings in Aid of Execution."

6          The holding in Plantations Industrial Supply has

7     never been questioned and remains the law of Rhode Island

8     and was binding on this Court and is binding on this Court

9     under Rule 69.

10         THE COURT:  That's an excellent argument that the

11    PA should have made.  But the PA defaulted, as they have

12    defaulted throughout.  And so the judgment that this Court

13    entered is a valid judgment, and the Court had jurisdiction

14    over the PA.

15         They defaulted, and the judgment was entered, and

16    that judgment's entitled to full faith and credit

17    throughout the United States.

18         And you have no standing to make that argument.

19         MR. MEDEIROS:  Your Honor, I'm not here today

20    carrying any water for either the PA or the PLO.

21         THE COURT:  You have no standing.  Leboeuf has no

22    standing to raise this question.

23         MR. MEDEIROS:  I've done the best I can so far to

24    explain why I think we do, but if I may continue with my

25    argument, Your Honor.
```

```
 1            THE COURT:  Go ahead, you can put it on the

 2    record, but you're going to have to make it in Boston.

 3            MR. MEDEIROS:  I understand, Judge, and we're

 4    prepared to do that if we have to.

 5            Just last week, Your Honor, on June 11, the

 6    Rhode Island Supreme Court decided another creditor's bill

 7    case named Trainor vs. Grieder, No. 2006-140-A, which can

 8    be found at 2007 Westlaw, 1662063, in which it reaffirmed

 9    that, quote, "A judgment creditor, aggrieved by an

10    unsatisfied execution, has two options to compel payment

11    from the debtor under Chapter 28."  I'm going to discuss

12    those two options in a moment because that's the next part

13    of my argument.

14            But the prerequisite of an unsatisfied execution

15    remains the law in Rhode Island.  That's one of three

16    reasons why the creditor's bill here, as presented to you

17    by the other side, was statutorily defective and void under

18    Rule 69.

19            A second reason is that the Plaintiffs proceeded

20    under the wrong section of the Creditor's Bill Statute, a

21    section that does not authorize either the procedure they

22    invoked, nor the relief they applied for and obtained.

23            Title IX, Chapter 28, Your Honor, has two distinct

24    avenues that a creditor can pursue in seeking to collect on

25    a judgment, and parenthetically, return of an execution
```

1    unsatisfied is an express prerequisite in both sections.

2    9-28-1 authorizes a creditor to institute a new civil

3    action to reach and apply assets in which the debtor has an

4    interest.

5         9-28-3 authorizes a creditor to apply for a

6    citation to the debtor in the existing action, to show

7    cause why the debtor should not be required to make

8    installment payments on the judgment.

9         Here, the Plaintiffs proceeded solely under

10   9-28-1.  Their application, which is ECF Document 370, was

11   entitled, quote, "Plaintiff's Creditor's Bill Pursuant to

12   RIGL 9-28-1," close quote.

13        The Ungars' brief in this action, in support of

14   their motion to dismiss, this declaratory judgment suit,

15   confirms that they had proceeded solely under 9-28-1.

16        And in a letter to the Court dated August 1, 2006,

17   which is ECF Document 375, entitled, quote, "Urgent Request

18   for Entry of Default on Plaintiff's Creditor's Bill," close

19   quote, Mr. Strachman stated, quote, "Under 9-28-1, a

20   creditor's bill is a civil action, and since the Defendants

21   have not answered or opposed Plaintiff's creditor's bill,

22   entry of default thereon is now in order," close quote.

23        But Plaintiffs did not bring a new civil action,

24   as required by 9-28-1.  Instead, they borrowed partly from

25   9-28-1, partly from 9-28-3, and jumbled it all together.

1           The Rhode Island Supreme Court has expressly held

2      that the two sections cannot be conflated and distorted

3      that way.  And that Court, the Rhode Island Supreme Court,

4      has invalidated an order that resulted from similarly

5      defective application by a judgment creditor.  The case is

6      Rhode Island Hospital vs. Collins, 368 A.2d, 1225, in 1977,

7      where the Hospital obtained a judgment against Collins.  It

8      then issued a writ of execution that was returned

9      unsatisfied.

10          The Hospital then proceeded under 9-28-3 in that

11     instance in the same proceeding and conducted a hearing

12     into the Collins' ability to pay the debt.  It turned out,

13     in the meantime, that Collins had, a few weeks earlier,

14     conveyed title to his home to a corporation of which he was

15     the sole shareholder.

16          At the conclusion of the 9-28-3 hearing, the

17     court-- the trial court ordered Collins to convey his stock

18     certificate in that corporation to the Hospital.  On

19     appeal, the Rhode Island Supreme Court vacated that order.

20          The Court held in pertinent part, quote,

21     "Chapter 28 of Title IX affords a judgment creditor with

22     two remedies when an execution is returned unsatisfied.

23     Section 9-28-1 specifically provides that a judgment

24     creditor may institute a civil action to reach and apply

25     assets.  On the other hand, Sections 9-28-3 through 9-28-7

