# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

      Plaintiffs – Judgment Creditors,

v.                                                              Civ. No. 00-105L

THE PALESTINIAN AUTHORITY, et al.,

      Defendants – Judgment Debtors.

### MEMORANDUM IN SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS' MOTION TO STRIKE DEFENDANTS' OBJECTIONS TO AND COMPEL COMPLIANCE WITH CERTAIN REQUESTS CONTAINED IN PLAINTIFFS-JUDGMENT CREDITORS' THIRD REQUEST FOR PRODUCTION

### Introduction

Plaintiffs-Judgment Creditors ("Ungars") respectfully submit this memorandum in support of their motion to strike the objections served by Defendants-Judgment Debtors Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") (collectively "Defendants") to certain document requests contained in the Ungars' Third Request of Defendant-Judgment Debtor the Palestinian Authority for Production of Documents and Things Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion ("Third RPD to the PA") and Third Request of Defendant-Judgment Debtor the Palestine Liberation Organization for Production of Documents and Things Relevant to Defendants-Judgment Debtors' Rule 60(b)(6) Motion ("Third RPD to the PLO"), and to compel Defendants' compliance with those requests.[1]

---

[1] The Ungars served their requests on the PA and PLO separately to ensure that the Defendants do not improperly conflate their answers. While the Defendants have filed a joint motion, the question of whether Rule 60(b)(6) relief is proper must be examined separately in respect to each defendant.

The Third RPD to the PA and Third RPD to the PLO (collectively "Third RPDs") closely parallel the notices of deposition pursuant to Rule 30(b)(6) served by the Ungars on the Defendants. On October 28, 2010, this Court entered an order which (a) found those Rule 30(b)(6) notices too extensive and overly burdensome and (b) delineated eight general topics on which the Ungars would be permitted discovery. Dkt. # 578.

Because the topics in the Third RPDs generally mirror those in the Rule 30(b)(6) notices, the Ungars respectfully assume that the Court's October 28 order describing the topics on which the Ungars are permitted discovery should, logically, apply to the Third RPDs as well.

Accordingly, the instant motion uses the Court's October 28 order as a guide, and seeks to compel production only of documents included in the areas of inquiry permitted in the order.

Moreover – in the spirit of the Court's October 28 order – even within the permitted discovery topics the instant motion does not seek production of all the documents originally requested. Rather, it seeks production only of a small group of the most important documents.

Copies of the Third RPD to the PA and the Third RPD to the PLO are attached as Exhibits A and B, respectively. A copy of Defendants' objections is attached as Exhibit C.[2]

---

[2] By letter to Defendants' counsel the Ungars withdrew several document requests, and narrowed and honed the language of numerous others. The final version of the requests for production, reflecting these modifications, was incorporated by Defendants into their objections (Exhibit C).

The Ungars note that Defendants have produced some documents purporting to be responsive to a small number of the Third RPDs. However, Defendants have made this very limited production subject to their objections – a tactic that allows Defendants to cherry-pick their production (i.e. to produce only those documents that they believe are helpful to their position) and withhold whatever responsive documents they please. Therefore the Ungars are constrained to move to strike and compel even in respect to those few requests in response to which Defendants have produced some (unilaterally selected) purportedly responsive documents.

## ARGUMENT

**I.    Defendants' "General Objections" Should Be Stricken**

In their objections to the Ungars' requests for production the Defendants assert a raft of general boiler-plate objections. *See* Exhibit C at 1-5. It is well established that the assertion of objections in this fashion is improper – and ineffective. *See e.g. Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005) ("boilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production of documents are insufficient to assert a privilege"); *Miller v. Pruneda*, 236 F.R.D. 277, 281 (N.D. W. Va. 2004) ("The advisory committee notes to Rule 26(b)(5) of the Federal Rules of Civil Procedure make clear that failure to comply with the rule may constitute a waiver of privilege. When a party files a boiler plate objection, refuses to comply with the rule and the Court finds the request is not patently improper, finding waiver of privilege is appropriate."); *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 514 (N.D. Iowa 2000) (boilerplate objections insufficient to resist discovery requests). *See also California Native Plant Society v. U.S. E.P.A.*, 251 F.R.D. 408, 413 (N.D. Cal. 2008) (conclusory boilerplate statements insufficient to assert deliberative process privilege); *Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) ("Objections, in such boilerplate terms as those stated by Defendants, are improper and therefore 'no claim of privilege at all.'") (citing *International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 94 (D. Del. 1974)); *Pham v. Hartford Fire Ins. Co.*, 193 F.R.D. 659, 662 (D. Colo. 2000) (boilerplate assertion of attorney-client privilege without privilege log waived objection to discovery requests).

