Fayyad Depo Transcript.txt

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
THE ESTATE OF YARON UNGAR, ET AL.,    Case No:

    Plaintiffs                   00-105L

vs.

THE PALESTINIAN AUTHORITY;
ET AL.,

        Defendants
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

------------------------------------------------------
VIDEOTAPED RULE 30 DEPOSITION OF:
SALAM FAYYAD
EAST JERUSALEM
JULY 28, 2010
------------------------------------------------------


Videotaped Rule 30 deposition of SALAM FAYYAD, taken in

the above-entitled cause pending in the United States

District Court, District of Rhode Island, pursuant to

notice, before ISABELLE KLEBANOW, RPR, CT No. 311,

Stenographer, at the Ambassador Hotel, East Jerusalem,

on Wednesday, the 28th day of July, 2010, at 4:15 p.m.

Jerusalem time.




REPORTED BY:  ISABELLE KLEBANOW, RPR, CT NO. 311

                                    Fayyad - 2


    1    APPEARANCE OF COUNSEL:

                        Page 1

Fayyad Depo Transcript.txt

```
 2   FOR PLAINTIFFS:

 3       WISTOW & BARYLICK
         By:  MAX WISTOW, ESQ.
 4       61 Weybosset Street
         Providence, Rhode Island 02903
 5       (401) 831-2700
         mw@wistbar.com
 6

 7       MCINTYRE, TATE & LYNCH
         By:  DAVID J. STRACHMAN, ESQ.
 8       321 South Main Street
         Providence, Rhode Island 02903
 9       (401) 351-7700

10   FOR DEFENDANTS:

11       MILLER & CHEVALIER CHARTERED
         By:  MARK J. ROCHON, ESQ.
12       By:  LAURA G. FERGUSON, ESQ.
         By:  ANDREW WISE, ESQ.
13       655 Fifteenth Street, N.W., Suite 900
         Washington, D.C. 20005-5701
14       (202) 626-5800 / Fax (202) 626-5801
         Mrochon@milchev.com
15       Lferguson@milchev.com
         Awise@milchev.com
16

17   ALSO PRESENT:

18       Mark Coopersmith, Videographer
19       Mordechai Haller
         Nitsana Darshan-Leitner
20       Osama Saadi
         George Salem
21

22

23

24

25
```

Fayyad - 3

```
 1                   INDEX

 2

 3

 4   DEPONENT        DIRECT   CROSS   REDIRECT  RECROSS

 5   SALAM FAYYAD

 6   BY ATTORNEY WISTOW  8             369, 399
```

Page 2

Fayyad Depo Transcript.txt

7    BY ATTORNEY ROCHON          357                397

8

9

10

11                        EXHIBITS

12    NO.    DESCRIPTION                        PAGE

13    1      Judge Marrero's Order, Knox Case     34

14    2      Letter, 2-29-08                      43

15    3      Letter, 8-15-05                      66

16    4      Letter, 4-27-06                     101

17    5      Fayyad Declaration                 114

18    6      Letter, June 18, 2005              124

19    7      Letter, 1-12-07                    266

20    8      Power of Attorney                 301

21    9      New York Times Article, 12-18-07  305

22    10     Order by Judge Lagueux            331

23    11     Download from UK Foreign Office   338

24    12     Israel Ministry of Foreign Affairs

25           Document

                                         Fayyad - 4


1                P R O C E E D I N G S

2                THE COURT REPORTER:  This is the videotape

3    deposition of Salam Fayyad taken by the Plaintiffs in

4    the matter of Ungar, et al. versus the Palestinian

5    Authority, et al., US District Court, District of Rhode

6    Island, Case No. 00-1056, held at the Ambassador Hotel

7    in East Jerusalem on July 27, 2010, at 4:00 p.m.

8                The court reporter is Isabelle Klebanow,

9    Post Office box 29077, East Talpiot, Jerusalem 91290.

10   The videotape specialist is Mark Coopersmith.

                        Page 3

Fayyad Depo Transcript.txt

11          And counsel will now state their appearance.

12          MR. ROCHON:  Thank you.  On behalf of the

13   Palestinian Authority and the PLO, you have Mark Rochon,

14   Laura Ferguson, Andrew Wise.  Also here are George Salem

15   and Osama Saadi, who are counsel for the Prime Minister.

16          MR. WISTOW:  Max Wistow for the Plaintiffs.

17          MR. STRACHMAN:  David Strachman for the

18   Plaintiffs.

19          MS. LASHNER-LEITNER:  Nitsana Lashner-

20   Leitner.

21          THE COURT REPORTER:  Okay.  I need to --

22          MR. WISTOW:  -- swear the witness.

23          THE COURT REPORTER:  Do you swear to tell

24   the truth, the whole truth, and nothing but the truth,

25   so help you God?

Fayyad - 5


1          MR. FAYYAD:  I do.

2          THE COURT REPORTER:  Thank you very much.

3   DIRECT EXAMINATION BY MR. WISTOW:

4     Q.  Firstly, I wanted to ask you, how should I

5   address you?  Is it all right if I call you Mr. Fayyad?

6     A.  That's fine.  Yes.

7     Q.  I understand that, at the present time, you are

8   overseeing the American cases involving victims under

9   the American Anti-Terrorism Act on behalf of the PLO and

10   the PA, is that true?

11     A.  As part of my over-all responsibility as Prime

12   Minister and Minister of Finance.

13     Q.  I'm not suggesting that's your sole duty.  But

14   that is part of your duties, is it not?

15     A.  Part of what I do, yes.

Fayyad Depo Transcript.txt

16    Q.  And you've tried to familiarize yourself with the
17  Ungar case, have you not?
18    A.  Yes.
19    Q.  And do you understand where the Ungar case sits
20  at the present time in the Federal Court?  What its
21  status is?
22    A.  Yes, I do.
23    Q.  Would you tell me what your understanding is.
24    A.  My understanding is that I am being deposed here
25  in connection with our attempt to have the case

                                          Fayyad - 6


1  litigated.
2    Q.  You understand that, at the moment, there's what
3  we call a default judgment?  Do you understand that
4  term?
5    A.  I do.
6    Q.  Okay.  Is there something comparable in
7  Palestinian law?
8    A.  Yes.  There is.
9    Q.  What is it called in English?  Can you translate
10  in English the term you would use?
11    A.  Default judgment --
12    Q.  Okay.
13    A.  -- or judgment in absentia.  Something like that.
14  In Arabic, I think that's the translation.
15    Q.  Okay.  So, obviously, I'm not familiar with
16  Palestinian law -- and I suppose you're not an expert in
17  it -- but you have some general knowledge, do you not?
18    A.  Yes.  Also in terms of familiarity with the case.
19  The fact that, as part of my over-all responsibilities,

                            Page 5

Fayyad Depo Transcript.txt

20    I follow up on this case, it doesn't mean that I will

21    know all the details associated with it.

22        Q.  Of course.  I understand.  But what I'd like to

23    explore with you just a little bit --

24        A.  Yes.

25        Q.  -- is, in -- there are lawsuits brought under the

Fayyad - 7


1    authority of the Palestinian Authority, are there not?

2    Under the laws in Palestine?

3        A.  There are, yes.

4        Q.  Yes.  And I assume that the person who's bringing

5    the lawsuit serves some kind of papers on the person

6    that's being sued?

7        A.  Yes.

8        Q.  And the person who's being sued is required by

9    the laws of Palestine to answer the case --

10        A.  Correct.

11        Q.  -- to respond?

12        A.  Correct, yes.

13        Q.  And if they don't, then one of the risks is

14    ultimately a default judgment?

15        A.  Yes.  That's correct.

16        Q.  Okay.  Now, I don't know how familiar you are

17    with the particular steps that this case has gone

18    through, so let me just ask you.

19        Have you ever read the motion that was filed on

20    behalf of the PLO and the PA -- let me stop and withdraw

21    that.

22        If I use the terms PLO for the Palestine

23    Liberation Organization --

24        A.  Yes.

Page 6

Fayyad Depo Transcript.txt

25     Q.  -- and PA for the Palestinian Interim

Fayyad - 8


1    Authority -- frankly, I'm not even sure that --

2        A.  Palestinian Authority.

3        Q.  All right.  If I use PLO and PA, we're going to

4    understand each other?

5        A.  Yes.

6        Q.  Okay.  Are you familiar with the motion itself

7    that was filed on behalf of the PLO and the PA to vacate

8    the default judgment?

9        A.  I'm familiar of the fact that actually there is

10   such a motion, but not -- you know, I'm not too familiar

11   with the details of it.

12       Q.  Have you ever read it?

13       A.  No.

14       Q.  Okay.  You know that you submitted a declaration

15   in support of the motion?

16       A.  Yes.

17       Q.  Okay.  And I'm going to read you from a small

18   portion of the motion.

19           MR. WISTOW:  I'm not going to make it an

20   exhibit because I don't think it's appropriate to make

21   exhibits out of pleadings in the case.

22           I'm happy to -- if you don't have the

23   motion, I'm happy to --

24           MR. ROCHON:  We'll take a copy.

25           MR. WISTOW:  I don't have a copy.  I didn't

Fayyad - 9


1    bring copies of the motions.  I thought you would have

Page 7

Fayyad Depo Transcript.txt

2    them.

3             Does anybody have your own motion?

4             MR. ROCHON:  We don't have the motion here.

5             MR. WISTOW:  If you want to look over my

6    shoulder to see that I'm not misreading it, or you'll

7    take my representation that I'm reading it correctly,

8    whichever you like.

9             MR. ROCHON:  Now that we started colloquy,

10   I'll be objecting on a form basis to leading questions.

11   And I didn't want to interrupt you before, and you

12   started with a leading matter.

13            But I just want to let you know I will be

14   objecting.  I'm sure you'll make a decision as to

15   whether you wish to correct that or not.

16            MR. WISTOW:  Yes.

17       Q.  Well, let me just see if I understand your

18   relationship to this lawsuit.

19       A.  Yes.

20       Q.  You understand there's a judgment against the PA,

21   correct?

22       A.  I do.

23       Q.  And that's for -- do you know approximately how

24   much?

25       A.  Originally $116 million, if I remember correctly.

                                      Fayyad - 10


1        Q.  And you know it's accrued interest?

2             MR. ROCHON:  Objection to form.

3        A.  Pardon me?

4        Q.  You know it's accrued interest?

5             MR. ROCHON:  Objection to form.

6        A.  No, I don't.

Fayyad Depo Transcript.txt

7    Q.  Okay.  You know it's at least $116 million?

8            MR. ROCHON:  Objection to form.

9    Q.  Do you?  Keep going.  Do you?

10           MR. ROCHON:  Objection to form.

11   Q.  Yes.  But would you please answer the question?

12   A.  Can you please repeat the question, because I was

13   distracted.

14   Q.  Okay.  Do you understand that there's a judgment

15   against the PA for approximately $116 million?

16   A.  I do.

17   Q.  All right.  And you are the Prime Minister of the

18   Palestinian Authority, are you not?

19   A.  Yes, I am.

20   Q.  And you would like to see that judgment vacated,

21   would you not?

22           MR. ROCHON:  Objection to form.

23           MR. WISTOW:  I'm trying to establish

24   adversity.  I mean I think this is kind of silly, and

25   that's why I want to lead because I think he's an

                                        Fayyad - 11


1    adverse witness.

2            I really -- I don't want to get into

3    colloquy with you.  I don't want to get into a fight.

4    But I think we're wasting time to suggest that this is

5    an adverse witness -- not an adverse witness -- and I

6    can't lead him.  But --

7            MR. ROCHON:  You know, that's what I'm

8    suggesting.  You could have -- give me a standing

9    objection to leading questions, and we can argue at a

10   later date.

                        Page 9

Fayyad Depo Transcript.txt

11      MR. WISTOW:  Of course.

12      MR. ROCHON:  But I -- so that I --

13      MR. WISTOW:  I don't want to -- if the only

14  objection is that it's leading, you don't have to make

15  it.  I'll agree to that.

16      MR. ROCHON:  So a standing objection to all

17  leading questions?

18      MR. WISTOW:  Yes.  Yes.  I don't have any

19  problem with that.

20      MR. ROCHON:  And you don't need me to tell

21  you when I think you've led or not.  We'll decide that

22  later.

23      MR. WISTOW:  I'm going to tell you right now

24  that almost everything I do, with relatively few

25  exceptions, is going to be leading questions.  Okay?

                                    Fayyad - 12


1       MR. ROCHON:  Okay.

2   Q.  You do want to see the default vacated, do you

3   not?

4   A.  I would like to see us able to defend ourselves.

5   Q.  Can you possibly answer my question directly?

6   A.  I have.

7   Q.  No.  With all due respect --

8   A.  Yes.

9   Q.  -- would you like to see the default vacated?

10  Could you please answer that yes or no.

11      MR. ROCHON:  Objection to form.

12  A.  As part of our effort to try to have ourselves

13  defense in the court of law in the United States, yes.

14  Q.  I'm going to try again.

15  A.  Yes.

Fayyad Depo Transcript.txt

16    Q.  We're going to be here a long time, and I'm going

17  to ask --

18    A.  -- and I'll ask the same way, with all due

19  respect.

20         MR. ROCHON:  Objection.

21    Q.  If necessary, I'm going to ask the US court to

22  allow additional time.

23    A.  Yes.

24    Q.  I'm asking you, very simply, for whatever the

25  reason, would you like to see the default judgment

                                      Fayyad - 13


1  vacated --

2         MR. ROCHON:  Objection.

3    Q.  -- yes or no?

4    A.  I would like to see us able to defend ourselves

5  in the courts of law.

6    Q.  Are you unwilling to answer my question yes or

7  no, sir?

8    A.  The objective is to have a chance to defend

9  ourselves.

10         MR. WISTOW:  Move to strike.

11    Q.  Are you unwilling to answer my question yes or

12  no?

13    A.  In the sense of what I have just said to you, the

14  answer is yes, because my understanding is that it's a

15  process we have to go through in order for us to be able

16  to defend ourselves.

17    Q.  So I'm going to try yet again.

18    A.  Yes.

19         MR. ROCHON:  Mr. Wistow --

                                   Page 11

Fayyad Depo Transcript.txt

20          MR. WISTOW:  I'm going --

21          MR. ROCHON:  -- we're going to need to get

22   the Magistrate Judge earlier.

23          MR. WISTOW:  Well, just instruct him not to

24   answer.

25          MR. ROCHON:  He's answered enough times.

                                            Fayyad - 14


1    You can't tell him how to answer a question.

2           MR. WISTOW:  Then instruct him not to

3    answer.

4           MR. ROCHON:  I'm not going to instruct him

5    not to answer, but you can't instruct him how to answer.

6           MR. WISTOW:  What you're doing now is the

7    very colloquy that's prohibited.  I'm going to ask him

8    one more time, and I ask you to please -- I moved to

9    strike his answer, and I'm asking him --

10     Q.  -- is it your desire to see the judgment by

11   default vacated, for whatever reason?

12     A.  Yes, for the reason I mentioned.  For the reasons

13   I mentioned.

14          MR. WISTOW:  I move to strike everything

15   after yes.

16     Q.  Now, I'm going to read you --

17          MR. ROCHON:  Mr. Wistow, we'll have an

18   agreement we'll deal with your motions to strike at some

19   later time, not now?  You don't want me to argue them

20   now, do you?

21          MR. WISTOW:  To whom?

22          MR. ROCHON:  Well, that's what I mean.

23          MR. WISTOW:  I just want the Court to know

24   that I moved to strike.

                     Page 12

Fayyad Depo Transcript.txt

25    A.  Can I ask a question myself?

                                        Fayyad - 15


1    Q.  Sure.

2    A.  Is it part of my right to actually explain what

3    it is that I'm saying?

4    Q.  I think that's best left to the Court to decide.

5    I take the position that --

6            MR. WISTOW:  Is it okay if I answer him?

7            MR. ROCHON:  (Indicating).

8    A.  The Court is not going to be able to decide if he

9    just sees yes to an answer without understanding the

10   motive.

11   Q.  Why don't you assume --

12   A.  Yes.

13   Q.  -- that a Court is capable of handling a case

14   appropriately.  Could you do that, please?

15           MR. ROCHON:  Objection.  Mr. Wistow, you're

16   arguing with the witness.

17           MR. WISTOW:  No, I'm not.  I'm not trying to

18   argue.  Let me just read to him something from the

19   motion.  Did you say you want to look over my shoulder

20   or accept my representation?

21           MR. ROCHON:  I didn't say anything.  Go

22   ahead.

23   Q.  All right.  This is from page 38 of the motion

24   that was filed on December 28, 2007, by your counsel in

25   the case.

                                        Fayyad - 16


1        So, on page 38, and it says, "As Prime Minister
                        Page 13

Fayyad Depo Transcript.txt

2    Fayyad's declaration makes clear, this judgment has

3    already been the subject of diplomatic communications at

4    the highest levels between our country's representatives

5    in the State Department and the governing officials in

6    the occupied territories.

7              If left intact, the judgment threatens to

8    undermine the relationship between the United States and

9    the Palestinian government, a relationship that the

10   executive branch of the United States government has

11   categorized as being crucial to the Israeli-Palestinian

12   peace process."

13             You understand what I've just read?

14   A.  I do.

15   Q.  Okay.  Now, I want to talk a little bit about the

16   contacts that are referred to there -- that is, between

17   our country's representatives and the governing

18   officials in the occupied territories.

19             Have you discussed this -- by the way, the

20   governing officials in the occupied territories, I

21   assume are Israeli officials?  Is that's what meant by

22   that?

23   A.  I did not understand it that way.

24   Q.  Okay.  How did -- tell me what you understand.

25   A.  I understood it as communications between us in

                                        Fayyad - 17


1    the Palestinian Authority and the United States.

2    Q.  Okay.  Fair enough.

3              Now, would you tell me whether or not you've

4    reviewed any documents prior to coming here to help you

5    recollect anything about those contacts.

6    A.  I have not reviewed any documents.
                          Page 14

Fayyad Depo Transcript.txt

7      Q.   At all?

8      A.   Not at all.

9      Q.   Nothing whatever?

10     A.   No.

11     Q.   When is the last time you've looked at any

12   documents that relate to this case?

13     A.   Probably around the time I made the declaration

14   in connection with the motion.  Probably.

15     Q.   In 2007?

16     A.   That's probably true.

17     Q.   Do you know when the motion was made?

18     A.   It must have been the second half of the year,

19   towards the end of the year probably.

20     Q.   Of 2007?

21     A.   2007, yes.

22     Q.   Okay.  So that's the last time you would have

23   looked at any of these documents, is that fair?

24     A.   I'm thinking, because I just need to make sure

25   that I'm answering you truthfully.

                                        Fayyad - 18


1      Q.   Take your time.  Take your time.

2      A.   Apart from flow of work -- usually

3   communications, telephone calls that I got on this

4   matter -- I believe that's true.

5               So apart from whatever things that happened

6   in the context of briefing me as to what was going on, I

7   believe that's the last time I saw the documentation

8   related to this case.

9      Q.   I want to make sure I understand you.

10     A.   Yes.

Fayyad_Depo_Transcript.txt

11      Q.  When is the last time you remember looking at any
12  documents?  That's all I'm asking you.  The last time
13  you remember.
14              MR. ROCHON:  Objection to form.
15      A.  It was around the time of filing.  Around the
16  time of filing.
17      Q.  So what you're saying --
18      A.  Yes.
19      Q.  -- is there may be other times, but you don't
20  remember?
21      A.  I don't really remember.  I don't believe that to
22  have been the case.
23      Q.  Okay.
24      A.  As I said, just to make sure that I'm telling you
25  what I know about this and that I'm answering correctly.

                                            Fayyad - 19


 1      Q.  Okay.
 2      A.  Apart from briefings that I got from time to time
 3  in the course of work via lawyers, but that's about it.
 4      Q.  I'm confused.  You said apart from briefings?
 5      A.  Yes.
 6      Q.  Do you remember seeing any --
 7      A.  No, no, no.
 8      Q.  You must --
 9      A.  But, you know --
10      Q.  Please.
11      A.  Okay.
12      Q.  Please.
13      A.  Yes.
14      Q.  As a courtesy to the stenographer, we can't both
15  talk at once.
                        Page 16

Fayyad Depo Transcript.txt

16    A.  I understand.  Okay.

17    Q.  So if you'll let me finish the question, it would

18  be good; and I'll try to not interrupt and let you

19  finish the answer.

20        Fair enough?

21    A.  Absolutely.

22    Q.  Okay.  So the way it stands is, the last time you

23  have an actual recollection of seeing any documents

24  which represent communications between the PA and PLO

25  and the American government regarding the Ungar lawsuit

                                        Fayyad - 20


 1  was back in 2007, is that fair?

 2    A.  That's my recollection, yes.

 3    Q.  Okay.  Now, can you tell me what documents you

 4  recollect seeing back then, before you wrote your

 5  declaration?

 6    A.  Well, I believe those letters that I myself, as a

 7  matter of fact, wrote to the Secretary of State,

 8  Condoleezza Rice, on this matter.

 9        There was also -- there was also some

10  communication later when I was outside of government.

11  But I'm not really sure -- I'm not believing that.

12            But I know of the existence of other

13  correspondence during the period when I was outside the

14  government.  Sometime in 2006, it must have been.

15    Q.  When you say outside of the government, is that

16  when you were with the Palestine Legislation --

17  Legislative Council?

18    A.  That's correct.  That's correct.

19    Q.  Okay.  And the document you're referring to when

                                Page 17

Fayyad Depo Transcript.txt

20    you were with the Palestine Legislative Council, what

21    was that document?

22        A.  No.  If I may correct --

23        Q.  Sure.

24        A.  -- I don't know if that's what you meant to ask.

25            If you're asking about the document I myself

Fayyad - 21

1    wrote, or letter I myself wrote, that happened before.

2        Q.  No, no. That's not what I'm asking.

3        A.  Okay.

4        Q.  I'm asking -- by the way, let me just back up

5    just a little bit.

6        A.  Yes.

7        Q.  You obtained a Ph.D. in the United States at the

8    University of Texas, correct?

9        A.  That's correct.

10        Q.  And they do speak -- I shouldn't be facetious --

11    and you're fluent in English, are you not?

12        A.  You be the judge of that.  I don't know.

13        Q.  Well, how do you feel about it?

14        A.  Fairly comfortable.

15        Q.  Good.  It was discussed -- whether you know this

16    or not -- it was discussed whether or not you need a

17    translator, and it was represented you could do the

18    deposition in English.

19            Are you aware of that?

20        A.  I am not really aware of that.

21        Q.  Okay.  But you're comfortable doing this in

22    English?

23        A.  I am.

24        Q.  Okay.  If I ask you any question --

Page 18

Fayyad Depo Transcript.txt

25    A.  Yes.

Fayyad - 22


1    Q.  -- where you're not absolutely sure of my

2   meaning, please tell me --

3    A.  Yes.

4    Q.  -- and I'll try to rephrase it so that you and I

5   are sure we're talking about the same thing at all

6   times.

7        Is that agreeable?

8    A.  Sure.

9    Q.  Okay.  What I'm asking you about is any documents

10  you looked at -- at any time now --

11    A.  Yes.

12    Q.  -- between the PLO, the PA, and the American

13  government with regard to the Ungar case.  Any

14  documents.

15    A.  Yes.  The document that I recall seeing around

16  that time is a document that I myself sent to then

17  Secretary of State Condoleezza Rice, when I was Minister

18  of Finance in 2005.  Yes.

19    Q.  Okay.  And is that the only document you recall?

20    A.  I'm aware that there are other documents.

21    Q.  You are aware?

22    A.  I'm aware there are other documents.  I do not

23  recall seeing them --

24    Q.  Okay.

25    A.  -- or reading them.  What I say is that this must

Fayyad - 23


1   have happened sometime in 2006, when I was not in the

Fayyad Depo Transcript.txt

2  government.

3    Q.  All right.  I'm a little bit confused.  It's not

4  your fault.  It's mine.

5    A.  Yes.

6    Q.  When you say you know there are other

7  documents --

8    A.  Yes.

9    Q.  -- first of all, what documents do you believe --

10    A.  Correspondence.

11    Q.  What are they?  Letters to Condoleezza Rice?  Are

12  they --

13    A.  That was my understanding.  There was further

14  communication between the PA and the US administration

15  in the form of letters.

16    Q.  Would one of those letters be a letter from

17  President Abbas?

18    A.  Probably, yes.

19    Q.  Do you recollect seeing such a letter?

20    A.  No.

21    Q.  Do you recollect hearing that there was such a

22  letter?

23    A.  Yes, I do.  Yes.

24    Q.  Okay.  But you never saw it?

25    A.  I don't believe I saw it, no.

                                        Fayyad - 24


1    Q.  Up to today, you haven't seen it?

2    A.  No, I haven't.

3    Q.  Okay.  Do you understand -- how did you learn

4  about this letter?

5    A.  You know, because, actually, when I rejoined the

6  government in the spring of 2007, we were in the process

Fayyad Depo Transcript.txt

7    of trying to actually find representation and all.

8        And I knew that we had to do this and give it --

9    treat it as a matter of priority.  And, in the process,

10   you know, I learned that there was communication like

11   that.

12   Q.  How did you learn?  What was the mechanism?

13   A.  Well, let me remember now as to how it happened.

14   Q.  Please.

15   A.  This takes us back to early 2007, around the time

16   when I joined the government in the spring of that year.

17       I know that there was an effort made by the

18   President's staff at the time to try to find legal

19   representation for the PA in the United States.

20   Q.  President Mustafa?

21   A.  President Abbas.

22   Q.  Oh, I'm sorry.  I misheard you.  Okay.  So --

23   A.  The staff of the President.

24   Q.  I see.  I'm sorry.  Okay.

25       What I'm trying to focus on right now is

Fayyad - 25


1    correspondence with the American government.

2    A.  Okay.

3    Q.  Are you with me?

4    A.  I am.

5    Q.  Okay.  You told me you believe there was a

6    letter --

7    A.  Yes.

8    Q.  You've got to let me finish.

9        You told me that you believe there was a letter

10   from President Abbas.  Yes?

Page 21

Fayyad Depo Transcript.txt

11    A.  I said I believe so.  Now I'm trying to remember.

12  I know there was communication between the PA and the US

13  administration.

14    Q.  Do you believe there was a letter from President

15  Abbas to Condoleezza Rice?

16    A.  It must have been at that level, yes.

17    Q.  And you believe it, correct?

18    A.  I have no reason not to believe so.

19    Q.  Did you ever ask anybody if you could see that

20  letter?

21    A.  I mean it's not that I could not see it if I

22  wanted to.

23    Q.  That's not my question.

24        MR. ROCHON:  You wanted him to finish his

25  answer, I'm sure.

                                        Fayyad - 26


1         MR. WISTOW:  I did.  Forgive me.

2    A.  Yes.

3    Q.  Have you finished your answer?

4    A.  You know, I'm really trying to really think now,

5  with all that I have to worry about and think about it.

6         I know what this case is generally about.  I know

7  generally what we're trying to do.  And I know there was

8  this filing on our behalf for the purpose I mentioned,

9  and there was an effort under way.

10        I know -- I'm aware that actually there was

11  correspondence, and probably between President Abbas and

12  the Secretary.  But I cannot tell you for sure right

13  now, you know, exactly what happened what day, as we

14  were doing that at the time.

15    Q.  Do you have my question in mind?  Do you remember

Fayyad Depo Transcript.txt

16   my question?

17      A.  I do.  Yes.

18      Q.  What was my question?

19      A.  Your question was do you believe there was the

20   letter -- ask it again.

21      Q.  No, Mr. Fayyad.  My question was, did you ever

22   ask anybody if you could see the letter.

23      A.  I don't remember.

24      Q.  Okay.  Now, did you ever learn of any American

25   court asking the State Department whether they wanted to

                                        Fayyad - 27


1    take any position in the cases against the PLO and the

2    PA?

3       A.  Can you say that again, please.

4       Q.  I'll withdraw it and I'll try to rephrase it.

5           Are you familiar with the term Statement of

6    Interest?

7       A.  I am.

8       Q.  Can you tell us, for the record, what that means?

9       A.  My understanding of it is a statement made by the

10   State Department representing interests of the United

11   States in the proceedings of a certain litigation.

12          That's my understanding.

13      Q.  All right.  And did you have an understanding

14   whether or not, if -- you know, strike that.  Let me

15   withdraw it.

16          You knew that the Statements of Interest would

17   come from the State Department?

18      A.  Yes.

19      Q.  And you knew that the State Department was part

Fayyad Depo Transcript.txt

20  of the executive branch of the government?

21      A.  Yes.

22      Q.  And these Statements of Interest would be

23  addressed to the judiciary, correct?

24      A.  That's my understanding, yes.

25      Q.  And you were long enough in the United States to

                                        Fayyad - 28


 1  know that we have three branches of government in the

 2  United States?

 3      A.  I'm familiar with the system, yes.

 4      Q.  Right.  The executive, the judiciary, and the

 5  legislative?

 6      A.  I'm familiar with the system.

 7      Q.  Okay.  And you understand that, in the United

 8  States, the various branches are supposed to be

 9  independent of each other?

10      A.  I'm aware of that.

11      Q.  That's one of the things we pride ourselves on.

12  Are you aware of that?

13      A.  Yes.

14      Q.  Okay.  Now, did you understand the Statement of

15  Interest was binding on the judiciary, or was it a

16  recommendation, or did you have any understanding at

17  all?

18      A.  No.  Given my understanding of the system of

19  government in the United States and the relationship

20  between the various branches of government, that the

21  executive branch of government was not in a position to

22  tell the judicial what to do.

23          I understand that to be an indication or a

24  representation of certain interests.

                        Page 24

Fayyad Depo Transcript.txt

25      Q.  Okay.  So you would understand that, if the

                                            Fayyad - 29


  1   judiciary refused to vacate this judgment, that that

  2   necessarily would not mean that the executive branch had

  3   any responsibility, correct?

  4              MR. ROCHON:  Objection to form.

  5      A.  Can you paraphrase.  There are too many parts in

  6   this.

  7      Q.  Okay.

  8      A.  Yes.  If you can.

  9      Q.  You understand that all the executive branch can

 10   do is make a recommendation to the judiciary, correct?

 11      A.  Yes.  But I also -- can I add something?

 12      Q.  Sure.

 13      A.  Okay.  I also understood that to be an option

 14   available to the executive branch and in the expectation

 15   of it having an effect.

 16           I understand the difference between the executive

 17   branch telling the judiciary what to do on the one hand,

 18   and the executive indicating interest in certain

 19   proceeding on the other, in the expectation that that

 20   representation would have an effect.

 21      Q.  Some effect.

 22      A.  That's my understanding.

 23      Q.  It would be taken into consideration.  Is that

 24   your understanding?

 25              MR. ROCHON:  Objection.  It's outside the

                                            Fayyad - 30


  1   scope of this witness's expertise.  Come on.

                        Page 25

Fayyad Depo Transcript.txt

2      MR. WISTOW:  Well, he's corresponding with

3  the United States.

4      MR. ROCHON:  Understood.

5      MR. WISTOW:  You know what?  What you just

6  did -- you did it very well -- is you made a speaking

7  objection.

8          And what I'd ask you to do is either just

9  object or tell him not to answer.  Please don't say why

10  the question's no good.

11      MR. ROCHON:  I'm trying to get you to -- I

12  haven't objected very much.  I'm trying to get you to

13  questions that aren't, and I think you're doing a pretty

14  good job of it.  I'm trying to do that.

15      MR. WISTOW:  Okay.

16   Q.  I'm going to try again.

17   A.  Okay.

18   Q.  Okay.  The bottom line is you understood, and you

19  understand, that the executive can only make

20  recommendations to the judiciary, isn't that so?

21   A.  That's my understanding, with the qualification I

22  added.

23      It's an instrument, an option, a certain action

24  available to the executive in cases like this where an

25  indication or a representation of interest was going to

                                          Fayyad - 31


1  have an effect, some effect.

2          Otherwise, it would not be there as an

3  instrument.

4   Q.  Did you believe -- did you believe that the

5  judiciary could not disregard the Statement of Interest

6  if it wished?

                    Page 26

Fayyad Depo Transcript.txt

7      A.  Within my understanding of it, number one, that

8   definitely was a possibility at this.

9          But, at the same time, my understanding was that,

10  when the executive branch makes such a recommendation --

11  not a -- such a representation, that it was going to be

12  taken seriously and with a good probability of being

13  given adequate weight in the outcome of these things.

14         So that was my understanding.

15     Q.  Okay.

16     A.  And let me add, if I may, that, actually, in all

17  discussions that I had on litigation against us in the

18  United States cases pending --

19             MR. ROCHON:  One second.

20             MR. WISTOW:  No, no.

21             MR. ROCHON:  I'm going to instruct the

22  witness.  I am instructing the witness.

23             And the instruction is, just make sure you

24  don't refer to any conversations with counsel as you

25  answer, because you were referencing discussions about

                                        Fayyad - 32


1   the cases.

2              MR. WISTOW:  Until I lay a proper framework

3   for it.

4              MR. ROCHON:  No.  He'll follow my

5   instructions on the privilege, not yours.  So he won't

6   reveal any --

7              MR. WISTOW:  That was directed to you.

8              MR. ROCHON:  All right.

9      Q.  So do you want to venture into that place where

10  he's asked you not to go?

                              Page 27

Fayyad Depo Transcript.txt
11          MR. ROCHON:  Objection.

12      A.  No.  Basically, let me tell you --

13      Q.  There's no question pending, and I want to get

14  out of here on time.

15      A.  Okay.

16          MR. ROCHON:  Objection.  There was a

17  question.

18          MR. WISTOW:  What was the question?

19          MR. ROCHON:  You said, Do you want to

20  venture into that place where he told you not to go.

21  You're asking him to violate his counsel's instructions.

22          Do you want to take that to Magistrate Judge

23  Martin?

24          MR. WISTOW:  No.

25          MR. ROCHON:  Where I had a privilege

                                        Fayyad - 33


1   objection and you ask him if he wants to follow my

2   advice?

3           MR. WISTOW:  Do you want to get excited?

4           MR. ROCHON:  I just did.

5           MR. WISTOW:  Okay.  Let's calm down.

6           MR. ROCHON:  No.  You had a question.

7   You're withdrawing it, I take it.

8           MR. WISTOW:  I am.

9           MR. ROCHON:  Fine.  Then I have nothing else

10  to say.

11      Q.  Are you aware of any American courts that asked

12  the State Department for a Statement of Interest?

13      A.  I don't know if I remember now.

14      Q.  Okay.  Maybe I can refresh your recollection.

15  Maybe not.
                        Page 28

Fayyad Depo Transcript.txt

16          I'm going to show you a copy of an order entered
17     by Judge Marrero in Knox versus the PLO and the PA and
18     others.
19          Do you know that case?
20     A.  Knox?  Yes, I do.
21          MR. ROCHON:  If you want stipulations on the
22     court --
23          MR. WISTOW:  No.  I don't want any anything,
24     okay?  I want to take this man's deposition.
25          MR. ROCHON:  If you want a stipulation --

                                        Fayyad - 34


1           MR. WISTOW:  I don't want any stipulations.
2      Q.  I'm going to show you a document which I
3      represent is a true copy of an order entered by Judge
4      Marrero (indicating).
5           MR. ROCHON:  Is this Exhibit A?
6           MR. WISTOW:  It's marked as Exhibit A as it
7      appears in the motion that you filed on 12-28-077.
8           MR. ROCHON:  For the purpose of this
9      hearing, I just want to make sure --
10          MR. WISTOW:  I'd like to make it Exhibit 1,
11     so we don't have confusion.
12          MR. ROCHON:  Sure.
13          MR. WISTOW:  What I did was I took exactly
14     what you submitted.
15          (Exhibit No. 1 marked for identification.)
16     Q.  So let me clarify this, if I might.
17          What you're looking at, Mr. Fayyad, is a copy of
18     a document that your counsel submitted to the United
19     States District Court when they filed the motion to

                        Page 29

Fayyad Depo Transcript.txt

20  vacate the judgment.

21      Do you understand that?

22  A.  I understand.

23  Q.  Okay.  Now, you want to take a look at it?

24  A.  Which part?  All of it?

25  Q.  All of it.

Fayyad - 35

1           (Witness peruses document.)

2           MR. WISTOW:  Can I get one of those back?

3  I'm sorry.

4           MS. FERGUSON:  I've marked on it.

5           MR. WISTOW:  Can I get yours back?

6           MR. ROCHON:  I've marked mine as well, but

7  it just says Exhibit 1 on it.

8           MR. WISTOW:  All right.  Can we just --

9           MR. ROCHON:  (Indicating).

10          MR. WISTOW:  Thank you.

11  Q.  Tell me when you've finished looking at the

12  document, Mr. Fayyad.

13  A.  I do.

14  Q.  All right.  All right.  I would suggest that the

15  most important part is the order which appears at the

16  bottom --

17  A.  So let me read that.

18  Q.  I'm sorry.  I thought you had.

19  A.  No, I haven't finished.  But let me -- that's why

20  I --

21  Q.  No, no, no.  Just tell me when you've finished.

22  A.  Okay.

23  Q.  Would it be all right if I took my jacket off?

24  A.  Sure.

Page 30

Fayyad Depo Transcript.txt

25              (Witness peruses document.)

                                                Fayyad - 36


    1    A.  I think I understand it.

    2    Q.  Okay.  The order, in effect, says that the judge,

    3  Judge Marrero, is ordering the United States to tell him

    4  whether or not they're contemplating issuing a

    5  suggestion (sic) of interest in the resolution of the

    6  Knox case.

    7         And then it says, "Or in any of the other cases

    8  pending in other juris- -- in other districts against

    9  the Defendants in this action, raising similar issues as

   10  to the appropriateness of reopening default judgments

   11  against the Defendants.

   12         I've read that correctly, have I not?

   13    A.  Yes.

   14    Q.  Okay.  So did you know that Judge Marrero ordered

   15  the United States to tell him whether or not they were

   16  going to file Statements of Interest?

   17         Did you know that?

   18    A.  I have to tell you, I really do not recall

   19  details of the motions and various orders made along the

   20  way.  I really don't.

   21         But I understand that this was the order anyway.

   22    Q.  No, no.  We're at cross purposes.  I'm not asking

   23  you to agree with me on was this the order or not.  I'm

   24  just asking if you knew about it.

   25         That's all I'm asking.

                                                Fayyad - 37


    1    A.  You know, can I really tell you something?  I'm

                          Page 31

Fayyad Depo Transcript.txt

2   here to really answer your questions.

3       Q.  I can see that.

4       A.  I really want to answer your questions.

5       Q.  I know you do.

6       A.  But, you know, I haven't prepared for this in the

7   sense of really having brought all kinds of

8   documentations, reviewed motions, or anything like that.

9           So you'll have to please give me little bit of

10  space and time in order to think as to what -- because I

11  don't want to misrepresent, overrepresent or under-

12  represent.

13      Q.  Mr. Fayyad --

14      A.  I feel I'm being pushed a little bit --

15      Q.  I'm sorry.

16      A.  -- the way that you're conducting this

17  deposition.

18      Q.  Forgive me.  Take all the time you want.

19      A.  All right.  So let's --

20      Q.  Take all the time you want.

21      A.  Let's calm down here a little bit.

22      Q.  Sure.

23      A.  And what I'm really telling you, once and for

24  all, I do not remember each and -- you know, each and

25  every step taken along the way of this process.

                                        Fayyad - 38


1           And so, if I'm really pressed to give you a

2   yes-or-no answer this afternoon here as we're doing

3   this, I can't but tell you no, I don't remember.

4       Q.  Mr. Fayyad, let me explain something, if I might.

5       A.  Yes.

6       Q.  Well, I won't explain anything.  I'll ask a

                        Page 32

Fayyad Depo Transcript.txt

7    question.

8        A.  Okay.

9        Q.  Do you understand that you have told the United

10   States District Court that the PLO and the PA would

11   participate in discovery in the case?

12           You understand that?

13       A.  I do.

14       Q.  Okay.  That means discovery under the American

15   rules, however strange they may be.

16           Do you understand that?

17       A.  I'm not objecting to the rules.

18       Q.  Okay.

19       A.  I'm objecting to the form in which this

20   deposition is being conducted.  These are two different

21   matters.

22       Q.  Do you feel that I'm being rude to you?

23       A.  I didn't say that.  It's just, basically, that I

24   do not feel I'm given -- I'm being given the space to

25   recollect what I'm being pushed to say yes or no.

                                         Fayyad - 39


1    That's basically what it is.

2            I'm familiar with this system as much as one can

3    be.  I'm not a citizen of the United States.  I lived

4    there long enough to know how it works.  But I know the

5    difference between doing it right and not doing it --

6    and doing it not so right.

7            That's basically what I'm saying.

8        Q.  Mr. Fayyad, are you saying that I'm asking the

9    questions too quickly and not giving you time to answer?

10       A.  Maybe it's not really that as much as it is when

                              Page 33

Fayyad Depo Transcript.txt

11    you say, Yes or no, yes or no, yes or no.  It's as if,

12    you know, I just came from a cramming room where I went

13    over -- where I've just gone over all these documents.

14        Q.  Did you?

15        A.  Fact of the matter is that I didn't.  I run a

16    government.  I have a lot of things to worry about.  And

17    this is one of them.  It's an important issue for me.

18            But I am not here to suggest to you in any

19    manner, shape or form, sir, that I can answer quickly

20    yes or no questions related to whether or not I read

21    certain documents three or four years ago.

22            That's basically what I'm saying, with all due

23    respect.

24        Q.  With all due respect to you, Mr. Fayyad, you're

25    not the first witness that I've asked questions of.  And

                                          Fayyad - 40


 1    I want to ask you a very straightforward -- I think --

 2    question.

 3            Were you aware of Judge Marrero's order?  If you

 4    don't know, you can say you don't know.  If you say you

 5    were aware of it, you can say you were.  If you weren't

 6    aware of it, you can say you weren't.

 7        A.  The truth, sir, is that I do not know.

 8            All I'm really trying to do here is to get you to

 9    see things from my own perspective as I communicate to

10    you my answers to questions you raise.

11            This has been a long process.  There is constant

12    discussion going on, and it's not really the only case.

13    There are several cases here.  So, at the time certain

14    significant things happened along the way, I'm sure I

15    was informed.  You know what I'm saying?

                              Page 34

Fayyad Depo Transcript.txt

16          But here we are months, years, after certain
17     things have happened.  I cannot really be so certain.  I
18     do not really want to tell you something yes or no when
19     I'm not really a hundred percent certain.
20          You know what I'm saying?  That's what I'm really
21     trying to do here.
22       Q.  That's fine.  That's not unusual.  That happens
23     to every witness.
24          MR. ROCHON:  May we take a break at this
25     point, given -- is that agreeable?

                                        Fayyad - 41


1          THE WITNESS:  Yes.
2          THE VIDEOGRAPHER:  Going off record at 4:55.
3          (Short recess taken.)
4          THE VIDEOGRAPHER:  Going on record at 5:00.
5       Q.  Mr. Fayyad --
6       A.  Yes.
7       Q.  -- do you understand, one of the things that I'm
8     trying to find out is what you know about the case?
9          Do you understand that?
10      A.  I understand that this is the nature of a
11     deposition, yes.
12      Q.  But my question to you is, do you understand that
13     one of the things I'm trying to find out is how much you
14     know about different aspects of the case.
15          Do you understand that?
16      A.  You're telling me that, and I take your word for
17     it.
18      Q.  Okay.  Now, what I'm trying to find out is, did
19     you ever learn of Judge Marrero's order to the United

                            Page 35

Fayyad Depo Transcript.txt

20  States, to your recollection.

21      A.  I don't remember.

22      Q.  Okay.  Fair enough.  You have no recollection of

23  learning of it at this point.  Is that fair?

24      A.  I just don't remember really.

25      Q.  You have no recollection of learning of it, is

                                              Fayyad - 42


 1  that fair?

 2              MR. ROCHON:  Objection.  Asked and answered.

 3              MR. WISTOW:  That's one of the things you're

 4  not supposed to do under our local rules.  You just

 5  object, okay?  Or instruct him not to answer, if you

 6  wish.

 7              MR. ROCHON:  Thank you for the suggestions.

 8      Q.  Is it fair to say that, as you sit here now,

 9  under oath, you have no present recollection of learning

10  of this order?

11          It may be you've forgotten it -- you knew it and

12  forgot it -- but you have no recollection?  Is that

13  fair?

14      A.  That's exactly what I meant when I said I don't

15  remember really.

16      Q.  Okay.  So, as we sit here today, you have no

17  recollection of ever learning of the order?

18              MR. ROCHON:  Objection.

19      Q.  Is that fair?

20              MR. ROCHON:  Objection.

21              MR. WISTOW:  I'm entitled to get a straight

22  answer.

23              MR. ROCHON:  Objection.

24      A.  I just gave you one.

                        Page 36

Fayyad Depo Transcript.txt

25      Q.  Is it fair --

Fayyad - 43


 1      A.  If what you said means I don't remember, then
 2  that's what I really mean to say.
 3      Q.  Okay.  Now, did you ever learn whether or not the
 4  United States complied with Judge Marrero's order?
 5      A.  I don't remember either.
 6      Q.  Maybe I can refresh your recollection.
 7      A.  Okay.
 8            MR. ROCHON:  If we show the witness the one
 9  that gets marked, we'll have two on our side --
10            MR. WISTOW:  Okay.  Sure.
11            MR. ROCHON:  -- if that's agreeable.
12            MR. WISTOW:  That's fine.
13            MR. ROCHON:  If that's okay with the court
14  reporter.
15            (Off-the-record discussion while exhibit is
16  marked).
17            (Exhibit No. 2 marked for identification.)
18      Q.  Now, do you know --
19            MR. ROCHON:  That's how this -- by doing it
20  that way, then we do get the two copies, so he's got
21  one.  We've got two.
22            The court reporter doesn't read them.  She
23  marks them.
24            MR. WISTOW:  That's fine.
25      Q.  Have you ever, to your recollection, seen this

Fayyad - 44


 1  document before?

Page 37

Fayyad Depo Transcript.txt

2          (Witness peruses document.)

3     A.  I don't know if I remember seeing this document

4   specifically.  I mean this very document.

5     Q.  Okay.  I would like to direct your attention --

6     A.  Yes.

7     Q.  -- to eight lines from the bottom of the first

8   page where it starts to read, The United States

9   respectfully informs the Court that it declines to file

10  a Statement of Interest concerning the Rule 60 issues

11  presented by this case, but will continue to monitor

12  this and other cases like it.

13          MR. ROCHON:  (Indicating).

14          MR. WISTOW:  Did you just point something to

15  him?

16          MR. ROCHON:  Yes.  The sentence we're

17  reading so he could find it on the page.  He was asking

18  for help.

19          MR. WISTOW:  Okay.

20    Q.  If you need assistance in finding something, I'd

21  ask you to tell me that you can't find it.

22    A.  Fine.

23    Q.  Is that fair?

24    A.  Fair.

25    Q.  Okay.  Have you located it?

                                        Fayyad - 45


1     A.  I have.

2     Q.  Okay.  Have I read it correctly?

3     A.  You have.

4     Q.  Okay.  Do you understand that to mean that, in

5   response to Judge Marrero's order to the United States

6   to state whether or not it would file a Statement of

Fayyad Depo Transcript.txt

7  Interest, the United States responded by saying they

8  would not file a Statement of Interest in this case --

9  the Knox case -- or any similar cases.

10      Do you understand that to mean that?

11  A.  I understood that to be the case.  I'd have to

12  read through the rest of the letter, or to continue that

13  sentence where it says, But will continue to monitor

14  this and other cases like it.

15  Q.  Yes.  Right.  I'm only talking about at the time.

16  A.  Yes.

17  Q.  I mean anything could happen after this.

18  A.  I understand.

19  Q.  But at that time --

20  A.  Yes.

21  Q.  -- which was February 29, 2008, if this document

22  is authentic, then the United States declined to give a

23  suggestion (sic) of interest in the Knox case -- and you

24  see, third line from the top -- or in any other of the

25  cases pending in other districts.

                                        Fayyad - 46


1       You see that?

2  A.  The third line --

3           (Witness peruses document.)

4  A.  I see that, yes.

5  Q.  Okay.  So did you ever learn from any source that

6  the United States had declined to issue a Statement of

7  Interest in the Knox case or in any of the other cases

8  pending in other districts against the PLO and the PA?

9           MR. ROCHON:  Objection.

10  Q.  Did you ever learn that from any source?

                        Page 39

Fayyad Depo Transcript.txt

11          MR. ROCHON:  Objection.  Don't answer yet.

12   You have to exclude conversations --

13          MR. WISTOW:  No.  I don't exclude

14   conversations.  It's not a privileged communication.

15   It's not confidential information.  It's relating --

16          MR. ROCHON:  Let me just -- I'm not arguing.

17          MR. WISTOW:  I don't want any fighting.  I

18   don't exclude anything.

19          MR. ROCHON:  We're agreeing.  The answer to

20   the question will not be deemed to be a waiver of

21   privilege.

22          MR. WISTOW:  That's right.  I believe

23   privilege has been waived for other reasons we'll get

24   into.  But I stipulate that an answer to this will not

25   represent a waiver.

                                        Fayyad - 47


 1          MR. ROCHON:  Mr. Prime Minister, you can

 2   answer the question.

 3     A.  Well, I remember that there was a process.

 4          And, as I told you myself, I myself communicated

 5   on this with the Secretary of State at the time,

 6   Condoleezza Rice, seeking help.  And I understood what

 7   the Statement of Interest meant -- Statement of Interest

 8   -- a term mentioned on several occasions in my

 9   discussions with US officials.

10          Now -- and I understood, at some point -- whether

11   in connection with this letter or some other

12   communication I can't remember right now -- that the US

13   did not submit, or did not want to submit, a Statement

14   of Interest.

15          But I also recall that it did not mean -- that

                              Page 40

Fayyad Depo Transcript.txt

16   representation done by the United States, it does not

17   mean that the administration was --

18          (Mr. Haller enters the room.)

19   Q.  I'm sorry.  I didn't hear the end.

20   A.  That it did not mean that the administration was

21   indifferent as to what was going on.

22          In other words, I understood that -- the way I

23   understood it was, in a formal sense of a Statement of

24   Interest, there was not acceptance of it.  There was not

25   a submission of it.  But, at the same time, there was a

Fayyad - 48

1   Statement of Interest in a generic sense.

2          And that actually is what's borne out if you read

3   a couple of lines down from where that reference which

4   you just cited, where the letter says, At the same time,

5   the United States remains concerned about the potential

6   significant impact of these cases -- significant impact

7   these cases may have on the financial and political

8   viability of the Defendants.

9   Q.  Have you finished your answer?

10   A.  Yes.

11          MR. WISTOW:  I move to strike.

12          THE COURT REPORTER:  Could you identify the

13   person who came in the room.

14          MR. WISTOW:  Could you identify yourself for

15   the record, please.

16          MR. HALLER:  Mordechai Haller.

17          THE COURT REPORTER:  Spell it for me,

18   please.

19          MR. HALLER:  M O R D E C H A I, H A L L E R.

Page 41

Fayyad Depo Transcript.txt

20    Plaintiffs' Israeli counsel.

21        Q.  Have you finished your answer, Mr. Fayyad?

22        A.  Yes.

23        Q.  Do you remember the question?

24        A.  I remember the question.

25            The question was that -- were you aware that

Fayyad - 49

1    there was -- or does this not say that the United States

2    did not want to submit a Statement of Interest.

3        Q.  No.  I'm not asking you about what the letter

4    says.

5        A.  Oh, okay.

6        Q.  I'm not.  I'm asking you if you ever became aware

7    of whether or not the United States responded to Judge

8    Marrero by saying -- let me finish, please --

9        A.  Yes.

10        Q.  -- by saying they declined to state -- to file a

11    Statement of Interest at that time.

12            Did you ever become aware of that?

13        A.  As I indicated, I'm aware that there were

14    discussions, communications, on this matter.  I was

15    aware that there was not a straightforward Statement of

16    Interest submitted by the US government to the Court.

17            But I also remember being told that that

18    statement or that communication or those communications

19    where Statement of Interest was not filed did not mean

20    that the administration was indifferent as to the

21    proceedings.

22            That's my answer.

23        Q.  Okay.  I'm going to press it a little bit.

24        A.  Okay.

Page 42

Fayyad Depo Transcript.txt

25    Q.  I'm really not asking you to interpret what the

Fayyad - 50


1    intent of the government was, the American government.

2         I'm asking you only if you were aware that, on

3    February 29, 2008, the United States said to Judge

4    Marrero, and I quote, "The United States respectfully

5    informs the Court that it declines to file a Statement

6    of Interest concerning the Rule 60 issues presented by

7    this case, but will continue to monitor this and other

8    cases like it.

9         Did you ever become aware of that declination?

10   A.  What I'm really trying to communicate to you, and

11   through you to the Court, is my understanding of the

12   nature of that communication; and, specifically, that

13   the administration did not file a Statement of Interest

14   in the way a Statement of Interest is technically

15   defined.

16        But I remember, in the context of communications,

17   suggesting that it was not not interested in what was

18   going on.  That's basically my recollection of the

19   exercise.

20   Q.  Mr. Fayyad, I'm going to ask you to try not to

21   communicate with the Court, as you just suggested you're

22   doing.

23        Try to just answer my questions.  The Court will

24   hear my questions, will hear your answers.  Under our

25   system, I get to ask questions and, hopefully, you

Fayyad - 51


1    answer them.

Page 43

Fayyad Depo Transcript.txt

2    I'm not trying to tell half the story.  You have

3  lawyers.  They can bring out what they want.

4    Do you understand?

5    A.  I respect the system, and I am doing my best to

6  answer your questions, sir.

7    Q.  Okay.  My question is, did you ever learn that

8  Judge Marrero was informed that the United States

9  declined to file a Statement of Interest.

10    MR. ROCHON:  Objection.

11    Q.  Can you answer that either yes, no, or I don't

12  remember?

13    MR. ROCHON:  Objection.

14    Q.  Can you?

15    MR. ROCHON:  You can answer the question.

16    A.  As I said, you know, I'm aware that there was

17  activity along those lines, but I do not remember each

18  and specific case or specific communication.

19    But the substance of what I recall is what I told

20  you.

21    Q.  Okay.  Did you learn, in substance --

22    A.  Yes.

23    Q.  -- that the United States declined to file a

24  Statement of Interest?  Did you learn that?

25    MR. ROCHON:  Objection.  You may answer.

Fayyad - 52


1    A.  I learned that.  But, at the same time, I learned

2  that the United States was not disinterested, and that

3  that view of the United States was communicated as well.

4    Q.  Okay.  The United States also expressed sympathy

5  for the victims, did it not?

6    A.  It did.

Page 44

Fayyad Depo Transcript.txt

7    Q.  And it expressed sympathy and interest in the PLO

8  and PA, did it not?

9    A.  It did.

10   Q.  So it wasn't indifferent to either side, was it?

11   A.  No.  But that's not what the letter said.  It's

12 not indifferent to either side.

13   Q.  That's right.

14   A.  Yes.

15   Q.  But the letter says they declined to file a

16 Statement of Interest.

17   A.  That's what the letter said.

18   Q.  Right.  Did you ever learn of that decision?

19   A.  Whether in this specific case or another case, I

20 really cannot tell you right now.

21      But I'm aware of the fact that the United States

22 did not file a Statement of Interest in the way a

23 Statement of Interest is construed to mean in a legal

24 sense.

25   Q.  How did you learn that?

Fayyad - 53

1         MR. ROCHON:  Objection.

2    A.  I've had discussions on this with US officials

3  all the time.

4    Q.  Really?

5    A.  Yes.

6    Q.  When was the last time you had a discussion with

7  a US official about this?

8    A.  Not the recent period.

9    Q.  Well, you said all the time.  I'm just asking you

10 when the last time was.

Page 45

Fayyad Depo Transcript.txt

11    A.  I'm trying to remember now.  All the time when

12  this was being activated and all.

13    Q.  Take your time, Mr. Fayyad.  There's no rush.

14    A.  I can actually give you a precise date if I can

15  remember when it is that I visited the State Department

16  and met with lawyers at the State Department.

17        I'd have to go back to my itinerary, my travel

18  records, and I'd be able to provide you with that.

19    Q.  Please understand --

20    A.  In other words, it's not -- I know that I did

21  discuss it.

22    Q.  Okay.  Please understand.  I don't expect you to

23  have exact dates.

24    A.  Okay.

25    Q.  Can you give me an approximate date?

                                            Fayyad - 54


 1    A.  Yes.  That I can.

 2    Q.  What is that?

 3    A.  Let me -- not necessarily in connection with this

 4  case, but generally, you know, cases filed against us in

 5  the United States.

 6        So I believe it must have been a year ago.

 7  That's when I believe I officially visited the United

 8  States.  A year ago.

 9        Again, I can look it up and provide with you the

10  records.

11    Q.  I'm only asking you for your best recollection.

12    A.  Yes.

13    Q.  And I understand all you can give me, without

14  checking your records, is your best recollection.

15    A.  My best recollection is that the last time I had

                                   Page 46

Fayyad Depo Transcript.txt

16    a discussion on cases -- on litigation against us in the

17    United States in connection with these matters --

18    general matters.  Not necessarily this case -- was a

19    year ago --

20        Q.  Okay.

21        A.  -- or thereabouts.

22        Q.  Okay.  When we say litigation generally and not

23    necessarily these cases --

24        A.  Yes.

25        Q.  -- we're talking about the so-called terrorist

                                            Fayyad - 55


1    claims, correct?

2        A.  Yes.

3        Q.  Claims against the PLO and PA that they were

4    involved somehow in terrorist activities?

5        A.  Yes.

6        Q.  So you spoke to somebody at the State Department

7    about a year ago?

8        A.  Yes.

9        Q.  Who was that?

10        A.  I don't -- lawyers.

11        Q.  Can you help me out a little bit?

12        A.  I can't remember the names right now.

13        Q.  Okay.  Do you remember their titles?

14        A.  I can't.

15        Q.  Do you remember how many there were?

16        A.  Maybe three, four.  I really don't remember.

17        Q.  So did you make -- were you accompanied by

18    anybody on your side?

19        A.  I really was there by myself.

                              Page 47

Fayyad Depo Transcript.txt

20    Q.  Okay.  And so these three or four lawyers, you

21  don't remember anybody's name?

22    A.  No.  Not right now.

23    Q.  And do you remember if you were -- you had

24  written to set up an appointment, or how it came to be?

25  Do you remember?

Fayyad - 56


1    A.  Precisely, I do not remember.  In connection with

2  this particular trip, I don't really remember now.

3    Q.  Okay.  Would it be fair to say you were asking

4  them to see if a Statement of Interest could be filed?

5         MR. ROCHON:  Objection.  Form and content.

6  In have a substantive objection on this.

7         You may want to take it outside the presence

8  of the witness so you don't think I'm engaging in

9  speaking objections.  But I need to discuss it with you

10  first before I take it to the judge.

11         MR. WISTOW:  Some kind of diplomatic

12  privilege?

13         MR. ROCHON:  Yes.

14         MR. WISTOW:  I have a -- it says, This

15  judgment has already been the subject of diplomatic

16  communications at the highest levels between our

17  country's representatives and the State Department.

18         You've told the Court about this, both the

19  Circuit Court and the Federal Court.  And, you know,

20  you're flaunting this issue.  Now you tell me that I

21  can't ask him about it?  Okay.  Just tell him not to

22  answer.  It's okay with me.

23         MR. ROCHON:  Well, we can take it to the

24  Magistrate Judge.  That's why we have him available, so

Fayyad Depo Transcript.txt

25    you can get a ruling on it.

                                              Fayyad - 57


1              THE VIDEOGRAPHER:  Excuse me.  I have to
2    change the tape.
3              MR. WISTOW:  Well, you know what?
4              MR. ROCHON:  We're going to go off the
5    record.
6              MR. WISTOW:  You know what?  I'm perfectly
7    happy with an instruction not to answer.  I don't want
8    to wait -- I have limited time today.  I want to get
9    this thing moving.
10             MR. ROCHON:  We have to go off the tape.
11   You can finish, but your tape's running out and you
12   won't be on the record.
13             THE VIDEOGRAPHER:  Going off the record at
14   5:18.
15             (Short recess taken.)
16             THE VIDEOGRAPHER:  Going on record at 5:20.
17             MR. WISTOW:  I'd ask you to reconsider.
18             You have affirmatively told the Court in
19   your pleadings that one of the reasons to vacate the
20   motion -- 60(b)6 motion -- is that -- and I quote from
21   your pleadings -- "This judgment has already been the
22   subject of diplomatic communications at the highest
23   levels between our country's representatives and the
24   State Department and the governing officials in the
25   Occupied Territories.

                                              Fayyad - 58


1              If left intact, the judgment threatens to

Fayyad Depo Transcript.txt

2  undermine the relationship between the United States and

3  the Palestinian government, a relationship that the

4  executive branch of the United States government has

5  categorized as being crucial to the Israeli-Palestinian

6  peace process."

7          I don't know how anything could become more

8  relevant, if you're urging that as a reason.  So I'm

9  asking him to tell me about all these high-level

10  conversations.

11          MR. ROCHON:  The fact of a communication

12  being made known to the Court does not waive any

13  privilege associated with it.

14          MR. WISTOW:  I'll tell you what?  Why don't

15  we do this?  If you could just let him answer this

16  question, if it involved asking for a Statement of

17  Interest, I'll agree that, in and of itself, that answer

18  doesn't waive any kind of privilege.

19          MR. ROCHON:  You know, you'll be leading me

20  down the primrose path.  I either object or I don't.

21  You mean you'll be done in this area?

22          MR. WISTOW:  I don't know.  If he says, no,

23  we didn't talk about that, then I certainly --

24          MR. ROCHON:  The problem is this.  The Prime

25  Minister has a portfolio that includes things other than

                                                Fayyad - 59


1  this case.  So he doesn't communicate only about this

2  case.

3          MR. WISTOW:  Oh, Please.  I don't want to

4  ask him anything that's not related to this case.  That

5  would be inappropriate, and I certainly wouldn't do it.

6          MR. ROCHON:  The problem is either -- see, I

Fayyad Depo Transcript.txt

7    asked the witness to step out because I don't want you

8    suggest I'm making speaking objections.

9              MR. WISTOW:  Why don't you step out.

10             MR. ROCHON:  Just escort the Prime Minister

11   out.

12             (The witness leaves the room.)

13             MR. WISTOW:  No.  I don't want --

14             MR. ROCHON:  I'll take the time.  I'll eat

15   the time.

16             MR. WISTOW:  I know.  But we have to keep

17   track of the time.

18             MR. ROCHON:  It's all right.  We can just

19   note when we start this discussion.  I'll eat the whole

20   time.

21             MR. WISTOW:  Why don't you do it.  Why don't

22   we -- you're the one who's --

23             MR. ROCHON:  What time is it now,

24   Mr. Coopersmith?

25             THE VIDEOGRAPHER:  The time is 5:22.

                                        Fayyad - 60


1              MR. ROCHON:  Thank you.  It's now my time.

2              We're on the record.  I'm just eating the

3    time.  It doesn't count on the seven hours.  Sometimes

4    lawyers try to use up the other guy's time.

5              (The witness leaves the room.)

6              MR. ROCHON:  The Prime Minister is out of

7    the room.

8              So, look, when he communicates, it's not

9    like he goes to the State Department only about these

10   cases.  He's there about a host of things.  He's trying

                            Page 51

Fayyad Depo Transcript.txt

11  to get money.  He's trying to get security.  He's trying

12  to --

13          And so none of these things are seen in

14  isolation.  So you can't, you know, discuss what did you

15  tell them about this because it's all part of a unified

16  conversation.

17          MR. WISTOW:  I didn't even ask him that.

18  All I said to him was, did you ask them if they would

19  file a Statement of Interest in these cases.

20          That's all I asked.  That's pretty

21  straightforward.

22          MR. ROCHON:  If your question is that, and

23  you're not going to claim it's a waiver of diplomatic

24  privilege --

25          MR. WISTOW:  I will not.

                                        Fayyad - 61


1           MR. ROCHON:  As long as we're on my time, do

2   you want to tell me -- he's out of the room.  Do you

3   want to tell me where else you're going to go, and we

4   can hash out the diplomatic issues now on my nickel?

5           MR. WISTOW:  I'd rather not --

6           MR. ROCHON:  All right.

7           MR. WISTOW:  -- because I don't know where

8   I'm going, if you haven't figured that out yet.  It's a

9   little loosey-goosey.

10          MR. ROCHON:  I'm offering it to you because

11  we'll be back on your time soon.

12          MR. WISTOW:  I guess, in fairness to you, if

13  he says yes, he did ask them for it, I'm going to ask

14  him did they say yes, did they say no, did they say

15  maybe.  That's all.

Fayyad Depo Transcript.txt

16            MR. ROCHON:  Well, then -- well, I know
17    that's all that you -- that's what implicates diplomatic
18    privilege.
19            MR. WISTOW:  I'm just asking a narrow issue.
20            MR. ROCHON:  I'm going to have to take this
21    to the Magistrate Judge.
22            I'm not going to instruct him not to answer
23    because you're trying to set me up for some kind of
24    sanctions if I instruct him not to answer.  I've got a
25    Magistrate Judge available because we started so late.

Fayyad - 62

1    That's why we have him, so I don't instruct him and have
2    you complain about it.
3            MR. WISTOW:  You know what I'd prefer doing,
4    because I'd like to brief this, because this is
5    fundamentally important.
6            MR. ROCHON:  We're not going to convene here
7    again.
8            MR. WISTOW:  Well, I'm going to brief it.
9            MR. ROCHON:  We got a Magistrate Judge --
10            MR. WISTOW:  And then what happens -- first
11    of all, the case was not referred to him for discovery
12    on this.  It was not, okay?
13            So what happens if he rules the way you like
14    it?  Then you take an appeal.  Or he rules, then I take
15    an appeal, or vice versa, right?
16            MR. ROCHON:  If he rules --
17            MR. WISTOW:  If he rules in your favor,
18    we'll take an appeal.  I guarantee it.
19            MR. ROCHON:  That's fine.  Then we might, in

Page 53

Fayyad Depo Transcript.txt

20    that case, over my objection, have to reconvene.  But

21    I'm not going to set up something where we automatically

22    have to reconvene.

23              MR. WISTOW:  Why don't you find out if he

24    asked.  If he says no, he didn't ask --

25              MR. ROCHON:  I don't anticipate --

                                          Fayyad - 63


1               MR. WISTOW:  He's going to say yes?

2               MR. ROCHON:  I'm not going to tell you what

3    he's going to say.  You know, I can't.

4               MR. WISTOW:  Why don't we do this?  Why

5    don't we get an answer just to that question so that we

6    can talk to the Magistrate.

7               MR. ROCHON:  All right.  Well, you're not

8    going to --

9               MR. WISTOW:  All I'm asking is did he ever

10   ask for a Statement of Interest.

11              MR. ROCHON:  I'm not going to let him answer

12   that now on diplomatic privilege grounds.  We'll take it

13   now.  You're setting me up to lose.  I said I'd do it if

14   that was all you were going to --

15              MR. WISTOW:  See if you can get the

16   Magistrate.

17              You know what I'd rather do?  You know what

18   I'd rather do?  Let's set this question aside and let's

19   go forward and let's get a whole list of questions to

20   ask the Magistrate at once.  Otherwise --

21              MR. ROCHON:  We're fine with that.

22              MR. WISTOW:  -- it's going to be a disaster.

23              MR. ROCHON:  Mr. Coopersmith, can I ask you

24   what time it is?

                    Page 54

Fayyad Depo Transcript.txt

25   THE VIDEOGRAPHER:  5:25.

                Fayyad - 64


1   MR. ROCHON:  5:25.  I just used three

2 minutes.

3   (Witness re-enters the room.)

4   MR. WISTOW:  Did you ask --

5   MR. ROCHON:  I need to put the provisions

6 regarding the confidentiality that we agreed to before

7 on the record.  I don't want to interrupt your -- tell

8 me when you'd like me to do that.  Next break?  Now?

9   MR. WISTOW:  Are we on my time or your time?

10   MR. ROCHON:  You have to eat this one.

11   MR. WISTOW:  No.  I'm not eating anything,

12 okay.  I'm giving you a courtesy.  Now, let's just --

13 we're not back on my time.

14   MR. ROCHON:  Yes, we are.

15   MR. WISTOW:  Then why don't you wait.

16   MR. ROCHON:  Mr. Coopersmith, what time is

17 it, please?

18   THE VIDEOGRAPHER:  5:26.

19   MR. ROCHON:  5:26.  For the record, the time

20 from 5:22 until we next give the time is mine.  So I'll

21 do it now, Mr. Wistow, on my time.

22   Just for the record, we have agreed,

23 Mr. Wistow, Mr. Strachman and myself, the parties have

24 agreed that this deposition will remain confidential and

25 under a protective order -- essentially embargo -- for a

                Fayyad - 65


1 two-week period after the time that both the written and

        Page 55

Fayyad Depo Transcript.txt

2    video transcript is made available for counsel for

3    review.

4              However, you can certainly use this

5    transcript if you need to for some purposes in the

6    litigation.  Just file it under seal.  We're not trying

7    to keep you from using it for any purpose, should that

8    be relevant.

9              MR. WISTOW:  I agree.  I don't have any

10   problem with that.

11             MR. ROCHON:  Thank you.

12             MR. WISTOW:  And what we -- we've also, I

13   think off the record, agreed to is that --

14             MR. ROCHON:  It was on the record, the

15   agreement about the Magistrate Judge and accumulating

16   issues.

17             MR. WISTOW:  Good.  Let's move on then.

18             MR. ROCHON:  We need to get the time so we

19   get back to you.

20             Sorry, Mr. Coopersmith.  What time is it,

21   please?

22             THE VIDEOGRAPHER:  5:27.

23             MR. ROCHON:  So the period that we were on

24   my time was 5:22 to 5:27.

25             MR. WISTOW:  Could you mark this, please.

                                      Fayyad - 66


1              (Exhibit No. 3 marked for identification.)

2        Q.  Have you ever seen that letter, August 15, 2005,

3    from Ramsey Clark to Victor Marrero?

4              MR. ROCHON:  Just for the record, that's

5    referring to Exhibit No. 3?

6              MR. WISTOW:  Yes.
                          Page 56

Fayyad Depo Transcript.txt

7     Q.  Have you ever seen that before?

8     A.  I don't recall seeing this letter, no.

9     Q.  Okay.  Have you read through it?  It's quite

10    short.  Why don't you take a minute and read through it

11    to yourself.

12              (Witness peruses document.)

13    A.  Yes.  I've just read it.

14    Q.  You've read it?

15    A.  Yes.

16    Q.  All right.  Basically, you understand this is a

17    letter from counsel for the PLO and PA in the Knox case?

18    Do you see where it says Knox versus PLO?

19    A.  Yes.  I see that.  Yes.

20    Q.  And you know Judge Marrero was the judge in the

21    Knox case, yes?

22    A.  I don't remember the name, but I assume.

23    Q.  Let's assume for the moment that Judge Marrero

24    was the judge in the Knox case.

25    A.  Yes.

                                            Fayyad - 67


1     Q.  This letter is basically telling the judge that

2     the PLO and the PA have instructed him to only present

3     their position that the US courts have no jurisdiction

4     over them and they would not answer the case.

5              Do you understand that?

6     A.  I understand that.

7     Q.  Okay.  Even though you don't recall whether you

8     ever saw this letter or not -- let me strike that one.

9              At the time this letter was written, you were the

10    Finance Minister?

Fayyad Depo Transcript.txt

11    A.  I was.

12    Q.  Okay.  At that time, or subsequent, at any time

13  have you learned that Ramsey Clark told Judge Marrero

14  that he was instructed by the PLO and the PA not to

15  answer the case in front of Judge Knox (sic)?

16        Did you ever learn that?

17    A.  I am aware of that having been taken as a

18  position, but not in 2005.  I don't remember this at

19  all.

20    Q.  Okay.  When did you first learn that that was the

21  position that was taken?  Approximately.

22    A.  Well before 2005.  Not 2005.

23    Q.  Well before?

24    A.  Yes.  Yes.

25    Q.  Well before.  What does well before mean?

Fayyad - 68

1    A.  I mean, since it came to my attention, to my

2  knowledge that, as a matter of fact, that there was

3  legal action pending against us in the United States.

4    Q.  Right.  What I mean by my question --

5    A.  Yes.

6    Q.  -- is when you say well before 2005, do you mean

7  two years?  Ten years?  Thirty years?

8    A.  No.  No.  It cannot be that.

9    Q.  What do you mean?

10    A.  It can't be that.  As far as I remember now,

11  these cases started in 2000, 2001, something like that.

12  I don't remember now a precise date but -- so it cannot

13  be a decade before, you know what I'm saying?

14    Q.  Of course.

15    A.  I'm aware of the fact that this was the position

Fayyad Depo Transcript.txt

16  communicated at the time, yes.  But not as recently as
17  August 2005.
18      Q.  You knew it before?
19      A.  That it was generally the position taken, yes.
20      Q.  Okay.  What I'm trying to find out is
21  approximately how long before.  We know that you became
22  the Finance Minister in what year?
23      A.  2002.
24      Q.  So presumably it was not before 2002 that you
25  were aware of it, or maybe it was?

Fayyad - 69


 1      A.  Oh, no.  It cannot have been before 2002.  Cannot
 2  be.
 3      Q.  Was it relatively soon after you became Finance
 4  Minister?
 5      A.  That time period.  But 2005 is too soon.
 6      Q.  You mean too late?
 7      A.  Too late I mean, in that sense.  So it must have
 8  happened before.  I'm not aware of this particular
 9  communication, this particular letter.
10      Q.  I understand.
11      A.  But I understand that was the position.
12      Q.  That was the position in all the terrorist cases,
13  correct?
14      A.  Yes.
15      Q.  All right.  And you became Finance Minister
16  around 2002?
17      A.  Correct.
18      Q.  And would it be closer to 2002 that you learned
19  of this rather than 2005?

Page 59

Fayyad Depo Transcript.txt

20    A.   Probably.  And I want to expand on this, if I
21   may.
22    Q.   Sure.
23    A.   Just to give you a little bit of -- you know, the
24   world as was happening then as I saw it, and the kind of
25   challenges that we really faced at the time, and maybe

Fayyad - 70

1   this will help you better understand where I'm coming
2   from as I try to answer your questions as best as I can.
3    Q.   I think I understand where you're coming from.
4    A.   When I first became Finance Minister, I was
5   immediately preoccupied with similar cases filed against
6   us in Israel, Israeli courts.
7         And I learned, shortly after I became Minister of
8   Finance, that the defense taken or the position taken
9   vis-à-vis those cases was similar to what is contained
10   in this letter -- meaning that there was no
11   jurisdiction, etc., on jurisdictional grounds.
12         And I was, you know, at the time, preoccupied
13   with trying to deal with that particular situation.
14    Q.   Okay.
15    A.   So it must have been, you know, a bit later after
16   that I became aware of legal action against us in the
17   United States.
18         And that position taken, as reflected in this
19   letter, is consistent with what I know was happening in
20   Israeli courts when I became Minister of Finance.
21    Q.   So sometime in 2003 anyway?
22    A.   Maybe.  Maybe something like that.
23    Q.   That's your best recollection?
24    A.   That would not be an unreasonable guess, sir.

Page 60

Fayyad Depo Transcript.txt
25     I'm trying to do the best I can.

                                        Fayyad - 71


     1     Q.  That's all I'm asking, and I appreciate you doing
     2   that.
     3     A.  Yes.
     4     Q.  So your best recollection would be around 2003?
     5            MR. ROCHON:  Objection.  Objection.
     6     Q.  Is that fair?
     7     A.  As I said, you know, I really cannot be precise
     8   with dates on this.  I mean it's a process.
     9            And that's why I did expand to tell you that this
    10   was the line taken and the position.  And I assume that
    11   it was really the position taken in US courts and in
    12   this case.
    13     Q.  Right.
    14     A.  But I -- I mean it's really a continuum.   I
    15   cannot really, you know, tell you precise dates when I
    16   became aware of it.
    17            But I certainly do not remember this letter.
    18     Q.  Okay.  That's fine.
    19            Now, I'm going to -- you first heard of the Ungar
    20   case around 2003, 2004?  Is that fair?
    21     A.  Probably.
    22     Q.  Okay.  And when you first heard of the Ungar
    23   case, you knew that that was what we've been calling a
    24   terrorist case?
    25     A.  Yes.

                                        Fayyad - 72


     1     Q.  And by the time you heard of the Ungar case -- by
                        Page 61

Fayyad Depo Transcript.txt

2  the way, 2003-2004, you were Finance Minister?

3      A.  Yes, I was.

4      Q.  Okay.  And by the time you heard of the Ungar

5  case, you were aware that the position that Mr. Clark

6  was conveying to Judge Marrero was the position also in

7  the Ungar case.

8          It was in all of the cases, right?

9      A.  Yes.  As I said to you, I was aware that that was

10  the position generally taken in those cases, yes.

11      Q.  Okay.  You knew that when you first became aware

12  of Ungar?

13      A.  I was -- yes.  I was -- when I first became aware

14  of Ungar as a case pending against us, I -- that was my

15  understanding, that that was the position taken.

16      Q.  That there was no jurisdiction over the PLO or

17  the PA?

18      A.  Yes.

19      Q.  And the case would not be answered?

20      A.  That basically the position was that there was a

21  case of sovereign immunity.

22      Q.  Okay.  And were you aware that there was also a

23  position taken that the case involved a so-called

24  "political question"?

25          Or, if you're unfamiliar with that concept, tell

                                          Fayyad - 73


1  me.

2      A.  No.  I'm not.

3      Q.  Okay.  And were you aware that the PLO and PA was

4  also taking the position that, not only was there

5  sovereign immunity, but they were not subject to suit in

6  the United States?

                        Page 62

Fayyad Depo Transcript.txt

7        Were you aware of that?

8    A.   I didn't understand the distinction.

9    Q.   Okay.  So all you recollect at this point is the

10   sovereign immunity issue?

11   A.   Yes.

12   Q.   Okay.  You're not saying these other issues

13   didn't come up.  You just don't recall?

14   A.   I don't remember really.

15   Q.   Okay.  Now, you know that, in March of this year,

16   the First Circuit Court of Appeals sent the case back to

17   Judge Lagueux for further consideration.

18        You're aware of that, aren't you?

19   A.   I'm aware, yes.

20   Q.   And you understand that that's really why we're

21   here today?

22   A.   I think I said this at the outset, yes.

23   Q.   Now, have you ever read the decision of the First

24   Circuit Court of Appeals?

25   A.   I don't recall reading the decision per se, but I

                                        Fayyad - 74


1    understand what's going on.

2    Q.   Okay.  I want to ask you if --

3            MR. WISTOW:  -- and, again, I'm not going to

4    mark it because it's a published opinion from the First

5    Circuit.  And if you want to look over my shoulder --

6            MR. ROCHON:  Actually, if you're going to

7    read it to him, you might just want him to be able to

8    see what you're reading because you're going to be

9    asking him questions.

10           MR. WISTOW:  Okay.  Do you mind if I come

                            Page 63

Fayyad Depo Transcript.txt

11  next to him?

12              MR. ROCHON:  Well, you could read it and

13  give it to him, is what I'd prefer.

14              MR. WISTOW:  Well, I'd like to -- yes.  I'll

15  read it and I'll give it to him.

16              MR. ROCHON:  That would be great.

17              MR. WISTOW:  So I don't have to --

18              THE WITNESS:  I don't mind if you want to

19  sit next to me.

20              MR. WISTOW:  If he doesn't mind, with your

21  permission, I'll just point to it.

22              THE WITNESS:  Go ahead.

23              MR. ROCHON:  Fine.  You see, the problem is

24  it will mess up your record with the videographer.  So,

25  actually, it might be better if --

                                        Fayyad - 75


 1      Q.  See the bracketed areas?

 2      A.  Yes.

 3      Q.  Why don't you read that, and you tell me when

 4  you're finished.

 5              (Witness peruses document.)

 6      A.  I read it.

 7      Q.  Okay.  May I?

 8      A.  (Indicating).

 9      Q.  I'm going to read it into the record, the part

10  that I put the brackets around.  This appears on page 4.

11          As the Defendants now concede -- you know who the

12  Defendants are, right?

13      A.  We are the Defendants.

14      Q.  The PLO and the PA?

15      A.  Yes.

                    Page 64

Fayyad Depo Transcript.txt

16      Q.  As the Defendants now concede, the decision to

17   stonewall in this fashion was a deliberate strategem

18   driven by the advice of their then counsel and their

19   unwillingness to recognize the authority of the federal

20   courts.

21          You read that?

22      A.  I read that.

23      Q.  Okay.  Now, who is the counsel that's referred to

24   as giving you advice?  When I say you, PLO, PA.  Who is

25   that?

                                        Fayyad - 76


1      A.  I was not, you know, that involved, because this

2   was really more of a continuation of something that

3   started to happen before I joined the PA.  And before I

4   joined the PA, I was not even aware of the legal action

5   against the PA in the US court.

6          So I don't know who was telling whom what at the

7   time, and who in any particular case was representing

8   the PA and PLO.  I have Ramsey Clark here in this

9   particular case, and I'm aware that actually, at

10   different points, he did represent the PA/ PLO.

11          So this is consistent with what I generally know

12   about the case now.

13          I mean I don't know to whom the statement is

14   attributed here.

15      Q.  That's what I'm trying to find out.

16      A.  Yes.  The statement that you read, you know, my

17   understanding is that it really was basically a good

18   faith understanding of, you know, how, you know, this

19   case could be dealt with, that it was not stonewalling

                           Page 65

Fayyad Depo Transcript.txt

20    or anything like that.

21         I mean as best as I know.

22    Q.  So you don't consider it was stonewalling?

23    A.  No.

24    Q.  You think it was the right thing to do?

25    A.  At the time, that was the judgment.  Basically,

Fayyad - 77

1     it was a good faith understanding of options available

2     under US law, or law generally -- a basic question of

3     jurisdiction.

4          And, in fact, I'm familiar with the argument

5     because, as I said, I first became involved in

6     litigation against us in Israeli courts, and that was

7     the position taken then.

8          So the position you're referring to here, in

9     terms of claiming sovereign immunity, was not something

10    that I heard about for the first time, because that was

11    the position taken by lawyers representing the

12    Palestinian Authority in the Israeli courts at the time.

13         It's consistent with that general proposition,

14    and that position was not, in the way that it's stated

15    here, taken as an instrument or a way to stonewall or

16    something like that.

17    Q.  Okay.

18    A.  It was -- basically, I don't agree with the

19    characterization.

20    Q.  Okay.  I guess that's what I'm trying to find out

21    is, I'm just saying what the First Circuit said.

22    A.  Yes.

23    Q.  And you don't agree with it.  That's what you

24    just said?

Page 66

Fayyad Depo Transcript.txt

25      A.  Yes.  I mean I --

Fayyad - 78


 1      Q.  Okay.  That's fine.
 2      A.  I don't agree that that's what was going on.  I
 3  mean it's a remedy, logically speaking, when you're sued
 4  that a question that is asked is does the court have
 5  jurisdiction over the matter.  And I suppose the first
 6  question was asked.
 7          I don't know.  I'm not a lawyer myself.  But I,
 8  you know, find it, therefore, logical to, you know, take
 9  that position when, in fact, there was no jurisdiction.
10      Q.  Have you finished your answer?
11      A.  I have.
12      Q.  Good.  All right.
13          Is it fair to say that it's the position of the
14  PLO and the PA that the murders -- the murder -- of
15  Yaron Ungar was caused by Hamas?  Is that fair?
16      A.  Can you say that again, please.
17      Q.  All right.  Is it the position of the PLO and the
18  PA that Yaron Ungar was murdered by Hamas?
19      A.  You know, as best as I know, this says what the
20  record now says.  I mean that's been proven that this is
21  what happened.
22      Q.  So that's the position of the PLO and the PA in
23  this case.  Is that fair?
24      A.  It's not the position.  It's a question of fact.
25  It's not a question of opinion.

Fayyad - 79


 1      Q.  I'm asking, is that what you're contending.

Page 67

Fayyad Depo Transcript.txt

2      A.  I'm not contending anything on the substance of

3  the case, sir.

4          All I'm telling you here is that, you know, the

5  facts, as I know them, the records say or suggest

6  strongly, and basically the evidence and what is known

7  about the case, is that, you know, Hamas was involved in

8  this.

9          That's -- it's not a position.

10     Q.  Are you aware that representations were made to

11  the United States District Court by the PLO and the PA

12  as follows -- and this is on the motion to vacate the

13  default.

14          I'm reading from the Palestinian Authority's and

15  the Palestinian Liberation Organization's reply to

16  Plaintiff's objection to motion for relief and default

17  judgment.  And I'll just read you what it says.

18          There is no dispute that Hamas operatives carried

19  out the attack that forms the basis for this lawsuit.

20          Do you believe that?

21     A.  Yes.  I believe that.

22     Q.  Okay.  That's all I'm asking.

23     A.  Okay.

24     Q.  Now, have you learned from any source up to today

25  that, after a default was entered -- let me withdraw

                                        Fayyad - 80


1  that.

2          Do you understand the difference between a

3  default and a default judgment?

4     A.  You tell me.

5     Q.  Okay.  Is the answer you don't?

6     A.  I don't know exactly.

                    Page 68

Fayyad Depo Transcript.txt

7    Q.  Okay.  Fair enough.

8         A default is where the Court, in effect, says the

9    Defendant is liable because they haven't answered the

10   case or have done something else that the Court feels is

11   inappropriate.

12        A default judgment is where the Court takes it a

13   step further and puts an amount of money on it.  Okay?

14   A.  Okay.

15   Q.  Are you aware today that that was a two-step

16   process with the PLO and the PA?

17   A.  I'm aware that there is a judgment in a certain

18   amount, so that's a default judgment.  Yes, I'm aware of

19   that.

20   Q.  Are you aware that, at one time, there was merely

21   a default?  If you were, you were.  If you weren't, you

22   weren't.

23   A.  I'm not sure I really was, or I knew what the

24   distinction was, or when, right now, when that happened

25   precisely.

Fayyad - 81


1         But I mean, to me, as soon as I learned of it, it

2    was in the form of a certain amount for which the Court

3    found us liable.

4    Q.  Okay.

5    A.  That's --

6    Q.  All right.  Did you ever become aware from any

7    source up to today that, after the PLO and the PA were

8    defaulted, but before the amount of money was decided

9    upon, the Court asked the PLO and the PA if they wanted

10   to participate in the hearing on damages?

Page 69

Fayyad Depo Transcript.txt

11    A.  Between the time there was default and --

12    Q.  No, no.  Have you ever learned that -- up to

13  today, have you ever learned that, in between the

14  default and the default judgment, the PLO and PA were

15  invited to participate in the hearing as to how much

16  money it would be put on the judgment?

17        Have you ever learned that?

18    A.  I don't remember really.  I don't remember.

19    Q.  Okay.  To the best of --

20    A.  To the best of my knowledge, I don't remember,

21  no.

22    Q.  Okay.  Now, your lawyers on your behalf, in their

23  motion to vacate --

24    A.  Yes.

25    Q.  -- the default, which was filed in December of

Fayyad - 82

1  2007 -- which was about three and a half years after the

2  default, does that sound right?

3        You know the default was in June or July of 2004?

4    A.  Well, okay.

5    Q.  Sounds about right?

6    A.  Sounds about right, yes, because, as I told

7  you --

8    Q.  It's a matter of record.  We don't need to spend

9  time.

10    A.  It's a matter of record.  But, again, just to

11  underscore what I just said before, and that is, you

12  know, I personally became seized with this as a case

13  involving payment, it appears, after it became a default

14  judgment.

15        And that must have happened in 2005.  So 2000 --

Page 70

Fayyad Depo Transcript.txt

16    there's a different -- 2004 -- probably.

17       Q.  You found out about this in 2005?

18       A.  When apparently it became a default judgment.

19       Q.  Well, it became a default judgment in the middle

20    of 2004.

21       A.  I don't remember.

22       Q.  What?

23       A.  I don't remember.

24       Q.  You don't remember what?

25       A.  I don't remember really.  I mean I thought it was

Fayyad - 83


1     2005, but you're telling me 2004.  Okay.

2        Q.  I'm representing that to you.  And if I gave you

3     the wrong date, your lawyer would be all over me.

4            MR. ROCHON:  I've offered you stipulations

5     when you want them.

6            MR. WISTOW:  I'm trying to find out what he

7     knows about this.

8        A.  All right.

9        Q.  Now, in the motion filed by your lawyers, they

10    told Judge Lagueux -- and I quote -- "The failure to

11    establish such lines of authority had created

12    conflicting instructions and confusion in the litigation

13    to the Defendants' detriment."

14           I'm going to ask you to accept, for the moment,

15    that that's in the motion and it's on page 35.

16           What were the conflicting instructions?

17           MR. ROCHON:  I'm going to object just --

18       Q.  If you know.

19           MR. ROCHON:  No, no.  Because you referenced

Fayyad Depo Transcript.txt
20  the term lines of authority and that has not been

21  discussed before.  So if you'd give the witness a little

22  more before you ask him the question, that's all I'm

23  asking.

24          MR. WISTOW:  Okay.

25      Q.  I'll read the beginning of the paragraph.

Fayyad - 84


1          By the end of 2006, however, "It became clear the

2   Palestinian government urgently needed an institutional

3   framework for responding comprehensively to the

4   litigation in the United States.

5          As Mr. Abdul Rahman notes, The failure to

6   establish such lines of authority had created

7   conflicting instructions and confusion in the litigation

8   to the Defendants' detriment.

9          Okay.  Do you understand the reference?

10      A.  I understand.

11      Q.  Do you have any knowledge whatever -- any -- as

12  to these so-called conflicting instructions?

13      A.  I don't know precisely, you know, what it really

14  refers to other than, if I understood what you have read

15  correctly, in terms of evolution in the position taken

16  by the Palestinian Authority in terms of how to pursue

17  this matter and how to defend ourselves, if that's

18  what's being referred to in what you read here, then I

19  believe, you know, consistent with what I know happened

20  around that time, 2005-2006, there was a discussion.

21          And I, you know, certainly cannot rule it out

22  that, during that period, you know, there were different

23  views expressed on this in terms of how to do this as a

24  matter of evolution in the direction which we ended up

Fayyad Depo Transcript.txt

25   taking eventually by wanting to defend ourselves

                                          Fayyad - 85


  1   actively in those cases.

  2      Q.  Mr. Fayyad, in English, I think conflicting

  3   instructions means one person gives instructions to

  4   somebody.  Another person gives conflicting instructions

  5   to somebody.

  6          Do you have that same understanding?

  7      A.  Yes.  That's what conflicting instructions means.

  8   I mean --

  9      Q.  Okay.  What I'm trying to find out -- I'm not

 10   asking you to rule out --

 11      A.  Yes.

 12      Q.  -- that that happened.  I'm not asking you to

 13   rule it in.  I'm just asking if you have any knowledge

 14   of such conflicting instructions.

 15          That's all I'm asking.

 16      A.  That's what I'm really trying to say to you here,

 17   again, trying to project, you know, the mindset, what

 18   was going on then is what I just described, in all

 19   candor.

 20      Q.  What were the conflicting instructions?  Some

 21   people told -- who were the instructions to, by the way?

 22      A.  I mean I understand this to be those involved.

 23   Probably lawyers to lawyers.  I do not know.

 24      Q.  You really don't know what the conflicting

 25   instructions are, do you?

                                          Fayyad - 86


  1      A.  I honestly do not know.

                      Page 73

Fayyad Depo Transcript.txt

2      Q.  All right.

3      A.  If I may finish --

4      Q.  Sure.

5      A.  -- all I am really trying to suggest to you here

6   is this does not sound like way out of line with what I

7   knew was happening around that time in the process of

8   evolution which took us to where we are today.

9      Q.  I'm not asking you whether it sounds way out of

10  line.  I'm asking for your knowledge about it.

11         And if you have no knowledge about it, all you

12  have to say is say I don't know.

13             MR. ROCHON:  I'm going to object only in

14  terms of, counsel, the time frame.

15             MR. WISTOW:  2006.

16             MR. ROCHON:  Thank you.  You may answer,

17  Mr. Prime Minister.

18             THE WITNESS:  Pardon?

19             MR. ROCHON:  I said it's okay to answer.  I

20  just asked for the time frame about what Mr. Wistow was

21  asking.

22             THE WITNESS:  Okay.

23      Q.  Sir, do you have any knowledge about what the

24  specifics are as to the conflicting instructions?

25      A.  No.  Specifics, no.

                                        Fayyad - 87


1      Q.  What?

2      A.  The specifics of what the conflicting

3   instructions were --

4      Q.  Yes.

5      A.  -- well, I can tell you my own understanding what

6   this refers to.  I can tell you what my own

Page 74

Fayyad Depo Transcript.txt

7    understanding was.

8        Q.  I'm only interested, if I may, sir, to save

9    time -- because what's going to happen is -- I'm going

10   to say this in fairness, and it's up to the Court to

11   decide -- I had originally anticipated that the material

12   that I've covered so far would take no more than about

13   twenty minutes.

14           And we're taking an enormous amount of time

15   because, with all due respect -- and I have to leave it

16   to the Court -- I'm not getting responsive answers.

17           I'm asking you, please -- and I'm going to ask

18   that you be brought back --

19           MR. WISTOW:  -- and I'm going to be ask that

20   he be brought to the United States, because I don't feel

21   like coming out here again.

22           Now -- and I don't think that's an

23   unreasonable request.  You're -- there's a default

24   judgment.  You've expressed total cooperation with our

25   discovery here.

                                        Fayyad - 88


1            And all I'm asking is, let me get out of

2    here today.  Let me try to finish this.

3        Q.  Mr. Fayyad, do you know what the conflicting

4    instructions that are referred to are?  Do you?

5        A.  I'm trying to understand.  I'm trying to

6    understand.  That's why I'm answering you the way I am.

7    It's not I'm really not wishing to answer.  I just don't

8    want to be misunderstood.  That's all.

9        Q.  You do not what?

10       A.  I do not wish to be misunderstood.

                            Page 75

Fayyad Depo Transcript.txt

11    Q.  Do you know what the conflicting instructions

12    are?

13    A.  That's really why I answered you the way I did,

14    in terms of trying to relate this statement here to what

15    I knew was happening around that time.

16    Q.  Do you know of any conflicting instructions, yes

17    or no, or you don't know?

18    A.  How can I really answer it?  You know, how --

19    Q.  I guess I'm at a loss to understand the problem.

20    A.  You know, I'm trying to tell you -- and I'm eager

21    to really get through this as soon as we possibly can.

22        But the one thing I do not want to happen is for

23    me to be quoted as having said something that does not

24    reflect what I knew about the situation or I did not

25    know about it.

                                        Fayyad - 89


1    Q.  I'm asking about what you know today.

2    A.  When you say --

3    Q.  I'm asking about what you know today as you sit

4    here.

5    A.  Sir --

6    Q.  Do you know of any conflicting instructions as

7    referred to in the papers submitted to Judge Lagueux?

8    That's all I'm asking.

9        If you don't, you don't.  If you do, please tell

10    me what they are.

11    A.  With all due respect, when you say conflicting

12    instructions, if I do not know what those conflicting

13    instructions were about, given the statement you just

14    read to me, I do not know what the context is.

15    Q.  I don't either.  That's why I'm asking the

Fayyad Depo Transcript.txt

16  questions.

17           MR. ROCHON:  Mr. Wistow, you've interrupted

18  the witness.

19           MR. WISTOW:  You're quite right.  You're

20  absolutely right.  I apologize.

21     A.  Do you understand what I'm saying?

22     Q.  I do.

23     A.  I'm being asked to answer either yes or no in

24  relation to a statement, a three-line sentence, that you

25  just read --

                                        Fayyad - 90


 1     Q.  Right.

 2     A.  -- are you aware of conflicting instructions as

 3  to this matter.  What conflicting instructions?  You

 4  just read to me something out of an over-all context.  I

 5  do not know what that is.  And I do not know --

 6     Q.  That's fine.  That's fine.

 7     A.  I do not know what conflicting instructions are.

 8  If you tell me what they are, I can answer you.

 9     Q.  I can't.  If I knew what they were --

10     A.  That's why I cannot say yes or no.  That's all.

11     Q.  If I knew what the conflicting instructions were,

12  I would suggest them to you.  All I know is what your

13  counsel told Judge Lagueux, and I'm trying to find out

14  is there substance to the statement or is there not.

15     A.  I believe --

16     Q.  That's what I'm trying to do.

17     A.  If I may add something.

18           That is exactly why I was saying to you

19  something, sir, about the environment, what was going on

                          Page 77

Fayyad Depo Transcript.txt

20  around that time in connection with those cases.

21      There was a process of evolution going on in

22  terms of how best to proceed.  There were people who

23  were saying the best thing to do is just basically to

24  really stick to the same line of defense that we had

25  before; and there were others who were saying, no, those

Fayyad - 91

1  should be actively pursued.

2      Q.  Good.

3      A.  To the extent that's what this refers to, I guess

4  that would be a first statement.

5      Q.  Okay.  That would be good, and we're making

6  progress.  Thank you.

7      So who was saying stand on the position and who

8  was saying no, answer the case?

9      A.  I do not know the answer to this question.  I was

10  outside of the government at the time.

11      Q.  But you believe some people were saying answer it

12  and some people were saying no?

13      A.  You know --

14      Q.  Is that true?

15      A.  Yes.  That's consistent with what I said, yes.

16      Q.  Okay.  But you don't know who these people are?

17      A.  I honestly don't.

18      Q.  Okay.  Fair enough.

19      A.  Yes.

20      Q.  One of things that I want to say, and I say this

21  in sincerity --

22      A.  Yes.

23      Q.  -- if you don't know the answer to something, I

24  won't press you.  I'll accept that answer.

Fayyad Depo Transcript.txt

25          Do you understand?

                                                    Fayyad - 92


    1    A.  I understand.

    2    Q.  Okay.  Now, Mr. Abdul Rahman, do you know who he

    3  is?

    4    A.  Can you give me his full name.

    5    Q.  Yes.  Is that because there are two Abdul

    6  Rahmans?

    7    A.  It's a common name.

    8    Q.  I see.  Okay.

    9          MR. ROCHON:  There maybe 200,000.

    10          MR. WISTOW:  Well, there are two involved in

    11  this case that I know of.  Bear with me.

    12          (Counsel peruses documents.)

    13          MR. ROCHON:  We can make a proffer if you

    14  want, counsel.

    15          MR. WISTOW:  Yes.  That would save me a

    16  little time.

    17          MR. ROCHON:  Ahmed Abdul Rahman.

    18          MR. WISTOW:  Okay.

    19    Q.  Do you know who he is?

    20    A.  I know who Ahmed Abdul Rahman is.

    21    Q.  Who is he?

    22    A.  He is part of the leadership.  I do not know if

    23  he right now has a position.  At the time he made the

    24  statement he made, he was in the leadership, but I do

    25  not know what specific position he held.

                                                    Fayyad - 93


    1    Q.  I'm a little bit confused.  You say he's part of

                                Page 79

Fayyad Depo Transcript.txt

2    the leadership, or you don't know?

3        A.  I know that he was in the sense --

4        Q.  I'm talking about today.

5        A.  Today?  No.

6        Q.  He's not part of -- -

7        A.  Right now, today, he doesn't have -- I haven't

8    seen him participate in any leadership meetings

9    recently.

10       Q.  Okay.  So, when he was in the leadership, what

11   was his job?

12       A.  I believe -- I believe he was Secretary General

13   of the Cabinet.  I believe.  I believe.  That's --

14       Q.  What was your function at the time?

15           MR. ROCHON:  Counsel, just the time frame

16   again.  At the time.

17       Q.  At the time that he was -- that Ahmed Abdul

18   Rahman -- whatever his name is -- was in this position,

19   what was your position at that time?

20       A.  I mean he was -- I think he was there a long

21   time.  I mean probably since the inception of the

22   Palestinian Authority.  I can't really give you an

23   answer right now.

24       Q.  Were you there --

25       A.  No.  I joined the PA in mid-2002 only.

                                          Fayyad - 94


1        Q.  So he was gone?

2        A.  No.  I don't know if he was there.  You know, I

3    used to see him at leadership meetings, you know, when I

4    was a member of Cabinet.

5        Q.  Okay.  So he would show up at leadership meetings

6    when you were the Finance Minister?

                          Page 80

Fayyad Depo Transcript.txt

7       A.  Yes.

8       Q.  Well, what was his job?

9       A.  You know, the reason -- if you just give me a

10   little bit of time --

11      Q.  Sure.

12      A.  -- to try to give you the best answer I can.

13      Q.  Take your time.

14      A.  The reason I'm having a hard time now remembering

15   is, over the period June, let's say 2002, to early

16   spring 2003, subsequent to that, the position of Prime

17   Minister was introduced and different personnel were

18   introduced at the time.

19          So if I have an overlap with Mr. Abdul Rahman in

20   an official capacity in matters related to Cabinet, it

21   must have been over that brief period between June-July

22   2002 and early 2003.

23      Q.  What was his job?

24      A.  Probably -- I am trying to translate now --

25   Secretary General.

                                        Fayyad - 95


1       Q.  Of?

2       A.  The Cabinet.

3       Q.  Okay.  Now --

4       A.  Or President.  I really don't know.  Because the

5   Presidency and the Cabinet -- you understand, we did not

6   have a Prime Minister position at the time.

7       Q.  Okay.  By the way, what is the difference today

8   between the duties of the President Abbas and you, sir?

9   Are you below him?

10      A.  Yes.

                            Page 81

Fayyad Depo Transcript.txt

11    Q.  He's your boss?

12    A.  For sure.  Yes.

13    Q.  Okay.  All right.  What are you authorized to do

14    and what is he authorized to do in kind of a nutshell,

15    so we can understand?

16    A.  I don't know if this can be answered in a

17    nutshell.

18    Q.  Do the best you can.  We don't need it in

19    excruciating detail.  Just so we have some general

20    understanding.

21    A.  Well, you know, to -- related to something that

22    is better known around the world, I mean he's like the

23    chief executive of the Palestinian Authority.  And he

24    got --

25        Under our Basic Law, a Prime Minister, who runs a

                                              Fayyad - 96


1    government, that is considered to be the President's

2    government.  So he executes the duties of his office as

3    CEO of the whole PA through a government which I head.

4        In a nutshell, this is what it is.

5    Q.  What can he do that you can't?

6    A.  He can appoint a Prime Minister.  He can fire

7    one.

8    Q.  Other than that?  Other than that?

9    A.  That's why I said it cannot be answered in a

10    nutshell.

11    Q.  Are there things that he can do -- I'm not trying

12    to give you a difficult time.

13    A.  I just gave you two examples.

14    Q.  Are there things that he can do, other than

15    appoint you or fire you, that you can't do?  Other than

Fayyad Depo Transcript.txt

16  that.

17      A.  Well, under the Constitution -- our Basic Law is

18  a Constitution -- he's also Commander in Chief of

19  Security Services.

20      Q.  I see.

21      A.  But that, too, is delegated.

22      Q.  To you?

23      A.  Yes.  To the government, in certain areas as a

24  matter of law written in the Basic Law.

25          And areas which -- and other areas of security,

Fayyad - 97


 1  he actually has delegated that to the government as

 2  well.

 3      Q.  Okay.  So, again, I'm not trying to give you a

 4  hard time on this.  I'm just trying to understand --

 5      A.  Fine.  Sure.

 6      Q.  -- because there are letters to and from

 7  President Abbas and letters to and from you.  And you

 8  understand how, in the United States, we may not be as

 9  familiar with this situation --

10      A.  I understand.

11      Q.  -- as you are.  So I'm trying to -- is it --

12          Are you telling me that he's basically delegated

13  all his powers to you, but he can exercise a veto and

14  tell you not to do something or instruct you to do

15  something?

16      A.  I mean it's a bit more complicated than that.

17      Q.  Okay.  Help me out.

18      A.  But possibly, if we talk about 2006 --

19      Q.  Let's talk about today.

Page 83

Fayyad Depo Transcript.txt

20    A.  Well --

21         MR. ROCHON:  Objection.

22    Q.  We can work backwards, if it's --

23         MR. ROCHON:  Objection.  Relevance.

24    A.  Yes.  You know, the reason I choose to talk about

25    2006, it may help, as a matter of fact, better --

Fayyad - 98


1    Q.  Okay.  Whatever you think would be --

2    A.  Yes.  Probably.  I mean it's not that I'm, you

3    know, answering a different question.

4         If this were to happen today, you know, letters

5    like this would be written by me.

6    Q.  Letters like what?

7    A.  Anything related to -- I mean any involvement by

8    the President, if you really are talking about these

9    cases, would be done by the Prime Minister.

10        The President was involved, if he was involved in

11   2006, is because, at the time, we had a government

12   headed by Hamas, as a matter of fact.  And Hamas was not

13   in a position to communicate with internationals on

14   anything.

15   Q.  Is that because they were terrorists?

16   A.  Technically, it was really they have not

17   fulfilled the requirements under the Road Map stipulated

18   at the time by the Quartet.

19   Q.  Were they declared to be terrorists by the United

20   States?

21   A.  They were declared to be terrorists by the United

22   States.  But, officially, the position taken, if I

23   remember well, by the United States -- as other players

24   on the international scene who took that position of

Page 84

Fayyad Depo Transcript.txt

25    boycotting the government at the time -- it was because

Fayyad - 99


 1    of noncompliance with requirements stipulated by the

 2    Quartet.

 3        Q.  Was there a list of terrorist organizations put

 4    out by the United States executive?

 5        A.  I'm aware there is something like that.

 6        Q.  Was not Hamas on that list?

 7        A.  I believe it.

 8        Q.  Okay.  Still is, is that so?

 9        A.  I don't know that for sure.  You're telling me.

10    I mean if you know it to be the case.

11        Q.  You're the Prime Minister.  You don't know if

12    Hamas is currently designated as a terrorist

13    organization by the United States?

14            Is that your testimony?

15        A.  I am the Prime Minister of the Palestinian

16    Authority, and I'm not here to profess that I know

17    everything --

18        Q.  That's fine.

19            MR. ROCHON:  Let the witness finish his

20    answer, please.

21        A.  So I can't tell you.  I mean I know that they

22    were.  No reason to believe they're not anymore.  It's

23    not something that I follow up on every day.

24            As a practical matter, I know the position taken

25    by the United States on Hamas is that failure by Hamas

Fayyad - 100


 1    to accept the Quartet conditions is what's getting in

Page 85

Fayyad Depo Transcript.txt

2   the way of the US communicating with Hamas.

3          That's the position as I understand it.

4   Q.  You know there was a time, for sure, that they

5   were designated as terrorists by the United States?

6   A.  Yes, yes.

7   Q.  Did that ever change, to your knowledge?

8   A.  No.

9   Q.  What?

10  A.  To my knowledge, no, it didn't.

11  Q.  To the best of your knowledge, they're still

12  designated as a terrorist organization?

13  A.  Yes, to the best of my knowledge.

14  Q.  Okay.  Now, Afif Safieh, do you know who that is?

15  A.  Former Ambassador or representative at the UN of

16  the PLO to the United States.

17  Q.  Okay.  I'm going to show you a letter he wrote to

18  Condoleezza Rice which was filed with the Federal

19  Court -- I can't make out the date.  You'll see why I

20  can't make it out in a second.

21          Could you make that out?

22          MR. ROCHON:  Would you like that marked

23  as -- what is that?  Exhibit 5.

24          THE WITNESS:  I don't have it.

25          MR. WISTOW:  I'm going to give it to you in

                                        Fayyad - 101


1   a moment.

2          MR. ROCHON:  I'm sorry, Mr. Prime Minister.

3          THE COURT REPORTER:  I think this is going

4   to be 4.

5          (Exhibit No. 4 marked for identification.)

6          THE VIDEOGRAPHER:  Going off record at 6:11.
                          Page 86

Fayyad Depo Transcript.txt

7                (Short recess taken.)

8                THE VIDEOGRAPHER:  Going on the record at

9    6:21.

10    Q.  Have you had an opportunity, Mr. Fayyad, to read

11    the letter to Condoleezza Rice dated April 27, 2006,

12    from Afif Safieh?

13                MR. WISTOW:  What exhibit was that?

14                THE COURT REPORTER:  4.

15                MR. WISTOW:  Exhibit 4.

16    A.  I just saw it now.  I mean I --

17    Q.  No.  I know.  But have you had an opportunity to

18    read it?

19    A.  No.  I just saw that.

20    Q.  I'm talking about this moment.  I just gave it to

21    you.  Have you finished reading it?

22    A.  No.

23                MR. ROCHON:  We didn't have it with us in

24    the break.  We left everything here.

25                MR. WISTOW:  Okay.  Fair enough.

Fayyad - 102


1    Q.  Take your time.

2                (Witness peruses document.)

3    A.  Okay.

4    Q.  All right.  Now, this letter refers, in part, to

5    the Ungar case, does it not?

6    A.  I didn't see -- oh, there's a reference to that

7    there.  Yes.  Okay.

8    Q.  I don't blame you for being confused a little bit

9    perhaps.  It says it's $216 million?

10    A.  I saw that.

Page 87

Fayyad Depo Transcript.txt

11    Q.  But it was only $116 million, a more modest

12    amount.  In any event, that is a reference, as you

13    understand it, to the Ungar case.

14          Then it goes on apparently -- first of all, did

15    you ever see this letter before?

16    A.  No.

17    Q.  Were you aware of its contents generally?

18    A.  I don't know.

19    Q.  Okay.  Were you aware that an attempt was made to

20    sell the PLO Mission in New York?

21    A.  No.

22    Q.  This is the first you've heard of that, is

23    reading this letter?

24    A.  Yes.  I wasn't aware of it.

25    Q.  Okay.  So, according to this letter, if

Fayyad - 103


1    Mr. Safieh is accurate, there was an attempt made to

2    sell the UN Mission in a proceeding in New York State to

3    pay the judgment.

4          And, in that case, the United States did put a

5    Statement of Interest in to prevent the sale of the

6    Mission.

7          Is that how you read the letter?

8    A.  That's what's in the letter there, but I was not

9    aware.

10    Q.  This is the first you've ever heard of that?

11    A.  Yes.  As a matter of fact, this is 2006,

12    April 22, 2006.  I was not in the government at that

13    time.

14    Q.  I'm not faulting you.

15    A.  No, no.

Page 88

Fayyad Depo Transcript.txt

16    Q.  I'm just asking did you ever become aware of
17    that.
18        Now, this -- for example, when you came here to
19    testify today, is there something called an Ungar file
20    that your government maintains?
21    A.  Not an Ungar file per se.  I mean we have, you
22    know, legal action against us in the United States in
23    connection with the Ungar case, but others as well.
24        And we have, you know, we have actually lawyers
25    who do this on our behalf.  That's why we have them.

                                        Fayyad - 104


1    It's not something that I do every day.
2        It's not that it's not important.  It is.  But
3    because it is so important, we have hired ourselves
4    legal counsel to represent us in those cases.
5    Q.  Right.  But does the PA have a file on the Ungar
6    case?
7        Whether it's important, whether it's unimportant,
8    whether you have lawyers, does it have a file?
9    A.  If you're really talking about matters pertaining
10    to this litigation being present somewhere, the answer
11    is yes.
12    Q.  Okay.  Are you telling me it's mixed up with the
13    other terrorist cases, or don't you know?
14    A.  I mean I know that they're present, I mean
15    matters pertaining to litigation against us in these
16    cases.
17    Q.  Do you understand what I mean -- forgive me.  I
18    didn't mean to interrupt.  Finish your answer.  I'm
19    sorry.

Fayyad Depo Transcript.txt

20    A.  I finished.

21    Q.  Okay.  Do you understand what I mean by a

22  discrete file, a file that only deals with, say the

23  Ungar case, and another file that deals with the Knox

24  case, and another file that deals with the Bitan case?

25         Do you understand what I mean by that?

Fayyad - 105


 1    A.  Yes.  I understand what you mean by that --

 2    Q.  Does the PA --

 3    A.  -- I mean --

 4    Q.  Does the PA have such files, separate files for

 5  each of these cases?

 6    A.  There definitely are on file.  I do not know

 7  they've got, for sure, if I've got Ungar file, such and

 8  such file, such and such file.

 9         I know there is a file that pertains to this case

10  and other cases as well.

11    Q.  Okay.  So what you're saying to me is you don't

12  know if there is a separate file for Ungar, or whether

13  it's incorporated into a bigger file with a lot of other

14  terrorist cases.

15         Is that fair?

16    A.  If I may explain --

17    Q.  Is that a fair statement?

18    A.  I'm trying to really answer your question.  I'm

19  really trying to answer your question.

20         And given my job and what I have to do, if there

21  is something I need to do as to what's going on, then,

22  you know, contact is made with our counsel to ask a

23  question.

24         Now, I am sure, if I really tried hard enough and

Page 90

Fayyad Depo Transcript.txt

25    spent the time needed, I myself would be able to do it.

Fayyad - 106

1    The material does exist.  But that's how I handle these
2    cases.
3        It's not that I'm not interested in them.  It's
4    that I manage this through our lawyers.  That's why we
5    have them.
6    Q.  Mr. Fayyad, please, I don't mean to suggest that
7    I think there's any fault if you have one kind of file
8    or another.  I'm not.
9        I'm just asking you if you know is there a
10   separate file for the Ungar case, if you know.  And if
11   you don't know, you don't know.
12   A.  I do not know if there is a separate case called
13   Ungar file.  I know that matters pertaining to the Ungar
14   case do exist on file.
15   Q.  Okay.
16   A.  Do you know what I'm saying?
17   Q.  I would hope so.  I mean it would be impossible
18   not to have a file dealing with the Ungar case, wouldn't
19   it?
20   A.  You're asking the question.
21   Q.  That's the question.  I said, Isn't it?  It would
22   be impossible.  You must have a file, right?
23   A.  I guess you're right, yes.
24   Q.  Okay.  Did you look at that file in preparation
25   to come here?

Fayyad - 107

1    A.  That's what I'm --

Page 91

Fayyad Depo Transcript.txt

2      Q.   Yes or no.  Did you?

3      A.   No.

4      Q.   Okay.  Who maintains that file?

5      A.   You know, it's a file that's available to the

6   Prime Minister's office, like other files that we have.

7      Q.   Who maintains it?  Do you understand?

8           I assume that every file, from the Sewer

9   Commission to the Fire Districts to the Bridge

10   Authority, I assume every file is available to you as

11   Prime Minister, right?

12      A.   Yes, yes.  Right.

13      Q.   But they're all maintained in different offices?

14      A.   Yes.

15      Q.   Okay.  Who maintains the Ungar file?

16      A.   In terms of person?

17      Q.   First let's start with bureau or department.

18      A.   Yes.  Prime Minister's office.

19      Q.   So it's in your office?

20      A.   Yes.  Prime Minister's office, yes.

21      Q.   Okay.  Now, and is there a section of your -- I'm

22   not familiar with your office, obviously.  So do you

23   have subsections?

24           Like is there a legal department in the Prime

25   Minister's office?

                                        Fayyad - 108


1      A.   Yes.  There is a legal department in the

2   secretariat of the Council of Ministers.

3      Q.   Yes.  But forgive me.  Maybe I misunderstood.  I

4   thought you said that there's a file --

5      A.   Yes.

6      Q.   -- in the --

Fayyad Depo Transcript.txt

7    A.  -- yes.

8    Q.  I haven't finished.

9        I thought you told me there's a file in the Prime

10   Minister's office, right?

11   A.  Yes.

12   Q.  Okay.  Now, we're trying to find out the

13   subsection, what it's called.

14       There are different departments in the Prime

15   Minister's office?  Yes?  Are there different

16   departments?

17   A.  Yes.

18   Q.  Okay.  And one of those departments maintains the

19   file that has the Ungar papers in it?

20   A.  But that's what I'm trying to explain to you,

21   sir.

22       As a matter of fact, what we have, we have files

23   for business of the Prime Minister in the Prime

24   Minister's office.  It's not that it is with a

25   department within the Prime Minister's office.

Fayyad - 109

1        Do you see what I'm saying?

2    Q.  So this is directly in the Prime Minister's

3    office?

4    A.  Yes.  It is in the Prime Minister's office.

5    Q.  Okay.  So there are various subdivisions?

6    A.  Exactly.

7    Q.  Give me just -- like, for an example, give me

8    another subdivision?

9    A.  You know, external relations.

10   Q.  External relations --

Page 93

Fayyad Depo Transcript.txt
11    A.  External relations.

12    Q.  Okay.  So external relations has files --

13    A.  Yes.

14    Q.  -- that are available to you?

15    A.  Yes.

16    Q.  But the Ungar papers would be in a file, not in

17  one of these separate departments within the Prime

18  Minister's office, but directly in the Prime Minister's

19  office?

20    A.  Yes.

21    Q.  Okay.  Fine.  Who has custody of them?  What

22  human being has custody of the files today?

23    A.  My secretary.

24    Q.  Your secretary?

25    A.  Yes.  My secretary.

                                        Fayyad - 110


 1    Q.  So these files are really in your custody, right?

 2  And you have a secretary who handles them for you?

 3  Right?

 4    A.  You know --

 5    Q.  I'll withdraw the question.  I'll withdraw the

 6  question.

 7    A.  Okay.

 8    Q.  What's your secretary's name?

 9    A.  Right now?

10    Q.  Yes.

11    A.  His name is Mohammed Jarrad.

12    Q.  Mohammed Jarrad?

13    A.  Mohammed Jarrad.  Yes.

14    Q.  Okay.  Could you spell that?

15    A.  Mohammed -- M O --
                        Page 94

Fayyad Depo Transcript.txt

16    Q.  Well, I got Mohammed.

17    A.  Jarrad -- J A R R A D.

18    Q.  Okay.  So if you wanted to look at the files that

19  have the Ungar papers in them, you would ask Mohammed

20  Jarrad to get it for you?

21    A.  If I needed that, then I would ask him, I would

22  say get me such and such.  I remember seeing

23  correspondence on such and such generally.  I would say

24  bring me that piece of paper, not the whole file.

25    Q.  If you said, Mr. Jarrad, bring me all of the

Fayyad - 111

1  papers on the Ungar file, he's the guy you'd expect to

2  bring them, right?

3    A.  He's my office director, yes.

4    Q.  He has the physical files?

5    A.  Then he would do something to actually bring that

6  file.

7    Q.  What would he do?  Would he get the file or would

8  he ask somebody else?

9    A.  He would ask one of his assistants to do so.

10    Q.  Okay.  So who -- is there somebody else who

11  actually keeps the files below him?

12    A.  Yes.  I mean he doesn't do filing himself.

13    Q.  Okay.  I don't know that.  I don't mean to insult

14  Mr. Jarrad.  Do you understand?

15    A.  Yes.  I understand.

16    Q.  Okay.  So do you know who maintains the file

17  physically?

18    A.  I know that there are individual staffers who

19  handle different chores in my office.  I do not know

Page 95

Fayyad Depo Transcript.txt

20  each one of them.

21      Q.  Do you know who does the filing for the American

22  terrorist cases?

23      A.  No.  I cannot tell you that.  See, I'm trying to

24  explain to you.  I do not have someone specialized in

25  filing these cases only.

Fayyad - 112

1      Q.  Okay.

2      A.  We have general filing, you know, for everything,

3  and it's not segregated in this way.

4      Q.  Okay.  So it would vary from day to day who would

5  do it?

6      A.  All I know, if I wanted something, I get it.

7  That's all.

8      Q.  All you know is you ask Jarrad for it?

9      A.  Yes.

10     Q.  How he gets it, you don't know?

11     A.  No, I don't.

12     Q.  Okay.  Fair enough.

13         Now, do you know -- probably there was some money

14  that was held in the registry of the United States

15  District Court for the District of Columbia, according

16  to Exhibit 4.

17         And Afif Safieh -- am I pronouncing that right?

18     A.  Close.  Safieh.

19     Q.  Safieh.  -- was asking Condoleezza Rice to assist

20  in freeing up that $200,000, correct?

21     A.  That's what he's asking for, yes.

22     Q.  You don't know if that happened, it didn't

23  happen?  You don't know what happened?

24     A.  I'm not aware about that.  I don't know.

Page 96

Fayyad Depo Transcript.txt

25    Q.  Okay.  Also, the Wachovia Bank was unwilling to

Fayyad - 113


1    provide commercial banking services, according to this?

2              MR. ROCHON:  Counsel, I'm going to object on

3    foundation, I mean for the obvious reasons given the

4    earlier answers.

5              You don't like speaking objections so I'm

6    not making one, but --

7              MR. WISTOW:  It's okay.  I'm going to move

8    on in just a second.

9    Q.  So you don't know about that either?

10             MR. WISTOW:  I just don't want to be

11   surprised later.  That's all.

12             MR. ROCHON:  He said he'd never seen it.

13             MR. WISTOW:  He never saw the letter.

14             MR. ROCHON:  And didn't know anything about

15   the substance.  That's what he said.

16             MR. WISTOW:  Just, please --

17             MR. ROCHON:  All right.  You know.

18             MR. WISTOW:  Please.  Indulge me.

19             THE WITNESS:  Excuse me.  I have to take

20   this phone.

21             MR. WISTOW:  Sure.  Do you want to step

22   outside?

23             MR. ROCHON:  We'll do that off the record,

24   Mr. Prime Minister.  Go off the record.

25             MR. WISTOW:  Yes.  You probably want to do

Fayyad - 114


1    this in private.

Page 97

Fayyad Depo Transcript.txt

2          THE WITNESS:  Yes, because I just need to

3  take this phone.

4          THE VIDEOGRAPHER:  Going off the record at

5  6:37.

6          (Exhibit No. 5 marked for identification.)

7          (Short recess taken.)

8          THE VIDEOGRAPHER:  Going on the record at

9  6:38.

10          MR. ROCHON:  Just for the record, so it was

11  about a one-minute break.

12          MR. WISTOW:  Okay.

13          MR. ROCHON:  Thank you.

14    Q.  I take it you're familiar with the document that

15  I just handed you, Exhibit 5?

16    A.  Yes.

17    Q.  And do you know what that is?

18          (Witness peruses document.)

19    A.  Yes.  It's a declaration that I made.

20    Q.  Right.  Do you remember signing it?

21    A.  Just give me a second while I just --

22          (Witness peruses document.)

23    A.  Yes.  That's my signature on it.

24    Q.  No, no.  I'm not asking if it's your signature.

25  I hope it is.  I'm asking if you remember signing it.

                                        Fayyad - 115


1    A.  Yes.  I remember the document.  Yes.

2    Q.  Okay.  I take it you didn't prepare the document?

3    A.  Pardon?

4    Q.  Did you prepare the document?

5          MR. ROCHON:  Objection.  We're going to get

6  into privileged areas.

Fayyad Depo Transcript.txt

 7          MR. WISTOW:  How can it be privileged.  All

 8  I'm asking him is -- I'm looking at all the information.

 9  I'm just asking who prepared it.

10      Q.  I assume your lawyer prepared it?

11          MR. ROCHON:  Objection.  Don't answer the

12  question.

13          MR. WISTOW:  Okay.

14      Q.  Did you prepare this declaration?

15      A.  Isn't that the same question you asked before?

16      Q.  I don't think so.

17          MR. ROCHON:  Counsel, the declaration speaks

18  for itself.  The preparation of it --

19          MR. WISTOW:  Whatever you say.  Just

20  instruct him not to answer.  I don't care.

21          MR. ROCHON:  Because it intrudes on matters

22  of privilege, and only for that reason, I'm instructing

23  the witness not to answer.

24          MR. WISTOW:  Okay.  So I just want to be

25  clear.  The question is did you prepare the declaration,

                                        Fayyad - 116


 1  and he's being told not to answer, correct?

 2          MR. ROCHON:  But only because, counsel, I

 3  know the answer, and it would implicate privilege

 4  because it could not be yes or no.  And you don't --

 5          MR. WISTOW:  Sure, it could be.  It could be

 6  an assistant prepared it.  It doesn't --

 7          First of all, there's no privilege even if

 8  it was you.  And second of all, saying he didn't prepare

 9  it doesn't mean necessarily a lawyer did.

10          But I don't want to fight.  I don't want to

                         Page 99

Fayyad Depo Transcript.txt
11    waste time.  I'll live with the instruction at this

12    point.

13        Q.  All right.  Did you understand the declaration

14    when you signed it?

15        A.  Yes.

16        Q.  Okay.  I'm going to ask you some questions about

17    it.  I'm going to go to page 2.

18            And you'll see, on the second line, it begins, On

19    June 18, 2005, I accordingly sent a letter to Secretary

20    of State Rice requesting her assistance in these cases

21    "consistent with the Constitution and laws of the United

22    States."

23            I emphasized in my letter that the attempt by

24    Plaintiffs' counsel to interfere with the actions of the

25    Palestinian government around the world was "not

                                                  Fayyad - 117


1    supported by United States law and also ran counter to

2    international law and the laws of several foreign states

3    in which the PNA operates."

4            Have I read that correctly?

5        A.  Yes, you have.

6        Q.  Okay.  Now, what laws were you referring -- what

7    was the basis for your statement that the attempts by

8    Plaintiffs' counsel to interfere with the actions of the

9    Palestinian government was not supported by United

10    States law?

11            What knowledge did you have at the time?

12            MR. ROCHON:  Mr. Prime Minister -- I didn't

13    want to interrupt your question -- I would object and

14    tell you that it's the same privilege, attorney-client

15    privilege -- not with my law firm, but with counsel to

Fayyad Depo Transcript.txt

16    the Pension Fund -- upon whose behalf the letter was

17    being written.

18              MR. WISTOW:  I just want it to be clear on

19    the record what we're talking about.

20              There's a letter, June 18, 2005, where he

21    says that the Plaintiffs' efforts to interfere was "not

22    supported by United States law."

23              MR. ROCHON:  Yes.

24              MR. WISTOW:  I'm just asking what knowledge

25    he had with regard to that statement.

                                           Fayyad - 118


 1              MR. ROCHON:  Okay.

 2              MR. WISTOW:  If you want -- I just want to

 3    make that clear.

 4              MR. ROCHON:  I understand.

 5              MR. WISTOW:  If he's got any basis to

 6    support the statement whatever.

 7              MR. ROCHON:  Because the answer would be

 8    premised on advice of counsel, I'm going to instruct the

 9    witness not to answer.

10              MR. WISTOW:  He could say I don't know.

11              MR. ROCHON:  He could say many things.

12    Because the answer is based --

13              MR. WISTOW:  Okay.  I accept the

14    instruction.

15              When I say I accept the instruction, I don't

16    mean that I agree with it.  I mean I don't want to fight

17    about it.

18              MR. ROCHON:  I understand.

19              MR. WISTOW:  Okay.

                          Page 101

Fayyad Depo Transcript.txt
20    Q.  It goes on to say that it ran counter to

21   international law.

22        Did you have any knowledge at the time of what

23   international law was being referred to?

24        MR. ROCHON:  Same objection.  Any knowledge

25   would have been based on advice of counsel.

Fayyad - 119


 1    Q.  Then it says, And the laws of several foreign

 2   states in which the PNA operates.

 3        Did you have any knowledge which foreign states

 4   were being referred to?

 5        MR. ROCHON:  Same objection, and the answer

 6   would be based on the advice of counsel.

 7        MR. WISTOW:  Okay.

 8    Q.  Now, you go on to say in your affidavit, I

 9   further explained to Secretary Rice my understanding at

10   the time that the PNA's failure to "file an unqualified

11   appearance in answer to Plaintiffs' complaint" had

12   occurred in order to preserve our legal position both in

13   the United States and overseas with respect to potential

14   efforts by Plaintiffs to seek enforcement of the default

15   judgment in other countries.

16        Have I read that correctly?

17    A.  Yes, you have.

18    Q.  Okay.  Now, do you know if anybody told you of

19   any risks associated with taking that legal position?

20        And I -- well, okay.

21        (Witness peruses document.)

22        MR. ROCHON:  Counsel, could you show the

23   witness the full letter that you're asking him about

24   parts of it.

Page 102

Fayyad Depo Transcript.txt

25              MR. WISTOW:  Sure.

Fayyad - 120

 1              MR. ROCHON:  Thank you.
 2              MR. WISTOW:  (Indicating).
 3              MR. ROCHON:  We should probably have it
 4  marked.
 5              MR. WISTOW:  Well, all right.
 6              MR. ROCHON:  I'm not insisting.
 7              MR. WISTOW:  Let's not mark it now.  I
 8  promise you we're going to get into it and we'll mark
 9  it.
10              MR. ROCHON:  Thank you.
11              MR. WISTOW:  Okay.
12              (Witness peruses document.)
13              MR. ROCHON:  And the section that's quoted
14  there, do you mind if I note where it is, counsel, in
15  the letter?
16              MR. WISTOW:  No.  I don't mind.
17              MR. ROCHON:  It's at the top of page 2 of
18  the letter, Mr. Prime Minister.
19              THE WITNESS:  Top of page 2?
20              MR. ROCHON:  Yes.  That paragraph
21  (indicating).
22              (Witness peruses document.)
23     A.  Okay.
24     Q.  Okay.  Do you have my question in mind, or would
25  you like me to repeat it?

Fayyad - 121

 1     A.  You asked me if I recall if somebody told me what

Page 103

Fayyad Depo Transcript.txt

2   this is about in terms of implications.

3      Q.  If anybody ever told you there was any risk

4   associated with the position set forth in the letter.

5   That's what I'm asking you.

6      A.  All I can tell you is I must have had good reason

7   to really include this.  This is a June 18, 2005 letter,

8   so I must have been aware of that risk at the time I

9   sent that letter.

10     Q.  What risk?

11     A.  That you're referring to.

12     Q.  What am I referring to?

13     A.  In terms of why it is we acted the way we did,

14  not filing an unqualified appearance before the Court.

15  That's what I thought you asked.

16     Q.  Okay.  Well, I'm glad you said that because you

17  misunderstood me.  It's my fault probably.  I didn't ask

18  the question very well.

19        What I'm trying to find out is whether you

20  understood that any risk was associated with taking that

21  position with the Court.

22     A.  Any risk?

23     Q.  If anything bad could happen by taking that

24  position.  That's what I'm asking.

25     A.  But that's how I understood the question.

Fayyad - 122


1      Q.  Okay.  Can you answer it?

2      A.  Basically, what I said.  I must have been aware

3   of that risk for me to refer to it.

4      Q.  What was that risk?

5      A.  As I explained to you.

6      Q.  That you would be defaulted?

Page 104

Fayyad Depo Transcript.txt

7    A.  Yes.

8    Q.  So you were aware of that risk?

9    A.  Basically, I was afraid -- basically, the concern

10   that we had is that this could form a basis for

11   collection against us everywhere.

12   Q.  I'm not talking about that.  Slow down for a

13   second, okay?

14   A.  Yes.

15   Q.  You explained to her --

16   A.  Yes.

17   Q.  -- that -- take a look at it -- that you failed

18   to file an unqualified appearance in answer to the

19   Plaintiffs' complaints, right?

20       You told her that?

21   A.  Yes.  Here it is.  To preserve our legal

22   position, both in the United States and overseas, with

23   respect to any potential efforts by Plaintiffs to seek

24   enforcement of the default judgment in other countries.

25       The PNA and the PLO continued to maintain that

Fayyad - 123


1    the District Court lacked both personal jurisdiction

2    over them and subject matter jurisdiction over the

3    dispute; and according -- and, accordingly, did not file

4    an unqualified appearance in answer to the Plaintiffs.

5    Q.  I understand.  What I'm asking you is, you

6    understood that a possible risk of not filing an

7    unqualified answer was that you could be defaulted,

8    correct?

9    A.  Yes.  That's basically -- yes.  I see that as a

10   risk.

Page 105

Fayyad Depo Transcript.txt

11    Q.  Okay.  Fair enough.

12        And now, in your declaration, you say, My focus,

13   as Finance Minister for the PA, was solely on the

14   immediate financial implications of the litigation.

15        You see that?

16    A.  Where?

17    Q.  In your declaration, towards the end of

18   paragraph 5.  Do you see that?

19    A.  Toward the end -- My focus, as Finance Minister

20   for the PA, was solely on the immediate financial

21   implications of the litigation and, as noted, my role as

22   Finance Minister ended not long -- yes -- not long after

23   I sent the correspondence to Secretary Rice.  Yes.

24    Q.  All right.  May I have the letter?

25    A.  The letter?  Yes (indicating).

Fayyad - 124


1    Q.  Yes.  The letter that you just handed me is the

2   letter referred to in your declaration, is it not?

3    A.  Yes.  Yes, it is.

4        MR. WISTOW:  Can we mark that.  Did I give

5   you guys copies?

6        MR. ROCHON:  No.  You gave the Prime

7   Minister the one the court reporter will mark once I

8   stop talking.

9        (Exhibit No. 6 marked for identification.)

10    Q.  Now, you left -- well, strike that.

11        Did you get an answer to the letter?

12    A.  I don't remember if I got an answer to the letter

13   because, you know, I left not long after that.

14    Q.  Well, this letter was sent in June of 2005.  When

15   did you leave?

Page 106

Fayyad Depo Transcript.txt

16    A.  I believe November 2005.

17    Q.  Wasn't it December of 2005?

18    A.  Yes.

19    Q.  Could be?

20    A.  Yes.  Exact date?  Yes.  Maybe early December

21  probably.  Yes.

22    Q.  Okay.  So that's -- I don't know --

23    A.  I mean, officially, it's like one's resignation

24  goes into effect and what have you.

25    Q.  Okay.  Well, how many months between the time you

Fayyad - 125


1  sent this letter and your leaving?

2    A.  I left in early December.  This is June 18.

3  Five, six months.

4    Q.  So you're unable to tell me whether or not you

5  got a response?

6    A.  Written -- written response on this, I'm not sure

7  exists.  I don't remember receiving a written response

8  to this letter.

9    Q.  Okay.  Did you get an oral response?

10    A.  I probably did, in the sense of, you know,

11  communication that the matter is under consideration, or

12  something like that.

13    Q.  Are you speculating?

14    A.  In the nature of things, I am, because that's how

15  business is done usually on matters like this.  It's not

16  -- and it's in line with practice.

17    Q.  Yes.  But what I'd like to do is -- you're under

18  oath.  It's a very serious matter.

19        I'm asking you, did you have an oral discussion

Fayyad Depo Transcript.txt

20   with Condoleezza Rice about the contents of your letter.

21       A.  Something to the effect of what I just said.

22   Cannot be more than that.

23       Q.  I don't know what you just said, to be honest.

24       A.  What I said before.  Something to the effect that

25   the matter was under consideration.

Fayyad - 126

1        Q.  So she did not say that to you?

2        A.  Not she personally.  I don't remember who

3    actually communicated this.

4        Q.  Somebody did?

5        A.  Yes.  Somebody did.

6        Q.  Where were you when they communicated this?  Were

7    you in Washington?

8        A.  No.  You know, there are always contacts between

9    us and the United States.  I don't have to be physically

10   present nor does the Secretary have to be physically

11   here.

12       Q.  I'm aware there are telephones.

13       A.  In addition, they have representation as well

14   here.

15       Q.  But here's what I'm trying to find out, okay?

16       A.  Yes.

17       Q.  You wrote a letter in June.  I'm trying to find

18   out if there was ever any kind of response to it,

19   whether it was oral, whether it was written.

20           Can you tell me?

21       A.  I am trying to remember now.

22       Q.  And if you don't remember, just say that.  Please

23   don't speculate.

24       A.  I'm not speculating.  I'm just trying to

Page 108

Fayyad Depo Transcript.txt

25    remember.

Fayyad - 127

1         First of all, there was no letter that I can
2    recall on this one, on this issue, other than letters
3    which had different things in them.
4         In terms of, you know, communication on the
5    substance of what this was about, I can't be a hundred
6    percent certain, but it is most unlikely, given the
7    importance of the case, that there was no, you know,
8    communication to the effect that I just told you.
9         Exactly when it happened, do I think for sure, I
10   cannot tell you.
11   Q.   What you're saying is, by custom and usage --
12   A.   Yes.
13   Q.   -- it would be very unusual --
14   A.   Yes.
15   Q.   -- for the Finance Minister to write to the
16   Secretary of State of the United States and not get the
17   courtesy of a reply?
18        Is that what you're saying?
19   A.   Well, you know, not necessarily in those precise
20   terms that you use.  But in the way business is done
21   between governments --
22   Q.   Yes?
23   A.   -- you submit a letter, because there are so many
24   facts to it.  And I do not know the extent to which, at
25   the time, the Secretary was aware of any of this, being

Fayyad - 128

1    it was important to do it in this expansive fashion at

Page 109

Fayyad Depo Transcript.txt

2    the time.

3        Now, again, given the way business is done,

4    matters like this and others, there would be subsequent

5    communication in the sense of, you know, something is

6    being done about this.  It's being looked at.

7        I can't really tell you for sure.  I know

8    something like that must have happened.

9    Q.  You expect you got some kind of reply?

10   A.  But not anything more than I told you.

11   Q.  You don't even remember that?

12   A.  I don't.

13   Q.  Maybe they said they'll take it under

14   consideration?  Maybe --

15   A.  Not anything more than that.

16   Q.  That's the most?

17   A.  Yes.

18   Q.  But even that may not have happened?

19   A.  You know --

20   Q.  It's unlikely, but --

21   A.  It's unlikely.  It's unlikely.  It's unlikely.

22   Q.  But you can say --

23   A.  It's unlikely.

24   Q.  -- you'd expect to get something.  But you don't

25   remember it at all?

                                    Fayyad - 129


1    A.  And if, for no other reason, because of, you

2    know, my own interest in it.  I mean there's just no way

3    that I would not really have asked again, you know, as

4    to what happened and where things were.

5        But I, sitting here now several years later --

6    five years later -- I cannot tell you exactly.
                        Page 110

Fayyad Depo Transcript.txt

7    Q.  So you agree with me this was important to you?

8    A.  Oh, it was.

9    Q.  Okay.  But you don't remember the follow-up?  You

10   don't remember the follow-up?

11   A.  It was a matter of a few months only.

12   Q.  Whether it was a few months or a few years, you

13   don't remember any follow-up, correct?

14   A.  In the months -- in the months that followed, and

15   while I was still in government, there was not anything

16   beyond what I told you --

17   Q.  Okay.

18   A.  -- you know.

19   Q.  So did you speak to anybody in government before

20   you left and say, look, we need to follow up with

21   Condoleezza Rice, or something to that effect?

22       Did you do that?

23   A.  You know, in the nature of -- this is something,

24   this particular -- this particular letter, as a matter

25   of fact, I remember personally handing it over to the

                                              Fayyad - 130


1    Secretary in a meeting by both sides, Palestinian and

2    American delegation, headed Condoleezza Rice.  And also

3    there were several ministers in the room.

4        And, when I left, it was basically left with my

5    successor, everything that was there.

6    Q.  Let me make sure I understood what you just said.

7        You said you physically handed this letter to

8    Condoleezza Rice?

9    A.  I remember that.  I explained it verbally; and

10   then I said, I have a letter to give you.

                        Page 111

Fayyad Depo Transcript.txt

11    Q.  Okay.  And you didn't get an answer right then

12  and there, did you?

13    A.  No.  I did not, no.

14    Q.  So -- and you don't recollect ever hearing a

15  response before you left government, correct?

16    A.  I do not have exact or specific recollection of

17  that happening.

18    Q.  You think, by custom and usage --

19    A.  Yes.

20    Q.  -- it probably happened?

21    A.  Yes.  But to the extent I explained to you.

22    Q.  Okay.  Fair enough.  So, at most, somebody said,

23  We're thinking about it?

24    A.  Yes.

25    Q.  Okay.  Now, when you left and you handed your

Fayyad - 131


1  portfolio over to somebody, who was that you handed the

2  portfolio to?

3    A.  My deputy at the time.

4    Q.  What was his name?

5    A.  Jihad Al-Wazir.

6    Q.  What?

7    A.  Jihad Al-Wazir.

8    Q.  How do you spell that?

9    A.  J I H A D, A L W A Z I R.

10    Q.  Okay.  Now --

11    A.  Can I explain this so this is placed in context?

12         This was something that lasted only three months

13  or so, because, after that, there was total government

14  change and Hamas came in power.

15         Well, you know, just so you know.

Page 112

Fayyad Depo Transcript.txt

16     Q.  Right.

17     A.  It was a period of transition, in other words.

18     Q.  Mr. Fayyad, have I not displayed to you that, if

19  I want to know something, I'll ask.  Haven't you figured

20  that out, with all due respect?

21          MR. WISTOW:  I'll withdraw the comment.

22     Q.  Mr. Fayyad, did you ask anybody to follow up with

23  Condoleezza Rice on this letter?

24     A.  No.  I did not specifically ask --

25     Q.  Okay.

                                          Fayyad - 132


 1     A.  -- somebody to follow up on this letter to

 2  Secretary Rice.

 3          But, by then, you know, it was known that there

 4  was an important issue to be pursued by whoever took

 5  over the portfolio.

 6     Q.  How did you know that it was known that there was

 7  an important issue to take over?  How do you know that

 8  this was just not a piece of paper filed in a file?

 9          Did you talk to people about it?

10          MR. ROCHON:  Objection.  Those are three

11  questions, and you have to pick which one you want him

12  to answer.

13          MR. WISTOW:  Okay.

14     Q.  How do you know that anybody was aware of this

15  issue?

16     A.  That is why I told you -- actually I remembered,

17  as I tried to understand basically what it is you're

18  looking for and asking about -- is that this was a

19  matter of importance to us, and not just an individual.

Page 113

Fayyad Depo Transcript.txt
20          And that's why I remember handing it over in a

21    meeting, official meeting, attended by several officers

22    on both sides, as a matter of fact.

23       Q.  Is this meeting when you gave it to Condoleezza

24    Rice?

25       A.  Yes.

Fayyad - 133


1        Q.  I'm not talking about that.

2        A.  Yes.

3        Q.  I'm talking about before you left --

4        A.  Yes.

5        Q.  -- months later --

6        A.  Yes.

7        Q.  -- did you ask anybody in government, Follow up

8     with Condoleezza Rice on this, what you've said, very

9     important matter?

10       A.  Yes.  No.  I did not specifically on this very

11    matter.

12       Q.  Okay.

13       A.  But, you know, it was understood this is an

14    important matter.

15       Q.  How -- that's what I'm trying to find out.  How

16    do you know -- who knew it was an important matter?  Who

17    are the human beings you're talking about?

18          MR. ROCHON:  That's the question you started

19    answering when you said he wasn't answering the

20    question.

21       Q.  Who knew about this important matter?

22       A.  Everybody who was in that room.  Everybody -- I

23    mean --

24       Q.  Who was that?

Page 114

Fayyad Depo Transcript.txt

25      A.  There were several ministers at the time at that

Fayyad - 134


 1   meeting.

 2      Q.  Who?

 3      A.  I don't remember for sure, but probably the

 4   Minister of Foreign Affairs was there.

 5      Q.  What was his name?

 6      A.  The Prime Minister then was there for sure.  I

 7   mean, there were several ministers attending.

 8          This is something that was, by that time, you

 9   know, discussed widely.  I mean it's --

10      Q.  It was a big deal?

11      A.  Yes.  It was a big deal.  Definitely, it was a

12   big deal.  For sure it was a big deal.

13      Q.  Okay.  When you came back into government --

14      A.  Yes.

15      Q.  -- did you, because it was such a big deal, try

16   to find out what happened?

17      A.  Yes.

18      Q.  What did you find out?

19      A.  I found out that, as a matter of fact, that the

20   President's office was seeing to the matter, and that

21   they were in the process of trying to find legal

22   representation.

23          And, you know, then I took over and I basically

24   carried this forward, and took -- and played an active

25   role in actually finding us legal representation to

Fayyad - 135


 1   pursue these cases.

Page 115

Fayyad Depo Transcript.txt

2    Q.  I'm not talking about that.  I'm talking about,

3    you asked Condoleezza Rice to do something, right?

4    A.  Yes.

5    Q.  Okay.  Up to the time you left --

6    A.  Yes.

7    Q.  -- you don't know if you ever heard from her

8    again, right?

9        MR. ROCHON:  Objection.  Asked and answered.

10   A.  Well, as I told you --

11       MR. WISTOW:  I'm trying to put him back

12   on --

13   A.  I really don't remember.  I told you that.

14   Q.  You don't remember hearing from her.  So, at

15   best, you told me before, you were told that the whole

16   issue was under advisement.

17       Do you remember that?

18   A.  Oh, yes.  What I'm really saying to you is I do

19   not remember specific, you know, communication on this

20   matter.

21       Given the importance that we attached to this at

22   the time, it is most unlikely that I did not follow up

23   on it.  Even if I did, the customary answer would have

24   been -- most likely something given as an answer was

25   that, you know, it was something that was being

                                        Fayyad - 136


1    considered.

2    Q.  So you followed up?

3    A.  Yes.  Yes.

4    Q.  How did you follow up?  What did you do?

5    A.  I don't know.  Typically, generally, first thing

6    you do when you have something like this --

                    Page 116

Fayyad Depo Transcript.txt

```
 7     Q.  Yes?
 8     A.  -- is to actually talk to the US representative
 9   here.
10     Q.  To the what?
11     A.  To the US representative here.
12     Q.  In Palestine?
13     A.  The Consul General in Jerusalem, yes.
14     Q.  Did you do that?
15     A.  Well, now, I really --
16     Q.  Did you do that?
17         MR. ROCHON:  Let him finish the answer.
18     A.  I can tell you, in all likelihood, given the
19   importance of the matter, I must have done.
20     Q.  Okay.  Where were you?  In his consulate?
21     A.  Pardon?
22     Q.  Was it in his consulate?
23     A.  Or in my office, or over the phone.
24     Q.  You don't remember?
25     A.  I don't remember.
```

Fayyad - 137

```
 1     Q.  Do you remember what he said?
 2         MR. ROCHON:  Counsel, you're repeating.  I'm
 3   not getting upset, because you don't like it, but it's
 4   been several times.  Let him finish.
 5         MR. WISTOW:  Okay.
 6         THE WITNESS:  Yes.
 7     A.  You know, as I tried to explain --
 8     Q.  Please, what did the US Consulate say?
 9     A.  Let me try to really say this -- I hope the last
10   time -- in a way that is clear or adequately and
```

Fayyad Depo Transcript.txt

11    sufficiently understood.

12          The matter is of importance to us.  I submitted

13    this letter to the Secretary.  In all likelihood, given

14    the importance of that matter to us, I must have, at the

15    time, followed up by asking, you know, questions as to

16    where do we stand on the matter, given what was

17    involved, given the importance of the issues.

18          Typically, those communications first take place

19    through and with the US Consul General in Jerusalem.

20    This could have happened at his office, at my office,

21    his office, my office, or telephone call.  You know,

22    things like this happen all the time.

23          I mean this is in the nature of on-going concern.

24    To not have gotten a written response to a letter like

25    this which is saying, you know, we have a problem, is

                                          Fayyad - 138


1    not out of the ordinary, to not have gotten a response

2    in writing.

3          So I think all of this is within the realm of

4    what is most likely to have happened.

5      Q.  Okay.  Do you have any recollection -- a real

6    memory -- of anything happening?

7      A.  Memo?

8              MR. ROCHON:  No, no.  He didn't say memo.

9    He said memory.

10      Q.  Memory.

11      A.  Memory.  All I'm telling you --

12      Q.  Do you have any memory, sir?

13      A.  What kind of question is this?

14      Q.  What kind of question?

15      A.  Yes.
                        Page 118

Fayyad Depo Transcript.txt

16      Q.  Do you know what memory is?

17          MR. ROCHON:  Your question wasn't specific.

18  You said, Do you have any memory.

19      Q.  Do you have any memory of getting a response from

20  the American Consulate?  Yes or no.

21      A.  I'm not, you know, with all due respect, counsel,

22  I mean I told you everything I know about this in the

23  way it must have happened.

24          This is five years ago.  Try to please understand

25  my world.

Fayyad - 139


1       Q.  Okay.

2       A.  You know, here I am dealing with all kinds of

3   things, and I have been over the past three years.

4   Something that happened five years ago, in all

5   likelihood this is what has happened.

6           I've given you a scenario.  I talk to the

7   Americans all the time about just about everything,

8   about all aspects of bilateral relations, on an ongoing

9   basis.  That is one of them.

10      Q.  Mr. Fayyad, I'm not suggesting there's anything

11  wrong if you don't remember.

12      A.  Yes.

13      Q.  I'm just trying to find out whether or not you do

14  remember.  That's all I'm trying to find out.

15          Do you remember?

16      A.  And what I'm really trying to tell you is that

17  this is something that must have happened really.

18      Q.  Do you have a memory of it happening?

19      A.  I cannot imagine it not having happened.

Page 119

Fayyad Depo Transcript.txt

20    Q.   Do you have a memory of it happening?

21    A.   I'm trying, you know.   What you're asking me, I

22    mean I really -- there is no other way in which I can

23    answer this question.

24         It must have happened.   That's what I'm really

25    trying to tell you.

                                                    Fayyad - 140


1     Q.    I'm going to ask you yet again.

2          Do you remember it happening, or are you saying

3     it must have happened?

4     A.   It must have happened.

5     Q.   But you don't remember it, is that fair?   You

6     believe it happened?

7     A.   Yes.

8     Q.   You believe it?

9     A.   Yes.

10    Q.   But you don't remember it, true?

11           MR. ROCHON:   Counsel, it's been asked and

12    answered.

13           MR. WISTOW:   No.   I never got an answer that

14    he has no memory.

15    A.   I mean if it settles it if I were to say no, I

16    don't remember, I don't remember.   If it settles it.

17    Thank you.

18    Q.   If it's true.   I don't want you to --

19    A.   I know.   But you're pushing me so much.   You want

20    to really end this line of questioning.   I'm compelled

21    to say no, I don't remember, to move on.   I mean really.

22    Q.   No.   You're compelled to answer the truth.   You

23    swore an oath.

24    A.   I am trying.   Honest to God, all I'm trying to do

                         Page 120

Fayyad Depo Transcript.txt

25    is to answer most faithfully all the questions that you

Fayyad - 141

1    are putting to me.
2        And I am trying to provide you with some
3    contextual remarks as to what has happened to try to
4    really project it as best as I can.
5    Q.  All I'm asking -- it's very simple --
6    A.  Yes.
7    Q.  -- is whether you have a memory of getting a
8    response from the American Consulate.  That's all I'm
9    asking.
10        And you said, a moment ago --
11    A.  The answer is no.  Let's move on, please.  And I
12    accept that as a matter of record, whatever happens,
13    just so we can move on really.
14        I feel I am being badgered here.
15    Q.  I apologize if you feel that way.  I feel like
16    I'm doing my job, and I intend to proceed.
17            MR. WISTOW:  If you want to take a moment to
18    take a break?
19            MR. ROCHON:  Can I just do this?
20            MR. WISTOW:  Yes.
21            MR. ROCHON:  It's maybe that there's a
22    suggestion that is being perceived that, when you say
23    somebody doesn't have a memory, that therefore it didn't
24    happen.
25            MR. WISTOW:  But that's not my fault.  I

Fayyad - 142

1    mean I don't -- look --

Fayyad Depo Transcript.txt

2          MR. ROCHON:  If we could clear --

3          MR. WISTOW:  I don't want to get into this

4   speaking thing.  I don't want to get into a discussion

5   with you.  I was told that he doesn't need a translator.

6   I told he's fluent in English.

7          MR. ROCHON:  There's no issue with

8   translation.

9          MR. WISTOW:  That's right.  It's not an

10  issue.  It's a common thing.  I've asked this kind of

11  question hundreds, if not thousands, of times.  It's

12  very symbol.  Do you remember it?  Not do you believe it

13  happened because that's the custom, but do you remember

14  it.

15         MR. ROCHON:  But you're connecting --

16         MR. WISTOW:  And you understand.  Let's just

17  move on.  We're wasting time.  He's answered the

18  question.

19         MR. ROCHON:  I don't understand, but I'll

20  move on if you wish.

21         MR. WISTOW:  I don't mind if you want to

22  take him out and talk to him now.  It's okay with me.

23         MR. ROCHON:  I'm actually trying to talk to

24  you, but you don't want to talk to me.  So let's go.

25         MR. WISTOW:  Okay.

                                        Fayyad - 143


1          MR. ROCHON:  I don't need to talk to the

2   Prime Minister about your questions.

3          MR. WISTOW:  Okay.

4     Q.  Now, I want to go to your letter.  Before I do

5   that, just a couple more questions about your

6   declaration.

                        Page 122

Fayyad Depo Transcript.txt

```
 7    A.  Okay.
 8    Q.  You affirmatively stated --
 9    A.  Which page, please?
10    Q.  Well, let me finish.
11         You affirmatively stated, in paragraph 12, that
12   you decided to retain new counsel for the PA and PLO.
13         Do you see that?  Paragraph 12?
14    A.  Paragraph 12, yes.
15    Q.  Why did you decide to retain new counsel for the
16   PA and PLO?
17    A.  Yes.  Because of, again, two things.
18         Number one, the importance of this matter, which
19   I definitely felt.
20         And, secondly, that, by that time, as I indicated
21   to you before, that there was this discussion and
22   evolution in the direction of actively defending
23   ourselves in this case, and other cases as well, which
24   required retaining lawyers, you know, to do this on our
25   behalf.
```

Fayyad - 144

```
 1    Q.  Mr. Clark couldn't defend the case?
 2    A.  I never met Mr. Clark.  But I know that
 3   Mr. Clark -- or I'm aware -- that he had a role in this
 4   at the time.  The position was there was no jurisdiction
 5   or this was a matter of sovereign immunity.
 6         And certainly, by early 2007, the view was that
 7   this was definitely not going to stand, and that we
 8   really needed to, you know, defend ourselves.
 9    Q.  Were you disappointed with his performance?  Is
10   that why you discharged him?
```

Fayyad Depo Transcript.txt

11    A.  You know, all I know is that I take matters like

12  this very seriously, lawsuits filed against us.

13        There was a position taken at the time, a case of

14  sovereign immunity.  There was a judgment made at the

15  time, as it was when I was first exposed to litigation

16  against us first in the Israeli courts.

17        And my only view at that time, because that had

18  immediate bearing on our finances early on in my career,

19  the best thing to do actually was hire legal counsel to

20  really defend ourselves in those cases in our Israel.

21    Q.  That was your decision?

22    A.  That was my disposition.

23    Q.  It was actually your decision?

24    A.  Yes.  I'm talking about the earlier cases in

25  Israel.

Fayyad - 145


1    Q.  Yes.  But you decided to discharge --

2    A.  That was my decision.

3    Q.  -- Ramsey Clark, correct?

4    A.  It was my decision to have new lawyers.

5    Q.  Well, to get a new lawyer means to get rid of the

6  old one?

7    A.  I don't know if I had the authority to fire or

8  discharge lawyers or do something like that.  What I

9  knew was we needed new counsel.

10    Q.  In addition to Ramsey Clark?

11    A.  Yes, for sure.  I mean I did not analyze --

12    Q.  What happened to Ramsey Clark?

13    A.  I honestly don't know.

14    Q.  You don't know?

15    A.  I don't.

Page 124

Fayyad Depo Transcript.txt

16    Q.  You don't know if he was discharged or not?

17    A.  Ramsey Clark does not represent us anymore.  I

18    may have actually done something about this, but I don't

19    remember.  I mean but, for sure, he's not -- he doesn't

20    represent us in these cases.

21    Q.  No, no.  I understand.  That's why I'm asking the

22    question what happened.

23        Was he discharged?

24    A.  Yes.  There was -- some formal process no doubt

25    must have happened, again.

Fayyad - 146


1     Q.  Again, you don't remember?

2     A.  I don't remember for sure.  But that is most

3     likely what has happened.

4     Q.  What's most likely happened?

5     A.  To have a --

6     Q.  -- a formal process?

7     A.  Yes, I mean in the sense of notifying him.  And,

8     as a matter of fact, it may have been me who did it.

9     Q.  But you don't remember?

10    A.  But I don't remember for sure.

11    Q.  Okay.  Were you dissatisfied with him?

12    A.  Well, how can you be -- I mean you never know,

13    when you're on a path of, you know, pursuing something a

14    certain way, the judgment is that this is the right

15    approach to take, it's difficult to know exactly how

16    things were going to go.

17        For sure, you know, with the benefit of what we

18    knew at the time we -- there was enough support for

19    moving forward with a new strategy.  I believe it was

Page 125

Fayyad Depo Transcript.txt
20  definitely the right course.
21      Q.  I'm asking whether or not you were dissatisfied
22  with him as a lawyer.
23      A.  You know, I can't really now, you know, sit here
24  and pass judgment on, if I can say legal counsel, in
25  this matter or any other matter.

Fayyad - 147


 1      Q.  I'm not asking you to pass judgment.
 2          I'm asking, in your mind at the time -- let me
 3  finish -- in your mind, at the time, were you
 4  dissatisfied with him.
 5              MR. ROCHON:  Objection, counsel, to the form
 6  of the question.
 7      A.  Well, I guess, given what I also told you about
 8  my position on the other cases, you know, I had my
 9  doubts.  So, therefore, I really wanted us to move
10  forward, move forward with a new strategy.
11      Q.  Were you dissatisfied with him?
12      A.  I can't say I was dissatisfied with the person
13  here, with the lawyer.  All I can tell you is that
14  obviously was a strategy that did not work out.
15      Q.  Did you consider telling him about the new
16  strategy and instructing him to go forward with the new
17  strategy?
18      A.  I was not involved in the litigation early on.  I
19  wasn't.
20      Q.  I'm talking about the retaining of new counsel.
21  Weren't you the person who did that?
22      A.  I can't tell you for sure it was.
23      Q.  Weren't you the person who did that?
24      A.  I can't tell you for sure it was.
                         Page 126

Fayyad Depo Transcript.txt

25    Q.  Okay.

Fayyad - 148


1    A.  But then, you know, here we are -- I mean, the

2  way I decide things, you know, you're running a certain

3  strategy today and you have certain individuals --

4  lawyers and non-lawyers -- doing it for you, and then

5  you pursue an entirely different strategy.

6      Common sense, as far as I'm concerned, you know,

7  required that I retain services of new lawyers to pursue

8  the new strategy, not the outgoing one.

9      How can a lawyer, who was yesterday arguing on

10  our behalf a certain key defense on grounds of

11  jurisdiction so emphatically and categorically, go the

12  next day and say -- I don't know --

13    Q.  So you weren't dissatisfied?

14    A.  It's just a natural thing for me to do.

15    Q.  So you weren't dissatisfied?

16      MR. ROCHON:  Objection.

17    A.  I don't think in those terms really, honestly.  I

18  mean I'm a practical person.  I mean we're moving on.

19  Different strategy, different lawyers.

20      THE VIDEOGRAPHER:  Excuse me.  I'd like to

21  change the tape.

22      MR. ROCHON:  Yes.  Please.  Off the record.

23      THE VIDEOGRAPHER:  Going off record at 7:16.

24      (Short recess taken.)

25      THE VIDEOGRAPHER:  Going on record at 7:30.

Fayyad - 149


1    Q.  Paragraph 13 of your declaration, line 4 -- well,

Page 127

Fayyad Depo Transcript.txt

2   why don't you just read paragraph 13 to yourself, up to

3   and including the sentence beginning, I personally

4   commit.

5            (Witness peruses document.)

6     A.  Yes.  I have.

7     Q.  Okay.  When you say you personally commit to

8   sustain this instruction, obviously you can be voted out

9   of office at any time, yes?

10    A.  Yes.

11    Q.  Okay.  I'm trying to find out what this means, I

12  personally commit.

13         If the instructions are changed somehow, do you

14  submit to the jurisdiction of the Federal Court in

15  Providence?  Does your commitment extend to that?

16            MR. ROCHON:  Objection, counsel.  Three

17  questions that time.  Again, just try to ask one at a

18  time.

19            MR. WISTOW:  Okay.

20    Q.  I'm trying to find out what I personally commit

21  means.

22    A.  Okay.

23    Q.  If there's a departure from this commitment, do

24  you personally submit to the jurisdiction of the court

25  in Rhode Island?

                                        Fayyad - 150


1     A.  I meant for the statement to be an emphatic

2   expression of commitment that the whole system is

3   stating.  When I say I personally, I meant it in that

4   way.

5     Q.  I'm not clear.  It says, I personally commit.

6   I'm trying to find out what happens if that commitment

Fayyad Depo Transcript.txt

7   is somehow not fulfilled.

8         Will you agree to submit to the Federal Court in

9   Providence?

10         MR. ROCHON:  Objection.  Mr. Prime Minister,

11  do not answer that question.  It's an argument.

12         MR. WISTOW:  It's not an argument.  It's a

13  question.  I'm asking him if he's willing to do that.

14  I'm trying to test the personal commitment.  That's all.

15         MR. ROCHON:  You don't want speaking

16  objections.

17         MR. WISTOW:  Okay.  Okay.  Okay.

18         MR. ROCHON:  If you clarify your question.

19  What are you asking him?  You want to ask that question,

20  you want to --

21         MR. WISTOW:  What does the personal

22  commitment amount to?  What happens if you violate your

23  commitment?

24         MR. ROCHON:  By you, counsel, you mean you

25  meaning --

                                    Fayyad - 151


1         MR. WISTOW:  Yes.

2         MR. ROCHON:  Meaning who?

3         MR. WISTOW:  You.  Mr. Fayyad.

4         MR. ROCHON:  The Prime Minister?

5         MR. WISTOW:  Yes.

6   A.  You know, I mean I think there's a responsibility

7   in all of its components and stages and phases.  I take

8   what I say very seriously.  I'm a man of my word.  And I

9   say I'm responsible and I'm committed means I'm

10  committed.

                        Page 129

Fayyad Depo Transcript.txt
11          And so, therefore, if I act in a manner that is
12   inconsistent with that commitment, I do not know exactly
13   what will happen, but I understand liability.  I mean I
14   understand I'll be liable for failing to fulfill a
15   commitment.
16      Q.  You understand you will be liable?
17      A.  I, you know -- let me tell you, first of all, you
18   know, my state of mind when I signed this declaration,
19   what it means.  Certainly, my role, you know, knowledge
20   and involvement in the way that is described here.
21          But when I say I'm personally committed, I
22   personally commit myself to pursuing these things, I
23   certainly mean that, but I mean more than that.
24          I mean more than just a personal commitment made
25   by me.  I'm doing it really in my capacity as Prime

                                             Fayyad - 152


1    Minister of Palestinian Authority, expecting fully well
2    the commitment to be honored by whoever proceeds me.
3       Q.  What if Hamas comes into power again?
4       A.  And then, if I'm sued on the basis of a
5    representation that I made here, I'd find that
6    reasonable.
7       Q.  So you're saying you do feel that you would have
8    personal liability?
9            MR. ROCHON:  Counsel --
10      Q.  Is that what you're saying?
11           MR. ROCHON:  Mr. Prime Minister, and
12   counsel, when you talk about personal liability,
13   counsel, you're -- you know you're -- I'll have to ask
14   Mr. Prime Minister -- I'll have to ask him to step out.
15           You know we need to discuss this.  This is a
                           Page 130

Fayyad Depo Transcript.txt

16    ridiculous line of inquiry.  I'll ask the witness to

17    step out and we can argue about it and you can move on.

18            I don't want to argue about it in front of

19    the witness because you'll get upset.

20            So, Ms. Ferguson --

21            MR. WISTOW:  No.  I'm not going to get

22    upset.  You know what --

23            MR. ROCHON:  You're not going to get upset

24    if I tell you why it's ridiculous?

25            MR. WISTOW:  Well, no.  I'm getting upset

                                           Fayyad - 153


1    because you say it's ridiculous, okay?  You can say it's

2    improper.  But, you know what?

3            MR. ROCHON:  Improper and --

4            MR. WISTOW:  Let's just move on.

5            MR. ROCHON:  Okay.

6            MR. WISTOW:  I got an answer from him that I

7    like, and I'll move on.

8            MR. ROCHON:  Counsel --

9            MR. WISTOW:  I'll move on.  I got an answer

10    and I'll move on.

11            MR. ROCHON:  You move on.

12            MR. WISTOW:  Okay.

13     Q.  Now, the last lines of that paragraph says,

14    Moreover, it is important to the PA's role in the

15    international community to participate in the legal

16    process, even when it is process brought in the United

17    States for actions by others that occurred far from the

18    United States.

19            Do you see that?  Do you see that?

                            Page 131

Fayyad Depo Transcript.txt
20    A.  It is important -- yes, I do.

21    Q.  I've read that correctly?

22    A.  Yes, you have.

23    Q.  Okay.  Now, the next line says, The importance of

24  this was not fully appreciated by the PA government, as

25  a whole, until recently.

Fayyad - 154


1         Have I read that correctly?

2     A.  You have, yes.

3     Q.  First of all, when is recently?  What do you mean

4  by that?  You wrote this declaration.

5     A.  Yes.  You know, I meant actually around the time

6  when we moved to defend ourselves and took practical

7  steps toward beginning to.

8     Q.  When was that?

9     A.  This must have been early 2007, late 2006.

10    Q.  Okay.  Now, you say it was not fully appreciated

11  by the PA government as a whole.  What do you mean, as a

12  whole?

13    A.  I make reference here to what I had told you

14  before about differing views within the PA as to how

15  this would be approached, and the process of evolution

16  that really took us through the point of seeking to

17  defend ourselves actively.

18    Q.  Who were the people that were involved in these

19  discussions?

20    A.  Just about everybody.

21    Q.  Just about everybody?

22    A.  Yes.  I mean --

23    Q.  Can you help me out a little bit?  What you're

24  indicating is there were a lot of people involved,
Page 132

Fayyad Depo Transcript.txt
25    right?

Fayyad - 155


1      A.  A lot of people involved in the sense of people

2    in government, you know.  Not a lot of people outside

3    the government.

4      Q.  I understand, Mr. Fayyad.  Who were the people in

5    government you're talking about?

6      A.  Now, you know, the issue would come up from time

7    to time.  Sometimes in formal settings, sometimes in

8    discussion.

9      Q.  Who are the people you're talking about?

10     A.  Various ministers, Cabinet officers.

11     Q.  Let's name some names.  President Abbas?

12     A.  From time to time.

13     Q.  Yes?

14     A.  Yes.

15     Q.  Okay.

16     A.  He certainly.

17     Q.  How about the --

18             MR. ROCHON:  Counsel --

19             MR. WISTOW:  Sorry.  I didn't mean to

20    interrupt.  I didn't mean to interrupt.

21             MR. ROCHON:  I know.  But you have to

22    control yourself and not interrupt, even if you don't

23    mean to.

24             MR. WISTOW:  Okay.  Well taken.  Fair point.

25     Q.  Continue.

Fayyad - 156


1      A.  I forgot where I was.

Page 133

Fayyad Depo Transcript.txt

2    Q.  We were talking about the members of government

3  who participated in these discussions where it was not

4  at first fully appreciated by the government as a whole.

5        We mentioned President Abbas.  And,

6  unfortunately, I interrupted you while you were

7  continuing.

8        Who else?

9    A.  People involved in this in terms of expressing a

10  view on, there were several of those actually.

11    Q.  Who?

12    A.  And when I say government here, I mean I do not

13  really necessarily mean, you know, government to be

14  technically defined to be only Cabinet officers.  You

15  know, when you say United States government, for

16  example, in that sense.

17        Certainly Cabinet officers, but others as well.

18    Q.  Fine.  I'm willing to accept whatever you meant

19  by this.  Who are the people?  Tell me the names of the

20  people.

21        We got one.  We got President Abbas.  And

22  certainly you also, right?

23    A.  Yes.

24    Q.  Okay.  Who else?

25    A.  I don't -- you know, people within the Ministry

                                        Fayyad - 157


1  of Finance, for example.

2    Q.  Which one?

3    A.  People who --

4    Q.  No.  Which Minister of Finance?

5    A.  Ministry of Finance.

6    Q.  How about, can you give me the name of a human

Fayyad Depo Transcript.txt

7    being?

8        A.  Deputy Minister of Finance.

9        Q.  Okay.

10       A.  Treasurer.  Legal counsel, Ministry of Finance.

11   It's just one agency.  Similarly, Ministry of Justice.

12       Q.  What?

13       A.  Ministry of Justice, Ministry of Foreign Affairs.

14       Q.  Okay.  So these were the people who did not

15   appreciate it until recently?

16       A.  No, no.  I didn't -- I thought I was answering a

17   different question, when you asked about who was

18   involved regardless of what, you know, position was

19   taken by whom.

20       Q.  I'm asking you -- it says here, The importance of

21   this was not fully appreciated by the PA government as a

22   whole.

23           Who are the people we're talking about that

24   didn't fully appreciate it?

25       A.  Oh, I was answering a different question.  Thank

Fayyad - 158


1    you for giving an opportunity to clarify.

2           I did not mean any of these individuals that I

3    referred as having been of the view that the case should

4    not be pursued in the way that it's being pursued right

5    now, which is to actively defend ourselves.

6           I thought I was answering a question as to who

7    may have been involved in the discussion with different

8    views and different takes, and not necessarily with the

9    same degree of depth or seriousness, if you will.

10          I mean there could be a casual comment on this by

Fayyad Depo Transcript.txt

11  someone.

12      Q.  Okay.  You said, and I quote yet again, The

13  importance of this was not fully appreciated by the PA

14  government as a whole.

15      A.  Yes.

16      Q.  You wrote that, correct?

17      A.  Fine.  Yes.

18      Q.  You believed it?

19      A.  It's in my declaration.  I know it to be true.

20      Q.  Okay.  Now, what I'm trying to find out is what

21  human beings are you referring to.

22      A.  You know, I'm referring actually not only to the

23  period of time that I was talking to you about in

24  2006-2007, because the line of questioning that took us

25  to that was really that time line.

                                            Fayyad - 159


1          But, historically, when the action was brought

2   against us first in the United States -- going back, I

3   believe, to 2000 -- clearly, you know, the opinion was

4   that the strategy ought to be what it was up until we

5   changed it.

6       Q.  Right.

7       A.  So I would say, you know, consistent with this

8   having happened, clearly, to the extent there was any

9   debate, you know, it was that.

10      Q.  Right.

11      A.  You know, over time, that, you know, strategy was

12  beginning to be second-guessed in the sense of whether

13  or not it was the right strategy.

14      Q.  Right.

15      A.  And it was in the nature of any evolutionary

                            Page 136

Fayyad Depo Transcript.txt

16    process.  I cannot tell you there was a point in time
17    when before -- it was not really a watershed here in the
18    sense of before and after.  It was just an evolutionary
19    process.
20         And you would find that people thinking a certain
21    way yesterday, that way yesterday, they're thinking
22    differently today.
23         So there's not anyone I know who was always
24    against or continued to be against or anything like
25    that.  It's just in the nature, if you will, of a

                                        Fayyad - 160


1     political process.
2       Q.  Yes.  But you wrote, The importance of this was
3     not fully appreciated by the PA government as a whole.
4       A.  Yes.
5       Q.  I'm looking for the names of any people, any
6     human beings, that you can identify as not fully
7     appreciating as you used the term.  Anybody.
8       A.  You know --
9       Q.  Is there any human being you can identify?
10      A.  No.  What I can tell you is what I told you
11    about.  I'm not really going to, you know, maybe
12    unfairly characterize someone as having taken a position
13    which he or she may not have taken at the time.
14         This is a statement of fact.  I meant it in the
15    same way it appears here, and I still believe in it.
16      Q.  Right.
17      A.  There was not really uniformity of view on this,
18    clearly.
19         For the most part, the overwhelming view was
                              Page 137

Fayyad Depo Transcript.txt

20  that, you know, those cases ought to be really dealt

21  with on the basis of, well, jurisdiction.  So there was

22  that debate.

23       I do not know if there was any one individual I

24  can point to who was of that view, continued to be of

25  that view.  So that's the sense in which I meant the

Fayyad - 161


1   sentence.

2       Q.  I'm not asking you who continued to be of the

3   view.  I understand it evolved.

4       A.  Yes.

5       Q.  It started out one way and it gradually --

6       A.  Yes.

7       Q.  -- ended up somewhere else.

8       A.  Yes.

9       Q.  Right?

10      A.  Yes.

11      Q.  Okay.  Here's what I'm doing.  You're asking the

12  Federal Court to vacate --

13      A.  Yes.

14      Q.  -- the default judgment.  Yes?

15      A.  Yes.

16      Q.  You understand that?

17      A.  Yes, yes.

18      Q.  You have put in a declaration under oath.  And

19  the purpose of this declaration is what?  Do you know?

20          The purpose of the declaration is in support of

21  the motion to vacate the default.

22      A.  Yes.

23      Q.  You know that, right?

24      A.  So we give ourselves the chance to defend

Fayyad Depo Transcript.txt

25    ourselves.

                                                Fayyad - 162


    1      Q.  Yes.  But the purpose of this declaration is to
    2    vacate the default, yes?
    3      A.  To be able to defend ourselves.
    4      Q.  I am aware that this declaration is being filed
    5    in support of a motion by the PA and the PLO to vacate
    6    the default, okay?  For whatever purpose.
    7      A.  For the purpose I stated.
    8      Q.  You understand it's to vacate a default, yes?
    9      A.  To defend ourselves.
   10      Q.  To vacate the default?
   11      A.  In order to defend ourselves.
   12      Q.  Okay.  Fine.  All right.  You understand that we
   13    oppose that, correct?
   14      A.  I do.
   15      Q.  Okay.  And do you understand that I'm trying to
   16    test the meaningfulness of your declaration?  Do you
   17    understand that?
   18      A.  I take its face value.
   19      Q.  I want to see if you can support any of these
   20    statements.
   21      A.  Yes.
   22      Q.  That's what -- do you understand that?
   23      A.  Fine.
   24      Q.  Okay.  Now, I'm asking you to support the
   25    statement that, The importance of this was not fully

                                                Fayyad - 163


    1    appreciated by the PA government as a whole.

                        Page 139

Fayyad Depo Transcript.txt

2          And I'm asking you to name anybody -- anybody --
3     who did not fully appreciate --
4              MR. ROCHON:  Counsel, do you want him to
5     support the statement or -- which of the two questions
6     do you want him to answer?  You've asked him two again.
7              MR. WISTOW:  Okay.
8     Q.  I want you to support the statement by supplying
9     names of people.
10             MR. ROCHON:  Counsel, you can't tell him how
11     to answer your questions.
12             MR. WISTOW:  Here's what I'm going to do.
13     I'm just going to ask this.
14     Q.  Do you know the names of anybody who did not
15     fully appreciate the importance of participating in the
16     legal process, as you've set forth here?  The names of
17     anybody at any time.
18     A.  I cannot really give you the names now.
19     Q.  Okay.  Fair enough.
20     A.  I haven't finished.
21          What I can tell you is that, for a long time --
22     this is really what this sentence is supposed to mean.
23     When I say, Was not fully appreciated, in the sense of
24     my feeling that probably this change of strategy should
25     have happened sooner.

                                          Fayyad - 164


1          It is in that sense that I really meant this
2     declaratory statement to be.  That is what it is
3     intended to say.  That's the meaning of fully
4     appreciated, in that sense.  Not in the sense of a
5     certain individual against or for.
6     Q.  Okay.  So you don't know of any person --
                              Page 140

Fayyad Depo Transcript.txt

7     A.  No.  I meant it precisely in the way I just

8  stated.

9     Q.  So you don't know the name of any person that you

10  can say that person in the government did not appreciate

11  the importance of participating in -- you can't name

12  anybody.

13        Is that fair?

14           MR. ROCHON:  You've got it already.

15           MR. WISTOW:  I want it again.

16     Q.  Is that fair?

17     A.  As I said, you asked me what's the meaning of the

18  sentence.

19           MR. WISTOW:  There's a reason for this.

20     A.  You know, going back to your --

21           MR. WISTOW:  I'll withdraw the question.

22     A.  Okay.

23     Q.  I want to go to your letter.

24     A.  Fine.

25           MR. ROCHON:  That's -- just for the record,

                                        Fayyad - 165


1  that is No. 6.

2     Q.  And this, indeed, is the letter referred to in

3  your declaration, is it not?

4     A.  It is.

5     Q.  Okay.  Now, one of the things you said in your

6  declaration is your focus, when you sent this letter,

7  was as a Finance Minister.

8     A.  Yes.

9     Q.  Now, in the letter, you refer to some really

10  important issues, don't you?

Fayyad Depo Transcript.txt

11    A.  That was the intention.

12    Q.  Yes.  And, for example, you point out, in the

13  very first paragraph, that you're writing for immediate

14  assistance, right?

15    A.  Yes.

16    Q.  Immediate meaning right away, yes?

17    A.  Yes.  Yes.  That's what immediate means.

18    Q.  Okay.  And what you say there is -- in the first

19  paragraph, you're talking about, to use your words, A

20  serious obstacle to the continued effective

21  participation of the PNA --

22        That's the Palestinian Authority, right?

23    A.  Yes.

24    Q.  What we've been calling the PA?

25    A.  Yes.

Fayyad - 166

1    Q.  -- in the Middle East peace process and the PNA's

2  role as a strong and viable partner of the United States

3  of America and the government of the State of Israel in

4  that process.

5        So that's a major major concern, isn't it?

6    A.  It is.

7    Q.  Very important?

8    A.  Yes.

9    Q.  Okay.  And then you go on in the second paragraph

10  and you say, Even now -- at the very end of the second

11  paragraph -- Even now, the enforcement actions being

12  taken by Plaintiffs, and the mere threat that Plaintiffs

13  may be successful, are causing substantial harm to the

14  Palestinian people and the PNA, and thereby threatening

15  the peace process itself.

Page 142

Fayyad Depo Transcript.txt

16          Yes?

17     A.   Correct.

18     Q.   That goes beyond just money.  We're talking about

19   threatening the peace process, aren't we?

20     A.   Yes.

21     Q.   Okay.

22     A.   You want me to explain?

23     Q.   No.  I don't want you to explain.

24     A.   But I really would want to --

25     Q.   Did you believe -- did you believe that these

                                          Fayyad - 167


1    enforcement actions threatened the peace process?

2      A.   In the following sense --

3      Q.   Go ahead.

4      A.   Did you want to ask me that, or --

5      Q.   No.  Here's what I want to do.  I want to ask the

6    questions.  If your counsel wants to follow up later

7    with you, I don't have any problem.

8      A.   Yes.

9      Q.   I want to finish up in my allotted time, and I

10   don't want to have to file motions saying that I ask a

11   question and I get speeches.  That's -- forgive me.

12          MR. ROCHON:  Counsel, counsel.  You ask

13   questions that invite them.  So --

14          MR. WISTOW:  Well, I don't think so.

15     Q.   Now, you also go on to say, in the footnote on

16   page 2 --

17     A.   Yes.

18     Q.   -- In addition to the Ungar case, the Plaintiffs'

19   counsel -- that means the Plaintiffs' counsel in the

Fayyad Depo Transcript.txt

20    Ungar case, right?

21        A.  Yes.

22        Q.  -- working with parties in Israel, has filed

23    other actions in the United States seeking millions and

24    millions of dollars from, inter alia, the PNA and the

25    PLO.  See, for example, Knox, et al. versus PLO.

Fayyad - 168

1            Now, it goes on to say, We believe that these

2    separate actions are part of a concerted effort to

3    impose crippling financial ability -- excuse me --

4    crippling financial liability on the PNA, thereby

5    undermining its ability to function as a partner in the

6    peace process.

7            Yes?

8        A.  That's what it states.

9        Q.  That's a very big deal, isn't it?

10       A.  The whole thing is a big deal.

11       Q.  Sorry?

12       A.  The whole thing is a big deal, which I

13    consider --

14       Q.  It goes way beyond the money.  We're talking

15    about endangering the peace of the region, correct?

16       A.  Yes.  But money is important in this.

17       Q.  Money is important.  And peace is more important,

18    isn't it?

19       A.  Yes.  But there is a causal link between what I

20    said here and the cause and the effect.  It acts through

21    the PA's capacity to continue to exist.

22       Q.  You believe --

23       A.  That's my view.  That was my view then, and

24    continues to be my view today.

Page 144

Fayyad Depo Transcript.txt

25          The PA, with this liability, you know, cannot

                                        Fayyad - 169


1    function.  And I regard the PA as a chief partner in
2    this political process.
3           And if the PA is disabled or otherwise unable to
4    continue to exist and function, clearly the process is
5    damaged irreparably.
6           That's what I meant.  That's my view.
7       Q.  I understand.  I understand.  I understand
8    exactly what you're saying.  So this is an
9    extraordinarily important issue?
10      A.  It is.
11      Q.  Okay.  Did you follow up on this letter?
12              MR. ROCHON:  Counsel, you've asked --
13              MR. WISTOW:  I'm pointing out to him now --
14   he's indicated how important this is.  I want to see if,
15   with that recollection, see if his recollection is
16   refreshed now that he focuses on this.
17      A.  Yes.
18      Q.  Does that refresh your recollection that you
19   followed up?
20      A.  I'll tell you what I told you before.
21      Q.  Okay.  Fair enough.
22      A.  There's no question in my mind that I did.  In
23   terms of specific occurrences of that --
24      Q.  Okay.
25      A.  -- is the stuff that I cannot really refer to

                                        Fayyad - 170


1    specifically.  But there is no question that it
                              Page 145

Fayyad Depo Transcript.txt

2  happened.

3     Q.  Okay.  What happened?

4     A.  That the follow-up happened.

5     Q.  What follow-up?  What did you do?

6          MR. ROCHON:  Counsel --

7     A.  In the sense of asking where things stood, asking

8  where things stood on this very important matter.

9          MR. ROCHON:  Counsel.  Redundant.

10          MR. WISTOW:  He brought it up.

11          MR. ROCHON:  Because you asked him to.

12          MR. WISTOW:  All right.  You know what?

13  We'll leave the record the way it is.

14     A.  Okay.  Okay.

15     Q.  Did you talk to President Abbas about this very

16  serious situation, now that you see the references to

17  undermining the whole peace process?

18     A.  Yes.  I have on numerous occasions.

19     Q.  I'm talking about this letter.

20     A.  This letter?  He was the President, as he is

21  today, and I'm sure I did.

22     Q.  Do you recollect it?

23     A.  No.

24     Q.  Okay.

25     A.  This has been coming up way too often -- do you

                                        Fayyad - 171


1  recollect a specific time and place, all this and that.

2          In the same way I must have had something on a

3  week ago.  I do not work, you know, that close on.  You

4  ask me what it is you had on that day.  I can't remember

5  in that sense.

6          But it is no natural for me to have told the
                           Page 146

Fayyad Depo Transcript.txt

7   President on numerous occasions, you know, about this

8   case.

9       Q.  About this letter?

10      A.  About this letter too.

11      Q.  Okay.  So we'll accept that.

12      A.  Okay.

13      Q.  So you spoke to -- you're confident --

14      A.  Yes.

15      Q.  -- that you talked to President Abbas about this

16  letter?

17      A.  Yes.  Absolutely.  Yes.

18      Q.  Okay.  Now, when you wrote this letter, you were

19  aware -- this is June of 2005?

20      A.  Okay.

21      Q.  You were aware that the First Circuit Court of

22  Appeals affirmed the judgment, correct?

23      A.  Now that I see the letter again, now that I see

24  the letter again, I understand that basically this was

25  basically final.

Fayyad - 172


1       Q.  Did you read this letter before you signed it?

2       A.  Yes.  I mean what I'm saying to you, I obviously

3   read the letter before I signed it.

4       Q.  Okay.

5       A.  But I did not see it before -- you asked me the

6   question, did you see this letter before this

7   deposition.  I haven't -- do you see what I'm saying?

8       Q.  Can we agree that, when you wrote this letter --

9       A.  Yes.

10      Q.  -- you knew that the First Circuit Court of

Fayyad Depo Transcript.txt

11   Appeals affirmed the judgment?

12       A.  Yes.

13       Q.  Yes?

14       A.  Whatever is in this letter I knew, for sure.

15       Q.  Do you remember this, or are you just saying?

16       A.  Five years later?  I'm certain I do not really

17   put my signature on something I do not believe to be

18   true.

19       Q.  No doubt, none, that you knew that the First

20   Circuit had affirmed this?

21       A.  The best that I could ascertain at the time.  I

22   would not sign a letter that I did not believe that what

23   was in it was factual.

24       Q.  Okay.  So let me rephrase the question.

25           There is no doubt at all that you believed the

                                        Fayyad - 173


1    First Circuit had affirmed it?  No doubt of that?

2        A.  There was no doubt, at the time I signed this

3    letter, that there was anything in it that was factually

4    incorrect.

5        Q.  So you believed it all, correct?

6        A.  Yes.  When I signed this letter, there was

7    nothing in it that I did not regard as factually

8    correct.

9        Q.  Now, did you discuss with anyone what to do now

10   that there had been an affirmance by an Appeals Court?

11       A.  In terms of follow-up you mean?  In terms of

12   process?  What do we do?

13       Q.  Yes.  We have a situation --

14       A.  Yes.

15       Q.  -- where the peace process --

                            Page 148

Fayyad Depo Transcript.txt

16    A.  Yes.

17    Q.  -- the peace process is imperiled?

18    A.  Yes.

19    Q.  Did you have discussions with anybody about what

20   to do?

21    A.  You know, when this happened, this was, as you

22   could tell -- as you could tell from the letter, this

23   appears to have been the first time the issue was raised

24   formally with the US administration in terms of, you

25   know, this being seen as a serious problem by us, you

                                              Fayyad - 174


1   know, trying to, you know, find a way as to how to deal

2   with this very important, very serious issue.

3        And we're talking about the second half of June

4   of 2005.  Two months later I was outside of government.

5   In the interim, there's no question that this was a

6   matter that was being pursued and followed up on.

7        Now, you know, going back to when the case was

8   filed -- 2000, 2001 -- I do not recall exactly --

9    Q.  2000.

10    A.  2000.  Okay.  We're talking about five years up

11   to that point in time before we actually wrote the

12   letter, before we approached anyone on it.

13        And so what is a matter of few months time to

14   suggest that it was not actually being pursued or this

15   was not something that was taken seriously.

16    Q.  Mr. Fayyad, I'm not suggesting anything.  I'm

17   just asking questions.

18        My question was, did you discuss the situation

19   with anyone within government after you learned that the

Fayyad Depo Transcript.txt

20    First Circuit had affirmed the judgment.

21        A.   No.

22        Q.   What?

23        A.   Like, you know, this other question that you

24    asked me before, I'm sure I did, in terms of what do we

25    do.  The nature of things, what kind of discussion would

Fayyad - 175


1     you have against a backdrop of something like this?

2            Are we doing this right, is it really not time to

3     do something, what else can we do.  You know, questions

4     like this.

5        Q.   To whom?

6        A.   People like I mentioned to you.

7        Q.   What people?

8        A.   People in government.

9        Q.   What people?

10       A.   Various Cabinet officers.

11       Q.   Will you name them, please.

12       A.   Minister of Foreign Affairs.

13       Q.   What's his name?

14       A.   At the time, I believe it was Nabil Sha'ath.

15       Q.   You spoke to him?  You remember?

16       A.   I mean most likely, you know, he was there and we

17    had conversations.  He was there at the meeting that

18    this letter was handed.  And I had discussions with

19    various officials.  Most likely he was one of them, for

20    sure.

21           The President himself for certain, on more than

22    one occasion.

23       Q.   So what did you decide to do, other than write to

24    Condoleezza Rice?

Page 150

Fayyad Depo Transcript.txt
25    A.  Look into what it is that can be done.

Fayyad - 176


1    Q.  What else did you do?
2    A.  As I told you, you know, a process of
3  deliberation must have started then, as evidenced by the
4  fact that, in the course of the months that followed,
5  including in the course of 2006, there was, you know,
6  the beginning of definition of a new strategy as to how
7  to handle this and other cases, as evidenced by the fact
8  that, ultimately, there was, indeed, a shift in that
9  strategy.
10    Q.  Okay.
11    A.  Yes.
12    Q.  Have you finished?
13    A.  Yes.
14    Q.  Okay.  On June 18, 2005 --
15    A.  Yes.
16    Q.  -- you, at least by that point, knew the Court of
17  Appeals had affirmed the judgment, correct?
18    A.  Yes.
19    Q.  Can you identify any person that you spoke with,
20  after this letter was given to Condoleezza Rice, to talk
21  with them about what do we do now?  Anybody.
22    A.  I talked to several people, you know, including
23  lawyers, including people not necessarily in government
24  either.
25        This is such a big deal.  I meant every word, you

Fayyad - 177


1  know, in this letter when I wrote it, when I signed that
Page 151

Fayyad Depo Transcript.txt

2   letter.  And I still do believe, you know, it definitely

3   reflected my state of mind at the time I signed it.

4       Q.  I'm sorry?

5       A.  It reflected my state of mind at the time I

6   signed it in terms of the importance in which we viewed

7   this issue.  So yes, it was definitely on our mind.  We

8   were trying to find a way.

9           It's not, you know -- you have to understand, I

10  do not know if the PA was sued in the United States

11  before.  I mean I don't know the history.

12          This is -- you know, the whole PA is new.  It's

13  not like every day something like this happened and we

14  have been in existence forever and, you know, there's a

15  book that tells you what to do in situations like this.

16          So, basically, we're trying to find our way.

17      Q.  Right.  So you talked to people?

18      A.  Yes.  I talked to people.

19      Q.  Who?

20      A.  People around me at the time.

21      Q.  Can you identify one?

22      A.  I mentioned you some.  The President.

23      Q.  Okay.  So you asked President Abbas --

24      A.  Yes.  I mean --

25      Q.  Let me finish.

Fayyad - 178


1       A.  Yes.

2       Q.  So you said you were talking with President Abbas

3   about, We got a bigger problem now.  We've got a

4   judgment that was affirmed by Court of Appeals, right?

5               MR. ROCHON:  Objection, counsel.

6               MR. WISTOW:  Okay.

Page 152

Fayyad Depo Transcript.txt

7          MR. ROCHON:  The leading is -- I know I've
8     got a standing objection.  And just because I'm --
9          MR. WISTOW:  You do.  You do.
10         MR. ROCHON:  -- mentioning it now, it
11    doesn't matter.  But you're going way too far.
12         MR. WISTOW:  Well, I don't think so.  You
13    know, thank you for trying to preserve my deposition.
14    Why don't you just let it go and these questions will be
15    stricken.
16         MR. ROCHON:  I don't mind if you're aware of
17    it.
18         MR. WISTOW:  Okay.  I'm aware of it.  I'm
19    doing it at my risk.
20    Q.  So, in substance, in substance -- I'm not
21    pretending that I know the exact words -- you said to
22    President Abbas, Look, the First Circuit has affirmed
23    this judgment.  We need to do something.
24         Is that a fair statement of the substance of what
25    you would have said?

                                        Fayyad - 179


1    A.  You know, I cannot tell you that, you know, the
2    words could have been anywhere near what you have
3    suggested in your statement by way of specificity, First
4    District Court having decided to do this, that or the
5    other thing.
6         But, you know, in substance, that this was a
7    situation that required that it be dealt with --
8    Q.  Okay.
9    A.  -- without, you know, getting into various
10   technical issues associated with it.

                        Page 153

Fayyad Depo Transcript.txt
11           You know, we knew there was an issue to be dealt
12    with.  And here is the President, and I had a
13    conversation with him.
14        Q.  Okay.  We know that you considered this to be a
15    matter of such grave importance --
16        A.  Yes.
17        Q.  -- threatening regional peace.  Maybe world
18    peace, right?
19        A.  I'm waiting for the question.
20        Q.  I said, Right?  I mean that was your state of
21    mind at the time?
22        A.  That was my state of mind.
23        Q.  So that convinces you that you would have talked
24    to President Abbas about it, correct?
25        A.  Yes.  That's right.

                                          Fayyad - 180


1         Q.  So what you're saying is that it was such a huge
2     issue, you would have done that, even though you don't
3     remember a particular discussion with him.
4             Is that fair?
5         A.  Very fair.
6         Q.  Okay.  Do you have any idea what the result of
7     that discussion was?  Any idea?
8         A.  It often happens.
9         Q.  I'm sorry?
10        A.  Oftentimes it happens that, regardless how
11    important issues are -- including a political matter --
12    that those discussions would take place and ideas are
13    put forward without conclusion in any given session,
14    say, when they should discuss as to exactly, you know,
15    what was going to happen afterwards.
                        Page 154

Fayyad Depo Transcript.txt

16      And that is -- I am really trying to project to

17  you as close to the way I believed it happen as it did.

18  You know, over time, there were discussions.  All I know

19  is we, in the nature of things, ended up on this new

20  path.

21      Q.  Sometime in 2007?

22      A.  Yes.  Or late 2006, early 2007.  That's when I

23  really got involved in this again.

24      Q.  Yes?

25      A.  Yes.

                                            Fayyad - 181


 1      Q.  So we're talking about a period of almost three

 2  years?

 3      A.  Little less.  Anyway, if you take June 2007 as

 4  starting point --

 5          MR. ROCHON:  Excuse me.

 6      Q.  No.  Take --

 7      A.  June 2007.  I'm sorry.  June 2005.

 8      Q.  No.

 9      A.  If you take June 2005 as --

10      Q.  No.  We'll take March 31, 2005.

11          Well, let me ask you this.  When did you learn

12  about the decision of March 31?

13      A.  It must have been, you know, during that time

14  period, between the time I wrote the letter and the time

15  it happened.

16      Q.  Well, I know that.

17      A.  I mean this is -- we're talking about a couple of

18  months here between the time, you know --

19      Q.  Do you remember learning of it?

                    Page 155

Fayyad Depo Transcript.txt

20    A.  Obviously.  That's why --

21    Q.  Do you remember learning -- in other words, did

22  you get a phone call where you were shocked?

23        Can you remember anything about your reaction

24  when you learned about it?

25            MR. ROCHON:  Counsel, four questions.

Fayyad - 182


1            MR. WISTOW:  All right.  Fine.  I'll take

2  the risk.

3    A.  No, sir.  I don't remember.

4            MR. ROCHON:  Counsel, we'll move on.  We

5  don't have to take the risk.  He actually gets to get

6  just one at a time even if you're willing to take the

7  risk.

8            MR. WISTOW:  Okay.  I'll do it one at a

9  time.  I'll do it one at time.

10    Q.  Do you remember your reaction when you learned of

11  the fact that an Appeals Court has sustained this

12  judgment?

13    A.  You know, I do not know exactly how I reacted.

14  All I know is that I viewed this -- and I continue to

15  view it -- as a very serious matter.

16    Q.  Okay.  Other than President --

17    A.  I am this way.

18    Q.  You're what?

19    A.  I am this way.

20    Q.  What way?

21    A.  You know, I'm just --I do not just jump up and

22  down whenever something happens, however important it

23  is.

24        I took it.  I understood there was an issue to be

Fayyad Depo Transcript.txt

25   dealt with, took that position, and since then, I've

Fayyad - 183

1   been working on it.

2      Q.  Okay.  When was the first time --

3      A.  Except for that time period when I wasn't in the

4   government.

5      Q.  Okay.  When was the first time it was dealt with

6   after you wrote this letter?

7      A.  At various discussions leading to the time when

8   we adopted, eventually, this new strategy.

9      Q.  When was any action taken to implement the new

10  strategy?

11     A.  You know, I can't tell you.  There was a period

12  of time subsequently when the PA was vigorously seeking

13  legal representation on this matter, without much

14  success, in the course of 2006.

15         This came to my attention after I rejoined the

16  government in March of 2007.

17     Q.  Okay.  You're telling me now the PA was trying to

18  get --

19     A.  Yes.

20     Q.  -- new lawyers in 2006?

21     A.  Yes.  Yes.

22     Q.  Couldn't find anybody?

23     A.  I understand that they were having difficulties.

24     Q.  Who did they contact?

25     A.  I don't know.

Fayyad - 184

1      Q.  Who told you this?

Page 157

Fayyad Depo Transcript.txt

2      A.  You know, people who were handling this at the
3   time.  Probably the head of the President's bureau.
4      Q.  What's his name?
5      A.  At the time, Rafiq Al-Husseini.
6      Q.  What?
7      A.  Rafiq Al-Husseini.
8      Q.  Can you spell that?
9      A.  R A F I Q.  That's his first name.  Al-Husseini.
10  A L - H U S S E I N I.
11     Q.  Okay.  And where is he now?
12     A.  He's not in the office anymore.
13     Q.  Where is he?
14     A.  I don't know if he's in the country now as we
15  speak.
16     Q.  Okay.  So are you telling me that this guy,
17  Husseini -- am I pronouncing it right?
18     A.  Yes.
19     Q.  -- he told you they were trying to find lawyers
20  in 2006?
21     A.  They were -- you know --
22     Q.  Did he tell you that?
23     A.  If you'd just give me a second to try to answer.
24     Q.  Okay.
25     A.  All I know is that he was the President's office

                                    Fayyad - 185


1   director at the time, and he had some people work for
2   him who were trying to help find legal representation in
3   the United States at the time.
4      Q.  He told you that?
5      A.  I can't tell you for sure if he did himself tell
6   me that, but I learned that that was actually what was
                                Page 158

Fayyad Depo Transcript.txt

7   happening.

8      Q.  When did you learn that?

9      A.  In early 2007, around the time I joined the

10  government, because I know that I personally was seized

11  with this immediately after I joined the government.

12         And I know that, as early as April, a little

13  about a month after the formation of the new government,

14  you know, we had legal representation.

15     Q.  So you tried to find out what had gone on

16  before --

17     A.  Yes.

18     Q.  -- correct?  And you found out that really

19  nothing --

20     A.  Not quite nothing.

21     Q.  All right.  I'll withdraw that.  Let me try it

22  again.

23     A.  Yes.

24     Q.  Let's focus on the other lawyers that --

25     A.  Yes.

                                            Fayyad - 186


1      Q.  -- were contacted.  Husseini told you that other

2   lawyers had been contacted and refused the case?

3          Is that what he said?

4      A.  I do not know if Rafiq Al-Husseini himself told

5   me this.

6          All I know is that he, and people working for

7   him, were in the process of finding legal representation

8   in the United States in connection with these cases in

9   the course of 2006.

10         Now, exactly when in 2006 I cannot tell you, but

Fayyad Depo Transcript.txt

11    I know -- all I know is that I'm aware of the fact that

12    the PA was actively seeking legal representation within

13    that time frame.

14        Q.  How do you know that?

15        A.  It's not exactly true that nothing was happening.

16        Q.  How do you know that?

17        A.  I became Finance Minister again.

18        Q.  I know you had to know as Finance Minister.

19        A.  Yes.

20        Q.  You either saw a piece of paper or somebody told

21    you, right?

22        A.  Yes.  Something -- I don't know if somebody gave

23    me a piece of paper.  Somebody must have told me this.

24    I asked because, you know, it's something that I felt we

25    really need to deal with.

                                              Fayyad - 187


1            You know, in my position as Minister of Finance

2    then, it's something that really we were interested in.

3    And you ask about it and somebody tells you.  It doesn't

4    really matter.

5            I ended up leading the effort actually to find

6    legal representation for us.  I did it against the

7    backdrop of knowing there was an effort by the PA to do

8    so, and I just continued with it.

9        Q.  Okay.  Did you find out any details about the

10    effort?  Anything?

11        A.  That it was serious and it was being made.

12        Q.  But did you find out any details whatever?  For

13    example, was one law firm contacted?  Two?  Three?

14    Five?  Ten?

15        A.  No.  What I recall about it is that there was a
                            Page 160

Fayyad Depo Transcript.txt

16  serious attempt made at finding legal representation,

17  without much success.

18      Q.  Okay.  How do you know it was serious?

19      A.  Well, in the way, you know, this issue was talked

20  about.

21      Q.  Well, what did they do to find legal counsel?

22  You said it was serious.

23      A.  They must have -- I mean I don't know exactly

24  what they did.

25          All I know is that, given basically the manner in

                                        Fayyad - 188


1   which I felt they were dealing with it, you know, when I

2   took over as Minister of Finance again, and the

3   seriousness with which they were talking to me about

4   it -- I mean, for example, somebody like

5   Mr. Al-Husseini -- I figured that this was for sure that

6   they were really serious about this.

7           And it is just that that they got to that point

8   in time having not succeeded in finding suitable legal

9   representation.  That's all.

10      Q.  Did you ask him what efforts they made?

11      A.  No.  I don't remember, you know, if I asked or

12  they told me specifically what they did.

13          But I got the distinct sense that they were

14  really serious about.  They were really desperate.  They

15  really wanted to do that.

16      Q.  And did you get a distinct sense of how long they

17  had been trying?

18      A.  I'm guessing now.  I mean I just don't know for

19  sure.  But it cannot be a matter of just a few weeks, in

                                Page 161

Fayyad Depo Transcript.txt

20    the way that I now remember it.

21        Probably more like a few months.

22    Q.  Maybe a few months?  Maybe a month or two?  You

23    don't know, do you?

24    A.  I really don't know for sure.

25    Q.  All right.  And you don't know who's telling you

Fayyad - 189


1    this, correct?

2    A.  Most likely --

3    Q.  Is it -- is that correct?

4    A.  Most likely Husseini.  Most likely.

5    Q.  But you don't remember it?

6    A.  I don't remember for sure.

7    Q.  Okay.  Now, do you remember who, if anybody, told

8    Husseini to find new lawyers?  It wasn't you, right?

9    A.  No.  I wasn't in the government at the time.

10    Q.  Right.  So it wasn't you?

11    A.  No.

12    Q.  Who was it who told Husseini to do it?

13    A.  It was probably the President.

14    Q.  It probably was --

15    A.  Probably.  Probably.  He worked for the

16    President.

17    Q.  So if I wanted to know the answer, I'd have to

18    ask President Abbas?

19    A.  I could ask him for you.  But I suppose, you

20    know, that Rafiq would not have done it on his own.  I

21    mean he was the Director of the President's office.

22    Q.  Well, what was the guy's title?  Husseini?

23    A.  Director of the President's office.

24    Q.  Okay.  Could he have gotten instructions from the

Fayyad Depo Transcript.txt
25    Finance Minister at the time?

Fayyad - 190


 1      A.  You know, the Director of the President's office
 2    does not -- I wish he did -- take instructions from the
 3    Minister of Finance.
 4      Q.  So what you're telling me is this was somebody
 5    who really would not respond to orders from you?
 6      A.  He doesn't work for the Minister of Finance.  He
 7    wouldn't.  We talked.  We talked.
 8      Q.  So you're telling me --
 9      A.  There is no line of authority between the
10    Minister of Finance and the Director of the President's
11    office.
12      Q.  So if Husseini did this, it would be on
13    instructions of Abbas?
14      A.  Probably.
15      Q.  Okay.  So Abbas would know when and where?
16      A.  You know --
17      Q.  Well, maybe he doesn't remember either.  But the
18    only way we'd know is to ask him.  All right.
19      A.  I don't know if --
20            MR. ROCHON:  There's no question pending,
21    Mr. Prime Minister.
22            THE WITNESS:  Pardon?
23            MR. ROCHON:  There's no question pending.
24            THE WITNESS:  Okay.
25      Q.  How hard was it for you to find a lawyer?  What

Fayyad - 191


 1    did you have to do?
                            Page 163

Fayyad Depo Transcript.txt

2    A.   Basically, I worked with these guys.

3    Q.   With what?

4    A.   With the people I mentioned to you.

5    Q.   What people?

6    A.   Rafiq Al-Husseini and his team, in terms of the

7    search that they had made.

8         And I remember, you know, taking a trip to the

9    United States, in April of 2007, when we had discussions

10   with lawyers whom we ended up retaining.

11   Q.   Now, you became -- you came back into government

12   when?

13   A.   March 2007.

14   Q.   Okay.  And so this conversation with Husseini --

15   if that's who it was -- had to be between March 2007 and

16   April of 2007, correct?

17   A.   Between March 2007?

18   Q.   Yes.  And April?

19   A.   April of 2007?

20   Q.   Yes.

21   A.   What about that?

22   Q.   The conversation, if any, with Husseini had to be

23   in that period, correct?

24   A.   Yes.  Probably right.  Fair guess, yes.  Maybe

25   before because -- let me really backtrack a little bit.

Fayyad - 192


1         It took a while to really put this government

2    together, the one that I joined actually in March.

3    There was a lot of discussion on it, and it became known

4    well before it actually happened I was going to be

5    rejoining it as Minister of Finance.

6         So during that period before the formation of the

Page 164

Fayyad Depo Transcript.txt

 7  government, it is conceivable that this conversation

 8  took place before, before March actually.

 9      Q.  Okay.  And as we said before --

10      A.  Yes.

11      Q.  -- even before putting the government together,

12  you were mindful this was a very important issue?

13      A.  Oh, yes.  Yes.

14      Q.  Okay.  So it would have been important to you to

15  know precisely what had taken place up to then, wouldn't

16  it?

17      A.  Yes, yes.

18      Q.  Okay.  And you've told me everything you can

19  recollect at this point, correct?

20      A.  As best as I can.

21      Q.  Okay.  Now, when you were Finance Minister and

22  wrote the letter to Condoleezza Rice --

23      A.  Yes.

24      Q.  -- you determined -- I shouldn't say you

25  determined.

                                        Fayyad - 193


 1          You knew, at the time that you wrote it, that the

 2  case had been lost in the Court of Appeals, right?

 3              MR. ROCHON:  Counsel.  Four times.

 4              MR. WISTOW:  I'm trying to bring it -- it's

 5  preliminary to where we're going.  Okay?

 6      Q.  You knew that?

 7      A.  I must have.

 8      Q.  Yes.  All right.

 9          Did you -- do you remember anything about an

10  attempt to go to the United States Supreme Court, in the

                    Page 165

Fayyad Depo Transcript.txt

11    period before you left government?

12       A.  That could have come up.  I can't be sure right

13    now, but it could have come up.

14       Q.  I understand it could have.  Do you remember

15    anything about it?

16       A.  If it did -- see, I'm trying to remember, piece

17    things together now, because I know that, during that

18    period of time, there was an attempt at collecting or

19    opposing that judgment by, as a matter of fact, taking

20    remedy in Israel.

21           And maybe, in the course of that period -- I

22    really do not know for sure now.  I mean there were lots

23    of things, lots of developments -- that issue came up.

24           But I can't really be sure now.  I cannot really

25    tell you I remember this specifically.

                                         Fayyad - 194


 1       Q.  Okay.  Bottom line is maybe you knew about the

 2    possible appeal to the Supreme Court, maybe not.

 3           Is that what we're saying?

 4       A.  Or thinking about it.  I do not know.  Thinking

 5    about going to Supreme Court.  Whether or not that

 6    actually happened, I do not know.

 7       Q.  Did you ever authorize anybody to do that?

 8       A.  I don't recall.

 9       Q.  Okay.  I'm going to talk my lessons from

10    Mr. Rochon.

11               MR. ROCHON:  Go off the record for a bit?

12               MR. WISTOW:  Yes.

13               THE VIDEOGRAPHER:  Going off the record at

14    8:18.

15               (Short recess taken.)
                        Page 166

Fayyad Depo Transcript.txt

16          THE VIDEOGRAPHER:  Going on record at 8:27.

17     Q.  I want to explore with you a little more the

18  letter that you wrote to Condoleezza Rice on June 18,

19  2005.

20     A.  Okay.

21     Q.  Now, you indicated to Ms. Rice that the

22  Plaintiffs in the Ungar case were sending out misleading

23  notices?

24          MR. ROCHON:  Do you have a page first?

25          MR. WISTOW:  Yes.  Page 3.

                                        Fayyad - 195


 1     Q.  The second paragraph from the bottom.  Do you see

 2  that?

 3     A.  Second paragraph?

 4     Q.  Yes.

 5          MR. ROCHON:  Do you mean -- that's the one

 6  that starts, As a result of receiving?

 7          MR. WISTOW:  No.  In addition.

 8          THE WITNESS:  In addition.

 9          (Witness peruses document.)

10     Q.  Do you see that?

11     A.  Yes.  I see it, yes.

12     Q.  Okay.  Do you understand what that refers to?

13     A.  Yes.

14     Q.  Could you explain it to me?

15     A.  In the sense of, for example, entities like the

16  Pension Fund and the PMA.

17     Q.  And, in fact, if you go to the top of the page --

18     A.  Yes.

19     Q.  -- the letter says, Despite the specificity of

Page 167

Fayyad Depo Transcript.txt

20    the District Court's orders, however, Plaintiffs'

21    counsel prepared a Notice of Injunction (the Notice) in

22    which they broadly assert that the injunction -- and it

23    goes on to quote the Notice.

24        Do you see that?

25    A.  I see it, yes.

Fayyad - 196


1     Q.  Okay.  So what you believed was happening is the

2     Plaintiffs were using the judgment they obtained in

3     court improperly, correct?

4     A.  Can you say this again.  I was looking here.

5     Yes.

6     Q.  What you were trying to tell Condoleezza Rice --

7     A.  Yes.

8     Q.  -- is that you believed that the Plaintiffs had

9     obtained an injunction from the Court and were using it

10    improperly, correct?

11    A.  That -- yes.  I mean, basically, in the sense of

12    it referring to entities that are independent of the PA

13    or the PLO, that I felt then -- and I feel now --

14    basically that, you know, that the enforcement action

15    that was being pursued by the Plaintiffs exceeded what

16    the remedy would be in terms of, you know, where to

17    collect and what is collectible.

18    Q.  Right.

19    A.  Yes.  Yes.

20    Q.  I think we're saying the same thing.

21    A.  Okay.  That's fine.

22    Q.  That they had gone to court, obtained an

23    injunction from the court --

24    A.  Yes.

Page 168

Fayyad Depo Transcript.txt

25      Q.  -- which was specific.  And, in your mind, the

                                        Fayyad - 197


1   Plaintiffs were using it in a much too broad way --
2       A.  Yes.
3       Q.  -- and were sending it out naming all kinds of
4   inappropriate entities?
5       A.  That's what I meant to say.
6       Q.  Right.  Okay.
7       A.  But, if I may, in the sense that I have just
8   described, in the sense of those entities being
9   independent --
10      Q.  Yes?
11      A.  -- of the PA and the PLO.  So, therefore, my view
12  is that they should not be, you know, pursued in
13  collection.
14      Q.  Yes.  I understand.
15      A.  Okay.
16      Q.  You thought -- do you -- are you familiar with
17  the English expression "fast one"?  You felt that the
18  Plaintiffs were pulling a "fast one"?
19          If you're not familiar with the expression, they
20  were doing something they shouldn't be doing, right?
21      A.  That's a better way.  I'd rather put it that way.
22      Q.  Okay.  It was unfair, inappropriate, and misusing
23  the injunction?
24      A.  Going beyond, you know, what could be pursued, is
25  how I'd put it.

                                        Fayyad - 198


1       Q.  They were misusing the injunction, in your mind?

                            Page 169

Fayyad Depo Transcript.txt

2            MR. ROCHON:  Counsel.  Objection.  He's

3  answered.

4            MR. WISTOW:  Can I get a yes?

5            MR. ROCHON:  You can't tell him what to say.

6            MR. WISTOW:  Can I get a no?  Can I get an I

7  don't know?

8            MR. ROCHON:  You got an answer.

9     Q.  Did you believe they were misusing the

10  injunction?

11     A.  All I know is that they were acting in a manner

12  that went beyond what would be pursued in this action.

13  I'll just say this the same way every time I've asked.

14     Q.  Okay.

15     A.  That's just the way I go about doing things.  I

16  just don't tend to really add top much color one way or

17  the other.

18     Q.  Okay.  They were doing something which you

19  believed they had no right to do.  Is that fair?

20            MR. ROCHON:  Counsel, you --

21            MR. WISTOW:  No, no.  I do it my way.  I

22  don't know what they do in Washington.  This is how I've

23  been making a living for a while, and I'm going to

24  persist.

25            MR. ROCHON:  I understand.  But you're

                                        Fayyad - 199


1  trying to make him say a particular word that you want.

2            MR. WISTOW:  That's exactly what I'm trying

3  to do.  That's exactly right.  He's an adverse witness.

4            MR. ROCHON:  He's not.  But, counsel --

5            MR. WISTOW:  I didn't say hostile.  I said

6  adverse.  I have a right to try to do it the way I'd
                        Page 170

Fayyad Depo Transcript.txt

7    like to if I can possibly.

8              MR. ROCHON:  Go ahead.

9       Q.  Can we agree to this, that you felt that they

10   were using the injunction beyond what they were entitled

11   to do with it.

12           Is that fair?

13      A.  I felt that they were going beyond what could

14   have been pursued.

15      Q.  With the injunction?

16      A.  Yes.

17      Q.  Okay.  Did you consider having your lawyers go

18   back to the District Court in Rhode Island and say

19   they're abusing the court's injunction?

20           Did you think about that?

21              MR. ROCHON:  Objection.  Assumes a fact not

22   in evidence.

23              MR. WISTOW:  What?

24              MR. ROCHON:  His lawyers.  You haven't

25   established --

Fayyad - 200


1              MR. WISTOW:  Okay.

2       Q.  The PLO and the PA's lawyers, did you think of

3    going back to the District Court in Rhode Island and

4    making it aware of this perceived abuse of its

5    injunction?

6           Did you?

7       A.  You know, at the time, you know, those cases were

8    not being pursued in the same way that they are being

9    pursued now.

10          As I told you, this letter essentially was a

Page 171

Fayyad Depo Transcript.txt

11  beginning of our formal involvement in the process in

12  the sense of really trying to find a way as to how to

13  best deal with it.

14      Q.  Have you finished your answer?

15      A.  I have.

16      Q.  Okay.  You wrote this letter?

17      A.  Yes.

18      Q.  I'm asking you, did you consider going back to

19  the District Court and saying that its injunction was

20  being misused.

21          That's all I'm asking.

22      A.  I don't know if I considered a certain, you know,

23  course of action, considered specifically or precisely

24  what to do, as much as I believe I was in the mode of

25  really trying to find out how best to deal with, you

                                        Fayyad - 201


1   know, this and other cases.

2       Q.  Well, didn't you talk to your lawyers at the time

3   about this?

4       A.  I was not really in direct communication with the

5   lawyers on this or other cases.

6       Q.  But you could have been?

7       A.  You know, the issue, as I told you, in this

8   particular case became one of immediate relevance to me,

9   in my capacity as Minister of Finance, only after

10  essentially, effectively, enforcement action began in

11  ways that involved freezing assets and other aspects of

12  actions taken in a manner that very much affected the

13  way we did business.

14          And so, therefore, you know, just really

15  basically trying to find out -- find a way as to how

                        Page 172

Fayyad Depo Transcript.txt

16    best to deal with this.

17         I cannot tell you exactly what sort of measures,

18    you know, are contemplated, are considered, actions that

19    we thought we should take, other than, at the time,

20    trying to really find a way, you know, considering the

21    line of defense that was adopted as strategy by the

22    PA/PLO's lawyers in the previous period.

23         That's all.

24    Q.   Okay.  We've already established that this was

25    not only a matter of a big financial problem, but

Fayyad - 202


1     threatened regional -- perhaps world -- peace.

2          We've already established that, have we not?

3     A.   Because it was a big financial problem.  That's

4     what I would add.  Because it was a big financial

5     problem, a very serious financial problem.  That's the

6     causal link.

7     Q.   Okay.

8     A.   That's the channel of influence, if you will.

9     Q.   All right.  But you were saying that, because of

10    this, the Palestinian government could fall down --

11    A.   Yes.

12    Q.   -- collapse, which would threaten regional and

13    world peace.

14         Yes?  Didn't you say that?

15    A.   I said that, and I --

16    Q.   Did you believe it?

17    A.   I did.

18    Q.   Okay.  Now, there's more financial problems being

19    caused by this injunction, correct?

Page 173

Fayyad Depo Transcript.txt
20    A.  What do you mean?

21    Q.  You're telling Condoleezza Rice about the

22  problems with this injunction, aren't you?

23    A.  Yes, I am.

24    Q.  Okay.

25    A.  Yes.

Fayyad - 203


1    Q.  So that injunction is also affecting the

2  finances, isn't it?

3    A.  Of course.

4    Q.  Okay.

5    A.  In the sense of it having led to, resulted in,

6  freezing of our assets.

7    Q.  Exactly.

8    A.  Definitely.

9    Q.  Exactly.  Threatening the financial collapse of

10  the PA.  Yes?

11    A.  I don't know.  Grossly undermining the PA's

12  capacity to function.  That was how I would put it.

13    Q.  Well, let's see how you put it.

14       If Plaintiffs' efforts prove successful, they

15  could completely undermine the PNA's ability to continue

16  to operate as a functioning government.

17       Correct?

18    A.  Amazing.  I mean I just said to you now what I

19  said in the letter, and really I did not look at the

20  sentence now.

21    Q.  Okay.  Because you really believe this?

22    A.  That's my state of mind.

23    Q.  Right.  Your state of mind was this could cause

24  the -- effectively the collapse of the PNA, correct?

Page 174

Fayyad Depo Transcript.txt

25          MR. ROCHON:  Counsel, you've asked it a

Fayyad - 204


1    dozen times.

2              MR. WISTOW:  I'd like to get it all in one

3    place, kind of bookend it.

4              I'm sorry I'm amusing you.

5    A.  What I said --

6    Q.  Can you please --

7    A.  What I said --

8    Q.  Yes.

9    A.  What I said was it threatened to grossly

10   undermine the capacity of the PA to function.  That's

11   what I just told you now.

12   Q.  To operate as a functioning government?

13   A.  And what you actually recited from the letter,

14   which I wrote in June of 2005 in English, is exactly

15   identical then to what I just said to you right now.

16   Q.  I accept that.

17   A.  That impresses me.

18   Q.  I accept that.  I salute you.  I salute you, sir.

19   A.  Thank you.

20   Q.  I want to take it a step further.

21   A.  Okay.

22   Q.  So with this threat, did you consider --

23   A.  Yes.

24   Q.  -- going to the Rhode Island court and saying

25   they're abusing the injunction?

Fayyad - 205


1              Can you answer that?

Page 175

Fayyad Depo Transcript.txt

2    A.   I think I did.

3    Q.   I don't think you did, with all due respect.

4    A.   I told you, you know, we were at the time -- we

5    had not, at the time, gotten to the point of actively

6    pursuing those cases in the sense of defending ourselves

7    against every motion or injunction.

8         It was the over-all strategy.  It was just

9    basically something that had just happened in the sense

10   of this ruling, this judgment, if you will, and the

11   entering of final judgment of a certain amount, freezing

12   of assets.

13        And so, basically, you ask what is it that got

14   you there in the first instance.  The inadequacy of the

15   defense on the grounds of jurisdiction or sovereign

16   immunity, that's what we were looking at at the time, or

17   that's what I recall was on my mind, not that particular

18   injunction.

19        In other words, you know, what we were doing then

20   was we were taking it step by step, action by action,

21   motion by motion.  It was just a different paradigm

22   altogether.

23        You know, the lawyers showed up and said, well,

24   no jurisdiction.  And so, basically, that's just the way

25   it was.

Fayyad - 206


1    Q.   But you had lost that in the Court of Appeals?

2    A.   I know.  We were just --

3         MR. ROCHON:  Counsel.

4    A.   We were just in the midst of trying to deal with

5    it.  That's basically what [I'm am trying to talk to you

6    about.

Fayyad Depo Transcript.txt

7    Q.  This is June 2005?

8    A.  It is June of 2005, yes.

9    Q.  Now, in June of 2005, you have a situation that

10   you claimed to Condoleezza Rice is threatening to

11   completely undermine the PNA's ability to continue to

12   operate as a functioning government?

13   A.  Yes, yes.

14   Q.  Correct?

15   A.  Correct.

16   Q.  And you really believed that?

17   A.  I did.

18   Q.  Okay.  Whatever else you were doing, did you give

19   any consideration whatever to going back to Judge

20   Lagueux and explaining to him that they were misusing

21   the injunction?

22       Did you consider it?

23   A.  You know, I never said -- and I'm not here to

24   suggest -- that I'm actually, or I ever, micro-managed

25   this process in the sense of me, you know, deciding

                                        Fayyad - 207


1    every step of this litigation.  That's what we have

2    lawyers for now, thankfully, and we're pursuing this

3    strategy.

4        We were not doing it this way then.  And even

5    today, with active, you know, counsel on our behalf, it

6    isn't the case that I just sit and decide in a

7    micro-management sense the steps that need to be taken.

8    Q.  Okay.

9    A.  I honestly don't.

10   Q.  So, in June of 2005 --

                        Page 177

Fayyad Depo Transcript.txt

11    A.  If it's true today, it was a lot more true then.

12    Q.  In June of 2005, you were content to leave this

13  issue in the hands of your then lawyers.

14         Is that what you're saying?

15         MR. ROCHON:  Objection to form.

16    A.  I was not really involved in it then in the same

17  way that I'm involved in it today.

18    Q.  I'm not asking you to compare the two.

19         I'm saying, in June of 2005 --

20    A.  Yes.

21    Q.  -- when you were telling Condoleezza Rice that

22  this injunction threatened to collapse the PNA, you were

23  content not to micro-manage it.

24         That was your expression, correct?

25    A.  Yes.  I never micro-managed it then, and I'm not

                                              Fayyad - 208


 1  micro-managing it now.

 2    Q.  So who was managing it in June of 2005?

 3    A.  It was -- as I told you, the issue became one

 4  that preoccupied me definitely when I basically found

 5  myself having to deal with the financial consequence of

 6  this.

 7    Q.  Listen to me.

 8         MR. ROCHON:  Counsel, don't tell the Prime

 9  Minister to listen to you.  Just because you don't get

10  the answer you want, don't tell him to listen to you.

11  He's been listening to you patiently for four hours.

12         MR. WISTOW:  All right.

13    Q.  Forgive me.  I apologize.

14         You indicated you didn't want to micro-manage

15  this problem, correct?

                    Page 178

Fayyad Depo Transcript.txt

16    A.  I didn't.  And I'm not doing it now either.

17    Q.  Okay.  Fair enough.

18    A.  It's not because I didn't want -- this is just

19  basically how I do business, whether this case or other

20  cases.  I'm not a lawyer.  That's what we have lawyers

21  for.

22    Q.  I'm not being critical.  I'm just asking the

23  question.

24    A.  Okay.

25    Q.  Okay.  Who was managing the situation, this

                                           Fayyad - 209


 1  litigation, in June of 2005?

 2    A.  I do not know if I can really tell you there was

 3  one individual or portfolio that was solely in charge of

 4  this operation.  I really can't.

 5    Q.  That's not what I'm asking you.  I'm asking if

 6  you know anybody who was involved in the management of

 7  it.  Anybody.

 8          MR. ROCHON:  When you say "it," counsel, the

 9  litigation?

10          MR. WISTOW:  The litigation.  Yes.

11    Q.  In June of 2005.

12    A.  I believe it was just counsel doing it, you know,

13  at the time, on the basis of the strategy that they

14  began, and basically continuing on with it.

15    Q.  So did you try to determine if there was anybody

16  else in the government that was involved in this?

17    A.  All I remember is when I actually, you know,

18  started to deal with it.  I did not really, at the time,

19  feel I was intruding on somebody's turf at the time.

                          Page 179

Fayyad Depo Transcript.txt

20    Q.   I don't understand that.  In June of 2005 --

21    A.   Yes.

22    Q.   -- you were not managing this litigation?

23    A.   No, I wasn't.

24    Q.   Okay.  Did you believe somebody else in the

25    government was, or some kind of combination of people in

Fayyad - 210


 1    the government?

 2    A.   I had assumed that to be the case.  But it looked

 3    to me to be more, you know, the lawyers doing it on an

 4    on-going inertia basis, if you will, on the basis of

 5    strategy that they adopted early on.

 6    Q.   Okay.  In June of 2005 then, you assumed somebody

 7    else in the government was managing it?

 8         That is what you said?

 9    A.   June 2005?

10    Q.   Yes.  When you wrote this letter.

11    A.   As I told you, in the way that I described to

12    you.

13         You know, again, we're really talking about a

14    fairly nascent authority --

15    Q.   What?

16    A.   Young authority, new authority, without well-

17    established systems of governance in various matters.

18         I mean it's not like, you know, an authority

19    that's been in existence forever, with everybody knowing

20    what they're supposed to be doing.

21    Q.   Did you assume someone was managing it --

22    A.   Yes.

23    Q.   -- or did you assume someone wasn't?

24         That's all I'm asking.

Page 180

Fayyad Depo Transcript.txt

25      A.  I assumed it was being managed in the way that I

                                          Fayyad - 211


      1    described -- namely, on the basis of strategy which was

      2    based on the notion that there was no jurisdiction in

      3    this particular case.

      4            And when a deposition is taken, this does not

      5    need day-to-day maintenance.  It's a paradigm that says

      6    we need not be involved in the details here basically.

      7            So, in the nature of it, I did not assume there

      8    was anyone actively involved in managing this process on

      9    a day-to-day basis.

      10     Q.  Okay.  But, in June of 2005, when you wrote the

      11    letter, you had already known that you lost on sovereign

      12    immunity in Court of Appeals.  You knew that.

      13     A.  I think that was on the table at the time.  I

      14    mean if I had not known that, I would not have been --

      15     Q.  It's in your letter?

      16     A.  Yes.

      17     Q.  So you knew that.

      18            Now, did you -- again, did you assume that

      19    somebody in government was involved in managing this, or

      20    did you not assume that?

      21            That's all I'm asking.

      22            MR. ROCHON:  Asked and answered.

      23            MR. WISTOW:  For the life of me, I don't

      24    know what the answer is.

      25     A.  You know, I did not know if there was anybody

                                          Fayyad - 212


      1    actively managing the case on a day-to-day basis.

                                  Page 181

Fayyad Depo Transcript.txt

2      Q.  Okay?

3      A.  For the reasons I mentioned.  So --

4      Q.  Did you assume there was?

5              MR. ROCHON:  Counsel.  You just asked it.

6              MR. WISTOW:  No.  He said -- he said, I

7      didn't know.  I'm asking, did you believe there was

8      somebody.

9              He said he didn't know.  I'm now asking him

10     did he believe somebody was managing it.

11     A.  You know, I don't know if I really went through

12     this thinking, assuming anything.

13         All I know is, when I found out about this, and

14     it came to my knowledge this was what was involved, this

15     was what a thing that was a priority issue for me, I

16     started to act on it.

17         Basically, that's what I'm trying to tell you.

18     Q.  Okay.  What I'm trying to ask you, when you

19     started to act, you wrote a letter?

20     A.  Yes.

21     Q.  Okay.  And that's the last thing before you left

22     government, right?

23     A.  Yes.

24     Q.  Okay.  Now, what I'm trying to get at though, is

25     did you believe that somebody else would be taking care

                                        Fayyad - 213


1      of this?

2      A.  If I did, I would not have written the letter

3      probably.

4      Q.  I'm sorry.  What?

5      A.  If I did, I probably would not have written the

6      letter I did.  I mean I probably would have gone to the
                           Page 182

Fayyad Depo Transcript.txt

7    person I had assumed was managing this.

8        Q.  So you believe nobody was managing it?

9        A.  I didn't really make an effort to find out.  I

10   just decided to deal with it myself.

11       Q.  Okay.  Fair enough.  Okay.

12           Now, you were aware, when you wrote this letter,

13   that there was a problem with the Wachovia Bank?

14                MR. ROCHON:  Page, counsel?

15                MR. WISTOW:  Yes.  Page 3, third paragraph

16   from the bottom.

17       A.  Page 3?

18       Q.  Yes.

19       A.  Yes.  The letter itself, right?

20       Q.  Yes.  Yes.

21       A.  Yes.

22           (Witness peruses document.)

23       A.  Yes.  Here I don't read through all of it, but I

24   believe I'm talking only about the Pension Fund and the

25   PNA.

                                        Fayyad - 214


1        Q.  Well, no.  It seems to be more than that because

2    it's talking about paying your employees salaries.

3            Do you see?

4        A.  Let me just continue.

5            (Witness peruses document.)

6        Q.  Where do I talk about salaries?

7        Q.  Well, it says, Expenses needed to run its office.

8    Maybe I shouldn't have assumed that would be --

9            What expenses were you talking about?

10       A.  Are we talking about the Pension Fund here?

                            Page 183

Fayyad Depo Transcript.txt

11    Q.   No.  It says -- I'll just -- I don't know what

12    we're talking about.  I'll just read what it says.

13    A.   Okay.

14    Q.   The PNA's bank in Washington --

15    A.   Where?  I mean I'm reading the wrong paragraph.

16    Q.   Oh, okay.  Fair enough.  Page 3, third paragraph

17    from the bottom.

18         MR. ROCHON: (Indicating).

19    A.   This one?

20    Q.   Yes.

21    A.   As a result of receiving notice?

22    Q.   Yes.  Exactly.  Take a minute, read it, tell me

23    when you're finished.

24    A.   Okay.

25         (Witness peruses document.)

                                        Fayyad - 215


1     Q.   And, incidentally, I do apologize for saying

2     before, Listen, it was an appropriate response from

3     Mr. Rochon.

4     A.   Yes.  Okay.

5     Q.   Okay?

6     A.   Yes.

7     Q.   When you say necessary expenses needed to run, I

8     assume that includes payroll and rent?

9     A.   All expenses, yes.

10    Q.   Yes.  Whatever?

11    A.   Yes.

12    Q.   Okay.  So this was a kind of an immediate crisis,

13    was it not?

14    A.   Yes.  I mean in the sense of it having led to a

15    situation where our Mission was not able to use its

                        Page 184

Fayyad Depo Transcript.txt

16  resources available to pay salaries of employees and

17  other operating expenses.

18      Q.  Yes.  It's an immediate crisis?

19      A.  I mean not only in the sense it was a big

20  problem.  It was a huge problem.

21      Q.  It's immediate crisis, is it not?

22      A.  Immediate crisis --

23      Q.  Is it that difficult to agree with me?

24      A.  I don't know.  Basically, I would have to be --

25  I'm responsible for things I say, not for things you

Fayyad - 216


 1  say, with all due respect.

 2      Q.  If you disagree with me --

 3      A.  I can't -- I mean, I'm just --

 4          MR. ROCHON:  Counsel --

 5      A.  Look.  I'm prepared to sit here as long as is

 6  necessary.  But I'm not really going to be forced into

 7  saying things not the way I want to say them.

 8      Q.  Okay.

 9      A.  I think it's fair enough.

10      Q.  I'll ask you this --

11      Q.  Please feel free to ask me however many questions

12  you like, and I am prepared to sit with you for as long

13  as it takes.

14          But I am not comfortable being framed in the way

15  to answer questions.

16      Q.  I can see that.  I can see that.

17          Did you consider it to be an immediate crisis?

18      A.  I considered it to be a very very big problem for

19  the Palestinian Authority.

Page 185

Fayyad Depo Transcript.txt

20        In this particular paragraph, we're referring --

21   we're talking about the operation of our Mission.  And

22   that's the PA in its entirety.

23        Remember this.  I regarded the whole case as one

24   that's posing serious threat to the capacity of the PA

25   to continue to function as a government.  That's

Fayyad - 217


1   basically --

2        Q.  Well --

3        A.  -- you know, and this -- reading through this

4   now, it's coming back to me -- basically, looking at the

5   myriad of actions, sequence of steps, a lot of things

6   happening at the same time, you know.

7        So anyone, you know, kind of sitting there having

8   to deal with the consequences of this, clearly could not

9   but have viewed this as a very very serious problem, for

10   sure.

11        Q.  Clearly could what?

12        A.  Not but have viewed this as a very serious

13   problem.

14        Q.  Now, you've seen about the bank thing.  And

15   that's yet another element of seriousness, right?

16        A.  I tell you, it's in there -- you know, the

17   reference to -- maybe in the subsequent paragraph which

18   I was reading before, thinking that was the paragraph

19   that interested you -- talking, for example, about

20   assets of the PMA, Palestine Monetary Authority, being

21   frozen.

22        Well, in fact, that was commercial bank money

23   they were dealing with.  For me, knowing what I know

24   about financial flows and check-clearing matters and the

Fayyad Depo Transcript.txt

25   rest of that, I knew this was debilitating way

Fayyad - 218

1   beyond,you know, the capacity to pay salaries.
2       Q.  Right.
3       A.  Here is an institution that is independent of the
4   PA, in every sense of the word, unable to function.
5       Q.  Right.
6       A.  So our banking system would be basically shut
7   down.  I mean that's what we're looking at, beyond
8   salaries.  So a serious problem.
9       Q.  You're talking Palestine Monetary --
10      A.  -- Monetary Authority, yes.
11      Q.  That's another problem that I'll talk to you
12  about in a minute.  But I'd like to do one at a time.
13              MR. ROCHON:  Counsel --
14      Q.  I want to talk about the bank in Washington,
15  Wachovia --
16      A.  Yes.
17      Q.  -- correct?  So that was an immediate serious
18  problem because the checking accounts that you paid
19  expenses, like salaries and rent, was frozen?
20      A.  You know, not as serious, for example, you know,
21  as PMA assets or assets handled by the PMA being frozen.
22          There are grades of problems here.  I mean --
23              MR. ROCHON:  Counsel, may I suggest that
24  leading questions may not be as advantageous in this
25  situation as you think.

Fayyad - 219

1              MR. WISTOW:  You may suggest, and I will

Page 187

Fayyad Depo Transcript.txt

2  disregard your suggestion.

3     A.  And I'll have to deal with the consequences.

4     Q.  I beg your pardon.  I'm going to continue.

5     A.  Okay.  Continue.

6     Q.  Whether it was the most serious problem, the

7  least serious problem, or some problem in the middle, it

8  was a problem that threatened --

9     A.  Problem.

10    Q.  -- to close down the offices in Washington of the

11 PNA.

12       At least that's what you told Condoleezza Rice,

13 correct?

14    A.  Yes.

15    Q.  Okay.  Now, you said that, The PNA's bank in

16 Washington has attempted to clarify with the Court and

17 the Plaintiffs whether the PNA's account can be used to

18 pay the necessary expenses needed to run its office,

19 without success.

20       Do you see that?

21    A.  Yes.

22    Q.  Can you tell me about that?  Do you know anything

23 about it?

24    A.  I don't really remember the details of this.  I

25 really don't.

                                        Fayyad - 220


1     Q.  Do you remember anything about it?

2     A.  You know, just as a consequence of the case, and

3  as information that was brought to my attention in the

4  context of writing the Secretary.

5     Q.  Well, was it clarified with the Court?

6     A.  I do not know.

Fayyad Depo Transcript.txt

7    Q.  Was that account freed up at some point?

8    A.  Yes.  At the time --

9    Q.  Was the account freed up?

10   A.  You know, basically the letter is a statement of

11   the way things were at the time the letter was written.

12   Then what happened afterwards --

13   Q.  Of course.

14   A.  -- I really do not know.

15   Q.  That's what I'm trying to find out.

16   A.  Yes.

17   Q.  So you don't know --

18   A.  I don't know.

19   Q.  -- if that serious problem got solved?

20   A.  I know it's solved now.  I mean I know we have an

21   office that's functioning now.  I mean for sure.

22   Q.  Now is five years later.

23   A.  It's been functioning since then.

24   Q.  Do you know how it was resolved?

25   A.  No, I don't.

                                        Fayyad - 221


1    Q.  Do you know when it was resolved?

2    A.  I don't know for sure.

3    Q.  Okay.  Do you know if you -- you -- I checked,

4    and it appears that you left your post as Finance

5    Minister on December 12 of 2005.

6        Does that refresh your recollection?

7    A.  Probably.  Well, if we're talking about days

8    making a difference here, I believe it was December 5.

9    That's my recollection I mean.

10   Q.  Fine.  Okay.  It's not worth fighting about.

Fayyad Depo Transcript.txt

11    A.  Yes.  I just say, for the record, that I don't

12    know.  I can check it out, but I sort of recall it was

13    5th of December, not 12th of December.

14    Q.  The -- you say here, in that second paragraph, In

15    addition, we have been informed by Arab Bank that it has

16    received a copy of Plaintiffs' notice and that, as a

17    result, it may have to freeze the PNA assets located

18    anywhere in the world.

19        You wrote that, correct?

20    A.  Yes.

21    Q.  Did that actually happen, that you got such a

22    notice?

23    A.  Yes.  It must have happened.  I mean I was not

24    really making it up.  I mean we were, at the time,

25    informed by Arab Bank that they did receive such a

Fayyad - 222


1    notice.

2    Q.  Okay.  You know that from your own personal

3    knowledge?

4    A.  I cannot tell you right now.  I really don't

5    recall.

6    Q.  Okay.  Do you know if, before you left, some five

7    months later, this was resolved with the Arab Bank in

8    any way?

9    A.  I'll tell you, what I remember is that we were

10   having a hard time.  We were very anxious.  We were

11   worried about assets being frozen.  It was just one

12   thing happening after another.

13       I was worried especially about, in addition to

14   PMA, I was worried about pension funds.  I mean these

15   are rights of pensioners who really have nothing to do

Page 190

Fayyad Depo Transcript.txt

16    with anything I mean.  So that was really, you know, our

17    immediate worry, you know, at the time.

18        So there was a lot to worry about during that

19    period.  There was a really a lot of commotion.

20    Q.  Right.  There was a lot to worry about.

21        What I'm trying to find out is, on this

22    particular issue with the Arab Bank, did you follow up

23    with that at all before you left six months later.

24    A.  Yes.

25    Q.  What did you do?

Fayyad - 223


1    A.  I do not know if that situation led to assets

2    being frozen.  I'm not sure I can say that.

3        But, at the time, yes.  I believe the bank was

4    put on notice that there is this action against us, and

5    that it could possibly lead to having our assets frozen.

6    Q.  Well, during the six months that you stayed on as

7    Finance Minister --

8    A.  Yes.

9    Q.  -- did you learn whether or not --

10    A.  No.  I don't believe assets were frozen at the

11    time.

12    Q.  You weren't sure?

13    A.  You know, if you give me a little bit of time to

14    scratch my head over this.  I just want -- what I don't

15    want to do is to give you some information that's not

16    accurate.

17        Look, I don't believe assets were frozen in

18    connection with what you have just referred to with Arab

19    Bank.  I don't believe so.

Page 191

Fayyad Depo Transcript.txt

20    Q.  Was the Pension Fund frozen?

21    A.  Yes.

22    Q.  Okay.  That was a serious concern?

23    A.  That was serious, and it continues to be.

24    Q.  What?

25    A.  And it continues to be.

Fayyad - 224

1    Q.  Okay.

2    A.  For obvious reasons.  This is not our money.

3    This is not PA money.

4    Q.  So I want to go for the request for intervention.

5    Do you see that paragraph?

6    A.  Which one?

7    Q.  Page 4.

8    A.  Which one?

9    Q.  The paragraph --

10    A.  Yes.

11    Q.  Why don't you read that to yourself silently.

12         (Witness peruses document.)

13    A.  Yes.

14    Q.  And principally, at that time, the freezing was

15    caused by the injunction, is that fair?

16    A.  Yes.  It was freezing assets.

17    Q.  Okay.  And, at the top of the page, you note, and

18    you tell Condoleezza Rice -- third line down --

19    A.  Yes.

20    Q.  -- that these actions, the freezing of the assets

21    of the Palestinian Pension Fund, are clearly not within

22    the scope of the preliminary injunction, correct?

23         That's what you told her?

24         MR. ROCHON:  Are you under Request for

Page 192

Fayyad Depo Transcript.txt

25   Intervention, counsel?

Fayyad - 225

1            MR. WISTOW:  I'm sorry.  I went to the top
2   of the page.  I didn't do that very elegantly.
3   Q.  Let's go to the top of the page.
4            (Witness peruses document.)
5   Q.  Do you see what I'm referring to?
6        I guess, in fairness, if you want to start the
7   beginning of the sentence -- which probably is
8   appropriate -- let me take you back to 3, the last line,
9   which says, In addition to freezing the assets --
10   A.  Okay.
11   Q.  -- of the PMA, Plaintiffs' enforcement actions
12   also resulted in the freezing of the assets of the
13   Palestinian Pension Fund.
14        You see?
15   A.  Yes.
16   Q.  And you say, Assets that, again, clearly are not
17   within the scope of the preliminary injunction.  Okay?
18   A.  Yes.
19   Q.  And you believed that at the time?
20   A.  Yes.
21   Q.  Okay.  And you're asking Condoleezza Rice --
22   A.  Yes.
23   Q.  -- to intervene, to the extent that she can
24   within the Constitution and the laws of the United
25   States?

Fayyad - 226

1   A.  Yes.

Page 193

Fayyad Depo Transcript.txt

2       Q.  But you don't ask Judge Lagueux to intervene in

3   any way on this issue of the misuse of the preliminary

4   injunction.

5           Is that fair?

6       A.  Not quite this way of, you know, one or the

7   other.  It's just basically as I told you.  We -- you

8   know, it was really the first official action, if you

9   will, on my part in this case.

10          And I thought it appropriate, given the enormity

11  of it, given how important it was, given how threatening

12  it was to our ability to continue to function, that I

13  thought it appropriate to raise it at that level.

14          You know, so basically it was not really a

15  question should I go to the Judge or to the Secretary of

16  State.  It was not really that.  And, again --

17      Q.  You could have done both?

18      A.  Again, I could have done both.  I mean maybe we

19  would have been in a different place had we done that.

20      Q.  Have you today --

21      A.  I mean we could have done many things, but we

22  didn't.

23      Q.  Have you, even today, gone to the Judge and asked

24  him to stop the abuse of the injunction?  Do you know?

25      A.  What I know today is that we are pursuing this

                                        Fayyad - 227


1   very closely and methodically, and doing what one should

2   do to defend one's self.

3       Q.  I'm asking you specifically if you know whether

4   or not you've gone to Judge Lagueux and tried to inform

5   him that his injunction is being abused.

6       A.  I don't --

                    Page 194

Fayyad Depo Transcript.txt

```
 7              MR. ROCHON:  Objection.
 8      Q.  If you know.
 9              MR. ROCHON:  There's an objection, Mr. Prime
10  Minister.
11              Are you asking on behalf of the PMA, the
12  PNF, the PA?
13              MR. WISTOW:  On behalf of anybody.
14      A.  Okay.  Well, I do know there were different
15  lawyers who were doing different things here.
16          The PMA definitely was pursuing that line of
17  defense, for sure.  And also the Pension Fund.
18      Q.  Has gone to Judge Lagueux?
19      A.  I don't know exactly what they're doing.
20      Q.  That's what I'm trying to find out.  If you know.
21      A.  What I know is that definitely they're
22  challenging it.
23      Q.  Let me try this again, Mr. Fayyad.
24          Do you know whether or not anybody has gone to
25  Judge Lagueux to say that the injunction he issued is
```

Fayyad - 228

```
 1  being abused?
 2          That's all I'm asking.
 3      A.  I assume this is what has happened in both of
 4  these cases, both the PMA and the Pension.
 5      Q.  You assume that?
 6      A.  Yes.
 7      Q.  Okay.  Why do you assume that?
 8      A.  I mean if I were actually representing either
 9  entity against the backdrop of, you know, the action to
10  freeze assets, it seems to me that would be the first
```

Page 195

Fayyad Depo Transcript.txt

11  thing I would try, as a point of logic I mean.

12      Q.  It makes sense, right?

13      A.  I would think so.

14      Q.  Okay.  Now, your position is that the Plaintiffs

15  were using the injunction inappropriately to freeze

16  assets of the PNA also, not just these other entities,

17  isn't that so?

18      A.  Here I'm talking about PMA, with an M as in

19  Michael.

20      Q.  Well, PNA is what?

21      A.  PNA is Palestinian National Authority.

22      Q.  Which we've said is the PA?

23      A.  It is the same as PA.

24      Q.  Okay.  Go down to the next paragraph, Request for

25  Intervention.

                                        Fayyad - 229


 1      A.  Yes.

 2      Q.  As set forth above --

 3      A.  Yes.

 4      Q.  -- the enforcement actions taken by Plaintiffs

 5  and their supporters in the Ungar case already have

 6  resulted in the freezing of numerous assets of both the

 7  PNA -- that's the PA, right?

 8      A.  Yes.  It's the same.

 9      Q.  -- and various independent entities that are not

10  subject to the District Court's preliminary injunction?

11      A.  Yes.

12      Q.  Okay.  Did you try to go back and say there were

13  assets that were frozen that shouldn't be?

14      A.  Did I?

15      Q.  When I say you, either the PLO or the PA.

                            Page 196

Fayyad Depo Transcript.txt

16    A.  Yes.

17    Q.  Did you?

18    A.  Do what?  I'm sorry.

19    Q.  Go back to Judge Lagueux and say the injunction

20  was being abused.

21    A.  Again, I believe, in those cases of PMA and the

22  Pension Fund -- PMA, Palestine Monetary Authority -- and

23  Pension Fund, that that was the case, yes.

24    Q.  Okay.  Now, what about the PNA?  Did they go to

25  Judge Lagueux and say the injection was being abused?

Fayyad - 230


1    A.  I do not know for sure.

2    Q.  Okay.

3    A.  I don't know for sure.

4    Q.  Okay.  Now, tell me about these efforts that

5  these other entities made to go see Judge Lagueux.  What

6  happened?

7    A.  I know that these cases continue to be pursued.

8  Determination is made or a finding is made in at least

9  one of them, and then an appeal.  And then, you know, I

10  know that it's still under way.

11    Q.  So there's somebody appearing before Judge

12  Lagueux talking about the injunction being abused?

13        Who is that?

14    A.  There is legal counsel --

15    Q.  What?

16    A.  There is legal counsel acting on behalf of the

17  Palestine Monetary Authority, and there is legal counsel

18  acting on behalf of the Pension Fund, in all aspect of

19  those cases.

Page 197

Fayyad Depo Transcript.txt
20   Q.  Have they gone to Judge Lagueux?

21   A.  I'm not aware of that.  I don't know.

22   Q.  Okay.  That's all I'm asking.

23   A.  I don't know.

24   Q.  And you're the person at the PA that's in charge

25   of the Ungar case, correct?

                                        Fayyad - 231


 1   A.  You know, I can tell you -- I am here to tell you

 2   that I consider myself to be in charge of this case.

 3        But please understand, that does not really mean

 4   that I manage this on a day-to-day basis or I

 5   micro-manage it.  That's why we have lawyers for the

 6   PNA.  That why we have lawyers for the PMA.  There are

 7   lawyers for the Pension Fund.

 8        It's their job to do this.  I'm seized with this,

 9   but that does not really mean I micro-manage the

10   process.

11   Q.  You trust your lawyers?

12   A.  No, no.  If what you're trying to establish, sir,

13   is that here you are -- you're telling me, You're in

14   charge of the Ungar case at the PMA, at the PNA, and you

15   don't know any of these things.

16        I know enough to really be satisfied that we are

17   pursuing this in the way it should be pursued to give

18   ourselves a chance to defend ourselves in all these

19   cases.

20        That's all I can say.

21   Q.  Have you finished your answer?

22   A.  I have.

23   Q.  Okay.  I did not suggest to you --

24   A.  It sounded to me you have.
                    Page 198

Fayyad Depo Transcript.txt

25      Q.  Well, you drew an inference.

                                                Fayyad - 232


1           All I'm asking is, are you the person at the PA
2    who's responsible for the Ungar case.
3               MR. ROCHON:  Objection.
4       A.  I am the person where the buck stops in this
5    particular case in the way that I described it.
6       Q.  Okay.  Who else in the PA --
7       A.  I am.
8       Q.  Well, no.  Who else --
9       A.  I am in charge.  I told you.
10      Q.  I haven't finished the question.  You said the
11   buck stops here?
12      A.  Yes.
13      Q.  You're in charge?
14      A.  I am.
15      Q.  Who else is involved in this case in the PA, if
16   anybody?
17              MR. ROCHON:  I'm going to object because
18   there are three different entities you've been talking
19   about so far -- the PMA --
20              MR. WISTOW:  No.  I'm only talking about PA.
21   I was very careful.
22              MR. ROCHON:  When you said the Ungar case,
23   you were talking about the PA Ungar case, not PMA or
24   Pension Fund, is that right?
25              MR. WISTOW:  That's right.

                                                Fayyad - 233


1               MR. ROCHON:  Thank you.

                          Page 199

Fayyad Depo Transcript.txt

2     Q.  Who else in the PA has anything to do with the

3   Ungar case?

4     A.  In an executive capacity, I am in charge of this.

5     Q.  No, no.  I understand you're in charge.  I'm just

6   asking is anybody else doing any work on it.

7     A.  Doing any work?  Our lawyers are doing work.

8     Q.  Outside lawyers or inside lawyers?

9     A.  Outside lawyers are working on it.

10    Q.  Okay.  I'm not asking about outside.  I'm talking

11  about, within the PA, is there anybody working on this

12  case, other than you.

13    A.  I mean, basically, I am overseeing the effort.

14  The lawyers are doing what they're supposed to do in

15  terms of pursuing, you know, the case in the United

16  States in all of the aspects of discovery and all.

17        And, you know, staff is involved in this to the

18  extent they are involved in facilitating the work of the

19  lawyers.

20        But they are the experts -- the lawyers are the

21  experts in this.  We are not.

22    Q.  Okay.  But, Mr. Fayyad, please.  All I'm trying

23  to find out -- I understand you've got lawyers.

24    A.  Yes.

25    Q.  I do.  And I understand that you're in charge in

                                            Fayyad - 234


1   the PA of the case.

2     A.  Yes.

3     Q.  What I'm trying to find out is if there's anybody

4   else in the PA -- in the PA -- who's got any

5   responsibility for the case.

6         I'm not talking about typists or file clerks, but

Fayyad Depo Transcript.txt

7   who's got any kind of responsibility, other than you.

8   Anybody.

9       A.  You know, collectively, when I say I, I just

10  don't mean in my personal capacity as Prime Minister.

11  So therefore, basically, it's a Cabinet issue.  It is

12  something that we talk about in the Cabinet.

13          There are various agencies involved.  The

14  Ministry of Justice is involved, for example.  So it's

15  not that this is something without record or a trail in

16  the PA.

17      Q.  Okay.

18      A.  But, you know --

19      Q.  Thank you.

20      A.  -- as I suggested to you, sir, this is something

21  that is definitely being pursued by our lawyers.  This

22  is not something that the PA is itself doing.

23      Q.  With all due respect, all I'm asking is who else

24  in the PA has any responsibilities for the case, other

25  than you.

Fayyad - 235


1           MR. ROCHON:  Same objection.

2           MR. WISTOW:  I am excluding --

3           MR. ROCHON:  By responsibilities, can you

4   clarify what you mean.

5           MR. WISTOW:  Working on the case.  Doing

6   anything on the case.

7           MR. ROCHON:  Let me explain the objection.

8   I don't think you'll mind the talking objection.

9           In order to get information, you have to go

10  to numerous people that you get information from.  They

Page 201

Fayyad Depo Transcript.txt

11  might be working on the case in the sense of

12  facilitating the flow of information.

13          Is your question who else makes decisions or

14  implements strategy or who gives, you know, I mean --

15          MR. WISTOW:  Okay.  Thank you.

16          MR. ROCHON:  If you're going to subpoena

17  records from a department, the Prime Minister doesn't go

18  get the records.  But that doesn't mean those people

19  have responsibility.  That's --

20      Q.  Well, all the records regarding this case are in

21  your office.

22          MR. ROCHON:  I said if you subpoena records.

23  You know, Mr. Strachman, before you got in this case, in

24  other matters has subpoenaed records when he's -- or

25  sought them in discovery.

Fayyad - 236


1           When he does that, the Prime Minister

2  doesn't go down and search the records.  So if you could

3  clarify your question --

4          MR. WISTOW:  Okay.  Fine.  I have no

5  problem.

6      Q.  We indicated that the Minister of Justice --

7  Minister of Justice -- has some involvement in the Ungar

8  case.

9          That's what you said a moment ago?

10      A.  Yes.

11      Q.  Okay.

12      A.  In the nature of things, you know, here we are.

13  We -- as I said, we have a discussion of this in the

14  Cabinet.  This is something that comes up from time to

15  time.

Fayyad Depo Transcript.txt

16     Q.  Right.

17     A.  The Minister of Justice, given its purview, is

18  naturally involved and concerned with this.

19          In terms of management and over-all direction, I

20  am the one who actually communicates that in my capacity

21  as Prime Minister.

22     Q.  To make decisions?

23     A.  To the lawyers.  Yes.

24     Q.  Okay.  But what I'm -- you said the Minister of

25  Justice is naturally involved in this.

Fayyad - 237


1     A.  Yes.  Naturally.

2     Q.  What does he do in this?

3     A.  Basically, you know, follows up in terms of

4  what's going on.

5          But, you know, he is not, nor has he been tasked,

6  with making decisions on this particular case.

7     Q.  I wasn't asking who's making decisions.  I'm just

8  asking you who's involved in the case.

9          Now, you said the Minister of Justice --

10     A.  Many people are involved in this.

11     Q.  Okay.  Many people.  Well, the Minister of

12  Justice, you said, is involved in the follow-up.

13          Do you remember that?

14     A.  And different agencies of government.  Several

15  agencies of government also.

16     Q.  I just want to talk about the Minister of

17  Justice.  One at a time.  Okay?

18     A.  Okay.

19     Q.  What follow-up is he involved in?

Page 203

Fayyad Depo Transcript.txt

20    A.  If you are a Minister of Justice, you basically

21  follow up in terms of what litigation is outstanding

22  against the PA, whether domestic or internationally, in

23  that sense.

24        But the Ministry of Justice is not involved in

25  managing this process.  It, like other agencies of the

Fayyad - 238

1  government, has been approached on different occasions

2  in the process of producing documentation, testimony,

3  evidence in connection with the discovery, whether in

4  this case or other cases, basically.

5    Q.  Mr. Fayyad --

6    A.  Yes.

7    Q.  -- the Minister of Justice follows up on what?

8  Frankly, I didn't understand.

9        In the Ungar case, what is his involvement?

10    A.  You know, generally speaking, in all litigation

11  against the PA --

12    Q.  Yes.

13    A.  -- or in which the PA is a party -- to which the

14  PA is party --

15    Q.  Yes.

16    A.  -- the Minister of Justice is involved in that

17  sense.

18    Q.  Domestic or --

19    A.  Domestic or international.  Domestic or

20  international.

21        Now, in the case of Ungar and other litigation

22  cases against us in the United States, the Minister of

23  Justice is not involved in decision-making.

24        The Minister of Justice and his ministry, as

Page 204

Fayyad Depo Transcript.txt

25    other agencies of government, have, at some point or

Fayyad - 239

1    another, played a role in this process -- and not only
2    Ungar, but these other cases of pending litigation in
3    the United States.
4            Again, the process of discovery, producing
5    evidence, what you call it, from time to time, producing
6    witnesses.
7            There are various agencies that were involved, a
8    lot of officials.  I'm not talking about Ungar alone,
9    but I'm talking about other cases as well.
10    Q.  So what you're saying, for example, if
11    interrogatories come in on a case, they're answered by
12    the Ministry of Justice in conjunction with your outside
13    lawyers?
14            MR. ROCHON:  Objection.
15    A.  If what comes?
16    Q.  Say interrogatories -- do you know what that is?
17    A.  Yes.  Some inquiry.
18    Q.  Interrogatories means questions asked by your
19    adversary in the case.
20    A.  Basically then, depending on who has to testify
21    or produce evidence, we -- my office -- approaches them,
22    and then they do what they have to do.
23    Q.  Approaches them?  The Ministry of Justice?
24    A.  Whether it's the Ministry of Justice or other
25    agencies or individuals.

Fayyad - 240

1    Q.  I'm trying to find out what the Ministry of

Page 205

Fayyad Depo Transcript.txt

2   Justice does.

3       Let's -- we're breaking the tape, so let's go off

4   the record.  Why don't you think about it --

5           MR. ROCHON:  Objection.  We're either on the

6   record or off.  Either we're stopping talking or --

7           MR. WISTOW:  Okay.  You got me.

8           MR. ROCHON:  Which one do you want?

9           MR. WISTOW:  We're off.

10          MR. ROCHON: I don't mind being on if you

11  want to --

12          MR. WISTOW:  We're off.

13          MR. ROCHON:  Okay.  We're off.

14          THE VIDEOGRAPHER:  Going off record at 9:17.

15          (Short recess taken.)

16          THE VIDEOGRAPHER:  Going on record at 9:29.

17      Q.  Mr. Fayyad, we were talking, before the break,

18  about the function of the Minister of Justice, do you

19  recall?

20      A.  Yes.

21      Q.  I want to make sure I understand.

22          You understand that, in the United States, we

23  have forms of discovery we go through.  Are you familiar

24  with that term?

25      A.  I am familiar with the term discovery.

                                        Fayyad - 241


1       Q.  Right.

2       A.  I do not know about various forms of discovery,

3   what it means.

4       Q.  Well, for example, what we're doing now, a

5   deposition, is a form of discovery.

6       A.  Yes.

                            Page 206

Fayyad Depo Transcript.txt

7        Q.  We have written questions we send to people.  We
8    call them interrogatories.
9        A.  Okay.
10       Q.  And we request documents.
11       A.  Yes.
12       Q.  We call those requests for production.  So those
13   are the common forms of discovery.
14           I get the impression that one of the functions of
15   the Ministry of Justice for these kinds of cases is that
16   the, say, request for production of documents or a
17   request for answers to interrogatories are initially
18   worked on by the Minister of Justice Department?
19           Certainly not by you, right?
20       A.  In general, in general, that is the case.
21           However, in this particular case, as in other
22   cases being litigated in the United States, you know,
23   the process goes through my office.
24           Whether it's a document that's required, an
25   individual being deposed, or any other thing that is of

                                        Fayyad - 242


1    interest to the attorneys, the court generally, the
2    request comes to my office.
3           And then it goes to, you know, the head of the
4    department concerned.  And if it's an individual, you
5    know, they appear.  If it's a document, they produce it
6    if it's available.
7           And that's the way it works.
8        Q.  So the Minister of Justice has not been involved
9    in these cases?
10       A.  In these cases, did not have that involvement

                              Page 207

Fayyad Depo Transcript.txt
11  which the Ministry of Justice generally has in cases of

12  litigation.

13      Q.  When you say cases of litigation, you mean --

14      A.  -- against the PA.

15      Q.  Right.

16      A.  To which the PA is a party.  Let's put it that

17  way.

18      Q.  For domestic cases?

19      A.  For domestics cases.

20          You know, it's not -- you know, there are

21  actually, as best as I can tell you right now, actually

22  two jurisdictions outside of Palestine where there are

23  cases in which the PA is involved.  One is in Israel.

24  The other is in the United States.

25          In both of these cases, you know, the point of

                                    Fayyad - 243


 1  management is my office, and the process is managed

 2  similarly by and through my office, and directly going

 3  to various agencies of government as may be required.

 4          That's just -- that's how, you know, those two

 5  classes of cases are being handled.

 6      Q.  So let me see if I understand.

 7          When you say two cases, one in the United

 8  States --

 9      A.  Two classes of cases.

10      Q.  Two groups of cases?

11      A.  Two groups of cases.  Two categories.  Yes.

12      Q.  Right.  And are there other international cases?

13      A.  That's what I just said.  No.  I don't think

14  there is pending litigation.

15      Q.  I'm sorry?

                          Page 208

Fayyad Depo Transcript.txt

16    A.  I do not believe there is pending litigation on

17  other cases in which the PA is involved internationally,

18  other than in the United States and in Israel.

19    Q.  And if there were, if one of those cases came up,

20  it would go --

21    A.  Depending.  Depending.  I mean, clearly, these

22  are cases that are clearly significant, for obvious

23  reasons, and after a period in which I do not believe

24  they were given the attention that they should have

25  required.

Fayyad - 244


1      But also all of this is to be seen against the

2  backdrop of a very young structural institution that the

3  PA generally --

4    Q.  I'm sorry.  The what?  The what kind of

5  structure?

6    A.  Weak, young, new.

7    Q.  Okay.

8    A.  -- where you do not have really established

9  systems of government structures that are clear with

10  clear mandates and all, you know, these two classes or

11  categories of cases, therefore, we decided to manage

12  them as well.

13    Q.  Okay.  We're talking about terrorist cases in the

14  US and Israel, or any kind of cases in the US and

15  Israel?

16    A.  I'm talking about cases in which the PA

17  officially is involved, not, say, a commercial entity

18  or --

19      I mean maybe there's a merchant in Palestine that

Fayyad Depo Transcript.txt

20  has dealings and there are cases for or against

21  somewhere else in the world.  But that's not, you know,

22  the business of government.

23      I'm talking to you about cases where, you know,

24  we are officially involved.

25      Q.  I'm not following you.

Fayyad - 245


1       Let's say there's a commercial case in the United

2  States.  Somebody sues the Palestinian Authority for

3  breach of contract.

4       Does that get handled by your office?

5      A.  We don't have, you know, cases like that now

6  anyway.

7       And, as I said, you know, the whole -- I mean the

8  PA is relatively new.  It's not that we have a long

9  history or tradition in which these cases are managed.

10  There is not anything that's fixed or structured if it

11  comes to this.

12      Q.  I see.

13      A.  It evolves out of necessity.  I find it very

14  important to really deal with these cases as matters of

15  very high priority.

16       You have systems of government that are not

17  mature enough where, you know, ministries and agencies

18  know what they should do and follow up and etc.

19       So, basically, in the nature of things, I just

20  happened to be there, and I knew those required serious

21  attention.  And you know, we manage them this way.

22      Q.  All right.  My question to you, though, is, if

23  there is a commercial case -- if there is -- that arises

24  in the United States, do you have an existing policy as

Fayyad Depo Transcript.txt

25    to who handles that.

Fayyad - 246


1    A.  I guess that's what I was really trying to say.

2    Q.  What is the policy?

3    A.  There is no such thing as an existing policy.

4    Q.  Okay.

5    A.  What we have is a situation that evolved out of

6    necessity in these particular cases, given the

7    ramifications and significance of those cases.

8    Q.  Okay.  So is it you that makes the judgment call

9    as to who's going to handle the case?

10        For example, let's say there's a commercial case

11    arising in the United States.  Do you make the decision,

12    today, as to what law firm is going to handle it and

13    what entity in the PA is going to work on it?

14        Is that your decision?

15    A.  We are, as I said, you know, not as a matter of

16    fixed rule or anything like that.  I'm just talking

17    about these two classes of cases.  I make a rule, and

18    the managers managed in the way they did.

19        Now, you know, something else happens, yes, the

20    PA is young.  Yes, we did not -- and we don't have

21    tradition in terms of how to handle these things.

22        But, certainly, it is my hope that we're mature

23    enough now where something like this goes to the

24    Ministry of Justice, as in other issues and other areas.

25        Matters are brought to my attention on a

Fayyad - 247


1    need-to-act basis.  If something, you know, for whatever

Page 211

Fayyad Depo Transcript.txt

2   reason, is not being resolved because the Minister of

3   Justice can't resolve it or because there is dispute as

4   to the charge, it usually is brought to my attention.

5   Otherwise, it isn't.

6      Q.  I guess I'm -- I really do want to move on, but

7   I'm having trouble understanding this.

8          If a case comes in to the PA's headquarters, and

9   you're being sued, say, in New York for some commercial

10  situation, who decides --

11     A.  Yes.

12     Q.  -- who decides what department handles it, since

13  there's no policy, you're telling me?

14     A.  If it is not clear outright, you know, who is to

15  decide it, usually it comes to my office in these cases

16  and others, and not necessarily matters of litigation.

17         Mail comes to me every day, and I just basically

18  direct that traffic to relevant agencies, agencies that

19  are in charge.

20         If an event, something like what you have just

21  suggested happened, happened, and tomorrow I go to my

22  office and there is a piece of mail that somebody has

23  filed a suit against the PA -- commercial or something

24  like this -- I probably would refer it to the Ministry

25  of Justice to handle it.

                                        Fayyad - 248


1      Q.  But it's your call?

2      A.  Yes.  It's my call.

3      Q.  That's all I'm trying to find out.

4      A.  Yes.

5      Q.  Okay.  So there's no set policy.  It's up to you

6   to decide who would get it.  Is that fair?

Fayyad Depo Transcript.txt

 7    A.  Now, I can tell you that there is policy in the

 8  sense of there are ministries with clear mandates and

 9  agencies as to what they're supposed to be doing.

10        What is not really established, what is not

11  there, is established pattern, practice, tradition.  But

12  not policy or mandate.

13        Do you see what I'm saying?

14    Q.  No, I don't.  Forgive me.

15    A.  Okay.

16    Q.  Let me try it a slightly different way, because I

17  know you're trying to answer.

18    A.  Yes.  Thank you.

19    Q.  Is there any written policy, procedure, protocol,

20  or whatever you want to call it, that tells the people

21  who work for the PA where to send any kind of lawsuit?

22  Any kind.

23    A.  You know, there is.  Of course.  There is.  For

24  example, there are cases, you know, filed against us in

25  local courts on a variety of matters.

                                        Fayyad - 249


 1        What happens is that the Attorney-General,

 2  Prosecutor-General, acting on behalf of the PA, informs

 3  us, informs the relevant agency of the executive branch,

 4  of the existence of an action against it.

 5        Then he would ask, in that communication, as to

 6  what response that agency may have to that particular

 7  complaint that's been filed against the PA.

 8    Q.  So --

 9    A.  Then he proceeds in filing, etc., etc.

10    Q.  So there is written policy?

                        Page 213

Fayyad Depo Transcript.txt

11    A.  Yes.  Insofar as that is concerned, there is.

12    Q.  How long has there been a written policy?

13    A.  I cannot tell you for sure, you know.

14        In terms of, you know, when the PA came into

15    existence, it did not really have a Minister of Justice.

16    It did not have an Attorney-General.  It did not have

17    these things.

18    Q.  I understand.

19    A.  Now, it happens to be the case that, early on --

20    and I know that this is what happened -- certain records

21    started to be produced as to the mandate and purview of

22    each agency of government.

23        Now, it's one thing to have this written

24    somewhere.  But it's quite another for that to translate

25    into an established pattern of practice, if you will.

Fayyad - 250

1    Q.  Okay.

2    A.  We are there in terms of what I described to you,

3    in the event that there is a motion and there is a

4    complaint against the PA, not only typically, but

5    always, it's the Prosecutor-General, acting on behalf of

6    the government, who gets to know first.

7        And then his office directs traffic to the agency

8    affected by this complaint, and the agency is supposed

9    to correspond with us through the attorney -- or the

10   Prosecutor-General as we call him -- and so on and so

11   forth.

12       In this case -- again, going back to when this

13   happened -- at the time, the PA was what?  Less than ten

14   years old, I guess.  And I believe, at least in part,

15   you know, we are where we are --

Fayyad Depo Transcript.txt

16    Q.  I believe it was 16 years old when this suit was

17  brought, wasn't it?

18    A.  No.

19    Q.  Wasn't the PA --

20    A.  The PA came into being in 1994.

21    Q.  The suit was in 2000.

22    A.  That's six, not 16.

23    Q.  Six years.  I'm sorry.

24    A.  You're off by ten.

25    Q.  By the way -- forgive me.

                                               Fayyad - 251


 1    A.  Yes.

 2    Q.  My only question was, is there a written policy.

 3  That was my only question.

 4        The answer seems to be -- but I'm not sure --

 5  yes, there is a written policy.

 6    A.  Insofar as this is concerned, yes.

 7    Q.  There is a written policy on lawsuits?

 8    A.  Yes.

 9    Q.  Okay.  Now, my next question is, for how long has

10  there been a written policy.

11    A.  You know, it may be -- and my answer, that, given

12  this day and date, back to, you know, early on after the

13  PA came into existence --

14    Q.  Okay.

15    A.  -- in the terms of manuals --

16    Q.  Okay.

17    A.  -- having been, you know, copied from other

18  jurisdictions, if you will, on the basis of what was

19  thought then to be suitable.

                            Page 215

Fayyad Depo Transcript.txt
20         Now, the extent to which --
21    Q.  All I'm asking is -- I don't want to interrupt,
22   but, you know, we're using up time.
23         All I'm asking you is, how old is the policy.
24   That's all.  And, again, I acknowledge I interrupted.
25   But, you know, we're going to run out of time here.

                                              Fayyad - 252


1    A.  Okay.
2    Q.  So the policy -- there may have been a written
3   policy as early as the beginnings of this, is that
4   right?
5    A.  Probably.
6    Q.  All right.  Who has copies of these policies?
7    A.  Various agencies in terms of organizational
8   structures.
9         There's -- I can tell you that there was an
10   attempt made at formalizing this at -- you know, PA --
11    Q.  Again, I'm going to do it.
12         All I'm asking is who has them.  That's all I'm
13   asking.
14              MR. ROCHON:  You can't --
15    A.  You know, this is not --
16    Q.  All I want to know -- forgive me --
17    A.  Let me --
18              MR. ROCHON:  We can't all three talk.
19              MR. WISTOW:  I know.  We can't all three
20   talk.  I just want to say --
21              MR. ROCHON:  Are you withdrawing your
22   question?
23              MR. WISTOW:  I'm withdrawing my question.
24              MR. ROCHON:  He's withdrawn the question.
                        Page 216

Fayyad Depo Transcript.txt

25                    THE WITNESS:  Okay.

Fayyad - 253

1                    MR. WISTOW:  I want to state on the record
2       what's happening here.
3                    I am asking questions that require a two- or
4       three-word answer -- maybe a sentence -- and I'm getting
5       long, long answers.  And I'm am certainly going to run
6       out of time as a consequence.
7                    And I'm mindful of the fact that, as a
8       common courtesy, I shouldn't interrupt witnesses.  But I
9       don't know what else to do here, because all I'm trying
10      to find out is who has the written policy.
11                   That's all I'm asking.
12         A.   And my answer is that, today -- today -- that
13      would be the Secretary General of the Cabinet.  He would
14      have records, you know, of everything.
15           But, you see --
16         Q.   Okay.  That's all I'm asking.
17         A.   I know that's what you're asking.  I mean I know
18      that's all you're asking.
19           But it is really my duty to really provide clear
20      and comprehensive answers to the fullest extent I can to
21      really place this in the context of an authority that is
22      not firmly established in terms of structures,
23      governance, processes and set-up.  That's all.
24         Q.   Please.
25                   MR. WISTOW:  I move to strike everything

Fayyad - 254

1       after the identity of the person.  And I don't mind that

Page 217

Fayyad Depo Transcript.txt

2  much because that was a relatively short answer, even

3  the unresponsive part.

4    Q.  Now, do you have copies of the policies and

5  procedures?

6    A.  Do I have them on me?

7    Q.  No, no.  Do you have them in your office?

8    A.  The Secretary General of the Cabinet would have

9  them.

10    Q.  Is the Secretary General of the Cabinet in your

11  office?

12    A.  In general, the Secretary of the Cabinet is

13  supposed to serve all ministries in the Prime Minister's

14  office.

15    Q.  Is he part of your office?

16    A.  If I want -- he's not part of my office, but if I

17  wanted, for example, a mandate of a minister --

18    Q.  -- you can get them?

19    A.  -- I can get it from the Secretary General.

20    Q.  So we know this.  Right now, the Secretary

21  General --

22    A.  Yes.

23    Q.  -- of the -- what is it called?

24    A.  Of the Cabinet.

25    Q.  The Secretary General of the Cabinet has the

Fayyad - 255


1  policies and procedures regarding the handling of

2  lawsuits?

3    A.  Mission statements, if you will, purviews,

4  mandates of various agencies of government are there,

5  yes.

6    Q.  Including how to handle lawsuits, correct?
      Page 218

Fayyad Depo Transcript.txt

7     A.  In the way that I described to you.  It being the

8   responsibility of the Prosecutor General in the case of

9   the PA to act on its behalf in legal matters, yes.

10    Q.  Let me try one more time.

11    A.  Yes.

12    Q.  The Secretary General of the Cabinet has the

13   policies and procedures for how to handle lawsuits.

14   Yes?

15    A.  The Secretary General of the Cabinet has material

16   on the mission statements, purviews, and mandates of all

17   agencies of government.

18       So if it's Ministry of Justice, of which the

19   Prosecutor General, is a part, yes, he would have that

20   material for sure.

21    Q.  Okay.  Fine.  And we're saying that that material

22   might go back, as far as you know, to the beginnings of

23   the PA?

24    A.  Not in its present form.

25    Q.  I understand that.  I understand that.

                                          Fayyad - 256


1     A.  Yes.

2     Q.  But in some form?

3     A.  In some form.  In some form or other.

4     Q.  Okay.  Fair enough.

5     A.  When you interrupted me --

6     Q.  Fair enough.

7     A.  You don't want me to add anything?

8     Q.  No?

9     A.  Okay.  Fine.

10    Q.  I really don't.

                      Page 219

                    Fayyad Depo Transcript.txt
11          Now, the -- right now, you -- we've established

12     that you're the one who decides how to handle

13     international terror suits, right?

14     A.  Many cases that are pending, yes.

15     Q.  Okay.  Who served that function before you?

16     Immediately before you.

17     A.  Yes.  I do not know if I can give you a precise

18     answer to that beyond what I have testified to before.

19     Q.  Well, is there a person?

20     A.  No.  As I mentioned to you before, I, as a matter

21     of fact, assumed responsibility for this.

22     Q.  I'm talking about before you.

23     A.  Before me?

24     Q.  Did anybody serve that function?

25     A.  Before me?  Before me meaning?

                                             Fayyad - 257


1      Q.  Before you were --

2      A.  Before I joined the PA?  Before 2002?

3      Q.  Yes.

4      A.  I do not know.

5      Q.  Okay.

6      A.  I do not know.

7      Q.  Fair enough.

8      A.  Yes.

9      Q.  Fair enough.  All right.  Now, the -- do you know

10     who Muhannad Jaouni is?

11     A.  Yes.  I know who Muhannad Jaouni is?

12     Q.  I know I butchered that.

13     A.  Muhannad Jaouni was my office director at some

14     point.

15     Q.  He worked for you personally?
                        Page 220

Fayyad Depo Transcript.txt

16    A.  He worked as my personal assistant when I was

17    Minister of Finance, I believe in 2002, 2003.  Around

18    that time period probably.

19              THE COURT REPORTER:  Can you spell that,

20    please.

21              THE WITNESS:  M U H A N N A D, and then

22    J A O U N I.

23    Q.  And he was your principal assistant?

24    A.  He was my personal assistant.

25    Q.  Did you say personal?

                                              Fayyad - 258


 1    A.  Personal assistant.

 2    Q.  Okay.

 3    A.  2002, 2003 probably.  Then he left.  And I

 4    brought him back as director of my office of the Prime

 5    Minister for a period of time.  Not long ago, as a

 6    matter of fact.  This is last year.

 7          And then he moved on again.  He no longer works

 8    for me.

 9    Q.  Do you know where he is now?

10    A.  I believe he works at the US Consulate.

11    Q.  And who is Nadim Barahmeh?

12    A.  He is currently head of the Land Authority.

13    Previously he was legal counsel of the Ministry of

14    Finance.

15    Q.  He was what?

16    A.  Previously --

17    Q.  Yes?

18    A.  -- he was legal counsel at the Ministry of

19    Finance.

Fayyad Depo Transcript.txt
20    Q.  Okay.

21    A.  Now he is head of the Land Authority.

22    Q.  Okay.  So, as legal counsel in the Ministry of

23  Finance, did he have any involvement at all in the Ungar

24  case at any point, if you know?

25    A.  I'm sure he did.  I'm sure he did.

Fayyad - 259


1    Q.  Okay.  And during what period of time are you

2  sure he would have been involved?

3    A.  You know, around 2005 probably.  But not before.

4    Q.  Okay.

5    A.  And in the way that I described to you.  In the

6  way that, you know, different departments and different

7  agencies were involved in this.  But not -- never in a

8  decision-making capacity.

9        And, to the best of my recollection, never that

10  involved in that anyway, beyond discussions that I, as a

11  matter of fact, led at the ministry at the time.

12    Q.  Okay.  Wasn't he -- he was the legal advisor to

13  the Ministry of Finance, wasn't he?

14    A.  Yes.  That's when I --

15    Q.  Okay.

16    A.  When I said legal counsel to the Ministry of

17  Finance, I meant -- we have terms for legal department

18  in the Ministry of Finance.

19        He was head of that department.  That's basically

20  what he was.

21    Q.  Did you ever discuss the Ungar case with him?

22    A.  Probably.

23    Q.  Do you remember one way or another?

24    A.  No.  I mean, in all likelihood, you know, we
Page 222

Fayyad Depo Transcript.txt

25    discussed it.  But not really in an extensive way or

Fayyad - 260


1    anything like that.

2        I mean in the sense of what's going on, in terms

3    of the relationship between that litigation and

4    enforcement action in Israel, because it's more involved

5    in the letter.

6    Q.  He's a trained lawyer?

7    A.  Pardon?

8    Q.  He's a trained lawyer?

9    A.  He has a law degree.

10   Q.  Do you regard him as a competent lawyer?

11   A.  He's a competent head of the legal department of

12   the Ministry of Finance.  I mean I don't think he does

13   any lawyering.

14       The legal counsel of the Ministry of Finance is

15   not actually involved in litigation or acting as a

16   lawyer as much as, you know, giving advice, giving

17   advice on various matters that come through the

18   Ministry.

19   Q.  Would that be legal advice that he would be

20   giving?

21   A.  Yes.  Yes.

22   Q.  That's why it's called legal advisor?

23   A.  I suppose so, yes.

24   Q.  Okay.  And did he ever give you any advice on the

25   Ungar case?

Fayyad - 261


1    A.  I don't believe he did on the Ungar case per se.

Page 223

Fayyad Depo Transcript.txt

2    Q.  Per se?

3    A.  Yes.  I don't believe so.

4    Q.  When you say per se, he may have given advice on

5    international terror cases?

6    A.  He was involved in these other cases in Israel.

7    Q.  Was he involved in any of the international

8    terror cases?

9    A.  Not that I remember really, beyond what I just

10   said in terms of the interface between, you know, cases

11   in the United States and those in Israel in connection

12   with enforcement action.

13   Q.  Now, if you wanted to talk to somebody within the

14   PA about the American terrorist cases, was there anybody

15   with any kind of legal background within the PA you

16   could talk to, say in the period 2002 to 2005?

17           MR. ROCHON:  Objection to form.  Could talk

18   to or did talk to?

19           MR. WISTOW:  No.  Could.  That's what I

20   said.

21           MR. ROCHON:  Okay.

22   A.  You know, I just -- during that period of time,

23   as I mentioned to you, no, I didn't.

24   Q.  I'm not asking if you did.  I'm saying was there

25   anybody available.

Fayyad - 262


1    A.  As I mentioned to you before, I was not really

2    involved in this particular litigation.  But in the

3    other cases I was, and there were people I talked to,

4    for sure.

5           You know, this did not really become an issue for

6    me at the time, as Minister of Finance, long before this

Page 224

Fayyad Depo Transcript.txt

7    letter was written, meaning, you know, shortly after the

8    default judgment was entered against us --

9        Q.  Please.

10       A.  -- when the assets-freezing began.

11       Q.  Mr. Fayyad, all I'm asking is, if you had wanted

12   to, was there somebody in the PA with a legal background

13   that you could have talked about these cases to.

14            That's all I'm asking.

15       A.  I suppose there probably was.  There probably

16   were people competent enough to talk to about this, yes.

17       Q.  There were quite a few lawyers who worked for the

18   Palestinian Authority in 2005, for example, weren't

19   there?

20       A.  I don't know if there were that many lawyers

21   working for the Palestinian Authority.  Actually, we

22   don't have enough lawyers.

23       Q.  I'm sorry?

24       A.  Today even, we don't have enough lawyers.

25       Q.  How many do you have?

                                              Fayyad - 263


1        A.  I mean I cannot really give you a number.

2        Q.  Roughly.

3        A.  I mean I can't really give you a number.

4        Q.  Can you give me any kind of number?

5        A.  I can't give you a number.

6        Q.  You don't know if it's more than a hundred?

7        A.  I really would not want to really speculate.  All

8    I know is we are still building up in that area.

9        Q.  What?

10       A.  We are still building up capacity in this area,

                              Page 225

Fayyad Depo Transcript.txt

11  whether in terms of judges, in terms of district

12  attorneys, in terms of --

13      Q.  How many people work in the Ministry of Finance

14  today?

15      A.  About 2,200 people.

16      Q.  How many?

17      A.  2,200 people.

18      Q.  2,200 people.

19          Now, when you first came in to the Ministry of

20  Finance -- which would be in 2000, I guess?

21      A.  2002.

22      Q.  I'm sorry.  2002.  -- approximately how many

23  people worked there?  Approximately.

24      A.  I really would have to -- I mean I would not

25  really want to venture a guess.

                                          Fayyad - 264


1           But I mean I know that the Ministry did not grow

2   that much in terms of numbers since I became Minister of

3   Finance.

4       Q.  So maybe the same number?  2000?

5       A.  Little less.  Maybe -- yes.  A little less.

6       Q.  All right.  How many -- going back to the period,

7   say 2000-2002, do you have an idea about the approximate

8   number of employees of the Palestinian Authority?

9   Approximately.

10      A.  I can provide you with that information.

11      Q.  I'm sorry?

12      A.  I can provide you with that information.

13      Q.  I just would like just an estimate.

14      A.  You know, probably -- probably -- but I could be

15  off -- about 100,000 people.  Maybe.

                        Page 226

Fayyad Depo Transcript.txt

16          Again, it's something I can provide you

17    information on later, if you like.

18        Q.  Okay.

19        A.  But around that time, about 100,000 people, both

20    Civil Service and security 100,000.  But this is both

21    Civil Service and security personnel.

22        Q.  When -- at the time of Yasser Arafat's death --

23        A.  Yes.

24        Q.  -- was there a Ministry of Justice?

25        A.  Yes, there was.

                                              Fayyad - 265


1        Q.  And was there a Ministry of Finance?

2        A.  There was.

3        Q.  Was there any Cabinet positions that have been

4    created since Arafat's death?

5        A.  Real Cabinet?  Just minimally, really.  For

6    example -- minimally, not -- for example, we do have a

7    portfolio --

8        Q.  I'm sorry?

9        A.  -- a portfolio in the Cabinet that's called

10    Administrative Development that was not there before.

11    It's within, you know, Ministry of Planning.  It's

12    Ministry of Planning and Administrative Development.  We

13    have that.

14          I'm just trying to remember if we have any new

15    portfolios.

16          No.  I cannot think of any right now that were

17    added.

18        Q.  Were there any departments, that you know of,

19    that have been created in the government since Arafat's

                              Page 227

Fayyad Depo Transcript.txt

20  death?

21      A.  The effort really has been more in the nature of

22  building up capacity, I think, in existing departments

23  than creating new ones.

24          So, in terms of -- for example -- I mean I can

25  give you examples of what I'm really talking about.

                                              Fayyad - 266


 1      Q.  You don't have to.  I'm just trying to find out

 2  if there's any new departments that were created --

 3      A.  Not beyond what I just told you.

 4      Q.  Okay.

 5          MR. ROCHON:  Did you want to have this

 6  marked?

 7          MR. WISTOW:  Yes.

 8          MR. ROCHON:  Okay.  Let the court reporter

 9  take a second.

10          (Exhibit No. 7 marked for identification.)

11          THE VIDEOGRAPHER:  Going off the record at

12  9:58.

13          (Short recess taken.)

14          THE VIDEOGRAPHER:  Going on record at 10:01.

15      Q.  Okay.  Do you recognize this letter I'm showing

16  you?  It appears to be from Condoleezza Rice to

17  President Abbas.

18          MR. WISTOW:  Is that No. 7?

19          THE COURT REPORTER:  No. 7.

20      Q.  Do you recognize that?

21      A.  I haven't seen it before.

22      Q.  This is the very first time you've ever seen it?

23      A.  Yes.  First time I've seen it.

24      Q.  Have you heard about it before?

Fayyad Depo Transcript.txt
25      A.  I heard that there was, you know, correspondence

                                        Fayyad - 267


  1   and communication between the President and the
  2   Secretary.  But I -- actually, this is the first time I
  3   see the letter.
  4      Q.  Well --
  5      A.  This is January 2007.
  6      Q.  Right.
  7      A.  Yes.
  8      Q.  Didn't the letter have something to do with
  9   taking the new tack?
 10      A.  Well, the letter is from the Secretary to the
 11   President.
 12      Q.  Right.
 13      A.  And it's saying to him -- I read it quickly.
 14      Q.  Well, you don't have to read it quickly.  Read it
 15   slowly.  Read it slowly to yourself.
 16      A.  All right.
 17      Q.  I don't want you to be surprised.
 18      A.  Okay.  Go ahead.
 19      Q.  Well, no.  I want to wait -- do you want to read
 20   it?
 21      A.  Yes.  So can I just basically finish the
 22   sentence, and if --
 23      Q.  Go ahead.
 24      A.  Okay.  What I was going to say, based on this
 25   letter -- which is from Secretary to the President --

                                        Fayyad - 268


  1      Q.  Yes.

Fayyad Depo Transcript.txt

2  A.  -- she is encouraging the President to respond to
3  the legal proceedings in good faith, and in response to
4  a letter which he appears to have sent to her earlier
5  raising concerns about, you know, the effects -- the
6  adverse effects -- financially of those cases on the
7  PA --
8  Q.  Right.
9  A.  -- which I suppose is not that different from the
10  substance of what I tried to do a couple of years
11  before.
12  Q.  Okay.  Well, what we're doing now is you're
13  trying to guess what President Abbas's letter of
14  November 28 says, right?
15  A.  Essentially, yes.
16  Q.  Did you ever see his letter?
17  A.  No.
18  Q.  Did you know he sent one?
19  A.  As I mentioned it to you, I was aware there was
20  communication on this issue between the President and
21  the Secretary.
22      And, you know, I've just seen this letter now.
23  Q.  Right.
24  A.  And it is in response to a letter that was sent
25  to her before.

Fayyad - 269

1  Q.  Right.  Now, when you became aware of the
2  correspondence between President Abbas and Condoleezza
3  Rice, when was that?
4  A.  Probably around the time when I joined the
5  government again, in the spring of 2007.  As I mentioned
6  to you before, that process took a long time to come to

Page 230

Fayyad Depo Transcript.txt

7    fruition.

8        Q.  You joined -- I'm sorry?

9        A.  I joined in March of 2007.

10       Q.  Yes.  Okay.

11       A.  But -- but getting there took a long time.  I

12   mean the process of government-formation took a long

13   time.

14           So ahead of joining the government formally, you

15   know, I started to really familiarize myself with what

16   was going on then.  And this was one area, obviously,

17   that was of great interest.

18       Q.  What?

19       A.  An area of great interest.

20       Q.  Right.

21       A.  And that's around the time I learned of the PA's

22   effort to try to actually find representation, legal

23   representation and all.

24       Q.  Right.  So the -- President Abbas asked you to

25   take charge of this serious matter, correct?

Fayyad - 270


1        A.  I don't know if he really specifically or

2    explicitly asked me.

3            But because I was handling it -- I mean, as

4    Minister of Finance, I mean I'm expecting to be handling

5    it.

6            And when he actually acted in the way he did, he

7    did because the government that was sitting then was not

8    a government that could communicate with the Secretary

9    of State of the United States.

10           So he was doing what the government should be

Page 231

Fayyad Depo Transcript.txt

11  doing at the time, as President, which was something I

12  tried to suggest or say to you before, which is he did

13  what he did only because the government that was sitting

14  at the time was not in position to do the job that the

15  government should do.

16      Whether the Minister of Finance or the Prime

17  Minister, it didn't matter.  But this is, typically --

18  you asked me about what the President did, what the

19  Prime Minister did -- this is typically an issue for the

20  government to handle, not the President.

21  Q.  Right.  But the government was dominated by

22  Hamas?

23  A.  It was all Hamas at the time.  It was a

24  Hamas-only government.

25  Q.  I thought the election was something like 72 out

                                    Fayyad - 271


1  of 134 seats or something.  Am I wrong?

2  A.  That sounds about right.

3  Q.  So that's not all Hamas, is it?  Oh, when you say

4  government, you mean Cabinet?

5  A.  I mean Cabinet.

6  Q.  All right.  So, in this period of time, Hamas has

7  got all the Cabinet seats?

8  A.  Yes.

9  Q.  But Abbas is still the President?

10  A.  Abbas was President, yes.

11  Q.  He's not Hamas?

12  A.  He's not Hamas.

13  Q.  Never was Hamas?

14  A.  He never was Hamas.

15  Q.  Okay.  And so let me see if I've got this

Fayyad Depo Transcript.txt

16    straight.

17         So, apparently, President Abbas -- is he also

18    called Abu Mazen?

19    A.  Yes.  Same person, yes.

20    Q.  Okay.  So do you have a name like that also?

21    A.  No.

22    Q.  No?  Okay.  So, in any rate, President Abbas

23    writes --

24    A.  I'm not known by another name, in other words.

25    Q.  Okay.

                                        Fayyad - 272


1     A.  It's not that -- I'm Abu Zambali, after my eldest

2     son's name.  But I'm not known by it.  I mean so it's

3     not --

4     Q.  So if I wanted to -- what's your oldest son's

5     name?

6     A.  My eldest son's name is Khalid.

7     Q.  Khali?

8     A.  Khalid.

9     Q.  Khale?

10    A.  Khalid.

11    Q.  So you would be Abu Khalid?

12    A.  I would be, but I'm not known by it.

13    Q.  All right.

14    A.  For better or worse I mean.

15    Q.  In any event, it appears that President Abbas

16    wrote to Condoleezza Rice -- it says November 28.  We'll

17    assume it was November 28, 2006.

18    A.  Yes.

19    Q.  We don't really know.

                        Page 233

Fayyad Depo Transcript.txt

20          And in going through the files -- did you go
21  through the files at all at any time?
22      A.  No.
23      Q.  Never.  So where would we expect to find
24  President Abbas's letter?
25          That would be something that wouldn't be tossed

Fayyad - 273

1  out on purpose.  You would expect to find that.  This is
2  a letter from the President of the PA to the Secretary
3  of State of the United States.
4          You'd expect that to be maintained, wouldn't you?
5      A.  Yes.  I would think so.
6      Q.  Yes.  Where would that letter be if you wanted to
7  find it?
8      A.  You know, I really do not know who actually is in
9  charge of the archives of the President's office, or
10  files.  I don't know.
11      Q.  The President would know presumably?
12      A.  I'm not certain.  I mean the President is the
13  President.  I honestly do not know if he is involved in
14  details of management of his own office.
15          I'm not sure he does.
16      Q.  Okay.  In any event --
17      A.  This is something typically his office director
18  would know.
19      Q.  Okay.
20      A.  Yes.
21      Q.  What's the office director's name?
22      A.  Rafiq Husseini.
23      Q.  Husseini?
24      A.  Yes.

Page 234

Fayyad Depo Transcript.txt

25      Q.  All right.

                                              Fayyad - 274


     1            THE WITNESS:  Pardon?

     2            MR. WISTOW:  I ask my co-counsel be

     3   sanctioned and my opposition be sanctioned.

     4            MR. ROCHON:  Just to correct the record, was

     5   your question as to who is in that position now, or

     6   then?

     7            MR. WISTOW:  Yes.  Now.

     8      A.  Oh, I thought the question was then.

     9      Q.  No.  Now.

    10      A.  Now it's not -- it's vacant.

    11      Q.  Vacant?

    12      A.  Vacant, yes.

    13      Q.  So who does the maintenance of his archives?

    14      A.  I honestly do not know.

    15      Q.  Okay.  Somebody's doing it?

    16      A.  No doubt somebody's doing it.  I don't know.

    17      Q.  All right.  Now, let's get back to this.

    18           It was known certainly, certainly in June of

    19   2005, that the Circuit had affirmed the judgment.

    20           Do you remember that's in your letter?

    21      A.  Yes.

    22      Q.  And let me represent to you that certiorari --

    23   that's a technical term.  I'll call it, with your

    24   permission, an appeal -- to the Supreme Court was

    25   denied.

                                              Fayyad - 275


     1            MR. WISTOW:  I want to ask Mr. Rochon's

Fayyad Depo Transcript.txt

 2   permission to use that term.  Technically, obviously,

 3   it's not an appeal.

 4           MR. ROCHON:  Use whatever you want.

 5           MR. WISTOW:  Okay.

 6      Q.  And you know that the appeal to the Supreme Court

 7   was denied.  You know that?

 8      A.  You're telling me.  I don't know.

 9      Q.  You don't know that even today?

10      A.  As I told you, when you asked me about the

11   Supreme Court, I did say that, you know, something like

12   this may have happened.

13           I did not know exact knowledge of it or what the

14   fate of it was.

15      Q.  Okay.  I thought maybe -- you know, you're

16   reading the letter from Condoleezza Rice, that maybe

17   refreshes your recollection.

18      A.  Oh, okay.

19      Q.  Do you see it?

20      A.  Yes.  The US Court of Appeals for the First

21   Circuit affirmed that judgment in 2005.  Because the US

22   Supreme Court has declined to grant further review, the

23   judgment is final.

24           Oh, okay.  Fine.

25      Q.  Does that refresh your recollection?

                                              Fayyad - 276


 1      A.  Not beyond what I just told you.

 2      Q.  Okay.  I'm not sure I understand.

 3           Do you now remember that there was an attempt

 4   made to go to the US Supreme Court that was declined, or

 5   you don't remember?

 6      A.  What I remember is that -- you know, I'm aware

                              Page 236

Fayyad Depo Transcript.txt

 7    that, you know, the issue came up.
 8           Now whether actually it was filed with the
 9    Supreme Court and what the Supreme Court did is not
10    something I knew.  But there was discussion of it.
11       Q.  So you never found out what happened?
12       A.  No.  I never found out.
13       Q.  All right.  Fair enough?
14       A.  This is the first time I see this letter anyway.
15       Q.  Okay.  Well, I mean do you agree there's other
16    ways to find out about the Supreme Court result other
17    than the letter?
18       A.  I mean it's knowable.
19       Q.  It's knowable?
20       A.  Yes, it's knowable.
21       Q.  But you didn't know it?
22       A.  As I said, I was just aware that there was
23    discussion of it.  What actually happened and what the
24    fate of it was is not something I knew at the time.
25       Q.  Okay.  You had previously, when you wrote in

                                        Fayyad - 277


 1    June, described to Ms. Rice --
 2       A.  June 2005.
 3       Q.  June 2005, which was, you know, roughly a year
 4    and a half before this letter, right?
 5       A.  Yes.  Yes.
 6       Q.  You knew, in 2005, that this was -- I'll use the
 7    colloquial expression -- big deal, these judgments?
 8       A.  Yes.
 9       Q.  Okay.  Now, apparently, we don't have President
10    Abbas's letter, but, apparently, he was looking for some
                        Page 237

Fayyad Depo Transcript.txt

11   kind of help from Condoleezza Rice with regard to this

12   judgment.

13       Is that -- would you assume that?

14   A.  Yes.  Basically -- I mean I have no way of

15   telling for sure.

16       But, you know, the fact is that this letter

17   acknowledges about the matter.  But precisely what the

18   President was asking for is not really self-evident from

19   the letter before me.

20   Q.  Right.  But, presumably, he's looking for some

21   kind of help of some sort?

22   A.  Yes.  That was not out of the ordinary.

23   Q.  I'm not suggesting there's anything wrong with

24   it.

25   A.  If that's what he was asking for, yes.

Fayyad - 278


1    Q.  Now, Condoleezza Rice writes back.  And she

2    says -- she gives the history of what happened --

3    A.  Yes.

4    Q.  -- in the second paragraph.

5        And she says that, The judgment is final and

6    enforceable in the United States courts against property

7    or interests owned by the PA, PLO or Hamas.

8        Right?

9    A.  That's what the letter says.

10   Q.  That's what she says?

11   A.  Yes.  That's what it says.

12   Q.  All right.  Then she goes on to say that she,

13   Encourages you -- I guess President Abbas -- as I would

14   any government, to respond to US legal proceedings in

15   good faith and in timely manner.

Page 238

Fayyad Depo Transcript.txt

16          Yes?  Have I read that correctly?

17     A.  You did.

18     Q.  Okay.  How much -- how long after this letter

19  were you first aware that the Ungar case was still

20  alive -- strike alive.

21          How long after the date of this letter were you

22  first asked by President Abbas to do something about the

23  Ungar case?

24     A.  I was not -- I don't recall being asked

25  specifically by President Abbas to do this.  This is

                                        Fayyad - 279


 1  November 2006, and --

 2     Q.  No, no.  I'm talking about January 12, 2007.

 3     A.  Oh, yes.  January 12, 2007.

 4     Q.  So how long after that -- you joined the

 5  government about six weeks later, right?

 6     A.  March 2007 -- a few weeks later.

 7     Q.  About six weeks?

 8     A.  Yes.  Yes.

 9     Q.  So do you learn from President Abbas that he got

10  a letter from Condoleezza Rice?

11     A.  I don't recall having been told about that by the

12  President, no.  Nor -- nor do I recall him specifically

13  instructing me or tasking me with following up on these

14  cases.

15          But I do remember, you know, telling him that I

16  was going to be doing it, for sure.

17     Q.  Okay.  So you -- sorry.  Forgive me.  I didn't

18  mean to interrupt.

19     A.  Yes, for sure, because I mean, in a formal way,

                              Page 239

Fayyad Depo Transcript.txt

20    as a matter of fact, I led the effort to actually get

21    the process on the track it is today --

22    Q.  Right.

23    A.  -- in the context of a visit I made to Washington

24    I remember, in April of that year, 2007.

25         So yes, I must have known enough about the need

Fayyad - 280


1    to go in a certain direction.  And, you know, typically,

2    in cases like this, I would tell the President what I

3    was going to be doing in the United States and, you

4    know, this was definitely on the agenda.

5         It was not the only thing I did.  It was part of

6    what I did.

7    Q.  I know you're a very busy man.  I'm not being

8    sarcastic.  I know you did many many other things.

9         But it was in the spring of 2007, you testified,

10    that you first got back into this Ungar case?

11    A.  That is correct, yes.

12    Q.  So -- and we can't give a precise date?

13    A.  During that narrow window.  I guess January to

14    March sometime.

15    Q.  Okay.  That's fair enough.

16    A.  Yes.

17    Q.  So you've been testifying, at various times,

18    about custom and usage and what you would expect --

19    A.  Yes.

20    Q.  -- would happen.

21         If President Abbas had gotten a letter from

22    Condoleezza Rice saying that the Ungar case is final and

23    unenforceable -- final -- the judgment -- let me start

24    over.

Page 240

Fayyad Depo Transcript.txt
25          The judgment in the Ungar case is final and

Fayyad - 281


1   enforceable in United States courts against property or
2   interests of PA or PLO, you would expect he would have
3   told you about that letter, wouldn't you?
4       A.  Yes.  I wasn't there when he got that letter.
5       Q.  No, no.  I understand that.  But you were there
6   like six weeks later?
7       A.  Yes.
8       Q.  And you were talking to him?
9           MR. ROCHON:  Just for the record, make it
10  eight weeks, January 12 to mid-March, by my calculation.
11          MR. WISTOW:  Okay.  Fair enough.
12      Q.  You were there about eight weeks later?
13      A.  All right.
14      Q.  Okay.  And so you spoke with him in that period
15  you told me, January to March --
16      A.  Yes.
17      Q.  -- about the Ungar case?
18      A.  Yes.
19      Q.  Okay.  And something's got to be done, right?
20      A.  Yes.
21      Q.  So you'd expect he would have told you, in that
22  conversation, of the letter from Condoleezza Rice,
23  because basically she said, I can't help, right?
24          MR. ROCHON:  Objection.  Calls for
25  speculation.  You can answer.

Fayyad - 282


1           MR. WISTOW:  It's not speculation when he
Page 241

Fayyad Depo Transcript.txt

2  tells me what the custom and usage is.  But when I

3  ask what it is --

4          MR. ROCHON:  If you want to argue for the

5  Judge, that means I'm going to have objections.

6          MR. WISTOW:  Okay.  Fair point.  I'll

7  withdraw.

8          MR. ROCHON:  Mr. Prime Minister, you can

9  answer the question.

10    A.  Okay.

11    Q.  Okay.  You would expect that a letter from the

12  Secretary of State dealing with the case you're about to

13  get involved in, where, effectively, she says, We can't

14  do anything -- the Secretary of State can't do

15  anything -- you would expect that he would tell you

16  about that, wouldn't you?

17    A.  You know, all of this, what this tells me really,

18  in terms of trying to piece it together as best as I

19  can --

20    Q.  I'm sorry?

21    A.  As I try to piece it together as best as I can --

22    Q.  Yes?

23    A.  -- all this tells me is that this was a matter

24  that was definitely in discussion at the President's

25  level around the time of this already, and even before.

Fayyad - 283

1          What I testified to before, and I repeat now, is

2  that I'm aware, based on my subsequent involvement in

3  this case, that the PA was making a serious effort

4  trying to identify an adequately suitable legal

5  representation in the United States before January of

6  2007.  I know this.

Page 242

Fayyad Depo Transcript.txt

```
 7     Q.  Oh, good.  Okay.

 8     A.  I know that to be the case.  I testified to that,

 9  and I repeat it now.

10     Q.  So that's --

11     A.  -- in 2006.

12     Q.  -- in 2006.  Unsuccessfully.

13     A.  Unsuccessfully, as I mentioned before.

14     Q.  Okay.  And if I wanted to get the details about

15  those efforts, who would I depose?

16          MR. ROCHON:  Objection.  Asked and answered.

17     Q.  If you know.

18          MR. ROCHON:  You've asked before.

19          MR. WISTOW:  I know.

20     A.  You know, the only person I know who, as a matter

21  of fact, was involved in this -- I mean probably had

22  people also help him -- was the director of the

23  President's office at the time.

24     Q.  Was that Husseini?

25     A.  Husseini.  Yes.
```

                                            Fayyad - 284


```
 1     Q.  Okay.  So, if I understand what we're saying

 2  here, you believe that you were told about Condoleezza

 3  Rice's response to the letter of President Abbas, or you

 4  were not?

 5          Which do you believe?

 6     A.  You know, in the course of many discussions on

 7  this issue over time, it's really hard for me now to

 8  tell you what happened when and which happened before

 9  which.

10          I became aware of the President's involvement in
```

                              Page 243

Fayyad Depo Transcript.txt

11   the sense of communications with the Secretary of State

12   of the United States, Condoleezza Rice, on this matter.

13        Q.  When?

14        A.  But I really cannot tell you.  I don't know.  I

15   don't remember.

16        Q.  He had heard back from the Secretary of State

17   apparently on or about January 12, okay?

18        A.  Okay.

19        Q.  So early on in your involvement with Ungar, you

20   had this discussion?

21        A.  No, no.  What I'm saying is that -- I'm sorry if

22   I was not really clear.  Let me clarify.

23        I meant to say that there were numerous

24   discussions on this case over an extended period of

25   time.  Part of that period, I was not in government.

                                         Fayyad - 285


 1   It's true.

 2        Q.  You were what?

 3        A.  Part of this period, you know, I was not in

 4   government.

 5        Q.  Okay.  That's the period.

 6        A.  Nevertheless -- yes.  Nevertheless, there was

 7   constantly discussion of that.

 8        Now, subsequently, I can tell you, for example,

 9   in more recent periods, since, you know, the filing of a

10   motion to vacate, there were several discussions with

11   our lawyers on this.

12        So I can't tell you now, with all of these

13   events, what happened when, to be honest with you, in

14   terms of when it is that I became aware precisely that

15   there was this communication between the President and

Fayyad Depo Transcript.txt

16  the Secretary.

17      Q.  Okay.  You were out of government --

18      A.  Yes.

19      Q.  -- from mid-December?

20      A.  A little before that.

21      Q.  Well, 12-12.  That's what we agreed.

22          MR. ROCHON:  No, no, you didn't.  He said

23  December 5.

24          MR. WISTOW:  Okay.  Sorry.  You're right.

25  Absolutely right.

                                        Fayyad - 286


 1      Q.  December 5?

 2      A.  Yes.

 3      Q.  Okay.  So you were out of government from

 4  December 5, 2005 to when?

 5      A.  March 2007.

 6      Q.  Okay.  And during that whole period, you were

 7  with the Palestinian Legislative Council?

 8      A.  I was in the government.  I mean I was not a

 9  minister.  I was not a Cabinet officer.

10      Q.  Okay.  But you were in the Palestinian

11  Legislative Council?

12      A.  I was a member.  And, technically, I still am

13  today.

14      Q.  Okay.  Fine.

15      A.  Yes.

16      Q.  So we know that -- what you've just said is, even

17  when you were in the Palestinian Legislative Council --

18      A.  Yes.

19      Q.  -- you were talking to somebody about the Ungar

Fayyad Depo Transcript.txt

20  case?

21      A.  I didn't say I was during that period.  No, I

22  didn't.

23      Q.  I thought you, said even when you were out of

24  government, you had these discussions?

25      A.  No.  I said these discussions were taking place.

                                            Fayyad - 287


1   I didn't say I was having the discussions.

2       Q.  I see.

3       A.  I said these discussions were taking place,

4   obviously, as evidenced by the fact of what I knew

5   subsequently --

6       Q.  Okay.

7       A.  -- of the President's office's involvement in

8   trying to find legal representation, which reflects to

9   me, which suggests to me -- or suggested to me then --

10  that it was being discussed before the letter that the

11  Secretary wrote to the President.

12          I mean, the PA was in the process of trying to

13  find legal representation in earnest in 2006 --

14      Q.  Right.

15      A.  -- and this clearly pre-dates the letter of the

16  Secretary.

17      Q.  Were you in the --

18      A.  You know, it may be, therefore, you know -- I

19  mean I do not know.  I really cannot tell.

20          It may be that the letter that the President sent

21  included reference to the efforts on the part of PA to

22  find lawyers.

23      Q.  You just don't know?

24      A.  I don't know.

                                Page 246

Fayyad Depo Transcript.txt

25    Q.  Okay.  When you were in the Legislative

Fayyad - 288


1  Council -- by the way, what is that Legislative Council?

2    A.  That's another term for Parliament, if you will.

3    Q.  Parliament?

4    A.  Yes.

5    Q.  When you were in that group, were you on the

6  Economics Committee?

7    A.  I was head of the Budget Committee.

8    Q.  Budget Committee?

9    A.  I may have also been on the Economic Committee.

10  I've forgotten.

11    Q.  So was part of your job on the Budget Committee

12  to know how much money is coming in and how much is

13  going out and what's owed?

14    A.  Except that, during that period, there was a

15  boycott of the PA, and the public finance system pretty

16  much broke down, with no capacity for the government of

17  the Palestinian Authority to deal with the banking

18  system.

19      So reporting capabilities of the Palestinian

20  Authority -- and specifically of the Ministry of

21  Finance -- were substantially impaired.

22      So during that time period, there was not really

23  a lot of flow of information in terms of what's coming

24  in and going out.  And that's a fact.

25    Q.  So you performed no duties on the committee?

Fayyad - 289


1    A.  Some.  We tried.  We kept asking for information.

Fayyad Depo Transcript.txt

2 We were sort of opposition at the time. We were asking

3 government for information in terms of what was going

4 on. Government was not forthcoming with information.

5 At least in part, they couldn't.

6      It took a long time, but we did have some

7 sessions.

8    Q. So Hamas was not giving you the kind of data you

9 wanted? Is that what you're saying?

10    A. You know, the whole system broke down. I mean

11 this was a period of serious commotion within the PA

12 politically. There was a serious breakdown.

13      The council that you referred to, the PNC -- or

14 the Legislative Council, if you will -- was not really

15 that functional. I mean it didn't really meet as often

16 as it should have. Its committees were not that

17 functional.

18      It was very difficult to operate.

19    Q. Did you threaten to resign in March of 2009?

20    A. March of 2009. As Prime Minister?

21    Q. Yes.

22    A. I mean I did. It's not that I tried to. I

23 actually submitted a resignation.

24    Q. That was because you were attempting to form the

25 unity government?

                                   Fayyad - 290


1    A. Well, to give way to the effort.

2      I mean basically to indicate that, you know, that

3 the time has come for a different kind of government if

4 there was going to be -- the hope was -- success in the

5 effort of achieving reconciliation, which would have

6 required, obviously, the formation of a different kind

Page 248

Fayyad Depo Transcript.txt

 7  of government.

 8      Q.  A unity government, I think.  Is that fair?  No?

 9      A.  A government reflecting, you know, post-

10  reconciliation essentially.

11      Q.  A government including Hamas?

12      A.  Not necessarily.

13          I mean a government can govern in the Palestinian

14  Authority that is made up of independents without one's

15  affiliation whatsoever, Hamas or Fatah or any other

16  party.

17          It's not a requirement.

18      Q.  The New York Times reported something -- that

19  doesn't mean it's true.  I'll just read you --

20      A.  If the New York Times reported it, it must be

21  true.

22      Q.  Well, not necessarily.  So you can tell me if

23  it's not.

24      A.  Okay.

25      Q.  This was on March 7, 2009.

                                        Fayyad - 291


 1          Jerusalem.  Salam Fayyad, the Prime Minister of

 2  the western-backed Palestinian Authority, on Saturday

 3  submitted his government's resignation, saying he hoped

 4  that it would help efforts to form a Palestinian unity

 5  government with the Islamic group Hamas.

 6      A.  That's phraseology.  But, basically, I don't

 7  remember using, you know, those terms, but -- in this

 8  way -- but, basically, the substance of it -- the

 9  substance --

10      Q.  What?

                        Page 249

Fayyad Depo Transcript.txt

11    A.  -- the substance of it is, if there was

12    reconciliation, there was going to be a new government

13    now -- call it unity government, consensus government.

14         Whatever it was, it did not have to be a

15    factional government.  It never had to be a factional

16    government.  It doesn't have to be a factional

17    government today.

18    Q.  It quotes you as saying that, He hoped that it

19    would help efforts to form a Palestinian unity

20    government with the Islamic group Hamas.

21         You don't think you said that?

22    A.  I don't remember, you know, exactly what I said

23    then.

24    Q.  Okay.

25    A.  But what I can tell you is that this was -- there

Fayyad - 292

1    was some kind of announcement that was supposed to be a

2    decisive session in the process of dialogue between the

3    factions, with high expectation that it was going to be

4    concluded within a month or something like that.

5         To indicate willingness, readiness, to really get

6    out of the way in a manner that would not be perceived

7    as getting in the way of that happening, I tendered a

8    resignation to basically -- and there is a letter on

9    this, and I can make it available to the Court.

10        I mean to you.  Sorry.

11    Q.  Would you do that, through counsel?

12    A.  I have no problem.

13             MR. WISTOW:  Can I get it, say within two

14    weeks?

15             MR. ROCHON:  Why don't you ask me the

Fayyad Depo Transcript.txt

16    questions, but not on the record.  He's not going to

17    answer that question for you.

18                    MR. WISTOW:  Okay.

19                    THE WITNESS:  Well, whatever.

20                    THE VIDEOGRAPHER:  Excuse me.  I'd like to

21    change the tape.  Going off record at 10:28.

22                    (Short recess taken.)

23                    THE VIDEOGRAPHER:  Going on record at 10:29.

24      Q.  The letter from Condoleezza Rice to President

25    Abbas says, When judgement is entered, it is also

                                              Fayyad - 293


1    possible to meet with the opposing side to explore

2    adequate solutions so as to avoid enforcement actions.

3          The office of the legal advisor of the Department

4    is willing to make its good offices available to

5    facilitate such meetings.

6          Did you ever learn that Condoleezza Rice was

7    offering her "good offices"?  Did you ever learn that?

8      A.  No.  As I mentioned, I really --

9      Q.  I'm sorry?

10     A.  As I mentioned before, I'm aware there was, you

11    know, communication.  But I was not really -- I didn't

12    know what the substance of it was about.

13     Q.  No.  I'm not talking about the letter.

14          I'm talking about, did you ever learn, from any

15    source in any way, that Condoleezza Rice had offered the

16    office of the legal advisor of the Department of State

17    to help try to resolve the matter.

18          Did you ever learn that?

19     A.  No.

                            Page 251

Fayyad Depo Transcript.txt

20      Q.  Okay.

21      A.  I don't remember this specifically being said to

22   me, or mentioned.

23      Q.  Okay.  That's fine.  I accept it.

24          Then it says, Additionally, the attorneys

25   representing the PIF -- representing the PIF --

Fayyad - 294


1       A.  Yes.

2       Q.  -- may contact the office of the legal advisor to

3   discuss the pending procedures.

4           Do you know if that was ever conveyed to them?

5       A.  I don't know.

6       Q.  Okay.  Now, I think we agreed earlier that you

7   had first learned of the Ungar case in 2003-2004?

8       A.  I don't know about 2003.

9       Q.  But certainly by 2004, right?

10      A.  I mean -- I mean I suppose really the thing that

11   I would say on this is, when there was a judgment

12   against us, it became known to me that there was --

13      Q.  So you learned about the judgment right away?

14      A.  Pretty much, yes.

15      Q.  Okay.  On page 24 of your deposition that was

16   taken on March 9, 2010 --

17          MR. ROCHON:  Are you going to show him a

18   copy?

19          MR. WISTOW:  Yes.  I thought by now he'd

20   figured out I wouldn't make it up.

21          MR. ROCHON:  No.  My goal isn't that I don't

22   trust you.  I want the witness to see the words before

23   he answers.  That's all.

24          MR. WISTOW:  Okay.

Fayyad Depo Transcript.txt

25    Q.  Take a look at the --

Fayyad - 295


1            MR. WISTOW:  Actually, the way I think it's
2    more often done is the lawyer reads it.  But that's
3    okay.
4    Q.  Do you see that?
5    A.  Yes.  I'm answering in this way.  I do not recall
6    precisely when I became aware of this particular case.
7            All I can tell you --
8    Q.  This particular case is the Saperstein case,
9    right?
10   A.  All I can tell you is that, maybe 2003, 2004, it
11   came to my knowledge that there were cases --
12   Q.  Wait.  You're going too fast and I can't
13   understand you.  And I don't think the stenographer can.
14           MR. ROCHON:  She seems to be doing all
15   right.
16   A.  I repeat.  I do not recall precisely when I
17   became aware of this particular case.
18           All I can tell you is that, maybe 2003, 2004, it
19   came to my knowledge that there were cases -- at least
20   one against -- one case I remember at this time -- that
21   was pending against us in the United States, and that
22   was being handled by lawyers.
23           And, at that time, the defense attitude was to
24   assert sovereign immunity.
25   Q.  I didn't hear you mention the name of the case.

Fayyad - 296


1    A.  It's not mentioned here.  It's not written here.
                    Page 253

Fayyad Depo Transcript.txt

2      Q.  Can I see this, please?

3      A.  Yes (indicating).

4      Q.  Do you know what case that was?

5      A.  I mean the position -- I give the position in the

6   Saperstein case.

7      Q.  Now, did you read this answer?

8      A.  I just did.

9      Q.  Didn't you say it doesn't have the name of the

10  case?

11     A.  Let's see.

12     Q.  (Indicating).

13              (Witness peruses document.)

14     A.  I do not precisely --

15     Q.  Take a look at the very end of the answer.

16     A.  Oh, the end.  I haven't read through enough of

17  that.

18              MR. ROCHON:  You interrupted him before he

19  finished it.

20     A.  Why don't you read it to yourself, in that case.

21     Q.  Okay.  I'm happy to do that.

22     A.  I mean I was stopped while mid-sentence.  And

23  then up until the point there was reference to this

24  case --

25     Q.  Shame on me.  I apologize.  No fault of yours.

                                        Fayyad - 297


1   Let's try it the way we normally do it in our

2   jurisdiction.

3      A.  Okay.

4      Q.  You were asked the following question --

5      A.  Okay.  Good.

6      Q.  Can you tell me what year it was that you first

Fayyad Depo Transcript.txt

7   learned about the Saperstein case?

8        Answer.  I do not recall precisely when I became

9   aware of this particular case.  All I can tell you is

10  that, maybe 2003, 2004, it came to my knowledge that

11  there were cases -- at least one case I can remember at

12  this time -- that was pending against us in the United

13  States and that was being handled by lawyers.

14       And at the time that the defense attitude was to

15  assert sovereign immunity, and there was not really much

16  attention paid to that.  The case I'm referring to is

17  the Ungar case.

18      A.  Okay.

19      Q.  Okay.  And -- here.  Just take a look

20  (indicating).

21      A.  Yes.  That's an accurate reading of what it says

22  here.  And that, I believe, I just testified before

23  reading it.

24      Q.  Okay.  Now, in 2003-2004, we already know you

25  were the Finance Minister?

                                        Fayyad - 298


1            MR. ROCHON:  Objection.  You had two dates

2   in there.

3            MR. WISTOW:  In those two years, 2003 and

4   2004.

5       A.  No.  I was --

6       Q.  -- for the entire period, the Finance Minister.

7       A.  I was Finance Minister beginning June 2003

8   through early December 2005.

9       Q.  So that means --

10      A.  Inclusive of those three years, yes.

Page 255

Fayyad Depo Transcript.txt

11    Q.  Now, you specifically hired lawyers to defend

12  Israeli terrorist cases, did you not?

13    A.  Are you talking about the case that we're talking

14  about today?

15    Q.  No, no.  Israeli terrorist cases.  The PA and PLO

16  were sued in Israeli courts?

17    A.  Yes.  Of course.

18    Q.  Sued in Israeli courts?

19    A.  Yes.

20    Q.  Okay.  And were those considered domestic cases?

21    A.  No.

22    Q.  No.  Very far from it, correct?

23    A.  I explicitly --

24    Q.  Withdraw that.  They were not domestic cases.

25    A.  I explicitly cited cases in Israel and the United

Fayyad - 299


1  States as cases the PA was involved in internationally.

2        That's what I said in earlier testimony.

3    Q.  Right.  Right.  So you consider Israeli cases to

4  be international?

5    A.  Yes.

6    Q.  And you consider American cases to be

7  international?

8    A.  Yes.

9    Q.  And you were involved personally --

10    A.  Yes.

11    Q.  -- in selecting counsel in the Israeli terrorist

12  cases because they were international, correct?

13    A.  Because the case was -- or the cases were --

14  important at the time.

15    Q.  Okay.  Fair enough.

Page 256

Fayyad Depo Transcript.txt

16    A.  Yes.

17    Q.  They were important?

18    A.  As I told you, the matter just evolved in an

19  evolving Palestinian Authority.  And it was important --

20  I was the one that actually retained the Israeli

21  lawyers.

22    Q.  Because these were important cases?

23    A.  Very important, yes.

24    Q.  So you actually were involved in the decision --

25  you actually decided --

Fayyad - 300


1    A.  I was the one that selected the lawyers, yes.

2    Q.  And you were the one who signed the

3  power-of-attorney?

4    A.  I did, probably.  Yes.

5    Q.  Okay.  Well, do you know what I'm referring to

6  when I say power-of-attorney?

7    A.  Yes.

8    Q.  Okay.  Could you explain what you understand?

9    A.  I mean it's delegation of authority to represent

10  us, if that's what you --

11    Q.  That was the Carmeli and Arnon law offices?

12    A.  That's correct.

13    Q.  When did you first hire lawyers at Carmeli and

14  Arnon to defend Israeli terrorist cases?

15    A.  You know, this must have happened either in late

16  2002 or early 2003.  I can't -- I don't remember for

17  sure, but I can look it up.

18    Q.  You can look it up?

19    A.  Yes.

Fayyad Depo Transcript.txt

20    Q.  Okay.  Is this your signature (indicating)?

21            MR. ROCHON:  Are you having that document

22    marked.

23            MR. WISTOW:  Yes.  Well, I'm not going to

24    mark that one.  Let me get that one back.

25            You know what I've managed to do?  I only

                                              Fayyad - 301


 1    have one copy of the Hebrew, which I made at home, so I

 2    used scrap paper on the back.

 3            It is attached?  I'll find it.  Forgive me.

 4    You're right.

 5            I'm going to mark the document, the

 6    power-of-attorney, along with an English translation

 7    from the Hebrew.  So can we mark that.

 8            (Exhibit No. 8 marked for identification.)

 9            (Off-the-record discussion.)

10            MR. ROCHON:  We have enough (indicating).

11    Fine.

12            MR. WISTOW:  Okay.

13    Q.  Can you go to the Hebrew document, which is the

14    very last page.

15    A.  Yes.

16    Q.  Does that appear to be your signature?

17    A.  It appears to be, yes.

18    Q.  Okay.  You recognize it as your signature, don't

19    you?

20    A.  Looks like my signature, yes.

21    Q.  Okay.  And can you read the date?

22    A.  24 February 2003.

23    Q.  Okay.

24    A.  And I -- and this is the power-of-attorney, I

Fayyad Depo Transcript.txt

25    told you, latter part of 2002, early 2003, that appears

                                          Fayyad - 302


1    to have been --
2        Q.  Right.  I'm not challenging you.  I just --
3        A.  I'm just doing this from recollection.
4        Q.  Right.  Right.  And whether or not there was an
5    earlier power-of-attorney or not, we don't know.
6            But certainly by February 24, 2003, you were
7    hiring Carmeli and Arnon law offices on these terrorist
8    cases, yes?
9        A.  As I mentioned to you.  But this is something
10   that came to my attention early on after I became
11   Finance Minister.
12           I had a lot of things to worry about, seriously.
13   This was one of them.  And I decided --
14       Q.  As you testified earlier, because it was
15   important?
16       A.  It was very important.
17       Q.  All right.
18       A.  I assume this is the power-of-attorney that
19   you're talking about?  Is that what it is?
20   Power-of-attorney.
21       Q.  I'm going to tell you that I don't read Hebrew.
22       A.  I don't either.  So that's why I'm asking.  If it
23   is the power-of-attorney, then yes.
24       Q.  All I can tell you is that we have had it
25   translated, and it seems to be a power-of-attorney.  But

                                          Fayyad - 303


1    don't rely on me.

                        Page 259

Fayyad Depo Transcript.txt

2       Do you often sign documents that you don't know

3   what they mean?

4       A.  I have people who actually read them for me and

5   tell me what they're about, for sure.

6       Q.  Okay.  Is there any doubt that you hired Carmeli

7   and Arnon?

8       A.  No.

9       Q.  And you know that, under the Israeli practice,

10  the client has to sign powers-of-attorney?

11      A.  I mean I do what I am told by lawyers when

12  they're pursuing due process.  And they know what the

13  law is and they know what the requirement are.

14          They come to me and say, You're required to do

15  this, and I do it.

16      Q.  All right.  But I'm asking if you recollect that

17  you did this many many times.

18      A.  Well, I can tell you, in cases like this, given

19  what I do, I rely on advice of counsel.  I mean they're

20  hired to really help me out.

21          They come to me.  I say, These papers we have to

22  sign today in order to do these tasks.  And, you know, I

23  have people read them for me say this is what they are,

24  and I sign.

25      Q.  You don't sign them without knowing what they

                                        Fayyad - 304


1   are?

2       A.  Oh, no.  I never sign without --

3       Q.  Okay.  So all I'm asking you is, do you remember

4   signing many powers-of-attorney.

5       A.  I don't know how many is many.  But I do remember

6   signing quite a few papers, you know, in connection with

                                Page 260

Fayyad Depo Transcript.txt

 7    legal proceedings in Israel.

 8        Q.  Okay.  More than one power-of-attorney?

 9        A.  I've signed more than one document, I believe.

10        Q.  You indicated that these terrorist cases in

11    Israel were important cases to you, right?

12        A.  Yes.  Definitely.

13        Q.  Approximately how many were there that you signed

14    powers-of-attorney for?

15        A.  You know, maybe tens of them.  There were tens of

16    those cases.

17        Q.  Tens meaning like 40, 50, 60?

18        A.  Maybe in that range.  In that range.

19        Q.  Maybe more?

20        A.  In that range, 40, 50.  Something like that.

21        Q.  Okay.  Now, I want to show you a document that

22    was filed by your lawyers -- your current lawyers --

23        A.  Yes.

24        Q.  -- in the Federal Court in support of the motion

25    to vacate (indicating).

                                            Fayyad - 305


 1            I'm sorry.  Forgive me.  I'm getting a little

 2    groggy.  It's Exhibit C to the original motions.

 3                (Exhibit No. 9 marked for identification.)

 4                MR. ROCHON:  Thank you.

 5        Q.  Did you know that your lawyers filed this in the

 6    Federal Court?

 7                (Witness peruses document.)

 8        A.  They may have.

 9        Q.  I know they may have.  I know they did.  I

10    represent they did.

                        Page 261

Fayyad Depo Transcript.txt

11          I'm asking you if you know -- if you knew they

12     did.

13        A.  I don't know if I remember, you know, that they

14     did.  But I know that they were active representing us,

15     and this is something that they may have done.

16        Q.  Okay.  So you don't know if you knew or not?  You

17     may have known or not.

18        A.  I cannot tell you that I did not know when it

19     happened, but I don't really remember now exactly what

20     happened when.

21        Q.  Okay.  I'm going to represent to you -- what I

22     mean by that is I'm going to give you my word --

23        A.  Okay.

24        Q.  -- that your lawyers filed this for Judge Lagueux

25     to read.

                                              Fayyad - 306


1         A.  Okay.

2         Q.  Now, go to the second paragraph.

3         A.  Yes.

4         Q.  Actually.  I'm sorry.  Go to the first paragraph,

5      which is Paris.

6              And it says, 87 countries and international

7      organizations pledged 7.4 billion in aid to the

8      Palestinians on Monday, in the most ambitious

9      fund-raising effort in more than a decade, to help

10     Palestinians create a viable peaceful and secure state

11     of their own.

12             Now, does that refresh your recollection that

13     that's what -- something that happened?

14        A.  Oh, yes.

15        Q.  Okay.  And the pledge of the 7.4 billion was

Fayyad Depo Transcript.txt

16  against a budgetary plan that you submitted, is that
17  right?
18      A.  That's correct.
19      Q.  And you were only asking, for the three-year
20  period, for $5.6 billion, is that true?
21      A.  I knew that the pledge was I mean an over-
22  subscription to what we had asked for.  Yes.  I mean the
23  7.4 billion.
24      Q.  Read the next paragraph.
25      A.  Okay.

                                        Fayyad - 307


 1      Q.  Read the next paragraph.
 2          (Witness peruses document.)
 3      A.  Yes.  That sounds right.
 4      Q.  That sounds right, being that you asked for
 5  5.6 billion?
 6      A.  Yes.
 7      Q.  So you got pledges of roughly 1.8 billion more
 8  than you asked for to take care of the budget?
 9      A.  In terms of pledge, yes.
10      Q.  By the way, I understand not all pledges are
11  fulfilled.
12      A.  That's the difference between a pledge and --
13      Q.  I notice it says, Many countries -- looking at
14  the second-to-the-bottom paragraph, it says, Many
15  countries do not fulfill pledges that they make at such
16  conferences.
17          Egypt and other Arab countries are known for
18  pledging funds to the Palestinian Authority that they do
19  not deliver.

                        Page 263

Fayyad_Depo Transcript.txt

20      Is that true?

21      A.  It is always the case -- almost always the

22  case -- that there is a difference between that which is

23  pledged and that which is actually disbursed.

24      Q.  Right.

25      A.  And, you know, we Palestinians do not have a

                                    Fayyad - 308


1  corner on that.  Our case is just typical.

2          So, yes.  It's not unique.  It happens.  This is

3  the way it usually happens --

4      Q.  I'm just asking you if you agree --

5      A.  -- for a variety of reasons.

6      Q.  I'm asking if you agree with the statement that,

7  Egypt and other Arab countries are known for pledging

8  funds --

9      A.  I wouldn't really state it this way.

10     Q.  You wouldn't?

11     A.  No.

12     Q.  Do you disagree with it?

13     A.  Yes, because it's not -- this is what?  2007?

14 Yes.  This December 18, 2007.

15         We'd have to go back to the record, and I do not

16 know if it would be fair to state it in the way it is

17 stated here -- are known to not fulfill -- I just -- I

18 wouldn't say that.

19     Q.  All right.

20     A.  From time to time, this happens in actual

21 performance relative to a pledge made by a donor

22 country.  And not only in the case of Palestine.  Others

23 as well.

24     Q.  Okay.  Now, you're currently not only the Prime

                              Page 264

Fayyad Depo Transcript.txt

25    Minister, but the Minister of Finance?

Fayyad - 309


 1    A.  Yes.

 2    Q.  So you're the immediate head of the Ministry of

 3   Finance, is that right?

 4    A.  Yes.

 5    Q.  Okay.  And I guess you guys -- strike that.  I'm

 6   being too informal.

 7        I guess the Ministry of Finance puts out

 8   quarterly reports?

 9    A.  It does.

10    Q.  Right.  And it also puts out reviews of annual

11   performance?

12    A.  It does.

13    Q.  So do you know when the last time -- when -- do

14   you know if there was a review of the 2009 performance?

15    A.  Oh, yes.

16    Q.  Okay.  When was that published?

17    A.  On our web site, probably you'll find it in the

18   first quarter of this year.

19        When we say published, it basically -- the

20   reference is made to dissemination on our web site.

21    Q.  That's what I mean by published.

22    A.  Right.

23    Q.  Okay.  So did you review it before it went out?

24    A.  I tend to -- I mean I had tended to do so more,

25   you know, when we had started to do this than I do it

Fayyad - 310


 1   right now.

Fayyad Depo Transcript.txt

2          I do not spend as much time on it as I used to

3    before.

4       Q.  That's not what I'm asking you.

5       A.  I'm really trying to give you a sense of the

6    extent to which I'm involved in this.  I'm much less

7    involved in this these days than I used to be.

8       Q.  Right.

9       A.  Which means I do not read them as carefully --

10      Q.  Do you read them?

11      A.  -- these days, before they're published, as I did

12   in earlier days.

13      Q.  Do you read them?

14      A.  Oh, yes.  I do.

15      Q.  Do you think you read the one in March?

16      A.  As I said, I do, you know, read our reports

17   before they're actually put out.  I used to, as a matter

18   of fact, clear them before they are disseminated.

19          But as I started to gain confidence in the

20   capacity of staff and integrity of the system, I

21   basically felt, so far as monthly reports are concerned,

22   without prior authorization, they could be published

23   without me really clearing them for publication.

24          And similarly, of course, the quarterly reports.

25   So I don't really clear them beforehand.

                                          Fayyad - 311


1       Q.  I didn't ask you --

2       A.  Now, two or three weeks later, I may leaf through

3    them and I read something.  But, certainly, annual

4    reviews, I will.

5       Q.  Okay.  You do read the annual reports?

6       A.  Yes, because that comes in the context of budget

Fayyad Depo Transcript.txt

7    preparation submission.

8        Q.  Okay.  So what we're saying is that the annual

9    review for 2009, which came out in March of 2010, is

10   something you would have read?

11       A.  No.  That's not what I really meant.  I meant the

12   -- basically, the material that goes into preparing the

13   budget circular for the year after, because that really

14   is important.  That forms the basis for projecting next

15   year's budget.

16           Those reports I tend to spend more time on

17   because they provide a basis of your direction, as

18   Minister of Finance, to the rest of the PA in terms of

19   what their submissions can be -- or the ceilings, so to

20   speak.

21           That's the material I spend more time on.  The

22   rest, no.  I don't anymore.

23       Q.  I'm totally confused.  I know it's my fault.

24           I'm trying to find out if -- first of all, we

25   agreed that, every March or thereabouts, there's an

                                             Fayyad - 312


1    annual review of the prior year's performance.

2           Is that true?

3        A.  What I can tell you is, since spring of 2008, the

4    commitment we made was to publish monthly information on

5    different fields of each month, because you say March.

6           There is not a date certain, you know, by which

7    or on which other type of material or data would be

8    disseminated, you know.  It is what it is really.

9           But it happens to be March.  I said that because

10   that would be a long enough time period for a full

                            Page 267

Fayyad Depo Transcript.txt

11  annual report from the preceding year to have been

12  published.

13       It could have come out in April.  It could have

14  come out in February.

15    Q.  Mr. Fayyad, was there a review of 2009's economic

16  performance?

17    A.  Yes.

18    Q.  Was it published?

19    A.  For the year, there was a report covering the

20  year.  If it came out in March, it came out in March.

21    Q.  I suggest to you -- you don't have to adopt

22  this -- I suggest to you it came out on March 23, 2010.

23    A.  It makes sense.

24    Q.  You don't have to adopt it.

25    A.  Makes sense.

                                        Fayyad - 313


 1    Q.  It did come out?

 2    A.  Yes.

 3    Q.  Okay.  Did you read it?

 4    A.  I read many reports.

 5    Q.  What?

 6    A.  I read many reports that come on my desk.

 7    Q.  That's very helpful.  I'm asking if you read this

 8  one.

 9    A.  We have so many reports that come out.  Every

10  three months we publish a report.

11    Q.  Do you have my question in mind?

12    A.  I know --

13    Q.  Can you tell me whether or not --

14    A.  You're holding a piece of paper and I've not see

15  it.  I don't know what it is.  You're telling me what it

                          Page 268

Fayyad Depo Transcript.txt

16    is.  And you've asked me --

17       Q.  No, I'm not.

18       A.  That's what I thought you're doing.

19       Q.  Well, I could be looking at --

20       A.  That's the point.

21       Q.  -- at anything.  So forget what I'm looking at.

22    We've established on the record --

23       A.  Yes.

24       Q.  -- that sometime in the first quarter --

25       A.  Yes.

Fayyad - 314


1        Q.  -- of 2010, the Ministry of Finance published an

2    annual performance evaluation for 2009.

3            You agreed with that, right?

4        A.  Yes.  I mean --

5        Q.  Okay.  All I'm asking you is, that document, was

6    it something you read.

7        A.  It's likely that I have looked at it, to the

8    extent to which -- I mean most of these reports look

9    alike.  Do you understand what I'm really trying to tell

10    you?

11           It's not something that stands out and I would

12    remember for sure what it said or anything like that I

13    mean, you know.  This is routine.

14           That's why I told you the difference between

15    those annual reviews and the reviews that form the

16    relationship for budget preparation annually.

17           So yes, I mean --

18       Q.  So yes what?

19       A.  I probably looked at the report.  But the extent

Fayyad Depo Transcript.txt

20   to which I read it, went through it or something like

21   that, I cannot really tell you now.  I mean I don't

22   know.

23       Q.  Okay.  I don't want you to -- I don't want you to

24   assume anything about what I'm looking at, okay?

25       A.  I thought you were looking at it.  You're

                                              Fayyad - 315


1    saying --

2        Q.  I'm just going to ask you some questions without

3    respect to this document (indicating).  This could be my

4    notes.  Who knows?

5            I just want to ask you if the PA had any bank

6    borrowings that it incurred in the year 2009.

7        A.  I'm sure we borrowed in 2009, yes.

8        Q.  Do you have any sense of how much?

9        A.  I mean our indebtedness in the banking system

10   through the year fluctuated in the range of $400 million

11   up to $735 million --

12       Q.  Okay.

13       A.  -- in the course of 2009.

14       Q.  That's fine.

15       A.  In that range.

16           MR. ROCHON:  Counsel, let him finish his

17   answer.  If you're going to do a memory test, let him

18   finish the test.

19           MR. WISTOW:  It's not a memory test.  Trust

20   me.

21       Q.  So we're talking hundreds of millions --

22       A.  Yes.  Hundreds of millions.

23       Q.  -- of bank loans.

24           How many different banks roughly?  Roughly.
                        Page 270

Fayyad Depo Transcript.txt

25    A.  We pretty much deal with all of them, which

Fayyad - 316

1    means -- not all of them completely -- but maybe 12, 13
2    banks.
3        Q.  Okay.  Now, when you -- you have to apply for the
4    loan, right?
5        A.  Yes.
6        Q.  And you have to tell them what your assets and
7    liabilities are, right?
8        A.  Yes.  Although, you know, we're a customer that
9    is known to the banks.
10       Q.  Assets and liabilities can change from year to
11   year?
12       A.  They do.  I mean --
13       Q.  Did you tell any of these banks about the
14   judgments that are outstanding against you?
15       A.  It's a well-known fact that there is.
16       Q.  Did you tell them?
17       A.  You know, let me go back.  That's why I told you,
18   you know, we are a customer that is well known to the
19   banks.
20           And when you say do you apply for the loan, I can
21   tell you what form that takes.  You know, it takes us
22   basically writing a letter to the bank saying we need to
23   borrow such and such amount of money.
24           As the Palestinian Authority that's borrowing,
25   the Ministry of Finance, we do not fill a detailed

Fayyad - 317

1    application.

Page 271

Fayyad Depo Transcript.txt

2     Q.   You fill in no application?

3     A.   Just what I told you.

4     Q.   Just a letter --

5     A.   Just a letter saying we need this much money.

6     Q.   So you did not tell these banks --

7     A.   We do not really submit an application for when

8     we borrow --

9     Q.   Okay.

10    A.   -- in the detailed form, say an individual

11    customer or business would.  I mean we're the

12    government.

13    Q.   Okay.  I understand.

14    A.   Yes.

15    Q.   Now, there was an Israeli incursion or

16    invasion -- whatever word you'd like -- into Gaza that

17    resulted in damage to electricity, to water systems, to

18    sanitation, to a lot of things in Gaza, right?

19    A.   Yes.

20    Q.   All right.  And did the PA spend monies, in 2009,

21    to repair any of the damages sustained by the

22    electricity, water, and sanitation networks in Gaza?

23    A.   Some.  To the extent that we could.

24    Q.   Okay.

25    A.   Yes.

                                          Fayyad - 318


1     Q.   And how is that money -- at this point in time,

2     Gaza is under the control of Hamas?

3     A.   That's correct, yes.

4     Q.   So how does that work?  How do you send the money

5     to take care of the water networks, for example?  To

6     whose account is the money sent?

Fayyad Depo Transcript.txt

7     A.  This work is basically done by the Water
8  Authority, which is a body of government that reports to
9  us, acting through contractors who are paid directly.
10         Similar to the Energy Authority that's in charge
11  of -- Energy Authority -- or Power Authority, if you
12  like -- that's in charge of direct electricity in Gaza.
13         So they report to us, and they are under our
14  control.  Those two particular agencies are.
15     Q.  So even though Hamas is occupying Gaza --
16     A.  Yes.
17     Q.  -- you control the electrical system?
18     A.  We -- you know, the entity that is in charge of
19  the power, if you will --
20     Q.  Yes?
21     A.  -- the power sector or electricity sector in
22  Gaza, and in the case of water, yes.
23     Q.  And also the sanitation system?
24     A.  Water, sanitation, it's the same authority.
25     Q.  So what you do is you send money to agencies in

Fayyad - 319

1  Gaza?
2     A.  Under our control, as we do for health, the
3  health sector.
4         As a matter of fact, we fund, you know, supplies
5  and medical equipment and things like that, and
6  treatment.  We do.
7     Q.  So these are expenditures --
8     A.  Yes.
9     Q.  -- that the Hamas government doesn't have to
10  make, isn't that true?

Fayyad Depo Transcript.txt

11    A.  Well, it is something that we do because it's our

12    responsibility to do, and we are a diligent government.

13    We act on behalf of the Palestinian people, both in Gaza

14    and the West Bank -- in Gaza where we can.  And in those

15    cases where we can, we do it.

16    Q.  I understand.  I'm not suggesting anything by it.

17         I'm just saying that, to the extent your

18    government pays for electricity and the repairs to the

19    damage, Hamas doesn't have to pay, correct?

20    A.  There's a lot of damage to be fixed.  I mean --

21    Q.  I understand that.  But, to the extent you pay

22    for any of it, to that extent Hamas doesn't.  Isn't that

23    so?

24         MR. ROCHON:  Objection.  That assumes facts

25    not in evidence.

Fayyad - 320


1         MR. WISTOW:  What?

2         MR. ROCHON:  Assumes facts not in evidence.

3         MR. WISTOW:  Sorry?

4         MR. ROCHON:  Assumes facts not in evidence.

5         MR. WISTOW:  Well, he's already told me that

6    they take care of --

7         MR. ROCHON:  That's not evidence that Hamas

8    pays for these things if they don't.

9         MR. WISTOW:  Who said they can pay?  Maybe

10    they can.

11         MR. ROCHON:  If the PA does, then they don't

12    have to.

13         MR. WISTOW:  Okay.

14    Q.  Let's put it this way.

15         That obligation to repair the electrical work --

Page 274

Fayyad Depo Transcript.txt

16    A.  Yes.

17    Q.  -- damaged by the Israeli incursion --

18    A.  Yes.

19    Q.  -- somebody's got to fix it?

20    A.  That's correct.

21    Q.  You fix it?

22    A.  As I told you --

23    Q.  The PA?

24    A.  -- our policy is to fix damage where we can.  If

25    we are in a position to do it, we will do it.

                                                    Fayyad - 321


1    Q.  Same for water?  Same for sanitation?

2    A.  That's true.

3    Q.  And also the medical system, the medical delivery

4    system?

5    A.  That's correct.

6    Q.  Okay.  In an area that is dominated and

7    controlled by Hamas, yes?

8    A.  Yes.  But not these agencies, as I mentioned to

9    you.

10    Q.  Hamas allows you to send the money in?

11    A.  What we, you know, pay our civil servants through

12    individual bank accounts to them directly, and not

13    through -- not through --

14    Q.  -- Hamas?

15    A.  -- not through structures controlled by Hamas.

16    Q.  Hamas has the physical ability to stop you

17    sending that money in, don't they?

18    A.  I suppose they could.  But why would they do

19    something like that?

                        Page 275

Fayyad Depo Transcript.txt

20    Q.  Exactly.  They don't want to.

21    A.  But the issue is, you know, are we going to get

22  in the way of somebody getting their allowance, their

23  salary, or their dues from the government that

24  represents them.

25        We're the government in charge, both in Gaza and

Fayyad - 322


1  the West Bank.

2        I know we're not in control of Gaza, but there

3  are agencies that still report to us -- we feel

4  adequately -- and there are areas where we feel we

5  definitely have to continue to intervene.

6    Q.  Definitely what?

7    A.  We definitely need to continue to intervene on

8  behalf of our people to help them out.

9        And there is no guarantee -- or expectation even,

10  for that matter -- that, if we didn't, Hamas would.  I

11  mean there is not really that assumption.  We just don't

12  act on that basis.

13    Q.  So Hamas just doesn't have to spend any money on

14  water, on electricity, or on sanitation, to the extent

15  that you pay for it.  Isn't that true?

16    A.  I'm not really sure Hamas would have paid if we

17  didn't pay.  I mean I just don't know.

18    Q.  Okay.

19    A.  All I know is we approach Gaza the same way we

20  approach the West Bank.  We move where we can as soon as

21  we can do it.  I mean --

22    Q.  So Hamas --

23    A.  We could do these things in Gaza when we did

24  that.  That's what we could do, and that's why we do it.

Fayyad Depo Transcript.txt

25    Q.  Hamas doesn't stop you from sending the money,

Fayyad - 323


1  correct?

2    A.  Hamas -- you know, this would involve, as a

3  matter of fact, interfering with the banking system.

4    Q.  Okay.

5    A.  This would be very very serious.  This could lead

6  to the banks being shut down.

7        We would do it.  We have the capacity to do it

8  if, in fact, there is that undue interference in the

9  banking system.

10    Q.  Okay.  So do you know whether or not there was a

11  rise in revenue of the PA between 2008 and 2009?

12    A.  Yes.  There was.

13    Q.  And do you have any idea of how big the rise was

14  in percentage?

15    A.  I know what it is like this year, what we have

16  been doing this year.

17    Q.  I'd like you to answer my question.

18    A.  I'm trying to really.  I'm trying to really

19  project backwards.  Please bear with me.

20    Q.  You don't have to project.

21        MR. ROCHON:  Let him think aloud.

22    Q.  Why don't you think to yourself.

23    A.  I'm really trying -- please.  I've been sitting

24  here trying, most faithfully and dutifully and

25  respectfully, to answer questions that you raise.

Fayyad - 324


1        It's not that I sat down, before coming here, to
                         Page 277

Fayyad Depo Transcript.txt

2  read volumes of material to prepare for this.  You ask

3  me questions.  I did not come here knowing what you're

4  going to ask me.

5       You're asking me a question.  I cannot tell you,

6  in 2009.  What I'm trying to really give you -- let me

7  finish.

8    Q.  All you have to do is say you don't know the

9  answer.

10   A.  Don't tell me what to say or how to say it.  I am

11  here to answer question.  You ask questions.  I answer

12  the way I want.  And let the Court be the judge of the

13  adequacy of my answers, sir, if I may.

14       I am required to really work myself into a mind

15  set of trying to give you an answer as best as I can do,

16  and you're preventing me from doing it.  That's what I

17  can tell you.  Will you please help me answer you as

18  best as I can.

19       Now, this is current data.  I know that, through

20  the first half of the year, our revenues have grown by

21  about 20 percent.  It may be the case that, last year,

22  for 2009, the growth was somewhere around seven, eight,

23  nine percent, then percent.

24       I don't know for certain.  This is the best sense

25  I can give you.

Fayyad - 325


1    Q.  Okay.  That's fair enough.

2    A.  Thank you.

3    Q.  And do you know whether or not the Palestinian

4  Authority Ministry of Finance described the growth in

5  gross revenue, between 2008 and 2009, as being the

6  result of reforms in domestic tax administration and

Page 278

Fayyad Depo Transcript.txt

7   robust economic growth?

8       A.  That's a fair statement, yes.

9       Q.  Okay.  And if I suggested to you -- and you don't

10  have to accept it -- that the income tax receipts in the

11  second half of 2009 were 58 percent over the same period

12  as in 2008, does that sound about right?

13      A.  Yes, it does.

14      Q.  Okay.

15      A.  This is something I remember because it's

16  extraordinary.

17      Q.  Okay.  And the value-added tax receipts as for

18  the second half of 2009 compared to the second half of

19  2008 were up about 35 percent.

20          Does that sound right?

21      A.  Yes.  The domestic VAT.

22      Q.  Yes.  Value-added tax.

23      A.  Yes.  Not the clearance, but the domestic side of

24  this.

25      Q.  Okay.

Fayyad - 326


1       A.  And those are, you know, small components of the

2   total.  That's why extraordinary growth in those

3   components doesn't mean correspondingly large growth in

4   over-all revenue.

5       Q.  In any event, you've already indicated that the

6   increase in revenues was the result of reforms in

7   domestic tax administration and robust economic growth.

8       A.  Yes.  That's a fair statement, yes.

9       Q.  Okay.  What are clearance revenues?

10      A.  Revenues collected by the government of Israel on

Page 279

Fayyad Depo Transcript.txt

11    behalf of the Palestinian Authority under the customs

12    union arrangement that governs the economic relationship

13    between the two sides, Israelis and Palestinians.

14        Q.  Okay.  So let me see if I understand this.

15            The Israeli government collects taxes in -- I

16    don't want to offend you.  I don't know what to call it.

17    The West Bank?

18        A.  Let me explain.

19        Q.  I just want to get a geographical denomination

20    that you can agree with.

21            Is it okay to call it the West Bank?

22        A.  The West Bank and Gaza.

23        Q.  Okay.  Well, Israel is not collecting taxes in

24    Gaza, is it?

25        A.  But let me explain to you what the principle is.

Fayyad - 327


1    You asked me what clearance revenues meant.

2        Q.  Fair enough.

3        A.  And clearance revenues are revenues collected by

4    the government of Israel on behalf of the Palestinian

5    Authority.

6            And the way this happens is, under the protocol

7    that governs economic relations between the PA and

8    Israel, it says that taxes are collected at point of

9    entry.

10           You know, the economic relationship between us

11   and Israel is described as a customs union.  Under a

12   customs union arrangement, the entity that is in control

13   of point of entry collects taxes, and then apportions

14   them to the sides on the basis of destination of use or

15   consumption.

Page 280

Fayyad Depo Transcript.txt

16          So let's say, you know, a shipment of cars is

17    imported through Haifa airport destined to the West Bank

18    or Gaza.  The collection is made at the point of entry.

19          Each month, there is a meeting between the

20    Palestinian side and the Israeli side to exchange

21    invoices as to where goods were consumed.

22          If they're consumed in Palestinian territory,

23    then the customs and dues collected by Israel in this

24    case would be transferred to the Palestinian Authority.

25          Since we import from Israel a lot more than

                                              Fayyad - 328


1     Israel imports from us, we are recipients in that

2     clearance process.  Hence the term clearance.

3          They come into the meeting with invoices.  We go

4     to the meeting with invoices.  We exchange invoices.

5     And he who imports more from the other guy gets more

6     revenue.

7          That's why they're called clearance revenues.

8     Q.  In any event, those revenues which you've just

9     described --

10    A.  Yes.

11    Q.  -- had a very substantial increase in the fourth

12    quarter of 2009, as compared no the fourth quarter of

13    2008, in the order of 24 percent.  Is that true?

14    A.  Probably true.

15    Q.  Okay.  And -- oh, I just wanted to get an idea of

16    the -- please understand.  I'm asking you this because,

17    in the United States, very few of us have very much

18    knowledge about the PA.

19          The employment by the PA in 2009 was roughly

                              Page 281

                        Fayyad Depo Transcript.txt
20   147,000 employees?

21       A.  Yes.  That's about right.

22       Q.  That sounds right?

23       A.  That's about right.

24       Q.  And the security personnel represented about

25   63,000?

                                              Fayyad - 329


 1       A.  About right, yes.

 2       Q.  Okay.  So it's roughly about 84,000 --

 3       A.  -- civilians.

 4       Q.  -- civil employees?

 5       A.  Yes.

 6       Q.  Let's go back to, say 2004, when you were Finance

 7   Minister.

 8       A.  Yes.

 9       Q.  Would those numbers be sort of roughly the same?

10       A.  No.  On a net basis, minimally, public sector

11   employment grows by 3,000 to 4,000 new personnel every

12   year.

13           So, in fact, if we're talking about how many

14   years now?

15       Q.  Six years.

16       A.  Yes.

17       Q.  Say 20,000 difference?

18       A.  Yes.  Probably.

19       Q.  Okay.  So we're still talking about 120,000

20   employees or thereabouts?

21       A.  Yes.  Maybe something like that.

22       Q.  Okay.  I want to talk just a little bit about

23   what's been happening in the West Bank --

24       A.  Yes.
                          Page 282

Fayyad Depo Transcript.txt

25      Q.  -- in terms of, well, let's say households with

                                              Fayyad - 330


 1   computers.
 2           That's something that you, as Finance Minister,
 3   would be interested in, right?
 4      A.  Yes.  This is a matter of general interest, I
 5   should say.
 6      Q.  Right.  It's a measurement of economic progress.
 7      A.  Yes.
 8      Q.  Okay.  Do you have any idea whether or not there
 9   were increases in households with computers, say from
10   2007 to 2008?
11      A.  Yes.  I think there was.
12      Q.  All right.  And if I suggested it was around
13   49 percent --
14      A.  About right.
15      Q.  -- that sounds right?
16      A.  Yes.
17      Q.  And let's take households with satellite dish.
18   So the increase from 2007 to 2008, maybe about
19   92 percent.  Does that sound right?
20      A.  Yes.  My sense is that the substantial majority
21   of people have that kind of access to satellite
22   television.
23      Q.  I'm talking about growth since 2007.
24      A.  Yes.
25      Q.  92 percent sounds about right?

                                              Fayyad - 331


 1      A.  It wouldn't surprise me.
                        Page 283

Fayyad Depo Transcript.txt

2      Q.  And about almost 96 percent of the households

3   have TV's.  Does that sound right?

4      A.  Probably.

5      Q.  Now, did you know that there was an order that

6   was entered by Judge Lagueux, in September of 2006,

7   transferring the ownership interest in the Palestine

8   Investment Fund Company?

9          Did you know that?

10     A.  I heard something like that, yes.

11     Q.  When did you hear that?

12     A.  Did you say 2006?

13     Q.  Yes.  Yes.

14             MR. WISTOW:  Can you mark this, please.

15             (Exhibit No. 10 marked for identification.)

16             (Witness peruses document.)

17     Q.  Are you aware -- let me make it simple because

18   it's really getting late.

19         Are you aware that Judge Lagueux not only entered

20   a default judgment for $116 million, but also ordered

21   the transfer of certain assets belonging to the

22   Palestinian Authority to the Plaintiffs?

23     A.  Yes.  I remember hearing something about that,

24   something that suggested to me an assertion or claim to

25   ownership of PA assets.  Something to this effect, yes.

Fayyad - 332

1      Q.  Okay.  But what I'm talking about is not an

2   assertion of claim, but an order by the Court.

3      A.  Oh, yes.  Okay.  I said -- something to the

4   effect, I said.  Yes.

5      Q.  Okay.  So how did you become aware of that?

6      A.  Probably around the time when I was beginning to

Fayyad Depo Transcript.txt

7    be involved again in these cases in early 2007.

8        Q.   Now --

9        A.   And probably that's not unrelated to what I told

10   you before, in terms of the PA's effort to try to seek

11   remedy and find legal representation because of that

12   year.

13           As I mentioned to you, this really took the form,

14   as best as I could conceive of the numbers now, a

15   succession of events one after the other --

16       Q.   Right.

17       A.   -- and this was one of them.

18       Q.   This galvanized everybody, right?

19       A.   Seems to have, yes.

20       Q.   Yes.  I mean this was a pretty dramatic event?

21       A.   I would say.

22       Q.   And that's part of what spurred the activity at

23   that point, correct?

24       A.   Probably did.  I don't know what I can tell you.

25   It's something that one would expect it to have that

                                          Fayyad - 333


1    kind of effect.  One would expect it to have had that

2    kind of effect.

3        Q.   Kind of a wake-up call?

4        A.   Well, I don't know if one can call it a wake-up

5    call.  I mean, as I said, the whole thing took a form of

6    succession of events.  It was not, you know, all at

7    once.

8            It was several things.  Different things happened

9    at different points in time.  This was one of them.

10           I must have learned about it, or something like

                              Page 285

Fayyad Depo Transcript.txt
11   it, having taken place in the time frame I mentioned
12   before, in early 2007.
13       Q.  Now, there was also a injunction issued by the
14   Court enjoining the Palestinian Liberation Organization
15   and the PA from transferring any assets?
16       A.  Yes.
17       Q.  You're aware of that?
18       A.  Injunction?
19       Q.  An injunction.  Remember, you wrote to
20   Condoleezza Rice?
21       A.  Yes.  An injunction to freeze assets.
22       Q.  Exactly.
23       A.  Yes.  Yes.  Okay.
24       Q.  Okay.  Now, that injunction was issued on May 5
25   of 2005.  I'm going to ask you to just accept my

                                             Fayyad - 334


 1   representation that that's so.  Okay?
 2       A.  You know, I remember we discussed that there was
 3   an injunction.  And we took issue with the way in which
 4   it was interpreted or used in the letter that I wrote to
 5   the Secretary of State then.
 6       Q.  Yes.
 7       A.  Okay.  If that's what you're talking about.
 8       Q.  Yes.  That's what I'm talking about.
 9       A.  Okay.
10       Q.  Now, after that injunction issued, do you know
11   whether or not money was taken out of the Palestinian
12   Investment Fund by the PA?
13               MR. ROCHON:  Counsel -- I withhold the
14   comment.  Go ahead, Mr. Prime Minister.
15               MR. WISTOW:  Well, you know what?  I'm just
                        Page 286

Fayyad Depo Transcript.txt

16  going to leave the question as is for a moment.

17      Q.  Do you know?

18      A.  I really cannot tell you.  I mean I don't

19  remember.  What I know --

20      Q.  Okay.

21      A.  All I know is -- I mean I don't remember money

22  going from the PIF to the government in that time frame.

23  I don't remember.

24      Q.  Okay.  You wouldn't deny it?  You just don't

25  remember?

Fayyad - 335


1       A.  I just don't remember.

2       Q.  Who would have authorized such a transfer?

3       A.  Transfer?

4       Q.  From the PIF to the PA?

5       A.  Depends on when it happened.

6       Q.  Well, let's assume for a moment that $27 million

7   was transferred from the PIF to the PA.

8       A.  When?

9       Q.  In October through December -- sometime between

10  October and December of 2006.

11      A.  October -- well, I really cannot tell you.  I was

12  not in government at the time.

13      Q.  Who would have the authority to make such an

14  order, if you know?

15      A.  I rely honestly do not.

16      Q.  Okay.  Fine.  Then we'll move on.

17          Who is Muhammad Mustafa?

18      A.  CEO of the PIF.  I believe Chairman of the Board

19  as well.

Page 287

Fayyad Depo Transcript.txt

20          MR. ROCHON:  Counsel, we're about done with

21    the five minutes.  Do you want to --

22          MR. WISTOW:  Oh, I'm sorry.

23          MR. ROCHON:  Can we go off the record.

24          THE VIDEOGRAPHER:  Going off the record at

25    11:21.

                                          Fayyad - 336


 1          (Short recess taken.)

 2          THE VIDEOGRAPHER:  Going on the record at

 3    11:36.

 4          MR. ROCHON:  Before we begin, this will be

 5    my time.  So 11:36 is my time until I say it's not.

 6          In the break, I offered the possibility of,

 7    after a period of time, whichever you wanted, I would do

 8    my examination, leaving you some time for redirect, or

 9    whatever you wish to call it.  I understand that you

10    don't want to take me on it.

11          I've also represented that I believe my

12    examination will be relatively short.  You never know

13    for sure.  I don't think it will be more than 15

14    minutes, 20 minutes.  Probably less.

15          But I understand that's, from your

16    standpoint, not an attractive offer, and you'd rather go

17    through to the end of your seven, and then have me

18    conduct my examination, is that right?

19          MR. WISTOW:  What I'm going to do -- here's

20    my problem.  We're not on my time.

21          MR. ROCHON:  We're on my time.

22          MR. WISTOW:  Okay.  How much time do you

23    get?

24          MR. ROCHON:  It's a matter of some debate.

                      Page 288

Fayyad Depo Transcript.txt

25    But well more than I'm going to use.

                                                Fayyad - 337

  1              MR. WISTOW:  Here's my problem, and I don't

  2    mean to start anything fracas.

  3              What I'm concerned about is, even if you do

  4    15 minutes, and I need -- and there's time to do a

  5    recross, if we have a representation -- I'm going to get

  6    a reaction over here -- if we have a repetition of what

  7    happened before, I'm going to get to ask like one

  8    question and it's going to take me 20 minutes to get an

  9    answer.  That's what I am worried about.

 10              So I'm actually willing to telescope down

 11    what I'm doing to save some time.  But I'm just worried

 12    about the responsiveness of the witness on redirect.

 13    There's nothing you can do or say about this.  I think

 14    I'm --

 15              MR. ROCHON:  We both have views as to why

 16    this has taken long.  My views are different than yours.

 17    But I'm not going to try to debate them with you.  I

 18    believe this could have gone much more quickly on your

 19    part.

 20              MR. WISTOW:  We'll go to the Court.

 21              MR. ROCHON:  Bottom line is I've offered to

 22    do my examination before you're done with your time, if

 23    you want me to.

 24              (Off-the-record discussion.)

 25              MR. ROCHON:  Mr. Strachman, thank you.  But

                                                Fayyad - 338

  1    your colleague has shown an ability to ask questions for

                        Page 289

Fayyad Depo Transcript.txt

2   an infinite period of time.  And even the Prime Minister

3   isn't ready to offer an infinite period of time.  He has

4   shown the ability to ask questions for two hours about a

5   three-page letter.

6                  So, given that, I can't rely on any

7   representation that we would finish in this lifetime,

8   let alone this day or tomorrow.

9                  MR. WISTOW:  Okay.  I don't know what we'll

10  do.  Let's see how I --

11                 MR. ROCHON:  What we'll do first is go back

12  on your time.  If we could, please, have the time,

13  Mr. Coopersmith.

14                 THE VIDEOGRAPHER:  Time is 11:39.

15                 MR. ROCHON:  Thank you.

16                 MR. WISTOW:  Mark this.

17                 (Exhibit No. 11 marked for identification.)

18     Q.  Now, this is something that your counsel -- your

19  present counsel -- submitted with the motion to vacate

20  the judgment that it filed on 12-28-07, and asked Judge

21  Lagueux to take this exhibit into consideration in

22  deciding the motion.

23         And I'd like to refer you to -- and, by the way,

24  what this document is is a download from the United

25  Kingdom government's Foreign Office.  Again, as

                                    Fayyad - 339


1   submitted by your lawyers to the Court.

2         And I'd like to take you to the last page.

3      A.  Okay.

4      Q.  And I'm going to read something in the record,

5   and I'm going to ask you if you're aware that this was

6   submitted to the Court.

                          Page 290

Fayyad Depo Transcript.txt

7          Human Rights.  On several occasions, the

8   Palestinian Authority has stated its commitment to

9   respecting all internationally recognized human rights

10  standards and to incorporating them fully into

11  Palestinian law.

12      A.  Yes.

13      Q.  I suppose you agree with that?

14      A.  Yes, I do.

15      Q.  Okay.  Then it goes on to say, The practice of

16  detention without trial or charge continues to be used,

17  and beatings and torture are not uncommon in Palestinian

18  detention centers.  The death penalty still exists, and

19  was used as recently as 2006.

20          The Palestinian Authority has also refused to

21  condemn the use of violence for political purposes and

22  the targeting of civilians.

23          Were you aware this was submitted to Judge

24  Lagueux?

25      A.  No.

                                        Fayyad - 340


1          MR. ROCHON:  Just objection, counsel.  You

2   suggested that that portion was upon which we relied.

3          MR. WISTOW:  No.  I didn't say you relied on

4   anything.  I said you submitted this document, which I

5   put in in its entirety, to the Court.

6       Q.  Let's move on.

7           I'm going to show you another document that was

8   submitted by your counsel for Judge Lagueux's reading in

9   support of the motion to dismiss.

10          I'm giving you the entire document as we mark it

                              Page 291

Fayyad Depo Transcript.txt

11    (indicating).

12            (Exhibit No. 12 marked for identification.)

13            (Off-the-record discussion.)

14    Q.  The document, in part, says -- on page 1, it

15    says, The Agreement.

16            The Interim Agreement, Oslo 2, states that Israel

17    may request from the Palestinian Authority the

18    transfer -- extradition -- of an individual located in

19    the autonomous areas who is suspected of an offense that

20    falls under Israeli criminal jurisdiction.  And then it

21    cites a reference.

22            The PA is obligated to comply with all formal

23    requests and to arrest and transfer the suspect to

24    Israel.

25            Do you agree that that's in the Oslo Accords?

                                    Fayyad - 341


 1    A.  If this is a direct quote of the Oslo Accords, I

 2    wouldn't dispute it.  But I, you know, cannot tell you

 3    independently that I recall every provision that is in

 4    here as something I have personally independently read

 5    or have verified.

 6            But if it's a direct quote, it's a direct quote.

 7    Q.  All right.  It also says that the Palestinian

 8    Authority refuses to hand over the four terrorists

 9    involved in the murder of four Americans.

10            Do you see that?

11    A.  Where?

12    Q.  Right above it.

13            MR. ROCHON:  May I point the witness to the

14    portion you're talking about?

15            MR. WISTOW:  Yes.

                    Page 292

Fayyad Depo Transcript.txt

16    Q.  Right above where we just read.

17    A.  Oh.  Here in the title?

18    Q.  No.  Below the title.  Do you see it?

19         MR. ROCHON:  I just object to whether it's

20    above or below the title, given the line that's

21    underneath.

22    Q.  It says, PA refuses to hand over four terrorists

23    involved in the murder of four Americans.  Do you see

24    that?

25    A.  I see that, yes.

                                              Fayyad - 342


1    Q.  Below that, it says, The Violations.  Go down

2    about three paragraphs?

3    A.  Yes.

4    Q.  On September 17, 1997, Israel submitted five new

5    requests to the PA for the transfer of terror suspects.

6    Previously, on March 31, 1997, Israel submitted

7    31 formal requests for the transfer of terror suspects.

8         Thus far, the PA not responded to any of Israel's

9    36 requests, except for two cases in December 1994, when

10    the PA rejected Israel's requests.

11         First, did you know that this was submitted to

12    Judge Lagueux?

13    A.  No.  I'm not aware of it.

14    Q.  Do you have any knowledge regarding if this is a

15    true or false statement?

16    A.  I do not know that.  I don't know that.

17    Q.  Okay.  The next paragraph says, Of the 36 terror

18    suspect whose transfer is being sought by Israel, 12 are

19    either serving in the Palestinian police or are in the

                            Page 293

Fayyad Depo Transcript.txt

20    process of joining its ranks.

21          Do you know whether that's true or not?

22    A.  I don't know.

23    Q.  Do you remember the --

24          MR. ROCHON:  Are we done with that document,

25    counsel?

Fayyad - 343


1          MR. WISTOW:  Yes.

2    Q.  Do you remember the hostage-taking in the Church

3    of the Nativity?

4    A.  Yes, I remember.  I remember.  2002 probably.

5    Yes.

6    Q.  What can you tell me about it from memory?

7    A.  Basically, that there were people who actually

8    sought refuge there for a long period of time, and at

9    least some of them gunmen.

10    Q.  Sorry.  Some of them were gunmen?

11    A.  Gunmen, yes.  That's what I recall about the

12    incident, and they were there for an extended period of

13    time.

14          But this was, I believe, before I joined the PA.

15    I think it was.

16    Q.  Okay.

17    A.  Yes.

18    Q.  Now, you say they sought refuge there.  This was

19    a Christian church --

20    A.  Yes.

21    Q.  -- right?

22    A.  Yes.

23    Q.  And there were monks there?

24    A.  I assume.  I suppose there were.

Page 294

Fayyad Depo Transcript.txt

25    Q.  This was a big news story, wasn't it?

Fayyad - 344


1    A.  It was a big story.

2    Q.  Yes.  Don't you remember that the monks were not

3    allowed to leave?  They were kept as hostages?

4    A.  I don't remember all aspects of the case.  All I

5    know is that it was, you know, a big event at the time.

6    There were just too many aspects to it, and it went on

7    for an extended period of time.

8    Q.  Yes.  And the monks were not allowed to leave.

9    Do you remember that?

10    A.  I don't remember that.

11    Q.  You don't deny it?

12    A.  I cannot -- I wouldn't deny it.  I'm not here to

13    really defend anything, to be honest.

14    Q.  Sorry?

15    A.  I'm not here to defend a certain action.

16    Q.  No.  I'm just asking you whether or not -- you

17    just don't know whether they were held as hostages?

18    A.  I just don't recall that.  I don't recall all

19    aspects of it.

20        All I know is that, you know, there was this

21    situation that lasted a long period of time.  It was

22    problematic.  It took a lot of effort to disentangle it.

23    That much I know.

24    Q.  When you say a lot of effort to disentangle it,

25    to break up the hostage-taking?

Fayyad - 345


1    A.  To really get those people who were in the --

Page 295

Fayyad Depo Transcript.txt

2    Q.  Right.

3    A.  -- church to actually leave.

4    Q.  Right.

5    A.  And they did leave, under certain arrangements.

6    Q.  Right.  And one of them was Abdallah Daoud?

7    A.  I don't know.

8    Q.  You don't know?

9    A.  No.  I don't.

10    Q.  He headed the Palestinian Intelligence Service in

11    Bethlehem?  Does that ring a bell?

12    A.  What?

13    Q.  I say does that ring a bell.

14    A.  The head of intelligence?

15    Q.  Yes.

16    A.  In Bethlehem?

17    Q.  The Palestinian Intelligence Services in

18    Bethlehem.

19    A.  When was that?  I mean at the time of this

20    incident.

21    Q.  In the past.  I don't have the date.  If you

22    don't know, you don't know.

23    A.  Well, I don't know.

24    Q.  Okay.  Do you remember that the terrorists --

25    people in the church -- were deported to foreign

                                        Fayyad - 346


1    countries?

2    A.  I'm aware that that was probably the arrangement.

3    Q.  Right.  Israel agreed to let them just leave?

4    A.  Yes.

5    Q.  And they were deported to foreign countries and

6    to Gaza?  Does that ring a bell?

Page 296

Fayyad Depo Transcript.txt

7     A.  Yes.

8     Q.  Okay.  And one of them -- Abdullah Daoud -- died

9  fairly recently.  Yes?

10    A.  Yes.  I now know -- I now remember that one who

11  was associated with that particular incident died

12  recently, yes.

13    Q.  Right.  Right.  So you remember somebody who was

14  involved in that hostage-taking in the Church of the

15  Nativity died recently?

16    A.  Yes.

17    Q.  Okay.  Was that Abdullah Daoud?

18    A.  I don't remember the name for sure, but I

19  remember it happening recently.  But I don't remember

20  the name for sure, for certain, probably because people

21  are known by more than one name.

22        The name you mentioned, Abu something -- I don't

23  know.

24    Q.  Abdullah Daoud.

25    A.  That could have been the name.

Fayyad - 347


1     Q.  Do you remember when this was, this funeral?

2     A.  No, I don't remember.

3     Q.  Was it a couple of months ago?

4     A.  Maybe.  Maybe more.  I really don't remember for

5  sure.

6     Q.  Was it like in April of 2010?

7     A.  It could have been.

8     Q.  Okay.  And did you pay a condolence visit to the

9  family of Daoud?

10    A.  Again, you know, the name now I do not remember

Page 297

Fayyad Depo Transcript.txt

11 well. I mean I did pay condolence visits in a number of

12 instances. This may have been one of them.

13    Q. Did you make a public statement about Daoud? Did

14 you say he was a shahid?

15    A. I don't know. I don't remember, you know, what I

16 said in all of these instances. But it's something that

17 I may have done, may have said.

18    Q. What's a shahid -- S H A H I D in English, I

19 guess? It's close enough. Shahid.

20    A. Yes. I understand what you're referring to.

21    Q. Right. I wanted to spell it for --

22    A. Okay.

23    Q. That means a martyr?

24    A. Yes.

25    Q. Okay. And you may have called him a martyr?

Fayyad - 348

1    A. It's possible. I do not recall for sure.

2    Q. Okay. And did you, in a public statement, note

3 his "suffering from the injustice of his expulsion"?

4    A. It's possible. It's possible I may have said

5 something like that. It's possible, but I do not recall

6 exactly.

7    Q. Okay. And do you know if President Abbas sent an

8 emissary to the funeral?

9    A. He may have.

10    Q. Wasn't there a lot of news stories in Palestine

11 about this?

12    A. Yes. You know, I did not immediately make the

13 association when you started asking questions.

14       But I remember now, as you went into the story

15 and questioning about it, that there was one who -- one

Fayyad Depo Transcript.txt

16  deportee -- who died, I believe in Algeria, recently.

17       And I just did not associate the name with that

18  particular incident.  And it could have been the person

19  you mentioned.

20  Q.  Right.  But you referred to him as a shahid?

21  A.  You said that there is a statement to this

22  effect.

23  Q.  I'm just asking you?

24  A.  Yes.  I may have.  I do not recall putting out a

25  statement as much as it is something I -- in the way I

Fayyad - 349


1  usually do things, when I go to places like this, houses

2  of mourning, I usually get up and say a few things.

3       And that's probably what you're referring to

4  here, as is customary.

5  Q.  Right.  Would it be customary to refer to the

6  injustice of his expulsion?

7  A.  I think the aspect of it, if that's what I had

8  said, what would have been on my mind is somebody who

9  was deported and who died in exile, so to speak.

10      There is that dimension of it that I think was

11  significant.

12  Q.  And unjust?

13  A.  I mean, when somebody is deported away from their

14  home and they die away from their family and relatives

15  and all those, there is a human dimension to that story

16  that touched a lot of people in a certain way.

17  Q.  And were you aware, at the time, that he was one

18  of the people who stormed the Church of the Nativity?

19  A.  I wasn't aware.  And, as I said, the incident --

Page 299

Fayyad Depo Transcript.txt

20    all the events leading to the Nativity Church incident,

21    my recollection of it, my knowledge of the situation is

22    not one where those people, including some gunmen,

23    stormed or took over the church, as much as having taken

24    refuge in it.

25        Q.  They took refuge and kept the monks there, didn't

Fayyad - 350


1    they?

2        A.  I don't remember that part of it.

3            I mean what I know about it, what I recall, is

4    that the situation was they came under pressure by the

5    Israeli army, and they sought refuge in the church.

6        Q.  You knew he was expelled to Algeria, you said?

7        A.  I mean I know that there was an individual who

8    passed away in Algeria, and he was deported.

9        Q.  Right.

10       A.  That -- and I knew of it after the fact, not

11   before.

12       Q.  Well, when you talked about the injustice of his

13   expulsion --

14           MR. ROCHON:  Objection.

15       A.  You know --

16           MR. ROCHON:  Mr. Prime Minister, there's an

17   objection.

18           The objection is, the witness having said

19   that he wasn't sure he said that, now you're assuming he

20   did.  That's even worse than assuming facts not --

21           MR. WISTOW:  This is a speaking objection.

22   All you've got to do is object or instruct him not to

23   answer.  This is a speaking objection.

24           And this is what I call cross-examination,

Page 300

Fayyad Depo Transcript.txt

25   okay?  He's an adverse witness.  And that is possibly

Fayyad - 351

 1   the most classic example of a speaking objection I've

 2   ever heard.

 3       Q.  Now, do you know whether President Abbas sent an

 4   emissary to the funeral?

 5           MR. ROCHON:  Asked and answered.

 6       A.  Yes.  As I said, I do not recall specifically in

 7   this particular case, but it's something that he may

 8   have done.

 9       Q.  Maybe this will refresh your recollection, maybe.

10           Do you recall the spokesman saying, We must

11   maintain the way of the shahid Daoud, who always

12   believed in the struggle and love of the homeland and

13   the realization of national unity?

14           Does that ring a bell?

15       A.  Not necessarily.

16       Q.  Okay.

17       A.  Or specifically.

18       Q.  Okay.  Do you know -- are you aware of the murder

19   of an Israeli, Rabbi Meir Avshalom Hai, in a drive-by

20   shooting?

21           There was a lot of newspaper coverage about that.

22       A.  When was that?

23       Q.  In December of 2009.

24       A.  Oh, yes.  Yes.  Yes.

25       Q.  Okay.  That was a big story?

Fayyad - 352

 1       A.  Yes.  Yes.  Yes.

Page 301

Fayyad Depo Transcript.txt

2      Q.   Okay.  It was a drive-by shooting, yes?

3      A.   It was a shooting in the north, near Nablus.

4      Q.   And there were three alleged terrorists arrested?

5      A.   I do not know if there were arrests in this case.

6      Q.   They were in a fire fight?

7      A.   No, no, no.  What happened, there was an Israeli

8    incursion into Nablus, and three were actually killed --

9    not arrested -- by the Israeli army.

10     Q.   They were assassinated?

11     A.   I mean there were eye-witnesses, including

12   children, that suggested that it was -- that they

13   actually were shot, at least -- I mean I'm trying to

14   really remember now, each one of them how it happened.

15          But the description that was given by eye-

16   witnesses was that they were fired at when they were not

17   resisting, or they were not firing at anyone.  In one

18   instance, a guy was coming down the stairs, as it was

19   described to me, and he was shot.

20          So they were assassinated.  They were not

21   arrested.  They were killed.

22     Q.   They were murdered?

23     A.   Yes.

24     Q.   You investigated, looked into it, came to that

25   conclusion?

                                    Fayyad - 353


1      A.   I mean this is a matter of great interest and

2    concern to us.  And we tried, as best as we can, to find

3    out what happened, and there was a lot of discussion on

4    this with Israeli counterparts.

5          And we definitely protested that whole operation,

6    the raid -- the incursion, if you will -- leading to

                              Page 302

Fayyad Depo Transcript.txt

7    those killings of the three individuals.  I mean there

8    was no trial or anything like that.

9        We don't know for sure, you know, if, in fact,

10   they're the ones who were involved in the killing of the

11   rabbi.

12   Q.  Do you recall this was big story?  We've said

13   that.

14   A.  It was.

15   Q.  Do you recall President Abbas honoring the three

16   people who were killed, who allegedly were the murderers

17   of the rabbi, saying that they were shahids of the

18   Palestinian revolution?

19       Does that sound right?  Do you remember that?

20   A.  I don't remember a statement made by the

21   President in connection with this.

22       But it was, as I mentioned to you, something that

23   really caused a great deal of difficulty at the time it

24   happened in the way it happened.

25       I know that we were actively involved and engaged

Fayyad - 354


1    in an effort to try to find who -- those who may have

2    been responsible for the shooting and the killing of the

3    rabbi, and this was acknowledged by Israeli

4    counterparts.

5        And we were stunned, actually, when, in the midst

6    of that discussion that was going on and we were trying

7    the best we can to piece it together, by this raid,

8    incursion by the Israeli army, which led to the killing

9    of these three individuals.

10   Q.  So you came to the conclusion the actions of the

Fayyad Depo Transcript.txt
11  Israeli army were unjustified, correct?

12    A.  That was my position then.  It is my position

13  today.

14        And the Israeli government knows about my

15  position.  It's not a question of statement.  I mean

16  it's a question of my position conveyed to them

17  officially, formally, in an open way.

18    Q.  Okay.

19              MR. WISTOW:  How much time is left?

20              MR. ROCHON:  First we have to know what time

21  it is.  Mr. Coopersmith?

22              THE VIDEOGRAPHER:  The time is midnight,

23  twelve midnight.  And there's 24 minutes up on the

24  table.

25              MR. STRACHMAN:  What did you say?  There's

                                        Fayyad - 355


 1  24 minutes?

 2              THE VIDEOGRAPHER:  24 and a half minutes.

 3              (Off-the-record discussion.)

 4              MR. WISTOW:  How much time is left?

 5              MR. ROCHON:  Oh, excuse me.  There's time

 6  left on the tape is what Mr. Coopersmith is talking

 7  about, not time left in your deposition.

 8              MR. WISTOW:  That's what I'm asking.

 9              MR. STRACHMAN:  Mr. Coopersmith, how much

10  time is left?

11              MR. WISTOW:  So I'll figure out whether to

12  stop, because I do have some other stuff.

13              THE VIDEOGRAPHER:  There's approximately 30,

14  32 minutes left on the tape.

15              MR. WISTOW:  No, no.  How much time is left
                          Page 304

Fayyad Depo Transcript.txt

16    for the deposition?  How close are we -- can we go off?
17                  THE VIDEOGRAPHER:  That's approximately the
18    same amount of time.  When we started this, there was an
19    hour left.  So there's 35 minutes left on the time.
20                  MR. WISTOW:  Could we go off the time for a
21    minute while we're talking?
22                  MR. ROCHON:  Go off the record?
23                  MR. WISTOW:  Okay.  Off the record.
24                  MR. ROCHON:  Let's go off the record,
25    Mr. Coopersmith.

                                              Fayyad - 356


1                  THE VIDEOGRAPHER:  Going off the record at
2    12:02.
3                  (Off-the-record discussion.)
4                  THE VIDEOGRAPHER:  Going back on the record
5    at 12:03.
6                  MR. WISTOW:  In order to avoid further
7    motions -- and which there will definitely be some -- we
8    have a controversy about what the seven hours means.
9                  And the suggestion has been made to me by
10   Mr. Rochon that all I get is seven hours, no matter
11   what, no matter how much time he takes on direct, in
12   effect.
13                 And I don't agree with that.
14                 MR. ROCHON:  Fine.
15                 MR. WISTOW:  What's that?
16                 MR. ROCHON:  That's fine.  I'm just talking
17   to counsel.
18                 MR. WISTOW:  And so, in order to try to
19   avoid that issue, and on the representation that your

                        Page 305

Fayyad Depo Transcript.txt

20    best judgment is you only need 15, I'm going to stop

21    asking some questions that I had so we can avoid that

22    controversy.

23              MR. ROCHON:  We can now -- the time will go

24    on my time, please.

25              THE VIDEOGRAPHER:  Time is 12:04.

Fayyad - 357


1               MR. ROCHON:  I did you a favor.  I'm going

2     to make my argument while we're on my time, not yours.

3               Our position is you've got seven hours.  Do

4     with it as you please.  You can go to seven hours, stop

5     at our cross.  You can stop now.

6               If you decide to stop now, you've said it's

7     based on 15 minutes.  I think that's what it will be.  I

8     put the 15 minutes think it will be on the record.  And

9     I'm prepared to go.

10              MR. WISTOW:  Good.

11              MR. ROCHON:  So thank you.

12    CROSS-EXAMINATION BY MR. ROCHON:

13       Q.  Mr. Prime Minister, just a few questions for you.

14    The first is this.

15              There came a period of time when counsel was

16    asking you questions about the finance report that had

17    been issued in March of 2010.

18              Do you remember those questions?

19       A.  Yes, I do.

20       Q.  And that was a document that he may or may not

21    have in his hand, but he certainly did not show you,

22    correct?

23       A.  He didn't.  Yes.

24       Q.  Okay.  What I want to ask you is, in light of the
                          Page 306

Fayyad Depo Transcript.txt

25    questions about numbers of TV's and the tax transfer

Fayyad - 358


1    money and the increase of domestic tax revenue and all

2    the other questions that he asked, can you indicate for

3    the Court what was the financial position of the

4    Palestinian Authority, during 2009, regarding its

5    over-all deficit funding.

6           Give us a sense of where it was during 2009.

7        A.  All those numbers and statistics are indicative

8    of a significant recovery in economic activity beginning

9    in the third quarter of 2007 onward.

10          But, you know, that does not really mean,

11    notwithstanding the improvement and government

12    involvement that was referred to, that the Authority was

13    out of the hole in terms of its financial position.

14          Our deficit this year, on the current side of the

15    budget, is still projected, notwithstanding all of the

16    improvements that were cited in the discussion before,

17    is projected still at $1.2 billion this year, 2010.

18        Q.  If you could, Mr. Prime Minister, is that 1.2 --

19        A.  -- billion.

20        Q.  With a B?

21        A.  With a B.  It's $1.2 billion on the current

22    budget.  This is just current expenditure minus

23    revenues.  It does not include development expenditure.

24    When you include development expenditure, the over-all

25    deficit.  Hence, the need for aid is more than

Fayyad - 359


1    $1.9 billion, with a B.

Page 307

Fayyad Depo Transcript.txt

2          So yes, notwithstanding the improvement in

3     revenue performance, we are still highly dependent on

4     foreign aid.  The deficit is very large.

5          And, right now, as a matter of fact, given what

6     we have received in terms of aid during the first six

7     months of the year, we have received less than was

8     projected for this year, and we're currently undergoing

9     very very great difficulty.

10          In fact, in the past few days, I've been

11     completely preoccupied trying to find the money needed

12     to make the bills for the month of July, which is not

13     assured as of yet.

14          So the fact there was recovery doesn't mean that

15     we are out of the woods in terms of our financial

16     position, which is still very precarious and highly

17     dependent on aid goals which have not surfaced and, so

18     far, not have been actually in line with commitments of

19     budgets made this rear.

20          MR. WISTOW:  Move to strike.  Not

21     responsive.

22     Q.  The next question, sir, relates to Exhibit 9.

23     I'm not going to show it you right now, unless you need

24     to see it to refresh your recollection.

25          But that's the exhibit that talked about the

Fayyad - 360


1     commitment that had been made by 87 countries and

2     international organizations that had pledged $7.4

3     billion.  And that was the article from December 18,

4     2007.

5          Roughly, sir, of the $7.4 billion that had been

6     pledged, how much actually came in?

Page 308

Fayyad Depo Transcript.txt

7      A.  That amount was to cover the three-year period
8   2008-2010.  I can tell you what we have received in
9   budget support, and we can add them up.
10         We received $1.8 billion in 2008, we received
11  $1.345 billion in 2009, and we are projected to receive
12  $1.2 billion this year.  The sum total of those three
13  components would represent the largest chunk of aid
14  actually received, you know.
15         On top of that, you need to add what we got in
16  terms of development expenditure aid over-all by the end
17  of the year.
18         My projection is that what we will have received
19  over the three-year period, 2008-2010, would be that
20  amount less than the $7.4 billion.
21     Q.  Thank you.  How much of the funding that you get
22  outside of the budgetary support is from donors?  I mean
23  give us a sense.
24     A.  You know, for example, this year 2010, we -- our
25  revenues, our own revenues -- revenues that we collect

Fayyad - 361


1   to be distinguished from aid that we need -- are
2   projected to amount to $2 billion at the close of 2010.
3          I mentioned to you that we needed -- we would
4   need about $1.9 billion.  So about 50/50.  You know,
5   50 percent of our over-all need is covered by our own
6   revenues, 50 percent is covered by donor assistance, for
7   both current expenditure and development expenditure.
8          I mean it's been declining, and the need for it
9   has been declining, but it's still very large.  We still
10  have very large aid dependency in Palestine.

Page 309

Fayyad Depo Transcript.txt

11    Q.  Over-all, without the donors, would the PA budget

12   be in deficit?

13    A.  Oh, substantial deficit.  Substantial deficit.

14        In fact, I can tell you, even this year, I mean

15   when revenues have been growing firmly at that pace,

16   2010, 2009, and all, if we did not get aid, we would

17   barely be able to pay just salaries and not anything

18   else.

19        I mean this is how bad it would be.  I mean there

20   is no way we'd be able to run the PA without that

21   assistance.

22    Q.  You were asked about this -- a relatively smaller

23   question -- at one point, you were asked about the legal

24   advisors in the Palestinian Authority at the time that

25   you were engaged in the process of working through the

                                             Fayyad - 362


 1   solution of hiring counsel in these cases.

 2        These legal advisors in the Palestinian

 3   Authority, as far as you know, were they trained or

 4   sophisticated in United States litigation matters?

 5             MR. WISTOW:  Objection.

 6    A.  No.  I don't believe so.  If any, very limited.

 7   And I know this is the case because we are really keen

 8   in developing our capability in this important area.

 9        And I personally have taken an interest in

10   looking for adequately trained people in this area, and

11   I have not been successful finding.

12        So no.  Lawyers we have are not well versed in US

13   law.

14    Q.  You were asked some questions about the funding

15   of sewer, health, medical, and electrical and other
                         Page 310

Fayyad Depo Transcript.txt

16    power in the Gaza after the Israeli incursion there.

17         If you could explain, why does the Palestinian

18    Authority support Gazans in that regard, and not do --

19    let Hamas take care of them, as the questions suggested.

20    A.  Because it's our responsibility.  I mean you had

21    it right when you said support Gazans.

22              THE COURT REPORTER:  You had what?

23              THE WITNESS:  Pardon me?

24              THE COURT REPORTER:  I didn't hear you.

25              THE WITNESS:  And then I forgot what I said.

                                          Fayyad - 363


 1              MR. ROCHON:  You had it right when you

 2    support Gazans.

 3              THE WITNESS:  Yes.

 4    A.  We view it as our responsibility, as the

 5    Palestinian Authority acting on behalf of the

 6    Palestinian people throughout the occupied Palestinian

 7    territory, both in the West Bank and Gaza.

 8         And so we do what we do because we are trying to

 9    do the best we can for and on behalf of our people in

10    Gaza.

11         I tell you, you have it right when you said we're

12    doing this for Gazans.  Gazans are citizens, Palestinian

13    citizen.  They're our citizens.  So we do it as a matter

14    of duty, responsibility.

15         Where we could, we did.  And those were areas we

16    found it necessary to intervene and, in fact, we were

17    able to intervene on behalf of the people.  And we did.

18    They're our people.

19         We were not doing it for Hamas or on behalf of

Fayyad Depo Transcript.txt

20  Hamas.  We obviously wouldn't.

21      Q.  I'd like to ask you -- you were asked some

22  questions about the decision to proceed and litigate

23  these cases.  Is that -- and you were asked about your

24  personal commitment on specific questions in one of the

25  declarations.

Fayyad - 364


1          Is the commitment to litigate these cases yours,

2  the government's, no one's?  Whose commitment is it

3  we're talking about?

4      A.  It's a PA commitment.  I believe I answered the

5  question when it was raised.  I meant to actually

6  project a full sense of commitment, and deep commitment

7  in the fullest extent of the word and the term.

8          This is a commitment that the PA takes very

9  seriously.  It is definitely our intention to do the

10  best we can to give ourselves a chance to defend

11  ourselves in this and other cases, in accordance with

12  what US law provides for.

13          And we'll be -- we are completely committed to be

14  respectful of the process in all of its components.  And

15  the commitment extends well beyond me personally.  This

16  is a commitment that we take upon ourselves as a system,

17  as a polity.

18          MR. WISTOW:  Move to strike.

19      Q.  If you could describe for us the cases -- and

20  what this motion is about is to vacate the default

21  judgment and to give the Palestinian Authority an

22  opportunity to litigate these cases.

23          Why is that important?

24      A.  I'm sorry?

Page 312

Fayyad Depo Transcript.txt

25     Q.  Why is it important -- or is it important -- to

                                              Fayyad - 365


1   have an opportunity to defend the Ungar case itself?

2      A.  It is very important, you know, to defend

3   ourselves as a state.

4          A certain action was brought against us in a

5   court of law in the United States, an action we do not

6   feel that we'll be found liable for if there's due

7   process, and if we go through a process that provides us

8   with an opportunity to defend ourselves.

9          It is our belief that if, in fact, that was to

10  happen, that if we're given a chance to defend

11  ourselves, that it is likely that we will not be found

12  liable in this particular case.

13         That's why we feel strongly about being given a

14  chance to defend ourselves.

15     Q.  The impact of the default -- excuse me.

16         The impact of the cases brought in the United

17  States under the ATA -- the Anti-Terrorism Act -- what

18  is the potential impact of those cases on the

19  Palestinian Authority taken as a whole?  That is, those

20  cases taken as a whole.

21             MR. WISTOW:  Objection.

22             MR. ROCHON:  Basis.

23             MR. WISTOW:  I don't care to state it.

24     Q.  Please answer the question.

25             MR. WISTOW:  I will state it.  Relevance.

                                              Fayyad - 366


1   What difference does it make what the impact of the

                         Page 313

Fayyad Depo Transcript.txt

2    other cases are.

3             MR. ROCHON:  Thank you.

4        Q.  You can answer the question, Mr. Prime Minister?

5        A.  It would be substantial.  It would be

6    debilitating.  These are large sums of money.

7             I mean, in the case at hand here, we're talking

8    about a very large sum of money relative to our over-all

9    revenue take and what we can collect and the aid that

10   we've been getting.

11            And when we factor in other cases, most

12   definitely it's something that would be highly

13   destabilizing.  It is something that we cannot afford.

14            In this particular case, at this juncture, all

15   we're looking for is an opportunity to defend ourselves.

16       Q.  What is the potential impact on the donor

17   committee of these large judgments in these cases, if

18   they were to occur?

19            MR. WISTOW:  Objection.

20       Q.  I said donor committee.  I meant donor community.

21       A.  Yes.

22            MR. WISTOW:  Objection.

23       Q.  You may answer the question this time.  This time

24   I don't care what it is.  You can answer the question.

25       A.  I think it would be a chilling effect on the

                                        Fayyad - 367


1    donor community's attitude to provide us with the aid

2    that is needed.

3             I mean, as it is, it's not really so easy to get

4    the assistance that we need, particularly for what we

5    call the current side of the budget, meaning current

6    expenditure, operational expenditure -- like wages and
                        Page 314

Fayyad Depo Transcript.txt

7   salaries and other operational expenditures.

8       To really factor in the possibility of having to

9   pay substantial amounts of money in connection with

10  these lawsuits, I don't believe the donors would be okay

11  with it in the terms of them feeling that their

12  resources that they are committing or making available

13  for development purposes are being siphoned off to be

14  used in connection with this litigation, with these

15  lawsuits.

16  Q.  Last question.

17  A.  That's what I think, I mean, that that would be

18  the case.

19  Q.  Last question, Mr. Prime Minister.

20      The commitment that was referenced to litigate

21  these cases that was made by you in the declaration in

22  December of 2007, have you followed through on that

23  commitment in connection with all of the other cases in

24  which the -- ATA cases in the United States?

25      MR. WISTOW:  Objection.

Fayyad - 368


1   A.  It is a commitment, you know, across the board in

2   connection with all the cases where there's pending

3   action in the United States.

4       And it's a commitment that we have demonstrated.

5   This is not a matter of words.  This is not something

6   that I would make a declaratory statement on only.

7       It is something that is backed fully by actions

8   that we have taken, not only in connection with the fact

9   that we have hired legal counsel to really pursue this

10  and other matters in this area in a serious and

Page 315

Fayyad Depo Transcript.txt

11    competent way, but also in the extent to which we

12    demonstrated to the process, in all of its aspects, all

13    of its phases, and throughout -- whether talking about

14    discovery in connection with production of evidentiary

15    material required, and also in various discussions and

16    other aspects of litigation, including settlement in

17    some -- which clearly demonstrates commitment to process

18    as foreseen and provided for under US law.

19       Q.  Thank you, sir.

20              MR. ROCHON:  May I ask the time,

21    Mr. Coopersmith?

22              THE VIDEOGRAPHER:  12:19.

23              MR. WISTOW:  All right.

24              MR. ROCHON:  That was 16 minutes, not 15.

25    And I do apologize.

                                             Fayyad - 369


1              MR. WISTOW:  I don't want to use the word

2    smarmy, but I can't think of another adjective.

3              Can we --

4              MR. STRACHMAN:  We'll take a break.

5              MR. ROCHON:  Go off the record?

6              MR. WISTOW:  Yes.  Please.

7              THE VIDEOGRAPHER:  Going off the record at

8    12:19.

9              (Short recess taken.)

10              THE VIDEOGRAPHER:  On the record at 12:30.

11              MR. ROCHON:  As I indicated off the record,

12    one quick thing to put on the record, which is that,

13    when you summarized my position on the length of the

14    time for depositions, you may have gotten it wrong.

15              I'm not saying my time eats into yours.  You

                         Page 316

Fayyad Depo Transcript.txt

16    have your seven hours.  You do with it as you wish.
17    Mine doesn't --
18            MR. WISTOW:  It looks like it's going to be
19    moot anyway.
20            MR. ROCHON:  Okay.  Go ahead.
21            MR. WISTOW:  It looks like we're not going
22    to have a problem.
23            MR. ROCHON:  Okay.  Go ahead.
24    REDIRECT EXAMINATION BY MR. WISTOW:
25      Q.  I want to talk with you just a little bit,

                                        Fayyad - 370


 1    Mr. Fayyad, about the -- I think you talked about a
 2    devastating effect paying the judgment in this case
 3    would have on the PA's financial situation, correct?
 4      A.  Yes.
 5      Q.  I'm focusing you on that.
 6          Now, do you know how much money is tied up in
 7    reference to the Ungar case?  Roughly.
 8      A.  I mean I know there's Pension Fund money tied up.
 9    Probably $50 million.
10      Q.  If I told you that more than $116 million was
11    tied up, would that be a surprise?
12      A.  It probably is within the realm of what I would
13    expect, yes.
14      Q.  If I told you it's significantly more than
15    $116 million, would that surprise you?
16      A.  Maybe not.
17      Q.  Okay.  Whatever's been tied up is totally
18    unavailable to you at the present time, right?
19      A.  It isn't available to us for use at the present
                            Page 317

Fayyad Depo Transcript.txt

20  time.

21      Q.  Right.  And it's not affecting your ability to

22  fund anything one way or another at the moment, because

23  you don't have access to it?

24      A.  But it has affected our ability already.

25      Q.  In the past.

Fayyad - 371


 1      A.  No.  In the following sense.

 2          You know, we always had a deficit, a substantial

 3  need for foreign assistance to fund that deficit

 4  throughout the period this was litigated -- and, in

 5  recent years, actually substantial deficit.

 6          And what it meant is that, by not having access

 7  to those funds, at least part of them, because they do

 8  not all fall in the same category, the point is we had

 9  to resort to bank borrowing in order to be able to make

10  end meets.

11          And this is way beyond what banks would -- you

12  know, whatever recourse to the banking system we would

13  have made in the absence of that attachment or the

14  freezing of those assets.

15      Q.  There's no question that getting the money would

16  be a benefit to you.  Getting it unfrozen and handed

17  over would be a benefit.

18          We all agree with that, correct?

19      A.  It definitely would be a benefit because we have

20  substantial liabilities, corresponding liabilities,

21  given the absence from our income stream of the assets

22  frozen.

23      Q.  All I'm doing is agreeing with you.  We're saying

24  it's a benefit if you get the money, correct?

Fayyad Depo Transcript.txt

25    A.  It's more than can be reflected by just saying

Fayyad - 372

 1    it's a benefit.

 2    Q.  It's a substantial benefit if you get the money,

 3    correct?

 4    A.  I certainly believe it would be great relief if

 5    those funds were unfrozen, for sure.

 6    Q.  But --

 7    A.  Not to mention, if I may, that some of those

 8    assets actually do not belong to the Palestinian

 9    Authority.

10         And I feel very bad about, in particular, for

11    example, Pension Fund money being frozen.  I mean that

12    money belongs to pensioners.

13    Q.  May I suggest that you consider --

14    A.  And if that money does not become available, with

15    the Pension Fund running out of money, it's a liability

16    of the government.  So I mean the tale on this has not

17    really all been written.  That's one.

18         And, secondly, we're talking about substantial

19    sums of money, not only in connection with this case,

20    but other cases.

21              MR. WISTOW:  You know, I just -- you've

22    given me a limited amount of time.  We're trying to

23    accommodate.

24              MR. ROCHON:  I haven't given you a limited

25    amount of time.  The rules give you your time.

Fayyad - 373

 1              MR. WISTOW:  I don't agree with that.

Page 319

Fayyad Depo Transcript.txt

2    Q.  Is this the kind of cooperation we can expect in

3    future, the way you're responding to my questions?

4              MR. ROCHON:  Objection.

5    Q.  Is it?

6    A.  What do you mean by cooperation?

7    Q.  Withdraw that.

8              MR. ROCHON:  Mr. Prime Minister, don't

9    answer that.

10   Q.  May I suggest, if you feel badly about what's

11   happening with --

12             MR. ROCHON:  Counsel, do you have a

13   question?

14             MR. WISTOW:  Yes.

15             MR. ROCHON:  What is it?

16   Q.  Have you considered, to mollify your feelings

17   about the Palestinian Investment Fund, that somebody

18   goes to court and tells Judge Lagueux, Something's

19   wrong?

20        Have you thought about that?  Yes or no.

21             MR. ROCHON:  Asked and answered.

22   A.  Can you please paraphrase.

23   Q.  I'll withdraw the question.

24        You were talking about deficits --

25   A.  Yes.

                                        Fayyad - 374


1    Q.  -- that you have.  Do you know whether the United

2    States is running a deficit?

3    A.  Yes.  The United States --

4    Q.  Very very substantial?

5    A.  Yes.

6    Q.  How about Spain?

                        Page 320

Fayyad Depo Transcript.txt

7    A.  I imagine a substantial deficit.

8    Q.  How about Greece?

9    A.  Yes.

10   Q.  How about the UK?

11   A.  Yes.

12   Q.  How about Italy?

13   A.  Okay.

14   Q.  How about the European Union?

15   A.  What is the point, sir?

16   Q.  What?

17   A.  What is the point?

18   Q.  I don't have to tell you the point.  I'm just

19   asking you, doesn't the European Union have all kinds of

20   deficits.

21   A.  The Palestinian Authority is not the European

22   Union.  Nor is it the United States.  The capacity of

23   the United States to run deficits is enormous.  Ours is

24   very very limited.

25   Q.  Sir -- sir --

                                        Fayyad - 375


1    A.  No, no.  But you're asking me a question with

2    that implication.

3    Q.  There is no implication.

4         MR. WISTOW:  I'm running out of time.  I'm

5    asking that he just answer my questions.

6    A.  I am.

7    Q.  We're running out of time.

8         All I asked is whether or not the United States

9    has a deficit.  That's all I asked.

10   A.  I am aware that the United States is running

                        Page 321

Fayyad Depo Transcript.txt

11    deficits, but the United States is not seeking foreign

12    assistance to bridge the gap in its finances.  We are.

13        Q.  Is the United States borrowing money overseas?

14        A.  Borrowing is different from getting grants.

15        Q.  Okay.  It's a lot better to get grants than to

16    borrow, I suggest to you.

17            The question, sir, is, is the United States --

18                MR. ROCHON:  Counsel, is that a question?

19        Q.  The question is, is the United States running a

20    deficit.

21        A.  It is running a deficit.

22        Q.  Okay.  That's all I'm asking.

23        A.  And it can finance it by borrowing.  We cannot

24    borrow.

25        Q.  Mr. Fayyad, if you want to come back after I

                                                    Fayyad - 376


1     finish and clarify, that's fine.  I would like to get a

2     straightforward answer to a question.

3             Let me ask you this, sir.

4         A.  Yes.

5         Q.  We were talking about what kind of growth did you

6     have in your gross domestic product last year.  Do you

7     know?

8         A.  Seven to eight percent.

9         Q.  Seven to eight percent.  What was the US --

10        A.  Not 78.

11        Q.  No.  Seven to eight.

12        A.  Yes.

13        Q.  I heard it.

14        A.  In that range, yes.

15        Q.  Okay.  And do you know, roughly, what the United

Fayyad Depo Transcript.txt

16   States was?

17       A.  About three percent maybe.

18       Q.  How about negative two and a half percent?

19       A.  When?

20       Q.  Last year.

21       A.  That may have been the case.

22       Q.  Okay.  That's all I'm asking.

23       A.  Okay.

24       Q.  You're an economist, a Finance Minister.  How

25   about the European Union?  What did they do in terms of

Fayyad - 377


 1   their gross domestic product?

 2       A.  The world went into deep financial crisis during

 3   2010 and 2009.  There was negative growth in several

 4   areas of the world, yes.  Okay.

 5       Q.  That's right.  And you had -- the West Bank had

 6   seven to eight percent increase in gross domestic

 7   product, correct?

 8       A.  After nearly ten years of recession conditions or

 9   outright recession, acting at a very low on the strength

10   of the stimulus.

11       Q.  Let me try it one more time.

12       A.  Yes.

13       Q.  The West Bank had an increase, in 2009, in its

14   gross domestic product of seven to eight percent?

15       A.  Correct.

16       Q.  Okay.  And, actually, that was better than

17   expected, correct?

18           Withdraw the question.  I want to move on.

19       A.  But you're asking me --

Fayyad Depo Transcript.txt

20    Q.  I withdraw the question.

21    A.  You're asking me questions and I have to answer

22    you analytically.  I mean the West Bank --

23    Q.  I withdraw the question.

24    A.  -- because you're starting from a very weak base.

25    The US economy --

Fayyad - 378


1    Q.  I am going to ask you to stop.

2         MR. WISTOW:  There is no question pending

3    and he's using up my time.  I withdrew the question.

4         MR. ROCHON:  Certainly, the court

5    reporter --

6    A.  If I may just clarify one thing.

7         MR. WISTOW:  This is not going to count on

8    my time.  This is unconscionable.

9    A.  I want to relieve you of that.

10        If you feel that I'm really taking part of your

11   time, I am prepared to offer the amount that you think I

12   am using of your time unproductively.

13        MR. WISTOW:  Is that agreeable?

14        MR. ROCHON:  We're not going to -- let's --

15        MR. WISTOW:  Is that agreeable?

16        MR. ROCHON:  We'll deal with it.  Just ask

17   your next question.

18        MR. WISTOW:  Okay.  And I move to strike

19   everything when there was no question pending.

20   Q.  Now, you said there were no lawyers that you had

21   availability for who had training in American law.

22        Do you remember that testimony?

23   A.  Yes, I did.

24        MR. ROCHON:  Objection.  Mischaracterizes

Page 324

Fayyad Depo Transcript.txt

25    the testimony.

Fayyad - 379

1    A.  I did testify to the effect that --
2    Q.  You already said, Yes, I did.
3    A.  Look, what I said was our lawyers are not well
4    versed in United States law.  That was precisely what I
5    said.
6    Q.  Do you know any lawyers who are consultants to
7    the PA who were trained as lawyers in the United States?
8    A.  I don't know.
9    Q.  Do you know who Omar Dajani is?
10    A.  I don't believe I know Omar Dajani.
11    Q.  Do you know that he's a legal consultant to the
12    PA?
13            MR. ROCHON:  Objection.  He just said he
14    didn't know him.
15            MR. WISTOW:  I'm saying, do you know that.
16    I'm trying to help him.
17    A.  I don't know.
18    Q.  Do you know a legal consultant named Hiba
19    Husseini?
20    A.  I know Hiba Husseini.
21    Q.  Where was he trained?
22    A.  She is a lawyer.
23    Q.  Where was she trained?
24    A.  I do not know where she was trained.
25    Q.  Well, you said there were none available to you

Fayyad - 380

1    who were trained in the United States that were familiar
Page 325

Fayyad Depo Transcript.txt

2   with American law.

3       A.  I don't know if she was trained in the United

4   States.  I don't know that.  I know who she is.

5       Q.  Okay.  And how about Michael Tarazi?

6       A.  I know Michael Tarazi, not that well.  But I do

7   not know if he -- I do not know if he's a lawyer, to

8   begin with, much less if he was trained in the United

9   States.

10      Q.  Wasn't he a legal consultant to the PA?

11      A.  If I remember well, he worked for or at the

12  negotiations support unit.  He provided technical

13  support for the negotiations team of the PLO.

14      Q.  Was he not a legal consultant?

15      A.  I do not know if he was.

16      Q.  Was he not trained in the United States?

17      A.  I do not know.

18      Q.  Okay.  Now, you were saying that there's a

19  question about the commitments from donors if you have

20  to pay this.

21          Have you spoken to individual donors,

22  representatives of donor nations, and discussed this

23  issue?

24      A.  You know, my sense is, what I described it to be

25  in terms of the chilling impact this would have on

                                    Fayyad - 381


1   donors, came from discussions that from time to time

2   happened, including around the time of that donor

3   conference in Paris, on which there was -- which you

4   showed me, in December 2007.

5       Q.  Who did you speak to that indicated this would

6   have a chilling effect?

                        Page 326

Fayyad Depo Transcript.txt

7    A.   Representatives of various donors.

8    Q.   Who?

9    A.   I don't remember individuals per se.

10   Q.   How about the countries?

11   A.   European Union.

12   Q.   There was a representative of the European Union

13   who commented?

14   A.   Several of them.  When I say European Union,

15   within the European Union, the EU itself as an

16   organization -- the Commission, that is.

17   Q.   Yes?

18   A.    There were about 80 or 90 members of the

19   international community attending that conference, a

20   large number of European Union countries participating.

21        The total number of countries in the European

22   Union is 27.  So there are many of them.

23   Q.   Would you name one person, please.  Just one --

24   A.   I can't.

25   Q.   Let me finish the question.

                                        Fayyad - 382


1         Would you name one person who indicated to you

2    that there would be a chilling effect if the judgment in

3    this case was paid.  One person.

4    A.   I cannot really give you a name.

5    Q.   Okay.

6    A.   All I can tell you is, based on those discussions

7    that I had and which came up from time to time -- and

8    not only at that donor conference -- my sense is that,

9    you know, it would have a chilling effect on them if

10   they knew effectively their money was going to be used

                          Page 327

Fayyad Depo Transcript.txt

11  in connection with such payments.

12      Q.  So that's your surmise?

13      A.  Based on those discussions.

14      Q.  But those discussions which you can't identify

15  for me at all --

16      A.  You know --

17      Q.  -- is that true?

18      A.  -- I have lots of discussions.

19          MR. ROCHON:  Counsel, stop interrupting.

20      A.  I have discussions with donor country

21  representatives on an on-going basis.  We have a very

22  active relationship with the international donor

23  community where all issues of relevance are brought up.

24      And these are periodic.  They happen all the

25  time.  Issues come up.  And I cannot tell you

Fayyad - 383


1  individually whom I spoke to, who said to me what when.

2  But I know it's an issue of relevance to them, for sure.

3      Q.  I'm not asking you when.  I'm just asking you

4  who.

5      This is a matter of importance to you, isn't it?

6      A.  It's a matter of huge importance.

7      Q.  And you don't remember one single person you can

8  identify.  Is that true?

9      A.  I can tell you --

10      Q.  Is that true?

11      A.  I can tell you representatives of the EU did

12  raise the issue with me.

13      Now, at this particular donor conference, it

14  doesn't tend to be the same representatives all the

15  time.  I'd have to go back and see who was in attendance

Page 328

Fayyad Depo Transcript.txt

16  at that particular donor conference or meeting to tell

17  you.

18      But I am certain that that sentiment was

19  communicated to me in more form than one.

20    Q.  As you sit here now, Mr. Fayyad --

21    A.  Yes.

22    Q.  -- can you name one person who discussed this

23  with you and indicated it would have a chilling effect?

24  Just one.

25    A.  I can't give you --

                                        Fayyad - 384


 1    Q.  Okay.

 2    A.  -- a name right away.  But it doesn't mean those

 3  conversations did not take place.

 4      I am here to testify definitely that those

 5  discussions came up.

 6    Q.  Somebody has to decide whether or not your

 7  statements are supportable.  I'm trying to find out --

 8    A.  I'm comfortable with that.  Yes.

 9    Q.  Okay.  Fine.

10      You indicated, in response to questions put to

11  you by Mr. Rochon, that you considered it important to

12  defend this case now.

13    A.  Yes.

14    Q.  And you explained the reasons?

15    A.  Yes.

16    Q.  Why didn't you defend it earlier?  For example,

17  in 2005, when you were involved?

18    A.  As I told you in previous testimony earlier on in

19  this session, that, you know, our position here, in this

                            Page 329

Fayyad Depo Transcript.txt

20    particular case, in terms of where we are today, has

21    evolved into what it is today, beginning with a position

22    where the defense was -- it's not that the PA or the PLO

23    did not try to defend themselves.  They did.

24          And the strategy that challenged the

25    appropriateness or adequacy in terms of jurisdictional

Fayyad - 385


1    issues, in terms of sovereign immunity, I regard that as

2    a line of defense.  I mean it's not true that the PLO

3    did not try to defend themselves.  It was the line of

4    defense that they used.

5          There was evolution away from that, over a period

6    of time, in the direction of seeking an opportunity to

7    have this litigated so it would be an opportunity to

8    defend ourselves against the specific charges made.

9          The way I understand the system is that

10   challenging the jurisdiction in a specific case on a

11   specific submission is a part of the defense.  That's my

12   understanding of it.  I mean it's not --

13         The way I see it, it's not that the PLO did not

14   try to defend itself.  It did, under the strategy that

15   we moved away from over time in an evolutionary way.

16   Q.  In fact, you decided to defend it on the merits

17   after you lost in the District Court, in the Circuit

18   Court, in the US Supreme Court, and immediately after

19   Condoleezza Rice said to President Abbas, This judgment

20   is valid and enforceable against all the PLO's and PA's

21   assets in the United States, and she could not do

22   anything about it.

23         And that's when you decided to defend it on the

24   merits.  Isn't that so?

Page 330

Fayyad Depo Transcript.txt
25          MR. ROCHON:  Objection.

Fayyad - 386


1     Q.  Isn't that so?

2     A.  What you just said, sir, does not seem to be

3   substantiated by the evidence discussed in the course of

4   this deposition.

5         The testimony will show, and statements read and

6   pieces of material evidence cited, strongly indicate

7   that the Palestinian Authority was trying to, in

8   earnest, to find adequate and competent legal

9   representation before that letter by the Secretary of

10  State was sent to President Abbas.

11        Looking for competent legal counsel in order to

12  represent it and to have this litigated on merits, as

13  you say, I mean before the letter from Secretary of

14  State Condoleezza Rice was sent to the President.

15    Q.  But it was a matter of a few months after that

16  letter from Condoleezza Rice that it was decided to do

17  it on the merits.  Isn't that so?

18          MR. ROCHON:  Objection.

19    A.  It is not true, based on testimony actually

20  discussed today and presented today, and material read.

21    Q.  And also --

22    A.  It is clear, and I said, and I repeat, and I

23  know -- and this is substantiated by evidence -- that

24  the PA was definitely seeking to recruit, to employ, to

25  hire, to retain the services of legal counsel in 2006.

Fayyad - 387


1         And the letter sent by Secretary of State Rice to
                        Page 331

Fayyad Depo Transcript.txt

2  President Abbas, that was presented to me which I saw

3  for the first time here at this deposition, was a letter

4  that was sent in January of 2007.

5     Q.  Name one lawyer -- one -- who was contacted by

6  the PLO or PA to come into this case.  Just one.

7           MR. ROCHON:  Asked and answered.

8     A.  I mean I don't know.

9     Q.  Okay.

10    A.  But I know that definitely was the case --

11    Q.  Okay.

12    A.  -- that the PLO was looking in the course of --

13    Q.  Do you know who Demming Sherman is?

14    A.  Pardon me?

15    Q.  Demming Sherman.

16    A.  I don't remember.

17    Q.  He was co-counsel --

18    A.  Oh, okay.

19    Q.  -- in this case.

20    A.  Okay.

21    Q.  Does that ring a bell?

22    A.  Co-counsel?  You mean with Ramsey Clark?

23    Q.  Yes.

24    A.  Possibly.

25    Q.  Possibly?  You don't know that?

                                        Fayyad - 388


1     A.  I mean I -- I mean I don't know if Ramsey Clark

2  was working on his own.  He probably had associates,

3  yes.

4     Q.  I'm not talking about associates.  Ramsey Clark

5  was not admitted to practice in Rhode Island.

6     A.  Okay.

                    Page 332

Fayyad Depo Transcript.txt

7     Q.  He had co-counsel who signed all the pleadings,

8   went to hearings.  Are you aware of that?

9     A.  I'm not aware.  I do not know how the proceedings

10  went.

11    Q.  Okay.

12    A.  All I know is that that was the position taken

13  and that was the submission made by the legal counsel

14  there.

15    Q.  Did anyone contact --

16    A.  Exactly who did it, I don't know.

17    Q.  Did anyone contact Demming Sherman or his firm to

18  see if they would represent the PLO and PA in 2006?

19    A.  That may have been the case.  I do not know.

20    Q.  Anything could have been.  Did you ask?

21    A.  I was not --

22    Q.  Did you ask?

23          MR. ROCHON:  Counsel, counsel, you're just

24  badgering.

25    Q.  All right.  I want to talk about the Mecca

                                            Fayyad - 389


1   agreement.

2     A.  Yes.

3     Q.  Okay.  Payments were made, and are to be made,

4   directly for Hamas security forces under the Mecca

5   agreement, are they not?

6     A.  Can you please repeat the question.

7     Q.  Payments are made by the PA, under the Mecca

8   agreement, for Hamas security forces.

9     A.  That's not true.

10    Q.  That's absolutely false?

                        Page 333

Fayyad Depo Transcript.txt

11    A.  There's not a provision in the Mecca accord that

12  has something specific pertaining to payments to

13  security forces or anything like that.

14    Q.  But there are payments made that end up

15  supporting security forces, aren't there?

16    A.  I mean --

17    Q.  Aren't there?

18    A.  Payments made available -- or donations, donor

19  assistance -- made available to the Palestinian

20  Authority is used to, among other things, pay salaries

21  and wages for PA employees, civilians and security

22  personnel.

23        That's not to say Hamas.

24    Q.  Well, the security personnel in Gaza, yes?

25    A.  Yes.

Fayyad - 390


1    Q.  Who are they under the control of?

2    A.  Palestinian security in Gaza, at the time this

3  all happened --

4    Q.  Today.

5    A.  Today?

6    Q.  Yes.

7    A.  I mean they're not working.  Security services

8  who are on our payroll right now are not doing anything.

9  I mean they're not functioning.

10    Q.  So you're still sending money into Gaza for

11  security forces?

12    A.  Our own.  Our own people.  People on our payroll.

13  They're not working for Hamas.

14    Q.  How do you determine that?

15    A.  We know that.

Fayyad Depo Transcript.txt

16    Q.  How do you know that?

17    A.  We know that.

18    Q.  How?

19    A.  If we --

20    Q.  How do you know that?

21         MR. ROCHON:  Would you let him answer the

22    question.

23    A.  Let me tell you.

24         If we -- as a matter of fact, if you review the

25    record in terms of what we did since 2007, after the

                                              Fayyad - 391


 1    violent take-over by Hamas in Gaza, you'll find that we

 2    had a policy -- and we still do have a policy, standing

 3    policy -- on not -- on interrupting, on stopping the

 4    payment of anyone who is actually affiliated with Hamas.

 5         I mean it's a matter of policy.  And it's

 6    challenged.  And it's a point on which we were

 7    criticized and continue to be criticized.  But it's

 8    standing policy.

 9    Q.  How do you determine if somebody works for Hamas

10    or not?

11    A.  You know, this is not really a large country, and

12    people know each other.  We have our way of knowing.

13         I mean, what I'm really telling you here is

14    something that can be substantiated very easily.

15    Q.  How?

16    A.  We have -- number one, I mean we have clear

17    decisions on this, Cabinet decisions, decrees and all.

18         Anyone who, as a matter of fact, is involved in

19    working for Hamas after the separation took place, after

                              Page 335

Fayyad Depo Transcript.txt

20    the violent take-over by Hamas in Gaza, is somebody

21    whose wage payment is interrupted, for certain.

22       Q.  All I'm asking you is how you determine, if you

23    know.

24       A.  Information.

25       Q.  Well, how do you get information?

Fayyad - 392

1        A.  We get information.  We have access to

2    information.  We know people in Gaza, and we do get

3    reports and we come to that determination.

4           We have a committee set up to review that

5    information consisting of various security branches.

6    They come to a determination, based on reports we

7    receive, as to the authenticity of the information we

8    receive.  And we make the best judgment, determination,

9    as to whether or not somebody's in compliance.

10          Somebody in compliance, the definition of

11    somebody in compliance is someone who is not, even

12    though they're in Gaza, who is not working with Hamas.

13    Most certainly in security.

14       Q.  Is there a hearing?  What happens?  How do you do

15    this?

16       A.  Those are challenged from time to time.  We look

17    into them again.  We try to verify.  We seek more

18    information.  We try as best as we can.

19          And we have been challenged in courts of law on

20    more than one occasion, as a matter of fact.  We defend

21    ourselves on the allegations I described to you.

22          There is something that happened in Gaza, in the

23    summer of 2007, that was a violent take-over of power

24    illegally by Hamas.

Page 336

Fayyad Depo Transcript.txt
25          And, on that basis, people affiliate d with Hamas

                                        Fayyad - 393


1   and their military way, clearly, you know, are outside
2   of the law.  And so, therefore, cannot be on our
3   payroll.  That's policy.
4          It's subject to challenge.  It's being challenged
5   in Palestinian courts, and we answer this way.  But I
6   mean it happens all the time.
7      Q.  How much money do you send into Gaza each year
8   approximately?
9      A.  About $120 million a month for all categories.
10     Q.  About $1.4 billion a year?
11     A.  About -- yes.  $1.4 billion annually.
12     Q.  Okay.
13            MR. WISTOW:  I have nothing further.
14            MR. ROCHON:  Thank you.  This concludes the
15  deposition, correct?  You're done.
16            MR. WISTOW:  Subject to the motions I'm
17  filing.
18            MR. ROCHON:  He will review the transcript,
19  and we can go off the record.
20            THE VIDEOGRAPHER:  Going off the record at
21  12:54.
22            MR. WISTOW:  There is one --
23            MR. ROCHON:  We have to go back on record --
24  I'm sorry --
25            MR. WISTOW:  Please.

                                        Fayyad - 394


1            MR. ROCHON:  To ask the witness?

Fayyad Depo Transcript.txt

2          MR. WISTOW:  Yes.  I'm just confused about

3     something.

4          MR. ROCHON:  Okay.

5          THE VIDEOGRAPHER:  Back on the record at

6     12:54.

7          MR. WISTOW:  Okay.

8     CONTINUED REDIRECT EXAMINATION BY MR. WISTOW:

9      Q.  Of the $7.4 billion pledged for the three-year

10    period, how much did you actually receive from donors

11    for that three years?

12     A.  Let me just add them up so I can give you a

13    number.

14         2.4 -- I mean I'll just speak out as I do this.

15     Q.  Fine.

16     A.  And I'm talking about budget support, category of

17    assistance called budget support.

18     Q.  I'm not familiar with that.  I'm talking about

19    the payments made by donors to the PA.

20     A.  I know.  If you'd just allow me to work through

21    this because I do not have a ready answer for you.

22         I'm trying to add this up so, in case this is

23    submitted to someone who's familiar with what I'm

24    talking about, they'll know what I'm talking about, and

25    it will be accurate.

                                        Fayyad - 395


1      Q.  Fair enough.

2      A.  The category that I'm really adding up now

3     represents the budget -- so-called budget component of

4     donor assistance.  $2.4 billion in 2008, $1.34 billion

5     in 2009, and this year we haven't received it, but it's

6     projected, what we needed out of that $7.4 billion, was
                          Page 338

Fayyad Depo Transcript.txt

7   $1.24 billion in 2010.

8       Now, let's see.  That adds up to -- eight, ten,

9   three, four, five -- this add up to about $5.08 billion

10  for the three years, emphasizing, as I must, that the

11  figure for 2010 is still a projection.  The year is not

12  up, as you know.

13      In addition to that, you need to add the

14  component of donor assistance that's called development

15  assistance.

16      Q.  Okay.

17      A.  And there was not really much of that in 2008.

18  Maybe about $200 million, something of that order, or

19  maybe even less.  About that much, a little bit more, in

20  2009.  And it's still early in 2010.  This is a lot

21  slower.

22      So maybe, all in all, at least so far in 2007 --

23  from 2008 onwards -- we're talking about maybe $500

24  million, $600 million, for the three years.

25      Q.  So if you add that --

                                        Fayyad - 396


1       A.  So $5.6 billion, $5.7 billion.  Something like

2   that.  Something like that.

3       Q.  How much did you ask for?

4       A.  I am emphasizing that what we're really talking

5   about here is something that is in the nature of a

6   projection.

7       Q.  I understand.  How much did you ask for?

8       A.  Probably around that much.

9       Q.  Okay.  Thank you.

10      A.  And -- except that what was promised was supposed

                                Page 339

Fayyad Depo Transcript.txt

11    to cover not only those areas, but others as well,

12    including money for UNRWA and other such institutions.

13       Q.  How much did you ask for?

14       A.  We asked for this much.

15       Q.  How much?

16       A.  About this much, $5.6 billion.  And what donors

17    pledged was 7.4, and what we're likely to get, from the

18    best figures I gave you, is what I've just added.

19       Q.  Pretty much what you asked for?

20       A.  But it's less than what was pledged.

21       Q.  Fine.

22       A.  And we ended up --

23            MR. ROCHON:  Counsel, the witness is still

24    testifying.  You're welcome to leave.  We're still on

25    the record.

                                        Fayyad - 397


1        A.  And we ended up needing more money in 2009 than

2     was projected, because of the war in Gaza.

3             MR. ROCHON:  If I could, Mr. Prime Minister,

4     what's the time, please?

5             THE VIDEOGRAPHER:  12:58.

6             MR. ROCHON:  Thank you.

7     RECROSS-EXAMINATION BY MR. ROCHON:

8        Q.  On the numbers he was just asking you about,

9     Mr. Prime Minister, you mentioned the war in Gaza?

10       A.  Yes.

11       Q.  And how much -- the numbers you'd asked for, the

12    $5.6 billion, that was in 2007.

13            When was the incursion, the war in Gaza?

14       A.  It was late 2008, early 2009.

15       Q.  And, obviously, these numbers could not take into
                          Page 340

Fayyad Depo Transcript.txt

16    consideration that?

17        A.  Definitely not.  Definitely not.

18        Q.  How much has the PA paid in connection with the

19    war in Gaza, that was not originally budgeted for that?

20        A.  We had to request supplemental, in 2009, in the

21    amount of $300 million.  And that was not the over-all

22    need.  It was just as much money as we thought we might

23    be able to get.  It was substantially below what was

24    required.

25            So, minimally, $300 million additional to what

Fayyad - 398


1    was projected before, in addition to the fact that we

2    used less of what was available for other sources.

3            In other words, we diverted or reclassified or

4    recommitted funds that were originally committed for

5    other purposes in order to be able to deal with the

6    immediate needs of our people in Gaza in the immediate

7    aftermath of that war.

8        Q.  You were asked questions about the $5.6 billion

9    that you roughly got.

10            Was the 5.6 billion number that was sought, was

11    that money sufficient, as it turns out, to address the

12    deficit shortages or the economic problems faced by the

13    PA?

14        A.  No.  In addition, there's something I really need

15    to make absolutely clear.

16            Even if we got everything that we were looking

17    for, remember it's foreign taxpayers' money.  It's not

18    our money.  You know, even if we get everything we're

19    looking for from donors today, I mean it doesn't really

Page 341

Fayyad Depo Transcript.txt
20   mean that we're healthy.

21      I mean we rely on our very existence on donor

22   assistance.  And the fact that we're getting it does not

23   mean that we're in good condition.  You see what I'm

24   saying?

25      Q.  Yes.

                                          Fayyad - 399


 1      A.  Even if we get every penny that we're looking for

 2   from donors, it doesn't mean that we're well.  We're

 3   not.  Because we're so reliant on aid.

 4      Q.  Thank you.

 5           MR. ROCHON:  I have no further questions.

 6           MR. WISTOW:  One more.

 7   REDIRECT EXAMINATION BY MR. WISTOW:

 8      Q.  If you settle this case, how much money will you

 9   free up?

10      A.  With the amount that's frozen?

11      Q.  You don't know the amount that's frozen, do you?

12      A.  I mean we talked about it.  You mentioned the

13   figure before.

14      Q.  You don't know the number?

15      A.  I don't know with precision how much it is.

16      Q.  Do you know what the judgment is today?

17      A.  The judgment was $116 million in this particular

18   case.

19      Q.  If you're so concerned about it, have you tried

20   to find out if there's interest?

21      A.  I mean we're trying to defend ourselves, because

22   I do not believe that we'll be found liable if we get a

23   chance to defend ourselves.

24      Q.  Did you hear my question?
                        Page 342

Fayyad Depo Transcript.txt
25      A.   I heard your question, yes.

                                              Fayyad - 400


     1      Q.   It's important to know how much you owe.
     2      A.   I mean I know that the judgment was $116 million.
     3      Q.   Have you tried to find out if there's interest
     4   that's added to that by law in the United States?
     5      A.   $116 million is large enough for me.
     6      Q.   It's good enough.  The rest of it's immaterial.
     7           MR. ROCHON:  Counsel --
     8      A.   It's not immaterial.  It's large enough.  I mean
     9   I said it's a very large sum of money for us.
    10      Q.   It's even bigger than you think.
    11      A.   I didn't say that that's the full extent of what
    12   it may be.  I said that this is the judgment that was
    13   entered at the time it was entered.
    14           And, usually, interest accrues and fees accrue to
    15   original judgments.  I'm generally aware of that.  How
    16   much precisely it is, I cannot tell you right now.  But
    17   I know it's large enough.
    18      Q.   Okay.  Thank you.
    19           MR. ROCHON:  I have no further questions.
    20   We can go off the record.
    21           THE VIDEOGRAPHER:  Going off the record at
    22   1:02.
    23           (Deposition concluded at 1:02 a.m. Israel
    24   time.)
    25

                                              Fayyad - 401


     1                 CERTIFICATE OF DEPONENT
                          Page 343

Fayyad Depo Transcript.txt

2

3    I, SALAM FAYYAD, do hereby certify that the foregoing

4   testimony is true and accurate to the best of my

5   knowledge and belief.

6

7

8

9

10    DATE                          SALAM FAYYAD

11

12

13

14  This          day of              , 2010, personally

15  appeared SALAM FAYYAD, and he made oath to the truth of

16  the foregoing answers by him subscribed.

17

18

19

20  Before me,                      , Notary Public.

21  My commission expires:

22

23

24

25

                                              Fayyad - 402


1          CERTIFICATE OF REPORTER

2      I, Isabelle Klebanow, a Notary Public duly

3   commissioned and qualified, do hereby certify that

4   pursuant to notice, there came before me, on the 28th

5   day of July, 2010, at 4:15 p.m. Israel time, the

6   following named person, to wit:  SALAM FAYYAD, who was

Fayyad Depo Transcript.txt

7  by me duly sworn to testify to the truth and nothing but

8  the truth; that he was thereupon carefully examined upon

9  his oath and his examination reduced to writing under my

10  supervision; that this deposition is a true record of

11  the testimony given by the witness.

12       I further certify that I'm neither attorney nor

13  counsel for, nor related to, nor employed by any of the

14  parties to the action in which this deposition is taken

15  and further that I'm not a relative or employee of any

16  attorney or counsel employed by the parties hereto, or

17  financially interested in the action.

18       IN WITNESS THEREOF, I have hereunto set my hand

19  and affixed my seal this 2nd day of August, 2010.

20

21

22                    ISABELLE KLEBANOW
23                    NOTARY PUBLIC

24  My commission expires:  8/31/2012

25

Page 345