المحامي محمد دحله ومشاركوه ـ مكتب محاماة وكاتب عدل

מוחמד דחלה ושות' - משרד עו"ד ונוטריון

**Muhammad Dahleh & Associates – Law Offices and Notary**

| | | |
|---|---|---|
| **4 Ibn Batotah St.** | רח' אבן בטוטה 4 | شارع ابن بطوطة 4, القدس |
| **Pob 1342 Jerusalem 91013** | ת.ד. 1342 ירושלים 91013 | ص.ب. 1342, القدس 91013 |
| **Tel: 02-6274070/1** | טל:02 – 6274070/1 | هاتف:02 – 6274070/1 |
| **Fax: 02-6274060** | פקס: 02 – 6274060 | فاكس: 02 – 6274060 |

**E-mail: Dahleh@Bezeqint.net**

| | | |
|---|---|---|
| **Muhammad Dahleh, Adv.*** | מוחמד דחלה, עו"ד | المحامي محمد دحله* |
| LLB. LLM. | מוסמך למשפטים | ماجستير في القانون |
| **Suhad Hammoud, Adv.** | סהאד חמוד, עו"ד | المحامية سهاد حمود |
| LLB. LLM. | מוסמך למשפטים | ماجستير في القانون |
| **Saed Dacca, Adv.** | סעיד דקה, עו"ד | المحامي سعيد دقه |
| **Saleh Dahleh, Adv.** | סאלח דחלה, עו"ד | المحامي صالح دحله |
| **Muhammad Masalha, Adv.** | מוחמד מסאלחה, עו"ד | المحامي محمد مصالحه |
| **Itzhak Harel, Adv.** | יצחק הראל, עו"ד | المحامي اسحق هارئيل |
| **Murad Khatib, Adv.** | מוראד ח'טיב, עו"ד | المحامي مراد خطيب |

Also Member of New York Bar        חבר בלשכת עוה"ד בניו יורק        *عضو في نقابة المحامين في نيويورك

**Expert Report by Advocate Muhammad Dahleh**

**Background & Qaulfications:**

A.        **Introduction**

1.        My name is Muhammad Dahleh. I was born in Nazareth – Israel. I'm a member of the Israeli Bar Association as well as of the New York Bar. I am the owner of a law office in Jerusalem which specializes in Torts law, Human Rights Law and Civil Litigation. I am a graduate of the law faculty of the Hebrew University in Jerusalem and a post graduate of the Washington College of Law at the American University in Washington DC where I mainly studied International Human Rights Law. The PA/PLO counsel has engaged me to serve as an expert witness in the case of the Estate of Yaron Ungar and others vs. The Palestinian Authority and others. I hereby provide my opinions

and the basis therefor on issues that are within my field of expertise – different issues in Israeli Torts Law.

**B. Qualifications to render my opinion**

My academic studies and legal training, as well as my 19 years of practice as an attorney have provided me with the knowledge base and experience in the subject matter of my opinion.

Since the beginning of my practice I have handled hundreds of tort cases in which I represented either the plaintiff/s or the defendant/s in Israeli courts at all levels (Magistrate Courts, District Courts and the Supreme Court).

Since the year 1993 I have been the legal counsel for two insurance companies and I have represented them in hundreds of tort cases in Israeli Court.

My Curriculum Vitae is attached as Exhibit A.

C.    **Biography**

I was born in Nazareth in 1968. After high school graduation I studied law at the Hebrew University in Jerusalem after which I completed the first part of my legal internship in one the leading law firms in Israel, Yigaal Arnon and Co, and the second part of my legal internship at the Israeli Supreme Court, being the first Arab legal trainee in the Supreme Court.

I passed the Israeli Bar exams and was admitted to the Israeli Bar in 1991.  I studied International Human Rights Law at the Washington College of Law for one year and graduated in 1992, after which I worked for one year as an attorney at the Association for Civil Rights in Israel (ACRI). In 1993 I joined the Law Office of attorney Mazen Qupty and together established a partnership (Qupty, Dahleh & Associates). In 2002, I established my own office which consists now of 7 lawyers (including me) and 3 interns. We represent, among others, insurance

companies, employers, employees, and persons injured or killed in a variety of cases including road traffic accidents and shootings. For more details see my attached C.V.

D.     **Prior testimony as expert witness** – In the previous four years I have not testified as an expert witness in any trial or deposition.

E.     **List of publications in the last ten years:**
       I have written in the last ten years two legal critiques of rulings issued by The High Palestinian Court in tort cases, which were published in the legal magazine Justice and Law in October 2004 and December 2006.

F.     **Terms of engagement and compensation** – I am being compensated at the rate of 400$ per hour for my services as an expert in this case. The compensation is not conditioned on the content of my opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

G.     **Material considered** – In addition to the materials cited in the report, I have also reviewed numerous Israeli Tort Law Text books, Israeli statutes and Israeli case law.

<u>**My opinions and the basis therefor**</u>

2.     In my opinion if the Ungar case was filed in an Israeli Court, based on the Israeli law, it would have been rejected. The Israeli Court would not hold the PLO or the PNA liable based on the tort law of Israel known as the Civil Wrongs Ordinance (New Version) – 1968, (hereinafter "CWO"). In addition, even if an Israeli court were to find liability it would not award damages in anywhere near the amount previously awarded by the American court.

3.      Although numerous attacks have been carried out by Palestinians against Israelis in Israel and the Occupied Palestinian Territories (hereinafter the "OPT") since 1990, and dozens of lawsuits have been filed in Israeli Court against the PA, to date there is not even one Israeli Court ruling that holds the PLO or the PA liable in torts towards the injured or the heirs and dependants of those who were killed.

4.      On the contrary, in a ruling on November 25, 2009 the District Court of Nazareth (Israel) rejected a lawsuit that was filed by an Israeli woman called Shola Gaon who was injured in an attack that took place on November 27, 2001 which was carried out by two Palestinians in the City of Afola in Israel[1]. The attackers came at noon that day and started shooting arbitrarily at innocent bystanders using machine guns that they brought with them. As a result of their attack, several people were killed and others were injured. Shola Gaon was one of the injured. She sustained a severe permanent disability. The attackers themselves were killed during the attack. Shola Gaon filed a lawsuit against the PA and the late Yasser Arafat.

5.      According to the Court ruling, "the plaintiff claimed in her complaint that one of the two murderers was a policeman in the PA and the second was member of al-Aqsa Martyrs' Brigades who is the central body of the defendant (the PA)". The plaintiff's claim in her complaint is that the terrorist attack "was carried out by representatives and/or agents and/or employees of the defendants, according to clear instructions, alternatively by their retroactive approval, unfortunately without taking any action to prevent it, although they had the ability to do so" (§33 of the complaint). In addition, the complaint enumerates numerous arguments, factual and legal, aiming at imposing liability for the incident on the defendants, which include the encouragement

---

[1] Civil case no. 1214/04, District Court of Nazareth, Shola Gaon vs. the Palestinian Authority.

of terror by the defendants, their abstention from taking actions to prevent terrorist attacks embarking from the PA territory etc"[2].

6.    The District Court of Nazareth rejected the lawsuit and stated:

"4. I have ordered to split the case so that the issue of liability of the defendant (the PA) for the terrorist attack is first decided.

