Table 5: Revenues by Source (Commitment Basis) December, 2008.

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | November | December | Jan - Dec | Budget 2008 |
|---|---|---|---|---|---|---|---|---|
| | | | (In millions of US dollars) | | | | | |
| **Total Net Revenue** | 334.7 | 571.6 | 493.4 | 365.6 | 144.5 | 104.0 | 1,765.4 | 1,486 |
| **Net Tax Revenues** | 298.3 | 328.4 | 347.1 | 305.1 | 100.0 | 94.8 | 1,278.9 | 1,213 |
| Domestic Tax Revenues | 68.1 | 80.9 | 62.8 | 61.0 | 25.6 | 15.1 | 272.8 | 145 |
| Income Tax | 33.9 | 24.0 | 14.8 | 11.3 | 3.9 | 3.9 | 84.0 | 55 |
| Value Added Tax | 21.3 | 39.5 | 29.6 | 35.3 | 17.4 | 6.3 | 125.7 | 55 |
| Customs | 2.7 | 3.4 | 4.7 | 3.8 | 1.6 | 1.2 | 14.5 | 5 |
| Excises on Beverages | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.3 | |
| Excises on Tobacco | 9.0 | 13.5 | 13.3 | 10.4 | 2.6 | 3.6 | 46.2 | 29 |
| Property Tax | 1.1 | 0.5 | 0.4 | 0.2 | 0.0 | 0.1 | 2.1 | 1 |
| Clearance Revenue | 267.7 | 290.6 | 308.4 | 255.6 | 78.1 | 82.7 | 1,122.3 | 1,087 |
| Customs | 75.6 | 91.9 | 110.3 | 90.5 | 27.9 | 37.4 | 368.3 | 333 |
| Value Added Tax | 86.8 | 108.1 | 109.6 | 80.8 | 23.0 | 22.6 | 385.3 | 409 |
| Purchase Tax | 1.1 | 1.0 | 0.8 | 0.7 | 0.3 | 0.0 | 3.6 | 12 |
| Petroleum Excises | 83.4 | 89.7 | 87.7 | 83.5 | 26.9 | 22.7 | 344.3 | 333 |
| Other (1) | 20.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 20.8 | |
| **Tax Refund** | 37.5 | 43.2 | 24.1 | 11.5 | 3.8 | 3.0 | 116.3 | 20 |
| **Domestic Fees and Charges** | 36.4 | 46.1 | 121.2 | 30.6 | 14.5 | 9.2 | 234.3 | 127 |
| Stamps Tax | 0.2 | 0.3 | 0.4 | 0.1 | 0.1 | 0.0 | 1.1 | |
| Civil Registration Fees | 2.8 | 5.9 | 4.9 | 3.1 | 1.0 | 0.9 | 16.7 | |
| Health Fees | 1.6 | 1.9 | 1.8 | 1.7 | 0.6 | 0.5 | 7.0 | |
| Health Insurance | 9.9 | 9.7 | 12.3 | 6.2 | 3.1 | 2.9 | 38.1 | |
| Transportation | 2.0 | 3.4 | 2.9 | 2.8 | 1.1 | 0.9 | 11.2 | |
| Agriculture Services | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.0 | 0.6 | |
| Local Government | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | |
| Ministry of Economy | 0.4 | 0.6 | 1.0 | 0.6 | 0.2 | 0.2 | 2.6 | |
| Shari'a Courts Fees | 0.3 | 0.4 | 0.5 | 0.3 | 0.1 | 0.1 | 1.5 | |
| Land Registration | 1.1 | 2.0 | 2.0 | 2.5 | 1.0 | 0.6 | 7.6 | |
| Ministry of Housing | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| Tourist Fees | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | |
| Telecommunication Fees | 0.2 | 0.2 | 0.1 | 0.2 | 0.0 | 0.1 | 0.6 | |
| Ministry of Education | 0.0 | 0.5 | 0.3 | 3.7 | 1.6 | 1.2 | 4.5 | |
| High Court of Justice Fees | 0.4 | 1.1 | 0.9 | 0.9 | 0.2 | 0.3 | 3.2 | |
| Foreign Affairs | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | |
| Licenses | 14.4 | 13.6 | 92.8 | 7.3 | 4.9 | 1.2 | 128.1 | |
| Others | 2.8 | 6.1 | 0.9 | 1.0 | 0.5 | 0.3 | 10.8 | |
| **Investments Profits (2)** | 0.0 | 197.1 | 25.0 | 30.0 | 30.0 | 0.0 | 252.1 | 146 |

