UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


YARON UNGAR, et al                    C.A. NO. 00-105 L

        Plaintiffs

V


THE PALESTINIAN LIBERATION          OCTOBER 25, 2010
ORGANIZATION, et al                 PROVIDENCE, RI

        Defendants


        BEFORE: MAGISTRATE JUDGE DAVID L. MARTIN


APPEARANCES:


FOR THE PLAINTIFFS:        DAVID J. STRACHMAN, Esq.
                           321 S. Main St.
                           Suite 400
                           Providence, RI 02903
                           401-351-7700

                           MAX WISTOW, Esq.
                           61 Weybosset St.
                           Providence, RI 02903
                           401-831-2700

FOR THE DEFENDANTS:        DEMING F. SHERMAN, Esq.
                           2800 Financial Plaza
                           Providence, RI 02903
                           401-274-9200

                           MARK J. ROCHON, Esq.
                           BRIAN A. HILL, Esq.
                           655 Fifteenth St., NW
                           Suite 900
                           Washington, DC 20005
                           202-626-5800

OCTOBER 25, 2010

THE COURT:  Good morning.  This is the matter of the estate of Yaron Ungar, et al vs The Palestinian Authority, et al, Civil Action No. 00-105 L.  We are commencing a hearing to address a number of motions. The first motion which the Court intends to take up is plaintiff's judgment creditors motion to preclude, to compel, and for related relief.  That's docket number 518.  Rather than announce all the motions scheduled for hearing I will announce them as we reach them.  So that's the first motion that we will be addressing. The attorneys will please identify themselves.

MR. STRACHMAN:  David Strachman for the plaintiffs.

MR. WISTOW:  Max Wistow for the plaintiffs.

MR. SHERMAN:  Deming Sherman for the Palestinian defendants.

MR. ROCHON:  Good morning, your Honor.  Mark Rochon, and Brian Hill is with me on behalf of the Palestinian defendants, as well.

MR. HILL:  Good morning, your Honor.

THE COURT:  Good morning.  Thank you, Counsel.

MR. ROCHON:  Your Honor, would the Court indulge from the defendants any brief introduction to

1    the total number of motions we have here or do you

2    prefer to dive into them one at a time?

3            THE COURT:  I'm willing to allow both sides

4    to make a general overview statement of the problem

5    that is presented, or the dispute that exists.  I'm

6    cognizant that there is an interrelationship among the

7    motions, and there's some larger issues that once

8    determined probably will impact most, if not all, of

9    the motions, so I'm willing to do that.  I will allow

10   you to make a general statement about the issues that

11   you think are common, and then I'll allow plaintiffs

12   to make a similar response to the common issues or

13   general larger dispute that the Court is being asked

14   to resolve and then we'll get into the individual

15   motions.  Mr. Rochon, you may proceed.

16           MR. ROCHON:  Thank you very much, your Honor.

17   It's safe to say that there's a real disconnect

18   between the plaintiffs and the defendants as to how

19   discovery should proceed in this sui generous

20   proceeding.  There's not really a template out there

21   for you as to how discovery is conducted in connection

22   with a hearing on a motion to vacate default because

23   the evidentiary hearing that's contemplated in this

24   case is not common to motions to vacate default.

25   Often they're decided on the papers or with argument.

1    In this instance, obviously with the remand from the
2    Court of Appeals the District Court is directed that
3    there be an evidentiary hearing that's allowed for
4    discovery to take place.  It is in the context of that
5    directive that all these disputes arise.  And in all
6    candor, I think both sides occasionally try to have
7    their cake and eat it, too.  Sort of -- each of us
8    have on occasion act as if full discovery as if a
9    trial is coming up is what should take place, and at
10   other times both sides argue, but wait, wait, wait,
11   this isn't a typical trial, and I assign that kind of
12   behavior to both sides.  We, and the plaintiffs in
13   this case, have great disagreement, for instance, as
14   to whether or not discovery in the sense of telling
15   each other who your witnesses are should occur.  In
16   our view, both by pursuant to interrogatories that
17   have been propounded and the district court's order,
18   the parties should exchange witnesses well in advance
19   of the date for the pretrial filing.  The plaintiffs
20   take the position they won't tell us who their
21   witnesses are until after we file our pretrial
22   statement on December 17th.  We think they should.  We
23   filed our expert reports consistent with the
24   expectation of the rules for a trial.  The plaintiffs
25   say, well, this isn't a trial, and those rules don't

apply.  On the other hand, we think that their

discovery is extremely broad and the kind of thing

that you might see in a case with a two year discovery

window eventually heading to a trial, and we think

that's inappropriate.

THE COURT:  Mr. Rochon, I'm informed that

another discovery motion has been filed to which the

objection period has not yet run.  Does that relate to

the issue that you just referred to, the

identification of witnesses?

MR. ROCHON:  Yes.

THE COURT:  All right.

MR. ROCHON:  And I brought today -- there are

two filings that we made on Friday, and I have a copy,

courtesy copy for you.  One is a reply on the 30(b)(6)

motion that's set tomorrow, which is before you

already.  And the other is the filing that you just

referenced.  If I may tender these to your clerk.

THE COURT:  You may do so but it's not my

intention at this point to try to address that motion.

MR. ROCHON:  I understand.  I think in the

course of things, I think it's highly likely it's

going to end up with you, but I realize it has not

been referred.

THE COURT:  All right, you may present it.

MR. ROCHON:  So I'm presenting to the Court both of those filings.

Judge, so these overarching issues kind of inform everything that's going on in these various motions, and it is our overall point of view that what you have here is a situation here where we need to move expeditiously through discovery in a very compressed time frame with a limited window for depositions, and that much of the discovery litigation we've been forced to initiate reflects the plaintiffs' approach to this thing as if it's a full bore scortched earth trial, and frankly, in our view, and you're the ultimate decider, much of the requests from the plaintiffs are designed to force us to come before you with these motions so that either in this case or another they can claim that we're no longer compliant with court directives or we don't comply with the Court.  It's a theme that we see throughout the pleadings.  I'll address it more specifically when we get to the motion related to the prime minister because it's referenced there.  But in our view, the overall approach of the plaintiffs in this case puts us in the position of having to come before you with all of these motions when, in fact, we could move through this stuff much more expeditiously, and get

1    the plaintiffs what they need, and get us what we

2    need, so Judge Lagueux can decide this motion on or

3    after January 10th.  These requests, in the way the

4    plaintiffs are proceeding, I know that they say they

5    don't want to delay this matter, but frankly given

6    what we've looked at, and even what's happened this

7    morning, I've been served with seven deposition

8    notices this morning, essentially using up the

9    available space that we have for depositions, which

10   we've been waiting on so that you could decide the

11   30(b)(6) motion.  Seven depositions that were served

12   this morning that could have, of course, been served a

13   long time ago, and we could have been conducting those

14   depositions, or addressing them, but served today.  We

15   have a very short window of time.  And, frankly, in

16   our view, what's going on is the plaintiffs are trying

17   to use up the space, avoid this thing getting done

18   with the discovery closeout, and the very serving of

19   seven or eight, I don't even know if I have the count

20   right, new deposition notices this morning, puts us in

21   a position of making it highly unlikely we'd be able

22   to do that.  We have a discovery cutoff of November

23   17th or 18th.  So that's our concern.  I'll save the

24   longer arguments when we get to the actual motions,

25   Judge.

1          THE COURT:  All right, thank you.  Who's

2     going to respond?  Mr. Wistow?

3          MR. WISTOW:  I will, your Honor, with your

4     permission.  To a certain extent, I agree with

5     Mr. Rochon that there are overriding issues that

6     relate to many of the motions in this case.  For me to

7     address Mr. Rochon's comments where he says we have an

8     ulterior motive to delay the case and we're not acting

9     in good faith, although they didn't expressly use that

10    term, that's the implication.  I do know, although I'm

11    new to the case, that when the issue of scheduling

12    first came up, the defendants were very eager to get a

13    hearing date much much later than the January date.

14    The plaintiffs were very eager to even get an earlier

15    date.  We have no desire whatever, I assure your

16    Honor, to continue this matter.  Rather than just

17    indulge in generalities, we think each of the motions

18    that are here need to be addressed on the merits of

19    each motion as painful as that may be, there's a lot

20    of them.  We spent a good amount of time on this case.

21    Whatever we filed by way of discovery, we think is

22    appropriate.  Whatever we filed by way of a motion to

23    compel, we think is appropriate.  Whatever we've

24    opposed by way of a motion for protective order on the

25    other side, or objections, we think is productive.  To

just throw rockets at each other and say this is just
some fiasco, I think the only way to do this, your
Honor, is to look at each and every motion separately.

I will say, as I said at the beginning, there
are certain overriding issues that relate to all of
the motions. For example, the defendants take the
position that there should be no inquiry into the
reasons for the default, that they've been -- they
concede they're willful defaulters and that should be
the end of the inquiry. And I concede that if your
Honor rules that, that will eliminate a lot of
discovery. The problem with that position that's
being taken by the defendants, as I would like to
elucidate, is it's not well-founded based on the
pleadings they filed and, most importantly, Judge
Lagueux has entered a specific order controlling that
very issue which I'm afraid they don't like Judge
Lagueux's order.

Another issue that is very very important in
most of these discovery motions is whether or not the
motion to vacate which was filed in December of '07,
as your Honor knows, some years after the July 2004
default judgment, was timely or not. The defendants
are taking the position that it's already been
adjudicated by Judge Lagueux and by the First Circuit,

that that's -- that indeed the motion to vacate is
timely.  If that's true, which we don't agree with at
all, that indeed that would eliminate a lot of the
discovery.  We think we can show conclusively when it
comes to those two individual issues, on the
individual motions where this comes up, that there
simply is no merit to what the defendants are saying.
Is this a unique case?  Absolutely.  Does it mean that
we should abandon the ordinary rules of civil
procedure that are required to be followed because
it's unique and involves extraordinary circumstances?
I don't think so, your Honor.  We're down for hearing
on particular motions.  I wish there were some silver
bullet to avoid hearing them all but I'm afraid there
isn't, and I would respectfully suggest we argue each
motion on its merits.

THE COURT:  All right.  Thank you,
Mr. Wistow.  With those introductory remarks from
counsel, we'll now proceed to commence the hearing on
the motions and we'll start with that first motion
which is document number 518.  The plaintiffs judgment
creditors motion to preclude, to compel and for
related relief.

MR. WISTOW:  Thank you, your Honor.  This is
not only a unique case in many respects, it's a unique

1   experience for me because I've been in the case

2   relatively shortly and I'm about to discuss with the

3   Court matters that in many respects I expect the Court

4   knows better than I do what the history is having been

5   involved in this so long.  And I say that not to

6   flatter the Court or to be sycophantic.  I'm torn

7   between going through a lot of explanations that would

8   ordinarily be made by lawyers before a court versus

9   being in a situation where your Honor has labored with

10  it so many years.  And what I basically decided the

11  best thing for me to do is to assume that we're all

12  humans.  We don't have total recall, and it would

13  probably be best to repeat with apologies some of the

14  history that I think there's a good chance that your

15  Honor not only knows but perhaps knows better than I

16  do.  In the context of the motion with regard to Prime

17  Minister Fayyad, let me say as follows: Basically the

18  context of that motion, and many, not many, virtually

19  all of the motions that we're going to be talking

20  about today follows hard on the heels of the Court of

21  Appeals decision, the First Circuit Court of Appeals

22  decision, this past spring, where basically Judge

23  Lagueux's decision to deny the motion to vacate that

24  the PLO and PA had filed in December of '07, his

25  decision to deny that motion was reversed and remanded

1    for further proceedings.  In essence, Judge Lagueux

2    had ruled that the fact that there was willful default

3    in the case was per se reason to refuse to allow the

4    vacating.  The Court of Appeals differed with that

5    assessment by Judge Lagueux and ruled that there was

6    "a unique blend of centrifugal and centri -- I don't

7    even know how to pronounce it, your Honor, so you know

8    what I'm referring to.

9              THE COURT:  I do.

10             MR. WISTOW:  If I had to guess, I would guess

11   centripetal forces.  That's at 599 F 3rd 79, and I'm

12   sure your Honor has read this case over and over again

13   in preparation for these matters.  But I would like to

14   emphasize just briefly what the Court said which I

15   think is the essence of their opinion, and they said:

16   A variety of factors can help an inquiring court to

17   strike the requisite balance.  Such factors include

18   the timing of the request for relief, the extent of

19   any prejudice to the opposing party, the existence or

20   nonexistence of meritorious claims of defense, and the

21   presence or absence of exceptional circumstances.

22   This compendium is neither exclusive nor rigidly

23   applied, rather the listed factors are incorporated

24   into a holistic appraisal of the circumstances.  I

25   think that's probably the key word, the holistic

appraisals.  In a particular case, that appraisal may or may not justify the extraordinary remedy of vacatur.

Now when the case came back to Judge Lagueux, on April 1, 2010, he entered an order, docket 519 in this case, it appears that it's Exhibit A to the memorandum in support of the instant motion that we're arguing today, and what Judge Lagueux said, and I quote because I think this is a very very central issue, this is post-remand from the circuit, and Judge Lagueux's statement of what he intends this hearing in January to encompass.  He says, in view of the fact that the Court of Appeals has stated that when a party is moving to set aside a judgment that was secured by intentional and deliberate default, the matter is fact specific, the Court will hold an evidentiary hearing to determine precisely, and I think this is key, your Honor, precisely what the facts are concerning the deliberate decision to default and the factual circumstances surrounding that matter.

The history of why this came up, in my opinion, is because the defendants themselves made this the very very central issue.  Originally in their motion to vacate, which was denied by Judge Lagueux, and also importantly before the Circuit Court of

Appeals which listened with sympathy to their plea
that they be allowed to come back and make a showing
beyond the fact that they were defaulted, and I'd like
to quote for you what the defendants themselves said
in the motion to vacate which, your Honor, I would
point out, is the presently existing motion before the
Court that is to be heard in January.  There has been
no subsequent revision of the motion to vacate.  What
we're going to be hearing in January of 2011 is the
motion to vacate that was filed in December of 2007.
And what the defendants said, and this is docket 408,
in that case, and I hope your Honor indulges me.  I
understand we need to get to the fired (inaudible)
issue, but I think preliminarily I would like to make
these background statements.  What the defendants said
in the motion to vacate, which is docket 408, and
specifically on page 38 and 39, is as follows, and
this is their words: Vacatur is also warranted because
of the significant foreign policy consequences that
have flowed from the $116 million default judgment
entered in this case.  As Prime Minister Fayyad's
declaration makes clear, and I'd like to emphasize
this, this judgment has already been the subject of
diplomatic communications at the highest levels
between our country's representatives in the state

department and the governing officials in the occupied territories.  If left intact, the judgment threatens to undermine the relationship between the United States and Palestinian Government, a relationship that the executive branch of the United States Government has characterized as being crucial to the Israeli/Palestinian peace process.

Now the defendants said in their brief to the First Circuit on appeal, at page 43, "Here the $116 million default judgment has been a recurring issue in the PA and PLO's interaction with the United States Department of State.  And, in part, in part, they relied on a letter that was sent by Prime Minister Fayyad, the deponent in question in this motion, to Secretary of State -- then Secretary of State Condoleezza Rice, a letter dated June 18, '05, and that letter indeed is attached as an exhibit to the motion to vacate filed in December of '07.  It appears in -- it's docket 408-2.  There's also Exhibit D to the present motion.  And what Prime Minister Fayyad said was, "I am writing to request your immediate assistance in addressing what has become a serious obstacle to the continued effective participation of the Palestinian National Authority (PNA) in the Middle East peace process, and the PNA's role as a strong and

viable partner of the United States of America and the
Government of the State of Israel in that process.  In
particular, we believe that the actions of the
plaintiffs in the Ungar case directly interfere with
the United States Government's conduct of foreign
relations in the Middle East to the grave detriment of
the Palestinian people.  More specifically, we believe
that actions taken by the plaintiffs under the
authority of the district court are inconsistent with
the United States' longstanding commitment to an
investment in the Middle East peace process."

       Now, your Honor, that's certainly heady
material.

       THE COURT:  Those last two quotes that you
read to me, Mr. Wistow, do you know which pages or
letter they appear on?

       MR. WISTOW:  I --

       THE COURT:  If you don't, it's all right.

       MR. WISTOW:  I don't off the top of my head.
I represent to your Honor --

       THE COURT:  I'm sure it's in there.

       MR. WISTOW:  Yeah.

       THE COURT:  All right, continue.

       MR. WISTOW:  If it's important, I can locate
it.

1      THE COURT:  I can find it.

2      MR. WISTOW:  Okay.  The -- did you say

3  Page 4?  Mr. Strachman has pointed out to you that it

4  appears -- the first paragraph I read to you is on

5  page 1, then the second paragraph is on page 4, your

6  Honor.

7      THE COURT:  Thank you.

8      MR. WISTOW:  And, you know, having been

9  confronted with these very weighty concerns, among

10 other arguments, the Court of Appeals remanded the

11 case.  Talking about these possible exceptional

12 circumstances.  And as your Honor knows, on June 1,

13 2010, Judge Lagueux entered his pre-hearing order, not

14 pretrial order, and I say that with reference to the

15 issue about disclosure of witnesses under Rule

16 26(a)(2).  We've, believe me, your Honor,

17 punctiliously tried to adhere to any orders of the

18 Court.  The last thing in the world we want to do is

19 be in arrears on something in as important a case as

20 this.

21      In any event, on June 1, 2002 (sic), Judge

22 Lagueux entered a pre-hearing order where he

23 specifically laid out what the discovery schedule was

24 going to be, when pretrial memos would be sent out,

25 and the like.  On July 28, 2010, Prime Minister Fayyad

1    was, indeed, deposed in East Jerusalem by this

2    speaker, and I might say quite an adventure for me.

3            Your Honor, what's obvious is the defendants

4    have made such an issue about foreign policy, their

5    communications with the United States, and were

6    successful in getting a reversal of Judge Lagueux.  I

7    can't put myself in the minds of the First Circuit.  I

8    don't know what determined them and what didn't, but I

9    know that argument was made before them, and I know

10   that the First Circuit was very concerned about -- I

11   shouldn't say concerned, was very interested in the

12   foreign policy implications and remanded for Judge

13   Lagueux to consider all that in his holistic approach

14   to the case.

