1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF RHODE ISLAND
2

3

YARON UNGAR, et al           C.A. NO.  00-105 L
4
     Plaintiff
5
     vs
6

7

THE PALESTINIAN LIBERATION     OCTOBER 26, 2010
8  ORGANIZATION, et al         PROVIDENCE, RI

9     Defendant

10

     BEFORE: MAGISTRATE JUDGE DAVID L. MARTIN
11

12  APPEARANCES:

13  FOR THE PLAINTIFF:     DAVID J. STRACHMAN, Esq.
                     321 S. Main St.
14                   Suite 400
                     Providence, RI 02903
15                   401-351-7700

16                   MAX WISTOW, Esq.
                     61 Weybosset St.
17                   Providence, RI 02903
                     401-831-2700
18
  FOR THE DEFENDANT:     DEMING F. SHERMAN, Esq.
19                   2800 Financial Plaza
                     Providence, RI 02903
20                   401-274-9200

21                   MARK J. ROCHON, Esq.
                     BRIAN A. HILL, Esq.
22                   655 Fifteenth St., NW
                     Suite 900
23                   Washington, DC 20005
                     202-626-5800
24

25

1    OCTOBER 26, 2010

2              THE COURT:  This is the matter of the Estate

3    of Yaron Ungar, et al, vs the Palestinian Authority,

4    et al, Civil Action No. 00-105 L.  This is a

5    continuation of a hearing addressing multiple motions

6    that have been filed in that case.  This morning we're

7    going to begin with the defendant, the Palestinian

8    Authority's motion to compel answers to defendants'

9    interrogatories numbers 12, 18, and responses to

10   defendants' requests for production numbers 8 to 15,

11   7 to 19.  The motion that we are addressing is

12   document number 530.  The attorneys will identify

13   themselves, please?

14              MR. STRACHMAN:  Good morning, your Honor.

15   David Strachman for the plaintiffs.

16              MR. WISTOW:  Max Wistow for the plaintiffs.

17              MR. SHERMAN:  Deming Sherman for the

18   Palestinian defendants.

19              MR. ROCHON:  Good morning, your Honor.  Mark

20   Rochon on behalf of the Palestinian defendants.  With

21   me is Brian Hill, also on behalf of the Palestinian

22   defendants.

23              MR. HILL:  Good morning, your Honor.

24              THE COURT:  Good morning.  Thank you,

25   Counsel.

1          MR. ROCHON:  Your Honor, the first motion

2     that you indicated is up this morning, which we are

3     the movant, that's why I assumed the lectern, I was

4     going to suggest to the Court, if I may, that of the

5     other two motions today, the one on seeking Rule 35

6     examinations, I think will be the briefest, and if the

7     Court were to permit, we might want to take that one

8     second, and then we'll see -- because I think it would

9     then give a better sense of how much time you need for

10    this third one, our motion to compel.  Obviously I'll

11    defer to the Court, but I think we may have a proposal

12    on the IMEs that will cut through some of the issues

13    there.  I defer to the Court on that.  In any event,

14    we're prepared to address this one now.

15               MR. WISTOW:  Your Honor --

16               THE COURT:  I'll give you a chance to be

17    heard, Mr. Wistow, but my inclination is I'll hear you

18    on the first motion.  I'll see where we are and I'll

19    give some consideration to your proposal that we take

20    what I called the last motion second.  Mr. Wistow?

21               MR. WISTOW:  I was just going to say, I have

22    no objection to do that.  In fact, I think, perhaps

23    even join in it, for whatever that's worth.

24               THE COURT:  All right.  So after we have

25    completed the arguments on this motion, which is

1    document number 530, I will consider addressing the

2    motion concerning mental examinations.

3              MR. ROCHON:   Thank you, your Honor.   Your

4    Honor, this may be an opportune time to once again

5    look at the bigger picture of what's going on in terms

6    of discovery in this case.   Yesterday I served you --

7    I didn't serve you with anything, I gave you copies of

8    the 30(b)(6) -- new 30(b)(6) notion -- notices that

9    the plaintiffs have propounded to us as of yesterday.

10   First of all, a technical matter, I take it they do

11   not or are not intended to supersede the ones on which

12   we're here to argue today, yet, of course one would

13   need leave of court to propound multiple deposition

14   notices to the same entity, and these new notices

15   purport to have not only to again seek depositions of

16   the PA and the PLO, but actually three different

17   depositions.   When you read them, the new notices seek

18   to have three additional depositions of the PA and PLO

19   on different topics, on different dates and times.

20             I would suggest to the Court that that's

21   consistent with what we're trying to suggest to you,

22   which is that the plaintiffs are pushing the discovery

23   boundaries in any matter way too far, and certainly in

24   connection with this matter.   But the district court,

25   when it set this down for an evidentiary hearing,

1    wanted witnesses.  He wanted to have evidence.  But

2    the idea that there would be sort of scorched earth

3    discovery is I'm sure not what the district court

4    envisioned in this matter.

5         The district court already has been pushed by

6    the plaintiffs the first go-around into error.  The

7    district court followed their urgings that he perform

8    a single factor analysis on the vacater motion and was

9    reversed.  The plaintiffs now are pushing discovery

10   seeking claims that we have waived privileged simply

11   by arguing willfulness.  Not that we asserted an

12   advice of counsel defense, but simply arguing

13   willfulness, and arguing that our motion is properly

14   before the Court and offering explanations for why

15   there was a willful default.  They're arguing we

16   waived privilege.  Again, a ruling that if made pushes

17   the Court into extremely troublesome waters.  And the

18   last thing that this case needs, if we were to

19   prevail, or not, is another extended round of appeals

20   before the matter is finally resolved on the merits.

21   The PA and the PLO have sought to litigate this case

22   on their merits.  Ironically, those cases where

23   default was granted, excuse me, vacater was granted,

24   are cases that are already either resolved or well to

25   resolution.  It is this case that lingers, and in

significant part because what I would contend to the Court are the overly aggressive postures taken by the plaintiffs in connection with the vacater motion.  The best example of that, or one example, not even the best, is to now, on the eve of this hearing, with essentially 3 and a half weeks left to take depositions, to propound seven brand new deposition notices, including three, and though they're put into a single piece of paper, three additional 30(b)(6)'s as to the two defendants.  I would suggest to the Court that this is either an instance where the plaintiffs think that the Court is somehow going to split the difference and therefore they have to push the envelope and therefore they'll get some of what they want, or I would suggest to the Court they're pushing the Court to error, and that we should reject that.  We don't need that kind of discovery to get the evidence so the district court can evaluate the motion to vacate.  That's all this discovery is for.  To put the district court in position to evaluate the motion to vacate, under the factors the First Circuit gave them.  The First Circuit clearly had understood that there was willful default here, and yet we have discovery that goes on ad nauseam about what kind of willfulness, and the plaintiffs claim they need that

1    because supposedly there have been all of these

2    different reasons given for the willful default here.

3    That's the argument.  We've heard that in connection

4    with the Qurei motion, we've heard it in connection

5    with the motion related to the Prime Minister's

6    deposition, we hear it again in connection with this

7    30(b)(6) motion, and they point to the same three

8    things every time.  So though it's raised in three

9    places, it's the same each time, and I'm going to --

10   the most detailed recitation actually comes in the

11   Qurei motion, it's just alluded to in this one, and

12   what they say, and what they cite to justify this

13   extensive discovery on willfulness, is they claim --

14           THE COURT:  Mr. Rochon, tell me which

15   document you have in your hands and what page.  Just

16   give me the number and the page.

17           MR. ROCHON:  Sure.  Document Number 556-1,

18   pages 4 to 5 are what I'll be referencing, and it is

19   their, plaintiffs -- it's where we address -- excuse

20   me, it's the plaintiffs' opposition to our motion for

21   protective order regarding the Qurei deposition.

22           THE COURT:  All right.

23           MR. ROCHON:  And they say the defendants have

24   provided at least three different versions of their

25   reasons for default.  The first one they cite is the

1    June 2005 letter from the Prime Minister about which

2    we heard so much yesterday.  Understanding in June

3    2005 he wasn't the Prime Minister, he wasn't

4    responsible for the litigation, and he was writing

5    about the impact of the judgment in this case on the

6    pension fund.  He's not writing in connection with the

7    motion to vacate.  He's not writing in connection with

8    litigation before this Court.  He's writing to the

9    Secretary of State about the problems associated and

10    the impact on the pension fund of the judgment here.

11    And he says that to preserve its legal position, with

12    respect to any potential efforts by plaintiffs to seek

13    enforcement of the default judgment in other

14    countries, the PNA and PLO continue to maintain the

15    district court lacked both personal jurisdiction over

16    them and subject matter jurisdiction.  Let me do the

17    math on this.  His letter says that to preserve its

18    position regarding enforcement of the default judgment

19    the PA and PLO took a position.  Ipse dixit.

20    Therefore the default judgment had been entered and

21    he's discussing the strategy following the default

22    judgment not explaining the decision to default.

23        The next two things that are cited by the

24    plaintiffs are filings by us, by the lawyers for the

25    PA and the PLO in connection with the motion to

vacate, not statements of officials, statements of

counsel, arguments, and they parse the arguments and

suggest that there's differences between them slightly

because in one we had said that the defendants had

intentionally defaulted because their belief in the

propriety of the sovereign immunity defense, and that

they acted to protect what they reasonably perceived

to be their rights under international law.

In fact, Judge, therefore we argued that's

why the defendants did it. First of all, the Prime

Minister's statement, which of course is after the

default, but it referenced the personal jurisdiction

and subject matter jurisdiction regarding the dispute,

essentially whether the defendants were properly

before the Court, as in a sovereign immunity defense.

The third one that they offer is as to our

appellate brief in the First Circuit. So now they're

saying that the huge inconsistencies that justify all

the discovery includes statements not by the clients

except through counsel in an argument to the First

Circuit in which all we can do, of course, is

paraphrase and argue the record below. And what we

said there, we being me and my colleagues, is that the

clients' reaction to being sued in Rhode Island, and

I'm slipping -- alliding by some of the language, was

inevitably dismissive, hyperpoliticized, and infused with a foxhole mentality, represented by activists and U.S. foreign policy critic Ramsey Clark, the PA and PLO intermittently filed briefs in the case arguing that the U.S. court should not exercise jurisdiction over them. True. And arguing the case should be dismissed on political question grounds. True. With Arafat refusing to recognize U.S. courts jurisdiction over him, the PA and PLO did not file an answer or participate in discovery. So the only part about that's about willful default is the last one. Arafat refusing to recognize the U.S. courts' jurisdiction over him, just as earlier they had asserted only jurisdictional and justiciability defenses, and as the Prime Minister said, questioning jurisdiction. They've created this idea that there's these wildly different explanations for the willful default in this case to justify the discovery. Read them closely. There's no, nothing, within those arguments. There's no inconsistency. And they don't cite -- they cite the Prime Minister in '05, arguing after the default as to its impact, and arguments of counsel in papers. One of them in the Court of Appeals where the record was fixed. That's what their argument is as to why we need all this willfulness discovery. Why do I address

that?  Because a lot of the 30(b)(6) notice goes to
this willfulness, and this problem with their argument
infects the Qurei motion, the Prime Minister motion,
and the instant motion.  You can only get so pregnant,
and you can only get so willful.  When Ramsey Clark
stood before Judge Lagueux and told him that the
defendants were intentionally defaulted, and we have
conceded that -- we have not argued it was an
inadvertent decision.  We have not argued that it was
an unconscious decision.  We have not argued anything
other than admit that it was a willful default.  And
the plaintiffs say, well, if we can find some
different aspect of the reason for that, we should go
through all of this discovery in connection with the
vacater motion set for hearing early next year.

Even if, and I'm not denying that the
district court can and will take into strong
consideration the willfulness of their fault.  But the
notion that the discovery in this case should be
turned upside down to explore different aspects of
decision-making regarding that, is a useless endeavor
when counsel stood before the Court and said it was
willful.  That's -- this case, this discovery, is
getting completely lopsided on this issue.

I would suggest to the Court that the

1    plaintiffs have not offered an adequate basis to

2    engage in that discovery though they have propounded

3    the supposedly three different statements.

4             In addition, the plaintiffs have argued that

5    timeliness is a critical issue, and that the first

6    circuit said so, in essence.  And if the Court directs

7    itself to the first circuit opinion, and the

8    discussion on timeliness in that opinion, it is in the

9    context of the first circuit describing what the

10   factors are in connection with consideration of a

11   motion to vacate.  And specifically in the opinion of

12   the first circuit on page 6, the court simply says a

13   variety of factors can help an inquiring court to

14   strike the requisite balance.  And then the court runs

15   through all of the factors.  This is the part of the

16   opinion in which the circuit court is laying out the

17   relevant law before it gets to the instant facts and

18   circumstances that are argued to the court regarding

19   this motion to vacate.  If the court had listed the

20   relevant facts and had not included timing, some

21   litigant three years from now would be saying timing

22   doesn't matter, in the Ungar case the first circuit

23   listed all the pertinent factors and did not list

24   timeliness.  The question is when the Court got to

25   considering this motion, having had the plaintiffs

argue, both to Judge Lagueux and to that court this whole untimeliness posture, the court went right by it and got to the merits of the motion. There's no question as to how long a period of time passed between default judgment and the motion to vacate being filed. If the plaintiffs are prejudiced by that delay, there's no question they get to argue that prejudice. But the notion that absent prejudice, that delay alone should be the occasion of extensive discovery in this case, again turns what the first circuit is asking the district court to do on its head. The first circuit was pretty darn clear about what it wanted the district court to do. It gave the district court explicit directions, and that's what the plaintiffs want to ignore as they consider other discovery in this case.

THE COURT: Mr. Rochon, Let me give you a hypothetical. A defendant who is moving to vacate a judgment, who claims that he defaulted because he erroneously believed particular law did not apply to him, and seven years later he moves to vacate the default judgment, and he says, I now realize the law applied to me. I was mistaken seven years ago when I allowed that default judgment to enter. Would it be relevant on the issue of timing if there were evidence

that 3 and a half years after default judgment entered
this defendant learned that the law did not apply?
Learned of his error, but took no action.  Waited
another 3 and half years.  Would it be relevant that
the defendant who is seeking to vacate the judgment
waited 3 and a half years after the knowledge had come
to his attention before filing a motion to vacate?

MR. ROCHON:  I think that defendant's motion
would not be under (b)(6), your Honor.  It would be
under, I think, (b)(5), although I don't have it in
front of me, and he would be alleging mistake, and it
may not be (b)(5), it may be another, I think it's
(b)(5), and therefore I think would be subject to the
one year limit.  And therefore --

THE COURT:  Let's assume that it's not -- he
wasn't mistaken about the law, let's say that there
were some facts that -- well, I suppose you would say
the same thing to my answer.  So your contention is
that it just doesn't matter, timing is not an issue
here, because your argument to the Court is that since
the first circuit didn't take the opportunity to say
this motion is untimely that the issue of timeliness
is no longer something that's relevant here and there
should be no discovery about it.  Is that right?  Is
that your position?

1          MR. ROCHON:  I would paraphrase it slightly

2     differently, if I may.

3          THE COURT:  All right, paraphrase it.

4          MR. ROCHON:  I would say that the plaintiffs,

5     having raised timeliness before the district court and

6     before the circuit court, and the circuit court having

7     considered the arguments of counsel and given clear

8     directive to the district court as to what to consider

9     in connection with this matter, that the issue of

10    timeliness is something that is relevant for

11    prejudice.  I'm not questioning -- I mean, the

12    plaintiffs can clearly be prejudiced by the passage of

13    time.  We don't think they are here.  But if they are,

14    we've never argued that they can't have prejudice

15    brought as a factor here.  And under the extraordinary

16    circumstances kind of wide array of things to consider

17    in connection with the (b)(6) motion that we have

18    filed, the district court clearly should consider

19    prejudice.  The idea that timeliness by itself should

20    be a basis at this juncture to deny the motion, I

21    think is problematic.  But especially where it's been

22    raised and found not to be persuasive by the first

23    circuit.

24          Moreover, the idea that one engages in

25    extremely intrusive, time consuming, costly discovery,

1    inevitably implicates attorney/client privilege, on

2    that factor is what, in fact, we are questioning with

3    our motion for a protective order.  And so I think we

4    always have to come back to the idea that the district

5    court will have the opportunity to consider

6    willfulness.  The district court obviously will do

7    what it wishes on timeliness.  We would suggest that

8    the district court would be advised pursuant to the

9    first circuit opinion to focus on those relevant

10   factors that have been laid out in the part of the

11   opinion that gives him direction, and that in any

12   event, the district court, I'm confident, does not

13   expect to have 30(b)(6) depositions conducted,

14   extensive interrogatories and requests for productions

15   of documents, claims of attorney/client waivers, on

16   the question of the time between '04 and '07 when the

17   motion was filed unless the plaintiffs are saying

18   identifying some specific prejudice from that, in

19   which case he'll focus on the prejudice.  Even if it

20   was a 9 month delay, prejudice is relevant.  You know,

21   again, it should come down to the factors.  Prejudice

22   is clearly a factor.  Just time in and of itself on a

23   (b)(6) motion, we would suggest not, and (b)(6) by its

24   terms does not put a time limit on the motion.  So

25   that this focus on the timeliness, I think it's a

little bit in apposite in the context of this case, in
particular, and most directly these discovery requests
in particular.

Your Honor, I want to focus, if I may, here's
what we're asking you to do. Let me cut to the chase
because time -- you had a chance to look at these
discovery requests. It's party, you know -- I don't
know what your visceral reaction was to them. When I
looked at them, I said I've never seen anything like
this in my life. These 30(b)(6) requests go beyond
anything I've ever seen propounded to an
organizational defendant to suggest that they can take
every contention, not in a complaint, but in a
lawyer's pleading on behalf of a client, and conduct
30(b)(6) depositions of the organizational defendants
represented by those lawyers is something I dare say
the Court hasn't seen. Hopefully, if you have, you've
issued a protective order against lawyers who sought
to have that kind of discovery. The cases don't
support it. The idea that discovery should be more
overbroad and intrusive in this sui-generous context
than it would be in another case suggests the
plaintiffs have sort of taken a punitive approach to
the defendants. Conscious of the potential animus a
court might feel for a willfully defaulting defendant.

