UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs,

        v.

THE PALESTINIAN AUTHORITY, et al.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 00-105L

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' NOTICE OF APPEAL OF MAGISTRATE JUDGE MARTIN'S OCTOBER 27 & 28 ORDERS (DKT. NOS. 575, 577, 578, 579)

The Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively, "Defendants"), by and through counsel, and pursuant to Federal Rule of Civil Procedure ("Rule") 72(a) and Local Civil Rule 72(c), hereby appeal portions of four orders issued by Magistrate Judge Martin on October 27 and 28, 2010.

These orders arose out of a two-day motions hearing before Magistrate Judge Martin during which he addressed several disputes that had arisen between the parties during the course of the limited discovery period allowed by the Court in anticipation of the January 18, 2011 hearing in this matter. That hearing was set by this Court in compliance with the First Circuit Court of Appeals' remand order, which instructed the Court to reassess the merits of Defendants' motion to vacate by evaluating factors in addition to the willfulness of Defendants' default. *See Ungar v. PLO*, 599 F. 3d 79 (1st Cir. 2010). To afford the parties an opportunity to prepare for this hearing, the Court set a discovery period of less than six months, which concludes on the 19th of November. Dkt. No. 489. Several discovery disputes arose regarding the scope of discovery appropriate for Defendants' Rule 60(b)(6) motion, resulting in the hearings before the

Magistrate Judge.  While below Defendants identify the specific aspects of the Magistrate Judge's orders that are challenged herein, it is first useful for this Court to get a snapshot of the discovery tactics employed by Plaintiffs over the last several months.

To put it mildly, Plaintiffs have made extensive use of this discovery period.  Indeed, Plaintiffs' track record during the last five months indicates their discovery plan has not been designed to obtain information necessary to present their case at the January hearing, but has instead been designed to overwhelm Defendants and their counsel with considerable discovery burdens in the hope that Defendants will be unable to comply with their obligations under the Federal Rules of Civil Procedure.  Plaintiffs' discovery tactics have included:

- Serving four sets of document requests pursuant to Rule 34, which contain over 200 individual requests;

- Serving Rule 30(b)(6) notices on each Defendant that required witness preparation on over 100 discrete deposition topics;

- Seeking two Rule 30(b)(1) depositions of current PA Prime Minister Salam Fayyad;

- Seeking a Rule 30(b)(1) deposition of former PA Prime Minister Ahmed Qurei, without any basis to believe he had knowledge relevant to this case;

- Propounding numerous discovery requests that facially seek voluminous amounts of attorney-client privileged or work-product protected material.

While not all of these requests have been upheld, the Plaintiffs' discovery demands have created substantial burdens on the Defendants in opposing the unreasonable requests, many of which the Magistrate Judge also found overbroad or otherwise questionable.  The Plaintiffs' approach to discovery cannot be what this Court envisioned when it set a brief discovery period to facilitate fact development in advance of the January 2011 hearing.

To make matters worse, Plaintiffs have essentially treated discovery in this matter as a one-way street, where Plaintiffs are allowed to seek discovery from Defendants regarding the

evidentiary foundation for the arguments that they intend to make at the January hearing, but where Defendants are not allowed the same type of discovery from Plaintiffs. Examples of this include:

- Propounding discovery requests requiring Defendants to identify the witnesses and documents they intend to present at the January 2011 hearing, but refusing to respond to identical discovery requests served on them;

- Propounding discovery requests regarding Defendants' meritorious defenses to the allegations raised in their Complaint, but refusing to provide discovery to Defendants regarding those same allegations;

- Refusing to provide Defendants with discovery needed to support their arguments concerning how Plaintiffs will not be prejudiced if the Court grants vacatur, while seeking prejudice discovery from the Defendants;

- Refusing discovery on how the damages award would not withstand adversarial testing;

- Refusing to provide Rule 26 reports for each of their expert witnesses and then also refusing to make these expert witnesses available for Defendants to depose.

Plaintiffs' aggressive and unreasonable discovery behavior necessitated bringing multiple disputes to the attention of the Magistrate Judge. For the most part, Defendants prevailed in narrowing Plaintiffs' discovery requests, with the Magistrate Judge (1) denying the effort to depose Prime Minister Fayyad for a second time, (2) denying the effort to depose former Prime Minister Qurei, (3) narrowing substantially the Plaintiffs' 30(b)(6) notices, and (4) also narrowing substantially Plaintiffs' requests for third-party communications between the PA/PLO and various entities targeted in Plaintiffs' collection efforts. Thus, Defendants are now appealing only select portions of four of Magistrate Judge Martin's six recent discovery orders. Hence, the instant appeal concerns:

(1) That portion of Magistrate Judge Martin's "Order Granting in Part and Denying in Part Motions" (Dkt. No. 575) that allows Plaintiffs to obtain discovery of Defendants' written

communications with non-party entities (i) Palestine Investment Fund ("PIF") and (ii) Palestine Commercial Services Company ("PCSC");

(2) That portion of Magistrate Judge Martin's "Order Granting in Part and Denying in Part Defendant's Motion to Compel" (Dkt. No. 577) that forbids Defendants from seeking certain discovery of Plaintiffs concerning factors relevant to deciding the motion to vacate, including (i) meritorious defense, (ii) prejudice to Plaintiffs, and (iii) extraordinary circumstances;

(3) That portion of Magistrate Judge Martin's "Order Granting Defendants' Motion for Protective Order and Identifying Relevant Rule 30(b)(6) Topics" (Dkt. No. 578) that allows Plaintiffs to obtain deposition discovery regarding (i) the willfulness of Defendants' default, (ii) the timeliness of Defendants' motion to vacate, and (iii) Defendants' communications with PIF and PCSC; and

(4) That portion of Magistrate Judge Martin's "Order Denying Defendants' Motion for Mental Examinations" (Dkt. No. 579) that forbids Defendants from obtaining Rule 35 examinations of Plaintiffs, but leaves open the possibility that Plaintiffs will be able to present new evidence concerning their mental conditions at the January 2011 hearing.

## **STANDARD OF REVIEW**

The Federal Rules of Civil Procedure allow a magistrate judge to hear and decide a non-dispositive matter and issue a written order stating the decision. Fed. R. Civ. P. 72(a). When a party objects to such an order, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.*

When the Court's review of a magistrate's decision turns on a pure question of law, that review is *de novo* under the "contrary to law" branch of Rule 72(a). *Compagnie de Reassurance*

*D'Ile de France v. New Eng. Reinsurance Corp.*, 57 F.3d 56, 71 (1st Cir. 1995); *Seaton Ins. Co. v. Clearwater Ins. Co.*, No. 09-516, 2010 U.S. Dist. LEXIS 91557, at *3 (D.R.I. Sept. 2, 2010). A magistrate's factual findings are reviewed by the district court under the "clearly erroneous" standard. *Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999) (citing 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a)). "A determination is 'clearly erroneous' when, although there is evidence to support it, the court, after reviewing all the evidence, is left with the definite and firm conviction that the magistrate judge made a mistake." *Harvard Pilgrim Health Care of New Eng. v. Thompson*, 318 F. Supp. 2d 1, 6 (D.R.I. 2004).

