UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE ESTATE OF YARON UNGAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 00-105L |
| | ) | |
| THE PALESTINIAN AUTHORITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S RULE 60(b)(4) MOTION FOR RELIEF FROM CREDITOR'S BILL JUDGMENT REGARDING THE PALESTINE INVESTMENT FUND**

Defendant The Palestinian Authority ("PA"), by and through counsel and pursuant to Federal Rule of Civil Procedure ("Rule") 60(b)(4), respectfully submits the following memorandum in support of its motion for relief from the Court's September 2006 creditor's bill judgment regarding the Palestine Investment Fund ("PIF").

**Procedural History**

Because the Court is all-too familiar with the *Ungar* litigation, Defendants will provide an abridged procedural history.

1.  The Rule 60(b)(6) Litigation, and the Ungars' Efforts to Make Vacatur Turn on the Validity of the Creditor's Bill Judgment.

In July 2004, the Court entered a $116 million default judgment against the Palestinian Authority and Palestine Liberation Organization ("PLO") in an Anti-Terrorism Act suit arising from the 1996 fatal shooting of Yaron Ungar by members of a Hamas cell. Dkt. No. 280. Following PA Prime Minster Fayyad's assumption of responsibility for directing the PA's and

PLO's response to the U.S. litigation and retention of new U.S. litigation counsel in mid-2007, Defendants filed a Rule 60(b)(6) motion to vacate the default judgment. Dkt. No. 408 (filed December 2007). The Court denied that motion in May 2009, concluding that the willful nature of the default precluded Rule 60(b)(6) relief. Dkt. No. 442.

On appeal, the First Circuit held that the willfulness of the default was not dispositive, vacated the Court's order denying the vacatur motion, and remanded the case for consideration of several other factors relevant to the vacatur analysis, including Defendants' meritorious defenses, the foreign policy impact of the $116 million default judgment, and whether the amount of the judgment would withstand adversarial testing. *Ungar v. Palestine Liberation Org.*, 599 F.3d 79 (1st Cir. 2010). The First Circuit characterized Defendants' arguments as "substantial" and "deserv[ing] [of] full-throated consideration." *Id.* at 86-87.

In its Order of April 1 following the remand, the Court announced its intent to hold an evidentiary hearing on the remanded Rule 60(b)(6) motion. Dkt. No. 482. That order was followed by a June 1 Pre-Hearing Order setting January 18, 2011 as the hearing date and directing the parties to complete pre-hearing discovery by November 19, 2010. Dkt. No. 489.

During the ensuing discovery period, it has become evident that Plaintiffs wish to make the PA/PLO's non-payment of the judgment a central focus of the January 2011 hearing. Defendants previously have briefed why Rule 60(b)(6) motions inevitably involve unpaid judgments and why the non-payment of the judgment may not, therefore, be a consideration in whether the vacatur motion should be granted. *See* Dkt. No. 561 at 8-11. The Ungars argue that the PA/PLO's non-payment is relevant because it allegedly reflects "malfeasance" rather than simply "nonfeasance" and, they argue, Defendants' "unclean hands" should be factored into the vacatur analysis. *See* Dkt. No. 570 at 3. Specifically, the Ungars allege that the PA is "active[ly]

siphoning . . . funds from a corporation (the PIF) the ownership of which was transferred to the Ungars by this Court (dkt. #381)." *Id.* The Ungars also repeatedly have contended in recent discovery motions that "Defendants have actively interfered with and sought to frustrate Plaintiffs' collection efforts regarding PIF and that Defendants' actions violate, disregard, or demonstrate disrespect for the orders of this Court," particularly the creditor's bill judgment. *See* Dkt. No. 575 at 5 (Oct. 27, 2010, Order summarizing the Ungars' arguments).

Plaintiffs have pursued extensive discovery, under the auspices of the pre-vacatur hearing discovery authorized by the Court, of the PA's relationship with and communications with PIF, including:

1. Third party subpoenas served on Dewey & LeBoeuf L.L.P., PIF's U.S. counsel, and on the Democracy Council, a California-based firm that provided consulting services to PIF. *See* Exh. A.

2. A deposition notice served on the PA for the November 4 deposition in Jerusalem of PIF Chief Executive Officer, Dr. Mohammad Mustafa, who also serves as Economic Adviser to President Abbas. *See* Exh. B.

3. A Rule 30(b)(6) Notice served on the PA seeking the PA to produce a designee to testify on 13 different topics related to PIF, subsequently narrowed by Magistrate Judge Martin to require the PA to produce a designee to testify to: "the relationship between Defendants and the Palestine Investment Fund . . . , Defendants' knowledge of: i) Plaintiffs' collection efforts relative to the PIF . . . , ii) actions taken by the PIF . . . in response to such efforts, and iii) Defendants' own actions, if any, in response to or because of such collection efforts." Dkt. No. 578 at 4. The Ungars subsequently chose not to schedule this deposition.

4. A Second Request for Production of Documents (Request No. 1) seeking "all written communications, relating to the [Ungar Rhode Island] case, the Judgment and/or the 2006 Judgment, between the PA and/or the PLO (including any office-holder, employee, <u>attorney</u> and/or agent of the PA and/or PLO)" and PIF, "including any person purporting to be an office-holder, employee, <u>attorney</u> and/or agent of the Palestine Investment Fund." *See* Exh. C (emphasis in original). Magistrate Judge Martin subsequently ordered the PA and PLO to produce any such non-privileged communications and provide a privilege log as to the privileged communications. Dkt. No. 575.

5.      A Third Request for Production of Documents (Request No. 10), seeking 13 different categories of documents related to PIF, including a request for "all documents relating to, referring to and/or evidencing the relationship between the Palestinian Investment Fund and the PA" and a request for "[a]ll documents relating to, referring to and/or evidencing the Palestine Investment Fund's governing structure and decision-making procedures." *See* Exh. D.

Following a two-day hearing on various discovery motions filed by the parties, Magistrate Judge

Martin ruled that "Defendants' post-judgment conduct relative to Plaintiff's efforts to enforce the

judgment via proceedings against or regarding the PIF . . . is relevant for purposes of deciding

whether the motion to vacate should be granted." Dkt. No. 575 at 4.  Yesterday, Defendants

filed Rule 72 objections to Magistrate Judge Martin's rulings allowing discovery on PIF-related

issues.  Dkt. No. 594.

