Case 1:00-cv-00105-L-DLM Document 607-527 Filed 11/18/10 Page 1 of 33 PageID #:
8609
Case 1:07-cv-02572-CM Document 27 Filed 08/28/07 Page 1 of 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

THE ESTATE OF YARON UNGAR by and through its
Administrator, DAVID STRACHMAN; DVIR
UNGAR, minor, by his guardians and next friends,
YISHAI UNGAR, minor, by his guardians and next
friends, PROFESSOR MEIR UNGAR, JUDITH
UNGAR, individually and in their capacity as legal
guardians of Plaintiffs DVIR UNGAR and YISHAI
UNGAR; RABBI URI DASBERG, and JUDITH
DASBERG, in their capacity as legal guardians of
Plaintiffs DVIR UNGAR and YISHAI UNGAR;
AMICHAI UNGAR; DAFNA UNGAR; and MICHAL
COHEN,

Docket no:
07 CV 2572 (CM) (LMS)

Plaintiffs / Judgment-Creditors,

-against-

ORASCOM TELECOM HOLDING S.A.E.

Defendant / Garnishee.

---------------------------------------------------------------------- X


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS


**JAROSLAWICZ & JAROS, LLC**
*Attorneys for the Plaintiffs*
225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

# Table of Contents

I.

RELEVANT BACKGROUND AND PROCEDURAL HISTORY ................................................. 1

II.

ORASCOM'S DEBT TO THE PA ................................................................................................ 4

III.

THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS ACTION ..................... 9

IV.

THE ASSET AT ISSUE IS A DEBT SUBJECT TO TURNOVER UNDER CPLR § 5227 ......... 12

V.

THIS COURT HAS JURISDICTION OVER ORASCOM ........................................................... 15

VII.

THE COMPLAINT STATES A CLAIM FOR TURNOVER ....................................................... 26

VII.

THE COMPLAINT STATES A CLAIM FOR TURNOVER ....................................................... 28

CONCLUSION ............................................................................................................................ 29

## Table of Authorities

**Cases**

*Aaron v. Mattikow,* 225 F.R.D. 407 (E.D.N.Y. 2004)..................................................................10

*Adelaide Prod. v. BKN Int'l AG,* 39 A.D.3d 254, 833 N.Y.S.2d 450 (1st
    Dept. 2007) ......................................................................................................................13, 14

*Allojet PLC v. Vantgage Associates,* 2005 WL 612848 *6 (S.D.N.Y.
    2005) ......................................................................................................................... 21-22

*Big Apple Pyrotechnic. v. Sparktacular,* 2007 WL 747807 *3 (S.D.N.Y.
    March 9, 2007) ...............................................................................................................15, 22

*Chestnut Ridge Air, Ltd. v. 1260269 Ontario Inc.,* 13 Misc.3d 807, 827
    N.Y.S.2d 461 (N.Y.Sup. 2006) .............................................................................................21

*Clarinda Color LLC v. BW Acquisition Corp.,* 2004 WL 2862298
    (D.Minn. 2004)......................................................................................................................11

*Downs v. Am. Mut. Liability Ins. Co.* 36 Misc.2d 1082, 233 N.Y.S.2d
    721 (N.Y. Sup. Ct. 1962) ......................................................................................................14

*Dye v. General Motors Corp.* 26 Misc.2d 264, 205 N.Y.S.2d 548 (N.Y.
    Sup. Ct. 1960)........................................................................................................................14

*Epperson v. Entertainment Express, Inc.* 242 F.3d 100 (2nd Cir. 2001) .................................10

*Erving v. The Virginia Squires Basketball Club,* 349 F. Supp. 709
    (E.D.N.Y. 1972) ....................................................................................................................17

*Ehrenfeld v. Mahfouz,* 489 F.3d 542 (2nd Cir. 2007)...............................................................26

*Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guarantee
    Corp.,* 921 F. Supp. 1113 (S.D.N.Y. 1996) .........................................................................14

*Harris v. Balk,* 198 U.S. 215 (1905) ........................................................................................13

*Hollins v. U.S. Tennis Ass'n,* 469 F. Supp. 2d 67 (E.D.N.Y. 2006)........................................26

*International Shoe Co. v. Washington,* 326 U.S. 310 (1945)....................................................26

*Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181 (2nd Cir. 1998) ..........................................2, 26

*Kingsepp v. Wesleyan University,* 763 F. Supp. 22 (S.D.N.Y. 1991) ...............................15, 23

*Knox v. Orascom Telecom Holding S.A.E.,* 477 F. Supp. 2d 642
    (S.D.N.Y. 2007) ..............................................................................................................11, 12

*Koehler v. Bank of Bermuda Ltd.*, 2005 WL 551115 *13 (S.D.N.Y. 2005) ........................................14

*Laufer v. Ostrow*, 55 N.Y.2d 305 (1982) ........................................16

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) ........................................26

*Mantello v. Hall*, 947 F. Supp. 92 (S.D.N.Y. 1996) ........................................ 16-17

*Merrell v. Miller*, 1998 WL 329264 (E.D. Va. 1998) ........................................10

*M'Baye v. World Boxing Ass'n*, 429 F. Supp. 2d 652 (S.D.N.Y. 2006) ........................................24

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) ........................................14, 16

*Mones v. Commercial Bank of Kuwait, S.A.K.*, 399 F. Supp. 2d 310 (S.D.N.Y. 2005) ........................................14

*Mones v. Commercial Bank of Kuwait*, S.A.K., ___ F. Supp. 2d ___, 2007 WL 2200706 *3 (S.D.N.Y. 2007) ........................................17

*NYC Med. and Neurodiagnostic, P.C. v. Republic Western Ins. Co.*, 8 Misc.3d 33, 798 N.Y.S.2d 309 (App. Term 2004) ........................................27

*Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563 (S.D.N.Y. 2006) ........................................20

*Palestine Monetary Authority v. Strachman*, Sup. Ct. N.Y. Cty. Index No. 107777/05, 2007 WL 1063867 ........................................ 14-15

*Peacock v. Thomas*, 516 U.S. 349 (1996) ........................................9

*SEC v. Antar*, 120 F. Supp. 2d 431 (D.N.J. 2000) ........................................10

*Uebler v. Boss Media*, 363 F. Supp. 2d 499 (E.D.N.Y. 2005) ........................................26

*UFCW Local 174 Commercial Health Care Fund v. Homestead Meadows Foods Corp.*, 425 F. Supp. 2d 392 (S.D.N.Y.2005) ........................................10

*Ungar v. Palestinian Authority*, 412 F. Supp. 2d 328 (S.D.N.Y. 2006) ........................................1, 2

*Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004) *aff'd* 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005) ........................................1

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2nd Cir. 2000) ........................................16, 19, 21, 22

## Statutes and Regulations

Antiterrorism Act ("ATA") 18 U.S.C. § 2331 et seq. ........................................1

NY CPLR § 301 ................................................................................................15, 21

NY CPLR § 5201(a) ..........................................................................................13, 14

NY CPLR § 5225 ....................................................................................................14

NY CPLR § 5227 ..............................................................................................14, 15

Fᴇᴅ. R. Cɪᴠ. P. 30(b)(6)..........................................................................................20

Fᴇᴅ. R. Cɪᴠ. P. 69 ....................................................................................................27

**Statutes and Regulations**

Prof. David D. Siegel, Practice Commentaries, New York Civil
    Practice Law and Rules 5201:13...........................................................................13

Prof. David D. Siegel, Practice Commentaries, New York Civil
    Practice Law and Rules 5201:6.............................................................................13

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO

## DEFENDANT'S MOTION TO DISMISS

### I.      RELEVANT BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs-Judgment Creditors ("Ungars") are the orphaned children, parents, siblings and administrator of the estate of United States citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat Ungar in a terrorist machine-gun attack on June 9, 1996, in Israel. The attack was carried out by members of the Hamas terrorist group acting in concert with and under the command of the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO").

In March 2000, the Ungars filed suit against the PA, the PLO, and other defendants, in the United States District Court for the District of Rhode Island under the Antiterrorism Act ("ATA") 18 U.S.C. § 2331 *et seq. Ungar et al. v. Palestinian Authority et al.*, Civil Action 00-105L (D.R.I.).

