# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ESTATE OF YARON UNGAR, et al.

                    Judgment Creditors,

     v.                                       Civ. No. 05-mc-180 (GK)

THE PALESTINIAN AUTHORITY, et al.

                    Judgment Debtors,

    - and -

ORASCOM TELECOM HOLDING S.A.E.

                    Garnishee.

## JUDGMENT CREDITORS' MEMORANDUM IN OPPOSITION TO ORASCOM'S MOTION TO QUASH THE WRIT OF ATTACHMENT

## INTRODUCTION

The Judgment Creditors ("Ungars") submit this memorandum in opposition to the Motion to Quash the Writ of Attachment filed by Garnishee Orascom Telecom Holding S.A.E. ("Orascom"). Orascom's motion seeks to dismiss on two grounds only: lack of personal jurisdiction and insufficient service of process.[1]

As shown below, Orascom's motion is meritless and should be denied.

---

[1] By agreement of the parties, Orascom has reserved the right to assert other defenses if the instant motion is denied.

## RELEVANT BACKGROUND

### A.    The Underlying Judgment

The Ungars are the orphaned children, parents, siblings and administrator of the estate of United States citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat Ungar in a terrorist machine-gun attack on June 9, 1996, in Israel.

In March 2000 the Ungars filed suit against the Palestinian Authority ("PA") and other defendants in the U.S. District Court for the District of Rhode Island under the civil provisions of the Antiterrorism Act ("ATA") 18 U.S.C. § 2333.

On July 12, 2004, the U.S. District Court in Rhode Island ordered entry of final judgment against the PA in the amount of $116,409,123.00. *Ungar v. Palestinian Authority*, 325 F.Supp.2d 15 (D.R.I. 2004). The First Circuit affirmed the Ungars' judgment. *Ungar v. Palestinian Authority*, 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005).

The PA refuses to honor the Ungars' judgment and has informed the Ungars' counsel that it "will never pay" the judgment. This contumacious refusal is merely the encore to years of intentional delay created by the PA during the underlying suit. *Ungar*, 325 F. Supp. 2d at 26, 62 (finding that the PA took "deliberate actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible" and imposing sanctions). Indeed, the U.S. District Court for the Southern District of New York has found that the Ungars are faced with "an elusive … judgment debtor." *Ungar v. PA*, 412 F.Supp.2d 328, 334 (S.D.N.Y. 2006).

B.      **The Palestine Investment Fund**

In the late 1990s the PA came under criticism for lack of transparency and accountability regarding its finances. As the result of that criticism, the PA decided to establish a "Palestine Investment Fund" to hold, manage and invest the PA's commercial assets.

The Palestine Investment Fund ("PIF") was first established by the PA in October 2000 by an executive decree issued by PA President Yasser Arafat. Thereafter, the PA began transferring its assets into the name of the PIF.

In March 2003, the PA formally incorporated the PIF under PA law as a public shareholding company, with the PA as sole shareholder. Between 2000 and 2005, the PA transferred several hundred million dollars of PA assets to the management of the PIF.

Under PA law and the PIF's Articles of Association the PIF is authorized to distribute back to the PA all assets held by the PIF, including any profits and/or interest thereon.

In their Traverse in this action, the Ungars assert that the PIF is the trustee of a trust created by the PA from its own assets, and that since the PA is both the settlor and the beneficiary of that trust and since the PIF is authorized to distribute to the PA all the assets held by it, all assets held by the PIF are subject to execution by creditors of the PA such as the Ungars. *See* dkt. # 89 at ¶¶ at 35-42. *See also generally* The Restatement (Second) of Trusts § 156(2) ("Where a person creates for his own benefit a trust for support or a discretionary trust, his transferee or creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit.").[2]

---

[2]      The Ungars reference the rule reflected in § 156(2) purely by way of explanation and background; as noted, this motion is concerned only with the issues of personal jurisdiction and service.

### C.      Orascom's Debt to the Palestine Investment Fund

Early in this decade the PA held ownership stakes in two Orascom subsidiaries, Orascom Telecom Algeria ("OTA") and Orascom Telecom Tunisia ("OTT"),

The PA's ownership stakes in OTA and OTT were transferred to the PIF on January 1, 2003, as part of the PA's overall transfer of its assets to the PIF.

