# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ESTATE OF YARON UNGAR, et al.

                                  Plaintiffs – Judgment Creditors

        v.                                          3:05mc208 (PCD)

THE PALESTINIAN AUTHORITY, et al.

                                  Defendants – Judgment Debtors

## (AMENDED) MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A TURNOVER ORDER AND APPOINTMENT OF A RECEIVER TO SELL PARTNERSHIP INTERESTS; AND IN OPPOSITION TO LEBOEUF'S CLAIM FOR DETERMINATION OF INTERESTS PURSUANT TO CONN. GEN. STAT. § 52-356c AND LEBOEUF'S MOTION TO DISMISS AND TO STRIKE THE APPEARANCE OF ROBERT TOLCHIN

### Introduction

Pursuant to the Court's order of July 15, 2008, Plaintiffs – Judgment Creditors ("Ungars" or "plaintiffs") respectfully submit this amended memorandum in further support of their pending Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests (dkt. #65) and in opposition to the Claim for Determination of Interests Pursuant to Conn. Gen. Stat. § 52-356c and the Motion to Dismiss, and Motion to Strike the Appearance of Robert Tolchin (dkt. # 97, 98, 106, 109) filed by the law firm of Leboeuf, Lamb, Greene & MacRae LLP ("Leboeuf"), purportedly on behalf of the Palestine Investment Fund ("PIF").[1]

---

[1] As shown below, LeBoeuf does not represent the PIF. Therefore, plaintiffs will refer herein to the papers filed by LeBoeuf purportedly on behalf of PIF as "LeBoeuf's motion" or "LeBoeuf memo," etc.. LeBoeuf itself previously moved for leave to intervene in its own name (dkt. # 72, 73, 77) but at the conference on October 19, 2007, LeBoeuf agreed to withdraw that motion as moot in light of its putative appearance on behalf of the PIF. The withdrawal of LeBoeuf's motion to intervene moots plaintiffs' motion to strike the motion to intervene (dkt. #82).

For the reasons set forth below, plaintiffs' motion should be granted and Leboeuf's motion should be denied.

## RELEVANT BACKGROUND

### I.    THE PA AND PLO REFUSE TO HONOR THE UNDERLYING JUDGMENT

The plaintiffs are the orphaned children, parents, siblings and administrator of the estate of United States citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat Ungar in a terrorist machine-gun attack on June 9, 1996, in Israel. The attack was carried out by members of the Hamas terrorist group acting in concert with and under the command of the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO").

In March 2000, the Ungars filed suit against the PA, the PLO, Hamas and other defendants, in the United States District Court for the District of Rhode Island under the Antiterrorism Act ("ATA") 18 U.S.C. § 2331 *et seq.. Ungar et al. v. Palestinian Authority et al.*, Civil Action 00-105L (D.R.I.).

The PA and PLO retained former United States Attorney General Ramsey Clark and the firm of Edwards Angell to defend the suit, and filed repeated motions to dismiss on multiple grounds, as well as an interlocutory appeal, all of which were rejected. *See Ungar v. Palestinian Authority*, 153 F.Supp.2d 76 (D.R.I. 2001); *Ungar v. Palestinian Authority*, 228 F.Supp.2d 40 (D.R.I. 2002); *Ungar v. Palestinian Authority*, 215 F.R.D. 36 (D.R.I. 2003); *Ungar v. Palestinian Authority*, 2003 WL 21254790 (1st Cir. 2003); *Ungar v. Palestinian Authority*, 315 F.Supp.2d 164 (D.R.I. April 23, 2004).

Though the PA and PLO repeatedly invoked the authority of the Rhode Island federal court and the First Circuit in order to dismiss the suit, when their arguments were rejected they refused to answer the complaint or conduct any discovery.

Case 1:00-cv-00105-L-DLM Document 607-8 Filed 11/18/10 Page 3 of 54 PageID #:
8672
Case 3:08-mc-00205-MCD Document 7-1 Filed 08/14/2008 Page 3 of 38

Accordingly, on July 12, 2004, the Rhode Island federal court ordered entry of final judgment for the Ungars and against the PA and PLO, jointly and severally, in the amount of $116,409,123.00 in damages. *Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004).[2]

The PA and PLO appealed to the First Circuit, which affirmed the judgment, and a petition for certiorari was denied by the Supreme Court. *Palestine Liberation Organization v. Estate of Ungar* 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005).[3]

Upon entering final judgment, the Rhode Island federal court emphasized the importance that it attached to the judgment being honored and enforced:

> The PA and PLO … are responsible for and must bear the ultimate burden of providing compensation, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to June 9, 1996. This Court hopes that in keeping with the ATA's purpose to deter acts of international terrorism, its judgment will "interrupt or at least imperil the flow of terrorism's lifeblood, money," and thus, prevent the PA and PLO from funding future terrorist acts such as the one that resulted in the Ungars' horrific deaths.

*Ungar*, 325 F. Supp. 2d at 25.

Well over ***three years*** have passed since the federal court penned this powerful statement, but the PA and PLO have refused to satisfy the Ungars' judgment, and have informed the Ungars' counsel that they "will never pay" the judgment. This contumacious refusal is merely the encore to years of intentional delay created by the PA and PLO during the underlying suit. *Ungar*, 325 F. Supp. 2d at 26, 62 (finding that the PA and PLO took "deliberate actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible"). Likewise, courts in this Circuit have noted that the Ungars are faced with "an elusive… judgment

---

[2]  The Rhode Island court received testimony and evidence regarding plaintiffs' damages in the context of entering judgment against Hamas. At plaintiffs' request – to which the PA and PLO did not object – the court applied those same damages findings in entering judgment against the PA and PLO. See *Ungar*, 325 F. Supp. 2d at 24-25, 66-67.

[3] The judgment has been registered in this Court pursuant to 28 U.S.C. § 1963.

debtor." *Ungar v. Palestinian Authority*, 412 F. Supp. 2d 328 (S.D.N.Y. 2006). *See also Estate of Ungar ex rel. Strachman v. Palestinian Authority*, 841 N.Y.S.2d 61, 65 (1st Dept. August 16, 2007) (Noting the Palestinian "Authority's documented history of engaging in dilatory tactics to plaintiffs' detriment in the underlying and other litigation").

Indeed, in light of the refusal of the PA and PLO to pay the judgment, the Rhode Island issued an injunction on May 5, 2005, prohibiting the PA and PLO from withdrawing or transferring any assets they may have in the United States. Exhibit A.

The refusal of the PA and PLO to honor the judgment harms not only the Ungars, but the interests of the United States:

> The legislative history of the ATA … reveal[s] this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks. …
>
> Therefore, Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations. Certainly, private tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism vindicate the national and international public interest.

*Weiss v. National Westminster Bank, PLC*, 242 F.R.D. 33 (E.D.N.Y. 2007) (citation omitted).

## II.   THE PALESTINE INVESTMENT FUND

The story of the Palestine Investment Fund starts with an entity known as the Palestine Commercial Services Corporation ("PCSC"). The PCSC was incorporated in the Gaza Strip in August 1994, as "a company owned and controlled by the Palestinian Authority" according to the PA's own Company Registrar. Exhibit B.

A study of the PA's finances prepared by the World Bank explains that the PCSC was capitalized by the PA using the PA's own tax revenues:

> It is a matter of record that … substantial amounts of PA funds
> were diverted to special PA accounts outside the budget, with little
> transparency concerning their usage. The IMF estimates that some
> $591 million of excise duties (on petroleum, tobacco and alcohol)
> were paid into these off-budget accounts over the period 1995 –
> 2000, along with at least $300 million in profits from PA
> commercial activities[5].
>
> [5] As to the use to which these funds were put, the petroleum
>    excise revenue was deposited by Israel into an Israeli bank
>    account in Tel Aviv, and expenditures from this account
>    could be readily traced. The IMF … has concluded that most
>    of the diverted revenue was used for investment in
>    commercial operations, through the then Palestine
>    Commercial Services Corporation (PCSC)
>
> ***
> As mentioned earlier, using PA revenues not paid into the budget
> (petroleum, tobacco and alcohol excises plus ongoing profits from
> these commercial operations) the PA-owned Palestine Commercial
> Service Organization (PCSC) invested PA funds in some 79
> commercial undertakings, both within [West Bank and Gaza] and
> abroad.

World Bank publication, "West Bank and Gaza Country Financial Accountability Assessment,"

June, 2004, pp. 11, 33), Exhibit C.[4]

A report prepared by the International Monetary Fund ("IMF") likewise explains that,

"Most of the diverted tax revenue was used for investment in PA commercial operations through

the PCSC." IMF publication, "Economic Performance and Reform under Conflict Conditions,"

Sept. 15, 2003, p. 89, Exhibit D.

Following various economic reforms, the PCSC was superseded in 2002 by a new entity,

the Palestine Investment Fund ("PIF"). Exhibit C, pp. 33-35; Exhibit D, p. 101.

Significantly, as the IMF explains:

---

[4] Notably, this World Bank study is published on, and was downloaded by plaintiffs' counsel from the Palestinian
Authority's own website, www.mof.gov.ps/CFAA.pdf. Its accuracy therefore cannot be contested.

The decree establishing the PIF made it illegal for the PA to conduct any commercial activity or any hold assets outside of the PIF.

Ex. D p. 101. *See also* Ex C, p. 33 ("Under the decree it is illegal for the PA to conduct any commercial activity or hold commercial assets outside of PIF.").

Accordingly, since the decree establishing the PIF prohibited the PA from holding any assets outside of the PIF, the PA assets held by the PCSC were transferred to the PIF, and a valuation and "transparency assessments" of these assets was solicited from the firm of Standard & Poors and the Democracy Council (hereinafter "S&P Report"). *See* Ex. C, pp. 34-35; Ex. D, p. 101.

A copy of the S&P Report is attached hereto as Exhibit E.

Pages 342-44 of the S&P Report consist of an appendix ("Appendix C") listing all of the assets in the PIF portfolio. *See* Exhibit E at pp. 342-44. That appendix lists, *inter alia*, "Companies Under Evaluation Process by Standard & Poor's". *See id.* at p. 342.

Significantly for the instant purposes, among the investments listed as "Under Evaluation Process" are "Canaan Equity II" and "Canaan Equity III". *See id.* at 342.

Soon thereafter, S&P issued a Valuation Report for the Canaan Equity II and Canaan Equity III investments. Exhibit F. That report, which explains that "The subject investments in the Partnerships were previously held by the Palestinian Commercial Services Corporation ("PCSC") and transferred to the [Palestine Investment] Fund on January 1, 2003" (*id.* at 3), analyzes the investments in detail. *Id. passim*.

The Democracy Council, which worked together with S&P on evaluating the PA assets being transferred from the PCSC to the PIF, produced "Transparency Diagnostics" in respect to

the Canaan Equity II and Canaan Equity III investments, which supplement the S&P Valuation Report. *See* Exhibits G, H.

On February 26, 2004, the (then) CEO of the PIF, Mohammed Rashid, wrote to Canaan Equity II and Canaan Equity III confirming:

> [T]he completion of the formal transfer of assets currently undertaken by the Palestine Investment Fund "PIF" from its predecessor company the Palestinian Commercial Services Company …

*See* Exhibit I.

There is no question whatsoever that these investments in Canaan Equity II and Canaan Equity III constitute assets of the Palestinian Authority:

First, as explained in the World Bank and IMF reports, the PCSC made its investments, which were later transferred to the PIF, ***using PA funds*** (i.e., tax revenues).

Unsurprisingly, then, the World Bank and IMF explicitly refer to the investments held by the PCSC and PIF as "***PA funds,***" "***PA investments,***" "***PA commercial investments***" (Ex. C, pp. 33, 35) and "***PA assets***" (Ex. D, p. 101).

Moreover, the PIF ***itself*** expressly and unhesitatingly acknowledges that the investments in its portfolio are assets of the PA. Thus, for example, the introduction to the PIF's 2003 Annual Report explicitly states:

> This first Annual Report of the Palestinian Investment Fund for fiscal year 2003 presents a full accounting and valuation <u>of the assets of the Palestinian Authority</u>.

Exhibit J, at p. 6 ("Chairman's Statement") (emphasis added).

The Canaan Equity II and III investments are expressly listed in the PIF Annual Report. *See* Exhibit J at p. 45, items 8 and 9 *See also id*. at p.50 (noting that Canaan Equity II and III "have performed very poorly").

Thus, under the very definition established on page 6 of the Annual Report, the Canaan II and III investments are incontrovertibly "assets of the Palestinian Authority."

Likewise, on its own website, the PIF explained that its purpose is "to provide responsible stewardship of the assets and holdings **of the Palestinian National Authority**." Exhibit O (emphasis added).[5]

Note: stewardship **not** of the **PIF's** assets, but of the **PA's** assets.

