UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE PALESTINIAN AUTHORITY, et al., ) <br> ) <br> Defendants. ) <br> ) | C.A. No. 00-105L |

**DEFENDANTS OPPOSITION TO PLAINTIFF-JUDGMENT CREDITORS'**
**FIRST MOTION IN LIMINE**

In their First Motion in Limine, Plaintiffs (the "Ungars") seek to preclude the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") (collectively, the "PA/PLO," or "Defendants") from presenting arguments, evidence, or testimony at the January 18, 2011, hearing on Defendants' Rule 60(b)(6) motion regarding the following: (1) whether the Ungars' Israeli law claims are "viable," and (2) whether the amount of the judgment entered in this action ($116 million) for Mr. Ungar's death was "erroneous." *See* Dkt. No. 585 at 1 (Motion).  The Ungars maintain that their entitlement to damages under their Israeli law claims was "already litigated" and that Defendants waived their right to litigate the amount of the damages.  Dkt. No. 586 (Memorandum) at 4-5, 6.

As their motion in limine demonstrates, the Ungars are intent on shielding their $116 million judgment from the scrutiny imposed by adversarial testing.  But, as discussed below, the

1119523.1

Ungars' position cannot be reconciled with the procedural history of this lawsuit, the law governing motions to vacate default judgments, or the First Circuit's remand decision.[1]

Because the Israeli law claims did not give rise to any of the damages awarded in the $116 million default judgment against the Defendants and are therefore of secondary importance, Defendants will address Plaintiffs' arguments regarding the $116 million Anti-Terrorism Act judgment before turning to their first argument regarding the Israeli law claims.

## I. Defendants Are Not Precluded from Challenging the Amount of the Judgment.

### A. The Propriety of the Amount of the Damages Award Has Not Been "Actively Litigated"; the $116 Million Judgment Resulted from Defendants' Default.

Plaintiffs assert that "the propriety of the amount of the judgment was actively litigated in the underlying proceedings." Dkt. No. 586 at 6. Plaintiffs apparently have selective amnesia regarding the default nature of the judgment they were awarded. Consistent with their decision to not litigate liability, Defendants also did not litigate the damages. As then defense counsel Ramsey Clark informed the Court at the August 22, 2003 hearing:

> [The PA and PLO] did not participate in the hearing on default and damages for Hamas, and we do not intend to participate. Our instructions have been that we would not participate. We informed this court on April 1st [2003] that those were our instructions, and it[']s been reinformed a couple of time[s] . . . . We do not seek to examine any of their witnesses if they appear and if they don't appear, because our instructions are that we should not participate in the proceedings until there has been a final decision on immunity.

---

[1] The Ungars' First Motion in Limine also is inconsistent with their Memorandum in Response to Defendants'-Judgment Debtors' Motion for Leave to Take Discovery on Whether the Damage Award Would Withstand Adversarial Testing, Dkt. No. 503, where Plaintiffs stated they "will not oppose (without waiving or derogating from their position as set forth above) defendants' motion to permit them to take some damages discovery," in part "because the Ungars do not want to hand defendants the opportunity to assert on appeal . . . that they were improperly deprived of all discovery regarding damages." *Id.* at 2.

*See Estates of Yaron Ungar and Efrat Ungar v. Palestinian Authority*, 325 F. Supp. 2d at 15, 66-67 (D.R.I. 2004) (quoting Tr. of 8/22/03 hearing at 25-26) (first alteration added).  Based on Mr. Clark's statement at the August 2003 hearing, Magistrate Judge Martin concluded that the "Palestinian Defendants have waived a hearing on damages" and accordingly "appl[ied] the findings regarding damages which it made as to each Plaintiff based on the evidence presented at the July, 2002, hearing on the Motion to Enter Default Judgment against Hamas . . . to the present Motions for Default Judgment." *Id.* at 67.

