# EXHIBIT L

# HERZOG, FOX & NEEMAN

ASIA HOUSE, 4 WEIZMANN ST.
64 239 TEL-AVIV, ISRAEL
TEL:     (972-3)-692-2020
FAX:     (972-3)-696-6464
EMAIL:      hfn@hfn.co.il

Daniel Reisner, Partner

## Expert Report by Daniel Reisner

### Introduction

1. I have been retained by counsel for the plaintiffs in the matter of *Ungar et al v. Palestinian Authority et al.*, Civ. No. 00-105L (D.R.I.) to serve as a testifying expert witness to respond to certain testimony to be given by defendants' witnesses Raja Shehadeh and Glenn E. Robinson as reflected in the expert reports prepared by Messrs. Shehadeh and Robinson.

2. The opinions I will express below and in my testimony relate only to certain, specific aspects of the reports and anticipated testimony of Messrs. Shehadeh and Robinson, and the fact that I do not address other assertions made in their reports should not be construed to imply my agreement with such other assertions.

### Qualifications, Publications, Previous Testimony and Compensation

3. I am a graduate of the Tel-Aviv University Faculty of Law and have been a member of the Israeli Bar since 1987.

4. For 19 years I served as a legal adviser in the Military Advocate General Corps of the Israel Defense Forces ("IDF"), which is the equivalent of the Judge Advocate General's Corps in the United States armed forces.

5. Between 1995 and 2004, I held the position of Head of the International Law Department in the Advocate General Corps of the IDF. In this capacity I was responsible for advising the IDF General Staff and other senior IDF officers, the Ministry of Defense and the Prime Minister's Office on a wide variety of legal issues relating, *inter alia*, to the Middle-East peace process, Israel's activities *vis-à-vis* the Palestinians and neighboring Arab States, and counter-terrorism operations.

6. In addition to the above, since 1994 I have served as a senior member of Israel's peace delegations with the Palestinians, working in the triple role of negotiator, legal advisor and drafter of the agreements. As such, I participated in the negotiations on the Gaza-Jericho agreement of May 1994, the agreement on Preparatory Transfer of Powers and Responsibilities of August 1994; the Protocol on Further Transfer of Powers and Responsibilities of August, 1995; the Interim Agreement of September 1995; the Hebron Protocol of January 1997; and the Wye River Memorandum of October 1998. I was also a member of the Israeli delegation to the Camp-David peace summit in July 2000. In this capacity, I have advised Prime Ministers Rabin, Peres, Netanyahu, Barak and Olmert.

7. I retired from the IDF with the rank of Colonel in 2004. Since leaving the IDF, I continue to advise senior members of the Israeli government on a variety of issues relating to the Middle East peace process and legal aspects of security issues.

8. Parallel to my professional career I pursue an active academic career. I serve as a lecturer in three Israeli academic institutions (Tel-Aviv University, the Herzlia Interdisciplinary Centre; and the Rishon Le Tzion School of Management). I have published several legal articles and I lecture often, both in Israel and abroad, on a variety of issues, including the Arab-Israeli conflict and peace process; legal aspects of terrorism; the laws of armed conflict; international criminal law; the law of transboundary water resources; general public international law; and international negotiations.

9. Between 2006 and 2008, I worked in my own law office in Tel-Aviv which specialized in representing international clients in public international law issues, as well as commercial activities both in Israel and abroad.

10. Since 2008 I have been a partner at Herzog, Fox, Neeman, Israel's largest law firm, where I head the firm's public international law and defense, aerospace and homeland security practices.

11. A true copy of my curriculum vitae, including a list of all publications authored by me in the previous 10 years, is attached hereto as Exhibit "A".

12. During the previous four years I have not testified as an expert at trial or by deposition. However, I have submitted expert affidavits in *Biton v. PA*, Civ. No. 01-00382(RMC) (D.D.C.) and in *Ungar v. PA*, Index No. 102101/06 (New York County). The *Biton* court affirmed my opinion regarding the legal status of the PA. *See Biton v. PA*, 510 F.Supp.2d

144 (D.D.C. 2007) ("Defendants' final claim, that the PA must be a political subdivision of the State of Israel if it is not a sovereign entity, is also without merit. The argument has been rejected by the Israeli government and the Israeli Supreme Court. *See* Reisner Aff. at ¶¶ 52-61").

13. I am being compensated for my work, preparation and testimony in this case at my regular rate of $400 per hour.

**Materials Considered, Basis for Opinion and Opinion**

14. I have examined and reviewed the following materials in preparing this report:
    a. The Amended Complaint in *Ungar v. PA* dated August 23, 2001.
    b. The Expert Report by Raja Shehadeh dated October 15, 2010.
    c. The Expert Report by Glenn E. Robinson dated October 15, 2010.
    d. The Declaration of Principles on Interim Self-Government Arrangements, September 13, 1993.
    e. The Agreement on the Gaza Strip and the Jericho Area, May 4, 1994.
    f. The Agreement on Preparatory Transfer of Powers and Responsibilities, August 29, 1994.
    g. The Protocol on Further Transfer of Powers and Responsibilities of August 27, 1995.
    h. The Interim Agreement on the West Bank and the Gaza Strip, September 28, 1995.

    For the sake of clarity, the agreements listed in (d) to (h) above will be referred to collectively as "the Oslo Accords".

15. My opinions presented herein are based on my many years of professional experience and knowledge regarding Israeli and international law, the provisions of the Oslo Accords (which were negotiated and drafted in significant part by me personally), and the origin, legal status and capacities of the Palestinian Authority.

