# EXHIBIT O

**Subject:**     FW: Shnoor Report
**Attachments:** Dr Boaz Shnoor Report.pdf

---

**From:** Robert Tolchin [mailto:tolchinlaw@gmail.com]
**Sent:** Wednesday, November 24, 2010 10:47 AM
**To:** dsherman@eapdlaw.com; Rochon, Mark; Hill, Brian; Hibey, Richard
**Cc:** Max Wistow; David J. Strachman
**Subject:** Shnoor Report

Counsel -

Without derogating from our positions that (a) defendants are precluded from challenging whether the Amended Complaint states claims under Israeli law (b) Rule 26 does not apply to this proceeding and (c) Rule 26, even if it applied, does not require reports from experts on foreign law, please find attached the expert report of Dr. Boaz Shnoor.

- Bob Tolchin

11/29/2010

## Expert Report by Dr. Boaz Shnoor, Adv.

### INTRODUCTION

I am a faculty member at the Academic Center of Law and Business in Ramat Gan, Israel, currently on sabbatical. This year I am a visiting scholar at the Cornell Law School where I am researching behavioral aspects of tort law, especially causation.

During the past seven years I held positions teaching law at the Faculty of Law of the Hebrew University in Jerusalem, Israel, at the College of Management (Academic Studies Division) in Rishon Letzion, Israel, and at the Shaarei Mishpat College, in Hod HaSharon, Israel.

My teaching and research fields focus primarily on Israeli tort law and environmental law. I am author of the book Torts and Pollution (forthcoming 2010, Sacher Institute) (Hebrew), co-author of the book Libel Law - De Lege Lata and De Lege Ferenda and have authored numerous other academic and professional papers on Israeli tort law and other legal topics.

I hold LL.B, LL.M and LL.D degrees from the Hebrew University. My doctoral dissertation dealt with Israeli and comparative tort law.

I am a member of the Israeli Bar and licensed to practice law in the State of Israel.

A copy of my curriculum vitae, which includes all publications authored by me in the past 10 years, is attached hereto as Exhibit A.

I have been retained by counsel for the plaintiffs in Ungar v. Palestinian Authority, Civ. No. 00-105L (D.R.I.) as a testifying expert witness to respond to certain testimony to be given by defendants' witnesses, attorneys Muhammad Dahleh and Raja Shehadeh, as set forth in the expert reports submitted by attorneys Dahleh and Shehadeh.

2

My opinions, both as discussed *infra* and in my live testimony, will address only specific topics contained in the reports submitted by attorneys Dahleh and Shehadeh. No inferences should be drawn regarding my opinions in respect to topics that I do not address.

During the previous four years I have not testified as an expert at trial or by deposition. I did submit an expert declaration in *Rothstein et al. v. UBS AG*, Civ. No. 08-4414 (S.D.N.Y.)

I am being compensated at the rate of $250 per hour for my services as an expert in this case. The compensation is not conditioned on the content of my opinions in this Report, nor is my compensation contingent on the results of these proceedings.

The basis of my opinion as set forth herein is my professional and academic legal studies, research, teaching and publishing over the course of many years, as well as the statutes, case law and authorities cited in this Report.

In preparing this Report I have examined and reviewed the Amended Complaint in *Ungar v. PA* dated August 23, 2001, the Expert Report by Muhammad Dahleh dated October 15, 2010 ("Dahleh Report") the Expert Report by Raja Shehadeh ("Shehadeh Report") dated October 15, 2010 and the statutes, case law and authorities cited herein.

For the purpose of this Report, I will assume (a) that the facts alleged in the Amended Complaint are true and (b) that points of U.S. law asserted in the Amended Complaint and referred to in this Report are accurately represented in the Amended Complaint.

## OPINION

### Negligence

1.    Mr. Dahleh assets that the Ungars' Amended Complaint does not state a viable claim for Negligence under Israel's **Civil Wrongs Ordinance [New Version] – 1968** ("CWO"). I completely disagree with this assertion for the reasons stated below.

