# Exhibit U

# **Expert Report by Ofer Saad**

## Introduction

I have been retained by the attorneys for the plaintiffs in *Ungar v. Palestinian Authority* to testify as an expert witness in response to certain testimony to be given by Glenn E. Robinson and Raja Shehadeh as stated in the expert reports prepared by them.

The opinions I state below, and that I will state in my testimony, relate only to some parts of the Robinson and Shehadeh reports and their anticipated testimony. If I do not address other assertions made in their reports that does not imply that I agree with them.

Between 1989 and 2009 I served in the Intelligence Branch of the Israeli army (known as the "Israel Defense Forces" or "IDF"). During most of my service in IDF Intelligence Branch I specialized in Palestinian affairs and terrorism and served in a variety of positions relating to those topics. In the course of my service in the IDF Intelligence Branch I received and read many thousands of intelligence items – including raw intelligence data obtained from electronic and human sources as well as intelligence summaries and analyses compiled from such raw data – relating to the activities of the Palestinian Authority ("PA"), the Palestine Liberation Organization ("PLO") and Hamas between 1994 and June 1996.

I retired from the IDF with the rank of Colonel. I am currently a Research Fellow at the Institute for Counter-Terrorism at the Interdisciplinary Center in Herzliya, Israel.

I have a B.A. in Middle Eastern and African Studies from Tel-Aviv University and completed course work toward an M.A. in Security Studies at Tel-Aviv University.

The basis for the substance of this report and the testimony I will give is the knowledge and information I acquired during my service in the IDF Intelligence Branch.

I have never testified as an expert at a trial, by deposition or otherwise and I have not authored publications. I am being paid $3000 for my work and testimony in this case.

Before preparing this report I examined the Expert Report by Glenn E. Robinson dated October 15, 2010 and the Expert Report by Raja Shehadeh dated October 15, 2010.

## During the Relevant Period the PA and PLO Controlled
## Areas in the West Bank and Most of the Gaza Strip

Mr. Robinson and Mr. Shehadeh both claim that the PA and PLO had limited, or no, de facto control in the West Bank and Gaza Strip in the period between the establishment of the PA in 1994 and the murder of the Ungars in June 1996.

With all due respect, this claim is without basis.

Upon its establishment in early 1994, about 80% of the Gaza Strip and the city of Jericho in the West Bank came under the PA's exclusive control. Following the signing of the 1995 Interim Agreement all the major Palestinian population centers in the West Bank (except Hebron), which are know as "Area A," came under the PA's exclusive control.

Between 1994 and June 1996, in the 80% of the Gaza Strip governed by the PA and in the West Bank cities designated as Area A, the PA had both complete territorial control and an extremely strong measure of control over the Palestinian population – a measure of control that was greater than the control that non-totalitarian regimes exercise over their populations.

The PA exercised this control over the territories and population under its governance in the West Bank and Gaza through its multiple security forces and intelligence agencies. Because the West Bank and Gaza are geographically separate regions, most of these security forces and intelligence agencies had separate headquarters, separate command structures and different commanders in each of the two regions.

The commanders of the PA's main security forces and intelligence agencies during this period were Mohammed Dahlan, Jibril Rajoub, Amin al-Hindi, Tewfiq Tirawi and Ghazi Jabali, all of whom were directly subordinate to Yasser Arafat. Via the security and intelligence forces under their control, these commanders had detailed and accurate intelligence regarding the population and territories under their jurisdiction, and exercised virtually unlimited and absolute power over that population and those territories. (Some of these men abused that power to collect unauthorized "taxes" on commercial activities and became extremely wealthy as a result).

Thus, ironically, while the PA was not a sovereign state, the domestic control it exercised during this period over the population and territories in Area A and in most of Gaza, was equal to that exercised by many totalitarian regimes and greater than that in democratic nations.

Mr. Robinson's claim that the PA's security services were weak and disorganized during this period is not true. The main PA security services and intelligence agencies were highly effective, had no trouble controlling the population and territories governed by the PA and had both the necessary intelligence and the operational capability to eliminate Hamas' infrastructure and prevent Hamas' activities in Area A and in PA-ruled Gaza if the PA had so desired.

Indeed, the PA's forces in Area A and in PA-ruled Gaza during this period were larger than the IDF forces that had been in these areas prior to the establishment of the PA.

The fact is that just three months after the Ungars' murder, in September 1996, the PA's security forces engaged in several days of actual military combat with the IDF, during which PA forces operated in a highly organized and militarily professional manner. Fifteen IDF soldiers and Israeli police were killed during this combat, and many more were wounded.

Thus, the PA had full control over Area A and 80% of the Gaza Strip during this period.

