UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE ESTATE OF YARON UNGAR, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 00-105L |
| THE PALESTINIAN AUTHORITY, et al., | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION PURSUANT TO *DAUBERT* AND FEDERAL RULES OF EVIDENCE 702
AND 403 TO EXCLUDE TESTIMONY BY PLAINTIFFS' EXPERT WITNESSES**

Defendants hereby move to exclude the testimony of *all* of Plaintiffs' expert witnesses.

In the normal course, a party may depose an expert witness to develop arguments in support of a

*Daubert* challenge. Accordingly, Defendants noticed the depositions of each of Plaintiffs'

experts in this matter shortly after they were disclosed. Plaintiffs, however, refused to produce

any of their expert witnesses for deposition -- with the exception of Ofer Saad -- and even then,

Plaintiffs noticed Mr. Saad's deposition themselves, as a *de bene esse* proceeding, depriving

Defendants of the opportunity to conduct a discovery deposition, and essentially limiting

Defendants to hearing cross-examination. Thus, Defendants are constrained to bring their

*Daubert* challenge now, as they must under the Court's scheduling order, but Defendants do so

without the benefit of any deposition testimony concerning the experts' opinions, their

underlying methodologies, or the bases for their opinions. So, based solely on their expert

reports, Defendants challenge herein the proposed testimony of Allan Brenman, Matthew Levitt,

Daniel Reisner, Barry Rubin, and Ofer Saad. As they must under the circumstances, Defendants

reserve the right to raise additional arguments to exclude the testimony of these five experts.

Defendants also reserve the right to raise appropriate *Daubert* challenges as to Plaintiffs' other experts after Defendants have had an opportunity to examine those witnesses.

## INTRODUCTION

Following the January 18, 2011 hearing in this matter, the Court will decide whether to vacate the default judgment entered against Defendants. As part of its analysis, the Court must consider, *inter alia*, two issues. First, the Court must assess whether the amount of damages awarded to Plaintiffs would withstand adversarial testing. The proposed testimony of one of Plaintiffs' experts -- Allan Brenman -- purportedly addresses this issue. Second, the Court must weigh Defendants' meritorious defenses, which include, simply put, that Mr. Ungar was not killed "by reason of" an "act of international terrorism" committed by Defendants. Plaintiffs have proffered the testimony of four "merits" experts -- Matthew Levitt, Daniel Reisner, Barry Rubin, and Ofer Saad -- purportedly to rebut Defendants' evidentiary showing on this single issue.

The Court should exclude the testimony of all five of these experts for at least three independent reasons. First, Plaintiffs have failed to establish that the proposed testimony of any one of the five expert witnesses is reliable. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Second, Plaintiffs have not demonstrated that the proposed testimony of their four "merits" experts is relevant. *Id*. And third, the testimony of the "merits" experts is cumulative, duplicative, and prejudicial. *See* Fed. R. Evid. 403.

Contemporaneous with the filing of this Motion, Defendants have moved to exclude the testimony of these same experts based on Plaintiffs' refusal to produce adequate and timely expert reports and to produce the experts for deposition as required by the Federal Rules of Civil Procedure. *See* Defendants' Motion to Exclude Evidence Not Disclosed or Produced by

2

1120996.4

Plaintiffs During the Discovery Period (Dkt. 620) ("Defendants' Motion to Exclude").  To the extent the Court denies Defendants' Motion to Exclude, the Court is asked to address the instant motion, and exclude any expert testimony that fails to comply with *Daubert* and the Federal Rules of Evidence.

## BACKGROUND

During the final week of the discovery period in this case, Plaintiffs provided Defendants with reports for some of their expert witnesses, including those witnesses who are the primary subjects of this motion: Allan Brenman, Matthew Levitt, Daniel Reisner, Barry Rubin, and Ofer Saad.  Defendants briefly describe the reports of each of these purported experts below.

A.    <u>Allan Brenman</u>

Dr. Brenman, a licensed psychologist, testified at the July 15, 2002 damages hearing in this matter.  At that hearing, Dr. Brenman testified about how the mental health of the minor Plaintiffs Dvir and Yishai Ungar would be affected by their father's death. *See generally* Transcript of July 15, 2002 Hearing at 3-28 (attached hereto as Exhibit A).  More specifically, Dr. Brenman opined that while the boys were doing "quite well" at the time, *id.* at 9, 26, he had concerns that Dvir was "overprotective" of his younger brother, *id.*, and that Yishai was "beginning to show a temper and some anger." *Id.* at 10.  Dr. Brenman also opined that they would "have to deal with their parents' death all over again" at certain developmental stages in their lives, *id.* at 14, 23, and that they might experience anxiety later in life. *Id.* at 21, 26-27.

