UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE PALESTINIAN AUTHORITY, et al., )<br><br>Defendants. ) | C.A. No. 00-105L |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO HAVE REQUESTS FOR ADMISSION DEEMED ADMITTED

The Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") (collectively, "Defendants"), through counsel, respectfully submit the following in Memorandum in Support of their Motion to Have Requests for Admission Deemed Admitted.

## INTRODUCTION

On October 20, 2010, Defendants propounded a set of Requests for Admission ("Requests") and served them on Plaintiffs pursuant to Federal Rule of Civil Procedure ("Rule") 36. *See* Exh. A. Through these Requests, Defendants sought to narrow the issues to be litigated at the January 18, 2011 evidentiary hearing by asking Plaintiffs to admit certain facts that should not be in dispute or are supported by the information and documents produced in discovery. For example, eight of the Requests ask Plaintiffs to admit the truth of several paragraphs in their Complaint. *See* Part II. A., *infra.* Another 47 of the Requests ask Plaintiffs to admit the truth of statements that pertain directly to Defendants' meritorious defenses and made on behalf of Plaintiffs during parallel litigation in another jurisdiction. *See* Part II. B., *infra.*

Plaintiffs responded to the Requests on November 19. *See* Exh. B. Plaintiffs answered only one of the 233 Requests. *Id.* at 48 (Response to Request 215). In response to the remaining 232 Requests, Plaintiffs provided only objections.

During a November 24 telephone call scheduled to address a number of discovery issues, Defendants attempted to meet and confer with Plaintiffs regarding their non-responsiveness to Defendants' Requests for Admission. When defense counsel began this discussion by asking Plaintiffs why they refused to admit or deny Request No. 1, which asked Plaintiffs to admit a statement taken directly from Plaintiffs' Complaint, Plaintiffs' counsel argued that Defendants did not need Plaintiffs to admit statements like these, and stated they would be standing on all of their objections.

In this Motion, Defendants have individually listed all of the Requests they are now asking this Court to deem admitted, as the Local Rules require. *See* LR Cv 37(a). For ease of reference, Defendants have organized their Requests and Plaintiffs' responses by category. For the reasons described below, Defendants' Requests seek admissions on issues of relevance to the vacatur proceedings and Plaintiffs' blanket refusal to respond to the Requests constitutes grounds for this Court to deem the Requests admitted.

## ARGUMENT

Federal Rule of Civil Procedure 36 allows a party to "serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1). "If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). "A denial must fairly respond to the substance of the matter; and when

good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." *Id.*

"The requesting party may move to determine the sufficiency of an answer or objection. Unless the court finds an objection justified, it must order that an answer be served." Fed. R. Civ. P. 36(a)(6). "On finding that an answer does not comply with this rule, the court may order *either* that the matter is admitted or that an amended answer be served." *Id.* (emphasis added). "Although the district court should ordinarily first order an amended answer, and deem the matter admitted only if a sufficient answer is not timely filed, this determination, like most involved in the oversight of discovery, is left to the sound discretion of the district judge." *Asea, Inc. v. Southern Pacific Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981). Indeed, "a district court may, under proper circumstances and in its discretion, order admitted matters which an answering party has failed to admit or deny, where the information known or readily obtainable after reasonable inquiry was sufficient to enable the answering party to admit or deny." *Id.* at 1245; *see also House v. Giant of Md., LLC*, 232 F.R.D. 257, 262 (E.D. Va. 2005) ("The party to whom requests for admission are propounded acts at his own peril when answering or objecting. Gamesmanship in the form of non-responsive answers, vague promises of a future response, or quibbling objections can result in the request being deemed admitted . . . *without* prior opportunity to correct the deficiency") (emphasis in original); *DuFresne v. Microsoft Corp.*, No: 02-11778, 2005 U.S. Dist. LEXIS 43214, at *3 (D. Mass. Feb. 11, 2005) ("Rule 36 requires Plaintiff to answer requests for admission. In answering requests, Plaintiff is permitted to respond with objections. However, Plaintiff must still answer the requests based on his understanding of the facts.").

In the instant case, it is plain that Plaintiffs have not taken their obligation to respond to Defendants' Requests seriously. They have instead engaged in "gamesmanship" by refusing to respond to *all but one* of Defendants' Requests, forcing Defendants to file the instant motion, apparently anticipating that they will have an opportunity to correct any deficiency the Court finds with their responses at a later time. The Court should not countenance such tactics.

If the Court allows Plaintiffs a second opportunity to meaningfully respond to Defendants' Requests after it has considered this Motion, Plaintiffs' opposition, and Defendants' reply, Plaintiffs' corrected responses will come, if at all, just prior to the January 2011 evidentiary hearing, when they will be of little use to Defendants. Defendants propounded these Requests to facilitate the drafting of their pre-hearing brief and to determine which witnesses and exhibits they will need to include on their pre-hearing submissions to the Court, all of which must be finalized by December 17 under the Court's pre-hearing order. *See* Dkt. No. 489 at 1-2. Accordingly, the Court should not endorse Plaintiffs' tactics by allowing them a second opportunity to respond, but should instead deem the Requests admitted, as the Court is permitted to do under Rule 36 in its "sound discretion." *Asea, Inc*, 669 F.2d at 1247.[1]

## I.     PLAINTIFFS' GENERAL OBJECTIONS SHOULD BE STRICKEN

Plaintiffs prefaced their responses to Defendants' Requests by lodging several pages of general objections. *See* Exh. B at 1-4. Plaintiffs' reliance on general objections is inconsistent with their position that the assertion of "general boiler-plate objections" is "improper." *See* Dkt. No. 584 (Plaintiffs' Motion to Compel) at 3 ("It is well established that the assertion of objections in this fashion is improper -- and ineffective."). The doctrine of judicial estoppel

---

[1] If the Court is not inclined to deem the Requests admitted, Defendants respectfully request that the Court direct Plaintiffs to provide amended answers within five days of the Court's order to reduce the prejudice to Defendants from receiving untimely answers.

"prevents litigants from taking inconsistent positions in the same or a related case" and prohibits "litigants [from] playing fast and loose with the courts to obtain an unfair advantage." *See Global Naps, Inc. v. Verizon New Eng. Inc.*, 603 F.3d 71, 91 (1st Cir. 2010) (internal citation and quotation omitted).

## II.    PLAINTIFFS' SPECIFIC OBJECTIONS TO DEFENDANTS' REQUESTS SHOULD BE OVERRULED AND THE REQUESTS DEEMED ADMITTED

### A.    Requests Taken Directly from Allegations in Plaintiffs' Complaint

Nine of Defendants' Requests -- reproduced immediately below -- pertain specifically to allegations made in the First Amended Complaint (Dkt. No. 41) ("Complaint").

**No. 1.** Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members of a Hamas cell.[2]

**No. 2.** The Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members received instructions, weapons, money, and material support from commanders and leaders of Hamas.[3]

**No. 8.** Jamal Abdel Fatah Tzabich Al Hor and Abdel Rahman Ismail Abdel Rahman Ghanimat carried out a machine-gun attack on Yaron Ungar on June 9, 1996 from a car driven by Raed Fakhri Abu Hamdiya.[4]

**No. 9.** No one other than Jamal Abdel Fatah Tzabich Al Hor and Abdel Rahman Ismail Abdel Rahman Ghanimat were passengers in the car driven by Raed Fakhri Abu Hamdiya when the June 9, 1996 machine gun attack on Yaron Ungar was carried out.

**No. 10.** The weapons used in the shooting attack on Yaron Ungar were two Kalashnikov rifles.[5]

**No. 11.** Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out a machine-gun attack on Yaron Ungar as agents of Hamas.[6]

---

[2] Compl. ¶ 15.

[3] *Id.* ¶ 16

[4] *Id.* ¶¶ 18, 19.

[5] *Id.* ¶ 18.

[6] *Id.* ¶ 18.

