# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE ESTATE OF YARON UNGAR, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE PALESTINIAN AUTHORITY, et al., )<br><br>Defendants. ) | C.A. No. 00-105L |

## DEFENDANTS THE PALESTINIAN AUTHORITY'S AND THE PALESTINE LIBERATION ORGANIZATION'S FIRST REQUEST FOR ADMISSIONS TO ALL PLAINTIFFS

Defendants, The Palestinian Authority ("PA") and The Palestine Liberation Organization ("PLO"), pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby require all Plaintiffs to answer the following Requests for Admission within thirty (30) days after service hereof.

## INSTRUCTIONS

1.      You should respond to these Requests in accordance with Federal Rule of Civil Procedure 36 and LR Cv 36.

2.      If you object to a particular request for admission, you must state your reasons. If you do not admit a request, you must specifically deny the matter or set forth in detail the reasons why you cannot truthfully admit or deny the matter. If you admit only certain portions of a request and deny other portions, your response shall identify which portions are admitted and which portions are denied.

3.      A denial shall fairly meet the substance of the requested admission, and when good faith requires that you qualify your answer or deny only a part of the matter of which an

admission is requested, you must specify so much of the matter as is true and qualify or deny the remainder.

    4.      You may not give lack of information or knowledge as a reason for failure to admit or deny any request unless you state that you have made reasonable inquiry and that the information known or readily obtainable by you is insufficient to enable you to admit or deny the request.

### **DEFINITIONS**

    1.      "PA" shall mean and refer to the Palestinian Authority.

    2.      "PLO" shall mean and refer to the Palestine Liberation Organization.

    3.      "Motion to Vacate" shall mean and refer to the document filed by Defendants' in this civil action and listed on the docket sheet as document number 408.

    4.      "the shooting" shall mean and refer to the shooting of Yaron Ungar on June 9, 1996.

    5.      "the Complaint" shall mean and refer to the document filed by Plaintiffs in this civil action and listed on the docket sheet as document number 41.

    6.      "Abdel Rahman Ismail Abdel Rahman Ghanimat" shall mean and refer to the person identified by that name in the Complaint.

    7.      "Jamal Abdel Fatah Tzabich Al Hor" shall mean and refer to the person identified by that name in the Complaint.

    8.      "Raed Fakhri Abu Hamdiya" shall mean and refer to the person identified by that name in the Complaint.

    9.      "Ibrahim Ghanimat" shall mean and refer to the person identified by that name in the Complaint.

10.     "Iman Mahmud Hassan Fuad Kafishe" shall mean and refer to the person identified by that name in the Complaint.

11.     "Hamas" shall mean and refer to the entity referred to as HAMAS in the Complaint.

12.     "Surif" shall mean and refer to the town in the West Bank near Hebron where Abdel Rahman Ismail Abdel Rahman Ghanimat lived prior to the shooting.

## REQUESTS FOR ADMISSION

**PLEASE ADMIT THE FOLLOWING STATEMENTS ARE TRUE:**

1.     Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members of a Hamas cell.[1]

2.     The Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members received instructions, weapons, money, and material support from commanders and leaders of Hamas.[2]

3.     The Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members did not receive instructions, weapons or money from the PA prior to the shooting.

4.     The Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members did not receive instructions, weapons or money from the PLO prior to the shooting.

5.     Plaintiffs have no evidence that the Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu

---

[1] Complaint at ¶ 15.

[2] Complaint at ¶ 16

3

Hamdiya were members received instructions, weapons or money from the PA prior to the shooting.

6.     Plaintiffs have no evidence that the Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members received instructions, weapons or money from the PLO prior to the shooting.

7.     Plaintiffs have no evidence that the Hamas cell of which Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya were members received instructions, weapons or money from either the PA or the PLO prior to the shooting.

8.     Jamal Abdel Fatah Tzabich Al Hor and Abdel Rahman Ismail Abdel Rahman Ghanimat carried out a machine-gun attack on Yaron Ungar on June 9, 1996 from a car driven by Raed Fakhri Abu Hamdiya.[3]

9.     No one other than Jamal Abdel Fatah Tzabich Al Hor and Abdel Rahman Ismail Abdel Rahman Ghanimat were passengers in the car driven by Raed Fakhri Abu Hamdiya when the June 9, 1996 machine gun attack on Yaron Ungar was carried out.

