# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs – Judgment Creditors,

v.                                                                   C.A. No. 00 - 105L

THE PALESTINIAN AUTHORITY, et al.,

    Defendants – Judgment Debtors.

### PLAINTIFFS' NOTICE
### OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)

**DEPONENT:**     **The Palestinian Authority**

**DATE:**     **September 28, 2010**

**TIME:**     **10:00 a.m.**

    **PLEASE TAKE NOTICE** that pursuant to Fed.R.Civ.P. Rule 30(b)(6), counsel for Plaintiffs-Judgment Creditors in the above-captioned matter will take the deposition of the Palestinian Authority ("PA") which examination will continue from day to day until completed, the same to commence on the date and time above stated at the offices of Plaintiffs' counsel Wistow & Barylick, Inc., 61 Weybosset Street, Providence, Rhode Island.

    The deposition shall be taken before a court reporter or any other officer authorized to take depositions. This deposition is being taken for the purpose of discovery, for use at the hearing scheduled in this matter, or for such other purposes as are permitted under the Federal Rules of Civil Procedure and the Local Rules of this Court.

    The deposition will be recorded by stenographic and audiovisual means.

    g. The involvement, duties, responsibilities and efforts of the persons who served as the PA's Attorney General from 2000 - present to gain information about and supervise U.S. litigation against the PA and/or PLO, from March 2000 until December 2007.

    h. The "Other pressing problems" facing the PA that complicated the creation of an organizational entity for defending foreign lawsuits brought against the PA.[41]

    i. The difficulty of PA decision-makers in understanding the complete picture of the litigation and the importance of full and complete participation in the process; any and all efforts made to understand the importance of full and complete participation in the process; and any and all discussions or communications with counsel concerning the importance of full and complete participation in the process.[42]

    j. The conflicting instructions and confusion caused by the PA's failure to establish lines of authority for handling foreign litigation.[43]

    k. The policies, procedures and/or guidelines for the handling of lawsuits brought against the PA.

**10. Regarding the Palestine Investment Fund:**

    a. The relationship between the Palestinian Investment Fund and the PA.[44]

    b. The PA's knowledge of, and when the PA first became aware of, the 2006 Judgment.

---

[41] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("With the support of President Abbas, Dr. Husseini began the process of creating an organizational entity within the President's Office responsible for defending domestic and foreign lawsuits brought against the Palestinian government, but it was a complicated task compounded by both a lack of familiarity in the Palestinian legal community with the American legal system, and by the fact that the Palestinian government had many other pressing problems to address.").

[42] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 34 ("These isolated decision-makers had difficulty understanding the complete picture of the litigation, the importance of full and complete participation in the process, and the basis for being haled into U.S. courts to litigate claims involving attacks in the Middle East that the PA and PLO did not commit.").

[43] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 35 ("As Mr. Abdel-Rahman notes, '[t]he failure to establish such lines of authority had created conflicting instructions and confusion in the litigation, to the Defendants' detriment.'").

[44] See Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment at 44.

    c. The transfer and/or payment of any funds, monies or assets from the Palestine Investment Fund to the PA from the date the 2006 Judgment was entered until the present day, and the amounts of such transfers and/or payments.

    d. Any and all decisions to carry out the transfers and/or payments referred to in the previous subsection (c), including the name, title, and present whereabouts of any person involved in making, participating in and/or authorizing such transfers and/or payments.

    e. The Palestine Investment Fund's articles of association and/or by-laws at any time.

    f. The Palestine Investment Fund's governing structure and decision-making procedures.

    g. Any and all efforts to change the articles of association of the Palestine Investment Fund at any time subsequent to the date that the 2006 Judgment was entered, including the name, title, and present whereabouts of any person involved in making, participating in and/or authorizing such changes.[45]

    h. The impairment of the PA's ability to carry on its governmental function caused by the freezing of assets of the PA and of various "independent entities", including but not limited to the Palestine Investment Fund.[46]

    i. Erosion of support for the PA's leadership and compromise of the efforts of the PA to achieve economic stability caused by the turning over of ownership of the Palestine Investment Fund.[47]

---

[45] See Declaration of Robert J. Tolchin, Ex. C to Plaintiffs-Judgment Creditors' Memorandum in Opposition to Defendants' Motion for Relief from Default Judgment, at ¶ 8 ("In the Connecticut case, attorneys purporting to act on behalf of the PIF (but in fact acting on behalf of the former CEO of the PIF, who is none other than the current Economic Advisor to the PA) appeared and advised the Court that in early 2007 the PA had purported to make self-serving changes to the PIF's bylaws in a post-hoc effort to defeat the effect of the judgment entered by this Court in September 2006 on the Ungars' creditor's bill conveying ownership of the PIF to the Ungars.").

