# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

    Plaintiffs – Judgment Creditors,

    v.                                                                                       Civ. No. 00-105L

THE PALESTINIAN AUTHORITY, et al.,

    Defendants – Judgment Debtors.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS' MOTION TO STRIKE AND TO COMPEL

### Introduction

On October 19, 2010, the Plaintiffs-Judgment Creditors' ("Ungars") served Defendants-Judgment Creditors Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") ("Defendants") with a Second Set of Interrogatories ("Interrogatories") and a Fourth Request for Production of Documents and Things ("RPDs"). Exhibits A-D.[1]

As has been their wont throughout these proceedings, Defendants asserted a raft of general and specific objections to virtually all of the Interrogatories and RPDs. Exhibits E-F.

Furthermore, Defendants' extremely partial answers to the Interrogatories are unsworn.

The Ungars therefore move to strike Defendants objections to Interrogatories Nos. 3 and 5 and to RPDs Nos. 1-6 and 9-15, and to compel Defendants to provide complete sworn answers to those Interrogatories and to produce the documents and things sought in those RPDs.

---

[1] The Interrogatories and RPDs served on each defendant are identical.

## ARGUMENT

I.     **Discovery Related to the Cairo Agreement**

Interrogatory No. 3 and RPDs Nos. 1-6 all relate to the "Cairo Agreement," also known as the "Cairo Declaration," of December 21, 1995.

Some brief background is necessary in order to explain the importance of this discovery to the Ungars' defense of Defendants' Rule 60(b)(6) motion:

This action arises from the machine-gun murder of U.S. citizen Yaron Ungar on June 9, 1996, near Beit Shemesh, Israel, by a squad of Hamas terrorists.

In support of its claim to have a "meritorious defense" to this action (which is a sine qua non condition for relief under Rule 60(b)) Defendants' intend to present opinion testimony asserting that, contrary to the allegations of the Ungars' Amended Complaint, during the years prior to the murder, the Defendants "[v]iolent[ly] repress[ed]" Hamas' terrorist activities. *See* Expert Report of Glenn E. Robinson, Exhibit G, at 14.

Defendants' also intend argue in support of their putative "meritorious defense" that the Hamas gunmen who murdered Mr. Ungar came from a village not under the control of the Defendants. *See* Expert Report of Raja Shehadeh, Exhibit H, at 3-4, ¶¶ 12-13.

Defendants' putative experts neglect to mention, however, that in late 1995 the Defendants and Hamas entered into negotiations regarding various matters, in the context of which the Defendants sought and received a commitment from Hamas that it would not carry out terrorist attacks ***in or from*** territory controlled by the Defendants. This commitment, which was reflected in a joint declaration made by representatives of Defendants and of Hamas in Cairo on December 21, 1995, is commonly termed the "Cairo Agreement" or "Cairo Declaration."

As one Middle East scholar explains:

2

> After lengthy negotiations, the two sides reached an agreement in Cairo on December 21, 1995, which essentially allowed Hamas to operate against Israel targets outside areas controlled by the PA. Arafat also agreed to a release of Islamist prisoners but won a number of political concessions. The document was signed by Khaled Mashal on behalf of Hamas and Salim Zanoun on behalf of the PNC, the legislative organ of the PLO.

Ofira Seliktar, Doomed to Failure?: The Politics and Intelligence of the Oslo Peace Process (Greenwood Publishing) (2009) at 74.

Defendants' purpose in obtaining this undertaking from Hamas was twofold: (a) it allowed Defendants to deflect blame for terrorism since the attacks would no longer take place in or from Defendants' territory[2] and (b) it allowed Defendants to argue that if Israel wanted to reduce attacks, it should cede more land to the Defendants. As PLO leader Salim Zanoun stated soon after he concluded the agreement on behalf of the Defendants:

> This should be understood by all. We are not the defenders of the Israeli entity [sic]. We see it as sufficient to obligate Hamas not to embarrass the PA, which is responsible for security in the areas it has received, and from which it will not allow action. … ***If Israel wants to spare itself Hamas attacks, it had better hurry and withdraw from the rest of the territories***.

