## Expert Report by Glenn E. Robinson

1. I have been engaged by counsel for the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) in this matter to serve as a testifying expert witness. This report is for use in the case of *Ungar v. the Palestinian Authority* currently pending in the United States District Court for the District of Rhode Island. I have not testified as an expert witness during the previous four years, however an expert report I prepared was submitted in the case of *Saperstein v. the Palestinian Authority*. I am being compensated at the rate of $125 per hour for my time, plus expenses, in connection with my work on this matter.

2. **Summary of Opinions**. I have been requested by Counsel for the PA and PLO to prepare a report based upon my experience and training concerning certain events and circumstances surrounding the June 9, 1996 shooting of Yaron Ungar. I am currently an associate professor in the Department of Defense Analysis at the Naval Postgraduate School in California, where I also serve as Co-Director of the Center on Terrorism and Irregular Warfare. My opinions are based on 30 years of regular travel to and residence in the West Bank and Gaza Strip, original and regular scholarly fieldwork in the West Bank and Gaza Strip since 1989, numerous professional consulting projects undertaken in the West Bank and Gaza Strip between 1995 and 2006, and significant scholarly research and publications on Palestinian politics since 1989. Included in this work has been detailed and regular interaction with Palestinian and Israeli officials, public figures, and ordinary citizens. A copy of my curriculum vitae is attached as Exhibit A.

   In furtherance of my analysis, I have reviewed and considered the material cited in this report and specified in Exhibit B (attached), and certain publicly available information including items produced by electronic and print media and other publicly available sources. I believe the materials I have reviewed and considered and the analysis I have conducted to date are sufficient and appropriate to support my opinions in this report.

   Based upon and subject to the analysis that follows, my principal opinions are:
   - Contrary to allegations in the Ungar complaint, the Palestinian Authority had limited "de facto control" and no "de jure control" of the Gaza Strip and West Bank in June 1996.
   - Contrary to allegations in the Ungar complaint, the PLO had limited "de facto control" and no "de jure control" of the PA or the Gaza Strip and West Bank in June 1996.
   - In the period leading up to the attack on Mr. Ungar in June 1996, the PA and PLO opposed the militant activities of Hamas, and, indeed, the PA and PLO have had a long history of animosity toward Hamas both before and after the Ungar attack.
   - The Ungar judgment as it now stands has negative implications for US foreign policy interests in the region and for Middle East peace.

Additional subsidiary opinions underlying the foregoing principal opinions, and the grounds and bases for all opinions in this report, are discussed in section 3, below. In addition, I reserve the right to form additional, supplemental or rebuttal opinions as additional facts or analysis may become available to me.

3. Discussion of and Grounds for Opinions:

   1. **<u>Minimal PA de facto control of the Gaza Strip and West Bank in June 1996</u>**

      Prior to the shooting of Mr. Ungar in June 1996, the Palestinian Authority's police and security forces had little time to establish control. The PA was formally established in May 1994 as part of the Gaza-Jericho agreement, and PA forces then arrived over the following two months in those areas. It was not until December 1995 that most urban areas in the West Bank came under PA control, and it was only in these "Area A" lands that the PA was allowed primary responsibility for security. Indeed, in neither the village of Surif in the West Bank where the Hamas shooters involved in this attack lived, nor in Israel itself where the attack occurred (near Beit Shemesh), did the PA even have legal authority to undertake security actions. Surif was under both Israeli military and civil authority in June 1996 and Beit Shemesh and the road on which the attack occurred are part of sovereign Israeli territory.

      Appendix C shows the Area A-B-C matrix established by the September 1995 interim agreement but not fully implemented at the time of the Ungar shooting. Beginning with the May 1994 Cairo agreement and extending to September 1995, the PA had limited control in the Gaza Strip and the city of Jericho in the West Bank. The 1995 interim agreement established PA security and civil control in a little under 20% of the West Bank, lands known as "Area A". Area A lands consisted of the most densely populated urban areas of the West Bank, excluding Hebron. By contrast, Area B lands gave PA civil authority, but retained overall security control in the hands of Israel. Area B lands constituted just over 20% of the West Bank and consisted primarily of Palestinian villages. The remaining 60% of the West Bank constituted Area C lands in which Israel maintained full civil and security authority.

      The city of Hebron was under a separate rubric, established by the 1997 *Protocol Concerning the Redeployment in Hebron*. This agreement split control of Hebron between Palestinian security authority (H1, or about 80% percent of the city) and Israeli security authority (H2, which constituted the remaining 20% percent of Hebron). See Exhibit D for a map of the Hebron Protocol.

