# Expert report by Raja Shehadeh

I. Introduction

1. I have been engaged by the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) to serve as a testifying expert witness. This report is for use in the case of Ungar v. Palestinian Authority.

2. Attached as exhibit A is my CV which describes various qualifications that enable me to render the opinions summarized and described below.

3. I was born in 1951. I am a Palestinian Lawyer and writer. I studied law in London where I was called to the Bar. My grandfather, Salim Shehadeh, served as a district court judge in the British Mandate on Palestine. My father Aziz was also a lawyer and was one of the first Palestinians to publicly support a two-state solution to the Arab Israeli conflict. I am the founder of the Palestinian human rights organization Al Haq, an affiliate of the ICJ. I have written several books and numerous articles published in international journals on international law, human rights and the Middle East. In 2008 I was awarded the Orwell Prize, Britain's preeminent award for political writing for my recent book, *Palestinian Walks*.

4. I have served as an expert witness in the case of Moshe Saperstein v. The Palestinian Authority and The Palestine Liberation Organization, Case No: 04-20225-CIV-SEITZ/O'Sullivan in the US District Court for the Southern District of Florida. I also served as an expert witness for the United States government in the case of United States v. Union Bank For Savings and Investments (JORDAN), Nos. 06-1187, 06-1423, 06-1444 (1st Cir. 2006).

5. Attached as exhibit B is a list of publications I have authored.

6. In addition to the material cited in this report and my prior writings and professional and life experiences, I have considered the Complaint filed in this matter and the material referenced in this report in forming my opinions in this case. I have also reviewed the material listed in Exhibit C.

7. I am being compensated at a rate of US$ 250 per hour for my time spent on this matter. My compensation does not depend on my opinion in this matter or the outcome of this matter.

II. Summary of Opinions

I intend to render the following opinions

1. The Oslo Accords were not properly or sufficiently designed nor were they intended to usher an end to the Israeli occupation of the West Bank and the Gaza Strip (WBG) or enable the PA to exercise true de facto or de jure control over the WBG following the creation of the PA.

2. In the Oslo Accords Israel took great care to retain jurisdiction over land on which Jewish settlements were established as well as land designated for their future expansion. They also retained ultimate responsibility for the security of Israeli settlers.

3. Not all political factions in the WBG supported the Oslo Accords with Israel. The main support came from Fateh, headed by Yasser Arafat. Hamas, which had been established in the Occupied Territories prior to the Oslo Accords, opposed them. Yasser Arafat and other Fateh leaders believed the transitional agreements enshrined in the Oslo Accords would lead to a final status agreement which would have been expected to result in a permanent peace based on the creation of a Palestinian state in the WBG alongside the Israeli state. Israel's expansion of settlements, the restrictions on Palestinian life and the infringement of the rights of Palestinians for the enjoyment of their natural resources, contributed to strengthening the opposition of the population to the Oslo Accords and to the Fateh faction that had negotiated them.

4. The establishment of the PA under the Oslo Accords essentially sub-contracted Israel's management of the civilian aspects of the occupation to the PA thereby easing the burden on Israel of administering a hostile population. This was attempted without the removal of the causes of this hostility, namely, the continuation of an occupation which was colonial in character that sought to settle the territory occupied and eventually formally annex it to its own. The illegal Israeli settlements and Israeli policies towards Palestinian society created an environment in which Israeli incursions and Palestinian militant resistance would inevitably occur and over which the PA and the PLO could neither fully control nor prevent.

5. Although the Oslo Accords were executed by the Palestine Liberation Organization (PLO), it was only given limited powers and could not exercise de facto or de jure influence, much less control, over either the territory or population of the WBG. The PLO, the second Defendant in this case, is not, as claimed in the complaint, in *de Jure* or *de facto* control of the territories in the Gaza Strip or the West Bank nor is it authorized and responsible under any law, local or international to exercise law enforcement powers and to maintain public order and security in the



territories of the West Bank and the Gaza Strip. It is also not true that at all time relevant to this Complaint the PLO by and through their officials, employees and agents, operated, maintained, managed, supervised or controlled various police forces, intelligence services, law-enforcement personnel, jails and penal institutions in the territories under their control.

6. The Palestinian Authority (PA) was established after 1995 with limited jurisdiction in the West Bank territory and none whatsoever in Israel. It cannot take responsibility for crimes taking place in Israel or for crimes that occurred prior to 1995.

