# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.,

        Plaintiffs – Judgment Creditors,

        v.                                  Civ. No. 00-105L

THE PALESTINIAN AUTHORITY, et al.,

        Defendants – Judgment Debtors.

## REPLY IN FURTHER SUPPORT OF PLAINTIFFS-JUDGMENT CREDITORS' MOTION TO STRIKE AND TO COMPEL

Plaintiffs-Judgment Creditors hereby file this reply in further support of their motion to compel compliance with certain requests contained in their third request for productions of documents, dkt. #583. This reply brief will address each of the five arguments Defendants raise in opposition to the motion to compel.

## I. DEFENDANTS' CLAIM THAT THE PARTIES DID NOT "MEET AND CONFER" IS UNFOUNDED AND MADE IN BAD-FAITH

Defendants begin their opposition memorandum with an attack on Plaintiffs for not having adequate communications with them about trying to "narrow or eliminate the issues presented by Defendants' objection and responses." Opposition p. 9. Not only is this argument sorely lacking merit, but it stands the parties' burdens on their head.

Defendants have created a straw man to castigate the Plaintiffs as a ruse to cover their own adamant refusal to provide the discovery requested. Defendants apparently believe that a "meet and confer" conference is merely a tool in their arsenal to whittle the document requests to what they deem appropriate.

In other words, by providing a massive overload of general and specific objections to each of Plaintiffs' requests, Defendants intended to trade away their objections so as to respond only to pared down requests regardless of the appropriateness of the original requests.

As the first twelve pages of Defendants' memorandum make clear, they believe that the discovery rules and even the "meet and confer" process is nothing more than a market in which to bargain. Hence they openly admit that their own massive general and specific objections are not truly relevant but merely props for "negotiations between the parties." Opposition p. 11.

Defendants cite to their own earlier five page recitation of the communications between counsel (including numerous emails and a telephone conference) to address Defendants' broad and unyielding objections to Plaintiffs' already narrowed document requests.[1]

Thus they criticize Plaintiffs for not falling into their trap because they did not "narrow or eliminate the issues present by Defendants' objections and responses." *Id*.

Defendants would have Plaintiffs litigate their Rule 60(b) motion by the Alice in Wonderland rules they request this Court to adopt:

1. Defendants make statements in their filings in support of their request for relief from a judgment.

2. Defendants have the burden to satisfy numerous criteria necessary to obtain the equitable relief sought.

3. Plaintiffs seek discovery regarding Defendants' own statements in their 100 pages of briefing in support of their motion and the Rule 60(b) criteria.

---

[1] Throughout the first half of their opposition memorandum, Defendants complain that the "meet and confer" conference did not take place *and* at the same time admit that the parties did have a telephone conversation (in addition to numerous emails and written communications).

4. Defendants present boilerplate objections applicable to each request which they use a bargaining chip.

5. Defendants seek to trade their boilerplate objections to curtail the discovery demands.

6. When Defendants refuse to withdraw their objections, they attempt to tarnish Plaintiffs for their refusal to accept the burden-shifting they try to impose.

In sum, Defendants' "never-never world" of discovery obstruction is exactly as Plaintiffs noted in their opening memorandum and no amount of back peddling or attack on Plaintiffs will cover their refusal to respond to the discovery demands. And as even the self-serving 5-page recitation of the pre-briefing communications between the parties demonstrates, Defendants acknowledge that they never sought to comply with Plaintiffs legitimate discovery demands but rather merely wanted to trade away their massive objections in "negotiations".

## II. DEFENDANTS' ATTEMPT TO EXCUSE THEIR NON-COMPLIANCE WITH PLAINTIFFS' LEGITIMATE DISCOVERY DEMANDS

Defendants argue over three full pages that Plaintiffs' motion should be denied merely because they have not copied each and every request and objection into the body of their motion to compel. This technical argument should be rejected as inapplicable in this matter.

While it is literally true that Plaintiffs have not reproduced the dozens of pages of requests and objections in their motion, in the context of this Court's familiarity with the identical discovery topics and prior ruling on the Rule 30(b)(6) motion (dkt. # 578, the "ruling"), Defendants' reliance on this argument to justify their non-compliance with Plaintiffs' legitimate discovery demands is absurd. This is not a case where a party haphazardly ignored a local rule having tremendous significance to both the Court and the parties. Rather, for several reasons the presentation and format of Plaintiffs' motion is entirely justified.

