No. 09-1778

---

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

---

EFRAT UNGAR, *et al.*,

*Plaintiffs-Appellees,*

v.

THE PALESTINE LIBERATION ORGANIZATION, *et al.*,

*Defendants-Appellants.*

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

---

## REPLY BRIEF FOR APPELLANTS

Mark J. Rochon
(1st Cir. Bar No. 97714)
 *Counsel of Record*
**Miller & Chevalier Chartered**
655 Fifteenth St., N.W.
Washington, D.C. 20005
(202) 626-5800

Deming E. Sherman
(1st Cir. Bar No. 31908)
**Edwards Angell Palmer & Dodge LLP**
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200

November 5, 2009          *Counsel for Defendants-Appellant*

# TABLE OF CONTENTS

Page

RESPONSE TO PLAINTIFFS'-APPELLEES' COUNTERSTATEMENT
OF THE CASE AND OF THE FACTS ........................................................ 1

    A.    Plaintiffs' Allegations Regarding Hamas, the Events
    Leading to the Default, and the Financial Impact of the
    Default Do Not Diminish the PA/PLO's Position that
    Their Meritorious Defenses and the Financial Impact of
    the Default Judgment Weigh in Favor of Vacatur ...................... 3

    B.    Plaintiffs' Assertion that "There Has Been No Change in
    Appellants' Conduct" Since Retaining New Litigation
    Counsel Is Demonstrably False ................................................... 5

        1.    The Knox, Biton and Saperstein Litigation ...................... 6

        2.    The Ungar Judgment........................................................ 8

ARGUMENT.................................................................................... 12

I.    Plaintiffs Cannot Effectively Defend the District Court's Failure to
    Consider All of the Relevant Factors in Resolving the PA/PLO's
    Rule 60(b)(6) Motion .......................................................... 12

II.    When All of the Relevant Factors Are Considered, Vacatur Is
    Warranted .......................................................................... 16

    A.    The PA/PLO's Meritorious Defense Compels Vacatur ............ 17

    B.    Plaintiffs Cannot Credibly Dispute that the Foreign and
    Public Policy Considerations, the Changing Political Dynamics
    of the PA and PLO, and the Size and Effect of the Judgment
    All Weigh in Favor of Vacatur ................................................ 19

    C.    The Prejudice Asserted by Plaintiffs Is Too Speculative to
    Support a Denial of Vacatur .................................................. 20

III.   Plaintiffs' Procedural and Other Arguments for Affirmance
Lack Merit ........................................................................... 25

    A.   The Motion to Vacate Was Timely ......................... 25

    B.   Granting Relief Would Not Implicate This Court's
Prior Rulings ............................................................ 29

CONCLUSION ........................................... 30

Case 1:00-cv-00105-L-DLM   Document 636-24   Filed 11/05/2009   Entry ID: 5390907

# TABLE OF AUTHORITIES

## CASES

*Coon v. Grenier,*
  867 F.2d 73 (1st Cir. 1989) ............................................................................18

*DeWeerth v. Baldinger,*
  38 F.3d 1266 (2d Cir. 1994) ..........................................................................29

*Gregorian v. Izvestia,*
  871 F.2d 1515 (9th Cir. 1989) ..........................................................................4

*KPS & Assocs. v. Designs by FMC,*
  318 F.3d 1 (1st Cir. 2003) ..............................................................................14

*Knox v. PLO,*
  248 F.R.D. 420 (S.D.N.Y. 2008) ...........................................................*passim*

*Knox v. PLO,*
  628 F. Supp. 2d 507 (S.D.N.Y. 2009) ..............................................................7

*Knox v. PLO,* No. 1:03-cv-4466,
  2009 U.S. Dist. LEXIS 52610 (S.D.N.Y. Mar. 26, 2009) ........................*passim*

*LSLJ Partnership, v. Frito-Lay, Inc.,*
  920 F.2d 476 (7th Cir. 1990) ..........................................................................29

*Palestine Monetary Auth. v. Strachman,*
  873 N.Y.S.2d 281 (N.Y. App. Div. 2009) .................................................10, 11

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,*
  507 U.S. 380 (1993) ..................................................................................14, 15

*Powerserve Int'l, Inc. v. Lavi,*
  239 F.3d 508 (2d Cir. 2001) ............................................................................23

*Saperstein v. Palestinian Auth.,* No. 1:04-cv-20225,
  2008 WL 4467535 (S.D. Fla. Sept. 29, 2008) ......................... 15, 16, 20, 22, 23

*Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*,
   2009 U.S. App. LEXIS 22747 (2d Cir. Oct. 16, 2009) ......................................9

*Standard Oil Co. v. United States*,
   429 U.S. 17 (1976).........................................................................................28

*Stone v. Morton Int'l, Inc.*,
   170 F.R.D. 498 (D. Utah 1997).......................................................................24

*Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline
   Transp. Co.*,
   953 F.2d 17 (1st Cir. 1992) ........................................................................18, 21

*United States v. Parcel of Land with Building, Appurtenances, etc.*,
   928 F.2d 1 (1st Cir. 1991) ...............................................................................13

## DOCKETED CASES

*Biton v. Palestinian Self-Interim Auth.*,
   No. 1:01-cv-382 (D.D.C.) ..................................................................................8

*Knox v. PLO*,
   No. 1:03-cv-4466 (S.D.N.Y.)...........................................................................6, 7

*Palestine Monetary Auth. v. Strachman*,
   New York Sup. Ct. Index No. 10777/2005, N.Y. App. Div.............................11

*Estate of Parsons v. Palestinian Auth.*,
   No. 1:07-cv-01847 (D.D.C.) ...........................................................................22

*Saperstein v. Palestinian Auth.*,
   No. 1:04-cv-20225 (S.D. Fla.)............................................................................8

*Ungar v. Palestinian Auth.*,
   New York Sup. Ct. Index No. 105521/2005......................................................9

