1

2                IN THE UNITED STATES DISTRICT COURT

3                   FOR THE DISTRICT OF RHODE ISLAND

4

5    * * * * * * * * * * * *    C.A. NO. 00-105L
     EFRAT UNGAR, et al       *
6                             *
     VS.                      *    NOVEMBER 17, 2010
7                             *    2:09 P.M.
     THE PALESTINIAN          *
8    LIBERATION ORGANIZATION,*
     et al                    *
9                             *    PROVIDENCE, RI
     * * * * * * * * * * * *
10

11

12            BEFORE THE HONORABLE RONALD R. LAGUEUX

13                          SENIOR JUDGE

14              (Motion for Preliminary Injunction)

15                           VOLUME I

16

17   **APPEARANCES**:

18

19   FOR THE PLAINTIFFS:    MAX WISTOW, ESQ.
                            Wistow & Barylick Incorporated
20                          61 Weybosset Street
                            Providence, RI  02903
21
                            DAVID J. STRACHMAN, ESQ.
22                          McIntyre Tate & Lynch LLP
                            321 South Main Street
23                          Suite 400
                            Providence, RI  02903
24

25

1    FOR THE DEFENDANTS:        DEMING E. SHERMAN, ESQ.
                                Edwards Angell Palmer & Dodge LLP
2                               2800 Financial Plaza
                                Providence, RI 02903
3
                                MARK J. ROCHON, ESQ.
4                               BRIAN A. HILL, ESQ.
                                Miller & Chevalier Chartered
5                               655 Fifteenth Street
                                Suite 900
6                               Washington, D.C.  20005-5701

7
     Court Reporter:           Debra D. Lajoie, RPR-FCRR-CRI-RMR
8                              One Exchange Terrace
                               Providence, RI 02903
9
                       Proceeding reported and produced by
10                          computer-aided stenography

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

3

**E X H I B I T S**

4

5

6      **DEFENDANT**                                    **FOR ID**        **IN FULL**

7

           1                                                            14
8          2                                                            15
           3                                                            16
9          4                                                            17
           5                                                            18
10         6                                                            20
           7                                                            24
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    17 NOVEMBER 2010 -- 2:09 A.M.

2              THE COURT:  The matter before the Court is the

3    Estate of Yaron Ungar, et al v. The Palestinian

4    Authority, et al.

5              It is here on Plaintiff's-Judgment Creditor's

6    urgent motion for a temporary restraining order, which

7    was issued, and now a preliminary injunction today.

8              I will hear this matter on permanent injunction

9    if both sides agree today.  If they don't agree, then

10   depending on what I do with this motion, I'll set it

11   down for hearing on permanent injunction in about three

12   weeks.  So if you want to try it twice, that's fine

13   with me.

14             Will the attorneys identify themselves for the

15   record.

16             MR. WISTOW:  Max Wistow for the Plaintiffs.

17             MR. ROCHON:  Good afternoon, Your Honor.

18   Mark Rochon on behalf of the Defendants.  With me is

19   Brian Hill.

20             MR. HILL:  Good afternoon, Your Honor.

21             MR. STRACHMAN:  David Strachman for the

22   Plaintiffs.

23             MR. SHERMAN:  Deming Sherman for the Palestinian

24   Defendants.

25             MR. WISTOW:  Did Your Honor want a response now

1    to the question about the permanent injunction?

2              THE COURT:  Yeah.  Do you want to talk to

3    somebody about it first?

4              MR. WISTOW:  No.  I think we're in a position to

5    agree to consolidating the hearings.

6              MR. ROCHON:  So are we, Your Honor.

7              THE COURT:  I'm sorry?

8              MR. ROCHON:  So are we.

9              THE COURT:  All right.  So I'll hear this

10    matter, then, on permanent injunction.

11              MR. WISTOW:  May I -- forgive me, Your Honor.  I

12    spoke rather hastily.  May have one moment to confer

13    with my brother?

14              THE COURT:  Yes.

15              Your Honor, let me express my concern about the

16    issue.  We're down for trial January 18th, as

17    Your Honor knows, on the motion to vacate.

18              If -- as I understand it now, if a preliminary

19    injunction is issued or not issued, there's an ability

20    to take an appeal to the First Circuit on the

21    preliminary injunction issue, but that would not divest

22    the Court of jurisdiction to have the hearing on the

23    18th on the underlying matter of the motion to vacate.

24              What I'm concerned about is, if there is a

25    permanent injunction entered in the case, I'm really

1    unclear, frankly, about, if there's an appeal from a

2    permanent injunction, would that divest the Court

3    entirely of its jurisdiction, and then we would mess up

4    the hearing date, arguably, in January.  So I have to

5    confess my ignorance of the issue.

6         What I really am very anxious to do is have the

7    hearing in January, and I don't want to do anything

8    that would --

9         THE COURT:  This is an ancillary matter, it

10   seems to me, and if there is an appeal pending in this

11   ancillary matter, I don't think it would prevent -- I

12   don't think the Court of Appeals would conclude that I

13   couldn't go forward with the hearing on the motion to

14   vacate.

15        MR. WISTOW:  I'm wondering if counsel for the

16   Defendants would agree that jurisdiction would remain

17   in this Court so that we could have the hearing in

18   January because I'm very, very concerned about that

19   issue.

20        MR. ROCHON:  Your Honor, it's -- I don't know if

21   you prefer us at counsel table or at the lectern when

22   we address the Court.

23        Your Honor, I don't know what the law is on

24   that, frankly.  It hadn't -- I don't think it's going

25   to be different depending on whether it's a preliminary

1   injunction or a permanent injunction if there's an
2   appeal, so that I --
3       THE COURT:  Well, I don't think there could be
4   an appeal if I issue a preliminary injunction.
5       MR. ROCHON:  Your Honor --
6       THE COURT:  I think that's not appealable.  It's
7   interlocutory.
8       MR. ROCHON:  -- it is our view that it's more
9   efficient to combine the proceedings, as I said.
10      I take no position on jurisdiction because I
11  just don't know, and the Appellate Court's not going to
12  let me decide that issue.  The First Circuit's not
13  going to come to me and say, Tell us about our
14  appellate jurisdiction.  It's our view that we should
15  go forward on the 18th, as scheduled.  It's our view
16  that we should have the combined hearing today.
17      MR. WISTOW:  Would it be possible, Your Honor --
18  forgive me, I just didn't anticipate this would come
19  up.  Would it be possible to have the hearing on
20  preliminary injunction and then get back to the Court
21  within 48 hours on the issue of whether or not it could
22  be consolidated?
23      MR. ROCHON:  All I'm asking is to know what I'm
24  doing.  I'm either having a combined hearing or I'm
25  not.  I think we should know that before we start.

1        So I don't think it takes away the jurisdiction.

2    I'll tell you that.  It's my view it does not.  I'm

3    just saying that, if we file a notice of appeal and the

4    First Circuit decides it does, we got an issue.

5        I frankly think it's pretty clear.  It's an

6    ancillary matter.  It would not divest you of

7    jurisdiction to have the hearing on the 18th.  I

8    haven't researched it, and it's not my call.  Appellate

9    jurisdiction is going to be decided by that Court, not

10   by me, that's for sure.

11       But I do feel that we should know before we

12   begin the hearing whether it's a combined hearing or

13   not.

14       MR. WISTOW:  May I suggest this, Your Honor?  By

15   statute, the grant of the preliminary injunction is

16   appealable by statute.

