```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF RHODE ISLAND
 2

 3   YARON UNGAR, et al        C.A. NO. 00-105 L

 4      Plaintiffs

 5
            V
 6

 7   THE PALESTINIAN           DECEMBER 3, 2010
     AUTHORITY, et al          PROVIDENCE, RI
 8
        Defendants
 9

10

11
          BEFORE: MAGISTRATE JUDGE DAVID L. MARTIN
12

13
     APPEARANCES:
14

15   FOR THE PLAINTIFFS:       DAVID J. STRACHMAN, Esq.
                               321 S. Main St.
16                             Suite 400
                               Providence, RI 02903
17                             351-7700

18                             MAX WISTOW, Esq.
                               61 Weybosset St.
19                             Providence, RI 02903
                               831-2700
20

21
     FOR THE DEFENDANTS:       BRIAN A. HILL, Esq.
22                             655 Fifteenth St., NW
                               Suite 900
23                             Washington, DC 20005
                               202-626-5800
24

25
```

DECEMBER 3, 2010

THE COURT:  This is the matter of the estate of Yaron Ungar, et al vs The Palestinian Authority, et al, Civil Action No. 00-105 L.  There are three motions scheduled for hearing in this matter this morning. Those three motions bear the document numbers 572, 583 and 604.  The Court intends to take the motions up in the order in which I've just announced them.  The attorneys will identify themselves, please.

MR. WISTOW:  Max Wistow for the plaintiffs.

MR. STRACHMAN:  David Strachman for the plaintiffs.

MR. HILL:  Good morning, your Honor.  Brian Hill for the defendants.

MR. SHERMAN:  Deming Sherman for the defendants.

THE COURT:  Thank you, Counsel.  All right, the first motion that we're going to take up is document number 572, the title of which is defendant The Palestinian Authority's motion to compel answers to defendant's interrogatories numbers 19 to 21, and responses to defendants' request for production numbers 23, 25, 26 and 29 to 35.

All right, Mr. Hill, I'll hear you, sir.

MR. HILL:  Hello again, your Honor.  Good morning.

1        THE COURT:  Good morning.

2        MR. HILL:  Let me start by making a preparatory

3   remark which is discovery is now closed, and so we're in

4   the unusual posture of asking you to compel answers to

5   interrogatories and production of documents at a point

6   in time when we're unable to do any further discovery

7   based on any production the Court may order.

8        I would also note for the Court, as you may have

9   seen in the docket, that on Monday we separately moved

10  to exclude from evidence at the January hearing any

11  witnesses who have not been identified before the close

12  of discovery, any experts for whom we have not received

13  expert disclosures, any experts for whom we have not had

14  the opportunity to take a deposition, and any documents

15  that have not been produced.  So this motion may have

16  been overtaken by that subsequent motion of the

17  defendants.

18        THE COURT:  I'm going to just interrupt,

19  Mr. Hill, on that point.  The Court had earlier

20  indicated that it would hear this motion on an earlier

21  date.  When that date came, it had to be rescheduled

22  because I was ill, I simply want to place that on the

23  record.  My recollection was that we had a chambers

24  conference about scheduling.  You indicated the

25  defendants were eager to have the Court address this

1    motion, and were asking to have the Court rule on the

2    motion on the papers without a hearing, and that counsel

3    for the plaintiffs, I think it was Mr. Strachman,

4    indicated that the plaintiffs would like the opportunity

5    to have a hearing and be heard on the motion, and in

6    response to that request, the Court said, all right, it

7    would place the matter down for hearing.  I forget the

8    exact date but I'm sure the record reflects it, and on

9    that date regrettably I was ill and, therefore, the

10   motion had to be rescheduled.  I believe it was

11   initially rescheduled, I think to Tuesday --

12          MR. HILL:  This past Wednesday.

13          THE COURT:  This past Wednesday.

14          MR. HILL:  Yes, your Honor.

15          THE COURT:  And then my clerk received word from

16   Mr. Sherman asking if the motion could be placed on

17   today's calendar with the other two motions that were

18   scheduled for hearing, and my response was that was

19   agreeable with the Court.  I had only put it down for

20   Wednesday in response to my understanding that

21   defendants were eager to have it heard as soon as

22   possible.  I understand that I may have concluded that

23   two days didn't make a lot of difference and you'd like

24   the opportunity to be here in person.  In any event, I

25   did move it from Wednesday to Friday.  But I felt I

1  wanted to put on the record how it came to be that this

2  motion is being heard on December 3rd and not earlier,

3  given the fact that the Court had indicated it would

4  hear it on an earlier date.  All right, you can --

5       MR. HILL:  Your Honor, I agree with everything

6  you've said and, in fact, the rationale for us asking to

7  move it from Wednesday to today is precisely as your

8  Honor said, just to avoid a second trip up here.

9       So having said that as a predicate, let me make

10 clear for the record that the relief defendants are

11 primarily seeking is the motion to exclude which was

12 filed on Monday, and I understand that has not been

13 referred to your Honor, and it's not before you today.

14 So what your Honor is left to do then is do something

15 with this motion in light of the fact that it may be

16 mooted if the Court subsequently grants the motion to

17 preclude.  And I'm happy to address it with that

18 understanding and that caveat.

19      THE COURT:  I want to be sure I understand what

20 you're saying, Mr. Hill.

21      MR. HILL:  Yes, your Honor.

22      THE COURT:  What you're saying is if the motion

23 to exclude is granted, it moots the motion here.

24      MR. HILL:  It would moot it in substantial part.

25 For example, I don't need to know any other witnesses

that are not going to be called at the hearing.  I don't need any further expert disclosures on experts that are not going to testify at the hearing.  I believe I was entitled to that discovery during the discovery during the discovery period and for the reasons your Honor just articulated we didn't get a ruling in time for us to do anything about it.  So our principal relief would be that these people would not be allowed to testify at the hearing, and that any documents that haven't been produced to us before the close of discovery wouldn't be utilized.

THE COURT:  When you say "these people", which people?

MR. HILL:  The ten expert witnesses that plaintiffs have thus far disclosed and any further witnesses that they would disclose in response to an order from the Court requiring the compulsion.  So here's what I would suggest.  I would suggest it's proper for the motion to be granted with the understanding that I'm not waiving my argument that these people should be precluded in any event because they weren't given to us in time to do discovery.

THE COURT:  Why don't you make your argument on this motion then.

MR. HILL:  Thank you, your Honor.  So the issue

1    appears to be then what the Court intended when it

2    entered the June 1st order allowing discovery in this

3    case, and I think it's worth quoting the order, which is

4    document 489 in the record.  This is the Court's June

5    1st, 2010 order entered by Judge Lagueux, which says:

6    "Pursuant to Rule 16 of the Federal Rules of Civil

7    Procedure, it is ordered that all pre-hearing discovery

8    be completed by November 19, 2010."  The Court further

9    orders that counsel present the following by December

10   17th, 2010, a typewritten memorandum, and then there is

11   a description of what the memorandum will include, a

12   list of exhibits intended to be offered, and there's

13   some details about how those have to be disclosed, a

14   list of all witnesses indicating those to testify as

15   experts, probable length of evidentiary hearing, any

16   additional matter which counsel feels will aid the Court

17   in the disposition of the hearing of said action, and

18   then it says an evidentiary hearing will be held on

19   January 18th.  And paragraph 9, of the order says,

20   failure to strictly comply with this order will result

21   in appropriate sanctions which may include dismissal or

22   default.  So there's nothing in the order which says the

23   defendants cannot discover the identity of witnesses

24   that the plaintiff will call at the hearing.  There's

25   nothing in the order that says the defendants cannot

discover opinions that experts called by the plaintiffs
may offer, or the bases for those opinions, and there's
nothing in the order that says defendants cannot
discover the identity of the exhibits the plaintiffs may
offer at the hearing in January.  The plaintiffs,
however, have taken the position that because of the
procedural posture of the case, which is, as the Court
knows, on a motion to vacate an existing judgment the
normal rules of civil procedure and the disclosure
requirements of Rule 26, in particular, don't apply, and
because the Court has required a memorandum on December
17th that requires disclosure of certain things to the
Court, that therefore the defendants can't discover that
material beforehand.  And I would suggest two things.
First of all, the argument about whether Rule 26
technically applies or doesn't is not relevant to this
particular motion.  It will be to one we talk about
later today I suppose.  But secondly, there's nothing in
the Court's order that says you can't discover who your
opponent is going to call at a hearing.  In fact, I
would suggest that that is one of the very basic things
that civil discovery allows so you can find out who the
witnesses are and then depose them so that when you get
to a hearing you know what they're going to say and you
can efficiently cross-examine them.  Same thing with

experts, there's nothing in this order that says we can't find out what their expert opinions are and what the bases for them are.  There's nothing in the order that says we can't discover what their exhibits are. And so I would respectfully suggest that the motion to compel should be granted with the caveat I gave earlier that I don't mean to waive the preclusion argument, which was made in a separate pending motion.

Let me address the second part of the motion which goes to discovery related to damages.  We have also propounded an interrogatory, which is interrogatory number 21, asking the plaintiffs if they contend that the amount of damages that were previously entered by the Court in the default judgment would withstand adversarial testing in this matter, and they have answered that interrogatory in part and said, yes, they believe it will.  And they have provided us with some of the bases for that assertion.  We would respectfully ask that the Court enter an order requiring them to give us a full and complete answer to that interrogatory that tells us the full bases for their contention that the amount of damages and the default judgment will withstand adversarial testing.

We have also asked for certain documents relevant to the amount of damages, and these documents fall into

roughly two categories.  Documents related to the claim by the plaintiff that the minor plaintiffs, the children of Mr. Ungar, have suffered mental injuries as a result of their father's death, and these are categorically any mental health records, any medical records, and preschool or school records.

THE COURT:  Mr. Hill, that I recall you argue in your memorandum that because the Court found that the two children would suffer mental illness in the future you're entitled to this discovery, and the Court found that the children would suffer mental anguish.  Is it your contention that mental anguish is mental illness?

MR. HILL:  Well, your Honor was here in 2002 at that hearing, I was not, but you did hear expert testimony from Dr. Alan Brenman who opined that the children were, among other things, more susceptible to suffer from mental illness in the future because of their father's death and so -- and I believe that your Honor specifically referenced that testimony in the Report and Recommendation that was subsequently adopted by Judge Lagueux as the basis for the damage award in this case.  And so I think, therefore, whether or not these minor plaintiffs have manifested mental illness is relevant to the reliability of Dr. Brenman's testimony that they were more likely to do so.  And we have, in

1  fact, submitted an expert report from our own expert

2  Dr. Eileen Ryan who has said that she does not believe

3  that Dr. Brenman had an adequate basis, did an adequate

4  methodological exam of the minor plaintiffs to draw the

5  conclusions that he then offered to the Court and which

6  I respectfully submit the Court then took and relied

7  upon in rendering the amount of damages that were made

8  by the plaintiffs in this case.  As the Court recalls

9  was, I believe, $10 million per child before trebling.

10 So it's a substantial award for people that are

11 obviously -- I don't mean to minimize the fact that

12 these children lost their father, but whether or not the

13 amount of that award is able to withstand adversarial

14 testing will involve, I think, fairly an inquiry of

15 whether those minor plaintiffs have suffered any mental

16 illness as a result of their father's premature death.

17 And the admissibility of Dr. Brenman's testimony will,

18 in part, turn on whether or not under Daubert he did an

19 adequate examination such that he had an adequate

20 methodology to render the opinions that he gave to the

21 Court and how much the Court relied at the time.

22      So I would submit that this is relevant for that

23 purpose.  And it would be relevant, incidentally,

24 whether or not we are talking about additional material

25 beyond what was given to the Court in 2002, as you may

1   recall from the October argument when Mr. Rochon was

2   talking about the need for mental examinations.  Our

3   position is that the $116 million will not withstand

4   adversarial testing, and we intend to demonstrate that

5   through, among other things, expert testimony that shows

6   those amounts are respectfully too much for the damages

7   that were demonstrated to the Court in July of 2002.

8   That will include inquiry about whether the expert

9   testimony that the plaintiffs presented and how much the

10  Court relied was admissible and otherwise appropriate

11  under the Daubert standard.  So these materials will

12  inform those decisions, and will inform the argument

13  about whether or not as a matter of fact those amounts

14  are appropriate.  So I would submit that they are

15  relevant and we ought to get them even at this point in

16  the case.

17        THE COURT:  You may continue or conclude.  It's

18  your pleasure.

19        MR. HILL:  I just wanted to make sure I wasn't

20  interrupting a forth coming question from the Court.

21        The other category is related in terms of the

22  theory of relevance, and it is materials related to the

23  death of Mr. Ungar.  So these are the autopsy materials,

24  the police reports, photographs of the crime scene, some

25  of which we have and some of which were in the record in

1   July of 2002.  We're just asking that we get all of that

2   material so our own forensic pathologist can examine

3   that material and have the best bases possible for

4   opining about the reliability of the testimony the Court

5   took from Dr. Friedman in July of 2002 who, as the Court

6   may recall, was not a forensic pathologist.  And I note

7   in this regard that the plaintiffs themselves have,

8   albeit late in the process, provided us with expert

9   reports from their own psychiatrists, own psychologist,

10  excuse me, Dr. Brenman, who apparently intends to

11  testify.  There's a different issue about whether the

12  Court is going to allow testimony on this, which I don't

13  want to get into right now, prepared to testify in

14  January, and from their own forensic pathologist, who's

15  prepared to testify in January, and I think fairness in

16  civil discovery requires that our experts have access to

17  this material to the extent the plaintiffs have it, and

18  I therefore respectfully ask that those materials be

19  compelled as part of this motion, as well.

20       And I think, unless the Court has questions for

21  me, I will sit down then and let you hear from the

22  plaintiffs.

23       THE COURT:  All right, thank you, Mr. Hill.

24       MR. WISTOW:  Your Honor, I would like to put this

25  motion, and the other two motions that your Honor has

1    scheduled for hearing today, in context.

2         What needs to be recalled here is --

3         THE COURT:  Excuse me, Mr. Wistow.  I just

4    realized that you didn't state your name when you went

5    to the podium and it will help whoever transcribes these

6    proceedings.  Mr. Wistow is recognized.  You may

7    proceed.

8         MR. WISTOW:  Thank you.  There's a terrible irony

9    that the plaintiffs are confronted with in this case,

10   and I hope it's going to become apparent in a few

11   moments.

12        This suit was brought in March of 2000.

13   Discovery was resisted by the defendants and, in part,

14   was the reason the judgment, final judgment, was entered

15   against them in July of 2004, which was affirmed by the

16   First Circuit.  There was a creditor's bill, your Honor

17   is familiar with that, in 2006, where the defendants

18   were, in effect, deprived of their stock ownership in

19   the Palestinian Investment Fund.  There was a motion to

20   vacate all of this in December of 2007, some two and a

21   half years after the original judgment was entered.

22   And, of course, the First Circuit reversed Judge Lagueux

23   because Judge Lagueux refused to vacate the judgment.

24   He imposed a per se rule that a willful defaulter cannot

25   get a vacation or a vacatur of a judgment, and that he

1    needed to hear multiple issues.  And, indeed, Judge

2    Lagueux scheduled discovery in this case, as my brother

3    has indicated.

4         What needs to be understood, your Honor, I think

5    it's very central, is the plaintiffs had achieved

6    judgment years before.  On October 15th, 2010, six weeks

7    ago, they, the defendants handed to the plaintiffs their

8    expert disclosures, and I'd like to hand them up to the

9    Court.  I don't expect the Court to read them, I just

10   want the Court to get a sense of the heft of what was

11   given to us on October 15th.  This was -- these

12   documents are the principal bases for the request for

13   the vacatur.  May I hand these to the Court?

14        THE COURT:  Any objection, Mr. Hill?

15        MR. HILL:  I don't object to you getting the

16   documents.  I will respond to the characterization if I

17   may separately.

18        THE COURT:  All right.  I'll give you that

19   opportunity.

20        MR. HILL:  Thank you.

21        (PAUSE)

22        THE COURT:  These were received by the plaintiffs

23   on October 15th, is that correct?

24        MR. WISTOW:  They were sent electronically and

25   received on October 15th.  They were under a cover

1   letter where the defendants purported to tender them

2   pursuant to Rule 26(a)(2), which requires disclosure of

3   expert reports 90 days before trial.  That rule, of

4   course, allows the other side, if it's applicable, to

5   provide any rebuttal experts within 30 days of receiving

6   the defendants' disclosures.

7          By the way, before I talk about our disclosures,

8   I would like to point out that October 15th is almost

9   precisely 90 days before the scheduled hearing, not

10  trial, which was down for January 18th, 2010, almost

11  precisely that date.  If your Honor wants to take the

12  trouble, you'll see that every one, every one of

13  defendants' expert disclosures, with one exception, is

14  dated October 15th, the date we got them.  It's clear

15  that the defendants told their experts not to send the

16  reports until that last day.  There's one exception, and

17  that exception, one of the several experts, his report

18  is dated October 14th.

19         So, we are confronted then with a disclosure of

20  multiple expert witnesses in areas that are extremely

21  unusual, in some respects.  For example, one of the

22  disclosures, Glen Robinson, an expert, supposed expert

23  on terrorism, is going to be talking about the effect on

24  the foreign policy of the United States, is not a very

25  typical situation.  And there are other expert reports

1   very unusual in nature.  We felt, and we still feel,

2   that Rule 26 is only applicable to experts who are going

3   to testify at trial, and I make a technical distinction,

4   and I'm going to amplify that later, but in an excess of

5   caution, in an absolute abundance of fear, we said we

6   better get our experts in within 30 days of that

7   disclosure to us.  Even though we don't think it's

8   required, we don't want to take the chance that somehow

9   the Court will say this is Rule 26 and we violated that.

10  So within 30 days on November 15th we supplied expert

11  reports which I would like to hand up to the Court.

12          THE COURT:  All right, you may do so.

13          MR. WISTOW:  Again, just for the heft of what was

14  involved here.

15          THE COURT:  These were served or transmitted to

16  the defendants on November 15th?

17          MR. WISTOW:  That's right.  Within the 30 days

18  which we don't even believe was required, but in an

19  excess of caution we did it.  And believe me, I think

20  your Honor can see there had to be a lot of scurrying

21  because, for example, one of their experts was a

22  forensic pathologist, a Dr. Baden, who said that he

23  believed that the decedent husband died within

24  approximately two seconds of the attack rather than the

25  up to 30 seconds as your Honor had found, we had to get

1   somebody to rebut that, and we did that, and we supplied

2   that to the defendants within 30 days.  At the same

3   time, we were scurrying around trying to respond to all

4   of the other things they were talking about.  There were

5   numerous issues that have arisen here.

6        On top of that, your Honor, on top of that, on

7   October 29, 2010, we received from Mr. Hill the

8   investigation of the murders by the Palestinian

9   Authority, I should say the investigation by the

10  Palestinian Authority, of the murders, something that

11  should have been supplied to us six years before, more

12  than six years before.  We got that on October 29th.

13  And I'd like to hand that up to your Honor.

14        THE COURT:  You may.  Is there an objection,

15  Mr. Hill?

16        MR. HILL:  Again, I'd like to respond to the

17  characterization, but I understand I'll get a chance to.