```
 1    permit a creditor to apply to the Court for a citation,

 2    which directs the debtor to appear in Court and show cause

 3    why an inquiry cannot be made into his ability to satisfy

 4    the judgment," close quote.

 5          The Court, in that case, invalidated the

 6    Hospital's attempt to short-circuit the reach-and-apply

 7    alternative.  And in the key passage for today's purposes

 8    from the Rhode Island Supreme Court's opinion, the Court

 9    held that, quote, "If the Hospital wishes to go the route

10    delineated in 9-28-1 and bring an independent civil action

11    to reach and apply Collins' interests in the corporation,

12    it may do so.  But the order now under review finds no

13    support whatever in the law," close quote.  That's 368 A.2d

14    at 1227.

15          Likewise, Plaintiff's distortion before Your Honor

16    of 9-28-1 in this case finds no support whatever in the

17    law.

18          And, again, in its decision last week in the

19    Trainor vs. Grieder decision, the Rhode Island Supreme

20    Court twice reaffirmed that 9-28-1 requires a judgment

21    creditor to institute a civil action.

22          The Ungars did no such thing here.  Their failure

23    to follow the Statute they themselves invoked, 9-28-1, is

24    inexcusable, particularly where they knew that, whatever

25    they presented to the Court, no opposition would be filed
```

1     by the PA.  And, therefore, they were placing entirely on

2     the Court the burden to independently identify and research

3     the Statutory flaws in what they were asking for.

4            THE COURT:  The PA defaulted.  The PA defaulted.

5     They've been defaulting throughout this trial, throughout

6     the whole proceedings, they defaulted.  Yasser Arafat

7     refused to recognize the jurisdiction of any United States

8     Courts and refused to respond to this case on the merits.

9            After the Court decided that there was

10    jurisdiction over the PA and the PLO, then they tried

11    diplomatic immunity.  That failed.  Then they tried

12    sovereign immunity.  That failed.  And then they refused to

13    participate further in this case.

14           The Court entered judgment for $116 million-plus,

15    and the Court has entered a judgment transferring the

16    assets, the intangible assets, the ownership assets of the

17    PA to the Ungar Plaintiffs.  And the Court has jurisdiction

18    to do that, and you cannot assail it.

19           MR. MEDEIROS:  Let me make another stab at it,

20    Judge.

21           The reason why--

22           THE COURT:  You're making all the arguments that

23    the PA should have made.

24           MR. MEDEIROS:  Not at all, Your Honor.

25           THE COURT:  Yes, you are.

1          MR. MEDEIROS:  The interests that I am arguing

2     for, Your Honor, are interests of Leboeuf-Lamb--

3          THE COURT:  They have no interests.

4          MR. MEDEIROS:  -- to represent its clients, who

5     were deprived of their rights by a creditor's bill that was

6     fatally flawed.  That's essentially the heart of my

7     argument, Judge, and that's why they have standing.

8          THE COURT:  They have no standing.  They have no

9     standing to contest the judgment that this Court entered.

10          MR. MEDEIROS:  Judge, the reason why the second

11     flaw--

12          THE COURT:  The PIF has no standing either because

13     the Court had jurisdiction over the PA, and the Court has

14     the power and authority and the jurisdiction to enter that

15     judgment on the creditor's bill.

16          MR. MEDEIROS:  Judge, Rule 69 tells the Court

17     that, in proceedings in aid of execution, the Court has to

18     follow Rhode Island State law.  That was not done here in

19     several significant respects, not--

20          THE COURT:  The PA did not make that argument.

21     They defaulted.

22          MR. MEDEIROS:  Leboeuf is here to make that

23     argument because it is--

24          THE COURT:  And you can't.

25          MR. MEDEIROS:  -- because it is entitled to,