Accordingly all of Defendants' general objections should be stricken.

## II. Requests Relating to the Reason(s) for Defendants' Willful Default and to the Timeliness of the Motion to Vacate

In its October 28, 2010 order, the Court ruled that the Ungars are entitled to discovery regarding Defendants' willful default and the reason(s) therefor and regarding the timeliness of Defendants' motion to vacate. Dkt. # 578 at 3.

The following document requests relate to these two topics and Defendants' objections thereto should be stricken and their production compelled:

### Requests 4(o)-(v)

Requests 4(o)-(v) seek the official internal decisions, minutes and records of the PA and PLO relating to this action and the judgment entered herein.[3] Such documents are clearly relevant as they are highly likely to reflect the decisions, policies and reasons that led to Defendants' default and their failure to seek to vacate the judgment for three and a half years.

By analogy: if a corporation intentionally defaulted an action and then waited years before moving to vacate the judgment, its internal decisions, minutes and records would be an excellent source of information regarding the reasons for its conduct.

---

[3] These requests also seek such records regarding the creditor's bill judgment entered by this Court in 2006 awarding the Ungars ownership of the Palestine Investment Fund ("PIF") and the Palestine Commercial Services Company ("PCSC"). Therefore, as discussed below, these requests are also relevant to the third topic described in the Court's October 28 order, i.e. the relationship between Defendants and the PIF and PCSC and "Defendants' knowledge of: i) Plaintiffs' collection efforts relative to the PIF and PCSC, ii) actions taken by the PIF and/or the PCSC in response to such efforts, and iii) Defendants' own actions, if any, in response to or because of such collection efforts." Dkt. # 578 at 4.

4

**Defendants' Objections to Requests 4(o)-(v)**

Defendants object to Requests 4(o)-(v) on a number of meritless grounds.[4]

*First*, Defendants object these Requests as overly broad and unduly burdensome. The Court should reject this assertion as bald and conclusory. Defendants do not even bother to attempt to explain what burden would be entailed in responding to this request. Surely the Defendants maintain records of their executive decisions and orders. Surely Defendants maintain files relating to this case. It is difficult to imagine that there could be more than a few hundred documents responsive to this request, at most. The fact that Defendants blithely assert "burden" even in respect to requests for which they claim there are no responsive documents demonstrates that this objection is pure, unsubstantiated boilerplate.

*Second*, Defendants object to these Requests as not reasonably calculated to lead to relevant or admissible evidence. But as discussed above, the documents sought are very likely to lead to relevant information. And such documents would of course be admissible as the Defendants' own records.

*Third*, Defendants object that, "as potentially construed," the phrase "referencing and/or relating to" used in the Requests is vague and ambiguous. This objection is a red herring: any term in the English language could "potentially" be "construed" in a vague and ambiguous manner. The phrase "referencing and/or relating to" is perfectly clear, and Defendants know exactly what it means.

---

[4] Defendants claim in respect to some of the requests that there are no responsive documents. This claim does not moot the issue, however, because it is made subject to Defendants' objections. Furthermore, Defendants have claimed in the past that they had no documents responsive to the Ungars' document requests, only to suddenly produce the document sought. For example, the Ungars requested production of the November 2006 letter from Mahmoud Abbas to Secretary of State Rice mentioned in Secretary Rice's January 2007 letter to Abbas. Defendants claimed in response that they did not have the Abbas letter – and then suddenly produced it without explanation over a month later. Thus, Defendants' claims of "no responsive documents" should be taken with a large grain of salt.

*Fourth*, Defendants object that, as potentially construed, these Requests seek documents protected by the work-product doctrine, the attorney-client privilege, the deliberative-process privilege, and other applicable privileges and protections. The answer to this objection is provided by the Federal Rules: if Defendants claim that any responsive documents are privileged they should provide a privilege log describing them.