5. In her attempt to prove the liability of the PA for the incident the plaintiff had testified (preceded by filing a main testimony affidavit), yet unfortunately I can not rely on anything that she said in her testimony which intend to engage the PA with the shooting incident. All what she said was hearsay, as she herself decently admitted in her cross examination, namely things that she heard in the media, things that she was told when she arrived to the hospital etc.

6. Other than her testimony the plaintiff presented before me a number of documents, based on which she is trying to convince me of the existence of a link between the PA and the terrorists and the terrorist act that they perpetuated. Sadly, the things that come out of these documents most probably will not assist in proving the liability of the PA for the incident. Those documents are partially not relevant (….) and the other part of the documents includes hearsay, which I can not rely on to determine a fact. From all said evidence I can not say that the plaintiff has met the burden of proving a relationship of the defendant to the terrorists and to the terrorist act they committed. None of numerous claims raised in the complaint was proved, not even the identity of the terrorists, their organizational membership and more.

---

[2] This Court Judgment, like many of the Israeli legal materials I quote in this report, is in Hebrew. The English quotations represent my translation of the Hebrew original.

7.  The experienced attorney of the plaintiff tried to convince me to conclude to the defendant's detriment, its abstention to present evidence. This argument can not assist in proving the plaintiff's claims, since the burden of proof lies with her to prove her complaint. Considering that she did not present such evidence, she failed to prove what needed to be proven. The abstention of the defendant from presenting witnesses can not support evidence that does not exist.

8.  Also the plaintiff's assertion that she had difficulty in providing evidence because the State Authorities (the IDF – the Israeli Defense Forces or the General Security Services) refused to help her, can not substitute the presenting of evidence to prove the link between the defendant and the incident. Her grievance should be directed towards the Authorities but she can not benefit from it in her lawsuit against the defendant. In any case, I'm doubtful if the mentioned state bodies have evidence that could prove, in a court of law, what needs to be proven, since every investigator in those bodies can not testify on the subject matter from personal knowledge, therefore his conclusions would not prove in a court of law what needs to be proven.

9.  Based on the above, the imperative result is rejecting the lawsuit. But before ending, I would like to make a few remarks.
    The incident based on which the lawsuit was filed is a very harsh one, in which many innocent civilians were killed and others, including the plaintiff, were injured. My heart goes out to the victims of this despicable act that was carried out by two terrorists. The experienced attorney of the plaintiff asked the court, although not explicitly, to draw conclusions regarding the liability of the defendant, based on knowledge that we all have from the media, as people who lived here during the years of the Intifada. This request by the plaintiff is not acceptable. Once the plaintiff brought her case to a court of law, she has to prove it in the methods set

fourth in the law, namely according to the evidence laws used in the court to prove alleged facts, and she failed to do so. The difficulty that she faced in proving her case is clear to me, yet the court acts based on the evidence laws, unlike other forums in which setting facts might be different, such as academic research (historical or other) journalist report etc.

10. Finally, since the plaintiff did not present any evidence whatsoever to prove the link of the defendant to the terrorist attack, I can not accept the claim, and I hereby reject it."

7. It is important to note another similar incident in which a ruling was issued by an Israeli Court[3]. It was a default ruling that was issued by the District Court of Tel Aviv and relating to a suicide bombing that took place on May 27, 2002 in a shopping mall in the city of Petah Tikva. In this bombing 56 year old Roti Peled and her toddler granddaughter, Sinai Peled, were killed. The lawsuit was filed by 6 family members:

a. Nathan Peled, who lost his wife Roti and his granddaughter Sinai

b. Ehud Peled who lost his mother Roti and his niece Sinai.

c. Lavi Peled who lost her mother Roti and her niece Sinai

d. Hen Kinan Peled who lost her mother Roti and her daughter Sinai and who was personally injured in the attack.

e. Leor Kinan who lost his daughter Sinai and his mother in law Roti and who was personally injured in the attack.

f. Rachel Simantov who lost her daughter Roti and her great granddaughter Sinai

---

[3] Civil case no. 2276/03, District Court of Tel Aviv, Natan Peled vs. the Palestinian Authority.

8.     The lawsuit was brought against the PA and the Palestinian Council. The court stated that the complaint was duly served on the defendants but no answer was filed.

9.     The Court stated in its default ruling that the plaintiffs have petitioned the court to grant them huge amounts of compensation, based on rulings rendered by American Courts, especially the ruling that was given by an American Court in Washington in the case of Eisenfeld on July 11, 2000 in which the court granted the plaintiffs, relatives of the victims of the terrorist attack that was carried out on February 25, 1996 in bus line 18 in Jerusalem, the amount of 327 million US$.

10.    The Tel Aviv District Court also ruled that it could impose punitive damages in certain relevant cases especially when the tort act was done intentionally or maliciously.

11.    The court stated in its ruling:

"It is not arguable that this case deals with an act of terror that was committed with highly malicious criminal intention. The goal of the act and its intention was to kill innocent people with no distinction for the purpose of killing the utmost number of victims.

Yet the Israeli Case law does not recognize/accept such high amounts of compensation. The compensation petitioned for in this case is unprecedented in its amount. The amount of compensation should take into consideration the severe and exceptional suffering and the murderous and malicious activity of the defendants that was not denied by them, in the absence of any answer, based on normal parameters used in Israel for calculation of compensation.

Therefore the compensation granted should, on the one hand, reflect the normal amount of damages that are normally granted in case of loss of a

family member, and on the other hand a punitive amount should be set fourth that suits the severity of the act.

The punitive amount that should be granted in such a very harsh case is much bigger than the amount granted in a normal case of tort act against negligent wrongdoer.

Thus, although the plaintiffs did not present an accurate calculation it is possible to evaluate the amount of compensation they are entitled to. There is no reason to differentiate between the plaintiffs in relation to the amount of compensation, since the victims are next of kin to all plaintiffs.

Therefore I hereby grant every plaintiff the amount of 12 million NIS as requested in §37 of the request[4]. Some of the plaintiffs have asked for a higher amount but there is no justification for that".

12. The defendants in the above case (the Peled case) filed a motion to vacate the default judgment. The Registrar of the District Court of Tel Aviv accepted the motion and vacated the default judgment[5]. After stating that it was convinced that the complaint was duly and legally served to the defendants and that there is no ground to repeal the default judgment based on the argument that the complaint was not duly served to the defendants the court added:

"Therefore, the only question that needs to be determined in the present motion is whether the default judgment should be rescinded based on the discretionary authority given to the court, in order to allow consideration of the case on the merits, a case that seemingly invokes complicated issues. In my opinion the answer to this question should be positive.