(1) First Quarter and Jan - Dec revenue include $ 20.8 million received in February as Initial interest payments on frozen clearance revenue.
(2) Non Tax revenue in the second quarter and in Jan - Dec total includes $197.1 million received as dividend from the PIF to repay PNA debt to the PIF which is included under Net Domestic Bank Financing.
In August non tax revenues include $79.8 million license fee from Wataniah Communication Company and $25 million as a cash dividend from the P.I.F. In November non tax revenues include $30 million as a cash divident from the P.I.F.

15 Jan,2009

Palestinian National Authority

Ministry of Finance

Fiscal Developments

**First Quarter 2010**

May 9, 2010

# Fiscal developments during the first quarter of 2010 (Q110)

## 1. Budget execution highlights during Q110

- **The current budget balance** of $ 307 million in Q110 is on track with the budget deficit target for 2010 of $ 1.24 billion
- **Gross revenues** increased by 35% in Q110 in NIS terms over revenues obtained in Q109, and are on target to exceed the $ 2 billion level for the first time, as projected in the budget.
- **Total expenditures and net lending** have fallen below the levels they had attained in Q409 and Q109, as most Gaza emergency expenditures have run their course. PNA public spending on an annual basis is running below budget targets for the full year by $ 90 million.
- **The wage bill** in Q110 is on track with the budget, except for a small overage (1.5%) due to the US dollar depreciation[1]. PNA employment increases have been kept within projected limits.
- **Non wage expenditures** of $ 280 million in Q110 are running substantially below, on an annual basis, budget targets for the year ($ 1.37 billion)
- **Net lending** of $ 71 million in Q110 is on a declining trend and on track to meet the ambitious budget target of $ 250 million
- **Development expenditures** of $ 56 million channeled through the Treasury in Q110, and mostly directed at

---

[1] Excluding one off items, see below.

2

community development projects, are on track towards the completion of another 1000 projects in 2010.
- **External budget support** of $ 208 million in Q110 fell short of the $ 300 million quarterly financing requirement from donor countries. This, coupled with very little development financing channeled through the Treasury ($ 2.2 million), compelled the PNA to increase its borrowing from banks ($ 98 million) and build up additional payment arrears ($ 68 million)

## 2. Revenue

**Total gross revenue** mobilized by the Palestinian authority during Q110, of $ 463 million increased by 35% over gross revenues collected during Q109 in NIS terms[2] (tables 1 and 5). Extrapolating this revenue mobilization to the full year 2010, by applying the economic growth assumed in the PNA 2010 budget (7%) to the revenue proceeds during the remaining three quarters, and by adding the projected dividend receipts ($ 55 million) expected before year end, we obtain $ 2.04 billion, or slightly above the 2010 budget target of $ 2.03 billion. Hence, revenues obtained in Q110 by the PNA, are in line with the budget target. Total net revenues of $ 440 million in Q110 are also in line with the annual budget projection of $ 1.93 billion, when factoring in expected growth and receipt of PIF dividends.

This strong revenue performance is mostly due to a large increase in domestic revenue, as a result of administrative reforms in the domestic tax departments. Domestic tax revenue of $ 117 million during Q110 increased by 54% over domestic tax revenue collected in Q109 (table 5 and Chart 1). Substantial revenue

---

[2] The US dollar depreciated by 7.8% when comparing the average exchange rate in Q110 (NIS/$ 3.73) to the average in Q109 (NIS/$ 4.04). Since all PNA revenues and expenditures are in NIS, comparisons across quarters must be conducted in NIS.

collection efforts were deployed by the income tax and VAT departments. Efforts at raising income tax revenues focused on enlarging the tax base, collecting payments in arrears, and systematically reviewing tax liabilities by the 100 largest corporations. Greater controls by custom officers have also raised VAT revenues.