15           Now, why are we pressing this?  Why are we

16   making such an issue out of this?  What we would like

17   to show Judge Lagueux, if we're fortunate enough to be

18   able to do it, is that this is not in the foreign

19   policy interest of the United States.  The United

20   States simply doesn't care.  And I think I said that a

21   little bit too brusquely.  I shouldn't say they don't

22   care.  I think it's a little bit more complex than the

23   plaintiffs would like -- the defendants would like to

24   make it out.  For example --

25           THE COURT:  Mr. Wistow, I don't want to

interrupt and derail you, but in reading the
memorandum, I believe when I read your reply, it
seemed to indicate that because the defendants were
not going to rely upon any foreign policy arguments
that were not in the public record, that the
plaintiffs would withdraw that prong of their motion
provided that commitment by the defendants were
memorialized in an order.  Is that correct?

MR. WISTOW:  That is correct, your Honor.

THE COURT:  It sounds to me as if you're
arguing a point that, when I read the memorandum, I
received the impression this might be an issue that,
in fact, had been resolved.  Am I mistaken in that, or
do you just feel it's important to recite this
background material and then get to the point where
because they're willing to rely on the public record
that portion of your motion, that prong of the motion,
need not -- you're withdrawing.  Could you perhaps
just enlighten me?  I'm sitting here listening to what
you're saying, but it's coming up in the back of my
mind, is this an issue I'm going to have to decide
because there was some suggestion in the memorandum
that the parties on this one issue had, in fact,
reached some sort of an agreement.  Could you just
enlighten me so I'll know whether I'm going to be

1    ruling on this part of the motion or not.

2            MR. WISTOW:  Fair enough.  If indeed there is

3    an agreement, which -- and the Court anchors it, so to

4    speak, with an order, then your Honor's quite right,

5    that aspect of our motion does become moot.

6            This background is relevant on two other

7    aspects of the motion.  The motion does not become

8    completely moot by virtue of the agreement.  I would

9    ask with the Court's indulgence because I think your

10   Honor is exactly right, we can shorten this somewhat

11   if indeed there is an agreement that all that the PLO

12   and the PA will rely on in support of the foreign

13   policy issues are publicly available materials.

14           THE COURT:  Mr. Rochon.

15           MR. ROCHON:  Can I approach the lectern, not

16   to take it away from Mr. Wistow but just to see if we

17   can get there.

18           THE COURT:  With that condition, I'll let you

19   approach, but you're not going to -

20           MR. ROCHON:  I'm not going to usurp it.  It's

21   just on this one issue, and his notes are still here,

22   and I only brought this -- you asked me a question

23   I've got my notes.

24           THE COURT:  Briefly.  Briefly answer the

25   question.

1    MR. ROCHON: I will. First of all, number 1,
2   we're certainly not relying on anything said between
3   Mr. Fayyad and the United States of America whatsoever
4   in any conversations for the foreign policy arguments.
5   We are, in terms of the United States' position and
6   impact, we think that the United States has spoken
7   through its official channels in regards to this
8   matter, and we're not going to be trying to rely on
9   the United States speaking in any other way, meaning
10  we're not going to be presenting evidence that the
11  United States really thinks acts even though they're
12  letters to Judge Marrero and Judge Kessler, have said
13  why.
14       THE COURT: Are those official channels
15  public?
16       MR. ROCHON: Yes, and the plaintiffs have
17  them. Those are written communications. The only
18  other communications on this issue that exist, that I
19  know of, are the letters of the Prime Minister that
20  Mr. Wistow has just been talking about, and obviously
21  the Prime Minister does not speak to the United
22  States. The United States foreign policy interests
23  are, of course, spoken to by the United States, not by
24  foreign officials. I think, in other words, we're in
25  agreement, the only question -- I don't want to get --

1    I don't want to later have someone think I violated an

2    agreement, as to what's in the public record. The

3    public record includes the letters that are in the

4    public, and the statements of the United States to the

5    various courts. We are not relying on any other

6    communications with the United States or from the

7    United States in this matter.

8           THE COURT: All right. Thank you,

9    Mr. Rochon.

10          MR. WISTOW: I don't know for a fact whether

11    or not the letters that we're talking about are part

12    of the public record to be candid with you, but not to

13    prolong the matter --

14          THE COURT: Well, Mr. Wistow, I mean the

15    letters are in the record in this case.

16          MR. WISTOW: In this case, yes.

17          THE COURT: The record in this case is

18    public, I believe.

19          MR. WISTOW: Yes.

20          THE COURT: All right. So --

21          MR. WISTOW: Fair enough.

22          THE COURT: Given the statement by

23    Mr. Rochon, it appears that as long as the Court

24    memorializes the agreement that's been made in the

25    order that I will issue, that portion of the instant

1    motion, that prong, you would withdraw, correct?

2          MR. WISTOW:  Yes.

3          THE COURT:  All right.

4          MR. WISTOW:  I think I would be less than

5    prudent if I weren't exactly clear on what the order

6    would say.  Let me restate it, as I understand it.

7    It's that the defendants will rely on nothing other

8    than what is in the public record with regard to the

9    issues of what is in the foreign policy interests of

10    the United States.  That's what I understand.

11          MR. ROCHON:  We rely on no other

12    communications.  We've already tendered an expert to

13    the plaintiffs, and a report from the expert, as to

14    this expert's view of the foreign policy impact.

15    That's an expert that they have his report.  He's not

16    going to rely on any communications that aren't in the

17    public record.

18          MR. WISTOW:  Well, that's part of my problem,

19    your Honor.  I mean, if the agreement is --

20          THE COURT:  All right.  Make your argument

21    and I'll rule on this matter.  Go ahead.

22          MR. WISTOW:  Thank you.  With apologies, your

23    Honor, I'm not trying to drag this thing out.  Our

24    view on this issue of the public policy is that Judge

25    Marrero this appears as docket 519-7 in the docket of

this case, Judge Marrero in the Knox case vs the PLO,
sent an order to the United States in December --
coincidentally in December of '07, the same month that
the motion to vacate was filed in this case, ordering
the United States to express as to whether or not it
contemplates issuing any suggestion of interest in the
resolution of this case or, or in any other of the
similar cases pending in other districts, and the
United States did reply to Judge Marrero in February
of 2008 and stated -- I'll read just very briefly from
the rather lengthy reply, "United States respectfully
informs the Court that it declines to file a statement
of interest concerning the Rule 60 issues presented by
this case."  That, too, was a motion to vacate.  "But
we'll continue to monitor this and other cases like
it.  The United States has not decided whether or not
to participate in those other cases.  The United
States supports just compensation for victims of
terrorism from those responsible for their losses and
has encouraged all parties to resolve these cases to
their mutual benefit.  At the same time, the United
States remains concerned about the potential
significant impact that these cases may have on the
financial and political viability of the defendants."
So the United States sent a very diplomatic letter

saying, you know, we feel for the plaintiffs and we're concerned about the defendants but refused to file a statement of interest. That was in February of 2008. Now when we deposed Prime Minister Fayyad in East Jerusalem, I asked him whether or not he was in contact with the United States post that filing in the Marrero case and asked them whether or not to file a statement of interest, and he was not allowed to comment on that. There was an instruction not to answer

THE COURT: And what was the question that he was --

MR. WISTOW: Here's the question. I'll read it precisely. "Mr. Wistow: I didn't even ask him that. All I said to him was, did you ask them if they would file a statement of interest in these cases. That's all I asked. That's pretty straightforward." The preamble to that, your Honor, is there's no dispute, this was within a year before the deposition, which was 2010, so it was sometime in 2009, long after the United States had refused, and he indicated these were people at the State Department that he spoke to about this.

THE COURT: What page of the transcript does your question appear at?

1          MR. WISTOW:  Yes, this is page 43.

2          THE COURT:  All right.  Please continue.

3          MR. WISTOW:  And it's attached as Exhibit A.

4    I'll just read you what he said.  Mr. Rochon, if your

5    question is that, and you're not going to claim it's a

6    waiver of diplomatic privilege, then I said I will

7    not, Rochon, as long as we're on my time, do you want

8    to tell me, he's out of the room, do you want to tell

9    me where else you're going to go and we can hash out

10   the diplomatic issues now on my nickel.  Mr. Wistow:

11   I'd rather not.  Mr. Rochon: All right.  Mr. Wistow:

12   Because I'm not -- I don't know where I'm going, if

13   you haven't figured that out yet.  It's an

14   embarrassing admission on my part.  It's a little

15   loosey-goosey, I said.  Mr. Rochon: I'm offering it to

16   you because we'll be back on your time soon.  Mr.

17   Wistow:  I guess in fairness to you, if he says yes,

18   he did ask them for it, meaning the statement of

19   interest, I'm going to ask him did they say yes, did

20   they say no, did they say maybe.  That's all.  Mr.

21   Rochon:  Well, then, well I know that's all -- that's

22   what implicates diplomatic privilege.

23          Now in response to the merits of this issue,

24   I understand there's an attempt to come to an

25   agreement about this, and I dearly would love to come

to an agreement, but I'm very reluctant to, you know, waive this and have some agreement, the parameters of which I frankly don't understand.  The defendants' claims on the merits with respect to not doing this is that, Number 1, there never was an instruction to the witness not to answer.  That's palpably not so, your Honor.  And I refer you to page 63, and I quote: "Mr. Wistow: All I'm asking is did he ever ask for a statement of interest?  Mr. Rochon:  I'm not going to let him answer that now on diplomatic privilege grounds.  We'll take it now.  You're setting me up to lose.  I said I'll do it if that was all you were going to -- and so I suggest that -- I don't know Mr. Rochon well, but from the little I've seen of him he seems to be a decent gentleman, I think he probably didn't read far enough in the deposition when he says that there was no instruction to the witness.

His second argument is that we didn't go to Judge Magistrate Martin for a decision on this issue while we were in Jerusalem.  Now, as we've provided in our papers in this case, your Honor, there's no dispute, there's been controversies between the plaintiffs and defendants on everything you can imagine.  It's sad to say.  When the issue of taking the deposition of Prime Minister Fayyad first came up,

1    Mr. Strachman sent an e-mail to the defendants.  It

2    appears as Exhibit C in our memo.  It's docket number

3    563-3, and Mr. Strachman said, if you are still

4    concerned about wasting Fayyad's time, I will be glad

5    to hold the deposition in the afternoon Jerusalem time

6    on a day that the court is available so that you can

7    phone the court and seek to bar lines of questioning

8    that you believe are irrelevant.

9         Now the defendants clearly accepted this

10   condition, or this proposal.  For example, in the

11   deposition transcript of Mr. Fayyad, for example, at

12   page 56, when we got into a controversy on this,

13   Mr. Rochon said I need to discuss it with you first

14   before I take it to the Judge.  And then on page 61,

15   Mr. Rochon said, I'm going to have to take this to the

16   Magistrate Judge.  Now, I said, and this appears, your

17   Honor, on page 63, see if you can get the Magistrate.

18   You know what I'd rather do?  You know what I'd rather

19   do?  Let's set this question aside and let's go

20   forward and get a whole list of questions to ask the

21   Magistrate at once otherwise -- Mr. Rochon: We're fine

22   with that.  Mr. Wistow:  It's going to be a disaster.

23   I had visions of, you know, calling your Honor up

24   every 15 or 20 minutes with some question out of

25   context.  I have to say in candor, I know your Honor

had a telephone conversation -- conference, rather,
about this deposition with Mr. Strachman and
representatives of the defendants.  I was not on the
line.  My impression was your Honor made no commitment
to rule on anything.  I think, you know, we're talking
about complex issues of diplomatic privilege.  I made
it clear at the deposition that I'd want to brief
these things.  These are not, you know, run of the
mill kind of things.  In any event, what happened was
my portion of the deposition concluded at 5:02
Providence time.  At that point, Mr. Rochon chose not
to call your Honor either because he thought you were
gone or -- I don't know why, but he decided that he
would begin examination of Mr. Fayyad himself, which
he did, and I redirected after Mr. Rochon, and it went
back and forth as lawyers do, they never put an end to
it, and the deposition didn't conclude until 6:02, and
nobody called.

THE COURT:  Mr. Wistow, you have ten more
minutes on this motion.

MR. WISTOW:  Yes, your Honor.  Okay.  The
second point that I would like to make is that there
was a declaration sub -- the declaration was submitted
to the Court.  I asked Mr. Fayyad if he prepared it,
prepared the declaration.  He was absolutely

instructed not to answer. We filed a motion to compel
an answer to who prepared the declaration. We were
served with an errata sheet, literally an errata
sheet, that said that they're changing the answer from
we're going to get into privileged areas to the
declaration was prepared jointly by me and lawyers at
Miller and Chevalier who are counsel for the PA and
the PLO, Walid Najjab who I had retained through his
company, Management Consulting Services, to facilitate
communication between myself and the U.S. Attorneys
retained to defend the P&A and PLO in litigation
brought against them, and the U.S. was involved in the
communications, et cetera, and they said the reason
for the change in the errata sheet was to: "The
objection is hereby withdrawn and the responsive
answer is provided." Now, what that does, your Honor,
is it makes a deposition a kind of a take home exam.
You know, you say whatever you want to say and then
make, you know, wildly substantial changes to it.
This is not, you know, a typographical error or an
answer, I made a mistake, I want to correct it. This
is, I'm not going to give you an answer, now I've
decided since you filed a motion here's the answer.
We were precluded from getting into any questions
about Najjab's participation, who he was, what he was

1    paid, what he was doing.

2        The last item that -- by the way, the item I

3    just addressed has nothing to do with the agreement.

4    We press that issue, regardless.

5        The next item also has nothing to do with the

6    agreement.  We asked the deponent what did he mean,

7    and what knowledge did he have of certain statements

8    he made in the declaration, which he submitted to this

9    Court and to the First Circuit, and he said, for

10   example, he said, in the motion to vacate to this

11   Court, he refers to the letter, and he says, "I

12   emphasize in my letter that the attempts by

13   plaintiffs' counsel to interfere with the actions of

14   the Palestinian government around the world was 'not

15   supported by U.S. law and ran counter to international

16   law."  And I asked him in the depo at page 116, flat

17   out, I'll read you what I said, "Now what laws were

18   you referring to?  What was the basis for your

19   statement?"  Now this is presented to this Court, your

20   Honor, by the declarant Fayyad under oath.  "Now what

21   laws were you referring to?  What was the basis for

22   your statement that the attempts by plaintiffs'

23   counsel to interfere with the actions of the

24   Palestinian government was not supported by United

25   States law?  What knowledge did you have at the time?"

And he was flat out instructed not to answer on the
basis of attorney/client privilege. And I submit,
your Honor, the law is very very clear that when one
is asked facts, even if he's learned those facts from
counsel, he cannot refuse to disclose those facts,
a fortiori in a situation where he gives an affidavit
to the Court saying that there's been a violation.
There's a case directly on point I cited in my brief.
The bottom line is what are we talking about overall
in this situation? What's the context where we are?
There was a final judgment in this case in July 2004.
The case was over. It went to the Court of Appeals.
The Court of Appeals affirmed the judgment. They
attempted to go to the U.S. Supreme Court. The
Supreme Court denied certiorari. They came forward
and they filed a brand new petition, and in that
petition they seek to vacate it. The burden is on
them as petitioners to prove their case. They've made
all kinds of statements in support of that proof we're
trying to test. Judge Lagueux said in his April 1st
order in this case within two weeks of the remand, and
I quote what he said, "The defendants will..." this is
at docket 519, your Honor. "The defendants will have
the burden of proving a variety of factors set forth
by the Court of Appeals which would justify a vacation

1    of the judgment under these circumstances, including

2    exceptional circumstances." In sum, your Honor, I

3    thank you for your indulgence in the time you've

4    allowed me. In sum, what we're saying is, they told

5    the Court vacate this and we'll be cooperative, we'll

6    give you discovery, we'll this, we'll that, in the

7    trial on the merits once you vacate. We can't get

8    discovery now, really, when they're in a position

9    where the burden is on them, where Judge Lagueux's

10   made it clear that they have the burden. Having said

11   all that, your Honor, we believe we're entitled to

12   continue with the deposition of Fayyad. We've asked

13   that he be brought to the United States. I realize

14   he's a high ranking official. If your Honor is

15   troubled by that, we're happy to go -- we're not

16   happy, we'd go back to East Jerusalem. We would ask

17   that the expenses associated -- the extra expenses

18   associated with that trip be borne by the defendants.

19   Thank you, your Honor.

20          THE COURT: Thank you, Mr. Wistow.

21   Mr. Rochon.

22          MR. ROCHON: Thank you, your Honor. Your

23   Honor, there's three potential communications at issue

24   here. Number 1, the conversation that Prime Minister

25   Fayyad had with state department officials which had

never been mentioned before in any pleading,
discovery, reference, affidavit, declaration, anywhere
by us until Mr. Wistow asked the Prime Minister about
it, and we've never relied on it for any purposes.
That's number 1.

Number 2 is a declaration signed by him in
December of 2007 in connection with our motion to
vacate.

Number 3 is a letter he wrote in 2005 that
was appended to his declaration.  Three statements,
one of them only potential, the conversations with the
state department officials.

Before I get there, though, I want to get to
the ad hominem part, page 3, footnote 3 of plaintiffs'
reply suggests that my client has continued to engage
in recalcitrant conduct, and they cite four cases.
I'd like to kind of walk the Court through those
because this is something we hear a lot and it's even
how Mr. Wistow closed that we still don't cooperate
with the courts.  They cite the Gilmore case where the
court suggested that we have chutzpah, and our client
had chutzpah in connection with something to do with a
bond.  Two points about that one.  Number 1, the Court
misunderstood.  We had offered to post a bond if
vacater was granted.  It would be paid to the

plaintiffs if there was further defaulting conduct. The Court thought that what we had offered in our motion to vacate was we would only provide the funds if there was another default. That would be chutzpah, but it's not what we had said. Here's what's most important. That statement by the Court was made in her order granting vacater. To the degree the Court had concerns about the conduct of my client, it's safe to say that she resolved them in my client's favor in the very order cited by the plaintiffs in footnote 3, page 3 of the reply brief.