1    The record would suggest that they're pursuing overly

2    aggressive discovery in the hopes that it will be

3    granted and that no defendant could comply with it,

4    then they will argue, oh, they're not really -- they

5    haven't really changed their stripes.  They can't come

6    up with a witness to talk about the impact of the

7    death of Arafat on the Palestinian Authority and,

8    therefore, they're not cooperative.  That's where we,

9    I guess, get the psychological, the psyche, of the

10   entire Palestinian people in the body of the

11   organizational defendant, and have it explained how

12   they felt about that.  It's absurd.  I apologize for

13   using such a sharp word, but it is absurd to think

14   that that kind of request can be tolerated.  We should

15   not have to go through the posture of going line by

16   line through these requests and examining them for

17   reason.  This Court should grant the protective order

18   as to them.

19            THE COURT:  Mr. Rochon, I just want to -- I

20   find your argument understandable, but it sounds to me

21   as if you're arguing the motion dealing with the

22   30(b)(6) notice, and we're engaged on 530 which deals

23   with the interrogatories and the request for

24   production, so I just thought I'd --

25            MR. ROCHON:  He should have tackled me then.

1    It's his motion.  I came up here because this was the

2    first -- I must have misheard the Court when you were

3    laying out what you wanted to do and in what order.

4    This had been the first filed and so I thought it was

5    going to be the one you heard, and I directly

6    apologize.

7          THE COURT:  Well, maybe I'm wrong.

8          MR. ROCHON:  Well, no, I doubt --

9          MR. WISTOW:  Your Honor announced it would be

10    the motion running against us.

11          MR. ROCHON:  530, your Honor, and the motion

12    for protective order on the 30(b)(6) deposition is

13    548.  It was filed after.

14          MR. WISTOW:  In any event, I don't want to

15    take advantage of that mistake.  I don't have any

16    objection to converting the first motion to this

17    30(b)(6).  In fact, I was very puzzled as to what we

18    were talking about, now I understand.  I don't have a

19    problem.

20          THE COURT:  I think given the investment that

21    we've made, we'll do that.  Since there's no objection

22    by the plaintiffs, as I understand.

23          MR. WISTOW:  There is not, your Honor.

24          MR. ROCHON:  I'm sorry.  I -- I think that

25    other one won't take nearly as long as this one.  This

1    is probably your priority this morning, anyway.

2           THE COURT: That's fine, Mr. Rochon. It's

3    not a big problem. We can --

4           MR. ROCHON: Well, it's an embarrassing

5    problem for me, your Honor, and I apologize.

6           THE COURT: So we'll continue with your

7    argument, but so the plaintiffs know what we're doing,

8    and so the record is clear, I'm now saying that the

9    motion that we are addressing is going to be

10    defendants' motion for entry of a protective order

11    regarding plaintiffs' notices of depositions pursuant

12    to Federal Rules of Civil Procedure 30(b)(6). This

13    motion is document number 548, and then I will be

14    hearing the plaintiffs' opposition to that motion.

15           MR. WISTOW: That's fine. I just want to

16    make it clear that your Honor was clear, and I sat

17    befuddled wondering whether we were rearguing the

18    matters from yesterday, frankly, or anticipating. But

19    it's no matter.

20           MR. ROCHON: Thank you, Mr. Wistow, and thank

21    you, your Honor. I take it now it's more clear why I

22    was focusing on the newly issued 30(b)(6) notices and

23    suggesting that vis-a-vis the motion that I am

24    arguing, that they suggest a level of impropriety

25    regarding the management of 30(b)(6) notices. And the

reason I was focusing on the supposed rationale or the

willfulness discovery the plaintiffs seek is because

the plaintiffs have argued in connection with the very

30(b)(6) matter that those inconsistent statements

justify in part the willfulness discovery they seek,

as they argued them as to the Qurei and the Prime

Minister deposition. I was not seeking to reargue

yesterday's motions, but showing how these (a) relate,

and (b) that the rationale for the discovery as to

this one as to those others is not supported. And

again, as to the issues of timing and many of these

issues do run through the papers and so I can

understand why everyone was mystified on the one hand,

but people were loath to interrupt me, which I

appreciate on the other hand.

THE COURT: Mr. Rochon, with reference to

your argument about it's agreed with the plaintiffs'

contention that defendants have given three, what the

plaintiffs believe, different explanations as for the

reason for the willful default. I believe in one of

your memoranda you indicate that the plaintiffs were

quoting language from the first circuit opinion, and

the implication is that the first circuit attributed

to the defendants a statement the defendants didn't

make. This relates to counsel, that they -- I don't

1    have the particular line in front of me, but my memory

2    is along the lines that the first circuit said that

3    defendants were mislead by their counsel, or not

4    well-served by their counsel, and that was the reason,

5    and the response that I see back is, from the

6    defendants, well, we didn't say that.  The first

7    circuit said that.  Is that what you're suggesting,

8    the first circuit got it wrong in its characterization

9    of what the defendants were saying about why there'd

10   been a willful default when the first circuit got the

11   impression that at least part of the reason for the

12   willful default was the legal advice the defendants

13   were getting from their then counsel at that time?

14             MR. ROCHON:  Your Honor, what I'm suggesting

15   is that the first circuit was never presented with an

16   issue regarding attorney/client waiver, or whether or

17   not it occurred here.  There's language in there that

18   refers to based on advice of counsel, and that's upon

19   which the plaintiffs rely for their argument in part

20   on waiver of attorney/client privilege.  That issue

21   was never briefed to the first circuit by either side,

22   and so the statement in the first circuit opinion that

23   the actions of the PA and PLO were based on advice of

24   counsel, I would suggest to the Court was not, I

25   think, of reflect of any kind of ruling or

1     consideration by the first circuit and not a notion

2     that there'd been any sort of waiver.  We had not

3     argued that there was an advice of counsel in our

4     motion to vacate.  We did not raise that as the

5     reason.  We said the defendants willfully defaulted.

6     We did not blame counsel for that.  The plaintiffs

7     have picked up --

8          THE COURT:  Is that the defendants' position

9     now that the defendants do not in any way say that the

10    responsibility for the willful default is attributable

11    to their prior counsel?

12         MR. ROCHON:  No.  We have referenced who

13    prior counsel was in our papers.  We have not relied

14    on an advice of counsel defense.  We have not said the

15    default was the advice of counsel.  Conscious

16    decision.  Counsel consulted with client.  We are not

17    raising that as the basis for our motion to vacate.

18    We didn't do it before Judge Lagueux in our papers.

19    We didn't argue advice of counsel on appeal.

20         THE COURT:  Defendants are not blaming their

21    prior counsel for the decision to willfully default in

22    this case?

23         MR. ROCHON:  No.

24         THE COURT:  They are not?

25         MR. ROCHON:  Double no.  We are -- and the

1    first circuit referenced counsel.  Counsel was a
2    lightning rod for the district court, I think.  It's
3    fair to say the district court has mentioned that
4    counsel by name regarding the decision and how the
5    district court has felt about the announcement of the
6    decision by that particular counsel.  In our motion to
7    vacate, we have said that the decision to default was
8    willful but should be excused.  We did not say that it
9    should be excused because of the product of
10   ineffective legal advice.  That's a third way of
11   putting it.  And we've been clear about that.  The
12   statement, therefore, in the first circuit opinion is
13   the plaintiffs are taking out of context to justify an
14   array of consequences that were never presented to the
15   first circuit, and certainly there's no decision
16   saying that we've waived attorney/client privilege.
17   We have not discussed in our papers private
18   communications between predecessor counsel and the
19   client.  They can parse through our papers.  We've not
20   reflected anything about those conversations.  We have
21   not waived privilege.  The plaintiffs' discovery, in
22   and of itself, even absent the waiver, would almost
23   compel one to respond to it, because it explicitly
24   asks, of course, for the reasons for decisions.  They
25   have a whole section of the 30(b)(6) that talk about

interaction with counsel. The whole area of the
timing of the motion is replete, of course, with
potential attorney/client's advice, and therefore,
despite the fact that we have not relied upon
communications between predecessor, let alone current
counsel and the clients, the plaintiffs are trying to
get in there, and if we don't produce people on a
claim of privilege, they will say we're not
cooperative. If we do and they answer questions,
they'll probably say waiver. It's an instance in
which we have suggested that much of the discovery is
trying to get the defendants in a position where they
appear not cooperative, even though the track record
of litigation of our clients, in other cases, these
same ATA cases is clear. We've been litigating and
going through discovery elsewhere. Took the case in
Florida from soup to nuts discovery, 'til just before
trial, no problem. In fact, the Court was critical of
the plaintiffs' counsel. Another case in the District
of Columbia, we're going through discovery. Are there
discovery spats? Yes, there are always discovery
spats. We took the case through the Knox discovery,
and Knox after the motion to vacate was granted, we
took it all the way through discovery regarding
assets. The plaintiffs were very aggressive regarding

1    our client's assets.  We went through discovery.  The

2    Court found we had complied with it.  But here they're

3    going to try to create, and argue falsely, an image of

4    defendants who haven't changed their posture.  They

5    want to focus in their discovery on the commitment to

6    litigate as expressed in 2007, so the Prime Minister's

7    deposition was, you know, who's in charge of the

8    commitment to litigate?  And if you go through his

9    deposition and read through it, they went over that,

10   and over that, and over that.  The proof of the

11   pudding, they say, is in the tasting.  We have three

12   years of litigation before multiple courts in this

13   country showing a commitment to litigate these cases.

14   We'll litigate this one.  Frankly, we're eager to.

15           THE COURT:  All right.  Mr. Rochon, have the

16   defendants argued that they didn't understand the

17   American legal system at the time of the default?

18           MR. ROCHON:  Yes.

19           THE COURT:  Would not their lack of

20   understanding be connected to the information being

21   provided by their then counsel?

22           MR. ROCHON:  It may have been but may not.

23   It doesn't matter because we haven't said that they

24   were mislead by their counsel.  We said that they

25   lacked an appreciation.  If one learns a fact, or

believes something to be true, it doesn't matter
whether one knows that because you've read it in the
newspapers, because you come with a certain
preconception, or learned it from counsel, the fact is
we have said that our clients misapprehended the
aspects of this country's legal system.

If I may, your Honor --

THE COURT: Give me an example. What did
they misapprehend about an aspect of this country's
legal system?

MR. ROCHON: I want to answer your question
directly, and I will first, but I'd like to -- after I
give you the answer directly I'd like to give a little
background. The idea that the Palestinian Authority,
which came into an existence about a year or year and
a half before the shooting case at issue here could be
hailed into the United States courts for litigation of
a matter in which a member of Hamas had killed a
person to thwart a peace process undoubtedly was
somewhat surprising to the nascent government that
hadn't built any institutions yet, and that's the
background I was going to give the Court. Some
historical context we have suggested is appropriate
here. The Palestinian Authority didn't exist in '92,
'93, '94. It comes into being roughly, not long

1    before this very incident at issue here.  The PLO, of

2    course, was not an entity that had extensive

3    participation in U.S. courts other than the one case,

4    Klinghoffer.  So you don't have a country at all.  You

5    don't have -- you have a country -- you know, it's as

6    if, if I may, in 1778, the United States had been

7    hailed into France in order to contest litigation

8    regarding something that had happened in the United

9    States, and before the constitutional congress had

10   concluded and people were trying to figure out what to

11   do, and the government was developing its

12   institutions, I imagine there would have been some

13   dumbfounded reactions to that.  Our client, hopefully,

14   in 250 years, will have the kind of developed

15   institutions we have, but it sure didn't have them

16   immediately after it was formed, and it should not

17   come as such a surprise to anyone, plaintiffs or the

18   U.S. courts, that it took some time to develop.  This

19   wasn't a country that -- China was excused from an

20   intentional default.  It's been in existence at least

21   since '47.  I probably have the date not quite right

22   but the forties.  Communist China, I guess.  We don't

23   call it that anymore, but it had a default case upon

24   which we've relied greatly, Jackson, in which it

25   didn't recognize the sovereignty of the United States

over it. It didn't recognize that it belonged in U.S. courts. Thought that it shouldn't be there. Made those decisions willfully, and was completely excused. Our clients, on the other hand, within a very short period of time, at least vis-a-vis China or these other countries that have dealt with U.S. courts, came to understand its obligations. Why that understanding in this area is because Ramsey Clark had some role in it. It's something we've never relied on. And it frankly, to us, seems sort of logical.

Now the plaintiffs want to do a whole discovery in this sort of state building, an institution building, and how this realization came to come up. But let's stand back and think. A man is killed in a tragedy by these Hamas individuals, a low level cell. It's an accepted fact it was Hamas. I'm not taking any contested fact, to thwart the peace process, which is what the plaintiffs' experts testified to in Washington, DC, Reuven Paz, their expert, said that's what Hamas was doing at the time, the very peace process that created the PA, and then four years later the PA is hailed into Rhode Island to litigate that case. The idea that somehow they thought they didn't belong here is not, to me, at least illogical. You may agree or disagree. Judge

Lagueux may agree or disagree, and the first circuit may agree or disagree, but the notion that we need extensive discovery, intrusive discovery into all of those issues, which can plainly be considered and argued, and have already been, is, I would suggest to the Court, an unreasonable use of the discovery process in connection with a 60(b)(6) motion.

Again, we always have to come back to the core issue of the discovery requests, and whether they bespeak reasonableness in this regard. I want to refer to some specifically because when you listen to the arguments about the factors that are relevant here, prejudice, meritorious defenses, willfulness or not, the plaintiffs want to have, for instance, a witness prepared to discuss the organizational and institutional structures and individuals within the PA responsible for monitoring and making decisions regarding the Israeli proceedings. Israeli proceedings. I'm reading from page 16 of the notice to the Palestinian Authority. Well, what are these Israeli proceedings? This seems like it might be a reasonable request. Israeli proceedings, quoted on page 19, shall mean and refer to and include collectively all legal proceedings brought by or against the PA and/or PLO in any Israeli court at

anytime. The plaintiffs, and I'm on page 16(g), now
here's something that goes right to the heart of this
motion. They want to get a witness that we have to
prepare and be deposed on the organizational and
institutional structures and individuals within the PA
responsible for monitoring and making decisions
regarding the Bucheit proceedings and regarding the
Danish road contractors' proceedings. That's
laughable, your Honor.

THE COURT: Mr. Rochon, I'm going to give you
8 more minutes, so adjust your time.

MR. ROCHON: Yes, I will. I cannot go
through in eight minutes all of the unreasonable
requests here. The plaintiffs have propounded them
and have a litany of them that simply go to
contentions, and I would not want to sit down without
referencing the Court to two specific cases. One is
the Lapare (Phonetic spelling) case, which we cite in
our papers on this motion at page 7 where the Court
found that the plaintiff's 30(b)(6) notice was unduly
burdensome because it asked the defendant to, and I
quote, "Produce a representative to testify about
every single allegation of conduct by defendant in the
entire petition, and all documents relating to the
conduct of its agents". Similarly, later in our

papers on page 23, we direct the Court to several authorities that have criticized the very use of these 30(b)(6) notices being used here, the very same approach that's being taken here, and we quote at some length on page 23, commentator about the misuse of 30(b)(6) deposition, and the commentator says, "Aggressive litigants and a few short-sited courts have bent this device into a form of 'contention discovery' in which an entity may be required to respond in impromptu oral examination to questions that require its designated witness to state all support and theories for myriad contentions in a complex case".  I won't go on with the rest of the quote.  It's in our papers.  That's what's happening here.  Lawyers have made arguments in support of a motion to vacate.  On the plaintiffs' theory, tomorrow we'll get a deposition notice for someone from my client to come to court to defend everything I just said because what's in our papers from 3 years ago is no different than me today.  It's a lawyer arguing on behalf of a client to a court.  The plaintiffs now want to have contention 30(b)(6) depositions as to everything that was said in our motion to vacate. That turns civil discovery upside down, and the notion that -- in the context of a motion to vacate that

1    we're going to conduct depositions that way is

2    entirely unreasonable. Our request to the Court is

3    that you grant our protective order. In the normal

4    course, the best thing to do then is tell the

5    plaintiffs draft one that's more reasonable. We can't

6    do that here because we have a deadline. We have

7    suggested in our papers appropriate topics for

8    30(b)(6) depositions. We're not trying to escape them

9    altogether. We've made that clear in our papers.

10    We're trying to have them be on reasonable topics, not

11    conducted by contention where our witnesses need to

12    explain our arguments, and to not go into unrelated --

13    I haven't even gotten into the enforcement discovery

14    that's in here. Once again, an entire section of

15    these 30(b)(6) going solely towards the enforcement

16    and collection matters, which have nothing to do with

17    the motion to vacate that's before the district court.

18    This discovery, as in all the new deposition notices

19    that were served yesterday, is occupying the time but

20    it's not going to help Judge Lagueux decide this

21    matter. It's an opportunity for the plaintiffs to try

22    to argue we're not being cooperative.

23        We'd ask the Court to grant the motion for

24    protective order, tell the plaintiffs to sit down and

25    issue with us a new one, along the lines that we've

propounded on prejudice, on meritorious defense, on foreign policy impact, so that they can have an appropriate institutional deposition. As to their new notices filed yesterday, which are procedurally improper, and go to additional areas that have no relevance here, obviously we would file a motion today to seek a protective order as to those, but we haven't had time. We've been a little busy, but this is creating a log jam, and I would suggest to the Court, I started yesterday telling you that they're trying to derail this litigation. They keep on saying they're in a hurry. They're not acting like it. Propounding 130 deposition topics for a 30(b)(6) and seven new deposition notices, including brand new 30(b)(6)'s on the eve of the close of discovery, is not conduct that's designed to resolve the discovery in this matter, in a timely manner, as directed by the district court. Thank you.

THE COURT: Mr. Rochon, before you leave the podium, would you address the issue of if the Court allows 30(b)(6) depositions the location where those depositions should take place?

MR. ROCHON: Yes, an institutional defendant should be deposed generally in the place where it conducts business or is located. That's what is

1     generally done.  My client has been deposed in other

2     litigations, in Florida cases, 30(b)(6) depositions.

3     We've had 30(b)(6) depositions in a case in United

4     States District Court for the District of Columbia,

5     our case called Kleinman.  Wasn't a vacater.  It's

6     just -- it had never been a default.  Other

7     30(b)(6)'s, of course, have been conducted at the

8     location where the client conducts business.