The standard that applies to mixed questions of law and fact is "nuanced," and depends on where the question falls along the along the degree-of-deference continuum, which stretches "from plenary review at one pole to highly deferential modes of review (*e.g.*, clear error, abuse of discretion) at the opposite pole." *Reich v. Newspapers of New England*, 44 F.3d 1060, 1069-1070 (1st Cir. 1995).

## ARGUMENT

I. **MAGISTRATE JUDGE MARTIN'S ORDER ALLOWING THIRD-PARTY COMMUNICATION DISCOVERY (DKT. NO. 575) IS CLEARLY ERRONEOUS AND CONTRARY TO LAW**

On October 27, 2010, Magistrate Judge Martin issued his ruling on (1) Defendants' Motion for Entry of a Protective Order Regarding Plaintiffs' Requests for Discovery of Certain Third Party Communications (Dkt. No. 526) and (2) Plaintiffs' Motion to Strike and to Compel (Dkt. No. 551). Dkt. No. 575 ("Order Granting in Part and Denying in Part Motions"). This order concerned Plaintiffs' requests for discovery of communications between Defendants and seven other entities concerning "the instant case," the 2004 default judgment in this case, and/or the Court's 2006 creditor's bill judgment. *See* Dkt. No. 526 at 1; *see also* Dkt. No. 527-7 at 5;

527-8 at 5. The Plaintiffs' requests sought communications not only between the Defendants and these entities, but also between counsel for the Defendants and counsel for the entities.

None of the seven other entities named by Plaintiffs in their discovery requests is a party to this litigation, but all of them have been targets of Plaintiffs' efforts to enforce the default judgment against Defendants.[1] Plaintiffs argued that communication between Defendants and these entities (including between their counsel) was an appropriate area of discovery because (1) evidence that Defendants had acted with "unclean hands" with respect to Plaintiffs' efforts to enforce their default judgment would be relevant to the question of whether vacatur should be granted and (2) Plaintiffs claimed they had reason to believe that Defendants had somehow violated this Court's orders by acting in concert with the seven named entities to inappropriately interfere with Plaintiffs' enforcement efforts. *See* Dkt. No. 553 at 3-12. Plaintiffs proffered nothing whatsoever to support this latter point with respect to six of the seven named entities. Their only specific proffer was as to PIF.

With respect to PIF, Plaintiffs claimed that, after the Court's 2006 creditor's bill ruling, PIF had taken several improper actions: transferring dividends and advances to the PA during the 2006-2010 time period, altering its articles of incorporation, and bringing legal actions in Ramallah, Cairo, and Amman to protect its assets from Plaintiffs. *Id.* at 8-11. With respect to the legal actions in the Middle East, Plaintiffs attributed PIF's actions to the PA on the sole basis that "Mohommad Mustafa, who purports to be both the CEO and Chairman of the PIF . . . also

---

[1] The discovery sought Palestinian Authority and PLO communications with (1) Orascom Telecom Holdings S.A.E. ("Orascom"), (2) the Palestine Monetary Authority ("PMA"), (3) the Palestinian Pension Fund for the State and Administrative Employees of the Gaza Strip ("Palestinian Pension Fund"), (4) various related investment entities known as "Canaan," (5) Becont Ltd., (6) the Palestine Investment Fund ("PIF"), and (7) the Palestinian Commercial Services Company, a subsidiary of PIF. *See* Dkt. No. 527 at 7-8.

serves as the "Economic Adviser to the PA President" and therefore "the PA itself is behind these proceedings brought by the former officers of PIF." *Id.* at 10.  The Plaintiffs further viewed the PA's receipt of transfers from PIF as evidence of "unclean hands" because, according to the Plaintiffs, the creditor's bill judgment reaches non-U.S. based assets of PIF.

Magistrate Judge Martin denied Plaintiffs' discovery requests as to five of the seven entities named by Plaintiffs, but held that, as to PIF and the PCSC (a subsidiary of PIF), discovery of the written communications sought by Plaintiffs was proper.  Dkt. No. 575. Magistrate Judge Martin based this ruling on his adoption of Plaintiffs' reasoning, holding that discovery regarding "Defendants' post-judgment conduct relative to Plaintiff's efforts to enforce the judgment via proceedings against or regarding the PIF and/or PCSC is relevant for purposes of deciding whether the motion to vacate should be granted," *id.* at 4, because evidence that Defendants "have actively interfered with and sought to frustrate Plaintiffs' collection efforts" with respect to PIF and PCSC would show that Defendants' actions "violate, disregard, or demonstrate disrespect for the orders of this Court," *id.* at 5.

This ruling is clearly erroneous and contrary to law for several reasons.   First, Plaintiffs cannot establish that post-judgment actions taken by PIF or its officers demonstrate inequitable conduct on the part of Defendants without first establishing that PIF's actions should be attributed to Defendants, and no such showing has been made.  And establishing that PIF is an "alter ego" of the PA, such that PIF's actions can be deemed evidence of "unclean hands" on the part of the PA, would be a fact-intensive inquiry that would derail the January 2011 Rule 60(b)(6) hearing.

Second, Plaintiffs' allegations that the PA and PIF have engaged in improper interference with the Court's creditor's bill judgment assume that the creditor's bill judgment controls PIF's

conduct and prohibits the PA from receiving any non-U.S. based funds or assets of PIF.   But, as

the Court lacked personal jurisdiction over PIF and subject matter jurisdiction to transfer PIF

assets, *see Peacock v. Thomas*, 516 U.S. 348 (1996), and lacked authority under R.I.G.L. § 9-28-

1 to reach non-U.S. based assets, the creditor's bill cannot -- as a matter of law -- limit PIF's

conduct nor can it preclude the PA from receiving transfers from the PIF as to non-U.S. based

funds.

Finally, Magistrate Judge erred in denying Defendants' motion for protective order as to

the PA-PIF/PCSC communications regarding *Ungar* because this discovery takes this Court far

afield from issues of actual relevance to Defendants' motion to vacate, as delineated by the First

Circuit in its March 2010 opinion (*see Ungar*, 599 F. 3d at 86).  Simply put, discovery related to

Defendants' communications with PIF is not relevant given the narrow purposes of the January

2011 vacatur hearing.  This Court should not allow such discovery to proceed, nor should it

allow Plaintiffs to occupy the Court's and Defendants' time and resources litigating the issue of

Defendants' communications with PIF at the January hearing.