On November 11, 2010, Plaintiffs filed an Urgent Motion for a Temporary Restraining

Order regarding a $45 million debt that an Egyptian appellate court recently ordered Egyptian

company Orascom Telecom Holding SAE ("Orascom") to pay to Ramallah-based PIF.  Dkt. No.

588.  Plaintiffs sought an order prohibiting the PA "from taking any actions to collect or enforce

any debt owed by Orascom to the PIF pending the hearing on and disposition of the motion for

preliminary injunction." *Id.* (Motion at 1).   In their TRO papers, the Ungars assert that "[s]ince

[PIF CEO] Mustafa is an officer and agent of the PA, and is acting in active concert or

participation with the PA, any injunction against the PA would automatically enjoin him as

well").  *Id.* at 3.  Thus, the Ungars seek to enjoin PIF, over whom the Court has no jurisdiction,

from taking any action to comply with an Egyptian court order directing that an Egyptian

company pay its debt to PIF.

The Plaintiffs argue they are entitled to this extraordinary relief because, "[o]n September

19, 2006, this Court entered a final judgment on the creditor's bill, transferring to the Ungars

ownership of the PIF." *Id.* at 2.  According to the Ungars, the "PA has refused to honor the 2006

creditor's bill judgment entered by this Court assigning ownership of the PIF to the Ungars." *Id.*

Following a November 11 hearing, the Court entered the TRO sought by the Ungars and

scheduled a preliminary injunction hearing for November 17.  Dkt. No. 589.

With this background as to why resolving the validity of the creditor's bill judgment has

become imperative to resolution of significant motions before the Court (Defendants' Rule

60(b)(6) motion and Plaintiffs' motion for preliminary injunction), as well as Rule 72 Objections

to rulings on discovery related to PIF, Defendants turn to a summary of the creditor's bill

proceedings.

2.    The September 2006 Creditor's Bill Judgment

In July 2006, the Ungar plaintiffs brought a "Creditor's Bill" pursuant to Rhode Island

General Law § 9-28- 1.  Dkt. No. 370.  Section 9-28-1 provides in pertinent part:

> Any judgment creditor, after his or her execution has been returned
> wholly or in part unsatisfied, may, by a civil action in the nature of
> a creditor's bill, reach and apply and subject to the payment and
> satisfaction of his or her judgment any equitable estate, any
> equitable assets, or any choses in action of the judgment debtor
> . . . .

R.I.G.L. § 9-28-1.  Although required to so by Section 9-28-1, Plaintiffs did not initiate a new

civil action but instead brought the creditor's bill under their 1:00-cv-105L Anti-Terrorism Act

civil action.  Nor did the Ungars return the execution unsatisfied.  Plaintiffs discarded this

statutory requirement as "a frivolous waste of resources, since there are no assets whatsoever

against which plaintiffs could ask the Marshal to act."  Dkt. No. 370 at 4 n.2.

In their creditor's bill, the Ungars argued they were entitled pursuant to Section 9-28-1 to

reach, apply and subject to payment of their judgment "all legal and equitable rights and interests

of the PA (a) in the PCSC and the PIF and (b) in the assets held by the PCSC and the PIF."[1] Although the Ungars claimed entitlement to "assets held by . . . the PIF," the Ungars did not serve PIF with notice of the creditor's bill, nor did the Plaintiffs establish that the Court had personal jurisdiction over PIF.

With respect to their claim that Section 9-28-1 authorized the Court to transfer the PA's stock ownership in PIF to the Ungars, Plaintiffs did not cite a single authority interpreting the Rhode Island statute as having extraterritorial effect, such that it would allow a federal court sitting in Rhode Island to "reach and apply" a judgment debtor's stock ownership in a foreign corporation where the judgment debtor has no jurisdictional contacts whatsoever *with Rhode Island* (recognizing the Court found jurisdiction contacts exist with the United States), the stock certificates are located outside the United States, and the purported stock transfer would affect the governance, control and operation of a separate entity which was not served with process and was not before the Court.

With respect to their claim that the Rhode Island statute authorized the Court to transfer to the Ungars a 100% ownership interest in PIF, the Plaintiffs asserted:

> At one time, the value of the PA assets held by the PIF and the PCSC exceeded the amount of the PA's judgment debt to the Ungars; however, the PA has recently encumbered over $500 million of these assets as collateral for loans, and upon information and belief the net unencumbered value of the remaining assets is now less than the amount of the Ungars' judgment.

---

[1] PCSC is the "Palestinian Commercial Services Company," many of whose assets were transferred to PIF when PIF was created prior to entry of the $116 million default judgment in this case.  The Palestinian Commercial Services Company remains a subsidiary of PIF and operates as a cement supplier. *See* http://www.pif.ps/index.php?lang=en&page=1249306363138 (last visited Nov. 16, 2010).  Plaintiffs' creditor's bill, as well as their discovery efforts in connection with the Rule 60(b)(6) motion and their recent motion for TRO and preliminary injunction separately reference PCSC and PIF.  For ease of reference, Defendant generically refers to PIF in this motion rather than identifying all the occasions in which Plaintiffs refer to both PIF and PCSC.

Dkt. No. 370 at 6 (citing Exhibit H). The only citation the Ungars offered for this key fact was a March 9, 2006, article from Forbes magazine, which described the Palestine Investment Fund, as "now believed to hold $1.4 billion in assets." Exh. E (Creditor's Bill Exhibit H). Thus, even if the Ungars were correct that the PA had recently encumbered over $500 million of those assets as collateral for loans, that would have left the PIF with unencumbered assets of $900 million, not -- as the Ungars informed the Court -- an amount "less than the amount of the Ungars' judgment."

When the creditor's bill was filed, the PA was still in the mode of not participating in the U.S. litigation. The PA thus did not appear in Rhode Island to challenge the creditor's bill, and the Court's judgment on the creditor's bill was a default judgment. At the hearing on the creditor's bill, the Court recognized the limited effect of the creditor's bill judgment:

> And I have limited jurisdiction because none of those entities are before this Court. The only jurisdiction I have is over the PA and the PLO, which I determined a long time ago. **So there's certainly a question about any judgment that I enter in this case as to its territorial effect.**

Tr. of Sept. 13, 2006 Hearing at 5:6-11 (emphasis added).