On July 12, 2004, the United States District Court in Rhode Island ordered entry of final judgment for the Ungars and against the PA and PLO, jointly and severally, in the amount of $116,409,123.00 in damages. *Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004) *aff'd* 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005).[1]

The PA and PLO have refused to satisfy the Ungars' judgment, and have informed the Ungars' counsel that they "will never pay" the judgment. This contumacious refusal is merely the encore to years of intentional delay created by the PA and PLO during the underlying suit. *Ungar*, 325 F. Supp. 2d at 26, 62 (finding that the PA and PLO took "deliberate actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible"). This Court, too, has noted that the Ungars are faced with "an elusive… judgment debtor." *Ungar v. Palestinian Authority*, 412 F. Supp. 2d 328 (S.D.N.Y. 2006).

As detailed below in Part II, defendant-garnishee Orascom Telecom Holding S.A.E. ("Orascom") is indebted to the PA in the amount of $45 million.

Accordingly, in August-September 2005, the Ungars took steps to obtain discovery relating to both (i) Orascom's debt to the PA, and (ii) Orascom's jurisdictional contacts with New York (and

---

[1] The judgment has been registered in this Court pursuant to 28 U.S.C. § 1963 under the

*(Footnote continued on the next page.)*

other jurisdictions in the U.S.). To this end, the Ungars served subpoenas on Orascom and on Orascom officers Hatim El Gammal and Zouhair Khaliq in both their individual and official capacities, and filed a motion pursuant to 28 U.S.C. § 1783 seeking to depose and obtain documents from Orascom's owner and chairman Naguib Sawiris.

On November 7, 2005, this Court issued a decision quashing the subpoenas on Orascom, El Gammal, and Khaliq in their official capacities, but upholding the subpoenas on El Gammal and Khaliq in their individual capacities only. *Estate of Ungar v. Palestinian Authority*, 400 F. Supp. 2d 541 (S.D.N.Y. 2005). The Court quashed the subpoena on Orascom because it found that the Ungars had failed to make a prima facie showing that Orascom was doing business in New York.[2]

On January 5, 2006, the Court entered a decision granting the Ungars' motion to issue a subpoena to Mr. Sawiris pursuant to 28 U.S.C. § 1783. *Ungar*, 412 F. Supp. 2d at 328 (S.D.N.Y. 2006). The Court specified that Mr. Sawiris would be required to produce only documents in his possession in his individual capacity. *Id.*, at 335 ("The subpoena issued pursuant to § 1783 is for the deposition testimony of Mr. Sawiris in his personal capacity, and does not compel Mr. Sawiris to produce corporate documents only in his possession by virtue of his position as Chairman of Orascom.")

In the meanwhile, the Ungars appealed the Court's decision of November 7, 2005 quashing the subpoena on Orascom. Significantly, Orascom moved to dismiss the appeal, on the ground that the November 7 decision finding that Orascom was not doing business in New York was not a final order, since this Court had stated its intention to revisit this question following Mr. Sawiris' deposition:

> [I]n the Magistrate Judge's January 5, 2006 Decision & Order, the Court expressly stated that "[t]he question of whether Orascom is in fact subject to the personal jurisdiction of this Court must be resubmitted to Judge McMahon for her reconsideration, should the Plaintiffs choose to do so, after the deposition of [Mr. Sawiris] is held pursuant to this

---

caption *Estate of Ungar v. Palestinian Authority*, Docket No. 18 MS 0302.

[2] The Court found that a prima facie showing was required by *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2nd Cir. 1998). See *Estate of Ungar*, 400 F. Supp. 2d at 549. As discussed in Part VI below, the Second Circuit has since clarified that *Jazini* does <u>not</u> require a prima facie showing.

order." *Estate of Ungar v. Palestinian Auth.*, 412 F. Supp. 2d 328, 334 (S.D.N.Y. 2006) (emphasis added).

***

Here, because the Estate's discovery efforts before the Magistrate Judge will involve legal issues concerning personal jurisdiction over Orascom that must ultimately be resolved by the District Court, the November 7 Decision & Order is not a final decision.

***

Because the District Court has not finally determined the issue of its personal jurisdiction over Orascom, this Court lacks appellate jurisdiction to review the November 7 Decision & Order.

(Ex. 38). (Emphasis in the original). The Court of Appeals did not dismiss the appeal, but effectively granted Orascom's motion by staying it pending further proceedings in this Court. (Ex. 39).

Thus, Orascom succeeded in denying the Ungars an appeal of the November 7, 2005, decision on personal jurisdiction on the ground that that decision was not final, and would be revisited in the future. Accordingly, the Court should utterly disregard the contradictory claim now unabashedly made by Orascom throughout its motion papers according to which the November 7 decision has already settled the issue of personal jurisdiction.

The Ungars subsequently served Orascom officers Aldo Mareuse and Emad Farid with state court subpoenas (the judgment has also been docketed in Supreme Court, New York County) while they were in New York on Orascom business. The state court permitted the Ungars to depose and obtain documents from Messrs. Mareuse and Farid in their individual capacity only. (Ex. 56).

Thus, to date the Ungars have obtained discovery from Orascom's officers in their personal capacity only, and have received <u>no jurisdictional discovery whatsoever</u> from Orascom itself. Therefore, Orascom's claim that "jurisdictional discovery is complete" (Orascom Memo., p. 2) is a blatant falsehood.[3]

---

[3] Orascom's claim that its officers produced "thousands of pages of shareholder documents (Memo., p. 8) is deceptive at best. What actually happened was that Orascom's counsel downloaded and sent to the Ungars thousands of pages of fianancial reports from Orascom's website, none of which were responsive to the discovery requested. (E.g., Ex. 14, p. 92). It appears clear that Oreascom's counsel did so precisely so they could eventually come before this court and

*(Footnote continued on the next page.)*

Case 1:00-cv-00105-L-DLM Document 607-27 Filed 11/18/10 Page 9 of 33 PageID #:
8617
Case 1:07-cv-02672-CM Document 27 Filed 08/28/07 Page 9 of 33

Despite the fact that Orascom is merely a garnishee, and has nothing to lose in this case, it has moved to dismiss this action on multiple grounds, all of which are meritless. That motion should be denied for the reasons set in this brief. Alternatively, the Court should grant jurisdictional discovery as requested in Part VI below and revisit this issue after such discovery.

## II.    ORASCOM'S DEBT TO THE PA

The story of Orascom's debt to the Palestinian Authority starts with an entity known as the Palestine Commercial Services Corporation ("PCSC"), which was incorporated in the Gaza Strip in August 1994. (Ex. 50).

As Mr. Sawiris explained at his deposition, the PCSC "is the vehicle which the Palestinian government or country invests with. It is like an investment vehicle." (Ex. 12, pp. 98-99). Mr. Sawiris clarified that by the term "Palestinian government" he meant the Palestinian Authority. (Ex. 12, pp. 114-15).

Indeed, as discussed in a study of the PA's finances prepared by the World Bank, the PCSC was capitalized by the PA using the PA's own tax revenues:

> It is a matter of record that … substantial amounts of PA funds were diverted to special PA accounts outside the budget, with little transparency concerning their usage. The IMF estimates that some $591 million of excise duties (on petroleum, tobacco and alcohol) were paid into these off-budget accounts over the period 1995 – 2000, along with at least $300 million in profits from PA commercial activities.[5]
>
> > [5]As to the use to which these funds were put, the petroleum excise revenue was deposited by Israel into an Israeli bank account in Tel Aviv, and expenditures from this account could be readily traced. The IMF … has concluded that most of the diverted revenue was used for investment in commercial operations, through the then Palestine Commercial Services Corporation (PCSC)
>
> ***
>
> As mentioned earlier, using PA revenues not paid into the budget (petroleum, tobacco and alcohol excises plus ongoing profits from these commercial operations) the PA-owned Palestine Commercial Service Organization (PCSC) invested PA funds in some 79 commercial undertakings, both within [West Bank and Gaza] and abroad.

claim to have provided "thousands" of documents.