On February 27, 2005, Orascom and the PIF executed a Share Purchase Agreement, pursuant to which Orascom purchased the PIF's stakes in OTA and OTT.

A dispute then erupted between Orascom and the PIF, and Orascom filed a request for arbitration. This dispute was soon resolved, and on April 17, 2005, Orascom and the PIF executed a Settlement Agreement. Exhibit A.

Article 4 of the Settlement Agreement required Orascom to make certain payments to the PIF by April 18, 2005, which were made.

Additionally, Article 4 required Orascom to pay the PIF the sum of $45 million at a later date, which has passed.

As the result of judgment creditor process served by the Ungars, Orascom has been prevented from paying the $45 million to the PIF.[3]

---

[3]      In its motion Orascom complains fulsomely that the Ungars have been "pursuing" Orascom as a garnishee in numerous courts. Orascom's complaints are galling, to say the least. If Orascom were a neutral garnishee, it would not have spent several years and significant resources fighting the Ungars' enforcement efforts tooth-and-nail, but would simply have paid the amount owed into a court registry and allowed the interested parties to litigate over the funds. Orascom has not done so because its owner, Naguib Sawiris, is a political supporter of the PA and PLO. *See* Exhibit B (open letter from Sawiris to Yasser Arafat praising the Intifada). Accordingly, Orascom has "coordinated" its opposition to the Ungars' enforcement efforts with the PIF in order to "benefit" the PIF. *See* Exhibit C.

4

This $45 million debt owed by Orascom and payable to the PIF is the asset against which the Ungars seek to enforce their judgment in this proceeding.[4]

## ARGUMENT

**A.      This Court Has Personal Jurisdiction Over Orascom**

Orascom asserts that this Court lacks personal jurisdiction over it. Orascom Memo at 3-7. This argument is meritless.

In the District of Columbia, service of a writ of attachment is governed by Super.Ct.Civ.R. 4, which governs service of a summons and complaint: "[W]e see no reason to formulate a different rule for the service of a writ of attachment on a corporation from that which applies the service of a summons and complaint." *Wrecking Corp. of America, Virginia, Inc. v. Jersey Welding Supply, Inc.*, 463 A.2d 678, 679 (D.C. 1983) (holding that service of an attachment is governed by Super.Ct.Civ.R. 4).

Civil Rule 4(k)(2) provides in relevant part that:

> If the exercise of jurisdiction is consistent with the Constitution and applicable law, serving a summons … is also effective, with respect to claims arising under such law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Super.Ct.Civ.R. 4(k)(2).

---

[4]      In the District of Columbia jurisdiction over the person of the garnishee empowers the court to order payment of a debt owed to the judgment debtor. *See e.g. Marvins Credit, Inc. v. General Motors Corp.*, 119 A.2d 447, 448 (D.C. 1956) ("Some jurisdictions hold to the theory that a debt has a situs and can be seized only in the jurisdiction where such situs exists. It is settled, however, in the District of Columbia that it is not the res which confers jurisdiction, but rather the person of the garnishee.") (internal quotations omitted). Again, since the instant motion deals only with the issues of personal jurisdiction and service, the question of the Court's power to order turnover of the debt is not on the agenda and Ungars cite this case solely to provide background.

5

All of these conditions are met here:

### i.    *"Consistent With the Constitution"*

Orascom argues that this Court cannot exercise personal jurisdiction over it because Orascom does not do business in the District of Columbia as required by D.C. Code § 13-334(a) and lacks constitutionally-sufficient contacts in the District of Columbia. Orascom Memo at 3-7.

Orascom's reliance on § 13-334(a) is a *non sequitur*. The Ungars do not base personal jurisdiction on § 13-334(a) but on Civil Rule 4(k)(2). Orascom entirely ignores Rule 4(k)(2).

Moreover, Orascom's constitutional argument fails because it has failed to demonstrate that it is entitled to the Due Process protections afforded by the Fifth and Fourteenth Amendments. The law is clear in this Circuit that:

> A citizen of a foreign state "without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C.Cir. 1999), cert. denied 529 U.S. 1104, 120 S.Ct. 1846, 146 L.Ed.2d 788 (2000); *see also 32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C.Cir. 2002). Aliens who have "come within the territory of the United States and developed substantial connections with this country," by contrast, are entitled to constitutional protections. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201 (D.C.Cir. 2001) (emphasis omitted) ("NCOR").