Since the assets held by the PIF belong to the PA, it comes as no surprise at all that the PA regularly withdraws funds from the PIF directly into the PA's own budget. Thus, in 2005, the PA withdrew $172.92 million dollars from the PIF. *See* Palestinian Authority Ministry of Finance publication, "Financial Progress of the National Palestinian Authority during 2005-2006", attached to Exhibit N.

During the first quarter of 2006, the PA withdrew another $41.05 million. *Id. See also* "Summary of Revenues and Expenditures from January to March 2006" attached to Exhibit N. During the second fiscal quarter of 2006, the PA took another $54.41 million out of the PIF. *See* "Financial Progress" *id.* at 2nd Quarter 2006. Between July and September 2006 – precisely when, as discussed below, the Ungars' creditor's bill proceeding was pending in Rhode Island – the PA withdrew another $60.68 million from the PIF. *See* "Summary of Revenues and Expenditures from July to September 2006" attached to Exhibit N.

Thus, during the period from January 2005 until September 2006, the PA withdrew $329.06 million from the PIF directly into its own operating budget.

Thus, the circle is complete: the PA capitalized the PCSC with its own tax revenues to purchase investments, transferred those investments into the name of the PIF, and withdraws

---

[5] This webpage was taken down after plaintiffs initiated their enforcement proceedings.

cash from the PIF as necessary. Clearly, then, the PIF is simply a holding company for the PA's own assets.

Last, but not least, in sworn affidavits submitted by the PA in civil proceedings pending in Israeli courts, the PA itself has identified the Canaan Equity II and III investments – specifically by name – as assets owned by the PA and available for the satisfaction of judgments against the PA.

As explained in the declaration of Israeli attorney Avraham Colthof (Exhibit P), the PA submitted those affidavits in support of motions filed by the PA in the Israeli courts to vacate or reduce the amount of prejudgment attachments that had been imposed on the PA. The PA appended to the affidavits filed in Israel a copy of "Appendix C" of the S&P Report (*see* Exhibit E at pp. 342-44), listing all of the assets in the PIF portfolio, including the investments in Canaan Equity II and III. *See* Exhibit P at ¶¶ 13-17; and *compare* to Exhibit E, pp. 342-44.

The PA confirmed that the assets listed in the S&P Report are its own ("assets of the Authority") and on that basis sought to persuade the Israeli courts that it had sufficient capital to pay any adverse judgment, and that therefore no prejudgment attachment was necessary to protect the plaintiffs. Exhibit P at ¶¶ 9-17.

Thus, the Canaan Equity II and III investments are not only assets of the PA, but have been identified by the PA as assets which could be used to satisfy a judgment against it.

Nothing could be more just, therefore, than to allow the Ungars to enforce their judgment against those investments.

## III.    PLAINTIFFS' INITIATE PROCEEDINGS IN THIS COURT

In May 2005, plaintiffs served subpoenas on Canaan Equity II L.P., Canaan Equity III L.P., Canaan Equity II Offshore C.V., Canaan Equity III Offshore C.V. and Canaan Offshore

Management N.V. ("Canaan entities") at their Rowayton offices, along with a copy of the injunction issued by the Rhode Island federal court (Exhibit A).

After entering a confidentiality agreement with the plaintiffs, the Canaan entities produced responsive documents regarding the investments in the name of the PIF, and regarding investments by Becont Ltd. (a PA-controlled offshore company) and the Palestine Pension Fund ("PPF").[6]

On August 25, 2005, plaintiffs caused a levy of execution to be served on the Canaan entities at their Rowayton offices. Exhibit Q.

Various procedural maneuvers by the Canaan entities the details of which are not relevant here (including a motion to trifurcate the proceedings and a frivolous demand that the Ungars put up a bond), prevented this case from moving off the blocks for nearly a year and a half. In November 2006 a status conference was held, at which the Court and the parties agreed to stay this matter pending the outcome of related proceedings in Rhode Island, which are discussed in the next section.

## IV. PLAINTIFFS' CREDITOR'S BILL

On July 3, 2006, the Ungars filed a Creditor's Bill against the PA in the U.S. District Court in Rhode Island, pursuant to § 9-28-1 of the Rhode Island General Laws. That provision permits a judgment creditor to "reach and apply and subject to the payment and satisfaction of his or her judgment any equitable estate, any equitable assets, or any choses in action of the judgment debtor". R.I.G.L. §9-28-1.

Under §9-28-1 of R.I.G.L., a judgment creditor is entitled to reach and apply to his judgment all legal and equitable rights and interests of the judgment debtor. *See e.g. Howe v.*

---

[6] Until receiving the production from Canaan, plaintiffs were entirely unaware of the Becont and PPF investments. The proceedings in this Court regarding the PPF were dismissed by stipulation. *See* dkt. # 55-58.

*Richardson*, 232 Bankr. 534 (Bankr. 1st Cir. 1999), *aff'd* 193 F.3d 60 (1st Cir. 1999) (Expansive language of §9-28-1 and statute's inclusion of "chose in action" permits judgment creditors to "tak[e] over debtors' legal claims against third parties" even when not subject to attachment under common law).

Among the rights and interests subject to §9-28-1 of R.I.G.L. are a judgment debtor's interests in a corporation. *See Rhode Island Hospital v. Collins*, 117 R.I. 535, 537, 368 A.2d 1225, 1227, R.I. (1977) (Pursuant to §9-28-1 a judgment creditor may "reach and apply [judgment debtor's] interest in [a] corporation" owned by judgment debtor).

Plaintiffs' Creditor's Bill requested that the Rhode Island federal court assign to the Ungars certain rights of the PA in respect to the PIF and the PCSC. See Creditor's Bill, Exhibit R, at ¶¶ 11-22.[7]

Specifically, the Creditor's Bill sought a judgment assigning to the Ungars two completely separate and distinct categories of rights belonging to the PA:

(1)    **Assignment of the PA's ownership of the PIF and the PCSC**

The Creditor's Bill requested that the PA's ownership of the PIF and PCSC corporations be assigned to the Ungars. *See* Exhibit R at the *ad damnum* clause.[8]

---

[7] Plaintiffs sought this relief against the PCSC because to date, not all of the PA assets held by the PCSC have been placed under the name of the PIF.

[8] The Ungars sought ownership of the PIF in order to control the PIF's corporate apparatus and thereby reach PA assets held by the PIF *outside* of the United States. The Creditor's Bill was *not* filed in order to reach the Canaan investments. The Canaan assets are subject to execution by the Ungars in conventional fashion, i.e. through normal enforcement process, which the Ungars initiated in May 2005, long before they ever dreamed of filing the Creditor's Bill. In the event, however, the Ungars have in the meantime replaced the PIF's directors and officers, as discussed below, and the new PIF officers have consented to the relief sought by the Ungars, rendering this case uncontested.

Nonetheless, even if the Court were to accept LeBoeuf's claim that the assignment of the PIF to the Ungars was invalid – i.e. even if the Court finds that this matter is contested – the Ungars would be entitled to enforce their judgment against the Canaan investments as they originally planned to, i.e. through standard judgment enforcement procedures, as shown below.

Case 1:00-cv-00105-L-DLM  Document 607-1  Filed 11/18/2008  Page 12 of 54 PageID
Case 3:05-mc-00208-PCD  Document 7-1  Filed 08/14/2008  Page 12 of 53
#: 8681

In order to demonstrate that the PA's is the sole owner of the PIF and PCSC
corporations, the Ungars submitted certificates from the PA's own companies registrar
showing that the PA is the sole owner of the PIF and the PCSC. *See* Exhibit R, at internal
exhibits C, D and F.

(2)  **Assignment of the PA's rights to property titled in the name of the PIF and
the PCSC**

Separately, the Creditor's Bill also requested that the PA's rights in property,
assets and credits titled and/or owed in the names of the PIF and PCSC be assigned to the
Ungars. *See* Exhibit E at the *ad damnum* clause.

Though it is incontrovertible (as shown above) that all assets titled to the PIF and
PCSC (which are simply holding companies for PA assets) are the property of the PA, the
Creditor's Bill did ***not*** seek to have the Rhode Island court make that determination.
Rather, the Creditor's Bill simply requested assignment of "all rights, benefits and
interests of the PA in all property, assets and credits, of any type, that are titled and/or
owed to the PCSC and the PIF" (*id.*) – ***without defining the scope and extent*** of those
"rights, benefits and interests."[9]

**Notably, neither prong of the Creditor's Bill sought assignment of any property,
interests or rights belonging to PIF or PCSC, or any other relief of any kind whatsoever**

---

[9] In other words, under the relief sought in this prong of the Creditor's Bill, the Ungars would still need to
demonstrate in the future before a relevant court that a given asset titled to the PIF or the PCSC as of September 19,
2006, was in fact an asset belonging to the PA. Once such proof was made, that asset would automatically be the
property of the Ungars, by operation of the September 19 judgment.

The Ungars sought this relief as a backup, in the event that they found themselves unable to reach certain assets via
control of the PIF's corporate apparatus or via conventional judgment enforcement process. In such a case, the
Ungars would be able to bring a claim for declaratory or other appropriate relief directly against the person holding
the asset, asserting that the asset had belonged to the PA as of September 19, 2006, and so now belongs to the
Ungars by operation of the September 19 judgment.

Case 1:00-cv-00105-L-DLM Document 607-1 Filed 11/18/10 Page 13 of 54 PageID
Case 3:05-mc-00208-PCD Document 71-1 Filed 03/14/2008 Page 13 of 53
#: 8682

against the PIF or the PCSC. The Creditor's Bill sought assignment only of the rights of
the Palestinian Authority.

The PA failed to answer the Creditor's Bill, and on August 1, 2006, the Ungars moved
for entry of default and default judgment thereon. *See Ungar v. Palestinian Authority*, (00-105L
D.R.I.) docket no. 375.

The Rhode Island federal court then ordered the PA to respond to the Ungars' default
motion by August 18, 2006, and scheduled a hearing on that motion for September 13, 2006. *Id.*
docket nos. 375, 376.

The PA filed no response to the default motion. The PA's counsel, Deming E. Sherman,
appeared at the hearing on the default motion but declined to take any position on the motion and
offered no defense or opposition thereto. *See* hearing transcript, September 13, 2006, Exhibit S,
at 2-3.

Attorney James Oswald also appeared at the September 13, 2006 hearing, on behalf of
the Canaan entities, to seek clarification about the impact of the Creditor's Bill on the
enforcement proceedings in this Court. *Id. passim.*

In respect to the ***first*** prong of the Creditor's Bill – the assignment of the PA's ownership
of the PIF and PCSC – Judge Lagueux explained at the hearing that the Ungars had proven that
the PA owned the PIF and the PCSC, and that the PA's "full ownership rights" of these
corporations would therefore be assigned to the Ungars:

> THE COURT: The proof of claim is, that <u>the PA owns these two
> entities and, therefore, the interests of the PA are assigned to the
> plaintiffs</u>. And then they can proceed to try to collect in
> Connecticut.
>
> MR. OSWALD: Whatever interests those happen to be are being
> assigned to the plaintiffs.

Case 1:00-cv-00105-L-DLM Document 607-1 Filed 11/8/08 Page 14 of 54 PageID
Case 3:05-mc-00208-PCD Document 7-1 Filed 08/14/2008 Page 14 of 53
#: 8683

THE COURT: It's ownership. Full ownership rights. That's what's
been proven to me through the documentation in this case.

*Id*. at 17-18 (emphasis added).

In respect to the ***second*** prong of the relief sought in the Creditor's Bill – assignment of
the PA's rights to assets titled in the name of the PIF and PCSC – Judge Lagueux explained that
he was granting the relief just as sought in the Creditor's Bill, i.e. that the PA's rights in such
assets would be assigned to the Ungars, without a determination about the ***extent*** of such rights:

MR. OSWALD:…If they have an interest, it is being assigned. But
the determination of whatever those interests are is ultimately
being left to the Connecticut court.

THE COURT: Well, the Connecticut court will have to decide
some issues here. I'm deciding that whatever the PA owns in these
two entities is assigned to the plaintiffs. Then the plaintiffs can
proceed as they see fit.

*Id*. at 13-14.

Accordingly, on September 13, 2006, Judge Lagueux ordered entry of final judgment on
the Creditor' Bill, assigning to the Ungars: (a) all of the PA's ownership of the PIF and PCSC;
and (b) any rights, benefits and interests of the PA in property, assets and credits that are titled
and/or owed to the PCSC and PIF. *See* Exhibit T.

On September 19, 2006, final judgment was entered pursuant to Judge Lagueux's order
of September 13. *See* Exhibit U.