Plaintiffs' claim that the "amount of the judgment was actively litigated in the underlying proceedings" -- bizarre as it is -- rests solely on a one-paragraph statement in a three-page objection Defendants filed to Magistrate Judge Martin's report and recommendation.  Dkt. No. 271.  According to Plaintiffs, as a result of these objections, Defendants "forever waived any and all challenges to the assessment of damages other than the arguments included in their objections."  Dkt. No. 586 at 6.  Plaintiffs are silent on the nature of the objections, which as to the damages award consisted solely of the following statement:

> Defendants the PA and PLO object to the Report's recommendation that multi-million dollar amounts be awarded as compensation for the death of one person in the context of an ongoing conflict in which thousands of innocent civilians on both sides have been killed without any hope of compensation; compensation on such an excessive scale is inappropriate particularly in the case of a person living permanently in Israel or Palestine during the ongoing Israeli-Palestinian conflict and belligerent occupation of Palestinian territories and where the ultimate burden of the compensation must be borne by an impoverished and oppressed people undergoing continuing humanitarian crises.  The law should not instigate or require such disproportionate compensation.

Dkt. No. 271 at 3.

The filing of a one-paragraph objection on political grounds to the damage award does not, Plaintiffs' position to the contrary, transform the $116 million damage award from one

3

resulting from Defendants' default to one that was "actively litigated." This is so for the simple reason that, in "the case of a judgment entered by . . . default, none of the issues is actually litigated." *Ariz. v. Cal.*, 530 U.S. 392, 414 (2000) (quoting Rest. 2d of Judgments, § 27).

Refusing to acknowledge how they came about their $116 million judgment, Plaintiffs argue: "It is well established that Rule 60(b) may not be used to relitigate issues already decided in the underlying case or on appeal." Dkt. No. 586 at 4. Plaintiffs follow this statement of the law with a lengthy string cite. *Id.* at 4-5. Rule 60(b) is, of course, often used to seek relief from non-default judgments where issues *were* actually litigated in the underlying case or appeal. As one would expect -- given that they involve issues that were litigated -- not one of the cases Plaintiffs cite involves a default judgment. A few examples should suffice. In *Dasey v. Massachusetts Department. of State Police*, 111 Fed. Appx. 620 (1st Cir. 2004), cited at page 4 of Plaintiffs' brief, the district court had granted the defendants' motion for summary judgment, and the First Circuit had affirmed on appeal. The plaintiff then filed Rule 60(b) motions with the district court seeking reconsideration of the grant of summary judgment, which the First Circuit had already affirmed. It was in that context that the First Circuit stated: "Dasey may not use a Rule 60(b) motion to relitigate issues already decided by this court, *Dasey v. Anderson*, 304 F.3d 148, 151 (1st Cir. 2002)." *Dasey*, 111 Fed. Appx. 620. In *George P. Reintjes Co., Inc. v. Riley Stoker Corp.*, 71 F.3d 44, 45 (1st Cir. 1995), also cited at page 4 of Plaintiffs' brief, the First Circuit held that newly discovered evidence of perjury during an earlier arbitration proceeding did not justify Rule 60(b)(2) relief from the district court judgment adopting the arbitration decision where the movant failed to seek relief within the one-year time limit imposed for motions brought under that provision of Rule 60(b).

### B. The First Circuit Already Has Rejected Plaintiffs' Position that the Damages Award May Not Be Challenged.

In addition to being based on a false premise (i.e., that the propriety of the amount of the damages award was already litigated), Plaintiffs' effort to preclude Defendants from challenging the amount of the judgment also is directly inconsistent with the First Circuit's remand decision in the instant litigation.

In its March 25, 2010 decision, the First Circuit generally concluded that a Rule 60(b)(6) determination requires "a holistic appraisal of the circumstances." *Ungar v. Palestine Liberation Org.*, 599 F.3d 79, 84 (1st Cir. 2010). The First Circuit then laid out the parties' "substantial dispute" about what factors should be considered as part of that appraisal, including Defendants' view that "the amount of the judgment [would be] unlikely to withstand adversarial testing." *Id.* at 86. While declining to decide whether any of Defendants' arguments would "ultimately carry the day," the Court of Appeals found that they were "substantial." *Id.* And it ultimately held that Defendants' "asseverational array deserves full-throated consideration." *Id.* at 86-87. In reaching its decision, the First Circuit did not limit this Court's consideration of Defendants' Rule 60(b)(6) motion to any particular factors (for example, their merit-based defenses), nor did it preclude Defendants from advancing any of the factors presented in its "asseverational array," which specifically included the amount of the judgment. *Id.* at 87. Plaintiffs' argument -- that Defendants should be precluded from raising one factor, the amount of judgment, out of many -- attempts to impose the very type of "hard-and-fast rule[]" that the Court of Appeals found to be "[in]compatible with Rule 60(b)(6) determinations." *Id.* at 84.