   *A.  Between 1994 and June 1996 the PA Was In De Jure Control of significant Areas in the West Bank and Most of the Gaza Strip*

16. The Amended Complaint alleges that at the relevant times (which I assume to mean the period between the establishment of the PA in 1994 and the murder of the Ungars in

June 1996) the PA was "in *de jure* ... control of territories in the Gaza Strip and in the West Bank". *Id.* at ¶ 9.

17. Messrs. Shehadeh and Robinson dispute this allegation, and assert that the PA did not have de jure control of territories in the Gaza Strip and in the West Bank during this period. *See* Expert Report by Raja Shehadeh ("Shehadeh"), *passim*; Expert Report by Glenn E. Robinson ("Robinson") at pp. 5-6.

18. In fact, between the time of its establishment in 1994 and the Ungars' murder in June 1996 the PA had de jure control over many areas in the West Bank and over approximately 80% of the Gaza Strip.

19. The source of the PA's de jure control at this date was the combined provisions of the Gaza-Jericho Agreement of May, 1994 and the Interim Agreement of September 1995.

20. Under the Gaza-Jericho Agreement, in May 1994 the territory of the Gaza Strip was divided into two main types: PA controlled territory (comprising some 80% of the total area of the Gaza Strip, including all major Palestinian cities, towns and villages); and the Settlement Areas and the Military Installation Area (which together comprised the approximate remaining 20% of the Gaza Strip).

21. Under the Gaza-Jericho Agreement, Israel withdrew from the PA controlled areas, transferring power to the PA, which was established by the Gaza-Jericho Agreement.

22. While it is true that Israel maintained some residual powers (authority over the Israeli Settlements and Military Installation Area; authority over Israelis; and the responsibility for external security and control over borders and air space), and denied the PA the capacity to engage in foreign relations, all of which negate any claim to sovereignty by the PA, none of these take away from the fact that, as a result of the Gaza Jericho Agreement the PA attained almost total *internal* territorial, functional and personal jurisdiction, powers and responsibilities in the PA-controlled areas in the Gaza Strip, making it both the de jure and de facto controlling entity therein and in relation to the Palestinian residents thereof.

23. Under the September 1995 Interim Agreement, the West Bank was divided into three areas. Area A, containing all major Palestinian cities and towns, was transferred to the authority of the PA, similarly to the PA controlled areas in the Gaza Strip. Area B, containing the majority of the Palestinian populated rural areas, was placed under a special regime under which the PA would be granted full responsibility for all civilian and public order related issues, while

Israel would retain responsibility for security matters. Area C, including all the Israeli settlements in the West Bank, would remain under Israeli control, except for some specific civilian spheres, which would also be transferred to PA responsibility.

24.     As a result of the above, the PA attained almost total *internal* territorial, functional and personal jurisdiction, powers and responsibilities in Areas A and B in the West Bank, and over the Palestinian residents of the West Bank, making it both the de jure and de facto controlling entity therein. Once again, this conclusion is not affected by the residual powers retained by Israel under the Interim Agreement, which are similar to those retained under the Gaza-Jericho Agreement, or the denial to the PA of the capacity to engage in foreign relations.

25.     It should further be noted that as, generally, no Israelis live in Palestinian controlled areas (either in the Gaza Strip or the West Bank) the limitation on the PA's authority over Israelis is meaningless in respect to these areas.

26.     Similarly, the claim that Israel conducted incursions into these PA-controlled areas which somehow derogated from the PA's *de jure* control is without basis. First, as a factual matter, it is uncertain whether any such incursions took place during this period. Second, the PA itself consistently objected to Israel's right to conduct any incursions into these areas – precisely because the PA views itself as having exclusive de jure control in these areas. Third, assuming Israel had and exercised "hot pursuit" rights to enter these areas, that in no way derogates from the PA's de jure powers.

### B.      There Was No Change in the Legal Liabilities of the PA in 1995

27.     Mr. Shehadeh asserts that the Palestinian Authority that exists today is not the same legal entity as the Palestinian Authority that existed prior to the 1995 Interim Agreement. *See* Shehadeh, p. 3 at ¶ 6 ("The Palestinian Authority (PA) was established after 1995 …"); p. 5 at ¶ 3 ("The Palestinian Council was established in 1995 under the Interim Agreement, and as such it can take no responsibility for events taking place prior to 1995).

28.     This claim is misleading.

29.     As explained above, the PA was originally established in 1994 under the Gaza Jericho Agreement. Due to the political realities of the time, the PA was not originally elected but was appointed by Yasser Arafat and the PLO. In accordance with the provisions of the 1993 Declaration of Principles, it was agreed between the parties that this appointed body would serve

as the authorized Palestinian leadership until the inauguration of the elected Palestinian Council, which would succeed it.

30. Accordingly, the following year, as part of the Interim Agreement, it was agreed between the parties to hold the elections for the "Palestinian Interim Self-Government Authority," which is the full proper name for the Palestinian Authority, and which is also referred to in the Interim Agreement as the "Palestinian Council." *See* Interim Agreement at Preamble. However, in order to prevent any claims (such as those now raised by Mr. Shehadeh) that the *elected* Palestinian Authority is not the full legal successor of the *appointed* PA under the Gaza Jericho Agreement, the parties specifically provided, in Article XX.4 of the Interim Agreement, that *"(T)he Council, upon its inauguration, will assume all the rights, liabilities and obligations of the Palestinian Authority"*.

31. Similarly, Article XXXI.2 of the Interim Agreement also clearly provides that: *"The Council, upon its inauguration, shall replace the Palestinian Authority and shall assume all the undertakings and obligations of the Palestinian Authority under the Gaza-Jericho Agreement, the Preparatory Transfer Agreement, and the Further transfer Protocol."*

32. Thus, the PA that exists today bears all the liabilities and obligations of the PA that existed prior to the elections that were held pursuant to the Interim Agreement.

November 15th, 2010

Daniel Reisner