3

2.     Mr. Dahleh first claims that defendants Palestinian Authority (hereinafter: "PA") and the Palestinian Liberation Organization (hereinafter: "PLO") had no conceptual duty of care. Dahleh Report at ¶¶ 18-20. This claim is entirely unsupportable. The Israeli courts have repeatedly held that the conceptual (sometimes translated as "notional") duty of care always, or almost always, exists. *See e.g.* C.A. 915/91 *State of Israel v. Levi* 48(3) P.D. 45, 67. Indeed, a recent Supreme Court decision proposed that the "conceptual duty of care" be eliminated as an element of negligence analysis. *See* C.A. 10078/03 *Shtil v. State of Israel* (3/19/2007) at ¶ 15.

3.     Furthermore, the Israeli Supreme Court has held that whenever the harm at issue is technically foreseeable (i.e. when it was <u>possible</u> to foresee that harm could be caused, irrespective of whether the specific defendant <u>actually</u> did so), a rebuttable presumption arises that a conceptual duty of care exists, which shifts the burden to the defendant to show "special" policy considerations that negate the conceptual duty of care:

> The rule is, that when the harm is foreseeable (on a technical level) … it also gives rise to a conceptual duty of care. The "burden" is therefore on those who assert the absence of a duty. Hence, it must be possible to point to special considerations of legal policy, which justify the creation of an exception, which negates the existence of the notional duty of care.

*City of Jerusalem v. Gordon* 39(1) P.D. 113, 131. See also C.A. 125/80 *Vaknin v. Local Council of Bet Shemesh*, 37(1) P.D. 113; Ariel Porat, *Tort Law*, in INTRODUCTION TO THE LAW OF ISRAEL 128 (Kluwer, A. Shapira & K. DeWitt-Arar eds. 1995) at 129; C.A. 4842/05 *Granit Engineering v. Clal Insurance Company Ltd.* (August 12, 2007) at ¶ 10; C.A. 1068/05 *Maimoni v. City of Jerusalem*, (December 14, 2006) at ¶ 13.

4.     The Amended Complaint alleges, *inter alia*, that the PA and PLO provided various types of material support to Hamas, and encouraged Hamas to carry out terrorist attacks,

4

in the period prior to the murder of Yaron Ungar, and that during this same period of time Hamas carried out other deadly terrorist attacks. Clearly, then, in light of the allegations of the Amended Complaint, the harm caused in this case – a deadly Hamas terrorist attack – could easily have been foreseen by the PA and PLO. Accordingly, a conceptual duty of care is presumed to exist, unless the defendants can point to special policy considerations that would negate it. Mr. Dahleh cites no such duty-negating policy considerations, nor in my opinion would any Israeli court find that such considerations exist. On the contrary, as a matter of judicial policy the Israeli courts treat terrorism-related activity very harshly, and it is inconceivable that they would find that the PA or PLO owed no conceptual duty of care toward persons harmed by terrorist attacks.

5.    Indeed, many scores of civil suits arising from terrorist attacks have been filed against the PA and PLO over the past decade but, to the best of my knowledge, not one has been dismissed for lack of a conceptual duty of care.

6.    Mr. Dahleh's claim that "the Israeli case law has never recognized a conceptual duty of care of the state of Israel itself towards the citizens of a foreign country for criminal acts committed against them by an Israeli citizen on the territory of a sovereign foreign country" (Dahleh Report at ¶ 20) is misleading. In C.A. 6970/99 *Abu Samara v. State of Israel* 56(6) P.D. 185 (2002), the Israeli Supreme Court expressly ruled that the State of Israel owed a conceptual duty of care to Palestinian residents of the Gaza Strip who had been attacked by Israeli residents of Gaza following the murder of a rabbi. The Supreme Court affirmed dismissal of the case, but only because Israeli authorities had tried to prevent the violence, and had not breached their duty of care, holding that: "Indeed, there is a duty of care of the defendants towards the plaintiffs, but this duty was not breached in our case." *Id.* at 188.