In their reports, Mr. Robinson and Mr. Shehadeh seek to detract from the above by focusing on the fact that the specific gunmen involved in murdering the Ungars lived in the village of Sourif, which was not part of Area A. This focus is misleading because it ignores the fact (discussed below) that Hamas – as an *organization* – existed and operated widely within Area A and the PA-controlled areas of Gaza between 1994 and June 1996. During this period and subsequently (indeed, until the present day) Hamas carried out numerous attacks using terrorists who lived outside of Area A and PA-controlled Gaza. Such individuals are valuable to Hamas as terrorists precisely because they are able to travel easily into and within Israel, often speak Hebrew and can sometimes successfully disguise themselves as Israelis.

Finally, I disagree with the assertion by Mr. Robinson and Mr. Shehadeh that the PLO had no control of territory in the West Bank and Gaza Strip. The fact is that the PLO exercised full political control over and set the policies of the PA during the relevant period. Indeed, the uncontested leader and sole policy-maker in the PA at that time – Yasser Arafat – was also the leader of the PLO. Thus, while the actual exercise of control on the ground was by the PA's security and intelligence forces, the PA was in turn run by the PLO.

3

Therefore, the PLO had the same measure of control over the population and territories in Gaza and Area A as the PA itself, the only difference being that the PA exercised that control directly and the PLO did so indirectly, via the PA.

The former Soviet Union is a helpful analogy: while the Red Army was, formally, controlled by the Soviet Union, the Soviet Union was controlled by the Communist Party and the Party was therefore in control of the Red Army no less than was the U.S.S.R. itself.

### The Relationship Between the PA/PLO and Hamas During the Relevant Period

Mr. Robinson's description of the relationship between the PA/PLO and Hamas between 1994 and June 1996 is fundamentally erroneous.

Mr. Robinson's claim that the PA's policy and actions toward Hamas during this period were characterized by hostility and "significant" or "violent" repression is wholly inaccurate. In fact, during this period the PA and PLO allowed Hamas to build and operate its extensive infrastructure and network of institutions in Area A and in PA-controlled Gaza, and recruited Hamas operatives into the PA security services where they received arms and salaries.

The PA took "repressive" action against Hamas only on isolated occasions during this period, and only then because the PA and PLO were constrained to do so due to extreme U.S. or Israeli pressure or other perceived threats to the self-interest of the PA and PLO. Soon after these "crackdowns" the Hamas operatives arrested were released, in a predictable pattern that eventually became to be known as the "revolving door policy."

While the PA and PLO had their political differences with Hamas during this period, Hamas was allowed to operate and grow in PA-controlled areas because it served an important function for the PA and PLO: it allowed the PA and PLO to continue the PLO's traditional policy of negotiating under the threat of violence. Because the Oslo Accords forbade the PA and PLO from threatening, much less using, violence, to achieve political goals, Hamas served as a proxy for that purpose. Throughout this period (and later) the PA and PLO warned Israel that unless it made concessions the position of the "pro-peace moderates" (as the PA and PLO presented themselves) would be weakened, and support for Hamas' terrorism would grow.

This policy was eventually enshrined in the "Cairo Agreement" or "Cairo Declaration" of December 1995, pursuant to which Hamas agreed not to carry out attacks from PA-controlled areas. This agreement allowed the PA and PLO to argue to Israel that by turning more territory over to the PA, Israel could reduce the areas from which terrorist attacks were launched.

(Mr. Robinson's claim on page 14 of his report that Hamas agreed to cease attacks entirely is not true; Hamas agreed only to cease attacks from PA-controlled territory).

Thus, in this way, the PA and PLO used Hamas, and the threat of Hamas terrorism, as a stick with which to threaten Israel during negotiations. Therefore, the PA and PLO had a strong interest in ensuring – and they ensured – that Hamas remained a viable terrorist threat to Israel.

### Security Cooperation with Israel During the Relevant Period

Mr. Robinson asserts that between 1994 and June 1996 the PA adequately cooperated with Israel on security matters, and that claims to the contrary are rightwing political rhetoric.

This assertion, too, is simply incorrect.

Throughout this period – under the Rabin, Peres and Netanyahu governments – the Israeli defense establishment, which operates under highly professional and apolitical guidelines, was extremely dissatisfied with the PA's relationship with and actions toward Hamas.

Israel made countless requests to the PA during this period to cease providing Hamas with a geographical base of operations within Area A and PA-governed Gaza, to uproot Hamas' infrastructure in these areas, to arrest and punish, or transfer to Israel, Hamas terrorists, and to cease hiring, arming and paying Hamas operatives in the PA security services.

With very rare exceptions, which invariability resulted from what the PA perceived to be a serious threat to its own self-interest (e.g. when Israel's requests were accompanied by serious pressure from United States) these requests were rejected and/or ignored by the PA.

November 15, 2010

_____
Ofer Saad

5