These opinions were based on what Dr. Brenman himself admitted were "superficial" conversations that he had with Dvir and Yishai Ungar, which Dr. Brenman stated in no way constituted "in-depth" assessments of them. *Id.* at 9.  Dr. Brenman indicated that he also spoke with the boys' grandparents and observed them with their grandparents. *Id.*

1120996.4

In his November 11, 2010 expert report, Dr. Brenman stated that he had reviewed his testimony from the damages hearing and "stand[s] by" it.  Report of Allan J. Brenman, Ed.D. at 1 (attached hereto as Exhibit B).  In his report, Dr. Brenman provides no additional support for his opinions.  *See generally id.*

B.   <u>Matthew Levitt</u>

In his report, Dr. Levitt disagrees with Defendants' expert (Glenn Robinson) that the PA's policy toward Hamas during the relevant period "was one of 'significant repression' and 'Violent repression.'"  Report of Matthew Levitt at 2 (attached hereto as Exhibit C).  Dr. Levitt opines that Dr. Robinson's "assertion cannot be squared with the facts on the ground in the PA-governed areas in the West Bank ('Area A') and Gaza Strip during this period."  *Id.*  Dr. Levitt asserts that "[d]uring the relevant period (and since)," Hamas conducted a "broad range" of so-called "social service" activities, which generated support for Hamas "and its platform," allowed Hamas to "raise funds for ostensibly legitimate purposes and then channel[] those funds to terrorist activities," and paid Hamas terrorist leaders and activists.  *Id.*  According to Dr. Levitt, "Hamas' 'social service' network openly maintained numerous institutions in the PA-governed areas in the West Bank and Gaza Strip."  *Id.*  Finally, Dr. Levitt states that "[w]hile at particular times of political crisis the PA acted to repress or disrupt these Hamas institutions, as a rule these institutions were permitted to operate in Area A and PA-controlled regions of the Gaza Strip during the relevant period."  *Id.* at 3.

In one sentence, Dr. Levitt explains the basis for his wide-ranging opinions:

> My opinions, as presented below and as will be presented in my testimony, are based knowledge [*sic*] acquired through many years of professional and academic study, research and publishing regarding Hamas, interviews that I have conducted with American, Palestinian and Israeli officials, publically available documents,

1120996.4

court and prosecutorial documents and non-public documents and
written materials that I have obtained in the course of my work.

*Id.* at 2.  Nowhere does Dr. Levitt's report list any specific materials relied upon, and nowhere in

his report does Dr. Levitt connect any particular document or interview to a given opinion.

Plaintiffs have failed to produce any of the materials -- the interviews, documents, and other

evidence -- considered by Dr. Levitt and referenced in his report.

    C.    <u>Daniel Reisner</u>

    The report of Mr. Reisner, an Israeli lawyer, greatly resembles that of Dr. Levitt.  Like

Dr. Levitt, Mr. Reisner states that "between the time of its establishment in 1994 and the Ungars'

murder in June 1996 the PA had de jure control over many areas in the West Bank and over

approximately 80% of the Gaza Strip."  Report of Daniel Reisner at ¶ 18 (attached hereto as

Exhibit D).  He further opines that "the PA attained almost total *internal* territorial, functional

and personal jurisdiction, powers and responsibilities in Areas A and B in the West Bank, and

over the Palestinian residents of the West Bank, making it both the de jure and de facto

controlling entity therein."  *Id.* at ¶ 24 (emphasis in original).

    As did Dr. Levitt, Mr. Reisner described the basis for his opinions in one sentence:

> My opinions presented herein are based on my many years of
> professional experience and knowledge regarding Israeli and
> international law, the provisions of the Oslo Accords (which were
> negotiated and drafted in significant part by me personally), and
> the origin, legal status and capacities of the Palestinian Authority.

*Id.* at ¶ 15.  While Mr. Reisner provides a list of certain materials he considered, those materials

are not relevant to the challenge made herein, and his report does not cite any of these materials

as support for the opinions described *supra*, nor does his report provide any other support for those opinions.[1]

    D.    <u>Barry Rubin</u>

In his lengthy report, Dr. Rubin spends twenty pages opining that Glenn Robinson and Raja Shehadeh, two of Defendants' expert witnesses, have "[m]ischaracterized" the control that Defendants had over "[m]ost of Gaza and [m]any [a]reas of the West Bank" in the years leading up to Mr. Ungar's death, and that Dr. Robinson has "[m]ischaracterized" the relationship between Defendants and Hamas during the same period. *See generally* Report of Barry Rubin at 5-24 (attached hereto as Exhibit E). It would make this Motion over-long if it sought to capture the breadth of Dr. Rubin's report, but suffice it to say that like Ofer Saad (see discussion *infra*), Dr. Rubin states that the PA's security forces could have controlled Hamas, but "[t]hey simply didn't try to do so at all except for rare occasions." *Id.* at 12. And as with all of Plaintiffs' "merits" experts, Dr. Rubin states that "[s]ince 1994, the PLO -- through the [PA] -- and the PA itself was the internationally recognized and functioning ruler of almost all of the Gaza Strip and much of the West Bank. It also did have direct control over Area A of the West Bank and over most of the Gaza Strip." *Id.* at 20. Otherwise, Dr. Rubin's report discusses the Oslo Accords (*id.* at 5-7), the PA's security forces (*id.* at 7-12), the purported relationship between Defendants and Hamas (*id.* at 12-18), and Yasser Arafat's purported "strategy to try to co-opt Hamas and other radical, anti-Oslo opposition groups politically while using them as a fighting force to further his needs" (*see id.* at 18-24).

---

[1] The materials that Mr. Reisner states he considered relate to the Oslo Accords. *See* Exhibit D at ¶ 14. He cites these materials as support for his opinion that "the PA that exists today bears all the liabilities and obligations of the PA that existed prior to the elections that were held pursuant to the Interim Agreement." *Id.* at ¶ 32.