**No. 23.**  In 1998, an Israeli court convicted Raed Fakhri Abu Hamdiya of membership in Hamas and of abetting the murder of Yaron Ungar.[7]

**No. 24.**  In 1998, an Israeli court convicted Abdel Rahman Ismail Abdel Rahman Ghanimat of membership in Hamas and of the murder of Yaron Ungar.[8]

**No. 25.**  In 1998, an Israeli court convicted Jamal Abdel Fatah Tzabich Al Hor of membership in Hamas and of the murder of Yaron Ungar.[9]

> With respect to Request No. 1, Plaintiffs provided the following response:

> > Plaintiffs incorporate by reference, as if fully set forth herein, the foregoing General Objections. In addition, Plaintiffs object to this Request on the grounds that: (a) it is not reasonably calculated to lead to the discovery of admissible evidence relating to the proceeding that is presently before this Court, i.e., Defendants' Rule 60(b) Motion to Vacate, (b) it requests information contrary to Magistrate Judge Martin's ruling that "Defendant The Palestinian Authority ("PA") does not need discovery from Plaintiffs in order to establish the existence of a meritorious defense . . . accordingly, Defendant is not entitled to merits of discovery," Dkt. # 577, p. 2, and (c) Magistrate Judge Martin has already ruled that Defendants are not permitted discovery which "would have the practical effect of re-opening this case before the Court has determined whether it should be reopened." Dkt. # 577, p. 3.

Exh. B at 4.  With respect to the remaining Requests that were tied to allegations in the

Complaint (Request Nos. 2, 8, 9, 10, 11, 23, 24, 25), Plaintiffs provided the following response:

> > Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1.

*Id.* at 6, 7, 9, 10.

---

[7] Compl. ¶ 20

[8] *Id.* ¶ 20.

[9] *Id.* ¶ 20.

Plaintiffs' first objection is that the Requests tied to the Complaint are "not reasonably calculated to lead to the discovery of admissible evidence relating to the proceeding that is presently before this Court, i.e., Defendants' Rule 60(b) Motion to Vacate." *Id.* at 4. Plaintiffs' position regarding relevancy is untenable. Defendants are seeking Plaintiffs' admission regarding specific allegations they made in their Complaint. Most of these Requests for Admission relate to allegations that the individuals who carried out the fatal attack on Mr. Ungar were members of a Hamas cell and acted on behalf of Hamas, facts that are relevant to the PA/PLO's meritorious defense that they are not responsible for the attack on Mr. Ungar. There can be no legitimate debate that the existence or non-existence of meritorious defenses is relevant to the Court's resolution of Defendants' Rule 60(b)(6) motion. *Ungar v. PLO*, 599 F.3d 79, 83 (1st Cir. 2010) (identifying "the existence or non-existence of meritorious claims of defense" as relevant to the Rule 60(b)(6) inquiry).

Plaintiffs' second objection regarding this category of Requests for Admission is that they "request[] information contrary to Magistrate Judge Martin's ruling that 'Defendant The Palestinian Authority ('PA') does not need discovery from Plaintiffs in order to establish the existence of a meritorious defense . . . accordingly, Defendant is not entitled to merits of discovery.'" Exh. B at 4 (quoting Dkt. No. 577 at 2).

Plaintiffs misapply Magistrate Judge Martin's ruling, which did not address Plaintiffs' obligation to respond to requests for admission. In his order of October 27, 2010, Magistrate Judge Martin denied in part Defendants' motion to compel answers to certain interrogatories and responses to certain document requests related to Defendants' meritorious defenses.[10] Magistrate Judge Martin explained: "While the existence or non-existence of meritorious claims

---

[10] Defendants have appealed Magistrate Judge Martin's ruling. *See* Dkt. No. 593.

of defense is a relevant factor in determining whether to grant relief pursuant to Fed. R. Civ. P. 60(b)(6), the underlying strength of Plaintiffs' claims is not. [Defendants do] not need *discovery* from Plaintiffs in order to establish the existence of a meritorious defense." Dkt. No. 577 at 1-2 (emphasis added). The rationale for Magistrate Judge Martin's ruling does not apply to requests for admission, which serve a different purpose than interrogatories and document requests. As Moore's Federal Practice explains:

> The general purpose of discovery is to elicit facts and information and to obtain production of documents. Requests for admission do not serve the same purpose as other discovery because requests for admission are not designed to elicit or discover facts but rather to eliminate issues not really in dispute between parties. By contrast, for example, interrogatories are designed to elicit relevant information that may or may not be admissible, but that may appear reasonably calculated to lead to discovery of admissible evidence. Because Rule 36 was not designed to elicit information, to obtain discovery of the existence of facts, or obtain production of documents, requests for admission should not be used as a method of discovery for those purposes.

7-36 Moore's Federal Practice - Civil § 36.02[2] (internal citations omitted). *See also Henry v. Champlain Enters., Inc.*, 212 F.R.D. 73, 77 (N.D.N.Y 2003) (noting that requests for admission are not a discovery device, but instead are intended to narrow issues and may be used to control costs of discovery); *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co.*, 174 F.R.D. 38, 42 (S.D.N.Y. 1997) (stating that Rule 36 is not a discovery device, but rather is used to reduce costs of litigation by eliminating need to prove facts not in substantial dispute); *Wigler v. Elec. Data Sys. Corp.*, 108 F.R.D. 204, 205 (D. Md. 1985) (stating that Rule 36 is not designed to obtain discovery of existence of facts, as such, but to discover and circumscribe contested factual issues so that disputed issues might be clearly and succinctly presented to trier of fact); *Printy v. Crochet & Borel Servs.*, 196 F.R.D. 46, 49 (E.D. Tex. 2000) (noting that the purpose of Rule 36 is to establish admission of facts about which there is no real dispute); *Safeco Ins. Co. of Am. v.*

*Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998) (describing the principal purpose of requests for admission as narrowing the range of issues for trial rather than as a discovery device).

Thus, in propounding Requests for Admission connected to the allegations in Plaintiffs' Complaint, Defendants were not asking Plaintiffs to provide them with discovery, but were asking Plaintiffs to agree or disagree that certain facts related to Defendants' meritorious defenses are conclusively established and not in dispute. *See, e.g., Duncan v. Santaniello*, No. 94-30224, 1996 U.S. Dist. LEXIS 3860, at *7 (D. Mass. Mar. 8, 1996) ("Indeed, to the extent that Defendants assert that the admissions sought are largely undisputed, the use of the request for admissions to 'conclusively establish' such facts as are not disputed is precisely the reason Rule 36 was adopted."). Nothing in Magistrate Judge Martin's ruling of October 27 excuses Plaintiffs from the obligation of responding to the Requests for Admission.

Plaintiffs' third objection is indistinguishable from the second, in that it relies upon a misinterpretation of Magistrate Judge Martin's October 27 Order. Plaintiffs state: "Magistrate Judge Martin has already ruled that Defendants are not permitted discovery which 'would have the practical effect of re-opening this case before the Court has determined whether it should be reopened.'" Exh. B at 4 (quoting Dkt. No. 577 at 3). But what Magistrate Judge Martin said in context is:

> Moreover, accepting [Defendants'] argument that [they are] entitled to merits discovery from Plaintiffs would have the practical effect of re-opening this case before the Court has determined whether it should be re-opened. . . . The Court declines to find that Defendants are [] entitled to impose the substantial burdens of merits discovery on Plaintiffs before Defendants have vacated the default judgment which Plaintiffs properly obtained.

Dkt. No. 577 at 3. Here, Defendants are not seeking discovery of Plaintiffs through their Requests for Admission. Moreover, it is hard to see how Defendants would be imposing a

"substantial burden" on Plaintiffs by asking them to admit certain allegations they have made in their Complaint.

For the foregoing reasons, Plaintiffs' objections to Request Nos. 1-2, 8-11, 23-25 should be overruled and the Requests deemed admitted.

### B.    Requests Taken Directly from Plaintiffs' Statements in *Ungar v. Iran*

Request Nos. 35-40 and 46-88 were tied directly to statements made by Plaintiffs and their witnesses and counsel in the parallel suit Plaintiffs brought against Iran to recover for their injuries (*see Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.) ("*Ungar v. Iran*")). Each request -- reproduced below -- was accompanied by a citation to the record in *Ungar v. Iran*. *See* Exh. A at 7-15.