10.    The weapons used in the shooting attack on Yaron Ungar were two Kalashnikov rifles.[4]

11.    Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out a machine-gun attack on Yaron Ungar as agents of Hamas.[5]

---

[3] Complaint at ¶ 18, 19.

[4] Complaint at ¶ 18.

12. Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya did not carry out the shooting attack on Yaron Ungar as agents of the PA.

13. Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya did not carry out the shooting attack on Yaron Ungar as agents of the PLO.

14. Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out the shooting attack on Yaron Ungar as agents of the PA.

15. Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out the shooting attack on Yaron Ungar as agents of the PLO.

16. Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor, Abdel Rahman Ismail Abdel Rahman Ghanimat, and Raed Fakhri Abu Hamdiya carried out the shooting attack on Yaron Ungar as agents of either the PA or the PLO.

17. Abdel Rahman Ismail Abdel Rahman Ghanimat resided in the town of Surif.

18. Jamal Abdel Fatah Tzabich Al Hor resided in the town of Surif.

19. Raed Fakhri Abu Hamdiya resided in Jerusalem.

20. Under the Interim Agreement on the West Bank and Gaza, the Palestinian Authority had no civil or security authority in Jerusalem during the 1996-1997 period.

_____

(footnote continued from previous page)
[5] Complaint at ¶ 18.

21.    In 1996, Israel had not transferred any civil authority or security authority to the Palestinian Authority as to the West Bank area that included Surif.

22.    At the time of the shooting, the Palestinian Authority had no civil or security authority over the vicinity of Beit Shemesh, where the shooting attack occurred.

23.    In 1998, an Israeli court convicted Raed Fakhri Abu Hamdiya of membership in Hamas and of abetting the murder of Yaron Ungar.[6]

24.    In 1998, an Israeli court convicted Abdel Rahman Ismail Abdel Rahman Ghanimat of membership in Hamas and of the murder of Yaron Ungar.[7]

25.    In 1998, an Israeli court convicted Jamal Abdel Fatah Tzabich Al Hor of membership in Hamas and of the murder of Yaron Ungar.[8]

26.    Ronni Shaked gave testimony as a witness for Plaintiffs at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).

27.    Ronni Shaked is beyond the subpoena power of the United States District Court for the District of Rhode Island.

28.    Reuvan Paz gave testimony as a witness for Plaintiffs at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).

29.    Reuvan Paz is beyond the subpoena power of the United States District Court for the District of Rhode Island.

30.    Patrick Clawson gave testimony as a witness for Plaintiffs at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).

---

[6] Complaint at ¶ 20

[7] Complaint at ¶ 20.

[8] Complaint at ¶ 20.

31.    Patrick Clawson is beyond the subpoena power of the United States District Court for the District of Rhode Island.

32.    The United States District Court for the District of Columbia ordered Plaintiffs' counsel David Strachman to serve as the file clerk for all documents delivered to the court by the Israeli government in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).[9]

33.    Plaintiffs' counsel David Strachman retains copies of all documents delivered to the court by the Israeli government in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.).[10]

34.    All of the exhibits received into evidence by the court at the January 15, 2002 hearing in *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.) are authentic copies of what they purport to be.

35.    Yaron Ungar was murdered by agents of Hamas acting on behalf of Hamas.[11]

36.    Yaron Ungar was murdered by agents of Hamas acting pursuant to the authorization of Hamas.[12]

37.    The commander of the Hamas cell that murdered Yaron Ungar was Nasser Salah Talachmeh.[13]

---

[9] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 128:18-129:17.

[10] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 128:18-129:17.

[11] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 3; *see also id.* at 18.

[12] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 3; *see also id.* at 18.

[13] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12.