[46] See June 18, 2005 letter from Salam Fayyad to Condoleezza Rice at 4 ("As set forth above, the enforcement actions taken by Plaintiffs and their supporters in the *Ungar* Case have already resulted in the freezing of numerous assets of both the PNA and various independent entities that are *not* subject to the District Court's Preliminary Injunction. The freezing of these assets poses an imminent threat to the continuing operation of critical institutions on which the Palestinian people depend for a functioning civil society. In addition, it also has significantly impaired the ability of the PNA to carry on its governmental function and, in fact, threatens to bankrupt the PNA.").

[47] See 3/6/08 Defendants' Reply to Plaintiffs' Objection to Motion for Relief from Default Judgment at 29 ("If the U.S. courts turn over the pension fund assets of Palestinian government workers and the ownership of the Palestine Investment Fund in satisfaction of this judgment, support for the moderate leadership of the PA will be severely eroded and its efforts to achieve economic stability compromised.").

    j. Any and all actions carried by Mohammed Mustafa on behalf of the PA and all services rendered by Mohammed Mustafa to or on behalf of the PA between July 2004 and the present day.

    k. Any and all papers, pleadings, affidavits and declarations submitted by the PA in the Israeli Proceedings, at any time, that reference the Palestine Investment Fund.

    l. Any and all legal actions and/or proceedings brought against Orascom Telecom Holding S.A.E. by persons purporting to represent the Palestine Investment Fund, including without limitation all such actions and/or proceeding brought in Egypt.

    m. Any and all legal actions and/or proceedings brought against Orascom Telecom Holding S.A.E. by persons purporting to represent the Palestine Investment Fund, and authentic copies of all transcripts, orders and decisions from such proceedings.

**11. Regarding the PA's ability to participate in discovery**

    a. The PA's difficulties finding documents and responding to requests for discovery between 2000 and December 2007.[48]

    b. The present ability of the PA to produce documents and respond to discovery requests, and how its current ability differs from that which obtained in 2000, 2001, 2002, 2003, and 2004.[49]

    c. The nature, type, contents and identity of the PA's records in Gaza that no are longer accessible.[50]

    d. The names, titles, and present whereabouts of any individuals involved in preparing responses and answers to all discovery requests propounded by Plaintiffs in this matter subsequent to June 1, 2010.

---

[48] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 1 ("Government offices and officials cannot work effectively or organize even on matters of extreme urgency. It has been impossible under such circumstances to locate people who could seek and find documents, who could gather information and prepare answers to interrogatories and could respond to requests for admissions.").

[49] See 1/27/03 Al-Kidwa letter to Judge Martin, Ex. L to Defendants' 12/28/07 Memorandum in Support of Defendants' Motion to Vacate Default Judgment, at 2 ("Only the achievement of a level of stability, free from the threat of daily attacks in our territory can make it possible to free personnel to gather the materials and information needed to proceed with a defense.").

[50] See Defendants' 2/15/2008 Motion to Dismiss in Parsons v. Palestinian Authority, No 07-1847 (JR) (D.D.C.) ("Gaza is now inaccessible for the purpose of conducting discovery or otherwise gathering facts and information that may be relevant to defending against [the Parsons] Plaintiffs' claims in this case [*Parsons v. PA*]. The dramatically changed circumstances in Gaza in 2007 will result in immense prejudice to Defendants if this litigation is permitted to proceed.").

8. "Achille Lauro Proceedings" shall mean, refer to and include collectively all legal proceedings in any court in the United States resulting and/or arising from the October 1985 seizure of the Italian passenger liner Achille Lauro to which the PLO was a party at any time.

9. "Danish Road Contractors Proceedings" shall mean, refer to and include collectively all arbitration and legal proceedings in Europe to which the Danish Road Contractors and the PA were parties.

10. "Bucheit Proceedings" shall mean, refer to and include collectively all proceedings in the matter of *Bucheit v. PLO*, Civ. No. 00-1455GK (D.D.C.)

Dated: August 31, 2010

Plaintiffs-Judgment Creditors,
by their Attorneys,

Max Wistow #0330
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)
mw@wistbar.com

David J. Strachman #4404
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com

20

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that, on August 31, 2010, a true and genuine copy of the foregoing was sent by first class mail and electronic mail to Defendants' counsel of record listed below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/s/ Daria Sosa
_____

     I HEREBY FURTHER CERTIFY that, on August 31, 2010, a true and genuine copy of the foregoing was hand delivered to Defendants' counsel of record listed below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

/s/ Daria Sosa
_____