Exhibit I at 2 (emphasis added).

---

[2] In fact, of course, Defendants remained no less blameworthy, since they continued to provide Hamas as an organization with safe-haven and other material support within the areas controlled by them.

Thus the Cairo Agreement directly refutes Defendants' claim that they "[v]iolent[ly] repress[ed]" Hamas' terrorist activities (Exhibit G at 14) and completely undermines Defendants' argument (Exhibit H, at 3-4, ¶¶ 12-13) that they cannot be blamed for the murder of Mr. Ungar because the Hamas shooters came from a village outside of Defendants' control. Indeed, the fact that the gunman came from such a village squares perfectly with the provisions of the Cairo Agreement, and Defendants' attempt to avoid liability for the murder on this ground is precisely consistent with their purpose in entering the Cairo Agreement.[3]

Significantly, moreover, Defendants' use of Hamas, via the Cairo Agreement, to urge Israel to deliver further territories in order to avoid further terrorist attacks (as reflected in Zanoun's statement "If Israel wants to spare itself Hamas attacks, it had better hurry and withdraw from the rest of the territories," Exhibit I at 2), perfectly fits the statutory definition of "international terrorism" for civil actions under the Antiterrorism Act. *See* 18 U.S.C. § 2331(1) (defining international terrorism as "activities that … appear to be intended … to influence the policy of a government by intimidation or coercion.").

Unfortunately, while the terms of the Cairo Agreement were widely reported in the Arabic-press, neither Defendants nor Hamas have published the Cairo Agreement, and absent discovery from the Defendants it will be extremely difficult if not impossible for the Ungars to obtain and present admissible evidence on this topic.

Accordingly, Interrogatory No. 3 and RPDs Nos. 1-6 seek information and documents regarding the Cairo Agreement. *See* Exhibits A-D.

---

[3] The origin of the specific gunmen is of course irrelevant. The attack was carried out by and on behalf of Hamas, to which Defendants provided material support and resources ***as an organization***, and Defendants therefore would be just as liable if the actual shooters came from Jordan or Lebanon.

In an effort to prevent any confusion or evasion, and to ensure a substantive response, the Ungars' Interrogatories and RPDs defined the "Cairo Agreement" as follows:

> [A]ny and all written and/or oral agreements, declarations, understandings and/or pacts that were made, reached and/or concluded on or about December 21, 1995, to which either of the Defendants and Hamas were parties.

Exhibits A-D at Specific Definitions.

Unfortunately, Defendants have refused to provide any discovery regarding the Cairo Agreement. In response to Interrogatory No. 3 Defendants have provided a very partial, unsworn and intentionally misleading response, which *inter alia* omits the fact that PLO leader Salim Zanoun executed the Cairo Agreement on behalf of the Defendants. Exhibit E. Moreover, Defendants' "response" is made subject to a number of objections. *Id*.

In response to RPDs Nos. 1-6, Defendants assert a number of objections, and state that subject to those objections they will produce documents "that are responsive to a reasonable and proper scope and interpretation" of these RPDs "that can be found through reasonable search efforts by Defendants" and that – subject to all the above – they "are not aware of any such" documents. Exhibit F.

In short, Defendants are, as usual, refusing to respond to legitimate discovery requests by hiding behind objections. But all of Defendants' objections are baseless and should be stricken.

Aside from their usual, unarticulated boilerplate "overly burdensome" objections (which Defendants have asserted in response to nearly every discovery request propounded by the Ungars to date) Defendants object to Interrogatory No. 3 and RPDs Nos. 1-6 on grounds of relevance, asserting that their purported meritorious defense is not a relevant subject of discovery

5

and that "Defendants are not relying on the alleged 'Cairo Agreement' with regard to their presentation on the issue of meritorious defenses in the vacatur proceedings." Exhibits E, F.