      The earliest Surif could conceivably have come under PA civil control was December 1995. However, it appears Surif did not enter the Area B rubric of the Oslo accords until mid-1997 when the Israel-appointed

*Robinson, p. 2*

Village Council was replaced by the PA-appointed Municipal Council.[1] Even today, areas of Surif on the west side of Road 354 are considered Area C lands under total Israeli control, while the remainder of the village is in Area B (PA civil authority, Israeli security authority). Thus, during the relevant period covered in the Ungar complaint, the village of Surif was under Israel's security and civil control. This is further evidenced by the fact that when Israel captured two members of the Hamas cell that had carried out the Ungar attack, Israel immediately imposed a curfew on Surif, something that the PA was powerless to do under the terms of Oslo.[2]

Security cooperation between Israeli and Palestinian forces was the norm between the establishment of the PA in 1994 and the capture of the Ungar assailants in 1997. The details of security cooperation and processes were a central component of the interim agreement. While there were natural tensions arising from this new arrangement between the PA and Israel, the overarching interest of both sides during this period was cooperation, not conflict. There were political imperatives on both sides that created some tension during this period. PA leaders needed to appear independent from Israel in the eyes of their population, and not be seen as simply Israel's new policemen in the occupied territories. Israeli leaders for their own political purposes would sometimes undermine the legitimacy of PA security forces through public demands for particular actions. It was a regular theme of Israeli political discourse, especially on the Israeli right wing, to publicly demand that the PA 'do more to stop terrorism.' Indeed, this was a key rhetorical component of Benjamin Netanyahu's successful 1996 election campaign for prime minister.[3] These periodic tensions on security issues should not be seen as detracting from the overall spirit of security cooperation demonstrated by Israel and the PA during the 1994-1997 time period. Rhetorical spats aside, the two sides cooperated on security issues during this time frame.

As I understand the details of the Ungar attack, at no time prior to or during the attack did the Hamas assailants live in territory under the security control of the PA. Apparently the two shooters were from Surif, and the driver from Jerusalem – both areas under complete Israeli control. They then carried out their attack near Beit Shemesh, southwest of Jerusalem and inside Israel proper. As I understand, months subsequent to the attack the assailants fled to PA controlled areas. The PA then arrested the assailants located in PA areas in April 1997, days after Israel arrested the other assailant (located in an Israeli-controlled area) and provided the names of cell members then located in PA areas. In addition, the recovery by Israel of the body of another Israeli killed by this same Hamas cell was made possible by

---

[1] *Surif Town Profile* (The Applied Research Institute – Jerusalem, 2009), p. 4.
[2] *J.Weekly.com*, April 18, 1997.
[3] *New York Times*, June 1, 1996.

intelligence provided by the PA to the CIA and to Israel.[4] This case shows the significant level of security cooperation that was then the norm between Israel and the PA.

Under the terms of the interim agreement, the PA could either handle the judicial process directly or could hand the suspects over to Israel for prosecution. During the transfer of the suspects to a Palestinian prison in Nablus (Area A), Israeli forces intervened in an area under their security control (Area B or C) and took the suspects.

There were a number of factors that limited the effectiveness of the Palestinian security forces during the 1990s. Perhaps most important was the sheer newness of these forces. Oslo's Declaration of Principles was first signed in September 1993 and the PA was first established in a very limited way in May 1994. Other than Jericho, no area of the West Bank came under any form of PA authority until December 1995, six months before the Ungar attack. The act of constituting a PA security force out of a mish mash of PLO fighters from abroad and local militants was a formidable challenge in any circumstance, and much more so in the shortened time frame under consideration in this case.

There were other important factors that tended to hinder the effectiveness of PA security forces, particularly in their early years. Command and control capabilities in PA police and security forces were quite low during this period. In addition to the newness of the forces, four factors stand out that limited PA security capability. First, the police and security forces (especially the main security organization, the Preventive Security Service, or PSS) had virtually no professional training at the time. Its members tended to come mostly from underground militia forces formed in the West Bank and Gaza during the first Palestinian uprising of 1987-1993, or secondarily from units within Fatah militias operating in the Diaspora who returned in 1994. Second, the forces were hindered by the same "inside-outside" dichotomy that informed many problems in the PA at the time, as most authority rested in the hands of a relatively small number of returning 'outsiders' coming from Tunisia and elsewhere. Third, as is common in the third world, security forces multiplied and were encouraged to compete with each other, limiting a clear chain of command and division of authority. Fourth, for reasons linked to the politics of power consolidation by the new PA regime, the police and security forces were subject to the same spirit of anti-institutionalization that was experienced by the PA and politics in general in the West Bank and Gaza after 1994, further hampering command and control effectiveness.

---

[4] *J.Weekly.com*, April 18, 1997.

*Robinson, p. 4*

2. <u>**No PA de jure control of Gaza Strip and the West Bank in June 1996**</u>

   i. *Oslo Accords do not confer sovereignty to the PA.* Under the terms of the Oslo Accords (1993, 1994, and 1995), the Palestinian Authority is not a sovereign power. Rather, it is recognized as a partially autonomous, transitional government with specified civil and security responsibilities in specified areas. The PA was supposed to last only during an interim period while final status negotiations were finalized. In theory, the PA was supposed to have dissolved by May 1999, five years after it was first established. The formal title of the 1993 accord connotes the limited nature of the PA's formal authority: *Declaration of Principles on Interim Self-Government Arrangements.* The formal title of the PA is: *The Palestinian Interim Self-Governing Authority.* The PA is to have "jurisdiction" over some areas of the West Bank and Gaza Strip, but not sovereignty. Israel maintained full authority over borders. Limitations to PA jurisdiction included (Article 4): "Jerusalem, settlements, military locations, and Israelis." Article 7 makes clear that duties not specifically transferred to the PA remain in the hands of Israel.