7. With the exception of East Jerusalem Israeli law does not apply in the West Bank.

8. The Agreement on the Gaza Strip and the Jericho Area of May 4, 1994 invoked in paragraph 69.d of the Complaint is not applicable in this case because it was expressly superseded by the Interim Agreement.

9. The Israeli forces never withdrew from the West Bank, they merely redeployed.

10. The scope of jurisdiction of the Palestinian Council was determined in the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip signed in Washington DC on 28 September 1995 between Israel and the PLO (hereafter The Interim Agreement).

11. The shooting of the Ungars, according to the Complaint, took place in Beit Shemish which is in Israel and outside the area of jurisdiction of the Palestinian Council. The Palestinian Police subsequently arrested the two shooters of the Ungars, Al Hor and Ghanimat. In doing so, they were acting within their powers established under the Interim Agreement. As I understand it, the Israelis subsequently captured Al Hor and Ghanimat at a checkpoint near Nablus while they were in the custody of Palestinian Preventative Security personnel who were transferring them from Hebron to a Palestinian prison in Nablus. In arresting and detaining Al Hor and Ghanimat, the Palestinian Police were acting within the powers granted to them by virtue of the Interim Agreement.

12. Most of the area in the south of the West Bank from where the shooters lived came to be defined under the terms of the Interim Agreement as Area B where the PA had limited jurisdiction and where Israel "retained the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism." The Agreement provided that the Palestinian police were responsible for handling public order incidents in which Palestinians were involved. Yet the work of the police was hampered, *inter alia*, by the restrictions that were placed on the

movement of uniformed police and on the kind and number of rifles the police were allowed to possess. The police were subjected to more stringent restrictions on movement in Area C which comprised around 62% of the territory of the West Bank.

13. Despite the establishment in the territory under the PA of a Palestinian police force, Israel continued to carry the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order. No police station was allowed to be established in Sourif where the shooters lived. (see 1.f. Apendix 3 of Annex I where the list of the "towns, villages and other places" where Palestinian Police was allowed to establish stations were listed.)

14. The Palestinian Police force established under the Oslo Accords had limited jurisdiction and had to act in a fragmented territory. It was generally linked and subordinate to the Israeli military. *"From a legal and political viewpoint, the Palestinian Police was a far cry from a national police force in an independent state. Its greatest anomaly was the fact that it was established not primarily to provide security and render services for the people among whom its members were recruited and whose territory exercised control but to ensure improved security for a foreign state and its citizens."* (Lia, Brynjar, A Police Force Without a State, A History of the Palestinian Security Forces in the West Bank and Gaza, Garnet Publishing Limited, Reading, UK 2006, p. 269.)

15. After the signing of the Interim Agreement Israel remained the source of the powers of the Palestinian Council and its police force established under this Agreement.

III. Grounds for the Opinions

1. The second Defendant in this case, The Palestine Liberation Organization (PLO), despite being a signatory to the Interim Agreement is not in *de Jure* or *de facto* control of the territories in the Gaza Strip and in the West Bank. It is also not authorized and responsible under any law, local or international, to exercise law enforcement powers or to maintain public order and security in the territories of the West Bank and the Gaza Strip. It is also not true that at all time relevant to this Complaint the PLO by and through their officials, employees and agents, operated, maintained, managed, supervised or controlled various police forces, intelligence services, law-enforcement personnel, jails and penal institutions in the territories under their control. The only power specifically left for the PLO under the Interim Agreement can be found in Article IX.5.b. which states that "...the PLO may conduct negotiations and sign agreements with states or international organizations for the benefit of the Council..."

2. The Declaration of Principles (DOP) signed on September 13, 1993 between Israel and the Palestine Liberation Organization (PLO) team (in the Jordanian–Palestinian delegation to the Middle East Peace Conference) (the 'Palestinian Delegation') representing the Palestinian People, and The Interim Agreement are the two applicable and relevant agreements to this complaint. Having shown that PLO was not in control, I will next interpret these two agreements in light of the facts mentioned in the Complaint and address the question of the extent to which the PA had control at the relevant time and place.

3. The Palestinian Council was established in 1995 under the Interim Agreement, and as such it can take no responsibility for events taking place prior to 1995.