First, to burden the Court (and the parties) with reproducing the dozens of pages of requests and objections would be excessively cumbersome and a colossal waste of paper and resources. Merely reading through such a document would be overly taxing and detract focus from the substance of the issues before the Court.

Second, and more importantly, Defendants' argument elevates form over substance. As Plaintiffs noted in their opening memorandum, their Third RPD generally mirrors their Rule 30(b)(6) deposition notice. Having received the Court's decision on the subjects of that motion, in large measure Plaintiffs' present motion expressly relied on that ruling in moving to compel compliance. Since the Court is already greatly familiar with the topics and subjects of the document requests (which directly parallel the issues the Court previously confronted), the format of the motion is entirely appropriate.

Third, the structure of the motion draws on the format utilized by the Court when grouping topics in its ruling on the Rule 30(b)(6) deposition notice. Dkt. 578, pp. 3-5. Taking guidance from the Court, Plaintiffs expected that the Defendants would have been grateful that the full plethora of their objections were not repeated over dozens of pages in their motion. As the Court previously indicated, "the sheer number of those topics and the minute detail sought with respect to those topics" would have made review of the motion difficult. Dkt. # 578, p. 2.

The grouping of subjects followed the cue of the Court and was intended to ease review.

## III.    THIS COURT'S PRIOR RULING SHOULD GUIDE ITS REVIEW OF THE MOTION TO COMPEL PRODUCTION

Plaintiffs expressly stated in their motion that they believe this Court's prior ruling on the Rule 30(b)(6) motion was the guidepost for their demands for document production. Dkt. #584, p. 2. Thus they readily acknowledged that they curtailed and tailored the document demands made prior to October 28, 2010 and moved to compel in reliance on that ruling.

Defendants however, refuse to acknowledge the Court's ruling as a guide for parallel document requests, filed an appeal of that ruling to Judge Lagueux (dkt. #593), and in their opposition to the motion to compel seek to undermine and avoid it.

Since the issues have largely already been litigated and ruled upon, discovery has closed, and the parties' pretrial submissions are less then three weeks away, it is obvious that Defendants are trying to delay and forestall production of documents that are vital to Plaintiffs' defense of the motion to vacate.

For instance, since this Court has ruled that a proper topic of discovery is the willfulness of Defendants' default, it is essential for Plaintiffs to obtain information about the other cases in the U.S. and Israel that Defendants actively litigated in the periods before and after their refusal to answer the Amended Complaint and obey discovery orders.

Refusing to acknowledge the guidance of the Court in its prior ruling, Defendants again fail to provide discovery to Plaintiffs just as they did eight years ago.

## IV.    DEFENDANTS' GENERAL OBJECTIONS ARE IMPROPER AND SHOULD BE STRICKEN

As Plaintiffs indicate in their opening memorandum, Defendants' boilerplate and excessive general objections are meritless and should be stricken. Defendants effectively admit as much by stating that certain general objections are applicable to individual document requests but they fail to bother to even attempt to inform the Court to which specific requests they apply.

Unable in their response memorandum to correlate any of the general objections to even a single specific document request, Defendants implicitly concede that the assertion of such broad objections to every request was improper.

Accordingly, Defendants' general objections should be stricken.

## V.   DEFENDANTS HAVE FAILED TO SUSTAIN THEIR BURDEN FOR REFUSING TO PRODUCE THE DOCUMENTS REQUESTED

### A. Requests 4(o) – (v)

Plaintiffs' argument concerning these requests is adequately addressed in pages 4-6 of their open memorandum. Plaintiffs only add that in light of the purported hardship the prior judgments of this Court allegedly had on Defendants and the extensive communications they have had with others about them, it is inconceivable that Defendants have no documents of any kind responsive to this request. Further, Plaintiffs are entitled to a response by Defendants without reservation or subject to objections lodged by counsel.