## STATUTES

Anti-Terrorism Act,
   18 U.S.C. § 2333..............................................................................................17

## MISCELLANEOUS

Fed. R. Civ. P. 30 ..................................................................................24

Fed. R. Civ. P. 60 ..................................................................................25

10A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 2700
(1998) ...........................................................................................23

United Nations General Assembly, G.A. Res. 3103, 28 U.N. GAOR at 512,
U.N. Doc. A/9102 (1973)................................................................18

## RESPONSE TO PLAINTIFFS'-APPELLEES' COUNTERSTATEMENT OF THE CASE AND OF THE FACTS

Plaintiffs-Appellees ("Plaintiffs") open their brief with allegations that Appellants' Statement of the Case and Statement of Facts "are thoroughly misleading" (p. 3 n.4) and "are riddled with egregious misstatements . . . all of which appear to be intended to pervert the outcome of this appeal" (p. 3). Plaintiffs then devote the next 33 pages to a purported clarification of the record, which instead consists of filtering the procedural history and facts through the lens of Plaintiffs' apparent deep mistrust and disdain for the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO").

Plaintiffs adopt one of two rhetorical tactics in this section.  The first tactic is to repeatedly misstate or distort the PA/PLO's statements and then attack the misstated or distorted statement rather than addressing the more moderate, reasonable statement the PA/PLO actually made.[1]  Plaintiffs even resort to

---

[1] A few examples should suffice.  *Compare* Pl. Br. at 17 ("To claim as Appellants do, that they did not defend this case, is absurd.") *with* PA/PLO Br. at 6 ("By 2004, the PA and PLO had exhausted their jurisdictional, immunity and political question defenses and the court's patience."); *compare* Pl. Br. at 14 ("Appellants' Brief subtly but distinctly attempts to personalize the handling of the original case, by referring repeatedly to decisions and actions taken by Yasser Arafat and Ramsey Clark . . . as if the actions and decisions of Messrs. Arafat and Clark were not attributable to Appellants themselves.") *with* the PA/PLO Br. at 5 (the "PA/PLO's defense of the litigation veered off the rails"), *id.* at 6 ("the PA and PLO had exhausted . . . the court's patience"), *id.* at 8 (in the motion to vacate, the PA/PLO "made no 'attempt to condone of justify many of the earlier actions in this

(footnote continued on next page)

imagining arguments the PA/PLO *might* make and then rejecting these imagined arguments as "misleading." Plaintiffs' ("Pl.") Br. at 35 n.23. The second tactic is to malign the PA/PLO by wrongly accusing them of "misleading" the district court and this Court (*id.* at 3 n.4, 16, 18, 23), attempting a "fraud on the district court" (*id.* at 19), "act[ing] with **purposeful bad-faith**" (*id.*), "continuing their bad-faith, dilatory litigation tactics until today, despite changing counsel" (*id.* at 35), making a "false claim" (*id.* at 20 n.11), and "making [the facts] up as they go along" (*id.* at 22).[2] So great is the Plaintiffs' animus for the PA/PLO that even the request for oral argument is treated as an opportunity to accuse the PA/PLO of violating the local rules (with a supposedly overly long request of only two paragraphs), a violation Plaintiffs allege "is consistent with [the PA/PLO's] history of disregard for the rules of the federal courts in this and other cases." Pl. Br. at viii n.2.

---

(footnote continued from previous page)
litigation,' and indeed expressed 'regret' for their 2001-2004 defense of the litigation."); and *compare* Pl. Br. at 25-30 (criticizing the PA/PLO's alleged "**shrill claims of financial ruin**" and alleged repeated references to financial "devastation") *with* the PA/PLO's actual discussion of the financial impact of the default judgment and its legal significance (PA/PLO Br. at 16-20, 49-51) . *See also* Pl. Br. at 23 (accusing the PA/PLO of misleading the Court by creating the impression that the district court required the PA/PLO leaders "to appear in Rhode Island for depositions" when the PA/PLO's brief said no such thing).

[2] Throughout this reply brief, all bold emphasis in quotations from Plaintiffs' brief appear in the original.

Although Plaintiffs accuse the PA/PLO early and often (and frequently in bold font) of all manner of bad conduct, none of the overheated invective serves to advance Plaintiffs' position on the issues before the Court.

**A.**     **Plaintiffs' Allegations Regarding Hamas, the Events Leading to the Default, and the Financial Impact of the Default Do Not Diminish the PA/PLO's Position That Their Meritorious Defenses and the Financial Impact of the Default Judgment Weigh in Favor of Vacatur.**

Plaintiffs devote the first ten pages of their counterstatement (Pl. Br. at 4-14) to arguing that the PA/PLO "Misrepresent Their Relationship with Hamas" only to conclude that there is a "sharp dispute" about whether the PA/PLO "opposed Hamas terrorism at the relevant time." *Id.* at 14. Such a conclusion does nothing, however, to undermine the PA/PLO's position that they meet the Rule 60(b)(6) standard for establishing a meritorious defense. *See* PA/PLO Br. at 51-54.

As the district court acknowledged, "There's no question that . . . there are factual issues as to whether the Palestinian Authority and the PLO would be liable in this case if the case were heard on the merits." JA947. Thus even the district court did not dispute that the PA/PLO presented a meritorious defense; the district court simply refused to weigh this factor in its analysis. Plaintiffs now concede the factor is relevant. Pl. Br. at 70-74.

Plaintiffs' discussion at pages 14-24 regarding the events leading to the default argues the willfulness of the default. But the PA/PLO are not challenging

the district court's finding that the default was willful; they are challenging the

court's treatment of willfulness as the sole, dispositive factor.  Plaintiffs'

characterization of the judgment as being a "default judgment only in the most

technical, narrow sense of the term" (*id.* at 17) is inexplicable given that liability

was not determined by litigation on the merits.  Moreover, Plaintiffs never explain

how a defendant who contests the court's jurisdiction and then defaults should be

in a worse posture for Rule 60(b)(6) purposes than a defendant who entirely

ignored the U.S. court.