17       THE COURT:  It is?

18       MR. WISTOW:  Yes, it is.

19       But the Court would not be divested of its

20   jurisdiction on the underlying matter.  What I'm

21   worried about is I haven't looked at the law on

22   permanent injunction, and I'm just -- nothing would be

23   worse for the Plaintiffs than to have this matter put

24   over from the January hearing date because there's an

25   appeal one way or the other.

1          I apologize to the Court for my ignorance, but I

2    hope you understand how significant this is.

3          THE COURT:  Well, do you think you can find a

4    quick answer?  I can take a short recess and think

5    about it myself because, frankly, over the years I have

6    not consolidated these hearings.  I have heard it on

7    preliminary injunction and issued my decision on

8    preliminary, and whether it's granted or denied, I set

9    it down on permanent injunction, and usually the case

10   has gone away by then.

11         MR. WISTOW:  Well, would it be possible, as a

12   compromise, to, if we're successful in getting a

13   preliminary injunction today, holding a decision on

14   whether or not it's permanent until the January

15   hearing?  That would solve my concern completely.  And

16   I think it would accomplish what everybody desires

17   anyway.

18         THE COURT:  I could put it over.  If I hear it

19   on preliminary, I can put over any hearing on the

20   permanent injunction until after I've heard the motion

21   to vacate.

22         MR. WISTOW:  I would very much be in favor of

23   that.

24         THE COURT:  I forgot to bring in my notebook.

25   Can you go and get me a notebook?

1      All right.  We'll hear it on preliminary

2  injunction, and we'll see where we go from there.

3          MR. WISTOW:  Thank you, Your Honor.

4          THE COURT:  I learned something today.  I always

5  thought that the issuance of a preliminary injunction

6  was not appealable because it was interlocutory.  But

7  now that I think about it, I've had some cases where

8  there's been appeal after I've issued a preliminary

9  injunction.  It's different in the State Court than it

10  is in the Federal Court.

11          MR. WISTOW:  Yes.

12          THE COURT:  Sometimes things come back to me

13  from my State Court years.  I spent 18 years on the

14  State Court and now 24 years on this Federal Court, so

15  I've completed 42 years as a Trial Judge last June.  I

16  thought I had seen about everything.  There's always

17  something new every day.

18          Do you intend to offer any evidence,

19  Mr. Strachman -- Mr. Wistow?

20          MR. WISTOW:  Only documentary evidence.

21          THE COURT:  Do you want to make an opening

22  statement before you submit the evidence?

23          MR. WISTOW:  Well, what I was planning to do is

24  make an argument and submit the documents as I spoke,

25  if that's all right with the Court.

1          THE COURT:  All right.

2          MR. WISTOW:  Shall I proceed, Your Honor?

3          THE COURT:  Just wait for my notebook so I can

4     take notes.

5          The Elmo is not working.

6          THE CLERK:  So we'll have to do it the

7     old-fashioned way.

8          THE COURT:  The old-fashioned way is --

9          MR. ROCHON:  That's the best.

10         THE COURT:  We don't have any witnesses, so

11    that's not a problem.

12         All right.  Go ahead.

13         MR. WISTOW:  Thank you, Your Honor.  We're here

14    on a very narrow and circumscribed issue.  Your Honor

15    issued a temporary restraining order, the operative

16    provisions of which were that the Palestinian

17    Authority, which is a judgment debtor in this case, and

18    I quote, Shall be and hereby is prohibited from taking

19    any actions to collect or compel payment of any debt

20    owed by Orascom to the Palestine Investment Fund

21    pending the hearing on and disposition of the motion

22    for the preliminary injunction.

23         And I just want to emphasize how narrow the

24    relief is we're looking for today.  We're asking only

25    for an injunction to run against the Palestinian

1    Authority.  We are not asking for an injunction against

2    Orascom.  We're not asking for an injunction against

3    the Palestine Investment Fund.

4         What we're asking for is the Court's

5    intervention to help protect the Plaintiffs from

6    obstruction by the Palestinian Authority, the

7    Defendant, from interference really with two judgments

8    entered by this Court, not merely the original default

9    judgment, but a subsequent judgment on the Creditor's

10   Bill.

11        And if I may go back historically, and I know

12   Your Honor will recall this, but just very briefly, the

13   original default judgment for the approximate amount of

14   $116 million was --

15        THE COURT:  Actually, it was about six different

16   judgments, wasn't it?

17        MR. WISTOW:  You're -- what we've done is we've

18   fallen into the trap of referring it as to one

19   judgment.  Your Honor is right.  There were multiple

20   Plaintiffs, each one had a separate judgment, for a

21   total of approximately $116 million.  But Your Honor is

22   precisely right, there were multiple judgments.

23        In any event, for ease of description, I'm going

24   to continue with my error, with the Court's permission,

25   of referring to it as if it were one judgment, which

1    indeed it was not.

2         THE COURT:  All right.

3         MR. WISTOW:  In any event, the $116 million

4    judgment was entered by this Court on July 13th of

5    2004.  The Defendants, Palestinian Authority and

6    Palestinian Liberation Organization, have been

7    represented by counsel throughout the proceedings and

8    up to the time of the default, and indeed there was an

9    appeal to the First Circuit, which affirmed

10   Your Honor's judgment on March 31st of '05.

11   Subsequently, the United States Supreme Court denied

12   *certiorari* on the request of the Defendants.

13        Almost exactly two years later, the Plaintiffs

14   came to the Court with a Creditor's Bill, and in the

15   Creditor's Bill, they asked this Court to transfer

16   ownership to the Plaintiffs of the stock ownership that

17   the Defendant Palestinian Authority had in a

18   corporation called the Palestinian Investment Fund.

19        On September 19th, 2006, Your Honor granted a

20   judgment in that Creditor's Bill, a final judgment.

21   Counsel, in the person of Mr. Sherman who's here today,

22   was present on that day that Your Honor decided to

23   grant the relief.

24        What I'd like to do is hand up to Your Honor,

25   just for the sake of expedition, copies of that final

1    judgment because there's something important in it that

2    I would like to point out to the Court.  With the

3    Court's permission, may I --

4         THE COURT:  Let's mark it as an exhibit.  We'll

5    mark it Plaintiffs' Exhibit 1.

6                        (Plaintiffs' Exhibit No. 1
                          was admitted in full).
7

8         MR. WISTOW:  Now, I'd like to refer Your Honor

9    to the last page of that judgment.  The judgment

10   incorporated certain documents within and is a part of

11   the judgment.  The very last page is a certificate of a

12   public shareholding company, and what's critical for

13   purposes of our hearing this morning is the

14   identification of the shareholders in the Palestine

15   Investment Fund.

16        It's clearly identified who the shareholders

17   are, the Palestinian National Authority, which is

18   another name that the Palestinian Authority is known

19   by.  So at the moment that Your Honor granted the

20   Creditor's Bill, the sole shareholder of the

21   Palestinian Investment Fund was the Palestinian

22   Authority.

23        Indeed, I have a copy of the Articles of

24   Association, as they existed at that time, which I also

25   would like to hand up to Your Honor.  This is not a

1   complete copy.  They're rather lengthy.  I just took

2   the applicable page.

3          THE COURT:  Let's mark it Plaintiffs' Exhibit 2.

4                     (Plaintiffs' Exhibit No. 2
                    was admitted in full.)
5

6          MR. WISTOW:  Now, as Your Honor will see, on the

7   second page of the Exhibit, which is actually the 11th

8   page of the document, in Paragraph No. 1.47, there's a

9   definition of the shareholder, which is totally and

10  completely consistent with the judgment Your Honor

11  entered.  It says, Shareholder means the Palestinian

12  National Authority acting through its successor as the

13  holder of the outstanding shares.