18        THE COURT:  You'll get a chance to make some

19  remarks.  This was received on October 29th from the

20  defendants?

21        MR. WISTOW:  Yes, your Honor, and I'm enclosing

22  the cover letter.  Now, if you stop and think about what

23  is going on here, this is a case where we have a

24  judgment.  It was by default, in part, because there was

25  no adequate disclosure, years ago.  We're now in a very

compressed period struggling, struggling, to comply with the massive requests that have been put upon us.  At the same time we're trying to get discovery out of them.  At the same time, there was, I don't know if your Honor is aware of this, there was a motion to intervene by the Palestinian Investment Group for the administrative employees of Gaza.  That was heard in front of Judge Lagueux.  He denied that.  That's on appeal.  There's a myriad of activities that have been going on here. We're doing our very best to stay current, and we're confronted with a response by these defendants that our responses to their discovery is not as rapid as they expect.

They talked about a psychologist, Dr. Ryan, that they've hired.  Dr. Ryan has put in a report that basically says that she disagrees with the methodology that was used by our expert, that it was not a sufficient forensic evaluation.  We had to prepare a rebuttal for that.  Bear in mind, your Honor, we only got this October 15th.  We prepared a rebuttal for that. They brought in a pathologist, Dr. Baden, on October 15th.  We had to get a rebuttal for that.  They brought in two experts, supposedly experts, on Israeli law, a Messrs, lawyers in Palestinian Authority, Dahleh and Shehadeh.  We had to get, and we did get, within 30

1   days, responses, expert reports, disputing what their

2   experts said.

3       On November 4th, your Honor, November 4th, the

4   defendants amended their answers to interrogatories and

5   added four new witnesses, Mohammad Dahaln, Hiba

6   Husseini, Rafik Husseini, Afif Safieh.

7       On November 11th, the defendants added three more

8   witnesses in their amended answers to interrogatories,

9   Yousef Qaddah, Hassan Asfour, Mazen Jadallah, and

10   specifically said in their answers to interrogatories on

11   November 11th when they entered this, that they reserved

12   the right to add additional witnesses up through and

13   including the time of the January hearing.

14       At the same time while all of this is going on,

15   not only are we confronted with the appeal in the First

16   Circuit on the motion to intervene, we're fighting about

17   collection efforts in other ports to try to preserve the

18   attachments and restraints we have in various other

19   places.  We've done, I believe, a yeoman's efforts.

20       Let me say specifically what the motion to compel

21   is about.  It's about interrogatories 19 through 21, and

22   let me specifically address what they've asked for.

23   They've asked for in 19 the witnesses at the hearing.

24   We've given them our experts reports.  We fully expect

25   that everyone of those experts will be witnesses at the

hearing.  We've written to them and said please consider

these experts as witnesses pursuant to the answers to

the interrogatories.  As far as I know at the moment, at

the moment I stand here, your Honor, there's one

possible fact witness that we're trying to get.  I can't

say we're going to be able to do it, but we've disclosed

what we know at this moment.  There's been no

requirement other than answers to interrogatories that

we make these disclosures.

Number 20 is the experts.  We've made a full

disclosure of the experts.  I don't know what else we

can do.

Then they've asked us in interrogatory number 21

for the factual basis that we have if we contend that

the amount of the verdict would withstand adversarial

testing.  Our response to that has been two-fold: One,

we've said that that issue is foreclosed, whether or not

it would withstand adversarial testing, and indeed, we

have a motion pending, a motion in limine, to exclude

any evidence attempting to challenge the amount of the

award.  And the reason we have that, your Honor, is

after your Honor made the recommendation to Judge

Lagueux for the $116 million total, the defendants

expressly specifically objected to the amount of the

award to Judge Lagueux.  And I'll read you from their

objection.  Defendants -- this is verbatim.  "Defendants

PA and PLO object to the report's recommendation that

multi-million dollar amounts be awarded as compensation

for the death of one person in the context of an ongoing

conflict in which thousands of innocent civilians on

both sides have been killed without any hope of

compensation."  And it goes on.  Compensation on such an

excessive scale is inappropriate particularly in the

case of a person living permanently in Israel or

Palestine during the ongoing Israeli Palestinian

conflict, et cetera.

THE COURT:  Mr. Wistow, do you have a document

number for what you just read from?

MR. WISTOW:  Yes, I do, I do, your Honor.  Bear

with me.

THE COURT:  You can provide it after the hearing.

MR. WISTOW:  Your Honor, I can give it to you

right now.  It's document 271.  It was sent by

Mr. Sherman on April 19, 2004.

THE COURT:  Do you have a page number, by chance?

MR. WISTOW:  Of the quote?

THE COURT:  Yes.

MR. WISTOW:  Yes, I do.  It's on page 3.

THE COURT:  Thank you.

MR. WISTOW:  So, you know, I'm not going to stand

1    here and tell your Honor they did a very good job

2    challenging the amount, but they challenged the amount

3    expressly, and Judge Lagueux denied their objection to

4    your Honor's recommendation.   And when they went up to

5    the First Circuit, on the initial appeal, the First

6    Circuit noted the defendants have, and I quote, 402 F3rd

7    282, "The defendants have not challenged either the

8    measure of damages utilized by the lower court or the

9    integrity of its mathematical computation."   Now, it's

10   true, it's true, that when the case was appealed the

11   second time to the First Circuit, what I mean by that is

12   after the motion to vacate was filed in December of 2007

13   and was denied by Judge Lagueux, and the case went up

14   again to the Circuit, at oral argument, for the very

15   first time, it was not in anybody's briefs, for the very

16   first time there was a discussion about the amount of

17   the judgment, and my brother, Mr. Strachman, who argued,

18   has no more the ability of total recall than I do, and

19   he had quite forgotten that this issue was fully

20   addressed before, and the Court made some comments about

21   would this withstand adversarial testing, et cetera, but

22   it was never argued before the Court, and it is now the

23   subject of a motion in limine before Judge Lagueux.   Now

24   it's true, the First Circuit has sent this thing back

25   for a "holistic" approach, but there are certain things

1    that I submit cannot be reviewed again, should not be.

2    For example, the First Circuit held there was

3    In personam jurisdiction over the PA and PLO.  Can it be

4    because there's a resubmission of the case that we're

5    going to relitigate whether there's personal

6    jurisdiction?  No, because the First Circuit held there

7    was.  That was litigated.

8          Sovereign immunity, that cannot be relitigated,

9    in my opinion.  That was adjudicated.  Whether there was

10    a political question or not cannot be adjudicated.  The

11    fact of the matter is the issue of the amount was

12    litigated, perhaps not very well but it was litigated,

13    and I submit that it is absolutely too late, and that

14    what's going to happen, I hope, is when Judge Lagueux is

15    confronted with this issue, he's going to say the

16    Circuit has asked me to look at all these issues, this

17    is an issue that has been adjudicated, and it's not

18    open, and for that reason I suggest that we have a

19    legitimate reason for not answering the questions on

20    damages.

21          Now, I hope I don't overstep my time here, your

22    Honor, but these are very important issues, obviously,

23    and I'd ask for the Court's indulgence.

24          The specific -- we went on, by the way, to answer

25    the interrogatory about damages, and we said

1   notwithstanding that we think it's foreclosed, we

2   specifically said what we relied on to support the

3   award, and we expressly stated that it was the testimony

4   before your Honor, your Honor's decision, and that's

5   what we rely on.

6        THE COURT:  Well, their complaint, Mr. Wistow, as

7   I recall, was the phrase inter alia, meaning among other

8   things, and the suggestion that although you identified

9   three items, or however many it was, the phrase inter

10  alia, I guess, concerned them that you would spring

11  something on them at the hearing.  You want to address

12  that part of their complaint?

13       MR. WISTOW:  Well, let me say this, I can't think

14  of what else we're going to put in at this point, and if

15  we do come up with something, I represent to you we will

16  instantly identify it.  I don't know what else to say.

17       THE COURT:  The other part of their complaint was

18  that you, I believe, cited numerous decisions in

19  terrorism cases and yet you used the phrase numerous

20  decisions and yet you cited only one case.

21       MR. WISTOW:  If the Court wants me to give a

22  citation of legal cases, we can do that in a few days, I

23  suppose.  I mean --

24       THE COURT:  I'm just observing at this point,

25  Mr. Wistow, what they complained about.

1      MR. WISTOW:  I just don't see that, you know, I'm

2  required to cite law to support it.  If that's what it

3  comes down to, and if it makes everybody more

4  comfortable that we're trying to comply, you know, give

5  us a reasonable time and we'll do that.

6      THE COURT:  Your point, Mr. Wistow, is you don't

7  feel you have to give them anything on the issue of

8  damages because they're precluded, but notwithstanding

9  that, you have told them the basis for your position

10  that you believe the amount of damages will withstand

11  adversarial testing for these reasons, that's your

12  position.

13      MR. WISTOW:  Absolutely.  Not only in that

14  answer, but we gave two expert reports to support what

15  the testimony had been before and what your Honor had

16  decided, that would be Dr. Fanning, the pathologist, and

17  Dr. Brenman, the psychologist, so they have those

18  reports.  I really don't know what else I could do.

19      Now, they also -- you know, they talk about in

20  their request for production of documents, which we

21  haven't addressed, they want all the documents that we

22  intend to put into evidence.  At this point in time,

23  your Honor, other than what the experts are saying, I

24  honest to goodness, I'm not sure what we're going to put

25  in.  And my excuse for that, my reason for saying this

1   at this stage is we continually are getting things -- I

2   mean, look at this, October 15th was when we got these

3   complex disclosures.  We got disclosures as late as

4   November 1st -- November 11th, I'm sorry.  I'm mindful

5   of our obligations under the rules to update

6   interrogatories on a reasonable basis, and we're ready

7   to do that instantly, we really are.  And, in any event,

8   we have to do that by December 17th which is two weeks

9   away anyway from the Judge's -- Judge Lagueux's

10  disclosure.  They also ask us for documents that were

11  provided by the plaintiffs or relied on by the witnesses

12  for the July 2000 damage hearing.  We've given a

13  privilege log and indicated that the great bulk of this

14  is correspondence between Mr. Strachman and the

15  individual plaintiffs and we've given you a privilege

16  log on that.

17             THE COURT:  How many documents,

18  approximately, are at issue do you think, Mr. Wistow,

19  there?

20             MR. WISTOW:  Under that category, I'm going

21  to say 15 maybe something like this.  Does that sound

22  right?  And we've provided a privilege log.

23             THE COURT:  The defendant cites some case

24  law that says there's a trend or a modern view, or an

25  emerging view that all communications between counsel

1    and expert witnesses should in fact be disclosed because

2    apparently I guess the rationale would be it bears on

3    the opinion of the expert or at least it should be

4    material available to the other side to fairly

5    cross-examine the expert.  Do plaintiffs disagree with

6    the case law or that it's a merging trend, or I disagree

7    with the proposition being advanced by the defendants.

8    Would you comment on that, Mr. Wistow.

9              MR. WISTOW:  Yes.  I think the trend is in

10   that direction but what's significant here is the

11   documents that we have from experts which are on the

12   privilege log, are from two experts who are not going to

13   testify at the hearing.  Professor Friedman and Doctor

14   Ziderman (phonetic spelling), who is the economist who

15   gave testimony.

16             THE COURT:  And who was Ziderman --

17   Professor --

18             MR. WISTOW:  He was the economist.

19             THE COURT:  And who was the other person?

20             MR. WISTOW:  The other one was Friedman who

21   testified about the shooting and he was a physician who

22   testified about the pain and suffering.  Neither one is

23   going to be testifying here.  SO I mean, it's just very

24   bizarre to ask for the expert reports.  Let me suggest

25   this, your Honor.  We've given your Honor a privilege

```
 1   log, if your Honor requires us to turn those over, you
 2   know, we'll -- of course, we'll turn them over.  It just
 3   seems to me totally inappropriate.  You know, one of the
 4   problems we've have is trying to keep our head above
 5   water trying to get ready for this case and it was --
 6   we've been -- we don't have the resources that the
 7   Palestinian Authority has that is a, you know, a quasi
 8   government and they've pulled out all the stops and
 9   we're just trying to, as I say, keep our head above
10   water.  If your Honor -- what can I say?  If your Honor
11   feels that the reports of the two experts who will not
12   be at the hearing should be disclosed we'll disclose
13   them.  I think that they shouldn't be because they're
14   not going to be experts at this hearing.  In any event,
15   the remaining, the remaining documents they want are the
16   psycological records of the kids, the medical records of
17   the kids, the daycare and preschool records, the school
18   records, all of those things.  What is that going to
19   prove?  If your Honor recalls, and I know you do, the
20   testimony of the expert, Dr. Brenman on the children was
21   very simple.  I don't want to say superficial, but it
22   almost was.  It was almost common sense.  He said that
23   an 8 month old baby and a 20 month old baby to be
24   suddenly deprived of their father represents
25   psychological trauma.  He stands on that, he'll be back
```

1   to testify to that, he's not saying he did some

2   extensive research with these kids.  He stands on that,

3   that's what he's going to say.  He went on to say that

4   children who lose their parents under certain -- at an

5   early age are at greater risks for psychological

6   problems in the future which he said was hard to

7   quantify and didn't attempt to quantify.  It's almost

8   like common sense but he's prepared to come in and

9   substantiate that and he will.  What are we going to do?

10  Are we going to get into a situation where we evaluate,

11  well, did the risk come into being?  Didn't it?  In

12  other words, are these kids doing well today, are they

13  doing badly?  Are we going to open this whole thing up?

14  What if it turns out they're doing badly today, can we

15  increase the award?  I suggest not because what happened

16  is you put in a case based on what the situation is at

17  the time.  Now your Honor was fully aware of the

18  relative limitations of the testimony.  He was not

19  saying that these kids will have psychological problems.

20  And if your Honor rereads your opinion you'll see that

21  you were aware that he did not -- you said there was an

22  increased risk.  What shouldn't be forgotten here is a

23  great deal and I don't know how much of the award was

24  the loss of society and companionship.  They want to

25  make a big deal out of the psychological injury which

the plaintiffs never even made a big deal out of.  And
never said anything but that there were increased risks
which we'll prepared to prove at the trial if it becomes
necessary if we have to get into that.  Besides all of
that the defendants themselves have said in their papers
that they've agreed to freeze the issue of the damages
as of the 2002 hearing.  So, I can't imagine, what in
the world are we doing with the school records if the
damages are to be frozen as of 2002?  You know, Judge,
the psychiatrist they've brought in, and I've read the
report very carefully, doesn't say these kids are at
that increased risk, doesn't say that they didn't have
trauma.  What it says is Brenman did not do a forensic
examination, a true forensic examination, and by the
way, he agrees with that that's in the report we've
submitted to them he did not do a forensic examination.
He gave limited testimony to the Court which was solid,
which was correct, and which was adopted by the Court.
The defendants also insist that we produce the crime lab
material that we have.  All I know, Judge, is we've
given them everything we had.  They want forensics,
we've given them everything that we have, they want some
color photos, that's -- we've given them everything we
have.  They themselves admit, your Honor, on Page 5 of
their reply to our objection to the motion to compel.

1   They admit their Rule 26(a)(2) does not apply in this

2   situation.  All we have is, have we complied with

3   answers to interrogatories and the like.  All I can tell

4   your Honor is we've, we have done everything we possibly

5   can.  If your Honor feels that there's more that we must

6   do, yup we will move heaven and earth to do it.  I don't

7   know what else to say.  I hope, for example, we're not

8   ordered to get school records in five days or something

9   like that in Israel for the various reasons I've stated

10  and also the time constraints.  But, you know we've put

11  in timely objections, we've put in objections in good

12  faith.  And for all these reasons, your Honor, in

13  considering the context that we're in we were trying to

14  get discovery to these people for years and we couldn't

15  do anything and now we're approached.  I respectfully

16  ask that your Honor understand the difficulties that

17  we've had in this case.  Thank you, your Honor.

18            THE COURT:  Thank you, Mr. Wistow.  Mr. Hill

19  I don't want to derail your thoughts but I can tell you

20  I am interested in hearing your response to the argument

21  that you really are precluded from relitigating the

22  issue of damages having previously challenged

23  unsuccessfully the amount of the damages so I'd like to

24  have you address that.

25            MR. HILL:  Your Honor would like me to start

1    with that issue?

2            THE COURT:  Yes.

3            MR. HILL:  I'd be glad to.  This precise

4    issue is the subject of the plaintiffs', I believe it's

5    called second motion in limine which is not before your

6    Honor today.  And let me make a conceptual point and

7    then I'm happy to address the merits if the Court wants

8    me to.  So your Honor is being asked to rule on a

9    discovery motion that material will not be admissible at

10   the hearing.  There is a --

11           THE COURT:  Well, I don't think so.

12           MR. HILL:  Okay.

13           THE COURT:  I think that's an overstatement,

14   Mr. Hill.  I understand you're saying that if I deny

15   that portion of your motion to compel on accepting the

16   plaintiffs' arguments if Judge Lagueux agrees with that

17   that rationale, then one could trace how that result

18   came about.  But what the plaintiffs are saying as I

19   understand it, that as to those requests that go to the

20   amount of damages it should be denied because you really

21   cannot relitigate in the context of a motion to vacate

22   an issue that you've already litigated.

23           MR. HILL:  Yes.

24           THE COURT:  So I didn't mean to cut you off

25   but I, it sounded as if to me you were saying or

1   suggesting that I not reach this issue in the context of

2   this motion and that I allow, if Judge Lagueux doesn't

3   refer that motion in limine to me allow Judge Lagueux to

4   make that decision.  And you're nodding your head as if

5   --

6          MR HILL:  I'm nodding, yes.  Your Honor, is

7   still speaking I don't want to interrupt.

8          THE COURT:  Well, then tell me about that

9   I'm always interested if I should defer --

10          MR. HILL:  Here's the issue.  This could

11   play out in one or two ways.  Your Honor could deny our

12   motion to compel and not give us this material.  If

13   Judge Lagueux grants the motion in limine then we'll be

14   arguing on appeal, I suppose, that Judge Lagueux erred

15   in granting the motion in limine, and we won't get to

16   put that evidence on at the hearing, and I suppose the

17   motion, however the motion goes, and somebody appeals,

18   that will be an issue for the First Circuit to resolve.