```
1    Judge--

2           THE COURT:  No, you can't.

3           MR. MEDEIROS:  -- as the lawyer for the entity who

4    was deprived of its rights by a creditor's bill that

5    shouldn't have been entered, that was flawed.  And the

6    reason--

7           THE COURT:  You have no standing.  You have no

8    standing.  Leboeuf has no standing in this proceeding.  And

9    I'm going to make that absolutely clear.  And you can

10   appeal to the Court of Appeals if you want one more time.

11          MR. MEDEIROS:  Judge, if they had done it the

12   right way, the way they had to do it to comply with

13   Rhode Island law, under 9-28-1--

14          THE COURT:  You have no standing to raise that

15   issue.

16          MR. MEDEIROS:  -- they would have had--

17          THE COURT:  The judgment of this Court stands

18   because the Court has jurisdiction to enter it, and it

19   affects the PA, who defaulted, and you have to accept that

20   judgment.  And every other Court in the United States has

21   to accept that judgment, must give it full faith and

22   credit.

23          MR. MEDEIROS:  We respectfully disagree with that,

24   Your Honor.

25          THE COURT:  All right.  You can disagree all you
```

1    want, but that's my judgment.

2            MR. MEDEIROS:  If I may proceed to finish, for the

3    record, my argument, I'd appreciate it.

4            THE COURT:  Go ahead.

5            MR. MEDEIROS:  The reason why this second grievous

6    noncompliance with the Rhode Island Statute is important--

7    it's not a mere technicality-- if Plaintiffs-- if the

8    Ungars had complied, as they were required to, with 9-28-1,

9    instituting a new reach-and-apply statute, they would have

10   been obligated to name the PIF as a Defendant in that

11   action.

12           THE COURT:  They do not.  They did not have the

13   requirement of naming the PIF.  The PIF had no interest,

14   had no interest in that proceeding.

15           MR. MEDEIROS:  It absolutely did, Your Honor.

16           THE COURT:  No, it did not.

17           MR. MEDEIROS:  It was the entity whose assets the

18   Ungars--

19           THE COURT:  No.

20           MR. MEDEIROS:  -- are trying to get their hands on

21   to satisfy their judgment.

22           THE COURT:  No, no, no.  What the Ungars were

23   trying to get hold of was the assets, the ownership

24   interests of the PA, and the PA defaulted.  The PIF was not

25   an indispensable party or even a required party to that

```
 1   creditor's bill.

 2        MR. MEDEIROS:  If I may have a moment, I'd like to

 3   read you something from one of Mr. Strachman's briefs.  He

 4   doesn't agree with what Your Honor just said.

 5        THE COURT:  Well, that's his problem.  What I say

 6   is the law of this case.  The PIF has no standing to assail

 7   this judgment.

 8        MR. MEDEIROS:  The reason why the PIF's interests

 9   were directly implicated, and in addition to any interests

10   the PA and the PLO had, is now virtually conceded by

11   Mr. Strachman in his memorandum in support of his motion to

12   dismiss, at Page 4, where he says specifically, "The

13   creditor's bill sought a judgment assigning to the Ungars

14   two distinct categories of rights belonging to the PA, the

15   second of which"-- I will jump over the first-- "the second

16   of which is the PA's rights in property, assets and credits

17   titled and/or owed in the names of the PCSC and the PIF."

18        He's admitting that he was seeking assets owned by

19   the PIF by reason of that creditor's bill.

20        THE COURT:  What does the judgment read?  What

21   does the judgment read?  What judgment did I enter?

22        MR. MEDEIROS:  You followed exactly what he asked

23   you to do, Your Honor.  In the second paragraph of your

24   final judgment, you ordered that all rights, benefits and

25   interests of the Palestinian Authority in all property,
```

```
1    assets and credits of any type that are titled to and/or

2    owed to the Palestinian Commercial Services Company and/or

3    to the Palestinian Investment Company would transfer to the

4    Plaintiffs."

5            Your Honor conveyed the assets of the PIF, even

6    though it was never before the Court, it was entitled to be

7    before the Court, it never had an opportunity to be heard,

8    and its interests were entirely distinct from either the PA

9    or the PLO.