*Fifth*, Defendants object to these requests as seeking "authentic" copies, and assert that Defendants have no duty to authenticate documents. This objection, too, is a red herring. The Ungars are entitled to request that Defendants produce authentic copies of their own documents.

In sum, Defendants' objections to these requests are meritless and should be stricken, and Defendants should be compelled to produce the documents sought.

**Requests 9(a)-(b); 9(u)-(v); 13(h)-(s); 13(v)-(w) and 13(dd)-(vv)**

In their motion to vacate, Defendants seek to blame their default, and their failure to move to vacate for years afterward, on the fact that the PA was a newly-created entity that lacked any "institutional structure" for handling lawsuits brought against it, and that such a "institutional structure" was created only in 2007, when President Abbas placed Salam Fayyad in charge of lawsuits brought against the PA and PLO. *See* Declaration of Ahmad Abdel-Rahman, dkt. # 408, Exhibit E, at ¶ 3 ("By the year 2000 … the Palestinian Authority was still in the beginning stages of developing the sort of institutional structure characteristic of mature governments."); at ¶ 5 ("By 2004 … no permanent institutional structure of Palestinian government existed for handling domestic and foreign legal actions brought against the Palestinian government."); and at ¶ 13 ("In early 2007 … President Abbas decided to place authority for the litigation in the hands of a single decision-maker … Salam Fayyad."). *See also* Declaration of Salam Fayyad, dkt. # 408, Exhibit B, at ¶ 5 ("During my service as Finance Minister [2002-2005] I became concerned

6

about the manner in which cases like the instant one were affecting the finances of the Palestinian government [but] controlling the positions taken by the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) in the litigation was not within the scope of my responsibilities."); dkt. # 408 at 33-35.

But these purported "explanations" for Defendants' default and their multiyear failure to move to vacate are *directly contradicted* by the following facts:

*First*, during his deposition, Prime Minister Fayyad admitted that the PA has had written policy guidelines governing how to respond to litigation against it since its creation. *See* Exhibit D at 251:7-13 ("Q. There is a written policy on lawsuits? A. Yes. Q. Okay. Now, my next question is, for how long has there been a written policy. A. You know, it may be – and my answer, that, given this day and date, back to, you know, early on after the PA came into existence."); 255:21-256:3 ("Q. … And we're saying that that material might go back, as far as you know, to the beginnings of the PA? A. Not in its present form. Q. I understand that. I understand that. A. Yes. Q. But in some form? A. In some form. In some form or other.").

Thus, Defendants' claim that they did not know how to respond to litigation is clearly untrue.

*Second*, the PA and/or PLO have actively defended and litigated numerous legal actions in the United States and Europe *since 1985*. These include (i) several civil actions brought against the PLO arising from the 1985 seizure of the Achille Lauro cruise liner (i.e. the *Klinghoffer* litigation), which the PLO defended aggressively and in which it participated in discovery, (ii) the matter of *Palestine Information Office v. Shultz*, Civ. A. No. 87-3085 (D.D.C.), which involved the closure of the PLO's office in the District of Columbia and which the PLO fought up to the D.C. Circuit, (iii) the matters of *U.S. v. PLO*, No. 88 Civ. 1962 (ELP)

7

(S.D.N.Y.) and *Mendelsohn v. Meese*, No. 88 Civ. 2005 (ELP) (S.D.N.Y.), which involved the closure of the PLO's office in New York and which the PLO litigated vigorously, (iv) the matter of *Bucheit v. PLO*, Civ. No. 00-1455GK (D.D.C.), a commercial action against the PA and PLO which they defended on the merits and in which they participated in discovery, (v) an arbitration proceeding brought against the PA in Europe by a consortium known as the "Danish Road Contractors."

Clearly, then, the Defendants have rich litigation experience extending back to 1985, and their claim that they could not respond properly to this suit or move timely to vacate the default judgment due to a lack of an "institutional structure" is baseless.

***Third***, since 1997 the PA and PLO have been actively litigating and defending scores of civil actions arising from terrorist attacks brought against them in Israel. In these Israeli actions, between 1997 and December 2007 (when Defendants filed their motion to vacate in this Court), the PA and PLO filed answers to the complaints against them on the merits, propounded discovery requests to the plaintiffs regarding the merits, and answered discovery requests propounded to them by the plaintiffs regarding the merits. *See* Exhibit E.