I have already written earlier that one should disconnect to the extent possible between the atrocities of the terrorist attack and its ruthless results and the not so simple legal issues arising in this case. For example, the petitioners have serious assertions that they are not the proper defendants in the lawsuit and

---

[4] Equivalent of 2,651,933 USD at the time the ruling was issued
[5] Civil case no. 2276/03, civil motion number 9505/04, District Court of Tel Aviv, The Palestinian Authority vs. Natan Peled

although Mr. Rot (the plaintiff's attorney) wished to learn from websites and other rulings of the courts in other matters regarding the involvement of the current defendants in the wave of terror of which the terrorist act mentioned in the complaint was part, there is no possibility to do the requested "jump" without determining the arguments on the merits. Also the fact that somebody wrote a letter to the UN General Assembly in which he attributed liability to the petitioners (annex B of the references of the motion to grant a default judgment) is not a substitute for acceptable evidence that links the petitioners to all that is attributed to them, it is certain to say that there is no judicial knowledge in such matters, that the PA is liable to the terrorist attack at hand (perhaps one can believe that there is a judicial knowledge regarding the involvement of the PA in terrorist attacks in general, but there should be a specific and concrete evidential foundation that was not present in the evidence that was provided to Honorable Judge Azar in support of the motion to grant a default judgment)".

13.    An appeal to a judge in the District Court of Tel Aviv was filed on the above decision that vacated the default judgment. The appeal was rejected[6]. In its reasoning, upon rejecting the appeal, the District Court stated:

"In this case, I'm of the opinion that given the serious factual and legal issues that the ruling invokes, the registrar has rightfully accepted the motion to vacate the default decision while imposing actual expenses that aim at reimbursing the plaintiffs for their expenses due to the refusal of the defendants to receive the complaint.

The Plaintiffs do not agree with this position, since they believe that the chances for the defendants to present a defense are very slim.

Without expressing an opinion as to the chances of the defense, I believe that given the fact that the dispute regarding the legal responsibility of the PA for

---

[6] Civil appeals no 1331/05 and 1469/5, the District Court of Tel Aviv, The Palestinian Authority vs. Natan Peled.

terrorist attacks has not been determined in Israel, and since there is no final binding supreme court precedent as to punitive damages, the defendants have succeeded to show, on its face, that they have a defense".

14.    On this District Court ruling a motion to grant a permit to appeal was brought before the Supreme Court of Israel. The Supreme Court denied the motion and upheld the District Court ruling to vacate the default judgment[7]. In its reasoning the Supreme Court stated:

"On the merits, I do not believe that I should interfere in the District Court ruling. As it appears from the material before me, and as detailed, the defendants have claims that are worth determining on the merits. The assertions that the plaintiffs raise against the District Court ruling, without expressing an opinion about them, should be examined and determined in the main proceeding. In addition, I do not accept the assertions that were raised in the factual level as if they would substitute an examination on the merits. The District Court registrar stated in his decision that based on websites, other court rulings and letters to the General Assembly of the UN the plaintiffs attorney wished to do 'the necessary jump without examining the claims on the merits'. I agree with his viewpoint. The issue whether this is enough to link the defendants with the terrorist attack in which the deceased were killed needs to be determined based on an objective examination of the complaint on its merits".

**Negligence**

15.    The plaintiffs in the Ungar case base their complaint, inter alia, on negligence pursuant to §35 of the CWO.

---

[7] Motion to permit appeal n. 8274/05 The Supreme Court, Natan Peled vs. The Palestinian Authority

16. The tort of negligence as it is construed in Israeli case law consists of the following elements:

    a. Duty of care that the defendant owes the plaintiff.

    b. Breach of duty (reflected in the defendant's failure to act as expected by a prudent person in the same circumstances).

    c. Factual and legal causation.

    d. Harm.

17. The duty of care is usually divided into two elements, the conceptual duty of care and the concrete duty of care.

18. When examining the conceptual duty of care, the question is an abstract one: "whether the general type of the wrongdoer, the harmed, the act and the harm might establish a duty of care…". It is basically classifying "entire categories of wrongdoers (manufacturers, employers, drivers, teachers), of injured persons (consumers, employees, pedestrians, pupils), of damages (physical, monetary), and of activities (acts, omissions). The examination is detached from the concrete facts of the specific case"[8]. The question is one of law and of facts and is based on classifications and divisions that might determine the end result of the lawsuit without even examining the concrete specific factual risk mentioned in the complaint.

19. According to this method a conceptual duty of care was recognized on the part of the driver towards pedestrians and passengers in his car, the employer towards his employees, the physician towards the patient, the teacher towards the pupil[9]…etc.

---

[8] Civil Appeal 145/80 Vaaknin vs.the local council of Bet Shemesh.
[9] Shirli Dagan Issues in Tort Law, page 282 and the Court rulings cited therein.

20.     To date no conceptual duty of care has been recognized or set forth in the relationship of the PLO or the PA and the Israeli citizens. As a matter of fact, and as far as my knowledge, the Israeli case law has never recognized a conceptual duty of care of the state of Israel itself towards the citizens of a foreign country for criminal acts committed against them by an Israeli citizen on the territory of a sovereign foreign country. Also, there has never been recognized a conceptual duty of care (nor tort liability in general) of any other foreign sovereign country towards Israeli civilians for criminal acts committed against them.

21.     In my opinion no concrete duty of care exists in this case.   The concrete duty of care means whether there is (or should be) a duty of care between the concrete wrongdoer and the concrete injured with regard to the actions (or omissions) that actually were carried out with regard to the harm that actually occurred.

22.     The attack was carried out by two shooters who were domiciled in the village of Surif – Hebron District in the West Bank. This village at the time of the attack was technically part of Area B (according to the territorial division and classification of the West Bank and Gaza Strip in the Oslo agreements that were signed between the PLO and Israel), but the PA had not yet assumed civil control[10]. As such it was under full Israeli civil and security control and the PA had no control whatsoever over that territory. Thus, it is not reasonable to say the PA owes a concrete duty of care under those circumstances.

23.     Similar to the PA duty to maintain law and order in the territories under its full control, the Israeli laws impose a duty on the Israeli police to maintain public order, to investigate to discover criminal offenses and prevent them. According to the line of argument utilized in the Ungar complaint, and given the fact that the attack was carried out in Israel's sovereign territory the

---

[10] Surif Town Profile, prepared by the Applied research institute - Jerusalem

plaintiffs could have sued the state of Israel for not preventing the attack. As we know Israel has been never sued by the plaintiffs due to this attack and it has never been sued by any other plaintiff due to any other attack.

24.    Moreover, the Israeli law does not impose a duty of care on the state (through its police and other security forces) for <u>any criminal act</u> committed against its citizens (even by its citizens). The Israeli case law imposes duty of care only when a special link or relationship exists between the police and the criminal, and in their absence no duty of care is sustained. Only when a link or relationship exists between the criminal act and the police acts or omissions, a duty of care will be imposed on the police. Such a link would be constituted if, for example, the police had succeeded to arrest the criminal but he escaped from its custody[11].

25.    A comparable case to the case at hand is the issue of liability of the state of Israel to compensate Palestinian residents of the OPT as a result of an act of assault perpetuated by the settlers against the Palestinians. Before digging into the comparison it is important to note that Israel's liability differs in a very substantial aspect, namely its control of the OPT and being the Occupying Power under international law with all that stems from that (military presence and having police forces in the OPT). Notwithstanding this, the Israeli courts generally did not hold Israel liable for assaults of the settlers against Palestinians. In one case that was adjudicated in the District Court of Jerusalem[12], the Court rejected the complaint filed by the Palestinians explaining that there is no conceptual duty of care in the relationship between the state of Israel and every resident of the OPT and because there is no concrete duty of care towards the plaintiffs. The Jerusalem District Court ruled also that no violation of a statutory duty was sustained.