**Non tax revenue** of $ 44 million during Q110, was at about the same level as in Q409, and registered only a 2% increase over Q109. License fees which would typically average $ 15 million per quarter were only $ 10 million in Q110. This revenue item tends to be volatile and the shortfall in revenues may simply indicate delays in license fee payments.

**Clearance revenue**, which account for two thirds of total PNA revenue, have also been doing well. At $ 303 million in Q110, they increased by 35 % over Q109 in NIS terms.  This is partly due to a weakness in clearance revenue during Q109, following the Gaza offensive, which depressed fuel and other import shipments to Gaza, thereby lowering indirect tax receipts from the Strip below their historical trend.

4

However, their performance also reflects growth in economic activity since mid 2009, as indicated by monthly increases during Q110. Projecting clearance revenue collected during Q110 for the full year, assuming that the economic growth projected in the 2010 Budget will be realized, clearance revenue in 2010 would reach $ 1.326 billion, or slightly above the budget projection of $ 1.320.

Clearance revenue in March 2010 included $ 2.7 million in income tax payments from Palestinian workers working in Israel. These payments have become quite significant. In 2009 they amounted to $ 20 million or the equivalent of 25% of all domestic income tax proceeds in 2009[3].

On the other hand, NIS 18 million per month, continue to be withheld from clearance revenue, by court order, to meet possible litigation awards. It should be recalled that in 2009, NIS 216 million were withheld ($ 55 million). All in all, while the PNA was owed $ 303 million in clearance revenue for Q110, what was actually cashed in was $ 227 million, due to various deductions, including for water and electricity bills[4].

**Tax refunds**, on a commitment basis amounted to $ 23 million during Q110, at about the same level as in Q109, and in line with the annual projection of $ 100 million. However, on a cash basis, only $ 1.1 million was disbursed, due to the large shortfall in external budget support, and the high indebtedness to the banking system.

## 3. Expenditures

Total expenditures and net lending during Q110 at $ 747 million, on a commitment basis, fell by 13 % from the expenditure level in Q409 (or by $ 100 million, Tables 1 and 2). Measured against Q109, they were also lower by 14%. Overall, Q110 public spending, when projected on an annual basis, falls below the 2010 Budget forecast by about $ 90 million.

---

[3] Given the magnitude of these receipts, MoF intends to take them out of clearance revenue and include them in income tax receipts, in line with GFS practice.
[4] Deductions for utilities are added to Net Lending

5

**Wage expenditure** of $ 395 million in Q110 (table 1) increased by 8.6% over the wage bill in Q109, in NIS terms and excluding two one off disbursements[5]. The 4% cost of living allowance, agreed to with the civil service union, became effective on January 1st 2010, and was disbursed in the February payroll. Projecting the wage bill for the full year, excluding one off items, would exceed the budget appropriation by 1.5%, which is entirely due to the 1.8% depreciation of the US dollar relative to NIS (NIS 3.73/$ Q110 rate, relative to NIS 3.8/$ budget rate). Therefore the wage bill, by end Q110, has been in line with budget appropriations.

Wage expenditures in cash (table 3) of $ 373 million fell short of the commitment level by $ 22 million. Arrears were incurred on the disbursement of the danger allowance in February and on remitting the employee contributions to the Pension Fund, all due to shortfalls in external budget support and resulting liquidity shortages.

**Employment** in the PNA authority increased from 147,726 employees at end December 2009, to 149,580 employees by end March 2010, of which 86,144 are civil servants and the rest, security personnel. The increase in employment of 1,854 mostly went to civil servants (1,508), particularly new teachers who were hired contractually at the beginning of the school year (September, 2009) but only confirmed in the payroll in Q110.

**Non wage expenditures** at $ 280 million in Q110 were lower than in Q109 ($ 399 million) or in Q409 ($ 343 million) in every category (tables 1 and 2). This welcome decline marks the unwinding of the Gaza emergency expenditures and the resumption of a normal expenditure pattern. As can be seen from chart 2, non-wage spending peaked in March 2009 and declined thereafter. Yet, because of liquidity shortages, due to much lower external budget support than committed by the donors, about $ 19 million in payment arrears were incurred (table 4).