Number 2, the Saperstein case, they cite, and they cite a statement by the Court but they fail to tell you that the Court in that statement was complaining about the difficulties of both parties in connection with a discovery dispute. It's safe to say discovery disputes happen all the time, and courts frequently make statements that amount to a pox on both your houses. That was the context of the statement she had made, but what's most important is in Saperstein which was vacated, another default judgment vacated, the defendants went through two years of discovery successfully. The Court -- the case was recently dismissed voluntarily with prejudice by the plaintiffs, and in the last order the Court

issued before the plaintiffs moved, the Court was not critical of both sides but instead noted that the difficulties in connection with discovery in that case arose with the entry of new counsel for the plaintiffs. She was not critical to the defendants. She was, in fact, critical to the plaintiffs' counsel in an order she issued on October 4th. Knox, they cite, and here the cite is even more distressing, the quote they offer is the Court discussing the plaintiffs' allegations. The plaintiffs allege the defendants weren't cooperating with discovery, and the Court discusses that. Subsequently, the Magistrate Judge in that case assigned to handle discovery, in a February 17, 2009 order, said, and I quote -- I'll start the quote in a second. He reached a, "conclusion that defendants had not improperly failed to comply with court discovery orders. If the Court had reason to believe that defendants had failed to comply with its orders without justification it would have ordered further discovery."

In Biton, which they cite, the Court referred to a motion to vacate as "an effort to derail conclusion of this hory (inaudible) litigation." Indeed we filed a motion, and it could be characterized as an effort to derail conclusion. It

1    was a motion to vacate. That case was dismissed with

2    prejudice by the plaintiffs. In fact, your Honor, of

3    the four cases cited by the plaintiffs, Knox settled,

4    Saperstein was dismissed with prejudice, Biton was

5    dismissed with prejudice, and Gilmore were actively

6    engaged in discovery. The defendants actually resent

7    the suggestion which is repeated that they're not

8    cooperating with discovery in these other cases.

9    Allegations made by the plaintiffs but not by the

10   courts.

11        As to the matters that are at hand, the

12   statements that are -- with the Prime Minister -- I'd

13   like to step back on a procedural point. Maybe we've

14   reached agreement, and let me just be clear so that

15   you can decide whether we've reached agreement. Our

16   expert does not rely on any statements that are other

17   than the public statements about which we've

18   discussed. He doesn't say I had conversations with

19   state department officials. He doesn't reference

20   personal knowledge of the United States foreign policy

21   interests. Our expert report which we served on the

22   plaintiffs consistent with what we think are the rules

23   that should be involved in this matter is available to

24   them and does not reference any such private

25   statements. So I think this may be a mountain out of

a mole hill and we have an agreement, but just in case, the plaintiffs make a couple of arguments. First is that you were on call but only for us. That only we could raise discovery issues with you at the Prime Minister's deposition. They could not. I frankly have never heard of such a thing. And it's belied by Mr. Wistow's own conduct in the hearing in which he says at one point, quote, and this is on page 63, lines 4 to 6, "Why don't we do this, why don't we get an answer just to that question so that we can talk to the Magistrate." A few lines later, Mr. Wistow, these are lines 15 to 16 on page 63, "See if you can get the Magistrate." Obviously this late developed notion that you were only available if we raised a discovery issue and not if they wished to raise one is -- I got to think it's an ad hoc -- I don't know what it is. I've never heard of anything like that.

Next point, your Honor, the notion that the Prime Minister was instructed not to answer a specific question. I'd ask the Court, when you review this transcript again, to go to page 59 where it says in parenthesis on line 12, (the witness leaves the room). The Prime Minister is not in the room during the colloquy between Mr. Wistow and myself, it goes from

1    page 59 until the Prime Minister comes back into the

2    courtroom, and just in case there is any suggestion

3    that I'd instructed him in the interim, I never leave

4    the room and we never take a break before he comes

5    back in there, on page 64.

6              THE COURT:  Excuse me, Mr. Rochon.

7              MR. ROCHON:  Yes, sir.

8              THE COURT:  Exhibit E, and Mr. Wistow, this

9    may be directed to plaintiffs, I've got your motion it

10   has exhibits, and Exhibit E are pages 1 to 61, and

11   Exhibit F is on pages 114 and on, so when Mr. Rochon

12   refers to page 64, okay, that's -- let me just ask

13   this, do I have the entire transcript?

14             MR. ROCHON:  You do, and it's --

15             THE COURT:  Fine.  I know.  There are

16   multiple -- as long as I have the entire transcript, I

17   can find it.  Please continue.

18             MR. ROCHON:  All right, thank you.  So you

19   will see when you have that opportunity, and just for

20   your clerk's record, it's D to their reply.  So the

21   plaintiffs supplied the entire transcript.  The

22   witness re-enters the room on page 64, and Mr. Wistow

23   continues his examination.  Does he crystalize his

24   question?  No. Does he have the witness instructed?

25   No.  Is there even an objection to his next round of

questioning?  No.  Mr. Wistow had said just before the
Prime Minister came back, and I quote, this is on page
63, lines 17 to 20, "You know what I'd rather do?  You
know what I'd rather do?  Let's set this question
aside and let's go forward and let's get a whole list
of questions to ask the Magistrate at once."  Not
issues, questions.  Mr. Wistow set the question aside.
Having set it aside, he's not in a position to now
complain to the Court that it was not answered.  We
should not speculate on what he might have done, or
would have done, as to this issue, as to the others,
given his own description of his course of questioning
as "loosey-goosey".  He suggested during the course of
the deposition, perhaps in an intentionally
self-deprecating way, which is his style, I recognize,
I do the same thing, when he suggested he was kind of
having to make it up as he went along because he was
new to the matter.  I understand if he was new to the
matter, and I understand if that's sort of the false
self-deprecation that we engage in, but under any
interpretation of what he did, the witness was not
instructed not to answer.  And he set the question
aside.  That's the record.  But let me back up and
note that as to this whole area, it's a contrived area
of inquiry.  The defendants have never relied on

private conversations between Palestinian officials
and U.S. officials to ask a court to vacate a default.
There's a passing reference in a pleading that it was
a subject of communication, yes, but we never said
because it's a subject of communication you shall
vacate a default.  The defendants have argued that
these cases impact U.S. foreign policy interests, but
the defendants have never said that the basis for your
conclusion that should be reached in that regard is
that it was raised as an issue at some point in
conversations or otherwise.

This is sort of a manufactured argument, in
any event, for a host of reasons.  Given the record,
therefore, on that issue, and given the likely
agreement the parties have now reached, I'll move on
to the other issues raised by the plaintiffs.

Now, as to the declaration of the Prime
Minister, let me -- and the 2005 letter.  I'm going to
talk about them a little bit jointly and then I'll
break them apart.  What had happened here is that this
motion was filed in December 2007 in collateral
litigation, in Knox where the case was vacated and
there was lengthy, lengthy discovery about the
defendants' ability to post a bond.  At some Mr.
Strachman, who is counsel to the plaintiffs in Knox,

had raised this 2005 letter suggesting that the Prime Minister had not been so pro-active in getting these cases under his control and in a proper position. So when his affidavit is filed in the instant case, it's appended. We did not rely on statements in the 2005 letter to ask a court to vacate default. The purpose of the Prime Minister's declaration in this case was simply to express his commitment to the litigation. That's how it was argued. In the motion to vacate default, we did not argue to the district court that he should grant the vacater because of what was said in the 2005 letter. We argued that he should grant vacater in part because of what was said in the 2007 declaration. If we had not included the 2005 letter, Mr. Strachman would have complained that we were hiding the ball from the Court about the fact that the Prime Minister had some involvement or knowledge of these cases in 2005. It's what happened to us in New York in Knox. So it's heads I win, tails you lose, if you append the letter. The only way the letter was used on appeal, and the portions referenced but not very specifically by plaintiffs' counsel, was as a shorthand way to refer to the collection matters. The cite in the brief says that after the judgment was issued in this case that there was a host of

collection actions engaged, and they cite the Prime

Minister's letter.  Not as a basis for foreign policy

vacater but as a shorthand way of describing the

collection actions in their providence.  Before this

Court and before other Courts, we have not relied on

that letter as the basis for a foreign policy

conclusion, and we don't rely on it now.  Again, this

whole issue about that letter and the 2007 declaration

is sort of, again, it's a more or less a manufactured

issue.  I'll tell you why I say that.  Mr. Wistow, at

the deposition, goes to the Prime Minister and wants

to ask a host of questions.  The questioning on this

2005 letter lasted so long, an hour, maybe more about

this letter, and the various statements.  And one of

them as to whether his statement about whether U.S.

laws were or were not violated by the way that the

collections were being done in this case.  Now have we

ever relied on the Prime Minister's letter to say that

there was any problems with the collections in this

case?  No, of course not.  Who would care what the

Prime Minister has to say about the United States laws

and whether they've been violated in connection with

the collections.  There's a letter he wrote to the

state department trying to get them to do something,

but we haven't argued to Judge Lagueux, to you, or to

1    any other court that you should find that the
2    collection efforts by the plaintiffs in this case are
3    improper because Prime Minister Fayyad says so.  But
4    he wants to go in and ask him what is your basis for
5    those statements in the letter about U.S. laws being
6    violated.  You can see we've gotten very far afield
7    from the issues that might be in play in January of
8    next year when that inquiry begins.  And it engenders
9    an objection because as I indicated, the question -- I
10   want to turn to the precise language of the question.
11   Hopefully I haven't lost it.  It's on page 117.  I
12   think Mr. Wistow probably said 116, which is the way
13   they print these things.  There's four pages on each
14   page.  The question itself is, one of those questions
15   that is really probably two questions, and I quote on
16   page 117, line 6: "Okay, now what laws were you
17   referring - what was the basis for your statement that
18   the attempts by plaintiffs' counsel to interfere with
19   the actions of the Palestinian government was not
20   supported by United States law?  What knowledge did
21   you have at the time."  Okay, so that's three
22   questions.  And I object.  That's principally the
23   objection upon which they rely.  I dare say what
24   question is being asked is not even clear.  Our
25   suggestion is that obviously this could implicate, and

1    I raised that it implicates advice of -- excuse me,

2    privilege, based on conversations with counsel.  It

3    goes on and there's additional discussion between Mr.

4    Wistow and I, and it says -- now I'm on page 118, this

5    is Mr. Wistow: "It goes on to say that it ran counter

6    to international law.  Did you have any knowledge at

7    the time of what international law was being referred

8    to?"  And I object again saying that any knowledge he

9    would have had would have been based on advice of

10   counsel.  He goes on, and it continues to be the same

11   framework finding out the basis for legal conclusions

12   in a letter as to what the Prime Minister's knowledge

13   of the law is as to these matters.  Again, way far

14   afield in terms of need for discovery in connection

15   with this motion to vacate.  How this relates to

16   whether or not there are foreign policy implications

17   in connection with this default judgment, I don't

18   know.  How it relates to meritorious defense, I don't

19   know.  How it relates to prejudice to the plaintiffs,

20   I don't know.  How it relates to anything other than

21   Mr. Wistow eliciting objections to questions about

22   what a lawyer told the Prime Minister that went into a

23   letter in 2005 that we're not relying on.  This is

24   truly a manufactured dispute.

25        In the course of this seven hour deposition

1　　　of the Prime Minister, and we were careful, my

2　　　objections, when he went out of the room, I don't know

3　　　if you noticed this, Judge, I took the time when we

4　　　were arguing that diplomatic privilege stuff, I wasn't

5　　　running out the clock. I said I'll take this time,

6　　　and I ate that time. So he had his full seven hours.

7　　　He didn't raise any of these issues with you. He

8　　　didn't perfect the diplomatic privilege issue. And

9　　　these others are just manufactured issues that have no

10　　　relevance to what we're doing here. The notion that

11　　　we're then going to bring in the Prime Minister to

12　　　answer more questions on this here, there, or

13　　　anywhere, is a waste of time. It's not going to help

14　　　the plaintiffs win. It's not going to help us lose.

15　　　We would suggest to the Court that the amount of time

16　　　that's been spent on this motion is more than should

17　　　have been spent on it. We'd ask you to deny it.

18　　　　　　　THE COURT: All right. Thank you,

19　　　Mr. Rochon.

20　　　　　　　MR. WISTOW: May I have just two moments to

21　　　reply, your Honor?

22　　　　　　　THE COURT: All right, Mr. Wistow.

23　　　　　　　MR. WISTOW: Whether or not, your Honor,

24　　　there was an instruction not to answer the question, I

25　　　rely exclusively and totally on page 63 of the

1    deposition where I say: "Mr. Wistow: All I'm asking

2    is did he ever ask for a statement of interest.

3    Mr. Rochon: I'm not going to let him answer that now

4    on diplomatic grounds." Flat out. Now, we didn't

5    call your Honor right away. I'm not suggesting if --

6    I didn't want to call the Court that your Honor would

7    hang up on me. What we were saying is there'd been an

8    arrangement, they need a protective order. They need

9    to stop the questioning, not us, to get an order to

10   compel it. So all I was saying is let's hold that

11   question, let's hold all the questions, and call the

12   Magistrate all at once. That's demonstrated by the

13   record in this case completely.

14        Now, I'm sorry to hear Mr. Rochon say that

15   the communications in that June 5th letter were not

16   relied on in presentation to the Court. That is

17   simply simply not true. I will quote you exactly what

18   was said. Mr. Rochon wants to say that the letter was

19   just -- the finance, the then finance minister's

20   concern about collection matters. Not so. Here is

21   what he said in the letter: "In particular, we believe

22   that the actions of the plaintiffs in the Ungar case

23   directly interfere with the United States Government

24   conduct of foreign relations in the Middle East to the

25   grave detriment of the Palestinian people, et cetera."

1    To suggest that that letter did not deal with foreign

2    policy implications is simply not true.

3         Additionally, it's not only the letter, it's

4    the declaration that was put into this court where

5    they said flat out, your Honor, and I quote from

6    docket 408: "Vacatur is also warranted because of the

7    significant foreign policy and consequences that have

8    flowed from the $116 million default judgment entered

9    in this case.  As Prime Minister Fayyad's declaration

10   makes clear, this judgment has already been the

11   subject of diplomatic communications at the highest

12   levels between our country's representatives, et

13   cetera, et cetera, et cetera.

14        Your Honor, I ask you not to tie Judge

15   Lagueux's hands at the hearing, tie our hands.  That's

16   all I ask.  What needs to be addressed here is this

17   holistic approach that the First Circuit asked for.

18   They're talking about intangible things.  I mean, the

19   best interest of the United States which raises all

20   sorts of questions as to whether the Court should

21   involve itself in making that judgment, or whether

22   it's political or not.  That's a whole other issue.

23   But I ask your Honor, allow us to explore these.

24   These artificial things that we didn't perfect the

25   record when after we're told flat out we will not

allow an answer, I think is unfair. Thank you, your

Honor.

THE COURT: The next two motions are related.

We have the defendants' motion for entry of a

protective order regarding plaintiffs' request for

discovery of certain third-party communications.

That's docket number 526. We also have plaintiffs'

judgment creditors motion to strike and compel, that's

docket 551. These motions relate to the same matter,

so I'm going to consider them jointly. Let me just

make an inquiry, does anyone need a recess at this

point?

VOICE: I would take one if it was offered to

me.

THE COURT: Well, I suspect if we don't take

a recess we're going to go until 12:30 nonstop, so

I'll take a 5 minute recess, all right? The Court

will be in recess.

THE CLERK: All rise.

(RECESS)

THE COURT: All right, we will take up

motions 526 and 551. Counsel, would you identify

yourself again?

MR. HILL: Good morning, your Honor. Brian

Hill. It's a pleasure to be appearing before you for

1    the first time.

2           THE COURT:  Good morning, Mr. Hill.

3           MR. HILL:  Let me return to the big picture

4    that Mr. Rochon started out this morning with, your

5    Honor, and that is that there are a number of

6    different topics on which discovery is being sought by

7    both sides here today.

8           THE COURT:  Excuse me, Mr. Hill.

9           MR. HILL:  Yes, your Honor.

10   (Pause)

11          THE COURT:  I apparently left my pad on my

12   desk.  Would you go get it please.  It will just take

13   a moment.

14          MR. HILL:  Certainly.

15          THE COURT:  Yellow legal pad with handwritten

16   notes.  If you don't find it come back immediately.

17   Thank you, Mr. Hill.  Please proceed.

18          MR. HILL:  Your Honor, with respect to the

19   big picture, there are a number of subject areas that

20   are at issue here today and tomorrow about which the

21   parties are seeking discovery.  This one is rather

22   discrete and it has to do with whether we're going to

23   be taking discovery about the inner actions of the

24   defendants with the third parties that are involved in

25   the various enforcement actions that the plaintiffs

have brought, and as you will see over the course of
the argument I'm going to suggest to the Court, argue
to the Court, that respectfully this is one topic that
the Court can and should just take off the table.
We've got approximately 25 days left in the discovery
period.  We've got a lot that we're going to need to
do to complete discovery by November the 19th.  This
area is discrete.  It is attenuated from the merits,
to say the least, and the particular requests that are
before your Honor unquestionably call for protected
work product, and for all those reasons we're going to
ask the Court to grant a protective order that the
discovery not be had with respect to the interrogatory
and the document request at issue.

Let me talk about the three reasons that the
Court should grant that motion.  They are, the
material sought is irrelevant, the request itself is
facially and tremendously overbroad, and in any event,
as I alluded to, the material that is sought is work
product, and there's been no showing by the plaintiffs
that that protection could be overcome even if it were
relevant and were not overbroad.

Let me talk about relevance to start with.
The theory of relevance that's being advanced by the
plaintiffs with respect to these materials, and those

1    materials are communications between the defendants

2    and the seven non-parties to this action. And the

3    communications that are sought are those that pertain

4    to this litigation, to the 2004 judgment in this case,

5    and the 2006 creditors' bill judgment in this case.

6    So the materials that are sought on their face pertain

7    to litigation. The requests expressly say they're

8    looking for attorney to attorney communications, which

9    would obviously be work product. I'm not sure that's

10    seriously contested by the plaintiffs. And the theory

11    of relevance is that these communications, the

12    plaintiffs hope, will show some connivance, some

13    cooperation, between the defendants and the

14    non-parties in the collection actions. And it's clear

15    through the briefing, we've now each had two briefs,

16    the plaintiffs are not contending this is relevant

17    just because the defendants haven't paid the judgment.

18    Everybody seems to agree that that's not the issue.

19    Everybody knows we haven't paid the judgment, and

20    that's not a factor that would prohibit the Rule

21    60(b)(6) relief that we're seeking. The plaintiffs'

22    contention is that these communications will reveal

23    some impropriety or malfeasance or violation of court

24    order by the defendants, and with the exception of one

25    example relating to the Palestinian investment fund,

which I'll talk about in more detail as I proceed with
the argument, there's no evidence that there's been
any improper communication or cooperation between the
defendants and the non-parties.  There's nothing at
all for the Court to look at and say communications
with the pension fund or the Palestine Monetary
Authority, or any of these other non-parties would be
inappropriate in any fashion for the defendants to be
having, and as we said in our opening briefs, it's
perfectly understandable that counsel for the
defendants would be communicating with counsel for
these non-parties over the plaintiffs' attempt to
enforce the judgment in this case against those
non-parties.  And there's nothing wrong with that, and
there's no indication from the plaintiffs, with the
exception of the PIF that the defendants have done
anything improper at all.