9            In order for individuals to travel to the

10    United States, if they're traveling as a PLO

11    representative, which by definition these people would

12    be doing, the likelihood of getting a visa by November

13    17th or 18th, zero.  The United States doesn't have

14    people come to the United States, and they have to say

15    why they're coming here.  You lie on a visa

16    application to come to the United States, you're never

17    getting anywhere.  So when you say I'm here to testify

18    on behalf of the PLO, I would rhetorically ask how the

19    United States office that processes those items in

20    East Jerusalem would react.  It is -- many of these

21    people are either unable to travel or it's unwieldy.

22    It's also expensive and inappropriate.  In order to

23    prepare the witnesses, we need to go over there, and

24    frankly the plaintiffs have noticed all of their own

25    depositions over there, in any event.  The ones we got

1    yesterday all say that they're going to be deposed

2    there.  The fact is the parties are going to be

3    overseas for the next three weeks.  We are.  We would

4    ask the Court, and it's very important, I think, to --

5    in fact, if we were here doing these 30(b)(6)'s next

6    week, which is the only time we can do these really is

7    next week.  I hope the Court understands, the time is

8    running out.  The plaintiffs new notices have eaten

9    the air out of the next two weeks.  So if you grant

10   our request, narrow these appropriately, we can have

11   witnesses ready to go as soon as Monday on some of

12   these issues, and next week.

13           THE COURT:  Well, let me be sure I understand

14   what you're asking me to do.  At one point it sounded

15   to me as if you were asking the Court to drastically

16   reduce the topics for the 30(b)(6) witnesses.

17           MR. ROCHON:  I am.

18           THE COURT:  In effect, direct, say these are

19   the topics.

20           MR. ROCHON:  Yes.

21           THE COURT:  And initially notices and do the

22   depositions, and then somewhat later, I understood you

23   to say that you wanted me to identify the areas and

24   direct the plaintiffs to issue new 30(b)(6) notices

25   identifying the topics within the areas I've

1    identified.

2              MR. ROCHON:  Your Honor, I said the normal

3    course that's what would happen.  We just don't have

4    time for the normal course here.  In the normal

5    course, I would have come to you today and said grant

6    our protective order and be done with these outrageous

7    requests, tell them to do new ones.  But then we would

8    be doing discovery in January instead of having a

9    hearing.  Instead, what we did was, in our view, at

10   least, take a more reasonable approach and lay out

11   areas in our opposition as to which 30(b)(6) should go

12   forward and say we're prepared to put -- have people

13   ready on those.  The plaintiffs could have taken us up

14   on that offer before today.  They haven't.  They want

15   to win their -- they want to win this motion, but I

16   would suggest to the Court that you accept our

17   proposal, it's in our papers, direct that depositions

18   occur along those lines, we'll be ready to go next

19   week, and then we might finish discovery in a timely

20   manner, especially given what the plaintiffs have

21   chosen to do with issuing these late notices of their

22   own.

23             THE COURT:  All right, Mr. Rochon.  Thank

24   you.

25             MR. ROCHON:  Thank you.

1          THE COURT:  Mr. Wistow.

2          MR. WISTOW:  Thank you, your Honor.  There is

3   no doubt that the plaintiffs have initiated a great

4   deal of discovery.  The justification for that is

5   obvious.  This is not a slip and fall in a supermarket

6   where we're trying to find out how long the banana has

7   been on the floor.  The issues that have been raised

8   by the defendants in this case, not raised by the

9   plaintiffs but by the defendants since they want to

10  get vacatur of a judgment that's been in place for

11  over six years and they've raised issues that are

12  absolutely sui-generous.  They've described them

13  themselves, the effect on international relationships,

14  the peace process, the economics of Palestine, their

15  inability to answer these cases.  These are remarkable

16  things that we have to address and be able to defend

17  against.  They're even asked a great deal of discovery

18  so that we can defend them.

19          What's also very remarkable about this case,

20  your Honor, is the absolute willingness of the

21  defendants to say that courts have misconstrued what

22  their positions are.  We heard yesterday that when

23  courts have not carefully studied the situation, and

24  in providently enter orders.  Judge Lagueux on this

25  question of willfulness, he's clear in his order.

1    They try to explain perhaps he wasn't focusing

2    correctly.  I don't really know what they're saying on

3    that, and I'm going to address the willfulness issue

4    in a moment.  But it's astonishing to me to hear them

5    say that advice of counsel is not an issue in this

6    case.  Here's what the first circuit said.  They said,

7    on page 82, as the defendants now concede, the

8    decision to stonewall in this fashion was a deliberate

9    stratagem driven by the advice of their then counsel

10   and their unwillingness to recognize the authority of

11   the federal courts.  Now, that is clear.  That is

12   unambiguous.  That is the statement of the first

13   circuit.  They're free to argue that the first circuit

14   doesn't know what they're talking about.  But the only

15   way for your Honor to second-guess the first circuit,

16   if you want to do that, is to sit and read all their

17   submissions to the first circuit.  The first circuit

18   read everything they said and came to this conclusion.

19   I don't even know if your Honor chose to sit and read

20   all their submissions to the first circuit, if you

21   could come away and say, you know, I don't agree with

22   the first circuit.  That's not what they did.  I'm not

23   suggesting you can't, but I mean, it does seem like a

24   problem.  That is what the court said.  That goes to

25   this very narrow issue that we're talking about of the

1   attorney/client privilege.

2          What they've agreed to -- I'm trying to sum

3   up what they've agreed is relevant.  They've agreed

4   that questions of prejudice to the plaintiffs are

5   relevant.  They've agreed -- when I say agreed, I'm

6   talking about in their papers here.  They've agreed

7   that the merit existence vel non of a meritorious

8   defense is relevant.  They've agreed and suggested and

9   urged that international relations in the peace

10  process is relevant.  They've acknowledged that the

11  defendants' ability and willingness to participate in

12  discovery and participate on the merits is relevant.

13  What they argue, and what they're trying to cut down

14  the 30(b)(6)'s are the following issues, which I'd

15  like to address.  Willfulness, timeliness, of the

16  motion to vacate, the so-called discovery we're

17  getting into in the collection actions, so-called,

18  which is absolutely preposterous.  We're not trying to

19  do that, and I'll explain at length.  And they're

20  saying the defense of other lawsuits, of other

21  lawsuits that we're trying, for example, the Bucheit

22  case that's mentioned.  They're saying that has no

23  relevance.  And I'd like to explain why all of these

24  things are relevant, why they're vital, why the

25  defendants themselves have made these central issues

1    in the case.

2         I'd also like to say, your Honor, that, you

3    know, in drafting the 30(b)(6), I'm not going to tell

4    you that I've had years and years of experience

5    drafting 30(b)(6) notices regarding to the effect of

6    international relationships and the peace process in

7    the Middle East, and all of these things that have

8    been raised by them.  But maybe I didn't do as careful

9    and as meticulous a job as I should have.  By the way,

10   I don't want to concede that.  I'm going to address

11   the particulars in a moment.  But I ask your Honor to

12   understand what it is the plaintiffs are trying to

13   deal with.  We're trying to fend off a motion to

14   vacate a default judgment that's been in place for

15   over six years, and during those six years there's

16   been lawsuits all over the United States, lawsuits in

17   Israel, lawsuits in Ramallah, in the West Bank, Syria,

18   Egypt.  There's been fantastic efforts involving this,

19   and what the defendants want to do is say, you know,

20   what is this?  I've never seen discovery like this.

21   This is incredibly broad.  Well, yes, I've never seen

22   a case anything like this case remotely, and I

23   respectfully suggest that the Court hasn't, either.

24   I'm not sure any Anglo American court has ever seen

25   anything quite like the issues that have been raised

1    in this case.

2            Now, I would point out, your Honor, they're

3    talking about undo burdens and overbroad.  If you look

4    at each one of our little separate categories, and if

5    you sub-categorize them, each one of those is

6    approximately $1 million of the judgment.  There's

7    about 120 odd million dollars.  It's closer to 130

8    with the interest at stake here, so looking at the

9    size, not just the size, the complexity, we're

10   entitled to ask many many questions.  What I would

11   really urge your Honor to do, before I get into this

12   issue of willfulness, what I did, in conjunction with

13   co-counsel, in preparing the 30(b)(6)'s, as I

14   anticipated, there would be all kinds of problems by

15   the defendants, so I did the best I could, the level

16   best I could, to actually annotate in the request

17   itself why the subject matter was relevant in the

18   case, and rather than burden the Court with going down

19   through all of these items, what I would ask the Court

20   to do, respectfully, before ruling, is look at the

21   requests that we made in the 30(b)(6), the particular

22   items, and in looking -- we actually literally say for

23   most of them in the request why they're relevant.  We

24   cite to the place.  Some of them are statements made

25   by counsel in briefs.  Some of them are statements

made by counsel in briefs relying, for example, on the
declarations of Fayyad, or Abdul Rahman, or other
factual representations.  The simple solution to that,
and I implore your Honor, is to please look at the
particular -- and, of course, your Honor will, the
30(b)(6)'s themselves and see whether or not they're
self-explanatory.  The vast majority actually have
footnotes to where the issues have come up.  There are
some where I didn't put footnotes because I thought it
was so obvious what the relevance was that it wasn't
necessary.  You'll see those, for example, where we
talk about the PLO's involvement in other litigation
before this.  One of the things they've constantly
been saying in this case is, they say the PA is a
nascent organization.  It didn't have the structure to
deal with all these things, and they forget, we have a
default judgment.  Not even as to just the PA but the
PLO.  And the PLO and the PA were represented by the
same counsel.  The judgments entered at the same time.
Everything was in pari materia.  We think it's
enormously relevant to show however nascent the PA was
in terms of being a new government.  The PLO had been
in existence from the sixties.  The PLO has been
defending cases, most famously, the Imel Klinghoffer
case, where terrorists took an American citizen in a

1    wheelchair and threw him off the Achille Lauro.  They

2    litigated that case, the PLO, and they come in here

3    and they tell you about, well, we really didn't

4    understand how the system worked, et cetera, et

5    cetera.  That's a little bit disingenuous, and frankly

6    we want to show that to the Court.  These guys knew

7    what they were doing.

8          On this issue of willfulness, which we keep

9    going back and forth on, what they're asking you to do

10    is, in effect, enter a summary judgment that

11    willfulness is not an issue in this case.  They want

12    you in the guise, effectively in the guise of a

13    discovery motion to say, look, that's not in the case.

14    It's not in the case.  That is their argument.  Well,

15    they're confronted by Judge Lagueux's order of April

16    1, 2010, which we argued extensively.  I'm not going

17    to read it again.  Judge Lagueux couldn't be more

18    categorical in saying that he wanted to hear about it.

19    Why did he want to hear about it?  The so-called

20    willfulness, it's not are you pregnant or are you not

21    pregnant, in that wonderful metaphor or simile, I'm

22    not sure which it was, that was used by Mr. Rochon.

23    There are degrees of willfulness.  There are degrees

24    of willfulness.  The first circuit has said, flat out,

25    in this case, in this case, on page 83 of their

decision, the decision to grant -- and I'm quoting:
"The decision to grant or deny such relief, meaning
60(b)(6), is inherently equitable in nature".  The
Court should sit and review the totality of the
circumstances, including, in the quote, holistic
approach, every item that the Court thinks is
relevant.  They want to show that -- they don't want
to even talk about willfulness because they know how
bad ultimately they're going to look, and we want to
show how bad they look.  For example, one of the
things that we want to prove is the reason they
finally woke up and said, oh, we're going to defend
this case, we want to vacate it.  The reason they did
that is, (1) there was a default judgment in the
district court.  That default judgment was affirmed on
appeal by the first circuit.  The United States
Supreme Court refused to take certiorari.  They wrote
to Secretary of State Rice, Fayyad wrote to her,
explained all of these circumstances, asked her to --
excuse me, President Abbas, explained, asked her to
intercede.  She said no, this is a valid judgment,
you're going to have to deal with it.  Suggested even
that they might want to sit down and consider settling
this case, and that as far as she was concerned the
documents will show this was a valid and enforceable

1    judgment against the PA and the PLO.  Wow, all of a
2    sudden they realized maybe this isn't such a good idea
3    what we've been doing, and we'd like to show that, and
4    it wasn't --
5        THE COURT:  But when you say that you'd like
6    to show that, Mr. Wistow, I don't think they dispute
7    that.  I mean --
8        MR. WISTOW:  Well, they do dispute that, your
9    Honor.  Forgive me for interrupting.  They say --
10       THE COURT:  What do they dispute?
11       MR. WISTOW:  They say that this was a
12   Nascent organization.  We really didn't understand
13   what was going on.  For example, what was the first
14   circuit referring to when they said that the decision
15   was based on advice of counsel?  What I'm suggesting
16   -- I'll tell you exactly what I'm referring to.  If
17   your Honor look at the declaration of Abdul Rahman,
18   for example, the declaration of Abdul Rahman, he talks
19   about nascent government.  If your Honor looks at the
20   declaration of Fayyad, and I'll read you exactly what
21   he says.  This is a declaration that they filed in
22   support of the motion to vacate the default.  It's
23   presently part of the papers, and what he says is: It
24   is important to the PA's role in the international
25   community to participate in the legal process -- this

is paragraph 13 of his declaration -- it is important
to the PA's role in the international community to
participate in the legal process even when it is
process brought in the United States for actions by
others that occurred far from the United States. The
importance of this was not fully appreciated by the PA
government as a whole until recently. Now we can act
on that understanding and we therefore seek to contest
this litigation. I would like to show your Honor that
that is a cynical misrepresentation of what happened,
that they chose not to -- because they didn't
appreciate what was going on, they did appreciate what
was going on and didn't care because they didn't think
they were going to be subjected to an actual effective
collection and that's what woke them up.

   In any event, your Honor, in any event, what
--

   THE COURT: Well, the plaintiffs' contention
is that it was the realization by the defendants that
they were going to be subjected to an effective
collection.

   MR. WISTOW: Exactly.

   THE COURT: That caused this change of
course.

   MR. WISTOW: That's exactly right, that's

exactly right, and the timing of the documents
demonstrates that.  I'm not asking your Honor to find
that as a matter of fact this morning the way my
brother says here, listen to my argument and decide
that we're acting in good faith, and we did -- I'm not
asking your Honor to make those decisions.  It's
inappropriate.  That's what Judge Lagueux is going to
be doing.  But I tell you flat out that the documents
we have show, show, that the efforts of the PA and the
PLO to get out of this only came -- when I say to get
out, I'm talking about the motion to vacate, for
example, only came after they were told by Condoleezza
Rice in writing that, hey, I can't help you.  There's
a valid enforceable judgment.  By the way, they were
writing to complain about the effect of the
injunctions that were entered by this Court, et
cetera, et cetera, et cetera.  But whatever it is,
your Honor, you know, are we going to be second
guessing Judge Lagueux's order?  I mean, Judge
Lagueux's order says what it says, and I think
correctly says what it says.  I don't blame them at
all for saying what they want to say.  They want to
say, look, everybody knows we defaulted.  Everybody
knows that.  The first circuit knows we defaulted, and
did it willfully, therefore, that's not an issue in

the case anymore.  Take it away.  If I were in their
shoes, I would do the same thing, because it makes
them look so bad, and the first circuit left it open,
by the way.  All of us have read the first circuit's
opinion about 15, 20, 30 times, perhaps.  The first
circuit made it very clear that if hearing all this
the Court decided that the willfulness alone was
sufficient.  Not per se, but weighing everything else,
the Court could sustain the judgment, and I think
that's in part the reason the Court wants to know,
sitting as a court in equity, do these guys come in
with clean hands or don't they.  It's not my
representation to you that the 60(b)(6) is an
equitable proceeding.  The first circuit said it in
this case.

Now, and your Honor knows when a court
sentences somebody, there are degrees of fault.  It's
not just a question did you do the act.  Did you do
the act.  Motivation is important.  Well, let's put it
this way, that's what we say, that's what Judge
Lagueux seems to indicate, in equity cases, the clean
hands or unclean hands of a proponent are important.
All I'm asking, your Honor, I'm not asking rule that
we win on willfulness this morning.  I'm asking you
please enable us to help prove how bad and how cynical

1    the acts of the PLO and PA were.

2            Now on the question of timing, timeliness, I

3    don't know how they can argue to this Court without

4    smiling that timeliness is not a factor.  The first

5    circuit said on page 81 in this case, and I quote,

6    "This appeal, the holding of the first circuit is very

7    very simple and very narrow, and here's the holding:

8    "This appeal turns on the question of whether there's

9    a categorical rule that a party whose strategic

10   choices lead to the entry of a default judgment is

11   precluded as a matter of law from later obtaining

12   relief from that judgment under Federal Rule of Civil

13   Procedure 60(b)(6).  The district court thought that

14   precedent required it to apply such a categorical bar,

15   and on that basis it denied relief.  We conclude that

16   no categorical bar applies."  That's it.  That's the

17   holding of the case.  The Court went on to explain in

18   the equity proceeding to vacate it that they ordered

19   to be held what are the factors that are important,

20   and they said, and I quote, on page 18: "A variety of

21   factors can help an inquiring court to strike the

22   requisite balance.  Such factors include the timing of

23   the request for relief."  Then it goes on and gives

24   the rest of the list.  Now, I'm surprised, I'm

25   surprised that my brothers haven't argued that there's

been no showing of prejudice. We can't make a showing
of prejudice as a matter of law because we did argue
prejudice in front of Judge Lagueux. He agreed there
was some level of prejudice, but he didn't rule on it.
And the circuit actually commented on it. They said
although the Court made a passing mention of potential
prejudice, it did not assess the mix of relevant
factors, but rather set aside factors other than the
defendants' strategic choice labelling such other
factors not determinative. So what the circuit said
is, look, there's a whole mixture of things that need
to be considered. We think Judge Lagueux was in
error. He didn't consider these other things. He
considered one thing only, and he applied a per se
rule which we not allow, we will not allow.