> **A.    There Is No Basis to Attribute the Post-Judgment Actions of PIF to Defendants, and Therefore No Basis for Plaintiffs' Allegations that Defendants Have "Unclean Hands"**

The first factual predicate upon which the relevance of Plaintiffs' discovery requests

depends is that the actions of PIF (1) in transferring funds of any kind to the PA; (2) in altering

its articles of association; and (3) in bringing legal actions in Ramallah, Cairo, and Amman to

protect itself from Plaintiffs' efforts to seize its assets are legally attributable to Defendants.  This

is so, because even assuming these actions ran afoul of some order of this Court, the actions

would not demonstrate "unclean hands" on the part of *Defendants* unless the actions of PIF could

be legally attributed to Defendants through an alter-ego type of relationship.

In their briefing, Plaintiffs attribute all of these PIF actions to the PA (*see* Dkt. No. 553 at 8-10; Dkt. No. 570 at 3), but offer only a single explanation to justify this attribution: that the CEO of PIF, Muhammad Mustafa, also serves as an Economic Advisor to President Abbas with ministerial rank, though the Plaintiffs often misstate his position as being an Economic Advisor to the Palestinian Authority (*see* Dkt. No. 553 at 10-11; Dkt. No. 570 at 7-8). *See also* Dkt. No. 570 at 8 ("[T]he person in effective control of the PIF . . . also serves as the PA's Economic Advisor. Obviously, then, the PA is directly involved in and responsible for the actions taken in the name of PIF.").

But the mere fact that a single individual holds a position of authority with an economic development corporation, such as PIF, and also serves as Economic Advisor to the head of the government with which that corporation is associated, does not make the actions of the economic development corporation attributable to the government. In the modern world, people have many roles, and the Plaintiffs' efforts to conflate Dr. Mustafa's roles is not supportable. To the contrary, as the Supreme Court has recognized, development corporations like PIF have "become an essential instrument of economic development," and their "separate legal personality" from the governments that they are associated with is "an almost indispensable aspect" of such organizations because it allows third parties to contract freely and safely with them. *First National City Bank v. Banco Para El Comercio Exterior De Cuba ("Bancec")*, 462 U.S. 611, 624-25 (1983); *see also id.* at 626-27 ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such").

To be sure, the presumption of independence afforded to juridical entities such as PIF can be overcome, but to do so requires a far greater showing of governmental control over the entity than the mere fact that some advisor to the government also happens to serve as the entity's

CEO. *E.g., Bayer & Willis Inc. v. Republic of the Gambia*, 283 F. Supp. 2d 1, 5 (D.D.C. 2003) ("Therefore, in order to hold Gamtel liable for the debts of its 'parent,' the Republic of Gambia, plaintiffs must make an extensive evidentiary showing that corporate formalities are almost entirely disregarded.") (internal quotation marks omitted); *see also id.* at 6 ("[P]laintiffs must meet a high burden to hold a subsidiary foreign instrumentality such as Gamtel liable for the debts of its parent state.").

Yet, Judge Martin relied *solely* on the fact that PIF's CEO serves as an economic advisor to President Abbas to justify Plaintiffs' discovery requests as being relevant. *See* Dkt. No. 575 at 3 (quoting Plaintiffs' Motion to Strike and to Compel, Dkt. No. 553, at 10). This is an inadequate evidentiary foundation to attribute PIF's purportedly "inequitable" actions to Defendants; the order based on it is clearly erroneous.

Further, to legitimately hold Defendants' responsible for PIF's actions would require this Court to delve into the relationship between PIF and the PA in a way that would be entirely inconsistent with this Court's prior decisions, and with the intended purpose of these vacatur proceedings -- namely, to determine whether factors actually mentioned in the First Circuit's remand order, of which post-judgment enforcement activity is not one, collectively weigh in favor of vacatur.

Indeed, this Court has consistently ruled -- in actions brought by the Palestine Monetary Authority, by PIF's counsel, and by the Palestinian Pension Fund -- that it will not entertain litigation or fact finding concerning whether entities not party to this case are sufficiently related to Defendants to be subject to Plaintiffs' enforcement efforts. Instead, the Court has uniformly held that the appropriate place to address such matters is in fora where targeted enforcement

assets are located, especially given the present posture of this case.  In fact, very recently the

Court denied a motion to intervene brought by the Palestinian Pension Fund saying:

> [I]f I grant this motion to intervene, I will have to have a factual
> hearing to determine . . . whether or not the Pension Fund is a
> separate entity and unconnected with the PA, and there will have to
> be a lot of discovery.  I'll be duplicating things that have already
> happened in New York, and that's a waste of time, a waste of
> judicial time.  I have enough to deal with in this case right now.
> So, for all these reasons, the motion of the Pension Fund to
> intervene in this case is denied.

Exh. 1, Sep. 21, 2010 Hearing Tr., at 24:24-25:8; *see also id.* at 23:5-14 (Plaintiffs' counsel:

"[I]f this Court were to grant this motion[,] instead of the next four months litigating and doing

discovery on the motion to vacate, we would be here on this parallel proceeding").

Accordingly, the Court should overrule Magistrate Judge Martin's order allowing

discovery that will do nothing but distract the parties and this Court from issues of actual

significance to the vacatur proceedings.

**B.    The Court's 2006 Creditor's Bill Judgment Does Not Provide a Proper
Foundation for Discovery Requests Here**

The underlying premise of the order requiring Defendants to produce their

communications with PIF regarding the *Ungar* litigation is that those communications could

potentially support Plaintiffs' "unclean hands" argument to the extent they show that the PA and

PIF do not recognize the Ungars as the owners of PIF and of all PIF's assets and proceed

accordingly as they carry out their operations in the West Bank.  However, the Court should be

wary of allowing discovery requests premised on enforcing the creditor's bill judgment as to PIF

or the PA's operations abroad.  The Rhode Island creditor's bill statute upon which the 2006

creditor's bill order was based, R.I. Gen. Laws § 9-28-1, does not reach into the West Bank to

control how the Palestine Investment Fund operates, and thus cannot control its decision to

amend its articles of incorporation, declare dividends, or initiate legal actions. Nor does it prohibit the PA from receiving non-U.S. based funds from PIF.

In bringing proceedings pursuant to R.I. Gen. Laws § 9-28-1, Plaintiffs were required by that statute to initiate a new civil action to reach PIF assets, name PIF as the defendant, provide notice to PIF, and establish the Court's personal jurisdiction over PIF -- none of which Plaintiffs did. When PIF's counsel LeBoeuf Lamb raised this issue with the Court in June 2007, the Court acknowledged that this was an "excellent argument," but held that LeBoeuf lacked the standing to raise it. Dkt. No. 561-3 at 30:10-18. Moreover, the creditor's bill purported to transfer all assets "titled and/or owed" to PIF, *i.e.*, *all* PIF assets (Dkt. No. 381), in satisfaction of a $116 million judgment against the PA and PLO when PIF, at the time, had assets of approximately $800 million (*see* Dkt. No. 561-5).