The Court then turned to a discussion of the Ungars' pending enforcement action in Connecticut, in which the Ungars sought turnover of PIF's investment in a Connecticut-based equity fund (Canaan). *See Strachman v. Palestinian Authority*, No. 3:05-mc-208 (D. Conn.) (application for writ of execution filed August 2, 2005).

> I'm satisfied that whatever judgment I enter here today has no bearing on the Connecticut case. If I enter a judgment assigning to the plaintiffs all the rights that the PA has in [PIF and PCSC], that's the limit of the order of the Court, the judgment of the Court, then that has to be executed somewhere where these two entities are doing business. They're not doing business in Rhode Island. As I said from the very beginning, there's no way I'm going to supervise the collection of this judgment because there are no assets in this jurisdiction of the PA and the PLO.

7

Tr. of Sept. 13, 2006 Hearing at 10:18-11:2. *See also id.* at 13:24-25, 14:7-8 ("And I'm deciding that whatever the PA owns in these two entities is assigned to the plaintiffs. . . . And the Connecticut court will decide who owns these assets.").[2]

The Court entered judgment on the creditor's bill on September 19, 2006. Dkt. No. 381. The final judgment transferred "all of the Palestinian Authority's ownership rights in the Palestine Investment Fund Company" and "all rights, benefits and interests of the Palestinian Authority in all property, assets and credits, of any type, that are titled and/or owed to . . . the Palestine Investment Fund Company" to the Ungars. *Id.* at 2.

### Legal Standard for Rule 60(b)(4) Motions

Under Rule 60(b)(4), "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" if "the judgment is void." Fed. R. Civ. P. 60(b)(4). A "void judgment is a legal nullity." *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1377 (2010). As the Supreme Court explained in that case: "Although the term 'void' describes a result, rather than the conditions that render a judgment unenforceable, it suffices to say that a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final." *Id.*

Rule 60(b)(4) provides a basis for vacating a final judgment where the "judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *Id.; see also United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990); 12 J. Moore et al., Moore's Federal Practice

---

[2] Defendant notes that Plaintiffs' motion for TRO and preliminary injunction treat Orascom's $45 million debt to PIF as a PA asset, and PIF as acting as an alter ego of the PA. But Plaintiffs have not cited, and Defendants are not aware of, any court that has concluded that PIF is holding any PA asset or property, including the $45 million Orascom debt, and no court has held that PIF is an alter ego of the PA, or that Dr. Mustafa acts on behalf of the PA when he carries out his functions as PIF CEO.

§ 60.44[1][a], pp. 60-149 to 60-151 (3d ed. 2010); 11 C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2862, p. 331 (2d ed. 1995 and Supp. 2009).

The First Circuit consistently has held that parties are entitled to relief under Rule 60(b)(4) "if the court that rendered judgment lacked jurisdiction or in circumstances in which the court's action amounts to a plain usurpation of power constituting a violation of due process." *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990); *see also Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir. 1995). A corollary rule is that the judgment is "void" within the meaning of Rule 60(b)(4) when "judgment is entered against an entity never properly served as a party to the case." *Shank/Balfour Beatty v. IBEW Local 99*, 497 F.3d 83, 94 (1st Cir. 2007) (granting Rule 60(b)(4) motion because the judgment was entered as to an entity that was a member of a joint venture that was a party but was not a party in its own right).

"Although denial of a Rule 60(b) motion is normally reviewed for abuse of discretion, a district court has no discretion when deciding a motion brought under Rule 60(b)(4) 'because a judgment is either void or it is not.'" *Shank/Balfour Beatty*, 497 F.3d at 94 (quoting *Fafel v. DiPaola*, 399 F.3d 403, 409-10 (1st Cir. 2005)).

## ARGUMENT

### I.    This Motion Is Not Untimely.

The PA acknowledges that four years have passed since the Court entered the creditor's bill judgment. During that time, consistent with the Court's above-referenced statements at the creditor's bill hearing, PIF has been litigating the alter ego issue and the ownership of its assets in Connecticut, where PIF's only U.S. based asset is located. *See Strachman v. Palestinian Authority*, 3:05-mc-208 (D. Conn.). Meanwhile the PA has sought to vacate the underlying $116 million default judgment from which the creditor's bill judgment emanated. And, given the

Court's position that "there's no way I'm going to supervise the collection of this judgment because there are no assets in this jurisdiction of the PA and the PLO," Tr. of Sept. 13, 2006 Hearing at 10:24-11:2, there seemed little reason to act on the creditor's bill judgment pending the Connecticut federal court's decision on PIF ownership issues and this Court's resolution of Defendants' Rule 60(b)(6) motion. Plaintiffs' recent efforts, however, to engage the Court in giving broad effect to the creditor's bill judgment in both their Rule 60(b)(6) related filings and in their motion for a preliminary injunction, necessitate the Court's immediate review of the validity of the judgment.

The PA need not, however, establish the reasonableness of the timing of this motion. First Circuit "precedent establishes that Rule 60(b)(4) motions cannot be denied on the procedural ground that they were not brought within a 'reasonable time' as required under Rule 60(b)." *Sea-Land Serv., Inc. v. Ceramica Europa II, Inc.*, 160 F.3d 849, 852 (1st Cir. 1998) As the Court explained in *Sea-Land*, motions to set aside a judgment for lack of jurisdiction under Rule 60(b)(4) may be made "at any time." *Id.* (citing *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990); *Precision Etchings & Findings, Inc. v. LGP Gem, Ltd.*, 953 F.2d 21, 23 (1st Cir. 1992)).

Because a void judgment is "from its inception a legal nullity," relief from a void judgment "has no time limitations." *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990). Thus, the rule in a number of Circuits, including the First Circuit, and adopted by Wright & Miller's Federal Practice and Procedure treatise, is that Rule 60(c)(1)'s "reasonable time" limitation has no application to Rule 60(b)(4) motions. *See Hertz Corp. v. Alamo Rent-A-Car*, 16 F.3d 1126, 1130-31 (11th Cir. 1994) (surveying law on this issue).

Because the First Circuit does not impose a timing requirement on Rule 60(b)(4) motions and requires that they be considered whenever brought, the timing of the PA's motion cannot provide a basis for denial.

Having explained why the validity of the creditor's bill judgment must now be addressed and having established that it is not too late to do so, the PA now turns to explain why the creditor's bill judgment is void for purposes of Rule 60(b)(4).