(Ex. 47, World Bank publication, "West Bank and Gaza Country Financial Accountability Assessment," June, 2004, pp. 11, 33).[4]

A report prepared by the International Monetary Fund ("IMF") likewise explains that, "Most of the diverted tax revenue was used for investment in PA commercial operations through the PCSC." (Ex. 48, IMF publication, "Economic Performance and Reform under Conflict Conditions," Sept. 15, 2003, p. 89).

Following various economic reforms, the PCSC was superseded in 2002 by a new entity, the Palestine Investment Fund ("PIF"). (Ex. 47, World Bank report, *pp.* 33-35; Ex. 48, IMF report, p. 101).

Significantly, as IMF explains: "The decree establishing the PIF made it illegal for the PA to conduct any commercial activity or any hold assets outside of the PIF." (Ex. 48, p. 101). (*See also* Ex 47, p. 33: "Under the decree it is illegal for the PA to conduct any commercial activity or hold commercial assets outside of PIF.").

Accordingly, since the decree establishing the PIF prohibited the PA from holding any assets outside of the PIF, the PA assets held by the PCSC were transferred to the PIF, and a valuation and "transparency assessment" of these assets was solicited from the firm of Standard & Poors and the Democracy Council (hereinafter "S&P Report"). (*See* Ex. 47, pp. 34-35; Ex. 48, p. 101). A copy of the S&P Report is attached hereto as Ex. 52.

Among the assets discussed in the S&P Report are investments in two Orascom subsidiaries, Orascom Telecom Algeria (a/k/a "Djezzy") ("OTA") and Orascom Telecom Tunisia (a/k/a "Tunisiana") ("OTT"). (Ex. 52, pp. 200-64).

The S&P Report explains that the PCSC held ownership stakes in OTA and OTT, which had been transferred to the PIF on January 1, 2003 (collectively hereinafter: "OTA/OTT Stakes"). (Ex. 52, pp. 202, 222, 235, and 256).

The details contained in the S&P Report were REDACTEDREDACTEDREDACTED REDACTEDREDACTED

---

[4] Notably, this World Bank study is currently published on, and was downloaded by plaintiffs' counsel from, the Palestinian Authority's own website. (R. Tolchin Declaration conveying exhibits, notation for Ex. 47). Its accuracy therefore cannot be contested.

On February 27, 2005, a Share Purchase Agreement was executed between Orascom and the PIF, pursuant to which Orascom agreed to purchase the OTA/OTT Stakes. (Ex. 61).[5] (*See also* Ex. 26 and 27, Orascom press releases of March 6, 2005 and April 24, 2005; Ex. 25, "*Pax Orascom?*" Business Today Egypt, April 2005).

A dispute erupted between Orascom and the PIF, and Orascom filed a request for arbitration. *See* Orascom press release of March 17, 2005 (Ex. 36). This dispute was soon resolved, and on April 17, 2005, Orascom and the PIF executed a Settlement Agreement to the Share Purchase Agreement of February 27, 2005. (Ex. 49).

Article 4 of the Settlement Agreement required Orascom to make certain payments to the PIF by April 18, 2005. (Ex. 49, ¶ 4). Additionally, and significantly for the instant case, Article 4 also required Orascom to pay the PIF the sum of $45 million, at a future date. (Ex. 49, p. 3, final paragraph).

At his deposition, Mr. Sawiris REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED This $45 million debt is the asset against which the Ungars seek to enforce their judgment in this case.

There is no question whatsoever that this $45 million debt constitutes an asset of the PA:

First, as explained in the World Bank and IMF reports, the PCSC (which Mr. Sawiris correctly characterized as an investment vehicle for the PA) made its investments, which were later transferred to the PIF, <u>using PA funds</u> (i.e., tax revenues). Unsurprisingly, then, the World Bank and IMF explicitly refer to the investments held by the PCSC and PIF as "***PA funds***," "***PA investments***," "***PA commercial investments***" (Ex. 47, pp. 33, 35) and "***PA assets***" (Ex. 48, p. 101). (Emphasis added). Indeed, the World Bank report specifically mentions the investment in OTA

---

[5] We apologize to the Court for the poor quality of the copy. Because Orascom refused to cooperate or provide any discovery, the Ungars were forced to spend two years and many thousands of investigative dollars trying to obtain a copy of this agreement indirectly. This is the best copy we were able to obtain.

and OTT, which it characterizes it as one of "*The largest PA investments*" (Ex. 47, p. 35). (Emphasis added).

Moreover, the PIF itself expressly and unhesitatingly acknowledges that the investments in its portfolio are assets of the PA. Thus, for example, the introduction to the PIF's 2003 Annual Report explicitly states:

> This first Annual Report of the Palestinian Investment Fund for fiscal year 2003 presents a full accounting and valuation <u>of the assets of the Palestinian Authority</u>.

(Ex. 51, at p. 6, "Chairman's Statement") (Emphasis added).

The OTA/OTT Stakes are listed in the PIF Annual Report. (Ex. 51, p. 38). Thus, under the very definition established on page 6 of the Annual Report, the OTA/OTT Stakes are incontrovertibly "assets of the Palestinian Authority."

Similarly, one of the PIF's investment advisors, Walid Najjab, testified under that the assets in the PIF's portfolio belong to the PA, and that placing the assets under the name of the PIF did not affect the PA's ownership thereof:

> Q.     During what period did you consult with the P.I.F.?
>
> A.     Between 2002 and the year 2004.
>
> Q.     2002 through 2004?
>
> A.     (Nodding.)
>
> Q.     What is the P.I.F.?
>
> A.     Palestine Investment Funds.
>
> Q.     What is that agency, what does it do?
>
> A.     It invests. It's an investment fund that is -- that invests. It took over PCSC's role.
>
> ***
>
> Q.     <u>But who did the funds belong to that the P.C.S.C. and the P.I.F. invested</u>?
>
> A.     Can you repeat the question?
>
> ***
>
> MR. TOLCHIN: For the third time. I'm going to ask the court reporter to read it back. (The record is read by the reporter as recorded above.)
>
> A.     <u>The Palestinian Authority</u>.
>
> Q.     As you sit here today, do you have an understanding why the Palestinian Authority's funds were invested through the agency Palestinian Investment Fund?

A.   Today?

Q.   I'm just asking if you understand why that was done.

A.   So that everything is invested in one place, and it's an investment vehicle.

Q.   <u>Putting those funds, putting the Palestinian Authority's funds in the name of the Palestinian Investment Funds didn't mean that the funds stopped belonging to the Palestinian Authority, correct</u>?

MR. KERR: Objection to form.

MR. TOLCHIN: You can answer.

A.   <u>No</u>.

(Ex. 21, Deposition of Walid Najjab in *Ungar v. Palestinian Authority*, Sup. Ct. N.Y. Cty. Index no. 102101 / 06, pp. 20-22). (Emphasis added).

Indeed, Orascom itself freely acknowledges (when it is not before a U.S. court) that its debt is an asset of the PA. On May 28, 2006, Orascom sent a letter (Ex. 62) to Mohammed Mustafa, who is both the Economic Advisor to the PA and (at that time) the CEO of the PIF. (Ex. 54). In that letter, which was sent in response to a letter from Mustafa demanding payment of the $45 million, Orascom stated:

> Orascom appreciates <u>the financial difficulties the Palestinian Authority is currently experiencing</u>, and we have consistently desired to meet our obligation to pay the PIF the $45 million (less legal fees).

(Ex. 62, p. 2). (Emphasis added). Here we see that Orascom openly recognizes that its $45 million debt, like all other assets in the PIF's portfolio, is an asset of the PA, which the PA intends to use to ease its alleged "financial difficulties."

Thus, in sum, the only people who <u>deny</u> that Orascom's debt is an asset of the PA are Orascom's counsel in the instant matter. In light of all the evidence to the contrary—including the PIF's own statement in its Annual Report—it is difficult to credit that denial as being made in good faith.

Last, but not least, in sworn affidavits submitted by the PA in civil proceedings pending in Israeli courts the PA itself has identified the OTA/OTT Stakes—specifically by name—as assets owned by the PA and available for the satisfaction of judgments against the PA. As explained in the Declaration of Israeli attorney Avraham Colthof, the PA submitted those affidavits in support of motions filed by the PA in the Israeli courts to vacate or reduce the amount of prejudgment attachments that had been imposed on the PA. The PA appended to the affidavits filed in Israel a

copy of pages 342-44 of the S&P Report (Ex. 52), which is an appendix to the S&P Report ("Appendix C") listing all of the assets in the PIF portfolio, including the investment in OTA and OTT. (Colthof Dec., ¶¶ 13-17; and compare to Ex. 52, pp. 342-44).