*Al-Aqeel v. Paulson*, 568 F.Supp.2d 64, 69 (D.D.C. 2008).

Orascom is "organized under the laws of Egypt and has its principal place of business in Egypt." Orascom Memo at 5.

Case 1:00-cv-00105-L-DLM Document 607-6 Filed 11/18/10 Page 7 of 21 PageID #:
8648
Case 1:05-mc-00180-AK Document 91 Filed 01/12/10 Page 7 of 41

Therefore, as a foreign corporation based in Egypt, Orascom cannot assert a Due Process defense unless and until it first demonstrates that it has "developed substantial connections with this country." *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C.Cir. 2002).

But Orascom has utterly failed to make such a showing. On the contrary, the declaration submitted by Orascom in support of its motion expressly asserts that Orascom has no contacts or presence whatsoever in the United States. *See* Declaration of Rodolphe Mareuse at ¶¶ 4-9.

Because Orascom has failed to demonstrate that it has "substantial connections" with the United States it has failed to show that it is entitled to Due Process protections.

Accordingly, exercise of jurisdiction by this Court over Orascom "is consistent with the Constitution" as required by Civil Rule 4(k)(2).

### ii.       *"Consistent With … Applicable Law"*

Civil Rule 4(k)(2) also requires that the exercise of jurisdiction must be "consistent with the … applicable law … with respect to claims arising under such law." This condition is clearly met here. The Ungars' attachment was issued and their Traverse was brought pursuant to the provisions of Chapter 5 of Title 16 of the D.C. Code. None of these provisions contain any geographical limitation on the exercise of jurisdiction over the person of the garnishee.

### iii.      *"Not Subject to the Jurisdiction of the Courts of Other States"*

Rule 4(k)(2) applies to a "defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state." This provision, like the other provisions of Civil Rule 4, is patterned on the Federal Rules of Civil Procedure. *See* Super.Ct.Civ.R. 4, Comment ("Federal Rule of Civil Procedure 4 was substantially revised and reorganized effective December 1, 1993. In order to maintain uniformity with the Federal Rule to the maximum extent feasible, Superior

Court Rule of Civil Procedure 4 has been similarly revised and reorganized to match the structure and substance of the new Federal Rule in large part.").

Thus, D.C. Civil Rule 4(k)(2) is analogous to Fed.R.Civ.P. 4(2), which also permits the exercise of jurisdiction over a defendant "not subject to jurisdiction in any state's courts of general jurisdiction." Fed.R.Civ.P. 4(k)(2).

It is well established that under Fed.R.Civ.P. 4(k)(2), the initial burden to demonstrate that the defendant is subject to suit in another state rests with the defendant, and that if the defendant fails to do so Fed.R.Civ.P. 4(k)(2) will apply. *See Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) ("If … the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).") (quoting *ISI Int'l v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).

Clearly, since D.C. Civil Rule 4(k)(2) is patterned on Fed.R.Civ.P. 4(k)(2), it should be construed in the same manner.

Thus, if Orascom did not want to be subject to Rule 4(k)(2), it had the burden to identify another U.S. jurisdiction in which it can be sued. Since it failed to do so, Rule 4(k)(2) applies.

In sum, this Court has personal jurisdiction over Orascom under Rule 4(k)(2), provided that service was effective. As shown in the next section, service was indeed effective.

### B.    Orascom Was Properly Served

Orascom asserts that service of the attachment was ineffective, because by operation of the Service Stipulation between the parties Orascom is deemed to have been served in New York, and Fed.R.Civ.P. 4.1(a) permits service of an attachment only within the territorial limits

of the state where the district court is located. Orascom Memo at 7-8.

The Ungars disagree with Orascom's claim that by operation of the Service Stipulation between the parties Orascom is deemed to have been served in New York.

However, the Court need not reach this question, because service of the attachment was valid even assuming purely *arguendo* that it is deemed to have occurred in New York.

Contrary to Orascom's belief, pursuant to Fed.R.Civ.P. 69 service of a post-judgment attachment is not governed by the Federal Rules of Civil Procedure, but by state-law provisions governing the service of attachments. *See Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 414-415 (6th Cir. 1999) (Under Fed.R.Civ.P. 69 the provisions of state law, not Fed.R.Civ.P. 4.1, govern service of post-judgment garnishment).