## V.    THE PIF'S DIRECTORS, OFFICERS AND COUNSEL ARE REPLACED

As noted *supra*, the Ungars sought ownership of the PIF in order to control the PIF's
corporate apparatus and so reach PA assets outside of the United States. Accordingly, shortly
after the judgment was entered on the Creditor's Bill, the Ungars replaced the directors and
officers of the PIF, as follows:

### a.        Replacement of the Directors

Article 6.1 of the PIF Articles of Association[10] provides that the PIF shall have a board of directors consisting of between seven and nine directors. *See* Exhibit V at §6.1

Article 6.4 of the PIF Articles provides that "any Director may be removed, but only with cause, by Resolution of the Shareholder." Article 4.1 identifies the "Shareholder" as the Palestinian Authority.

Since the PA's ownership rights in the PIF were assigned to the Ungars in the judgment entered by the Rhode Island federal Court on September 19, 2006, the Ungars are now vested with all the ownership rights previously enjoyed by the PA under the PIF Articles of Association.

Accordingly, on October 17, 2006, acting in their capacity as the owners of the PIF and pursuant to their authority under Article 6.4 of the Articles of Association, the Ungars executed a Resolution removing all Directors of the PIF with cause. *See* Declaration of Professor Meir Ungar ("Ungar Declaration"), Exhibit W, at ¶ 5.

---

[10] LeBoeuf submitted to the Court a document dated August 2002, which it purported to be the PIF's Articles of Association. *See* Exhibit 25 to LeBoeuf's Motion to Dismiss, and Motion to Strike the Appearance of Robert Tolchin. Dkt. # 97, 98. The provisions of that 2002 document (which bears no certification of any type) differ substantively from those of the **certified** Articles of Association from May 2003 (Ex. V), (which were produced to plaintiffs by Canaan), specifically regarding the authority of the owner of the PIF to appoint new directors. (Notably, the provisions of the certified Articles produced by Canaan match those of an additional copy of the Articles obtained by us recently from the PIF's own website).

LeBoeuf has also submitted a document which it purports to be new Articles of Association enacted in 2007. *See* LeBoeuf Exhibit 26. This document is nugatory for a number of reasons. First, unlike the 2003 Articles which are certified by the PA's company controller (*see* Ex. V at Bates 480), the purported 2007 Articles are not certified. Nor are they supported by an affidavit or other evidence of their authenticity, and there is no way to know who drafted them. Second, even if authentic, this 2007 document is **facially** invalid, because the 2003 Articles expressly provide that they may be amended only by resolution of the directors. Exhibit V at § 14.1. Since the lawful Directors – i.e. those appointed by the Ungars – did not approve these purported amendments, they are of no effect. Clearly, this document purportedly from 2007 can have no relevance or effect regarding the change of ownership and management in the PIF, which took place in 2006. Third, to the extent that this document purports to negate the effect of the judgment on the Creditor's Bill (and LeBoeuf does not explicitly assert that it does), it could not do so. *See e.g. J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Limited*, 37 N.Y.2d 220 (N.Y. 1975) (foreign confiscatory decrees are not entitled to comity). In any event, because the PA is not a sovereign state, its laws are not subject to comity. *See e.g. Lyons v. Bell Asbestos Mines, Ltd.*, 119 F.R.D. 384, 388 (D.S.C. 1988) ("the legislative enactments of a provincial government such as Quebec are not entitled to comity under the principles of international law."). The plaintiffs reserve the right to address this document in full detail, if and when LeBoeuf ever submits proof that it is authentic.

Case 1:00-cv-00105-L-DLM Document 607-1 Filed 11/18/2008 Page 16 of 54 PageID
Case 3:05-mc-00208-MCD Document 17-1 Filed 03/14/2008 Page 16 of 38
#: 8685

Article 6.1 of the PIF Articles provides that "the Directors shall be elected or appointed by Resolution of the Shareholder" and that at least 50% of the Directors shall be independent directors. Accordingly, the Resolution executed on October 17, 2006, appoints seven new directors, a majority of whom are independent. *See* Exhibit W at ¶ 6.[11]

Thus, the Resolution of October 17, 2006, which replaced the directors of the PIF, was executed in full compliance with the PIF's Articles of Association. Therefore, the current Directors of the PIF are the seven persons named in that Resolution.

### b.     Replacement of the Officers

Article 5.2 of the PIF Articles provides that all officers of the PIF (other than the General Manager) "shall be appointed by Resolution of Directors" and Article 5.2(c) provides that "any officer elected or appointed by the Board of Directors may be removed at any time, with or without cause, by Resolution of Directors."

Thus, all officers of the PIF other than the General Manager may be removed with or without cause by a Resolution of the PIF Directors.

Article 5.2(d) of the PIF Articles provides that the General Manager may be removed from office at any time with cause, either by the President of the PA "or by the vote of at least two-thirds of the whole Board of Directors."

In sum, the Directors are empowered to remove <u>all</u> the officers of the PIF, including the General Manager, except that the latter may be removed only with cause and only by agreement of at least two-thirds of the Directors.

---

[11] Article 6.1 provides that the Chairman of the Board shall be appointed by the president of the PA personally. However, Article 6.3(c) makes clear that the lack of a Chairman in now way prevents the PIF from functioning. Accordingly, no Chairman was appointed.

Article 6.2(e) provides that the Board of Directors "may meet at such times and in such manner and places within Palestine as the Board of Directors may determine to be necessary or desirable" and Article 1.35 defines "Palestine" as meaning the West Bank and Gaza Strip.

Thus, meetings of the PIF's Board of Directors may be held in the West Bank.

Article 6.3(a) provides that "Notice of any meeting of the Board of Directors may be waived by a Director before, at or after the meeting."

On October 19, 2006, all seven Directors of the PIF met in person for a meeting of the PIF Board of Directors. *See* Exhibit W at ¶ 7. The Directors waived prior notice of the meeting, in accordance with Article 6.3(a). <u>See</u> Resolutions and Minutes of the Meeting of the Board of Directors of the Palestine Investment Fund Company, October 19, 2006 ("Resolutions and Minutes") attached to Exhibit W as internal Exhibit 2.

The Board of Directors meeting was held in the West Bank, in accordance with Article 6.2(e). Exhibit W at ¶ 7.

At the meeting on October 19, 2006, the PIF Directors adopted a series of resolutions unanimously dismissing the PIF's existing officers, including the General Manager, with cause, effective immediately. *See* Resolutions and Minutes ¶¶ 2.2, 3.1; Exhibit W at ¶ 8.

As discussed *supra*, the Directors were fully authorized to take this action pursuant to Articles 5.2(c)-(d).

Article 6.2(b) provides that the "Board of Directors may, by a Resolution of Directors, appoint any Person, including a person who is a Director, to be an officer or agent of the Company."

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 11/8/10   Page 18 of 54 PageID
Case 3:05-mc-00208-PCD   Document 7-1   Filed 03/14/2008   Page 18 of 38
#: 8687

Accordingly, at the meeting on October 19, 2006, the PIF Directors adopted a series of resolutions unanimously appointing Meir Ungar and Uri Dasberg as the sole officers and signatories of the PIF. *See* Resolutions and Minutes ¶¶ 3.2 – 3.11; Exhibit W at ¶¶ 8-9.

Thus, the resolutions adopted by the PIF Directors on October 19, 2006, conformed fully with the Articles of Association, and today the sole officers and signatories of the PIF are Meir Ungar and Uri Dasberg.

Messrs. Ungar and Dasberg have retained the firm of Jaroslawicz & Jaros to represent the PIF. *See* Exhibit W at ¶¶ 10-13.

Accordingly, Robert Tolchin and Jaroslawicz & Jaros are authorized counsel for the PIF.[12]

## VI.   THE RHODE ISLAND FEDERAL COURT CONFIRMS THAT THE UNGARS ARE THE OWNERS AND OFFICERS OF THE PIF

On November 8, 2006, the plaintiffs filed a motion before Judge Lagueux seeking to modify the confidentiality agreement governing documents produced by the Canaan entities pursuant to the subpoena served on them by the plaintiffs, by excluding from its provisions any documents generated by the PIF and any documents to which the PIF is a party or signatory. *See Estate of Ungar et al. v. Palestinian Authority et al.*, 00-105L (D.R.I.), dkt. #382-383, ("motion to modify"). The motion to modify was accompanied by a letter from Mr. Tolchin on behalf of the PIF consenting to the release of these PIF documents.

---

[12] In conferences before the Court and in its papers LeBoeuf has insinuated – by tone, but without explanation – that there is somehow something improper about the appointment of Mr. Tolchin, who is counsel for the Ungars' personally, as counsel for the PIF. LeBoeuf has been unable to articulate what this putative impropriety might be, because there is none. Nothing could be simpler and more natural than for their Ungars to have their own lawyer represent the PIF, of which they are now the sole owners. Closely-held corporations and their owners are frequently represented by the same attorneys, as the Court is well aware.

Case 1:00-cv-00105-L-DLM  Document 607-1  Filed 11/18/10  Page 19 of 54 PageID
Case 3:05-mc-00208-MCD  Document 7-1  Filed 08/14/2008  Page 15 of 38
#: 8688

A short time later, LeBoeuf filed an action seeking a declaratory judgment establishing that the Ungars are not the owners and officers of the PIF. *See LeBoeuf, Lamb, Greene & MacRae LLP v. Strachman ex rel. Ungar*, C.A. No. 06-501-L-DLM.

On June 19, 2007, Judge Lagueux held a hearing on LeBoeuf's action, dismissed it in a decision from the bench, and stated that LeBoeuf's conduct in bringing the action might be sanctionable. *See* Transcript, June 19, 2007, Exhibit X.

During the course of the hearing, Judge Lagueux repeatedly and emphatically stated that his judgment of September 19, 2006, had assigned the PA's full ownership rights in the PIF to the Ungars, that the PIF had had no right to participate in the creditor's bill proceeding, that the only party with standing to oppose the assignment of the PA's rights was the PA and that the September 19 judgment was entitled to full faith and credit in any court in the United States. *See* Exhibit X, *passim*.

LeBoeuf did not appeal that decision.

On September 25, 2007, Judge Lagueux issued an order granting the Ungars' motion to modify "upon the reasons and findings set forth by the Court on the record during the hearing in this matter on September 18, 2007". Exhibit Y.

At that September 18 hearing, Judge Lagueux explicitly held that:

> T]he Court has entered judgment in the petition to reach and apply the assets of the Palestinian Authority in the Palestine Investment Fund. And the Palestinian Authority defaulted, and the Court entered judgment and transferred to the Plaintiffs all interests of the Palestinian Authority in that Fund, that separate corporation. So **the Plaintiffs became the stockholders, the sole stockholders of the Palestine Investment Fund**.
>
> ***
>
> The Plaintiffs have demonstrated that they have exercised their ownership interest, their stock ownership interest in the Fund **by**

> *ousting directors and officers and electing representatives among themselves to be directors and to run the corporation and fired the prior counsel, Leboeuf, and hired new counsel*. And new counsel, based on the documents that have been presented, have indicated that they have no objection to this motion.
>
> So, essentially, *the Plaintiffs are standing in the position of the Palestine Investment Fund at this point*, and there's no now sound basis for the confidentiality agreement. They should be able to use *their own documents* any way they see fit.

Transcript, Sept. 18, 2007, Exhibit Z, at 13-14.

Thus, the Rhode Island court has clear held that the Ungars are now the owners and managers of the PIF, and that Mr. Tolchin – and not LeBoeuf – is the counsel for the PIF.[13]

## ARGUMENT

## I.   THE PIF HAS CONSENTED TO THE RELIEF SOUGHT BY THE UNGARS

On July 3, 2006, the Ungars filed a Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests (dkt. #65).

The same day, the PIF, represented by attorney Robert Tolchin and PIF's local counsel Stephen Wright[14], filed papers consenting to the relief sought by the Ungars. *See* dkt. # 66, 70.

---

[13] LeBoeuf has submitted a document purporting to be an *ex parte* PA court order (Exhibit B to the LeBoeuf's Exhibit 7) which has expired *on its face*. *See id.*, final sentence ("I also order … the claimant to bring suit within a period of eight days; otherwise, the order issued in this claim shall be considered null and void"). LeBoeuf has not asserted much less shown that such a suit was brought (and the Ungars are certainly unaware of any such suit) and the "order" is therefore nugatory on its own terms.

Because this *ex parte* "order" has facially expired, the Ungars will not waste the Court's time addressing the putative legal force of decisions issued by PA courts. If it becomes necessary in the future, the Ungars will demonstrate that the courts of the PA have no subject-matter or personal jurisdiction to hear any dispute involving the Ungars, and moreover that no decision of a PA court regarding the matters at issue here would be entitled to recognition or effect in a United States court because, *inter alia*, the Ungars would not obtain a fair hearing even if they could attend such a proceeding without immediate risk to their lives, which they cannot. *See* Declaration of Lt. Colonel (Res.) Baruch Yedid, Exhibit AA. Indeed, PA courts are known to indict, "try" and execute – all in one day – *Palestinians* suspected of "cooperating with Jews." It is thus easy to imagine what type of "justice" would be meted out to the Ungars in a PA court. *See e.g. Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1410-1413 (9th Cir. 1995) (citing numerous cases for the rule that United States courts will not give effect to a foreign judgment that "was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law").