The premise of the Ungars' First Motion in Limine is that "these matters" -- including the propriety of the amount of the judgment -- were "already litigated in the underlying action." Dkt. 586 (Memorandum) at 1. At the January 2010 oral argument on Defendants' appeal of this

5

Court's denial of their Motion to Vacate the Default Judgment, there was discussion about whether the $116 million award would survive adversarial testing and whether the propriety of the award was a proper consideration in the Rule 60(b)(6) context. At one point, Plaintiffs' counsel argued that Defendants were barred from challenging the damages award because the reasonableness of the damages award was "already litigated." Counsel's argument fell on deaf ears, with all three judges on the panel rejecting the notion that the propriety of the damages award was "law of the case" and Judge Selya characterizing Plaintiffs' argument as "the most rank kind of bootstrapping": [2]

> Justice Souter: How could we do that [*i.e.*, affirm the denial of the vacatur motion,] for example, given the -- I'll just take one factor -- given the amount of the judgment? You are engaging, for example, at the beginning of your argument in an explanation of why the judgment is as high as it is and you may well be right but we're also dealing with a wrongful death case -- two deaths and a recovery well in excess of $100 million.[3] That's not a kind of slam dunk, the basis for a slam dunk argument that that factor could only be weighed or is so obviously discounted by others that it doesn't give them a reasonable argument to make -- isn't that so?
>
> Mr. Strachman: The issue with respect to the amount of the judgment -- when the defendants notified the court that they did not want to cross-examine witnesses -- did not want to participate in any proving up, if you will, of any damages.
>
> Justice Souter: But that's derivative of the willfulness argument.
>
> Mr. Strachman: That was already litigated. They had an opportunity to address those issues when they took their second appeal after the judgment entered and they addressed the impact,

---

[2] The following account of the argument before the First Circuit is counsel's transcription of the audio, a copy of which has been sent on CD to the Court and Plaintiffs' counsel simultaneous to the filing of this document. The portion transcribed above begins at 35:48 of the file and ends at 40:33.

[3] In fact, the damage award is for one, not two, deaths. Although Efrat Ungar also died in the Hamas attack on Yaron Ungar, she was not a U.S. national, so her "estate, survivors, or heirs" were not entitled to compensation under the Anti-Terrorism Act, 18 U.S.C. § 2333(a). *See Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 97 (D.R.I. 2001).

alleged impact, on the Palestinian government at the time. So we believe that issue has already been litigated. They should not have an opportunity to re-litigate that again in this forum . . . and the cases are replete with --

Justice Souter: So, you're saying basically "law of the case."

Mr. Strachman: It's the law of the case many times, repeatedly, not just once. There were four motions to dismiss in the case. There were 279 pleadings before the default judgment (default judgment in the most technical sense) entered. Here, we are now literally five years later - five and a half years later - after the judgment entered.

Judge Lipez: Counsel, I thought that, you're referring to the prior appeal. The issues there were justiciability, immunity, and whether the district court made a mistake in the language it sequenced its immunity ruling and discovery. I don't -- even on a law of the case principle -- I don't see anything in that decision which would preclude the kind of analysis of all the factors that go into whether this judgment should be vacated.