5

7.    In discussing the *Abu Samara* case, Mr. Dahleh focuses on the decision in the district court (which found that the State of Israel did not have a conceptual duty of care to the plaintiffs) and neglects to mention that the Supreme Court explicitly reversed this holding and found that the State did indeed owe a duty of care to the plaintiffs. Dahleh Report at ¶¶ 25-26.

8.    Mr. Dahleh also argues that no concrete duty of care exists here. *Id.* at 21-26. This argument, too, cannot be supported.

9.    In support of this claim, Mr. Dahleh argues that the terrorists who shot the deceased lived in a village that was not under PA control, and that it would therefore be unreasonable to impose a concrete duty of care on the PA vis-à-vis persons harmed by those terrorists. *Id.* at 22. But this argument appears, with all due respect, to be a "straw man," because it ignores the actual allegations of the Amended Complaint. The Amended Complaint alleges that the defendants are liable because they actively provided Hamas as an organization, and the individual terrorists, with various types of material support and encouragement to carry out terrorist attacks. The Amended Complaint clearly alleges far more than that the PA had control over the individual shooters' hometown; indeed, from my reading of the Amended Complaint, there appears to be no allegations at all regarding PA control over the shooters' village. Rather, the Amended Complaint alleges that Hamas as a whole, i.e. as an organization, operated from territories under the control of the PA and PLO.

10.    Mr. Dahleh does not assert that the actual allegations of the Amended Complaint – i.e. that the PA and PLO affirmatively assisted and urged Hamas and the individual gunmen to carry out terrorist attacks – do not give rise to a concrete duty of care. And for good reason: there is no question that they do, as I assume Mr. Dahleh himself would have to agree.

6

11.    Next, Mr. Dahleh concedes that the PA has a "duty to maintain law and order in the territories under its full control," but argues that – like the duty of the State of Israel to maintain law and order within Israel – that duty is limited under Israeli law, and "does not impose a duty of care on the state (through its police and other security forces) for any criminal act committed against its citizens (even by its citizens). The Israeli case law imposes duty of care only when a special link or relationship exists between the police and the criminal, and in their absence no duty of care is sustained." *Id.* at ¶¶ 23-24.

12.    While it is true that under Israeli negligence law there is no general duty on the State to prevent all crimes, when the State has enabled the committing of the crime (for example by providing the means to it), or when the State has prior knowledge about similar criminal actions that were done in the past, or about the possibility of the crime's occurrence, then there is a duty of care to prevent the crime. For example, when the police failed to stop the plaintiff's neighbors from repeatedly harassing him and damaging his property, the police were found liable in negligence for all the harms he subsequently suffered. C.A. 16780/01 *State of Israel v. Weiss* 58(5) P.D. 167 (2004). Likewise, in another case the Israeli police were held liable in negligence for the damage suffered by a woman whose husband managed to flee the country although there was a court order forbidding his departure. C.A. 429/82 *State of Israel v. Suhan* 42(3) P.D. 733 (1988). And in a recent case the court held a municipality liable in negligence for the damage that was caused to the plaintiff after falling from a horse. The ruling was based upon the fact that the horse farm was not licensed and although the municipality (which was responsible for enforcing the law) warned the owner of the farm to close the farm or get a license, it did not enforce its own order and therefore it was liable for all the damages stemming from the operation of the farm. C.A. 1068/05 *Maimoni v. The Municipality of Jerusalem* (12/14/2006).

7

13.    Moreover, there is a broad tendency in the Israeli case law to hold public authorities liable for negligence.

14.    Thus, there is no doubt that in the circumstances described in the Amended Complaint the PA and PLO had a concrete duty of care under Israeli negligence law.

15.    Mr. Dahleh further asserts that the allegations of the Amended Complaint do not sufficiently show causation. I disagree.