Throughout his report, Dr. Rubin adopts obvious hearsay statements attributed to various individuals, and supported by citations to news reports. *See, e.g., id.* at 9 n.9; *id.* at 19 n.33; *id.* at 19-20 n.34. He also cites "interviews" (some anonymous, some attributed to specific individuals) to support claims (some relaying additional hearsay) that, for example, human rights activists "and those exposing corruption" were arrested (*id.* at 11 n.17), that Mr. Arafat failed to take action against an alleged Hamas terrorist after Israel gave Mr. Arafat intelligence about the terrorist's "activities and whereabouts" (*id.* at 15 n.23), that Mr. Arafat threatened to walk out of a summit with President Clinton (*id.* at 16 n.28), and that in late 1996, Mr. Arafat agreed to a ceasefire with Israel after threatened with the prospect of Israeli tanks entering Nablus (*id.* at 16 n.29).

In one sentence, Dr. Rubin states that all of these opinions are based on:

> decades of academic and professional studies and research, and monitoring of events in the West Bank and Gaza Strip through, *inter alia*, the Palestinian print and electronic news media, the official publications and websites of the PA and of the PLO and the PLO's various factions, and personal contacts and discussions with Palestinian political leaders and academics.

*Id.* at 5. Plaintiffs have failed to produce to Defendants any of the interviews considered by Dr. Rubin, in particular those referenced at footnotes 17, 23, 28 and 29 of his report.

E.    Ofer Saad

As with all of Plaintiffs' other "merits" experts, Ofer Saad also opines that "[b]etween 1994 and June 1996, in 80% of the Gaza Strip governed by the PA and in the West Bank cities designated as Area A, the PA had both complete territorial control and an extremely strong measure of control over the Palestinian population." Report of Ofer Saad at 2 (attached hereto as Exhibit F); *see also id.* at 3 ("Thus, the PA had full control over Area A and 80% of the Gaza Strip during this period."). He also states that the PA "security services and intelligence agencies

1120996.4

were highly effective, had no trouble controlling the population and territories governed by the PA and had both the necessary intelligence and the operational capability to eliminate Hamas' infrastructure and prevent Hamas' activities in Area A and in PA-ruled Gaza if the PA had so desired." *Id.* at 3. And Mr. Saad also claims, as did Dr. Levitt, that the PA's policy and actions toward Hamas during this period were not characterized by hostility or significant or violent repression. *Id.* at 4.

With even less detail than any of the other merits experts' single-sentence explanations of their opinions, Mr. Saad has based his expert opinion solely on "the knowledge and information [he] acquired during [his] service in the [Israeli] IDF intelligence branch." *Id.* at 1. Mr. Saad describes that "knowledge and information" as follows: "In the course of my service in the IDF Intelligence Branch I received and read many thousands of intelligence items -- including raw intelligence data obtained from electronic and human sources as well as intelligence summaries and analyses compiled from such raw data -- relating to the activities of the [PA], the [PLO] and Hamas between 1994 and June 1996." *Id.*

Mr. Saad's report provides no list of source materials, and counsel for Plaintiffs has confirmed that Mr. Saad actually reviewed *no* data or information in forming his opinions in this case. Exhibit G at 4. Instead, Mr. Saad's report is admittedly based on nothing more than "his *experience and knowledge generally.*" *Id.* (emphasis added).

## ARGUMENT

Plaintiffs have not met their burden of establishing that the proposed testimony of Allan Brenman is reliable, and they have not met their burden of demonstrating that the proposed testimony of Matthew Levitt, Daniel Reisner, Barry Rubin, and Ofer Saad is reliable, relevant, and non-cumulative. As a result, and as described in greater detail below, the Court should

1120996.4

exclude the testimony of all five of these experts.  In addition, Defendants reserve the right to raise additional arguments to exclude the testimony of the experts who are the primary subjects of this motion, as well as to raise appropriate *Daubert* challenges as to Plaintiffs' other experts after Defendants have had an opportunity to examine the witnesses, to determine, in part, whether their offered opinions, their underlying methodologies, or the bases for their opinions meet the gate-keeper threshold established by *Daubert* and its progeny.

## I.    BEFORE THE COURT CAN ADMIT EXPERT TESTIMONY, PLAINTIFFS MUST ESTABLISH THAT THE PROPOSED TESTIMONY IS BOTH RELIABLE AND RELEVANT

Federal Rule of Evidence 702 makes admissible expert testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Despite the "apparent breadth" of this language, the rule "does not give experts carte blanche." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 80 (1st Cir. 1998).  Instead, the trial court acts as a gatekeeper and regulates the testimony of expert witnesses.

The trial court's inquiry under Rule 702 is "flexible." *United States v. Vargas*, 471 F.3d 255, 261 (1st Cir. 2006).  The court, which "enjoys broad latitude in executing its gate-keeping function," is not required to follow a particular procedure. *Id.*  That said, however, in its role as gatekeeper, the trial court must ensure that two threshold requirements are met before the court admits expert testimony. *Id.*  First, the court must ensure that an expert's proposed testimony rests "on a reliable foundation." *Id.* (quoting *Daubert*, 509 U.S. at 597).  Second, the court must also ensure that the expert's proposed testimony "is relevant to the task at hand." *Id.*

These two considerations, which are explained in greater detail below, are "legal judgments," and the trial court "cannot abdicate the responsibility for making those judgments by delegating them to the scientific community." *Ruiz-Troche*, 161 F.3d at 81.  Indeed, "the trial

1120996.4

court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

Moreover, it is the proponent's burden to demonstrate the admissibility of the expert's proposed testimony. *Ruiz-Troche*, 161 F.3d at 85. "In meeting this burden, the proponent must not assume that an evidentiary hearing will be held; the trial court has the discretion to decide the motion on briefs and with reference to expert reports, depositions and affidavits on record." *Koken v. Auburn Manufacturing, Inc.*, No. 02-83-B-C, 2004 U.S. Dist. LEXIS 16738, at *27 (D. Me. Aug. 20, 2004) (citing *Ruiz-Troche*, 161 F.3d at 83-84). In *Koken*, the Court expressly relied on the proposed experts' deposition testimony to determine whether there was a factual basis to exclude their testimony from evidence. *See id.* at *27-30. Plaintiffs, however, have unilaterally denied Defendants the opportunity to develop deposition testimony here.