**No. 35.** Yaron Ungar was murdered by agents of Hamas acting on behalf of Hamas.

**No. 36.** Yaron Ungar was murdered by agents of Hamas acting pursuant to the authorization of Hamas.

**No. 37.** The commander of the Hamas cell that murdered Yaron Ungar was Nasser Salah Talachmeh.

**No. 38.** At the time of the shooting, Nasser Salah Talachmeh was a high-ranking Hamas commander.

**No. 39.** Prior to the shooting, Nasser Salah Talachmeh supplied the Hamas cell that murdered Yaron Ungar with a steady supply of money to increase the volume of Hamas terrorist activity.

**No. 40.** Prior to the shooting, Nasser Salah Talachmeh supplied the Hamas cell that murdered Yaron Ungar with a Kalashnikov automatic rifle used to shoot at the car in which Yaron Ungar was killed, as well as funds to purchase other weapons.

**No. 46.** In 1995, the terrorist activities of the Hamas cell that murdered Yaron Ungar were not particularly successful, involved mostly killing with pistols, and were limited to the West Bank.

**No. 47.** In 1995, the Hamas cell that murdered the Ungars suffered from a lack of training.

**No. 48.** At the time of the shooting, Hassan Salameh was a senior member of Hamas.

**No. 49.** Prior to the shooting, Hassan Salameh had been trained by Iran to train others how to commit terrorist operations.

**No. 50.** Prior to the shooting, Nasser Salah Talachmeh specifically requested that Hassan Salameh train members of the cell that murdered Yaron Ungar in shooting techniques.

**No. 51.** By the time of the shooting, Hassan Salameh had trained the Hamas cell that murdered Yaron Ungar in how to commit terrorist operations.

**No. 52.** The operational ability of the Hamas cell that murdered Yaron Ungar improved sharply when Hamas military commander Hassan Salameh became the military trainer of the cell.

**No. 53.** Senior Hamas operative Hassan Salameh, who was personally trained in Iran by Iranian personnel in the use of machine-guns and in conducting ambushes from moving vehicles, was the military trainer of the Hamas cell that killed Yaron Ungar.

**No. 54.** Prior to the shooting, Hassan Salameh transferred the technical knowledge and expertise he acquired in Iran to the Hamas cell that murdered Yaron Ungar.

**No. 55.** Without the training provided by Hassan Salameh to the Hamas cell that murdered Yaron Ungar, the cell would not have been able to achieve success in its terrorist activities.

**No. 56.** At the time of the shooting, only those Hamas members trained by Iran were trained to shoot from moving cars.

**No. 57.** At the time of the shooting, Iran specifically trained Hamas operatives to carry out shooting attacks and ambushes from moving vehicles.

**No. 58.** Prior to the shooting, Hassan Salameh had been trained in Iran in weapons use and in executing ambushes from moving vehicles.

**No. 59.** Without training on how to carry out shooting attacks from moving vehicles, Hamas could not have executed the attack in which Yaron Ungar was killed.

**No. 60.** It is very likely that Hassan Salameh was the person who trained members of the Hamas cell who shot Yaron Ungar how to shoot from a moving car.

**No. 61.** Yaron Ungar was shot from a moving car.

**No. 62.** At the time of the shooting, Hamas viewed itself as a rival and as an alternative to the PLO.

**No. 63.** At the time of the shooting, Hamas viewed itself as a rival and as an alternative to the Palestinian Authority.

**No. 64.** At the time of the shooting, Hamas viewed itself as a rival and as an alternative to the Palestinian leadership.

**No. 65.** At the time of the shooting, Iran encouraged Hamas to carry out as much terrorist activity as possible to prevent any improvement or any progress in the peace process between Israel and the Palestinian leadership.

**No. 66.** At the time of the shooting, Hamas used terrorism as a tool to interfere with the peace process between Israel and the Palestinian leadership.

**No. 67.** Without the support provided to it by Iran, Hamas would have been quite anemic at the time of the shooting.

**No. 68.** Without the support provided to it by Iran, Hamas would not have been the well-organized and successful group that it was at the time of the shooting.

**No. 69.** Without the support provided to it by Iran, Hamas would have been extremely limited in its operational capabilities at the time of the shooting.

**No. 70.** Absent Iranian support and training, Hamas would have been unable to carry out the attack in which Yaron Ungar was killed.

**No. 71.** Hamas would have been unable to mount and execute the attack in which the Yaron Ungar was killed without Iranian training of some provenance.

**No. 72.** At the time of the shooting, PLO Chairman Yasser Arafat was not happy about the relationship between Hamas and Iran.

**No. 73.** At the time of the shooting, PLO Chairman Arafat was blaming Iran for its encouragement of terrorist acts.

**No. 74.** Iran had a direct involvement with the Hamas cell that shot Yaron Ungar.

**No. 75.** There is a direct connection between Iran and the shooting of Yaron Ungar.

**No. 76.** Iran provided the resources that led very specifically to the shooting of Yaron Ungar.

**No. 77.** Iran provided the know-how that led very specifically to the shooting of Yaron Ungar.

**No. 78.** Iran provided the knowledge that led very specifically to the shooting of Yaron Ungar.

**No. 79.** Iran provided the technical skills that led very specifically to the shooting of Yaron Ungar.

**No. 80.** At the time of the shooting, Hamas had ruled out any possibility of peace between the Palestinians and Israelis, and considered it the prime religious obligation to eradicate the Jewish State by use of violence.

**No. 81.** At the time of the shooting, the only source from which Hamas could receive weapons to conduct and expand its armed struggle against Israel was Iran.

**No. 82.** At the time of the shooting, the only source from which Hamas could receive financing to conduct and expand its armed struggle against Israel was Iran.

**No. 83.** At the time of the shooting, the only source from which Hamas could receive military training to conduct and expand its armed struggle against Israel was Iran.

**No. 84.** By 1996, the professional military training provided to Hamas by Iran had significantly boosted Hamas' operational capabilities.

**No. 85.** By 1996, the skills acquired by Hamas operatives during Iranian training enabled Hamas to translate its militant ideology into effective and deadly terrorist attacks, since many of those skills are precisely the things that Hamas did not have a few years earlier before its cooperation with Iran became much closer.

**No. 86.** The overwhelming Iranian contribution to Hamas' operational capabilities is clearly evident in the terrorist attack in which Yaron Ungar was killed.

**No. 87.** The overwhelming Iranian contribution to Hamas' operational capabilities is clearly evident in the structure of the Hamas cell that carried out the attack in which Yaron Ungar was killed.

**No. 88.** The overwhelming Iranian contribution to Hamas' operational capabilities is clearly evident in the activities of the Hamas cell that carried out the attack in which Yaron Ungar was killed.

With respect to each of these requests, Plaintiffs provided the same response: "Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1." *See* Exh. B at 12-22.

Plaintiffs' objections are meritless for the reasons stated above. *See* Part II. A., *supra*. As with the first category of Requests, the Requests related to the *Ungar v. Iran* litigation are indisputably "relevant" to Defendants' Rule 60(b) Motion to Vacate, because they pertain to who is responsible for shooting Yaron Ungar -- an issue of unquestionable importance to these proceedings. Moreover, the Requests for Admission ask Plaintiffs to admit statements made in support of their lawsuit against Iran which tend to show that it is *Iran* that is responsible for

Plaintiffs' injuries, *not Defendants*. The Requests therefore pertain to Defendants' burden of proving meritorious defenses and are relevant. With respect to Plaintiffs' remaining argument that Magistrate Judge Martin's October 27 ruling (Dkt. No. 577) excuses them of the obligation to answer requests for admission, Defendants previously explained that the rationale of the October 27 ruling does not extend to requests for admission.

Accordingly, Plaintiffs' objections to Request Nos. 35-40, 46-88 should be overruled and the Requests deemed admitted.

### C.    Requests Concerning Liability Issues

Numerous additional requests relate to various theories of liability Plaintiffs appeared to advance in their Complaint. For purposes of this motion, these requests have been grouped into three categories: (1) requests concerning liability based on alleged territorial control; (2) requests concerning liability based on Defendants' alleged relationship (or lack thereof) with the perpetrators; and (3) requests concerning liability based on alleged provision of material support.