38.    At the time of the shooting, Nasser Salah Talachmeh was a high-ranking Hamas commander.[14]

39.    Prior to the shooting, Nasser Salah Talachmeh supplied the Hamas cell that murdered Yaron Ungar with a steady supply of money to increase the volume of Hamas terrorist activity.[15]

40.    Prior to the shooting, Nasser Salah Talachmeh supplied the Hamas cell that murdered Yaron Ungar with a Kalashnikov automatic rifle used to shoot at the car in which Yaron Ungar was killed, as well as funds to purchase other weapons.[16]

41.    Prior to the shooting, Nasser Salah Talachmeh supplied Abdel Rahman Ismail Abdel Rahman Ghanimat with 2000 Jordanian Dinar.

42.    Prior to the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat supplied Iman Mahmud Hassan Fuad Kafishe with the 2000 Jordanian Dinar he had received from Nasser Salah Talachmeh.

43.    Prior to the shooting, Iman Mahmud Hassan Fuad Kafishe used the 2000 Jordanian Dinar he received from Abdel Rahman Ismail Abdel Rahman Ghanimat to buy a Kalashnikov automatic rifle.

44.    The Hamas cell that murdered Yaron Ungar used the rifle purchased by Iman Mahmud Hassan Fuad Kafishe to shoot at the car in which Yaron Ungar was killed.

45.    Prior to the shooting, Nasser Salah Talachmeh supplied Abdel Rahman Ismail Abdel Rahman Ghanimat with 2000 Jordanian Dinar, which Abdel Rahman Ismail Abdel

---

[14] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12

[15] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12.

[16] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12

Rahman Ghanimat gave to Iman Mahmud Hassan Fuad Kafishe, who used that money to buy a Kalashnikov automatic rifle used to shoot at the car in which Yaron Ungar was killed.

46.    In 1995, the terrorist activities of the Hamas cell that murdered Yaron Ungar were not particularly successful, involved mostly killing with pistols, and were limited to the West Bank.[17]

47.    In 1995, the Hamas cell that murdered the Ungars suffered from a lack of training.[18]

48.    At the time of the shooting, Hassan Salameh was a senior member of Hamas.[19]

49.    Prior to the shooting, Hassan Salameh had been trained by Iran to train others how to commit terrorist operations.[20]

50.    Prior to the shooting, Nasser Salah Talachmeh specifically requested that Hassan Salameh train members of the cell that murdered Yaron Ungar in shooting techniques.[21]

51.    By the time of the shooting, Hassan Salameh had trained the Hamas cell that murdered Yaron Ungar in how to commit terrorist operations.[22]

---

[17] See Ungar v. The Islamic Republic of Iran, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12

[18] See Ungar v. The Islamic Republic of Iran, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12

[19] See Ungar v. The Islamic Republic of Iran, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 73:15-74:3.

[20] See Ungar v. The Islamic Republic of Iran, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 56:17-62:18; 72:9-74:3.

[21] See Ungar v. The Islamic Republic of Iran, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 14.

[22] See Ungar v. The Islamic Republic of Iran, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 13.

52.     The operational ability of the Hamas cell that murdered Yaron Ungar improved sharply when Hamas military commander Hassan Salameh became the military trainer of the cell.[23]

53.     Senior Hamas operative Hassan Salameh, who was personally trained in Iran by Iranian personnel in the use of machine-guns and in conducting ambushes from moving vehicles, was the military trainer of the Hamas cell that killed Yaron Ungar.[24]

54.     Prior to the shooting, Hassan Salameh transferred the technical knowledge and expertise he acquired in Iran to the Hamas cell that murdered Yaron Ungar.[25]

55.     Without the training provided by Hassan Salameh to the Hamas cell that murdered Yaron Ungar, the cell would not have been able to achieve success in its terrorist activities.[26]

56.     At the time of the shooting, only those Hamas members trained by Iran were trained to shoot from moving cars.[27]

57.     At the time of the shooting, Iran specifically trained Hamas operatives to carry out shooting attacks and ambushes from moving vehicles.[28]

---

[23] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12-13.

[24] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 23.

[25] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 15.

[26] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 15.

[27] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 16; *see also Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 75:25-76:9.

[28] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 14.