This argument is meritless. As shown above, Defendants' purported expert intends to testify that Defendants were violently repressing Hamas. The Ungars should be allowed discovery about the Cairo Agreement – which will thoroughly refute this claim.

Moreover, the claim that "Defendants are not relying on the alleged 'Cairo Agreement' with regard to their presentation on the issue of meritorious defenses in the vacatur proceedings" is blatantly false. Defendants' putative expert claims that in 1995 "Hamas informally agreed to PA demands to stop attacks against Israel" (Exhibit G at 14) – a clear reference to the Cairo Agreement. (Of course, Defendants' "expert" fails to mention that Hamas' agreement was only to cease attacks in or from Defendants' territory, and that the Defendants used this arrangement to attempt to extort concessions from Israel).

In sum, Defendants' objections to Interrogatory No. 3 and RPDs Nos. 1-6 should be stricken, and Defendants should be ordered to provide a complete, sworn answer to this Interrogatory and to produce the documents sought.

## II. Interrogatory No. 5

In his November 28, 2006, letter to Secretary of State Rice, PA President Mahmoud Abbas asserted that "[t]he counsels [sic] of the PA are also taking the necessary legal steps to counter" the Ungars' enforcement proceedings. Exhibit J.

This statement – which confirms that as of November 2006 the Defendants had counsel capable of "taking necessary legal steps" to protect the Defendants' interests directly undermines Defendants' attempts to explain away their lengthy delay in filing their Rule 60(b)(6) motion.

Accordingly, Interrogatory No. 5 requests that Defendants identify these counsel, state when they were hired and dismissed (if ever) and detail the "necessary legal steps" mentioned in the letter. Exhibits A, B. Defendants have both objected to this request on grounds of relevancy and "potential privilege" and provided an unsworn "answer" stating that "Defendants do not know what specific 'counsels of the PA' or what 'necessary legal steps'" the letter is referring to. Exhibit E.

Defendants' objections are frivolous. This Interrogatory is clearly relevant to the timeliness of Defendants' motion, and Defendants' bald claim of possible privilege is baseless (how could the identity of their attorneys be privileged?). Defendants' "answer" is just as bad. Defendants are deemed to have the same knowledge as their officers, and they are obligated to ask Abbas, or whoever wrote the letter for him, what it was referring to.

## III. RPDs Nos. 9-15

RPDs Nos. 9-15 seek documents intended to test and disprove Defendants' claim that they "violently repressed" Hamas during the relevant period. Specifically, these requests seek documents evidencing whether any Hamas operatives were ever indicted by the PA and if so whether any served prison sentences, as well as documents relating to Israel's requests to the PA for surrender of wanted Hamas terrorists and the PA's refusal to comply with these requests and its hiring of these wanted terrorists into the PA's security services.

Defendants have refused to produce any documents in response to these requests, once again baldly claiming "burden" without explaining what burden would be entailed (e.g. what a search would entail and the extent of the responsive documents) and asserting that the documents are irrelevant. Exhibit F.

As discussed above, documents related to Defendants' purported meritorious defense, and their claim that they "repressed" Hamas, are highly relevant.

Accordingly, these objections should be stricken and Defendants compelled to produce the documents.

**WHEREFORE**, the instant motion should be granted.

Dated: November 29, 2010                    Plaintiffs-Judgment Creditors,
                                                                      by their Attorneys,

/s/ David J. Strachman
David J. Strachman (#4404)
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

Max Wistow (#0330)
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI 02903
(401) 831-2700
(401) 272-9752 (fax)

Robert J. Tolchin
JAROSLAWICZ & JAROS, LLC
225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780
tolchinlaw@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 29, 2010, a true copy of the foregoing was filed by ECF which served Defendants' counsel of record listed below:

Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701