   The 1995 accord, titled *The Israeli-Palestinian Interim Agreement on the West Bank and Gaza Strip,* codified the fact that the PA had only those authorities enumerated, and Israel retained all other authority in the West Bank and Gaza Strip (Article 1.1). Article 9.5 further demonstrates that the PA was not a sovereign power by denying it the right to conduct foreign relations:

   > "In accordance with the DOP, the Council [PA] will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions."

   Israel remained the sovereign authority with overall responsibility for the West Bank and Gaza Strip under the terms of Oslo.

   Notwithstanding the fact that the PA has unsuccessfully asserted sovereign immunity from certain lawsuits, the Palestinian Authority has not claimed sovereign powers denied to it under the terms of Oslo, nor has it asked states to recognize the PA as a sovereign power. There is discussion today among PA officials that they may seek to claim sovereignty and have that sovereignty recognized by the UN Security Council in 2011, further demonstrating that no sovereign claim has been made to date by the PA. Moreover, no country has recognized the PA as a sovereign power.

   ii. *IDF incursions into Palestinian areas.* The Oslo accords did not prevent Israeli incursions and other security activities into areas under

*Robinson, p. 5*

the security control of the PA to arrest or kill wanted militants. Such incursions were (and still are) regular events. For example, the Israeli assassination of Hamas leader Yahya Ayyash in Gaza, which prompted a series of retaliatory terror attacks by Hamas in Israel in early 1996, occurred in ostensibly PA controlled lands.

3. **Limited PLO de facto control of the PA in the Gaza Strip and West Bank in June 1996**

    i. *What is the PLO?* The Palestine Liberation Organization (PLO) was formed in 1964 to advance the cause of Palestinian rights in historic Palestine. During the 1948 war that created Israel, about 85% of the Palestinian population of what became Israel, or about 700,000 people fled what became Israel. While Palestinians were displaced in various ways during 1948, an Israeli cabinet decision in June 1948 turned Palestinians into permanent refugees when it voted to prohibit any Palestinians displaced by war to return to their homes. They and their descendants today number over 4 million registered refugees, constituting about half of the world's total Palestinian population. The Oslo accords did not deal with the refugee issue other than to assign it to final status negotiations that have yet to come to anything. The discernable product of this situation is that there is a vocal, active, and often militant segment of the Palestinian refugee population that has rejected Oslo and sees the peace process as without hope for them.

    The PLO is the main vehicle of Palestinian national aspirations for statehood. The dominant Palestinian national narrative holds that Palestine was stolen from its rightful owners by European Jewish migrants under the banner of Zionism. Zionism, essentially a doctrine of Jewish nationalism, formed during the second half of the 19th century in Europe. Zionism encouraged all Jews, most of whom lived in Europe at the time, to emigrate to Palestine in order to form an independent Jewish state and to "normalize" Jewish life. At the time, very few Zionist Jews lived in Palestine, although traditional Jewish communities in the cities of Hebron, Jerusalem, Tiberias and Safad dated back centuries. Beginning in 1897, an organized, institutionalized process of Jewish migration to Palestine was undertaken. By the time of WW I, Jews made up about 10% of the population of Palestine and owned about 2% of its land. European Jewish migration to Palestine received a significant boost in 1917 when Britain issued the Balfour Declaration, which expressed official British support for a "Jewish national home in Palestine." The Balfour Declaration was contained within the structures of the British Mandate of Palestine. British policy under its League of Nations Mandate in Palestine encouraged further Jewish migration and, indeed, Britain formed the Jewish Agency to allow the expanding Zionist population to self govern in most respects. Rising violence and opposition to this migration prompted Britain to limit Jewish immigration in 1939, with

*Robinson, p. 6*

mixed success. By the time of the UN Partition of Palestine in 1947, Jews made up about 30% of the population and owned about 7% of the land of Palestine. The UN partition of Palestine immediately resulted in war, first a communal war between Jews and Palestinians and, beginning in April 1948, between Israel and surrounding Arab states. Israel won the war decisively, expanding its territory from about 53% of Palestine to 77%.

The 1948 war shattered Palestinian society (Palestinians refer to the 1948 war as the *nakba*, or the catastrophe). Not only were many Palestinians made refugees, but Palestine itself was fragmented into three territories: Israel, the West Bank annexed by Jordan, and the Gaza Strip administered by Egypt. Palestinians not only lived under those three governments, but in Syria and Lebanon as well. Reversing the outcome of the 1948 war has long been the goal of Palestinian society, including by the PLO when it was formed.

The PLO acceptance of Israel in 1988 and then its formal exchange of recognition letters with Israel in 1993 ushered in a new political chapter, but Palestinian historiography has little changed. Even the most peacenik Palestinian will argue today that the creation of Israel came at the expense of the Palestinians and constituted an historic injustice against the Palestinian people. The PLO embodies that national narrative of injustice and trying to right an historic wrong through statehood. The meaning of statehood has involved over time from an exclusivist vision of all Palestine only for Palestinians (and Jews present before the Balfour Declaration of 1917) to a vision of a two state solution, Palestine and Israel.