4. Article 1.1 states that 'Israel shall transfer powers and responsibilities ... to the Council..." On 23 November 1995 the "Commander of the Israeli Army in the Area of Judea and Samaria" [the name Israel uses for the West Bank] issued Military Proclamation Number 7, entitled Order for the Implementation of the Interim Agreement. According to Article 4.a. of this Order, "the Military Commander of the Israeli Army in the Area and the head of the Civil Administration shall transfer to the Council and its agencies, powers and responsibilities exercised by them or by those delegated or appointed by them to include legislative, judicial and executive powers. All of this shall be in accordance with the provisions of the Interim Agreement and as provided therein." (This is my translation from the Arabic version of the Proclamation).

According to Article 6.a. of the Proclamation, "The Israeli military commander in the area and whoever is appointed by him or acts on his behalf shall continue to exercise the powers, responsibility and duties including legislative, judicial and executive powers relating to each of the following spheres:
a. The settlement and military locations;
b. Area C;
c. Israelis;
d. Every matter relating to the external security of the area and the public order of the settlements, military locations and Israelis;
e. Security and public order in areas under the responsibility of Israeli security; and
f. Other powers and scope of responsibility which according to the Interim Agreement are given to the Commander of the Israeli Army in the area including all residual powers and responsibilities which were not transferred by virtue of the Agreement." (This again is my translation from the Arabic version of the Proclamation).


> It is clear from the above that as far as Israel was concerned it remained the source of the powers exercised by the PA.

5. Under Article XVII.2.a.b and c. of the Interim Agreement three types of jurisdiction were established in the areas covered by this Agreement, namely; territorial, functional and personal. The Agreement distinguished three categories of land, Areas, A, B and C which were defined in Article IX and delineated on the map attached to the Agreement. Area A referred to the populated areas including six of the main Palestinian cities. The City of Hebron was excluded from the redeployment and became subject to a special arrangement spelled out in the "Protocol Concerning the Redeployment in Hebron," 17 January 1997. Area B included most of the Palestinian villages and environs. And Area C, which included the Jewish settlements. Area C was the largest and remains the largest area comprising 62% of the West Bank. In sections 11, 14 and 22 of the complaint where it is claimed that Hamas "is based and operates from territories controlled by defendants PA and PLO..." it is not clear to which of the three categories of land is being referred and hence whether the area in question was under Palestinian police force control. Because Area C is by far the largest area and is not under the control of the PA, there is a strong likelihood that the Hamas operatives were operating from an area not under the control of the PA. Indeed Sourif, where the shooters lived, is situated in Area B, which was and is under the Israeli security control.

6. With the exception of East Jerusalem, the State of Israel did not annex the territories of the West Bank or the Gaza Strip which were occupied by it in 1967. This means that the Israeli Civil Wrongs Ordinance (New Version) 1968, on which the second claim of the complaint is based, never applied in the West Bank or the Gaza Strip and remains inapplicable in these territories up to the date of this opinion. Likewise, and for the same reason, the Israel Penal Code of 1977, the Terrorism Prevention Ordinance of 1948 and the Defense Regulations (Emergency) of 1945, on which the third claim of the Complaint is based, do not apply in the West Bank.

7. The Agreement on the Gaza Strip and the Jericho Area of May 4, 1994 which is invoked in point 69.d of the Complaint is not applicable because it was specifically superseded by the Interim Agreement. The last paragraph in the Preamble of the Agreement states that "The Gaza-Jericho Agreement [defined earlier as the Agreement on the Gaza Strip and the Jericho Areas on May 4, 1994]... will be superseded by this Agreement."

8. The DOP set the parameters for subsequent agreements between the two sides. As such it constitutes the most significant basic text that should be given particular attention if the nature of the arrangements between the parties is to be understood. The DOP distinguishes two stages in the "agreed political process," an interim phase and the permanent status

settlement. As laid down in Article I, the objective of the interim phases is "the [establishment of] a Palestinian Interim Self-Government Authority, the elected Council (the "Council") for the Palestinian people in the West Bank and the Gaza Strip, for a transitional period not exceeding five years..." The jurisdiction for the Council according to Article IV "... will cover West Bank and Gaza Strip territory except for issues that will be negotiated in the permanent status negotiations." The absence of the definite article before "West Bank and Gaza Strip," should be noted. It is meant to indicate that what is meant is not the whole of the West Bank and the Gaza Strip territories. This is confirmed in the Agreed Minutes to the article that are attached to the DOP where it is asserted that 'it is understood that 1, Jurisdiction of the Council will cover West Bank and Gaza Strip territory except for issues that will be negotiated in the permanent status negotiations: Jerusalem, settlement, military locations and Israelis. 2. The Council's jurisdiction will apply with regard to the agreed powers, responsibilities, spheres and authorities transferred to it.'