### B. Requests 9(a)-(b), 9(u)-(v), 13(h)-(s), 13(v)-(w) and 13(dd)-(vv)

Defendants continue to resist providing documents about their many years of active litigation prior to their default in this action, the written policy guidelines Prime Minister Fayyad testified about in his deposition and the dozens of terrorism and other suits in which they actively litigated in Israel.

As indicated in Plaintiffs' opening memorandum, this continued refusal flies in the face of Defendants' own admissions about the handling of their litigation, the public record and their willingness to provide some 10,000 documents about their U.S. terrorism litigation.[2]

Defendants also argue that they should be excused from producing the materials from the Israeli cases – which will show that while they were defaulting this action and failing to move

---

[2] Defendants' produced five boxes of documents in response to Plaintiffs Third Request for Production of Documents. Almost the entire production is merely publically available copies of briefs (and exhibits such as news paper clippings, treaties etc) filed in this action as well as other suits by terrorism victims in New York and Washington D.C. against the PA and PLO. Obviously, this is a cynical attempt to create a massive production of documents for show with very little substance.

6

for vacatur for three and a half years Defendants were actively litigating terrorism suits in Israel

on the merits under Fayyad's supervision – because the requests may "expose them to legal

action in Israel" and they are otherwise prohibited from producing such record. Opposition p. 23.

In purported support of this argument, Defendants have submitted a declaration from

their own lawyer, Joseph Arnon. In fact, however, Mr. Arnon's claims are entirely baseless, as

demonstrated in the attached declaration prepared by Dr. Itay Lipschits, a professor of Israeli

civil procedure at several Israeli law schools. Dr. Lipshchits dismantles the claims by

Defendants' lawyer brick-by-brick:

10. Mr. Arnon states in ¶ 6 of his Declaration that "In a number of meetings with Defense counsel, I have objected to producing copies of the documents listed above" and in ¶ 16 that "unless there is a court order requiring my office to do so, I object to having to produce the documents that have been requested of me." Under Israeli law, Mr. Arnon has no legal basis to refuse a request from the Defendants, who are his clients, for copies of the documents relating to the civil suits against the Defendants. Israeli law considers the documents in a client's file to be the property of the client, not the attorney (who is considered the client's agent and fiduciary pursuant to § 8 of Israel's Trust Law, 5725-1965) and the client has an absolute right to obtain copies of such documents on demand. *See e.g.* Misc.Civ.Mot. 19582/06 (Tel Aviv Dist. Ct.) *Mercantile Discount Bank Ltd. v. Adv. Erez Bey-Ezer*, (1/29/07) at ¶ 9.6 (Noting that documents in a client's file "belong to the client and not to the attorney, and they are the property of the former.").[3]

11. Moreover, under Israeli Supreme Court precedent, any refusal by Mr. Arnon to provide copies of the documents to the Defendants at their request would constitute a violation of the rules of professional ethics governing the conduct of attorneys in Israel. *See e.g.* I.B.A 18/85 *Adv. David Maimon v. The District Committee of the Bar, Jerusalem District*, P.D. 40(2) 517.

---

[3] Mr. Arnon is of course entitled to require Defendants to pay the cost of copying the documents.

12.  In ¶¶ 8-11 of his Declaration, Mr. Arnon asserts, citing the Regulations of the Courts and Labor Tribunals (Reviewing Cases), that "a non-party wishing to examine documents filed in a particular case must file a pleading with the judge handling that case, referencing the case number, and explaining the reasons they seek access to the case files." *Id.* at ¶ 8. This assertion is misleading. The Regulations cited by Mr. Arnon govern requests by non-parties to receive court files <u>from the court</u> for examination. Nothing in the Regulations, or in any other provision of Israeli law, provides that a "non-party wishing to examine documents filed in a particular case must" follow the procedure set in the Regulations. For example, nothing in the Regulations, or in any other provision of Israeli law, prevents a non-party from approaching a party directly and requesting copies of documents generated in a legal proceeding. More importantly in the instant context, nothing in the Regulations, or in any other provision of Israeli law, prevents a party from providing a non-party with copies of documents generated in a legal proceeding (unless, as discussed below, the court enters a specific order prohibiting release of such documents). Therefore, Mr. Arnon's citation to the Regulations of the Courts and Labor Tribunals (Reviewing Cases) is a non sequitur. While the Plaintiffs <u>could</u> file applications pursuant to the Regulations to examine the relevant files they are certainly not <u>required</u> to. Moreover, that procedure is time-consuming and Defendants could oppose Plaintiffs' applications. Most importantly, the Regulations in no way prohibit Defendants from complying with Plaintiffs' discovery requests.