 Plaintiffs also make the curious assertion that the PA/PLO were "seeking

**affirmative relief"** from the U.S. court by arguing sovereign immunity.  *Id.* at 18.

The notion that the PA was using the U.S. courts as a vehicle for obtaining the

statehood it "had failed to achieve in the political realm" (*id.*) rests on the

unsustainable premise that a U.S. court could confer statehood on the PA and that a

party seeks "affirmative relief" by arguing immunity from suit.  If Plaintiffs' point

is that a party asserting a sovereign immunity defense is later precluded from

obtaining Rule 60(b)(6) relief, the case law is to the contrary.  *See Gregorian v.

Izvestia*, 871 F.2d 1515, 1523-25 (9th Cir. 1989).

 The discussion at pages 25-30 regarding the financial impact of the

judgment establishes only that the Plaintiffs have not yet succeeded in putting the

PA "out of business."  Clearly.  But the fact that the PA continues to operate

despite the Ungars' monthly attachment of 18 million NIS should do nothing to diminish the concern expressed by the United States Government "about the potentially significant impact that these cases may have on the *financial* and political viability of the [PA and PLO]." JA685 (emphasis added). Moreover, with the PA "deeply in debt and reliant on the international donor community to fund basic operations,"[3] Plaintiffs' assertion that the attachment of 80% of the [$116 million] judgment "**by the Israeli Treasury as of October 2009**" had "**no effect at all on Appellants' financial stability or viability**" is a transparent overstatement. Pl. Br. at 29.

### B. Plaintiffs' Assertion that "There Has Been No Change in Appellants' Conduct" Since Retaining New Litigation Counsel Is Demonstrably False.

The final sections of Plaintiffs' counterstatement (pp. 30-37) address the PA/PLO's post-judgment conduct. Here, Plaintiffs attempt to create doubt that the PA/PLO are committed to fully engaging in the U.S. litigation in a good faith manner. Plaintiffs' assertions, however, do not withstand scrutiny. Since mid-2007, the PA/PLO have been actively defending a number of U.S. lawsuits, including by participating in discovery. For 2-1/2 years, they have followed Secretary Rice's advice that the PA/PLO "respond to U.S. legal proceedings in

---

[3] *Knox v. PLO*, No. 1:03-cv-4466, 2009 U.S. Dist. LEXIS 52610, at *29 (S.D.N.Y. Mar. 26, 2009).

good faith and a timely manner" and carried out Prime Minister Fayyad's commitment that the PA/PLO "participate fully in [the U.S. litigation], in a cooperative manner, including complete participation in the discovery process." JA424, JA111.

### 1. *The Knox, Biton, and Saperstein Litigation*

Plaintiffs assert that "**at least three federal courts** have found that Appellants have continued their bad-faith, dilatory litigation tactics until today, despite changing counsel." Pl. Br. at 35 (referring to *Knox*, *Saperstein*, and *Biton* cases). This is untrue. Plaintiffs' assertion is particularly egregious because their counsel also serves as plaintiffs' counsel in the *Knox* and *Biton* cases and is well aware of the unfairness of these allegations.

With respect to *Knox*, the parties "entered into a Settlement Agreement dated October 20, 2009 . . . which, if fully performed, will ultimately result in the parties' joint submission to the Court of a proposed order unconditionally vacating the judgment and dismissing the action with prejudice." *Knox v. PLO*, No. 1:03-cv-4466 (S.D.N.Y.) (Dkt. No. 214 at 2). Presumably, this Settlement Agreement, entered into by Plaintiffs' counsel in the present appeal, is not a "bad-faith, dilatory litigation tactic."

With respect to Plaintiffs' suggestion that the *Knox* court deemed the PA/PLO to have "concealed relevant information during discovery," Pl. Br. at 35,

the court was merely summarizing the parties' positions and acknowledging areas of dispute. *Knox v. PLO*, 628 F. Supp. 2d 507, 509-10 (S.D.N.Y. 2009). In fact, after presiding over extensive asset-related discovery, Magistrate Judge Katz denied the *Knox* plaintiffs' efforts to obtain further discovery despite similar unfounded allegations of PA/PLO misconduct. In an endorsed order dated February 17, 2009, Magistrate Judge Katz wrote: "Implicit in this court's determination that there would be no further discovery on bond-related issues was the conclusion that Defendants had not improperly failed to comply with Court discovery Orders. If the Court had reason to believe that Defendants had failed to comply with its Orders without justification, it would have ordered further discovery." *Knox v. PLO*, No. 1:03-cv-4466 (S.D.N.Y.) (Dkt. No. 180 at 2). Moreover, in his Report and Recommendation, Magistrate Judge Katz expressed his view that "Plaintiffs' microscopic analysis of every statement made by PA and PLO representatives, in the press and to this Court, tends to lead to semantical, rather than substantive inconsistencies, and results in a failure to discern the proverbial forest from the trees." *Knox*, 2009 U.S. Dist. LEXIS 52610, at *27. This phenomenon is equally at work in Plaintiffs' Counterstatement here.

As to *Biton*, Plaintiffs neglect to mention that subsequent to the ruling denying the PA/PLO's Motion to Vacate Default, the case was voluntarily dismissed by plaintiffs with prejudice -- hardly a sign of bad-faith behavior by the

PA/PLO. *Biton v. Palestinian Self-Interim Authority*, No. 1:01-cv-382 (D.D.C.) (Dkt. No. 115).