14          So that's where we stood.  At the time

15  Your Honor turned the shares over in the Creditor's

16  Bill to the Plaintiffs, the shareholder was the

17  Defendant, Palestinian Authority.

18          Now, something happened thereafter that's

19  critically important and helps show why we need

20  protection against the Palestinian Authority in terms

21  of their frustrating our ability to collect both the

22  underlying judgments for the $116 million, plus the

23  Creditor's Bill.

24          On November 28th, 2006, the President of the

25  Palestinian Authority and the Executive Officer of

1      the -- well, the Chairman of the Executive Committee of

2      the Palestinian Liberation Organization, Mahmoud Abbas,

3      wrote a letter to Dr. Condoleezza Rice, who was at that

4      time the Secretary of State of the United States,

5      regarding this very lawsuit.

6             Now, Your Honor, this letter now is two months

7      following the Creditor's Bill where Your Honor made the

8      award, and this document of course has been produced to

9      us by the Defendants.  May I --

10            THE COURT:  We'll mark it Plaintiffs' Exhibit 3.

11

12                              (Plaintiffs' Exhibit No. 3
                                 was admitted in full)

13            MR. WISTOW:  The most critical portion of the

14     letter, Your Honor, is the first paragraph and the last

15     paragraph on the second page.

16            THE COURT:  All right.

17            MR. WISTOW:  So, as Your Honor can see, as of

18     November 28th, 2006, the President of the Defendant PA

19     and the Chairman of the Executive Committee of the

20     Defendant PLO was completely and fully aware of what

21     had been taking place in Your Honor's Court.  In fact,

22     the letter does everything but name you by name.  It

23     describes the dates that everything happened.

24            And what is also significant in the letter, and

25     I'll refer back to it later, is the fact that President

1    and Chairman Abbas refers to the PIF in the second

2    paragraph, the second sentence.  He talks about the PIF

3    being incorporated in 2003, and then he flat out says,

4    It falls under the supervision of my office.  The PIF

5    falls under the supervision of his office is what he

6    told Condoleezza Rice at that time.

7            Now, Secretary Rice wrote back to

8    President Abbas in response to this letter about two

9    weeks later, on January 12th, 2007, and if I might hand

10   it up to Your Honor.

11           THE COURT:  Plaintiffs' Exhibit 4.

12                              (Plaintiffs' Exhibit No. 4

13                               was admitted in full)

14           MR. WISTOW:  So, as Your Honor sees, two weeks

15   after Mr. Abbas asked Condoleezza Rice for her, quote,

16   Kind assistance in addressing this serious matter, she

17   wrote back and in very diplomatic fashion indicated

18   that, while she was sympathetic, there was nothing she

19   could do about it, presumably because of the separation

20   of powers that we have in the United States and the

21   fact that we have an independent judiciary, and she

22   urged that the PA meet with the opposing side to see if

23   there's possibly some out-of-court resolution that

24   could be made but effectively declining to do anything.

25           Then, after getting this letter and

1    approximately two weeks later, actually, less than two

2    weeks later, the Palestinian Authority decided to do

3    something to frustrate Your Honor's order.  And what

4    the Palestinian Authority did was it changed the

5    stockholder.  It ceased being the shareholder of the

6    Palestinian Investment Fund by a Presidential

7    proclamation on January 27th -- let me get the precise

8    date -- January 27th, 2007.

9         And what I have is the Presidential decree of

10   Abbas, which was issued about nine days -- excuse me --

11   approximately 15 days after Secretary of State

12   Condoleezza Rice declined to be of any assistance.

13        And with permission, I'd like to hand that up to

14   Your Honor.

15        THE COURT:  We'll mark it Plaintiffs' 5.

16
                         (Plaintiffs' Exhibit No. 5
17                        was admitted in full)

18        MR. WISTOW:  Now, on Page 3 of the document

19   you'll see, in the Article 6, that the shares are no

20   longer owned by the Palestinian Authority, they're now

21   owned, fully owned by the Palestinian people,

22   represented by the President of the PNA.

23        On Page 4 of the document, Your Honor will note

24   that, under Article 8, Paragraph 1 on Page 4, it

25   reiterates what is very clear from the prior page, The

1    company shares are registered in the name of the

2    Palestinian people, represented by the President of the

3    PNA.  No longer is the PA the shareholder.

4         Furthermore, the President of the Palestinian

5    Authority completely runs this entity under these

6    bylaws.  For example, on Page 8, Article 10, The Board

7    of Directors comprising of seven members, including the

8    Chairman, assumes management of the company.  The Board

9    of Director members are thereto assigned by the

10   President of the PNA according to merits of efficiency

11   and experience.

12        Under Article 11, The President of the PNA shall

13   appoint the Board of Director Chairman and his deputy.

14        On Page 12, Your Honor, Article 12 -- excuse

15   me -- Article 20 on Page 12, The company Chief

16   Executive Officer shall be appointed and relieved of

17   his duties as per decision by the President of the PNA.

18        Finally, Your Honor, on Page 15, you'll see that

19   the, quote, General Assembly of the company, which is

20   Article 24 on Page 15, The company General Assembly

21   comprises of the President of PNA *ex-officio*, as

22   representative of the Palestinian people.

23        And then it goes on to say that the decisions of

24   everything of interest to the company is decided by the

25   General Assembly.  Effectively, the President of the

1    PNA runs the Palestinian Investment Fund.

2         But more important than that, Your Honor, is

3    the -- what appears to be a frank fraudulent transfer

4    of the ownership of the Palestinian Investment Fund

5    following Your Honor's turning over that ownership to

6    the Plaintiffs.

7         Interestingly enough, Your Honor, the

8    Palestinian Authority, when it suits them, when it

9    suits them, claims that the investments in the PIF

10   belong directly to the PA, as opposed to what's being

11   said now, that they belong to the Palestinian

12   Investment Fund.

13        And the basis for that statement, Your Honor, is

14   when the Plaintiffs' Creditor's Bill was filed back in

15   2006, attached to that -- and I'll hand it up for the

16   Court's convenience -- attached to the Creditor's

17   Bill --

18        THE COURT:  Plaintiffs' 6.

19
                              (Plaintiffs' Exhibit No. 6
20                             was admitted in full)

21        MR. WISTOW:  -- was an affidavit that had been

22   supplied by an Israeli lawyer.  The affidavit is of one

23   Nadim al-Barahama, who, in an Israeli terrorist

24   proceeding, identified himself as legal counsel for the

25   Palestinian Office of Finance.

1    And he made the affidavit -- I don't know if

2    Your Honor is able to locate it.  It's -- these are,

3    unfortunately, unnumbered pages.  It's about midway

4    through, it's entitled, Affidavit.

5    And what he says, what Barahama says, is that he

6    makes the affidavit on the motion -- in support of the

7    motion of the Palestinian Authority to vacate an order

8    of attachment that was entered against its property,

9    and as I say, this was in an Israeli anti-terrorist

10   proceeding.

11   And what he says in Paragraph 5, is, Likewise,

12   the Palestinian Authority has investments worth at

13   least $600 million in various companies, including the

14   Algerian, Jordanian and Tunisian communication

15   companies, the Palestinian cement company, as well as

16   hotels, banks, airlines, real estate ventures and the

17   like.

18   And then he says, A copy of the appendix to the

19   report by the Standard & Poor's Company regarding

20   assets of the Authority, assets of the Authority, is

21   attached hereto as Appendix A as an inseparable part of

22   my affidavit.