19   If, however, you deny our motion to compel, and Judge

20   Lagueux denies the motion in limine, then we're in a

21   posture where we're having a hearing in January on an

22   issue that the district court has ruled is admissible

23   but we don't have the discovery, and that's going to

24   affect the ability to do the hearing in January.  So

25   this is a little bit like Pascal's wager, to a certain

extent, right?  If your Honor orders this discovery, and this was the first time I heard anything about a burden associated with it, I'm not even sure there's an objection about burdensomeness, but presumably the plaintiffs can produce it, or can produce a reasonable amount of it, and will have it.  If Judge Lagueux grants the motion in limine, there's no harm done.  It's not coming into the hearing.  The problem is the other side of the coin.  If your Honor denies our motion to compel, and we don't have the evidence, then Judge Lagueux is going to have to make findings based on the hearing in January when everybody seems to agree this would be relevant to the issue of whether the damages would sustain adversarial testing, and that evidence won't be before him.  And so that's the problem with denying it on the basis that it's unlikely to be admissible at the hearing, and that's why I would suggest, as your Honor suggested I was suggesting, that you not reach that issue, but you instead just rule in accordance with, by the way, if there's repeating, the order that your Honor entered in July, which was not appealed to Judge Lagueux, that it is permissible to have discovery on this issue, and I can just remind the Court of that history, and I'm sure you're aware of it, but early on in the discovery period there was a suggestion at a

hearing both off the record and on the record, I

believe, by Judge Lagueux, that he had a concern about

whether this was a legitimate area of discovery, and we

filed a motion seeking leave of court to take discovery

on this very issue, and the plaintiffs' filed an

opposition where they said, you know, we don't agree

it's relevant but we don't want to hand the defendants

an issue on appeal so we don't oppose the motion, and

your Honor ruled that the motion was unopposed and

granted it.  So if the subject matter that your Honor is

being asked to rule on now is whether there should be

discovery on whether damages will withstand adversarial

testing, you decided that in July.  You decided the

answer was yes, and so I respectfully suggest that the

only issue your Honor ought to be addressing with

respect to damages discovery now is whether the

particular discovery that is before you is appropriate.

And we litigated this on the issue of mental

examinations in October.  Your Honor concluded that they

would be too burdensome on the plaintiffs and didn't

allow them, and that was consistent with your Honor's

ruling that, you know, the general subject matter may be

relevant but this particular discovery is not.  So the

particular discovery before you, I would suggest, is not

unduly burdensome.  In fact, Mr. Wistow has said he was

prepared to answer the interrogatory.  He said he's
prepared to produce the communications with the experts
who testified at the prior hearing.  He's told me for
the first time today that he's given me all the
information on the pathology and on the crime scene,
anyway.  So really the only issue is how much of the
children's material is it reasonable for them to produce
to us in the admittedly short amount of time that we
have left, and I would suggest that the Court can order
that they can give us what's reasonably available.
Presumably the custodians of the children have this
material, and it's not hard to get, or they can get it
from the children's school.  So that's how I would
suggest your Honor deal with this.

        Now, if your Honor wants me to address the merits
of the motion in limine, I admittedly wasn't prepared to
do that.  I can do it as best I can, and I'd refer your
Honor to our opposition brief and ask your Honor to read
that before you rule on the issue, but I really would
suggest to the Court that sitting in the context of the
discovery motion the better practice would be to rule on
the merits of the discovery motion without attempting to
essentially prejudge what the district court may do on
the motion in limine.  Have I adequately addressed the
Court's concern?

1          THE COURT:  You have, Mr. Hill.

2          MR. HILL:  Thank you, your Honor.  Let me return

3    to the batting order in which things came up.  I just

4    want to address some things in the order that Mr. Wistow

5    addressed them.

6          Mr. Wistow suggested that the material we served

7    in the form of our expert reports was, I don't think he

8    said it, but there was a notion that maybe we had done

9    something improper and I wanted to just be clear that I

10   don't believe we have.  We provided those materials at

11   the date they were due under Rule 26(a)(2),

12   approximately 90 days, a little more, technically, than

13   before the hearing on January 18th, so those were timely

14   disclosures.  We believe we were required by the rules

15   of discovery to produce them, so I'm not sure what the

16   basis would be to complain about them.

17         He also suggested, and this is why I wanted to

18   clarify that these were the principal bases for a

19   vacatur, I would suggest that's an

20   over-characterization.  We have, I believe, six expert

21   witnesses.  We disclosed a number of fact witnesses.  We

22   produced a number of documents, including as Mr. Wistow

23   alluded to, the Palestinian Security Services own

24   investigative file of the people who killed the Ungars,

25   so there's a substantial amount of evidence that we've

```
 1    produced and will be relying on that at the hearing in

 2    January.

 3          He also suggested that we first produce the

 4    investigative file on October 29th.  He did not give me

 5    a copy of what he handed your Honor, but if your Honor

 6    could look at that, or if I could see it, I believe that

 7    bates range was produced --

 8          THE COURT:  Miss Saucier, this is the third

 9    document, I believe.  Show that to Mr. Wistow to make

10    sure that that's the document that he handed up third.

11          MR. WISTOW:  It is, your Honor.

12          THE COURT:  All right.

13          MR. HILL:  Okay.  Your Honor, what this says then

14    is it's material that is in both Arabic and certified

15    translation in English.  The Arabic materials were

16    produced on September 27th which was the response date

17    for the third request for production of documents.  We

18    produced the original materials on the day in response

19    to the third request which we'll be arguing about later

20    today, on the day they were due.  It did take us some

21    time to get the certified translation, and we provided

22    that on October 29th.  So the plaintiffs have had this

23    material since September 27th, albeit it in a foreign

24    language, which was one of the issues in the case.  I'm

25    happy to tender this back to the Court.
```

1          THE COURT:  Please do so.

2          MR. WISTOW:  I'd like the Court to take judicial

3     notice I don't speak or read Arabic, either.

4          MR. HILL:  Neither do I, and I also don't speak

5     or read Hebrew, but that's an issue in the cases,

6     unfortunately.

7          So, you know, I'm not sure that there -- I mean,

8     if delays and translations it's the nature of the case,

9     there's nothing improper with us producing the certified

10    translations in October, having given them the original

11    Arabic on the date the response was required.  And, of

12    course, we are I note, of course as everybody agrees,

13    required to supplement by rule, and so the fact that

14    we've supplemented our interrogatory responses with

15    additional witnesses as we've identified them is what

16    we're supposed to do.  So there's nothing wrong there.

17         With respect to the plaintiffs' experts,

18    Mr. Wistow said they've now given you the reports and

19    given us the reports for the witnesses they're going to

20    call.  Again, if I may look at what was given to the

21    Court, I just have a question about it because there was

22    a late report.  I'm not sure if it's part of that

23    package.

24         THE COURT:  Miss Saucier, give it to Mr. Hill.

25    Mr. Hill, show that to Mr. Wistow to make sure that's

 1  what was handed up second.

 2       MR. WISTOW:  It is, your Honor.

 3       THE COURT:  Thank you.

 4       MR. HILL:  Your Honor, there was -- I believe I

 5  received one report on November 12th, one on the 13th,

 6  four on the 15th, and then I received a report, which is

 7  the last one in this package, on November 24th, which is

 8  after the close of discovery.  So just so the record is

 9  clear, one of these was not even given to us until after

10  discovery had closed, and that's the report of

11  Dr. Boaz, B-O-A-Z Shnor, S-H-N-O-R.

12       THE COURT:  Miss Saucier, give the sticky to

13  Mr. Hill and ask him to just attach that sticky to the

14  document that he says he got on November 29th.

15       MR. HILL:  I believe the Court said the 29th.  It

16  was the 24th.  It was the day before Thanksgiving.

17       THE COURT:  Thank you.

18       MR. HILL:  So if, in fact, and let me make this

19  point, the plaintiffs have also identified three other,

20  I guess, potential expert witnesses for whom we have not

21  got reports or interrogatory responses.  I wasn't

22  entirely clear from what Mr. Wistow said whether those

23  three people are going to be called at the hearing or

24  not.  If they're not, obviously I need their

25  interrogatory responses and their reports against the

```
 1   eventuality that they're allowed to testify so I can
 2   properly examine them otherwise I don't have any idea
 3   what they would say, and for that reason, unless
 4   Mr. Wistow has taken those folks off the table, we're
 5   going to need an answer to the pending interrogatory.
 6   So all this points up the fact that the plaintiffs ought
 7   to give us a clear final answer to the interrogatory,
 8   and we ought to get it respectively before the 17th of
 9   December because on December 17th, two weeks from today,
10   we have to file our pre-hearing memoranda, and in order
11   for us to effectively inform Judge Lagueux of who we're
12   going to call, what exhibits we're going to use, it
13   would obviously be helpful to know who they're going to
14   call and what exhibits they're going to use.  And
15   Mr. Wistow talked with respect to exhibits that he
16   wasn't quite sure yet what they were going to use.
17   Well, if he files a brief on the 17th of December that
18   says here are my exhibits, and I have to file a brief on
19   that same day saying here are my exhibits, obviously
20   it's going to be very difficult for us to ensure that
21   we've got the right exhibits that respond to theirs.  So
22   I would respectfully request that the Court enter the --
23   grant the motion to compel, order them to provide us
24   with all the documents they're going to use, sometime
25   reasonably before December 17th, identify any other
```

1    witnesses.  He mentioned there was a fact witness who

2    may be out there.  I obviously don't have a chance to

3    depose that person.  I'm maintaining my right to

4    preclude them, but I ought to know who they are so that

5    I can, you know, if there's a document I need to put on

6    my exhibit list, or a witness I need to put on my

7    witness list.  If I don't know who they are, there's no

8    way for me to do that.  And again, this all goes to

9    efficiently helping Judge Lagueux know what's going to

10   happen in January.  I think those are reasonable

11   requests and they ought to be ordered.

12        Let me make a couple other points about damages.

13   With respect to the communications with the experts.

14   Those documents are on a privilege log the plaintiffs

15   provided to us, and your Honor mentioned -- I don't

16   think there's a serious legal dispute about the

17   discoverability of that material, at least prior to the

18   amendment to the rule, and so we'd like to get those

19   materials.

20        THE COURT:  Mr. Hill, when you say prior to the

21   amendment to the rule, which amendment --

22        MR. HILL:  Nobody's mentioned it yet.  Rule 26

23   was amended effective yesterday, and so under the

24   implementation provisions of that, it applies to cases

25   filed after yesterday, and whatever the standard

language is, you know, to the extent consistent with

equity to pending cases.  Now, nobody has argued that

you ought to apply the new rule to this, particularly

where these communications took place in 2002, we asked

for them long before December 1st, the motion was ripe

long before December 1st.  You know, we're only here

because of the accidents of people's timing and so

forth, so unless there's some request, I don't think the

Court ought to consider the current rule.  But there are

-- these are documents 18 to 25 on their list.  It

obviously wouldn't be very difficult for them to produce

them, and they're listed on page 13 of our brief which

is document 572.  So I would request that the Court

order those.

        Now, Mr. Wistow made the point --

        THE COURT:  Which requests are you referring to,

Mr. Hill?

        MR. HILL:  Well, I'm talking about the

plaintiffs' privilege log regarding defendants' request

number 25 and 26.  The pertinent portion is reprinted on

page 13 of our motion to compel, which is document 572.

        THE COURT:  So you're asking the Court order that

the documents listed in the privilege log be produced to

you?

        MR. HILL:  Yes, your Honor.  And now Mr. Wistow

makes a point that the two experts that these pertain to

will not be testifying in January.  That doesn't mean

they're not relevant because, again, assuming your Honor

is not going to rule that there won't be any evidence on

damages, and whether they would withstand adversarial

testing at the hearing in January.  These experts

presented testimony to your Honor on which you relied in

fashioning the damages amounts, and the admissibility of

that testimony, the reliability of that expert

testimony, will be one of the issues that is confronted

in January, assuming we get to litigate the issue of

whether the damages will withstand adversarial testing.

So they would be relevant even though those people won't

be appearing.

On the documents related to the children, when

you're talking about whether the damages are likely to

withstand adversarial testing, the issue is, is the

amount of money awarded appropriate for the amount of

damages the children sustained, and I respectfully

submit that there's a real question here that wasn't

adequately developed in the prior record and we ought to

have an opportunity to develop it at the hearing in

January.  These children were quite young at the time

their parents were killed, and as Dr. Ryan points out in

her report, the fact that someone is an orphan doesn't

1    automatically translate into them having a mental

2    illness, and your Honor had expert testimony at the time

3    about the likelihood of that, and I submit relied on

4    that in fashioning a damages amount, and what actually

5    happened to the children as they have grown will

6    obviously inform the reliability of a prediction that

7    they would have mental illness, and Mr. Wistow suggested

8    that perhaps -- and again, we don't have any of this

9    information so I don't know whether it's true or not,

10   what if one of these children has developed a mental

11   illness, well, that would obviously be pertinent.  But

12   the point I would make is this, your Honor made

13   identical awards for both children.  If one has

14   developed mental illness, and another has not, that

15   might be an argument about why the award shouldn't be

16   identical.  And so I submit that this is clearly

17   relevant and would a Judge Lagueux in making

18   determinations about whether these amounts are likely to

19   withstand adversarial testing and I therefore ask that

20   -- I'm not asking for something unreasonable but to the

21   extent that these documents are reasonably available to

22   the plaintiffs that they be produced to us before

23   December 17th so we can utilize them at the hearing to

24   the extent the Court allows argument on that issue.

25           And on the last point about the pathology reports

and crime scene reports.  Mr. Wistow has said we have

everything they have.  There's one issue about whether

we have color copies of all the photos, but we can work

those out amongst ourselves.  So based on counsel's

representation that they've produced everything they

have, I don't see a reason for the Court to compel

material that they've on the record said they don't have

anymore.

Unless the Court has questions for me, I think

I'm ready to conclude on this motion.

THE COURT:  All right, Mr. Hill.

MR. HILL:  Thank you, your Honor.

MR. WISTOW:  May I respond very briefly, your

Honor?

THE COURT:  Very briefly.

MR. WISTOW:  The motion that my brother referred

to, to conduct discovery regarding damages, we expressly

preserved, expressly preserved, all objections of any

nature whatsoever regarding any questions put that's in

the Court's documents.  We simply said there was no

reason that we wanted to fight about this at that time

but preserved every single objection which we are now

making on a timely basis.  To require us to turn over

the experts reports that are on the privilege list,

experts who are not going to testify, almost certainly

1    invites us to now bring those experts in because who

2    knows what ambiguities are going to arise out of looking

3    at say raw data or materials that are used without the

4    person there.  What is suppose to happen with those

5    documents?  It just intrudes in this case another

6    unnecessary complication.

7           Finally, and I can't emphasize this too strongly,

8    your Honor, nobody ever said, neither our expert

9    Dr. Brenman nor your Honor, ever said that these

10   children would have mental illness.  No one ever came

11   close to that.  All it said was the loss of a parent

12   increases the risk.  That's in the record, and your

13   Honor adopted that, and that's true and it's

14   uncontrovertible, and to start now getting into this

15   issue about what really happened to these kids flies in

16   the face of every case that's ever happened.  You can't

17   get into this.  People after their awards, some of them

18   go to Lourdes and they make a fantastic recovery, and

19   what happens then?  The defendant comes in and asks for

20   a new trial?  The thing is frozen at the time.  To ask

21   now what happened to these kids since then introduces

22   into this already amalgam of confusion, another web, and

23   one that's absolutely prohibited.  So I ask your Honor,

24   however convenient or inconvenient it is to get these

25   things, and I don't know, I don't know what the

situation is in Israel in getting these records, however
convenient or inconvenient, I ask your Honor not to
order production of records which are not relevant to
what we're talking about.

THE COURT:  Mr. Wistow, is it your position that
it's frozen in time --

MR. WISTOW:  Yes.

THE COURT:  -- does that depend on whether or not
there has been litigation or with the amount of damages?

MR. WISTOW:  I don't understand your Honor's
question.  I apologize.

THE COURT:  Let's say Hamas, who never did
anything in this case --

MR. WISTOW:  Right.

THE COURT:  -- in 2010 files a motion to vacate
the judgment and argues that the amount of the judgment
will not withstand adversarial testing, and they're
making the same argument these defendants are making --

MR. WISTOW:  Yes.

THE COURT:  -- they want to get the school
records of the children, the mental health records of
the children to show that --

MR. WISTOW:  I understand.

THE COURT:  -- the children have not suffered so
much --

1          MR. WISTOW:  Now I understand your Honor's

2     question.

3          THE COURT:  -- does it make a difference?

4          MR. WISTOW:  No, it doesn't make a difference for

5     this reason, for this reason, if the expert testified

6     these children are having tremendous problems today, he

7     said that to your Honor, and your Honor adopted that,

8     and the fact of the matter is that was a bunch of

9     baloney, unless it's relevant, I think what needs to be

10    done is would the award withstand adversarial testing is

11    based on what is the testimony and what did your Honor

12    rely on and what did you conclude.  So if he had said,

13    yes, these children are having terrible psychological --

14    they can't sleep at night, they're doing terribly at

15    school, and they will never get out of second grade, if

16    that's what he said and your Honor adopted that, then I

17    could see where this would potentially become very

18    relevant, but we need to focus on what is it that

19    happened.  What was the testimony and what did your

20    Honor decide.  I implore your Honor, and I'm sure you've

21    done it, to reread your Honor's recommendation and

22    you'll that it's exactly what I said, that the testimony

23    was these kids are at an increased risk, period.  He

24    didn't say 40 percent, 90 percent.  You said that, too.

25    And it's true, and we're prepared to prove that.

1            THE COURT:  All right, thank you, Mr. Wistow.

2            MR. WISTOW:  Thank you.

3            THE COURT:  We're going to take a ten minute

4      recess and then we'll take up the remaining two motions.

5      (RECESS)

6            THE COURT:  Before we proceed to the second

7      motion, I just want to ask plaintiffs' counsel about the

8      first motion.  The defendants in their memorandum say

9      basically this is what they're seeking in this motion,

10     the first motion, the identity of plaintiffs' hearing

11     witnesses, expert reports or any expert witnesses

12     plaintiffs may call for hearing, documents plaintiffs

13     may offer in evidence at hearing, and evidence regarding

14     plaintiffs' contention that the amount of damages would

15     withstand adversarial testing.  So, four things.  The

16     first thing, identity of plaintiffs' hearing witnesses.

17     Mr. Wistow, do I understand correctly, plaintiffs say

18     they have disclosed all witnesses with the possible

19     exception of one?

20           MR. WISTOW:  Yes, your Honor.  As matters now

21     stand, the only witness other than an expert is a fact

22     witness that we don't know whether or not he's going to

23     be available we can use him.  That's all we know at the

24     moment.

25           THE COURT:  And as to expert reports, or any

1   expert witnesses that plaintiffs may call at the

2   hearing, you say you provided that already?

3          MR. WISTOW:  Yes, we have.

4          THE COURT:  And any documents plaintiffs may

5   offer in evidence at the hearing, you have provided

6   that.

7          MR. WISTOW:  No, I'm not saying that.

8          THE COURT:  You're not saying that.

9          MR. WISTOW:  I'm not saying that.  We really

10  don't know.  I can say we will use all of the documents

11  that have been exhibits in the various motions to date.

12  If we have to go through the formality of filing an

13  interrogatory that says that, we'll do that.  But we

14  really -- I don't know how else to say this, we have

15  been so deluged with activity in this case that we're

16  not a hundred percent sure of what the exhibits are

17  going to be at this point.  I don't know what else to

18  say.

19         May I just add one point on that?  I just want to

20  hand up to your Honor a copy of the docket from June

21  1st, 2010 to November 30th, I've never seen anything

22  like it, and, you know, and it gives you an idea of

23  what's been going on.

24         THE COURT:  Mr. Wistow, on the third category,

25  documents plaintiffs may offer in evidence, your

1   response is, no, you're not representing that you have

2   provided all the documents but you are representing that

3   documents that you might offer in evidence at the

4   hearing have previously been introduced as an exhibit in

5   some proceeding.