10           THE COURT:  Then the PIF should assert those

11   rights.  Leboeuf doesn't have the right to assert those

12   rights.

13           MR. MEDEIROS:  We found just one reported decision

14   in Rhode Island bearing on the issue of whether, if the

15   Ungars had done it as staturorily authorized, they would

16   have been required to name the PIF.

17           The case is Berard vs. Blais, 186 A.475, at 476,

18   Rhode Island, 19-- Rhode Island Supreme Court, 1936, where

19   the Court seemed to accept that, as a given, without even

20   needing discussion, that the third party whose assets are

21   sought to satisfy a judgment against the debtor, like the

22   PIF's assets here, must be named as a Defendant in a

23   reach-and-apply suit under 9-28-1.

24           What we did find, Your Honor, are numerous cases

25   under reach-and-apply statutes in Massachusetts and
```

1    throughout the country that so hold explicitly, and just

2    for one example, out of the Bankruptcy Court in

3    Massachusetts, a case called In Re:  Fraden, F-r-a-d-e-n,

4    317 Bankruptcy Reporter 24, at Page 38, 2004.

5         And Am. Jur. and CJS compile the voluminous

6    authorities, without overstating it, that make it pretty

7    apparent that PIF would have had to have been named as a

8    party, if they could even get jurisdiction over the PIF

9    here, if they had done it the right way under the

10   Rhode Island Statute.

11        THE COURT:  No jurisdiction over PIF in this

12   Court, but I had jurisdiction over the PA.

13        MR. MEDEIROS:  I understand that.

14        THE COURT:  And that's all that was necessary.

15        MR. MEDEIROS:  If the Ungars had complied with

16   9-28-1, they would have faced the impossibility of

17   obtaining personal jurisdiction over the PIF here in

18   Rhode Island, so their solution was to just ignore the

19   requirement.

20        In short, Your Honor, the Ungars cut every corner.

21   The Ungars did nothing by the book with respect to the

22   creditor's bill.  They did not provide Your Honor with the

23   controlling precedents that were directly against them, as

24   they had an obligation to do.  The Court was sold a bill of

25   goods.

1          If given the opportunity, the Rhode Island Supreme

2     Court unquestionably would declare the creditor's bill and

3     the judgment that followed in this case flawed.

4          For all these reasons, the creditor's bill that

5     was the foundation for the final judgment entered

6     September 19, 2006, was fatally defective and a nullity

7     from its inception.  And, accordingly, the portion of the

8     final judgment that assigned to the Ungars ownership of the

9     PIF, which is the portion they're purporting to rely upon

10    to deprive Leboeuf of representing the PIF, which is what

11    this lawsuit is all about, is not entitled to enforcement

12    by any of the Courts that have this matter under

13    consideration, Your Honor or either of the other two

14    Federal judges.

15         In the interest of time, I'm simply going to

16    summarize a final few points in response to the Ungars'

17    reply memo and rely upon our written submissions for the

18    rest of our argument.

19         First, as to the value of the PIF's assets, in

20    comparison to the amount of the Ungars' judgment, with

21    respect to our argument that the Court could not convey,

22    didn't have the power to convey outright ownership of the

23    PIF to satisfy a debt that was only a fraction of its net

24    worth, the other side argues, at Page 13 of its reply memo,

25    that, quote, "It has already been established, as a matter

1    of law, that the net value of the PIF is less than the

2    amount of the Ungars' judgment," close quote.

3            That contention is simply wrong.  We invite

4    Your Honor to look again at Exhibit H to the creditor's

5    bill, which Mr. Strachman is relying on as his support for

6    that contention.  Exhibit H was a "Forbes Magazine" article

7    dated March 9, 2006, containing the following three

8    pertinent statements:

9            First, quote, "The Fund"-- meaning the PIF-- "even

10   published Ernst & Young-audited financials, which showed it

11   held $1 billion of assets at the end of 2004," close quote.

12           Two, quote, "The Investment Fund is now believed

13   to hold $1.4 billion in assets," close quote.

14           And three, quote, "Abbas, a political rival to

15   Hamas, known as Abu Marsden, made up for the Palestinian

16   part of the shortfall by taking out about $500 million in

17   bank loans secured by Investment Fund assets," close quote.

18           $1.4 billion, minus $500 million, leaves

19   $900 million of assets available to satisfy the