Moreover, in the two cases in which default judgment was entered against Defendants in these Israeli terrorism cases (due to oversight) Defendants instantly moved to vacate. *Id*. at ¶ 10. Significantly, Defendants acted to vacate these Israeli judgments during 2004 – exactly when they were purposely defaulting the instant action.

Most importantly, Mr. Fayyad confirmed during his deposition that he *personally* has been in charge of the Israeli litigation ***since 2003*** and that he is managing the Israeli and the U.S. litigation jointly since both involve "international cases." *See* Exhibit D at 298:11-299:16 ("Q. Now, you specifically hired lawyers to defend Israeli terrorist cases, did you not? A. Are you

8

talking about the case that we're talking about today? Q. No, no. Israeli terrorist cases. The PA and PLO were sued in Israeli courts? A. Yes. Of course. Q. Sued in Israeli courts? A. Yes. Q. Okay. And were those considered domestic cases? … A. I explicitly cited cases in Israel and the United States as cases the PA was involved in internationally. That's what I said in earlier testimony. Q. Right. Right. So you consider Israeli cases to be international? A. Yes. Q. And you consider American cases to be international? A. Yes … A. … I was the one that actually retained the Israeli lawyers. … Q. When did you first hire lawyers at Carmeli and Arnon to defend Israeli terrorist cases? A. You know, this must have happened either in late 2002 or early 2003."); 242:2-243:2 ("[T]here are … two jurisdictions outside of Palestine where there are cases in which the PA is involved. One is in Israel. The other is in the United States. In both of these cases, you know, the point of management is my office, and the process is managed similarly by and through my office.").

Thus, the Defendants will need to justify to this Court why they defaulted this case and then waited three and a half years to move to vacate the default when – during the very same period – they were defending the Israeli cases on the merits, participating in discovery in those cases and moving with lightening speed to vacate default judgments that were entered against them in Israel due to oversight – all under the supervision of Mr. Fayyad since 2003 (who Defendants claim was placed in charge of the U.S. litigation only in 2007).

In order to obtain admissible evidence regarding the above – i.e. regarding Defendants' policy guidelines for responding to litigation, Defendants' participation on the merits in U.S. and European litigation since 1985 and Defendants' participation on the merits in the Israeli litigation since 1997 – the Ungars propounded (*inter alia*) document Requests nos. 9(a)-(b); 9(u)-(v); 13(h)-(s); 13(v)-(w) and 13(dd)-(vv).

9

All of these requests seek documents directly and highly relevant to Defendants' efforts to explain away their intentional default and the untimeliness of their motion to vacate.

Defendants object to Requests 9(a)-(b); 9(u)-(v); 13(h)-(s); 13(v)-(w) and 13(dd)-(vv) on various grounds, none of which have any merit:

### Defendants Objections to Requests 9(a)-(b) and 9(u)-(v)

Defendants object to Requests 9(a)-(b) and 9(u)-(v) on the grounds that the reason(s) for their default and the timeliness of their motion to vacate are not relevant issues.

This objection fails in light of the explicit ruling of the Court in its October 28 order that these issues are indeed relevant.

Defendants further object to Requests 9(a)-(b) and 9(u)-(v) on the grounds that the Request, as phrased, seeks privileged documents. This objection should be rejected: if Defendants believe that any responsive documents are privileged they must produce a privilege log so that their claim can be tested.

Defendants' third objection to Requests 9(a)-(b) and 9(u)-(v) is that the terms "relating to, referring to and/or evidencing" and "constituting" are vague and ambiguous. There is nothing whatsoever vague or ambiguous about these words, and this objection should be rejected.

### Defendants Objections to Requests 13(h)-(s)

Defendants object to Requests 13(h)-(s) on the grounds that the reason(s) for their default and the timeliness of their motion to vacate are not relevant issues. As noted above, this objection fails in light of the October 28 order holding that these issues are indeed relevant.

Defendants also object to Requests 13(h)-(s) as overly broad and unduly burdensome. This objection should be rejected because Defendants can obtain the documents requested simply by contacting their Israeli attorney and asking for copies.