---

[11] Civil case 2555/00 (District Court of Jerusalem) Raviv Margalit vs. The State of Israel.
[12] Civil case 438/94 Ahmad abu Samara vs. 1.The State of Israel 2. The Israeli Military Commander of the Gaza Strip.

26.     The appeal that was filed in the Israeli Supreme Court was denied. The Supreme Court stated there was no breach of duty of care, namely, it was not proven that the state was in default and that it did not take the reasonable measures to prevent the harm.[13]

27.     In addition, it is also my opinion that the causation element has not been met either.

28.     Causation in Israeli law is composed of factual and legal causation (§64 of the CWO).

29.     The factual causation means that for a defendant to be held liable, it must be shown that the particular acts or omissions were the cause of the loss or damage sustained. The basic test is to ask whether the injury would have occurred but for, or without, the accused party's breach of the duty owed to the injured party.

30.     In my opinion, this test is not met in the Ungar case. Even if the PA and the PLO had acted and taken all the measures that plaintiffs allege defendants have failed to take (although in practice they have taken most of those measures, such as arrests etc.), and even if the defendants would not have done certain acts attributed to them by plaintiffs (such as supporting incitement etc), most probably the tragic result of murdering Yaron Ungar would have still occurred.

31.     The legal causation is often a question of public policy: is this the sort of situation in which, despite the outcome of the factual inquiry, we might nevertheless release the defendant from liability, or impose liability? The law

---

[13] Civil Appeal 6970/99 Ahmad Abu Samara vs. 1. The state of Israel 2. The Israeli military commander of the Gaza Strip.

often intervenes and says that it will nevertheless not hold the defendant liable because in the circumstances the defendant is not to be understood, in a legal sense, as having caused the loss. The tests utilized in examining the legal causation are three: the foreseeablity test, the risk test and the common sense test.

32. Applying these tests in the Ungar case on the alleged breach of duty of the PA and the PLO will, most probably, lead to the conclusion that the legal causation is not met either. Is the killing of Israeli civilians due to a willful attack inside Israel by a cell of Hamas a reasonably anticipated damage ensuing from the acts or omissions attributed (not yet proven) to the PA and PLO? I believe the answer is negative. Likewise it can be said that the tragic result in this case was not within the risk that the acts and omissions attributed to the PA and PLO have created or would probably create.

33. In addition, it can be noted that the killing of Yaron Ungar by a cell of Hamas was in any case an intervening cause (novus actus interviens) under §64(2) of the CWO that breaks the chain of events, i.e. the liability of the PLO and the PA stops at that point, and the new actor, the attackers, will be liable for all that flows from their killing. §64(2) of the CWO states that the causation is revoked "if somebody else's fault was the decisive cause for the damage".

34. In this case the intervening cause was a willful felony by a third party. This usually is considered as an act that revokes causation. The question whether the intervening case was the decisive cause of the harm is also determined based on the aforementioned tests of causation (foreseeablity, the risk and the common sense test).

## Violation of a statutory obligation

35. Under Israeli law this tort is composed of the following elements:

    a.   A violation of a statutory obligation by the defendant.

    b.   The statutory obligation is purposed to protect the injured.

    c.   The harm is of the kind that the statute meant.

    d.   The harm stems from the breach of the statutory obligation (factual and legal causation).

36.    First it should be noted that statutory obligation is an obligation set forth by a statute. A statute is defined in the Interpretation Ordinance (new version) – 1951, as "any law or regulation".

37.    Thus all the obligations of the PA and PLO under the different agreements signed with Israel and that were mentioned in the complaint are not statutory obligations within the meaning of the CWO. In the Israeli legal system, international agreements and conventions do not have the status of a local law and one can not base a claim based on them in the local courts. Only customary international law is considered part of the local laws.

38.    Contrary to what was mentioned in the complaint the Agreements between Israel and the PLO (mentioned in the complaint) were not fully incorporated in the Israeli legal regime. Several Israeli laws were enacted following the said agreements, yet they aimed to implement only certain parts and arrangements that were agreed upon between the parties (such as the transfer of taxes and custom dues to the PA). In any case, none of the articles of said agreements referred to in the complaint was incorporated into local Israeli legislation.

39.    In addition, while many of the statutory obligations stated in the complaint are relevant to the attackers who perpetuated the killing (such as §300 of The Penal Code – 197, §2 and§ 3 of The Terrorism Prevention Ordinance – 1948 and §58 of The Defense Regulations (Emergency) – 1945, they are not relevant to the PA and the PLO since from the outset it can not be said that they have directly breached those duties.

40. Any violation of the other statutory obligations mentioned in the complaint would be very hard to prove, (see the Shola Gaon case mentioned above). Moreover, all of those statutory obligations are criminal offenses. In my view, it is questionable whether these obligations are at all relevant for examining the acts and omissions of a government or authority (of another country or territory) as opposed to a human actor. Needless to say, the PA and the PLO, unlike the members of the Hamas cell, were never charged in any criminal proceedings let alone convicted in a criminal proceeding.

41. Furthermore, most of the statutory obligations do not meet the second condition of this tort, i.e. that they are purposed at the protection of the deceased. Although the Israeli case law has widely broadened the definition of this element, still some statutory obligations do not fulfill this requirement. Justice Barak stated in one of the leading cases[14] regarding this issue as follows:

"It seems to me that a statute "is purposed for the interest or the protection of somebody else" if the statute sets norms and behaviors that are purposed to protect the interests of the individual. As opposed to a statute of this type there are statutes that are not purposed to protect the interests of the individual, among them can be included those laws that purpose to protect the interest of the state, of the government and of the collective social fabric and the nations way of life".

42. Justice Barak identifies the crime of treason as an example of a statutory obligation that is not purposed to protect the interests of the individual but rather those of the state.

43. The Scholar, Bar Shira Ada, in her book, Torts law, Particular torts, Violation of statutory obligation – 1989, states as an example for statutory obligations that are not purposed to protect the interests of the individual but those of the

---

[14] Civil Appeal 145/80 Vaaknin vs.the local council of Bet Shemesh, pp. 141-142

state "laws that impose duties for the interest of the state such as offenses against national security". (page 33)

44. Consequently, to the extent the statutory obligations enumerated in the complaint are considered national security offenses; it is my opinion that they do not fulfill the second requirement of this tort.

45. Moreover, the other elements of this tort can not be easily met - especially the fourth element, i.e. causation. In this regard, what was discussed in the preceding paragraphs (related to negligence) is valid here, namely, there is no factual or legal causation between the alleged violations of the mentioned statutory obligations and the tragic killing of Yaron Ungar.

**Assault**

46. The tort of assault alleged in the complaint is not relevant to the PA and PLO because no direct liability can be imposed on them for the assault as opposed to the actual perpetuators.

**Vicarious responsibility**

47. The plaintiffs also alleged that the PA and the PLO are vicariously responsible for the torts that were committed by the actual perpetuators of the killing based on §12, §13 and §14 of the CWO.

48. §13 and §14 can not be of help to the plaintiffs simply because the members of the Hamas cell who conducted the attack are not alleged to be either employees of the PA or the PLO or their agents.

49. §12 also can not assist the plaintiffs. This article has been rarely used in the Israeli case law and this case does not fulfill the requirements for its application.