---

[5] Beginning January 2010, wage bill classification has been adjusted to GFS standards. Thus, transportation allowances have been shifted to operational expenditure while contractual employees payments, included in operational expenditures, were shifted to the wage bill. The January 2010 wage bill included a $ 2 million payment to the National Fund, which was due in December. In February, a danger allowance of $ 7.5 million was paid to health sector employees, retroactively to the beginning of 2009.



Projections of Q110 spending for the full year indicate that non wage spending may fall below budget appropriations by about $ 200 million. It should be noted however that transfers and operational spending tend to build up during the year.

**Operational expenditures of** $ 108 million during Q110 (table 2) fell by 24% from the Q409 level, partly due to a shift in classification of wages paid to contractual employees away from operational expenditures and into the wage bill. Nevertheless, operational expenditures declined by 21% from the Q109 emergency spending levels (on a comparable basis). The largest declines were in the health related expenditures (drugs and medical equipment) and in the emergency material which was procured for Gaza. Projecting operational spending on an annual basis, which now includes transportation allowances for PNA employees, would fall short of the budget appropriation by about $ 60 million.

7

**Transfers** of $ 170 million in Q110 were also lower than in Q409 ($ 206 million, table 2) and in Q109 ($ 234 million). However, most of the decline was due to lower compensation levels provided to the population impacted by the Gaza offensive and lower purchases of medical services. Projections of transfer spending for the full year indicate that it will be substantially lower than the budget appropriation.

There was a spike in transfers in March 2010 reaching $ 67 million, as opposed to an average of $ 52 million in January- February. This was essentially due to a World Bank transfer of social allowances in March amounting to $ 18 million.

**Minor capital expenditures** were very low during Q110, amounting to only $ 1.6 million, whereas the budget appropriation for the full year is $ 43 million. This is partly due to the liquidity shortage experienced during Q110 as a result of the shortfall in external budget support. It is also due to a prudent budgetary policy, restraining capital expenditures until a clearer picture on external financing emerges. It should be recalled that substantial spending took place in both 2008 and 2009 on office equipment and vehicles, exceeding budgetary appropriations due to accumulated payments arrears from earlier years. Since various ministries and agencies have already been well equipped, the pacing of current capital expenditures can be managed with some flexibility.

**Net lending** amounted to $ 71 million in Q110 (tables 1 and 2), marking a significant decline over the levels reached in Q409 ($101 million) and in Q109 ($ 76 million). It should be recalled that the budget appropriation for net lending in 2010 has been sharply reduced from $ 380 million in 2009 to $ 250 million in 2010, in the context of a policy aimed at eliminating net lending altogether. Thus, while an extrapolation of net lending expenses in Q110 on an annual level may indicate that the budget appropriation will be exceeded, net lending is on a declining trend, and MoF fully expects that the budget appropriation will be respected.

Strong collection efforts have been mobilized in West Bank municipalities, with a growing portion remitted to the PNA. In 2006, West Bank unpaid electricity bills passed on to the PNA Treasury amounted to $ 350 million. By end 2009, this

financial burden declined to $ 70 million. The implementation of the recently enacted Electricity Law, with the establishment of Electricity Distribution companies and the expansion of pre-paid meters would further strengthen collections and reduce net lending

In Gaza, the PNA had to pay both IEC electricity bills and fuel expenses to the Gaza Generating Electricity Company, which averaged NIS 40 million per month. Beginning in 2010, the Gaza Electricity Distribution Company (GDEC), which so far had appropriated the revenue obtained from electricity bill payments, started remitting about NIS 4 million per month to the PNA. MoF has also put the GEDC on a declining schedule of Treasury payments for fuel: NIS 36 million in January, NIS 32 million in February, NIS 28 million in March and so forth until the GEDC assumes full responsibility for fuel payments towards the end of 2010.

**Development expenditures** channeled through the PNA Treasury amounted to $ 56 million during Q110 (tables 1 and 2). This is lower than the $ 72 million in Q409, but substantially higher than the $9 million channeled through the Treasury in Q109. There was a slow build up in development spending, mostly on community development projects, starting with $ 3 million in January and rising to $ 32 million in March, which recorded the completion of 1000 community development projects. It is expected that another 1000 projects will be completed by the end of the year.