            Let me also make this point, and those
non-parties have repeatedly come to this Court, and
come to Judge Lagueux, and asked him to get involved
in this issue of whether or not the judgment in this
case can properly be enforced against those
non-parties, and the district court has repeatedly
said he's not going to do that.  He said that that
issue, whether they're alter egos, whether they're

holding PA, PLO assets, that's got to be decided in
the cases where the judgment enforcement actions are
pending, and this happened as recently as last month
with the Palestinian pension fund which sought to
intervene and have the Court clarify its prior
injunctive order and whether it applied to the pension
fund, and the Court said I'm not in that.  I'm not
going to do that.  That's got to be decided in the
other court.  Ironically, somewhat, the other courts
have now for the most part all stayed their
proceedings pending Judge Lagueux's resolution of the
motion to vacate on the obvious theory that if the
motion to vacate is granted, the collection actions
will then be mooted because the judgment will be
vacated.

Now what the plaintiffs are asking the Court
to do in the context of ruling on the motion to vacate
now is to adjudicate the very questions that Judge
Lagueux has repeatedly said he does not want to
adjudicate in this action which is are these
non-parties alter egos of the PA or PLO, or in some
way holding PA or PLO assets.  So we've sort of gone
into a vicious circle now where the collection actions
are stayed pending resolution of the motion to vacate.
The district court has said repeatedly he's not going

to adjudicate the questions which are being considered
in the collection actions, which is, is there an
identity between the defendants and these non-parties,
and the plaintiffs now want to argue that the motion
to vacate should be denied because of an identity
between the non-parties and the defendants.  I would
respectfully suggest that this is not going to be a
profitable area of discovery and the Court ought to,
for that reason, rule that it's irrelevant given the
repeated statements of Judge Lagueux that he does not
want to adjudicate those issues, and I wouldn't think
that there'd be any reason for him to do it in the
pending motion to vacate.

Let me talk a minute about over-breadth.  The
requests request all communications between the PA and
the PLO, and the non-parties related to this action.
And as I've just mentioned, there's no indication that
there's anything improper going on with the possible
exception of the allegations related to the PIF.  So
if the Court were to order any discovery at all, it
has to be significantly narrowed, and this was a bone
of contention in the parties' discussions where we had
meet and confer discussions about, you know, what is
it you're looking for, what is it you're hoping to
find.  The one example is the same one that's now

before the Court relating to the PIF, and we asked

them, will you narrow your requests to just that, and

the answer is no.  So there's no justification for the

broad, overbroad --

THE COURT:  Do I take from that comment,

Mr. Hill, that had the plaintiffs been willing to

narrow the requests to just the Palestine Investment

Fund, the defendants would have been agreeable to

answering?

MR. HILL:  I don't think so for the reasons

that I'm going to describe now because I think there's

adequate reasons to not allow that discovery, either.

But the point I would make overall is if the Court is

seeking to allow any discovery into this area at all,

it could only be as to the areas where the plaintiffs

have articulated some reason to think there'd be

something worth finding.

THE COURT:  All right, please continue.

MR. HILL:  So let me talk about privilege, or

more specifically work product.  Now, the materials

sought on the face of the request pertains to

litigation, pertains to this litigation and the two

judgments in this case.  It is almost of necessity

going to be material that's prepared in anticipation

of litigation, and for that reason it's work product,

and the majority of the communications that we've been able to identify in our efforts to get our hands around this are attorney to attorney communications, mostly between my firm and the firms that are representing the non-parties in the various collection actions.  So we're talking about work product here, and the plaintiffs, I don't think, seriously contend that this material is not work product.  There are instead advanced four or five, I'm not sure how many of them are still being pressed, theories of waiver or non-protection.  Let me just address those.

The first one is that the Court should order all the material to be produced because we haven't provided a privilege log, and there were some discussions early on between the parties about whether we should log this material, and it became apparent to us as we looked at the volume of the material involved, it's tangential, at best, relevance, and the overbreadth of it that it wasn't going to be a useful exercise of time or resources to create an extensive privilege log for the vast majority of stuff which is not even arguably relevant.  So we did what the rules require, which is we objected and we said in accordance with Rule 26(b)(5) that we would provide a privilege log for any material that is "not otherwise

discoverable" which is what the rule allows, and we cited to your Honor the D.C. circuits decision in the Phillip Morris case which very clearly reads the rule and the comment correctly to say that as long as a party is objecting to material on grounds other than privilege, it's not necessary for the party to go through the exercise of creating a privilege log, and here we've lodged objections both to relevance and over-breadth.  We don't believe there's been any waiver of the privilege because we have asked the Court to rule on our relevance and over-breadth objections before we are put to the burden of creating a privilege log.

The plaintiffs in their second brief, we both filed two briefs here, cite the Banks case which is a subsequent decision from Magistrate Judge Fasciola in D.C. who is a privilege maven of sorts in the local courts down there, and he makes the point correctly that a lawyer should be wary about not serving a privilege log unless they're going to go to court and ask to be excused from providing a privilege log.  Well, that, of course, is exactly what we've done, your Honor.  We have moved for a protective order seeking, among other things, that you order that we not be required to go through the exercise of logging

material between my firm and the firms representing the non-parties which are patently work product.  It wouldn't be in anybody's interest except to expend time and resources that are better spent on the relevant discovery issues that we need to cover in the next 25 days in this case.  So respectfully there's been no waiver from our failure to submit a log.  We did exactly what the case law says we're supposed to do.  We're asking you to excuse us from that requirement.  We've also asked you to excuse us from that requirement because the material that you'd need to know about whether it's privileged is already here. We're talking about communications between lawyers for entities that are not adverse about litigation. That's work product.  Because they're not adverse, there's been no waiver of the work product protection. There's no point in producing a log of all these communications when the basis for the work product claim is already before the Court.

Now there's been some argument that with respect to two of the entities there has been a waiver because the PA is, in fact, adverse to them.  And the theory here is that they are adverse to them because the PIF has sued them in foreign actions.  So there's two points to be made here.  First, with respect to

1    relevance, the plaintiffs relevance theory is that

2    communications with those entities, Becont and

3    Orascom, are relevant because they will show the PA is

4    in collusion with Becont and Orascom to avoid payment

5    of this judgment.  That's the relevance theory.  This

6    is inconsistent with the work product waiver theory

7    which is that the PA and the PLO are adverse to Becont

8    and Orascom and therefore their communications would

9    be waived because they're adverse to one another.  So

10   obviously it can't be both ways.  They would be

11   irrelevant if we are adverse to them, or they would be

12   work product if we're not adverse to them.

13         Very important point to consider here again

14   is PIF.  The lawsuits at issue are brought not by the

15   PA but by PIF.  In order for the Court to find that

16   the PA is adverse to Becont and Orascom, the Court

17   would have to find that the PA is an alter ego of PIF,

18   and that is precisely the issue that Judge Lagueux has

19   repeatedly said he is not going to decide.  That

20   should instead be decided in the enforcement action

21   with which respect to the PIF is pending in

22   Connecticut.

23         Let me talk a little bit about substantial

24   need.  The plaintiffs --

25         THE COURT:  Before you leave that point,

1    Mr. Hill, didn't Judge Lagueux, in 2006, issue an

2    order awarding to the plaintiffs the interest of the

3    PIF?

4           MR. HILL:  That order is out there, yes, your

5    Honor, and I do intend to address that in detail.  I

6    can do that now or I can finish what I had planned to

7    do and then get to that.

8           THE COURT:  As long as you're going to

9    address it, you can continue.

10          MR. HILL:  I will.  That's the most

11    complicated piece and I'm saving it for the end for

12    that reason.

13          THE COURT:  All right, please continue.

14          MR. HILL:  On substantial need, the argument

15    appears to be that because the plaintiffs want this

16    information there is a substantial need for it, and it

17    sort of becomes a tautology when the plaintiffs seek

18    to discover attorney work product, and that's all the

19    discovery request is addressed to, there will of

20    necessity be no other way to get it than the

21    attorney's work product, so there's a little bit of a

22    trick here in the argument.  But the point to be made

23    is, to the extent the work product involved is mental

24    impressions or strategies of the lawyers which is the

25    only thing that could be relevant, I mean, if it

suggests here's a copy of something we filed, that's
not going to be relevant, so the only relevant
material that they're claiming to seek are the
strategies and mental impressions of the lawyers
involved, that is the sort of thing you can't get even
if you had a substantial need.  That's the sacrosanct
stuff that you're not supposed to be able to get under
the work product doctrine.  So substantial need is not
going to get them there, either.

There's an argument that was made in their
first brief about standing, in their second brief they
seem to have abandoned it, but the theory was that, I
think, that because the PA is not a party in the
enforcement actions, the communications from the
lawyers representing the non-parties wouldn't be work
product defensible in this action because they're not
"From a party in this case".  We pointed out that,
well, if that is the argument, then you have to get
those seven entities in here to assert their own work
product claims.  The plaintiffs in their last reply
brief said that we could adequately represent that.
So I don't think that's currently an issue before your
Honor, but maybe the plaintiffs can correct us if
that's still an issue out there.  But I think we can
legitimately say that communications between the PA

1    and the PLO and the non-parties are protected work

2    product either because it's the PA and the PLO's work

3    product or because it's the non-parties work product

4    that's been shared with a non adverse party.

5           So, let me talk about the PIF, and this has

6    two aspects that are pertinent here.  One is relevance

7    and one is the crime fraud exception.  Now let me make

8    this point about the crime fraud exception to the

9    attorney/client privilege with the work product rule.

10          In order to overcome a privilege, the

11   plaintiffs would have to show two things, they'd have

12   to show a crime or a fraud recognizing that that can

13   be a broad category of material, and they'd have to

14   show that the attorney communications were in

15   furtherance of it, or to conceal it.  So let me start

16   with the easy part which is, are the attorney

17   communications in furtherance of the alleged crime or

18   fraud?  The alleged crime or fraud here that the

19   plaintiffs have used as an example and this is their

20   only example.  Again with respect to the entities

21   other than the PIF, there's nothing in the record to

22   suggest that there's any crime or fraud, any

23   impropriety, any violation of any court order.  The

24   example here is the payment of dividends and advances

25   by the PIF to the PA.  These happened.  They are, as

we said, I think, in our brief, open and notorious.
They're available on websites. The plaintiffs
attached the documents showing the amounts of these
dividends and advances.

And so the first question for the Court with
respect to the crime fraud exception is, are there any
attorney communications that furthered those payments
or dividends. And as far as I'm aware, there are
none. So the second prong of the crime fraud
exception would not apply to that example.

Now let me answer the question your Honor
asked me a few minutes ago which is what about the
creditors bill judgment. So the creditors bill
judgment was entered by Judge Lagueux in 2006, and it
has two aspects to it. I think it has three
paragraphs but there are really two aspects, as I see
it. First, it purports to convey the PA's ownership
interest in the PIF to the plaintiffs in this case.
Second, it purports to convey the assets titled in the
PIF, or titled to the PIF, I think is the language in
the order, to the plaintiffs in this case. There are
a host of issues about the enforceability of that
creditors bill judgment against the PIF and, frankly,
your Honor, as against the defendant, the PA. And let
me just annotate them for you here. And these are all

helpfully laid out in Exhibit, I believe it's L, to the plaintiffs first brief which is the brief that the PIF filed in the enforcement action in Connecticut. As the PIF points out, there are personal jurisdiction issues with the enforceability of the creditors bill judgment.  At the time the creditors bill judgment was entered, the Court, this Court, did have personal jurisdiction over the PA under its prior decisions in this very matter.  The Court has said it did not have any PA or PLO assets before it at the time.  The creditors bill judgment nevertheless purports to convey the PA's ownership in the PIF to the plaintiffs.  So there's an issue here about whether the Court could convey ownership of an asset that was admittedly not before it.  This is, I think, analogous to if the PA owned a house in London, the Court conveying ownership of that house to the plaintiffs, and I think there are obvious personal jurisdiction issues with doing that sort of a thing.  That's why judgments have to be domesticated in other places. There were personal jurisdictional issues with respect to the PIF.  The creditors bill judgment purports to convey assets that are titled to the PIF to the plaintiffs, but the PIF was not before the Court, and Judge Lagueux has subsequently acknowledged that he

1    doesn't have, and didn't have, personal jurisdiction

2    over the PIF.  So there's a legitimate question about

3    whether that aspect of the order that conveyed the

4    PIF's assets is an enforceable order that could be

5    enforced against the PIF.

6              There are due process issues with the

7    creditors bill judgment.  Judge Lagueux subsequently

8    decided the North Atlantic Distribution case, which I

9    believe Mr. Wistow successfully argued, and he held in

10   that case that it would be a violation of due process

11   to enforce a judgment against a non-party to the

12   judgment unless that party had an opportunity to

13   defend their interests.  Well, PIF never had that

14   opportunity in this court.  It was never hailed into

15   court here.

16             THE COURT:  Is the case you just cited, that

17   you just referred to, cited in any of your memos?  And

18   if not, do you have a citation for it?

19             MR. HILL:  It is, your Honor.  And it is 497

20   F.Sup. 2d 315.

21             THE COURT:  315?

22             MR. HILL:  315, yes, your Honor.

23             THE COURT:  Thank you.

24             MR. HILL:  Another due process concern about

25   the creditors bill judgment is that it purports to

convey all of the ownership of the PIF to the
plaintiffs, but the PIF was and is worth substantially
in excess of the judgment at issue.  So an asset has
been conveyed that is worth much much more than the
amount of the judgment that the PA owes.  I believe at
the time it was conveyed the PIF was worth
approximately $800 million.  It was conveyed to
satisfy a judgment of the $116 million, plus whatever
the prejudgment interest was at that point in time.

In addition to the personal jurisdiction and
due process concerns with the creditors bill judgment,
there are concerns about -- of the Rhode Island
statute and whether it was complied with.  As your
Honor knows, when you're proceeding under Rule 69, the
federal court applies the law of the state in which it
sits.  The creditors bill judgment purported to be an
action under Rhode Island General Statute 9-28-1.
There are two prerequisites of that statute that were
not followed in connection with the entry of the
creditors bill judgment.  One, there had to be an
attempt of an execution against the PA.  That was not
done.  The Rhode Island Supreme Court has said that
that is a prerequisite and it has to be done.  It
wasn't done in this case.  And perhaps even more
glaringly, 9-28-1 requires a new action to be brought,

1    and that wasn't done.  Instead, the action was brought

2    in the pending existing action that we're here today

3    on.  And when the LeBeuf Lamb firm which represents

4    the PIF brought an action in this court, and made that

5    argument to Judge Lagueux, what Judge Lagueux said was

6    that is an excellent argument but you don't have

7    standing to make it.  So Judge Lagueux himself has

8    acknowledged that there is this issue with whether the

9    Rhode Island statute was followed.

10              THE COURT:  Who was that law firm

11   representing when it was here before Judge Lagueux?

12              MR. HILL:  That's a very interesting

13   question.  So what happened was, after the creditors

14   bill judgment was entered, an action was brought by

15   the Ungars in Connecticut to try and collect against a

16   PIF asset which is called Canaan, and that is pending

17   before Judge Dorsey in the District of Connecticut,

18   and then a new lawyer appeared on behalf of the

19   defendant PIF.  His name is Robert Tolchin.

20   Mr. Tolchin has represented a number of claimants

21   against the PA in other ATA actions, including a

22   couple of the cases Mr. Rochon mentioned to you.  He

23   appeared in Connecticut on behalf of the PA

24   representing its new owners, the Ungars.  The PIF, I'm

25   sorry, the PIF representing its new owners, the

Ungars.  The PIF had, in the meantime, retained LeBeuf
Lamb Greene and McCrab, I believe it was called at
that time.  It's now Dewey LeBeuf (coughing) to
represent them in the case in Connecticut.  They then
sought guidance from the Court in Connecticut about
who really was representing the PIF because the Court
in Connecticut now had the Ungars' lawyer as the new
owners under this Court's order telling them one thing
and the PIF, I guess old management or current
management, whatever you want to call it, represented
by LeBeuf, telling them another thing, and what LeBeuf
ended up doing was filing an action here seeking a
declaration that the creditors bill judgment was
invalid, and what Judge Lagueux said is, I am not
going to decide who owns the PIF.  That's got to be
decided by the Judge in Connecticut, and he dismissed
the case saying that LeBeuf didn't have standing to
raise that issue here.

One more area of a problematic nature of the
creditors bill judgment is federal subject matter
jurisdiction.  The Supreme Court's decision in the
Peacock case, which is also cited in the Exhibit L to
the plaintiffs' second brief, very clearly held that
there is no ancillary or supplemental federal subject
matter jurisdiction to enforce a judgment against a

non-party to the judgment.  Now that is what happened here because we have an action here against the PA, PLO, Hamas, and the other individuals that were dismissed, but a creditors bill was brought in this case to enforce the judgment against PIF by conveying, among other things, assets titled to PIF to the plaintiffs.  I say all of this because it's obviously very complicated whether or not the PIF has violated an enforceable order against itself.

Let me return the Court to what the PA is alleged to have done here that is allegedly inequitable or unclean hands.  What the PA is alleged to have done here is to essentially cash checks that were sent to it by the PIF.  Whether or not that was improper is obviously going to involve an inquiry about whether there was a violation of the creditors bill judgment.  And let me make this point.  No less than the United States Government has made it clear by its conduct since the entry of the creditors bill judgment that the Ungars are not the legitimate owners of the PIF.  The United States has continued to do business with the PIF, with its current leadership, which was the predecessor leadership, not the Ungars, notwithstanding the Court's order, and I think there are serious questions about the validity of that

order.  That order is the subject of the Connecticut
enforcement action which has been stayed pending the
ruling on the motion to vacate, and I think with
everything that Judge Lagueux has to do, and that
frankly the parties have to do between now and
November 19th, it's not going to be profitable for us
to have extensive discovery on these issues about the
PIF, particularly where any responsive material would
be work product but for a potential application of the
crime fraud exception where there's a serious question
about whether the order has been violated, or could be
violated, given its extraterritorial effect and all of
the issues that I just described for you, and, I think
most importantly, where there's no indication that the
lawyers and the material that is sought by the request
were involved such that the crime fraud exception
could apply.  So we've got something that is of
tangential relevance but is clearly work product, and
at least one of the prongs of the crime fraud
exception wouldn't apply.  For all of those reasons,
we would ask you to grant the motion for the
protective order, that the material that is sought and
the interrogatory and the document request at issue
not be had.  I'm happy to answer any other questions
that the Court may have.