By the way, the plaintiffs asked the circuit
to review the entire record de novo to sustain Judge
Lagueux, and they refused, and here's what they said,
and this is really important in understanding what
Judge Lagueux's job is at this point, and I quote from
page 87, and forgive me, your Honor, I don't like to
keep quoting from -- I know how dreadful it is but
it's so central. "As a fallback, the plaintiffs
invite us to review the record de novo and affirm the
district court's order on the alternative ground that

1    the equities weigh in their favor".  We decline this
2    invitation.  Appellate and trial courts have different
3    institutional competencies.  Here the parties
4    competing proffers must be sorted and weighed.  The
5    district court enjoys a long familiarity with the case
6    and that court's fact finding capabilities put it in a
7    better position to construct the fact specific balance
8    that Rule 60(b)(6) demands.  That's what this is all
9    about.  The suggestion that the court, the appeals
10   court sat and looked at a judgment that was entered in
11   July of '04, a motion to vacate two and a half years
12   later and found as a matter of law, fact, mixed
13   question of law, in fact that that was timely, is
14   patently absurd.  That did not happen, whatever.  That
15   issue is fully open to the court.  And I suggest that
16   it really, if we're allowed to get into the question
17   of timeliness on the discovery, and if by some
18   happenstance Judge Lagueux decides it's not relevant,
19   yes, we've wasted some time, we spent effort on the
20   issue of timeliness, but we're not prejudiced further
21   by not being able to make our case to Judge Lagueux.
22   And when you talk about time spent on a case, the
23   additional time that would be involved in timeliness
24   that absolutely palls -- or pales, I guess, into
25   insignificance.  When you think about the efforts that

1    had been made by the plaintiffs in this case to

2    collect on the judgment over time.

3          Now, your Honor, I've tried, I tried with

4    Fayyad in the deposition in Jerusalem to get answers

5    to some of the questions that we're addressing here

6    and to some -- first of all, what I'd like to do, your

7    Honor, is on the question of timeliness, to show you,

8    with the Court's permission I'd like to hand up to you

9    a document that's been referred to over and over

10   again, and that's the letter in June of 2005 from

11   Prime Minister Fayyad to Condoleezza Rice, and I think

12   it will inform the Court as to some of these issues.

13         THE COURT:  You may do so, Mr. Wistow.  I

14   know it's in the record.  I've seen it before but it

15   will save me from hunting for it again.

16         MR. WISTOW:  And I want to bring this up in

17   several contexts, but most immediately and most

18   importantly the question of timeliness.  This is a

19   letter of June 18, 2005.  It's 2 and a half years, 2

20   and a half years before the motion to vacate.  "Dear

21   Dr. Rice, I am writing to request your immediate

22   assistance in addressing what has become a serious

23   obstacle to the continued effective participation of

24   the PNA in the Middle East peace process and the PNA's

25   role as a strong and viable partner of the United

1    States of America and the Government of the State of

2    Israel.  He goes on and he explains in excruciating --

3    strike excruciating.  In some detail that he has full

4    knowledge of everything that's been going on, and has

5    gone on, in the American case, the Ungar case, named

6    specifically, including, your Honor, if you go to page

7    2, that the First Circuit Court of Appeals affirmed

8    the judgment in March of '05.  This is a letter that

9    they've attempted to explain.  It wasn't his job to do

10   this.  He was interested in the Palestine Investment

11   Fund.  All kinds -- and maybe they'll prevail on what

12   their explanation is.  I want to say to the Court what

13   is going on here?  Two and a half years before the

14   motion to vacate they were lighting and saying we know

15   all about this and this is having a fantastic effect

16   potentially on the peace process and the role of the

17   PNA as a viable partner of the United States of

18   America.  And they're saying, and I don't blame them.

19   We don't want to get into timeliness.  I don't blame

20   them.  None of this was argued originally on the

21   motion to vacate because Judge Lagueux found it

22   appropriate to say there was a per se rule.

23          By the way, I can tell you that I asked

24   Fayyad flat out what was going on with these various

25   decisions.  We're talking about now the issue of what

role did counsel have in this, and here's what he said. This is on page 208 of his deposition. Who is managing the situation, this litigation, in June of 2005? And the reason, your Honor, I picked June of 2005 is the letter that he wrote to Condoleezza Rice. Answer: I do not know if I can really tell you there was one individual or a portfolio that was solely in charge of this operation. I really can't. Question: That's not what I'm asking you. I'm asking if you know anybody who was involved in the management of it, anybody? Mr. Rochon: When you say it, Counsel, the litigation? Mr. Wistow: The litigation, yes. Question by me: In June of 2005? Answer: I believe it was just counsel doing it, you know, at the time on the basis of the strategy that they began and basically continuing onward. That's what he said. That's what he said under oath, your Honor.

Now, counsel represented to the first circuit in their memorandum, their briefs, they picked out Ramsey Clark. They picked him out by name, described him as an activist lawyer who had problems with the foreign policy practices of the United States and made numerous references which is where they ended up giving the first circuit a clear and correct understanding that what was going on here was

supposedly being run by Ramsey Clark, and these were
just innocents who didn't understand what was going
on.  And, by the way, it's not just my interpretation.
Fayyad said that under oath that counsel was running
these cases.

All we're looking for, your Honor, at this
point, is an opportunity to address issues that we
think are open.  They've come forward and they say,
you know, we're innocent, we didn't do anything, we
want to prove our innocence, we want to prove our
ability to defend, we want to prove all these things.
I'm going to confess, your Honor, that it's my every
desire, and I'm going to make every effort, to prevail
at the hearing to show that the default should be
maintained, but I need to be enabled -- I need to have
to be able to do that material to contradict the
arguments that are being made.  You know, on the one
hand they say they're arguments.  They're not just
contentions.  It's not a contention.  The difference
between a contention interrogatory and a fact
interrogatory, I think I can give a simple example.
If in an answer, the answer says statute of
limitations, I think an interrogatory address to why
do you say there's a statute of limitations would be
appropriate rather than deposing a witness who

probably has no idea what the statute of limitations
means, and say to the defendant, what do you mean
statute of limitations.  And I agree with that
concept.  But what if you have a statute of
limitations defense which says, say we talk about a
medical malpractice case where the plaintiff is
alleging the statute has not expired even though more
than 3 years has gone by because the plaintiff had no
reason to know what, or should have known about the
malpractice, and in the answer the defendant says, no,
you were informed, the plaintiff was informed of the
acts of which he claims not to be knowledgeable.  That
is not a contention interrogatory even though it
refers to a contention made by counsel in defense
because it's dependent on facts.  What Mr. Rochon is
arguing here is not dependent on Mr. Rochon getting up
and telling you what happened.  Some of this, not some
of it, it's all got to be proven factually.

By the way, he said something yesterday that
I think there was no time to comment on.  When he said
to the Court that, you know, he's prepared to take the
stand and testify that Qurei doesn't know anything
about anything, I accept that he would say that and he
would testify as to his honest belief, but how does he
know what Qurei knows?  I mean, that's what's wrong

1    with this case.  So much has been counsel making
2    representations to the Court, and being successful,
3    and then coming back and saying, well, wait a minute,
4    these are not factual issues, these are legal
5    arguments we're making.  Well, he can't just make up
6    legal arguments, they got to be founded in fact, and
7    he has particularly alleged and included facts.  This
8    business about willfulness, not to belabor it too
9    much, if you look at the affidavit of Abdul Rahman, if
10   I recall the name correctly, he talks about, you know,
11   how innocent this newly created government was.  They
12   didn't know what they were doing.  I'm not talking
13   about, your Honor, after 2007 when they moved to
14   vacate.  I'm talking about, you know, not handling the
15   case in the first place.
16            So for all of these reasons, your Honor,
17   here's what I respectfully suggest -- by the way, even
18   though there's a hundred odd little items, if you look
19   at them you'll see each one is within a paragraph that
20   has a heading that describes the general nature of
21   what we're looking for, and all I ask your Honor is
22   please look at the request for production -- excuse
23   me, the 30(b)(6) notices and if you think they're
24   relevant to this case, please allow us to do them.  If
25   you think they're not, or they're burdensome, even in

1    this extraordinary circumstance, what else can I say.

2    But I think the alpha and omega of the inquiry is to

3    look at the actual documents themselves.  Thank you,

4    your Honor.

5              THE COURT:  Mr. Wistow --

6              MR. WISTOW:  Yes?

7              THE COURT:  Would you respond to Mr. Rochon's

8    argument that the idea of getting visas for PLO

9    representatives to come to the United States by

10   November 19th is doubtful.

11             MR. WISTOW:  I have no knowledge.  I'm sure

12   if he said it, he believes it.  It sounds logical to

13   me, so what I would suggest on that regard, rather

14   than get into a whole big fight about it is I'm happy

15   to -- not happy, I'm reluctant, but I will go there,

16   but I think under the circumstances they ought to pay

17   the expenses, and let me say why I think they should

18   pay the expenses.  This is -- even if they prevail on

19   the motion to vacate, even if they prevail, I think

20   legitimately the Court should say, wait a minute, you

21   know, you made all this litigation on the motion to

22   vacate, you ought to pay those expenses.  I think

23   that's pretty clear.  I think if they want to do it in

24   East Jerusalem, I'm not thrilled about the prospects

25   of going back there, but I think they ought to be

1  required to pay counsel's reasonable expenses.  I
2  won't travel first class.  I won't take additional
3  baggage.  We'll keep the expenses down.  In other
4  words, I'm not pressing on the taking it here in the
5  U.S. in view of that representation.  Thank you, your
6  Honor.
7          THE COURT:  Would you be traveling alone?
8          MR. WISTOW:  No, I --
9          THE COURT:  Let me clarify.  In terms of
10  legal counsel.  I mean, I don't care if you bring
11  someone else, but in terms of the plaintiffs' legal
12  defense team, would it be just you or would you be
13  taking someone else?
14          MR. WISTOW:  Let me say, your Honor, I'm of
15  an age where the only people I'd be traveling with
16  would be legal counsel.  I wouldn't -- but this is a
17  big case.  I've only been involved in it a few months.
18  Mr. Strachman has, you know, lived with this, as you
19  know, for many years.  I would be foolish to go there
20  by myself, so I'd like to go just with Mr. Strachman.
21  Yes.  I mean, I might point out when I was in East
22  Jerusalem, the other side had 1, 2, 3, 4 - I want to
23  say at least, 5 and possibly 6 lawyers.  This is a
24  complicated case, your Honor.
25          THE COURT:  All right, thank you.

1      Mr. Rochon, I'll give you a chance.  We're going to

2      take a ten minute recess and then you'll get your

3      chance to make a brief response.

4              MR. ROCHON:  Yes, sir.

5              THE COURT:  And after that we'll take up that

6      motion on the mental examinations, all right?

7              MR. ROCHON:  Yes, sir.

8              THE COURT:  So ten minutes.

9              THE CLERK:  All rise.

10     (RECESS)

11             THE COURT:  All right, Mr. Rochon, I'll hear

12     from you, a brief response to Mr. Wistow's remarks.

13             MR. ROCHON:  Thank you.  Your Honor, there's

14     been a lot of discussion about the quote from the

15     first circuit opinion referencing advice of counsel.

16     I'd like to circle back to that for a second.

17             In the briefs to the first circuit, which our

18     brief is before the Courts, it's Exhibit 1 to the

19     plaintiffs' opposition to our, what may be our next

20     motion, the Rule 35 motion they submit our entire

21     brief, you will see that the briefs quote that the --

22             THE COURT:  Mr. Rochon, I'm going to stop you

23     because during the recess I wanted to make sure I had

24     the brief, and I had my clerk locate it and mark it.

25     I didn't think I would have occasion to need it during

this portion of the hearing, but since you're going to reference it, I thought I would get it so I can have it before me while you make your point.

MR. ROCHON:  Yes, sir.

MR. WISTOW:  There's also a reply brief, obviously.

MR. ROCHON:  Right.

THE COURT:  Thank you for pointing that out, Mr. Wistow.

MR. WISTOW:  Forgive me.

MR. ROCHON:  Thank you.  And your Honor, I was going to quote for reference from that brief, page 8 of our opening brief before the Court.

THE COURT:  All right.

MR. ROCHON:  The first circuit, and note that we told the first circuit, and quoted the filings below, that we made no attempt to condone or justify many of the earlier actions in this litigation, and expressed regret, noted that they were repentant and ready and prepared to litigate this matter fully and responsibly.

If one looks through the entire brief, I can't prove an omission, and I'm not going to ask you to read the entire brief as I stand here.  There's no responsibility for the decisions placed on counsel.

1    Defendants stated over and over again that the

2    behavior was willful and took responsibility for it.

3    That's the same thing in our reply brief.  The issue,

4    the statement by the Court, which is to the effect of

5    -- though it uses the word advice of counsel.  It says

6    the decision to stonewall in this fashion was a

7    deliberate stratagem.  We've always said it was

8    deliberate.  It says, driven by the advice of their

9    then counsel and their unwillingness to recognize the

10   authority of the federal courts.  The Court of Appeals

11   there is not trying to analyze what prompted it in the

12   sense of assigning certain result to one or the other.

13   It is discussing what had happened, that it was a

14   deliberate and willful default, which is what the PA

15   said all along.  Had the PA or the PLO offered that

16   they were not responsible for it because of bad advice

17   of counsel, this entire proceeding before the district

18   court and the first circuit would have proceeded

19   differently.  The plaintiffs go on to argue that

20   there's this advice of counsel they can't really point

21   you anywhere else where there's any reference to

22   advice of counsel prompting the decision to default.

23   The Abdul Rahman declaration about which we heard so

24   much yesterday, which described the circumstances

25   leading to default, did not assign responsibility to

advice of counsel.  The other letters that have been
discussed in this matter do not say that there was
advice of counsel leading to the decision to willfully
default.  Mr. Wistow points the Court to the Prime
Minister's letter from June of 2005.  That's after the
default and after the default judgment, and does not
itself assign responsibility for the decision to
default to any lawyer.  Mr. Wistow referenced a
portion of the transcript of the Prime Minister in an
apparent effort to bolster this argument but it is
unavailing, and the reason that effort is unavailing
is because the Court again has the entire transcript
before you.  It's in the reply, attached to the reply,
and I'm not going to quote from it.  I'm just
reminding the Court you have the entire transcript of
the Prime Minister's deposition.  Mr. Wistow, I
believe, just cited you to page 100 of that
deposition, and I would remind the Court when you look
at it that what Mr. Wistow is doing there is asking
the Prime Minister questions about the letter which
the Prime Minister told him was written on behalf of
the pension fund.  The Prime Minister had explained he
did not have responsibility for the litigation at the
time.  Mr. Wistow pressed him, nonetheless, to try to
tell him who did have responsibility, and after a

great reluctance on the Prime Minister's part to
address matters that he didn't have much knowledge of,
he said it was the counsel.  Even if true, the fact
that counsel still had responsibility for the
litigation post judgment is irrelevant to whether or
not the Palestinian Authority or the PLO are relying
on advice of counsel for the decision to willfully
default.  That transcript does not say, and Mr. Wistow
could not point you to any part of it that does, where
the Prime Minister ever said the decision-making
regarding default was Mr. Clark's, nor did he say it
wasn't.  The Prime Minister was not involved in that
decision-making, and proclaimed not to have direct and
personal knowledge of it.  So I would suggest to the
Court that the plaintiffs' effort to suggest that
there's an advice of counsel that waives privilege
here relies solely on the passing reference in the
first circuit opinion which a review of the briefs
will show was not based on arguments that there was
advice of counsel such that the privilege would be
waived.  It's a passing reference in the opinion.  Not
a holding.  It's really not even -- if anything, it'll
probably rise to dicta.  They're not purporting to
reach a conclusion about advice of counsel in the
sense of anything that had any impact whatsoever.

1    From that little, it's not even an acorn, because they

2    can't grow a tree out of it, that little bit they

3    tried to create a waiver of privilege even though

4    there's no other record basis for it.

5            Your Honor, the plaintiffs also referenced

6    the Klinghoffer case.  I'll just say in passing, you

7    know, they say, well, they want to show that the

8    defendants litigated the Klinghoffer case and

9    therefore they want to undermine the various letters

10   or statements to the contrary.  First of all, the

11   Klinghoffer case, first off, Number 1, it wasn't

12   against the Palestinian Authority.  Number 2, it's a

13   pre ATA case.  It's not even this statute by which our

14   clients were hailed into this courthouse pursuant to

15   the anti-terror act.  It was actually the case that

16   prompted the passage of the ATA act.  In any event,

17   the conduct of that litigation in which the merits

18   were not reached, and the same types of defenses were

19   offered, does not show an understanding of how this

20   litigation would proceed.  The plaintiffs haven't said

21   to you, nor could they, that there was discovery, that

22   there was a trial, that there was a full bore

23   proceedings in Klinghoffer because, in fact, there

24   wasn't, and so they can't really point you to anything

25   except it's something that happened a long time ago

that they now want to seek discovery on that has no
direct bearing on this case.

The plaintiffs have studiously avoided
discussing any of the specifics of their 30(b)(6)'s in
their argument despite the fact that we referenced
numerous ones that we considered to be problematic.
Instead, plaintiffs more or less say, well, if there's
problems with some of them you know there's a little
bit of back and forth from plaintiffs' counsel that,
you know, if there were mistakes there were mistakes,
but they sincerely believe they're relevant, and not a
specific defense of them, they encourage you to read
them and see that the broad subject areas that they
purportedly relate to they contend are relevant. We
disagree about that, and let me direct the Court to
just a few of the 30(b)(6) requests that we think are
particularly telling as to the overbreadth of the
requests that the plaintiffs are making here. And
after directing your attention to just a few of them,
I'll then take the opportunity to sit down.

The plaintiffs, your Honor, are seeking,
among other discovery, a person to be prepared, and
I'm referring to -- each of these will be PA requests,
just for the sake of convenience, not PLO requests.
They are essentially but not precisely the same.

There's a few additional ones but I'm going to go with the PA.  On page 10 of the request, 8(d), 8(b), excuse me, they seek a witness to describe the circumstances and impact on Yassar Arafat and the PA of any "besiegement" of Yassar Arafat during the period 2002 to 2004.  There have been books written on this topic. That is one of 130.  The plaintiffs seek the details under (d) on the same page.  The details and circumstances of Yassar Arafat's extended and ultimately fatal illness, and its impact on the defendants and their participation in this litigation extraordinarily broad, elusive, and not based on any -- they have the affidavits of people who said these things.  They haven't sought to depose those people. They go and they make numerous requests based on the Prime Minister's 2005 letter, and when you go through these, you'll see they're footnoted, and many of the footnotes go to the Prime Minister's 2005 letter.  I will remind the Court, that letter comes into this litigation only because it was appended to his declaration, not because the contents of it was relied upon, but as I indicated yesterday, otherwise the plaintiffs would contend they hadn't gotten the full picture of the Prime Minister's involvement, such as it was, in these cases.  The 2005 letter wasn't a

1    letter that sought to vacate a default judgment.  It

2    was a letter written on behalf of the pension fund.