This Court has recognized that a presumptively separate juridical entity should never be deprived of its assets in the absence of constitutional and statutory safeguards. *See North Atlantic Distrib., Inc. v. Teamsters Local Union No. 430*, 497 F. Supp. 2d 315, 326-27 (D.R.I. 2007) ("In this case, the requirements of due process make it impossible for this Court to extend a default judgment to a non-party, regardless of the non-party's relationship to the original party."). Indeed, if the creditor's bill judgment were to be given effect as to PIF, the due process implications would be particularly serious because the Ungars seek to hold a foreign government development instrumentality answerable for the actions of that foreign government, to the great detriment of the people the instrumentality was created to assist. *See First Nat'l City Bank*, 462 U.S. at 624-25; *see also* Exh. 2, Declaration of Dr. Mohammad Mustafa, at 4-5, 6-7 (describing July 2007 agreement among PIF (not the PA), the Overseas Private Investment Corporation and the Aspen Institute launching the Middle East Investment Initiative loan fund and describing

other major PIF development projects); Exh. 3, July 24, 2007 U.S. Department of State Press Release (describing the Middle East Investment Initiative program as a "close collaboration between OPIC, the PIF and the Aspen Institute for over two years" that will "use funds from the U.S. Government entity OPIC and the PIF to leverage $228 million in loans to small business").

In addition to the Court's lack of personal jurisdiction over PIF and the due process defects as to PIF, the Court also lacked subject matter jurisdiction to adjudicate whether assets "titled and/or owed" to PIF can be used to satisfy the Ungars' judgment against the PA or PLO. A federal court's ancillary jurisdiction to enforce its judgments does not extend to enforcement proceedings against entities not a party to the original judgment and against whom enforcement is sought on veil-piercing or alter ego theories. *See Peacock v. Thomas*, 516 U.S. 349 (1996); *Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536 (S.D.N.Y. 2008); *Knox v. Orascom Telecom Holding, S.A.E.*, 477 F. Supp. 2d 642, 647-48 (S.D.N.Y. 2007).

In his order, Magistrate Judge Martin expressed his belief that the Court's 2006 creditor's bill had the force and effect that Plaintiffs claim it does because "R.I. Gen. Laws § 9-28-3 allows the Court to order Defendants, who are subject to its jurisdiction, to take action with respect to property located outside of Rhode Island." Dkt. No. 575 at 5, n.3.  In so stating, the Magistrate Judge cited his own "Order Granting Motion for a Payment Decree" (Dkt. No. 484) at 11-21 for support.  This aspect of Judge Martin's order too is contrary to law, as the Court's 2006 creditor's bill order was based on the provisions of R.I. Gen. Laws § 9-28-1, not R.I. Gen. Laws § 9-28-3, which provides an entirely separate type of enforcement mechanism.  Moreover, when this Court reviewed the Magistrate's Order Granting Motion for a Payment Decree, this Court did not endorse or approve it, or its reasoning.  Instead, the Court said it was subject to *de novo* review, and the Court deferred that review until after the hearing on the Motion to Vacate.

Moreover, at the hearing on the appeal of the Payment Decree order, the Court stated to defense counsel, "I agree that you've raised substantial questions about the applicability of 9-28-3 in these proceedings." Exh. 4, June 15, 2010 Hearing Tr., at 26:8-10; *see also id.* at 28:16-24 (noting that in the course of the hundred or so cases the Court had heard dealing with § 9-28-3, the Court had never seen that statute applied to any type of defendant other than an individual). Given the plethora of problems with the Magistrate Judge's Order on the Payment Decree, it ought not be the basis for subsequent discovery rulings depending on the rationale of that Order.

In sum, the creditor's bill judgment could not, and presumably was never intended to, have effect outside the reach of the Court's jurisdiction, and PIF and assets titled to PIF were, and remain, inarguably beyond the reach of the Court's personal and subject matter jurisdiction. Indeed, even the United States government does not recognize Plaintiffs' claim that they own PIF on the basis of the Court's 2006 creditor's bill order, as evidenced by the fact that one of its overseas investment arms has contracted with PIF, not through the Ungars, but through the allegedly "former" officers of PIF, including its CEO, Dr. Mustafa. *See* Exh. 2 at 4-5, 6-7; Exh. 3. Thus any PIF actions "inconsistent" with the creditor's bill judgment cannot be imputed to the PA or PLO. If they could, such actions are not "unlawful" because the creditor's bill is not enforceable as to PIF.

Accordingly, the Court should overrule Magistrate Judge Martin's order allowing discovery of Defendants' communications with PIF and PCSC because there is no basis to find that such communications are in any way relevant to the instant proceedings.

## II.    THE MAGISTRATE JUDGE'S ORDER DENYING DEFENDANTS THE ABILITY TO CONDUCT MERITS DISCOVERY OF PLAINTIFFS (DKT. 577) IS CONTRARY TO LAW AND SHOULD BE SET ASIDE

The Magistrate Judge denied Defendants' document requests and interrogatory requests focused on the Plaintiffs' allegations of the Defendants' liability. However, documents and

14

information underlying Plaintiffs' allegation that Defendants are liable for Mr. Ungar's murder are relevant to Defendants' entitlement to Rule 60(b)(6) relief, as they relate to three of the factors to be considered by the Court: (1) the existence or non-existence of any meritorious defense, (2) the extent of any prejudice to Plaintiffs, and (3) the presence or absence of exceptional circumstances. *See generally* Defendant The Palestinian Authority's Motion to Compel Answers to Defendant's Interrogatory Nos. 12-18 and Responses to Defendant's Request for Production Nos. 8-15, 17-19 (Dkt. No. 530). Because Magistrate Judge Martin's order denying Defendants the ability to conduct merits discovery of Plaintiffs is one-sided, incorrectly decided, and legally inconsistent, *see* Order Granting in Part and Denying in Part Defendant's Motion to Compel at 4 (Dkt. No. 577), it is contrary to law and should be set aside.

In its March 25, 2010 decision, the First Circuit held that the factors that this Court should consider in determining whether to vacate the default judgment against Defendants include, *inter alia*, "the extent of any prejudice to the opposing party, the existence or non-existence of any meritorious claims of defense, and the presence or absence of exceptional circumstances." *Ungar*, 599 F.3d at 83. As a prelude to the January 18, 2011 evidentiary hearing, this Court ordered the parties to engage in discovery. Dkt. No. 489. Notably, the Court's order did not impose any limits on the scope of discovery, or preclude one side or the other from engaging in discovery on any issue. Dkt. No. 489.