## II.    The Creditor's Bill Judgment Is Void Because It Exceeded the Proper Scope of the Court's Enforcement Jurisdiction.

### A.    Enforcement Jurisdiction Does Not Extend to Enforcement Actions in Which Third Parties Are Held Answerable to a Judgment Based on Veil Piercing or Alter Ego Theories.

As the First Circuit has explained:  "[A]lthough federal courts are courts of limited jurisdiction, they often retain residual federal jurisdiction over postjudgment enforcement proceedings flowing from their original jurisdiction over the action."  *U.S.I. Properties Corp. v. M.D. Construction Co.*, 230 F.3d 489, 496 (1st Cir. 2000).  Where a postjudgment proceeding presents an attempt "simply to collect a judgment duly rendered by a federal court, even if chasing after the assets of the judgment debtor now in the hands of a third party, the residual jurisdiction stemming from the court's authority to render that judgment is sufficient to provide for federal jurisdiction over the postjudgment claim."  *Id.* at 498.

However, "where that postjudgment proceeding presents a new substantive theory to establish liability directly on the part of a new party, some independent ground is necessary to assume federal jurisdiction over the claim, since such a claim is no longer a mere continuation of the original action."  *Id. See also Sandlin v. Corporate Interiors, Inc.*, 972 F.2d 1212, 1216-17 (10th Cir. 1992) ("[W]hen postjudgment proceedings seek to hold nonparties liable for a judgment on a theory that requires proof on facts and theories significantly different from those

underlying the judgment, an independent basis for federal jurisdiction must exist."). As the First Circuit observed in *U.S.I. Properties*, "[t]hese distinctions might strike a metaphysical note for some, but they have been long honored by the law and have been recognized by the Supreme Court." 230 F.3d at 498-99.

Both the Supreme Court and the First Circuit have held that a federal court cannot exercise its ancillary enforcement jurisdiction to enforce a federal money judgment against an entity that was not a party to the original action, even if that entity is alleged to be an alter ego of the judgment debtor. *Peacock v. Thomas*, 516 U.S. 349 (1996); *U.S.I. Properties Corp. v. M.D. Construction Co.*, 230 F.3d 489 (1st Cir. 2000).[3]

In *Peacock*, the plaintiffs obtained a federal money judgment against one party (Tru-Tech), which they then sought to collect from another party (Peacock) in a supplemental action. The district court allowed the action to go forward, found that Peacock was an alter ego of Tru-Tech, and made Peacock answerable for the underlying judgment. The Supreme Court reversed, holding that any subsequent federal lawsuit seeking to impose an obligation to pay a judgment on a person not already liable for that judgment requires a separate basis for federal jurisdiction, and is not ancillary to the original proceeding. The Court explained that a proceeding to make a third party answerable for the underlying judgment on an alter ego theory is not "ancillary" to the original action but is instead "entirely new and original" because it depends on different factual and legal theories not resolved in the original suit. As the Court noted, the original suit will

---

3 This limitation on ancillary enforcement jurisdiction is recognized in other Circuits as well. *See, e.g.*, *Hudson v. Coleman*, 347 F.3d 138 (6th Cir. 2003) (affirming dismissal for lack of subject matter jurisdiction under *Peacock* of action by plaintiffs who secured federal judgment against police officers to enforce judgment against City based on indemnity theory); *Abbott Laboratories v. CVS Pharmacy, Inc.*, 290 F.3d 854, 858 (7th Cir. 2002) ("As *Peacock* holds, a suit involving Party A does not permit a district court to enter a judgment against Party B, even when A and B are affiliated.").

focus on the merits of the claims, but the subsequent proceeding will focus on the relationship between the third party and the party already responsible for the federal judgment and thus has little connection to the original case "[o]ther than the existence of the . . . judgment itself." *Peacock*, 516 U.S. at 359.

In *U.S.I. Properties*, 230 F.3d 489, the First Circuit, applying *Peacock*, held that the Commonwealth of Puerto Rico could not be subject to the ancillary enforcement jurisdiction of the federal courts on a theory that the judgment debtor was the alter ego of Puerto Rico. The judgment debtor (Compania de Desarrollo Cooperativo, or "CDC") was a public corporation created by the Commonwealth of Puerto Rico to foster housing cooperatives. *Id.* at 492. The judgment creditor (Futura) was unsuccessful in enforcing its $ 12.3 million against CDC "because the Commonwealth of Puerto Rico had depleted CDC of its funds and assets so that CDC could not satisfy the judgment against it." *Id.* The judgment creditor then sought to enforce the judgment against the Commonwealth as a supplementary proceeding in the original action. Futura alleged that the federal court had ancillary enforcement jurisdiction and that CDC was an alter ego of the Commonwealth. The district court took jurisdiction over the postjudgment action but denied the claim. *Id.* On appeal, the First Circuit held that "Futura's effort to establish liability against the Commonwealth exceeds the proper scope of federal enforcement jurisdiction absent some independent ground of federal jurisdiction over the claim." *Id.* "Since the [judgment creditor's] alter ego argument offers a new substantive theory that seeks to establish liability directly on the part of a third party, the residual federal jurisdiction from the original action does not flow to such a claim, and hence some independent ground for federal jurisdiction is necessary." *Id.* at 499.

**B.     The Creditor's Bill Required an Independent Ground for Federal Jurisdiction Because Plaintiffs Sought the Transfer of PIF Assets Under a Veil Piercing or Alter Ego Theory.**

The creditor's bill judgment reflects an attempt by the *Ungar* plaintiffs to make PIF answerable for the money judgment they had previously obtained against the PA. Because the creditor's bill judgment is premised on a theory that was not essential to the original proceedings that resulted in the entry of the default judgment (namely the theory that PIF is an alter ego of the PA and thus holds PA assets even though the assets are titled to PIF), it exceeded the scope of the Court's ancillary jurisdiction.