The PA confirmed that the assets in the S&P Report are its own ("assets of the Authority") and on that basis sought to persuade the Israeli court that it had sufficient capital to pay any adverse judgment, and that therefore no prejudgment attachment was necessary to protect the plaintiffs. (Colthof Dec., ¶¶ 9-17).

Thus, the debt owed by Orascom is not only an asset of the PA, but has been identified by the PA as an asset which could be used to satisfy a judgment against it. Nothing could be more just, therefore, than to allow the Ungars to enforce their judgment against that debt.

## III.    THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS ACTION

Orascom seeks to dismiss this case for lack of subject-matter jurisdiction because under *Peacock v. Thomas*, 516 U.S. 349 (1996) a federal court's ancillary subject-matter jurisdiction does not extend to alter ego and veil-piercing claims, and because, according to Orascom, the complaint in this action "necessarily" requires the Court to make an alter ago or veil-piercing finding. (Memo., p. 20).

Orascom is 100 percent right on the law: if this action required the Court to make an alter ago or veil-piercing determination it would have to be dismissed. But Orascom is 101 percent wrong in claiming that this action requires any such determination. Where, as here, an asset is titled to a third party, the judgment creditor can potentially reach the asset in one of two distinct ways:

(i)    By showing that the third party itself is liable for the judgment, because the third party is an alter ego of the judgment debtor or because the corporate veil between the judgment and the third party should be pierced ("Scenario 1"); or

(ii)    By showing that the asset remains the property of the judgment debtor itself, despite the fact that it is titled to the third party. Typically this is done by demonstrating that the conveyance of the asset to the third party was fraudulent, or that the third party is holding the asset as a trustee of the judgment creditor (i.e., constructive trust or resulting trust theories) ("Scenario 2").

In Scenario 1 the judgment creditor prevails even though the asset is the property of the third party, because the third party is found liable for the judgment.

In Scenario 2 the judgment creditor prevails even though the third party is not liable for the judgment, because the asset titled to the third party actually belongs to the judgment debtor.

The leading Second Circuit case interpreting and applying *Peacock* is *Epperson v. Entertainment Express, Inc.* 242 F.3d 100 (2nd Cir. 2001). In *Epperson*, the Second Circuit explained that *Peacock* established a simple bright-line rule: As long as the judgment creditor is claiming only that the asset titled to the third party belongs to the judgment debtor and not that the third party is liable for the judgment (i.e., Scenario 2) the court has ancillary jurisdiction. *Epperson*, 242 F.3d at 103-07. *See also UFCW Local 174 Commercial Health Care Fund v. Homestead Meadows Foods Corp.*, 425 F. Supp. 2d 392, 393 (S.D.N.Y.2005) ("Because the plaintiffs seek to collect a judgment issued by this Court by <u>tracing the judgment debtor's assets into the hands of a third party</u>, there is subject matter jurisdiction over this action.") (emphasis added).[6]

The Ungars assert that all assets titled to the PIF belong to the PA because they were <u>never purported to have been conveyed</u> to the PIF. As shown in Part II above, this assertion is expressly supported by the PIF, PA, the IMF and the World Bank.[7]

Notably, *Epperson* held that even a fraudulent conveyance claim is within a court's ancillary subject-matter jurisdiction. *Id.* Thus, as a matter of simple logic, since ancillary subject-matter

_____

[6] *See also Aaron v. Mattikow*, 225 F.R.D. 407, 415 (E.D.N.Y. 2004) (holding that ancillary action by judgment creditor to reach stock titled to judgment debtor's wife "is proper under both *Peacock* and *Epperson*, for this Court's exercise of ancillary jurisdiction" and denying motion to dismiss for lack of subject-matter jurisdiction); *SEC v. Antar*, 120 F. Supp. 2d 431, 440 (D.N.J. 2000) (holding a proceeding seeking "to reach assets belonging to the judgment debtor but found in the hands of" third parties "is exactly the sort of claim approved in *Peacock*"); *Merrell v. Miller*, 1998 WL 329264, at * 2 (E.D. Va. 1998) (permitting claim to proceed on basis of *Peacock* since "plaintiff does not allege that he should be able to satisfy his judgments by reaching Ms. Deal's assets or Ms. Locher's assets; rather, he alleges that the assets in question rightly belong to defendant Miller.").

[7] In the face of the overwhelming and uncontested evidence that the asset belongs to the PA, Orascom's accusation that the Ungars are disguising their real theories for relief through artful pleading and a "semantic ploy" (Memo., p. 20) is simply laughable. Does Orascom believe that the PIF, PLO, IMF, World Bank and Mr. Najjab are also in on the "ploy"? The only "artful pleader" here is Orascom, which seeks to rewrite the Ungars' allegations in manner that has no support in either the complaint or empirical reality in order to <u>defeat</u> jurisdiction.

jurisdiction permits a court to determine <u>even</u> whether an asset was <u>conveyed fraudulently</u>, it must also, *a fortiori*, permit a court to determine that <u>an asset was never purported to have been conveyed at all</u>, which is precisely what the Ungars are asserting here (and what all the evidence demonstrates).[8]

At bottom, Orascom's argument is that when an asset is titled to a third party the only way to reach that asset is through alter ego or veil-piercing theories which require an independent basis for subject-matter jurisdiction. That was precisely the argument rejected in *Epperson*.

Judge Marrero's decisions in *Knox v. Orascom Telecom Holding S.A.E.*, 477 F. Supp. 2d 642 (S.D.N.Y. 2007) *recon. den.* 242 F.R.D. 251 (S.D.N.Y. 2007), upon which Orascom seeks to rely, are easily distinguished. Obviously, Judge Marrero did not rule on the <u>facts</u> of the case, but rather on the <u>allegations</u> of the *Knox* complaint. Notably, Orascom has carefully refrained from submitting the complaint in the *Knox* matter. Little wonder: a perusal of the *Knox* complaint reveals an allegation that "The PCSC and PIF are shell entities wholly owned and controlled by the PA …". (Ex. 55, ¶ 30).

Orascom argued, and Judge Marrero agreed, that this "shell entity" allegation was in substance an alter ego and/or veil-piercing claim: "Orascom…argues that in asserting that the PIF is a 'shell entit[y]' owned and controlled by the PA, Plaintiffs clearly seek relief based on a new theory of liability." *Knox*, 477 F. Supp. 2d. at 646. On that basis, Judge Marrero dismissed the case. *Id.* at 648-649. Judge Marrero reiterated this finding upon reconsideration: "[a]s Plaintiffs specifically allege that the PIF is a 'shell entity' and that the PA uses the 'PIF to conceal, hold, manage and invest the PA's assets,' the Court construed the complaint to necessarily allege that the PIF was an alter-ego of the PA despite Plaintiffs' disavowal of such an allegation." *Knox*, 242 F.R.D. 251.

---

[8] If the PA's ownership of the asset were ever contested in this case, the Ungars would assert theories of trust, resulting trust, constructive trust and fraudulent conveyance, all of which are within the Court's ancillary subject-matter jurisdiction. *See e.g. Clarinda Color LLC v. BW Acquisition Corp.*, 2004 WL 2862298 (D.Minn. 2004) (trust theories are within court's ancillary enforcement jurisdiction); *Epperson*, 242 F.3d 100 (fraudulent conveyance within ancillary jurisdiction).

The complaint in the instant action contains no such "shell entity" allegation, for the simple reason that the question of the PIF's corporate status is utterly irrelevant to this case: the Ungars allege here—as they have consistently alleged from day one—*only* that the asset at issue (the debt owed by Orascom) <u>is the property of the PA</u>, and *not* that the PIF is liable for the judgment against the PA.

Judge Marrero also found that if the Knoxes intended to allege that Orascom's debt is actually owned by the PA, then they should have included in their complaint an allegation that the PIF was merely an agent or a trustee for assets of the PA, which they did not. *Knox*, 242 F.R.D. 251.