Thus, District of Columbia law governs service of post-judgment attachments. As noted, under binding precedent (*Wrecking Corp. of America*, 463 A.2d at 679), service of a writ of attachment is governed by Super.Ct.Civ.R. 4. And Rule 4 permits service of process outside of the District of Columbia – which means that under D.C. law an attachment may indeed be served outside of the District.

Orascom will likely argue in its reply that even if Fed.R.Civ.P. 4.1(a) does not govern service here, the Court should apply Super.Ct.Civ.R. 4.1(a) which (in the absence of a specific statutory mandate) limits service of other process to the territory of the District of Columbia.

The Court should reject any such argument for two reasons:

First, under the express, binding precedent of the District of Columbia Court of Appeals (*Wrecking Corp. of America*, 463 A.2d at 679), service of an attachment is governed by Rule 4. Unless and until that court modifies that holding, it remains the law in this jurisdiction.

Second, Civil Rule 4.1 was adopted only in June 1995 and there is no indication

whatsoever that by adopting this rule the District of Columbia intended to modify the holding in *Wrecking Corp. of America* or to create a new geographical limit on the service of attachments. Absent evidence of such an intention, *Wrecking Corp. of America* remains valid and this Court should not impose a geographical limit on service of an attachment not recognized by D.C. law.

WHEREFORE, the instant motion should be denied.

Judgment Creditors,
by their Attorney,

/s/ David J. Strachman
David J. Strachman
D.C. Bar No. D00210
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

## CERTIFICATION

I hereby certify that on January 12, 2010 this memorandum was served on counsel for garnishee Orascom Telecom Holding S.A.E., listed below, via ECF.


Christopher M. Curran
Nicole E. Erb
Matthew S. Leddicotte
701 Thirteenth Street, N.W.
Washington, D.C. 20005


                                    /s/ David J. Strachman

STRICTLY CONFIDENTIAL

APRIL 17, 2005 SETTLEMENT AGREEMENT TO THE

SHARE PURCHASE AGREEMENT DATED FEBRUARY 27, 2005

This Settlement Agreement (hereinafter referred to as the "Settlement Agreement") to the Share Purchase Agreement Dated February 27, 2005 is made and entered into on April 17, 2005.

BY AND BETWEEN

1. **ORASCOM TELECOM HOLDING S.A.E.**, a company incorporated under the laws of Egypt, located at Nile City Towers – South Tower, Ramlet Beaulac, Cornish El Nile, Cairo, Arab Republic of Egypt, represented in this Agreement by Mr. Naguib Sawiris in his capacity as the Chairman and the CEO.

(hereinafter referred to as "OTH" or the "Purchaser")

AND

2- **PALESTINE INVESTMENT FUND**, a fund organized under the laws of the Palestinian Territory, represented in this Agreement by Dr. Salam Fayyad in his capacity as the Chairman.

(hereinafter referred to as "PIF" or the "Seller")

(Collectively referred to as the "Parties" and individually referred to hereinafter as a "Party")

## 1    PREAMBLE

**WHEREAS,** the Parties have entered into a share purchase agreement dated February 27, 2005 (the "SPA");

WHERAS, the Parties desire to settle all matters associated with the implementation of the SPA

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants herein contained, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## 2    DEFINITIONS; INTERPRETATION; AUTHORITY

Capitalized terms used herein without otherwise being defined have the meanings set forth in the SPA. Save as otherwise stated in this Settlement Agreement, the provisions of the SPA and the obligations contained therein shall be kept unchanged and shall continue to be effective and binding on its parties. Notwithstanding anything to the contrary in Section 8.2 of the SPA, this Settlement Agreement should be interpreted in conjunction with the SPA. In the event of any conflict between the terms of this Settlement Agreement and the SPA, the terms of this Settlement Agreement shall govern.