[14] See footnote 12.

As shown above, Mr. Tolchin is authorized counsel for the PIF, appointed by Messrs. Ungar and Dasberg, who are the sole officers and signatories of the PIF.

Accordingly, this proceeding is not contested, and the relief sought in the Ungars' Motion for a Turnover Order and Appointment of a Receiver (dkt. #65) should be granted forthwith.

## II. THE JUDGMENT ON THE CREDITOR'S BILL IS VALID AND ENTITLED TO FULL FAITH AND CREDIT

LeBoeuf challenges the validity of the September 19, 2006 judgment conveying ownership of the PIF to the Ungars on several grounds.[15] As shown below, LeBoeuf's arguments are all meritless.

### a. The Creditor's Bill Action Did Not Affect the Rights of the PIF, and the PIF Therefore Had No Standing Therein

LeBoeuf's main argument is that entry of that judgment violated the Due Process clause of the Constitution and the Rhode Island creditor's bill statute, because PIF was not a party to the Creditor's Bill proceeding. Accordingly, LeBoeuf asserts, the judgment is void and/or not entitled to full faith and credit. LeBoeuf Memo at 12-16.

This argument is meritless because it is founded on the premise that PIF had some standing to oppose the conveyance of the PA's ownership rights to the Ungars. That premise is completely baseless, and LeBoeuf has provided no legal authority in support of it because none exists: it is long and well established that a corporation has no more standing to object to its assignment to new owners as part of a judgment enforcement proceeding (or otherwise) than does a house, a car or a horse. The corporation is merely the *object* of the ownership rights, *the thing owned*, and it has no say as to whether and to whom those rights may be assigned. This

---

[15] LeBoeuf attacks only the first prong of the judgment entered on the Creditor's Bill, i.e. that part of the judgment which conveys ownership of the PIF to the Ungars. LeBoeuf does not challenge the second prong of the judgment, which conveyed to the Ungars any rights of the PA in assets titled to the PIF. In any event, as discussed above, the second prong of the judgment does not relieve the Ungars of the task of demonstrating that a given asset titled to the PIF is the property of the PA.

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 11/18/10   Page 22 of 54 PageID
Case 3:05-mc-00208-PCD   Document 71   Filed 03/14/2008   Page 22 of 38
#: 8691

flows from the hornbook principle that "a corporation does not have standing to bring an action

to enforce or redress the rights of its shareholders." 9 Fletcher Cyc. Corp. § 4227 (2006). *See

also Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1050

(8th Cir. 2002) ("a corporation has no standing to assert rights belonging to its shareholders")

(citing *Waseca Co. Bank v. McKenna*, 21 N.W. 556 (Minn. 1884)).

     The facts of the *Waseca* decision cited by the Eighth Circuit are highly apposite to those

underlying the Creditor's Bill. There, a banking corporation filed an action to prevent levy and

sale of shares belonging to the stockholders of the bank, to satisfy a debt. The court held that the

bank had no standing to interfere:

> The plaintiff is not in position to maintain this action … the only
> thing which the defendant as treasurer can do is to levy upon and
> sell the shares of stock of individual stockholders for the tax upon
> such shares. This is all that he threatens to do, and is what the
> action seeks to enjoin him from doing. Such sale would have the
> effect only to transfer to whomsoever should purchase at the sale
> the title to the stock sold. This would not affect the bank in any
> other way, nor be any more a wrong against it than would a
> transfer by the stockholders themselves. The wrong, if any, in
> making the levy and sale would be a wrong against the individual
> stockholders and not against the bank. It has, therefore, no legal
> interest in the matter.

*Waseca Co. Bank v. McKenna*, 21 N.W. 556 (Minn. 1884) (emphasis added).

     Thus, the PIF, like the bank in *Waseca*, had no standing and no legal right to challenge

the assignment of the PA's ownership rights of the PIF to the Ungars via the Creditor's Bill.

     Similarly, in *Silesian-American Corp. v. Markham*, 156 F.2d 793 (2nd Cir. 1946), a

corporation sought to oppose the compulsory assignment of its shares to the Alien Property

Custodian. Judge Learned Hand held that the corporation had no standing to do so:

> The [corporation] has no interest in the controversy, legally
> recognizable…It has no standing vicariously to assert against the

claims of third persons, the interests of those who may appear on
its books to be its shareholders

*Id.* at 795. The Supreme Court affirmed this holding:

It was held by the Circuit Court of Appeals that Silesian had no
'standing vicariously' to assert the interests of its shareholders. We
agree. Silesian has no legal interest in the issue as to the ownership
of its stock.

*Silesian Am. Corp. v. Clark*, 332 U.S. 469, 740 (1947).

Exactly so here, the PIF had (and has) no standing whatsoever to oppose assignment of

the PA's ownership of the PIF to the Ungars, and "no legal interest in the issue as to the

ownership" of the PIF. Therefore, it had no right whatsoever to be a party to the Creditor's Bill

proceeding under the Due Process clause or Rhode Island law.

The reason for this rule is simple and dispositive: a corporation simply has no property

interest in the ownership rights of its shareholders:

The shares of stock in a corporation are property of the individual
stockholders and not the property of a corporation …

A corporation has no property interest in the shares of its stock
owned by its stockholders, *In re Texas Consumer Finance
Corporation*, 480 F.2d 1261, 1266 (5th Cir. 1973); *Journal-News
Corp.* 193 F.2d 492 (2d Cir. 1951).

*Matter of Calamity Jane's, Inc.,* 22 B.R. 5, 7 (D.N.J. 1982).

This rule is recognized and applied without exception, including by the federal courts of

this Circuit:

T]he fact that the stock at issue here is "McCrory" stock does not
give McCrory a property interest in those shares; it is well-
established that a corporation has no such interest in shares of its
stock held by stockholders. *In re Journal-News Corp*, 193 F.2d
492 (2d Cir. 1951); *Matter of Calamity Jane's, Inc.*, 22 B.R. 5, 7
(D.N.J.1982).

*Victor v. Riklis*, 1992 WL 122911 at *4 (S.D.N.Y. 1992).

Similarly:

> It is widely recognized, and we have previously held, that a corporation, even if a debtor in bankruptcy, has no property interest in the shares of its stock owned by shareholders. *In re Texas Consumer Finance Corp.,* 480 F.2d 1261, 1266 (5th Cir.1973); *see also In re Journal-News Corp.,* 193 F.2d 492, 492 (2nd Cir.1951).

*Matter of Paso Del Norte Oil Co.*, 755 F.2d 421 (5th Cir. 1985).

Likewise:

> A "[d]ebtor has no property interest in shares of its own stock owned by its stockholders." *In re New York & Worcester Express, Inc.,* 294 F.Supp. 1163, 1165 (S.D.N.Y. 1968) (*citing In re Journal-News Corp., 193 F.2d 492 (2d Cir. 1951)*).

*In re Hirsch*, 339 B.R. 18, 30 (E.D.N.Y. 2006).

The New York Court of Appeals recognized this principle nearly 120 years ago:

> The only real issue in the case was between the plaintiffs and the defendant Barnes as to who were the real or equitable owners of the stock in Barnes' possession, and in the settlement of this question these defendants [the corporation and its directors] had no interest. In case the plaintiffs succeeded, they would be entitled to so much stock as the court might award to them respectively, and the consequent rights which their ownership of such stock gave them in the defendant corporation; and if they were defeated, the title to the stock would remain as it was, and no right of the company would in either event be affected.

*King v. Barnes*, 109 N.Y. 267, 282 (1888) (emphasis added).

Furthermore, because a corporation has no property interest in the ownership of its shares, a corporation is neither a necessary nor an indispensable party to proceedings – such as plaintiffs' Creditor's Bill – affecting the ownership of the corporation:

> [T]he issue presented is whether or not [corporation] JII is a nominal or unnecessary party. JII is not a party to the contract, and the contract by its terms deals with the sale of stock held by Johnston. Indeed the only role for the corporation in the event of the success of Coleman and WNC on the merits of the dispute

would be to perform the ministerial act of transferring the shares upon the books of the corporation. <u>As counsel for Johnston pointed out, were it otherwise, every dispute over stock ownership would require the presence of the issuing corporation. Fortunately the issue has been faced and resolved by other courts whose decisions are hereby relied upon.</u> *Salem Trust Co. v. Manufacturers' Finance Co.*, 264 U.S. 182, 189-90, 44 S.Ct. 266, 267, 68 L.Ed. 628 (1924); *Kearney v. Dollar*, 111 F.Supp. 738, 745 (D.Del. 1953); *American Mfrs. Mut. Ins. Co. v. Manor Invest. Co.*, 286 F.Supp. at 1010-11. Since JII is not a necessary party as indicated by these authorities, its presence does not defeat diversity on the first cause of action.

*Coleman v. Johnston*, 532 F.Supp. 370, 371 (S.D.N.Y. 1981) (emphasis added).

Similarly:

[I]n *Kearney v. Dollar*, 111 F.Supp. 738 (D.Del. 1953)…the district court held that <u>a corporation whose shares were the subject of an ownership dispute was not a necessary or indispensable party,</u> but was instead only a nominal and formal party, because the only connection it had with the controversy was that it was enjoined from transferring the shares to anyone other than the parties to the suit. *Id.* at 744. The *Kearney* court reasoned that the corporation's presence as a defendant could not affect removal because <u>the corporation had no rights to be contravened.</u> *Id.* at 745.

*Pesch v. First City Bank of Dallas*, 637 F.Supp. 1530, 1537 (N.D.Tex. 1986) (emphasis added).

*See also Perkins v. Benguet Cons. Min. Co.*, 55 Cal.App.2d 720, 738-739 (1942) ("It is well settled that a corporation is not a necessary party to an action between rival claimants to shares of its stock.") (citing *In re Thomas' Estate*, 147 Cal. 236, 81 P. 539; 6A Cal.Jur., p. 360, at p. 362, § 196).

It is thus crystal clear that the only party with standing to oppose the Creditor's Bill was the (former) owner of the PIF – i.e. the PA itself. "Individual rights of shareholders and injuries against shareholders individually cannot be enforced or redressed in an action by the corporation, but the action must be by the shareholders individually." 12B Fletcher Cyc. Corp. § 5934 (2006).

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 11/18/10   Page 26 of 54 PageID
Case 3:05-mc-00208-MCD   Document 7-1   Filed 03/14/2008   Page 25 of 33
#: 8695

In the event, of course, the PA intentionally defaulted the Creditor's Bill, failed to appeal the judgment entered thereon, and failed to file a motion for relief under Fed.R.Civ.P. 60 within the mandatory one-year period. That judgment is thus final and unassailable in every respect.

LeBoeuf points to *Covington Industries, Inc. v. Resintex A. G.*, 629 F.2d 730 (2nd Cir. 1980) and to Judge Lagueux's recent decision in *North Atlantic Distribution, Inc. v. Teamsters Local Union No. 430*, 497 F.Supp.2d 315 (D.R.I. 2007) as purported support for its claim that it was denied due process. *See* LeBoeuf's "Supplemental Memorandum" dkt. # 109, at 2-3. But *Covington Industries* and *North Atlantic Distribution* are entirely inapposite. In *Covington Industries*, a Georgia court entered a default judgment for monetary damages against a party over which it had no personal jurisdiction. In *North Atlantic Distribution*, a plaintiff holding a money judgment against a corporation sought to hold the shareholder of the judgment debtor corporation and its sister corporation liable for the money judgment under alter ego and federal labor law doctrines. *Id.* at 319.

Here, in complete contrast, plaintiffs' Creditor's Bill sought nothing from the PIF, and the judgment entered does not affect the PIF's rights in any manner, because the PA's ownership of the PIF was a right belonging to the PA, not the PIF, as the extensive case law cited above demonstrates beyond the shadow of a doubt. Indeed, State and federal courts across the country levy and execute against judgment debtors' shares and ownership rights in corporations every single day, and the corporations themselves – the object of the ownership – have no standing to argue about who should own them.[16]

---

[16] LeBoeuf also cites *Berard v. Blake*, 186 A. 475, 476 (R.I. 1936) and *In re Fraden*, 317 B.R. 24, 38 (D. Mass. 2004) in support of its argument that under the Rhode Island creditor's bill statute, R.I.G.L. § 9-28-1, the PIF should have been named as a party to the Ungars' Creditor's Bill. LeBoeuf Memo at 15.