Mr. Strachman: If they didn't like the damage calculation which was extensively documented first by Judge Martin, then by Judge Lagueux, and by the way the damage calculation though large is entirely consistent with foreign sovereign immunities terrorism cases, ATA terrorism cases and the only reason they are large is because the statute allows for so many defendants, excuse me, so many plaintiffs, and also because the damages are trebled, and if you reduce it back, it's not large at all, it's trebled because the statute allows trebling and there are so many plaintiffs that are allowed -- not only the estate, the orphans, the family members, the parents, and the siblings. They had an opportunity to litigate --

Judge Selya: Isn't that the most rank kind of bootstrapping. Here they are -- they are coming in and saying this was a mistaken strategy by a regime that went out of control and this case -- this case wasn't defended and we now have a sensible regime in place -- that's what they say -- that's trying to affect relations with the United States. We want to remove the default and litigate this matter. And you're taking all the collateral consequences of the default and saying those should all be deemed as law of the case for purposes of this motion. That defeats without letting it get out of the starting gate, the argument that they are trying to make that they deserve another chance because they have got a new regime that has seen the light and which has confessed error and that these

> are exceptional circumstances given the national interest and all the other things.
>
> Mr. Strachman: First of all there is no national interest. Condoleezza Rice --
>
> Judge Selya: No, no, but that's what they're arguing, alright -- and you're trying to cut off their argument by saying "well everything has already been decided because they could have contested everything all along the line, everything is law of the case" and that just bothers me.

Undeterred by the panel's reaction at the oral argument, Plaintiffs continue to press the same rejected preclusion theory, though this time untethered from any recognized legal theory of preclusion. Plaintiffs do not even attempt to argue that the Israeli law claims or the amount of the damages is subject to the "law of the case" doctrine or issue preclusion. Instead they make factually unsupported assertions that the issues were "actively litigated" and ask the Court to draw its own legal conclusions. But, although sovereign immunity, personal jurisdiction, and the applicability of the political question doctrine were litigated by Defendants, Defendants defaulted as to issues other than jurisdiction and justiciability. As the Court has recognized on many occasions, that default extended to the damages proceedings. Plaintiffs may not now credibly argue otherwise.

## II. The PA and PLO Are Not Foreclosed from Establishing That They Have Meritorious Defenses to Plaintiffs' Israeli Law Claims.

In their First Motion in Limine, Plaintiffs claim that the Ungars' entitlement to damages under Israel's Civil Wrongs Ordinance was "actively litigated." Dkt. No. 586 at 6. According to Plaintiffs, "Defendants can no more challenge the viability of the Ungars' Israeli causes of action than they can challenge venue, personal jurisdiction, justiciability, whether the complaint states an ATA claim or any of the other myriad issues actively litigated and determined prior to entry of judgment." *Id.* Although they characterize Defendants as having "actively litigated" the

Israeli law claims, Plaintiffs eschew any discussion of the nature of this "active litigation" and any citation to legal authority supporting their position that Defendants are precluded from presenting defenses to the Israeli law claims in the context of their Rule 60(b)(6) motion. A closer examination of the procedural history establishes that Defendants are not precluded from arguing they have meritorious defenses to the Israeli law claims.

In the Amended Complaint's Second, Third, and Fourth Claims for Relief, the Ungars sought to impose liability on the PA and PLO pursuant to the Israeli Civil Wrongs Ordinance for negligence, breach of statutory duty, and assault, respectively. *See* Dkt. No. 41 (Amended Complaint) at ¶¶ 49-82. In their November 2001 motion to dismiss (Dkt. No. 47), Defendants noted that "Plaintiffs cite Israeli statutory law as the basis for imposing vicarious liability upon the PA and PLO for claims for negligence, breach of statutory obligation and assault without demonstrating how the law would be applied in the present case." *Id.* at 2. Defendants did not elaborate further as to the negligence and assault claims or provide any basis for granting a motion to dismiss as to those claims. As to the breach of statutory duty claim, Defendants asserted they did not operate in Israel, where Mr. Ungar was shot, and that a "police force can have a duty to provide police protection in another jurisdiction, or an area they do not operate, only by contract, other agreement, or where it is imposed by law." *Id.* Defendants then contended that the "policy considerations that need to be taken into account in assessing the extent and quality of the duty of the PA to furnish police services and particularly so within Israel" involve factors that "are so incapable of assessment as to fall within the category of matters that are nonjusticiable." *Id.* at 4-5.