16.    Under Israeli law causation includes both causation in fact and legal causation (proximate cause). Cause in fact is generally determined in Israel according to the "but for" test. The question is a factual one and requires evidence. However, due to the hypothetical nature of the application of the but-for test (always requiring the determination of a hypothetical situation that would have happened but-for the breach of duty) if the plaintiff proves that the defendant's tortious behavior increased the risk of damage, and if proving actual causation seems impractical, courts usually shift the burden of proof to the defendant to prove that he did not cause the damage. R.H. 5712/01 *Barazani v. Bezeq* 57(6) P.D. 385, 448-9 (2003).

17.    The Amended Complaint alleges that the PA and PLO actively assisted Hamas to carry out terrorist attacks, and allowed Hamas to operate in PA-controlled territory. These allegations are more than adequate to plead factual causation under Israeli law. Furthermore, the Israeli Supreme Court has held that any provision of support to a terrorist organization serves to increase its ability to carry out attacks. Cr. A. 3827/06 *Doe v. The State of Israel* (27/3/07). In any event, because the defendants' conduct certainly increased the risk of harm, the burden is on them to show that they did not cause the harm. *See Barazani.*

18.    There are three different tests for determining legal causation: proximity, risk and common sense. However, the main factor that determines the result of all three tests is the

8

forseeability – the ability of the reasonable person to foresee the harm. Once the reasonable person could have foreseen that a harm of the kind that happened might happen the legal causation requirement is met. The acts of a third party – even criminal acts or malicious acts – do not negate legal causation unless they were unforeseeable. Thus, Mr. Dahleh's claim that Hamas' actions constituted an intervening cause that broke the chain of causation is incorrect.

19.     Given that Hamas launched numerous terrorist attacks prior to the attack on the Ungar family, a reasonable person could have seen that unless stopped, it might continue its actions, and therefore the attack on the Ungar family was foreseeable by the PLO and PA and legal causation exists.

20.     Moreover, the Israeli Supreme Court has held that when a defendant has a duty to guard against the acts of a third party, and he breaches his duty, the acts of the third party do not constitute an intervening cause. C.A. 6649/9, *Gilead v. Hadassah* 53(3) P.D. 529 (1999). As Mr. Dahleh acknowledges, the PA has a "duty to maintain law and order in the territories under its full control." *Id.* at ¶ 23. Having breached this duty, defendants cannot argue that it was not foreseeable that such attacks would continue.

21.     In sum, the Amended Complaint states a cause of action for Negligence under Israeli law, and Mr. Dahleh's claims to the contrary are without merit.

**Breach of Statutory Obligation**

22.     Mr. Dahleh also argues on several grounds that the Amended Complaint does not state a claim for Breach of Statutory Obligation. Here, again, I disagree with his arguments.

23.     Mr. Dahleh first asserts (a) that some of the many provisions cited in ¶ 69 of the Amended Complaint do not meet the definition of "statutory obligation" and (b) that some of these provisions are relevant to the attackers only. Dahleh Report at ¶¶ 37-39.

9

24.     However, a plaintiff need cite only a *single* viable statutory obligation to state a claim for Breach of Statutory Obligation. Accordingly, since Mr. Dahleh has taken issue with only *some* of the provisions cited, and has thereby effectively conceded (correctly) that the other provisions cited in the Amended Complaint meet the definition of "statutory obligation" and are potentially relevant to the PA and PLO (and not just the attackers), I will refrain from addressing his arguments regarding the definition of "statutory obligation" and whether the provisions he claims are relevant to the attackers only are indeed such (though I disagree with his position).

25.     Next, Mr. Dahleh notes that the remaining statutory obligations are criminal offenses and questions (without taking a position) whether "these obligations are at all relevant for examining the acts and omissions of a government or authority (of another country or territory) as opposed to a human actor." There is a simple answer to this question: Israeli law recognizes the imposition of criminal liability on non-natural persons – including municipal governments. *See e.g.* Cr. App. 7001/04 *State of Israel v. City of Beersheva* (7/9/06).

26.     Mr. Dahleh then asserts that "to the extent the statutory obligations enumerated in the complaint are considered national security offenses" they should not be considered to be intended for the protection of the public. *Id.* at ¶¶ 41-44.

27.     I would note, in the first place, that many of the provisions cited in the Amended Complaint are garden-variety crimes unrelated to national security.