A.    <u>To Establish the Reliability of an Expert's Proposed Testimony, the Record Must Contain Evidence Explaining the Methodology Employed, Provide the Data Underlying the Expert's Opinions, and Explain How the Expert's Experience Leads to the Conclusion Reached</u>

The court's reliability analysis "includes consideration of several factors: the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community." *Ruiz-Troche*, 161 F.3d at 80-81. While the foregoing factors do not constitute a definitive checklist or test, analysis of such matters ensures that "proposed expert testimony imparts 'scientific knowledge' rather than guesswork." *Id.* at 81 (quoting *Daubert*, 509 U.S. at 592). Thus, it is the proponent's responsibility "to ensure that the record contains evidence explaining the methodology the expert employed to reach the challenged conclusion

10

and why this methodology is a reasonably reliable one to employ." *Koken*, 2004 U.S. Dist. LEXIS 16738, at *27-28.

As part of its reliability assessment, the trial court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche*, 161 F.3d at 81. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.* (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "Stated otherwise, expert opinions must have a 'traceable, analytical basis in objective fact.'" *United States ex rel. Maxwell v. Kerr-McGee Chemical Worldwide, LLC*, No. 04-cv-01224-PSF-CBS, 2006 U.S. Dist. LEXIS 49859, at *22 (D. Colo. July 21, 2006) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998)).

Should the proponent of the expert testimony fail to provide the data and information underlying the expert's opinion, the court should exclude the expert's testimony. *See, e.g.*, *United States v. Brien*, 59 F.3d 274, 277-78 (1st Cir. 1995) (sustaining trial court's decision to exclude expert testimony, where the trial court "made clear his need for some proffer of data or literature underlying the expert's assumptions and conclusions, and the defense offered practically nothing"); *Figueroa v. Simplicity Plan de Puerto Rico*, 267 F. Supp. 2d 161, 167 (D.P.R. 2003) (granting motion to exclude expert's testimony, where "respected psychiatrist" did not "provide the scientific knowledge and methodology used to produce his opinion and diagnosis in his psychiatric report of the plaintiffs").

Exclusion is appropriate even when the information underlying the expert's opinion is confidential and the proponent is unwilling or unable to supply that information. For example, in *In re Leap Wireless Int'l, Inc.*, 301 B.R. 80, 84 (Bankr. S.D. Cal. 2003), the court excluded

1120996.4

testimony from a valuation expert that was based upon confidential pricing information that the witness was not able to disclose. *See id.* As the court explained: "The Court is left with a report which inextricably relies on confidential information for the conclusions reached by the witness." *Id.* "The Court and [creditor] are left with the bare option of, to paraphrase, to trust but not to verify." *Id.* at 85. As such, the court refused to allow such unverifiable testimony into evidence: "Although this evidence may be probative, its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* (citing Fed. R. Evid. 403); *see also Brien*, 59 F.3d at 277 (affirming exclusion of expert testimony where the expert "offered a set of assertions whose helpfulness and reliability in this case depended on what lay underneath them," but proponent had failed to provide the data or literature underlying the expert's opinions).

And exclusion remains appropriate when the expert witness's testimony relies, without explanation, on his experience. "[T]he witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Nacchio*, 555 F.3d at 1258 (quoting Fed. R. Evid. 702 advisory committee's note (2000)). Even where an expert witness has generally been permitted to testify in the past, the trial court cannot rely on the witness's qualifications to tip the balance in favor of admissibility. *Id.* Instead, the court has "an obligation to assess the methodology" actually employed in the case at hand. *Id.*; *see also United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-240-G, 2007 U.S. Dist. LEXIS 51184, at *8, 25-26 (N.D. Tex. July 16, 2007) (holding that the Government -- which had indicated that much of Dr. Levitt's testimony would be drawn from a book he authored -- had not met its burden of establishing the reliability of Dr. Levitt's methodology, and requiring a *Daubert* hearing to "establish the reliability thereof").

12

1120996.4

Finally, while an expert's opinion may be based on hearsay, the expert's testimony "may not be a conduit for the introduction of factual assertions that are not based on personal knowledge." *Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 2010 U.S. Dist. LEXIS 53295, at *9 (D.D.C. May 29, 2010). "This sort of summarizing of factual evidence is particularly of concern" where the party proffering the evidence "will offer no fact witness on these issues that the defendant could test through cross-examination." *United States v. Paracha*, No. 03-CR-1197, 2006 U.S. Dist. LEXIS 1, at *70 (S.D.N.Y. Jan. 3, 2006).