### 1.    Requests Concerning Liability Based on Alleged Territorial Control

The Complaint alleges that the Hamas cell responsible for the attack on Mr. Ungar "was subordinate to, and received instructions, weapons, money and material support from, commanders and leaders of defendant HAMAS who operated from territories controlled by defendants PA and PLO." Dkt. No. 41 at ¶ 16. Several of the Requests for Admission (Nos. 17-22 and 192-97) were intended to establish that the Palestinian Authority did not exercise control over the territory where the attack occurred or over the territory where the assailants resided:

**No. 17.** Abdel Rahman Ismail Abdel Rahman Ghanimat resided in the town of Surif.

**No. 18.** Jamal Abdel Fatah Tzabich Al Hor resided in the town of Surif.

**No. 19.** Raed Fakhri Abu Hamdiya resided in Jerusalem.

**No. 21.**  In 1996, Israel had not transferred any civil authority or security authority to the Palestinian Authority as to the West Bank area that included Surif.

As to Request Nos. 17-19 and 21, Plaintiffs' Response was as follows:  "Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1."  *See* Exh. B at 8-9.  Plaintiffs' stock objection is inadequate for the reasons previously articulated.

Additional requests that fall into this category (related to liability based on Defendants' alleged territorial control) include the following:

**No. 20.**  Under the Interim Agreement on the West Bank and Gaza, the Palestinian Authority had no civil or security authority in Jerusalem during the 1996-1997 period.

**No. 22.**  At the time of the shooting, the Palestinian Authority had no civil or security authority over the vicinity of Beit Shemesh, where the shooting attack occurred.

**No. 192.**  At the time of the shooting, the town of Surif was under Israeli administrative control.

**No. 193.**  At the time of the shooting, the town of Surif was under Israeli security control.

**No. 194.**  At the time of the shooting, the town of Surif was not under PA administrative control.

**No. 195.**  At the time of the shooting, the town of Surif was not under PA security control.

**No. 196.**  At the time of the shooting, the town of Surif was not under PLO administrative control.

**No. 197.**  At the time of the shooting, the town of Surif was not under PLO security control.

As to Request No. 20, Plaintiffs provided the following response, which they then incorporated by reference as objections to Request Nos. 22 and 192-97:

> Plaintiffs incorporate by reference, as if fully set forth herein, the foregoing General Objections.  In addition, Plaintiffs object to this Request on the grounds that: (a) it is not reasonably calculated to lead to the discovery of admissible evidence relating to the proceeding that is presently before this Court, i.e., Defendants' Rule 60(b) Motion to Vacate, (b) it requests information contrary to Magistrate Judge Martin's ruling that "Defendant The Palestinian Authority ("PA") does not need discovery from

> Plaintiffs in order to establish the existence of a meritorious defense. . .accordingly, Defendant is not entitled to merits of discovery," Dkt. # 577, p. 2, (c) Magistrate Judge Martin has already ruled that Defendants are not permitted discovery which "would have the practical effect of re-opening this case before the Court has determined whether it should be reopened." Dkt. # 577, p. 3, and (d) it relates to or seeks a conclusion of law.

*See* Exh. B at 9. *See also id.* at 9, 42-43 (incorporating by reference as to Request Nos. 22 and 192-97 "the foregoing General Objections and the specific objections asserted in response to Request No. 20").

The specific objection asserted in response to Request Nos. 20, 22 and 192-97 is identical to the specific objection asserted in response to Request No. 1 and numerous other requests, with the exception of a new objection that the request "relates to or seeks a conclusion of law." Exh. B at 9 (objection (d)). This objection also is meritless. Rule 36 expressly permits requests for admission concerning "facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a)(1)(A); *see also Panteleakis v. Kalams*, 659 F. Supp. 212, 214 (D.R.I. 1987) ("In his requests for admissions, plaintiff sought an admission by defendants that he is the holder in due course of the note. Such a request involves the application of law to fact and is proper under Fed. R. Civ. P. 36(a). Therefore, by failing to answer or object to that request, defendants have admitted plaintiff's preferred status.") (internal citation omitted); *Hanover Ins. Group v. Rosciti*, No. 06-276T, 2008 U.S. Dist. LEXIS 31149, at *4-5 (D.R.I. Apr. 15, 2008) (citing case law and overruling objection that "requests each call for a legal opinion"). Thus, even assuming requests for admission regarding whether certain areas of Israel and the West Bank fall within Israeli, PA, or PLO security or administrative control could be considered as seeking the application of law to facts, such requests are proper under Rule 36.

### 2.    Requests Concerning Liability Based on Defendants' Alleged Relationship (or Lack Thereof) with the Perpetrators

Several Requests asked Plaintiffs to admit that none of the seven individuals listed in Plaintiffs' Complaint has an agency or employment relationship with either the PA or PLO. Similarly, Defendants asked Plaintiffs to admit that Defendants do not have an agency or alter-ego relationship with Hamas. Requests falling into this category include:

**No. 12.** Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya did not carry out the shooting attack on Yaron Ungar as agents of the PA.

**No. 13.** Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya did not carry out the shooting attack on Yaron Ungar as agents of the PLO.

As to Request Nos. 12 and 13, Plaintiffs provided the following objection: "Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1." Exh. B at 7.

Additional Request for Admissions encompassed within this category include:

**No. 89.** At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an agent of the PA.

**No. 91.** At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an employee of the PA.

**No. 93.** At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an agent of the PLO.

**No. 95.** At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an employee of the PLO.

**No. 97.** At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an agent of the PA.

**No. 99.** At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an employee of the PA.

**No. 101.** At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an agent of the PLO.

**No. 103.** At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an employee of the PLO.

**No. 105.** At the time of the shooting, Raed Fakhri Abu Hamdiya was not an agent of the PA.

**No. 107.** At the time of the shooting, Raed Fakhri Abu Hamdiya was not an employee of the PA.

**No. 109.** At the time of the shooting, Raed Fakhri Abu Hamdiya was not an agent of the PLO.

**No. 111.** At the time of the shooting, Raed Fakhri Abu Hamdiya was not an employee of the PLO.

**No. 113.** At the time of the shooting, Ibrahim Ghanimat was not an agent of the PA.

**No. 115.** At the time of the shooting, Ibrahim Ghanimat was not an employee of the PA.

**No. 117.** At the time of the shooting, Ibrahim Ghanimat was not an agent of the PLO.

**No. 119.** At the time of the shooting, Ibrahim Ghanimat was not an employee of the PLO.

**No. 125.** At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an agent of the PA.

**No. 127.** At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an employee of the PA.

**No. 129.** At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an agent of the PLO.

**No. 131.** At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an employee of the PLO.

**No. 133.** At the time of the shooting, Hassan Salameh was not an agent of the PA.

**No. 135.** At the time of the shooting, Hassan Salameh was not an employee of the PA.

**No. 137.** At the time of the shooting, Hassan Salameh was not an agent of the PLO.

**No. 139.** At the time of the shooting, Hassan Salameh was not an employee of the PLO.

**No. 141.** At the time of the shooting, Nasser Salah Talachmeh was not an agent of the PA.

**No. 143.** At the time of the shooting, Nasser Salah Talachmeh was not an employee of the PA.

**No. 145.** At the time of the shooting, Nasser Salah Talachmeh was not an agent of the PLO.

**No. 147.** At the time of the shooting, Nasser Salah Talachmeh was not an employee of the PLO.

**No. 149.** At the time of the shooting, Hamas was not an agent of the PA.

**No. 151.** At the time of the shooting, Hamas was not an alter-ego of the PA.

**No. 153.** At the time of the shooting, Hamas was not an agent of the PLO.

**No. 155.** At the time of the shooting, Hamas was not an alter-ego of the PLO.

With respect to the foregoing requests, Plaintiffs provided the same objection: "Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 20." *See* Exh. B at 22-34. These objections are not proper for the same reasons provided above as to the objections to Request No. 20: the Requests seek admissions with respect to issues relevant to Defendants' meritorious defenses, the Requests are not precluded by Magistrate Judge Martin's October 27 ruling, and, to the extent they seek admissions regarding the application of law to fact, they are nonetheless proper under Rule 36(a)(1)(A).

### 3. Requests Concerning Liability Based on Alleged Provision of Material Support

Plaintiffs seek to impose liability on the PA and PLO under the theory that they provided material support to the group responsible for the shooting attack on Mr. Ungar. Defendants asked Plaintiffs to admit that the perpetrators of Yaron Ungar's murder did not receive their instructions, money and weapons from Defendants (Request Nos. 3-4). Defendants also asked Plaintiffs to admit certain facts pertaining to the particular manner in which the perpetrators obtained one of the two weapons used to shoot Yaron Ungar (Request Nos. 41-45).