58.     Prior to the shooting, Hassan Salameh had been trained in Iran in weapons use and in executing ambushes from moving vehicles.[29]

59.     Without training on how to carry out shooting attacks from moving vehicles, Hamas could not have executed the attack in which Yaron Ungar was killed.[30]

60.     It is very likely that Hassan Salameh was the person who trained members of the Hamas cell who shot Yaron Ungar how to shoot from a moving car.[31]

61.     Yaron Ungar was shot from a moving car.

62.     At the time of the shooting, Hamas viewed itself as a rival and as an alternative to the PLO.[32]

63.     At the time of the shooting, Hamas viewed itself as a rival and as an alternative to the Palestinian Authority.[33]

64.     At the time of the shooting, Hamas viewed itself as a rival and as an alternative to the Palestinian leadership.[34]

---

[29] See *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 14.

[30] See *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 14.

[31] See *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 74:4-79:19; *see also id.* at 76:10-11 ("[I]t is very likely that he was the guy who trained the Talachmeh cell . . . .").

[32] See *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 84:12-16.

[33] See *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 84:12-16.

[34] See *Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 84:12-16.

65.    At the time of the shooting, Iran encouraged Hamas to carry out as much terrorist activity as possible to prevent any improvement or any progress in the peace process between Israel and the Palestinian leadership.[35]

66.    At the time of the shooting, Hamas used terrorism as a tool to interfere with the peace process between Israel and the Palestinian leadership.[36]

67.    Without the support provided to it by Iran, Hamas would have been quite anemic at the time of the shooting.[37]

68.    Without the support provided to it by Iran, Hamas would not have been the well-organized and successful group that it was at the time of the shooting.[38]

69.    Without the support provided to it by Iran, Hamas would have been extremely limited in its operational capabilities at the time of the shooting.[39]

70.    Absent Iranian support and training, Hamas would have been unable to carry out the attack in which Yaron Ungar was killed.[40]

71.    Hamas would have been unable to mount and execute the attack in which the Yaron Ungar was killed without Iranian training of some provenance.[41]

---

[35] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 85:1-9.

[36] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 85:1-14.

[37] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 89:11-22; *see also Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 11-12.

[38] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 89:11-22; *see also Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 11-12.

[39] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 11-12.

[40] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 22.

72.     At the time of the shooting, PLO Chairman Yasser Arafat was not happy about the relationship between Hamas and Iran.[42]

73.     At the time of the shooting, PLO Chairman Arafat was blaming Iran for its encouragement of terrorist acts.[43]

74.     Iran had a direct involvement with the Hamas cell that shot Yaron Ungar.[44]

75.     There is a direct connection between Iran and the shooting of Yaron Ungar.[45]

76.     Iran provided the resources that led very specifically to the shooting of Yaron Ungar.[46]

77.     Iran provided the know-how that led very specifically to the shooting of Yaron Ungar.[47]

78.     Iran provided the knowledge that led very specifically to the shooting of Yaron Ungar.[48]

_____

(footnote continued from previous page)

[41] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 23.

[42] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 104:16-106:11; *see also id.* at 105:1 ("PLO chairman Yasar Arafat [] is not happy about it").

[43] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 106:3-7.

[44] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 120:22-24.

[45] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 124:3-8.

[46] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 124:3-6.

[47] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 124:3-6.

[48] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 124:3-6.

79.    Iran provided the technical skills that led very specifically to the shooting of Yaron Ungar.[49]

80.    At the time of the shooting, Hamas had ruled out any possibility of peace between the Palestinians and Israelis, and considered it the prime religious obligation to eradicate the Jewish State by use of violence.[50]

81.    At the time of the shooting, the only source from which Hamas could receive weapons to conduct and expand its armed struggle against Israel was Iran.[51]

82.    At the time of the shooting, the only source from which Hamas could receive financing to conduct and expand its armed struggle against Israel was Iran.[52]

83.    At the time of the shooting, the only source from which Hamas could receive military training to conduct and expand its armed struggle against Israel was Iran.[53]

84.    By 1996, the professional military training provided to Hamas by Iran had significantly boosted Hamas' operational capabilities.[54]

85.    By 1996, the skills acquired by Hamas operatives during Iranian training enabled Hamas to translate its militant ideology into effective and deadly terrorist attacks, since many of

---

[49] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), January 15, 2002 Hearing Transcript at 124:3-6.

[50] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 4.

[51] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 5.

[52] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 5.

[53] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 5.