The PLO narrative of Zionist and Israeli theft of Palestinian land over the past century can be summarized graphically by the following map, published by *The Atlantic Online* (March 11, 2010):



Robinson, p. 7

The PLO as an organization can be depicted schematically in the following graph. The Palestine National Council is considered the main decision making body for the national movement, and includes representatives from all major secular Palestinian factions (and a number of minor ones as well). The membership of the PNC has fluctuated over the years, but typically includes about 500 members. Hamas and the Palestinian Islamic Jihad are not members of the PLO so do not serve on the PNC, although there have been some discussion periodically about inclusion. The Palestine Liberation Army was the armed wing of the PLO, and had units stationed in Jordan, Syria, Lebanon and elsewhere over the years. The PLA was largely integrated into the police and security forces of the PA following the



signing of the Oslo Accord in 1993. The PLO's Central Committee was established to give counsel to the Executive Committee in the absence of a full meeting of the PNC. Its membership is generally under 100 members. The Executive Committee, long led by Yasir Arafat and now led by Mahmud Abbas, is the top executive body in the PLO, tasked with implementing the decisions of the PNC.

For the purpose of clarifying this political history I have attached five additional maps. The first, Exhibit E, shows the boundaries of British Mandatory Palestine and Transjordan (1922-1948); Exhibit F notes the 1947 United Nations Partition Plan and the 1949 Armistice Lines (also known as the 1967 boundaries); Exhibit G shows land ownership patterns in 1947 and the "nakba" of destroyed Palestinian villages primarily from the 1948 war; Exhibit H shows the results of the 1967 war when Israel conquered the West Bank and Gaza Strip, as well as surrounding lands; and Exhibit C (noted earlier) is a map of the West Bank under the terms of Oslo II (1995). Exhibit I is a timeline of major events from 1967 to 1997 relevant to this case.

*Robinson, p. 8*

ii. ***Fragmentation of the PLO by Oslo.*** The PLO's acceptance of the terms of Oslo was highly controversial both inside the PLO and within Palestinian society. Oslo contained terms that the PLO had heretofore rejected and that Israel had demanded. Before Oslo, the PLO had always demanded, consistent with UN resolutions, that any deal include the dismantling of settlements, Palestinian control of East Jerusalem, and a right of return for Palestinian refugees. The PLO had also sought a final deal with no interim period, believing that such an interim period would turn into a form of permanent limited autonomy, not independence.

Because of the weakness of the PLO coming out of the 1991 Gulf War – having backed Iraq and thus losing the support of most Arab and international governments -- the PLO in secret negotiations accepted terms that included an interim period, no immediate dismantling of settlements, the exclusion of East Jerusalem from interim Palestinian control, and no immediate return of refugees.

Because of these significant concessions by Arafat, the terms of Oslo were rejected by some within the PLO, both on a factional level (e.g., the PFLP) and among leading individuals from the historic leadership (e.g., Faruq Qaddumi). The contentiousness of the terms of Oslo thus weakened the PLO as an organization and therefore its ability to exert control over the Gaza Strip and West Bank.

The same pattern of fragmentation held for Palestinian society as a whole. Many political groups outside of the PLO, including Hamas and the Palestinian Islamic Jihad, likewise rejected the terms of Oslo and sought to delegitimize the PLO leadership that accepted those terms. Even the chief Palestinian negotiator at the 1991-92 Madrid summit and Washington peace talks, Haydar 'Abd al-Shafi, rejected the terms of Oslo, saying that they would not yield a Palestinian state. When 'Abd al-Shafi died 15 years later, his words were seen as prophetic by many Palestinians.

One byproduct of the Oslo process was to shift funding streams from the PLO to the PA, further limiting the ability of the PLO to wield influence in Gaza and the West Bank. Governments in the Arab world in particular shifted their financial contributions to the Palestinian cause from the PLO to the PA during the 1990s and after.

In summary, the contentious and controversial terms of the Oslo accords brought many Palestinians into opposition to the PLO, limiting, although not eliminating, the PLO's influence in Gaza and the West Bank. The decreasing financial resources of the PLO likewise contributed to its increasingly limited influence.

*Robinson, p. 9*

    iii. ***Overlapping PA/PLO officials.*** A number of top officials in the PLO also had PA jobs. For example, Yasir Arafat was both the head of the PLO and the elected president of the PA. Mahmud Abbas has played the same dual role since 2005. These overlapping jobs would indicate a degree of PLO influence in the PA. It is important to recall, however, that the PLO could not just assign officials to the PA; all PA officials at the time of the Ungar incident were either elected in the January 1996 elections or appointed by those who won the elections. It would not be accurate to say the PLO had no influence on the PA; at the same time, one would be mistaken to overstate this influence. In the final analysis, the PA's authority derived primarily from the legitimacy of its elected officials, both presidential and parliamentary.

4. **No PLO de jure control of the PA in June 1996 or of the Gaza Strip and West Bank**

       i. ***PLO has no de jure control over the PA.*** The PA (or rather the PISGA) was created by the Declaration of Principles signed in 1993 by the State of Israel and the PLO, as formally witnessed by the US and Russia. Israel and the PLO shared in the de jure formation of the PA. However, the PA government was to be elected by a vote of Palestinians in the West Bank, East Jerusalem and the Gaza Strip and was thus accountable to the electorate. The first election for the PA Legislative Council and the Presidency occurred in January 1996. The only formal role the PLO has under Oslo is to be the negotiator for the Palestinians with Israel, particularly on a Final Status Agreement. The only formal organizational tie between the PA and PLO is the representation of members of the Legislative Council in the Palestine National Council, a body of the PLO. PA representatives constituted about 13% of the membership of the PNC. The PNC has no formal authority over the PA's Legislative Council, nor does the Legislative Council report to the PLO's Executive Committee. The head of the PLO is not formally in charge of the President of the PA, although both Arafat and Abbas have held both roles simultaneously. In short, at the formal, de jure level, the PLO and the PA are independent organizations with no legal control of one over the other.