9. Article I further asserts that these 'interim arrangements' are an integral part of the whole peace process and will lead "to a permanent settlement based on Security Council Resolutions 242 and 338." Resolution 242 affirms the principle of withdrawal by Israel of territory occupied in 1967. The DOP deals with three main subjects: the framework of the Interim Agreement, security and economic matters and cooperation (Israeli-Palestinian cooperation concerning regional programs).

10. The term used in Article XIII of the DOP in relation to the Israeli forces is "redeployment," not "withdrawal." The Article states that: "After the entry into force of this Declaration of Principles, and not later than the eve of elections for the Council, a redeployment of Israeli military forces in the West Bank and the Gaza Strip will take place..."

11. Despite the establishment in the territory under the PA of a Palestinian police force, Israel continued to carry the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order. Article VIII of the DOP provides that "in order to guarantee public order and internal security for the Palestinians of the West Bank and the Gaza Strip, the Council will establish a strong police force..." The Article then continues that meanwhile "Israel will continue to carry the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order." This is further confirmed in the Agreed Minutes to Article VII.5 attached to the DOP. The said Article stated that "After the inauguration of the Council, the Civil Administration will be dissolved, and the Israeli military government will be withdrawn." It should be noted that the word used regarding the Israeli military government is not dissolved or abolished but only "withdrawn." The Agreed minutes to this article state that "the withdrawal of the military government will not prevent Israel from



exercising the powers and responsibilities not transferred to the Council." These include territorial jurisdiction over the parts excluded from the jurisdiction of the council (settlements, Jerusalem and military locations) as well as functional jurisdiction over the excluded "issue" of Israelis. This principle was never amended or compromised in future agreements between Israel and the PLO.

12. It is clear from the above that no security role was assigned to the PLO, that the Israeli forces only redeployed but did not withdraw, that the Israeli military government was not abolished and that Israel through the DOP and the Agreed Minutes attached to it did all it could to retain ultimate powers over security in the Palestinian Occupied Territories.

13. It is also clear from the above that the jurisdiction of the new Council builds on the legal situation that existed prior to the DOP. When the Israeli army occupied the West Bank and Gaza Strip in June 1967, the Israeli military government that was established assumed under Military proclamation No. 2 all legislative, executive and judicial powers which it exercised as *de facto* power. As Israeli civilians came to be illegally settled in the West Bank and the Gaza Strip, the Israeli Knesset passed legislation that extended the application of certain Israeli laws to Jewish settlers living outside the area of the Israeli state. This happened despite the fact that, with the exception of East Jerusalem, annexation of the West Bank and the Gaza Strip to Israel did not take place. The *de facto* source of authority, executive, legislative and judicial, was the military commander who exercised some of his powers through the Head of the Civil Administration whom he appointed in accordance with Military order 947 of 1982.

14. Sub articles 4-8 of Article V.3.b. of Annex I of the Interim Agreement, Protocol Concerning Redeployment and Security Arrangements, specify the restrictions on movement of uniformed police "in Area B outside places where there is a Palestinian police station or post." According to Appendix 3.2 (of Annex I) "the rifles in each of these police stations will be used only for the purpose of guarding the police station. In special cases, where the use of rifles outside the police station is required for the exercise of public order responsibility, prior notification shall be given to the [its joint District Coordination Office] ('DCO')." As to movement in Areas C, this is spelled out in sub article 6 of Article V, which states that "Movement of uniformed policemen whether armed or unarmed, as well as armed on-duty plainclothes policemen, in Area C, will be confirmed and coordinated by the relevant DCO. Movement of such policemen between Area A and Area B will be approved by the relevant DCO."

15. By arresting two of the Hamas perpetrators of the shooting of the Ungars, the Palestinian Police were carrying out their responsibilities under the Interim Agreement.