13.  Mr. Arnon claims in ¶ 12 of his Declaration that some of the documents requested by the Plaintiffs "contain private and personal information related to the plaintiffs in the Israeli cases, including information concerning their physical and mental health, financial matters and other information" and that "Pursuant to the Israeli Privacy Protection Law of 1981, the dissemination of such documents may violate individual privacy rights." This claim lacks foundation for at least three reasons. <u>First</u>, the Israeli Supreme Court has held, in respect to a refusal to disclose a document on the grounds that the disclosure would violate the privacy of a third party under the Privacy Protection Law, that the burden to prove the potential violation rests with the person asserting it. Thus, Defendants would need to make a specific showing that production of a given document would violate the Law. *See* L.C.A. 10454/08 *Doveronsky v. Y.D. Arteries and Distribution Ltd.*, (1/22/09) at ¶ 13. <u>Second</u>, the Israeli Supreme Court has held that the Privacy Protection Law

8

does not provide a basis for refusing a discovery request, even when the privacy of a non-party is involved. *Id*. Third, § 18(2)(b) of the Privacy Protection Law expressly provides that no criminal or civil liability may be imposed when the person disseminating the information had a "legal, moral, social or professional" duty to do so. Thus, if Defendants are ordered to produce these documents by the Court in the above-captioned action, they cannot face any civil or criminal sanction under the Privacy Protection Law. For the same reason, Mr. Arnon cannot face any liability whatsoever as a result of providing the Defendants with a copy of their documents, since he is under a legal obligation to do so.

14. Mr. Arnon implies in ¶ 13 of his Declaration – without explicitly stating – that some of the cases are being conducted *in camera* because they involve minors. To the extent that any case is subject to a court order providing that the proceedings therein be held *in camera*, and depending on the specific provisions of such an order, Defendants might be prohibited from producing documents from that case. But in the absence of such an order, Defendants are not legally prohibited from producing documents relating to a minor. Needless to say, not every case involving minors is heard *in camera*. A common example of cases involving minors which are not held *in camera* are tort actions for the death of the minor's parent.

15. In ¶ 14 of his Declaration Mr. Arnon claims that "in cases involving Israeli corporations, the documents that are the subject of Plaintiffs' requests contain potential commercial secrets. Such commercial secrets are protected by the Israeli Commercial Torts Law of 1999. Revealing such information to third parties would also require us to obtain the plaintiffs' consent." Here, again, there is no basis for this claim. Section 23 of the Commercial Torts Law of 1999 empowers Israeli courts to enter orders ensuring that commercial secrets revealed in legal proceedings are not revealed to the public. Unless such an order was entered in a specific case Defendants are not legally prohibited, by the Commercial Torts Law or otherwise, from producing documents containing potential commercial secrets.

16. In ¶ 15 of his Declaration Mr. Arnon asserts that "because of the privacy concerns I have laid out above, I believe that requiring my office to hand over the documents I have described (which we hold for our clients and copies of which our clients do not necessarily possess) may expose me, personally, and my staff, to legal action." There is no basis at all in Israeli law for this claim.

Indeed, with all due respect, this claim is frivolous. As discussed above, Mr. Arnon cannot refuse to provide copies of Defendants' files to them; on the contrary, a refusal to do so would violate professional ethics. What the Defendants do with their own documents (which, as noted, are the property of the Defendants under Israeli law) is simply, to put it bluntly but accurately, not Mr. Arnon's business. Nor could Mr. Arnon possibly be held liable for providing copies of the documents to the Defendants even if Defendants' production of the documents was legally barred – which, as discussed above, it is not – since he is legally obligated to provide them copies of their documents on demand.