In *Saperstein*, the court did not find that the PA/PLO had engaged in "bad-faith, dilatory litigation tactics" or anything of the sort. Rather, in the course of resolving a discovery dispute between the parties, the Court commented as to both parties' discovery conduct: "Unfortunately for the Court and their clients, it appears that Plaintiff's counsel has not been communicative or efficient, and Defendants counsel has not been cooperative, and neither parties' counsel has met their potential and the Court's expectations." *Saperstein v. PA*, No. 1:04-cv-20225 (S.D. Fla.) (Dkt. No. 320 at 1). This kind of statement, in addressing a discovery spat, is hardly supportive of the notion advanced in Plaintiffs' merits brief, that Appellants are engaged in the same sort of conduct that precipitated the default in this and other cases. The PA/PLO have been actively engaged in discovery in *Saperstein* for nearly a year and have participated in a number of hearings before both the district court and magistrate judge, neither of whom has accused the PA/PLO of engaging in "bad-faith, dilatory litigation tactics."

2.    *The Ungar Judgment*

Plaintiffs assert that the PA/PLO have not paid the judgment. Fair enough, but that is always the case when a defendant seeks Rule 60(b) relief and such a fact is not viewed as disqualifying. Plaintiffs then accuse the PA/PLO of "scofflaw"

behavior in connection with Plaintiffs' efforts to collect their judgment. Specifically, Plaintiffs fault the PA/PLO for defending an enforcement action in a New York state court and falsely imply that President Abbas has engaged in efforts to fraudulently convey PA assets from the reach of the Ungars.  Each of these allegations will be addressed in turn.

Plaintiffs characterize the PA/PLO as scofflaws because they appeared in a New York court "in order to oppose the Ungars' request for turnover of a mere $11,000."  Pl. Br. at 31.  The action, *Ungar v. Palestinian Authority* (New York Sup. Ct. Index  No. 105521/2005), involved the Ungars' attempt to interrupt international wire transfers in which the PA/PLO were either the transferor or transferee on the theory that the funds were PA/PLO funds as they passed through a U.S. intermediary bank even if the U.S. was neither the source nor destination of the funds.

Plaintiffs neglect to inform the Court that shortly after the application for an Order to Show Cause was filed, they withdrew their application.  JA430.  In any event, the Second Circuit recently held that electronic funds transfers cannot be attached while in the possession of an intermediary bank, vindicating the PA/PLO's general position that the attachment was improper.  *See Shipping Corp. of India Ltd. v. Jaldhi Oversas PTE Ltd.*, 2009 U.S. App. LEXIS 22747 (2d Cir. Oct. 16, 2009).

Plaintiffs also assert that "the Appellate Division of the New York Supreme Court recently found that **the PA committed a fraudulent conveyance** to the Palestine Monetary Authority" and imply that President Abbas, by authorizing the alleged conveyance, was "personally" involved in this purported "fraudulent" transaction. Pl. Br. at 32 (citing *Palestine Monetary Auth. v. Strachman*, 873 N.Y.S.2d 281, 289-90 (N.Y. App. Div. 2009)). The Ungars allege that the PA engaged in this so-called "fraudulent conveyance" when it approved PMA's decision to retain its 2005 profits rather than transferring those profits to the PA. This is a false allegation, but demonstrating so requires a little "inside baseball" discussion.

First, it is important to note that New York Debtor and Creditor Law on fraudulent conveyance does not contain a scienter requirement. Thus, a conveyance is deemed fraudulent if "made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him." *Id.* at 290 (quoting New York Debtor and Creditor Law § 273-a). In light of the presumption being applied, the suggestion that the PA acted "fraudulently" is extremely misleading, since it suggests some sort of intentional misconduct, which is not even what is alleged, much less what any court has found.

Second, the dispute between the Palestine Monetary Authority and the Ungars as to the significance of the Appellate Division decision is ongoing. There was no "fraudulent conveyance" issue before the Appellate Division on the merits; rather, the issue was the propriety of the trial court's denial of the Ungars' request for leave "to amend their counterclaim to assert a claim against the PA for fraudulent conveyance . . . because the PA had waived receipt of PMA's 2005 profits." *Id.* at 287, 288-90. After the Ungars appealed, the Appellate Division reversed and remanded, holding that "the PMA has the burden of proof on the issues of . . . its assertions that the PA has no property interest in the PMA profits." *Id.* at 294. As an appellate court, the Appellate Division could not make fact findings on the "fraudulent conveyance" issue, and certainly could not resolve factual issues that had not even been litigated below (such as whether the PA had any rights to the 2005 profits, the reason PMA retained the profits, the reason the PA agreed to the retention, etc.). Although the Appellate Division at one point opines that the "record fairly supports" a finding that the elements of a fraudulent conveyance claim had been satisfied (*id.* at 290), this comment occurred in the context of a decision permitting the claim to go forward and remanding to the trial court for development of the record. *Id.* at 288. The issue is now back before the Appellate Division. *See Palestine Monetary Authority v. Strachman*, New York

Sup. Ct. Index  No. 10777/2005, N.Y. App. Div. (Notice of Appeal filed April 30,

2009).

In sum, Plaintiffs' allegation that "there has been no change in Appellants'

conduct" or that the PA/PLO has engaged in bad faith is insupportable.  Entering

into a settlement agreement in *Knox*, actively engaging in discovery in a number of

the U.S. cases (*see* PA/PLO Br. at 22), obtaining the entry of a dismissal with

prejudice in *Biton*, and paying the *Bucheit* judgment (*id.* at 23 n.7) all reflect

marked changes in the PA/PLO's conduct of the U.S. litigation and display the

PA/PLO's good faith in its dealing with the U.S. courts and U.S. plaintiffs.

Plaintiffs expose their unreasonable bias against the PA/PLO by suggesting

otherwise.

## ARGUMENT

I.    **Plaintiffs Cannot Effectively Defend the District Court's Failure to
      Consider All of the Relevant Factors in Resolving the PA/PLO's Rule
      60(b)(6) Motion.**

The opening brief demonstrated how the district court abused its discretion

when it denied the PA/PLO's motion for Rule 60(b)(6) relief from a $116 million

default judgment by focusing only on the circumstances that led to its entry, rather

than on the many other extraordinary circumstances that warranted its vacatur.