23   And that Appendix shows -- it's on the

24   letterhead of the Palestinian Investment Fund and lists

25   all of the investments that are in the Palestinian

1    Investment Fund.

2            So when the PA wanted to tell the Israeli Courts

3    that it was their assets, they had no problem doing

4    that and were able to relieve themselves in many cases

5    of attachments, which raises the interesting conflicts

6    of laws problem about whether or not judicial estoppel

7    applies in a situation where there are representations

8    made to an Israeli Court which are accepted by that

9    Court, and now contradictory statements are being made

10   to this Court.

11           In any event, what we see happening here,

12   Your Honor, is we've been -- when I say we, the

13   Plaintiffs have been attempting to collect the

14   underlying judgment since 2004, and a great many

15   activities have been going on.  There are attachments

16   in Israel that we've been successful in getting.  The

17   Palestinian Authority has appealed -- let me back up to

18   explain the situation.

19           The Plaintiffs took Your Honor's judgment and

20   domesticated it in the Israeli Trial Courts and were

21   able to get an attachment against the Israeli

22   Government, which was holding funds belonging to the

23   Palestinian Authority.

24           That domestication has been appealed by the

25   Palestinian Authority to the Supreme Court of

1    Israel, and that attachment may or may not prevail,

2    depending on the outcome in the Supreme Court of

3    Israel.

4           Also, there's a serious issue about whether or

5    not an attachment runs against the Israeli Government.

6    It's beyond my ability to explain the issues, but that

7    is being litigated as we speak in Israel.

8           So there's a need for security.  And one of the

9    things that we're very concerned about is that the

10   Palestinian Authority is doing what it can to take

11   assets that otherwise ultimately would be available and

12   putting them outside the United States.

13          A very, very eloquent statement of the PA's

14   involvement is a privilege log, which we just received

15   from the Defendants within the last several days, the

16   origin of this was we asked in request for production

17   of documents, running between the Palestinian Authority

18   and the Palestinian Investment Fund.

19          The argument was made that privileges existed

20   between those two entities, and Judge Martin ordered a

21   privilege log be generated.

22          This privilege log, which I'd like to hand up to

23   Your Honor, is dated November 12th, 2010, so it's just

24   a very few days old.

25          THE COURT:  We'll mark it Plaintiffs' 7.

1           (Plaintiff's Exhibit No. 7
                was admitted in full).
2

3        MR. WISTOW:  The earliest entry -- the log is

4   not in chronological order for reasons I don't know.

5   It was prepared by defense counsel.

6        The earliest entry dates to 2007, and in that

7   relatively brief period of time -- I say relatively

8   brief, in the history of this case, three years is not

9   that long a time -- you can see that 309 communications

10  over -- roughly 100 a year, two a week have been

11  exchanged between the Palestinian Authority and the

12  Palestinian Investment Fund.

13       And, obviously, there's a great deal going on

14  between them that we don't know and we don't

15  understand, and we're going to be filing various

16  motions regarding the disclosure of some of these

17  privileges.

18       But, in any event, what we're really coming down

19  to say is we think we've made a good demonstration that

20  the PA has been doing what they can to frustrate our

21  collection of both judgments and that all we're asking,

22  we're not asking that the PIF doesn't collect from

23  Orascom, we're not asking Orascom not to pay the PIF in

24  this Court, all we're asking is that Your Honor

25  continue the temporary restraining order as a

1    preliminary injunction saying to the PA, stay away from

2    the assets of the PIF that we -- that this Court

3    assigned over to the Plaintiffs.

4        Now, not to prolong this unduly, but we just

5    received, I think it was last night, a motion that the

6    Defendants have filed to vacate Your Honor's Creditor's

7    Bill order.  In other words, we have of course -- we

8    were confronted in January with the motion to vacate

9    the underlying judgments.  We just received a motion

10   saying that Your Honor's final judgment of turnover of

11   the PIF to the Plaintiffs is void and fraught with

12   error and they want that vacated too.

13       Now, that's not before Your Honor, and as far as

14   I'm concerned, if that issue comes up today, all that

15   really needs to be said is there's an order Your Honor

16   entered.  We'd like that order protected, and the time

17   may come, it apparently is coming, where we're going to

18   be fighting about the validity of your Your Honor's

19   order, but that is not before the Court.

20       And, therefore, Your Honor, for all of those

21   reasons, we would ask for the preliminary injunction to

22   at least be continued till the hearing in January.

23       By the way, on the question of a bond, that

24   mention was made of a bond, if the PA could show how

25   they're being hurt, that would be one thing.  We're not

1    even talking about the PIF not getting the money, we're

2    not talking about Orascom not paying the money, so I

3    really don't understand why there would be even an

4    argument in favor of the bond, which in any event, in

5    the First Circuit is discretionary with Your Honor

6    anyway.  Your Honor could decide that no bond is

7    necessary at all.

8         THE COURT:  The 45 million is the security in

9    this case.

10        MR. WISTOW:  I beg your pardon, Your Honor?

11        THE COURT:  The 45 million is the security.

12        MR. WISTOW:  Well, we're hoping to make it the

13   security.  There's huge fights.  Your Honor would --

14   the litigation that has been going on in this case is

15   truly mind-boggling to enforce these things, but

16   there's a $45 million debt that is owed by Orascom, the

17   Egyptian company, to the PIF, and we -- as far as we're

18   concerned, whether or not that should be paid, that's

19   being litigated in other courts.

20        All we're asking this Court is to tell the

21   Palestinian Authority to stay out of that issue.

22   That's all we're asking.  And that is what the TRO has

23   ordered, and that's what we're asking to be continued.

24   And we're asking that other courts decide whether

25   Orascom should pay, whether they shouldn't pay, not

1    this Court, and I don't think Your Honor wants to get

2    into that complication.

3         THE COURT:  I have no jurisdiction over the PIF

4    and Orascom.

5         MR. WISTOW:  Of course, and nobody's

6    suggesting --

7         THE COURT:  My jurisdiction is over the

8    Palestinian Authority.

9         MR. WISTOW:  Right.  Believe me, Your Honor --

10        THE COURT:  That's who I issue orders against.

11        MR. WISTOW:  Believe me, Your Honor, if I

12   thought Your Honor had jurisdiction against Orascom or

13   the Palestinian Investment Fund, we would have asked

14   for relief.  We agree there's no jurisdiction of this

15   Court over them, and we're not asking for any relief as

16   against them.

17        Thank you, Your Honor.

18        MR. ROCHON:  Good afternoon, Your Honor.

19   Mark Rochon on behalf of the Palestinian Authority and

20   the PLO.

21        This request we would contend to the Court does

22   not belong here for several reasons, and I'll get into

23   those.

24        But first I'd like to take the Court back to

25   what you heard today and contrast it with what you read

1    since they got the TRO.  The memorandum in support of

2    the TRO and the preliminary injunction reads nothing

3    like the presentation that counsel just made.

4            The written memoranda in support of the request

5    talks about the premise for the Court ordering this

6    having to do with a Mr. Mustafa who they claim is

7    subject to the order that this Court is being asked to

8    issue and that Mr. Mustafa, because he also is with

9    PIF, can therefore be directed to take no actions to

10   collect on this debt.

11           And, therefore, though they don't tell you this,

12   the Plaintiffs' papers contend that any order you issue

13   as against the PA will have the effect of telling the

14   PIF what to do or not do even though you do not have

15   jurisdiction over it, as you well know and as we have

16   all agreed.

17           Their papers say that.  That is how they

18   interpret the TRO you issued, and that is how they

19   interpret the preliminary injunction they're asking you

20   to issue.