6          MR. WISTOW:  Yes.

7          THE COURT:  So we're not going to have a

8   situation where the defendants are going to say we've

9   never seen this document before, because any documents

10  the plaintiffs intend to utilize at the hearing in

11  January will have been previously provided to the

12  defendants somewhere along the line?

13         MR. WISTOW:  By December 17th, certainly.  I'm

14  not -- I'm embarrassed to be in this situation, your

15  Honor, but we've done everything humanly possible to try

16  to -- to comply.

17         THE COURT:  Going back to the first --

18         MR. WISTOW:  Excuse me.  I think there's one

19  other, one other issue.  Mr. Strachman reminds me that

20  there are some reports -- I believe we have supplied the

21  reports of the experts on Israeli law.  I believe we

22  have.  To the best of my knowledge, your Honor, we have

23  supplied the reports of every expert that we intend to

24  use.

25         THE COURT:  Mr. Wistow, just going back to the

```
 1    first two categories.
 2            MR. WISTOW:  Yes.
 3            THE COURT:  The identity of your witnesses and
 4    the expert reports for those witnesses.
 5            MR. WISTOW:  Yes.
 6            THE COURT:  The January hearing, you say you've
 7    given this to defendants already.
 8            MR. WISTOW:  To the best -- I believe we have.
 9    Is there any doubt about that, Mr. Strachman?  To the
10    best of my knowledge, that's right, your Honor.
11            THE COURT:  In terms of the Court granting the
12    motion as to those two categories, is there any
13    objection from the -- at this point, if I say that as to
14    those two categories of documents, identity of witnesses
15    and expert witness reports, plaintiffs represent they
16    have provided all such names and reports to the
17    defendants?
18            MR. WISTOW:  Expert witnesses.
19            THE COURT:  Yes.
20            MR. WISTOW:  That's -- what I don't, what I don't
21    want to get mixed up on here is we don't believe that
22    Rule 26(a) applies.  We're complying pursuant to answers
23    to interrogatories.  So what we're saying is we've
24    answered the interrogatories with reference to the
25    experts.  That's what we're saying.  We don't want to be
```

1    conceding that Rule 26(a) applies to the expert

2    disclosure.

3            THE COURT:  But you've also identified all your

4    witnesses, expert and nonexpert, for the January 17th

5    hearing?

6            MR. WISTOW:  With the -- as I said, your Honor,

7    there's a possibility of at least one fact witness, at

8    least one --

9            THE COURT:  But previously, Mr. Wistow, you said

10   one witness, now you're saying at least one witness --

11           MR. WISTOW:  Well --

12           THE COURT:  How --

13           MR. WISTOW:  There's only one that I'm cognizant

14   of now.  There's been such activity in this case, I

15   don't want to stand here and say that if we have some

16   kind of lightning bolt that hits us going over all of

17   this before December 17th that we can't supply it.  I'm

18   not trying to be elusive.

19           THE COURT:  Is there any reason why you could not

20   definitively identify this possible additional witness

21   in five days from today's date?

22           MR. WISTOW:  I don't know.  He's in Israel, and I

23   don't know.  I, I --

24           THE COURT:  All right.

25           MR. WISTOW:  I don't know.

1          THE COURT:  All right, fine.  I just wanted to

2     ask those questions.

3          MR. WISTOW:  I'm trying to be as candid with the

4     Court as possible.

5          THE COURT:  Thank you.  Now with regard to the

6     documents pertaining to damages that you claimed a

7     privilege on.  Today is Friday.  I want to decide these

8     motions as quickly as possible.  I'm not sure I'm going

9     to look at them but I think I'd like you to submit them

10    to chambers for a possible in camera examination, so if

11    I decide I need to do an in camera examination of them,

12    I'll have them.  I can do it this weekend, and then I

13    can just rule as opposed to waiting until Monday and

14    then deciding I need to see them.  Could you see that

15    copies of those documents that you claim are privileged

16    as to your -- I'm referring to the damages experts.

17         MR. WISTOW:  Just the experts, not the

18    communication with the clients.

19         MR. HILL:  Your Honor, if it will aid the Court,

20    I haven't moved on the communications with the clients.

21    I've only moved on the ones with the experts, which I

22    believe are 18 to 25 on the --

23         THE COURT:  Number 18 to 25?

24         MR. HILL:  18 to 25.

25         THE COURT:  18 to 25.  Would you submit those

1    documents, 18 to 25, to my chambers today?

2           MR. WISTOW:  May we do that --

3           THE COURT:  Mr. Strachman?

4           MR. STRACHMAN:  I'm pretty sure I can, Judge.

5           THE COURT:  All right.  I'll be here until 6.

6           MR. STRACHMAN:  Judge, I have a situation, Jewish

7    Sabbath, at 3:30.

8           THE COURT:  Okay.  I understand.

9           MR. STRACHMAN:  I'm going to do my best when we

10   get out of here.

11          THE COURT:  If you're not able to, I understand,

12   Mr. Strachman.

13          MR. STRACHMAN:  Thank you.

14          THE COURT:  If it has to wait until Monday, it

15   has to wait until Monday, fine.

16          MR. STRACHMAN:  Okay, thank you.

17          THE COURT:  Okay, fine.  That takes care of my

18   questions on that first motion.  We're now going to go

19   to the second motion.

20          The second motion is document 583.  This is

21   plaintiffs' judgment creditors motion to strike

22   defendants' objection to and compel compliance with

23   certain requests contained in plaintiffs' judgment

24   creditors third request for production.  Mr. Wistow.

25          MR. WISTOW:  Thank you, your Honor.  If your

1   Honor has looked at the request for production, you'll

2   notice that it's virtually identical in terms of topics

3   to the request for 30(b)(6) depositions where your Honor

4   made a ruling, and that's in docket number 578.  You'll

5   recall there were very extensive request for produc --

6   excuse me, request for depositions under 30(b)(6), and

7   your Honor whittled them down very significantly in an

8   order which is number 578.

9        We filed the request for production which

10  mirrored the 30(b)(6) request for depositions long

11  before your Honor had ruled, as you did, in number 578.

12  Once -- and by the way, you ruled on that on October

13  28th, the 30(b)(6), and what you indicated was that you

14  would allow discovery in certain areas, and just to sum

15  them up, willfulness of the default that was objected

16  to, and as a matter of fact the subject of appeal to

17  Judge Lagueux now that the defendants contend that their

18  willfulness and the degree of willfulness is not open to

19  review at this time.  The second was the timeliness of

20  the motion to vacate, which they also contended was not

21  open to review.  Your Honor disagreed.  That's also on

22  appeal.  But in any event, the existing order is for

23  willfulness, timeliness.  Your Honor indicated that it

24  was appropriate to ask about the relationship between

25  the Palestinian Investment Fund and the defendants,

1    their knowledge about the collection efforts that the

2    plaintiffs were making to recover under the judgment of

3    2004, the Palestinian Investment Fund actions in

4    connection with those attempts to collect.  Your Honor

5    ruled that it was appropriate to ask questions about

6    meritorious defenses, and also whether or not there was

7    prejudice to the plaintiffs because of the delay in

8    discovery, and the delay in the motion to vacate, and

9    the basis for the defendants' affirmative contention

10   that there was no prejudice.  Your Honor under that

11   heading also said we would be entitled to ask questions

12   about the roles of certain leadership individuals who

13   were noticed to deposition in the original case and

14   whose failure to be produced was part of the reason for

15   the default judgment.  Your Honor indicated we could ask

16   about political ramifications of the judgment, the

17   effect on international relationship, and finally how

18   the defendants' ability and willingness to participate

19   in discovery differed today from where it had been on

20   January 27, '03, and your Honor expressly referred to

21   this when a Mr. Al- Kidwas wrote a letter to your Honor.

22        First I want to say, I don't, for the life of me,

23   understand how my brother can say that we did not meet

24   and confer on these requests for productions.  His own

25   attachments to his objection shows the enormous amount

1  of time, not very productive time, that was spent trying

2  to work something out, but there was an enormous effort

3  to try to resolve this.  I don't know where in the world

4  he can come up and say that there's been no meeting to

5  confer.

6         After your Honor ruled in docket number 578

7  limiting the issues, we've, in turn, attempted to

8  confine our motion to those matters that fall within

9  what your Honor said are legitimate areas.

10 Specifically, and I'm going to do this in chronological

11 order of the numbers of the request for production, the

12 first is number 4.0 to 4.Z.  Every one of these

13 interrogatories relates to willfulness and timeliness.

14 I said interrogatories, I misspoke.  Request for

15 production.  They ask for any kind of records from the

16 Palestinian cabinet, or the Palestinian Liberation

17 Organization's executive committee, dealing with the

18 judgment of 2004, the default judgment, and the 2006

19 creditors bill judgment.  That's the judgment where

20 Judge Lagueux assigned all of the PA's ownership

21 interest in the PIF over to the plaintiffs.  The motion

22 contains an error in it.  It refers to any documents

23 relating to the action.  That's not what the request for

24 production -- the request for production, and all we're

25 pressing, is documents that relate to the 2004 default

1    judgment and the 2006 judgment on the creditors' right.

2         The defendants have stated after very lengthy

3    objections, most of which are boilerplate, that they

4    claim that neither the PA cabinet nor the PLO executive

5    committee has any such documents.  And I'll just read

6    you what their response is to several of these.  The

7    defendants hereby incorporate by reference as is fully

8    set forth herein the foregoing general and specific

9    objections.  Subject to, and without waiving the

10   foregoing general and specific objections, and without

11   prejudice to defendants' right to modify, amend or

12   supplement their responses as appropriate, defendants

13   state that there are no documents responsive to this

14   request.  Now all I would ask there, your Honor, to

15   those responses, is that to avoid any ambiguity later,

16   that the objections be stricken, and if they want to

17   stand and say there are no such documents, well, of

18   course, we have to accept that, and so I would ask that

19   for items 4.0 through 4.R.

20        Now, items 4.S through V are a little bit

21   different.  They're related but different.  4.S through

22   4.V specifically asks for such records of any ministry,

23   agencies, department or bureau rather than the

24   Palestinian Authority's cabinet or executive committee

25   of the PLO.  And interestingly enough, when it comes to

1    responding to those requests -- and again, your Honor,

2    these are the documents relating to the judgment, the

3    default judgment.  This is related to the default

4    judgment, and which your Honor has already ruled, and I

5    believe consistent with what Judge Lagueux has ordered,

6    that the willfulness is an open issue, and their

7    response -- I'm not even going to bother reading the

8    general and specific objections because they're

9    boilerplate, the same throughout everything here, but

10   their response is as follows, and it's very telling:

11   Defendants hereby incorporate by reference as is fully

12   set forth herein the foregoing general and specific

13   objections.  This is 4.S, your Honor.  Subject to and

14   without waiving the foregoing general and specific

15   objections, and without prejudice to defendants' right

16   to modify, amend or supplement the responses as

17   appropriate, defendants state they will produce

18   documents containing nonappropriate and nonprotected

19   information within their possession, custody or control,

20   that are responsive to a reasonable and proper scope and

21   interpretation of this request, and that can be found

22   through reasonable search efforts by defendants.

23        Now, your Honor, if that passes muster as a

24   satisfactory answer to a request for production, I'm

25   going to use it myself from now on in every case that I

1    have because it says nothing.  It says we're going to

2    produ -- first of all, we have objections, then, but

3    notwithstanding those objections, we'll give you the

4    stuff that's nonprivileged and nonprotected so long as

5    it's subject to a reasonable and proper scope of

6    interpretation.  It's absolute smoke, that answer.  Now

7    if they want to say there are no such documents, there's

8    nothing I can do about that.  But it's a world of

9    difference between the answers saying they have none and

10   this really elusive answer.  And so I would ask your

11   Honor that you order production of those documents.

12   They're absolutely central to the hearing on willfulness

13   and timeliness.

14        By the way, I might point out to your Honor, I

15   don't know if your Honor is aware of this, that within

16   the last, and I've lost track of time, I'm going to say

17   the last couple of weeks, anyway, no more than that, the

18   defendants have now filed a motion to vacate the 2006

19   creditors' bill judgment.  So we're not talking just

20   about the original 2004 judgment, they're trying to

21   vacate the second creditors' bill judgment.  And one of

22   the things we're saying here is that they sat on their

23   rights, let years go by, let us litigate in all kinds of

24   other courts trying to collect on this thing, and just

25   on that timely and -- I just go on.  I should go on to

1    the next subject.

2          We're asking that they be compelled to produce

3    the items referred to in 6.J.L, and basically those go,

4    I don't know how anything could go more directly to

5    meritorious defense than these items, and what they are,

6    your Honor, is -- and recall, by the way, that the

7    murder in question was in June of 1996.  What these are

8    asking for is, are the records of any communications,

9    written agreements, between Hamas and on the one hand

10   the PA, on the other hand the PLO, and finally Fatah,

11   which is the largest political component of the --

12          THE COURT:  Excuse me, Mr. Wistow, you're talking

13   about 6.J through 6.L?

14          MR. WISTOW:  That's right.

15          THE COURT:  I have your memorandum in front of

16   me.

17          MR. WISTOW:  Yes.

18          THE COURT:  And you just concluded speaking about

19   requests 4.0 through 4.V.

20          MR. WISTOW:  Yes.

21          THE COURT:  And the next group that's addressed

22   in this request 9.A to B, 9.U to V, 13.H, S, I'm sort of

23   flipping through your memo trying to find 6.J.

24          MR. WISTOW:  It's there.  What I've done, your

25   Honor, is I've put them in a slightly different order

than they are in the memo.  I put them in the order, the
absolute chronological order, the correct order.  6.J
through L is -- if your Honor wishes, I can try to find
that.  I represent it's in the memo.

THE COURT:  Well, I see on page 15 there are
three lines.  It says request 6.J to L seeks documents
directly related to defendants' claimed meritorious
defenses.

MR. WISTOW:  Yes, exactly.

THE COURT:  So that's it?

MR. WISTOW:  Yes.

THE COURT:  Okay, continue.

MR. WISTOW:  What I wanted -- I thought it was
better.  I apologize for the way they -- I think it
would have been clearer if we did the memo in the
correct order, the chronological order of the requests
rather than -- that's what I'm trying to do now.

THE COURT:  All right.

MR. WISTOW:  Because what's happened, your Honor,
is you can see that the documents are so lengthy that we
thought it better to just attach them as an exhibit, so
I thought when your Honor's looking at these things it
would be easier to look in correct -- I keep saying
chronological order, I guess the correct sequential
order is what I really mean.

1              THE COURT:  All right.

2              MR. WISTOW:  In any event, 6.J to L relates to

3     communications between Hamas and the PA, PLO and Fatah,

4     in the period September 1st '93 to June 9th '96, and

5     what that relates to, your Honor, is the early date,

6     really the creation of the PA under the Oslo Accords and

7     the last date relates to when the murder took place, and

8     we're asking -- we're saying there's agreement -- it's

9     undisputed in this case.  They're claiming that Hamas

10    committed the murders and that they had nothing to do

11    with Hamas at that time and, in fact, Hamas was acting

12    contrary to their wishes.  Now, again, we have this

13    bizarre response from them on these issues where they

14    say again, defendants state they will produce documents

15    containing nonprivileged and nonprotected information

16    within their possession, custody or control that are

17    responsive to a reasonable and proper scope and

18    interpretation of this request, and that can be found

19    through reasonable search efforts by defendants.  So

20    again, we have that, you know, we'll give you something

21    if we feel like it answer, and this is very very central

22    to the meritorious defense issue.

23             The next in sequential order, your Honor, is 9.A

24    and B, and what those requests directly relate to are

25    three issues that your Honor ruled were relevant.  One

1    is the willfulness of the default, next is the

2    timeliness, and a new issue here, their claim that this

3    relates to willfulness.  They had claimed in their

4    pleadings earlier that they had no structure in place to

5    monitor these lawsuits, will take care of these

6    lawsuits, and that was part of why everything sort of

7    went under the radar and they got defaulted, and what

8    9.A and B asks is who was monitoring the lawsuits that

9    they -- the terrorists lawsuits that they were involved

10   in, in Israel and the United States in the period 1993

11   when the PA was created through 2007.  Now if the

12   argument needs to be made that this is too broad a

13   period of time, which I don't think it is, what I would,

14   as a minimum, would ask the Court to give us is what

15   were they doing in the period that this lawsuit was

16   pending, which is the years 2000 through 2006.  And the

17   only reason I say 2006 is that's the date of the

18   creditors' bill default, which they're also asking be

19   vacated.  So I deposed Prime Minister Fayyad in

20   Jerusalem, and he testified that indeed they had

21   policies and guidelines for handling these cases at

22   least from 1993 on, and that he, Fayyad, was in charge

23   of the Israeli defense cases, at least from 2003, and

24   we're asking your Honor that we get the records

25   regarding those lawsuits, at least for the period 2000

1    to 2006, which is directly relevant to the default

2    period here, and we're asking flat out that they give us

3    the policies and procedures which is 9.U through V, the

4    policies and procedures that Fayyad testified under oath

5    existed at least from 1993.

6         10.A through Q are documents relating to the

7    relationship between the Palestinian Authority and the

8    Palestinian Investment Fund which was expressly ruled by

9    your Honor to be an appropriate area.

10        We're also asking within that group for documents

11   that reflect the Palestinian Authority's awareness of

12   the 2006 creditors' bill judgment which now four years

13   later they're trying to vacate that, also.

14        And probably most important, most important in

15   this category, are records regarding the payments from

16   the Palestinian Investment Fund to the Palestinian

17   Authority.  I can't emphasize how central those

18   documents are to what we're trying to prove in this

19   case, and let me explain a little bit more because

20   there's been some subsequent activity your Honor may or

21   may not be aware of.

22        We recently attempted to get a preliminary

23   injunction within the last couple of weeks from Judge

24   Lagueux regarding payments by an Egyptian company,

25   Orascom, to the Palestinian Investment Fund, and without

1   getting into just, you know, an overwhelming amount of

2   collateral material, Judge Lagueux said that he would

3   not issue the preliminary injunction.  He affirmatively

4   said that that does not mean he would not issue a

5   permanent injunction after hearing in January if we

6   could present evidence that the PIF -- excuse me, that

7   the PA was siphoning funds from the Palestinian

8   Investment Fund, which is one of the things we're trying

9   to prove here.  We're also trying to prove that under

10  First Circuit case law a party who comes in and asks for

11  the vacatur of a default judgment must have clean hands,

12  and one of the considerations to deny vacatur is if the

13  party has acted with unclean hands.  One of the things

14  we want to show is that after Judge Lagueux awarded the

15  stock ownership of the Palestinian Investment Fund to

16  the plaintiffs, took it away from the Palestinian

17  Authority, that notwithstanding that, the Palestinian

18  Authority paid to the -- excuse me, the Palestinian

19  Investment Fund paid to the Palestinian Authority all

20  kinds of money that we contend it shouldn't have, and

21  this was something that Judge Lagueux expressly referred

22  to as being something which might persuade him to enter

23  a permanent injunction.  And, in any event, regardless

24  of the injunction issue, we think we're entitled to show

25  that these defendants have completely disregarded Judge

1    Lagueux's order of 2006 turning over the investment fund

2    to the plaintiffs, and that that alone -- by the way,

3    once that argument was made, that precipitated, in my

4    opinion, the recent motion to vacate the 2006 turnover

5    order because I think the defendants realized they have

6    some real peril if we can show that despite the

7    creditor's bill judgment in our favor, they have

8    disregarded the fact that we're the owners.  Now that's,

9    your Honor -- I'm not trying to persuade you that we win

10   on that.  It's a big issue, but it's an issue we would

11   like to be able to present Judge Lagueux with evidence

12   that there have been many many many millions of dollars

13   turned over from the PIF to the PA after the transfer of

14   ownership to the plaintiffs, and so we're asking at an

15   absolute minimum that we get the records of those

16   payments.