20   $115 million judgment in this case.  And that calculation

21   can be confirmed-- the accuracy of that calculation can be

22   confirmed by going to the PIF's website right now, which

23   includes another set of Ernst & Young-audited financials as

24   of year end 2006 that shows that PIF has a net worth of

25   over $800 million.

1          The Ungars were entitled to ask Your Honor, at

2    most, for a levy against the PIF's assets up to the amount

3    needed to pay the judgment, but there was no way they were

4    entitled to outright ownership of the PIF, given the

5    disparate values we're talking about.

6          On the issue of domicile, for purposes of

7    diversity of citizenship, Mr. Strachman's reply memo

8    argues, at Page 17, that, quote, "This Court has clearly

9    and irrefutably established that Yaron Ungar was domiciled

10   abroad at the time of his death," close quote.

11         Respectfully, that is a misreading of Your Honor's

12   decision, which makes no mention whatsoever of the word

13   "domicile."  Domicile was not an issue at that time.

14         As a matter of law, somebody can live away from

15   his domicile for 20 years, even longer than Yaron Ungar had

16   been in Israel, but if he intends to return, that remains

17   his domicile.  Here, all we have are self-serving,

18   incomplete and inconclusive affidavits of Amichai Ungar.

19         The other side argues that we are bound by what is

20   said in those affidavits that his lawyers doubtless

21   prepared for him to sign.  They argue that we are precluded

22   from cross-examining the affiant under oath to test his

23   truthfulness.  They argue that we can't conduct other

24   discovery designed to determine whether the Ungars really

25   were domiciled abroad.  They cite no authority for such an

 1    extreme position, and there is none.

 2            And, finally, Your Honor, the other side argues

 3    that the suit must be dismissed because Leboeuf is merely

 4    seeking to assert a derivative claim, which it cannot do.

 5    In support of their argument, they cite the decision in

 6    Weissman-- the Weissman case, decided by the Seventh

 7    Circuit.

 8            But that decision actually undercuts our

 9    adversary's position.  The Court there explained that it

10    would not allow a claim by a personal guarantor of a

11    corporate loan because the corporation had the right to

12    recover full damages, and the derivative claim, if allowed,

13    would resist-- would risk double-counting.

14            No such rationale applies here.  Here, a law firm,

15    Leboeuf, has a claim directly on its own behalf for

16    recognition of the attorney-client relationship that it has

17    with the PIF.  It's a distinct claim that is personal to a

18    law firm and presents no issue of potential double-counting

19    or even money damages at all.  Rather, it presents issues

20    under the Rules of Professional Conduct, separate and apart

21    from whatever injury the PIF itself may have suffered.

22            So, in conclusion, we ask the Court to deny the

23    motion to dismiss and allow this case to proceed on the

24    merits of our claims.

25            Thank you, Your Honor.

1          THE COURT:  All right.  I'll recap what I've

2     already said during the course of argument.

3          In the underlying case, the PA and the PLO made a

4     strategic decision to deny that the courts of the United

5     States had any jurisdiction over them.

6          And when this case was first brought, the Court

7     dealt with the issue of whether there was jurisdiction, and

8     the Court decided there was jurisdiction.

9          The PA and the PLO maintained two offices in this

10    country, one in New York to lobby the United Nations and

11    one in Washington to lobby the United States Government and

12    the people of the United States of America.

13         They had bank accounts, and they were involved in

14    making investments in this country and using banks even for

15    international transactions in this country.

16         The Court made that determination, that there was

17    jurisdiction and that venue was proper in this Court, and

18    there is a written decision to that effect.

19         The next ploy utilized by the PA and the PLO was

20    to claim sovereign immunity.  Well, that was the last ploy.

21    The Court decided twice that there was no sovereign

22    immunity, and finally it went to the Court of Appeals, and

23    the Court of Appeals decided that the PA and the PLO did

24    not have sovereign immunity.

25         There was also an attempt to claim diplomatic

1    immunity, but that went by the board, along with the

2    jurisdictional argument.