Defendants further object to Requests 13(h)-(s) because, as potentially construed, the phrase "Israeli Proceedings," and other phrases used in these requests, are vague and ambiguous. This objection is baseless. The term "Israeli Proceedings" is defined in the "Specific Definitions" section of the Third RPDs as "all legal proceedings brought by, or against, the PA and/or PLO in any Israeli court at any time," and none of the other phrases referenced by the Defendants is vague or ambiguous. Indeed, Defendants' "vague and ambiguous" argument, which they recycle at every opportunity, is just a tactic for obstructionist stalling.

Defendants also object to Requests 13(h)-(s) on the ground that they have no obligation under the Federal Rules to authenticate documents. As discussed above, this argument is meritless and Defendants can be required to produce authentic copies of documents.

Defendants object to some of Requests 13(h)-(s) as "inconsistent with Israeli law and procedure" since "pleadings and other judicial filings in the Israeli court system are subject to certain protections and controls, such that non-parties seeking copies of such documents must make an application to the appropriate Israeli judicial authority to obtain them."

This objection is entirely frivolous. The Ungars have confirmed with their Israeli counsel (and, out of an abundance of caution, with a professor of Israeli civil law) that there is no "Israeli law and procedure" whatsoever prohibiting the production sought.[5]

Furthermore, "the party relying on foreign law bears the burden of demonstrating that such law actually bars the production or testimony at issue. In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and

---

[5] If the Defendants stand on this baseless objection in their opposition to this motion, thereby compelling the Ungars to obtain and submit a declaration from an Israeli law expert in support of their reply, the Ungars will seek all available remedies.

11

specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (citations omitted).

Defendants have not even attempted to meet this burden, because they cannot.

**Defendants Objections to Requests 13(v)-(w)**

Defendants object to these requests on the same shopworn grounds of relevancy, privilege and vagueness they assert regarding the requests above.

These objections should be rejected for the reasons stated above.

**Defendants Objections to Requests 13(dd)-(vv)**

Defendants' objections to these requests are identical to those raised regarding Requests 13(h)-(s) and should be rejected for the same reasons as set forth above.

Defendants also claim (regarding certain of these requests) that the documents requested are part of the public record and are as available to the Ungars as they are to the Defendants.

This objection should be rejected because (a) other than published court decisions the documents requested are not in the public domain, (b) all the documents in question are in the Defendants' possession, custody or control (directly or via their attorneys), and the Defendants should be required to produce them rather than send the Ungars on a scavenger hunt, and (c) the production of the documents by Defendants authenticates them, and relieves the Ungars (and the Court) of wasting time and resources on foundational witnesses regarding documents whose authenticity cannot be disputed in good faith.

Accordingly, these objections, too, should be rejected.

**III.   Requests Relating to the PIF**

In its October 28, 2010 order, the Court ruled that the Ungars are entitled to discovery regarding "the relationship between Defendants and the Palestine Investment Fund ("PIF") and

the Palestine Commercial Services Company ("PCSC"), Defendants' knowledge of: i) Plaintiffs' collection efforts relative to the PIF and PCSC, ii) actions taken by the PIF and/or the PCSC in response to such efforts, and iii) Defendants' own actions, if any, in response to or because of such collection efforts." Dkt. # 578 at 4.

The following document requests relate to this topic and Defendants' objections thereto should be stricken and their production compelled:

### Requests 4(o)-(v)

As discussed above, Requests 4(o)-(v) seek the official internal decisions, minutes and records of the PA and PLO relating to this action, the judgment entered herein in 2004 and the 2006 judgment on the Ungars' creditor's bill awarding them ownership of the PIF and PCSC.

These documents are therefore very likely to shed light on "the relationship between Defendants and the Palestine Investment Fund ("PIF") and the Palestine Commercial Services Company ("PCSC"), Defendants' knowledge of: i) Plaintiffs' collection efforts relative to the PIF and PCSC, ii) actions taken by the PIF and/or the PCSC in response to such efforts, and iii) Defendants' own actions, if any, in response to or because of such collection efforts."

As shown above, Defendants objections to these requests are meritless.

Accordingly, the Court should strike Defendants' objections and order the production of these documents.

### Requests 10(a)-(g); 10(j)-(m)

Requests 10(a)-(g) and 10(j)-(m) seek documents squarely within the PIF/PCSC topic delineated in this Court's October 28 order.