### The proper plaintiffs

50.    Death proximately caused by a tort gives a rise to a claim for the decedent's estate and his dependants. The dependants' claim is for the monetary damages they incurred due to the death. The estate's claim is for the damages of the deceased that passes to the heirs. Although those two legal claims are distinct they still partially overlap.

51.    In this case, the sons of the late Yaron Ungar (i.e. Dvir and Yishai) are the heirs under Israeli law. Naturally, since they are both minors, they are also dependants of the late Yaron Ungar. However, his adult brother and two sisters and his parents are normally not considered as dependants, because they are adults and need no support unless proven otherwise, and especially given the fact that the late Yaron Ungar was married and a head of family and his salary was relatively low, barely sufficing for his own family unit.

52.    Under Israeli tort law the parents and siblings can become secondarily harmed, and thus could have an independent legal cause for mental injury due to the death. For this to happen, 4 conditions must be met:

    a.    The secondarily harmed has to be a first degree relative to the injured person.

    b.    The secondarily harmed must be personally impacted by the incident. This traditionally meant that they need to witness the incident in which their loved one was injured or killed. Yet, this requirement was expanded by the case law to allow the possibility for a secondarily harmed who received the impact regarding the incident through an intermediary, if the damage sustained was foreseeable.

    c.    Proximity in time and place between the incident and the occurrence of damage to the secondarily injured.

    d.    A severe mental injury that is tantamount to psychosis or neurosis.

53.    In this case, it was not alleged in the complaint (let alone proven) that the parents or siblings have a severe mental injury that is tantamount to psychosis or neurosis. Thus, this condition of the test is not met. In addition, based on the material I have reviewed, it seems that the second condition is not met either and it is questionable whether the third condition is met.

54.    To conclude this section, it is my opinion that the parents and siblings of the late Yaron Ungar are not proper plaintiffs under Israeli law and are not entitled to compensation as they are not heirs or dependants, and did not sustain psychosis or neurosis.

## Categories of damage

55.    The Israeli law recognizes the following categories of damage in the dependants' case:

a.   Loss of financial support.

b.   Loss of parental services.

c.   Funeral costs and burial expenses.


56.    For the estate's case it recognizes the following categories of damages:

a.   Pain and suffering and the shortening of life expectancy of the deceased.

b.   Loss of earnings in the 'lost years'.

c.   Funeral costs and burial expenses.

57.    As we can see the category of funeral costs is identical in both claims. Loss of financial support for the dependents overlaps with loss of earnings in the lost years, since both are based on the deceased's income that was lost. Yet, when calculated under the estate's claim, is usually higher.

58.    It should be noted that there is no double compensation. Therefore, the categories of damage that are identical or partially overlap are not paid twice i.e. in the estate's claim and the dependants'.

59.    When the heirs of the estate and the dependants are identical as in this case, the amount of damages in the estate's claim is higher (because in this claim we add a "saving hand" to the calculation, as explained later). In such a case, the category of "loss of paternal services" should be added to the damages of the estate.

**Calculation of the damages under Israeli Law**

**Pain and suffering and the shortening of life expectancy of the deceased:**

60.    This category was not explicitly defined in the CWO, but is generally defined as non-monetary damage and a damage that can not be directly translated into monetary terms. Thus, the amounts granted under this category are based on intuitive assessment.

61.    This category includes the pain and suffering of the deceased during the period between the injury and the time of death. When assessing this part of the category the court takes into consideration all relevant circumstances, and mainly the length of the period of suffering. If it is longer, the pain is greater, and damages are higher and vice versa.

62.    The other part of this category, i.e. the shortening of life expectancy of the deceased is an objective one and not related to the subjective feelings of the deceased and his awareness of the his upcoming death. It is meant to compensate for the non-economic loss sustained due to the shortening of life

expectancy. The compensation for the shortening of life expectancy is based on assessment. When assessing the court mainly considers the age of deceased (i.e. the number of years lost due to the tort from the life expectancy of the deceased) and quality of the lost years.

63.     Israeli courts usually combine the above two sub-categories and grant one total amount. This is usually the case when the death is almost simultaneous with the harmful act. In this case the main amount is for the shortening of life expectancy giving weight to the circumstances of the death. In the Ungar case, assuming that the death was immediate, it is appropriate to grant one total amount for both sub categories.

64.     Comparable cases that were adjudicated before Israeli courts are as follow:

a.     The Supreme Court of Israel upheld the amount of 750,000 NIS[15] that was granted by the district court in February 2002, for the shortening of the life expectancy of a three year old girl who inhaled poisonous gasoline from a heater. The District Court did not grant any compensation for pain and suffering, pointing out the girl was unconscious for two days after the incident. The Supreme Court upheld the decision including with regard to the pain the suffering stating that "the rule is that the estate is not entitled under these circumstances to compensation for pain and suffering, the existence of which, during the said two days was not proven"[16].

b.     In another case adjudicated before the District Court of Jerusalem, the court granted in October 2002 the total amount of 1,000,000[17] NIS for the categories of pain and suffering and shortening of life expectancy for the estate of a 17 year old girl who drowned.

65.     It is worth noting the age of the deceased in both above mentioned cases is less than the late Yaron Ungar when he was killed.

---

[15] Equivalent of 159,000 USD at the time the ruling was issued.
[16] Civil appeal 5145/02 The Supreme Court, Gross vs. Paz Gas Company.
[17] Equivalent of 207,200 USD at the time the ruling was issued

**Loss of earnings in the 'lost years'.**

66.    The calculating loss of earnings in the lost years is based on the "hands method". It is assumed that every family member consumes one hand (one portion from the deceased salary). The household consumes one hand as well. The deceased himself has two hands. The first is what he consumes (what he spends out for his own living) and the second is what he supposedly saves. When the head of a family passes away, the "hand for living" is saved, thus the compensations are for the remaining hands which also diminish in the future as the minors reach the age of maturity.

67.    In the Ungar case, and given the passing away of Efrat Ungar (the late Yaron's wife) in the attack, the total number of hands for the sake of calculation is 5; one for the household, one for each son, one for Yaron's living and one for his saving. Yaron's salary prior to his death was 4662[18] NIS, after adding index  and inflation from the time of incident to the date of the default judgment (i.e. March 31, 2004) the salary becomes 6,157 NIS. Thus the value of each hand is 1231 NIS.

Loss of earnings up to the default judgment date:

68.    During this period we have 4 hands out of 5 (taking away the hand for living). Thus the loss is 4/5* 6157(the salary) = 4926 NIS. This loss times 96 (months) = 472,896 NIS together with accrued interest the amount is 576,915 NIS[19].

---

[18] Equivalent of 1,030 USD at the time the default judgment was issued (The exchange rate on March 31, 2004 was 1 US$ = 4.528 NIS).
[19] Equivalent of 127,410 USD at the time the default judgment was issued

<u>Loss of earnings from the date of the default judgment to the age of maturity Dvir Ungar (until June 24, 2012):</u>

69.     Also during this period we have 4 hands out of 5. Thus the calculation is 4/5* 6157 * 87.6034 (net present value for 99 stipends) = 431,534 NIS[20]

<u>Loss of earnings from June 24, 2012 until Yishai Ungar reaches maturity age : i.e. until August 23 2013:</u>

70.     During this period we have 3 hands out of four. Thus, the calculation is ¾ * 6157 * 14.7042 (net present value for 14 months) * 0.789409 (net present value for a payment due after 8.25 years from the day of calculation – i.e. the day of the default judgment) = 53,592 NIS[21].