**The recurrent fiscal deficit** in Q110 amounted to $ 307 million on a commitment basis (table 1). A simple extrapolation of this deficit for the full year would bring it to $ 1.228 billion, or within the budget appropriation of $ 1.243 billion. In fact, it is expected that some budgetary items such as net lending will decline during the course of the year, while clearance revenues should increase. Thus, budget execution so far appears to be on track with the 2010 deficit target. The deficit on a cash basis was substantially lower, at $ 260 million, mostly due to financing shortfalls (table 3).

**Financing** of the budget deficit in Q110 from external budget support, amounted to $ 208 million, mostly from the European Commission ($ 106 million) and from the World Bank Trust Fund ($96 million, table 7). However, this external budget

support fell substantially short of the quarterly financing requirement of about $ 300 million. This shortfall has prompted the Treasury to increase its borrowing from the banking system by $ 98 million during the first quarter, even though the PNA had already reached the upper limits of its borrowing capacity from the banking system, under sound prudential criteria applied by lenders. This shortage of liquidity also resulted in some accumulation of expenditure payment arrears ($ 45 million) as well as tax refunds arrears ($ 23 million). Development financing channeled through the Treasury only amounted to $ 2.2 million.

Thereafter

Session of November 7, 2006                                      Claim Number 217/2006
The Ruling Tribunal Judge Raslan Arafat         Ramallah Court of First Instance

**The Counsel for the Claimant Attorney Ali Safarini is present before the court**
**None of the defendants is present:**   1- Meir Weininger
    2- Yehoshua Cohen
    3- Professor Meir Ungar
    4- Uri Dasberg
    5- Amichai Ungar
    6- Yochanan Harris
    7- Yosef Meir

### Order
Upon examination, I conclude from the evidence submitted along with this claim, which itself was submitted on urgency basis, which (the evidence—*Inserted by the translator*) consists of the testimony of witness Attorney Rasem Mohammad Said Rasem Kamal, in addition to the written evidence that was submitted, Exhibits T/1 to T/6, that proves that possible harm may be caused should time elapse, if the court sends copies to the defendants of the claim along with a notice to be present before the court. Therefore, pursuant to article 102 of the Civil and Commercial Law Number 2 of 2001, I decide to look into this claim on urgency basis, and with the presence of one party, that is the claimant, due to the urgency, since possible damage could be caused should time elapse if the court decides to send a notification to the claimant to be present before this court; (order—*Inserted by the translator*) delivered on November 7, 2006.

                                                         The Judge
                                                         (Signature)

The counsel for the claimant said: I plea to the honorable court to consider the evidence submitted along this Urgent Claim as evidence for the claimant regarding the merit of the claim.

### Order
I order to accept the request and to consider the evidence submitted in relation to this urgent claim, which consisted of the testimony of the witness Attorney Rasem Mohammad Said Kamal, in addition to the written evidence Exhibits T/1 to T/6 respectively, as evidence of the claimant regarding (the merit—*Inserted by the translator*) of the claim; (order—*Inserted by the translator*) delivered on November 7, 2006.

                                                         The Judge
                                                         (Signature)

The counsel for the claimant said: I hereby present the rest of my evidence regarding the claim, and I present to the honorable court a bail bond, that guarantees the compensation of any delay or damage that may be caused to the defendants should it appear that the claimant's claim is illegitimate. The bail bond is duly organized and endorsed.

                                                         Judge
                                                     Raslan Arafat
                                                     (Signature)

Thereafter

### Order

I order that the bail bond shall be submitted and shall be named T/7; (order—*Inserted by the translator*) delivered on November 7, 2006.

The Judge<br>(Signature)

The counsel for the claimant said: I hereby conclude the evidence submitted by me and I request, in accordance with the evidence submitted, which is the testimony of Attorney Rasem Mohammad Said Kamal and Exhibits T/1 to T/6, submitted on urgency basis in this claim, and which your court has decided to accept and to consider as evidence for the claimant regarding the (merit—*Inserted by the translator*) of the claim, in addition to the bail bond, which guarantees that any delay or damages caused to the defendants shall be compensated in case it appears that the claimant's claim is illegitimate, Exhibit T/7—I request that the court issues a temporary injunction order, banning any and all of the defendants, any representative, agent or attorney thereto, from claiming that they represent the Board of Directors (BOD) of the claimant, or to take any action on behalf of the claimant (the company), or to correspond with any institution or party or entity on behalf of the claimant, regarding any matter or issue pertaining to the claimant, its rights or its assets; and to cancel, nullify and cease any decision the defendants have taken in the name of claimant; and to bring this to the attention of all institutions and companies, in which the claimant owns any rights or investments, of whatever type they are; and whether it existed in Palestine or abroad; and to consider the Law Firm of LeBauf, Lamb, Greene, & MacRae, based in New York, and which was retained by the claimant, as the legal representative that represents it and undertakes the defense of its rights in the United States of America.