THE COURT:  Mr. Hill, the plaintiffs cite the Motorola case --

MR. HILL:  Yes.

THE COURT:  -- in support of their position, and the Motorola case, or they cite it for the proposition that the post-judgment conduct of a party moving under Rule 60(b) to vacate a judgment is relevant in determining whether or not the motion should be granted.  Is that law with which the defendants agree?  Is that something that Judge Lagueux should be considering when he rules upon the motion to vacate?

MR. HILL:  Well, let me make two points about Motorola.  First of all, it's not controlling. Secondly, it's not a 60(b)(6) motion, it's a 60(b)(5) motion, and there the issue was whether the amount of the judgment should be reduced because of certain other payments the plaintiffs had received from non-parties.  But absolutely the Second Circuit in that case was quite exercised about what the judgment debtors in the Motorola case had done.  And I would suggest when you read it, Judge, it's nothing like what the PA is accused of doing here.  What the PA is accused of doing here, with any specificity at all, other than the absolute fishing expedition that the

requests themselves would launch us on, is they are
accused of accepting dividends and advances from the
PIF under the circumstances where the PIF has operated
as a separate entity, is recognized as such by the
United States, and there are serious questions about
whether or not the creditors bill could have prevented
the PIF from doing what the PIF did.

One thing I would suggest your Honor would
look at factually on this is the declaration of
Mr. Mustafah, who is the head of the PIF, which is
Exhibit G, it's either G or 6, I can't read my own
writing, to our second brief, where he discusses in
detail the way the PIF operates, how it operates
independently of the PA, how it makes its own
decisions about dividends and advances, and that's the
evidence that's in the record.

Now, I hesitate --

THE COURT: Is he the same individual that
the plaintiffs contend actually holds a ministerial
rank in the --

MR. HILL: Yeah, and that's addressed in his
declaration, your Honor. Maybe I should get it out
and refer to it more specifically, but (inaudible)

THE COURT: Well, I need to watch the time
here, Mr. Hill, because I need to hear from

1    plaintiffs, so --

2         THE COURT:  Yeah, it is Exhibit 6 to our

3    second brief.  He does explain that he holds that

4    rank.  That it's a voluntary position.  He's not

5    compensated for it.  And that his work for the PIF is

6    in his capacity as the chairman of the PIF and not as

7    any sort of PA official, and that's what's in the

8    record.

9         THE COURT:  You suggest that Motorola is

10   distinguishable and not applicable here.  In the

11   Motorola case there was reference the Court was

12   displeased with the actions of the movants in

13   initiating litigation in foreign countries that the

14   Court perceived as interfering with the attempts to

15   collect judgment, and the plaintiffs here cite

16   litigation, I guess initiated by the PIF, in Egypt or

17   somewhere internationally, that they contend is the

18   same thing here.  Would you respond to that?

19        MR. HILL:  Well, I certainly can, your Honor.

20   And what's going on here is the PIF, again who I don't

21   represent, but they're not a party to this action.

22   They eventually learn that the Court has entered the

23   creditors bill judgment in this case which purports to

24   change their ownership, and they go to courts in Aman,

25   Jordan where they are located and in the West Bank, in

Ramallah, to get a determination about who actually
owns them, and those courts have found, for what it is
worth, that the PIF continues to be owned by its prior
owners and is not owned by the Ungars.  Those courts
have found what remains, remains sub-justice
(inaudible) in Connecticut which is, you know, is this
an order that's enforceable against a foreign entity
under these circumstances.

THE COURT:  And the affidavit that you just
referred to that explains the relationship between
Mr. Mustafah, I guess, and --

MR. HILL:  Yes, your Honor.

THE COURT:  And where is that affidavit
again?

MR. HILL:  Exhibit 6 to our reply brief.

THE COURT:  Okay.  Thank you, Mr. Hill.

MR. HILL:  Thank you, your Honor.

THE COURT:  Mr. Wistow.

MR. WISTOW:  Thank you, your Honor.  If all
that was involved here is having the lawyers say on
the one hand my clients didn't do anything wrong, and
me on the other saying they did, without any
subsidiary facts, without any documents, without any
discovery, I don't know how your Honor would rule.
The statements that all of the letters we're talking

about are from lawyers to other lawyers, that's not
what we asked for.  We asked for all communications.
There may be that some are privileged, maybe not.  I'm
going to get into the privilege log in a moment, but
there's something very dramatic that I think I want to
share with the Court.  This business about Mustafah,
and what is his role.  This is a central issue.  If
your Honor would look at document 570-2 in this case,
it's a letter from the president of the PA, Mahmoud
Abbas, and the head of the PLO, and he wrote to --

        THE COURT:  Stop, Mr. Wistow, I need
direction in this mass of paper.  It's 570-2, but what
is 570?

        MR. WISTOW:  Okay, let me see if I can
actually hand it up to your Honor.  I, too, am awash
in documents.  570 is the reply in further support of
plaintiffs' judgment creditors motion to strike and
compel.

        THE COURT:  Okay.  I have that document.

        MR. WISTOW:  Okay.  Look at Exhibit B, your
Honor.

        THE COURT:  All right.  That's the November
28, 2006 letter?

        MR. WISTOW:  Yes.  And if your Honor will
note, it's a letter from the head of the PLO and the

1  head of the PNA.  As your Honor knows, we use the

2  terms PA and PNA interchangeably.  Mahmoud Abbas is

3  the president of both the PLO and the PA, as the

4  letterhead indicates.

5       Now all of this business about Mustafah and

6  what he was doing is belied by this letter.  First of

7  all, the letter discusses the PLO and the PA's

8  knowledge, actual knowledge, of Judge Lagueux's

9  September 2006 order, and I direct your Honor to the,

10 it looks like the fourth sentence of the first

11 paragraph.  It says on September 19th?  Well,

12 actually, there's no reason not to read the entire

13 paragraph.  It's not that long a letter.  (Pause)

14       THE COURT:  I've read the letter,

15 Mr. Wistow.

16       MR. WISTOW:  So, if your Honor --

17       THE COURT:  That first paragraph, I've read.

18       MR. WISTOW:  Okay.  The first paragraph is

19 important because it shows that post the June

20 judgement by Judge Lagueux in this case, I said June,

21 I meant September 2006, that there's full, full actual

22 knowledge, not notice, but actual knowledge of exactly

23 what Judge Lagueux had done.  Now who is Mustafah and

24 who is the PIF?  The next paragraph tells you flat

25 out, flat out, that the PIF falls under the

supervision of my office. This is not some casual
letter. This is to the Secretary of State of the
United States. I'd like to come back to this issue
about the Mustafah and the PA and the like, but before
I do that, I'd like to put this issue into context.

I'm really astonished to hear counsel get up
here and say Judge Lagueux's order has the following
problems with it, and we don't think it's valid, or
there are issues with its validity, and what's the
problem, in effect, if we disobey it? When you cut
everything away with the jurisdiction here, the Natco
case, everything else, what they're saying to your
Honor is Judge Lagueux's order is no good, what's the
problem if we don't pay attention to it? That's the
-- and I'm not here, by the way, your Honor, to argue
on the merits of the validity of Judge Lagueux's
order. There's an order in place. A judgment in
place that must be respected. And if it's not, I
think Judge Lagueux is entitled to know that. I think
he's entitled to know that after they said that they
will respect the orders of the United States courts,
that they are, in effect, saying we'll respect the
orders of the United States courts if we think they're
right.

Now, the burden is on the defendants,

vis-a-vie, the protective order, to show good cause.
What they've managed to do is argue in generalities
about these documents and what they contain, and if
not, all you'd have to do, nobody could ever get
discovery.  Lawyers would come into court and they'd
just say it's irrelevant, it's got nothing to do with
anything, there's a lot of lawyers letters, they're
privileged.  And how would the court ever rule on
this?  The bottom line here, your Honor, is there's no
issue, none, that Judge Lagueux intended to transfer
ownership of the PIF to the plaintiffs.  Did he have
the right to do it?  Was it valid?  That's not for us
to say.  They could have taken -- somebody could have
taken an appeal.  Somebody could have done something.
They're not allowed under our system of law to just
say the Judge is wrong, we don't care, we're not going
to pay attention.  What did Judge Lagueux think this
was all about?  He said, and this appears, your Honor,
I'm going to quote -- by the way, I believe the law in
the United States is that if there is an order in a
case, and you disobey it, and there's an issue of
contempt, you don't get to argue about the validity.
I think maybe there's some exception for First
Amendment and the press, maybe, but generally
speaking, when you violate a court order, you don't

get to come walking in and say, Judge, let's have a
discussion now about the validity of this thing.  What
did Judge Lagueux say about what he intended?  These
are his words.  They appear in a transcript of
September of '07.  It's Exhibit E, document 552.
Document 552 is our original memorandum in support of
the objection to the motion for protective order.  And
what Exhibit E says, and I'll read you exactly, these
are Judge Lagueux's words: "The Court has entered
judgment in the petition to reach and apply the assets
of the Palestinian Authority in the Palestine
Investment Fund, and the Palestinian Authority
defaulted, and the Court entered judgment and
transferred to the plaintiffs all interests of the
Palestinian Authority in that fund, that separate
corporation."

        THE COURT:  Excuse me, Mr. Wistow, I've got
Exhibit E which are pages 13 and 14 of a transcript.
Which page are you on?

        MR. WISTOW:  Okay, bear with me, your Honor.
Page 13.

        THE COURT:  Can you direct me to which line
you're reading from?

        MR. WISTOW:  I will.  I'm working --
Mr. Strachman is feeding me clues.  I'd be better off

1    if I found it myself.  So hang on just one second.

2    On page 13, your Honor, about the middle of the page.

3    Where it says, since that time the Court has entered

4    judgment.

5              THE COURT:  I have it.  All right.

6              MR. WISTOW:  There's no sense my reading it

7    out loud.  I would just ask your Honor to read that

8    paragraph and the next paragraph, and when your Honor

9    has concluded with that, I'd be happy to go forward.

10             THE COURT:  I've read the paragraph,

11   Mr. Wistow.

12             MR. WISTOW:  So not only does Judge Lagueux

13   explain what is self-evident, what he intended to do,

14   but here's what's really in my mind very important.

15   On the very next page, on page 14, Judge Lagueux shows

16   that he knows what the plaintiffs have done.  It's the

17   first full paragraph the plaintiffs have demonstrated,

18   if your Honor would read that paragraph. (Pause)

19             THE COURT:  Mr. Wistow, even though I can

20   read it, my copy is extremely faint, so I'm going to

21   ask you to actually read it.

22             MR. WISTOW:  Fair enough, your Honor.  "The

23   plaintiffs have demonstrated that they have exercised

24   their ownership interest, their stock ownership

25   interest in the fund by ousting directors and

officers, and electing representatives among
themselves, to be directors and to run the
corporation, and fired the prior counsel LeBeuf and
hired new counsel. And new counsel based on the
documents that have been presented here have indicated
they have no objection to this motion.

Now, I respect counsel's arguments, and their
right to make arguments about whether it's valid or
it's not valid, but not in this forum, not in this
manner, not in this method. This is contemptuous of
the judgments of this Court, and I believe something
that Judge Lagueux is entitled to consider from people
who come in here essentially, essentially, as
supplicants saying, Judge, this is -- and, by the way,
whether it be 60(b)(5), 60(b)(6), 60(b)(1), (2), (3),
(4), all of the 60(b) motions are, in effect,
petitions in equity where the litigant comes in and
says, relieve me of this judgment. That's what the
case law is, equitable considerations. Now equitable
considerations are something that would vary from
Judge to Judge, what he'd want to hear, what not, and
I ask your Honor not to deprive Judge Lagueux of the
necessary information about what has been happening
here post-judgment and how his judgments have been
disregarded. And, I think, again, your Honor, it's

especially important because the constant promise, we

will honor, we've learned our lesson, we've turned

over a new leaf, we will be good guys, and we will

respect the decisions of the Court.  We will not be

recalcitrant in the future.  Well, they have been

recalcitrant post-judgment.  Post motion to vacate the

judgment.  Post motion to vacate.  For example,

they've withdrawn, and we lay this out in our brief,

they withdrew $27 million in October and November of

2006.  That's Exhibit H to the document we're talking

about.  In 2007, they withdrew $78 million; in 2008,

$52 million, and in 2010 they estimate they're going

to withdraw another $55 million.

We've also demonstrated that after this

judgment was entered transferring the assets, there

was an attempt to modify the Articles of Association

after the corporation, the shares had been transferred

to us.  By the way, who is Mohammad Mustafah?  He was

appointed chairman in January 1st of 2009, and he was

the CEO prior to that at all relevant times.  The

official website of the PIF says that he's economic

advisor the President of the PA with a ministerial

level ranking, and the issues that -- I'm at a loss.

I can't show your Honor, I cannot, that these

defendants have done anything inappropriate with the

1   other named third parties at this point.  I can't.

2   And if I just came in here saying let's -- give me an

3   opportunity to explore and go fishing, well, first of

4   all, I wouldn't do that.  And, second of all, I

5   wouldn't be surprised if your Honor said no.  But

6   we've made more than a prima facie case.  I think

7   we've made an overwhelming case that at least with

8   respect to these investment vehicles, the PIF, that

9   there is something that Judge Lagueux needs to hear.

10  What he's going to do with it at the end of the day,

11  that's up to him.  Whether he wants to say, you know,

12  my judgment's no good, I don't blame them for doing

13  this, or whether he says my judgment is good, which I

14  suspect he will because I think the judgment is good,

15  for various reasons.  By the way, I don't want to get

16  into a whole litigation on this issue about whether

17  the PIF had to be in the case or not.  There's a

18  myriad of cases, myriad of cases, and we cite them at

19  length in our brief on page 7, I believe, where the

20  transfer of the stock ownership of a corporation

21  requires only jurisdiction over the shareholders and

22  not over the corporation.  The corporation is

23  technically unaffected by the change in ownership,

24  technically.  And under that theory, the judgment is

25  perfectly valid.  I --

1          THE COURT:  What about, Mr. Wistow, the point

2     that the assets of the fund are $800 million, or were

3     at the time, the amount of the judgment is $116

4     million, and the literal language of apparently of

5     Judge Lagueux's order was, in effect, transferred not

6     just the interest of the defendants to the plaintiffs

7     but transferred the entire assets of the PIF to the

8     plaintiffs, more than the amount of judgment.  Do you

9     want to say anything about that point made by Mr.

10    Hill?

11         MR. WISTOW:  I don't have any choice since

12    you bring the subject up and you asked a legitimate

13    question.  Here's what I would have done if I were the

14    PA, assuming those facts are right, you know, one

15    thing we shouldn't be having here, your Honor, is a

16    trial about these facts.  You know, he says it's $800

17    million.  I'll accept that hypothetically.  But I

18    don't think your Honor should just accept it as a

19    matter of fact.  Let's accept it hypothetically.  The

20    PA, which has been involved now with motions and all

21    that, why doesn't the PA come into the court and say,

22    your Honor, look at this.  This thing is worth 800

23    million bucks, the most we owe is the 116 plus

24    interest, which today is about, I think 130

25    altogether, or something like that.  All we owe is

130.   Why don't you cut the -- transfer the asset of
the shareholders down to some other number, maybe 200
million, if it's 800.   Why didn't they do that?   And
in fairness, your Honor, why are we, you and I,
evaluating the validity of Judge -- that's Judge
Lagueux's order.   That's what he did.   They defaulted.
They don't want any participation.   They've been
before this Court now working on three years since the
motion to vacate where they're supposedly on top of
all these things.   So instead of doing what they're
doing, just come in and say, Judge, here's a problem.
That's my answer, your Honor.   I don't know if it's
satisfactory or not.

                THE COURT:   All right.

                MR. WISTOW:   Now the bottom line is, your
Honor, I don't dispute the fact that defendants on
occasion can come in and get a protective order before
having to put a privilege log in.   That concept is not
unknown to me.   What is unknown to me, and I don't
think there's case law supporting it, is that they can
answer the interrogatories, respond to the request for
production, and then after the time has gone by for
compliance, then file a motion for protective order.
That's hugely different.   The documents in question
were served on June 30th.   The responses were on

August 2nd, and not only was there no motion for
protective order, there was actually an offer to put
in a privilege log that was made to me and to
Mr. Strachman.  And by the way, that offer for the
privilege log, I -- was made at a time when I was
saying, you know, you've waived your objections.  You
should have put a privilege log in.  And they said,
and we've attached the correspondence as an exhibit,
we said, all right, and we did it really
ex gratia, but we are trying to move this thing along,
believe it or not.  Go ahead, put the privilege log
in, and then as they said they changed their mind
after the fact.  They don't want to do it.

Now, the objections that they now make to the
discovery, your Honor, take a look at them, they're
absolutely, absolutely, boilerplate.  They're repeated
over, and over, and over, pleadings.  They're overly
broad and burdensome.  They don't tell your Honor,
they don't say, you know, we looked and it appears
that there are 20,000 documents or 6 documents.  They
don't say anything.  It's just their categorization
that it's overly broad and burdensome.  Now, if that
carries the day, I'm going to adopt that process
myself in the future.  It's very easy for a lawyer to
say it's overly broad and burdensome without any

specificity.  Then they argue it's vague and
ambiguous, when we say it's relating to the instant
case, the judgment, the original judgment in 2004, and
the 2006, and then they say, and I'm talking about the
actual objections they filed.  And when I say
boilerplate, I think this proves it.  They say that
answering it requires legal conclusions on their part
in order to determine what is the meaning of officers,
employees, attorneys, and agents, unquote.  That's
legal conclusions.  And by the way, we were not
limiting the request to correspondence with
discussions with lawyers.  Then they say that the
information is not known or knowable.  Again, your
Honor, I'm talking about what they actually filed with
the Court.  Now if the information is not known or
knowable, your Honor knows all they have to say is we
don't have this information, and that's the end of
that.  Then they argue that it's irrelevant in this
case, and we went to use it in other cases.  Your
Honor, it is not irrelevant.  I think I've
demonstrated as best I can.  If I could prove that
they did what I'm saying they did in the PIF case, I
wouldn't ask for the discovery, but I think I've made
a prima facie showing that these people did do
something wrong and we're entitled.  The work product,

1     common interest and other privileges, there's just

2     been a rank, a rank representation to the Court that

3     what, that everyone of these documents is even from

4     lawyers, is there nothing else?  And, your Honor, your

5     Honor knows the case, Consortio Del Prosciutto, the

6     San Daniele vs Daniele.  It's a pleasure to say the

7     name of the case.  It's getting to lunchtime.  Where

8     your Honor has said, you know, you want to raise the

9     privilege, you've got to put a privilege log in, not

10    just get up and make a speech saying this is all

11    privileged.  Now we all look at each other and say

12    where do we go from here.  Now what's really different

13    about this case, your Honor, is they expressly said in

14    their formal responses that they would provide the

15    privilege log, and I refer you to their answers in

16    document 552-23.  I'll read you what they said.  "To

17    the extent that any of the requests seek the

18    disclosure of information or documents protected from

19    disclosure by any applicable privilege, including but

20    not limited to the attorney/client privilege, the work

21    product doctrine, the joint defense privilege, the

22    common interest doctrine, state secrets, derivative

23    process, or other statutory or common law privileges,

24    defendants object to such a request and will identify

25    the information or documents in the manner and to the

extent required by the Federal Rules of Civil Procedure and the local rules of this court. That's buried in several pages of boilerplate. I'm not sure they were aware they even said it.