3            THE COURT:  You have three minutes,

4    Mr. Rochon.

5            MR. ROCHON:  Thank you.  Let me go to page 12

6    where the plaintiffs ask for a page and a half, from

7    12 through 14, questions about the Palestinian

8    Investment Fund, and have a witness who's supposed to

9    be prepared on everything from the relationship

10   between the Palestinian Investment Fund and the PA to

11   the Palestinian Investment Fund's governing structure,

12   to erosion of support for the PA's leadership and

13   compromise of the efforts of the PA to achieve

14   economic stability caused by the turning over of the

15   Palestinian Investment Fund.

16           On page 14 where they ask for any and all

17   actions carried out by Mohammad Mustafah on behalf of

18   the PA, and all services rendered by Mohammad Mustafah

19   on behalf of the PA between July 2004 and the present

20   day, whenever that deposition might take place.  These

21   are not focusing on the issues at stake in the motion

22   to vacate.

23           On page 15 where they ask for, among other

24   things, any and all communications between the

25   Palestinian Authority and its lawyers, between

Arafat's death and the filing of the motion to vacate.

On page 16 where they ask for, among other things, "The PA's actual conduct" in the related cases. In other words, a witness to come forward and tell them everything about the PA's conduct in the related cases. They want a witness to come forward and talk about -- on page 11 they just go through a whole list of things that simply come from our filings and talk about, for instance, page 11(9)(b), "The considerable obstacles that the PA faced in responding to U.S. litigation from the time of Arafat's death until December 2007".

Judge, these are things that may be the subject of the hearing, but the notion that they're proper subjects for 30(b)(6) depositions as opposed to interrogatories which ask us for the basis. The notion we have to get a witness, the depositions, if there was one person on this, Mr. Wistow says, well, it's about a million dollars a question or topic, in a relatively offhand way. Well, if you had one person prepared, and you had seven hours to do this, you'd have about 5 minutes of topic. It is obvious that these are overbroad as for the purposes of this litigation and the topics in them are grossly irrelevant in many regards, the specific question.

1    We've offered the Court, I think, a much more
2    reasonable way through this and offered to put forth a
3    witness on the relevant issues.  If you rule that
4    timeliness or willfulness are relevant topics, then
5    they could certainly be explored more adequately than
6    through these overly specific contentious and
7    irrelevant questions, even as to those topics.
8             THE COURT:  Thank you, Mr. Rochon.  I look at
9    you, Mr. Wistow, only out of courtesy.  If you want to
10   say anything, you may.  If you don't, the Court --
11            MR. WISTOW:  Thank you so much, your Honor, I
12   do.
13            THE COURT:  All right.
14            MR. WISTOW:  The discussion about the PIF,
15   why we're asking about Mustafah and the PIF, hopefully
16   your Honor will recall -- I know your Honor will
17   recall, we talked about that yesterday, now we find
18   out that you heard Mr. Rochon say this, that the PA
19   and the PLO, the Prime Minister, was writing to
20   Condoleezza Rice out of concern for the PIF.
21            MR. ROCHON:  The pension fund is what I
22   certainly meant to say.
23            MR. WISTOW:  Okay.
24            MR. ROCHON:  And I believe did say.
25            MR. WISTOW:  Fine.  What I'm trying to --

1     there are a lot of things -- again, all I can say,

2     your Honor, is they can pick generalized concepts and

3     make them sound very broad.  If you look at the actual

4     topics, the actual topics, it should be self-evident

5     why we need the information for the hearing.

6         For example, I hope there's no controversy

7     about this.  The defendants were ordered to produce

8     certain witnesses for the deposition, and we list

9     those, Arafat and Darlon (Phonetic spelling), and

10     various other people, some of whom have died, by the

11     way, since the order.  Arafat died before the

12     judgment.  Some have died since the motion to vacate.

13     I hope there's no controversy that the questions we

14     ask about the relative involvement of those people

15     will be forthcoming.

16         What the problem here is, what makes this

17     look so encompassing, is that we gave a lot of

18     specifics.  We could have limited it to the general

19     subject matter and then asked specifics of the person

20     when we got there.  I think we're actually helping the

21     situation by giving the specifics.  I'm perfectly

22     happy to do the general subject matters that we asked

23     for, and there's only about 7 or 8 of them, and I'm

24     perfectly happy to have your Honor re-class this.  I

25     don't want to ask -- I know it's a burden, but just

1     strike the topics you think are too intrusive or too

2     burdensome.  But I do ask that your Honor enable us to

3     have witnesses on the willfulness, have witnesses on

4     timeliness, have witnesses on the handling of other

5     cases, because the purpose of the handling of the

6     other cases goes to the willfulness.  They said over

7     and over again, we didn't know how to handle these

8     cases, we didn't understand them.  We want to show

9     they did understand them.  For example, they were

10     defending hundreds of Israeli cases during this same

11     period of time extraterritorially, and we think that's

12     relevant.  We want to show the Court there were

13     mechanisms in place not only post 2005 but before the

14     judgments.  They had people who were defending these

15     cases on the merits that understood them.  And, by the

16     way, it appears the Israeli legal system is not

17     terribly different from ours in their discovery and

18     all this kind of stuff.  I'm not asking your Honor to

19     rule that they knew how to do the defense of these

20     cases and that their claims of relative innocence are

21     invalid.  I'm not asking that.  I'm asking for the

22     discovery that would enable us to prove this at the

23     hearing.  My brother, Mr. Rochon, continues to suggest

24     that these are all matters that should be aired out

25     really for the first time at the hearing.  That's not

what should happen. There should be discovery so that
the hearing goes forward appropriately. Thank you,
your Honor, for the opportunity.

THE COURT: All right, thank you, Mr. Wistow.
All right, now we're going to take up the motion
dealing with the mental examinations, that is
defendants' Rule 35(a) motion to compel mental
examinations of plaintiff. The motion is document
number 559, and the Court will hear first from
Mr. Hill.

MR. ROCHON: Actually, your Honor, it's me
again.

THE COURT: Oh, I'm sorry.

MR. HILL: You got me at the very end for the
easy one, Judge.

MR. ROCHON: I don't know about that, but
maybe I can argue the right motion this time if I'm
careful, your Honor.

Your Honor, on this one, we've not had -- the
time for filing a reply has not yet passed, or come,
and we have not filed a reply but we're prepared to
address the matter in the absence of the reply, and
are glad that it's on the docket to move the matter
forward.

Your Honor, we see this as having two issues,

1    and we can cut through it. The first is the

2    plaintiffs say that we can't challenge the judgment at

3    all. The second thing is the plaintiffs say that the

4    record is fixed as to the judgment. These are related

5    but different points, I believe, that are the essence

6    of the plaintiffs' filing, that we're stuck with the

7    judgment and there should be no discovery whatsoever

8    on it, and we can't even challenge it. And secondly,

9    the record is what it is.

10           Let me deal with the first and then propose a

11   resolution as to the second. The parties have spent a

12   lot of time with this first circuit opinion, and I

13   would suggest to the Court that that's once again

14   where we should turn for guidance on whether or not we

15   can challenge the amount of the judgment. The Court

16   of Appeals on page 13 of its opinion lists our array

17   of claims, and it states, and I won't read the entire

18   thing, but --

19           THE COURT: Which first circuit opinion?

20           MR. ROCHON: The one I like. The one where

21   they granted reversal and remanded to this hearing.

22           THE COURT: Okay. That's the March 25, 2010

23   opinion which I have in front of me.

24           MR. ROCHON: Yes.

25           THE COURT: But it begins on page 79, so when

1    you said page 13, I'm --

2         MR. ROCHON:  I'm reading a slip opinion, but

3    I'll get --

4         MR. HILL:  It's on page 86 of the reported

5    opinion, your Honor.

6         MR. ROCHON:  Thank you, Mr. Hill.  It's page

7    86 of the reported opinion, your Honor, and it starts

8    with:  But the defendants tell a different tale, and

9    it goes on to list several claims that we have made as

10   to why a hearing -- why there were factors other than

11   willfulness that were relevant, and the Court of

12   Appeals notes, they also see the amounts of the

13   judgment as unlikely to withstand adversarial testing.

14   The next later, two paragraphs later, they state that

15   the decisions and consideration indicate, "That the

16   defendants asseverational (phonetic spelling) array

17   deserves full throated consideration."  The

18   asseverational (phonetic spelling) array, the

19   collections of strongly put forward arguments, is as

20   to the items listed in the paragraph that begins that

21   the defendants tell a different tale.  The Court of

22   Appeals decision suggests that the district court

23   needs to give that array of matters full throated

24   consideration, including whether or not the amount of

25   the judgment is likely or not to withstand adversarial

testing.  That's what that opinion says.

The plaintiffs would like to exclude damages from the hearing.  The first circuit disagrees with the plaintiffs, in our view.  And, therefore, the amounts of the judgment, which was part of the default, and as to which the defendants did not participate, and we've admitted on behalf -- the defense have admitted that was a willful decision, they apologized for it, but the question is would, with an adversarial testing, the amounts had been different.  Awkward to argue this to you, your Honor, because I know this is your ruling, that is the judgment itself.  But the first circuit said that the district court needs to give that argument full throated consideration.

Now we filed a motion saying that part of that would be to have independent medical examination of the plaintiffs, and the plaintiffs' counsel have argued that that would be inappropriate for a host of reasons, one of them being that the record should be deemed fixed.  We are prepared to take them at that offer, and to test whether or not, in other words, to present evidence as to whether that record would have withstood adversarial testing, but without creating new factual evidence, without having them retested,

1  without hearing how their high school grades are

2  going, without hearing about fact events since that

3  time, but rather to bring to the argument our experts

4  and others that would say, no, that had we -- had the

5  defendants participated, as they should have, and as

6  we admitted they should have, and had they presented

7  these challenges, that indeed that may well have

8  informed the judgment of the Court as to the amount of

9  judgment.  In other words, I want to win on the

10 argument as to whether or not we're allowed to discuss

11 and have part of the hearing before the district court

12 the amount of damages.  And the plaintiffs contest

13 whether we may do so.  But if the plaintiffs are not

14 going to seek to introduce new evidence as to damages,

15 and the focus shall be solely on the strength or lack

16 thereof of the evidence they did put on, with the help

17 of our expert witnesses, we will attack that and show

18 in our view that the amount of judgment would not have

19 withstood adversarial testing.  That approach saved

20 the plaintiffs from that which plaintiffs' counsel

21 said would be an unpleasant experience, and I

22 recognize that.

23         THE COURT:  I'm not sure I'm understanding.

24 You say that approach saved the plaintiffs from an

25 unpleasant experience.  You're saying no examination?

MR. ROCHON:   That's what I just said.

THE COURT:   So what is the motion before me?

MR. ROCHON:   Well, the motion before you was for these examinations.

THE COURT:   Which you no longer want.

MR. ROCHON:   Well, what I want, and what the defendants of the motion -- the plaintiffs have argued before you that we can't challenge damages at all, even though, as we've laid out, they did not oppose our motion for discovery on damages.  We're willing to have the record fixed so long as -- I don't want the plaintiffs to come to court and then when I start -- we have our experts, and so on and so forth, to attack that evidence, for them to say, oh, this is new evidence, that's inconsistent, or to say, you're not allowed to test this.  We provide our expert reports to them.  All we want to do is what the first circuit told us we can do, which is put on evidence to show that the judgment as it existed back then on the evidence presented to this Court would not have withstood adversarial testing, and among the expert reports are reports that suggest some arguments to that effect.  You're maybe saying to me, Mr. Rochon, what do I have to decide.  Once we saw the plaintiffs' position suggesting that they're willing to lock the

evidence in as it was at that time, which wasn't that clear to us, this, what I'm telling you now is what we would have said in our reply. We just have moved forward quickly. My replies to their filing would have been, okay, you say you're willing to lock the evidence as it was. They're not going to come up and say new psychological damages. They're not going to come up and say new test scores. They're not going to call witnesses to say that problems have been exacerbated or continued. They're not going to try to alter the factual damages record. That's what they've represented in their opposition. I didn't have that.

THE COURT: Are you withdrawing the motion before me?

MR. ROCHON: Well, the motion before you includes a legal issue as to whether we're allowed to challenge damages. That is one of the issues before you now. Yes, we're asking for IMEs. No. In light of the plaintiffs representations that they're willing to close the record, we're willing to withdraw it. But, you know, I don't want them to say I'm sandbagging them at the hearing when I come up and say it. I'm saying it in the open now.

MR. WISTOW: Here's my proposal on that. I'm totally unclear, frankly, exactly the ramifications of

what he's proposing.  I'm happy to have him prepare a stipulation that sets forth exactly what he wants, which I candidly want to run by my clients.  I don't want to be just sitting here and making, you know, far ranging decisions like that without consulting the clients.  What I would like to do is say, I'm prepared to argue on the merits against this.  I don't want to delay the arguments.  I don't want to even give any hope to him that his solution is going to cure the situation.  So my proposal is let's argue this on the merits.  If he wants to give me a written stipulation that we can agree to, we will get back to your Honor promptly with a solution, but I have no authority to make such a decision.  This is a very important thing for me to just stand here and say, yeah, I agree to this.  Frankly, I don't even understand it.  All I'm saying is if he wants to withdraw the motion, that's his right.  If he doesn't, you know, let's argue this thing.

MR. ROCHON:  Here's what I suggest to the Court, I suggest that in light of what I understand to be the plaintiffs' position that you hold this motion in abeyance and decide it if we're not able to work out this stipulation on the papers without further oral argument.

1      MR. WISTOW:  No, I really would like to

2   argue.  This is very important, your Honor, and I

3   stayed up until 4 o'clock in the morning doing this.

4   I'd like to talk about it.

5      THE COURT:  Mr. Wistow, I'll give you a

6   chance to argue, to respond.  Just let Mr. Rochon

7   complete his remarks.

8      MR. ROCHON:  Your Honor, the need for the

9   examinations would be relevant to -- if the -- let me

10  back up.  We thought, when the Court of Appeals says

11  whether or not the damage would withstand adversarial

12  testing, that it would be unfair to the plaintiffs to

13  leave the record as it was, and to say, okay, they're

14  stuck with the record they created in our absence.  So

15  we said, therefore the record would be expanded and

16  therefore be relevant what their current condition is,

17  and other information since 2004 would be relevant.

18  Plaintiffs come back, no, no, no, we want to leave the

19  record as it was and decide this question if it's

20  going to be decided by reference to that record.  We

21  would be okay with that.  Now, so that's our position.

22  I don't know why it's not clear to Mr. Wistow.  Maybe

23  it's not clear to the Court.  I can only put it so

24  many ways.  Either the damages assessment, that is

25  what the plaintiffs' claim on the damages, is based on

1    the 2004 record created in our absence, or the

2    plaintiffs are going to argue something since then.

3    If they're willing to sit on that record, then we will

4    simply attack it, but not seek to create new evidence

5    as to the plaintiffs' damages since 2004.  In other

6    words, not seeking the school records since then.  Not

7    seeking their mental examinations or physical

8    examinations of them.  Not seeking to change the

9    record or introduce any new evidence or seek to

10   introduce any new factual evidence since 2004.  We'll

11   take the plaintiffs at that offer.  If on the other

12   hand the plaintiffs were going to offer anything since

13   then, obviously we would need to have the

14   examinations.  They can't have it both ways if they're

15   going to offer any evidence since then.  That's where

16   we are.  I'd like to attack that record.  I'm fine

17   attacking that record.  So that's where our position

18   is.  If Mr. Wistow can tell the Court that he's

19   satisfied with that record, I still think he ought to

20   take it under abeyance and see where we are after we

21   negotiate.

22        THE COURT:  Mr. Rochon, this motion, document

23   559, defendants' Rule 35(a), motion to compel mental

24   examination of plaintiffs.  Are the defendants

25   pressing this motion, yes or no?

1    MR. ROCHON:  In the absence of a concession,
2    I have to, yes.
3        THE COURT:  Thank you.  All right, I'll hear
4    from Mr. Wistow;
5        MR. WISTOW:  Thank you, your Honor.  Our
6    first position on this, I'm going to argue for the
7    record and say to your Honor, you don't even need to
8    reach the first issue that I raise, and that is that
9    the question of the size of the award was argued
10   before this Court, before the appeal.  Judge Lagueux
11   expressly heard the arguments about the size of the
12   award, rejected it.  There was no appeal taken on that
13   until the original appeal which related to political
14   questions, sovereign immunity, personal jurisdiction.
15   This case went up.  And they, the defendants,
16   abandoned, abandoned that issue.  Now we have this
17   weird situation.  What am I saying?  Is the whole case
18   res judicata?  If it was, why are we having a motion
19   to vacate?  The answer is there's certain things they
20   cannot argue again in front of Judge Lagueux.  They
21   can't argue that there's sovereign immunity.  They
22   litigated that on the merits, so to speak, and they
23   lost.  What they're hoping to do is come in and argue
24   those things that they didn't argue.  For example,
25   meritorious defense.  There's no question they didn't

1    argue that, and there's no question the circuit says

2    that something that they can argue.  But let me tell

3    you exactly what happened factually on this first

4    issue.  And again, I don't think it's necessary for

5    your Honor to reach this but I do want to put it on

6    the record.

7                On April 19, 2004 -- let me just go back.

8    Originally your Honor will recall you had a hearing on

9    damages against Hamas, and that hearing was on July 3,

10   2003, and that resulted in a judgment that Judge

11   Lagueux entered on January 27, '04.  Thereafter, you

12   heard a second series of -- you had a second series of

13   hearings on damages against the PLO and the PA.  That

14   series of hearings -- I really was up until 4 o'clock

15   in the morning last night, you can really hear it in

16   what's happening here.  That hearing resulted in your

17   recommendation for the judgments in question today, on

18   3/31/04, resulting in a judgment by Judge Lagueux on

19   7/13/04.  Now, you specifically invited the defendants

20   to come in a second time not only to contest the Hamas

21   proceedings, which they didn't want to do, but notice

22   was given to them there was going to be a second

23   hearing to determine what the damages should be with

24   the PLO, PA, and on the record you were told by

25   Mr. Sherman -- I should say Mr. Strachman wrote to

1    Mr. Sherman and advised that Mr. Sherman had no

2    interest in participating in that hearing.