In accordance with that order, Defendant PA served on Plaintiffs its First Set of Interrogatories and its First Request for Production of Documents and Things. These requests sought, *inter alia*, discovery concerning Plaintiffs' allegation that the PA and PLO should be held liable for Mr. Ungar's murder. *See generally* Dkt. No. 530. In their initial and supplemental responses to Interrogatory Nos. 12-18 and Request Nos. 8-15 and 17-19, Plaintiffs

provided only objections and failed to respond substantively. *Id.* at 3-14. The PA then moved to compel answers and responses to these discovery requests. *See generally id.*

On October 27, 2010, Magistrate Judge Martin granted in part and denied in part the PA's motion to compel. *See generally* Dkt. No. 577. However, the portion of the order granting the motion ordered the turn-over only of documents received by Plaintiffs in connection with, and all materials submitted to the court in the case of *Ungar et al v. Islamic Republic of Iran*, No. 00-cv-02606 (D.D.C., filed Oct. 27, 2000. These documents, as the Magistrate Judge noted, "could be considered court documents or documents which would otherwise be available to Defendant had a court not directed that they be maintained by Plaintiffs' counsel." *Id.* at 4. But Judge Martin otherwise denied the PA's motion. *Id.* at 1-4. In short, the order concluded that Defendants are not entitled to merits discovery because:

(1)     Defendants do not need such discovery to establish the existence of a meritorious defense, *id.* at 1-2, which the Plaintiffs contend is merely a pleading standard;

(2)     Though the Plaintiffs refuse to concede that Defendants have met the meritorious defense standard, Defendants cannot use that as "a basis to allow merits discovery," *id.* at 2-3;

(3)     Allowing such discovery "would have the practical effect of re-opening this case before the Court has determined whether it should be re-opened," *id.* at 3; and

(4)     Regardless of Defendants' need for such discovery to test "whether Plaintiffs would truly be prejudiced" (an argument that has "a certain surface appeal"), Defendants would "impose on Plaintiffs the same discovery burden which the Court has already concluded is inappropriate unless and until the judgment is vacated." *Id.* at 3-4.

The PA herein appeals Judge Martin's ruling on its motion to compel merits discovery because it is contrary to law and should be set aside.

First, in contravention of the spirit of the Federal Rules of Civil Procedure, the result of the order is that merits discovery is permitted, but only by the Plaintiffs as against Defendants.

16

As made clear in the PA's motion to compel and at the October 26, 2010 hearing before Magistrate Judge Martin, Plaintiffs have sought discovery from Defendants relating to Defendants' meritorious defenses. *See* Dkt. No. 530 at 17-18 ("For example, Plaintiffs have sought '[a]ll documents relating to, referring to and/or evidencing the PA's active efforts to "quash" HAMAS's influence in the West Bank and Gaza and to cut off funding to HAMAS from international sources' and '[a]ll documents relating to, referring to and/or evidencing the Defendants' claim that . . . HAMAS "indisputably" committed the shooting.'"); Exh. 5, Oct. 26, 2010 Hearing Tr.. at 132:14-17 (defense counsel describing 30(b)(6) deposition notice propounded by Plaintiffs, "which seeks to require to have [Defendants] designate someone and prepare to talk about an alleged agreement between the PA and Hamas that occurred in December of 1995"). So, on the one hand, Plaintiffs have sought merits discovery from Defendants, while on the other hand they claim that the PA's efforts to obtain merits discovery are impermissible. More importantly, the Magistrate Judge's order supports the Plaintiffs' "heads I win, tails you lose" approach.

A one-way approach to civil discovery is insupportable. It leaves Plaintiffs free to appear at the January 18, 2011 hearing and present whatever evidence they have on Defendants' purported liability for the shooting of Mr. Ungar, without providing Defendants an opportunity to see and prepare for that evidence. *See id.* at 109:23-110:2 (explaining that if Defendants appear at the evidentiary hearing without knowing "what document is coming next, or what witness is coming next, that doesn't advance the fact finding process that the [F]irst [C]ircuit wanted Judge Lagueux to undertake").

Second, at the January 18, 2011 hearing, both parties will present evidence of whether Defendants have a meritorious defense to Plaintiffs' allegation that the PA and the PLO are

responsible under the variety of theories that have been pled in the Amended Complaint. Defendants' meritorious defense is their lack of liability, the existence of which they can only demonstrate with evidence showing that others are liable and Defendants are not. In so doing, Defendants should be able to discover the basis for the allegations against them.

Further, even if Plaintiffs are correct in arguing that the issue of meritorious defenses is simply one of pleading and not one of evidence, *see* Dkt. 577 at 1-2, the information Defendants seek from Plaintiffs still remains directly relevant to Plaintiffs' claim that they would be prejudiced were the Court to vacate the default judgment because certain witnesses have died or are no longer employed by Defendants. *See* Exh. 5 at 103. Knowing what liability evidence Plaintiffs *do* have or once had is clearly relevant to whether Plaintiffs would actually be prejudiced by a lack of access to these witnesses. If the Plaintiffs had no case to begin with, then they cannot claim prejudice. Yet, pursuant to the Magistrate Judge's order, they are free to assert prejudice without providing discovery as to it.

Finally, the very rationale of Judge Martin's order is legally inconsistent. He ordered Plaintiffs to produce materials from *Ungar v. Iran* that go to the very same liability issue -- whether Defendants are responsible for Mr. Ungar's shooting -- as the other discovery requests to which the he refused to compel Plaintiffs to respond. *See id.* at 101:14-15 (describing the *Ungar v. Iran* proceedings, which addressed the merits of Iran's liability for Mr. Ungar's death, and at which Plaintiffs called witnesses and entered exhibits into evidence that included "statements of the actual killers that were involved in this case"). Thus, Judge Martin implicitly concluded that the *Ungar v. Iran* documents are relevant to the present matter, or he would not have ordered Plaintiffs to produce them to Defendants. Given that those documents reflect the very same issue addressed by Defendants' other disputed discovery requests -- the merits of

Plaintiffs' allegations against Defendants -- the Magistrate was incorrect as a matter of law in denying Defendants' motion to compel responses to those other requests.

### III. MAGISTRATE JUDGE MARTIN'S ORDER APPROVING INAPPROPRIATE DEPOSITION TOPICS (DKT. NO. 578) IS CLEARLY ERRONEOUS AND CONTRARY TO LAW

On October 28, 2010, Magistrate Judge Martin issued his ruling on Defendants' Motion for Entry of a Protective Order regarding Plaintiffs' Notices of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) (Dkt. No. 548). Dkt. No. 578 ("Order Granting Defendants' Motion for Protective Order and Identifying Relevant Rule 30(b)(6) Topics"). Defendants sought this protective order in response to notices of deposition that Plaintiffs had served on both Defendants, each of which identified over 100 separate deposition topics. *See* Dkt. No. 548 at 1; *see also* Dkt. No. 549-1; Dkt. No. 549-2. Because the deposition topics were so voluminous, Magistrate Judge Martin stated he had "little difficulty concluding that the notices [were] unreasonable on their face," and he therefore granted Defendants' motion for entry of a protective order. Dkt. No. 578 at 2. Defendants do not object to this aspect of Magistrate Judge Martin's order.