The underlying Rhode Island proceeding was a federal action brought under the Anti-Terrorism Act, in which the *Ungar* plaintiffs ultimately secured a $116,000,000 default judgment against the PA and PLO. PIF was not a party to that proceeding, and it is undisputed that PIF is not even subject to jurisdiction in Rhode Island. Moreover, PIF enjoys the strong presumption of separateness afforded to public development corporations under *First National City Bank v. Banco Para El Commercio Exterior de Cuba*, because such corporations have "become an essential instrument of economic development" and their "[s]eparate legal personality" from the governments with which they are associated is "an almost indispensable aspect" of such organizations because it allows third parties to contract freely with them. 462 U.S. 611, 624-25 (1983). *See also id.* at 626-27 ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."). *See also Knox v. Orascom Telecom Holding S.A.E.*, 477 F. Supp. 2d 642, 647 (S.D.N.Y. 2007) ("Whether the PIF is simply an investment vehicle for the PA, it is nonetheless a separate corporate entity.").

The Rhode Island judgment takes two actions with respect to PIF. First, the Rhode Island creditor's bill judgment purports to "assign, transfer and convey" to the *Ungar* plaintiffs all of the PA's "ownership rights" in PIF. Second, the Rhode Island creditor's bill judgment purports to "assign, transfer, and convey" all rights of the PA that are "titled and/or owed to" PIF. In short, in a post-judgment proceeding pursuant to the Court's ancillary enforcement jurisdiction, the Rhode Island creditor's bill judgment purports to assign ownership of a non-party corporate entity, as well as assets "titled to" the entity, to the *Ungar* plaintiffs -- even though the corporate entity was not a party to the original lawsuit and was not even subject to the court's personal jurisdiction. In so doing, the creditor's bill proceeding ran afoul of *Peacock* and First Circuit authority regarding the scope of the court's enforcement jurisdiction. *See, e.g., U.S.I. Properties Corp. v. M.D. Construction Co.*, 230 F.3d 489 (1st Cir. 2000).

Plaintiffs cannot avoid *Peacock's* restrictions on the scope of the Court's enforcement jurisdiction by arguing that the creditor's bill did not seek turnover of *PIF* assets on the theory that PIF was an alter ego of the PA but instead sought turnover of *Palestinian Authority* assets "titled to" PIF. One federal court already has rejected a similar argument made by the Ungars regarding their efforts to compel turnover of Orascom's $45 million debt to PIF, the same debt that is the subject of their recent motion for TRO and preliminary injunction. *See Estate of Yaron Ungar v. Orascom Telecom Holdings S.A.E.*, 578 F. Supp. 2d 536 (S.D.N.Y. 2008). Another federal court has rejected similar arguments made by other plaintiffs (the Knox plaintiffs) as to the same Orascom debt. *Knox*, 477 F. Supp. 2d at 642; *Knox v. Orascom Telecom Holding S.A.E.*, 242 F.R.D. 251, 253-54 (S.D.N.Y. 2007) (denying motion for reconsideration).

As the district court explained in the Ungar Orascom litigation in New York: "Plaintiffs seek an order compelling Orascom to turn over to Plaintiffs the assets Orascom owes to the PIF in order to satisfy the judgments against the PA, under the theory that the assets at issue are only 'nominally titled' to the PIF, but are actually owned by the PA." 578 F. Supp. 2d at 547. "Just like the *Knox* plaintiffs, the Ungars argue they are not proceeding on an alter ego theory, and that . . . they do not seek to hold the PIF liable for the judgment because the debt at issue is allegedly owed to the PA itself." *Id.*

The court rejected the Ungars' position. "Plaintiffs' vigorous assertion that the PA's assets are only 'nominally titled' to the PIF (but owned by the PA) is similar, for jurisdictional purposes, to an allegation that the PIF was an alter ego of the PA, despite Plaintiffs' disavowal of such an allegation." *Id.* at 550 (internal quotation and citation omitted). *Accord Knox*, 242 F.R.D. at 254. Ultimately, plaintiffs' claims that PA's assets were nominally titled to PIF required the court "'to treat the corporate form of [PIF] as a complete nullity -- to look through its legal identity to the party standing behind it -- and to do so under the guise of making a factual determination necessary to determine [this Court's] subject matter jurisdiction over this case.'" *Ungar*, 578 F. Supp. 2d at 548 (quoting *Futura Dev. Of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico*, 144 F.3d 7, 12 (1st Cir. 1998)) (alteration in *Ungar* decision). Because such an exercise would require the court "to make a determination that was not part of the underlying ATA action," the court concluded that it lacked ancillary enforcement jurisdiction. *Accord Knox*, 242 F.R.D. at 255.

In *Knox*, 477 F. Supp. 2d 642, the plaintiffs obtained a default judgment in a terrorism lawsuit against the PA, and returned to the district court post-judgment seeking an order requiring Orascom to turnover any funds in its possession that it owed to the PIF in satisfaction

of the judgment. *Id.* at 643-44. The plaintiffs' theory of recovery was that because PIF allegedly owned interests in Orascom, and because PIF was purportedly a "shell company" for the PA, Orascom could be made to turnover its assets to the plaintiffs. *Id.* at 644.

Relying on *Peacock*, the district court rejected this argument because "in order to direct the turnover of funds in its possession to Plaintiffs, the Court would have to conclude that the PIF is in fact legally, beneficially and equitably owned by the PA." *Id.* at 647. As the district court explained, "once the Court is required to engage in a veil-piercing or alter ego analysis as to this question, an independent basis for jurisdiction is required." *Id.* The court accordingly ruled that "this action does in fact seek to hold nonparties liable for a judgment on a theory that requires proof on facts and theories different from those underlying the judgment," and dismissed the action for lack of subject matter jurisdiction under *Peacock*. *Id.* at 648.

Judge Marrero reaffirmed his ruling in *Knox v. Orascom Telecom Holding S.A.E.,* 242 F.R.D. 251 (S.D.N.Y. 2007), denying plaintiffs motion for reconsideration. The court again emphasized that "Plaintiffs' complaint requires the Court to address whether the PIF would be obligated to turn these funds over to the PA, which makes this action founded upon facts different from those underlying the [Anti-Terrorism Act] action, and makes it inappropriate for a federal court to assert ancillary enforcement jurisdiction." *Id. at* 255.