By contrast, both the original complaint and the amended complaint in this case explicitly allege that "The PIF is a corporation established by the PA to serve as a <u>custodian of assets</u> owned by the PA" and that "ORASCOM's Debt is titled to the PIF, only because the PIF was established to serve as a <u>custodian of assets</u> owned by the PA." (Amended Complaint, ¶¶ 29, 32.)

Thus, the complaint in *Knox* is materially distinguishable, and so the decision in *Knox* is inapposite, both because it alleged that the PIF was a "shell entity" and because it failed to allege that the PIF was a mere custodian for assets of the PA.[9]

## IV. THE ASSET AT ISSUE IS A DEBT SUBJECT TO TURNOVER UNDER CPLR § 5227

Orascom moves to dismiss on the further ground that the asset at issue is "located overseas" and is this "beyond the territorial jurisdiction of this Court." (Memo., p. 21). This argument is fails for several reasons:

<u>First</u>, there is no question whatsoever that the asset at issue here is a simple intangible debt, arising from a contract (Ex. 49). Indeed, in its 2006 annual report Orascom itself helpfully defines the amount owed to the PIF as a "debt due." (Ex. 53, ¶ 18, debt due for purchase of "Minority interest in OTA & OTT").[10]

---

[9] In any event, the Ungars respectfully believe that *Knox* (which is now on appeal) was wrongly decided.

[10] The 2006 annual report is available online at www.otelecom.com/Investor_Relations/pdfs/OT%20AR%202006.pdf. The amount of the debt reported, $48,653,726, reflects the entire amount payable to the PIF ($45 million) and the Palestinian Pension Fund ($5 million) under the Settlement Agreement (Ex. 49) REDACTED   REDACTED   REDACTED   REDACTED

*(Footnote continued on the next page.)*

Thus, it is not the Ungars alone who are "characterizing the assets in question as a 'debt'" as Orascom asserts (Memo., p. 22) but rather <u>Orascom itself</u> which has done so. Notably, a recent decision of the Appellate Division utilized precisely this methodology—reliance on a garnishee's own financial reports—to determine whether the garnishee owed a debt to the judgment debtor:

> The petition established the existence of a debt owed by respondent to the judgment debtor, submitting respondent's 2001 annual report which stated, under the section denominated "Receivables and Long Term Payables to Related Party," that "the Company has a payable to Durham Capital Holdings, Inc. … in the amount of [ ]1,545,000."

*Adelaide Prod. v. BKN Int'l AG*, 39 A.D.3d 254, 255, 833 N.Y.S.2d 450 (1st Dept. 2007).

<u>Second</u>, CPLR § 5201 provides that New York courts may exercise jurisdiction in a turnover proceeding with respect to a ***debt*** created or owed anywhere in the world:

> A money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor, <u>whether it was incurred within or without the state, to or from a resident or non-resident</u> …

CPLR § 5201(a) (emphasis supplied).

Thus, in New York, a debt has no situs, and "if the judgment debtor's debtor, the garnishee, is subject to New York jurisdiction, the debt that the garnishee owes the judgment debtor can be levied on simply by means of the sheriff's serving on the garnishee a copy of the execution." Prof. David D. Siegel, *Practice Commentaries, New York Civil Practice Law and Rules* 5201:13. *See also, id.* at 5201:6 (intangible debt has no situs and is available for turnover under § 5227 whenever garnishee is subject to jurisdiction of New York courts) (*citing Harris v. Balk*, 198 U.S. 215 (1905)). *See also, e.g., Downs v. Am. Mut. Liability Ins. Co.* 36 Misc.2d 1082, 1083, 233 N.Y.S.2d 721 (N.Y.Sup. 1962) (holding, in reliance on *Harris v. Balk*, that "[p]ower over the person of the garnishee confers jurisdiction on the courts of the State where the writ issues."); *Dye v. General Motors Corp*. 26 Misc.2d 264, 205 N.Y.S.2d 548, 550 (N.Y. Sup. 1960) (New York courts have adopted the rule that "the person of the garnishee grants jurisdiction to the court").

Indeed, the recent decision in *Adelaide Productions*, 39 A.D.3d at 255, 833 N.Y.S.2d at 450, is exactly on point here: a petition was brought against a German company for turnover of a debt

REDACTED    REDACTED    REDACTED    REDACTED

owed by it to the judgment debtor. The German company asserted (as Orascom does here) that the action should be dismissed for lack of personal jurisdiction, but the court disregarded "the carefully worded affidavits submitted" by the company (more shades of Orascom) and found on the facts that jurisdiction was proper. Though the court ultimately remanded to determine the <u>amount</u> of the debt, it is perfectly clear that it found the debt—owed, as here, by a foreign company—subject to turnover solely by virtue of the fact that the foreign company was subject to personal jurisdiction in New York. *Id.*

Exactly so, since this Court has personal jurisdiction over Orascom, it can order Orascom to turnover and pay its debt to the Ungars pursuant to CPLR § 5227.

<u>Third</u>, none of the cases cited by Orascom are on point. In *Koehler v. Bank of Bermuda Ltd.*, 2005 WL 551115 *13 (S.D.N.Y. 2005) the assets at issue were actual share certificates, i.e. property, not a debt. Turnover of property is governed by § 5225, not §§ 5201 and 5227, and property, unlike debts, does indeed have situs. The decision in *Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guarantee Corp.*, 921 F. Supp. 1113 (S.D.N.Y. 1996) is inapposite because it dealt with assets of a "foreign state," and specifically noted that it was conducting an "analysis of the location of the accounts under the principles of sovereign immunity." *Id.* at 1118. Also the assets in *Fidelity Partners* were bank accounts, subject to the "separate entity" rule. The asset at issue here is a simple contractual debt, not a bank account. In *Mones v. Commercial Bank of Kuwait, S.A.K.*, 399 F. Supp. 2d 310, 317-18 (S.D.N.Y. 2005), the judgment creditor himself deemed the accounts at issue "Property of Judgment Debtors" (id. at 312) and the court therefore conducted its entire analysis under CPLR § 5225, which governs <u>property</u>, and did not reach, much less decide, whether the accounts were "debts" subject to turnover under § 5227. Nor is *Palestine Monetary Authority v. Strachman*, Sup. Ct. N.Y. Cty. Index No. 107777/05, 2007 WL 1063867, at *6 (Apr. 2, 2007) of any assistance to Orascom since the court there determined that the assets at issue there were "property" being held by the PA's central bank in the Palestinian territories.

In short, this Court is empowered to order turnover of Orascom's debt under § 5227 since it has personal jurisdiction over Orascom.

## V.      THIS COURT HAS JURISDICTION OVER ORASCOM

Orascom's motion to dismiss this action for lack of personal jurisdiction should be denied. As shown below, Orascom's activities in New York easily satisfy both the "solicitation-plus" standard under CPLR § 301, and constitutional Due Process requirements.

### a.      Under the "Solicitation-Plus" Formula, All Contacts Which Benefit Orascom Are Cognizable, and Must Be Considered in the Aggregate

Before detailing the facts of Orascom's New York business activities we address three glaring misstatements of the law contained in Orascom's motion:

First, Orascom argues that it cannot be "doing business" in New York for purposes of CPLR § 301 since it does not have the "traditional indicia" of doing business (e.g., office, telephone listing, bank account, etc.) in New York. (Orascom Memo., p. 10-11).

This is erroneous. Under the "solicitation-plus" formula, a corporation which has none of these "traditional indicia" in New York will be held to be "doing business" for the purpose of CPLR § 301, if it engages in continuous and substantial solicitation, plus some additional activity in New York. *See e.g. Big Apple Pyrotechnic. v. Sparktacular*, 2007 WL 747807 *3 (S.D.N.Y. March 9, 2007) ("solicitation-plus" standard permits exercise of jurisdiction even in the absence of "any of the traditional markers of doing business-office, bank account, phone number, public relations, or permanent employees-nor any permanent physical presence in New York," provided that defendant's "solicitation of New York business, as measured by employee visits, sales, and customer contacts [was] 'substantial and continuous'"); *Kingsepp v. Wesleyan University*, 763 F. Supp. 22, 27 (S.D.N.Y. 1991) ("Dartmouth is not licensed to do business in New York, it maintains no offices in New York, and it does not list a phone number in New York. Nonetheless, Dartmouth engages in a continuous and systematic course of conduct sufficient to warrant a finding that it is doing business in New York [under CPLR § 301]").