OTH hereby reserves all of its available rights and remedies under the SPA and this Settlement Agreement in the event that any of the documents or actions set forth in Section 3 below are deemed to be incomplete or otherwise invalid for purposes of transferring all right, title and interest in the Transfer Shares to OTH, which rights and remedies shall include, but not be limited to, OTH's pursuit

CONFIDENTIAL MATERIAL                                                    PPF 0038636

of the pending arbitration action filed with International Chamber of Commerce against PIF on March 17, 2005 (assigned the reference 13758/EC) associated with the Agreement, enforcement of any and all injunctions applicable to PIF issued by the English High Court of Justice, Queen's Bench Division, Commercial Court (hereinafter the "Court"), and pursuit of any similar arbitration or other remedial action in connection with the SPA and this Settlement Agreement (collectively, the "Actions"). Notwithstanding anything to the contrary in the SPA, this Settlement Agreement or otherwise, the obligations of PIF set forth in this Settlement Agreement are in no way intended to directly or indirectly invalidate or otherwise diminish the validity of the transfers of any of the Transfer Shares to OTH already effected pursuant to the SPA, or, if the performance of such PIF obligations are deemed to be incomplete or otherwise invalid for purposes of transfer all right title and interest in the Transfer Shares to OTH, to prejudice in any way OTH's rights in connection with the Actions.

PIF hereby represents and warrants that Dr. Salam Fayyad, Chairman of the PIF, and Mr. Mohamed Rachid, have had at all relevant times the authority to bind the PIF pursuant to any and all agreements between PIF (and any predecessor entity thereof) and OTH executed by them on behalf of PIF, and that Dr. Salam Fayyad is duly authorized to bind PIF to, fulfil, or cause to be fulfilled, all of PIF's obligations under the SPA and this Settlement Agreement. PIF hereby expressly waives any and all rights that it may have to challenge the validity of any term of the SPA and this Settlement Agreement. Except in the event that any of the documents or actions set forth in Section 3 below are deemed to be incomplete or otherwise invalid for purposes of transfer all right title and interest in the Transfer Shares to OTH, OTH hereby agrees to refrain from pursuing any of the Actions.

## 3    DOCUMENTS & ACTIONS

The Parties hereby acknowledge and agree that on the date of this Settlement Agreement the Seller has delivered to the Purchaser or undertakes to perform, as the case may be, the following:

    (a)    An original of the Agreement and the April 17, 2005 Amendment thereto duly executed by an authorized representative of the Seller.

    (b)    In respect of the Oratel Shares:

        (i)    An original share transfer form in the form attached to this Agreement as Annex 1 of the SPA duly executed by the Seller in favour of the Purchaser;

        (ii)    Originals of the share certificates number 16, 17, 18, 20 and 25; and

        (iii)    An original of the resignation of the board member representing the interest of the Seller from the board of directors of Orascom Telecom Algeria s.p.a.

    (c)    In respect of the OTUH Shares:

        (i)    An original share transfer form in the form attached to this Agreement as Annex 2 of the SPA duly executed by the Seller in favour of the Purchaser; and

        (ii)    The Seller's hereby undertakes to execute all documents and take all other action necessary, at the sole expense of the Seller, for purposes of release of the original copy of the share certificate number 8 by ABC International Bank PLC as deemed necessary or advisable by the Purchaser, including, without limitation, an original letter signed by a duly authorized representative of the Seller, addressed to Bayerische Hypo-und Verinsbank AG (with a copy to ABC International Bank PLC) stating the following: "In reference to the March 6, 2005 correspondence from Mr. Majed Shriqat on behalf of the Palestine Investment Fund ("PIF"), the purpose of this letter is instruct you to disregard the substance of such letter in its entirety. The PIF hereby certifies that the 22,025 Orascom Telecom Tunisia Holding Ltd.

CONFIDENTIAL MATERIAL        PPF 0038637

shares registered in the name of PIF and represented by share certificate number 8 in the possession of ABC International Bank PLC have been duly transferred from PIF to Orascom Telecom Holding S.A.E. ("OTH"). In addition, PIF hereby acknowledges and agrees that the agreement corresponding to such transfer is entirely valid and enforceable. As such, you are hereby requested to proceed with any actions requested by OTH for purposes of releasing the original share certificate number 8 registered in the name of PIF and reissuing a new share certificate corresponding to those same shares in the name of OTH.", which letter has been delivered to the Purchaser by the Seller on the date of this Settlement Agreement.

(d)     In respect of the CC Shares:

        (i)     an original share transfer form in the form attached to this Agreement as Annex 3 duly executed by the Seller in favour of the Purchaser; and

        (ii)    original of the share certificate number 7.