But *Berard* contains no holding at all, or for that matter even any dicta, in support of LeBoeuf's position. The court did not even address the issue. Rather, as it so happened, the judgment creditor named third parties indebted to his judgment debtor as respondents to the creditor's bill. The fact that a judgment creditor did something is not

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 11/18/2008   Page 27 of 54 PageID
Case 3:05-mc-00208-PCD   Document 7-1   Filed 03/14/2008   Page 27 of 38
#: 8696

Moreover, Judge Lagueux made this point perfectly clear to LeBoeuf's counsel in Rhode Island, Mr. Medeiros, during the hearing on June 19, 2007:

> MR. MEDEIROS: … I'd like to quote from Page 12, where the [Ungars] argue, quote, "As a matter of law, the PIF had no right or standing whatsoever to participate in the creditor's bill proceeding. That proceeding, and the judgment entered thereon, affected only the rights and assets of the PA, not the PIF, and therefore, the only party that had standing to oppose the creditor's bill, or to appeal the judgment, was the PA itself. But the PA intentionally defaulted the creditor's bill and failed to appeal the judgment thereon," close quote.
>
> THE COURT: That's absolutely accurate.
>
> MR. MEDEIROS: It is not, Your Honor, and I'd like to explain—
>
> THE COURT: Yes, it is.

Exhibit X at p. 25, lines 1-14. Likewise:

> MR. MEDEIROS: The reason why this second grievous noncompliance with the Rhode Island Statute is important—it's not a mere technicality—if Plaintiffs—if the Ungars had complied, as they were required to, with 9-28-1, instituting a new reach-and-apply statute, they would have been obligated to name the PIF as a Defendant in that action.
>
> THE COURT: They do not. They did not have the requirement of naming the PIF. The PIF had no interest, had no interest in that proceeding.
>
> MR. MEDEIROS: It absolutely did, Your Honor.

---

"authority" for anything. Moreover, the judgment creditor sought affirmative relief against those third parties, i.e. an injunction. *Id*. at 476 ("Hector J. Blais and Lucy Blais be enjoined from paying any part of said note to Cesaire Blais"). Here, of course, the Ungars neither sought nor received any relief against the PIF.

*In re Fraden* is no less irrelevant. The court there determined that under Massachusetts law, no **equitable lien** was created in a reach and apply proceeding, unless the person holding the property owing to the judgment debtor was also made a party to the proceeding. *Id*. at 38. This decision is triply inapposite to this case because (a) it deals with the force and effect of liens, not Due Process concerns (b) it is given under Massachusetts law and (c) the PA's ownership rights in the PIF were not property "held" by the PIF.

27

THE COURT: No, it did not.

MR. MEDEIROS: It was the entity whose assets the Ungars—

THE COURT: No.

MR. MEDEIROS: — are trying to get their hands on to satisfy their judgment.

THE COURT: No, no, no. What the Ungars were trying to get hold of was the assets, the ownership interests of the PA, and the PA defaulted. The PIF was not an indispensable party or even a required party to that creditor's bill.

*Id*. at p. 38 lines 5-25 – p. 39 line 1.

Judge Lagueux conclusion is supported by the wall-to-wall authority brought above.

In sum, the PIF had no standing or right whatsoever to be a party to the Creditor's Bill proceeding or to object to the transfer of the PA's rights to the Ungars, and Judge Lagueux's judgment assigning those rights to the Ungars was therefore entirely valid and appropriate under both the Due Process clause and the Rhode Island creditor's bill statute.

**b.      The PIF and Its Former Officers Have No Standing to Challenge the Creditor's Bill Judgment in This Court**

Because PIF had no standing to oppose the Creditor's Bill in the first place, it has no standing in this Court to challenge the judgment entered thereon.

Of course, since the Ungars are the officers of the PIF and Mr. Tolchin is the PIF's counsel, as discussed above, the distinction between the PIF's initial standing to oppose and its current standing to challenge the judgment is purely hypothetical: because LeBoeuf does not represent the PIF, no challenge is currently being made by PIF.

That distinction would be relevant, however, if the Court were to find for some reason (which the plaintiffs respectfully cannot imagine) that their replacement of the PIF's officers and counsel was ineffective, and that LeBoeuf represents the PIF.

Case 1:00-cv-00105-L-DLM Document 607-21 Filed 08/04/10 Page 29 of 54 PageID
Case 3:05-mc-00208-PCD Document 7-1 Filed 08/14/2008 Page 25 of 38
#: 8698

In that event, the Court could and should reject LeBoeuf's challenge to the judgment for lack of standing in *this* Court, for the same reasons set forth in subpart (b) above.

### c.  The Judgment Is Res Judicata In Respect to the PIF Because the PIF Was in Privity with the PA

Alternatively, assuming, purely *arguendo*, that the PIF had some right to participate in and challenge the Creditor's Bill proceeding, that right was fully exercised by the PA on behalf of the PIF as its privy, and the judgment therefore fully binds the PIF just as if it had been a named party:

It is undisputed that until of September 19, 2006 (when ownership was transferred to the Ungars) the PA was the sole owner of the PIF. *See* Exhibit X. In other words, during the pendency of the plaintiffs' Creditor's Bill proceeding, the PIF was a closely-held corporation, owned exclusively by the PA.

The Restatement (Second) of Judgments, §59, sets forth the following rules in respect to the preclusive effects of a judgment as between a closely-held corporation and its owner(s):

> (3) If the corporation is closely held, in that one or a few persons hold substantially the entire ownership in it, the judgment in an action by or against the corporation or the holder of ownership in it is conclusive upon the other of them as to issues determined therein as follows:
>
> (a) The judgment in an action by or against the corporation is conclusive upon the holder of its ownership if he actively participated in the action on behalf of the corporation, unless his interests and those of the corporation are so different that he should have opportunity to relitigate the issue; and
>
> (b) The judgment in an action by or against the holder of ownership in the corporation is conclusive upon the corporation except when relitigation of the issue is justified in order to protect the interest of another owner or a creditor of the corporation.

Restatement (Second) of Judgments, §59(3) (emphasis added).

Case 1:00-cv-00105-L-DLM Document 607-1 Filed 11/18/10 Page 30 of 54 PageID
Case 3:05-mc-00208-PCD Document 7-1 Filed 03/14/2008 Page 35 of 38
#: 8699

The difference between the two scenarios described in subsection (a) and (b) respectively

was explained in a widely-cited decision of the Seventh Circuit:

> The Restatement sets up different standards for preclusion in
> connection with closely held corporations depending on the
> "direction" in which the preclusion "runs": if a person seeks to
> preclude relitigation by a shareholder based on a prior suit by the
> corporation, the person claiming preclusion must show that the
> shareholder "actively participated in the action"; <u>however, if
> estoppel is asserted against the corporation based on prior litigation
> by a shareholder, preclusion is only denied where the interests of
> third parties would be unfairly concluded by barring relitigation</u>.

*Aetna Cas. and Sur. Co. of Hartford, Connecticut v. Kerr-McGee Chemical Corp.*, 875 F.2d

1252, 1259 (7th Cir. 1989) (emphasis added).

The rationale underlying the rule governing estoppel of the closely-held corporation on

the basis of a judgment against the owner(s) was explained in a decision of the Supreme Court of

Connecticut:

> The comments to § 59 of the Restatement (Second) of Judgments
> explain why a judgment rendered against the shareholders of a
> closely held corporation may be binding on the corporation.
> "When the corporation is closely held ... interests of the
> corporation's management and stockholders and the corporation
> itself generally fully coincide.... For the purpose of affording
> opportunity for a day in court on issues contested in litigation ...
> there is no good reason why a closely held corporation and its
> owners should be ordinarily regarded as legally distinct. On the
> contrary, it may be presumed that [the interests of the shareholders
> and the closely held corporation itself] coincide and that one
> opportunity to litigate issues that concern them in common should
> sufficiently protect both." *Id.*, comment (e), p. 99. These principles
> have been accepted by other courts; *see, e.g., Aetna Casualty &
> Surety Co. of Hartford v. Kerr-McGee Chemical Corp.*, 875 F.2d
> 1252, 1258-59 (7th Cir. 1989); *Red Carpet Corp. v. Roberts,* 443
> So.2d 377, 380 (Fla.App. 1983), rev. denied sub nom. *Hatcher v.
> Roberts,* 488 So.2d 68 (Fla. 1986); *Spickler v. Dube,* 644 A.2d 465,
> 468 (Me. 1994); *Missouri Mexican Products, Inc. v. Dunafon,* 873
> S.W.2d 282, 286 (Mo.App. 1994); and Joe's Pizza has failed to
> advance any reason why we should not follow them in this case.

Case 1:20-cv-00105-DLM-MCD   Document 607-1   Filed 11/18/10   Page 31 of 54 PageID
Case 3:05-mc-00208-MCD   Document 7-1   Filed 08/14/2008   Page 31 of 53
#: 8700

*Joe's Pizza, Inc. v. Aetna Life and Cas. Co.*, 236 Conn. 863, 869-870, 675 A.2d 441 (Conn. 1996).

Significantly, this rule is also accepted in the First Circuit. *See McLaughlin v. Morton*, 977 F.2d 566 (Table) (1st Cir. 1992) (citing *Aetna Cas.*, 875 F.2d 1252 and §59(3)(b) of the Restatement for the rule that a "judgment in action brought by shareholder of closely held corporation is binding on corporation in later litigation, absent evidence of harm to another shareholder or creditor").

Therefore, by virtue of the fact that the PA was the sole owner of the PIF during the pendency of the Creditor's Bill proceeding (until the moment judgment was entered thereon), the PIF is estopped and bound by the judgment exactly as the PA itself.

Furthermore, application of estoppel is particularly appropriate in light three crucial facts obtaining here:

First, the PIF was not merely some business enterprise that happened to be the solely-owned property of the PA. Rather, as detailed above, the PIF was the holding company for the PA's own commercial assets, from which the PA was withdrawing tens of million dollars every month, including during the pendency of the Creditor's Bill proceeding. *See* Exhibit N. The PA therefore had an extremely strong incentive to defend the Creditor's Bill (if it had had any defense, which it did not).

Second, in a typical case, a judgment enters against the owner regarding some garden-variety issue, and then preclusion is sought against the corporation on that issue. *See e.g. Joe's Pizza,* 675 A.2d 441 (insurance entitlements). Here, by contrast, the very subject of the suit against the owner was the ownership of the corporation itself. Clearly, the PA's continued

Case 1:00-cv-00105-L-DLM Document 607-1 Filed 11/18/10 Page 32 of 54 PageID
Case 3:05-mc-00208-PCD Document 71-1 Filed 08/14/2008 Page 32 of 53
#: 8701

ownership of the PIF was an "issue[] that concern[ed] them in common," and thus their interests
"fully coincide[d]." *Id*. (quoting Comment (e) to § 59 of the Restatement).

Third, at the time the Creditor's Bill proceeding was pending, the CEO of the PIF was
Dr. Mohammed Mustafa. *See* LeBoeuf's Exhibit 7. But Dr. Mustafa wore two hats. In addition to
his position as CEO of the PIF, he was also the Economic Advisor to the PA. *See* Exhibits BB,
CC and DD at p. 4/11.

Thus, the PA and the PIF had not only a full identity of interests in respect to the
Creditor's Bill proceeding, but an identity of key personnel responsible for their financial affairs.
Indeed, the fact that the same person served as both the CEO of the PIF and Economic Advisor
to the PA – presumptively with no conflict of interest – is proof positive that the economic
interests of the PA and PIF were perfectly aligned. In light of these facts it would be absurd to
argue (as LeBoeuf may) that the PA and PIF were not in privity or that interests of the PIF were
not adequately represented by the PA.

Therefore, purely in the alternative, should the Court find that some right of the PIF was
somehow implicated by the Creditor's Bill proceeding, it can and should hold that the PIF is in
privity with the PA and so bound by the judgment just as the PA.

### d.    The Judgment Did Not Convey Property in Excess of Plaintiffs' Judgment

LeBoeuf also argues that the judgment is unconstitutional because it conveys to the
Ungars property in excess of their judgment. LeBoeuf Memo at 12. This argument fails for at
least three reasons.

First, this argument is based on a factual premise which is unproven because it is ***untrue***.
The solitary "proof" proffered by LeBoeuf that the PIF was worth more than the balance of the

Ungars' judgment (over $116 million) is the Forbes news report which the Ungars themselves submitted as Exhibit H to the Creditor's Bill. *See* LeBoeuf Memo at 12.

The Ungars submitted that Forbes article in support of the following allegation:

> At one time, the value of the PA assets held by the PIF and the PCSC exceeded the amount of the PA's judgment debt to the Ungars; however, the PA has recently encumbered over $500 million of these assets as collateral for loans, and upon information and belief the net unencumbered value of the remaining assets is now less than the amount of the Ungars' judgment. <u>See</u> Exhibit H.