In November 2002, the Court denied Defendants' motion to dismiss. *Estates of Yaron Ungar and Efrat Ungar v. Palestinian Authority*, 228 F. Supp. 2d 40 (D.R.I. 2002) (Dkt. No. 90).

With respect to the Israeli law claims, the Court simply summarized the allegations in the complaint and then concluded:

> Upon examination of the amended complaint, it is evident that plaintiffs have alleged three statutory violations under Israeli law and have likewise alleged sufficient facts to maintain a cause of action under each. Consequently, the PA defendants' motion to dismiss the state law claims for failure to assert claims upon which relief can be granted is denied.

*Id.* at 48.

When Defendants subsequently defaulted and Magistrate Judge Martin recommended that Plaintiffs' motion for default judgment be granted, Dkt. No. 269, he found "that no additional damages are due for the claims pled under Israeli law as the injuries sustained by the Plaintiffs are the same and have already been addressed by the [$116 million Anti-Terrorism Act] award recommended above." *Estates of Yaron Ungar and Efrat Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15, 67 (D.R.I. 2004). The Court subsequently adopted Magistrate Judge Martin's recommendation and entered a final default judgment against Defendants in July 2004, imposing liability on the Defendants under the Anti-Terrorism Act. *See* Dkt. No. 279. Thus, the Court ruled only that Plaintiffs' Israeli law claims could survive a motion to dismiss. After that ruling, the parties did not litigate the Israeli law claims, nor did the Court ever determine that Plaintiffs were entitled to damages under their Israeli law claims.

Given this procedural history, Plaintiffs' position that their right to damages under Israeli law was "already litigated" -- and thus cannot be litigated in the event of vacatur or in the context of establishing meritorious defenses for purposes of the Rule 60(b)(6) motion -- is untenable. Plaintiffs make the mistake of equating a motion to dismiss with a motion for summary judgment. Defendants are no more precluded from asserting meritorious defenses to the Israeli law claims than they are from making meritorious defenses to the Anti-Terrorism Act claim,

which also was the subject of a motion to dismiss. Plaintiffs' preclusion theory would operate only to bar Defendants from filing another motion to dismiss. The Court's denial of Defendants' motion to dismiss does not operate, in the event of vacatur, to preclude Defendants from litigating the Israeli law claims, anymore than the denial of a motion to dismiss precludes a defendant from litigating a claim in a non-default case. Simply by surviving a motion to dismiss, Plaintiffs have not established their entitlement to damages under the Israeli Civil Wrongs Ordinance.

While arguing that Defendants are precluded from presenting meritorious defenses as to the Israeli law claims, Plaintiffs at the same time argue that Defendants must present such defenses if they are to establish a meritorious defense for purposes of Rule 60(b)(6). According to Plaintiffs, a "party seeking to vacate a judgment under Fed.R.Civ.P. 60(b)(6) must present a meritorious defense to *all* the causes of action set forth in the complaint -- otherwise there would be no point in vacating the judgment." Dkt. 586 at 3 (emphasis in original). "Thus," Plaintiffs continue, "in the instant case the Defendants are required to present meritorious defenses to the Ungars' ATA claim and to their supplemental Israeli causes of action . . . ." *Id.* Plaintiffs apparently contend that the Court's denial of Defendants' motion to dismiss forecloses Defendants from defending the Israeli law claims on the merits and presenting meritorious defenses as to those claims in support of their Rule 60(b)(6) motion, which in turn precludes them from entitlement to Rule 60(b)(6) relief.

Plaintiffs' position is flawed in three key respects. First, as previously noted, a denial of a motion to dismiss, is not a final adjudication of the merits of the claim, so there has been no prior adjudication of the merits of the Israeli law claims. Second, Plaintiffs offer no citation for their theory that Rule 60(b)(6) requires the movant to present meritorious defenses as to all

causes of action pled in the complaint. The sole case Plaintiffs cite (*id.*), *Widmer-Baum v. Chandler-Halford*, 162 F.R.D. 545, 557-58 (N.D. Iowa 1995), deals with a single cause of action (42 U.S.C. § 1983). Third and finally, where, as here, the $116 million default judgment was entered only as to the Anti-Terrorism Act claim, Defendants need only establish meritorious defenses as to that claim when seeking Rule 60(b)(6) relief.