28.     Furthermore, even in respect to national security crimes, Mr. Dahleh's claim that these provisions are not intended to protect the public is refuted by the recent decision of the U.S. District Court for the District Columbia in the matter of *Wultz v. Islamic Republic of Iran*, which found, on the basis of numerous Israeli precedents, that the same national security and counter-terrorist laws cited in the Amended Complaint are intended to protect the public and can

10

serve as the basis for a Breach of Statutory Duty claim under Israeli law. *See Wultz v. Islamic Republic of Iran*, --- F.Supp.2d ----, 2010 WL 4228350 at *55-57 (D.D.C. Oct. 20, 2010).

29.    Finally, Mr. Dahleh asserts that the Amended Complaint does not show causation in respect to the Breach of Statutory Duty claim, for the same reasons presented by him regarding negligence. I disagree, for the reasons stated above in the negligence context.

30.    In sum, the Amended Complaint states a valid claim for Breach of Statutory Duty.

**Aiding and Abetting**

31.    Mr. Dahleh argues that the Amended Complaint fails to state a claim against the PA or PLO under § 12 of the CWO because "This article has been rarely used in the Israeli case law and this case does not fulfill the requirements for its application." Dahleh Report at ¶ 49.

32.    I do not agree. Section 12 of the CWO states that one who helps another or encourages him to perform a civil wrong, is liable as if he committed the wrong himself. Although this section is not used often, it is in no way obsolete, and in proper circumstances it is used. See e.g. C.A. 6871/99 *Rinat v. Rom* 56(4) P.D.72 (2002).

33.    The courts have ruled that in order for a person to be liable under § 12, he must either aid the principal actor in performing a civil wrong (e.g. by providing the means or the opportunity to commit the civil wrong or by otherwise providing needed help) or encourage him to perform it, foreseeing that the principal actor is about to commit the wrong. It is doubtful whether this help or encouragement must be a "but for" cause of the civil wrong.

34.    In our case it seems clear from the Amended Complaint that the defendants encouraged and helped Hamas knowing that this help would enable the Hamas to launch terrorist attacks harming persons in Israel and therefore it is my opinion that they would be held liable for the attack on the Ungars pursuant to § 12.

11

## Damages

35.    Paragraphs 50-82 of the Dahleh Report discuss the Israeli law of damages.

36.    I am informed that the question of whether the Israeli law of damages in tort (as opposed to Israeli law governing liability in tort) applies to this case has not yet been determined, and that under applicable choice-of-law rules the court may elect to apply the law of one jurisdiction to liability and the law of another jurisdiction to damages. In this regard I would note that the limitations on damages in Israeli law (e.g. the identity of the family members entitled to compensation, the types of damages awarded and the size of the judgments awarded in Israel) clearly appear to be a function of a concern for harming the Israeli economy (e.g. the Israeli insurance industry).

37.    In any event, assuming that Israeli damages law applies to this case, Mr. Dahleh makes a number of assertions in respect thereto that are not accurate.

38.    First, the claim that Mr. Ungars' parents and siblings are not "proper plaintiffs" is not correct. As Mr. Dahleh himself concedes, family members of a victim may be entitled to compensatory damages under certain conditions. Whether or not the conditions are met and the family members will ultimately be entitled to damages in a given case is a matter for the trial court to determine, but family members are certainly "proper plaintiffs."

39.    Second, the claim that Mr. Ungars' parents and siblings are not "proper plaintiffs" is mistaken because it ignores the fact that family members of terrorist victims are entitled to punitive damages. It is now settled in Israel that punitive damages may be awarded. C.A. 140/00 *Ettinger v. The Society for Development of the Jewish Quarter* 58(4) P.D. 486, 562-567 (2004); C.A. 9656/03 *Marciano v. Zinger* (2005).

12

40.    The Israeli courts have consistently awarded large punitive damages to the family members of terrorism victims. For example, in C.C. 4421/02 (Jerusalem District Court) *Gavish v. Hamas* (1.22.06) nine family members who sued each received 10 million NIS in punitive damages, which equaled (at the time) about 2.16 million dollars.