> B.  To Establish That an Expert's Proposed Testimony Is Relevant, There Must Be a Valid Scientific Connection to the "Pertinent Inquiry" -- Whether Mr. Ungar Was Killed "By Reason of" an "Act of International Terrorism" Committed by Defendants

As for the relevancy requirement, "[t]o be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, *see* Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81. "In other words, Rule 702, as visualized through the *Daubert* prism, 'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Id.* (quoting *Daubert*, 509 U.S. at 592).

Here, the "pertinent inquiry" for the "merits" experts is whether Mr. Ungar was killed "by reason of" an "act of international terrorism" committed by Defendants. 18 U.S.C. § 2333(a). As the "by reason of" language makes clear, the ATA expressly requires a causal connection between acts of the defendant and the death or injury of the U.S. national. *See Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 295 (S.D.N.Y. 2009) (explaining that Section 2333(a)'s "'by reason of' language, ultimately derived from the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 12-27, 52-53, has typically been construed to be synonymous with 'proximate cause.'"); Memorandum Order at 10, *Parsons v. Palestinian Auth.*, No. 07-1847 (D.D.C. Sept.

13

30, 2008) ("Adhering to traditional theories of tort law infused by Congress into the ATA, a plaintiff's injuries must also be the reasonably foreseeable result of a defendant's acts."); *Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702, 2006 U.S. Dist. LEXIS 72649, at *57 (E.D.N.Y. Oct. 5, 2006) (under Section 2333, defendants' actions must be "a substantial factor in the sequence of responsible causation"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 102 (D.D.C. 2003) ("to succeed on any of their [ATA] claims … plaintiffs will have to establish … an appropriate causal link between the actions of that defendant and plaintiffs' injuries.").

In other ATA cases brought against Defendants, courts have found expert testimony to be irrelevant where the testimony did not provide a connection between Defendants and the attack in question. For example, in *Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 2010 U.S. Dist. LEXIS 53295, at *8-9 (D.D.C. 2010), Judge Robertson found a report submitted by Dr. Levitt to be inadmissible on the basis of relevance -- in that it failed to tie the attack at question to Defendants (through Defendants' purported affiliation with the Popular Resistance Committee ("PRC")). *See id.* ("What the report does not do is offer any additional information that would support a finding that the PRC was responsible for the attack that killed Parsons.").

Similarly, another district court has found expert testimony on terrorism to be irrelevant, where, "though based on . . . extensive and continuing research," the proposed testimony was not relevant to the issues in the particular case. *United States v. Amawi*, 541 F. Supp. 2d 945, 949 (N.D. Ohio 2008). In *Amawi*, the court found that "[w]hat matter[ed]" in the case was whether the defendants' viewing and use of certain materials helped prove a fact in issue, "*i.e.*, their intent or other elements of one or more of the offenses charged." *Id.* at 950. In light of those considerations, the court held that the expert's proposed testimony "about the source, nature and utility of these materials [was] not necessary." *Id.*

1120996.4

*** 

Plaintiffs have failed to establish that the proposed testimony of any one of the five expert witnesses at issue is reliable. Their reports contain no evidence explaining the methodologies the experts have employed, provide none of the data underlying the experts' opinions, and do not explain how the experts' experience leads to the conclusions they have reached. Moreover, Plaintiffs have not demonstrated that the proposed testimony of their four "merits" experts is relevant. As a result of these deficiencies, the Court should grant Defendants' motion and exclude the testimony of all five experts pursuant to Rule 702.

## II.    PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THE PROPOSED TESTIMONY OF ALLAN BRENMAN RESTS ON A RELIABLE FOUNDATION

As described *supra*, at the July 15, 2002 damages hearing in this matter, the Court received testimony from Dr. Allan Brenman concerning how the mental health of the minor Plaintiffs Dvir and Yishai Ungar would be affected by their father's death. This was the only expert testimony before the Court that addressed the minor plaintiffs' mental injuries. And because Dr. Brenman's expert report "stand[s] by" his prior testimony and provides no additional support for his opinions, *see generally* Exhibit B, his prior testimony will remain the only information before the Court on this issue. Thus, whether the damages awarded to the minor plaintiffs on the basis of their mental injuries could withstand adversarial testing depends heavily on the admissibility of Dr. Brenman's testimony.

Yet, Plaintiffs have not established that Dr. Brenman's prior testimony is reliable. While the record explains the methodology employed by Dr. Brenman to reach his conclusions, that methodology consisted solely of admittedly "superficial" conversations with Dvir and Yishai Ungar, which were not "in-depth" assessments of them, as well as conversations with the boys' grandparents. *Id.* at 9.

15

With this bare record, Plaintiffs have failed to produce "evidence explaining...why this methodology is a reasonably reliable one to employ." *Koken*, 2004 U.S. Dist. LEXIS 16738, at *27-28. To the contrary, Dr. Brenman's assessment of the boys was wholly inadequate. *See* Report of Dr. Eileen Ryan at 2 (attached hereto as Exhibit H) ("A thorough forensic evaluation would need to have included a standard psychological or psychiatric evaluation of each boy, including a mental status evaluation, in order to diagnose the presence or absence of a mental disorder."). And relying on the perceptions of the boys' grandparents was an inadequate substitute for a thorough evaluation of the boys' emotions, cognitions, and behaviors. *Id.* In short, because Dr. Brenman lacked sufficient data on the boys' then-current mental state, his opinion was based on the possibilities of how children *might be expected* to react -- not how the boys *actually* reacted. *Id.* An adequate evaluation would have included additional data such as school, medical, and mental health records, and interviews with additional collateral sources who know the boys. *Id.*