**No. 3.** The Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members did not receive instructions, weapons or money from the PA prior to the shooting.

**No. 4.**  The Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members did not receive instructions, weapons or money from the PLO prior to the shooting.

**No. 41.**  Prior to the shooting, Nasser Salah Talachmeh supplied Abdel Rahman Ismail Abdel Rahman Ghanimat with 2000 Jordanian Dinar.

**No. 42.**  Prior to the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat supplied Iman Mahmud Hassan Fuad Kafishe with the 2000 Jordanian Dinar he had received from Nasser Salah Talachmeh.

**No. 43.**  Prior to the shooting, Iman Mahmud Hassan Fuad Kafishe used the 2000 Jordanian Dinar he received from Abdel Rahman Ismail Abdel Rahman Ghanimat to buy a Kalashnikov automatic rifle.

**No. 44.**  The Hamas cell that murdered Yaron Ungar used the rifle purchased by Iman Mahmud Hassan Fuad Kafishe to shoot at the car in which Yaron Ungar was killed.

**No. 45.**  Prior to the shooting, Nasser Salah Talachmeh supplied Abdel Rahman Ismail Abdel Rahman Ghanimat with 2000 Jordanian Dinar, which Abdel Rahman Ismail Abdel Rahman Ghanimat gave to Iman Mahmud Hassan Fuad Kafishe, who used that money to buy a Kalashnikov automatic rifle used to shoot at the car in which Yaron Ungar was killed.

With respect to each of these Requests for Admission, Plaintiffs provided their stock objection:  "Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1."  *See* Exh. B at 5, 13-14.  For the same reasons already explained, these objections should be overruled, and Requests 3-4, and 41-45 should be deemed admitted.

**D.**    **Requests Concerning the Lack of Evidence Linking Defendants to the Shooting**

In connection with the Requests asking Plaintiffs to admit certain facts pertaining to the various theories of liability described above, Defendants also included Requests asking Plaintiffs to admit that they have no evidence to contest the truth of those facts.  Defendants included these Requests in the event Plaintiffs chose to respond to the liability-related Requests by claiming they did not have sufficient information to answer, which is sometimes allowed by Rule 36.  *See*

Fed. R. Civ. P. 36(a)(4) ("The answering party may assert lack of knowledge or information as a reason for failing to admit or deny . . . ."). The following Requests are included in this category:

**No. 5.** Plaintiffs have no evidence that the Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members received instructions, weapons or money from the PA prior to the shooting.

**No. 6.** Plaintiffs have no evidence that the Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members received instructions, weapons or money from the PLO prior to the shooting.

**No. 7.** Plaintiffs have no evidence that the Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members received instructions, weapons or money from either the PA or the PLO prior to the shooting.

**No. 14.** Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out the shooting attack on Yaron Ungar as agents of the PA.

**No. 15.** Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out the shooting attack on Yaron Ungar as agents of the PLO.

**No. 16.** Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out the shooting attack on Yaron Ungar as agents of either the PA or the PLO.

**No. 90.** Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an agent of the PA at the time of the shooting.

**No. 92.** Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an employee of the PA at the time of the shooting.

**No. 94.** Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an agent of the PLO at the time of the shooting.

**No. 96.** Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an employee of the PLO at the time of the shooting.

**No. 98.** Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an agent of the PA at the time of the shooting.

**No. 100.** Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an employee of the PA at the time of the shooting.

**No. 102.**  Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an agent of the PLO at the time of the shooting.

**No. 104.**  Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an employee of the PLO at the time of the shooting.

**No. 106.**  Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an agent of the PA at the time of the shooting.

**No. 108.**  Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an employee of the PA at the time of the shooting.

**No. 110.**  Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an agent of the PLO at the time of the shooting.

**No. 112.**  Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an employee of the PLO at the time of the shooting.

**No. 114.**  Plaintiffs have no evidence that Ibrahim Ghanimat was an agent of the PA at the time of the shooting.

**No. 116.**  Plaintiffs have no evidence that Ibrahim Ghanimat was an employee of the PA at the time of the shooting.

**No. 118.**  Plaintiffs have no evidence that Ibrahim Ghanimat was an agent of the PLO at the time of the shooting.

**No. 120.**  Plaintiffs have no evidence that Ibrahim Ghanimat was an employee of the PLO at the time of the shooting.

**No. 126.**  Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an agent of the PA at the time of the shooting.

**No. 128.**  Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an employee of the PA at the time of the shooting.

**No. 130.**  Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an agent of the PLO at the time of the shooting.

**No. 132.**  Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an employee of the PLO at the time of the shooting.

**No. 134.**  Plaintiffs have no evidence that Hassan Salameh was an agent of the PA at the time of the shooting.

**No. 136.**  Plaintiffs have no evidence that Hassan Salameh was an employee of the PA at the time of the shooting.

**No. 138.**  Plaintiffs have no evidence that Hassan Salameh was an agent of the PLO at the time of the shooting.

**No. 140.**  Plaintiffs have no evidence that Hassan Salameh was an employee of the PLO at the time of the shooting.

**No. 142.**  Plaintiffs have no evidence that Nasser Salah Talachmeh was an agent of the PA at the time of the shooting.

**No. 144.**  Plaintiffs have no evidence that Nasser Salah Talachmeh was an employee of the PA at the time of the shooting.

**No. 146.**  Plaintiffs have no evidence that Nasser Salah Talachmeh was an agent of the PLO at the time of the shooting.

**No. 148.**  Plaintiffs have no evidence that Nasser Salah Talachmeh was an employee of the PLO at the time of the shooting.

**No. 150.**  Plaintiffs have no evidence that Hamas was an agent of the PA at the time of the shooting.

**No. 152.**  Plaintiffs have no evidence that Hamas was an alter-ego of the PA at the time of the shooting.

**No. 154.**  Plaintiffs have no evidence that Hamas was an agent of the PLO at the time of the shooting.

**No. 156.**  Plaintiffs have no evidence that Hamas was an alter-ego of the PLO at the time of the shooting.

With respect to Request Nos. 5-7 and 14-16, Plaintiffs provided the following objection: "Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1." *See* Exh. B at 5-8. With respect to the remainder of the Requests falling into this category, Plaintiffs provided the following objection: "Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No.

23

20." *Id.* at 22-34.  These objections should be overruled for the reasons stated above and the

Requests deemed admitted.

### E.    Requests Concerning Causation

The Complaint alleges that Ibrahim Ghanimat was among those responsible for the attack

on Mr. Ungar and further alleges that the PA provided shelter to Ibrahim Ghanimat.  *See* Dkt. No

41 at ¶¶ 15, 17, 22.  In Request Nos. 121-24, Defendants attempted to narrow the contested

issues by propounding several Requests concerning Ibrahim Ghanimat:

**No. 121.**  Ibrahim Ghanimat was not in the car with members of the Hamas cell who shot Yaron
Ungar when Yaron Ungar was shot.

**No. 122.**  Plaintiffs have no evidence that Ibrahim Ghanimat was in the car with members of the
Hamas cell who shot Yaron Ungar when Yaron Ungar was shot.

**No. 123.**  Ibrahim Ghanimat was not a proximate cause of Yaron Ungar's death.

**No. 124.**  Plaintiffs have no evidence that Ibrahim Ghanimat was a proximate cause of Yaron
Ungar's death.

With respect to Request No. 121, Plaintiffs provided the following objection:  "Plaintiffs

hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and

the specific objections asserted in response to Request No. 1."  Exh. B at 28.  With respect to

Request Nos. 122-24, Plaintiffs provided the following objection:  "Plaintiffs hereby incorporate

by reference, as if fully set forth herein, the foregoing General Objections and the specific

objections asserted in response to Request No. 20."  *Id.*

Thus, Plaintiffs objected to these Requests on the ground that they are not relevant, are

inconsistent with Magistrate Judge Martin's October 27 Order, and "relate[] to or seek[] a

conclusion of law" (*see* Response to Request 20).  But these Requests are relevant because they

relate directly to allegations in Plaintiffs' Complaint and therefore are relevant to Defendants'

meritorious defenses.  Moreover, the Requests are not inconsistent with the recently issued

discovery orders, none of which addresses requests for admission.  Further, because the Requests

seek to narrow the issues in dispute, they are an appropriate use of Rule 36.  Finally, there is

nothing improper with asking Plaintiffs to admit Ibrahim Ghanimat was not a proximate cause of

their injuries, because this is a simple application of law to the facts of this case, which is

contemplated by Rule 36.  *E.g., Panteleakis v. Kalams*, 659 F. Supp. 212, 214 (D.R.I. 1987) ("In

his requests for admissions, plaintiff sought an admission by defendants that he is the holder in

due course of the note.  Such a request involves the application of law to fact and is proper under

Fed. R. Civ. P. 36(a).  Therefore, by failing to answer or object to that request, defendants have

admitted plaintiff's preferred status.") (internal citation omitted).