[54] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 11.

those skills are precisely the things that Hamas did not have a few years earlier before its cooperation with Iran became much closer.[55]

86.     The overwhelming Iranian contribution to Hamas' operational capabilities is clearly evident in the terrorist attack in which Yaron Ungar was killed.[56]

87.     The overwhelming Iranian contribution to Hamas' operational capabilities is clearly evident in the structure of the Hamas cell that carried out the attack in which Yaron Ungar was killed.[57]

88.     The overwhelming Iranian contribution to Hamas' operational capabilities is clearly evident in the activities of the Hamas cell that carried out the attack in which Yaron Ungar was killed.[58]

89.     At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an agent of the PA.

90.     Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an agent of the PA at the time of the shooting.

91.     At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an employee of the PA.

92.     Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an employee of the PA at the time of the shooting.

---

[55] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 11.

[56] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12.

[57] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12.

[58] *See Ungar v. The Islamic Republic of Iran*, Civ. No. 00-2606 JR (D.D.C.), Dkt. No. 29 at 12.

93.    At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an agent of the PLO.

94.    Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an agent of the PLO at the time of the shooting.

95.    At the time of the shooting, Abdel Rahman Ismail Abdel Rahman Ghanimat was not an employee of the PLO.

96.    Plaintiffs have no evidence that Abdel Rahman Ismail Abdel Rahman Ghanimat was an employee of the PLO at the time of the shooting.

97.    At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an agent of the PA.

98.    Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an agent of the PA at the time of the shooting.

99.    At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an employee of the PA.

100.    Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an employee of the PA at the time of the shooting.

101.    At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an agent of the PLO.

102.    Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an agent of the PLO at the time of the shooting.

103.    At the time of the shooting, Jamal Abdel Fatah Tzabich Al Hor was not an employee of the PLO.

104.   Plaintiffs have no evidence that Jamal Abdel Fatah Tzabich Al Hor was an employee of the PLO at the time of the shooting.

105.   At the time of the shooting, Raed Fakhri Abu Hamdiya was not an agent of the PA.

106.   Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an agent of the PA at the time of the shooting.

107.   At the time of the shooting, Raed Fakhri Abu Hamdiya was not an employee of the PA.

108.   Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an employee of the PA at the time of the shooting.

109.   At the time of the shooting, Raed Fakhri Abu Hamdiya was not an agent of the PLO.

110.   Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an agent of the PLO at the time of the shooting.

111.   At the time of the shooting, Raed Fakhri Abu Hamdiya was not an employee of the PLO.

112.   Plaintiffs have no evidence that Raed Fakhri Abu Hamdiya was an employee of the PLO at the time of the shooting.

113.   At the time of the shooting, Ibrahim Ghanimat was not an agent of the PA.

114.   Plaintiffs have no evidence that Ibrahim Ghanimat was an agent of the PA at the time of the shooting.

115.   At the time of the shooting, Ibrahim Ghanimat was not an employee of the PA.

116.    Plaintiffs have no evidence that Ibrahim Ghanimat was an employee of the PA at the time of the shooting.

117.    At the time of the shooting, Ibrahim Ghanimat was not an agent of the PLO.

118.    Plaintiffs have no evidence that Ibrahim Ghanimat was an agent of the PLO at the time of the shooting.

119.    At the time of the shooting, Ibrahim Ghanimat was not an employee of the PLO.

120.    Plaintiffs have no evidence that Ibrahim Ghanimat was an employee of the PLO at the time of the shooting.

121.    Ibrahim Ghanimat was not in the car with members of the Hamas cell who shot Yaron Ungar when Yaron Ungar was shot.

122.    Plaintiffs have no evidence that Ibrahim Ghanimat was in the car with members of the Hamas cell who shot Yaron Ungar when Yaron Ungar was shot.

123.    Ibrahim Ghanimat was not a proximate cause of Yaron Ungar's death.

124.    Plaintiffs have no evidence that Ibrahim Ghanimat was a proximate cause of Yaron Ungar's death.

125.    At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an agent of the PA.

126.    Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an agent of the PA at the time of the shooting.

127.    At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an employee of the PA.

128.    Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an employee of the PA at the time of the shooting.