       ii. ***PLO has no de jure control over the Gaza Strip and West Bank.*** The PLO has never claimed to be the sovereign power over the Gaza Strip and West Bank, nor is it recognized internationally as the sovereign power over these lands. The PLO is widely recognized internationally as the "sole legitimate representative of the Palestinian people" and in that capacity negotiates with various parties over the fate of historic Palestine and the Palestinian people. In its 1964 Charter, the PLO rejected the legitimacy of Israel in any part of Palestine, but did not claim specific territorial sovereign authority unto itself. The PLO's 1988 Declaration of Independence accepted a two state solution with

*Robinson, p. 10*

Israel and formally declared an independent Palestinian state, although its territorial composition was left unclear. Here again the PLO did not claim sovereign authority unto itself. The 1993 Oslo Accord with Israel (and its successor agreements) likewise did not assign the PLO the role of sovereign authority over the Gaza Strip or West Bank and, indeed, the provisions of Oslo noted above make clear that Israel is still the formal sovereign authority over the territory pending a final status agreement.

5. **In the period leading up to the attack on Mr. Ungar, the PA and PLO opposed the activities of Hamas.**

   i. *Tense Relations between PLO and Hamas, 1987-1994.* In the wake of events in recent years, it is an obvious statement to say that relations between the PA and the PLO[5] on the one hand, and Hamas on the other hand, are generally hostile. Hamas and the PLO, especially Fatah, fought a long running low intensity conflict that erupted into essentially a brief civil war in 2007 when Hamas violently drove Fatah from the Gaza Strip. PA and PLO leaders have referred to these events as a "coup" by Hamas, and relations remain tense to this day.

   Recent years are no anomaly and serve to illustrate the poor, often tense, relations between Hamas and Fatah from the inception of Hamas in 1987. Hamas emerged from the Muslim Brotherhood (MB) in Gaza at the outset of the first Palestinian uprising, or intifada, in December 1987. Even prior to the founding of Hamas, Fatah (and the PLO more broadly) rejected the politically quiescent approach of the Muslim Brotherhood in the West Bank and Gaza Strip. The MB in the West Bank had been part of Jordan's MB organization while Jordan ruled the West Bank between the 1948 and 1967 Arab-Israeli wars. Jordan's MB's organization was a legal, main-stream social and political organization that the Hashemite monarchy tended to favor as a counterweight to the more politically hostile Arab nationalist groups in Jordan. This quietist approach to politics by the MB carried over in the West Bank after Israel took control in 1967. The emergence of the PLO as a powerful force in the West Bank in the 1970s further strained relations between the forces of active and often militant secular nationalism and the forces of religious quietism epitomized by the Muslim Brotherhood.

   The story was much the same in the Gaza Strip, even though the Gazan branch of the MB emerged under Egyptian rule from 1948 to

---

[5] A couple of small factions inside the PLO, including the leftist Popular Front for the Liberation of Palestine, or PFLP, created a rejectionist alliance with Hamas beginning in 1991 in order to oppose the peace process begun in that same year. The large majority of the PLO rejected Hamas as antithetical to Palestinian national goals. In this discussion, reference to the PLO means more specifically Fatah and the other factions that make up the large majority of the PLO.

*Robinson, p. 11*

1967. The Egyptian MB in the 1950s and 1960s was a militant organization, but took a sharp turn toward political moderation in the 1970s. As in the West Bank, the MB in Gaza was considered by PLO supporters to be too "soft" in confronting Israel's occupation of Palestinian lands. Relations between the two groups were often tense in the 1980s, and periodically devolved into violence. In an indication of relations between the PLO and the Islamists, in 1982 all secular Palestinian groups, including Fatah, signed a document condemning the Muslim Brotherhood.

Israeli policy vis-à-vis the Muslim Brotherhood until well into the first intifada (late 1980s) only added to PLO suspicions of the group. Israel, like many surrounding Arab countries, undertook a 'divide and conquer' strategy toward the Palestinians. Viewing the secular nationalist PLO as a far more problematic and powerful opponent to its policies, Israel supported the MB in various ways while it suppressed the PLO in the occupied territories. Israel did not outlaw the MB (as it did the PLO), allowed the MB space to organize and recruit (denied the PLO), allowed the transfer of monies and resources to the MB from various sources (again, denied the PLO), and may have financially subsidized the Muslim Brotherhood directly. As in many countries of the Middle East, this Israeli strategy turned out to be short-sighted as powerful Islamist movements emerged as a result, including, in this case, Hamas.

The rejection of militant activities against Israel's occupation by the MB not only angered PLO supporters, but also created tensions inside the MB. A younger "second stratum" of MB cadres had argued for the necessity of responding to PLO criticism and confronting the occupation directly.[6]

The spontaneous outbreak of violence in December 1987 in Gaza against Israel following a traffic accident afforded the MB in Gaza the opportunity to create a more militant resistance wing, satisfying both its internal and external critics. Hamas was born, and quickly spread to the West Bank as well.