16. It was agreed in Article II.7.a of Annex IV of the Interim Agreement, Protocol Concerning Legal Matters, that "where a non-Israeli suspected of, charged with, or convicted of, and offense that falls within Israeli criminal jurisdiction, is present in the Territory [i.e. the West Bank and Gaza] Israel may request the Council to arrest and transfer the individual to Israel." It is not clear to me whether such a request was put forward by Israel to the Palestinian Police for the Hamas shooters of the Ungars. Assuming that the Israeli Authorities did indeed make such a request, the Palestinian police were not required to make an immediate transfer of those in their custody, but could continue to hold persons they already had in their custody "for the duration of the detention or imprisonment," according to Article II.7.f.2 of Annex IV of the Interim Agreement.

October 15, 2010

*[signature]*

Raja Shehadeh
Barrister,
26 Main Street,
Ramallah,
The Palestinian Territories, via Israel

# EXHIBIT A

# RAJA SHEHADEH

## Biographical statement

| | |
|---|---|
| 1973 | Graduated with honors from the American University of Beirut in literature and philosophy; |
| 1976 | Called to the English Bar as member of Lincoln's Inn; |
| 1978-81 | Joined the Shehadeh Law Firm and became senior partner in 1985; |
| 1979-91 | Founded and co-directed al Haq, the West Bank affiliate of the International Commission of Jurists; |
| 1983 | Received the Issam Sartwai Peace Prize; |
| 1986 | Received the Rothko Chapel Award for Commitment to Truth and Freedom presented by President Jimmy Carter; |
| 1991-2 | Acted as legal advisor to the Palestinian Delegation to the Israeli – Palestinian Peace talks in Washington D.C.; |
| 1979-present | Lectured extensively and attended a number of international conferences on the legal and human rights aspects of the Israel-Palestinian conflict. |
| 1995-present | Full time writer and legal consultant. Serving as Commissioner on the Independent Commission for Human Rights; |
| 2005-2008 | Magnus Magnusson Fellow at the Glasgow Caledonian University. |
| 2008 | Winner of Orwell Prize for political writing. |

# EXHIBIT B

# RAJA SHEHADEH

## Publications

### BOOKS

1. THE WEST BANK AND THE RULE OF LAW (PUBLISHED IN ENGLISH, FRENCH AND ARABIC);

2. THE THIRD WAY, A JOURNAL OF LIFE IN THE WEST BANK ORIGINALLY PUBLISHED IN THE UK (ALSO PUBLISHED IN US, GERMANY, HOLLAND, FRANCE, ISRAEL AND EGYPT);

3. OCCUPIERS LAW, ISRAEL AND THE WEST BANK, 1985 AND 1988, INSTITUTE OF PALESTINE STUDIES, WASHINGTON DC;

4. THE SEALED ROOM, SELECTIONS FROM THE DIARY OF A PALESTINIAN LIVING UNDER ISRAELI OCCUPATION, PUBLISHED IN THE UK;

5. LAW OF THE LAND, SETTLEMENTS AND LAND ISSUES UNDER ISRAELI MILITARY OCCUPATION, PUBLISHED IN JERUSALEM;

6. THE DECLARATION OF PRINCIPLES AND THE LEGAL SYSTEM IN THE WEST BANK, PUBLISHED IN JERUSALEM;

7. TOWARDS EQUALITY, AN EXAMINATION OF THE STATUS OF PALESTINIAN WOMEN UNDER EXISTING LAW, PUBLISHED IN JERUSALEM;

8. FROM OCCUPATION TO INTERIM ACCORDS, ISRAEL AND THE PALESTINIAN TERRITORIES, PUBLISHED BY KLUWER LAW INTERNATIONAL IN CONJUNCTION WITH SOAS;

9. STRANGERS IN THE HOUSE, COMING OF AGE IN OCCUPIED PALESTINE, HARDCOVER PUBLISHED BY STEERFORTH, PAPERBACK BY PENGUIN, US. ALSO PUBLISHED IN THE UK, GERMANY AND ISRAEL;

10. WHEN THE BIRDS STOPPED SINGING, LIFE IN RAMALLAH UNDER SIEGE, PUBLISHED BY PROFILE BOOKS IN THE UK. ALSO PUBLISHED IN THE US., FRANCE AND NORWAY;

11. PALESTINIAN WALKS, FORAYS INTO A VANISHING LANDSCAPE, PUBLISHED IN THE US BY SCRIBNER, 2008 AND IN TEN OTHER COUNTRIES;