17.   In sum, any refusal by Mr. Arnon to provide copies of the documents to the Defendants would have no basis in, and indeed would violate, Israeli law. Moreover, unless Defendants can point to court orders barring disclosure of documents in specific cases, nothing in Israeli law prohibits Defendants from producing documents from cases filed against them in Israel, and Defendants would face no civil or criminal liability for doing so. Thus, any claims by Defendants that production of such documents would be "inconsistent with Israeli law and procedure" and/or that "pleadings and other judicial filings in the Israeli court system are subject to certain protections and controls, such that non-parties seeking copies of such documents must make an application to the appropriate Israeli judicial authority to obtain them" are baseless.

Exhibit A.

It is well established that a party seeking to fend off a discovery request by citing foreign law barring such production bears the burden of proving the existence of that law. *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) ("[T]he party relying on foreign law bears the burden of demonstrating that such law actually bars the production or testimony at issue. In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law.") (citations omitted).

Defendants have utterly failed to meet this burden. Indeed, Dr. Lipschits' declaration demonstrates that Defendants' arguments in this regard are wholly frivolous.

Finally, Defendants' suggestion that producing the materials from the Israeli cases (and from their earlier litigation experiences in the United States) would be too burdensome is cynical in the extreme in light of the fact that Defendants have served the Ungars with some 10,000 pages of documents from the cases now pending against them in the U.S. which, Defendants believe, prove that they are now cooperative litigants in the U.S. courts.

Thus, Defendants' method is clear: in respect to documents that they believe *support* their position no burden is too great, and they eagerly make a 10,000 "document dump" from the recent American case files. But when it comes to documents that will *undermine* their position – i.e. the documents from the Israeli case files showing that Defendants were actively litigating those cases on the merits between 1997 and 2007 – even the slightest burden is too great.

The Ungars would also note that Defendants' complaints about the burdens of hand-copying the documents are totally baseless. Just as in the U.S., there are vendors in Israel that can copy (or scan) documents at a fraction of the cost and time required to do so by hand.

**C. Requests 10(a)-(g), 10(j)-(m), 13(a) and 13(bb)**

Defendants continue to resist providing documents related to the PIF despite this Court's *two* explicit rulings on this subject see Dkt. # 575, pp. 3-5 and Dkt. # 578, p. 4.

Seeking a third bite of the apple in defiance of these prior rulings, Defendants still refuse to provide *any* documents response to Plaintiffs' legitimate discovery demands about the relationship between the PA and PIF. Rather than complying with the orders that previously addressed the PIF topic, Defendants quibble over definitions, the relevancy and scope of the requests, and document authentication.

11

The nature and extent of these arguments and objections (made just weeks after this Court twice ruled on this subject) reveals Defendants' true intent to stonewall and hinder discovery even while feigning to have turned over a new leaf.

### D. Requests 6(j)-(l) and 14(a)

Defendants refuse to produce documents in response to Requests 6(j)-(l) and 14(a) concerning their purported meritorious defense to Plaintiffs' action. Arrogating to themselves the right to pick and chose which orders to comply with, they ignore this Court's prior ruling which specifically permits discovery with respect to their meritorious defense. Dkt. # 578, p. 4.

Their insistence on responding subject to objections leaves Plaintiffs without any clarity as to whether in fact Defendants really believe there are no responsive documents.

This problem is compounded by Defendants' failure to articulate the steps they made to "look" for the requested documents in the 30 days following their receipt of the Third RPD as well as any subsequent measures taken to find them. In light of the notoriety of the relationship between the Hamas and the PA/PLO during the mid-1990s and the repeated public reports of their discussions, the notion that Defendants have no responsive documents is not believable.

For example, in late 1995 the Defendants and Hamas entered into negotiations regarding various matters, in the context of which the Defendants sought and received a commitment from Hamas that it would not carry out terrorist attacks *in or from* territory controlled by the Defendants. This commitment, which was reflected in a joint declaration made by representatives of Defendants and of Hamas in Cairo on December 21, 1995, is commonly termed the "Cairo Agreement" or "Cairo Declaration."

As one Middle East scholar explains:

> After lengthy negotiations, the two sides reached an agreement in Cairo on December 21, 1995, which essentially allowed Hamas to operate against Israel targets outside areas controlled by the PA. Arafat also agreed to a release of Islamist prisoners but won a number of political concessions. The document was signed by Khaled Mashal on behalf of Hamas and Salim Zanoun on behalf of the PNC, the legislative organ of the PLO.