Chief among the factors ignored by the district court was Appellants' meritorious

defense, which was supported by a detailed proffer raising the specter that the

default judgment erroneously makes the PA/PLO liable for an attack carried out by Hamas extremists, not by individuals acting with the support or under the direction of the PA/PLO. The opening brief also showed how the district court ignored the significant foreign and public policy consequences of rigidly adhering to a $116 million default judgment, which has impeded the PA's efforts to further normalize and strengthen its relations with the United States.

The PA/PLO's contention that Rule 60(b)(6) requires a district court to consider all of the relevant circumstances finds support from three sources -- (1) this Court's precedents, (2) the precedents from other federal courts around the country, and (3) two recent district court decisions granting vacatur under indistinguishable circumstances. *See* PA/PLO Br. at 26-43.

Notably, Plaintiffs make no attempt to defend the district court's single-factor analysis until page 57 of their brief, and even then, they abandon the First Circuit law on which the district court relied. This is unsurprising. As the opening brief showed, none of the First Circuit cases relied on by the district court supports the one-factor rule applied below. PA/PLO Br. at 30-34. Moreover, in *United States v. Parcel of Land with Building, Appurtenances*, 928 F.2d 1, 6 (1st Cir. 1991), this Court held that a district court must consider the existence of a meritorious defense in ruling on a Rule 60(b)(6) motion.

Having abandoned the First Circuit law on which the district court based its ruling, Plaintiffs cite new cases that supposedly permitted the district court to ignore PA/PLO's showing of extraordinary circumstances. Pl. Br. at 57-58. But Plaintiffs' new cases fare no better than the district court's. Like the cases relied on below, Plaintiffs' cases also arose from routine commercial disputes in which defaults had been imposed for the failure to meet filing deadlines and in which extraordinary circumstances warranting vacatur were not alleged or demonstrated.

For example, *KPS & Associates v. Designs by FMC*, 318 F.3d 1, 12 (1st Cir. 2003), was a routine breach-of-contract case that emphasized the importance of flexibility in the district court's analysis, refused to set forth any precise formula, and identified "no fewer than seven factors" that were relevant to the vacatur inquiry. Moreover, while the Court ultimately affirmed the denial of the vacatur motion, it did so after not only examining the circumstances that led to the default, but also after concluding that, although the district court had not expressly considered factors other than the circumstances that led to the default, it had at least implicitly reviewed and rejected the meritorious defense factor and all of the other relevant circumstances. *Id.* at 14-15.

Another case relied on heavily by Plaintiffs, *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnerships*, 507 U.S. 380, 382-83 (1993), addresses whether a party who had negligently failed to meet a bankruptcy

deadline could be permitted to submit a late filing upon a showing of excusable neglect under Bankruptcy Rule 9006(b)(1). *Id.* The Supreme Court held that the Bankruptcy Rule permitted relief under such circumstances, after extensively reviewing the "range of possible explanations for a party's failure to comply with a court-ordered filing deadline." *Id.* 387-88. By way of analogy, the Court noted that Rule 60(b)(1) permits a party to be relieved of the consequences of meeting a filing deadline upon a showing of "excusable neglect" within one year of the judgment. *Id.* at 393. The Court then contrasted that provision with Rule 60(b)(6). Because Rule 60(b)(6) has no one-year time limit, it requires a higher standard for relief from a filing deadline than does Rule 60(b)(1), such that a party generally must be "faultless" to secure relief. *Id.*

*Pioneer* cannot fairly be stretched to support either Plaintiffs' arguments or the judgment below. Nothing in *Pioneer* suggests the Court was seeking to rewrite the entire "extraordinary circumstances" doctrine of Rule 60(b)(6) in cases that did not involve disputes over why a party had missed a filing deadline. Nor has it been read so broadly by the many decisions granting vacatur discussed in the opening brief.

In their opening brief, the PA/PLO identified *Knox v. PLO*, 248 F.R.D. 420 (S.D.N.Y. 2008), and *Saperstein v. Palestinian Auth.,* No. 1:04-cv-20225, 2008 WL 4467535 (S.D. Fla. Sept. 29, 2008), as decisions that should guide the Court's

15

analysis because both decisions address the unique circumstances presented by the U.S. litigation involving the PA/PLO.  In granting vacatur, each of these cases not only utilized a multi-factored approach and relied heavily on Appellants' status as a foreign government, but also went on to specifically reject many of the same objections Plaintiffs have raised in their brief here.

Plaintiffs seek to distinguish or discount these cases, arguing that *Knox* was wrongly decided and in any event involved a younger default judgment and that *Saperstein* was merely a Rule 55 case that did not involve a judgment.  Pl. Br. at 60.  There is no merit, however, to the suggestion by Plaintiffs that the *Knox* decision ran afoul of Second Circuit precedent; to the contrary, the Court relied extensively on Second Circuit precedent holding that a showing of extraordinary circumstances can suffice to warrant relief from even a willful default.  *Knox*, 248 F.R.D. at 425-26.  Nor is there any hint in the *Knox* opinion that its multi-factor analysis would have come out differently if the judgment were slightly older.  *Saperstein*, moreover, made clear that its analysis was conducted in light of both Rule 55 and Rule 60(b)(6) factors.  2008 WL 4467535, at *9-11.

## II.    When All the Relevant Factors Are Considered, Vacatur Is Warranted.

Fairly examined, every factor relevant to the Rule 60(b)(6) analysis other than the one singled out by the district court weighs heavily in favor of vacating the judgment.

## A. The PA/PLO's Meritorious Defense Compels Vacatur.

Rather than vigorously defending the district court's failure to consider the meritorious defense factor, Plaintiffs instead ask the Court to "find that Appellants have failed to assert a meritorious defense." Pl. Br. at 70.