21           So though they like to say we're just asking you

22   to tell the PA not to do anything, in fact, and I would

23   encourage the Court to ask them, isn't it your view,

24   Plaintiffs' counsel, that if the Court issues this

25   injunction, that it will bind the PIF as well because

1    of their theory of the connection of Mr. Mustafa to it?

2        This Court cannot escape the fact that what --

3    this doesn't belong here.  There is a debt owed in

4    Egypt by Orascom to the PIF.  The Plaintiffs for five

5    years have tried various theories to have that debt be

6    part of a collection action in this case.  They've

7    conducted that litigation in courts in the

8    United States multiple times, multiple places.

9        We, the PA and the PLO, have never appeared in

10   any of those courts in connection with that effort.

11   The PIF has not appeared in any of those courts in

12   connection with that collection effort.

13       Orascom has.  And when Orascom has appeared in

14   courts, Federal and State, in connection with this

15   debt, this $45 million dispute originating out of

16   Egypt, they have prevailed as against the Plaintiffs

17   every single time.

18       The Ungars have gone to seek that debt.  So too

19   did the Knoxes.  You'll recall Judge Marrero, United

20   States District Court in New York, had the Knox case in

21   front of him, and they sought also to enforce as

22   against Orascom for this debt in connection with the

23   judgment they had.

24       Judge Marrero said, You can't do that, there's

25   not jurisdiction, and he found that PIF was not an

1     alterego and was not subject to any of the collection

2     efforts that he had before him in connection with his

3     judgment, and he threw out that effort as being

4     unfounded and without jurisdiction.

5          The Ungars went and were in front of another

6     United States District Court Judge in New York,

7     Judge McMahon, and they sought the same action, to

8     bring an action seeking collection on this debt, trying

9     to suggest that PIF -- that any debt to PIF was

10    collectable in connection with your judgment, and

11    Judge McMahon threw them out of court for no

12    jurisdiction.

13         They went to the United States District Court

14    for the District of Columbia and sought the same

15    type of action, and I'd like to tell you what the

16    United States District Court said about their theory of

17    jurisdiction on this debt.

18         And I quote from Magistrate Judge Kay's report

19    and recommendation adopted by United States District

20    Court Kessler in her eventual ruling, Plaintiffs'

21    argument is more than a non sequitur; it is fallacious

22    and borders on outright sophistry.  This undersigned

23    wholeheartedly rejects it.  Close quote.

24         The Plaintiffs went to New York State Court and

25    sought to bring the same issue of this Orascom debt and

1    whether it's collectable in connection with your

2    judgment on the same notion, and on August 16th, 2006,

3    Judge Konreich ruled, and again, I quote -- and this is

4    in Docket 108090, 2005, August 15th, 2006.

5        She vacated a Sheriff's levy, the same type of

6    levy that they say is currently holding this asset.

7    She vacated the Sheriff's levy and execution issued to

8    Orascom because, and now the quote begins, I quote, The

9    attachment here targets no property located in

10   New York, close quote.

11       Yes, the Plaintiffs have chased this

12   $45 million.  The reason that it is not collectable in

13   the United States is absolutely clear, because there's

14   no jurisdiction over that asset.  It's owed by Orascom

15   ostensibly to the PIF in a matter that's been

16   adjudicated in Egypt but as to which there's no

17   jurisdiction here.  It is an asset outside the reach of

18   US Courts.

19       The PIF is not before you, and you have no

20   jurisdiction over it.  But when you listen to

21   Mr. Wistow -- let me back up for a second, Your Honor.

22       The evidence in front of you in connection with

23   this hearing, no witnesses, no cross-examination, the

24   Plaintiffs have put nothing before you, but they've

25   tried to put facts before you and ask you to reach

1    certain factual conclusions.

2         They filed a verified memorandum, and it was

3    sworn to by an Attorney Robert Tolchin who also seeks

4    to appear before you in this case pro hac vice.  His

5    application is pending.  Whether or not that raises

6    issues of lawyer as witness --

7         THE COURT:  I granted it this morning.

8         MR. ROCHON:  Then we may not leave it for

9    another day, but that's a separate matter.  He is an

10   attorney in this case, and he provides the affidavit

11   that prompted the TRO and is the basis for us being

12   here today.  And I'd like to tell you, Your Honor, that

13   he says in that affidavit several things that I think

14   you should pay careful attention to.

15        The first is he says, at the bottom of the first

16   page, and he's sworn to the truth of this, he says,

17   This debt is restrained by a writ of execution issued

18   from a New York State Court.

19        Your Honor, that's not accurate, or at least it

20   omits a material fact.  As he knows, because he's

21   counsel in the matter, Orascom has brought to the

22   attention of the New York State Court that has that

23   proported levy the fact that it is itself void because

24   he failed to serve it in time and expired as a matter

25   of law.

1     That issue hasn't been decided by the New York

2  State Court, but the fact is Mr. Tolchin, in his

3  verified memorandum, didn't tell you that there's a

4  question of whether or not this asset as to which

5  they're seeking to have you issue some directive or

6  order to our client or injunction as to our client, he

7  didn't tell you that, that asset may well not even be

8  attached, and, more importantly, he didn't tell you

9  that a New York State Court, in 2006, August -- I have

10  just quoted you the opinion -- when he sought to attach

11  that asset the first time there, found there was no

12  jurisdiction over it.  There is only a matter of time

13  before he loses again on the issue of whether there's

14  jurisdiction over this asset that brings us to you.

15     The Plaintiffs in this case, if they -- oh,

16  there's one other thing he said in there that I want to

17  bring to your attention before I get to the Plaintiffs.

18     It's no surprise to me that the Plaintiffs today

19  haven't talked very much about his memorandum, which is

20  what caused you to issue your TRO.  And it's no

21  surprise to me they didn't talk very much about

22  Mr. Mustafa, and they didn't stand apparently behind

23  the representations made under oath to you.

24     On Page 7 of the sworn-to verified memorandum,

25  Mr. Tolchin states, in the pleading that's -- I know

1    Mr. Strachman submitted it, but it's Mr. Tolchin who

2    makes the sworn statement that is adopted by the

3    filing -- he says in a November 28th, 2006 letter,

4    Defendants' leader, Mahmoud Abbas, expressly stated

5    that he had tasked Mustafa with fighting the Creditor's

6    Bill's judgment.

7          That's a pretty strong statement, and that's

8    their hook to say that you should equate what PIF does

9    with the PA.

10          Thereafter, in the memorandum that's before you,

11    they repeatedly refer to the actions taken by PIF as

12    the PA acting putatively in the name of PIF, all on the

13    hook of Mr. Mustafa and the supposed directive to him

14    from President Abbas to, quote, fight the Creditor

15    Bill's judgment.

16          The basis for that is said to be what's referred

17    to as Exhibit R but which is before you this afternoon

18    as an exhibit from Plaintiffs, referred to as

19    Exhibit 3.  That's the letter from President Abbas to

20    Secretary Rice.

21          Now, what does it say that he told Mr. Mustafa

22    to do?  I mean, given the representation that

23    President Abbas expressly stated he tasked Mustafa with

24    fighting the Creditor Bill judgment, you would think

25    there would be support.  That's a strong statement, and

1    that's the hook in the memorandum for you to find that

2    the PIF acts at the behest of the PA.

3        Well, at the end, after he, President Abbas,

4    gives his compliments and thanks for the Secretary's

5    consideration of the matter, he says the following

6    about what he's asking Mustafa to do, quote, I will ask

7    my economic advisor and the CEO of the PIF,

8    Dr. Muhammad Mustafa, to follow up on this matter with

9    US Consul General in Jerusalem, Mr. Jacob Walles,

10   W-a-l-l-e-s, period, close quote.

11       Follow up with the US Consul is a far cry from

12   I've directed him to fight this Creditor Bill judgment.

13   Judge, this memorandum --

14       THE COURT:  Well, you're doing it now by filing

15   a motion to vacate it, aren't you?