17          Now in response to that, they've incorporated

18   their general objections and they said defendants do not

19   intend to produce any documents in response to this

20   request, and --

21          THE COURT:  Which request is that again,

22   Mr. Wistow?

23          MR. WISTOW:  That relates to all of these

24   requests.

25          THE COURT:  Give me a number.

1        MR. WISTOW:  10.A to Q.

2        THE COURT:  Okay, thank you.  Mr. Wistow, I need

3   to tell you that I can probably give you 15 more minutes

4   total, so you may want to hit high points.  I have read

5   your memo.

6        MR. WISTOW:  Okay.  Fair enough.

7        THE COURT:  And I think I've read it twice, in

8   fact.  I think I've read all the memos twice, but I just

9   want to alert you, I'll give you 15 more minutes, hit

10  the high points that you'd like.

11       MR. WISTOW:  I will, your Honor.  This is an

12  painful for me as it is for you, I think.

13       In any event, 13.H through F, the Israeli

14  proceedings, one of the big arguments that has been made

15  before this Court and before the circuit is that the

16  defendants represent immature quasi-governmental group,

17  unsophisticated, didn't know how to handle these things,

18  the suit here, and that's one of the reasons they got

19  defaulted.  We would like to show, and we have reason to

20  believe this is absolutely true, that in the -- there

21  were many Israeli suits brought against the PA and the

22  PLO under Israeli law for terrorist activities, and that

23  the PLO and the PA had no trouble defending those cases,

24  participating in discovery, and not getting defaulted,

25  and one of the things we want to show ultimately is the

1  reason that they defaulted in this case is because they

2  felt there was never going to be an opportunity for the

3  plaintiffs to ever collect anything, regardless of what

4  the result was.  They knew that an Israeli judgment,

5  because of the occupation of the west bank and Gaza,

6  would be collectible against them.  So we want to show

7  that they adequately defended those cases.

8       There's a very specific document we would like,

9  and I think this shows you the approach of the

10  defendants generally to this, it's 13.BB, and it's a

11  specific affidavit of a Muhannad Jaouni dated 2/22/05.

12  It was introduced in an Israeli case.  And that relates

13  -- I'll read you what it says.  An authentic copy of the

14  affidavit of Muhannad Jaouni dated February 22, 2005

15  submitted by the PA in the Jerusalem District Court in

16  Civil Case so and so, and it identifies it, and they've

17  taken the position that they're not allowed, among other

18  things, they're not allowed to produce this document.

19  It's inconsistent with Israeli law and procedure.  We

20  supplied an affidavit from a professor, Israeli law

21  schools, indicating that the law in Israel is virtually

22  identical to the law here in the United States, that if

23  the PA or the PLO goes to its lawyer, goes to its lawyer

24  and says give me a copy of my file, the lawyer must do

25  it, and this is the affidavit of Professor Lipschits.

1    The lawyer must provide the documents.  In fact, it's a

2    violation of the disciplinary rules in Israel.  It's an

3    exact perfect corollary of what we have here.  So we're

4    asking for that affidavit.

5         Similarly, another specific is the Fayyad

6    resignation, which is referred to in 14.A, and they

7    refuse to give us that, and we think that the Fayyad --

8    Fayyad is the present prime minister of the Palestinian

9    Authority.  He was the finance minister during much of

10   the period we're talking about, and we think that

11   resignation letter is going to be vital in terms of

12   showing participation between the PA and the PLO, and we

13   don't understand why we can't get it.

14        I skipped over some other things.  This is --

15   your Honor has read it, and I leave it to your Honor to

16   decide the relevance and the importance of these

17   matters.  I understand, your Honor, that there's a fair

18   amount of work to get this stuff together on the part of

19   the defendants.  I don't suggest that this is an

20   overwhelmingly simple task, although it is for some of

21   the items like the affidavit and the letter of

22   resignation, and also the records of payments that the

23   PIF made to the PA.  That should be simple.  The others,

24   I agree, requires some effort, but let's look at the

25   context of this.  These defendants are in this court

1     saying please relieve us from $116 million judgment, and

2     let us go forward and do a trial.  And we say before you

3     do that, let's go through these steps.  Let's take the

4     effort and produce the documents.  Agree there's an

5     effort involved.  And I think it's warranted.

6                THE COURT:  Thank you, Mr. Wistow.

7                MR. WISTOW:  Thank you, your Honor.

8                THE COURT:  Mr. Hill.

9                MR. HILL:  Thank you, your Honor.  Let me start

10    with a big picture point which is this, the arguments

11    that have just been made to your Honor about why these

12    materials need to be produced were never made to me in a

13    meet and confer with the plaintiffs lawyers.  We

14    attempted to confer with them about these requests

15    before the date of our response, and Mr. Wistow told us

16    he didn't want to talk to us.  He would only deal with

17    us in a letter, so we wrote him a letter, and in

18    response to that letter, they removed six of the 205

19    requests and tweaked the rest.  We served our responses

20    on September 27th.  Subsequently, Mr. Strachman

21    reflected that we have a meet and confer about our

22    responses, and Mr. Wistow did not participate in that

23    conversation, but I spoke with Mr. Strachman.  During

24    that conversation, none of the issues that were raised

25    in this motion were discussed with me.  There has never

1   been a meet and confer between the parties about the

2   substance of the motion that is before you today, and I

3   think more importantly, that conversation with

4   Mr. Strachman took place before we had the arguments in

5   late October, and before your Honor issued the order on

6   the Rule 30(b)(6) deposition.  And after your Honor

7   issued that order, which as they acknowledge, it

8   substantially narrowed the topics that the Court thought

9   were appropriate for discovery, we never had a

10  conversation about what if anything we would do in

11  response to that order as it relates to these requests.

12  Now I think the fact that we never had that conversation

13  is reflected in what is frankly a waste of the Court's

14  time on some of the issues that have just been argued to

15  you.  And I'll just pick a couple of low hanging fruit.

16  One is request 14.A.  Your Honor, if I may, I did what

17  the plaintiffs didn't do, which is what is required by

18  the local rule, I actually exerted the requests and the

19  objections, and I have them here.  I'd like to hand them

20  up to the Court because I think your Honor needs to look

21  at these requests.  May I do that?

22          THE COURT:  You may.

23          MR. HILL:  I have copies for counsel, as well, if

24  you'd like them.

25          Request Number 14.A on the exhibits that I just

1    handed your Honor, on page 72, and that says they

2    request an authentic copy of the letter of resignation

3    referred to by Salam Fayyad on pages 289 to 292 of the

4    transcript of his July 28, 2010 deposition.  This is

5    actually a reasonable request.  It's very specific.  And

6    if you look at our response, we say defendants state

7    they will produce a document responsive to a reasonable

8    and proper scope and interpretation of this request.

9    And what's really extraordinary is that we did.  And it

10   was in the production that we made on September 27th.

11   Mr. Strachman subsequently asked me to provide an index

12   of my production, and I gave it to him, and in that

13   index -- I'm trying to put my hands on right now.  This

14   is in the record as Exhibit 17 to our opposition brief,

15   which is document number 610.  On page 2 of that

16   document, I don't know if your Honor is trying to find

17   it.  I'll wait.  On page 2, in the left-hand column, we

18   list 3 RPD 14(a) and we list the bates range, page 12158

19   to 12159.  That is the two page resignation letter of

20   Prime Minister Fayyad, and so it's extraordinary to me

21   that even in oral argument Mr. Wistow is suggesting to

22   the Court that we didn't produce it and asking that I be

23   ordered to produce it when the fact of the matter is I

24   did produce it on September 27th, and, you know, it's

25   just extraordinary to me that Rule 37 requires the

1    parties to get together and have a conversation to try

2    and narrow discovery disputes before the Court is asked

3    to rule on them, and everything I've said about this for

4    the last few minutes has been a complete waste of

5    everyone's time, and that's just one example.  Let me

6    give you another one.

7         The plaintiffs have moved to compel on both their

8    requests 9.A and 9.B and their requests 13.V and 13.W,

9    and if you look at request 9.A, which is on page 18 of

10   the exhibit I just handed your Honor, and to keep your

11   thumb there, and then find 13.V, which is on page 48 of

12   that same document --

13        THE COURT:  Are you saying V as in Victor?

14        MR. HILL:  V as in Victor.  13 Victor on page 48,

15   and you compare 13.V with 9.A, you'll see they're

16   exactly the same thing.  So they've moved to compel on

17   two identical requests.  And again, if they had just

18   bothered to have a phone conversation, we wouldn't have

19   wasted time briefing this issue.  There's no point in

20   moving on two identical requests.  And let me give the

21   Court one more example.

22        If the Court will look at request number 14.F.i,

23   I'm sorry, 14.F(iii), so it's 14.F.iii, this is on page

24   97 of the document I just handed up, this asks for all

25   documents related to, referring to, and/or evidencing

1    any and all positions, titles and/or jobs held by Amin

2    Al Hindi in the PA or the PLO on the date that you

3    produced documents in response to this request.  So this

4    would have required us to provide documents related to

5    Mr. Al Hindi's jobs, essentially, as of September 27,

6    2010.  Well, Mr. Al Hindi died on August 17, 2010.  So

7    this is a request to provide the current job of someone

8    who's deceased.  This is something they need to compel

9    on.  And again, if they'd just complied with the rule

10   and had a substantive conversation with us about the

11   arguments they're now making about the requests they're

12   now seeking to have us ordered to produce documents in

13   response to, we wouldn't have wasted everyone's time

14   litigating 14.F.iii.

15        Now, more examples, and I'll reference them as I

16   talk about these individual requests, but I wanted to

17   say at the outset this is not the way you're suppose to

18   do this.  We're not suppose to waste your Honor's time

19   and the parties' time briefing a motion on things that

20   can get resolved in a phone call between counsel.  And

21   the case law is very clear, that that is the basis alone

22   to deny the motion, and I would request that the Court

23   do that.  Now unless the Court's prepared to do that

24   right now, I, of course, need to go on and address the

25   merits, and I'll do that.

1           THE COURT:  Please do.

2           MR. HILL:  And the second point I want to make is

3    there is also a failure to comply with the local rule,

4    which is local rule 37(a), and I know the Court is

5    familiar with it, but I think it bears reading it into

6    the record, which is, a motion to compel a response, or

7    further response to an interrogatory request for

8    production or request for admission shall state the

9    interrogatory or request, the response made, if any, and

10   the reasons for why the movant maintains the response is

11   inadequate.  That's not been done here.  And, frankly,

12   it makes it very difficult to respond to the arguments

13   that are made, and I know it makes it difficult for the

14   Court.  I have just handed you the hundred pages of

15   requests that are at issue and the responses that are at

16   issue.  That is how much thicker the opening briefs

17   should have been had the local rule been complied with.

18   And I'm going to take your Honor through, if not all of

19   these, a vast majority of them in the course of this

20   argument because I feel I have to have you look at the

21   language that you're being asked to order my clients to

22   comply with, and the plaintiffs want your Honor to do

23   this at 20,000 feet and just say, oh, well, there's some

24   categories here, there's some categories there, but the

25   fact of the matter is the language of the requests

1   matter, and that is the language that we've made

2   objections to, and so the notion that the plaintiffs can

3   just say, oh, well, generally this topic area is

4   relevant therefore you should compel the following 22

5   specific requests, that just can't work that way. We've

6   got to work through the details and determine whether

7   these are proper in scope, whether they call for

8   privileged information, if they do, whether I should be

9   required to produce a privilege log. Let me make this

10  big point, a lot of these are for all documents relating

11  to a general category of material, including in some

12  instances all documents related to blah, blah, blah,

13  this action. Well, Judge, that literally requires me to

14  log everything in my office about this case, and that is

15  not reasonable. There's no reason for that. And if I

16  sent them a document request that said produce all

17  documents related to this case, they would object and

18  say it's ridiculous, it includes a ton of

19  attorney/client and attorney work product, and I've made

20  those objections. But the arguments the plaintiffs are

21  making is, oh, no, you should just order them to produce

22  all that stuff. And so we're going to need to go

23  through these in some detail, and if your Honor is going

24  to order anything, your Honor is put in the unfortunate

25  position of having to basically blue pencil these

1   requests.  And I was struck by one of the things

2   Mr. Wistow said in his argument which was there's a

3   mistake in the motion.  I think it's with respect to

4   request 4.0, and he says there's an error, we're not

5   asking for all documents related to the action.  But

6   when you look at 4.0, which is on page 5 of the exhibit

7   I handed to your Honor, it asks for authentic copies of

8   all PA cabinet minutes, protocol and/or records from

9   anytime referencing and/or relating to the judgment, any

10  proceedings brought to enforce the judgment, the 2006

11  judgment, and/or the instant action.  And, again, if we

12  had a meet and confer, and he said, you know what, I'm

13  not asking for everything about the case, I'm just

14  asking about the judgments, well, that would have

15  substantially narrowed this request.  Now in this one,

16  it turns out to be a no set because there aren't

17  anything even to the broader ones, but as you'll see as

18  we go through these, this is a consistent problem

19  throughout these document requests.  They are requesting

20  in here that literally, if read, require every document

21  that has Salam Fayyad's name on it.  There are documents

22  in here that literally, if read, require me to log every

23  document in my office related to this and, frankly, it's

24  not fair to the Court to require you to now take a blue

25  pen to these and make them reasonable.  You should

1    require the parties to have done that before we get here

2    several weeks after the close of discovery on a motion

3    to compel 90, really discount the duplicates, 88

4    document requests.  So I think independently the failure

5    to comply with the local rule and produce for your Honor

6    in a way that's easy for your Honor to utilize the

7    actual requests and the actual responses is another

8    basis on which to deny this without even reaching the

9    individual merits.  But I understand the Court wants me

10   to proceed with the argument, and I'll proceed to the

11   individual merits at this point.

12          THE COURT:  Just so you won't be surprised,

13   Mr. Hill, I'm going to let you begin, because I let

14   Mr. Wistow begin and go on awhile with each individual

15   request, but I'm going to limit you to about the same

16   amount of time Mr. Wistow had.  I doubt that you'll get

17   through all of these, so I'm going to let you go, but

18   you're not going to get through all of them, I don't

19   think, unless you speak extremely fast.

20          MR. HILL:  Well, your Honor, I will obviously do

21   as the Court complies.  I'd ask that the Court note my

22   objection to that because I'm being -- your Honor is

23   being asked to incorporate these particular

24   constructions into an order, and I think before your

25   Honor can do that I should have the chance to argue them

1    all, and I will obviously try and meet the Court's

2    timing requirement.  I appreciate this could take a long

3    time.

4          THE COURT:  Well, it sounds to me, Mr. Hill,

5    you're suggesting I'm not being fair to you when I -- I

6    don't share that view.  The Court's trying to be quite

7    fair.  I'm going to let you go, but I generally balance

8    the amount of time allocated to each side on a matter,

9    try to be approximately equal, and I've allowed you to

10   submit documents to support your argument, including the

11   one that you've handed up this morning just now, and you

12   have your written argument, so I really don't think by

13   limiting you to approximately the same amount of time

14   that I allowed Mr. Wistow, I think that you're in any

15   way being deprived of a fair opportunity to be heard.

16         MR. HILL:  I appreciate that, your Honor.  I just

17   wanted to note the objection for the record.  I will

18   follow the Court's direction.

19         THE COURT:  Specifically, what are you objecting

20   to?

21         MR. HILL:  Well, the problem, your Honor, is

22   there are 88 requests here, and you're being asked to

23   order us to respond to all 88 of them, and I'm just not

24   sure that in 15 minutes I can adequately address 88

25   requests.  I haven't done the math but that's, you know,

```
1    20 seconds per request, or something like that, and some

2    of them are able to be grouped and connected in that

3    way, and I will do my best to address them all.  I don't

4    want my client to be prejudiced because the plaintiffs

5    have chosen to move on 88 requests.  So let me proceed

6    with --

7          THE COURT:  I haven't limited you to 15 more

8    minutes, Mr. Hill.

9          MR. HILL:  I understand.

10         THE COURT:  I've indicated I'm going to allocate

11   to you the same amount of time, approximately, as

12   Mr. Wistow had, and that's all I've indicated to you.  I

13   haven't cut your argument off.  What I've done is to

14   give you the courtesy of letting you know that you're

15   probably in that amount of time not going to be able to

16   get through all of these, and to allow you to know that

17   in advance so that if there are some that you think are

18   more important that you might want to address those

19   first.  But other than the fact that I'm saying you're

20   not going to get significantly more time than

21   Mr. Wistow had, I'm not limiting your ability to argue

22   this motion, given the fact that I've accepted your

23   documents and I've read your memorandum.  So with that,

24   please continue.

25         MR. HILL:  Yes, your Honor.  To address request
```

1   number 4.0 to V, which I believe begin on page 5, I

2   think these are actually relatively easily disposed of

3   because we've looked for these materials and there are

4   none, and so I don't see any reason why we should be

5   compelled to produce documents in response to 4.0

6   through V because we haven't found any.  Now let me make

7   a distinction between 4.0 to R and 4.F to V, and if I

8   could call the Court's attention to 4.S.  The problem

9   here is the breadth of the request.  This requires all

10   minutes, protocols and/or records generated by any PA,

11   ministry, agency, department, division, bureau and/or

12   other government body from anytime referencing and/or

13   relating to the judgment, any proceedings brought to

14   enforce the judgment, the 2006 judgment, and/or the

15   instant action.  So this is a very broad request.  This

16   requires us to search everywhere in the PA for any

17   record generated by anywhere in the PA from anytime

18   relating to the case, and so let me first note it's

19   tremendous overbroad.

20         Secondarily, let me note that it calls for

21   privileged information.  I mean, any records from the PA

22   that are communicated to my firm would be

23   attorney/client privilege.  It would be unduly

24   burdensome for me to log all attorney/client

25   communications related to the case, but that is facially

what 4.S requires.  We have, as we said in our response,
which is on the next page, page 10, we have looked for
and said we would produce documents containing
nonprivileged and nonprotected information.  So again,
I'm not going to produce my attorney/client
communications, I don't have to, I shouldn't have to,
within our possession, custody or control, that are
responsive to a reasonable and proper scope and
interpretation of the request, and that can be found
through reasonable search efforts.  And we have done
that.  We have conducted a reasonable search of the PA
to try and find documents that are not privileged, that
are about this case, and to this point in time we have
not located any.  And so I would respectfully ask that
we not be compelled to produce documents that we can't
find, or to log them all as privileged, which would be a
waste of everyone's time.