3          So the PA and the PLO made a strategic

4    determination.  It was reported to this Court by

5    Ramsey Clark, the attorney for the PA and the PLO, that

6    Yasser Arafat, who was the leader of the PA, that the

7    attorneys were not to defend this case on the merits and

8    would not be authorized to do anything on behalf of the PA

9    and the PLO.

10         As a result of those machinations, the Court

11   entered a default judgment of more than $116 million for

12   the Ungar Plaintiffs against the PA and the PLO.

13         The Court pointed out, after various post-judgment

14   matters were brought to the Court's attention, that there

15   were no assets of the PA or PLO in this State, and

16   therefore, the Plaintiffs would have to seek to satisfy

17   that judgment elsewhere.

18         After various attempts, and being unsuccessful,

19   and being told that, under no circumstances would the PA

20   and the PLO pay such a judgment, the Plaintiffs brought

21   this creditor's bill in the underlying action.

22         The PA, although it had counsel present, did not

23   dispute the creditor's bill, made no argument against it

24   and, in effect, defaulted, as they have defaulted

25   throughout.

1          Therefore, the Court entered judgment within the

2     underlying case, assigning to the Plaintiffs whatever

3     rights, intangible rights, that the PA had in two entities,

4     the PIF and another entity, and judgment was entered.

5          As I've previously stated, the Court had

6     jurisdiction to enter that judgment.  No arguments were

7     made against the entry of that judgment by the only party

8     in interest, the PA, and that judgment became final.

9          And because that final judgment was entered by a

10    Court having jurisdiction and the power and authority to

11    enter that judgment, that judgment's entitled to full faith

12    and credit anywhere in the United States, in every court of

13    the United States.

14         The attempt now by Leboeuf to make the arguments

15    that the PA should have made is to no avail.  Leboeuf has

16    no standing to make those arguments.  It has no standing to

17    contest or assail the judgment entered by this Court.

18         That's the first cause of action that's asserted

19    in this declaratory judgment complaint, that the District

20    Court could not properly convey ownership in the PIF.

21    Well, the Court had jurisdiction to do it, and the Court

22    did it.  And Leboeuf is a stranger and interloper to that

23    judgment.

24         The second cause of action is that the Ungars

25    purported to take over the PIF, and that was ineffective

1    under applicable corporate law and under the Articles of

2    Association of the PIF.  The Leboeuf law firm has no

3    standing to make that argument, to make that claim, to

4    assert that claim.

5         The only persons who can make that claim are the

6    deposed officers and directors of the PIF.  They might have

7    standing to make that claim, but of course they don't want

8    to do that because they would submit themselves to the

9    jurisdiction of the Court.  So the Leboeuf law firm is

10   merely a stand-in and has no standing itself to assert

11   those claims.

12        And in any event, those claims should be asserted

13   elsewhere, not in this Court.  The Court readily concedes

14   that it has no jurisdiction over the PIF.  The PIF has no

15   connection to Rhode Island, so far as we know.  And the

16   proper venue for the directors and officers of the PIF to

17   make those claims is obviously where the PIF is located.

18        But, again, this is part of the international

19   conspiracy that's been going on here, based on the decision

20   of an arrogant despot, Yasser Arafat.  And the PA and the

21   PLO must suffer the consequences of the action taken to

22   continue to dispute the jurisdiction of the United States

23   Courts.  Ye shall reap based on the way one sews.

24        So it is the decision of this Court that the

25   Plaintiff, Leboeuf, Lamb, Greene & Macrae, has no standing

1    to assert these two causes of action that are contained in

2    this complaint.  And, therefore, this case is dismissed,

3    and the Clerk shall enter judgment for the Defendants.

4            Enough said.

5            (The proceeding was concluded at 3:27 p.m.)

6

7

8

9            C E R T I F I C A T I O N

10

11

12            I, Debra D. Lajoie, RPR-FCRR-CRI, do hereby

13    certify that the foregoing pages are a true and accurate

14    transcript of my stenographic notes in the above-entitled

15    case.

16

17

18    _____

19            Debra D. Lajoie, RPR-FCRR-CRI

20

21

22    _____6/20/07_____

23            Date

24

25