Defendants object to these requests on grounds of relevancy, but this objection is moot in light of the Court's October 28 order.

Defendants further object to these requests on the grounds that they are overly broad and unduly burdensome. Once again, however, the Defendants do not explain why this is so. Absent any convincing explanation as to burden, the Court should reject this objection as boilerplate.

Defendants also claim that as potentially construed, these requests seek documents outside their possession, custody, or control. This objection is a non sequitur: if the documents are not in Defendants' possession, custody, or control, they are not required to produce them.

Defendants argue, as they do in respect to virtually every request, that these requests contain vague or ambiguous phrases. As noted above, this saw is no more than a delaying tactic.

Defendants also assert that "as potentially construed" these requests seek privileged documents. Again, if that is the case, Defendants should provide a privilege log identifying them.

Defendants also object again to being required to produce authentic documents and documents in their possession, custody or control but also purportedly "available" to the Ungars in public court files in Egypt. As discussed supra, both of these objections are meritless.

In sum, Defendants' objections to these requests should be stricken.

### Requests 13(a) and 13(bb)

Request 13(a) self-evidently falls under the PIF/PCSC topic permitted in the Court's October 28 order. Defendants object to this request on their usual grounds of relevance, burden, vagueness and potential privilege, all of which should be rejected for the reasons stated above.

Request 13(bb) is also directly relevant to this topic, because it seeks an affidavit submitted to the Jerusalem District Court on behalf of the PA by a senior official in the PA Finance Ministry, which identifies the assets held under the name of the PIF as assets of the PA.

Defendants object to this request as seeking an irrelevant document, as improperly requiring them to provide an authentic document and as in conflict with Israeli law. These objections should all be rejected for the reasons discussed above regarding Requests 13(h)-(s).

## IV.    Requests Relating to Defendants' Purported Meritorious Defenses

In its order of October 28, 2010, the Court ruled that the Ungars are entitled to discovery regarding Defendants' meritorious defenses. Dkt. # 578 at 4.

Requests 6(j)-(l) seek documents directly related to Defendants' claimed meritorious defenses. Defendants object to these requests on the grounds that the Ungars are not entitled to discovery on this topic, which objection is mooted by the October 28 order.

Defendants also object to these requests based on their usual menu: i.e. unarticulated burdensomeness, vagueness and as potentially construed the requests seek documents not in Defendants' possession and privileged documents. The Court should reject these reprise objections for the reasons discussed above.

Request 14(a) also relates to this topic. That request seeks Mr. Fayyad's letter of resignation to allow formation of a Hamas-led government, and so undermines Defendants' claim to be arch-enemies of Hamas. Defendants object to this request as irrelevant and as improperly requiring them to produce an authentic document. These objections should be rejected, particularly since at his deposition Mr. Fayyad offered to provide a copy of this letter. *See* Exhibit D at 292:8-9.

Accordingly, Defendants' objections should be stricken and the production of these documents compelled.

## V.     Requests Relating to Prejudice

In its order of October 28, 2010, the Court ruled that the Ungars are entitled to discovery regarding the prejudice they would suffer if required to litigate the case today. Dkt. # 578 at 4.

Requests 14(b)-(f), which seeks documents evidencing the past and current "officer" status of the PA leaders whom the PA was previously ordered to produce in this case obviously fall squarely into this topic.

In response to these obviously relevant requests, Defendants have cut-and-pasted their usual litany of unarticulated boilerplate objections, none of which has merit.

The objections should be stricken and the production of these documents compelled.

**WHEREFORE**, the Ungars' motion should be granted.

Dated: November 5, 2010

Plaintiffs-Judgment Creditors,
by their Attorneys,

/s/ David J. Strachman
David J. Strachman (#4404)
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com



Max Wistow (#0330)
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)
MW@wistbar.com

## RULE 37 CERTIFICATE

I HEREBY CERTIFY that I made a good faith effort to resolve the within discovery dispute with opposing counsel prior to the commencement of this motion practice.

/s/ David J. Strachman

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 5, 2010, a true and genuine copy of the foregoing (with exhibits) was filed by ECF which served Defendants' counsel of record listed below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

Additionally, this document and exhibits were hand delivered to the following counsel on November 5, 2010:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

/s/ David J. Strachman