<u>Loss of earnings from August 23, 2013 until Yaron Ungar reaches retirement age (67 years old) i.e. until August 19, 2037</u>

71.     In view of the fact that when Yishai reaches the maturity age, no dependants remain, the loss of earnings for the above period shall be calculated as described in the Supreme Court Pintz case[22], namely we deduct from the income of the deceased 70% (as living expenses) and the rest is savings that would be part of the estate.

72.     The calculation, therefore, is as follows: 6157 NIS (the salary) * 0.30 (the savings portion) * 205.1241 (net present value for 24 years) * 0.766417 (net present value for a payment due after 9.4 years = 290,383[23] NIS.

73.     The total amount for loss of earnings in the lost years is 1,352,424 NIS[24].

---

[20] Equivalent of 95,303 USD at the time the default judgment was issued
[21] Equivalent of 11836 USD at the time the default judgment was issued
[22] Civil appeal no.10990/05 the Supreme Court, David Pintz vs. Harel Insurance CO.
[23] Equivalent of 64,130 USD at the time the default judgment was issued
[24] Equivalent of 298,680 USD at the time the default judgment was issued

**Funeral costs and burial expenses:**

74.    This category needs usually to be proven. Examining the Israeli case law shows that the amount granted under this category is around 15, 000 NIS[25].

**Loss of paternal services**

75.    In a recent judgment (on October 2009) given in the case of death due to a car accident of two parents (both parents were 26 years old at the time of accident) who left 2 infants (28 months old and seven months at the date of accident) who also were injured in the accident, the District Court granted the amount of 1,258,000[26] NIS for loss **of both parental** services and for the value of the third party's assistance (the grandmother).

76.    Usually the Israeli courts grant smaller amounts for the loss of services of one parent. The above case was exceptional due to the death of both parents.

**Punitive damages:**

77.    The authority of the courts to grant punitive damages under Israeli Tort law is not yet beyond any doubt and some still question its existence.

78.    As matter of practice, the Israeli courts usually do not grant punitive damages. When they rarely did so, they did it cautiously and amounts granted were very modest (usually not exceeding 20,000 US$).

79.     In any case the Israeli CWR and the Israeli case law do not have any punitive damages principle of tripling the compensation.

---

[25] Equivalent of 3,312 USD at the time the default judgment was issued.
[26] Equivalent of 340,000 USD at the time the judgment was issued by the district court.

**Deductions:**

80.    Under Israeli Tort Law any financial benefit that the plaintiff receives due to the tort and its result must be deducted from the compensation.

81.    Some of the plaintiffs in this case are entitled under the law of Compensation for the Victims of Hostile Acts - 1970, to a monthly stipend and other different financial benefits. According to the common practice in Israeli courts in tort cases, I have asked an actuary to prepare an actuarial opinion calculating the net present value of the payments that will be paid to the heirs of the late Yaron Ungar from the National Insurance Institute under the said law.

82.    Based on his opinion[27] the parents and children of the late Yaron Ungar will receive from the state of Israel a total amount of approximately 2,385,348 NIS[28] as compensation due to the attack.

Muhammad Dahleh

October 15, 2010

---

[27] The actuary opinion is attached to my report as an exhibit.
[28] Equivalent of 668,350 USD at the date of the actuarial opinion.

# EXHIBIT A

Curriculum Vitae

# MUHAMMAD A. DAHLEH

## PERSONAL:

| | |
|---|---|
| Name: | Muhammad Dahleh |
| Date of birth: | April 16th 1968 |
| Address: | 4 Ibn Batotah Street |
| | P.O.Box 1342 |
| | Jerusalem 91013 |
| Tel: | 02-6274070-1 |
| Mobile: | 050523910 |
| Fax: | 02-6274060 |
| E-mail: | Dahleh@014.net.il |

## LEGAL PRACTICE HISTORY

**The Law Offices of Muhammad Dahleh & Associates, Jerusalem.**
**2002-to present**

The head of a law firm practicing located in Jerusalem.

**Primary practice** and areas of expertise are torts law, human rights law and civil litigations in the Israeli Courts.

**June 2004, won the land mark case against the wall in the Israeli Supreme Court** (in which the Court ruled that 30 km of the Wall in the North West of Jerusalem are illegal).

**The Law Offices of Qupty, Dahleh & Associates, Jerusalem.**
Partner, 1993 to 2002

**The Hebrew University, Faculty of Law, Jerusalem.**
Adjunct lecturer, Constitutional Law, 1993 to 2002

**Ramat Gan College of law**
Adjunct lecturer, the Legal Status of the Palestinians in Israel, 2002 to 2004

**The Association for Civil Rights, Jerusalem.**
Staff Attorney - September 1992 to September 1993.
Researched cases, documented civil rights complaints, and litigated cases before the Supreme Court of Israel.

**Yigal Arnon and Co., Advocates and Notary Public, Jerusalem.**
Law Clerkship in one Israel's leading corporate firm - 1990 to 1991.
Researched and drafted briefs, memorandum and motions in preparation for litigation in the areas of corporate Law, trading and banking, property law, and workmen's compensation. Assisted in trial preparation strategy.

**The Supreme Court of Israel, Jerusalem.**
Judicial Clerkship under the Deputy Chief Justice - 1989 to 1990.
First Arab legal trainee to clerk for the Supreme Court in Israel.
Researched and drafted legal opinions concerning all aspects of Israeli and international
Law, including: civil procedure; corporations; trade; banking and human rights.

## PROFESSIONAL ASSOCIATIONS:

**Israel Chemicals Company ltd**
One of the leading Israeli publicly traded companies
Member of Board of Directors 1999 - 2006

**Dead Sea Bromine Company ltd**
Member of Board of Directors 2002 - 2006

**The Israeli Cable Television Council.**
Member of Board of Directors (1994 to 1998)
The first Arab to serve as a member

**The Hebrew University, Faculty of Law, Jerusalem.**
Research Assistant to Dr. Gedon Lybson - 1990 to 1991.
Researched and edited drafts of articles on the Islamic Legal system and shari'a.  Edited
a casebook on interaction between secular Israeli Law and shari'a, as applied to the Arab
Islamic minority in Israel.

**Israel Department of Industry and Trade Consumer Protection Division,** Jerusalem.
Law Clerk - (1988 to 1990).
Drafted affidavits and pre-trial motions, and mediated settlements between consumers
and businesses.

**Adalah – The Legal Center for Arab Minority Rights in Israel.**
Co-founder and Chairperson of the board (1997 to 2002)

**Israel/Palestine Center for Research and Information.**
Member of the advisory board of the Law and Development Program.

**The Bir Zeit University Law Center, West Bank.**
Researcher.
Researched and studied the labor laws in Palestine. Also participated and lectured in a
multinational conference held in Bir Zeit Law Center about labor laws in Palestine and
neighboring countries.