### Order

In accordance with the evidence submitted in this claim, which consists of the testimony of Attorney Rasem Mohammad Said Rasem Kamal, in addition to the written evidence submitted, which consists of the Certificate of Incorporation of the Palestine Investment Fund Public Shareholding Company Ltd. Exhibit T/1, and a certificate listing the names of the BOD members of this company Exhibit T/2, and an English copy of the default judgment issued by the District Court of Rhode Island against the Palestinian National Authority in July 2004, with its Arabic translation, which requires that the Palestinian National Authority pay a sum exceeding $116 Million to the Estate of Yaron Ungar Exhibit T/3, and a copy of the claim document submitted by the Estate of Yaron Ungar in the year 2006, to cease the assets of the claimant, and a translation to Arabic of such document, Exhibit T/4, through which that court decided to accept the request of defendants, and authorized them to cease the assets of the Palestine Investment Fund Public Shareholding Company within and outside the United States, and in any place, including the assets of the company in Palestine in accordance with the judgment issued in that case in September 2006 AD; through which the heirs of Yaron Ungar composed a BOD for the Claimant company, and considered themselves as owners of the properties and assets of the Palestine Investment Fund Company, wherever such properties and assets exist. Also, in accordance with that judgment, they appointed new lawyers on behalf of the Palestine Investment Fund, and dismissed the fund's counsels in the United

Judge<br>Raslan Arafat<br>(Signature)

Thereafter

States of America, Exhibit T/5. And a copy of the letter that was sent by the attorney of the defendants to the lawyer of the Palestine Investment Fund Company, informing him of (their—*Inserted by the translator*) decision to dismiss him from the representation of the Palestine Investment Fund Company, and that the defendants and also the heirs of the plaintiffs in that case, became one party, and that they have started sending letters and correspondence to the banks and to other parties with whom the Palestine Investment Fund Company transact, as well as to the members of the BOD of the Palestine Investment Fund Company, through which they inform them that they became the new owners and directors and officers of the Palestine Investment Company, with an Arabic translation thereof, Exhibit T/6. In addition to the bail bond that guarantees the compensation of any and all delay or damage that may be caused to the defendants in case it appears that the claim of the Palestine Investment Fund Company is illegitimate, Exhibit T/7.

Therefore, and given the evidence that has been submitted in relation to the claim mentioned supra, including the bail bond that guarantees the compensation of any and all delay or damage that may be caused to the defendants: Meir Weininger, Yehoshua Cohen, Professor Meir Ungar, Uri Dasberg, Amichai Ungar, Yachanan Harris and Yosef Meir, and their address for notifications is: through the Law Office of Jaroslawicz & Jaros, 150 William Street, 19th Floor, New York, 10038, United States of America; in case it appears that the claim of the Palestine Investment Fund Company is illegitimate, and in accordance with the provisions of article 102 of the Civil and Commercial Procedures Law no. 2 of 2001;

I hereby order to take temporary actions, through issuing a temporary injunction, banning any and all of the defendants listed supra, any of their representatives, agents, or counsels from assuming the identity of the BOD of the claimant—The Palestine Investment Fund Public Shareholding Company Ltd., and (banning them—*Inserted by the translator*) from taking any action on behalf of the claimant, or corresponding with any institution or entity or party on behalf of the claimant in relation to any matter or issue that relates to the claimant, its rights or its assets. And (I also order—*Inserted by the translator*) to nullify and cancel and stop the effect of any decisions that were made by the defendants on behalf of the BOD of the claimant; and to bring (this order —*Inserted by the translator*) to the attention of all institutions and companies in which the claimant—the Palestine Investment Fund Company owns any rights or investments of whatever type, and whether it existed in Palestine or abroad. I also order that the Law Firm of LeBauf, Lamb, Greene and MacRae of New York, which was retained by the claimant—the Palestine Investment Fund Public Shareholding Company, shall be considered as the legal representative that represents it and undertakes the defense of its rights and assets in the United States of America. I also order, pursuant to article 107 of the Civil and Commercial Procedures Law no. 2 of 2001 to instruct the claimant to bring a suit within a period of eight days; otherwise, the order issued in this claim shall be considered null and void; (order—*Inserted by the translator*) delivered on November 7, 2006.