We've cited the cases and they're all over the United States. You can't just put in boilerplate objections in this and then expect that after you put in inadequate objections, then after the fact you file a late motion for protective order.

Your Honor please, I do not expect, and I'm ready to say right now and bind the plaintiffs, we are not going to ask Judge Lagueux for a determination of who owns what. They're right. These matters are pending in front of other courts. We're only going to ask Judge Lagueux to determine that these defendants violated his orders. If the orders are invalid for whatever reason, or if the property -- that is not something we're going to get into in front of the Court. We're just going to say, Judge, here's your order, here's what they did, please consider that.

I just want to read you -- again, I don't want to overstay my welcome, but this is fundamental to what Judge Lagueux, I believe, sees as the case. Mr. Matthew Medeiros was in here arguing on very similar arguments about the invalidity of the order,

and this is at -- I just want to read you briefly the
exchange between Mr. Medeiros and Judge Lagueux.  This
is at document 570-1.  Mr. Medeiros: The reason why
the second grievous noncompliant with the Rhode Island
statute is important, it's not a mere technicality.
If plaintiffs, if the Ungars had complied as they were
required to do with 9-28-1, instituting a newer reach
and apply statute, they would have been obligated to
name the PIF as a defendant in that action.  The
arguments that we've heard today, Mr. Medeiros is
saying it.  The Court: They do not, they did not have
the requirement of naming the PIF.  The PIF had no
interest, had no interest in that proceeding.  Mr.
Medeiros:  It absolutely did, your Honor.  You have to
admire Mr. Medeiros' courage.  The Court: No, it did
not.  Mr. Medeiros: It was the entity whose assets the
Ungars -- The Court:  No.  Mr. Medeiros:  -- are
trying to get their hands on to satisfy the judgment.
The Court:  No, no, no.  What the Ungars were trying
to get hold of was the assets, the ownership interest
of the PA and the PA defaulted.  The PIF was not an
indispensable party even -- or even a required party
in that creditors bill.  Is that right?  Is that
wrong?  What the Judge said?  I think it's right.
Does it matter?  By the way, we own the PIF, according

1    to Judge Lagueux. For goodness sakes, can we at least

2    get the correspondence with our own company? That was

3    not addressed. It seems to me an absolute minimum

4    where Judge Lagueux said we own that company.

5         THE COURT: You have about 3 minutes,

6    Mr. Wistow.

7         MR. WISTOW: Okay. Well, this time I don't

8    need the remaining time. I just -- all I want to say

9    is that whether or not these defendants comply with

10   American norms, legal norms, as they promised to do,

11   is of enormous significance. Your Honor is right,

12   they've done stuff, ala the Motorola case. They've

13   brought suits against the plaintiffs in Syria, in the

14   West Bank, and in Egypt, all with the purpose of

15   invalidating these things, almost in an exact analogy.

16   In any event, I don't think I need case law to support

17   the proposition that this is an equitable proceeding

18   and somebody who's in equity asking for relief, as in

19   effect a supplicant, needs to, and is susceptible to

20   an argument that they're there without clean hands.

21   Thank you, your Honor.

22        THE COURT: Mr. Wistow, the defendants say

23   that the issue that they haven't paid the judgment,

24   they don't dispute that fact.

25        MR. WISTOW: And we don't argue. That's not

1    part -- that's not my complaint.

2              THE COURT:  And so when you say that the

3    defendants have done something wrong with respect to

4    the PIF --

5              MR. WISTOW:  Yes.

6              THE COURT:  Identify for me again what is it

7    that these defendants have done wrong with respect to

8    the PIF?

9              MR. WISTOW:  Your Honor will recall I read

10   where the president of the PO (sic), and the president

11   of POL (sic), describe the PIF as under the

12   supervision of his office.  That's evidence in this

13   case.  So he caused -- he knowing, knowing that the

14   assets belonged to the Ungars under Judge Lagueux's

15   order, which he told, he expressly discussed all of

16   this.  He told Condoleezza Rice, Judge Lagueux did

17   this thing.  The PIF is under my supervision, and

18   after doing that, he had the PIF and allowed the PIF

19   to take money and to give it to the PA.

20             THE COURT:  Which then did not pay the

21   judgment with the funds.

22             MR. WISTOW:  I'm sorry?

23             THE COURT:  Which then did not pay the

24   judgment.

25             MR. WISTOW:  Yes, that's right.  Not only

that, but depleted, depleted the assets of the
corporation which Judge Lagueux gave to these people,
to the plaintiffs, again rightly or wrongly, it
doesn't matter.  The PA and the PLO on the judgment of
Judge Lagueux had no right to do what they did, based
on the judgment.  I'm not complaining that over the
years they haven't paid the judgment.  What I'm
complaining about is their interference with Judge
Lagueux's judgment from 2006.

         THE COURT:  And they interfered again by
doing what?

         MR. WISTOW:  By taking money from a
corporation that belonged to the Ungars.  The Ungars
owned the PIF flat out.  That's what Judge Lagueux
said.  When I read you what he said, he said not only
did they own it, Judge Lagueux recognized that they
exercised their ownership prerogative and fired the
directors and officers, fired them, and also, by the
way, Abbas told Condoleezza Rice the same thing, and
they said but that doesn't count.  We're not going to
pay attention to that.

         THE COURT:  All right, thank you, Mr. Wistow.

         MR. HILL:  Would you like to hear from me
briefly, your Honor?

         THE COURT:  Very briefly, Mr. Hill.  I'll

1   give you a maximum of 5 minutes.

2               MR. HILL:  I hope to not take it all.  Let me

3   begin with the point that Mr. Wistow ended with, which

4   is what the PA is alleged to have done wrong is caused

5   the PIF to pay the PA money.  The issue then is, is

6   the PA PIF or is the PA in control of PIF, or is it an

7   alter ego.  That is precisely the issue that is being

8   litigated in Connecticut and the analogue of which,

9   with respect to the PMA and the pension fund, Judge

10  Lagueux's repeatedly said he doesn't want litigated

11  here.  So the factual predicate for the alleged

12  wrongdoing of the PA, and it's only the PA, the PLO is

13  not involved in this motion at all, really, is that

14  the PIF is part of the PA or an alter ego of the PA,

15  and that's the very factual issue that Judge Lagueux

16  said he doesn't want to have adjudicated here.

17              THE COURT:  What about his original order in

18  which he, in effect, awarded the defendants' interest

19  in the PIF to the plaintiffs?

20              MR. HILL:  That's what the order literally

21  says, and Mr. Wistow took us to task for not moving to

22  vacate it.  Perhaps in hindsight we should have.  That

23  occurred to me on the plane on the way up here.  I

24  mean, it would be sort of unnecessary to do it if the

25  pending motion to vacate is granted because the

underlying judgment will disappear, but, I mean, that
order is out there.  It was entered in a default
posture similar to the underlying order that we're now
asking to have vacated, and there are all of these
issues about its validity that I alluded to earlier.
And it's an issue that Judge Lagueux said he doesn't
want to adjudicate here.  He has entered his order.
It says what it says, but the question that's now
being pressed on him in the context of the pending
motion to vacate is should the PA be denied the motion
to vacate on the underlying judgment because it
allegedly violated the subsequent judgment which is
being litigated in another federal court, the validity
of which is being litigated in another federal court
and which Judge Lagueux said he doesn't want to have
litigated here, and this is why Motorola doesn't
apply.  In Motorola the conduct that was at issue was
the conduct of the judgment debtor.  Here there's a
question about whether the conduct the plaintiffs are
complaining about is the conduct of the judgment
debtor, the PA, or an independent organization, the
PIF, and Judge Lagueux said he doesn't want to resolve
that issue here.

        Just a couple other quick points.  The
question is not whether Judge Lagueux will be able to

hear about the withdrawals or, as the plaintiffs
characterized them, or the, as the documents call
them, the dividends or the advances that the PIF paid.
Those are a matter of public knowledge.  He can
certainly be told that the dividends were paid.  The
issue is whether the plaintiffs are going to get
discovery of work product about this case, and about
the enforcement action.  And as I said earlier,
there's no indication that the lawyers, whose
documents are at issue here, are related to those
decisions to pay those advances or dividends.  So
we're talking about one thing, which is why were the
dividends and advances made, and there is a separate
discovery request pending for that, but here the
discovery request that's before you is not about that.
It's much broader.  It's about anything related to the
case.  About a whole host of other entities, and I
think Mr. Wistow has essentially conceded that the PIF
is the only issue.  So at the very least, we shouldn't
be talking about anything other than the PIF, or at
least there wasn't an argument that they had evidence
that there had been any wrongdoing with anything other
than the PIF.

          And with respect to the $800 million issue,
I'll just note that was -- the value of the PIF at the

1    time was the attachment that the plaintiffs had to

2    their motion, so they were the ones who said it was

3    worth $800 million at the time.

4            On the issue about whether we should have

5    moved sooner or back and forth about the privilege

6    log, I mean, we made the decision to move because it

7    appears to us that there are over 3000 potentially

8    responsive documents to this overbroad request.  It

9    just doesn't make sense to have to log them all,

10   particularly whereas we've now heard that there's

11   really only a potential relevance as to a very small

12   issue, which may not even be within the scope of the

13   request.

14           THE COURT:  What do you say about the

15   argument that you moved untimely, that you answered

16   and then you moved for a protective order?

17           MR. HILL:  Well, we filed our responses as

18   required by the rules within 30 days.  We had an

19   extensive meet and confer.  I think we had two or

20   three different phone calls, or we talked about this

21   trying to work it out, and it finally became apparent

22   that we weren't going to be able to work it out, and

23   in the meantime we figured out what the scope of the

24   material involved was and we promptly moved for the

25   order that we're now requesting your Honor to enter.

THE COURT: All right. I'll see you at
2 o'clock, Counsel.

MR. HILL: Thank you, your Honor.

THE CLERK: All rise.

(RECESS)

THE COURT: This is a resumption of a hearing
on discovery motions in the matter of the Estate of
Yaron Ungar vs the Palestinian Authority, Civil Action
No. 00-105 L. We're now going to take up the
defendants, the Palestine Liberation Organization's
motion for entry of a protective order regarding
plaintiffs' notice of taking the deposition of Hamid
Qurei, document number 528. Mr. Rochon.

MR. ROCHON: Thank you, your Honor. I think
I'll be relatively brief on this. You never know for
sure, but it would seem the record on this is that the
plaintiffs have no actual stated basis to believe this
witness has any knowledge about this case in terms of
the relevant, the issues they claim are relevant, that
is, though he was the Prime Minister during a certain
period of time, the Court has before it the
declaration submitted in this case before Mr. Qurei
was ever an issue. It indicates that the authority
for the handling of these cases was not given to the
Prime Minister's office until after Mr. Qurei had left

1 that office.  And the plaintiffs have not offered in

2 their opposition to our motion anything specific to

3 suggest he did have responsibility for these cases, or

4 knowledge about the decisions that were made regarding

5 them.  And we have said, if they want to make

6 something out of that, that it's a bad thing that the

7 Prime Minister did not have such responsibilities at

8 the time, they're free to do so.  But the fact is that

9 for a deposition of this witness to be conducted in

10 this context, particularly a senior individual in

11 terms of his age, and a person who is being sought by

12 the plaintiffs as a supposed officer of the PLO now,

13 that's why they argue he's producible, he's supposedly

14 an officer of the PLO.  We contest that.  But they

15 don't want to ask him about anything to do with his

16 current duties with the PLO, which relate to the

17 Jerusalem Affairs Department, and he serves on the

18 executive committee of the PLO.  They want to ask him

19 about his duties when he's with the PA.  So we have a

20 situation, your Honor, where they seek him as an

21 officer of the PLO to ask him about issues at a time

22 when his supposed knowledge came as the Prime Minister

23 of the Palestinian Authority.  Moreover, you have

24 before you the representations consistent with the

25 declaration that the Prime Minister's office wasn't

given responsibility for these cases until after he
left the office, and that they were handled through
the President's office until that time.  Unrebutted
declaration.  Not even submitted in an effort to
thwart the deposition, but submitted in this case
almost 2 and a half years ago, or more than 2 and a
half years ago, so I would suggest to the Court that
one way to cut through this, of course, is why go
through the exercise of the deposition in light of
that.  There's a host of other legal issues associated
with the deposition that we've raised in our papers.
I'm happy to get to them.  But I'm trying to find
pragmatic ways to get through some of the discovery
issues that have been put in front of you in
connection with this matter, your Honor, and that's
one extremely pragmatic matter.

            Another fact is that the plaintiffs have
submitted 30(b)(6) notices that go to a host of
issues.  We're going to talk about them tomorrow.
And, indeed, this morning, when we got here, we
received two more 30(b)(6) notices for the Palestinian
Authority and the PLO, which I'd like to tender to the
Court because it can be relevant to tomorrow's
hearing, if I may tender them.  They're obviously
notes of counsel.  May I approach, your Honor?

1          THE COURT:  You may.

2          MR. ROCHON:  Thank you, your Honor.  The fact

3     is we have argued in response to this motion and to

4     tomorrow's motions that the issues of timing and

5     willfulness are not actually proper areas for

6     discovery in this matter.  We've argued that timing is

7     a threshold matter, and willfulness is a conceded

8     matter.  We think those are strong arguments.  In any

9     event, however the Court comes down on those, the fact

10    that they're now dominating the discovery in this case

11    is turning this entire discovery process upside down.

12    We have a situation where the defendants have stood

13    before Judge Lagueux, both in papers and in person,

14    and the First Circuit, and said willfulness is

15    conceded.  And yet the entirety, not the entirety, but

16    huge swats of the discovery sought by the plaintiffs

17    go to willfulness.  And other huge swats go to why did

18    you file your motion in December 2007 instead of

19    sometime between July 2004 and then.

20          THE COURT:  Well, let me stop you at that

21    point.  Your position is that the issue of

22    willfulness, that the defendants deliberately

23    defaulted, is not an issue as relevant -- not an issue

24    that requires any discovery because you've conceded

25    that.

1             MR. ROCHON: Yes.

2             THE COURT: Yet Judge Lagueux's April 1, 2010

3 order states that the Court will hold an evidentiary

4 hearing to determine precisely what the facts are

5 concerning the deliberate decision to default, and the

6 factual circumstances surrounding that matter. Why do

7 you think Judge Lagueux put that in his order --

8             MR. ROCHON: Well --

9             THE COURT: If it's not an issue that needs

10 to be addressed at the hearing? If it's a fact that

11 you've conceded, then that factor is to be weighed

12 against you, heavily, according to the applicable law,

13 why does Judge Lagueux have this language?

14             MR. ROCHON: Well, I can think of several

15 reasons. First of all, when he issued the order, I

16 don't know if he was focusing on the fact that the

17 concession of willfulness was going to continue.

18 Maybe he thought the defendants would raise some new

19 issues. On its face, the order references only

20 willfulness, your Honor, as a factor, and as we know,

21 that's something the plaintiffs had urged on them

22 before, and it got Judge Lagueux reversed in the Court

23 of Appeals, and I can tell the Court that a focus

24 solely on willfulness cannot be what ought to occur

25 here on the face of the order. I think everyone

agrees there are issues other than willfulness that ought to have discovery, so I don't know that we should read over much into the wording of that order. But let me take your point instead of arguing with it. And not to say the Court makes points, but take the thrust of your question. Even if willfulness plays some role at that hearing, if you look at the 30(b)(6) notices, and we've attached and referenced the request for documents, which numbered in the 230s, you can see that the plaintiffs discovery in this case is all focusing on this issue of willfulness, which is conceded in this compressed timeframe. And what I'm suggesting to the Court is that they are certainly going way too far with this discovery thrust, and the occupation of all these issues in our limited time available to us. And without deciding whether some discovery is relevant as to willfulness, the notion that plaintiffs can just pluck a former Prime Minister, as to whom they have no reason to believe he has any information about willfulness, and say we ought to have a deposition of him to see whether he knows something about it, and if he doesn't, ask him why he doesn't know something about it, I would suggest is not a proper use of that deposition process even if some discovery as to willfulness is

appropriate. Tomorrow we have other issues on the 30(b)(6), and if the Court orders that there be some discovery as to willfulness, we'll argue to the Court that it should be constrained to a reasonable level, and not get so out of hand, as we will discuss tomorrow.