3    Thereafter, thereafter, an objection was filed to your

4    Honor's recommendation.  The recommendation was

5    3/31/04, the defendants filed an objection on 4/19, or

6    4/18, I can't read my writing, '04, including a claim

7    that the award was "disproportionate compensation" for

8    the injuries.  That issue came up.  Judge Lagueux

9    ruled against them.  They took an appeal on all the

10   other associated issues and failed to raise that.  So

11   what I'm saying is that is res judicata, and if it's

12   not, because it's a motion to vacate, then they can

13   re-litigate the question of sovereign immunity,

14   political question, and all the other things that have

15   been litigated on which they've lost on the merits.

16   Having said all of that, we don't even need to reach

17   that issue.  Here's why we don't.

18          First of all, even in the usual circumstances

19   where there's a request for Rule 35, and the usual

20   circumstance is we're going to be going to trial.  The

21   plaintiffs have put their mental situation in issue.

22   We'd like to have an examination.  That's the usual

23   situation.  It's extraordinary, absolutely

24   extraordinary for what they're trying to do now.  The

25   only case they cite in support of it, the Shepard

case, is completely distinguishable because what happened in the Shepard case is there was a default entered, and before, before a determination was made on the issue of damages, the defendants were told there was going to be a hearing. They asked for a Rule 35 exam, and they were given. And appropriately so. There was going to be a contested hearing on damages. Here, this is a unique circumstance, absolutely unique.

And by the way, in the first circuit, in the first circuit, the decision as to whether or not to grant Rule 35, even in the ordinary case, the ordinary case, is completely discretionary, and that's in the case of Reel vs Hogan (phonetic spelling), 828 F.2d 58. Now, what is the relevancy of this testimony going to be, at any rate? They're going to have somebody come in and say -- by the way, let's just focus on what your Honor actually awarded compensation. There were five adults involved in the case who got compensation for loss to society, companionship and grieving. Those were the two parents of the deceased husband and his three siblings. They came in and they testified about their grief. They didn't say they were debilitated, and I say that with confidence. I read the transcript. And

1    I say with confidence because I also read your Honor's

2    decision.  Your Honor's decision is very clear that as

3    to the adults, you're simply making an award based on

4    their testimony about how they felt about having their

5    son, a brother, taken away from them under these

6    circumstances.  Your Honor heard that testimony, made

7    an award based on what you heard, compared that award

8    to whatever judges had done in terrorist cases, and

9    there we are.  Are we going to have a mental exam,

10    somebody come in now and say, well, let's talk about

11    your grief.  That's eight and a half -- by the way,

12    the hearing on this was on July of 2002, your Honor.

13    Eight and a half years ago was this testimony.  So

14    what are we going to have, they got a psychiatrist to

15    examine these people.  They have the psychiatrist say

16    tell me about your grief since then.  Now what is the

17    psychiatrist going to say?  Well, it's not as bad as

18    it is for a lot of other people, it's worse, or these

19    people are lying.  I mean, what is it?  It's just

20    absolute weirdness to have this.  And by the way, many

21    of the cases, many of the cases, where they even do

22    allow this on a discretionary basis, only do it when

23    there's something beyond the garden variety, as they

24    call it.  It's a terrible expression, but the cases

25    use it, the garden variety grief that's encountered as

a result of a death.

I'd ask your Honor to just briefly, I'm sure you've done it already, but I'm not sure if you've done it in connection with this issue, take a look at what your Honor found in making your recommendations on the award, specifically on page 36. You basically described the factual relationship of the closeness of the parents and the siblings to the deceased, and let me see if I can find it, your Honor. It starts on page 36.

THE COURT: Excuse me, Mr. Wistow.

MR. WISTOW: Yes.

THE COURT: It's now 12:28.

MR. WISTOW: Yes, your Honor.

THE COURT: If you think you're going to finish in 5 minutes, I'll keep going. If you think you'll be longer than 5 minutes, I'm going to break for a recess now.

MR. WISTOW: With apologies, I will be longer than 5 minutes.

THE COURT: All right, we'll take our recess. We'll reconvene at 2 o'clock and we'll resume with Mr. Wistow.

MR. WISTOW: Thank you, your Honor.

THE COURT: The Court will stand in recess.

1    (RECESS)

2         THE COURT:  All right, we'll resume with

3    Mr. Wistow's argument.  Mr. Wistow.

4         MR. WISTOW:  Thank you, your Honor.  As I was

5    suggesting, if your Honor review the basis for the

6    findings you made on the loss of consortium and grief,

7    which begins at page 270 of 304 F.Supp., I think it

8    will confirm the fact that as far as the parents and

9    the siblings are concerned, your Honor made an

10   assessment based on the factual testimony of what kind

11   of grief these people were experiencing, what kind of

12   relationship they had with the deceased, and came to

13   an independent conclusion not involving any kind of

14   expert testimony whatever about mental conditions or

15   anything like that, and I don't really understand how

16   an expert could address the findings you made in that

17   regard.

18        Insofar as the children are concerned, your

19   Honor went into very substantial detail.  Indeed,

20   there was an expert involved in that, a psychologist,

21   but when you see in fact what he testified to and what

22   your Honor did with that testimony, it really becomes

23   a matter of almost common sense, and I'm going to

24   presume to sum up what your Honor said in your

25   recommendation and decision.  You referred to the

expert Brennan.  You testified that at that point in
time the older brother Dvir had apparently displayed
some overprotected, overprotectedness of his younger
brother.  There was testimony from Brennan that there
was psychic trauma to the children, and you said,
"Though it was difficult today to gauge the magnitude
and impact".  And there was testimony in the record
that these are two little children, and one was
8 months old, one was 20 months old at the time they
lost both parents, some difficulty sleeping.  You can
almost take judicial notice, your Honor, that you take
little children that age and separate them abruptly
from their parents that, of course, there's psychic
trauma, whether it's a big deal or little deal.  I
don't know what to say, but it wasn't, yes, they
didn't say this was a magnitude very unusual.  It
really was, what do you expect kind of thing, and I'm
not sure you need a psychologist to say this in the
first place.  He testified, and you noted in the
record another thing that was to me pro forma, not pro
forma, you noticed that the pro forma, the
psychologist testified to, he said these children are
being brought up by their grandparents who are a
generation older than their parents, they're going to
be orphaned twice, and when their grandparents die,

1    and they can be expected to die at a much earlier age

2    when their natural parents would, and then he said

3    that they were "susceptible, susceptible in the future

4    to depression, anxiety, and the like, and that he

5    would not be surprised, not surprised, if they needed

6    psychotherapy. Your Honor evaluated, or gave it the

7    weight. I'm essentially quoting from what your Honor

8    found. You gave it the weight that it deserved, and

9    all of this is really just common sense stuff. You

10    have two little kids, 8 months old, 20 months old,

11    their parents disappear suddenly, of course they're

12    going to have some immediate psychotrauma, and as your

13    Honor said, it's difficult to gauge the magnitude of

14    impact.

15    The susceptibility to depression and anxiety,

16    again, kind of common sense, to have two little

17    children whose parents are murdered and they learn of

18    this over the -- he didn't say they were going to have

19    it, he didn't say it was reasonably probable, he said

20    they were susceptible to it. And if they want to

21    bring in a psychiatrist who says that makes no sense.

22    The mere fact that you become an orphan at 8 months

23    and 20 months doesn't make you more susceptible, they

24    can do that. They don't need a physical exam. He

25    said -- Brennan said he would not be surprised if they

needed psychotherapy. He didn't say probably. He didn't say certainly. They want to bring in a psychiatrist to say there was no reasonable basis to make this statement at all, they can do that without your Honor having to order that they be examined again.

The bottom line is that, and I hate to keep coming back, but this is an equity case. The first circuit has said this is an equity case, and the defendants have said on the record in this case, and I want to quote: "Plaintiffs may suggest that the family should not be required to testify again about the incident. Defendants agree." Well, they're talking about a situation where even if they win the motion to vacate, they're saying, they agree that the plaintiffs oughtn't to go through this trauma again. Here we've converted this into a situation. We don't even have the motion to vacate granted. They're saying we want to go through this. Granted, they don't want them to testify, but it's been recognized in Wright & Miller, Section 2234, they say flat out and cites cases for the proposition that mental or physical exam is often more likely to be more grueling than a deposition.

So, in considering the equity of this, the

1    defendants had a right to participate in the past.

2    They were invited to do so.  They refused to do so,

3    and now they want to take some kids who -- by the way,

4    the testimony of Brennan at the time he testified in

5    front of your Honor said the kids seemed to be doing

6    all right at the time.  It's not like anybody's trying

7    to pull a fast one and making a big deal out of what

8    was going on.

9            In the Gilmore case, which is 675 F.Supp 2d

10   at 104, which is the district court in D.C. in 2009,

11   the Court referred to the enormous emotional cost to

12   plaintiffs should they be forced to undergo the

13   excruciating process of testifying about their loss

14   all over again, and the severe prejudice to plaintiffs

15   that would result from their undergoing the wrenching

16   process of testifying again.  What is to weighing all

17   of this in this equitable situation, your Honor?  It

18   seems to me to require the parents to come in, the

19   siblings to come in and talk to a psychiatrist about

20   their grief is not helping anybody.  To bring the

21   children in at this point, the kids, to bring them in

22   and run the risk of -- and I'm not an expert, but it

23   doesn't seem like a good idea to me to be evaluating

24   these children today in the context of a case

25   involving the murder of their parents.

1          By the way, on that issue of the no prior

2     notice to the defendants about the hearing, I just

3     quote from your Honor's opinion at page 66, at the

4     August 22, 2003 hearing, Mr. Strachman, counsel for

5     plaintiffs, stated that he had written to counsel for

6     the Palestinian defendants approximately three weeks

7     earlier and offered to make the witnesses who had

8     testified at the damages hearing, which this

9     Magistrate Judge had conducted on July 12 and 15,

10    2002, in connection with the motion to enter default

11    judgment against Hamas, available to be deposed or

12    cross-examined either in Israel or the United States.

13    So that's the same witnesses we're talking about now

14    were offered to be examined in Israel or the United

15    States.  Mr. Strachman stated that he had not received

16    a reply to that letter and therefore requested that

17    the damages findings made by the Court as a result of

18    that hearing, that is the Hamas, be applied to the

19    Palestinian defendants.  Subsequently, and I think

20    this is very important, your Honor, subsequently the

21    Court asked Mr. Clark about plaintiffs' offer to have

22    the witnesses from the damages hearing made available

23    for deposition either in Israel or here.  MR. Clark

24    responded that the Palestinian defendants, and I

25    quote, "Did not participate in the hearing on default

1    and damages with Hamas and we do not intend to

2    participate.  Our instructions have been we would not

3    participate.  We informed this Court on April 1, 2003

4    that those were our instructions, and it has been

5    reinforced a couple of times.  We do not --", and I

6    can go on.  I think your Honor has found the

7    reference.

8         So at this late date, in the case of equity,

9    in a case where your Honor would have had absolute

10   discretion, even if we were about to go forward with

11   the real trial to say no, and after the judgment in

12   this case, it just seems to me cruel and inhuman --

13   well, let me not overstate.  It seems to me cruel to

14   require an examination at this point under these

15   particular circumstances, and I would respectfully ask

16   your Honor to refuse the request, and as I said

17   before, I don't think you need to reach at all the

18   issue of res judicata about their waiver, and

19   although, but I don't mean to yield that point.  I

20   think it is res judicata and we intend to argue that

21   at the trial, but that's obviously different than the

22   issue of the discovery.  Thank you, your Honor.

23        THE COURT:  Thank you, Mr. Wistow.

24   Mr. Rochon, you're asking to respond to Mr. Wistow's

25   argument?

1    MR. ROCHON:  I was going to point how we're

2    passing like two ships in the night, and would point

3    out that aspect.

4    THE COURT:  I'll give you five minutes, then

5    Mr. Wistow gets five minutes next, and then we're done

6    on this motion.

7    MR. ROCHON:  Since I was the movant, I was

8    anticipating rebuttal, but I can be very brief, your

9    Honor.  We are passing like two ships in the night,

10   and all I'm saying to the Court, and offer to

11   Mr. Wistow, is if they're not going to further seek to

12   put into evidence the mental status of these

13   individuals, then we don't need this examination.

14   Mr. Wistow spoke all that time and didn't address the

15   one thing that I said to you in my first argument.  If

16   I'm not going to hear that the motion to vacate in

17   January, or the hearing on the motion to vacate in

18   January, or in between now and then, or as to any

19   additional mental health status from these

20   individuals, then I'm not seeking the IME.  If I am

21   going to have them further put into issue, their

22   mental status, then I believe we are entitled to it.

23   That's our position.  Thank you.

24   THE COURT:  All right, Mr. Wistow.

25   MR. WISTOW:  Very briefly, your Honor.  Apart

1  from the fact that I'm not authorized to be making

2  such agreements now without consultation with the

3  clients, apart from the fact that we really need to

4  think through the ramifications of all this, I see a

5  perfectly valid objection in the sense if their

6  psychiatrist comes in, for example, and says this is

7  utterly preposterous what they're suggesting here,

8  there's no way that these kids would have had any

9  problems. It's ridiculous. Am I going to be

10 foreclosed from introducing evidence and say on

11 examination of her, on cross, and say, look, you know,

12 I'm going to show you a record they've been

13 institutionalized for three months? By the way, I'm

14 not suggesting any of this is happening. I'm just

15 suggesting -- I just can't stand up and agree in the

16 abstract to what we're talking about. I've never

17 encountered this problem, and even if I had, I would

18 want to consult with the clients. I'm not looking to

19 make a big complicated thing out of it, but I just

20 can't accept the prohibition to introduce evidence no

21 matter what.

22        I can say this, at the moment, and I hope

23 this representation counts for something, at the

24 moment we have no intention of doing that, at the

25 moment, but I'm not authorized to make a concession on

1     the point. And I'll give one example where we might

2     feel we were forced to introduce such evidence. Thank

3     you, your Honor.

4            THE COURT: I can tell, Mr. Rochon, that you

5     are really desirous of speaking one final time. Stay

6     there and just say what you want to say briefly.

7            MR. ROCHON: We have supplied our expert

8     reports consistent with as to how we interpret the

9     rules. So they have what our experts will say is

10    available to them. It won't be a surprise at the

11    hearing. And if they had such documents that

12    Mr. Wistow referenced, they've already been the

13    subject of a discovery demand and have not been

14    satisfied. I have no reason to believe they're going

15    to do that thing that I'm concerned about, but if they

16    are, I think we would be entitled to the examination.

17    Thank you for the additional time.

18           THE COURT: All right. Take up the last

19    motion now which I believe is interrogatories. This

20    is document 530 which is (Noise from microphone)

21    motion to file answers to defendants' interrogatory

22    numbers 12 to 18, and responses defendants' request

23    for production numbers 15, 17, 19. Is that the

24    correct motion, Mr. Hill?

25          MR. HILL: That is the correct motion, your

Honor.

THE COURT: All right, I'll hear you, sir.

MR. HILL: As I indicated earlier, I hope this one doesn't take very long. I think this one actually is not that complicated. The discovery that we're seeking here is contention interrogatories asking the plaintiffs to state the factual basis for allegations they make in their amended complaint which is the operative pleading in the case. In any normal discovery situation a plaintiff would be required to disclose to the defendant before the close of discovery what evidence they have that supports the contentions they're making on the merits of the case.

As we've talked about over the last couple of days, and I think Mr. Wistow said this morning, one of the issues that will be before Judge Lagueux at the hearing in January is whether or not the defendants are liable, whether the defendants have a meritorious defense to the allegation that the PA and the PLO are responsible under a variety of theories that have been pled in the complaint for the death of Mr. Ungar, and that's what these interrogatories go to, that's what the accompanying document requests seek to discover.

The other category of materials that's before the Court on the instant motion are the documents that

1    the plaintiffs utilized in connection with another

2    action they brought for the same death of Mr. and Mrs.

3    Ungar, that was brought against Iran, and that action

4    was brought in the District of Columbia, and Iran in

5    that instance defaulted, and there was a hearing on

6    the merits because it's a different statute and you

7    had to have a hearing on the merits before you could

8    enter the default under that particular statute, and

9    the plaintiffs put on evidence. They called

10   witnesses. They put in exhibits. They propounded a

11   Hague request to the government of Israel. The

12   government of Israel responded and provided. It

13   appears from the transcript of the hearing in D.C. a

14   variety of information, including statements of the

15   actual killers that were involved in this case, and

16   we've asked for the plaintiffs to turn that over, and

17   in any normal case you would be able to get from your

18   opponent the discovery they've obtained from a

19   non-party, in this case the State of Israel. We have

20   in this action, as part of this discovery, made a

21   similar Hague request to the government of Israel and

22   they haven't got back to us yet. So we're facing the

23   prospect of discovery closing on the 19th of November

24   and going to a hearing with the plaintiffs in the

25   possession of the Israeli government documents that

1   they used to try and prove their case in D.C. and they

2   won't give them to us.  And it's -- I said it was an

3   easy motion.  From my perspective it is.  Why should

4   the plaintiffs be allowed to withhold from us

5   information they have in their possession that is

6   clearly relevant to one of the issues that the Court

7   is going to consider in January, and the plaintiffs'

8   position is that discovery on the issue of whether the

9   PA and the PLO are liable or have a meritorious

10  defense is a purely one way discovery street, and

11  they've made these arguments in their opposition that

12  because we have the burden of proof as the movant

13  therefore they don't have to produce any evidence,

14  they've made the argument that because we know what we

15  did they don't have to show us what they have, and we

16  would respectfully submit that that's not the way

17  discovery works in the American system.  Defendants

18  can always take discovery from plaintiffs about what

19  they have.  It goes to the defendants' liability.  So

20  this is a very normal discovery request in that

21  respect.  But even if the plaintiffs were

22  hypothetically right that there's some special rule in

23  the context of a 60(b)(6) motion where the plaintiffs

24  are entitled to not show their hand to the defendants

25  in the course of the sui-generous discovery that we're

1    engaged in, it would be relevant for an entirely

2    different reason which it also goes to the plaintiffs

3    claims that they've been prejudiced.  The plaintiffs'

4    claim here, and they will argue this undoubtedly to

5    Judge Lagueux in January, is that they can't prove

6    their case because they can't access certain

7    witnesses, some of which, as Mr. Wistow alluded to

8    earlier, have now passed away, some of which no longer

9    are employed by the defendants, and their contention

10   is that the default judgment should remain in place

11   because they can't access that testimony.  Well,

12   obviously it would be irrelevant to determining

13   whether or not they are prejudiced to see what they

14   have.  This is like playing poker and saying, well, I

15   can draw cards but I'm not going to show you what I've

16   got but I'm prejudiced.  Trust me, Judge, you know, I

17   can't prove my case -- I can see what's in my hand, I

18   won't let the defendants see it.