However, Judge Martin went on to identify topics he believed would be relevant areas of inquiry during re-noticed Rule 30(b)(6) depositions, including (1) "the willfulness of Defendants' default," (2) "the timeliness of [Defendants'] motion to vacate," and (3) "the relationship between Defendants and the [PIF] and the [PCSC], Defendants' knowledge of: i) Plaintiffs' collection efforts relative to the PIF and PCSC, ii) actions taken by the PIF and/or the PCSC in response to such efforts, and iii) Defendants' own actions, if any, in response to or because of such collection efforts." *Id.* at 3-4. It is these three aspects of Judge Martin's order that are clearly erroneous and contrary to law given the procedural posture of this case.

19

Defendants note that, though Plaintiffs re-noticed Rule 30(b)(6) depositions on each of these three topics after Judge Martin issued this order, Plaintiffs later withdrew these amended deposition notices. In this respect, Judge Martin's Rule 30(b)(6) order may have elements of mootness, particularly as there is insufficient time left in the discovery period for Plaintiffs to conduct depositions, or any other discovery, on the basis of this ruling. However, because Defendants believe the order was erroneous, and to ensure there is no claim Defendants waived any objections to the order or its rationale, Defendants below demonstrate that it should be reversed.

### A.    Discovery Related to PIF and PCSC Is Not Relevant

In identifying deposition discovery pertaining to Plaintiffs' enforcement efforts against PIF/PCSC as potentially relevant to these proceedings, Magistrate Judge Martin relied upon his earlier ruling concerning Plaintiffs' requests for discovery of communications between Defendants and PIF/PCSC. *See id.* at 4, n.4 (citing Dkt. No. 575). But that order is clearly erroneous and contrary to law for the reasons given by Defendants on pages 5-14, *supra*. Accordingly, this aspect of Judge Martin's Rule 30(b)(6) order is also clearly erroneous and contrary to law, and it should be overturned.

### B.    Discovery Related to the Willfulness of Defendants' Default Is Not a Proper Area of Discovery

As Defendants' explained to Judge Martin, much of the discovery sought by Plaintiffs during the pre-hearing period was directed at re-establishing the willfulness of Defendants' default. Dkt. No. 549 at 11. But both this Court and the First Circuit have already determined that the default was willful, and Defendants repeatedly have conceded as much. *See* Exh. 6, Oct. 25, 2010 Hearing Tr., at 102:12-17 ("We have a situation where the defendants have stood before Judge Lagueux, both in papers and in person, and the First Circuit, and said willfulness is

conceded.  And yet the entirety, not the entirety, but huge [swaths] of the discovery sought by the

plaintiffs go to willfulness.").  Accordingly, Plaintiffs should not be entitled to Rule 60(b)(6)

discovery on a factor as to which there is no continuing factual dispute.

      Magistrate Judge Martin concluded otherwise, holding that "the reason(s) for

[Defendants'] default is [] a proper subject of discovery."  Dkt. No. 578 at 3, n.2.  To support this

holding, Judge Martin first reasoned that, in remanding this case for reconsideration, the First

Circuit stated that "Defendants 'blame[d] political extremism within the PLO and the PA for

their earlier decision to default,'" and the First Circuit "appeared" to include this argument as a

relevant basis on which to grant vacatur if it "carried the day."  *Id.* (quoting *Ungar*, 599 F. 3d at

86).  But this mention of "political extremism" in the First Circuit's remand order provides no

justification for allowing "willfulness" discovery because Defendants did not rely on argument

that their default was anything less than legally "willful" in appealing this Court's denial of the

relief that they are seeking.  Instead, Defendants identified the following factors as relevant and

"weighing in favor of vacatur" before the Court of Appeals:  (1) "the PA's status as a foreign

government," (2) "the public policy implications of having a terrorism lawsuit against the PA

and PLO resolved through a default judgment rather than on the merits," (3) "the size of the

judgment, the potential impact of the judgment on the political and financial viability of the PA,"

(4) "the PA/PLO's strong meritorious defenses," and (5) "their commitment to litigate the case

on the merits as part of their efforts to further normalize relations with the United States."  *See*

Exh. 7, Defendants' September 14, 2009 Appeal Brief, at 24.

      Thus, because Defendants did not rely on argument that "political extremism" of any

kind was a basis upon which the Court of Appeals should overturn and remand this Court's

vacatur ruling, and because Defendants are certainly not seeking to re-litigate the issue of

willfulness at the January 2011 hearing, Judge Martin's reliance on the First Circuit's remand order in support of his "willfulness" ruling is in error.

Judge Martin also based his ruling on his reading of this Court's April 1, 2010 order stating that it would set an evidentiary hearing to re-evaluate Defendants' motion to vacate. *See* Dkt. No. 578 at 3, n.2 (citing Dkt. No. 482). In that order, this Court, apparently on its initial reading of the First Circuit's remand decision, stated the First Circuit had instructed it to "determine precisely what the facts are concerning the deliberate decision to default and the factual circumstances surrounding that matter." Dkt. No. 482 at 2. But this order provides no basis for Judge Martin's ruling permitting discovery aimed at willfulness.

The First Circuit held that this Court erred in treating willfulness as the sole, dispositive factor relevant to Defendants' motion to vacate and directed the Court to consider the *other* factors relevant to vacatur on remand. *See Ungar*, 599 F. 3d at 86 (stating that the court did "not mean to minimize the gravity of a willful default in calibrating the Rule 60(b)(6) balance," but noting "there is a substantial dispute between the parties about the incidence and weight *of other, potentially relevant factors*") (emphasis added). When deciding whether to grant Rule 60(b)(6) relief, the Court can of course weigh the fact that Defendants intentionally defaulted and have conceded the willful nature of their default. But, with willfulness having been conceded, making willfulness the subject of discovery and of the January 2011 evidentiary hearing improperly diverts attention from the "other" factors on which the First Circuit directed the Court to focus.[2]

---

[2] In this respect, Defendants note that Plaintiffs have threatened to make the willfulness of Defendants' default "a primary focus of the January hearing." Dkt. No. 565 at 3. Given the rationale of the First Circuit's remand order, should Plaintiffs make good on their threat, it would provide basis for the First Circuit to overturn any order adverse to Defendants that arises out of the January hearing.

Moreover, given the limited time available before the hearing and the number of contested Rule 60(b)(6) factors on which to conduct discovery and be addressed in the parties' pre-hearing briefs, there is no good reason for allowing the willfulness factor to take up any more of the Court's or the parties' time and resources. This is especially so in the context of deposition discovery, which is what Judge Martin was addressing when he issued his order. *Dongguk Univ. v. Yale Univ.*, No. 3:08-cv-441, 2010 U.S. Dist. LEXIS 83987, at *10 (D. Conn. Aug. 17, 2010) (holding that because depositions "are inherently 'time-consuming and inefficient,' they ought to 'be productive and not simply an excuse to seek information that is already known.'") (quoting *Tri-State Hosp. Supply Corp. v. U.S.*, 226 F.R.D. 118, 126 (D.D.C. 2005)).