Here, many of the Plaintiffs' allegations in the creditor's bill would have required the court to delve into alter ego and veil-piercing inquiries forbidden by *Peacock*. Plaintiffs' creditor's bill alleged not only that the PA owned an interest in PIF, but also that PIF's assets were really PA's assets. *See* Dkt. No. 370 at 5 (asserting that the PA uses PIF to "hold, manage and invest the PA's assets"). Likewise, in their memorandum in support of their Motion to Modify Stipulation and Confidentiality Order, Dkt. No. 385, in enforcement proceedings before

this Court, the Plaintiffs asserted: "[t]he PIF was established as a holding company for assets of the PA.  The Ungars sought ownership of the PIF in order to take control of PIF's corporate apparatus, and thereby reach assets of the PA held by the PIF (which are scattered around the world) in satisfaction of their judgment against the PA." *Id.* at 3.  The Ungars' allegations and claims cannot be reconciled with *Peacock* and similar First Circuit authority precluding the exercise of enforcement jurisdiction based on the theory that assets of a  third party should be treated as assets of the judgment debtor.  *See U.S.I. Properties Corp.*, 230 F.3d 489 .

In sum, by transferring assets titled to the PIF to the Ungars, the Court exceeded the bounds of its enforcement jurisdiction, and for that reason alone the creditor's bill judgment is void.

### C.    Plaintiffs Cannot Avoid the Result that the Court's Creditor's Bill Judgment Is Void as an Improper Extension of the Court's Enforcement Jurisdiction.

Plaintiffs cannot avoid *Peacock* by arguing that the creditor bill proceeding was an exercise of the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  In order for the creditor's bill to be a valid exercise of supplemental jurisdiction, Plaintiffs' alter ego claim as to PIF would have to arise from the same nucleus of operative facts as the original action over which the court had federal question jurisdiction.  Here, there is no commonality between the operative facts as to the creditor bill and the operative facts giving rise to the underlying Anti-Terrorism Act on which the Court's original jurisdiction is based.

In *Futura Development of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico*, 144 F.3d 7 (1st Cir. 1998), the judgment creditor (Futura) attempted to enforce its judgment against a public corporation and instrumentality of the Commonwealth of Puerto Rico ("CDC") by bringing an enforcement action against the Commonwealth, under the theory that CDC was an alter ego of the Commonwealth.   Having concluded that *Peacock* barred the exercise of

enforcement jurisdiction over the action against the Commonwealth, the First Circuit then addressed Futura's argument that "its alter ego claim is within the district court's supplemental jurisdiction because that claim is so related to its civil rights claims against the individual defendants, claims over which the court undeniably has original jurisdiction, that it forms part of the same case or controversy." *Id.* at 12. Holding that "federal courts may only assert supplemental jurisdiction under 28 U.S.C. § 1367 where the claims arise from the same 'nucleus of operative facts,'" the court held that the claims underlying the original action and the claims underlying the enforcement action "are sufficiently distinct to require an independent jurisdictional basis." *Id.* at 13. Similarly, here, the claims underlying the creditor's bill and those underlying Plaintiffs' Anti-Terrorism Act suit are sufficiently distinct to require an independent jurisdictional basis.

Nor can the Plaintiffs avoid the creditor bill's jurisdictional defect by arguing that the PA defaulted in the creditor's bill proceeding. The fact that the PA defaulted by not participating in the creditor's bill proceeding is no defense to the lack of jurisdiction. Plaintiffs had the burden of establishing the Court's jurisdiction -- even in the face of a defaulting judgment debtor. "It is to be presumed that a cause of action lies outside [the federal courts'] limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (citation omitted); *accord Ungar*, 578 F. Supp. 2d at 545. Moreover, "when judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to assure itself that it has jurisdiction over both the subject matter and the parties." *Argent Mortg. Co., LLC v. East Wallum Lake Trust*, No. 08-110, 2010 U.S. Dist. LEXIS 96689, at *8-9 (D.R.I. Aug. 23, 2010). *See also Hugel v. McNell*, 886 F.2d 1, 3 n.3 (1st Cir. 1989) ("[W]here the court rendering the default

judgment is shown to lack personal jurisdiction over the defendant, ... the judgment may be vacated and set aside by the rendering court on motion, or by another court on collateral attack.").

Finally, the fact that the Ungars sought relief pursuant to Rule 69 and the Rhode Island creditor's bill statute does not obviate the need to establish federal court jurisdiction over the state-law based enforcement action. The "fact that Rule 69(a) may (by way of state law) afford procedural mechanisms for enforcing an existing federal judgment against a third party not otherwise liable does not obviate the need to establish the jurisdiction of the federal court over the supplemental proceeding." *U.S.I. Properties Corp. v. M.D. Construction Co.*, 230 F.3d 489, 499 n.8 (1st Cir. 2000). As the First Circuit explained in *U.S.I. Properties*, "[t]he Federal Rules of Civil Procedure can neither expand nor limit the jurisdiction of the federal courts, Fed. R. Civ. P. 82, and the issue of jurisdiction remains distinct from the question of procedure." *Id.*

## II.    The Rhode Island Judgment Is Void Because It Transferred Assets of PIF in the Absence of Personal Jurisdiction Over PIF and Without Affording the PA or PIF Constitutionally and Statutorily-Mandated Due Process Protections.

A Rule 60(b)(4) motion must be granted if the judgment at issue was entered against a party over whom the Court lacked personal jurisdiction or against an entity that was not a party to the action. *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990); *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir. 1995). *See also Shank/Balfour Beatty v. IBEW Local 99*, 497 F.3d 83, 94 (1st Cir. 2007) (granting Rule 60(b)(4) motion because the judgment was entered as to an entity that was a member of a joint venture that was a party but was not a party in its own right).

There is no dispute that PIF was not a party to either the underlying Anti-Terrorism Act action or the creditor's bill action. The Court previously has acknowledged it lacked jurisdiction over PIF. Tr. of Sept. 13, 2006 Hearing at 5:6-8 ("And I have limited jurisdiction because none

of those entities [i.e., PIF] are before this Court.  The only jurisdiction I have is over the PA and the PLO."); Tr. of June 19, 2007 Hearing at 49 ("The Court readily concedes that it has no jurisdiction over the PIF.  The PIF has no connection to Rhode Island.").