Next, Orascom argues repeatedly that certain types of contacts do not "count" for jurisdictional analysis. This claim, too, is mistaken:

> [A] finding of "solicitation" in the jurisdictional context does not necessarily require "solicitation" in the sense of an offer of contract. Rather, the central question is <u>whether the defendant (or its agent) behaved in such a way so as to encourage others to spend money (or otherwise act) in a manner that would benefit the defendant</u>.

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 98 (2nd Cir. 2000) (emphasis added).

Thus, as the Second Circuit has made perfectly clear, ***any*** activity in New York by Orascom and its agents intended to benefit Orascom constitutes "solicitation."

Third, throughout its memorandum Orascom employs a faulty methodology, arguing that the Ungars cannot identify any one specific contact in New York which is sufficient standing alone to give rise to personal jurisdiction. But jurisdictional analysis is not performed by shooting down individual contacts one by one as "insufficient," but rather by examining the sum total of contacts. "There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; underline courts should assess the defendant's contacts as a whole." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d at 570 (emphasis added); *Laufer v. Ostrow*, 55 N.Y.2d 305, 310 49 N.Y.S.2d 456, 458 (1982) (courts should look to "the aggregate of the corporation's activities in the State").

**b.      The Nature of Orascom's Business**

Properly characterizing the nature of Orascom's business is of crucial importance in the Court's jurisdictional analysis under CPLR § 301, because the weight to be attached to any given jurisdictional contact is a function of relationship of that contact to the defendant's core business. Simply put, contacts that relate directly to the defendant's main business will be afforded more weight in the jurisdictional calculus than contacts that are merely incidental to the defendant's main business. *See e.g. Laufer v. Ostrow,* 55 N.Y.2d 305 at 311, 449 N.Y.S.2d at 459 (A corporation, the business of which is limited to the soliciting of orders and servicing of purchasers' accounts, engages directly in its corporate activity when, by persons in its employ and present in New York, it solicits and services New York accounts on a continuous basis); *Mantello v. Hall,* 947 F. Supp. 92, 98 (S.D.N.Y. 1996) ("a defendant who lacks the traditional indicia of doing business nevertheless does business in New York when it engages in its principal corporate activity within New York on a systematic and continual basis") (emphasis added); *Mones v. Commercial Bank of Kuwait, S.A.K.,* ___ F. Supp. 2d ___, 2007 WL 2200706 *3 (S.D.N.Y. 2007) ("The term 'doing business' is used in reference to foreign corporations to relate to the ordinary business which the corporation was organized to do") (emphasis added, internal brackets and quotes omitted); *M'Baye v. World Boxing Ass'n,* 429 F. Supp. 2d 652 (S.D.N.Y. 2006) (sanctioning boxing matches in New York constituted

"doing business" since the business of the World Boxing Association is to sanction such events); *Erving v. The Virginia Squires Basketball Club,* 349 F. Supp. 709, 713-15 (E.D.N.Y. 1972) (since business of basketball team was to play basketball, games held in New York were "doing business").

So what is Orascom's business? In their earlier filings in this matter, in 2005, the Ungars described Orascom as "an Egyptian telecommunications company specializing in mobile phone ("GSM") and internet services."[11] But our characterization of Orascom as a telecommunications provider (which was based on the scant information available to us at the time), was fundamentally mistaken.

In fact, as Orascom's officers have explained in their depositions, REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

Orascom is merely a holding company (as its full name, "Orascom Telecom Holding," implies), with very narrow and specific functions. Indeed, Orascom has only 150-160 employees. (Ex. 12, p. 36; REDACTED Orascom's core business is REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED . Its subsidiaries have 19,000 employees. (Ex. 12, p. 36).

Thus, Orascom's activities to raise capital in New York—which, as shown below are systematic, extensive and on-going—constitute its very corporate raison d'être, and should be afforded maximum weight in the Court's jurisdictional calculus.

Orascom will no doubt attempt to argue in its reply papers that its main business is really providing cellular services. The Court should pay no heed to such an argument, both because it is factually untrue and because Orascom itself previously argued precisely the contrary: In its motion to quash the Ungars' subpoenas, Orascom argued that the telecommunication contracts (the

---

[11] *See, e.g.,* Memorandum of Law in Opposition to Motions to Quash By Non-Party Subpoena Recipients Orascom and Bishara, p. 3; Memorandum of Law in Support of Plaintiffs' Motion for a Subpoena Pursuant to 28 U.S.C. § 1783, p. 4, both filed in *Ungar v. Palestinian Authority*, Docket No. 18 Misc. 18 0302.

"roaming agreements") entered into by Orascom's subsidiaries (which are the actual service providers) cannot be attributed to Orascom itself, because the subsidiaries are separate corporations. (Ex. 59, Orascom Telecom's Reply in Support of Its Motion to Quash Nonparty Subpoenas, dated Sept. 26, 2005, pp. 4-5).

Indeed, the Abaza Declaration submitted in support of Orascom's instant motion insists that Orascom's "subsidiaries and affiliates are legal entities separate and distinct from" Orascom and that "corporate formalities are preserved and observed." (Abaza Dec., ¶ 10).

Fair enough. But that selfsame principle must now be applied in determining what Orascom's main business is. Orascom cannot argue with a straight face that it does **not** provide cellular services (so that the roaming agreement and other activities of its subsidiaries cannot be attributed to it), and at the same time claim that its main business **is** to provide cellular services (so that its activities to raise capital should be regarded as merely incidental to its main business). Orascom cannot have it both ways.

The plain truth is that Orascom's "principal corporate activity," *Mantello,* 947 F. Supp. at 98, includes the solicitation of capital, and the Court's jurisdictional analysis should reflect that fact.

### c.      Orascom's Solicitation of Business in New York

Despite the fact that the Ungars have obtained no discovery whatsoever from Orascom, they have obtained evidence from other indirect sources showing that Orascom continuously and systematically solicits business in New York, in several different ways.

### Roadshows and Conferences

Between March 2004 and January 2007, teams of senior Orascom officers traveled to New York on at least 20 separate occasions to participate in "road shows" and investor conferences. The chart attached as Ex. 58 lists each of these visits, and identifies the respective deposition transcripts, and information subpoena responses, and other documents from which the information about each of these visits was gleaned.[12]

---

[12] All of the deposition transcripts, information subpoena responses and other documents referenced in the chart are attached as exhibits to the Declaration of Robert Tolchin.

Orascom's officers testified that the purpose of these visits was to encourage current and potential institutional investors to buy Orascom's stock in Egypt, its GDR's, and/or its bonds. (Ex. 13, p. 83, 86, 119 *et seq*.). Orascom CEO Naguib Sawiris explained that the road shows are "to get shareholders interested in the company so they would buy the stock." (Ex. 12, p. 57). Orascom CFO Adlo Mareuse explained that the "roadshows" were intended "to communicate the story to investors." (Ex. 13, p. 56).

Orascom's officers further testified that on each of these trips, they typically conducted meetings with between 15-30 different institutional investors. (Ex. 13, pp. 88-93, 98-102, 104-10, 112-15, 118-31; Ex. 14, pp. 22-49; Ex. 19, # 23; Ex. 20, #24(v)-(viii)). Indeed, the sole itinerary for one of these road shows that the Ungars have been able to obtain (in the absence of any discovery from Orascom) shows that on a trip in April 2005, the Orascom team met with over 30 different major institutional investors. (Ex. 10).

Thus, assuming a conservative average of only 20 such meetings during each roadshow or investor conference, and approximately 20 roadshows/investor conferences between March 2004 and the filing of the instant action, that means that **Orascom conducted over 400 meetings with institutional investors in New York in order to solicit investments during the 36 months preceding the filing of this suit!**

Each of these meetings was obviously intended "to encourage others to spend money (or otherwise act) in a manner that would benefit" Orascom. *Wiwa*, 226 F.3d at 98. Clearly, then, Orascom is involved in substantial, continuous and systematic solicitation of business in New York.