**4.     PAYMENTS**


The payment of the Purchase Price by the Purchaser to the Seller shall be made in two instalments as follows:

    b)     On April 18, 2005, the Purchaser shall take all necessary action, including delivering any necessary notification to the Court, to release the first instalment amounting to **$100,000,000 (one hundred million US Dollars)** to an account designated by the Seller in writing (the "**First Instalment**"); and

    c)     On April 18, 2005, the second instalment amounting to **$240,000,000 (two hundred forty million US Dollars)** shall be made by the Purchaser to an account designated by the Seller in writing (the "**Second Instalment**").

The Seller hereby acknowledges and agrees that the Purchaser has settled the following amounts owed to the Seller pursuant to a transfer from the Purchaser to the designated account of the Seller made on March 2, 2005 with a value date of March 3, 2005 (the "**Outstanding Amount**"):

    a)     A cash payment of Euros 7,708,550 representing the Seller's contribution to the cash collateral for the letter of credit issued by Carthage Consortium in the amount of Euro 17.5 million in the context of the sponsor support arrangements in relation to the long term finance of OTT; and

    b)     The portion of the cash collateral contributed by the Seller to support the cash collateral made by Carthage Consortium related to the Tunisian International Bank bridge loan to OTT in the amount of Euros 2,303,977.70.

The Purchaser hereby acknowledges and agrees that it shall pay the Seller US$45 million (net of taxes) upon the Purchaser's receipt of its calendar year 2004 dividends as a shareholder in Orascom Telecom Algeria s.p.a. ("OTA").

CONFIDENTIAL MATERIAL        PPF 0038638

In addition, the Purchaser hereby acknowledges and agrees that it shall pay the Palestine Pension Fund for the State Administrative Employees ("PPF") US$5 million (net of taxes) upon the Purchaser's receipt of its calendar year 2004 dividends as a shareholder in OTA.

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be executed on April 17, 2005.

ORASCOM TELECOM HOLDING S.A.E. ("OTH")

Signature:

Name:         Mr. Naguib Sawiris

Capacity:     Chairman

PALESTINE INVESTMENT FUND ("PIF")

Signature:

Name:         Dr. Salam Fayyad

Capacity:     Chairman

STRICTLY CONFIDENTIAL

CONFIDENTIAL MATERIAL

PPF 0038639

Case 1:0̶6̶-̶c̶v̶-̶0̶0̶1̶0̶5̶-̶L̶-̶D̶L̶M̶0̶-̶D̶o̶c̶u̶m̶e̶n̶t̶-̶6̶0̶7̶ 9̶1̶-̶2̶ ̶F̶i̶l̶e̶d̶ 1̶1̶/̶1̶8̶/̶1̶0̶/̶1̶0̶ P̶a̶g̶e̶ 1̶6̶ ̶o̶f̶ 2̶1̶ PageID
Case 1:08-mc-00180-AK Document 91-2 Filed 01/12/10 Page 9 of 21
#: 8657



Al-Ahram Weekly Online
14 - 20 March 2002
Issue No.577

Published in Cairo by AL-AHRAM established in 1875    Current issue | Previous issue | Site map

# Intellectuals for Intifada

A GROUP of 100 Egyptian intellectuals, writers, artists, politicians and businessmen has issued an open letter to President Yasser Arafat in support of the Palestinian people. "We support you as a leader and president of the Palestinian people despite the wishes of the occupying state, and we trust that the Intifada of independence will ultimately reach its goals, in spite of the brutality and destruction sustained with the support of the American administration," the statement read.

Among the signatories are Osama Anwar Okasha, Ismail Sabri Abdallah, Amin Howeidy, Amina Shafiq, Anouar Abdel-Malik, Gaber Asfour, Gamal El-Ghitani, Husam Badrawi, Khaled Moheiddin, Ragaa El-Naqqash, Raouf Abbas, Sameh Ashour, Samiha Ayoub, Soheir El-Morshedi, Fathiya El-Assal, Farida El-Naqqash, Mohamed Farag Amer, Mohamed Farid Khamis, Mahmoud Amin El-Alem, Mourad Ghaleb, Mustafa El-Feki, Naguib Sawiris, Noaman Gomaa, Nur El-Sherief, Youssra and Yunan Labib Rizk.