Creditor's Bill, Exhibit R, at ¶ 17.

The PA did not dispute the allegation that the net unencumbered value of the PIF was less than the amount of the Ungars' judgment, and defaulted the Creditor's Bill. Accordingly, the truth of this allegation is deemed established as a matter of law. *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 771 F.2d 5, 13 (1st Cir. 1985).[17]

The PA did not deny this allegation for a simple reason: it could not. While the Forbes report was generally accurate in respect to the amount of assets that had been encumbered (which was the point which the Ungars sought to prove by means of the article) it was wildly mistaken about the gross value of the PIF portfolio.

As a recent World Bank report has confirmed (and as the Ungars were aware from other sources at the time), the PIF portfolio was ***not*** worth $1.4 billion in late 2005/early 2006, as Forbes reported, but $858 million. *See* Exhibit EE at p. 53. Of that $858 million, assets amounting to $561 million were encumbered. *Id*.

---

[17] It is obvious that in determining the value of a judgment debtor's property in the context of an enforcement proceeding, the relevant question is the net unencumbered value of the property, not the gross value. Thus, if a judgment debtor owns a $1 million home which is subject to an $800,000 mortgage, the home may fairly be conveyed to a person holding a $250,000 judgment against the homeowner.

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 08/4/2008   Page 34 of 54 PageID
Case 3:05-mc-00208-PCD   Document 7-1   Filed 11/18/10   Page 34 of 53
#: 8703

Thus, as of late 2005/early 2006, the net unencumbered value of the PIF was $297 million. However, as shown above, between January and September 2006, the PA withdrew another $156.14 million from the PIF. *See* Exhibit N.

Therefore, the net value of the PIF as of September 2006, when judgment entered on the Creditor's Bill, was $140.86 million not including additional assets collateralized by the PA during the first 9 months of 2006. Given the rate and extent of the PA's collateralization of the assets held by the PIF ($500 million in 2005 alone, *see* Ex. EE at p. 53) it is obvious that the net unencumbered value of the PIF as of September 2006 was far less than the value of the Ungars' judgment, and may well have been close to zero.

Thus, the allegation contained in ¶ 17 of the Creditor's Bill was absolutely correct, and it is wholly unsurprising that the PA did not deny it.

LeBoeuf has not offered an iota of proof to the contrary.

Second, LeBoeuf's argument here entirely ignores Judge Lagueux's order of September 13, 2006, directing entry of final judgment on the Creditor' Bill. *See* Exhibit T. That order directs the Ungars to file a satisfaction of judgment if, when and to the extent they succeed in recovering any of the PA funds held by the PIF. *Id.* at ¶ 4.

That order reflects the fact that ownership of the PIF, standing alone, is of no value whatsoever to the Ungars, since it is a non-liquid asset for which there exists no purchasers and so no market value.

On the other hand, however, the order prevents the Ungars from extracting from the PIF a penny more than their judgment (which in any case they have no desire or intention to do).

Therefore, if and when the Ungars succeed in collecting the full amount of their judgment, whether via the PA funds held by the PIF or otherwise, they will be required to file a

Case 1:00-cv-00105-L-DLM Document 607-8    Filed 11/18/10 Page 35 of 54 PageID
#: 8704
Case 3:05-mc-00208-PCD Document 7-1   Filed 03/14/2008 Page 35 of 53

full satisfaction of judgment, and will prohibited from seeking any further funds. Moreover, if
and when the underlying judgment is satisfied in full, the PA would be free to file appropriate
papers seeking to vacate the September 2006 judgment or to otherwise recover ownership of the
PIF (or to simply request that the Ungars convey ownership back to the PA, a request to which
the Ungars would agree).[18]

Thus, notwithstanding LeBoeuf's arguments, the Ungars have not been and cannot be
unjustly enriched, and the PA has not been and cannot be unjustly deprived of property, as a
result of the Creditor's Bill.

Third, even if the Creditor's Bill judgment somehow granted the Ungars a windfall
(which is not the case) the PIF has absolutely no standing to challenge that judgment. The only
party which could even attempt to is the PA. That is because it is not the alleged unjust
**enrichment** of the Ungars' which could potentially implicate a due process concern, but rather
the unjust **deprivation** of the PA of its property. The due process issue could not be the Ungars'
unfair gain, but the PA's unfair loss.

Therefore, the only party with standing to make this argument would have been the PA,
which under LeBoeuf's theory is the party which suffered a loss. Clearly, the PA's alleged losses
are simply none of the PIF's business.

e.     **The Additional Defects Asserted by LeBoeuf Are Meritless**

In addition to its Due Process-related arguments, discussed above, LeBoeuf also asserts
that the Creditor's Bill proceeding and the judgment thereon are invalid under Rhode Island law
because (a) the plaintiffs did not bring the Creditor's Bill as a "new civil action" and (b) the

---

[18] Indeed, the PA could redeem the PIF *today* if it wished to, simply by paying the underlying judgment. If the PA
did so, the Ungars would agree to vacate the judgment on the Creditor's Bill.

plaintiffs did not obtain an unsatisfied execution prior to filing the Creditor's Bill. LeBoeuf Memo at 14-16.[19]

These arguments can and should be rejected **summarily**, without even addressing their substance, for several reasons:

First, the PA itself, which is the only party whose rights were affected by the Creditor's Bill, failed to raise these objections, and so waived them. The PIF had and has no standing to object to the Creditor's Bill, because its rights are not affected, and therefore would not have had any basis to raise these arguments even it had sought to appear in the proceeding in Rhode Island. All the less so now, after judgment has entered.

Second, even assuming the PIF would have had some ground to oppose entry of judgment on the Creditor's Bill on the basis of these alleged procedural errors which the PA itself waived, the PA's failure to object binds the PIF, since they are in privity as discussed above.

Third, it is hornbook law, both in the federal courts and in Rhode Island, that a judgment may not be attacked collaterally merely because it is erroneous. *See e.g. Lubben v. Selective Service System Local Board No. 27*, 453 F.2d 645, 649 (1st Cir. 1972) ("A void judgment is to be distinguished from an erroneous one, in that the latter is subject only to direct attack. A void judgment is one which, from its inception, was a complete nullity and without legal effect. In the interest of finality, the concept of void judgments is narrowly construed ... Only in the rare

---

[19] Additionally, LeBoeuf claims in passing that the judgment purports to convey "shares" – apparently implying share certificates – which were not in Rhode Island and so beyond the Rhode Island court's jurisdiction. LeBoeuf Memo at 13. This assertion fails because in fact the judgment does *not* purport to convey physical share certificates (which in any case merely *evidence* ownership and can always be canceled), but rather "all of the Palestinian Authority's ownership rights" which are of course intangible and have no situs. *See* Exhibit U. In any case, a Rhode Island court can indeed transfer ownership of actual share certificates if it so desires (which was not the case here), since the Rhode Island creditor's bill statute allows the court to convey ownership of even tangible property located out of state. *See e.g. Desper v. Talbot*, 727 A.2d 1233 (R.I. 1999) (conveying interest in real property located in Massachusetts).

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 11/18/10   Page 37 of 54 PageID
Case 3:05-mc-00208-MCD   Document 7-1   Filed 03/14/2008   Page 37 of 38
#: 8706

instance of a clear usurpation of power will a judgment be rendered void."); *George v. Infantolino*, 446 A.2d 757, 759 (R.I. 1982) ("Once a judgment of a court having the requisite subject-matter jurisdiction has become final, it is a violation of the principles of res judicata to permit a collateral attack on the basis of error even though the error may be egregious").

Therefore, LeBoeuf's assertions regarding the absence of a "new" civil action and an unsatisfied execution – which even if true would amount to mere technical errors under Rhode Island procedural law – should be summarily disregarded.

In any event, these arguments fail on the merits:

LeBoeuf claims that R.I.G.L § 9-28-1 required the Ungars "to institute a new civil action" which, according to LeBoeuf, the Ungars did not do. LeBoeuf Memo at 15. While LeBoeuf does not clearly articulate this argument, it apparently means to say that the Ungars were required to pay a new filing fee and file the Creditor's Bill under a new caption and case number.

This claim is without merit. Section § 9-28-1 says nothing about a filing a "new" action. The term "new" was injected by LeBoeuf. Furthermore, Rhode Island precedent expressly demonstrates that once judgment enters, the judgment creditor may seek relief under § 9-28-1 simply by filing a motion in the underlying case:

> Evelyn filed a civil action in the Providence County Superior Court against Leah. …
>
> On July 25, 1997, summary judgment for $101,488.57 in Evelyn's favor was entered in her civil action claim. Execution on that judgment was issued on September 2, 1997, and was returned nulla bona--wholly unsatisfied. On September 5, 1997, <u>Evelyn filed a post judgment motion</u> … to reach and apply the Franklin property towards satisfaction of the July 25, 1997, judgment, pursuant to G.L. 1956 § 9-28-1.
>
> ***

37

> Evelyn, in her appeal, claims that the trial justice erred in concluding that the Superior Court lacked subject matter jurisdiction on her judgment creditor's equitable action brought pursuant to § 9-28-1. We agree.

*Desper v. Talbot*, 727 A.2d 1233, 1234 (R.I. 1999).

Clearly, then, the Ungars were entitled to file the Creditor's Bill under the caption of their underlying case, and LeBoeuf's claim to the contrary is baseless.[20]

LeBoeuf's argument regarding the absence of an unsatisfied execution is equally meritless. A creditor's bill was traditionally an equitable remedy. *Merchants' Nat. Bank v. Paine*, 13 R.I. 592 (R.I. 1882). As such, the creditor was not permitted such equitable relief until she had demonstrated that the debtor had no property in the jurisdiction subject to execution at law. *Id*. Accordingly, the creditor was typically required to present an unsatisfied execution, as evidence that no property subject to execution at law existed in the jurisdiction. *Id*.

Simply put, the purpose of requiring an unsatisfied execution is ***evidentiary***, i.e. to prove the absence of remedies at law.[21]

Therefore, under Rhode Island law, when it is clear on other grounds that the judgment creditor has remedy at law and that an execution would be futile – such as when the judgment debtor is located outside of Rhode Island and indisputably has no property in the Rhode Island – a creditor's bill is not conditioned on presentation of an unsatisfied execution:

> [V]ery clearly where no legal remedy exists, none can be exhausted, and the reason for the rule would cease, and with the reason the rule itself. "*Cessante ratione legis, cessat ipsa lex*."

---

[20] LeBoeuf's related argument that the PIF should have been made a party to the Creditor's Bill was addressed above.

[21] Actually, the court in *Merchants' Nat. Bank* articulates a second reason for requiring a return of the execution, which relates to the division of labor between courts of law and equity. *Id*. This rationale is obviously irrelevant here, and in most jurisdictions in this day and age.

Case 1:00-cv-00105-L-DLM   Document 607-8   Filed 11/18/2008   Page 39 of 54 PageID
Case 3:05-mc-00208-PCD   Document 7-1   Filed 08/14/2008   Page 65 of 38
#: 8708

*Merchants' Nat. Bank*, 13 R.I. 592 (excusing creditor from a return of unsatisfied execution since debtor is outside the state and has no property in the state).

Obviously, the PA and PLO have no presence in Rhode Island.[22] Furthermore, plaintiffs' Creditor's Bill expressly alleged that "Defendants PA and PLO have no assets in this jurisdiction and any execution issued on plaintiffs' judgment would be returned wholly unsatisfied" and that "delivering an execution to the United States Marshals Service would be a frivolous waste of resources, since there are no assets whatsoever against which plaintiffs could ask the Marshal to act." *See* Creditor's Bill, Exhibit R, at ¶ 10. The PA willingly defaulted the Creditor's Bill, and the truth of this allegation is therefore deemed established as a matter of law. *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 771 F.2d 5, 13 (1st Cir. 1985). Indeed, no one – not even LeBoeuf – claims that the PA or PLO have any assets in Rhode Island.

Accordingly, Rhode Island law did not require the Ungars to go through the futile effort of seeking execution at a law, since "where no legal remedy exists, none can be exhausted." *Merchants' Nat. Bank*, 13 R.I. 592.

Indeed, Judge Lagueux explicitly held that the PA has no assets in Rhode Island, and that that fact excused the Ungars from issuing an execution. *See* Exhibit X, p. 26 line 21 – p. 27 line 3.

As purported authority to the contrary, LeBoeuf cites *Plantations Indus. Supply v. O'Brien*, 379 A.2d 365 (R.I. 1977). LeBoeuf Memo at 14-15. But *Plantations* is wholly inapposite for several reasons. That case involved not a creditor's bill, but rather issuance of a "citation to show cause why installment payments should not be decreed" pursuant to R.I.G.L. § 9-28-3. That provision empowers the clerk of the court to issue an order ("citation") requiring the

---

[22] Personal jurisdiction was obtained in the underlying suit on the basis of the nationwide contacts of the PA and PLO, none of which were in Rhode Island. *See Ungar*, 325 F.Supp.2d at 47-59.