Though Defendants are not required to present a meritorious defense to the Israeli law claims, they are entitled to do so in the context of addressing another Rule 60(b)(6) factor identified by the First Circuit, namely whether the amount of the award would withstand adversarial testing. To the extent Defendants are successful in arguing that the Anti-Terrorism Act award was too high and was awarded to individuals who are not proper plaintiffs under the ATA, Defendants seek to establish that the award also would not be justified by the Plaintiffs' Israeli law claims.

### III. Plaintiffs' Claim that the Court's Time and Resources Will Be "Wasted" Is Based on Exaggeration of the Facts and the Erroneous Premise that Defendants' Arguments Are "Precluded."

As their final argument, Plaintiffs contend that their time and resources -- and that of the Court -- should not be "waste[d] on these precluded issues." Dkt. No. 586 at 7. In a circular fashion, Plaintiffs argue that Defendants should be precluded from presenting witnesses and evidence at the January 2011 on the Israeli law claims and the amount of damages because such an effort will cause the Court to "waste extensive time and resources." *Id.* Why? Because "Defendants are precluded from challenging these issues." *Id.* Defendants agree that if the Court concludes that Defendants are barred from presenting meritorious defenses to Plaintiffs' Second, Third, and Fourth Claims for Relief (the Israeli law claims) and from arguing that the amount of the damages award would not withstand adversarial testing, then there is no reason for

the parties to present witnesses and evidence on those issues. Defendants, however, for the reasons stated above, do not agree that they are precluded.

To the extent Plaintiffs seek to persuade the Court to preclude consideration of the Israeli law claims and the amount of the damages on the basis that these issues will result in an "extravaganza that would cost the Court weeks of hearings, cost the Ungars tens of thousands of dollars in rebuttal experts, and significantly delay the disposition of Defendants' Rule 60(b)(6) motion," Dkt. No. 586 at 4, Plaintiffs' argument should be rejected. An issue relevant to the Rule 60(b)(6) motion does not become irrelevant because Plaintiffs would prefer not to devote resources to litigating it or because its consideration inevitably requires attention from the Court. In any event, Plaintiffs claims regarding the "time and resources" involved are exaggerated. Plaintiffs have served only two expert reports on damages issues and none on the Israeli law claims. Moreover, Plaintiffs have refused to make any of their experts available for deposition. Thus, by separate motion, Defendants will be moving to preclude Plaintiffs' expert witnesses from testifying at the hearing. Defendants have three experts on damages issues and one on the Israeli law claim, and it is highly unlikely their testimony, including cross, would "waste weeks of precious hearing time." *See id.* at 7. But, as the First Circuit's remand makes the amount of the damages award relevant to Defendants' Rule 60(b)(6) motion, Defendants are entitled to present witnesses and evidence without regard to the effect on the duration of the hearing.

         Respectfully submitted,

Dated: November 22, 2010    /s/ Mark J. Rochon
              Mark J. Rochon (D.C. Bar #376042)
              Admitted *pro hac vice*
              Richard A. Hibey (D.C. Bar #74823)
              Admitted *pro hac vice*
              Brian A. Hill (D.C. Bar #456086)
              Admitted *pro hac vice*
              MILLER & CHEVALIER CHARTERED
              655 Fifteenth Street, N.W., Suite 900
              Washington, DC  20005-5701
              Tel. (202) 626-5800
              Fax. (202) 628-0858
              mrochon@milchev.com
              rhibey@milchev.com
              bhill@milchev.com

              Deming E. Sherman (#1138)
              EDWARDS ANGELL PALMER
              & DODGE LLP
              2800 Financial Plaza
              Providence, Rhode Island 02903
              Tel. (401) 274-9200
              Fax. (401) 276-6611
              dsherman@eapdlaw.com

              *Attorneys for the Palestinian Authority and*
              *the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 22nd day of November, 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to counsel of record for all parties.

/s/ Mark J. Rochon