41.    Third, Mr. Dahleh's assertions regarding deductions of benefits the Ungars may have received from the Israeli National Insurance Institute (which parallels the U.S. Social Security Administration) as victims of terrorism are incorrect. While the general rule under Israeli tort law is that any financial benefits the plaintiff receives should be deducted from the compensation awarded, there is an exception regarding benefits paid to victims of terrorism. The Israeli Supreme Court has ruled that a victim of terrorism must refund to the National Insurance Institute any benefits received, before he or she can obtain an award of damages via a civil suit pursuant to the CWO. *See* C.A. 1162/96 *Weiss v. Mack* 53(2) P.D. 79 (1999).

42.    Thus, since any such benefits must be returned to the National Insurance Institute, there would be no just or logical basis to deduct them from any award of damages to victims of terrorism such as the Ungar family.

### Choice of Law

43.    Mr. Shehadeh states in his Report that the CWO does not apply as domestic law in the West Bank or Gaza Strip. Shehadeh Report, p. 6 § 6.

44.    While this statement is true, I do not understand its relevance in light of the fact that, as I have been informed, the U.S. court has already determined that Israeli law should apply to the non-federal causes of action in this case.

45.    If Mr. Shehadeh is arguing that Israeli courts do not apply the CWO in tort cases arising from events in the West Bank and Gaza Strip he is mistaken. Israeli courts, applying

13

Israeli choice-of-law principles, have applied the CWO to torts occurring in the West Bank and Gaza. This was done routinely in claims relating to terrorist attacks against Israelis in this area.

46.     The primary ruling in this regard is L.C.A. 4060/03 *PA v. Dayan* (7/17/2007) which dealt with this question in respect to more than sixty cases against the PA for damages stemming from terrorist attacks on Israelis. The Supreme Court held that, in general, Israeli law should govern these cases since Israel has the greatest interest in controlling those incidents.

### The *Gaon* Case

47.     Mr. Dahleh starts his Report with a discussion of the *Gaon* case in which a civil suit against the PA arising from an act of terrorism was dismissed. I have left this issue for last because of its irrelevance. In the last decade many dozens of lawsuits arising from terrorist attacks have been filed against the PA and PLO in Israel. Currently almost all of them are still awaiting trial, and only one of them materialized into a verdict on the merits. In that case (C.C. 1214/04 (Dist. Ct. Nazereth) *Gaon v. PA* (11/25/2009) (appeal pending) the court ruled that the plaintiffs failed to bring evidence in support of their claim that the PA was responsible for the harm. However, the court did not rule that as a matter of principle the PA was not responsible to terrorist attacks, but rather that none of the relevant facts were proved by admissible evidence.

48.     Moreover, one can learn about the Israeli courts' attitude toward the PA's liability from a number of interim decisions made in the pending cases imposing pre-judgment attachments on the PA. In order for a court to grant such relief it has to be convinced, *inter alia*, that "there is allegedly admissible evidence that there is a good cause of action" (Civil Procedure Rules, 1984, § 362). In recent years many such motions were granted, which means that the Israeli courts believe that there is a good chance that the PA will be held liable for terrorist attacks. *See e.g.* C.C. 650/09 (1398/09) (Dist. Ct. Nazereth), *Hamud v. PA* (1/4/2010)).

14

November 23, 2010

_B. Shnoor_

Dr. Boaz Shnoor

# Curriculum Vitae - Boaz Shnoor

Name: Boaz Shnoor
Address: David Goitein 4/4, Jerusalem 97782, Israel
e-mail: msshnoor@mscc.huji.ac.il; shnoor@clb.ac.il
Home phone: 972–2–5858092
Fax: 972-2-5858092

Date of birth: June 13, 1970
Place of birth: Jerusalem, Israel
Marital status: married with 3 children

## Education

1997 - 2004    LL. D (direct track), Law faculty, Hebrew University, Jerusalem
Doctoral advisor: Prof. Israel Gilead.
Dissertation topic: "Torts as a Means of Preventing Environmental Pollution"
(submitted 2004, approved 2005)