In sum, Plaintiffs have not provided the Court with sufficient information for the Court, in its gate-keeping role, to ensure that Dr. Brenman's proposed testimony rests "on a reliable foundation." *Vargas*, 471 F.3d at 261 (quoting *Daubert*, 509 U.S. at 597). As a result, the Court should exclude Dr. Brenman's testimony. *See* Fed. R. Evid. 702; *Figueroa*, 267 F. Supp. 2d at 167; *see also Gier v. Educational Serv. Unit No. 16*, 66 F.3d 940, 944 (8th Cir. 1995) ("Even if we considered the evaluation methodology employed by the appellants' experts in this case to be reliable, it would be reliable only to choose 'a course of psychotherapy for these disturbed children, . . . which must . . . rely on perception as well as reality, and upon the subjective reports of parents or others.' *The methodology is not reliable enough to make factual or 'investigative conclusions' in legal proceedings*.") (citation omitted, alterations in original, emphasis added).

1120996.4

**III.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THE PROPOSED TESTIMONY OF THEIR "MERITS" EXPERTS -- MATTHEW LEVITT, DANIEL REISNER, BARRY RUBIN, AND OFER SAAD -- IS RELIABLE**

Nor have Plaintiffs established that the proposed testimony of any of their "merits" experts is reliable. The helpfulness and reliability of the testimony of these four experts depends on what lies underneath their opinions. *Brien*, 59 F.3d at 277. But Plaintiffs have failed to provide sufficient evidence for the court, as gate-keeper, to verify even the most minimal of requirements -- that the expert's theories are based on something more than guesswork. *Ruiz-Troche*, 161 F.3d at 81. For example, there is no indication that the merits experts' opinions have been subject to peer review, *id.*, or that the experts' (undisclosed) methodology was a "reasonably reliable one to employ." *Koken*, 2004 U.S. Dist. LEXIS 16738, at *27-28.

For the most part, the court cannot evaluate the data offered to support the experts' bottom-line opinions, because Plaintiffs have provided no such data. As a result, the Court is left without any evidence to determine whether that data would "provide adequate support to mark the expert[s'] testimony as reliable." *Ruiz-Troche*, 161 F.3d at 81. The opinions proffered by Plaintiffs' experts are theoretically connected to data "only by the *ipse dixit*" of the experts themselves. *Id.* This is unacceptable, and the Court should exclude the experts' testimony. *See, e.g.*, *Brien*, 59 F.3d at 277-78; *Figueroa*, 267 F. Supp. 2d at 167.

Exclusion is clearly appropriate for the testimony of Dr. Levitt, Mr. Reisner, and Mr. Saad. Their expert reports provide no substantive explanation for their opinions at all. Instead, they seem to merely rely, without explanation, on their experience. This cannot suffice to meet Plaintiffs' burden, as they must instead "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Nacchio*, 555 F.3d at 1258. None of the expert reports comes

17

close to accomplishing this, and in the past this approach has doomed the testimony of Dr. Levitt in particular. *Holy Land Found. for Relief & Dev.*, 2007 U.S. Dist. LEXIS 51184, at *8, 25-26 (holding that the Government had not met its burden of establishing the reliability of Dr. Levitt's methodology, where the Government had merely indicated that much of Dr. Levitt's testimony would be drawn from a book he authored).

And even in the case of Dr. Rubin, who provided citations for some -- but not all -- of his assertions, exclusion remains appropriate. His report cites interviews, often undated, with no description of the place or circumstances surrounding the interview. *See, e.g.*, Exhibit E at 11 n.17, 15 n.23, 16 n.28, 16 n.29. And there are dozens of instances in which Dr. Rubin has provided no citation at all for his statements. *See generally* Exhibit E. These undocumented statements are *ipse dixit* in the worst sense. Even where Dr. Rubin's report does provide citations -- most of which are to news articles, which contain an unknown number of layers of hearsay -- they do not even purport to support the opinions challenged here. While an expert's opinions may be *based* on hearsay, an expert's testimony "may not be a conduit for the introduction of factual assertions that are not based on personal knowledge." *Parsons*, 2010 U.S. Dist. LEXIS 53295, at *9. Plaintiffs' blatant attempt to introduce hearsay in the guise of expert testimony "is particularly of concern," as Plaintiffs "will offer no fact witness on these issues that the defendant could test through cross-examination." *Paracha*, 2006 U.S. Dist. LEXIS 1, at *70.

Finally, while these deficiencies provide clear grounds to exclude the testimony of all Plaintiffs' merits experts, Defendants are in a situation in which they face particularly severe prejudice from Mr. Saad's proposed testimony. Plaintiffs do not plan to call Mr. Saad as a witness at the January 18, 2011 hearing; instead, they have scheduled a *de bene esse* deposition for December 1, 2010 to memorialize his testimony, which Plaintiffs will presumably seek to

introduce at the hearing itself. Because Mr. Saad "reviewed no specific documents in preparing his report," and because his opinion is based solely "on his experience and knowledge generally," *see* Exhibit G at 4, Defendants have no access to any of the factual bases for Mr. Saad's opinions. Thus, Defendants will have no opportunity to impeach or undermine the reliability of his testimony through source material, and they will necessarily be prejudiced in their ability to cross-examine him. Indeed, Mr. Saad's opinion is at least in part purportedly based on confidential intelligence information. *See In re Leap Wireless Int., Inc.*, 301 B.R. at 84. As the Court found in *In re Leap Wireless Int.*, although Mr. Saad's evidence "may be probative, its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 85; *see also Brien*, 59 F.3d at 277 (affirming exclusion of expert testimony where proponent had failed to provide the data or literature underlying the expert's opinions).