Accordingly, Requests 121-124 should be deemed admitted.

## F.    Requests Concerning Prejudice to Plaintiffs

Several of Defendants' Requests addressed the question of what prejudice Plaintiffs

contend they would suffer if the default judgment were vacated (Request Nos. 203-14).  That is

an area of undisputable relevance to the January 2011 vacatur hearing because it is one of the

specific factors this Court must consider in assessing Defendants' Motion to Vacate.  *See Ungar

v. PLO*, 599 F.3d 79, 83 (1st Cir. 2010).

Plaintiffs have described the prejudice they would suffer as follows:  "[B]ecause the

PA/PLO officials whom Defendants were ordered but refused to produce for depositions [] have

all either died or left Defendants' employ, and because of the loss of Defendants' records and

documents in the Gaza strip, the Ungars no longer have any means of proving their case today."

Dkt. No. 558 at 10.  Accordingly, Defendants sought to conclusively establish several facts

pertaining to Plaintiffs' prejudice claim.   Requests falling under this category include:

**No. 203.**  Yasser Arafat was a PA/PLO official whom the Court ordered Defendants to produce
at one time.

**No. 204.** Plaintiffs have never interviewed Yasser Arafat about the allegations in the Complaint.

**No. 205.** Razi Jabali was a PA/PLO official whom the Court ordered Defendants to produce at one time.

**No. 206.** Plaintiffs have never interviewed Razi Jabali about the allegations in the Complaint.

**No. 207.** Muhammed Dahlan was a PA/PLO official whom the Court ordered Defendants to produce at one time.

**No. 208.** Plaintiffs have never interviewed Muhammed Dahlan about the allegations in the Complaint.

**No. 209.** Amin Al-Hindi was a PA/PLO official whom the Court ordered Defendants to produce at one time.

**No. 210.** Plaintiffs have never interviewed Amin Al-Hindi about the allegations in the Complaint.

**No. 211.** Tawfik Tirawi was a PA/PLO official whom the Court ordered Defendants to produce at one time.

**No. 212.** Plaintiffs have never interviewed Tawfik Tirawi about the allegations in the Complaint.

**No. 213.** Jibril Rajoub was a PA/PLO official whom the Court ordered Defendants to produce at one time.

**No. 214.** Plaintiffs have never interviewed Jibril Rajoub about the allegations in the Complaint.

Plaintiffs objected to the first of these Requests -- Request 203 -- as follows, and then incorporated that objection by reference in response to all the remaining prejudice Requests:

> Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections.
>
> In addition, Plaintiffs object to this Request on the grounds that: (a) it is not reasonably calculated to lead to the discovery of admissible evidence relating to the proceeding that is presently before this Court, i.e., Defendants' Rule 60(b) Motion to Vacate, (b) that it requests information contrary to Magistrate Judge Martin's ruling that "Defendant The Palestinian Authority ("PA") does not need discovery from Plaintiffs in order to establish the existence of a meritorious defense. . .accordingly, Defendant is not entitled to merits of discovery," Dkt. # 577, p. 2, (c) Magistrate Judge Martin has already ruled that Defendants are not permitted

discovery which "would have the practical effect of re-opening this case before the Court has determined whether it should be reopened." Dkt. # 577, p. 3, (d) it seeks information/and or an admission concerning a matter that was previously litigated, (e) it seeks information/or an admission relating to the prejudice Plaintiffs suffer as a result of Defendants' refusal to comply with prior discovery orders, and (f) it violates Magistrate Judge Martin's ruling of October 27, 2010, "Defendant PA also argues that it is entitled to this discovery as a means of testing whether Plaintiffs would truly be prejudiced by the granting of the motion to vacate. See Defendant The Palestinian Authority's Reply in Further Support of Its Motion to Compel Answers to Defendants' Interrogatory Nos. 12-1 8 and Responses to Defendants" Request for Production Nos. 8-1 5, 17-1 9 ("Defendants' Reply") at 7 ("The extent to which Plaintiffs currently posses[] information and documents supporting their claims is something for this Court to consider when determining whether Plaintiffs would be prejudiced by the granting of Defendants' Motion to Vacate."). While this argument has a certain surface appeal, the reality is that accepting it would result in Defendant being able to impose on Plaintiffs the same discovery burden which the Court has already concluded is inappropriate unless and until the judgment is vacated. The Court declines to do so." Dkt. # 577 pp. 2-3.

*See* Exh. B at 44-45; *see also id.* at 46-48 (as to Request Nos. 204-14, incorporating by reference "as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 203").

Objections (a) though (c) of Plaintiffs' specific objection have been previously addressed. Objection (d) states these Requests "seek[] information/and or an admission concerning a matter that was previously litigated." Presumably Plaintiffs mean by this objection that there has already been litigation concerning whether the individuals identified in the Request should be produced for deposition. But whatever Plaintiffs mean, there is nothing inappropriate with propounding requests for admissions on issues that have been litigated, and to the extent the result of the litigation produced an outcome that is not disputed, such requests should be very easy to answer. *See Duncan v. Santaniello*, No. 94-30224, 1996 U.S. Dist. LEXIS 3860, at *7 (D. Mass. Mar. 8, 1996) ("Indeed, to the extent that Defendants assert that the admissions sought

are largely undisputed, the use of the request for admissions to 'conclusively establish' such facts as are not disputed is precisely the reason Rule 36 was adopted.").

Objection (e) and (f) are apparently meant to be read in relationship to one another. The gist of these two objections is that by, seeking admissions on the issue of prejudice, the Requests supposedly run afoul of Magistrate Judge Martin's October 27 Order. As previously discussed, however, Magistrate Judge Martin's October 27 ruling does not address whether Defendants are entitled to propound Requests for Admission. Because Defendants are entitled to use Requests for Admissions to narrow the issues that must be litigated at the January 2011 hearing and because the prejudice factor is inarguably relevant to Defendants' pending vacatur motion, Plaintiffs' objections should be overruled and the Requests deemed admitted.

### G. Requests Concerning Damages Awarded Based on the Ungar Children's Mental Status

Another issue of relevance to Defendants' Motion to Vacate is whether the $116 million damages award that resulted from Defendants' default would withstand adversarial testing. Accordingly, Defendants propounded several Requests that pertain to this issue. Specifically, Defendants propounded Requests asking Plaintiffs to admit that neither of the Ungar children has suffered from a severe mental injury at any relevant time, and asking them to admit that the mental-health witness that Plaintiffs relied upon at the 2002 damages hearing in this case has never performed an examination of either child that would allow him to opine reliably otherwise. The Requests are as follows:

**No. 157.** Dvir Ungar has never suffered from a severe mental injury.

**No. 158.** Dvir Ungar did not suffer from a severe mental injury in 2002.

**No. 159.** Dvir Ungar does not currently suffer from a severe mental injury.

**No. 160.** Dvir Ungar has never suffered from psychosis.

**No. 161.** Dvir Ungar did not suffer from psychosis in 2002.

**No. 162.** Dvir Ungar does not currently suffer from psychosis.

**No. 163.** Dvir Ungar has never suffered from neurosis.

**No. 164.** Dvir Ungar did not suffer from neurosis in 2002.

**No. 165.** Dvir Ungar does not currently suffer from neurosis.

**No. 166.** Dvir Ungar has never suffered from a psychiatric disorder.

**No. 167.** Dvir Ungar did not suffer from a psychiatric disorder in 2002.

**No. 168.** Dvir Ungar does not currently suffer from a psychiatric disorder.

**No. 169.** Dr. Allan Brenman has never performed an in-depth assessment of Dvir
Ungar.

**No. 170.** Dr. Allan Brenman has never performed a forensic evaluation of Dvir Ungar.

**No. 171.** Dr. Allan Brenman has never performed a psychological evaluation of Dvir Ungar.

**No. 172.** Dr. Allan Brenman has never performed a psychiatric evaluation of Dvir Ungar.

**No. 173.** Yishai Ungar has never suffered from a severe mental injury.

**No. 174.** Yishai Ungar did not suffer from a severe mental injury in 2002.

**No. 175.** Yishai Ungar does not currently suffer from a severe mental injury.

**No. 176.** Yishai Ungar has never suffered from psychosis.

**No. 177.** Yishai Ungar did not suffer from psychosis in 2002.

**No. 178.** Yishai Ungar does not currently suffer from psychosis.

**No. 179.** Yishai Ungar has never suffered from neurosis.

**No. 180.** Yishai Ungar did not suffer from neurosis in 2002.

**No. 181.** Yishai Ungar does not currently suffer from neurosis.

**No. 182.** Yishai Ungar has never suffered from a psychiatric disorder.

**No. 183.** Yishai Ungar did not suffer from a psychiatric disorder in 2002.

**No. 184.**  Yishai Ungar does not currently suffer from a psychiatric disorder.

**No. 185.**  Dr. Allan Brenman has never performed an in-depth assessment of Yishai Ungar.

**No. 186.**  Dr. Allan Brenman has never performed a forensic evaluation of Yishai Ungar.

**No. 187.**  Dr. Allan Brenman has never performed a psychological evaluation of Yishai Ungar.

**No. 188.**  Dr. Allan Brenman has never performed a psychiatric evaluation of Yishai Ungar.

Plaintiffs objected to the first of these Requests -- Request 157 -- as follows, and then incorporated that objection by reference in response to Request Nos. 158-88:

> Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1.
>
> Plaintiffs further object on the grounds that (a) this Request is in violation of the Order denying Defendants' Motion for Mental Examination (dkt. # 579) since the request for information and/or an admission about damages is "premature because Defendants' motion to vacate has yet to be granted," (b) the amount of damages has already been litigated, and (c) Defendants' have waived their right to challenge the measure of damages. *Ungar* v. PLO, 402 F.3d 274 (1st Cir. 2005).

*See* Exh. B at 34; *see also id.* at 34-40.  Objection (a) is that these Requests violate the Court's Order denying Defendants' the ability to conduct a Rule 35 mental health evaluation of the Ungar children for purposes of challenging the sustainability of the damages award (Dkt. No. 579).  But nothing in the reasoning of that Order makes it applicable to the Rule 36 requests at issue here.  The premise of the Court's Rule 35 Order was that it would be difficult for the Ungar children to undergo a mental heath examination, and they should not be forced to endure such difficulty until after the default judgment has been vacated.  *See id.*  By contrast, admitting, denying, or stating there is insufficient information to admit or deny that the Ungar children have ever had severe mental injuries poses no such difficulty.

Objections (b) and (c) are both premised on the notion that Defendants have no right to challenge the amount of the damages award. But that position cannot be squared with the First Circuit's 2010 decision in this case. *See Ungar v. PLO*, 599 F. 3d 79, 86-87 (1st Cir. 2010) (identifying whether the amount of the judgment is unlikely to withstand adversarial testing as a factor to be addressed on remand). *See also* Dkt. No. 506 (the Court's Order granting Defendants leave to discovery on whether the damages award would withstand adversarial testing).

Defendants previously have argued their entitlement to present evidence in support of their position that the $116 million damage award would not withstand adversarial testing. *See* Dkt. No. 612 (Defendants' Opposition to Plaintiffs' First Motion in Limine). Defendants will not repeat those arguments here. Suffice it to say, if the Court denies Plaintiffs' First Motion in Limine, then Plaintiffs' objection to the Requests for Admission related to damages also must be overruled.

## H.    Requests Concerning Bias

Several of the Requests for Admission related to potential bias of the Plaintiffs:

**No. 189.** Judith Dasberg and Uri Dasberg told Benjamin Netanyahu that an appropriate way to prevent acts of terror such as the one in which Yaron Ungar was killed is to build a settlement every time an Israeli is killed by terrorists.

**No. 190.** Judith Dasberg told Benjamin Netanyahu that an appropriate way to prevent acts of terror such as the one in which Yaron Ungar was killed is to build a settlement every time an Israeli is killed by terrorists.

**No. 191.** Uri Dasberg told Benjamin Netanyahu that an appropriate way to prevent acts of terror such as the one in which Yaron Ungar was killed is to build a settlement every time an Israeli is killed by terrorists.

**No. 198.** Judith Dasberg and Uri Dasberg told Benjamin Netanyahu that Yasser Arafat was a wicked man.

**No. 199.** Judith Dasberg told Benjamin Netanyahu that Yasser Arafat was a wicked man.

**No. 200.** Uri Dasberg told Benjamin Netanyahu that Yasser Arafat was a wicked man.

**No. 201.** Uri Dasburg has said that an appropriate response to the attack in which Yaron Ungar was killed is to hold on to the West Bank more strongly with our fingers, with nails deep, deep in the earth.

**No. 202.** Judith Dasberg has said that the Ungars were victims of the Oslo Accords.

With respect to these Requests, Plaintiffs provided the following objection:

Plaintiffs hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 1.

In addition, Plaintiffs object to this Request on the grounds that it: (a) is not reasonably calculated to lead to the discovery of admissible evidence relating to the relevant issues as determined by Judge Lagueux in his April 1, 2010 Order (dkt. # 482), (b) it seeks information and/or an admission concerning the parties' political, legal, religious and/or social beliefs and (c) seeks information and/or an admission concerning the motivation for bringing suit. *See, e.g., Walton v. Bridgestone/Firestone, Inc.*, No. 05-CV-3027, 2009 WL 2778441, at *9 (D. Ariz. Jan. 16, 2009) ("Irrelevant and prejudicial references to Plaintiffs' plans for lawsuit proceeds or Plaintiffs' motives for initiating this action are also precluded."); *Woods v. Frensenius Med. Care Group of N Am.*, No. 06-CV-1804, 2008 WL 151836, at *2 (S.D. Ind. Jan. 16,2008) (quashing subpoenas for records from plaintiffs former employer served by defendant "to show Plaintiffs credibility and motive in bringing suit"); *Couch v. Village of Dixmoor*, No. 05-CV-963, 2006 WL 3409153, at *3 (N.D. Ill. Nov. 27, 2006) (granting motion to "keep out of the case evidence as to 'plaintiffs motives for filing suit'" and explaining that it is improper to "impugn the motives of any plaintiff for doing what the law not only permits but encourages: the pursuit of his or her perceived rights through litigation"); *Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 414 (M.D.N.C. 1992) ("It is well-established that in ordinary litigation, not involving the clean hands defense, the plaintiffs motive in bringing suit is not relevant to the subject matter of the litigation and is not a matter for discovery."); *Digital Equip. Corp. v. Sys. Indus., Inc.*, 108 F.R.D. 742, 743 (D. Mass. 1986) (discussing various cases "where discovery was sought concerning the initiation of a lawsuit" and "the motive behind the institution of the action was deemed not relevant to the subject matter involved"); *Foremost Promotions, Inc. v. Pabst Brewing Co.*, 15 F.R.D. 128, 130 (N.D. Ill. 1953) ("It is difficult to see how an inquiry into the circumstances surrounding the instigation of the

action could affect the substance of the claim."); *Horsey v. Asher*, 741 F.2d 209, 212-13 (8th Cir. 1984) ("We can assume that plaintiff harbors bitter feelings towards [defendant], in part, at least, because of his having given evidence against him. But if in fact [defendant] wrongfully beat [plaintiff] and unconstitutionally seized his property, the fact that plaintiff hates the defendant, for these or other reasons, does not justify dismissal of the complaint as malicious. It is the maliciousness of the complaint, not of the plaintiff personally, that is important. It may be assumed that most people who have been deprived of their constitutional rights have little regard for those who have wronged them.").

*See* Exh. B at 40-42 (Objection to Request No. 189); *see also id.* at 42-44 (as to Request Nos. 190-91, 198-202, incorporating by reference "the foregoing General Objections and the specific objections asserted in response to Request No. 189").