129.    At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an agent of the PLO.

130.    Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an agent of the PLO at the time of the shooting.

131.    At the time of the shooting, Iman Mahmud Hassan Fuad Kafishe was not an employee of the PLO.

132.    Plaintiffs have no evidence that Iman Mahmud Hassan Fuad Kafishe was an employee of the PLO at the time of the shooting.

133.    At the time of the shooting, Hassan Salameh was not an agent of the PA.

134.    Plaintiffs have no evidence that Hassan Salameh was an agent of the PA at the time of the shooting.

135.    At the time of the shooting, Hassan Salameh was not an employee of the PA.

136.    Plaintiffs have no evidence that Hassan Salameh was an employee of the PA at the time of the shooting.

137.    At the time of the shooting, Hassan Salameh was not an agent of the PLO.

138.    Plaintiffs have no evidence that Hassan Salameh was an agent of the PLO at the time of the shooting.

139.    At the time of the shooting, Hassan Salameh was not an employee of the PLO.

140.    Plaintiffs have no evidence that Hassan Salameh was an employee of the PLO at the time of the shooting.

141.    At the time of the shooting, Nasser Salah Talachmeh was not an agent of the PA.

142.    Plaintiffs have no evidence that Nasser Salah Talachmeh was an agent of the PA at the time of the shooting.

143.    At the time of the shooting, Nasser Salah Talachmeh was not an employee of the PA.

144.    Plaintiffs have no evidence that Nasser Salah Talachmeh was an employee of the PA at the time of the shooting.

145.    At the time of the shooting, Nasser Salah Talachmeh was not an agent of the PLO.

146.    Plaintiffs have no evidence that Nasser Salah Talachmeh was an agent of the PLO at the time of the shooting.

147.    At the time of the shooting, Nasser Salah Talachmeh was not an employee of the PLO.

148.    Plaintiffs have no evidence that Nasser Salah Talachmeh was an employee of the PLO at the time of the shooting.

149.    At the time of the shooting, Hamas was not an agent of the PA.

150.    Plaintiffs have no evidence that Hamas was an agent of the PA at the time of the shooting.

151.    At the time of the shooting, Hamas was not an alter-ego of the PA.

152.    Plaintiffs have no evidence that Hamas was an alter-ego of the PA at the time of the shooting.

153.    At the time of the shooting, Hamas was not an agent of the PLO.

154.    Plaintiffs have no evidence that Hamas was an agent of the PLO at the time of the shooting.

155.    At the time of the shooting, Hamas was not an alter-ego of the PLO.

156.    Plaintiffs have no evidence that Hamas was an alter-ego of the PLO at the time of the shooting.

157.    Dvir Ungar has never suffered from a severe mental injury.

158.    Dvir Ungar did not suffer from a severe mental injury in 2002.

159.    Dvir Ungar does not currently suffer from a severe mental injury.

160.    Dvir Ungar has never suffered from psychosis.

161.    Dvir Ungar did not suffer from psychosis in 2002.

162.    Dvir Ungar does not currently suffer from psychosis.

163.    Dvir Ungar has never suffered from neurosis.

164.    Dvir Ungar did not suffer from neurosis in 2002.

165.    Dvir Ungar does not currently suffer from neurosis.

166.    Dvir Ungar has never suffered from a psychiatric disorder.

167.    Dvir Ungar did not suffer from a psychiatric disorder in 2002.

168.    Dvir Ungar does not currently suffer from a psychiatric disorder.

169.    Dr. Allan Brenman has never performed an in-depth assessment of Dvir Ungar.[59]

170.    Dr. Allan Brenman has never performed a forensic evaluation of Dvir Ungar.

171.    Dr. Allan Brenman has never performed a psychological evaluation of Dvir Ungar.

172.    Dr. Allan Brenman has never performed a psychiatric evaluation of Dvir Ungar.

173.    Yishai Ungar has never suffered from a severe mental injury.

174.    Yishai Ungar did not suffer from a severe mental injury in 2002.

---

[59] *See Ungar v. The Palestinian Authority*, C.A. No. 00-105L (D.R.I.), July 15, 2002 Hearing Transcript at 8:13-9:7.