The charter (*mithaq*) that Hamas published the following summer (1988) underlined the stark differences it had with the PLO. While careful not to be too critical of the popular group that had led Palestinian resistance to Israel, Hamas nonetheless accused the PLO of being an inauthentic Palestinian movement because it was secular. Hamas argued that the PLO adopted secularism due to confusion and the influence of European imperialism. "Secularism", according to Hamas, "completely contradicts religious ideology in its attitudes,

---

[6] For a fuller discussion of this internal tension, see my discussion in Glenn E. Robinson, "Hamas as Social Movement", in Quentin Wiktorowicz, ed., *Islamic Activism* (Bloomington: Indiana University Press, 2003).

*Robinson, p. 12*

conduct and decisions" and it urges the PLO to "adopt Islam as its way of life." (Article 27). The rest of the charter consists of Hamas' rejection of Israel and Zionism, denunciation of any peace with Israel, plenty of anti-Semitic drivel, and bizarre conspiracy theories.

As Hamas began militant resistance against Israel during the first intifada (1987-93), it remained firmly outside the PLO umbrella. Both Hamas as an organization and its military arm (the *Iz al-Din al-Qassam Brigades*) remained autonomous, rarely even cooperating with the PLO much less taking orders from it. The leadership of the first intifada was provided by local PLO militants in the form of the Unified National Leadership of the Uprising, or UNLU. The UNLU consisted of representatives from four PLO factions: Fatah, PFLP, DFLP, and the PCP. The UNLU was regularly issuing leaflets (*bayanat*) that gave direction to Palestinians about how to sustain this largely unarmed uprising. Hamas made a point of being contrarian to many of the UNLU's directives. For example, when the UNLU called for all Palestinians to remain motionless and speechless for several minutes on a particular date and time as a silent protest against occupation, Hamas published an instruction to its followers not to obey the UNLU's directive. This was common throughout the first uprising.

While the PLO and Hamas often worked at cross purposes on the ground during the first uprising, it was with the advent in 1991 of the Middle East Peace Process that relations worsened substantially. While the PLO accepted the peace process and worked toward its success in trying to realize Palestinian national aspirations for statehood, Hamas rejected any efforts for peace with Israel in the harshest terms imaginable. The PLO was portrayed by Hamas as selling out Palestinian rights for the personal benefit of a few leaders. This was no mild political disagreement, but was instead framed by Hamas in terms of PLO "betrayal" and "treason." For example, in a lengthy leaflet, Hamas described the Madrid peace conference as an attempt "to liquidate the Palestinian cause" and accused the PLO of "capitulation" to "US-Zionist conditions", and bluntly stated the PLO had no legitimacy to reach an agreement that would "cede or relinquish any part of Palestine" – including what is now Israel. A constant stream of Hamas rejection of the PLO's "treason" greeted the PLO's acceptance of the 1991 Madrid peace conference, the subsequent Washington talks, the breakthrough 1993 mutual recognition and Declaration of Principles (Oslo accord), and the 1994 Gaza-Jericho agreement in Cairo that established the Palestinian Authority.

Indeed, in response to the PLO's strategic decision to make peace with Israel, Hamas portrayed itself as the new sole, legitimate representative of the Palestinian people – taking up the PLO's long time mantle. It had some diplomatic success; Iran, for example, broke its relations with the PLO and recognized Hamas as the legal representative of Palestine.

*Robinson, p. 13*

ii. *Ongoing tensions between the PA and Hamas 1994-1996.* Tensions between the PLO and Hamas deepened with the establishment of the Palestinian Authority in 1994. The PA was initially staffed largely by Fatah and other PLO cadres. To summarize these relations, the PA's approach involved significant repression of Hamas through the PA's new security forces and security courts, but also inducements to Hamas to accept and even join the new political processes established by the Oslo accords. Hamas, for its part, tried a balancing strategy of positioning itself as the leader of militant resistance to Israel, but at the same time not employing violence against Israel in ways that would invite significant blame by the Palestinian community for ruining opportunities for freedom. As a result, most Hamas terrorism in this period came in the form of retaliation for specific Israeli attacks. Neither Hamas nor the PA/PLO wanted to invite Palestinian blame by taking irresponsible actions that would invite civil war.

Violent repression of Hamas by the PA began within months of its establishment in 1994. The most notable event in this early period was the bloody repression of a Hamas rally in November 1994 called to protest the Oslo accords. Not yet trained in effective crowd control, PA forces shot dead 16 protestors and injured more than 200. The crackdown continued throughout the first half of 1995, as the PA arrested scores of Hamas militants associated with its military wing, the Iz al-Din al-Qassam Brigades. State Security Courts were established by the PA to deal with "security cases" – which generally meant prosecuting Hamas militants. These courts, of questionable legal status and highly unpopular among Palestinians, were supported by the US, Israel and surrounding Arab states (most of which had similar institutions). Established by presidential decree in February 1995, the State Security Courts were abolished in 2003.