12. A RIFT IN TIME, TRAVELS WITH MY OTTOMAN UNCLE, PUBLISHED BY PROFILE BOOKS IN THE UK, 2010.

## CHAPTERS IN BOOKS

1. *THE WEIGHT OF LEGAL HISTORY: CONSTRAINTS AND HOPE IN THE SEARCH FOR A SOVEREIGN LEGAL LANGUAGE,* IN **THE ARAB-ISRAELI ACCORDS: LEGAL PERSPECTIVES**, EDITED BY EUGENE COTRAN AND CHIBLI MALLAT, KLUWER LAW INTERNATIONAL IN CONJUNCTION WITH SCHOOL OF AFRICAN AND ORIENTAL STUDIES, UNIVERSITY OF LONDON, 1996;

2. *ANALYZING PALESTINE: POST-MORTEM OR PROGNOSIS,* IN **WAITING FOR THE BARBARIANS, A TRIBUTE TO EDWARD W. SAID**, EDITED BY MUGE GURSOY SOKMEN AND BASAK ERTUR, VERSO, 2008;

3. *AN ENGLISH EDUCATION,* IN **LOVESONGS TO THE AULD ENEMY**, ESSAYS ON ENGLAND BY SCOTTISH WRITERS, EDITED AND WITH AN INTRODUCTION BY DAVID GRIEG, CAPERCAILLIE BOOKS, EDINBURGH, 2007; AND

4. *ECHOING LANDS,* IN **A WILDER VEIN**, EDITED BY LINDA CARKNELL, TWO RAVENS PRESS, FORTHCOMING, NOVEMBER, 2009

5. **VILLA IN THE JUNGLE**, IN **MIDNIGHT ON THE MAVI MARMARA, THE ATTACK ON THE GAZA FREEDOM FLOTILLA AND HOW IT CHANGED THE COURSE OF THE ISRAEL/PALESTINE CONFLICT**, EDITED BY MOUSTAFA BAYOUMI, O/R BOOKS, NEW YORK, 2010.

## ARTICLES

**WHAT LAW, THE MIDDLE EAST,** LONDON, 1980

**LETTER FROM RAMALLAH, MIDDLE EAST INTERNATIONAL,** LONDON 1980

**LETTER FROM JERICHO, MIDDLE EAST INTERNATIONAL,** LONDON, 1980
ISRAEL'S USURPATION OF THE LAW, MIDDLE EAST INTERNATIONAL, LONDON 1980

**TESTIMONY BEFORE THE UNITED NATIONS**

**ANNEXATION BY LAW, MIDDLE EAST INTERNTIONAL,** LONDON 1981

**LEGAL SYSTEM OF ISRAELI SETTLEMENTS,** THE REVIEW OF THE INTERNATIONAL COMMISSION OF JURISTS, GENEVA

**THE LAND LAW OF PALESTINE,** JOURNAL OF PALESTINE STUDIES, WASHINGTON DC, 1982

**REAGAN'S PLAN OFFER PALESTINIANS HOPE,** NEW YORK TIMES, 1982

**THE PROPHETS OF THE HOLY LAND, SCENES FROM THE FUTURE OF THE MIDDLE EAST,** HARPERS, 1984

**DAYS OF RAGE,** LIFE MAGAZINE, 1988

**THE MYTH OF LAW AND ORDER,** THE JERUSALEM POST, 1988

**OCCUPIER'S LAW AND THE UPRISING,** JOURNAL OF PALESTINE STUDIES, 1988

**NEGOTIATING SELF-GOVERNMENT ARRANGEMENTS,** JOURNAL OF PALESTINE STUDIES, 1992

**PEACE NEEDS A NEW BEGINNING,** HADASHOT, ISRAELI DAILY NEWSPAPER, 1992

**FOR PALESTINE, A SMALL STEP ON A LONG ROAD,** THE AGE, AUSTRALIAN DAILY NEWSPAPER, 1993

**CAN THE DECLARATION OF PRINICPLES BRING ABOUT A 'JUST AND LASTING PEACE'?** EUROPEAN JOURNAL OF INTERNATIONAL LAW, 1993