Ofira Seliktar, Doomed to Failure?: The Politics and Intelligence of the Oslo Peace Process (Greenwood Publishing) (2009) at 74.

Defendants' purpose in obtaining this undertaking from Hamas was twofold: (a) it allowed Defendants to deflect blame for terrorism since the attacks would no longer take place in or from Defendants' territory[4] and (b) it allowed Defendants to argue that if Israel wanted to reduce attacks, it should cede more land to the Defendants. As PLO leader Salim Zanoun stated soon after he concluded the agreement on behalf of the Defendants:

> This should be understood by all. We are not the defenders of the Israeli entity [sic]. We see it as sufficient to obligate Hamas not to embarrass the PA, which is responsible for security in the areas it has received, and from which it will not allow action. … *If Israel wants to spare itself Hamas attacks, it had better hurry and withdraw from the rest of the territories*.

Exhibit B at 2 (emphasis added).

Clearly, then, Defendants must have responsive documents.

---

[4] In fact, of course, Defendants remained no less blameworthy, since they continued to provide Hamas as an organization with safe-haven and other material support within the areas controlled by them.

13

### E. Requests 14(b)-(f)

Despite the simplicity and clarity of these requests, Defendants have attempted to create confusion by obfuscation and diverting attention from their own failure to provide even basic information about the "officer" status of the PA leaders they were previously ordered to produce for depositions. Now, eight years after they were ordered to produce these deponents, Defendants still insist on stonewalling by failing to provide even basic background information about them and have reserved to themselves the right to determine whether a "need" exists for their current contact information. Lastly, the Defendants suggest that they have provided information about the job titles of these individuals but that Plaintiffs simply didn't find them in the haystack of 10,000 plus pages of documents Defendants provided.

In fact, Plaintiffs found the purportedly responsive documents. They consist of several copies of the proverbial phone book. For example instead of responding with the official documents requested, Defendants provide copies of the privately published "Diary" of the Palestinian Academic Society for the Study of International Affairs.[5] Exhibit C.

This document lists the names and office information for several PA officials. But since it's published by a local non-profit organization and is not an official directory, it is not responsive to the request. Also, the third party directory does not contain information such as work and home addresses, much less information that would demonstrate that these individuals are no longer officers of the PA or PLO.

_____

[5] According to its website, "PASSIA is an Arab non-profit institution located in Jerusalem/Al-Quds with a financially and legally independent status. It is not affiliated with any government, political party or organization." www.passia.org.

Again despite their repeated promises, Defendants continue in their old ways.

Accordingly, the motion to compel should be granted with respect to Requests 14(b)-(f).

**WHEREFORE** the instant motion should be granted.


Dated: November 30, 2010                          Plaintiffs-Judgment Creditors,
                                                  By their Attorneys,

                                                  /s/ David J. Strachman
                                                  David J. Strachman (#4404)
                                                  McIntyre, Tate & Lynch LLP
                                                  321 South Main Street, Suite 400
                                                  Providence, RI 02903
                                                  (401) 351-7700
                                                  (401) 331-6095 (fax)
                                                  djs@mtlesq.com

                                                  Max Wistow (#0330)
                                                  Wistow & Barylick, Inc.
                                                  61 Weybosset Street
                                                  Providence, RI 02903
                                                  (401) 831-2700
                                                  (401) 272-9752 (fax)
                                                  mw@wistbar.com

                                                  Robert J. Tolchin
                                                  The Berkman Law Office, LLC
                                                  111 Livingston Street
                                                  Suite 1928
                                                  Brooklyn, NY 11201
                                                  (718) 855-3627
                                                  (718)-504-4943 (fax)
                                                  rjt@tolchinlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 30, 2010, a true and genuine copy of the

foregoing was served by ECF on Defendants' counsel of record listed below:


Deming E. Sherman
Edwards Angell Palmer & Dodge LLP
2800 Bank Boston Plaza
Providence, RI 02903

Richard A. Hibey
Mark J. Rochon
Brian Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

/s/ David J. Strachman