Plaintiffs rely principally on excerpts of anti-Arafat speeches by Congresswoman Ros-Lehtinen, former Congressman Lantos, and former Senator D'Amato and articles or studies produced by purported terrorism experts, almost all of whom are Israeli and at least some of whom (Ganor and Gold) have ties to the Government of Israel. *Id.* at 4-11. Leaving aside the reliability or probity of dated political diatribes against Arafat and the opinions of individuals who have clear allegiances to the Israeli side of the Israeli-Palestinian conflict, much of the quoted language consists of allegations that Arafat should have done more to control Hamas. By failing to adequately police and sufficiently root out Hamas from the area the PA allegedly controlled, Arafat is characterized as providing Hamas "sanctuary." *See id.* at 6-7. Such allegations, however, do not give rise to material support liability under the Anti-Terrorism Act, 18 U.S.C. § 2333.

Getting little mileage from the statements of the politicians and Israeli consultants and academics, Plaintiffs then imply that former PA security chief Jibril Rajoub "expressly admitted" PA support for Hamas terrorism. Plaintiffs provide an English translation of an excerpt of an interview given by Rajoub.

According to the translation, Rajoub stated: "We have never had a dispute with Hamas or anyone else regarding the principle of resistance." Pl. Br. at 13. Plaintiffs then assert: "Thus, while Appellants have political disputes with Hamas, on the issue of 'resistance' -- i.e., terrorism -- they are in agreement." *Id.* Plaintiffs thus attempt -- without argument -- to equate "resistance" with "terrorism" (attacks on unarmed civilians). This is not only unsupported, it is misleading. Resistance to an Occupation, so long as it is not targeted at civilians, is not terrorism, but is instead a right recognized under international law. *See, e.g.*, United Nations General Assembly, G.A. Res. 3103, 28 U.N. GAOR at 512, U.N. Doc. A/9102 (1973). History is replete with examples of national liberation movements that engage in legitimate forms of resistance.

While the PA/PLO disagree with Plaintiffs' factual contentions on the meritorious defense factor, and extensively briefed for the district court the flaws with Plaintiffs' arguments and assertions, JA654-66, the Court's task here is not to resolve the underlying merits of Plaintiffs' claims. The meritorious defense standard requires only that a litigant "give the trial court reason to believe that vacating the judgment will not be an empty exercise." *Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co.*, 953 F.2d 17, 20 (1st Cir. 1992). Thus, "a party's averments need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense." *Coon v.*

*Grenier*, 867 F.2d 73, 77 (1st Cir. 1989). The law is well-settled on this point, and Plaintiffs' brief does not even try to show otherwise.

With Plaintiffs having argued in their parallel lawsuit in Washington that the attack was the result of *Iran's* support of Hamas (*see* PA/PLO Br. at 52-53), with Plaintiffs recognizing on appeal that the PA/PLO's support of "Hamas terrorism during the relevant period is **very much** in dispute" (Pl. Br. at 4), and with even the district court acknowledging "[t]here is no question that . . . there are factual issues as to whether the Palestinian Authority and the PLO would be liable in this case if the case were heard on the merits" (JA947), there can be no legitimate debate that the PA/PLO satisfy the meritorious defense factor.

**B.    Plaintiffs Cannot Credibly Dispute that the Foreign and Public Policy Considerations, the Changing Political Dynamics of the PA and PLO, and the Size and Effect of the Judgment All Weigh in Favor of Vacatur.**

The opening brief also showed that foreign and public policy considerations, the changing political dynamics of the PA/PLO, and the size and effect of the judgment should have been factored into the Rule 60(b) analysis but were improperly ignored by the district court. PA/PLO Br. at 43-51. In response, the Plaintiffs have little to say, other than to mistakenly assert that foreign and public policy factors can be considered only when the defaulting party is also a foreign sovereign (a point anticipated and refuted in PA/PLO Br. at 40), to question whether the PA and PLO have really "changed" (Pl. Br. at 33-37), and to question

19

whether the effect of $116 million default judgment obligation is really a very serious burden on the Palestinian government because it has not yet collapsed as a result of the on-going enforcement proceedings.  *Id.* at 25-30.  The latter two points were previously addressed.  *See supra* pp. 4-12.

But the simplest response to these arguments are the rulings setting aside a default judgment and a default in both *Knox v. PLO*, 248 F.R.D. 420 (S.D.N.Y. 2008), and *Saperstein v. PA,* 2008 WL 4467535 (S.D. Fla. Sept. 29, 2008).  Each of these decisions relied heavily on these same factors in setting aside a deliberate default.  *See* PA/PLO Br. at 40-51.

### C.    The Prejudice Asserted by Plaintiffs Is Too Speculative to Support a Denial of Vacatur.

Another factor that should have been fully considered by the district court was the likelihood of cognizable prejudice in light of vacatur.  Although this factor was not seriously analyzed by the district court, Plaintiffs repeatedly invoke it here, imploring the Court not to vacate the default judgment because they could never prove their case in a court of law.  Pl. Br. at 38, 55.  As items of prejudice, Plaintiffs claim to have been deprived by the default of calling a number of former employees of the Palestinian government as witnesses, and of the opportunity to secure documentary evidence from Gaza.  *Id.* at 38-55.

Plaintiffs begin their analysis of the prejudice factor by claiming that the district court's one-paragraph aside about how vacatur would supposedly result in

prejudice constituted a "fact-finding," which should alone serve to warrant affirming the judgment.  *Id.* at 39.  But the district court's cursory paragraph on prejudice, which did nothing more than repeat Plaintiffs' allegations and did not consider any ways to mitigate prejudice, was immediately qualified by the following statement:  "analysis of the prejudice to plaintiffs and the other *Superline* factors is not determinative to the Court's decision herein because, in the First Circuit, a litigant's strategic choice to default *precludes* a finding of exceptional circumstances under Rule 60(b)(6)."  Add.22 (emphasis added).  The district court's own order thus refutes Plaintiffs' "alternative ground" theory on its face.