16       MR. ROCHON:  Your Honor, we did not file a

17   motion to vacate previously because, up until now, the

18   Creditor's Bill judgment did not ask the Defendant PA

19   or PLO to do anything.  It was a document that acted on

20   its own, ostensibly transferring assets to the

21   Plaintiffs.

22       That, as you have often said to lawyers who've

23   come here to try to talk to you about the implications

24   of that and your other -- your underlying judgment, the

25   interpretation of that and its meaning is to be

1    determined in the places where the assets reside.

2            When the pension fund came here, that's what you

3    suggested to them.  When the PIF tried to come here

4    through their lawyers, Leboeuf, they tried to appear

5    before you, that's what you told them.

6            You have been consistent, Your Honor, in

7    directing that people who come to you regarding your

8    orders in this case take their dispute to the place

9    where the asset is and deal with it there.

10           Until today with this motion, this injunction

11    has not been brought before you with them asking you to

12    tell the PA to do something.  The Plaintiffs are now

13    trying to use -- what's going on here, Judge, let's be

14    clear, this is part of an effort by the Plaintiffs to

15    try to win the hearing in January.

16           Their theory is that the Defendants have acted

17    with unclean hands and, therefore, that's a basis for

18    you to deny the underlying judgment.

19           Our position in challenging the underlying

20    judgment had been we did not need to attack the

21    Creditor's Bill, which was derivative of the underlying

22    judgment.  We challenged the underlying judgment.  The

23    Creditor's Bill had not resulted in anything except

24    litigation over its meaning elsewhere.

25           The United States District Court in Connecticut

1    is considering its validity, but they've stayed it

2    while they wait on the eventual resolution of the

3    vacator motion.  The other courts that have been asked

4    to do anything on it have made determinations as to its

5    extent, its validity or its meaning.

6        The Orascom raised in Cairo this order, the

7    Creditor's Bill judgment order, and whether in fact the

8    Ungars or the -- what we call the original PIF was the

9    proper party, and the Egyptian Courts reached that

10   issue.

11       So your judgment has been subject to

12   interpretation and discussion in the places where

13   assets lie until today.  The Plaintiffs want to bring

14   this to you now and accelerate this matter as to which,

15   let's face it, unless the PA has a connection where it

16   can control what PIF does, this is a -- this doesn't

17   matter.  The money isn't owed to the PA.  It's owed to

18   PIF.

19       THE COURT:  Plaintiffs have no objection if it's

20   paid to PIF.  They only want an injunction against

21   meddling by the Palestinian Authority --

22       MR. ROCHON:  If the Plaintiffs agree --

23       THE COURT:  -- over whom I do have jurisdiction.

24       MR. ROCHON:  Absolutely.  I agree with you,

25   Your Honor, that if the money is paid to the PIF, it's

1    not before you and it's not the PA.  We are not PIF.

2         They're implicitly suggesting to you to

3    somehow -- I guess all that argument, you know, there

4    was a lot of talk about what the President has or has

5    not done with PIF.  Ultimately, since the debt isn't

6    owed to my client, neither of them and we don't control

7    what happens with it, why are we here on a preliminary

8    injunction?

9         THE COURT:  They want to be sure that the PA

10    does not interfere and somehow get those funds.

11         MR. ROCHON:  Your Honor, the issue of the

12    Orascom paying PIF we all agree is not before you.  I

13    agree with you, and I agree with the Plaintiffs.  That

14    issue --

15         THE COURT:  My injunction will not have anything

16    to do with that.

17         MR. ROCHON:  And, therefore, the real question

18    is:  What are the Plaintiffs seeking to do here?

19         But let's -- if I may, Your Honor, point out to

20    you that the Plaintiffs, they may say, oh, we're just

21    here to tell the PA or the PLO what to do, but if you

22    would look, Your Honor, at their papers, at the

23    verified memoranda, you can see that they actually are

24    going to interpret your order more broadly than they

25    admit.

1          If your order simply says the PA, as opposed to

2     PIF, is enjoined from taking action to collect this

3     debt and you have no jurisdiction over PIF,

4     that's fine.

5          But that's not what they're saying to you,

6     Your Honor.  They actually are claiming in their papers

7     that we, the PA, because Dr. Mustafa is an economic

8     advisor to the President and is also the President of

9     the PIF, that an order to us controls what PIF may do.

10    That's what they say.

11         Ask them, Your Honor, because what I don't want

12    to have happen is for you to issue an order telling my

13    client what not to do and, if PIF gets this money,

14    they're going to come in and scream and say it's our

15    fault, and that would be unfair and legally

16    unsupportable.

17         What they're really trying to do is do a

18    back-door peacock analysis, and that's the case that

19    suggests that when a judgment is sought to be enforced

20    against a nonparty, you need jurisdiction over that

21    nonparty.  You don't have jurisdiction over PIF, and

22    you're not in a position to tell them what to do.

23         THE COURT:  You keep saying that, and of course

24    I agree with you.

25         MR. ROCHON:  I know, Your Honor, but what's

1   going to happen is when you issue this --

2          THE COURT:  You keep confusing the two.

3          MR. ROCHON:  I am not --

4          THE COURT:  You're contributing to this

5   confusion.

6          MR. ROCHON:  Your Honor, because --

7          THE COURT:  If I issue an injunction in this

8   case, it will be against the PA and the PA only over

9   whom I have jurisdiction, and you agree.

10         MR. ROCHON:  We certainly have lost on that

11  issue and are not challenging it, Your Honor.

12         If the Court would -- the Plaintiffs contend and

13  have said to you, on Page 3 of their papers, Since

14  Mustafa is an officer and agent of the PA and is acting

15  in active concert or participation with the PA, any

16  injunction against the PA would automatically enjoin

17  him as well.

18         THE COURT:  I don't agree with that.  Mustafa is

19  not involved.

20         MR. ROCHON:  Your Honor --

21         THE COURT:  If he purports to act on behalf of

22  the PA and I've issued an injunction, that will bind

23  the PA, and contempt proceedings may be brought against

24  the PA but not Mustafa.  I'm not issuing anything

25  against Mustafa.

1          MR. ROCHON:  Your Honor, in terms of the other

2     matters that I'd want to bring to your attention,

3     essentially, therefore, the injunction they seek, the

4     Plaintiffs aren't contending that we, the PA, have

5     pursued the -- let me back up.

6          In their papers, when they refer to the

7     litigation, the Orascom litigation, they say that it's

8     brought by the PA.  That's what this declaration signed

9     by this guy Tolchin says.  But it's false.

10         THE COURT:  What is brought by the PA?

11         MR. ROCHON:  The Orascom action itself in Cairo

12    they say is brought by the PA.  That's what Mr. Tolchin

13    says in his papers.

14         THE COURT:  Well, I don't have to accept that.

15         MR. ROCHON:  Well, I would urge the Court not to

16    because it's false.  It's brought in the name of the

17    PIF.  When he says that the -- if you go through these

18    papers and you circle every time where it says the PA

19    did something putatively as PIF, it tells you what

20    their real theory is here.