     4.T is similar.  It's just with respect to the
PLO as well as instead of the AP.  4.U is similar, and
this is on page 11 of the exhibit I handed to the Court.
It's a little different.  Instead of looking for
minutes, protocols and records, now we're being asked to
look for decisions, orders and directives.  But again,
it's decisions, orders and directives from anyone in the
PA relating to the case.  And again, we've looked for

1   nonprivileged material and we're not locating any.  If

2   we find it, we will produce it, but we respectfully

3   ought not be required to log anything our client has

4   written related to the case that's been an

5   attorney/client communication or that's been work

6   product anymore than the plaintiffs should be required

7   to log all of their attorney/client communications or

8   work product.

9        Let me move, sticking with Mr. Wistow's format of

10  moving through these in numerical order, let me move to

11  6.J through L.  6.J is located on page 13, and J, K and

12  L of request 6 are the same except for the alleged

13  contracting parties, so J is the PA, K is the PLO and L

14  is Fatah.  And looking to J, all documents relating to,

15  referring to, and/or evidencing any communications and

16  written agreements, accords and/or pacts to which Hamas

17  and the PA were parties at anytime between September 1st

18  '93 and June 9th, '96.  Let me make a point about

19  relevance, first of all.

20       Mr. Wistow suggested this was unquestionably

21  relevant to our meritorious defense.  We have said this

22  in other discovery responses.  Let me make it absolutely

23  clear, the PA and the PLO are not relying on any written

24  agreements, accords and/or pacts with Hamas to assert a

25  meritorious defense.  The plaintiffs are relying on

1    these alleged pacts to assert our liability, okay?   So

2    if the Court is going to limit discovery to our

3    meritorious defenses, these documents are not part of my

4    meritorious defense.

5         Let me make another point, and that's this, this

6    request as written requires communications and written

7    agreements, accords, and/or pacts, to which Hamas and

8    the PA were parties.  We have conducted a search for

9    written agreements between the PA and Hamas, and we

10   can't find any.  We don't think there are any.  There

11   were written agreements between the PLO and Israel,

12   there's the Oslo Accord, but there aren't any treaties

13   between the PA and Hamas.  Similarly, there aren't any

14   between the PLO and Hamas, and there aren't any between

15   Fatah and Hamas.  So in the absence of any written

16   agreements, accords or pacts, if that's the

17   construction, and I suggest that that is the proper

18   construction since it's communications and written

19   agreements, and is different than or, so we're looking

20   for documents that is both a communication and a written

21   agreement.  Since there are no written agreements

22   between these three entities and Hamas, there is nothing

23   that's responsive to these three requests.  So that's

24   what this literally requires us to produce, and since we

25   haven't found any written agreements, there's nothing

1    that's responsive to this.  Hypothetically, if there is

2    a written agreement, there's a problem because it

3    doesn't just ask for the written agreement, it asks for

4    all documents relating to it.

5           Now, your Honor will appreciate that when we got

6    this document request, we started looking for these

7    documents, and there is a fair amount of attorney/client

8    communication and attorney work product that relates to

9    trying to find these documents.  Again, I shouldn't have

10   to log my efforts to comply with the document request

11   because they're responsive to the document request

12   because it's so overbroad.  It's all documents relating

13   to a written agreement.  Well, I went and looked for

14   one.  I didn't find one.  I shouldn't have to log all

15   the attorney/client communications and attorney work

16   product that went into the effort of finding out that we

17   don't have one.  So I'd respectfully request that the

18   motion be denied with respect to the sixes.

19          THE COURT:  All right, Mr. Hill, have you

20   finished on the sixes?

21          MR. HILL:  I'm done with the sixes, yes, your

22   Honor.

23          THE COURT:  All right, it's 12:31, we're going to

24   break for lunch at this point.  We'll resume at

25   2 o'clock.  The Court will stand in recess.

1   (RECESS)

2         THE COURT:  All right, Mr. Hill, you may resume

3   when you're ready.

4         MR. HILL:  Thank you, your Honor.  Good

5   afternoon.  I have endeavored to try and streamline this

6   as much as possible.  There are four areas I need to

7   cover which for lack of a better title we could call the

8   nines, the tens, the thirteens and the fourteens, though

9   there's several of some of them.  Let me start with the

10  nines and start with 9.A and B, which if your Honor

11  still has the truncated versions, on page 18 is 9.A, and

12  9.A and B are the same except one is directed to the PA

13  and the PLO.

14        So, a couple of points we make here.  First of

15  all, just the time frame, the request is between '93 and

16  December 2007.  I understood Mr. Wistow to say they

17  would like to narrow that to 2000 to 2006.  We wouldn't

18  have any objection to narrowing it, however, what I

19  think is, when you read the request, there's also not

20  going to be anything responsive to this, and I'll

21  explain why.  It says all documents relating to,

22  referring to, and/or evidencing, and then there's a list

23  of things that these documents have to relate to, refer

24  to, or evidence.  One, the organizational, and two,

25  institutional structures, and three, individuals within

1   the PA responsible for, and again there's another list,

2   1, monitoring, and 2, making decisions regarding

3   lawsuits filed against PA in, and they got another two

4   things, in, 1, the United States, and 2, in Israel.  So

5   this is a document that's got to have all of these

6   things in it, and I don't believe there is such a

7   document, and let me explain why.  Let me do that in the

8   context of the next set, which is 9.U and 9.V.

9         9.U, again these are the same except for the 9.U

10   is the PA and 9.V is the PLO, and 9.U, which is on page

11   20 of the document that I believe your Honor is looking

12   at, requests for all documents from anytime prior to

13   December 2007, again, I'm assuming this has now been

14   narrowed to 2000, relating to, referring to, evidencing,

15   containing and/or constituting policies, procedures

16   and/or guidelines for the handling of lawsuits brought

17   against the PA.  Now this one is broader because it's

18   not limited to lawsuits in the United States or Israel.

19   But I don't think there is a relevant document

20   constituting policies, procedures, and/or guidelines for

21   handling lawsuits brought against the PA.

22         Let me talk about the prime minister's testimony

23   because that's what Mr. Wistow referenced.  The prime

24   minister was examined at some length about whether there

25   were policies and procedures of the PA that would be

1    involved here, and the examination starts on page 230 of

2    his deposition and runs to page 256.  I'm not going to

3    read it all.  But let me make this point, and it's this,

4    and this is -- by the way, it's in the record.  It's

5    Exhibit D to the motion to compel that we're discussing

6    now which is document 484-9, and I'd like to start on

7    page 238.  238, line 5, there's a question:  Mr. Fayyad,

8    the minister of justice follows up on what?  Frankly, I

9    don't understand.  In the Ungar case, what is his

10   involvement?  Answer: You know, generally speaking, in

11   all litigation against the PA, or in which the PA is a

12   party, to which the PA is a party, the minister of

13   justice is involved in that sense.  Domestic or

14   international, now in the case of Ungar and the other

15   litigation cases against us in the United States, the

16   minister of justice is not involved in decision-making.

17   Okay.

18        If you would, your Honor, I would like to draw

19   your attention to page 241, starting at line 14.  The

20   question is: I get the impression that one of the

21   functions of the ministry of justice for these kinds of

22   cases is that --

23        THE COURT:  Excuse me, Mr. Hill, for some reason

24   my page numbers don't seem to correlate with yours.  I'm

25   looking at the page number at the bottom, 241, I also

```
 1    see at various points different page numbers, so it must

 2    be other page numbers that you're referring to.

 3           MR. HILL:  Exactly, your Honor.  I apologize

 4    about that.  It's the nature of the exhibit.

 5           THE COURT:  You're at 241?

 6           MR. HILL:  I'm at 241, line 14 of the smaller

 7    pages, if you will.

 8           THE COURT:  Yes, okay.

 9           MR. HILL:  Okay.  So question by Mr. Wistow: I

10    get the impression that one of the functions of the

11    ministry of justice to these kinds of cases is that,

12    say, request for production of documents or request for

13    answers to interrogatory, are initially worked on by the

14    minister of justice department, certainly not by you,

15    right?  Answer: In general.  In general, this is the

16    case, however, in this particular case, as in the other

17    cases being litigated in the United States, you know,

18    the process goes through my office.  Whether it's a

19    document that's required, an individual being deposed,

20    or any other thing that is of interest to the attorneys,

21    the Court, generally, the request comes to my office and

22    then it goes to, you know, the head of the department

23    concerned, and if it's individual, you know, they

24    appear.  If it's a document, they produce it if it's

25    available.  Next question, 242, line 8: So the minister
```

of justice has not been involved in these cases?

Answer:   In these cases did not have that involvement

which the ministry of justice generally has in cases of

litigation.   So, let me just make a comment here.   So

the prime minister is saying in the U.S. litigation it's

the prime minister's office that makes the decision, not

the ministry of justice.   The ministry of justice is not

involved.   Then if you jump ahead, there's a line of

questioning about litigation more generally.   Okay.   So

if your Honor would look at page 248, starting at line

5, there's some discussion about a hypothetical lawsuit

filed against the PA.   It says, okay, so there's no set

policy.   It's up to you to decide who would get it, is

that fair?   Answer: Now I can tell you there is a policy

in the sense of there are ministries with clear mandates

and agencies as to what they're suppose to be doing.

What is not really established, what is not there, is

established pattern, practice, tradition, but not policy

or mandate.   Next question, 248, line 19: Is there any

written policy, procedure, protocol, or whatever you

want to call it, that tells the people who work for the

PA where to send any kind of lawsuit, any kind?   Answer:

You know, there is.   Of course there is.   For example,

there are cases, you know, filed against us in local

courts, meaning courts in the west bank or Gaza, on a

variety of matters.  What happens is that the attorney

general, prosecutor general, acting on behalf of the PA,

informs us, informs the relevant agency of the executive

branch and of the existence of an action against it,

then he would ask in that communication as to what

response that agency may have to that particular

complaint that's been filed against the PA of any

proceeding that's been filed, et cetera, et cetera.  So

there is a written policy?  Answer: Yes.  Insofar as

that case is concerned, there is.  So it's clear when

you read the testimony, and of course the Court is free

to read this entire exchange, that when the prime

minister is talking about a policy, he's talking about a

policy that exists for local actions filed against the

PA and Palestine.  And so therefore when we return to

the request at issue here, 9.A and 9.B are about actions

in the United States or Israel.  Obviously, this policy

would not be responsive to those requests.  So that

leads us to 9.U and 9.V which generally asks for any

lawsuits against the PA, but I would submit that the

policy about what the PA does when it's sued in the west

bank is not going to be relevant here, and I think the

plaintiffs agree.  If you look at the last -- 13, I

believe it is, yeah, so on page 71, 13.VV as in Victor,

page 71 of the document request, the exhibit that I

1   handed up earlier today, page 71, your Honor, it asks

2   for all documents relating to, referring to, or

3   evidencing any legal or arbitration proceedings other

4   than those explicitly referred to in this request for

5   production brought by or against the PA and PLO at

6   anyplace outside the west bank and Gaza Strip at anytime

7   prior to December of 2007, and so the plaintiffs own

8   requests don't appear to be asking for Gaza and west

9   bank litigation, I can't imagine that it would be

10  relevant.  So with that understanding, I don't believe

11  there are responsive documents to 9.A, 9.B, 9.U or 9.V,

12  if they're construed literally.  Now if they're

13  construed in an overbroad fashion, your Honor could see

14  that there could be many many documents about, as

15  Mr. Wistow put it in his argument, who's monitoring the

16  litigation.  I mean, since 2007, my firm has been

17  monitoring the litigation.  So if it means to encompass

18  all the litigation documents, then we're back into the

19  same posture of not needing to log all the litigation

20  documents.  So I think either way, when you read it

21  literally, there are no responsive documents, and I

22  would ask the Court not to construe it in an overbroad

23  way that would make us log things.

24        I think I'm going to talk about the tens.  The

25  tens pertain to the Palestine Investment Fund.  And I

note, as your Honor is aware, that we have appealed your
ruling on the relevance of PIF communications.  I won't
reargue that issue here.  So with that ruling and
background, let's talk about whether these particular
requests are things that we should be compelled to
produce documents in response to.  10.A, which is on
page 23 of the handup, asks for all documents relating
to, referring to, and/or evidencing the relationship
between the Palestinian Investment Fund and the PA.
This conceivably is any document the PA has that talks
about the Palestine Investment Fund.  Conceivably any
document would relate to the relationship, and if you
look at the definition that the plaintiffs have put on
relating to, it is, as the language is by itself,
extremely broad.  This is on page 31 of the document
request.  Relate to, or relating to, shall mean and
include constituting, discussing, mentioning,
containing, embodying, reflecting, identifying,
incorporating, referring to, dealing with or pertaining
to in any way.  So I think literally the overbreadth of
this is everything that says PIF on it, and clearly that
wouldn't be a reasonable request.  I would note that
they already have the PIF articles of incorporation.
They already have PIF's annual reports, which discuss
this very issue.  So I don't believe the plaintiffs have

1    met their need to showing that the need for additional

2    information about the relationship between the PA and

3    the PIF would outweigh the burden of this particular

4    request, and I don't know that the Court needs to try

5    and fashion a narrower request that would be reasonable.

6    I just ask you to deny the motion to compel on this one.

7         10.B, which is on page 24, again, this one asks

8    for all documents relating to, referring to, and/or

9    evidencing the PA's knowledge of, and when the PA first

10   became aware of the 2006 judgment.  This is the

11   September 19, 2006 creditors' bill judgment.  Again, on

12   the one hand it seems very narrow because, as I think

13   Mr. Wistow noted at the November 17th hearing before

14   Judge Lagueux, Mr. Sherman was in the courtroom when

15   Judge Lagueux announced this from the bench, and so in

16   that sense the PA first became aware of it because

17   counsel heard about it in court.  So if all we're asking

18   for is all documents relating to when the PA first

19   became aware, they've got the transcript.  They've got

20   it already.  If they're asking for something else, and

21   it's not clear what they are asking for, you know, it

22   sounds like it's going to, at the very least, involve

23   attorney/client communications between Mr. Deming and

24   the clients.  So I don't think there's a basis to compel

25   us to log all communications with the clients from

1   September 2006 about the creditors' bill judgment.  And,

2   for what it's worth, we're not contending that the PA

3   didn't know about it contemporaneously.  No argument

4   that we weren't aware of it.  We obviously were aware of

5   it by operation of law when our counsel heard about it

6   from the lips of the Court.

7        10.C is all documents relating to, referring to,

8   and/or evidencing the transfer, and/or payment of any

9   funds, monies or assets, from the PIF to the PA from the

10  date the 2006 judgment was entered until present day.

11  Let me stop there.  Actually, the second one is

12  including all documents relating to, referring to,

13  and/or evidencing in the amounts of such transfer.  So

14  this is every document that the PA or the PLO has about

15  any transfer from the PIF to the PA from 2006 to the

16  present.  I would submit the objection to overbreadth

17  ought to be sustained here.  There's no effort to try

18  and narrow out what they already know about in the

19  motion, in the opposition they filed to our motion for

20  protective order on PA, PIF communications.  They

21  included in the record several documents that are

22  publicly available that show such transfers.  There's

23  been no showing that we need to go, turn over every

24  stone in the PA and produce every document showing every

25  transfer for this time period.  They have that evidence

1  already.

2       THE COURT:  They have a record of every transfer

3  between the PIF and the PA?

4       MR. HILL:  I don't know that I can represent that

5  they have the record of every transfer, your Honor.  I

6  hesitate to make that representation.

7       THE COURT:  So all you can say is they have some?

8       MR. HILL:  Well, and I guess the point I would

9  make is, isn't some enough?  I mean, if the issue is

10  that the transfers themselves are somehow evidence of

11  unclean hands, or bad faith, or however you want to

12  characterize it, I mean, I obviously disagree with those

13  characterizations, but they have evidence of millions of

14  dollars of transfers already.  So if there is, you know,

15  if we turn the PA upside down and find additional

16  transfers, I don't know it's going to add anything to

17  the plaintiffs' argument that there were transfers.  The

18  transfers are either, you know, proper or not, and Judge

19  Lagueux will decide that in some context, I suppose, but

20  there's no need for us to go searching every drawer in

21  the PA to find every document relating to every transfer

22  from 2006 when they've already got substantial evidence

23  that such transfers had taken place.

24       10.D is related.  10.D asks for all documents --

25  I'm on page 26, your Honor.  This one was amended, so

the corrected one is on page 26.  All documents relating

to, referring to, and/or evidencing all decisions to

carry out the transfers and/or payments.  I'm not sure

what this adds, referred to in the previous section C,

including, but this is a big addition, all documents

evidencing the name, title and present whereabouts of

any person involved in making, participating, and/or

authorizing such transfers and/or payments.  Again, this

is one that is spaciously overbroad.  It would require

us to, first of all, figure out who was involved, but

then we have to give them every document that has that

person's name on it regardless of whether it has any

bearing on the case.  That's what it literally calls

for.

        THE COURT:  Mr. Hill, you have 10 minutes,

maximum.

        MR. HILL:  Your Honor, I will try and expedite

myself.  10.E, all documents constituting the PIF

investment fund, articles of association, and/or bylaws.

I believe they already have them.  I'm not sure why we

need to be compelled to produce them, and they should go

get them from the PIF, not from us.

        10.F, all documents relating to, referring or

evidencing the PIF's governing structure and

decision-making procedures.  Again, they should get them

1    from the PIF, and they already have the articles of

2    association.  I'm not sure what more they need to prove

3    that issue.

4         10.G is all documents relating to, referring or

5    evidencing any efforts to change the articles of

6    association of the PIF on any date subsequent to the

7    judgment.  Again, they have the amended articles.  They

8    ought to get them from the PIF rather than from us, and

9    again, this one has the same overbreadth problem as, I

10   forget which number it is, but they ask for every

11   document with the name of any person involved.  So, if

12   hypothetically, President Abbas was at the meeting where

13   they were adopted, then I'd have to give them every

14   document that has President Abbas' name on it under

15   literal construction of this request.

16        The next one, 10.J, asks for all documents

17   related to, referring to, or evidencing all actions

18   carried out by Mohammad Mustafah on behalf of the PA and

19   all services rendered by Mohammad Mustafah here on

20   behalf of the PA between July 2004 and the present day.

21   Again, I don't know why July 2004 would be relevant.

22   Even under the plaintiffs' theory, it would be September

23   2006 that would be relevant.  But again, why do we need

24   every document about what Dr. Mustafah has done for the

25   PA?  There's no showing that that burdensome, you know,

1    search for every document that has Mustafah's name on

2    it, is justified for the discovery that they claim to

3    need.

4         And then let me deal with 10.K in the context of

5    the Israeli proceedings.  10.L, which is on page 32, is

6    documents relating to legal actions brought against

7    Orascom by PIF, and 10.M is papers in those cases

8    brought against Orascom by PIF.  Again, the plaintiffs

9    have cases against both Orascom and PIF.  They can get

10   those materials from those nonparties.  I don't know why

11   they need to get them from us.  I also note that your

12   Honor previously denied their request for communications

13   between us and Orascom on the theory that it wasn't

14   relevant, so I don't know why this would be anymore

15   relevant than the communications that counsel for the PA

16   had with Orascom that you previously denied the motion

17   to compel on.