**The Hebrew University, Faculty of Law, Jerusalem.**
Research Assistant to Dr. Gedon Lybson - 1990 to 1991.
Researched and edited drafts of articles on the Islamic Legal system and shari'a.  Edited
a casebook on interaction between secular Israeli Law and shari'a, as applied to the Arab
Islamic minority in Israel.

**EDUCATION:**

**American University Washington College of Law, Washington, D.C.**
LL.M - 1992. International Legal Studies.

**The Hebrew University, Jerusalem**
LL.B - 1990.

**The Israeli Bar**, admitted 1991.

**The New York Bar**, admitted 1994.

**Honors:**

Judge Kassan Award for Academic Excellence, 1988, 1989.
Dean's List, 1987.
Admissions Office Award for Academic Excellence, 1986.

**Publications:**

Co-Author of the book: "Legal Aspects of Doing Business in Palestine". 1995
The labor laws in the West Bank and Gaza, a comparative study, Ber Zeit Law Center

# EXHIBIT B

**Gad Shapira, Actuary, Economist Ltd.** M.BA.
20 Ben Gurion Street, Givat Shemuel 54017
Tel. 03-5320708, Mobile: 050-7293113, Fax. 03-5320531
email: cgadi@bezeqint.net      www.gadshapira-actuarim.com

1

Date: October 12, 2010

Our ref.: 1527/1/17688

Adv. Mohammed Dahla

Dear Sir,

*Re:* The late Yaron Unger, decd.

1.  Pursuant to your request, attached is an actuarial opinion **with regard to the capitalization of payments to victims of enemy action for the heirs of the aforesaid deceased.**

2.  I am at your disposal for additional clarifications, and of course for additional cases.

Yours faithfully,

Gad Shapira, Actuary, Economist

**Gad Shapira, Actuary, Economist Ltd.** M.BA.
20 Ben Gurion Street, Givat Shemuel 54017
Tel. 03-5320708, Mobile: 050-7293113, Fax. 03-5320531
email: cgadi@bezeqint.net      www.gadshapira-actuarim.com

Date: October 12, 2010
Our ref.: 1527/1/17688

## Actuarial Opinion

The late Yaron Unger, decd.

I the undersigned, Gad Shapira, actuary and economist, have been requested by Advocate Mohammed Dahla to prepare an actuarial opinion with regard to the capitalization of payments to victims of enemy action from the National Insurance Institute for the heirs of the aforesaid deceased.

## Details of my education

I have a first degree in Economics and Statistics from Tel-Aviv University.
I have a second degree in Business Management from Tel-Aviv University.

I am a graduate of the Actuarial Faculty at Tel-Aviv University and a qualified actuary from that University.

## Details of my experience

Actuary with Migdal Insurance Company from 1978 to 2001.
I have prepared actuarial opinions and advised financial corporations and the Ministry of Finance since 1980.
I am a full member of the Israel Association of Actuaries, the International Actuarial Association and ASTIN.

I am giving this opinion as a qualified actuary instead of evidence under oath in the court.
I know that for the purpose of the provisions of criminal law, this opinion, when signed by me, is equivalent to evidence under oath in the court.

**Gad Shapira, Actuary, Economist Ltd.** M.BA.
20 Ben Gurion Street, Givat Shemuel 54017
Tel. 03-5320708, Mobile: 050-7293113, Fax. 03-5320531
email: cgadi@bezeqint.net     www.gadshapira-actuarim.com

- 2 -

1.    Figures and assumptions on which the actuarial calculation is based

1.1    Capitalization date: September 30, 2010.

1.2    Date of death: June 9, 1996.

1.3    I have been asked to calculate the capitalization of payments to victims of enemy action for the heirs and family of the aforesaid deceased.

1.4    The father, Meir, born December 20, 1942.

The mother Yehudit, born December 26, 1943.

The sister, Michal, born June 27, 1967.

The brother, Amihai, born November 11, 1976.

The sister, Dafna, born December 9, 1979.

The son of the deceased, Devir, born June 24, 1994.

The son of the deceased, Yishai, born August 23, 1995.

1.5    The amount of the payment to someone orphaned of both parents on the capitalization date: NIS 3,737.01 per month, up to age 27, and NIS 2,989.61 per month from age 27 to age 37.

1.6    The amount of the payment to two bereaved parents on the capitalization date: NIS 5,694.52 per month, without children under the age of 21, and NIS 4,555.62 per month for a single parent without children under the age of 21.

1.7    In addition, I have calculated the following benefits:

1.7.1    Holiday payment for bereaved parents in an amount of NIS 2,976 per annum, as of the capitalization date.

1.7.2    Contribution to payment for use of telephone for bereaved parents in a sum of NIS 263 per month, as of the capitalization date.

1.7.3    Exemption from television fee for bereaved parents in a sum of NIS 400 per annum, as of the capitalization date.

**Gad Shapira, Actuary, Economist Ltd.** M.BA.
20 Ben Gurion Street, Givat Shemuel 54017
Tel. 03-5320708, Mobile: 050-7293113, Fax. 03-5320531
email: cgadi@bezeqint.net        www.gadshapira-actuarim.com

- 3 -

1.7.4   Marriage grant for orphans in a sum of NIS 105,837 as of the capitalization date. I have assumed that they will marry when they reach the age of 30.

1.8   I have calculated the capitalization of the payments to bereaved payments and the benefits in paragraph 1.7 from the capitalization date for the whole of their lives.

1.9   I have calculated the capitalization of the payments to the orphans until age 37, as stated in paragraph 1.5.

1.10   In the capitalization of the payments in the future, I have used capitalization tables and commutation values in the Collection of National Insurance Institute Regulations no. 5027 of April 23, 1987. Calculation interest: 3% per annum.


2.   Results of the actuarial calculation (in NIS)

2.1   Capitalization of the payments in the future, from the date of capitalization onwards:        2,385,348.

I have not included in the aforesaid result:

1.   A discount in Municipal property taxes that a bereaved parent may receive from the Municipality. The discount depends upon the number of rooms and the number of persons.

2.    Housing loans and grants for bereaved parents.

3.   Study grants for orphans and children of bereaved parents if they study at institutes of higher education.

4.   Assistance for the purchase of a car and a contribution to driving lessons for an orphan, for bereaved parents.

5.   An exemption from the fee for registering the inheritance of a victim of enemy action.

6.   An exemption from the fee for registering of transfer of land to bereaved parents and orphans.

**Gad Shapira, Actuary, Economist Ltd.** M.BA.
20 Ben Gurion Street, Givat Shemuel 54017
Tel. 03-5320708, Mobile: 050-7293113, Fax. 03-5320531
email: cgadi@bezeqint.net     www.gadshapira-actuarim.com

- 4 -

7.   Loans that the orphans or the bereaved parents may receive for rehabilitation of an self-employed business.

8.   A discount in purchase tax that bereaved parents may receive.

9.   Payment for assistance as a result of a medical disability for bereaved parents.

10.  A grant for covering burial expenses.

11.  An annual memorial grant for bereaved parents.

12.  A contribution to erecting a gravestone, participation in expenses of maintaining a grave and a grant for a contribution to mourning expenses.