The Judge
(Signature)

Judge
Raslan Arafat
(Signature)

Thereafter

(Revenues Stamp)

(Seal of the Ramallah Court of First Instance-Supreme Court of Justice – The Palestinian National Authority)
(Seal stating that the document is a true copy of the original/Chief Clerk of the Ramallah First Instance Court/Ramallah, Date November 7, 2006)
(Seal of the Palestinian National Authority – Supreme Judicial Council – Ramallah Court of First Instance, stating that 6.5 Shekels were paid in fees to the court, to obtain a copy of the judgment, on November 7, 2006, indicating the receipt number (3/64827), and duly signed by the Treasurer)

Judge<br>
Raslan Arafat<br>
(Signature)

Amman First Instance Court
Urgent Matters
Case No. 2949/2006

The Hashemite Kingdom of Jordan
Ministry of Justice
Urgent Judgment
Issud by the Judge Ms. Fida' Al-Hmood
who is permitted to perform the Trial and issue the Judgment in the name of the King
of the Hashemite Kingdom of Jordan his Majesty Abdullah II Ibn Al-Hussain

The Claimant, the Palestinian Investment Fund, and its representatives the Attorneys Salah aldin Albashir, Islam Alsmadi, Jamal Alhamawi and Others
**Have submitted this request in the Case No. 2949/2006 against**

**The Defendants:**

1. Judith Dasberg, in her personal capacity, and in the capacity of a heiress in the estate of the late Yaron Ungar in addition to the estate
2. Meir Weininger
3. Yehoshua Cohen
4. Pofessor Meir Ungar
5. Uri Dasberg
6. Amichai Ungar
7. Yochanan Harris
8. Yousef Meir

The Claimant requests issuing an urgent judgment to prevent the Defendants from conducting any action that may link or give the impression that those defendants are affiliated with the management of the Claimant's Company and to refrain the Defendants from committing any attempts that could deceive others to believe of the existence of such relation. And also to affirm the right of the current board of directors to manage the company in the Hashemite Kingdome of Jordan.

The Urgent Matters Judge has previously issued a decision on 10/11/2006 stating that the conditions which should be available to execute the Urgent Judiciary are not met in this case according to Article 32 of the Civil Procedure Code. But the Claimant was not satisfied in such decision. Therefore, the Claimant appealed that decision and the Court of Appeal had decided in its decision No. 224/2006 that requesting the issuance of a temporary decision to prevent the Defendants from acting as the board of directors of the Claimant's company and to affirm the right of the current board of directors to manage the company in the Hashemite Kingdome of Jordan till the subject matter of this Case is finalized does not contradict with the Law on the contrary it complies with Article 32/1 of the Civil Procedures Code. This decision is based on the submitted papers and documents which reflect that there is a serious conflict concerning the administration of the Claimant's Company. Therefore, the Court of Appeal has decided to revoke the Judgment which has been issued by the Urgent Matters Judge and to examine the submitted evidence to issue a decision concerning the subject matter of the request.

After Examination:

In reference to the evidence and documents which were submitted by the Claimant which are; a copy of the District of Rhode Island Court's Judgment dated July, 2004 along with its Judgment issued on 19/06/2006. In addition, the registration certificate of the Claimant which outlines the authorized signatories and the names of the members of the board of directors. And also a letter sent by the Defendants to the Arab Bank to modify the names of the owners of the Palestinian Investment Fund.
As a result and in reference to the Judgment of the Court of Appeal, I find that there is a necessity to revert to the Urgent Judiciary to protect the most deserving party of protection in the Case, particularly because of the existence of imminent danger in regard of the administration of the Claimant's Company, the nature of its relation with others, and its right to be represented before those others which could cause the Claimant damages that are irreversible in the future if this conflict was left to the normal court, which renders the Claimant the most deserving party of protection at this stage.