As to this witness, and this issue, on willfulness, I would suggest the plaintiffs have a problem that's far bigger than whether there should be discovery on willfulness. And the problem is that on their notion, they can pluck people out of the Government, as to whom they have no reason to believe they have notice, and say, let's have a deposition of this man. Now they say because he was the Prime Minister, this is what they argued, and the next Prime Minister had knowledge about this, that therefore he must have had knowledge about this. But that is rebutted by the declaration that has been submitted to the Court unrebutted that authority wasn't given to the Prime Minister until 2007. That's -- and remember, they've had a deposition of the Prime Minister already on these issues. It's not as if at the deposition of the Prime Minister I was telling him don't answer questions about willfulness and instructing him not to answer. You have the entire

transcript before you. A discussion on willfulness
goes on and on, even though the Prime Minister wasn't
around at that time of the decision to default in a
significant way. He'd been the finance minister at
one point during the relevant time period but not the
Prime Minister, but they got their questions, and we
didn't instruct him not to answer. But the idea is
having had that Prime Minister deposed and going
through those issues to then say we now need to bring
in this other person and have him deposed is, I would
suggest to the Court, it takes fishing expedition to a
whole new level. And they've admitted in their
papers, they don't have a fact, they don't have him
ever saying, in any of his public statements, any role
or involvement, or knowledge of these cases. He was
deposed in another matter. They don't say there was
any evidence in connection with that deposition
conducted by brother counsel who also represents the
Ungars in other cases. They don't say he had any
knowledge that was revealed in that deposition about
the decision to default or willfulness or timeliness.
So they offer nothing except the desire to depose him.
On that record, I would suggest, that even if you
allow some discovery on willfulness and timeliness,
it's not through this person. And if you want to cut

1    through the issues, let's suppose tomorrow I come

2    before you and I argue that there should be nothing on

3    willfulness or timeliness in this discovery, you will

4    either agree with me, in which case this is a moot

5    point, or you will disagree with me, in which case

6    there will be a 30(b)(6) deposition that goes into

7    those issues somewhat.  That's the way for them to get

8    to it, not by picking random witnesses and saying

9    let's have a deposition.

10        So I think your Honor's questions do go to

11   the heart of the matter, but they don't lead to the

12   conclusion that Mr. Qurei should be deposed on those

13   issues absent a basis for it.  And, your Honor, I hate

14   to be so pragmatic, but I think that's -- we're going

15   to have argument tomorrow.  It will go one of two

16   ways, and then at the end of that argument they will

17   either be getting a 30(b)(6) on timeliness and

18   willfulness, with a witness who needs to be prepared

19   on those issues.  You can direct that the person speak

20   to Mr. Qurei in preparation, if you want, but the idea

21   that so that person can come in and say I spoke to

22   him, he knows nothing, just like we all know he knows

23   nothing, it's just -- this process is extremely, I

24   would suggest, an inappropriate way to get about it.

25             THE COURT:  When you say we all know he knows

1   nothing, is there any declaration or affidavit from

2   him in the record stating I don't have this

3   information?

4           MR. ROCHON:  No, your Honor.  Our problem is,

5   if we submit a declaration, they say now we want to

6   depose him based on his declaration, we get to

7   challenge it, so we're always in a -- that's been the

8   course of other litigation with brother counsel.  But

9   I can tell the Court that you have, what I think is

10  even more persuasive, which is a declaration from

11  someone with actual knowledge as to how the cases were

12  managed, submitted before an effort to depose this

13  witness was ever sought, so there wasn't even a focus

14  or concern.  First of all, it doesn't describe him

15  having any responsibility personally.  It doesn't

16  describe his position as having any responsibility,

17  and describes the office which did have

18  responsibility, which was the president's office, not

19  the Prime Minister's office.  So I think what you have

20  is not a self-interested declaration to avoid a

21  deposition, which the plaintiffs would question, but

22  instead a declaration submitted at a time at which

23  this issue had not surfaced and the notion of taking

24  discovery in this case was certainly far off.  And I

25  think that's even more persuasive than a self-serving

1    declaration today.  And the plaintiffs' opportunity to

2    take discovery on these issues is not going to end

3    with Mr. Qurei, in any event.  They want to have

4    30(b)(6)'s, they want to have paper discovery, they've

5    sought all these different means, they've asked the

6    Prime Minister about it.  It has become the tail

7    chasing the dog of the issues here, on an issue that's

8    conceded.

9          In addition to all of those arguments, your

10   Honor, we have described to you why he is not, in

11   fact, an officer of the PLO now, remembering that they

12   seek him as an officer of the PLO, but to ask him

13   about PA matters.  His role with the PLO now is with

14   the Jerusalem Affairs Department where he does not

15   have the kind of decision-making authority that would

16   have him deemed an officer, and his position on the

17   PLO executive committee, which may sound lofty, has 18

18   members, and again doesn't have final decision-making

19   on behalf of the PLO.  He does not stand as an

20   officer, as that term is understood.  The plaintiffs

21   have suggested that the decision of a Magistrate Judge

22   in another court in Florida is collateral estoppel as

23   to our ability to challenge -- collaterally estops me

24   from making this argument.  I will tell the Court, I

25   don't think the doctrine of collateral estoppel would

1    reach that decision for numerous reasons.  The

2    judgment there, recently the case was dismissed with

3    prejudice, but the plaintiffs indicated there's going

4    to be an appeal, and have told us that, and again I

5    could call on brother counsel that attorney's work

6    closely here with Mr. Strachman, and the attorney has

7    represented to us and to the Court down there the he

8    will appeal.  In any event, the issue that was

9    decided, whether or not Mr. Qurei was an officer, was

10   not one that was essential to the dismissal with

11   prejudice particularly since he eventually was

12   deposed, in fact, in that case.  And the objections to

13   his being deemed an officer were never decided by the

14   district court.  They're essentially mooted out

15   because the deposition eventually occurred.  It

16   frankly showed that he had very little knowledge about

17   that case.

18         So I would suggest to the Court he's not an

19   officer.  We've argued, as well, he's not producible,

20   even if he were to be deemed an officer, relying on a

21   fairly well-reasoned case, Stone, which we cited to

22   the Court in our papers, that says he's not producible

23   as an officer.  And for all those reasons, Judge, the

24   record suggests he has no relevant knowledge, that

25   he's not producible as an officer, that he's not, in

1  fact, an officer, and there's far more reasonable

2  means to get to what the plaintiffs want through the

3  30(b)(6)'s if you allow willful discovery to go

4  forward. I suggest for all those reasons that this

5  deposition, our motion for protective order ought to

6  be granted.

7  THE COURT: Do I recall reading in your

8  papers that you say that if I were inclined to allow

9  the deposition it should take place in Jerusalem, and

10  I should -- I'm not sure you said I should do this,

11  but a special master or a magistrate judge should go

12  and preside over the deposition?

13  MR. ROCHON: Yes, your Honor. We have argued

14  that in -- I could argue those points.

15  THE COURT: Who would pay for this master?

16  MR. ROCHON: We could talk about with the

17  plaintiffs how that would be funded. We think it's an

18  important issue such that if it were to be ordered, we

19  would have to work that out with the plaintiffs, your

20  Honor, but I don't respectfully think we should get

21  there for the reasons we have indicated, as to this

22  witness, when we have no basis to believe he has

23  knowledge.

24  THE COURT: I understand that is only if I

25  reach the point that the deposition should take place.

1   You make that very clear in your memorandum.

2      MR. ROCHON:  Yes, sir.

3      THE COURT:  Anything else, Mr. Rochon?

4      MR. ROCHON:  No, sir.

5      THE COURT:  All right.  Mr. Wistow.

6      MR. WISTOW:  I don't think I should presume

7  to explain Judge Lagueux's reasoning for the language

8  that he placed in the order.  I have some possible

9  explanations but I can't speak for what Judge Lagueux

10  -- I would add, by the way, in spite of what my

11  brother suggested that he focused only on the

12  deliberate decision in that order, he went on to say

13  in the very next sentence, the defendants will have

14  the burden of proving the variety of factors set forth

15  by the Court of Appeals which would justify a vacation

16  of the judgment under these circumstances, including

17  exceptional circumstances.  I mean, Judge Lagueux was

18  very much aware of what the First Circuit ordered him

19  to do, so he was not in any way, shape or form going

20  to limit it to the facts concerning the deliberate

21  decision.  Here's my belief, your Honor, of why he

22  said he wants to look into that, and that's because

23  the defendants have been all over the place in

24  explaining why they defaulted, and I'm going to quote

25  verbatim some of the varieties that they've used to

1    try to take the curse off of the willful default.  For

2    example, on page 31 to page 32 of the motion to vacate

3    filed December 28, '07, now pending before the Court,

4    and which will be heard in an evidentiary hearing in

5    January, here's what the defendants say: "The

6    defendants mindset throughout the course of this

7    litigation will be another important factor for this

8    Court to consider in determining whether extraordinary

9    circumstances exist sufficient to warrant vacatur.  At

10   the time of the default in this case, defendants were

11   understandably perplexed about the ability of the

12   United States courts to hail them into court.  From

13   defendants' view, it seemed illogical that American

14   courts could properly adjudicate claims arising from a

15   longstanding and ongoing foreign conflict.  That is

16   language that is pending now before the Court in the

17   motion.

18          They also put in a declaration that sought to

19   take some of the curse off of this issue of

20   willfulness, and I read you from the declaration which

21   my brother referred to as the one that supports that

22   Qurei has very limited knowledge, Qurei being the

23   proposed deponent here.  That's in docket 408-5, and

24   here's what the defendants' witness said about the

25   problems with the case.  This, too, your Honor, is

1    pending, this is part of the motions before the Court.

2    Mr. Abdul Rahman said in late 2000, however, violence

3    broke out in the region and Israeli defense forces

4    began to engage in bombing raids and other actions

5    against the main elements of the Palestinian

6    government.  Without regard to the basis for the

7    Israeli raids and actions, the inescapable fact is

8    that as a result of them by January 2002, the security

9    situation in the occupied Palestinian territories

10   approached lawlessness and anarchy, and the

11   organizational structure of the entire government had

12   deteriorated significantly.  An upshot of this

13   escalation in violence was the destruction and/or

14   paralysis of many fledgling institutions of the

15   Palestinian governing system.

16          The First Circuit said on remanding, they

17   said on page 86 at 599 F.3d, First Circuit said:

18   Defendants blame political extremism within the PLO

19   and the PA for their Auralia (Phonetic spelling)

20   decision to default.

21          Your Honor, Judge Lagueux was very mindful, I

22   believe, of these various issues that say yes, there's

23   no question we didn't answer.  There's no question

24   that we chose not to answer.  That's not in dispute.

25   But this little nuance of how bad is it, and rightly

1    or wrongly, Judge Lagueux wants to hear about it. He

2    said flat out he wants, and again I have to say, it

3    seems to me he's quite right, and the First Circuit

4    also wants, I believe, ultimately to hear about this.

5    I can understand readily why they don't want

6    to get into it. They have all kinds of conflicting

7    stories about it, and it's an area that is going to

8    count heavily against them when we're able to marshal

9    the additional evidence that we want to put in about

10    the willfulness of this default, and just how bad it

11    was.

12    By the way, one of the premises for the

13    motion for protective order is plainly erroneous. My

14    brothers say as to our allegations, and I quote, they

15    say: We are -- plaintiffs are mistaken. What they're

16    talking about is when was Qurei a Prime Minister.

17    They claim that the Court affirmed Magistrate Judge

18    Martin's April 18, 2003 order granting plaintiffs' a

19    default judgment against defendants on August 5, 2003,

20    prior to Mr. Qurei becoming Prime Minister in October

21    2003. That is plain ordinary wrong. Your Honor knows

22    better than anybody in this courtroom that all you did

23    on April 18, 2003 was grant an ordinary default. No

24    way the default judgment that they are now

25    representing to the Court you entered on that day.

1     What we have is a situation where this man was Prime

2     Minister from October 2003 to January 2006, so the

3     judgment on your Honor's report and recommendation --

4     the report and recommendation was March 31, '04.

5     Judge Lagueux entered judgment on that on 7/13/04.  So

6     what the defendants failed to point out, in fact they

7     go a long way to obscuring it, if not misstating it,

8     is that the Prime Minister Qurei in October 2003, to

9     the period when your Honor made the report and

10     recommendation, was the Prime Minister at that time,

11     and had been for six months, and by the time the

12     default judgment had entered in July of '04, he, at

13     that point, was Prime Minister for another ten months.

14     Then he remained in place as the Prime Minister an

15     additional one and a half years after Judge Lagueux's

16     final judgment.

17          Now, they seek a flat prohibition on the

18     taking of this deposition, and your Honor knows that

19     in the First Circuit a party seeking a protective

20     order must demonstrate particular and specific facts

21     to establish good cause for the order prohibiting the

22     taking of depositions is an extraordinary measure, and

23     the moving party has a heavy burden of showing

24     extraordinary circumstances based on specific facts

25     that would justify the order.  It's really not my

1    burden to show, you know, some overwhelming need,

2    although I believe we have demonstrated a real need.

3    It's their burden to show the opposite.

4         It's also very important, your Honor, to

5    remember the context that we find ourselves in.  We

6    have a judgment.  They're petitioning to vacate the

7    judgment.  Again, I hate to keep using the word

8    supplicant, but maybe that overstates it, but they're

9    the petitioner.  They've, you know, promised to engage

10   in all kinds of discovery when you vacate -- well,

11   when Judge Lagueux vacates the judgment, I can't even

12   get discovery before we vacate the judgment that they

13   pledge cooperation with.

14        They claim, by the way, that I've said that I

15   only wanted to depose Qurei on two topics, and they

16   rely on my letter which, by the way, your Honor, is

17   document 529-5.  My letter absolutely does not say

18   that.  It does not limit it to two issues, namely

19   willfulness and timeliness.  And I'll tell you, I'll

20   read you verbatim what my letter says with reference

21   to Qurei: Mr. Qurei's importance as a witness is

22   obvious.  He was the Prime Minister of the PA that is

23   second in command after Arafat for a period of time,

24   and then Abbas for another period between October 2003

25   and January 2006, which encompasses both the period of

1    defendants' intentional default and the first 18

2    months after the default. He's therefore a key

3    witness, if not the key witness, regarding defendants'

4    decision to default and their subsequent failure to

5    move to vacate timely among other relevant topics.

6    And I said that flat out. I never said that we were

7    limiting to those issues.

8    Now, your Honor, the bottom line on many of

9    this is, in some respects, being in this case it's

10    felt like playing a game of whacker ball. I deposed

11    Prime Minister Fayyad. He was as vague as vague could

12    be about what was going on in terms of the decision

13    not to move to vacate this. He wasn't in charge. He

14    didn't miss. If the suggestion is that I feel like

15    doing Qurei's deposition just to do his deposition, I

16    don't know how anybody else feels in this case, but

17    I've got other things to do and I'm trying to pin down

18    exactly what the decision-making process, or lack

19    thereof was, and I represent to the Court if your

20    Honor reads any portion of the Fayyad depo and, in

21    fact, tomorrow we're going to be talking about this

22    very issue, and I'll demonstrate to your Honor that I

23    tried like the devil to pin Fayyad down on some of

24    these issues, and got absolutely nowhere. These

25    defendants are telling the Court --

1          Here's another reason why I think Judge

2     Lagueux might be interested in the willfulness issue

3     of the decision-making process.  What these defendants

4     are telling the Court is they've changed their

5     position.  They respect the Court's now.  They're

6     going to honor it.  How is Judge Lagueux going to

7     understand what they're saying if he doesn't know

8     exactly what they're position was in the first place.

9     What motivated them to do what they did when they

10     chose to get themselves defaulted.  In any event, we

11     shouldn't be second-guessing Judge Lagueux's order.

12     What he said is what he said.  This is another

13     instance where, in effect, we're hearing arguments

14     that the Judge really wasn't focused, he wasn't

15     thinking.  The Judge's order is entitled to be read

16     for what it says.

17          THE COURT:  Mr. Wistow, why would not a

18     30(b)(6) deponent be the appropriate and better way to

19     get the information you seek, which is -- you didn't

20     say this, but I will, a straight answer as to why they

21     defaulted as opposed to the different explanations

22     they offer?  Don't read anything into my comments.

23     I'm just trying to make it easy for Mr. Wistow.

24          MR. WISTOW:  I appreciate that.

25          THE COURT:  For the record -- excuse me,

1      Mr. Wistow. For the record, the Court looked at

2      defendants' counsel when it made the statement that --

3             MR. WISTOW: Agreed.

4             THE COURT: All right. Go ahead, Mr. Wistow.

5             MR. WISTOW: The answer to that question is

6      -- I want to say this in a cautious and fair way. I

7      believe that the witnesses that I will be furnished

8      for the 30(b)(6) are going to be selected for very

9      very particular purposes, and that Qurei is somebody

10     who they're trying to shelter and keep from this

11     because he has knowledge that's important.

12          By the way, your Honor asked a very very

13     telling question. Is there an affidavit from Qurei

14     saying he doesn't know from anything about this case.

15     The answer is not. And then when you hear the reason

16     for it, the reason is if they put in an affidavit

17     saying I have no knowledge about this matter, I'm

18     going to bootstrap that into a reason to take his

19     deposition. I mean, so the solution to that is, don't

20     have him say it, have somebody else say he doesn't

21     know anything about it. I suggest, your Honor, that

22     turns logic absolutely on its head, and I warrant to

23     your Honor that I would not have -- the word chutzpah

24     was used before in this case, I would not have the

25     chutzpah to say now I want to take his deposition to

1      test whether or not he knows something about it.

2              The reference in the Abdul Rahman declaration

3      is nowhere near as clear cut as you've given the

4      impression.  Let me tell you what Abdul Rahman says.

5      This is in document 562-2 in paragraph 10.  Should I

6      wait for your Honor to find it or --

7              THE COURT:  I'll let you go ahead.  I've seen

8      the document.  I can find it later.

9              MR. WISTOW:  I warrant to you I'll read it

10     correctly.  It's paragraph 10.  In such an

11     environment, it was difficult to create the sort of

12     permanent governmental institutions needed to respond

13     to litigation in a foreign country.  Thus, while the

14     Palestinian government had begun substantial efforts

15     to create a modern governmental structure in April

16     2005, and while this effort included the goal of

17     creating a permanent entity designed to respond to

18     foreign litigation, no such structure existed

19     throughout the year 2006.  Instead, and this is the

20     important part, instead, various high level

21     governmental decision-makers were contacted about the

22     litigation from time to time in response to particular

23     problems.

24              By the way, this happens to be another

25     instance of this what is willfulness.  There are all

1    sorts of levels of willfulness, some contemptuous of

2    the court, some sort of representing a stupid choice.

3    We're all over the place in what the reasons for this

4    is.  But here's the situation where it doesn't say

5    that the PM doesn't know anything.  There was an

6    inadequate structure, they claim, and from time to

7    time when decisions needed to be made they went to

8    various unidentified high level government

9    decision-makers.  Now we can go on a search until

10   doomsday to figure out who all this is.  I'm asking

11   only that I be allowed to depose the Prime Minister,

12   who was the Prime Minister at that time, really the

13   most important times we're talking about.

14           By the way, when he left in January 2006, the

15   Prime Minister came from the Hamas party, known

16   terrorists, and continued on until the spring of 2007

17   when Fayyad became Prime Minister, the man that I

18   deposed, and it's been a job, your Honor, to try to

19   track down who's doing what to whom.