19         And respectfully, Judge, it just doesn't make

20   any sense.  Discovery should be two ways, at least on

21   relevant topics, and this one is concededly relevant.

22   I was pausing in case your Honor had a question.

23         THE COURT:  I do but I want you to complete

24   your argument.  Are you finished?

25         MR. HILL:  I'm pretty close on this point.

Go ahead.

THE COURT: Well, the plaintiffs cite case law, I believe, that indicates that the existence of meritorious defense is to be based on pleadings.

MR. HILL: Right.

THE COURT: Not on discovery facts that are established, do you want to address the case law?

MR. HILL: Certainly, your Honor. And as we pointed out in our reply brief, you know, the issue is not just have we alleged that we didn't do it. We have, and it's part of the motion to vacate we served --

THE COURT: You're aware they dispute that.

MR. HILL: Oh, I understand.

THE COURT: They make that point.

MR. HILL: Exactly, and we, in our motion to vacate, we cited evidence that we're not liable. We tendered an answer denying our liability which for not want of the Indigo case seems to suggest on its own is enough, but I hadn't got a concession from the plaintiffs here that this is a nondisputed issue, and the plaintiffs apparently intend to contest the issue at the hearing. In fact, we got, just yesterday, we got four deposition notices. I'll hand it up to the Court, if I may. May I approach?

1    THE COURT:  Please give it to the clerk.

2    MR. HILL:  The plaintiff has noticed the

3 depositions of these four individuals, one of which

4 who was coincidentally a testifying expert for the

5 plaintiffs in the Ungar versus Iran case.  They

6 haven't told me, because they haven't answered my

7 interrogatories, among other things, what these

8 witnesses are likely to say.  I can't even tell if

9 they're fact witnesses or expert witnesses, from the

10 notice.  Mr. Wistow mentioned as we were coming back

11 from the break that these are de bene esse

12 depositions.  The plaintiffs are going to put evidence

13 on, on the issue of whether we have a meritorious

14 defense and whether we're liable, and the rules of

15 civil discovery should apply.  In fairness, the whole

16 point of having civil discovery, as Mr. Wistow said

17 earlier today or yesterday, it's so it doesn't all

18 come out at the hearing.  Well, we received notice

19 that there are going to be de bene esse depositions

20 which will essentially be the hearing testimony on

21 these issues commencing on the 11th of November, and

22 in fairness, we need to know what do these people

23 know.  What documents do they have that they're going

24 to rely on.  If these people are experts, and this

25 goes more to the second motion that was filed on

1    Friday, we need to have their expert reports before

2    they're deposed.  It's just not fair for us to show up

3    for depositions in Jerusalem where they're going to be

4    put on direct examination that they intend to use with

5    Judge Lagueux in January and we don't know if they're

6    a fact witness or if they're an expert witness.  If

7    they're an expert, what their opinions are, what

8    documents the plaintiffs have they might use with

9    them, or documents the plaintiffs have that might

10   impeach them.  I mean, we need to have this discovery

11   and we need to have it right away.

12        THE COURT:  But that motion is not before me,

13   Mr. Hill.

14        MR. HILL:  Well, it's not before you yet but,

15   I mean, I think it will be and we're running out of

16   time, is part of the reason I bring it up here.

17        THE COURT:  I think you're right that it

18   likely will be before me, but it's not before me yet.

19   I mean, you're suggesting that I somehow advance

20   consideration of that motion because you seem to be

21   arguing that motion now.

22        MR. HILL:  Your Honor, I think that would be

23   perfectly fair.  I mean, I think today it would not be

24   out of line to ask the plaintiffs to explain why they

25   won't tell us who they're going to call in January.

1   We told them.  Why they won't give us expert reports.

2   We've given them ours.  Why they won't show us what

3   their hearing exhibits are likely to be.  But even if

4   you just wanted to confine it to the motion that is

5   before you, it's probably the same stuff.  It's

6   probably the stuff about whether we're liable and

7   whether we have a defense on the merits, and the

8   plaintiffs have obviously got something.  Now they've

9   contended sort of inconsistently that they have enough

10  evidence to show that we're liable, but they've also

11  contended that they can't prove we're liable because

12  they can't depose certain people or they can't get

13  certain documents that have allegedly been destroyed,

14  and there's no way for us to test those claims unless

15  they show us what they're holding.  They got to show

16  us what they have in their hand, Judge, before we're

17  able to argue, okay, maybe you are prejudice, but you

18  claim you needed testimony from Mr. X but you've got

19  an admissible statement from Mr. X, so maybe you

20  didn't need that testimony.  My point is, I don't know

21  what they have, and it's not fair for us to go into a

22  hearing which for these de bene esse depositions will

23  be the week after next, is there notice, and show up

24  here for the first time in a hearing examination

25  context, you know, who the person is, if they're an

1    expert, what their expertise is, what the basis for

2    their opinions are, what their opinions are, and then

3    be expected to, on the spot, conduct a

4    cross-examination that is then going to be the only

5    record that gets before Judge Lagueux in January.

6    It's just not fair, and if we're going to have

7    discovery, we ought to have discovery, and if we're

8    going to have discovery and you can't find out who the

9    witnesses are, or what their expert opinions are, or

10   what documents they're going to use, we just sort of

11   rhetorically ask, I think I did in our reply brief,

12   what are we having discovery about?  I mean, in

13   fairness, we need to get this information and we need

14   to get it soon otherwise we're just being sandbagged,

15   and that's not the way civil discovery is suppose to

16   work.

17            THE COURT:  Would you like to address the

18   consideration that the defendants refused to provide

19   discovery to plaintiffs eight years ago?

20            MR. HILL:  Sure.

21            THE COURT:  And then you now turn to the

22   plaintiffs and say, give us the evidence that shows

23   that we have no meritorious defenses that you have

24   valid claims when the defendants refused to provide

25   discovery, and that was why default judgment was

1    entered.  Would you address --

2              MR. HILL:  Yeah, certainly, your Honor.

3              THE COURT:  I heard you, Mr. Hill, make a

4    somewhat impassioned argument about the unfairness

5    that the defendants are being subjected to, and I

6    recall that the defendants refused to provide

7    discovery, and so I have at least that as a background

8    for your claim that what's happening now is unfair, so

9    let me hear you on that.

10             MR. HILL:  Well, your Honor, I mean, you

11   know, the obvious truism that two wrongs don't make a

12   right.  The defendants did refuse to make discovery

13   previously before I was counsel.  We're here seeking

14   to have the default judgment that was the consequence

15   of that failure vacated.  We're seeking to be able to

16   make the arguments to the district court that we

17   believe on balance, a balancing of the equities would

18   merit, giving us a chance to challenge this case on

19   its merits, and one of the issues that everybody

20   agrees is, you know, is it all a waste of time because

21   the defendants are liable anyway, and that's one of

22   the issues that the Judge is going to have to grapple

23   with in January, and if we're going into that hearing

24   unable to know, you know, what document is coming

25   next, or what witness is coming next, that doesn't

advance the fact finding process that the first
circuit wanted Judge Lagueux to undertake, and, you
know, your Honor, I can't defend the prior decision to
not give discovery by the defendants other than to say
that it was wrong, and as Mr. Rochon said in his
argument earlier, you have before you new counsel
representing defendants that are under different
management, different leadership.  The individuals who
made those decision, probably the individual, in
fairness, who made that decision, is not the party in
the case.  These are organizations of people that are
under new leadership, who have had a change in
approach, a change in leadership, and they want the
opportunity to defend the organizations on the merits,
and the fact that they previously decided not to do
so, if we're going to have discovery on a Rule
60(b)(6) motion, it doesn't make sense now to say,
well, you didn't give discovery before therefore you
can't take any discovery in this process.  Judge
Lagueux's order doesn't say discovery shall be by the
plaintiffs of the defendants only, but the defendants
shall not have the opportunity to take discovery from
the plaintiffs, and that's just not the way courts
usually do things, and that's my response.  I
appreciate your Honor where you're coming from, and I

appreciate, you know, you were the one that was told
that discovery was not going to happen and these
defendants were not going to participate, and it's
hard for me to argue to you that you ought to excuse
my client for something that they did years ago. But
I think in fairness, if we're going to have a hearing
on the merits, and we're going to have a free exchange
of information, and we're going to develop the best
possible record for Judge Lagueux to make his
decisions on, then everybody's got to have discovery,
and we're producing discovery on these issues. We
think they should have to do the same. It's only
fair.

        THE COURT: All right, thank you, Mr. Hill.

        MR. STRACHMAN: Your Honor, I'm sort of
surprised to hear my brother even take the position
that he's taking now after Mr. --

        THE COURT: Mr. Strachman, just state your
name for the record so your voice is recognizable. I
know who you are and maybe the person who transcribes
this, if that is called upon to be done will recognize
it, but it's helpful for someone to state your name.

        MR. STRACHMAN: David Strachman for the
plaintiffs, your Honor.

        THE COURT: Thank you.

1          MR. STRACHMAN:  I'm somewhat surprised to

2     hear Mr. Hill take a position directly contrary to

3     Mr. Rochon.  What Mr. Rochon said when it was

4     convenient for the defendants in the context of a

5     30(b)(6) deposition request that what we are here to

6     do is to deal with only the elements that the first

7     circuit certified to Judge Lagueux, the elements that

8     address a motion to vacate, and he very clearly said

9     that this case should not be expanded any further

10    beyond those elements.  So I fully expected that

11    Mr. Hill would get up and say the same kind of thing

12    when it comes to this particular motion, which is

13    number 530, which is the motion with respect to the

14    interrogatories and request for production of

15    documents.  But here we have Mr. Hill taking a direct

16    opposite position from Mr. Rochon, and he comes to

17    court, comes before you now, and he says we're not

18    here to deal with solely the elements that have been

19    certified, or the issues that have been certified to

20    this court, or remanded to this court, we're here to

21    deal with the issues that were part of not only the

22    complaint, Judge, because the interrogatories and the

23    document requests reference the amended complaint,

24    document 41, and the original complaint, docket number

25    1.  The defendants now, in this motion, seek to go

back ten years, literally ten years, ten and a half
years, and seek to litigate the allegations in the
complaint. There's simply no authority for that.
What we hear, and you heard Mr. Hill say repeatedly,
liability. He believes that we're going to have a
hearing on liability in January, and that the issue
that's been remanded, despite Judge Lagueux's April
1st order, is the underlying merits. That's not at
all what's suppose to happen in this case. That's not
what we're here for. What we're here for is to deal
with the remand and Judge Lagueux's, the contours of
that remand, as Judge Lagueux said it, and he said
very clearly we're here to deal with their willful
default, et cetera, et cetera. They're not going back
eight years to docket 41, which is the amended
complaint. They had an opportunity to do that, as you
pointed out, your Honor. They had the opportunity to
bring in a slew of witnesses. They were given years
of opportunity to comply with orders. They refused to
comply with the set of requests for documents,
interrogatories, and a request for admission. We're
way past that. The only issue before this Court now
is the motion to vacate, and to that extent, the only
issue that has anything to do with merits is
meritorious defense, not the merits of the underlying

claim. To do otherwise would not only expand the
litigation tremendously, far beyond the remand and far
beyond the contours that Judge Lagueux set, but it
would force us to litigate this case now on a motion
to vacate, not with one hand tied behind our back, but
two, ten and a half years later. It's simply
inappropriate. What they fail to disclose, and what
Mr. Hill has failed to disclose, and we point out in
our brief, is that when they asked us for discovery
about the meritorious defense type issues, the issues
that are before this Court, we answered those
interrogatories, and I direct the Court's attention to
Exhibit C of our pleading. Our pleading is 558.
Exhibit C is the plaintiff judgment creditors amended
and supplemental objections. Pages 1 through 12 are
answered, responding to interrogatories on those very
kinds of issues. So, for instance, if I can point the
Court to page 2, and in the interrogatory asks for --
        THE COURT: Excuse me, Mr. Strachman.
(Pause)
        THE COURT: You can resume, Mr. Strachman.
        MR. STRACHMAN: Thank you, your Honor.
Interrogatory Number 1, they ask for information about
our contention in our response to the motion to
vacate, which was docket number 415. They said,

basically, how do you tell us that you're prejudiced?
And we answer at page 3 and page 4, and the beginning
of page 5, in two and a quarter pages we answered
that.  That's the proper inquiry.  They're not just
satisfied with that answer, and that's not before the
Court.  But the litigation that we're all agreed on
should be on the issues on the motion to vacate not
the underlying merits.  If you skip ahead and you look
at the interrogatories that are at issue in this case,
each and every one of them, and each and every one of
the document requests, except for the ones that go to
the Iran case, ask for us to litigate the underlying
merits, again, not just the amended complaint, but it
also references the complaint, docket number 1 from
March of 2000.  That's not what's before this Court.
That's grossly attempting to expand this litigation.
And you heard from Mr. Hill.  He said repeatedly, he
wants to litigate liability in this case.  Liability
is not the issue.  The issue is meritorious defense,
timeliness, prejudice, et cetera.  Never once, to the
best of my knowledge, in their motion to vacate, in
their reply to the motion to vacate, in the oral
arguments before Judge Lagueux, in the two pleadings
that they made in the first circuit, and the oral
arguments before the first circuit, have they said

1    that that they need to litigate the merits of the case
2    in order to show prejudice.  This is backfill.  This
3    is an argument that we're getting now for the very
4    first time having recognized that they're going far
5    beyond the scope of the discovery that was set for
6    this proceeding in this time and place right now.  Now
7    they're coming in to say, well, we need this for
8    prejudice, and they're also coming in to say that we
9    need it for some extraordinary circumstances.  Of
10   course, in all the other pleadings that they filed in
11   this case, the extraordinary circumstances had to do
12   with the peace process, their economy, the effect on
13   every day Palestinians, U.S. relations, et cetera, et
14   cetera.  Now to kind of, I guess, bootstrap a weak
15   argument, they're trying to come in and say, well, we
16   have to go test the underlying allegations in this
17   case.  They cited no authority.  Not a single
18   authority did they cite for this proposition, that on
19   a motion to vacate they can come in and litigate the
20   underlying merits.  What we've brought to the table,
21   and it is true that they've tried to distinguish these
22   cases, but what we've brought to the table without any
23   counter-authority, are a series of decisions.
24   Plaintiffs assert the sixth circuit decision in Borel
25   (phonetic spelling), which is cited in several places

1   in our pleadings.  It said, "When reviewing a motion

2   for relief under Rule 60(b), the Court is not

3   permitted to consider the underlying strength of the

4   plaintiffs' claim".  We're not here to litigate the

5   underlying merits.  We're here to litigate the motion

6   to vacate.  And, of course, in the Sierra Foods case,

7   if I could read two sentences, "Facts contrary to

8   those alleged by the plaintiff were and are within the

9   knowledge of the defendants since they were the only

10  other parties to the transactions upon which

11  plaintiffs' claims are based, thus, defendants had no

12  need for discovery to uncover such facts".  If they

13  want to know about their own conduct, whether they did

14  something, whether they didn't do something, they have

15  that information in front of them.  They have it

16  before them.  They can search their records and

17  determine how much they paid Hamas or didn't pay

18  Hamas, whether they harbored them or they didn't

19  harbor them.  We're not here to test our allegations

20  in the complaint.  And it's striking, especially in

21  the context of the Rule 30(b)(6) motion argued

22  earlier, which I think it was every single citation

23  that was made in that -- almost every single citation

24  that was made in our 30(b)(6) notice was tied directly

25  to the statements they made on the motion to vacate,

1     the motion, the reply, the pleadings, in the first

2     circuit.  Not a single one was made to the answer that

3     they've provided.  We're not looking for discovery

4     with respect to their answer.  We were looking in that

5     motion for, in that request, for discovery with

6     respect to the issues that are before us, when they

7     come in and they say we didn't answer because of X, Y

8     and Z, but we sought to test that.  They're turning

9     the whole process on its head, and as the Court

10    rightfully, I think, recognized in its comments to now

11    use the motion to vacate to go back and re-litigate

12    something that they had an opportunity to do eight or

13    nine years ago is an absurdity.  It's almost to me

14    like a twilight zone episode.  And to completely turn

15    the tables on the plaintiffs when it's entirely

16    inappropriate, there is no authority, and the first

17    circuit just ruled, just in February, in the Indigo

18    case, that establishing the existence of a meritorious

19    defense is not a particularly arduous task.  A party's

20    averment need only plausibly suggest the existence of

21    facts which if proven at trial would constitute a

22    cognizable defense.  They said that in February.

23    That's the law governing this pleading standard for a

24    meritorious defense.  Now we disagree with whether

25    they have complied with that, and if they ask us a

proper interrogatory, tell us why you think, you know, we disagree with whether defendants have met that standard. That may be a proper interrogatory. And, in fact, as Exhibit C says in 12 pages, we answered interrogatories akin to that. But to go back and to look back 10 years, 9 years, and try to look for a proof standard on the underlying allegations in the complaint is just completely inappropriate, it's unprecedented. There's absolutely no citation that they bring that suggests they have the right to do that. We clearly have made a good faith response to 12 pages of discovery. That's why they haven't moved to compel further answers with respect to the first 12 pages of Exhibit C, and they skip right ahead to some of the other interrogatories that go to merit.

         With respect to the documents, your Honor, virtually the same except for they asked on a couple of occasions for documents pertaining to the Iran case. As the Court knows, the Ungars sued unsuccessfully Iran. There was a series of representations in that case about the Hamas, and the symbiotic relationship between the Hamas and Iran. It's not mutually exclusive to any conduct of the PA, and, of course, they make sort of an ad hominem comment in their reply suggesting that we were less

than -- we don't respond with candor with respect to documents that I was asked by the Judge 8 years ago to hold on to. We have those documents. We have them in the original file. They stuck them in, which I think is request for document number 16 to sort of make that attack on me personally even though it's not before the Court. They also suggest there is another Hague convention --

THE COURT: Mr. Strachman, you're saying that when Mr. Hill argued, the second part of his argument was they want the documents pertaining to the Iran action, that's not within the scope of this present motion. Is that what you're saying.