With the PA and PLO already having apologized to the Court and already having offered a sincere *mea culpa* on the intentional default, Plaintiffs' continued focus on willfulness appears punitive and designed solely to harass and embarrass Defendants. Accordingly, within the specific context of these proceedings, Judge Martin's order allowing Plaintiffs to conduct willfulness discovery is contrary to law, and should be overturned.

### C.    Discovery Related to the Timeliness of Defendants' Motion to Vacate Is Not a Proper Area of Discovery

Plaintiffs have also focused a host of discovery requests on the reasons why Defendants waited 3 and ½ years after the default judgment to file their motion to vacate. *See, e.g.,* Dkt. No. 549-1 at 15. Magistrate Judge Martin's Rule 30(b)(6) order has endorsed this practice by allowing Plaintiffs' to re-notice depositions concerning this topic. Dkt. No. 578 at 3.

In arguing that this discovery topic is improper and irrelevant, Defendants made the point that the timing of Defendants' motion "is what it is," and that Plaintiffs do not need discovery regarding Defendants' ability or inability to have brought their motion earlier to make their case

that Defendants' motion was not made within a "reasonable time," as required by Rule 60(c)(1). Dkt. No. 571 at 8-9; *see also* Dkt. No. 548 at 17-18. Defendants' pointed out that Plaintiffs had already argued extensively to this Court and to the Court of Appeals that Defendants' motion was not timely pursuant to Rule 60(c)(1). *See* Dkt. No. 571 at 8; *see also* Dkt. No. 548 at 16-17. Defendants further pointed out that several federal courts have treated Rule 60(c)(1)'s "reasonable time" requirement as a threshold issue, which must be determined before assessing the merits of a motion to vacate brought under Rule 60(b)(6). *See id.* As such, Defendants' explained, the fact that neither this Court (in initially denying Defendants' vacatur motion) nor the First Circuit (in reversing that denial) focused at all on whether the timing of Defendants' motion was "reasonable" under the circumstances indicated that that question is no longer at issue in this case. *See id.*

In response, Plaintiffs argued that Defendants' position was "bizarre," and stated flatly that "timeliness" remained at issue because "the First Circuit listed it among the factors to be considered on remand." Dkt. No. 565 at 5. Magistrate Judge Martin apparently adopted Plaintiffs' two-sentence position, because he approved of "timeliness" discovery in footnote 3 of his order. Dkt. No. 578 at 3, n.3. Judge Martin's ruling in this respect is contrary to law for at least two reasons.

First, Plaintiffs' "timeliness" argument focused on a section of the First Circuit's opinion addressing factors that are *generally* relevant when a court considers a motion to vacate. *See* Dkt. No. 565 at 5 (quoting *Ungar*, 599 F. 3d at 83). But when the First Circuit describes the factors relevant to Defendants' *particular* motion to vacate, given the posture of this case, it does not cite timeliness. *See Ungar*, 599 F. 3d at 86. Specifically, the First Circuit stated:

> Here, however, there is a substantial dispute between the parties about the incidence and weight of other, potentially relevant factors.

> For their part, the plaintiffs insist that granting Rule 60(b)(6) relief at this late date would work undue prejudice; in their view, the passage of time and the shifting political winds have caused a loss of material evidence and witnesses. Moreover, they maintain that the defendants have no viable defenses.

> But the defendants tell a different tale. They blame political extremism within the PLO and the PA for their earlier decision to default. They insist that they have had a good-faith change of heart and that they have legitimate, merit-based defenses to the action. They also see the amount of the judgment as unlikely to withstand adversarial testing. They vigorously dispute the plaintiffs' claim that evidence and witnesses have been irreparably compromised. They emphasize the special nature of the cause of action, the uniqueness of the case, its political ramifications, and its potential effect on international relations. Taken in the ensemble, these justifications, in the defendants' view, add up to exceptional circumstances.

> Whether or not the defendants' arguments ultimately carry the day, they are substantial.

*Id.*

Thus, the First Circuit considered the passage of time relevant only in the sense Plaintiffs may have been prejudiced by a loss of material evidence or witnesses because of it. The First Circuit did not list the *reasons* for the timing of Defendants' vacatur motion as one of the "other potentially relevant factors" deserving of consideration by this Court. Why the motion was filed when it was filed is not the question -- the question is whether the Plaintiffs were prejudiced by the timing. Accordingly, discovery pertaining to that subject should not now be deemed relevant.

Second, even if the Court were inclined to believe that the timeliness untethered to prejudice was at issue, there is no reason to have discovery on the timing of the filing of the motion and the reasons therefore. Simply put, Plaintiffs do not need discovery on the reasons

why Defendants filed their motion to vacate when they did to argue that the timing of that

motion was unreasonable. *Cf.* Dkt. No. 577 at 1-2 (Judge Martin holding that Defendants do not

need merits discovery from Plaintiffs to make their case that Defendants have meritorious

defenses). This is especially so given the limited nature and timeframe of the discovery and

briefing period allowed by the Court, and the numerous other issues that remain in dispute and

that are relevant to these proceedings.

Accordingly, Magistrate Judge Martin's order allowing "timeliness" discovery to proceed

under the present circumstances of this case should be overturned as contrary to law.

## IV.   MAGISTRATE JUDGE MARTIN'S ORDER DENYING DEFENDANTS THE ABILITY TO CONDUCT RULE 35 EXAMINATIONS (DKT. NO. 579) IS CONTRARY TO LAW

The Magistrate Judge's order denies the Defendants any opportunity to have mental

examinations of the Plaintiffs whose injuries formed the basis for the damages award. *See* Dkt.

No. 579. However, in light of the First Circuit's March 25, 2010 decision in this matter and this

Court's August 18, 2010 order (Dkt. No. 506), there can be no doubt that Defendants should be

permitted to challenge the amount of the judgment.

The First Circuit did not limit this Court's consideration of Defendants' Rule 60(b)(6)

motion to any particular factors, nor did it preclude Defendants from advancing any of the

factors presented in the "asseverational array" of arguments presented to the Court of Appeals,

which included an argument concerning the extremely high $116 million damages award. *See*

*generally Ungar*, 599 F.3d at 84, 86. In accordance with this directive, the Defendants moved

for discovery on this very issue (Dkt. No. 497), Plaintiffs did not oppose the motion, and

Magistrate Judge Martin granted it (*see* Dkt. No. 506).