Nor can there be any legitimate dispute that the creditor's bill took action against PIF, because it transferred assets that are "titled and/or owed" to the Palestine Investment Fund to the Ungars (Dkt. No. 381 at 2) and also transferred 100% ownership of PIF to the Ungars, even though its value far exceeded the amount of the judgment.  *See* Exh. F (Ernst & Young Audited Financial Statement for PIF for Year Ending December 31, 2006) at 1 (showing assets of approximately $800 million).[4]

The notion that the creditor's bill was not directed at PIF is belied by the fact that the Ungars use the creditor's bill judgment as the basis for asserting that they now are entitled to control PIF and all its assets.  *See, e.g.*, Dkt. No. 588 at 5 (Memo. in Support of Plaintiffs' Urgent Motion for a Temporary Restraining Order and Preliminary Injunction) (following entry of the creditor's bill judgment, the "Ungars then exercised their rights as the sole owners of the PIF to dismiss the directors and officers of the PIF and appoint themselves as the new directors and officers of PIF."); *id.* at 2 (treating PIF CEO Mohammad Mustafa's exercise of control over PIF and over the assets held by PIF, which the Ungars characterize as the "PA assets held by the PIF," as a violation of the creditor's bill judgment).

---

[4] In this respect, the Court's transfer of the ownership of PIF is no different than a Rhode Island state court, on a post-judgment motion by a Rhode Island bank holding a $50,000 promissory note secured by a deed of trust on real property owned by a third-party located in Paris, France that is valued at $4 million, conveying the ownership of the real property in its entirety to the bank in satisfaction of the $50,000 promissory note and making no provision for the management of the real property, the preservation of its value, the liquidation of the real property and the return to the third party of the proceeds of the foreclosure sale after satisfaction of the $50,000 promissory note.

The Rhode Island creditor's bill judgment also is unenforceable because it purported to transfer PIF's assets to the Plaintiffs without affording PIF fundamental safeguards required under constitutional principles of due process. *See North Atlantic Distrib., Inc.("NORAD") v. Teamsters Local Union No. 430*, 497 F. Supp. 2d 315, 326-27 (D.R.I. 2007) ("In this case, the requirements of due process make it impossible for this Court to extend a default judgment to a non-party, regardless of the non-party's relationship to the original party.").

In *NORAD,* the judgment creditor sought to make alleged alter egos -- the President and the sole corporate shareholder (the President), as well as a Rhode Island corporation (*NORAD*) owned and operated by the same person -- answerable for a default judgment against NATCO. The President and NORAD had not been part of the original Pennsylvania proceeding against NATCO.  Judge Lagueux declined to enforce the Pennsylvania judgment in Rhode Island against those non-parties, explaining that "it is clear [the President] was neither given notice of the Pennsylvania Action, nor did he have an opportunity to defend against it.  He was not served with process individually, nor did he have reason to expect he might be pursued to satisfy any judgment against NATCO [the judgment debtor].  Because NATCO opted to default, there was no litigation for [the President] to participate in, much less control." *NORAD*, 497 F. Supp. 2d at 325.

The Court continued:

> In this case, the requirements of due process make it impossible for this Court to extend a default judgment to a non-party, regardless of the non-party's relationship to the original party. There is no need, therefore, for the Court to determine whether NATCO was an alter ego of [the President] or NORAD, or whether the 'single employer' doctrine binds the entities and the individual shareholder.  In short, the *due process clause* is the determinative factor in this case. Plaintiffs cannot be made liable to pay the default judgment entered against NATCO. To make Plaintiffs

liable to pay that judgment would result in a violation of basic principles of due process of law.

*Id.* at 326-27.

This Court's decision in *NORAD* is amply supported by other similar rulings from the appellate courts. For example, in *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 62 (2d Cir. 2004), the Second Circuit emphasized the impermissibility of making third parties answerable for judgments against others without affording due process, vacating a judgment against 130 purported alter egos of a judgment debtor, and explaining that "we cannot reconcile the District Court's broad assessment of liability with fundamental notions of due process, including the principle that non parties must be accorded an opportunity to be heard and participate in litigation that could give rise to a judgment against them."

In *Bollore SA Import Warehouse, Inc., v. ,* 448 F.3d 317, 323-24 (5th Cir. 2006), the Fifth Circuit held that the trial court erred as a matter of law by making alter ego determinations in the course of a turnover proceeding, cautioning that various state law procedural restrictions on the nature of turnover proceedings "ultimately spring from due process concerns consistent with those that underlie the requirement of personal jurisdiction, i.e., they prevent the original trial court from reaching out and assuming jurisdiction for trial purposes of potential lawsuits involving third parties." In other words, the *Bollore* court explained, "[c]ourts must respect . . . limitations on the turnover statute's reach because whether a turnover order is enforceable by a contempt order directed to a stranger to the lawsuit is a serious matter that goes to the very heart of due process." 448 F.3d at 323-24, *quoting in part, Ex Parte Swate*, 922 S.W.2d 122, 125 (Tex. 1996) (Gonzalez, J., concurring). Ultimately, the Fifth Circuit determined that "[c]onsistent with due process, a court may not -- as the district court attempted to do in this case

-- use the turnover statute to adjudicate the rights and seize the assets of a third party who might not otherwise be amenable to jurisdiction in that court." *Bollore*, 448 F.3d at 324.

*Bollore* gets to the heart of the problem in this case -- the creditor's bill judgment purports to adjudicate rights and seize assets of PIF without complying with the basic rudiments of due process or of the Rhode Island statutory provisions that govern these sorts of actions.

Specifically, the *Ungar* plaintiffs failed to comply with provisions of R.I.G.L. § 9-28-1, which required them to commence a separate civil action against PIF, to provide PIF with proper notice of that action, and to obtain personal jurisdiction over PIF before attempting to acquire full ownership of its assets in execution of the judgment against the PA. *See Rhode Island Hospital v. Collins*, 368 A.2d 1225 (R.I. 1977) (holding that § 9-28-1 requires the judgment creditor to "institute a civil action"); *Berard v. Blais*, 186 A. 475, 476 (R.I. 1936) (Rhode Island Supreme Court decision taking as a given that third party whose assets are sought to satisfy a judgment against the debtor must be named as a defendant in a reach and apply statute under § 9-28-1); *see also In re Fraden*, 317 B.R. 24, 38 (D. Mass. 2004) (holding that the Massachusetts reach and apply statute required that a third party whose assets were sought to satisfy a judgment against the debtor be named as a defendant.). Any actual knowledge of the Rhode Island lawsuit by PIF would not mitigate these due process failings. *See NORAD*, 497 F. Supp. 2d at 325 ("shareholder's mere knowledge of the lawsuit does not constitute notice").