The scope of a defendant's New York business relative to its non-New York business can be relevant to the jurisdictional analysis. *See Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 569 (S.D.N.Y. 2006) ("Courts will frequently look to the percentage of a company's revenue attributable to New York business in determining whether solicitation is substantial and continuous.")

Accordingly, we questioned Orascom's officers regarding the percentage of Orascom's Egyptian stock held by New York institutional investors, and the percentage of the bond sold to New York investors (Ex. 13, pp. 86-87, 129-130)

In respect to the stock, Mr. Mareuse testified that he did not know the answer but Orascom could obtain this information from the Cairo stock exchange (Ex. 13, pp. 86-87). Mr. Mareuse also denied knowing what percentage had been purchased by New York investors (Ex. 13, pp. 129-130), but Mr. Sawiris contradicted this claim and stated that Mr. Mareuse did know the figure, and that other Orascom personnel had the information as well (Ex. 12, pp. 61-63).

Thus, jurisdictional discovery from Orascom itself, which would include a witness or witnesses designated under FED. R. CIV. P. 30(b)(6) who would perforce have this and other relevant information, would clarify exactly what percentage of Orascom's Egyptian stock and its bond are held by New York investors.

### Conference Calls

Every fiscal quarter and at year end, Orascom invites its current and potential institutional investors to participate in conference calls. (Ex. 22, list of conference call transcripts from Orascom's website; Ex. 23, sample invitation to one such conference call; Ex. 24, sample conference call transcript).[13]

Mr. Sawiris testified that there are between 50-150 participants in each call, including participants in New York such as the "major financial institutions" that invest in Orascom, and that the purpose of the conference calls is to insure that the shareholders "remain loyal." (Ex. 12, p. 58-60).[14]

Thus, the conference calls are clearly intended "to encourage others to spend money (or otherwise act) in a manner that would benefit" Orascom, *Wiwa*, 226 F.3d at 98, and therefore constitute solicitation. Nor is there any question that solicitation by telephone is a cognizable contact under CPLR § 301. The New York courts have held that the "doing business" requirement of § 301 may be satisfied in this day and age by long-distance electronic communication with New

---

[13] The fact that the conference call can be accessed by a U.S. toll-free number fefutes Orascom's claim (Memo., p. 12) that "the analysts and researchers who follow Orascom's GRR's are all based in London."

[14] Jurisdictional discovery would show the exactly how many New York institutions are invited to participate, and actually participate, in these calls.

York, including the use of the telephone, websites, e-mail and instant messaging. *See Chestnut Ridge Air, Ltd. v. 1260269 Ontario Inc.*, 13 Misc.3d 807, 827 N.Y.S.2d 461 (N.Y.Sup. 2006).

### Interactive Website

Orascom also maintains an interactive website, which allows a visitor to sign on to receive information updates from Orascom by email. *See* http://www.otelecom.com/media/Register.aspx. The delivery of information to persons in New York through interactive websites of this type constitutes solicitation for purposes of § 301. *See Chestnut Ridge,* supra.

The Ungars' counsel signed on to this service, and between September 5, 2006 and August 13, 2007 received 46 email updates from Orascom alerting him to information of interest to Orascom investors. (Declaration of Robert J. Tolchin Esq., ¶¶ 2-3). It is more than reasonable to assume that Orascom is delivering information to many other New Yorkers in the same manner. Jurisdictional discovery would show how many other New Yorkers are subscribed to this information service.

### d.      The "Plus" Contacts

It is well-established that "[u]nder th[e] 'solicitation-plus' rule, once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.'" *Allojet PLC v. Vantgage Associates*, 2005 WL 612848 *6 (S.D.N.Y. 2005) (internal quotes omitted). *See also, e.g., Big Apple Pyrotechnic*, 2007 WL 747807 at *3 (same).

The "plus" requirement is easily met here, since Orascom has a number of significant contacts with New York in addition the solicitation detailed above.

### Orascom's New York GDR Program

As discussed, Orascom has for years been soliciting investors in New York both for its Egyptian stock, and for its GDRs.

Solicitation for investors to purchase stock or GDR constitutes solicitation <u>irrespective</u> of whether the stock/GDR is registered in New York, or elsewhere.

For example, by coming to New York to persuade investors to buy its stock in Egypt, Orascom has engaged in solicitation in New York, even though the stock is registered on the Cairo stock market.

By contrast, Orascom's GDR program <u>is based in New York</u>. Thus, in addition to soliciting investments in that GDR program (= solicitation), the on-going operation of the GDR program in and of itself constitutes a separate and distinct contact (= a "plus" contact).

There is no question that operation of a GDR program is a jurisdictionally significant contact. In *Wiwa*, not only did the Second Circuit made clear that **any** activity designed to benefit the foreign corporation is a cognizable contact, but it expressly held that stock market activities are included in this category. *See Wiwa*, 226 F.3d at 97.

As detailed in the attached Declaration of George H. Gregor, Orascom's GDR program involved and continues to involve manifold, on-going activities in New York.

Accordingly, the establishment, existence and operation of the GDR program in New York, standing alone, easily meets the "plus" element of the "solicitation-plus" standard.

### Orascom's New York Bond Program

As discussed *supra*, and in the testimony of Orascom's officers (Ex. 13, pp. 119 *et seq.*). shortly before the instant action was filed, an Orascom team came to New York to solicit investments in its $750 million bond.

However, the jurisdictional significance of the bond is far greater than Orascom's solicitation of the <u>initial</u> purchasers for the bond. As explained in the attached Declaration of George H. Gregor, the master bond itself is being held in New York, and all future trades in the bond is conducted through New York institutions and governed by New York law. When investors anywhere in the world buys or sells an Orascom bond, they are buying or selling a piece of the master bond located in New York.

Issuance of a bond is a jurisdictional contact under § 301 even when the issuer is an educational institution. *See Kingsepp*, 763 F. Supp. at 27 (finding that Dartmouth College was doing business in New York *inter alia* on the basis of the fact that it "has issued bonds in New York").

All the more here, where the defendant's <u>core business</u> includes raising capital!

The ongoing existence of this bond program in New York constitutes an additional "plus" factor.

### Contract with Warner Music

In February, 2007, Orascom entered into an agreement—a "strategic partnership"—with Warner Music Group of New York. (Ex. 46). Under the agreement, Orascom will purchase music content from Warner, including "ringtones, mastertones, ringback tones, video tones, wallpapers and full track downloads." *Id.*

Orascom's agreement with the New York-based Warner constitutes yet another "plus" factor.

### Stock Exchange Committee Membership

In 2005, Orascom's chairman, Mr. Sawiris, was appointed to the prestigious International Advisory Committee of the New York Stock Exchange. (Ex. 28, 30, 31). Mr. Sawiris' participation in the committee is ongoing, and has involved several meetings in New York. (Ex. 28, 31).

There several clear reasons that this New York contact should be attributed to Orascom itself, and not only to Mr. Sawiris personally:

First, Mr. Sawiris was appointed to the NYSE committee by virtue of his position at Orascom. (Ex. 29) (committee composed of "Active chairs and/or chief executive officers of non-U.S. based companies or financial institutions"); (Ex. 28, Letter from John A. Thain to Naguib Sawiris, Nov. 1, 2005: "we would consider it a privilege to have the guidance and support of a global corporate leader like you on the Committee"). (Emphasis added). Thus, Mr. Sawiris' membership on the committee is *ex officio*, as the head of Orascom, rather than personal.

Second, Orascom itself issued press releases boasting of the appointment. (Ex. 34, quoting a press statement released by Orascom; Ex. 33, Orascom press release). Obviously, Orascom would not have wasted time and money issuing press releases, if it did not view the appointment as Orascom's achievement.

Third, objectively speaking, in the marketplace, the NYSE committee membership is a prestigious achievement for Orascom which boosts its reputation and goodwill. For example, the appointment was raised by a Bloomberg reporter in the context of an interview regarding Orascom's business activities, who treated it as a significant feather in Orascom's cap. (Ex. 35).