# Festive films

THE FILM Association's Festival began its 28th round on Sunday. Six films are in competition: *Ayam El-Sadat, Ula Thanawi, Al- Abwab Al-Mughlaqa, Gawaz Biqarar Gumhuri, Muwatin wa Mukhbir wa Harami,* and *Asrar Al-Banat*.

Surprisingly, director Youssef Chahine has withdrawn from the festival, much to the disappointment of the jurists and organising committee. Chahine explained to reporters that since 1997 he had decided not to enter any competitions, and that his withdrawal was not intended as a snub.

# ...and more

THE EIGHTH National Film Festival begins on 9 April. The opening ceremony will be held at the Cairo Opera House, announced Ali Abu Shadi, the festival's director.

This round will honour directors Kamal El- Sheikh and Samir Ouf, actress Nadia Lutfi, director of photography Ramsis Marzouk, and film historian Mohamed Mounir Ibrahim.

# Barakat honour

THE FRENCH government has made Lebanese novelist Hoda Barakat a chevalier. It is a significant honour, given the fact that Barakat writes in Arabic. Three of her novels: *Ahl Al- Hawa, Hagar Al-Dahk* and *Harith Al-Miyah*, have been translated into French.

## Photographing Islam

THE LEBANESE-based Libyan filmmaker Mohamed Makhlouf is putting the finishing touches to his latest work, a documentary entitled *In the Shadow of the Tree*. Subtitled *A Photographer's Journey to Islam*, the film retells the story of British photographer Peter Sandras. It follows the photographer's spiritual and geographical journeys through the Far East, the Arab world and Europe and captures his relationship with Islam and with photography.

## Festival in Doha

THE DOHA Cultural Festival, organised by the Qatari National Council for Culture and Arts, is due to begin on the 21st. The events include several musical concerts, poetry readings and art exhibitions.

A special exhibition of Islamic historical artefacts -- metalwork from the Islamic Courts, and jewelled items from the Moghul Courts -- is included as are a whole range of events grouped under The Iraqi Cultural Week.

Egyptians are represented through an exhibition of paintings by Minister of Culture Farouk Hosni and Mohamed Sobhi's theatrical hit *Mama Amerika*.

Among the poets participating with readings are Qassem Haddad, Fadel Al-Azawi, Ali Mirza, Abdel-Moneim Ramadan, Mohamed Ali Shamseddin and Mamdouh Odwan.

The highlight of the festival is expected to be a concert held by Lebanese diva Fairouz, scheduled on the eighth day of the festival.

## Books in Beirut

THE LEBANESE Book Festival continues in Beirut until the 17th. Unlike the annual book fair sponsored by the Arab Cultural Club, this festival remains a local event with only 30 publishing houses participating, and many of the most prestigious Lebanese publishers staying away.

Fringe events include honouring a number of Lebanese cultural figures as well as a number of cultural symposia -- four this year: one centred around the work of Lebanese intellectual Amin Youssef Al-Hagg, another on Amin Al- Rihani on the occasion of the 125th anniversary of his birth; a third on the prospects for peace in the Middle East, and finally a sumposium discussing Nicola Nassif's book on Raymond Eddé.

## Roy jailed and released

INDIAN novelist Arhundhati Roy served a symbolic one-day prison term and paid a fine of 2,000 rupees ($42) after being found guilty of contempt of court. She was released from jail last Thursday.

Roy took part in a demonstration in December in opposition to India's Supreme Court's decision to allow the resumption of work at the controversial Narmada Dam project. She also criticised the Supreme Court's judgment and accused it of trying to silence dissent and harassment.

The Narmada dam project has attracted a great deal of controversy in India with many questioning its benefits and the cost of large- scale human displacement.

Arundhati Roy won the 1998 Booker Prize for her novel *The God of Small Things*.

## Women in Alexandria

THE LIBRARY of Alexandria celebrated International Women's Day by honouring Egyptian women film pioneers. The celebration honoured Aziza Amir, who made 25 films for the Egyptian screen including *Layl* in 1927; Bahiga Hafez who starred in the classic adaptation of Mohamed Hussein Heikal's novel *Zaynab* in addition to production and directing several films; and Asia, who starred in 15 movies and is best known as a producer, making 33 films. Also honoured were Fatma Roushdi, who played leading roles in some 100 plays and 16 films and Marie Queeny, the Lebanese- Egyptian actress-producer who made 26 films in Egypt, starring in nine.