Case 1:00-cv-00105-L-DLM   Document 607-3   Filed 11/04/2008   Page 40 of 54 PageID
Case 3:05-mc-00208-PCD   Document 7-1   Filed 09/14/2008   Page 45 of 53
#: 8709

judgment debtor to show cause why a debtor's examination should not be conducted and installment payments ordered. § 9-28-3. Issuance of the citation is conditioned upon the return of an unsatisfied execution. *Id.*

The judgment creditors in *Plantations* caused an execution to issue, but their counsel, rather than the sheriff, signed the return stating that the judgment debtor had no assets. *Id.* at 428. The clerk of the court rejected this execution and refused to issue the citation, because it had not been returned by the sheriff. *Id.* The plaintiffs then sought mandamus relief directing the clerk of the court to issue the citation. The court held that the clerk was authorized to determine whether the execution had been properly served by the sheriff before issuing the citation, and that his authority was therefore discretionary and not subject to mandamus relief. *Id.* at 429.

Thus, the decision in *Plantations* is inapposite for multiple reasons:

First, *Plantations* had nothing whatsoever to do with a creditor's bill. A citation under § 9-28-3 is an *ex parte* court order disobedience of which is punishable by contempt. *See e.g. Rhode Island Hospital v. Collins*, 368 A.2d 1225 (R.I. 1977). A creditor's bill is not an order, but rather a civil action to reach and apply, which is served upon the judgment debtor in the usual manner, and which the judgment debtor is free to answer and litigate in due course. Issuance of an order under § 9-28-3 therefore implicates due process concerns requiring procedural safeguards which are completely irrelevant to a creditor's bill.

Indeed, there is not the slightest reason to believe that the rule governing creditor's bills set forth in *Merchants' Nat. Bank*, 13 R.I. 592 is no longer good law in Rhode Island.

Second, *Plantations* addressed only the question of whether the clerk could scrutinize whether the execution, when issued, has been served and returned by the proper party (i.e. the

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 11/18/10   Page 41 of 54 PageID
Case 3:05-mc-00208-MCD   Document 7-1   Filed 08/14/2008   Page 41 of 53
#: 8710

sheriff). The decision did not discuss, much less determine, whether in certain circumstances a citation could be issued absent any execution.

Third, and critically here, *Plantations* addressed only the question of whether the clerk can be required to issue a citation without a properly served execution. It did not address whether a citation issued by the clerk absent such an execution would be valid <u>after the fact</u>, or whether an installment order <u>issued by a court</u> subsequent to and on the basis of such a citation would be valid.

Therefore, even assuming *arguendo* that the execution requirement for a creditor's bill could be analogized to that for a citation – a proposition for which LeBoeuf provides no support and which is specious given the drastically different nature of the two procedures – nothing in *Plantations* indicates that the absence of an unsatisfied execution against the PA renders the filing of the Creditor's Bill – and all the less so Judge Lagueux's subsequent entry of judgment thereon – invalid even ***after*** the fact.

***

In light of all the above, it is clear that the judgment on the Creditor's Bill is valid, that the Ungars are the owners and officers of the PIF, that Mr. Tolchin (not LeBoeuf) is counsel for the PIF, and that the PIF, through its authorized counsel Mr. Tolchin, has consented to the Ungars' Motion for Turnover and Appointment of a Receiver.

Accordingly, the Court can conclude its analysis here, grant the Ungars' motion as unopposed, and deny (or more appropriately: strike) the motion filed by LeBoeuf purportedly on behalf of the PIF.

Alternatively, if the Court finds for some reason that the judgment on the Creditor's Bill is not valid and/or that Mr. Tolchin does not represent the PIF (an eventuality which the

plaintiffs respectfully believe to be very unlikely) – in other words, if the Court finds that the Ungars are regular garden-variety judgment creditors, that LeBoeuf represents the PIF and that this case is therefore contested – it should grant the Ungars' motion and deny LeBoeuf's motion to dismiss on the merits, for the reasons set forth below.[23]

## III.  THE COURT HAS SUBJECT-MATTER JURISDICTION TO GRANT THE RELIEF SOUGHT BY THE UNGARS

LeBoeuf seeks to dismiss this case for lack of subject-matter jurisdiction, because under *Peacock v. Thomas*, 516 U.S. 349, 116 S. Ct. 862 (1996) a federal court's ancillary subject-matter jurisdiction does not extend to alter ego claims, and because, according to LeBoeuf, the relief sought by the Ungars in this action necessarily requires the Court to make an alter ago finding. LeBoeuf Memo at 16-17.

LeBoeuf is 100% right on the law: if this action required the Court to make an alter ago determination it would have to be dismissed.[24]

But LeBoeuf is 101% wrong in claiming that this action requires or that the Ungars seek any such determination. Where, as here, an asset is titled to a third party, the judgment creditor can potentially reach the asset in one of two distinct ways:

(i)  By showing that the third party itself is liable for the judgment, because the third party is an alter ego of the judgment debtor or because the corporate veil between the judgment and the third party should be pierced ("Scenario 1"); or

ii)  By showing that the asset remains the property of the judgment debtor itself, despite the fact that it is titled to the third party. Typically this is done by demonstrating that the

---

[23] Since, one way or the other, the PIF is represented in this case, the Court could in theory by-pass the questions of whether the Ungars are the owners and officers of the PIF (i.e. by-pass LeBoeuf's challenges to the Creditor's Bill judgment), assume without deciding that this case is contested and grant the Ungars' motion on the merits as a regular judgment enforcement proceeding, if it found that a simpler and more efficacious way of proceeding.
[24] Nor do the Ungars dispute that the PIF is a separate legal entity, as LeBoeuf argues heatedly in its papers.

Case 1:00-cv-00105-L-DLM Document 607-1 Filed 11/18/2008 Page 43 of 54 PageID
Case 3:05-mc-00208-PCD Document 7-1 Filed 08/14/2008 Page 43 of 53
#: 8712

conveyance of the asset to the third party was fraudulent, or that the third party is holding the

asset as a trustee of the judgment creditor (i.e. constructive trust or resulting trust theories)

("Scenario 2").

In other words:

**In Scenario 1** the judgment creditor prevails even though the asset is the property

of the third party, because the third party is found liable for the judgment;

**In Scenario 2** the judgment creditor prevails even though the third party is not

liable for the judgment, because the asset titled to the third party actually belongs to the

judgment debtor.

The leading Second Circuit case interpreting and applying *Peacock* is *Epperson v.*

*Entertainment Express, Inc.* 242 F.3d 100 (2nd Cir. 2001). In *Epperson*, the Second Circuit

explained that *Peacock* established a simple bright-line rule: As long as the judgment creditor is

claiming only that the asset titled to the third party belongs to the judgment debtor and not that

the third party is liable for the judgment (i.e. Scenario 2) the court has ancillary jurisdiction.

*Epperson,* 242 F.3d at 103-107. *See also UFCW Local 174 Commercial Health Care Fund v.*

*Homestead Meadows Foods Corp.*, 425 F.Supp.2d 392, 393 (S.D.N.Y.2005) ("Because the

plaintiffs seek to collect a judgment issued by this Court by tracing the judgment debtor's assets

into the hands of a third party, there is subject matter jurisdiction over this action.") (emphasis

added); *Aaron v. Mattikow*, 225 F.R.D. 407, 415 (E.D.N.Y. 2004) (holding that ancillary action

by judgment creditor to reach stock titled to judgment debtor's wife "is proper under both

*Peacock* and *Epperson*, for this Court's exercise of ancillary jurisdiction" and denying motion to

dismiss for lack of subject-matter jurisdiction); *Securities & Exchange Comm'n v. Antar,* 120 F.

Supp. 2d 431, 440 (D.N.J. 2000) (holding a proceeding seeking "to reach assets belonging to the

judgment debtor but found in the hands of" third parties is "is exactly the sort of claim approved in *Peacock*"); *Merrell v. Miller*, 1998 WL 329264, at * 2 (E.D.Va. 1998) (permitting claim to proceed on basis of *Peacock* since "plaintiff does not allege that he should be able to satisfy his judgments by reaching Ms. Deal's assets or Ms. Locher's assets; rather, he alleges that the assets in question rightly belong to defendant Miller.").

The Ungars assert that all assets titled to the PIF belong to the PA because they were <u>never purported to have been conveyed</u> to the PIF. As shown in above, this assertion is expressly supported by the PIF, PA, the IMF and the World Bank.

Notably, *Epperson* held that even a fraudulent conveyance claim is within a court's ancillary subject-matter jurisdiction. *Id*. Thus, as a matter of simple logic, since ancillary subject-matter jurisdiction permits a court to determine <u>even</u> whether an asset was <u>conveyed fraudulently</u>, it must also – *a fortiori* – permit a court to determine that <u>an asset was never purported to have been conveyed at all</u> – which is precisely what the Ungars are asserting here (and what all the evidence demonstrates).

If it is necessary to give a formal legal label to PIF's function vis-à-vis the assets of the PA, then, as the facts shown above demonstrate, the PIF is best defined as a trust established to hold and invest the PA's commercial assets. Under *Epperson* the Court clearly has jurisdiction to order turnover against assets of the judgment debtor held in trust, since in doing so it merely determines that the asset titled to the third party belongs to the judgment debtor, and not that the third party is liable for the judgment. *Epperson,* 242 F.3d at 103-107. *See also UFCW Local 174 Commercial Health Care Fund*, 425 F.Supp.2d at 393 ("Because the plaintiffs seek to collect a judgment issued by this Court by tracing the judgment debtor's assets into the hands of a third party, there is subject matter jurisdiction over this action."); *Clarinda Color LLC v. BW*

*Acquisition Corp.*, 2004 WL 2862298 (D.Minn. 2004) (trust theories are within court's ancillary enforcement jurisdiction).

At bottom, LeBoeuf's argument is that when an asset is titled to a third party the only way to reach that asset is through an alter ego theory. That was precisely the argument rejected in *Epperson*.

The decisions in *Knox v. Orascom Telecom Holding S.A.E.*, 477 F.Supp.2d 642 (S.D.N.Y. 2007) *reconsideration denied* 242 F.R.D. 251 (S.D.N.Y. 2007), upon which LeBoeuf seeks to rely, are easily distinguished. *Knox* was a plenary action based upon a complaint, and the court did not examine the <u>facts</u> of the case based on evidentiary submissions (as here) but rather ruled on the basis of the facial allegations of the complaint. In *Knox*, the garnishee argued, and the court agreed, that the plain language of the complaint asserted an alter ego and/or veil-piercing claim: "Orascom … argues that in asserting that the PIF is a 'shell entit[y]' owned and controlled by the PA, Plaintiffs clearly seek relief based on a new theory of liability." *Knox*, 477 F.Supp.2d. at 646.

On *that* basis – i.e. the language of the complaint, which the court found to imply an alter ego or veil-piercing claim, rather than the facts – the case was dismissed. *Id.* at 648-649. The court reiterated this finding upon reconsideration. *See Knox*, 242 F.R.D. 251.

The Ungars do not make any such "shell entity" allegations here, for the simple reason that the question of the PIF's corporate status is utterly irrelevant to this case: the Ungars allege here – as they have consistently alleged from day one and as the evidence clearly shows – *only* that the assets at issue (the partnership rights in Canaan) are the property of the PA, and *not* that

the PIF is liable for the judgment against the PA. Thus, the *Knox* is materially distinguishable – and so inapposite.[25]

In the face of all the evidence clearly demonstrating that the Canaan investments remain the property of the PA despite being held under the name of the PIF – including the PIF's own 2003 report and the PA's affidavits submitted to the Israeli courts – it is obvious that no alter ego determination is necessary in this case, and that the Court has subject-matter jurisdiction to order execution against these assets. *Securities & Exchange Comm'n,* 120 F. Supp. 2d at 440 (a proceeding seeking "to reach assets belonging to the judgment debtor but found in the hands of" third parties is "is exactly the sort of claim approved in *Peacock*").

## IV.    THE ASSETS AT ISSUE ARE WITHIN THE COURT'S JURISDICTION

Finally, LeBoeuf asserts that the partnership interests in Canaan are located outside of the United States and so are beyond the jurisdiction of this Court. LeBoeuf Memo at 18-21. This argument fails for multiple reasons:

First, there are two categories of assets at issue here: (a) the underlying partnership interests in Canaan Equity II and III and (b) cash distributions held by Canaan totaling nearly $200,000 currently held by Canaan. *See* Exhibit K.