1996 - 1999    LL.M., Law faculty, Hebrew University, Jerusalem (as part of accelerated doctoral program)

1991 - 1995    LL.B., (*magna cum laude*), Law faculty, Hebrew University, Jerusalem

## Awards and Prizes

2002    Birk Prize for Academic Excellence in Law or Agriculture

1995    The Law Faculty (Hebrew University) Academic Excellence Scholarship

1994    Krip Prize for scholastic excellence of undergraduate law student

1993    Dinsky Prize for scholastic excellence of undergraduate law student

1992, 1993    Dean`s list

## Work Experience

2010 – 2011 Visiting Scholar, Cornell University Law School

2005 -    Founder and Academic Supervisor of the Environmental Law Clinic, Academic Center of Law and Business, Ramat-Gan (previously – The Ramat-Gan Law School)

2004 -    Lecturer - Academic Center of Law and Business, Ramat-Gan
Courses: Tort Law, Environmental Law, Libel and Privacy Law, Causation in Tort, Uncertainty in Tort Law

| | |
|---|---|
| 2004 - | Adjunct Lecturer, Law faculty, Hebrew University, Jerusalem – Tort Law, Environmental Law and Causation in Tort Law |
| 2002 - 2009 | Adjunct Lecturer, School of Law, The College of Management, Academic Studies Division, Rishon LeZion – Tort Law, Causation in Tort Law |
| 2006 – 2007 | Adjunct Lecturer, Sha'arei Mishpat College, - Tort Law |
| 2003 - 2004 | Adjunct Lecturer, Academic Center of Law and Business, Ramat-Gan - Environmental Law |
| 2002 - 2004 | Taught the courses: Tort Law, Causation in Tort Law, and Environmental Law, Law faculty, Hebrew University, Jerusalem |
| 2002 - 2004 | Student advisor, Law faculty, Hebrew University, Jerusalem |
| 1999 - 2002 | Assistant student advisor, Law faculty, Hebrew University, Jerusalem |
| 1997 - 1999 | Teaching assistant in Corporate Law, Law faculty, Hebrew University, Jerusalem |
| 1996 - 2001 | Teaching assistant in Tort Law, Law faculty, Hebrew University, Jerusalem |
| 1996 - 2000 | Teaching assistant in Tort Law, Ramat-Gan Law School |
| 1994 - 1997 | Ephraim Abramzon & Co., Law Offices (student, intern, lawyer) |
| 1994 - 1996 | Teaching assistant in Criminal Law, Law faculty, Hebrew University, Jerusalem |
| 1993 - 1994 | Research assistant for Prof. Israel Gilead |
| 1992 - 1993 | Research assistant for Prof. Yoram Shahar |

## Professional Positions & Memberships

| | |
|---|---|
| 2010 - | Member, The Society for Empirical Legal Studies |
| 2008 – | Member, The Society for the Protection of Nature in Israel |
| 2002 - | Member, Israel Society for Ecology & Environmental Quality Sciences |
| 1998 - | Member, Adam Teva V'din - Israel Union for Environmental Defense |
| 1996 - | Member, Israeli Bar |

1993 - 1994  "Mishpatim" - Hebrew University Law Journal – Editor-in-Chief

## Publications

<u>Doctoral Dissertation</u>

"Torts as a Means of Preventing Environmental Pollution", Hebrew University, Jerusalem, Israel. (approved 2005).

<u>Books</u>

TORTS AND POLLUTION (forthcoming 2010, The Sacher Institute, Hebrew University) (Heb.)

K. Genaim, M. Kremnitzer, B. Shnoor, LIBEL LAW - DE LEGE LATA AND DE LEGE FERENDA  (487 pages, 2005, The Sacher Institute and The Israel Democracy Institute, Heb.).