Without fail, all four of Plaintiffs' merits experts have provided single-sentence descriptions of the bases for their opinions, relying entirely on a variety of anonymous data -- interviews with "officials" and "personal contacts," documents (some publicly available, some not, but usually not described at all much less with sufficient information to be useful to Defendants), unnamed court documents, "intelligence reports," and unspecified "experience." In essence, Plaintiffs are asking the Court to trust these experts' proposed testimony, but not to verify it. As gate-keeper, the Court should not permit this. Because Plaintiffs have refused to produce any of the data underlying their experts' opinions, and because the experts' experience alone is insufficient to demonstrate the reliability of their opinions, the Court should exclude their testimony. *See Ruiz-Troche*, 161 F.3d at 85; *Brien*, 59 F.3d at 277; *Nacchio*, 555 F.3d at 1258; *Holy Land Found. for Relief & Dev.*, 2007 U.S. Dist. LEXIS 51184, at *8.

1120996.4

IV.   **PLAINTIFFS HAVE NOT ESTABLISHED THAT THE PROPOSED TESTIMONY OF THEIR FOUR "MERITS" EXPERTS IS RELEVANT TO THE TASK AT HAND**

Assuming *arguendo* that the Court finds any of the proposed testimony of Plaintiffs' merits experts to be reliable, their testimony is otherwise irrelevant. As a result, their opinions do not help prove a fact in issue, their testimony is "not necessary," and it should be excluded. *Amawi*, 541 F. Supp. 2d at 949; *see also* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 597.

First, most of the merits experts' proposed testimony largely hinges on Hamas' alleged activities in Area A of the West Bank and in "PA-controlled" regions of the Gaza Strip. But, as noted in the report of Defendants' expert Glenn Robinson, the individuals who attacked Mr. Ungar did not live in territory under the security control of the PA. Report of Glenn Robinson at 3 (attached hereto as Exhibit I). Instead, they were from Surif and Jerusalem, *id.*, which, as admitted by Plaintiffs' own experts, remained under the control of Israel at the time of Mr. Ungar's death. Exhibit D at ¶ 23; Exhibit F at 3. As a result, nothing that Defendants allegedly did (or failed to do) in Area A or the West Bank provides a causal connection between acts or omissions of Defendants and Mr. Ungar's death, *see* 18 U.S.C. § 2333(a), and their opinions in this regard are therefore irrelevant, *Parsons*, 2010 U.S. Dist. LEXIS 53295, at *8-9.

Second, some of the experts' proposed testimony concerns events that post-date Mr. Ungar's death. This testimony is likewise irrelevant and should be excluded. *See, e.g., In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1026 (D. Mo. 2009) (holding that expert witnesses could not "base their testimony on conditions outside the relevant time frame"); *Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.*, 245 F. Supp. 2d 563 (D.N.J. 2001) (excluding testimony on dust sampling conducted in 1996, 1997 and 2000 to demonstrate asbestos conditions during the years relevant to the lawsuit, 1978-1991); *Adams v. NVR Homes,*

1120996.4

*Inc.*, 141 F. Supp. 2d 554, 560 (D. Md. 2001) (holding that expert witness's proposed testimony was irrelevant because it did not "shed light" on the applicable standard of care during relevant time period).

And finally, whatever remains of the experts' proposed testimony, it fails to "fit" the issues presented in this case. *See Ruiz-Troche*, 161 F.3d at 81 (noting the "intuitive idea of 'fit'" that the courts "have come to call the special kind of relevance that *Daubert* demands"); *Parsons*, 2010 U.S. Dist. LEXIS 53295, at *8-9.

Dr. Levitt's testimony is irrelevant on all three of the grounds mentioned *supra*. According to Dr. Levitt, the so-called "social services" conducted by Hamas operated in "the PA-governed areas *in the West Bank ('Area A') and Gaza Strip...*" Exhibit C at 2 (emphasis added). Dr. Levitt also relies on events that occurred after Mr. Ungar's death. *Id.* (stating that Hamas conducted these "social service" activities "[d]uring the relevant period (*and since*)") (emphasis added). And once these opinions are excluded, what remains is Dr. Levitt's testimony concerning the existence and substance of Hamas' purported "social services," which has nothing at all to do with this case: Plaintiffs do not allege that a Hamas-affiliated charity killed Mr. Ungar, so evidence relating to Defendants' purported failure to crack down on these organizations does not "fit" the issues presented in this case.

The proposed testimony of Mr. Reisner is irrelevant for similar reasons. He likewise relies on Hamas' purported activities in Area A and the Gaza Strip, Exhibit D at ¶¶ 16-26, when this case is wholly unrelated to those geographic areas. Mr. Reisner also provides an opinion on the issue of successor liability. *See id.* at ¶¶ 27-32. While Mr. Reisner's proposed testimony on this point is arguably in response to Mr. Shehadeh's report, *see id.* at ¶ 27, it remains irrelevant.

21

1120996.4

Mr. Ungar was killed in 1996; opinion evidence concerning the significance of changes made in 1995 to the PA's legal liabilities -- a year *before* Mr. Ungar's death -- are of no moment.