Contrary to Plaintiffs' assertions that Plaintiffs' views of the PA are not relevant, courts recognize that "evidence of bias is always relevant." *See Saperstein v. Palestinian Authority (In re Goldberg)*, 693 F. Supp. 2d 81, 86 (D.D.C. 2010) ("Given the political nature of Saperstein's [Anti-Terrorism Act] claims against [the PA and PLO], that they engaged in acts of terrorism against Jewish civilians, evidence of his bias may be significant to defendant's impeachment of Saperstein's credibility by establishing that his action against the PA is politically motivated as the acts of a man who despises the PA.").

## I.    Requests Concerning the Authenticity of Potential Trial Exhibits

Request Nos. 218-29 ask Plaintiffs to admit the authenticity of public documents that Defendants have produced to Plaintiffs in discovery and upon which Defendants may seek to rely as exhibits at the January 2011 hearing.

Rule 36 explicitly provides for this. *See* Fed. R. Civ. P. 36(a)(1)(B) (stating the Rule may be used to establish "the genuineness of any described documents"). As Moore's Federal Practice explains: "Requests for admission relating to genuineness of documents can be particularly useful in helping parties determine which documents that are to be introduced at trial

will present foundational problems and which will not." 7-36 Moore's Federal Practice - Civil § 36.10[9] (footnote omitted); *see also, e.g., Barbosa v. Cincinnati Milacron, Inc.*, No. 81-665, 1984 U.S. Dist. LEXIS 16923, at *7 (D. Mass. May 7, 1984) ("The purpose of the Rule regarding documents is to allow the requesting party to find out in advance of trial which documents will have to be authenticated. The plaintiffs are certainly not limited to requesting the defendant to admit the authenticity of only those documents author[ed] by the defendant.").

Requests falling within this category include the following:

**No. 218.** The document produced to Plaintiffs by Defendants and labeled 01:0012181-01:0012205 is an authentic copy of what it purports to be.

**No. 219.** The document produced to Plaintiffs by Defendants and labeled 01:0012207-01:0012210 is an authentic copy of what it purports to be.

**No. 220.** The document produced to Plaintiffs by Defendants and labeled 01:0012212-01:0012291 is an authentic copy of what it purports to be.

**No. 221.** The document produced to Plaintiffs by Defendants and labeled 01:0012293-01:0012294 is an authentic copy of what it purports to be.

**No. 222.** The document produced to Plaintiffs by Defendants and labeled 01:0012295 is an authentic copy of what it purports to be.

**No. 223.** The document produced to Plaintiffs by Defendants and labeled 01:0012296-01:0012297 is an authentic copy of what it purports to be.

**No. 224.** The document produced to Plaintiffs by Defendants and labeled 01:0012298-01:0012299 is an authentic copy of what it purports to be.

**No. 225.** The document produced to Plaintiffs by Defendants and labeled 01:0012300-01:0012304 is an authentic copy of what it purports to be.

**No. 226.** The document produced to Plaintiffs by Defendants and labeled 01:0012305-01:0012320 is an authentic copy of what it purports to be.

**No. 227.** The document produced to Plaintiffs by Defendants and labeled 01:0012321-01:0012358 is an authentic copy of what it purports to be.

**No. 228.** The document produced to Plaintiffs by Defendants and labeled 01:0012359-01:0012401 is an authentic copy of what it purports to be.

**No. 229.**  The document produced to Plaintiffs by Defendants and labeled 01:0012402-01:0012464 is an authentic copy of what it purports to be.

With respect to Request Nos. 218, 219 and 221-29, Plaintiffs provided the following objection:

> Plaintiffs incorporate by reference, as if fully set forth herein, the foregoing General Objections and the specific objections asserted in response to Request No. 20.  Plaintiffs further object as this Request seeks Plaintiffs to authenticate a copy of a Geneva Convention, and accordingly, this request for information and/or an admission is not a proper subject for a request for admissions under Rule 36.

Exh. B at 49 (response to Request No. 218); *see also id.* at 49-53 (incorporating by reference, as to Request Nos. 219 and 221-29, "the foregoing General Objections and the specific objections asserted in response to Request No. 218").

For the reasons described above, Plaintiffs objections to Request 20 are no bar to these requests seeking admissions on the authenticity of documents, and Plaintiffs remaining objection is equally invalid.  There is nothing improper about asking for authenticity admissions about publicly available documents authored by sources as well-known as the United Nations.  *See Barbosa*, 1984 U.S. Dist. LEXIS 16923, at *7 ("If the defendant is of the view that seeing the originals is necessary in order to admit or deny genuineness, the defendant must take it upon itself, as part of the required 'reasonable inquiry', to view the originals.").

Accordingly, Requests 218-29 should be deemed admitted.

**J.      Requests Concerning Plaintiffs' Witnesses and Evidence in *Ungar v. Iran***

Finally, Defendants included several Requests intended to facilitate the introduction into evidence of certain materials from the *Ungar v. Iran* case at the January 2011 hearing.  As explained above, Plaintiffs' witnesses in the *Ungar v. Iran* proceedings gave testimony that would be very useful in establishing Defendants' meritorious defenses.  *See* Part II. B, *supra*.

This testimony is admissible under the Rule 804(b)(1) exception to the hearsay rule. *See* Fed. R. Evid. 804(b)(1) (allowing introduction of "former testimony" into evidence). One of the requirements under that Rule is that the declarant must be "unavailable," in the sense that the person is absent from the hearing and cannot be made to appear "by process or other reasonable means." Fed. R. Evid. 804(a)(5). This "unavailability" criteria should be met here because Defendants understand that none of the *Ungar v. Iran* witnesses live within this Court's jurisdiction, and therefore the Court cannot compel them to attend the January hearing. Indeed, Defendants understand that at least some of these witnesses live in Israel.

Defendants accordingly propounded Requests asking Plaintiffs to admit the identity of the persons who gave testimony for them at the *Ungar v. Iran* hearing, and then asking them to admit that these witnesses are beyond the subpoena power of the Court (*see* Request Nos. 26-31). Defendants also asked Plaintiffs to admit that all of the documents and other materials introduced into evidence by Plaintiffs in the *Ungar v. Iran* proceedings are authentic (*see* Request 34).

**No. 26.** Ronni Shaked gave testimony as a witness for Plaintiffs at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).

**No. 27.** Ronni Shaked is beyond the subpoena power of the United States District Court for the District of Rhode Island.

**No. 28.** Reuvan Paz gave testimony as a witness for Plaintiffs at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).

**No. 29.** Reuvan Paz is beyond the subpoena power of the United States District Court for the District of Rhode Island.

**No. 30.** Patrick Clawson gave testimony as a witness for Plaintiffs at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).

**No. 31.** Patrick Clawson is beyond the subpoena power of the United States District Court for the District of Rhode Island.

**No. 34.**    All of the exhibits received into evidence by the court at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.) are authentic copies of what they purport to be.

Plaintiffs did not answer any of these Requests, and instead objected to all of them on the basis of the stock objections raised in response to Request No. 1 (as to Request Nos. 26, 28, and 30) and Request No. 20 (as to Request Nos. 27, 29, 31, 34).  *See* Exh. 2 at 10-12.  Thus, Plaintiffs objected to all of these Requests on the grounds that they seek irrelevant information and seek information pertaining to meritorious defenses, which -- they claim -- is inappropriate under their reading of Magistrate Judge Martin's October 27 Order.  Plaintiffs also objected that the Requests asking them to admit that witnesses were beyond this Court's jurisdiction and the Request asking them to admit the authenticity of their own prior hearing exhibits "relate[] to or seek[] a conclusion of law."  As previously argued, none of these stock objections has merit, and Request Nos. 26-31 and 34 therefore should be deemed admitted:

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Have Requests for Admission Deemed Admitted should be granted.

Respectfully submitted,

Dated: November 29, 2010

/s/ Mark J. Rochon
Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Brian A. Hill (D.C. Bar #456086)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
mrochon@milchev.com
mailto:rhibey@milchev.com
bhill@milchev.com

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and
the Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 29th day of November 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to counsel of record for all parties.

<u>/s/ Mark J. Rochon</u>