175.   Yishai Ungar does not currently suffer from a severe mental injury.

176.   Yishai Ungar has never suffered from psychosis.

177.   Yishai Ungar did not suffer from psychosis in 2002.

178.   Yishai Ungar does not currently suffer from psychosis.

179.   Yishai Ungar has never suffered from neurosis.

180.   Yishai Ungar did not suffer from neurosis in 2002.

181.   Yishai Ungar does not currently suffer from neurosis.

182.   Yishai Ungar has never suffered from a psychiatric disorder.

183.   Yishai Ungar did not suffer from a psychiatric disorder in 2002.

184.   Yishai Ungar does not currently suffer from a psychiatric disorder.

185.   Dr. Allan Brenman has never performed an in-depth assessment of Yishai Ungar.[60]

186.   Dr. Allan Brenman has never performed a forensic evaluation of Yishai Ungar.

187.   Dr. Allan Brenman has never performed a psychological evaluation of Yishai Ungar.

188.   Dr. Allan Brenman has never performed a psychiatric evaluation of Yishai Ungar.

189.   Judith Dasberg and Uri Dasberg told Benjamin Netanyahu that an appropriate way to prevent acts of terror such as the one in which Yaron Ungar was killed is to build a settlement every time an Israeli is killed by terrorists.[61]

---

[60] *See Ungar v. The Palestinian Authority*, C.A. No. 00-105L (D.R.I.), July 15, 2002 Hearing Transcript at 8:13-9:7.

[61] *See* Exhibit 1, attached hereto.

190.    Judith Dasberg told Benjamin Netanyahu that an appropriate way to prevent acts of terror such as the one in which Yaron Ungar was killed is to build a settlement every time an Israeli is killed by terrorists.[62]

191.    Uri Dasberg told Benjamin Netanyahu that an appropriate way to prevent acts of terror such as the one in which Yaron Ungar was killed is to build a settlement every time an Israeli is killed by terrorists.[63]

192.    At the time of the shooting, the town of Surif was under Israeli administrative control.[64]

193.    At the time of the shooting, the town of Surif was under Israeli security control.[65]

194.    At the time of the shooting, the town of Surif was not under PA administrative control.

195.    At the time of the shooting, the town of Surif was not under PA security control.

196.    At the time of the shooting, the town of Surif was not under PLO administrative control.

197.    At the time of the shooting, the town of Surif was not under PLO security control.

198.    Judith Dasberg and Uri Dasberg told Benjamin Netanyahu that Yasser Arafat was a wicked man.[66]

199.    Judith Dasberg told Benjamin Netanyahu that Yasser Arafat was a wicked man.[67]

---

[62] *See* Exhibit 1, attached hereto.

[63] *See* Exhibit 1, attached hereto.

[64] *See* Exhibit 1, attached hereto.

[65] *See* Exhibit 1, attached hereto.

[66] *See* Exhibit 1, attached hereto.

200.    Uri Dasberg told Benjamin Netanyahu that Yasser Arafat was a wicked man.[68]

201.    Uri Dasburg has said that an appropriate response to the attack in which Yaron Ungar was killed is to hold on to the West Bank more strongly with our fingers, with nails deep, deep in the earth.[69]

202.    Judith Dasberg has said that the Ungars were victims of the Oslo Accords.[70]

203.    Yasser Arafat was a PA/PLO official whom the Court ordered Defendants to produce at one time.

204.    Plaintiffs have never interviewed Yasser Arafat about the allegations in the Complaint.

205.    Razi Jabali was a PA/PLO official whom the Court ordered Defendants to produce at one time.

206.    Plaintiffs have never interviewed Razi Jabali about the allegations in the Complaint.

207.    Muhammed Dahlan was a PA/PLO official whom the Court ordered Defendants to produce at one time.

208.    Plaintiffs have never interviewed Muhammed Dahlan about the allegations in the Complaint.

209.    Amin Al-Hindi was a PA/PLO official whom the Court ordered Defendants to produce at one time.

(footnote continued from previous page)
[67] *See* Exhibit 1, attached hereto.

[68] *See* Exhibit 1, attached hereto.

[69] *See* Exhibits 2 & 3, attached hereto.