PA pressure on the military wing of Hamas was accompanied later in 1995 by attempts to encourage political leaders of Hamas to participate in the political process unfolding in the West Bank and Gaza. The PA's carrot-and-stick approach to Hamas in 1995 was largely successful. Under intense pressure from the PA and not wanting to alienate the Palestinian public that supported the peace process (over 72% support according to an October 1995 CPRS poll), Hamas informally agreed to PA demands to stop attacks against Israel.[7] While Hamas would not agree to participate in the upcoming legislative elections, they did encourage their members to register to vote, tolerated Hamas-leaning individuals to run as independent candidates, and promised to participate in the municipal elections that were suppose to take place shortly after the January 1996 legislative and presidential elections.

---

[7] For a good discussion of the PA-Hamas dynamics that led to Hamas' cessation of attacks in 1995, see Muhammad Muslih, *The Foreign Policy of Hamas* (New York: Council on Foreign Relations, 1999), especially p. 35.

*Robinson, p. 14*

Israel's assassination of top Hamas militant Yahya Ayyash on January 5, 1996 was seen by Hamas as a major violation of the informal cease fire in place since August 1995 (the last Hamas suicide attack at the time). Hamas carried out four retaliatory suicide bombings between February 25 and March 4, 1996, killing 59 Israelis. After this bloody week of retaliatory violence there were no more Hamas suicide attacks for a year (until March 1997). However, there were several isolated shooting attacks during this period, including the Ungar incident.

While the PA was reasonably successful in its approach toward Hamas during this period, it always had to be careful not to be viewed as Israel's lapdog by its own constituents. By any objective measure, Israel remained the overwhelmingly dominant power in the West Bank and Gaza Strip, continuing to control the daily lives of Palestinians in myriad ways. The Oslo accords did not change that basic reality, certainly not by 1996. Under these circumstances, the PA was always at risk of being criticized – and was indeed criticized by detractors – as playing the role of Israel's security enforcer in Palestinian areas.

Hamas itself had increasing fissures appearing in the 1995-96 period.[8] Of particular interest in the Ungar case was the fissure between Hamas' external leadership and its leaders based in Gaza and the West Bank. The external leadership was (and is) more hardline and militant toward Israel and the PA than the internal leadership, and it appears that most of Hamas' military and terror attacks were instigated by the external leadership. Hamas' internal leadership was much more prone toward cooperation with the PA, including participation in the 1996 elections, while the outside leadership was the champion of militancy and non-cooperation. Here's my conclusion on this fissure from my 1997 book:

> "Quite naturally, the diaspora leadership is more hardline on the issue of accommodation with the PA or Israel. As such, it has been the diaspora leaders that have generally been the strongest supporters of the Iz al-Din al-Qassam brigades. The closer the inside political leadership came to doing a deal with the PA, the more intransigent the 'outside' became."[9]

iii. *The Struggle for Peace: Who's Who.* The conflict between Israelis and Palestinians is primarily about land and the willingness (or unwillingness) of various parties to share the land in a meaningful way. Not only is the struggle over land between the two adversaries,

---

[8] For a fuller discussion of these fissures, see my *Building a Palestinian State* (Bloomington: Indiana University Press, 1997) pp. 192-195.
[9] *ibid*, p. 193.

*Robinson, p. 15*

but also inside each. That is, each side has strong voices who advocate for a peaceful resolution of the conflict that entails the creation of two states, Israel and Palestine, living in peace, based largely on the 1967 borders; and each side has strong voices who advocate for the exclusive or near-exclusive use of the land between the Mediterranean Sea and the Jordan River for their side only. It is not clear today, nor was it clear in 1996, nor was it clear in 1993 when the original Oslo Accord was signed, which side inside both Israeli and Palestinian societies will prevail.

This nationalist struggle over land has been complicated in the post-1967 period by an overlay of growing religious nationalism on both sides. That is, today there are large numbers of both Israelis and Palestinians who advocate for the whole of the land for their side only based on a belief that God promised the land to their side. For Palestinians, the leading advocate of this position today is Hamas. In its founding 1988 Charter (*mithaq*), Hamas argues that the whole of Palestine (today's Israel, West Bank and Gaza) constitutes a religious endowment (*waqf*) given by God for exclusive use by Muslims until the end of times. There is no room at all for Israel in this vision. Inside Israel, religious Zionism has grown enormously since 1967. The settler community is the most significant manifestation of this belief. For religious Zionists, God gave all of the Land of Israel (*Eretz Yisrael*) to Jews for their exclusive use, including the whole of the West Bank, or "Judea and Samaria."

While religious nationalists are today the single biggest impediment to a two-state solution to the conflict (the preferred solution by the United States and virtually every country in the world), there are also secular hardliners on both sides who also reject a meaningful two-state solution. On the Israeli side, secular rejectionism is embodied by "revisionist Zionism", most notably in the Likud Party. The Likud Party specifically rejects a two-state solution, and Likud-led governments have consistently taken actions that reinforce a vision of permanent Israeli control over all or much of the West Bank. Secular Palestinians today overwhelmingly support a two-state solution, but elements inside the secular camp, most notably the Popular Front for the Liberation of Palestine (PFLP) continue to support a single, binational state in all of historic Palestine.

The following graph depicts the major trends in both Palestinian and Israeli societies, with the x-axis representing more secular or more religious ideology, and the y-axis representing support for a two-state solution or support for a one-state ideology. The US Government and most of the international community support the goals of those organizations found in the upper-right quadrant.