**FLAWS IN THE OSLO ACCORDS – AN "INSIDER'S" VIEW,** MIDDLE EAST INTERNATIONAL 1994

**QUESTIONS OF JURISDICTION: A LEGAL ANALYSIS OF THE GAZA-JERICHO AGREEMENT,** JOURNAL OF PALESTINE STUDIES, 1994

**THE JERICHO TERMINAL,** MEDITERRANEANS 1994

**WHOSE LAW SHALL APPLY?** MIDDLE EAST INTERNATIONAL, 1995

**EARLY TRANSFER OF POWERS IN THE WEST BANK,** JOURNAL OF PALESTINE STUDIES, 1995

**TRANSFER AND POWERS, THE AUGUST AGREEMENT AND THE JORDANIAN OPTION,** MIDDLE EAST REPORT, WASHINGTON D.C. 1995

**THE GENEVA CONVENTION AND THE AUTONOMOUS TERRITORIES,** A REJOINDER, SECURITY DIALOGUE, OSLO, 1996

**THE ENTRY ON THE PALESTINIAN LEGAL SYSTEM IN THE ENCYCLOPEDIA OF THE PALESTINIANS** PUBLISHED IN THE US IN 1998

**THE PATH FROM OSLO TO WAR,** NEW YORK TIMES 2002

**ISRAEL ABANDONING THE PEACE PROCESS,** THE BOSTON GLOBE, 2002

**LEARNING TO LIVE TOGETHER,** YEDIOTH AHRANOTH, 2002

**INTERVIEW ARTICLE WITH POET MAHMOUD DARWISH IN BOMB MAGAZINE,** US 2002

ARTICLE IN THE SPANISH PAPER (TITLE ASSIGNED BY NEWSPAPER) LA VANGUARDIA, 2002

**DIARY SECTION,** LONDON REVIEW OF BOOKS, 2002

**WHAT WE THINK OF AMERICA,** GRANTA, 77 SPRING OF 2002

**ISRAEL ABANDONING THE PEACE PROCESS,** THE BOSTON GLOBE, FEBRUARY 2, 2002

**RAMALLAH DIARY, DESOLATION ROAD,** IN THE NATION, JULY 21 2003

**DIARY PIECE,** THE NATION, US, 2003 AND ARTICLE IN THEIR WEBSITE 2003

ARTICLE IN THE SUNDAY HERALD (TITLE ASSIGNED BY NEWSPAPER), 2003

**A DRIVE ON A FORBIDDEN ROAD,** JOURNEY TO RAMALLAH, IN EUROZINE, 26 SEPTEMBER, 2004.

**JUSTICE UNDER OCCUPATION,** A REVIEW ARTICLE IN JOURNAL OF PALESTINE STUDIES DECEMBER 27, 2005

**ACTING ON AN OCCUPIED STAGE,** REVIEW ARTICLE, IN JOURNAL OF PALESTINE STUDIES JUNE 19, 2006

**THE PALESTINIAN PATIENT, REVIEW ARTICLE IN THE NATION,** MARCH 6, 2006

**HAVE A GOOD DAY,** CORNERSTONE ISSUE NUMBER 39, WINTER 2006

**WORDS BETWEEN WORLDS, EVA HOFFMAN AND RAJA SHEHADEH IN CONVERSATION,** INDEX ON CENSORSHIP VOLUME 35 NUMBER 2, 2006

**THE GAZA OCCUPATION: BEGINNINGS AND ENDINGS,** IN THE PALESTINE YEARBOOK OF INTERNATIONAL LAW, VOLUME XIV, 2006/2007

**REVIEW ARTICLE, OF CHRISTIANS IN PALESTINE,** IN JOURNAL OF PALESTINE STUDIES JANUARY 30, 2007

**REVIEW ARTICLE OF PALESTINE:** PEACE NOT APARTHEID, BY JIMMY CARTER IN CALIFORNIA LITERARY REVIEW, 3 JULY, 2007.

**OCCUPATION HAS STRENGTHENED IDENTITY,** IN JEWISH CHRONICLE 13 JUNE 2007.

**LETTER FROM RAMALLAH,** IN PMLA 2007, PUBLISHED BY THE MODERN LANGUAGE ASSOCIATION OF AMERICA;

**FORTY YEARS ON, OCCUPATION HAS CHANGED THE FACE OF THE LANDSCAPE:** PALESTINIANS FEEL LIKE FOREIGNERS IN THEIR OWN COUNTRY, INDEX ON CENSORSHIP, VOLUME 36 NUMBER 3, 2007.