Plaintiffs' more substantive contention is that the existence of prejudice, even though not weighed into the calculus by the district court, should nonetheless be considered in their favor by this Court.  The problem with this argument, however, is that Plaintiffs' assertions of prejudice are entirely speculative and could be easily mitigated by less severe sanctions, just as the courts in both *Knox* and *Saperstein* concluded.

In the first place, the plaintiffs still make no effort to reconcile their speculation that they would be unfairly prejudiced with the fact that other U.S. plaintiffs currently are litigating cases against the PA/PLO, without any apparent prejudice, relating to terrorism attacks from the 2000-2004 period, including attacks that -- unlike the one at issue in this case -- occurred in Gaza.  *See*

*Saperstein,* 2008 WL 4467535, at *13 (holding that prejudice factor weighs in favor or vacating default); *see also Estate of Parsons v. Palestinian Auth.*, No. 1:07-cv-01847 (D.D.C.) (Anti-Terrorism Act case arising out of 2003 bombing attack in Gaza).

Nor do Plaintiffs attempt to reconcile their prejudice arguments with the decision in *Saperstein*, a case that involved a shooting in Gaza, but where the court rejected plaintiff's claims that he would be prejudiced by loss of evidence resulting from the passage of time and the unrest in Gaza.  Instead, the court found that the prejudice factor weighed in favor of vacatur:  it is "undisputable that most discovery difficulties that might arise in this case will be attributable not to the delay caused by the default, but to the difficulties that inevitably arise in cases involving incidents occurring, and involving parties residing, in foreign lands.  Exacerbating these difficulties in this case, is not the fact of default, but the on-going political instability and strife in the area." *Saperstein*, 2008 WL 4467535, at *13.  *See also Knox*, 248 F.R.D. at 429 (rejecting same contention with regard to purported prejudice from loss of access to Gaza).

Plaintiffs also do not reconcile their prejudice claims with the fact that their litigation against Iran gave them every incentive to fully investigate and secure whatever evidence existed to support their claims of liability.  Nor do Plaintiffs even acknowledge that the district court possesses a variety of measures, short of

resolution of the case by default, to address any specific prejudice that might arise
out of vacatur. *See Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 515-16 (2d Cir.
2001); *cf.* 10A Charles Alan Wright, *et al.*, *Federal Practice and Procedure*
§ 2700, at 170-71 (1998) ("The imposition of conditions as part of granting a Rule
55(c) motion can be used to rectify any prejudice suffered by the nondefaulting
party as a result of the default and the subsequent reopening of the litigation.").
*See also Knox*, 248 F.R.D. at 432 (imposing conditions on vacatur); *Saperstein*,
2008 WL 4467535, at *16-17 (same).

Plaintiffs also fail to assert any colorable theory as to how the individuals
they describe as "critical witnesses" would have been available to them in the first
place, or would have been even remotely likely to present information that would
have been favorable to their case. Simply labeling individuals as "witnesses" and
pointing to their unavailability cannot establish cognizable prejudice. Rather, with
regard to someone like Arafat, who features prominently in Plaintiffs' prejudice
discussion, Plaintiffs would need to at least articulate some basis to believe that
Arafat's deposition, noticed in 2003 (*see* Pl. Br. at 40), would have occurred
despite his illness and that such a deposition would have yielded information that
could not have been gleaned from other sources. Plaintiffs' discussion ignores
these critical matters. Plaintiffs, for example, have nothing to say about the fact
that they remain free to discover and present evidence of Arafat's purported

involvement in the Hamas shooting from a variety of other sources, including

materials that may be available from the Israeli government, or from documents

secured by the Israeli government during its incursions into Palestinian territory.

As to the other three individuals who are purported to be former PA or PLO

employees, Pl. Br. at 43-48, Plaintiffs fail to address the fact that they remain as

free to seek their testimony as they were before vacatur.  Plaintiffs' sole contention

on this point is that these individuals are no longer "employed" by the PA and

PLO, *see id.*, but this cannot suffice to establish cognizable prejudice.  Plaintiffs

had no right under the Federal Rules of Civil Procedure to have "employees"

produced by the Defendants simply on the basis of their employment status.  *See*

*Stone v. Morton Int'l, Inc.*, 170 F.R.D. 498, 500 (D. Utah 1997).  Rather, the PA

and PLO would have been required under the pertinent rules to produce the

individuals within the organization who are most knowledgeable on relevant

subjects identified by Plaintiffs, and they will remain so obligated if the default

judgment is vacated.  *See* Fed. R. Civ. P. 30(b)(6).  Such testimony will more than

suffice to ensure that Plaintiffs receive testimony from the persons within the PA

and PLO with any relevant knowledge of the matters related to this lawsuit, and are

not prejudiced by the vacatur of the default judgment.

## III. Plaintiffs' Procedural and Other Arguments for Affirmance Lack Merit.

Apart from arguments with regard to the various factors that must be considered in a Rule 60(b)(6) motion, Plaintiffs also assert a host of procedural and other purported impediments to relief. None of these were relied on by the Court below, and none has any merit.

### A. The Motion to Vacate Was Timely.

Plaintiffs assert in their brief that the motion to vacate came too late. Pl. Br. at 62-69. No time limit exists for Rule 60(b)(6) motions, so long as they are brought within a reasonable time. Fed. R. Civ. P. 60(c)(1).

In their motion to vacate, the PA/PLO detailed why the timing of their motion was reasonable under the circumstances. JA97-98. In the face of these arguments, the district court never questioned the timing of the motion, and never suggested that it had not been brought within a reasonable time. Because the district court made no adverse ruling on the timing question, the PA/PLO did not address the issue in their opening brief. Nonetheless, Plaintiffs now assert that Appellants have somehow "abandoned" their arguments below. Pl. Br. at 62-63. But the PA/PLO were under no obligation to explain why the motion was timely, given the lack of any adverse ruling. The notion that the PA/PLO cannot be heard to respond to Plaintiffs' timeliness arguments because they did not affirmatively

address in their opening brief a ground never relied on by the district court is difficult even to understand, and has no merit whatsoever.