21         And I think the Court -- I am on the same

22    wavelengh with you as to the jurisdiction you do have

23    and the authority you do have in connection with this

24    matter.  The Plaintiffs are going to twist the order

25    and try to use it to suggest --

```
1        THE COURT:  I can't anticipate what they're
2    going to do in other courts.
3        MR. ROCHON:  Right.  Well, I guess what I'm
4    suggesting to the Court is the right place for them to
5    be in connection with this matter is a place where they
6    have jurisdiction over PIF because PIF is to whom the
7    debt is owed.  Their notion is that ultimately they
8    should get the money that is owed to PIF.  They've
9    got --
10        THE COURT:  Well, they'll have to go somewhere
11    else to do that.  I can't do it.  I can't handle that.
12        MR. ROCHON:  I agree.  But they have
13    jurisdiction over PIF they claim in Connecticut.  They
14    have jurisdiction they claim over Orascom itself in
15    New York.  I think they have no basis for it, but
16    that's what they say.
17        THE COURT:  Well, that's up to them, and that's
18    up to other courts.
19        MR. ROCHON:  But that's the right place to be in
20    connection with this debt, which is not owed to my
21    client and as to which my client is not a party and as
22    to which it's over in Egypt, not before any of these
23    courts.
24        So this preliminary injunction, this TRO is kind
25    of an odd beast because they're asking you to order
```

1    someone to whom no money is owed who's not a party in

2    the contested debt to do something or not do something

3    as between those two other entities which have the debt

4    between them.

5         THE COURT:  They're asking me to tell the PA not

6    to interfere in that matter.

7         MR. ROCHON:  I guess what I'm telling the Court

8    is there's no basis to believe we would.

9         THE COURT:  Well, I don't know whether you would

10   or not.

11        MR. ROCHON:  They haven't made a factual basis

12   for that.

13        THE COURT:  The PA has a long history of

14   disregarding my orders.

15        MR. ROCHON:  Your Honor, in terms of the

16   Creditor's Bill judgment and PIF, PIF is represented by

17   counsel, separate counsel.  The Ungars and PIF's

18   original directors have disputes as to the meaning and

19   effect of your order.  The PA has and raised yesterday

20   with the Court whether or not the Creditor's Bill

21   judgment is properly entered for a host of reasons.

22        That action was prompted by the -- now they're

23   coming in and trying to use it to direct our client

24   what to do regarding PIF.  It's the Plaintiffs who

25   prompted yesterday's filing.  Why we are here on this

1    $45 million debt, which is owed between these other two

2    parties when we should be focused on a vacator hearing

3    is beyond me.

4         But I know the answer to the question.  They

5    just want to use this as a vehicle to try to suggest to

6    you that you should deny that other motion.  That's

7    what's going on.

8         THE COURT:  I'll deal with that other motion at

9    the appropriate time.

10         MR. ROCHON:  If I could have the Court's brief

11    indulgence.

12         There was one other important point.  Thank you.

13         The Plaintiffs' procedure by virtue of these

14    exhibits and the verified memorandum, which is sworn to

15    by this lawyer who seeks to appear -- I guess now has

16    been granted permission to appear before you, we

17    contend that there's a host of inaccuracies in that

18    memorandum.

19         It omits material facts, it misrepresents the

20    meaning of what President Abbas did regarding

21    Mustafa --

22         THE COURT:  I will disregard it.

23         MR. ROCHON:  Well, Your Honor, if the Court's

24    going to disregard the memorandum in its entirety,

25    which I think is what you should do, another reason to

1    do so is the Court doesn't know what interests the

2    affiant has in the outcome of the litigation.

3        If the Plaintiffs had proceeded with evidence

4    proper instead of hearsay from him, he could have been

5    examined as to whether or not he has an interest in

6    this debt if it should come to the Ungars.

7        Mr. Tolchin says he represents the Ungars.  We

8    don't have his engagement letter or his financial

9    terms, but I would suggest to the Court that, before

10   one could properly consider it, you would also need to

11   know whether or not the affiant has an interest in the

12   outcome.  It's classic bias.

13       It's one thing if you represent a party and you

14   provide an affidavit in connection with some matter in

15   connection with your representation, but this affiant

16   seeks to tell the Court what happened with Mustafa and

17   the President, what's happened in Cairo, what has

18   happened in a host of places, what is happening in

19   New York State Courts, all of which he claims to have

20   actual knowledge of pursuant to his declaration --

21       THE COURT:  You're beating a dead horse.  I'm

22   going to disregard that affidavit, I told you --

23       MR. ROCHON:  Very well, Your Honor.  If the

24   Court --

25       THE COURT:  -- because that's my policy.  I

1    don't like affidavits because people can say most

2    anything on an affidavit and not be subject to

3    cross-examination.  And I only accept affidavits when

4    the affiant is subject to cross-examination.

5        MR. ROCHON:  Thank you, Your Honor.  Then I'll

6    stop with that dead horse and suggest to the Court

7    that, once one removes that affidavit from your

8    consideration, what Mr. Wistow has offered you by way

9    of exhibits today does not provide a basis for the

10   Court to conclude that the PA has any involvement in

11   this debt or that you should order the PA to do or not

12   do anything.

13       A few things I'd like to say about what he's

14   proffered to you.  The articles that he's put before

15   you, essentially that was a long way of him saying, we

16   think the PA has some control over what PIF does.  I

17   know you agree you don't have jurisdiction over PIF

18   nonetheless, but that's where he was going with that.

19       And the fact of the matter is that the Courts

20   have recognized PIF is a separate legal entity.  The

21   Plaintiffs agree with that.  They claim that it's --

22   they don't disagree that it's a separate legal entity.

23       In the papers that you're disregarding, they

24   were calling it a self-settled trust, the PIF.  Today

25   they've argued about that obviously it's controlled by

1    shareholders.  They've abandoned the notion that it is

2    a self-settled trust.

3         THE COURT:  I don't know what that means.

4         MR. ROCHON:  I don't know either, but that's

5    what they called it in their papers that prompted the

6    TRO that you're disregarding.

7         The Plaintiffs' theory is the PIF is wandering,

8    and the reason it's wandering is because it has no

9    business being before you asking us to do anything in

10   regard to it.

11        They should get PIF before a court that has

12   jurisdiction over it or stop wasting the time and

13   effort in connection with a $45 million debt that has

14   no connection to the United States.

15        Every Court that's ever seen this thing has

16   said, Get out of here.  I actually suggest that's the

17   right result here as well.  To tell the PA what to do

18   about a debt that is elsewhere that is not owed to it

19   tends to bring this Federal Court into a matter that

20   really you might as well tell the man on the street not

21   to do anything.  We -- it's not owed to us.

22        THE COURT:  The PA has a history here in this

23   case --

24        MR. ROCHON:  The PA has a history in this case,

25   Your Honor, but that doesn't --

1         THE COURT:  -- of stonewalling --

2         MR. ROCHON:  -- that doesn't --

3         THE COURT:  -- and interfering with the

4    collection of this judgment.  And that's what the

5    Plaintiffs are asking me to do, tell them not to

6    interfere in this particular matter.

7         MR. ROCHON:  Your Honor, I don't know the basis

8    for the Court's statement to say the PA's interfered

9    with the collection of the judgment.  I understand that

10   the PA has not paid the judgment.  That's why we

11   proceed under 60(b)6, but I don't know the basis to say

12   we have interfered with it.  And we would contend --

13        THE COURT:  And they have refused to pay it.

14        MR. ROCHON:  That is -- it is clearly not paid.

15   The PA has said for the last three years they seek to

16   litigate the case, and when that Knox -- that was the

17   order of the Court, they may litigate the case, the

18   case was settled, the PA moved forward properly through

19   litigation.