18        I believe I'm now ready to talk about the

19   thirteens.  Okay.  And the whole series of these,

20   starting with -- I'm sorry, 13.A is again the same as I

21   think 10.B, when we first became aware of the creditors'

22   bill proceeding.  We became aware of it when Mr. Sherman

23   got a copy of the creditors' bill.  There's no need for

24   any further discovery on that.

25        So, starting on 13.H, there's a whole series that

1    deal with the Israeli proceedings, and let me just make

2    a general point about these rather than going through

3    them individually.  So there is a procedure under

4    Israeli law to get these materials from the Israeli

5    courts, and that procedure requires the parties to be

6    informed of that and have a say about whether a nonparty

7    should get them, and I think the appropriate thing for

8    the Court to do is, well, first of all, not allow this

9    because it's not relevant.  I mean, you're talking about

10   seven years of litigation in Israel in other cases.  I

11   just can't fathom that those documents are going to be

12   exhibits in January, or if they are, very many of them

13   could possibly be.  So it's a tremendously burdensome

14   request.  There's an affidavit in the record from the

15   defendants' Israeli lawyer that says it's going to take

16   200 hours of time to sort through and make this document

17   production.  I note that your Honor previously denied

18   the plaintiffs' request to take a 30(b)(6) on this very

19   issue of the Israeli litigation, so I don't know why it

20   would be appropriate for us to have to produce hundreds

21   or thousands of documents from other cases in Israel if

22   we didn't have to produce a witness to talk about the

23   other cases in Israel.  I think your Honor has already

24   ruled on the relevance of this to a certain extent.

25        I'd also note that, you know, the plaintiffs had

1    Israeli counsel, some of which are counsel in these

2    other cases.  It's my understanding that the plaintiffs'

3    Israeli lawyers represent other plaintiffs in Israeli

4    cases in thirteen cases against the PA and PLO.  They

5    obviously already have that information through their

6    own counsel, and if there is no prohibition under

7    Israeli law in sharing it, I don't know why they'd need

8    us to produce it again.  They've clearly got a

9    relationship with the affiant attached to their motion,

10   Mr. Roth, at Exhibit E, who described some cases he's

11   brought against the PA and the PLO.  I don't know why

12   they couldn't get the material from him as opposed to

13   from us.

14        Let me make one point about a very specific

15   request, which is 13.BB, I believe, which is on page 51

16   of the exhibit I gave your Honor.

17        First of all, I need to make a correction to our

18   brief.  We said in our brief that this had been marked

19   as an exhibit at a preliminary injunction hearing by PA,

20   PLO counsel.  That is a mistake.  It was not.  In fact,

21   a different affidavit was marked by Mr. Wistow, so that

22   should be stricken from page 26 of our opposition brief.

23   But the point is, this is so clearly described that I

24   have a strong suspicion the plaintiffs already have it,

25   and in fact, it's my understanding that the plaintiffs'

1    Israeli lawyer is the lawyer representing the plaintiffs

2    in this case that's described here in 13.BB.  And if

3    they don't have it, Judge, I'll give it.  I'll give them

4    this one.  This one is specific enough.  We can go find

5    it.  But the notion that we need to produce all of the

6    material from those other cases, I think, is

7    inappropriate.

8          The other thirteen all pertain to other old

9    American litigation.  So there's the Achille Lauro case,

10   there's the PA, there's the PLO, US vs PLO case, there's

11   the Mendelson case, there's the Danish road contractors

12   arbitration proceeding in Europe, there's the Beucheit

13   case.  Your Honor didn't allow deposition, 30(b)(6)

14   deposition testimony on these topics.  These are other

15   old litigations.  They're not likely to lead to relevant

16   evidence that's going to justify the burden of requiring

17   us to go search old files and produce these old

18   materials.  And as the plaintiffs acknowledge, in

19   substantial part, these materials are publicly

20   available, anyway.  If it's really important to know

21   what orders were entered in the Achille Lauro case, they

22   can go get them from the court that handled the Achille

23   Lauro case, and they ought to do so.

24         I believe I'm now ready to talk about the

25   fourteenth, which is my last topic, and these are

1    similar.  They are parallel requests relating to four

2    individuals, Mohammad Dahaln, Jabril Rajub, Tofee Tirawi

3    and Amin el Hindi, and let me get to the first one which

4    is on page 73 of my handout, request number 14.B.1, and

5    the problem with all of these is that they're

6    tremendously overbroad, and we've given them the

7    documents sufficient to show what they claim they want

8    to know.  This 14.B.1, I'll just use as an example, all

9    documents relating to, referring to, and/or evidencing

10   any and all positions, titles and/or jobs held by

11   Mohammad Dahaln in the PA and/or PLO between January

12   1st, '97 and June 6th, '96.  This facially calls for

13   every document, every business document, at least, that

14   has Mr. Dahaln's name on it, because any of those would

15   relate to his job.  This would be like asking for any

16   documents that relate to Brian Hill's job from my law

17   firm.  You'd have to give them everything with my name

18   on it.  It's tremendously overbroad.  But the point is,

19   if the issue is what job he had at the time, we already

20   produced sufficient information to them to establish

21   that, and we've never had a meet and confer where

22   they've told me, you know, I don't know what he was

23   doing between June and July of '95.  If they ask me

24   that, I would tell them.  And, in fact, I think a good

25   example of this is, Mr. Dahaln, who's on our witness

1    list, and we're planning to have him testify in January,

2    we initially thought he wasn't going to make it.  We've

3    noticed his deposition.  I got an email from

4    Mr. Strachman saying is Mr. Dahaln currently an officer,

5    director or managing agent of the PA or PLO, and I wrote

6    him back, I think the same day or the next day and said

7    no, he's not.  So if the issue is were they officers at

8    the time, what's their officer status today, they're are

9    a lot less burdensome ways to get at that information

10   than producing every document that's got Mr. Dahaln's

11   name on it.

12          May I just confer with my colleague to make sure

13   I didn't overlook anything, your Honor?  I may be at my

14   time limit, anyway.

15          THE COURT:  You may.  Have you concluded,

16   Mr. Hill?

17          MR. HILL:  I think I'm done.  Thank you.

18          MR. WISTOW:  May I have just a few moments, your

19   Honor?

20          THE COURT:  You may, Mr. Wistow.

21          MR. WISTOW:  Thank you.  I want to say first of

22   all --

23          THE COURT:  Mr. Wistow, I'll try to be as close

24   as I can on this.  You have a maximum of ten minutes.

25          MR. WISTOW:  I won't take that.  And I don't mean

1    to impose on your Honor's patience.  I want to make

2    clear why -- Mr. Hill indicated that he tried to speak

3    with me, and I told him please put it in writing, and

4    your Honor will recall that I was anonymously admonished

5    by the Court for using vulgar language that was quoted

6    in a letter, and I'm certainly not going to repeat the

7    vulgar language, but it was a phrase that concluded with

8    an accusation that Mr. Hill was a liar.  I'm sorry to

9    bring this up, but he brought up the subject of why I

10   insisted on a letter from him.  I felt that he had made

11   a commitment to me orally, and completely breached it,

12   that's why I used that vulgar phrase that he quoted to

13   your Honor, and that's why I insisted on a letter.

14        Now, if you listen to Mr. Hill's argument, he's

15   taken everything we've asked and reduced it by the

16   process of (inaudible).  There's literally nothing we've

17   asked for with one or two exceptions that isn't too

18   broad.  If he keeps saying to the Court that he doesn't

19   have certain items, if he would just state categorically

20   in response to the items that we moved to compel that

21   they don't exist, we would not pursue, and would not

22   have pursued those items here.  We would not.

23        Now he tells us that Al Hindi, for example, died,

24   I believe he said on August 17, 2000, I don't read the

25   obituaries in the west bank, or Gaza, or wherever he is,

1   and he could have at least dropped us a letter, or done

2   something, to tell us that Al Hindi had passed away.

3   That goes for many of the items he talks about here.  He

4   could have simply sent a letter explaining what his

5   position is.  The difficulty with trying to negotiate

6   with Mr. Hill on these meet and confers is, I hate to

7   say it, he's been completely and totally unyielding.  He

8   only goes one way.  There is never a compromise that

9   he's willing to make that we've been able to accomplish,

10  and that's why we're here today.  And it really is

11  painful to hear him say that we haven't entered into

12  attempts to meet and confer.  They've been the most

13  frustrating experiences I've ever had.

14       I agree that there are certain things here that

15  are difficult to produce, that require a lot of work,

16  but this is a big big case, and I need to emphasize

17  these defendants are asking the Court to vacate a

18  judgment that's been in place for years and years and

19  years.

20       By the way, he says that -- I think it's like the

21  essence of his argument, this is exemplary of what he

22  says, why do we need the transfers from the PIF to the

23  PA?  Well, we only have some.  Why do we need them?

24  Well, one thing is, Judge Lagueux, within the last

25  couple of weeks, said that if we could display that

money was being drained out of the PIF, that he would

consider entering a permanent injunction at the hearing.

That's why we need it.  I don't even know how to

respond.  I'm at a loss to say, well, you have some of

the information, why do you need the rest.  How big a

deal is it to get the information of the transfers from

the PIF to the PA.  They ought to be in one single

place.  There's got to be accounts.  He says we already

have the PIF articles, why are we asking for the

articles?  Well, the reason we're asking for the

articles is I know from my experience with Mr. Hill that

at the hearing in January, if we attempt to introduce

the articles that we have, he's going to say who

authenticates those?  Where did those come from?  I

don't agree those are the articles.  And that's why I

want them.  I want them to produce them so I can say at

the hearing these are the articles, your Honor.  They

were produced by the defendants.  He says, well, why

don't we get them from the PIF?  He has them.  Your

Honor has seen the letter from the president of the PA,

Mohammad Abbas, where he wrote to Condoleezza Rice in

November of 2006 where he said that the PIF, the PIF is

under, I quote, the supervision of his office, the PLO

president's office.  They have these record.  So to

chase us somewhere else, it's just typical of

1   everything, the frustration that we've had.  What

2   they've done is they produced, I would say, more than

3   10,000 pages of pleadings from American cases that are

4   readily available to us, and probably 30 pages of real

5   documents out of all the things we've asked for in the

6   past.  I ask your Honor to please look at these

7   requests.  Some of them are broad, I admit it, but I

8   don't think they're excessively broad.  For example, the

9   proceedings in the Israeli courts during the period of

10  time that they were claiming they didn't know how to

11  defend these cases, we would like to be able to show

12  they had a structure in place.  They had represented to

13  the circuit court and to this Court that they were an

14  immature organization with no organized structure in

15  place to handle these.  We would like to attempt to show

16  that that's not true, and the Israeli documents are

17  going to be very important in that regard.    Now my

18  brother says, well, we have some of them from a witness

19  who we may use.  Indeed, that's the fact witness that we

20  may or may not use, Roland Roth.  Yes, he has some of

21  those documents.  What we'd like to show the Judge in

22  January that there's hundreds of these things, and

23  they're readily available to them.

24        Then he says, for example, we already have the

25  affidavit, very specific affidavit.  We've identified

it.  So clearly we must have it.  Yes, we do have it,

but I don't want to be confronted in January with an

argument what is this thing?  Where did it come from?

And who's authenticated it?  So we asked them to produce

it.  It's an affidavit they gave to an Israeli court.

Your Honor, the deponents that were ordered to

come here, that's the last, the fourteens, that's those

people that we're talking about, the ones that were

ordered to come, and I believe out of the ones that were

ordered, I believe they're now all dead with the

exception of Dahaln, and so we think we're entitled to

get the information we ask for under these very unusual

circumstances.  I know --

And let me say one further thing about the fact

that we didn't include all of these requests within the

body of our memo.  I don't even know how to respond to

that.  We attached the next exhibit.  It would have made

the memo a hundred pages long.  So, yes, your Honor has

to go to the exhibits to see what we're referring to,

but that's the kind of objection we've been confronted

with.

I respectfully ask your Honor to, I know how

meticulous you've been in this case, to look at our

requests, and to look at them in a fashion not to strain

reason, to make them utterly unreasonable on their face,

1   which is what my brother does.  It just seems we're not

2   capable of making a request that he is not equally

3   capable of making it seem like we're completely out of

4   balance in what we're asking for.  We tried to be

5   restrictive as much as possible in the spirit of what

6   your Honor ordered, and I respectfully ask your Honor to

7   go down the list of things we asked for and

8   independently decide which is relevant and which not.

9         I do admit, by the way, there were a couple of

10  mistakes we made.  We did ask for something twice.  We

11  shouldn't have.  And there were some other mistakes we

12  had, but this is all part of what we've been confronted

13  with in this brief period where we really are, I used

14  the word before, scurrying, and I'll repeat it,

15  scurrying around trying to keep up with what's been

16  going on here.  Thank you, your Honor.

17        THE COURT:  Thank you, Mr. Wistow.  Mr. Hill,

18  with regard to Mr. Wistow's point that as to documents

19  that you say they already have, the reason he wants

20  defendants to produce them is so to avoid objection from

21  you at the hearing in January that the copy they're

22  offering is not authentic or questionable, would you

23  respond to that part of the argument?

24        MR. HILL:  Judge, I wish I heard this before

25  today.  There has been an occasion where there was an

1    issue about whether an email that one of my partners,

2    Charles MacAleer, who happens to be here today, had sent

3    in another case.  It was an authentic email, and I think

4    it was Mr. Strachman who emailed me and said is this an

5    authentic email that Mr. MacAleer sent?  And I emailed

6    him back and said, yes.  So, I mean, these can be

7    resolved through a stipulation about authenticity.  I've

8    instead got a document request that doesn't ask for me

9    to agree that these are authentic copies of the articles

10   of association.  It asks me to produce all documents

11   related to the articles of association.  That's my point

12   about burden.  There's been no effort to confer and

13   reach reasonable resolutions to these things.

14         Your Honor, while I'm here, I'd note two other

15   things just in response to Mr. Wistow, if your Honor

16   will permit me.  On the issue of Mr. Al Hindi's death, I

17   think it's apparent that the plaintiffs did know he was

18   dead.  If you look at their request number 14, there are

19   four sets of parallel requests of five inquiries, the

20   last one of which is always give me the person's current

21   work and home address.  They deleted that for

22   Mr. Al Hindi, so I believe they did know he was dead.

23   I'm not in a position to say for sure.

24         And on the topic of deaths, my understanding is

25   that the list with Mr. Dahaln, Tirawi and Rajub are

1    alive, last I knew.  That's all I have, your Honor.

2         THE COURT:  And those are three individuals that

3    were sought to be deposed back in 2004?

4         MR. HILL:  That's correct, and one of them is on

5    our witness list and we anticipate he will testify live

6    in January.

7         THE COURT:  All right, thank you, Mr. Hill.  All

8    right, I'll take the second motion under advisement.  We

9    will proceed now to the third motion scheduled for

10   hearing, that is document 604 which is plaintiffs'

11   judgment creditors motion for protective order, and

12   order quashing deposition notices, or alternatively for

13   an order of preclusion.

14        MR. WISTOW:  Thank you, your Honor.

15        THE COURT:  All right, Mr. Wistow, I'll hear you

16   on the third motion.

17        MR. WISTOW:  Your Honor has already heard perhaps

18   too much that we were supplied with a list of expert

19   witnesses on October 15th, six and a half years after

20   the judgment was entered in this case.  We responded.

21   We provided the experts within 30 days following that

22   October 15th, really in an excess of caution, and

23   maintaining expressly when we produced the experts

24   reports that we did not believe that Rule 26 applied.

25   We expressly said that.  But we didn't want to run the

1    risk that a court might disagree with us and so we came

2    up with those things.

3         We've decided that from our perspective, we did

4    not wish to take depositions of the other side, even

5    30(b)(6) depositions, although at first we intended to

6    do it.  The various reasons for that, some of them

7    involve our work product and our strategy, but I can say

8    that one of the reasons was so that we were not

9    confronted with the argument that we were required to

10   produce experts because we had taken certain positions.

11   That's a minor issue in the thing.  Basically we made a

12   decision, it's common in Rhode Island, not to take

13   expert depositions in the other side.  For example, many

14   lawyers who do medical malpractice cases in Rhode

15   Island, many of them do not do expert depositions, many

16   of them do, depending on the case.  We decided in this

17   case not to do this.

18        In any event, after we supplied the names of our

19   experts, which we contend we did really pursuant to

20   interrogatory questions and not 26, we were given a slew

21   of notices to depose our experts, many of which were

22   literally on the same day and at the same time, and we

23   moved for a protective order, and really the basis for

24   the protective order is quite simple, it's that Rule

25   26(a)(2), which is the only rule that provides for the

1   taking of deposition of experts, specifically talks

2   about experts who are going to be used at trial.  It

3   uses the term trial, and that is not a simply technical

4   position we're taking.  Wright & Miller in Federal

5   Practice and Procedure, Section 2031.1 says Rule

6   26(a)(2) does not apply to hearings on motions, and

7   26(a)(2), of course, is the provision for taking

8   depositions of experts.  And, in fact, Wright & Miller

9   says, and I quote:  The disclosure requirement is keyed

10  to trial, unquote, and may not apply to use of experts

11  in various pretrial or nontrial activities.  Citing a

12  case UAW vs General Motors Corporation, Eastern District

13  of Michigan, which was affirmed by the Sixth Circuit.

14         Now, if you take a look, your Honor, at Rule 33,

15  which relates to interrogatories, it makes no such

16  restriction about using interrogatories only for trials.

17  Similarly, for Rule 34, which is request for production

18  of documents.  Same thing for Rule 35, which is physical

19  or mental examination.  Same thing for Rule 36, for

20  request for admissions.  All of those, if you look at

21  them separately, talk about using interrogatories,

22  document requests, requests for physical exams, really

23  in any kind of actions.  The only rule that talks about

24  use at trial is Rule 26.  And by the way, the reason for

25  that may well be because for many many years after the

1   rules were promulgated you could not take the deposition

2   of an expert at all, and obviously that rule changed, I

3   believe, quite a long time ago, 1970, but when it

4   changed, and it allowed the taking of depositions, it

5   was very clear that it was intended to be for those

6   experts who were going to testify at trial.

7           Now, my brothers have cited some cases in their

8   opposition to our motion for protective order, which are

9   completely beside the point.  In two of the cases where

10  the parties were sanctioned, it was because the lawyers

11  for the adversary had represented and agreed to produce

12  certain people and then didn't.  Indeed, two of their

13  cases don't even involve experts at all.  Their failure

14  to produce employees at deposition.  There's no question

15  that -- I'm not suggesting, by the way, that we don't

16  control the experts to a certain extent.  I would not

17  insult the Court's intelligence by that.  What I am

18  saying is we have a right to say that the discovery here

19  has to be in accordance with the rules.  Judge Lagueux

20  did not in any way, shape or form, change that.  He said

21  there would be discovery in the case, and discovery

22  would close on a certain day, and we're ready, willing

23  and able to abide by that, but we also think that the

24  rule regarding experts, I'll read it to the Court, it's

25  facially directly on point: A party may depose any

1    person who has been identified as an expert whose

2    opinion may be presented at trial, and it's not a flight

3    of fancy that I'm alluding to.  I quoted you from Wright

4    & Miller where they make that distinction between trial

5    and hearing.