Sincerely,

Gad Shapira, Actuary, Economist

# EXHIBIT C



**M.BA.** גד שפירא, אקטוארים, כלכלנים בע"מ

רח' בן גוריון 20 גבעת שמואל 54017

טל : 03-5320708, נייד: 293113-0507, פקס : 03-5320531

email : cgadi@bezeqint.net   www.gadshapira-actuarim.com

תאריך: 12/10/2010

מספרי: 1527/1/17688

לכבוד

עו"ד מוחמד דחלה

א.נ.,

הנדון: ירון אונגר ז"ל

1. בהתאם לבקשתך רצ"ב חוו"ד אקטוארית **לעניין היוון קצבות נפגעי פעולת איבה ליורשי המנוח הנ"ל.**

2. אני עומד לרשותך להבהרות נוספות וכמובן למקרים נוספים.

בכבוד רב,

גד שפירא, אקטואר, כלכלן

גד    שפירא, אקטוארים, כלכלנים בע"מ M.BA.

רח' בן גוריון 20 גבעת שמואל 54017

טל : 03-5320708, נייד: 0507-293113, פקס : 03-5320531

email : cgadi@bezeqint.net   www.gadshapira-actuarim.com



גד   שפירא, אקטוארים, כלכלנים בע"מ M.BA.
רח' בן גוריון 20 גבעת שמואל 54017
טל' :03-5320708, נייד:0507-293113, פקס : 03-5320531
email : cgadi@bezeqint.net   www.gadshapira-actuarim.com

תאריך: 12/10/2010
מספרי: 1527/1/17688


### חוות דעת אקטוארית

המנוח ירון אונגר


אני החתום מטה, גד שפירא, אקטואר וכלכלן, נתבקשתי ע"י עו"ד מוחמד דחלה
לערוך חוות דעת אקטוארית לגבי היוון קצבות נפגעי פעולת איבה מאת המוסד לביטוח לאומי ליורשי
המנוח הנ"ל.


### פרטים על השכלתי


הנני בוגר תואר ראשון בכלכלה ובסטטיסטיקה באוניברסיטת תל-אביב.
הנני בוגר תואר שני במנהל עסקים באוניברסיטת תל-אביב.

הנני בוגר החוג לאקטואריה באוניברסיטת תל-אביב ואקטואר מוסמך מטעם אוניברסיטה זאת.


### פרטים על ניסיוני


אקטואר במגדל חברה לביטוח משנת 1978 עד שנת 2001.
אני עורך חוות דעת אקטואריות ויועץ לתאגידים פיננסיים ולאוצר משנת 1980.
הנני חבר מלא באגודת האקטוארים בישראל, F.IL.A.A , באגודת האקטוארים הבינלאומית
ובאסטין.


אני מוסר חוות דעת זו כאקטואר  מוסמך במקום עדות בשבועה בבית המשפט.
ידוע לי כי לדבר הוראות החוק הפלילי, דין חוות דעת זו, כשהיא חתומה על ידי, כדין עדות בשבועה בבית
המשפט.

**גד שפירא, אקטוארים, כלכלנים בע"מ** M.BA.

רח' בן גוריון 20 גבעת שמואל 54017

טל': 03-5320708; נייד: 0507-293113, פקס : 03-5320531

email : cgadi@bezeqint.net    www.gadshapira-actuarim.com

-2-

| | |
|---|---|
| 1 | נתונים והנחות עליהם התבסס החישוב האקטוארי |

1.1    מועד ההיוון: 30/09/10.

1.2    מועד הפטירה: 9/6/96.

1.3    התבקשתי לחשב את היוון קצבות נפגעי פעולות איבה ליורשי המנוח הנ"ל ולמשפחתו.

1.4    האב מאיר יליד 20/12/42.

האם יהודית ילידת 26/12/1943,

האחות מיכל ילידת 27/6/67,,

האח עמיחי יליד 11/11/76.

האחות דפנה ילידת 9/12/79.

בן המנוח דביר יליד 24/6/94.

בן המנוח ישי יליד 23/8/95.

1.5    גובה קצבה ליתום משני הוריו במועד ההיוון: 3,737.01 ₪ לחודש עד גיל 27
ו- 2,989.61 ₪ לחודש מגיל 27 עד גיל 37.

1.6    גובה קצבה לשני הורים שכולים במועד ההיוון: 5,694.52 ₪ לחודש ללא ילדים
מתחת לגיל 21 ו- 4,555.62 ₪ לחודש להורה יחיד ללא ילדים מתחת לגיל 21.

1.7    בנוסף, חישבתי את ההטבות הבאות :

1.7.1    דמי הבראה להורים שכולים בסך 2,976 ₪ לשנה נכון למועד ההיוון.

1.7.2    השתתפות בדמי שימוש בטלפון להורים שכולים בסך 263 ₪ לחודש נכון למועד
ההיוון.

1.7.3    פטור מאגרת טלוויזיה להורים שכולים בסך של 400 ₪ לשנה נכון למועד ההיוון.

1.7.4    מענק נישואין ליתומים  בסך של 105,837 ₪ נכון למועד ההיוון.
הנחתי שיינשאו בהגיעם לגיל 30.

1.8    חישבתי את היוון הקצבות להורים שכולים ואת ההטבות שבסעיף 1.7 ממועד ההיוון
לכל החיים.

1.9    חישבתי את היוון הקצבות ליתומים עד גיל 37 כמפורט בסעיף 1.5.

1.10    בהיוון הקצבות בעתיד השתמשתי בלוחות היוון וערכי קומוטציה שבקובץ תקנות
המוסד לביטוח  לאומי מס. 5027 מיום 23.4.87.
ריבית חישובית: 3% לשנה.

**גד שפירא, אקטוארים, כלכלנים בע"מ** M.BA.

רח' בן גוריון 20 גבעת שמואל 54017

טל: 03-5320708, נייד: 0507-293113, פקס: 03-5320531

email : cgadi@bezeqint.net  www.gadshapira-actuarim.com

-3-

2    תוצאות החישוב האקטוארי (בש"ח)

2.1    היוון התשלומים בעתיד, ממועד ההיוון ואילך:    2,385,348

לא כללתי בתוצאה דלעיל:

1. הנחה בארנונה שהזורה שכול עשוי לקבל מהעירייה. ההנחה תלויה במס' החדרים ומס' הנפשות.
2. הלוואות ומענקי דיור להורים שכולים.
3. מענק לימודים ליתומים ובני הורים שכולים אם ילמדו במוסד להשכלה גבוהה.
4. עזרה ברכישת רכב והשתתפות בלימודי נהיגה ליתום להורים שכולים.
5. פטור מאגרת רישום ירושת נספה פעולת איבה
6. פטור מאגרת העברת מקרקעין להורים שכולים ויתומים.
7. הלוואות שעשויים היתומים או ההורים השכולים לקבל עבור שיקום עסק עצמאי.
8. הנחה במס רכישה שעשויים הורים שכולים לקבל.
9. תשלום עבור עזרה עקב מגבלה רפואית להורים שכולים.
10. מענק לכיסוי הוצאות קבורה.
11. מענק אזכרה שנתי להורים שכולים.
12. השתתפות בהקמת מצבה, השתתפות בהוצאות אחזקת מקום קבורה ומענק להשתתפות בהוצאות אבל.

בכבוד רב ,

גד שפירא, אקטואר, כלכלן