Therefore, I decide to issue an Urgent Judgment preventing the Defendants from committing any act that may reflect that they are affiliated with the management of the Claimant's Company and to refrain the Defendants from committing any attempts that could deceive others to believe of the existence of such relation. And also to affirm the right of the current board of directors to manage the company till the Case is finalized, which is filed before the Court of First Instance, under No. 2949/2006 providing that the Claimant shall provide a Notarized Guaranty amounting 40000 JD to ensure whatever damages that might affect the Defendants, and to postpone issuance of any documents until providing the required Notarized Guaranty.

**A Judgment may be appealed issued on 27/11/2006**

The Urgent Matters Judge

Fida' Al-hmood

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF YARON UNGAR, *et al.*, <br><br> Plaintiffs / Judgment Creditors, <br><br> v. <br><br> PALESTINIAN AUTHORITY, *et al.*, <br><br> Defendants / Judgment Debtors. | Miscellaneous Action No. 05-180 (GK) |
| ORASCOM TELECOM HOLDING S.A.E., <br><br> Nonparty. | |

### ORASCOM TELECOM HOLDING S.A.E.'S
### NOTICE OF DEVELOPMENTS IN RELATED EGYPTIAN LITIGATION

Nonparty Orascom Telecom Holding S.A.E. ("Orascom") — a corporation organized under the laws of Egypt, headquartered in Egypt, and with its principal place of business in Egypt — respectfully submits this notice regarding recent developments in related Egyptian legal proceedings. Such developments may concern the same property that purportedly is subject to the Writ of Attachment that is presently before this Court. Orascom has moved to quash the Writ of Attachment for lack of personal jurisdiction and improper service of process. That motion is fully briefed. *See* Dkt. Entry #90 (motion to quash); Dkt. Entry #91 (opposition to motion to quash); Dkt. Entry #92 (reply in support of motion to quash).

Orascom is mindful that this filing does not request relief from the Court. Nevertheless, it is out of respect for this Court that Orascom provides this notice so that the Court may be fully informed of all developments that may be relevant to these proceedings.

As Plaintiffs are already aware through their March 2007 deposition of Orascom's Executive Chairman, the Palestinian Investment Fund ("PIF") initiated legal proceedings in Egypt against Orascom concerning the same property that purportedly is subject to the Writ of Attachment at issue here. Orascom has been defending itself against the PIF in Egyptian courts for four years and, until recently, has succeeded in obtaining dismissals of the PIF's action from three different Egyptian courts.

In 2008, the PIF appealed the most recent dismissal to the Court of North Cairo (Appellate Division — Civil). Orascom's Egyptian litigation counsel has been informed that on March 27, 2010, the Court of North Cairo issued an oral ruling apparently reversing the lower court's dismissal of the PIF's action and finding in favor of the PIF. Orascom understands that the Court of North Cairo is expected to publish a formal written decision addressing the specifics of its ruling in the near future. Until Orascom receives the published decision, Orascom has no further information concerning the details of the Egyptian Court's decision.

As a result of the Egyptian Court's decision, Orascom now may find itself in a predicament not of its own making. In particular, Orascom is facing a court order in Egypt — Orascom's home country — in favor of the PIF with regard to property held by Orascom in Egypt. This Egyptian court order may address the same property that Plaintiffs contend (and Orascom denies) is subject to the Writ of Attachment at issue here.

- 3 -

Orascom stands ready to provide the Court with any additional information regarding the Egyptian proceedings to date in the manner that the Court would find most helpful. Orascom also will provide this Court with a copy of the Egyptian Court's published decision as soon as it becomes available.

Dated: April 7, 2010

Respectfully submitted,

**WHITE & CASE** LLP

/s/ Nicole E. Erb
Christopher M. Curran (D.C. Bar No. 408561)
Nicole E. Erb (D.C. Bar No. 466620)
Matthew S. Leddicotte (D.C. Bar No. 487612)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone:  + 1 202 626 3600
Facsimile:   + 1 202 639 9355

*Attorneys for Orascom Telecom Holding S.A.E.*