20           My brothers say we also focused on

21   timeliness, and that's not in the case.  Somehow

22   timeliness has been decided.  That is absolutely,

23   absolutely not the case.  Indeed, the First Circuit in

24   the decision reversing Judge Lagueux, giving the list

25   of the various factors that -- I'll read you what it

says verbatim: A variety of factors can help an
inquiring Court to strike the requisite balance.  Such
factors include the timing of the request for relief,
the extent of any prejudice, and so forth and so on.
The very first one that's mentioned is the timing.
The First Circuit never, never said that this delay,
which was 3 and a half years after the default
judgment, default judgment 2004, the motion to vacate
December '07, there never was a holding by the, indeed
a full fledged argument, one way or the other, about
the timeliness of this.  What my brother is suggesting
is, well, if it wasn't timely, why would the First
Circuit reverse?  Why didn't they just say it's not
timely.  Well, the answer is, that was never explored.
Judge Lagueux took the position, which the Circuit did
not agree with, that the willfulness portion was, per
se, disqualifying to the motion to vacate and never
reached the other issues.  It's absolutely bizarre to
suggest that timeliness is off the table, and what
they're really asking you to do is to make a ruling,
in effect, Judge Lagueux, I've ruled that timing is
off, the -- timeliness is off the table, willfulness
is off the table, there shouldn't be discovery in all
of that.  And I really think that that would do
violence to what Judge Lagueux was -- intends to do,

1   and what the Circuit, more importantly intended Judge
2   Lagueux to do.  What the First Circuit said about the
3   remand was this, and it includes the timeliness, the
4   First Circuit said, and I quote: "The District Court
5   enjoys a long familiarity with the case and that
6   Court's factfinding capabilities put it in a better
7   position to construct the facts specific balance that
8   Rule 60(b)(6) demands."  The First Circuit never
9   evaluated and made a decision about whether this thing
10  was timely or not.  And I suggest, your Honor, that
11  it's absolutely disingenuous to suggest that they did.
12       Now on the question is - the question of what
13  is former Prime Minister Qurei today?  We suggest that
14  he is absolutely the equivalent of a member of the
15  board of directors of that entity, and I say that --
16       THE COURT:  Of which entity?
17       MR. WISTOW:  The PLO.  PLO.  Forgive me, your
18  Honor.  And the reason I say that with some confidence
19  is that matter was litigated in front of a U.S.
20  Magistrate, as referred to my brother.  He came down
21  with a decision December 31, 2009, and from the name
22  of the Magistrate, you can tell it's not somebody
23  you'd want to fight with.  It's Magistrate John J.
24  O'Sullivan in the District Court in Florida, and what
25  he specifically found was -- this is from his

decision: The plaintiff cites to the PLO's
constitution, which provides that the executive
committee -- and, by the way, it's been stipulated
that Qurei is a member of the executive committee.
The executive committee is the highest executive
authority of the organization.  It shall remain in
permanent session.  Its members devoting themselves
exclusively to their work.  It shall be responsible
for executing the policies, programs, and planning
approved by the National Assembly to which it shall be
responsible collectively and individually.  The
executive committee shall assume responsibility for
(a) representing the Palestinian people; (b)
supervising the organization's subsidiary bodies; (c)
issuing regulations.  And Magistrate O'Sullivan goes
on and on and on with these other responsibilities.
And he says, and these are the Magistrate's words: The
plaintiff has met his modest burden.  There's
references in the decision that cites the case law
that when the plaintiff alleges that somebody is an
employee, officer, or director, the burden of showing
that is somewhat modest.  We don't have to have the
trial on the merits.  Anyway, Magistrate O'Sullivan
said the plaintiff has met its modest burden.  Mr.
Qurei's membership in the executive committee suggests

that he is a high ranking official within the PLO and
his activities on behalf of the Jerusalem Affairs
Department, including meeting with EU envoys, suggest
to the Court that he is the functional equivalent of a
director or officer of the PLO.  The Court concludes
that Mr. Qurei is subject to deposition by notice
under Rule 3(b)(1).  The defendants in that case
argued that fine, if you're going to make him come to
be deposed, then limit it to what he learned in his
capacity as a director, officer of PLO, as has been
argued here.  And the Magistrate refused to put such a
limitation on the scope.  And here's the irony of
this, and this is, to me a common theme.  What the
Magistrate did do by way of giving them relief was to
say, if it's a big problem, you can substitute
somebody else for Qurei, but if that person isn't able
to answer the relevant questions, then you're going to
have to produce Qurei.  So what did they do?  They
produced, to avoid producing Qurei, they produced the
Prime Minister of the Palestinian Authority to be
deposed, and when he ended up not being able to answer
questions, it was necessary to finally depose Qurei.

       THE COURT:  Where did they produce him?

       MR. WISTOW:  In Jerusalem.

       THE COURT:  Okay.

MR. WISTOW: I'm mindful of that issue, your Honor. The only thing I have to justify having him come here is my reluctance to go back there, and maybe more important, the fact that they are, in effect, the plaintiffs in this case, and I think -- well, your Honor asked the cogent question, it was done in East Jerusalem.

By the way, on this issue of whether or not O'Sullivan's decision represents collateral estoppel or not, it's certainly persuasive. He made certain findings of fact. I believe, by the way, that the decision is collateral estoppel. It involved the same defendants, the same lawyers, and the same issue about Qurei, and even though it was not a final judgment in the case itself, the final decision on a particular issue in the case, and there's case law supporting the proposition whether, for example, the Loomis case from the Second Circuit, 297 F.2d 80, addresses the issue. It says whether a judgment not final in the sense of 28 USC Section 1291 ought nevertheless be considered "final" in the sense of precluding litigation on the same issues. It turns upon such factors as the nature of the decision, that is, that it was not avowedly tentative, which this was not, the adequacy of the hearing, it was a full hearing in front of a Judge

1    Magistrate, and the opportunity for review.  They

2    chose not to perfect or take an appeal on it.

3    Finality in the context here relevant means little

4    more than the litigation of a particular issue has

5    reached such a stage that a court sees no really good

6    reason for permitting it to be litigated again.  And

7    there's other cases to the same effect.  There's no

8    need to go into a whole thing.  It was not the final

9    judgment in the case.  No question about it.  But, you

10   know, how many times does this same issue have to be

11   litigated?

12           The bottom line, your Honor, is this man was

13   -- the only thing that I can say is they ought to be

14   grateful that we didn't ask to have President Abbas

15   deposed, but we were respectful of what's been going

16   on with the recent peace talks, and certainly we

17   didn't want to be in here saying we need a priority

18   deposition of the President of the PLO and the PA who

19   was, up until recently, actively engaged.  But now

20   we're being confronted with the statement that all

21   knowledge derived from Abbas.  We're trying to be

22   modest.  This guy was the second in command at a very

23   very relevant time.  There's been no categorical

24   denial that he has, except from counsel, and a very

25   indirect -- and by the way, I don't question that

counsel -- I'm not suggesting you're misrepresenting
to the Court, I'm sure they were told he doesn't know
from nothing, to use the colloquial phrase, but that
isn't sufficient, your Honor, and the declaration or
affidavit they rely on raises more question than is
asked. I don't want to make the concession that, you
know, we're ready to go to East Jerusalem to depose
him, but I have a funny feeling that I'm not going --
that's my best shot, and so if I have to go to
Jerusalem to depose him, that's what I'm willing to
do, but he's a very very important witness in the
context of this case, your Honor.

        THE COURT: All right. Thank you,
Mr. Wistow.

        MR. ROCHON: Your Honor, counsel has said
he's a very important witness, and you have about less
on that than you do from us on the fact he knows
nothing. You have to remember, he sat for a
deposition. I am the lawyer who prepared him. I'm
the lawyer who sat next to him during the deposition.
I would take an oath as to the fact that he knows
nothing about the circumstances of the default, or the
willfulness of the default. Mr. Wistow knows nothing
about him, and has still offered you nothing about
him. He said he's important, and they have reason to

believe we're hiding him. Mr. Qurei is a difficult man. I'm not hiding that. You can read the deposition transcript and see it, but he knows nothing about the willful default in this case.

THE COURT: Which deposition transcript are you talking about?

MR. ROCHON: In Saperstein, the case where he was sat for a deposition.

THE COURT: Is that in this record?

MR. ROCHON: There's allusions to it in this record but I can get it to you quite readily.

THE COURT: Well, I'm quite frankly not looking for more papers, Mr. Rochon.

MR. ROCHON: I'm sure of that. I'm sure of that. But the fact of the matter is, your Honor, the plaintiffs want it all ways. They wanted to depose the Prime Minister. We suggested hold off on that until further discovery takes place. They said no, you've made him the centerpiece of this thing, take him now. We had not proffered him as the decision-maker regarding the willfulness of the default. We had not proffered him as that. He has been discussed in terms of foreign policy impact of the commitment to litigate these cases. They deposed him and they didn't get the answers they wanted on

1    these issues.

2              THE COURT:  Who's "they"?

3              MR. ROCHON:  Mr. Wistow.  I'm talking about

4    the current Prime Minister, Salam Fayyad.

5              THE COURT:  I lost the transition there.

6              MR. ROCHON:  Okay.  Let me back up then

7    because I think the transition matters.  They sought

8    the deposition of Salam Fayyad in this case.  We said,

9    hold off.  You've got the e-mail it's in from the

10   argument we had this morning where we argue, don't do

11   it yet.  They say they're not going to hold off.

12   We've made him the centerpiece of this case.  They're

13   going to do it now.  They resisted our request that

14   they conduct further discovery first.  We had not

15   proffered him as the king explainer of the willfulness

16   of default.  Prime Minister Fayyad's relevance to this

17   case is the foreign policy implications impacted these

18   judgments on the entity, on this date -- excuse me,

19   the PA, the PLO, and on the commitment to litigate

20   these cases.  That's what his declaration discusses.

21   They then find out that he doesn't know as much as

22   they would like about willfulness, and Mr. Wistow

23   complains about it mightily here.  Now they want to

24   depose another guy who doesn't know anything about it,

25   and they'll complain again.  The means by which you

get collective knowledge of an organization about a
series of steps is through a 30(b)(6) notice. Not by
picking people out of the blue and finding out what
they know. And they have still proffered nothing to
you that suggests he has actual knowledge of anything
to do with the decision-making in this case.
Mr. Wistow -- may I retreat?

             THE COURT: You may.

             MR. ROCHON: I want to get the affidavit he
was quoting.

             THE COURT: All right.

             MR. ROCHON: He wanted to talk about
paragraph 10 of Mr. Abdul Rahman's declaration, which
is appended to our reply as Exhibit 2. And in
paragraph 10, which he cites and read to the Court,
what that is discussing is what the structure that
existed throughout the year 2006 of the effort to
design a permanent entity, to create a permanent
entity designed to respond to foreign litigation.
That's at the top of page 5 of that declaration. The
next sentence says that instead, various high level
governmental decision-makers were contacted about the
litigation from time to time in response to particular
problems. That's talking about 2006. This gentleman
wasn't in office in 2006. So the relevance of this to

supposedly say, well, this declaration doesn't tell
you anything about what he would know.  In fact, what
it says, is that the whole thing was a mess.  It was
being run out of the president's office.  The Prime
Minister wasn't delegated to answer -- to handle this
until early 2007.  This declaration was filed in the
Saperstein case, that you've heard so much about, but
not in an effort to avoid Mr. Qurei's deposition.
This declaration was filed in connection with the
motion to vacate default in that case.  No Qurei
issues involved.  No effort to sidestep it.

Now, the variety of means by which you can
get information about what this man might know,
include this, include, of course, the fact he was
deposed in another case, asked questions.  No evidence
surfaced there of him having involvement in this
decision-making regarding the willful default.  No
suggestion he has knowledge here.  The plaintiffs are
saying they're trying to get to what my client knows
about the decision-making, if you allow that kind of
discovery to go forward.  And I would suggest that the
Court knows as well as I that the way they should have
done it first was through the organizational
deposition, not depose the Prime Minister and then
complain that he doesn't know things that they think

1    he should know about that occurred when he was not in

2    responsibility for these cases, and suggest that

3    somehow those answers say that now they need to depose

4    this gentleman.  We told them they were going at it

5    backwards.  They proceeded anyway and now they

6    complain about the answers they got.  Now they want to

7    depose this gentleman, and they'll complain about the

8    answers they get.  I would suggest to the Court that

9    tomorrow when we resolve the 30(b)(6) motion that as

10   we pointed out you'll either let discovery proceed on

11   willfulness and timeliness issues or not, and if you

12   do, they will get a witness, who's prepared to address

13   them, and if the Court directs, the witness can speak

14   to Mr. Qurei who will testify under oath about what he

15   does not know.  And I would suggest to the Court that

16   is the way to proceed if you're going to allow

17   discovery in these areas.  The rest of these issues --

18           The only other thing I would say is

19   plaintiffs have made something out of the fact that we

20   took the date of default as a relevant date, as the

21   date of the default judgment.  I frankly think the

22   date of default is a relevant date, but I apologize if

23   my using that date in our pleadings has upset the

24   plaintiffs.  I would suggest to the Court that that

25   date is a relevant date, vis-a-vis the Prime

Minister's service because the default occurred as of
that date. Yes, the default judgment occurred later,
but at that point there was the issue of damages that
was being assessed, not the question of whether there
was a default. Either way, there's no suggestion the
man knew anything about either, however, so it's sort
of a moot point.

On the issue of his status and whether he's
an officer or director, again, I think it's kind of a
sideshow to the question of whether or not we ought to
proceed to discovery on these issues through this
means or through a more reasonable means. I will say
that Mr. Wistow said that he's a director. I don't
believe they've even noticed him as a director. The
question would be whether he's an officer.

And on the question of whether the decision
of the Magistrate Judge in Florida is collateral
estoppel, undoubtedly a fascinating legal issue. I
would suggest it's one you don't need to reach because
of the fact that we shouldn't be proceeding with his
deposition at all. But if the Court is interested in
that issue, and wishes to reach it, what you have is a
decision to order a deposition. Say you ordered this
deposition, an appeal of it that's never decided. The
deposition goes forward. The case is dismissed on

1    motion of the plaintiffs with prejudice.  And the

2    question is whether or not that decision is entitled

3    to the sense of finality such that it can never be

4    litigated again.  I would suggest to the Court that's

5    not what the record in Saperstein would support here

6    and the issue is clearly open before this Court, as to

7    whether or not this person is an officer of the PLO

8    such that he can be ordered to appear for a deposition

9    and then asked about something that happened when he

10   wasn't an officer of the PLO.

11            THE COURT:  Did you say the case was

12   dismissed by the plaintiffs with prejudice?

13            MR. ROCHON:  Yes, dismissed by the plaintiffs

14   with prejudice because they can't make their case, and

15   they said so.  Now they think it's because of some

16   rulings they did not like and want to appeal it.

17            THE COURT:  All right.

18            MR. ROCHON:  It's all public, it's not a --

19            THE COURT:  I just didn't understand how

20   someone could dismiss the case with prejudice and take

21   an appeal on that, but you've explained it.

22            MR. ROCHON:  Your Honor asked -- as you can

23   imagine, that's a point that one of our lawyers will

24   be making in the Eleventh Circuit, if necessary.

25            Your Honor, on this issue of Mr. Qurei,

1    that's all we have.  Thank you.

2                THE COURT:  Thank you.

3                MR. WISTOW:  May I just add --

4                THE COURT:  Yes.  You're going to have the

5    final word, so go ahead, Mr. Wistow.

6                MR. WISTOW:  Not if it upsets your Honor.

7                THE COURT:  It doesn't.  I'm not upset.  I'm

8    just -- defendants know they're just going to have to

9    sit there and bear it in silence because you get the

10   last word, Mr. Wistow.

11               MR. WISTOW:  Thank you, your Honor.  I only

12   wanted to add that the Saperstein case, of which I

13   know very little about, but I did read that

14   deposition, Qurei was deposed on matters relating to

15   supplying money to Hamas and not on the issues that

16   we're talking about here.  He was not asked about

17   willful default or timeliness or anything of that

18   nature.

19               THE COURT:  So you would agree, Mr. Wistow,

20   that there's nothing in that transcript that would

21   indicate that he has knowledge about the decision in

22   this case to default, to not to move to vacate?

23               MR. WISTOW:  Yes, I have to agree with that.

24               THE COURT:  All right, please continue.

25               MR. WISTOW:  The affidavit -- again, I think

what's very very telling here is the minimal
requirement of getting an affidavit from Qurei has not
been adhered to at all, and what we're talking about
is this declaration of Abdul Rahman.  Portions were
read to you.  I'm not going to read extensively except
to say paragraph 5, it also talks about reasons for
not answering the case.  It says no person within the
Palestinian government structure had primary
responsibility for monitoring the lawsuits in the
United States.  Primary responsibility.  It doesn't
say no one had any responsibility.  The man was the
Prime Minister at the time we're talking about, and
can I prove, as I stand here now, that he has
knowledge?  No, I can't.  But I would like to
understand what the structure is.  For example, if we
ask him nothing else, as Prime Minister, all of these
issues about, you know, they're saying to the Court,
nobody had primary responsibility for monitoring the
lawsuits, that the government was in chaos.  I'd like
to say to the Prime Minister, who was Prime Minister
at that time, tell me about that.  What was the chaos.
Are they just allowed to come forward and make all of
these claims and we can't test them?  Are they going
to say can they possibly suggest he has no knowledge
about that?  About what the state of the government

1    was that he was the Prime Minister?  It's implausible.

2    And for that reason, your Honor -- and I did never, I

3    never suggested that I intended to limit the questions

4    to timeliness and willfulness, but your Honor can see

5    why willfulness becomes such an issue here.  Every

6    time you turn around there's an explanation for not

7    answering the case, and that's why Judge Lagueux

8    wanted that addressed.

9         THE COURT:  All right, thank you,

10   Mr. Wistow.  All right, this will conclude the hearing

11   for this afternoon on the motions that were scheduled

12   for hearing today.  I will resume hearing the

13   remaining motions tomorrow morning at 10 o'clock.

14   Court will stand in recess.

15        THE CLERK:  All rise.

16   (RECESS)

17

18

19

20

21

22

23

24

25

1
2
3
4
5                     C E R T I F I C A T I O N
6       I, court approved transcriber, certify that the
7       foregoing is a correct transcript from the official
8       electronic sound recording of the proceedings in the
9       above-entitled matter.
10
11
12      /sJOSEPH A. FONTES/
13      COURT REPORTER
14      NOVEMBER 10, 2010
15      DATE
16
17
18
19
20
21
22
23
24
25