MR. STRACHMAN: It's not in the scope of the present motion, absolutely, your Honor, but they specifically said that there were certain documents that, document number 15, they said the answer basically wasn't honest, Strachman must be holding on to these documents because the Judge, 8 years ago, told us to hold onto these documents. Of course we have them. I have them. We never said we didn't have them, and we never said we weren't going to produce them if the Court ordered us to. We objected to getting into the underlying merits as opposed to the meritorious defense.

1          They also make a point, Judge, of saying --

2          THE COURT:  Is there a difference, though,

3    Mr. Strachman, between 8 and a half years ago when

4    they refused to provide discovery and you argued we

5    shouldn't go back and re-litigate what the facts were

6    8 and a half years ago, but I gather that the Iran

7    action was subsequent to that, am I correct?  The Iran

8    case was 2006, 2007, or something?

9          MR. STRACHMAN:  No, Judge.  The Iran case was

10   heard by -- I have a docket here -- was heard by

11   Judge Robertson in January 15, 2002.  That's when we

12   had an evidentiary hearing, and there was a ruling in

13   June of 2002.  And what they were saying with respect

14   to one set of documents is at that hearing the Court

15   asked me to hold on to them.  We have them.

16   Subsequently, a couple of years later, there was a --

17   in 2003 we made a Hague request to appoint

18   commissioners and to take depositions, and they make a

19   mistake in their brief, the defendants cite a May 22,

20   2003 request and suggest that when we say we don't

21   have any documents, you know, that may not be

22   truthful.  In fact, if they only went to the docket,

23   and they looked at the docket, docket number 38, the

24   docket number that they reference, refers to a request

25   for depositions, not for documents at all, and we told

1    them we never got any documents.  We don't recall

2    getting any documents in response to a request for

3    depositions, and that's true.  In fact, the

4    depositions never occurred, either.

5             In sum, I think --

6             THE COURT:  Before you leave this point, the

7    impression I glean from what I read was that the

8    district court didn't want to place the burden for the

9    safe keeping of these documents with the clerk and

10   placed that burden on you, Mr. Strachman, is that

11   correct?

12            MR. STRACHMAN:  Correct.  If I could, Judge,

13   it was a Hague convention request of October 2001, and

14   for some reason the appropriate authority and the

15   Justice Ministry, I forget offhand, sent them to me,

16   original documents.  I walked into court with them and

17   I returned them to the court and asked the court to

18   hold onto them.  The Court said, no, Strachman, you're

19   on the hook, and you hold onto them.  In fact, some of

20   them frankly were pictures, and Mr. Hill knows that we

21   had an agreement that I would send him copies of those

22   pictures because some of those pictures were pictures

23   that were entered in evidence before your Honor when

24   we had a hearing in the Hamas case here, and he knows

25   that I sent him those pictures last week.  Thursday

1    night they went out at great expense to my client.

2    They provided color copies of those pictures not in

3    the context of this request but in the contest of

4    asking for documents that they claim they didn't have

5    even though they were given to Mr. Sherman and

6    Mr. Clark just before the hearing before your Honor.

7    THE COURT:  It sounds to me, Mr. Strachman,

8    that in a perfect world where clerks have unlimited

9    space, and unlimited assistance, that the Court might

10   have accepted these documents for safekeeping, but

11   chose not to do so because we don't live in a perfect

12   world, but they were documents that would, in effect,

13   have been filed with the court, and if that's the

14   case, then when the defendants say the plaintiffs are

15   in possession of some documents that, were it not for

16   the fact that we're not in a perfect world, would have

17   been available to us at the clerk's office, we'd like

18   these documents.  That's what I'm hearing.  You are

19   opposed to providing these documents to him?  You're

20   not willing to do so?

21   MR. STRACHMAN:  We don't want to, and we

22   objected to providing them, Judge, because they get

23   to, as Mr. Hill said, they go to liability.  They

24   don't go to meritorious defense, and we raised a

25   series of objections, and that's why we don't want to

1     produce them, and they parallel a similar Hague

2     request that was made several months ago here.

3            THE COURT: By the defendants.

4            MR. STRACHMAN: By the defendants here.

5            THE COURT: But they say they have not got a

6     response to yet.

7            MR. STRACHMAN: I guess the first we had a

8     discussion about that in the last few months since --

9     I have no idea.

10           THE COURT: Mr. Strachman, I hear your

11     argument that plaintiffs believe it's inappropriate,

12     completely, to litigate the merits of the plaintiffs'

13     claim in the context of this motion to vacate. When

14     you say you are also opposed to providing the

15     defendants with documents that would have been filed

16     with a court, had the court had the resources and the

17     staff to do it, I see a difference between two

18     situations. I want to be sure I understand. What you

19     say in response is that it's the same issue, Judge.

20     It goes to the merits. They don't have any need for

21     this because they want to take this and show that, you

22     know, we never had a case, or we didn't have a case

23     and we shouldn't prevail and, you know, why give them

24     something that they're not entitled to. So I just

25     want to --

1    MR. STRACHMAN:  If I could, Judge, I'm sorry

2    to interrupt, I don't disagree that there's a

3    distinction.  There's a distinction between those

4    documents, the Hague convention request documents and

5    the other, you know, other information about the

6    complaint.  I agree, the concern that we had is that

7    if we -- one of the concerns is that if we agreed to

8    provide these documents, which we can readily do, then

9    we're opening up a slippery slope and now it will be

10   seen as an attempt, or a derogation of our position

11   that we're not here to get into the merits, but I

12   don't disagree that there's a distinction.  Absolutely

13   there's a distinction, for sure, Judge, and that

14   implies one of the reasons why when they ask for

15   photocopies, excuse me, color copies of the photograph

16   portions of these documents we gave them to them, at

17   our expense.

18           THE COURT:  Have you completed,

19   Mr. Strachman?

20           MR. STRACHMAN:  Yes, your Honor.

21           THE COURT:  All right, thank you.  All right,

22   Mr. Hill, I'll hear you briefly, please.

23           MR. HILL:  Thank you, your Honor.  To pick up

24   with the last issue, let me just first of all say

25   Mr. Strachman said he thought there was an ad hominem

in the brief, and if there was it certainly wasn't
intended.  I don't intend to attack Mr. Strachman in
any way.  But your Honor has put your finger on it.
You know, some of the materials that are being
withheld are those that we request in request number
15, which is reprinted on page 12 of our brief, which
are the documents received by the plaintiffs pursuant
to the Hague request from October of 2001, and as it
just came out in the argument, these, I think I heard
Mr. Strachman say, were the originals sent to him by
the Israelis.  If that is the case, my Hague request
is going to be returned with no documents because the
Israelis have sent them to Mr. Strachman, and then as
your Honor was pointing out, had the clerk's office in
D.C. had the room for them, Judge Robertson would have
stored them there and I would have had them long ago.
It cannot be that because Judge Robertson didn't want
to burden the clerk with maintaining these, and
instead burden Mr. Strachman with maintaining these,
that I cannot now get from Mr. Strachman what is the
equivalent of a public record.  That seems to be the
very easy resolution with respect to that particular
set of documents, and I would request that the Court
order Mr. Strachman to deliver them to us, he said
they were easy to get to, as soon as possible.  We

1    should have had them months ago.

2              THE COURT:  You're referring to the documents

3    referred to in request number 15?

4              MR. HILL:  Yeah.  I think we should get every

5    document that the Israel government sent to him in

6    response to that Hague request, and he's indicated

7    that he used some of them in evidence with your Honor.

8    We should not be limited to what the plaintiffs have

9    selected.  We should get the whole file.  That's

10   essentially a public record, and we ought not to be

11   limited to just what the plaintiffs want to disclose,

12   and to return to my analogy of playing cards, you

13   know, we ought not to be limited to seeing just what

14   the plaintiffs want to show us.  Discovery is, you got

15   to show us what you got, and that would include at the

16   very least this material that's the functional

17   equivalent of a public record.  And if I can press my

18   point for the material that might not fall into that

19   category, let me just say this, the Court of Appeals'

20   decision indicated among the aversational (phonetic

21   spelling) array, I may be mispronouncing that word,

22   that the Court needed to consider was the defendants

23   "insistence that they have legitimate merit based

24   defenses to the action", and Mr. Strachman is arguing,

25   in essence, that, well, you're trying to take

discovery of our liability case, not your merits
defense.  Judge, these are the flip sides of the same
coin.  We're not alleging a statute of limitations
defense or an affirmative defense of some sort that
requires proof other than proof of liability or
failure to prove liability.  The allegations in the
complaint are that we sponsored the killers, that we
aided and abetted them, that we actively encouraged
and harbored Hamas, and we're saying, no, we didn't.
Well, that is our merits based defense, and if we're
going to have discovery before a Rule 60(b)(6)
hearing, it ought to be bilateral.  We ought to be
taking evidence from each other on at least the issues
where we agree that they're relevant to the Court's
hearing.  It just doesn't make any sense to tie
essentially Judge Lagueux's hands by saying, okay, you
can only see what the plaintiffs have that they want
to show you and the defendants can't respond with what
the plaintiffs have that perhaps undercuts their case,
or undercuts their case on prejudice, and the point
about responding to the interrogatories on prejudice,
I think you can sort of slide by a little too easily.

        You know, the point I'm making about
prejudice is the plaintiffs have made assertions that
they are prejudiced because they cannot now take

certain depositions or gather certain unspecified
documents, and in order for us to contest those
assertions we need to know what equivalent of
testimony they have, that would be statements that
would be admissible against them.  That's the
equivalent of testimony under the federal rules.  What
documents they have, they may well be claiming that we
have lost or destroyed documents they have.  I cannot
attest to that claim unless I get this discovery,
otherwise we may have a situation which is not suppose
to happen in civil cases where you go to trial, and
because the plaintiffs only list on their exhibit list
the documents they want to use, and they're holding
something that would, you know, be favorable to our
case, or impeach their case, I'm not allowed to get it
because the argument is made that, well, it's just a
pleading standard and, you know, you have the burden
of proof therefore you can't take it.

And let me make this point, Judge, I've now
received notice that they're going to be deposing four
people in Jerusalem next month.  I did not hear a
denial that that's about the merits, that that's about
whether or not we aided and abetted or supported
Hamas, and I suspect that's what those are about
because one of the people that's being wound up for a

1       deposition testified in the other case about Iranian

2       support for Hamas, and that's got to be relevant,

3       Judge.  I mean, Mr. Strachman says, well, it's not

4       mutually exclusive that they could have been supported

5       both by the PA and the PLO and Iran.  Well, perhaps

6       not.  It could have been more than one, but it might

7       have just been Iran.  And that's something we're

8       entitled to explore as part of putting on our case

9       that we have a meritorious defense.

10              So I would respectfully submit to the Court

11      that if we're going to have discovery on a 60(b)(6)

12      motion, and you usually don't, You usually do this on

13      allegations or affidavits, You don't usually have an

14      evidentiary hearing, but that is what Judge Lagueux

15      has ordered.  If we're going to have an evidentiary

16      hearing on whether the defendants have a meritorious

17      defense to the claims that they aided and abetted the

18      killers of Mr. Ungar, in fairness, we have to have

19      discovery from the plaintiffs about what evidence they

20      have that they say proves that we aided and abetted

21      the killers of Mr. Ungar.

22              Your Honor, that is it on that motion.  If I

23      may make one housekeeping point, and it is about

24      depositions abroad.  There was a question earlier

25      today about whether the defendants should be required

to pay the travel costs for the plaintiffs to travel to the Middle East to take depositions. The plaintiffs have, as I just mentioned a couple of times, noticed depositions of their own in the Middle East. They're going to be over there for those depositions anyway. We're going to have to travel to attend them, obviously. In equity, unless the Court is going to require them to pay for our travel over there or us to pay for their travel, it makes sense for each side to just bear its own costs. And if the Court eventually grants our motion and vacates the judgment, payment of attorneys fees and costs will be one of the issues that Judge Lagueux would be entitled to undertake. So I suggest rather than rule in advance that somebody has to pay for somebody's hotel room for certain days, or whatever, we just let the Court sort it out at the end of the day. I have nothing further unless the Court has something for me.

THE COURT: You want to say anything about the Indigo case?

MR. HILL: Yeah. What's interesting about Indigo, and this is somewhat water under the bridge, but footnote 1 of Indigo talks about how the answer had denied the allegations of breach. This was a breach of contract case, set forth in Indigo's

complaint.  No more was needed at the pleadings stage.
So there might be one view of the world that says,
look, defendants have filed an answer.  That's it, we
have a meritorious defense.  We've denied these
things, and if that were where we were, then maybe we
wouldn't need any discovery on this, and the
plaintiffs wouldn't be trying to take discovery on
this, and they wouldn't be trying to call people who
may well be expert witnesses to give opinions about
our liability in the case, but for better or for
worse, that's not where we are.  Where we are is they
have propounded extensive discovery to us, including
the most recent 30(b)(6) notice, which I think I
brought up with me, which seeks to require to have us
designate someone and prepare to talk about an alleged
agreement between the PA and Hamas that occurred in
December of 1995.  That has got to be about
meritorious defense, and if we're going to have
discovery on the factor of whether the defendants have
a meritorious defense, my only point is that in
fairness it needs to be both ways.  It just would not
be fair for us to go to a hearing, frankly to the
defendants or to Judge Lagueux, to go to a hearing in
January where the only evidence from the plaintiffs is
what the plaintiffs want to show us, and whatever they

don't want to show us, especially if it's a public
record, is something they won't show us, and so then
Judge Lagueux had a trial on less than all the facts
that are available to the parties. That's not what
civil discovery is suppose to be about. You're
suppose to share with each other before the hearing so
that as Mr. Wistow said earlier, we're not hearing
about it for the first time at the hearing. Let's
have the discovery on meritorious defense, let's let
it run both ways. I ask you to compel them to answer
the interrogatories. If they don't have anything,
they don't have anything. It's not a hard
interrogatory. If they've got it, they've got it in
their file, it won't take them long to send it over to
me. So I respectfully request that your Honor grant
the motion to compel, and please help us with these
other issues, as well. You know, I know it's not time
for the opposition yet, but it would really be fair
for us to get expert reports before we have to depose
people who are experts. It would really be fair to
know whether there are any more witnesses than these
four that they've noticed that they're going to call
because if there are, we should get a chance to depose
them. That's what discovery is suppose to be about.
Thank you, your Honor.

1      THE COURT:  All right, thank you, Mr. Hill.

2      MR. STRACHMAN:  May I respond very briefly,

3  Judge?

4      THE COURT:  Yes, Mr. Strachman, briefly.

5      MR. STRACHMAN:  Thank you, your Honor.

6  First, your Honor, I really object to this plea both

7  early this morning and today to deal with things that

8  are not scheduled for the Court to address today.  The

9  Court has been very methodical.  We had a conference

10  about dealing with specific motions.  Your Honor

11  scheduled these motions.  There are issues that are

12  not ripe, that are not even briefed yet, and my

13  brother would have you set a schedule to deal with

14  them right away.  A motion we just got late Friday

15  night, for instance.

16      Secondly, what I didn't hear from my brother

17  is why there should be a rule in derogation of the

18  Borel case and the Indigo case.  What he is advocating

19  for, and I think we respectfully suggest we need to be

20  very clear about that.  Instead of saying, according

21  to the defendants, instead of saying that there's a

22  meritorious defense prong, if you will, of a motion to

23  vacate, what we have here is a liability defense.  So

24  any defendant who's in default can come in and say,

25  you know what, to vacate the judgment I want to try

the case. I want to try that right now, and by trying
that case and testing every allegation in the
complaint and, of course, in most motions to vacate
years have transpired. In this case, it's literally
8 years since we filed an amended complaint and
10 years since we filed the complaint, 10 and a half
years, so he's asking for a rule that suggests that
prong means nothing. Meritorious defense doesn't mean
a thing. What it means is liability. That's not what
the first circuit said. That's not what any of the
cases say. They don't provide a single citation for
this radical and extreme position because if they did,
and if the courts were to rule that way, then the
motion to vacate would mean nothing and there would
always be the equivalent of a trial on the merits, and
that would mean that the discovery in this case would
expand tremendously, far beyond what's at issue, and
they still have not responded to the point clearly.
When they asked us the question, why do you feel that
you're prejudiced, we answered that in 2 and a quarter
pages, and they were satisfied. If they asked us why
do you feel we have not met the meritorious defense
burden, why do you not believe that we haven't averred
the suggestion of sufficient facts, that may be a
proper question. Proffer that question and we may

1 answer that because we have to, because that's at

2 issue before Judge Lagueux, not the liability, not the

3 complaints, and they refuse to do that. Thank you,

4 your Honor.

5    THE COURT: All right, thank you,

6 Mr. Strachman. All right, Counsel, the Court thanks

7 you for your arguments. I recognize that there is a

8 need for a rapid determination of each of the motions

9 on which I've heard argument. It is my intention to

10 address them as rapidly as I can. These motions pose

11 issues that I could easily spend 20 pages writing on,

12 and there are eight motions. Unfortunately, if I did

13 that, it would not be speedy. So my intent is to

14 issue written orders reflecting the ruling, briefly

15 explaining why I'm ruling the way I am, and get the

16 decision out to you. I'm not going to set a specific

17 deadline. I certainly expect to have some of these

18 out this week. Maybe all of them out by the close of

19 business Friday, but some of that depends on what

20 happens in terms of other cases between now and then.

21 Your request for resolution of these larger issue, I

22 will attempt in the course of deciding these motions

23 to indicate how the Court views some of these larger

24 issues and how they should be resolved. Maybe that

25 will avoid future hearings on at least some of the

1    motions that you've indicated are presently in

2    dispute.  That's my goal.  I recognize there are big

3    issues.  I hope my rulings and explanation as to why

4    I'm ruling the way I am will give you some guidance

5    that will make it unnecessary to bring further motions

6    to seek to address similar or the same issues.  I

7    think that's about all I need to tell you.  And I

8    expect some of these rulings will be out this week,

9    maybe all of them.  I recognize again that November

10   19th is the close of facts of the discovery period.

11   I'm very conscious that you need a speedy resolution,

12   and that's my intent.  All right, the Court will stand

13   in recess.

14   (RECESS)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, court approved transcriber, certify that the
foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the
above-entitled matter.


/sJOSEPH A. FONTES/
COURT REPORTER
NOVEMBER 11, 2010
DATE