Defendant the PA then, reasonably enough, propounded an interrogatory as to the basis

upon which the Plaintiffs contended that the amount of the judgment was likely to withstand

adversarial testing.  The Plaintiffs responded that their basis was that the judgment is supported by "the evidence and testimony submitted by the plaintiffs in the context of the damages hearing held by this Court."  Exh. 8, Plaintiffs-Judgment Creditors' Objections and Answers to the Palestinian Authority's Second Set of Interrogatories (19-21), at 6.  Notably, that "evidence and testimony" included fact and expert testimony concerning how the Plaintiffs' mental conditions were, and would be, affected by the death of Yaron Ungar.  *See* Dkt. 560, Memorandum of Law in Support of Defendants' Rule 35(a) Motion to Compel Mental Examinations of Plaintiffs ("Rule 35 motion"), at 5-7.  Thus, given the importance of Plaintiffs' mental injuries to the issue of whether the damages awarded to them would withstand adversarial testing, Defendants moved pursuant to Federal Rule of Civil Procedure 35(a) to compel mental examinations of each Plaintiff.  *See id.*

At the October 26, 2010 hearing in this matter, the Defendants proposed an entirely rational approach to the issue of the Rule 35 examinations.  On the record at the hearing, Defendants offered to forego the requested mental examinations if Plaintiffs would agree to freeze the factual record as of the July 12, 2004 date on which the Court entered judgment against Defendants.  *See* Exh. 5 at 77-83, 97, 99.  The Defendants made their position clear:  they were willing to demonstrate to the Court that the existing record would not withstand adversarial testing without any need for the Rule 35 examinations, but if the Plaintiffs were going to reference additional damages evidence as to the presence or extent of Plaintiffs' injuries, then the Defendants should have the opportunity to subject that evidence to factual challenge, including by having the Plaintiffs examined.  However, Plaintiffs declined this offer, *id.* at 80-81, 97-99, thereby apparently reserving the right to introduce new post-damages-hearing evidence on damages, while prohibiting Defendants from developing any counter-evidence.  *See id.* at 98

(counsel for Plaintiffs asserting that it might be appropriate, for example, for Plaintiffs to introduce a record demonstrating that since the damages hearing, one of the Plaintiffs was institutionalized for three months).

On October 28, 2010, Magistrate Judge Martin denied Defendants' Rule 35 motion on two grounds. First, the Court denied the motion based on the grief, distress, and sadness that mental examinations would cause Plaintiffs. Dkt. No. 579 at 1. Second, the Court concluded that "such examinations are premature because Defendants' motion to vacate has yet to be granted." *Id.* at 2. The Court did not address, whatsoever, Defendants' offer to forego the examinations if the Plaintiffs would simply agree not to seek to introduce new evidence as to damages at the January 2011 hearing.

Since the motion was argued before Judge Martin, Plaintiffs have suggested that they will accept Defendants' proposal to freeze the factual record in this matter as of July 12, 2004. *See* Dkt. No. 587 at 6 (Plaintiffs conceding that, if the Court permits argument on the amount of damages, they would rely solely "on the evidence presented at the July 12 and 15, 2002 hearings to rebut Defendants' challenge to the award of damages") (internal quotation marks omitted). If this concession stands, then the appeal as to the Rule 35 examinations may be rendered moot, however, this reference in a pleading is not a concession that would allow this Court to uphold the Magistrate Judge's ruling. Defendants have no way to enforce the Plaintiffs' "concession" or to prevent Plaintiffs from presenting new factual evidence at the January 2011 evidentiary hearing. Defendants are therefore exposed to the risk that there will not be a balanced factual record on the issue of the damage award unless Defendants are able to conduct the requested mental examinations of Plaintiffs.

If the Court holds Plaintiffs to their concession that the factual record on damages should be limited to the evidence presented at the July 12 and 15, 2002 hearings, Defendants stand by their offer not to seek mental examinations of the Plaintiffs. But in the absence of such assurance from the Court, Defendants' motion was proper and Judge Martin erred in denying it.

Moreover, Plaintiffs recently provided a report from Allan Brenman, who testified at the damages hearing in 2002. Given this, it appears that Plaintiffs intend to call Brenman at the January hearing. If this is the case, then it appears that Plaintiffs are seeking to do more than just rely on the previous evidence: they plan on calling the witness who met with the Plaintiffs in connection with the damages hearing while denying any opportunity to have Defendants' expert meet with the Plaintiffs.

Defendants are permitted to challenge the amount of damages previously awarded to Plaintiffs, and as established in Defendants' Rule 35 motion, mental examinations of Plaintiffs are warranted if Plaintiffs have put their mental conditions "in controversy" and there is "good cause" for such examinations. *See* Dkt. 560; *see also Tomlin v. Holecek*, 150 F.R.D. 628, 632 (D. Minn. 1993) (holding that Rule 35 provides a "'level playing field' between the parties in their respective efforts to appraise the Plaintiff's psychological state"); *Van Sice v. Oldcastle Glass, Inc.*, No. 03-BB-114, 2005 U.S. Dist. LEXIS 550, at *11 (D. Colo. Jan 10, 2005) (Plaintiffs "may not raise the very condition of which [they] complain[]" to defeat Defendants' ability to challenge the extent and severity of that condition). The Defendants offered a reasonable resolution to the instant issue; one involving a "level playing field," but the Plaintiffs appear to want to hold open the possibility of new evidence on damages. As such, this Court should allow the Rule 35 examinations.

## **CONCLUSION**

For the foregoing reasons, the Court should:

(1)  Overrule that portion of Magistrate Judge Martin's "Order Granting in Part and Denying in Part Motions" (Dkt. No. 575) that allows discovery of Defendants' communications with PIF and PCSC;

(2)  Overrule that portion of Magistrate Judge Martin's "Order Granting in Part and Denying in Part Defendant's Motion to Compel" (Dkt. No. 577) that forbids Defendants from seeking certain discovery of Plaintiffs concerning factors relevant to deciding the motion to vacate, including (a) meritorious defense, (b) prejudice to Plaintiffs, and (c) extraordinary circumstances;

(3)  Overrule that portion of Magistrate Judge Martin's "Order Granting Defendants' Motion for Protective Order and Identifying Relevant Rule 30(b)(6) Topics" (Dkt. No. 578) that allows discovery regarding (a) the willfulness of Defendants' default, (b) the timeliness of Defendants' motion to vacate, and (c) the relationship between Defendants and PIF and PCSC, Defendants' knowledge of: i) Plaintiffs' collection efforts relative to PIF and PCSC, ii) actions taken by the PIF and/or the PCSC in response to such efforts, and iii) Defendants' own actions, if any, in response to or because of such collection efforts; and

(4)  Overrule that portion of Magistrate Judge Martin's "Order Denying Defendants' Motion for Mental Examinations" (Dkt. No. 579) that forbids Defendants from obtaining Rule 35 examinations of Plaintiffs, but leaves open the possibility that Plaintiffs will be able to present new evidence concerning their mental conditions at the January 2011 hearing.

Respectfully submitted,

Dated:  November 15, 2010

/s/ Mark J. Rochon
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Brian A. Hill (D.C. Bar #456086)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
mrochon@milchev.com
rhibey@milchev.com
bhill@milchev.com

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and
the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 15th day of November 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI 02903
> djs@mtlhlaw.com
>
> Max Wistow
> Wistow and Barylick Incorporated
> 61 Weybosset Street
> Providence, RI 02903
> mwistow@wistbar.com
>
> *Attorneys for Plaintiffs*

_/s/ Mark J. Rochon_