Moreover, Section 9-28-1 expressly requires as a statutory prerequisite to filing a creditor's bill that an execution first be returned unsatisfied. The Ungars conceded they did not attempt to execute against the PA. *See* Dkt. No. 370 at 4 n.2 (characterizing this step as a "frivolous waste of resources"). That excuse, however, was flatly rejected by the Rhode Island Supreme Court in *Plantations Indus. Supply v. O'Brien*, 379 A.2d 365 (R.I. 1977). There, the

judgment creditor argued that execution would be futile because he would not be able to identify for the sheriff any assets to be levied upon. *Id.* at 366. The Rhode Island Supreme Court rejected the futility argument, stating: "This court has repeatedly stressed that legislative enactments relating to the service of process are to be followed and construed strictly." *Id.* at 367. The court then held that an execution returned unsatisfied was an absolute prerequisite to the judgment creditor proceeding further.

Predictably, these constitutional and statutory failings have engendered additional related problems with the creditor's bill judgment. Most strikingly, the failure to afford rudimentary process in the Rhode Island proceeding has resulted in an order purporting to award the Ungar family assets that far exceed the amount of the underlying judgment. The Paintiffs purport to control all of PIF, and PIF's value greatly exceeds the amount of the judgment. *See* Exh. F (E&Y Audited Financial Statement for PIF for Year Ending December 31, 2006). The very exhibit on which the Ungars relied in their creditor's bill to argue that PIF was worth less than $116 million (Dkt. No. 370, Exhibit H) described PIF as "now believed to hold $1.4 billion in assets." *See* Exh. E (March 9, 2006 Forbes article).

With all due respect, the Court must put an end to the charade that the Ungars own PIF by virtue of the creditor's bill judgment. It is black-letter law that a judgment is void for purposes of Rule 60(b)(4) if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law. Here, all three infirmities are present. The Court's creditor's bill judgment exceeded the scope of its enforcement jurisdiction, took adverse action as to foreign non-party over which it lacked jurisdiction (i.e., PIF), and transferred in violation of due process and the procedural

requirements of the Rhode Island creditor's bill statute the ownership and assets of PIF in the face of evidence that PIF's value greatly exceeded the amount of the judgment.

Having procured this insupportable result, Plaintiffs have made maximum mischief with it. Any actions by the PA or PIF that are inconsistent with their position that the Ungars own and control PIF and its assets are characterized as an affront to the Court, "scofflaw" behavior, improper interference with the $116 default judgment, and -- more recently -- "unclean hands" precluding the PA and PLO from Rule 60(b)(6) relief. And, with the recent motion for preliminary injunction, the Ungars treat the creditor's bill judgment as authorizing this Court to interfere with the consummation of an Egyptian appellate court order directing an Egyptian telecommunications company to pay its debt to Ramallah-based PIF. The Rhode Island legislature never intended Section 9-28-1 to reach so far, nor do the limits of a federal court's jurisdiction reach so far.

PIF plays a significant role in the economic development of the Occupied Palestinian Territories and creation of economic opportunity for Palestinians. For example, in July 2007, the Palestine Investment Fund partnered with the Overseas Private Investment Corporation ("OPIC") and the Aspen Institute to launch the Middle East Investment Initiative loan fund. *See* Exh. G at 1 (July 25, 2007, U.S. Department of State press release describing the Middle East Investment Initiative program as a "close collaboration between OPIC, the PIF, and the Aspen Institute for over two years" that will "use funds from the U.S. Government entity OPIC and the PIF to leverage $228 million in loans to small businesses"). In its first two years, the Middle East Investment Initiative "has facilitated 210 loans totaling $45 million, generating 3,514 new jobs." Exh. H at 2 (Walter Isaacson, "In the Holy Land, Resetting U.S. Mideast Policy," Time Magazine, Dec. 10, 2009).

And earlier this year, the Palestinian Authority announced the launch of a landmark $500 million mortgage finance program, Affordable Mortgage and Loan program, or "AMAL," which will double the number of Palestinian families who are able to purchase homes. As explained in OPIC's press release

> Funding for [the] mortgage program is being supplied by leading international and Palestinian financial institutions that include the **Palestine Investment Fund, (PIF), an independent, state-owned investment fund working on economic development in Palestine,** which will provide financing of $72 million; the Overseas Private Investment Corporation (OPIC), a U.S. government agency whose mission is to facilitate US private sector investment in less-developed countries, which will provide $241 million; and the International Finance Corporation (IFC), a member of the World Bank Group, which will provide $72 million.

Exh. I at 1 (June 2, 2010, OPIC Press Release, "$500 Million Mortgage Facility Launched in Palestine") (emphasis added). *See also* Exh. J at 2 (June 3, 2010, Remarks by Senator George J. Mitchell at the Palestine Investment Conference) ("AMAL is aimed at extending affordable long-term mortgages of up to 25 years to families with moderate incomes. As you know, Amal, in Arabic, means 'hope,' a fitting title for a project that has the potential to give so many Palestinians the security of owning a home.").

Plaintiffs' efforts to disrupt PIF's operations and to make claims on its assets -- assets over which the Court has no jurisdiction -- cannot be maintained. The rest of the world continues to view PIF as not subject to the control of an Israeli family, holding a Rhode Island judgment. The Palestinian government should not be required to disengage from all dealings with PIF and engage in some alternate reality from the rest of the world as to PIF to avoid being castigated as engaging in "malfeasance" with respect to the Court's orders.

The creditor's bill proceedings provide a stark example of the bad results that can flow when a judgment is not the product of adversarial litigation. Here, the Court was not well served by either party -- the Defendants because they defaulted and the Plaintiffs because they took advantage of the default nature of the proceedings to secure entry of a judgment that the court lacked jurisdiction and statutory authority to enter and because they alleged that the PA's ownership interest in PIF was less than the amount of the judgment, when their own exhibit showed otherwise.

Leaving aside the assignment of blame for the outcome, the remedy is clear:  the Court can no longer recognize the validity of the creditor's bill judgment.

### Conclusion

For the foregoing reasons, Defendant's Motion for Relief from Creditor's Bill Judgment Regarding PIF should be granted.

Respectfully submitted,

Dated:  November 16, 2010

/s/ Mark J. Rochon
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Brian A. Hill (D.C. Bar #456086)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
mrochon@milchev.com
mailto:rhibey@milchev.com
bhill@milchev.com

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and
the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 16th day of November 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to counsel of record for all parties.

/s/ Mark J. Rochon