Likewise, the chairman of the Chinese firm Suntech Power Holdings Co., who was also appointed to the NYSE International Advisory Committee, described the appointment as "a great honor for me as well as for Suntech." (Ex. 32). (Emphasis added). Since the NYSE committee

membership of its chairman is a great honor for Suntech, the NYSE committee membership of Mr. Sawiris is clearly also a great honor for Orascom.

Significantly, activities that increase the defendant's "prestige" and goodwill in the marketplace are jurisdictionally significant. *See M'Baye*, 429 F. Supp. 2d at 658 (finding that defendant was "doing business" in New York under § 301 because, *inter alia*, it had "gained prestige over the years" by carrying out activities in New York).

Accordingly, Mr. Sawiris' on-going membership and participation in the NYSE committee, and his visits to New York in connection therewith, should be attributed to Orascom as another jurisdictional "plus."

### Repeated Submission to New York Jurisdiction and Law and Appointment of Multiple New York Agents for Service

Orascom's claim that it should not be haled into court in New York is not a little absurd, in light of the fact that Orascom has repeatedly submitted itself to the jurisdiction of the New York courts and to New York law, and appointed numerous agents in New York for service of process.

For example, Orascom entered an agreement with GTE Telecom International (Ex. 44). Despite the fact that GTE is located in Texas, not New York (*id.*, at p. 1) that agreement provides that it shall be governed by "the laws of the state of New York, and all cases and controversies arising under or related to this [agreement] shall be subject to the exclusive jurisdiction of the courts therein." (*Id.* at ¶ 12.)

Thus, Orascom has gone out of its way to invoke the jurisdiction of the New York courts even when—as in the case of GTE—its business dealings have no New York nexus whatsoever. By doing so, Orascom has purposely availed itself of a service provided by the State and taxpayers of New York: a free dispute-resolution service, known as the New York State Judiciary. And indeed, a dispute arose between Orascom and GTE, and was litigated in the courts of New York. (Ex. 45).

The GTE contract was only the first of several agreements in which Orascom submitted itself to the jurisdiction and/or law of New York. REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED

For Orascom to now pretend it is a stranger to the New York courts — whose jurisdiction Orascom is more than happy to invoke for its own benefit — is galling.

Orascom's voluntary submission to New York courts and laws, and its appointment of agents for service in New York, constitute further "plus" contacts.

**e.      Due Process**

It is clear, in light of Orascom's multitude of contacts with New York, and the fact that Orascom is merely a garnishee and faces no liability, that the maintenance of this suit is constitutionally permissible and "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

**VI.    ALTERNATIVELY, PLAINTIFFS HAVE MADE A "SUFFICIENT START" ENTITLING THEM TO JURISDICTIONAL DISCOVERY**

The Ungars respectfully believe that they have demonstrated this Court's *in personam* jurisdiction over Orascom by the preponderance of the evidence, or at the very least prima facie. However, purely in the alternative, if the Court finds that they have not made even the prima facie showing necessary to defeat Orascom's motion to dismiss, the Ungars have surely made the "sufficient start" which entitles them to jurisdictional discovery.

Orascom argues, citing to *Jazini*, that if the Ungars fail to make out a "prima facie showing of personal jurisdiction over Orascom, they are not entitled to jurisdictional discovery." (Orascom Memo., p. 17). Unfortunately for Orascom, the Second Circuit has recently clarified that *Jazini* held no such thing:

> If the District Court understood *Jazini* as forbidding jurisdictional discovery any time a plaintiff does not make a prima facie showing of jurisdiction, this would indeed be legal error.

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 n.6 (2nd Cir. 2007).

Moreover, even prior to *Ehrenfeld*, a prima facie showing was <u>never</u> a precondition for jurisdictional discovery in this Circuit. *See e.g. Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 70-72 (E.D.N.Y. 2006) ("[D]istrict courts in this Circuit have ordered jurisdictional discovery where plaintiff made less than a prima facie showing but 'made a sufficient start toward establishing personal jurisdiction.'") (quoting *Uebler v. Boss Media*, 363 F. Supp. 2d 499, 506-07 (E.D.N.Y. 2005)); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 28 (2d Cir. 2003) (authorizing jurisdictional discovery where allegations constituted "arguable" jurisdictional basis, so plaintiff could develop facts in support of prima facie showing).

Furthermore, because FED. R. CIV. P. 69 requires the Court to apply New York law and procedure to this turnover action, New York's jurisdictional discovery rule is applicable. Under New York law, too, the standard is "sufficient start":

> Whenever a plaintiff makes a "sufficient start," i.e., a <u>non-frivolous showing</u> that facts pertinent to an acceptable basis for jurisdiction may exist, a plaintiff is entitled to jurisdictional discovery, and thus need not make a prima facie showing of jurisdiction at the pre-discovery stage (see Weinstein-Korn-Miller, N.Y. Civ. Prac. ¶ 301.07; see also *Peterson v. Spartan Ind.*, 33 N.Y.2d 463, 354 N.Y.S.2d 905, 310 N.E.2d 513 [1974] ).

*NYC Med. and Neurodiagnostic, P.C. v. Republic Western Ins. Co.*, 8 Misc.3d 33, 36-37, 798 N.Y.S.2d 309, 312 (App. Term 2004). (Emphasis added).

Notably, as discussed *supra*, the testimony of Orascom's officers shows that Orascom has at its fingertips highly salient information regarding the percentages of its stock held by New York institutions and the extent of bond sales to New York institutions, as well as the number of New York invitees and participants in the conference calls.

Mr. Sawiris also testified it is likely that Orascom officers have made business trips to New York other than the trips known to the plaintiffs. (Ex. 12, pp. 37-38).

Additionally, it is clear that Orascom's officers have withheld information. When Mr. Sawiris was asked whether Orascom has contracts with any New York companies, he told the Ungars' counsel to name companies, and he (Sawiris) would then confirm whether or not a

contract existed or not. (Ex. 12, p. 71). That reply could be aptly restated as: "If you know about it already I'll confirm it, but I won't provide new information." But clearly, this response by Mr. Sawiris acknowledges that such contracts exist.

Likewise while Mr. Mareuse claimed ignorance of the amount of bonds purchased in New York (Ex. 13, pp. 129-130), Mr. Sawiris testified that Mareuse had to know the answer. (Ex. 12, pp. 61-63).

REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED
REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED
REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED
RED ACTE .[15]

The evasive conduct of Orascom's officers is, unfortunately, not surprising, since it is a matter of public record that Orascom's principals are political supporters of the PA. Indeed, in letters sent to Mohammed Mustafa, the Economic Advisor for the PA and former CEO of the PIF (Ex. 54), Orascom notes that it has been coordinating with the PA/PIF the defense of the Ungars' enforcement proceedings. (Ex. 62-64).

In short, it is clear that discovery from Orascom itself is certain to reveal numerous additional salient jurisdictional facts, and therefore such discovery should be granted in the event (which we respectfully believe should not be the case) the Court finds that the Ungars have not made a prima facie showing.

## VII.    THE COMPLAINT STATES A CLAIM FOR TURNOVER

Orascom argues that the complaint does not state a claim for turnover because it "fails to allege any specific facts in support of" the purportedly "conclusory" allegation that the debt at issue is an asset of the PA. This argument fails because Orascom is attempting to conjure up

---

[15] REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED
REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED
REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED
REDACTED    REDACTED    REDACTED    REDACTED    REDACTED

complexity where there is none. As stated clearly in the complaint, and as discussed above at length, the asset is an asset of the PA because is and always has been, and no one but Orascom's lawyers have ever claimed otherwise. And the asset is titled in the name of the PIF for the simple reason that it is the job of the PIF to act as a custodian for assets of the PA just as alleged in the complaint. That the empirical facts are that simple does not make them "conclusory."

Orascom's claim that the PA has not been served as required by CPLR § 5227 is factually baseless. *See* Ex. 57.

## CONCLUSION

For the reasons set forth herein, plaintiffs respectfully request that the Court enter an order denying the defendant's motion in all respects.

Dated:     New York, New York
            August 15, 2007

Respectfully submitted,

JAROSLAWICZ & JAROS, LLC
*Attorneys for the plaintiffs*

by: _____
            Robert Tolchin

225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

-28-