## Yasin and Bahiya?

NAGUIB Sorour's masterpiece *Yasin and Bahiya* is to be produced at Al-Hanager, directed by Syrian Rola Fattal. The production will star Muhsina Tewfik, Nourhan, Sayed El-Roumi and Ahmed Ezzeddin.

*Compiled by **Amina Elbendary***

 E-mail this page to someone

© Copyright Al-Ahram Weekly. All rights reserved

Send a letter to the Editor

Egypt | Economy | Region | Focus | International | Opinion | Letters | Culture

Books | Features | Living | Sports | Profile | People | Time Out | Chronicles | Cartoons





STRICTLY CONFIDENTIAL

March 28, 2006

<u>SENT VIA TELEFAX TO:</u> 00-9702-297-4148
Total Pages = 2
CONFIRMATION VIA E-MAIL TO: aalhasan@pif.ps

Dr. Mohamed Abdullah Mostafa
Chief Executive Officer
Palestine Investment Fund (PIF)
Ramallah, Palestine

Dear Dr. Mostafa:

Thank you for your March 25, 2006. Regarding your request for payment of the US$45 million amount of Orascom Telecom Algerie (OTA) dividends, and as discussed by our Legal Department with representatives of the PIF and the Palestinian Pension Fund (PPF) over the past several months, Orascom Telecom Holding SAE (OTH) is currently subject to a New York State court order that obligates it to make all payments due to the PIF and the PPF to the Estate of Ungar (the "Order").

As mentioned in telephone conversations with representatives of the PIF and PPF last year and earlier this year, OTH's contractual obligation to pay OTA dividends, or any other amounts, to the PIF and PPF would be deemed illegal in light of the Order. In the summer of 2005, OTH appointed outside counsel for purposes of vigorously challenging the validity of the Order both on jurisdictional and substantive grounds and has coordinated with PIF's outside counsel in setting forth a consistent challenge to the Order and other claims of the Estate.

Over the past ten months, OTH has been subject to perpetual and extremely burdensome challenges to their defense by the Estate of Ungar that have involved a substantial amount of time and effort. In addition, representatives of the Estate have sought to shamelessly tarnish me personally by baselessly associating me with so-called 'terrorists' in the press. Through our ongoing efforts, which I emphasize directly benefit PIF's position in the Estate of Ungar dispute, we are striving to invalidate the Order in order to be able to finalize the payments to PIF and PPF as soon as legally possible. However, OTH is in no position to directly or indirectly violate the Order until it is fully and finally invalidated.

Orascom Telecom Holding S.A.E, (Société Anonyme Egyptienne), with a Paid Capital: 1,100,000,000 LE.
(Subject to law No. 95 / 1992), CR. 365751 - Cairo
Nile City Towers, Cornish El Nile, Ramlet Beaulac, Cairo, Egypt
South Tower, 26th & 27th Floor
Tel :(202) 461 50 50/1
Fax :(202) 461 50 54/5
e-mail: info@otelecom.com

Case 1:06-cv-00105-L-DLM   Document 607-91-3   Filed 11/18/12   Page 21 of 21 PageID
Case 1:08-mc-00180-AK   Document 91-3   Filed 01/12/10   Page 2 of 2   PageID
#: 8662



As mentioned by our Legal Department in previous discussions with Mr. Shqirat and Mr. Najjab, OTH will deduct the direct legal fees and expenses incurred in challenging the Order from the amounts payable to PIF and PPF in light of OTH's complete independence from the Estate of Ungar matter and the benefit to PIF and PPF from OTH's ongoing efforts.

In the meantime, we will certainly keep you apprised of all relevant developments regarding this matter.

Kind regards,

Naguib Sawiris
Chairman & CEO
Orascom Telecom Holding S.A.E.

Orascom Telecom Holding S.A.E, (Société Anonyme Egyptienne), with a Paid Capital: 1,109,000,000 LE.
(Subject to law No. 95 / 1992), CR. 365751 - Cairo
Nile City Towers, Cornish El Nile, Ramlet Beaulac, Cairo, Egypt
South Tower, 26th & 27th Floor
Tel :(202) 461 50 50/1
Fax:(202) 461 50 54/5
e-mail: info@otelecom.com