LeBoeuf does not argue (because it cannot even attempt to do so) that the cash distributions are beyond the Court's jurisdiction. Accordingly, the cash can and should be turned over, irrespective of the LeBoeuf's claims regarding the partnership interests.

Second, LeBoeuf's argument regarding the partnership interests fail because they are intangible rights that have no physical situs.  The Canaan limited partnership agreements create intangible obligations and debts vis-à-vis the limited partners, and it is long and well established that debts and obligations are intangible and have no fixed situs. They are located for

---

[25] In any event, the Ungars respectfully believe that *Knox* (which is now on appeal) was wrongly decided.

jurisdictional purposes wherever a court has jurisdiction over the debtor or obligor. The leading case establishing this principle is *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625 (1905). As one federal court explained:

> [F]or purposes of determining the amenability of property to garnishment or other collection process, the location, or situs, of an intangible, or more specifically, a "debt," is a concept which is different from that of the location of tangible property. The location of the latter is its actual physical location, while the former has no material existence, and, therefore, has no physical location. A debt is considered located in any (and every) state where the garnishee may be sued, i.e., where personal jurisdiction over the garnishee may constitutionally be exercised. *Harris v. Balk,* 198 U.S. 215, 223, 25 S.Ct. 625, 626-27, *overruled on other grounds by Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569 (1977).

*In re McAllister*, 216 B.R. 957, 974 n.12 (N.D.Ala. Bkrtcy. 1998). *See also Champion Intern. Corp. v. Ayars*, 587 F. Supp. 1274 (D.Conn 1984) ("Under Supreme Court and Second Circuit cases, the *Harris v. Balk* case is valid to the extent that when debtor is sued in court with personal jurisdiction of the debtor, debt has its situs in that jurisdiction.").

The partnership rights are intangible contractual rights. They are not embodied in any instrument, and the partnership contracts themselves merely ***evidence*** the contract between the parties. Therefore, if the Court has jurisdiction over the Canaan – upon which rests the obligation of performance – it has jurisdiction over the partnership interests:

> [T]he attachment here … seeks to reach intangible personal property belonging to LTD – its interest in the Licensing Agreement. The situs of that intangible property is in New York where there is to be found the other party to the Licensing Agreement, INC, upon whom rests the obligation of performance. Tangible personal property obviously has a unique location and can only be attached where it is. It is true that some intangibles are deemed to have become embodied in formal paper writings, e.g., negotiable instruments, and in such instances attachment depends on the physical presence of the written instrument within the attaching jurisdiction (e.g., CPLR 5201, subd. (c), par. 4; 6202). No fact of physical location or concept of embodiment applies, however, to intangible property in an ordinary contract, written or

oral; if in writing, that writing is only the evidentiary manifestation of the contract between the parties; it is not the contract itself.

*ABKCO Industries, Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 675, (1976). *See also Levin v. Tiber Holding Corp.,* 277 F.3d 243, 249 (2nd Cir. 2002) (same) *Dorr-Oliver, Inc. v. Willett Associates*, 153 Conn. 588, 219 A.2d 718 (Conn. 1966) (Court has jurisdiction to render judgment against garnishee, a foreign corporation over which personal jurisdiction had been obtained, even though alleged indebtedness did not arise in state.).

Indeed, in *Parker, Peebles & Knox v. National Fire Ins. Co.*, 111 Conn. 383, 150 A. 313 (Conn. 1930) the court held:

> It may be stated as a general proposition of law that debts, being intangible, have no strictly legal situs, though for most purposes they are given the situs of the creditor. However, for purposes of attachment by foreign creditors, they are by a legal fiction generally regarded as located where the debtor resides … We hold the law of this state to be in accord with the conclusion of the United States Supreme Court in the case of *Harris v. Balk*, 198 U.S. 215, 25 S. Ct. 625, 626 …
>
> ***
>
> The obligation of the insurance company to pay El Saieh attached to the debtor at all times after the fire, and in all places, whether in Haiti or Connecticut, or indeed at any other place where the company had a legal location and in a jurisdiction to which it had submitted itself.

*Id*. at 316.

There is no question whatsoever that the debtors/obligors, Canaan Equity II and Canaan Equity III, are subject to the personal jurisdiction of this Court for the simple but dispositive reason that they have filed a Claim for Determination of Interests in Disputed Property pursuant to Conn. Gen. Stat. §52-356(c).[26] The Claim for Determination of Interests seeks affirmative

---

[26] Significantly, the claim for determination was also filed by the General Partner of the Canaan Equity funds, Canaan Offshore Management N.V.. *See* Statement in Support of Canaan's Claim for

Case 1:00-cv-00105-L-DLM Document 607-1 Filed 11/18/10 Page 49 of 54 PageID
Case 3:05-mc-00208-PCD Document 71-1 Filed 03/14/2008 Page 45 of 50 PageID
#: 8718

relief from this Court – i.e., that the Court determine the respective interests of the various
claimants in the partnership interests, including Canaan's own rights (e.g. to oppose turnover, to
dilute, to receive capital calls, etc.) in respect thereto. *See* Canaan's Claim for Determination,
dkt. # 5, at 12-13.

Critically, Conn. Gen Stat. §52-356(c)(b) expressly provides that a Claim for
Determination of Interests constitutes an "appearance."

The Canaan partnerships have therefore appeared and submitted themselves to the
personal jurisdiction of this Court, and the intangible debts and obligations of the Canaan
partnerships vis-à-vis the limited partners – i.e. the partnership interests which the Ungars seek to
sell through a receiver – are thus clearly under the jurisdiction of this Court. *Parker, Peebles &
Knox*, 111 Conn. at 316.

The fact that the Canaan partnerships are registered in the Netherlands Antilles, and that
those debts and obligations arise from contracts governed by Netherlands Antilles law, as
LeBoeuf's argues, is completely irrelevant to Canaan's submission of those debts and obligations
to this Court's jurisdiction. The result would be the same if a California partnership filed a claim
for determination of interests in this Court. The issue is not the scope and substance of the
partnerships' obligations to the Palestinian partners, but the Ungars' right to execute against
those obligations – whatever their scope and substance might be under Netherlands Antilles
law.[27]

---

Determination of Interests, at 1 and 3, dkt # 5. Thus, to the extent that the General Partner should be
considered the obligor/debtor, it too is subject to this Court's jurisdiction.

Notably, both Mr. Tolchin and LeBoeuf have filed a Claim for Determination of Interests on behalf of PIF. Thus,
one way or the other, the PIF itself has also appeared in this case and submitted itself to the jurisdiction of the Court.

[27] Notably, <u>performance</u> of the obligations by the Canaan partnerships – i.e. payment of distributions to
the PIF – is not linked in any way to the Netherlands Antilles. Payment of the partnership distributions to

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 08/04/2008   Page 50 of 54 PageID
Case 3:05-mc-00208-PCD   Document 7-1   Filed 10/18/2008   Page 55 of 58
#: 8719

Likewise, LeBoeuf's *ipse dixit* attempt to analogize the partnership interests to corporate stock is also meritless. Stock is stock and limited partnership interests are something else entirely. Moreover, critically, the limited partnership interests are not represented or evidence by share certificates with a physical situs.

Finally, the cases cited by LeBoeuf do not support its claims. LeBoeuf cites *Barna v. Schreck*, 2000 WL 1196437 (Conn.Super. 2000), which held that a court cannot attach property located outside of the state. Aside from the fact that the assets at issue here are intangible obligations which are not "located" anywhere but are subject to execution in any court having jurisdiction over the obligors (Canaan), *Barna* is not good law, as this Court expressly found:

> Defendant erroneously contends that because NTP is a foreign corporation that holds no assets within the State of Connecticut, NTP's assets cannot be attached. (*See* Dkt. 9, at 3-4 & Exh. A). This Court has personal jurisdiction over NTP; thus, "if justice and the reasonable demands of the situation warrant," this Court "may order the defendants to do or refrain from doing, certain acts in another state." *Fleming v. Gray Manufacturing Co.,* 352 F.Supp. 724, 726 (D.Conn. 1973)(multiple citations omitted). Moreover, it is within this Court's power to "effectuate a [prejudgment remedy] issued under Connecticut law by ordering the parties over whom the [C]ourt has in personam jurisdiction" to bring such assets into Connecticut for purposes of attachment. *Hamma v. Gradco Sys., Inc.,* 1992 WL 336740, at *2, 1992 U.S. Dist. LEXIS 17601, at *8-9 (D.Conn. Nov. 4, 1992) (citation omitted) …
>
> Defendant relies on a medical malpractice case, *Barna v. Schreck*, 2000 WL 1196437, at *1, 2000 Conn.Super. LEXIS 1965, at *4, to support its contention that its property is not subject to attachment. In that case, Judge Radcliffe noted that "plaintiff had pointed to no authority which would validate an attachment of real or personal property located in another jurisdiction." *Id*. As stated above, such authority exists in this District.

---

the PIF was to be made to bank accounts in New York and Cairo, further illustrating that the partnership obligations have no situs. See Exhibit FF.

Case 1:00-cv-00105-L-DLM   Document 607-1   Filed 11/18/40   Page 51 of 54 PageID
Case 3:05-mc-00208-MCD   Document 7-1   Filed 08/14/2008   Page 5 of 58
#: 8720

*Lyons Hollis Associates, Inc. v. New Technology Partners, Inc.*, 278 F.Supp.2d 236, 246-247
(D.Conn. 2002).

    LeBoeuf also cites four New York cases. These cases are all inapposite, in the first place,
because under Fed.R.Civ.P. 69 the amenability of the assets at issue here to execution is
governed by Connecticut, not New York law. These cases are also easily distinguishable on the
facts. The decision in *Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guarantee
Corp.*, 921 F. Supp. 1113 (S.D.N.Y. 1996) is inapposite because it dealt with assets of a "foreign
state," and specifically noted that it was conducting an "analysis of the location of the accounts
under the principles of sovereign immunity." *Id.* at 1118. Also, the assets in *Fidelity Partners*
were bank accounts, subject to the "separate entity" rule. The asset at issue here is a simple
contractual obligation, not a bank account. In *Mones v. Commercial Bank of Kuwait, S.A.K.*, 399
F.Supp.2d 310, 317-318 (S.D.N.Y. 2005), the judgment creditor himself deemed the accounts at
issue "Property of Judgment Debtors" (*id.* at 312) and the court therefore conducted its entire
analysis under CPLR § 5225, which governs property, and did not reach, much less decide,
whether the accounts were intangible "debts" subject to turnover under CPLR § 5227. In *Koehler
v. Bank of Bermuda Ltd.*, 2005 WL 551115 *13 (S.D.N.Y. 2005) the assets at issue were actual
share certificates – i.e. property, not a debt. Property – unlike contractual obligations – does
indeed have situs. Nor is *Palestine Monetary Authority v. Strachman*, Index No. 107777/05,
2007 WL 1063867, at *6 (N.Y. Sup. Ct. Apr. 2, 2007) of any assistance to LeBoeuf since the
court there determined that the assets at issue there were "property" being held by the PA's
central bank in the Palestinian territories.

    In any event, these cases applied New York law, which is irrelevant to this case.

    In sum, this Court therefore has jurisdiction over the partnership interests at issue, as well
as the cash distribution.

51

## V.     CONCLUSION

The Ungars' motion should be granted and LeBoeuf's motion should be denied.

Plaintiffs-Judgment Creditors,
by their Attorneys,

/s/ David J. Strachman
David J. Strachman
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

Stephen P. Wright
Harlow, Adams & Friedman, P.C.
300 Bic Drive
Milford, CT 06460
(203) 878-0661
(203) 878-9568 (fax)
spw@quidproquo.com

## CERTIFICATION OF SERVICE

On August 14, 2008 the following counsel of record were served this pleading via ECF:

Robert F. Maslan, Jr.
9 Old King's Highway South
P.O. Box 37
Darien, CT 06820

Robert A. Alessi
Mary McCann
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, NY 10005-1702

Thomas G. Rohback
Gail L. Gottehrer
LeBoeuf, Lamb, Greene & MacRae
225 Asylum St.
Hartford, CT 06103

Case 1:00-cv-00105-L-DLM   Document 607-8   Filed 11/18/10   Page 53 of 54 PageID
#: 8722
Case 3:05-mc-00208-MCD   Document 1-21   Filed 03/14/2008   Page 53 of 58

Anthony Rosato Minchella
Anthony R. Minchella, LLC
530 Middlebury Rd., Suite 209B
Middlebury, CT 06762

Robert Tolchin
Jaroslawicz & Jaros, LLC
225 Broadway, 24th Floor
New York, New York 10007

Charles L. Kerr
Mark D. McPherson
Morrison & Foerster
1290 Avenue of the Americas
New York, NY 10104-0050

/s/ David J. Strachman

# Exhibits A – FF

## Oversized Exhibits to Be Filed by Hand