<u>Articles</u>

Eyal Katvan, Boaz Shnoor, "Between Civility and Reputation, Following C.A. 1104/07 Kheir v. Gil" 15 *Hamishpat* 71 (2010, Heb.),

"Loss of Chance: A Behavioral Analysis of the Difference Between Medical Negligence and Toxic Torts" 33(1) *American Journal of Trial Advocacy* 71 (2009),

Talma Izak-Biran, Richard Laster, Tamar Berman, Boaz Shnoor "Consequences of Ignoring Uncertainty – 'Probability of Causation' in Radiation Cases 39(1) *Environmental Policy and Law* 70-72 (2009),

"The Theoretical Foundation of Proportional Liability in Israel" 37 *Mishpatim Law Review* 177-218 (2007). (Heb.).

"Causation in Fact in Toxic Torts", <u>23(2)</u> *Law Studies* 559-620 (2007) (Heb.).

"Volenti Non Fit Injuria: Theory and Reality", *1 Alei Mishpat* (2000), pp.327-354 (Heb.).

<u>Book Chapters</u>

Tamar Gidron, B. Shnoor, *Pure Economic Loss in Israel, in* PURE ECONOMIC LOSS 186-217 (Mauro Bussani, Vernon Palmer, Eds., Routledge-Cavendish publishing, 2009). A revised version of this chapter was published in ISRAELI REPORTS TO THE XVII INTERNATIONAL CONGRESS OF COMPARATIVE LAW (The Sacher Institute, 2009).

K. Genaim, M. Kremnitzer, B. Shnoor, "Libel Law" in DEFENDING FREEDOM OF SPEECH IN THE DEMOCRATIC STATE (M. Kremnitzer ed., 2003, The Israel Democracy Institute, Heb.) pp. 179 – 233.

## Conference Papers

"Economic Incentives and Pollution: Goal and Methods", Conference on Economic Incentives in Environmental Law, Academic Center of Law and Business, Ramat-Gan, June 2008 (Heb.).

"Loss of Chance: A Behavioral Analysis of the Difference Between Medical Negligence and Toxic Torts" Departmental Seminar, Law School, The College of Management, Academic Studies Division, Rishon LeZion, May 2008 (Heb.).

"Evidence Law and Uncertainty in Tort Law", Conference on Evidence Law, Haifa University and The Institute of Advanced Judicial Studies, Haifa, May 2008 (Heb.)

"Environmental Tort Law" Conference on Environmental Law, The Israeli Bar and Tel-Aviv University, Tel-Aviv, February 2008 (Heb.).

"Remedies in Libel Law", Conference on Libel Law, The Institute of Advanced Judicial Studies, Neve-Ilan, October 2007 (Heb.).

"Libel law – Theory and Reality" Conference on Libel Law in The Israel Democracy Institute, Jerusalem, March 2007 (Heb.)

B. Shnoor, T. Gidron, "Pure Economic Loss in Israel", the 17th Congress of the International Academy of Comparative Law, Utrecht, The Netherlands, July 2006.

"Non-Pecuniary Damage" The Israeli Bar and Tel-Aviv University, Tel-Aviv, June 2006 (Heb.).

"Pets, Torts and Animal Rights", Conference on Animal Rights and Biodiversity, Ramat-Gan, Israel, May 2006. (Heb.)

"Environmental Law: From Public to Private Enforcement", the 8th International Conference of the Israel Society for Ecology and Environmental Quality Sciences - Living with Global Change: Challenges in Environmental Sciences, Rehovot, Israel, May - June 2005.

"The Causal Connection in the Shamgar Committee Report on the Kishon River", the 13th annual conference of the Rationality Center of the Hebrew University, Ein Gedi, Israel, December 2003 (Heb.).

"Causation in Environmental Tort", the annual convention of the Israel Society for Ecology and Environment, Tel Aviv, Israel, December 2002 (Heb.).

"Report on the major findings of the book: M. Kremnitzer, K. Genaim, B. Shnoor, Libel Law - De Lege Lata and De Lege Ferenda", Conference on Defending Freedom of Speech in a Democratic Society, the Israel Democracy Institute, Jerusalem, Israel, April 2002 (Heb.).