Dr. Rubin's report also fails on all three relevance grounds. His proposed testimony addresses the PA's control of Area A of the West Bank and regions of the Gaza Strip. Exhibit E at 6. Dr. Rubin also relies on numerous events post-dating Mr. Ungar's death in reaching his opinion. *Id.* at 14 (describing occasions in November 1996, November 1997, and in 2002, when "the PA was able to deliver calm without difficulty"); *id.* at 16 (describing a "tunnel crisis" that took place in "late 1996"); *id.* at 17 ("From the beginning of the PA in 1994 *to the present day*, no PA official . . . has ever been expelled, censured, fired, or punished for involvement in terrorism.") (emphasis added); *id.* (stating, rhetorically, that it was only after Hamas' election victory in 2005 that they "dare[d] [to] defy the PA regime"); *id.* at 19 (describing an "incident that happened in 2000"). Such testimony, pertaining to events outside the relevant time frame, do not help prove a fact in issue in this case. The remainder of Dr. Rubin's testimony does not "fit" this case either. His report centers around the theme that Defendants were purportedly unwilling to "reign in" Hamas in areas Defendants controlled. But Mr. Ungar was killed in Israel, and his assailants lived in areas of the West Bank controlled by Israel at the time of Mr. Ungar's death. Thus, Dr. Rubin's remaining proposed testimony on the Oslo Accords (*id.* at 5-7), the PA's security forces (*id.* at 7-12), the purported relationship between Defendants and Hamas (*id.* at 12-18), and Mr. Arafat's purported "strategy to try to co-opt Hamas and other radical, anti-Oslo opposition groups politically while using them as a fighting force to further his needs" (*see id.* at 18-24) does not fit this case and is irrelevant.

Finally, Mr. Saad's report also fails on all three relevance grounds. As with all of Plaintiffs' other merits experts, his report focuses on Defendants' purported control of Area A

1120996.4

and Gaza.  Exhibit F at 2-4.  In addition, he relies on events that took place after Mr. Ungar's death.  *Id.* at 3 (describing combat between the PA's security forces and the Israel Defense Forces in September 1996 -- three months after Mr. Ungar's death).  And the remainder of his proposed testimony -- concerning the power exercised by the commanders of the PA's security forces and Defendants' unwillingness to "control" Hamas in areas for which Defendants were responsible -- fails to fit Plaintiffs' own allegations.

## V.  PURSUANT TO FEDERAL RULE OF EVIDENCE 403, THE COURT SHOULD NOT PERMIT PLAINTIFFS' MERITS EXPERTS TO OFFER NEEDLESSLY CUMULATIVE TESTIMONY

Finally, Plaintiffs appear to have taken the "broken record" approach to engaging experts to testify on their behalf, as they seem to believe that it is better to have four experts give the same exact testimony than just one.  Yet, Federal Rule of Evidence 403 "enables a trial judge to exclude needlessly cumulative evidence," *Secretary of Labor v. DeSisto*, 929 F.2d 789, 794-795 (1st Cir. 1991), and gives the Court "wide discretion to determine whether testimony [is] … needlessly cumulative." *United States v. Rosa-Carino*, 615 F.3d 75, 81 (1st Cir. 2010).  Permitting numerous experts to opine on the same subject can be particularly prejudicial, given the potential weight afforded expert testimony.  *See Douglas v. United States*, 386 A.2d 289, 295 (D.C. 1978) ("[B]ecause scientific or expert testimony possesses an 'aura of special reliability and trust-worthiness,' . . . the reception of such evidence must be more limited than would be the case of similar non-expert testimony.") (internal citations omitted); *see also LaPlace-Bayard v. Batlle*, 295 F.3d 157, 164 (1st Cir. 2002) (affirming trial court's exclusion of expert testimony as cumulative).

There is no doubt that the proposed testimony of Plaintiffs' four "merits" experts is needlessly cumulative.  Three of them offer the same opinion, in remarkably similar language,

23

about Defendants' purported control over Area A of the West Bank and certain regions of the Gaza Strip. *See, e.g.*, Exhibit D at ¶¶ 16-26; Exhibit E at 6; Exhibit F at 2-4. And three of them opine on whether the PA significantly or violently repressed Hamas during the relevant period of time. *See, e.g.*, Exhibit C at 2-3; Exhibit E at 12-18; Exhibit F at 4-5.

Thus, should the Court find that any of the proposed testimony of Plaintiffs' "merits" experts is both reliable and relevant, Plaintiffs should be limited to offering a single expert witness as to each unique opinion. Plaintiffs should not be permitted to offer additional cumulative testimony that has the principal capacity to unfairly prejudice Defendants.

## CONCLUSION

For the reasons set forth herein, pursuant to *Daubert* and Federal Rules of Evidence 702 and 403, the Court should exclude the testimony of Plaintiffs' expert witnesses Allan Brenman, Matthew Levitt, Daniel Reisner, Barry Rubin, and Ofer Saad at the January 18, 2011 hearing in this matter.

1120996.4

Respectfully submitted,

Dated:  November 29, 2010

/s/ Mark J. Rochon
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
Richard A. Hibe y (D.C. Bar #74823)
Admitted *pro hac vice*
Brian A. Hill (D.C. Bar #456086)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
mrochon@milchev.com
rhibey@milchev.com
bhill@milchev.com

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and
the Palestine Liberation Organization*

1120996.4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 29th day of November 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to counsel of record for all parties.


_____/s/_____
Mark J. Rochon

1120996.4