[70] *See* Exhibit 2, attached hereto.

210.    Plaintiffs have never interviewed Amin Al-Hindi about the allegations in the Complaint.

211.    Tawfik Tirawi was a PA/PLO official whom the Court ordered Defendants to produce at one time.

212.    Plaintiffs have never interviewed Tawfik Tirawi about the allegations in the Complaint.

213.    Jibril Rajoub was a PA/PLO official whom the Court ordered Defendants to produce at one time.

214.    Plaintiffs have never interviewed Jibril Rajoub about the allegations in the Complaint.

215.    Exhibit A to Defendants' Reply in support of their Motion to Vacate (Dkt. No. 423) is an authentic copy of a letter from the United States Department of Justice to the United States District Court for the Southern District of New York.

216.    The document produced to Plaintiffs by Defendants and labeled 01:0012160-01:0012178 is an authentic copy of what it purports to be.

217.    The document produced to Plaintiffs by Defendants and labeled 01:0012179 is an authentic copy of what it purports to be.

218.    The document produced to Plaintiffs by Defendants and labeled 01:0012181-01:0012205 is an authentic copy of what it purports to be.

219.    The document produced to Plaintiffs by Defendants and labeled 01:0012207-01:0012210 is an authentic copy of what it purports to be.

220.    The document produced to Plaintiffs by Defendants and labeled 01:0012212-01:0012291 is an authentic copy of what it purports to be.

221.    The document produced to Plaintiffs by Defendants and labeled 01:0012293-01:0012294 is an authentic copy of what it purports to be.

222.    The document produced to Plaintiffs by Defendants and labeled 01:0012295 is an authentic copy of what it purports to be.

223.    The document produced to Plaintiffs by Defendants and labeled 01:0012296-01:0012297 is an authentic copy of what it purports to be.

224.    The document produced to Plaintiffs by Defendants and labeled 01:0012298-01:0012299 is an authentic copy of what it purports to be.

225.    The document produced to Plaintiffs by Defendants and labeled 01:0012300-01:0012304 is an authentic copy of what it purports to be.

226.    The document produced to Plaintiffs by Defendants and labeled 01:0012305-01:0012320 is an authentic copy of what it purports to be.

227.    The document produced to Plaintiffs by Defendants and labeled 01:0012321-01:0012358 is an authentic copy of what it purports to be.

228.    The document produced to Plaintiffs by Defendants and labeled 01:0012359-01:0012401 is an authentic copy of what it purports to be.

229.    The document produced to Plaintiffs by Defendants and labeled 01:0012402-01:0012464 is an authentic copy of what it purports to be.

230.    Nitsana Darshan-Leitner has an attorney-client relationship with the Plaintiffs.

231.    Nitsana Darshan-Leitner is the founder and director of Shurat HaDin Israel Law Center.

232.    Shurat HaDin, on its website, www.israellawcenter.org, uses the motto "Bankrupting Terrorism One Lawsuit at a Time."

233.    Shurat HaDin, on its website, www.israellawcenter.org, describes Nitstana Darshan-Leitner as leading the struggle to fight Palestinian terrorist organizations in the courtroom and identifies the Palestinian Authority as one of the Palestinian "terrorist organizations."

Dated:  October 20, 2010

*Mark J. Rochon*

Mark J. Rochon (D.C. Bar #376042)
Admitted *pro hac vice*
Richard A. Hibey (D.C. Bar #74823)
Admitted *pro hac vice*
Brian A. Hill (D.C. Bar #456086)
Admitted *pro hac vice*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
mrochon@milchev.com
rhibey@milchev.com
bhill@milchev.com

*Deming E. Sherman*

Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
Tel. (401) 274-9200
Fax. (401) 276-6611
dsherman@eapdlaw.com

*Attorneys for the Palestinian Authority and
the Palestine Liberation Organization*

27

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that, on this 20th day of October, 2010, a true and genuine copy of the foregoing served by hand delivery on the following:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
djs@mtlhlaw.com

Max Wistow
Wistow and Barylick Incorporated
61 Weybosset Street
Providence, RI 02903
mwistow@wistbar.com

*Attorneys for Plaintiffs*


Deming E. Sherman