*Robinson, p. 16*



6. **Implications for US Policy and Middle East Peace in the Ungar Judgment**

The existing Ungar judgment has negative implications for current US policy to achieve a two-state solution to the Israeli-Palestinian conflict by September 2011. The most serious peace talks in a decade were initiated in Washington last month under the personal direction of President Obama, and were launched with the full support of the Arab League, the European Union, Russia, and the United Nations. The existing Ungar judgment has negative political and economic consequences for US interests in resolving this conflict by establishing an independent Palestinian state living side by side in peace and security with Israel. Most seriously, the case as it now stands hurts US credibility by undermining its declaratory policy of bolstering the PA (and especially the government of President Mahmud Abbas and Prime Minister Salam Fayyad) on the path toward statehood. The Ungar judgment as it stands says that the PA and PLO materially support terrorism while at the same time the US Administration seeks to strengthen the PA through assistance and training as a bulwark against terrorism. The PLO remains the

*Robinson, p. 17*

official negotiating partner with Israel and the United States in the peace talks, and retains official missions in both New York (to the UN) and Washington DC (to the US). The Ungar judgment would essentially reward Hamas – the bitter opponent of the PA and peace with Israel – for its violent actions, which themselves are designed to undermine prospects for peace and a two-state solution. Making matters worse, the fact that the beneficiaries of such a large amount of money would be anti-Oslo settlers in the West Bank would likely be used politically by Hamas to undermine the PA and US policy goals.[10]

There is clear recognition by the USG that the longer the Israeli-Palestinian conflict goes unresolved, the worse the implications for US policy in the broader Middle East. General David Patraeus gave voice to these concerns in his recent testimony before the Senate Armed Services Committee:

> *"The conflict foments anti-American sentiment, due to a perception of U.S. favoritism for Israel. Arab anger over the Palestinian question limits the strength and depth of U.S. partnerships with governments and peoples in the AOR [area of responsibility] and weakens the legitimacy of moderate regimes in the Arab world. Meanwhile, al-Qaeda and other militant groups exploit that anger to mobilize support. The conflict also gives Iran influence in the Arab world through its clients, Lebanese Hezbollah and Hamas."*

Moreover, the Ungar judgment undermines US interest in rewarding governments that abide by international rules and norms, and ostracizing governments whose actions are often described as "rogue". The PA has taken major steps forward in terms of professionalism and abiding by international norms and commitments, especially since the death of Yasir Arafat in 2004. Hamas (and its government in Gaza), by contrast, continues to be formally listed by the US State Department and by the European Union as a terrorist organization. By rewarding Hamas for its violence and hurting the PA, the Ungar judgment undermines US credibility by penalizing a government (the PA) that is seeking to play by accepted international rules and standards.

Even apart from the peace process, the US has an interest in a stable, strong and moderate PA that can both bring higher levels of security to Israel and increase Palestinian self-governance. The international and American focus on arming and training PA police and security forces in recent years is an example of the importance of this endeavor. There has also been significant security sector reform under the Abbas/Fayyad government that has enhanced the professionalism and capacity of PA security forces. Israeli officials have commonly noted how much more effective PA security forces have been in recent years. Enforcing the Ungar judgment likely would have the ironic and unfortunate effect of undermining the goal of enhanced PA

---

[10] At the time of the attack, much of the extended Ungar family lived in West Bank settlements (see the *Jerusalem Post*, June 11, 1996). The family's anti-Oslo sentiments can be found in the *Los Angeles Times* (June 11, 1996), the *Baltimore Sun* (April 13, 1997), and the *Chicago Tribune* (June 11, 1996).

*Robinson, p. 18*

security capacity by reducing the resources critical to preventing future Hamas attacks. In a major and recent report on Palestinian security reform, the respected International Crisis Group noted just how far the PA had come in recent years:

> *"In the past few years, the Palestinian Authority largely has restored order and a sense of personal safety in the West Bank... Militias no longer roam the streets, uniformed security forces are back, Palestinians mostly seemed pleased; even Israel...is encouraged. Initial steps, long overdue, have been taken to reorganize an unwieldy security sector, where overlapping unaccountable branches had become fiefdoms of powerful chiefs."[11]*

The Ungar judgment likewise negatively impacts US foreign policy goals through the impact of the $116m award. The amount of the award represents a significant amount of total US aid to the PA and, indeed, the PA's total budget. The Ungar award represents the equivalent of 23% of total USG assistance to the PA in FY2010 of $502 million.[12] Broken down, the Ungar award represents:
- More than the total of direct US budgetary support for the PA ($100m)
- Nearly four times the amount spent on promoting good governance, the rule of law, and Palestinian civil society ($38m)
- More than all health, education and social services support ($93.5m)
- More than all economic development support ($95m)
- Nearly five times the amount spent on humanitarian assistance ($24m)

The amount of the Ungar award also represents a significant percentage of the total PA budget, which in 2010 reported $3.13 billion in expenditures on just over $2 billion in revenues. In short, the sheer size of the award significantly undermines US assistance to the PA and the PA's ability to meet its own budgetary responsibilities.

_____          October 15, 2010
Glenn E. Robinson                        Date

---

[11] International Crisis Group, *Squaring the Circle: Palestinian Security Reform under Occupation*, September 7, 2010.

[12] Figures come from Congressional Research Services, *US Foreign Aid to the Palestinians*, August 12, 2010.

*Robinson, p. 19*