**A RAMADAN REMEMBERED,** ON PALESTINIAN WRITER REFLECTS ON THE FIRST TIME HE BROKE THE FAST, EPICURE, JULY 2008.

**IN MEMORY OF ESTHER: CINEMA DUNIA, IN ARTEAST,** 22 APRIL, 2008 AND IN THE ELECTRONIC INTIFADA, 10 APRIL, 2008

**ACKNOWLEDGING THE TRAGEDY,** THE ELECTRONIC INTIFADA, 21 MAY, 2008

**HUMAN RIGHTS AND THE ISRAELI OCCUPATION,** THE NEW CENTENNIAL REVIEW, MICHIGAN STATE UNIVERSITY PRESS, VOL 8 NO. 1, 2008, PP33-55

**A SHORT WALK IN PALESTINE- OR IS IT ERETZ YISRAEL,** IN NEW STATESMAN, 3 JULY, 2008

**ARTICLE IN RED PEPPER,** SUMMER, 2008

**HOPE FOR PALESTINE'S HILLS, IN ELECTRONIC INTIFADA** 29 OCTOBER 2008.

**REVIEW ARTICLE OF COURTING CONFLICT:** THE ISRAELI MILITARY COURT SYSTEM IN THE WEST BANK AND THE GAZA BY LISA HAJJAR, IN JOURNAL OF PALESTINE STUDIES,

**IT MOVED ME, MOUNTAINEERING IN SCOTLAND BY WH MURRAY,** IN THE SUNDAY TIMES 10 AUGUST, 2008.

**ECHOING LANDS,** THE GUARDIAN, TRAVEL SECTION, SATURDAY 11 JULY 2009;

**AFTER THE FACT,** A SHORT STORY POSTED ON PEN, AMERICAN CENTER, WWW.PEN.ORG;

**REVIEW OF PALESTINE INSIDE OUT: AN EVERYDAY OCCUPATION BY SAREE MAKDISI,** IN THE POLITICAL QUARTERLY VOL 80, NO.2 PUBLISHED IN LONDON;

**TWO WALKS: PALESTINE AND THE PEAK DISTRICT,** A CONVERSATION BETWEEN RAJA SHEHADEH AND MARIN LEWYCHKA, SEPTEMBER 2008. POLITICAL QUARTERLY VOL. 80 NO 1, JANUARY –MARCH 2009;

**LETTER TO PRESIDENT BARACK OBAMA READ ON BBC WORLD SERVICE PROGRAM,** THE STRAND, JANUARY 2009;

**RESILIENT, PROMPT AND ENLIGHTENING, ARTICLE IN THIS WEEK IN PALESTINE,** DECEMBER 1, 2009;

**INTERVIEW ON HUMAN SECURITY ENTITLED: WE MUST FIND A WAY OF COOPERATING AS A REGION,** PALESTINE-ISRAEL JOURNAL 2 JUNE 2009;

**REVIEW OF THE ISRAELI FILM AJAMI,** READ ON BBC ARTS PROGRAM, THE STRAND, MARCH 1ST, 2010;

**ISRAEL'S SEARCH FOR GOOD ARABS,** BOOK REVIEW IN THE NATIONAL, MARCH 11, 2010;

**TURKEY ROCKS: CAPPADOCIA'S CAVE CHURCHES,** THE GUARDIAN SATURDAY APRIL 10, 2010.

**WALKING THE PAST,** SUMMER ISSUE, THE JEWISH QUARTERLY LONDON, 2010.

# EXHIBIT C

FOLLOWING IS THE LIST OF MATERIAL REVIEWED BY ME FOR THE PREPARATION OF THE EXPERT REPORT.

1. THE COMPLAINT FILED IN THE CASE OF UNGAR V. PALESTINIAN AUTHORITY;

2. ESTATE OF UNGAR 325 F SUPP 2D 15;

3. 1997.04.13 CHICAGO TRIBUNE ARTICLE, LAST DEATH SQUAD FIGURE SURRENDERS; ISRAELIS CLAIM BREAKUP OF HAMAS TERROR CELL; AND

4. 1997.11.17 AGENCE FRANCE PRESS- ENGLISH, PALESTINIANS PROTEST ARAFAT'S SECURITY FORCES.