The motion to vacate the default judgment in this case was preceded by a variety of unique and extraordinary challenges. PA/PLO Br. at 11-16; *see also* JA68-69, JA97-98. Those included changing the institutional nature of the Palestinian government so that it could not only move to vacate a default judgment, but also so that it could effectively defend the litigation on the merits if the default was vacated. These challenges also involved ensuring that sufficient resources were set aside for dealing with this costly international litigation -- a task that included finding and retaining new counsel, and setting up institutional structures for dealing with extensive American discovery conducted approximately 7000 miles from the courthouse. Once the PA/PLO had begun to confront these challenges and retained new counsel, the vacatur motion was filed within six months of counsel's undertaking representation in all the cases.

As the PA/PLO explained in their vacatur motion, after being retained in May 2007, new counsel "immediately began the task of moving to vacate defaults and default judgments in various courts around the country. At the same time, counsel was required to defend on-going damages proceedings, respond to discovery in these cases, and to investigate the availability of meritorious defenses." JA98. This investigation was complicated by the existence of parallel

cases, such as the one filed in the District of Columbia by Plaintiffs here.  Given

the substantial effort entailed in filing six vacatur motions, all of which required

extensive research into often complex procedural histories and the investigation of

meritorious defenses, it is not unreasonable that it took counsel until the end of the

year to file all of the vacatur motions.

Plaintiffs criticize even this effort, however, also claiming that Appellants

should be faulted for representing in August 2007 that they would file their vacatur

motion "soon" in this case, but did not actually file until December 2007.   Pl. Br.

at 67-68.  Appellants will leave for this Court whether that is "soon" or not under

the circumstances, for a motion with as complicated a history as that presented

here.  Plaintiffs also claim that Appellants' counsel admitted in August 2007 "that

they **delayed filing of their Rule 60(b) motion for their own strategic purposes**

-- i.e. to lobby the State Department to submit a statement of interest. . . ." *Id.* at

68.  Although the referenced affidavit refers to "efforts to gain State Department

support," it says nothing about those efforts affecting the timing of the motion.  *See*

JA622 (noting it "is difficult to assess the likelihood of success on the motion as

we cannot assess what position, if any, the United States Department of State will

take on the Motion").  Counsel proceeded to file vacatur motions throughout the

fourth quarter of 2007 without awaiting a U.S. Statement of Interest.

**B.      Granting Relief Would Not Implicate This Court's Prior Rulings.**

Plaintiffs also argue that this Court has at least implicitly foreclosed the

possibility of Rule 60(b)(6) relief in its prior rulings.  Pl. Br. at 56.  As Plaintiffs'

concede, however, the district court did not reach this argument, *id.* at 57, and for

good reason:  It is meritless.  At bottom, Plaintiffs' contention glosses over the

basic difference between an appeal from the judgment and the post-judgment

procedures contained in Rule 60(b).

The Supreme Court made clear in *Standard Oil Co. v. United States*, 429

U.S. 17, 18-19 (1976) (*per curiam*), that an appellate court's affirmance of a

judgment says nothing about whether the trial court can grant relief based on a

post-judgment showing sufficient to satisfy Rule 60(b).  As the Court explained:

> Like the original district court judgment, the appellate mandate *relates
> to the record and issues then before the court, and does not purport to
> deal with possible later events*.  Hence, the district judge is not
> flouting the mandate by acting on the motion.

*Id.* at 18 (emphasis added).

Just as in *Standard Oil*, the crux of Appellants' Rule 60(b)(6) motion was

that a variety of factors that were never before this Court or the district court --

namely, the strength of the meritorious defense, the changing nature of the

Palestinian leadership and the foreign and public policy factors that support vacatur

-- constituted "extraordinary circumstances" that now warranted vacating the

default judgment.  There can be no reasonable argument that this Court's ruling

28

either expressly or implicitly addressed these matters. *See DeWeerth v. Baldinger*,
38 F.3d 1266, 1271 (2d Cir. 1994) (Rule 60(b) motion based on changed
circumstances permissible unless appellate court expressly or implicitly addressed
those changed circumstances in its ruling).

This Court's decision on appeal thus cannot prevent plenary consideration of
the extraordinary circumstances presented in this Rule 60(b) motion. The only
limitation on relief imposed by the appellate court litigation is that the Rule 60(b)
motion must be supported by circumstances not before the appellate court in the
direct appeal. That is precisely the situation here. *Knox*, 248 F.R.D. at 426
(rejecting virtually identical argument); *LSLJ P'ship, v. Frito-Lay, Inc.,* 920 F.2d
476, 478-79 (7th Cir. 1990) (district court abused discretion by refusing to consider
vacatur motion based on incorrect belief that affirmance of judgment made Rule
60(b) relief improper).

# CONCLUSION

The district court's denial of the PA/PLO's motion for relief from the final default judgment should be reversed, and the matter should be remanded to the district court for proceedings on the merits.

Respectfully submitted,

_____s/ Mark J. Rochon_____
Mark J. Rochon (1st Cir. Bar No. 97714)
 *Counsel of Record*
Miller & Chevalier Chartered
655 Fifteenth St., N.W.
Washington, D.C. 20005
(202) 626-5800

Deming E. Sherman (1st Cir. Bar No. 31908)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200

November 5, 2009          *Counsel for Defendants-Appellants*
*The Palestinian Authority and the Palestine*
*Liberation Organization*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

XX   this brief contains 6,948 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

___ this brief uses a monospaced typeface and contains [*state the number of lines*] of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because:

XX   this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point font in Times New Roman, or

___ this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

November 5, 2009                    ___s/ Mark J. Rochon_____
                                    Mark J. Rochon

                                    C*ounsel for the Palestinian Authority and the Palestine Liberation Organization*

31

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2009, I electronically filed the

foregoing **Reply Brief for Appellants** with the Clerk of Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

David J. Strachman
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903

s/ Mark J. Rochon
Mark J. Rochon