20        Where the PA's been allowed to litigate, it has

21   complied with the orders of the Court.  The PA seeks

22   only the opportunity to be heard in the matter, regrets

23   its previous misbehavior, but it has not interfered

24   with the collection of this judgment, Your Honor, and

25   if and when it gets an opportunity to litigate this

1    case, it will litigate it properly.

2         Thank you.

3         THE COURT:  Mr. Wistow?

4         MR. WISTOW:  May I respond very briefly,

5    Your Honor?

6         THE COURT:  Yes.

7         MR. WISTOW:  One of the reasons that I didn't

8    spend any significant time talking about the affidavit

9    is because I was familiar with Your Honor's

10   long-standing feelings about affidavits, and that's why

11   I put in documentary -- unquestioned documentary

12   evidence.

13        That evidence shows conclusively that, after

14   Your Honor ordered the transfer of the shares of stock

15   from the PA to the Ungars, the PA took the shares of

16   stock and transferred them after the judgment to the,

17   quote, Palestinian people and divested them -- it's on

18   its face a fraudulent transfer.

19        Now, my brother says that one of the things

20   we're trying to do is use this ultimately at the

21   hearing, and indeed I confess to that.  One of the

22   things that this hearing is, is an action in equity.

23   A motion to vacate under 60(b), according to the

24   First Circuit, is an equitable proceeding.

25        And one of the things we're going to ask

1    Your Honor to take into account is, after, after they

2    claimed that they had turned over a new leaf and were

3    now in compliance and were ready to follow the orders

4    of American Courts and subject them to jurisdiction,

5    we're going to show that behind the scenes they

6    continue to flout the authority of this Court by

7    actively violating an order.

8         Now, I'm not embarrassed to tell Your Honor that

9    I'm planning to bring that up, that you shouldn't be

10   able to go into a Court and ask the Court's indulgence

11   to vacate an order of default unless you're prepared to

12   show that you have turned over a new leaf.  They have

13   not.

14        Also, I didn't want to prolong this, but one of

15   the things that is indisputable, it's in their papers

16   and they will not be able to say no, is that, after,

17   after the PIF was assigned to the Ungars, indeed, even

18   after the motion to vacate was filed in December of

19   '07, the Palestinian Authority took money out of the

20   PIF, many, many, many millions of dollars.  It's

21   reflected in the filing.  There's no question of the

22   authenticity of those documents.  They're generated by

23   the PIF.

24        So, for all of those reasons, Your Honor, all

25   we're saying is what Your Honor said, we're not asking

1    that the PIF be enjoined, we're not asking that the

2    Orascom being be enjoined.  We're asking Your Honor to

3    tell the PA not to interfere further in this collection

4    proceeding in any way, shape or form.

5         Now, I'm not -- I hope Your Honor knows I'm not

6    a fool.  I'm not going to come back in here, if I am

7    fortunate enough to get a preliminary injunction from

8    you that enjoins the PA, I'm not going to come back in

9    here and try to prove they've violated it unless I

10   think I really can.  I'm not trying to set up some

11   straw man here.

12        And if Your Honor gives us a preliminary

13   injunction and we can prove that they violated it, for

14   sure we'll be back here as a minimum at the hearing in

15   on January 18th.  But I can represent to the Court I'm

16   not going to come in here and get my head handed to me

17   by the Court by trying to prove the PA did something it

18   didn't.

19        Thank you, Your Honor.

20        MR. ROCHON:  Your Honor, if I may briefly, there

21   was a couple of new things Mr. Wistow said.

22        THE COURT:  All right.

23        MR. ROCHON:  First of all, there's two things,

24   points I'd like to make.  He references again these

25   articles and the changed shareholder.  And this is the

1    problem of relying on hearsay evidence.  Those

2    articles -- they haven't presented a witness as to why

3    it occurred, why the articles of incorporation were

4    changed.  He hasn't discussed that with you.

5          But you -- if there were a witness from the

6    Plaintiffs on this, because they argue that, therefore,

7    you should assume that, because the articles are

8    changed, it has something to do with this case.

9          The fact of the matter is, and the Plaintiffs

10   know this because PIF in other courts has argued this,

11   because Hamas was involved in the unity Government at

12   the time, they didn't want Hamas to get ownership of

13   PIF, which was worth all that money.

14         And the United States of America, which

15   recognized that PIF should be deemed independent and

16   was a proper entity for US citizens to deal with, was

17   pleased at the idea that Hamas would not be able to tap

18   in to PIF because you'll recall the President of the PA

19   during part of this time is Hani -- I can't pronounce

20   his name -- is a gentleman from Hamas, and that is what

21   PIF would say as to why they changed them.

22         I'm not PIF.  I can't present you the witnesses

23   as to why PIF changes its articles of incorporation,

24   but they want you to reach a factual conclusion as to

25   that because they're not proceeding with witnesses'

1    live testimony.  They're proceeding with hearsay on

2    those articles.

3         The second thing I'd like to tell you is that

4    they refer to the PA supposedly violating or

5    disparaging your judgment because they have, they say,

6    taken money from PIF.

7         PIF is an investment vehicle that everyone has

8    agreed has provided dividends or payments to the PA,

9    never an amount that would threaten the judgment in

10   this case, never more -- the PIF has never been worth

11   less than a whole lot more than the judgment in this

12   case.

13        And so this sideshow of PIF and what it does

14   with its money is -- it suggests too much.  The PA

15   receives funds from a host of entities, including the

16   United States of America, and it does so, frankly, even

17   though it has the judgment outstanding in this case.

18        Are the Plaintiffs going to come and say, when

19   the United States of America gives money to the

20   Palestinian Authority or when it asks for that money,

21   that they should stand in between the United States and

22   the PA?

23        This is such a sideshow to the actual issues

24   that are before you, Your Honor.  And the arguments

25   that must be made by the Plaintiffs to get the relief

1    and the ones I must make in order to oppose it make

2    clear that this preliminary injunction must have some

3    purpose other than the actual merits of whether that

4    money's going to end up with PIF or not.

5         Thank you.

6         THE COURT:  I want to read all these papers

7    overnight, and I'll render a decision tomorrow at

8    2:00 -- not tomorrow.  I'm sorry.  I can't sit

9    tomorrow.  Friday, Friday at 2:00.

10        MR. ROCHON:  Would you like us here tomorrow,

11   Your Honor?

12        THE COURT:  I'm sorry?

13        MR. WISTOW:  Friday.

14        MR. ROCHON:  You'd like us here Friday at 2:00,

15   Your Honor?

16        THE COURT:  Friday at 2:00.  I have other things

17   to do tomorrow, personal things.

18        MR. ROCHON:  Yes, sir.  Thank you.  May I say

19   one other thing?

20        THE COURT:  Yes.

21        MR. ROCHON:  Thank you.  This privilege log,

22   it's referred to as a privilege log, I'd ask the Court

23   to note we have never claimed to be in privilege in

24   terms of attorney-client privilege or common interest

25   with the PIF.  This is a work product claims that are

1    made as to the communications, not attorney-client

2    privileged communications.  I just want the Court --

3             THE COURT:  You see that's noted on the end.

4             MR. ROCHON:  It is, and it's -- you'll see, for

5    every single entry, the type of privilege claimed is

6    work product, not attorney.

7             Thank you, Your Honor.

8             THE COURT:  All right.  Friday at 2:00.

9             (Court was concluded at 3:26 p.m.)

10

11             C E R T I F I C A T I O N

12

13

14             I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

15    hereby certify that the foregoing pages are a true and

16    accurate transcription of my stenographic notes in the

17    above-entitled case.

18

19

20

21             /s/ Debra D. Lajoie

22

23

24

25             11/29/10