6           I would also again ask your Honor to take a look

7    at the language of when you can ask interrogatories,

8    when you can do document requests, when you can do

9    physical exams, when you can do requests for admissions,

10   and your Honor will see that the rules make a

11   distinction.

12          In any event, we voluntarily produced also

13   reports of experts we're going to use to testify on

14   legal matters, straight legal matters, Israeli law, and

15   under Rule 44.1, it's our position we didn't even have

16   an obligation to produce reports at all on those issues,

17   and it's a fortiori as to those witnesses.

18          THE COURT:  I'm sorry, Mr. Wistow, I'm not sure

19   I'm catching the distinction.  You're talking about

20   those witnesses being different from the other

21   witnesses.  Tell me about the two groups of witnesses

22   you're drawing a distinction between.

23          MR. WISTOW:  Okay.  Expert witnesses who are

24   going to testify about matters of Israeli law versus

25   other experts who will testify, for example, about the

1   connection between Hamas and the PLO and the PA, and the

2   cooperation between them.  That's the distinction I'm

3   drawing, and that distinction is embodied in, I believe,

4   in Rule 44.1 where we simply, if we wished, could submit

5   just plain old affidavits to the Court at the time of

6   hearing, without even producing the expert.  The reason

7   for that, your Honor, is that -- I'll just read briefly

8   from the rule: A party who intends to raise an issue

9   about a foreign country's law must give notice by a

10  pleading or other writing.  In determining foreign law,

11  the Court may consider any relevant material or source,

12  including testimony whether or not submitted by a party

13  or admissible under the Federal Rules of Evidence.  The

14  Court's determination must be treated as a ruling on a

15  question of law.  So there is a distinction.  I don't

16  want to burden the Court with making too big a deal out

17  of the distinction.  I think it puts an a fortiori spin

18  to the experts on foreign law, but I don't think that's

19  a sufficiently significant point to burden the Court

20  with asking a distinction be made.

21       I want to point out one other thing, your Honor,

22  the rules really do recognize the difference between a

23  trial and motions.  For example, Rule 43 says -- it's

24  entitled Taking Testimony, and it starts off: (A) in

25  open court, at trial, at trial, the witness's testimony

1    must be taken in open court unless a federal statute,

2    the Federal Rules of Evidence, these rules or other

3    rules adopted by the Supreme Court provides otherwise,

4    and it goes on.  It talks about at trial.

5        Then, (c), evidence on a motion, when a motion

6    was, in fact, outside the record, the Court may hear the

7    matter on affidavits or may it wholly or partly on oral

8    testimony or on depositions.  The rules make a

9    distinction between a trial and a motion, and while

10   there's going to be a hearing with evidentiary aspects

11   of it, to it, rather, it still remains a motion, a

12   motion to vacate the judgment, and under the rules,

13   specifically Rule 43, you may have a motion where there

14   is evidence taken, it's still a motion.  It's not a

15   trial.  And we take the position, your Honor, that we

16   have no obligation to produce these experts, and indeed

17   the rules don't allow for it and we'd ask for a

18   protective order in that regard.  We didn't take the

19   extreme position of just refusing to do it.  We're not

20   going to act at our peril when the matter is serious.

21   Having said all that, we ask the Court to agree with us

22   that we're under no obligation to produce expert

23   witnesses.

24        THE COURT:  Thank you, Mr. Wistow.  Mr. Hill.

25        MR. HILL:  Your Honor, I'm confident this one

1   won't take as long as the last one.

2         Let me start with again a big picture comment

3   which is that this has, to a certain extent, been

4   overtaken by the close of discovery.  As a practical

5   matter now we can't take the depositions because

6   discovery closed on November 19th.  On November 29th, in

7   accordance with the Court's deadline for motions, we did

8   file a motion to exclude the testimony of any of the

9   witnesses, the expert witnesses, that the plaintiffs

10  have identified but did not make available for

11  depositions.  So, just to be clear, the relief we want

12  from the inability, from the failure of the plaintiffs

13  to produce the witnesses for deposition is that they

14  will not be allowed to testify at the hearing, and

15  that's consistent with the general equitable Rule 37

16  principles that if you don't make discovery available

17  you can't rely on it at the hearing.

18         Then let me make this big picture comment.  So

19  we're reduced to arguing about the meaning of Rule 26(b)

20  --

21         THE COURT:  Let me ask you a question, Mr. Hill.

22         MR. HILL:  Yes, sir.

23         THE COURT:  If I grant your motion, does that

24  mean you do not intend to take the depositions but

25  simply would perhaps take my order and show it to Judge

1  Lagueux and say, Judge, you should exclude, grant my

2  motion to exclude the testimony because Judge Martin

3  found that the plaintiffs wrongly failed to produce

4  these witnesses for deposition.  You don't intend to try

5  to actually depose these people at this point.

6        MR. HILL:  Well, it does depend on your Honor's

7  ruling, and that's a good point that I should make.  So

8  it's not my motion, it's their motion, so I'd ask you to

9  deny the motion under any circumstances, but --

10        THE COURT:  Okay, thank you.  You're right on

11  that point, Mr. Hill.  It's their motion, they're

12  seeking a protective order.  If I deny the motion for

13  protective order, I'm asking you, do you intend to

14  depose these people or are you simply going to take the

15  ruling and use it as support for your other motion?

16        MR. HILL:  Yeah.  What I would ask the Court to

17  do is deny the motion, and if Judge Lagueux grants the

18  motion to exclude, obviously I'm quite happy.  These

19  people are not going to testify at the hearing, which I

20  think is a fair result.  If on the other hand Judge

21  Lagueux is going to deny the motion to exclude and these

22  people are going to be allowed to testify at the hearing

23  in January, I will want them to be produced so I can

24  examine them beforehand.  And let me just give your

25  Honor an example of why.  Mr. Wistow related the

depositions that have been taken in this case, and as it turns out, over the 5 and a half month discovery period only 2 depositions were taken, the deposition of the prime minister which the plaintiffs noticed, and a deposition of one of these seven experts, which the plaintiffs noticed, and so what's going on here is when I want to take a deposition of people that are going to testify at the hearing, the plaintiffs say, I'm sorry, you're not entitled to do it, but when they want to take a deposition of somebody who's going to testify at the hearing, they voluntarily produce this person, and of course we attend it because we got the notice that we had to do so, and I think this goes more to the motion to exclude, but this shows why we wanted the depositions.  We learned among other things at this deposition of this expert, Offir Saad, that Mr. Saad had not written his own report, that it was written by the plaintiff Israeli lawyer and sent to Mr. Saad for his review.  He gave him a little feedback.  The lawyer made changes and then Mr. Saad signed it.  This is secondhand.  I wasn't at the deposition.  This is what I understand from the people that were there.  So that's an example of why we needed to take these depositions, and I think the overall equitable point is that if these people are going to appear at a hearing, we should have

1    had an opportunity in discovery to take their

2    depositions.  Now I realize they were disclosed

3    relatively late with only a week left, that's why they

4    got notice for the last week of deposition.  Some double

5    tracking was necessary when you have seven witnesses and

6    only five business days to do them in, and some less

7    because we got some of the reports on Monday the 15th,

8    and discovery closed on Friday the 19th.  So we were

9    trying to avoid the prejudice of not having an

10   opportunity to examine the people before the hearing.

11   That's why we noticed the depositions in the fashion

12   that we did.  So why don't we go into the main event, I

13   guess, of which is are we entitled to it, and --

14       THE COURT:  You noticed these depositions were in

15   the United States, correct?

16       MR. HILL:  Well, actually I noticed some in

17   Israel because the history of this, Judge, is that at

18   the October 25th hearing when we were all here in the

19   courtroom, we came in that morning, and we were given

20   deposition notices by the plaintiffs that morning, and

21   four of those were for expert witnesses, we didn't even

22   have reports at that point in time, that the plaintiffs

23   had noticed to take depositions of in Israel.

24   Subsequently, they decided they didn't want to take

25   depositions of three of those people, they only wanted

1     to take the deposition of Mr. Saad, which actually

2     happened last Wednesday, the 1st, by agreement of the

3     parties.  So when they withdrew the notices for the

4     other three, we issued notices for those three people in

5     Israel, and the plaintiffs said they're not going to

6     show up, and then on the 12th, I got a list of six

7     additional witnesses, not reports.  I only got one

8     report on the 12th.  Six additional witnesses, two of

9     which are located, as I understand it, in Providence,

10    and I noticed their depositions for here in Providence,

11    and four of which, I'm not quite sure of everyone's

12    location, I think two are located in Washington.  I

13    noticed their depositions in Washington.  And the last

14    two, I wasn't quite sure where they were because the

15    plaintiffs didn't tell me their addresses.  I noticed

16    them for Washington.  So, from my perspective, you know,

17    I'm being told a week before discovery closes, here are

18    six additional expert witnesses, and we're just trying

19    to cure the prejudice that we're necessarily going to

20    suffer if we can't depose them before the period ends.

21    And the argument that's being made to you now is, as I

22    think Mr. Wistow acknowledged, rather technical, and I

23    think there's a simple explanation for why the rule

24    talks about deposing somebody who is going to testify at

25    trial, and it is the following.  You know, 26(b)(4)(A)

1    and (B) distinguishes between two types of experts, as

2    your Honor is undoubtedly aware.  There are 26(b)(4)(A)

3    experts, experts who may testify, and 26(b)(4)(B)

4    experts, experts employed only for trial preparation.

5    These are typically thought of as the consulting expert

6    versus the testifying expert.  And now it is true that

7    the language of 26(b)(4)(A) says a party may depose any

8    person who has been identified as an expert whose

9    opinions may be presented at trial.  This is in contrast

10   to 26(b)(4)(B) which says ordinarily a party may not by

11   interrogatories or deposition discover facts known or

12   opinions held by an expert who has been retained

13   especially employed by another party in anticipation of

14   litigation or to prepare for trial and who is not

15   expected to be called as a witness at trial.  So I would

16   submit that the distinction in 26(b)(4)(A) about trial

17   is not about trial versus hearing, it's about testifying

18   at trial versus testifying in anticipation of trial.  So

19   I don't think you can read over much into the use of the

20   word trial in 26(b)(4)(A).

21        But let me make the bigger point which is this,

22   if the plaintiffs are right, Judge Lagueux entered an

23   order in June pursuant to Rule 16 saying all discovery

24   had to be concluded by November 19, 2010.  If he is

25   right, if the plaintiffs are right, that means that we

1  will be going to a hearing in January where we will be

2  cross-examining, I guess six, because they noticed one

3  of the seven for themselves, six people that we never

4  had an opportunity to depose during the discovery

5  period, and the plaintiffs' position appears to be that,

6  well, because that's a motion, that's fine, and I

7  respectfully submit that's not what Judge Lagueux had in

8  mind.  I mean, this hearing in January may not be a

9  trial in the sense of, you know, a typical jury trial,

10 but it's very much like a trial.  He's making factual

11 findings.  He's hearing live evidence.  If I may, I left

12 something at my desk, your Honor.  And I don't know that

13 it's materially distinguishable from any other bench

14 trial that you might have where this would apply.  I'm

15 going to quote Mr. Wistow from the November 17, 2010

16 hearing before Judge Lagueux.  This is on page 5 of the

17 transcript at line 15: Your Honor, let me express my

18 concern about the issue.  We're down for trial January

19 18th, as your Honor knows, on the motion to vacate.  So,

20 I mean, you know, this technicality about whether this

21 is a trial versus a hearing is really pushing a

22 technical point here.  We're going to have an

23 adversarial hearing in January where Judge Lagueux is

24 expecting to hear live testimony, and make findings of

25 fact, based on that testimony and the documents that are

admitted into evidence, and the plaintiffs are asking

your Honor to rule that because 26 uses the word trial,

it means that they don't have to produce their experts

for deposition unless, of course, they want to depose

their own experts, which heightens the unfairness of

what's going on here.

I'll also note that we separately moved on the

29th to exclude these witnesses on Daubert grounds, and

for a number of them we had a hard time coming up with

our Daubert grounds because we couldn't examine them.

The typical discovery process is you get a disclosure

from a witness, an expert witness, and then you can

examine them, and then you can file your Daubert motion,

and the Court can perform its gatekeeper function of

determining whether this is relevant and reliable and

otherwise admissible.  All of that has been truncated

here because the plaintiffs waited until the end to

produce their reports and then wouldn't make the people

available for deposition.  So I'd respectfully submit

that a motion for protective order is not justified.

Let me make a point about Rule 30 which is

different than Rule 26, of course.  Rule 30(a)(1) says a

party may, by oral questions, depose any person,

including a party without leave of court except as

provided in Rule 30(a)(2) which doesn't apply.  The

1   deponent's attendance may be complied by subpoena under

2   Rule 45.   And, Mr. Wistow is right, I do not have a case

3   that says a party has to produce an expert under Rule 30

4   for deposition because you typically do it under Rule

5   26(b)(4)(A), and there's no dispute about that.   But the

6   fact of the matter is, these are people that the

7   plaintiffs are paying to give testimony.   They're

8   clearly within their control.   They say as much in their

9   opening brief, or they say if your Honor orders them to

10   produce them, they will.   So these are not people that

11   the plaintiffs could not have produced for deposition.

12   These are plaintiffs (sic) that the people (sic) didn't

13   want to produce for a deposition, and I think

14   unfortunately, as Mr. Wistow was explaining part of the

15   rationale, he was suggesting that he didn't take our

16   experts in part because they wanted to maintain this

17   position.   That's not what civil discovery is suppose to

18   be about.   The parties are suppose to make disclosures.

19   They're suppose to discover the facts before you get to

20   the trial or evidentiary hearing, or how you might

21   characterize January's proceedings, and that helps the

22   Court, because the Court is not then faced with us doing

23   an exploratory cross-examination.   The Court's got a

24   real cross-examination because we've already done a

25   deposition, and so for those reasons I would ask that

1    the Court deny the motion for protective order.

2            There is a cross-motion which I don't think

3    Mr. Wistow mentioned seeking to exclude all evidence

4    from us.  I don't know how seriously this is pressed,

5    but I mean I'll just make the point that under Rule 37

6    in order to exclude evidence from the defendants for

7    failure to provide initial disclosures there would have

8    to be some prejudice to the plaintiffs.  There is none

9    here.  They sent us interrogatories saying who your

10   witnesses are.  We answered them.  We supplemented them.

11   They asked us what our exhibits were.  We produced them.

12   So there's no prejudice that would merit some preclusive

13   sanction against the defendants.

14            THE COURT:  The cross-motion is not before me.

15            MR. HILL:  The cross-motion is not before you,

16   okay.  Well, then you don't need to --

17            THE COURT:  Not this afternoon, certainly,

18   Mr. Hill.

19            MR. HILL:  Then you don't need to have me talk

20   about that.  Thank you, your Honor.

21            MR. WISTOW:  I'll be very brief, your Honor.

22            THE COURT:  All right, Mr. Wistow.

23            MR. WISTOW:  Actually, the motion for protective

24   order asks alternatively, if the Court believes that

25   Rule 26 applies, that there be a preclusion against the

defendants in this case because they did not produce the
--

THE COURT:  That's included within the motion.

MR. WISTOW:  It is within the motion.

THE COURT:  All right, thank you for alerting me
to that fact.

MR. WISTOW:  And, by the way, my brother says
there's no prejudice because they supplied all this
information.  He said that within a minute or two after
commenting that we waited until "the last minute" to
give our experts.  I would remind the Court, we got
their expert reports October 15th.  They've been adding
witnesses through, I told you, most recently November
11th.  They didn't make the initial disclosures.  I'm
not saying they have to.  I'm saying if Rule 26 applies,
then it applies for them, also.  It's staggering to me,
your Honor, to hear Mr. Hill say that I'm being
technical.  If anybody is being technical in this case,
in a million places, it's Mr. Hill, and he's entitled to
be technical.  I'm entitled to be technical, also.  We
didn't -- and, by the way, I misspoke that day when we
were in front of Judge Lagueux, we were there on a
preliminary injunction hearing, and I used the term
"trial" once, and I misspoke.  We were very careful,
always in writing, to take the position that our

1   disclosures were not intended to be under 26(a).  That

2   cannot be (inaudible).  So if I'm going to be punished

3   for that error that day, I think that that's a bit much.

4   The depo that we did take of Saad, one of our experts,

5   was a de bene esse depo.  It was not a discovery depo.

6   We're not taking depositions of our own experts for

7   discovery purposes.  We did it because Mr. Saad cannot

8   be in the hearing in January, cannot, so we felt his

9   testimony was important, and we took his depo for that

10   reason.  It was not a discovery depo.

11        By the way, the statement that's made, I wasn't

12   present at the hearing in the deposition, either, but my

13   understanding of how the report of Mr. Saad was

14   generated was contrary to what Mr. Hill says.  Mr. Saad,

15   who is not a fluent English speaker, he speaks English,

16   he told an Israeli attorney what to put in the affidavit

17   specifically.  That Israeli attorney did so, sent it to

18   Mr. Saad.  Mr. Saad made changes in the English because

19   he has a good enough English to understand what it says,

20   although he prefers not to write it in the first

21   instance.  He did make changes and then confirmed under

22   oath that the affidavit, excuse me, the report,

23   represented his honest beliefs.  So I think it's totally

24   unfair to make the suggestion that Mr. Hill did.  And I

25   stand on what I said, your Honor.  We filed in good

1   faith a motion for protective order.  We're not trying

2   to delay anything.  We're the first to recognize that if

3   we're wrong about our interpretation of the law, your

4   Honor will say so and we'll do the best we can to remedy

5   it.  But we were not trying to pull any fast ones about

6   giving this information at the last -- that is so

7   painfully here, Judge.  We get all of those expert

8   reports on October 15th.  We give everything back to

9   them, and you've seen what those reports look like,

10  within 30 days, and they say we waited until the last

11  minute.  On the contrary, we believe that the dates on

12  their expert reports are all October 15th.  The day they

13  were submitted indicates that they told their experts to

14  hold off giving the reports.  Thank you, your Honor.

15          THE COURT:  All right, thank you, Mr. Wistow.

16  I'll take these matters under advisement.  I'll issue

17  written rulings.  I intend to work on this immediately.

18  I recognize these matters are pressing.  Because they're

19  pressing, my ruling will be similar to the previous

20  orders I've issued, which means they'll be relatively

21  brief.  I'll try to put forth my reasons for ruling as I

22  do, and I'll try to get them out promptly.  If the

23  plaintiffs are able to submit those documents this

24  afternoon, do so.  If they're not, Monday is acceptable,

25  Mr. Strachman.  I'm referring to the in camera review.

1   All right, this will conclude the hearing.  The Court

2   will be in recess.

3   (RECESS)

4

5

6

7

8              C E R T I F I C A T I O N

9   I, court approved transcriber, certify that the

10  foregoing is a correct transcript from the official

11  electronic sound recording of the proceedings in the

12  above-entitled matter.

13

14

15  /sJOSEPH A. FONTES/

16  COURT REPORTER

17  DECEMBER 9, 2010

18  DATE

19

20

21

22

23

24

25